1  Jon V. Swenson (SBN 233054)
   BAKER BOTTS LLP
2  620 Hansen Way
   Palo Alto, CA 94304
3  Telephone: (650) 739-7500
   Facsimile: (650) 739-7699
4  Email: jon.swenson@bakerbotts.com

5  John M. Taladay (*pro hac vice*)
6  Erik T. Koons (*pro hac vice*)
   Charles M. Malaise (*pro hac vice*)
7  BAKER BOTTS LLP
   1299 Pennsylvania Ave., N.W.
8  Washington, DC 20004-2400
   Telephone: (202) 639-7700
9  Facsimile: (202) 639-7890
   Email: john.taladay@bakerbotts.com
10 Email: erik.koons@bakerbotts.com
   Email: charles.malaise@bakerbotts.com
11

12 *Attorneys for Defendants Koninklijke Philips, N.V.,*
   *Philips Electronics North America Corporation, Philips*
13 *Taiwan Ltd., and Philips do Brasil Ltda.*

14 [Additional counsel listed on signature page]

15          **UNITED STATES DISTRICT COURT**

16         **NORTHERN DISTRICT OF CALIFORNIA**

17            **SAN FRANCISCO DIVISION**

18 In re:  CATHODE RAY TUBE (CRT)           )  Case No. 07-5944-SC
   ANTITRUST LITIGATION                     )
19                                          )  MDL No. 1917
                                            )
20 This Document Relates to:                )  **DEFENDANTS' OPPOSITION TO**
                                            )  **PLAINTIFFS' MOTION IN LIMINE # 11:**
21 *Siegel v. Hitachi, Ltd.,*               )  **TO ESTABLISH THE PRECLUSIVE**
   *No. 11-cv-05502;*                       )  **EFFECT OF, OR IN THE ALTERNATIVE**
22                                          )  **ADMIT, THE EUROPEAN COMMISSION**
   *Siegel v. Technicolor SA,*              )  **DECISION**
23 *No. 13-cv-05261;*                       )
                                            )  **[DECLARATIONS OF TIFFANY B.**
24 *Best Buy Co., Inc. v. Hitachi, Ltd.,*   )  **GELOTT  AND PIERRE LAROUCHE**
   *No. 11-cv-05513;*                       )  **FILED CONCURRENTLY HEREWITH]**
25                                          )
   *Best Buy Co., Inc. v. Technicolor SA,*  )  Date:    None set
26 *No. 13-cv-05264;*                       )  Place:   1, 17th Floor
                                            )
27 *Sears, Roebuck and Co. and Kmart Corp. v.* )  Hon. Samuel Conti
   *Technicolor SA,  No. 13-cv-05262*       )
28                                          )

1 | *Sears, Roebuck and Co. and Kmart Corp. v.* )
*Chunghwa Picture Tubes, Ltd.,* )
2 | *No. 11-cv-05514* )
)
3 | *Sharp Electronics Corp. v. Hitachi Ltd.,* )
*No. 13-cv-1173 SC* )
4 | )
*Sharp Electronics Corp. v. Koninklijke Philips* )
5 | *Elecs., N.V., No. 13-cv-2776 SC* )
)
6 | *ViewSonic Corp. v. Chunghwa Picture Tubes,* )
*Ltd., No. 14-cv-2510 SC* )
7 | )
)
8 | )
)
9 |
10 |
11 |
12 |
13 |
14 |
15 |
16 |
17 |
18 |
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 3

ARGUMENT ..................................................................................................................... 7

I.  THE EC DECISION SHOULD NOT BE RECOGNIZED UNDER THE PRINCIPLES
    OF INTERNATIONAL COMITY. .......................................................................... 7

II. THE EC DECISION SHOULD NOT BE GIVEN PRECLUSIVE EFFECT. .......................... 10

    A.  Element One: Plaintiffs Cannot Establish That The EC Addressees Had A Full
    And Fair Opportunity To Litigate Before The EC. ....................................... 10

        1.  Procedural rights unavailable in the proceeding before the EC could
        cause a different result in this action. ................................................ 10

        2.  The EC Addressees lacked the incentive and ability to litigate the EC's
        allegations. ........................................................................................ 13

    B.  Element Two: Plaintiffs Have Failed To Establish An Identity Of Issues. ................... 13

        1.  There is significant divergence between the evidence and arguments to
        be advanced in this litigation and what was before the EC. .............................. 14

        2.  A different rule of law governs EC proceedings. ................................................. 15

        3.  Defendants were not afforded a trial as part of the EC proceeding and
        thus pretrial preparation in the EC did not embrace the issues of this
        action. ................................................................................................ 17

        4.  Plaintiffs' claims are fundamentally inconsistent with the EC Decision. .......... 18

    C.  Element Three: Plaintiffs Have Failed To Show The Issues Were Actually
    Litigated Before The EC Or Were Necessary To The EC's Decision. .......................... 18

    D.  Granting The EC Decision Preclusive Effect Would Be Fundamentally Unfair
    To Defendants. ............................................................................................ 20

III. THE *VICHI* DECISION DOES NOT SUPPORT A GRANT OF PRECLUSIVE
     EFFECT HERE BECAUSE IT IS LEGALLY AND FACTUALLY
     DISTINGUISHABLE. ......................................................................................... 21

IV. THE EC DECISION SHOULD NOT BE ADMITTED IN EVIDENCE. ................................. 22

    A.  The EC Decision Should Be Excluded Under Rule 403 Because It Is Unduly
    Prejudicial, Would Confuse The Jury, And Would Waste Time. ................................. 22

    B.  The EC Decision Is Inadmissible Hearsay. ................................................... 24

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Bank of Montreal v. Kough*,
  612 F.2d 467 (9th Cir. 1980) ........................................................................................... 13

*Beachy v. Boise Cascade Corp.*,
  191 F.3d 1010 (9th Cir. 1999) ......................................................................................... 24

*Bobby v. Bies*,
  556 U.S. 825 (2009) ......................................................................................................... 19

*Briscoe v. LaHue*,
  460 U.S. 325 (1983) ........................................................................................................... 9

*British Midland Airways Ltd. v. Int'l Travel, Inc.*,
  497 F.2d 869 (9th Cir. 1974) ........................................................................................... 13

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*
  429 U.S. 477 (1977) ......................................................................................................... 17

*City of New York v. Pullman Inc.*,
  662 F.2d 910 (2d Cir. 1981) ............................................................................................ 25

*Coleman v. Home Depot, Inc.*,
  306 F.3d 1333 (3d Cir. 2002) .......................................................................................... 26

*Collins v. D.R. Horton, Inc.*,
  505 F. 3d 874 (9th Cir. 2007) .......................................................................................... 10

*E. & J. Gallo Winery v. EnCana Energy Servs., Inc.*,
  No. CVF 03-5412 AWI LJO, 2008 WL2220396 (E.D. Cal. May 27, 2008) ................... 16

*Hilton v. Guyot*,
  159 U.S. 113 (1895) ........................................................................................................... 7

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  580 F. Supp. 2d 896 (N.D. Cal. 2008) ............................................................................. 16

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) ......................................................................................... 10

*Kleenwell Biohazard Waste & Gen. Ecology Consultants, Inc. v. Nelson*,
  48 F.3d 391 (9th Cir. 1995) ............................................................................................. 12

*Lewis v. City of Chicago Police Dep't*,
  590 F.3d 427 (7th Cir. 2009) ........................................................................................... 24

*Lipsky v. Commonwealth United Corp.*,
  551 F.2d 887 (2d Cir. 1976) ........................................................................................ 13

*Maciel v. C.I.R.*,
  489 F.3d 1018 (9th Cir. 2007) ................................................................................. 10, 11

*Maersk, Inc. v. Neewra, Inc.*,
  No. 05 Civ. 4356(CM), 2010 WL 2836134 (S.D.N.Y. July 9, 2010) ............................ 7

*McGlinchy v. Shell Chem. Co.*,
  845 F.2d 802 (9th Cir. 1988) ...................................................................................... 15

*Miller v. County of Santa Cruz*,
  39 F.3d 1030 (9th Cir. 1994) ....................................................................................... 13

*Murdoch v. Castro*,
  609 F.3d 983 (9th Cir. 2010) ......................................................................................... 9

*Nelson v. Emerson*,
  C.A. No. 2937-VCS, 2008 WL 1961150 (Del. Ch. May 6, 2008) ................................ 23

*Oneac Corp. v. Raychem Corp.*,
  20 F. Supp. 2d 1233 (N.D. Ill. 1998) ........................................................................... 11

*Parklane Hosiery Co. v. Shore*,
  439 U.S. 322 (1979) ............................................................................................... 21, 22

*Peterson v. Clark Leasing Corp.*,
  451 F.2d 1291 (9th Cir. 1971) ..................................................................................... 16

*Rodriguez-Garcia v. Miranda-Marin*,
  610 F.3d 756 (1st Cir. 2010) ....................................................................................... 25

*RTC v. Keating*,
  186 F.3d 1110 (9th Cir. 1999) ........................................................................... 14, 18, 20

*Shapley v. Nevada Bd. of State Prison Comm'rs*,
  766 F.2d 404 (9th Cir. 1985) ....................................................................................... 13

*Spectrum Health Continuing Care Grp. v. Anna Marie Bowling Irrevocable Trust Dated June 27, 2002*,
  410 F.3d 304 (6th Cir. 2005) ....................................................................................... 19

*Sugar Ass'n, Inc. v. McNeil-PPC, Inc.*,
  No. CV 04-10077 ......................................................................................................... 24

*Sun Microsystems Inc. v. Hynix Semiconductor, Inc.*,
  622 F. Supp. 2d 890 (N.D. Cal. 2009) ......................................................................... 16

*Syverson v. Int'l Bus. Machs Corp.*,

472 F.3d 1072 (9th Cir. 2007) ............................................................................... 10, 21

*Trevino v. Gates*,
99 F.3d 911 (9th Cir. 1996) ...................................................................................... 10

*United States v. Container Corp. of Am.*,
393 U.S. 333 (1969) .................................................................................................. 17

*United States v. Richardson*,
596 F.2d 157 (6th Cir. 1979) .................................................................................... 17

*United States v. U.S. Gypsum Co.*,
438 U.S. 422 (1978) .................................................................................................. 17

*University of Tennessee v. Elliott*,
478 U.S. 788 (1986) ............................................................................................ 12, 13

*Vichi v. Koninklijke Philips Elec., N.V.*,
85 A.3d 725 (Del. Ch. 2014) ............................................................................... 22, 23

*Walia v. Aegis Center Point Developers Private Ltd.*,
No. CV-12-4660-CRB, 2014 WL 296003 (N.D. Cal. Jan. 27, 2014) ........................... 13

**STATUTES**

15 U.S.C. §6a ................................................................................................................ 15

18 U.S.C. § 1001 ............................................................................................................ 8

**OTHER AUTHORITIES**

Federal Rule of Evidence 403 ....................................................................................... 23

Guidelines On The Applicability Of Article 101 Of The Treaty On The Functioning Of The
European Union To Horizontal Co-Operation Agreements ............................................ 17

Issue Preclusion—Necessarily Decided, 18 Fed. Prac. & Proc. Juris. § 4421 (2d ed.) .................. 19, 20

"On the Merits" – Admissions, Stipulations, and Consent Judgments, 18A Fed. Prac. & Proc.
Juris. § 4443 (2d ed.) ............................................................................................. 19, 20

25966640.3

**INTRODUCTION**

Under the guise of issue preclusion, Plaintiffs argue that this Court should find, in essence, that they are entitled to judgment as a matter of law on all dispositive issues, other than damages, against numerous Defendants in this case.[1] Plaintiffs' attempt to sidestep their fundamental burden of proof is based on the decision of a foreign law enforcement agency (the European Commission or the "EC"), which determined that several Defendants in this action (the "EC Addressees") violated the antitrust laws of the European Union.[2]  In making their demand for preclusive effect, Plaintiffs ask the Court to ignore crucial distinctions between due process-based litigation in the United States and the administrative proceedings of the EC, as well as the gross divergence between Plaintiffs' allegations and the findings set forth in the EC's decision (the "EC Decision").  *See* Ex. J to the Declaration of Jill S. Casselman in Support of Plaintiffs' Motions in Limine.  When those differences are exposed, it is clear that Plaintiffs have failed to establish a basis for the application of collateral estoppel, or to justify the admission into evidence of the EC Decision.

In considering whether to give a decision of a foreign administrative agency preclusive effect, this Court must as a preliminary measure assess whether the foreign decision can be recognized in accordance with international comity.  Recognition requires that the procedures in the foreign proceeding be consistent with U.S. due process principles.  If that standard is met, then the Court has discretion to apply collateral estoppel, but only if Plaintiffs have established that: (i) the EC Addressees had a full and fair opportunity to litigate the issues at stake; (ii) the issues in this case are identical to those decided in the EC proceeding; and (iii) those identical issues were actually litigated and were necessary to the decision rendered by the EC.[3]  Under these factors, no U.S. court has ever granted preclusive effect to the findings of the EC.

---

[1] Plaintiffs do not argue that the preclusive effect of the prior proceeding can be expanded beyond the actual parties to that proceeding based on privity.

[2] An "addressee" before the EC is the equivalent of a defendant in U.S. proceedings.

[3] Although separate requirements, because the "actually litigated" and "necessary" elements are closely related here, Defendants will address them as a general matter together for brevity.

1    Those standards also are not met in this case.  First, the EC Decision should not be recognized

2    under the principles of international comity.  The EC Addressees were not provided with any of the

3    due process rights expected under the Due Process Clause.  The Commission based its decision heavily

4    on the unsworn, oral statements of counsel for the EC Addressees seeking leniency.  No statements

5    were ever made under oath, no witnesses with first-hand knowledge ever appeared, and the EC

6    Addressees never had an opportunity to cross-examine their accusers or confront them in any way.

7    The EC Addressees also lacked any meaningful ability to pursue discovery or to challenge the

8    admissibility or reliability of evidence.  In light of such an utter lack of procedural rights, this Court

9    should find that the EC Decision cannot be recognized under comity and end the inquiry there.

10    Second, and for similar reasons, the EC Addressees have not yet had a full and fair opportunity

11    to litigate the issues at stake.  This factor assesses the fullness and fairness of the prior proceeding and

12    whether procedural protections present in the current proceeding could readily lead to a different

13    result.  The significant additional rights afforded to EC Addressees, including the right of cross-

14    examination, could easily lead to a different result as to the facts for which Plaintiffs' seek estoppel.

15    Third, Plaintiffs have failed to show an identity of issues.  Simply because two proceedings

16    may involve the same events does not, ipso facto, mean they involve the same issues—e.g., an identity

17    of issues does not exist where different legal standards are involved.  Despite Plaintiffs' assertion that

18    U.S. and EU law are functionally equivalent because they both prohibit price-fixing, those jurisdictions

19    enforce their bans against anti-competitive conduct in very different ways.  For example, Plaintiffs fail

20    to explain that the EC Decision was premised on the concept of an "undertaking," which is the EU

21    equivalent of alter ego liability, as to all but one of the EC Addressees.  In stark contrast to vicarious

22    liability under U.S. law, EU law *presumes* a lack of corporate separateness between a parent and its

23    wholly-owned subsidiary, and requires the parent to rebut that presumption.  Because the EC viewed

24    nearly all of the evidence before it through the "undertaking" prism, there is no identity of issues.  An

25    identity of issues is also lacking because the evidence introduced at trial in this case would be

26    markedly different from the evidence relied on by the EC, e.g., whereas the EC found that the CDT

27    and CPT cartels operated separately and independently, Plaintiffs intend to introduce evidence proving

28

-2-

that they did not operate separately or independently and that there was only a single CRT conspiracy.

Finally, the issues at stake were neither actually litigated nor necessary to the EC Decision. The EC strongly encourages corporations that have concerns regarding their compliance with EU antitrust laws to seek leniency. In requesting leniency, corporations are required to add "substantial value" to the EC's investigation, which usually comes in the form of oral statements by counsel. Where a leniency application has been filed, and where the level of relief granted hinges entirely on the Commission's subjective assessment of "added value," the applicant obviously has muted incentive to challenge the findings of the Commission and, therefore, the EC's statements reiterating those representations have not been "actually litigated." It is virtually impossible to assess which of the more than 1,100 paragraphs in the EC Decision may fairly be considered to have been actually litigated or necessary to the ultimate decision. In such a situation, the only equitable result is to find that none meet the "actually litigated" and "necessary" standards.

As a separate matter, this Court should deny Plaintiffs' alternative request to admit the entirety of the EC Decision into evidence. Whatever minimal probative value the EC Decision has is substantially outweighed by the risk that the jury will abdicate its fact-finding role and defer entirely to the conclusions of the EC. Admitting the EC Decision will also confuse the jury because it will force the parties to offer extensive collateral evidence and testimony about the EC, its legal standards, and its decision-making process so the jury can give proper weight to the statements in the EC Decision.

## BACKGROUND

The European Commission is a self-described law enforcement agency that has broad powers to investigate and prosecute alleged violations of EU competition law.[4]  It is not a tribunal.[5]  The

---

[4] *See* Ex. A to the Declaration of Tiffany B. Gelott in Support of Defendants' Opposition to Plaintiffs' Motion in Limine # 11: To Establish The Preclusive Effect of, Or in the Alternative Admit, the European Commission Decision ("Gelott Decl."), Brief of the Commission of the European Communities as Amicus Curiae in Support of Petitioner, *Intel Corp. v. Advanced Micro Devices*, No. 02-572, 2002 WL 32157391, at 3 (U.S. Nov. 15, 2002) ("The Commission functions primarily as a law enforcement agency in the antitrust field.").

Commission has the power to request documents, interview witnesses, and conduct "dawn raids." *See* Declaration of Professor Pierre Larouche ¶ 19–20 ("Larouche Decl.") (filed concurrently).[6] Dawn raids are the equivalent of the execution of a search warrant by the Department of Justice except that the EC does not need to seek judicial approval and determines for itself whether a dawn raid is "necessary." *Id*. ¶ 20  The Commission alone decides what information to collect in a dawn raid. *Id*.

The EC also collects information that it uses as evidence through its leniency program.  Similar to that of the Department of Justice, the EU's leniency program offers immunity or a reduced fine to those who assist the EC's investigations.[7]  An unusual aspect of the EC's program, however, is that it is based on oral proffers by counsel for potential infringing parties.  Larouche Decl. ¶ 25.  Despite the incentive for a leniency applicant to minimize its own alleged role in anticompetitive conduct and to exaggerate the role of others, the EC does not require leniency proffers to be made under oath or under penalty of perjury. *Id*.  The only potential penalty for making a false or misleading statement in connection with a leniency application is the denial or withdrawal of leniency. *Id*.

If the EC determines that it has sufficient evidence that a violation of EU competition law has occurred, then it issues a Statement of Objections ("SO") to one or more addressees, which functions like an indictment. *Id*. ¶ 21–22.  However, unlike an indictment, the EC's decision to issue a SO is not subject to any independent review or approval, such as a grand jury. *Id*. ¶ 21.  Nor do addressees have any ability to seek to dismiss or limit a SO. *Id*. ¶ 22.  While addressees are permitted to respond to the SO in writing, where a SO involves multiple addressees, those addressees may not view each other's

---

(...Continued)

[5] *See* Ex. B to the Gelott Decl., GC, 14 May 1998, Case T-348/94 *Enso Espanola v. Commission*, ECR 1998, p. II-1884 ¶ 56 ("It is also settled law that the Commission cannot be described as a 'tribunal' within the meaning of Article 6 of the ECHR.").

[6] Prof. Pierre Larouche is University and Vice-Director of The Tilburg Law and Economics Center (Tilec), as well as Professor at The College Of Europe (Bruges) and the Institut D'etudes Politiques (Paris).

[7] *Leniency,* EUROPEAN COMMISSION (Mar. 12, 2015), http://ec.europa.eu/competition/cartels/leniency/leniency.html.

1   response to the SO, regardless of whether it implicates other parties in alleged wrongdoing.  *Id*.

2   The EC does provide addressees access to documents that it collected during its investigation,

3   and does not provide addressees with the power to compel the production of any documents from

4   anyone.  *Id*. ¶ 23.  The EC also does not provide addressees with an opportunity to present their

5   defense to the actual decision-makers, i.e., the twenty-eight individuals who make up the College of

6   Commissioners.  *Id*. ¶ 27.  The addressees are allowed the opportunity to supplement their written

7   submissions during a Hearing.  *Id*. ¶ 26.  Yet the Hearing is not attended by the Commissioners and

8   instead is conducted by a Hearing Officer.  *Id*. ¶ 27.  The Hearing Officer plays no role in the decision-

9   making process.  *Id*.  Hearings primarily involve statements and arguments by counsel, although

10  addressees are permitted to present statements from live witnesses if those witnesses voluntarily attend.

11  *Id*. ¶ 26.  Addressees do not have the right to compel the attendance of any witness or individual—then

12  or at any other time—and have no right to cross-examine anyone.  *Id*.

13  Relevant here, the EC began an investigation into a potential cartel involving CPTs and CDTs

14  in 2007.  *See* EC Decision ¶¶ 91–107.  Chunghwa sought and received conditional immunity, and

15  several EC Addressees sought and received leniency.  *See id*.[8]  On November 23, 2009, the EC

16  adopted a Statement of Objections as to eleven Defendants in this action.  *See id*.[9]  The SO was not

17  adopted as to the remaining twenty-nine Defendants.  *See id*.  A two-day hearing was held.  *Id*. ¶ 101.

18  At the conclusion of its investigation, the EC penalized all EC Addressees for violating Article 101(1)

19  of the Treaty on the Functioning of the European Union.  Specifically, the EC concluded that there

20  were two separate and distinct cartels—one involving CPTs and one involving CDTs.  *Id*. ¶ 656

21  ("There is no evidence supporting the conclusion that there was an overarching scheme that would

22

23  [8] The EC Addressees that received leniency are Samsung SDI Co., Ltd, Samsung SDI Germany

24  GmbH, Samsung SDI (Malaysia) Berhad Ltd., Koninklijke Philips Electronics, N.V., and Technicolor
    S.A.

25  [9] The SO was adopted only as to Chunghwa Picture Tubes Co. Ltd.; Chunghwa Picture Tubes

26  (Malaysia) Sdn. Bhd.; Samsung SDI Co., Ltd.; Samsung SDI Germany GmbH; Samsung SDI
    (Malaysia) Berhad; Koninklijke Philips Electronics N.V.; LG Electronics, Inc.; Technicolor S.A.;

27  Panasonic Corporation; Toshiba Corporation; and MT Picture Display Co., Ltd.

28

1   bind the two infringements together. . . . In fact, both cartels could—and did—function separately and

2   independently from one another.").

3       The EC's conclusion was based on several unique aspects of EU competition law.  As the EC

4   explained, all that is required to establish agreement is (i) attendance at a meeting at which

5   anticompetitive agreements are formed and (ii) a lack of manifest opposition.  *Id.* ¶ 630.  In that case,

6   the EC is not required to show an actual knowing agreement.  *See id*.  The rationale behind that

7   approach is that silence "effectively encourages the continuation of the infringement," absent the party

8   "publicly distancing itself from its content or reporting it to the administrative authorities."  *Id.* ¶ 633.

9   Similarly, "the mere fact of receiving information concerning competitors, which an independent

10  operator preserves as business secrets, is sufficient to demonstrate the existence of an anti-competitive

11  intention."  *Id.* ¶ 634.  The liability of the EC Addressees was limited to the "period of [their]

12  adherence to the common scheme," without regard to when the actual scheme began.  *Id.* ¶ 641.[10]

13      In determining whether the EC Addressees violated Article 101, the EC applied the concept of

14  an "undertaking."  *See generally id*. ¶¶ 735–980.  An undertaking refers to any entity engaged in

15  commercial activity and essentially operates as a theory of vicarious liability.  *See id*. ¶¶ 721–27.  The

16  EC relied on the undertaking concept to expand the liability of six EC Addressees to include the

17  conduct of their subsidiaries because it concluded that those EC Addressees exercised "decisive

18  influence" over the subsidiaries.  As the EC explained, "[t]he question of decisive influence relates to

19  the level of autonomy of the subsidiary with regard to its overall commercial policy."  *Id*. ¶ 724.  In

20  stark contrast to U.S. law, "[a] parent company may exercise decisive influence over its subsidiaries

21  even when it does not make use of any actual rights of co-determination and refrains from giving any

22  specific instructions or guidelines on individual elements of commercial policy."  *Id*. ¶ 727.  Having

23  found that the EC Addressees were part of undertakings, the EC was not required to find that any

24  specific corporate entity violated EU law, but could instead add up the disparate actions of each

25  _____

26  [10] For example, the EC found that Koninklijke Philips Electronics N.V. (n/k/a Koninklijke Philips
    N.V.) could only be held liable based on the acts of its subsidiaries relating to the CPT cartel for the

27  period from September 21, 1999, to June 30, 2001.  *See* EC Decision ¶ 1072.

28

1  separate corporate entity within the undertaking to meet its burden.[11]

2  **ARGUMENT**

3  Where a plaintiff pursues offensive, non-mutual collateral estoppel based on a foreign decision,

4  courts engage in a two-step analysis.  The first step is assessing whether that decision should be

5  "recognized" pursuant to international comity.  Only if the answer is yes, the second step is to

6  determine whether the plaintiff has met all of the necessary requirements for issue preclusion.

7  For many reasons, including the absence of several basic procedural protections in the

8  proceeding before the EC, this Court should not recognize the EC Decision, nor should the Court give

9  it preclusive effect.  The Court should also not admit the EC Decision in evidence because it is unduly

10  prejudicial and would confuse the jury and waste time.

11  **I.     THE EC DECISION SHOULD NOT BE RECOGNIZED UNDER THE PRINCIPLES OF INTERNATIONAL COMITY.**

12  "[D]eference to a foreign adjudication as a matter of comity is by no means automatic."

13  *Maersk, Inc. v. Neewra, Inc.*, No. 05 Civ. 4356 (CM), 2010 WL 2836134, at *11 (S.D.N.Y. July 9,

14  2010).  In its seminal opinion on comity, the U.S. Supreme Court explained the type of process

15  required for recognition of a foreign decision in the United States:  "there has been opportunity for a

16  full and fair *trial* abroad before a *court* of competent jurisdiction, conducting the trial upon regular

17  proceedings . . . ."  *Hilton v. Guyot*, 159 U.S. 113, 202 (1895) (emphasis added).   But the EC is clearly

18  not a foreign "court," and there was no "trial" before the EC—fair or otherwise.  The EC itself has also

19  vigorously opposed classification as a "tribunal" under U.S. law.  *See, e.g.*, Br. of the Comm'n of the

20  European Cmtys. as Amicus Curiae in Support of Pet'r,  *Intel Corp. v. Advanced Micro Devices*, No.

21  02-572, 2002 WL 32157391, at 3 (U.S. Nov. 15, 2002) ("The Commission functions primarily as a law

22

23

24  [11] *See, e.g.*, EC Decision ¶ 781 ("In a number of pieces of evidence on collusive contacts no names of
25  participating individuals or of exact legal entity were mentioned but the documents contain reference
    to the participation of Philips.  Therefore, taking into account that all the entities that were conducting
26  CRT business activity were part of the operational structure under the ultimate parent KPE N.V., the
    Commission concludes that also for these collusive contacts where no names of individuals or of exact
27  legal entity were mentioned the participation of the Philips Group is established.").

28

1   enforcement agency in the antitrust field.  Investigation and adjudication are far more distinct under

2   United States law than they are in the European Community.”); *id*. (explaining that the EC “does not

3   adjudicate the rights of parties, as a tribunal would do”).  The European Court of Justice agrees with

4   the EC: “The Commission . . . cannot . . . be classified as a tribunal within the meaning of Article 6 of

5   the European Convention for the Protection of Human Rights, under which everyone is entitled to a

6   fair hearing by an independent and impartial tribunal.”[12]

7       Indeed, in U.S. federal court filings, the EC has expressly equated itself to the U.S. Department

8   of Justice,[13] and compared its Statement of Objections to an indictment.[14]  While Plaintiffs would have

9   this Court view the EC’s actions as if they were taken by a court, the apt question is whether the EC’s

10  practices are consistent with U.S. due process principles.  The unavoidable answer to that question is

11  no because the EC’s procedures fall far short of minimum due process standards in three clear respects.

12      First, in unilaterally determining that it met its own burden of proof, *see* EC Decision ¶ 660, the

13  EC relied heavily on evidence it obtained through its leniency program—unsworn, out-of-court oral

14  proffers from counsel that were made in pursuit of a reduced penalty for their clients.  *See, e.g.*, EC

15  Decision ¶ 1116.  The EC does not require proffers in support of leniency to be made in writing or

16  under penalty of perjury.  Unlike U.S. law, which criminalizes the making of false or misleading

17  statements to the government, *see* 18 U.S.C. § 1001, there are no penalties under EU law for making a

18  false statement to the EC.  Larouche Decl. ¶¶ 25–26.  Counsel for the addressees are permitted to

19  review transcripts of the leniency statements, but only at the offices of the EC; neither counsel nor the

20  addressees are ever provided with a copy of the transcript to use in preparing their defense against

21  _____

22  [12] ECJ, 29 October 1980, Joined Cases 209–215 and 218/78 *Landewyck et al. v. Commission* ECR 1980, p. 3125.

23  [13] *See* Br. of the Comm’n of the European Cmtys. as Amicus Curiae in Support of Pet’r,  *Intel Corp. v.*

24  *Advanced Micro Devices*, No. 02-572, 2002 WL 323157391, at 3 (U.S. Nov. 15, 2002).

25  [14] *See* Ex. C to the Gelott Decl., Mem. of Law in Support of Mot. by Intervenor-Applicant European Commission to Reconsider in Part the Court’s Order Compelling Discovery of Confidential Materials,

26  Case No. 2:08-mc-00180-DWA, Dkt. No. 200-1 at 2 (W.D. Pa. Oct. 8, 2009) (“As its investigation proceeds, the EC submits a ‘Statement of Objections’ (akin to an indictment) to entities suspected of

27  illegal activity.”).

28

1    allegations made in the unsworn statements of counsel.  *Id*. ¶¶ 23, 25.

2          Second, the EC Addressees had no right to discovery from other addressees or third parties.  *Id*.

3    ¶ 23.  They were essentially limited to defending themselves based on (i) documents that the EC (i.e.,

4    the prosecutor) chose to collect when it was searching for inculpatory documents, and (ii) evidence that

5    the EC Addressees had in their possession.  Addressees did not even have the right to "discover" how

6    other addressees responded to the EC's Statement of Objections.[15]

7          Third, the EC Addressees had no access to compulsory process or confrontation rights.

8    Through the unsworn statements of counsel, the individuals providing information to the EC are

9    essentially free to make accusations against other addressees without concern of ever being challenged

10   on the accuracy or completeness of those statements.  That is because addressees lack the power to

11   compel witnesses to appear and subject themselves to cross-examination—the "greatest legal engine

12   ever invented for the discovery of truth."  *Murdoch v. Castro*, 609 F.3d 983, 1008 (9th Cir. 2010).

13   Despite the significance that the EC places on the purported recollections of a witness, as reflected in

14   counsel's statements, the accused never has the opportunity to confront that witnesses.

15         Those three deficiencies, chief among many others, are wholly incompatible with the most

16   basic requirements of due process under U.S. law.  The right to compel one's accuser to identify

17   himself, to testify under penalty of perjury, and to subject himself to cross-examination is essential to

18   ensuring that a decision is based on reliable evidence and that the accused has a full and fair

19   opportunity to test that evidence.  *See Briscoe v. LaHue*, 460 U.S. 325, 333–34 (1983) ("[T]he truth-

20   finding process is better served if the witness's testimony is submitted to 'the crucible of the judicial

21   process so that the factfinder may consider it, after cross-examination, together with the other evidence

22   in the case to determine where the truth lies.'").  Tellingly, Plaintiffs cite no cases where a U.S. court

23   found that the practices of the EC satisfy U.S. due process principles, nor have they cited any cases

24   where a U.S. court granted preclusive effect to a foreign decision despite the absence of so many basic

25

26   _____

27   [15] *See* EC Decision ¶ 104 ("By letter of 19 November 2010 the Commission rejected otherwise
     Panasonic/MTPDs request for access to Statement of Objections replies.").

28

1  procedural rights.  For those reasons, the Court should find that the principles of international comity

2  are not served by recognizing the EC Decision.

3  **II.      THE EC DECISION SHOULD NOT BE GIVEN PRECLUSIVE EFFECT.**

4         Even if the Court finds that it has discretion to recognize the EC Decision, it cannot be given

5  preclusive effect unless Plaintiffs have established three elements: (i) that the EC Addressees had a full

6  and fair opportunity to litigate the issues at stake; (ii) that the issues at stake are identical to those

7  litigated before the EC; and (iii) that the identical issues were actually litigated, and were necessary to

8  the decision rendered.  *See Syverson v. Int'l Bus. Machs Corp.*, 472 F.3d 1072, 1078–79 (9th Cir.

9  2007); *Trevino v. Gates*, 99 F.3d 911, 923 (9th Cir. 1996).  Plaintiffs cannot satisfy any of these

10 elements.  Moreover, even if they could satisfy all of them, which they must, *see Kendall v. Visa*

11 *U.S.A., Inc.*, 518 F.3d 1042, 1050–51 (9th Cir. 2008), this Court still retains broad discretion in

12 determining whether to apply offensive, nonmutual issue preclusion, and should refuse to do so where,

13 as here, it would be unfair to both the EC Addressees and the other Defendants.  *See Collins v. D.R.*

14 *Horton, Inc.*, 505 F. 3d 874, 882 (9th Cir. 2007).

15        **A.      Element One: Plaintiffs Cannot Establish That The EC Addressees Had A Full**
                    **And Fair Opportunity To Litigate Before The EC.**

16

17        The inquiry into whether a defendant had a full and fair opportunity to litigate—the first of the

18 three required elements—is based on "at least two considerations."  *Maciel v. C.I.R.*, 489 F.3d 1018,

19 1023 (9th Cir. 2007).  First, the court must consider whether "procedural opportunities unavailable in

20 the first action could readily cause a different result in the second action."  *Id*.  Second, "the court must

21 consider the parties' incentives to litigate in the two actions." *Id*.  Both factors weigh against

22 application of collateral estoppel.

23        **1.      Procedural rights unavailable in the proceeding before the EC could cause**
                    **a different result in this action.**

24        Plaintiffs seek to preclude the EC Addressees from litigating 158 paragraphs in the EC

25 Decision.  *See* Proposed Order re: Plaintiffs' Motions in Limine [Dkt. No. 3558].  Many of the

26 "paragraphs" are simply charts reiterating statements in other documents.  *See, e.g.*, *id.*, identifying EC

27 Decision ¶¶ 188, 256 & 412.  Thus, this Court must analyze whether the factual findings that Plaintiffs

28

seek to establish here via estoppel could come out differently if litigated in U.S. federal court.[16]  As explained above, the EC does not provide addressees with any of the most basic procedural protections, including the right to elicit sworn testimony, the right to obtain helpful evidence through a discovery process, or the right to cross-examine witnesses.  Exercise of any of those rights could cause the jury's interpretation of the evidence to diverge from the EC's views.

For example, if a witness purports to have knowledge of wrongdoing, that witness is much more likely to strive for accuracy when he is testifying under the penalty of perjury, as he would have to do in a U.S. Court.  Before the EC, however, not only does a witness have no obligation to make any personal statement (under oath or otherwise), but there are no consequences to that individual for making a false statement.  In the context of a leniency submission before the EC, the concern over unreliability is heightened because witnesses could have an incentive to exaggerate the potential wrongdoing of others, while minimizing their own potential involvement.  A requirement that statements are subject to punishment would likely impact the testimony before this Court.

Further, the Commission relied heavily on the handwritten notes of a single individual as a basis for its findings.  *See, e.g.*, EC Decision ¶¶ 435, 935 & 959.  The ability to cross-examine the author of those notes under oath is critically important and could alter the conclusions drawn from the notes by the jury here.  And that cross-examination will be aided the Addressees' right to take discovery regarding the allegations against them—they will have opportunities to introduce conflicting or exculpatory evidence that could cause a different result as to the conclusions made by the EC.[17]  An

---

[16] Importantly, the question for the Court is not whether additional procedural opportunities could lead to a different ultimate result, i.e., whether the EC Addressees engaged in anti-competitive practices, because Plaintiffs are not seeking claim preclusion.  As authority cited by Plaintiffs explains, *see* Mot. at 41, "there is no preclusive effect to questions of law or mixed questions of fact and law" for foreign decisions.  *Oneac Corp. v. Raychem Corp.*, 20 F. Supp. 2d 1233, 1242 (N.D. Ill. 1998).

[17] *Cf. Kleenwell Biohazard Waste & Gen. Ecology Consultants, Inc. v. Nelson*, 48 F.3d 391, 394–95 (9th Cir. 1995) (finding an adequate opportunity to litigate where "the parties were provided with proper notice and an opportunity to be heard, they were represented by counsel, briefs were filed, evidentiary objections were made, exhibits were admitted into evidence, and direct testimony and cross examination were made.").

additional problem with the EC's reliance on a copious number of handwritten notes is that it did not require them to be authenticated in any way before relying on them.  In this Court, however, Plaintiffs would have to establish the admissibility of every document they seek to rely on, addressing authenticity and hearsay among other issues.  The process in this Court could readily cause a different result as to those issues.

The cases cited by Plaintiffs that purportedly support the idea that the procedures of the EC are consistent with due process are wholly inapposite, as most do not even address the full and fair opportunity to litigate element.  For example, in *Information Resources v. Dun & Broadstreet,* the court considered a decision of the Canadian Competition Tribunal.  No. 96 CIV. 5716 (LLS), 1998 WL 851607 (S.D.N.Y. Dec. 8, 1998).  But the Canadian Competition Tribunal is in fact a tribunal, unlike the EC, that functions like an actual court:  "The Competition Bureau . . . investigates complaints and decides whether to proceed with the filing of an application under the Competition Act to the Tribunal. The Competition Tribunal is a strictly adjudicative body with no function other than that associated with the hearing of applications made to it pursuant to the Competition Act and the issuance of orders."[18]  Similarly, in *University of Tennessee v. Elliott*, 478 U.S. 788 (1986), Elliott had his claim fully adjudicated by an Administrative Law Judge, and there was apparently no dispute that his hearing complied with the Tennessee Uniform Administrative Procedures Act—which provides access to an impartial forum, discovery procedures, and cross-examination of witnesses.  *See id*. at 791; Tenn. Code Ann. § 4-5-303, 4-5-311, 4-5-312(a).  The other cases cited by Plaintiffs are similarly inapposite.[19]

---

[18] *Frequently Asked Questions*, COMPETITION TRIBUNAL (Mar. 12, 2015), http://www.ct-tc.gc.ca/Procedures/FAQs-eng.asp.

[19] *See Miller v. County of Santa Cruz*, 39 F.3d 1030 (9th Cir. 1994) (no consideration of whether the procedures of the Santa County Civil Service Commission provided the plaintiff with a full and fair opportunity to litigate); *Shapley v. Nevada Bd. of State Prison Cmm'rs*, 766 F.2d 404, 405–08 (9th Cir. 1985) (no consideration of full and fair opportunity when deciding whether to given a prior U.S. federal court judgment preclusive effect); *Bank of Montreal v. Kough*, 612 F.2d 467, 472–73 (9th Cir. 1980) (considering application of res judicata to a judgment from a British Columbia court where defendant did not argue a lack of full and fair opportunity to litigate); *British Midland Airways Ltd. v. Int'l Travel, Inc.*, 497 F.2d 869, 871 (9th Cir. 1974) (observing that procedures in the courts of England are consistent with U.S. due process with no consideration of whether there had been a full

(Continued...)

1

   **2.  The EC Addressees lacked the incentive and ability to litigate the EC's allegations.**

2

3

  Even if the EC provided the Addressees with fundamental due process protections, the EC Addressees had little incentive or ability to litigate the issues at stake before the EC.  At the encouragement of the EC and on the promise of the reduced penalties, several of the EC Addressees sought leniency in connection with the EC's investigation.  *See* EC Decision ¶¶ 91–98.[20]  As a condition of seeking leniency, an addressee agrees to offer information to the Commission and commits to providing "substantial value" to the investigation.  *Id.* ¶ 1116.  Thus, an addressee will have much less incentive to dispute or challenge the EC's allegations or else it will risk losing the possibility of being granted leniency.  That lack of incentive permeates the EC Decision, which is more akin to a consent decree, which generally does not receive preclusive effect,[21] than a judicial decision that is the product of an adversarial process.  The EC's heavy reliance on leniency submissions combined with the EC Addressees lack of incentive to dispute the EC's allegations, which was limited to this one proceeding and solely to the jurisdiction of the EU, would work a great injustice against the EC Addressees, punishing them for cooperating with the EC.

4

5

6

7

8

9

10

11

12

13

14

15

  **B.  Element Two: Plaintiffs Have Failed To Establish An Identity Of Issues.**

16

  As to the second element necessary to apply collateral estoppel, four factors guide the determination of whether the issues at stake are identical: (1) substantial overlap between the evidence or arguments in the actions; (2) application of the same rule of law in the actions; (3) whether pretrial

17

18

19

20

_____

21

(...Continued)

22

and fair opportunity to litigate); *Walia v. Aegis Ctr. Point Developers Private Ltd.*, No. CV-12-4660-CRB, 2014 WL 296003, at *2 (N.D. Cal. Jan. 27, 2014) (applying California law and giving preclusive effect to a judgment from an Indian court with no consideration of whether there had been a full and fair opportunity to litigate).

23

24

[20] One Addressee received a reduction of its fine based on inability to pay and therefore had even less incentive to dispute the EC's views.  *See* EC Decision ¶¶ 1173–82.

25

26

[21] *See Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893–94 (2d Cir. 1976) (finding that "consent decrees" do not preclude a party from actually litigating the issues because they "are not true adjudications  of the underlying issues").

27

28

1    preparation in the first action could have reasonably been expected to have embraced the matter in the

2    second action; and (4) relations between the claims in the actions.  *RTC v. Keating*, 186 F.3d 1110,

3    1116 (9th Cir. 1999).  Each of these factors weighs against a finding that the identity of issues

4    requirement has been met.

> **1.    There is significant divergence between the evidence and arguments to be
> advanced in this litigation and what was before the EC.**

5

6

7        There are major substantive differences between the evidence and arguments before the EC and

8    in this case.  The "evidence" before the EC was artificially restricted to what the EC chose to collect

9    and consider.  For example, the EC did *not*: elicit testimony regarding any of the documents collected;

10   provide an opportunity for discovery by the addressees; provide the power to compel witness

11   testimony; permit cross-examination of witnesses or the authors of documents; permit expert testimony

12   regarding the scope, duration, or effects of any alleged cartel; permit any opportunity to challenge the

13   admissibility of proffered "evidence"; or otherwise conduct the enforcement proceeding in a manner

14   designed to balance the interests of the EC and Addressees, as would be required before rights are

15   finally resolved in the United States.

16       Indeed, the EC proceeding was akin to a prosecutorial action bearing virtually no resemblance

17   to the balanced presentation of evidence that will occur before this Court.  The fact that Defendants

18   have built their own affirmative discovery record and will now have the opportunity to present and

19   cross-examine fact and expert witnesses will necessarily lead to consideration by the jury of very

20   different evidence.

21       The focus of the decision-maker will also be different: the EC's jurisdiction is limited to anti-

22   competitive conduct that affects the EU, *see* EC Decision ¶¶ 585–88, much like this Court's

23   jurisdiction is limited to conduct that impacts the U.S., *see* Foreign Trade Antitrust Improvements Act

24   of 1982 ("FTAIA"), 15 U.S.C. §6a.  As a result, the evidence here will focus on the existence or non-

25   existence of any cartel affecting the U.S. as opposed to impact on the EU.  The EC was not focused on

26   the U.S. CRT market, U.S. indirect customers (like the DAPs here), or the duration, scope, or

27   purported effects of any cartel relating to the U.S.  Here, the EC Addressees will present substantial

28

1   evidence regarding the lack of U.S. effects.  Indeed, they have submitted *in limine* motions seeking to

2   exclude claims based on foreign conduct and commerce under the FTAIA and, if necessary, will

3   present argument to the jury establishing that certain of Plaintiffs' claims are barred under that

4   statute.[22]  Such evidence and argument was not relevant to, and was not presented in, the EC

5   enforcement proceeding.

6       Another important difference is that EU law does not require a showing of injury.  *See*

7   Declaration of Professor Ariel Ezrachi, dated Feb. 13, 2015, ¶ 19 [Dkt. No. 3558]  ("Ezrachi Decl.")

8   ("In deciding whether an agreement is prohibited by Article 101(1) TFEU, there is no need to take

9   account of its actual effect once it appears that its object is to prevent, restrict or distort competition

10  within the internal market.").  U.S. law does.  *See McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 811

11  (9th Cir. 1988) (explaining requirement to show "agreement" that is "intended to harm or unreasonably

12  restrain competition" . . . "which actually causes injury to competition").  Thus, there will be

13  significant evidence in these proceedings about how, if at all, the effects of the alleged conspiracy were

14  felt in the U.S. for an additional reason.

15              **2.    A different rule of law governs EC proceedings.**

16      Plaintiffs misleadingly ignore at least four crucial distinctions between EU and U.S. legal

17  principles that demonstrate a lack of identity of issues.

18      First, the EC's factual analysis and conclusions were premised on a theory of vicarious liability

19  that directly conflicts with U.S. law.  Under U.S. law, a wholly-owned subsidiary is *presumed* to be

20  distinct from its parent company.  *See E. & J. Gallo Winery v. EnCana Energy Servs., Inc.*, No. CVF

21  03-5412 AWI LJO, 2008 WL2220396, at *5 (E.D. Cal. May 27, 2008) ("The independence of a

22  subsidiary from the parent corporation is to be presumed").  EU law presumes the exact opposite:  a

23  parent corporation is presumed one and the same as its wholly-owned subsidiary, and therefore liable

24  _____

25  [22] *See* Defs.' Joint Opp'ns to Direct Action Plaintiffs Motions in Limine (Nos. 1-18), at 39; *see also*
    Defs.' Joint Notice of Mot. and Mot. for Summ. J. Based Upon Pls.' Failure to Distinguish Between
26  Actionable and Non-Actionable Damages Under the FTAIA [Dkt. No. 3008].

27

28

1    for, the acts of its subsidiaries.  *See* EC Decision ¶ 723.  For that reason, the EC proceeding did not

2    focus on attributing conduct to a specific entity within a corporate group, and the EC Addressees had

3    no reason or ability to litigate which entity was purportedly responsible for which conduct.  That legal

4    issue will be paramount here and the EC's legal premise runs headlong into the U.S. requirement that

5    plaintiffs prove that each defendant knowingly participated in the alleged cartel.  *See In re Static*

6    *Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008)

7    (recognizing that "Plaintiffs will need to provide evidence of each Defendants' participation in any

8    conspiracy").

9         To overcome the U.S. presumption of corporate separateness, Plaintiffs will have to show that

10   the EC Addressees so dominated the day-to-day control over their subsidiaries that the subsidiaries

11   lacked their own identities.  *See Sun Microsystems Inc. v. Hynix Semiconductor, Inc.,* 622 F. Supp. 2d

12   890, 899 (N.D. Cal. 2009) (finding that "day to day control" is a key factor in determining whether a

13   subsidiary is the agent of the parent).  *But see* EC Decision ¶ 724 (stating that liability can be

14   established  upon showing that a parent exercised "decisive influence" over its  subsidiary).  The EC's

15   assumption of lack of corporate separateness against the EC Addressees underscores the lack of issue

16   identity between the EC and U.S. proceedings.  *See Peterson v. Clark Leasing Corp.*, 451 F.2d 1291,

17   1292 (9th Cir. 1971) ("Issues are not identical if the second action involves application of a different

18   legal standard, even though the factual setting of both suits be the same.").

19        Second, the EU sets a much lower standard for what constitutes an unlawful "agreement."

20   Under EU law, a party can be held liable if it has knowledge of anticompetitive conduct and does not

21   affirmatively disassociate itself from that conduct.  *See supra* at 6.  But under U.S. law, Plaintiffs must

22   show that *each* Defendant knowingly entered into an unlawful agreement.  *See United States v. U.S.*

23   *Gypsum Co.*, 438 U.S. 422, 422 (1978) ("[L]iability could only be predicated on the knowing

24   involvement of each defendant, considered individually, in the conspiracy alleged,").  If a Defendant

25   was simply aware that other Defendants were violating the law, but did not agree to join and did not

26   participate, then that party cannot be held liable.  *See United States v. Richardson*, 596 F.2d 157, 162

27   (6th Cir. 1979) ("[M]ere knowledge, approval of or acquiescence in the object or the purpose of the

28

conspiracy . . . is not sufficient to make one a conspirator.") (internal quotation marks omitted).

Third, EU competition law holding that mere "information sharing" constitutes a violation of the antitrust laws is also in conflict with settled U.S. antitrust law.  Under EU law, "[i]nformation exchanges between competitors of individualised data regarding intended future prices or quantities should . . . be considered a [per se] restriction of competition."  Guidelines On The Applicability Of Article 101 Of The Treaty On The Functioning Of The European Union To Horizontal Co-Operation Agreements ¶ 74.  In the U.S., such information exchanges may be, but are not always illegal, and are sometimes viewed only as evidence suggesting an illegal agreement.  *See United States v. Container Corp. of Am.*, 393 U.S. 333, 337 (1969) ("Price information exchanged in some markets may have no effect on a truly competitive price.").  The EC applied that standard here, and it could have skewed their view or led them to look less critically at certain evidence.

Finally, contrary to basic principles of U.S. antitrust law, EU law does not require a showing of actual injury; liability can be established from conduct alone.  *See* Ezrachi Decl. ¶ 19.  There is no requirement that plaintiffs establish antitrust injury—i.e., "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful."  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc*. 429 U.S. 477, 477 (1977).  Plaintiffs here, of course, bear the burden of establishing not just that the EC Addressees engaged in unlawful conduct, but that Plaintiffs were injured as a direct and proximate result of that alleged unlawful conduct.  Thus, the EC and this Court will apply conflicting law regarding basic concepts as liability and antitrust injury.

Because EU and U.S. law are at odds on such fundamental issues as the presumption of corporate separateness, what constitutes an unlawful "agreement," the legality of "information sharing," and the need to prove any actual "injury" resulting from the EC Addressees' alleged conduct, the proceedings before this Court will not "involve the application of the same rule of law as that involved in the [EC] proceedings."  *Keating*, 186 F.3d at 1116.

### 3. Defendants were not afforded a trial as part of the EC proceeding and thus pretrial preparation in the EC did not embrace the issues of this action.

In considering identity of issues, courts consider whether "pretrial preparation and discovery

1   related to the matter presented in the first action [could] reasonably be expected to have embraced the

2   matter sought to be presented in the second." *Keating*, 186 F.3d at 1116.  The EC Addressees were not

3   afforded the right to a trial.  As such, there was no pretrial preparation.  None of the indicia of

4   procedural fairness inherent in the U.S. litigation system and provided in the Federal Rules of Civil

5   Procedure or Evidence were present in the EC enforcement proceedings.  For example, before this

6   Court, the EC Addressees have been able to participate in substantial written and documentary

7   discovery, deposition examinations and cross-examinations, motions practice, including the shaping of

8   evidentiary rulings through *in limine* motions, and presentation of expert witness opinions.  None of

9   these pretrial procedures were available in the EC proceeding.  The differences in the pretrial

10  preparation could not be more stark and should weigh heavily against a finding of an identity of issues.

11  **4.     Plaintiffs' claims are fundamentally inconsistent with the EC Decision.**

12          The statements of the EC are not closely related to the claims asserted by Plaintiffs.  First,

13  Plaintiffs' claims here are limited to U.S. impact—impact on the EU is irrelevant.  *See supra* at 15–16.

14  Second, Plaintiffs claim that there was a single CRT conspiracy, *see* Sharp Electronics Corporation &

15  Sharp Electronics Manufacturing Company of America, Inc.'s Opp'n to Joint Defense Motion In

16  Limine No. 10 – Motion to Exclude Evidence of Any Alleged CDT Price-Fixing Conspiracy, at 1

17  [Dkt. No. 3690] ("Sharp has alleged a single CRT conspiracy"); *see also Best Buy v. Hitachi Ltd.*,

18  ("Best Buy First Amended Compl.") ¶¶ 1–9, 89 & 109–15. [Dkt. No. 1978], whereas the EC rejected

19  that theory, *see* EC Decision ¶ 649.  Third, Plaintiffs were not parties to the EC proceeding, and now

20  raise different theories of liability and damages than those before the EC.  Fourth, Plaintiffs' claims

21  involve nearly twice as many defendants as there were Addressees before the EC.  *Compare* Best Buy

22  First Amended Compl. *with* EC Decision ¶¶ 339–40.  Similarly, some addressees that were before the

23  EC are not named as Defendants here and vice-versa.  *See id*.  Given the myriad differences between

24  the EC proceeding and the U.S. claims here, the Court should conclude that there is not sufficient

25  identity of issues.

26  **C.     Element Three: Plaintiffs Have Failed To Show The Issues Were Actually
        Litigated Before The EC Or Were Necessary To The EC's Decision.**

27

28          "Issue preclusion bars successive litigation of an issue of fact or law that is actually litigated

-18-

1   and determined by a valid and final judgment, and is [necessary] to the judgment."  *Bobby v. Bies*, 556

2   U.S. 825, 834 (2009) (internal quotation marks omitted).  It is not uncommon for the necessity

3   principle and the requirement of actual litigation to be closely related.  *See* Issue Preclusion—

4   Necessarily Decided, 18 Fed. Prac. & Proc. Juris. § 4421 (2d ed.).

5          Whether an issue is "actually litigated" often depends on the intent of the parties and whether

6   they intended for the issues to be resolved through an adjudicative process—"issue preclusion

7   ordinarily does not attach unless it is clearly shown that the parties intended that the issue be

8   foreclosed in other litigation."  "On the Merits"—Admissions, Stipulations, and Consent Judgments,

9   18A Fed. Prac. & Proc. Juris. § 4443 (2d ed.).  Along those lines, "[t]o the extent that individual issues

10  or entire judgments rest on admission or consent . . . a major element of preclusion is missing."  *Id.*[23]

11  In some cases, a prior proceeding is resolved "in part from adjudication and in part from private

12  agreement."  *Id.*  In such a case, "it may prove difficult to untangle the preclusion consequences."  *Id.*

13         When assessing the necessity principle, courts often must conduct a "detailed inquiry to

14  understand how specific findings came to be made and to determine whether they were necessary to

15  the first judgment.  If the inquiry reveals that the matters had come under consideration only

16  collaterally or incidentally, preclusion is denied."  Issue Preclusion—Necessarily Decided, 18 Fed.

17  Prac. & Proc. Juris. § 4421 (2d ed.); *see also Keating*, 186 F.3d at 1115 ("Preclusive force attaches to

18  determinations that were necessary to support the court's judgment in the first action.  Litigants

19  conversely are not precluded from relitigating an issue if its determination was merely incidental to the

20  judgment in the prior action.").

21          As the EC acknowledged, much of its decision is based on the admissions of the EC

22  Addressees who sought leniency.  *See, e.g.*, EC Decision ¶¶ 1115–62.  However, the EC goes to great

23  lengths to protect the confidentiality of those submissions, and does not attempt to identify which of its

24  "findings" are in fact admissions and which findings were the result of adjudication.  Plaintiffs have

---

[23] *Accord Spectrum Health Continuing Care Grp. v. Anna Marie Bowling Irrevocable Trust Dated June 27, 2002*, 410 F.3d 304, 312 (6th Cir. 2005).

1  cited no authority for the idea that they receive the benefit of the doubt in such a situation, entitling

2  them to preclusion on voluntary admissions from which they would not otherwise benefit.

3  Considering that fairness is the primary concern when applying offensive, non-mutual estoppel, it

4  would be fundamentally unfair to punish the EC Addressees for cooperating with the EC by according

5  preclusive effect to any finding that Plaintiffs so choose.  For the same reasons, Plaintiffs cannot

6  establish that any finding was necessary to the EC's decision.  Plaintiffs here seek preclusive effect as

7  to only some of the EC's individual factual findings.  It is exceptionally difficult or impossible to

8  conclude which of those factual findings, taken alone, are "necessary" to and which are "incidental" to

9  the EC's conclusions.

10  **D.      Granting The EC Decision Preclusive Effect Would Be Fundamentally Unfair To Defendants.**

11

12  This Court has "broad discretion to determine when [offensive issue preclusion] should be

applied."  *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979).[24]  Where, as here, "the

13  application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use

14  of offensive collateral estoppel."  *Id*.  Therefore, even if the Court were to find that Plaintiffs meet the

15  above mentioned factors—which it should not—it should still deny Plaintiffs' motion because giving

16  the EC Decision preclusive effect would be manifestly unfair to all Defendants.

17  Indicia of unfairness include whether certain procedural opportunities were unavailable to the

18  defendant in the first action that could readily cause a different result in the second action and whether

19  the defendant in the first action lacked the incentive to defend the suit with full vigor.  *See Syverson*,

20  472 F. 3d at 1079.  As explained above, both of these factors are met here.  *See supra* at 10–14.

21  Additionally, the multiparty nature of this suit means that if the Plaintiffs' preclusion request is

22  granted as to any Defendant, all Defendants will be injured.  Faced with certain facts that are

23

24

25  [24] *Syverson*, 472 F.3d. at 1078–79 ("The Supreme Court's grant of 'broad discretion' to trial courts

26  provides those courts the authority to take potential shortcomings or indices of unfairness into account

27  when considering whether to apply offensive nonmutual issue preclusion, even where the above-listed standard prerequisites are met.").

28

1   determined as to some Defendants but not others, the jury may simply apply a guilt-by-association

2   standard, assuming that if certain points are true of one Defendant, they are probably true of all

3   Defendants.  Defendants—particularly those that were never a part of the proceedings in front of the

4   EC, including entire corporate groups, e.g., Hitachi, and various subsidiaries of certain Defendants—

5   should not suffer the substantial risk that the jury will apply all findings to all Defendants.  Granting

6   preclusive effect would also introduce another layer of complexity to an already complex case, making

7   it that much more difficult for the jury to develop an understanding of the relevant facts and law.

8   Where affording the EC Decision preclusive effect will be so clearly unfair to Defendants, federal law

9   requires that this Court refuse to do so.  *See Parklane*, 439 U.S. at 331.[25]

10  **III.     THE *VICHI* DECISION DOES NOT SUPPORT A GRANT OF PRECLUSIVE EFFECT HERE BECAUSE IT IS LEGALLY AND FACTUALLY DISTINGUISHABLE.**

11

12          Plaintiffs argue that this Court should grant preclusive effect to all identified paragraphs in the

13  EC Decision in part because the Delaware Court of Chancery permitted one narrow holding of the EC

14  decision to have preclusive effect in *Vichi v. Koninklijke Philips Elec., N.V.*, 85 A.3d 725 (Del. Ch.

15  2014).  *See* Mot. at 41–42.  But *Vichi* is legally and factually distinguishable from the case at hand.

16          In *Vichi*, the court assessed the plaintiff's claim of fraud against Koninklijke Philips, N.V.

17  ("Philips N.V.")—a Defendant in this action—in connection with a loan that had been made by Vichi,

18  a European investor, to LPD, a joint venture between Philips N.V. and LG Electronics, Inc.  *Vichi*, 85

19  A.3d at 734–35.  Vichi alleged that Philips N.V. should have disclosed LPD's alleged participation in a

20  price-fixing cartel.  The court, prior to rejecting all of Vichi's claims, concluded that the EC Decision

21  had preclusive effect as to one point only:  that LPD—which is not a party to this litigation—

22  _____

23  [25] Further, the Court should deny Plaintiffs' Motion regardless of whether any of the EC Addressees
    have appealed.  *See* Mot. at 48–51.  EC procedures provide limited appeal rights; the General Court

24  may only conduct a limited review of the Commission's factual conclusions.  *See* Larouche Decl. ¶ 30.
    These limited appellate remedies demonstrate an additional inconsistency with U.S. due process

25  principles and provide another reduced incentive to dispute or challenge the EC's allegations or
    conclusions.  Thus, the absence of an appeal certainly does not demonstrate agreement with the EC

26  Decision.  *See* Ex. D to the Gelott Decl., (1/9/2015) 30(b)(6) Meggan Ehret Dep. Tr. 104:13–105:8

27  ("However, its decision not to appeal that decision . . . does not mean that Thomson SA agrees or
    accepts as true any statements in the [decision].").

28

1  participated in price-fixing in the EU.  *Id.* at 783.  However, the *Vichi* court also held that the EC

2  decision was *not preclusive* as to whether Philips N.V.—the sole defendant in *Vichi*—had knowledge

3  of or participated in a price-fixing cartel.  *Id.* at 783–84.  ("The EC Decision is not preclusive,

4  however, as to [Philips N.V.]'s knowledge of or participation in that CRT cartel….").

5       In so finding, the court applied Delaware law on collateral estoppel, which differs markedly

6  from federal law, which controls here.  Under Delaware law, "'the preclusive effect of a foreign

7  judgment is measured by [the] standards [used by] the rendering forum.'"  *Vichi*, 85 A.3d at 780

8  (quoting *Nelson v. Emerson*, C.A. No. 2937-VCS, 2008 WL 1961150, at *6 (Del. Ch. May 6, 2008)

9  (alterations in original).  This test is strikingly different from the federal standard, which is driven by

10  concerns over international comity—an issue that was not even mentioned in *Vichi*, let alone addressed

11  in the affirmative, *see Vichi,* 85 A.3d at 782–84—concerns over basic fairness, and assurances of basic

12  procedural guarantees, particularly a full and fair opportunity to litigate identical issues.  The court in

13  *Vichi* did not address any of these variables.[26]

14       Even if this Court were to consider *Vichi* relevant to its analysis, its holding is inapposite to

15  Plaintiffs' requested relief.  Contrary to Plaintiffs' suggestions, *Vichi* did not broadly grant preclusive

16  effect to the EC Decision, nor did it even attempt to evaluate the preclusive effect of the EC Decision

17  in an antitrust context.  Rather, it was limited to reviewing the preclusive effect of the EC Decision

18  under the law of the rendering forum (EU law), and examined only whether the EC Decision was

19  preclusive as to a finding of a violation of *EU antitrust laws* and the fraudulent implications of such a

20  violation.  *Id.* at 782.  The court did not consider whether the EC Decision should be afforded

21  preclusive effect as to an alleged violation of *U.S. antitrust law*, as is the case here.  Accordingly, *Vichi*

22  does not support giving the EC Decision preclusive effect, and it should be disregarded.

23  **IV.    THE EC DECISION SHOULD NOT BE ADMITTED IN EVIDENCE.**

24       **A.    The EC Decision Should Be Excluded Under Rule 403 Because It Is Unduly
            Prejudicial, Would Confuse The Jury, And Would Waste Time.**

26  [26] Notably, if this Court disregards the legal differences and chooses to follow *Vichi* (it should not), it
27  must find that the EC Decision is *not* preclusive as to Philips N.V.  *See Vichi*, 85 A.3d at 783–84.

28

Admitting the EC Decision in evidence would violate of Federal Rule of Evidence 403 because its probative value is substantially outweighed by a danger of unfair prejudice to Defendants; it would also mislead the jury, confuse the issues, and waste time.

As an initial matter, the EC Decision has minimal, if any, probative value.  Although Plaintiffs argue that the EC Decision is relevant, they ignore the many ways that the EC Decision is directly contradictory to Plaintiffs' theories and therefore inescapably confusing.  The crux of the EC Decision, for example, is that there were two separate cartels (CPT and CDT).  *See* EC Decision ¶ 649.  But Plaintiffs here strenuously assert that there was only a single CRT conspiracy.  *See supra* at 18−19. Also, as Plaintiffs acknowledge, the EC was focused only on conduct affecting the European market. *See* Mot. at 51.  Impact on the European market is not relevant in this case.  Further, although Plaintiffs would certainly like to present the EC Decision as "rejecting" Defendants' arguments, *see* Mot. at 52, because that decision was based on completely different procedures and legal standards, as well as a complete absence of evidentiary standards, the EC's treatment of those "arguments" has no probative value here.  To the contrary, if the findings are admitted, Defendants will be forced to detail the EC proceeding for the jury so that the jury understands the context in which those findings were made.

Regardless, whatever minimal probative value the EC Decision may have, it is substantially outweighed by other considerations.  First, the jury is likely to give undue weight to the EC Decision such that it would unfairly prejudice Defendants.  *See, e.g.*, *Beachy v. Boise Cascade Corp.*, 191 F.3d 1010, 1015 (9th Cir. 1999) (noting the high "risk of unfair prejudice involved in introducing a final agency ruling . . . because a jury might find it difficult to evaluate independently evidence of discrimination after being informed of the investigating agency's final results"); *Lewis v. City of Chicago Police Dep't*, 590 F.3d 427, 442 (7th Cir. 2009).  The EC Decision also did not examine impact on the U.S., and applies a very different standard than applicable here when assessing impact on its relevant market.  However, there is a real risk that the jury will simply ignore these distinctions and conclude that the EC Decision establishes a direct cartel effect on the U.S.

Second, admitting the EC Decision would confuse and mislead the jury.  The EC Decision contains inapposite standards of EU law and numerous statements that have no bearing here.  The jury

1   would be asked to assess a decision reached under EC legal standards, while being instructed to apply

2   U.S.—and only U.S.—law to the facts at hand.  Such a task would be Herculean for the stoutest expert

3   on international comparative law, let alone a lay jury, and should not be required from jurors in this

4   case.  *See Sugar Ass'n, Inc. v. McNeil-PPC, Inc.*, No. CV 04-10077 DSF(RZX), 2008 WL 4755611, at

5   *2 (C.D. Cal. Jan. 7, 2008) (holding that the "dangers of unfair prejudice or confusing or misleading

6   the jury" from admitting foreign judgments "substantially outweigh [their] probative value").

7          Third, allowing the EC Decision in evidence would cause undue delay and waste time as

8   Defendants would be required to present a great deal of evidence and argument on a number of

9   collateral matters—such as the scope of the EC's investigation and the differences between the EU and

10  U.S. law on procedural and substantive issues.  These mini-trials regarding "collateral issues regarding

11  the accuracy of the [EC Decision] and the methods used in its compilation" would only "protract an

12  already prolonged trial."  *City of New York v. Pullman Inc.*, 662 F.2d 910, 915 (2d Cir. 1981).

13         Finally, allowing the EC Decision in evidence would needlessly present cumulative evidence.

14  Plaintiffs are not suggesting, for example, that if the EC Decision were admitted in evidence it would

15  eliminate their need to introduce the underlying documents relied on by the EC in reaching those

16  conclusions.  Nor would admission of the EC Decision avoid the need to ensure the authentication of

17  documents, witnesses to testify as to those documents, or cross-examination of those witnesses.  It

18  would instead needlessly duplicate the information put before the jury in a cumulative way that could

19  only cause confusion and waste time.[27]

20         **B.      The EC Decision Is Inadmissible Hearsay.**

21         The EC Decision should also be excluded as inadmissible hearsay.  *See* Fed. R. Evid. 801.

22  Plaintiffs do not dispute that the EC Decision is hearsay, but erroneously suggest that the EC Decision

23

24  _____

25  [27] The lack of efficiency gains is an additional reason why the application of offensive, non-mutual
    estoppel is inappropriate.  *See Rodriguez-Garcia v. Miranda-Marin*, 610 F.3d 756, 772 (1st Cir. 2010)

26  ("a district court may refuse to apply nonmutual collateral estoppel when, for example, its application

27  . . . would not result in efficiency gains because litigation of the live issue may require introduction of
    some of the same evidence pertinent to the estopped issues") (citations and quotations omitted).

28

1  should be admitted pursuant to the public records exception.  *See* Mot. at 53 (citing Fed. R. of Evid.

2  803(8) (providing that a "record or statement of public office" is admissible if "it sets out . . . in a civil

3  case . . . factual findings from a legally authorized investigation" and if the document is trustworthy).

4       However, the EC decision is not sufficiently trustworthy to qualify for the exception under

5  Rule 803(8).  Courts often look to "the extent to which . . . agency findings are based upon, or are the

6  product of, proceedings involving the receipt of materials which would not be admissible as evidence

7  in the courts" in the considering whether the agency's report is trustworthy.  *Rambus,* 222 F.R.D. at

8  109; *Coleman v. Home Depot, Inc.*, 306 F.3d 1333, 1342 n.4 (3d Cir. 2002).  Here, the EC relied

9  principally upon unsworn statements of counsel, which in turn are based on unsworn statements of

10  non-party witnesses, as well as numerous unauthenticated meeting notes, many of which contained

11  multiple layers of hearsay.  Indeed, there is almost nothing contained in the EC Decision that would

12  have been admissible in the U.S. courts in the form and manner in which it was relied upon by the EC.

13                                      **CONCLUSION**

14       For the foregoing reasons, the Court should deny Plaintiffs' Motion in Limine # 11.  Each of the

15  below-listed Defendants joins this Opposition only as to the cases in which it remains active.

16

17

18  Dated: March 13, 2015

19

20

21

22

23

24

25

26

27

28

By: /s/ John M. Taladay
John M. Taladay (*pro hac vice*)
Erik T. Koons (*pro hac vice*)
Charles M. Malaise (*pro hac vice*)
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, DC 20004-2400
Telephone: (202) 639-7700
Facsimile: (202) 639-7890
Email: john.taladay@bakerbotts.com
Email: erik.koons@bakerbotts.com
Email: charles.malaise@bakerbotts.com

Jon V. Swenson (SBN 233054)
BAKER BOTTS LLP
620 Hansen Way
Palo Alto, CA 94304
Telephone: (650) 739-7500

1    Facsimile: (650) 739-7699
     Email: jon.swenson@bakerbotts.com
2

3    *Attorneys for Defendants Philips Electronics
     North America Corporation, Philips Taiwan
     Ltd., and Philips do Brasil Ltda.*
4

5    FAEGRE BAKER DANIELS LLP

6
     By: */s/ Kathy L. Osborn*
7    FAEGRE BAKER DANIELS LLP
     Kathy L. Osborn (*pro hac vice*)
8    Ryan M. Hurley (*pro hac vice*)
     300 N. Meridian Street, Suite 2700
9    Indianapolis, IN 46204
     Telephone: (317) 237-0300
10   Facsimile: (317) 237-1000
     kathy.osborn@FaegreBD.com
11   ryan.hurley@FaegreBD.com

12
     Calvin L. Litsey (SBN 289659)
13   Faegre Daniels LLP
     1950 University Avenue, Suite 450
14   East Palo Alto, CA 94303-2279
     Telephone: (650) 324-6700
15   Facsimile: (650) 324-6701
     calvin.litsey@FaegreBD.com
16

17   *Attorneys for Defendants Thomson SA and Thomson
     Consumer Electronics, Inc.*
18

19
     MUNGER, TOLLES & OLSON LLP
20

21   By: */s/ Miriam Kim*
     JEROME C. ROTH (State Bar No. 159483)
22   jerome.roth@mto.com
     MIRIAM KIM (State Bar No. 238230)
23   miriam.kim@mto.com
     MUNGER, TOLLES & OLSON LLP
24   560 Mission Street, Twenty-Seventh Floor
     San Francisco, California 94105-2907
25   Telephone: (415) 512-4000
     Facsimile: (415) 512-4077
26

27   BRAD D. BRIAN (SBN 079001)
     brad.brian@mto.com
28

WILLIAM D. TEMKO (SBN 098858)
William.Temko@mto.com
GREGORY J. WEINGART (SBN 157997)
gregory.weingart@mto.com
E. MARTIN ESTRADA (SBN 223802)
martin.estrada@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue, Thirty-Fifth Floor
Los Angeles, CA 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

ROBERT E. FREITAS (SBN 80948)
rfreitas@fawlaw.com
FREITAS ANGELL & WEINBERG LLP
350 Marine Parkway, Suite 200
Redwood Shores, California 94065
Telephone: (650) 593-6300
Facsimile: (650) 593-6301

*Attorneys for Defendant LG Electronics, Inc.*

WINSTON & STRAWN LLP
By: */s/ Jeffrey L. Kessler*
JEFFREY L. KESSLER (*pro hac vice*)
JKessler@winston.com
A. PAUL VICTOR (*pro hac vice*)
PVictor@winston.com
ALDO A. BADINI (SBN 257086)
ABadini@winston.com
EVA W. COLE (*pro hac vice*)
EWCole@winston.com
MOLLY M. DONOVAN
MMDonovan@winston.com
**WINSTON & STRAWN LLP**
200 Park Avenue
New York, NY 10166
Telephone: (212) 294-6700
Facsimile: (212) 294-4700

STEVEN A. REISS (*pro hac vice*)
steven.reiss@weil.com
DAVID L. YOHAI (*pro hac vice*)
david.yohai@weil.com
ADAM C. HEMLOCK (*pro hac vice*)
adam.hemlock@weil.com
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153-0119
Telephone: (212) 310-8000

-27-

1    Facsimile: (212) 310-8007

2    *Attorneys for Defendants Panasonic Corporation (f/k/a*
     *Matsushita Electric Industrial Co., Ltd.), MT Picture*
3    *Display Co., Ltd.*

4

5    **WHITE & CASE** LLP

6    By:  /s/ Lucius B. Lau
     Christopher M. Curran (*pro hac vice*)
7    ccurran@whitecase.com
     Lucius B. Lau (*pro hac vice*)
8    alau@whitecase.com
     Dana E. Foster (*pro hac vice*)
9    defoster@whitecase.com
     701 Thirteenth Street, N.W.
10   Washington, DC  20005
     tel.: (202) 626-3600
11   fax: (202) 639-9355

12

13   *Counsel to Defendants Toshiba Corporation, Toshiba*
     *America, Inc., Toshiba America Consumer Products,*
14   *LLC, Toshiba America Information Systems, Inc., and*
     *Toshiba America Electronic Components, Inc.*

15

16   SHEPPARD MULLIN RICHTER & HAMPTON LLP

17   By:  /s/ James L. McGinnis
     James L. McGinnis, Esq.
18   Gary L. Halling, Esq.
     Michael W. Scarborough, Esq.
19   Four Embarcadero Center, 17th Floor
     San Francisco, California  94111-4106
20   Telephone:  415-434-9100
     Facsimile:  415-434-3947
21   ghalling@sheppardmullin.com
     jmcginnis@sheppardmullin.com
22   mscarborough@sheppardmullin.com

23

24   *Counsel for Defendants Samsung SDI Co., Ltd., Samsung*
     *SDI America, Inc., Samsung SDI (Malaysia) SDN. BHD.,*
25   *Samsung SDI Mexico S.A. de C.V., Samsung SDI Brasil*
     *Ltda., Shenzen Samsung SDI Co., Ltd., and Tianjin*
     *Samsung SDI Co., Ltd.*

26

27   Pursuant to Local Rule 5-1(i), the filer attests that the concurrence in the filing of this document

28

has been obtained from each of the above signatories.