Jon V. Swenson (SBN 233054)
BAKER BOTTS LLP
620 Hansen Way
Palo Alto, CA 94304
Telephone: (650) 739-7500
Facsimile: (650) 739-7699
Email: jon.swenson@bakerbotts.com

John M. Taladay (*pro hac vice*)
Erik T. Koons (*pro hac vice*)
Charles M. Malaise (*pro hac vice*)
BAKER BOTTS LLP
1299 Pennsylvania Ave., N.W.
Washington, DC 20004-2400
Telephone: (202) 639-7700
Facsimile: (202) 639-7890
Email: john.taladay@bakerbotts.com
Email: erik.koons@bakerbotts.com
Email: charles.malaise@bakerbotts.com

*Attorneys for Defendants Koninklijke Philips N.V.,
Philips Electronics North America Corporation, Philips
Taiwan Limited, and Philips do Brasil, Ltda.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** | Case No. 07-5944 SC |
| | MDL No. 1917 |
| This Document Relates to: | |
| | **DECLARATION OF TIFFANY B. GELOTT IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE # 11: TO ESTABLISH THE PRECLUSIVE EFFECT OF, OR IN THE ALTERNATIVE ADMIT, THE EUROPEAN COMMISSION DECISION** |
| *Siegel v. Hitachi, Ltd., No. 11-cv-05502;* | |
| *Siegel v. Technicolor SA, No. 13-cv-05261;* | |
| *Best Buy Co., Inc. v. Hitachi, Ltd., No. 11-cv-05513;* | Date: None set |
| | Time: 10:00 a.m. |
| | Place: Courtroom No. 1 |
| *Best Buy Co., Inc. v. Technicolor SA, No. 13-cv-05264;* | Hon. Samuel Conti |

DECLARATION OF TIFFANY B. GELOTT IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE # 11: TO ESTABLISH THE PRECLUSIVE EFFECT OF, OR IN THE ALTERNATIVE ADMIT, THE EUROPEAN COMMISSION DECISION

1
2

*Sears, Roebuck and Co. and Kmart Corp. v. Technicolor SA,* No. 13-cv-05262

3
4

*Sears, Roebuck and Co. and Kmart Corp. v. Chunghwa Picture Tubes, Ltd.,* No. 11-cv-05514

5
6

*Sharp Electronics Corp. v. Hitachi Ltd.,* No. 13-cv-1173 SC

7
8

*Sharp Electronics Corp. v. Koninklijke Philips Elecs., N.V.,* No. 13-cv-2776 SC

9
10

*ViewSonic Corp. v. Chunghwa Picture Tubes, Ltd.,* No. 14-cv-2510 SC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I, Tiffany B. Gelott, hereby declare as follows:

1.      I am an associate with the law firm of Baker Botts L.L.P., counsel for Defendants Koninklijke Philips N.V., Philips Electronics North America Corporation, Philips Taiwan Limited, and Philips do Brasil, Ltda. (collectively, the "Philips Defendants").  I am a member of the bar of the District of Columbia and I am admitted to practice before this Court *pro hac vice*.  I submit this declaration in support of  Defendants' Opposition To Plaintiffs' Motion In Limine # 11: To Establish The Preclusive Effect Of, Or In The Alternative Admit, The European Commission Decision  (the "Opposition"). The information contained herein is based on my own personal knowledge, and if called as a witness I could, and would, testify competently that the matters set forth herein are true.

2.      Attached hereto as Exhibit A is a true and correct copy of the Brief of the Commission of the European Communities as Amicus Curiae in Support of Petitioner, *Intel Corp. v. Advanced Micro Devices*, No. 02-572, 2002 WL 32157391 (U.S. Nov. 15, 2002).

3.      Attached hereto as Exhibit B  is a true and correct of the case, GC 14 May 1998 Case T-348/94 *Enso Espanola v. Commission*, ECR 1998.

4.      Attached hereto as Exhibit C is an a  true and correct copy of the Memorandum of Law in Support of Motion by Intervenor-Applicant European Commission to Reconsider in Part the Court's Order Compelling Discovery of Confidential Materials, Case No. 2:08-mc-00180-DWA, Dkt. No. 200-1 (W.D. Pa. Oct. 8, 2009).

5.      Attached hereto as Exhibit D  is an excerpt from the 30(b)(6) Deposition of Meggan Ehret, dated January 9, 2015.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on March 13, 2015 in Washington, DC.

_/s/ Tiffany B. Gelott_
Tiffany B. Gelott

1

DECLARATION OF TIFFANY B. GELOTT IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION IN LIMINE # 11: TO ESTABLISH THE PRECLUSIVE EFFECT OF, OR IN THE ALTERNATIVE
ADMIT, THE EUROPEAN COMMISSION DECISION

# Exhibit A

2002 WL 32157391 (U.S.) (Appellate Petition, Motion and Filing)
Supreme Court of the United States.

INTEL CORPORATION, Petitioner,

v.

ADVANCED MICRO DEVICES, INC., Respondent.

No. 02-572
November 15, 2002.

On Petition for a Writ of Certiorari to the United States Court of Appeals for the Ninth Circuit

**Related Westlaw Journal Article**

**Brief of the Commission of the European Communities as Amicus Curiae in Support of Petitioner**

Jonathan L. Abram [†] , Richard L.A. Weiner, Hogan & Hartson L.L.P., Washington, D.C., Counsel for Amicus Curiae.

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii
STATEMENT OF INTEREST OF AMICUS CURIAE ................................................................ 1
SUMMARY OF ARGUMENT ........................................................................................... 3
ARGUMENT ............................................................................................................... 4
I. THE NINTH CIRCUIT'S DECISION FUNDAMENTALLY MISCONSTRUES THE NATURE OF 4
THE EUROPEAN COMMISSION ........................................................................................
II. THE NINTH CIRCUIT'S DECISION MAY UNDERMINE THE COMMISSION'S LAW 6
ENFORCEMENT MISSION ...............................................................................................
CONCLUSION ............................................................................................................. 8

TABLE OF AUTHORITIES

STATUTE:
28 U.S.C. § 1782 ....................................................................................................... 3, 4
OTHER AUTHORITIES:
Agreement Between The Government Of The United States Of America And The Commission 5
Of The European Communities Regarding The Application Of Their Competition Laws, Official
Journal of the European Communities, No. L 95, at 47 (April 27, 1995) ..................................
Commission Notice On The Non-Imposition Or Reduction Of Fines In Cartel Cases, Official 2
Journal of the European Communities ("OJ") C 207, at 4 (July 18, 1996), as amended,
Commission Notice On Immunity From Fines And Reduction Of Fines In Cartel Cases, OJC 45,
at 3 (Feb. 19, 2002) ...................................................................................................
Treaty Establishing The European Community, consolidated version pub. in Official Journal of 2
the European Communities C 340, at 3 (Nov. 10, 1997) ......................................................

STATEMENT OF INTEREST [1]

This brief is submitted on behalf of the Commission of the European Communities (the "European Commission" or the "Commission") as *amicus curiae* in support of the petition for writ of certiorari.

The European Commission is a unique institution under international law, covering subject areas ranging from antitrust ("competition law") to international trade and from foreign aid to environmental protection. The Treaty establishing the

European Community (the "EC Treaty") sets up an institutional system in which the Council of the European Union represents the national governments, the European Parliament is directly elected by citizens and the Commission is entrusted with a general role as "Guardian of the Treaty." [2] This "institutional triangle" is flanked by two additional institutions, the Court of Justice and the Court of Auditors. [3]

The Commission has been granted direct enforcement powers, in particular in the field of EC competition law and policy. As part of its duties, the Commission, through its services (the Directorate-General for Competition), regularly investigates the compatibility of certain behavior or proposed activities with EC competition law. The activities of the Commission services include not only reviewing proposed mergers and policing alleged industrial cartels and monopolies, but also overseeing government financial aid and formulating policies designed to aid market liberalization.

As part of its enforcement activities, the Commission operates a Leniency Program, [4] under which leniency applicants are encouraged to submit information and evidence regarding the existence of cartels, as well as other details of their involvement.

*Amicus* is concerned that the Ninth Circuit's opinion may interfere with the normal conduct of the Commission's law enforcement mission. First, the decision may undermine its Leniency Program by permitting United States courts to order discovery of leniency applications made to the Commission—thus deterring companies from coming forward in the first place with vital information. More fundamentally, the Ninth Circuit's decision is predicated on a misunderstanding of the unique role and status of the European Commission, which, while it may in some circumstances indeed function as a "tribunal," in other circumstances acts as a law enforcement agency, detecting and investigating alleged cartels and imposing fines on cartel participants. Finally, the opinion below arguably risks interfering with the normal conduct of international cooperation between the Commission services and United States antitrust authorities.

It should be noted that the filing of this *amicus* brief in no way reflects support by the European Commission of the merits of the underlying claims made by either party to this proceeding. Rather, it reflects the European Commission's overwhelming interest in ensuring the continued proper functioning of its antitrust enforcement proceedings, unhindered by the decision of the Ninth Circuit herein at issue.

## SUMMARY OF ARGUMENT

The purpose of this brief is not to expand on the legal arguments presented by the petitioner. Rather, amicus seeks to assist this Court in understanding the nature of the European Commission and the impact the Ninth Circuit's decision may have on its law enforcement mission. The Ninth Circuit based its decision below on the notion that the Commission is a "tribunal" under 28 U.S.C. § 1782. The Commission has significant law enforcement functions, however, and the court's holding that it is a "tribunal" for purposes of ordering discovery may have adverse collateral consequences for the Commission's law enforcement efforts.

## ARGUMENT

## I. THE NINTH CIRCUIT'S DECISION FUNDAMENTALLY MISCONSTRUES THE NATURE OF THE EUROPEAN COMMISSION.

The Ninth Circuit held that the Commission's investigation of the complaint lodged against Intel "qualifies as a 'proceeding before a tribunal' within the meaning of 28 U.S.C. § 1782." Pet. App. 7a. As a result, anyone who submits a complaint to the Commission may potentially invoke the broad discovery procedures of the United States to obtain documents and other forms of discovery "for use in" the Commission "proceeding" instituted pursuant to that complaint. 28 U.S.C. § 1782. The Ninth Circuit also held that "there is no requirement that AMD show that what is sought would be discoverable in the proceedings before the European Commission." Pet. App. 9a. Thus, United States discovery procedures would become available to persons filing

complaints with the Commission, even when the Commission *itself*, exercising its discretion, does not consider it necessary to request or even subsequently to review the documents sought—as was the case here.

The Ninth Circuit's holding fundamentally misconstrues the nature of the European Commission. The Commission functions primarily as a law enforcement agency in the antitrust field. Investigation and adjudication are far more distinct under United States law than they are in the European Community, where the Commission has significant responsibilities that may partake of an adjudicatory character, and also significant law enforcement duties as well.

While the Commission's status may not fit perfectly within concepts of United States law, it is clearly vested under EC law with a law enforcement mission in many areas. Tribunals decide the merits of one party's claim against another. The Commission, in contrast, *never* adjudicates disputes between parties; it is empowered (among other things) to receive a complaint by one party, to conduct an investigation into that party's allegation of wrongdoing, and to fine the wrongdoer if it is violating EC competition law. Thus, a principal function of the Commission is to conduct investigations, sometimes based on information or documents submitted to it in confidence. While the Commission may in this context investigate complaints, it does *not* adjudicate the rights of parties, as a tribunal would do. The parties to a complaint cannot be considered "litigants" before a "tribunal." [5] Although enjoying certain rights attached to such status, a complainant ultimately is only a person reporting an alleged violation of the law to a public authority.

Indeed, the Commission often finds itself investigating matters in conjunction with United States authorities. Like those of the United States Department of Justice (DOJ) and the Federal Trade Commission (FTC), the European Commission's inquiries often require investigation of international anti-competitive behavior. As such, the Commission has a formal cooperation agreement with the DOJ and the FTC to share information and conduct parallel investigations, and those entities have engaged in numerous coordinated investigations of international cartels. *See* Agreement Between The Government Of The United States Of America and The Commission Of The European Communities Regarding The Application Of Their Competition Laws, *Official Journal of the European Communities*, No. L 95, 47 (April 27, 1995). The 1995 EC-United States Agreement puts the Commission and the DOJ or FTC on equal footing as enforcement bodies, defining each as "competition authorities."

## II. THE NINTH CIRCUIT'S DECISION MAY UNDERMINE THE COMMISSION'S LAW ENFORCEMENT MISSION.

The Commission has the responsibility to ensure the enforcement of EC competition rules. For that purpose, the Commission has been granted specific investigatory powers. One of the critical functions of any law enforcement agency is to receive information from persons or companies about potentially unlawful conduct that it may investigate.

To that end, the Commission developed its Leniency Program, under which companies are encouraged to submit information regarding existing cartels of which they have knowledge in exchange for leniency from the Commission with respect to their own wrongdoing. The information companies submit is typically in the form of "Corporate Statements"—evaluative documents written exclusively for the purposes of a leniency application to the Commission, expressing a company's own description of the cartel's action and practices deriving from its own participation in the cartel. The Leniency Program has been highly successful and constitutes an important enforcement tool of the Commission.

The success of the Commission's Leniency Program depends critically on the Commission's ability to assure leniency applicants that their self-evaluative submissions remain confidential. If the Ninth Circuit's holding regarding discovery in the United States extends to leniency documents, it could have a chilling effect on the willingness of leniency applicants to come forward to the Commission. It is of paramount importance that the Commission be in a position to assure confidentiality, as law enforcement agencies all around the world must often do, and that submissions to it not become discoverable on the mistaken premise that it is primarily or exclusively a "tribunal."

The finding of the Ninth Circuit could be used in an effort to undermine the Commission's current and future efforts before United States courts to protect the confidentiality of leniency submissions presented to the Commission. Those submissions should benefit from the same protection granted to other law enforcement agencies under the "law enforcement investigatory privilege." The Ninth Circuit's conclusion that the Commission is a "tribunal" may significantly hamper the Commission's ability to invoke that protection as the law enforcement agency it is in the antitrust area, and may expose confidential statements to full discovery processes—thereby severely undercutting the effectiveness of the Leniency Program.

This is a very serious matter. If the United States court's conclusion undermines the effectiveness of the Commission's proceedings, for example through chilling its Leniency Program and complicating the Commission's ability to assert the law enforcement privilege, this would be a breach of the principle of international comity. The Commission has already intervened in United States civil proceedings to make clear that written leniency statements made to Directorate-General for Competition should not be discoverable to civil plaintiffs. In such cases, the Commission has argued that the production of written leniency statements is a key feature of the procedure that the Commission has put in place, as a law enforcement agency, to detect and prosecute cartels and other anti-competitive practices. The Commission's ability to enforce EC competition law could be critically undermined by the discoverability of the leniency statements it has been given by leniency applicants. If United States courts were to routinely order the production of such documents, it would undermine the effectiveness of the Commission's law enforcement efforts—a breach of the principle of international comity.

The Ninth Circuit's decision may also undermine the purpose of the United States-EC Antitrust Agreement, which places the DOJ, the FTC, and the Commission on equal footing as "competition authorities" in order to promote cooperation and coordination of their actions in the antitrust field. The European Community's effective Leniency Program assists United States authorities' efforts to prosecute international cartels, because participation in the Commission's Leniency Program may influence whether companies come forward under similar programs in the United States.

## CONCLUSION

For the foregoing reasons, the European Commission respectfully urges that the petition for certiorari be granted. Respectfully submitted,

JONATHAN L. ABRAM[†], RICHARD L.A. WEINER, HOGAN & HARTSON L.L.P., 555 Thirteenth Street, N.W., Washington, D.C. 20004-1109, (202) 637-5681, *Counsel for amicus Curiae*

10 NO. 8 Andrews Antitrust Litig. Rep. 3

**Related Westlaw Journal Article(Back to Top)**
10 NO. 8 Andrews Antitrust Litig. Rep. 3

Footnotes

| | |
|---|---|
| † | Counsel of Record |
| 1 | No counsel for any party authored this brief in whole or in part, and no person or entity, other than the *amicus curiae*, its members, or its counsel, made a monetary contribution to the preparation or submission of this brief. S. Ct. Rule 37.6. The brief is filed with the consent of the parties, and copies of the consent letters have been filed with the Clerk. |
| 2 | EC Treaty, art. 189, 202, 211. |
| 3 | *Id.* art. 220, 246. A Court of First Instance is attached to the Court of Justice to hear certain matters—including competition cases —subject to a right of appeal to the Court of Justice. *Id.* art. 225. |
| 4 | Commission Notice On The Non-Imposition Or Reduction Of Fines In Cartel Cases, *OfficialJournal of the European Communities* ("*OJ*") C 207, at 4 (July 18, 1996), *as amended*, Commission Notice On Immunity from Fines And Reduction Of Fines In Cartel Cases, *OJC* 45, at 3 (Feb. 19, 2002). |

5      The Court of First Instance exercises judicial review of Commission decisions in the field of EC competition law, subject to a right of appeal to the Court of Justice on points of law.

†      Counsel of Record

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit B

# JUDGMENT OF THE COURT OF FIRST INSTANCE
## (Third Chamber, Extended Composition)
### 14 May 1998 *

In Case T-348/94,

**Enso Española S. A.,** a company incorporated under Spanish law, established at Castellbisbal, Barcelona (Spain), represented initially by Antonio Creus Carreras and Xavier Ruiz Calzado, of the Barcelona Bar, José Ramón García-Gallardo, of the Burgos Bar, and Bonifacio García Porras, of the Salamanca Bar, subsequently by Antonio Creus Carreras, Xavier Ruiz Calzado and Eva Contreras Ynzenga, of the Madrid Bar,

applicant,

v

**Commission of the European Communities,** represented initially by Francisco Enrique González Díaz and Richard Lyal, of its Legal Service, acting as Agents, subsequently by Richard Lyal, assisted by Ricardo Garcia Vicente, of the Madrid Bar, with an address for service in Luxembourg at the office of Carlos Gómez de la Cruz, of its Legal Service, Wagner Centre, Kirchberg,

defendant,

---

* Language of the case: Spanish.

ENSO ESPAÑOLA v COMMISSION

APPLICATION for annulment of Commission Decision 94/601/EC of 13 July 1994 relating to a proceeding under Article 85 of the EC Treaty (IV/C/33.833 — Cartonboard, OJ 1994 L 243, p. 1),

THE COURT OF FIRST INSTANCE
OF THE EUROPEAN COMMUNITIES
(Third Chamber, Extended Composition),

composed of: B. Vesterdorf, President, C. P. Briët, P. Lindh, A. Potocki and J. D. Cooke, Judges,

Registrar: J. Palacio González, administrator,

having regard to the written procedure and further to the hearing which took place from 25 June 1997 to 8 July 1997

gives the following

**Judgment**

**Facts**

1  This case concerns Commission Decision 94/601/EC of 13 July 1994 relating to a proceeding under Article 85 of the EC Treaty (IV/C/33.833 — Cartonboard, OJ 1994 L 243, p. 1), as corrected prior to its publication by a Commission

decision of 26 July 1994 (C(94) 2135 final) (hereinafter 'the Decision'). The Decision imposed fines on 19 producers supplying cartonboard in the Community on the ground that they had infringed Article 85(1) of the Treaty.

2    The product with which the Decision is concerned is cartonboard. The Decision refers to three types of cartonboard, designated as 'GC', 'GD' and 'SBS' grades.

3    GD grade cartonboard (hereinafter 'GD cartonboard') is white-lined chipboard (recycled paper) which is normally used for the packaging of non-food products.

4    GC grade cartonboard (hereinafter 'GC cartonboard') is cartonboard with a white top layer and is normally used for the packaging of food products. GC cartonboard is of higher quality than GD cartonboard. During the period covered by the Decision there was normally a price differential of approximately 30% between those two products. High quality GC cartonboard is also used, but to a lesser extent, for graphic purposes.

5    SBS is the abbreviation used to refer to cartonboard which is white throughout (hereinafter 'SBS cartonboard'). The price of this cartonboard is approximately 20% higher than that of GC cartonboard. It is used for the packaging of foods, cosmetics, medicines and cigarettes, but is designated primarily for graphic uses.

6    By letter of 22 November 1990, the British Printing Industries Federation ('BPIF'), a trade organisation representing the majority of printed carton producers in the United Kingdom, lodged an informal complaint with the Commission. It claimed

that the producers of cartonboard supplying the United Kingdom had introduced a series of simultaneous and uniform price increases and it requested the Commission to investigate whether there had been an infringement of the Community competition rules. In order to ensure that its initiative received publicity, the BPIF issued a press release. The content of that press release was reported in the specialised trade press in December 1990.

7    On 12 December 1990, the Fédération Française du Cartonnage also lodged an informal complaint with the Commission, making allegations relating to the French cartonboard market which were similar to those made in the BPIF complaint.

8    On 23 and 24 April 1991, Commission officials acting pursuant to Article 14(3) of Council Regulation No 17 of 6 February 1962, First Regulation implementing Articles 85 and 86 of the Treaty (OJ, English Special Edition 1959-1962, p. 87, hereinafter 'Regulation No 17'), carried out simultaneous investigations without prior notice at the premises of a number of undertakings and trade associations operating in the cartonboard sector.

9    Following those investigations, the Commission sent requests for both information and documents to all the addressees of the Decision pursuant to Article 11 of Regulation No 17.

10   The evidence obtained from those investigations and requests for information and documents led the Commission to conclude that from mid-1986 until at least (in most cases) April 1991 the undertakings concerned had participated in an infringement of Article 85(1) of the Treaty.

11  The Commission therefore decided to initiate a proceeding under Article 85 of the Treaty. By letter of 21 December 1992 it served a statement of objections on each of the undertakings concerned. All the addressees submitted written replies. Nine undertakings requested an oral hearing. A hearing was held on 7, 8 and 9 June 1993.

12  At the end of that procedure the Commission adopted the Decision, which includes the following provisions:

'*Article 1*

Buchmann GmbH, Cascades SA, Enso-Gutzeit Oy, Europa Carton AG, Finnboard — the Finnish Board Mills Association, Fiskeby Board AB, Gruber & Weber GmbH&Co KG, Kartonfabriek "de Eendracht NV" (trading as BPB de Eendracht NV), NV Koninklijke KNP BT NV (formerly Koninklijke Nederlandse Papierfabrieken NV), Laakmann Karton GmbH&Co KG, Mo Och Domsjö AB (MoDo), Mayr-Melnhof Gesellschaft mbH, Papeteries de Lancey SA, Rena Kartonfabrik A/S, Sarrió SpA, SCA Holding Ltd (formerly Reed Paper & Board (UK) Ltd), Stora Kopparbergs Bergslags AB, Enso Española SA (formerly Tampella Española SA) and Moritz J. Weig GmbH&Co KG have infringed Article 85(1) of the EC Treaty by participating,

— in the case of Buchmann and Rena from about March 1988 until at least the end of 1990,

— in the case of Enso Española, from at least March 1988 until at least the end of April 1991,

— in the case of Gruber & Weber from at least 1988 until late 1990,

— in the other cases, from mid-1986 until at least April 1991,

in an agreement and concerted practice originating in mid-1986 whereby the suppliers of cartonboard in the Community

— met regularly in a series of secret and institutionalised meetings to discuss and agree a common industry plan to restrict competition,

— agreed regular price increases for each grade of the product in each national currency,

— planned and implemented simultaneous and uniform price increases throughout the Community,

— reached an understanding on maintaining the market shares of the major producers at constant levels, subject to modification from time to time,

— increasingly from early 1990, took concerted measures to control the supply of the product in the Community in order to ensure the implementation of the said concerted price rises,

— exchanged commercial information on deliveries, prices, plant standstills, order backlogs and machine utilisation rates in support of the above measures.

(...)

*Article 3*

The following fines are hereby imposed on the undertakings named herein in respect of the infringement found in Article 1:

(...)

(xviii)  Enso Española SA, a fine of ECU 1 750 000;

(...)'

13    According to the Decision, the infringement took place within a body known as the 'Product Group Paperboard' (hereinafter 'the PG Paperboard'), which comprised several groups or committees.

14    In mid-1986 a group entitled the 'Presidents Working Group' (hereinafter 'the PWG') was established within that body. This group brought together senior representatives of the main suppliers of cartonboard in the Community (some eight suppliers).

15    The PWG's activities consisted, in particular, in discussion and collaboration regarding markets, market shares, prices and capacities. In particular, it took broad decisions on the timing and level of price increases to be introduced by producers.

ENSO ESPAÑOLA v COMMISSION

16   The PWG reported to the 'President Conference' (hereinafter 'the PC'), in which almost all the managing directors of the undertakings in question participated (more or less regularly). The PC met twice each year during the period in question.

17   In late 1987 the Joint Marketing Committee (hereinafter 'the JMC') was set up. Its main task was, on the one hand, to determine whether, and if so how, price increases could be put into effect and, on the other, to prescribe the methods of implementation for the price initiatives decided by the PWG, country-by-country and for the major customers, in order to achieve a system of equivalent prices in Europe.

18   Lastly, the Economic Committee discussed, *inter alia*, price movements in national markets and order backlogs, and reported its findings to the JMC or, until the end of 1987, to the Marketing Committee, the predecessor of the JMC. The Economic Committee was made up of marketing managers of most of the undertakings in question and met several times a year.

19   According to the Decision, the Commission also took the view that the activities of the PG Paperboard were supported by an information exchange organised by Fides, a secretarial company, whose registered office is in Zurich, Switzerland. The Decision states that most of the members of the PG Paperboard sent periodic reports on orders, production, sales and capacity utilisation to Fides. Under the Fides system, those reports were collated and the aggregated data were sent to the participants.

20   According to the Decision, the applicant, Enso Española SA (formerly Tampella Española SA), participated in certain meetings of the JMC (between February 1989 and April 1991), of the PC (from May 1988 to May 1989), and of the Economic Committee (from February 1987 to May 1989).

## Procedure

21    The applicant brought this action by application lodged at the Registry of the Court on 8 October 1994.

22    Sixteen of the eighteen other undertakings held to be responsible for the infringement have also brought actions to contest the Decision (Cases T-295/94, T-301/94, T-304/94, T-308/94, T-309/94, T-310/94, T-311/94, T-317/94, T-319/94, T-327/94, T-334/94, T-337/94, T-338/94, T-347/94, T-352/94 and T-354/94).

23    The applicant in Case T-301/94, Laakmann Karton GmbH, withdrew its action by letter lodged at the Registry of this Court on 10 June 1996 and the case was removed from the Register by order of 18 July 1996 (Case T-301/94 *Laakmann Karton GmbH* v *Commission*, not published in the ECR).

24    Four Finnish undertakings, members of the trade association Finnboard, and as such held jointly and severally liable for payment of the fine imposed on Finnboard, have also brought actions against the Decision (Joined Cases T-339/94, T-340/94, T-341/94 and T-342/94).

25    Lastly, an action was also brought by an association, CEPI-Cartonboard, which was not an addressee of the Decision. However, it withdrew its action by letter lodged at the Registry of the Court on 8 January 1997 and the case was removed from the Register of the Court by order of 6 March 1997 (Case T-312/94 *CEPI-Cartonboard* v *Commission*, not published in the ECR).

26    By letter of 5 February 1997 the Court requested the parties to take part in an informal meeting with a view, in particular, to their presenting observations on a possible joinder of Cases T-295/94, T-304/94, T-308/94, T-309/94, T-310/94, T-311/94, T-317/94, T-319/94, T-327/94, T-334/94, T-337/94, T-338/94, T-347/94, T-348/94, T-352/94 and T-354/94 for the purposes of the oral procedure. At that meeting, which took place on 29 April 1997, the parties agreed to such a joinder.

27 By order of 4 June 1997 the President of the Third Chamber, Extended Composition, of the Court, in view of the connection between the abovementioned cases, joined them for the purposes of the oral procedure in accordance with Article 50 of the Rules of Procedure and allowed an application for confidential treatment submitted by the applicant in Case T-334/94.

28 By order of 20 June 1997 he allowed an application for confidential treatment submitted by the applicant in Case T-337/94 which related to a document produced in response to a written question from the Court.

29 Upon hearing the report of the Judge Rapporteur, the Court (Third Chamber, Extended Composition) decided to open the oral procedure and adopted measures of organisation of procedure in which it requested the parties to reply to certain written questions and to produce certain documents. The parties complied with those requests.

30 The parties in the cases referred to in paragraph 26 above presented oral argument and gave replies to the Court's questions at the hearing which took place from 25 June to 8 July 1997.

**Forms of order sought**

31 The applicant claims that the Court should:

— annul the Decision in whole or in part to the extent to which it concerns the applicant;

— in the alternative, annul the fine imposed on it;

— in the further alternative, substantially reduce the amount of the fine;

— order the Commission to pay the costs, including the expenses and interest associated with the provision of a bank guarantee or the payment of the whole or part of the fine.

32    The Commission contends that the Court should:

— dismiss the application;

— order the applicant to pay the costs.

## The application for annulment of the Decision

A — *The plea of infringement of the fundamental right to an independent and impartial tribunal*

*Arguments of the parties*

33    The applicant submits that the Commission's dual function as investigating authority and decision-making authority infringes the applicant's fundamental right to an independent and impartial tribunal.

II - 1894

34    This plea is in two parts. In the first part, the applicant submits that the funda-
mental right is laid down in Article 6 of the European Convention for the Protec-
tion of Human Rights and Fundamental Freedoms of 4 November 1950 (herein-
after 'the ECHR'). In the second part, it argues that this right is enshrined in the
constitutional traditions of the Member States.

35    As regards the first part of the plea, it submits that a court hearing a criminal
charge within the meaning of Article 6 of the ECHR must be impartial. The inves-
tigation and the adoption of the decision terminating the investigation must there-
fore be carried out by different instances or persons (judgments of the European
Court of Human Rights of 1 October 1982 *Piersack*, A Series, No 53, and of 26
October 1984, *De Cubber*, A Series, No 86). The European Commission of
Human Rights has described decisions adopted pursuant to competition law as
criminal charges (decision of 9 February 1990, *M & Co.* v *Germany*, No 13258/87,
Vol 64, p. 138, and opinion in *Stenuit* v *France*, No 11598/85, report of 30 May
1991, A Series, No 232-A).

36    Effect should have been given to the rights guaranteed under Article 6 of the
ECHR for three reasons.

37    First, the Commission's decision is penal in nature (opinion of the European
Commission of Human Rights in *Stenuit* v *France* and *M & Co.* v *Germany*, cited
above). The fines are penal because they are intended to act as a deterrent, as is
evident from the publicity given to the fines by the Commission with that end in
view.

38    Second, even if the fine imposed was not penal in nature, the safeguards in regard
to criminal charges should have been applied to a coercive administrative pro-
cedure such as that before the Commission. The formal classification of fines
under domestic law and, in the present case, under Community law, are of little
relevance in that regard.

39 Citing judgments of the European Court of Human Rights (judgments of 8 June 1976, *Engel and Others*, Series A, No 22, of 21 February 1984, *Öztürk*, Series A, No 73, and of 28 June 1984, *Campbell and Fell*, Series A, No 80), the applicant maintains that the fundamental right to a fair trial can be applied to the present case, even though it has been held that the Commission is not a tribunal within the meaning of Article 6 of the ECHR (judgments of the Court of Justice in Joined Cases 209/78 to 215/78 and 218/78 *Van Landewyck and Others* v *Commission* [1980] ECR 3125, paragraphs 79 to 91, and Joined Cases 100/80, 101/80, 102/80 and 103/80 *Musique Diffusion Française and Others* v *Commission* [1983] ECR 1825).

40 Finally, bias by the Commission could be rectified if it were possible subsequently to bring an action before a court that has full jurisdiction (judgment in *De Cubber*, cited above). There is, however, no such possibility in the present case, because the power of review exercised by the Court of First Instance pursuant to Articles 172 and 173 of the Treaty is not a full power of review, within the meaning of the judgment in *De Cubber*, cited above, by which all the assessments of fact and of law may be reviewed.

41 Under the review procedure provided for by Article 173 of the Treaty the Court of First Instance has no power to assess the factual or economic circumstances taken into consideration when the contested decision was adopted or the recommendation drawn up, except in a case where the Commission is accused of a misuse of power or of having manifestly failed to observe the provisions of the Treaty or a legal rule relating to its application. Citing two judgments of the Court of Justice (Case 42/84 *Remia and Others* v *Commission* [1985] ECR 2545, paragraph 34, and Case C-225/91 *Matra* v *Commission* [1993] ECR I-3203, paragraph 23), the applicant submits that the judicial review of Commission decisions on the basis of Article 173 of the Treaty is a mere review of legality and does not satisfy the requirement that there be an unlimited power of review.

42 The power to review fines, as provided for in Article 172 of the Treaty, is formally a review of unlimited jurisdiction and is an extension of the Community judicature's powers of review in the context of an application for annulment (judgment

in Case 9/56 *Meroni & Co. Industrie Metallurgiche* v *High Authority* [1958] ECR 9).

43    However, that power of review is not a review by a court that has full jurisdiction, as required by the ECHR, because the Court of First Instance is empowered to exercise it only in the case of manifest injustice (Case 8/56 *ALMA* v *High Authority* [1957] ECR 1979, 192) or material error of fact or of law (Opinion of Advocate General Warner in Joined Cases 32/78, 36/78 to 82/78 *BMW Belgium and Others* v *Commission* [1979] ECR 2435, at 2484).

44    Even if that review were considered to be a review by a court that has full jurisdiction, it does not cover all the elements of the contested decision, as required by the European Court of Human Rights. The only possible result of such review is an alteration in the fine imposed; there is no examination of the facts and findings of fact which the Commission took into account in order to demonstrate the legal basis for its imposition of that fine.

45    In the second part of the plea the applicant asserts that the fundamental right to an independent and impartial tribunal is recognised by the traditions of the Member States.

46    Article F(2) of the Treaty on European Union lays down that fundamental rights as they result from the constitutional traditions of the Member States are to be applied. The fundamental right to an impartial tribunal is assured in the Member States by means of the two types of procedure for the review of infringements of competition law referred to in the *De Cubber* judgment, cited above.

47    The first type of procedure separates the investigation and decision-making phases from the very beginning. The French, Greek, Belgian, Portuguese, Spanish, Dan-

ish, Austrian, Finnish and Swedish national systems for the control of competition make that distinction between investigation and decision-making. The Belgian, Portuguese, Spanish, Danish and Swedish systems even allow for unlimited review in a subsequent phase. On the other hand, under the procedure for applying competition law in the United Kingdom, Ireland, Luxembourg and the Netherlands, the bodies whose task it is to safeguard free competition are not allowed to impose fines.

48   The second type of procedure, in force in Germany and in Italy, does not distinguish between the investigation and decision-making phases, but provides for an action before a court that truly has full jurisdiction, whose characteristics render it consistent with Article 6 of the ECHR.

49   Having regard to those aspects, the constitutional traditions of the Member States give better protection to the right to an impartial tribunal than is required by the *de minimis* interpretation of Article 6 of the ECHR adopted by the European Court of Human Rights. Consequently, even if the Court of First Instance were to take the view that the Decision is consistent with the right to an impartial tribunal in line with the rules laid down by the European Court of Human Rights, it could not find that the Decision guaranteed the right to an impartial tribunal, as defined in the constitutional traditions of the Member States and reflected in their procedures for the application of competition law.

50   The Commission considers, first, that Community competition law does not fall within the scope of criminal law and is not therefore subject to Article 6(1) of the ECHR.

51   Second, the Commission cannot be classified as a tribunal for the purposes of Article 6 of the ECHR.

ENSO ESPAÑOLA v COMMISSION

52 Third, the applicant misinterprets Article 173 of the Treaty and the case-law relating thereto in arguing that the *De Cubber* judgment, cited above, cannot be applied in the Community context owing to the fact there is no subsequent appeal to a court with jurisdiction to examine and review each of the factual elements of the decision and the Commission's assessment of those elements.

53 Article 173 of the Treaty authorises the Community judicature, through a review of errors of fact and of law, to undertake an exhaustive review of both the Commission's findings and its assessment of the facts. Although the Community judicature may not substitute its own assessment for that of the Commission, under Article 176 of the Treaty the Commission must nevertheless adopt all the necessary measures to comply with a judgment annulling its decision (Joined Cases T-68/89, T-77/89 and T-78/89 *SIV and Others* v *Commission* [1992] ECR II-1403). Finally, the European Commission of Human Rights itself considered that Article 173 is an example of limited but normal review for the purposes of Article 6 of the ECHR (Report of 17 July 1980, Kaplan, DR, Vol 21, p. 66).

54 As regards the review of penalties provided for in Article 172 of the Treaty, the Community judicature's practice goes further than review of manifest injustice (*ALMA* v *High Authority*, cited above) or of material error (Opinion of Advocate General Warner in *BMW Belgium and Others* v *Commission*, cited above), because the Community judicature also verifies, *inter alia*, whether the fine is proportionate to the seriousness of the infringement (judgments in Case 16/61 *Acciaierie Ferriere e Fonderie di Modena* v *High Authority* [1962] ECR 547, 576 and 581, and Joined Cases 6/73 and 7/73 *Istituto Chemioterapico Italiano and Commercial Solvents* v *Commission* [1974] ECR 223, 260).

*Findings of the Court*

55   It is settled law that fundamental rights form an integral part of the general prin-
ciples of law whose observance the Community judicature ensures (see, in particu-
lar, Opinion 2/94 [1996] ECR I-1759, paragraph 33, and judgment of the Court in
Case C-299/95 *Kremzow* [1997] ECR I-2629, paragraph 14). For that purpose, the
Court of Justice and the Court of First Instance draw inspiration from the consti-
tutional traditions common to the Member States and from the guidelines supplied
by international treaties for the protection of human rights on which the Member
States have collaborated or of which they are signatories. The ECHR has special
significance in that respect (Case 222/84 *Johnston* v *Chief Constable of the Royal
Ulster Constabulary* [1986] ECR 1651, paragraph 18, and *Kremzow*, cited above).
Moreover, pursuant to Article F (2) of the Treaty on European Union, 'the Union
shall respect fundamental rights, as guaranteed by the [ECHR] and as they result
from the constitutional traditions common to the Member States, as general prin-
ciples of Community law'.

56   It is also settled law that the Commission cannot be described as a 'tribunal' within
the meaning of Article 6 of the ECHR (*Musique Diffusion Française and Others* v
*Commission*, cited above, paragraph 7). The applicant's argument that the Decision
is unlawful simply because it was adopted under a system in which the Commis-
sion carries out both investigatory and decision-making functions is therefore
irrelevant. The Court emphasises, however, that the Commission is required, dur-
ing the administrative procedure before it, to observe the procedural guarantees
provided for by Community law.

57   The applicant also submits that, as Community law currently stands, bias by the
Commission cannot be redressed by means of an action brought to contest the
Commission's decision before a court that has full jurisdiction and that this is con-
trary to the obligations imposed by the ECHR.

58   The Court points out in that regard that Community law confers upon the Commission a supervisory role which includes the task of taking proceedings in respect of infringements of Articles 85(1) and 86 of the Treaty.

59   Furthermore, Regulation No 17 gives it the power to impose, by decision, fines on undertakings and associations of undertakings which have infringed those provisions either intentionally or negligently.

60   The requirement for effective judicial review of any Commission decision that finds and punishes an infringement of those Community competition rules is a general principle of Community law which follows from the common constitutional traditions of the Member States (see, to that effect, Case T-186/94 *Guérin Automobiles* v *Commission* [1995] ECR II-1753, paragraph 23).

61   In the present case, that general principle of Community law has not been infringed.

62   First, the Court of First Instance is an independent and impartial court, established by Council Decision 88/591/ECSC, EEC, Euratom of 24 October 1988 (OJ 1988 L 319, p. 1, corrected version in OJ 1989 L 241, p. 4). As is apparent from the third recital in the preamble to that decision, the Court was established in order particularly to improve the judicial protection of individual interests in respect of actions requiring close examination of complex facts.

63   Second, by virtue of Article 3(1)(c) of that decision, the Court of First Instance is required to exercise the jurisdiction conferred on the Court of Justice by the Treaties establishing the Communities and by the acts adopted in implementation thereof, *inter alia*, 'in actions brought against an institution of the Communities by

natural or legal persons pursuant to the second paragraph of Article 173 ... of the EEC Treaty relating to the implementation of the competition rules applicable to undertakings'. In the context of actions based on Article 173 of the Treaty, the review of the legality of a Commission decision finding an infringement of the competition rules and imposing a fine in that respect on the natural or legal person concerned must be regarded as effective judicial review of the measure in question. The pleas on which the natural or legal person concerned may rely in support of his application for annulment are of such a nature as to allow the Court to assess the correctness in law and in fact of any accusation made by the Commission in competition proceedings.

64    Third, in accordance with Article 17 of Regulation No 17, the Court has 'unlimited jurisdiction within the meaning of Article 172 of the Treaty to review decisions whereby the Commission has fixed a fine or periodic penalty payment [and] it may cancel, reduce or increase the fine or periodic penalty payment imposed'. It follows that the Court has jurisdiction to assess whether the fine or penalty payment imposed is proportionate to the seriousness of the infringement found.

65    Having regard to all the foregoing, the plea must be rejected as unfounded.

B — *The plea of infringement of the rights of the defence*

*Arguments of the parties*

66    The applicant submits that the statement of objections did not define the geographical market on which it was alleged to have committed infringements of com-

petition law. The statement of objections mentioned the Spanish market only once and made no mention at all of the Irish, Portuguese and Greek markets.

67 The applicant concluded from this that the Spanish, Irish, Portuguese and Greek markets were not the subject-matter of the investigation. It did not therefore believe that it had to defend itself against allegations by the Commission that it had committed infringements on those geographical markets.

68 Contrary to the Commission's submissions in its written pleadings to the Court, the statement of objections did not clearly cover 'the Spanish and Irish markets and, in part, the Portuguese and Greek markets (at least as regards the information exchange system)'. Moreover, by that statement the Commission implicitly recognised that the cartel did not cover the Greek and Portuguese markets.

69 More specifically, as regards the application of the Decision to the Spanish and Irish markets, the Commission's reference to certain appendices to the statement of objections (appendices 5, 6, 18, 20 to 22, 55, 56, 60, 71, 80, 81, 109, 110, 111 and 118) is irrelevant, because none of those appendices contain any evidence that the alleged infringement covered those markets. In particular, appendices 5, 6, 55, 56, 60 and 71 do not concern Ireland.

70 As to the alleged coverage of part of the Greek and Portuguese markets, the Commission itself acknowledges that the meetings of the PG Paperboard did not deal with questions relating to the Greek and Portuguese markets. Furthermore, a number of appendices on which the Commission relies do not relate to those markets.

71    In any event, the evidence showing that the Spanish, Irish, Greek and Portuguese markets were not covered by the statement of objections is much more cogent than the evidence to the contrary, in particular because the Commission did not include any of those four countries in its highly-detailed analysis of the seven price initiatives set out in the statement of objections.

72    A comparison between the tables summarising the price initiatives, as annexed to the statement of objections and to the Decision, shows that two succinct notes relating to the price increases in Spain for the initiatives in October 1989 (initiative E) and in January 1991 (initiative G) were included in the tables annexed to the Decision. Only the second of those notes refers to the applicant.

73    None of the above four markets is cited in the Decision in connection with the implementation of the PG Paperboard's decisions relating to prices on the national markets.

74    In failing clearly to indicate the relevant geographic market, the Commission infringed the obligation to give an appropriate definition of the relevant market, an obligation which the Court has found to be a general principle which must be observed (*SIV and Others* v *Commission*, cited above, paragraph 159).

75    The Decision indicates that the investigation and the infringement covered the whole of the Community except for Portugal and Greece (point 138), whereas the statement of objections gave it to be understood that Spain and Ireland were not covered by the objections either. In adopting objections in the Decision on which the applicant had not had an opportunity to make known its views, the Commission infringed Article 4 of Commission Regulation No 99/63/EEC on the hearings provided for in Article 19(1) and (2) of Council Regulation No 17 (OJ, English Special Edition 1963-1964, p. 47).

76   The Commission considers that the statement of objections, a term covering both the basic text and its appendices, clearly covers the Spanish and Irish markets in regard to all aspects of the infringement, and, in part, the Greek and Portuguese markets inasmuch as the evidence of collusion relating to those two markets relates only to the information exchange system. However, it cannot be inferred from the latter circumstance that the cartel did not cover the whole of the Community. The only concession that could be made is that there was no concrete evidence that the cartel extended to those markets.

77   As regards the geographical scope of the infringement, the Commission refers to appendices 5, 6, 18, 20 to 22, 49, 55, 56, 58, 60, 65, 71, 80, 81, 86, 88, 109, 110, 111, 117 and 118 to the statement of objections. In the light of those documents, it submits that it cannot be called upon to answer for the applicant's decision not to defend itself on that point during the administrative procedure.

78   As regards the price initiatives, the Commission considers that the comparison, made by the applicant in its pleadings, between the tables summarising the initiatives is manifestly incorrect, because the information relating to the October 1989 and January 1991 price increases was sent to it before the Decision was adopted.

79   As to the need to define the relevant geographical market before examining the illegality of specific conduct in the light of Article 85(1) of the Treaty, it considers that there is no need for such a definition at all where a restriction of competition is being assessed and it is clear, as it is in the present case, that the participation of almost all the undertakings operating on the relevant market on the Community's territory rules out any possible application of the *de minimis* rule to the infringement. That view is not inconsistent with the judgment in *SIV and Others* v *Commission*, cited above.

*Findings of the Court*

80    Observance of the right to be heard is, in all proceedings in which sanctions, in particular fines or penalty payments, may be imposed, a fundamental principle of Community law which must be respected even if the proceedings in question are administrative proceedings (Case 85/76 *Hoffmann-La Roche* v *Commission* [1979] ECR 461, paragraph 9).

81    Applying that principle, Article 19(1) of Regulation No 17 and Article 4 of Regulation No 99/63 require the Commission to include in its final decision only those objections in respect of which the undertakings concerned have been afforded the opportunity of making known their views.

82    The seventh indent of Article 1 of the Decision asserts that the undertakings referred to in that Article planned and implemented simultaneous and uniform price increases 'throughout the Community'.

83    Since the applicant submits that the statement of objections makes no reference to such price collusion in four Member States of the Community, namely Spain, Ireland, Greece and Portugal, it is necessary to ascertain whether, in this instance, the statement of objections was couched in terms that, albeit succinct, were sufficiently clear to enable the parties concerned properly to take cognizance of the geographical scope of that collusion. It is only on that condition that the statement of objections could have fulfilled its function under the Community regulations of giving undertakings all the information necessary to enable them to defend themselves properly, before the Commission adopts a final decision (see, *inter alia*, Joined Cases C/89/85, C-104/85, C-114/85, C-116/85, C-117/85 and C-125/85 to C-129/85 *Ahlström Osakeyhtiö and Others* v *Commission* [1993] ECR I-1307, paragraph 42).

ENSO ESPAÑOLA v COMMISSION

84    The statement of objections sent to the applicant consists of the basic document, the appendices and the individual particulars concerning the applicant. The basic document does not contain an operative part, but a 'summary of infringement'. That summary states, *inter alia*, that the producers supplying cartonboard in the EEC, in concert and complicity and contrary to Article 85 of the Treaty, 'planned and implemented simultaneous and uniform price increases throughout the EEC'. It expressly states that it must be read subject to the detailed objections set out in the remainder of the document.

85    When the statement of objections is read as a whole, it can be seen that, in the Commission's view, the alleged infringement extended to the whole of the Community. An examination of the allegations made in the statement of objections relating to the geographical scope of the anti-competitive acts cannot be restricted to collusion on prices, since it is apparent from the statement of objections (pp. 83 to 88) that the purpose of the main features of the 'price before tonnage' scheme was to restrict competition within the common market.

86    In its assessment of the facts, the statement of objections (p. 37) states, in regard to the JMC's role in the price collusion:

'The JMC discussed market-by-market the detailed implementation of the price decisions taken by the PWG. Its main function was to "determine whether and, if so, how price increases could be put into effect and to work towards achieving an equivalent (i. e. uniform) price system in Europe"'.

87    As to the collusion on market shares, it states (p. 51) that the understanding on market shares 'related to the shares in Western Europe as a whole'.

II - 1907

88    On that point, it refers to Stora's statements, according to which (Appendix 43 to the statement of objections, point 1.1):

.     'Discussions took place in the PWG on tonnage market shares. Virgin fibre qualities (GC and UC grades) and recycled fibre qualities (GD and UD grades) were considered separately. Levels for Europe as a whole and for individual countries were discussed. "Europe" for the purposes of the discussions meant EC and EFTA countries.'

89    As regards the collusion on prices, it states (p. 69):

      'The documentation also shows that the so-called "equivalent" or "European" price system had been implemented, with similar list price levels being introduced simultaneously across Europe.'

90    In its legal assessment, the Commission states *inter alia* (p. 83), in the section headed 'The nature of the infringement in the present case':

      .     'The main features of the "price before tonnage" scheme were:

      .     [...]

      II - 1908

ENSO ESPAÑOLA v COMMISSION

— the periodic implementation of agreed price initiatives involving simultaneous and uniform price increases by all producers in each national market;

— the achievement of a uniform pricing system on a European-wide basis;

[...]'.

91    Finally, in the section headed 'Effect upon trade between Member States', the statement of objections states (p. 88):

'In the present case, the pervasive nature of the collusive arrangements, which covered virtually all trade throughout the EEC (and other Western European countries) in a major industrial product, must automatically have resulted in the diversion of trade patterns from the course they would otherwise have followed.'

92    The explanations regarding the geographical scope of the alleged infringement, as contained in the body of the statement of objections itself, are corroborated in that document by the main evidence on which the Commission relies, namely Stora's statements. According to those statements, the geographical scope of the anti-competitive acts regarding prices extended, at least, to the whole of the territory of the Community. By way of example, Stora states, in regard to the two price increase initiatives adopted in 1988, that 'agreement was reached on the introduction (in 1988) of two price increases throughout the EC market' (Appendix 39 to the statement of objections, point 4). Similarly, as has already been pointed out (see paragraph 88 above), Stora states that the collusion on market shares concerned Europe as a whole.

93    In those circumstances, the statement of objections must be considered to satisfy the abovementioned requirement of clarity regarding the extension of the collusion to the whole of the Community. Consequently, the mere fact that some Community countries were not expressly mentioned is irrelevant.

94    Nor, in the present case, was it necessary for the Commission, prior to finding that there had been a restriction of competition, to define the geographical market on which it had taken place (see paragraph 231 et seq. below).

95    However, inasmuch as it is clear from the information supplied by the applicant in reply to a written question from the Court that the majority of its sales were on the Spanish market, the Court finds that several documents referred to in the statement of objections and annexed thereto do expressly refer to the Spanish market (Appendices 109, 110, 111, 117 and Technical Appendices E and G).

96    In particular, on page 55 of the statement of objections, Appendix 109 is referred to in the following terms:

'Those producers present at the meeting [of the JMC of 16 October 1989] ... reported on the progress in each national market of the price increase which had been announced to take effect (for most countries) on 1 October 1989'.

ENSO ESPAÑOLA v COMMISSION

97    The Spanish market is expressly included amongst the national markets referred to in Appendix 109:

'(a) Spain

The price increase has been notified and can be applied without any great difficulty [...]'.

98    Furthermore, Appendix E, which relates to the price increase initiatives in October 1989, makes comments on, and partially reproduces Appendix 111 to the statement of objections, namely a price list found at Rena. Although that list was stated to be Appendix 110 to the statement of objections, a careful reader could not have been unaware that it was in fact referring to Appendix 111.

99    The information reproduced concerns the prices, by grade of cartonboard, for each country and the date of the announcement of the price increases; information relating to the Spanish national market is expressly set out in that document.

100   Lastly, Appendix E states:

'Details of the price increases of each manufacturer are indicated in Table E.

JUDGMENT OF 14. 5. 1998 — CASE T-348/94

(N. B.: Finnboard, Feldmühle and Kopparfors all increased their prices for Spain by the amounts indicated in Appendix 117).'

101 Although the reference to Appendix 117 to the statement of objections is an unfortunate error, as the appendix referred to is in fact Appendix 111, the Court finds that Appendix E relates expressly to the Spanish national market.

102 Finally, Appendix G (p. 4), which relates to the January 1991 price initiatives, states as follows:

'The details of each producer's price increases are set out in Table G.

The main producers supplying the Spanish market (Cascades, Finnboard, Iggesund, Tampella Española, Feldmühle) all announced an increase of 5 PTA/kg.'

103 In summary, in the light of the foregoing considerations, the applicant cannot assert that its rights of defence were infringed.

104 The plea must therefore be rejected.

II - 1912

C — *The plea of infringement of Article 190 of the Treaty*

*Arguments of the parties*

105    Pointing out that the extent of the requirement to state reasons depends upon the particular circumstances (Opinion of Advocate General Van Gerven in Case C-137/92 P *Commission* v *BASF* [1994] ECR I-2555, at I-2572, the applicant submits that it is necessary to adopt a strict interpretation of the obligation to state the reasons on which a decision imposing fines is based, above all where the Commission's decision goes appreciably further than its previous decisions (Case 73/74 *Groupement des Fabricants de Papiers Peints de Belgique and Others* v *Commission* [1975] ECR 1491).

106    In the present case, the Decision did not clearly and coherently set out, in regard to the applicant, the considerations of fact and of law which led the Commission to adopt that decision. Neither the applicant nor the Court are therefore in a position to ascertain the considerations on which its reasoning is based. That is particularly so in regard to the definition of the relevant geographical market and the assessment of the applicant's participation in the alleged infringements.

107    Finally, the Commission infringed the obligation to state reasons for its determination of the amount of the fines.

108    The Commission submits that the plea must be rejected, because it merely refers generally to Article 190 of the Treaty. It is in any event unfounded, because the Decision contains an adequate statement of reasons.

*Findings of the Court*

109  It is settled law that the purpose of the obligation to give reasons for an individual decision is to enable the Community judicature to review the legality of the decision and to provide the party concerned with an adequate indication as to whether the decision is well founded or whether it may be vitiated by some defect enabling its validity to be challenged; the scope of that obligation depends on the nature of the act in question and on the context in which it was adopted (see, *inter alia*, Case T-49/95 *Van Megen Sports* v *Commission* [1996] ECR II-1799, paragraph 51). Although pursuant to Article 190 of the Treaty the Commission is bound to state the reasons on which its decisions are based, mentioning the facts, law and considerations which have led it to adopt them, it is not required to discuss all the issues of fact and law which have been raised during the administrative procedure (see, *inter alia, Van Landewyck and Others* v *Commission*, cited above, paragraph 66).

110  In the present case, the Decision refers directly to the applicant in the context of its description of the concerted price increases (points 77 and 89 of the Decision). Moreover, the points of the Decision describing the discussions with an anti-competitive object in the JMC (in particular, points 44 to 46, 58, 71, 73, 84, 85 and 87 of the Decision) necessarily relate to the applicant, which does not dispute having participated in meetings of that body. Lastly, the Decision clearly sets out the reasoning followed by the Commission in reaching its conclusion that the applicant participated in an overall cartel (points 116 to 119 of the Decision).

111  In such circumstances, the statement of reasons for the Decision gave the applicant sufficient indication of the principal points of fact and law which constituted the basis for the reasoning which led the Commission to hold it responsible for an infringement of Article 85(1).

112  As to the statement of reasons concerning the geographical market to which the Decision relates, it suffices to find that not only the Decision's operative part

(Article 1), but also the supporting grounds for it (*inter alia*, point 2, first paragraph, third and fifth indents; point 44, second paragraph, second indent; point 52 and point 76, first paragraph) relate to anti-competitive actions throughout the Community.

113    In those circumstances, the Court cannot uphold the applicant's argument that the statement of reasons was inadequate on that point.

114    Finally, as regards the alleged infringement of the obligation to state reasons for the Commission's determination of the amount of the fines, the Court finds that such an infringement, if proved, can affect only the lawfulness of Article 3 of the Decision, which imposes a fine on the applicant. The arguments in question must therefore be considered with the pleas raised in support of the application for annulment or reduction of the fine (see paragraph 238 et seq. below).

115    It follows that the plea must be rejected as unfounded.

D — *The plea that Article 85(1) of the Treaty was wrongly applied to the applicant's actions*

*Arguments of the parties*

116    This plea is in four parts.

117    In the first part, the applicant disputes that it participated in an overall plan to restrict competition.

118 In its reply to the statement of objections it acknowledged that it had been a member of the PG Paperboard and had participated in meetings of certain of its bodies and in the Fides information exchange system. However, it was unaware that the information supplied had restricted competition.

119 Its adherence to an overall plan to restrict competition cannot be inferred from its limited participation in the bodies of the PG Paperboard and the information exchange within that structure. Moreover, by referring in its defence to the 'bodies of the cartel', the Commission wrongly classes its participation in the bodies of the PG Paperboard as participation in the cartel itself.

120 The Commission has not furnished credible and cogent evidence to link the applicant to the common system. Since the applicant is not referred to in any of the documents cited as evidence in the Decision, the only matters which can be considered to have been proved are its mere presence at meetings and participation in an information exchange. The applicant stresses the difference between participation in an overall plan to restrict competition and participation in some of the actions capable of constituting less serious infringements in the context of that plan (presence at meetings and participation in the information exchanges).

121 The applicant sets out the test used by the Commission in order to establish the participation in the cartel of each addressee of the Decision (points 116 to 121 of the Decision) and argues that the application of that test to its own situation shows that it did not participate in the alleged common scheme. None of the evidence relied on in the Decision is such as to prove a link between the applicant and the collusion.

122 In the second part of the plea, the applicant submits that it did not participate in the price increases agreed at the JMC meeting of 6 September 1990 (point 89 of the

ENSO ESPAÑOLA v COMMISSION

Decision). As stated in its reply to the statement of objections (point 5.2.2, and in particular 5.2.2.1), its participation in, and implementation of, the price collusion have not been proved.

123   Moreover, neither the Decision nor the statement of objections contains the slightest evidence of its participation in monitoring the implementation of the price increases.

124   In its reply it explains that, when assessing its assertion that it did not participate in the collusion on prices, it must be borne in mind, first, that it did not undertake to apply a particular price level: that does not mean that it was unaware of the existence of agreements made by the major producers to that effect, probably in PWG meetings. Second, it should be borne in mind that its commercial policy always followed different criteria than those of its competitors.

125   In the third part of the plea the applicant submits that it did not participate in collusion on control of production volumes or in collusion on market shares.

126   According to the Decision (point 51 et seq.), a mechanism for controlling prices and production volumes, based on an alleged 'price before tonnage' policy, was initiated in the PG Paperboard. It is also alleged (point 58) that the smaller cartonboard producers, although not privy to the detailed discussions on market shares which took place in the PWG, were, as part of the 'price before tonnage' policy to which they all subscribed, well aware of the general understanding between the major producers to maintain constant levels of supply and of the need to adapt their own conduct to it.

127 However, there is no evidence for that assertion as regards the applicant. On the contrary, its commercial policy, explained in its reply to the statement of objections, was always to increase the quantity of products on the market, even to the detriment of the margin on prices obtained.

128 Furthermore, the Commission wrongly alleges that it participated in the collusion on downtime and on market shares. In point 116 of the Decision the Commission acknowledges that only the major producers concluded agreements on production volumes and market shares.

129 The objection that markets were shared is not proved or even supported by any evidence in the Decision. In any event, the changes in the applicant's sales on the Community markets suffice to prove that this allegation is unfounded in regard to it.

130 Finally, in the fourth part of the plea, the applicant contends that the failure in the statement of objections to clarify the relevant geographical market (see point 66 et seq. above) is repeated in the Decision. The only passage in the Decision which specifies the limits of that market is point 138, in which it is accepted that the infringements were not committed in Portugal and Greece. The applicant asserts that there is an inconsistency between point 138 and point 61, in which it is stated that the Fides information exchange system covered the whole of Western Europe.

131 A definition of the relevant geographical market is essential to an assessment of whether or not an infringement existed and of how serious and extensive it was. Since the Spanish, Portuguese, Greek and Irish markets, on which it carried on the major part of its activities, are not covered by the procedure, the applicant was only a marginal participant in the infringement.

132   Moreover, the Irish and Spanish markets seem to have been regarded as part of the relevant geographical market (point 72 of the Decision), whereas the majority of the evidence adduced in the Decision does not refer to those national markets at all. In particular, the evidence on which the Commission relies in order to prove the existence of an agreement to increase prices refers to the Spanish and Irish markets only in the context of the October 1989, April 1990 and January 1991 price increases.

133   The Commission states that the arguments submitted by the applicant in its reply to the statement of objections are inadmissible because they have not been shown to be pertinent to the validity of the contested decision.

134   The proper approach in a case such as the present one is to demonstrate the existence, operation and salient features of the cartel as a whole and then to determine whether there is credible and persuasive proof to link each individual producer to the common scheme, and the period of each producer's participation. In that context it refers to point 116, second paragraph, of the Decision, according to which price collusion and volume control were inextricably linked aspects of the same overall plan.

135   As the objective of the PG Paperboard was in itself principally unlawful, the Commission assumes that any producer that was a member of the PG Paperboard and sat in its various committees was a participant in the cartel. The PWG and the JMC dealt almost exclusively with price fixing and market sharing.

136   Furthermore, as is shown in the Decision and the appendices to the statement of objections, there are numerous items of concrete evidence to show that the applicant participated in the infringement. The applicant is referred to in the key documents proving the existence of the cartel as a whole or its various aspects.

137  As to the second part of the plea, the Commission contends that the applicant's participation in price collusion has been proved. Its participation in the bodies of the cartel precludes it from arguing that the alleged time lag between the announcement of prices was the result of intelligent adjustment to the market conditions, and its reply to the statement of objections only goes to confirm its participation in the price collusion.

138  As regards the third part of the plea, the Commission observes that the applicant does not deny participating in the main bodies of the cartel, other than the PWG, and that the existence of the agreement and the concerted practice imputed to the applicant has been proved in regard to those bodies (see, *inter alia*, points 111 to 113 of the Decision). The Commission does not therefore have to have concrete evidence showing that each alleged participant expressly consented to or committed an overt act in support of each and every individual aspect or manifestation of the cartel throughout its duration (point 116 of the Decision). Reasons of substantive law and of practicality militate against such a fragmented approach, because the infringement consisted, in essence, in the combination of the producers over several years in a joint unlawful enterprise pursuant to a common design (*ibidem*).

139  Even if it was only the major producers which discussed, in particular, market shares and production downtime in the PWG, that does not mean that the smaller producers were not involved in that element of the infringement. They were aware of, and accepted, the market sharing policy adopted in the PWG (point 58 of the Decision); facilitated the implementation of the scheme for the control of sales volumes and market shares by supplying the necessary information to Fides; and were informed of the plans for downtime in the JMC (point 71).

140  The Commission contends that the fourth part of the plea should also be rejected.

ENSO ESPAÑOLA v COMMISSION

141   In that regard it refers, in essence, to the arguments set out above (see paragraph 76 et seq.). It emphasizes, however, that point 138 of the Decision states that there is no reliable evidence of price-fixing arrangements in Greece and Portugal, not that infringements did not take place in those countries. It also contests the applicant's allegation that there is an inconsistency between the statement that the Fides information exchange covered the whole of Europe and the statement that there is no evidence of agreements on prices in Greece and Portugal.

*Findings of the Court*

142   The Court will first examine the first three parts of the plea alleging that the applicant did not participate in the infringement found in Article 1 of the Decision. The fourth part, arguing that there was no adequate definition of the relevant geographical market will be examined separately.

The first three parts of the plea: the applicant did not participate in the infringement found in Article 1 of the Decision

143   First of all, the Court points out that under Article 44(1)(c) of the Rules of Procedure all applications must indicate the subject-matter of the proceedings and include a brief statement of the grounds relied on. The information given must be sufficiently clear and precise to enable the defendant to prepare its defence and the Court to decide the case, if appropriate without other information in support. In order to ensure legal certainty and the sound administration of justice, if an action is to be admissible, the essential facts and law on which it is based must be apparent from the text of the application itself, even if only stated briefly, provided the statement is coherent and comprehensible (see, for example, the order in Case T-56/92 *Koelman* v *Commission* [1993] ECR II-1267, paragraph 21).

144 In the present case, the Court finds that the applicant, in referring to the arguments submitted in its reply to the statement of objections, is not relying on a plea or argument which was not submitted in its application. The reference in the application to certain arguments set out in the reply to the statement of objections merely seeks to support and supplement the main body of the application on specific points. In those circumstances, the applicant's arguments in support of the present plea must be considered admissible.

145 The Court must examine, in the first place, whether the Commission has proved that the applicant participated in an infringement of Article 85(1) of the Treaty from March 1988 until February 1989, the month in which it admits that it began to participate in JMC meetings. It will then examine whether the Commission has proved that the applicant participated in an infringement of Article 85(1) of the Treaty in regard to the remaining period, that is to say, from February 1989 until April 1991.

1. Period from March 1988 until February 1989

146 The fourth paragraph of point 162 of the Decision states:

'Enso Española started attending meetings of a PG Paperboard grouping (the Economic Committee) on a regular basis in 1987 and the first President Conference it attended was that of 25 May 1988. It claims to have started going to the JMC only in February 1989. However, it did take part in the first price initiative of 1988 and its effective participation in the infringement may be taken to have begun at about that time.'

ENSO ESPAÑOLA v COMMISSION

147   As proof of the applicant's participation in an infringement of the Community competition rules during the period in question, the Commission relies on its participation in the PC meetings of 25 May and 17 November 1988 (Table 3 annexed to the Decision), in the Economic Committee meeting of 3 May 1988 (Table 6 annexed to the Decision) and, finally, its actual conduct in regard to prices.

148   Each of those items of evidence should be examined in the above order.

(a) The applicant's participation in meetings of the PC

149   As regards the applicant's participation in two specific meetings of the PC, the Commission does not advance any evidence as to the object of those meetings. Consequently, when it refers to that participation as evidence of the undertakings's participation in an infringement of Article 85(1) of the Treaty, it necessarily bases its assertion on the general description, set out in the Decision, of the object of the meetings of that body and on the evidence put forward in the Decision in order to support that description.

150   In that regard, the Decision states: 'As Stora has explained one of the PWG's functions included explaining to the President Conference the measures which were necessary to bring order to the market ... In this way, the managing directors attending the President Conferences were informed of the decisions taken by the PWG and of the instructions to be given to their sales departments to implement the agreed price initiatives' (point 41, first paragraph, of the Decision). The Commission also observes: 'The PWG invariably met before each scheduled President Conference, and since the same person was in the chair at both meetings, it was no doubt he who communicated the result of the PWG deliberations to others among the so-called "Presidents" who were not members of the inner circle' (point 38, second paragraph, of the Decision).

II - 1923

151    Stora has indicated that the participants in PC meetings were informed of decisions adopted by the PWG (appendix 39 to the statement of objections, point 8). However, the correctness of that assertion is contested by several of the undertakings which took part in PC meetings. In particular, it is contested implicitly by the applicant inasmuch as it disputes that it participated in an infringement of Article 85(1) of the Treaty. Consequently, Stora's statements relating to the PC's role cannot, unless supported by other evidence, be considered sufficient evidence of the object of the meetings of that body.

152    Admittedly, there is a document in the file, a statement of 22 March 1993 by a former member of the management of Feldmühle (Mr Roos), which at first sight corroborates Stora's assertions. Mr Roos indicates, *inter alia*, as follows: 'The content of the discussions in the PWG was communicated to the undertakings not represented in that group at the immediately following Presidents' Conference, or, if there was no immediate Presidents' Conference, at the JMC'. However, even though there is no express reliance on that document in the Decision in support of the Commission's assertions as to the object of the PC meetings, it cannot, on any view, be considered to constitute evidence supplementing Stora's statements. As those statements are a synthesis of the replies submitted by each of the three undertakings, including Feldmühle, owned by Stora during the period of the infringement, the former member of the management of Feldmühle necessarily constitutes one of the sources for the statements by Stora itself.

153    The Commission submits in the Decision that Appendix 61 to the statement of objections, a note discovered at Mayr-Melnhof's UK sales agent which refers to a meeting held in Vienna on 12 and 13 December 1986, is 'corroboration of Stora's admission that the President Conference did in fact discuss collusive pricing' (point 41, third paragraph, and point 75, second paragraph). That document contains the following:

'UK pricing

Recent Fides meeting included the representative of Weig stating that they thought 9% too high for the United Kingdom and were settling at 7%! Great disappoint-

ENSO ESPAÑOLA v COMMISSION

ment as it signals a "negotiating" level for everybody else. UK pricing policy will be left to RHU with the support of [Mayr-Melnhof] even if it means a *temporary* reduction in tonnes while we attempt (and be seen to attempt) to pursue 9%. [Mayr-Melnhof]/FS maintain a growth policy for UK but reduced returns are serious and we have to fight to regain control on pricing. [Mayr-Melnhof] accept that it doesn't help that they are known to have increased their tonnes in Germany by 6 000!'

154    Mayr-Melnhof states (reply to a request for information, appendix 62 to the statement of objections) that the Fides meeting referred to at the beginning of the passage quoted is probably the PC meeting of 10 November 1986, at which, according to Table 3 annexed to the Decision, the applicant was not present.

155    The document in question shows that Weig reacted to an initial level of price increase by indicating its future pricing policy in the United Kingdom.

156    It cannot, however, be considered to prove that Weig reacted in relation to a particular level of price increase agreed between the undertakings within the PG Paperboard before 10 November 1986.

157    The Commission does not rely on any other evidence to that effect. Moreover, Weig's reference to a price increase of '9%' may be explained by the price increase in the United Kingdom announced by Thames Board Ltd on 5 November 1986 (annex A-12-1). That announcement was made public shortly afterwards, as is clear from a press cutting (annex A-12-3). Lastly, the Commission has not pro-

duced any other document capable of constituting direct evidence that discussions on price increases took place at meetings of the PC. In those circumstances, it cannot be ruled out that Weig's remarks, as related in appendix 61 to the statement of objections, were made on the fringe of the meeting of the PC on 10 November 1986, as Weig repeatedly submitted at the hearing.

158    The Commission also states in the Decision that '[d]ocumentation found by the Commission at FS-Karton (part of the M-M group) confirms that at the end of 1987 agreement had been reached in the two Presidents' groups on the linked issues of volume control and price discipline' (point 53, first paragraph, of the Decision). It refers in that regard to appendix 73 to the statement of objections, a confidential note dated 28 December 1988 from the Marketing Director of the Mayr-Melnhof group in Germany (Mr. Katzner) to the Managing Director of Mayr-Melnhof in Austria (Mr Gröller) concerning the market situation.

159    The author of the note refers by way of introduction to the closer cooperation within the 'Presidents' grouping' ('Präsidentenkreis'), an expression interpreted by Mayr-Melnhof as a general reference to both the PWG and the PC, that is to say, without reference to a specific event or meeting (appendix 75 to the statement of objections, point 2. a).

160    Although the applicant does not dispute that appendix 73 to the statement of objections is corroborative evidence of Stora's statements concerning the existence of collusion on market shares between the undertakings allowed to participate in the 'Presidents' grouping' and of collusion on downtime between those same undertakings, the Commission has not, however, adduced any other evidence to confirm that the object of the PC was, *inter alia*, to discuss collusion on market shares and control of production volume. Consequently, the expression 'Presi-

dents' grouping' ('Präsidentenkreis') used in appendix 73 to the statement of objections cannot, despite the explanation supplied by Mayr-Melnhof, be construed as referring to bodies other than the PWG.

161  Having regard to the foregoing, the Commission has not proved that the meetings of the PC had an anti-competitive function alongside its lawful activities. It follows that it was not entitled to infer from the evidence relied upon that the undertakings which participated in meetings of the PC had taken part in an infringement of Article 85(1) of the Treaty.

162  The applicant's participation in two meetings of the PC does not therefore prove that it infringed Article 85(1) of the Treaty from March 1988 until February 1989.

b) The applicant's participation in one meeting of the Economic Committee

163  It is common ground that between March 1988 and February 1989 the applicant participated in only one meeting of the Economic Committee, that of 3 May 1988. Since the Commission has not adduced any evidence relating to that meeting, it is necessary to examine more generally whether the meetings of the Economic Committee had an anti-competitive object.

164  The Decision states that 'the "central theme" of the discussions of the Economic Committee was the analysis and assessment of the cartonboard market in the various countries' (point 50, first paragraph, of the Decision). The Economic Committee 'discussed *inter alia* price movements in national markets and order backlogs and reported its findings to the JMC (or its predecessor the Marketing Committee before the end of 1987)' (point 49, first paragraph, of the Decision).

165 According to the Commission, '[t]he discussions on market conditions were not unfocused; talks on the state of each national market must be seen in the context of the planned price initiatives, including the perceived need for temporary plant shutdowns to support price increases' (point 50, first paragraph, of the Decision). Furthermore, the Commission considers that: '[t]he Economic Committee may have been less directly concerned with price fixing as such but it is not credible that those who attended were unaware of the illicit purpose for which the information they knowingly provided to the JMC was to be used' (point 119, second paragraph, of the Decision).

166 To support its contention that the discussions held in the Economic Committee had an anti-competitive object, the Commission refers to a single document, a confidential note by a representative of FS-Karton concerning the essential points of the Economic Committee's meeting of 3 October 1989 (appendix 70 to the statement of objections).

167 In the Decision the Commission summarises the content of that document as follows:

'... in addition to a detailed survey of demand, production and orders in hand in each national market, the meeting was concerned with:

— perceived strong customer resistance to the last GC price increase, effective on 1 October,

— the respective state of the order backlog of the GC and GD producers, including individual positions,

— reports on downtime taken and planned,

— the particular problems of implementing the price increase in the United Kingdom and its effect on the necessary price differential between GC and GD grades,

— the comparison against budget of incoming orders for each national grouping' (point 50, second paragraph, of the Decision).

168   That description of the content of the document is, in essence, correct. However, the Commission does not rely on any evidence to support its assertion that appendix 70 to the statement of objections may be regarded 'as indicative of the real nature of the deliberations of that body' (point 113, last paragraph, of the Decision). Furthermore, Stora states: '[T]he JMC was set up at the end of 1987 and held its first meeting in early 1988 taking over part of the functions of the Economic Committee from that time. The other functions of the Economic Committee were taken over by the Statistical Committee' (appendix 39 to the statement of objections, point 13). At least as regards the period which commenced at the beginning of 1988, the only period during which the applicant is considered to have infringed Article 85(1) of the Treaty, Stora's statements do not therefore contain any evidence supporting the Commission's assertion concerning the allegedly anti-competitive object of that body's discussions. Nor, lastly, does the Commission refer to any evidence to support the view that the participants in the meetings of the Economic Committee were informed of the precise nature of the meetings of the JMC, the body to which the Economic Committee reported. Consequently, it cannot be ruled out that some participants in the Economic Committee's meetings who did not also participate in the meetings of the JMC were not aware of the precise use to which the reports prepared by the Economic Committee were put by the JMC.

169   Consequently, appendix 70 to the statement of objections does not demonstrate the true nature of the discussions which took place at meetings of the Economic Committee.

170 Furthermore, the Commission itself appears to take the view that participation in meetings of the Economic Committee does not constitute adequate proof of any infringement, because the applicant, which had been present at meetings of the Economic Committee in 1987, was not considered to have infringed the competition rules prior to March 1988.

171 In the light of the foregoing, the fact that the applicant took part, during the period in question, in one meeting of the Economic Committee does not prove that it participated in an infringement of Article 85(1) of the Treaty.

c) The applicant's actual conduct in regard to prices

172 As regards the period in question (March 1988 until February 1989), it is apparent from Table B annexed to the Decision that the Commission found that the applicant had implemented price increases in France and in the United Kingdom on 1 March and 1 April 1988 respectively, that is to say, on dates corresponding to those allegedly agreed in the bodies of the PG Paperboard. According to that same table, the Commission did not find that the applicant had increased its prices on other national markets upon the occasion of the March/April 1998 price increase initiative.

173 Furthermore, according to Table C annexed to the Decision, the Commission does not have any information regarding price increases by the applicant upon the occasion of the October 1988 price increase initiative.

174 In those circumstances, the applicant's actual conduct in regard to prices, as established by the Commission, does not corroborate the Commission's assertion that the applicant participated in an infringement of Article 85(1) of the Treaty.

(d) Conclusion relating to the period in question

175  Having regard to the whole of the foregoing considerations, the evidence on which the evidence relies, even considered as a whole, does not prove that the applicant participated in an infringement of Article 85(1) of the Treaty between March 1988 and February 1989.

2. Period between February 1989 and April 1991

176  According to Article 1 of the Decision, the undertakings referred to in that provision infringed Article 85(1) of the Treaty by participating, in the case of the applicant from March 1988 until at least the end of April 1991, in an agreement and concerted practice originating in mid-1986 whereby the suppliers of cartonboard in the Community, *inter alia*, 'agreed regular price increases for each grade of the product in each national currency' and 'planned and implemented simultaneous and uniform price increases throughout the Community', 'reached an understanding on maintaining the market shares of the major producers at constant levels, subject to modification from time to time', and 'increasingly from early 1990, took concerted measures to control the supply of the product in the Community in order to ensure the implementation of the said concerted price rises'.

177  It therefore follows that, according to the Decision, each of the undertakings referred to in Article 1 thereof infringed Article 85(1) of the Treaty by participating in a single infringement which consisted of collusion on three matters which were different but which pursued a common objective. Those three types of collusion must be regarded as the constituent elements of the overall cartel.

178   In those circumstances, the applicant's participation in each type of collusion must be examined separately.

a) The applicant's participation in price collusion

179   According to the Commission, the main purpose of the JMC was, from the outset:

'— to determine whether, and if so how, price increases could be put into effect and to report its conclusions to the PWG,

— to work out the details of the price initiatives decided by the PWG on a country-by-country basis and for the major customers with the aim of achieving an equivalent (i. e. uniform) price system in Europe ...' (point 44, last paragraph, of the Decision).

180   More specifically, the Commission maintains in the first and second paragraphs of point 45 of the Decision, that:

'This committee discussed market-by-market how the price increases agreed by the PWG were to be implemented by each producer. The practicalities of bringing proposed price increases into effect were addressed in "round table" discussions, with each participant having the chance to comment on the suggested increase.

Difficulties in the implementation of price increases decided by the PWG, or the occasional refusal to cooperate, were reported back to the PWG, which then (as Stora put it) "sought to achieve the level of cooperation considered necessary". Separate reports were made by the JMC for GC and GD grades. If the PWG

ENSO ESPAÑOLA v COMMISSION

modified a pricing decision on the basis of the reports it had received back from the JMC, the steps necessary to implement it would be discussed at the next meeting of the JMC'.

181   The Court finds that the Commission was entitled to refer to Stora's statements (appendices 35 and 39 to the statement of objections) as support for those findings as to the object of the meetings of the JMC.

182   Moreover, even if the Commission does not possess any official minutes of a meeting of the JMC, it obtained from Mayr-Melnhof and Rena some internal notes relating to the meetings of 6 September 1989, 16 October 1989 and 6 September 1990 (appendices 117, 109 and 118 to the statement of objections). Those notes, the tenor of which is given in points 80, 82 and 87 of the Decision, set forth the detailed discussions held during those meetings relating to concerted price initiatives. They therefore constitute evidence which clearly corroborates the description of the JMC's functions given by Stora.

183   In that regard, reference should be made by way of example to the note obtained from Rena regarding the JMC meeting of 6 September 1990 (Appendix 118 to the statement of objections), in which it is stated, *inter alia*:

'Price increase will be announced *next week in September*.

| | |
|---|---|
| FFF | 40 |
| L | 14 |
| DDM | 12 |
| ILIT | 80 |
| BBF | 2.50 |
| CHSF | 9 |
| GB£ | 40 |
| IRL£ | 45 |

All grades should be increased equally GD, UD, GT, GC etc.


Only 1 price increase a year.

For deliveries from 7 Jan.

Not later than 31st January.

14 of September letter with price increase (Mayr-Melnhof).

19 Sept. Feldmühle sending its letter.

Cascades before end of Sept.

All must have sent out their letters before 8 October.'


184  As the Commission explains in points 88 to 90 of the Decision, it was also able to obtain internal documents supporting the conclusion that the undertakings, and in particular those named in appendix 118 to the statement of objections, actually announced and implemented the agreed price increases.


185  As regards Appendix 117 to the statement of objections, a note relating to the JMC meeting of 6 September 1989, the Commission submits that it is evidence of collusion on the October 1989 price increase initiative. It states, in particular, that the note 'shows details of the price increases which had been announced in each currency and assesses customer reaction and the progress already being made towards implementation in each national market' (point 80, fifth paragraph, of the Decision). The applicant, which took part in the JMC meeting of 6 September 1989 (table 4 annexed to the Decision), does not dispute that Appendix 117 to the statement of objections refers to that meeting. Nor does it dispute the Decision's description of the subject-matter of that meeting.


186  The Commission's assertion that the undertakings referred to in Article 1 of the Decision monitored the implementation of the price increases (point 82 of the Decision) relates to Appendix 109 to the statement of objections, which concerns a

meeting of the JMC on 16 October 1989. The applicant does not dispute the Decision's description of the content of that document.

187   Even though the documents on which the Commission relies concern only a small number of the JMC's meetings held during the period covered by the Decision, all the available documentary evidence corroborates Stora's statement indicating that the main object of the JMC was to determine and plan the implementation of concerted price increases, and to monitor their actual implementation. The almost total absence of minutes, whether official or internal, of the meetings of the JMC must be regarded as sufficient proof of the Commission's assertion that the undertakings which participated in the meetings attempted to hide the true nature of the discussions in that body (see, in particular, point 45 of the Decision). In those circumstances, the burden of proof was reversed and it was for the addressees of the Decision which participated in the meetings of that body to prove that it had a lawful object. Since such proof was not adduced by those undertakings, the Commission was entitled to consider that the discussions which the undertakings held in the meetings of that body had a principally anti-competitive object.

188   As regards the applicant's own situation, its participation in nine meetings of the JMC, and in particular in that of 6 September 1989, must, in the light of the foregoing, be regarded as sufficient proof of its participation in collusion on prices.

189   The Court cannot accept the applicant's argument that its actual conduct on the market is inconsistent with the Commission's assertions regarding its participation in price collusion.

190   First, the existence of price collusion should not be confused with the implementation of the agreed price increases. The probative value of the evidence adduced by

the Commission is such that the information relating to the applicant's actual conduct on the market cannot undermine the Commission's conclusions as to the applicant's participation in price collusion. At the very most, the applicant's arguments might tend to show that its conduct did not follow that agreed between the undertakings meeting in the PG Paperboard.

191 Second, it is settled law that the fact that an undertaking does not abide by the outcome of meetings which have a manifestly anti-competitive purpose is not such as to relieve it of full responsibility for the fact that it participated in the cartel, if it has not publicly distanced itself from what was agreed in the meetings (see, for example, the judgment in Case T-141/89 *Tréfileurope Sales* v *Commission* [1995] ECR II-791, paragraph 85). Even assuming that the applicant's conduct on the market was not in conformity with the conduct agreed, that in no way affects its liability for an infringement of Article 85(1) of the Treaty, since it did not publicly distance itself from what was agreed at the meetings in which it took part.

192 Having regard to the foregoing considerations, the Commission has proved that the applicant participated in collusion on prices during the period from February 1989 until April 1991.

(b) The applicant's participation in collusion on downtime

193 According to the Decision, the undertakings present at PWG meetings participated, from the end of 1987, in collusion on downtime and downtime was actually taken as from 1990.

194 It is apparent from point 37, third paragraph, of the Decision that the true purpose of the PWG, as described by Stora, 'included "discussions and concertation on markets, market shares, prices, price increases and capacity"'. Moreover, referring to 'the agreement reached in the PWG during 1987' (point 52, first paragraph, of the Decision), the Commission states that that agreement aimed in particular to maintain 'constant levels of supply' (point 58, first paragraph, of the Decision).

195 As to the role played by the PWG in the collusion on the control of supply, which was a feature of the consideration of machine downtime, the Decision states that the PWG played a decisive role in implementing downtime when, from 1990, production capacity increased and demand fell: 'From the beginning of 1990 ... the industry leaders ... considered it necessary to concert on the need for taking downtime in the forum of the PWG. The major producers recognised that they could not increase demand by lowering prices and that maintaining full production would simply bring prices down. In theory, the amount of downtime required to bring supply and demand back into balance could be calculated from the capacity reports' (point 70 of the Decision).

196 It is also observed: 'However, the PWG did not formally allocate the "downtime" to be taken by each producer. According to Stora, there were practical difficulties in reaching a coordinated plan on downtime to cover all the producers. Stora says that for these reasons only "a loose system of encouragement existed"' (point 71 of the Decision).

197 The Court points out that Stora explains as follows (appendix 39 to the statement of objections, point 24): 'With adoption by the PWG of the policy of price before tonnage and the gradual implementation of an equivalent price system from 1988, members of the PWG recognised that downtime would have to be taken to maintain those prices in the face of a reduced growth in demand. Without taking down-

time the producers would have been unable to maintain agreed price levels in the face of an increasing excess of capacity'.

198    In point 25 of its statement, Stora adds: 'In 1988 and 1989 the industry was able to run at near full capacity. Downtime in addition to normal closure for repairs and holidays became necessary from 1990. ... Ultimately downtime had to be taken when the order flow ceased in order to maintain the price before tonnage policy. The amount of downtime required to be taken by producers (to maintain the balance between production and consumption) could be calculated from the capacity reports. No formal allocation of downtime was made by the PWG, although a loose system of encouragement existed ...'.

199    The Commission also bases its conclusions on Appendix 73 to the statement of objections (see point 158 above).

200    According to that document, cited in points 53 to 55 of the Decision, the closer cooperation within the 'Presidents' grouping' ('Präsidentenkreis') decided on in 1987 had produced 'winners' and 'losers'.

201    The reasons adduced by the author of the note in order to explain why he considered Mayr-Melnhof to be a 'loser' at the time when the note was written are significant evidence of the existence of collusion on downtime between the participants in the meetings of the PWG.

202   The author states:

   '(4) It is at this point that there begins to be a difference in opinion between the parties involved as to what is desired.

[...]

   (c) All sales representatives and European agents were released from their quantity budgets and a pricing policy followed which admitted of practically no exceptions (our employees often did not understand our changed attitude to the market — in the past they were just required to go for tonnage and now the sole objective is price discipline with the danger of having to stop machines).'

203   Mayr-Melnhof states (appendix 75 to the statement of objections) that the passage reproduced above refers to its own internal situation. However, when considered in the light of the more general background to the note, that passage reflects the implementation, at the level of sales personnel, of a rigorous policy adopted within the 'Presidents' grouping'. The document must therefore be construed as meaning that the participants in the 1987 agreement, that is to say, the participants in the meetings of the PWG at least, undoubtedly weighed up the consequences the agreed policy would have if it were to be applied rigorously.

204   On the basis of the foregoing, the Commission has proved that there was collusion on downtime between the participants in the meetings of the PWG.

205   According to the Decision, the undertakings which participated in the meetings of the JMC, the applicant amongst them, also took part in that collusion.

206   In that regard the Commission states, *inter alia*:

'Besides the Fides procedure which gave globalised figures, it was regular practice for each individual producer to disclose its own order backlog to competitors in JMC meetings.

This information on the number of days' orders in hand was relevant for two purposes:

— deciding whether conditions were right for introducing a concerted price increase,

— determining the downtime necessary to maintain the supply-demand balance ...' (point 69, third and fourth paragraphs, of the Decision).

207   The Commission also observes as follows:

'The unofficial notes made of two JMC meetings, one in January 1990 (see recital 84), the other in September 1990 (recital 87), as well as other documents (recitals 94 and 95) confirm, however, that the major producers kept their smaller competitors closely and continuously informed in the PG Paperboard of their

plans to take additional downtime as an alternative to decreasing prices' (point 71 of the Decision).

208    The documentary evidence relating to the JMC meetings (appendices 109, 117 and 118 to the statement of objections) confirm that discussions on downtime took place in the context of the preparation of concerted price increases. In particular, Appendix 118 to the statement of objections, a Rena note dated 6 September 1990 (see also paragraph 183 above), refers to the amounts of price increases in several countries, the dates for the future announcements of those increases and the state of the order backlogs expressed in working days for several manufacturers. The author of the document notes that certain manufacturers were providing for downtime, which he illustrates as follows:

'Kopparfors    5-15 days
                       5/9 will stop for five days'.

209    Moreover, although appendices 109 and 117 to the statement of objections do not contain information relating directly to the downtime envisaged, they show that the state of order backlogs and order entries were discussed at the JMC meetings of 6 September 1989 and 16 October 1989. The Court points out that the applicant took part in the JMC meeting of 6 September 1989 (see paragraph 185 above).

210    Those documents, read in conjunction with Stora's statements, constitute sufficient proof of participation in collusion on downtime by the producers represented at the JMC meetings. The undertakings participating in collusion on prices were necessarily aware that the object of examining the state of order backlogs and order entries and discussions on possible downtime was not merely to determine whether the market conditions were favourable to a concerted price increase but also to determine whether downtime was necessary in order to avoid the agreed price level being jeopardised by an excess of supply. In particular, it is apparent

JUDGMENT OF 14. 5. 1998 — CASE T-348/94

from appendix 118 to the statement of objections that the participants in the JMC meeting of 6 September 1990 agreed on the announcement of an imminent price increase, even though several producers had stated that they were preparing to stop production. Consequently, the market conditions were such that the effective application of a future price increase was going to require, in all probability, that (additional) downtime be taken, and this is therefore a consequence which was accepted, at least implicitly, by the producers.

211    On that basis, and without the need to consider the other evidence on which the Commission relies in the Decision (appendices 102, 113, 130 and 131 to the statement of objections), the Court finds that the Commission has proved that the undertakings participating in the meetings of the JMC and in the collusion on prices took part in collusion on downtime.

212    In that context, the Court must reject the applicant's argument that its non-participation in the collusion on downtime is proved by the fact that it never stopped production.

213    First, the Commission accepts in the Decision that it was the main producers which took upon themselves the burden of reducing output so as to maintain price levels (point 71, second paragraph).

214    Second, even assuming that it had been proved that the applicant used its production capacities to the maximum and that such utilisation was not in accordance with what had been agreed with its competitors in the JMC, that does not prove that it did not participate in collusion on downtime (see, in particular, Case T-6/89 *Enichem Anic* v *Commission* [1991] ECR II-1623, paragraph 165).

215   The applicant must therefore be considered to have participated from February 1989 until April 1991 in collusion on downtime.


   (c) The applicant's participation in collusion on market shares


216   The applicant disputes that it participated in collusion on market shares, but does not challenge the assertion in the Decision that the producers which participated in the PWG meetings concluded an agreement which provided for 'the "freezing" of the west European market shares of the major producers at existing levels, with no attempts to be made to win new customers or extend existing business through aggressive pricing' (point 52, first paragraph, of the Decision).


217   In those circumstances, the Court points out that the Commission states as follows in the Decision in regard to the undertakings which did not participate in the meetings of the PWG:


'While the smaller cartonboard producers attending meetings of the JMC were not privy to the detailed discussions on market shares in the PWG, they were, as part of the "price before tonnage" policy to which they all subscribed, well aware of the general understanding between the major producers to maintain "constant levels of supply" and no doubt of the need to adapt their own conduct to it' (point 58, first paragraph, of the Decision).

218  Although it does not emerge expressly from the Decision, the Commission is in this respect confirming Stora's statements according to which:

'Other producers who did not participate in the PWG were not generally informed of the detail of the market share discussions. Nevertheless, as part of the price before tonnage policy in which they participated, they would have been aware of the understanding by the major producers not to undermine prices by maintaining constant levels of supply.

As regards the supply of GC grades, in any event, the shares of the producers who did not participate in the PWG were of such an insignificant level that their participation or non-participation in the market share understandings had virtually no impact one way or the other' (appendix 43 to the statement of objections, point 1.2).

219  The Commission, like Stora, is therefore proceeding from the assumption that, even in the absence of direct evidence, the undertakings which did not participate in meetings of the PWG but which have been proved to have subscribed to the other constituent elements of the infringement set out in Article 1 of the Decision must have been aware of the existence of collusion on market shares.

220  Such a line of reasoning cannot be accepted. First, the Commission does not rely on any evidence to show that the undertakings which were not present at the meetings of the PWG subscribed to a general agreement providing, in particular, for the freezing of the market shares of the main producers.

221  Second, the mere fact that those undertakings participated in collusion on prices and collusion on downtime does not demonstrate that they also participated in collusion on market shares. Contrary to the Commission's apparent claim, the

collusion on market shares was not intrinsically linked to collusion on prices and/ or collusion on downtime. It suffices to point out that the aim of the collusion on market shares by the main producers who met in the PWG was, according to the Decision (see paragraphs 78 to 80 above), to maintain market shares at constant levels, with occasional amendments, even during periods in which market conditions, and in particular the balance between supply and demand, were such that it was unnecessary to control production in order to guarantee the effective implementation of the agreed price increases. It follows that any participation in collusion on prices and/or collusion on downtime does not show that the undertakings which were not present at the meetings of the PWG participated directly in collusion on market shares, or that they were, or necessarily should have been, aware of it.

222   Lastly, in the second and third paragraphs of point 58 of the Decision, the Commission relies, as additional evidence to support the assertion in question, on appendix 102 to the statement of objections setting out a note obtained from Rena which, according to the Decision, relates to a special meeting of the Nordic Paperboard Institute held on 3 October 1988. It suffices to state that the applicant was not a member of the Nordic Paperboard Institute and that the reference in that document to a possible necessity to take downtime cannot, for the reasons already stated, constitute evidence of collusion on market shares.

223   In order to be entitled to hold each addressee of a decision, such as the present decision, responsible for an overall cartel during a given period, the Commission must demonstrate that each undertaking concerned either consented to the adoption of an overall plan comprising the constituent elements of the cartel or that it participated directly in all those elements during that period. An undertaking may also be held responsible for an overall cartel even though it is shown that it participated directly only in one or some of the constituent elements of that cartel, if it is shown that it knew, or must have known, that the collusion in which it participated was part of an overall plan and that the overall plan included all the constituent elements of the cartel. Where that is the case, the fact that the undertaking concerned did not participate directly in all the constituent elements of the overall

cartel cannot relieve it of responsibility for the infringement of Article 85(1) of the Treaty. Such a circumstance may nevertheless be taken into account when assessing the seriousness of the infringement which it is found to have committed.

224   In the present case, the Court finds that the Commission has not proved that the applicant knew, or must have known, that its own unlawful conduct was part of an overall plan which included, over and above the collusion on prices and the collusion on downtime in which it actually participated, also collusion on the market shares of the major producers.

225   In the light of the foregoing, the Commission has not proved that the applicant participated in collusion on market shares between March 1989 and April 1991.

(d) The applicant's participation in a common industry plan to restrict competition

226   The applicant's argument must be understood as a plea that the Commission infringed Article 85(1) of the Treaty in taking the view that it sufficed for it to prove the existence, functioning, and principal characteristics of the cartel as a whole, and then to establish the existence of credible and persuasive proof to link each individual producer to the common scheme, and to determine the period during which each producer participated (point 116 of the Decision).

227   It has already been found that the Commission has proved that the applicant participated during the period in question in collusion on prices and on downtime, but not in collusion on market shares.

II - 1946

228    As regards the applicant, the common industry plan to restrict competition in
       which, according to Article 1 of the Decision, it took part therefore related only to
       collusion on prices and on downtime.


       (e) Conclusions regarding the period from February 1989 until April 1991


229    Having regard to the whole of the foregoing, the eighth indent of Article 1 of the
       Decision, according to which the object of the agreement and concerted practice in
       which it participated was to '[maintain] the market shares of the major producers
       at constant levels, subject to modification from time to time' must be annulled as
       against the applicant.


230    For the remainder, the Commission has proved that the applicant participated
       from February 1989 until April 1991 in the infringement found in Article 1 of the
       Decision.


       The fourth part of the plea: no definition of the relevant geographical market


231    Article 85(1) of the Treaty prohibits 'all agreements between undertakings, deci-
       sions by associations of undertakings and concerted practices which may affect
       trade between Member States and which have as their object or effect the preven-
       tion, restriction or distortion of competition within the common market.'


232    In the present case, the Commission took the view that the applicant had partici-
       pated in an agreement and concerted practice, the object of which was to restrict

competition within the common market and which affected trade between Member States (points 133 to 138 of the Decision). As has already been found (see paragraph 112 above), it is clear from the grounds of the Decision that the Commission took the view that the collusion between the undertakings covered the whole of the territory of the Community. Since the Commission therefore found that there had been an infringement whose object was to restrict competition throughout the Community, it was not necessary first to define the geographical market before it found that there was such a restriction of competition (see, to the same effect, Joined Cases 56/64 and 58/64 *Consten and Grundig* v *Commission* [1966] ECR 299, 342 and Case T-29/92 *SPO and Others* v *Commission* [1995] ECR II-289, paragraph 74).

233    The applicant cannot claim that, having regard to point 138 of the Decision, the anti-competitive acts did not relate to the Portuguese and Greek markets. In that point of the Decision, the Commission refers to the pervasive nature of the collusive arrangements, which covered virtually all trade throughout the Community in a major industrial product. The footnote stating that 'the only Member States for which there is no reliable evidence of price fixing arrangements were Portugal and Greece, which have no domestic cartonboard producer' must, in the light of all the grounds of the Decision and its operative part, be understood as meaning that, in the Commission's view, the whole of the Community market was affected by the infringement found, even though there was no specific proof in regard to the Portuguese and Greek markets.

234    It follows that the Commission did not state that the anti-competitive acts alleged in the Decision did not cover the Greek and Portuguese markets. As the applicant's allegation of a contradiction in the Decision (see paragraph 130 above) is incorrect, its argument must be rejected.

235    The fourth part of the plea must therefore be rejected.

236   It follows from the foregoing that Article 1 of the Decision must be annulled as regards the applicant inasmuch as it states that the applicant participated in an infringement of Article 85(1) of the Treaty prior to February 1989. Furthermore, the eighth indent of Article 1 of the Decision, according to which the object of the agreement and concerted practice in which it participated was to '[maintain] the market shares of the major producers at constant levels, subject to modification from time to time' must be annulled as regards the applicant.

237   The remainder of the plea must be rejected.

**The application for annulment or reduction of the fine**

A — *The plea of infringement of Article 190 of the Treaty in regard to the fines*

*Arguments of the parties*

238   The applicant pleads infringement of the obligation to state reasons for the Commission's method of calculating the amount of the fine. It states, in particular, that the Commission did not indicate either the reference year adopted for the purpose of applying the percentage of turnover, or the percentage of turnover adopted as a basic rate before mitigating and aggravating factors were taken into account, or even the turnover figure which it took. Similarly, a mere list of the circumstances which the Commission allegedly took into account in order to determine the amount of the fines does not constitute an adequate statement of reasons.

239 The right to effective judicial review presupposes that undertakings are able to verify whether the undertakings accused jointly of participating in a collective, single and continuous infringement have been treated without discrimination. In holding that it was unacceptable for persons to have to bring court proceedings in order to determine details of the method of calculating the fine imposed (Case T-148/89 *Tréfilunion* v *Commission* [1995] ECR II-1063, paragraph 142), the Court laid down a general principle that sufficient information must be made available to the persons concerned to enable them to understand the method of calculation used. Such information should therefore be supplied, *a fortiori*, during the procedure before the Court.

240 A distinction must be made between the Commission's discretion in regard to the determination of the amount of the fines to be imposed and its obligation to state the reasons on which its decisions are based. The Commission's discretion cannot override the right to effective judicial protection. The Commission must therefore provide detailed explanations of the manner in which it reached the final percentage of turnover adopted in order to fix each fine. That would not undermine the secret nature of the Commission's discussions, nor involve disclosure of the undertakings' business secrets. The turnover achieved by the undertakings to which the Decision was addressed are neither secret nor confidential.

241 The Commission states that the applicant has misinterpreted the judgment in *Tréfilunion* v *Commission*, cited above. In that judgment the Court held that the objection grounded on failure to state reasons could not be upheld, since the statement of reasons in the Decision had to be considered adequate. In the present case too, the Commission gave an adequate statement of reasons for the fine imposed on the applicant, in accordance with the relevant case-law of the Court of Justice (points 167 to 172 of the Decision).

242 As regards the applicant's assertion that the indication of the percentage of turnover used in order to fix the amount of the fine does not disclose confidential information of the undertakings which took part in the cartel, the Commission

points out that such information is normally published as an aggregate figure, which does not allow competitors accurately to ascertain the turnover of the undertaking in question in a given sector of its business, still less on a particular product market.

*Findings of the Court*

243   The Court has already drawn attention to the purpose of the obligation to state the reasons on which an individual decision is based (see paragraph 109 above).

244   As regards a decision which, as in this case, imposes fines on several undertakings for infringement of the Community competition rules, the scope of the obligation to state reasons must be assessed in the light of the fact that the gravity of infringements falls to be determined by reference to numerous factors including, in particular, the specific circumstances and context of the case and the deterrent character of the fines; moreover, no binding or exhaustive list of criteria to be applied has been drawn up (order in Case C-137/95 P *SPO and Others* v *Commission* [1996] ECR I-1611, paragraph 54).

245   Moreover, when fixing the amount of each fine, the Commission has a margin of discretion and cannot be considered obliged to apply a precise mathematical formula for that purpose (see, to the same effect, the judgment in Case T-150/89 *Martinelli* v *Commission* [1995] ECR II-1165, paragraph 59).

246   In the Decision, the criteria taken into account in order to determine the general level of fines and the amount of individual fines are set out in points 168 and 169

JUDGMENT OF 14. 5. 1998 — CASE T-348/94

respectively. Moreover, as regards the individual fines, the Commission explains in point 170 that the undertakings which participated in the meetings of the PWG were, in principle, regarded as 'ringleaders' of the cartel, whereas the other undertakings were regarded as 'ordinary members'. Lastly, in points 171 and 172, it states that the amounts of fines imposed on Rena and Stora must be considerably reduced in order to take account of their active cooperation with the Commission, and that eight other undertakings, including the applicant, were also to benefit from a reduction, to a lesser extent, owing to the fact that in their replies to the statement of objections they did not contest the essential factual allegations on which the Commission based its objections.

247   In its written pleas to the Court and in its reply to a written question put by the Court, the Commission explained that the fines were calculated on the basis of the turnover on the Community cartonboard market in 1990 of each undertaking addressed by the Decision. Fines of a basic level of 9 or 7.5% of that individual turnover were then imposed, respectively, on the undertakings considered to be the cartel 'ringleaders' and on the other undertakings. Finally, the Commission took into account any cooperation by undertakings during the procedure before it. Two undertakings received a reduction of two-thirds of the amount of their fines on that basis, while other undertakings received a reduction of one-third.

248   Moreover, it is apparent from a table produced by the Commission containing information as to the fixing of the amount of each individual fine that, although those fines were not determined by applying the abovementioned figures alone in a strictly mathematical way, those figures were, nevertheless, systematically taken into account for the purposes of calculating the fines.

249   However, the Decision does not state that the fines were calculated on the basis of the turnover of each undertaking on the Community cartonboard market in 1990. Furthermore, the basic rates of 9 and 7.5% applied to calculate the fines imposed

on the undertakings considered to be 'ringleaders' and those considered to be 'ordinary members' do not appear in the Decision. Nor does it set out the rates of reduction granted to Rena and Stora, on the one hand, and to eight other undertakings, on the other.

250  In the present case, first, points 169 to 172 of the Decision, interpreted in the light of the detailed statement in the Decision of the allegations of fact against each of its addressees, contain a relevant and sufficient statement of the criteria taken into account in order to determine the gravity and duration of the infringement committed by each of the undertakings in question (see, to the same effect, Case T-2/89 *Petrofina* v *Commission* [1991] ECR II-1087, point 264). Similarly, point 168 of the Decision, which must be read in the light of the general criteria concerning the fines in point 167, contains an adequate statement of the criteria taken into account in order to determine the general level of the fines.

251  Second, where, as in the present case, the amount of each fine is determined on the basis of the systematic application of certain precise figures, the indication in the decision of each of those factors would permit undertakings better to assess whether the Commission erred when fixing the amount of the individual fine and also whether the amount of each individual fine is justified by reference to the general criteria applied. In the present case, the indication in the Decision of the factors in question, namely the reference turnover, the reference year, the basic rates adopted, and the rates of reduction in the amount of fines would not have involved any implicit disclosure of the specific turnover of the addressee undertakings, a disclosure which might have constituted an infringement of Article 214 of the Treaty. As the Commission has itself stated, the final amount of each individual fine is not the result of a strictly mathematical application of those factors.

252  The Commission also accepted at the hearing that nothing prevented it from indicating in the Decision the factors which had been systematically taken into account

and which had been divulged at a press conference held on the day on which that decision was adopted. In that regard, it is settled law that the reasons for a decision must appear in the actual body of the decision and that, save in exceptional circumstances, explanations given *ex post facto* cannot be taken into account (see Case T-61/89 *Dansk Pelsdyravlerforening* v *Commission* [1992] ECR II-1931, paragraph 131, and, to the same effect, Case T-30/89 *Hilti* v *Commission* [1991] ECR II-1439, paragraph 136).

253    Despite those findings, the reasons explaining the setting of the amount of fines stated in points 167 to 172 of the Decision are at least as detailed as those provided in the Commission's previous decisions on similar infringements. Although a plea alleging insufficient reasons concerns a matter of public interest, there had been no criticism by the Community judicature, at the moment when the decision was adopted, as regards the Commission's practice concerning the statement of reasons for fines imposed. It was only in the judgment of 6 April 1995 in *Tréfilunion* v *Commission*, cited above, paragraph 142, and in two other judgments given on the same day (T-147/89 *Société Métallurgique de Normandie* v *Commission* [1995] ECR II-1057, summary publication, and T-151/89 *Société des Treillis et Panneaux Soudés* v *Commission* [1995] ECR II-1191, summary publication), that this Court stressed for the first time that it is desirable for undertakings to be able to ascertain in detail the method used for calculating the fine imposed without having to bring court proceedings against the Commission's decision in order to do so.

254    It follows that, when it finds in a decision that there has been an infringement of the competition rules and imposes fines on the undertakings participating in it, the Commission must, if it systematically took into account certain basic factors in order to fix the amount of fines, set out those factors in the body of the decision in order to enable the addressees of the decision to verify that the level of the fine is correct and to assess whether there has been any discrimination.

ENSO ESPAÑOLA v COMMISSION

255 In the specific circumstances set out in paragraph 253 above, and having regard to the fact that in the procedure before the Court the Commission showed itself to be willing to supply any relevant information relating to the method of calculating the fines, the absence of specific grounds in the Decision regarding the method of calculation of the fines should not, in the present case, be regarded as constituting an infringement of the duty to state reasons such as would justify annulment in whole or in part of the fines imposed.

256 This plea cannot therefore be upheld.

B — *The plea alleging incorrect assessment of the criteria adopted in the Decision in order to determine the fine*

*Arguments of the parties*

257 The applicant contests, first, the Commission's assertion that the addressees of the Decision committed a deliberate infringement and attempted to disguise the existence of the cartel (point 167 of the Decision). In the case of the applicant, the documents in the file do not support this assertion.

258 Second, the Commission should have taken into account the fact that the applicant's business was concentrated on the Portuguese, Greek, Irish and Spanish markets, that is to say, national markets not covered by the Decision.

259    Third, the Commission did not correctly apply to the applicant the criterion of the particular role played by each undertaking in the collusive arrangements (point 169, first paragraph, first indent, of the Decision). Not only did it not set out the precise extent to which each undertaking participated and operated in the cartel, but it merely made an overgeneralised distinction between the 'ringleaders' and the other undertakings. That distinction was the criterion for application of the two rates of 9 and 7.5%. The former rate was adopted in regard to the 'ringleaders', who, according to the statements made to the press by the member of the Commission responsible for competition matters, were those who had decided upon and imposed the arrangements. The latter rate was applied to the other undertakings, including the applicant. However, those two rates do not appropriately reflect the role played by each undertaking in the collusive arrangements. The difference between the two rates is proportionately much less than that adopted in previous similar cases. On that point, the applicant sets out in a table the different fines, expressed as percentages, imposed in this case and in previous similar cases on the undertakings deemed to be 'ringleaders' or 'other undertakings'.

260    According to the Commission, where the infringement of the competition rules is as flagrant as it was in this case, the applicant cannot genuinely claim to have been unaware that its acts were unlawful. Furthermore, it has been proved that documentary evidence of the activities of the PWG and of the JMC was suppressed in order to conceal the unlawful conduct.

261    As regards the geographical scope of the infringement, the Commission refers to the arguments already submitted by it (see point 76 et seq. and point 141 above).

262    Lastly, it considers that by distinguishing the categories of participants (point 170 of the Decision) it adequately took into account the role played by the various undertakings in the cartel.

II - 1956

ENSO ESPAÑOLA v COMMISSION

*Findings of the Court*

263 According to the third paragraph of point 167 of the Decision, 'a particularly grave aspect of the infringement is that in an attempt to disguise the existence of the cartel the undertakings went so far as to orchestrate in advance the date and sequence of the announcement of each major producer of the new price increases'. The Decision also states as follows: 'the producers could as a result of this elaborate scheme of deception have attributed the series of uniform, regular and industry-wide price increases in the cartonboard sector to the phenomenon of "oligopoly behaviour"' (point 73, third paragraph). Finally, according to the sixth indent of point 168, the Commission, in determining the general level of fines, took into account the fact that 'elaborate steps were taken to conceal the true nature and extent of the collusion (absence of any official minutes or documentation for the PWG and JMC; discouraging the taking of notes; stage-managing the timing and order in which price increases were announced so as to be able to claim they were "following", etc.)'.

264 The Commission rightly inferred from the evidence obtained that the undertakings pre-arranged the dates and order of letters announcing price increases in an attempt to disguise the existence of the concertation on prices. This pre-arrangement is clear in particular from Stora's statements (appendix 39 to the statement of objections, point 30): '[t]here was no standard procedure for who would announce a price increase first and who would follow. The PWG would discuss and agree on who would announce each price increase first and the dates of announcements of the other main producers. The pattern was not the same each time.' Its existence is also confirmed by the Rena note concerning the JMC meeting of 6 September 1990 (appendix 118 to the statement of objections). That document contains precise indications regarding the dates for the announcement of the January 1991 price increases for certain member undertakings of the PWG (Mayr-Melnhof, Feldmühle and Cascades), dates which correspond exactly to the dates on which those undertakings actually sent their announcement letters (see points 87 and 88 of the Decision).

JUDGMENT OF 14. 5. 1998 — CASE T-348/94

265 The absence of official minutes and the almost total absence of internal notes relating to the meetings of the PWG and of the JMC constitute, having regard to the number of such meetings, to the length of time for which they continued and to the nature of the discussions in question, sufficient proof of the Commission's allegation that the participants were discouraged from taking notes.

266 It follows from the foregoing that the undertakings which participated in the meetings of those bodies were not only aware of the unlawfulness of their conduct but also took steps to conceal the collusion. Accordingly, the Commission was fully entitled to hold those steps to be aggravating circumstances when assessing the gravity of the infringement.

267 Next, as regards the applicant's argument that the Commission should have taken into account the fact that its business was concentrated on the Portuguese, Greek, Irish and Spanish markets, it suffices to find that it is apparent from the Decision that those markets were covered by the collusion between the undertakings (see paragraph 112 above). In those circumstances, the Commission did not commit an error of assessment in taking into account, in order to determine the amount of the fine, the turnover achieved by each undertaking on the Community cartonboard market in 1990.

268 Finally, as regards the applicant's argument that the Commission did not correctly assess the role which it played in the collusive arrangements, the Court points out that the Commission has proved that, because the applicant participated in the JMC meetings, it took part in collusion on prices and collusion on downtime from February 1989 until April 1991.

269 On the other hand, the Court has found that the applicant could not be held responsible for collusion on market shares.

270  Despite that finding, the Court considers, in the exercise of its unlimited jurisdiction, that the gravity of the infringement of Article 85(1) of the Treaty which the applicant is found to have committed, namely its participation in the collusion on prices and on downtime, is still such that the amount of the fine should not be reduced.

271  In that regard, the Court observes that the applicant did not participate in the PWG meetings and fines were not therefore imposed upon it as a cartel 'ringleader'. Because, as the Commission itself states, the applicant was not a 'prime mover' of the cartel (point 170, first paragraph, of the Decision), the level of fine adopted in regard to it was 7.5% of its turnover on the Community cartonboard market in 1990. That general level of the fines is justified (see paragraph 349 et seq. below).

272  Furthermore, even though the Commission wrongly considered that producers which were not represented in the PWG were 'well aware' of the collusion on market shares (point 58, first paragraph, of the Decision), it is nevertheless clear from the Decision itself that it was the undertakings meeting in the PWG which took concerted action on the 'freezing' of market shares (in particular point 52 of the Decision) and that there was no discussion of the market shares held by the producers which were not represented in it. Moreover, as the Commission stated in point 116, second paragraph, of the Decision, 'by their very nature the market sharing arrangements (particularly the freezing of shares described in recitals 56 and 57) involved primarily the major producers'. The collusion on market shares wrongly attributed to the applicant was therefore, in the Commission's own view, merely a secondary aspect of collusion on prices.

273  Inasmuch as the applicant submits that the fine imposed on it is excessive in comparison with the fines imposed on the 'ringleaders', the Court finds that the Commission rightly considered that undertakings which participated in the meetings of the PWG had to bear a special responsibility for the infringement (point 170 of the Decision). It then correctly evaluated the gravity of the infringement committed by the 'ringleaders' of the cartel and by 'ordinary members' respec-

tively, by adopting, for the purpose of calculating the fines imposed on those two categories of undertakings, basic rates of 9 and 7.5% of relevant turnover.

274  In that context, it must be emphasised that the applicant has not advanced specific evidence to support its claim that the basic rates adopted for the purpose of calculating the fines do not correctly reflect the special responsibility to be borne by the undertakings which participated in the meetings of the PWG.

275  In the light of the foregoing, the plea cannot be upheld.

*C — The plea alleging that the applicant did not commit the infringement intentionally or negligently*

276  The applicant submits that the fine is unjustified because it did not commit the infringements deliberately or through gross negligence. It must be inferred from the wording of Article 15(2) of Regulation No 17 that there is a third category of conduct which is exempt from fines, that is to say, actions performed by undertakings wholly innocently or involuntarily.

277  That plea cannot be upheld. It is settled case-law that it is not necessary for an undertaking to have been aware that it was infringing Article 85(1) of the Treaty for an infringement to be regarded as having been committed intentionally. It is sufficient that it could not have been unaware that the contested conduct had as its object or effect the restriction of competition in the common market (Case 246/86

ENSO ESPAÑOLA v COMMISSION

*Belasco and Others* v *Commission* [1989] ECR 2117, paragraph 41, and *Dansk Pelsdyravlerforening* v *Commission*, cited above, paragraph 157).

278   In the present case, the Commission has proved that, because the applicant participated in the JMC meetings, it participated in collusion on prices and collusion on downtime during the period from February 1989 until April 1991. Having regard to the nature of the actions it was found to have committed, the applicant must have been aware that their object was to restrict competition.

D — *The plea alleging that the fine was incorrectly calculated*

*Arguments of the parties*

279   This plea is in two parts.

280   In the first part, the applicant submits that when the Commission determined the amount of the fine it should not have taken into consideration the applicant's turnover on the markets which were not, according to the statement of objections, covered by the infringement, that is to say, the Spanish, Irish, Greek and Portuguese markets. Nor does the applicant know whether the Commission used the turnover corresponding to net sales volume.

281   In the second part, the applicant asserts that there are several factors which mitigate the gravity of the infringement. Those factors were not adequately taken into account by the Commission.

282   First, the Commission should have taken the applicant's conduct in the cartel into account (Case 44/69 *Buchler* v *Commission* [1970] ECR 733, paragraph 56), which was characterised by a lack of protective policy on its national market and an increase in penetration of other markets.

283   Second, the applicant's limited or passive participation in the PG Paperboard did not merit a fine or, at most, merited only a small fine (see Commission Decision 73/109/EEC of 2 January 1973 relating to a proceeding under Articles 85 and 86 of the EEC Treaty (IV/26.918 — European sugar industry) (OJ 1973 L 140, p. 17) and Commission Decision 84/405/EEC of 6 August 1984 relating to a proceeding under Article 85 of the EEC Treaty (IV/30.350 — Zinc Producer Group) (OJ 1984 L 220, p. 27)).

284   Its role as 'outsider' is clear from the tables annexed to the Decision, which show that it is alleged to have participated in only four of the seven price initiatives: the Commission alleges that the applicant participated in price initiatives on only one or two of the six markets involved. Moreover, the applicant is not accused of having done so in respect of different grades of cartonboard.

285   Third, it did not implement the decisions allegedly adopted. In particular, the fact that it considerably increased its exports (Commission Decision 69/240/EEC of 16 July 1969 relating to a proceeding under Article 85 of the Treaty (IV/26.623 — International quinine cartel) (OJ 1969 L 192, p. 5)) and the fact that it did not participate in the price increase on one of the markets to which the collusion related (Commission Decision 69/243/EEC of 24 July 1969, relating to a proceeding under Article 85 of the EEC Treaty (IV/26.267 — Dyestuffs) (OJ 1969 L 195, p. 11)) should have been taken into account by the Commission.

286   Furthermore, the Commission has not adduced sufficient evidence of the applicant's actual conduct.

287   Fourth, lack of intention to commit an infringement should, at least, lead to a reduction in the fine. As regards, in particular, the information exchange system, the applicant had only recently become aware of the Community competition rules, following the accession of the Kingdom of Spain to the Community in 1986. Such knowledge cannot be compared to the other undertakings' long-standing awareness.

288   Fifth, the fact that it was the first time that the practices had been held to be contrary to competition law justifies a reduction in the fine. The same is true of the — novel — classification of the information exchange as an infringement of the competition rules.

289   Sixth, the Commission and the Court have always taken the view that a crisis or continuous recession in the industry in question should regarded as a mitigating factor.

290   Furthermore, the applicant's own loss-making situation during the years covered by the alleged cartel should have been taken into account.

291   Seventh, the applicant's small size in comparison with the European producers as a whole should have been taken into account when the amount of the fine was evaluated in economic terms. A mere reference to point 169 of the Decision does not disclose whether that factor was actually taken into account when the fine was determined.

292  Eighth, the applicant considers that the fact that no measures were taken to monitor the implementation of the alleged cartel (points 82 and 136 of the Decision) is also a ground for reducing the fine.

293  Finally, it considers that there is no foundation for the Commission's claim that the Court should increase its fine by one third. It has not changed its position in relation to that adopted during the procedure before the Commission.

294  The Commission contends that its decision to use the turnover in the Community of the undertakings which participated in the infringement is within the limits of its discretion under Article 15(2) of Regulation No 17.

295  As regards the alleged mitigating circumstances, it submits that neither the applicant's decision to increase its production capacity in the expectation of an increase in demand, nor its alleged aggressive export policy, can be regarded as inconsistent with the cartel's aims or its active participation in it.

296  It correctly assessed the applicant's role in the cartel by not including it amongst the 'ringleaders'. Moreover, it correctly assessed the applicant's acts in the light of Article 85(1).

297  As regards the mitigating factor said to result from the fact that the information exchange had not previously been held to be an infringement, the Commission states that the use of an information exchange system as a support for a cartel cannot be regarded as a novel infringement of competition law.

ENSO ESPAÑOLA v COMMISSION

298   The situation in the industry does not justify a reduction in the fine. Furthermore, it is not required to take the financial situation of the undertakings into account when it fixes the fine (judgment in Joined Cases 96/82 to 102/82, 104/82, 105/82, 108/82 and 110/82 *IAZ and Others* v *Commission* [1983] ECR 3369, paragraph 55).

299   The applicant's small size was duly taken into consideration, as the respective importance of each undertaking in the industry was taken into account in order to determine the amount of the fine (point 169 of the Decision).

300   Finally, as to the alleged absence of measures to monitor the implementation of the cartel, it is apparent from points 82 and 136 of the Decision that steps were taken by the members of the cartel in the JMC, *inter alia*, to track the price initiatives, sales and order backlogs, which enabled them to monitor and discipline undertakings which had not adopted the agreed course of conduct.

301   The Commission concludes that this plea has no foundation whatsoever. It also requests the Court, in the exercise of its unlimited jurisdiction in relation to fines, to increase the fine imposed on the applicant by at least one third, the amount corresponding to the reduction in the fine awarded to it for not disputing, in the reply to the statement of objections, the principal allegations of fact on which the Commission based its complaints. The reduction in the fine has no longer any real justification in fact, because the applicant has contested before the Court all aspects of the infringement other than its participation in the meetings.

*Findings of the Court*

302   The Court has already held that, as the Portuguese, Greek, Irish and Spanish markets were covered by the Decision, the Commission did not commit an error of assessment when, in order to determine the amount of the fine, it took into account the turnover achieved by each of the undertakings on the Community cartonboard market in 1990, including turnover on the national markets in question (see paragraph 267 above).

303   The first three factors on which the applicant relies, namely its conduct in the cartel, its restricted and passive participation in the bodies of the PG Paperboard and its failure to implement the price increases agreed in the PG Paperboard, all seek to contest the Commission's assessment of the applicant's role in the cartel.

304   The Commission has proved that, because the applicant participated in the JMC meetings, it participated in collusion on prices and on downtime during the period from February 1989 until April 1991. Moreover, as the Court has already found, the fact that the infringement committed by the applicant did not extend to collusion on market shares does not justify a reduction in the fine imposed.

305   In the present case, the applicant cannot claim that it played a less active role in the cartel than the other undertakings considered to be its 'ordinary members'. It is clear from Table 4 annexed to the Decision that from February 1989 until April 1991 it was a regular participant in the JMC meetings.

306  Furthermore, the fact that an undertaking which has been proved to have participated in collusion on prices with its competitors did not behave on the market in the manner agreed with its competitors is not necessarily a matter which must be taken into account as a mitigating circumstance when determining the amount of the fine to be imposed. An undertaking which despite colluding with its competitors follows a more or less independent policy on the market may simply be trying to exploit the cartel for its own benefit.

307  In the present case, it cannot be concluded from the evidence adduced by the applicant that its actual conduct on the market was of such a nature as to counteract the anti-competitive effects of the infringement found. In particular, in its reply to the statement of objections, the applicant submitted that it had not announced price increases to customers but had merely supplied the new price rates to its agents in order that they should use them in individual negotiations with customers. It relied on graphs in that regard (pp. 37 and 39 of its reply to the statement of objections) which, it claimed, proved that prices obtained had been lower than quoted prices and that it had been able to increase its market shares on several export markets.

308  However, in the Decision the Commission accepts that transaction prices were not always the same as announced prices. It states, in particular, (point 101, sixth paragraph): 'Even if all the producers stayed resolute on introducing the full increase, the possibilities for customers of switching to a cheaper quality or grade meant that a supplying producer might have to make some concessions to its traditional customers as regards timing or give additional incentives in the form of tonnage rebates or large order discounts in order for the customer to accept the full basic-price increase. A price increase would therefore inevitably take some time before it worked through.' The applicant has not therefore proved that its transaction prices were materially different from those of the other participants in the infringement.

309    Furthermore, the applicant does not claim that it was pressured by the other undertakings participating in the cartel. Nor does it claim that it publicly distanced itself from the decisions on price increases adopted at the meetings in which it participated.

310    In those circumstances, the Commission was entitled to consider that the applicant's conduct on the market, allegedly different from that agreed in the PG Paperboard, did not constitute a mitigating factor.

311    Nor can the applicant claim that it did not intend to commit the infringement. The Court points out that, having regard to the nature of the acts found to have been committed, the applicant must have been aware that their objective was to restrict competition (paragraphs 277 and 278 above).

312    The applicant also pleads that classification of the information exchange as an infringement of the competition rules is novel.

313    The Court points out, however, that, according to Article 1 of the Decision, the undertakings referred to therein had infringed Article 85(1) of the EC Treaty by participating in an agreement and concerted practice whereby they, *inter alia*, 'exchanged commercial information on deliveries, prices, plant standstills, order backlogs and machine utilisation rates in support of the above measures', that is to say, collusion on prices, market shares and downtime.

314   The Commission therefore took the view that the information exchange was contrary to Article 85(1) of the Treaty only in that it supported the cartel. Accordingly, the applicant's argument is without foundation.

315   Nor has the applicant proved that during the period covered by the Decision the cartonboard industry was in such a crisis as to justify a reduction in the fines.

316   It cannot submit that its loss-making situation should have constituted a mitigating factor. To find that there is such an obligation would be tantamount to giving an unjustified competitive advantage to undertakings least well adapted to the market conditions (judgment in *IAZ and Others* v *Commission*, cited above, paragraph 55).

317   As regards the applicant's small size, the Court finds that this factor was taken into account by the Commission, because it took each undertaking's turnover on the Community cartonboard market in 1990 as a basis for determining the amount of the fine.

318   As to the final mitigating factor, the alleged absence of measures to monitor the implementation of the cartel, the Court points out that, although the existence of measures to monitor the implementation of a cartel may be taken into account as an aggravating factor when fixing the fines, the absence of such measures cannot, in itself, constitute a mitigating factor. Moreover, the applicant itself refers, *inter alia*, to point 136 of the Decision, according to which (last paragraph of that point) 'the documentation makes it clear, however, that the implementation of price initiatives was closely monitored and that failure to cooperate would be the subject of discussions in the JMC, with the perceived laggards being urged to support the price increases by the market leaders'. Since the applicant has not disputed the

correctness of that finding, there is no basis for the view that the Commission could have taken into account, as a mitigating circumstance, the absence of measures to monitor the implementation of the cartel.

319   Finally, as regards the Commission's request that the Court increase the fine, it suffices to find that the Commission, in replying to a question from the Court at the hearing, was unable to specify which points had been disputed by the applicant in its pleadings but not in its reply to the statement of objections. In view of that finding alone, the Commission's request cannot be granted.

320   In the light of the foregoing, the present plea and the Commission's request for an increase in the fine imposed on the applicant must be rejected.

E — *The plea of infringement of the principle of equal treatment*

*First part of the plea: failure to take into account the fall in value of the Spanish peseta*

Arguments of the parties

321   The applicant submits that the failure to take into account the effects of fall in value of certain European currencies, in this case the Spanish peseta, treats persons in the same situation differently.

II - 1970

ENSO ESPAÑOLA v COMMISSION

322  From January 1991 until July 1994 the Spanish peseta fell heavily in value against the ecu. The exchange rate between the PTA and the ecu in July 1990 was one ecu to PTA 127.29, whereas in July 1994 it was one ecu to PTA 157.32. The economic impact of payment of the fine expressed in ecus is therefore proportionately much greater for undertakings with the majority of their turnover in currencies that have fallen in value against the ecu.

323  In procedures in which fines are imposed collectively, differences between the fines imposed on the undertakings must be justified by objective reasons associated with the attitude and/or subjective conduct of each of them. In the present case, however, the Decision does not contain any reasons to justify the *de facto* discrimination resulting from expression of the fine in ecus. The Commission therefore acted negligently and infringed the principle of equal treatment.

324  In order to calculate the fine imposed, the Commission converted the turnover achieved during the reference year, that is to say, 1990, into ecus using the average rate applicable to that year. It then determined the amount of the fine by applying the percentage rate previously chosen, that is to say, in the applicant's own case, the basic rate of 7.5%, which was first of all reduced by 33.3% because the applicant had not disputed the essential facts, then by an additional percentage in order to take into account the shortness of its participation in the infringement. The applicant asserts that in national currency it would today have to pay approximately PTA 275 000 000 in order to discharge the fine. If the Commission had applied the current exchange rate in order to convert the applicant's turnover from cartonboard sales in the Community in 1990 the amount of the fine would have been ECU 1 420 000, or, at the current exchange rate, approximately PTA 225 000 000. The applicant's fine was thereby increased by PTA 50 000 000.

325  The Commission's assertion that it is necessary to convert turnover figures expressed in different currencies into ecus in order to compare them, and so guarantee equality of treatment, is wholly erroneous. It is not necessary to convert

II - 1971

turnover into ecus in order to comply with the principle of equal treatment, because that principle is observed where, for two undertakings whose infringement is of the same gravity and same duration, identical percentages are applied to the turnover figures corresponding to the same financial year. That conclusion is not inconsistent with the judgment in *Musique Diffusion Française and Others* v *Commission*, cited above.

326   The origin of the discrimination by the Commission lies in the expression of the fines in ecus. It runs counter to the case-law of the Court of Justice, according to which there is no need to convert into ecus. There is no primary or secondary rule of Community law which requires such conversion; nor is it justified in order to reflect economic reality (Joined Cases 41/73, 43/73 and 44/73 *Société Anonyme Générale Sucrière and Others* v *Commission* [1977] ECR 445, paragraphs 12 to 15, 25 and 26). In his Opinion in that case, Advocate General Warner stated that it was necessary for the Commission, when calculating fines in ecus, to take into account the reality of monetary events in order to avoid undesirable distortions. He stated that the Commission must first decide in which currency it will quantify the fine for the purposes of enforcement and then decide on the appropriate amount of it having regard to the true value of that currency.

327   In other areas the Court has recommended that, in order to avoid any inequality of treatment, medical expenses should be reimbursed in national currency to Community officials residing in different countries (Case 256/78 *Misenta* v *Commission* [1980] ECR 219). It has ensured that the principle of equal treatment is observed in disputes concerning the effects of monetary fluctuations, in particular in the area of the common commercial policy (Case 135/79 *Gedelfi Großeinkauf* [1980] ECR 1713 and Case 248/80 *Gebrüder Glunz* [1982] ECR 197) and of the common agricultural policy (Case 39/84 *Maizena and Others* [1985] ECR 2115 and Case 46/84 *Nordgetreide* [1985] ECR 3127).

328   Regulation No 17 does not require the ecu to be used in order to calculate or to express the amount of the fine provided for in Article 15(2). In providing for the

ENSO ESPAÑOLA v COMMISSION

possibility of imposing a fine of up to 10% of turnover in the preceding business year of each undertaking participating in the infringement, the regulation clearly links the amount of the fine to the advantage gained by the undertaking from the infringement. That return is reflected principally in the turnover achieved, which is calculated in national currency, not in ecus.

329   Finally, the use of the ecu is not practical. The fine is paid in national currency and, if not paid, the Commission would enforce it in national currency.

330   The Commission considers that, where fines are imposed on undertakings established in different Member States whose turnover figures are expressed in different currencies, the principle of equal treatment requires that it should be possible to compare those fines. The only way in which to compare separate currencies is to convert them into the same unit, in this case the ecu. The Court of Justice has acknowledged that the fines must be comparable. It has held that, to the extent that reliance is to be placed on the turnover of undertakings involved in the same infringement for the purpose of determining the proportions between the fines to be imposed, the period to be taken into consideration must be ascertained in such a way that the resulting turnovers are as comparable as possible (*Musique Diffusion Française and Others* v *Commission*, cited above, paragraph 122).

331   In the present case, the Commission's choice, namely to calculate the fines on the basis of turnover in 1990 converted into ecus at the average exchange rate for 1990, is wholly justified. Not only does that represent the Commission's well established practice, which the Community judicature has not criticised, but it also reflects in a precise manner the whole of any benefits derived from the infringement (Joined Cases T-39/93 and T-40/92 *CB and Europay* v *Commission* [1994] ECR II-49).

332    The judgment in *Société Anonyme Générale Sucrière and Others* v *Commission*, cited above, is to be read in a very specific context and cannot therefore support the applicant's assertions. It follows from that judgment, interpreted in the light of the facts in that case, that the Commission must fix the amount of the fines in ecu, whereas the time of payment and the paying bank determine the currency and rate of exchange.

333    Finally, thanks to the relative stability of the ecu, the use of the ecu in order to calculate and fix the amount of fines makes it possible to avoid the discrimination between undertakings which might be caused by monetary fluctuations. That system enables the Commission to ensure that fines actually represent a given percentage of the real value of an undertaking's turnover during the reference year.

Findings of the Court

334    Article 4 of the Decision states that the fines are to be payable in ecus.

335    Nothing precludes the Commission from expressing the amount of the fine in ecus, a monetary unit which is convertible into national currency. That also allows the undertakings more easily to compare the amounts of the fines imposed. Moreover, the possibility of converting the ecu into national currency distinguishes that monetary unit from the 'unit of account' referred to in Article 15(2) of Regulation No 17, in regard to which the Court expressly held that, since it was not a currency in which payment was made, it necessarily meant that the amount of the fine had to be determined in national currency (*Société Anonyme Générale Sucrière and Others* v *Commission*, cited above, paragraph 15).

II - 1974

336    The Court cannot uphold the applicant's criticism in regard to the legality of the Commission's method of converting into ecus the undertakings' reference turnover at the average exchange rate for that same year (1990).

337    First of all, the Commission should ordinarily use one and the same method of calculating the fines imposed on the undertakings penalised for having participated in the same infringement (see *Musique Diffusion Française and Others* v *Commission*, cited above, paragraph 122).

338    Second, in order to be able to compare the different turnover figures sent to it, which are expressed in the respective national currencies of the undertakings concerned, the Commission must convert those figures into a single monetary unit. As the value of the ecu is determined in accordance with the value of each national currency of the Member States, the Commission rightly converted the turnover figure of each of the undertakings into ecus.

339    The Commission also acted correctly in taking the turnover in the reference year (1990) and converting that figure into ecus on the basis of the average exchange rates for that same year. In the first case, the taking into account of the turnover achieved by each undertaking during the reference year, that is to say, the last complete year of the period of infringement found, enabled the Commission to assess the size and economic power of each undertaking and the scale of the infringement committed by each of them, those aspects being relevant for an assessment of the gravity of the infringement committed by each undertaking (see *Musique Diffusion Française and Others* v *Commission*, cited above, paragraphs 120 and 121). In the second place, taking into account, in order to convert the turnover figures in question into ecus, the average exchange rates for the reference year adopted, enabled the Commission to prevent any monetary fluctuations occurring after the cessation of the infringement from affecting the assessment of the undertakings' relative size and economic power and the scale of the infringement committed by each of them and, accordingly, its assessment of the gravity of that infringement. The assessment

of the gravity of an infringement must have regard to the economic reality as revealed at the time when that infringement was committed.

340 Thus, the argument that the turnover figure for the reference year should have been converted into ecus on the basis of the rate of exchange at the date of adoption of the Decision cannot be upheld. The method of calculating the fine by using the average rate of exchange for the reference year makes it possible to avoid the uncertain effects of changes in the real value of the national currencies which may, and in this case actually did, arise between the reference year and the year in which the Decision was adopted. Although this method may mean that a given undertaking must pay an amount, expressed in national currency, which is in nominal terms greater or less than that which it would have had to pay if the rate of exchange at the date of adoption of the Decision had been applied, that is merely the logical consequence of fluctuations in the real values of the various national currencies.

341 In addition, several of the addressee undertakings of the Decision own carton-board mills in more than one country (see points 7, 8 and 11 of the Decision). Moreover, the addressees of the Decision generally carry out their activities in more than one Member State through the intermediary of local representatives. As a result, they operate in several national currencies. The applicant itself achieves more than one third its turnover on export markets. Where a decision like the decision at issue penalises infringements of Article 85(1) of the Treaty and where the addressees of the decision generally pursue their activities in several Member States, the turnover for the reference year converted into ecus at the average exchange rate used during that same year is made up of the sum of the turnovers achieved in each country in which the undertaking operates. It therefore takes perfect account of the actual economic situation of the undertakings concerned during the reference year.

342 The first part of the plea must therefore be rejected.

ENSO ESPAÑOLA v COMMISSION

*The second part of the plea: the level of fines is higher than that adopted by the Commission in comparable cases*

Arguments of the parties

343   The applicant contends that, as the Commission has itself accepted (written question No 2296/85, OJ 1986 C 123, p. 26), the Commission must observe the principle of equal treatment in regard to the level of fine imposed in comparable decisions.

344   In the present case, the principle of equal treatment was infringed, because the percentage of turnover used in order to determine the fine was 9% for the undertakings considered to be the ringleaders of the cartel. That level of fine is considerably higher than that in previous similar decisions (in particular Commission Decision 89/515/EEC of 2 August 1989 relating to a proceeding under Article 85 of the EEC Treaty (IV/31.553 — welded steel mesh) (OJ 1989 L 260, p. 1), and Commission Decision 94/215/ECSC of 16 February 1994 relating to proceeding pursuant to Article 65 of the ECSC Treaty concerning agreements and concerted practices engaged in by European producers of beams (OJ 1994 L 116, p. 1)). In particular, the applicant submits that during 1994 the Commission adopted, in less than five months, two quite different decisions concerning the same type of pan-European cartel, but did not provide a real statement of reasons for its change in approach. It must therefore be concluded that there was discrimination or unequal treatment of undertakings in comparable circumstances.

345   The Commission cannot use its discretion in such a way as to commit blatant infringements of the principle of equal treatment.

346   Furthermore, even though the Commission considers that the correct application of the Community competition rules presupposes that it should be able to adapt

the level of fines at any moment to the needs of competition policy, that does not mean that the Commission is authorised to raise and lower the general level of fines from one infringement to another without giving adequate objective reasons.

347    Finally, the applicant considers, relying on Commission Decision 94/815/EEC of 30 November 1994 relating to a proceeding under Article 85 of the EC Treaty (IV/33.126 and 33.322 — Cement) (OJ 1994 L 343, p. 1), that there is, in comparison with the present case, a blatant infringement of the principle of equal treatment and a clear disproportion in setting the overall percentage of the turnover adopted in order to determine the amount of the fines.

348    The Commission considers that, having regard to the gravity, geographical extent and duration of the infringement found, the level of the fine is wholly justified.

Findings of the Court

349    Under Article 15(2) of Regulation No 17, the Commission may by decision impose on undertakings fines ranging from ECU 1 000 to 1 000 000, or a sum in excess thereof but not exceeding 10% of the turnover in the preceding business year of each of the undertakings participating in the infringement where, either intentionally or negligently, they infringe Article 85(1) of the Treaty. In fixing the amount of the fine, regard is to be had to both the gravity and the duration of the infringement. As is apparent from the case-law of the Court of Justice, the gravity of infringements falls to be determined by reference to numerous factors including, in particular, the specific circumstances and context of the case, and the deterrent character of the fines; moreover, no binding or exhaustive list of the criteria which must be applied has been drawn up (order in *SPO and Others* v *Commission*, cited above, paragraph 54).

350   In the present case, the Commission determined the general level of fines by taking into account the duration of the infringement (point 167 of the Decision) and the following considerations (point 168):

'— collusion on pricing and market sharing are by their very nature serious restrictions on competition,

— the cartel covered virtually the whole territory of the Community,

— the Community market for cartonboard is an important industrial sector worth some ECU 2 500 million each year,

— the undertakings participating in the infringement account for virtually the whole of the market,

— the cartel was operated in the form of a system of regular institutionalised meetings which set out to regulate in explicit detail the market for cartonboard in the Community,

— elaborate steps were taken to conceal the true nature and extent of the collusion (absence of any official minutes or documentation for the PWG and JMC; discouraging the taking of notes; stage-managing the timing and order in which price increases were announced so as to be able to claim they were "following", etc.),

— the cartel was largely successful in achieving its objectives.'

351   It is common ground that fines of a basic level of 9 or 7.5% of the turnover on the Community cartonboard market in 1990 of each undertaking addressed by the

Decision were imposed on the undertakings regarded as the 'ringleaders' of the cartel and on the other undertakings respectively.

352  It should be pointed out, first, that when assessing the general level of fines the Commission is entitled to take account of the fact that clear infringements of the Community competition rules are still relatively frequent and that, accordingly, it may raise the level of fines in order to strengthen their deterrent effect. Consequently, the fact that in the past the Commission applied fines of a certain level to certain types of infringement does not mean that it is estopped from raising that level, within the limits set out in Regulation No 17, if that is necessary in order to ensure the implementation of Community competition policy (see, *inter alia*, *Musique Diffusion Française and Others* v *Commission*, cited above, paragraphs 105 to 108, and Case T-13/89 *ICI* v *Commission* [1992] ECR II-1021, paragraph 385).

353  Second, the Commission rightly argued at the hearing that, on account of the specific circumstances of the present case, no direct comparison could be made between the general level of fines adopted in the present decision and those adopted in the Commission's previous decisions, in particular in Commission Decision 86/398/EEC of 23 April 1986 relating to a proceeding under Article 85 of the EEC Treaty (IV/31.149 — Polypropylene) (OJ 1986 L230, p. 1, 'the Polypropylene decision'), which the Commission itself considered to be the most similar to the decision in the present case. Unlike in the Polypropylene case, no general mitigating circumstance was taken into account in the present case when determining the general level of fines. Moreover, as the Court has already held, the intricate steps taken by the undertakings to conceal the existence of the infringement constitute a particularly serious aspect of it which differentiates it from the infringements previously found by the Commission.

354 Third, the Court notes the lengthy duration and obviousness of the infringement of Article 85(1) of the Treaty which was committed despite the warning which the Commission's previous decisions, in particular the Polypropylene decision, should have provided.

355 On the basis of those factors, the criteria set out in point 168 of the Decision justify the general level of fines set by the Commission.

356 Finally, in setting the general level of fines in the present case, the Commission did not so depart from its previous line of decisions as to oblige it to give a more detailed account of the reasons for its assessment of the gravity of the infringement (see, *inter alia, Groupement des Fabricants de Papiers Peints de Belgique and Others* v *Commission*, paragraph 31).

357 The second part of the plea must therefore also be rejected.

358 In the light of the foregoing, the plea must be rejected in its entirety.

F — *The plea of infringement of the principle of proportionality*

359 The applicant contends that the principle of proportionality was infringed in this case, because the crisis in which the industry currently finds itself was totally ignored when the fine was assessed. The same is true of the difference in the treat-

ment of undertakings in the present case and that of undertakings in similar proceedings before the Commission.

360    The fine, corresponding to 2.2% of turnover, imposed on Tetra Pak for a particularly serious and lengthy infringement (Commission Decision 92/163/EEC of 24 July 1991 relating to a proceeding under Article 86 of the EEC Treaty (IV/31.043 — Tetra Pak II) (OJ 1992 L 72, p. 1)) was much lower than that imposed on the applicant, even though the infringements it is alleged to have committed were much shorter and less serious than those alleged against Tetra Pak.

361    The disproportion between the basic rates adopted for the 'ringleaders' of the cartel and for its 'ordinary members' is a further clear infringement of the principle of proportionality.

362    The Court points out that the applicant has not proved that the cartonboard industry is currently in crisis. Nor has it explained why such a situation, even if proved, should be taken into account when fixing the fines.

363    For the remainder, the applicant merely repeats, in support of its plea, the arguments which it has already raised in support of its other pleas for annulment or reduction of the fine.

364    As those arguments have been rejected, the present plea cannot be upheld.

365 In the light of the whole of the foregoing, Article 1 of the Decision must be annulled as against the applicant to the extent that it states that the applicant participated in an infringement of Article 85(1) of the Treaty prior to February 1989. Furthermore, the eighth indent of Article 1 of the Decision, according to which the object of the agreement and concerted practice in which it participated was to '[maintain] the market shares of the major producers at constant levels, subject to modification from time to time' must be annulled as against the applicant.

366 As regards the amount of the fine imposed, regard must be had to the fact that the applicant can be held responsible for an infringement of Article 85(1) of the Treaty only for the period from February 1989 until April 1991. On the other hand, as has already been found (see paragraph 269 et seq. above), the fact that the infringement committed by the applicant did not extend to collusion on market shares does not justify a reduction in the amount of the fine imposed.

367 As the other pleas relied upon by the applicant in support of its application for annulment or reduction of the fine have been rejected, the Court, exercising its unlimited jurisdiction, will fix the amount of that fine at ECU 1 200 000.

368 The remainder of the application must be rejected.

**Costs**

369 Under Article 87(3) of the Rules of Procedure, the Court may, where each party succeeds on some and fails on other grounds, order costs to be shared or order each party to bear its own costs. As the action has been only partially successful,

the Court considers it fair in the circumstances of the case to order each party to bear its own costs.

370   The applicant has sought an order that the Commission should pay the costs, including the costs and interest associated with the provision of a bank guarantee or payment of the fine. However, it is settled law that expenses incurred in providing a bank guarantee in order to avoid the enforcement of a decision are not expenses incurred for the purpose of the proceedings within the meaning of Article 91(b) of the Rules of Procedure (see the order of 20 November 1987 in Case 183/83 *Krupp* v *Commission* [1987] ECR 4611, paragraph 10, and Case T-77/92 *Parker Pen* v *Commission* [1994] ECR II-549, paragraph 101). The same holds for expenses incurred in payment of the fine.

On those grounds,

THE COURT OF FIRST INSTANCE (Third Chamber, Extended Composition)

hereby:

1. **Annuls, as regards the applicant, Article 1 of Commission Decision 94/601/EC of 13 July 1994 relating to a proceeding under Article 85 of the EC Treaty (IV/C/33.833 — Cartonboard) in so far as the date of the beginning of the infringement alleged against it is stated to be prior to February 1989;**

ENSO ESPAÑOLA v COMMISSION

2. **Annuls, as regards the applicant, the eighth indent of Article 1 of Decision 94/601;**

3. **Sets the amount of the fine imposed on the applicant by Article 3 of Decision 94/601 at ECU 1 200 000;**

4. **Dismisses the application as regards the remaining claims;**

5. **Orders each party to bear its own costs.**

Vesterdorf                          Briët                          Lindh

Potocki                          Cooke

Delivered in open court in Luxembourg on 14 May 1998.

H. Jung                                                    B. Vesterdorf

Registrar                                                    President

JUDGMENT OF 14. 5. 1998 — CASE T-348/94

## Summary

Facts .................................................................................................... II - 1885

Procedure ............................................................................................. II - 1892

Forms of order sought ........................................................................... II - 1893

The application for annulment of the Decision .......................................... II - 1894

   A — The plea of infringement of the fundamental right to an independent and impartial
   tribunal ........................................................................................... II - 1894

      Arguments of the parties ................................................................ II - 1894

      Findings of the Court ..................................................................... II - 1900

   B — The plea of infringement of the rights of the defence ...................... II - 1902

      Arguments of the parties ................................................................ II - 1902

      Findings of the Court ..................................................................... II - 1906

   C — The plea of infringement of Article 190 of the Treaty ..................... II - 1913

      Arguments of the parties ................................................................ II - 1913

      Findings of the Court ..................................................................... II - 1914

   D — The plea that Article 85(1) of the Treaty was wrongly applied to the applicant's
   actions ............................................................................................ II - 1915

      Arguments of the parties ................................................................ II - 1915

      Findings of the Court ..................................................................... II - 1921

         The first three parts of the plea: the applicant did not participate in the
         infringement found in Article 1 of the Decision ............................ II - 1921

            1. Period from March 1988 until February 1989 ......................... II - 1922

            (a) The applicant's participation in meetings of the PC ................. II - 1923

            (b) The applicant's participation in one meeting of the Economic Com-
                mittee .................................................................................. II - 1927

            (c) The applicant's actual conduct in regard to prices .................... II - 1930

            (d) Conclusion relating to the period in question ......................... II - 1931

            2. Period between February 1989 and April 1991 ........................ II - 1931

            (a) The applicant's participation in price collusion ....................... II - 1932

            (b) The applicant's participation in collusion on downtime .............. II - 1936

            (c) The applicant's participation in collusion on market shares .......... II - 1943

            (d) The applicant's participation in a common industry plan to restrict
                competition ......................................................................... II - 1946

ENSO ESPAÑOLA v COMMISSION

(e) Conclusions regarding the period from February 1989 until April 1991 .................................................................... II - 1947

The fourth part of the plea: no definition of the relevant geographical market .... II - 1947

The application for annulment or reduction of the fine ......................................... II - 1949

A — The plea of infringement of Article 190 of the Treaty in regard to the fines ....... II - 1949

Arguments of the parties ............................................................. II - 1949

Findings of the Court ............................................................... II - 1951

B — The plea alleging incorrect assessment of the criteria adopted in the Decision in order to determine the fine ........................................................... II - 1955

Arguments of the parties ............................................................. II - 1955

Findings of the Court ............................................................... II - 1957

C — The plea alleging that the applicant did not commit the infringement intentionally or negligently .................................................................... II - 1960

D — The plea alleging that the fine was incorrectly calculated ........................... II - 1961

Arguments of the parties ............................................................. II - 1961

Findings of the Court ............................................................... II - 1966

E — The plea of infringement of the principle of equal treatment ....................... II - 1970

First part of the plea: failure to take into account the fall in value of the Spanish peseta ................................................................................ II - 1970

Arguments of the parties ....................................................... II - 1970

Findings of the Court ......................................................... II - 1974

The second part of the plea: the level of fines is higher than that adopted by the Commission in comparable cases ...................................................... II - 1977

Arguments of the parties ....................................................... II - 1977

Findings of the Court ......................................................... II - 1978

F — The plea of infringement of the principle of proportionality ....................... II - 1981

Costs ......................................................................................... II - 1983

# Exhibit C

# UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: FLAT GLASS ANTITRUST | ) | Master Docket |
| LITIGATION (II) | ) | Misc. Action No. 08-mc-180 |
| | ) | MDL No. 1942 |
| | ) | |
| This Document Relates to: | ) | |
| All Actions | ) | Judge Donetta W. Ambrose |
| | ) | |
| **European Commission** | ) | |
| | ) | |
| Motion For Partial Reconsideration | ) | Electronically Filed |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION BY INTERVENOR-APPLICANT EUROPEAN COMMISSION TO RECONSIDER IN PART THE COURT'S ORDER COMPELLING DISCOVERY OF CONFIDENTIAL MATERIALS

Carter G. Phillips (DC 264176) (*pro hac vice*)
Richard Klingler (DC 438908) (*pro hac vice*)
James C. Owens (DC 490140) (*pro hac vice*)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, DC  20005
Phone:  (202) 736-8000
Fax:      (202) 736-8711
Email: cphillips@sidley.com
          rklingler@sidley.com
          jcowens@sidley.com

*Attorneys For Intervenor-Applicant European Commission*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ......................................................................................................1

STATEMENT OF THE CASE.....................................................................................1

I.      EC Law ...........................................................................................................1

II.     The European *Flat Glass* Cartel Investigation.................................................3

III.    Civil Proceedings Respecting *Flat Glass* In The United States ......................3

LEGAL STANDARD...................................................................................................5

ARGUMENT...............................................................................................................5

I.      International Comity Requires Preserving The Confidentiality Under EC Law Of
        Certain Documents That Plaintiffs Have Requested ...........................................5

        A.      The EC's Interest In Preserving Confidentiality Is Clearly Important,
                Advances The U.S. Government's Interest, And Only Marginally Impairs
                The Interest Of Private Litigants.............................................................8

                1.      *The EC Has A Strong And Longstanding Interest In Preserving
                        The Confidentiality Of Certain Investigatory Materials Guaranteed
                        By Its Laws* .................................................................................9

                2.      *The United States Government Has An Interest In Preserving The
                        Confidentiality Of Documents Generated Pursuant To An Antitrust
                        Amnesty Program, Including The EC's Program* .....................11

                3.      *The EC's Interest Is Confirmed By The Documents' Confidential
                        Status* .........................................................................................14

        B.      Confidentiality Is Narrowly Tailored Here, So The Documents That
                Should Be Protected Are Few In Number And Not Important To This
                Litigation......................................................................................................15

        C       The Document Request Was Not Sufficiently Narrow...........................17

        D.      The Information Did Not Originate In The United States ......................18

        E.      There Are Alternative Means Of Securing The Information..................18

II.      The Act Of State Doctrine Prohibits Judicial Challenge To The Commission's
         Promise Of Strict Confidentiality In Exchange For Cooperation ......................................19

CONCLUSION ....................................................................................................................20

# TABLE OF AUTHORITIES

## CASES

*In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288 (3d Cir. 2004) ...................................7

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) ......................................................19

*Gross v. German Found. Indus. Initiative*, 456 F.3d 363 (3d Cir. 2006) ..................................6, 19

*Hilton v. Guyot*, 159 U.S. 113 (1895) ...........................................................................................6

*Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004) ..................................................1

*Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669 (3d Cir. 1999) ..................5

*Phila. Gear Corp. v. Phila. Gear de Mexico, S.A.*, 44 F.3d 187 (3d. Cir. 1994)............................6

*Reinsurance Co. of Am. v. Administratia Asigurarilor de Stat*, 902 F.2d 1275 (7th Cir. 1990) ........................................................................................................................................11

*Remington Rand Corp.-Del. v. Bus. Sys. Inc.*, 830 F.2d 1260 (3d Cir. 1987) ................................6

*Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468 (9th Cir. 1992) ......................7, 8

*In re Rubber Chems. Antitrust Litig.*, 486 F. Supp. 2d 1078 (N.D. Cal. 2007) ................15, 17, 18

*Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for the S. Dist. of Iowa*, 482 U.S. 522 (1987)...........................................................................................................7

*Somportex Ltd. v. Phila. Chewing Gum Corp.*, 453 F.2d 435 (3d Cir. 1971) ................................6

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 618 F. Supp. 2d 1194 (N.D. Cal. 2009) ................13

*United States ex rel. Saroop v. Garcia*, 109 F.3d 165 (3d Cir. 1997) ........................................6, 7

*United States v. First Nat'l Bank of Chi.*, 699 F.2d 341 (7th Cir. 1983) ......................................11

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.*, 493 U.S. 400 (1990) ......................................19

*White v. Kenneth Warren & Son, Ltd.*, 203 F.R.D. 369 (N.D. Ill. 2001).....................................15

## RULES

Fed. R. Civ. P. 26(b)(1) ............................................................................14
Fed. R. Civ. P. 54(b) ................................................................................5

Fed. R. Evid. 501 ...................................................................................14

## INTERNATIONAL MATERIAL

Commission Decision, Case COMP/39165 - Flat Glass, 2008 O.J. (C 127) 9, *at* http://ec.europa.eu/competition/antitrust/cases/decisions/39165/en.pdf .........................................3

EC Council Regulation of 16 December 2002, no. 1/2003, O.J. (L 1) 1, *at* http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=CONSLEG:2003R0001:20061018:EN:PDF ......10

EC Council Regulation of 22 December, 2005, no. 139/2004, O.J. (C 325) 7, *at* http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:C:2005:325:0007:0015:EN:PDF .................17

EC Commission Regulation of 7 April 2004, no. 773/2004, O.J. (L 123) 18, *at* http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=OJ:L:2004:123:0018:0024:EN:PDF .................10

EC, *Staff Regulations of Officials of the European Communities* (Jan. 5, 2004), *at* http://ec.europa.eu/dgs/personnel_administration/statut/tocen100.pdf .........................................10

EC Treaty, 2002 O.J. (C 325) 1, *at* http://europa.eu/eur-lex/pri/en/oj/dat/2002/c_325/c_32520021224en00010184.pdf.....................................................................................10

## OTHER AUTHORITIES

Restatement (Second) of Foreign Relations Law (1965)...................................................8

Restatement (Third) of Foreign Relations Law (1987)......................................7, 15, 19

U.S. Dep't of Justice, *Antitrust Division Manual* (4th ed. 2008), *at* http://www.usdoj.gov/atr/public/divisionmanual/atrdivman.pdf...................................................12

# INTRODUCTION

Intervenor-Applicant European Commission ("EC" or "Commission") respectfully petitions the Court to reconsider in part its order of July 29, 2009 in the above-captioned action (Docket No. 185) ("Discovery Order") compelling discovery and production of certain materials that are confidential under EC law. The Commission is not supporting any of the private parties to this action, and has sought to intervene here only for the limited purpose of preventing the discovery of certain investigatory materials whose continued confidentiality is critical to the EC's ability as a sovereign to investigate and deter unlawful cartel activities.

Preserving the confidentiality of these materials is vital to the Commission's ongoing ability to detect and investigate unlawful cartel activity and would require only a very limited restriction on the plaintiffs' access to discovery because the confidentiality attaches to only a small number of the documents in Guardian's possession. Therefore, based on the principles of international comity and the act of state doctrine, the Court should partially reconsider the Discovery Order and decline to compel the discovery of material that is confidential under EC law.

# STATEMENT OF THE CASE

## I.   EC Law

The European Commission is an institution representing the sovereign interests of the European Community. The Commission "exercises responsibility over the wide range of subject areas covered by the European Union treaty" including laws "governing competition." *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 250 (2004). Investigations into cartels are based on extensive investigative powers aimed at allowing the Commission to uncover documents and information relating to the most serious violations of competition law. *See* Declaration of Philip Lowe, ¶ 2 (attached) ("Decl. Lowe"). Equally important is the Leniency

Program, which encourages the voluntary cooperation of parties in return for immunity or a reduction of a fine; the Leniency Program is closely related to the United States Department of Justice's Amnesty Program. *Id.*; *see also*, Letter of Dep't of Justice ("DOJ Letter"), attached as Exhibit to Declaration of James Owens. The decisions of the European Commission applying the competition rules are subject to judicial review by the European Court of First Instance and, on appeal, by the European Court of Justice. Decl. Lowe ¶ 2.

In investigating unlawful cartel activities, the Commission collects sensitive material from suspects in two principal ways: by voluntary submissions through the Leniency Program and by compulsory process. As related in greater detail in the attached Declaration of Philip Lowe, the Director General of the Commission's Directorate General for Competition, certain documents prepared or collected by the Commission are protected under EC law, and cannot be used by any of the parties (including the Commission) in any matter other than the investigation itself. *Id.* The Commission collects the documents and information into an administrative file, which includes confidential and non-confidential material.

As its investigation proceeds, the EC submits a "Statement of Objections" (akin to an indictment) to entities suspected of illegal activity. The Statement of Objections is also confidential because it often directly quotes from corporate statements and other confidential replies to information requests made by the EC. Recipients may submit replies to the Statement of Objections. These replies are kept confidential and are not made available to the other parties or to the general public. While recipients are authorized to review and copy certain portions of the Commission's investigative file (which may include confidential submissions by other parties under investigation) in preparing their defenses, they are strictly prohibited by law from using information obtained in this way or for any reason outside responding to or otherwise

participating in the investigation itself. *Id.* The EC can and will take disciplinary action against external counsel for infringing such rules. *Id.*

## II.  The European *Flat Glass* Cartel Investigation

Following its *Flat Glass* investigation, the Commission imposed fines amounting to EUR 486.9 million (approximately $718.11 million at the then-prevailing exchange rate) on four flat glass producers on November 28, 2007.[1] The EC launched the investigation with unannounced inspections of certain companies. Further information was collected by sending formal requests for information to the entities potentially involved in the suspected anticompetitive agreement. One of the suspects, Asahi/Glaverbel Corp. ("Asahi"), cooperated by submitting further information, which added significant value to the body of evidence relevant in establishing the existence of the cartel. Asahi's voluntary cooperation qualified it for substantially reduced fines under the Leniency Program. Commission Decision, Case COMP/39165 – Flat Glass, O.J. (C 127) 9, 127, 24.5.2008, § 8.7, ¶ 541.

One of the Commission's findings was that Guardian Industries Corp. and its wholly owned subsidiary Guardian Europe S.à.r.l. (hereinafter jointly referred to as "Guardian") had participated in the European cartel from April 20, 2004 until February 22, 2005. This resulted in a fine of EUR 148 million (approximately $218.28 million in 2007 dollars). *Id.* On February 12, 2008, Guardian appealed that decision to the Court of First Instance. That appeal is currently pending.

## III.  Civil Proceedings Respecting *Flat Glass* In The United States

On June 20, 2008, a number of actions involving allegations of U.S. antitrust violations in the flat glass industry were transferred to this Court under the multi-district litigation ("MDL")

---

[1] *See* Commission Decision, Case COMP/39165 – Flat Glass, O.J. (C 127) 9, 127, 24.5.2008, § 8.7, ¶ 541 (Nov. 28, 2007), *available at* http://ec.europa.eu/ competition/ antitrust/ cases/ decisions/ 39165 /en.pdf.

process.  On July 2, 2009, the plaintiffs filed a motion to compel seeking discovery of a wide

range of documents relating to the Commission's *Flat Glass* investigation, including:

    (1)    documents provided to or received from the European Commission ("EC") in connection with any proceeding or investigation relating to Construction Flat Glass;

    (2)    documents the EC obtained from Defendants in connection with any proceeding or investigation relating to Construction Flat Glass;

    (3)    reports, findings, decisions, Statements of Objections, and hearing transcripts made or issued in connection with any proceeding or investigation by the EC relating to Construction Flat Glass, including but not limited to, any such documents relating to EC Case COMP/39.165 – Flat Glass; and

    (4)    documents relating to any investigation by the EC in connection with any proceeding or investigation relating to Construction Flat Glass not otherwise specified in Plaintiffs' Request for Production.

Plt's Br. In Support of Mot. to Compel, at 1 (Docket No. 172).  On July 17, 2009, Guardian filed

a brief opposing the motion.  Def's Br. in Opp'n (Docket No. 179).  On July 29, the Court

granted the Motion to Compel, holding *inter alia*:

[a]s to principles of international comity, I find that the production would not violate such principles.  Most of the documents are in Defendant's possession, the EC investigation has concluded, and Defendant Guardian has already produced an unredacted version of the EC decision.  Furthermore, a protective order is in effect.

Discovery Order at 2.  Guardian notified the Commission of the Court's order on August 26,

2009.  Guardian Letter, attached as Exhibit to Decl. Lowe.

Thereafter, the EC moved to intervene and now seeks partial reconsideration of the

Court's July 29, 2009 Order to the extent that it requires production of confidential information.

As indicated in the attached Declaration, EC confidentiality does not affect all, or possibly even

most, of the material at issue here.  *See* Decl. Lowe ¶ 4.  The Commission does not seek to

prevent the discovery of Guardian's pre-existing documents, or of any other non-confidential material.

## LEGAL STANDARD

This Court has the authority under Rule 54(b) to reconsider its discovery ruling "and [the ruling] may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). To prevail on a motion for reconsideration, a litigant must demonstrate: "(1) an intervening change in the controlling law; (2) the availability of new evidence ...; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999).

## ARGUMENT

This Court should reconsider and modify the Discovery Order to correct a clear error of law. In that Order, the Court applied the well-established rules of international comity incorrectly because the parties neglected adequately to address the state of EC law, and the existing protective order does not meet the requirements of EC law. In addition, the parties failed to notify the Court that discovery was also barred by the act of state doctrine. On reconsideration, the Court should deny plaintiffs' motion to compel as it pertains to a small number of investigatory materials that are confidential under EC law.

### I. International Comity Requires Preserving The Confidentiality Under EC Law Of Certain Documents That Plaintiffs Have Requested

Documents that are protected from discovery in Europe should not be subject to discovery in the United States, particularly where, as here, entities cooperated with an EC investigation in detrimental reliance on sovereign guarantees of confidentiality. EC competition law requires that certain documents related to the Commission's investigations be kept

5

confidential, and courts should respect this confidentiality under international comity. European competition law's procedures – and especially its successful Leniency Program – depend on assurances that certain types of information exchanged during the investigation will be accorded absolute and legally binding confidentiality outside of the investigation itself. While the discovery protection afforded certain investigatory materials lies at the core of European competition law and policy, respecting this confidentiality would have a minimal effect on private litigants in the United States because Guardian's pre-existing business documents, even if produced to the EC, would not be protected. Therefore, international comity prohibits discovery of certain investigatory documents in this matter.

International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws." *Hilton v. Guyot,* 159 U.S. 113, 164 (1895); *see also Remington Rand Corp.-Del. v. Bus. Sys. Inc.,* 830 F.2d 1260, 1266 (3d Cir. 1987). The doctrine is "more than mere courtesy and accommodation," and represents "a nation's expression of understanding which demonstrates due regard both to international duty and convenience and to the rights of persons protected by its own laws." *Somportex Ltd. v. Phila. Chewing Gum Corp.*, 453 F.2d 435, 440 (3d Cir. 1971). "Comity should be withheld only when its acceptance would be contrary or prejudicial to the interest of the nation called upon to give it effect." *Id; see also, Gross v. German Found. Indus. Initiative*, 456 F.3d 363, 392-94 (3d Cir. 2006); *United States ex rel Saroop v. Garcia*, 109 F.3d 165, 170 (3d Cir. 1997); *Phila. Gear Corp. v. Phila. Gear de Mexico, S.A.*, 44 F.3d 187, 193-94 (3d Cir. 1994).

International discovery is one of the core conflicts that comity addresses. Courts must "exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position," and "[j]udicial supervision of discovery should always seek to minimize its costs and inconvenience and to prevent improper uses of discovery requests." *Societe Nationale Industrielle Aerospatiale v. United States Dist. Court for the S. Dist. of Iowa*, 482 U.S. 522, 546 (1987) ("*Aerospatiale*"). Thus, "[w]hen it is necessary to seek evidence abroad, . . . the district court must supervise pretrial proceedings particularly closely to prevent discovery abuses." *Id.*; *see also In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 301 (3d Cir. 2004) (quoting same).

Comity requires courts to balance competing interests in a manner akin to a conflicts of law analysis. As *Aerospatiale* indicated, 482 U.S. at 544 n.28, the Restatement (Third) of Foreign Relations Law articulates one well-established set of factors to consider:

- the importance to the investigation or litigation of the documents or other information requested;

- the degree of specificity of the request;

- whether the information originated in the United States;

- the availability of alternative means of securing the information; and

- the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

Restatement (Third) of Foreign Relations Law, § 442(1)(c) (1987).[2] The last factor is considered "the most important." *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1476 (9th Cir. 1992). The Third Circuit has applied this balancing test. *Garcia*, 109 F.3d at 169 n.8.

---

[2] The Restatement (Second) enunciates a rule that differs only marginally, and it also supports the Commission's position. Section 40 of the Restatement (Second) of Foreign Relations Law provides:

Beginning with the last factor and examining each of the other factors in turn, each mandates respect for the EC's strong interest in preserving the confidentiality of certain documents closely related to its anti-cartel investigations.

A.    <u>The EC's Interest In Preserving Confidentiality Is Clearly Important, Advances The U.S. Government's Interest, And Only Marginally Impairs The Interest Of Private Litigants</u>

Preserving the confidentiality of investigatory materials is strongly supported by balancing the relative interests of the litigants, the United States, and the Commission. This "most important" factor requires courts to "assess the interests of each nation in requiring or prohibiting disclosure, and determine whether disclosure would 'affect important substantive policies or interests' of either the United States or [the European Union]. In assessing the strength of [the EC's] interests, [courts] will consider 'expressions of interest by the foreign state,' 'the significance of disclosure in the regulation ... of the activity in question,' and 'indications of the foreign state's concern for confidentiality *prior to the controversy*.'" *Richmark Corp.*, 959 F.2d at 1476 (citation omitted, emphasis in original, alterations added). These considerations favor the application of comity here in at least three ways: (1) EC's longstanding and robust sovereign interest in preserving its successful mechanism of combating unlawful cartels clearly outweighs any interest private litigants may have in obtaining marginal discovery; (2) the United States government shares the Commission's strong interest in

---

Where two states have jurisdiction to prescribe and enforce rules of law and the rules they may prescribe require inconsistent conduct upon the part of a person, each state is required by international law to consider, in good faith, moderating the exercise of its enforcement jurisdiction in the light of such factors as (a) vital national interests of each of the states, (b) the extent and the nature of the hardship that inconsistent enforcement actions would impose upon the person, (c) the extent to which the required conduct is to take place in the territory of the other state, (d) the national of the person, and (e) the extent to which enforcement by action of either state can reasonably be expected to achieve compliance with the rule prescribed by that state.

Restatement (Second) of Foreign Relations Law, § 40 (1965).

preserving the confidentiality of certain documents relating to the two sovereigns' leniency or amnesty programs; and (3) the documents are confidential and not discoverable under comity and the Federal Rules.

      1.    *The EC Has A Strong And Longstanding Interest In Preserving The Confidentiality Of Certain Investigatory Materials Guaranteed By Its Laws*

The Commission's policies and laws respecting the confidentiality of certain investigatory documents are longstanding and represent important sovereign interests. As related in greater detail in the attached Declaration of Philip Lowe, *see* Decl. Lowe ¶ 2, EC law accords strict confidentiality to documents that are generated pursuant to or obtained from third parties during the course of the Commission's anti-cartel investigations. For instance, the Leniency Program requires applicants to produce incriminating material as part of their cooperation. *Id.* Moreover, the Commission's briefs or other filings may contain confidential material, while suspects are allowed to review portions of the Commission's administrative file (which may include sensitive material submitted by third parties) to assist in the preparation of their legal defenses. *Id.* In addition, different private parties can attend closed hearings during which confidential material (including that from third parties) may be disclosed. *Id.* All of these types of information are at issue here.

The creation and exchange of investigatory material is central to European legal procedures and depends on cooperation from private parties, which in turn arises from the Commission's assurances that the information will be accorded strict confidentiality under EC law. Consequently, none of the parties to any given investigation – including the Commission itself – may use or discover the confidential material in any matter or for any purpose other than the investigation itself. Decl. Lowe ¶ 2; *see also* Antitrust Modernization Commission,

Submission by Directorate General of the EC, § 2.4; EC Treaty art. 287, 2002 O.J. (C 325) 1; EC Council Regulation of 16 December 2002, no. 1/2003 art. 28, 2003 O.J. (L1) 1; EC, *Staff Regulations of Officials of the European Communities*, art. 17 (Jan. 5, 2004); EC Commission Regulation of 7 April 2004, no. 773/2004 art. 15(4), 2004 O.J. (L 128) 18 ("Documents obtained through access to the file pursuant to this Article shall only be used for the purposes of judicial or administrative proceedings for the application of Articles 81 and 82 of the Treaty"); *see generally*, DOJ Letter. The Leniency Program – the most successful instrument for detecting and punishing unlawful cartels in Europe – relies on voluntary submissions of sensitive material by applicants, but applicants would not participate if they were put in a worse position for having volunteered this information. *See* DOJ Letter at 4 ("Turning over information provided by a leniency applicant will create disincentives for companies to apply for leniency in the European Union"). As such, the protective order in place in this litigation is inadequate because, by its terms, entities who were not parties to the Commission's investigation may be granted access to confidential material to use in entirely separate proceedings.

Preserving the protection from discovery of investigative materials is critical to EC's sovereign interests. EC investigation procedures are designed to encourage private parties to provide sensitive material in detrimental reliance on the Commission's legally binding assurance of confidentiality. It follows that destroying the confidentiality *post facto* creates an unfair and unexpected harm to companies who cooperated with the Commission, would reduce confidence in the Commission's sovereign promises, and, in turn, would make it more difficult for the Commission to secure future cooperation from and to negotiate with suspects. According to the Department of Justice, such a result would harm the EC as well as the United States: "the disclosure of such documents will harm the EC's leniency program and its investigative abilities

and could have a corresponding negative impact on the Antitrust Division's leniency program and its international anti-cartel enforcement program." *Id.* at 1. Moreover, the EC's sovereign guarantee is protected by statute and, therefore, the discovery protection cannot be waived by private parties, even if a party produces some limited set of the confidential material inadvertently. In short, the guarantee of confidentiality lies at the heart of the Commission's ability to detect and punish unlawful cartels, and anything that damages that guarantee would undermine the EC's sovereign interest in preventing cartels and risk serious economic harm to consumers in the European Union. In light of the global nature of much cartel activity, impeding the Commission's ability to combat unlawful cartels would likely have negative effects on consumers in other places—including the United States.[3]

> 2. *The United States Government Has An Interest In Preserving The Confidentiality Of Documents Generated Pursuant To An Antitrust Amnesty Program, Including The EC's Program*

The Commission and the United States share an equally strong interest in protecting the confidentiality of materials obtained through their respective antitrust amnesty programs or otherwise through their anti-cartel investigations. Enforcement of competition laws benefits both the EC and U.S. in their antitrust enforcement, and the U.S. Government (often in cooperation with the EC) has also recognized that antitrust enforcement depends on the continued confidentiality of materials such as those at issue here. *See* DOJ Letter at 4 ("Due to the critical role of the Division's leniency program in its international anti-cartel enforcement program . . . harm to the EC leniency program could result in harm to the Division's ability to detect and successfully prosecute international cartels that target U.S. businesses and consumers.").

---

[3] The EC laws at issue are longstanding, have broad application in the European Union, and cannot be characterized as mere blocking statutes designed to frustrate foreign judicial proceedings. *See Reinsurance Co. of Am. v. Administratia Asigurarilor de Stat*, 902 F.2d 1275, 1282-83 (7th Cir. 1990) (Romanian secrecy law respected where it applied to domestic and foreign litigants with equal force); *United States v. First Nat'l Bank of Chicago*, 699 F.2d 341, 345-46 (7th Cir. 1983) (Greek bank secrecy laws outweighed U.S. interest in collecting taxes).

In a program that is very similar to that administered by the EC, the U.S. Department of Justice offers leniency to cartel participants who inform on their fellow cartel participants and then continue cooperating with the subsequent investigation. *See* U.S. Dep't of Justice, *Antitrust Division Manual*, at III-102-09 (4th Ed. 2008). "The leniency program is clearly the [Antitrust] Division's most effective generator of international cartel cases" and "has led to the detection and prosecution of more international cartels than all of the Division's search warrants, consensual monitoring, and FBI interrogations combined." DOJ Letter at 2; *see also* Br. of United States, *Empagran, S.A. v. F. Hoffman-Laroche, Ltd.*, No. 01-7115, 2005 WL 388672, at *19 (D.C. Cir. Feb. 16, 2005) (describing the program as "the primary engine of the government's anti-cartel enforcement"). Like the Commission's Leniency Program, the Amnesty Program's success depends on obtaining the cooperation of would-be informants by "offer[ing] incentives to cartel members who voluntarily disclose their criminal conduct and cooperate with prosecutors," *Empagran* Br. at *19, "[b]ecause cartels operate in secret, [and] obtaining the cooperation of insiders is the best and frequently the only way to break open a cartel." DOJ Letter at 2.

The Justice Department believes ongoing confidentiality is a critical element of any leniency or amnesty program. As the Antitrust Division explains in a letter prepared for the purpose of assisting the EC in this matter:

> Confidentiality is one of the hallmarks of leniency programs, and a lack of confidentiality is a major disincentive for leniency applications. . . . Many leading members of the private antitrust bar who represent leniency applicants have advised . . . that the Division's promise of confidentiality is a critical, and in some cases determinative, factor that companies rely upon in making the decision to self-report pursuant to the Division's leniency program.

*Id.* at 3. Thus, as it explained in a brief opposing the discoverability of Amnesty-related documents in the first *Flat Glass* MDL, "[t]he Division holds the identity of amnesty applicants in strict confidence" based on "the common-sense understanding that corporations or individuals will be unwilling to step forward unilaterally to admit their guilt if their request and the information they supply is made public." Br. of United States as *amicus curiae*, *In re Flat Glass Antitrust Litig.*, MDL No. 1200, Misc. No. 97-550, at 5-6 (W.D. Pa. Mar. 26, 1998). In fact, "the Division will not publicly disclose the identity of an amnesty applicant" because "both the Division and any applicant for amnesty rely on and expect their discussions to remain confidential." *Id.* at 6. Materials "that may have been specially created – or statements that may have been specifically made – in connection with an amnesty application," *id.* at 7, are protected from discovery under the law enforcement investigatory privilege. *See* Br. of United States, *Nelson v. Pilkington*, No. 98-3498, at 13-14 (3d Cir. Dec. 7, 1998); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 618 F.Supp. 2d 1194, 1194-95 (N.D. Cal. 2009) (analyzing applicant's duties under the Antitrust Criminal Penalty Enhancement and Reform Act of 2004).

Leniency programs are critical to international anti-cartel enforcement efforts, as the Department of Justice explains:

> [t]he [Antitrust] Division has advised a number of foreign governments in the drafting and implementation of effective leniency policies [because t]he emergence of leniency polices of different governments with similar requirements has made it much easier and far more attractive for companies to develop a global strategy for reporting international cartel offenses and had led leniency applicants to report their conduct to multiple jurisdictions simultaneously.

DOJ Letter at 3. Indeed, "the European Commission has been one of the Division's closest partners in the fight against international cartels" and "[o]ver ninety percent of the international cartels that have been prosecuted by the Division were active in Europe as well as in the United

13

States." *Id.* at 4.  Therefore, enhancing anti-cartel enforcement in the United States requires courts to respect sovereign guarantees of confidentiality across international borders.  As the Justice Department explains, "[i]f companies that have dual exposure in the United States and the European Union are dissuaded from applying for leniency with the European Commission, then they may also choose not to apply for leniency in the United States."  *Id.*  This would have serious ramification for enforcement efforts in the United States: "Due to the critical role of the Division's leniency program in its international anti-cartel enforcement program as described above, harm to the EC leniency program could result in harm to the Division's ability to detect and successfully prosecute international cartels that target U.S. businesses and consumers."  *Id.*

Although the two programs are structured somewhat differently, both the United States and the Commission have determined that preserving the strict confidentiality of material that is closely related to their respective leniency programs is an important and necessary element to the programs' continued success, and to protect consumers in the EC and in the United States.

3. *The EC's Interest Is Confirmed By The Documents' Confidential Status*

The strength of the EC's interest in confidentiality is confirmed by the fact that the documents and other materials in question here are protected from discovery under EC law. Third parties were encouraged to provide statements in the EC based on the Commission's sovereign guarantees of confidentiality – assurances backed by law.  Decl. Lowe ¶ 2.  As documents privileged from discovery, those at issue here are entitled to the highest level of protection under comity principles.  *See* Fed. R. Civ. P. 26(b)(1) (discovery extends only to matters that are "nonprivileged"); Fed. R. Evid. 501 ("the privilege of a witness, person, government, State, or political subdivision thereof, shall be governed by the principles of the common law").

14

Discovery privileges are not restricted to those specifically established within the United States. Indeed, the Restatement (Third) explains that "a communication privileged where made—for instance, *confidential testimony given to a foreign government investigation under assurance of privilege*—is not subject to discovery in a United States court." Restatement (Third) of Foreign Relations Law, § 442 cmt. d (emphasis added); *see also White v. Kenneth Warren & Son, Ltd.*, 203 F.R.D. 369, 372 (N.D. Ill. 2001) (English legal proceeding was confidential under English law, and therefore not subject to discovery in the United States; "if a privilege is recognized in a foreign country, then comity requires us to apply that country's laws to the documents at issue.") (citing *McCook Metals L.L.C. v. Alcoa, Inc.*, 192 F.R.D. 242, 256 (N.D. Ill. 2000)).

The materials at issue here were provided by third parties to the EC, and in turn by the EC to other parties, under the EC's strict assurance of confidentiality. Accordingly, as in the example provided in comment d to § 442 of the Restatement (Third), the Court should treat the confidential information and documents as privileged and non-discoverable under the Federal Rules.

B.    Confidentiality Is Narrowly Tailored Here, So The Documents That Should Be Protected Are Few In Number And Not Important To This Litigation

Only a limited number of confidential documents are at issue here, and their non-disclosure should have no material effect on this litigation. This fact weighs heavily in favor of respecting EC law. "[C]ourts are less inclined to ignore a foreign state's concerns where the outcome of litigation 'does not stand or fall on the present discovery order,' or where the evidence sought is cumulative of existing evidence." *In re Rubber Chems. Antitrust Litig.*, 486 F. Supp. 2d 1078, 1082 (N.D. Cal. 2007) (denying motion to compel discovery of EC competition enforcement materials).

15

That is the case here: as set forth in the attached affidavit from the Director General of the Commission's Directorate for Competition, many – perhaps most – of the documents that are potentially responsive to the plaintiffs' discovery motion are *not* confidential and would be responsive to plaintiffs' request if the EC's motion is granted. Decl. Lowe, ¶ 4. For instance, the Commission does not object to Guardian's production of its own documents that pre-existed the investigation, even if it produced those documents to the Commission. *Id.* Nor does it object to Guardian producing documents and briefs it created in response to the investigation – including documents it provided to the Commission – so long as it redacts all confidential information that it had obtained from the Commission (such as the trade or business secrets of third parties).

Specifically, the Commission believes that:

- First, Guardian should be required to withhold entirely the following classes of documents:

    i.   pre-existing documents and information produced to the Commission by third parties, obtained by Guardian from the Commission's administrative file;

    ii.  the Commission's Statement of Objections, which incorporates third-party confidential information;

    iii. transcripts or other records of oral proceedings before the Commission, which includes confidential statements by the Commission and third parties; and

    iv.  the Commission's legal brief and associated materials filed in opposition to Guardian's pending appeal to the European Court of First Instance.

- Second, Guardian should be required to redact confidential information pertaining to third parties or the Commission before it can lawfully produce the following documents:

    i.   Guardian's reply to the Statement of Objections;

    ii.  the Commission's request for information under Article 18;

    iii. Guardian's response to the Commission's Article 18 request; and

    iv.    Guardian's briefs and associated documents filed in its pending appeal to the Court of First Instance.

*See* Decl. Lowe ¶ 4.  The Commission does not seek to prevent the discovery of Guardian's pre-existing documents, or of any other non-confidential material.  *See generally*, 1/2003, EC Commission Regulation 773/2004 and Commission Notice on the rules for access to the Commission file in cases pursuant to Articles 81 and 82 of the EC Treaty, Articles 53, 54 and 57 of the EEA Agreement and Council Regulation (EC) No 139/2004 ("Access to File Notice") (providing one definition of business secrets and other confidential information under EC law).

In short, the only material confidential under EC law for the purposes of this litigation is that which was created by the Commission or provided to the Commission by third parties.  This would include Guardian's own documents to the extent that they contain confidential information received from the Commission or third parties.  This likely represents a limited number of documents, and should have no material effect on this litigation.

    C.    <u>The Document Request Was Not Sufficiently Narrow</u>

This factor also favors non-disclosure.  "[G]eneralized searches for information whose disclosure is prohibited under foreign law are discouraged."  *In re Rubber Chems.*, 486 F. Supp. 2d at 1083.  The plaintiffs here elected to demand production of a wide and poorly-defined range of documents "in connection with" the Commission's investigations "but not limited to" the Commission's specific case, including "documents . . . received from the European Commission" and "documents relating to any investigation by the EC."  Mot. to Compel at 1.  The lack of specificity and limitation in the discovery motion fails to provide the level of precision that might better enable the Court and the parties to limit the proposed document production to non-confidential material.

### D. The Information Did Not Originate In The United States

Documents created abroad are more widely protected under principles of international comity, and most, if not all, of the documents at issue here either were prepared by European companies or subsidiaries for the purpose of responding to or cooperating with the Commission's investigation, or else they were prepared or transcribed by the Commission itself for the purpose of its investigation. Guardian may have these materials in its possession only because the Commission provided the documents to the party's European counterparts to assist in their legal defense in Europe. "The fact that [Guardian or any of the other parties] has access to these documents in the U.S. is not dispositive [because t]he documents were created, transmitted, and used only in Europe and in conjunction with the European enforcement proceedings." *In re Rubber Chems.*, 486 F. Supp. 2d at 1083.

### E. There Are Alternative Means Of Securing The Information

Finally, there are alternative means of securing most of the information sought in the discovery motion, which also weighs in the Commission's favor. "If the information sought can easily be obtained elsewhere, there is little or no reason to offend foreign law." *Id.* Most of the documents at issue are already non-confidential, or at least discoverable with appropriate redactions. Moreover, information relating to the defendants' practices in the United States "is likely to be more relevant to [plaintiffs] than the EC documents." *Id.* An additional critical consideration is that many of the documents of third parties that pre-existed the Commission's investigation – possibly including some material that may be confidential and protected if obtained through the Commission's legal process – may be discoverable *from those parties directly* if the information is relevant and if the Court otherwise has jurisdiction over those parties and papers.

## II. The Act Of State Doctrine Prohibits Judicial Challenge To The Commission's Promise Of Strict Confidentiality In Exchange For Cooperation.

The Court should deny the motion to compel confidential documents under the act of state doctrine. This doctrine does not allow courts to "inquir[e] into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 401 (1964); *see also* Restatement (Third) of Foreign Relations Law § 443(1) (courts should not invalidate the "acts of a governmental character done by a foreign state within its own territory and applicable there"). As the Third Circuit has explained, "[c]ourts must dismiss under the act of state doctrine when resolution of a suit would require the court to declare invalid and ineffective as 'a rule of decision for the courts of this country' the official act of a foreign sovereign." *Gross v. German Found. Indus. Initiative*, 456 F.3d at 391-92 (quoting *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.,* 493 U.S. 400, 405 (1990) (citing *Ricaud v. Am. Metal Co.,* 246 U.S. 304, 310 (1918))). "In every case in which [the Supreme Court has] held the act of state doctrine applicable, the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick,* 493 U.S. at 405.

The act of state doctrine bars discovery of certain documents in this case. The Commission, acting as a sovereign, provided private parties with assurances of confidentiality that are legally binding under EC law. This discovery protection is absolute: neither the Commission nor any of the parties may use or produce any of the documents covered by the confidentiality in any way or for any matter other than the investigation itself. Decl. Lowe ¶ 2. Each of the exchanges of information between the Commission and the private parties occurs under the aegis of strict and binding confidentiality created by the EC's rules.

19

Therefore, judicial orders countermanding the confidentiality binding under EC law necessarily call into question the validity of public acts by a sovereign authority within its own borders.  That is, this Court cannot compel the discovery of documents that are protected under EC law without simultaneously declaring invalid and ineffective the official acts of a foreign sovereign that extended the confidential status to the documents.  Accordingly, the Court should not authorize the discovery of documents or information confidential under EC law.

## CONCLUSION

For the foregoing reasons, this Court should grant the EC's Motion for Partial Reconsideration and deny in part the plaintiffs' motion as it pertains to confidential material.


Dated:  October 8, 2009                    Respectfully submitted,


                                   ___/s/ Carter G. Phillips_____
                                   Carter G. Phillips (DC 264176) (*pro hac vice*)
                                   Richard Klingler (DC 438908) (*pro hac vice*)
                                   James C. Owens (DC 490140) (*pro hac vice*)
                                   SIDLEY AUSTIN LLP
                                   1501 K Street, N.W.
                                   Washington, DC  20005
                                   Phone:  (202) 736-8000
                                   Fax:     (202) 736-8711
                                   Email: cphillips@sidley.com
                                           rklingler@sidley.com
                                           jcowens@sidley.com

                                   *Attorneys For Intervenor-Applicant European Commission*

# Exhibit D

Page 1

1          UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA
2              SAN FRANCISCO DIVISION

3

4    In re:                        )
     CATHODE RAY TUBE (CRT)        )CASE NO. 07-cv-05944 SC
5    ANTITRUST LITIGATION          )MDL No. 1917

6

7

8                    VIDEOTAPED
9            DEPOSITION OF MEGGAN EHRET
10                   VOLUME I
11

          The deposition upon oral examination of MEGGAN
12   EHRET, a witness produced and sworn before me,
     Tamara J. Brown, CSR, RMR, CRR, Notary Public in and
13   for the County of Marion, State of Indiana, taken on
     behalf of the Plaintiffs, at the offices of Faegre
14   Baker & Daniels, 300 North Meridian Street,
     Indianapolis, Marion County, Indiana, on the 8th day
15   of January, 2015, pursuant to the Federal Rules of
     Civil Procedure with written notice as to time and
16   place thereof.

17

18

19

20

21

22

23

24

25

Page 104

```
 1              MS. OSBORN:  Object to form, to the extent     11:47:26
 2         it discloses attorney work product and              11:47:28
 3         decisions.  You can answer.                          11:47:30
 4    A    It is my understanding, without giving you any      11:47:33
 5         confidential information, without waiving the        11:47:35
 6         privilege, that those documents were produced in     11:47:37
 7         their entirety, subject to a privilege review,       11:47:41
 8         whatever documents were withheld for privilege,      11:47:45
 9         I understand were logged.                            11:47:47
10    Q    Thomson SA has not appealed the EC decision.  Is     11:47:52
11         that correct?                                        11:47:54
12    A    That is correct.                                     11:47:55
13    Q    And neither Thomson SA nor Thomson Consumer are      11:47:57
14         disputing the findings in the EC decision.  Is       11:48:02
15         that correct?                                        11:48:04
16              MS. OSBORN:  Object to form.  It assumes        11:48:05
17         facts not in evidence.                               11:48:06
18    A    That is not correct.                                 11:48:08
19    Q    Okay.  Are there specific facts in the EC            11:48:11
20         decision that Thomson SA is disputing?               11:48:14
21              MS. OSBORN:  Object to form.  You can           11:48:20
22         answer to the extent that it doesn't call for        11:48:20
23         privileged disclosure.                               11:48:22
24    A    I'm happy for you to ask me questions about,         11:48:25
25         specifically about the European Commission's         11:48:28
```

Page 105

| | | | |
|---|---|---|---|
| 1 | | nonconfidential decision.  And you are correct | 11:48:31 |
| 2 | | that Thomson SA has not appealed that decision. | 11:48:35 |
| 3 | | However, its decision not to appeal that | 11:48:39 |
| 4 | | decision -- without giving you any confidential | 11:48:41 |
| 5 | | information, without waiving privilege -- does | 11:48:44 |
| 6 | | not mean that Thomson SA agrees or accepts as | 11:48:46 |
| 7 | | true any statements in the European | 11:48:51 |
| 8 | | Commission's. | 11:48:53 |
| 9 | Q | Okay.  Thomson SA admitted to the European | 11:48:56 |
| 10 | | Commission that it participated in | 11:48:59 |
| 11 | | anticompetitive conduct in the CRT industry. | 11:49:01 |
| 12 | | Correct? | 11:49:03 |
| 13 | | MS. OSBORN:  Objection.  Attorney-client | 11:49:04 |
| 14 | | privilege, work product, privileged and | 11:49:05 |
| 15 | | confidential EC communication.  You can answer | 11:49:08 |
| 16 | | to the extent you can answer without disclosing | 11:49:13 |
| 17 | | privileged communications. | 11:49:16 |
| 18 | A | It's easier for me if you walk me through | 11:49:17 |
| 19 | | provisions of the European Commission decision. | 11:49:19 |
| 20 | | It's a very lengthy document. | 11:49:23 |
| 21 | Q | Has Thomson SA stated in its annual reports that | 11:49:30 |
| 22 | | it acknowledged to the European Commission that | 11:49:33 |
| 23 | | it participated in anticompetitive conduct in | 11:49:35 |
| 24 | | the CRT industry, Ms. Ehret? | 11:49:37 |
| 25 | | MS. OSBORN:  Object to form. | 11:49:40 |