# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| **IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** | |
| *Best Buy Co., Inc., et al. v. Hitachi, Ltd., et al.,* No. 11-cv-05513-SC | Master Case No. 3:07-cv-5944-SC MDL No. 1917 |
| *Best Buy Co., Inc., et al. v. Technicolor SA, et al.,* No. 13-cv-05264-SC | |
| *Target Corp. v. Chunghwa Picture Tubes, Ltd., et al.,* No. 11-cv-05514-SC | |
| *Target Corp. v. Technicolor SA, et al.,* No. 13-cv-05686-SC | |
| *Alfred H. Siegel, as Trustee of the Circuit City Stores, Inc.. Liquidating Trust v. Hitachi, Ltd., et al.,* No. 11-cv-05502-SC | **DECLARATION OF PIERRE LAROUCHE** |
| *Sears, Roebuck and Co. et al. v. Chunghwa Picture Tubes, Ltd., et al.,* No. 11-cv-05514-SC | |
| *Sharp Electronics Corp. et al. v. Hitachi Ltd., et al.,* No. 13-cv-1173-SC | |
| *Sharp Electronics Corp., et al. v. Koninklijke Philips Electronics N.V., et al.,* No. 13-cv-2776-SC | |
| *ViewSonic Corporation v. Chunghwa Picture Tubes, Ltd., et al.,* No. 14-cv-02510 | |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................... 1

I.      THE EUROPEAN COMMISSION .......................................................................... 2

II.     CARTEL PROHIBITION UNDER EU LAW ......................................................... 3

III.    ANTITRUST ENFORCEMENT BY THE EUROPEAN COMMISSION ...................... 8

        A.      Legal Rights Of Parties Charged With Violating EU Law ....................... 8

        B.      The European Commission's Investigation And Prosecution Of Cartels ................. 9

IV.     JUDICIAL REVIEW .............................................................................................. 13

V.      FINAL DECLARATION ........................................................................................ 15

I, Pierre Larouche, declare as follows:

1.      I submit this Declaration pursuant to Federal Rule of Civil Procedure 44.1 on behalf of Panasonic Corporation of North America, MT Picture Display Co., Ltd., and Panasonic Corporation (f/k/a Matsushita Electrical Industrial Co.); LG Electronics, Inc.; Toshiba America Consumer Products, L.L.C., Toshiba America Electronic Components, Inc., Toshiba America, Inc., Toshiba America Information Systems, Inc., and Toshiba Corporation; Samsung SDI America, Inc., Samsung SDI Co. Ltd., Samsung SDI (Malaysia) Sdn. Bhd., Samsung SDI Mexico S.A. De C.V., Samsung SDI Brasil Ltda., Shenzen Samsung SDI Co., Ltd., and Tianjin Samsung SDI Co., Ltd.; Koninklijke Philips N.V., Philips Electronics North America Corporation, Philips Taiwan Limited, and Philips do Brasil Ltda.; and Technicolor SA (f/k/a Thomson SA) and Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.).

2.      I have been asked to provide (i) legal background concerning the competition laws of the European Union ("EU") and (ii) background on the procedures used by the European Commission when enforcing EU competition laws.

## INTRODUCTION

3.      I am full Professor of Competition Law at Tilburg Law School, Tilburg University (the Netherlands), Founding Director of The Tilburg Law and Economics Center (TILEC), as well as Professor at the College of Europe (Bruges).  I hold a bachelor degree in law from McGill University (Montreal, Canada), a masters from University of Bonn (Germany) and a Ph.D. from Maastricht University (the Netherlands).  Before embarking on an academic career, I clerked at the Supreme Court of Canada from 1991-1992 and practiced law for three years in the European Union Law Unit of Stibbe Simont Monahan Duhot (now Stibbe) in Brussels.  My teaching and research focus includes Competition Law, Regulation of Network Industries (including Telecommunications Law and Media Law), general European Union Law,

1

comparative law (in particular as regards tort law) and comparative legal theory.  I have held

guest or visiting positions at McGill University in 2002, at the National University of Singapore

in 2004, 2006, 2008, 2011 and 2013, and at Institut d'études politiques (Sciences Po, Paris) in

2012.  I was a senior fellow at Northwestern University Law School in 2009-2010, and I am

currently a visiting scholar at the University of Pennsylvania Law School.  I have published more

than fifty papers in reputable law and economics journals and in collective works.  I have

attached a more detailed resume as Exhibit A.

## I.     THE EUROPEAN COMMISSION

4.     Established by the Treaty of Rome in 1958, the European Commission (the

"Commission" or "EC") acts as a supranational institution that is independent from the Member

States.  The Commission is headed by a College of Commissioners, composed of 28 individual

members, one from each Member State.  One of the twenty-eight members (currently Jean-

Claude Juncker) is elected by the European Parliament to serve as President.

5.     The EC is responsible for proposing legislation, enforcing European law,

managing and implementing EU policies, and representing the EU outside of Europe, e.g.,

negotiating trade agreements between the EU and other countries.[1]

6.     Despite its long history, the EC's role in enforcement of antitrust laws has

evolved significantly during the last 10 to 15 years—the number of cartel cases handled by the

---

[1] *See* About the European Commission, http://ec.europa.eu/about/index_en.htm (last visited
March 13, 2015).

EC along with the level of fines imposed has increased many times over.[2]  That evolution has led

many to question whether the EC's procedures are adequately serving its relatively new role.[3]

## II.    CARTEL PROHIBITION UNDER EU LAW

7.    In connection with its law enforcement role within the EU, the Commission has

responsibility for enforcing EU competition law, which is set forth in Articles 101 through 108

of the Treaty on the Functioning of the European Union ("TFEU"), and in the EU Merger

Control Regulation (Regulation 139/2004 of 20 January 2004).   For the purposes of this

declaration, only Article 101 of the TFEU is relevant.[4]

---

[2] *See* Alan Riley, Centre for European Policy Studies, The Modernisation of EU Anti-Cartel Enforcement: Will the Commission Grasp the Opportunity? at 2–6 (Jan. 2010).

[3] *See, e.g.*, David Anderson & Rachel Cuff, *Cartels in the European Union: Procedural Fairness for Defendants and Claimants*, 34 Fordham Int'l L.J. 385, 385–86 (Feb. 2011) ("There has been a creeping criminalization of antitrust infringement in the European Union, but its system is designed with administrative sanctions in mind, and as a result, lacks the rigorous procedural safeguards necessary to ensure due process in such a regime."); Ian S. Forrester, *Due Process in EC Competition cases: A Distinguished Institution With Flawed Procedures*, 34 The European Law Review 817 (Dec. 2009) (explaining how the EC, a "talented and prestigious institution is weakened by unique, and uniquely unsatisfactory, processes and procedures"); Prof. Dr. Jurgen Schwarze, et al., Gleiss Lutz Rechtsanwalte, Deficiencies in European Community and Competition Law: Critical analysis of the current practice and proposals for change at 5 (Sept. 2008) ("In light of this increase [in fines], the legal foundation of substantive and procedural rules on which the European Commission's fine decisions are based needs to be reviewed and reconsidered."); Organisation for Economic Co-operation and Development, European Commission—Peer Review of Competition Law & Policy at 63–64 (2005) (criticizing the Commission's approach to hearing cases, in part, because "the Commission is too large to effectively deliberate and decide fact intensive matters," "[n]o Commissioner, including even the Competition Commissioner, will have attended the hearing," and "there is no ex parte rule or other control on contacts between investigating staff and the Commissioners who decide the matter").

[4] The whole of EU law as it relates to the general policing of the economy is referred to as "competition law," comprising the prohibition of restrictive agreements and practices (Article 101 of the TFEU), the prohibition of abuses of dominant position (Article 102 of the TFEU), merger control (Regulation 139/2004), the control of State subsidies to firms (known as State aids, Articles 107 and 108 of the TFEU) as well as the policing of State firms and monopoly rights (Article 106 of the TFEU).  It has become customary in the EU to refer to the subset of competition law found in Articles 101 and 102 TFEU as "antitrust."  Since this declaration is concerned with Article 101 and the term "antitrust" is commonly used in the U.S. to refer to the

8.      Article 101(1) of the TFEU prohibits "all agreements between undertakings . . . and concerted practices which may affect trade between Member States and which have as their object or effect the prevention, restriction or distortion of competition within the internal market."  Broadly speaking, it is the functional equivalent of Section 1 of the Sherman Act, 15 USC § 1.[5]

9.      An "agreement" under Article 101 centers "around the existence of a concurrence of wills between at least two parties, the form in which it is manifested being unimportant so long as it constitutes the faithful expression of the parties' intention."[6]  In line with the prevalent view in most continental European legal systems, there are no formal requirements for the existence of an agreement.  No writing is required, and the existence of an agreement can be inferred from circumstantial evidence, such as presence at a location where terms of a agreement were discussed, and subsequent behavior that is consistent with acquiescence in that agreement. However, conduct may still violate Article 101 even though there was no agreement to engage in anti-competitive conduct.[7]  For instance, if a firm learns that other firms intend to engage in anti-competitive conduct, that knowledge by itself can lead to antitrust liability, unless the

---

equivalent provisions of the Sherman Act, I will use "antitrust" for the sake of terminological convenience.

[5] Agreements in breach of Article 101(1) can be saved through the application of Article 101(3), but that possibility is not material for the purposes of this declaration.

[6] *See* GC, 26 October 2000, Case T-41/96, *Bayer v. Commission*, ECR 2000, p. II-3383, ¶ 69, referring to ECJ, 15 July 1970, Case 41/69, *ACF Chemiefarma v. Commission*, ECR 1970, p. 661, ¶¶ 111, 112.

[7] *See, e.g.*, CJEU, 4 June 2009, Case C-8/08, *T-mobile Netherlands*, ECR 2009, p. I-4529 (where an agreement to exchange information regarding wholesaler remuneration was found to be sufficiently linked with an observed retail price parallelism, even though the information exchange was not made with a express intent to coordinate retail prices).

corporation affirmatively disassociates itself from the anti-competitive conduct.[8]   Knowledge alone is considered sufficient to impose liability because it is presumed that the knowledge itself will lead to actual anti-competitive conduct.[9]   Similarly, a "concerted practice" does not require a knowing agreement, but instead applies to "coordination between undertakings which . . . knowingly substitutes practical cooperation between the undertakings for the risks of competition."[10]   It is not legally necessary for the Commission to categorize conduct found as either an agreement or a concerted practice.[11]

        10.     Notably, Article 101(1) applies to agreements and the concerted practices of "undertakings."  The concept of an undertaking is "aimed at economic units which consist of a unitary organization of personal, tangible and intangible elements which pursue a specific economic aim on a long term basis."[12]   The concept of "undertaking" under EU competition law does not focus on legal forms.  If two separately incorporated entities are deemed to be part of a

---

[8] See GC, 28 April 2010, Case T-452/05, *Belgian Sewing Thread NV (BST) v. Commission*, ECR II-1373, ¶ 37 ("Furthermore, according to the case-law, it is sufficient for the Commission to show that the undertaking concerned participated in meetings at which anti-competitive agreements were concluded, without manifestly opposing them, to prove to the requisite standard that the undertaking participated in the cartel.  Where participation in such meetings has been established, it is for that undertaking to put forward evidence to establish that its participation in those meetings was without any anti-competitive intention, by demonstrating that it had indicated to its competitors that it was participating in those meetings in a spirit that was different from theirs.").

[9] See GC, 12 July 2001, Joined Cases T-202/98, T-204/98 and T-207/98, *Tate & Lyle et al. v. Commission*, ECR II-2035, ¶ 66 ("[T]he mere fact that it received at those meetings information concerning competitors, which an independent operator preserves as business secrets, is sufficient to demonstrate that it had an anti-competitive intention").

[10] ECJ, 14 July 1972, Case C-48/69, *ICI v. Commission*, ECR 1972, p. 619.

[11] See, e.g., Ex. J to the Declaration of Jill S. Casselman in Support of Plaintiffs' Motions in Limine, CRT European Commission Decision ¶ 612 (the "EC Decision") ("In the case of a complex infringement of long duration, it is not necessary for the Commission characterise the conduct as exclusively one or other of the forms of illegal behaviour referred to in this Section.").

[12] EC Decision ¶ 721 (collecting authority).

single undertaking, then they are jointly and severally liable for each other's anti-competitive conduct.

11.     The undertaking concept arises most frequently in the context of parent-subsidiary relationships, and it turns on whether the parent exercised "decisive control" over the subsidiary. As the EC has explained, "[t]he question of decisive influence relates to the level of autonomy of the subsidiary with regard to its overall commercial policy."[13]  Further, "[a] parent company may exercise decisive influence over its subsidiaries even when it does not make use of any actual rights of co-determination and refrains from giving any specific instructions or guidelines on individual elements of commercial policy."[14]

12.     While the Commission generally bears the burden of establishing that two separately incorporated entities are part of the same undertaking, where a parent directly or indirectly owns 100% (or close to 100%) of the subsidiary, then "there exists a rebuttable presumption that the parent also in fact exercises that control without the need for the Commission to adduce further evidence on the actual exercise of control."[15]  But that presumption may only be rebutted where the parent lacked knowledge of the subsidiary's infringing conduct.  "Where a parent company has the ability to exercise control over its subsidiary (or over a joint venture) and is aware of the infringement and does not stop it, it will be held liable for its infringement," regardless of the actual exercise or non-exercise of decisive control by the parent.[16]  In other words, even when a parent does not in any way approve of or

---

[13] *Id*. ¶ 724.

[14] *Id*. ¶ 727.

[15] *Id*. ¶ 723.

[16] *Id*. ¶ 725; *see also* CJEU, 23 April 2009, Case C-97/08P, *Akzo Nobel v. Commission*, ¶ 92 ("[T]he decisive influence of the parent company does not necessarily have to result from specific instructions, guidelines or rights of co-determination in terms of pricing, production and

agree to participate in that conduct, then the parent may be held vicariously liable for the acts of its subsidiary.

13.     Article 101(1) applies to agreements that have as their object or effect the prevention, restriction or distortion of competition.   There is a long line of case-law on the distinction between restrictions by object and by effect and on the applicable tests for each of these two categories,[17] but this distinction is not material for the purposes of this declaration.

14.     Finally, Article 101(1) only applies to agreements or concerted practices that "affect trade between Member States" and have as their object or effect the prevention, restriction or distortion of competition "within the internal market."   Without an effect on trade between Member States, the agreement or practice will fall outside of the scope of application of EU competition law and will fail to be assessed, as the case may be, under the national competition laws of EU Member States.   The notion of "effect on trade between Member States" is interpreted very broadly, such that the threshold for the application of Article 101 is very low: for instance, a single pub tenancy agreement, if representative of pub tenancies in a Member State, has been found to affect trade between Member States.[18]

---

sales activities or similar aspects essential to market conduct . . . nor, a fortiori, can it depend on whether the parent company has interfered in the day-to-day business of its subsidiary, or, equally, whether anticompetitive activities engaged in by the subsidiary were attributable to an instruction from the parent company or known to the latter.").

[17] *See* CJEU, 11 September 2014, Case C-67/13 P, *Groupement des cartes bancaires* v. *Commission*, not yet reported, ¶ 48–54.

[18] CJEU, 28 February 1991, Case C-234/89, *Delimitis* v. *Henninger Braü*, ECR I-935; *see generally* Commission Notice on Guidelines on the Effect of Trade Concept Contained in Articles [101] and [102] of the Treaty [2004] OJ C 101/81.

## III.    ANTITRUST ENFORCEMENT BY THE EUROPEAN COMMISSION

### A.    Legal Rights Of Parties Charged With Violating EU Law

15.    In a well-established line of case-law, the Court of Justice of the European Union ("CJEU") has constantly held that the provisions of the European Convention on Human Rights ("ECHR") constitute general principles of EU law, applicable to the actions of EU institutions such as the EC.   In addition, when the Treaty of Lisbon went into force in 2009, the EU enshrined its own Charter of Fundamental Rights, which applies to all EU activities and overlaps in substance with the ECHR.   As a result, EU Courts, such as the General Court and the European Court of Justice ("ECJ"), are often called upon to determine whether an act of one of the EU institutions (like the European Commission) is compatible with the fundamental rights, as protected by the ECHR and the EU Charter of Fundamental Rights.

16.    Article 6(1) of the ECHR provides that, "In the determination of his civil rights and obligations or of any criminal charge against him, everyone is entitled to a fair and public hearing within a reasonable time by an independent and impartial tribunal established by law."[19]

17.    In recent years, the application of Article 6 and Article 47 has come under scrutiny in a number of cases.   For example, ruling on Italian competition law, which features a comparable institutional setting to EU competition law, the European Court of Human Rights found that the initial decision made by the Italian competition authority could not meet the requirements of Article 6, since the authority was a mere administrative authority and not a tribunal.[20]   To qualify as a tribunal, an entity must be independent of the executive.[21]   It should be noted that, applying that standard, the European Court of Justice has held that "[t]he

---

[19] *See also* Article 47 of the EU Charter of Fundamental Rights.

[20] European Court of Human Rights, 27 September 2011, *Menarini* v. *Italy*, ¶¶ 58–59.

[21] *Id*. ¶ 61.

Commission . . . cannot . . . be classed as a tribunal."[22] Since the requirements of Article 6 are not fulfilled by the competition authority itself, the availability of judicial review to an independent court is then crucial for fundamental rights protection.[23]   Leaving aside the discussion of when and how that judicial review itself meets the requirements of Article 6 and Article 47, there is broad consensus that the procedure before the Commission, taken alone and in the absence of judicial review (or pending judicial review), is not sufficient to guarantee that the right of the parties to a fair trial has been respected.

## B.    The European Commission's Investigation And Prosecution Of Cartels

18.    The reasons why the Commission, when enforcing antitrust law, is not a tribunal within the meaning of Article 6 and Article 47 become apparent once the enforcement model is studied in greater detail.  That model is set out in Regulation 1/2003 of 16 December 2002 on the implementation of the rules on competition, secondary legislation, and relevant case-law.[24]  As a starting point, the EC holds, in a single hand, the power to investigate, prosecute, and adjudicate antitrust cases ("single model"); this stands in marked contrast to the "dual model" familiar to U.S. lawyers, where an agency investigates and prosecutes cases, with a view to bringing them before a separate and independent tribunal for adjudication.

---

[22] ECJ, 29 October 1980, Joined Cases 209–215 and 218/78, *Landewyck and Others v. Commission*, ECR 1980, p. 3125; *see also* GC, 14 May 1998, Case T-348/94, *Enso Espanola v. Commission*, ECR 1998, p. II-1884 ¶ 56 ("It is also settled law that the Commission cannot be described as a 'tribunal' within the meaning of Article 6 of the ECHR.").

[23] European Court of Human Rights, *Menarini*, supra, ¶ 58; Opinion of Advocate General Sharpston, 10 February 2011, C 272/09 P, *KME and Others v. Commission*, ¶ 68 ("[T]here may be cogent grounds for taking the view that the Commission is not, in that regard, an 'independent and impartial tribunal established by law'").

[24] The Commission has set out its practice in greater detail in the Commission Notice on best practices for the conduct of proceedings concerning Articles 101 and 102 of the TFEU [2011] OJ C 308/6.

19.     In addition, the European Commission enjoys very broad investigative powers. For example, the Commission has what amounts to unlimited subpoena power.  It can require any individual or entity to produce documents, provide a statement, or answer questions about a document.[25]

20.     The Commission also has the power to conduct searches on corporate premises,[26] in what are known as "dawn raids," a term that essentially speaks for itself—it involves the Commission arriving and entering premises unannounced for the purpose of collecting evidence. Before conducting a dawn raid, the Commission does not need to obtain any form of permission from a court, and the Commission unilaterally conducts the exercise to collect the evidence.  The only test is whether the Commission itself deems the raid "necessary."  While the raided party may challenge the right of the EC to have conducted the raid after the fact, it is extremely rare for the "necessary" standard to not have been met.

21.     As part of the EC investigation, once the EC decides to prosecute a case on the basis of its investigation, it will issue a Statement of Objections to what is known in the EU as an addressee (but is the functional equivalent of a defendant under U.S. law).[27]   In a dual enforcement model, the Statement of Objections would approximate an indictment; however, instead of bringing the case before the adjudicator, the Commission sets forth its activities and proceeds to decide the case.  The Statement of Objections sets forth the official charges of the Commission against the addressee.  Statements of Objections are not publicly available.

---

[25] Regulation 1/2003, Art. 18.

[26] Regulation 1/2003, Art. 20. The Commission may also search other—non-corporate—premises, under more restrictive conditions: Art. 21.

[27] Regulation 1/2003, Art. 27(1).

22.     If an individual or entity receives a Statement of Objections, it has the opportunity to respond, but the addressee has no ability to attempt to have the Statement of Objections dismissed or quashed.  The response to the Statement of Objections is legally significant to the extent that the EC must allow addressees to comment on the Statement.[28]  Like the Statement of Objections, the response of an addressee is not publicly available.  Further, where a single Statement of Objections is directed at several addressees, those addressees have in principle no access to each other's responses, except in redacted form.[29]

23.     In addition to receiving the Commission's accusations in a Statement of Objections, an addressee also has the right to access what is known as the Commission's file (the "File").[30]  The File essentially contains all of the documents that the Commission unilaterally chose to collect as part of its investigation.  Whilst the Commission, as an administrative agency, is meant to investigate fully, addressees have no ability to compel discovery from anyone, co-addressees or otherwise.

24.     While the File may contain evidence that the Commission will rely on in an attempt to prove a violation of Article 101, the Commission (at least over the last 10-15 years) has come to rely heavily on leniency submissions as the lynch pins of their cartel enforcement actions.  The Commission's leniency program is meant to reward entities—through some form of immunity or a reduced penalty—for admitting wrongdoing or assisting the Commission in its

---

[28] *Id*.

[29] Best Practices, ¶ 103.

[30] Regulation 1/2003, Art. 27(2), with further explanations in the Best Practices.

investigation.[31]   To that end, the Commission permits addressees to seek leniency through what amounts to an attorney proffer, called a "corporate statement" under EU law.[32]

25.    An important aspect of the Commission's leniency program is confidentiality. The Commission goes to great lengths to protect the information it receives through leniency submissions from not only public disclosure but from use in subsequent litigation—that is true in particular for the attorney proffer or "corporate statement" mentioned above.[33] Counsel for the addressee has the opportunity to provide the Commission with an oral statement, which often includes representations as to the recollection of witnesses.  The Commission does not require any statement to be made under penalty of perjury.  The only possible consequences for making false or misleading statements in a leniency proffer is the rejection or withdrawal of leniency itself.  In a situation involving one or more addressees who are seeking leniency, the other addressees do not receive a copy of any corporate statements, regardless of whether such statement implicates that addressee in wrongdoing.  The EC maintains exclusive access to the corporate statements.

26.    In addition to having the right to receive access to the File, an addressee also has the right to request a hearing.[34]  Importantly, "hearing" as used in the EC enforcement process is very different from "hearing" as that term is generally used in judicial proceedings.  A hearing in this context simply refers to the ability of the addressees to orally expand on their written submissions.  Although the addressees have the option to have witnesses speak on their behalf

---

[31] *See* Commission Notice on Immunity From Fines and Reduction of Fines in Cartel Cases [2006] OJ C 298/17.

[32] *Id*. ¶ 9.

[33] *See* Directive 2014/104 of 26 November 2014 on certain rules governing actions for damages under national law for infringements of the competition law provisions of the Member States and of the European Union [2014] OJ L 349/1, Art. 6(6).

[34] Regulation 1/2003, Art. 27(3), with further explanations in the Best Practices.

(like the leniency process, no part of the hearing is conducted under penalty of perjury), they have no right to compel the attendance of any witness.  Similarly, addressees have no right to cross-examine any witness, even if they appear and make a statement.  No aspect of the hearing is designed to evaluate or assess the reliability of the evidence on which the Commission intends to rely.

27.     Whilst the hearing is attended by Commission officials responsible for the File, it is not attended by the ultimate decision-makers, i.e., the twenty-eight Commissioners.  The hearing is presided over by the Hearing Officer, who is a member of the Commission's staff. The Hearing Officer plays no active role in the investigation or prosecution of alleged competition law violations.  He or she serves in primarily an administrative role.

## IV.     JUDICIAL REVIEW

28.     Pursuant to Article 19 of the EU Treaty, EU courts "shall ensure that in the interpretation and application of the Treaties the law is observed."  If a party objects to the actions of an EU administrative agency, like the Commission, it can seek relief first in the General Court, and then in the European Court of Justice.

29.     The General Court carries out what would qualify as a full jurisdiction review over those parts of the Commission decision concerning fines.[35] As for the rest of the Commission decision, the standard of review is more complex, balancing the requirements of Article 6 of the ECHR and Article 47 of the EU Charter, with a more *Chevron*-like deferential review. In a recent case, the CJEU framed the standard of review of the General Court as follows:

> It must be noted at the outset that it follows from Article 256
> TFEU and the first paragraph of Article 58 of the Statute of the

---

[35] Regulation 1/2003, Art. 31.

Court of Justice of the European Union that the General Court has exclusive jurisdiction, first, to find the facts, except where the substantive inaccuracy of its findings is apparent from the documents submitted to it, and, secondly, to assess those facts. However, when the General Court has found or assessed the facts, the Court of Justice has jurisdiction under Article 256 TFEU to review the legal characterisation of those facts by the General Court and the legal conclusions it has drawn from them.

In addition, it must be noted that, in accordance with the rules of the EU and FEU Treaties, relating to the division of powers between the Commission and the Courts of the European Union, it is for the Commission, subject to review by the General Court and the Court of Justice, to ensure application of the principles laid down in Articles [101 and 102 TFEU].

It must also be noted that the principle of effective judicial protection is a general principle of EU law to which expression is now given by Article 47 of the Charter of Fundamental Rights of the European Union.

Consequently, it is apparent from the EU case-law that, when an action is brought before it under Article 263 TFEU for the annulment of a decision applying Article [101 TFEU], the General Court must generally undertake, on the basis of the evidence adduced by the applicant in support of the pleas in law put forward, a full review of whether or not the conditions for applying that provision are met. The General Court must also establish that the Commission has stated reasons for its decision.

In carrying out such a review, the General Court cannot use the margin of assessment which the Commission enjoys by virtue of the role assigned to it in relation to competition policy by the EU and FEU Treaties, as a basis for dispensing with an in-depth review of the law and of the facts.

In particular, although the Commission has, in accordance with that role, a margin of assessment with regard to economic matters, in particular in the context of complex economic assessments, that does not mean, as is apparent from the preceding paragraph, that the General Court must refrain from reviewing the Commission's legal classification of information of an economic nature. Although the General Court must not substitute its own economic assessment for that of the Commission, which is institutionally responsible for making those assessments, it is apparent from now well-settled case-law that not only must the EU judicature establish, among other things, whether the evidence relied on is factually accurate, reliable and consistent but also whether that evidence contains all the relevant information which must be taken into account in order to assess a complex situation and whether it is capable of substantiating the conclusions drawn from it.[36]

30.     As indicated above, on issues of fact, the decision of the General Court is final.

On issues of law, an addressee can appeal to the Court of Justice of the European Union.

## V.     FINAL DECLARATION

31.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct.

Professor Pierre Larouche

Executed: March 13, 2015

Washington, D.C.

---

[36] CJEU, *Groupement des cartes bancaires*, supra, para. 41-46 [references omitted]; *KME et al. v. Commission*, C 272/09 P, EU:C:2011:810, §§ 91–111; *Kone Oyj et al. v. European Commission*, C-510/11 P, EU:C:2013:696, §§ 20–33.

15

EXHIBIT A

**PIERRE LAROUCHE**

**WORK ADDRESS***:*  Tilburg University
      Tilburg Law School
      Warandelaan 2, PO Box 90153
      NL-5000 LE Tilburg
      Tel.: +31.13.466.8033
      Fax: +31.13.466.8047
      e-mail: pierre.larouche@tilburguniversity.edu

**PLACE AND DATE OF BIRTH***:* Chicoutimi (Quebec), Canada, 18 June 1968.

**PROFESSIONAL QUALIFICATIONS***:* Member of the Quebec Bar (1991).

**RELEVANT EXPERIENCE**

2002-    Professor of Competition Law (Hoogleraar Mededingingsrecht), Tilburg University.
     Full-time appointment (1,0 fte), with 0,4 fte of research time.

1999-2002  Associate Professor (Universitair hoofddocent) and Post-doctoral researcher, Maastricht University.
     Full-time appointment (1,0 fte), with 0,4 fte of research time.

1996-1999  Research associate, METRO Institute, Maastricht University.
     Full-time appointment (1,0 fte), entirely for research.

1993-1996  Associate, Stibbe Simont Monahan Duhot, Brussels.
     Main fields of practice: EU competition law, EU telecommunications law, international trade law, environmental law, general EU law.

1991-1992  Law Clerk, Justice Charles D. Gonthier, Supreme Court of Canada, Ottawa.

1990-1991  Assistant to the Director, Legal Methodology Programme, McGill University.

**EDUCATION**

1996-2000  Universiteit Maastricht. Doctorate.
     Doctorate thesis: "The Bases of EC Telecommunications Law after Liberalization" (supervisors: Professors Walter Van Gerven and Bruno de Witte).

1992-1993  Rheinische Friedrich-Wilhelms-Universität Bonn. Magister der Rechtsvergleichung (M.iur.comp.). Distinction: cum laude.
     Masters thesis: "Die Verordnung (EWG) Nr. 3932/92 der Kommission vom 21. Dezember 1992 über die Anwendung von Artikel 85 Absatz 3 EWG-Vertrag auf bestimmte Gruppen von Vereinbarungen, Beschlüssen und aufeinander abgestimmten Verhaltensweisen im Bereich der Versicherungswirtschaft, insbesondere die Freistellung von Muster allgemeiner Versicherungsbedingungen" (supervisor: Professor Wulf-Henning Roth).
     Scholarship of the German Academic Exchange Service (DAAD).
     Scholarship of the Quebec Fonds pour la formation de chercheurs et l'aide à la recherche (FCAR).

1986-1990  McGill University, Montreal. Bachelor of Civil Law (B.C.L., droit civil) and Bachelor of Laws (LL.B., common law). Distinction: Upper Second Class Honours.

| | |
|---|---|
| University Scholar (1990). | James McGill Award (1989, 1987). |
| Member of the Scarlet Key Society (1990). | Faculty Scholar (1989, 1987). |
| McGill Law Students Association Prize (1990). | Wainwright Essay Prize (1989). |
| John G. Ahern, Q.C. Memorial Award (1990). | Daniel Mettarlin Scholarship (1989, 1988). |
| John W. Cook, K.C. Prize (1990). | Pelletier, Poirier, Leroux, Kimmel Award (1989). |
| Maurice Goldenberg Scholarship (1990). | David Litner, Q.C., Scholarship (1988). |
| Rogers, Bereskin and Parr Prize in the Law | Lord Reading Law Society Prize (1987). |
| of Intellectual and Industrial Property (1990). | Adolphe Mailhot Commemorative Prize (1987). |

1

**MAJOR GRANTS AND AWARDS (RESEARCH COUNCILS)**

Grant from the European Union (7th Framework Programme) as part of a consortium "Growth and Sustainability Policies for Europe" (GRASP) (2010-2014).

Grant from the Hague Institute for the Internationalization of Law (HiiL) for a research project on coping with the challenges of globalization (2007-2010).

Grant from the Netherlands Organization for Scientific Research (NWO) for research projects on the future of Article 86(2) EC on services of general economic interest (2008-2012) and on the new institutional frameworks in competition and electronic communications law (2004-2008).

Grant from the European Union (6th Framework Programme) to create an Economic Impact Group within the Network of Excellence on Common Principles of European Contract Law (CoPECL) (2004-2008).

**PUBLICATIONS**

**Monographs**

*The constitutionalization of European budgetary constraints* (editor, with M. Adams and F. Fabbrini) (Oxford: Hart, 2014) 428 p.

*National Legal Systems and Globalization: New Role, Continuing Relevance* (editor, with P. Cserne) (The Hague: TMC Asser Press, 2012) 388 p.

*Economic analysis of the DCFR - The work of the Economic Impact Group within CoPECL* (editor, with F. Chirico) (Munich/Oxford: Sellier European Publishing, 2010) 337 p.

*Een schets van het Europese mediabeleid* (with I. van der Haar), Study for the WRR Media Project (Amsterdam: Pallas, 2005) 90 p.

*The role of the market in economic regulation*, Inaugural lecture (14 November 2003) 38 p.

*European Communications at the Crossroads* (co-rapporteur with M. Cave), CEPS Working Party Report, (Brussels: CEPS, 2001) 32 p.

*Tort Law* (with W. van Gerven and J. Lever), in the series *Ius Commune Casebooks for the Common Law of Europe* (Oxford: Hart Publishing, 2000) 969 + xcix p.

*Competition Law and Regulation in European Telecommunications* (Oxford: Hart Publishing, 2000) 445 p.

*Tort Law: Scope of Protection* (co-author), in the series *Ius Commune Casebooks for the Common Law of Europe* (Oxford: Hart Publishing, 1998) 494 + lv p.

*Environment and Europe* (co-author), (Deventer: Kluwer, 1994) 221 + xii p.

**Articles and book chapters**

"Interoperability standards, patents and competition policy" (with G. van Overwalle), in P. Delimatsis, ed., *The Law, Economics and Politics of International Standardization* (2015, forthcoming).

"Injunctive Relief in Disputes Related to Standard-Essential Patents: Time for the CJEU to Set Fair and Reasonable Presumptions" (with N. Zingales), (2014) 10 Eur Competition J 231-276 (forthcoming).

"Settling FRAND Disputes: Is Mandatory Arbitration a Reasonable and Non-Discriminatory Alternative?" (with J. Padilla and R.S. Taffett) (2014) 10 J Competition Law & Econ 581-610.

"The constitutionalization of European budgetary constraints: Introduction" (with M. Adams and F. Fabbrini), in M. Adams, F. Fabbrini and P. Larouche, eds., *The constitutionalization of European budgetary constraints* (Oxford: Hart, 2014) 1-15.

2

"Continental Drift in the Treatment of Dominant Firms: Article 102 TFEU in Contrast to § 2 Sherman Act" (with M. P. Schinkel), in D. Sokol and R. Blair, eds., *Oxford Handbook of International Antitrust Economics – Vol. 2* (Oxford: OUP, 2014) 153-187.

"Five Neglected Issues About Network Neutrality", in A. Strowel, ed., *Net Neutrality in Europe – La neutralité de l'Internet en Europe* (Brussels: Bruylant, 2013) 77-91.

"Legal Emulation Between Regulatory Competition and Comparative Law", in P. Larouche and P. Cserne, eds., *National Legal Systems and Globalization – New Role, Continuing Relevance* (The Hague, TMC Asser Press, 2013) 247-287.

"Conclusions" (with P. Cserne), in P. Larouche and P. Cserne, eds., *National Legal Systems and Globalization – New Role, Continuing Relevance* (The Hague, TMC Asser Press, 2013) 371-383.

"A Vision of Global Legal Scholarship" (2012) 17 Tilburg Law Review 206-216.

"Cloud computing in the EU policy sphere interoperability, vertical integration and the internal market" (with J. Sluijs and W. Sauter) (2012) 3 Journal of Intellectual Property, Information Technology and E-Commerce Law 12-32.

"Network Neutrality: The Global Dimension", in M. Burra, ed., *Trade Governance in the Digital Age* (Cambridge: CUP, 2012) 91-122.

"Law, Society and Normativity", in S. Muller, S. Zouridis, M. Frishman and L. Kistemaker, eds., *The Law of the Future and the Future of Law* (Oslo: Torkel Opsahl, 2011) 407-416.

"The coming of age of EU regulation of network industries and services of general economic interest" (with L Hancher), in P. Craig and G. de Búrca, eds., *The Evolution of EU Law*, 2nd ed (Oxford: OUP, 2011) 743-781.

"Conclusions" (with F. Chirico and E. Van Damme), in P. Larouche and F. Chirico, eds., *Economic analysis of the DCFR - The work of the Economic Impact Group within CoPECL* (Munich/Oxford: Sellier European Publishing, 2010) 319-332.

"'Legally Relevant Damage' and A Priori Limits to Non-Contractual Liability in the DCFR", in P. Larouche and F. Chirico, eds., *Economic analysis of the DCFR - The work of the Economic Impact Group within CoPECL* (Munich/Oxford: Sellier European Publishing, 2010) 297-318.

"Contrasting legal solutions and the comparability of US and EU experiences", in F. Levêque and H. Shelanski, eds., *Antitrust and Regulation in the EU and US: Legal and Economic Perspectives* (Cheltenham: Edward Elgar, 2009) 76-100.

"The European *Microsoft* case at the crossroads of competition policy and innovation" (2009) 75 Antitrust LJ 933-964.

"Ex Ante Evaluation of Legislation Torn among its Rationales", in J. Verschuuren, ed., *The Impact of Legislation – A Critical Analysis of Ex Ante Evaluation* (Leiden/Boston: Martinus Nijhoff, 2009) 39-62.

"Abuse of a dominant position: Cases and experiments" (with E. van Damme and W. Müller), in J. Hinloopen and H.-T. Normann, eds., *Experiments and Competition Policy* (Cambridge: Cambridge University Press, 2008) 107-159.

"Europe and investment in infrastructure, with emphasis on electronic communications", in G. Arts, W. Dicke and L. Hancher, eds., *New Perspectives on Investment in Infrastructures*, WRR studies (Amsterdam: Amsterdam University Press, 2008) 241-269.

"On the future of information law as a specific field of law", in N. van Eijk and B. Hugenholtz, eds., *Liber amicorum Egbert Dommering* (Amsterdam: Otto Cramwinkel, 2008) 221-230.

"Conceptual divergence, functionalism and the economics of convergence" (with F. Chirico), in S. Prechal et al, eds., *The Coherence of EU Law* (Oxford: OUP, 2008) 463-494.

"A review of the WTO regime for telecommunications services" (with M. Bronckers), in K. Alexander and M. Andenas, eds., *World Trade Organization and Trade in Services* (Leiden: Brill, 2008, update from previous publication).

"The triangular relationship between the Commission, NRAs and national courts revised" (with M. de Visser) (2006) 64 Communications & Stratégies 124-145.

"A view from the outside", in C. Fijnaut and A. Littler, eds., *The regulation of gambling. European and national perspectives* (Leiden/Boston: Martinus Nijhoff Publishers, 2006) 1-7.

"Contrôle ex ante et ex post – Possibilités et contraintes en droit national, à la lumière de l'expérience néerlandaise", in M.A. Frison-Roche, ed., *Les engagements en régulation économique* (Paris: Dalloz, 2006) 95-108.

"Regulating Access to Stimulate Competition in Postal Markets?" (with E. van Damme and P. de Bijl), in M. Crew and P. Kleindorfer, eds., *Progress towards liberalization of the postal and delivery sector* (Springer: 2006) 153-172.

"Coordination of European and Member State Regulatory Policy – Horizontal, Vertical and Transversal Aspects", in D. Geradin et al., eds., *Regulation through agencies in the EU*, (Cheltenham: Edward Elgar, 2005) 164-179, also in (2004) 5 Journal of Network Industries 277-293.

"Telecommunications Services" (with M. Bronckers), in P. Macrory et al., eds., *The World Trade Organization: Legal, Economic and Political Analysis – Vol. I* (New York: Springer, 2005) 989-1040.

"What went wrong [with telecommunications]: the European perspective", in E. Dommering and N. van Eijk, eds., *Conference Papers of the Round Table Expert Group on Telecommunications Law* (Amsterdam: IvIR, 2005) 99-138.

"Legal issues surrounding remedies in network industries", in D. Geradin, ed., *Remedies in Network Industries: EC Competition Law vs. Sector-specific Regulation* (Antwerp: Intersentia, 2004) 21-46.

"Dealing with convergence at the international level", in D. Geradin and D. Luff, ed., *The WTO and Global Convergence in Telecommunications and Audio-Visual Services* (Cambridge: Cambridge University Press, 2004) 390-422 and in (2003) 23 Singapore L. Rev. 85-114, also in shorter form "Legal and Policy Implications of Convergence at the International Level" in ITU, *Proceedings of the TELECOM 03 Forum* (2003).

"L'application décentralisée du droit de la concurrence dans les secteurs libéralisés – L'exemple du secteur des communications électroniques" (with D. Geradin), in P. Nihoul, *La décentralisation dans l'application du droit de la concurrence – Un rôle accru pour le praticien?* (Brussels: Bruylant, 2004) 165-190.

"Principles of Good Market Governance" (with L. Hancher and S. Lavrijssen) (2003) 4 Journal of Network Industries 355-389, also in (2004) 49 Tijdschrift Econ Man 339-374.

"Op weg naar een vrije postmarkt" (co-author) (2003) 88 Economisch Statistische Berichten 566-568.

"Een kritische beschouwing van de onderliggende aannames van de EG regelgeving betreffende elektronische communicatie" (with S. Lavrijssen) (2002) 50 SEW 258-268.

"A closer look at some assumptions underlying EC regulation of electronic communications" (2002) 3 Journal of Network Industries 129-149.

"L'intégration, les systèmes juridiques et la formation juridique" (2001) 46 McGill LJ 1101-1033.

"The *Brasserie du pêcheur* puzzle", in J. Wouters and J. Stuyck (eds.), *Principles of Proper Conduct for*

*Supranational, State and Private Actors in the European Union: Towards a* Ius Commune (Antwerpen: Intersentia, 2001) 111-127.

"Relevant Market Definition in Network Industries: Air Transport and Telecommunications" (2000) 1 Journal of Network Industries 407-445.

"Recueils Ius commune pour le droit commun de l'Europe" (2000) 3:1 Revue de la common law en français 99.

"Ius Commune Casebooks for the Common Law of Europe: Presentation, Progress, Rationale" (2000) 8 European Review of Private Law 101-109.

"Telecommunications", in D. Geradin, ed., *The Liberalization of State Monopolies in the European Union and Beyond* (The Hague: Kluwer Law International, 2000) 15-47.

"Comments" (on P. Mavroidis and D. Neven, "The WTO Agreement and Telecommunications: It's Never Too Late"), in D. Geradin, ed., *The Liberalization of State Monopolies in the European Union and Beyond* (The Hague: Kluwer Law International, 2000) 319-329.

"Constitution et sécurité juridique – Canada" (1999) 15 Annuaire international de justice constitutionnelle (AIJC) 131-141.

"Access to resources: Can competition law deliver?", in ITU, *Proceedings of the TELECOM 99 & INTERACTIVE 99 Forum* (1999).

"EC Competition Law and the Convergence of the Telecommunications and Broadcasting Sectors" (1998) 22:3 Telecommunications Policy 219-242.

"Telecommunications services and the WTO" (co-author) (1997) 31:3 Journal of World Trade 5-48.

"Les discriminations positives – Canada" (1997) 13 AIJC 95-120.

"École, religion et constitution – Canada" (co-author) (1996) 12 AIJC 189-207.

"Révision de la Constitution et justice constitutionnelle – Canada" (1994) 10 AIJC 49-58.

"Constitution et partis politiques – Canada" (1993) 9 AIJC 97-124.

"Les méthodes de travail des juridictions constitutionnelles – Canada" (1992) 8 AIJC 225-242.

"La procédure abusive" (1991) 70 Canadian Bar Review 650-680.

"L'évolution du droit constitutionnel canadien" (co-author), yearly chronicle 1988-1992, in 5-8 AIJC.

## *Reports*

"Network industries: efficient regulation, affordable & adequate services - CERRE Regulation Dossier for the Incoming European Commission 2014-2018" (with 5 co-authors), CERRE, 2014.

"CERRE Code of Conduct and Best Practices for the setup, operations and procedure of regulatory authorities", CERRE, 2014.

"Regulating Smart Metering in Europe: Technological, Economic and Legal Challenges" (with G. Cervigni), CERRE Report, 2014.

"Law, economics and growth in Europe – Integrating innovation into competition policy and economic regulation" (with co-authors), Report on the work of WP5 within GRASP, 2013.

"Independence, Accountability and Perceived Quality of Regulators" (with C. Hanretty and A. Reindl), CERRE Report, 2012.

"Enforcement and judicial review of decisions of national regulatory authorities" (with X. Taton), CERRE Report, 2011.

"Universal Service in Banking" (with P. de Bijl, E. van Damme, S. Janssen), TILEC Report, 2006.

"Light is Right: Competition and Access Regulation in an Open Postal Sector" (with E. van Damme and P. de Bijl), TILEC Report, 2005.

"On the law and economics of price squeeze in telecommunications markets" (with G. Brunekreeft, E. van Damme and V. Sorana, TILEC Report, 2005.

"Call Termination on Mobile Networks" (with Paul de Bijl, Gert Brunekreeft, Eric van Damme, Natalya Shelkoplyas, Valter Sorana), TILEC Report, 2004.

"Towards a liberalized postal market" "Op weg naar een vrije postmarkt", TILEC Report, 2003.

***Working papers and work in progress (see also SSRN author no. 537158)***

"Network neutrality in the EU" (with F. Chirico and I. van der Haar), TILEC Discussion Paper 2007-030.

"L'enrichissement réciproque des droits nationaux et communautaire en matière de services d'intérêt général" (with C. Humpe), TILEC Discussion Paper, 2002.

"Communications convergence and public service broadcasting", TILEC Discussion Paper, 2002.


TEACHING EXPERIENCE
(* when co-taught)

*At Tilburg University*:

Advanced Competition Law and Economic Regulation*
Advanced European Law*
European Communications Law
European Competition Law
Global Law: Methods and Techniques of Legal Research*
Global Law: Tort Law*
Law and Economics
Mededingingsrecht (Competition Law)*

*At the College of Europe*:

Case Law Seminar (European Law and Economic Analysis programme)*
Droit européen des industries de réseau

*At Maastricht University*:

European Media Law
European Union Law: Foundations*
Private Law in Europe: Tort

*As a visiting professor*:

Comparative Competition/Antitrust Law, at Northwestern University (2010).

European Union Law*, at McGill University (2002), National University of Singapore (2004, 2006, 2008, 2011, 2013), University of Connecticut (2009).

Introduction to Regulation, at Bonn University (2007-2008).

Law and Economics*, at Sciences Po Paris (2012).


ADMINISTRATIVE AND MANAGEMENT EXPERIENCE

Co-director of the Tilburg Law and Economic Centre (TILEC) (2002-2011), and now Founding Director. My

co-director Eric van Damme and I started with a limited amount of venture funding from the University and built up a Centre of Excellence, with more than 40 members, significant outside funding from research councils and public/private sponsors (budget of EUR 1,5m/year), an attractive academic programme and a steady research output.

Director of Studies, Bachelor Global Law (2010-2014). Academic and administrative development of an innovative bachelor-level education programme, in three years from concept to launch in September 2013.

Director of Studies, LL.M. in International Business Law (2002-2007). Academic and administrative development of a new masters-level programme, launched in September 2003.

Head of Department, European and International Public Law (2003-2005).

Member of the Research Assessment Committee (2011-).

Joint Academic Director, Centre on Regulation in Europe (CERRE) (2010-2011, 2013-).

## SUPERVISION OF PH.D. STUDENTS

K.J. Cseres, *Competition Law and Consumer Protection* (defended 2005).

A. de Streel, *On the edge of antitrust: The relationship between competition law and sector regulation in European electronic communications* (defended 2006).

I. van der Haar, *Technology neutrality and content regulation* (defended 2008).

M. de Visser, *The new EC competition law and electronic communications frameworks: towards a new institutional model for the application and enforcement of EC law?* (defended 2009, cum laude).

E. Ehlers, *Comparative Analysis of the Unbundling Processes in the Electricity and Gas Industries in Great Britain, Germany and the Netherlands – European, Constitutional and Public Law Aspects* (defended 2009)

A. Littler, *Regulation of European Gambling Markets* (defended 2009).

L. Parret, *Side effects of the modernization of EU competition law* (defended 2011).

J. Sluijs, *Network Neutrality and European Law* (defended 2012, cum laude).

N. Fiedziuk, *Services of General Economic Interest in EU Law* (defended 2013).

V. Daskalova, *Buyer Power under EU Competition Law* (defence set for 2015).

C.Y. Zhang, *Banking Resolution in China and the EU* (defence set for 2015).

Z. Georgieva, *Soft law in EU Competition Law* (defence set for 2016).

J. Broulik, *Economic Arguments in Judicial Reasoning* (defence set for 2016).

B. Hock, *The Rise of Global Extraterritoriality and the Effectiveness of the OECD Anti-Bribery Enforcement Regime* (defence set for 2016).

S. Kasiyanto, *Payment Systems – Comparative Approach under competition law, consumer law and financial regulation* (defence set for 2016).

V. Kathuria, *Critical Competition Law Issues in Developing Countries* (defence set for 2016).

T. Tseliou, *Health Care Regulation and EU Law* (defence set for 2016).

## OTHER ACTIVITIES

Professor at the College of Europe, Bruges (2003, 2004-).

Visiting Scholar, Center for Technology, Innovation and Competition (CTIC), School of Law, University of Pennsylvania, Philadelphia (2015).

Visiting Professor and Gide Loyrette Nouel chair, Institut des sciences politiques (Sciences Po) (2012).

EXHIBIT A

Searle Visiting Fellow, Searle Center on Law, Regulation and Economic Growth, School of Law, Northwestern University, Chicago (2009-2010)

Guest Professor, University of Connecticut (2009).

Professor, Masters of European Regulation of Network Industries, Rheinische Friedrich-Wilhelms-Universität Bonn (2007-2008).

Guest Professor, National University of Singapore (2004, 2006, 2008, 2011, 2013).

Visiting Professor, McGill University (2002).

Jean-Monnet European Module coordinator (2003-2006).

Member of the CEPS Task Force on the Treatment of Exclusionary Abuses under Article 82 (2009).

Special advisor to European Commissioner Reding (Information Society) on the reform of electronic communications regulation (2007).

Co-rapporteur of CEPS Working Party on the new regulatory framework for electronic communications (2001).

Chairman, Management Committee, Ius Commune Casebooks for the Common Law of Europe (2001-)

Co-editor-in-chief, Journal of Network Industries (2000-2007).

Regular participation in academic and professional conferences, workshops and seminars.

Numerous memberships of expert committees and panels, and expert opinions.

Referee for various academic journals and periodicals.


**LANGUAGES**

Fluent in French (mother tongue), English, German and Dutch. Basic notions of Spanish, Italian and Polish.