# EXHIBIT 141

# HITACHI

HITACHI AMERICA, LTD.
COMPUTER DIVISION
200 LOWDER BROOK DRIVE, SUITE 2200
WESTWOOD, MA 02090-1157
TELEPHONE  (617)890-0804
FAX        (617)890-6677

**BILL TO:**
CUSTOMER NUMBER: 4940
Dash Inc (Crago Corp)
7228 W Frontage Road
MERRIAM KS  66203

**SHIP TO:**
CUSTOMER NUMBER: 4940
Dash Inc (Crago Corp)
913-888-6555
7228 W Frontage Road
MERRIAM KS  66203

# INVOICE: 9004069761

| | |
|---|---|
| INVOICE DATE: | 03/05/2002 |
| CUST PO NUMBER: | 34066 |
| CUST PO DATE: | 02/26/2002 |
| DELIVERY NOTE: | 80129677 |
| DELIVERY DATE: | 03/05/2002 |
| BILL OF LADING: | 153 889 542 |
| SHIPMENT DATE: | 03/06/2002 |
| SALES ORDER NO: | 81138 |

| | |
|---|---|
| CURRENCY: | USD |
| DELIVERY TERMS: | FOB Destination |
| PAYMENT TERMS: | Cash in advance |

**REMIT TO:**
Hitachi America Ltd.
Drawer CS 198308
Atlanta GA 30384-8308

PAID BY CHECK # 023255 DATED 2/27/02

| OUR LINE | CUST LINE NO | MATERIAL | DESCRIPTION QTY | | PRICE/PER UNIT | | VALUE |
|---|---|---|---|---|---|---|---|
| 000002 | | CM615U-521 | 17" Color CRT Monitor | | | | |
| | | | 72  PC | | 149.0000 / | 1 | 10,728.00 |
| 000004 | | CM715U-511 | 19" Color CRT Display Monitor | | | | |
| | | | 48  PC | | 244.0200 / | 1 | 11,712.96 |

|  | TOTAL: | 22,440.96  USD |
|---|---|---|

**THESE COMMODITIES ARE LICENSED BY THE UNITED STATES FOR ULTIMATE DESTINATION USA.  DIVERSION CONTRARY TO U.S. LAW PROHIBITED.**



Exhibit No. 2

ES  COOPER MOELLER

CRAGO0000001

# HITACHI

HITACHI AMERICA, LTD.
COMPUTER DIVISION
200 LOWDER BROOK DRIVE, SUITE 2200
WESTWOOD, MA 02090-1157
TELEPHONE   (617)890-0804
FAX            (617)890-6677

**BILL TO:**
CUSTOMER NUMBER: 4940
Dash Inc (Crago Corp)
7228 W Frontage Road
MERRIAM KS  66203

**SHIP TO:**
CUSTOMER NUMBER: 4940
Dash Inc (Crago Corp)
7228 W Frontage Road
MERRIAM KS  66203

# INVOICE: 9004069221

| | |
|---|---|
| INVOICE DATE: | 02/27/2002 |
| CUST PO NUMBER: | 34005 |
| CUST PO DATE: | 02/18/2002 |
| DELIVERY NOTE: | 80129051 |
| DELIVERY DATE: | 02/27/2002 |
| BILL OF LADING: | 153 880 514 |
| SHIPMENT DATE: | 02/28/2002 |
| SALES ORDER NO.: | 80719 |

| | |
|---|---|
| CURRENCY: | USD |
| DELIVERY TERMS: | FOB Destination |
| PAYMENT TERMS: | Cash in advance |

**REMIT TO:**
Hitachi America Ltd.
Drawer CS 198308
Atlanta GA 30384-8308

PAID BY CHECK # 023219 DATED 2/20/02

| OUR LINE | CUST LINE NO | MATERIAL | DESCRIPTION QTY | PRICE/PER UNIT | VALUE |
|---|---|---|---|---|---|
| 000002 | | CM715U-511 | 19" Color CRT Display Monitor | | |
| | | | 36  PC | 244.0200 /   1 | 8,784.72 |

| | | |
|---|---|---|
| | TOTAL: | 8,784.72  USD |

**THESE COMMODITIES ARE LICENSED BY THE UNITED STATES FOR ULTIMATE DESTINATION USA.  DIVERSION CONTRARY TO U.S. LAW PROHIBITED.**

CRAGO0000002

# HITACHI

HITACHI AMERICA, LTD.
COMPUTER DIVISION
200 LOWDER BROOK DRIVE, SUITE 2200
WESTWOOD, MA 02090-1157
TELEPHONE   (617)890-0804
FAX          (617)890-6677

**INVOICE: 9004069494**

| | |
|---|---|
| INVOICE DATE: | 02/28/2002 |
| CUST PO NUMBER: | 34005 |
| CUST PO DATE: | 02/18/2002 |
| DELIVERY NOTE: | 80129049 |
| DELIVERY DATE: | 02/27/2002 |
| SHIPMENT DATE: | 02/28/2002 |
| SALES ORDER NO: | 80719 |

BILL TO:
CUSTOMER NUMBER: 4940
Dash Inc (Crago Corp)
7228 W Frontage Road
MERRIAM KS  66203

| | |
|---|---|
| CURRENCY: | USD |
| DELIVERY TERMS: | FOB Destination |
| PAYMENT TERMS: | Cash in advance |

SHIP TO:
CUSTOMER NUMBER: 4940
Dash Inc (Crago Corp)
7228 W Frontage Road
MERRIAM KS   66203

REMIT TO:
Hitachi America Ltd.
Drawer CS 198308
Atlanta GA 30384-8308

PAID BY CHECK # 023219 DATED 2/20/02

| OUR LINE | CUST LINE NO | MATERIAL | DESCRIPTION QTY | | PRICE/PER UNIT | | VALUE |
|---|---|---|---|---|---|---|---|
| 000001 | | CM615U-512 | 17" Color CRT Display Monitor | | | | |
| | | | 36  PC | | 155.8200 / | 1 | 5,609.52 |

|  | TOTAL: | 5,609.52  USD |
|---|---|---|

**THESE COMMODITIES ARE LICENSED BY THE UNITED STATES FOR ULTIMATE DESTINATION USA.   DIVERSION CONTRARY TO U.S. LAW PROHIBITED.**

CRAGO0000003

# EXHIBIT 142

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION


IN RE:  CATHODE RAY TUBE (CRT)  Case No.
ANTITRUST LITIGATION            ) 3:07-cv-5944 SC
                                )
_____ ) MDL No. 1917
                                )
This Documents Relates to:     )
ALL DIRECT PURCHASER ACTIONS   )
                                )


   30(b)(6) Crago Corp d/b/a Dash Computers, Inc.


   REALTIME DEPOSITION OF DAVID MILTON ALLEN,

a Plaintiff, taken on behalf of the Defendant

Hitachi, LTD, before Ellen L. Stock, KS CSR

#0766, MO CCR # 891, RMR, pursuant to notice on

Friday, the 14th day of June 2013, at the law

offices of Polsinelli PC, Twelve Wyandotte Plaza,

120 West 12th Street, Kansas City, Missouri 64105.

1

1          Q.  That's right.

2          A.  Yes.

3          Q.  What is that?

4          A.  1995 to 2007.

5          Q.  Okay.

6          A.  March of '95.

7          Q.  You've produced -- or Crago has a

8     handful of invoices reflecting purchases of

9     cathode ray tube monitors; is that correct?

10         A.  The invoices from Hitachi?

11         Q.  That's correct.

12         A.  Yes.

13         Q.  Are those the only purchases that Crago

14    is pursuing a claim for?

15              MR. OWEN:  Objection.  Calls for a

16    legal conclusion.  Go ahead.

17         A.  I think so.

18         Q.  (BY MS. CHIU)  Okay.  Let's -- let's

19    just mark those documents so we have a point of

20    reference.

21              (Deposition Exhibit 2 was marked for

22    identification by the reporter.)

23         Q.  (BY MR. EVERETT)  So I've just handed

24    you -- it's actually a compilation of documents

25    that have been marked as Allen Deposition Exhibit

15

2.

After you've had a chance to review

those documents, are these the documents that

Crago produced in response to defendant's

document request.

     A.  I believe so.

     Q.  And just for the record, these are

documents bearing Bates numbers CRAG 1 through 8.

And let's just -- well, actually, before

we do that.  So the documents that have been

marked as Allen Exhibit 2 that have the Bates

numbers I just mentioned, CRAG 1 through 8, are

they documents that were kept by Crago in the

ordinary course of its business?

     A.  Yes, they were.

     Q.  And do they appear to be authentic

copies of documents that were kept in Crago's

files?

     A.  They certainly look like it to me.

     Q.  All right.  CRAG 1 is an invoice from

Hitachi America Limited dated March the 5th,

2002; is that correct?

     A.  Yes.

     Q.  Okay.  I just want to make sure I get on

the record what these various documents are

16

1  or hard copy price quotations from Samsung,

2  Samtron, or Hitachi?

3      A.  Not that I'm aware of.  And I should add

4  that I'm -- I can't even say for sure that those

5  existed.  They might have been just a function of

6  telephone conversations.

7      Q.  Who from Hitachi, if you recall, did you

8  have telephone conversations with about prices?

9      A.  I don't recall.

10      Q.  Was there a particular person that you

11  always called, or was it more a general Hitachi

12  number?

13      A.  I can't recall that for sure, but my

14  usual practice was try to concentrate on one

15  person.  Try to develop a relationship with one

16  person.

17      Q.  Okay.  The invoices at Allen Exhibit 2

18  from Hitachi are from Hitachi America Limited.

19  Was that the Hitachi entity that Crago dealt with

20  for CRT products?

21      A.  Yes.  That's correct.

22      Q.  Okay.  And do you recall the person that

23  you dealt with from Samsung or Samtron?

24      A.  Not anymore, no.

25      Q.  Did you deal separately with Samsung and

23

1    Q.  And did you consider the value of a

2    volume discount versus the cost of keeping

3    product in inventory in making decisions about

4    purchasing?

5    A.  I hope we did.  We should have.

6    Q.  Okay.  So let's take a look at Allen

7    Exhibit 2 and the first page CRAG 1.

8    A.  Okay.

9    Q.  We discussed previously that's an

10   invoice from Hitachi America that's dated March

11   the 5th, 2002; correct?

12        MR. OWEN:  Objection.  Asked and

13   answered.  Go ahead.

14   A.  Yes.

15   Q.  (BY MR. EVERETT)  So it appears that the

16   the customer PO date you'll see is February 26,

17   2002?

18   A.  That's what it says.

19   Q.  And I'd just like to look at some of the

20   terms.  So the payment terms indicate cash in

21   advance.  What's your understanding of what that

22   means?

23   A.  That means the invoice had to be paid

24   before Hitachi would release it for shipment.

25   Q.  And I think you mentioned previously

54

1   that you would demand a lower price if the

2   supplier required payment up front.  Is that the

3   case here?

4        A.  Well, no.  I didn't say we would demand

5   it, but we would expect it.  We would look for

6   it.  We would hope for it.  We would certainly

7   weigh the price together with the terms, and if

8   there was prepayment involved, we would be

9   looking for a better price.

10       But we weren't usually in position to

11   demand it.  We could ask for it.  We might get

12   it, we might not get it.  It was hard to demand

13   it.

14       Q.  And then the delivery terms are FOB

15   destination, do you see that?

16       A.  Yes.

17       Q.  Is it your understanding that the cost

18   of freight was included in the price for these

19   products?

20       A.  It's hard to say that, but it means that

21   we didn't have to pay a shipping item

22   specifically.  The cost would be -- what do I

23   want to say?  Payment to the shipper would be

24   made by -- excuse me.  Payment to the carrier

25   would be made by the shipper.

55

1    Q.   So your Hitachi America would have made

2    whatever payments were --

3    A.   To the carrier.

4    Q.   -- to the carrier?

5    A.   Now, realistically, they are not going

6    to -- they are not in the habit of giving money

7    away.  They have to get that money from

8    someplace, and the customer is where they get

9    that money from.  So one way or another I assume

10   we pay for it.  But it's not spelled out.  We

11   didn't have to pay the carrier.

12   Q.   And there wasn't a separate invoice to

13   charge from Hitachi America for freight to

14   Crago?

15   A.   Correct.

16   Q.   Okay.  So looking at the products that

17   were purchased, it appears there were two

18   different products that Crago purchased through

19   this invoice; is that correct?

20   A.   Yes.

21   Q.   17-inch color CRT monitor?

22   A.   Yes.

23   Q.   With the price of $149 per monitor?

24   A.   Um-hum.  Yes.

25   Q.   And then a 19-inch color CRT monitor

56

1    $244.02; is that correct?

2         A.  Yes.

3         Q.  Let's look at CRAG 3.  This is an

4    invoice that is dated roughly five days before on

5    February 28, 2002; correct?

6         A.  Yes.

7         Q.  And this relates to a purchase of a

8    17-inch color CRT display monitor as well; is

9    that correct?

10        A.  Yes.

11        Q.  The price for the monitor on CRAG 3 is

12   $155.82; correct?

13        A.  For which product?

14        Q.  I'm sorry.  CRAG 3?

15        A.  Oh, 3?

16        Q.  Yes.

17        A.  Okay.

18        Q.  155.82; correct?

19        A.  Yes.

20        Q.  Which is, you know, roughly six to seven

21   dollars higher than the price of the 17-inch

22   color CRT monitor that is reflected on CRAG 1; is

23   that correct?

24             THE WITNESS:  Can you read that

25   back?

                                                    57

1    (The requested portion of the record was read

2    by the reporter as follows:  "Which is, you know,

3    roughly six to seven dollars higher than the

4    price of the 17-inch color CRT monitor that is

5    reflected on CRAG 1; is that correct?")

6              MR. OWEN:  Objection.  Assumes

7    facts not in evidence.  Go ahead.

8        A.  If we're comparing the monitor in the

9    CRAG 3 exhibit at a price of 155, to the price of

10   the 17-inch monitor on Crago 1 --

11       Q.  (BY MR. EVERETT)  Um-hum.

12       A.  -- yeah, that's six, almost seven

13   dollars difference.

14       Q.  Do you know whether it was the same

15   monitor that Crago was purchasing, same model

16   monitor, Crago was purchasing in CRAG 1 and CRAG

17   3?

18       A.  I don't know for sure.  I can only go by

19   the description.  And there is a difference in

20   the part number in the material column of those

21   two invoices.  I don't know if that's a typo.  I

22   suspect it was just a typo.  I suspect they were

23   the same product.  And the number -- the

24   difference is just a typo.

25       Q.  Okay.  Do you recall if you personally

                                                    58

1  dealt with Hitachi America in relation to these

2  purchases?

3       A.  Not in relation to these purchases, no,

4  I don't recall.

5       Q.  But did you have -- did you deal with

6  Hitachi America directly?

7       A.  Yes.

8       Q.  And do you know if your buyers that you

9  identified previously dealt directly with Hitachi

10  America at all?

11       A.  I don't know.  I would suspect one of

12  them, maybe both of them did.

13       Q.  Do you know why the pricing differed

14  over the course of one week for the same

15  product?

16       A.  I don't know.

17            MR. OWEN:  Objection.  Assumes

18  facts not in evidence.  Go ahead.

19       A.  Yeah, I don't know.  I can only

20  speculate.

21       Q.  (BY MR. EVERETT)  Let's look at CRAG 6.

22            Actually, before we do that, the

23  monitors that are identified in CRAG 1, can you

24  tell anything about the specifications for these

25  monitors other than the size of the screen and

59

1    that they were CRT monitors from the invoice?

2        A.  I can't tell any difference from the

3    invoice.

4        Q.  Is there other information in Crago's

5    possession that would allow it to identify the

6    specifications for these monitors?

7        A.  In our possession today?

8        Q.  Um-hum.

9        A.  I don't know.  Maybe, but it would be a

10   long shot.  Chances are that stuff is gone.

11       Q.  Where would you look for that

12   information?

13       A.  Through any file drawers remaining that

14   haven't already been cleaned out.  There's a

15   chance we might find it.  There's a chance we

16   might have an old catalog of ours in the file, or

17   an old -- you know, maybe some literature from

18   Hitachi.

19           The other way you could do it, I'm sure,

20   which would be more efficient and certainly would

21   be the first place to start, would be to just go

22   to the Internet.

23       Q.  On the Internet you would look for

24   information --

25       A.  By model number.

60

1        Q.  -- by model number?

2        A.  Um-hum.  There's a good chance you could

3   Google it on your laptop.

4               (Discussion off the record.)

5        Q.  (BY MR. EVERETT)  So now turning to CRAG

6   6.  The third item on the invoice is a 17-inch

7   XGA 27 millimeter -- I don't know what NI -- with

8   speakers monitor; is that correct?

9        A.  Yes.

10       Q.  And so did that monitor have

11  incorporated into it speakers?

12       A.  It looks like it.  I don't have a

13  specific recollection, but from the listing here,

14  yeah, it looks that way.

15       Q.  Were at least some of Crago's purchases

16  of monitors, monitors that incorporated

17  speakers?

18       A.  Yes.

19       Q.  The price of a monitor with

20  speakers -- well, strike that.

21               There's -- on the line 3 of the invoice

22  at CRAG 6, there's a single price per piece for

23  that monitor with speakers; is that correct?

24       A.  Correct.

25       Q.  The speakers weren't purchased

                                                      61

C E R T I F I C A T E

 

    I, Ellen L. Stock, Certified Court
Reporter in and for the State of Missouri, do
hereby certify:

       That prior to being examined the
witness was by me duly sworn;

       That said deposition was taken down by
me in shorthand at the time and place
hereinbefore stated and was thereafter reduced to
writing under my direction;

       That I am not a relative or employee or
attorney or counsel of any of the parties, or a
relative or employee of such attorney or counsel,
or financially interested in the action.

       WITNESS my hand and seal this 20th day
of June, 2013.

 

 

 

_____
ELLEN L. STOCK, MO CCR 891

99

# EXHIBIT 143

1   MORGAN, LEWIS & BOCKIUS LLP
    KENT M. ROGER, State Bar No. 95987
2   DIANE L. WEBB, State Bar No. 197851
    MICHELLE PARK CHIU, State Bar No. 248421
3   JASON B. ALLEN, State Bar No. 251759
    One Market, Spear Street Tower
4   San Francisco, CA  94105-1126
    Tel:  415.442.1000
5   Fax:  415.442.1001
    E-mail:  kroger@morganlewis.com
6            dwebb@morganlewis.com
             mchiu@morganlewis.com
7            jason.allen@morganlewis.com

8   Attorneys for Defendants
    HITACHI, LTD.
9   HITACHI DISPLAYS, LTD.
    HITACHI ASIA, LTD.
10  HITACHI AMERICA, LTD.
    HITACHI ELECTRONIC DEVICES (USA), INC.

11

12              UNITED STATES DISTRICT COURT

13            NORTHERN DISTRICT OF CALIFORNIA

14               SAN FRANCISCO DIVISION

15

16  IN RE CATHODE RAY TUBE (CRT)        Case No. C07-5944 SC
    ANTITRUST LITIGATION
17                                      **MDL NO. 1917**

18                                      Judge: Hon. Samuel Conti

19                                      Special Master: Hon. Charles A. Legge (Ret.)

20                                      **DECLARATION OF TILLIE LIM IN**
                                        **SUPPORT OF THE HITACHI**
21  This Document Relates To:           **DEFENDANTS' EVIDENTIARY**
                                        **PROFFER**
    ALL ACTIONS
22

23                  **DECLARATION OF TILLIE LIM**

24       I, Tillie Lim, declare:

25       1.      I am the Associate General Counsel and Secretary of Hitachi America, Ltd.

26  ("HAL").  I make this declaration in support of the Hitachi Defendants' proffer.  I have personal

27  knowledge of the facts contained in this declaration, except for those, if any, based on

28  information and belief, and, if called as a witness, would and could competently testify to them.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DB2/22081000.4                                                              MDL 1917
          DECLARATION OF TILLIE LIM IN SUPPORT OF
          THE HITACHI DEFENDANTS' EVIDENTIARY PROFFER

2.      Upon information and belief, HAL has never manufactured any CPT or CDT tubes or CPT or CDT finished products.

3.      Upon information and belief, HAL sold CDT computer monitors during the period 2001 to early 2002.  HAL did not sell CDT computer monitors from late 2002 to present.

I declare under the penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed this 7th day of December, 2010, in Tarrytown, New York.

_____
Tillie Lim

DECLARATION OF TILLIE LIM IN SUPPORT OF
THE HITACHI DEFENDANTS' EVIDENTIARY PROFFER

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# EXHIBIT 144

```
<DOCUMENT>
<TYPE>20-F
<SEQUENCE>1
<FILENAME>k00264e20vf.txt
<DESCRIPTION>HITACHI, LTD
<TEXT>
<PAGE>
```
=====================================================================

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 20-F

(Mark One)

(    )    REGISTRATION STATEMENT PURSUANT TO SECTION 12(b)
          OR 12(g) OF THE SECURITIES EXCHANGE ACT OF 1934

                         OR

( X )    ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
          OF THE SECURITIES EXCHANGE ACT OF 1934

          For the fiscal year ended March 31, 2002
                         ---------------
                         OR

(    )    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
          OF THE SECURITIES EXCHANGE ACT OF 1934

          For the transition period from          to
                              ------------    ------------

          Commission file number 1-8320
                                 ------

          KABUSHIKI KAISHA HITACHI SEISAKUSHO
          ------------------------------------
          (Exact name of Registrant as specified in its charter)

                      Hitachi, Ltd.
                      --------------
          (Translation of Registrant's name into English)

                      Japan
                      -----
          (Jurisdiction of incorporation or organization)

          6, Kanda-Surugadai 4-chome, Chiyoda-ku, Tokyo 101-8010, Japan
          ------------------------------------------------------------
          (Address of principal executive offices)

     Securities registered or to be registered pursuant to Section 12(b) of the Act.

<TABLE>
<CAPTION>

| Title of each class | Name of each exchange on which registered |
| ------------------- | ----------------------------------------- |
| American Depositary Shares | New York Stock Exchange |
| Common Stock | New York Stock Exchange |

</TABLE>

     Securities registered or to be registered pursuant to Section 12(g) of the Act.

                              None
-----------------------------------------------------------------------
                         (Title of Class)

          Securities for which there is a reporting obligation pursuant to
                   Section 15(d) of the Act.

                              None
-----------------------------------------------------------------------
                         (Title of Class)

Indicate the number of outstanding shares of each of the issuer's classes of
capital or common stock as of the close of the period covered by the annual
report.

Common Stock      3,338,481,041 shares

Indicate by check mark whether the registrant (1) has filed all reports required
to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during
the preceding 12 months (or for such shorter period that the registrant was
required to file such reports), and (2) has been subject to such filing
requirements for the past 90 days.

Yes   X    No
      -----    -----

Financial services originated to extend credit to purchasers of Hitachi products. This segment currently provides leases, loan guarantees and insurance services and conducts business in the area of securitization and outsourcing services.

On October 1, 2000, Hitachi Credit Corporation, a subsidiary of the Company, merged with Hitachi Leasing, Ltd., an affiliate of the Company, for the purpose of strengthening management and promoting business development in the area of financial services. The merged company changed its name to Hitachi Capital Corporation.

In fiscal 2001, the segment accounted for 6% of net sales before eliminations and posted operating income of JPY 37 billion.

Competition

Hitachi is subject to intense competition in each of its businesses. Among its major competitors are some of the top-ranking industrial companies in Japan, U.S., Europe and Asia. Depending on the nature of the business, the competition is marked by rapid progress in technology or the need to reduce costs to meet customer requirements. In addition, Hitachi is facing more competition against companies that focus exclusively on specific market segments. See "Segment Information" in this Item for details of competition in each segment.

Raw Materials and Energy

Hitachi has many suppliers from which it purchases a variety of raw materials, and is not dependent on any single source of supply for any of its raw materials. In light of the fact that Japan produces very few of the raw materials Hitachi uses in its manufacturing processes, Hitachi monitors the availability of raw materials on a regular basis. There are currently no particular energy or raw material shortages that are likely to materially affect Hitachi's business.

Intellectual Property and Licenses

Hitachi holds numerous patents, trademark rights and copyrights. While Hitachi considers them to be valuable assets and important for its operations, it believes that its business is not dependent to any material extent upon any single patent, trademark right, copyright or any related group of such rights it holds.

Hitachi also has many licenses and technical assistance agreements covering a wide variety of products. They grant Hitachi the rights to use certain Japanese and foreign patents or the rights to receive certain technical information. Hitachi is not materially dependent on any single such agreement.

Hitachi has granted licenses and technical assistance to various companies located in Japan and overseas. In certain instances, Hitachi has entered into cross-licensing agreements with other major international electronics and electrical equipment manufacturers.

Government Regulations

Hitachi's business activities are subject to various governmental regulations in countries where it operates, which include investment approvals, export regulations, tariffs, antitrust, intellectual property, consumer and business taxation, exchange controls, and environmental and recycling requirements. At present, Hitachi manages to operate its business without any significant difficulty in coping with them.

17

<PAGE>
C.   Organizational Structure

The table below shows major subsidiaries of Hitachi, Ltd. as of March 31, 2002.

<TABLE>
<CAPTION>

| Name of company | Country of incorporation | Percentage owned |
|---|---|---|
| <S> | <C> | <C> |
| (1) Information & Telecommunication Systems | | |
| Hitachi Electronics Services Co., Ltd. | Japan | 100.0% |
| Hitachi Information Systems, Ltd. | Japan | 52.8 |
| Hitachi Software Engineering Co., Ltd. | Japan | 52.5 |
| Hitachi Systems & Services, Ltd. | Japan | 100.0 |
| Hitachi Telecom Technologies, Ltd. | Japan | 100.0 |
| Hitachi Computer Products (America), Inc. | U.S.A | 100.0 |
| Hitachi Computer Products (Asia) Corp. | Philippines | 100.0 |
| Hitachi Computer Products (Europe) S.A. | France | 100.0 |
| Hitachi Data Systems Holding Corp. | U.S.A | 100.0 |
| (2) Electronic Devices | | |
| Hitachi Electronics Engineering Co., Ltd. | Japan | 61.0% |
| Hitachi High-Technologies Corporation | Japan | 73.4 |
| Hitachi Hokkai Semiconductor, Ltd. | Japan | 100.0 |
| Hitachi Medical Corporation | Japan | 65.4 |
| Hitachi Semiconductor and Devices Sales Co., Ltd. | Japan | 100.0 |

```
Hitachi Tohbu Semiconductor, Ltd.                           Japan          100.0
Hitachi Tokyo Electronics Co., Ltd.                         Japan          100.0
Trecenti Technologies, Inc.                                 Japan           60.0
Hitachi Electronic Devices (USA), Inc.                      U.S.A          100.0
Hitachi Nippon Steel Semiconductor Singapore Pte. Ltd.      Singapore       53.8
Hitachi Semiconductor (America) Inc.                        U.S.A          100.0
Hitachi Semiconductor (Europe) GmbH                         Germany        100.0
Hitachi Semiconductor (Malaysia) Sdn. Bhd.                  Malaysia        90.0

(3) Power & Industrial Systems
Babcock-Hitachi Kabushiki Kaisha                            Japan          100.0%
Hitachi Air Conditioning Systems Co., Ltd.                  Japan          100.0
Hitachi Building Systems Co., Ltd.                          Japan          100.0
Hitachi Construction Machinery Co., Ltd.                    Japan           54.8
Hitachi Engineering Co., Ltd.                               Japan          100.0
Hitachi Engineering & Services Co., Ltd.                    Japan          100.0
Hitachi Industries Co., Ltd.                                Japan          100.0
Hitachi Kiden Kogyo, Ltd.                                   Japan           58.5
Hitachi Plant Engineering & Construction Co., Ltd.          Japan           56.3
Hitachi Service & Engineering (East), Ltd.                  Japan          100.0
Hitachi Service & Engineering (West), Ltd.                  Japan          100.0
Hitachi Via Mechanics, Ltd.                                 Japan          100.0
Japan Servo Co., Ltd.                                       Japan           53.0
Hitachi Automotive Products (USA), Inc.                     U.S.A.         100.0
Taiwan Hitachi Co., Ltd.                                    Taiwan          61.5

(4) Digital Media & Consumer Products
Hitachi Hometec, Ltd.                                       Japan          100.0%
Hitachi Maxell, Ltd.                                        Japan           52.4
Hitachi Media Electronics Co., Ltd.                         Japan          100.0
Hitachi Home Electronics (America), Inc.                    U.S.A          100.0
Shanghai Hitachi Household Appliances Co., Ltd.             China           60.0
</TABLE>
```

18

```
<PAGE>
<TABLE>
<CAPTION>

                                              Country of
            Name of company                  incorporation   Percentage owned
            ---------------                  -------------    ----------------
<S>                                          <C>              <C>
(5) High Functional Materials & Components
Hitachi Cable, Ltd.                           Japan           52.7%
Hitachi Chemical Co., Ltd.                    Japan           52.6
Hitachi Metals, Ltd.                          Japan           55.0

(6) Logistics, Services & Others
Chuo Shoji, Ltd.                              Japan          100.0%
Hitachi Life Corporation                      Japan          100.0
Hitachi Mobile Co., Ltd.                      Japan          100.0
Hitachi Transport System, Ltd.                Japan           59.9
Nikkyo Create, Ltd.                           Japan          100.0
Hitachi America, Ltd.                         U.S.A          100.0
Hitachi Asia Ltd.                             Singapore      100.0
Hitachi (China), Ltd.                         China          100.0
Hitachi Europe Ltd.                           U.K.           100.0

(7) Financial Services
Hitachi Capital Corporation                   Japan           53.1%
Hitachi Insurance Services, Ltd.              Japan          100.0
</TABLE>
```

19

```
<PAGE>
```
D.   Property, Plants and Equipment

Most of Hitachi's plants, offices and other fixed assets are located in Japan.
Hitachi considers its properties to be well maintained and believes its plant
capacity is adequate for its current needs. Certain of Hitachi's properties such
as land and buildings are subject to mortgages in respect of bonds and loans.
The total outstanding balance of the secured loans and bonds as of March 31,
2002 was JPY 15 billion.

The following table shows relevant property data in relation to major lines of
business as of March 31, 2002.

```
<TABLE>
<CAPTION>
      Name              Location        Area              Principal products
      ----              --------        ----              ------------------
                                     (thousands of
                                     square meters)
<S>                      <C>             <C>              <C>
In Japan

Hitachi, Ltd.:
Semiconductor & Integrated    Tokyo, etc.      601       Semiconductors
  Circuits
Thermal & Hydroelectric       Ibaraki        3,638       Power generating equipment, Turbines
  Systems Division, etc.
Displays                      Chiba            521       Liquid crystal displays
Sales Offices                 Osaka, etc.      229           -
Research & Development Group   Tokyo, etc.      941           -
```

# EXHIBIT 145

**Panasonic Consumer Electronics Company**
A Unit of Matsushita Electric Corporation of America

# INVOICE

01

| Remittance Address |
|---|
| PANASONIC COMPANY EAST |
| P.O. BOX 13509 |
| NEWARK, NJ 07188-0509 |

| Invoice Date | Invoice Number |
|---|---|
| 091099 | 21983063 |
| Account Number | Control Number |
| 3006100 | 11079429 |
| | ORG:004   WHSE:411 |

| Customer Service Contact |
|---|
| PINOVER     LORI |

| Bill to |
|---|
| ARCH ELECTRONICS INC. |
| 2006 CHESTNUT STREET |
| PHILADELPHIA, PA 19103 |

| Ship To Address |
|---|
| ARCH ELECTRONICS INC. |
| 2006 CHESTNUT STREET |
| PHILADELPHIA, PA 19103 |

**Absolutely no returns will be accepted unless shipped prepaid after receipt of prior written authorization. All other claims must be made within 10 days after receipt of merchandise by consignee.**

| Terms of Payment | Net Due Date | Order Date | Customer PO Number |
|---|---|---|---|
| 2% 30 NET 31 | 101199 | 090399 | 0903SN |

| Panasonic Model Number / Customer Product Number | Quantity Ordered | B/O Quantity | Quantity Shipped | Gross Unit Price | Net Unit Price / Discounts and Charges | Total |
|---|---|---|---|---|---|---|
| 1 PV-M2079 | 2 | | 2 | 311.00 | 311.00 | 622.00 |
| | SLMN 1E | | | | | |
| 2 CT-27SF26 | 2 | | 2 | 450.00 | 450.00 | 900.00 |
| | SLMN 1E | | | | | |
| 3 SA-EX110 | 2 | | 2 | 104.00 | 104.00 | 208.00 |
| | SLMN 1E | | | | | |
| 4 CT-27G14 | 2 | | 2 | 315.00 | 315.00 | 630.00 |
| | SLMN 1E | | | | | |
| 5 RX-DS19 | 4 | | 4 | 72.00 | 72.00 | 288.00 |
| | SLMN 1E | | | | | |
| 8 SL-BD20D | 1 | | 1 | 112.00 | 112.00 | 112.00 |
| | SLMN 1E | | | | | |
| 10 VHQ-940 | 3 | | 3 | 88.00 | 79.20 | 237.60 |
| | SLMN 1E | | | | | |
| | SPA | | | | -$8.80 | |
| 11 SC-AK27 | 1 | | 1 | 205.00 | 195.00 | 195.00 |
| | SLMN 1E | | | | | |
| | MCA | | | | -$10.00 | |

ARCH0000019

| Carrier | B/L Number | | |
|---|---|---|---|
| SHELDON DELIVERY | B28895 | Subtotal | |
| | PRO NO.  990828895 | Sales/Use Tax | |
| | | Shipping Charges | |
| Shipping Terms | Store Number | | |
| Prepaid | Store 0000 | TOTAL INVOICE > | Continued |
| | AccNo 1006613 ARCH ELECTRONICS INC. | | |

EXHIBIT

1656

SM620-13

PREPAID 000631L689

**Panasonic Consumer Electronics Company**
A Unit of Matsushita Electric Corporation of America

# INVOICE

| Invoice Date | Invoice Number |
|---|---|
| 101399 | 22053418 |
| Account Number | Control Number |
| 3006100 | 11101105 |
| | ORG:004  WHSE:411 |

**Customer Service Contact**
KOWAL       LINDA

**Remittance Address**

PANASONIC COMPANY EAST

P.O. BOX 13509

NEWARK, NJ 07188-0509

**Bill to**

ARCH ELECTRONICS INC.

2006 CHESTNUT STREET

PHILADELPHIA, PA 19103

**Ship To Address**

ARCH ELECTRONICS INC.

2006 CHESTNUT STREET

PHILADELPHIA, PA 19103

**Absolutely no returns will be accepted unless shipped prepaid after receipt of prior written authorization. All other claims must be made within 10 days after receipt of merchandise by consignee.**

| Terms of Payment | Net Due Date | Order Date | Customer PO Number |
|---|---|---|---|
| 2% 30 NET 31 | 111399 | 092499 | 0923SN |

| Panasonic Model Number / Customer Product Number | Quantity Ordered | B/O Quantity | Quantity Shipped | Gross Unit Price / Discounts and Charges | Net Unit Price | Total |
|---|---|---|---|---|---|---|
| 10 CT-13R3C | 1 | | 1 | 166.00 | 164.34 | 164.34 |
| | | SLMN 1E | | | | |
| | | REBATE OFI | | -1.00% | | |



PAID 11/12/99
Ck# 2372

ARCH00000#2

| Carrier | B/L Number | | |
|---|---|---|---|
| UPS GROUND SERVICE | 466538 | Subtotal > | 164.34 |
| | PRO NO. | Sales/Use Tax > | 0.00 |
| Shipping Terms | Store Number | Shipping Charges > | 0.00 |
| Prepaid | Store 0000 | TOTAL INVOICE > | 164.34 |
| | AccNo 1006613 ARCH ELECTRONICS INC | | |



EXHIBIT
1658
JM 6d2018

PENGAD 800-631-6989

# EXHIBIT 146

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

-    -    -

IN RE:  CATHODE RAY TUBE

(CRT) ANTITRUST LITIGATION

Master File No.

CV-07-5944-SC

MDL No. 1917

-    -    -

June 20, 2013

-    -    -

Oral deposition of STEVEN R. NUSBAUM taken pursuant to notice, held at the Law Offices of Morgan, Lewis & Bochius, 1701 Market Street, Philadelphia, PA 19102, commencing at 9:13 a.m., on the above date, before Jennifer P. Miller, Registered Professional Reporter and Notary Public for the Commonwealth of Pennsylvania.

1

1          marked for identification.)

2                          –   –   –

3     BY MR. MARKMAN:

4          Q.   Sir, I'm handing a document that has

5     been marked Exhibit 1656, and it is Bates

6     labeled ARCH0000019, and it appears to be a

7     Panasonic Consumer Electronics invoice dated

8     September 10th 1999.

9                    Do you recognize this document,

10    sir?

11         A.   Yes.

12         Q.   Under terms of payment, do you see

13    where it says two percent, 30 net 31?

14         A.   Correct.

15         Q.   What does that mean?

16         A.   If we paid within 30 days of the

17    invoice date, if they –– if they received our

18    check within 30 days of the invoice date, we

19    could take a two-percent discount on the

20    entire invoice.  After that point, we would

21    have to pay the entire invoice as a net

22    invoice.

23         Q.   Under the customer product number,

24    I'm going to go ahead and run through a few of

25    these, and I'm hoping you can identify what

85

1    the model is based on the customer product

2    number.

3              The first one is PV-M2079.

4         A.   Correct.

5         Q.   What is that product reference

6    there?

7         A.   It's a TV/VCR combination.

8         Q.   Can you explain again how you know

9    that it's a TV/VCR combination?

10        A.   The designation PV is the -- again,

11   a logo, a phrase, for the TV/VCR combination.

12   M indicates it's a monitor.  20 indicates it's

13   a 20-inch TV.  And 79 is a series number.

14              As a matter of fact, I believe

15   that the nine referred to the date of '99.

16   And '98, it would have been a 78, so to speak.

17        Q.   So that last digit would correspond

18   to year model --

19        A.   In this case, yes.

20        Q.   Can you identify the model in line

21   two, CT-27SF26?

22        A.   That's a 27-inch monitor, TV/VC --

23   just a TV monitor.  Again, the CT would

24   indicate it's a television, CRT-type

25   television.

86

1      Q.    And what about for line three where

2  the customer product number is SA-ES100?

3      A.    That's actually an audio receiver.

4      Q.    So that is not a television monitor?

5      A.    That's not, that's correct.

6      Q.    Skipping down to line five, the RX

7  --

8      A.    It's DS.

9      Q.    DS.  Thank you for clarifying.  Is

10  that a CRT product listed there?

11      A.    No.

12      Q.    What about for number eight where

13  the prefix is SL, is that a CRT product?

14      A.    No.

15      Q.    Line number ten, where the prefix is

16  VHQ, does that signify a CRT product?

17      A.    No.

18      Q.    And under line ten, under quantity

19  ordered, there's the abbreviation SPA.

20      A.    Right.

21      Q.    What does that abbreviation signify?

22      A.    Special purchase allowance.

23      Q.    Can you explain what that is?

24      A.    If I'm not mistaken, that was a VCR

25  product that was to be discontinued, and I

87

1   believe it was discontinued the previous

2   summer.

3                   This invoice was September.  It

4   was discontinued in the summer.  And they

5   wanted to just get rid of them, so they put a

6   special allowance on it that we can purchase.

7                   If we purchased it, within the

8   terms, within the $5,000 total order, with

9   everything else, then they priced it, and we

10  got this allowance -- I don't know how they

11  came up with the $8.80, but I think that's

12  what it is.

13      Q.   What is the just below that in line

14  11, what does the MCA abbreviation signify?

15      A.   I don't know that.  But, again, it

16  was another allowance.

17                  This particular item was a mini

18  system, an audio system.  And, again, that was

19  a discontinued piece that they were allowing

20  another discount on in order to move it out.

21  I don't now what the MCA designation meant.

22      Q.   Under shipping terms, do you see

23  where it says prepaid?

24      A.   Correct.

25      Q.   How would prepaying for shipping

88

1    impact the price of your purchase?

2              MR. GRABAR:  Objection.

3              You can respond.

4              THE WITNESS:  This order

5        qualified because it was a $5,000 order

6        that we would not have to pay the

7        shipping.  They would pay the shipping

8        into wherever we told them to ship it to.

9    BY MR. MARKMAN:

10       Q.   Would all orders of $5,000 or more

11   quality for prepaid shipping?

12       A.   Yes.

13                     -   -   -

14              (Whereupon, Exhibit 1657 was

15          marked for identification.)

16                     -   -   -

17   BY MR. MARKMAN:

18       Q.   I'm handing a document that has been

19   marked Exhibit 1657.

20              And can you identify the

21   product based on the customer product number

22   of CT-20G14?

23       A.   Yes.

24       Q.   What would that product be?

25       A.   It's a 20-inch CRT tube television.

                                                        89

1          Q.   Do you know what the G14 reference

2     is?

3          A.   No, I don't.  Again, it's part of

4     the series.

5          Q.   Is this invoice another example

6     where Arch Electronics received a volume

7     discount?

8          A.   Yes.

9          Q.   How are you able to determine that?

10         A.   I'm assuming you are talking about

11     the $5,000?

12         Q.   I am.

13         A.   Because I didn't order anything less

14     than $5,000.

15                    -   -   -

16              (Whereupon, Exhibit 1658 was

17         marked for identification.)

18                    -   -   -

19     BY MR. MARKMAN:

20         Q.   You can put that document aside.

21              Sir, I'm handing you a document

22     that has been marked 1658, and it's Bates

23     labeled ARCH0000042.

24              Do you recognize this document

25     as an invoice from Panasonic Consumer

                                                    90

1    Electronics Company dated October 13th 1999?

2        A.    Yes.

3        Q.    Do you see the customer product

4    number is CT-13R30?

5        A.    Yes.

6        Q.    What type of product is this?

7        A.    This is a 13-inch cathode ray tube

8    television.

9        Q.    Under quantity order, where it says

10   rebate DFI, do you see that, sir?

11       A.    Yes.

12       Q.    Did I get the abbreviation right,

13   actually?

14       A.    I think so.

15       Q.    Do you know what that abbreviation

16   signifies?

17       A.    I believe that this is again --

18   previously, we talked about a SPA, special

19   purchase allowance.  This is the same type of

20   a thing.

21              And I don't know why they call

22   it a rebate.  I can't tell you that.  But it

23   was again based on quantity.

24       Q.    Did Arch Electronics receive any

25   discounts from Matsushita for CRT products

                                              91

1   during the relevant period that were not

2   related to volume?

3        A.   No.

4                      -   -   -

5                 (Whereupon, Exhibit 1659 was

6          marked for identification.)

7                      -   -   -

8   BY MR. MARKMAN:

9        Q.   You can put that document aside.

10                 Sir, I'm handing a document

11   that has been marked Exhibit 1659, and it's

12   Bates label ARCH0000057.

13                 Do you recognize this document

14   as a Panasonic Consumer Electronics Company

15   invoice dated February 14 of 2000?

16        A.   Yes.

17        Q.   Can you explain for me again what

18   the customer product prefix of PV signifies?

19        A.   This is a TV/VCR combination.

20        Q.   And underneath the quantity ordered,

21   where it says DAP.

22        A.   Correct.

23        Q.   What does that signify?

24        A.   I don't know what the DAP means.  I

25   do know that this television was a 1999

92

CERTIFICATE

1                 CERTIFICATE

2         I HEREBY CERTIFY that the

3 proceedings, evidence and objections are

4 contained fully and accurately in the

5 stenographic notes taken by me upon the

6 deposition of STEVEN R. NUSBAUM taken on

7 June 20, 2013 and that this is

8 a true and correct transcript of same.

9

10

11

12            _____

13            Jennifer Miller, RPR and

14            Notary Public

15

16

17

18

19

20

21         (The foregoing certification of

22 this transcript does not apply to any

23 reproduction of the same by any means

24 unless under the direct control and/or

25 supervision of the certifying reporter.)

115

# EXHIBIT 147

PETER ROOT (142348)
DEWEY & LEBOEUF LLP
1950 University Avenue
East Palo Alto, California 94303
Telephone: (650) 845-7000
Facsimile: (650) 845-7333
Email: proot@dl.com

JEFFREY L. KESSLER (*Admitted Pro Hac Vice*)
A. PAUL VICTOR (*Admitted Pro Hac Vice*)
DEWEY & LEBOEUF LLP
1301 Avenue of the Americas
New York, NY 10019
Telephone: (212) 259-8000
Facsimile: (212) 259-7013
Email: jkessler@dl.com

STEVEN A. REISS (*Admitted Pro Hac Vice*)
DAVID L. YOHAI (*Admitted Pro Hac Vice*)
DAVID YOLKUT (*Admitted Pro Hac Vice*)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153-0119
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email: steven.reiss@weil.com

*Attorneys for Defendant Panasonic Corporation*
*(f/k/a Matsushita Electric Industrial Co., Ltd.)*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No.:  M-07-5944 SC MDL No. 1917 |
| This Document Relates to:  DIRECT PURCHASER ACTIONS | **DEFENDANT PANASONIC CORPORATION'S ANSWER TO THE DIRECT PURCHASER PLAINTIFFS' CONSOLIDATED AMENDED COMPLAINT** |

Defendant PANASONIC CORPORATION ("Panasonic"), by and through its attorneys, responds as follows to the allegations set forth in the Direct Purchaser Plaintiffs' Consolidated Amended Complaint (the "Complaint") filed by plaintiffs ("Plaintiffs"). To the extent not specifically admitted herein, all allegations of the Complaint are denied. Furthermore, the section headings included herein are included only for purposes of clarity and organization, and Panasonic does not admit, but rather specifically denies, any factual or legal allegations in the headings used in the Complaint.

## I.

## "INTRODUCTION"

1. Panasonic admits that Plaintiffs purport to bring this action on behalf of the persons described in the first sentence of Paragraph 1 of the Complaint, but Panasonic denies that this action can proceed as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Panasonic lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of Paragraph 1, and therefore denies them. Panasonic admits that Plaintiffs define the terms "CPTs," "CPT Products," "CDTs," "CDT Products," "CRTs," and "CRT Products" as set forth in Paragraph 1.

2. Panasonic lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 2 of the Complaint, and therefore denies them.

3. Panasonic lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 3 of the Complaint, and therefore denies them. The allegations contained in the second sentence of Paragraph 3 include conclusions of law to which no responsive pleading is required. To the extent that a response is required, Panasonic denies the allegations contained in the second sentence of Paragraph 3.

4. The allegations contained in Paragraph 4 of the Complaint include conclusions of law to which no responsive pleading is required. To the extent that a response is required, Panasonic denies the allegations contained in Paragraph 4.

5. Panasonic denies the allegations contained in Paragraph 5 of the Complaint.

44. Panasonic denies the allegations contained in Paragraph 44 of the Complaint in their entirety for lack of knowledge or information sufficient to form a belief as to the truth thereof.

45. The allegations in Paragraph 45 of the Complaint constitute characterizations of the allegations of Plaintiffs' Complaint to which no responsive pleading is required.

**"Panasonic Entities"**

46. Panasonic admits that it is a Japanese entity with an office in Osaka, Japan at the address listed in Paragraph 46, and that it was known as Matsushita Electric Industrial Co., Ltd. ("MEI") prior to October 1, 2008. Panasonic admits that MEI held 64.5% of Matsushita-Toshiba Picture Display Co., Ltd., ("MTPD") at the time when MEI and Toshiba Corporation transferred their CRT businesses to MTPD in 2003, and that MTPD became a 100% subsidiary of MEI in 2007. Panasonic admits that it is best known for its Panasonic brand, but Panasonic lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in the sixth sentence of Paragraph 46, and therefore denies them. Panasonic admits that MEI or its affiliates sold some products containing CRTs in the United States during the purported Class Period, but denies the remaining allegations contained in Paragraph 46.

47. Panasonic denies the allegations contained in Paragraph 47 of the Complaint in their entirety, except admits that Matsushita Electronics Corporation (Malaysia) Sdn Bhd ("Matsushita Malaysia") was a Malaysian entity that that had an office in Shah Alam Malaysia, and was a wholly owned indirect subsidiary of Panasonic. Panasonic avers that Matsushita Electronics Corporation (Malaysia) Sdn Bhd is a defunct entity that was voluntarily dismissed from the case by Plaintiffs.

48. Panasonic denies the allegations contained in Paragraph 48 of the Complaint in their entirety, except admits that Panasonic Corporation of North America ("PNA") is a defendant in this action, and is a Delaware corporation with its headquarters in Secaucus, New Jersey at the address listed, and is a wholly owned subsidiary of Panasonic. Panasonic also

admits that PNA sold CRT televisions in the United States during the purported Class Period.

49.     Panasonic denies the allegations contained in Paragraph 49 of the Complaint in their entirety, except admits that Panasonic Consumer Electronics Company ("PCEC") is an unincorporated division of PNA with its headquarters in Secaucus, New Jersey at the address listed. PCEC has been voluntarily dismissed from the case by Plaintiffs.

50.     The allegations in Paragraph 50 of the Complaint constitute characterizations of the allegations of Plaintiffs' Complaint to which no responsive pleading is required. Panasonic notes that Matsushita Malaysia and PCEC have been voluntarily dismissed from the case by Plaintiffs.

**"Philips Entities"**

51.     Panasonic denies the allegations contained in Paragraph 51 of the Complaint in their entirety for lack of knowledge or information sufficient to form a belief as to the truth thereof.

52.     The allegations contained in Paragraph 52 of the Complaint include conclusions of law to which no responsive pleading is required. To the extent that a response is required, Panasonic denies the allegations contained in Paragraph 52 of the Complaint in their entirety for lack of knowledge or information sufficient to form a belief as to the truth thereof.

53.     The allegations contained in Paragraph 53 of the Complaint include conclusions of law to which no responsive pleading is required. To the extent that a response is required, Panasonic denies the allegations contained in Paragraph 53 of the Complaint in their entirety for lack of knowledge or information sufficient to form a belief as to the truth thereof.

54.     The allegations contained in Paragraph 54 of the Complaint include conclusions of law to which no responsive pleading is required. To the extent that a response is required, Panasonic denies the allegations contained in Paragraph 54 of the Complaint in their entirety for lack of knowledge or information sufficient to form a belief as to the truth thereof.

55.     The allegations contained in Paragraph 55 of the Complaint include conclusions of law to which no responsive pleading is required. To the extent that a response is

WHEREFORE, Panasonic prays for judgment as follows:

1.   That Plaintiffs take nothing under the Complaint, and the Complaint be dismissed with prejudice;

2.   That judgment be entered in favor of Panasonic and against Plaintiffs on each and every cause of action set forth in the Complaint;

3.   That Panasonic recover its costs of suit and attorneys' fees incurred herein; and

4.   That Panasonic be granted such other and further relief as the Court deems just and proper.

Dated: April 29, 2010                    By: _____/s/ Jeffrey L. Kessler_____

JEFFREY L. KESSLER (*pro hac vice*)
Email: jkessler@dl.com
A. PAUL VICTOR (*pro hac vice*)
Email: pvictor@dl.com
**DEWEY & LEBOEUF LLP**
1301 Avenue of the Americas
New York, New York 10019
Telephone: (212) 259-8000
Facsimile: (212) 259-7013

PETER ROOT (142348)
Email: proot@dl.com
**DEWEY & LEBOEUF LLP**
1950 University Avenue
East Palo Alto, California 94303
Telephone: (650) 845-7000
Facsimile: (650) 845-7333

STEVEN A. REISS (*pro hac vice*)
Email: steven.reiss@weil.com
DAVID L. YOHAI (*pro hac vice*)
Email: david.yohai@weil.com
DAVID E. YOLKUT (*pro hac vice*)
Email: david.yolkut@weil.com
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue

# EXHIBIT 148

1   PETER ROOT (142348)
    DEWEY & LEBOEUF LLP
2   1950 University Avenue
3   East Palo Alto, California 94303
    Telephone: (650) 845-7000
4   Facsimile: (650) 845-7333
    Email: proot@dl.com
5
6   JEFFREY L. KESSLER (*Admitted Pro Hac Vice*)
    A. PAUL VICTOR (*Admitted Pro Hac Vice*)
7   DEWEY & LEBOEUF LLP
    1301 Avenue of the Americas
8   New York, NY 10019
    Telephone: (212) 259-8000
9   Facsimile: (212) 259-7013
    Email: jkessler@dl.com
10
11  STEVEN A. REISS (*Admitted Pro Hac Vice*)
    DAVID L. YOHAI (*Admitted Pro Hac Vice*)
12  DAVID YOLKUT (*Admitted Pro Hac Vice*)
    WEIL, GOTSHAL & MANGES LLP
13  767 Fifth Avenue
    New York, New York 10153-0119
14  Telephone:  (212) 310-8000
    Facsimile:  (212) 310-8007
15  Email: steven.reiss@weil.com
16
17  *Attorneys for Defendant Panasonic Corporation of North America*

18              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
19

20  **IN RE CATHODE RAY TUBE (CRT)**          ) No.:  M-07-5944 SC
    **ANTITRUST LITIGATION**                   ) MDL No. 1917
21                                             )
    ─────────────────────────────             )
22                                             ) **DEFENDANT PANASONIC**
    This Document Relates to:                 ) **CORPORATION OF NORTH**
23                                             ) **AMERICA'S ANSWER TO THE**
    DIRECT PURCHASER ACTIONS                  ) **DIRECT PURCHASER PLAINTIFFS'**
24                                             ) **CONSOLIDATED AMENDED**
                                               ) **COMPLAINT**
25                                             )
                                               )
26                                             )
    ─────────────────────────────             )
27

28

Defendant PANASONIC CORPORATION OF NORTH AMERICA ("PNA"), by and through its attorneys, responds as follows to the allegations set forth in the Direct Purchaser Plaintiffs' Consolidated Amended Complaint (the "Complaint") filed by plaintiffs ("Plaintiffs"). To the extent not specifically admitted herein, all allegations of the Complaint are denied. Furthermore, the section headings included herein are included only for purposes of clarity and organization, and PNA does not admit, but rather specifically denies, any factual or legal allegations in the headings used in the Complaint.

## I.

## "INTRODUCTION"

1.      PNA admits that Plaintiffs purport to bring this action on behalf of the persons described in the first sentence of Paragraph 1 of the Complaint, but PNA denies that this action can proceed as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. PNA lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the second sentence of Paragraph 1, and therefore denies them.  PNA admits that Plaintiffs define the terms "CPTs," "CPT Products," "CDTs," "CDT Products," "CRTs," and "CRT Products" as set forth in Paragraph 1.

2.      PNA lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 2 of the Complaint, and therefore denies them.

3.      PNA lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in the first sentence of Paragraph 3 of the Complaint, and therefore denies them.  The allegations contained in the second sentence of Paragraph 3 include conclusions of law to which no responsive pleading is required.  To the extent that a response is required, PNA denies the allegations contained in the second sentence of Paragraph 3.

4.      The allegations contained in Paragraph 4 of the Complaint include conclusions of law to which no responsive pleading is required.  To the extent that a response is required, PNA denies the allegations contained in Paragraph 4.

5.      PNA denies the allegations contained in Paragraph 5 of the Complaint.

6.      PNA denies the allegations contained in Paragraph 6 of the Complaint.

thereof.

45.  The allegations in Paragraph 45 of the Complaint constitute characterizations of the allegations of Plaintiffs' Complaint to which no responsive pleading is required.

**"Panasonic Entities"**

46.  PNA admits that Panasonic Corporation is a Japanese entity with an office in Osaka, Japan at the address listed in Paragraph 46, and that it was known as Matsushita Electric Industrial Co., Ltd. ("MEI") prior to October 1, 2008.  PNA admits that MEI held 64.5% of Matsushita-Toshiba Picture Display Co., Ltd., ("MTPD") at the time when MEI and Toshiba Corporation transferred their CRT businesses to MTPD in 2003.  PNA admits that Panasonic Corporation is best known for its Panasonic brand, but PNA lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in the sixth sentence of Paragraph 46, and therefore denies them.  PNA admits that MEI or its affiliates sold some products containing CRTs in the United States during the purported Class Period, but denies the remaining allegations contained in Paragraph 46.

47.  PNA denies the allegations contained in Paragraph 47 of the Complaint in their entirety, except admits that Matsushita Electronics Corporation (Malaysia) Sdn Bhd ("Matsushita Malaysia") was a Malaysian entity that had an office in Shah Alam Malaysia, and was a wholly owned indirect subsidiary of Panasonic.  PNA avers that Matsushita Electronics Corporation (Malaysia) Sdn Bhd is a defunct entity that was voluntarily dismissed from the case by Plaintiffs.

48.  PNA denies the allegations contained in Paragraph 48 of the Complaint in their entirety, except admits that it is a defendant in this action, and is a Delaware corporation with its headquarters in Secaucus, New Jersey at the address listed, and is a wholly owned subsidiary of Panasonic.  PNA admits that it sold CRT televisions in the United States during the purported Class Period.

49.  PNA denies the allegations contained in Paragraph 49 of the Complaint in

their entirety, except admits that Panasonic Consumer Electronics Company ("PCEC") is an unincorporated division of PNA with its headquarters in Secaucus, New Jersey at the address listed. PCEC has been voluntarily dismissed from the case by Plaintiffs.

50. The allegations in Paragraph 50 of the Complaint constitute characterizations of the allegations of Plaintiffs' Complaint to which no responsive pleading is required. PNA notes that Matsushita Malaysia and PCEC have been voluntarily dismissed from the case by Plaintiffs.

**"Philips Entities"**

51. PNA denies the allegations contained in Paragraph 51 of the Complaint in their entirety for lack of knowledge or information sufficient to form a belief as to the truth thereof.

52. The allegations contained in Paragraph 52 of the Complaint include conclusions of law to which no responsive pleading is required. To the extent that a response is required, PNA denies the allegations contained in Paragraph 52 of the Complaint in their entirety for lack of knowledge or information sufficient to form a belief as to the truth thereof.

53. The allegations contained in Paragraph 53 of the Complaint include conclusions of law to which no responsive pleading is required. To the extent that a response is required, PNA denies the allegations contained in Paragraph 53 of the Complaint in their entirety for lack of knowledge or information sufficient to form a belief as to the truth thereof.

54. The allegations contained in Paragraph 54 of the Complaint include conclusions of law to which no responsive pleading is required. To the extent that a response is required, PNA denies the allegations contained in Paragraph 54 of the Complaint in their entirety for lack of knowledge or information sufficient to form a belief as to the truth thereof.

55. The allegations contained in Paragraph 55 of the Complaint include conclusions of law to which no responsive pleading is required. To the extent that a response is required, PNA denies the allegations contained in Paragraph 55 of the Complaint in their entirety for lack of knowledge or information sufficient to form a belief as to the truth thereof.

No. M-07-5944 SC
MDL No. 1917
9
Defendant Panasonic Corporation of North America's
Answer to the DP-CAC

defenses and affirmative defenses as this action proceeds, the right to file an amended answer asserting additional defenses or affirmative defenses, and/or file a cross-complaint, in the event that discovery indicates that such pleadings are appropriate.

WHEREFORE, PNA prays for judgment as follows:

1.    That Plaintiffs take nothing under the Complaint, and the Complaint be dismissed with prejudice;

2.    That judgment be entered in favor of PNA and against Plaintiffs on each and every cause of action set forth in the Complaint;

3.    That PNA recover its costs of suit and attorneys' fees incurred herein; and

4.    That PNA be granted such other and further relief as the Court deems just and proper.

Dated: April 29, 2010

By: _____/s/ Jeffrey L. Kessler_____

JEFFREY L. KESSLER (*pro hac vice*)
Email: jkessler@dl.com
A. PAUL VICTOR (*pro hac vice*)
Email: pvictor@dl.com
**DEWEY & LEBOEUF LLP**
1301 Avenue of the Americas
New York, New York 10019
Telephone: (212) 259-8000
Facsimile: (212) 259-7013

PETER ROOT (142348)
Email: proot@dl.com
**DEWEY & LEBOEUF LLP**
1950 University Avenue
East Palo Alto, California 94303
Telephone: (650) 845-7000
Facsimile: (650) 845-7333

STEVEN A. REISS (*pro hac vice*)
Email: steven.reiss@weil.com
DAVID L. YOHAI (*pro hac vice*)
Email: david.yohai@weil.com
DAVID E. YOLKUT (*pro hac vice*)

No. M-07-5944 SC
MDL No. 1917
40
Defendant Panasonic Corporation of North America's
Answer to the DP-CAC

# EXHIBIT 149

1   JEFFREY L. KESSLER (*Admitted Pro Hac Vice*)
2   A. PAUL VICTOR (*Admitted Pro Hac Vice*)
    DEWEY & LEBOEUF LLP
3   1301 Avenue of the Americas
    New York, NY 10019
4   Telephone: (212) 259-8000
    Facsimile: (212) 259-7013
5   Email: jkessler@dl.com

6
    STEVEN A. REISS (*Admitted Pro Hac Vice*)
7   DAVID L. YOHAI (*Admitted Pro Hac Vice*)
    DAVID YOLKUT (*Admitted Pro Hac Vice*)
8   WEIL, GOTSHAL & MANGES LLP
    767 Fifth Avenue
9   New York, New York 10153-0119
    Telephone:   (212) 310-8000
10  Facsimile:   (212) 310-8007
11  Email: steven.reiss@weil.com

12  **Attorneys for Defendants Panasonic Corporation of North America, MT Picture Display**
13  **Co., Ltd., and Panasonic Corporation (f/k/a Matsushita Electric Industrial Co., Ltd.)**

14              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
15

16  **In Re CATHODE RAY TUBE (CRT)**          )   No.:   M-07-5944 SC
    **ANTITRUST LITIGATION**                   )   MDL NO. 1917
17                                             )
    _____        )
18                                             )   Judge: Hon. Samuel Conti
    This Document Relates to:                  )   Special Master: Hon. Charles A. Legge
19                                             )   (Ret.)
    DIRECT PURCHASER ACTION                    )
20                                             )   **OBJECTIONS AND RESPONSES OF**
                                               )   **PANASONIC CORPORATION OF**
21                                             )   **NORTH AMERICA, MT PICTURE**
                                               )   **DISPLAY CO., LTD. AND PANASONIC**
22                                             )   **CORPORATION (F/K/A MATUSHITA**
                                               )   **ELECTRIC INDUSTRIAL CO., LTD.)**
23                                             )   **TO DIRECT PURCHASER**
                                               )   **PLAINTIFFS' FIRST SET OF**
24                                             )   **INTERROGATORIES**
25  _____        )
26

27

28
    _____
    MDL NO. 1917                    PANASONIC DEFENDANTS' OBJECTIONS AND RESPONSES
                          TO DIRECT PURCHASER PLAINTIFFS' FIRST SET OF INTERROGATORIES

Pursuant to Rule 26 and 33 of the Federal Rules of Civil Procedure, Defendants Panasonic Corporation of North America ("PNA"), MT Picture Display Co., Ltd. ("MTPD"), and Panasonic Corporation, f/k/a Matsushita Electric Industrial Co., Ltd. ("Panasonic Corp.," and together with PNA and MTPD, the "Panasonic Defendants") hereby respond and object to the Direct Purchaser Plaintiffs' ("Plaintiffs") First Set of Interrogatories, dated March 12, 2010 ("Interrogatories").

## **PRELIMINARY STATEMENT**

The following objections and responses are based upon the information currently known and available to Panasonic Defendants.   Discovery and investigation are in the preliminary stages and are ongoing, and may disclose the existence of additional facts or documents, add meaning to known facts or documents, or lead to additions, variations or changes to these objections and responses.

Without obligating themselves to do so, except to the extent required under the Federal Rules of Civil Procedure, Panasonic Defendants reserve the right to amend or supplement the responses as additional information is discovered, revealed, recalled or otherwise ascertained, and as further analysis, research, investigation and discovery disclose additional facts, documents, contentions or legal theories that may apply.   Panasonic Defendants reserve the right to supplement the responses subject to any applicable Order by the Court.   Further, Panasonic Defendants specifically reserve the right to utilize subsequently discovered information or evidence at trial.

The general and specific objections set forth below are intended to apply to all information provided pursuant to the Interrogatories.   Furthermore, these responses do not in any way waive any objections by Panasonic Defendants, in this or in any subsequent proceeding, on any grounds, including objections as to the competency, relevancy, materiality, privilege or admissibility of the responses, or the subject matter thereof.

1  **RESPONSE TO INTERROGATORY NO. 6**

2        Panasonic Defendants object to Interrogatory No. 6 on the grounds that it is vague,

3  ambiguous, overly broad, and unduly burdensome.   Further, Interrogatory No. 6 seeks

4  information that is neither relevant nor reasonably calculated to lead to the discovery of

5  admissible evidence, specifically by requesting information regarding products that were not

6  sold in the United States.

7        Subject to and without waiver of the foregoing general and specific objections, the

8  following are bates ranges for documents produced by Panasonic Defendants that, after a

9  diligent search, Panasonic Defendants have identified thus far as containing information

10  responsive to this request:   PAN0000001-PAN0000515.   Panasonic Defendants will

11  produce additional documents sufficient to show price changes for CRTs and Finished CRT

12  Products that were sold in the United States during the Limitations Period, if any, when they

13  make their additional document productions.

14  **INTERROGATORY NO. 7**

15        Identify and describe all joint ventures, partnerships or other cooperative business
relationships, during the Relevant Time Period, relating to CRT and/or CRT Products
16  between You and any other CRT or CRT Products producer.

17  **RESPONSE TO INTERROGATORY NO. 7**

18        Panasonic Defendants object to Interrogatory No. 7 on the grounds that it is overly

19  broad and unduly burdensome.   Further, Interrogatory No. 7 seeks information that is neither

20  relevant nor reasonably calculated to lead to the discovery of admissible evidence, specifically

21  by requesting information regarding (i) products that were not sold in the United States or (ii)

22  any Finished CRT Products.   Panasonic Defendants object to Interrogatory No. 7 on the

23  grounds that the term "partnership" and the phrase "other cooperative business relationships"

24  are vague and ambiguous.

25        Subject to and without waiver of the foregoing general and specific objections,

26  Panasonic Defendants respond that, in 2003, Matsushita Electric Industrial ("MEI," what is

27  now known as Panasonic Corp.) formed a joint venture with Toshiba called MT Picture

28

1   Display Co., Ltd. ("MTPD") – in which Toshiba held 35.5% of the joint venture and MEI

2   held 64.5% of the venture.    At the time of MTPD's formation, MEI put its CRT

3   manufacturing operations into MTPD.

4         Specifically, on January 21, 2003, Matsushita Display Devices Corporation of

5   America ("MDCCA") was incorporated as a wholly-owned subsidiary of MEI.    Matsushita

6   Electric Corporation of America ("MECA," what is now known as PNA) transferred the

7   assets and liabilities of Matsushita Display Devices Company of America ("MDDA") and

8   certain other assets to MDCCA.    On January 29, 2003, MEI and Toshiba agreed to form a

9   joint venture.    On March 20, 2003, MEI transferred its shares of MDDCA stock to MTPD.

10  On October 1, 2003, MDDCA changed its name to MTPDA(OH).    On the same day,

11  Toshiba Display Devices, Inc. ("TDD") changed its name to MTPDA(NY).    On October 31,

12  2003, MT Picture Display of America ("MTPDA") was incorporated to serve as a holding

13  company for MTPDA(OH) and MTPDA(NY).

14        MTPDA(OH) and MTPDA(NY) were the U.S. CRT manufacturing subsidiaries.

15  These subsidiaries were separate legal entities both wholly owned by MTPDA, which in turn

16  was wholly owned by MTPD– the joint venture.    Both MTPDA(OH) and MTPDA(NY)

17  produced color picture tubes ("CPTs").    Color display tubes ("CDTs") were not

18  manufactured in the U.S. by the Panasonic Defendants during the Limitations Period.

19        MTPD also had manufacturing subsidiaries operating in Malaysia (MTPDM);

20  Germany (MTPDG); Thailand (MTPDT); and Indonesia (MTPDI).    Some of the

21  manufacturing subsidiaries had, before the joint venture, been Toshiba businesses; others had

22  previously been Matsushita businesses.

23        By December of 2004, MTPDA (NY) had ceased operations.    It dissolved on March

24  31, 2006.    By January of 2006, MTPDA (OH) had ceased operations.    It dissolved on

25  March 27, 2007.    MTPDA, the holding company, dissolved on March 27, 2007.    In 2007,

26  MEI became the 100% owner of MTPD.    The remaining MTPD subsidiaries are dissolved or

27  their shares were sold to third parties.

28

1   Dated: May 12, 2010                    By: _____/s/ Jeffrey L. Kessler_____
2                                          JEFFREY L. KESSLER (*pro hac vice*)
                                           Email: jkessler@dl.com
3                                          A. PAUL VICTOR (*pro hac vice*)
                                           Email: pvictor@dl.com
4                                          **DEWEY & LEBOEUF LLP**
5                                          1301 Avenue of the Americas
                                           New York, New York 10019
6                                          Telephone: (212) 259-8000
                                           Facsimile: (212) 259-7013
7
8                                          PETER ROOT (142348)
                                           Email: proot@dl.com
9                                          **DEWEY & LEBOEUF LLP**
                                           1950 University Avenue
10                                         East Palo Alto, California 94303
                                           Telephone: (650) 845-7000
11                                         Facsimile: (650) 845-7333
12                                         STEVEN A. REISS (*pro hac vice*)
13                                         Email: steven.reiss@weil.com
                                           DAVID L. YOHAI (*pro hac vice*)
14                                         Email: david.yohai@weil.com
                                           DAVID E. YOLKUT (*pro hac vice*)
15                                         Email: david.yolkut@weil.com
                                           **WEIL, GOTSHAL & MANGES LLP**
16                                         767 Fifth Avenue
17                                         New York, New York 10153-0119
                                           Telephone:   (212) 310-8000
18                                         Facsimile:   (212) 310-8007
19                                         GREGORY D. HULL (57367)
20                                         Email: greg.hull@weil.com
                                           **WEIL, GOTSHAL & MANGES LLP**
21                                         201 Redwood Shores Parkway
                                           Redwood Shores, California 94065-1175
22                                         Telephone: (650) 802-3000
                                           Facsimile: (650) 802-3100
23
24                                         ***Attorneys for Defendants Panasonic***
                                           ***Corporation of North America, MT Picture***
25                                         ***Display Co., Ltd., Panasonic Corporation (f/k/a***
                                           ***Matsushita Electric Industrial Co.)***
26
27

28

# EXHIBIT 150
## [Document Submitted Under Seal]

# EXHIBIT 151

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO


IN RE: CATHODE RAY TUBE (CRT)

ANTITRUST LITIGATION,


    vs.                Case No. 3:07-cv-5944 SC

                      MDL No. 1917

This Document Relates To:

DIRECT PURCHASER PLAINTIFF

ACTION


_____/_


    **C O N F I D E N T I A L   T R A N S C R I P T**


    The Deposition of DAVID DEMARTRA,

    Taken at 4460 44th Street,

    Grand Rapids, Michigan,

    Commencing at 9:12 a.m.,

    Friday, August 9, 2013,

    Before Willie Anderson, Jr., CSR-8600.


1

David Demartra
Confidential

1    Q.    Who billed the company for CRT products they

2          purchased?  Was it always the manufacturer?

3    A.    That's how I know it.

4                  MS. WHEATON:  I'd like to take a quick

5          break, if you're okay with that, sir.

6                  THE WITNESS:  Okay.

7                  (Recess taken at 11:18 a.m.)

8                  (Back on the record at 11:29 a.m.)

9                  MS. WHEATON:  Sir, I'm handing you an

10         exhibit marked 1956.

11                 MARKED FOR IDENTIFICATION:

12                 DEPOSITION EXHIBIT 1956

13                 11:30 a.m.

14                 MS. WHEATON:  I represent to you that

15         that's Meijer's initial production of documents.  I

16         just want to show you this one (Indicating).

17                 I'm also handing you Exhibit 1957, which is

18         Meijer's supplemental production in this matter.

19                 MARKED FOR IDENTIFICATION:

20                 DEPOSITION EXHIBIT 1957

21                 11:30 a.m.

22   BY MS. WHEATON:

23   Q.    If you can flip through that.

24   A.    Okay.

25   Q.    Do you recognize those documents, generally?

91

David Demartra
Confidential

1    A.   Yes.

2    Q.   Together, do those represent all the documents that

3         Meijer produced in this case?

4    A.   To my knowledge, yes.

5    Q.   Let's take a look at the first page in the production.

6         There's a Bates number at the bottom, 1?

7    A.   You're talking about this --

8    Q.   Yeah.

9    A.   -- packet?  Okay.

10               MR. GERMAIN:  Just so the record is clear,

11        I think the copies are all -- cut off the Bates number

12        a little bit.

13               MS. WHEATON:  Oh, yeah.  My apologies.  It

14        looks like a little cut off.  We'll manage the best we

15        can.

16   BY MS. WHEATON:

17   Q.   Do you know what this document is?

18   A.   This particular page?

19   Q.   Yes.

20   A.   Is a record of products, UPCs, item codes, vendor

21        names, vendor numbers, invoice numbers to these

22        specific products, and invoice dates.

23   Q.   How was this document created?

24   A.   How was it created?  I don't know.  Someone put this

25        together.  I can't specify how exactly it's created.

92

1    Q.    Do you know which person or department at Meijer would

2          have kept track of this sort of information in this

3          form?

4    A.    It could have been anyone put this together.

5    Q.    Let me direct you to the first sheet that you're

6          looking at --

7    A.    Okay.

8    Q.    -- second row.

9                 What's the product that's being purchased

10         or sold?

11   A.    Second row?  Are you referring to line number 2?

12   Q.    Yes.

13   A.    And what was your question after that?

14   Q.    What's the product being purchased or sold?

15   A.    The item description is a Toshiba 19-inch television.

16   Q.    Why are rows two through five separated out when

17         they're all for a Toshiba 19-inch television?  Do you

18         know?

19   A.    I don't understand what you mean why are they

20         separated out?

21   Q.    Do you know why each is on a different row?  The UPC,

22         item code, item description, vendor number, vendor

23         name are all the same.

24                So why do they have different lines?

25   A.    They have different invoice numbers.

93

**David Demartra**
**Confidential**

1   Q.   What does that mean?

2   A.   The invoice number is the number assigned by the

3        manufacturer to the invoice that they're billing.

4   Q.   Does that mean that these orders were placed at

5        different times?

6   A.   They may have been.

7   Q.   Okay.  I'm just trying to learn because the invoice

8        dates for the first three is the same.  So I wondered

9        why other -- why else you would have a different

10       invoice number?

11  A.   I cannot speak to how Toshiba assigns their invoice

12       numbers.

13  Q.   Okay.  Flip to the third page of that document I gave

14       you.

15                  Yeah.  There you go.

16  A.   Third page, okay.

17  Q.   Yeah.  The row number -- is probably the easiest

18       way -- is Row 76.

19  A.   Okay.

20  Q.   With Column F?

21  A.   Okay.

22  Q.   There's not a typical invoice number.

23                  Do you know what that refers to?

24  A.   It's referring to a debit memo of non-received goods.

25  Q.   What does that mean in layperson's speak?

94

```
 1   A.   This is a claim that was paid back based on some

 2        goods, it looks like, we didn't think we received.

 3   Q.   Okay.  On Page 5, if you flip with me, there's a list

 4        of Philips radios.

 5             Do you know whether Philips radios contain

 6        CRTs?

 7             MR. GERMAIN:  Objection to the form.  It

 8        mischaracterizes the document.

 9             THE WITNESS:  My understanding is that this

10        is a TV band so -- but I don't know that for a fact.

11   BY MS. WHEATON:

12   Q.   What kind of product would this be?

13   A.   It appears to be a -- some type of combination of a

14        product that has an AM/FM radio along with a

15        television band.

16   Q.   I see.  Let's flip to Page 35, if you can make sense

17        of the Bates numbers.

18   A.   Not really.  Is there -- is this number ending in 35?

19   Q.   Yes.

20   A.   Is that what you're referring to?

21             MR. GERMAIN:  Can you make out the numbers

22        enough to see?

23             THE WITNESS:  I'm going to get there.  I

24        can't find the right page.

25   ///
```

95

**David Demartra**
**Confidential**

1    BY MS. WHEATON:

2    Q.   Yep, that's it.  So you see that the row starts with

3         No. 1 again on that page?

4    A.   Yes.

5    Q.   Okay.  We're in the right place.  If you look at Row

6         19 on Page 35 --

7    A.   Okay.

8    Q.   Again, I'm looking at the Column F?

9    A.   Uh-huh.

10   Q.   That one says -- has a DM and MRT at the end.  What

11        does that refer to?

12   A.   Again, this looks like another debit memo on a claim

13        that was paid back for whatever MRT means.

14   Q.   You don't know what MRT means?

15   A.   I'm not familiar with that term.

16   Q.   Do you know who would be?

17   A.   Someone within Meijer's perhaps.  It's not something

18        that I used to do.

19               MR. GERMAIN:  I'll represent to you that

20        it's actually a code from a Legacy system that's no

21        longer in use.

22               MS. WHEATON:  The Legacy system, so it's

23        the actual technology that Meijer used?

24               MR. GERMAIN:  No.  No.  No.  That code is

25        from a Legacy system that's no longer in use today.

96

David Demartra
Confidential

1           MS. WHEATON:  I see.  Thank you.

2     BY MS. WHEATON:

3     Q.   So if you flip to the next page, Page 36, there's a

4          column labeled "J" --

5     A.   Okay.

6     Q.   -- as in John?

7     A.   Uh-huh.  I see that.

8     Q.   What does that represent?

9     A.   I believe they represent line item totals to the

10         previous page.  It looks like this is part of an Excel

11         printout, two pages.

12    Q.   Does the line item total reflect any discounts that

13         Meijer would have received?

14    A.   I believe these totals reflect what was on that

15         invoice.  I cannot speak to what was on the invoice,

16         but these are totals for these line items.

17    Q.   Let's flip ahead past these spreadsheets to Page 73,

18         which is the first page after the spreadsheet.

19              We're looking here at the corporate

20         structure of Meijer; right?

21    A.   Yes.

22    Q.   Do you know which entity, actually, made the purchases

23         of CRT products?

24    A.   Yes.

25    Q.   Which one?

                                                              97

David Demartra
Confidential

1    A.    Meijer distribution.

2    Q.    That was true throughout the whole class period?

3    A.    Yes.

4    Q.    Do you know which entity sold the CRT products?

5    A.    I don't know.

6    Q.    Who would know?

7    A.    Depends on what stores they went to.  If -- when you

8          say "sold," item sold to a consumer?

9    Q.    Yes.

10   A.    Whatever -- whichever they went to, I don't know.

11         Someone, perhaps, at Meijer would know that.

12   Q.    Did -- so it depends on the geographic area in which

13         the product was resold?

14   A.    We operate stores in several states.

15   Q.    If you flip to the next page, which is Bates No. 74 --

16   A.    Okay.

17   Q.    -- what is this that we're looking at?

18   A.    The vendor agreement.

19   Q.    For which company?

20   A.    Toshiba America Consumer Products.

21   Q.    This is one of the vendor agreements we were talking

22         about earlier?

23   A.    Yes.  This is a vendor agreement.

24   Q.    If you look at Page 2 under "Special Allowances," it

25         shows a 2 percent bill back.

98

# EXHIBIT 152

DEPOSITION
EXHIBIT
1953
DEMARTRA
8/09/13

PENGAD 800-631-6989

1   Guido Saveri (22349) guido@saveri.com
    R. Alexander Saveri (173102) rick@saveri.com
2   Geoffrey C. Rushing (126910) grushing@saveri.com
    Cadio Zirpoli (179108) cadio@saveri.com
3   SAVERI & SAVERI, INC.
    706 Sansome Street
4   San Francisco, CA 94111
    Telephone:   (415) 217-6810
5   Facsimile:    (415) 217-6813

6   *Interim Lead Counsel for the Direct Purchaser*
    *Plaintiffs*
7
    [*Additional counsel appear on signature page.*]
8

9              UNITED STATES DISTRICT COURT

10       NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

11

12   IN RE: CATHODE RAY TUBE (CRT)          MASTER FILE NO. 07-cv-5944 SC
     ANTITRUST LITIGATION
13   _____            MDL NO. 1917

14   This Document Relates to:             **MEIJER, INC.'S AND MEIJER**
                                           **DISTRIBUTION, INC.'S RESPONSES TO**
15   ALL DIRECT PURCHASER ACTIONS          **DEFENDANT SAMSUNG SDI CO.,**
                                           **LTD.'S FIRST SET OF**
16                                         **INTERROGATORIES**

17

18   PROPOUNDING PARTY:        SAMSUNG SDI CO., LTD.

19   RESPONDING PARTY:         MEIJER, INC. AND MEIJER DISTRIBUTION, INC.

20   SET NO.:                  ONE

21          Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Direct Purchaser

22   Plaintiffs Meijer, Inc. and Meijer Distribution, Inc. ("Plaintiffs" or "Meijer"), by their attorneys,

23   object and respond to Defendant Samsung SDI Co., Ltd.'s First Set of Interrogatories to the Direct

24   Purchaser Plaintiffs (the "Interrogatories") as follows:

25                          **GENERAL OBJECTIONS**

26          Each of the following objections is incorporated by reference into each of the responses

27   herein:

28          1.      Plaintiffs and their counsel have not completed their (1) investigation of the facts

                                              1                          MDL NO. 1917

1   **RESPONSE TO INTERROGATORY NO 6:**

2       Plaintiffs incorporate the General Objections as though fully set forth herein.  Plaintiffs

3   further object to this interrogatory on the grounds that it is vague and ambiguous, overly broad and

4   unduly burdensome. Plaintiffs also object to this interrogatory on the ground that responsive

5   information is already in the possession of Defendants or is available through other less

6   burdensome means.  Plaintiffs further object to this interrogatory on the ground that it is

7   duplicative of other interrogatories served in this action.  Plaintiffs further object to this

8   interrogatory on the ground that it is compound.  Subject to, and without waiving, the foregoing

9   objections, Meijer responds that it has not purchased CRTs during the Relevant Period.

10   **INTERROGATORY NO. 7:**

11       For each acquisition of a CRT PRODUCT identified in Interrogatory No. 3, state and

12   describe the actual quantities and prices of each of YOUR purchases, including discounts and

13   rebates, and identify the seller from whom each purchase was made.

14       As part of YOUR response, IDENTIFY each DOCUMENT that YOU contend supports

15   YOUR response.

16   **RESPONSE TO INTERROGATORY NO. 7:**

17       Plaintiffs incorporate the General Objections as though fully set forth herein.  Plaintiffs

18   further object to this interrogatory on the grounds that it is vague and ambiguous, overly broad and

19   unduly burdensome.  Plaintiffs also object to this interrogatory on the ground that responsive

20   information is already in the possession of Defendants or is available through other less

21   burdensome means.  Plaintiffs further object to this interrogatory on the ground that it is

22   duplicative of other interrogatories served in this action.  Plaintiffs further object to this

23   interrogatory on the ground that it is compound.  Subject to, and without waiving, the foregoing

24   objections, Meijer responds that the answers to this interrogatory may be derived from Meijer's

25   production of documents.

26   **INTERROGATORY NO. 8:**

27       For each acquisition of a CRT identified in Interrogatory No. 2, state whether the CRT was

28   acquired as part of a system or other bundled product and, if so, the value of each component of

1  further object to this interrogatory on the ground that it is vague and ambiguous, overly broad and

2  unduly burdensome.  Plaintiffs further object to this interrogatory on the ground that it seeks

3  information that is already in Defendants' possession or is obtainable from some other source that

4  it more convenient, less burdensome or less expensive.  Plaintiffs also object to this interrogatory

5  on the ground that it seeks information that is neither relevant nor calculated to lead to the

6  discovery of admissible evidence to the extent it calls for documents relating to purchases of CRT

7  from anyone other than Defendants.  Subject to, and without waiving, the foregoing objections,

8  Meijer responds that the answer to this interrogatory can be derived from Meijer's production of

9  documents.

10  DATED:   July 8, 2010                    By:      /s/ Guido Saveri

11                                               SAVERI & SAVERI, INC.
                                                   706 Sansome Street
12                                               San Francisco, CA 94111
                                                   Telephone:    (415) 217-6810
13                                               Facsimile:     (415) 217-6813

14                                               *Interim Lead Counsel for the Direct*
                                                   *Purchaser Plaintiffs*
15

16                                               Linda P. Nussbaum
                                                   NUSSBAUM LLP
17                                               88 Pine Street, 14th Floor
                                                   New York, NY 10005
18                                               Telephone:  (212) 838-7797
                                                   Fax:  (212) 838-7745
19                                               E mail:  lnussbaum@nussbaumllp.com

20

21                                               David P. Germaine
                                                   VANEK, VICKERS & MASINI, P.C.
22                                               111 S. Wacker Drive, Suite 4050
                                                   Chicago, IL 60606
23                                               Telephone:  (312) 224-1500
                                                   Fax:  (312) 224-1510
24                                               E mail:  dgermaine@vaneklaw.com

25                                               *Counsel for Meijer, Inc. and*
                                                   *Meijer Distribution, Inc.*
26

27

28

MEIJER, INC.'S AND MEIJER DISTRIBUTION, INC.'S RESPONSES TO DEFENDANT SAMSUNG SDI CO.,
LTD.'S FIRST SET OF INTERROGATORIES

1

# VERIFICATION

2

3     I, Tim Kause, declare as follows:

4     I am a Buyer/Merchandiser for Meijer Distribution, Inc., a Plaintiff in the above-named

5 action.  I am a representative of Meijer Distribution, Inc. and Meijer, Inc. and I am authorized to

6 act on their behalf in connection with submission of these interrogatory answers.

7

8     I have read Meijer, Inc.'s and Meijer Distribution, Inc.'s Responses To Defendant

9 Samsung SDI Co., Ltd.'s First Set of Interrogatories to the Direct Purchaser Plaintiffs.

10     I verify that the answers provided and written above by Meijer, Inc. and Meijer

11 Distribution, Inc. in these responses are true, accurate and correct to the best of my personal

12 knowledge, information and belief and that of Meijer, Inc. and Meijer Distribution, Inc. derived

13 from information available to Meijer, Inc. and Meijer Distribution, Inc.

14     I declare under penalty of perjury under the laws of the United States that the foregoing is

15 true and correct, on this the _8th_ day of July, 2010.

16

17                                          _Tim Kause_ (signature)
                                            Tim Kause
18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 153

**[Document Submitted Under Seal]**

# EXHIBIT 154

Christopher M. Curran (*pro hac vice*)
ccurran@whitecase.com
George L. Paul (*pro hac vice*)
gpaul@whitecase.com
Lucius B. Lau (*pro hac vice*)
alau@whitecase.com
White & Case LLP
701 Thirteenth Street, N.W.
Washington, D.C.  20005
Telephone:  (202) 626-3600
Facsimile:  (202) 639-9355

*Counsel to Defendants Toshiba America, Inc.,*
*Toshiba America Information Systems, Inc.,*
*Toshiba America Consumer Products, L.L.C.,*
*and Toshiba America Electronic Components, Inc.*

White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
(SAN FRANCISCO DIVISION)

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 07-5944 SC<br>MDL No. 1917 |
| This Document Relates to:<br><br>ALL ACTIONS | **DISCLOSURE STATEMENT OF TOSHIBA AMERICA, INC., TOSHIBA AMERICA INFORMATION SYSTEMS, INC., TOSHIBA AMERICA CONSUMER PRODUCTS, L.L.C., AND TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC.** |

Pursuant to Rule 7.1 of the Federal Rules of Civil Procedure, Defendants Toshiba America, Inc., Toshiba America Information Systems, Inc., Toshiba America Consumer Products, L.L.C., and Toshiba America Electronic Components, Inc. make the following disclosure:  Toshiba America Information Systems, Inc., Toshiba America Consumer

Products, L.L.C., and Toshiba America Electronic Components, Inc. are wholly owned subsidiaries of Toshiba America, Inc.  Toshiba America, Inc. is a wholly owned subsidiary of Toshiba Corporation in Japan.  Toshiba America, Inc. is not publicly held.  Toshiba Corporation is a publicly held company traded in Japan.

Dated:  May 8, 2008                          Respectfully submitted,

                                             **WHITE & CASE** LLP

                                             By:  /s/ Christopher M. Curran
                                                  Christopher M. Curran (*pro hac vice*)
                                                  George L. Paul (*pro hac vice*)
                                                  Lucius B. Lau (*pro hac vice*)
                                                  701 Thirteenth Street, N.W.
                                                  Washington, D.C.  20005
                                                  tel.: (202) 626-3600
                                                  fax: (202) 639-9355

                                                  *Counsel to Defendants Toshiba America,
                                                  Inc., Toshiba America Information
                                                  Systems, Inc., Toshiba America Consumer
                                                  Products, L.L.C., and Toshiba America
                                                  Electronic Components, Inc.*

# EXHIBIT 155
## [Document Submitted Under Seal]

# EXHIBIT 156

**TOSHIBA**



**TOSHIBA ANNUAL REPORT 2002**
Year ended March 31, 2002

**CASH FLOWS**

Net cash provided by operating activities amounted to ¥149.2 billion (US$1,122 million), a steep ¥304.4 billion decline from ¥453.6 billion recorded in the previous fiscal year. Despite a rise in cash inflows resulting from a decline in notes and accounts receivables and inventories, net cash provided by operating activities declined because of the large net loss as well as a decrease in such non-cash items as deferred tax expenses. Net loss for fiscal year 2001 included a ¥94.6 billion non-cash loss from sales disposal and impairment of property and securities, net, and that was eliminated in adjustment to net cash.

Net cash used in investing activities rose ¥148.9 billion from the previous fiscal year, from ¥176.7 billion, to ¥325.6 billion (US$2,448 million), owing to such factors as increases in property, plant and equipment.

Net cash provided by financing activities amounted to ¥53.5 billion (US$402 million), compared with ¥285.6 billion in net cash used in financing activities in the previous fiscal year.

This was due to a ¥30.9 billion rise in interest-bearing liabilities and ¥52.4 billion (US$394 million) in proceeds from stock offering by subsidiaries despite Toshiba's continued efforts to reduce interest-bearing liabilities.

In addition, the effect of exchange rate changes was to increase cash by ¥5.7 billion (US$43 million). Cash and cash equivalents at the end of the fiscal year declined ¥117.2 billion from ¥487.6 billion the end of the previous fiscal year, to ¥370.4 billion (US$2,785 million).

## PRINCIPAL SUBSIDIARIES AND AFFILIATED COMPANIES

As of March 31, 2002                                                                                     Percentage held by Group

| Consolidated Subsidiaries: | | Affiliated Companies: | |
|---|---|---|---|
| **Japan** | | Japan | |
| Toshiba Building & Lease Co., Ltd. | 100 | Toshiba Ceramics Co., Ltd. | 41 |
| Toshiba Elevator and Building System Corporation | 80 | | |
| Toshiba Plant Kensetsu Co., Ltd. | 56 | | |
| Toshiba TEC Corporation | 50 | | |
| U.S.A | | U.S.A. | |
| Semiconductor America, Inc. | 100 | Flash Vision, L.L.C. | 50 |
| Toshiba America Electronic Components, Inc. | 100 | | |
| Toshiba America, Inc. | 100 | | |

# EXHIBIT 157

BAKER BOTTS L.L.P.
Jon V. Swenson (SBN 233054)
1001 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 739-7500
Facsimile:  (650) 739-7699
Email: jon.swenson@bakerbotts.com

BAKER BOTTS L.L.P.
John M. Taladay (*pro hac vice*)
Joseph Ostoyich  (*pro hac vice*)
Erik T. Koons (*pro hac vice*)
Charles M. Malaise (*pro hac vice*)
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
Telephone: (202) 639-7700
Facsimile:  (202) 639-7890
Email: john.taladay@bakerbotts.com
Email: joseph.ostoyich@bakerbotts.com
Email: erik.koons@bakerbotts.com
Email: charles.malaise@bakerbotts.com

*Attorneys for Defendant Philips Electronics North America Corporation*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 3:07-cv-05944-SC (N.D. Cal.) |
| | MDL No. 1917 |
| This Document Relates to: | **OBJECTIONS AND RESPONSES OF DEFENDANT PHILIPS ELECTRONICS NORTH AMERICA CORPORATION TO DIRECT ACTION PLAINTIFFS' FIRST SET OF INTERROGATORIES** |
| *Electrograph Systems, Inc., et al. v. Hitachi, Ltd., et al.*, No. 11-cv-01656; | |
| *Siegel v. Hitachi, Ltd., et al.* No. 11-cv-05502;| |
| *Best Buy Co., Inc., et al. v. Hitachi, Ltd., et al.*, No. 11-cv-05513; | |
| *Target Corp, et al. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 11-cv-05514; | |
| *Interbond Corporation of America v. Hitachi, et al.*, No. 11-cv-06275; | |
| *Office Depot, Inc. v. Hitachi Ltd., et al.,* | |

PROPOUNDING PARTY:             Direct Action Plaintiffs Electrograph Systems, Inc. and
                              Electrograph Technologies Corp.; Alfred H. Siegel, solely
                              as Trustee of the Circuit City Stores, Inc. Liquidating
                              Trust; Best Buy Co., Inc., Best Buy Purchasing LLC, Best
                              Buy Enterprise Services, Inc., Best Buy Stores, L.P.,
                              Bestbuy.com, L.L.C., and Magnolia Hi-Fi, Inc.; Target
                              Corp., Sears, Roebuck, and Co., Kmart Corp.; Interbond
                              Corporation of America; Office Depot, Inc.; CompuCom
                              Systems, Inc.; Costco Wholesale Corporation; P.C.
                              Richard & Son Long Island Corporation, MARTA
                              Cooperative of America, Inc., and ABC Appliance, Inc.;
                              Schultze Agency Services, LLC on behalf of Tweeter
                              Opco, LLC and Tweeter Newco, LLC; Tech Data
                              Corporation and Tech Data Product Management, Inc.;
                              Dell Inc. and Dell Products L.P.; Sharp Electronics
                              Corporation; and Sharp Electronics Manufacturing
                              Company of America, Inc.

RESPONDING PARTY:              Philips Electronics North America Corporation

SET NO.:                       One

-3-

PHILIPS ELECTRONICS NORTH AMERICA CORPORATION'S OBJECTIONS AND RESPONSES TO DIRECT ACTION
PLAINTIFFS' FIRST SET OF INTERROGATORIES

discovery of admissible evidence, and inconsistent with the defined "Relevant Period" set forth in DAPs' pleadings.

12.     PENAC objects to the Interrogatories and the instructions therein, including but not limited to General Instructions Nos. 2, 5, and 6 to the extent that they seek to impose obligations on PENAC beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any Order of this Court.

## SPECIFIC RESPONSES TO INTERROGATORIES

## INTERROGATORY NO. 1. - REQUEST FOR ADMISSION NO. 1

If your response to any request for admission in Direct Action Plaintiffs' First Set of Requests for Admission to Philips Defendants served with these Interrogatories is not an unqualified admission:

(a) State the number of the request;

(b) State all facts upon which you based your response;

(c) Identify each person who has knowledge of those facts; and

(d) Identify all documents that support your response

## RESPONSE TO INTERROGATORY NO. 1 - REQUEST FOR ADMISSION NO. 1

In addition to PENAC's General Objections, which PENAC incorporates by reference, PENAC specifically objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to DAPs or stated in publicly available documents.  PENAC also objects to this Interrogatory on the ground that it calls for a legal argument or legal conclusion.  PENAC further objects to the use of the terms "unqualified," "knowledge," and "support" because they are vague, ambiguous, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving its foregoing objections, PENAC states that PENAC has not been a wholly-owned subsidiary of Philips Holding USA Inc. from the beginning of the relevant period through the present.  PENAC states that Philips Holding USA Inc. was

1  incorporated in July 1995.  PENAC became a wholly-owned subsidiary of Philips Holding USA

2  Inc. on January 1, 1996.  From January 1, 1995 through December 31, 1995, PENAC was named

3  FGP Corp. and was a wholly-owned subsidiary of Philips Electronics N.V.  The name of FGP

4  Corp. was changed to PENAC effective December 31, 1995.

5  **INTERROGATORY NO. 2. - REQUEST FOR ADMISSION NO. 2**

6  If your response to any request for admission in Direct Action Plaintiffs' First Set of

7  Requests for Admission to Philips Defendants served with these Interrogatories is not an

8  unqualified admission:

9  (a) State the number of the request;

10  (b) State all facts upon which you based your response;

11  (c) Identify each person who has knowledge of those facts; and

12  (d) Identify all documents that support your response

13  **RESPONSE TO INTERROGATORY NO. 2 - REQUEST FOR ADMISSION NO. 2**

14  In addition to PENAC's General Objections, which PENAC incorporates by reference,

15  PENAC specifically objects to this interrogatory on the grounds that it is overly broad, unduly

16  burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks

17  information that is maintained by and equally available to DAPs or stated in publicly available

18  documents.  PENAC also objects to this Interrogatory on the ground that it calls for a legal

19  argument or legal conclusion.  PENAC further objects to the use of the terms "unqualified,"

20  "knowledge," and "support" because they are vague, ambiguous, overbroad, unduly burdensome,

21  and not reasonably calculated to lead to the discovery of admissible evidence.

22  Subject to and without waiving its foregoing objections, PENAC states that Philips

23  Holding USA Inc. has not been a wholly-owned subsidiary of Koninklijke Philips N.V. for any

24  period from the beginning of the Relevant Period through the present.  PENAC states that from

25  1995 through 2009 Koninklijke Philips N.V. owned 100% of the outstanding shares of Philips

26  Holding USA, Inc.  In 2009 a corporate restructuring occurred and the ownership structure from

27  Koninklijke Philips N.V. to Philips Holding USA Inc. became the following:  Koninklijke Philips

28

1  N.V. owns 75.32% and Philips Belgium N.V. and Sedena Financial Services GCV have a

2  combined 24.68% ownership interest in Philips Investment Services Lux Sarl.  Philips Investment

3  Services Lux Sarl owns 100% of Philips Investment Services B.V.  Philips Investment Services

4  B.V. owns 73.37% of Philips Holding USA Inc., while the remaining 26.63% is owned by:

5  Respironics Holding France B.V. (0.398%), Respironics Holding UK B.V. (1.39%, Respironics

6  Holding Switzerland B.V. (00.133%), Respironics Bermuda Ltd. (11.82%), Genlyte Holding C

7  B.V. (2.16%), Genlyte Holding Canada B.V. (3.94%), Lifeline Systmes Holding B.V. (0.796%)

8  and Respironics Holding Japan B.V. (6.17%).  As of May 16, 2014, Philips Lumileds Holding

9  B.V. became an owner of 5.263% of Philips Holding USA Inc.

10 **INTERROGATORY NO. 3. - REQUEST FOR ADMISSION NO. 3**

11     If your response to any request for admission in Direct Action Plaintiffs' First Set of

12 Requests for Admission to Philips Defendants served with these Interrogatories is not an

13 unqualified admission:

14     (a) State the number of the request;

15     (b) State all facts upon which you based your response;

16     (c) Identify each person who has knowledge of those facts; and

17     (d) Identify all documents that support your response

18 **RESPONSE TO INTERROGATORY NO. 3 - REQUEST FOR ADMISSION NO. 3**

19     In addition to PENAC's General Objections, which PENAC incorporates by reference,

20 PENAC specifically objects to this interrogatory on the grounds that it is overly broad, unduly

21 burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks

22 information that is maintained by and equally available to DAPs or stated in publicly available

23 documents.  PENAC also objects to this Interrogatory on the ground that it calls for a legal

24 argument or legal conclusion.  PENAC further objects to the use of the terms "unqualified,"

25 "knowledge," and "support" because they are vague, ambiguous, overbroad, unduly burdensome,

26 and not reasonably calculated to lead to the discovery of admissible evidence.

27     Subject to and without waiving its foregoing objections, PENAC states that it has no

28

record of a business division named Philips Consumer Electronics Co.  PENAC further states that prior to January 1, 2008, PENAC had a division named Philips Consumer Electronics Company.

**INTERROGATORY NO. 4. - REQUEST FOR ADMISSION NO . 4**

If your response to any request for admission in Direct Action Plaintiffs' First Set of Requests for Admission to Philips Defendants served with these Interrogatories is not an unqualified admission:

(a) State the number of the request;

(b) State all facts upon which you based your response;

(c) Identify each person who has knowledge of those facts; and

(d) Identify all documents that support your response

**RESPONSE TO INTERROGATORY NO. 4 - REQUEST FOR ADMISSION NO. 4**

In addition to PENAC's General Objections, which PENAC incorporates by reference, PENAC specifically objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to DAPs or stated in publicly available documents.  PENAC also objects to this Interrogatory on the ground that it calls for a legal argument or legal conclusion.  PENAC further objects to the use of the terms "unqualified," "knowledge," and "support" because they are vague, ambiguous, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving its foregoing objections, PENAC states that Philips Consumer Electronics was not a business division of PENAC from the beginning of the relevant period through the present.  PENAC states that as of January 1, 1998, the Philips enterprise went through a corporate reorganization where the previous business divisions of Sound & Vision, Business Electronics, Industrial Electronics were regrouped into the new division Philips Consumer Electronics.  Philips Consumer Electronics was a business division of the Philips enterprise until January 1, 2008 when it became Philips Consumer Lifestyle.

1    Dated:  July 10, 2014                              BAKER BOTTS LLP

2

3                                                       _____

4                                                       Email: charles.malaise@bakerbotts.com
                                                        BAKER BOTTS LLP
5                                                       1299 Pennsylvania Avenue, N.W.
                                                        Washington, D.C. 20004-2400
6                                                       Telephone: (202) 639-1117
                                                        Facsimile:  (202) 585-1037
7
                                                        *Attorney for Philips Electronics North American
8                                                       Corporation*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          46                            MDL 1917
        PHILIPS ELECTRONICS NORTH AMERICA CORPORATION'S OBJECTIONS AND RESPONSES TO DIRECT ACTION
                          PLAINTIFFS' FIRST SET OF INTERROGATORIES

1

## **VERIFICATION**

2

    I, James Durchak, am the Director, Risk Management of Philips North America

3

Corporation ("PENAC"), and I am authorized to make this Verification on PENAC's behalf.  I

4

have read the attached Philips North America Corporation's Supplementary Objections and

5

Responses to DAPs' First Set of Interrogatories and know its contents.  I am informed and believe

6

that the matters and things stated therein are true, and upon that ground allege that the matters and

7

things stated therein are true.

8

    I hereby declare under penalty of perjury under the laws of the United States of America,

9

and pursuant to Title 28, U.S. Code, Judiciary and Judicial Procedure § 1746 "Unsworn

10

Declarations Under Penalty of Perjury," that the facts set forth in the document described above

11

are true and correct.

12

    Executed on July 9, 2014 at Andover, MA.

13

14

15

16

17

            James Durchak

18

            Director, Risk Management

            Philips North America Corporation

19

20

21

22

23

24

25

26

27

28

PHILIPS ELECTRONICS NORTH AMERICA CORPORATION'S OBJECTIONS AND RESPONSES TO DIRECT ACTION
PLAINTIFFS' FIRST SET OF INTERROGATORIES

# EXHIBIT 158

BAKER BOTTS L.L.P.
Jon V. Swenson (SBN 233054)
1001 Page Mill Road
Palo Alto, CA 94304
Telephone: (650) 739-7500
Facsimile: (650) 739-7699
Email: jon.swenson@bakerbotts.com

BAKER BOTTS L.L.P.
John M. Taladay (*pro hac vice*)
Joseph Ostoyich (*pro hac vice*)
Erik T. Koons (*pro hac vice*)
Charles M. Malaise (*pro hac vice*)
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
Telephone: (202) 639-7700
Facsimile: (202) 639-7890
Email: john.taladay@bakerbotts.com
Email: joseph.ostoyich@bakerbotts.com
Email: erik.koons@bakerbotts.com
Email: charles.malaise@bakerbotts.com

*Attorneys for Defendant Koninklijke Philips N.V.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 3:07-cv-05944-SC (N.D. Cal.) |
| | MDL No. 1917 |
| This Document Relates to: | **OBJECTIONS AND RESPONSES OF DEFENDANT KONINKLIJKE PHILIPS N.V. TO DAPS' FIRST SET OF INTERROGATORIES** |
| *Electrograph Systems, Inc., et al. v. Hitachi, Ltd., et al.*, No. 11-cv-01656; | |
| *Siegel v. Hitachi, Ltd., et al.* No. 11-cv-05502; | |
| *Best Buy Co., Inc., et al. v. Hitachi, Ltd., et al.*, No. 11-cv-05513; | |
| *Target Corp, et al. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 11-cv-05514; | |
| *Interbond Corporation of America v. Hitachi, et al.*, No. 11-cv-06275; | |
| *Office Depot, Inc. v. Hitachi Ltd., et al.*, | |

PROPOUNDING PARTY:     Direct Action Plaintiffs Electrograph Systems, Inc. and Electrograph Technologies Corp.; Alfred H. Siegel, solely as Trustee of the Circuit City Stores, Inc. Liquidating Trust; Best Buy Co., Inc., Best Buy Purchasing LLC, Best Buy Enterprise Services, Inc., Best Buy Stores, L.P., Bestbuy.com, L.L.C., and Magnolia Hi-Fi, Inc.; Target Corp., Sears, Roebuck, and Co., Kmart Corp.; Interbond Corporation of America; Office Depot, Inc.; CompuCom Systems, Inc.; Costco Wholesale Corporation; P.C. Richard & Son Long Island Corporation, MARTA Cooperative of America, Inc., and ABC Appliance, Inc.; Schultze Agency Services, LLC on behalf of Tweeter Opco, LLC and Tweeter Newco, LLC; Tech Data Corporation and Tech Data Product Management, Inc.; Dell Inc. and Dell Products L.P. ; Sharp Electronics Corporation; and Sharp Electronics Manufacturing Company of America, Inc.

RESPONDING PARTY:     Koninklijke Philips N.V.

SET NO.:     One

on KPNV beyond those of the Federal Rules of Civil Procedure, the Local Rules, or any Order of this Court.

## SPECIFIC RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1. - REQUEST FOR ADMISSION NO. 1**

If your response to any request for admission in Direct Action Plaintiffs' First Set of Requests for Admission to Philips Defendants served with these Interrogatories is not an unqualified admission:

(a) State the number of the request;

(b) State all facts upon which you based your response;

(c) Identify each person who has knowledge of those facts; and

(d) Identify all documents that support your response

**RESPONSE TO INTERROGATORY NO. 1 - REQUEST FOR ADMISSION NO. 1**

In addition to KPNV's General Objections, which KPNV incorporates by reference, KPNV specifically objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to DAPs or stated in publicly available documents.  KPNV also objects to this Interrogatory on the ground that it calls for a legal argument or legal conclusion.  KPNV further objects to the use of the terms "unqualified," "knowledge," and "support" because they are vague, ambiguous, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving its foregoing objections, KPNV states that Philips Electronics North America Corporation has not been a wholly-owned subsidiary of Philips Holding USA Inc. from the beginning of the relevant period through the present.  KPNV states that Philips Holding USA Inc. was incorporated in July 1995.  Philips Electronics North America Corporation became a wholly-owned subsidiary of Philips Holding USA Inc. on January 1, 1996. From January 1, 1995 through December 31, 1995, Philips Electronics North American Corporation was named FGP Corp. and was a wholly-owned subsidiary of Philips Electronics

N.V.  The name of FGP Corp. was changed to Philips Electronics North America Corporation effective December 31, 1995.

**INTERROGATORY NO. 2. - REQUEST FOR ADMISSION NO. 2**

If your response to any request for admission in Direct Action Plaintiffs' First Set of Requests for Admission to Philips Defendants served with these Interrogatories is not an unqualified admission:

(a) State the number of the request;

(b) State all facts upon which you based your response;

(c) Identify each person who has knowledge of those facts; and

(d) Identify all documents that support your response

**RESPONSE TO INTERROGATORY NO. 2 - REQUEST FOR ADMISSION NO. 2**

In addition to KPNV's General Objections, which KPNV incorporates by reference, KPNV specifically objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to DAPs or stated in publicly available documents.  KPNV also objects to this Interrogatory on the ground that it calls for a legal argument or legal conclusion.  KPNV further objects to the use of the terms "unqualified," "knowledge," and "support" because they are vague, ambiguous, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving its foregoing objections, KPNV states that Philips Holding USA Inc. has not been a wholly-owned subsidiary of KPNV for any period from the beginning of the Relevant Period through the present.  KPNV states that from 1995 through 2009 KPNV owned 100% of the outstanding shares of Philips Holding USA, Inc.  In 2009 a corporate restructuring occurred and the ownership structure from KPNV to Philips Holding USA Inc. became the following:  KPNV owns 75.32% and Philips Belgium N.V. and Sedena Financial Services GCV have a combined 24.68% ownership interest in Philips Investment Services Lux Sarl.  Philips Investment Services Lux Sarl owns 100% of Philips Investment Services B.V.

Philips Investment Services B.V. owns 73.37% of Philips Holding USA Inc., while the remaining 26.63% is owned by: Respironics Holding France B.V. (0.398%), Respironics Holding UK B.V. (1.39%, Respironics Holding Switzerland B.V. (00.133%), Respironics Bermuda Ltd. (11.82%), Genlyte Holding C B.V. (2.16%), Genlyte Holding Canada B.V. (3.94%), Lifeline Systmes Holding B.V. (0.796%) and Respironics Holding Japan B.V. (6.17%).  As of May 16, 2014, KPNV, Philips Lumileds Holding B.V. became an owner of 5.263% of Philips Holding USA Inc.

**INTERROGATORY NO. 3. - REQUEST FOR ADMISSION NO. 3**

If your response to any request for admission in Direct Action Plaintiffs' First Set of Requests for Admission to Philips Defendants served with these Interrogatories is not an unqualified admission:

(a) State the number of the request;

(b) State all facts upon which you based your response;

(c) Identify each person who has knowledge of those facts; and

(d) Identify all documents that support your response

**RESPONSE TO INTERROGATORY NO. 3 - REQUEST FOR ADMISSION NO. 3**

In addition to KPNV's General Objections, which KPNV incorporates by reference, KPNV specifically objects to this interrogatory on the grounds that it is overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks information that is maintained by and equally available to DAPs or stated in publicly available documents.  KPNV also objects to this Interrogatory on the ground that it calls for a legal argument or legal conclusion.  KPNV further objects to the use of the terms "unqualified," "knowledge," and "support" because they are vague, ambiguous, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving its foregoing objections, KPNV states that it has no record of a business division named Philips Consumer Electronics Co.

**INTERROGATORY NO. 4. - REQUEST FOR ADMISSION NO. 4**

If your response to any request for admission in Direct Action Plaintiffs' First Set of

1   Requests for Admission to Philips Defendants served with these Interrogatories is not an

2   unqualified admission:

3       (a) State the number of the request;

4       (b) State all facts upon which you based your response;

5       (c) Identify each person who has knowledge of those facts; and

6       (d) Identify all documents that support your response

7   **RESPONSE TO INTERROGATORY NO. 4 - REQUEST FOR ADMISSION NO. 4**

8       In addition to KPNV's General Objections, which KPNV incorporates by reference,

9   KPNV specifically objects to this interrogatory on the grounds that it is overly broad, unduly

10  burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and seeks

11  information that is maintained by and equally available to DAPs or stated in publicly available

12  documents.  KPNV also objects to this Interrogatory on the ground that it calls for a legal

13  argument or legal conclusion.  KPNV further objects to the use of the terms "unqualified,"

14  "knowledge," and "support" because they are vague, ambiguous, overbroad, unduly burdensome,

15  and not reasonably calculated to lead to the discovery of admissible evidence.

16      Subject to and without waiving its foregoing objections, KPNV states that Philips

17  Consumer Electronics was not a business division of Philips Electronics North America

18  Corporation from the beginning of the relevant period through the present.  KPNV states that as

19  of January 1, 1998, the Philips enterprise went through a corporate reorganization where the

20  previous business divisions of Sound & Vision, Business Electronics, Industrial Electronics were

21  regrouped into the new division Philips Consumer Electronics.  Philips Consumer Electronics

22  was a business division of the Philips enterprise until January 1, 2008 when it became Philips

23  Consumer Lifestyle.

24  **INTERROGATORY NO. 5. - REQUEST FOR ADMISSION NO. 5**

25      If your response to any request for admission in Direct Action Plaintiffs' First Set of

26  Requests for Admission to Philips Defendants served with these Interrogatories is not an

27  unqualified admission:

28

1

2

3    Dated:  July 10, 2014                    BAKER BOTTS LLP

4

5

6                                             Email: charles.malaise@bakerbotts.com
                                             BAKER BOTTS LLP
7                                            1299 Pennsylvania Avenue, N.W.
                                             Washington, D.C. 20004-2400
8                                            Telephone: (202) 639-1117
                                             Facsimile:  (202) 585-1037
9
                                             *Attorney for Koninklijke Philips N.V.*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

KONINKLIJKE PHILIPS N.V. OBJECTIONS AND RESPONSES TO DIRECT ACTION PLAINTIFFS' FIRST SET OF
INTERROGATORIES

**VERIFICATION**

1

2    I, Jap Jongedijk, am Senior Legal Counsel with Philips International B.V., and I am

3    authorized to make this Verification on Koninklijke Philips N.V.'s behalf.  I have read the

4    attached Koninklijke Philips N.V.'s Supplementary Objections and Responses to DAPs' First Set

5    of Interrogatories and know its contents.  I am informed and believe that the matters and things

6
     stated therein are true, and upon that ground allege that the matters and things stated therein are
7
     true.
8

9    I hereby declare under penalty of perjury under the laws of the United States of America,

10   and pursuant to Title 28, U.S. Code, Judiciary and Judicial Procedure § 1746 "Unsworn

11   Declarations Under Penalty of Perjury," that the facts set forth in the document described above

12   are true and correct.

13   Executed on July 10, 2014 at Amsterdam, Netherlands.

14

15

16

17   _____

18   Jap Jongedijk
     Senior Legal Counsel
19   Philips International B.V.

20

21

22

23

24

25

26

27

28

KONINKLIJKE PHILIPS N.V. OBJECTIONS AND RESPONSES TO DIRECT ACTION PLAINTIFFS' FIRST SET OF INTERROGATORIES

# EXHIBIT 159

```
<DOCUMENT>
<TYPE>20-F
<SEQUENCE>1
<FILENAME>u43961e20-f.txt
<DESCRIPTION>KONINKLIJKE PHILIPS ELECTRONICS N.V.
<TEXT>

<PAGE>   1
```

-----------------------------------------------------------------

As filed with the Securities and Exchange Commission on May 7, 2001

-----------------------------------------------------------------


SECURITIES AND EXCHANGE COMMISSION

WASHINGTON, D.C. 20549

FORM 20-F

(Mark one)

[   ]          REGISTRATION STATEMENT PURSUANT TO SECTION 12(b)
               OR (g) OF THE SECURITIES EXCHANGE ACT OF 1934
               For the fiscal year ended December 31, 2000
[ x ]                             OR
               ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
               OF THE SECURITIES EXCHANGE ACT OF 1934
[   ]          For the fiscal year ended December 31, 2000
                                  OR

               TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
               OF THE SECURITIES EXCHANGE ACT OF 1934


Commission file number 2-20193

KONINKLIJKE PHILIPS ELECTRONICS N.V.

(Exact name of Registrant as specified in charter)

THE NETHERLANDS

(Jurisdiction of incorporation or organization)

REMBRANDT TOWER, AMSTELPLEIN 1, 1096 HA AMSTERDAM, THE NETHERLANDS

(ADDRESS OF PRINCIPAL EXECUTIVE OFFICE)

Securities registered or to be registered pursuant to Section 12(b) of the Act:

Title of each class                      Name of each exchange on which registered

COMMON SHARES - PAR VALUE                          NEW YORK STOCK EXCHANGE
EURO (EUR) 0.20 PER SHARE

```
<DOCUMENT>
<TYPE>EX-8
<SEQUENCE>4
<FILENAME>u43961ex8.txt
<DESCRIPTION>LIST OF SIGNIFICANT SUBSIDIARIES
<TEXT>

<PAGE>    1
```

EXHIBIT 8

LIST OF SIGNIFICANT SUBSIDIARIES

Philips Electronics Nederland B.V., Eindhoven, the Netherlands (100%)

Philips Electronics North America Corporation, Delaware, United States of America (100%)

Philips Beteiligungs-GmbH, Hamburg, Germany (100%)

Compagnie Francaise Philips, Suresnes, France (100%)

Philips UK Limited, Croydon, United Kingdom (100%)
```
</TEXT>
</DOCUMENT>
```

# EXHIBIT 160

**Panasonic Consumer Electronics Company**
A Unit of Matsushita Electric Corporation of America

# INVOICE

| Invoice Date | Invoice Number |
|---|---|
| 091798 | 21386176 |

| Account Number | Control Number |
|---|---|
| 4010305 | 10750811 |
| | ORG:004  WHSE:411 |

| Customer Service Contact | |
|---|---|
| PINOVER | LORI |

**Remittance Address**

PANASONIC COMPANY EAST

P.O. BOX 13509

NEWARK, NJ 07188-0509

**Bill to**

TRANSAMERICA COMM FINANCE CORP

P.O. BOX 94900

PALATINE, IL 60094-4700

**Ship To Address**

NATHAN MUCHNICK/TCFC

1725 CHESTNUT STREET

PHILADELPHIA, PA 19103

Absolutely no returns will be accepted unless shipped prepaid after receipt of prior written authorization. All other claims must be made within 10 days after receipt of merchandise by consignee.

| Terms of Payment | Net Due Date | Order Date | Customer PO Number |
|---|---|---|---|
| 27 DUE ON RECEIPT | 101298 | 091698 | 916GM-FC |

| Panasonic Model Number / Customer Product Number | Quantity Ordered | B/O Quantity | Quantity Shipped | Gross Unit Price | Net Unit Price / Discounts and Charges | Total |
|---|---|---|---|---|---|---|
| 2 CT-27SF25 | 4 | 2 | 2 | 450.00 | 445.50 | 891.00 |
| 478800 SLMN 1E | | | | | | |
| IN LIEU OF REBATE | | | | | -1.00% | |
| 8 SC-PM01 | 2 | | 2 | 140.00 | 138.60 | 277.20 |
| 475874 SLMN 1E | | | | | | |
| IN LIEU OF REBATE | | | | | -1.00% | |
| 9 RX-DS12 | 4 | | 4 | 66.50 | 65.84 | 263.36 |
| 475874 SLMN 1E | | | | | | |
| IN LIEU OF REBATE | | | | | -1.00% | |
| 10 RQ-SW35V | 6 | | 6 | 54.00 | 53.44 | 332.64 |
| 475874 SLMN 1E | | | | | | |
| IN LIEU OF REBATE | | | | | -1.00% | |
| 11 RQ-SW45V | 6 | | 6 | 63.00 | 62.37 | 374.22 |
| 475874 SLMN 1E | | | | | | |
| IN LIEU OF REBATE | | | | | -1.00% | |

*phs* 909.49  #37609
*fps* 909.49  #37693
*ish* 909.48  #37806

| Carrier | B/L Number | Subtotal > | |
|---|---|---|---|
| SHELDON DELIVERY | B93379 | Sales/Use Tax > | |
| | PRO NO. 98DB93379 | Shipping Charges > | |

| Shipping Terms | Store Number | TOTAL INVOICE > | Continued |
|---|---|---|---|
| Prepaid | Store 0000 | | |
| | Acc.No 1007588 NATHAN MUCHNICK/TCFC | | |

(Rev. 11/97)                    ORIGINAL

EXHIBIT
1736
JM 627-B

NM00001

# EXHIBIT 161

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

-   -   -

IN RE:  CATHODE RAY TUBE

(CRT) ANTITRUST LITIGATION

Master File No.

CV-07-5944-SC

MDL No. 1917

-   -   -

June 27, 2013

-   -   -

Oral deposition EUGENE MUCHNICK taken
pursuant to notice, held at the Law Offices of
Berger & Montague, P.C., 1622 Locust Street,
Philadelphia, PA  19103, commencing at 9:30
a.m., on the above date, before Jennifer P.
Miller, Registered Professional Reporter and
Notary Public for the Commonwealth of
Pennsylvania.

1

Eugene Muchnick

```
1   BY MR. MARKMAN:

2        Q.   Sir, I'm handing you a document that

3   has been marked Exhibit 1736.  And it is Bates

4   labeled MM00001.

5             MR. MARKMAN:  Can we go off the

6        record for a second.

7                        -   -   -

8             (Whereupon, an off-the-record

9        discussion was held.)

10                       -   -   -

11  BY MR. MARKMAN:

12       Q.   Sir, you have Exhibit 1736 in front

13  of you; is that correct?

14       A.   Correct.

15       Q.   And do you recognize this document

16  as an invoice from Panasonic Consumer

17  Electronics Company dated September 17th 1988?

18       A.   Yes.

19       Q.   I'd like to have you walk through a

20  few things on this invoice.  If you turn your

21  attention to halfway down on the left-hand

22  side, it says customer product number; do you

23  see that, sir?

24       A.   Yes.

25       Q.   The first entry says, please correct
```

65

**Eugene Muchnick**

1    me if I read this wrong, is it CT-27SF25?

2         A.    Yes.

3         Q.    Do you know what model that customer

4    product number references?

5         A.    Yes.

6         Q.    What is it?

7         A.    It's a 27-inch Panasonic flat

8    screen.  When I say "flat screen," I mean flat

9    screen CRT.

10        Q.    Okay.

11        A.    As opposed to an LCD.

12        Q.    And do you see for that same product

13   entry under quantity ordered, it says SLMN1E,

14   under the quantity ordered?

15        A.    S-N-L-M-N, yes.

16        Q.    What does that abbreviation

17   reference, sir?

18        A.    No idea.

19        Q.    And below that it says in lieu of

20   rebate?

21        A.    Yes.

22        Q.    Do you see that?

23        A.    There's a one-percent discount

24   extended out.  You can see that in lieu of

25   rebate.

66

**Eugene Muchnick**

1      Q.   And what is the one-percent discount

2  reference here for?

3      A.   The quantity discount -- or quantity

4  rebate at the end of the year.  I don't

5  remember.  I don't remember.

6      Q.   Would this be an example of a volume

7  discount?

8      A.   Yes, I guess it could be a volume

9  discount.

10     Q.   The next entry for a customer

11  product number, it says SC-3M01.

12     A.   Uh-hum.

13     Q.   Do you see that, sir?

14     A.   Yes.

15     Q.   What is that model reference there?

16     A.   I'm trying to think of that.  I

17  think it was a combination of a -- it was a

18  portable CD and radio combination.  It sold

19  for about $180.

20     Q.   And if we go to the next entry, it

21  says RX-DS12.

22     A.   Yes, that was a portable boom box.

23     Q.   What about the customer product

24  number RQ-SW35V?

25     A.   Three five and four five were

67

**Eugene Muchnick**

1    Walkman.

2        Q.   Under shipping terms it says

3    prepaid; do you see that?

4        A.   I don't really -- down at the

5    bottom, I see.

6        Q.   The bottom left.

7        A.   Yes.

8        Q.   Was this typical of your purchases

9    from Panasonic?

10       A.   Well, this is what they shipped.

11   The order would have been much greater.

12            They didn't have everything in

13   stock at any given time necessarily.  So here

14   they shipped part of this order.  And this

15   could have referenced several different

16   purchase orders.  It didn't necessarily all

17   come from one purchase order.

18       Q.   And if you look on the top left on

19   the second box, it says bill to Transamerica

20   Commercial Finance Corporation.

21       A.   Yes.

22       Q.   Can you remind me again who is

23   Transamerica.

24       A.   They're a finance company.  They're

25   a factor.

68

Eugene Muchnick

1      Q.   So can you explain how the billing

2  process would work between Panasonic,

3  Transamerica and Nathan Muchnick, Inc.?

4      A.   We -- Panasonic shipped the product

5  and billed us and we paid Transamerica because

6  Transamerica paid Panasonic.

7      Q.   And under terms of payment, does it

8  say 2 percent?

9               I can't read what number it

10 says.

11     A.   Probably says 2 percent, 30, I would

12 guess, or 90 day.  And you had to pay -- I

13 could pay it all in 30 days and get a 2

14 percent discount or I could take the 90 days

15 and pay it in thirds, which is what I did.

16     Q.   That's what you did.  As a general

17 matter, you paid it in 90 days?

18     A.   Well, you paid the third and 30,

19 third and 60, third and 90.

20               And you can see that's what I

21 did on the invoice here.

22     Q.   That was my next question.  Thank

23 you very much.

24     A.   Staying ahead of you here, if I can.

25               -  -  -

69

Eugene Muchnick

```
 1                  CERTIFICATE

 2          I HEREBY CERTIFY that the

 3     proceedings, evidence and objections are

 4     contained fully and accurately in the

 5     stenographic notes taken by me upon the

 6     deposition of EUGENE MUCHNICK taken on

 7     June 27, 2013 and that this is

 8     a true and correct transcript of same.

 9

10

11

12          _____

13          Jennifer Miller, RPR and

14          Notary Public

15

16

17

18

19

20

21          (The foregoing certification of

22     this transcript does not apply to any

23     reproduction of the same by any means

24     unless under the direct control and/or

25     supervision of the certifying reporter.)
```

91

# EXHIBIT 162

## [Document Submitted Under Seal]

# EXHIBIT 163

CERTIFIED COPY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

---o0o---

In Re: CATHODE RAY TUBE (CRT)  )
ANTITRUST LITIGATION,          )
                               )
                Plaintiff,     )
-----------------------------  )   Case No.
                               )   07-5944 Sc
                               )   MDL No. 1917
                               )
This Document Relates to:      )
                               )
ALL ACTIONS,                   )
                               )

<u>DEPOSITION OF PRINCETON DISPLAY TECHNOLOGIES, INCORPORATED'S</u>

<u>30(b)(6) WITNESS SUPRASAD BAIDYAROY, PH.D.</u>

July 12, 2013

BALINDA DUNLAP, CSR No. 10710

360347




barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine        (858) 455-5444 San Diego
(916) 922-5777 Sacramento     (408) 885-0550 San Jose         (760) 322-2240 Palm Springs   (951) 686-0606 Riverside
(818) 702-0202 Woodland Hills (212) 808-8500 New York City    (347) 821-4611 Brooklyn       (518) 490-1910 Albany
(516) 277-9494 Garden City    (914) 510-9110 White Plains     (312) 379-5566 Chicago        (702) 366-0500 Las Vegas
          +33 1 70 72 65 26 Paris      +971 4 8137744 Dubai        +852 3693 1522 Hong Kong

1   products?

2        A.    No.

3        Q.    Thank you.  From whom did Princeton

4   purchase CDTs during the relevant period?

10:54  5        A.    Chunghwa Picture Tubes and Samsung SD.

6        Q.    Those were the only two suppliers that

7   Princeton used?

8        A.    Yes.

9        Q.    During what period of time did Princeton

10:55 10   purchase CDTs from Chunghwa?

11             MS. FAIT:  If you can remember.

12        Q.  BY MR. CUNNINGHAM:  As best you can

13   remember.

14        A.    From memory, just approximately 2003,

10:55 15   2004.

16        Q.    So you started making purchases in 2003

17   and ended in 2004, to the best of your

18   recollection?

19        A.    With Chunghwa.

10:55 20        Q.    Right.  And during what period of time did

21   Princeton purchase CDTs from Samsung SDI?

22        A.    From -- again, from 2003 to 2009.  So it

23   is past the relevant period.

24        Q.    Did Princeton purchase any CDTs before

10:56 25   2003?

72

BARKLEY
Court Reporters

1  Q. Do you know if the destination of the CDT

2 shipment played any role in the pricing you

3 received for the CDTs?

4  A. No.

12:43 5  Q. If you could turn to PRINCETON 29, please?

6  A. Yes, sir.

7  Q. PRINCETON 29 is a commercial invoice from

8 Samsung SDI Malaysia, Bhd, correct?

9  A. Uh-huh.  Bhd, yes.

12:44 10  Q. My question is:  Is this the SDI entity

11 that you made -- that Princeton made all of its CDT

12 purchases from?

13  A. All 15-inch.

14  Q. And the 10-inch was made from a different

12:44 15 entity?

16  A. Yes, I think Busan or Busan or whatever

17 you call them, came from Korea.

18  Q. Did -- forgive me if I've asked this

19 before, but did you correspond or speak on the

12:44 20 phone with anyone from Samsung SDI Malaysia ever

21 during the relevant period?

22  A. No.

23  Q. Okay.  Did you correspond on -- or speak

24 on the phone with anyone from a Samsung SDI company

12:45 25 during the relevant period?

130

SUPRASAD BAIDYAROY, PH.D. 30(b)(6)

BARKLEY
Court Reporters

1        A.    Yes.

2        Q.    Okay.  Do you remember who?

3        A.    Kevin Kim.

4        Q.    Okay.  Do you know what Kevin Kim's role

12:45  5   was at SDI?

6        A.    He's in sales, and he's on some of our

7   purchase orders.

8        Q.    And what would you discuss with Kevin Kim?

9        A.    Kevin Kim was based in Korea, Seoul, so

12:45  10  mostly for 10-inch business, but he was also

11  channeling -- or monitoring the shipments out of

12  Malaysia.

13          So when we remit money or send a purchase

14  order, it is called in to -- to Mr. Kevin Kim.  So

12:45  15  all our purchase orders were faxed to him or

16  emailed to him.  Mostly fax at the time, but later

17  on we sent emails.

18        Q.    Is Kevin Kim the person who gave you price

19  quotations for your purchase of a 10-inch?

12:46  20  A.    In the beginning he may have.  I don't

21  remember.  But most of it was channeled through my

22  friend in India.

23        Q.    Okay.  So how often did you speak to

24  Mr. Kim?

12:46  25  A.    Not very often, maybe once a year.

131



1      Q.    Okay.  On what occasion would you speak to

2   him?

3      A.    Begging him to ship quickly.

4      Q.    Were you successful in getting him to ship

12:46   5   quickly when you begged him?

6      A.    Sometimes.

7      Q.    Okay.  And did you also correspond with

8   him by email?

9      A.    I don't recall.

12:46  10      Q.    Most of your contact was by phone; is that

11   correct?

12      A.    With him, yes.

13      Q.    Okay.  Do you remember any other

14   individuals from Samsung SDI Co. that you either

12:46  15   talked to or corresponded with?

16      A.     In Malaysia there are some logistical

17   people, sometimes the container movement, some

18   nonimportant things.

19          If things needed immediate attention, I

12:47  20   would pick up a phone and talk to some people.  I

21   don't even remember their names today.  This is

22   just to control the flow of the product.

23      Q.    But you didn't have a regular contact in

24   Malaysia like Mr. Kim?

12:47  25      A.    No, no.


132

SUPRASAD BAIDYAROY, PH.D. 30(b)(6)



```
 1              DEPOSITION OFFICER'S CERTIFICATE
 2   STATE OF CALIFORNIA      )
                              ) ss.
 3   COUNTY OF SAN FRANCISCO  )
 4
 5
 6          I, BALINDA DUNLAP, hereby certify:
 7          I am a duly qualified Certified Shorthand
 8   Reporter in the State of California, holder of
 9   Certificate Number CSR 10710 issued by the Court
10   Reporters Board of California and which is in full force
11   and effect.  (Fed. R. Civ. P. 28(a)).
12          I am authorized to administer oaths or
13   affirmations pursuant to California Code of Civil
14   Procedure, Section 2093(b) and prior to being examined,
15   the witness was first duly sworn by me.  (Fed. R. Civ.
16   P. 28(a), 30(f)(1)).
17          I am not a relative or employee or attorney or
18   counsel of any of the parties, nor am I a relative or
19   employee of such attorney or counsel, nor am I
20   financially interested in this action.  (Fed. R. Civ. P.
21   28).
22          I am the deposition officer that
23   stenographically recorded the testimony in the foregoing
24   deposition and the foregoing transcript is a true record
25                          / / /
```

156

SUPRASAD BAIDYAROY, PH.D. 30(b)(6)

BARKLEY
Court Reporters

1    of the testimony given by the witness.  (Fed. R. Civ. P.

2    30(f)(1)).

3        Before completion of the deposition, review of

4    the transcript [ x ] was [  ] was not requested.  If

5    requested, any changes made by the deponent (and

6    provided to the reporter) during the period allowed, are

7    appended hereto.  (Fed. R. Civ. P. 30(e)).

8    Dated: July 26, 2013

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

157

BARKLEY
Court Reporters

# EXHIBIT 164

SAMSUNG SDI CO., LTD. AND SUBSIDIARIES

Consolidated Financial Statements

**December 31, 2011 and 2010**

(With Independent Auditors' Report Thereon)

**SAMSUNG SDI CO., LTD. AND SUBSIDIARIES**
Notes to the Consolidated Financial Statements

**For the years ended December 31, 2011 and 2010**

**3. Significant Accounting Policies, Continued**

**(1) Basis of consolidation, Continued**

Details of consolidated subsidiaries are as follows:

*(In thousands of won, except number of shares and percentage of ownership)*

| Subsidiaries | Location | Primary business | Capital stock as of December 31, 2011 | Percentage of ownership (***) | |
|---|---|---|---|---|---|
| | | | | December 31, 2011 | December 31, 2010 |
| Samsung SDI America, Inc. ("SDIA") | U.S.A. | Manufacturing and sale of PDP | 28,626,950 | 91.70% | 91.70% |
| Samsung SDI Germany GmbH ("SDIG") (*) | Germany | Supporting sales in Europe region | 22,400,891 | 100.00% | 100.00% |
| Samsung SDI Hungary Rt. ("SDIHU") | Hungary | Manufacturing and sale of PDP | 4,860,887 | 100.00% | 100.00% |
| Samsung SDI Europe GmbH ("SDIEU") (*) (**) | Germany | Sale of Solar Cell | 1,558,180 | 100.00% | - |
| Samsung SDI (Malaysia) Sdn, Bhd. ("SDI(M)") | Malaysia | Manufacturing and sale of CPT | 43,581,363 | 68.60% | 68.60% |
| Samsung SDI Vietnam Ltd. ("SDIV") (*) | Vietnam | Manufacturing and sale of rechargeable battery | 17,326,000 | 100.00% | 100.00% |
| Samsung SDI Energy Malaysia Sdn, Bhd. ("SDIEM") (**) | Malaysia | Manufacturing and sale of rechargeable battery | 11,781,000 | 100.00% | - |
| Samsung SDI (Hong Kong) Ltd. ("SDIHK") | Hong Kong | Sale of rechargeable battery, PDP | 261,864,048 | 95.90% | 95.90% |
| SVIC 15 Fund ("SVIC 15") | Korea | Investments in new technology Venture business | 29,818,182 | 99.00% | 99.00% |
| **Subsidiary of SDIA** | | | | | |
| Samsung SDI Mexico, S.A. de C.V. ("SDIM") | Mexico | Manufacturing of PDP | 8,157,806 | 91.70% | 91.70% |
| **Subsidiary of SDIG** | | | | | |
| Samsung SDI Brazil Ltda. ("SDIB") | Brazil | Supporting sales in South America region | 117,239,846 | 95.90% | 95.90% |
| **Subsidiaries of SDIHK** | | | | | |
| Shenzhen Samsung SDI Co., Ltd. ("SSDI") (*) | China | Manufacturing and sale of CRT, PDP | 148,353,146 | 76.70% | 76.70% |
| Tianjin Samsung SDI Co., Ltd. ("TSDI") (*) | China | Manufacturing and sale of rechargeable battery | 113,123,338 | 76.70% | 76.70% |
| Shanghai Samsung SVA Electronic Devices Co., Ltd. ("SSED") (*) | China | Manufacturing and sale of VFD, rechargeable battery | 47,671,714 | 57.90% | 57.90% |

(*)   In accordance with the local laws and regulations, no shares have been issued.
(**)  For the year ended December 31, 2011, SDIEU and SDIEM which were established during 2011 were included in the consolidated entities, which are located in Germany and Malaysia, respectively.
(***) The above ownership percentages take into consideration both the Group's direct ownership and the Group's indirect ownership through its subsidiaries.

# EXHIBIT 165

## [Document Submitted Under Seal]

# EXHIBIT 166

## [Document Submitted Under Seal]

# EXHIBIT 167
## [Document Submitted Under Seal]

# EXHIBIT 168

## [Document Submitted Under Seal]

# EXHIBIT 169

HITACHI AMERICA LTD — HED
HOME ELECTRONICS DIV.
DUNS 05-156-2908

1855 DORNOCH COURT
SAN DIEGO, CA. 92154

| DOCUMENT NUMBER | DOCUMENT DATE | ACCOUNT | STORE | REGION | OPEN ACCOUNT |
|---|---|---|---|---|---|
| 402514-001 | 9/19/01 | 323196 | 8888 | 020 | |

PLEASE ENCLOSE REMITTANCE
COPY WITH YOUR PAYMENT.

BILL TO:

RADIO & TV EQUIPMENT, INC.

3317 FIECHTNER DR
P.O. BOX 9496
FARGO                   ND 58103

SEND REMITTANCE TO: PO BOX 60090

LOS ANGELES CA 90060

SHIP TO:
RADIO & TV EQUIPMENT, INC.

3317 FIECHTNER DRIVE

FARGO

ND 58103

TERMS
2% 60,NET 61
RESALE# 36593

LORI A/P LORI@RTVINC.COM

FREIGHT

PPD

| LINE NUMBER | CUSTOMER REFERENCE/ ORDER DATE | MODEL NUMBER/DESCRIPTION | CONTROL NUMBER | SHIP QUANTITY | UNIT PRICE | NET AMOUNT |
|---|---|---|---|---|---|---|
| 1 | 4144$ 9/19/01 | 36UX01S 36" COLOR TV $50.00  SPA | 536283-004 CA01012121 000209-029 | 4 | 795.79 | 3183.16 |
| 2 | 4144$ 9/19/01 | 53SBX10B 53" PROJ TV | 536283-007 CA01012121 | 4 | ~~50.00~~ 1311.83 | ~~200.00~~ 5247.32 |
| 3 | 4144$ 9/19/01 | 53SWX10B 53" PROJ TV | 536283-008 CA01012121 | 2 | 2333.33 | 4666.66 |
| 4 | 4144$ 9/19/01 | 61UDX10B 61" PROJ TV | 536283-010 CA01012121 | 2 | 2064.52 | 4129.04 |
| 5 | 4144$ 9/19/01 | DVP415U DVD PLAYER Z LASER M | 536283-013 CA01012121 | 4 | 155.91 | 623.64 |

(PLEASE PAY THIS AMOUNT)

TOTAL NET INVOICE            17649.82
                            ==========

PAID

RETURN OF MERCHANDISE WILL NOT BE ACCEPTED WITHOUT PRIOR MRA AUTHORIZATION.
RETURNED MERCHANDISE MAY BE SUBJECT TO A RESTOCKING CHARGE.

I015 (8/96)

TOTAL

RADIO0002259

# EXHIBIT 170



# HITACHI

**Hitachi Home Electronics (America), Inc.**

D-U-N-S- 06-772-9368

| DOCUMENT NUMBER | DOCUMENT DATE | ACCOUNT | STORE | REGION | OPEN ACCOUNT |
|---|---|---|---|---|---|
| 277298 | 1/29/99 | 323196 | 8888 | 020 | |

PLEASE ENCLOSE REMITTANCE
COPY WITH YOUR PAYMENT.

BILL TO:

RADIO & TV EQUIPMENT, INC.

P.O. BOX 9496

FARGO                 ND 58106

SEND REMITTANCE TO: P.O. BOX 101093

ATLANTA, GA 30392

SHIP TO:

RADIO & TV EQUIPMENT, INC.

3317 FIECHTNER DRIVE

FARGO                 ND 58103

| TERMS | | FREIGHT | | | |
|---|---|---|---|---|---|
| 2% 60,NET 61 | | PPD | | | |

| LINE NUMBER | CUSTOMER REFERENCE/ ORDER DATE | MODEL NUMBER/DESCRIPTION | CONTROL NUMBER | SHIP QUANTITY | UNIT PRICE | NET AMOUNT |
|---|---|---|---|---|---|---|
| 1 | 11085 1/29/99 | 27CX28B 27" COLOR TV | 419360-001 AN99001162 | 2 | 315.79 | 631.58 |
| 2 | 11085 1/29/99 | 50UX58B 50" PROJ TV | 419360-002 AN99001162 | 1 | 1605.26 | 1605.26 |
| 3 | 11085 1/29/99 | 60UX58K 60" PROJ TV | 419360-003 AN99001162 | 1 | 2056.84 | 2056.84 |
| 4 | 11085 1/29/99 | VMBPL13A PERFECT POWER 1.350M | 419360-004 AN99001162 | 2 | 40.24 | 80.48 |
| 5 | 11085 1/29/99 | VTFX633A 380 MM CHASSIS MBR V | 419360-006 AN99001162 | 2 | 126.32 | 252.64 |

Pricing OK'd By

Vendor #

Account Code

Account Payable

PAID
29298

RETURN OF MERCHANDISE WILL NOT BE ACCEPTED WITHOUT PRIOR MRA AUTHORIZATION.
RETURNED MERCHANDISE MAY BE SUBJECT TO A RESTOCKING CHARGE.

PAGE: 001 OF 001 (END)

TOTAL

ORIGINAL

1016 (8/98)

RADIO0000904