**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | MDL No. 1917<br><br>Master Case No. CV-07-5944-SC |
| This Order Relates To:<br><br>ALL DIRECT PURCHASER ACTIONS | Individual Case No. CV-14-2058-SC<br><br>ORDER IN RE CLASS CERTIFICATION WITH RESPECT TO THE THOMSON AND MITSUBISHI DEFENDANTS |

## I.   INTRODUCTION

Now before the Court is a motion by the Direct Purchaser Plaintiffs ("DPPs") for Class Certification with respect to the Defendants Thomson and Mitsubishi.[1]  Thomson has settled and

---

[1] As used herein, "Thomson" refers to:  Technicolor SA (f/k/a Thomson SA) ("Thomson SA") and Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("Thomson Consumer"), and Technologies Displays Americas LLC (f/k/a Thomson Displays Americas LLC) ("TDA").  Allied with Thomson is Defendant Videocon Industries, Ltd. ("Videocon").  As used herein, "Mitsubishi" refers to: Mitsubishi Electric Corporation, Mitsubishi Electric US, Inc. (f/k/a Mitsubishi Electric & Electronics USA, Inc.), and Mitsubishi Electric Visual Solutions America, Inc. (f/k/a Mitsubishi Digital Electronics America, Inc.).  Thomson, Videocon, and Mitsubishi are referred to collectively herein as "Defendants."  The other co-

**United States District Court**
For the Northern District of California

1   stipulated to class certification, pending hearing.[2]  Accordingly,

2   Mitsubishi is the only remaining Defendant.  Mitsubishi opposes the

3   motion.

4        The motion has been fully briefed,[3] and the matter is

5   appropriate for decision without oral argument per Civil Local Rule

6   ///

7   ///

8   _____

9   conspirators, with most of whom the Direct Purchaser Plaintiffs
    ("DPPs") have already settled, are: (a) Chunghwa Picture Tubes,
10  Ltd. and Chunghwa Picture Tubes (Malaysia) Sdn Bhd. (collectively
    "Chunghwa"); (b) Daewoo International Corporation, Daewoo
11  Electronics Corporation f/k/a Daewoo Electronics Company, Ltd.,
    Orion Electric Company ("Orion"), and Daewoo-Orion SocieteAnonyme
12  (collectively "Daewoo/Orion"); (c) Hitachi Ltd.; Hitachi Displays,
    Ltd., Hitachi America, Ltd., Hitachi Asia, Ltd., Hitachi Electronic
13  Devices (USA), and Shenzhen SEG Hitachi Color Display Devices, Ltd.
    (collectively "Hitachi"); (d) Irico Group Corporation, Irico Group
14  Electronics Co., Ltd., and Irico Display Devices Co., Ltd.
    (collectively "Irico"); (e) LG Electronics, Inc. ("LGE"), LG
15  Electronics USA, Inc., and LG Electronics Taiwan Taipei Co., Ltd.
    (collectively "LG"); (f) LP Displays International, Ltd. ("LPD");
16  (g) Panasonic Corporation, f/k/a Matsushita Electric Industrial
    Co., Ltd., Matsushita Electronic Corporation (Malaysia) Sdn Bhd.,
17  and Panasonic Corporation of North America (collectively
    "Panasonic"); (h) Koninklijke Philips Electronics N.V., Philips
18  Electronics Industries Ltd., Philips Electronics North America,
    Philips Consumer Electronics Co., Philips Electronics Industries
19  (Taiwan), Ltd., and Philips dba Amazonia Industria Electronica
    Ltda. (collectively "Philips"); (i) Samsung Electronics America,
20  Inc., Samsung SDI (Malaysia) Sdn Bhd., Samsung SDI Co., Ltd. f/k/a
    Samsung Display Device Company ("Samsung SDI" or "SDI"), Samsung
21  SDI Mexico S.A. de C.V., Samsung SDI Brasil Ltda., Shenzhen Samsung
    SDI Co. Ltd., and Tianjin Samsung SDI Co., Ltd. (collectively
22  "Samsung"); (j) Thai CRT Company, Ltd.; (k) Toshiba Corporation,
    Toshiba America, Inc., Toshiba America Consumer Products LLC,
23  Toshiba America Consumer Products, Inc., Toshiba America Electronic
    Components, Inc., Toshiba America Information Systems, Inc., and
24  Toshiba Display Devices (Thailand) Company, Ltd. (collectively
    "Toshiba"); (l) MT Picture Display Co., Ltd., f/k/a Matsushita
25  Toshiba Picture Display Co., Ltd., ("MTPD"); and (m) Bejing-
    Matsushita Color CRT Company, Ltd. ("BMCC").
26  [2] See ECF No. 3562.  The Court has granted preliminary approval of
    DPP's class action with the Thomson and TDA Defendants, pending a
27  fairness hearing.  Order of the Court dated June 12, 2015, ECF No.
    3872.
28  [3] ECF Nos. 2969 ("Mot."), 3109 ("DPP Ex."), 3709 ("Opp'n"), 3710
    ("Def. Ex.") and 3820("Reply").

2

1   7-1(b).  As explained below, the Court now GRANTS DPP's motion for

2   class certification with respect to Mitsubishi.[4]

3   **II.   <u>BACKGROUND</u>**

4        The parties are familiar with this case's facts.[5]  Even so, a

5   brief summary follows.

6        This MDL concerns allegations of a worldwide conspiracy to fix

7   prices in the Cathode Ray Tube ("CRT") market.  CRTs are discrete

8   products that can only be used as components in finished products

9   ("CRT Products" or "finished products").  CRTs are therefore

10  produced as Color Picture Tubes ("CPTs"), often used in

11  televisions, and Color Display Tubes ("CDTs"), often used for

12  computer monitors or small screen devices.  The Named DPPs,[6] the

13  proposed class representatives, purchased primarily finished

14  products[7] containing CRTs, including CPTs and CDTs.

---

[4] This order is in accordance with several earlier orders in this case.  <u>See, e.g.,</u> Order of the Court dated November 29, 2012, ECF No. 1470, <u>available at</u> <u>In re Cathode Ray Tube (CRT) Antitrust Litig.,</u> 911 F. Supp. 2d 857, 869 (N.D. Cal. 2012); Order of the Court dated September 24, ECF No. 1950, <u>available at</u> <u>In re Cathode Ray Tube (CRT) Antitrust Litig.,</u> No. C-07-5944-SC, 2013 U.S. Dist. LEXIS 137946, 2013 WL 5391159 (N.D. Cal. Sept. 24, 2013) (adopting ECF No. 1743, <u>available at</u> <u>In re Cathode Ray Tube (CRT) Antitrust Litig.,</u> No. JAMS REF. 1100054618, 2013 U.S. Dist. LEXIS 137944, 2013 WL 5428139 (N.D. Cal. June 20, 2013)).

[5] The Court further notes that many of the facts are well summarized by the Court's previous rulings on summary judgment and the discussion of the Interim Special Master ("ISM") as related to the Indirect Purchaser Plaintiffs ("IPPs").  <u>See</u> Order of the Court dated November 29, 2012, ECF No. 1470; Order of the Court dated September 24, 2013, ECF No. 1950; Report and Recommendation Regarding IPP's Motion for Class Certification, dated June 20, 2013, ECF No. 1742.

[6] Arch Electronics, Inc.; Crago, d/b/a Dash Computers, Inc.; Meijer, Inc. and Meijer Distribution, Inc.; Nathan Muchnick, Inc.; Princeton Display Technologies, Inc.; Radio & TV Equipment, Inc.; Studio Spectrum, Inc.; and Wettstein and Sons, Inc., d/b/a Wettstein's.  Each has provided records of their purchase or described them in evidence provided.  <u>See</u> Reply at 8-9.

[7] The Court has previously considered and ruled upon a Motion for Summary Judgment, holding that DPPs could proceed and recover as a matter of law, even though they had apparently only purchased

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    DPPs now seek to certify a class of DPPs alleging harm,

2  supported by the expert testimony of Dr. Jeffrey J. Leitzinger.[8]

3    **A.    The Market**

4    An overview of the CRT market is helpful to understand DPPs'

5  theory of the case.  During the "Class Period," from March 1, 1995

6  to November 25, 2007, CRTs were the dominant components of

7  televisions and computer monitors.[9]  CRTs are very expensive and

8  therefore are alleged to represent large portions of the prices of

9  the finished products that contain them.  CRTs are not uniform:

10 they differ in size, deflection yoke frequencies, resolutions,

11 shadow masks, phosphors, glass bulbs, electron guns, size, and

12 assembly.  The two types of CRTs at issue in this case -- CPTs and

13 CDTs -- are also components of different finished products

14 (televisions and computer monitors, respectively).  See Opp'n at 2-

15 3.

16    DPPs allege Defendants and their co-conspirators formed an

17 international price-fixing cartel to restrict the prices of CRTs.

18 DPPs maintain that Defendants carried out their conspiracy through

19 frequent group and bilateral meetings over the course of twelve

20

21 finished products, on the theory of the ownership-and-control
   exception to Royal Printing Co. v. Kimberly-Clark Corp., 621 F.2d
22 323, 326 (9th Cir. 1980).  C.f. Illinois Brick Co. v. Illinois, 431
   U.S. 720, 724 (1977).  See the Court's Order, dated 29 November
23 2012, ECF No. 1470.  The Court has before and now again recognizes
   that this technically makes most of the plaintiffs at bar "indirect
24 purchasers" despite the label "DPP."  Some DPPs are alleged to have
   purchased directly and thus were not part of the earlier motion for
25 summary judgment.  See Reply at 10, n. 13.  Even so, the Court will
   continue to designate all the plaintiffs as DPPs to differentiate
26 them from the already certified class of IPPs.
   [8] Dr. Leitzinger's declaration in support of this motion, filed
27 with the Court under seal, is summarized infra in relation to the
   Court's analysis of predominance under Rule 23(b)(3).
28 [9] With the advent of Liquid Crystal Displays ("LCDs") and plasma
   displays, demand for CRTs dwindled.

years.  The bilateral meetings were specifically arranged to accommodate co-conspirators who avoided the group meetings due to antitrust fears.  The meetings were formalized and organized on three levels: (1) quarterly top-level meetings attended by CEOs and CRT business heads; (2) monthly management-level meetings attended by Sales VPs, for example; and (3) monthly or semi-monthly working-level meetings attended by lower-level employees, who prepared materials and data for use in the management- and top-level meetings.  DPP Ex. 31 at 4-8 (labeled 52-57), 11-12 (labeled 73-74).  These meetings were supplemented by golf outings among key executives.  Id. at 13 (labeled 75).

The substance of all of these meetings concerned: (1) market updates; (2) market-share analysis; (3) discussion of recent customer negotiations; (4) analysis of global CRT supply and demand; (5) discussion of members' compliance with earlier agreements; and (6) "AOB," or "any other business" to include the time and location of the next meeting.  Specifically, Defendants are alleged to have used these meetings to set prices, production levels, and market shares.  The DPPs have submitted substantial documentary evidence, including meeting reports, e-mails, memoranda, and testimony documenting these meetings, Defendants' efforts to police the conspiracy, and Defendants' methods to conceal the conspiracy.

**B.   Investigations**

American and international governmental agencies began investigating Defendants' practices in 2007.  Investigating agencies included: the U.S. Department of Justice ("DOJ"), the European Commission ("EC"), the Japanese Fair Trade Commission

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1   ("JFTC"), the Korean Fair Trade Commission ("KFTC"), the Canadian

2   Competition Bureau ("CCB") and the Czech Office for the Protection

3   of Competition ("COPC").  Specifically as part of the DOJ's

4   investigation, Defendant Chunghwa disclosed the conspiracy for

5   amnesty from criminal prosecution; SDI pled guilty to participation

6   in the CRT conspiracy; and six former SDI, Chunghwa, LGE, and LPD

7   executives have been indicted in association with the conspiracy.

8   DPP Exs. 5-8.

9        The DPPs now propose to certify a class defined as:

10              All persons and entities who, between March
                1, 1995 and November 25, 2007, directly
11              purchased a CRT Product in the United States
                from any Defendant or any subsidiary or
12              affiliate thereof, or any co-conspirator or
                any subsidiary or affiliate thereof.
13              Excluded from the class are defendants,
                their parent companies, subsidiaries or
14              affiliates, any co-conspirators, all
                governmental entities, and any judges or
15              justices assigned to hear any aspect of this
                action.
16

17  **III.   LEGAL STANDARD**

18       Class actions play an important role in the private

19  enforcement of antitrust actions.  *In re Citric Acid Antitrust*

20  *Litigation*, No. C-95-2963 FMS, 1996 U.S. Dist. LEXIS 16409, *22,

21  1996 WL 655791 at *8 (N.D. Cal., October 2, 1996).  Courts

22  therefore "resolve doubts in these actions in favor of certifying

23  the class."  *In re Rubber Chemicals Antitrust Litigation*, 232

24  F.R.D. 346, 350 (N.D.Cal. 2005).  "Courts have stressed that price-

25  fixing cases are appropriate for class certification because a

26  class-action lawsuit is the most fair and efficient means of

27  enforcing the law where antitrust violations have been continuous,

28  widespread, and detrimental to as yet unidentified consumers."  *In*

**United States District Court**
For the Northern District of California

1   re TFT-LCD (Flat Panel) Antitrust Litigation ("LCDs"), 267 F.R.D.

2   583, 592 (N.D. Cal. 2010), amended in part, 2011 U.S. Dist. LEXIS

3   84476, 2011 WL 3268649 (N.D. Cal. July 28, 2011) (internal

4   citations omitted).

5        Parties seeking class certification must, as "a threshold

6   matter, and apart from the explicit requirements of Rule 23(a),"

7   show an "identifiable and ascertainable class exists."  Mazur v.

8   eBay Inc., 257 F.R.D. 563, 567 (N.D. Cal. 2009) (since class would

9   include non-harmed auction winners, this portion of the class

10  definition was imprecise and overbroad).  Upon making this showing,

11  the Court then turns to Rule 23 of the Federal Rules of Civil

12  Procedure, which otherwise govern class actions.  It is the

13  plaintiffs' burden to show that they have met the four requirements

14  of Rule 23(a) and at least one requirement of Rule 23(b).  See Gen.

15  Tel. Co. v. Falcon, 457 U.S. 147, 158-61 (1982); Doniger v. Pac.

16  Nw. Bell, Inc., 546 F.2d 1304, 1308 (9th Cir. 1977); Zinser v.

17  Accufix Research Institute, Inc., 253 F.3d 1180, 1186 (9th Cir.

18  2001).  Rule 23(a) states that a district court may certify a class

19  only if:

20          (1) the class is so numerous that joinder of
            all members is impracticable; (2) there are
21          questions of law or fact common to the
            class; (3) the claims or defenses of the
22          representative parties are typical of the
            claims or defenses of the class; and (4) the
23          representative parties will fairly and
            adequately protect the interests of the
24          class.

25  These four requirements are called (1) numerosity, (2) commonality,

26  (3) typicality, and (4) adequacy of representation.  Mazza v. Am.

27  Honda Motor Co., Inc., 666 F.3d 581, 588 (9th Cir. 2012).

28  ///

**United States District Court**
For the Northern District of California

DPPs assert that their class should be certified under Rule 23(b)(3), which requires the Court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  This subsection must be satisfied "through evidentiary proof."  Comcast, 133 S. Ct. at 1431.  However, proving predominance does not require plaintiffs to prove that every element of a claim is subject to classwide proof: they need only show that common questions predominate over questions affecting only individual class members.  Amgen Inc. v. Ct. Retirement Plans and Trust Funds, 133 S. Ct. 1184, 1196 (2013).

Further, the district court's class-certification analysis "must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.'"  Id. at 1194 (2013) (quoting Wal-Mart Stores, Inc. v. Dukes ("Dukes"), 131 S. Ct. 2541, 2551 (2011)).  Even so, Rule 23 does not permit the court to "engage in free-ranging merits inquiries at the certification stage."  Id. at 1194-95.  The court may consider merits questions only to the extent that they are relevant to whether the Rule 23 prerequisites are satisfied.  Id. at 1195.

If the court finds that the moving party has met its burden of proof, the court has broad discretion to certify the class.  Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1186, amended by 273 F.3d 1266 (9th Cir. 2001).

## IV. DISCUSSION

The Court will briefly albeit "rigorous[ly]" consider numerosity and typicality, each of which were pled by the

Plaintiffs and not directly challenged by Mitsubishi.  See Amgen, 133 S. Ct. at 1194.  The Court will then discuss in turn ascertainabilty, commonality, adequacy of representation, and predominance, each of which Mitsubishi challenges.

**A.  Numerosity**

Rule 23(a)(1) requires that a class be so numerous that joinder is impracticable.  No precise number of potential class members is required, and whether joinder would be impracticable depends on the facts and circumstances of each case.  Bates v. United Parcel Service, 204 F.R.D. 440, 444 (N.D. Cal 2001); 1 Robert Newberg, Newberg on Class Actions, § 3:3 (4th Ed. 2002) ("Where the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied.").  See also Ries v. Ariz. Bevs. United States LLC, Hornell Brewing Co., 287 F.R.D. 523, 536 (N.D. Cal. 2012).  Here, DPPs cite to a large number of members of the proposed class.  Mot. at 15.  Mitsubishi does not challenge their assertion.  The facts and circumstances of this case also suggest that there are a large number of potential plaintiffs who may have bought a finished product containing a price-fixed CRT from an entity owned or controlled by any allegedly conspiring defendant (or co-conspirator).[10]  As there are numerous and sufficient indicia that the potential class would be large, the Court finds that DPPs have satisfied the numerosity requirement.

///

_____

[10] The Court only considers Plaintiffs who are so situated or similarly situated, as DPPs are proceeding in this case on the theory of the ownership-and-control exception to Royal Printing Co. v. Kimberly-Clark Corp., 621 F.2d 323, 326 (9th Cir. 1980).  See the Court's Order, dated 29 November 2012, ECF No. 1470.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

**B.   Typicality**

Rule 23(a)(3) requires that the claims or defenses of the representative parties be typical of the claims or defenses of the class.  The class representatives must generally be part of the class, and must possess the same interest and suffer the same injury as the class members.

Typicality requirements are often satisfied "wherein it is alleged that the defendants engaged in a common [price-fixing] scheme relative to all members of the class."  In re Catfish Antitrust Litig., 826 F. Supp. 1019, 1035 (N.D. Miss. 1993).  In such cases, "there is a strong assumption that the claims of the representative parties will be typical of the absent class members."  Id.  This is true even where "the plaintiff followed different purchasing procedures, purchased in different quantities or at different prices, or purchased a different mix of products than did the members of the class."  In re TFT-LCD Antitrust Litig. ("TFT-LCDs"), 267 F.R.D. 291, 300 (N.D. Cal. 2010) (quoting In re Dynamic Random Access Memory Antitrust Litig. ("DRAM"), No. M 02-1486 PHJ, 2006 U.S. Dist. LEXIS 39841, *30, 2006 WL 1530166, *4 (N.D. Cal. 2006)).

Accordingly, DPPs argue that claims of all other class members stem from the same event, practice, or course of conduct, namely the conspiracy.  Mitsubishi does not directly challenge this prong.[11]  Yet even had Mitsubishi directly challenged typicality, the pervasive nature and common impact of Defendants' alleged price-fixing scheme supports that the claims made by the DPPs "stem

---

[11] Insofar as arguments Mitsubishi makes that might be relevant are made within the context of other prongs, they are addressed infra.

**United States District Court**
For the Northern District of California

1   from the same event, practice, or course of conduct that forms the

2   basis of the claims of the class and are based on the same legal or

3   remedial theory." In re Citric Acid, 1996 U.S. Dist. LEXIS 16409

4   at *8-9, 1996 WL 655791 at *3.  Therefore, typicality is satisfied.

5       **C.   Ascertainability**

6       Mitsubishi argues that the proposed class definition is not

7   ascertainable because, for various reasons, the scope of language

8   in the proposed class is overbroad.

9       "As a threshold matter, and apart from the explicit

10  requirements of Rule 23(a), the party seeking class certification

11  must demonstrate that an identifiable and ascertainable class

12  exists." Mazur v. eBay, Inc., 257 F.R.D. 563, 567 (N.D. Cal.

13  2009).  "A class definition should be precise, objective, and

14  presently ascertainable." Id.  The class definition must be

15  sufficiently definite such that its members can be ascertained by

16  reference to objective criteria.  Whiteway v. FedEx Kinko's Office

17  & Print Servs., Inc., No. C 05-2320 SBA, 2006 U.S. Dist. LEXIS

18  69193, *10, 2006 WL 2642528, *3 (N.D. Cal. Sept. 14, 2006).  "[A]

19  class will be found to exist if the description of the class is

20  definite enough so that it is administratively feasible for the

21  court to ascertain whether an individual is a member." O'Conner v.

22  Boeing N. Am., Inc., 184 F.R.D. 311, 319 (C.D. Cal. 1998).

23      Here, the Court finds that the class can be ascertained by

24  reference to objective criteria.  The class requires a class

25  member: (a) to be harmed within a specific date range; (b) to have

26  made their purchase within the United States; (c) to have purchased

27  a CRT Product; (d) to have made the purchase from a discrete seller

28  (namely a Defendant in this action or a subsidiary or affiliate

11

thereof or any co-conspirator or any subsidiary or affiliate

thereof); and finally (e) not be among those specifically excluded.

Mitsubishi disagrees, making three arguments directly

attacking ascertainability.  The Court addresses each in turn.

### i.    The Terms "Defendant" and "Affiliate"

Mitsubishi first contends that the DPPs' proposed class is not

ascertainable because the class does not adequately distinguish

between those who would be within the class from those who would be

excluded and because it includes those who lack standing.[12]  Put

more artfully, Mitsubishi argues the class is overbroad in scope in

light of the Court's earlier ruling.

The Court is not convinced.  Plaintiffs' definition is not out

of line with previously certified classes in this action.  See ECF

Nos. 1179, 1412, 1333, 1508, 1441, 1621, 1603, 1791.  While the

scope of the class as worded may seem broad at first blush, there

is little danger of being unable to ascertain whether one is a

member of the class or accidentally including somebody without

standing.  DPPs limit the scope of the class to those who, within a

specific date and location, purchased from a defined group a "CRT

Product."[13]  Thus DPPs here are those who would claim to have

bought finished products directly from Defendants, co-conspirators,

or entities owned or controlled by them, which comprises those whom

the Court has already stated would have standing in its earlier

///

---

[12] This argument was offered as part of the "threshold" argument at
Opp'n 7-9, but is in line with and thus addressed here, as part of
Mitsubishi's first argument.
[13] But c.f. Sanders v. Apple Inc., 672 F. Supp. 2d 978, 991 (class
not ascertainable where the class proposed contained no limits on
class membership accounting for purchase of the owned product or
owners being deceived by advertisements).

1  ruling.[14]  Potential class members can determine if they fall

2  within the class by review of their sales records and invoices.

3  See Reply at 4, 4 n. 7.  Thus class members will easily be able to

4  answer the question, "Did you buy a 'CRT Product' from a Defendant

5  or an alleged co-conspirator or known subsidiary thereof?"  All

6  harm was also in the past, obviating concerns about whether

7  somebody who receives notice would know if they were harmed (and

8  thus be able to intentionally decide whether or not to opt out of

9  the class).[15]  The class as drafted therefore allows for people to

10  determine whether they are class members and have standing in line

11  with the exception to Illinois Brick Co. v. Illinois, 431 U.S. 720,

12  97 (1977) this court has found to apply per Royal Printing Co. v.

13  Kimberly-Clark Corp., 621 F.2d 323, 326 (9th Cir. 1980).  See Order

14  of the Court dated November 29, 2012, ECF No. 1470.  Insofar as

15  Mitsubishi is merely inviting the Court to readdress its earlier

16  order, the Court declines.

17      Mitsubishi next contends that the term "defendant" in the

18  proposed class definition is over-inclusive and not objectively

19  ascertainable because it would incorporate CRT Product sellers from

20  a "defendant" without requiring any showing that the "defendant" is

21  a conspiring seller or an entity "owned or controlled" by a

22  ///

23  ────────────────────
[14] But c.f. Bishop v. Saab Automobile A.B., No. CV-95-0721 JGD
24  (JRx), 1996 LEXIS 22890, *14, 1996 WL 33150020, *5 (C.D. Cal. 1996)
(where a "vast majority of the purported members lack[ed] standing"
25  having either not suffered any harm or being directly barred from
suit by law).
26  [15] But c.f. Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234
(9th Cir. Cal. 1996) ("serious due process concerns" about
27  providing adequate notice to allow people to opt out where there
was no way for drug users to know whether they were in the future
28  going to experience sufficient actual injury to become part of the
class).

**United States District Court**
For the Northern District of California

conspiring seller.  Opp'n at 9-11.  Mitsubishi expresses special concern that some Defendants who sold finished products were not even in the CRT business and therefore could not have been "conspiring sellers."  Opp'n at 9-10.

The Court is still not convinced.  The Court has not prohibited finished product sellers from being defendants in this action.[16]  See Order of the Court dated November 29, 2012, ECF No. 1470.  That some finished product sellers may, by stipulation, have not been in the CRT business does not mean they were not owned or controlled by a member of the CRT business.  Thus they may well be a proper "defendant."  If they were not a proper defendant, then they could easily seek relief pursuant to the Court's earlier ruling on summary judgment -- which seems to be what Mitsubishi is really challenging.  However, given the sheer scope of this conspiracy it seems that the concern raised here will be the highly rare exception rather than the rule.  Even if some individuals are thus able to join the class and then are later determined to not have valid claims against a proper defendant, this does not preclude class certification.  Kohen v. Pac. Inv. Mgmt. Co., 571 F.3d 672, 677 (7th Cir. 2009) ("a class will often include persons who have not been injured by the defendant's conduct . . . [but] [s]uch a possibility or indeed inevitability does not preclude class certification").  As the "general outlines of the membership of the class are determinable at the outset of the litigation," the class can be ascertained.  O'Connor, 184 F.R.D. at 319.[17]  Whether

---

[16] Indeed, DPPs expressly note the existence of at least one named plaintiff (Princeton) who purchased CRTs directly from conspirators.  See Reply at 10 n. 13.
[17] Mitsubishi cites Mazur to suggest that a class is not ascertainable when the definition is so imprecise that (a)

**United States District Court**
For the Northern District of California

the DPPs can prove at trial that the alleged Defendants were either conspiring sellers of price-fixed CRTs or owned or controlled by those sellers per <u>Royal Printing</u> is a question not properly resolved on a motion for class certification.  Insofar as Mitsubishi is yet again inviting the Court to readdress its earlier order, the Court again declines.

Mistubishi's argument as to the term "affiliate" being over-inclusive is similar, slightly more compelling, but still easily overcome.  Mitsubishi notes that "affiliate" could be used to sweep within the proposed class parties that lack standing.  While the Court holds that much of the rationale above still applies, the Court does appreciate that the limits innately present in the term "defendant" do not similarly limit the term "affiliate."  To allay any potential concern for related ascertainability issues, the Court hereby ORDERS DPPs to specifically identify the "affiliate[s]" in the class definition (and class notice) to enable

///

///

---

individuals might not be able to determine if they are eligible members of the class or (b) when the class includes members who are unharmed or lack standing under the law.  <u>See</u> <u>Mazur</u>, 257 F.R.D. 567-8; Opp'n at 8.  However, <u>Mazur</u> makes clear that "the class need not be so ascertainable that <u>every</u> potential member can be identified at the commencement of the action."  <u>Mazur</u>, 257 F.R.D. at 567 citing <u>O'Connor</u>, 184 F.R.D. 311, 319 (C.D. Cal 1998).  In <u>Mazur</u>, the court found the first class of people who actually won an online auction was objective and likely readily ascertainable by records.  <u>Mazur</u>, 257 F.R.D. at 567.  <u>Mazur</u> found difficulties with that same group and another subclass insofar as there was a wide swath of potential class members who would be unharmed, statutorily barred, or who could not discern from records whether they were part of the class.  <u>Id.</u>  Specifically, such people were <u>not yet</u> aggrieved.  Here, as evidence supports so much of the market being controlled or impacted by a single CRT conspiracy, there is unlikely to be a large group who is not yet harmed or whose claims would be barred (except per the Court's order on summary judgment).

United States District Court
For the Northern District of California

the parties and class members to better determine who is in the class.[18]

### ii.      Overlap Between the IPP and DPP Classes

Mitsubishi also contends that the proposed class overlaps with the now-approved IPP class.  Opp'n at 11-12.  The IPP class is defined to include "All persons and entities . . . who, from March 1, 1995 to November 25, 2007 . . . purchased Cathode Ray Tubes incorporated in televisions and monitors . . . indirectly from any defendant or subsidiary thereof, or any named affiliate or any named co-conspirator, for their own use and not for resale . . . ." ECF No. 1742.  Mitsubishi argues this definition encompasses at least some of the DPPs' proposed class members because said class members also indirectly bought CRTs incorporated in televisions and monitors.  Thus purchasers who receive both class notices would theoretically not be able to determine whether they belong in one class or the other.

The Court finds that the classes do not overlap.  The IPP class is expressly limited to end-users who not only purchased the relevant products "indirectly," as opposed to "directly," but also who purchased for their own use and not for resale.[19]  While the

---

[18] In making this order, the Court notes that DPPs specifically volunteered to adhere to this approach which has been previously applied in TFT-LCDs, 267 F.R.D. at 299-300.  Reply at 5 n.8.
[19] In Loeb Indus. v. Sumitomo Corp. (In re Copper Antitrust Litig.), 196 F.R.D. 348, 358 (W.D. Wis. 2000), the class at issue did not describe "persons who bought Product X at any time between such and such dates."  Here, that is very much the type of description this court evaluates.  Other cases cited by Mitsubishi to support that "[t]he potential overlapping class membership . . . demonstrates it would not be administratively feasible for the court to ascertain whether an individual is a class member" do not seem to directly discuss overlapping classes or else are not binding authority for the Court.  See Opp'n at 11-12 (internal citations omitted).

United States District Court
For the Northern District of California

1   Court understands the concern that an indirect purchaser of
2   finished products not for resale might think he or she could be
3   part of both classes, the Court finds the concern is ultimately
4   invalid here.  For the concern to be valid, it would necessitate a
5   purchaser receive both notices.  In such a case,[20] the difference
6   would be clear on the face of the notice(s).  The Court thus finds
7   that there is no real risk of a notice recipient not reasonably
8   being able to determine its class eligibility.

9          **iii.    <u>Standing</u>**

10          Mitsubishi argues that the Court's ruling on summary judgment
11   does not constitute a finding that class representatives actually
12   have standing.  It further argues that a showing of class
13   ascertainability must be made prior to class certification.  And
14   finally, Mitsubishi asserts that the present showing fails to
15   exclude potential class members who lack standing.  Opp'n at 12-13.

16          The Court agrees it has not found by its previous ruling that
17   standing exists as to every possible defendant, merely that there
18   continues to be a material question of fact making summary judgment
19   inappropriate at that time as against the plaintiffs included in
20   that motion.  While the Court must make a "rigorous" inquiry into
21   class certification, the Court is not to enter the merits of this
22   case more than is necessary to determine if certification of the
23   class is appropriate.  <u>Amgen</u>, 133 S. Ct. at 1194-95.  Here, the
24   Court finds there is ample evidence that could be used at trial to
25   support the limited theory of standing permitted to DPPs.  The mere
26   "possibility or indeed inevitability" of including a member in the

27   _____
    [20] Per DPP Ex. 179, such a case is unlikely.  Mitsubishi also does
28   not cite a likely example where this might happen, let alone happen
    to an unsophisticated party likely to be confused.

17

**United States District Court**
For the Northern District of California

1    class who ultimately, at the end of trial, turns out to lack

2    standing does not prevent class certification.  <u>Kohen</u>, 571 F.3d at

3    677.  Where, as here, there are "general outlines of the membership

4    of the class" which are "determinable at the outset of the

5    litigation, a class will be deemed to exist." <u>O'Connor</u>, 184 F.R.D.

6    at 319.[21]  Accordingly, the Court rejects Mitsubishi's standing

7    arguments.  Therefore, the class as proposed by DPPs is found to be

8    ascertainable (subject to the Court's order of specifically

9    identifying "affiliates").

10       **D.    Commonality**

11       Mitsubishi argues both that there are no common questions that

12   relate to the existence of the alleged conspiracy, and second that

13   there are no common questions relating to the existence of

14   classwide impact or damages.  Opp'n at 13-16.  For the reasons set

15   forth below, the Court rejects both these arguments and finds that

16   commonality is satisfied.

17       Rule 23(a)(2) requires that there be "questions of law or fact

18   common to the class."  "Commonality requires the plaintiff to

19   demonstrate that the class members have suffered the same injury.

20   This does not mean merely that they have all suffered a violation

21   of the same provision of law." <u>Dukes</u>, 131 S. Ct. at 2551 (internal

22   citations and quotation marks omitted).  Instead, plaintiffs'

23   "claims must depend upon a common contention . . . of such a nature

24   that it is capable of classwide resolution -- which means that

25   determination of its truth or falsity will resolve an issue that is

26   ────────────────

27   [21] The Court agrees that a showing must be made before
     certification that the class is ascertainable.  <u>See</u> <u>In re Paxil</u>
     <u>Litig.</u>, 212 F.R.D. 539, 545 (C.D. Cal. 2003) (cited by Mitsubishi

28   in Opp'n at 12-13).  However, for the reasons set forth above, the
     Court finds that here that requirement has been satisfied.

**United States District Court**
For the Northern District of California

central to the validity of each one of the claims in one stroke."
Id. Thus, "[w]hat matters to class certification . . . is not the
raising of common 'questions' -- even in droves -- but, rather the
capacity of a classwide proceeding to generate common answers apt
to drive the resolution of the litigation.  Dissimilarities within
the proposed class are what have the potential to impede the
generation of common answers." Id. (internal quotation omitted).

Courts in this judicial district have been consistent: "where
an antitrust conspiracy has been alleged, courts have consistently
held that the very nature of a conspiracy antitrust action compels
a finding that common questions of law and fact exist." DRAM, 2006
U.S. Dist. LEXIS 39841 at *29, 2006 WL 1530166 at *3.  DPPs cite
similar authorities, and assert additional common questions include
(1) whether Defendants' conduct caused the prices of CRTs to be set
at supra-competitive levels, (2) the measure of classwide damages,
and (3) whether Defendants engaged in affirmative acts to conceal
the conspiracy.  Mot. at 16.

Mitsubishi opposes these contentions.  It argues, first, that
there are no common questions relating to the existence of the
alleged conspiracy because CPTs and CDTs were discussed in separate
meetings for most of the twelve-year class period, which would
require the two types of CRTs to be analyzed separately.  Opp'n at
14-15.  According to Mitsubishi, that most law enforcement agencies
have analyzed the two CRT types separately for criminal liability,
that Dr. Leitzinger (DPP's expert) often treats the two differently
even in this case, and that the evidence generally supports
different answers at different times with respect to the different
CRT products shows that the DPPs' allegations of conspiracy lack

United States District Court
For the Northern District of California

1   common evidence.  Id.  Second, Mitsubishi contends that the

2   difference in market factors between CPTs and CDTs belies DPPs'

3   argument that the putative class shares common questions of impact

4   or damages.  Id. at 15-16.  On this point, Mitsubishi points to the

5   fact that Dr. Leitzinger's quantitative studies evaluate CPTs and

6   CDTs separately and did not show that prices of CDTs and CPTs were

7   linked.  Mitsubishi therefore concludes that Plaintiffs fail to

8   show common questions capable of producing common answers for the

9   entire class in "one stroke" with respect to the alleged

10  conspiracy's impact on CPTs and CDTs.  Id. at 16 (citing Dukes, 131

11  S. Ct. at 2551).

12      The Court finds that the DPPs satisfy the commonality

13  requirement.  Per Dukes, the DPPs' antitrust claim depends on a

14  common contention that Defendants' alleged price-fixing conspiracy

15  increased the prices of all CRT products -- including CPTs and

16  CDTs.[22]  Mitsubishi concedes that there were joint meetings prior

17  to 2000.  See Opp'n at 14.[23]  DPPs' evidence suggests that even

18  [22] Mitsubishi cites Ellis v. Costco Wholesale Corp., 657 F.3d 970,

19  981 (9th Cir. 2011), quoting Dukes, 131 S. Ct. at 2552, to
    emphasize the need of common questions to answer the underlying

20  question of why something happened rather than merely whether a
    group was commonly harmed.  The Court finds the common evidence

21  here does precisely that, answering not only whether Plaintiffs
    were harmed but also the critical question of why they were harmed

22  with a common answer -- namely, a massive conspiracy by Defendants
    whose reach was so wide it included multiple (or else all) facets

23  of the CRT market to such a substantial degree that differences
    which may exist between one market sub-facet and another appear

24  inconsequential in context.  See Ellis, 657 F.3d at 981 ("all
    questions of fact and law need not be common to satisfy the

25  rule")(internal citations omitted).
    [23] Mitsubishi alleges it did not attend any of the joint or

26  separate meetings.  Opp'n at 14.  However, Exhibits submitted under
    seal by DPPs and Mitsubishi suggest there may be factual dispute as

27  to that point.  See, e.g., Def. Ex. 1 at 14, 16, 19, 24; Def. Ex. 6
    at 12; Expert Report of Dr. Leitzinger at 19; DPP Ex. 2 at 2

28  (labeled 60); DPP Ex. 28 at 39; DPP Ex. 38 at 2.  The Court does
    not opine upon or seek to resolve that dispute here, but the

1    after the CPT and CDT meetings were separated, they involved mostly

2    the same companies and were attended by mostly the same people.

3    Mot. at 7.  DPPs even show that certain size CDTs and CPTs were

4    built in the same factories using processes allowing Defendants to

5    change production from one to another.  See DPP Ex. 67 at 4

6    (labeled 114).  The DPPs' documentary evidence and their economic

7    analyses also indicate that CDTs and CRTs are not so dissimilar as

8    to impede common resolution of the DPPs' claims, even if different

9    meetings and products were involved.  See Mot. at 7.  Accordingly,

10   the Court is not persuaded as to Mitsubishi's first argument that

11   the differences between CDTs and CPTs are so great that they cannot

12   be included in one class.

13       Insofar as Mitsubishi's arguments go specifically toward

14   commonality (vice predominance), it is clear to the Court that

15   there are common questions of law and fact here which are

16   appropriate for resolution at trial.  Resolving these factual

17   matters at this stage would be an intrusion into the merits beyond

18   the scope of an inquiry into class certification.  There may be

19   some dissimilarities within the class, but based on the DPPs'

20   theories and evidence, they have provided a common way to account

21   for the factual and legal differences raised here.  See Dukes, 131

22   S. Ct. at 2551; see also Meyer v. Portfolio Recovery Assocs., LLC,

23   707 F.3d 1036, 1041 (9th Cir. 2012) ("All questions of fact and law

24   need not be common to satisfy the [commonality requirement]"

25   (citations and quotation marks omitted) (citing Hanlon v. Chrysler

26   Corp., 150 F.3d 1011, 1019 (9th Cir. 2008)).

27

28   existence of the dispute underscores that common facts about the
     conspiracy may answer questions common to both those who purchased
     any type of CRT Product -- CPTs and CDTs.

1    Accordingly, the Court finds that DPPs satisfy commonality per

2    Rule 23(a)(2).  The Court discusses predominance further below.

3    **E.   <u>Adequacy of Representation</u>**

4    Rule 23(a)(4) requires that the Named DPPs (1) have no

5    interests that are antagonistic to or in conflict with the

6    interests of the class; and (2) be represented by counsel able to

7    vigorously prosecute their interests.  <u>In re Static Random Access</u>

8    <u>(SRAM) Antitrust Litig.</u>, No. C 07-01819-CW, 2008 U.S. Dist. LEXIS

9    107523, *40, 2008 WL 4447592, *4 (N.D. Cal. Sept. 29, 2008) (citing

10   <u>Staton v. Boeing Co.</u>, 327 F.3d 938, 957-58 (9th Cir. 2003)).  In

11   this case, the Court finds Named DPPs' interests do not conflict

12   with those of the absent class members, and counsel for the

13   putative class is skilled and experienced.  <u>See</u> Mot. at 17-18.

14   Mitsubishi argues that the class representatives have failed

15   to make a showing of standing under the limited theory of standing

16   left to them pursuant to <u>Illinois Brick</u>, <u>Royal Printing</u>, and this

17   Court's earlier ruling.  Specifically, Mitsubishi argues that "DPPs

18   cannot satisfy their burden for establishing adequacy by merely

19   identifying evidence from which the Court could infer the possible

20   existence of standing.  DPPs should be required to satisfy that

21   burden prior to class certification."  Opp'n at 22.  Mitsubishi

22   also seems to suggest allegations of fact are insufficient to show

23   standing.  Opp'n at 23-24.

24   The Court has addressed standing arguments several times

25   above, and remains unpersuaded by this variant.  A district court

26   may address standing before it addresses the issue of class

27   certification.  <u>Easter v. Am. West Fin.</u>, 381 F.3d 948, 962 (9th

28   Cir. 2004); <u>In re Ditropan XL Antitrust Litig.</u>, 529 F. Supp. 2d

**United States District Court**
For the Northern District of California

1098, 1107 (N.D. Cal. 2007).[24]  Mitsubishi cites <u>Lierboe</u> for the proposition that "class representatives must have standing to bring all claims held by the putative class to which they belong and which they purpose to represent."  Opp'n at 21.  In <u>Lierboe</u>, the appellate court vacated class certification where the sole plaintiff in that class action suit was found via intervening action by the State Supreme Court to have no legally cognizable claim and thus lacked standing.  <u>Lierboe v. State Farm Mut. Auto. Ins. Co.</u>, 350 F.3d 1018, 1020-1022 (9th Cir. 2003).  Mitsubishi is thus in effect urging the Court to consider that "standing is the threshold issue in any suit.  If the individual plaintiff lacks standing, the court need never reach the class action issue." <u>Id.</u> at 1022, <u>citing</u> 3 Herbert B. Newberg on Class Actions § 3:19, at 400 (4th ed. 2002).  However, this case does not involve a single plaintiff who has been found to lack standing, but rather a price-fixing scheme where the Court has already recognized that cognizable legal theories of standing may exist for DPPs to a degree sufficient to deny summary judgment.[25]  Accordingly, <u>Lierboe</u> does not require the Court to dismiss this motion.

///

[24] DPPs urge that, properly understood, these cases provide that the Court <u>may</u> reach standing prior to class certification but do not obligate such a review.  Reply at 10 n. 14.  The Court understands the distinction but declines to opine on it, as the distinction would not make any difference to the outcome here.
[25] The Court is not the first to note such distinctions.  <u>See, e.g.</u>, <u>In re Static Random Access Memory Antitrust Litig.</u>, No. 07-md-01819 CW, 2010 U.S. Dist. LEXIS 141670, *57, 2010 WL 5071694, *10 (N.D. Cal. 2010) (distinguishing <u>Lierboe</u> in a price-fixing case where, if proven, alleged facts would constitute a violation of the Sherman Act); <u>Nat'l Fed'n of the Blind v. Target Corp.</u>, No. C 06-01802 MHP, 2008 U.S. Dist. LEXIS 84390, *4, 2008 WL 54377, *1 (N.D. Cal. 2008) (finding <u>Lierboe</u> "inapposite" where a party established legal standing to assert an ADA claim but failed to survive summary judgment on the merits).

United States District Court
For the Northern District of California

Even within the theory permitted by the Court's order on summary judgment, DPPs have met their standing burden.  Mitsubishi states that standing in this case requires a showing that DPPs "purchased finished products directly from an entity owned or controlled by Defendants or an alleged co-conspirator."  Opp'n at 22.  "Standing is satisfied if at least one named plaintiff meets the requirements."  Stearns v. Ticketmaster Corp., 655 F.3d 1013, 1021 (9th Cir. 2011).  DPPs extensively cite exhibits wherein multiple named Plaintiffs allege purchasing CRTs or finished products from an entity owned or controlled by or else directly from an alleged co-conspirator.  See Reply at 8-9; 10 n. 13.  The Court therefore finds DPPs meet their burden on standing sufficiently to certify the class.[26]

Mitsubishi further argues that DPP's pleadings do not fully support standing.  Mitsubishi cites that DPPs are alleged to have purchased "one or more CRTs directly from one of the Defendants or Co-Conspirators and/or their subsidiaries" without naming a specific DPP who purchase a finished product.  Opp'n at 23.  Absent such a showing, Mitsubishi argues that DPPs lack standing.

The Court also rejects this argument.  In response to Mistubishi's concern, DPPs expressly cite a named Plaintiff who

---

[26] The Court agrees with DPPs that Preap v. Johnson, 303 F.R.D. 566, 584 (N.D. Cal. 2014) does not state a legal standard for evaluating standing, merely the standard for evaluating Rule 23 categories.  C.f. Reply at 10; contra Opp'n at 22-23.  The Court suspects that the proper standard is a preponderance of the evidence but does not resolve the question here because the Court is satisfied that a preponderance of the evidence shows there would be standing at trial based on the limited evidence submitted to the Court.  The Court also does not reach the question of whether a specific claim of standing as to a particular named DPP would survive if evaluated for summary judgment on the merits or presented trial.

United States District Court
For the Northern District of California

1    directly purchased a CRT from a "Co-Conspirator[] and/or their

2    subsidiar[y]."  See Reply at 10 n. 13.  DPPs also cite where, in a

3    section other than "Parties," they allege purchase of finished

4    products.  See Reply at 11.  Per Stearns, only a single Plaintiff

5    needs to meet standing requirements.  655 F.3d at 1021.

6    Accordingly, the crux of Mitsubishi's argument has been rebutted.

7        Embedded in this argument, Mitsubishi also seeks to assert

8    that the Court cannot expand the class definition to accommodate

9    the owned-or-controlled theory without an amended complaint.

10   Authorities within this judicial district diverge on whether the

11   Court is actually bound to class definitions provided in the

12   complaint.  Compare Costelo v. Chertoff, 258 F.R.D. 600, 604-05

13   (C.D. Cal. 2009)(the Court is bound by the class definitions

14   provided in the complaint), with In re Conseco Life Ins. Co.

15   Lifetrend Ins. Sales & Mktg. Litig., 270 F.R.D. 521, 530 (N.D. Cal.

16   2010) (allowing Plaintiffs to narrow their breach of contract

17   theory via class certification motion based on factual developments

18   that have occurred since the filing of the complaint).  Mitsubishi

19   cites as persuasive authority Savanna Group, Inc. v. Trynex, Inc.,

20   No. 10-cv-7995, 2013 U.S. Dist. LEXIS 1277, *7-10, 2013 WL 66181,

21   *2-3 (N.D. Ill. 2013).  There, in considering that courts will

22   "typically, though not invariably" hold a Plaintiff to the

23   definition in the complaint, the Court recognized that "a motion

24   for class certification does not operate as a de facto amendment of

25   a party's complaint [but that] d[oes] not suggest that differing

26   class definitions preclude[] certification."  2013 U.S. Dist. LEXIS

27   1277 at *9, 2013 WL 66181 at *3 (internal citations omitted).

28   Savanna also considered that Rule 23 contemplated amendment of a

1   class certification order prior to judgment and recognized that

2   Defendants were not prejudiced by the timing where they had been

3   given ample chance to respond to the updated definition.  2013 U.S.

4   Dist. LEXIS 1277 at *9-10, 2013 WL 66181 at *3.  Accordingly, the

5   change of class definition did "not forestall the Court's class

6   certification inquiry."  2013 U.S. Dist. LEXIS 1277 at *10, 2013 WL

7   66181 at *3.  Here, the Court recognizes that the parties have all

8   had ample time to consider and respond to the class definition as

9   proposed, that amendments (if any) to the complaint would only be

10  necessary to conform the complaint to the results of litigation in

11  this same case (<u>e.g.</u>, the Court's ruling on summary judgment), and

12  that if an amendment is actually necessary[27] it can be made prior

13  to judgment but after the class is certified.  Accordingly, this

14  issue does not forestall the Court's class certification inquiry.

15       Therefore, the Court finds DPPs have satisfied adequacy.

16  **F.   <u>Predominance under Rule 23(b)(3)</u>**

17       Rule 23(b)(3) requires that "questions of law or fact common

18  to class members predominate over any questions affecting only

19  individual members" and that class action is superior to other

20  available methods for fair and efficient adjudication.  <u>See Amchem</u>

21  <u>Prods. Inc. v. Windsor</u>, 521 U.S. 591, 615 (1997).  In determining

22  whether the predominance requirement is satisfied, the court must

23  identify the case's issues and determine which are subject to

24  common proof and which are subject to individualized proof.  <u>See</u>

25

26  [27] The Court does not opine on this, though encourages DPPs to
    review this matter to determine if an amendment of the complaint

27  will be necessary.  If so, the Court grants leave to amend the
    complaint within 30 days of this order for the single, <u>limited</u>

28  purpose of conforming its definition(s) of parties with the
    description of the class as certified in this order.

United States District Court
For the Northern District of California

1  LCDs, 267 F.R.D. at 600.  "When common questions present a
2  significant aspect of the case and they can be resolved for all
3  members of the class in a single adjudication, there is clear
4  justification for handling the dispute on a representative rather
5  than on an individual basis."  Hanlon v. Chrysler Corp., 150 F.3d
6  1011, 1022 (9th Cir. 1998).

7      In "price-fixing cases, courts repeatedly have held that the
8  existence of the conspiracy is the predominant issue and warrants
9  certification even where significant individual issues are
10 present."  Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives &
11 Composites, Inc. ("Newport"), 209 F.R.D. 159, 167 (C.D. Cal. 2002).
12 The issue of whether questions of law or fact common to class
13 members predominate begins with the elements of the underlying
14 cause of action.  Erica P. John Fund, Inc. v. Halliburton Co., 131
15 S. Ct. 2179, 2184 (2011).  For antitrust cases, this requires: (1)
16 a conspiracy to fix prices in violation of the antitrust laws
17 ("conspiracy"); (2) an antitrust injury -- i.e., the impact of the
18 defendants' unlawful activity ("impact"); and (3) damages caused by
19 the antitrust violations ("damages").  LCDs, 267 F.R.D. at 600.

20     DPPs argue that common questions predominate because they can
21 establish that for each of the three prongs (conspiracy, impact,
22 and damages), generalized proof is applicable to the class as a
23 whole.  Mot. at 19.  DPPs present Dr. Leitzinger's expert report
24 (submitted under seal) to support their contention that they can
25 prove antitrust impact and damages on a classwide basis.
26 Mitsubishi does not directly oppose the conspiracy prong, but does
27 dispute the impact and damages prongs.  Mitsubishi also did not
28 submit an expert report in response to Dr. Leitzinger, though they

did include another expert report (submitted under seal) responsive
to the opinions of other experts on matters related to this case.

The Court will review Dr. Leitzinger's report in depth
(altering the order to better align with issues the Court is asked
to address), then address each of the three prongs in turn, and
finally conclude with a brief discussion of superiority.

### i.    Dr. Leitzinger's Report

Dr. Leitzinger is an economist and a managing director at Econ
One Research, Inc., an economic research and consulting firm.  ECF
No. 2968-4 (Expert Report of Jeffrey J. Leitzinger ("Leitzinger
Report")) ¶ 1.[28]  He has a Ph.D. in economics from the University
of California at Los Angeles, and for thirty-four years he has
worked extensively on market analysis and the assessment of
allegations of anticompetitive conduct, including a number of
antitrust conspiracy cases.  Id.  In this case, Dr. Leitzinger
reviewed evidence of the alleged conspiracy and then formed an
opinion that there is evidence common to members of the proposed
class that is sufficient to prove widespread impact.  Id. ¶ 6.
This evidence involves:

> (1)   The broad extent of communication and cooperative
>       activities within the alleged conspiracy;
>
> (2)   Activities that would have assisted the alleged
>       conspiracy in constraining output of CRTs;
>
> (3)   The alleged conspiracy's control over the vast
>       majority of sales;
>
> (4)   Regression analysis showing prices of CRTs to be
>       largely determined by factors that are common to
>       Class Members;

---

[28] The DPPs filed two earlier reports from Dr. Leitzinger in this
case, ECF Nos. 1825-1 and 2208-8, both related to DPP class
certification.  The Court considers only the expert reports filed
in this motion, except as clearly incorporated by motion argument.

United States District Court
For the Northern District of California

(5)   Jointly determined "Target Prices" for CRTs representing the vast majority of total sales;

(6)   Structural elements in CRT pricing that tended to link prices for CRTs of different types and sizes;

(7)   Regression analysis showing that "Target Prices" established thought the alleged conspiracy had a demonstrable effect on actual prices paid; and

(8)   The existence of other market characteristics which would be expected as an economic matter to cause the effects of conspiratorial behavior to be felt broadly across customers.

Id.

### a.   **Background**

Before beginning any statistical analysis, Dr. Leitzinger first reviewed the background of CRTs, including their various uses over the years and technical descriptions of CRT products.  Id. ¶ 8-10.  Dr. Leitzinger next overviewed varieties of CRT products. He found "CRTs differed mainly by type of use, size, and display resolution, though other characteristics, such as shape, sometimes varied as well." Id. ¶ 11.  Most CRTs sold during the Class Period were able to display color images.  While CDTs were used in computer monitors and devices like ATMs to accommodate higher resolution whereas CPTs were used in televisions to accommodate brighter screen, the basic technology of CDTs and CPTs is the same. Id.  The quality of viewing a CRT device is determined by many characteristics, most important of which are the screen size and resolution.  Id. ¶ 12.  CPTs were most commonly made in 14, 20, 21, and 29 inches, which comprised about 79 percent of sales during the class period.  CDTs were most commonly made in 14, 15, and 17 inches, which comprised 91 percent of sales during the Class Period.  Id.

United States District Court
For the Northern District of California

29

Next, Dr. Lietzinger turned to the CRT Defendants and co-conspirators.  Id. ¶ 13-14.  Of particular note, the first such large multinational corporation (or their subsidiaries) listed is Mitsubishi Entities, followed by various other co-conspirators listed herein.  Together, "[t]hese companies accounted for 85-100 percent of CDT sales and 70-80 percent of CPT sales during the class period."  Id. ¶ 13.  Products were then sold to various manufacturers or redistributors to sell to third parties, or else used in-house in CRT products and sold to big-name retailors such as Best Buy, Wal-Mart, et cetera.  Id. ¶ 14.

Dr. Lietzinger then turned to tracing the history of CRTs. The CRT industry steadily grew though the end of the twentieth century, peaking in 1999 at a value of almost $20 billion.  Id. ¶ 15.  However, by the end of the class period, other display technologies had supplanted CRTs, for reasons Dr. Leitzinger examines, with notable shut-downs of CRT production by parent companies from 2005 to 2008.  Id. ¶ 16-18.

### b.   Characteristics and Structural Factors

Throughout his report, Dr. Leitzinger noted characteristics of the conspiracy and (what the parties call) structural factors that Dr. Leitzinger opines are evidence "indicative of anticompetitive activity that is broad in scope and multi-faceted in the manner in which it affects firm behavior," thus supporting his opinion that "impact of the alleged conspiracy would be felt broadly by CRT buyers."  Id. ¶ 26.  These characteristics and factors include:

(1) From 2000-2006, Defendants and co-conspirators held close to 90 percent of the market, and 80-100 percent of the industry's capacity.  Id. ¶ 20.   If participants could collectively coordinate pricing decisions their control over

industry output would translate into industry-wide price effects. Moreover, a high degree of control would simplify coordination issues due to little outside competitive presence to exert pressure on the alleged conspiracy's coordination efforts. Id. ¶ 21.

(2)  The conspiracy was global, and conspirators were cognizant of regional price levels which they adjusted to keep in line with their global pricing strategy. Prices in the United States tracked with those elsewhere in the world. Id. ¶ 58-59, Figures 12-13.

(3)  The conspiracy, which included dealings with Mitsubishi and Thomson, was highly organized (per the structure of the Glass Meetings, regional meetings) and ongoing for many years. The information and organization from this scope, frequency, and depth of meetings suggests extensive communication and coordination regarding the participants' activities, facilitating close alignment among participants with the goals of the alleged conspiracy and broad price impact. Id. ¶¶ 27-29, 31-34, 36.

(4)  The conspiracy entered into and enforced restrictions on capacity and output, including allocation of market shares, price stabilization efforts, which facilitated close alignment among the participants with the goals of the conspiracy and would allow borad impact on prices. Id. ¶¶ 28-29, n. 55, 36-37. See also id. 38-42.

(5)  Barriers to entry into the CRT market were high, including high market entry prices and substantial excess capacity. High barriers to entry promote widespread impact because they discourage new competition that could de-stabilize the conspiracy or create pockets of competitive pricing. Id. ¶¶ 60-63.

(6)  Product differentiation among CRTs was limited to a relatively small number of major characteristics based on standardized product specifications. Combined with a structured pricing environment and the ability to produce different products, Dr. Leitzinger found both economic and documentary evidence showing the conspiracy would be expected to have influenced prices across the product spectrum. Price agreements for top selling CRTs in their base configuration would signal a corresponding set of prices for other configurations for the same and other CRTs. Id. ¶¶ 52-54.

31

(7)   Defendants were easily able to obtain a high level of information about their competitors, both publicly and as a result of the conspiracy. This allowed the conspirators to readily identify attainable prices while also monitoring and enforcing price-fixing activities. Id. ¶¶ 28-29, 36. See also id. ¶ 53.

(8)   Dr. Leitzinger's staff assembled a data set from Glass Meeting documents which, despite certain gaps, allowed Dr. Leitzinger to find that targeted CRTs accounted for 90 percent of CPTs and 98 percent of CDTs. Id. ¶¶ 43-44. He opined that price targeting, if effective in influencing actual prices just for the targeted CRTs, would have directly impacted products accounting for approximately 94 percent of CRT shipments during the Class Period. Id. ¶ 44, Figure 7.

c.   **Statistical Analysis**

Dr. Leitzinger also performed extensive statistical analyses, which he opined shows classwide impact through common evidence and methodologies. He analyzed pricing variation among CRT buyers over the 104 quarter Class Period, performing a series of hedonic regressions using a set of observable characteristics about CDTs and CPTs: size, widescreen, ITC or bare,[29] transaction quantity, and brand. Id. ¶¶ 22-25, Figure 5. This analysis showed that most (96% for CPTs and 82% for CDTs) price variation among buyers is attributable to those product characteristics. Id. ¶ 25. This suggests that selective impacts were not the reason for observed price variability.

Dr. Leitzinger later examined the effects of Defendants' price targets on actual prices from the data set described earlier. This included three (sets of) calculations. He first looked to see whether target prices and actual prices moved together. On a range

---

[29] Integrated tube component (ITC) CRTs were sold with a deflection yoke, whereas those sold without a deflection yoke were called "bare" CRTs.

32

**United States District Court**
For the Northern District of California

of 0 to 1 (low-to-high), the correlation coefficient was 0.98, indicating to Dr. Leitzinger that higher price targets were closely associated with higher actual prices.  Id. ¶ 47.  Second, Dr. Leitzinger analyzed the relationship between target prices and transaction prices, including multiple relevant factors and data drawn from regression models based on quarterly averages, actual prices, product differences, and supply and demand factors likely to have influenced prices -- represented separately for CDTs and CPTs.  He found a positive and 95% statistically significant relationship between target prices and actual prices, separate and apart from market factors.  Id. ¶ 48, Figure 8.  Third, Dr. Leitzinger showed results of target price regressions estimated separately for North-American sales and sales elsewhere.  The results showed with a high degree of statistical significance that target prices developed pursuant to the conspiracy resulted in higher CRT prices in both North America and the rest of the world.  Id. ¶ 49, Figure 9.

Dr. Leitzinger also considered impact on the CRT configurations for which he was not able to find price targets (1.8 percent of CDT shipments and 9.8 percent of CPT shipments).  He examined qualitative evidence drawn from DPP's discovery efforts crossed with economic theory.  The qualitative evidence included an analysis of how CPTs and CDTs were in some ways similar or otherwise related.  Id. ¶ 51-52.[30]  Dr. Leitzinger expressly notes that CPTs and CDTs were manufactured using the same basic production process, that they could be (and were) produced on the

---

[30] The Court goes into detail here as this directly relates to several arguments made by Mitsubishi.

**United States District Court**
For the Northern District of California

same production lines, and that product differentiation was largely a matter of size and performance metrics that each manufacturer was capable of producing.  There were even standardized product specifications that all manufacturers used.  Dr. Leitzinger also noted that production facilities often produced a mix of products configured for different applications, and production was so flexible configurations could be changed in some cases the same day to accommodate short term needs.  Accordingly, price differences between CRTs of different characteristics that were not cost-related would be expected, as matter of economic theory, to favor more profitable configurations, pressuring the market to re-align prices accordingly.  Therefore, Dr. Leitzinger concluded that prices across CRT configurations would be economically linked over time.[31]  Id. ¶ 51-52.  He further concluded that, due to the structured pricing environment and the level of attention given to relationships between prices and demands of differing CRT products, the conspiracy would influence prices across the product spectrum. Id. ¶ 53-54.

Dr. Leitzinger also performed a correlation analysis of the prices over time for top-selling CDTs and CPTs, determining that all of these prices were highly correlated.[32]  Id. ¶ 55, Figure 10. He then performed a correlation analysis of targeted CRT products and non-targeted products, finding a clear correlation (correlation

---

[31] Dr. Leitzinger cites as support documents which were largely provided (in whole or in excerpts) by the parties and which the Court has separately reviewed.

[32] Dr. Leitzinger calculated his correlations using Fisher Matched-Model price indexes, which are designed to measure price changes in a group of products accounting for changes in the composition of sales among different products.  Leitzinger Report n. 122.  The plaintiffs' expert in TFT-LCDs also used matched model price-index analyses.  See TFT-LCDs, 267 F.R.D. at 312.

**United States District Court**
For the Northern District of California

1  coefficient often exceeding 0.8, which, weighted by sales dollars,

2  averaged to a correlation coefficient of 0.93) across major

3  products.  Id. ¶ 57, Figure 11.  Based on the qualitative and

4  statistical evidence, Dr. Leitzinger concluded that price targeting

5  would likely have impacted these other CRTs as well.  Id. ¶ 50.

6              **d.   Damages**

7      Dr. Leitzinger also examined overcharges that resulted from

8  the conspiracy, including costs to both true direct purchasers and

9  to indirect purchasers who are nonetheless part of the DPP class.

10     The first method used, a "before/after" analysis,[33] compares

11 pricing during the period of the conspiracy to pricing before

12 and/or afterwards.  Id. ¶ 64.  Dr. Leitzinger conducted a

13 regression analysis of the relationship between CRT prices, market

14 demand and supply variables, and the presence of the conspiracy to

15 provide an estimate of the impact of the alleged conspiracy on

16 prices while holding constant supply-demand effects.  This "reduced

17 form" model is widely used by economists.  Id. ¶¶ 64-65.[34]  Dr.

18 Leitzinger found demand and supply factors explained almost all

19 variability in CRT prices, and that there were positive and highly

20 statistically significant coefficient variables for the conspiracy

21 indicators.  Together these indicate that the conspiracy elevated

22 CRT prices independent of the demand and supply factors.  Id. ¶ 70,

23 Figure 14.[35]  Dr. Leitzinger used that information from the

24 _____

[33] The difference between prices actually charged for CRTs during
25 the Class Period and prices in a "but for" world is sometimes
called the "usual measure" of damages.  This is a common damages
26 calculation method.  See, e.g., TFT-LCDs, 267 F.R.D. at 312, n. 13.
[34] Dr. Leitzinger also details the methodology used to determine
27 the proper "before" and "after" periods and the inclusion of other
related variables.  Leitzinger Report, ¶¶ 66-69.
28 [35] Dr. Leitzinger was able to run this analysis for all types of
CRTs in a single data set.  Dr. Leitzinger expressly noted there

1   regression models to show average actual prices of CDTs and CPTs

2   versus the prices as they are estimated but-for the conspiracy.

3   Id. ¶ 71, Figures 15-16.  He concluded that the conspiracy effect

4   ranged from 0.1 percent to 10.5 percent for CDTs and from 0.2

5   percent to 8.3 percent for CPTs.  Id. ¶ 72.

6       The second model used was a regression model examining the

7   statistical relationship between CRT prices and CRT product prices.

8   The CRT is the most costly input in CRT monitors and TVs,

9   accounting for "40 to 50 percent of the cost of manufacturing the

10  finished product and up to 70% of the cost materials."  Id. ¶ 79.

11  Thus Dr. Leitzinger expected to see a correlation, based on his

12  review of economic academic theory and evidence in this case.  See

13  id. ¶¶ 74-78.  The method for this regression analysis was a

14  "reduced form" model similar to the one previously described, and

15  Dr. Leitzinger again listed and explained the variables he used.

16  Id. ¶¶ 79-80.  He found that the coefficient indicates that

17  increases in CRT prices resulted in increases in finished product

18  prices both for CDTs and CPTs.  Id. ¶ 81.  For CPTs, a one percent

19  price increase was associated, on average, with a 0.78 percent

20  increase in the finished product, whereas for CDTs a one percent

21  ///

22  ///

23

24  was a "prospect that there are common elements in CRT pricing
    across models for a given manufacturer in a given quarter, with
25  variability across models largely as the result of the differences
    in configurations."  Id. n. 158.  He therefore used a method to
26  treat the experience across all models sold by a given manufacturer
    in a given quarter in a single observation, resulting in more
27  conservative measures of statistical strength.  Id.  Careful review
    of Figure 14 shows that the regression analysis accounted
28  separately for CDT and CPT conspiracy indicators and sales, though
    the final observations and R-squared were joint.

increase was associated, on average, with a 0.72 percent increase in the finished product price.[36]  Id.

Using the overcharge estimates provided, Dr. Leitzinger proposed that classwide overcharges could be calculated.  He could take the CRT sales data and calculate sales by Defendants and co-conspirators to class members for each year, and then apply the overcharge percentages for each type of CRT per year to get the overcharge amount associated with each type of CRT each year.  Id. ¶ 82.  In the same manner, he could compute the damages to purchasers of CRT finished products.  To do so, Dr. Leitzinger would calculate the average annual dollar overcharge for a given CRT and multiply it by the corresponding units of CRT finished product sales for the class members.  Adding totals across products over time would yield the total damages.  Id. ¶ 83.

### ii.   Conspiracy

DPPs allege that proof of the price-fixing scheme includes all the underlying cause(s) of action.  Thus, if required of them, each class member would show that Defendants and their co-conspirators organized, operated, and participated in a global price-fixing scheme.  The evidence would be the same for each, including the number and frequency of Glass Meetings, documentary and testimony evidence related thereto, and other efforts by employees to price-fix.  Mot. at 19-20.  Mitsubishi does not challenge this prong.  Upon its own inquiry, the Court is satisfied that the quantity and quality of the evidence supports by a preponderance of the evidence

---

[36] Dr. Leitzinger gave a helpful illustration: "if a $100 CPT increased in price to $101 (i.e. 1 percent), a $200 TV containing that tube would be expected to increase in price by $1.56 (i.e. 0.78 percent of the $200 finished product price)."  Id. ¶ 81.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  that there was a price-fixing scheme and its existence and

2  operations would be a question common to all class members.  Thus

3  DPPs meet the conspiracy prong.

4      **iii.**    <u>**Impact**</u>

5         For impact in an antitrust case, the Court must determine

6  whether the DPPs have shown a reasonable method for determining, on

7  a classwide basis, the alleged antitrust activity's impact on class

8  members.  See <u>LCDs</u>, 267 F.R.D. at 601; <u>see also</u> <u>DRAM</u>, 2006 U.S.

9  Dist. LEXIS 39841 at *44-45, 2006 WL 1530166 at *9.  This is a

10  question of methodology, not merit.  See <u>DRAM</u>, 2006 U.S. Dist.

11  LEXIS 39841 at *44-48, 2006 WL 1530166 at *9.  The DPPs must make

12  an evidentiary case for predominance, which the Court must analyze

13  rigorously, <u>Comcast</u>, 133 S. Ct. at 1431; <u>Amgen</u>, 133 S. Ct. at 1196;

14  <u>Dukes</u>, 131 S. Ct. at 2551,[37] but the Court cannot undertake a full

15  merits analysis at this point, and should avoid engaging in a

16  battle of the experts.  See <u>Amgen</u>, 133 S. Ct. at 1194-95; <u>DRAM</u>,

17  2006 U.S. Dist. LEXIS 39841 at *45, 2006 WL 1530166 at *9.

18      DPPs suggest that the key question is whether plaintiffs have

19  demonstrated that there is a way to prove a classwide measure of

20  impact through generalized proof.  See <u>TFT-LCDs</u>, 267 F.R.D. at 313;

21  <u>In re Online DVD Rental Antitrust Litig.</u>, No. M 09-2029 PJH, 2010

22  U.S. Dist. LEXIS 138558, *62, 2010 WL 5396064, *10 (N.D. Cal. Dec.

23  23, 2010) <u>aff'd sub nom.</u> <u>In re Online DVD-Rental Antitrust Litig.</u>,

24  779 F.3d 934 (9th Cir. 2015).  DPPs cite to three such offerings:

25  ─────────────────

26  [37] Due in part to these cases, the Court does not merely rely on
its earlier decisions granting class certification within this case
but undergoes a new analysis.  Even so, in undergoing this new

27  analysis, the Court is mindful of its earlier findings of impact
and damages to IPPs, some of which required showings of impact and

28  damages to DPPs.  See Order of the Court dated September 24, 2013,
ECF No. 1950.

United States District Court
For the Northern District of California

contemporaneous evidence of classwide impact, statistical evidence
of classwide harm found by expert economist Dr. Leitzinger, and
classwide impact based on the structure of the CRT market given the
operation of the CRT conspiracy.  Mot. at 21.  Mitsubishi disputes
all three claims.  First, Mitsubishi argues there is no classwide
proof of impact because the alleged "contemporaneous evidence" is
not common for all members as a result of the differences between
CDTs and CPTs.  Second, Mitsubishi argues Dr. Leitzinger's
statistical evidence does not show any meaningful correlation
between CPT and CDT prices per commonality arguments made earlier,
and therefore lack predominance.  Third, Mitsubishi attacks the
argument that classwide impact flows in part from the "structure of
the CRT market and the operation of the CRT conspiracy," noting
that such arguments fail where products do not have structural
factors that generate classwide impact.  The Court disagrees with
Mitsubishi, and for the reasons below finds that DPPs have
adequately shown impact.

Mitsubishi argues there is no classwide proof of impact
because the alleged "contemporaneous evidence" is not common for
all members as a result of the differences between CDTs and CPTs.
Opp'n at 17.  The Court agrees there may be real differences
between the products and the methodology required to prove the
specific, actual loss suffered due to the impact of the conspiracy
on each of the products.  However, DPPs put forward evidence (as
reviewed by Dr. Leitzinger) suggesting that all but a small
fraction of the CRT market was impacted, that the conspiracy's
price goals were achieved a significant portion of the time, and
that conspirators were effective at monitoring and enforcing

**United States District Court**
For the Northern District of California

conspiratorial agreements.  <u>See</u> Mot. at 21-22.  Given a conspiracy of such magnitude, that was so successful, and was able to self-enforce, the distinction between impact on the sub-markets of CDTs and CPTs does not create individualized issues at a methodological level sufficiently significant to overcome the fairness and efficiency of addressing the two together.  Moreover, the means of proof required and the evidence expected to be presented at trial will largely be the same for both products, with only minimally differing documentation and associated numerical impact near the end of the analysis.[38]  Thus the Court finds the "contemporaneous evidence" has the ability to show impact through common evidence and methods.

Mitsubishi encourages the Court to consider <u>Funeral Consumers Alliance, Inc. v. Service Corp. Int'l ("Funeral Consumers")</u>, 695 F.3d 330, 348-49 (5th Cir. 2012) for the proposition that individualized issues predominate where "plaintiffs fail to explain how statements made by one associate in one area of the country equates to a nationwide conspiracy."  However, a proper understanding of <u>Funeral Consumers</u> is that in determining predominance, individualized issues take on greater force where there is no national market or nationwide conspiracy.  <u>Id.</u> at 348.  <u>Funeral Consumers</u> focused on the inability of the plaintiffs to

---

[38] Even if DPPs were forced into two separate classes -- one for CPTs and one for CDTs -- the Court could easily envision a trial strategy wherein DPPs, to maximize their claims for damages, in each case attempt to introduce exactly the same evidence of CPT <u>and</u> CDT damages to emphasize the degree of market control, the extent of impact, and the pervasive nature of the conspiracy.  The Court is neither suggesting this strategy nor ruling upon its viability under applicable evidence rules; rather, the intuitive appeal of such a methodology underscores why there is such a strong trend to finding predominance (and impact) in price-fixing cases upon proof of just the conspiracy.  <u>See, e.g.</u>, <u>Newport</u>, 209 F.R.D. at 167.

1  establish a conspiracy, to show that the conspiracy was prevalent

2  (they owned less than 10% of funeral homes in the United States and

3  sold only 45% of caskets in the United States), or that it had

4  consistent effect, execution, or impact from state to state.  Id.

5  348-49.  Here, DPP's evidence shows and Dr. Leitzinger expressly

6  discussed how this conspiracy was global, controlling almost the

7  entire market internationally, with consistent price inflation

8  attributable directly to the conspiracy.  This evidence defeats

9  both the limited purpose for which Mitsubishi cited Funeral

10  Consumers and Mitsubishi's more general concern that individualized

11  issues predominate (and thus preclude impact) in spite of proof

12  that there was such a pervasive, all inclusive conspiracy.

13      Next, Mitsubishi asserts Dr. Leitzinger's statistical evidence

14  does not show any meaningful correlation between CPT and CDT prices

15  per commonality arguments made earlier.  The Court notes that the

16  very paragraph Mitsubishi's earlier commonality argument[39] cites

17  specifies that this conclusion is what is "expected as an economic

18  matter."  Leitzinger Report, ¶ 52.  Thus it appears Dr. Leitzinger

19  is applying an economic theory to facts to yield a specific

20  conclusion which may be accepted or rejected at trial.  Mitsubishi

21  does not attack this at a methodological level but a factual one.

22  The attempt to use Dr. Leitzinger's own work against him, citing

23  how his own statistical analysis analyzes CPTs and CDTs separately,

24  does not rebut the application of economic theory.  See Opp'n at

25  15.  The Court does not doubt that there are differences between

26  CPTs and CDTs which Mitsubishi may be able to show at trial, as

27  addressed in connection with commonality.  However, as a

28  _____

[39] Opp'n at 15-16.

**United States District Court**
For the Northern District of California

methodological matter, Dr. Leitzinger's report included at least one statistic potentially showing a correlation between CPTs and CDTs,[40] whereas Mitsubishi did not submit any expert analysis showing a lack thereof or showing why economic theory or statistics could never support such a conclusion.  Therefore, the Court sees no methodological problem[41] with Dr. Leitzinger applying his expert knowledge of economics to anticipate a potential correlation, especially when that correlation was supported by deposition testimony he reviewed (and quoted) in direct connection with this speculative conclusion.  See Leitzinger Report, ¶ 53 (citing what has been provided to the Court as DPP Ex. 31, 18-20 (labeled page 296-98)).

Mitsubishi then attacks the argument that classwide impact flows in part from the "structure of the CRT market and the operation of the CRT conspiracy," noting that such arguments fail where products do not have structural factors that generate classwide impact.  In support, Mitsubishi primarily relies on In re Graphics Processing Units Antitrust Litig. ("GPU"), 253 F.R.D. 478, 489, 491 (N.D. Cal. 2008).  GPU dealt with a conspiracy to fix prices of graphic processing units that were mounted on graphic chips and cards, which were in turn used in game consoles, laptops, mobile devices and other products.  A very large percentage of graphic cards and chips were individually customized for a particular customer or application.  The "overwhelming majority" of wholesale purchases of hundreds of types of chips and cards were

---

[40] Leitzinger Report, ¶ 55, Figure 10.
[41] While the Court may hesitate to find it sufficient if presented as the sole methodology, here it is one of many that Dr. Leitzinger employs.  The Court does not opine on the accuracy of Dr. Leitzinger's conclusion or whether it would prevail on the merits.

**United States District Court**
For the Northern District of California

individually negotiated, the ultimate price depending on the volume, market power of the purchaser, degree of customization, and many other factors.  Here, customization was far more limited, there are far fewer types of CRT products at issue and wholesale purchases were rarely negotiated individually.  GPU also did not include guilty pleas or ongoing criminal investigations (thus lacking "extrinsic evidence of harm") and the products involved in GPU were customized and not fungible.  See LCDs, 267 F.R.D. at 605 (distinguishing GPU).[42]  Therefore, the Court finds Mitsubishi's reliance on GPU unpersuasive.[43]  Moreover, contrary to Mitsubishi's claims, DPPs do not merely rely on vague structural factors but provide expert analysis and statistical methodology to turn the raw market data into a working formula for damage determinations while discounting non-conspiracy factors which would otherwise cause prices to fluctuate.  The Court's review of structural factors presented by Dr. Lietzinger shows, by a preponderance of the evidence, that structural issues could be shown at trial to have generated class impact.

Thus the Court finds DPPs have shown impact for predominance.

### iv.    Damages

The Court finds DPPs have sufficiently shown a methodology of establishing damages.  As a threshold matter, the Court has already reached this conclusion as a necessary finding for certifying the IPP class, wherein a pass-through theory required the Court to

---

[42] See also Report and Recommendation dated June 20, 2013, ECF No. 1743; Report and Recommendation dated June 20, 2013, ECF No. 1742.
[43] Mitsubishi's reliance on Gitto/Global Corp. v. Rohm & Haas Co. (In re Plastics Additives Antitrust Litig.), No. 03-CV-2038, 2010 U.S. Dist. LEXIS 90135, *26, 2010 WL 3431837, *6-7 (E.D. Pa. Aug. 31, 2010) is similarly unavailing, for largely the same reasons.

**United States District Court**
For the Northern District of California

1    directly consider and rule upon whether methodology had shown

2    damages for the DPPs (damages which in turn were then passed along

3    in whole or in part to the IPPs).  The Court reaffirms its ruling,

4    adopts its former reasoning and that of the Interim Special Master

5    as presented in the related Report and Recommendation.  See Order

6    of the Court dated September 24, 2013, ECF No. 1950; Report and

7    Recommendations dated June 20, 2013, ECF No. 1742.  Even so, were

8    the Court to be addressing the matter here for the first time, the

9    Court would still find DPPs have provided a methodology sufficient

10   to establish damages.

11       Insofar as Mitsubishi's attack can be construed as a

12   methodological attack on using averages (which do not, by their

13   nature, account for the differences stressed by Mitsubishi), the

14   Court is still not convinced.  As has been previously noted in this

15   case, attacking averaged data is a standard defense tactic in

16   antitrust cases, so it is unsurprising that courts have often

17   evaluated and approved the appropriate use of averages.  See ECF

18   No. 1743 at 16.  Further, the Ninth Circuit has recognized that the

19   use of aggregate data in regression analysis is often appropriate

20   "where [a] small sample size may distort the statistical analysis

21   and may render any findings not statistically probative."  Paige v.

22   California, 291 F.3d 1141, 1148 (9th Cir. 2002) (amended).  In such

23   a case, the use of "aggregate numbers" may "allow for a [more]

24   robust analysis and yield more reliable and more meaningful

25   statistical results."  Ellis v. Costco Wholesale Corp., 285 F.R.D.

26   492, 523 (N.D.Cal.2012), appeal dismissed (Jan. 16, 2013).  See

27   also In re High-Tech Emp. Antitrust Litig., 289 F.R.D. 555, 580

28   (N.D. Cal. 2013).  The Court finds that the DPPs have presented a

44

**United States District Court**
For the Northern District of California

1  functioning model tailored to the facts of the case, using

2  aggregate data to produce a coherent, efficient model based on the

3  available data, and avoiding the risk of using overly granular data

4  sets that would have produced unreliable or statistically

5  meaningless data.  See id.

6      Primarily, however, Mitsubishi seems to present a more nuanced

7  argument that differences in the nature of the various class

8  members precludes common proof of damages.  Yet "[th]e presence of

9  individualized damages cannot, by itself, defeat class

10 certification under Rule 23(b)(3)."  Leyva v. Medline Indus., 716

11 F.3d 510, 514 (9th Cir. 2013).  In Leyva, a district court abused

12 its discretion by denying class certification where the primary

13 differences among class members rested in damages for each person

14 in the 500 member class who was shortchanged in different amounts

15 by a company's rounding or bonus pay policies.  Id. at 513.  Here,

16 with likely far more class members, the only major differences

17 cited by Mitsubishi are those between the different types of

18 products purchased (CDTs vice CPTs, sizes, etc.).  Opp'n at 20.

19 Some of these are the types of variances that Dr. Leitzinger's

20 analysis is able to largely discount as he shows a generalized

21 methodology showing the degree to which the conspiracy caused

22 common harm to all Plaintiffs.  Where his formula cannot discount

23 the differences (as with CDTs and CPTs), Dr. Leitzinger is able to

24 slightly tweak the data or add a single extra calculation into the

25 same, existing regression model.  This latter circumstance does not

26 mean damages are not commonly shown, only that there is some nuance

27 to the damages resulting from the same one global conspiracy proved

28 by common evidence and damages distributed by common regression

45

**United States District Court**
For the Northern District of California

1    models.  To separate each subgroup of damaged product purchasers

2    into separate classes would create more burden on the Court rather

3    than less, and would be the death knell of class actions which

4    Leyva seeks to avoid.  Leyva, 716 F.3d at 514.  Moreover, the Court

5    has already ruled, in accordance with Royal Printing, that DPPs are

6    permitted to sue for the entire overcharge, eliminating most if not

7    all individualized concerns.  See Order of the Court dated November

8    29, 2012, ECF No. 1470 at 21.

9        To the extent that Mitsubishi relies on In re Rail Freight

10   Fuel Surcharge Antitrust Litigation, 725 F.3d 244 (D.C. Cir. 2013),

11   to support discounting Dr. Leitzinger's model and thus not certify

12   the class, the Court is not convinced.  In Rail Freight, a group of

13   railway shippers sued four major freight railroads for imposing

14   rate-based fuel surcharges on shipments over their tracks, alleging

15   that the railroads had fixed surcharge prices.  The plaintiffs

16   presented a model that attempted to account for the fact that

17   certain plaintiffs -- "legacy plaintiffs" -- paid rates under

18   contracts they entered with the railway companies years before the

19   class period.  Id. at 252-53.  Bizarrely, the plaintiffs' damages

20   model in that case returned the result that the legacy plaintiffs

21   had been injured by the alleged price-fixing, an obviously

22   erroneous outcome given that the prices they paid were fixed by

23   pre-conspiracy contracts.  Id.  The D.C. Circuit rightly vacated

24   the district court's class certification decision because the lower

25   court had certified the class where the damages model that was

26   inextricably linked to plaintiffs' argument for common proof was

27   obviously flawed.  Id. at 253, 255.  Here, the Court sees no such

28   glaring error, and Plaintiffs' statistics appear to be sound.

United States District Court
For the Northern District of California

1  Mitsubishi failed to show how the model Dr. Leitzinger presented

2  exhibits false positives.

3      The Court also reviewed the "Expert Report of Dov Rothman,

4  Ph.D." ("Rothman Report") submitted by Mitsubishi.[44]  While the

5  issues raised therein clearly relate to this case, the Court found

6  the document non-responsive to the report by Dr. Leitzinger,

7  rebutting the opinions of other experts whose testimony is not

8  presently before the Court.  The Rothman Report's two principle

9  critiques are:  (1) that plaintiffs' experts provide insufficient

10  economic basis for linking Mitsubishi to the CRT conspiracy; and

11  (2) that plaintiffs' experts presented no evidence that plaintiffs

12  paid overcharges on purchased of CRTs from Mitsubishi (vice any

13  other conspirator).  Rothman Report ¶ 5.[45]

14      Even had Dr. Rothman's report been directly responsive to Dr.

15  Leitzinger's latest report and even if both Dr. Rothman's concerns

16  remained valid, the Court is still not tasked with resolving

17  conflicts between opposing experts when evaluating predominance.

18  See Amgen, 133 S. Ct. at 1194-96; DRAM, 2006 U.S. Dist. LEXIS 39841

19  at *45, 2006 WL 1530166 at *9.  In analyzing the arguments of DPPs,

20  Mitsubishi, and related experts of each, the Court reiterates that

21  its task at this stage is simple: it must determine whether the

22  DPPs have made a sufficient showing that the evidence they intend

23  to present concerning antitrust impact will be made using

24

[44] ECF No. 3708-10 (filed under seal).

25  [45] The Court will not address Dr. Rothman's critiques as applied to
other experts upon whom DPPs do not rely for this motion.  Insofar

26  as Dr. Rothman's concerns might apply to Dr. Leitzinger's report,
the Court notes Dr. Leitzinger has cited a substantial amount of

27  evidence and economic theory to rebut both concerns -- possibly
after taking Dr. Rothman's critiques into account.  However, the

28  Court need not and does not make a finding here for the reasons
that immediately follow.

47

**United States District Court**
For the Northern District of California

generalized proof common to the class, and that these common issues will predominate. DRAM, 2006 U.S. Dist. LEXIS 39841 at *44-45, 2006 WL 1530166 at *9; TFT-LCDs, 267 F.R.D. at 313. The Court only analyzes questions of methodology at this point. Merits questions are for the finder of fact.

The Court finds that the DPPs' presentation of their methodology for determining antitrust damages on a classwide basis is plausible. Dr. Leitzinger's report is supported by both documentary facts and industry data, his approach to determining whether Mitsubishi was part of the conspiracy or sold CRT products in connection therewith is based on factual review of evidence produced by DPPs in discovery, and his use of regression and correlation analysis is well established as a means of providing classwide proof of antitrust injury and damages. See, e.g., TFT-LCDs, 267 F.R.D. at 313 (citing cases). Insofar as Mitsubishi provides any expert analysis for the Court to consider, the issues raised are not methodological challenges but rather merits-based issues properly left for trial.

The Court is therefore satisfied that DPPs have shown by a preponderance of the evidence that there is a viable methodology DPPs could present at trial to show damages (irrespective of whether such a methodology would ultimately succeed).

### v. Superiority

As part of the predominance analysis, DPPs must also demonstrate that a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3). DPPs do so demonstrate. See Mot. at 25. Mitsubishi does not separately challenge the superiority of

**United States District Court**
For the Northern District of California

1  proceeding as a class, and insofar as its arguments may be relevant
2  they have been addressed above.

3      Per Rule 23 and upon review of the evidence presented, the
4  Court finds: (1) that class members have an interest in ceding
5  individual control of the prosecution or defense of separate
6  actions; (2) the extent and nature of the litigation against
7  defendants is extensive beyond the means of most individual
8  plaintiffs; (3) concentrating the litigation in the particular
9  forum is desirable both to expedite review of claims and in
10 accordance with the direction of the Judicial Panel on
11 Multidistrict Litigation; and (4) the difficulties in managing a
12 class action will be relatively few, and certainly far fewer than
13 attempting to consider as individual cases the many claims that
14 would otherwise result from this litigation.  See Rule 23(b)(3).
15 The Court also notes that continuing in the form of a class action
16 will promote judicial efficiency, is likely the only means of
17 recovery for many plaintiffs whose recovery would otherwise be too
18 low to justify the cost of individual litigation, and there seems
19 to be little disagreement among the proposed class regarding
20 whether class treatment would be beneficial.  See Local Joint
21 Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands,
22 Inc., 244 F.3d 1152, 1163 (9th Cir. 2001); Valentino v. Carter-
23 Wallace, Inc., 97 F.3d 1227, 1234-35 (9th Cir. 1996); LCDs, 267
24 F.R.D. at 608 (quoting SRAM, 2008 U.S. Dist. LEXIS 107523 at *49,
25 2008 WL 447592 at *7) ("[i]n antitrust cases such as this, the
26 damages of individual direct purchasers are likely to be too small
27 to justify litigation, but a class action would offer those with
28 ///

**United States District Court**
For the Northern District of California

1   small claims the opportunity for meaningful redress.").   Therefore,
2   the superiority requirement is met.

3        Accordingly, the Court finds that DPPs have carried their
4   burden on predominance under Rule 23(b)(3).

5

6   **V.   CONCLUSION**

7        Upon completion of a "rigorous analysis" of the required
8   elements of class certification, for good cause shown, the Court
9   finds that all the threshold and minimum requirements of Rule 23(a)
10  and 23(b)(3) have been met.

11       Therefore, the Court GRANTS the motion for class certification
12  as against remaining Defendant Mitsubishi.   DPPs are ORDERED to
13  specifically identify the "afilliatte[s]" in the class definition
14  (and class notice) to enable the parties and class members to
15  better determine who is in the class.   DPPs are also granted
16  discretionary leave to amend the underlying complaint within 30
17  days of the date of this Order for the single, <u>limited</u> purpose of
18  conforming its definition(s) of parties with the description of the
19  class as certified in this order.

20

21       IT IS SO ORDERED.

22

23       Dated: July  8 , 2015

24                                           UNITED STATES DISTRICT JUDGE

25

26

27

28