# Exhibit 2

1   Calvin L. Litsey (SBN 289659)
    FAEGRE BAKER DANIELS LLP
2   1950 University Avenue, Suite 450
    East Palo Alto, CA  94303-2279
3   Telephone: +1 650-324-6700
    Facsimile: +1 650-324-6701
4   calvin.litsey@FaegreBD.com

5   Kathy L. Osborn (*pro hac vice*)
    Ryan M. Hurley (*pro hac vice*)
6   FAEGRE BAKER DANIELS LLP
    300 N. Meridian Street, Suite 2700
7   Indianapolis, IN  46204
    Telephone: +1 317-237-0300
8   Facsimile: +1 317-237-1000
    kathy.osborn@FaegreBD.com
9   ryan.hurley@FaegreBD.com

    Jeffrey S. Roberts (*pro hac vice*)
    FAEGRE BAKER DANIELS LLP
    3200 Wells Fargo
    1700 Lincoln Street
    Denver, CO  80203
    Telephone: +1 303-607-3500
    Facsimile:  +1 303-607-3600
    jeff.roberts@FaegreBD.com

    Stephen M. Judge (*pro hac vice*)
    FAEGRE BAKER DANIELS LLP
    202 S. Michigan Street, Suite 1400
    South Bend, IN  46601
    Telephone: +1 574-234-4149
    Facsimile:  +1 574-239-1900
    steve.judge@FaegreBd.com

10  ***Attorneys for Defendants Thomson SA and
    Consumer Electronics, Inc.***

11

12                    **UNITED STATES DISTRICT COURT**

13                  **NORTHERN DISTRICT OF CALIFORNIA**

14                       **SAN FRANCISCO DIVISION**

15

16   IN RE CATHODE RAY TUBE (CRT)          No. 07-cv-5944-SC
     ANTITRUST LITIGATION                  MDL No. 1917

17   _____

18   This Document Relates to:            **THOMSON DEFENDANTS'
                                          OPPOSITION TO DIRECT ACTION
                                          PLAINTIFFS' MOTION TO COMPEL**
19   *Electrograph Systems, Inc. et al. v. Technicolor*   **30(b)(6) TESTIMONY OF THOMSON SA
     *SA, et al., No. 13-cv-05724;*        AND THOMSON CONSUMER
20                                         ELECTRONICS, INC.**

21   *Alfred H. Siegel, as Trustee of the Circuit City
     Stores, Inc. Liquidating Trust v. Technicolor
22   SA, et al., No. 13-cv-05261;*

23   *Best Buy Co., Inc., et al. v. Technicolor SA, et
     al., No. 13-cv-05264;*
24
25   *Interbond Corporation of America v.
     Technicolor SA, et al., No. 13-cv-05727;*
26
     *Office Depot, Inc. v. Technicolor SA, et al., No.
27   13-cv-05726;*

28   *Costco Wholesale Corporation v. Technicolor*

1   *SA, et al., No. 13-cv-05723;*

2   *P.C. Richard & Son Long Island Corporation,*
3   *et al. v. Technicolor SA, et al., No. 31:cv-*
    *05725;*
4
5   *Schultze Agency Services, LLC, o/b/o Tweeter*
    *Opco, LLC, et al. v. Technicolor SA, Ltd., et al.,*
6   *No. 13-cv-05668;*

7   *Sears, Roebuck and Co. and Kmart Corp. v.*
    *Technicolor SA, No. 3:13-cv-05262;*
8
9   *Target Corp. v. Technicolor SA, et al., No. 13-*
    *cv-05686*

10  *Tech Data Corp., et al. v. Hitachi, Ltd., et al.,*
    *No. 13-cv-00157*
11
12  *Sharp Electronics Corp., et al. v. Hitachi, Ltd.,*
    *et. al., No. 13-cv-01173*
13
14  *ViewSonic Corporation v. Chunghwa Corp., et*
    *al., No. 14-cv-02510*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.    INTRODUCTION

The Supreme Court has long recognized that memoranda prepared by outside counsel reflecting counsel's interviews of a corporation's current or former employees for purposes of providing the corporation legal advice about pending or threatened litigation are protected by the attorney-client privilege and work product doctrine and are not discoverable. *Upjohn v. United States*, 449 U.S. 383, 395-400 (1981).  Indeed, the forced disclosure of the contents of such materials "is particularly disfavored because it tends to reveal the attorney's mental processes." *Id*. at 399.  Accordingly, such materials are afforded "special protection."  *Id*. at 400.

Moreover, while facts communicated during privileged employee interviews are not shielded from discovery merely because they were communicated to an attorney, it does not follow that a corporation must prepare a Rule 30(b)(6) designee to reveal the contents of privileged attorney interview memoranda.  Instead, as numerous courts have recognized, a party may discover these facts by directly deposing the individual witness who was interviewed by the corporation's counsel.  *See id*. at 396 (emphasizing that results of internal investigation could not be discovered from corporation but that the opposing party "was free to question the employees who communicated with [inside] and outside counsel."); *Hickman v. Taylor*, 329 U.S. 495, 509 (1947) (holding that attorney's witness interview notes could not be discovered, but that "the essence of what petitioner seeks … is readily available to him direct from the witnesses for the asking."); *Admiral Ins. Co. v. U.S. Dist. Court for Dist. of Arizona,* 881 F.2d 1486, 1492 (9th Cir. 1989) (finding memoranda reflecting corporation's interviews of former employees may not be discovered, but that information communicated by the witnesses could be discovered "by deposing the employees.")

Direct Action Plaintiffs ("DAPs") seek to discover the results of privileged, work product protected interviews conducted by outside counsel for Thomson SA and Thomson Consumer Electronics, Inc. ("Thomson Consumer") (collectively the "Thomson Defendants") by compelling them to prepare their Rule 30(b)(6) designee to review the protected materials and testify about their factual content.    As discussed below, and as supported by case law, compelling such testimony would be tantamount to compelling production of the privileged witness memoranda.

1

DAPs' attempts to discover this privileged and protected information is improper and not supported by applicable case law, which, as noted above, recognizes that the proper manner to discover information in the possession of the Thomson Defendants' former employees is to depose these individuals directly.  Indeed, if the DAPs could force the Thomson Defendants to prepare a Rule 30(b)(6) representative to testify regarding the contents of privileged memoranda prepared during the course of an internal investigation, the attorney-client privilege and work product protections traditionally afforded to such materials would be eviscerated.  The Court should not countenance such a result especially when, as here, alternative means exist to discover this information through depositions of individual witnesses.  Therefore, DAPs' motion to compel should be denied.

## II.    FACTUAL BACKGROUND

Upon receiving a subpoena from the United States Department of Justice ("DOJ") and notice from the European Commission ("EC") regarding those agencies' investigations into potentially anticompetitive conduct in the cathode ray tube ("CRT") industry, in late 2007, the Thomson Defendants engaged the outside law firm Sullivan and Cromwell LLP ("Sullivan") to conduct an internal investigation into the Thomson Defendants' participation, if any, in the alleged conduct.  (Declaration of Jeffrey S. Roberts in Support of Thomson Defendants' Opposition to Direct Action Plaintiffs' Motion to Compel 30(b)(6) Testimony ("Roberts Decl.") at ¶ 2, attached as **Ex. 1**.)  So that it could provide legal advice to the Thomson Defendants and assist them in responding to the EC and/or DOJ, Sullivan conducted a series of interviews with then current or former employees of the Thomson Defendants.[1]  (*Id*. at ¶ 3.)  The Sullivan attorneys selected the subjects addressed and questions posed during the interviews and then, after the interviews were completed, prepared memoranda which summarized the results of the interviews based on the attorneys' understanding and judgments of which comments made by the

---

[1] The identity of the individuals counsel selected to interview is protected work product.  *In re MTI Tech. Corp. Sec. Litig. II,* 2002 WL 32344347, at *3 (C.D. Cal. June 13, 2002); *Mitchell Engineering v City and County of San Francisco,* 2010 WL 1853493, at *1 (N.D. Cal. May 6, 2010).

attorneys and interviewees were important and potentially legally significant ("Sullivan Memos"). (*Id.* at ¶ 4.) The memoranda are not verbatim records of the interviews, do not contain any clearly delineated "fact" sections, and reflect the mental impressions, opinions, and conclusions of the attorneys regarding the interviews, including the legal import of the information the interviewees provided. (*Id.* at ¶ 5.)

In May 2014, as part of its defense of the instant actions, the Thomson Defendants' current outside law firm, Faegre Baker Daniels LLP ("Faegre") conducted a limited number of interviews of certain former employees of Thomson SA. (*Id.* at ¶ 6.) Thomson Consumer's General Counsel, Ms. Meggan Ehret, was also present during some of these interviews. (*Id.* at ¶ 7.) Faegre attorneys selected the subjects addressed and questions posed during the interviews and then, after the interviews were completed, prepared memoranda which summarized the results of the interviews based on the attorneys' understanding and judgments of which comments made by the attorneys and interviewees were important and potentially legally significant ("Faegre Memos"). (*Id.* at ¶ 8.) Like the Sullivan Memos, the Faegre Memos are not verbatim records of the interviews, do not contain any clearly delineated "fact" sections, and reflect the mental impressions, opinions, and conclusions of the attorneys regarding the interviews, including the legal import of the information the interviewees provided. (*Id.* at ¶ 9.)

Since discovery against the Thomson Defendants in these actions began, the Thomson Defendants have produced to the Plaintiffs over 283,000 bates labeled pages of documents. Because many of these documents were produced in native format with a single bates number and many of these native files are twenty pages or longer, the Thomson Defendants have likely produced over 1 million pages of documents. (*Id.* at ¶ 10.) To date, DAPs have deposed five former employees of Thomson Consumer – Mr. Jack Brunk, a former CPT salesman, Mr. Tom Carson, a former manager of Thomson Consumer's CPT sales and operations, Mr. J.P. Hanrahan, a former manager of Thomson Consumer's NAFTA CPT sales, Mr. Alex Hepburn, a former NAFTA CPT market intelligence analyst, and Mr. Jack Hirschler, a former CPT salesman. DAPs also deposed the only current Thomson Consumer employee who played a meaningful role in its former CPT business, Ms. Jackie Taylor-Boggs, an executive formerly responsible for procuring

raw materials used to manufacture CPTs and related components.  (*Id.* at ¶ 11.)    The Court has also granted DAPs' motions for issuance of letters of request seeking judicial assistance, which have been served on the French court, so that in accord with Hague Convention procedures, DAPs may take the depositions of four former Thomson SA employees in France – Mr. Emeric Charamel, a former CPT salesman, Mr. Christian Lissourges, a former manager of CPT sales, Ms. Agnes Martin, a former market intelligence analyst, and Mr. Didier Trutt, a former manager of CPT operations.    On January 22, 2015, counsel for DAPs informed the Thomson Defendants "that the clerk at the Paris court responsible for overseeing the letters of request has received the letters of request and has reserved a courtroom on March 6, 9, and 10 for our requested depositions.  We understand that a judge will be assigned to the matter within one or two weeks, and that the judge will issue witness notices shortly thereafter."  (Jan. 22, 2015 Email from C. Benson, attached as **Ex. 2**.)    Accordingly, DAPs will soon depose former Thomson SA employees from whom they may directly discover potentially relevant facts.  In addition to this discovery, DAPs have received millions of pages of documents and deposed over one hundred individuals from the Thomson Defendants' alleged co-conspirators.

On January 8-9, 2015, the DAPs and DPPs took the Fed. R. Civ. P. 30(b)(6) depositions of the Thomson Defendants.  Ms. Ehret, the Thomson Defendants' Rule 30(b)(6) designee,[2] spent over 100 hours preparing for the deposition by reviewing documents, attending depositions, and communicating with current and former employees.  (*See* Thomson Defendants' Rule 30(b)(6) Depo. at 384:14-25; 526:1-18; 589:16-590:10, attached as **Ex. 3**.)  However, because they are protected by the attorney client privilege and the work product doctrine, Ms. Ehret did not review in preparation for the deposition and has never read at any other time, the Sullivan and Faegre Memos.  (*Id.*at 538:19-540:12.)

---

[2] Because the Thomson Defendants exited the CPT industry in 2005, no individuals with significant knowledge regarding the Thomson Defendants' former CPT business are still employed by the companies.  Accordingly, the Thomson Defendants designated Ms. Ehret, who attended several of the depositions that DAPs have conducted of former Thomson Consumer employees, as their Rule 30(b)(6) designee.

During the Rule 30(b)(6) deposition the Thomson Defendants' counsel instructed Ms. Ehret not to testify about information she learned while attending the Faegre interviews, if the Faegre interview was Ms. Ehret's only source of information about the topic. (*See e.g*., **Ex. 3** at 661:14-663:14.)   However, to the extent Ms. Ehret possessed information about the topic from any other non-privileged source, she was permitted to testify.   (*Id*.)   As such, during the Rule 30(b)(6) deposition Ms. Ehret did not testify about: (1) the contents of the Sullivan and Faegre Memos and (2) her recollection of information she learned exclusively through her attendance at some of the Faegre interviews.

## III.     ARGUMENT

### A.     The Sullivan and Faegre Memos are Protected by the Attorney-Client Privilege and May Not Be Discovered.

The attorney-client privilege precludes discovery of confidential communications between attorneys and their clients made for the purpose of seeking or reflecting legal advice. *See* 8 Wigmore Evidence § 2292 at 554. The privilege "applies to communications by any corporate employee regardless of position when the communications concern matters within the scope of the employee's corporate duties and the employee is aware that the information is being furnished to enable the attorney to provide legal advice to the corporation." *Admiral Ins. Co.,* 881 F.2d at 1492 (citing *Upjohn*, 449 U.S. at 394).   The attorney-client privilege also applies to communications with former employees because "[f]ormer employees, as well as current employees, may possess the relevant information needed by corporate counsel to advise the client with respect to actual or potential difficulties." *Id*. at 1493.   Critically, the Ninth Circuit has emphasized that "there is no unavailability exception to the attorney-client privilege" – it bars discovery of attorney-client communications even when information provided to the attorney may not be discovered from another source. *Id*. at 1488.

For example, in *Admiral Ins. Co.,* a corporation engaged outside counsel to conduct interviews of company employees regarding its investigation into potential securities laws violations. *Id*. at 1489.   One of the employees interviewed by outside counsel invoked his privilege against self-incrimination when noticed for a deposition in civil litigation brought against the company. *Id*.   In response, plaintiffs sought production of the statements the

employee had given to the corporation's counsel.  *Id*.  The Ninth Circuit rejected plaintiff's request, holding that the statements given to the corporation's counsel were "protected unequivocally by the attorney-client privilege."  *Id*. at 1490.   Quoting *Upjohn*, the Court recognized, as DAPs argue here, that "the privilege only protects disclosure of communications; it does not protect the disclosure of the underlying facts by those who communicated with the attorney."  *Id*. at 1493.  Thus, the Ninth Circuit explained that in the typical circumstance, "the adverse party could discover the information contained in the [interviews] *by deposing the employees*."  *Id*. (emphasis added).

Although, as a result of the employee's decision to invoke the *fifth amendment,* the "plaintiffs' ability to discover the underlying facts may be impeded," this did not justify creating an unavailability exception to the attorney-client privilege that would have allowed the plaintiffs to discover the contents of outside counsel's interviews.  *Id*.  "An unavailability exception to the privilege would force counsel to warn their clients against communicating sensitive information for fear of subsequent forced disclosure.   Here, but for the attorney-client privilege, [the corporation] might not have directed [the employee] to speak to counsel for fear of creating a transcribed statement for plaintiffs' benefit."  *Id*. at 1495.  Allowing the plaintiffs to discover the contents of the privileged interview because the employee himself could not be deposed "either would destroy the privilege or render it so tenuous and uncertain that it would be 'little better than no privilege at all.'"  *Id*. at 1495 (quoting *Upjohn*, 449 U.S. at 353); *see also, Upjohn,* 449 U.S. at 396 (finding plaintiff "was free to question the employees who communicated with [in-house] and outside counsel" and that although it would be more convenient if, rather than deposing the employees, the privileged results of the internal investigation could be discovered, "such considerations of convenience do not overcome the policies served by the attorney-client privilege.")

Application of these principles here mandates finding that the contents of the Sullivan and Faegre Memos are protected from disclosure by the attorney-client privilege.   Instead of attempting to force the Thomson Defendants' Rule 30(b)(6) representative to testify about the privileged Sullivan and Faegre interviews, DAPs may discover facts by deposing former

6

employees directly.  That is exactly what DAPs have done.  In addition to deposing over one-hundred individuals who worked for the Thomson Defendants' alleged co-conspirators, they have deposed current or former Thomson Consumer employees Jack Brunk, Tom Carson, Jackie Taylor-Boggs, J.P. Hanrahan, Alex Hepburn, and Jack Hirschler  and a French court has reserved dates in March of former Thomson SA employees Emeric Charamel, Christian Lissourges, Agnes Martin, and Didier Trutt.[3]  (Jan. 22, 2015 Email from C. Benson, attached as **Ex. 2**.) Accordingly, DAPs will soon depose former Thomson SA employees from whom they may directly discover potentially relevant facts.[4]  But even if these individuals could not be deposed by DAPs, the Ninth Circuit's holding in *Admiral Ins. Co.* mandates that the contents of the Sullivan and Faegre Memos may not be discovered by DAPs under any circumstances.  *Admiral Ins. Co.,* 881 F.2d at 1488.

The fact that DAPs seek to discover the contents of the Sullivan and Faegre Memos through a Rule 30(b)(6) deposition instead of through production of the memos themselves does not change this result.  As the *Admiral Ins. Co.* Court emphasized, if exceptions to the privilege are created corporate counsel will be forced "to warn their clients against communicating sensitive information for fear of subsequent forced disclosure" and counsel will forego creating memoranda summarizing the results of internal investigations out of fear that they will be forced to disclose their sensitive, otherwise privileged contents during a Rule 30(b)(6) deposition.  *Id.* at 1494; *Hickman v. Taylor,* 329 U.S. 495, 512-13 (1947) ("forcing an attorney to repeat or write out all that witnesses have told him and to deliver the account to his adversary gives rise to grave dangers of inaccuracy and untrustworthiness.   No  legitimate  purpose  is  served  by  such production.").  Such a Rule 30(b)(6) deposition privilege exception "either would destroy the privilege or render it so tenuous and uncertain that it would be little better than no privilege at

---

[3] Of course nothing prevented DAPs from identifying additional former employees of the Thomson Defendants to depose, but assuming the French depositions go forward, DAPs will have deposed all of the individuals they identified for depositions.

[4] Assuming these dates hold, DAPs will depose three French witnesses the Thomson Defendants' counsel interviewed in May 2014, plus Mr. Lissorgues.  (*See* DAPs' Mot. at 3.)

7

1    all." *Admiral Ins. Co.,* 881 F.2d at 1495.  Consistent with Ninth Circuit authority, the Court

2    should bar DAPs from discovering from the Thomson Defendants the contents of the Sullivan

3    and Faegre Memos.

4    **B.    The Sullivan and Faegre Memos are Protected Opinion Work Product.**

5              First recognized in *Hickman v. Taylor,* 329 U.S. 495 (1947), the work product doctrine

6    provides that a "party may not discover documents and tangible things that are prepared in

7    anticipation of litigation or for trial" unless "the party shows that it has substantial need for the

8    materials to prepare its case and cannot, without undue hardship, obtain their substantial

9    equivalent by other means." Fed.R.Civ.P. 26(b)(3)(A).  Under Ninth Circuit law, the level of

10   protection provided depends on whether the relevant materials constitute fact or opinion work

11   product.  If the work product "contains only non-privileged facts and a party satisfies the

12   substantial need and undue hardship elements, a court may order discovery of the relevant

13   materials, known as fact work product." *SEC v. Berry*, 2011 WL 825742 *8 (N.D. Cal. Mar. 7,

14   2011).  "However, courts must further protect against the disclosure of 'opinion work product' –

15   that is, the mental impressions, conclusions, opinions, or legal theories of a party concerning the

16   litigation.  Under Ninth Circuit law, such opinion work product is discoverable only if it is at

17   issue in the case and the need for the material is compelling." *Id.* (internal quotations and

18   citations omitted); *see also Holmgren v. State Farm Mut. Auto. Ins. Co.,* 976 F.2d 573, 577 (9th

19   Cir. 1992).

20             The Sullivan and Faegre Memos, as well as Ms. Ehret's impressions of the limited

21   number of interviews she attended of former Thomson SA employees in May 2014, are classic

22   opinion work product and thus may not be discovered because the mental impressions of the

23   Thomson Defendants' attorneys are not at issue in this litigation.  *SEC v. Berry*, 2011 WL 825742

24   at 9; *see also O'Conner v. Boeing North America*, 216 F.R.D. 640, 643 (C.D. Cal. 2003) (citing

25   cases stating that an attorney's witness interview notes and memoranda are opinion work

26   product).  For example, in *Upjohn Co.,* the Supreme Court considered whether attorney's notes

27   from employee interviews were protected from disclosure. 449 U.S. at 400-402. The Court held

28   that the attorney's mental impressions qualified as work product, and also that the work product

doctrine protected from disclosure the underlying facts contained within the notes and reports to the extent that the facts were only preserved in the minds of the attorneys who conducted the interviews and subsequent writings they prepared. *Id*. The Court noted that the party seeking disclosure in that case cited to language from *Hickman* in which the Court recognized that there might be certain circumstances where facts embedded in written materials prepared by an adversary's counsel could be discovered. *Id*. at 399. The Court emphasized, however, that this language from *Hickman* "did not apply to 'oral statements made by the witness . . . whether presently in the form of [the attorney's] mental impressions or memoranda.' As to such material the Court did "not believe that any showing of necessity can be made under the circumstances of this case to justify production . . . Forcing an attorney to disclose notes and memoranda of witnesses' oral statements is particularly disfavored because it tends to reveal the attorney's mental processes," and that the memoranda are afforded "special protection." *Id*. at 399-400 (*quoting Hickman,* 329 U.S. at 513 ("the statement would be [the attorney's] language, permeated with his inferences")); *see also* Fed. R. Civ. P. 26 1970 advisory committee's note ("The *Hickman* opinion drew special attention to the need for protecting an attorney against discovery of memoranda prepared from recollection of oral interviews. The courts have steadfastly safeguarded against disclosure of lawyers' mental impressions and legal theories.").

Similarly, in *Mitchell Engineering v City and County of San Francisco,* the plaintiff moved to compel production of witness interview notes. *See* 2010 WL 1853493, at *1 (N.D. Cal. May 6, 2010). The district court held that the notes constituted protect attorney work protect, and cited *Hickman,* 329 U.S. at 508, for the proposition that "an investigator's notes of witness interviews … are likely to be permeated with the investigator's own impressions and possibly even attorney theories or strategies, and are therefore protected from discovery." *Id*. Like the DAPs here, the plaintiff sought to circumvent the work product doctrine by conducting a deposition of the investigator "regarding the facts he learned through his investigation and his interviews with various witnesses." *Id*. at 2. Judge Illston rejected the request holding that "it would be unworkable for [the plaintiff] to re-depose [the investigator] and ask him to list the facts he learned during his investigation." *Id*. While the plaintiff was free to attempt to discover these

9

facts by deposing the underlying witnesses themselves, he could not obtain them by deposing the opposing party's investigator.  *Id.*; s*ee also S.E.C. v. Morelli,* 143 F.R.D. 42, 47 (S.D.N.Y. 1992) (proposed 30(b)(6) deposition was an impermissible attempt to inquire into the mental processes and strategies of the Securities and Exchange Commission and was thus barred by the work-product privilege).

The Sullivan and Faegre Memos and Ms. Ehret's impressions of the limited number of interviews she attended of former Thomson SA employees in May 2014 constitute opinion work product because they do not reflect verbatim recitations of the interviewees' own words, but instead constitute the attorneys' thought processes in recalling, interpreting, and analyzing the interviews. (Roberts Decl. at ¶¶ 4-5, 8-9.)  And the very questions counsel asked and the issues discussed with the witness reflect mental impressions, opinions, and strategy of the Thomson Defendants' counsel.  *Mitchell Engineering*, 2010 WL 1853493, at *1; *In re Linerboard Antitrust Litig.,* 237 F.R.D. 373, 386 (E.D. Pa. 2006) (party could not discover facts learned by opposing counsel during internal investigation because those facts were "thoroughly intertwined" with attorney's mental impressions and  the questions the attorney chose to ask to elicit those facts, which were themselves "core work product.")  As the *Upjohn* Court recognized, because they will necessarily be inextricably intertwined with an attorney's protected opinions and mental impressions, oral statements made by a witness to an attorney may not be discovered from the attorney or the attorney's client, but instead must be discovered from the witness.  *Upjohn,* 449 U.S. at 396, 400-2; *In re Linerboard Antitrust Litig.,* 237 F.R.D. at 386 (finding that "[i]t is hard to conceive of a circumstance in which an attorney's mental impressions would be more thoroughly intertwined with facts than in the counsel's recollection of an internal investigation.").  Thus, there is no way to separate the "facts discussed during each interview,"[5] as DAPs seek in their motion, from the attorneys' mental impressions, thought processes, and strategy in selecting the subject matter discussed and questions posed during the interviews.[6]

---

[5] (*See* DAPs' Mot. at 7.)

[6] As noted above, nor are DAPs entitled to "the identify of each person interviewed" (DAPs' Mot. at 7) because such information is protected by the work product doctrine.

Barring "exceptional" circumstances when the facts are not available from any other source, courts have rejected attempts to use "a Rule 30(b)(6) witness to discover facts within an attorney's knowledge without asking counsel directly." *In re Linerboard Antitrust Litig.,* 237 F.R.D. at 380.  In *In re Linerboard Antitrust Litig.,* the plaintiffs, like the DAPs here, sought to conduct a Rule 30(b)(6) deposition of one of the defendants regarding facts it discovered during its internal investigation regarding alleged anticompetitive conduct.  *Id.* at 378-380.  The plaintiffs argued that as part of the Rule 30(b)(6) designee's deposition preparation, the designee "should be required to speak with [defendant's counsel] and educate himself with all facts [counsel] recalls from the internal investigation." *Id.* at 379.  The defendant objected, arguing that answering such questions would necessarily require it to divulge privileged and work product protected information.  *Id.* at 378.

The court agreed with the defendant, finding that "any facts learned during [counsel's] internal investigation [were] so intertwined with mental impressions that it amounts to opinion work product and is, therefore, not subject to discovery." *Id.* at 379.  The court explained that if a Rule 30(b)(6) designee is required to become educated with all facts within the corporation's attorneys' knowledge, a "Rule 30(b)(6) deposition will become the functional equivalent of a deposition of [counsel]" regarding all information counsel learned while serving her client.  *Id.* at 384.[7]  Finally, the court emphasized that it was concerned about the accuracy of information that might be gleaned about the internal investigation, since the reliability of information obtained during an internal interview "is subject to many factors, including interview conditions, delays in recording the interviews, and the attorney's editorial discretion." *Id.* at 386 (quoting *In re Grand Jury Investigation,* 599 F.2d 1224, 1231 (3rd Cir. 1979).)  Accordingly, the court held that the

---

[7] The *Linerboard* court also noted that opposing counsel may only be deposed if: (1) no other means exist to obtain the information; (2) the information sought is relevant and not privileged; and (3) the information sought is crucial to preparation of the case.  *Id.* at 385 (citing *Shelton v. American Motors Corp.,* 805 F.2d 1323, 1327 (8th Cir. 1986).)  These factors were not satisfied because the plaintiffs were free to depose the individuals who were interviewed by defense counsel and plaintiffs had failed to establish that the information they sought was crucial to the preparation of their case.  *Id.* at 385-87.

defendant was not required to educate its Rule 30(b)(6) designee about all facts the corporation's counsel learned during its internal investigation. *Id*. at 379-80, 390.

The Court should apply the same principles in this case and deny DAPs' motion. Any facts learned by Sullivan and Faegre during their internal investigations are so intertwined with the Thomson Defendants' attorneys mental impressions that they amount to opinion work product that may not be discovered because they are not at issue in this litigation. *Holmgren v. State Farm Mut. Auto. Ins. Co.,* 976 F.2d at 577. Moreover, even if the Court determined that this information constituted mere fact work product – which it does not – DAPs cannot establish that they have a "substantial need" for information that is otherwise available to them through depositions of individual fact witnesses. *See* Fed.R.Civ.P. 26(6)(3). Nor can DAPs establish that they are entitled to the functional equivalent of a deposition of the Thomson Defendants' attorneys. *Shelton*, 805 F.2d at 1327.

## C.     The Thomson Defendants' Rule 30(b)(6) Representative Should Not Be Compelled to Testify Regarding Statements of Former Employees.

Even if the attorney-client privilege and the work product doctrine did not preclude the DAPs from discovering the contents of the Sullivan and Faegre Memos – which they do – the Thomson Defendants should not be compelled to adopt statements made by former employees as binding Rule 30(b)(6) testimony. While the Ninth Circuit has not decided the issue, other courts have held that the testimony of the Rule 30(b)(6) representative binds the corporation, and thus, during a Rule 30(b)(6) deposition the deposing party is entitled to discover the "corporation's positions." *Louisiana Pac. Corp. v. Money Market 1 Institutional Investment Dealer et al.,* 285 F.R.D. 481, 487 (N.D. Cal. 2012). However, it is well-settled that the testimony of former employees does not bind a corporation. *See, e.g., EEOC v. Dana Corp.,* 202 F.Supp.2d 827, 830 (N.D. Ind. 2002); *Orlowski v. Dominick's Finer Foods, Inc.,* 937 F.Supp. 723, 728 (N.D. Ill. 1996); *Durham v. Advance Stores Co. Inc.,* 2007 WL 2903206, *1 (S.D. Miss. Sept. 30, 2007) ("former employee's statements cannot bind the corporation and are not excluded from the hearsay rule as admissions"). Thus, the Thomson Defendants' Rule 30(b)(6) designee is not required to adopt as binding corporate testimony statements that were made by former employees

12

during privileged interviews.  Again, to the extent the DAPs wish to discover information possessed by former employees of the Thomson Defendants, DAPs have been afforded ample opportunity to depose such individuals.

**D.     The Cases Cited By DAPs Do Not Require the Thomson Defendants' Rule 30(b)(b) Designee to Review and Testify About the Contents of the Sullivan and Faegre Memos.**

The cases cited by DAPs do not support the proposition that a party may use a Rule 30(b)(6) deposition to compel the opposing party to testify about the contents of privileged, work product protected interview memoranda that were prepared for purposes of providing legal advice to a corporation.   Indeed, if a Rule 30(b)(6) deposition could be used for such a purpose the strong privilege and work product protections the *Upjohn* Court emphasized would be effectively destroyed.

DAPs rely heavily on *Sprint Communications Co., L.P. v. TheGLOBE.Com, Inc.,* but it does not require the Thomson Defendants' designee to testify about the contents of the Sullivan and Faegre Memos.   In that case, Sprint filed a patent infringement suit alleging that the defendants infringed its patents.  236 F.R.D. 524, 526 (D. Kan. 2006).  The defendants sought to conduct a Rule 30(b)(6) deposition of Sprint regarding the facts surrounding the preparation and filing of the patents and Sprint filed a motion for protective order arguing that the employee inventor had died and the only other individuals with knowledge about the noticed topics were in-house Sprint attorneys.  *Id*. at 526-27.  Sprint asserted that a deposition of these attorneys was improper because there is a general prohibition against depositions of opposing counsel and "all information pertaining to the subjects listed in the Notice are protected from disclosure by attorney-client privilege." *Id*. at 527.  The Court rejected Sprint's argument, stating that "[w]hile it is conceivable that every relevant piece of information regarding 'preparing, filing and revising' Sprint's Patents could be found as privileged and protected communications, Sprint has not established this proposition in its briefing." *Id*. at 529.  The Court ordered Sprint to prepare a 30(b)(6) designee to testify about non-privileged information, but also recognized that while preparing its designee "counsel may wish to exercise caution in preparing the witness or witnesses with privileged information or documents, otherwise the privilege may be waived." *Id*.

This is exactly what the Thomson Defendants and their counsel did to prepare for the Rule 30(b)(6) deposition.  Ms. Ehret spent over 100 hours reviewing non-privileged sources to prepare to testify about over 35 highly-detailed topics regarding a business the Thomson Defendants exited ten years ago.   As a result of her diligent preparation, Ms. Ehret testified at length about the noticed topics even though no current employees of the Thomson Defendants possess detailed knowledge about the noticed topics.  However, the Thomson Defendants' Rule 30(b)(6) designee was not obligated to review or be prepared to testify about the results of the Thomson Defendants' privileged interviews of their former employees.  Neither *Sprint Communications,* nor any other case cited by DAPs holds otherwise. *See e.g. Great American Ins. Co. v. Vegas Construction Co., Inc.,* 251 F.R.D. 534, 541 (D. Nev. 2008) (ordering party to produce adequately prepared Rule 30(b)(6) designee, but not addressing whether corporation is obligated to testify regarding privileged internal investigation).

Finally, DAPs' request for attorney's fees is wholly without merit.  Such sanctions are only granted where the opposing party's objections are not "substantially justified."  Fed. R. Civ. P. 37(a)(5)(A)(ii).  Based on the authority discussed above, the Thomson Defendants have in good faith refused to disclose the contents of the privileged, work product protected Sullivan and Faegre interviews.  As such, the Thomson Defendants are more than "substantially justified" in opposing this motion to compel, and sanctions are not warranted. *See Santana Row Hotel Partners, L.P. v. Zurich Am. Ins. Co.,* 2007 WL 1168677, at *3 (N.D. Cal. Apr. 18, 2007); *Palmer v. Stassinos,* 2005 WL 3868003, at *5 (N.D. Cal. May 18, 2005) (request for attorney's fees denied where defendant made "valid objections" to plaintiffs' discovery requests); *Devaney v. Continental Am. Ins. Co.,* 989 F.2d 1154, 1163 (11th Cir. 1993) ("An individual's discovery conduct should be found 'substantially justified' under Rule 37 if it is a response to a genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action.").

## IV.   CONCLUSION

For the foregoing reasons, the Sullivan and Faegre Memos and Ms. Ehret's impressions of the limited number of May 2014 interviews of former Thomson SA employees are protected from

1    disclosure by the attorney-client privilege and the work product doctrine. The DAPs' motion to

2    compel should be denied.

3

4    Dated:  January 27, 2015                    Respectfully submitted,

5

6                                                 */s/ Kathy L. Osborn*
                                                 Kathy L. Osborn (*pro hac vice*)
                                                 Ryan M. Hurley (*pro hac vice*)
7                                                FAEGRE BAKER DANIELS LLP
                                                 300 N. Meridian Street, Suite 2700
8                                                Indianapolis, IN  46204
                                                 Telephone: +1-317-237-0300
9                                                Facsimile: +1-317-237-1000
                                                 kathy.osborn@FaegreBD.com
10                                               ryan.hurley@FaegreBD.com

11                                               Jeffrey S. Roberts (*pro hac vice*)
                                                 FAEGRE BAKER DANIELS LLP
12                                               3200 Wells Fargo Center
                                                 1700 Lincoln Street
13                                               Denver, CO  80203
                                                 Telephone: +1-303-607-3500
14                                               Facsimile:  +1-303-607-3600
                                                 jeff.roberts@FaegreBD.com
15
                                                 Stephen M. Judge (*pro hac vice*)
16                                               FAEGRE BAKER DANIELS LLP
                                                 202 S. Michigan Street, Suite 1400
17                                               South Bend, IN  46601
                                                 Telephone: +1 574-234-4149
18                                               Facsimile:  +1 574-239-1900
                                                 steve.judge@FaegreBd.com
19

20                                               Calvin L. Litsey (SBN 289659)
                                                 FAEGRE BAKER DANIELS LLP
21                                               1950 University Avenue, Suite 450
                                                 East Palo Alto, CA  94303-2279
22                                               Telephone: +1-650 324-6700
                                                 Facsimile: +1-650 324-6701
23                                               calvin.litsey@FaegreBD.com

24                                               ***Attorneys for Thomson SA and Thomson
                                                 Consumer Electronics, Inc.***

25

26

27

28

                                                15

# EXHIBIT 1

1   Calvin L. Litsey (SBN 289659)                    Jeffrey S. Roberts (*pro hac vice*)
    FAEGRE BAKER DANIELS LLP                          FAEGRE BAKER DANIELS LLP
2   1950 University Avenue, Suite 450                 3200 Wells Fargo
    East Palo Alto, CA  94303-2279                    1700 Lincoln Street
3   Telephone: +1 650-324-6700                        Denver, CO  80203
    Facsimile: +1 650-324-6701                        Telephone: +1 303-607-3500
4   calvin.litsey@FaegreBD.com                        Facsimile:  +1 303-607-3600
                                                      jeff.roberts@FaegreBD.com
5   Kathy L. Osborn (*pro hac vice*)
    Ryan M. Hurley (*pro hac vice*)                   Stephen M. Judge (*pro hac vice*)
6   FAEGRE BAKER DANIELS LLP                          FAEGRE BAKER DANIELS LLP
    300 N. Meridian Street, Suite 2700                202 S. Michigan Street, Suite 1400
7   Indianapolis, IN  46204                           South Bend, IN  46601
    Telephone: +1 317-237-0300                        Telephone: +1 574-234-4149
8   Facsimile: +1 317-237-1000                        Facsimile:  +1 574-239-1900
    kathy.osborn@FaegreBD.com                         steve.judge@FaegreBd.com
9   ryan.hurley@FaegreBD.com

10  ***Attorneys for Defendants Thomson***
    ***Consumer Electronics, Inc. and Thomson SA***

11

12                      **UNITED STATES DISTRICT COURT**

13                     **NORTHERN DISTRICT OF CALIFORNIA**

14                         **SAN FRANCISCO DIVISION**

15  IN RE CATHODE RAY TUBE (CRT)            No. 07-cv-5944-SC
    ANTITRUST LITIGATION,                   MDL No. 1917
16  _____

17  This Document Relates to:               **DECLARATION OF JEFFREY S.
                                            ROBERTS IN SUPPORT OF THOMSON
18  *Electrograph Systems, Inc. et al. v.*  DEFENDANTS' OPPOSITION TO
    *Technicolor SA, et al., No. 13-cv-05724;*  DIRECT ACTION PLAINTIFFS'
19                                          MOTION TO COMPEL 30(b)(6)
                                            TESTIMONY**
20  *Alfred H. Siegel, as Trustee of the Circuit*
    *City Stores, Inc. Liquidating Trust v.*
21  *Technicolor SA, et al., No. 13-cv-05261;*

22  *Best Buy Co., Inc., et al. v. Technicolor SA,*
    *et al., No. 13-cv-05264;*
23

24  *Interbond Corporation of America v.*
    *Technicolor SA, et al., No. 13-cv-05727;*
25
    *Office Depot, Inc. v. Technicolor SA, et al.,*
26  *No. 13-cv-05726;*

27  *Costco Wholesale Corporation v.*
    *Technicolor SA, et al., No. 13-cv-05723;*
28

*P.C. Richard & Son Long Island
Corporation, et al. v. Technicolor SA, et al.,
No. 31:cv-05725;*

*Schultze Agency Services, LLC, o/b/o
Tweeter Opco, LLC, et al. v. Technicolor SA,
Ltd., et al., No. 13-cv-05668;*

*Sears, Roebuck and Co. and Kmart Corp. v.
Technicolor SA, No. 3:13-cv-05262;*

*Target Corp. v. Technicolor SA, et al., No.
13-cv-05686*

*Tech Data Corp., et al. v. Hitachi, Ltd., et
al., No. 13-cv-00157*

*Dell Inc. v. Hitachi Ltd.,
No. 13-cv-02171;*

*Sharp Electronics Corp., et al. v. Hitachi,
Ltd., et. al., No. 13-cv-01173*

*ViewSonic Corporation v. Chunghwa Corp.,
et al., No. 14-cv-02510*

I, Jeffrey S. Roberts, hereby declare as follows:

   1.     I am currently an attorney with the law firm Faegre Baker Daniels LLP, counsel for Defendants, Thomson SA and Thomson Consumer Electronics, Inc. ("Thomson Consumer") (collectively, "Thomson Defendants"). I am an active member in good standing of the bars of the State of Colorado and am admitted to practice *pro hac vice* before the United States District Court for the Northern District of California. I make this declaration in support of Thomson Defendants' Opposition to Direct Action Plaintiffs' Motion to Compel 30(b)(6) Testimony of the Thomson Defendants. The statements contained in this declaration are based on my personal knowledge and, if called as a witness, I could competently testify to the following facts.

   2.     Upon receiving a subpoena from the United States Department of Justice ("DOJ") and notice from the European Commission ("EC") regarding those agencies' investigations into potentially anticompetitive conduct in the cathode ray tube ("CRT") industry, in late 2007, the

1     Thomson Defendants engaged the outside law firm Sullivan and Cromwell LLP ("Sullivan") to

2     conduct an internal investigation into the Thomson Defendants' participation, if any, in the

3     alleged conduct.

4          3.      So that it could provide legal advice to the Thomson Defendants and assist them in

5     responding to the EC and/or DOJ, Sullivan conducted a series of interviews with then current or

6     former employees of the Thomson Defendants.

7          4.      The Sullivan attorneys selected the subjects addressed and questions posed during

8     the interviews and then, after the interviews were completed, prepared memoranda which

9     summarized the results of the interviews based on the attorneys' understanding and judgments of

10     which comments made by the attorneys and interviewees were important and potentially legally

11     significant ("Sullivan Memos").

12          5.      I have reviewed the Sullivan Memos and they are not verbatim records of the

13     interviews, do not contain any clearly delineated "fact" sections, and reflect the mental

14     impressions, opinions, and conclusions of the attorneys regarding the interviews, including the

15     legal import of the information the interviewees provided.

16          6.      In May 2014, as part of its defense of the instant actions, the Thomson

17     Defendants' current outside law firm, Faegre Baker Daniels LLP ("Faegre") conducted a limited

18     number of interviews of certain former employees of Thomson SA. I participated in these

19     interviews.

20          7.      Thomson Consumer's General Counsel, Ms. Meggan Ehret, was also present

21     during some of these interviews.

22          8.      The Faegre attorneys selected the subjects addressed and questions posed during

23     the interviews and then, after the interviews were completed, prepared memoranda which

24     summarized the results of the interviews based on the attorneys' understanding and judgments of

25     which comments made by the attorneys and interviewees were important and potentially legally

26     significant ("Faegre Memos").

27          9.      I was involved in the preparation of the Faegre Memos and they are not verbatim

28     records of the interviews, do not contain any clearly delineated "fact" sections, and reflect the

1  mental impressions, opinions, and conclusions of the attorneys regarding the interviews,

2  including the legal import of the information the interviewees provided.

3     10.    Since discovery against the Thomson Defendants in these actions began, the

4  Thomson Defendants have produced to the Plaintiffs over 283,000 bates labeled pages of

5  documents. Because many of these documents were produced in native format with a single bates

6  number and many of these native files are twenty pages or longer, the Thomson Defendants have

7  likely produced over 1 million pages of documents.

8     11.    Since discovery against the Thomson Defendants in these actions began, the

9  plaintiffs have deposed the following current or former employees of Thomson Consumer: (1)

10  Mr. Jack Brunk; (2) Mr. Tom Carson; (3) Mr. J.P. Hanrahan; (4) Mr. Alex Hepburn; (5) Mr. Jack

11  Hirschler; and (6) Ms. Jackie Taylor-Boggs.

12     12.    Attached hereto as **Exhibit 1** is a true and accurate copy of a January 22, 2015

13  email from Mr. Craig Benson.

14     13.    Attached hereto as **Exhibit 2** are true and accurate copies of excerpts of the

15  January 8-9, 2015 Fed.R.Civ.P. 30(b)(6) deposition of the Thomson Defendants.

16     I declare under penalty of perjury, under the laws of the United States of America, that the

17  foregoing is true and correct.

18

19     Executed this 27th day of January 2015, at Denver, Colorado.

20

21                    /s/ Jeffrey S. Roberts_____

22

23

24

25

26

27

28

# EXHIBIT 2

**Subject:**                          French depositions

**From:** "Benson, Craig A" <cbenson@paulweiss.com>
**Date:** January 22, 2015 at 5:10:02 PM EST
**To:** "Osborn, Kathy L." <Kathy.Osborn@faegrebd.com>
**Cc:** "Gallo, Kenneth A" <kgallo@paulweiss.com>
**Subject: French depositions**

Kathy:

We have been informed by our French counsel that the clerk at the Paris court responsible for overseeing the letters of request has received the letters of request and has reserved a courtroom on March 6, 9, and 10 for our requested depositions.  We understand that a judge will be assigned to the matter within one or two weeks, and that the judge will issue witness notices shortly thereafter.

We would therefore like to confer with you, if you intend to represent the witnesses, to learn about their availability on those dates.

Many thanks,
Craig

**Craig Benson | Partner**
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
2001 K Street, NW | Washington, DC 20006-1047
(202) 223-7343 (Direct Phone) | (202) 204-7343 (Direct Fax)
cbenson@paulweiss.com | www.paulweiss.com

This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.

# EXHIBIT 3

Page 321

1                UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
2                  SAN FRANCISCO DIVISION
3
4    In re:                    )
     CATHODE RAY TUBE (CRT)    )CASE NO. 07-cv-05944 SC
5    ANTITRUST LITIGATION      )MDL No. 1917
6
7
8                        VIDEOTAPED
9              DEPOSITION OF MEGGAN EHRET
10                      VOLUME II
11
         The deposition upon oral examination of MEGGAN
12   EHRET, a witness produced and sworn before us,
     Tamara J. Brown, CSR, RMR, CRR, Notary Public in and
13   for the County of Marion, and Janine Ferren, RPR,
     CSR, CRR, Notary Public in Hamilton County, State of
14   Indiana, taken on behalf of the Plaintiffs, at the
     offices of Faegre Baker & Daniels, 300 North
15   Meridian Street, Indianapolis, Marion County,
     Indiana, on the 9th day of January, 2015, pursuant
16   to the Federal Rules of Civil Procedure with written
     notice as to time and place thereof.
17
18
19
20
21
22
23
24
25

Page 382

1  A  There are two emails that appear to be exchanged      10:17:39
2      between the two individuals. Both emails are      10:17:41
3      dated April 24th, 2002.      10:17:44
4  Q  And to the best of your knowledge, is the      10:17:48
5      underlying document, the one that we have had      10:17:51
6      translated, is that a true and correct copy of a      10:17:54
7      document as maintained in the files of Thomson      10:17:58
8      SA?      10:18:01
9          MS. OSBORN: Object to form.      10:18:02
10  A  I can tell you from the Bates label in the      10:18:02
11      bottom right-hand corner with TSA that this was      10:18:04
12      a file in TSA's files that was reviewed and      10:18:07
13      produced to you.      10:18:12
14  Q  And is this a document that was created and      10:18:13
15      maintained in the ordinary course of business at      10:18:15
16      Thomson SA?      10:18:18
17          MS. OSBORN: Object to form. Calls for a      10:18:19
18      legal conclusion.      10:18:20
19  A  I can only tell you about this document based on      10:18:21
20      the Bates label information in the bottom      10:18:24
21      right-hand corner, that it was a document in      10:18:27
22      Thomson SA's files that was in turn produced to      10:18:30
23      you in this litigation.      10:18:32
24  Q  You've told us that Agnes Martin regularly      10:18:33
25      communicated with her colleagues at Thomson by      10:18:36

Page 383

1      email. Correct?      10:18:39
2          MS. OSBORN: Object to form.      10:18:40
3      Mischaracterizes former testimony.      10:18:41
4  A  I have told you that Ms. Martin, based on my      10:18:44
5      review of the documents, Ms. Martin --      10:18:46
6      reasonably available to Thomson SA -- Ms. Martin      10:18:48
7      communicated using email to internal Thomson SA      10:18:52
8      employees.      10:18:56
9  Q  Would you say you have reviewed dozens of emails      10:18:56
10      that Ms. Martin sent to internal Thomson      10:18:59
11      employees?      10:19:01
12          MS. OSBORN: Object to form.      10:19:02
13      Argumentative.      10:19:03
14  A  Very difficult for me to quantify, given the --      10:19:05
15      that there have been numerous emails that I have      10:19:10
16      seen from Ms. Martin in Thomson SA's files to      10:19:12
17      other Thomson SA employees.      10:19:16
18  Q  Do you think it's fewer than a dozen emails that      10:19:17
19      you reviewed from Ms. Martin to other Thomson      10:19:20
20      employees?      10:19:23
21          MS. OSBORN: Object to form. Calls for      10:19:24
22      speculation.      10:19:25
23  A  Your original question to me was dozens and      10:19:26
24      dozens, if I remember.      10:19:29
25  Q  No, it was dozens.      10:19:30

Page 384

1  A  Dozens.      10:19:32
2  Q  Right.      10:19:33
3  A  So that, so now you're asking me did I read 12      10:19:33
4      emails from her?      10:19:35
5  Q  Do you think it's fewer than a dozen?      10:19:37
6          MS. OSBORN: Same objections.      10:19:40
7  A  Yeah, I believe I reviewed more than 12 emails      10:19:41
8      from Ms. Martin in the files of Thomson SA to      10:19:44
9      other Thomson SA employees.      10:19:49
10  Q  Do you believe you read more than two dozen      10:19:50
11      emails?      10:19:52
12          MS. OSBORN: Object to form. Calls for      10:19:55
13      speculation.      10:19:56
14  A  I can't, because I have spent, easy to quantify      10:19:57
15      hours, certainly more than that, but just      10:20:00
16      preparing for this deposition, attending the      10:20:03
17      other depositions, easy to quantify, more than      10:20:06
18      130 hours.      10:20:10
19          If we begin to spend all the time that I      10:20:10
20      have spent generally reviewing the documents, I      10:20:12
21      can't -- I have not paid attention during my      10:20:14
22      deposition prep to counting any records and      10:20:17
23      counting and logging and trying to memorize how      10:20:20
24      many of any one individual's emails I've      10:20:23
25      reviewed.      10:20:26

Page 385

1  Q  Including Ms. Martin?      10:20:29
2  A  She was among the individuals with emails that I      10:20:32
3      have reviewed.      10:20:35
4  Q  And you're unable to say whether you reviewed      10:20:37
5      two dozen of her emails in the hundreds of      10:20:40
6      documents you purport to have reviewed in      10:20:43
7      preparation for this deposition?      10:20:45
8          MS. OSBORN: Object to form. Asked and      10:20:47
9      answered. Argumentative.      10:20:48
10  A  You have asked me whether or not I have reviewed      10:20:50
11      more than 24 records.      10:20:53
12  Q  No, I haven't.      10:20:55
13  A  Okay.      10:20:57
14  Q  I just asked if you -- if you've reviewed two      10:20:58
15      dozen.      10:21:02
16  A  Have I read precisely 24 emails from Ms. Martin?      10:21:03
17          MS. OSBORN: Object to form. Same      10:21:08
18      objections.      10:21:09
19  Q  Do you think that you have read at least 24      10:21:10
20      emails from Ms. Martin in connection with your      10:21:12
21      preparation for this deposition?      10:21:15
22          MS. OSBORN: Same objections. Asked and      10:21:18
23      answered.      10:21:19
24  A  Originally you asked me about emails between      10:21:21
25      Ms. Martin and other Thomson SA employees. Are      10:21:24

17 (Pages 382 - 385)

Page 526

1  Q  Okay.  Are you in a position, as the          15:37:32
2     representative of Thomson Consumer here today,   15:37:34
3     to confirm whether this information was shared   15:37:35
4     by Thomson Consumer with Mr. Shibata,          15:37:37
5     Mr. Iwamoto, and Mr. Usuda on August 19, 2003?  15:37:41
6         MS. OSBORN:  Object to form.             15:37:50
7  A  I would direct you to the deposition testimony  15:37:51
8     of either Mr. Hanrahan or Mr. Hirschler, perhaps  15:37:53
9     both of them.  But I know at least one of them  15:37:57
10    testified as to this document Bates-labeled    15:37:59
11    MTPD-057683E and can -- are in a better position  15:38:05
12    to provide you with information.  Thankfully,   15:38:12
13    today I did not memorize their entire or all of  15:38:16
14    the 1300 pages of deposition testimony by       15:38:19
15    Thomson Consumer former or current employees in  15:38:25
16    preparation for today.  I certainly did review   15:38:25
17    it.  I also attended live, five of those         15:38:29
18    depositions.                                    15:38:32
19  Q  But is your answer that, beyond what you have   15:38:32
20    already told me, beyond referring me to those    15:38:34
21    deposition transcripts, you're not in a position  15:38:37
22    to confirm or deny the contents of that meeting?  15:38:40
23        MS. OSBORN:  Object to form.              15:38:44
24  Q  I think it's a simple question.               15:38:45
25        MS. OSBORN:  Object to form, asked and     15:38:47

Page 527

1     answered.                                       15:38:48
2  A  I think I can answer it the same way.  I can    15:38:49
3     refer you out to their transcripts.             15:38:52
4  Q  Okay.  Next document I'd like to mark is 4820 --  15:38:55
5     it's previously been marked as 5828, 5828E.     15:39:12
6     It's document bearing Bates label MTPD-223790   15:39:17
7     through 792, and the translation of that.       15:39:23
8  A  I have completed review of Deposition          15:42:04
9     Exhibit 5828E.  I didn't read --               15:42:05
10 Q  You didn't read the Korean version?            15:42:09
11 A  I did not.                                     15:42:13
12 Q  Okay.                                          15:42:14
13 A  I skipped that.                                15:42:14
14 Q  Or maybe it's Japanese.                        15:42:14
15        MS. STEWART:  Japanese.                   15:42:17
16 Q  Japanese, sorry.                              15:42:17
17        If I could direct you once again to your --  15:42:18
18    to Exhibit 8111, your supplemental responses to  15:42:19
19    plaintiff's first set of interrogatories, you   15:42:23
20    have identified in your second chart in response  15:42:25
21    to Interrogatory 8 a meeting occurring on       15:42:31
22    August 15th, 2002, in the United States between  15:42:34
23    Shinichi Iwamoto of MTPD and J.P. Hanrahan of   15:42:42
24    Thomson; is that correct?                       15:42:51
25        MS. STEWART:  Objection, mischaracterizes  15:42:53

Page 528

1     the document.                                   15:42:54
2  A  I see that in Thomson Consumer's supplemental  15:42:55
3     answer to Interrogatory 8, there is an entry on  15:42:57
4     there dated 15 August 2002, with a location in   15:43:01
5     the U.S. that identifies two participants in    15:43:05
6     meetings and/or communications.                 15:43:09
7  Q  And those two participants are Shinichi Iwamoto  15:43:13
8     MTPD of J.P. Hanrahan of Thomson.  Are we       15:43:19
9     disagreeing about that?                         15:43:24
10 A  Thomson Consumer.                              15:43:25
11 Q  Thomson Consumer.                              15:43:26
12 A  If you add "Thomson Consumer," then -- then both  15:43:27
13    those names appear there.                       15:43:29
14        MS. STEWART:  Sorry to interrupt.  I would  15:43:32
15    just like to object to this document to the     15:43:33
16    extent it's characterizing MTPD as existing in  15:43:35
17    August 15, 2002.  The company did not yet exist.  15:43:39
18        MR. BENSON:  You're objecting to Thomson   15:43:42
19    Consumer's supplemental interrogatory responses?  15:43:44
20    I just want to make sure which document you're   15:43:46
21    objecting to.                                    15:43:49
22        MS. STEWART:  Yes, or the testimony that's  15:43:50
23    stating that MTPD was in existence prior to     15:43:52
24    that.                                           15:43:54
25        MR. BENSON:  Okay, you're -- okay.  I don't  15:43:54

Page 529

1     know that you can object to testimony, but      15:43:55
2     you're objecting to this document?  Okay.       15:43:57
3  Q  So now let's look back at the exhibit that I    15:44:00
4     have just marked.                               15:44:04
5  A  This is 5828E?                                 15:44:07
6  Q  Correct.  If I could direct you to what appears  15:44:10
7     to be the second email in this chain, it is from  15:44:19
8     Shinichi -- do you see that the "from" line says  15:44:23
9     "Iwamoto Shinichi"?                             15:44:26
10 A  I see, yes, an email that states it is from, I   15:44:33
11    won't try to pronounce the name.                15:44:37
12 Q  Okay.  And it is to -- it's dated Thursday,      15:44:40
13    August 15th, 2002; correct?                     15:44:45
14 A  I see that date.                               15:44:46
15 Q  And that is the same date that is included in    15:44:47
16    Thomson Consumer's chart, 8/15/2002; correct?   15:44:50
17 A  Same date in Thomson Consumer's chart.         15:44:54
18 Q  Okay.  And the subject matter is "Information    15:44:55
19    exchange with Thomson"; correct?                15:44:57
20 A  That is the subject of the email.              15:45:00
21 Q  And this is -- the next line says, "To:         15:45:01
22    President Nakamoto"; correct?                   15:45:03
23 A  I see those words on this page.                15:45:05
24 Q  And the next line says, "Today, J.P. Hanrahan,   15:45:09
25    Thomson's CRT sales GM, came, and we exchanged   15:45:13

53 (Pages 526 - 529)

Page 538

1 Q  Are we disagreeing about that?          15:53:41
2      MS. OSBORN:  Object to form, argumentative.   15:53:43
3 A  I just wanted to make sure I understood your   15:53:44
4      question.                            15:53:46
5      There is no column, there is no Bates label   15:53:48
6   identified for any communication on 15 August   15:53:49
7   2002.                                  15:53:53
8 Q  Thank you.                            15:53:55
9      MS. OSBORN:  Can we take a break?      15:53:55
10     MR. BENSON:  I'm sorry?                15:53:57
11     MS. OSBORN:  We're taking a break.  I need   15:53:58
12  to use the restroom.                      15:54:00
13     MR. BENSON:  Okay.                    15:54:02
14     THE VIDEOGRAPHER:  This ends disk 5.  We   15:54:03
15  are off the record.  The time is 3:53 p.m.   15:54:04
16     (A recess was taken.)                   15:54:09
17     THE VIDEOGRAPHER:  This begins disk 6.  We   15:56:56
18  are on the record.  The time is 4:06 p.m.   16:06:54
19     MR. BENSON:  I just want to make a       16:07:01
20  statement on the record first.             16:07:02
21     We've learned, in the course of this       16:07:03
22  deposition but off the record, that Thomson's   16:07:05
23  prior outside counsel, Sullivan & Cromwell,   16:07:09
24  conducted interviews of then-current and former   16:07:12
25  employees and prepared memoranda that      16:07:16

Page 539

1   memorialized those interviews, and that the   16:07:19
2   30(b)(6) witness has not been educated on the   16:07:25
3   contents of those interviews.             16:07:28
4      We have also learned that there were a   16:07:31
5   limited number of interviews that Thomson's   16:07:34
6   current law firm conducted with three of the   16:07:38
7   French witnesses that we are currently trying to   16:07:40
8   procure for depositions in this case.  We have   16:07:43
9   learned that Ms. Ehret sat in on a couple of   16:07:50
10  those interviews.  And we understand that      16:07:56
11  Thomson's position is that information that was   16:07:58
12  learned in those interviews is not information   16:07:58
13  that is discoverable, and that Ms. Ehret is not   16:08:01
14  revealing any facts learned during the course of   16:08:04
15  those interviews as part of her testimony today.   16:08:07
16     I would like to get a statement on the      16:08:14
17  record as to whether our understanding of those   16:08:15
18  facts is clear.                          16:08:17
19     MS. OSBORN:  I'm rereading just to --      16:08:19
20  You're correct.  In the summary of the       16:08:35
21  facts, I would note that the fact that we did   16:08:36
22  not prepare Ms. Ehret on the content of those   16:08:39
23  notes wasn't for a lack of diligence or lack of   16:08:43
24  preparation, but that those notes contain       16:08:46
25  confidential and privileged attorney-client   16:08:50

Page 540

1   thoughts, memoranda, conclusions, and that they   16:08:53
2   are not discoverable in this matter and,       16:08:55
3   therefore, we did not prepare Ms. Ehret on them.   16:08:59
4   She has not read them.                    16:09:02
5      And our position, as I mentioned on the   16:09:04
6   break, is that the law is very clear that you're   16:09:11
7   not entitled to the information contained in   16:09:13
8   that memoranda.  You're entitled to pursue   16:09:15
9   depositions of the four French witnesses that   16:09:18
10  you've noticed and can learn facts from them.   16:09:21
11  You seem to be well on your way of accomplishing   16:09:24
12  that.  And that is our position on these issues.   16:09:27
13     MR. BENSON:  Okay.  And we have decided,   16:09:29
14  based on our discussions off the record, that --   16:09:34
15  we disagree with your position, as you know, and   16:09:36
16  this is a subject that will be taken up       16:09:40
17  separately, litigating it before the Court.  And   16:09:42
18  I believe you have represented that you will not   16:09:47
19  take the position that our failure to bring the   16:09:49
20  matter to the special master in the context of   16:09:51
21  our deposition today, that will not constitute   16:09:54
22  any waiver of our position that this witness has   16:09:59
23  not been adequately prepared.  And that, if you   16:10:02
24  are not successful in your position that you may   16:10:05
25  legally withhold this information, you will not   16:10:08

Page 541

1   argue that you do not need to make Ms. Ehret   16:10:11
2   available again at the time, educated with the   16:10:14
3   facts that were contained in those interview   16:10:18
4   memoranda and/or that she learned as part of her   16:10:21
5   interviews with those three French witnesses.   16:10:24
6      Is that -- my understanding correct on   16:10:26
7   that point?                            16:10:27
8      MS. OSBORN:  It is correct, although I will   16:10:28
9   say that we will argue at that time that, if the   16:10:30
10  Court concludes that you're entitled to       16:10:32
11  additional information, you will be limited to   16:10:34
12  the time you have left for this deposition based   16:10:36
13  on the discovery order in this matter.         16:10:41
14     MR. BENSON:  Well, we will -- we will argue   16:10:43
15  against that --                          16:10:44
16     MS. OSBORN:  I understand.             16:10:45
17     MR. BENSON:  -- because we have asked      16:10:46
18  questions that the answers would have been      16:10:47
19  comprehensive if she had been adequately      16:10:48
20  prepared.  So I think we're prepared to litigate   16:10:55
21  that, and --                            16:10:55
22     MR. GALLO:  And I believe this is the first   16:10:58
23  time we're hearing that.                   16:11:00
24     MR. BENSON:  Yeah, this is the first time   16:11:01
25  that you have actually made that additional   16:11:03

56 (Pages 538 - 541)

Page 586

1  Q  Okay.                                             17:14:24
2  A  So what Thomson Consumer did, in furtherance of  17:14:25
3     the sale of its CPT business to Videocon, was    17:14:27
4     create a limited liability company in the States 17:14:31
5     called Thomson Displays Americas, I believe.  It 17:14:34
6     then transferred its CPT manufacturing and other 17:14:39
7     operations to that wholly owned subsidiary,      17:14:43
8     caused that wholly owned subsidiary to employ    17:14:46
9     certain employees of Thomson Consumer involved   17:14:49
10    in the CPT business.  And then that entity was   17:14:53
11    sold to a Videocon entity, I'm not sure which    17:14:56
12    legal entity in the Videocon family that         17:14:59
13    acquired it.  But that's the path for the U.S.   17:15:01
14    Thomson Consumer employees.                      17:15:05
15       With respect to Thomson SA, at some point     17:15:06
16    in time, and you probably recall me testifying   17:15:10
17    that I couldn't remember exactly who employed    17:15:12
18    each person.  There was a already-existing       17:15:14
19    European -- in certain countries, there was an   17:15:18
20    Italian entity, for example, there was a French  17:15:22
21    entity, for example, that employed the actual    17:15:25
22    people.  Some of them are still employed by      17:15:27
23    Thomson SA.  And I'm not exactly certain the     17:15:31
24    precise path that the employees traveled,        17:15:35
25    although I think the documents tell us, and I     17:15:37

Page 587

1     just don't have them memorized.  But ultimately  17:15:40
2     the people, or certain people employed by        17:15:43
3     Thomson SA or certain European subsidiaries      17:15:46
4     working for the CPT business were then           17:15:49
5     transferred over to an entity that became owned  17:15:51
6     by Videocon.                                     17:15:54
7  Q  Do you know approximately how many employees     17:15:59
8     were transferred?                               17:16:01
9        MS. OSBORN:  Object to form, calls for        17:16:03
10       speculation.                                 17:16:04
11 A  Oh, gosh.  I have not -- I've seen lists of      17:16:05
12    employees' names, but I did not bother to total  17:16:08
13    it or take note of how many pages or how long    17:16:11
14    any of that was.                                17:16:15
15 Q  Do you know if Jack Brunk from Thomson Consumer   17:16:19
16    went to work for Videocon?                      17:16:24
17 A  There is a list of Thomson Consumer employees    17:16:27
18    who move off.  It would be really helpful for me 17:16:30
19    to see that particular list  But it is my        17:16:34
20    memory that Mr. Brunk transfers of employment of 17:16:36
21    an -- of a legal entity that is ultimately       17:16:41
22    wholly owned in some way, shape or form by a     17:16:43
23    Videocon entity.                                17:16:47
24       MR. BENSON:  I think I may be ready to take   17:16:48
25    a break, and I may be ready to --               17:16:50

Page 588

1        THE VIDEOGRAPHER:  We are off the record.     17:16:54
2     The time is 5:16 p.m.                           17:16:54
3        (A recess was taken.)                         17:17:00
4        THE VIDEOGRAPHER:  We are back on record.     17:25:20
5     The time is 5:25 p.m.                           17:25:44
6                                                     17:25:47
7  FURTHER DIRECT EXAMINATION,                         17:25:47
8  QUESTIONS BY DAVID M. PETERSON:                     17:25:49
9  Q  Good afternoon, Ms. Ehret.                       17:25:50
10 A  Hello                                           17:25:53
11 Q  My name is David Peterson.  I represent the      17:25:53
12    Circuit City Liquidating Trust.  I have just a   17:25:56
13    few questions for you.  Thank you for all of     17:25:58
14    your patience throughout the last two days; it's 17:25:59
15    greatly appreciated.                            17:26:01
16 A  Of course.                                       17:26:02
17 Q  In preparing for today's deposition, were there  17:26:03
18    any current Thomson Consumer employees with      17:26:05
19    knowledge of relevant facts that you did not     17:26:08
20    interview?                                      17:26:11
21 A  I do not believe there are any current Thomson   17:26:13
22    Consumer employees that have facts relevant to   17:26:15
23    this litigation.                                17:26:22
24 Q  That you did not have the chance to interview?   17:26:26
25 A  That I did not speak to.  I spoke to as many --  17:26:28

Page 589

1     anytime anyone gave me a name, I went and        17:26:30
2     interviewed that individual.  If they gave me    17:26:34
3     any names, I went and interviewed that          17:26:37
4     individual.  I got to a point where no one had   17:26:39
5     any other additional suggestions of any current 17:26:41
6     Thomson Consumer employees that would have       17:26:44
7     information relevant to this litigation.         17:26:46
8  Q  Did you take any notes during those interviews   17:26:48
9     in preparation for your -- today's deposition?   17:26:50
10 A  I would have occasionally sent an email.  I do a 17:26:54
11    lot of my stuff via email to my outside lawyers. 17:27:01
12    To the extent that I learned anything that I     17:27:05
13    thought was information that was helpful or      17:27:09
14    necessary, would have forwarded that along to    17:27:12
15    them.                                           17:27:14
16 Q  In preparing for today's deposition, were there  17:27:15
17    any former Thomson Consumer employees with       17:27:16
18    knowledge of relevant facts that you did not     17:27:18
19    have the chance to interview?                    17:27:20
20 A  Oh, goodness.  I mean, throughout the relevant   17:27:27
21    period, there were, I'm sure, substantial -- a   17:27:30
22    lot of employees by Thomson Consumer.  I did not 17:27:32
23    speak to all individuals employed during the     17:27:34
24    relevant period by Thomson Consumer.  I did try  17:27:37
25    to interview, and you are aware that I've        17:27:41

68 (Pages 586 - 589)

Page 590

1  interviewed and attended the depositions of          17:27:45
2  Mr. Brunk; I did not attend Mr. Herschler's         17:27:48
3  deposition, I could not; Mr. Carson;                17:27:55
4  Mr. Hepburn; Mr. Hanrahan.  I also spoke with       17:27:56
5  other former Thomson Consumer Electronics -- or     17:28:05
6  Thomson Consumer employees to determine if they     17:28:10
7  had any relevant information.                       17:28:14
8      But if you're asking me if I interviewed        17:28:15
9  every Thomson Consumer employee or former           17:28:18
10 employee?  I did not.                               17:28:19
11 Q  And I'm really asking if there's any former      17:28:21
12 Thomson Consumer employees who would have           17:28:25
13 substantial knowledge of relevant facts that you    17:28:27
14 did not have the chance to interview.               17:28:29
15     MS. OSBORN:  Object to form, calls for          17:28:31
16 speculation.                                        17:28:32
17 A  Based on my interviews of individuals as well as 17:28:34
18 my review of documents -- I mean, we could talk     17:28:38
19 about what "substantial" means -- but I tried to    17:28:41
20 get to those former employees of Thomson            17:28:45
21 Consumer that would have relevant information,       17:28:47
22 information relevant to this case, who are still     17:28:50
23 alive.                                              17:28:52
24 Q  In preparing for today's deposition, were there  17:28:53
25 any current Thomson SA employees with knowledge     17:28:55

Page 591

1  of relevant facts that you did not have the         17:28:58
2  opportunity to interview?                           17:29:01
3  A  Current Thomson SA employees?  No.               17:29:03
4  Q  And in preparing for today's deposition, were    17:29:05
5  there any former Thomson SA employees with          17:29:07
6  knowledge of relevant facts that you did not        17:29:11
7  have the opportunity to interview?                  17:29:13
8  A  When you say "did not have the opportunity to    17:29:15
9  interview," do you mean me personally in my         17:29:19
10 capac-- -- in my preparation for my 30(b)(6)        17:29:22
11 today?                                              17:29:24
12 Q  That's correct.                                  17:29:24
13 A  In my capacity in preparation for my 30(b)(6),   17:29:25
14 yes, there are Thomson SA former employees who I    17:29:28
15 did not have the opportunity to -- to interview     17:29:32
16 in specific preparation for this deposition.        17:29:34
17 Q  And to be clear, to the extent that you had      17:29:36
18 talked to any of the former Thomson SA employees    17:29:38
19 you were referring to in the previous question,     17:29:43
20 that information is not informing your testimony     17:29:45
21 as a 30(b)(6) witness; correct?                     17:29:49
22 A  Just so that I can restate that question so that 17:29:52
23 you check and make sure you understand what         17:29:56
24 you're asking me?                                   17:29:58
25 Q  Please.                                          17:29:59

Page 592

1  A  There -- I did sit in on certain limited         17:30:00
2  interviews of former Thomson SA employees, and      17:30:05
3  at the time that those interviews were              17:30:11
4  conducted, I attended those meetings in my          17:30:13
5  capacity as in-house counsel for Thomson            17:30:16
6  Consumer, and it was not in preparation for this    17:30:20
7  two days of deposition on behalf of Thomson SA      17:30:26
8  or Thomson Consumer.  I mean, I'm not trying to     17:30:30
9  make a legal -- I'm just saying that I'm            17:30:33
10 in-house employed by Thomson Consumer.              17:30:35
11 Q  Thank you for the clarification.                 17:30:37
12     And just to make sure the record's              17:30:38
13 extremely clear, regardless of what capacity you    17:30:40
14 were sitting in, whether in-house counsel or        17:30:44
15 versus in preparation for the deposition, you       17:30:48
16 have not intended to reveal any facts that were     17:30:51
17 learned in those meetings during your two-day       17:30:54
18 deposition; correct?                                17:30:59
19     MS. OSBORN:  Object to form.                    17:31:00
20 A  In those limited -- just so that we're on the    17:31:03
21 same page, in those limited interviews of former    17:31:06
22 Thomson SA employees, I am not disclosing any       17:31:09
23 facts unique -- I should say uniquely learned       17:31:15
24 from -- that I wouldn't have otherwise had from     17:31:18
25 any other source other than my attendance at an     17:31:21

Page 593

1  interview conducted by Thomson Consumer and         17:31:26
2  Thomson SA's outside counsel, Faegre Baker          17:31:32
3  Daniels.  If I otherwise knew of the information    17:31:34
4  and it was reasonably available to Thomson SA or    17:31:38
5  Thomson Consumer from a means or a source other     17:31:42
6  than those interviews, those particular limited     17:31:45
7  interviews, I would have testified to that          17:31:50
8  yesterday and today on behalf of whichever          17:31:52
9  entity it was relevant to.                          17:31:54
10 Q  To be clear, you did not speak with Agnes Martin 17:31:57
11 in preparation for today's deposition; correct?     17:32:03
12     MS. OSBORN:  Object to form.  Also object       17:32:05
13 to the extent that identity of anyone that we       17:32:07
14 interviewed or talked to is privileged.             17:32:10
15     THE WITNESS:  Am I okay to answer?              17:32:14
16     MS. OSBORN:  You're okay to answer to -- in     17:32:16
17 terms of preparation for today's deposition.        17:32:17
18 A  In preparation for today's and yesterday's       17:32:19
19 deposition on behalf of Thomson SA, I did not       17:32:23
20 speak with Ms. Martin.                              17:32:26
21 Q  Did you attempt to speak with Ms. Martin in      17:32:28
22 preparation for your 30(b)(6) deposition?           17:32:31
23     MS. OSBORN:  Asked and answered.                17:32:35
24     THE WITNESS:  He's asking -- I think he's       17:32:36
25 asking --                                           17:32:37

69 (Pages 590 - 593)

Page 658

1  REDIRECT EXAMINATION,                          19:22:42
2     QUESTIONS BY CRAIG BENSON:                   19:22:42
3  Q  You did not speak with Agnes Martin in       19:22:43
4     preparation for the deposition today; is that 19:22:46
5     correct?                                      19:22:47
6  A  As I testified when counsel for Circuit City  19:22:49
7     asked me this question, and I think, just to  19:22:53
8     make sure, I think you're asking me if I      19:22:56
9     specifically, for preparation for these -- this 19:22:58
10    testimony on behalf of either Thomson Consumer 19:23:01
11    or Thomson SA, did I speak with Ms. Martin in 19:23:05
12    connection with that preparation?  As I       19:23:08
13    testified earlier, no.                        19:23:11
14 Q  Okay.  And you did participate in a discussion 19:23:12
15    with Ms. Martin separately that wasn't part of 19:23:14
16    what you're calling your preparation for this  19:23:20
17    deposition; is that correct?                  19:23:22
18       MS. OSBORN:  Object to form.  Also object  19:23:24
19    to the extent it's privileged work product, and 19:23:26
20    the identities of the individuals we interviewed 19:23:29
21    are privileged.                               19:23:32
22 A  I did, as I testified earlier, attend a       19:23:34
23    interview of Ms. Martin conducted by Thomson  19:23:39
24    Consumer and Thomson SA's outside lawyers,    19:23:44
25    Faegre Baker Daniels.                         19:23:48

Page 659

1  Q  Was that discussion in person?               19:23:50
2        I'm sorry, you're looking at your lawyer.  19:23:58
3     Was that discussion in person, Ms. Ehret?     19:24:00
4        MS. OSBORN:  Object to form.  Again, I     19:24:02
5     think this goes beyond the scope of what --   19:24:04
6        MR. BENSON:  Well, your redirect -- your   19:24:08
7     questions were specifically about Ms. Martin, so 19:24:09
8     I'm entitled to know what meetings you had.   19:24:12
9        MS. OSBORN:  They were, but it was based   19:24:15
10    upon the information that was available to her. 19:24:16
11 Q  Okay.  Did you meet with Ms. Martin personally? 19:24:18
12       MS. OSBORN:  Let me finish my statement.   19:24:22
13       You can answer that question.              19:24:24
14 A  I met -- I attended an interview that was     19:24:25
15    conducted in person with Ms. Martin.  That    19:24:32
16    interview was conducted by Thomson Consumer and 19:24:34
17    Thomson SA's outside counsel, Faegre Baker    19:24:38
18    Daniels.  I attended that interview as I noted, 19:24:41
19    and there's a distinction that we're drawing, at 19:24:45
20    least, between that interview that I attended, 19:24:48
21    which I attended as counsel for Thomson Consumer 19:24:50
22    and Thomson SA, and not attended that -- I did 19:24:59
23    not, in preparation for today's and yesterday's 19:25:04
24    testimony on behalf of Thomson SA and Thomson 19:25:07
25    Consumer, speak with Ms. Martin either live -- 19:25:09

Page 660

1     in -- not in person, nor over the phone.      19:25:14
2  Q  Where was the meeting that you attended with  19:25:17
3     Ms. Martin and Faegre Baker Daniels' counsel? 19:25:23
4  A  When I met with -- when Faegre Baker Daniels  19:25:29
5     interviewed Ms. Martin, that meeting occurred 19:25:33
6     somewhere in or around Paris, France.         19:25:38
7  Q  Okay.  And am I correct that none of your     19:25:40
8     testimony today -- in none of your testimony  19:25:42
9     today are you revealing any facts that you    19:25:46
10    learned in that meeting with Ms. Martin in     19:25:49
11    France?                                       19:25:53
12       MS. OSBORN:  Objection based on            19:25:54
13    attorney-client privilege.                    19:25:56
14       You can answer the question, however.      19:25:57
15 A  That is -- that is correct.  Although I have   19:26:02
16    noted yesterday and today in answering anyone's 19:26:09
17    question whether or not I was withholding      19:26:12
18    information which Thomson SA or Thomson Consumer 19:26:15
19    considers to be privileged or confidential when 19:26:18
20    I gave those answers.                         19:26:21
21 Q  And you consider all of the information that  19:26:23
22    Ms. Martin shared with you in that meeting to be 19:26:26
23    privileged and confidential; is that correct? 19:26:29
24       MS. OSBORN:  Object to form, calls for a   19:26:31
25    legal conclusion.  Her attorneys consider all of 19:26:32

Page 661

1     the information shared in that interview to be 19:26:35
2     privileged.                                   19:26:38
3        And I direct you not to answer.            19:26:38
4  Q  Okay.  Well, no.  The question is:  Is there any 19:26:43
5     information that you learned in that meeting   19:26:46
6     that you are not taking the position here is   19:26:48
7     privileged and confidential?  And it may be that 19:26:51
8     your lawyer has just answered the question for 19:26:53
9     you, but I think that's a yes-or-no question.  19:26:55
10       MS. OSBORN:  Object to form, asked and     19:26:58
11    answered.  And she -- she answered this earlier, 19:27:01
12    I believe.                                     19:27:07
13       MR. BENSON:  Well, then, she should have no 19:27:08
14    problem answering it now.                      19:27:11
15       MS. OSBORN:  We can go through the          19:27:13
16    transcript and find it.                        19:27:14
17       MR. BENSON:  Well, or she can just answer  19:27:15
18    the question.                                  19:27:16
19 A  I believe I can answer that question without  19:27:17
20    revealing any privileged or confidential       19:27:19
21    information.                                   19:27:21
22       To the extent that in my extensive          19:27:22
23    preparation for testimony today on behalf of   19:27:24
24    Thomson SA or on behalf of Thomson Consumer, I 19:27:29
25    learned of information either from interviews   19:27:32

86 (Pages 658 - 661)

Page 662

1  that I conducted of Thomson Consumer former and    19:27:37
2  current employees, documents that I reviewed in    19:27:41
3  the files of Thomson SA or Thomson Consumer, and    19:27:43
4  I learned about a fact, I identified that    19:27:45
5  information today. I did not, in other words,    19:27:51
6  Mr. Benson -- I think to answer your question, I    19:27:53
7  am not withholding information from you that I    19:27:56
8  may have learned from those other means, that    19:28:00
9  may have also been stated by Ms. Martin that,    19:28:04
10  because she stated it during a Faegre Baker    19:28:08
11  Daniels' interview, that I then claim the    19:28:10
12  information that I learned through another means    19:28:15
13  cannot now be disclosed.    19:28:18
14 Q  I think you might be answering a more    19:28:19
15  challenging question than the one I am asking.    19:28:22
16 A  Okay.    19:28:24
17 Q  Which is: Information that Agnes Martin    19:28:24
18  transmitted in that meeting that you attended    19:28:27
19  with Faegre Baker Daniels in Paris, are you    19:28:31
20  taking the position that the information that    19:28:39
21  Ms. Martin shared with you in that meeting is    19:28:40
22  privileged, such that you are not testifying    19:28:43
23  about any information that you learned in that    19:28:44
24  meeting here today?    19:28:46
25      MS. OSBORN: Objection, asked and answered,    19:28:48

Page 663

1  privileged.    19:28:49
2      You can answer the question.    19:28:50
3 A  If I only or would have only known of that fact    19:28:55
4  because I happened to have attended as counsel    19:29:02
5  an interview of Ms. Martin conducted by Faegre    19:29:07
6  Baker Daniels, then I did not disclose that    19:29:13
7  information yesterday or today. However, if    19:29:17
8  there would have been a fact that I learned that    19:29:20
9  I separately, outside of that, would have known,    19:29:23
10  learned, found, discovered through another means    19:29:27
11  that was outside of that interview, then I would    19:29:30
12  have told you about that if it was relevant to a    19:29:32
13  question that you asked me yesterday or today on    19:29:36
14  behalf of Thomson SA or Thomson Consumer.    19:29:39
15 Q  Fair enough.    19:29:42
16 A  Did I answer that well?    19:29:42
17 Q  I think -- I think you did, thank you.    19:29:44
18      When was the meeting that you attended with    19:29:45
19  Faegre Baker Daniels and Ms. Martin in Paris or    19:29:49
20  in or around Paris?    19:29:52
21      MS. OSBORN: Objection. I've given you    19:29:54
22  some leeway here, but I'm going to direct her    19:29:56
23  not to answer. You're just not entitled to know    19:29:59
24  these details about the privileged conversations    19:30:02
25  and communications we had --    19:30:04

Page 664

1      MR. BENSON: I'm entitled to know when they    19:30:06
2  occurred.    19:30:08
3      MS. OSBORN: -- with these former    19:30:08
4  employees.    19:30:10
5      MR. BENSON: I'm entitled to know when they    19:30:10
6  occurred. We asked about Ms. Martin, we've    19:30:12
7  asked for her location. I'm entitled to know    19:30:14
8  when these -- this discussion and this meeting    19:30:17
9  occurred.    19:30:18
10      MS. OSBORN: And she testified that we had    19:30:19
11  the short meetings, they wouldn't have talked to    19:30:21
12  her since.    19:30:23
13      MR. BENSON: No, let her -- let her answer    19:30:24
14  the question.    19:30:26
15 Q  When did the meeting occur?    19:30:27
16      THE WITNESS: Are you instructing me not to    19:30:30
17  answer?    19:30:32
18      MS. OSBORN: I'm not instructing you not to    19:30:32
19  answer. You can answer the question.    19:30:34
20      But I'm giving you a short leash. It's    19:30:35
21  late, we're tired. She's answered the    19:30:36
22  questions.    19:30:36
23      MR. BENSON: This is discoverable    19:30:38
24  information. I don't care what kind of leash    19:30:39
25  you're giving me.    19:30:41

Page 665

1 Q  Please answer the question as to when you    19:30:43
2  attended this meeting.    19:30:44
3      THE WITNESS: Just so I'm clear, am I okay    19:30:45
4  to answer the question?    19:30:47
5      MS. OSBORN: You're okay to answer when we    19:30:49
6  interviewed her, if you can remember the date.    19:30:50
7 A  It was sometime during the month of May 2004.    19:30:53
8 Q  May 2004?    19:30:58
9      MS. OSBORN: 2014.    19:31:00
10 A  I wondered why you all looked at me. May 2014.    19:31:02
11      MR. BENSON: Okay, thank you. Those are    19:31:13
12  all the questions I have.    19:31:14
13      MS. OSBORN: Anyone else?    19:31:18
14      THE WITNESS: Everybody done?    19:31:20
15      THE VIDEOGRAPHER: This concludes the    19:31:21
16  deposition of Meggan Ehret. We are off the    19:31:22
17  record. The time is 7:30 p.m.    19:31:28
18
19  _____
       MEGGAN EHRET
20
21  Subscribed and sworn to before me
22  this       day of       , 2015.
23
24  _____
       NOTARY PUBLIC
25

87 (Pages 662 - 665)