1   GUIDO SAVERI (22349)
        *guido@saveri.com*
2   R. ALEXANDER SAVERI (173102)
        *rick@saveri.com*
3   GEOFFREY C. RUSHING (126910)
        *grushing@saveri.com*
4   CADIO ZIRPOLI (179108)
        *cadio@saveri.com*
5   TRAVIS L. MANFREDI (281779)
        *travis@saveri.com*
6   SAVERI & SAVERI, INC.
7   706 Sansome Street
    San Francisco, CA 94111
8   Telephone: (415) 217-6810
    Facsimile: (415) 217-6813
9

10  *Lead Counsel for the Direct Purchaser Class*

11              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
12                 **SAN FRANCISCO DIVISION**

13
    IN RE: CATHODE RAY TUBE (CRT)          Master File No. 07-5944-SC
14
    ANTITRUST LITIGATION                   MDL No. 1917
15

16  _____

17                                         **CLASS ACTION**
    This Document Relates To:
18                                         **SECOND AMENDED DIRECT**
                                           **PURCHASER PLAINTIFFS' CLASS**
19                                         **ACTION COMPLAINT AGAINST**
    *Crago, d/b/a Dash Computers, Inc., et al. v.*   **MITSUBISHI AND THOMSON**
20  *Mitsubishi Electric Corporation, et al.*, Case
    No. 14-CV-2058 (SC).                   **JURY TRIAL DEMANDED**
21
                                           ***REDACTED* VERSION OF**
22                                         **DOCUMENT SOUGHT TO BE**
                                           **SEALED**
23  _____

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS .................................................................................................... i

I.      INTRODUCTION ................................................................................................... 1

II.     JURISDICTION AND VENUE ............................................................................. 4

III.    PARTIES ................................................................................................................ 4

    A.      Plaintiffs ..................................................................................................... 4

    B.      Defendants .................................................................................................. 6

        1.      Thomson Entities .......................................................................... 6

        2.      Mitsubishi Entities ....................................................................... 9

        3.      Technologies Displays ................................................................ 10

        4.      Videocon ..................................................................................... 11

IV.     AGENTS AND CO-CONSPIRATORS ............................................................... 11

V.      AGENTS .............................................................................................................. 25

VI.     CLASS ACTION ALLEGATIONS ..................................................................... 26

VII.    TRADE AND COMMERCE ................................................................................ 28

VIII.   FACTUAL ALLEGATIONS ............................................................................... 28

    A.      CRT Technology ...................................................................................... 28

    B.      Structure of the CRT Industry ................................................................. 30

        1.      Market Concentration ................................................................. 30

        2.      Information Sharing .................................................................... 30

        3.      Consolidation .............................................................................. 30

        4.      High Costs of Entry Into the Industry ........................................ 31

        5.      Homogeneity of CRT Products .................................................. 31

    C.      Defendants' and Co-Conspirators' Illegal Agreements ........................... 31

        1.      "Glass Meetings" ........................................................................ 32

        2.      Bilateral Discussions .................................................................. 35

        3.      Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions .................................................................. 37

            a.      Thomson's Admitted Participation in the CRT Conspiracy .......... 37

            b.      Mitsubishi's Participation in the CRT Conspiracy ........................ 44

            c.      Co-Conspirators' Participation in the CRT Conspiracy................. 47

|  |  |  |  |
|---|---|---|---|
| | D. | The CRT Market During the Conspiracy | 53 |
| | E. | International Government Antitrust Investigations of the CRT Conspiracy | 55 |
| | F. | Effects of the CRT Conspiracy | 58 |
| | | 1. Examples of Reductions in Manufacturing Capacity | 58 |
| | | 2. Examples of Collusive Pricing for CRTs | 59 |
| | | 3. Summary of Effects of the Conspiracy Involving CRTs | 60 |
| IX. | CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1 | | 61 |
| X. | FRAUDULENT CONCEALMENT | | 63 |
| XI. | TOLLING | | 67 |
| XII. | DAMAGES | | 67 |
| XIII. | PRAYER FOR RELIEF | | 67 |
| XIV. | JURY TRIAL DEMANDED | | 68 |

## I.    INTRODUCTION

1.    Plaintiffs bring this action on behalf of themselves individually and on behalf of a Plaintiff class (the "Class") consisting of all persons and entities who directly purchased a Cathode Ray Tube ("**CRT**") or Cathode Ray Tube Product ("**CRT Products**"), as defined below, in the United States from any Defendant, Co-Conspirator or any subsidiary or affiliate thereof between March 1, 1995 and November 25, 2007 (the "Class Period").

2.    Defendants and Co-Conspirators, conducted an international cartel for over twelve years. The purpose and effect of this conspiracy was to fix, raise, stabilize and maintain prices for CRTs.

3.    *Defendant Technicolor SA, which during the Class Period was known as Thomson SA, has <u>admitted</u> that it participated in the conspiracy to fix the prices of CRTs. In its 2011 Annual Report to shareholders, Technicolor SA stated that it "played a minor role in the alleged anticompetitive conduct [regarding CRTs]."* While Plaintiffs dispute that Technicolor SA's role in the conspiracy was minor, whatever that may mean, and believe that discovery in this case to date has demonstrated and further discovery will demonstrate Technicolor SA's role was substantial, there is no dispute that Technicolor SA participated in fixing the prices of CRTs. Following an investigation lasting four years, *in December 2012 the European Commission levied a fine of €38.6 million against Technicolor SA for participating in a conspiracy to fix CRT prices. In its 2012 Annual Report, Technicolor SA acknowledged that "[f]ollowing the European Commission decision, purchasers may bring individual claims against the Company seeking compensation for alleged loss suffered as a result of the anti-competitive conduct."*

4.    Defendants and Co-Conspirators are or were among the leading manufacturers of: (a) color picture tubes ("**CPTs**"), which are CRTs used primarily in color televisions; (b) color display tubes ("**CDTs**"), which are CRTs used primarily in color computer monitors; and (c) electronic devices containing CPTs (such as televisions) or CDTs (such as computer monitors). For the purposes of this Complaint, CPTs of all sizes and the products containing them will be referred to collectively as "**CPT Products**." Also for the purposes of this Complaint, CDTs of all sizes and the products containing them will be referred to as "**CDT Products**." CDT Products and

1   CPT Products will be referred to collectively herein as "**CRT Products**."

2       5.      During the Class Period, Defendants and their co-conspirators controlled the

3   majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over

4   $19 billion dollars in gross revenue. During the Class Period, virtually every household in the

5   United States owned at least one CRT Product.

6       6.      Since the mid-1990s, the CRT industry faced significant economic pressures as

7   customer preferences for other emerging technologies shrank profits and threatened the

8   sustainability of the industry. In order to maintain price stability, increase profitability, and

9   decrease the erosion of pricing in the CRT market, Defendants and their co-conspirators

10  conspired, combined and contracted to fix, raise, maintain and stabilize the price at which CRTs

11  were sold in the United States.

12      7.      With respect to CRTs, Defendants, their co-conspirators and/or their agents agreed,

13  *inter alia,* to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter*

14  *alia*, shipments, prices, production and customer demand; (c) coordinate public statements

15  regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical

16  integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose

17  cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share

18  of overall sales; (g) influence and, at times, coordinate pricing with producers in other geographic

19  areas; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each

20  producer's share of certain key customers' sales; and (k) restrict output.

21      8.      The conspiracy concerning CRTs commenced with bilateral meetings that began in

22  at least March of 1995 and continued throughout the Class Period. Also beginning in 1995, the co-

23  conspirators began to engage in informal group meetings. By 1997, these group meetings had

24  become more formalized, as described in greater detail below. There were at least 500 conspiracy

25  meetings during the Class Period, including hundreds of group meetings and hundreds of bilateral

26  meetings. These meetings occurred in various locales, including Taiwan, South Korea, Indonesia,

27  Thailand, Singapore, Malaysia, China, the U.K., Europe, and the United States. These meetings

28  included representatives from the highest levels of the respective companies, as well as regional

1 managers and others.

2       9.     During the Class Period, the conspiracy affected billions of dollars of commerce

3 throughout the United States.

4       10.    This conspiracy is being investigated by the United States Department of Justice

5 ("**DOJ**") and by multiple foreign competition authorities, including the European Commission, the

6 Korean Fair Trade Commission, and the Japan Fair Trade Commission. Technicolor USA, Inc.

7 (f/k/a Thomson Consumer Electronics, Inc.) was subpoenaed by the DOJ in connection with its

8 investigation of CRT price-fixing. Technicolor SA is the subject of an investigation by the

9 Mexican Federal Competition Commission, and its affiliate in Brazil is under investigation by the

10 Brazilian Ministry of Justice for fixing the prices of CRTs. The first participant to be indicted by

11 the DOJ was C.Y. Lin, the former Chairman and CEO of co-conspirator Chunghwa Picture Tubes,

12 Ltd., who had a two-count indictment issued against him by a federal grand jury in San Francisco

13 on February 10, 2009. Since then, five more individuals have been indicted in connection with

14 Defendants' CRT price-fixing conspiracy.

15       11.    In March 2011, co-conspirator Samsung SDI Company, Ltd. ("**Samsung SDI**")

16 pleaded guilty to fixing the prices of CDTs during at least the nine-year period from January 1997

17 to March 2006. Samsung SDI paid a criminal fine to the United States of $32 million. Samsung

18 SDI pleaded guilty to conspiring with its competitors and co-conspirators to raise the prices of

19 CDTs, to reduce output of CDTs, and to allocate target market shares for the CDT market overall

20 and for certain customers.

21       12.    During the Class Period, Plaintiffs purchased CRTs and CRT Products in the

22 United States and elsewhere directly from Defendants, and/or Defendants' subsidiaries and

23 affiliates and/or any agents Defendants or Defendants' subsidiaries and affiliates controlled.

24 Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and bring this action to

25 recover the overcharges paid for the CRTs and CRT Products containing price-fixed CRTs they

26 purchased during the Class Period.

27       13.    This case is related to and concerns the same anti-competitive conspiracy and many

28 of the same transactions and events that are presently pending in *In re Cathode Ray Tube (CRT)*

*Antitrust Litigation*, MDL No. 1917 ("*CRT*"), filed in this Court and presently pending before the Honorable Samuel Conti in the Northern District of California (Master File No. 3:07-cv-05944-SC, MDL No. 1917). Both this case and *CRT* are suits for damages arising out of the conspiracy to fix the prices of and restrain competition for CRTs in violation of the federal antitrust laws and state antitrust and unfair competition laws.

## II.   JURISDICTION AND VENUE

14.    Plaintiffs bring this action to obtain injunctive relief and to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees arising from Defendants' and Co-Conspirators' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and 1367.

16.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C. § 1391(b) and (c), in that at least one of the Plaintiffs or Defendants resides in this judicial district, is licensed to do business or is doing business in this judicial district.

## III.   PARTIES

### A. Plaintiffs

17.    Plaintiff Crago, d/b/a Dash Computers, Inc., is a Kansas corporation with its principal place of business in Merriam, Kansas. During the Class Period, this Plaintiff purchased one or more CRTs and/or CRT Products directly from one of the Defendants or Co-Conspirators and/or their subsidiaries and suffered injury as a result of Defendants' and Co-Conspirators' unlawful conduct.

18.    Plaintiff Arch Electronics, Inc. is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania and has its principal place of business in Glenside, Pennsylvania. During the Class Period, this Plaintiff purchased one or more CRTs and/or CRT Products directly from one of the Defendants or Co-Conspirators and/or their subsidiaries and suffered injury as a result of Defendants' and Co-Conspirators' unlawful conduct.

19.    Plaintiffs Meijer, Inc. and Meijer Distribution, Inc. are Michigan corporations with their principal place of business in Grand Rapids, Michigan. During the Class Period, these

1  Plaintiffs purchased one or more CRTs and/or CRT Products directly from one of the Defendants
2  or Co-Conspirators and/or their subsidiaries and suffered injury as a result of Defendants' and Co-
3  Conspirators' unlawful conduct.

4      20.     Plaintiff Nathan Muchnick, Inc. was a corporation organized and existing under the
5  laws of the Commonwealth of Pennsylvania and had its principal place of business in
6  Philadelphia, Pennsylvania. During the Class Period, this Plaintiff purchased one or more CRTs
7  and/or CRT Products directly from one of the Defendants or Co-Conspirators and/or their
8  subsidiaries and suffered injury as a result of Defendants' and Co-Conspirators' unlawful conduct.

9      21.     Plaintiff Princeton Display Technologies, Inc. is a New Jersey corporation with its
10 principal place of business in Princeton, New Jersey. During the Class Period, this Plaintiff
11 purchased one or more CRTs and/or CRT Products directly from one of the Defendants or Co-
12 Conspirators and/or their subsidiaries and suffered injury as a result of Defendants' and Co-
13 Conspirators' unlawful conduct.

14     22.     Plaintiff Radio & TV Equipment, Inc. is a business headquartered in Fargo, North
15 Dakota. During the Class Period, this Plaintiff purchased one or more CRTs and/or CRT Products
16 directly from one of the Defendants or Co-Conspirators and/or their subsidiaries and suffered
17 injury as a result of Defendants' and Co-Conspirators' unlawful conduct.

18     23.     Plaintiff Studio Spectrum, Inc. is a California business with its principal place of
19 business in Burbank, California. During the Class Period, this Plaintiff purchased one or more
20 CRTs and/or CRT Products directly from one of the Defendants or Co-Conspirators and/or their
21 subsidiaries and suffered injury as a result of Defendants' and Co-Conspirators' unlawful conduct.

22     24.     Plaintiff Wettstein and Sons, Inc., d/b/a Wettstein's is a corporation organized and
23 existing under the laws of the State of Wisconsin with its principal place of business in La Crosse,
24 Wisconsin. During the Class Period, this Plaintiff purchased one or more CRTs and/or CRT
25 Products directly from one of the Defendants or Co-Conspirators and/or their subsidiaries and
26 suffered injury as a result of Defendants' and Co-Conspirators' unlawful conduct.

27

28

**B. Defendants**

    **1. Thomson Entities**

    25.    Defendant Technicolor SA (f/k/a Thomson SA) ("**Thomson SA**") is a French Corporation with its principal place of business located at 1-5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France. Thomson SA, on its own or through its wholly owned subsidiary Thomson Consumer Electronics, Inc., and other subsidiaries, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe. Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere. For much of the Class Period, the television manufacturing division of Thomson SA manufactured and sold in the United States CRT televisions under the RCA and GE brands. In July 2005, Thomson SA sold its CRT business to Defendant Videocon Industries, Ltd. for €240 million. Simultaneously, Thomson SA invested a total of €240 million in Videocon, comprised of a €225 million investment in Videocon Industries, Ltd. and a €15 million investment in Videocon International, and acquired 13.1% of Videocon Industries, Ltd. The agreement with Videocon provided that Thomson management would help Videocon run the CRT business during the transition period and beyond. Videocon and Thomson also agreed to set up Preferred Supplier Agreements for Thomson's display components business. Thomson SA also received at least one seat on Videocon's board of directors when it invested in Videocon Industries, Ltd. Thomson SA maintained at least a 10% ownership interest in Videocon Industries, Ltd. for the remainder of the Class Period. In January 2010, Thomson SA changed its name to Technicolor SA. During the Class Period, Thomson SA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, to customers throughout the United States.

    26.    Defendant Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) ("**Thomson Consumer**") is a United States corporation with its principal place of business located at 10330 N. Meridian St., Indianapolis, Indiana 46290-1024. Thomson Consumer is a wholly owned subsidiary of Thomson SA and was Thomson SA's primary subsidiary for the manufacture and sales of CRTs in the United States during the Class Period. Thomson Consumer was a major

1  manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania;

2  Marion, Indiana; and Mexicali, Mexico. Thomson Consumer sold its CRTs to television

3  manufacturers in the United States, Mexico and elsewhere. Thomson Consumer's CRT business

4  was sold by its parent Thomson SA to Videocon Industries, Ltd. in 2005. Simultaneously,

5  Thomson Consumer's parent company Thomson SA invested €240 million into Videocon

6  Industries, Ltd. and obtained 13.1% ownership of Videocon Industries, Ltd. Thomson SA also

7  received at least one seat on Videocon's board of directors when it invested in Videocon

8  Industries, Ltd. The agreement with Videocon provided that Thomson management would help

9  Videocon run the CRT business during the transition period and beyond. Videocon and Thomson

10  also set up Preferred Supplier Agreements for Thomson's displays components businesses.

11  Thomson SA maintained at least a 10% ownership interest in Videocon Industries, Ltd. throughout

12  the Class Period. Thomson Consumer was a parent corporation of its wholly owned subsidiary,

13  Thomson Displays Americas LLC (now known as Technologies Displays America, LLC). In

14  January 2010, Thomson Consumer Electronics, Inc. changed its name to Technicolor USA, Inc.

15  During the Class Period, Thomson Consumer manufactured, marketed, sold and/or distributed

16  CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

17      27.      Defendant Thomson SA had sufficient minimum contacts with the United States

18  during the Class Period for it to be subject to personal jurisdiction in the United States. Thomson

19  SA purposefully availed itself of the United States market for CRTs and CRT products. Thomson

20  SA fixed prices and constrained competition on CRTs it and its wholly owned subsidiary in the

21  United States, Thomson Consumer, sold in the United States. Thomson SA had significant

22  contacts with the United States, and it dominated and/or controlled the finances, policies, and/or

23  affairs of its U.S.-based subsidiary, Thomson Consumer, relating to the antitrust violations alleged

24  in this Complaint. During the Class Period, Thomson SA was a large multinational industrial and

25  technology company. Thomson SA was neither a mere holding company nor a corporate shell, and

26  its subsidiaries, including Thomson Consumer, were more than simple investment mechanisms for

27  diversifying risk. Thomson SA had a controlling role in the operation of its subsidiaries and

28  exercised a central management function over its subsidiaries, including Thomson Consumer,

which served the function of servicing the pivotal U.S. CRT market. During the Class Period, between 40-50% of Thomson SA's revenues were derived from the United States, and Thomson SA's CEO described the United States as Thomson SA's most important market. Thomson SA managed its business centrally, including that of U.S. subsidiary Thomson Consumer, and its management and board of directors set its policies and direction. Thomson SA employees oversaw the United States profits and losses associated with Thomson Consumer's high-end and value TV businesses. Thomson SA also was involved in planning and purchasing discussions with U.S. CRT customers, Thomson SA had to approve the purchases made by U.S. customers, and Thomson SA was involved in CRT production and pricing discussions relating to CRTs manufactured in Mexico for the North American market. During the Class Period, many Thomson SA executives also served as executives and/or board members of Thomson Consumer, and Thomson Consumer executives served as executive officers of or directors of Thomson SA, including the Chairman and CEO of Thomson SA who simultaneously served as the President and CEO of Thomson Consumer, and thereafter as the Chairman of Thomson Consumer:

| Name | Role with Thomson SA | Role with Thomson Consumer |
|---|---|---|
| Thierry Breton | Chairman and CEO (1997-2001); Member, Board of Directors (2002-2005) | President & CEO (1997-2000); Chairman (1997-2001) |
| Olivier Mallet | Senior Vice President, Finance (1996-2000) | Director (1999-2000) |
| Charles Dehelly | Senior Executive Vice President (1998-2000); Senior Executive Vice President and COO (2001); CEO (2002-2004) | Director (2002-2003) |
| Julian Waldron | Senior Executive Vice President, CFO (2001-2007); Interim CEO and Senior Executive Vice President, CFO (2007-2008) | Director (2001-2007) |
| Frederic Rose | CEO (2008-present) | Chairman (2012-present) |

Moreover, numerous other Thomson SA "Executive Officers" had operational responsibilities in the United States: Jim Meyer was Senior Executive Vice President of SBUs Americas, Multimedia Products and New Media Services; Al Arras was Executive Vice President of SBU Audio and Communications; Michael O'Hara was Senior Vice President of SBU Americas; and Enrique Rodriguez was Vice President of SBU Multimedia Products. All were stationed at

1    Thomson Consumer in Indianapolis, Indiana.

2        28.    Thomson SA and Thomson Consumer are collectively referred to herein as

3    "**Thomson**."

4        **2. Mitsubishi Entities**

5        29.    Defendant Mitsubishi Electric Corporation ("**Mitsubishi Electric Japan**") is a

6    Japanese corporation located at Building 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.

7    Mitsubishi Electric Japan is a Fortune Global 500 Company that was ranked 214 in 2011 and that

8    had combined net sales of over $44 billion in 2012. It has various subsidiaries operating in the

9    United States, Mexico, and Canada. Mitsubishi Electric Japan and its subsidiaries manufactured

10   CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.

11   These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division

12   and to other television and monitor manufacturers in the United States and elsewhere. Mitsubishi's

13   television and monitor division also purchased CRTs from other CRT manufacturers. During the

14   Class Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRT

15   Products in the United States.

16       30.    Defendant Mitsubishi Electric US, Inc. (f/k/a Mitsubishi Electric & Electronics

17   USA, Inc.) ("**Mitsubishi Electric USA**") is a United States corporation located at 5900-A Katella

18   Avenue, Cypress, California 90630. Mitsubishi Electric USA is a wholly-owned subsidiary of

19   Mitsubishi Electric Japan. Mitsubishi Electric USA manufactured CRTs for the United States

20   market in plants located in Mexicali, Mexico and Ontario, Canada. Mitsubishi Electric USA sold

21   its CRTs internally to its television and monitor manufacturing division and to other television and

22   monitor manufacturers in the United States and elsewhere. Mitsubishi's television and monitor

23   division also purchased CRTs from other CRT manufacturers. During the Class Period, Mitsubishi

24   Electric USA manufactured, marketed, sold and distributed CRT Products in the United States.

25       31.    Defendant Mitsubishi Electric Visual Solutions America, Inc. (f/k/a Mitsubishi

26   Digital Electronics America, Inc.) ("**Mitsubishi Digital**") is a United States corporation located at

27   9351 Jeronimo Road, Irvine, California 92618. Mitsubishi Digital is a wholly-owned subsidiary of

28   Mitsubishi Electric Japan. During the Class Period, Mitsubishi Digital manufactured, marketed,

1   sold and distributed CRT Products in the United States.

2        32.    Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are

3   collectively referred to herein as "**Mitsubishi**."

4            **3. Technologies Displays**

5        33.    Defendant Technologies Displays Americas LLC (f/k/a Thomson Displays

6   Americas LLC) ("**TDA**") is a Delaware limited liability company with its principal place of

7   business located at 1778 Carr Road Ste 4B, Calexico, California 92231. TDA is a wholly owned

8   subsidiary of Videocon. TDA acquired Thomson's U.S. CRT assets in 2005 after a period of

9   cooperation and transition with Thomson entities subsequent to and in connection with the

10  purchase and sale in 2005. TDA was originally formed with its governing members represented

11  equally from both Thomson and Videocon. TDA is owned by Eagle Corp., Ltd. Eagle Corp., Ltd.

12  became a wholly owned subsidiary of Videocon on December 31, 2005, after Videocon acquired

13  the balance 81% equity stake in Eagle Corp., Ltd. Eagle Corp., Ltd. acquired TDA in September

14  2005. In August 2005, Thomson Consumer made a capital contribution to TDA in the form of a

15  transfer of assets and contract rights related to TDA's North American CRT business. TDA is the

16  parent corporation of its co-conspirator, Technologies Displays Mexicana, S.A. de C.V., a

17  Mexican corporation which during the Class Period manufactured CRTs and sold the CRTs to

18  TDA for sale and distribution. During the Class Period, TDA manufactured, marketed, sold and/or

19  distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to

20  customers throughout the United States. Defendants Thomson and then Videocon dominated

21  and/or controlled the finances, policies, and/or affairs of TDA and its subsidiary Technologies

22  Displays Mexicana, S.A. de C.V., relating to the antitrust violations alleged in this Complaint.

23  Two high-level Thomson managers—Thomson's Managing Director of NAFTA Sales, Jack K.

24  Brunk ("**Brunk**"), and Thomson's General Manager, James P. Hanrahan ("**Hanrahan**")—

25  transitioned to work for TDA after it acquired Thomson's CRT business. In addition, TDA

26  referred to itself as a "Thomson" business after Videocon's acquisition of Thomson's CRT

27  business. TDA and Technologies Displays Mexicana, S.A. de C.V., are collectively referred to as

28  "**Technologies Displays**."

### 4. Videocon

34.     Defendant Videocon Industries, Ltd. ("**Videocon**") is an Indian corporation with its principal place of business located at Aurangabad Paithan Road 14, KM Stone, Chitegaon, Aurangabad 431005, India. In 2005, Videocon acquired Thomson's CRT business for €240 million, which included facilities and personnel in the United States, Poland, Italy, Mexico and China. The deal for Videocon to acquire Thomson SA's CRT business was completed through a special purpose vehicle, Eagle Electronics. At the same time that Videocon purchased Thomson's CRT business, Thomson SA invested a total of €240 million in Videocon, comprised of a €225 million investment in Videocon Industries, Ltd. and a €15 million investment in Videocon International, and acquired 13.1% of Videocon Industries, Ltd. The agreement with Videocon provided that Thomson management would help Videocon run the CRT business during the transition period and beyond. Videocon and Thomson also agreed to set up Preferred Supplier Agreements for Thomson's displays components businesses. Thomson SA maintained at least a 10% ownership interest in Videocon throughout the Class Period. Thomson SA also received one or more seats on Videocon's board of directors when it invested in Videocon. Videocon's purchase of Thomson's CRT business included acquisition of TDA and its Mexican subsidiary, **Thomson Displays Mexicana**, including their facilities and personnel located in the United States, through Videocon's wholly owned investment entity located in the Cayman Islands, Eagle Corporation Limited. Videocon manufactured CRTs for the United States market in Thomson's former CRT plants in Mexicali, Mexico and China. During the Class Period, Videocon manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

### IV.     AGENTS AND CO-CONSPIRATORS

35.     Various persons that are not named as Co-Conspirators herein have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof. Plaintiffs reserve the right to name some or all of these persons as Co-Conspirators at a later date.

36.     Whenever in this complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or

through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

37.    Co-Conspirators are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

38.    Each of the Co-Conspirators named herein acted as the agent of, co-conspirator with, or joint venturer of the other Co-Conspirators with respect to the acts, violations and common course of conduct alleged herein.

39.    Co-conspirator Hitachi, Ltd. is a Japanese company with its principal place of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products. In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent. During the Class Period, Hitachi, Ltd. manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

40.    Co-conspirator Hitachi Displays, Ltd. ("**Hitachi Displays**") is a Japanese company with its principal place of business located at 3300 Hayano, Mobara-shi, Chiba-ken, 297-8622, Japan. Hitachi Displays was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943. In 2002, all the departments of planning, development, design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun off to create a separate company called Hitachi Displays. During the Class Period, Hitachi Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Co-conspirator Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi Displays relating to the antitrust violations alleged in this complaint.

41.    Co-conspirator Hitachi America, Ltd. ("**Hitachi America**") is a New York company with its principal place of business located at 50 Prospect Avenue, Tarrytown, New York 10591. Hitachi America is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd. During the Class Period, Hitachi America manufactured, marketed, sold and/or distributed

1   CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

2   Co-conspirator Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi

3   America relating to the antitrust violations alleged in this complaint.

4        42.    Co-conspirator Hitachi Asia, Ltd. ("**Hitachi Asia**") is a Singaporean company with

5   its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore

6   528736. Hitachi Asia is a wholly-owned and controlled subsidiary of Defendant Hitachi, Ltd.

7   During the Class Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRT

8   Products, either directly or through its subsidiaries or affiliates, throughout the United States. Co-

9   conspirator Hitachi, Ltd. dominated and controlled the finances, policies and affairs of Hitachi

10  Asia relating to the antitrust violations alleged in this complaint.

11       43.    Co-conspirator Hitachi Electronic Devices (USA), Inc. ("**HEDUS**") is a Delaware

12  corporation with its principal place of business located at 1000 Hurricane Shoals Road Suite D-

13  100, Lawrenceville, GA 30043. HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi

14  Displays. During the Class Period, HEDUS manufactured, marketed, sold and/or distributed CRT

15  Products, either directly or through its subsidiaries or affiliates, throughout the United States. Co-

16  conspirators Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies

17  and affairs of HEDUS relating to the antitrust violations alleged in this complaint.

18       44.    Co-conspirator Shenzhen SEG Hitachi Color Display Devices, Ltd. ("**Hitachi**

19  **Shenzhen**") was a Chinese company with its principal place of business located at 5001

20  Huanggang Road, Futian District, Shenzhen 518035, China. Hitachi Displays, Ltd. owned at least

21  a 25% interesting in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around

22  the time that the government investigations into the CRT industry began). Thus, Hitachi Shenzhen

23  was a member of the Hitachi corporate group for all but the last two weeks of the Class Period.

24  During the Class Period, Hitachi Shenzhen manufactured, marketed, sold and/or distributed CRT

25  Products, either directly or through its subsidiaries or affiliates, throughout the United States. Co-

26  conspirators Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies

27  and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this complaint.

28       45.    Co-conspirators Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia,

1    HEDUS and Hitachi Shenzhen are collectively referred to herein as **"Hitachi."**

2          46.      Co-conspirator IRICO Group Corporation ("**IGC**") is a Chinese company with its

3    principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021.

4    IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing,

5    distribution and sale of CRT Products. During the Class Period, IGC manufactured, marketed, sold

6    and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout

7    the United States.

8          47.      Co-conspirator IRICO Group Electronics Co., Ltd. ("**IGE**") is a Chinese company

9    with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province

10   712021. IGE is owned by Defendant IGC. According to its website, IGE was the first CRT

11   manufacturer in China and one of the leading global manufacturers of CRTs. Its website also

12   claims that in 2003 it was the largest CRT manufacturer in China in terms of production and sales

13   volume, sales revenue and aggregated profit, and taxation. During the Class Period, IGE

14   manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

15   subsidiaries or affiliates, throughout the United States. Co-conspirator IGC dominated and

16   controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this

17   complaint.

18         48.      Co-conspirator IRICO Display Devices Co., Ltd. ("**IDDC**") is a Chinese company

19   with its principal place of business located at No. 16, Fenghui South Road West, District High-

20   tech Development Zone, Xi'an, SXI 710075. IDDC is a partially-owned subsidiary of co-

21   conspirator IGC. In 2006, IDDC was China's top CRT maker. During the Class Period, IDDC

22   manufactured, marketed, distributed and/or sold CRT Products, either directly or through its

23   subsidiaries or affiliates, throughout the United States. Co-conspirator IGC dominated and

24   controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in

25   this complaint.

26         49.      Co-conspirators IGC, IGE and IDDC are collectively referred to herein as

27   "**IRICO**."

28         50.      Co-conspirator LG Electronics, Inc. ("**LGEI**") is a corporation organized under the

laws of the Republic of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea. LGEI is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968. The company's name was changed from Gold Star Communications to LGEI in 1995, the year in which it also acquired Zenith in the United States. In 2001, LGEI transferred its CRT business to a 50/50 joint venture with co-conspirator Koninklijke Philips Electronics N.V. called LG.Philips Displays ("**LGPD**"). On April 1, 2007, LGPD became an independent company and changed its name to LP Displays International Ltd. During the Class Period, LGEI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

51.     Co-conspirator LG Electronics USA, Inc. ("**LGEUSA**") is a Delaware corporation with its principal place of business located at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632. LGEUSA is a wholly-owned and controlled subsidiary of co-conspirator LGEI. During the Class Period, LGEUSA manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Co-conspirator LGEI dominated and controlled the finances, policies and affairs of LGEUSA relating to the antitrust violations alleged in this complaint.

52.     Co-conspirators LGEI and LGEUSA are collectively referred to herein as "**LG Electronics.**"

53.     Co-conspirator LP Displays International Ltd. f/k/a LGPD ("**LP Displays**") is a Hong Kong company located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong. LP Displays is the successor entity to LGPD, which was created in 2001 as a 50/50 joint venture between co-conspirators LGEI and Royal Philips. In March 2007, LP Displays became an independent company. LP Displays is a leading supplier of CRTs for use in television sets and computer monitors with annual sales for 2006 of over $2 billion and a market share of 27%. LP Displays announced in March 2007 that Royal Philips and LGEI would cede control over the company and the shares would be owned by financial institutions and private equity firms. During the Class Period, LP Displays manufactured,

1  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or
2  affiliates, throughout the United States.

3      54.      Co-conspirator Panasonic Corporation, which was at all times during the Class
4  Period known as Matsushita Electric Industrial Co, Ltd. and only became Panasonic Corporation
5  on October 1, 2008, is a Japanese entity located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-
6  8501, Japan. During the Class Period, Panasonic Corporation manufactured, marketed, sold and/or
7  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the
8  United States.

9      55.      Co-conspirator Panasonic Corporation of North America ("**PCNA**") is a Delaware
10  corporation with its principal place of business located at One Panasonic Way, Secaucus, New
11  Jersey 07094. PCNA is a wholly-owned and controlled subsidiary of co-conspirator Panasonic
12  Corporation. During the Class Period, PCNA manufactured, marketed, sold and/or distributed
13  CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.
14  Co-conspirator Panasonic Corporation dominated and controlled the finances, policies and affairs
15  of PCNA relating to the antitrust violations alleged in this complaint.

16      56.      Co-conspirator Matsushita Electronic Corporation (Malaysia) Sdn. Bhd.
17  ("**Matsushita Malaysia**") was a Malaysian company with its principal place of business located at
18  Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam Malaysia
19  40000. Matsushita Malaysia was a wholly-owned and controlled subsidiary of co-conspirator
20  Panasonic Corporation. Panasonic Corporation transferred Matsushita Malaysia to MT Picture
21  Display Co., Ltd. ("**MTPD**"), its CRT joint venture with Toshiba Corporation, in 2003. It was re-
22  named MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly-owned subsidiary of
23  MTPD until its closure in 2006. During the Class Period, Matsushita Malaysia manufactured,
24  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or
25  affiliates, throughout the United States. Co-conspirator Panasonic Corporation dominated and
26  controlled the finances, policies and affairs of Matsushita Malaysia relating to the antitrust
27  violations alleged in this complaint.

28      57.      Co-conspirators Panasonic Corporation, PCNA, and Matushita Malaysia are

SECOND AMENDED DPPs' CLASS ACTION COMPLAINT AGAINST MITSUBISHI AND THOMSON

1   collectively referred to herein as "**Panasonic**."

2          58.     Co-conspirator MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

3   Display Co., Ltd. ("**MTPD**") is a Japanese entity located at 1-15 Matsuo-cho, Kadoma-shi, Osaka,

4   571-8504, Japan. In 2002. Panasonic Corporation entered into a joint venture with co-conspirator

5   Toshiba Corporation called Matsushita Toshiba Picture Display Co., Ltd. to manufacture CRTs.

6   Panasonic Corporation was the majority owner with 64.5 percent. On March 30, 2007, Panasonic

7   Corporation purchased the remaining 35.5 percent stake in the joint venture, making Matsushita

8   Picture Display Co., Ltd. a wholly-owned subsidiary of Panasonic Corporation, and renaming it

9   MT Picture Display Co., Ltd. During the Class Period, MTPD manufactured, marketed, sold

10  and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout

11  the United States.

12         59.     Co-conspirator Beijing Matsushita Color CRT Co., Ltd. ("**BMCC**") is a Chinese

13  company with its principal place of business located at No. 9 Jiuxianqiao N. Rd., Dashanzi

14  Chaoyang District, Beijing, China. BMCC is a joint venture company, 50% of which is held by

15  co-conspirator MTPD. The other 50% is held by Beijing Orient Electronics (Group) Co., Ltd.,

16  China National Electronics Import & Export Beijing Company (a China state-owned enterprise),

17  and Beijing Yayunchun Brach of the Industrial and Commercial Bank of China (a China state-

18  owned enterprise). Formed in 1987, BMCC was Panasonic Corporation's first CRT manufacturing

19  facility in China. BMCC is the second largest producer of CRTs for televisions in China. During

20  the Class Period, BMCC manufactured, marketed, sold and/or distributed CRT Products, either

21  directly or through its subsidiaries or affiliates, throughout the United States.

22         60.     Co-conspirator Koninklijke Philips Electronics N.V. a/k/a Royal Philips

23  Electronics ("**Royal Philips**") is a Dutch company with its principal place of business located at

24  Amstelplein 2, 1070 MX Amsterdam, The Netherlands. Royal Philips, founded in 1891, is one of

25  the world's largest electronics companies, with 160,900 employees located in over 60 countries.

26  Royal Philips had sole ownership of its CRT business until 2001. In 2001, Royal Philips

27  transferred its CRT business to a 50/50 joint venture with co-conspirator LGEI, forming co-

28  conspirator LGPD (n/k/a LP Displays). During the Class Period, Royal Philips manufactured,

1  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

2  affiliates, throughout the United States.

3       61.    Co-conspirator Philips Electronics North America Corporation (**"Philips**

4  **America"**) is a Delaware corporation with its principal place of business located at 1251 Avenue

5  of the Americas, New York, New York 10020-1104. Philips America is a wholly-owned and

6  controlled subsidiary of co-conspirator Royal Philips. During the Class Period, Philips America

7  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

8  subsidiaries or affiliates, throughout the United States. Co-conspirator Royal Philips dominated

9  and controlled the finances, policies and affairs of Philips America relating to the antitrust

10 violations alleged in this complaint.

11      62.    Co-conspirator Philips Electronics Industries (Taiwan), Ltd. (**"Philips Taiwan"**) is

12 a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street,

13 Nangang District, Taipei, Taiwan. Philips Taiwan is a subsidiary of co-conspirator Royal Philips.

14 During the Class Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRT

15 Products, either directly or through its subsidiaries or affiliates, throughout the United States. Co-

16 conspirator Royal Philips dominated and controlled the finances, policies and affairs of Philips

17 Taiwan relating to the antitrust violations alleged in this complaint.

18      63.    Co-conspirator Philips da Amazonia Industria Electronica Ltda. (**"Philips Brazil"**)

19 is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1

20 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly-owned and

21 controlled subsidiary of co-conspirator Royal Philips. During the Class Period, Philips Brazil

22 manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

23 subsidiaries or affiliates, throughout the United States. Co-conspirator Royal Philips dominated

24 and controlled the finances, policies and affairs of Philips Brazil relating to the antitrust violations

25 alleged in this complaint.

26      64.    Co-conspirators Royal Philips, Philips America, Philips Taiwan and Philips Brazil

27 are collectively referred to herein as **"Philips."**

28      65.    Co-conspirator Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company

("**Samsung SDI**") is a South Korean company with its principal place of business located at 575 Shin-dong, Youngtong-gu, Suwon, South Korea. Samsung SDI is a public company. Samsung Electronics Corporation ("**SEC**") is a major shareholder of Samsung SDI, holding almost 20 percent of the stock. Founded in 1970, Samsung SDI claims to be the world's leading company in the display and energy business, with 28,000 employees and facilities in 18 countries. In 2002, Samsung SDI held a 34.3% worldwide market share in the market for CRTs; more than any other producer. Samsung SDI has offices in Chicago and San Diego. During the Class Period, Samsung SDI manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. SEC dominated and controlled the finances, policies and affairs of Samsung SDI relating to the antitrust violations alleged in this complaint.

66.     Co-conspirator Samsung SDI America, Inc. ("**Samsung SDI America**") is a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California 92612. Samsung SDI America is a wholly-owned and controlled subsidiary of co-conspirator Samsung SDI. During the Class Period, Samsung SDI America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. SEC and co-conspirator Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI America relating to the antitrust violations alleged in this complaint.

67.     Co-conspirator Samsung SDI Mexico S.A. de C.V. ("**Samsung SDI Mexico**") is a Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico. Samsung SDI Mexico is a wholly-owned and controlled subsidiary of co-conspirator Samsung SDI. During the Class Period, Samsung SDI Mexico manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. SEC and co-conspirator Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Mexico relating to the antitrust violations alleged in this complaint.

68.     Co-conspirator Samsung SDI Brasil Ltda. ("**Samsung SDI Brazil**") is a Brazilian

1  company with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito

2  Industrial, 69088-480 Manaus, Amazonas, Brazil. Samsung SDI Brazil is a wholly-owned and

3  controlled subsidiary of co-conspirator Samsung SDI. During the Class Period, Samsung SDI

4  Brazil manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

5  subsidiaries or affiliates, throughout the United States. SEC and co-conspirator Samsung SDI

6  dominated and controlled the finances, policies and affairs of Samsung SDI Brazil relating to the

7  antitrust violations alleged in this complaint.

8       69.    Co-conspirator Shenzhen Samsung SDI Co., Ltd. ("**Samsung SDI Shenzhen**") is a

9  Chinese company with its principal place of business located at Huanggang Bei Lu, Futian Gu,

10  Shenzhen, China. Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of co-

11  conspirator Samsung SDI. During the Class Period, Samsung SDI Shenzhen manufactured,

12  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

13  affiliates, throughout the United States. SEC and co-conspirator Samsung SDI dominated and

14  controlled the finances, policies and affairs of Samsung SDI Shenzhen relating to the antitrust

15  violations alleged in this complaint.

16       70.    Co-conspirator Tianjin Samsung SDI Co., Ltd. ("**Samsung SDI Tianjin**") is a

17  Chinese company with its principal place of business located at Developing Zone of Yi-Xian Park,

18  Wuqing County, Tianjin, China. Samsung SDI Tianjin is a wholly-owned and controlled

19  subsidiary of co-conspirator Samsung SDI. During the Class Period, Samsung SDI Tianjin

20  manufactured, marketed, sold and/or distributed CRT Products, either directly or through its

21  subsidiaries or affiliates, throughout the United States. SEC and co-conspirator Samsung SDI

22  dominated and controlled the finances, policies and affairs of Samsung SDI Tianjin relating to the

23  antitrust violations alleged in this complaint.

24       71.    Co-conspirator Samsung SDI (Malaysia) Sdn. Bhd. ("**Samsung SDI Malaysia**") is

25  a Malaysian corporation with its principal place of business located at Lots 635 & 660, Kawasan

26  Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.

27  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of co-conspirator Samsung

28  SDI. During the Class Period, Samsung SDI Malaysia manufactured, marketed, sold and/or

SECOND AMENDED DPPs' CLASS ACTION COMPLAINT AGAINST MITSUBISHI AND THOMSON

distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. SEC and co-conspirator Samsung SDI dominated and controlled the finances, policies and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this complaint.

72. Co-conspirators Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin and Samsung SDI Malaysia are collectively referred to herein as "**Samsung SDI**."

73. Co-conspirator Thai CRT Co., Ltd. ("**Thai CRT**") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand. Thai CRT is a subsidiary of Siam Cement Group, and it was established in 1986 as Thailand's first manufacturer of CRTs for color televisions. During the Class Period, Thai CRT manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

74. Co-conspirator Toshiba Corporation ("**TC**") is a Japanese company with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan. In 2001, TC held a 5 to 10 percent worldwide market share for CRTs used in televisions and in computer monitors. In December 1995, TC partnered with Orion Electronic Co. and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("**TEDI**") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999. In 2002, TC entered into MTPD, a joint venture with co-conspirator Panasonic Corporation, in which the entities consolidated their CRT businesses. During the Class Period, TC manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States.

75. Co-conspirator Toshiba America, Inc. ("**Toshiba America**") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, New York 10020. Toshiba America is a wholly-owned and controlled subsidiary of co-conspirator TC. During the Class Period, Toshiba America manufactured, marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the United States. Co-conspirator TC dominated and controlled the finances, policies and affairs of

Master File No. 07-5944-SC
SECOND AMENDED DPPs' CLASS ACTION COMPLAINT AGAINST MITSUBISHI AND THOMSON

1   Toshiba America relating to the antitrust violations alleged in this complaint.

2          76.    Co-conspirator Toshiba America Consumer Products, LLC ("**TACP**") is a limited

3   liability company that is headquartered at 82 Totowa Rd., Wayne, New Jersey 07470-3114. TACP

4   is a wholly-owned and controlled subsidiary of co-conspirator TC through Toshiba America.

5   During the Class Period, TACP manufactured, marketed, sold and/or distributed CRT Products,

6   either directly or through its subsidiaries or affiliates, throughout the United States. Co-conspirator

7   TC dominated and controlled the finances, policies and affairs of TACP relating to the antitrust

8   violations alleged in this complaint.

9          77.    Co-conspirator Toshiba America Electronic Components, Inc. ("**TAEC**") is a

10  California corporation with its principal place of business located at 19900 MacArthur Boulevard,

11  Suite 400, Irvine, California 92612. TAEC is a wholly-owned and controlled subsidiary of co-

12  conspirator TC through Toshiba America. During the Class Period, TAEC manufactured,

13  marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

14  affiliates, throughout the United States. Co-conspirator TC dominated and controlled the finances,

15  policies and affairs of TAEC relating to the antitrust violations alleged in this complaint.

16         78.    Co-conspirator Toshiba America Information Systems, Inc. ("**TAIS**") is a

17  California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine,

18  California 92618-1697. TAIS is a wholly-owned and controlled subsidiary of co-conspirator TC

19  through Toshiba America. During the Class Period, TAIS manufactured, marketed, sold and/or

20  distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout the

21  United States. Co-conspirator TC dominated and controlled the finances, policies and affairs of

22  TAIS relating to the antitrust violations alleged in this complaint.

23         79.    Co-conspirator P.T. Tosummit Electronic Devices Indonesia ("**TEDI**") was a CRT

24  joint venture formed by TC, Orion Electronic Co., and two other entities in December 1995.

25  TEDI's principal place of business was located in Indonesia. TEDI was projected to have an

26  annual production capacity of 2.3 million CRTs by 1999. In 2003, TEDI was transferred to co-

27  conspirator MTPD, TC's joint venture with Panasonic Corporation, and its name was changed to

28  PT.MT Picture Display Indonesia. During the Class Period, TEDI manufactured, marketed, sold

1   and/or distributed CRT Products, either directly or through its subsidiaries or affiliates, throughout

2   the United States. Co-conspirator TC dominated and controlled the finances, policies, and affairs

3   of TEDI relating to the antitrust violations alleged in this complaint.

4         80.    Co-conspirator Toshiba Display Devices (Thailand) Co., Ltd. ("**TDDT**") was a

5   Thai company with its principal place of business located at 142 Moo 5 Bangkok Industrial Estate,

6   Tivanon Road, Pathum Thani, Thailand 12000. TDDT was a wholly-owned and controlled

7   subsidiary of co-conspirator TC. In 2003, TDDT was transferred to co-conspirator MTPD, TC's

8   joint venture with Panasonic Corporation. It was re-named MT Picture Display (Thailand) Co.,

9   Ltd. and operated as a wholly-owned and controlled subsidiary of MTPD until its closure in 2007.

10   During the Class Period, TDDT manufactured, marketed, sold and/or distributed CRT Products,

11   either directly or through its subsidiaries or affiliates, throughout the United States. Co-conspirator

12   TC dominated and controlled the finances, policies and affairs of TDDT relating to the antitrust

13   violations alleged in this complaint.

14         81.    Co-conspirators TC, Toshiba America, TACP, TAEC, TAIS, TEDI, and TDDT are

15   collectively referred to herein as "**Toshiba**."

16         82.    Co-conspirator Orion Electronic Co. ("**Orion**") was a Korean corporation. It filed

17   for bankruptcy in 2004. Orion was a major manufacturer of CRT Products. In 1995, approximately

18   85% of Orion's $1 billion in sales was attributed to CRT Products. Orion was involved in CRT

19   Products sales and manufacturing joint ventures and had subsidiaries all over the world, including

20   South Africa, France, Indonesia, Mexico, and the United States. Plaintiffs are informed and

21   believe that Orion was wholly owned by the "**Daewoo Group**." The Daewoo Group included

22   Daewoo Electronics Co., Ltd. ("**Daewoo Electronics**"), Daewoo Telecom Co., Daewoo

23   Corporation, and Orion Electronic Components Co. The Daewoo Group was dismantled in or

24   around 1999. Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called

25   Daewoo-Orion Societe Anonyme ("**DOSA**") in France. As of approximately 1996, DOSA

26   produced 1.2 million CRTs annually. Daewoo sold DOSA's CRT business in or around 2004.

27   During the Class Period, Orion, Daewoo Electronics, and DOSA manufactured, marketed, sold

28   and/or distributed CRTs and/or CRT Products, either directly or through their subsidiaries of

1   affiliates, throughout the United States.

2       83.   Co-conspirators Orion, Daewoo Electronics, and DOSA are collectively referred to

3   herein as "**Daewoo**."

4       84.   Co-conspirator Chunghwa Picture Tubes, Ltd. ("**Chunghwa PT**") is a Taiwanese

5   company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan,

6   Taiwan. It was established in 1971 by Tatung Corporation to manufacture CRTs. In 1974,

7   Chunghwa PT's CRTs received certification by the United States, giving the company entry into

8   that market. Throughout the Class Period, Chunghwa PT was one of the major global CRT

9   manufacturers. During the Class Period, Chunghwa PT manufactured, marketed, sold and/or

10  distributed CRT Products, either directly or through its subsidiaries or affiliates (such as its

11  Fuzhou subsidiary), throughout the United States.

12      85.   Co-conspirator Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("**Chunghwa**

13  **Malaysia**") is a Malaysian company with its principal place of business at Lot I, Subang Hi-Tech

14  Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia. It is a wholly-

15  owned subsidiary of Chunghwa PT. Chunghwa Malaysia is focused on CRT production, and it has

16  established itself as one of the leading worldwide suppliers of CRTs. During the Class Period,

17  Chunghwa Malaysia manufactured, marketed, sold and/or distributed CRT Products, either

18  directly or through its subsidiaries or affiliates, throughout the United States. Co-conspirator

19  Chunghwa PT dominated and controlled the finances, policies and affairs of Chunghwa Malaysia

20  relating to the antitrust violations alleged in this complaint.

21      86.   Co-conspirators Chunghwa PT and Chunghwa Malaysia are collectively referred to

22  herein as "**Chunghwa**."

23      87.   Co-conspirator Technologies Displays Mexicana, S.A. de C.V. ("**Technologies**

24  **Displays Mexicana**"), formerly known as Thomson Displays Mexicana, is a Mexican corporation

25  with its principal place of business located at Calz. Robledo Industrial Colorad, Mexicali, B.C.

26  21384, Mexico. Technologies Displays Mexicana is a wholly owned subsidiary of defendant

27  TDA, which is itself a wholly owned subsidiary of defendant Videocon. During the Class Period,

28  Technologies Displays Mexicana manufactured, marketed, sold and/or distributed CRT Products,

1    either directly or indirectly through subsidiaries or affiliates, to customers throughout the United

2    States. Defendants Thomson SA and later Videocon and TDA dominated and/or controlled the

3    finances, policies and/or affairs of Technologies Displays Mexicana relating to the antitrust

4    violations alleged in this Complaint.

5         88.    Co-conspirator TCL Thomson Electronics Corporation ("**TCL Thomson**") is a

6    joint venture formed between Thomson SA and TCL International Holdings Ltd. ("**TCL**"). TCL

7    Thomson is headquartered at the TCL Building, South Nanhai Road, Nanshan District, Shenzhen,

8    Guangdong, China. During the Class Period, TCL Thomson manufactured, marketed, sold and/or

9    distributed CRT Products, either directly or indirectly through subsidiaries or affiliates, to

10   customers throughout the United States. One of the direct or indirect subsidiaries of TCL

11   Thomson or TCL that manufactured, marketed, sold and/or distributed CRT Products in the

12   United States was TTE Technology, Inc. ("**TTE**"). Defendant Thomson SA dominated and/or

13   controlled the finances, policies and/or affairs of TCL Thomson and TTE relating to the antitrust

14   violations alleged in this Complaint.

15                    **V.    AGENTS**

16        89.    The acts alleged against Defendants in this Complaint were authorized, ordered, or

17   done by their officers, agents, employees, or representatives, while actively engaged in the

18   management and operation of Defendants' businesses or affairs.

19        90.    Each Defendant or co-conspirator acted as the principal, agent, or joint venturer of,

20   or for, other Defendants and co-conspirators with respect to the acts, violations, and common

21   course of conduct alleged by Plaintiffs. Each Defendant and co-conspirator that is a subsidiary of a

22   foreign parent acts as the United States agent for CRTs and/or CRT Products made by its parent

23   company.

24        91.    The acts charged in this Complaint have been done by Defendants and their co-

25   conspirators, or were authorized, ordered or done by their respective officers, agents, employees or

26   representatives while actively engaged in the management of each Defendant's or co-conspirator's

27   business or affairs.

28

## VI.    CLASS ACTION ALLEGATIONS

92.    Plaintiffs bring this action both on behalf of themselves, and as a class action pursuant to Federal Rules of Civil Procedure, Rule 23(a) and (b)(3), on behalf of the following class (the "Class"):

> All persons and entities who, between March 1, 1995 and November 25, 2007, directly purchased a CRT or a CRT Product in the United States from any Defendant or any subsidiary or affiliate thereof, or any co-conspirator. Excluded from the Class are defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, all governmental entities, and any judges or justices assigned to hear any aspect of this action.[1]

93.    The Class definition encompasses those who bought a CRT Product directly from a Defendant and Co-Conspirator, even if the CRT contained therein was manufactured by an affiliated entity, principal, agent, or co-conspirator.

94.    Plaintiffs do not know the exact number of Class members because such information is in the exclusive control of Defendants and Co-Conspirators. Plaintiffs believe that,

---

[1] The "subsidiaries and affiliates" not named as Defendants or Co-Conspirators are: Chunghwa Picture Tubes Fuzhou; Chunghwa Picture Tubes Taiwan; Daewoo Electronics America, Inc.; Hitachi Electronic Display (USA); Hitachi High-Technologies America, Inc. (f/k/a Nissei Sangyo America, Ltd.); Hitachi High-Technologies Corporation (f/k/a Nissei Sangyo Co., Ltd.); LG Electronics Service Europe Netherlands B.V.; LG Electronics Wales Ltd.; LG Philips Displays; LG.Philips Displays Brasil Ltda.; LG.Philips Displays Holding B.V.; LG.Philips Displays International Ltd.; LG.Philips Displays Korea Co. Ltd.; LG.Philips Displays Mexico SA de CV; LG.Philips Displays USA Inc.; MELCO Display Devices Mexico, S.A. de C.V.; Mitsubishi Display Devices America, Inc.; Mitsubishi Electric Sales America, Inc.; Mitsubishi Electric US Holdings, Inc.; Mitsubishi Electronics America, Inc.; Mitsubishi Electronics Industries Canada, Inc.; MT Picture Display Corporation of America (New York); MT Picture Display Corporation of America (Ohio); NEC-Mitsubishi Electric Visual Systems Corporation; NEC-Mitsubishi Electronics Display of America, Inc.; NM Visual Systems de Mexico S. A. de C.V.; Orion Electric Components, Co., Ltd.; Orion Engineering & Service, Inc.; Orion Mexicana, SA de CV; P.T. Tosummit Electronic Devices Indonesia; Panasonic AVC Networks America; Panasonic Sikoku Electronics Corporation of America; PCB Integrated Manufacturing System, S.A. de C.V.; Philips Holding USA Inc.; PT.MT Picture Display Indonesia; Samsung Electronics Co., Ltd.; Samsung SDI (Hong Kong), Ltd.; Samsung SDI America, Inc.; Samsung SDI Co. Ltd. (Korea); Samsung SDI Germany GmbH; Samsung SDI Hungary Ltd.; Samtel Color, Ltd.; Tatung Company of America, Inc.; TCL International Holdings Ltd.; TCL Thomson Electronics Corporation; Technologies Displays Mexicana, S.A. de C.V. (f/k/a Thomson Displays Mexicana, S.A. de C.V.); Tianjin Samsung SDI Co. Ltd.; TTE Technology, Inc.; and Zenith Electronics Corporation (a/k/a Zenith Electronics LLC).

1  due to the nature of the trade and commerce involved, there are most likely thousands of Class

2  members, geographically dispersed throughout the United States such that joinder of all class

3  members is impracticable.

4        95.    Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs are direct

5  purchasers of CRTs. All Class members were damaged by the same wrongful conduct of

6  Defendants and their Co-Conspirators as alleged herein, and the relief sought is common to the

7  class.

8        96.    Numerous questions of law or fact arise from Defendants' and Co-Conspirators'

9  anticompetitive conduct that is common to the Class, including but not limited to:

10          a.    Whether Defendants and Co-Conspirators engaged in a contract,

11  combination, and/or conspiracy to fix, raise, maintain, or stabilize prices of CRTs sold in the

12  United States;

13          b.    Whether Defendants and Co-Conspirators engaged in a contract,

14  combination, and/or conspiracy to restrict output of CRTs sold in the United States

15          c.    Whether Defendants and Co-Conspirators shared non-public information,

16  allocated markets and customers, restricted output of CRTs sold in the United States and

17  committed other conduct in furtherance of the alleged conspiracy;

18          d.    Whether Defendants' and Co-Conspirators' conduct caused the prices of

19  CRTs sold in the United States to be at artificially high and noncompetitive levels;

20          e.    Whether Plaintiffs and the other members of the Class were injured by

21  Defendants' and Co-Conspirators' conduct, and, if so, the appropriate class-wide measure of

22  damages for Class members; and

23          f.    The scope of any injunctive relief to which Plaintiffs and the other members

24  of the Class are entitled.

25        97.    These and other questions of law and fact are common to the Class, and

26  predominate over any questions affecting only individual Class members.

27        98.    Plaintiffs' claims are typical of the claims of the Class because Plaintiffs directly

28  purchased CRTs and/or CRT Products from one or more of the Defendants, subsidiaries or

Master File No. 07-5944-SC

SECOND AMENDED DPPs' CLASS ACTION COMPLAINT AGAINST MITSUBISHI AND THOMSON

1  affiliates thereof, and/or co-conspirators.

2      99.    Plaintiffs will fairly and adequately represent the interests of the Class in that

3  Plaintiffs are direct purchasers of CRTs and/or CRT Products and have no conflict with any other

4  members of the Class. Furthermore, Plaintiffs have retained competent counsel experienced in

5  antitrust, class action, and other complex litigation.

6      100.    Defendants and Co-Conspirators have acted on grounds generally applicable to the

7  Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

8      101.    This class action is superior to the alternatives, if any, for the fair and efficient

9  adjudication of this controversy. Prosecution as a class action will eliminate the possibility of

10  repetitive litigation. There will be no material difficulty in the management of this action as a class

11  action.

12      102.    The prosecution of separate actions by individual Class members would create the

13  risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for

14  Defendants and Co-Conspirators.

15              **VII.    TRADE AND COMMERCE**

16      103.    During the Class Period, each Defendant, or one or more of its subsidiaries, sold

17  CRTs and/or CRT Products in the United States in a continuous and uninterrupted flow of

18  interstate commerce and foreign commerce, including through and into this judicial district.

19      104.    During the Class Period, Defendants and Co-Conspirators collectively controlled a

20  majority of the market for CRTs and CRT Products, both globally and in the United States.

21      105.    The business activities of the Defendants and Co-Conspirators substantially

22  affected interstate trade and commerce in the United States and caused antitrust injury in the

23  United States.

24              **VIII.    FACTUAL ALLEGATIONS**

25  **A.  CRT Technology**

26      106.    A CRT has three components: (a) one or more electron guns, each of which is a

27  series of metallic structures used to generate a beam of electrons; (b) a magnetic or other

28  deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that

phosphoresces when struck by an electron beam, thereby producing a viewable image. A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image. An aperture or shadow mask—a thin screen of perforated metal—is welded to the faceplate panel and, to produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of narrow lines of red, green, blue and black.

107.    CRT technology was first developed more than a century ago. The first commercially practical CRT television was made in 1931. However, it was not until RCA Corporation introduced the product at the 1939 World's Fair that it became widely available to consumers. After that, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors and ATMs.

108.    The quality of a CRT itself determines the quality of the CRT display. No external control or feature can make up for a poor quality tube. In this regard, the CRT defines the whole CRT product so that the product is often simply referred to as "the CRT."

109.    Although there have been refinements and incremental advancements along the way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT technology used today is similar to that RCA unveiled in 1939.

110.    CRTs can be subdivided into CDTs and CPTs. As noted above, CPTs are used primarily in televisions and related devices and CDTs are primarily used in computer monitors and similar devices. The primary difference is that CDTs typically yield a higher resolution image requiring more pixels than do CPTs.

111.    CRTs have no independent utility, and have value only as components of other products, such as TVs and computer monitors. The demand for CRTs thus directly derives from the demand for such products.

112.    The market for CRTs and the market for the products into which they are placed are inextricably linked and intertwined because the CRT market exists to serve the CRT Products markets. The markets for CRTs and CRT Products are, for all intents and purposes, inseparable in that one would not exist without the other.

113. Plaintiffs have participated in the market for CRTs through their direct purchases from Defendants and Co-Conspirators of CRTs and CRT Products containing price-fixed CRTs. Defendants' unlawful conspiracy has inflated the prices at which Plaintiffs bought CRTs and CRT Products, and Plaintiffs have been injured thereby and paid supra-competitive prices for CRTs and CRT Products.

**B. Structure of the CRT Industry**

114. The CRT industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces and homogeneity of products.

**1. Market Concentration**

115. During the Class Period, the CRT industry was dominated by relatively few companies. In 2004, Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together held a collective 78% share of the global CRT market. The high concentration of market share facilitates coordination because there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

**2. Information Sharing**

116. Because of common membership in trade associations, interrelated business arrangements such as joint ventures, allegiances between companies in certain countries and relationships between the executives of certain companies, there were many opportunities for Defendants and co-conspirators to discuss and exchange competitive information. The ease of communication was facilitated by the use of meetings, telephone calls, e-mails and instant messages. Defendants and co-conspirators took advantage of these opportunities to discuss, and agree upon, their pricing for CRTs as alleged below.

**3. Consolidation**

117. The CRT industry also had significant consolidation during the Class Period, including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's and

1   Panasonic's CRT businesses into MTPD.

2   **4.  High Costs of Entry Into the Industry**

3   118.   There are significant manufacturing and technological barriers to entry into the

4   CRT industry. It would require substantial time, resources and industry knowledge to overcome

5   these barriers to entry. It is also extremely unlikely that a new producer would enter the market in

6   light of the declining demand for CRT Products.

7   **5.  Homogeneity of CRT Products**

8   119.   CRT Products are commodity-like products which are manufactured in

9   standardized sizes. One Defendant's CRT Product for a particular application, such as a particular

10  size television set or computer monitor, is substitutable for another's. Defendants and co-

11  conspirators sold CRTs primarily on the basis of price.

12  120.   It is easier to form and sustain a cartel when the product in question is commodity-

13  like because it is easier to agree on prices to charge and to monitor those prices once an agreement

14  is formed.

15  **C.  Defendants' and Co-Conspirators' Illegal Agreements**

16  121.   In order to control and maintain profitability during declining demand for CRT

17  Products, Defendants and their co-conspirators have engaged in a contract, combination, trust or

18  conspiracy, the effect of which has been to raise, fix, maintain and/or stabilize the prices at which

19  they sold CRTs to artificially inflated levels from at least March 1, 1995 through at least

20  November 25, 2007.

21  122.   The CRT conspiracy was effectuated through a combination of group and bilateral

22  meetings. In the formative years of the conspiracy (1995-1996), bilateral discussions were the

23  primary method of communication and took place on an informal, ad hoc basis. During this

24  period, representatives from Daewoo, LG Electronics and Samsung SDI visited other

25  manufacturers, including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba and Panasonic, to

26  discuss increasing prices for CRTs in general and to specific customers. These meetings took

27  place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia and Singapore. Samsung SDI,

28  LG, and Chunghwa, along with Daewoo, also attended several group meetings during this period.

The participants at these group meetings discussed increasing prices for CRTs.

123.   As more manufacturers formally entered the conspiracy, group meetings became more prevalent. Beginning in 1997, group meetings occurred in a more organized, systematic fashion, and a formal system of multilateral and bilateral meetings was put in place.

124.   The overall CRT conspiracy raised and stabilized worldwide and U.S. prices that Defendants and their co-conspirators charged for CRTs.

### 1. "Glass Meetings"

125.   The group meetings among the participants in the CRT price-fixing conspiracy were referred to as "glass meetings" or "GSM." Glass meetings were attended by employees at three general levels of the participant corporations.

126.   The first level meetings were attended by high level company executives including CEOs, Presidents, and Vice Presidents, and were known as "top" meetings. Top meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements. Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements. Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.

127.   The second level meetings were attended by high level sales managers and were known as "management" meetings. These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at top meetings.

128.   Finally, the third level meetings were known as "working level" meetings and were attended by lower level sales and marketing employees. These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements. These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority. The working level meetings also tended to be more regional and often took place near the conspirators' factories.

129.   The Chinese glass meetings began in 1998 and generally occurred on a monthly

SECOND AMENDED DPPs' CLASS ACTION COMPLAINT AGAINST MITSUBISHI AND THOMSON

basis following a top or management level meeting. The China meetings had the principal purpose of reporting what had been decided at the most recent glass meetings to the Chinese manufacturers. Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of other conspirators, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

130.   Glass meetings also occurred occasionally in various European countries. Attendees at these meetings included those conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG Electronics, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo) and IRICO. Chunghwa also attended these meetings.

131.   Representatives of the conspirators also attended what were known amongst members of the conspiracy as "green meetings." These were meetings held on golf courses. The green meetings were generally attended by top and management level employees of the conspirators. During the Class Period, glass meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, Malaysia, and the United States.

132.   Participants would often exchange competitively sensitive information prior to a glass meeting. This included information on inventories, production, sales and exports. For some such meetings, where information could not be gathered in advance of the meeting, it was brought to the meeting and shared.

133.   The glass meetings at all levels followed a fairly typical agenda. First, the participants exchanged competitive information such as proposed future CRT pricing, sales volume, inventory levels, production capacity, exports, customer orders, price trends and forecasts of sales volumes for coming months. The participants also updated the information they had provided in the previous meeting. Each meeting had a rotating, designated "Chairman" who would write the information on a white board. The meeting participants then used this information to discuss and agree upon what price each would charge for CRTs to be sold in the following month or quarter. They discussed and agreed upon target prices, price increases, so-called "bottom"

1   prices and price ranges for CRTs. They also discussed and agreed upon prices of CRTs that were

2   sold to specific customers, and agreed upon target prices to be used in negotiations with large

3   customers. Having analyzed the supply and demand, the participants would also discuss and agree

4   upon production cutbacks.

5       134.    During periods of oversupply, the focus of the meeting participants turned to

6   making controlled and coordinated price reductions. This was referred to as setting a "bottom

7   price."

8       135.    The conspiracy included agreements on the prices at which certain conspirators

9   would sell CRTs to their own corporate subsidiaries and affiliates that manufactured end products,

10  such as televisions and computer monitors. The conspirators realized the importance of keeping

11  the internal pricing to their affiliated OEMs at a high enough level to support the CRT pricing in

12  the market to other OEMs. In this way, Defendants and their co-conspirators ensured that all direct

13  purchaser OEMs paid supracompetitive prices for CRTs.

14      136.    The agreements reached at the glass meetings included:

15          a.  agreements on CRT prices, including establishing target prices, "bottom" prices,

16              price ranges and price guidelines;

17          b.  placing agreed-upon price differentials on various attributes of CRTs, such as

18              quality or certain technical specifications;

19          c.  agreements on pricing for intra-company CRTs sales to vertically integrated

20              customers;

21          d.  agreements as to what to tell customers about the reason for a price increase;

22          e.  agreements to coordinate with competitors that did not attend the group meetings

23              and agreements with them to abide by the agreed-upon pricing;

24          f.  agreements to coordinate pricing with CRT manufacturers in other geographic

25              markets such as Brazil, Europe and India;

26          g.  agreements to exchange pertinent information regarding shipments, capacity,

27              production, prices and customers' demands;

28          h.  agreements to coordinate uniform public statements regarding available capacity

and supply;

i.  agreements to allocate both overall market shares and share of a particular customer's purchases;

j.  agreements to allocate customers;

k.  agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

l.  agreements to keep their meetings secret.

137.  Efforts were made to monitor each conspirator's adherence to these agreements in a number of ways, including seeking confirmation of pricing both from customers and from employees of the conspirators themselves. When cheating did occur, it was addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of its principal customers; and 4) a recognition of a mutual interest in living up to the target price and living up to the agreements that had been made.

138.  From 2005-2007 the group glass meetings became less frequent and bilateral meetings again became more prevalent.

### 2.  Bilateral Discussions

139.  Throughout the Class Period, the glass meetings were supplemented by bilateral discussions between various Defendants and their co-conspirators. The bilateral discussions were more informal than the group meetings and occurred on a frequent, ad hoc basis, often between the group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

140.  During the Class Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, Mexico, and the United States.

141.  The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations.

142.   In order to ensure the efficacy of their global conspiracy, Defendants and their co-conspirators also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico, and the United States, such as Philips Brazil, Samsung SDI Brazil and Samsung SDI Mexico. These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRT Products. As further alleged herein, North America was the largest market for CRT televisions and computer monitors during the Class Period. Because these manufacturers are all wholly-owned and controlled subsidiaries of Philips and Samsung SDI, they adhered to the unlawful price-fixing agreements. In this way, Defendants and their co-conspirators ensured that prices of all CRTs sold in the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

143.   Defendants and co-conspirators also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices. The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

144.   Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings. It was often the case that in the few days following a top or management meeting, the attendees at these group meetings would meet bilaterally with the other conspirators for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting. For example, Samsung SDI had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi. LG Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba. Similarly, Samsung SDI had regular communications with Defendant Mitsubishi. Hitachi and Toshiba implemented the agreed-upon pricing as conveyed by Samsung SDI, and LG Electronics. Other times, Hitachi and Toshiba attended the glass meetings. In this way, Hitachi and Toshiba participated in the conspiracy to fix prices of CRTs.

### 3. Defendants' and Co-Conspirators' Participation in Group and Bilateral Discussions

#### a. Thomson's Admitted Participation in the CRT Conspiracy

145.    Thomson has admitted that it participated in the CRT price-fixing conspiracy. In its 2011 Annual Report (released in late March 2012), Thomson told its shareholders and the public:

> On January 9, 2008, Thomson/Technicolor received a request under art 18 (2) of Council Regulation n1/2003 from the European Commission (the "EC") also relating to the CRT industry. Thomson/Technicolor received three further requests for information from the EC on January 16, 2009, January 19, 2009, and September 15, 2009 respectively. On November 25, 2009, Thomson/Technicolor received a Statement of Objections ("SO") from the European Commission. On March 3, 2010, Thomson/Technicolor filed its written response to the "SO." On May 26 and 27, 2010, Thomson/Technicolor attended an Oral Hearing together with the other parties and the European Commission. ***Thomson/Technicolor stated that it played a minor role in the alleged anticompetitive conduct.***

Technicolor Annual Report 2011, at 226 (emphasis added). While Plaintiffs dispute that Thomson's role in the CRT price-fixing conspiracy was minor and believes the evidence adduced to date demonstrates it was substantial, what cannot be contested is that Thomson *by its own admission* was one of the conspirators.

146.    In December 2012, following an investigation of more than four years, the EC released its finding on the CRT price-fixing conspiracy. It found that seven companies, including Thomson, participated in cartels lasting "almost ten years, between 1996 and 2006," to fix the prices of CRTs. The EC concluded that "these companies fixed prices, shared markets, allocated customers between themselves and restricted their output." The EC official responsible for competition policy described the CRT cartels as "textbook cartels [that] feature all the worst kinds of anticompetitive behavior." Fines totaling €1,470,515,000 were assessed against the members of the CRT cartels, including a fine of €38,631,000 against Thomson, an amount which was reduced due to Thomson's cooperation with the EC investigation. The EC investigation found that the CRT cartels "operated worldwide" and were "among the most organized cartels that the Commission has investigated."

147.    After the EC announced its finding that Thomson participated in the CRT price-fixing conspiracy and after Thomson paid the fine imposed by the EC, Thomson again

1    acknowledged its participation in the conspiracy. In its 2012 Annual Report (released in late

2    March 2013), Thomson informed its shareholders and the public that "[f]ollowing the European

3    Commission decision, purchasers may bring individual claims against the Company seeking

4    compensation for alleged loss suffered as a result of the anti-competitive conduct." Technicolor

5    Annual Report 2012, at 216.

6          148.    Between at least 1995 and 2005, Thomson participated in and/or was a party to

7    over 15 bilateral meetings and over 25 group meetings, including "green meetings" in the United

8    States, with the Defendants and co-conspirators in which unlawful agreements as to, inter alia,

9    price, output restrictions, and/or customer and market allocation of CRTs occurred. These

10   meetings attended by Thomson occurred in the United States, Europe, Japan, and China, and were

11   also attended by representatives from Samsung SDI, MTPD, LPD, Philips, Toshiba, and

12   Chunghwa, among other co-conspirators. The purpose of these meetings, and other

13   communications, between Thomson and the co-conspirators was to raise and stabilize the prices

14   and set supply levels of CRTs sold by Thomson and its competitors in North America, including

15   the United States. Documents reflect that these meetings among competitors did not occur in the

16   context of a customer-supplier relationship. Thomson also discussed with competitors CRT prices,

17   production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer

18   allocation, and new product development, including for North American CRTs. A substantial

19   number of these meetings were attended by high level sales, operations, and sourcing managers

20   from Thomson Consumer and/or Thomson SA. In addition to in-person meetings, Thomson also

21   communicated with its competitors over the telephone and by email. On information and belief,

22   Plaintiffs anticipate additional evidence of Thomson's conspiratorial meetings and/or

23   communications with the Defendants and co-conspirators will be revealed through discovery of

24   Thomson. As examples of Thomson's active participation in a conspiracy to fix CRT prices during

25   the Class Period:

26   ████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SECOND AMENDED DPPs' CLASS ACTION COMPLAINT AGAINST MITSUBISHI AND THOMSON

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Master File No. 07-5944-SC

SECOND AMENDED DPPs' CLASS ACTION COMPLAINT AGAINST MITSUBISHI AND THOMSON

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Master File No. 07-5944-SC

SECOND AMENDED DPPs' CLASS ACTION COMPLAINT AGAINST MITSUBISHI AND THOMSON

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16    149.    Thomson SA participated in the conspiracy in its own right and through its wholly

17 owned subsidiary, Thomson Consumer, through at least 2005, and participated thereafter through

18 Videocon, in which it retained a 13.1% ownership stake after selling its CRT business to Videocon

19 in 2005. Thomson SA maintained at least a 10% ownership interest in Videocon throughout the

20 conspiracy period. Thomson SA never effectively withdrew from this conspiracy.

21    150.    Thomson Consumer directly participated in the conspiracy in the United States,

22 which was Thomson's largest market for CRTs. Between at least 1995 and 2005, Thomson

23 Consumer knowingly participated in and/or was a party to bilateral and group meetings, including

24 "green meetings" in the United States, in which unlawful agreements as to, inter alia, price, output

25 restrictions, and/or customer and market allocation of U.S.-market CRTs occurred. As examples of

26 Thomson Consumer's active participation in a conspiracy to fix CRT prices during the Class

27 Period:

28

SECOND AMENDED DPPs' CLASS ACTION COMPLAINT AGAINST MITSUBISHI AND THOMSON

Master File No. 07-5944-SC

SECOND AMENDED DPPs' CLASS ACTION COMPLAINT AGAINST MITSUBISHI AND THOMSON

151. In addition to the meetings with co-conspirators alleged above, Thomson Consumer's Hanrahan met with the General Sales Manager of MTPD approximately every six months from 2002 through 2006 to exchange information regarding production and capacity of North American CRT factories, as well as future CRT prices. Following one of these information exchanges, the MPTD representative acknowledged in an internal email that acquiring information about Thomson's CRT production "is a violation of antitrust."

152. Thomson Consumer knowingly participated in the conspiracy both in its own right and through its parent company Thomson SA, through at least 2005, and participated thereafter through Videocon, in which Thomson SA maintained at least a 10% ownership interest throughout the conspiracy period. Thomson Consumer never effectively withdrew from this conspiracy.

### b. Mitsubishi's Participation in the CRT Conspiracy

153. Between at least 1995 and 2005, Defendant Mitsubishi participated in multiple bilateral and group meetings with its competitors, including but not limited to, co-conspirators Samsung SDI, Toshiba, Chunghwa, and Hitachi. These meetings were attended by high level sales managers and other senior executives from Mitsubishi. At these meetings, Mitsubishi discussed such things as CRT prices, production, future production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices, customer allocations, and supply levels for CRTs. In addition to in-person meetings, Mitsubishi also communicated with its competitors by telephone and email. Examples of

Mitsubishi's active participation in the conspiracy to fix CRT prices during the Class Period include, but are not limited to:

SECOND AMENDED DPPs' CLASS ACTION COMPLAINT AGAINST MITSUBISHI AND THOMSON

Master File No. 07-5944-SC

SECOND AMENDED DPPs' CLASS ACTION COMPLAINT AGAINST MITSUBISHI AND THOMSON

1

2

3

4   All of the above acts, as well as others, were in furtherance of the conspiracy.

5

6

7

8

9

10

11            **c.  Co-Conspirators' Participation in the CRT Conspiracy**

12        155.  Between at least 1996 and 2001, co-conspirator Hitachi, through Hitachi, Ltd.,

13 Hitachi Displays, Hitachi Shenzhen and Hitachi Asia, participated in several glass meetings. These

14 meetings were attended by high level sales managers from Hitachi. Hitachi also engaged in

15 multiple bilateral discussions with other participants, particularly with Samsung. Through these

16 discussions, Hitachi agreed on prices and supply levels for CRTs. Hitachi never effectively

17 withdrew from this conspiracy.

18        156.  Co-conspirators Hitachi America and HEDUS were represented at those meetings

19 and were a party to the agreements entered at them. To the extent Hitachi America and HEDUS

20 sold and/or distributed CRT Products to direct purchasers, they played a significant role in the

21 conspiracy because Defendants and their co-conspirators wished to ensure that the prices for CRT

22 Products paid by direct purchasers would not undercut the CRT pricing agreements reached at the

23 glass meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the

24 alleged conspiracy.

25        157.  Between at least 1998 and 2007, co-conspirator IRICO, through IGC, IGE and

26 IDDC, participated in multiple glass meetings. These meetings were attended by the highest

27 ranking executives from IRICO. IRICO also engaged in multiple bilateral discussions with other

28 participants, particularly with other Chinese manufacturers. Through these discussions, IRICO

1  agreed on prices and supply levels for CRTs. None of IRICO's conspiratorial conduct in

2  connection with CRTs was mandated by the Chinese government. IRICO was acting to further its

3  own independent private interests in participating in the alleged conspiracy.

4      158.   Between at least 1995 and 2001, co-conspirator LG Electronics, through LGEI,

5  participated in at least 100 glass meetings at all levels. After 2001, LG Electronics participated in

6  the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP Displays). A

7  substantial number of these meetings were attended by the highest ranking executives from LG

8  Electronics. LG Electronics also engaged in bilateral discussions with other participants on a

9  regular basis. Through these discussions, LG agreed on prices and supply levels for CRTs. LG

10 Electronics never effectively withdrew from this conspiracy.

11     159.   Co-conspirator LGEUSA was represented at those meetings and was a party to the

12 agreements entered at them. To the extent LGEUSA sold and/or distributed CRT Products, it

13 played a significant role in the conspiracy because Defendants and their co-conspirators wished to

14 ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT

15 pricing agreements reached at the glass meetings. Thus, LGEUSA was an active, knowing

16 participant in the alleged conspiracy.

17     160.   Between at least 2001 and 2006, co-conspirator LP Displays (f/k/a LGPD)

18 participated in at least 100 glass meetings at all levels. A substantial number of these meetings

19 were attended by the highest ranking executives from LP Displays. Certain of these high level

20 executives from LP Displays had previously attended meetings on behalf of LG Electronics and

21 Philips. LP Displays also engaged in bilateral discussions with other participants. Through these

22 discussions, LP Displays agreed on prices and supply levels for CRTs.

23     161.   Between at least 1996 and 2003, co-conspirator Panasonic, through Panasonic

24 Corporation and Matsushita Malaysia, participated in several glass meetings. After 2003,

25 Panasonic participated in the CRT conspiracy through MTPD, its joint venture with Toshiba.

26 These meetings were attended by high level sales managers from Panasonic and MTPD.

27 Panasonic also engaged in multiple bilateral discussions with other participants. Through these

28 discussions, Panasonic agreed on prices and supply levels for CRTs. Panasonic never effectively

SECOND AMENDED DPPs' CLASS ACTION COMPLAINT AGAINST MITSUBISHI AND THOMSON

1    withdrew from this conspiracy.

2         162.   PCNA was represented at those meetings and was a party to the agreements entered

3    at them. To the extent PCNA sold and/or distributed CRT Products to direct purchasers, it played

4    a significant role in the conspiracy because Defendants and their co-conspirators wished to ensure

5    that the prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

6    agreements reached at the glass meetings. Thus, PCNA was an active, knowing participant in the

7    alleged conspiracy.

8         163.   Between at least 2003 and 2006, co-conspirator MTPD participated in multiple

9    glass meetings and in fact led many of these meetings during the latter years of the conspiracy.

10   These meetings were attended by high level sales managers from MTPD. MTPD also engaged in

11   bilateral discussions with other participants. Through these discussions, MTPD agreed on prices

12   and supply levels for CRTs.

13        164.   Between at least 1998 and 2007, co-conspirator BMCC participated in multiple

14   glass meetings. These meetings were attended by high level sales managers from BMCC. BMCC

15   also engaged in multiple bilateral discussions with other participants, particularly the other

16   Chinese CRT manufacturers. Through these discussions, BMCC agreed on prices and supply

17   levels for CRTs. None of BMCC's conspiratorial conduct in connection with CRTs was mandated

18   by the Chinese government. BMCC was acting to further its own independent private interests in

19   participating in the alleged conspiracy.

20        165.   Between at least 1996 and 2001, co-conspirator Philips, through Royal Philips and

21   Philips Taiwan, participated in at least 100 glass meetings at all levels. After 2001, Philips

22   participated in the CRT conspiracy through its joint venture with LG Electronics, LGPD (n/k/a LP

23   Displays). A substantial number of these meetings were attended by high level executives from

24   Philips. Philips also engaged in numerous bilateral discussions with other participants. Through

25   these discussions, Philips agreed on prices and supply levels for CRTs. Philips never effectively

26   withdrew from this conspiracy.

27        166.   Co-conspirators Philips America and Philips Brazil were represented at those

28   meetings and were a party to the agreements entered at them. To the extent Philips America and

1    Philips Brazil sold and/or distributed CRT Products to direct purchasers, they played a significant

2    role in the conspiracy because Defendants and their co-conspirators wished to ensure that the

3    prices for CRT Products paid by direct purchasers would not undercut the CRT pricing

4    agreements reached at the glass meetings. Thus, Philips America and Philips Brazil were active,

5    knowing participants in the alleged conspiracy.

6          167.    Between at least 1995 and 2007, co-conspirator Samsung SDI, through Samsung

7    SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen and Samsung SDI Tianjin, participated in at

8    least 200 glass meetings at all levels. A substantial number of these meetings were attended by the

9    highest ranking executives from Samsung SDI. Samsung SDI also engaged in bilateral discussions

10   with each of the other participants on a regular basis. Through these discussions, Samsung SDI

11   agreed on prices and supply levels for CRTs.

12         168.    Co-conspirators Samsung SDI America, Samsung SDI Brazil and Samsung SDI

13   Mexico were represented at those meetings and were a party to the agreements entered at them.

14   Thus, Samsung SDI America, Samsung SDI Brazil and Samsung SDI Mexico were active,

15   knowing participants in the alleged conspiracy.

16         169.    Between at least 1997 and 2006, co-conspirator Thai CRT participated in multiple

17   glass meetings. These meetings were attended by the highest ranking executives from Thai CRT.

18   Thai CRT also engaged in multiple bilateral discussions with other participants. Through these

19   discussions, Thai CRT agreed on prices and supply levels for CRTs. Thai CRT never effectively

20   withdrew from this conspiracy.

21         170.    Between at least 1995 and 2003, co-conspirator Toshiba, through TC, TDDT and

22   TEDI, participated in several glass meetings. After 2003, Toshiba participated in the CRT

23   conspiracy through MTPD, its joint venture with Panasonic. These meetings were attended by

24   high level sales managers from Toshiba and MTPD. Toshiba also engaged in multiple bilateral

25   discussions with other participants. Through these discussions, Toshiba agreed on prices and

26   supply levels for CRTs. Toshiba never effectively withdrew from this conspiracy.

27         171.    Co-conspirators Toshiba America, TACP, TAEC and TAIS were represented at

28   those meetings and were a party to the agreements entered at them. To the extent Toshiba

1   America, TACP, TAEC and TAIS sold and/or distributed CRT Products to direct purchasers, they
2   played a significant role in the conspiracy because Defendants and their co-conspirators wished to
3   ensure that the prices for CRT Products paid by direct purchasers would not undercut the CRT
4   pricing agreements reached at the glass meetings. Thus, Toshiba America, TACP, TAEC and
5   TAIS were active, knowing participants in the alleged conspiracy.

6       172.   Between at least 1995 and 2006, co-conspirator Chunghwa, through Chunghwa PT,
7   Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland,
8   participated in at least 100 glass meetings at all levels. A substantial number of these meetings
9   were attended by the highest ranking executives from Chunghwa, including the former Chairman
10  and CEO of Chunghwa PT, C.Y. Lin. Chunghwa also engaged in bilateral discussions with other
11  participants on a regular basis. Through these discussions, Chunghwa agreed on prices and supply
12  levels for CRTs.

13      173.   Between at least 1995 and 2004, co-conspirator Daewoo, through Daewoo
14  Electronics, Orion and DOSA, participated in at least 100 glass meetings at all levels. A
15  substantial number of these meetings were attended by the highest ranking executives from
16  Daewoo. Daewoo also engaged in bilateral discussions with other participants. Through these
17  discussions, Daewoo agreed on prices and supply levels for CRTs. Bilateral discussions involving
18  Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004.
19  Daewoo never effectively withdrew from this conspiracy.

20      174.   Upon information and belief, between 2005 and 2007, Defendant Videocon
21  participated in several glass meetings and multiple bilateral meetings with its competitors,
22  continuing the practice established by Thomson. These meetings were attended by high level sales
23  and marketing managers and executives from Videocon, including one Thomson employee who
24  sat on Videocon's Board of Directors, and by employees who had previously attended meetings on
25  behalf of Thomson. At these meetings, Videocon discussed such things as CRT prices, production,
26  revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation,
27  and new product development, and agreed on prices and supply levels for CRT Products. These
28  meetings included discussions in which Videocon shared information with competitors regarding

1  the U.S. market for CRTs. Documents reflect that these meetings among competitors did not occur

2  in the context of a customer-supplier relationship. ███████████████████████████████████

3  ████████████████████████████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████████████████████████████

7  ██████████████████████████████████████████████████████████████████ Videocon never

8  effectively withdrew from this conspiracy.

9        175.    Defendant TDA was responsible for the sales and marketing of CRT Products in

10  North America on behalf of its parent company, Videocon. Upon information and belief,

11  Videocon dominated and/or controlled the finances, policies and/or affairs of TDA and directed its

12  pricing of CRT Products sold to the North America market. ████████████████████████

13  ████████████████████████████████████████████████████████████████████████████████████

14  ████████████████████████████████████████████████████ Upon information and

15  belief, between 2005 and 2007, TDA (originally known as Thomson Displays Americas), and its

16  wholly owned Mexican subsidiary and co-conspirator Technologies Displays Mexicana,

17  knowingly participated in conspiracy meetings and/or were parties to the agreements entered at

18  them, individually and through their parent company Videocon. The prices established by TDA

19  were, thus, the product of conspiratorial communications between Videocon and TDA and their

20  co-conspirators.

21        176.    To the extent Defendants Thomson Consumer, TDA, and its Mexican subsidiary

22  and co-conspirator Technologies Displays Mexicana, distributed CRTs to direct purchasers, they

23  played a significant role in the conspiracy because Defendants wished to ensure that the prices for

24  such products paid by direct purchasers would not undercut the pricing agreements reached at

25  these various meetings. Thus, Thomson Consumer, TDA, and Technologies Displays Mexicana

26  were at those meetings and/or were parties to the agreements and were active, knowing

27  participants in this conspiracy.

28        177.    When Plaintiffs refer to a corporate family or companies by a single name in their

allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them.

**D. The CRT Market During the Conspiracy**

178.    Until the last few years of the CRT conspiracy, CRTs were the dominant technology used in displays, including televisions and computer monitors. During the Class Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

179.    The following data was reported by Stanford Resources, Inc., a market research firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|----------------------|------------------------------|-------------------------------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0[2] | $235 |

180.    During the Class Period, North America was the largest market for CRT TVs and computer monitors. According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America. By 2002, North America still consumed around 35 percent of the world's CRT monitor supply. *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

---

[2]    Estimated market value of CRT units sold.

181.   Defendants' and co-conspirators' collusion is evidenced by unusual price movements in the CRT Product market during the Class Period. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

182.   In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose. The price increase was allegedly based on increasing global demand. In fact, this price increase was a result of the collusive conduct as herein alleged.

183.   After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

184.   A BNET Business Network news article from August 1998 reported that "key components (cathode ray tubes) in computer monitors have risen in price. 'Although several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October . . . . While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

185.   A 2004 article from Techtree.com reports that various computer monitor manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their monitors in response to increases in CRT prices caused by an alleged shortage of glass shells used to manufacture the tubes. Philips is quoted as saying that, "It is expected that by the end of September this year [2004] there will be [a] 20% hike in the price of our CRT monitors."

186.   Defendants and co-conspirators also conspired to limit production of CRTs by

SECOND AMENDED DPPs' CLASS ACTION COMPLAINT AGAINST MITSUBISHI AND THOMSON

1  shutting down production lines for days at a time, and closing or consolidating their manufacturing

2  facilities.

3       187.    For example, CRT factory utilization percentage fell from 90% in the third quarter

4  of 2000 to 62% in the first quarter of 2001. This is the most dramatic example of a drop in factory

5  utilization. There were sudden drops throughout the Class Period but to a lesser degree. Plaintiffs

6  are informed and believe that these sudden, coordinated drops in factory utilization by Defendants

7  and co-conspirators were the result of agreements to decrease output in order to stabilize the prices

8  of CRTs.

9       188.    During the latter part of the Class Period, while demand in the United States for

10  CRT Products declined, the conspiracy was effective in moderating the normal downward

11  pressures on prices for CRT Products caused by the entry and popularity of the new generation

12  LCD panels and plasma display products. As Finsen Yu, President of Skyworth Macao

13  Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT

14  technology is very mature; prices and technology have become stable."

15       189.    During the Class Period, there were not only periods of unnatural and sustained

16  price stability, but there were also increases in prices of CRTs and CRT Products. These price

17  increases were despite the declining demand due to the approaching obsolescence of CRT

18  Products caused by the emergence of a new, potentially superior and clearly more popular,

19  substitutable technology.

20       190.    These price increases and price stability in the market for CRT Products during the

21  Class Period are inconsistent with a competitive market for a product facing rapidly decreasing

22  demand caused by a new, substitutable technology.

23  **E.  International Government Antitrust Investigations of the CRT Conspiracy**

24       191.    Defendants' and co-conspirators' conspiracy to fix, raise, maintain and stabilize the

25  prices of, and restrict output for, CRTs sold in the United States during the Class Period, has been

26  and the subject of a multinational investigation commenced by the Antitrust Division of the

27  United States DOJ.

28       192.    Separately, the European Commission and Japan and South Korea's Fair Trade

1   Commissions also opened investigations into illegal price-fixing of CRTs that were being sold in

2   Europe and Asia.

3        193.   In its 2008 Annual Report, co-conspirator Toshiba reports that "[t]he Group is also

4   being investigated by the [European] Commission and/or the U.S. Department of Justice for

5   potential violations of competition laws with respect to semiconductors, LCD products, cathode

6   ray tubes (CRT) and heavy electrical equipment."

7        194.   On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its

8   own investigation into the CRT cartel. The HCA described the cartel as follows:

9

10   The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated
     a competition supervision proceeding against the following undertakings: Samsung
11   SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt.,
     Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays,
12   Chunghwa Pictures Tubes (UK) Ltd, Chunghwa Pictures Tubes Ltd, Daewoo Orion
     S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT
13   Picture Display Germany GmbH, Matsushita Global HQ, Matsushita European
     HQ.
14
     Based on the data available the undertakings mentioned above concerted their
15   practice regarding the manufacturing and distribution of cathode-ray tubes
     (including coloured pictures tubes and coloured screen tubes) on the European
16   market between 1995 and 2007. The anti-competitive behaviour may have
     concerned the exchange of sensitive market information (about prices, volumes
17   sold, demand and the extent to which capacities were exploited), price-fixing, the
     allocation of market shares, consumers and volumes to be sold, the limitation of
18   output and coordination concerning the production. The undertakings evolved a
     structural system and functional mechanism of cooperation.
19
     According to the available evidences it is presumable that the coordination of
20   European and Asian undertakings regarding to the European market also included
21   Hungary from 1995 to 2007. The coordination concerning the Hungarian market
     allegedly formed part of the European coordination. Samsung SDI Magyarország.
22   was called into the proceeding since it manufactured and sold cathode-ray tubes in
     Hungary in the examined period, and it allegedly participated in the coordination
23   between its parent companies.

24

25        195.   On February 10, 2009, the DOJ issued a press release announcing that a federal

26   grand jury in San Francisco had that same day returned a two-count indictment against the former

27   Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin a/k/a C.Y. Lin, for his

28   participation in global conspiracies to fix the prices of two types of CRTs used in computer

1  monitors and televisions. The press release notes that "[t]his is the first charge as a result of the
2  Antitrust Division's ongoing investigation into the cathode ray tubes industry." The press release
3  further notes that Lin had previously been indicted for his participation in a conspiracy to fix the
4  prices of TFT-LCDs. Mr. Lin's indictment states that the combination and conspiracy to fix the
5  prices of CRTs was carried out, in part, in California.

6  196.   On August 19, 2009, the DOJ issued a press release announcing that a federal
7  grand jury in San Francisco had the previous night returned a one-count indictment against Wu
8  Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs,
9  the type of CRT used in computer monitors. Tony Cheng formerly was an assistant Vice-President
10  of Sales and Marketing at Chunghwa. The press release notes that Cheng previously had been
11  indicted for his participation in a conspiracy to fix the prices of TFT-LCDs. Mr. Cheng's
12  indictment states that the combination and conspiracy to fix the prices of CRTs was carried out, in
13  part, in California.

14  197.   On March 30, 2010, the DOJ issued a press release announcing that a federal grand
15  jury in San Francisco had that same day returned a one-count indictment against Chung Cheng
16  Yeh a/k/a Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type
17  of CRT used in computer monitors. The press release identifies Yeh as a "former director of sales"
18  at "a large-Taiwan based color display tube (CDT) manufacturer." The indictment states that the
19  combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

20  198.   On November 9, 2010, the DOJ issued a press release announcing that a federal
21  grand jury in San Francisco had that same day returned a one-count indictment against Seung-Kyu
22  Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim for their
23  participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer
24  monitors. The press release identifies Lee, Yang, and Kim as "former executives from two color
25  display tube (CDT) manufacturing companies." The indictment states that the combination and
26  conspiracy to fix the prices of CRTs was carried out, in part, in California.

27  199.   On March 18, 2011, the DOJ issued a press release announcing that it had reached
28  an agreement with co-conspirator Samsung SDI in which it would plead guilty and pay a $32

1  million fine for its role in a conspiracy to fix prices of CDTs.

2      200.    Samsung SDI admitted that from at least as early as January 1997 until at least as

3  late as March 2006, it participated in a conspiracy among major CDT producers to fix prices,

4  reduce output, and allocate market shares of CDTs sold in the United States and elsewhere.

5  Samsung SDI admitted that in furtherance of the conspiracy it, through its officers and employees,

6  engaged in discussions and attended meetings with representatives of other major CDT producers.

7  During these discussions and meetings, agreements were reached to fix prices, reduce output, and

8  allocate market shares of CDTs to be sold in the United States and elsewhere. Samsung SDI

9  further admitted that acts in furtherance of the conspiracy were carried in California.

10      201.    The plea agreement of Samsung SDI requires that it cooperate with the DOJ's

11  ongoing investigation of federal antitrust and related criminal laws involving the manufacture or

12  sale of CDTs and CPTs.

13      202.    As described above, in December 2012 the European Commission announced that

14  it fined seven companies for participating in cartels to fix the prices of CRTs lasting almost ten

15  years: Thomson, Samsung SDI, Philips, LG Electronics, Toshiba, Panasonic, and MTPD. The EC

16  concluded that "the cartelists carried out the most harmful anti-competitive practices including

17  price fixing, market sharing, customer allocation, capacity and output coordination and exchanges

18  of commercial sensitive information."

19  **F.  Effects of the CRT Conspiracy**

20      **1.  Examples of Reductions in Manufacturing Capacity**

21      203.    During the Class Period, the conspirators conspired to limit production of CRTs by

22  shutting down production lines for days at a time and closing or consolidating manufacturing

23  facilities.

24      204.    In December of 2004, MTPD closed its American subsidiary's operations in

25  Horseheads, New York, citing price and market erosion. Panasonic announced that the closing was

26  part of the company's "global restructuring initiatives in the CRT business." The company further

27  stated that in the future, "CRTs for the North American market will be supplied by other

28  manufacturing locations in order to establish an optimum CRT manufacturing structure."

205.    In July of 2005, LGPD ceased CRT production at its Durham, England facility, citing a shift in demand from Europe to Asia.

206.    In December of 2005, MTPD announced that it would close its American subsidiary's operations in Ohio, as well as operations in Germany, by early 2006. Like LG Philips, the company explained that it was shifting its CRT operations to Asian and Chinese markets.

207.    In late 2005, Samsung SDI followed the lead of other manufacturers, closing its CRT factory in Germany.

208.    In July of 2006, Orion shut down a CRT manufacturing plant in Princeton, Indiana. The same month, Panasonic announced it was shutting down its CRT factory in Malaysia and liquidating its joint venture with Toshiba.

## 2.  Examples of Collusive Pricing for CRTs

209.    Defendants' collusion is evidenced by unusual price movements in the CRT market. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

210.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ."

211.    In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

212.    Despite the ever-increasing popularity of, and intensifying competition from, flat panel monitors, prices for CRT monitors were "stuck stubbornly at high price levels" throughout 1995 according to a *CNET News.com* article. This price stabilization was purportedly due exclusively to a shortage of critical components such as glass. This was a pretext used to conceal the conspiracy.

213.    Prices for CRT monitors did fall sharply as a result of the Asian economic crisis of

1  1998, which severely devalued Asian currencies. This prompted the keynote speaker at Asia

2  Display 1998, an annual conference for the display industry, to state:

> We believe that now is the time to revise our strategic plan in order to survive in his tough environment and also to prepare for the coming years. This means that we have to deviate from the traditional approach of the simple scale up of production volume.

6       214.   In early 1999, despite declining production costs and the rapid entry of flat panel

7  display products, the price of large-sized color CRTs actually rose. The price increase was

8  allegedly based on increasing global demand for the products. In fact, this price rise was the result

9  of collusive conduct amongst Defendants.

10      215.   After experiencing an oversupply of 17" CRTs in the second half of 1999, the

11  average selling price of CRTs rose again in early 2000. A March 13, 2000 article quoted an

12  industry analyst as saying that this price increase was "unlike most other PC-related products."

13      216.   On June 1, 2004, LG Electronics raised the prices of its 15" and 17" CRT monitors

14  in India. This price hike was falsely attributed exclusively to a shortage of glass needed to

15  manufacture CRTs.

16      217.   Over the course of the Class Period, the price of CRTs remained stable, and in

17  some instances went up in an unexplained manner, despite the natural trend in most technology

18  products to go down over time. CRT technology was mature, and the costs of production were

19  relatively low compared to other emerging technologies. As Finsen Yu, President of Skyworth

20  Macao Commercial Off Shore Co., Ltd, a television maker, was quoted as saying in January of

21  2007, "[t]he CRT technology is very mature; prices and technology have become stable."

22      218.   CRT prices resisted downward price pressures and remained stable over a period of

23  many years. Even in periods of decreasing prices caused by outside factors, such as the Asian

24  currency crisis, the prices of CRT Products did not decline as much as they would have absent the

25  conspiracy. The stability of the price of CRTs was accomplished by the collusive activities alleged

26  above.

27          **3.  Summary of Effects of the Conspiracy Involving CRTs**

28      219.   The above combination and conspiracy has had the following effects, among

1    others:

2        a.  Price competition in the sale of CRTs by Defendants and their co-conspirators has

3            been restrained, suppressed and eliminated throughout the United States;

4        b.  Prices for CRTs in CRT Products sold by Defendants to Plaintiffs directly and

5            indirectly have been raised, fixed, maintained and stabilized at artificially high and

6            noncompetitive levels throughout the United States; and

7        c.  Plaintiffs were deprived of the benefit of free and open competition in the purchase

8            of CRT Products.

9        d.  As a direct and proximate result of the unlawful conduct of Defendants, Plaintiffs

10           were injured in their businesses and property in that they paid more for CRT

11           Products than they otherwise would have paid in the absence of the unlawful

12           conduct of Defendants.

13                   **IX.    CLAIM FOR VIOLATIONS OF 15 U.S.C. § 1**

14       220.   Plaintiffs incorporate by reference all the above allegations as if fully set forth

15   herein.

16       221.   From March 1, 1995, the exact date being unknown to Plaintiffs and exclusively

17   within the knowledge of Defendants and Co-Conspirators, Defendants and their Co-Conspirators

18   entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and

19   commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or

20   eliminating competition in the United States.

21       222.   In particular, Defendants have combined and conspired to raise, fix, maintain or

22   stabilize the prices of CRTs sold in the United States, which had an effect of raising the prices of

23   CRT Products sold in the United States.

24       223.   As part of and in furtherance of this conspiracy, Defendants and Co-Conspirators or

25   their agents engaged in various collusive practices with respect to CRTs that affected the pricing

26   of CRT Products.

27       224.   With respect to CRTs, Defendants and Co-Conspirators or their agents agreed, *inter*

28   *alia*, to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*,

shipments, prices, production, and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the Co-Conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (h) influence and, at times, coordinate pricing with producers in other geographic markets; (i) limit competition for certain key customers; (j) allocate customers; (k) allocate each producer's share of certain key customers' sales; and (l) restrict output.

225.   As a result of Defendants' and Co-Conspirators' unlawful conduct, prices for CRTs were raised, fixed, maintained and stabilized in the United States, which also affected the price of CRT Products.

226.   The contract, combination or conspiracy among Defendants and Co-Conspirators consisted of a continuing agreement, understanding and concerted action among Defendants and their Co-Conspirators.

227.   For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their Co-Conspirators did those things they contracted, combined, or conspired to do, including:

    a.  Participating in meetings and conversations to discuss and agree upon the prices and supply of CRTs;

    b.  Communicating in writing and orally to fix prices, allocate customers, and restrict output;

    c.  Agreeing to manipulate prices and supply of CRTs sold in the United States, and to allocate customers of such products, in a manner that deprived direct purchasers of free and open competition;

    d.  Issuing price announcements and price quotations in accordance with the agreements reached;

    e.  Selling CRTs to customers in the United States at non-competitive prices; and

    f.  Providing false statements to the public to explain increased prices for CRTs.

## X.   FRAUDULENT CONCEALMENT

228.   Plaintiffs had neither actual nor constructive knowledge of the facts supporting its claims for relief despite diligence in trying to discover the pertinent facts. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein. Defendants engaged in a secret conspiracy that did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRTs.

229.   Because Defendants' agreement, understanding and conspiracy were kept secret, Plaintiffs were unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for CRT Products.

230.   The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection. As noted above, Defendants and their co-conspirators organized glass meetings to avoid detection, conducted bilateral meetings in secret and agreed at glass meetings to orchestrate the giving of pretextual reasons for their pricing actions and output restrictions. Defendants and their co-conspirators would coordinate and exchange in advance the texts of the proposed communications with customers containing these pretextual statements and would coordinate which co-conspirator would first communicate these pretextual statements to customers.

231.   By its very nature, Defendants' price-fixing conspiracy was inherently self-concealing.

232.   Plaintiffs could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, conspiracy or combination. The contract, conspiracy or combination as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings, surreptitious communications between Defendants by the use of the telephone or in-person meetings in order to prevent the existence of written records, discussion on how to evade antitrust laws and concealing the

existence and nature of their competitor pricing discussions from non-conspirators (including customers).

233.    Defendants and their co-conspirators agreed not to publicly discuss the existence or nature of the conspiracy or their agreements. Meetings related to CDTs and CPTs were held separately to avoid detection. Participants at glass meetings were also told not to take minutes. Attending companies also reduced the number of their respective attendees to maintain secrecy. During these meetings, top executives and other officials attending these meetings were instructed on more than once occasion not to disclose the fact of these meetings to outsiders, or even to other employees of Defendants not involved in CRT pricing or production. In fact, the top executives who attended conspiracy meetings agreed to stagger their arrivals and departures at such meetings to avoid being seen in public with each other and with the express purpose and effect of keeping them secret.



SECOND AMENDED DPPs' CLASS ACTION COMPLAINT AGAINST MITSUBISHI AND THOMSON



Master File No. 07-5944-SC
SECOND AMENDED DPPs' CLASS ACTION COMPLAINT AGAINST MITSUBISHI AND THOMSON

1

2

3

4

5

6    236.    Defendants also agreed at glass meetings and bilateral meetings to give pretextual

7 reasons for price increases and output reductions to their customers.

8    237.    As alleged above, in early 1999, despite declining production costs and the rapid

9 entry of flat panel display products, the price of large-sized color CRTs actually rose. The price

10 increase was allegedly based on increasing global demand for the products. In fact, this price rise

11 was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

12    238.    As alleged above, despite increased competition from flat panel monitors, prices for

13 CRT monitors were stuck stubbornly at high price levels throughout 2001. This price stabilization

14 was purportedly due exclusively to a shortage of critical components such as glass. This was a

15 pretext used to cover up the conspiracy.

16    239.    In addition, when several CRT manufacturers, including Samsung, Philips and LG

17 Electronics, increased the price of CRTs in 2004, the price hike was blamed on a shortage of glass

18 shells use for manufacturing CRT monitors. In justifying this price increase, a Deputy General

19 Manager for an LG Electronics distributor in India stated, "[t]his shortage [of glass shells] is a

20 global phenomena and every company has to increase the prices of CRT monitors in due course of

21 time."

22    240.    Manufacturers such as LG Electronics periodically issued press statements falsely

23 asserting that CRT prices were being driven lower by intense competition.

24    241.    Plaintiffs are informed and believe, and thereon allege, that the purported reasons

25 for the price increases of CRTs were materially false and misleading and made for the purpose of

26 concealing the conspirators' anti-competitive scheme as alleged herein.

27    242.    As a result of Defendants' and their co-conspirators' fraudulent concealment of

28 their conspiracy, the running of any statute of limitations has been tolled with respect to any

1  claims that Plaintiffs have as a result of the anticompetitive conduct alleged in this complaint.

2  <center>**XI.    TOLLING**</center>

3      243.    Since November 4, 2011, Plaintiffs have been parties to a tolling agreement with

4  Technicolor SA (f/k/a Thomson SA) and Technicolor USA, Inc. (f/k/a Thomson, Inc.; Thomson

5  Multimedia Inc.; and Thomson Consumer Electronics, Inc.) ("Thomson Agreement"). The

6  Thomson Agreement tolls all limitations periods for all claims that Plaintiffs could have asserted

7  against Thomson as of the effective date of the Thomson Agreement. Pursuant to various

8  extensions, the Thomson Agreement currently remains in effect as of the date of the filing of this

9  Complaint.

10     244.    Since November 7, 2011, Plaintiffs have been parties to a tolling agreement with

11  Mitsubishi ("Mitsubishi Agreement"). The Mitsubishi Agreement tolls all limitations periods for

12  all claims that Plaintiffs could have asserted against Mitsubishi as of the effective date of the

13  Mitsubishi Agreement. Pursuant to various extensions, the Mitsubishi Agreement currently

14  remains in effect as of the date of the filing of this Complaint.

15     245.    As discussed in paragraphs 10-11 and 191-201 above, the DOJ instituted criminal

16  proceedings and investigations against several Defendants and co-conspirators commencing on at

17  least November 2007 through the present. The limitations period has been tolled during these

18  criminal proceedings pursuant to 15 U.S.C. § 16. *See, e.g.*, Order Granting In Part and Denying In

19  Part the Thomson Defendants' Motions to Dismiss at 25-29 (Dkt. No. 2440) (Mar. 13, 2014).

20  <center>**XII.    DAMAGES**</center>

21     246.    During the Class Period, Plaintiffs and the other members of the Class purchased

22  CRTs directly from Defendants and Co-Conspirators, or their subsidiaries, agents, and/or

23  affiliates, and, by reason of the antitrust violations herein alleged, paid more for such products

24  than they would have paid in the absence of such antitrust violations. As a result, Plaintiffs and the

25  other members of the Class have sustained damages to their business and property in an amount to

26  be determined at trial.

27  <center>**XIII.    PRAYER FOR RELIEF**</center>

28     WHEREFORE, Plaintiffs pray that the Court enter judgment on its behalf and on behalf of

<center>67</center>

1   the Class herein, adjudging and decreeing that:

2         A.    This action may proceed as a class action, with Plaintiffs as the designated Class

3   representatives and its counsel as Class Counsel;

4         B.    Defendants have engaged in a contract, combination, and conspiracy in violation of

5   Section 1 of the Sherman Act (15 U.S.C. § 1), and that Plaintiffs and the members of the Class

6   have been injured in their business and property as a result of Defendants' violations;

7         C.    Plaintiffs and the members of the Class recover damages sustained by them, as

8   provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs

9   and the Class be entered against the Defendants in an amount to be trebled in accordance with

10   such laws;

11         D.    Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the

12   respective officers, directors, partners, agents, and employees thereof and all other persons acting

13   or claiming to act on their behalf be permanently enjoined and restrained from continuing and

14   maintaining the combination, conspiracy, or agreement alleged herein;

15         E.    Plaintiffs and members of the Class be awarded pre-judgment and post-judgment

16   interest, and that such interest be awarded at the highest legal rate from and after the date of

17   service of the initial complaint in this action;

18         F.    Plaintiffs and members of the Class recover their costs of this suit, including

19   reasonable attorneys' fees as provided by law; and

20         G.    Plaintiffs and members of the Class receive such other or further relief as may be

21   just and proper.

22                              **XIV.    JURY TRIAL DEMANDED**

23         Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all

24   of the claims asserted in this Complaint so triable.

25       / / /

26       / / /

27       / / /

28       / / /

Master File No. 07-5944-SC

SECOND AMENDED DPPs' CLASS ACTION COMPLAINT AGAINST MITSUBISHI AND THOMSON

1    DATED: August 6, 2015              By: */s/ Guido Saveri*
                                        Guido Saveri
2                                       R. Alexander Saveri
                                        Geoffrey C. Rushing
3                                       Cadio Zirpoli
                                        Travis L. Manfredi
4                                       SAVERI & SAVERI, INC.
                                        706 Sansome Street
5                                       San Francisco, California 94111
                                        Telephone: (415) 217-6810
6
7                                       *Lead Counsel for the Direct Purchaser Class*
8
                                        Joseph W. Cotchett
9                                       Steven N. Williams
                                        COTCHETT, PITRE & McCARTHY
10                                      San Francisco Airport Office Center
                                        840 Malcolm Road, Suite 200
11                                      Burlingame, CA 94010
                                        Telephone: (650) 697-6000
12
13                                      Michael P. Lehmann
                                        HAUSFELD PLLC
14                                      44 Montgomery Street, Suite 3400
                                        San Francisco, CA 94104
15                                      Telephone: 415-633-1908
16
                                        H. Laddie Montague, Jr.
17                                      Ruthanne Gordon
                                        BERGER & MONTAGUE, P.C.
18                                      1622 Locust Street
                                        Philadelphia, PA 19103
19                                      Telephone: (215) 875-3000
20
                                        Bruce Lee Simon
21                                      Aaron M. Sheanin
                                        PEARSON, SIMON & WARSHAW, LLP
22                                      44 Montgomery Street, Suite 2450
                                        San Francisco, CA 94104
23                                      Telephone: (415) 433-9000
24
                                        Steven A. Kanner
25                                      William London
                                        Douglas A. Millen
26                                      FREED KANNER LONDON & MILLEN LLC
                                        2201 Waukegan Road, Suite 130
27                                      Bannockburn, IL 60015
                                        Telephone: (224) 632-4500
28

SECOND AMENDED DPPs' CLASS ACTION COMPLAINT AGAINST MITSUBISHI AND THOMSON

1    Joseph J. Tabacco, Jr.
      Christopher T. Heffelfinger
2    BERMAN DEVALERIO
      One California Street, Suite 900
3    San Francisco, CA  94111
      Telephone: (415) 433-3200
4

5    Anthony J. Bolognese
      Joshua H. Grabar
6    BOLOGNESE & ASSOSCIATES, LLC
      1500 JFK Boulevard
7    Philadelphia, PA 19102
      Telephone: (215) 814-6751
8

9    Roger M. Schrimp
      Kathy L. Monday
10   DAMRELL, NELSON, SCHRIMP,
      PALLIOS, PACHER, & SILVA
11   1601 I St, 5th Floor
      Modesto, CA 95354
12   Telephone: (209) 526-3500
13

14   Daniel E. Gustafson
      Jason S. Kilene
15   Sung Yun K. Smith
      GUSTAFSON GLUEK PLLC
16   650 Northstar East
      608 Second Avenue South
17   Minneapolis, MN 55402
      Telephone: (612) 333-8844
18

19   Randy R. Renick
      HADSELL STORMER KEENY RICHARDSON
20   & RENICK
      128 North Fair Oaks Avenue, Suite 204
21   Pasadena, CA 91103
      Telephone: (626) 585-9600
22

23   Anthony D. Shapiro
      Ronnie Seidel Spiegel
24   HAGENS BERMAN SOBOL SHAPIRO
      1301 5th Ave., Suite 2900
25   Seattle, WA 98101
      Telephone: (206) 623-7292
26

27

28

SECOND AMENDED DPPs' CLASS ACTION COMPLAINT AGAINST MITSUBISHI AND THOMSON

Vincent J Esades
HEINS MILLS & OLSON, PLC
310 Clifton Ave
Minneapolis, MN 55403
Telephone: (612) 338-4605

Robert N. Kaplan
Gregory K. Arenson
KAPLAN FOX LLP
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980

Gary L. Specks
KAPLAN FOX LLP
423 Sumac Rd.
Highland Park, IL 60035
Telephone: (847) 831-1585

Steven F. Benz
William J. Conyngham
Andrew C. Shen
KELLOGG, HUBER, HANSEN, TODD & EVANS,
P.L.L.C.
1615 k Street NW
Suite 400
Washington, DC 20036-3209
Telephone: (202) 326-7900

Richard M. Heimann
Eric B. Fastiff
Brendan P. Glackin
Lin Y. Chan
LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000

W. Joseph Bruckner
LOCKRIDGE GRINDAL NAUEN PLLP
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone (612) 339-6900

SECOND AMENDED DPPs' CLASS ACTION COMPLAINT AGAINST MITSUBISHI AND THOMSON

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Harry Shulman
THE MILLS LAW FIRM
145 Marina Boulevard
San Rafael, CA 94901
Telephone: (415) 445-1326

Mark Reinhardt
Garrett D. Blanchfield, Jr.
REINHARDT WENDORF & BLANCHFIELD
East 1250 First National Bank Building
322 Minnesota Street
St. Paul, MN 55101
Telephone: (651) 287-2100

Dianne M. Nast
RODANAST, PC
801 Estelle Drive
Lancaster, PA 17601
Telephone: (717) 892-3000

Daniel D. Owen
POLSINELLI SHUGHART, P.C.
Twelve Wyandotte Plaza - Suite 1600
120 W. 12th Street
Kansas City, MO 64105
Telephone: (816) 395-0671

Eugene A. Spector
William G. Caldes
SPECTOR ROSEMAN & KODROFF PC
1818 Market Street, 25th Floor
Philadelphia, PA 19103
Telephone: (215) 496-0300

Allan Steyer
STEYER LOWENTHAL BOODROOKAS ALVAREZ
& SMITH LLP
One California Street, Third Floor
San Francisco, CA 94104
Telephone: (415) 421-3400

Lisa J. Rodriguez
TRUJILLO, RODRIGUEZ & RICHARDS, LLP
8 Kings Highway West
Haddonfield, NJ 08033
Telephone: (856) 795-9002

72                                    Master File No. 07-5944-SC
SECOND AMENDED DPPs' CLASS ACTION COMPLAINT AGAINST MITSUBISHI AND THOMSON

1

Joseph M. Vanek
David P. Germaine
2   VANEK VICKERS MASINI, P.C.
111 S. Wacker, Suite 4050
3   Chicago, IL. 60606
Telephone: (312) 224-1500
4

5   Kenneth A. Wexler
WEXLER WALLACE LLP
6   55 W. Monroe Street, Suite 3300
Chicago, IL 60603
7   Telephone: (312) 589-6270

8

Terry Gross
9   Gross Belsky Alonso LLP
One Sansome Street, Suite 3670
10   San Francisco, CA 94104
Telephone: (415) 544-0200
11

12   Mary Jane Fait
Law Offices of Mary Jane Fait
13   115 S. LaSalle Street
Suite 2910
14   Chicago, IL. 60603
Telephone: (847) 922-6729
15

16   Daniel A. Small
Cohen, Milstein, P.L.L.C
17   1100 New York Avenue NW
Suite 500, West Tower
18   Washington, D.C. 20005
Telephone: (202) 408-4600
19

20   Bryan L. Clobes
Cafferty Cafferty Clobes
21   Meriwether & Sprengel LLP
1101 Market Street, Suite 2650
22   Philadelphia, PA 19107
Telephone: (215) 864-2800
23

24   *Attorneys for Plaintiffs*

25

26

27

28