Guido Saveri (22349)
    *guido@saveri.com*
R. Alexander Saveri (173102)
    *rick@saveri.com*
Geoffrey C. Rushing (126910)
    *grushing@saveri.com*
Cadio Zirpoli (179108)
    *cadio@saveri.com*
Travis L. Manfredi (281779)
    *travis@saveri.com*
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

*Lead Counsel for the Direct Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** | Master File No. CV-07-5944-SC<br><br>MDL No. 1917 |
| This Document Relates to:<br><br>ALL DIRECT PURCHASER ACTIONS | **DIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:        October 23, 2015<br>Time:       10:00 a.m.<br>Judge:      Hon. Samuel Conti<br>Courtroom: 1 |

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ................................................................................................... iii

NOTICE OF MOTION AND MOTION ................................................................................ vii

MEMORANDUM OF POINTS AND AUTHORITIES ......................................................... 1

I.   INTRODUCTION ......................................................................................................... 1

II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY ............................... 3

    A.  Commencement of the Case ................................................................................. 4

    B.  The DOJ Intervenes ............................................................................................ 5

    C.  DPPs File Their Consolidated Complaint; Defendants File Motions To Dismiss ................ 5

    D.  Defendants' Rule 11 Motion ............................................................................... 6

    E.  Finished Products Summary Judgment Motion ................................................... 8

    F.  Discovery ............................................................................................................. 8

        1.  Requests for Production of Documents and Interrogatories ....................... 9

        2.  Depositions .............................................................................................. 10

        3.  Discovery of Plaintiffs ............................................................................ 10

    G.  Motion for Class Certification ........................................................................... 10

    H.  Settlements ........................................................................................................ 11

    I.  Miscellaneous Motions ..................................................................................... 13

III. ARGUMENT ............................................................................................................. 13

    A.  The Common Fund Doctrine and the Percentage-of-the-Recovery Approach ................... 14

        1.  The Ninth Circuit Recognizes the Common Fund Doctrine ......................... 14

        2.  Percentage-of-the-Recovery Approach Is the Predominant Method for Determining Attorneys' Fees Under Ninth Circuit Law ........................ 15

    B.  Application of the Pertinent Factors Shows that an Upward Adjustment of the Benchmark Is Justified ........................ 15

        1.  Class Counsel Achieved an Excellent Recovery for the Class ....................... 17

        2.  A High Level of Skill Was Required to Prosecute This Case and Class Counsel Are Highly Qualified ........................ 17

        3.  The Risks of This Litigation ................................................................... 18

            a.  Defendants Have Tremendous Resources ......................................... 18

      b.   Antitrust Class Actions Are Unpredictable ............................................................ 18

      c.   The Risk that Class Certification Will Be Denied............................................. 19

      d.   The Risk of Not Being Able to Establish Liability or Recover Substantial Damages ............................................................................................................. 19

   4.  Contingent Nature of the Fee ............................................................................20

   5.  Delay...................................................................................................................20

   6.  High Quality of Work Performed .......................................................................21

   7.  Lodestar Cross-Check Confirms the Reasonableness of the Requested Fee .................21

   8.  The Reaction of the Settlement Class to Date Supports the Fee Request .....................22

C.  Class Counsel Are Entitled to Reimbursement for Their Reasonable Litigation Expenses ..................................................................................................................... 23

IV. CONCLUSION ............................................................................................................ 25

# TABLE OF AUTHORITIES

**CASES**

*Alpine Pharmacy, Inc. v. Charles Pfizer & Co., Inc.*,
  481 F.2d 1045 (2d Cir.), *cert. denied*, 414 U.S. 1092 (1973) .................................... 14

*Arenson v. Board of Trade*,
  372 F. Supp. 1349 (N.D. Ill. 1974).......................................................................... 18

*Blum v. Stenson*,
  465 U.S. 886 (1984) .................................................................................................. 14

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) .................................................................................................. 14

*Central R.R. & Banking Co. v. Pettus*,
  113 U.S. 116 (1885) .................................................................................................. 14

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) .................................................................................. 15

*Hawaii v. Standard Oil Co.*,
  405 U.S. 251 (1972) .................................................................................................. 14

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983) .................................................................................................. 17

*In re Activision Sec. Litig.*,
  723 F. Supp. 1373 (N.D. Cal. 1989).......................................................................... 16

*In re ATM Fee Antitrust Litig.*,
  686 F.3d 741 (9th Cir. 2012) ...................................................................................... 8

*In re Citric Acid Antitrust Litig.*,
  191 F.3d 1090 (9th Cir. 1999), *cert. denied sub nom. Gangi Bros. Packing Co. v. Cargill,
  Inc.*, 529 U.S. 1037 (2000) ....................................................................................... 19

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
  M-02-1486, 2007 WL 2416513 (N.D. Cal. Aug. 16, 2007)...................................... 16

*In re Flash Memory Antitrust Litig.*,
  No. C 07-0086 SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010).......................... 19

*In re Graphics Processing Units Antitrust Litig.*,
  253 F.R.D. 478 (N.D. Cal. 2008) .............................................................................. 19

*In re Heritage Bond Litig.*,
  02-ML-1475 DT, 2005 WL 1594403 (C.D. Cal. June 10, 2005)............................... 16

*In re High-Tech Employee Antitrust Litig.*,
  No. 11-CV-02509-LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) .................... 17

*In re Keegan Management Co. Sec. Litig.*,
    78 F.3d 431 (9th Cir. 1996) ........................................................................ 7

*In re King Res. Co. Sec. Litig.*,
    420 F. Supp. 610 (D. Colo. 1976) ............................................................. 18

*In re Linerboard Antitrust Litig.*,
    No. CIV.A. 98-5055, 2004 WL 1221350 (E.D. Pa. June 2, 2004)............... 18

*In re Media Vision Tech. Sec. Litig.*,
    913 F. Supp. 1362 (N.D. Cal. 1995)........................................................... 24

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
    187 F.R.D. 465 (S.D.N.Y. 1998)................................................................ 18

*In re Omnivision Tech., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2008) .............................. 16, 17, 21, 23

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 914 (9th Cir. 2015) ..................................................................... 19

*In re Online DVD-Rental Antitrust Litig.*,
    779 F.3d 934 (9th Cir. 2015) ............................................................. *passim*

*In re Optical Disk Drive Antitrust Litig.*,
    303 F.R.D. 311 (N.D. Cal. 2014) .............................................................. 19

*In re Optical Disk Drive Antitrust Litig.*,
    Case No. 10-md-2143 RS (N.D. Cal. July 23, 2015) (Dkt. No. 1658)....... 16

*In re Pac. Enters. Sec. Litig.*,
    47 F.3d 373 (9th Cir. 1995) ....................................................................... 17

*In re Portal Software, Inc. Sec. Litig.*,
    No. C-03-5138 VRW, 2007 WL 4171201 (N.D. Cal. Nov. 26, 2007) ....... 22

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013).................................................................... 19

*In re Remeron Direct Purchaser Antitrust Litig.*,
    No. Civ.03-0085 FSH, 2005 WL 3008808 (D.N.J. Nov. 9, 2005)............. 23

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    Case No. 07-md-1819-CW (N.D. Cal. June 30, 2011) (Dkt. No. 1370) ............. 15, 16

*In re Superior Beverage/Glass Container Consol. Pretrial*,
    133 F.R.D. 119 (N.D. Ill. 1990) ................................................................ 18

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. M 07-1827 SI, 2011 WL 7575003 (N.D. Cal. Dec. 27, 2011) .............. 15, 16

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. M 07-1827 SI, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ................ 15, 16

iv

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  No. M 07-1827 SI, 2013 WL 149692 (N.D. Cal. Jan. 14, 2013) .................................. 15, 16, 22

*In re Veeco Instruments Inc. Sec. Litig.*,
  Case No. 05-md-01695(CM), 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ........................... 20

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
  19 F.3d 1291 (9th Cir. 1994) ....................................................................... 14, 15, 20

*Knight v. Red Door Salons, Inc.*,
  No. 08-01520 SC, 2009 WL 248367 (N.D. Cal. Feb. 2, 2009)....................................... 16

*Mark v. Valley Ins. Co.*,
  Case No. CV 01-1575-BR, 2004 WL 2260605 (D. Or. Oct. 6, 2004) ................................ 17

*Meijer v. Abbott Laboratories*,
  C-07-05985 (N.D. Cal. Aug. 11, 2011) (Dkt. No. 514) .............................................. 15

*Mills v. Elec. Auto-Lite Co.*,
  396 U.S. 375 (1970) ................................................................................... 14

*Paul, Johnson, Alston & Hunt v. Graulty*,
  886 F.2d 268 (9th Cir. 1989) ........................................................................ 14

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
  392 U.S. 134 (1968) ................................................................................... 14

*Pillsbury Co. v. Conboy*,
  459 U.S. 248 (1983) ................................................................................... 14

*Pokorny v. Quixtar, Inc.*,
  Case No. c 07-0201 SC, 2013 WL 3790896 (N.D. Cal. July 18, 2013)............................... 16

*Redding v. Fairman*,
  717 F.2d 1105 (9th Cir. 1983) ....................................................................... 24

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979) ................................................................................... 14

*Royal Printing Co. v. Kimberly-Clark Corp.*,
  621 F.2d 323 (9th Cir. 1980) ......................................................................... 8

*Six (6) Mexican Workers v. Arizona Citrus Growers*,
  904 F.2d 1301 (9th Cir. 1990) ....................................................................... 16

*Thornberry v. Delta Air Lines*,
  676 F.2d 1240 (9th Cir. 1982), *remanded on other grounds*, 461 U.S. 952 (1983).................. 24

*Torrisi v. Tucson Elec. Power Co.*,
  8 F.3d 1370 (9th Cir. 1993) .......................................................................... 15

*Townsend v. Holman Consulting Corp.*,
  929 F.2d 1358 (9th Cir. 1991) (en banc) ............................................................. 7

v

*Vincent v. Hughes Air West*,
    557 F.2d 759 (9th Cir. 1977) .................................................................................. 23

*Vizcaino v. Microsoft Corp.*,
    142 F. Supp. 2d 1299 (W.D. Wash. 2001) *aff'd*, 290 F.3d 1043 (9th Cir. 2002) ................ 17, 18

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) ....................................................................... 15, 20, 21

**STATUTES**

28 U.S.C. § 1292(b) ..................................................................................................... 8

Clayton Act, 15 U.S.C. § 15 ..................................................................................... 4, 5

Sherman Act, 15 U.S.C. § 1 ......................................................................................... 4

**OTHER AUTHORITIES**

1 Alba Conte, *Attorney Fee Awards* (3d ed. 2004) ............................................... 23, 24

**RULES**

Federal Rule of Civil Procedure 11 ............................................................................ 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that at 10:00 a.m. on October 23, 2015, Direct Purchaser Plaintiffs ("DPPs") and their counsel ("Class Counsel") will, and hereby do move before the Honorable Samuel Conti, United States District Judge, at the United States Courthouse, 450 Golden Gate Avenue, Courtroom 1, San Francisco, California, for an award of attorneys' fees in the amount of 30% of the Settlement Fund ($38,235,000) plus interest, reimbursement of litigation expenses in the amount of $1,927,392.12. DPPs also seek approval of $2,867,395.32 in expenses paid with settlement funds. This motion is brought pursuant to Fed. R. Civ. P. 23(h), 54(b) and 54(d)(2).

This motion is made on the grounds that (a) such fees are fair and reasonable in light of Class Counsel's efforts in creating the Settlement Fund; (b) the requested fees comport with the Ninth Circuit case law in common fund cases; and (c) the expenses for which reimbursement is sought were reasonably and necessarily incurred in connection with the prosecution of this action.

This motion is based upon this Memorandum of Points and Authorities; the Declaration of R. Alexander Saveri in Support of Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Expenses; the proposed order submitted herewith; the declarations of Class Counsel, and other records, pleadings, and papers filed in this action; and upon such argument and further pleadings as may be presented to the Court at the hearing on this motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Direct Purchaser Plaintiffs ("DPPs") and their counsel ("Class Counsel") respectfully submit this Memorandum of Points and Authorities in Support of Plaintiffs' Motion for an Award of Attorneys' Fees and Reimbursement of Expenses. DPPs have achieved an excellent result for the class. They have secured settlements with all seven of the original defendant groups totaling $127.45 million (the "Settlement Fund"). To do so, Class Counsel have invested over $43,335,517.50 in time and $1,927,392 in out of pocket expenses since this case began almost eight years ago. DPPs now seek an award of attorneys' fees of $38,235,000—30% of the Settlement Fund. DPPs also seek reimbursement of their litigation expenses in the amount of $1,927,392.12, and approval of $2,867,395.32 in expenses paid with settlement funds.

Class Counsel have prosecuted this case on a purely contingent basis. The settlements were achieved in the face of a tremendously hard fought defense, fueled by Defendants' near limitless resources. The settlements represent excellent recoveries for the class, and the fee class counsel seeks is eminently fair in light of the mammoth investment of time and money they have made and the substantial risks they have undertaken. Indeed, Class Counsel seek over $5 million less than the value of time that they have incurred to date in the prosecution of the case.

As detailed in the accompanying declarations, the work done by Class Counsel was reasonable and necessary, of high quality, and efficiently performed. Among other things, Class Counsel have:

- Conducted an initial investigation of this case to develop the theories and facts that formed the basis of the allegations against Defendants. The research included a review of publicly available information regarding the CRT industry and consultation with industry experts and economists prior to the filing of the complaints (*see e.g.,* Declaration of R. Alexander Saveri in Support of Direct Purchaser Plaintiffs' Notice of Motion and Motion for an Award Of Attorneys' Fees and Reimbursement of Expenses; Memorandum of Points and Authorities In Support Thereof ("Saveri Decl.") ¶ 15);

- Drafted a comprehensive consolidated amended complaint detailing the Defendants' violations of the antitrust laws (*id.* ¶¶ 15, 24–25);

- Conducted exhaustive legal research regarding the class's claims and the defenses thereto (*id.* ¶ 15);

- Successfully defended, over the course of nearly a year, a set of hard-fought motions to dismiss the complaint before the Special Master and this Court (*id.* ¶¶ 15, 26–30);

- Successfully defended, over the course of a year, a Summary Judgment motion by which the Defendants sought to deny any recovery for Finished Products, which constitute the majority of DPPs purchases (*id.* ¶¶ 15, 36–40);

- Propounded discovery that—after extensive research, negotiations with defendants, and motion practice—resulted in the identification of dozens of defendant-employee custodians and the production of millions of documents, as well as voluminous electronic transactional data (*id.* ¶¶ 15, 41–48);

- Reviewed and analyzed these documents (many of which were in foreign languages and required translation), as well as the transactional data (*id.*);

- Propounded several sets of interrogatories on defendants and issued Rule 30(b)(6) deposition notices (*id.* ¶¶ 15, 43–44, 49);

- Cooperated with the Indirect Purchaser Plaintiffs ("IPPs") and the Direct Action Plaintiffs ("DAPs") to take over one hundred depositions of employees and officers of Defendants (*id.* ¶¶ 15, 49);

- Contended with near-constant discovery disputes and motions to compel (*id.* ¶¶ 15, 53);

- Responded to Defendants' numerous document requests and interrogatories and prepared and defended the depositions of the class representatives (*id.* ¶¶ 15, 50–52);

- Prepared a motion for class certification and supporting materials, including over one hundred exhibits and the expert report of Dr. Jeffrey Leitzinger (*id.* ¶¶ 15, 54–56);

- Consulted extensively with experts on issues pertaining to liability, class certification, and damages throughout the course of the Action and defended the deposition of DPPs' expert Dr. Leitzinger (*id.*);

- Engaged in extensive settlement negotiations with each of the seven Defendant groups (*id.* ¶¶ 15, 58–67); and

- Documented each settlement and did the substantial work necessary to obtain final approval of each settlement—e.g., drafted and filed motions for preliminary and final approval, drafted class notices, and worked with the settlement administrator to provide notice to the class of each settlement (*id.*).

DPPs have also faced substantial risks in this case, including, among others:

- The risk of litigating against some of the largest and most sophisticated law firms in the world with seemingly limitless resources;

- The risk that the consolidated complaints would not withstand the individual and joint motions to dismiss, which claimed, *inter alia*, that the alleged conspiracy was not plausible under *Twombly* and *Iqbal*; that certain DPPs lacked standing to sue for federal antitrust violations; and that the claims were time barred;

- The risk that there would be no recovery for Finished Products—i.e., televisions and computer monitors—which comprised the vast majority of DPPs' purchases;

- The risk that Defendants would successfully argue that any antitrust violation engaged

in by their company's representatives caused no antitrust impact or damages to class members;

- The risk of not achieving class certification;

- The risk of trying a case in which many of the events occurred as much as nineteen years ago, and in which much evidence and many witnesses are now unavailable;

- The risk of diminished recovery because of the financial difficulties, bankruptcy, and/or disappearance of corporate defendants as a result of the demise of the CRT industry; and

- The changing landscape of the law with respect to civil antitrust actions and class actions.

In this context, it is apparent that the recovery DPPs obtained for the class is excellent and that DPPs' request for a fee award of 30% of the settlements is fair and reasonable. While the benchmark for attorneys' fees in the Ninth Circuit is 25%, in practice, awards generally approximate 30%. Many courts have awarded 30%, or higher, where, as here, the litigation posed substantial risks and the multiplier is low.

Importantly, DPPs' fee request appears to have the near unanimous support of the class. Each of the five notices of settlement sent to the over sixteen thousand class members disclosed that class counsel would seek as much as one-third of the settlement fund as a fee, and no objections were received. *See* Dkt. Nos. 1323-3, Ex. A; 1464-2, Ex. A; 1573-2, Ex. A; 1757-2, Ex. A; 2728-2, Ex. A. This is especially significant where, as here, the class contains many large and sophisticated companies. Saveri Decl. ¶ 78.

Class Counsel should also be reimbursed for the expenses they have advanced on behalf of the class. All were reasonable and necessary.

## II.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case is notable for and characterized by the complex issues it has presented and the tenacity and creativity with which Defendants—all possessing enormous resources and represented by law firms among the best and largest in the world—have litigated those issues. Defendants have steadfastly opposed DPPs on a cornucopia of grounds. From the outset of the case, Defendants have contended that DPPs are entitled to little or no recovery because, *inter alia*, (1) the conspiracy was limited to Asia and did not affect the United States; (2) the FTAIA barred DPPs' case; (3) DPPs lacked standing because the conspiracy did not extend to the Finished Products (i.e.,

3

computer monitors and televisions) most had purchased; (4) DPPs claims were barred by the statute of limitations; (5) the conspiracy involved only CDTs; and (6) the conspiracy, if it existed, caused little or no damage to DPPs. Several defendants also asserted that they were not conspirators or had withdrawn from the conspiracy long ago. At every stage of this case, Defendants asserted these arguments as a basis to dismiss all or part of the case, to limit damages, or to deny or limit discovery. DPPs battled Defendants at every step, but the battles were difficult and drawn out. For example, Defendants' motions to dismiss ultimately entailed over 500 pages of briefing and took over a year to resolve. Defendants' summary judgment motion to eliminate Finished Products from the case—which would have gutted DPPs' case—also involved hundreds of pages of briefing and took over a year to finally resolve. In this context, it is plain that the efforts of Class Counsel were not only essential to the substantial benefits conferred on the class by the settlements obtained, but that Class Counsel also managed the litigation effectively and efficiently. Saveri Decl. ¶ 15, 26–30, 36–40.

### A.     Commencement of the Case

This multidistrict litigation arises from an alleged worldwide conspiracy to fix prices of Cathode Ray Tubes ("CRTs"). CRTs are the primary components of CRT televisions and computer monitors. The alleged conspiracy involved some of the largest companies in the world—Samsung SDI, Panasonic, LG, Toshiba, Hitachi, and Philips. Saveri Decl. ¶ 18.

After the United States Department of Justice ("DOJ") announced its investigation into the conspiracy in November of 2007, twenty direct purchaser plaintiff class action complaints were filed alleging a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.[1] Saveri Decl. ¶ 19.

Plaintiffs commenced proceedings before the JPML, and on February 15, 2008, the JPML

---

[1] On February 10, 2009 and November 9, 2010, the DOJ announced the indictment of executives of Defendants Samsung SDI, LG Electronics and Chunghwa for price fixing Cathode Display Tubes ("CDTs") used in computer monitors. Ultimately, the DOJ secured only a single conviction. Defendant Samsung SDI admitted to participation in a conspiracy to fix the prices of CDTs between January 1997 and March 2006. Saveri Decl., Ex. 8 (Amended Plea Agreement, *U.S. v. Samsung SDI Co.*, Case No. 11-cr-162-WHA (N.D. Cal. Aug. 8, 2011) (Dkt. No. 29)). There were no indictments or guilty pleas with regard to Cathode Picture Tubes ("CPTs") used in televisions.

transferred all related actions to this Court. Dkt. No. 122. On May 9, 2008, the Court appointed

Saveri & Saveri, Inc. ("S&S") Interim Lead Class Counsel for the putative nationwide class of

direct purchasers. Dkt. No. 282. The Court's order tasked S&S with making sure the DPP action

was prosecuted in an efficient manner, and required, among other things, the periodic collection of

time and expenses from Class Counsel, and coordination of the work of Class Counsel. Saveri

Decl. ¶ 20.

During this time, DPPs effected service of their complaints on Defendants. As to several,

plaintiffs were required to utilize the procedures for international service of process set forth in the

Hague conventions. This was a lengthy, time consuming, and, in certain instances, expensive

endeavor requiring the appointment of a special international process server. Saveri Decl. ¶ 21.

## B.    The DOJ Intervenes

On February 21, 2008, the DOJ moved to intervene in the litigation for the purpose of

seeking a stay of the action pending its own investigation. As a result of the DOJ's request, with

the exception of limited written discovery—i.e., interrogatories—the Court stayed discovery in the

action. Ultimately, document discovery was stayed, for over two years, until March 8, 2010.

Depositions of Defendants and their employees were stayed until March 11, 2011. Dkt. No. 798.

Saveri Decl. ¶¶ 22–23.

## C.    DPPs File Their Consolidated Complaint; Defendants File Motions To Dismiss

On March 16, 2009, Plaintiffs filed their Consolidated Amended Complaint ("CAC")

alleging an over-arching horizontal conspiracy among the Defendants and their co-conspirators to

fix prices, restrict production, and to allocate markets and customers for the sale of CRTs and

Finished Products in the United States from March 1, 1995 through November 25, 2007 (the "Class

Period"). The CAC alleged, *inter alia,* that Plaintiffs and members of the Class were direct

purchasers of CRTs and/or CRT Finished Products from Defendants and/or their subsidiaries and

were injured because they paid more for CRTs and/or CRT Finished Products than they would

have absent the conspiracy. CAC ¶¶ 213–221. Plaintiffs sought, *inter alia*, treble damages pursuant

to Section 4 of the Clayton Act, 15 U.S.C. §§ 15 and 22. CAC at p. 47. Saveri Decl. ¶¶ 24–25.

On May 18, 2009, beginning a process that would take almost a year to complete,

Defendants filed a massive set of motions to dismiss the CAC. Defendants filed a joint motion, and nine individual motions. Their total briefing included 197 pages of argument and hundreds of pages of supporting material. *See* Dkt. Nos. 463–493. Defendants argued, *inter alia*, that the CAC failed to allege a plausible conspiracy, that the FTAIA barred DPPs' action, that DPPs lacked antitrust standing, and that DPPs had failed to allege fraudulent concealment of the conspiracy sufficient to avoid the bar of the statute of limitations. Saveri Decl. ¶ 26.

DPPs filed their opposition to Defendants' motions—118 pages of argument, along with over 250 pages of supporting declarations and other material—on August 3, 2009 (Dkt. Nos. 530, 531) and August 31, 2009 (Dkt. No. 537). Defendants' reply briefs totaled 132 pages of argument and hundreds more pages of supporting material. *See* Dkt. Nos. 545–561. Saveri Decl. ¶¶ 27, 30.

A full-day hearing was held on October 5, 2009.[2] On February 5, 2010, the Special Master issued his Report and Recommendation ("R&R") denying Defendants' motions. Dkt. No. 597. Defendants objected to virtually all of the Special Master's recommendations. The parties filed briefs in support and in opposition to adoption of the R&R (approximately 80 pages of argument) (*See* Dkt. Nos. 605–641), and the Court conducted another hearing on March 18, 2010. Dkt. No. 656. On March 30, 2010, this Court adopted the Special Master's ruling and recommendation granting in part and denying in part Defendants' Motions to Dismiss. Dkt. No. 665. Saveri Decl. ¶ 28.

Finally, on April 9, 2010, Defendants moved to certify the Court's order for interlocutory appeal. Dkt. No. 667. DPPs filed their opposition on April 27, 2010. Dkt. No. 673. The matter was heard on April 30, 2010. Dkt. No. 711. The Court denied the motion to certify on that date. *Id.* Saveri Decl. ¶ 29.

### D.      Defendants' Rule 11 Motion

On April 12, 2011, certain Defendants moved to strike allegations of a finished product conspiracy from the CAC pursuant to FRCP 11. Dkt. No. 880. DPPs' opposition, filed under seal on April 20, 2011 (Dkt. No. 896) ("Rule 11 Opp."), explained that the motion was meritless for

---

[2] Defendants' motions to dismiss the Indirect Purchaser Plaintiffs' ("IPPs") complaint were also argued.

several reasons, namely: (1) DPPs' allegations that the conspiracy embraced Finished Products were supported by evidence and, therefore, not "baseless"; and (2) DPPs had conducted a reasonable investigation prior to filing the complaint. Rule 11 Opp. at 9–24. Defendants, therefore, did not satisfy either of the requirements of Rule 11.[3] In addition, among other things, Defendants' motion was procedurally improper: Defendants had not properly followed the required "safe harbor" provisions, the motion was filed before DPPs' allegations—which this Court had already upheld as "plausible"—had been determined to lack merit, and Defendants were seeking to use the motion as, essentially, a summary judgment motion before DPPs had a chance to conduct meaningful discovery. *Id.* at 9. Saveri Decl. ¶ 31.

After a hearing on May 26, 2011, however, and despite finding that DPPs' had conducted a reasonable inquiry prior to filing their complaint, the Special Master recommended that the motion be granted. Dkt. No. 947. The Special Master recommended that DPPs' allegations of a finished products conspiracy be stricken from the complaint and certain discovery be disallowed, but did not recommend that DPPs be otherwise sanctioned. *Id.* at 14. Saveri Decl. ¶ 32.

On June 29, 2011, DPPs objected to the Special Master's R & R. Dkt. No. 957. DPPs explained, *inter alia*, that the Special Master's finding that they had conducted a reasonable investigation compelled the denial of the motion, that he had failed to credit the evidence adduced by DPPs, had misunderstood well-established antitrust law, and had applied an improper Rule 11 standard to conclude that DPPs' allegations were baseless. Defendants asked the Court to adopt the R& R the same day. Dkt. No. 953. Saveri Decl. ¶ 33.

The Court set the matter for hearing on September 2, 2011. Dkt. No. 968. Prior to the hearing, on August 26, 2011, the parties entered into a stipulation resolving the matter. It provided, among other things, that the Special Master's recommended finding that Plaintiffs violated Rule 11 be vacated, and that DPPs withdraw their allegations of a conspiracy encompassing Finished Products and certain discovery. Significantly, the stipulation preserved DPPs' damage claims based

---

[3] Under the Ninth Circuit's decisions in *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358 (9th Cir. 1991) (en banc) and *In re Keegan Management Co. Sec. Litig.*, 78 F.3d 431 (9th Cir. 1996), the filer of a complaint may not be subject to Rule 11 sanctions unless he or she failed to conduct a reasonable inquiry under the circumstances *and* the claims are objectively baseless.

1    on their purchases of Finished Products. Dkt. No. 996. Saveri Decl. ¶ 34.

2        **E.    Finished Products Summary Judgment Motion**

3        On December 12, 2011, Defendants moved for Summary Judgment against Plaintiffs who

4    purchased CRT Finished Products only. Dkt. No. 1013. Defendants contended, as they had in their

5    motions to dismiss, that DPPs could not bring claims under the federal antitrust law based on

6    purchases of Finished Products containing price fixed CRTs. *Id.* at 5–12. Saveri Decl. ¶ 36.

7        On February 24, 2012, DPPs filed their opposition under seal (*see* Dkt. No. 1057) arguing

8    that, as the Court had noted in its Order on Defendants' motion to dismiss, purchasers of finished

9    products containing price fixed goods had antitrust standing under *Royal Printing Co. v. Kimberly-*

10   *Clark Corp.*, 621 F.2d 323 (9th Cir. 1980). In addition, DPPs submitted a massive declaration

11   collecting evidence that each of the class representatives Defendants had moved against had

12   purchased Finished Products from entities "owned or controlled" by an alleged conspirator. *See*

13   Dkt. No. 1057. DAPs also opposed the motion. Dkt. No. 1056. The motion was heard on March 20,

14   2012. Saveri Decl. ¶¶ 37, 40.

15       On May 31, 2012, the Special Master issued his Report and Recommendation that the Court

16   grant Defendants' motion for summary judgment and that judgment be entered against certain

17   plaintiffs that purchased CRT Finished Products from defendants. Dkt. No. 1221. The parties filed

18   briefs in support and in opposition to adoption of the R&R. On November 29, 2012, the Court

19   declined to adopt the R&R, and ruled that the "Ownership and Control Exception" created in *Royal*

20   *Printing*, 621 F.2d 323, and confirmed by the Ninth Circuit in *In re ATM Fee Antitrust Litig.*, 686

21   F.3d 741 (9th Cir. 2012), conferred standing on Plaintiffs to sue "insofar as they purchased

22   [Finished Products] incorporating the allegedly price-fixed CRTs from an entity owned or

23   controlled by any allegedly conspiring defendant" (Dkt. No. 1470 at 16). Saveri Decl. ¶ 38.

24       Finally, some Defendants asked the Court pursuant to 28 U.S.C. section 1292(b) to certify

25   the Order for interlocutory appeal. Dkt. No. 1499. DPPs filed an opposing brief. Dkt. No. 1525.

26   The Court denied defendants' request on February 13, 2013. Dkt. No. 1569. Saveri Decl. ¶ 39.

27       **F.    Discovery**

28       Discovery in this action was extensive and hard-fought. Defendants opposed DPPs at

8

almost every step. Ultimately, DPPs—in cooperation with the IPPs and the DAPs—obtained millions of documents, took over one hundred depositions, and obtained important information via interrogatories and other discovery devices. Saveri Decl. ¶ 41.

### 1. Requests for Production of Documents and Interrogatories

On March 12, 2010, after the partial stay of discovery was lifted, Plaintiffs propounded their Second Set of Document Requests and First Set of Interrogatories. Among other things, Defendants sought to limit the temporal and geographic scope of the discovery and sought to avoid searching the files of some or all of their subsidiaries or related companies. DPPs, along with the IPPs, engaged in exhaustive separate negotiations with each Defendant group. Eventually, Defendants agreed to produce documents from the files of designated document custodians. These negotiations, however, were lengthy and difficult, and required the intervention of the Special Master. DPPs briefed, along with the IPPs, at least ten motions relating to Defendants' discovery responses. Ultimately, Defendants produced millions of documents. Saveri Decl. ¶¶ 42–43, 46–48, 53.

DPPs, with the IPPs and DAPs, also spent substantial time obtaining Defendants' transactional data and negotiating a protocol relating to ESI. Dkt. No. 828. Saveri Decl. ¶¶ 15, 44.

A substantial percentage of the documents produced in this action were in Korean, Chinese, or Japanese. Consequently, DPPs utilized foreign language attorneys and paralegals both to review and analyze these documents, as well as to translate working copies of important documents. In addition, DPPs, along with the other parties, worked with commercial translators in order to produce "certified translations" of thousands of evidentiary documents. Ultimately, all parties negotiated a Translation Protocol (as part of the larger discovery protocol). Dkt. No. 1128. This was a laborious process that involved, first, a proposed translation, then an opportunity for other parties to object, then a meet and confer process, and, ultimately, a procedure for the Court to resolve disputes. The protocol applied to all translated documents used at depositions, attached to motions, or which a party intended to use at trial. After the protocol was established, negotiation with the Defendants about translations was virtually continual. Saveri Decl. ¶ 45.

DPPs' NOMAM FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES; Case No. 07-cv-5944-SC

### 2. Depositions

Beginning in June of 2012, after meeting and conferring with Defendants regarding the scope and topics of 30(b)(6) witnesses, Plaintiffs began taking 30(b)(6) depositions of Defendants. Beginning in December of 2012, Plaintiffs began taking merits depositions. DPPs coordinated with DAPs and IPPs in the taking all of these depositions to avoid duplication of effort. Generally, one plaintiffs' firm representing the DAPs, IPPs, or DPPs was designated to take the lead with regard to preparing for and taking each deposition. The non-lead plaintiffs would assist, as necessary, in the preparation for the depositions and the examination of the witnesses. Over one hundred depositions were taken. DPPs took the lead in over twenty-five depositions, and assisted the lead attorneys in most of the rest. DPPs participation in the depositions of some Defendants diminished after DPPs had settled with them. Saveri Decl. ¶¶ 15, 49.

### 3. Discovery of Plaintiffs

DPPs also spent substantial time responding to discovery propounded by Defendants. DPPs worked with each of the Class Representatives to collect and provide discoverable information and documents, object where appropriate, and meet and confer with Defendants. DPPs also briefed, in cooperation with the IPPs unless the issue was particular to the DPPs, several discovery motions in connection with Defendants' discovery demands. Saveri Decl. ¶ 50.

Defendants propounded eight sets of interrogatories and nine sets of document requests. Each of the ten Class Representatives participated in the collection of responsive hard copy documents and identification of ESI sources likely to contain responsive data. In total, the Class Representatives produced over twelve thousand pages of documents. These document requests required the Class Representatives to search for and produce both hard copy and, in certain circumstances, electronic documents from multiple sources. Saveri Decl. ¶ 51.

The Class Representatives were also deposed. DPPs spent substantial time preparing each Class Representatives for their deposition, and defending the depositions. Saveri Decl. ¶ 52.

### G. Motion for Class Certification

DPPs filed a motion for class certification against Defendants Hitachi and Samsung SDI on May 14, 2013. Dkt. No. 1674. The motion was supported by the report of DPPs' expert economist,

10

Dr. Jeffrey Leitzinger and a declaration of counsel attaching over 130 exhibits. DPPs' moving papers comprised in excess of 2,600 pages. Defendants filed their nearly fifty-page opposition to class certification, which included hundreds of pages of exhibits, as well as a 176 page expert report critiquing Dr. Leitzinger's report, on September 11, 2013. *See* Dkt. No. 1921. DPPs filed their reply brief and Dr. Leitzinger's rebuttal report on November 11, 2013. Dkt. Nos. 2208-3, 2208-4. Saveri Decl. ¶¶ 15, 54.

DPPs spent an enormous amount of time and effort drafting their motion for class certification, analyzing relevant evidence, working with Dr. Leitzinger and his associates, preparing Dr. Leitzinger for deposition and defending his deposition, and analyzing and responding to the Defendant's opposition papers and expert report. Saveri Decl. ¶¶ 55–56.

After the motion was filed, DPPs reached settlements with both Hitachi and Samsung SDI. DPPs reached agreement with Samsung SDI after the matter was fully briefed. Saveri Decl. ¶ 57.

### H.    Settlements

DPPs spent substantial time in settlement negotiations throughout the litigation. Ultimately, DPPs reached settlements with all of the Defendants who appeared in the action. Saveri Decl. ¶ 58.

DPPs first settled with Chunghwa, the amnesty applicant. The parties executed an agreement in April, 2009 after several months of negotiation. The settlement required Chunghwa to pay the class $10 million and to cooperate with DPPs in the prosecution of the case against the rest of the Defendants. Saveri Decl. ¶ 59.

DPPs next settled with Philips. The parties reached an agreement in principle in January, 2012, and executed a written agreement in February, 2012, after almost a year of negotiations. The settlement required Philips to pay the class $15 million (after an opt-out reduction) and cooperate with DPPs in prosecution of the case against the remaining Defendants. Saveri Decl. ¶ 60.

DPPs moved for preliminary and final approval of the Chunghwa and Philips settlements in the summer of 2012. The Court certified settlement classes, notice was given to the classes, and, on October 19, 2012, the Court granted final approval of the two settlements. Saveri Decl. ¶ 61.

DPPs' next settled with Panasonic. The parties executed a settlement agreement in June, 2012 after several months of negotiation. The settlement required Panasonic to pay the class $17.5

11

1  million and to cooperate with DPPs in the prosecution of the case against the rest of the

2  Defendants. After DPPs moved for preliminary and final approval of the settlement, certification of

3  a settlement class and notice to the class, the Court granted final approval of the Panasonic

4  settlement on December 27, 2012. Saveri Decl. ¶ 62.

5       DPPs executed a fourth settlement agreement with LG on August 13, 2012. The Court

6  finally approved the LG settlement on April 1, 2013, after DPPs moved for preliminary and final

7  approval of the settlement, certification of a settlement class and notice to the class. The settlement

8  required LG to pay the class $25 million and to cooperate with DPPs in the prosecution of the case

9  against the rest of the Defendants. Saveri Decl. ¶ 63.

10      DPPs executed a fifth settlement with Toshiba on February 6, 2013. The settlement was a

11  reached as a result of a mediation before Mr. Eric Green. The parties exchanged mediation briefs

12  and attended a one-day mediation on October 3, 2012. While no settlement was reached at the

13  mediation, the parties continued their discussions with the assistance of Mr. Green and eventually

14  reached agreement. The Court finally approved the settlement on July 23, 2013, following DPPs'

15  motions for preliminary and final approval of the settlement, certification of a settlement class and

16  notice to the class. Toshiba agreed to pay $13.5 million and cooperate with DPPs in the prosecution

17  of the case against the rest of the Defendants. Saveri Decl. ¶ 64.

18      DPPs next settled with Hitachi. DPPs engaged in settlement discussions with Hitachi over

19  the course of the litigation. The settlement was finally reached as a result of mediation sessions

20  conducted by Judge Vaughn Walker (Ret.). The parties exchanged mediation briefs and attended a

21  mediation session on March 26, 2013. On May 14, 2013, the parties again exchanged briefs and

22  attended another mediation session. While no settlement was reached at the mediation sessions, the

23  parties continued their discussions with the assistance of Judge Walker and executed an agreement

24  on November 29, 2013. Hitachi agreed to pay $13.45 million and cooperate in the prosecution of

25  the case against the rest of the Defendants. Saveri Decl. ¶ 65.

26      DPPs settlement with Samsung SDI was also reached as a result of mediation sessions

27  conducted by Judge Walker. The parties exchanged mediation briefs and attended a mediation

28  session on March 19, 2013. On September 24, 2013, the parties again submitted briefs and attended

12

1  another session. While no settlement was reached at the mediations, the parties continued their

2  discussions with the assistance of Judge Walker and executed an agreement on February 11, 2014.

3  Samsung SDI agreed to pay the class $33 million and to cooperate with DPPs in the prosecution of

4  the case against other alleged conspirators. Saveri Decl. ¶ 66.

5  　　　　The Court granted preliminary approval, certified settlement classes, and approved class

6  notice for the Hitachi and Samsung SDI settlements. After notice to the class, the Court held a final

7  approval hearing on August 22, 2014. However, because of motion practice relating to DAP Sharp

8  Corporation's failure to submit a timely request for exclusion from the settlement classes, final

9  approval of these settlements was delayed until July 22, 2015. Saveri Decl. ¶ 67.

10  ### I.　　Miscellaneous Motions

11  　　　　DPPs were involved in a number of other motions in addition to those described above. In

12  February, 2014, two large purchasers of CRTs and CRT Products, Viewsonic and Unisys, who had

13  opted out of the DPP settlements with Chunghwa, Philips, Panasonic, LG, and Toshiba, moved to

14  withdraw their requests for exclusion and rejoin the settlement classes. Dkt. No. 2403. DPPs

15  opposed the motion and the Court denied the motion. Dkt. Nos. 2417, 2517. Saveri Decl. ¶¶ 68–69.

16  　　　　In the summer of 2014, two DAPs with large CRT purchases—Sharp and Dell— who

17  failed to submit timely requests for exclusion from the Hitachi and Samsung SDI settlement classes

18  moved the Court for leave to submit a late request. Dkt. Nos. 2696, 2698. The Court granted Dell's

19  request and denied Sharp's. Dkt. No. 2746. Sharp moved for leave to submit a late objection to the

20  settlements and for reconsideration. Dkt. Nos. 2750, 2751. The DPPs submitted briefs in

21  connection with these motions, as well as Sharp's later request for a status conference. Dkt. Nos.

22  2715, 2753, 3160. Sharp ultimately settled with Samsung SDI and Hitachi and thus mooted the

23  question of Sharp's membership in the settlement classes. Dkt. No. 3842. These proceedings

24  delayed final approval for nearly a year. Saveri Decl. ¶ 70.

25  ### III.　　**ARGUMENT**

26  　　　　DPPs' requests (1) for an award of attorneys' fees in the amount of 30% of the Settlement

27  Fund; (2) for approval of expenses; and (3) for reimbursement of expenses Class Counsel have

28  advanced on behalf of the class are reasonable and appropriate.

**A.**     **The Common Fund Doctrine and the Percentage-of-the-Recovery Approach**

        **1.**     **The Ninth Circuit Recognizes the Common Fund Doctrine**

Counsel who represent a class and produce a benefit for class members are entitled to compensation. As the Supreme Court has explained, "this Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). *See also Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 392–93 (1970); *Central R.R. & Banking Co. v. Pettus,* 113 U.S. 116, 123 (1885). The Supreme Court has also recognized that under the "common fund doctrine" a reasonable fee may be based "on a percentage of the fund bestowed on the class." *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984). The purpose of this doctrine is that "those who benefit from the creation of the fund should share the wealth with the lawyers whose skill and effort helped create it." *In re Wash. Pub. Power Supply Sys. Sec. Litig*., 19 F.3d 1291, 1300 (9th Cir. 1994) ("*WPPSS*"); *see also Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 271 (9th Cir. 1989) ("*Paul, Johnson*") (well-settled that lawyer who helps create common fund should be allowed to share in the award).

The Supreme Court has repeatedly recognized that private antitrust litigation is essential to the enforcement of the antitrust laws. *See, e.g., Pillsbury Co. v. Conboy*, 459 U.S. 248, 262–63 (1983); *Reiter v. Sonotone Corp*., 442 U.S. 330, 331 (1979); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 266 (1972); *Perma Life Mufflers, Inc. v. Int'l Parts Corp*., 392 U.S. 134, 139 (1968). Reasonable fee awards encourage meritorious class actions, and thereby promote private enforcement of—and compliance with—the antitrust laws. "In the absence of adequate attorneys' fee awards, many antitrust actions would not be commenced . . . ." *Alpine Pharmacy, Inc. v. Charles Pfizer & Co., Inc.*, 481 F.2d 1045, 1050 (2d Cir.), *cert. denied*, 414 U.S. 1092 (1973),

Here, Class Counsel's efforts have created a common fund of $127.45 million. Under either a "percentage-of-the-fund" or "lodestar" method, Class Counsel's requested fee is warranted in light of the value of the extensive work performed, the difficulty and risk of the case, and the results achieved, among other things.

**2.      Percentage-of-the-Recovery Approach Is the Predominant Method for Determining Attorneys' Fees Under Ninth Circuit Law**

The amount an award of reasonable attorneys' fees and expenses is within the sound discretion of the court. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998); *WPPSS*, 19 F.3d at 1296. In the Ninth Circuit, the court has discretion in a common fund case to choose either the "percentage-of-the-fund" or the "lodestar" method to determine fees. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) ("*Vizcaino II*"); *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015) ("*Online DVD*"). Most courts have exhibited a clear preference for the percentage-of-the-fund method. Virtually all of the major recent antitrust class actions in the Northern District of California have applied the percentage-of-the-fund approach. *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2011 WL 7575003, at *1–2 (N.D. Cal. Dec. 27, 2011) ("*LCD I*") (30%); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2013 WL 149692, at *1–2 (N.D. Cal. Jan. 14, 2013) ("*LCD II*") (30%); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2013 WL 1365900, at *7–8 (N.D. Cal. Apr. 3, 2013) ("*LCD III*") (28.6%); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, Case No. 07-md-1819-CW (N.D. Cal. June 30, 2011) (Dkt. No. 1370) ("*SRAM*") (attached as Exhibit 9 to the Saveri Declaration) (30%); *Meijer v. Abbott Laboratories*, C-07-05985 (N.D. Cal. Aug. 11, 2011) (Dkt. No. 514) ("*Meijer*") (attached as Exhibit 10 to the Saveri Declaration) (33⅓%).

**B.      Application of the Pertinent Factors Shows that an Upward Adjustment of the Benchmark Is Justified**

"[I]n this circuit, the benchmark percentage is 25%." *Id.* at *9. However, "[t]he 25% benchmark rate, although a starting point for analysis, may be inappropriate in some cases." *Vizcaino II*, 290 F.3d at 1048. Indeed, *Vizcaino II* makes clear that it is not sufficient to arbitrarily apply a percentage; rather the District Court must show why that percentage and the ultimate award are appropriate based on the facts of the case. *Id.*; *see also Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993) ("This 'benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors.'" (quoting *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir.

15

1990)). In considering whether an award of 30% would be fair, several factors may be considered:

> In [*Vizcaino II*], we listed several factors courts may consider in assessing a request for attorneys' fees that was calculated using the percentage-of-recovery method. These factors include the extent to which class counsel "achieved exceptional results for the class," whether the case was risky for class counsel, whether counsel's performance "generated benefits beyond the cash settlement fund," the market rate for the particular field of law (in some circumstances), the burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work), and whether the case was handled on a contingency basis. In addition, a court may cross-check its percentage-of-recovery figure against a lodestar calculation.

*Online DVD*, 779 F.3d at 954–55 (citations omitted). In addition, the Court may consider other factors including the volume of work performed, counsel's skill and experience, the complexity of the issues faced, and the reaction of the class. *See, e.g.*, *In re Heritage Bond Litig.*, 02-ML-1475 DT, 2005 WL 1594403, at *18–23 (C.D. Cal. June 10, 2005) ("*Heritage Bond*").

As this Court has noted, fee awards tend to approximate 30%. *Knight v. Red Door Salons, Inc.*, No. 08-01520 SC, 2009 WL 248367, at *6 (N.D. Cal. Feb. 2, 2009) ("nearly all common fund awards range around 30%" (quoting *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1377–78 (N.D. Cal. 1989) ("*Activision*"))); *Pokorny v. Quixtar, Inc.*, Case No. c 07-0201 SC, 2013 WL 3790896, at *1 (N.D. Cal. July 18, 2013) ("30% award the norm"); *In re Omnivision Tech., Inc.*, 559 F. Supp. 2d 1036, 1048 (N.D. Cal. 2008) ("*Omnivision*") (same).

Thus, in other large electronics antitrust class actions in this district, the court has generally awarded a fee of 30% or near 30%. *See, e.g.*, *LCD I*, 2011 WL 7575003 (30%); *LCD II*, 2013 WL 149692 (30%); *LCD III*, 2013 WL 1365900 (28.6%); *SRAM*, Case No. 07-md-1819-CW (N.D. Cal. June 30, 2011) (Dkt. No. 1370) (30%); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, M-02-1486, 2007 WL 2416513 (N.D. Cal. Aug. 16, 2007), at *1 ("*DRAM*") (25%); *In re Optical Disk Drive Antitrust Litig.*, Case No. 10-md-2143 RS (N.D. Cal. July 23, 2015) (Dkt. No. 1658) (attached as Exhibit 7 to the Saveri Declaration) (30%).

Fee awards of less than 30%, unlike this case, usually involve multipliers—*i.e.*, counsel receive a multiple of their hourly rate. *See, e.g.*, *DRAM*, 2007 WL 2416513 (multiplier of 2.3); *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730, at *10–11 (N.D.

Cal. Sept. 2, 2015) ("*High-Tech*") (multiplier of 2.5). By the same token, fees in excess of 30% often involve cases presenting substantial risk, again, as here. *See, e.g., In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) ("*Pac. Enters.*") (33%).

In this context, it is plain that the award DPPs seek is consistent with recoveries awarded in other major class action cases. Consideration of the *Vizcaino* factors confirms its fairness.

### 1.    Class Counsel Achieved an Excellent Recovery for the Class

Courts emphasize that the recovery achieved is an important factor to be considered in determining an appropriate fee award. *See Hensley v. Eckerhart*, 461 U.S. 424, 431 (1983); *Vizcaino v. Microsoft Corp.*, 142 F. Supp. 2d 1299, 1303 (W.D. Wash. 2001) *aff'd,* 290 F.3d 1043 (9th Cir. 2002) ("*Vizcaino I*"); *Omnivision*, 559 F. Supp. 2d, 1046. Here, DPPs have obtained a $127.45 million in cash. The settlement fund confers a substantial and immediate benefit to class members, and represents an excellent recovery, especially in light of the many risks involved in the action. The quality of the recovery in this action is confirmed by the fact that in December of 2014, sophisticated DAPs with large purchases who initially opted out of the first five settlements sought to revoke their opt-out notices and rejoin the class in order to participate in the settlements. Dkt. 2403; Saveri Decl. ¶ 68.

### 2.    A High Level of Skill Was Required to Prosecute This Case and Class Counsel Are Highly Qualified

The skill and quality of legal counsel also support the requested fee award. *See Mark v. Valley Ins. Co.*, Case No. CV 01-1575-BR, 2004 WL 2260605, at *2 (D. Or. Oct. 6, 2004). Class Counsel are among the nation's most experienced and skilled practitioners in the antitrust litigation field, and each firm has successfully litigated these types of cases on behalf of direct purchasers of price-fixed products throughout the country.[4]

This was a complex case which required DPPs to confront novel and difficult legal and factual issues which courts have recognized as a significant factor to be considered in making a fee award. *See*, *e.g.*, *Vizcaino I*, 142 F. Supp. 2d at 1303, 1306. Antitrust price-fixing conspiracy cases

---

[4] *See, e.g.*, *DRAM*, MDL No. 1482; *SRAM*, MDL No. 1819; *LCD*, MDL No. 1827. *See also* Exhibit 1 to the Saveri Decl. and firm biographies attached to Class Counsel's declarations.

are notoriously complex and difficult to litigate. *See, e.g.*, *In re Linerboard Antitrust Litig.*, No. CIV.A. 98-5055, 2004 WL 1221350, at *10 (E.D. Pa. June 2, 2004) ("antitrust class action is arguably the most complex action to prosecute"). Class Counsel also effectively managed the logistics of such a complex case, with more than thirty plaintiffs' firms, scores of able defense counsel, and seven defendant groups. Saveri Decl. ¶ 17, 42.

The caliber of opposing counsel is another important factor in assessing the quality of Class Counsel's work. *Vizcaino I*, 142 F. Supp. 2d at 1303; *In re King Res. Co. Sec. Litig.*, 420 F. Supp. 610, 634 (D. Colo. 1976); *Arenson v. Board of Trade*, 372 F. Supp. 1349, 1354 (N.D. Ill. 1974). Here, DPPs were opposed by attorneys from some of the best and largest firms in the country with near limitless resources.[5]

### 3.     The Risks of This Litigation

Risk is another important factor in determining a fair fee award. *Online DVD*, 779 F.3d at 954–55. Consistent with the complexity and difficulty of antitrust class actions in general, this case presented substantial risk. Some of these risk factors are discussed below.

#### a.     Defendants Have Tremendous Resources

The resources available to the opposing parties are a significant indicator of risk. *See Vizcaino I*, 142 F. Supp. 2d at 1303–04. Here, of course, Defendants' resources are vast.[6]

#### b.     Antitrust Class Actions Are Unpredictable

"Antitrust litigation in general, and class action litigation in particular, is unpredictable." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 475 (S.D.N.Y. 1998). "The 'best' case can be lost and the 'worst' case can be won, and juries may find liability but no damages. None of these risks should be underestimated." *In re Superior Beverage/Glass Container Consol. Pretrial*, 133 F.R.D. 119, 127 (N.D. Ill. 1990). There is also always a risk of unfavorable changes in the law.

---

[5] For example, Kirkland & Ellis LLP (Hitachi's counsel) employs over 1,600 attorneys in 12 offices worldwide. *See* http://www.kirkland.com.

[6] For example, Samsung Group, parent of the Samsung Defendants, has $470.2 billion in assets and employs over 425,000 people. *See* http://www.samsung.com/us/aboutsamsung/samsung_group/our_performance.

18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### c.     The Risk that Class Certification Will Be Denied

While the Court ultimately granted certification here, the risk that class certification will be denied is real. Several large antitrust class actions have been denied certification in recent years. *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 508 (N.D. Cal. 2008) (denying certification of indirect purchaser class and certifying a direct purchaser class that was much smaller than requested); *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 325 (N.D. Cal. 2014); *In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081, at *19 (N.D. Cal. June 9, 2010). *See also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 255 (D.C. Cir. 2013).

### d.     The Risk of Not Being Able to Establish Liability or Recover Substantial Damages

This case also presented substantial risks on the merits. Many large antitrust cases do not make it past summary judgment. *See*, *e.g.*, *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 914, 918 (9th Cir. 2015) (affirming grant of summary judgment against plaintiffs); *In re Citric Acid Antitrust Litig.*, 191 F.3d 1090, 1093, 1108 (9th Cir. 1999), *cert. denied sub nom. Gangi Bros. Packing Co. v. Cargill, Inc.*, 529 U.S. 1037 (2000) (summary judgment in favor of Cargill).

While one defendant eventually pled guilty, Defendants have strenuously argued the conduct underlying that plea related only to the market for CDTs in Asia, and did not support the global market wide conspiracy DPPs allege.

Defendants have also steadfastly maintained that DPPs are entitled to no recovery for finished products—i.e., televisions and computer monitors—which account for the vast majority of DPPs' damages. DPPs estimate that finished products constitute over 70% of class members' purchases. Saveri Decl. ¶ 77. The danger this argument posed to the class is made clear by the fact that the Special Master recommended that the Court grant Defendants' summary judgment motion on this issue. Dkt. No. 1221; Saveri Decl. ¶ 38.

Defendants also argued that the FTAIA and the statute of limitations bar some or all of DPPs alleged damages, and that the alleged conspiracy caused no harm to the class. Saveri Decl. ¶¶ 15, 26, 79.

19

Some Defendants—e.g., Hitachi, Philips, LG, and Panasonic—moved their CRT businesses into separate entities in 2001 -2004. They have argued that they withdrew from the conspiracy, and, because of the statute of limitations, have no liability whatsoever. Saveri Decl. ¶ 75.

Finally, some of the largest CRT manufacturers—e.g., Daewoo and LPD, the joint venture between LG and Philips—were bankrupt or essentially defunct by the time the case was filed. Saveri Decl. ¶ 76.

All of these issues posed serious threats to DPPs ability to prove liability against some or all Defendants or to recover substantial damages.

### 4.     Contingent Nature of the Fee

The Ninth Circuit has confirmed that a fair fee award must include consideration of the contingent nature of the fee, where there is no assurance of attorneys' fees or reimbursement of expenses. *See, e.g.*, *Vizcaino II*, 290 F.3d at 1050; *Online DVD*, 779 F.3d at 954–55 & n.14. The commencement of a class action is no guarantee of success. "[T]he risk of non-payment in complex cases, such as this one, is very real." *In re Veeco Instruments Inc. Sec. Litig.*, No. 05-md-01695(CM), 2007 WL 4115808, at *6 (S.D.N.Y. Nov. 7, 2007). It is well-established that attorneys who take on the risk of a contingency case should be compensated for the risk they take:

> It is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases. *See* Richard Posner, *Economic Analysis of Law* § 21.9, at 534–35 (3d ed. 1986). Contingent fees that may far exceed the market value of the services if rendered on a non-contingent basis are accepted in the legal profession as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless whether they win or lose.

*WPPSS*, 19 F.3d at 1299.

Class Counsel have received no compensation during the almost eight year course of the litigation. They have invested over $43 million in time and $1.9 million in expenses, and took the chance that they might never be compensated. This factor strongly supports the requested fee.

### 5.     Delay

For virtually all of the services for which DPPs seek payment now, Class Counsel have waited years for payment. Thus, even if DPPs were to receive their full lodestar, they would not be

20

fully compensated for the value of their time. *See, e.g.*, *Vizcaino*, 290 F.3d at 1051 ("Calculating

fees at prevailing rates to compensate for delay in receipt of payment" allowed).

### 6.   High Quality of Work Performed

Finally, Class Counsel respectfully submit that their work has been of the highest quality

and has been of great benefit to the class. The Court is familiar with the history of this case, having

presided over years of contentious litigation, represented by over four thousand docket entries. This

brief provides an overview of the work Class Counsel performed by describing the various

substantive motions, procedural matters, discovery requests and disputes, depositions, and other

matters. Further description of the work performed by Class Counsel is set forth in the Saveri

Declaration and the declarations of other Class Counsel. The amount and quality of the work of

Class Counsel also strongly supports the fee they seek.

### 7.   Lodestar Cross-Check Confirms the Reasonableness of the Requested Fee

Finally, a cross-check of the requested fee with Class Counsel's lodestar demonstrates that

the proposed fee is reasonable. The lodestar method requires that the Court determine the number

of hours reasonably spent by counsel on a matter, multiply it by counsel's reasonable hourly rates,

and then adjust the lodestar up or down based on various factors similar to those relevant to the

percentage method. Ordinarily, where there has been a substantial recovery for the class, the Court

applies a multiplier to account for contingency, risk, delay and other factors which can range from

one to four. *Omnivision*, 559 F. Supp. 2d, 1048. Here, because the fee sought amounts to less than

the value of the time Class Counsel has invested in the case, and because the circumstances would

support the application of a multiplier, the lodestar cross-check confirms the reasonableness of the

fee DPPs seek. *See, e.g.*, *Online DVD*, 779 F.3d at 949; *Vizcaino II*, 290 F.3d at 1048–50.

Class Counsel have spent 95,229.33 hours prosecuting this Action. As explained above, all

of this time was reasonable and necessary for the prosecution of this action. *Online DVD*, 779 F.3d

at 949. Among other things, work was assigned by S&S among Class Counsel to avoid duplication;

as required by CMO 1, counsel kept contemporaneous time records and periodically reported their

time to S&S; and, where possible, DPPs worked with the IPPs and DAPs to avoid duplication of

1    effort. Saveri Decl. ¶¶ 8, 17.

2          Moreover, the lodestar understates the work performed by Class Counsel. It includes time

3    from May 9, 2008, the date the Court appointed interim lead counsel through January, 2014, when

4    DPPs reached agreement on a settlement with Samsung SDI. At that time, S&S instructed Class

5    Counsel to stop working. It therefore excludes substantial work by counsel in connection with their

6    pre-filing investigation of the case, the JPML proceeding, and the organization of counsel. It also

7    does not include substantial time preparing this application for fees and reimbursement of

8    expenses. Saveri Decl. ¶ 8.[7]

9          At historic hourly rates—i.e., those in place at the time the work was performed—this time

10   results in a lodestar of $43,335,517.50. *See* Saveri Decl. ¶ 8 & Ex. 4. The record demonstrates that

11   Class Counsel's hourly rates are reasonable. Each firm avers that the rates charged are that firm's

12   usual and customary rates at the time the work was performed. *See* Declarations of Class Counsel

13   filed herewith. *See also High-Tech*, 2015 WL 5158730, at *9 (approving rates).

14         DPPs' fee request of $38,235,000 thus amounts to just 88% of their lodestar. This confirms

15   its reasonableness beyond question. *In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW,

16   2007 WL 4171201, at *16 (N.D. Cal. Nov. 26, 2007) (fact that fee sought is less than the lodestar

17   suggests fairness of award); *LCD II*, 2013 WL 149692, at *1 (fact that fee sought is less than the

18   lodestar "serves to confirm the reasonableness of the fees requested.").

19         **8.    The Reaction of the Settlement Class to Date Supports the Fee Request**

20         Settlement notices were sent to class members in connection with each settlement reached

21   with Defendants. Altogether, five settlement notices were sent to class members. Each informed

22   class members that "At a future time, Interim Lead Counsel will ask the Court for attorneys' fees

23   not to exceed one-third (33.3%) of this or any future Settlement Fund plus reimbursement of their

24   costs and expenses." *See* Dkt. Nos. 1323-3, Ex. A; 1464-2, Ex. A; 1573-2, Ex. A; 1757-2, Ex. A;

25   ───────────────

[7] S&S's declaration includes additional time through July 31, 2015 for work relating preliminary

26   and final approval of the Hitachi and Samsung SDI settlements, motion practice relating to the

failure of Dell and Sharp to timely submit their requests for exclusion from those settlement

27   classes, and administrative matters. After January, 2014, S&S and Class Counsel also worked on

the case against Mitsubishi and Thomson. However, DPPs do not seek a fee award for that work at

28   this time, and have not included any such time in their lodestar calculation. Saveri Decl. ¶¶ 71–73.

22

2728-2, Ex. A. As noted above, out of over 16,000 class members, including many large and sophisticated businesses, no objections were received. Saveri Decl. ¶ 78. This is another strong indication of the reasonableness of the fee DPPs seek. "When a class is comprised of sophisticated business entities that can be expected to oppose any request for attorney fees they find unreasonable, the lack of objections 'indicates the appropriateness of the [fee] request.'" *In re Remeron Direct Purchaser Antitrust Litig.*, No. Civ.03-0085 FSH, 2005 WL 3008808, at *13 n.1 (D.N.J. Nov. 9, 2005) (awarding fee of 33.3% of a $75 million settlement).

C.     **Class Counsel Are Entitled to Reimbursement for Their Reasonable Litigation Expenses**

Class Counsel also request reimbursement and/or approval of litigation costs and expenses they incurred on behalf of the class. Attorneys who create a common fund for the benefit of a class are entitled to be reimbursed out-of-pocket expenses incurred in creating the fund so long as the submitted expenses are reasonable, necessary and directly related to the prosecution of the action. *Vincent v. Hughes Air West*, 557 F.2d 759, 769 (9th Cir. 1977); *OmniVision*, 559 F. Supp. 2d at 1048 ("Attorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters."). Reasonable reimbursable litigation expenses include: those incurred for document production, experts and consultants, depositions, translation services, notice, and claim administration. *See, e.g.*, 1 Alba Conte, *Attorney Fee Awards* § 2.19 (3d ed. 2004).

Class Counsel incurred a total of $4,794,787.44 in reasonable expenses as follows : (i) document management system and database costs of $283,694.51; (ii) mediation costs of $83,724.42; payments to special masters of $186,644.14; (iv) payments to translation services of $127,083.17; (v) Court filing fees and costs of $6,352.59; (vi) payments to experts of $3,076,506.85; (vii) federal express costs of $14,339.14; (viii) transcript costs of $166,311.46; (ix) online legal and factual research (e.g., LexisNexis and Westlaw) of $245,126.87; (x) messenger and delivery costs of $788.60; (xi) in-house copy charges (capped at 20 cents per page) of $140,085.84; (xii) professional copy charges of $12,083.24; (xiii) postage charges of $1,331.39; (xiv) service of process charges of $22,789.36; (xv) telephone and facsimile charges of $35,282.68; and (xvi) travel and meal charges of $392,643.18. Saveri Decl. ¶¶ 12–13. As detailed in the

23

1    Declarations of Class Counsel, these expenses were reasonable and necessary for the prosecution

2    of this action and are customarily approved by courts as proper litigation expenses. *See In re Media*

3    *Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1366 (N.D. Cal. 1995) (Court fees, experts/consultants,

4    service of process, court reporters, transcripts, deposition costs, computer research, photocopies,

5    postage, telephone/fax); *Thornberry v. Delta Air Lines*, 676 F.2d 1240, 1244 (9th Cir. 1982),

6    *remanded on other grounds*, 461 U.S. 952 (1983) (travel, meals and lodging); *Redding v. Fairman*,

7    717 F.2d 1105, 1119 (9th Cir. 1983) (same); Conte, *Attorney Fee Awards* § 2.19.

8        Of the total amount, Class Counsel advanced $1,927,392.12 out of their own funds on

9    behalf of the class. $986,167.30 of this was paid out of a litigation fund established by Class

10   Counsel and maintained by S&S (the "Litigation Fund"). An accounting of the payments from the

11   Litigation Fund by category is set forth in Exhibit 5 to the Saveri Declaration. *Id.* $941,224.82 was

12   paid by individual Class Counsel and is detailed in their individual declarations. Exhibit 4 to the

13   Saveri Declaration summarizes these expenses. Class Counsel therefore request that the Court

14   Order that they be reimbursed in the amount of $1,927,392.12 from the Settlement Fund. Saveri

15   Decl. ¶¶ 9–10.

16       Class Counsel paid $2,867,395.32, the balance of the expenses, from the Settlement Fund

17   as authorized by the Court. *See* Dkt. Nos. 1506, 1507 and 1833. The Court authorized the use of up

18   to $3 million from the Settlement Fund for use in the prosecution of the litigation, subject to an

19   accounting. *See id.* Exhibit 6 to the Saveri Declaration accounts for these expenses per the Court's

20   order. Saveri Decl. ¶ 11. Class Counsel request that the Court approve these expenses as

21   reasonable. Class Counsel do not seek reimbursement for these expenses.

22       / / /

23       / / /

24       / / /

25       / / /

26       / / /

27       / / /

28       / / /

1    IV.    **CONCLUSION**

2         For the foregoing reasons, DPPs respectfully request that the Court grant Plaintiffs' Motion

3    for an Award of Attorneys' Fees and Reimbursement of Expenses.

4    Dated: September 11, 2015                    Respectfully submitted,

5                                                  /s/ *Guido Saveri*
                                                  Guido Saveri (22349)
6                                                  R. Alexander Saveri (173102)
                                                  Geoffrey C. Rushing (126910)
7                                                  Cadio Zirpoli (179108)
                                                  Travis L. Manfredi (281779)
8                                                  SAVERI & SAVERI, INC.
                                                  706 Sansome Street
9                                                  San Francisco, CA 94111
                                                  Telephone: (415) 217-6810
10                                                 Facsimile: (415) 217-6813

11                                                 *Lead Counsel For Direct Purchaser Plaintiffs*

12                                                 Joseph W. Cotchett
                                                  Steven N. Williams
13                                                 Adam J. Zapala
                                                  COTCHETT, PITRE & McCARTHY, LLP
14                                                 840 Malcolm Road
                                                  Burlingame, CA 94010
15                                                 Telephone: (650) 697-6000
                                                  Facsimile: (650) 697-0577
16
                                                  Bruce L. Simon
17                                                 Aaron M. Sheanin
                                                  PEARSON, SIMON & WARSHAW LLP
18                                                 44 Montgomery Street, Suite 2450
                                                  San Francisco, CA 94104
19                                                 Telephone: (415) 433-9000
                                                  Facsimile: (415) 433-9008
20
                                                  H. Laddie Montague, Jr.
21                                                 Ruthanne Gordon
                                                  Charles P. Goodwin
22                                                 Candice Enders
                                                  BERGER & MONTAGUE, P.C.
23                                                 1622 Locust Street
                                                  Philadelphia, PA 19103
24                                                 Telephone: (800) 424-6690
                                                  Facsimile: (215) 875-4604
25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Michael P. Lehmann
HAUSFELD LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Telephone: (415) 633-1908
Facsimile: (415) 358-4980

Gary Specks
KAPLAN FOX
423 Sumac Road
Highland Park, IL 60035
Telephone: (847) 831-1585
Facsimile: (847) 831-1580

Douglas A. Millen
William H. London
FREED KANNER LONDON & MILLEN
2201 Waukegan Road
Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
Facsimile: (224) 632-4519

Eric B. Fastiff
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

W. Joseph Bruckner
Elizabeth R. Odette
LOCKRIDGE GRINDAL NAUEN P.L.L.P
100 Washington Avenue S
Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

*Attorneys for Plaintiffs*

DPPs' NOMAM FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES; Case No.
07-cv-5944-SC