Mario N. Alioto (56433)
Joseph M. Patane (72202)
Lauren C. Capurro (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123
Telephone: 415-563-7200
Facsimile: 415- 346-0679
Email: malioto@tatp.com
jpatane@tatp.com
laurenrussell@tatp.com

***Lead Counsel for the
Indirect Purchaser Plaintiffs***

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. CV-07-5944-SC<br><br>MDL No. 1917 |
| This Document Relates to:<br><br>All Indirect Purchaser Actions | **INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS TO CLASS REPRESENTATIVES**<br><br>Hearing Date:  November 13, 2015<br>Time: 10:00 a.m.<br>Courtroom: One, 17th Floor<br>Judge:  Honorable Samuel Conti |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ....................................................................1

INTRODUCTION ..........................................................................................................................1

SUMMARY OF THE LITIGATION ..............................................................................................2

    A.    The Complaints ..........................................................................................................2

    B.    Discovery ....................................................................................................................3

    C.    Class Certification ......................................................................................................4

    D.    Summary Judgment ....................................................................................................4

    E.    Trial Preparations ......................................................................................................4

    F.    Settlement Negotiations .............................................................................................5

    G.    Class Notice ................................................................................................................5

MEDIATIONS AND SETTLEMENTS ..........................................................................................5

    A.    The Two Settlements Approved Before Class Certification.......................................6

        1.    Chunghwa ........................................................................................................6

        2.    LG ....................................................................................................................7

    B.    The Remaining Settlements .......................................................................................7

        1.    Philips...............................................................................................................7

        2.    Panasonic .........................................................................................................7

        3.    Hitachi .............................................................................................................7

        4.    Toshiba............................................................................................................8

        5.    Samsung SDI ...................................................................................................8

        6.    Thomson and TDA ..........................................................................................8

ARGUMENT ..................................................................................................................................9

I.    The Court Should Award The Requested Fees .....................................................................9

    A.    The Requested Fee Is an Appropriate Percentage of the Settlement Fund.................10

i

INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES,
REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

B.    The Circumstances Here Justify the Requested Fee Award ........................11

    1.    IPP Counsel Secured an Exceptional Result for the Class ................11

    2.    This Case Represents Multi-District Antitrust Litigation at its Most Complex..........................................................................13

        a.    Before CAFA, This Indirect Purchaser Case Would Have Been Filed  As Twenty-Two Separate State Class Actions.........................13

        b.    The Global Nature of the CRT Business and the Conspiracy..............15

        c.    Complexities Due to the Age of the CRT Case...................................16

        d.    Complexities at Class Certification....................................................17

        e.    Depositions........................................................................................18

        f.    Summary Judgment Motions...............................................................18

        g.    Proving Pass-through of the Overcharge..............................................19

        h.    Trial Structure....................................................................................19

        i.    Trial Preparation ...............................................................................20

    3.    The Risks Assumed by IPP Counsel Were Enormous.....................20

        a.    The Risk That IPPs Would Fail To Establish Liability .....................21

        b.    The Risk that the Court would Deny Class Certification ...................21

        c.    The Risk of Litigating Under Unsettled Legal Precedent...................22

        d.    The Risk of Recovering Nothing at Trial ..........................................22

        e.    The Long Duration of this Case..........................................................23

    4.    The Skill and Quality of Work by IPP Counsel...............................23

    5.    The Contingent Nature of the Fee....................................................23

    6.    The Award Sought Comports with Awards in Similar Cases.........................24

C.    A Lodestar Cross-Check Confirms the Requested Fee Amount Is Reasonable..........25

II.    THE COURT SHOULD APPROVE THE REIMBURSEMENT OF EXPENSES ..............27

A.    Common Litigation Expenses.............................................................28

B.    Expenses Incurred by the Individual IPP Firms .......................................28

III.   THE COURT SHOULD APPROVE THE REQUESTED INCENTIVE AWARDS.............29

CONCLUSION.............................................................................................................................31

INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES,
REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

# TABLE OF AUTHORITIES

## **Cases**

*Allapattah Servs. Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006)............................11, 24

*Animal Sci. Prods. Inc. v. China Minmetals Corp.*, 654 F.3d 462 (3d Cir. 2011)............................15

*Arenson v. Board of Trade*, 372 F. Supp. 1349 (N.D. Ill. 1974) ...............................................13

*Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983). ................14

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980)................................................................10

*Brewer v. Southern Union Co.,* 607 F. Supp. 1511 (D. Col. 1984)............................................25

*Buccellato v. AT&T Operations*, Inc., No. C10-00463-LHK, 2011 WL 3348055
    (N.D. Cal. June 30, 2011) .................................................................................27

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) .....................................................18, 22

*In re Activision Secs. Litig.*, 723 F. Supp. 1373 (N.D. Cal. 1989)............................................9

*In re Apollo Group, Inc. Secs. Litig.*, No. 04-2147, 2012 WL 1378677 (D. Ariz. Apr. 20, 2012)......24

*In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011) ...........................24

*In re Combustion*, 968 F. Supp. 1116 (W.D. La. 1997).................................................24, 25

*In re CRT*, MDL No., 1917, 2014 WL 2581525 (N.D. Cal. June 9, 2014)........................ ...............15

*In re CV Therapeutics, Inc. Sec. Litig.*, No. c-03-3709-SI, 2007 WL 1033478
    (N.D. Cal. Apr. 4, 2007 ....................................................................................10

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M-02-1486-PJH, 2007 WL
    2416513 (N.D. Cal. Aug. 16, 2007)......................................................................10

*In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081
    (N.D. Cal. June 9, 2010) ...................................................................................21

*In Re Flonase Antitrust Litig.*,291 F.R.D. 93 (E.D. Pa. 2013)...............................................21

*In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739 (E.D. Pa. 2013).....................................9, 25

*In re Graphics Processing Units Antitrust Litig.,* 253 F.R.D. 478 (N.D. Cal. 2008) ........................21

*In re IPO Secs. Litig.*, 671 F. Supp. 2d 467 (S.D.N.Y. 2009).................................................24

*In re King Res. Co. Secs. Litig.*, 420 F. Supp. 610 (D. Colo. 1976) ........................................13

*In re Linerboard Antitrust Litig.,* No. A-98-5055, MDL No. 1261, 2004 WL 1221350
    (E.D. Pa. June 2, 2004) ....................................................................................13

*In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) .........................20, 25

iv

INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES,
REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

*In re Omnivision Technologies,* 559 F. Supp. 2d 1036 (N.D. Cal. 2008)............................9, 10, 11, 24

*In re Online DVD-Rental Antitrust Litig.,* 779 F.3d 934 (9th Cir. 2015) ............................9, 20, 29, 30

*In re Optical Disk Drive Antitrust Litig.,* 303 F.R.D. 311 (N.D. Cal. 2014) ......................................21

*In re Rail Freight Fuel Surcharge Antitrust Litig.,* 725 F.3d 244 (D.C. Cir. 2013) ...........................22

*In re Static Random Access Memory (SRAM) Antitrust Litig.,* No. 4:07-md-01819, Dkt. 1407 ¶A
    (N.D. Cal. Oct. 14, 2011).................................................................................................................9

*In re Superior Beverage/Glass Container Consol. Pretrial,* 133 F.R.D. 119 (N.D. Ill. 1990)...........20

*In re TFT-LCD (Flat Panel) Antitrust Litig.,* No. 07-md-01827, 2011 WL 7575003
    (N.D. Cal. Dec. 27, 2011) ...................................................................................................9, 10, 30

*In re TFT-LCD (Flat Panel) Antitrust Litig.,* No. 07-md-01827, 2013 WL 149692
    (N.D. Cal. Jan. 14, 2013) .............................................................................................................9, 10

*In re TFT-LCD (Flat Panel) Antitrust Litig.,* No. 07-md-01827, 2013 WL 1365900
    (N.D. Cal. Apr. 3, 2013) .................................................................................................9, 10, 25, 30

*In re Tricor Direct Purchaser Antitrust Litig.,* No. 05-cv-00340 (D. Del. Apr. 23, 2009) ...........24, 25

*In re Visa Check/Mastermoney Antitrust Litig.,* 297 F. Supp. 2d 503 (E.D.N.Y. 2003) ....................25

*In re Vitamins Antitrust Litig.,* MDL 1285, 2001 WL 34312839 (D.D.C. July 16, 2001) .................24

*Lotes Co. v. Hon Hai Precision Industry Co.,* 753 F.3d 395 (2d Cir. 2014) .......................................15

*Mego Fin. Corp. Sec. Litig.,* 213 F.3d 454 (9th Cir. 2000) ................................................................30

*Minn-Chem Inc. v. Agrium Inc.,* 683 F.3d 845 (7th Cir. 2012) ...........................................................15

*Missouri v Jenkins,* 491 U.S. 274 (1989)...........................................................................................26

*Moore v. Verizon Communications Inc.,* No. C 09–1823 SBA, 2013 WL 4610764
    (N.D. Cal. Aug. 28, 2013)...............................................................................................................30

*Motorola Mobility LLC v. AU Optronics Corp.,* 775 F.3d 816 (7th Cir. 2015) ...........................15, 22

*The Dow Chemical Company v. Industrial Polymers,* Inc., No. 14-1091 .............................................22

*Tyson Foods, Inc. v. Bouaphakeo,* No. 14-1146, 135 S.Ct. 2806 (June 8, 2015)................................22

*U.S. v. Hsiung,* 778 F.3d 738 (9th Cir. 2015) .....................................................................................15

*Vincent v. Hughes Air W., Inc.,* 557 F.2d 759 (9th Cir.1977) ............................................................10

*Vizcaino v. Microsoft Corp.,* 142 F. Supp. 2d 1299................................................................11, 13, 20

*Vizcaino v. Microsoft Corp.,* 290 F.3d 1043 (9th Cir. 2002)...................................9, 10, 24, 25, 27

*Wakefield v. Wells Fargo & Co.,* No. 3:13-cv-05053 LB, 2015 WL 3430240

(N.D. Cal. May 28, 2015) ........................................................................................27

*Willner v. Manpower Inc.*, No. 11-cv-02846-JST, 2015 WL 3863625 (N.D. Cal. June 22, 2015) .....27

**Statutes**

15 U.S.C. § 6a ..........................................................................................................2

28 U.S.C. § 1332(d) ................................................................................................13

Fed. R. Civ. P. 23(e) .................................................................................................1

Fed. R. Civ. P. 23 subd. (h) .....................................................................................27

Fed. R. Civ. P. 23(h) .................................................................................................1

Fed. R. Civ. P. 54(b) .................................................................................................1

Fed. R. Civ. P. 54(d)(2) ............................................................................................1

**Other Authorities**

IIA Areeda et al., Antitrust Law ¶ 396 (3d ed. 2006) ..............................................12

Ronald W. Davis, Amchem and Antitrust: Have the Ground Rules for Antitrust Class Actions

  Changed?, 12 Antitrust 39, 44 (Fall 1997) ..........................................................12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NOTICE OF MOTION AND MOTION

### TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 13, 2015 at 10:00 a.m., before the Honorable Samuel Conti, United States District Court for the Northern District of California, 450 Golden Gate Ave., Courtroom 1, 17th Floor, San Francisco, California, the Indirect Purchaser Plaintiffs ("IPPs") will move the Court, pursuant to Federal Rule of Civil Procedure 23(e), for entry of an Order for an award of attorneys' fees in the amount of one-third (33.3%) of the $576,750,000 Settlement Fund plus interest, reimbursement of litigation expenses in the amount of $3,174,674.55, approval of the additional $4,495.878.02 in expenses paid with settlement funds, and payments to the Class Representatives for their time and effort representing the Class throughout the litigation.

This motion is brought pursuant to Federal Rules of Civil Procedure 23(h), 54(b) and 54(d)(2).  The grounds for the motion are that: (a) such fees are fair and reasonable in light of IPP Counsels' efforts in creating the Settlement Fund; (b) the requested fees comport with the Ninth Circuit case law in common fund cases; (c) the expenses for which reimbursement is sought were reasonably and necessarily incurred in connection with the prosecution of this action; and (d) a reasonable payment to each Class Representative for their efforts on behalf of the Class is warranted and appropriate.

This motion is based on this Notice of Motion and Motion; the supporting Memorandum of Points and Authorities; the accompanying Declaration of Mario N. Alioto ("Alioto Decl."); the Declaration of Richard Pearl ("Pearl Decl."); the Compendium of IPP Counsel Declarations ("Compendium Decl."); and any further papers filed in support of this motion, the argument of counsel, and all pleadings and records on file in this matter.

INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

After eight years of litigation, Indirect Purchaser Plaintiffs ("IPPs") have recovered $576.75 million, one of the largest recoveries ever on behalf of indirect purchasers. There are no coupons or vouchers and there will be no reversion or refund to any Defendant under any circumstances. No *cy pres* distribution is contemplated.

As reflected in the accompanying declarations, IPP Counsel have expended tremendous amounts of time and resources over the past eight years litigating this complex case, and have done so strictly on a contingency basis. IPP Counsel now move for an award of 33.3% of the Settlement Fund in attorneys' fees, equating to a reasonable multiplier of 2.3; reimbursement of $3,174,647.55 in litigation expenses; and modest incentive awards to Class Representatives for their service.

Throughout this litigation, IPP Counsel were at all times highly cognizant of the need to work efficiently, avoid duplication and prudently manage expenses. To date, IPP Counsel have performed the following services:

- Researched and pled antitrust and unfair competition claims under the laws of 21 States and the District of Columbia (hereinafter "22 States");
- Successfully defended the pleadings against two rounds of motions to dismiss comprising 11 joint and separate motions that raised a multitude of difficult issues;
- Propounded several sets of written discovery requests, resolved dozens of discovery issues and disputes through meet and confers with Defendants without the need for Court involvement, and successfully moved to compel when necessary;
- Reviewed and analyzed tens of thousands of documents, a vast number of which were in a foreign language and required translation;
- Coordinated discovery and analysis of over 40 Defendants' and over 50 third parties' transactional data, including global CRT Product sales and cost data for hundreds of millions of transactions spanning a 13-year period;
- Deposed witnesses in locations around the world, often through interpreters;

- Obtained class certification of 22 statewide classes in proceedings lasting over a year, requiring analysis of complex economic evidence and expert testimony to develop proof of injury and damages on a class-wide basis;

- Opposed 11 summary judgment motions raising complex legal and factual issues including the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a ("FTAIA"), antitrust standing, and withdrawal from the conspiracy;

- Fully readied the case for trial by designing trial strategy; preparing trial witnesses, exhibits, demonstratives, and deposition designations; briefing pretrial motions; and participating in mock trials; and

- Negotiated with Defendants to obtain one of the largest settlement funds in the history of indirect purchaser class actions.

Finally, IPP Counsel successfully coordinated their efforts to prosecute this case with three other plaintiff groups—Direct Purchaser Plaintiffs ("DPPs"), Direct Action Plaintiffs ("DAPs"), and governmental entities.[1]

All of these efforts—which do not include time spent on future matters such as claims administration and other tasks—are described in detail in the accompanying Alioto Declaration.

The fees sought are fair in light of the substantial investment by IPP Counsel and the great risks that the litigation presented.  Likewise, the expenses to be reimbursed are reasonable, and the incentive awards are warranted.

## **SUMMARY OF THE LITIGATION**[2]

### A.    **The Complaints**

This highly complex litigation has been ongoing for eight years.  IPPs filed their original complaints in various federal courts throughout the country beginning in November 2007.  The

---

[1] The DPPs filed suit at the same time as the IPPs in 2007.  In late 2011/early 2012, 13 DAPs and the Attorneys General of California, Florida, Illinois, Washington and Oregon also filed suit.  The DAPs consist of corporate plaintiffs that purchased CRT Products from Defendants, primarily directly. The DAPs and the Florida Attorney General filed suit in the MDL.  The other State Attorneys General filed suit in their respective state courts.  Declaration of Mario N. Alioto in Support of Indirect Purchaser Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards ("Alioto Decl.") ¶ 5.

INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

1   Judicial Panel on Multidistrict Litigation transferred all related indirect purchaser actions to the

2   Northern District of California, where they were consolidated with similar class actions by DPPs,

3   and assigned to this Court as MDL No. 1917.  Alioto Decl. ¶¶ 9-10.

4        IPP Counsel prepared and filed four Consolidated Amended Complaints ("CAC") between

5   March 16, 2009, and January 12, 2013 (Dkt. Nos. 437, 716, 827 and 1526) asserting claims under

6   the laws of 22 States.  Defendants asserted dozens of complex legal and factual defenses, including

7   applicability of the FTAIA; lack of antitrust standing; and jurisdictional and statute of limitations

8   defenses.  It took almost two years and two rounds of motions to dismiss before Defendants finally

9   answered the Third CAC on January 26, 2011.  Alioto Decl. ¶¶ 13-21.

10       **B.**    **Discovery**

11        Discovery demanded a massive effort at both the class certification and the merits stages.

12   The discovery effort was complicated by the global nature of the CRT business and the fact that the

13   alleged conspiracy began more than 20 years ago.  The meet and confers with Defendants regarding

14   their document productions lasted for more than two years.  The document review process consisted

15   of analysis of over tens of thousands of documents—some hundreds of pages long and many

16   handwritten.  The most important of these documents were in Korean, Japanese or Chinese and

17   required certified translations.  In total, over 250 depositions were taken, many in other countries and

18   requiring the use of official interpreters.  The fact that IPP Counsel had to coordinate discovery with

19   other plaintiff groups asserting claims not only in this MDL, but also in state courts, added another

20   layer of complexity.  *Id.* ¶¶ 25-59.

21        In addition to the massive document and deposition discovery, this case also entailed

22   extensive expert discovery.  A total of 17 expert witnesses produced voluminous opening,

23   opposition, rebuttal and sur-rebuttal reports.  These reports contained complex economic analyses

24   relating to liability, damages and defenses specific to each Defendant.  IPP Counsel and IPPs'

25   expert, Dr. Netz, had to be fully informed on all expert reports, not only those which pertained to the

26

27

28   [2] The history of this litigation is more fully described in the Alioto Declaration.

INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES,
REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

1   IPPs.  This is because expert reports that involved other parties also involved issues which impacted

2   the IPP case.  *Id.* ¶¶ 60-65.

3       **C.**    **Class Certification**

4          Preparation for class certification took over two years.  It involved the taking of over 50

5   depositions (including depositions of class representatives, Defendants, third-parties and experts);

6   the translation, review and analysis of thousands of documents relating specifically to impact and

7   other Rule 23 requirements; and the work of experts conducting highly sophisticated economic

8   analyses of Defendants' and third parties' data.  In addition to moving for class certification, IPPs

9   also had to defend against Defendants' motion to strike IPPs' expert reports.  All told, the parties'

10  briefings and expert reports consisted of over 6,000 pages.  The motions themselves took over a year

11  to resolve.  *Id.* ¶¶ 66-72.

12      **D.**    **Summary Judgment**

13         At the summary judgment stage, Defendants filed 36 motions.  Eleven of them were directed

14  at IPPs.  However, IPP Counsel also had to coordinate with other plaintiff groups on responses to the

15  remaining motions, because rulings on these motions could have affected IPPs' case.[3]  These

16  motions raised difficult and complex legal and factual issues regarding the FTAIA, antitrust standing

17  and other dispositive issues.  *Id.* ¶¶ 73-80.

18      **E.**    **Trial Preparations**

19         At the same time as the summary judgment motions, IPP Counsel were preparing for trial.

20  This effort—which entailed analyzing the best evidence garnered in eight years—required the

21  preparation of a trial exhibit list, jury instructions, deposition designations, the Pretrial Statement,

22  and witness lists; authentication of documents; the briefing of 64 motions *in limine* and other trial-

23  related issues; preparing expert and class representative witnesses to testify at trial; mock trials; and

24  of course preparing IPPs' case-in-chief.  *Id.* ¶¶ 86-93.

25

26

27  [3] For example, Defendants filed separate motions against IPPs and certain DAPs based on the

28  FTAIA.  Defendants also filed motions against certain DAPs regarding state law claims that overlapped with IPPs' claims.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### F.      Settlement Negotiations

IPP Counsel engaged in settlement negotiations with Defendants throughout the litigation. IPPs reached two settlements before class certification with Defendants Chunghwa Picture Tubes, Ltd. ("Chunghwa") and LG Electronics, Inc. and LG Electronics USA, Inc. (collectively "LG"), which the Court has finally approved.  (Dkt. Nos. 1105 and 2542.)  Additional hard-fought settlement negotiations with the remaining Defendants took place throughout 2014 and early 2015, with a pending trial date of March 2015.  Alioto Decl. ¶¶ 94; 101-112.  IPPs ultimately settled all their claims.[4]  IPP Counsel worked with a Settlement/Claims Administrator to devise an appropriate Notice and claims distribution process, and moved for preliminary approval of these additional settlements.  The Court has preliminarily approved the settlements and directed that Notice be given. (Dkt. No. 3906.)

### G.      Class Notice

Following preliminary approval of the recent settlements, the Claims Administrator published the Notices online and in various publications throughout the United States, in accordance with the Court's Order.  The Claims Administrator also directly mailed and emailed notice to 10,082,690 unique addressees.  Alioto Decl. ¶ 114.  The Notices advised Class Members of the material terms of the proposed settlements, including the intent of IPP Counsel to apply to the Court for an award of attorneys' fees and expenses.  The Notices further stated that IPP Counsel would seek up to one-third of the Settlement Fund, plus reimbursement of expenses and incentive awards for the class representatives.  *Id.* ¶ 115.

### MEDIATIONS AND SETTLEMENTS

IPP Counsel began engaging in settlement discussions in 2008 and continued through early 2015.  These settlement negotiations with Defendants were hard-fought and at times contentious. Each settlement was reached only after extensive, arm's-length negotiations between counsel for the Settling Defendant and Plaintiffs.  The parties were assisted by the Honorable Vaughn R. Walker

---

[4] The IPPs also named Videocon Industries, Ltd. as a defendant in *Luscher, et al. v. Videcon Industries, Ltd., et al.,* No. 13-cv-03234 SC, part of this MDL.  Claims against Videocon, which has defaulted, are still pending.

INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

1  (Ret.), former Chief Judge of the Northern District of California, and the Honorable Fern Smith

2  (Ret.), former Judge of the Northern District of California.  Alioto Decl. ¶ 94.

3       Including the funds previously obtained from the Chunghwa and LG settlements, the total

4  Settlement Fund recovered on behalf of the indirect purchaser class members is $576,750,000, plus

5  accrued interest.  There are no coupons or vouchers and there will be no reversion or refund to any

6  defendant under any circumstances.  No *cy pres* distribution is contemplated.  *Id.* ¶ 95.

7       In addition to monetary consideration, all of the settlements contain cooperation provisions

8  requiring Defendants to provide specified cooperation to IPPs in the prosecution of any continuing

9  litigation.  The cooperation provisions are material and valuable terms of the settlements.  They

10 enhanced the settlement prospects with the remaining Defendants because they obligated the settling

11 Defendants, to varying degrees, to provide cooperation to the IPPs in prosecuting the remaining

12 Defendants, including authentication of documents, production of witnesses for interviews,

13 depositions and/or trial, and other assistance.  *Id.* ¶ 96.

14 **A.   The Two Settlements Approved Before Class Certification**

15      **1.   Chunghwa**

16      IPP Counsel began settlement negotiations with counsel for Defendant Chunghwa in July

17 2008.  On February 5, 2009, the IPPs and Chunghwa reached agreement on the principal terms of a

18 settlement, which were memorialized in a memorandum of understanding.  Pursuant to that

19 memorandum of understanding, Chunghwa's counsel provided IPP Counsel with information

20 regarding the conspiracy during a series of in-person meetings in February 2009.  The information

21 provided by Chunghwa assisted IPP Counsel in the preparation of the Consolidated Amended

22 Complaint ("CAC").[5]  The Court granted final approval of the settlement on March 22, 2012 (Dkt.

23 No. 1105).  Alioto Decl. ¶ 101.

24

---

25 [5] While the information Chunghwa provided regarding the CRT conspiracy was very helpful,
   especially at the pleadings and motion to dismiss stage, it became apparent as the case progressed

26 that Chunghwa's evidence of the conspiracy was limited.  For example, Chunghwa only
   manufactured small and medium-sized CRTs, and it manufactured primarily Color Display Tubes

27 ("CDTs") for computer monitors.  Further, and relatedly, Chunghwa did not have a manufacturing
   plant or subsidiary in North America, where most of the large Color Picture Tubes ("CPTs") for

28 televisions sold in the United States were manufactured.  As a result, Chunghwa was unable to
   provide IPPs with much, if any, information regarding Defendants' conspiratorial activities relating

1

**2.    LG**

2

On May 18, 2013, prior to the ruling on IPPs' motion for class certification, IPPs entered into

3

a settlement with LG for $25,000,000 cash and specified cooperation.  Pursuant to the settlement

4

agreement, LG's counsel provided IPP Counsel with an oral proffer of evidence.  In addition, IPP

5

Counsel interviewed two cooperating LG witnesses.  The Court granted final approval of this

6

settlement on April 18, 2014 (Dkt. No. 2542).  Alioto Decl. ¶ 105.

7

**B.    The Remaining Settlements**

8

**1.    Philips**

9

Settlement discussions with the Philips entities[6] (collectively "Philips") began many months

10

before the parties reached an agreement in principle.  Judge Walker assisted the parties in reaching

11

final settlement, and the agreement was executed on January 26, 2015.  Philips has paid

12

$175,000,000 in cash into an escrow account.  *Id.* ¶ 107.

13

**2.    Panasonic**

14

The IPPs and the Panasonic entities[7] (collectively "Panasonic") began negotiations more than

15

six months prior to reaching a settlement.  Judge Walker assisted the parties in reaching a settlement

16

during the latter part of 2014.  The final agreement was executed on January 28, 2015.  Panasonic

17

has paid $70,000,000 in cash into an escrow account. *Id.* ¶ 108.

18

**3.    Hitachi**

19

IPPs and the Hitachi entities[8] (collectively "Hitachi") engaged in mediation before Judge

20

Walker on March 5, 2014.  The parties continued to discuss settlement with Judge Walker's

21

22

23

24

to large CPTs sold in or into the United States market, or the United States CRT market in general.
This lack of evidence regarding the United States market helped Defendants' FTAIA defense.  *See
further* Alioto Decl. ¶¶ 102-104.

25

[6] Koninklijke Philips N.V. (f/n/a Koninklijke Philips Electronics N.V.), Philips Electronics North

26

America Corporation, Philips Taiwan Limited (f/n/a Philips Electronics Industries (Taiwan), Ltd.),
and Philips do Brasil, Ltda. (f/n/a Philips da Amazonia Industria Electronica Ltda.)

27

[7] Panasonic Corporation (f/k/a Matsushita Electric Industrial Co., Ltd.), Panasonic Corporation of
North America, MT Picture Display Co., Ltd.

28

[8] Hitachi, Ltd., Hitachi Asia, Ltd., Hitachi America, Ltd., Hitachi Electronic Devices (USA), Inc.
and Hitachi Displays, Ltd. (n/k/a Japan Display Inc.).

1   assistance for the remainder of 2014 and executed the settlement on February 19, 2015.  Hitachi has

2   paid $28,000,000 in cash into an escrow account.  *Id.* ¶ 109.

3       **4.**    **Toshiba**

4       IPPs and the Toshiba entities[9] (collectively "Toshiba") continued with initial settlement

5   efforts for several months in 2014 but these efforts were unsuccessful.  With the assistance of Judge

6   Fern Smith (Ret.), the parties entered into mediation and ultimately reached a settlement.  The final

7   settlement was executed on March 6, 2015.  Toshiba has paid $30,000,000 in cash into an escrow

8   account.  *Id.* ¶ 110.

9       **5.**    **Samsung SDI**

10      IPPs and the Samsung SDI entities[10] (collectively "Samsung SDI") reached an agreement in

11  principle on January 23, 2015 after two full days of mediation with Judge Walker.  The parties

12  continued to negotiate the terms of the settlement with Judge Walker's assistance for two months

13  thereafter.  The final settlement was executed on April 1, 2015.  Samsung SDI has paid

14  $225,000,000 in cash into an escrow account.  *Id.* ¶ 111.

15      **6.**    **Thomson and TDA**

16      IPPs entered into settlement negotiations with the Thomson and TDA entities[11] following

17  IPPs' settlements with the other five sets of Defendants.  The settlement was reached after the parties

18  engaged in numerous settlement discussions.  These negotiations continued over several weeks and

19  involved the exchange of information concerning Thomson's financial condition and the

20  collectability of a judgment against Technicolor SA.  IPPs and the Thomson and TDA Defendants

21  entered into settlement agreements on June 10, 2015.  The Thomson and TDA Defendants have paid

22  $13,750,000 in cash into an escrow account.  *Id.* ¶ 112.

23

24  [9] Toshiba Corporation, Toshiba America, Inc., Toshiba America Information Systems, Inc., Toshiba
25  America Consumer Products, L.L.C., and Toshiba America Electronic Components, Inc.

26  [10] Samsung SDI Co. Ltd; Samsung SDI America, Inc.; Samsung SDI Brasil, Ltd.; Tianjin Samsung
    SDI Co. Ltd; Shenzhen Samsung SDI Co., Ltd; SDI Malaysia Sdn. Bhd; and SDI Mexico S.A. de
    C.V.

27  [11] The Thomson and TDA entities include: (a) Technicolor SA (f/k/a Thomson SA) and Technicolor
28  USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) (collectively "Thomson"); and (b)
    Technologies Displays Americas LLC (f/k/a Thomson Displays Americas LLC) ("TDA").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# ARGUMENT

## I.      THE COURT SHOULD AWARD THE REQUESTED FEES

IPPs respectfully request that the Court award $192,250,000, one-third (33.3%) of the Settlement Fund, as attorneys' fees.  This amount is within the acceptable range of attorney fee awards in this Circuit.  The 25% benchmark rate in common fund cases, while appropriate in some instances, is merely "a starting point for analysis."  *Vizcaino v. Microsoft Corp. ("Vizcaino II"),* 290 F.3d 1043, 1048 (9th Cir. 2002).  When the circumstances warrant, higher percentages have been found reasonable based on such factors as the results obtained, the complexity of the case, the length the case has been transpired, and the risk taken by plaintiffs' counsel.  *Id.* at 1049.  In fact, "in most common fund cases, the award exceeds that benchmark."  *In re Omnivision Technologies*, 559 F. Supp. 2d 1036, 1047 (N.D. Cal. 2008) (Conti, J.).[12]  Courts in this District have recently awarded fees ranging between 28.6% and 33.3% of the common fund in similar antitrust cases.[13]  The fee percentage should be calculated on the total settlement fund.  *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 953 (9th Cir. 2015).

In short, the standard is not whether a district court should or should not apply a particular percentage, but rather "whether in arriving at its percentage it considered all the circumstances of the case and reached a reasonable percentage."  *Vizcaino II*, 290 F.3d at 1048.

---

[12] *See also In re Flonase Antitrust Litig.,* 951 F. Supp. 739, 749 (E.D. Pa. 2013) (noting that "in the last two-and-a-half years, courts in eight direct purchaser antitrust actions approved one-third fees" and citing cases); *In re Activision Secs. Litig.,* 723 F. Supp. 1373 (N.D. Cal. 1989), cited by *Omnivision*.  In *Activision*, the district court observed that "the benchmark is closer to 30%" and that the fee award in common fund cases "almost always hovers around 30% of the fund created by the settlement").  *Id.* at 1377.  That court concluded, upon reviewing decisions of nearly all common fund cases reported at the time:  "Adoption of a policy of awarding approximately 30% of the fund as attorneys' fees in the ordinary case is well-justified in light of the lengthy line of cases which find such an award appropriate and reasonable . . . ."  *Id.* at 1375; *see id.* at 1377-1378 (listing cases).

[13] *See In re Static Random Access Memory (SRAM) Antitrust Litig.,* No. 4:07-md-01819, Dkt. 1407 ¶A (N.D. Cal. Oct. 14, 2011) (33.3% of $41,322,000); *In re TFT-LCD Antitrust Litig.* ("*LCD I*"), No. 07-md-01827, 2011 WL 7575003 (N.D. Cal. Dec. 27, 2011) (30% of $405,022,242); *In re TFT-LCD (Flat Panel) Antitrust Litig.* ("*LCD II*"), No. 07-md-01827, 2013 WL 149692 (N.D. Cal. Jan. 14, 2013) (30% of $68 million); *In re TFT-LCD Antitrust Litig.* ("*LCD III*"), No. 07-md-01827, 2013 WL 1365900, at *8 & n.11 (N.D. Cal. Apr. 3, 2013) (28.6% of $1.082 billion).   In *LCD III*, the Court awarded IPP counsel 28.6% in fees but also awarded 1.4% to Settling States, for a total fee award of 30%.  *See id.* at *14.

1    IPPs respectfully submit than an award of 33.3% is warranted here, given: (a) the exceptional

2    results obtained for the Class; (b) the exceptional nature and complexity of the case, as well as its

3    long duration; and (c) the enormous financial  risks that prosecuting a case of this size has presented

4    for the past eight years.  The award sought is also consistent with a lodestar cross-check – it equates

5    to a modest 2.3 multiplier – and with awards accorded in similar cases.

6    **A.      The Requested Fee Is an Appropriate Percentage of the Settlement Fund**

7    Under the "common fund doctrine," attorneys who recover a fund for the benefit of the class

8    are "entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*,

9    444 U.S. 472, 478 (1980).  "It is well established that 'a private plaintiff, or his attorney, whose

10   efforts create, discover, increase or preserve a fund to which others also have a claim is entitled to

11   recover from the fund the costs of his litigation, including attorneys' fees.'" *Omnivision*, 559 F.

12   Supp. 2d at 1046, citing *Vincent v. Hughes Air W., Inc.,* 557 F.2d 759, 769 (9th Cir.1977).

13   In the Ninth Circuit, courts may choose either the "percentage-of-the-fund" or the "lodestar"

14   method in calculating the appropriate fee award.  *See Vizcaino II,* 290 F.3d at 1047.  However, "the

15   primary basis of the fee award remains the percentage method."  *Id.* at 1050.  In this District,

16   virtually all courts awarding fees in common fund cases have applied the percentage-of-recovery

17   approach.[14]

18   In determining the appropriate fee, courts should consider the following factors: (1) the

19   results achieved for the class; (2) the risk of litigation, including the complexity and duration of the

20   case; (3) the skill and quality of work of counsel; (4) the contingent nature of the fee and the

21   financial burden carried by plaintiffs; and (5) awards in similar cases.  *See Omnivision,* 559 F. Supp.

22   2d at 1046.  The overall benefit to the class is the most critical factor.  *See id.*  As shown below, all

23   these factors support IPP Counsels' fee request.

24   //

25   //

26   _____

27   [14] *See, e.g., In re CV Therapeutics, Inc. Sec. Litig.*, No. c-03-3709-SI, 2007 WL 1033478, at *1
     (N.D. Cal. Apr. 4, 2007); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M-
28   02-1486-PJH, 2007 WL 2416513, at *1 (N.D. Cal. Aug. 16, 2007); *LCD I,* 2011 WL 7575003, at *1–
     2; *LCD II,* 2013 WL 149692, at *1–2; *LCD III,* 2013 WL 1365900, at *7–8.

1

2

**B.      The Circumstances Here Justify the Requested Fee Award**

**1.      IPP Counsel Secured an Exceptional Result for the Class**

"The overall result and benefit to the class from the litigation is the most critical factor in granting a fee award."[15]  "Factors indicating 'exceptional success' include success achieved under unusually difficult or risky circumstances and the size of plaintiffs' recovery."  *Allapattah Servs. Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 2004-05 (S.D. Fla. 2006) (citation omitted).

The $576.75 million Settlement Fund is one of the largest antitrust settlements ever.  Indeed, IPP Counsel believe it is second only to the *LCD* case in the context of indirect purchaser cases.  Moreover, the *LCD* conspiracy began more recently (in 2001); most of the defendants were still active in the LCD business during the litigation; most of the defendants had pled guilty to violating the Sherman Act and admitted their conduct had an impact in the United States; and the U.S. DOJ's criminal fines totaled $894 million, an indicator of the defendants' liability.  Alioto Decl. ¶¶ 97-98.

The exceptional results here were achieved under more difficult and risky circumstances than *LCD* and fully support the requested fee.  The CRT conspiracy began 20 years ago (in 1995) and most defendants were no longer manufacturing CRTs by 2005.  These facts made it very difficult for IPPs to obtain relevant documents and depose witnesses, and for witnesses to recollect events that had occurred a long time ago.  *Id.* ¶¶ 32-26; 48-50.  In addition, by 2007 when this litigation began, several major participants in the CRT conspiracy were bankrupt or no longer existed, which meant IPPs could not collect any damages from them.   The declining CRT market also meant the prices of CRTs were naturally in decline, making proof of price fixing and damages much more difficult.

Finally, only one defendant, Samsung SDI, pled guilty to fixing prices, and that guilty plea pertained to only one type of CRT (Color Display Tubes used in monitors) and only for sales to certain customers.  Moreover, the DOJ's single criminal fine of $32 million imposed on Samsung SDI amounted to less than 3.5 percent of the fines made in connection with the *LCD* conspiracy, meaning that the CRT defendants had much less exposure than the *LCD* defendants who paid fines.

---

[15] *Omnivision*, 559 F. Supp. 2d at 1046 (citation omitted); *see also Vizcaino v. Microsoft Corp. ("Vizcaino I")*, 142 F. Supp. 2d 1299 at 1303 (W.D. Wa. 2001).  (noting that in a common fund case, "'size of the recovery constitutes a suitable measure of the attorneys' performance'");

11

1    The lack of action by the DOJ against most Defendants, and the narrow plea by Samsung SDI, made

2    the settlement negotiations with Defendants much more difficult.  *Id.* ¶ 99.

3          The IPP Settlement Fund is particularly impressive when compared to the recoveries

4    obtained by the other litigants in this multi-district litigation and in related CRT actions.  For

5    example, the DPPs recovered $137.2 million[16] on behalf of their class of direct purchasers of CRTs.

6    The IPP settlements are over four times the total direct purchaser settlements.  It is rare and therefore

7    exceptional for an indirect class to recover more than a direct purchaser class because indirect

8    purchaser cases are so much more difficult to prove.[17]  Indeed, the DPP settlements in this case were

9    an obstacle to settlement for IPPs because Defendants consistently refused to pay more to IPPs than

10   what they had paid to DPPs.  *LCD* is the only other known example of a case in which indirect

11   purchaser settlements surpassed those of the related direct purchaser action.  And in *LCD,* the total

12   indirect purchaser settlements were only twice the amount of the total direct purchaser settlements.[18]

13         Likewise, the recovery by the DOJ in its related CRT action[19] pales in comparison to that

14   achieved by the IPPs.  The DOJ imposed a single fine of only $32 million, and on only one

15   participant in the CRT conspiracy.  By contrast, the IPPs will be paying hundreds of millions of

16   dollars to consumers in 22 States.

17         In short, the settlements achieved by IPP Counsel on behalf of indirect purchasers of CRT

18   Products are exceptional, both in absolute terms and in the circumstances of this case.  IPP Counsel

19   should be compensated in an amount commensurate with the exceptional result achieved.

---

20

21   [16] Chunghwa paid the DPPs $10 million; Philips paid $15 million; Panasonic paid $17.5 million; LG paid $25 million; Toshiba paid $13.5 million; Hitachi paid $13.45 million; Samsung SDI paid $31 million; and Thomson/TDA paid $9.75 million.  *See* Dkt. No. 4055.

22

23   [17] In an antitrust case, indirect purchasers have an extra layer of proof that direct purchasers do not have: They must prove pass-through of the overcharge – often through several levels of the distribution chain – to end consumers.  *See, e.g.,* IIA Areeda et al., Antitrust Law ¶ 396 (3d ed. 2006) (illustrating the "complexity" and "practical problems of proof" in indirect-purchaser suits); Ronald W. Davis, Amchem *and Antitrust: Have the Ground Rules for Antitrust Class Actions Changed?*, 12 Antitrust 39, 44 (Fall 1997) ("[T]he cold fact remains that, in order to recover, the indirect purchasers must prove something about the facts and/or the law which . . . direct purchasing . . . class members do not need to prove.  That means the indirect purchaser has a harder row to hoe than the direct purchaser.").

24

25

26

27   [18] In fairness to the DPPs, who also obtained an excellent result for their class, they faced some legal obstacles in this case that were not present in *LCD.* Alioto Decl. ¶ 100.

28   [19] The DOJ instigated a criminal proceeding against one Defendant, Samsung SDI Co., Ltd.

### 2. This Case Represents Multi-District Antitrust Litigation at its Most Complex

"'"An antitrust class action is arguably the most complex action to prosecute . . . .  The legal and factual issues involved are always numerous and uncertain in outcome."'  *In re Linerboard Antitrust Litig.,* No. A-98-5055, MDL No. 1261, 2004 WL 1221350 at *10 (E.D. Pa. June 2, 2004) (citations omitted).  It is no exaggeration to say that this case represents antitrust litigation, and multi-district litigation, at its most complex.  As shown by the summary of IPP Counsel's efforts provided herein, as well as the summaries in the accompanying Alioto Declaration and the declarations of other IPP counsel, this case required IPP Counsel to confront many novel and/or difficult legal and factual issues that make this case exceptional.  Courts have recognized that the novelty and difficulty of issues in a case are significant factors to be considered in making a fee award. *See*, *e.g.*, *Vizcaino I*, 142 F. Supp. 2d at 1303, 1306.

#### a. Before CAFA, This Indirect Purchaser Case Would Have Been Filed As Twenty-Two Separate State Class Actions

Before the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) ("CAFA"), this indirect purchaser case would have been filed as 22 separate class actions in 22 separate state courts.  Since CAFA, indirect purchasers have been required to file in federal court alongside related direct purchaser cases asserting Sherman Act claims.  This makes prosecuting these cases exponentially more complex than before.

The indirect purchaser case involved claims under the laws of 22 States, brought by 40 class representatives and 50 law firms located throughout the United States.  The IPPs litigated against nine Defendant groups consisting of multiple entities across the globe.  These Defendants were represented by a coterie of preeminent defense counsel from large, international law firms with decades of experience litigating antitrust actions and able to draw on virtually limitless resources.[20]

---

[20] The caliber of opposing counsel is another important factor in assessing the quality of IPP Counsel's work.  *See, e.g., Vizcaino I*, 142 F. Supp. 2d at 1303; *In re King Res. Co. Secs. Litig.*, 420 F. Supp. 610, 634 (D. Colo. 1976); *Arenson v. Board of Trade*, 372 F. Supp. 1349, 1354 (N.D. Ill. 1974).

In addition, IPP Counsel were required to coordinate the prosecution of the case with counsel for the DPPs, the DAPs and several State Attorneys General.  This effort was often problematic due to conflicting interests, approaches and strategies.  Indeed, on some occasions, IPPs found themselves in positions adverse to their co-plaintiffs.[21]  This situation also gave Defendants a strategic advantage, as it allowed them to re-litigate issues against these other plaintiffs that had already been decided in the IPP case, potentially to the detriment of IPPs.[22]

IPP Counsel also had to research the laws of 22 states, draft the pleadings in accordance with the laws of those states, and respond to dispositive motions raising a myriad issues specific to those state laws.  IPPs' CAC was almost 100 pages long due, in part, to the need to separately state a claim under each state's laws.  The number of separate motions to dismiss, the complexity and number of the issues raised, the volume of the briefing, and the length of time it took to settle the pleadings in this case (almost three years), was extraordinary.  *Id.* ¶¶ 13-21.

There were also significant organizational and logistical problems associated with a class consisting of 40 class representatives represented by 50 law firms located all over the country, such as gathering documents from the class representatives; obtaining responses to written discovery and collecting verifications of those responses; preparing for and defending depositions at locations all over the United States; and preparing class representatives to testify at trial.  Simply communicating with all the class representatives and their local counsel was logistically difficult, and there was constant need for communication over the entire pendency of this case.  *Id.* ¶ 125.

---

[21] For example, IPPs had to intervene in the California Attorney General's state court action and object to their settlement with defendant Philips because Philips contended that the settlement released IPPs' class claims on behalf of California natural persons.  IPPs also found themselves in a potentially adverse position with the DAPs in the event of a joint trial, as further described below. IPP Counsel worked closely with counsel for the other plaintiffs to manage these conflicts.  *See* Alioto Decl. ¶¶ 81-85; 126.

[22] For example, IPPs successfully opposed the Defendants' motion to dismiss on antitrust standing grounds under *Associated Gen. Contractors v. Cal. State Council of Carpenters,* 459 U.S. 519 (1983) ("*AGC*").  (Dkt. No. 665.)  But when the DAPs joined the litigation in 2011 and 2012, the Defendants filed the same motion against them.  Special Master Legge recommended that the Court grant the motion to dismiss the DAPs' claims for lack of antitrust standing.  (Dkt. No. 1664.)  The IPPs joined in the objection to this ruling by Special Master Legge and assisted on the briefing of the matter.  The Court declined to adopt the recommendation and denied the motion to dismiss.  Had the Court adopted the motion, IPPs would almost certainly have faced an immediate motion for summary judgment for lack of antitrust standing, and the dismissal of 12 of the 22 state law claims. *Id.* ¶ 126.

INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

1    Not only did IPP Counsel effectively manage the logistics of litigating such a complex case,

2    but as further described below, they successfully tackled many difficult legal and factual issues

3    presented by this case.[23]

4              **b.        The Global Nature of the CRT Business and the Conspiracy**

5    Many complex issues arose in this case due to the fact that most Defendants are foreign

6    companies that manufactured and sold CRTs abroad, primarily in Asia.  Very few CRTs were made

7    in North America, and even less in the United States.  Moreover, very few of the foreign-made CRTs

8    were sold directly into the United States.  Defendants often sold their CRTs to foreign manufacturers

9    of CRT televisions and computer monitors, who imported the finished products to the United States.

10   Alioto Decl. ¶ 7a.  Further, the vast majority of the conspiracy meetings and other conspiratorial

11   communications among Defendants occurred abroad, in Asia or Europe.[24]

12   As a result, the FTAIA, which restricts certain claims involving foreign commerce, was a

13   major issue throughout the litigation—at the motion to dismiss stage, during discovery, at class

14   certification, and at summary judgment.  The fact that the Ninth Circuit and several other federal

15   appellate courts issued rulings on the FTAIA during the pendency of this case compounded the

16   complexity and amplified the risk to IPPs.[25]  Indeed, the *Hsiung* case, which addressed an appeal by

17   criminal defendants in the related *LCD* litigation and involved issues very similar to issues in this

18   case, was awaiting rehearing *en banc* by the Ninth Circuit while IPPs were preparing their

19   opposition to Defendants' summary judgment motions.  IPPs had to monitor these cases and review

20   appellate briefings, and each time a ruling was due, consider whether that ruling might adversely

21   affect IPPs' claims based on foreign CRT sales.  Alioto Decl. ¶ 76.

22

23

---

24   [23] A more complete description of the efficient manner in which the case was organized and
     prosecuted by IPP Counsel is contained in the Alioto Declaration.

25   [24] *See, e.g., In re CRT,* MDL No., 1917, 2014 WL 2581525, at *8 (N.D. Cal. June 9, 2014)

26   (acknowledging that "much of the alleged conspiracy-related activity occurred abroad. . . .").

27   [25] *See Lotes Co., Ltd. v. Hon Hai Precision Industry Co.,* 753 F.3d 395, 412-13 (2d Cir. 2014)*;
     Animal Sci.* Prods. *Inc. v. China Minmetals Corp.,* 654 F.3d 462 (3d Cir. 2011); *Minn-Chem Inc. v.
     Agrium Inc.,* 683 F.3d 845 (7th Cir. 2012); *Motorola Mobility LLC v. AU Optronics Corp.,* 775 F.3d

28   816 (7th Cir. 2015); and *United States v. Hsiung ("Hsiung"),* 778 F.3d 738 (9th Cir. 2015).

---

15

1    The global nature of the CRT business and the conspiracy also meant that IPPs had to

2    conduct worldwide discovery in multiple languages—primarily Chinese, Korean and Japanese.  This

3    complicated the process of identifying the participants in the conspiracy, obtaining their documents,

4    translating, reviewing, and analyzing the documents, and deposing them.  *Id.* ¶¶ 30-32; 40-41; 48-

5    50; 52.  Defendants' complex global business also complicated efforts to prove pass-through of the

6    overcharge on foreign-made CRTs to consumers of CRT televisions and computer monitors in the

7    22 States.  IPPs were obliged to engage in the lengthy, complex and expensive collection and

8    analysis of worldwide pricing and cost data over a nearly 13-year period.  *Id.* ¶ 36.

### c.    Complexities Due to the Age of the CRT Case

10   The alleged CRT conspiracy began in March 1995 – over 20 years ago.  By the time this

11   litigation began in 2007, cathode ray tubes as a display technology were almost obsolete in the

12   United States and throughout the Western world.  The vast majority of the Defendants were no

13   longer active in the CRT business and had either spun off or sold their CRT business, entered

14   bankruptcy, or simply closed down their factories and stopped selling CRTs.  In fact, several major

15   participants in the CRT conspiracy (including the largest CRT manufacturer in the world) were

16   bankrupt or no longer existed.[26]  This meant not only that IPPs could not collect damages from these

17   entities, but also that most of their documents and witnesses were unavailable and could not be used

18   against the remaining Defendants.  *Id.* ¶ 7b.

19   The age of the CRT case engendered a whole host of discovery complications and problems.

20   For example, relevant documents, emails and data were lost or destroyed.  Technical issues arose

21   due to old and corrupted databases and technology that required technical experts.  IPP Counsel had

22   to travel to multiple storage facilities throughout the United States and abroad to review and select

23   hard copy documents.  IPP counsel also had to subpoena documents from bankruptcy trustees both

24   here and abroad and retain foreign counsel to advise on international subpoenas and foreign privacy

---

26   [26] LG.Philips Displays ("LPD"), a Netherlands-based joint venture between defendants LG
Electronics and Philips, was the largest manufacturer of CRTs in the world before it entered
bankruptcy in January 2006.  Alioto Decl. ¶ 36. *See also*
*http://www.electronicsweekly.com/news/components/led-lighting/lg-philips-seeks-bankruptcy-protection-in-europe-2006-01/* (accessed September 8, 2015).

1    laws.  In addition, third party data providers of industry information, such as Display Search and

2    iSupply, no longer had data on the CRT industry; and many of the Defendants' employees who

3    participated in the conspiracy were no longer employed by Defendants and could not be produced

4    for deposition.  *Id*. ¶¶ 32-36.  IPP Counsel used various innovative, informal methods of discovery to

5    recover missing documents and find former employees, thereby mitigating the negative effects on

6    the case.  *Id*. ¶¶ 49-50.

7            Defendants also relied on the age of the case to assert defenses such as, for example, statutes

8    of limitations and withdrawal from the conspiracy, which rely on complex legal and factual

9    arguments.  No less than four defendant groups moved for summary judgment on the grounds that

10   they withdrew from the conspiracy as a matter of law when they spun off their CRT businesses to

11   form joint ventures with other defendants, and that various state statutes of limitations had run on

12   IPPs' claims.  Other difficult legal issues included, *inter alia*, whether IPPs could compel

13   Defendants to restore old databases and backup tapes containing relevant data and information;

14   whether IPPs could compel the depositions of Defendants' former employees, or employees of

15   Defendants' affiliates; and whether Defendants could invoke foreign privacy laws and refuse to

16   provide information regarding their former employees.  *Id*. ¶¶ 32-36; 48; 50.

17                          **d.      Complexities at Class Certification**

18           Class certification is always one of the biggest hurdles in a class action, and particularly in an

19   indirect purchaser antitrust class action.  But the class certification proceedings here were

20   extraordinarily complex.  The discovery effort required to prepare for the motion was massive: 25

21   depositions of class representatives; 26 Rule 30(b)(6) depositions of Defendants; two DAP

22   depositions; three expert depositions; data collected from over 50 third party resellers of CRT

23   Products at different levels of the distribution chain; and the review of tens of thousands of

24   documents, the majority of which were in foreign languages.  Alioto Decl. ¶¶ 66-70.  Dr. Netz, the

25   IPPs' economic expert, conducted extensive economic analyses that included 47 pass-through

26   studies using over 40 data sets from 29 entities and 131 million individual CRTs.  She also examined

27   worldwide pricing data, hundreds of meeting reports and thousands of target prices set by the cartel.

28   *Id*. ¶ 70.

1    IPP Counsel briefed not only the motion for class certification, but also Defendants' motion

2    to strike Dr. Netz's expert report.  (Dkt. Nos. 1388 and 1539.)   IPPs also addressed the Supreme

3    Court's *Comcast* ruling[27], issued while IPPs' motion for class certification was pending.  Special

4    Master Quinn held a full-day hearing.  IPPs then provided additional briefing on the objections to the

5    Special Master's Reports and Recommendations before this Court, and on Defendants' Rule 23(f)

6    petition objecting to the Court's ruling certifying the class.  (Dkt. Nos. 1812; 1813; 1885; 1887.)  In

7    all, the motion for class certification took more than a year to resolve and dominated the litigation

8    for more than two years.  Moreover, after the close of merits discovery, certain Defendants moved to

9    decertify the class on ascertainability grounds.  (Dkt. No. 3585.)  IPP Counsel addressed this issue

10   while preparing for trial.  Alioto Decl. ¶¶ 70-72.

### e.    Depositions

12   The sheer number of depositions taken in this case is exceptional.  There were over 100

13   defense percipient witness depositions; 34 Rule 30(b)(6) depositions of Defendants; 25 class

14   representative depositions; 79 depositions of DAP witnesses; 35 depositions of expert witnesses; and

15   13 depositions of third parties.  All of these depositions required coordination with the three other

16   plaintiff groups; a massive document review effort; certified translations of the majority of exhibits

17   to be entered; travel all over the United States and abroad; foreign language depositions that lasted

18   four days; official interpreters and check interpreters for both sides; multiple motions to compel; and

19   investigation of the whereabouts of certain former employees.  The depositions themselves were

20   hard fought and adversarial; most of the defense witnesses were not forthcoming regarding the CRT

21   conspiracy and did not admit their participation in it.  Alioto Decl. ¶¶ 44; 46-54; 64.

### f.    Summary Judgment Motions

23   Likewise, the sheer number of summary judgment motions filed in this case (36 in total; 11

24   against IPPs) and the volume of the briefing, was exceptional.  The motions were not

25   straightforward.  They raised a number of difficult legal and factual issues relating to, e.g., the

26   FTAIA, antitrust standing, withdrawal from the conspiracy, statutes of limitations, vicarious liability,

27

28   [27] *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) (reversing the order granting class certification and remanding).

---

18

1    and piercing of the corporate veil.  The Philips Defendants also sought to dismiss the IPP claims

2    against them on grounds that the California Attorney General's settlement with Philips in her state

3    action released the IPPs' claims on behalf of California natural persons.  Several of these motions

4    had the potential to eliminate the majority of IPPs' claims, so these motions substantially increased

5    the risk faced by the IPPs.  Alioto Decl. ¶¶ 73-80.

### g.    Proving Pass-through of the Overcharge

7         IPP Counsel, together with their expert, Dr. Netz, also had to develop proof of injury and

8    damages on a class-wide basis to millions of indirect purchasers at the bottom of a complex

9    distribution chain.  These indirect purchaser class members purchased many different products at

10   many different prices from many different sources, over a 13-year period.  This challenge required

11   IPP Counsel to pursue third party data discovery from over 50 manufacturers, distributors and

12   retailers, and alone added a level of complexity and difficulty beyond that in both a typical direct

13   purchaser antitrust case and even other indirect purchaser cases.  *Id.* ¶¶ 28, 70.

### h.    Trial Structure

15        Other difficult and novel issues arose relating to how the IPP and DAP claims would be tried.

16   These issues also added to the complexity and uncertainty of this case.  DAP claims are primarily

17   direct purchaser claims based on federal law, while the IPP claims are based on state laws.

18   Normally, direct and indirect purchaser cases are on different schedules, and even used to be tried in

19   different courts.  Indeed, before CAFA direct purchaser cases were tried in federal courts, and

20   indirect purchaser cases in state courts.  *Id.* ¶ 81.

21        There is no definitive law on whether direct and indirect purchaser cases may be tried

22   together.  A joint trial would have been highly prejudicial to both plaintiff groups due, primarily, to

23   their conflicting positions on pass-through of the overcharge.  The DAPs contend that evidence of

24   pass-through is barred in their cases.  The IPPs were obligated to present evidence of pass-through as

25   an element of their case.  A joint trial could also have created jury confusion over different claims

26   subject to different laws.  Yet Defendants argued in favor of a joint trial on efficiency grounds.  It

27   appeared for much of the case that there would be a joint trial of direct (DAP) and indirect purchaser

28   (IPP) claims.  Even if the Court had ordered bifurcated or separate trials of the direct and indirect

1    purchaser claims, other complex issues would still have arisen, such as whose claims would be tried

2    first, and—in the case of bifurcation—which plaintiffs would get the same jury to hear the liability

3    and damages portions of their cases.  *Id.* ¶¶ 82-84.

4           The Court did not decide whether there would be a joint trial or separate trials before it

5    vacated the trial date.  The prospect of a joint trial required extensive negotiations and coordination

6    among IPPs and DAPs and, if not properly managed, the outcome could have had a very negative

7    impact on the IPP case.  The uncertainty also complicated the settlement negotiations with

8    Defendants.  IPP Counsel successfully managed these issues and were able to effectively prosecute

9    the case alongside the DAPs, and secure exceptional settlements from Defendants.  *Id.* ¶ 85.

10                        **i.       Trial Preparation**

11          Finally, this case is also exceptional because, unlike many antitrust class actions that settle

12   soon before or after class certification, the litigation continued up to the eve of trial.  IPP Counsel

13   effectively managed a massive volume of potential trial exhibits and authentication of those

14   documents as business records, deposition designations, and translation objections.  They

15   participated in three mock trials involving seven mock juries and prepared witnesses to testify at

16   trial.  They briefed 64 motions *in limine* and prepared witness lists, jury instructions, the Special

17   Verdict Form and the Pretrial Statement.  IPP Counsel were fully prepared to go to trial on March 9,

18   2015—the originally scheduled trial date.  Alioto Decl. ¶¶ 86-92.

19          In sum, the indirect purchaser case was unusually complex and difficult in many different

20   respects.  This factor strongly supports the fee requested.

21                   **3.  The Risks Assumed by IPP Counsel Were Enormous**

22          Risk is an important factor in determining a fair fee award.  *See In re Online DVD-Rental*,

23   779 F.3d at 955.  Ninth Circuit courts have recognized that risk is a reason to increase a fee award

24   above the 25% benchmark.  *See Vizcaino I*, 142 F. Supp. 2d at 1303–04.

25          "Antitrust litigation in general, and class action litigation in particular, is unpredictable." *In*

26   *re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 475 (S.D.N.Y. 1998).  "The 'best' case

27   can be lost and the 'worst' case can be won, and juries may find liability but no damages.  None of

28   these risks should be underestimated." *In re Superior Beverage/Glass Container Consol. Pretrial*,

20

INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES,
REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

1   133 F.R.D. 119, 127 (N.D. Ill. 1990).  Moreover, there is always the risk that the law may change in

2   unfavorable ways.  In this case, due to the complexities and difficulties described above, as well as

3   the long duration of this case, the risks assumed by IPP Counsel were enormous.

4       **a.**    **The Risk That IPPs Would Fail To Establish Liability**

5         Liability was by no means a foregone conclusion.  The information provided by Chunghwa

6   was limited.  It lacked evidence of a conspiracy on large CPTs (Color Picture Tubes) sold in or into

7   the United States market, and the United States CRT market in general.  This limitation allowed

8   Defendants to argue that the United States market was not part of the conspiracy, and also supported

9   Defendants' FTAIA defense.  Alioto Decl. ¶¶ 102-103.  Further, only one defendant pled guilty to

10  conspiring to fix the prices of CRTs, and for only one type of CRT sold to four U.S. customers.  All

11  of the other defendants strenuously denied their participation in the alleged global CRT conspiracy

12  and its impact on the United States.  They were aided in these denials by the facts that the DOJ had

13  dropped its investigation of them without indictment; that many of the relevant documents had been

14  destroyed; and that witnesses were long-gone.  *Id.* ¶ 6.  Given the heightened risk IPP Counsel faced

15  without the aid that an active government investigation or set of indictments brings, a higher fee

16  award is warranted. [28]

17      **b.**    **The Risk that the Court would Deny Class Certification**

18        The risk that the Court would deny certification of the 22 statewide classes of indirect

19  purchasers was substantial.  Courts in this District have denied class certification in several similar

20  indirect purchaser cases.[29]  And even after the Court granted class certification of the IPP classes, the

21  possibility of decertification existed.  Indeed, certain Defendants filed a motion for decertification on

22  ascertainability grounds on the eve of trial.  (Dkt. No. 3585.)

---

24  [28] *See In Re Flonase Antitrust Litig.,* 291 F.R.D. 93, 104-05 (E.D. Pa. 2013) 951 F. Supp. 2d 739,
25  749 (E.D. Pa. 2013) (lack of assistance by government investigation is an "important consideration"
    weighing in favor of proposed fee, where—much like here—counsel "led joint litigation efforts,
26  taking the lead in discovery and development of scientific and [] experts, significant motion practice,
    and trial preparation").

27  [29] *See, e.g., In re Graphics Processing Units Antitrust Litig.,* 253 F.R.D. 478, 508 (N.D. Cal. 2008)
    (denying certification of indirect purchaser class); *In re Flash Memory Antitrust Litig.,* No. C 07-
28  0086 SBA, 2010 WL 2332081, at *19 (N.D. Cal. June 9, 2010) (same); *In re Optical Disk Drive
    Antitrust Litig.,* 303 F.R.D. 311 (N.D. Cal. 2014) (same).

c.      **The Risk of Litigating Under Unsettled Legal Precedent**

The law on class certification and the FTAIA, two of the major, case-dispositive issues in the case, was the subject of several important rulings by the Supreme Court and several Courts of Appeals during the litigation.  Some of these rulings were unfavorable to indirect purchasers.[30]  In addition, the Supreme Court has granted *certiorari* in two class certification cases, one of which is an antitrust class action.[31]  These rulings magnified the large risk for IPPs already existing on class certification and FTAIA issues.

Similarly, Special Master Legge issued several unfavorable rulings against the DPPs and the DAPs.[32]  These rulings, if approved by the Court, would have almost completely eliminated the direct purchaser claims against Defendants, and could have negatively impacted IPPs' case.  For example, the ruling that the DAPs lacked antitrust standing was arguably directly applicable to many of the IPPs' claims and therefore threatened the viability of those claims.  Alioto Decl. ¶ 126.

d.      **The Risk of Recovering Nothing at Trial**

The risk that IPPs would recover nothing had they taken this case to trial was significant.  In *LCD*, for example, the direct purchaser class plaintiffs went to trial against Toshiba.  The jury returned a favorable verdict for the plaintiffs on liability, but only awarded $87 million in damages.  Plaintiffs already had obtained over $443 million in settlements from other defendants, and Toshiba

---

[30] *See, e.g., Comcast Corp. v. Behrend,* 133 S. Ct. 1426 (vacating order granting class certification); *In re Rail Freight Fuel Surcharge Antitrust Litig.,* 725 F.3d 244, 255 (D.C. Cir. 2013) (vacating district court's grant of class certification and remanding for further proceedings in light of *Comcast*); *Motorola Mobility LLC v. AU Optronics Corp.,* 773 F.3d 826 (7th Cir. 2014), *withdrawn and superseded by,* 775 F.3d 816 (7th Cir. 2015) (dismissing plaintiff Motorola's claims as barred under the FTAIA and the indirect purchaser doctrine in *Illinois Brick*).

[31] In *Tyson Foods, Inc. v. Bouaphakeo,* No. 14-1146, 135 S.Ct. 2806 (June 8, 2015) the Supreme Court granted *certiorari* on the following issues: "(1) Whether differences among individual class members may be ignored and a class action certified . . . where liability and damages will be determined with statistical techniques that presume all class members are identical to the average observed in a sample; and (2) whether a class action may be certified . . . when the class contains hundreds of members who were not injured and have no legal right to any damages."  The Supreme Court has also granted *certiorari* on similar issues in an antitrust class action entitled *The Dow Chemical Company v. Industrial Polymers, Inc., et al.,* No. 14-1091.

[32] *See, e.g.,* Report and Recommendation Regarding Defendants' Joint Motion for Summary Judgment (May 31, 2012) (Dkt. No. 1221) (recommending dismissal of the direct purchaser claims under the indirect purchaser rule in *Illinois Brick*); Report and Recommendations Regarding Defendants' Motions to Dismiss Direct Action Plaintiffs' Complaints (May 2, 2013) (Dkt. No. 1664) (recommending dismissal of DAPs' claims for lack of antitrust standing).

1   was entitled to offset that sum against the damages award.  As a result, plaintiffs recovered nothing

2   on behalf of the direct purchaser class.  Likewise, one of the DAPs in *LCD*, Best Buy, went to trial

3   against two defendants: Toshiba and Hannstar Display Corporation.  Like the direct purchaser

4   plaintiffs, Best Buy also recovered nothing.  The jury found that Toshiba did not participate in the

5   conspiracy and awarded only $7.5 million against Hannstar.  Once Best Buy's settlements with the

6   other defendants in *LCD* had been offset, Hannstar owed nothing to Best Buy.  Alioto Decl. ¶ 93.

7   **e.      The Long Duration of this Case**

8           IPP Counsel litigated this case for seven and a half years with only very small settlements (a

9   total of $35 million obtained from Chunghwa and LG) in the bank.  The other, substantial

10  settlements did not materialize until early 2015, on the eve of trial.  *Id.* ¶ 94.  Thus, the risk that IPP

11  Counsel would receive nothing for all of their efforts continued throughout the long duration of this

12  litigation.

13          In short, the enormous risk assumed by IPP Counsel – thousands of hours, millions of

14  dollars, and nearly eight years of work – supports the requested fee.

15  **4.      The Skill and Quality of Work by IPP Counsel**

16          IPP Counsel respectfully submit that the work they have performed has been of the highest

17  quality and of great benefit to the Class.  The Court is familiar with the history of this case, having

18  presided over almost eight years of contentious litigation, represented by over four thousand docket

19  entries.  The Alioto Declaration provides a comprehensive description of the substantial work IPP

20  Counsel undertook including the various substantive motions, procedural matters, discovery requests

21  and disputes, depositions, and other work necessary to build a case of this magnitude.  *See* Alioto

22  Decl. ¶¶ 9-115 and Exhibits 1-12 thereto.  The benefit conferred on Class members here is the result

23  of the skill, industry, dedication and efficiency of IPP Counsel.  The amount and quality of the work

24  by IPP Counsel also supports the fee they seek.

25  **5.      The Contingent Nature of the Fee**

26          It is well-established that attorneys who take on the risk of a contingency case should be

27  compensated for the risk they take.  "The importance of assuring adequate representation for

28  plaintiffs who could not otherwise afford competent attorneys justifies providing those attorneys

1    who do accept matters on a contingent-fee basis a larger fee than if they were billing by the hour or

2    on a flat fee." *In re Omnivision,* 559 F. Supp. 2d at 1047.

3              IPP Counsel have been litigating this case for almost eight years and have devoted

4    approximately 183,000 hours to the case during that time.  The work will continue as there is still

5    much to be done to administer the settlements and distribute the monies to class members.  Alioto

6    Decl. ¶ 123.

7              IPP Counsel have to date received no compensation for their time while at the same time

8    advancing millions of dollars to prosecute the case.  Due to complexity of this case and the amount

9    of work involved, certain lead attorneys were working full time on this case for several years and

10   were unable to take on other work.  All of this work was performed on a wholly contingent basis and

11   the risk of nonpayment continued until early 2015.  *Id.* ¶¶ 3, 6.  This factor also strongly supports the

12   requested fee.

13         **6.      The Award Sought Comports with Awards in Similar Cases**

14             The award sought here comports with awards in similar cases.  "Courts nationwide have

15   repeatedly awarded fees of 30 percent or higher in so-called 'megafund' settlements."  *In re*

16   *Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1367 (S.D. Fla. 2011) (awarding 30% of

17   $410 million settlement fund); *see also Allapattah*, 454 F. Supp. 2d at 2010 ("In particular, federal

18   district courts across the country have, in the class action settlement context, routinely awarded class

19   counsel fees in excess of the 25% 'benchmark,' even in so-called 'mega-fund' cases.").

20             The Ninth Circuit has not endorsed a limitation on fee awards in megafund cases.  *See*

21   *Vizcaino II*, 290 F.3d at 1047 (size is merely "one relevant circumstance"; refusing to adopt an

22   "increase-decrease rule" "as a principle governing fee awards").  The one-third fee requested is in

23   line with awards in similar cases and is warranted here.[33]  This is especially true when one considers

24

25   ─────────────────────

26   [33] *See, e.g., In re Vitamins Antitrust Litig.,* MDL 1285, 2001 WL 34312839, at *10 (D.D.C. July 16, 2001) (34.06% of $359,438,032); *Tricor Direct Purchaser Antitrust Litig.,* No. 05-cv-00340, Dkt. 543 ¶ 11(l) (D. Del. Apr. 23, 2009) (33% of $250,000,000); *In re IPO Secs. Litig.,* 671 F. Supp. 2d

27   467, 516 (S.D.N.Y. 2009) (33$^{1}$/3% of $510,253,000); *In re Combustion,* 968 F. Supp. 1116, 1136, 1142 (W.D. La. 1997) (36% of $127,396,000); *In re Apollo Group, Inc. Secs. Litig.,* No. 04-2147, 2012 WL 1378677, at *7 (D. Ariz. Apr. 20, 2012) (33% of $145 million); *Allapattah,* 454 F. Supp.

28   2d at 1189) (31.33% of $1.075 billion).

1    the exceptional complexity of the case, the results achieved, the duration of the case, and the

2    relatively low multiplier.

3          **C.      A Lodestar Cross-Check Confirms the Requested Fee Amount Is Reasonable.**

4          Courts relying on the percentage method often apply a lodestar cross-check.  *See Vizcaino II*,

5    290 F.3d at 1050 (calculating the lodestar to measure the attorneys' investment of time in the case

6    "provides a check on the reasonableness of the percentage award").  The lodestar is obtained by

7    multiplying the total number of attorney hours by a reasonable hourly rate.  A lodestar multiplier is

8    obtained by dividing the amount of fees sought by the lodestar.  *See In re Flonase Antitrust Litig.*,

9    951 F. Supp. 2d at 749-50.

10         Courts may exercise their discretion to enhance or reduce the lodestar through the use of

11   multipliers.  Multipliers of two to four are frequently applied in common fund cases when the

12   lodestar method is applied.[34]  For example, *Vizcaino II* approved a fee award amounting to 28% of a

13   $96.9 million settlement fund, corresponding to a multiplier of 3.65.  *See Vizcaino II,* 290 F.3d at

14   1051.  Comparable multipliers have been applied in antitrust actions.  *See, e.g., In re Flonase*

15   *Antitrust Litig.*, 951 F. Supp. 2d at 750-51 (awarding $50 million in fees (33.3% of $150 million

16   common fund), equal to a 2.99 lodestar multiplier); *Brewer v. Southern Union Co.*, 607 F. Supp.

17   1511, 1533 (D. Col. 1984) (the multiplier in antitrust cases "has ranged from 2.0 to 4.0").

18         Multipliers applied in recent antitrust cases involving large settlement funds are similar as

19   well.  *See, e.g., LCD III*, 2013 WL 1365900, at *8 ($308 million fee award, equating 2.4-2.6

20   multipliers); *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-00340, Dkt. 543 ¶ 11(l)

21   ($83,333,333 fee award, equaling a 3.93 lodestar multiplier); *In re Visa Check/Mastermoney*

22   *Antitrust Litig.*, 297 F. Supp. 2d 503, 524 (E.D.N.Y. 2003) ($220 million fee award, equaling a 3.5

23   lodestar multiplier); *see also In re NASDAQ*, 187 F.R.D. at 489 ("The percentage fee award in this

24   case represents a multiplier of approximately 3.97 times Class Counsel's lodestar of $36,191,751. A

25

26

27   _____

[34] *See In re Combustion, Inc.*, 968 F. Supp. at 1133-34, 1141 (applying a 2.99 multiplier to
28   $127,396,000 settlement fund; citing cases and opining that "[a] large common fund award may
     warrant an even larger multiplier").

1   multiplier of 3.97 is not unreasonable in this type of case.  Indeed, as noted by the Honorable

2   Leonard B. Sand, 'In recent years multipliers of between 3 and 4.5 have become common.'").

3       Here, IPP Counsel are filing along with this Motion a Compendium of IPP Firm Declarations

4   regarding their work in this case, their firms' lodestar, and the expenses for which they are seeking

5   reimbursement.  Lead Counsel has employed many measures to ensure that the lodestar figure is not

6   improperly inflated.  For example, Lead Counsel (1) capped the hourly rate for document review to

7   $350 per hour and $400 per hour for foreign language document review; (2) provided strict

8   guidelines to IPP Counsel that they were only to work on the case at the direction of Lead Counsel

9   and that only time authorized or approved by Lead Counsel would be included in an application to

10  the Court; (3) instructed all firms to exclude time spent on the lead counsel motions and internal case

11  management; (4) required IPP Counsel to periodically submit contemporaneous time records to

12  ensure compliance with Lead Counsel's guidelines; and (5) included hours billed by IPP Counsel

13  only through May 31, 2015.  Alioto Decl. ¶ 118.

14      Lead Counsel, with assistance from an audit committee comprised of several firms who

15  performed the majority of the work in this case, has reviewed and audited the daily time entries of all

16  firms that are included in this Motion.  The audit committee ensured that the time included in each

17  firm's lodestar complies with the instructions above, and is otherwise reasonable and properly

18  calculated.  *Id.* ¶ 119.[35]  In addition, the hourly rates charged by IPP Counsel were reviewed by

19  Richard Pearl, an expert in attorney fee matters.  Mr. Pearl has concluded that the rates are

20  reasonable.  *See* Declaration of Richard M. Pearl in Support of IPP Motion for Attorneys' Fees,

21  Reimbursement of Expenses, and Incentive Awards ("Pearl Decl.") ¶¶ 28-37.

22      The total lodestar at historical rates for all firms is $83,753,999.05.  Thus, the fee requested

23  by IPPs ($192,250,000) equates to a reasonable 2.3 multiplier.  Alioto Decl. ¶ 121.  Counsel were

24  also asked to provide their total lodestar at current rates.  *See Missouri v Jenkins*, 491 U.S. 274, 283

25  (1989) ("Clearly, compensation received several years after the services were rendered . . . is not

26

27  [35] Certain firms did not agree with the cuts to their lodestars imposed by the audit committee, and/or
    they did not submit a declaration in time for it to be filed with this motion.  Based on the audit

28  committee's review of these firms' daily time records, Lead Counsel has included a reasonable
    lodestar for these firms in the total lodestar.  *See further id.* ¶ 120.

1   equivalent to the same dollar amount received reasonably promptly as the legal services are

2   performed, as would normally be the case with private billings.")  The reported total at current rates

3   is $90,075,076.90, equating to a multiplier of 2.13.  Alioto Decl. ¶ 122.

4        These multipliers are well within the accepted range.  In fact, they are on the low end of the

5   range.[36]  A multiplier in the range of 2.13 - 2.3 is warranted here in light of the exceptional

6   complexity of this litigation and results obtained for the Class.[37]  Moreover, IPP Counsel continue to

7   perform substantial work in this case that is not captured in this fee motion.  Alioto Decl. ¶ 123.  If

8   this time were included in the lodestar, the multiplier would be even lower.

9   **II.   THE COURT SHOULD APPROVE THE REIMBURSEMENT OF EXPENSES.**

10       "Class counsel are entitled to reimbursement of reasonable out-of-pocket expenses."

11  *Wakefield v. Wells Fargo & Co.*, No. 3:13-cv-05053 LB, 2015 WL 3430240, at *6 (N.D. Cal. May

12  28, 2015); *see also* Fed. R. Civ. P. 23 subd. (h) ("In a certified class action, the court may award

13  reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties'

14  agreement.").  Out-of-pocket expenses that are reasonable, necessary, directly related to the

15  litigation, and normally charged to a fee-paying client are recoverable.  *See, e.g., Willner v.*

16  *Manpower Inc.*, No. 11-cv-02846-JST, 2015 WL 3863625, at *7 (N.D. Cal. June 22, 2015) (attorney

17  may recover from common fund the out-of-pocket expenses normally charged to a paying client,

18  such as research, filing fees, travel, mediation, telephone charges, obtaining transcripts, copying, and

19  mailing); *Buccellato v. AT&T Operations, Inc.*, No. C10-00463-LHK, 2011 WL 3348055, at *2

20  (N.D. Cal. June 30, 2011) (litigation costs and expenses incurred by class counsel that are adequately

21  documented and reasonably incurred for the benefit of the class are recoverable).

22       IPP Class Counsel incurred a total of $7,670,525.57 in reasonable and necessary expenses as

23  follows.

24  *//*

25

26

---

27  [36] *See, e.g., Vizcaino II,* 290 F.3d at 1050-51 (upholding a 28% fee award that constituted a 3.65
28  multiplier); *id.* at 1052-54 (noting district court cases in the Ninth Circuit approving multipliers as
    high as 6.2, and citing only seven of 34 decisions with approved multipliers below 2.0).

1

### A.    Common Litigation Expenses

2
3
4

Lead Counsel established a litigation expense fund ("Litigation Expense Fund") to pay common litigation expenses.   During the course of the litigation, Lead Counsel collected $2,405,000 from certain law IPP firms for the Litigation Expense Fund.  Alioto Decl. ¶ 128.

5
6
7

Lead Counsel also obtained Court Orders allowing the withdrawal of $2,500,000 from the Chunghwa escrow (Dkt. No. 1334) and $3,750,000 from the LG escrow (Dkt. Nos. 2618, 2944 and 3524) to be used to pay common litigation expenses ("Future Expense Fund").  Alioto Decl. ¶ 129.

8
9
10
11
12
13
14
15

From inception through September 15, 2015, IPP Counsel have incurred a total of $6,900,878.02 in common litigation expenses.  Of this total, $2,405,000 was paid from the Litigation Expense Fund and $4,495,878.02 from the Future Expense Fund.[38]  Id. ¶ 130.  These common litigation expenses were reasonable and necessary for the prosecution of this action and are customarily approved by courts as proper litigation expenses.  They include expert economist, special masters, mediators, certified translations, document management, filing and witness fees, and trial related expenses.[39]  None of these expenditures has been included for reimbursement in any of the individual IPP firm expenses described below.  Id. ¶ 132.

16

### B.    Expenses Incurred by the Individual IPP Firms

17
18
19
20

In addition to the common expenditures listed above, individual IPP firms have separately incurred $769,647.55 in reasonable and necessary expenses for which they also seek reimbursement. These individual expenses include travel, photocopying, overnight mail, computer research, and filing fees.  These expenses are supported by each firm's separate declaration in support of fees and

21
22
23
24

---

25

[37] Factors warranting a multiplier support the requested multiplier here.  See Pearl Decl. ¶¶39-45.

26

[38] The $1,754,121.98 remaining in the Future Expense Fund, as well as monies received from the Direct Action Plaintiffs, will be retained in the Future Expense Fund to fund the ongoing litigation. Lead Counsel will file an additional report with the Court at the conclusion of the litigation to account for the monies retained in the Future Expense Fund.  Id. ¶ 133.

27
28

[39] A detailed list of the common litigation expenses is attached to the Alioto Declaration as Exhibit 13.

1  expenses.[40]  None of these expenditures has been included in IPP Counsels' request for

2  reimbursement of amounts contributed to the Litigation Expense Fund.  Alioto Decl. ¶ 134.

3       In summary, IPP Counsel have incurred expenses totaling $7,670,525.57 ($2,405,000 from

4  the Litigation Expense Fund + $4,495,878.02 from the Future Expense Fund + $769,647.55

5  individual unreimbursed expenses).  All of these expenses were reasonable and necessary for the

6  prosecution of this case.  *Id.* ¶ 135.

7       IPP Counsel seek reimbursement of $3,174,647.55 ($2,405,000 contributed to the Litigation

8  Expense Fund + $769,647.55 individual unreimbursed expenses) and seek the Court's approval of

9  the $4,495,878.02 expenditure from the Future Expense Fund.  *Id.* ¶ 136.  All of these expenses are

10  of a type routinely charged to paying clients in a case of this size, and they were necessary to the

11  litigation of this action.  They should be reimbursed in full.

12  **III.  THE COURT SHOULD APPROVE THE REQUESTED INCENTIVE AWARDS**

13       Incentive awards are designed to compensate class representatives for work performed on

14  behalf of a class, and they are "'fairly typical in class action cases.'"  *Online DVD*, 779 F.3d at 943

15  (citation omitted).  IPP Counsel respectfully request incentive awards of $15,000 for each of 25

16  Court-appointed class representatives who represented the interests of 22 different jurisdictions and

17  made very significant contributions of time and effort to this litigation.[41]  In addition, IPP Counsel

18  requests $5,000 for an additional 15 named plaintiffs who, although not appointed by the Court,

19  represented their respective states for certain periods and diligently performed their duties as class

20  representatives.[42]

21

22  _____

[40] All of the individual IPP firm declarations are attached to the Compendium of IPP Counsel
23  Declarations as Exhibits 1-45.

[41] The 25 Court-appointed class representatives who should receive $15,000 incentive award
24  payments are: Brian Luscher, Jeffrey Figone, Steven Ganz, Lawyer's Choice Suites, Inc., David
    Rooks, Daniel Riebow, Travis Burau, Southern Office Supply, Inc., Kerry Lee Hall, Lisa Reynolds,
25  David Norby, Barry Kushner, Charles Jenkins, Steven Fink, Gloria Comeaux, Craig Stephenson,
    Janet Ackerman, Louise Wood, Patricia Andrews, Gary Hanson, Jeff Speaect, Albert Sidney Crigler,
26  Margaret Slagle, John Larch, and Brigid Terry.

[42] The 15 named plaintiffs who should receive $5,000 incentive award payments are: Frank Warner,
27  Samuel Nasto, Carman Gonzales, Dana Ross, Ryan Rizzo, Misti Walker, Conrad Carty, Bedrock
    Management Company, Inc., Brady Lane Cotton, Colleen Sobotka, Steven Hawley, Daniel Hergert,
28  Chad Klebs, Donna Marie Ellingson, and Jerry Cook.

1       The size of these proposed awards is reasonable and warranted by the facts of this case.

2   First, the total amount of the requested awards is $450,000.  This amount represents only 0.07% of

3   the $576.75 million Settlement Fund.  In *In re Online DVD*, the court considered the number of

4   named plaintiffs receiving awards, the amount of the awards, and the size of the awards relative to

5   the settlement amount.  The court affirmed an award of $5,000 to nine class representatives, totaling

6   $45,000, or .17% of the total settlement fund.  *Id.* at 947.  The amount of the awards requested here

7   represents a much smaller percentage.

8       Second, "[i]n this district, a $5,000 payment is presumptively reasonable."  *Moore v. Verizon*

9   *Communications Inc.*, No. C 09–1823 SBA, 2013 WL 4610764, at *15 (N.D. Cal. Aug. 28, 2013)

10  (citations omitted).[43]  Here, the proposed $5,000 awards to 15 named plaintiffs are warranted by the

11  work each of them performed.  Many of these named plaintiffs maintained viable claims on behalf of

12  their states for several years and were only replaced due to a strategic decision by counsel or some

13  other factor outside of their control.  Some of them were deposed (e.g., Frank Warner and Samuel

14  Nasto) and all of them searched for and produced documents, and worked with their counsel to

15  prepare responses to several sets of interrogatories.  Finally, this group of named plaintiffs reviewed

16  the Complaints filed on their behalf and stayed in contact with their lawyers throughout the

17  litigation.  *See* Alioto Decl. ¶ 138.  Even though these named plaintiffs were not appointed as class

18  representatives, they still made important contributions throughout the case that warrant incentive

19  payments for each of them in the amount of $5,000.  *See LCD III*, 2013 WL 1365900, at *17

20  (granting incentive payments of $7,500 to certain named plaintiffs who were not appointed as class

21  representatives, because of their contributions).

22      As for the requested awards of $15,000 to the 25 Court-appointed representatives, these are

23  well-justified.  Courts in this District have approved awards of $15,000 or more for significant

24  contributions by class representatives.  *See, e.g., LCD I*, 2011 WL 7575003, at *2 (granting incentive

25  payments of $15,000 to the Court-appointed class representatives).

26

27  [43] *See also, e.g., In re Online DVD*, 779 F.3d at 941, 947-48 (affirming incentive awards of $5,000 each to nine class representatives); *Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000)

28  (affirming incentive awards of $5,000 to each of two class representatives in a $1.725 million settlement).

INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES,
REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

In this case, the Court-appointed class representatives' dedication and hard work on behalf of the Classes they represent support incentive awards for each of them in the amount of $15,000. Every representative – ordinary consumers and small businesses alike - prepared for and gave their deposition.  Each representative met with counsel in person at least once to prepare for their deposition, and many of them met with counsel on several occasions.  As trial approached, certain representatives worked closely with counsel to prepare to testify live at trial.  All representatives were prepared and willing to testify at trial.  Alioto Decl. ¶ 137.

Of course every representative produced relevant documents and helped respond to several sets of interrogatories—including comprehensive contention interrogatory responses, and in this long case there were many supplements that required additional time and effort.  Many of the representatives contacted banks, credit card companies, and retail stores for receipts, cancelled checks and other proof of purchase.  Others had their CRT monitors or televisions taken apart to inspect the CRT inside and then submitted declarations in support of IPPs' motion for class certification regarding the manufacturer of the CRT.  All of the representatives reviewed amended complaints and additional allegations against new defendants; and at all times, these representatives were in regular contact with their lawyers and stayed apprised of the material developments in the litigation.  *Id.*  The contributions of the Class Representatives should be recognized.

## **CONCLUSION**

Based on the foregoing, IPPs respectfully request that the Court:  (1) grant IPPs' motion for attorneys' fees in the amount of $192,250,000 or 33.3% of the Settlement Fund; (2) award IPP Counsel reimbursement of $3,174,647.55 in litigation expenses and approve the $4,495,878.02 expenditure from the Future Expense Fund; and (3) approve the requested incentive awards to Class Representatives in the amounts of $5,000 and $15,000, all as described herein.

1  Dated:  September 23, 2015                Respectfully submitted,

2                                            */s/ Mario N. Alioto*
                                             Mario N. Alioto (56433)
3                                            malioto@tatp.com
                                             Joseph M. Patane (72202)
4                                            jpatane@tatp.com
                                             Lauren C. Capurro (241151)
5                                            laurenrussell@tatp.com
                                             TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
6                                            2280 Union Street
                                             San Francisco, CA 94123
7                                            Telephone: 415-563-7200
                                             Facsimile: 415-346-0679

8
                                             *Lead Counsel for Indirect Purchaser*
9                                            *Plaintiffs*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INDIRECT PURCHASER PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES,
REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC