MARIO N. ALIOTO, ESQ. (56433)
JOSEPH M. PATANE, ESQ. (72202)
LAUREN C. RUSSELL, ESQ. (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA  94123
Telephone:  (415) 563-7200
Facsimile: (415) 346-0679
E-mail: malioto@tatp.com
laurenrussell@tatp.com

*Lead Counsel for the Indirect Purchaser Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** ) | Master File No. CV-07-5944 SC |
| ) | MDL No. 1917 |
| ) | **DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS** |
| **This document relates to:** ) | Hearing Date:  November 13, 2015 |
| **ALL INDIRECT PURCHASER ACTIONS** ) | Time:  10:00 a.m. |
| ) | Courtroom: One, 17th Floor |
| ) | Judge:  Honorable Samuel Conti |

1

I, Mario N. Alioto, declare:

1.      I am an attorney duly licensed by the State of California and am admitted to practice before this Court.  I am a partner with the law firm Trump, Alioto, Trump & Prescott, LLP and my firm serves as Lead Counsel for the Indirect Purchaser Plaintiffs ("IPPs") in the above-captioned action.  I submit this declaration in support of the IPPs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards.  The matters set forth herein are within my personal knowledge and if called upon and sworn as a witness I could competently testify regarding them.

2.      I and members of my firm have been involved in every aspect of this litigation since its inception.  This Court appointed the undersigned and my firm as Interim Lead Counsel for the Indirect Purchaser Class on May 9, 2008 (Dkt. No. 47), and confirmed the appointment as Lead Counsel on September 24, 2013.  (Dkt. No. 1950).  I, or members of my firm, have personally overseen all of the work performed in this litigation on behalf of the Class.

3.      Lead Counsel and the other IPP firms that worked on this case on behalf of indirect purchasers (collectively "IPP Counsel") have litigated this case for the past eight-years on a contingency fee basis and have assumed significant risks that we would receive no compensation for our work. IPP Counsel have declined the opportunity to perform other legal work in favor of pursuing this litigation.  Due to complexity of this case and the amount of work involved, certain lead attorneys (including several from my firm) were working full time on this case for several years and were unable to take on any other work.

4.      I provide in this declaration a summary of: (a) the work performed by IPP Counsel; (b) the history of the litigation; (c) the time expended in litigating this case; (d) the steps Lead Counsel has taken to manage this case efficiently; (e) the expenses reasonably incurred in support of the litigation; and (f) the work performed by Class Representatives in support of IPP Counsel's request for incentive awards.

DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

## INTRODUCTION AND SUMMARY OF WORK PERFORMED

5.   During the course of this eight-year litigation, as Interim Lead Counsel and then as Lead Counsel, I have directed and supervised the work of IPP Counsel.  My aim was to obtain excellent work-product in an efficient manner.  To date, IPP Counsel have performed the following services on behalf of the Class:

- Conducted an initial investigation of the case to develop the theories of liability and the facts that formed the basis of the allegations against Defendants;

- Researched and pled a comprehensive consolidated amended complaint that detailed Defendants' violations of the antitrust and unfair competition  laws of 21 states and the District of Columbia;

- Successfully defended the pleadings against two rounds of motions to dismiss comprising 11 joint and separate motions that raised a multitude of difficult issues;

- Propounded several sets of interrogatories and document requests, and responded to several sets of discovery propounded by Defendants, including extensive contention interrogatories concerning liability;

- Resolved dozens of discovery issues and disputes through extensive meet and confers with Defendants, without the need for Court involvement, and successfully moved to compel when necessary;

- Organized a team of lawyers that searched, reviewed and analyzed tens of thousands of documents, a vast number of which were in a foreign language and required translation;

- Coordinated discovery and expert analysis of Defendants' and third parties' transactional data, including global CRT Product sales and cost data for hundreds of millions of transactions spanning a 13-year period;

3

DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

- Prepared for and defended the depositions of 25 class representatives located across the United States;

- Consulted extensively with expert economists on liability, class certification and damages throughout the litigation, and defended five depositions of IPPs' testifying expert, Dr. Janet S. Netz;

- Obtained class certification of 22 statewide classes in proceedings lasting over a year, requiring analysis of complex economic evidence and expert testimony to develop proof of injury and damages on a class-wide basis;

- Deposed over 100 defense witnesses in locations around the world, often through interpreters;

- Opposed 11 joint and individual summary judgment motions raising complex legal and factual issues regarding, among others, the Foreign Trade Antitrust Improvements Act of  1982, 15 U.S.C. § 6a ("FTAIA"), antitrust standing, and withdrawal from the conspiracy;

- Fully readied the case for trial by designing trial strategy; preparing trial witnesses, exhibits, demonstratives, and deposition designations; briefing pretrial motions; and participating in three mock trials;

- Negotiated with Defendants to obtain one of the largest settlement funds in the history of indirect purchaser class actions;

- Documented the settlements with the Defendants, briefed motions for preliminary and final approval, and engaged experts noted in the field of class action notice for the purpose of developing an extensive notice program to inform the Class regarding the pending settlements; and

DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

1       •   Successfully coordinated the efforts to prosecute this case with three other

2           plaintiff groups—the Direct Purchaser Plaintiffs ("DPPs"), the Direct Action

3           Plaintiffs ("DAPs"), and governmental entities.[1]

4                     **RISKS INCURRED BY IPP COUNSEL**

5       6.     I summarize below some of the risks incurred by IPP Counsel in litigating this

6 case on a contingency basis for the past eight years.

7       •   The risk of litigating against global companies represented by some of the

8           largest and best law firms in the country, with nearly limitless resources;

9       •   The risk that Defendants would prevail on their motions to dismiss,

10           particularly on defenses that could have gutted the IPPs' case, such as antitrust

11           standing or the application of the FTAIA;

12       •   The risk that Defendants would successfully oppose IPPs' motion for class

13           certification, and/or successfully move to strike IPPs' expert reports;

14       •   The risk that Defendants would prevail at summary judgment on arguments

15           that they did not participate in the alleged conspiracy, or that the conspiracy

16           was much more limited in scope than IPPs alleged, or that the FTAIA

17           precluded IPPs' claims;

18       •   The risk that a jury would not find Defendants liable;[2]

19

20 _____

21 [1] The DPPs filed suit at the same time as the IPPs in 2007.  In late 2011/early 2012, 13 DAPs and

22 the Attorneys General of California, Florida, Illinois, Washington and Oregon also filed suit.  The DAPs consist of corporate plaintiffs that purchased CRT Products from Defendants, primarily

23 directly.  They include computer and television manufacturers such as Dell and Sharp, and retailers such as Target, Best Buy and Costco.  The DAPs and the Florida Attorney General filed suit in the MDL.  The other State Attorneys General filed suit in their respective state courts.

24 [2] Only one defendant pled guilty to conspiring to fix the prices of CRTs, and for only one type of

25 CRT sold to four U.S. customers.  All of the other defendants strenuously denied their participation in the alleged global CRT conspiracy and its impact on the United States.  They

26 were aided in these denials by the facts that the DOJ had dropped its investigation of them without indictment; that many of the relevant documents had been destroyed; and that witnesses

27 were long-gone.

28 | DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

1         •   The risk inherent in litigating unsettled aspects of the law, such as class

2             certification and the scope of the FTAIA;

3         •   The risk of taking this complex case to trial, especially given uncertainty over

4             trial structure and whether IPPs would go to trial separately or along with the

5             DAPs; and

6         •   The risk that IPPs could not collect on a judgment or a settlement if

7             Defendants filed for bankruptcy or if Defendants' financial condition

8             deteriorated.

9         7.      Many of these risks stemmed from two factors that complicated every aspect of

10  this case: the global nature of Defendants' CRT business and the age of the CRT case:

11         a.   Global nature of Defendants' CRT business: Most of the Defendants in this

12             case are foreign companies that manufactured and sold CRTs abroad,

13             primarily in Asia.  Very few CRTs were made in North America, and even less

14             in the United States.  Moreover, very few of the foreign-made CRTs were sold

15             directly into the United States.  Defendants often sold their CRTs to foreign

16             manufacturers of CRT televisions and computer monitors, who imported the

17             finished products to the United States.  Further, the vast majority of the

18             conspiracy meetings and other conspiratorial communications among

19             Defendants occurred abroad, in Asia or Europe.[3]  As a result, the FTAIA was a

20             major issue throughout this case.  This also meant that IPPs had to conduct

21             worldwide discovery in multiple languages, as further described herein.

22         b.   The age of the CRT case: The alleged CRT conspiracy began in March 1995 –

23             over 20 years ago.  By the time this litigation began in 2007, cathode ray tubes

24             as a display technology were almost obsolete in the United States and

25

26  [3] See, e.g., In re CRT, 2014 WL 2581525, at *8 (N.D. Cal. June 9, 2014) (Acknowledging that

27  "much of the alleged conspiracy-related activity occurred abroad. . . .")

28  DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
Master File No. CV-07-5944-SC

1    throughout the Western world.  The vast majority of the Defendants were no

2    longer active in the CRT business and had either spun off or sold their CRT

3    business, entered bankruptcy, or simply closed down their factories and

4    stopped selling CRTs.  In fact, several major participants in the CRT

5    conspiracy (including the largest CRT manufacturer in the world) were

6    bankrupt or no longer existed.[4]  This meant not only that IPPs could not collect

7    damages from these entities, but also that most of their documents and

8    witnesses regarding the conspiracy were gone and could not be used against

9    the remaining Defendants.  The length of the conspiracy (almost 13 years) also

10   meant that the volume of data and documents needed to prove it was vast, and

11   the number of witnesses identified in the documents increased exponentially.

12       8.       The global nature and the age of the CRT case required IPP Counsel to spend

13   more time and money on this case, both of which increased the financial risks incurred.

14                          **INCEPTION OF THE LITIGATION**

15       9.       IPP Counsel filed the original indirect purchaser complaints in various federal

16   courts throughout the country beginning in November 2007.  In all, over 20 complaints were filed

17   on behalf of indirect purchasers of cathode ray tubes ("CRTs") and products containing CRTs

18   (collectively "CRT Products").  Because most of the Defendants named in the complaints were

19   located abroad, IPPs were required to translate the complaint into several foreign languages and

20   effectuate service of process through the Hague Convention and Letters Rogatory.

21       10.      The Judicial Panel on Multidistrict Litigation transferred all related indirect

22   purchaser actions to the Northern District of California, where they were consolidated with

---

[4] LG.Philips Displays ("LPD"), a Netherlands-based joint venture between defendants LG Electronics and Philips, was the largest manufacturer of CRTs in the world before it entered bankruptcy in January 2006.  *See http://www.electronicsweekly.com/news/components/led-lighting/lg-philips-seeks-bankruptcy-protection-in-europe-2006-01/* (accessed September 8, 2015).

DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

1    similar class actions by DPPs and assigned to this Court as MDL No. 1917.

2         11.   On May 9, 2008 the Court appointed the undersigned, Mario N. Alioto of Trump,

3    Alioto, Trump & Prescott, LLP as Interim Lead Counsel.  (Dkt. No. 47.)  Upon my appointment,

4    I immediately began organizing IPP Counsel and the class representatives, and coordinating with

5    the DPPs and Defendants.  For example, Lead Counsel set up a protocol for all IPP firms to

6    report their time on a quarterly basis and prepared a questionnaire for all of the class

7    representatives named in the various indirect purchaser complaints.  The questionnaire was

8    designed to vet the class representatives and ensure they could properly represent their respective

9    states.  Lead Counsel used these questionnaires to select the best class representatives for the

10   Consolidated Amended Complaint ("CAC").

11        12.   On August 1, 2008, IPP Counsel successfully moved for an Order authorizing

12   them to serve certain foreign defendants through service of the Summons and Complaint on their

13   U.S. wholly-owned subsidiary, related entity, or U.S. counsel, as permitted by Rule 4(f)(3) of the

14   Federal Rules of Civil Procedure. (Dkt. No. 374.)  IPP Counsel were able to use this Order again

15   later in the case to serve several additional foreign defendants.  This Order saved the indirect

16   class the substantial expense and delay associated with translating the Complaint and hiring an

17   international process server to serve the Complaint in accordance with the Hague Convention, or

18   by Letter Rogatory.  Lead Counsel researched, briefed and argued this motion.

19                              **PLEADINGS AND MOTIONS TO DISMISS**

20        13.   Lead Counsel filed the CAC on March 16, 2009.  (Dkt. No. 437.)  The CAC was

21   90 pages long and pled a nationwide injunctive relief claim under Section 1 of the Sherman Act

22   (15 U.S.C. § 1), as well as damages and/or restitutionary claims under the laws of 22 states

23   (including the District of Columbia).  The CAC named 31 class representatives and 48 separate

24   Defendants comprising 11 Defendant groups.  Lead Counsel researched the laws of the 22 states

25   and the factual allegations, and drafted the CAC with assistance from some other IPP Counsel.

26   Lead Counsel spent substantial time reviewing documents and data, and researching the CRT

27

28

DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
Master File No. CV-07-5944-SC

1    industry and which entities should be named as Defendants. This research was complicated by

2    the fact that most of these entities were no longer manufacturing CRTs, and many of them were

3    bankrupt or no longer existed.

4         14.    On May 18, 2009, Defendants filed one joint motion and nine individual motions

5    to dismiss the CAC. The joint motion raised various arguments common to all defendants, on

6    complex, unsettled issues such as the new federal pleading standards under *Bell Atlantic Corp. v.*

7    *Twombly,* 550 U.S. 544 (2007) and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009); the FTAIA; antitrust

8    standing under *Associated Gen. Contractors v. Cal. State Council of Carpenters,* 459 U.S. 519

9    (1983) ("*AGC*"); various state statutes of limitations; and issues specific to certain state law

10   claims. The separate motions to dismiss raised issues specific to each of the nine defendant

11   groups, including failure to state a claim as to each defendant entity, withdrawal from the

12   conspiracy, vicarious and alter ego liability, and lack of personal jurisdiction.[5] The briefs filed in

13   support of and in opposition to Defendants' motions totaled more than 700 pages.

14        15.    The Court-appointed Special Master, the Honorable Charles A. Legge (Ret.),

15   conducted a hearing on the motions on October 3, 2009, and heard almost 9 hours of oral

16   argument. Judge Legge issued his rulings on the motions to dismiss on February 5, 2010, and

17   granted the motions only as to certain state law claims. (Dkt. No. 597.) Defendants objected to

18   those rulings that were unfavorable to them, which required additional briefing on the motions.[6]

19   Defendants' objections were heard by Judge Conti and rejected in an Order dated March 31,

20   2010. (Dkt. No. 665.) Defendants then moved the Court for permission to file an interlocutory

21   appeal pursuant to 28 U.S.C. §1292(b) (Dkt. No. 667), which again required additional briefing.

22   (Dkt. No. 674.) IPPs were again successful in defeating Defendants' motion. (Dkt. No. 711.)

23        16.    Lead Counsel, with assistance from other IPP Counsel, took the lead in preparing

24   IPPs' briefing on this first round of motions to dismiss. Lead Counsel drafted the majority of the

---

25

26   [5] The motions to dismiss are listed in Exhibit 1 of this Declaration.

27   [6] *See* Dkt. Nos. 608, 610, 611, 613, 614, 617, 619, 622, 626-632 and 641.

9

1   150-page omnibus opposition brief, the responses to the Defendants' objections, and the

2   opposition to the interlocutory appeal, and spent substantial time editing and incorporating the

3   drafts of other IPP Counsel into the final briefs.  Lead Counsel also attended the hearings before

4   the Special Master and the Court and argued the motions.

5       17.     On May 10, 2010, Lead Counsel prepared and filed IPPs' Second CAC.  (Dkt. No.

6   716.)  The Second CAC amended certain state law claims and added others.  Defendants filed

7   another joint motion to dismiss on various state-law grounds.  (Dkt. No. 733.)  It was denied in

8   part and granted in part, with leave to amend certain state law claims.  (Dkt. No. 799.)  Lead

9   Counsel again took the lead on briefing and arguing the second round of motions to dismiss, with

10  assistance from some other IPP Counsel.

11      18.     On December 11, 2010, Lead Counsel prepared and filed IPPs' Third CAC, which

12  added new plaintiffs and removed certain state law claims that had been dismissed.  (Dkt. No.

13  827.)  Defendants finally answered IPPs' complaint on January 26, 2011 – more than 3 years

14  after the litigation began.

15      19.     In the summer of 2012, due to additional evidence uncovered during the course of

16  the litigation, IPPs moved for leave to amend the Third CAC to substitute certain class

17  representatives and add certain Thomson and Mitsubishi entities[7] as defendants.  (Dkt. Nos.

18  1226, 1325.)  Ultimately, IPPs named the Thomson and Mitsubishi entities, and Videocon

19  Industries, Ltd ("Videocon"), an Indian CRT manufacturer, as co-conspirators in the Fourth

20  CAC, which was filed on January 10, 2013.  (Dkt. No. 1526.)

21      20.     IPPs also filed a separate action against Videocon and its U.S. and Mexican

22  subsidiaries, former Thomson entities now known as Technologies Displays America ("TDA")

23

24  ───────────────

25  [7] Thomson SA (n/k/a Technicolor SA) and Thomson Consumer Electronics, Inc. (n/k/a
    Technicolor USA, Inc.) (together "Thomson") and Mitsubishi Electric Corp., Mitsubishi Digital
26  Electronics America, Inc., and Mitsubishi Electric & Electronics, USA, Inc. (together
    "Mitsubishi").

27                                              10

28  ──────────────────────────────────────────────────────────
    DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
    FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
    Master File No. CV-07-5944-SC

1    and Technologies Displays Mexicana S.A. de C.V. ("TDM").[8]  IPPs served Videocon and TDA

2    with process.  Videocon has not appeared and has defaulted.  TDA has entered into a settlement

3    agreement with IPPs.

4         21.    Finally, after further investigation and discovery, including depositions of several

5    former Philips employees in late 2013/early 2014, Lead Counsel revived the litigation against

6    two foreign Philips entities, Philips Taiwan Limited ("Philips Taiwan") and Philips do Brasil

7    Ltda. ("Philips Brasil") in early 2014.  Both entities had moved to dismiss for lack of personal

8    jurisdiction in the first round of motions to dismiss in 2009.  At that time, Lead Counsel elected

9    to stay the case against these Defendants pending further discovery.  Philips Taiwan and Philips

10   Brazil again moved to dismiss on personal jurisdiction grounds on March 26, 2014. (Dkt. No.

11   2470.) They also argued that IPPs had failed to properly serve them with process and had failed

12   to prosecute the case.  *Id.*  Because the motion was filed after discovery, it became more akin to a

13   summary judgment motion and required a tremendous amount of work to oppose.  *See, e.g.,* Dkt.

14   Nos. 2536-2538, and 2575.  The Court denied the motion on all counts in a very favorable ruling

15   for IPPs.  (Dkt. No. 2611.)  This was a significant ruling because it ensured that the Philips

16   Defendants could not escape liability by blaming the conspiracy on foreign affiliates that were

17   not before the Court.  It provided great momentum not only to the IPPs' claims against Philips,

18   but also as to their claims against the other Defendants.  Lead Counsel again took the lead on

19   briefing this motion with assistance from some other IPP Counsel.

20                              **RULE 11 MOTION**

21         22.    On April 12, 2011, certain Defendants filed a motion for sanctions against the

22   IPPs and DPPs pursuant to Federal Rule of Civil Procedure 11 on the grounds that plaintiffs'

23   allegations regarding a finished-CRT-product-conspiracy (as opposed to a narrower CRT

24   conspiracy) had no evidentiary basis.

25   _____

26   [8] *Luscher et al. v. Videcon Industries, Ltd., et al.,* No. 13-cv-03234 SC, part of this MDL.  TDM
     was subsequently dismissed without prejudice.  (*Luscher,* Dkt. No. 18.)

27                                      11

28   _____
     DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
     FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
     Master File No. CV-07-5944-SC

23.     Lead Counsel for the IPPs performed an extensive review of the strength and importance of these allegations.  As a result, Lead Counsel agreed to voluntarily withdraw these allegations and moot the Rule 11 motion.  On April 20, 2011, IPPs and Defendants filed a stipulation providing that IPPs would withdraw the finished-CRT-products-conspiracy allegations from their complaint. (Dkt. No. 895.)  The Court entered an order to that effect on April 22, 2011. (Dkt. No. 904.)

24.     Special Master Legge recommended that the Court grant the Rule 11 motion against the DPPs.  (Dkt. No. 947.)  The ruling had no effect on the IPPs because they had already voluntarily dismissed their claim.  The DPPs subsequently withdrew their finished-CRT-product allegations before the Court ruled on the motion. (Dkt. No. 996.)

## DISCOVERY

25.     Lead Counsel managed the overall discovery process and also performed a substantial amount of the actual work.  Lead Counsel assigned one IPP firm to each Defendant group, and each IPP firm became primarily responsible for obtaining discovery from their Defendant.  These firms were charged with reviewing and analyzing their Defendants' written discovery responses and negotiating with defense counsel regarding those responses; identifying potential document custodians and deposition witnesses; reviewing and analyzing their Defendants' document productions; and moving to compel supplemental responses and/or productions where necessary.  Lead Counsel supervised this process, to ensure, among other things, that IPPs' positions on the various issues were coordinated and consistent.  In this role, Lead Counsel participated in most of the negotiations with defense counsel.  Lead Counsel performed a substantial amount of ground level work as well: Lead Counsel drafted and propounded discovery requests; negotiated extensively with Defendants regarding discovery; drafted meet and confer letters; took the lead in briefing and arguing discovery motions; and took and defended depositions.  Lead Counsel also played a central role in the analysis of documents and other discovery, including the review and analysis of foreign language documents.  Finally,

DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

1    Lead Counsel also took the lead on coordinating all of the discovery efforts with the other

2    plaintiff groups.

3    **Document Discovery**

4           26.     IPP Counsel drafted and served the first set of document requests on Defendants

5    in June 2008 seeking production of the documents Defendants had produced to the Grand Jury.

6    But on July 7, 2008, the Department of Justice's Antitrust Division ("DOJ") moved for a stay of

7    all discovery pending their criminal investigation into the CRT conspiracy.  (Dkt. No. 321.)

8    Thereafter, IPP Counsel engaged in extensive negotiations with the DOJ, the DPPs and

9    Defendants and worked out a Stipulated Order dated September 12, 2008 that provided for a

10   limited stay of merits discovery until September 12, 2009.  (Dkt. No. 379.)  At the request of the

11   DOJ, this stay was extended on several occasions, with the stay on document discovery

12   continuing until March 12, 2010, and the stay on deposition discovery continuing until March 1,

13   2011.  (Dkt. Nos. 425, 590, 798.)

14          27.     The Stipulated Order also contained various document requests to Defendants.

15   These requests sought sales and cost data and other information relevant to class certification.

16   Certain Defendants produced documents and data responsive to these requests.  The others took

17   the position that they need not respond to discovery until the motions to dismiss were decided.

18          28.     Beginning in January 2009, while the DOJ stay on merits discovery was in effect,

19   IPP Counsel worked with the expert economists to subpoena and negotiate productions of

20   documents and data from over 50 third-party retailers, distributors and CRT television and

21   monitor manufacturers.[9]  Each of these subpoenas had to be individually negotiated with the

22   assistance of IPPs' expert economists.  Lead Counsel handled several of the subpoena

23   negotiations and assigned the others to various IPP Counsel.  Lead Counsel oversaw all of these

24   negotiations and kept track of their status.  The negotiations were often difficult and protracted

25   _____

26   [9] A list of all the third-party subpoenas served by IPPs is contained in Exhibit 2 to this
     Declaration.

27

28
     _____
     13
     DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
     FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
     Master File No. CV-07-5944-SC

1    given the breadth of the information IPP Counsel were requesting, the age of the data and the fact

2    that these third parties had no interest in the case.  This data was critical to the preparation of

3    IPPs' motion for class certification.

4         29.    The DOJ's stay was partially lifted on March 8, 2010 and certain Defendants

5    began their rolling production of so-called "Grand Jury documents."[10]  Additionally, on March

6    25, 2010, Lead Counsel, with the assistance of some other IPP Counsel, propounded a second set

7    of document requests and interrogatories on all Defendants.  The meet and confers with defense

8    counsel regarding Defendants' responses to those requests began in June 2010 and continued for

9    approximately two years.

10        30.    Defendants strenuously objected to IPPs' discovery requests and initially refused

11   to produce any documents or data, or respond to any interrogatories regarding their activities

12   outside the United States.  Despite having lost their motion to dismiss IPPs' claims based on

13   foreign CRT sales under the FTAIA, Defendants argued that foreign discovery was barred under

14   the FTAIA.  Defendants also asserted that the four-year statute of limitations barred all discovery

15   regarding their activities prior to November 2003 (four years before the filing of the first IPP

16   complaint), and refused to produce any discovery regarding finished CRT products on the

17   grounds that it was irrelevant.  These objections required extensive meet and confers and,

18   ultimately, several motions to compel before the Special Master in the Fall of 2010.[11]  Lead

19   Counsel and one other IPP firm did a substantial amount of work on these motions in

20   coordination with DPP Counsel.

21        31.    Even after these issues were resolved and the Special Master ordered the parties to

22

23   _____

24   [10] Only Defendants Chunghwa, Samsung SDI, Philips, and Hitachi produced documents to the
25   Grand Jury, and the productions from Philips and Hitachi came only from their U.S. subsidiaries.
     In other words, the Grand Jury production was very limited.

26   [11] A list of all the discovery motions briefed by IPP Counsel is contained in Exhibit 3 to this
     Declaration.

27

28
14

DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
Master File No. CV-07-5944-SC

1  agree on "custodians"[12] from whose files all responsive documents would be produced (Dkt. No.

2  809), many additional, complex issues arose.

3       32.    First, identifying potential custodians was a very difficult and time consuming

4  task.  Many of the names given to IPPs by Chunghwa as part of its settlement proffer were

5  Korean or Japanese names that had been translated phonetically into Chinese and then

6  phonetically into English.  As a result, the spelling of the names was frequently incorrect, which

7  allowed Defendants to claim they were unable to identify many of IPPs' proposed custodians.

8  This problem was compounded by the fact that the alleged conspiracy began in 1995.  Most

9  Defendants were no longer in the CRT business, and claimed they didn't have organizational

10  charts identifying their employees dating back to that time.

11       33.    Further, many of the alleged participants in the CRT conspiracy were no longer

12  employed by the Defendants, which meant that Defendants could not interview them regarding

13  the conspiracy or determine where their documents were stored.  All of these issues were further

14  complicated by the fact that each of the nine Defendant groups comprised multiple entities

15  located around the world, many of which no longer existed.  The process of identifying

16  custodians, and negotiating with Defendants regarding their documents, therefore continued

17  throughout the litigation as IPPs uncovered additional information regarding the participants in

18  the conspiracy.

19       34.    Second, even after IPPs and Defendants agreed on a list of custodians whose files

20  were to be searched for responsive information, the actual productions IPPs received from those

21  custodian files were often paltry or completely non-existent.  Defendants claimed that many of

22  the custodian files and other records relating to their former CRT businesses had been destroyed

23  and/or were stored on backup systems that were not reasonably accessible.  Defendants made

24  similar claims with regard to their sales and cost data, which are critical for class certification and

---

26  [12] The term "custodians" refers to current or former employees of Defendants whose files were

27  likely to contain relevant documents.

28  DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
Master File No. CV-07-5944-SC

1   proving damages.  The negotiations regarding Defendants' sales and cost data lasted for over a

2   year and IPP Counsel had to have continuous consultations with their economic experts in order

3   to develop an understanding of the data and the Defendants' databases.  IPP Counsel were also

4   forced to hire technical experts to advise them regarding the burdens of restoring backup tapes

5   and to assist with bringing motions to compel before the Special Master.

6         35.    Third, because most Defendants were no longer involved in the CRT business,

7   IPPs also had to travel to several storage facilities both here and abroad to manually search

8   Defendants' paper records for relevant documents.  For example, in October 2010 Lead Counsel

9   travelled to the Netherlands to review documents gathered by Defendants LG and Philips as part

10  of their due diligence prior to forming their joint venture, LG.Philips Displays ("LPD").[13] Lead

11  Counsel even had to consult with Dutch counsel to assist in obtaining relevant documents and

12  data from the Dutch bankruptcy trustee of LPD, the largest manufacturer of CRTs in the world

13  before it entered bankruptcy in 2006. IPPs were eventually able to get at least some of LPD's

14  documents and data from its Dutch, U.S. and Hong Kong bankruptcy trustees.  Defendants finally

15  produced the vast majority of their documents in late 2011/early 2012.  Document productions

16  continued throughout the litigation, however, as IPPs uncovered additional information about the

17  participants in the conspiracy and demanded that Defendants produce more documents.

18        36.    IPPs were never able to obtain relevant documents or sales data from several

19  major participants in the CRT conspiracy because these companies no longer exist (e.g., Orion

20  Electric Company and Thai CRT Company, Ltd.), or defaulted (e.g., IRICO and Samtel Color

21  Co., Ltd.).  This fact complicated not only IPPs' ability to prove the existence of a worldwide

22  conspiracy to fix CRT prices, but also their ability to show that the conspiracy had a common,

23  class-wide impact on CRT Product prices.

---

25  [13] LPD was a CRT joint venture formed in June 2001 by defendants LG Electronics, Inc. ("LG")

26  and Koninklijke Philips Electronics N.V. ("Philips").  LG and Philips both claimed that all of the documents relating to their CRT businesses and their participation in the conspiracy prior to June 2001 had been transferred to LPD.

27

28  DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

1      37.     Ultimately, while Defendants' productions of documents and data were

2   voluminous (the database ultimately contained 1,804,284 documents comprised of 7,867,927

3   pages) and IPPs were successful in most of their motions to compel further productions from

4   Defendants, I believe that much of the evidence of CRT conspiracy was no longer available.

5   **Document Review**

6      38.     The documents produced by Defendants were loaded into a web-based electronic

7   database, which IPP Counsel used to review and analyze the documents, and identify the

8   important evidence in the case.

9      39.     Lead Counsel selected an electronic database hosted by Milberg, LLP, one of the

10  firms representing the IPPs in this case.  The database was very sophisticated and enabled IPP

11  Counsel to conduct targeted searches for the most important documents using a number of

12  different analytical tools.  The cost to the IPP Class of Milberg's document review platform was

13  a fraction of the cost quoted to Lead Counsel by other vendors.  Further, after the DAPs joined

14  the litigation in late 2011/early 2012, Lead Counsel worked with counsel for the various DAPs to

15  coordinate on document review and deposition preparation, and share the costs of Milberg's

16  electronic review platform.  As a result, the cost to the IPP Class was further reduced.

17     40.     Reviewing and analyzing Defendants' documents was a massive project that

18  continued throughout the litigation as IPPs prepared for class certification, depositions, summary

19  judgment and trial.  At times there were over 50 attorneys working on document review.  At least

20  15 of these attorneys were fluent in Korean, Chinese, Japanese or Dutch.  In all, IPP Counsel

21  reviewed tens of thousands of documents.  This process identified the important evidence in this

22  case.

23     41.     Most of the important documents in the litigation were in a foreign language.

24  Foreign language attorneys had to identify the documents (by searching the database using

25  foreign language search terms) and prepare summaries and informal translations so that others

26  could assess their significance.  Many of the foreign language documents were handwritten notes,

27

28  DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
    FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
    Master File No. CV-07-5944-SC

which meant they did not respond to search terms and were much more difficult to identify.  In order to use these foreign language documents in a brief, at a deposition, or later as a trial exhibit, IPPs then had to obtain certified translations.  IPPs hired two translation companies for this purpose.  IPP Counsel obtained certified translations of approximately 2,400 documents during the course of the litigation, to which Defendants lodged nearly 8,500 objections.[14]  Negotiating and keeping track of the objections to translations and subsequent revisions was a mammoth task, and was handled principally by IPP Counsel on behalf of all the different plaintiff groups.[15]

42.     Lead Counsel organized and supervised the entire document review effort.  Lead Counsel assigned attorneys from many of the IPP firms to work on the document review.  Lead Counsel, with assistance from other IPP Counsel, set up the database and designed the work flow for the document review; drafted the "coding manual"[16]; and drafted detailed background memoranda for the document reviewers regarding the Defendants, the CRT industry, the evidence needed, and the important legal issues IPPs were facing.  The document reviewers were divided into teams with at least one senior attorney overseeing each team.  Initially, the teams focused on searching for and gathering evidence relevant to class certification.  After class certification, the focus of the teams switched to finding important documents for specific deponents, with each team assigned to one Defendant group.  Lead Counsel held frequent telephone conferences with the leaders of the document review teams throughout the document

---

[14] Most of these objections were trivial and IPP Counsel did not allow them to bog down the preparation of the IPPs' case.  There were, however, a significant number of more substantive objections in which the Defendants disputed the meaning of an important word in order to alter the meaning of a document.  For example, in the Korean language, although similar sounding, 합의 [hab-ui] and 협의 [hyub-ui] are two different words and translated as agreement and discussion, respectively.  Defendants repeatedly objected to the translation of Korean word 합의 [hab-ui] as agreement and attempted to change it to discussion only to later admit that 합의 is in fact accurately translated as agreement.  Defendants' objections to the word "agreement" in their documents is just one example of the thousands of translation objections Defendants lodged in their effort to soften and/or eradicate evidence of the conspiracy.

[15] Attached hereto as Exhibit 4 is an excerpt of IPP Counsel's chart tracking the status of the translation objections.  The full document is 1,149 pages.

DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

1  review process.  Each team had to produce regular lists of important documents and, ultimately, a

2  detailed memorandum regarding the evidence they had found.  Lead Counsel frequently reviewed

3  the lists of important documents and memoranda, identified gaps in the evidence, and then re-

4  directed the teams as necessary.

5  **Discovery from Class Representatives**

6        43.     Various Defendants propounded several sets of document requests and

7  interrogatories on the 40 class representatives named in the complaints.  IPP Counsel spent a

8  significant amount of time responding to these requests and coordinating with local counsel for

9  the class representatives located throughout the United States.  IPP Counsel assisted the class

10  representatives in the search and production of relevant documents and with responses to

11  interrogatories.  All class representatives searched for and produced documents responsive to

12  Defendants' requests and responded to their interrogatories.

13        44.     IPP Counsel also spent a significant amount of time responding to contention

14  interrogatories regarding the conspiracy allegations, and preparing for and defending each of the

15  25 class representative depositions.[17]  These depositions took place all over the United States

16  between February and July 2012.[18]

17        45.     Lead Counsel supervised and directed the collection of documents from the class

18  representatives, reviewed and edited their written discovery responses, and met and conferred

19  with defense counsel regarding the responses.  Lead Counsel also defended several class

20  representative depositions and was involved in the preparations for, and defense of, the rest.

21  **Merits Depositions**

22        46.     In early 2012, in anticipation of the start of deposition discovery, Lead Counsel

---

24  [16] The coding manual contained the mechanical and substantive instructions for the attorneys doing the document review.

25  [17] The number of class representatives named in the Complaint was winnowed down from 40 to

26  25 after discovery.

27  [18] All of the class representative depositions are listed in Exhibit 5 to this Declaration.

19

28  DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

1  negotiated a complex discovery protocol with counsel for the DPPs, DAPs, the California

2  Attorney General and the Defendants.[19]  A protocol for certified translations was included in this

3  broader discovery protocol.  The negotiations were long and protracted and ultimately the parties

4  were able to agree on most, but not all, aspects of the protocol.  Together with DPP Counsel,

5  Lead Counsel briefed and argued these issues before Special Master Legge.  Overall, the

6  resulting protocol was very favorable for IPPs. (Dkt. No. 1128.)  For example, Defendants were

7  ordered to bring their percipient witnesses to the Northern District of California for deposition

8  unless they could show it was not appropriate.  In addition, the protocol required Defendants to

9  supply the official interpreters for their witnesses' depositions.  Both of these provisions meant

10  substantial cost savings for the IPP Class.

11       47.     Merits depositions began in December 2012 (a full year before IPPs' class

12  certification motion would be resolved) and continued for more than two years, through the close

13  of fact discovery on September 5, 2014 and into March 2015.

14       48.     As with document discovery, IPP Counsel's attempts to depose the participants in

15  the CRT conspiracy met many roadblocks due to the age of the case and the fact that most

16  Defendants no longer make CRTs.  Defendants claimed that many of the main participants in the

17  CRT conspiracy were no longer employees and that they had no idea how to contact these

18  individuals.  IPP Counsel successfully moved to compel most Defendants to provide the last

19  known addresses for these former employees, but the addresses provided were frequently

20  outdated or were for locations in Asia or Europe.  Attendance at depositions in those parts of the

21  world is often only voluntary.  Consequently, compelling the deposition of these individuals was

22  next to impossible.  Further, the Japanese Defendants asserted the Japan Privacy Law ("JPL") as

23  a basis to refuse to provide *any* information regarding their former employees.  This assertion led

24  

25  [19] In late 2011/early 2012, 13 DAPs and the Attorneys General of California and Florida joined
   this case.  The DAPs consist of corporate plaintiffs that purchased CRT Products from

26  Defendants, primarily directly.  They include computer and television manufacturers such as Dell
   and Sharp, and retailer

27  

28  DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
   FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
   Master File No. CV-07-5944-SC

1    to extensive meet and confers between the parties and multiple motions before the Special

2    Master.  IPP Counsel also consulted with Japanese counsel regarding the proper application of

3    the JPL.

4           49.    As a result of these difficulties, IPP Counsel could not rely solely on formal

5    methods of seeking discovery under the Federal Rules of Civil Procedure.  IPP Counsel tracked

6    down several key witnesses with private investigators and by searching public records.  These

7    witnesses included Jim Smith, a former executive of Philips and LPD and the former Chairman

8    of the Glass Meetings, who was living in England; W.R. Kim, a former Samsung SDI America

9    employee; and Kyu In Choi, a former LG and LPD USA employee.  All three witnesses gave

10   extremely helpful testimony regarding the existence of the alleged conspiracy and the agreements

11   reached among Defendants.  Messrs. Kim and Choi also gave very favorable testimony regarding

12   Defendants' alleged conspiratorial activities in North America (including the United States) and

13   the impact of the conspiracy in the United States.  This testimony was critical for opposing

14   Defendants' summary judgment motions on FTAIA grounds.  The testimony of these witnesses

15   was in stark contrast to the testimony given by the other defense witnesses and was a direct result

16   of IPP Counsel's persistence.

17          50.    IPP Counsel's persistence also led to the revelation that several key defense

18   witnesses had been transferred to an entity related to two of the Japanese Defendants.  These

19   Defendants refused to provide the witnesses for their deposition and, citing the JPL, also refused

20   to provide any information regarding the dates that the witnesses had left their original employ

21   and the circumstances of their departure.  Following extensive meet and confers, IPP Counsel

22   moved to compel the depositions of these witnesses or, in the alternative, asked that the Court

23   order their documents admissible for all purposes at trial.  The Court granted IPPs' alternative

24   motion and ordered all of these key witnesses' documents admissible for trial.  (Dkt. No. 2734.)

25   This was an important victory since one of these witnesses was the note-taker at the conspiracy

26   meetings.

27

28

DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
Master File No. CV-07-5944-SC

51.     In total, IPP Counsel, together with the other plaintiff groups, took over 70 percipient witness depositions of defense witnesses and an additional eight depositions of Defendants under Federal Rule of Civil Procedure 30(b)(6).[20]  The depositions themselves were hard fought and adversarial; most of the defense witnesses were not, in my view, forthcoming regarding the CRT conspiracy and did not admit their participation in it.  IPP Counsel took the lead on many of these depositions, attended all of them, questioned the witness at most of them, and were heavily involved in the preparation for all of them.  Preparing for and taking these depositions was a huge undertaking requiring a high-level of organization and coordination with the other parties.  Lead Counsel organized IPP Counsel into Defendant teams, the leaders of which were responsible for (1) identifying the witnesses to be deposed; (2) directing the search and review of documents for potential deposition Exhibits and selecting the final Exhibits; (3) getting certified translations of the final deposition Exhibits; (4) preparing an outline of potential questions and corresponding Exhibits; (5) meeting and conferring with defense counsel regarding scheduling of the deposition; (6) questioning the witness on behalf of the IPPs; and (7) coordinating with the other plaintiff groups regarding all of the foregoing.

52.     Several merits depositions took place abroad in Taiwan, Korea, Mexico, England and France.  The vast majority of the defense witnesses were deposed in a foreign language (Chinese, Korean, Japanese or French), which required the presence of an official interpreter and two check interpreters.  The discovery protocol provided that these depositions could last for up to four days.  The extra deposition time was necessary because the interpreter needed to translate every question and answer, and all four plaintiff groups (IPPs, DPPs, DAPs, and Attorneys General) needed sufficient time to question the witness.

---

[20] All of the defense percipient witness depositions are listed in Exhibit 6 of this Declaration.

DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
Master File No. CV-07-5944-SC

53.     There were also numerous other depositions of expert witnesses, third-party resellers of finished products containing CRTs, and witnesses for the DAPs. The third-party reseller depositions and DAP depositions were noticed by Defendants and were often focused on pass-through of the overcharge – a crucial issue in the IPP case.  This meant that IPP Counsel often had to attend these depositions to protect the record.  There were a large number of these depositions and they occurred during a very short time frame in summer 2014, just before the close of discovery in September 2014.[21]  Often two, or even three, depositions were taken on the same day.  IPP Counsel participated in, or monitored, all of these depositions under Lead Counsel's direction.

54.     Merits discovery closed on September 5, 2014, but some discovery continued after the September 5 cut-off.  In particular, several depositions were scheduled for a later date and contention interrogatories propounded by all parties led to IPP Counsel filing several motions to compel further responses from certain Defendants.

**Written Discovery**

55.     In the last month or two before the September 5 discovery cut-off, all but one Defendant served contention interrogatories on IPPs regarding IPPs' evidence of their participation in the CRT conspiracy, pass-through of the overcharge, the application of the FTAIA, and ascertainability of class members.  In response, IPP Counsel compiled a "meeting grid" identifying 2,281 meetings among Defendants during the Class Period, and including the date, location, individual participants, Bates citations, and relevant deposition testimony.[22]  This was another massive undertaking requiring a substantial amount of document review and analysis.  None of the Defendants filed motions to compel against IPPs regarding their responses to these contention interrogatories.  This allowed IPPs to continue to move towards trial.

---

[21] A list of the DAP and third-party depositions is contained in Exhibit 7 of this Declaration.

[22] A copy of the first ten pages of the meeting grid is attached hereto as Exhibit 8.  The full document is 256 pages.

DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

56.     During the same period, IPP Counsel propounded contention interrogatories and Requests for Admissions on all Defendants regarding, *inter alia*, their participation in the CRT conspiracy, certain Defendants' claimed withdrawal from the conspiracy and other defenses, and Defendants' sales of CRT Products in or into the United States.  Many Defendants failed to adequately respond to IPPs' requests in the first instance, which required expedited meet and confers and motions to compel due to the impending discovery cut-off.

57.     IPP Counsel spent many hours researching the law, drafting meet and confer letters, negotiating with defense counsel, and drafting the motions to compel.  This work was further complicated by the fact that IPPs were dealing with five separate defendant groups, *and* the DAPs were also engaged in contention discovery with Defendants.  This circumstance required coordination among the IPP Counsel assigned to each Defendant, and separately with their DAP counterparts.  IPP Counsel needed to compare Defendants' responses and objections and ensure consistency in the meet and confers.

58.     Ultimately, IPP Counsel were successful in persuading all but one Defendant to supplement their responses voluntarily, which meant that the motions could be withdrawn as to those Defendants.  Nevertheless, the briefing on the motions continued into October 2014 and the motions remained unresolved by the time of IPPs entered into settlements with Defendants in early 2015.

59.     Lead Counsel was involved in every aspect of the above-described written discovery.  Lead Counsel assigned IPP Counsel to draft the contention interrogatories and Requests for Admissions, and reviewed, edited and served those requests.  Lead Counsel also participated in most of the meet and confers with defense counsel regarding their responses, and briefed the motions to compel.  In addition, Lead Counsel coordinated IPP Counsel's efforts to respond to Defendants' contention requests, and reviewed, edited and served those responses.

**Expert Discovery on Liability and Damages**

60.     The IPPs, DAPs, Defendants, and the California Attorney General exchanged

1    expert reports on liability and damages starting in April 2014 and continuing through September

2    2014.  These included voluminous opening, opposition, rebuttal and sur-rebuttal reports from 17

3    expert witnesses.

4           61.     Each Defendant group had its own expert who opined on issues and defenses

5    specific to that Defendant.  In addition, three experts attacked different elements of the IPPs'

6    claims on behalf of all Defendants.

7           62.     The DAPs had another seven experts, some of whom opined on behalf of a single

8    DAP and others who opined on different elements of the DAPs' claims.  IPP Counsel and Dr.

9    Netz had to be fully informed on all expert reports, not only those which pertained to the IPPs.

10    This is because expert reports that involved other parties also involved issues which impacted the

11    IPP case.

12           63.     The defense experts opined that IPPs suffered little or no damages as a result of

13    Defendants' alleged anticompetitive activity.  They maintained that the alleged conspiracy was

14    ineffective and unsuccessful, and that IPPs were incapable of "linking" any allegedly agreed-

15    upon price increases for CRTs to allegedly increased prices of finished CRT Products purchased

16    by class members.  In contrast, IPPs' expert opined that damages were significant and that the

17    alleged anticompetitive price increase of CRTs was passed-on to class members.

18           64.     All of these experts were deposed, often multiple times, regarding their reports.[23]

19    As noted, IPPs' expert, Dr. Netz, was deposed three times – once regarding her opening report;

20    once regarding her rebuttal to the expert reports on Defendants' withdrawal defense; and once

21    regarding her rebuttal report.

22           65.     Lead Counsel supervised and directed all of the expert work with substantial

23    assistance from other IPP Counsel.  Lead Counsel worked closely with Dr. Netz on her three

24    reports on liability and damages, and defended her deposition on two occasions (in addition to

25

26    [23] A list of all the expert depositions taken in this litigation is contained in Exhibit 9 of this
Declaration.

27

28    DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
Master File No. CV-07-5944-SC

1   defending her deposition on two occasions at the class certification stage).

2                                **CLASS CERTIFICATION**

3          66.    IPP Counsel, under the direction and supervision of Lead Counsel, began

4   preparing for the motion for class certification in January 2009 – long before the Court had even

5   issued its rulings on the motions to dismiss.  IPP Counsel served over 50 third party subpoenas

6   on resellers of CRT Products at different levels of the distribution chain, such as Dell, Sharp, HP,

7   Apple, Target and Costco.  The sales and cost data from these companies were essential for IPPs

8   to show that the overcharge on CRTs passed through the distribution chain to end-consumers of

9   finished CRT products on a class-wide basis.

10         67.    IPP Counsel retained Janet S. Netz, Ph.D of applEcon to assist in collecting the

11  global sales and cost data of Defendants and third parties, analyze that data, and render an

12  opinion on class certification.  Dr. Netz has extensive experience with indirect purchaser cases,

13  including the indirect purchaser *LCD* and *Microsoft* cases.

14         68.    Under the direction and supervision of Lead Counsel, IPP Counsel also undertook

15  a massive document review to uncover evidence relevant to class certification, such as evidence

16  of the scope of the conspiracy, its participants, the agreements reached and, most importantly, the

17  impact on CRT Product pricing at every level of the distribution chain.  In consultation with their

18  experts, IPP Counsel also gathered evidence regarding the global nature of the CRT market, its

19  manufacturing and production processes, the myriad of different types of CRTs, and the technical

20  terms used to describe them.  Lead Counsel organized IPP Counsel into six document review

21  teams, each of which produced detailed memoranda regarding the evidence they uncovered.

22  Lead Counsel reviewed and edited these memoranda and provided them to the experts to inform

23  their analysis of class certification issues.  These memoranda also provided the basis for the

24  comprehensive factual background developed by Lead Counsel for the class certification motion.

25         69.    Beginning in June 2012 and continuing through September 2012, IPP Counsel, in

26  coordination with DPPs, deposed 26 Rule 30(b)(6) witnesses provided by Defendants on issues

27                                          26

28  DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
    FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
    Master File No. CV-07-5944-SC

1    relevant to class certification, including, *inter alia,* CRT Product manufacturing, production,

2    pricing, sales processes, channels of distribution, the FTAIA and ascertainability.  IPP Counsel

3    took the lead on most of these depositions, attended all of them, questioned the witness at most of

4    them, and prepared extensively for all of them.  Each of these depositions required extensive

5    document review and preparation, as well as frequent consultations with the experts regarding the

6    information they needed for class certification.  These depositions took place all over the United

7    States and many of them were conducted in Korean, Japanese or Chinese.  This required certified

8    translations of all deposition exhibits, and the presence of an official interpreter, and two check

9    interpreters – one for each side – at each deposition.[24]  Lead Counsel attended the vast majority

10   of these depositions, and directed and supervised the attendance and preparation of other IPP

11   Counsel.

12           70.     IPP Counsel filed their motion for class certification, along with the Declaration of

13   Janet S. Netz, Ph.D, on October 1, 2012. (Dkt. No. 1388.)  Dr. Netz engaged in extensive

14   analyses of common proof of impact to direct purchasers,[25] pass-through to resellers and class

15   members,[26] and proposed methods of calculating damages on a class-wide basis.  Her opening

16   and rebuttal reports exceeded 200 pages of detailed economic analysis and dozens of exhibits

17   related to the economic facts of the case.  Lead Counsel worked closely with Dr. Netz to ensure

18   that she had access to all the facts and documents she needed to undertake her analyses.  In

19   addition, IPP Counsel submitted declarations attaching almost 150 exhibits that contained

20   evidence relevant to class certification collected by the document review teams.  Lead Counsel

21

22   _____

23   [24] The Defendants' Rule 30(b)(6) depositions are listed in Exhibit 10 of this Declaration.

24   [25] Dr. Netz conducted two regression analyses of 4,281 target prices of CRTs, which were set by
     Defendants during their conspiratorial meetings, and two such analyses of Defendants' actual,
25   global sales prices of CRTs.

26   [26] Dr. Netz conducted 47 pass-through studies that calculated separate pass-through rates for each
     application, *i.e.*, CRTs, monitors, and televisions, and each level of the distribution chain.  The
27   pass-through studies included over 40 data sets from 29 different entities representing over 131

                                                        27

28

1    reviewed hundreds of potentially important documents for class certification and selected all of

2    150 exhibits cited in the memorandum.  Lead Counsel also drafted the factual sections of the

3    memorandum, and reviewed and edited the other sections of the memorandum.

4          71.      Defendants vigorously opposed IPPs' motion for class certification and moved to

5    strike Dr. Netz's reports.  Defendants deposed Dr. Netz twice, regarding each of her reports

6    (opening and reply), and IPP Counsel deposed Defendants' expert, Dr. Robert Willig, regarding

7    his opposition report.  Lead Counsel, with assistance from other IPP Counsel, prepared Dr. Netz

8    for her two depositions and defended them.  While the IPPs' motion was pending, the United

9    States Supreme Court issued its ruling in *Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013),

10    which overturned class certification in that case.  This led to another round of letter briefs

11    regarding class certification standards.  The complete record on class certification (including

12    exhibits) totaled approximately 6,000 pages, with the three expert reports accounting for

13    approximately 800 pages of that total.

14          72.      Interim Special Master Martin Quinn held a six hour hearing on the competing

15    motions.  Lead Counsel argued the motion along with several other IPP Counsel.  The Special

16    Master recommended that the Court grant IPPs' motion for class certification and deny

17    Defendants' motion to strike the expert report of Dr. Netz.  (Dkt. Nos. 1742 and 1743.)  IPP

18    Counsel defended the Special Master's rulings in another round of extensive briefing on

19    Defendants' objections to those rulings.[27]  On September 24, 2013, this Court adopted the Special

20    Master's Reports and Recommendations and certified 22 state-wide classes of indirect purchasers

21    of CRTs.  (Dkt. No. 1950.)  Defendants then filed a petition to appeal this Court's Order pursuant

22    to Federal Rule of Civil Procedure 23(f), and more briefing ensued. (Dkt. No. 2012.)  IPP

23    Counsel were again successful in opposing this petition.  The Ninth Circuit Court of Appeals

24

---

25    million individual CRTs, each with a corresponding cost and price; and they covered transactions

26    between February 1994 and November 2011.

27    [27] (Dkt. Nos. 1812, 1813, 1885 and 1887.)

28

28   
DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION<br>FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –<br>Master File No. CV-07-5944-SC

1   denied Defendants' petition to appeal on December 23, 2013 – more than a year after IPPs filed

2   their original motion.  (Dkt. No. 2283.)

3                              **SUMMARY JUDGMENT MOTIONS**

4          73.    At the direction of Lead Counsel, IPP Counsel began preparing for Defendants'

5   motions for summary judgment approximately one year before they were filed in November

6   2014.  Lead Counsel, with assistance from other IPP Counsel, examined the major issues in the

7   case and the summary judgment motions filed in several recent indirect purchaser cases, and

8   created a list of anticipated motions in this case.  From there, Lead Counsel assigned the same

9   IPP Counsel teams that prepared for and took the depositions of Defendants' percipient

10  witnesses, to prepare memoranda containing the best evidence of their Defendant's participation

11  in the conspiracy.  Lead Counsel also assigned other IPP Counsel to research and prepare legal

12  and factual memoranda on other major defenses likely to be raised on summary judgment,

13  including the FTAIA, antitrust standing, statute of limitations and withdrawal from the

14  conspiracy.  Lead Counsel created the template for these memoranda, reviewed and edited the

15  memoranda and directed additional searches for evidence as needed.  As a result, by the time the

16  summary judgment motions were filed in November 2014, IPPs had comprehensive "best

17  evidence memoranda" containing the best evidence on every Defendant's participation in the

18  conspiracy and all of the major legal issues in the case.

19         74.    On November 7, 2014, the Defendants filed 36 motions for summary judgment.[28]

20  Eleven of these were directed specifically at IPPs' claims; the other 25 were directed at the

21  DAPs.  These other 25 motions nonetheless raised legal issues and arguments that overlapped

22  with issues in the IPP case.  This meant that IPP Counsel needed to monitor those motions and

23  coordinate with the DAPs on the oppositions thereto.

24         75.    Four out of the five remaining (non-settling) Defendant groups filed motions

25  _____

26  [28] A list of the summary judgment motions filed by Defendants is contained in Exhibit 11 of this
    Declaration.

27                                          29

28  DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
    FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
    Master File No. CV-07-5944-SC

1   variously contending that there was insufficient evidence of their (or certain entities within the

2   defendant group) participation in the conspiracy; that they withdrew from the conspiracy and the

3   statute of limitations had run; and that the claims of natural persons in California had been

4   extinguished by a settlement in a parallel case brought by the California Attorney General.

5        76.     Three of the summary judgment motions were based on the FTAIA and were

6   joined by all Defendants.  All three motions contended that the FTAIA barred IPPs' state law

7   claims for damages based on foreign CRT sales, and attacked IPPs' damages calculations for

8   allegedly failing to distinguish between damages based on domestic and foreign CRT sales.

9   These were the most significant motions in terms of the potential impact on the damages sought

10   by IPPs and the relative uncertainty in the applicable law.  If granted, the three FTAIA motions

11   could have eliminated at least three quarters of IPPs' damages claims and could have provided

12   Defendants with an argument to decertify the IPP class.  Further, the FTAIA had recently been

13   the subject of several major appellate decisions from the Second, Third, Seventh and Ninth

14   Circuits, which provided new interpretations of the FTAIA's impact on foreign sales and its

15   jurisdictional effect.  These decisions were directly relevant to the IPPs' claims.[29]  Indeed,

16   *Hsiung*, which addressed an appeal by the criminal defendants in the related *LCD* litigation and

17   involved issues very similar to those in this case, was awaiting rehearing *en banc* by the Ninth

18   Circuit while IPP Counsel were preparing their opposition to Defendants' FTAIA motions.

19        77.     Another motion that had the potential to eliminate a large portion of IPPs' claims

20   was Defendants' motion for summary judgment for lack of antitrust standing under *AGC*.  Courts

21   in this District have ruled both ways on similar motions in other indirect purchaser cases, so the

22   outcome of that motion was also uncertain.

23        78.     IPP Counsel had anticipated and prepared "best evidence" memoranda for all of

24

---

25   [29] *See Lotes Co., Ltd. v. Hon Hai Precision Industry Co.,* 753 F.3d 395, 412-13 (2d Cir. 2014)*;
26   Animal Sci. Prods. Inc. v. China Minmetals Corp.,* 654 F.3d 462 (3d Cir. 2011); *Minn-Chem Inc.
     v. Agrium Inc.,* 683 F.3d 845 (7th Cir. 2012); *Motorola Mobility LLC v. AU Optronics Corp.,* 775
27   F.3d 816 (7th Cir. 2015); and, *U.S. v. Hsiung* ("*Hsiung*"), 778 F.3d 738 (9th Cir. 2015).

28   DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
     FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
     Master File No. CV-07-5944-SC

1   the motions directed at IPPs, which made responding to the motions more streamlined and

2   efficient because the relevant law and evidence were easily accessible.  In addition, Lead Counsel

3   assigned the same IPP Counsel who prepared the "best evidence" memoranda to prepare the

4   oppositions to their Defendants' summary judgment motions.  This meant they were very familiar

5   with both the issues raised in the motions and the relevant evidence.  Lead Counsel supervised all

6   of the assignments and assisted in drafting the oppositions to the FTAIA motions and the motions

7   filed by Philips.  Lead Counsel also reviewed, edited and finalized many of the other opposition

8   briefs, and reviewed and edited the rest.  In addition, Lead Counsel coordinated all of the

9   opposition briefing with the DAPs.

10          79.     As a result of their preparation, IPP Counsel did not need to seek extensions of

11   time to brief the motions for summary judgment.  IPP Counsel filed their oppositions to the 11

12   motions on December 22, 2014.[30]  Defendants filed their replies on January 23, 2015.[31]  The

13   complete record on the summary judgment motions directed at IPPs totaled over 22,000 pages.

14   The pretrial schedule and the trial date remained in place throughout the briefing on the summary

15   judgment motions.

16          80.     The motions were fully briefed before the settlements were executed, but no

17   rulings had been issued.  Defendants have withdrawn the motions as to the IPPs pending final

18   approval of the settlements.

19                                          **TRIAL**

20   **Trial Structure**

21          81.     IPP Counsel faced considerable uncertainty in preparing for trial because we did

22   not know whether the Court would order a joint or separate trial of the IPPs' and DAPs' claims.

23   IPP Counsel had to prepare for the possibility of either outcome, which made trial preparation

24   

25   [30] (Dkt. Nos. 3266-4, 3270-4, 3272-4, 3250-4, 3282-3, 3248-4, 3241, 3247, 3287, 3245-4, 3240.)

26   [31] (Dkt. Nos. 3439-18, 3433-6, 3457-4, 3448, 3435-3, 3457-4, 3460-4, 3456, 3450-4, 3426-4,

27   3467.)

31

28   DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
Master File No. CV-07-5944-SC

1   very complex.  DAP claims are primarily direct purchaser claims based on federal law, while the

2   IPP claims are based on state laws.  Normally direct and indirect purchaser cases are on different

3   schedules, and they even used to be tried in different courts.  Indeed, before the Class Action

4   Fairness Act of 2005, 28 U.S.C. § 1332(d) ("CAFA"), direct purchaser cases were tried in federal

5   courts, and indirect purchaser cases in state courts.

6       82.     There is no definitive law on whether direct and indirect purchaser cases can be

7   tried together.  A joint trial would have been highly prejudicial to both plaintiff groups due,

8   primarily, to their conflicting positions on pass-through of the overcharge.  The DAPs contend

9   that evidence of pass-through is barred in their cases. The IPPs were obligated to present

10  evidence of pass-through as an element of their case.  A joint trial could also have created jury

11  confusion over different claims subject to different laws; IPP Counsel had to prepare for this

12  eventuality.

13      83.     During the summer of 2014, Lead Counsel met and conferred with counsel for the

14  DAPs and the Defendants, and consulted extensively with Special Master Walker, regarding this

15  difficult and complex issue.  Defendants argued in favor of a single trial, claiming it would be

16  more efficient.  IPPs and DAPs jointly moved for separate trials in October 2014 (Dkt. Nos.

17  2897, 2903) and Defendants cross-moved for a single trial.  (Dkt. No. 2914.)  The Court had not

18  ruled on the motions by the time IPPs entered into settlements with Defendants.

19      84.     It appeared for much of the case that there would be a joint trial of direct and

20  indirect purchaser claims.  Even if the Court had ordered bifurcated or separate trials of the direct

21  and indirect purchaser claims, other complex issues would still have arisen, such as whose claims

22  would be tried first, and—in the case of bifurcation—which plaintiffs would get the same jury to

23  hear the liability and damages portions of their cases.

24      85.     The Court did not decide whether there would be a joint trial or separate trials

25  before it vacated the trial date.  The prospect of a joint trial required extensive negotiations and

26  coordination among IPPs and DAPs and, if not properly managed, the outcome could have had a

27

28

DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
Master File No. CV-07-5944-SC

1    very negative impact on the IPP case.  The uncertainty also complicated the settlement

2    negotiations with Defendants.  Lead Counsel successfully managed these issues and was able to

3    effectively prosecute the case alongside the DAPs, and secure exceptional settlements from

4    Defendants.

5    **Trial Preparation**

6        86.    Notwithstanding the uncertainty regarding the trial structure, IPP Counsel

7    prepared for the March 9, 2015 trial[32] by anticipating various likely trial scenarios.  The

8    identification of potential trial Exhibits began in April 2014.  Lead Counsel with assistance from

9    other IPP Counsel identified all potential sources of trial Exhibits, including, the "best evidence"

10   memoranda; the class certification briefing and expert declarations; the expert reports on liability

11   and damages; and deposition Exhibits.  This initial list totaled some 8,500 documents.  Lead

12   Counsel then assigned senior attorneys to review and rank these documents as potential trial

13   Exhibits during the summer of 2014.  IPP Counsel continued to review and pare down the list of

14   potential trial Exhibits throughout the fall of 2014 and added new documents from the

15   depositions taken from September to December 2014.  Lead Counsel provided IPPs' initial trial

16   Exhibit list to Defendants on December 5, 2014.

17       87.    As part of the process of identifying trial exhibits, IPP Counsel also identified

18   important documents for authentication as business records for use at trial.  IPP Counsel

19   propounded Requests for Admissions on Defendants regarding the authenticity of their

20   documents, which occasioned lengthy negotiations with defense counsel and culminated in

21   motion practice before the Special Master.  These motions were pending at the time of the

22   settlements with Defendants and were withdrawn as to the IPPs.

23       88.    The exchange of trial exhibit lists also required that IPP Counsel obtain certified

24   translations of several hundred documents that had not previously been entered into the record.

25   Defendants did the same for new documents on their trial exhibit list.  This led to another round

26

27

28

DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
Master File No. CV-07-5944-SC

1    of objections to the certified translations of these new documents and the negotiation of hundreds

2    of disputes.  These disputes added to as-yet-unresolved disputes regarding existing translations.

3    All of the work involved with certified translations was spearheaded by the IPP Counsel on

4    behalf of all plaintiffs.

5           89.    IPP Counsel also spent significant time during this period designating deposition

6    testimony for trial, responding to Defendants' objections to IPPs' trial evidence designations, and

7    objecting to Defendants' trial evidence designations.  IPP Counsel prepared and served a trial

8    witness list, met with and prepared certain class representatives to testify at trial, met with and

9    prepared Dr. Netz to testify at trial, and began preparing deposition video clips to play at trial as

10   part of IPPs' case-in-chief.  IPP Counsel travelled to China to meet with and prepare cooperating

11   Chunghwa witnesses.  IPP Counsel also drafted and negotiated a proposed Special Verdict Form,

12   Proposed Jury Instructions and a Pretrial Statement.

13          90.    In January and February of 2015, IPP Counsel participated in three mock trials

14   involving seven mock juries.  Since IPP Counsel still did not know how the Court would conduct

15   the trials, IPP Counsel participated in mock jury trials of a case involving the DAPs and mock

16   jury trials of a case not involving the DAPs.

17          91.    Also in February 2015, the IPPs, DAPs and Defendants filed 64 motions *in limine*

18   and other pretrial motions.[33]  Because the trial structure had not yet been decided, and IPPs were

19   facing the specter of a joint trial with the DAPs, IPP Counsel had to respond to the DAPs'

20   motions in addition to Defendants' motions.  These motions were briefed in varying degrees

21   before the settlement agreements were executed.  Pursuant to their settlement agreements, the

22   Defendants have provisionally withdrawn all of the motions pending against IPPs.[34]

23          92.    Lead Counsel directed, supervised and coordinated all of the work done by IPP

24

25   [32] By Order dated February 9, 2015, the Court vacated the trial date.  (Dkt. No. 3515.)

26   [33] A list of all the motions in limine and other pretrial motions is contained in Exhibit 12 of this
     Declaration.

27

28
DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
Master File No. CV-07-5944-SC

1    Counsel to prepare for trial, and also did much of the substantive work.  Lead Counsel: (a)

2    briefed the motion for separate trials in coordination with the DAPs and with assistance from

3    other IPP Counsel; (b) led the review of potential trial exhibits and reviewed many of the

4    documents in-house; (c) set up the database and designed the protocol for designating testimony

5    from 250 deposition transcripts; (d) designated deposition testimony for several of the most

6    important witnesses in the case, collected the designations done by other IPP Counsel, and

7    reviewed and edited those designations before serving them on Defendants; (e) assisted with

8    drafting and editing the Special Verdict form; (f) assisted with drafting and editing the Proposed

9    Jury Instructions; (g) drafted the Pretrial Statement; (h) prepared IPPs' witness list; (i) assisted

10   with drafting and editing the briefing on 64 motions *in limine*; (j) prepared Dr. Janet Netz to

11   testify at trial, along with other IPP Counsel; (k) attended the three mock trials, presented the

12   defense arguments on damages to the mock juries, and assisted other IPP Counsel with their

13   presentations; and (l) coordinated all of the trial preparations with the DAPs.

14        93.    As part of my analysis and preparation for trial, my co-counsel and I considered

15   the risk that IPPs would recover nothing if we took this case to trial.  We considered that risk to

16   be significant based, in part, upon two recent jury trials.  In *LCD*, for example, the direct

17   purchaser class plaintiffs went to trial against Toshiba.  The jury returned a favorable verdict for

18   the plaintiffs on liability, but only awarded $87 million in damages.  Plaintiffs already had

19   obtained over $443 million in settlements from other defendants, and Toshiba was entitled to

20   offset that sum against the damages award.  As a result, plaintiffs recovered nothing on behalf of

21   the direct purchaser class.  Likewise, one of the DAPs in *LCD*, Best Buy, went to trial against

22   two defendants: Toshiba and Hannstar Display Corporation.  Like the direct purchaser plaintiffs,

23   Best Buy also recovered nothing.  The jury found that Toshiba did not participate in the

24   conspiracy and awarded only $7.5 million against Hannstar.  Once Best Buy's settlements with

25   the other defendants in *LCD* had been offset, Hannstar owed nothing to Best Buy.

26

27   [34] (Dkt. Nos. 3801, 3802, 3812, 3851, 3852.)    35

28

**SETTLEMENTS**

94.     Lead Counsel engaged in settlement negotiations with all of the Defendants throughout the litigation.  The settlement negotiations were hard-fought and adversarial, and were at all times conducted at arms'-length.  Other than the two settlements prior to class certification, the settlement negotiations proved unfruitful until the last few months before the March 9, 2015 trial date.  This was in large part due to Defendants' refusal up to that point to pay more to settle the IPPs' claims than they paid to settle the DPPs' claims.

95.     Including the funds previously obtained from the Chunghwa and LG settlements, the total Settlement Fund recovered on behalf of the indirect purchaser class members is $576,750,000, plus accrued interest.  There are no coupons or vouchers and there will be no reversion or refund to any defendant under any circumstances.  No *cy pres* distribution is contemplated.

96.     In addition to monetary consideration, all of the settlements contain cooperation provisions that require defendants to provide specified cooperation to IPPs in the prosecution of any continuing litigation.  The cooperation provisions are material and valuable terms of the settlements.  They enhanced the settlement prospects with the remaining defendants because they obligated the settling defendants, to varying degrees, to provide cooperation to the IPPs in prosecuting the remaining defendants, including authentication of documents, producing witnesses for interviews, depositions and/or trial, and providing other assistance.

97.     I believe the $576.75 million settlement fund is second only to the *LCD* case in the context of indirect purchaser cases.

98.     In *LCD*, the conspiracy began more recently (in 2001); most of the defendants were still active in the LCD business during the litigation; most of the defendants had pled guilty to violations of the Sherman Act and admitted that their conduct had an impact in the United States; and the U.S. DOJ's criminal fines totaled $894 million, an indicator of the defendants' liability.

DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

99.     By contrast, the CRT conspiracy began 20 years ago (in 1995) and most defendants were no longer manufacturing CRTs by 2005.  These facts made it very difficult for IPPs to obtain relevant documents and depose witnesses, and for witnesses to recollect events that had occurred a long time ago.  In addition, by 2007 when this litigation began, several major participants in the CRT conspiracy were bankrupt or no longer existed, which meant IPPs would not be able collect any damages from them.  The declining CRT market also meant the prices of CRTs were naturally in decline, making proof of price fixing and damages much more difficult.  Finally, only one defendant, Samsung SDI, pled guilty to fixing prices, and that guilty plea pertained to only one type of CRT (Color Display Tubes used in monitors) and only for sales to certain customers.  The DOJ's single criminal fine of $32 million imposed on Samsung SDI amounted to less than 3.5 percent of the fines made in connection with the *LCD* conspiracy, meaning that the CRT defendants had much less exposure than the *LCD* defendants who paid fines.  The lack of action by the DOJ against most Defendants, and the narrow plea by Samsung SDI, made the settlement negotiations with Defendants much more difficult.

100.     The DPPs recovered $137.2 million[35] on behalf of their class of direct purchasers of CRTs.  The IPP settlements are over four times the total direct purchaser settlements.  It is very rare for an indirect class to recover more than a direct purchaser class because indirect purchaser cases are so much more difficult to prove.[36]  Indeed, the DPP settlements in this case were an obstacle to settlement for IPPs because Defendants consistently refused to pay more to

---

[35] Chunghwa paid the DPPs $10 million; Philips paid $15 million; Panasonic paid $17.5 million; LG paid $25 million; Toshiba paid $13.5 million; Hitachi paid $13.45 million; Samsung SDI paid $31 million; and Thomson/TDA paid $9.75 million.  *See* Dkt. No. 4055.

[36] In an antitrust case, indirect purchasers have an extra layer of proof that direct purchasers do not have: They must prove pass-through of the overcharge – often through several levels of the distribution chain – to end consumers.  *See, e.g.*, IIA Areeda et al., Antitrust Law ¶ 396 (3d ed. 2006) (illustrating the "complexity" and "practical problems of proof" in indirect-purchaser suits); Ronald W. Davis, Amchem *and Antitrust: Have the Ground Rules for Antitrust Class Actions Changed?*, 12 Antitrust 39, 44 (Fall 1997) ("[T]he cold fact remains that, in order to recover, the indirect purchasers must prove something about the facts and/or the law which . . . direct purchasing . . . class members do not need to prove.  That means the indirect purchaser has a harder row to hoe than the direct purchaser.").

37

1   IPPs than what they had paid to DPPs.  *LCD* is the only other known example of a case in which

2   indirect purchaser settlements surpassed those of the related direct purchaser action.  And in

3   *LCD,* the total indirect purchaser settlements were only twice the amount of the total direct

4   purchaser settlements.[37]

5   **Chunghwa Settlement**

6        101.    In July 2008, the IPP Counsel began settlement negotiations with counsel for

7   defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa").  During numerous in-person and

8   telephonic meetings, IPP Counsel vigorously negotiated the terms of a proposed settlement with

9   Chunghwa's counsel, who are experienced in antitrust law and class actions.  On February 5,

10   2009, the IPPs and Chunghwa reached agreement on the principal terms of a settlement, which

11   were memorialized in a memorandum of understanding.  Pursuant to that memorandum of

12   understanding, Chunghwa's counsel provided IPP Counsel with information regarding the

13   conspiracy during a series of in-person meetings in February 2009.  The information provided by

14   Chunghwa assisted IPP Counsel in the preparation of their CAC.  IPPs and Chunghwa signed a

15   formal Settlement Agreement on April 18, 2009.  Lead Counsel led these settlement negotiations

16   with Chunghwa, attended all of the meetings with Chunghwa's counsel, drafted the settlement

17   agreement, briefed and argued the motions for preliminary and final approval of the settlement,

18   and worked with the Settlement Administrator to provide notice of the settlement to class

19   members.

20        102.    While the information Chunghwa provided regarding the CRT conspiracy was

21   helpful, especially at the pleadings and motion to dismiss stage, it became apparent as the case

22   progressed that Chunghwa's evidence of the conspiracy was limited.  For example, Chunghwa

23   only manufactured small and medium-sized CRTs, and it manufactured primarily Color Display

24   Tubes ("CDTs") for computer monitors.  Further, and relatedly, Chunghwa did not have a

25   _____

26   [37] In fairness to the DPPs, who also obtained an excellent result for their class, they faced some
     legal obstacles in this case that were not present in *LCD.*

27

28   DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
     FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
     Master File No. CV-07-5944-SC

1   manufacturing plant or subsidiary in North America, where most of the large Color Picture Tubes

2   ("CPTs") for televisions sold in the United States were manufactured.  As a result, Chunghwa

3   was unable to provide IPP Counsel with very little information regarding Defendants'

4   conspiratorial activities relating to large CPTs sold in or into the United States market, or the

5   United States CRT market in general.

6          103.    Indeed, the lack of evidence from Chunghwa on these important issues allowed

7   the other Defendants to argue, strenuously and repeatedly, that: (1) the United States was a

8   separate market and was not part of the CRT conspiracy; (2) large CPTs (which were used to

9   make many of the TVs sold in the United States) were not part of the conspiracy; and (3) the

10  FTAIA barred any recovery, because any anti-competitive behavior by Defendants in Asia was

11  remote and had no impact on the United States since the CRTs had to travel through a complex

12  distribution chain before reaching U.S. consumers.  This lack of evidence also meant that

13  manufacturers of large CPTs, like Thomson and Videocon, were initially not named as

14  defendants in the CAC since IPP Counsel had no information regarding their involvement in the

15  conspiracy.

16         104.    Accordingly, despite the helpful information obtained from Chunghwa, IPP

17  Counsel still had much to discover and prove regarding the CRT conspiracy and its scope, its

18  participants and, most importantly, its impact on prices of finished CRT televisions and computer

19  monitors sold to U.S. consumers.

20  **LG Settlement**

21         105.    On May 18, 2013, prior to the ruling on IPPs' motion for class certification, Lead

22  Counsel negotiated and entered into a settlement with Defendants LG Electronics, Inc. and LG

23  Electronics USA, Inc. ("LG"), for $25,000,000 cash plus specified cooperation.  The settlement

24  negotiations continued over several months and involved the review and analysis of LG's sales

25  data by Lead Counsel and consultation with the expert economists.  Pursuant to the settlement

26  agreement, LG's counsel provided IPP Counsel with an oral proffer of evidence.  In addition, IPP

27

28

39

DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
Master File No. CV-07-5944-SC

1    Counsel interviewed two cooperating LG witnesses.  The Court granted Preliminary Approval of

2    this settlement on December 9, 2013 (Dkt. No. 2248), and Final Approval on April 18, 2014

3    (Dkt. No. 2542).  Like the prior Chunghwa settlement, the IPPs received the benefits of this

4    settlement and also retained their full damage claims against the remaining Defendants.

5         106.    Lead Counsel negotiated the settlement with LG's counsel, drafted and negotiated

6    the settlement agreement, attended the oral proffer of evidence and the interviews of the LG

7    witnesses, briefed the motions for preliminary and final approval of the settlements, and designed

8    the notice program with the Settlement Administrator.

9    **Philips Settlement**

10        107.    Lead Counsel's settlement discussions with the Philips Defendants[38] (collectively

11   "Philips") began many months before the parties reached an agreement in principle.  Lead

12   Counsel participated in many in-person and telephonic meetings with counsel for Philips, who

13   are very experienced in antitrust law and class actions.  Judge Walker assisted the parties in

14   reaching a final settlement, and the agreement was executed on January 26, 2015.  Lead Counsel

15   drafted the settlement agreement and negotiated its terms with Philips' counsel.  Philips has paid

16   $175,000,000 in cash into an escrow account.

17   **Panasonic Settlement**

18        108.    Lead Counsel and the Panasonic Defendants[39] (collectively "Panasonic") began

19   negotiations in 2014, more than six months prior to reaching a settlement.  In fact, Lead Counsel

20   had discussed settlement with Panasonic's counsel on several occasions throughout the litigation.

21   Lead Counsel participated in many telephonic meetings with Panasonic's counsel, who is widely-

22   recognized as one of the leading antitrust lawyers in the country.  Judge Walker assisted the

23   _____

24   [38] Koninklijke Philips N.V. (f/n/a Koninklijke Philips Electronics N.V.), Philips Electronics
     North America Corporation, Philips Taiwan Limited (f/n/a Philips Electronics Industries
25   (Taiwan), Ltd.), and Philips do Brasil, Ltda. (f/n/a Philips da Amazonia Industria Electronica
     Ltda.)

26   [39] Panasonic Corporation (f/k/a Matsushita Electric Industrial Co., Ltd.), Panasonic Corporation
27   of North America, MT Picture Display Co., Ltd.

40

28   DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
     FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
     Master File No. CV-07-5944-SC

1  parties in reaching a settlement during the latter part of 2014.  Lead Counsel drafted the

2  settlement agreement and negotiated its terms with Panasonic's counsel.  The final agreement

3  was executed on January 28, 2015.  Panasonic has paid $70,000,000 in cash into an escrow

4  account.

5  **Hitachi Settlement**

6        109.    Lead Counsel and the Hitachi Defendants[40] (collectively "Hitachi") engaged in

7  mediation before Judge Walker on March 5, 2014.  Lead Counsel drafted the mediation brief

8  with assistance from other IPP Counsel, and attended the mediation on behalf of IPPs.  The

9  parties continued to discuss settlement with Judge Walker's assistance for the remainder of 2014

10 and executed the settlement on February 19, 2015.  Lead Counsel drafted the settlement

11 agreement and negotiated its terms with Hitachi's highly experienced counsel.  Hitachi has paid

12 $28,000,000 in cash into an escrow account.

13 **Toshiba Settlement**

14        110.    Lead Counsel and the Toshiba Defendants[41]  (collectively "Toshiba") engaged in

15 initial settlement efforts for several months in 2014 but these efforts were unsuccessful.  With the

16 assistance of Judge Fern Smith (Ret.), the parties entered into mediation and ultimately reached a

17 settlement.  Lead Counsel drafted the mediation brief with assistance from other IPP Counsel,

18 and attended the mediation on behalf of IPPs.  Lead Counsel also drafted the settlement

19 agreement and negotiated its terms with Toshiba's highly experienced counsel.  The final

20 settlement was executed on March 6, 2015.  Toshiba has paid $30,000,000 in cash into an escrow

21 account.

22 **Samsung SDI Settlement**

23

24

─────────────────

25 [40] Hitachi, Ltd., Hitachi Asia, Ltd., Hitachi America, Ltd., Hitachi Electronic Devices (USA), Inc. and Hitachi Displays, Ltd. (n/k/a Japan Display Inc.).

26 [41] Toshiba Corporation, Toshiba America, Inc., Toshiba America Information Systems, Inc.,

27 Toshiba America Consumer Products, L.L.C., and Toshiba America Electronic Components, Inc.

41

28

1    111.    IPPs and the Samsung SDI Defendants[42] (collectively "Samsung SDI") reached an

2    agreement in principle on January 23, 2015 after two full days of mediation with Judge Walker.

3    Lead Counsel drafted the mediation brief with assistance from other IPP Counsel, and attended

4    the two-day mediation on behalf of IPPs.  Lead Counsel also drafted the settlement agreement

5    and continued to negotiate its terms with Samsung SDI's highly experienced counsel for two

6    months thereafter.  The final settlement was executed on April 1, 2015.  Samsung SDI has paid

7    $225,000,000 in cash into an escrow account.

8    **Thomson and TDA Settlement**

9    112.    Lead Counsel entered into settlement negotiations with the Thomson and TDA

10   Defendants[43] following IPPs' settlements with the other five Defendant groups.  The settlement

11   was reached after the parties engaged in numerous settlement discussions.  These negotiations

12   continued over several weeks and involved the exchange of information concerning Thomson's

13   financial condition and the collectability of a judgment against Technicolor SA.  IPPs entered

14   into settlement agreements with Thomson and TDA on June 10, 2015.  Thomson and TDA have

15   paid $13,750,000 in cash into an escrow account.

16                      **SETTLEMENT APPROVAL AND NOTICE TO THE CLASS**

17   113.    Most recently, IPPs moved for preliminary approval of the seven new settlements

18   with the Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, Thomson and TDA Defendants.

19   (Dkt. No. 3861.)  As part of the motion, IPPs also requested that the Court approve the proposed

20   notice program and plan of distribution.  Lead Counsel briefed the motion for preliminary

21   approval and designed the notice program and plan of distribution in consultation with the claims

22

23   [42] Samsung SDI Co. Ltd; Samsung SDI America, Inc.; Samsung SDI Brasil, Ltda.; Tianjin
24   Samsung SDI Co. Ltd; Shenzhen Samsung SDI Co., Ltd; SDI Malaysia Sdn. Bhd; and SDI
     Mexico S.A. de C.V.

25   [43] The Thomson and TDA entities include the following two sets of defendants: (a) Technicolor
26   SA (f/k/a Thomson SA) and Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.)
     (collectively "Thomson"); and (b) Technologies Displays Americas LLC (f/k/a Thomson
     Displays Americas LLC) ("TDA").

27

28   DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
     FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
     Master File No. CV-07-5944-SC

1    administrator.

2          114.    After this Court preliminarily approved the settlements (Dkt. No. 3906), the

3    claims administrator published the Notices online and in various publications throughout the

4    United States, in accordance with the Court's Order.  The claims administrator also directly

5    mailed and emailed notice to **10,082,690** unique addressees.

6          115.    The Notices advised Class Members of the material terms of the proposed

7    settlements, including the intent of IPP Counsel to apply to the Court for an award of attorneys'

8    fees and expenses.  The Notices further stated that IPP Counsel would seek up to one-third of the

9    Settlement Fund, plus reimbursement of expenses and incentive awards for the class

10   representatives.

11         116.    IPP Counsel will be filing IPPs' motion for final approval of the seven new

12   settlements on October 23, 2015.

13                          **IPP COUNSEL'S FEE DECLARATIONS**

14         117.    Lead Counsel is filing along with this Motion a Compendium of IPP Firm

15   Declarations regarding their work in this case, their lodestar, and the expenses for which they are

16   seeking reimbursement.

17         118.    Lead Counsel has employed many measures to ensure that the lodestar figure is

18   not improperly inflated.  For example, Lead Counsel (a) capped the hourly rate for document

19   review to $350 per hour and $400 per hour for foreign language document review; (b) provided

20   strict guidelines to IPP Counsel that they were only to work on the case at the direction of Lead

21   Counsel and that only time authorized or approved by Lead Counsel would be included in an

22   application to the Court; (c) instructed all firms to exclude time spent on the lead counsel motions

23   and internal case management; (d) required IPP Counsel to periodically submit contemporaneous

24   time records to ensure compliance with Lead Counsel's guidelines; and (e) included hours only

25   through May 31, 2015 for IPP Counsel.

26

27

28

DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
Master File No. CV-07-5944-SC

119.    Lead Counsel, with assistance from an audit committee comprised of several firms who did a great deal of work in this case, has reviewed and audited the daily time entries of all firms that are included in this Motion.  The audit committee ensured that the time included in each firm's lodestar complies with the instructions above, and is otherwise reasonable and properly calculated.  The audit committee made substantial cuts to certain firms' lodestars.

120.     Four firms did not agree with the cuts to their lodestars imposed by the audit committee, and/or did not submit a timely declaration.  Based on the audit committee's review of these firms' daily time records, Lead Counsel has included a reasonable lodestar of $348,096.25 for these firms in the total historical lodestar, and $420,662.50 in the total current lodestar.

121.    The total lodestar at historical rates for all firms is $83,753,999.05.  This amount equates to a multiplier of 2.3.

122.    IPP Counsel were also asked to provide their total lodestar at current rates.  The total lodestar at current rates is $90,075,076.90, which equates to a multiplier of 2.13.

**FUTURE WORK**

123.    Lead Counsel and a few other IPP firms still have much to do to complete this litigation.  This future work includes drafting and filing the motion for final approval of the settlements; responding to any objections to the settlements and the motion for attorneys' fees; propounding discovery on objectors and possibly deposing them; and managing the claims distribution process.  Moreover, if past is prologue, at least some objectors will appeal the orders on final settlement approval and attorneys' fees, which will require additional, substantial work and will further delay payment to IPP Counsel.  None of this future work is accounted for in the total lodestar submitted to the Court.

**CASE ORGANIZATION**

124.    Lead Counsel efficiently organized this complex case involving claims under the laws of 22 states, brought by 40 class representatives and 50 law firms located throughout the United States.  The IPPs litigated against nine Defendant groups consisting of multiple entities

44

DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

1  across the globe.  These Defendants were represented by a coterie of preeminent defense counsel

2  from large, international law firms with decades of experience litigating antitrust actions and able

3  to draw on virtually limitless resources.

4       125.    There were significant organizational and logistical problems associated with a

5  22-state class with 40 class representatives represented by 50 law firms located all over the

6  country, including gathering documents from the class representatives; obtaining responses

7  written discovery and collecting verifications of those responses; preparing for and defending

8  depositions at locations all over the United States; and preparing class representatives to testify at

9  trial.  Simply communicating with class representatives and local counsel was logistically

10  difficult, and there was constant need for communication over the entire pendency of this case.

11       126.    In addition, IPP Counsel were required to coordinate the prosecution of the case

12  with counsel for the DPPs, the DAPs and several State Attorneys General.  This effort was often

13  problematic due to conflicting interests, approaches and strategies.  Indeed, on some occasions,

14  IPPs found themselves in positions adverse to their co-plaintiffs.[44]  This situation also gave

15  Defendants a strategic advantage, as it allowed them to re-litigate issues against these other

16  plaintiffs that had already been decided in the IPP case, potentially to the detriment of IPPs.[45]

17       127.    As demonstrated herein, Lead Counsel organized IPP Counsel at each stage of the

18  case, and ensured the efficient and successful prosecution of this litigation.

19  _____

20  [44] For example, IPPs had to intervene in the California Attorney General's state court action and
21  object to their settlement with defendant Philips because Philips contended that the settlement
   released IPPs' class claims on behalf of California natural persons.  IPPs also found themselves
22  in a potentially adverse position with the DAPs in the event of a joint trial, as further described
   below.  IPP Counsel successfully negotiated these issues with their co-counsel.

23  [45] For example, IPPs successfully opposed the Defendants' motion to dismiss on antitrust
   standing grounds under *AGC*.  (Dkt. No. 665.)  But when the DAPs joined the litigation in 2011
24  and 2012, the Defendants filed the same motion against them.  Special Master Legge
   recommended that the Court grant the motion to dismiss the DAPs' claims for lack of antitrust
25  standing.  (Dkt. No. 1664.)  The IPPs joined in the objection to this ruling by Special Master
   Legge and assisted on the briefing of the matter.  The Court declined to adopt the
26  recommendation and denied the motion to dismiss.  Had the Court adopted the motion, IPPs
   would almost certainly have faced an immediate motion for summary judgment for lack of
27  antitrust standing, and the dismissal of 12 of the 22 state law claims.

45

28  DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
   FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS –
   Master File No. CV-07-5944-SC

**EXPENSES**

**Common Expenses**

128.     In order to finance the joint prosecution of this litigation, Lead Counsel established and maintained a litigation expense fund (the "Litigation Expense Fund").  Lead Counsel collected monetary contributions from certain IPP firms totaling $2,405,000.

129.     Lead Counsel also obtained Court Orders authorizing the withdrawal of $2,500,000 from the Chunghwa escrow (Dkt. No. 1334) and $3,750,000 from the LG escrow (Dkt. Nos. 2618, 2944, 3524) to be used to pay common litigation expenses ("Future Expense Fund").

130.     Through September 15, 2015, IPP Counsel have incurred a total of $6,900,878.02 in reasonable and necessary common expenses in prosecuting this case.  Of this total, $2,405,000 was paid from the Litigation Expense Fund and $4,495,878.02 was paid from the Future Expense Fund.  A detailed list of these expenses is attached hereto as Exhibit 13.  The separate categories and totals are as follows:

| CATEGORY | AMOUNT |
|---|---|
| Experts/Consultants/Investigators | $5,767,600.46 |
| Special Masters | $   171,481.80 |
| Mediators | $     25,555.00 |
| Document Depository/Management | $   636,931.13 |
| Translations | $   142,500.08 |
| Court Reporters/Deposition Transcripts | $   125,874.69 |
| Deposition Facilities Rental/Travel | $     18,865.78 |
| Filing/Witness Fees/Service of Process | $       5,097.30 |
| Conference Calls | $       1,487.40 |
| Miscellaneous | $       5,484.38 |
| **TOTAL** | $6,900,878.02 |

131.     These expenditures are reflected in the books and records maintained by Lead Counsel and are supported by invoices, which are available to the Court upon request.

132.     These expenses were reasonable and necessary for the prosecution of this action and are customarily approved by courts as proper litigation expenses.  None of these expenditures has been included for reimbursement in any of the individual fee and expense declarations of any IPP Counsel.  IPP Counsel seek reimbursement of the $2,405,000 they contributed to the Litigation Expense Fund and the Court's approval of the $4,495,878.02 expenditure from the Future Expense Fund.

133.     The $1,754,121.98 remaining in the Future Expense Fund, as well as monies received from the Direct Action Plaintiffs, will be retained in the Future Expense Fund to fund the ongoing litigation.  Lead Counsel will file an additional report with the Court at the conclusion of the litigation to account for the monies retained in the Future Expense Fund.

**Expenses Incurred by the Individual IPP Firms**

134.     In addition to the expenditures detailed above, individual IPP firms have separately incurred $769,647.55 in reasonable and necessary expenses for which they seek reimbursement.  These individual expenses include travel, photocopying, overnight mail, computer research, and filing fees.  These expenses are supported by each firm's separate declaration in support of fees and expenses.  None of these expenditures has been included in IPP Counsels' request for reimbursement of amounts contributed to the Litigation Expense Fund. The separate categories and totals for the individual firm expenses are as follows:

| CATEGORY | AMOUNT |
| --- | --- |
| Outside Copies | $  22,077.81 |
| In-house Reproduction/ Copies | $146,748.01 |
| Court  Costs & Filing Fees | $   8,933.28 |
| Court Reporters/ Transcripts | $ 15,768.88 |
| Computer Research | $110,649.06 |
| Telephone & Facsimile | $ 18,112.80 |
| Postage/Express Delivery/ Courier | $ 14,045.69 |
| Witness/Service Fees | $ 12,122.30 |
| Travel: Airfare | $166,312.47 |
| Travel: Lodging/Meals | $202,935.77 |
| Travel: Other | $ 10,909.63 |

DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

| | |
|---|---|
| Car Rental/Cabfare/ Parking | $ 28,898.64 |
| Other Expenses | $ 12,133,21 |
| **TOTAL** | $769,647.55 |

**Expense Reimbursement Summary**

135.    Through September 15, 2015, IPP Counsel have incurred expenses totaling $7,670,525.57 ($2,405,000 from the Litigation Expense Fund + $4,495,878.02 from the Future Expense Fund + $769,647.55 individual unreimbursed expenses).  All of these expenses were reasonable and necessary for the prosecution of this case.

136.    IPP Counsel seek reimbursement of $3,174,647.55 ($2,405,000 contributed to the Litigation Expense Fund + $769,647.55 individual firm unreimbursed expenses) and seek the Court's approval of the $4,495,878.02 expenditure from the Future Expense Fund.

### CLASS REPRESENTATIVE INCENTIVE AWARDS

137.    IPP Counsel seek $15,000 awards for each of the 25 court-appointed class representatives.[46]  Each of these class representatives devoted significant time and effort towards the prosecution of this action.  Among other tasks, they:

- Produced relevant documents and helped to respond to several sets of interrogatories, including many supplemental responses;

- Contacted banks, credit card companies, and retail stores for receipts, cancelled checks and other proof of purchase;

- Had their CRT monitors or televisions taken apart to inspect the CRT inside and then submitted declarations in support of IPPs' motion for class certification regarding the manufacturer of the CRT;

---

[46] The 25 Court-appointed class representatives who should receive $15,000 incentive award payments are: Brian Luscher, Jeffrey Figone, Steven Ganz, Lawyer's Choice Suites, Inc., David Rooks, Daniel Riebow, Travis Burau, Southern Office Supply, Inc., Kerry Lee Hall, Lisa Reynolds, David Norby, Barry Kushner, Charles Jenkins, Steven Fink, Gloria Comeaux, Craig Stephenson, Janet Ackerman, Louise Wood, Patricia Andrews, Gary Hanson, Jeff Speaect, Albert Sidney Crigler, Margaret Slagle, John Larch, and Brigid Terry.

48

- Reviewed highly confidential contention interrogatory responses (requiring extra care to maintain confidentiality) and signed verifications;

- Reviewed amended complaints and additional allegations against new defendants;

- Stayed in regular contact with their lawyers and stayed apprised of the material developments in the litigation;

- Met with counsel to prepare for their deposition;

- Submitted to depositions; and

- Prepared to testify at trial.

138.    IPP Counsel also seek $5,000 awards for 15 named plaintiffs.[47]  While these named plaintiffs were not appointed as class representatives, they still made important contributions to the case.  Many of these named plaintiffs maintained viable claims on behalf of their states for several years and were only replaced due to a strategic decision by counsel or some other factor outside of their control.  Some of them were deposed (e.g., Frank Warner and Samuel Nasto) and all of them searched for and produced documents, and worked with their counsel to prepare responses to several sets of interrogatories.  Finally, this group of named plaintiffs reviewed the Complaints filed on their behalf and stayed in contact with their lawyers throughout the litigation.

139.    By shouldering the burdens associated with this litigation, each Class Representative and named plaintiff listed herein has made a significant contribution to the recovery obtained for the Class.  In light of the benefits conferred by the settlements reached in this case, the important role of the Class Representatives and named plaintiffs should be

---

[47] The 15 named plaintiffs who should receive $5,000 incentive award payments are: Frank Warner, Samuel Nasto, Carman Gonzales, Dana Ross, Ryan Rizzo, Misti Walker, Conrad Carty, Bedrock Management Company, Inc., Brady Lane Cotton, Colleen Sobotka, Steven Hawley, Daniel Hergert, Chad Klebs, Donna Marie Ellingson, and Jerry Cook.

DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC

acknowledged with a reasonable payment to compensate them for their time and expenses associated with actively participating in this litigation.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of September, 2015, at San Francisco, California.

/s/      *Mario N. Alioto*
Mario N. Alioto

**Lead Counsel for the Indirect Purchaser Plaintiffs**

DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-SC