Jan L. Westfall
29896 Blue Water Way
Menifee, CA 92584
Tel: 619-940-2880
Email: jlwestfall.esq@gmail.com

*Attorney for Objector Donnie G. Clifton*

**FILED**

OCT -6 2015

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. CV-07-5944-SC<br><br>MDL No. 1917 |
| This Document Relates to:<br><br>ALL INDIRECT PURCHASER ACTIONS | **OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT AND AWARD OF ATTORNEYS' FEES**<br><br>Hearing Date:  November 13, 2015<br>Time:  10:00 a.m.<br>Courtroom: One, 17th Floor<br>Judge: Hon. Samuel Conti |

Donnie G. Clifton hereby objects to the settlement in the above-captioned matter.  He has filed a claim form proving his class membership, which is his proof of membership in the class and his signature below attests to his membership in the class and support of these objections. His address is P.O. Box 120285, San Diego, CA, 92112.  His telephone number is (619) 264-1475.

Mr. Clifton objects that this settlement is unfair to class members residing in states with stronger consumer protection laws, like California, in that it treats all members of the damages class equally, although their legal claims are not equal.  In addition, the attorneys' fees of

1

$192,250,000.00 are excessive in a case of this size, and represent an unfair allocation of the settlement proceeds to class counsel rather than class members.  His objections are further detailed below.

## Summary of Proposed Settlement

This settlement resolves claims against Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, Thomson and TDA.  The underlying lawsuit claimed these defendants, as well as Chunghwa and LG (who settled previously) fixed prices for CRT products for nearly a 25 year period.  Chunghwa and LG previously settled for $10 million and $25 million respectively.  The new settlements add $541,750,000, creating a total settlement fund of $576,750,000.

The settlement provides for two distinct types of recovery:  residents of certain states will receive monetary recovery (the damages class), while residents of other states will receive no monetary recovery at all (called the nationwide class), but will instead receive injunctive relief. Monetary compensation will be available to individual indirect purchasers in any of 21 states (Arizona, California, the District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia or Wisconsin) and the District of Columbia.  The settlement covers purchases from March 1, 1995 to November 25, 2007 (with slightly different dates for certain states).  With the exception of residents of Illinois, Oregon and Washington (because Attorney Generals in those states are suing the Defendants on behalf of their states' residents), residents of all other states are included in this settlement as their "claims" are being released in exchange for injunctive relief.  Individuals or businesses that submit valid claims are assured they will receive a minimum payment of $25.  Compensation will also depend on the product purchased, as purchases of large CRT TVs and CRT Computer Monitors will be weighted at 4.3 and 3, as compared to purchases of standard TVs which will be unweighted (i.e., weighted as 1).  Class counsel's request for an award of attorneys' fees  of $192,250,000.00 plus multiple expense items is also before the court.

## OBJECTIONS TO THE PROPOSED SETTLEMENT AND AWARD OF ATTORNEYS FEES

**A. The settlement does not adequately account for the material differences between class members from different states.**

Although this settlement differentiates between the claims of class members who live in states that allow indirect purchaser antitrust claims (so-called repealer states, for states that have specifically repealed the Supreme Court's holding in *Illinois Brick Co. v Illinois*, 431 U.S. 720 (1977)) and those who do not, it does not adequately account for the material differences among and between states.

**1.   *The damages class improperly treats the claims of residents of all states as equivalent.***

The complex differences between the rights and legal protections available in those states that do allow for individual indirect purchaser claims renders the certification of a single damages class, comprised of claimants from 21 states, problematic.  Even among the so-called "repealer states," the strength of individual claims varies.  Some repealer states only allow the state's attorney general to pursue indirect purchaser claims, while individual consumers do not appear to have compensable claims.  Other states have not explicitly repealed *Illinois-Brick*, but by judicial decision have created private rights of action for indirect purchasers.  The single damages class approved for settlement purposes does not take account of the significant differences that exist in various state laws.

In *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 65 (D. Mass. 2005) the District Court of Massachusetts confronted exactly this issue.  The court required the settling parties go through multiple levels of analysis to ensure that the differences in the strengths of legal claims of residents of different states were reflected in the settlement.  In that case an allocation committee was established so that the parties could engage in negotiations to determine the role that differences in state law should play in the settlement.  Negotiation over this issue was protracted, but resulted in a settlement that provided *quantitavely* different settlement consideration to reflect *qualitatively* different legal claims.  In *Relafen*, the parties determined that the differences

3

between the relative strengths of legal claims from residents of different state should be

accounted for according to the following formula:

- Residents of Hawaii would receive 90% of all net Relafen and nabumetone purchases.

- Residents of New Mexico would receive 85% of all net Relafen and nabumetone purchases.

- Group I States (including District of Columbia, Arizona, California, Illinois, Iowa, Massachusetts, Nebraska, Nevada, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin) would receive 82.5% of all net Relafen and Nabumetone purchases.

- Residents of Florida, Maine, Michigan, Minnesota, North Carolina, North Dakota would receive 60% of all net Relafen and nabumetone purchases.

- Residents of New York would receive 52.5% of all net Relafen and nabumetone purchases

- Residents of Group II States (consisting of Alabama, Alaska, Arkansas, Colorado, Connecticut, Delaware, Georgia, Idaho, Indiana, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Montana, Missouri, New Hampshire, New Jersey, Ohio, Oregon, Oklahoma, Pennsylvania, Rhode Island, South Carolina, Texas, Utah, Virginia, Washington, Wyoming, and Territories of the United States) would receive 9.2% of net Relafen purchases only.

*Id.* In keeping with *In re Relafen*, the settlement fund here should be allocated in a way that

tracks the differences in various states' consumer protection and antitrust laws.

### 2. *The Nationwide Class is also problematic.*

Under *Illinois Brick*, consumers residing in states that have not expressly authorized

indirect purchasers to sue for damages in that state's courts have no damages claims, and

therefore no standing to bring claims for damages against defendants in federal court. The

settlement recognizes these limitations – and yet purports to release the claims of individuals

residing in those states through a nationwide class receiving only injunctive relief.

Unfortunately, injunctive relief has little value to current class members, as injunctive relief will

only benefit *future* purchasers, not *past* purchasers. In addition, the court may not even have

jurisdiction over those individuals who have no real claims since a district court's jurisdiction is

limited to actual controversies. The re-characterization of those claims as injunctive *only*

essentially contradicted the court's class certification order, which allowed the case to go

forward based on a single theory of damages.

4

### 3. *The settlement improperly treats dissimilar claims as equivalent based in part on a lack of adequate representation.*

The settlement is thus substantively unfair because it treats dissimilar claimants and claims as equivalent. Of particular relevance to this objector (a California purchaser) is the fact that California is generally recognized as having one of the strongest consumer protection regimes among the 50 states. As a result, California consumers have stronger damages claims than residents of states with weaker consumer protection statutes. If a class representative *had* adequately represented the interests of California residents, that difference would be reflected in the settlement.

This substantive unfairness points to the underlying procedural unfairness. Review of the claims made in the Fourth Amended Complaint indicates class counsel selected individual representative plaintiffs to represent different states' interests. See Dkt. 1526, pages 64-84. Class counsel also requested service awards for 25 different representative plaintiffs. These class representatives also apparently had separate legal representation at certain stages of the litigation. Despite this, the settlement does not reflect any of the differences in individual state law. Although the plaintiffs had obtained class certification of 22 statewide classes, these subclasses are not reflected in the settlement proposed here. Based on the settlement agreed to, it is not clear that these individual plaintiffs in any way advocated specifically based on the relative strengths of their states' consumer protection laws. Moreover, the class representatives – even if geographically widespread --could not adequately represent the interests of claimants from different states while at the same time purporting to represent the interests of a single unitary class.

The single unitary damages class – even if only composed of purchasers in states having repealed *Illinois Brick* – lacks the commonality and typicality required by Rule 23(a), subsections (2) and (3). Where the legal claims and remedies of individuals residing in different states are so distinct, it is impossible to conclude that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and

that a class action is superior to other available methods for the fair and efficient adjudication of the controversy, as required by Rule 23(b)(3).

The Supreme Court's analysis of commonality in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011) confirms that common questions must be rooted in legal claims that can appropriately be *resolved* on a class-wide basis. "'What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. *Id.* at 2551. See also *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998) ("An absence of material conflicts of interest between the named plaintiffs and their counsel with other class members is central to adequacy and, in turn, to due process for absent members of the class."). Here the differences in the strengths of legal claims of certain class members created conflicts of interests that were not addressed by the settlement structure. The class definitions thus guarantee that predominance is lacking, and that the class is not sufficiently cohesive to warrant adjudication by representation.

In addition, the claims of the nationwide class – *even if not compensable* – must be adequately represented for them to be released. As noted by the Second Circuit in *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2005), "due process requires that released claims be adequately represented" ("Due process requires adequate representation at all times throughout the litigation ...." (citation omitted). "Before the bar of claim preclusion may be applied to the claim of an absent class member, it must be demonstrated that invocation of the bar is consistent with due process ...." *citing Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222, 1226 (11th Cir.1998).).

The problems with this settlement could have been avoided through the prudent use of subclasses. The court could require the creation of settlement only sub-classes that reflect the differences in various state laws. Class consideration could be allocated according to a grid system similar to that used in *In re Relafen Antitrust Litig., supra*. The settlement should account for the greater rights afforded by California law. If a grid system is established, the

claims of California residents will surely prove to be far stronger than the claims of many states

lacking the strong *Illinois Brick* repealer statute and strong consumer protection claims available

under California law.  California precedent, and even courts in other jurisdictions construing

California law, strongly support such an approach.  *See e.g., In re Heritage Bond Litig.*, 2005

U.S. Dist. LEXIS 13555, *37-38 (C.D. Cal. 2005)(reasonableness of settlement depends on

whether it allocates "more of the settlement to class members with stronger claims on the

merits"); *In re Bankamerica Corp. Sec. Litig.*, 210 F.R.D. 694, 712 (E.D. Mo. 2002)(denying

settlement approval because plan of allocation failed to account for "strength of [class members']

claims under California law"); *and In re Oracle Sec. Li*tig., 1994 U.S. Dist. LEXIS 21593, *3-4

(N.D. Cal. 1994)(reasonable to allocate more to class members with stronger claims).

### B. The attorneys' fees requested are excessive out of line with Ninth Circuit precedent.

The attorneys are requesting fees of one third of the settlement amount, or

$192,250,000.00.  This fee represents a 2.3 multiplier of their lodestar of $83,753,999.05.  That

lodestar is in turn based on 95,229.33 hours, at an average hourly rate of $879.50.[1]  Combined

with the request for expenses (both already incurred and future expenses), the request amounts to

over $200 million, or 35% of the settlement fund.[2]

One of the advantages of class action treatment should be economy of scale.  Courts

approve settlements grouping together large groups of litigants because of the efficiency of doing

so.  The economies of scale and efficiencies achieved should result in savings on fees for class

members.  Hence for settlements over $100 million, fees well *below* the Ninth Circuit's

---

[1] The court should pay particular attention to the hourly rate behind the lodestar; that rate includes the work of paralegals and contract attorneys doing document review at low hourly rates, before adjustment by the 2.3 multiplier.  Recognizing this, an *average* hourly rate of $879.50 is particularly high.

[2] Plaintiffs are requesting $3,174,674.55 for past litigation expenses, $4,495,878.02 for "additional" expenses, $337,500.00 for incentive awards for court appointed class representatives (25 representatives at $15,000 each), $75,000.00 for additional named plaintiffs who were not appointed by the court ($5,000 for each of 15), yielding total additional expense items of $8,083,052.57.  Combined with the fee award, the total request is for $200,333,053.00.

benchmark of 25% are typically considered appropriate. Here, rather than reducing their percentage fee request because of the large size of the settlement, class counsel are instead asking for 8 1/3 % *more* than the Ninth Circuit's benchmark.

Courts around the country routinely endorse a reduction in overall percentage fees for larger settlement funds. In *In re Domestic Air Transp. Antitrust Litig* ., 148 F.R.D. 297 (N.D.Ga.1993), for example, the court found that for megafund cases, fees in the range of 6-10% are common:

> While the benchmark for a percentage award in a normal common fund case falls between 20–30%, the present action is an exception to the typical common fund case because of the size of the recovery. . . . based on empirical research covering settlements as late as 1991, Newberg notes that percentage awards tend to decline as the size of the recovery increases. (*citing* HERBERT P. NEWBERG, ATTORNEY FEE AWARDS § 2.09 (1986)). . . In megafund cases where extraordinarily large class recoveries of $75–$200 million and more are recovered, courts most stringently weigh the economics of scale inherent in class actions in fixing an appropriate per cent recovery for reasonable fees. *Id.* Accordingly, fees in the range of 6–10% and even lower are common in this large scale context.

*Id.* at 350-351.[3]   *Accord. Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 52 (2nd

---

[3] Footnote 76 in *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 351 (N.D.Ga.1993) cites additional examples of cases in which courts awarded substantially lower fees in megafund cases.

> Footnote 76: *See, e.g., In re Folding Carton Antitrust Litig.*, 84 F.R.D. 245 (N.D.Ill.1979) ($200 million class settlement in antitrust price-fixing suit, 6.6% of fund awarded for fees); *In re Corrugated Container Antitrust Litig.*, 1983–2 Trade Cas (CCH) ¶ 65,628, 1983 WL 1872 (S.D.Tex.1983) ($366 million class recovery, approximately 9% fees and expenses awarded); *Sioux Nation of Indians v. U.S.*, 650 F.2d 244, 227 Ct.Cl. 404 (1981) ($106 million class recovery, fees of 10% awarded); In re MGM Grand Hotel Fire Litigation, 660 F.Supp. 522 (D.Nev.1987) ( $205 million plus interest class recovery, 7% fees awarded). *Cf. In re Plywood Antitrust Litig.*, MDL 159 (E.D.La.1988) ($171 million class recovery, fees awarded of 15% or $25.5 million); *In re Standard Oil Co./ British Petroleum Litig.*, No. 126760 (Ohio 1987) ($618 million take-over enhancement for class, 3.5% fees requested and awarded or $22 million); *In re "Agent Orange" Prod. Liab. Litig.*, 611 F.Supp. 1296 (E.D.N.Y.1985) ($180 million class recovery, 5.5% fees awarded); *In re Baldwin–United Corp. Litig.*, 1986–1987 Fed.Sec.L.Rep. (CCH) 92,918, 986 WL 12195 (S.D.N.Y.1986) ($183.8 million class recovery, 4.1% fees awarded out of 5% requested).

Cir. 2000) ("Obviously, it is not ten times as difficult to prepare, and try or settle a 10 million dollar case as it is to try a 1 million dollar case." (internal quotation omitted)), *and In re Prudential Ins. Co.*, 148 F.3d 283, 339 (3rd Cir. 1998) (reducing percentage fee due to size of fund, explaining "the basis for this inverse relationship is the belief in many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel.").

Contrary to class counsel's assertions, fee awards in similar large antitrust actions do not support their fee request. In the case of *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96 (2005), the Second Circuit affirmed a district court's reduction of the fee award from the 18% requested to 6.5%). The settlement fund created in that case was $3.05 billion, and the attorneys requested fees of $609,012.00. As summarized by the Second Circuit:

> The [district] court found this request "excessive," "fundamentally unreasonable, and wholly out of character for a group of counsel whose commitment to the corner store merchants they represent has, until now, been admirable and unflagging." (citation omitted).

*Wal-mart Stores*, 396 F.3d at 106. Although the district court complimented the work of the attorneys, it nonetheless determined that a reduced fee award was appropriate. The Second Circuit agreed, explaining that "[w]hile courts in megafund cases often award higher percentages of class funds as fees than the district court awarded in this instance [internal citation omitted] the sheer size of the instant fund makes a smaller percentage appropriate." *Id.* at 123. The Second Circuit also agreed with the district court that the reduced fee would not be a disincentive to other attorneys to pursue such claims, and agreed with the district court's observation that "If [this fee award] amounts to punishment, I am confident there will be many attempts to self-inflict similar punishment in future cases." *Id.* Needless to say, the difference between the 6% awarded in the *Walmart* megafund litigation, and the 33% requested here, is huge.

Ninth Circuit case law also recognizes that even the benchmark for fees of 25% might be too great in megafund cases. For example, *In Van Vranken v. Atlantic Richfield Co.*, 901 F.

Supp. 294 (N.D. Cal. 1995), the district court noted that "in megafund cases with class recoveries of $75-200 million, courts are even more stringent, and fees in the 6-10 percent range and lower are common." *Id.* at 298.   In cases where the Ninth Circuit has addressed larger fee awards in class action matters, it has often indicated that even the 25% benchmark may not be appropriate. *See, e.g., In re Bluetooth Headset Product Liability Lit,.* 654 F.3d 935, 942-43 (9th Cir. 2011), where the court observed that when "awarding 25% of a megafund would yield windfall profits for class counsel . . . , courts should adjust the benchmark percentage or employ the lodestar method instead." *Accord. Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (2002) (fund size may make 25% benchmark rate an "inappropriate ... starting point for analysis ... in some cases.").

Empirical studies of fee awards in large class action settlements also indicate that attorney fee percentage awards in large class actions generally show an inverse relationship to the size of the award. *See Brian T. Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards,* 7 J. EMPIRICAL L. STUD. 811 (2010).   Fitzpatrick found that in cases involving common funds ranging from $500 million to $1 billion, the mean and median awards were both 12.9%" of the fund. See Table 10, attached hereto as page 2 of Exhibit A.   The work of Theodore Eisenberg, a professor at Cornell Law School and Geoffrey P. Miller, a professor at both Harvard and New York University Law Schools corroborates Fitzpatrick's findings.   See Eisenberg, Theodore and Miller, Geoffrey P., *"Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008"* (2009). Cornell Law Faculty Working Papers.   Paper 64, *available at* http://scholarship.law.cornell.edu/clsops_papers/64.   See Eisenberg's Table 15, attached hereto as page 3 of Exhibit B.   According to their study, for settlements with class awards greater than $175.5 million, the mean attorney's fee was only 12.0%, and the median was only 10.2%.   In light of these findings, attorney's fees of 33.3% on a settlement with a fund of over $500 million seems particularly inappropriate.

Finally, the court should also separate out litigation expenses, settlement administration expenses and costs incurred in providing notice to the class before calculating the percentage fee

10

awarded. The one-third award class counsel are seeking is based on the entire settlement fund, but notice and settlement administration expenses are more correctly considered a benefit for the defendants, and class counsel's fee should not include a reward for these expenditures. Treating settlement administration and notice expenses as a class benefit perverts incentives, and effectively enables class counsel to receive a commission on monies paid to third parties. If, instead, attorneys' fees are paid only on what the class receives, class counsel will have appropriate incentive to prevent overbilling or wasteful expenditures. The Seventh Circuit's analysis in *Redman v. RadioShack Corp.*, 768 F.3d 622 (2014) supports this approach. As Justice Posner observed, "administrative costs should not have been included in calculating the division of the spoils between class counsel and class members. Those costs are part of the settlement but not part of the value received from the settlement by the members of the class. The costs therefore shed no light on the fairness of the division of the settlement pie between class counsel and class members." *Id.* at 630. *Accord. Pearson v. NBTY, Inc.*, 772 F.3d 778, 781 (7th Cir. 2014)

### Conclusions

For the foregoing reasons, the court should DENY approval of the proposed settlement, settlement class certification and award of attorneys' fees unless the settlement is modified to take account of the relative strengths of various states' consumer protection laws and the attorneys' fees are reduced to a more reasonable amount in keeping with the above arguments.

Dated:   September 27, 2015

Respectfully submitted,

By: Donnie G. Clifton

Donnie G. Clifton
*Class Member and Objector*

And by his attorney

Jan L. Westfall
*Counsel for Objector Donnie G. Clifton*

11

# Exhibit A



*Journal of Empirical Legal Studies*
Volume 7, Issue 4, 811–846, December 2010

# An Empirical Study of Class Action Settlements and Their Fee Awards

*Brian T. Fitzpatrick\**

This article is a comprehensive empirical study of class action settlements in federal court. Although there have been prior empirical studies of federal class action settlements, these studies have either been confined to securities cases or have been based on samples of cases that were not intended to be representative of the whole (such as those settlements approved in published opinions). By contrast, in this article, I attempt to study every federal class action settlement from the years 2006 and 2007. As far as I am aware, this study is the first attempt to collect a complete set of federal class action settlements for any given year. I find that district court judges approved 688 class action settlements over this two-year period, involving nearly $33 billion. Of this $33 billion, roughly $5 billion was awarded to class action lawyers, or about 15 percent of the total. Most judges chose to award fees by using the highly discretionary percentage-of-the-settlement method, and the fees awarded according to this method varied over a broad range, with a mean and median around 25 percent. Fee percentages were strongly and inversely associated with the size of the settlement. The age of the case at settlement was positively associated with fee percentages. There was some variation in fee percentages depending on the subject matter of the litigation and the geographic circuit in which the district court was located, with lower percentages in securities cases and in settlements from the Second and Ninth Circuits. There was no evidence that fee percentages were associated with whether the class action was certified as a settlement class or with the political affiliation of the judge who made the award.

## I. Introduction

Class actions have been the source of great controversy in the United States. Corporations fear them.[1] Policymakers have tried to corral them.[2] Commentators and scholars have

*Vanderbilt Law School, 131 21st Ave. S., Nashville, TN 37203; email: brian.fitzpatrick@vanderbilt.edu.

Research for this article was supported by Vanderbilt's Cecil D. Branstetter Litigation & Dispute Resolution Program and Law & Business Program. I am grateful for comments I received from Dale Collins, Robin Effron, Ted Eisenberg, Deborah Hensler, Richard Nagareda, Randall Thomas, an anonymous referee for this journal, and participants at workshops at Vanderbilt Law School, the University of Minnesota Law School, the 2009 Meeting of the Midwestern Law and Economics Association, and the 2009 Conference on Empirical Legal Studies. I am also grateful for the research assistance of Drew Dorner, David Dunn, James Gottry, Chris Lantz, Gary Peeples, Keith Randall, Andrew Yi, and, especially, Jessica Pan.

[1]See, e.g., Robert W. Wood, Defining Employees and Independent Contractors, Bus. L. Today 45, 48 (May–June 2008).

[2]See Private Securities Litigation Reform Act (PSLRA) of 1995, Pub. L. No. 104-67, 109 Stat. 737 (codified as amended in scattered sections of 15 U.S.C.); Class Action Fairness Act of 2005, 28 U.S.C. §§ 1453, 1711–1715 (2006).

Table 10:   Mean, Median, and Standard Deviation of Fee Awards by Settlement Size in 2006–2007 Federal Class Action Settlements Using the Percentage-of-the-Settlement Method With or Without Lodestar Cross-Check

| Settlement Size (in Millions) | Mean | Median | SD |
|---|---|---|---|
| [$0 to $0.75] (n = 45) | 28.8% | 29.6% | 6.1% |
| ($0.75 to $1.75] (n = 44) | 28.7% | 30.0% | 6.2% |
| ($1.75 to $2.85] (n = 45) | 26.5% | 29.3% | 7.9% |
| ($2.85 to $4.45] (n = 45) | 26.0% | 27.5% | 6.3% |
| ($4.45 to $7.0] (n = 44) | 27.4% | 29.7% | 5.1% |
| ($7.0 to $10.0] (n = 43) | 26.4% | 28.0% | 6.6% |
| ($10.0 to $15.2] (n = 45) | 24.8% | 25.0% | 6.4% |
| ($15.2 to $30.0] (n = 46) | 24.4% | 25.0% | 7.5% |
| ($30.0 to $72.5] (n = 42) | 22.3% | 24.9% | 8.4% |
| ($72.5 to $6,600] (n = 45) | 18.4% | 19.0% | 7.9% |

SOURCES: Westlaw, PACER, district court clerks' offices.

Table 11:   Mean, Median, and Standard Deviation of Fee Awards of the Largest 2006–2007 Federal Class Action Settlements Using the Percentage-of-the-Settlement Method With or Without Lodestar Cross-Check

| Settlement Size (in Millions) | Mean | Median | SD |
|---|---|---|---|
| ($72.5 to $100] (n = 12) | 23.7% | 24.3% | 5.3% |
| ($100 to $250] (n = 14) | 17.9% | 16.9% | 5.2% |
| ($250 to $500] (n = 8) | 17.8% | 19.5% | 7.9% |
| ($500 to $1,000] (n = 2) | 12.9% | 12.9% | 7.2% |
| ($1,000 to $6,600] (n = 9) | 13.7% | 9.5% | 11% |

SOURCES: Westlaw, PACER, district court clerks' offices.

# Exhibit B

**Cornell Law Library**
## Scholarship@Cornell Law: A Digital Repository

Cornell Law Faculty Working Papers        Faculty Scholarship

10-30-2009

# Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008

Theodore Eisenberg
*Cornell Law School*, ted-eisenberg@lawschool.cornell.edu

Geoffrey P. Miller
*New York University Law School*, geoffrey.miller@nyu.edu

Follow this and additional works at: http://scholarship.law.cornell.edu/clsops_papers

Part of the Litigation Commons

## Recommended Citation

Eisenberg, Theodore and Miller, Geoffrey P., "Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008" (2009). *Cornell Law Faculty Working Papers*. Paper 64.
http://scholarship.law.cornell.edu/clsops_papers/64

This Article is brought to you for free and open access by the Faculty Scholarship at Scholarship@Cornell Law: A Digital Repository. It has been accepted for inclusion in Cornell Law Faculty Working Papers by an authorized administrator of Scholarship@Cornell Law: A Digital Repository. For more information, please contact jmp8@cornell.edu.

# NEW YORK UNIVERSITY SCHOOL OF LAW

## NYU Center for Law, Economics and Organization



Attorneys' Fees and Expenses in
Class Action Settlements: 1993-2008

*Theodore Eisenberg and Geoffrey P. Miller*

November 2009

**LAW & ECONOMICS RESEARCH PAPER SERIES
WORKING PAPER NO. 09-50**

Electronic copy available at: http://ssrn.com/abstract=1497224

Table 15. Mean, Median, and Standard Deviation of Multiplier,
Controlling for Class Recovery Amount, 1993-2008

| Range of class recovery (millions) decile | Mean | Median | Standard deviation | N |
|---|---|---|---|---|
| Recovery <=1.1 | 0.88 | 0.74 | 0.45 | 33 |
| Recovery >1.1 <=2.8 | 0.95 | 0.77 | 0.67 | 40 |
| Recovery >2.8 <=5.3 | 1.44 | 1.25 | 0.74 | 32 |
| Recovery >5.3 <=8.7 | 1.59 | 1.25 | 1.32 | 34 |
| Recovery >8.7 <=14.3 | 1.49 | 1.45 | 0.87 | 37 |
| Recovery >14.3 <=22.8 | 1.68 | 1.51 | 0.85 | 38 |
| Recovery >22.8 <=38.3 | 1.83 | 1.44 | 1.44 | 33 |
| Recovery >38.3 <=69.6 | 1.98 | 1.75 | 1.00 | 38 |
| Recovery >69.6 <=175.5 | 2.70 | 2.09 | 2.43 | 43 |
| Recovery >175.5 | 3.18 | 2.60 | 1.99 | 40 |

Sources: Westlaw, LexisNexis, PACER.

## V. Costs and Expenses

Costs and expenses (collectively "costs") tended to be a small percentage of the class recovery and have remained a fairly constant percentage over time. For the 232 cases from 1993 to 2002 for which cost data were available, mean costs were 2.8% of the recovery and median costs were 1.7%. For the 304 cases with necessary data from 2003 to 2008, mean costs were 2.7% of the recovery and median costs remained at 1.7%. As before, we found no evidence that the cost percent increased over time.[31]

We further explored costs as a function of four variables: (1) the class recovery, (2) the fee, (3) the hours reported in the court's opinion, and (4) the age of the case in years. We only coded hours billed and case age beginning with the 2003 to 2008 data. Figure 8 shows the relation between costs and the four factors and limits the sample to cases in which hours were reported in opinions and costs were at least $100. All four factors are positively associated with costs. The figure also suggests that the strongest association is between costs and hours.

---

[31] Id.

26

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2015, I mailed the foregoing objection and attachments by ordinary U.S. mail, postage prepaid to the following address:

Class Action Clerk
United States District Court for the
Northern District of California
450 Golden Gate Avenue, 16th Floor
San Francisco, CA 94102

Dated this 27th Day of September, 2015

By: _Donnie G. Clifton_
Donnie G. Clifton

12