1  ANDREA VALDEZ (Cal. Bar No. 239082)
   530 S. Lake Avenue, No. 574
2  Pasadena, CA 91101
   Tel: (626) 817-6547
3  andrea.valdez.esq@gmail.com

4  JOSEPH SCOTT ST. JOHN (*pro hac vice* pending)
   514 Mockingbird Drive
5  Long Beach, MS 39560
   Tel: 410-212-3475
6  jscottstjohnpublic@gmail.com

7  *Attorneys for Objector Douglas W. St. John*

8              **UNITED STATES DISTRICT COURT**

9              **NORTHERN DISTRICT OF CALIFORNIA**

10             **SAN FRANCISCO DIVISION**

11
   **IN RE CATHODE RAY TUBE (CRT)**          Master File No. 3:07-cv-5944 SC
12 **ANTITRUST LITIGATION**
                                             MDL No. 1917
13
14                                           **OBJECTION OF CLASS MEMBER**
                                             **DOUGLAS W. ST. JOHN TO**
15                                           **IPP MOTION FOR AWARD OF**
                                             **ATTORNEYS' FEES AND**
16                                           **CONDITIONAL OBJECTION TO**
                                             **SETTLEMENT**
17 This Document Relates To:
   All Indirect Purchaser Actions           Hearing Date: November 13, 2015
18                                           Time: 10:00 a.m.
                                             Courtroom: One, 17th Floor
19                                           Judge: Hon. Samuel Conti
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ..................................................................................................... i

**TABLE OF AUTHORITIES** ........................................................................................... iv

**SUMMARY AND INTRODUCTION** .............................................................................. 1

**STANDING** ........................................................................................................................ 2

**NOTICE OF INTENT TO APPEAR** .............................................................................. 2

**LEGAL STANDARDS** ..................................................................................................... 2

**ARGUMENT** ..................................................................................................................... 3

I.   ANTITRUST LIABILITY AGAINST CHUNGHWA, SAMSUNG SDI, AND PHILIPS WAS LARGELY ESTABLISHED BY THE DEPARTMENT OF JUSTICE, THE EUROPEAN COMMISSION, AND THE *VICHI* PLAINTIFF. ............. 3

    A.   Defendants were the subject of antitrust investigations around the world, and everyone knew it before the first complaint was filed. ................................. 3

    B.   Chunghwa settled, cooperated, and provided documents detailing the defendants' illegal conduct. ............................................................................. 4

    C.   Samsung SDI Co., Ltd. pled guilty to violating the Sherman Act. ........................... 6

    D.   The European Commission found that defendants in the Chunghwa, Samsung SDI, Philips, LG, Panasonic, Toshiba, and Technicolor groups violated European competition law. ......................................................................... 8

II.   IPP COUNSEL'S REQUEST FOR OVER $192 MILLION IN FEES IS GROSSLY EXCESSIVE. ......................................................................................... 11

    A.   IPP Counsel improperly ties its request to the entirety of the $576 million megafund, although a significant portion of the recovery is attributable to DOJ, the European Commission, and the *Vichi* plaintiff. ........................................ 11

    B.   The size of the settlement fund was driven by the pervasive nature of CRT products and a class that included nearly every household in 21 states and the District of Columbia. ......................................................................................... 13

C.     Based on the awards in similar cases, the Court should award IPP Counsel no more than 10% of the $576 million megafund.................................................. 14

    1.     To avoid the "anchoring effect," the Court should look primarily to empirical evidence to determine the appropriate fee award, without reference to IPP Counsel's request. ............................................. 14

    2.     Empirical evidence supports awarding a decreasing portion of the fund as the size of the common fund increases, and class counsel in similar cases receive only about 10% of the fund.......................................... 14

    3.     The results of *ex ante* bidding in class action cases confirm that an award of 10% of the recovery is more than adequate to compensate IPP Counsel. ....................................................................... 15

III.    IPP COUNSEL'S CLAIMED LODESTAR IS INFLATED, INCLUDES MULTIPLE DUBIOUS CLAIMS, AND WAS CALLED INTO DOUBT BY THEIR OWN COLLEAGUE, MR. BONSIGNORE.  IT SHOULD NOT BE USED AS A CROSS-CHECK. ...................................................................... 17

    A.     The claimed lodestar reflects the inefficiency of having 49 separate law firms work on this case, and the claimed expenditure of 183,000 hours is grossly excessive. ........................................................................ 17

    1.     The class should not pay for the inefficiency of having 49 separate law firms work on this case. ...................................................... 17

    2.     Spending 183,000 hours on this litigation was grossly excessive, and IPP Counsel proffer little evidence that doing so was reasonable. .............. 18

    B.     No multiplier is warranted............................................................... 20

    C.     The fee request of lead counsel's own firm is deficient and unreliable, raising serious doubt as to the entirety of IPP Counsel's claimed lodestar.......................... 21

    1.     TATP's fee application fails to support much of its requested fee, and it appears to impermissibly seek compensation at associate rates for work performed by contract attorneys......................................................... 21

2.   IPP Counsel appear to impermissibly seek fees incurred in connection with claims that were withdrawn in the face of a Rule 11 motion. ...................................................................... 23

3.   The Declaration of Robert J. Bonsignore (D.E. 4072) raises serious doubt as to TATP's timekeeping and the entirety of IPP Counsel's claimed lodestar. ...................................................... 24

**CONCLUSION** .......................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 964 (C.D. Cal. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Banas v. Volcano Corp.*, 47 F. Supp. 3d 957 (N.D. Cal. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Chalmers v. City of Los Angeles*, 796 F.2d 1205 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*City of Burbank v. Gen. Elec. Corp.*, 329 F.2d 825 (9th Cir. 1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*City of Pontiac Gen. Employees Ret. Sys. v. Lockheed Martin Corp.*, 954 F. Supp. 2d 276  (S.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . 22

*Devlin v. Scardelletti*, 536 US 1 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Dowdy & Dowdy P'ship v. Arbitron, Inc.*, No. 2:09-cv-253, 2010 U.S. Dist. LEXIS 10712 (S.D. Miss. Oct. 6, 2010) . . . . . . . . . . . 7

*Gutierrez v. Wells Fargo Bank, N.A.*, No. 07-05923-WHA, 2015 WL 2438274 (N.D. Cal. May 21, 2015) . . . . . . . . . . . . . . . . . 14

*In re Bluetooth Headset Prods. Liability Litig.*, 654 F.3d 935 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 19

*In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752 (S.D. Ohio 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 14

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011 (N.D. Cal. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . 23

*In re Cendant Corp. PRIDES Litigation*, 243 F. 3d 722 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*In re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943 (N.D. Ill. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Coordinated Pretrial Proceedings*, 109 F.3d 602 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . 2, 11, 18, 23

*In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141 (D. Conn. 2009) . . . . . . . . . . . . . . . . . . . . . 11

*In re High-Tech Employees Antitrust Litig.*, No. 11-cv-02509, 2015 U.S. Dist. LEXIS 118052 (N.D. Cal. Sept. 2, 2015) . . 14, 15, 19

*In re Mercury Interactive Sec. Litig.*, 618 F.3d 988 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283 (3d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13

*In re Quintus Securities Litigation*, 148 F. Supp. 2d 967 (N.D. Cal. 2001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Slatkin*, 525 F.3d 805 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. MDL-07-1827, 2012 U.S. Dist. LEXIS 14803 (N.D. Cal. Oct. 11, 2012) . . . . . . . . 8

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F. 3d 1291 (9th Cir. 1994) ("*WPPSS*") . . . . . . . . . . . . . . . . . . . . . . . 3, 13, 20

*In re Weatherford Int'l Sec. Litig.*, No. 11-cv-1646, 2015 U.S. Dist. LEXIS 3370 (S.D.N.Y. Jan. 5, 2015) . . . . . . . . . . . . . . . . . . 22

*Intel Corp. v. Adv. Micro Devices, Inc.*, 542 U.S. 241 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Kremer v. Chem. Constr. Corp.*, 456 U.S. 461 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Lane v. Wells Fargo Bank, N.A.*, No. 12-04026 WHA, 2013 U.S. Dist. LEXIS 87669 (N.D. Cal. June 21, 2013) . . . . . . . . . . . . . 17

*Loretz v. Regal Stone Ltd.*, 756 F. Supp. 2d 1203 (N.D. Cal. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Marcus v. BMW of N. Am., LLC*, 687 F.3d 583 (3d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*State Farm Fire & Cas. Co. v. Bomke*, 849 F.2d 1218 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Torres v. Pet Extreme*, No. 1:13-cv-01778-LJO-SAB, 2015 U.S. Dist. LEXIS 5136 (E.D. Cal. Jan. 15, 2015) . . . . . . . . . . . . . . . 18

*United States ex rel Miller v. Bill Harbert Int'l Constr. Inc.*, 608 F. 3d 871 (D.C. Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . 8

*Vichi v. Koninklijke Philips Elecs.*, 85 A. 3d 725 (Del. Ch. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 11

*Washington Public Power System Securities Litigation*, 779 F. Supp. 1056 (D. Ariz. 1991), *vacated on other grounds* 19 F.3d 1291 (9th Cir. 1994)

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Zucker v. Occidental Petrol. Co.*, 192 F.3d 1323 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## Statutes

15 U.S.C. § 16(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

28 U. S. C. § 1738 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Haw. Rev. Stat. § 480-3 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Miss. Code Ann. § 75-21-9 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## Other Authorities

Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) . . . . . 14, 15

S. Pete Worden, *On Self-Licking Ice Cream Cones*, 26 ASP Conference Series 599 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Theodore Eisenberg & Geoffrey Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. Empirical L. Stud. 248

(2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Theodore Eisenberg & Geoffrey Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical L. Stud. 27 (2004) 17

## Rules

Fed. R. Civ. P. 23 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fed. R. Evid. 803(8)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Fed. R. Evid. 807 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## Treatises

Albert A. Foer & Rand Stutz, eds. *Private Enforcement of Antitrust Law in the United States* (2012) . . . . . . . . . . . . . . . . . . . . . 5

## SUMMARY AND INTRODUCTION

This was not a case where plaintiffs' counsel had to probe in the darkness knowing only the vague outlines of an antitrust conspiracy. Rather, as the first complaint pled, competition authorities around the world were investigating price-fixing by the defendants. The Department of Justice even intervened in this litigation when it was only three months old seeking a stay of discovery in favor of its criminal investigation. The apparent amnesty applicant, Chunghwa, then settled before the resulting stay was lifted, and Chunghwa presumably turned over to IPP Counsel the meticulous minutes and summaries of over 500 meetings of CRT and LCD price fixing cartels kept by Chunghwa executives.

By mid-2011, defendant Samsung SDI Co., Ltd., had pled guilty to violating the Sherman Act, and the European Commission had made findings regarding the participation of various Chunghwa, LG, Panasonic, Philips, Samsung SDI, Technicolor, and Toshiba entities in the global CRT price-fixing cartels. A Delaware court subsequently found certain of the Commission's findings preclusive vis-a-vis defendant Koninklijke Philips Electronics N.V. Not surprisingly, the settlement contributions of Samsung SDI and Philips make up a vastly disproportionate share of the common settlement fund. Because the disproportionate excess of those contributions is not attributable to IPP Counsel, it cannot form the basis of a fee award.

Particularly on these facts, awarding IPP Counsel $192 million out of the $576 million settlement, i.e., 33.3% of the fund, would be grossly excessive. Indeed, the increase-decrease rule and empirical evidence suggest that an award of 10% or less is appropriate. IPP Counsel's lodestar fares no better: it reflects **49** law firms feeding at the trough, and it claims more than double the number of hours reasonably expended in similar antitrust cases. Parts of the claimed lodestar are facially unsupported, and IPP Counsel's timekeeping was expressly called into doubt by one of IPP Counsel's own sworn declarations. Granting IPP Counsel's excessive fee request would be inconsistent with the Court's fiduciary duty to the class, and it would play directly into the public's worst perceptions that the class action mechanism principally benefits lawyers rather than the consumers they supposedly represent.

**STANDING**

Objector Douglas W. St. John is a member of the settlement classes. Declaration of Douglas W. St. John in Support of His Objection (hereinafter "D.W. St. John Decl.") at ¶¶ 16-20. He timely filed a claim. *Id.* at ¶ 19 and Comp. Ex. 1. Mr. St. John therefore has standing to object to the settlement and IPPs' Motion for Award of Attorneys' Fees (D.E. 4071) (hereinafter "Fee Mot."). *See, e.g., Devlin v. Scardelletti*, 536 US 1, 14 (2002).[1]

**NOTICE OF INTENT TO APPEAR**

Objector Douglas W. St. John intends to appear, by and through the undersigned counsel, at any hearings relating to (a) the settlement of indirect purchaser claims or (b) claims against the settlement fund such as requests for attorney fees. Mr. St. John reserves the right to engage in cross-examination and to seek discovery.

**LEGAL STANDARDS**

"An attorney's right to common fund fees arises from equitable principles of restitution." *In re Coordinated Pretrial Proceedings*, 109 F.3d 602, 609 (9th Cir. 1997) ("*CPP*"). "Where a settlement produces a common fund for the benefit of the entire class, courts have discretion to employ the lodestar method or the percentage-of-recovery method" to compensate counsel. *In re Bluetooth Headset Prods. Liability Litig.*, 654 F.3d 935, 942 (9th Cir. 2010). The court's discretion must be exercised to achieve a reasonable result, and a court "abuses [its] discretion when it uses a mechanical or formulaic approach that results in an unreasonable award." *Id.* at 944. Thus, while Ninth Circuit law provides for a 25% percentage-of-recovery benchmark, "where awarding 25% of a 'megafund' would yield windfall profits for class counsel in light of the hours spent on the case, courts should adjust the benchmark percentage or employ the lodestar method instead." *Id.* at 942.

---

[1]     To the extent any party contends Mr. St. John's declaration and the exhibits attached thereto are not sufficient to establish his class membership and standing, Mr. St. John objects to the settlements in their entirety based on lack of fairness, lack of ascertainability, and lack of notice. *See, e.g.,* Fed. R. Civ. P. 23; *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012). Indeed, IPP Counsel induced the Court to rule against defendants on the issue of ascertainability by asserting that the information supplied by Mr. St. John would be adequate to support a claim. *R & R Regarding IPPs Motion for Class Certification* (D.E. 1742) at 14-15, *adopted in full* (D.E. 1950) at 2.

The party petitioning for attorneys' fees bears the burden of justifying its request by "submitting detailed time records justifying the hours claimed to have been expended." *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F. 3d 1291, 1305 (9th Cir. 1994) ("*WPPSS*"). Particularly in a class action, the court cannot unquestioningly accept such a petition. *Zucker v. Occidental Petrol. Co.*, 192 F.3d 1323, 1328-29 & n.20 (9th Cir. 1999). Rather, "[b]ecause the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage," "the district court must assume the role of fiduciary for the class plaintiffs" when awarding attorneys' fees from a common fund. *In re Mercury Interactive Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010) (internal quotations omitted). "As a fiduciary for the class, the district court must act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is." *Id.*

## ARGUMENT

I.   **ANTITRUST LIABILITY AGAINST CHUNGHWA, SAMSUNG SDI, AND PHILIPS WAS LARGELY ESTABLISHED BY THE DEPARTMENT OF JUSTICE, THE EUROPEAN COMMISSION, AND THE *VICHI* PLAINTIFF.**

   A.   **Defendants were the subject of antitrust investigations around the world, and everyone knew it before the first complaint was filed.**

The issue of liability in this case was never in serious doubt, and liability was largely established at taxpayer expense. Even the initial complaint alleged "that defendants are currently under investigation by government authorities around the world for anticompetitive conduct in connection with the CRT industry." Complaint (D.E. 1) at ¶ 94. It also alleged that a "US investigation of the CRT conspiracy is being conducted by the DOJ's Antitrust Division in the Northern District of California." *Id.* Those allegations were not mere inferences. Weeks before the first complaint was filed, the European Commission ("Commission") announced that it had conducted "unannounced inspections" of CRT manufacturers because they "may have violated . . . Treaty rules on cartels and restrictive business practices." Declaration of Joseph Scott St. John in Support of Douglas W. St. John's Objection (hereinafter "J.S. St. John Decl.") Ex. 1. By the time the first complaint's piggybacking allegations appeared, Philips had acknowledged that it was the subject

1    of the Commission's surprise inspections, and Samsung SDI had acknowledged that it was the

2    subject of a similar antitrust investigation in Korea. J.S. St. John Decl. Exs. 2, 3, and 4; *see also*

3    Complaint (D.E. 1) at ¶¶ 95-98 (citing specific media coverage).[2]

4         DOJ soon brought its own antitrust investigation into the spotlight by seeking to intervene.

5    *See* U.S. Memo of Points & Authorities (D.E. 80) at 2. DOJ acknowledged that it was investigating

6    "possible criminal antitrust violations in the CRT industry," that the "investigation involves the same

7    conduct alleged in the plaintiffs' complaints," and that "the civil and criminal matters have common

8    parties." *Id.* at 4. As a result, merits discovery was largely stayed from September 12, 2008, until

9    March 8, 2010. *See, e.g.*, Alioto Dec. (D.E. 3862) at ¶ 5; Stipulation and Order to Extend Limited

10   Discovery Stay (D.E. 798) at Recitals.

11

12        **B.    Chunghwa settled, cooperated, and provided documents detailing the
            defendants' illegal conduct.**

13

14        Despite the stay of discovery, Chungwha settled the indirect purchasers' claims on April 8,

15   2009, just a few weeks after its former C.E.O. was indicted on two counts of violating the Sherman

16   Act. *See* Settlement Agreement (D.E. 884-1); J.S. St. John Decl. Exs. 5, 6, and 7. That Chunghwa

17   settled early is unsurprising: it was the cooperating leniency applicant in the European Commission's

18   investigation of the CRT market, and it was apparently the amnesty applicant in DOJ's parallel

19   investigation. St. John Decl. Ex. 15 at ¶ 26 ("Chunghwa was the first undertaking to submit

20   information and evidence meeting the conditions of . . . the 2006 Leniency Notice. The fine to be

21   imposed was reduced by 100 % for both CDT and CPT cartels."); Settlement Agreement (D.E. 884-

22   1) at ¶ 24 (Chunghwa agrees . . . to the extent consistent with Chunghwa's obligations to the U.S.

23   Department of Justice . . . ."); *see also* J.S. St. John Decl. Ex. 8.  Having already admitted its

24   participation in the conspiracy by participating in the leniency and amnesty programs, a low-dollar

25

26

27        _____

          [2]       For consistency, the same shorthand references to defendant groups used in the Fee
28   Motion are also used in this Objection.

early settlement in exchange for a cooperation agreement was—quite literally—the textbook legal strategy for Chunghwa.[3]

To that end, the settlement agreement between the indirect purchaser plaintiffs and Chungwha called for a payment of $10 million dollars and required Chunghwa

> to cooperate with Plaintiffs . . . by (i) promptly providing a full account to Lead Counsel of all facts known to Chunghwa that are relevant to the Action, (ii) producing in the United States relevant documents relating to sales, pricing, capacity, production, and damages, including English translations to the extent reasonably required, as well as *documents (including English translations) sufficient to evidence any collusive meetings among CRT makers* and the manner in which any alleged conspiracy was formed, implemented, and enforced, to the extent known by Chunghwa, (iii) making available appropriate employees for such interviews and depositions as are reasonably required by Lead Counsel, and (iv) producing at trial . . . representatives to testify as reasonably required by Lead Counsel.

Settlement Agreement (D.E. 884-1) at ¶ 24.

The conspiracy in this case is unusual in that Chunghwa executives meticulously documented their meetings with other defendants, resulting in "*minutes and summaries of over 500 meetings of CRT and LCD price fixing cartels* . . . from 1996 to 2006."  *Vichi v. Koninklijke Philips Elecs.*, 85 A. 3d 725, 784 (Del. Ch. 2014); *see also* Ex. 16 at *passim* (referencing and quoting

---

[3]     As one treatise explained:

In situations where the DOJ has brought a criminal indictment, or there is public information about an ongoing grand jury investigation with allegations of market collusion, early settlement strategies are easier to formulate. In that circumstance, often there is a cooperating defendant that has come forward to assist the government in its investigation in exchange for amnesty . . . . The amnesty recipient is often a ripe candidate for early settlement discussions, because the guilty plea will typically carry a collateral estoppel effect on liability as to the timing and products alleged by the DOJ.  * * * * Under ACPERA, an amnesty recipient is also given immunity from treble damages provisions of the federal antitrust laws. Accordingly, the "threat" of a large treble judgment as leverage to engage in settlement negotiations is somewhat lessened. However, the negative value of this diminished leverage, along with potentially lower monetary recoupment, is usually more than offset by the tremendous advantages that can be obtained from cooperation . . . . Indeed, the main value of an early settlement with an amnesty applicant is usually the information provided to lay out a roadmap of whatever conspiracy or violation is alleged.

Albert A. Foer & Rand Stutz, eds. *Private Enforcement of Antitrust Law in the United States* § 12.04.1(A) (2012).

meeting minutes). Assuming that class counsel held Chungwha to the terms of its settlement agreement, IPP Counsel was in the unusual position of possessing some of the most damning documents imaginable *before undertaking significant discovery*.[4]

### C.    Samsung SDI Co., Ltd. pled guilty to violating the Sherman Act.

Less than eight months after merits discovery was allowed to proceed, the DOJ filed an indictment alleging that three individuals violated the Sherman Act by engaging in a conspiracy "to suppress and eliminate competition by fixing prices, reducing output, and allocating market shares of color display tubes ("CDTs") to be sold in the United States and elsewhere," and that the conspiracy began "at least as early as January 1997" and extended "until at least as late as March 2006." J.S. St. John Decl. Ex. 9 at ¶ 2. Although not expressly identified, the indictment provided ample detail for anyone with even a rudimentary knowledge of the electronics industry to identify the indictees' likely employers among the defendants.

On May 12, 2011, Samsung SDI Co. Ltd. executed an agreement to plead guilty to "participating in a conspiracy to suppress and eliminate competition by fixing prices, reducing output, and allocating market shares of color display tubes . . . sold in the United States and elsewhere, from at least as early as January 1997, until at least as late as March 2006, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1." J.S. St. John Decl. Ex. 10 at ¶ 2; *see also* J.S. St. John Decl. Ex. 11. The plea agreement provided a publicly available overview of Samsung SDI's

---

[4]    IPP Counsel attempts to downplay the value of Chunghwa's assistance, arguing that "while the information Chunghwa provided regarding the CRT conspiracy was very helpful," "Chunghwa's evidence of the conspiracy was limited . . . ." Fee Mot. (D.E. 4071) at 6 n.5. IPP Counsel emphasizes gaps in the information Chunghwa provided as part of a preliminary settlement, but IPP Counsel undercuts their own argument by emphasizing how weak the IPP's case was vis-à-vis products for which Chunghwa did not supply information. Alioto Dec. (D.E. 4071-1) at ¶¶ 102-103. Indeed, IPP Lead Counsel's declaration makes clear that at least  Thomson and Videocon were not named in the consolidated amended complaint—filed 16 months after the start of this litigation—because Chunghwa did not supply information on them, and "IPP Counsel [therefore] had no information regarding their involvement in the conspiracy." *Id.* at ¶ 103. IPP Counsel notably makes no reference to the "minutes and summaries of over 500 meetings" that Chunghwa presumably provided after it executed the formal settlement agreement.

1    involvement in the CDT conspiracy, and it directly contemplated the high likelihood of collateral

2    civil liability in this litigation:

> In light of the civil class action cases filed against the defendant,
> including *In re Cathode Ray Tube (CRT) Antitrust Litigation*, No. C07-
> 5944 SC, MDL No. 1917, in the United States District Court,
> Northern District of California, which potentially provide for a
> recovery of multiple actual damages . . . the United States and the
> defendant agree that the recommended sentence [of a criminal fine of
> $32 million, and no order of restitution] provided for in Paragraph 8
> of this Plea Agreement does not include a restitution order for the
> offense charged in the Information.

9    St. John Decl. Ex. 10 at ¶ 11. Indeed, Judge Alsup specifically advised Samsung SDI Co. Ltd. that by

10   pleading guilty, it risked "prejudicing itself in the civil litigation." St. John Decl. Ex. 12 at 14:2-16.

11           As Judge Alsup suggested, Samsung SDI's guilty plea is prima facie evidence of its violation

12   of the Sherman Act, which IPPs assert in this case. 15 U.S.C. § 16(a); *City of Burbank v. Gen. Elec.*

13   *Corp.*, 329 F.2d 825, 834 (9th Cir. 1964) (a guilty plea "constitutes prima facie evidence of the

14   violation of antitrust laws"). Samsung's guilty plea is in fact preclusive of that violation, as well as the

15   facts set forth in the plea agreement and the plea colloquy. *See, e.g.*, *United States v. $31,697.59 Cash*,

16   665 F.2d 903, 906 (9th Cir. 1982) (parties in a civil action are "collaterally estopped from litigating

17   the matters disposed of in [a] criminal case by their guilty pleas"). That plea is also likely preclusive

18   of many of the state law antitrust claims at issue here, which—with the exception of permitting

19   claims by indirect purchasers—directly parallel federal antitrust law. *See, e.g.*, Haw. Rev. Stat. § 480-3

20   (2014) ("This chapter shall be construed in accordance with judicial interpretations of similar federal

21   antitrust statutes, except that lawsuits by indirect purchasers may be brought as provided in this

22   chapter."); *Dowdy & Dowdy P'ship v. Arbitron, Inc.*, No. 2:09-cv-253, 2010 U.S. Dist. LEXIS 10712 at

23   *7 (S.D. Miss. Oct. 6., 2010) ("Courts have treated claims under [Miss. Code Ann. § 75-21-3] as

24   analytically identical to claims under Sections 1 and 2 of the Sherman Antitrust Act.").

25           Given the preclusive effect of Samsung's guilty plea, IPP Counsel were presented with an

26   early, taxpayer-financed *fait accompli*. But even if the Court were to disagree as to the preclusive effect

27   of Samsung SDI Co. Ltd.'s guilty plea, the IPPs would still be able to introduce that plea—and the

28   associated plea agreement—as unusually powerful evidence of liability. *E.g.*, *In re Slatkin*, 525 F.3d

805, 812 (9th Cir. 2008) (plea agreement is admissible under Fed. R. Evid. 807); *State Farm Fire & Cas. Co. v. Bomke*, 849 F.2d 1218, 1220 (9th Cir. 1988) ("Even though a guilty plea is not conclusive for purposes of collateral estoppel [under controlling State law], a guilty plea is admissible in a subsequent civil action on the independent ground that it is an admission."); *United States ex rel Miller v. Bill Harbert Int'l Constr. Inc.*, 608 F. 3d 871, 891-92 (D.C. Cir. 2010) (guilty plea to violation of Sherman Act and accompanying plea memorandum are admissible against alleged co-conspirators); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. MDL-07-1827, 2012 U.S. Dist. LEXIS 14803 at *51 n.1 (N.D. Cal. Oct. 11, 2012) (rejecting application of offensive issue preclusion "as to the identity of the participants in the conspiracy" but noting that "it would be appropriate to instruct the jury that LG Phillips LCD Co., Ltd., Chunghwa Picture Tubes, Ltd., Chi Mei Optoelectronics Corporation, and HannStar Display Corporation pled guilty, and that Samsung Electronics Co., Ltd. was granted amnesty and admitted to violating the U.S. antitrust laws").

### D. The European Commission found that defendants in the Chunghwa, Samsung SDI, Philips, LG, Panasonic, Toshiba, and Technicolor groups violated European competition law.

The U.S. Department of Justice was not alone in investigating the defendants. In March 2007, Chunghwa submitted an antitrust immunity application to the European Commission, which was conditionally granted. J.S. St. John Decl. Ex. 14 at C303/7. That November, the Commission announced that it had "carried out unannounced inspections on the premises of manufacturers of cathode ray tubes," and noted that "[s]urprise inspections are a preliminary step in investigations into suspected cartels." J.S. St. John Decl. Ex. 1. At least Philips publicly announced that it had been a target of the inspections, and like Samsung SDI and Panasonic, it filed a leniency application shortly thereafter. J.S. St. John Decl. Ex. 2, 14 at C303/7.

In November 2009, the Commission adopted a statement of objections ("SO") concerning two separate cartels related to cathode ray tubes. J.S. St. John Decl. Ex. 14 at C303/7. The recipients of the SO included Chunghwa Picture Tubes Co., Ltd.; Samsung SDI Co., Ltd.; Royal Philips Electronics N.V.; L.G. Electronics Inc.; and Toshiba Corp.; Panasonic Corp.; and Technicolor SA, all of whom responded. *Id.* at C303/7-8 & nn.3-7. The Commission then issued a 340 page decision

with specific findings of unlawful collusion on prices, market shares, customers, and output in the markets for color display tubes ("CDT") used in computer monitors and color picture tubes ("CPT") used in color televisions. J.S. St. John Decl. Ex. 16. A summary of that decision was published in the Official Journal of the European Union on October 13, 2013, noting the following findings:

- [T]he CDT cartel lasted from October 1996 until March 2006 and the CPT cartel from December 1997 until November 2006.

  The following undertakings [violated European antitrust laws] by participating . . . in a single and continuous complex of agreements and concerted practices in the sector of colour display tubes used in computer monitors:

  o Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., CPTF Optronics Co., Ltd., from 24 October 1996 until 14 March 2006;

  o Samsung SDI Co., Ltd., Samsung SDI (Malaysia) Berhad, from 23 November 1996 until 14 March 2006;

  o Koninklijke Philips Electronics NV, from 28 January 1997 until 30 January 2006;

  o LG Electronics, Inc., from 24 October 1996 until 30 January 2006.

- The following undertakings [violated European antitrust laws] by participating . . . in a single and continuous complex of agreements and concerted practices in the sector of colour picture tubes used for colour televisions:

  o Chunghwa Picture Tubes Co., Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., CPTF Optronics Co., Ltd., from 3 December 1997 until 6 December 2005;

  o Samsung SDI Co., Ltd., Samsung SDI (Malaysia) Berhad, Samsung SDI Germany GmbH, from 3 December 1997 until 15 November 2006;

  o Panasonic Corporation, from 15 July 1999 until 12 June 2006;

  o Toshiba Corporation, from 16 May 2000 until 12 June 2006;

  o MT Picture Display Co., Ltd., from 1 April 2003 until 12 June 2006;

  o Koninklijke Philips Electronics NV, from 21 September 1999 until 30 January 2006;

  o LG Electronics, Inc., from 3 December 1997 until 30 January 2006;

  o Technicolor SA, from 25 March 1999 until 19 September 2005.

- [T]he CDT cartel fixed prices, allocated market shares and customers and restricted output. The . . . CPT cartel fixed prices, allocated market shares and restricted

output. The price fixing, market sharing and output restrictions were also subject to regular monitoring in both cartels and, in the case of the CDT cartel, at times the capacity restrictions were also audited with plant visits.

- The two cartels were highly organized [*sic*]. There were regular multilateral meetings involving different corporate levels of the addressees up to the executive level. The multilateral meetings were complemented by bilateral meetings and other exchanges.

- European meetings [of the CDT cartel] focused more specifically on Europe but Asian cartel contacts covered more clearly the worldwide level.

J.S. St. John Decl. Ex. 15 at ¶¶ 9-14.  A redacted version of the Commission's full decision—containing substantially more detail—was published thereafter. *See* St. John Decl. Ex. 16. [5]

As would be expected of any party represented by competent counsel, at least the Direct Purchaser Plaintiffs followed the Commission's investigation, and they sought discovery of related

---

[5]    In *Intel Corp. v. Adv. Micro Devices, Inc.*, the Supreme Court summarized European Commission antitrust enforcement:

> [T]he European Commission, acting through the DG-Competition, enforces European competition laws and regulations. The DG-Competition's overriding responsibility is to conduct investigations into alleged violations of the European Union's competition prescriptions. On receipt of a complaint or *sua sponte,* the DG-Competition conducts a preliminary investigation.  In that investigation, the DG-Competition may take into account information provided by a complainant, and it may seek information directly from the target of the complaint. Ultimately, DG Competition's preliminary investigation results in a formal written decision whether to pursue the complaint. If the DG-Competition declines to proceed, that decision is subject to judicial review by the Court of First Instance and, ultimately, by the court of last resort for European Union matters, the Court of Justice for the European Communities (European Court of Justice).
>
> If the DG-Competition decides to pursue the complaint, it typically serves the target of the investigation with a formal "statement of objections" and advises the target of its intention to recommend a decision finding that the target has violated European competition law.  The target is entitled to a hearing before an independent officer, who provides a report to the DG-Competition. Once the DG-Competition has made its recommendation, the European Commission may dismiss the complaint, or issue a decision finding infringement and imposing penalties.  The Commission's final action dismissing the complaint or holding the target liable is subject to review in the Court of First Instance and the European Court of Justice.

542 U.S. 241, 254-55 (2004) (internal quotations and citations omitted).

documents as early as 2010. *See Order Denying Motion to Compel* (D.E. 2463) at 2.  Their doing so is unsurprising: some of the Commission's findings may be issue preclusive. *See, e.g., Intel Corp. v. Adv. Micro Devices, Inc.*, 542 U.S. 241, 246-47, 258 (2004) (concluding that the European Commission is an adjudicatory "tribunal" for purposes of seeking antitrust-related discovery pursuant to 28 U.S.C. § 1782(a)). Indeed, in *Vichi v. Koninklijke Philips Elecs., N.V.*, a multi-hundred million dollar fraud case in which Koninklijke Philips Electronics N.V was a defendant, a Delaware court held that the Commission's findings were preclusive as to:

- [the] participation [of LG.Philips Displays Holdings B.V. ("LPD"), a joint venture between Philips Electronics and LG Electronics] in a CRT price fixing cartel;

- the price fixing conduct of LPD and the CRT subsidiaries that preceded it; and

- its determination that certain Philips N.V. CRT subsidiaries engaged in illegal price fixing before the formation of LPD.

85 A.3d 725, 783-84 & n. 370 (Del. Ch. 2014). Notably, the Delaware court's holding that the Commission's findings are issue preclusive may itself be preclusive.  28 U. S. C. § 1738; *see also Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 485 (1982). But even if the Commission's findings are not preclusive, those findings would still be admissible as substantive evidence against defendants who were also defendants in the Commission proceedings. *See, e.g., In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 159, 180 (D. Conn. 2009) (holding that Commission "statement of objections" is admissible under Fed. R. Evid. 803(8)(C)).

## II.   IPP COUNSEL'S REQUEST FOR OVER $192 MILLION IN FEES IS GROSSLY EXCESSIVE.

### A.   IPP Counsel improperly ties its request to the entirety of the $576 million megafund, although a significant portion of the recovery is attributable to DOJ, the European Commission, and the *Vichi* plaintiff.

IPP Counsel acknowledge that overall benefit to the class is the most critical factor in setting an appropriate fee award. Fee Mot. (D.E. 4071) at 10. But the basis for awarding fees lies in equity. *CPP*, 109 F.3d at 609. Fees are therefore awarded based on the benefit ***attributable to the applicant***, as opposed to the efforts of other groups, such as government agencies conducting investigations. *See, e.g., In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 338 (3d Cir. 1998). The problem for IPP Counsel is that the benefit at issue—the settlement fund—was

1    significantly inflated by the efforts DOJ, the European Commission, and the plaintiff in the *Vichi*

2    litigation.

3         To put IPP Counsel's problem in numeric terms: the Samsung SDI settlement, at

4    $225,000,000, and the Philips settlement, at $175,000,000, together account for 69.3% of the

5    $576,750,000 settlement fund, although a total of 8 groups of defendants contributed to that fund.

6    *See* Fee Mot. (D.E. 4071) at 6-8. IPP Counsel offers no explanation for the disproportionate

7    contributions of Samsung SDI and Philips, and the most reasonable inference is that the discrepancy

8    is attributable to Samsung SDI Co., Ltd.'s guilty plea and the issue preclusion holding against

9    Koninklijke Philips Electronics N.V. in *Vichi*. Of course, the benefits resulting from those factors

10   are not in any way attributable to IPP Counsel.

11        One way of valuing the contributions of the DOJ et al is to compare the discrepancy

12   between the settlement contributions of Samsung SDI and Philips with their share of the CRT

13   market during the class period. Philips claimed that it and Samsung SDI together had 28% of the

14   global market for CRTs in 2000, i.e., a discrepancy of over 40% vis-a-vis their contributions to the

15   settlement fund. J.S. St. John Decl. Ex. 17 at 13; *see also* Ex. 18 at 9. Regardless of how valued, the

16   impact of the efforts of the DOJ, the European Commission, and the *Vichi* plaintiff should be given

17   major consideration in setting IPP Counsel's fees. *See In re Cendant Corp. PRIDES Litigation*, 243 F. 3d

18   722, 741 (3d Cir. 2001) ("Cendant's liability and consequent collectability had been conceded at the

19   outset of the PRIDES controversy, and that fact should have been given major consideration by the

20   District Court when setting Kirby's attorneys' fees."); *In re Prudential,* 148 F.3d at 337 ("Allowing

21   private counsel to receive fees based on the benefits created by public agencies would undermine the

22   equitable principles which underlie the concept of the common fund, and would create an incentive

23   for plaintiffs attorneys to minimize the costs of failure . . . by free riding on the monitoring efforts of

24   others."); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 766 (S.D. Ohio 2007) ("Lead

25   Counsel faced less risk than in other securities cases because it piggybacked on the success of a prior

26   SEC investigation.").

27

28

1

**B.     The size of the settlement fund was driven by the pervasive nature of CRT products and a class that included nearly every household in 21 states and the District of Columbia.**

2

3     Contra the Fee Motion, the size of the settlement fund in this case provides little if any

4 evidence that IPP Counsel obtained exceptional results. *See WPPSS*, 19 F.3d at 1303. Rather, this

5 case is a quintessential example of a "recovery [that] is merely a factor of the size of the class and has

6 no direct relationship to the efforts of counsel." *In re Prudential*, 148 F.3d at 339.

7     Here, antitrust regulators pointed IPP Counsel to a price fixing conspiracy involving a

8 product—TV—that the U.S. Census Bureau reports was present in over 98% of American

9 households throughout the class period. J.S. St. John Decl. Ex. 19 at 696 Table 1090; *see also* Ex. 20

10 at 3. Not only was a TV present in nearly every American household, most households had more

11 than one TV. J.S. St. John Decl. Ex. 20 at 4; *see also* D.W. St. John Decl. at ¶¶ 21-24. If that wasn't

12 enough, the claims also involve a second product—computer monitors—that American households

13 were rapidly acquiring during the class period. *See* J.S. St. John Decl. Ex. 19 at 696 Table 1090. Even

14 more TVs and computer monitors were present in American businesses of all sizes. In short, it was

15 the pervasive nature of CRT Products during the class period that is responsible for the size of the

16 common settlement fund. Awarding IPP Counsel 33.3% of that $576 million fund would therefore

17 be an unearned windfall.[6]

18

19

20     [6]     To put the size of the settlement fund in context: Mississippi law permits a party injured by a violation of its antitrust laws to "recover all damages of every kind sustained by him or it and in addition a penalty of five hundred dollars," and the "penalty may be recovered in each instance of injury." Miss. Code Ann. § 75-21-9 (2015). The 2000 U.S. Census enumerated 1,046,434 households in Mississippi. J.S. St. John Decl. Ex. 21 at 4. Environmental regulators have estimated the lifespan of a CRT TV at 6-7 years. J.S. St. John Decl. Ex. 18 at 4. And IPPs successfully asserted that "defendants controlled approximately 90% of the CRT commerce worldwide" such that "approximately 9 out of every 10 finished CRT products sold in the United States contained a CRT made by one of the defendants or their co-conspirators . . . ." *R & R Regarding IPPs' Motion for Class Certification* (D.E. 1742) at 15, *adopted in full* (D.E. 1950) at 2. Accepting those statistics, and inferring from the CRT TV's limited lifespan that household with TVs purchased at least one CRT TV during the class period, defendants were potentially liable for over $462 million (1,046,434 x 0.982 x 0.9 x $500) in statutory penalties—plus actual damages—in Mississippi alone. That estimate obviously does not include the impact of households that purchased multiple TVs, households that purchased a computer monitor, or CRT TVs and computer monitors purchased by businesses.

21

22

23

24

25

26

27

28

C.    **Based on the awards in similar cases, the Court should award IPP Counsel no more than 10% of the $576 million megafund.**

1.    **To avoid the "anchoring effect," the Court should look primarily to empirical evidence to determine the appropriate fee award, without reference to IPP Counsel's request.**

The Court should start its percentage of the fund analysis with an open mind, unframed by IPP Counsel's fee request. As one court explained, "cases that employ the percentage approach arbitrarily tend to start their analysis with the attorneys' request, rather than at an objective marker," thereby tending to "anchor" the Court's analysis to the attorneys' biased fee request. *In re Cardinal Health*, 528 F. Supp. 2d at 762-63. "This anchoring effect allows plaintiffs' counsel to manipulate the fee award they are likely to receive by simply requesting a higher percentage." *Id.* at 763. To minimize this problem, the Court should look primarily to empirical evidence to determine the starting point for an appropriate fee award, not IPP Counsel's request. *See id.*

2.    **Empirical evidence supports awarding a decreasing portion of the fund as the size of the common fund increases, and class counsel in similar cases receive only about 10% of the fund.**

Cherry-picked string cites of cases awarding large fees are of little utility to the Court, and the opposite point can be made in identical form. *See, e.g., Gutierrez v. Wells Fargo Bank, N.A.*, No. 07-05923-WHA, 2015 WL 2438274 (N.D. Cal. May 21, 2015) (listing cases and awarding 9% of $203 million megafund because 25% would be "ridiculous"). Empirical studies of fee awards across large numbers of megafund cases are far more informative. Two such studies are commonly referenced by courts analyzing the reasonableness of fee requests: Brian Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) ("Fitzpatrick"), and Theodore Eisenberg & Geoffrey Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. Empirical L. Stud. 248 (2010) ("Eisenberg"). *See, e.g., In re High-Tech Employees Antitrust Litig.*, No. 11-cv-02509, 2015 U.S. Dist. LEXIS 118052 at *48-50 (N.D. Cal. Sept. 2, 2015).

In this case, IPP Counsel's proffered fee expert, Mr. Richard Pearl, relies on the Fitzpatrick study as purportedly supporting the reasonableness of IPP Counsel's request for 33.3% of the $576 million megafund. Pearl Decl. (D.E. 4071-15) at ¶¶ 13, 22. But Mr. Pearl notably omits Professor

Fitzpatrick's finding that "fee percentage is strongly and inversely associated with settlement size . . . ." Fitzpatrick, 7 J. Empirical L. Stu. at 837. Professor Fitzpatrick elaborated that "fee percentages tended to drift lower at a fairly slow pace until a settlement size of $100 million was reached, at which point the fee percentages plunged well below 20 percent, and by the time $500 million was reached, they plunged well below 15 percent, with most awards at that level under even 10 percent." *Id.* at 838; *see also id.* at 839 Table 11.

A similar result was found in the much larger Eisenberg study, which analyzed 689 common fund cases reported between 1993 and 2008. Eisenberg, 7 J. Empirical L. Stu. at 251. Like the Fitzpatrick study, the Eisenberg study found that "class action awards . . . exhibit a strong scale effect," such that "[a]ttorneys receive a smaller proportion of the recovery as the size of the recovery increases." *Id.* at 279.  In the highest decile of recoveries analyzed, i.e., the 68 cases with recoveries greater than $175.5 million, the mean fee percentage was 12.0% and the median fee percentage was 10.2%. *Id.* at 265 Table 7.

Both the Fitzpatrick and Eisenberg studies were cogently analyzed by Judge Koh. *See In re High-Tech Employees*, 2015 U.S. Dist. LEXIS 118052, at *48-50. Like this litigation, *High-Tech Employees* began with an investigation by antitrust regulators, involved multiple defendants, and settled on the eve of trial. *Id.* at *8, 12. Although the initial settlement was not approved, a second settlement of $415 million received the court's blessing. *Id.* at 12, 14-15. Relying on the Eisenberg study, Judge Koh concluded that awarding fees amounting to 9.8 % or 10.5% of the recovery (depending on how calculated) was reasonable. *Id.* at 50. The Court should do the same in this case and award IPP Counsel no more than 10% of the $576 million recovery.

3.      **The results of *ex ante* bidding in class action cases confirm that an award of 10% of the recovery is more than adequate to compensate IPP Counsel.**

The Fitzpatrick and Eisenberg studies are consistent with the results obtained by courts that selected class counsel through an *ex ante* bidding process. The fee proposals in such cases are typically on a sliding-scale, with the winning proposals for high-dollar recoveries being in the same

range as the empirical results discussed above, i.e., single digit to very low double digit percentages of the recovery.

*In re Quintus Securities Litigation*, 148 F. Supp. 2d 967 (N.D. Cal. 2001) is instructive. In that case, then-Judge Walker solicited sealed bids from firms seeking appointment as class counsel. *Id.* at 974. He allowed the fee proposals to vary by the amount of recovery and by the stage of litigation in which the case was resolved. *Id.* at 974-5. He reviewed bids from five firms, as well as a non-bid proposal from a sixth firm. *Id.* at 969. As relevant here, the bids for recoveries during "stage 2" of the litigation, i.e., "after motion to dismiss through summary judgment," ranged from 5% to 14% of recoveries over $20 million. *Id.* at *passim.* The bids for recoveries during "stage 3" of the litigation, i.e., "after summary judgment through trial verdict," ranged from 6% to 18% of recoveries over $20 million. *Id.* at *passim.* The winning bid, by "an accomplished plaintiff class action firm" with two megafund recoveries under its belt, was:

|              | Stage 1 | Stage 2 | Stage 3 | Stage 4 |
|--------------|---------|---------|---------|---------|
| $0-$4 mil    | 7.5%    | 8.5%    | 9.0%    | 9.0%    |
| $4-$8 mil    | 7.0%    | 8.0%    | 8.5%    | 8.5%    |
| $8-$12 mil   | 6.5%    | 7.5%    | 8.0%    | 8.0%    |
| $12-$16 mil  | 6.0%    | 7.0%    | 7.5%    | 7.5%    |
| $16-$20 mil  | 5.5%    | 6.0%    | 6.5%    | 6.5%    |
| Over $20 mil | 5.0%    | 5.5%    | 6.0%    | 6.0%    |

*Id.* at 977-78, 988; *see also id.* at 987 (noting that the class representative in a related case negotiated a fee scale culminating at 10% of any recovery over $40 million and a fee cap).

An antitrust class action, *In re Amino Acid Lysine Antitrust Litigation*, 918 F. Supp. 1190 (N.D. Ill. 1996), is to the same effect. In that case, eight firms submitted sealed bids to serve as class counsel. *Id.* at 1192. The winning bid was "20% of the first $5 million recovered, plus 15% of the next $10 million and 10% of the next $10 million." *Id.* at 1198, 1202. The court authorized the winning firm to affiliate with other firms as necessary, but made clear that any resulting fees were class counsel's responsibility. *Id.* at 1202. In doing so, the court rejected as "clearly inferior" a bid by

the Milberg Weiss firm for "an across-the-board fee of 25% of total recovery, to increase to 30% if the case must be tried," plus expenses. *Id.* at 1199. The court similarly rejected out-of-hand a bid by the Kaye, Scholer firm for the higher of its lodestar or 18% of recovery across-the-board. *Id.* at 1198. Both Kaye, Scholer and Milberg Weiss were among the most preeminent firms in the country, and their rejected bids were lower than IPP Counsel's fee request in this case.

## III.   IPP COUNSEL'S CLAIMED LODESTAR IS INFLATED, INCLUDES MULTIPLE DUBIOUS CLAIMS, AND WAS CALLED INTO DOUBT BY THEIR OWN COLLEAGUE, MR. BONSIGNORE.  IT SHOULD NOT BE USED AS A CROSS-CHECK.

IPP Counsel proffers a lodestar calculation, i.e., hours they claim were reasonably expended multiplied by their claimed hourly rate, as a cross-check on their fee request. Of course, "courts cannot easily determine either the reasonable hours or the reasonable hourly rate; [and] there are few protections against counsel exaggerating either or both . . . ." Theodore Eisenberg & Geoffrey Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, 1 J. Empirical L. Stud. 27, 31 (2004). Moreover, "the method creates a perverse incentive to counsel to waste time in order to run up the bill." *Id.* Those criticisms are particularly apt in this case, where **49** law firms claim to have expended more than 183,000 hours, i.e., more than twice the number and rate of hours expended in similar cases. Zooming into lead counsel's fee requests raises yet more doubts. The Court's fiduciary obligation to the class thus compels reduction of the claimed lodestar by half or more.

### A.   The claimed lodestar reflects the inefficiency of having 49 separate law firms work on this case, and the claimed expenditure of 183,000 hours is grossly excessive.

#### 1.   The class should not pay for the inefficiency of having 49 separate law firms work on this case.

In *Lane v. Wells Fargo Bank, N.A*, Judge Alsup found it "disturbing that counsel propose[d] to employ four law firms and thus multiply the lodestar, all at the expense of the class." No. 12-04026 WHA, 2013 U.S. Dist. LEXIS 87669, at *43 (N.D. Cal. June 21, 2013). Rejecting the involvement of so many firms, Judge Alsup observed that "[o]ne firm is usually best for the class because it eliminates the inefficiency in keeping a multiplicity of law firms up to speed." *Id.*

Here, lead counsel Mario Alioto and his firm apparently entered into agreement with the much larger Zelle firm because Mr. Alioto "had never acted as lead counsel in any federal antitrust action of this size and . . . did not have the expertise or staff" to do so. Scarpulla Dec. (D.E. 4069) at ¶ 8. Despite Judge Alsup's observation, such an agreement might be acceptable, at least if it were fully disclosed to the court. But **49** law firms are seeking fees for work in this case. *See* D.E. 4069, 4072, 4073. The result—with 17 of those firms seeking fees of over a million dollars—is what one court described as "lawyers feeding at the trough (labeled as lead counsel, liaison counsel, plaintiffs' steering committee and what have you . . .)" that "inevitably ups the ante in terms of the total fee applications tendered to the court for approval." *In re Comdisco Sec. Litig.*, 150 F. Supp. 2d 943, 950 n.12 (N.D. Ill. 2001); *see also In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110, 128 (S.D.N.Y. 2009) ("With so many firms dabbling in this litigation, duplication was inevitable, and therefore, the lodestar is almost certainly inflated.").

No paying client—sophisticated or otherwise—would tolerate the massive inefficiencies and coordination problems of having 49 distinct law firms work on a matter. *Cf. CPP*, 109 F. 3d 602, 608 (9th Cir. 1997) (a lawyer is not "entitled to compensation for hours a reasonable lawyer would not have spent, hours unreasonably spent, or work done so badly it is of no value to the common fund beneficiaries"); *Torres v. Pet Extreme*, No. 1:13-cv-01778-LJO-SAB, 2015 U.S. Dist. LEXIS 5136, at *26 (E.D. Cal. Jan. 15, 2015) ("In determining reasonable attorney fees, the court should exclude hours that could not reasonably be billed to a private client, such as hours that are excessive, redundant or unnecessary."). Such inefficiencies certainly should not be foisted on the class, which had no say in the management of this litigation. *See CPP*, 109 F.3d at 608. IPP Counsel's lodestar should be reduced dramatically to account for the substantial negative value of having dozens of law firms participate in this litigation.

**2.      Spending 183,000 hours on this litigation was grossly excessive, and IPP Counsel proffer little evidence that doing so was reasonable.**

In their fee motion, IPP Counsel seek compensation for approximately 183,000 hours—equivalent to ***over 91 man-years***—purportedly spent on this case. Fee Mot. (D.E. 4071) at 24; *see also* Compendium of IPP Counsel Dec. (D.E. 4073) Exs. But only hours that were "reasonably

expended" can be incorporated in a lodestar calculation. *In re Bluetooth*, 654 F.3d at 941, 944. IPP Counsel offer no support for their claim beyond a single paragraph of *ipse dixit* by their proffered expert, Mr. Pearl, in which he opines only that 183,000 hours "appears to be in the ballpark" of what is reasonable. Pearl Dec. (D.E. 4071-15) at ¶ 38. Two problems are apparent.

*First*, assuming arguendo that Mr. Pearl's *ipse dixit* is otherwise adequate to carry IPP Counsel's burden, it is doubtful that Mr. Pearl is qualified to opine on the reasonableness of hours expended in this large antitrust litigation. Mr. Pearl has been a "sole practitioner" since 1987, and "[m]ore than 90% of [his] practice is devoted to issues involving court-awarded attorneys' fees." *Id.* at ¶¶ 2, 4. Mr. Pearl's declaration includes no obvious evidence that he has any experience managing a large litigation of any type.[7]

*Second*, comparable cases make clear that 183,000 hours cannot be justified as "reasonably expended" in this matter. For example, the *High-Tech Employees Antitrust Litigation* was litigated for over four years, involved hundreds of thousands of documents and over 15 gigabytes of data, and resulted in $415 million in settlements, but only 36,215 hours were expended by plaintiffs' counsel. 2015 U.S. Dist. LEXIS 118052, at *15, *35-36.  Similarly, the *Currency Conversion Fee Antitrust Litigation* spanned eight years, involved hundreds of thousands of documents, and resulted in a $336 million settlement plus injunctive relief, but only 76,877 hours were expended by plaintiffs' counsel. 263 F.R.D. 110, 116, 123, 124, 128, 129 (S.D.N.Y. 2009). Significantly, *Currency Conversion Fee* was not preceded by a government investigation. *Id.* at 129.

Like this case, *High-Tech Employees* and *Currency Conversion Fee* were large antitrust litigations with multiple sophisticated defendants represented by counsel of the highest caliber, and each yielded a multi-hundred million dollar settlement. But plaintiffs' counsel in those litigations

---

[7]     Mr. Pearl's authorship of a treatise on the issue of attorney fees is noteworthy, and he may qualify as an expert on the **law** of attorney fees. But his qualification to opine on the factual question of the reasonableness of IPP Counsel's fee request is doubtful. Indeed, the "knowledge, skill, experience, training, or education," Fed. R. Evid. 702, that purportedly qualifies Mr. Pearl to opine on the reasonableness of that fee request appears to largely consist of the fact that he regularly opines on attorney fee requests. *Cf.* S. Pete Worden, *On Self-Licking Ice Cream Cones*, 26 ASP Conference Series 599, 600-01 (1992).

expended only about 10,000 hours per year of litigation, i.e., less than half of the 22,000 hours per year that IPP Counsel seeks to include in their lodestar for this case. It is not mere hindsight criticism to suggest that the number of "reasonably expended" hours is far less than—perhaps half—the 183,000 hours IPP Counsel claims.

### B.    No multiplier is warranted.

Despite seeking fees for 49 separate law firms, with the resulting inefficiencies yielding a grossly excessive claim for 186,000 hours of legal services, IPP Counsel seeks to multiply that result even further, asserting "the exceptional complexity of this litigation" and the "results obtained for the Class." Fee Mot. (D.E. 4071) at 27. As explained above, the results in this case are not exceptional, and the size of the settlement is primarily attributable to the efforts of persons other than IPP Counsel, as well as the pervasiveness of CRT Products. Even if the Court were to disagree, exceptional results do not in of themselves justify a multiplier. *WPPSS*, 19 F.3d at 1303.

IPP Counsel notably claim very high "reasonable hourly rates" of up to $1,250 per hour. *See, e.g.*, Scarpulla Dec. (D.E. 4069) at ¶ 7. To support the reasonableness of those rates, IPP Counsel's proffered expert, Mr. Richard Pearl, compares the claimed hourly rates to similar—but frequently lower—rates charged by the nation's premier white shoe law firms. Pearl Dec. (D.E. 4071-15) at ¶ 34. Clients do not retain such firms—or pay those rates—with the expectation of obtaining anything less than extraordinary results in exceptionally complex cases.

In *Washington Public Power System Securities Litigation*, 779 F. Supp. 1056 (D. Ariz. 1991), *vacated on other grounds* 19 F.3d 1291 (9th Cir. 1994), the court addressed this very issue. Noting that the plaintiffs' counsel in that case "represent[ed] the highest echelon in the securities litigation bar" and "their stature is linked to past success," the court concluded that "[t]heir hourly rates necessarily reflect the same component." 779 F. Supp. at 1061-62. The court then explained that "[c]ommensurate with their skill and reputation comes an expectancy of results that exceed average levels." *Id.* at 1062. Those "[c]ounsel demand and receive the highest fees *because* they obtain extraordinary results." *Id.* And because "[t]hose very fees formed the basis of [the] court's lodestar calculation," the court declined to award a multiplier because the results did not "exceed the

extraordinary." *Id.* This Court applied essentially the same analysis in *Loretz v. Regal Stone Ltd.*, 756 F. Supp. 2d 1203, 1216 (N.D. Cal. 2010) (Conti, J.). It should do so again here: IPP Counsel can have their high hourly rates or they can have their multiplier; they cannot have both.[8]

### C.   The fee request of lead counsel's own firm is deficient and unreliable, raising serious doubt as to the entirety of IPP Counsel's claimed lodestar.

#### 1.   TATP's fee application fails to support much of its requested fee, and it appears to impermissibly seek compensation at associate rates for work performed by contract attorneys.

In determining class counsel's lodestar, "the district court must determine a reasonable hourly rate considering the experience, skill, and reputation of the attorney requesting fees." *Adoma v. Univ. of Phoenix, Inc.*, 913 F. Supp. 2d 964, 983 (C.D. Cal. 2012) (quoting *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986)). "This determination is not made by reference to rates actually charged . . . ." *Id.* "Instead, the court should use the prevailing market rate in the community for similar services of lawyers of reasonably comparable skill, experience, and reputation." *Id.* The fee applicant, of course, bears the burden of supplying the court with the requisite information.

Here, lead counsel's firm, Trump, Alioto, Trump & Prescott LLP ("TATP"), seeks fees based on the work of seventeen timekeepers. But TATP's fee application provides information on the experience, skill, and reputation for only three of those timekeepers: Mario Alioto, Joseph Patane, and Lauren Capurro. *See generally* Alioto Dec. (D.E. 4073-1) at Ex. 1. The court therefore has no basis for ascertaining the reasonable hourly rate for the remaining fourteen timekeepers.

Of the TATP timekeepers whose experience was not submitted for the court's review, ten are identified as TATP "associates," a term generally understood to refer to attorneys who are regular employees of a law firm. But those ten individuals appear to have been employed as contract attorneys, not as associates. For example, a search of the California bar roll for TATP "associate" David Denison yields a single candidate. J.S. St. John Decl. Comp. Ex. 23. But Mr. Denison's LinkedIn profile does not indicate any affiliation with TATP, and instead states that he was an

---

[8]   A significant portion of IPP Plaintiffs' claims were withdrawn in the face of a Rule 11 motion. Alioto Dec. (D.E. 4071-1) at ¶ 22-24. Pressing claims that violate Rule 11 is emphatically not characteristic of the highest echelon of the bar and its attendant hourly rates.

"independent legal consultant" during the same time frame. *Id.* Mr. Denison confirmed that he worked only as a "project attorney" for TATP. J.S. St. John Decl. at ¶ 30. The LinkedIn profile of TATP "associate" Silvia Roell even makes express what Mr. Denison's implies: Ms. Roell was employed by TATP as a "contract attorney," not as an associate. J.S. St. John Decl. Comp. Ex. 24.

More broadly, TATP's fee request offers no reason to believe any of the ten "associate" timekeepers for whom no background information was submitted were anything other than low-level contract attorneys. TATP itself characterizes as "document review" 82.1% of the work—totaling 5833 hours—performed by those ten individuals. And TATP characterizes another 8.1% of their work—totaling 575 hours—as "deposition preparation," although none of them appear to have taken or defended a deposition. Indeed, Natalie Kabasakalian is the only one of the ten "associates" who appears to have undertaken significant work outside of those two categories.

Although there is some doubt as to whether a sophisticated client would tolerate any markup of work performed by contract attorneys, courts often assume otherwise. Regardless, contract attorneys should not be incorporated into a fee request using the same billing rates as associate attorneys. *E.g., City of Pontiac Gen. Employees Ret. Sys. v. Lockheed Martin Corp.*, 954 F. Supp. 2d 276, 280 (S.D.N.Y. 2013) ("[T]he Court questions the reasonableness of a mark-up of these contract attorneys' rates to $295 to $435 per hour. * * * * [A] sophisticated client, knowing these contract attorneys cost plaintiff's counsel considerably less than what the firm's associate attorneys cost (in terms of both salaries and benefits) would have negotiated a substantial discount in the hourly rates charged the client for these services."); *see also In re Weatherford Int'l Sec. Litig.*, No. 11-cv-1646, 2015 U.S. Dist. LEXIS 3370, at *5 (S.D.N.Y. Jan. 5, 2015) (noting lack of persuasive evidence justifying over 600% markup of "staff attorney" rates to $375-$395 per hour); *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 970 (N.D. Cal. 2014) (noting rates of $47 and $59 per hour for contract attorneys); *Apple, Inc. v. Samsung Elec. Co.*, No. 11-1846 LHK, 2012 U.S. Dist. LEXIS 160668 at *26 Table (N.D. Cal. Nov. 7, 2012) (noting rate of $125 per hour for contract attorneys).

TATP claims billing rates of up to $450 per hour for the ten contract attorney "associates" for whom TATP elected to forego providing background information. The billings for those "associates" account for about $2.8 million of TATP's $15.7 million lodestar. Assuming a market

rate of $50 per hour for contract attorneys in the Bay Area, the correct lodestar for those ten "associates" is about $356 thousand. *See Banas*, 47 F. Supp. 3d at 970. Even assuming the more generous rate of $125 per hour in *Apple*, the lodestar for those ten "associates" is only $889 thousand. Either way, TATP's requested lodestar should be reduced by at least $2 million.

TATP is not alone in its deficiencies. IPP Counsel's fee requests are replete with attorneys with only a name disclosed, but for whom breathtakingly high rates are claimed. For example, Lovell Stewart Halebian and Jacobson LLP seeks $3,194,982.50 for 7350.0 hours of work—at rates of up to $950 per hour—but fails to provide information other than the names of its attorneys and whether each is a partner or associate. Compendium Dec. (D.E. 4073-5). Neither the Court nor class members can meaningfully review such claims. Any IPP Counsel that failed to submit adequate information regarding the experience, skill, and reputation of its attorneys should have its claimed lodestar significantly reduced.

### 2.    IPP Counsel appear to impermissibly seek fees incurred in connection with claims that were withdrawn in the face of a Rule 11 motion.

IPP Counsel appear to seek fees incurred in connection with claims withdrawn in the face of a Rule 11 motion. *See* Alioto Dec. (D.E. 4071-1) at ¶¶ 22-24. Moreover, those fees appear to be a material part of at least TATP's fee request. *Id.* at ¶ 23 ("Lead Counsel for the IPPs performed an *extensive* review of the strength and importance of these allegations."); *cf. In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1016-17 (N.D. Cal. 2010) ("The Indirect Complaint is . . . *replete* with allegations concerning both CRT and CRT Products. * * * * The Court concludes that both complaints allege conspiracies regarding both CRTs and the products into which CRTs are incorporated."). Of course, time spent on claims that were withdrawn in the face of a Rule 11 motion is a quintessential example of "hours a reasonable lawyer would not have spent, hours unreasonably spent, or work done so badly it is of no value to the common fund beneficiaries." *CPP*, 109 F.3d at 608. No fees may be awarded for such work. *See id*. TATP's failure to break out its fee request by task, however, leaves the Court ill-equipped to evaluate whether or not such hours are impermissibly included in TATP's fee request or to make the appropriate reduction.

1

        **3.**        **The Declaration of Robert J. Bonsignore (D.E. 4072) raises serious doubt as to TATP's timekeeping and the entirety of IPP Counsel's claimed lodestar.**

2

3        This case includes the unusual circumstance of an IPP Counsel submitting a sworn

4 declaration raising doubt as to the reliability of TATP's timekeeping. Bonsignore Dec. (D.E. 4072) at

5 ¶ 14 (regarding timekeeping: lead counsel Mario Alioto "told me not to 'worry about it', and that he

6 'figure(s) time at the end of every case'"). Particularly when viewed in light of IPP Counsel's

7 dubious assertion that 183,000 hours were "reasonably expended" in this litigation, their submission

8 of only vague bins of those hours in a dozen amorphous categories, and the specific deficiencies in

9 the fee request of TATP, i.e., lead counsel's own firm, there is substantial reason to doubt the

10 entirety of IPP Counsel's lodestar. The claimed lodestar should therefore not be used to award fees

11 or as a reliable cross-check for fees awarded as a percentage of the fund.

12

13                                       **CONCLUSION**

14        Granting IPP Counsel's grossly excessive request for over $192 million—33.3% of the $576

15 million megafund—would be inconsistent with the Court's fiduciary duty to the class, and it would

16 play directly into the public's worst perceptions that the class action mechanism principally benefits

17 lawyers, rather than the consumers they supposedly represent. In view of the facts of this case and

18 the fee awards in similar cases, a reasonable fee award for IPP Counsel is no more than 10% of the

19 $576 million megafund settlement.

20

21

22

23

24

25

26

27

28

1    Dated: October 8, 2015                     By:        /s/ Andrea Valdez

2                                                      _____

3                                               ANDREA VALDEZ (Cal. Bar No. 239082)
                                                530 S. Lake Avenue, No. 574
                                                Pasadena, CA 91101
4                                               Tel: (626) 817-6547
                                                andrea.valdez.esq@gmail.com
5
                                                JOSEPH SCOTT ST. JOHN
6                                                 (*pro hac vice* pending)
                                                514 Mockingbird Drive
7                                               Long Beach, MS 39560
                                                Tel: 410-212-3475
8                                               jscottstjohnpublic@gmail.com

9                                               *Attorneys for Objector Douglas W. St. John*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I, Andrea Valdez, declare as follows:

I am counsel of record for Objector Douglas W. St. John. I am over the age of eighteen years and not a party to this action.

On October 8, 2015, I caused the foregoing OBJECTION OF CLASS MEMBER DOUGLAS W. ST. JOHN TO IPP MOTION FOR AWARD OF ATTORNEYS' FEES AND CONDITIONAL OBJECTION TO SETTLEMENT to be served via the Court's CM/ECF system.

On October 8, 2015, I caused the foregoing OBJECTION OF CLASS MEMBER DOUGLAS W. ST. JOHN TO IPP MOTION FOR AWARD OF ATTORNEYS' FEES AND CONDITIONAL OBJECTION TO SETTLEMENT to be served via First Class Mail on

>       CRT Claims
>       c/o The Notice Company
>       P.O. Box 778
>       Hingham, MA 02043

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES THAT THE FOREGOING IS TRUE AND CORRECT.


Executed at Pasadena, California on October 8, 2015.


>                       /s/ Andrea Valdez