Christopher M. Curran (*pro hac vice*)
ccurran@whitecase.com
Lucius B. Lau (*pro hac vice*)
alau@whitecase.com
Dana E. Foster (*pro hac vice*)
defoster@whitecase.com
White & Case LLP
701 Thirteenth Street, N.W.
Washington, DC  20005
Telephone:  (202) 626-3600
Facsimile:  (202) 639-9355

*Counsel to Defendants Toshiba Corporation,
Toshiba America, Inc., Toshiba America
Information Systems, Inc., Toshiba America
Consumer Products, L.L.C., and Toshiba America
Electronic Components, Inc.*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
(SAN FRANCISCO DIVISION)

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 07-5944 SC<br>MDL No. 1917 |
| This Document Relates to:<br><br>CERTAIN DIRECT ACTION PLAINTIFFS' ACTIONS | **DECLARATION OF SAMUEL J. SHARP IN SUPPORT OF TOSHIBA'S REPLY IN SUPPORT OF ITS MOTION FOR RECONSIDERATION** |

White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005

I, Samuel J. Sharp, hereby declare as follows:

1.      I am an attorney with the law firm of White & Case LLP, counsel for Defendants Toshiba Corporation, Toshiba America, Inc., Toshiba America Consumer Products, LLC, Toshiba America Information Systems, Inc., and Toshiba America Electronic Components, Inc. (collectively, "Toshiba").

2.      I submit this declaration in support of Toshiba's Reply in Support of Its Motion for Reconsideration, filed contemporaneously herewith.  I have personal knowledge of the facts stated herein, and I could and would competently testify thereto if called as a witness

3.      Attached hereto as Exhibit A is a true and correct copy of the May 6-7, 2002 Minutes of the Civil Rules Advisory Committee as made publicly available at: www.uscourts.gov/file/15155/download?token=-4CXsAs7.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed this 11th day of December, 2015, in Washington, D.C.


_____
Samuel J. Sharp

DECLARATION OF SAMUEL J. SHARP IN SUPPORT OF
TOSHIBA'S REPLY IN SUPPORT OF ITS MOTION FOR RECONSIDERATION
Case No. 07-5944-SC
MDL No. 1917
2

White & Case LLP
701 Thirteenth Street, NW
Washington, DC 20005

# EXHIBIT A

**Minutes**

**Civil Rules Advisory Committee**

**May 6-7, 2002**

The Civil Rules Advisory Committee met on May 6 and 7, 2002, at the Park Hyatt Hotel in San Francisco. The meeting was attended by Judge David F. Levi, Chair; Sheila Birnbaum, Esq.; Justice Nathan L. Hecht; Dean John C. Jeffries, Jr.; Mark O. Kasanin, Esq.; Judge Paul J. Kelly, Jr.; Judge Richard H. Kyle; Professor Myles V. Lynk; Hon. Robert D. McCallum, Jr.; Judge H. Brent McKnight; Judge Lee H. Rosenthal;  Judge Thomas B. Russell; Judge Shira Ann Scheindlin; and Andrew M Scherffius, Esq.  Professor Edward H. Cooper was present as Reporter, and Professor Richard L. Marcus was present as Special Reporter.  Judge Anthony J. Scirica, Chair, Judge Sidney A. Fitzwater, and Professor Daniel R. Coquillette, Reporter, represented the Standing Committee. Judge Bernice B. Donald attended as liaison from the Bankruptcy Rules Committee. Peter G. McCabe, John K. Rabiej, and James Ishida represented the Administrative Office.  Thomas E. Willging represented the Federal Judicial Center. Ted Hirt, Esq., Department of Justice, was present. Observers included John Beisner; Alfred W. Cortese, Jr.;  Jonathan W. Cuneo (NASCAT); Peter Freeman (ABA); Jeffrey Greenbaum (ABA); Elizabeth Guarnieri; Marcia Rabiteau; Ira Schochet; and Sol Schreiber.

Judge Levi opened the meeting by observing that although the agenda book was thick with several long projects, many of the items on the agenda had become familiar by long study over the years.  Most committee members have participated in the process from the beginning of these projects to the present conclusions.  The long-drawn-out committee process has been vindicated. Public comments, both in writing and at the hearings, have been very useful.  The committee recognizes its debt of gratitude to the many lawyers, judges, and others who have helped to improve the proposed rules.  The committee also has done good work.  Judge Rosenthal in particular has devoted enormous effort to Rule 23 for many years.  The Reporters have done a marvelous job in synthesizing the public comment and in preparing the rule language and notes for the Committee's consideration.  And the support provided by John Rabiej has been extremely important.

Many successive drafts of the agenda materials have culminated in proposals of extraordinarily high quality.  The reporters have had to struggle with the multiple functions of the Committee Notes.  When first published, the Notes have been used to explain why the Committee believes the proposed changes are desirable.  But as the process matures, the Notes have shifted to the reduced role of explaining what the committee has done as a guide to future application.  The Notes for these rules proposals reflect a dramatic pruning process in response to these concerns.

*January 2002 Minutes*

The committee approved the minutes for the January 2002 meeting.

*Rule 51*

Only one change was proposed in the text of Rule 51 as published.  Some comments, and particularly the comments by the Department of Justice, suggested that the plain error provision of Rule 51(d)(3) might go too far.  As published, Rule 51(d) provided that a party "may assign as error" three categories of instruction mistakes.  The third, (d)(3), was "a plain error in or omission from the instructions."  The "plain error" term was borrowed from Criminal Rule 52(b), a general plain-error

Minutes
Civil Rules Advisory Committee, May 6-7, 2002
page -2-

provision that applies to a wide variety of errors in addition to instruction errors. But Criminal Rule 52(b) does not establish a right to assign a plain error. Instead, by providing that a plain error may be "noticed," it recognizes judicial discretion. As a general matter, the Standing Committee prefers that different sets of rules adopt the same approach to similar problems unless a good reason can be shown for differences. There is little apparent reason to believe that plain-error review should be more readily available in a civil action than in a criminal prosecution. Adoption of the Criminal Rule approach was approved accordingly. Two additional changes in the plain-error provision were suggested as well. The first was to delete "or omission from," on the theory that a "plain error in the instructions" embraces wrongs both of omission and commission. This change was approved. The second was to adopt the expression of the newly restyled Criminal Rules by substituting "consider" for "notice." This change too was approved.

As thus amended and redesignated as Rule 51(d)(2), the plain error provision recommended to the Standing Committee for adoption reads: "A court may consider a plain error in the instructions affecting substantial rights that has not been preserved as required by Rule 51(d)(1)(A) or (B)."

Two additions were proposed for the Rule 51 Committee Note. The first adds three sentences on "scope," stating that Rule 51 governs instructions on the law that governs the jury's verdict. Other instructions, such as preliminary instructions to a venire or cautionary instructions in immediate response to events at trial, fall outside Rule 51. This addition was discussed briefly by asking whether it was useful to give examples of instructions that fall outside Rule 51. The conclusion was that the examples are useful, and that it was clear that they were only examples, not a complete list. The second Note addition is a brief description of Supreme Court decisions that explain the plain-error approach taken in criminal cases. Both changes were approved.

A substantially reduced version of the published Committee Note was presented as an illustration of the ways in which justifications and helpful practice comments can be stripped away, leaving only explanations of the changes made in the rule. The proposed deletions were reviewed in order, and approved for deletion.

The committee voted to recommend that the Standing Committee recommend adoption of Rule 51 as revised.

*Rule 53*

Judge Scheindlin presented the report of the Rule 53 Subcommittee. She observed that although the public comments and testimony on the proposed Rule 53 did not match in volume the comments on Rule 23, the comments were very helpful. They led the Subcommittee, meeting by telephone, to suggest ten changes in the rule as published. In order of the Rule 53 subdivisions, these are to: (1) add to subdivision (a)(1)(C) an express preference to "pretrial and post-trial" matters; (2) make a small style change in (a)(2); (3) add several specific matters to the (b)(2) provisions that address the contents of the order appointing a master; (4) provide an opportunity to be heard before the appointment order is amended; (5) clarify the (b)(4) effective-date provision; (6) raise the

October 7, 2002

Minutes
Civil Rules Advisory Committee, May 6-7, 2002
page -3-

question whether the court "must" afford an opportunity to be heard before acting on a master's report; (7) recommend a new (g)(3) provision that increases the court's responsibility of de novo review of the facts; (8) change the (g)(4) provision for review of conclusions of law to parallel the changes on fact review; (9) adopt the tentatively published (g)(5) provision for reviewing matters of discretion; and (10) delete entirely subdivision (i), which deals with appointment of magistrate judges to serve as masters.

These changes, and other possible changes that were considered but not recommended, were discussed one-by-one.

Rule 53(a)(1)(C), as published, authorizes appointment of a master to "address matters that cannot be addressed effectively and timely by an available district judge or magistrate judge of the district." Some of the comments expressed concern that this general provision might be read to supersede the limits that Rule 51(a)(1)(B), drawing from longstanding doctrine, imposes on reference to a master for trial. This interpretation was not intended. Instead, (C) was intended to establish a standard to control the uses of masters for pretrial and post-trial purposes that have grown up since Rule 53 was adopted. The standard is different from the trial-master standard, and must be kept clearly separate. The distinction is emphasized by adding an explicit reference to these uses, so that (C) will read: "address pretrial and post-trial matters * * *." This proposed change was accepted without further discussion.

A separate question was addressed to (a)(1)(C). Suppose a master is appointed to address defined matters on a showing that no available district judge or magistrate judge can address those matters effectively and timely, but later developments in the court's docket make it possible for a judge to address those matters? It was agreed that the time for applying the (a)(1)(C) standard is the time of the initial appointment; the appointment need not be subject to the disruption of continual reexamination of this criterion.

Rule 53(a)(2) addresses grounds for disqualification. As published, it referred to disclosure of "a" potential "ground" for disqualification. A style improvement was suggested, making the rule refer to disclosure of "the potential grounds for disqualification." The style change was accepted without further debate. The appropriateness of permitting the parties to consent to appointment of a master who would be disqualified without party consent was discussed. The parties cannot consent to continued service by a judge who is disqualified; why should party consent be accepted as to a master? Two responses were given. A master is not a judge; all parties may prefer the appointment of a particular person who is particularly well qualified to discharge the master's duties, and in such circumstances the need to protect the open assurance that there is no basis for disqualification appears in a different light. In addition, one reason for refusing to accept party consent to continued service by a judge who otherwise should be disqualified is concern that lawyers who expect to appear before the same judge in other matters may feel pressure to consent. That concern is much reduced with respect to a master.

October 7, 2002

Minutes
Civil Rules Advisory Committee, May 6-7, 2002
page -4-

Rule 53(a)(3) was addressed by several comments.  As published, it provides that a master must not during the period of the appointment appear as an attorney before the judge who made the appointment.  The comments suggested that this disqualification will impose an undue hardship, particularly on lawyers in small firms.  The subcommittee considered these comments, but concluded that the provision should remain as published.

Discussion of the disqualification as attorney began with the observation that the disqualification may deprive the court of the opportunity to appoint a good lawyer as master.  There is no disqualification from appearing in other cases before a judge who has appointed a lawyer to conduct a trial or appeal; why should appointment as master be any different?  The immediate response was that a master is functioning not in the adversary process, as an appointed lawyer does, but as an adjunct of the court.

One approach might be to mollify the rule by excepting cases that are active at the time of the appointment as master.  Another might be to seek the consent of the parties in other cases in which the master appears as lawyer, but that would be an invitation to withhold consent as a means of disqualifying a feared adversary.  Concern also was expressed that if the master is not disqualified, a party in another case with the master as attorney might seek to disqualify the appointing judge.

It was protested that the disqualification will be particularly costly in a small bar with few lawyers.  In the western states, for example, masters are regularly appointed in water-rights cases.  A master may be involved as lawyer in twenty other cases — and there is only one judge handling them all.

The appearance of impropriety was brought back to the discussion, asking whether it is proper for the same person to act simultaneously as a court adjunct and also as an adversary representative before the court.  Perhaps the concerns about depleting the pool available for appointment could be addressed by adding a qualification that permits an attorney-master to appear before the appointing judge in exceptional circumstances.

The question was renewed: what do we lose by deleting the disqualification?  It remains possible for the judge to impose disqualification in making the initial appointment.

It was suggested that the (b)(2)(B) limit on ex parte communications between master and judge may reduce the fears of parties in other litigation that a master-attorney has a special entree with the judge.

The interest of the states in regulating attorney conduct was noted.  The problem of simultaneously working as a judge's master and appearing before the judge in unrelated litigation is likely to be seen as presenting a problem of conflicting interests, a matter traditionally regulated by state disciplinary authorities.  States likewise regulate the appearance of impropriety, a concept with a long and detailed history.  A federal judge cannot, by appointment, immunize a master from regulation by state authorities.

October 7, 2002

Minutes
Civil Rules Advisory Committee, May 6-7, 2002
page -5-

A different analogy is provided by magistrate judges. Judicial Conference conflict-of-interest rules for part-time magistrate judges provide that a part-time magistrate judge may appear in any civil action in any court, and may appear as counsel in a criminal action in any state court but not in any court of the United States. A partner or associate of a part-time magistrate judge may appear as counsel in any federal court other than in the district in which the part-time magistrate judge serves, so long as the magistrate judge has not been involved in the criminal proceeding in connection with official duties.

Noting that the rule does not require disqualification of the master's firm — and that the Note observes that this question is left to the discretion of the appointing judge — it was asked why the appearance is different for other lawyers in the master's firm. It was suggested that screening mechanisms can be used within the firm. But it was noted that the firm is likely to make it known — perhaps on its web page — that one of its lawyers is master for a named judge. And some clients are likely to find this an inducement to retain the firm. On the other hand, disqualification of the entire firm would make it impossible for any lawyer in a firm with many lawyers to accept appointment as a master.

The question of screening within the firm was carried further. Many states accept the use of ethics screens to avoid extending disqualification from an individual lawyer to an entire firm. But other states do not. Discussions of possible federal rules of attorney conduct have repeatedly explored the question whether a federal rule, or a federal court order, can immunize a lawyer from state discipline. The question has proved very difficult. Simply attempting to provide an answer in Rule 53 will not guarantee the result. Perhaps the risk of conflict with state requirements, or confusion, means that (a)(3) should be deleted.

In addition to state rules, most federal courts have local rules that include conflict-of-interest provisions. Adoption of an express Rule 53 provision would override many of these rules.

It was suggested that perhaps (a)(3) should be revised to state that the court may, in appointing a master, order that the master be disqualified. But there is no need to say that in the rule; the judge can impose that term as a condition of appointment. Indeed, a judge would be expected to screen a lawyer before appointment as master, at least asking how many cases the lawyer has before the judge. But the parties may recommend the master, and the judge may be lulled by the parties' recommendation to avoid further inquiry.

A counter-suggestion was that it would be better to establish a presumption of disqualification, subject to exceptions.

This discussion prompted the suggestion that it is proper to write a rule that does not attempt to solve every possible problem. Retaining the (a)(3) disqualification provision may create a problem. Big firms and small firms both may find that a lawyer cannot practicably serve as master, although for different reasons. Big states with big bars may avoid problems that will be encountered in smaller states with small bars. The duration of an appointment may be unpredictable when it is

October 7, 2002

Minutes
Civil Rules Advisory Committee, May 6-7, 2002
page -6-

made, making it more difficult to foresee what problems a disqualification provision will generate.

An observer stated that in twenty-four years of serving as a master in many cases, the judge always asks whether there is a conflict. Both the master and judge always assume that the master will not appear before the judge. But the matter is not addressed in the order of appointment. At the same time, it is always assumed that the master's firm can appear before the judge so long as there is an ethical wall — the Note language suggesting the judge has discretion to disqualify the entire firm should be abandoned.

The Federal Judicial Center study of masters did not come across any case in which the disqualification question was addressed.

It was suggested that it might be better to address the disqualification question only in the Note, perhaps by suggesting that the question is one that may be addressed by disciplinary rules.

The response was made that disqualification does belong in the rule. Rule 53 has spoken only to trial masters. The revision is designed to bring Rule 53 to bear on the many appointments for non-trial duties. All master appointments should be brought into the rule. The disqualification issue is important. That it is difficult does not justify leaving it out of the rule.

Another suggestion was that the disqualification problem may not be as severe as it seems: in a multi-judge district, the master can avoid disqualification by having other cases reassigned to other judges. Yet reassignment may not be a panacea; the master's client may prefer the judge originally assigned, creating a conflict for the master. And the court itself may not allow reassignment.

The discussion of disqualification was summarized by suggesting four alternatives: carry forward the disqualification provision as published in (a)(3); modify the provision by permitting defeat of the disqualification in exceptional circumstances; modify the provision still further, to say only that the court may order disqualification; or delete the provision entirely.

A motion to delete (a)(3) passed by voice vote, with dissents. Mark Kasanin abstained because he is a member of the Maritime Law Association practice and procedure committee that was one of the groups raising the issue.

The Note is to be revised to describe the question, alluding to the overtones of state disciplinary interests.

Rule 53(b)(2) sets out matters that must be included in the order appointing a master. The Department of Justice suggested several additions to this provision, reflecting their frequent experience with masters. The Subcommittee decided to recommend adoption of several of these additions.

One change was recommended in (b)(2)(A), adding specification of any investigating or

October 7, 2002

Minutes

Civil Rules Advisory Committee, May 6-7, 2002
page -7-

enforcement duties.  This change was approved, with a style change to read "any investigation or enforcement duties."

(b)(2)(B), addressing ex parte communications between master and the parties or court, would be changed by adding this: "limiting ex parte communications with the court to administrative matters unless there is good cause to permit ex parte communications on other matters."  It was asked how the limit on ex parte communications with the court will work.  The order will tell the parties what the rules are.  The judge adopts the limit in the appointing order, or decides not to adopt the limit so that ex parte communications are not limited to administrative matters.  And the order can be amended.

Ex parte communications with the parties are treated differently — some master functions with respect to mediation or settlement require ex parte communication.  But an observer noted that in many years of experience as a master, he has followed the practice of never talking to either side without the permission of all parties.  He suggested that the rule should adopt this standard, with an exception for settlement masters or enforcement masters.

It was asked why have a "good cause" restraint on permitting ex parte communications with the court on non-administrative matters?  Why not just leave it to the court, abandoning the suggested new language?  A response was that appointment of a master is an exceptional event; the rule should state the normal expectation.  A further response was that in settlement or mediation, the parties may prefer that the court not hear from the master.  And if the master believes there would be a benefit in ex parte communications with the court, the master can raise the question.  But it was responded that it is difficult to understand what circumstances might establish good cause — as a matter of ethics, for example, a master should not communicate with the court on settlement matters.  In rebuttal, it was urged that there are many different master functions.  In a mass-tort case, for example, the master may be appointed for functions that require constant communication with the court; in one current action the master consults with the court daily.

Further discussion was followed by adoption of a motion to change the wording of (b)(2)(B): "the circumstances — if any — in which the master may communicate ex parte with the court or a party, limiting ex parte communications with the court to administrative matters unless the court in its discretion permits ex parte communications on other matters."

(b)(2)(C), proposed after much discussion of what Rule 53 might say about the record of proceedings before a master, simply states that the order appointing a master must state the nature of the materials to be preserved as the record.  The Department of Justice suggested that the rule should be made more specific, addressing the manner in which the record is made, including an obligation to create a record.  The difficulty, however, is that masters perform many functions; it may be difficult or even counter-productive to require a record of settlement or mediation work, or of enforcement-investigation work.  We do not want to require every master to preserve a record of everything done as master.  The key may be whether the master is to engage in fact-finding, but even

October 7, 2002

Minutes
Civil Rules Advisory Committee, May 6-7, 2002
page -8-

that may be difficult to draft. But even then there is a risk that a direction to preserve identified categories of material may lead a master to disregard other material that should be retained.

The problem of making a record remains difficult. It was agreed to add a filing requirement in (C), to parallel the method-of-filing addition to (D) that was discussed in tandem. The order must state "the nature of the materials to be preserved and filed as the record * * *." It may be difficult to know what materials should be filed at the time the appointment is made, but the core requirement is clear: a master should make and file a complete record of everything that is to be considered in making or recommending findings of fact on the basis of evidence. The order can be amended to respond to needs that emerge as the master proceeds to discharge the appointed duties.

It was asked whether the (b)(2)(D) requirement that the order state the standards for reviewing the master's order and recommendations could be used to supersede the standards of review set out in (g)(3) and (4). It would be possible to ensure against this possibility by expressly incorporating (g)(3) and (4), so that the appointing order must state "the standards under Rule 53(g)(3) and (4) for reviewing the master's orders and recommendations." But it was concluded that the intent is sufficiently clear on the face of the rule; a sentence will be added to the Committee Note, however, to make the point.

Subdivision (b)(3) provides that the order appointing a master may be amended at any time after notice to the parties. Two changes were considered; one is recommended for adoption. The public comments suggested that if the master is appointed by consent of the parties under Rule 53(a)(1)(A), consent of all the parties should be required to amend the order. Although this suggestion seems attractive on first approach, it dissolves on closer examination. The most compelling problem is that the court must have power to cancel the appointment if the master's duties are not being performed well, or if the court concludes that the court itself should discharge those duties. Other problems can emerge as well — the need to adjust the terms of compensation, for example, might be thwarted by the veto of one interested party. That change is not recommended. But a second change is recommended: the rule should expressly provide an opportunity to be heard on a proposed amendment. This change was adopted. Later discussion led to one more change: subdivision (b)(4), dealing with entry of the appointing order, was moved ahead of (b)(3) because entry logically comes before amendment. What was published as (b)(3) will become (b)(4), renumbering what was (b)(4) as (b)(3).

The "effective date" provision published as Rule 53(b)(4) was awkwardly drafted. Further reflection led to a recommendation that it be changed to a paragraph on "Entry of order." Brief discussion led to approval of this draft: "The court may enter the order appointing a master only after the master has filed an affidavit disclosing whether there is any ground for disqualification under 28 U.S.C. § 455 and, if a ground for disqualification is disclosed, after the parties have consented with the court's approval to waive the disqualification."

Action on a master's order, report, or recommendations is covered by subdivision (g). (g)(1),

October 7, 2002

Minutes

Civil Rules Advisory Committee, May 6-7, 2002

page -9-

as published, said that the court "may" afford an opportunity to be heard.  The committee approved the subcommittee recommendation that "may" be changed to "must."  As with other hearing requirements in the rules, a "hearing" does not require live argument.  When there is no occasion to take witness testimony, the court can afford a hearing by written submissions only.

It was asked whether it is wise to include in (g)(1) authority for the court to take evidence in acting on a master's report.  This authority appears in present Rule 53(e)(2).  Given all that masters may be asked to do, it seems wise to preserve the authority — the alternative of remanding to the master to take any "new" evidence may be cumbersome, and the court may prefer to hear again the same testimony that was presented to the master.  The opportunity to take evidence may be particularly useful when the court provides de novo review, as recommended by proposed revisions of Rule 53(g)(3).

It was pointed out that subdivision (g)(2) is captioned "Time," but in fact is the basic provision for objections.  It was agreed that a new caption must be found.  One possibility is "Time for Objections."

Fact review was addressed by publishing two versions of Rule 53(g)(3).  Version 1 called for de novo review unless the appointing order directed review for clear error, or unless the parties stipulate with the court's consent that the master's findings will be final.  Present Rule 53(e)(2) establishes clear-error review in nonjury cases, and (e)(4) permits the parties to stipulate for finality. The first version retained these as options, but established a preference for de novo review.  Version 2 sought to parallel the distinctions made on review of a magistrate judge by providing a preference for de novo review as to "all substantive fact issues," but a preference for clear-error review of "non-substantive fact findings or recommended findings."  Both versions reflected the growing concern expressed by several courts of appeals that Article III courts should not — and perhaps may not — surrender factfinding responsibilities to a non-Article III court adjunct.

The subcommittee proposed a new version that would require de novo review of all fact issues unless the parties stipulate with the court's consent that review will be for clear error or that the findings of a master appointed with party consent under 53(a)(1)(A) or for pretrial or post-trial duties under 53(a)(1)(C) will be final.  The requirement of party consent to depart from de novo review would reduce the Article III concerns.  Even then, it is not clear that the Article III problem is solved.  The problem is particularly acute with respect to a trial master who makes or recommends findings on the merits of the claims or defenses in the action.  But the parties cannot control the standard of review simply by their stipulation — the court must consent to the stipulation.  There is a long tradition of reliance on special masters, and Rule 53 has provided for clear-error review unless the parties stipulate to finality.  These traditions may satisfy the demands of Article III.  The *LaBuy* decision, however, may reflect an evolving trend that will reach beyond the justification for appointing a master to the standards of review.  A confident answer cannot be given until the Article III courts determine just how far Article III limits master practice.  It should be remembered that the project to rewrite Rule 53 is motivated by the desire to bring pretrial and post-trial masters into the

October 7, 2002

Minutes
Civil Rules Advisory Committee, May 6-7, 2002
page -10-

rule for the first time. Present Rule 53 governs only trial masters. There is no clear reason yet to write a rule that rejects any use of trial masters, abandoning everything that has been in Rule 53 up to now. For the present, it seems better to continue to permit appointment of trial masters subject to the several new restrictions embodied in the rule: a presumption for de novo review that can be overcome only on stipulation of all parties and with the court's consent, abolition of masters in jury trials absent party consent, and a paring back that deletes the right of the parties to stipulate to finality for a trial master's findings unless the initial appointment was made by consent of the parties.

It was asked what value there is in having a master if all findings have to be reviewed de novo. One answer is that many masters will be appointed for pretrial and post-trial duties that do not lead to review of everything the master does. Even when review is sought, the parties may stipulate to clear-error review in these settings more readily than they would stipulate if finality were permitted for a trial master. And if the initial appointment is by party consent, stipulations for clear-error review or finality are likely to be made. De novo review is most likely to be provided for a trial master. Courts will not always be asked to decide every issue de novo.

The next question was whether the de novo review provision will require that the court review every fact finding even though no one objects. It was responded that in a vast number of cases nothing is done because there is no objection. But the court should remain free to act in the absence of objections. The process of resolving some objections, moreover, may lead the court to review and determine related fact findings that have not been the subject of objections. Still, it needs to be decided whether the district judge is required to act in the absence of objections. The Article III question does not extend to requiring decision of an issue that no party has asked to have decided. This conclusion seems even more clear when the master is acting on many types of pretrial matters, such as determining the facts surrounding a challenged discovery response.

It was asked how a court can make a de novo determination of credibility — clearly a matter of fact — without hearing the witness? It was pointed out that in reviewing findings by a magistrate judge, the court is not required to rehear the witnesses. Section 636(b)(1) provides that when a magistrate judge conducts evidentiary hearings a judge of the court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. * * * The judge also may receive further evidence or recommit the matter to the magistrate with instructions." In *United States v. Raddatz*, 1980, 447 U.S. 667, the Court ruled that de novo determination does not require rehearing the witness through live testimony. The Court, however, cautioned against rejecting a magistrate judge's credibility determination without seeing and hearing the witness, and several lower court decisions suggest that a redetermination of witness credibility requires hearing the witness.

These questions were redirected toward the provision for reviewing questions of law. Should the parties be able to consent to finality with respect to questions of law? It was urged that it is a bad idea to "box the judge in on the law." And it was asked when it is expected that the court will consent to a stipulation for finality — when the appointment is made, or when the parties seek to

October 7, 2002

Minutes

Civil Rules Advisory Committee, May 6-7, 2002

page -11-

make a stipulation later?  The stipulation is likely to be plausible only before findings are made. After findings are made, it is possible that all parties are prepared to make objections but to surrender the objections in return for surrender of all objections.  Then the situation is the same as if no objections are made.  But should the court be able to withdraw its consent to the finality stipulation after the findings are made?  And if the parties stipulate to finality, is the stipulation binding in the court of appeals as well as in the district court?  Surely both the district court and the court of appeals should be able to override the stipulation?

Several related questions came next: is there any need to provide for reviewing questions of law?  Why not make the review provision parallel to the fact-review provision?  Why not simply provide that review of law questions is de novo?

The question of an obligation to review in the absence of objections recurred.  Should a judge be obliged to review privilege determinations made by a master with respect to 500 documents when objections are made only as to ten?  Surely the provision should require de novo review only if an objection is made, giving permission to review de novo if no objection is made without requiring review.

It was observed that Rule 53(g) does not attempt to provide guides for distinguishing between matters of law and fact, nor to suggest the complications of "mixed questions."  There is a difference between interpreting a statute and applying a rule to a specific fact situation.  A party stipulation for finality with respect to issues of law application seems different from a stipulation with respect to more general questions of law.  Perhaps some questions of law-application should be analogized to matters of fact for this purpose, at least if we are to distinguish law from fact.  The Civil Rules never have attempted to provide guidance on these questions, however, and it is better not to begin the attempt now.

Further consideration of subdivisions (g)(3) and (4) included an alternative approach that would substitute a waiver approach for the stipulation for finality.  The waiver would be added as a new final sentence of (g)(2): "But the parties may with the court's consent waive the opportunity to object to a master's findings of fact or conclusions of law."  This waiver would be reflected in a revised (g)(3): "If a party has objected under Rule 53(g)(2) the court must decide de novo all issues raised by the objection on which a master has made or recommended findings of fact or conclusions of law, unless the parties have stipulated with the court's consent that the findings will be reviewed for clear error."  It would be possible to vary this approach by adding an express recognition that the court can review findings even in the absence of an objection: "The court may — and if a party has objected under Rule 53(g)(2) must — decide de novo * * *."

Discussion of this alternative approach led to revision of the new version initially submitted by the subcommittee.  The committee approved Rule 53(g)(3) to read: "The court must decide de novo all objections to findings of fact made or recommended by a master unless the parties stipulate with the court's consent that (A) the findings will be reviewed for clear error, or (B) the findings of

October 7, 2002

Minutes

Civil Rules Advisory Committee, May 6-7, 2002
page -12-

a master appointed under Rule 53(a)(1)(A) or (C) will be final." The committee approved Rule 53(g)(4) to read: "The court must decide de novo all objections to conclusions of law made or recommended by a master." The Committee Note will state that the court may decide questions of fact or law de novo even when no party objects.

Rule 53(g)(5) was published in brackets that expressed uncertainty whether it should be adopted. It establishes an abuse-of-discretion standard of review for a master's rulings on a procedural matter unless the appointing order establishes a different standard. Comments endorsed adoption of this provision. Courts should be able to determine what is a matter of "procedure" for this purpose. Adoption, deleting the brackets, was approved.

Rule 53(i) was designed to regulate the use of magistrate judges as masters. The version published for comment was shaped by concerns expressed in the Standing Committee. The published version was an awkward reflection of several pressures that push in different directions. There is a strong pressure to have judges act only in their official roles as judges. Stepping outside to perform other public acts is always sensitive, and it becomes even more sensitive when the acts are directly related to litigation before the judge's own court. This consideration would lead to prohibiting any role for a magistrate judge as master: if the task is one that can be performed as magistrate judge, it should be performed by acting as magistrate judge. If the task is one that cannot be performed as magistrate judge, a magistrate judge should not be appointed to perform it as master. This pressure is offset by others. One offsetting pressure arises from 28 U.S.C.A. § 636(b)(2), which provides both that a judge may designate a magistrate judge to serve as a special master pursuant to the Federal Rules of Civil Procedure and also that on consent of the parties a magistrate judge can be appointed to serve as special master in any civil case "without regard to the provisions of rule 53(b) * * *." This statute seems to favor appointment of magistrate judges, perhaps in part because the parties would not become responsible for the master's compensation. The force of this statute is reduced, however, by its position in the history of § 636: it was adopted before later amendments that considerably expanded the range of duties that can be assigned to a magistrate judge acting as magistrate judge. A second offsetting pressure arises from specific statutory provisions for special masters. Title VII of the Civil Rights Act of 1964 provides for assigning cases to a special master, and some judges have found magistrate judges a useful resource for these cases. Yet a third offsetting pressure arises from the concern that at times it may be better to assign a public judicial officer to perform some of the roles that may be assigned to a master and that cannot be assigned to a magistrate judge acting as magistrate judge. Hence the second sentence of the published proposal: "Unless authorized by a statute other than 28 U.S.C. § 636(b)(2), a court may appoint a magistrate judge as master only for duties that cannot be performed in the capacity of magistrate judge and only in exceptional circumstances."

Rule 53(i) elicited strong and cogent negative comments. It was opposed by the Committee on Administration of the Magistrate Judges System and by the Federal Magistrate Judges Association. These comments reflected the severe tensions at work in this area. The committee

October 7, 2002

Minutes
Civil Rules Advisory Committee, May 6-7, 2002
page -13-

concluded that it is better to delete all of 53(i).  These questions are better left to further evolution
of practice under the relevant statutes.

Deletion of Rule 53(i) led to discussion of the subcommittee proposal to adopt a new Rule
53(h)(4) that would absorb the final sentence of Rule 53(i) as published: "A magistrate judge is not
eligible for compensation under Rule 53(h)."  It was pointed out that there is no need for this
provision, and that including it in Rule 53 might create a confusing implication.  In April 1976, 1976
Conf. Rept. pp. 19-20, the Judicial Conference adopted a policy that precludes even a part-time
magistrate judge from accepting fees for services performed as a special master, "whether or not such
service is rendered in the magistrate judge's official capacity."  The committee agreed to delete newly
proposed 53(h)(4).

Further discussion of Rule 53 led to the question whether a master can be appointed to
conduct "Markman" hearings on the interpretation of patent claims under the pretrial provisions of
(a)(1)(C), or whether the appointment must meet the trial-master standards of (a)(1)(B).  The
Committee Note suggests that this task blurs the divide between trial and pretrial functions.  The
Markman case ruled that interpretation of patent claims presents a question of law to be decided by
the court, not a fact question for the jury.  Review of the master will be de novo as a matter of law
under Rule 53(g)(4).  Experience suggests that an expert master may be able to help resolve the
matter both more effectively and more timely, meeting the standards for appointment as a pretrial
master.  The Federal Circuit has approved and even praised the use of masters in this setting.  If the
expense seems disproportionate to the needs and stakes of the case, party objections to a reference
are likely to block the reference.  It was agreed that the Committee Note should be expanded slightly
to reflect this discussion.

The subcommittee did not have an opportunity to make recommendations on a substantially
shortened Committee Note that resulted from deletions proposed by the reporter.  Discussion led to
restoration of a few of the deletions and approval of the Note as thus shortened.  It was observed that
reduction of the lengthy Note was a good thing.

Finally, a few changes not recommended were discussed briefly.  The Department of Justice
proposed that Rule 53(c) be amended by adding an express provision that a master can enter a
protective discovery order under Rule 26(c).  The subcommittee concluded that confusion might
arise from singling out this one specific issue from the many other orders that a master might enter.
The subcommittee also reconsidered, in light of comments, two issues that had regularly been
considered in the course of preparing Rule 53 for publication.  One issue goes to the liability of a
master for malfeasance; early drafts included a provision for a bond to ensure an effective remedy,
but this provision was deleted.  One reason for deletion was fear that these issues approach matters
of substantive liability.  A second issue goes to appeal.  The opportunities for interlocutory review
of an order appointing a master are slim.  Many other important pretrial orders also are ordinarily
not appealable, however, and the subcommittee concluded that there is no reason to accord special
treatment to master appointments.  There is nothing like the years of experience and frustration that

October 7, 2002

Minutes

Civil Rules Advisory Committee, May 6-7, 2002
page -14-

led to adoption of the class-certification appeal provisions in Rule 23(f). Finally, several comments expressed fear that appointment of masters might be unduly encouraged by deletion of the provision in present Rule 53(b) that "reference to a master shall be the exception and not the rule." The Committee Note twice says that deletion of this phrase is not intended to weaken the strictures against appointing trial masters, the only subject covered by present Rule 53. The "exceptional condition" term is retained, and does all the needed work. Locating "the exception and not the rule" within a revised Rule 53 that covers pretrial and post-trial masters, and also masters appointed by consent, would of itself create problems. There was no suggestion that any of these items be added to Rule 53.

The revisions of Rule 53 approved by the committee, and the reduction of the Committee Note, were approved for recommendation to the Standing Committee.

*Rule 23*

Judge Rosenthal introduced the report of the Rule 23 Subcommittee. The first matter for attention will be to finish action on the proposals published in August 2001 in light of the public comments and testimony. The published proposals are deliberately narrow, although not unimportant. They focus on process. They provide guidance from the time of the certification decision to the end-point of acting on attorney fees. The Committee Notes published with these proposals may be shortened; much-improved versions are included in the materials. They describe what the amendments do. Further suggestions for refinement will be welcomed.

The second matter for attention is to consider what other Rule 23 topics might be approached. Earlier proposals to sharpen the criteria for class certification have been put aside for the foreseeable future. We chose not yet to address settlement classes, but to wait for *Amchem* and *Ortiz* to "percolate" in the lower courts. But the time may have come to think further about a settlement-class rule, and also about the special problems presented by "futures" plaintiffs.

Turning to the published proposals, the first amendment — Rule 23(c)(1)(A) — changes the time for certification from "as soon as practicable" to "at an early practicable time." This proposal, and the accompanying Note material, provoked extensive comment. The Subcommittee recommends that the published Rule be adopted, but proposes changes in the Committee Note to further improve the discussion of the relation between discovery and a well-informed certification decision.

Changes are proposed for other parts of (c)(1). (c)(1)(B) is changed by adding an express requirement that an order certifying a class appoint class counsel under Rule 23(g). (c)(1)(C) is changed by dropping all reference to a "conditional" class certification; the footnote explains the need to avoid any hint that a tentative class certification is appropriate. The Committee Note is changed to emphasize the ability to change the class definition if trial makes the need apparent. The amendment that changes the cut-off of amendment from "decision on the merits" to "final judgment" is retained.

October 7, 2002

Minutes
Civil Rules Advisory Committee, May 6-7, 2002
page -15-

A substantial change is proposed in Rule 23(c)(2). The published proposal would require notice by means calculated to reach a reasonable number of members in a (b)(1) or (b)(2) class. Civil rights plaintiffs protested that notice costs would cripple worthwhile class actions, to the point of deterring filing. Others argued that notice is desirable as a matter of principle. In place of the requirement, revised (c)(1)(A) would provide simply that the court may direct appropriate notice to a (b)(1) or (2) class. This authority exists, at least in part, under present Rule 23(d)(2), but this express provision will serve both as a reminder and as an encouragement. The revised Committee Note will emphasize the need to consider the cost of notice and the opportunity to devise forms of notice that are inexpensive. This proposal is meant to strike a fair balance between the competing concerns. As to (c)(2)(B), the Committee Note discussion of plain language is improved. Other technical changes are proposed as well.

A number of changes are proposed for the settlement-review provisions of Rule 23(e). As published, (e)(1) made explicit the requirement that many courts have read into the ambiguous notice provision in present Rule 23(e): notice must be directed to a proposed class even if the action is settled or dismissed before a decision whether to certify the class. The public comments raised several questions about notice in these circumstances. Many comments agreed that it is rare to find that absent class members have relied on the filing and consequent tolling of limitations periods; few class-action filings generate much publicity. There is room for concern that class-action allegations may be added to a complaint to draw attention to the case or to exert settlement pressure, but there is little that a court can practicably do to address this concern when the only parties before it agree to terminate the litigation on terms that do not affect the class. There also is room for concern that a number of actions may be filed in different courts, using pre-certification dismissals as a means of forum shopping. Again, however, there are few practical remedies. In addition to the infrequent benefits, a notice requirement poses distinct problems. One obvious problem is cost. A second problem may be the means of notice: general notice addressed to the class described in the complaint may not do much good, but without extensive discovery it may be difficult to identify the persons who would get more individualized notice. Notice costs are an obvious concern. Some of the comments added concern that limitations on the opportunity to "withdraw" class claims would interfere with the right to amend a complaint under Rule 15(a). Pre-certification developments can demonstrate the value of withdrawing some theories that may impede certification, for example, and it would intrude on adversary preparation to require a justification for the withdrawal.

Faced with these concerns, the subcommittee advises that it would be better to delete any requirement that the court approve pre-certification dismissal. Subdivision (e)(1) should be amended to apply the court-approval requirement only to dismissal of the claims, issues, or defenses of a certified class. Notice is still required for all class members who would be bound by a settlement.

Early drafts of proposed Rule 23(e) included a lengthy list of factors to guide the court's determination whether a proposed settlement is fair, reasonable, and adequate. Doubts about the wisdom of including such a "laundry list" in the rule led to displacing the list from the rule text to

October 7, 2002

Minutes
                    Civil Rules Advisory Committee, May 6-7, 2002
                                    page -16-

the Committee Note.  There is less risk that a list in the Note will be mistaken as an exclusive list of considerations, and less risk that the list will become a check-off form applied by rote in reviewing all settlements.  Comments on the published Note, however, expressed the same reservations even about including the list in the Note.  Deletion of the list is among the recommended Note changes.

     A second major change is proposed for the Rule 23(e)(2) provision on "side agreements." The published rule would authorize the court to direct the parties to file a copy or summary of any agreement or understanding made in connection with the proposed settlement.  Many comments suggested that a filing requirement should be imposed on the parties.  The Subcommittee proposes to amend the rule to require parties seeking approval of a settlement to file a statement identifying any agreement or understanding made in connection with the settlement.  The Committee Note would be changed to describe the court's authority to require that copies be filed, and to direct filing of summaries or copies of agreements not identified by the parties.

     The change in Rule 23(e)(2) that requires the parties to identify agreements adds to the load that must be carried by the description of the agreements as those "made in connection with the proposed settlement."  This phrase is not precise.  It would be good to draft a more precise description if one can be devised, but repeated efforts have failed.  The difficulty is to find a phrase that encourages filing of the important related agreements, but does not create a "trap for the wary" by language that includes too much on retrospective inquiry.

     Rule 23(e)(3) published alternative versions of a discretionary "settlement opt-out" provision. The first provided that notice of settlement of a (b)(3) class action must include a right to opt out of the settlement if an earlier opt-out opportunity had expired, unless the second opportunity is excluded "for good cause."  The second alternative was less directive, simply providing that the notice of settlement may state terms that afford a second opportunity to request exclusion.  The Subcommittee recommends adoption of the second alternative.  It is more discretionary with the trial court.  Even this discretionary provision may provide great benefits to the court and to class members.  The court will be able to use this opportunity to gain information about the quality of the settlement.  The opportunities for abuse of the second opt-out to disrupt a good settlement, however, will be reduced.

     Comments on the Rule 23(e)(4) provisions for making and withdrawing objections reflected the long-running disagreements the committee has encountered.  Plaintiffs and defendants commonly unite in challenging the value of objections to settlements that have been hammered out between the parties.  Objectors commonly unite in challenging the quality of many settlements.  These comments have not shown persuasive reasons to change the published rule.  But the Note language can be revised.  The object is to achieve a Note statement that reflects the distinction between personal and class-wide objections.  The Note reminds the court that it can inquire into an unexplained withdrawal.  There was concern that the published Note encouraged too much discovery for objectors; the Note is revised to emphasize the need for court control of discovery.

October 7, 2002

Minutes
Civil Rules Advisory Committee, May 6-7, 2002
page -17-

The attorney-appointment provisions in Rule 23(g) are new.  Most of the comments agreed that it is good to include an express appointment provision in Rule 23.  It is important to define the responsibilities of class counsel, and to define the procedure for appointment.  The comments, however, suggested that Rule 23(g), and particularly the Committee Note, reflected an intent that the court stir up competition for appointment as class counsel even in cases with only one applicant.  The Note should be revised to show that there is no intent to favor competition when there is none, that when there is only one applicant the court's responsibility is the present responsibility to assure adequate representation.  In no-competition cases, Rule 23(g) simply shifts the focus on counsel competence from Rule 23(a)(4) to Rule 23(g), separating it from the focus on the adequacy of the class representative.  When there are rival applicants, on the other hand, the rule directs the court to look beyond mere adequacy to select the attorney best able to represent class interests.

The counsel-appointment criteria in Rule 23(g)(1)(C) raised concern that the rule would further entrench an already entrenched class-action bar.  The subcommittee recommends addressing this concern by adding an emphasis on knowledge and experience in the law as a relevant factor independent of experience with complex litigation.  Similar refinements are recommended for the role of counsel's ability to devote resources to the litigation: resources, although important, are not to be determinative.

A further change is recommended for Rule 23(g)(2) by making express provision for designation of interim class counsel.

Rule 23(g)(1)(C)(iii) and 23(g)(2)(C) provide a bridge to the attorney-fee provisions of Rule 23(h) by establishing a foundation to consider fee terms during the appointment stage.

Rule 23(h) is recommended for adoption with only small style changes.  The express incorporation of Rule 54(d)(2) was again considered, but the incorporation remains important because of the nexus among Rule 54(d)(2), Rule 58, and Appellate Rule 4.  Notice to class members of an attorney fee application is limited to "a reasonable manner" because of concerns about adding another large cost item.  Note language is recommended that stresses the importance of allowing an adequate time for objectors to examine the materials that support a fee application before the objection deadline expires.  The Note also emphasizes the need to consider benefits actually achieved for class members in setting fees.  The focus can be on amounts actually distributed, the value of coupons, or the non-cash value of specific relief.

Other recommended changes in the Committee Note would delete discussion of risks borne by counsel, and delete much of the discussion of agreements about fees, "inventory" lawyers, the individual clients of class counsel, and the like.  The details seemed to generate risks of over-statement or confusion.

Open discussion followed this introduction.

October 7, 2002

Minutes

Civil Rules Advisory Committee, May 6-7, 2002
page -18-

*Rule 23(c)*

Beginning with Rule 23(c)(1), it was asked whether it is desirable to eliminate the provision for "conditional" certification.  The original purpose of this provision was to allow a court to rule that a class is certified subject to fulfillment of stated conditions, such as a condition that a more adequate representative be found.  There is reason to doubt the wisdom of what seems to be a premature certification in such circumstances; the effort to foresee the future effects of the dramatic changes made in 1966 may have failed on this score as well as with respect to the growth of (b)(3) class actions.  More importantly, this original intent seems to have been lost in practice.  Instead, the invitation to conditional certification seems to be read all too often as an invitation to certify now in the face of uncertainty, reasoning that a tentative certification can be undone later.  Tentative certification exerts great pressure, even if it is expressed as tentative.  It is better to defer the certification decision until the court is clear that certification is — or is not — appropriate.  The value of conditional certification is further reduced by the continuing express provision that an order determining whether to certify a class may be amended before final judgment.

Another comment noted that conditional certification can be misused.  It may be used to encourage settlement in an action that cannot be tried; one purpose may be to avoid choice-of-law problems that would defeat a class trial.  Making a certification "conditional" accomplishes nothing.  State courts frequently make use of this device, and it is misused.

Discussion asked whether "conditional" certification makes sense when it is not clear whether individual or class issues will "predominate" in a (b)(3) class.  A related question was whether a provisional certification for purposes of reviewing a proposed settlement remains available, and what its effect may be.  A provisional certification for settlement review, for example, may indicate that the action has proceeded to a point that deserves protection by injunction against rival litigation that might undo the settlement.  The response was that care should be taken in certifying a class without at least a good sense that certification requirements are satisfied, a matter addressed also in connection with the time-of-certification provision.  A provisional certification for settlement review, however, should be viewed as a certification that deserves protection by whatever means would be available to protect a proposed settlement in a class that had been certified before the settlement was reached and proposed to the court for approval.

The frequency of decertification was addressed by Mr. Willging, who noted that the FJC study of class actions in four courts for two years found that a decertification question was raised 23 times out of 402 actual cases.  In 9 of the 23 cases the certification was affirmed; in 3 it was reversed or modified; and in the remaining cases there was no action on the question.

It was suggested that a "conditional" certification is eligible for appeal under Rule 23(f).

This discussion concluded by the committee's decision to delete conditional certification from

October 7, 2002

Minutes

Civil Rules Advisory Committee, May 6-7, 2002
page -19-

Rule 23(c)(1)(C).

Discussion of Rule 23(c)(1)(B) led back to (c)(1)(A). The question was how can a court define the class claims, issues, or defenses at the time of certification? The Note discussion of (c)(1)(A) suggests "controlled" discovery that will inform the certification decision. The Note further suggests that some courts require trial plans that describe the issues that will be tried on a class basis and the issues that will be tried on an individual basis; it was suggested that perhaps it should say that "many" courts require trial plans. The public comments provided much information about the need to be able to illuminate the certification decision through discovery. They also suggested the fear that pre-certification discovery will generate many disputes as proponents of certification seek unlimited discovery on the merits while opponents argue that all discovery requests are improper because they address the merits rather than certification issues. The experience of some committee members reflects these perspectives, reporting extensive arguments about the scope of pre-certification discovery. The Committee Note seeks to address these comments by stating the importance of active discovery management by the court.

The problem of certification discovery was put in perspective by the comment that this is not an issue in many classes. Matters pertinent to the certification decision can be found out quickly in employment, securities, and other cases. The trial plan, and questions of class-wide proof, are a problem in mass torts. The Note, as revised, does the best that can be done with these problems. The Note follows the direction that is emerging in the cases, including decisions by the 3d and 7th Circuits in 2001 that recognize the need for some merits discovery to inform the certification decision. Arguments can still be made whether the emphasis on "controlled" discovery into the merits is too much offset by the implication that it can be artificial and wasteful to attempt fine distinctions between certification discovery and merits discovery. But the Note seems in all to strike the right balance, recognizing that what is most important is effective case-by-case control.

Discussion moved to the Committee Note commenting on the (c)(2)(B) requirement that notice of certification must be in plain, easily understood language. The Note refers to the need to consider whether class members are more likely to understand notice in a language other than English. But any large class is likely to include some members who are more fluent in other languages. This level of detail seems better left to the Manual on Complex Litigation. The committee determined to delete the proposed new Note sentence on other languages.

The text of Rule 23(c)(2)(B), with the revisions proposed by the Subcommittee, was approved without further comment.

*Rule 23(e)*

Discussion of Rule 23(e) began with a reminder that the Subcommittee proposes to limit the requirement of court approval to settlements of the claims, issues, or defenses "of a certified class." The history is that some courts read present Rule 23(e) to require approval of pre-certification dismissal. Rule 23(e)(1)(A) as published made that requirement explicit. The Committee Note,

October 7, 2002

Minutes
                    Civil Rules Advisory Committee, May 6-7, 2002
                                      page -20-

however, reflected the committee's uncertainty as to what remedies might be applied in lieu of approving dismissal. Notice to members of the alleged class might protect reliance on the pending action to toll limitations periods. Other methods might be devised to check forum-shopping.

The Subcommittee proposes new Note language that would reflect elimination of the requirement of court approval for pre-certification dismissal. Other new language, however, would suggest that the court can impose terms that protect potential class members who may have relied on the class filing or that prevent abuse of class-action procedure. This language was challenged as very open. It was noted that these problems will appear only in a very small number of cases. "The rare case will be reliance, or forum-selecting that goes beyond the pale." The Note language is intentionally open, but not empty.

The Note language may not be empty, but it was observed that it has no foundation in the rule once the approval requirement is removed. There also may be a conflict with the right to amend under Rule 15(a), which seems to permit amendment once as a matter of course to delete class allegations before a responsive pleading is filed.

It was asked as a counter what is the bearing of Rule 41(a)(1), which opens the description of the plaintiff's right to dismiss by "Subject to the provisions of Rule 23(e)." It was noted that this qualification still has meaning under revised 23(e)(1), since court approval still is required for voluntary dismissal after a class is certified. Whether the meaning of 41(a)(1) is changed depends on whether present Rule 23(e) is interpreted to require approval of a pre-certification dismissal.

A committee member recalled directing notice of a pre-certification dismissal: if it can be done under the present rule, it can be done under the new rule without facing these problems in the Note. The Manual for Complex Litigation advises that if there is abuse of the class process, the court can protect the class by giving notice that would allow others to come in to represent the class. There also may be inherent power to protect the class. And the authority to regulate related case filings may support measures to address forum-shopping concerns.

A motion to delete the two proposed new sentences that describe terms exacted for pre-certification dismissal was adopted.

The Subcommittee recommends changes in the Committee Note to respond to comments that thought the published Note was hostile to settlements. There was no intent to reflect hostility, and new language has been added to reflect the need to balance the values achieved by settlement against the need for care to ensure that the general value of settlement is not vitiated by a particular inadequate settlement.

The Rule 23(e)(1)(B) provision for notice of a proposed settlement "in a reasonable manner" would be supplemented by new Committee Note language discussing the need for individual notice "in the manner required by Rule 23(c)(2)(B) for certification of a Rule 23(b)(3) class" in some circumstances. It was asked whether this observation should be qualified by referring to individual

October 7, 2002

Minutes

Civil Rules Advisory Committee, May 6-7, 2002
page -21-

notice "when practicable." This qualification is part of (c)(2)(B), however, so it is incorporated by that reference.

A similar question was addressed to notice if a settlement opt-out opportunity is provided under Rule 23(e)(3). This question will arise only if a (b)(3) class is settled after expiration of the initial opportunity to request exclusion. Rule 23(e)(1)(B) requires notice to the class in a reasonable manner; the court can determine how far the manner of notice should be adjusted to reflect what is practicable to protect the second opt-out.

Attention turned to the Subcommittee proposal to revise Rule 23(e)(2) to require the parties to identify any agreement or understanding made in connection with a proposed settlement. The first comment was that a decision must be made as to what agreements are covered. The rule language is very broad: does it reach an unspoken "understanding"? "A wink and a nod"? The reference to "understanding" is troubling. The Committee Note describes agreements that "bear significantly on the reasonableness of the settlement." That is an appropriate test. But that is a very small problem. What other agreements might be seen to be made in connection with a settlement? An agreement to settle individual cases on terms different from the terms available to class members? An agreement among attorneys on fee division? There is a further problem with oral agreements: we do not want to encourage hidden agreements. But the whole provision is very broad.

One possibility would be to add a stronger link to the settlement terms to anchor the duty to identify. The requirement could be limited to agreements "directly related" to the settlement. But some comments thought such rule terms would make it too easy to avoid the requirement. We need a formula that people can understand, but that reaches most of what we need.

It was responded that what we need depends on what we are trying to close down.

One example of the difficulty is provided by a recent Seventh Circuit case in which the class action that was eventually settled was launched by paying a $100,000 consultation fee to a lawyer who had a client that became the class representative. It is difficult to know whether the referral fee agreement was made in connection with the settlement. There might have been a direct connection, but it may have been no more than the easiest way to initiate the action.

The question whether "understanding" is a necessary part of the rule was renewed. It is clear that unwritten agreements should be reached, but so long as they are agreements they are covered by the requirement to identify an agreement. The advice to delete "understanding" was renewed later.

Some interpretive help may be found in the Committee Note sentence stating that: "The functional concern is that the seemingly separate agreement may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others." But is that guidance enough?

The next suggestion was that the test should be "materiality." What we need is identification

October 7, 2002

Minutes
Civil Rules Advisory Committee, May 6-7, 2002
page -22-

of something that brought about the settlement. The materiality suggestion was later renewed: we should require disclosure of "any agreement or understanding material to the settlement." Any agreement that affects the fairness of the settlement terms is material. This wording was resisted, with an alternative suggestion that the rule address an agreement that "may have influenced the terms of the settlement." The "may have influenced" suggests a historical inquiry, but that may be acceptable. A more specific objection was that focus on influencing "the terms of the agreement" may not reach the side agreements without which there would not have been any settlement. Such vital agreements are the ones we most want to know about, but might not be seen to have influenced any specific settlement term.

Another alternative formulation was suggested: an agreement that "bears significantly" on the settlement must be identified. But this formula does not escape the "eye of the beholder" problem.

One fear is that any formulation will encourage objectors to seek depositions of the attorneys who negotiated the settlement. None of the alternatives seems to reduce the risk: materiality, bears significantly, made in connection with, simply frame the question in different terms.

It was observed that "objectors are bought off every day. You are giving a weapon to the bad objectors." Even if "understanding" is dropped, a problem will remain. The settlement negotiation will be conducted in a manner similar to the practice that attorney fees are not discussed before the settlement terms are agreed upon: "it is in the room. These matters will be put off."

The question was posed whether in fact there are agreements that relate to the settlement but are not part of the settlement terms. An answer was that there are, but that they "see the light of day. You cannot eliminate unethical behavior." The proposal goes too far; it will deter good settlements.

Another drafting suggestion was to limit the identification requirement to any agreement made in connection with "and as a condition of" settlement.

A reminder was provided that the process is designed in two steps: the parties identify agreements, and the court then decides whether to require further disclosure. It was responded that the objectors will demand to see any identified agreement.

The next observation was that any clear standard invites people on the borderline to avoid identification. Perhaps it is best to adopt a broad standard, but to encourage the judge not to go too deeply into the next step of requiring further disclosures. "I despair of finding a formula" more effective than "made in connection with." It was further observed that broad wording of the identification requirement may discourage the parties from making the kinds of agreements that we worry about.

Further discussion suggested that this proposal is likely to be controversial. It is a mistake

October 7, 2002

Minutes
Civil Rules Advisory Committee, May 6-7, 2002
page -23-

to rely on the Note alone; the rule itself should say, as closely as possible, what we want to make happen.

The committee was reminded of the process that led to the present suggestion. The "made in connection with" formula was part of the published proposal that simply authorized the court to direct the parties to file a copy or summary of the agreement. That proposal did not address the means by which the court might become aware of the agreements it might wish to examine. The many comments favoring mandatory identification by the parties responded to the understandable concern that ordinarily the court would have no basis for knowing about agreements that do not directly affect the settlement terms that apply to class members. None of the comments helped to sharpen the formula that defines the agreements to be identified by the parties. The value of a precise formula is increased by changing to a party-identification requirement. But the difficulty of drafting a precise formula is not reduced. The Subcommittee recognized the problem and struggled with it, but was unable to find better wording.

So the court's need to know of the agreements it might wish to explore must be defined in a way that, to repeat the phrase, is not "a trap for the wary." One way to alleviate uncertainty may be to reinstate the examples of "side agreements" that the Subcommittee would strike from the Committee Note.

Returning to the rule reference to an "understanding," it was noted that the word "agreement" is familiar to the law. It is well developed in the law of contracts. "Understanding," on the other hand, is not well developed. The course of safety is to rely on the well-developed "agreement" concept and to delete the non-technical reference to understanding. To be sure, even the concept of agreement has its ragged edges — the law of conspiracy, both criminal and civil, is sufficient illustration.

The "made in connection with" formula was supported as an objective standard. Tests that suggest a response that "I was not influenced by it" are not. But it was responded that "there will be no agreements in connection with the settlement."

It was asked whether the rule should specify "oral or written" agreements. A counter-proposal was that the rule might be limited to a copy of any written agreement.

The problem continued: the rule should not be so narrow as to be easily circumvented. One approach would be to adopt a broad standard for the requirement that parties identify agreements, but a narrow standard for the court to direct disclosure to others.

New Subcommittee language for the Committee Note on agreements made by insurers was addressed. This language was proposed in response to the testimony and comments of insurance companies. An essential part of the process that leads a defendant to settlement is often resolution of an insurer's participation in paying part of the settlement. Insurers fear that agreements they make with their insureds may seem to be made in connection with the settlement, and that identification

October 7, 2002

Minutes
Civil Rules Advisory Committee, May 6-7, 2002
page -24-

and eventual disclosure will make it more difficult to reach these agreements.  One illustration was an agreement with the insured on how many "occurrences" are involved in the litigation.  Other illustrations were complex, drawing from areas of insurance practice that were not fully illuminated by the testimony.  The first suggestion was that it is better to say that "information about" insurance coverage may bear on the reasonableness of a settlement than to say that "an understanding of" insurance coverage is relevant.  It was noted that the insurance policies themselves are commonly made available; indeed, disclosure often may be required by Rule 26(a)(1)(D).  And the court may need to know about agreements that affect how much insurance money is available.  The resources available have an important bearing on the reasonableness of a settlement.  Simply knowing the policy terms often does not carry far enough. But it was protested that people are not now asking for disclosure of such agreements.  The concern for confidentiality may be met, however, if disclosure is made only to the court.

The Committee concluded that there is not enough information to support sophisticated understanding of the problems that arise from agreements about an insurer's share of settlement payments.  Without a good understanding, it is better not to adopt the suggested new language.

Further overnight deliberations by the Subcommittee led to specific proposals. Rule 23(e)(2) would be amended by deleting "or understanding" from the party-identification requirement.  The duty to identify would be limited to "any agreement made in connection with the proposed settlement, voluntary dismissal, or compromise."  The Committee Note would be revised to read as follows:

Subdivision (e)(2) requires parties seeking approval of a settlement, voluntary dismissal, or compromise under Rule 23(e)(1) to file a statement identifying any agreement made in connection with the settlement.  This provision does not change the basic requirement that the parties disclose all terms of the settlement or compromise that the court must approve under Rule 23(e)(1).  It aims instead at related undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others.  Doubts should be resolved in favor of identification.

Further inquiry into the agreements identified by the parties should not become the occasion for discovery by the parties or objectors.  The court may direct the parties to provide to the court or other parties a summary or copy of the full terms of any agreement identified by the parties.  The court also may direct the parties to provide a summary or copy of any agreement not identified by the parties that the court considers relevant to its review of a proposed settlement.  A direction to disclose may raise concerns of confidentiality.  Some agreements may include information that merits protection against general disclosure.

This language makes it clear that the court may direct that a summary or copy be provided to the court only, be provided to the court and parties only, or be made available more generally.

It was urged that there should be further work on this language to address confidentiality

October 7, 2002

Minutes
Civil Rules Advisory Committee, May 6-7, 2002
page -25-

concerns. The court may examine a summary or copy of an agreement and conclude that the agreement is not relevant to the settlement review. It may be useful to add a statement that the court should provide an opportunity to make claims to work product or other relevant protections.

The proposed Note language renewed the question of the court's sources of information about agreements not identified by the parties. This question, however, is less pressing than it was under the published version of (e)(2) that did not require the parties to identify their agreements.

The question whether to include examples of side agreements in the Committee Note was renewed. The Subcommittee continued to recommend against providing examples. The Manual for Complex Litigation can provide a more useful, and more easily changed, list.

It was urged that the committee consider restoring Committee Note language addressing the concerns that should be considered in determining whether to direct filing of a copy or summary of an agreement identified by the parties. The language would have to be rewritten to avoid the tie to deleted references to "the functional concern" underlying (e)(2) identification requirements. But it may be useful as a further explanation of the value of the filing requirement. It was replied that it adds nothing useful to say the same thing again in the context of court directions to file. But it was protested that something may be added. One example that the Subcommittee would delete from the Committee Note is the "blow out" provision that empowers a defendant to escape a proposed settlement if a specified threshold of opt-outs is exceeded. Practice is to disclose these agreements to the court in camera; the parties to the settlement do not want the class and others to know the terms for fear of encouraging concerted efforts to solicit exclusion requests. It was urged that these matters are better covered by the Manual for Complex litigation; there is no problem that requires a "solution" by advice in the Committee Note. But it may remain possible to add a clause to the proposed Note language that refers to the value of court directions for further disclosure.

A final question was whether the Note should refer to "trading away" advantages for the class. The language was defended on the ground that the settlement negotiation process is very much a trading process, in which many possible alternative packages of terms are explored and winnowed down by trading off provisions for mutual advantage. But it may be possible to substitute some other word. The reporter, Subcommittee chair, and committee chair were left free to decide whether to say "relinquish" or something similar in place of "trading away."

The changes in Rule 23(e)(2) and the Committee Note language proposed by the Subcommittee were approved.

Rule 23(e)(3), creating a "settlement opt-out," was published in alternative versions. The Subcommittee recommends adoption of the second version, which provides in neutral terms that the court may provide a second opportunity to opt out of a (b)(3) class settlement if the original opportunity expired before settlement terms were announced. This version was favored by many of the comments, although other comments favored the first version that provided a second opt-out opportunity unless good cause is shown to deny the opportunity.

October 7, 2002

Minutes
                    Civil Rules Advisory Committee, May 6-7, 2002
                                    page -26-

The committee voted to recommend adoption of the second version.  Discussion then turned to the Committee Note.

The first question noted that several comments opposed any settlement opt-out, and suggested that perhaps these comments reflect experience in specific subject-matters.  Perhaps the Note could suggest that there are classes of cases that are not suited to the settlement opt-out.  It was decided that it would be too difficult to establish support for identifying what those cases might be.

A second question addressed the Subcommittee proposal to add Note language saying that an agreement among the parties to settlement terms that permit exclusion may be a factor weighing in favor of settlement.  The language is a brief summary of many longer passages recommended for deletion.  It was concluded that this sentence should be retained.

A third question addressed Committee Note language stating that the settlement opt-out reduces the influence of inertia and ignorance that apply at the time of the first opt-out opportunity.  The language seems weak.  The committee agreed to delete this language.

The next question went to new language addressing the possibility that a court may wish to impose terms to control the effect of a settlement opt-out.  Two terms are identified: that a class member who elects exclusion is bound by rulings on the merits made before the settlement, or cannot participate in any other class action pursuing claims arising from the same transactions or occurrences.  Such terms dilute the value of the opportunity to opt out, even recognizing that courts will not exact such terms in all cases.  A prohibition on joining another class action, for example, may defeat a central purpose for requesting exclusion — the hope that better terms can be got in circumstances that do not reasonably support individual litigation.  We should not discourage other class actions when many members of the present class are dissatisfied with the settlement terms.  And we should not adopt changes that make it more difficult to bring class actions.  It was responded that today there is no second opportunity to opt out after settlement terms are known; it is proper to suggest discretion to impose limits that avoid a "free ride."  But it was protested that this Note language does not interpret anything in the text of Rule 23(e)(3).  The stakes are not high; it is not quite right to say cautionary things about administration of this new device.

The discussion of terms limiting the effect of a settlement opt-out was defended on the ground that the Note attempts to address objections to the settlement opt-out provision.  And the Note is a help in resolving uncertainties as to the consequences, particularly with respect to issue preclusion.  The question of "opt-out farmers," however, may be distinct.

A motion was approved to delete the Note sentence suggesting that the court might condition exclusion on the term that a class member who opts for exclusion may not participate in another class action pursuing claims arising from the same underlying transaction or occurrence.

Rule 23(e)(4) recognizes the right of any class member to object to a proposed settlement and

October 7, 2002

Minutes
                    Civil Rules Advisory Committee, May 6-7, 2002
                                    page -27-

provides that an objection may be withdrawn only with the court's approval.  Discussion began with
the question whether a class member must intervene to object.  It was agreed that intervention is not
necessary to support an objection in the trial court.  The distinctive question whether intervention
is needed to support standing to appeal is now pending in the Supreme Court and is not referred to
in the revised Committee Note.

        Objection was made to suggested Committee Note language stating that the court has
discretion whether to provide procedural support to an objector.  This sentence distills a much
lengthier discussion in the published Note.  There were objections that the published Note went too
far in encouraging support for objectors, but concern remains that the rule and Note should not
discourage support for objectors.  But shortening the statement may be even more dangerous, leaving
an open-ended invitation to expand support for objectors beyond present levels.  "We don't need it;
it is dangerous."  The committee voted to reject the proposed new sentence.

        It was suggested that as published, Rule 23(e)(4)(B) seems to apply to any objector, whether
or not a class member.  It was agreed that (B) should be restyled: "An objection made under Rule
23(e)(4)(A) may be withdrawn only with the court's approval."  Since (A) applies only to an
objection by a class member, the ambiguity is removed.

        The committee voted to adopt 23(e) as revised during the discussion.

                                    *Rule 23(g)*

        Rule 23(g) brings appointment of class counsel into Rule 23 for the first time.  It was
introduced without further summary.

        The first question expressed concern with the appearance of unfairness that may arise when
the trial judge who is to hear the case gives time so competing applications can be made and then
makes the appointment.  It would be better to have a different judge make the appointment.  The
class adversary will fear that the judge who selects the lawyer will be too much impressed by the
lawyer.  The provision allowing a reasonable period to apply for appointment "may lead to an
internet solicitation by the court."  The rule, moreover, seems tilted toward the experienced lawyer,
at the expense of the neophyte who actually "discovered the pollution" and filed the action.

        A prompt reaction was that although it has been suggested that appointment of class counsel
might be assigned to a magistrate judge, it is better to have the appointment made by the judge
responsible for the class action.

        A second reaction was that the problem of appearances arises when there is more than one
applicant for appointment.  These circumstances occur now, and the court is involved now.
Adopting express provisions in Rule 23(g) reduces the appearance of unfairness by establishing a
regular, transparent process that is guided by explicit criteria and bounded by the standard calling
for appointment of the attorney best able to represent the class.


October 7, 2002

Minutes
Civil Rules Advisory Committee, May 6-7, 2002
page -28-

The problem of entrenching already entrenched class-action specialists is recognized in proposed additions to the list of appointment criteria and also in new Note provisions.

It was suggested that the Note discussion of Rule 23(g)(2)(B) "does not seem to track the rule." As published, (g)(2)(B) allows a reasonable period for applications by attorneys seeking to represent the class even when there are no present competitors. It seems to invite the delay. "I just don't like appointing counsel who did not file." It was responded that such appointments occur now when there are parallel actions. And new language suggested for the Committee Note says that the primary ground for deferring appointment would be that there is reason to anticipate competing applications. Examples are provided — there are multiple class actions, or individual actions are pending on behalf of putative class members. It was suggested that these illustrations should be incorporated in the rule itself. This suggestion was resisted on the ground that these are but illustrations, and it is difficult to draft suitable rule language that does not fall short or go too far.

The Subcommittee concluded that this discussion points to reconsideration of some of the Note language addressing the process for selecting among several applications. The Note can be made to flow better, and to distinguish more clearly between situations with only one applicant for class counsel and situations with rival applicants. The account must include recognition that it may be better to allow time for new applicants when the only present applicant will not provide adequate representation for the class. This concern makes it appropriate to discuss deferring decision even when there is only one applicant. But the Note should be reviewed further to ensure that it does not encourage over-use of delay to wait for competing applications.

The revised Note discussion was applauded as excellent. A friendly amendment was proposed in this spirit. The first paragraph of the revised Note includes a sentence stating that the procedure and standards for appointment vary depending on whether there are multiple applicants to be class counsel. It would help to add to Rule 23(g)(2)(C) an express statement of the court's duty when there is only one applicant. A model might be found in the later Note statement that when there is only one applicant, the court's task is limited to ensuring that the applicant is adequate under the criteria specified in Rule 23(g)(1)(C). The rule does not now state that the court must assure that counsel is adequate; (2)(C) is the best place to say it.

This approach was supported by observing that it is better to state the adequate representation requirement in the rule rather than resolve a possible ambiguity in the Note.

A beginning draft was suggested: "If there is one applicant for appointment as class counsel the court must assure * * *." This amendment was moved for adoption.

Adoption of the amendment was resisted on the ground that there is no need for it. The "must assure" language, further, may imply that the court has a continuing obligation to supervise class counsel. An alternative draft might be: "If there is one applicant for appointment as class counsel, the court must ensure that the applicant is adequate under Rule 23(c)(1)(B)."

October 7, 2002

Minutes
Civil Rules Advisory Committee, May 6-7, 2002
page -29-

This approach was supported with the observation that there is no ambiguity in the published draft, but that the addition will "get everyone quickly and easily attuned to it." Committee members who have worked intensely with these problems "can connect the dots," but it is not so easy for those who come to the question afresh.

It was protested that even as reduced, the proposed language still seems to emphasize the court's "duty to qualify counsel."

An alternative was suggested for (C): "If more than one <u>qualified</u> applicant * * *." This addition was adopted, with leave to substitute some other word such as "adequate." It was also agreed to include in Rule 23(g)(2)(B) a statement of the standard the court should use to determine whether to appoint the only applicant. The Subcommittee was charged with drafting this provision.

A motion was made to delete all of 23(g)(2)(B), eliminating any express reference in the rule to allowing a reasonable period for applications for appointment as class counsel. The motion was opposed on the ground that (B) simply describes what happens. A response was that there is no need to advertise what happens. A further response was that a good illustration is provided by the recent Seventh Circuit decision in the tax-refund-anticipation-loan case. The class action was filed after many other actions had been filed, and in face of a class action in a state court that was nearing trial. The fact that the attorneys filing the present action could provide adequate representation does not ensure that they can provide the most effective representation for the class in these circumstances, and there is good reason to anticipate that if the court delays the certification decision other counsel may apply. The Note can help, but "there is a place for this in the Rule."

The committee voted to delete Rule 23(g)(2)(B). The Committee Note can be revised to express the thought expressed by (B).

Attention turned to Rule 23(g)(2)(A), proposed by the Subcommittee. This subparagraph expressly recognizes the court's authority to designate interim class counsel before determining whether to certify a class. How can counsel be designated to act for a class that does not yet exist? It was urged by many voices that commonly there is much that must be done on behalf of a proposed class before a certification decision can be made. Motions are made and must be responded to. Discovery often is appropriate or necessary. The conceptual concern that a class has not yet come into recognized existence can be met by adding a few words: "The court may designate interim counsel, to act on behalf of the putative class, before determining whether to certify the action as a class action." This change was approved by the committee.

It was observed that Rule 23(g) generally does a brilliant job of regulating attorney conduct without regulating attorney conduct. Duties are placed on the court and the parties, not directly on the attorneys. The one exception is the direct command of Rule 23(g)(1)(B) that class counsel must fairly and adequately represent the interests of the class. State rules of professional responsibility and many local district rules regulate the general duty to represent a client. They also address the division of fealty owed as between class and class representative as clients. The Committee Note

October 7, 2002

Minutes
Civil Rules Advisory Committee, May 6-7, 2002
page -30-

expressly says that the obligation of class counsel may be different from the obligation that has been adopted by most state and local rules. This intrusion on state and local-rule regulation could be avoided by reframing the rule: "The court must ensure that class counsel fairly and adequately represents the interests of the class."

This concern was met by recalling that many comments from class counsel welcomed Rule 23(g)(1)(B). They now explain to class representative clients that the decision to frame an action as a class action imposes on counsel a professional obligation to the class that must be reconciled with the obligation to the representative client, and that the obligation to the representative client changes accordingly. But it was responded that the source of this practice now is in state rules of professional responsibility. 23 (g)(1)(B) changes that, and imposes the obligation "top-down" in the federal system. It was rejoined that this consequence already flows from Rule 23(a)(4), which establishes requirements of adequate representation by class counsel through the requirement that the representative provide adequate representation for the class.

No motion was made to amend the Rule 23(g)(1)(B) statement.

It was asked whether designation of interim class counsel is now the norm. It was agreed that the Note could say that the rule authorizes designation when needed.

It was observed that "everyone who files will seek to be designated as a head-start in the race for appointment as class counsel." It was agreed in response that the Note could be revised to describe designation of interim class counsel not "in order" to protect class interests but "if necessary" to protect class interests.

Attention was directed next to Rule 23(g)(1)(C)(iii), which provides that the court may direct potential class counsel to propose terms for attorney fees and nontaxable costs. It was urged that this provision should be deleted. The Committee Note discusses many other examples of information that applicants might be directed to provide. The explicit reference to fees provides a hint that we are ready to go back to low bidding and auctions. The response was that there were many comments and much testimony on the direction to provide fee information. We were repeatedly encouraged to get the court involved in regulating attorney fees at the beginning of the action, not to facilitate bidding but to avoid later difficulties. It helps to start thinking about these issues early. The Note explicitly says that there will be numerous class actions in which information about fees and costs is not likely to be useful. But fee information is a distinct concern in many class actions. The Federal Courts Study Committee thought that early guidelines are important. (iii) is not an expression that either favors or disfavors auctions.

The provision for information about fees and nontaxable costs was questioned from a different perspective by asking whether we should view the court as a consumer of the legal services provided by class counsel. It was agreed that it does not help to view the court as consumer, but the fee topic is important nonetheless.

October 7, 2002

Minutes

Civil Rules Advisory Committee, May 6-7, 2002
page -31-

A motion to strike the reference in 23(g)(1)(C)(iii) to proposing terms for attorney fees and nontaxable costs failed.

Turning back to Rule 23(g)(1)(C)(i), it was agreed that the third "bullet," focusing on the work counsel has done in identifying or investigating potential claims in the case, should be moved up to become the first item in the list. This is a logical first point in the appointment inquiry.

Further discussion led to agreement that an evaluation of counsel's "experience" should include not only frequency and duration of involvement, but also the rate of success and failure.

The Committee Note on Rule 23(g)(1)(B) was discussed next, pointing to the statement that the class representative cannot command class counsel to accept or reject a settlement proposal. It was observed that we are separating counsel appointment from its present roots in Rule 23(a)(4). This is a further attenuation of the relationship between the representative and class counsel. The separation may reflect reality. But this is a fundamental policy question. The Private Securities Litigation Reform Act adopts the representative-as-client approach. Rule 23(g) assigns to the court responsibility for selecting who will be attorney for one side of the case.

The response was that in many actions it is class counsel, not the class representative, who is the "main actor." The bond between attorney and representative as client may seem attenuated. There are cases in which the court looks to class counsel. The role of class representative has caused difficulties. An example is the representative who refuses settlement unless there is a large individual payoff for the representative. The Note has been stripped of case citations, but the cases confirm the Note statement. The problem cannot be made to go away by ignoring it in the Note. The Private Securities Litigation Act is a break with this tradition. The class action continues to be one on behalf of other people. Outside securities litigation, it is not the class representative's position to replace class counsel. It is proper to be concerned about the separation between class representative and class counsel. Some of the comments and testimony reflected the importance of maintaining real attorney-client relationships forged between class representative and class counsel, and the Note has been changed to reflect this concern. But Rule 23(g) is intended to adopt, in a modest way, the best practice, to bring to it standards, discipline, regularity.

The committee was reminded that by putting a duty on the attorney to represent the interests of the class Rule 23(g)(1)(B) is invoking disciplinary rules. Enforcement will be not only through the court in the class action but also by state orders suspending or disbarring lawyers who fail the duty.

The committee agreed that it was useful to have had this discussion, and that nothing need be changed.

*Rule 23(h)*

Rule 23(h) is proposed in the same mode as Rule 23(g), as a clear restatement of present good practices.

October 7, 2002

Minutes
Civil Rules Advisory Committee, May 6-7, 2002

page -32-

A specific drafting question was asked of Rule 23(h)(2): "A class member or a party from whom payment is sought may object to the motion."  In a common-fund award case, it could be argued that a class member is a party from whom payment is sought.  It was agreed to clarify the separation by adding commas — "A class member, or a party from whom payment is sought, may * * *."

It was observed that disciplinary rules commonly regulate the reasonableness of attorney fees. Rule 23(h) avoids the risk of trespassing on these rules by putting the obligation to determine reasonableness on the court.

In a reprise of a discussion that was addressed to the Rule 23(e) Note, it was observed that the Committee Note cites a specific case.  There is a view, shared by some Standing Committee members, that it is unwise to cite specific cases.  A case that is an exemplary statement of current wisdom may pass into oblivion, or even be overruled.  The advantages of invoking a good judicial discussion should not lead to frequent citation.  It was agreed that if possible the Note should paraphrase, rather than cite, specific decisions.

It was suggested that it is not useful to refer in the Note to the importance of judicial involvement with fee awards "to the healthy operation" of class actions.  It was agreed that "healthy" would be replaced by "proper."

It was asked why Rule 23(h)(1) sets specific notice requirements for a fee motion by class counsel — will there be fee motions by others?  The answer is that indeed there may be fee motions by others.  A person who acted to represent a putative class in the interim before appointment of class counsel, for example, may be awarded fees even though someone else was appointed as class counsel.  Notice to the class of motions by persons not appointed as class counsel might be useful, but the timing of such motions often may make it impossible to combine notice of the fee application with another notice that must go out for independent reasons.  Separate notice is expensive.  An application by class counsel, on the other hand, can be described in the Rule 23(e) notice of settlement review.  But if the class claims are adjudicated rather than settled, separate notice "in a reasonable manner" is required.  These matters are discussed in the Committee Note.

A motion to adopt Rule 23(h) was approved.  With the revisions discussed at this meeting, the committee recommends to the Standing Committee that Rules 23(c), (e), (g), and (h) be recommended for adoption.

*Minimal Diversity Jurisdiction*

Judge Levi introduced discussion of a memorandum describing the need to consider minimal diversity or similar legislation that might reduce problems that arise from overlapping, duplicating, and competing class actions.  These problems have been described to the Committee for many years. Most of the problems arise from class actions filed in state courts; the systems for transfer of related

Minutes
Civil Rules Advisory Committee, May 6-7, 2002
page -33-

cases among federal courts seem to reduce to manageable proportions the problems that might arise from multiple federal filings. A year ago this committee concluded that the remaining problems are so serious as to warrant adoption of Rule 23 provisions. The proposed provisions would test the limits of Enabling Act authority, however, and also would raise questions under the anti-injunction act. Rather than ask the Standing Committee to approve publication of the proposals, it was decided in the end to seek comment by more informal means. The Reporter circulated a Call for Informal Comment. Many responses were made in the course of the hearings and written comments on the published Rule 23 proposals. These comments showed that the problems that the Committee has heard about over the last ten years persist. The problems are so important as to justify continuing work toward an answer.

At the January 2002 meeting the committee considered the many comments already in hand and concluded that it is better to support legislative solutions before devoting any more effort to contentious court rule proposals. It asked for a draft resolution on possible legislation. The memorandum in support of a resolution concludes with a set of findings and recommendations. It aims at the broad concept of legislation, without attempting to endorse any particular bill or even a particular legislative approach.

The first question addressed Item 6 in the findings and recommendations. Item 6 says that legislation addressing these problems can be adopted without imposing undue burdens on federal courts. Is it proper to make this assertion? There have been many suggestions that a substantial number of cases might be drawn into the federal courts by legislation adopted to regulate state-court class actions. It was responded that the burden that might result from carefully designed legislation is not undue. Of course it is difficult to predict with certainty what the burden will be, apart from the confident prediction that the burden will depend on the particular solutions adopted. But it must be remembered that legislation can be helpful — indeed most helpful — without drawing all class actions from state courts into federal courts. The Judicial Conference Executive Committee expressed opposition in 1999 to proposed bills that seemed likely to bring all class actions to federal courts. That position need not extend to more carefully designed legislation.

Another committee member said that the memorandum presents an elegant, balanced, and thoughtful summary of the problems. It does not weigh in on any side of the debate. It only urges the importance of further study. It remains important to determine who the audience will be: is it to be only the Standing Committee? Does the memorandum become a public document? Is it crafted so Congress will understand the importance of the points being made?

It is clear that the memorandum can be addressed to the Standing Committee. There is reason to believe that the Standing Committee will pursue the topic within the Judicial Conference. Other Judicial Conference committees have an interest in these problems. The Federal-State Jurisdiction Committee has considered the questions raised by minimal diversity class-action bills for some years now. The Court Administration and Case Management Committee also may be interested. It will be important to follow the ordinary processes of communication among the

October 7, 2002

Minutes
Civil Rules Advisory Committee, May 6-7, 2002
page -34-

committees.

Further expressions of support led to adoption of the memorandum as the committee's statement.

### Other Class-Action Questions

The committee was asked what Rule 23 topics might remain to be addressed. No other topic has been developed to a point that would justify a present vote committing the committee to further work, but any directions to help prepare for the October meeting would be helpful. Settlement classes remain a matter of active interest. The problems of future claims also remain, as witnessed by the report of the mass torts subcommittee of the Bankruptcy Administration Committee. Opt-in class proposals were suggested by several of the witnesses and comments addressed to the August 2001 proposals. It would help to offer suggestions to the Subcommittee of any other subjects it should address.

### Bankruptcy Committee Mass-Torts Report

The Committee on the Administration of the Bankruptcy System appointed a Subcommittee on Mass Torts to consider the proposals of the National Bankruptcy Review Commission that the bankruptcy statutes be amended to establish a system to handle "mass future claims" in bankruptcy. Judge Rosenthal acted as this committee's liaison to the subcommittee.

Judge Rosenthal introduced the subcommittee report by acknowledging that it is incomplete. Some of the areas of less-than-complete analysis are reflected in the reporter's memorandum summarizing the report. The report was a group effort to point to problems that are apparent on not very searching review of the Commission recommendations.

The problem of identifying mass future claims so that a representative can be appointed is real. The hope was to achieve a final resolution of future claims in bankruptcy courts. It is an ambitious and interesting set of proposals. The *Amchem* and *Ortiz* decisions mean that Rule 23 is not now a realistic response to mass future claims. Many have been searching for a solution.

That the proposals are interesting does not disguise the fact that they present many problems. The most fundamental problems arise from the relationship between Article III courts and the bankruptcy courts; due process; and federalism. None of the reports goes as far as necessary to reach final answers to these problems.

The subcommittee's conclusion that the Commission proposals "are an important step in the right direction" is sound if it is understood to mean that the inquiry must be continued. The recommendation would be premature if it were read as a more enthusiastic affirmation of the Commission proposals.

The Commission definition of mass future claims is open-ended. The subcommittee report

October 7, 2002

Minutes
Civil Rules Advisory Committee, May 6-7, 2002
page -35-

recommends that it be made more specific.  But a workable degree of specificity might create a procedure that cannot be useful — there may be no useful circumstances in which it is possible to estimate with confidence the number of future victims and the severity and value of their injuries. These and other problems are identified, but are not explored at the level of detail that provides a basis to guess whether solutions are possible.

It seems reasonable to endorse careful further study, but not to endorse adoption of the Commission recommendations.  It would be premature to take the subcommittee report to the Judicial Conference.  Further study by the Bankruptcy Committee would be appropriate.  Or, if the task of exploring the remaining problems to a practical conclusion seems onerous, it also would be appropriate to put aside the Commission recommendations.

Further discussion noted that the Commission recommendations allow a "defendant" to take all matters into the bankruptcy courts, apparently making the bankruptcy courts into courts of general jurisdiction.  Although the proposal is interesting, it requires study in the years-long level of detail that has characterized this committee's study of class actions.

It was noted that future claims are addressed "every day" by bankruptcy courts that deal with asbestos claims.  Some of the companies going into bankruptcy say they are not insolvent because they view the claims as fraudulent.  These asbestos cases are governed by a specific provision in the bankruptcy statute.  It is worthwhile to keep working on these problems to see whether a more general bankruptcy statute can be adopted for other defendants.

The committee concluded that it is not able to endorse the Commission recommendations as an approach to the complicated and important problems generated by anticipated mass future tort claims.  The proposals are important, but further investigation and study are needed.  The ongoing experience with asbestos may help.  Judge Levi will transmit this conclusion to the Bankruptcy Administration Committee.

*Electronic Discovery*

Professor Lynk stated that since the January meeting the Discovery Subcommittee has met by conference call.  He and Professor Marcus have continued to work together. Although in January the Subcommittee expected that it would now be seeking authorization to draft specific proposals for consideration at the October meeting, more work remains to be done before specific proposals may be feasible.  "There is a lot of heat" in the world of practice, but there is little light to illuminate the nature of the problems or the rules approaches that might prove helpful.

Professor Marcus noted the preliminary report from the Federal Judicial Center in the agenda materials.  The report is in preliminary form; there is time to ask for a different approach if that might be more helpful.  The FJC has pursued many inquiries.  What remains now is to complete a set of ten specific case studies.  The work to date, however, has not suggested any particularly clear line of inquiry or rulemaking.  If better questions should be asked, it is important to describe them

October 7, 2002

Minutes
                Civil Rules Advisory Committee, May 6-7, 2002
                            page -36-

now.

There are many approaches that could be taken to drafting new rules, but many people have expressed doubts whether changing the rules can do much to ameliorate the problems encountered in practice. There is great interest in the problems, but not much enthusiasm for any particular solutions. And the problems continue to present a series of moving targets.

It was noted that the FJC study seeks to identify problems that rules changes might address, but offers few rule suggestions. Rule 37 requires an order before sanctions can be imposed. The rules do not adequately address spoliation. Discovery of computer-based information may raise such distinctive spoliation problems that we need a new and distinctive rule for them.

It was agreed that the preservation-spoliation problem has been a longstanding concern. Businesses desperately want clear and reliable guidelines for record preservation policies. And even at that, they may not appreciate how truly great their problems are.

Another set of new problems presented by discovery of computer-based information relate to third-party protection. Email, for example, is now used for purposes that would not have generated any form of communication a few years ago. Some companies permit use of company email facilities for personal messages. Outsiders seeking discovery of the company email records gain access to much personal information that is completely irrelevant to any litigation or the purposes of discovery. We need to explore whether there are ways to get information of the discovery to the affected individuals, and ways to protect their privacy interests.

Another set of problems that may prove distinctively different with discovery of computer-based information relate to cost sharing. The problem of who should pay arises in every case. This is particularly important with discovery from nonparties. Practice for the moment seems to have developed no more acceptance of cost bearing between the parties than has developed with other modes of discovery. As to discovery from nonparties, however, it seems to be accepted that the requesting party should bear the costs of responding. But a different view was expressed that cost shifting among parties may be gaining more acceptance because of the great costs that can arise from extraordinary recovery efforts.

Still another set of problems arise from the choice between responding in electronic form or in hard copy.

The cost of preserving back-up tapes can be another special problem. One committee member has a client that is spending $1,000,000 a month to preserve back-up tapes.

One extreme possibility is that the use of electronic technology will be severely restricted if companies come to fear discovery.

Texas has adopted specific court rules for discovery of electronic information. But so far there are no available cases to show how the rules are working.

October 7, 2002

Minutes
                    Civil Rules Advisory Committee, May 6-7, 2002
                                   page -37-

        Two final observations were that special masters may be particularly useful in sorting through problems arising from discovery of computer-based information and that the committee may be driven to creating laboratory experiments that test the effects of different possible rules.

                              *Federal Judicial Center Report*

        Mr. Willging described work in progress on Rule 23. A preliminary presentation was mailed out before this meeting. "Very preliminary" data have been compiled on filings and on overlapping actions. One purpose of presenting the preliminary report is to learn whether it would be helpful to present the data in different forms.

        Even in this preliminary stage, there are some intriguing results. The raw filings data change a lot when account is taken of consolidation and similar efforts. But such empirical work will be most effective if it can be focused on the questions that interest the committee.

        The same observation is true of the next step, which will inquire into the motives that guide attorneys as they choose between federal and state courts. A draft questionnaire is included in the materials: can it be better focused? The questionnaire will go to both plaintiff and defendant lawyers, seeking comparison of federal courts with state courts in a number of dimensions.

        Discussion confirmed that it is good to ask about the effect of choice-of-law approaches on forum selection, and about the effect of approaches to objectors.

        It was suggested that many lawyers seek state courts to avoid the restrictions that the *Daubert* rules place on use of expert witnesses in federal courts.

        Another factor to explore is the complexity of pretrial procedures. Many lawyers perceive federal pretrial practice to be more complex than the practice in state courts.

        One of the motives for undertaking this study is to determine whether certification standards for settlement classes in federal courts are encouraging plaintiffs to file in state courts rather than federal courts.

        Mr. Willging also noted that Todd Hillsee, who testified on the class-action notice provisions at the January hearing, has provided the Federal Judicial Center with draft short-form notices. Reactions of the committee to these forms would be useful.

                                      *Other Items*

        The relation-back provisions of Rule 15(c)(3) will be on the October agenda for discussion. A simple revision has been suggested by the opinion in *Singletary v. Pennsylvania Department of Corrections,* 3d Cir.2001, 266 F.3d 186. The suggestion is attractive. The specific problem is that a plaintiff who knows that it is impossible to identify an intended defendant is given less effective relief than a plaintiff who mistakenly believes that the proper defendant has been properly named. But in approaching it the committee must consider a series of questions. Perhaps the first question

October 7, 2002

Minutes
Civil Rules Advisory Committee, May 6-7, 2002
page -38-

is how frequently the committee should act to correct interpretations of the rules that seem wrong. It is not wise, and perhaps would not be possible, to react whenever a court seems to give a wrong answer. Even when a number of courts have concurred in a seemingly wrong answer, the question may not be so important as to deserve a rule amendment. Continual amendment to provide specific answers to ever more specific questions could produce rules that are too complex and too rigid to survive. A second question is whether this specific question should be addressed without also reviewing other aspects of Rule 15(c)(3) that seem unsatisfactory. There are good reasons to question the way the rule is presently drafted. A third question, specific to Rule 15(c), is whether it is wise to continually revisit a rule that presents significant Enabling Act questions. One main function of Rule 15(c)(2) and (3) is to allow claims that would be barred by limitations in the state courts that provide the law governing the claim. Acting to expand this incursion into the realms of state law may be inappropriate.

The Appellate Rules Committee has urged revision of Rule 6(e) to correct an ambiguity about the effect of the provision that when service is made by mail or other defined means "3 days shall be added to the prescribed period" for responding. This committee can take the lead by proposing an answer at the fall meeting. It will remain to be determined whether the Appellate Rules Committee will wish to publish a parallel provision for the Appellate Rules at the same time, or will prefer to await comments on a published Rule 6(e) revision.

Judge Jane J. Boyle has urged that some Judicial Conference committee should consider the problems that arise from the interplay between Rule 54(d) and the increasingly antique cost provisions in 28 U.S.C. § 1920. The problem is that some courts have felt unable to adjust provisions that address the costs of preparing papers for application to video and other modern media. The committee concluded that the problem is better addressed through statutory revision than through rules amendments. The question of taxable costs has a sufficiently substantive element that it would be better not to take it on through the Enabling Act if other approaches are possible. The topic is recommended for consideration by the appropriate Judicial Conference committee.

There may be a problem of notice to the Attorney General when the constitutionality of a federal statute is required. Notice is required by statute, and Rule 24(c) regulates the manner of notice. But Rule 24(c) does not work as well as it might. This problem was raised during the process of amending the Appellate Rules provisions that address these issues. The Department of Justice has confirmed that failures of the notice process are sufficiently frequent to justify consideration of new rule provisions. This topic will be placed on the fall agenda.

One of two consent calendar items, 02-CV-A, was brought on for discussion. The committee is requested to do something about a district court practice that requires advance permission to file new actions after an individual litigant has been identified as a vexatious litigant. The committee concluded that this specific problem is not of the character that justifies adoption of a general national rule. This item is removed from the agenda without further action. The recommendation to remove the other consent calendar item from the agenda was approved for want of any motion to

October 7, 2002

Minutes
Civil Rules Advisory Committee, May 6-7, 2002
page -39-

remove it from the consent calendar.

It was noted that progress is being made with development of a new Admiralty Rule G to govern civil forfeiture practice.  The Maritime Law Association has approved the approach taken in current drafts.  It is hoped that a draft will be ready to circulate for informal comments over the summer, and to place on the agenda for the fall meeting.

### Next Meeting

The next meeting was set for October 3 and 4 in Santa Fe, New Mexico.

Respectfully submitted

Edward H. Cooper, Reporter

October 7, 2002