JOSEF D. COOPER (CASB No. 53015)
TRACY R. KIRKHAM (CASB No. 69912)
JOHN D. BOGDANOV (CASB No. 215830)
COOPER & KIRKHAM, P.C.
357 Tehama Street, Second Floor
San Francisco, CA  94103
Telephone:  (415) 788-3030
Facsimile:  (415) 882-7040
jdc@coopkirk.com
trk@coopkirk.com
jdb@coopkirk.com


FRANCIS O. SCARPULLA (CASB No. 41059)
PATRICK B. CLAYTON (CASB No. 240191)
LAW OFFICES OF FRANCIS O. SCARPULLA
456 Montgomery Street, 17th Floor
San Francisco, CA  94111
Telephone:  (415) 788-7210
Facsimile:   (415) 788-0706
fos@scarpullalaw.com
pbc@scarpullalaw.com

*Counsel for Indirect-Purchaser Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:  CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION. | **Master File No. 3:07-cv-5944 JST** **MDL No. 1917** |
| This Document Relates to: All Indirect-Purchaser Action | **DECLARATION OF JOSEF D. COOPER IN SUPPORT OF MOTION RE: APPOINTMENT OF CO-LEAD CLASS COUNSEL FOR INDIRECT-PURCHASER PLAINTIFFS WITH CLAIMS IN NON-REPEALER STATES** Date:         January 21, 2016 Time:         2:00 p.m. Judge:        The Hon. Jon S. Tigar Courtroom: 9, 19th Floor |

I, Josef D. Cooper, declare as follows:

1.     I am a member in good standing of the State Bar of California, and licensed to practice in the states of California, Illinois and Hawaii.  I am a Principal in Cooper & Kirkham, P.C.  I have personal knowledge of the facts stated in this Declaration and, if called as a witness, I could and would testify competently to them.  I make this Declaration in support of the Notice of Motion and Motion Re: Appointment of Co-Lead Class Counsel for Indirect Purchaser Plaintiffs with Claims in Non-Repealer States.

2.     This litigation involves an alleged price-fixing conspiracy to raise prices of Cathode Ray Tubes used in TVs and computer monitors sold throughout the United States.

3.     Settlements with all remaining defendants are pending before this Court. Consumers with claims in 22 so-called "*Illinois Brick* Repealer" states may receive monetary recovery if these settlements are approved.  Although the settlements release all claims that consumers may have in the so-called non-repealer states, no consideration of any kind is being given to any of those consumer class members.  Lead Counsel claims that this is permissible because none of these consumers has a viable claim for relief.  Because Lead Counsel has abandoned these consumers, the undersigned, along with Francis O. Scarpulla of the Law Offices of Francis O. Scarpulla, respectfully request that this Court appoint them Co-Lead Counsel to represent all consumers with claims in the non-repealer states.

4.     My firm has sufficient liquid assets to finance the representation of the abandoned class members, and I am prepared to devote the necessary time to representation of such class members.

5.     Attached hereto as Exhibit 1 is a true and correct copy of "Indirect Purchaser Plaintiffs' Motion for Final Approval of Settlements with the Philips, Panasonic, Hitachi, Toshiba,

Samsung SDI, Technicolor, and Technologies Displays Americas Defendants; Memorandum in Support Thereof," dated November 19, 2015 and received on November 20, 2015 via the Case Anywhere document portal from JAMS.

6.    Attached hereto as Exhibit 2 is a true and correct copy of the "Reply in Support of Objections to Indirect-Purchaser Plaintiffs' Motion for Final Approval of Settlements with Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, Technicolor, and Technologies Displays Americas Defendants," lodged on December 9, 2015 with Special Master Quinn at JAMS via the Case Anywhere document portal.

7.    Attached hereto as Exhibit 3 is a true and correct copy of the Memorandum and Order entered August 11, 2015 in *In re Parking Heaters Antitrust Litig.,* Case No. 1:15-mc-00940-JG-JO (E.D.N.Y.) (Dkt. No. 49), appointing Francis Scarpulla and me as Interim Co-Lead Counsel for Indirect Purchaser Plaintiffs in that action.

8.    Attached hereto as Exhibit 4 is a true and correct copy of Dkt. 3200, "Special Master's Report and Recommendation re Settlement", dated December 12, 2014.

9.    Cooper & Kirkham has substantial experience in complex litigation and antitrust class action cases, including litigating numerous indirect purchaser antitrust class actions.  I have served as Lead Counsel, a member of the Executive Committee and/or Liaison Counsel in a number of the largest antitrust actions in the last forty five years.  My appointment to leadership positions began upon my entering private practice, in *In re Plumbing Fixtures Litig.*, M.D.L. No. 3 (E.D. Pa.) and *In re Gypsum Wallboard Litig.,* M.D.L. No. 14 (N.D. Cal.), including positions in the mid-1970's as Plaintiffs' Liaison Counsel in *In re Sugar Industry Antitrust Litig.*, M.D.L. No. 201 (N.D. Cal.), Chairman of the Plaintiffs' Briefing Committee in *In re Folding Carton Antitrust Litig.,* M.D.L. No. 250 (N.D. Ill.), and as Co-Lead Counsel in *In re Cement and Concrete Antitrust Litig.,* M.D.L. No. 296 (D. Ariz.).  More recently, I was a member of the Executive Committees in

*Microsoft I-V Cases*, J.C.C.P. No. 4106 (San Francisco Super. Ct.), where a California class of indirect purchasers of Microsoft operating system and applications software settled for over $1.1 billion, and *In Re TFT-LCD (Flat Panel) Antitrust Litigation,* M.D.L. No. 1827 (N.D. Cal.), where settlement classes of indirect purchasers recovered over $1 billion from major international manufacturers of Flat Panel screens.  I am currently one of four Co-Lead Counsel in *In Re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, M.D.L. No. 1486 (N.D. Cal.), where the Court approved settlements in excess of $310 million.  Counsel intend to make application to the *DRAM* Court seeking distribution of the net settlement funds in the first half of 2016.

10.     My firm has participated in the litigation of many of the nation's major cases that, in addition to recovering billions of dollars for class members, have added to the seminal precedent in the area of antitrust law.  For example, we were the lead drafters of the petition for rehearing, and, subsequently, the briefing on rehearing *en banc* in *Sullivan v. DB Invs., Inc.,* 667 F.3d 273 (3d Cir. 2011) (*en banc*), *cert. denied sub nom. Murray v. Sullivan,* 132 S. Ct. 1876 (2012) ("*Sullivan*"), a decision that is widely regarded as one of the most complete expositions extant of the law and policy underlying the settlement of antitrust class actions.

11.     My firm resume, which contains biographical data and a more complete list of my firm's cases and representative clients is attached hereto as Exhibit 5 and incorporated by this reference.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 11th day of December, 2015, in San Francisco, California.

   /s/ Josef D. Cooper
                Josef D. Cooper

---

DECLARATION OF JOSEF D. COOPER IN
SUPPORT OF MOTION RE: APPOINTMENT OF
CO-LEAD CLASS COUNSEL

- 3 -

Master File No. 3:07-cv5944 JST
MDL 1917

# EXHIBIT 1

1   Mario N. Alioto (56433)
    Joseph M. Patane (72202)
2   Lauren C. Capurro (241151)
    TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
3   2280 Union Street
    San Francisco, CA 94123
4   Telephone: 415-563-7200
    Facsimile: 415- 346-0679
5   Email: malioto@tatp.com
    jpatane@tatp.com
6   laurenrussell@tatp.com

7   *Lead Counsel for the*
    *Indirect Purchaser Plaintiffs*

8

9

10                          **UNITED STATES DISTRICT COURT**

11                          **NORTHERN DISTRICT OF CALIFORNIA**

                                **SAN FRANCISCO DIVISION**
12

13   IN RE: CATHODE RAY TUBE (CRT)          Master File No. CV-07-5944-JST;
     ANTITRUST LITIGATION                    No. CV-13-03234-JST
14
                                             MDL No. 1917
15
     ─────────────────────────────
16   This Document Relates to:              **INDIRECT PURCHASER PLAINTIFFS'**
                                            **MOTION FOR FINAL APPROVAL OF**
17   All Indirect Purchaser Actions         **SETTLEMENTS WITH THE PHILIPS,**
                                            **PANASONIC, HITACHI, TOSHIBA,**
18                                          **SAMSUNG SDI, TECHNICOLOR, AND**
                                            **TECHNOLOGIES DISPLAYS AMERICAS**
19                                          **DEFENDANTS; MEMORANDUM IN**
                                            **SUPPORT THEREOF**
20
                                            Hearing Date:  March 15, 2016
21                                          Time: 2:00 p.m.
                                            Judge: Honorable Jon S. Tigar
22                                          Court: Courtroom 9, 19th Floor
                                            Special Master: Martin Quinn, JAMS
23

24

25

26

27

28

─────────────────────────────────────────────────────────────────────
INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF – Master File No. CV-07-5944-JST

**TABLE OF CONTENT**

INTRODUCTION .................................................................................................................1

SUMMARY OF SETTLEMENT TERMS...........................................................................3

    A.    The Proposed Settlements............................................................................3
.
    B.    Consideration................................................................................................5

    C.    Releases....................................................................................................... 6

PROCEDURAL HISTORY....................................................................................................7

ARGUMENT..........................................................................................................................8

I.      THE SETTLEMENTS WARRANT FINAL APPROVAL ......................................8

    A.    Class Action Settlement Procedure...............................................................8

    B.    The Notice Plan Comports with Due Process................................................9

    C.    The Court Should Finally Certify the Settlement Class................................10

        1.    Numerosity........................................................................................11

        2.    Commonality......................................................................................11

        3.    Typicality...........................................................................................12

        4.    Adequacy of Representation ..............................................................12

        5.    Predominance.....................................................................................13

        6.    Superiority.........................................................................................13

    D.    The Proposed Settlements Should Be Finally Approved...........................14

        1.    Strength of IPPs' Case......................................................................15

        2.    Risk, Expense and Complexity of the Litigation..............................15

        3.    Risk of Maintaining Class Action Status..........................................19

        4.    Amount Offered in Settlement...........................................................19

        5.    Extent of Discovery and Stage of Proceedings.................................19

        6.    Experience and Views of Lead Counsel............................................20

        7.    Government Participation...................................................................21

        8.    Reaction of Class Members to the Proposed Settlements.................21

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

9.      Exclusion Requests..........................................................................22

II.     THE COURT SHOULD APPROVE THE PLAN OF DISTRIBUTION ............................22

        A.      Compensation to Indirect Purchaser State Class Members..........................22

        B.      Treatment of Nationwide Class Members ......................................................23

III.    THE COURT SHOULD OVERRULE THE OBJECTIONS TO THE
        SETTLEMENTS .................................................................................................................23

        A.      Only 11 Objections Were Filed, and Two Have Already Been Withdrawn................24

        B.      Objectors Bear the Burden of Establishing Unfairness...............................26

        C.      The Objections Driven by Disgruntled "Insider Objectors" Lack Merit....................27

                1.      Cooper and Scarpulla Have No Standing to Object to the Proposed
                        Settlements ..............................................................................................27

                2.      The Timing and Motivations Behind the Insider Objectors' Objections
                        Are Highly Suspect ..................................................................................28

        D.      The Objections by Professional Objectors Should be Treated with Skepticism .........29

        E.      The Objections to the Scope of the Release Lack Merit................................31

                1.      The Release of Injunctive Relief Claims ................................................32

                2.      The Release of Potential Damages Claims ..............................................34

        F.      Massachusetts, Missouri and New Hampshire Were Not Wrongly Excluded ............36

                1.      Massachusetts...........................................................................................36

                2.      Missouri....................................................................................................37

                3.      New Hampshire........................................................................................38

        G.      Weighting Claims According to the Perceived Strength of the States' Laws Would
                Be Speculative and Contrary to the Evidence..............................................39

        H.      The Nationwide Class Was Adequately Represented....................................41

        I.      The Notice Program Was the Best Notice Practicable Under the Circumstances.......43

        J.      The Total Settlement Amount is More than Fair, Reasonable and Adequate.............47

        K.      The CA AG's Statement of Interest ..............................................................48

        L.      Unsatisfied Objectors Could Have Opted Out.............................................49

CONCLUSION.................................................................................................................49

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

# TABLE OF AUTHORITIES

Cases

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997) ................................................................. passim

*Barnes v. FleetBoston Fin. Corp.*, No. 01-10395-NG, 2006 WL 6916834
(D. Mass. Aug. 22, 2006) ....................................................................................................31

*Bennett v. Behring Corp.*, 96 F.R.D. 343 (S.D. Fla. 1982) .................................................25

*Billingham v. Dornemann*, 447 Mass. 1113 (2006) ...........................................................36

*Boulds v. Chase Auto Finance Corporation*, 266 S.W. 847 (Mo. App. 2008) ...........34, 38

*Carnegie v. Household Int'l Inc.*, 376 F.3d 656 (7th Cir. 2004) .......................................11

*Churchill Village LLC v. General Electric,* 361 F.3d 566 (9th Cir. 2004) ................9, 15, 23

*City of Detroit v. Grinnell Corp.,* 495 F.2d 448 (2d Cir.1974) ..........................................48

*Class Plaintiffs v. City of Seattle,* 955 F.2d 1268 (9th Cir. 1992) ...................................6, 23

*Comcast Corp. v. Behrend,* 133 S. Ct. 1426 (2013) ...........................................................17

*Daniels v. Aéropostale West, Inc.*, No. C-12-05755, 2014 WL 2215708
(N.D. Cal. May 29, 2014) .....................................................................................................35

*Darwich v. city of Dearborn*, No. 13-10254, 2014 WL 4600902 (E.D. Mich. Sept. 15, 2014).........27

*Eisen v. Porsche Cars N. Am., Inc.*, No. 2:11-CV-09405-CAS, 2014 WL 43900
(C.D. Cal. Jan. 30, 2014), *appeal dismissed* (Sept. 22, 2014) .........................................49

*Ellis v. Naval Air Rework Facility,* 87 F.R.D. 15 (N.D. Cal. 1980), *affd,* 661 F.2d 939
(9th Cir. 1981) .......................................................................................................................14, 21

*Garner v. State Farm Mut. Auto. Ins. Co.,* No. CV 09 1365 CW, 2010 WL 1687832
(D. Cal. Apr. 22, 2010) .........................................................................................................24

*Hanlon v. Chrysler Corp.,* 150 F.3d 1011 (9th Cir. 1998) ..........................................11, 23

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ....................................................17, 18, 34, 39

*In re Airline Ticket Commission Antitrust Litig.*, 953 F. Supp. 280 (D. Minn. 1997) .......................40

*In re Bankamerica Corp. Secs. Litig.*, 210 F.R.D. 694 (E.D. Mo. 2002) ...........................39

*In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897,
1999 U.S. Dist. LEXIS 12936 (N.D. Ill. Aug. 17, 1999)....................................................40

*In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152 (N.D. Cal. 2001) .......................22

*In re Corrugated Container Antitrust Litig.*, 556 F. Supp. 1117 (S.D. Tex. 1982)
*aff'd*, 687 F.2d 52 (5th Cir.1982) ...................................................................................40

*In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297 (N.D. Ga. 1993)....................44

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M-02-1486, 2013 U.S. Dist. LEXIS 188116 (N.D. Cal. Jan. 8, 2013)........................................................................39

*In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010)........................................................................................................................19

*In re General Motors Corp.*, 55 F.3d 768 (3d Cir.1995) .......................................................26

*In re Google Referrer Header Privacy Litig.*, 87 F. Supp. 3d 1122 (N.D. Cal. 2015) .................43, 45

*In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008)...........................19

*In re Heritage Bond Litig.,* MDL No. 02-ML-1475 DT, 2005 WL 1594403
(C.D. Cal. June 10, 2005) ....................................................................................21, 39

*In re Indus. Diamonds Antitrust Litig.,* 167 F.R.D. 374 (S.D.N.Y. 1996)...........................13

*In re IPO Secs. Litig.,* 226 F.R.D. 186  (S.D.N.Y. 2005) ...........................................11, 33

*In re Linerboard Antitrust Litig.,* 203 F.R.D. 197 (E.D. Pa. 2001) .....................................12

*In re Linerboard Antitrust Litig.,* No. A-98-5055, MDL No. 1261, 2004 WL 1221350
(E.D. Pa. June 2, 2004) .......................................................................................15

*In re Linerboard Antitrust Litig.,* 321 F. Supp. 2d 619 (E.D. Pa. 2004).............................24

*In re Linkedin User Privacy Litig.,* -- F.R.D. --, 2015 WL 5440975 (N.D. Cal. Sept. 15, 2015)........21

*In re Lloyds' Am. Trust Fund Litig.,* No. 96 Civ.1262 RWS, 2002 WL 31663577
(S.D.N.Y. Nov. 26, 2002) ...................................................................................22

*In re Market-Makers Antitrust Litig.,* 169 F.R.D. 493 (S.D.N.Y. 1996) ............................13

*In re Master Key Antitrust Litig.,* 528 F.2d 5 (2d Cir. 1975)...............................................13

*In re NASDAQ Mkt.-Makers Antitrust Litig.,* 187 F.R.D. 465 (S.D.N.Y. 1998).................16

*In re Online DVD-Rental Antitrust Litig.,* 779 F.3d 934 (9th Cir. 2015).....................46, 47

*In re Omnivision Technologies, Inc.,* 559 F. Supp. 2d 1036 (N.D. Cal. 2008)....................22

*In re Optical Disk Drive Antitrust Litig.,* 303 F.R.D. 311 (N.D. Cal. 2014)........................19

*In re Oracle Secs. Litig.,* No. C-90-0931, 1994 WL 502054 (N.D. Cal. 1994)....................39

*In re Paine Webber Partnerships Litig.,* 171 F.R.D. 104 (S.D.N.Y. 1997),
*aff'd* 117 F.3d 721 (2d Cir. 1997)..........................................................................21

v

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN SUPPORT THEREOF - Master File No. CV-07-5944-JST

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244 (D.C. Cir. 2013) ...........................17

*In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005) ......................................................39, 42

*In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603
(N.D. Cal. 2009)........................................................................................................................12, 13, 14

*In re Sunrise Secs. Litig.*, 131 F.R.D. 450 (E.D. Pa. 1990)...............................................................27

*In re Superior Beverage/Glass Container Consol. Pretrial*, 133 F.R.D. 119 (N.D. Ill. 1990)............16

*In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078 (N.D. Cal. 2007).........................................26

*In re TFT-LCD Antitrust Litig.*, MDL No. 1827, 2011 WL 7575004  (N.D. Cal. Dec. 27,
2011).....................................................................................................................................................22

*In re TracFone Unlimited Serv. Plan Litig.*, --- F.Supp.3d --- (2015), 2015 WL 4051882
(N.D. Cal. July 2, 2015).......................................................................................................................27

*In Re: Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F.Supp.2d 1011 (N.D. Cal. 2010)....................4

*In re Vitamins Antitrust Litig.*, No. 99–197 TFH, 2000 WL 1737867 (D.D.C. Mar. 31, 2000).........22

*Klee v. Nissan N. Am., Inc.*, No. CV-12-08238, 2015 WL 4538426
(C.D. Cal. July 7, 2015) (*appeal filed*) ...............................................................................................49

*Milligan v. Toyota*, No. 3:09–cv–05418–RS, slip op. at 13 (N.D. Cal. Jan. 6, 2012) ........................49

*Mirfasihi v. Fleet Mortg. Corp.*, 551 F.3d 682 (7th Cir. 2008) ..........................................................33

*Motorola Mobility LLC v. AU Optronics Corp.*, 773 F.3d 826 (7th Cir. 2014), *withdrawn and
superseded by*, 775 F.3d 816 (7th Cir. 2015)........................................................................................17

*Nat'l Rural Telecomms. Coop. v. DIRECTV Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004)..................21, 23

*Nguyen v. Radient Pharmaceuticals Corp.*, No. SACV 11–00406 DOC (MLGx),
2014 WL 1802293 (C.D. Cal. May 6, 2014) ............................................................................. passim

*Pallas v. Pacific Bell*, No. C-89-2373 DLJ, 1999 WL 1209495 (N.D. Cal. July 13, 1999)...............24

*Parker v. Time Warner Entertainment Co., LP*, 631 F. Supp. 2d 242 (E.D.N.Y. 2009)....................32

*Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615 (9th Cir. 1982) ........................................14

*Radcliffe v. Experian Information Solutions, Inc.*, 715 F.3d 1157 (9th Cir. 2013)............................49

*Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir.2009)....................................................48

*Saylor v. Lindsley*, 456 F.2d 896 (2d Cir.1972)..................................................................................25

*Silber v. Mabon*, 18 F.3d 1449 (9th Cir. 1994)....................................................................................9

*Sullivan v. DB Investments Inc.*, 667 F.3d 273 (3d Cir. 2011) ................................................. passim

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives and Composites, Inc.*, 209 F.R.D. 159 (C.D. Cal. 2002)..........................................................................................................13

*U.S. Football League v. Nat'l Football League*, 887 F.2d 408 (2d Cir.1989)...................48

*United States v. Oregon*, 913 F.2d 576 (9th Cir.1990) ....................................................27

*Van Bronkhorst v. Safeco Corp.,* 529 F.2d 943 (9th Cir. 1976) ......................................14

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96 (2d Cir. 2005) .......................9, 33

*Yoshioka v. Charles Schwab Corp.*, No. C-11-1625, 2011 WL 6748984 (N.D. Cal. Dec. 22, 2011) .................................................................................................35

Statutes

28 U.S.C. § 1332(d) (Class Action Fairness Act of 2005) ................................................43

28 U.S.C. § 1715(b) ..........................................................................................................24

Fed. R. Civ. P. 23..........................................................................................................9, 11

Fed. R. Civ. P. 23(a) ...........................................................................................11, 12, 13

Fed. R. Civ. P. 23(b) ................................................................................................. passim

Fed. R. Civ. P. 23(c) .........................................................................................................46

Fed. R. Civ. P. 23(e) ........................................................................................................8, 9

Mass. Gen. Laws Ch. 260, § 5A (2012)...........................................................................34

N.H. Rev. Stat. § 358-A:3 ............................................................................................34, 38

 Other Authorities

4 Newberg on Class Actions §§ 13:1, §§ 3:58, *et seq.* (5th ed. 2015)...........................8, 41

American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.04 (Comment) (2015) .........................................................................................................46

Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010) ("FJC Checklist") ..................................................................9

United States; application of the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA")........................................................................................................................15, 16

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN SUPPORT THEREOF - Master File No. CV-07-5944-JST

## MEMORANDUM OF POINTS AND AUTHORITIES

## <u>INTRODUCTION</u>

Indirect Purchaser Plaintiffs ("IPPs") move for final approval of their settlements with the Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, Technicolor, and Technologies Displays Americas Defendants (the "Proposed Settlements").

IPPs submit this Memorandum pursuant to the Court's July 9, 2015 Order granting preliminary approval of these seven settlements (the "Preliminary Approval Order"). (Dkt. No. 3906.) In the Preliminary Approval Order, the Court provisionally certified the Settlement Class, preliminarily approved the Settlements and the Plan of Distribution, and ordered dissemination of notice to Class Members regarding the preliminary approval of the Settlements, the Fairness Hearing, and rights to submit objections and requests for exclusion.

Notice was provided in accordance with the Preliminary Approval Order. Out of millions of indirect purchaser class members, only 11 objections were filed by 22 objectors, and two of them have already been withdrawn (subject to Court approval). Only five requests for exclusion were received.

Under the Proposed Settlements, IPPs have recovered ***$541,750,000*** on behalf of a proposed Settlement Class that includes a Nationwide Class and 22 Indirect Purchaser State Classes (including the District of Columbia). The total amount recovered, adding in monies recovered under previously approved settlements, is ***$576,750,000***. This is an extraordinary result. Indeed, it is one of the largest recoveries ever on behalf of indirect purchaser plaintiffs. There are no coupons or vouchers and there will be no reversion or refund to any Defendant under any circumstances. As for the Plan of Distribution, it is fair, reasonable and adequate. No *cy pres* distribution is contemplated, and Class members are being compensated according to a generally-accepted pro-rata approach taking into account the value of their claims.

The eleven objections to the Proposed Settlements should be overruled. To begin, the objections are suspect. Three of the objections were lodged by four attorneys who have represented class members in this litigation (the "Insider Objectors")—attorneys who have had notice of the settlement terms and the notice program *at least* since the filing of IPPs' motion for preliminary

approval, and yet only voiced concerns after IPP Counsel's Audit Committee reviewed their timesheets and made cuts to their lodestars.[1]  Thus, the motivation behind these objections, and their timing, are suspicious.  In addition, the Cooper/Scarpulla objections must be stricken for lack of standing because they were not submitted on behalf of any class member.  Seven other objections were filed by "serial" or "professional" class-action objectors whose motivations are likewise suspect.[2]  In the end, this leaves only one objection (filed by an attorney acquainted with one of the Insider Objectors)[3], along with a "Statement of Interest" filed by the California Attorney General. (Dkt. No. 4118.)

Moreover, the objections lack substance.  Most of the objections focus on the lack of financial compensation to members of the Nationwide Class who release (1) their claims for injunctive relief, and (2) all claims that "were or could have been" asserted in this litigation—a standard release in a settlement agreement.  Indeed, this Court has already finally approved an identical release in conjunction with IPPs' settlement with defendant LG Electronics, Inc. ("LG"). (Dkt. No. 2542.)

The Proposed Settlements do not provide injunctive relief for the Nationwide Class.  The reason is that the CRT market is dying and almost all manufacturers, including all of the alleged conspirators, have left the market, making it very unlikely that the alleged conduct could recur in the future.  A stipulated injunction with Defendants would therefore not be meaningful.  And, because the injunctive relief claims are not viable, releasing these claims without financial compensation as part of a global release is fair, reasonable and adequate.

The release of potential damages claims of purchasers outside the 22 Indirect Purchaser State Classes is also fair, reasonable and adequate.  The damages claims for these states are not viable and are completely speculative.

---

[1] Josef Cooper and Francis Scarpulla (Dkt. Nos. 4115 and 4116); Robert Bonsignore (Dkt. Nos. 4119 and 4144); Theresa Moore (Dkt. No. 4113).

[2] Donnie Clifton (Dkt. No. 4099); Sean Hull, Gordon Morgan (Dkt. No. 4101); Douglas St. John (Dkt. No. 4106); John Finn, Laura Townsend Fortman (Dkt. No. 4111); Paul Palmer (Dkt. No. 4120); Josie Saik (Dkt. No. 4140-3); and Elizabeth Johnson (Dkt. No. 4128).

[3] Dan L. Williams & Co. (Dkt. No. 4112).

Lastly, in view of the magnitude of the settlement amounts, Defendants' insistence on global releases is understandable. The release of valueless claims satisfies Defendants' desire to forestall the defense of nuisance claims in the future. At the same time, the release does not prejudice class members who give up nothing of value.

The other objections to the settlements, such as inadequate representation and inadequate notice, are likewise meritless and should be overruled. All of the class representatives are members of both the Indirect Purchaser State Classes and the putative Nationwide Class, so there is no conflict. In addition, IPPs' comprehensive notice program reached an estimated 83% of class members, which is well within the acceptable range. The notice provided to class members was the best notice practicable under the circumstances, and comports with due process.

In sum, the Court should find that the Proposed Settlements are fair, reasonable and adequate, and grant final approval.

## SUMMARY OF SETTLEMENT TERMS

As detailed in IPPs' preliminary approval papers (*see* Dkt. Nos. 3861 and 3875), IPPs have entered into settlements (collectively the "Settlement Agreements") with the remaining seven groups of Defendants in their case.

### A.     The Proposed Settlements

The Proposed Settlements resolve all claims against Defendants stemming from an alleged conspiracy to fix prices for CRT Products[4] indirectly purchased from Defendants. The proposed Settlement Class is defined as follows:

NATIONWIDE CLASS

All persons and or entities who or which indirectly purchased in the United States for their own use and not for resale, CRT Products manufactured and/or sold by the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time during the period from March 1, 1995 through November 25, 2007. Specifically excluded from this Class are claims on behalf of Illinois persons (as defined by 740 ILCS 10/4) for purposes of claims under 740 Ill. Comp. Stat § 10/7(2), Oregon

---

[4] CRT Products are defined in the Settlement Agreements to mean Cathode Ray Tubes of any type (e.g. color display tubes, color picture tubes and monochrome display tubes) and products containing Cathode Ray Tubes. Color Display Tubes ("CDTs") were used to manufacture computer monitors. Color Picture Tubes ("CPTs") were used to manufacture televisions.

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN SUPPORT THEREOF - Master File No. CV-07-5944-JST

natural persons (as defined by ORS 646.705 (2)) for purposes of claims under ORS § 646.775(1), and Washington persons (as defined by RCW 19.86.080) for purposes of claims under RCW 19.86.080 (1).  Also specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and, any affiliate, legal representative, heir or assign of any Defendant.  Also excluded are named co-conspirators, any federal, state or local government entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.[5]

INDIRECT PURCHASER STATE CLASSES:[6]

All persons and or entities in Arizona, California, District of Columbia, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin who or which indirectly purchased for their own use and not for resale, CRT Products manufactured and/or sold by the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time during the period from March 1, 1995 through November 25, 2007.

All persons and entities in Hawaii who or which indirectly purchased for their own use and not for resale CRT Products manufactured and/or sold by  the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time from June 25, 2002 through November 25, 2007.

All persons and entities in Nebraska who or which indirectly purchased for their own use and not for resale CRT Products manufactured and/or sold by the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time from July 20, 2002 through November 25, 2007.

All persons and entities in Nevada who or which indirectly purchased for their own use and not for resale CRT Products manufactured and/or sold by  the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time from February 4, 1999 through November 25, 2007.

Specifically excluded from these Classes are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and, any affiliate, legal representative, heir or assign of any Defendant.  Also excluded are named co-conspirators, any federal, state or local government entities,

---

[5] Residents of Illinois, Oregon and Washington are excluded from the Nationwide Class because the Attorneys General of those states are suing the Defendants on behalf of residents of those states.

[6] All of the Indirect Purchaser State Classes are the same except that three states, Hawaii, Nebraska and Nevada, have slightly shorter damages periods.  This is because the statutes allowing indirect purchasers to bring an antitrust claim for damages in Hawaii, Nebraska and Nevada were enacted after March 1, 1995, the beginning of the alleged Class Period.  This Court dismissed claims based on purchases made prior to the enactment of these statutes on the grounds that the state legislatures did not intend the statutes to apply retroactively.  *In Re: Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F.Supp.2d 1011, 1025-26 (N.D. Cal. 2010).

any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

This proposed Settlement Class is identical to the class preliminarily approved by the Court with respect to the settlements at issue (Dkt. No. 3906), as well as the Settlement Class finally approved by the Court in conjunction with IPPs' settlement with LG (Dkt. No. 2542). The Court has also certified 22 indirect purchaser state classes which are defined similarly to the Indirect Purchaser State Classes proposed here (the "Certified Class") (Dkt. Nos. 1742 and 1950.) The Settlement Class is broader than the Certified Class in the following respects: (1) the Certified Class requires that the Indirect Purchaser State Class Members be residents of the respective States, whereas the Settlement Class requires only that the purchase was made in one of the States; (2) the Certified Class is limited to televisions and monitors containing CRTs, whereas the Settlement Class includes CRTs, televisions and monitors containing CRTs, and other products containing CRTs; and (3) the Certified Class consists of the Indirect Purchaser State Classes defined above, while the Settlement Class also includes the Nationwide Class. The broader class definition provides complete peace to Settling Defendants and will allow more purchasers of CRT Products to receive compensation.

**B.     Consideration**

Under the Proposed Settlements, the Settling Defendants have paid a total of $541,750,000 in cash to settle all indirect purchaser claims against them. (*See* Dkt. Nos. 3861, 3875.) Together with the two previously approved settlements with Defendants Chunghwa Picture Tubes, Ltd. ("Chunghwa") and LG Electronics, Inc. ("LG"), the total Settlement Fund is $576,750,000. The payments are summarized in the chart below:

| DEFENDANT | TOTAL SETTLEMENT |
|---|---|
| Philips | $ 175,000,000 |
| Panasonic | $  70,000,000 |
| Hitachi | $  28,000,000 |
| Toshiba | $  30,000,000 |
| Samsung SDI | $ 225,000,000 |
| Thomson and TDA | $  13,750,000 |
| **Total of seven currently proposed settlements** | **$ 541,750,000** |
| Chunghwa | $  10,000,000 |
| LG | $  25,000,000 |

5

| | |
|---|---|
| Total of two previously approved settlements | $ 35,000,000 |
| **Grand total of all settlements** | **$ 576,750,000** |

The Settlement Amounts have been deposited into an escrow account and have been invested in United States Treasury bills and other instruments insured or guaranteed by the full faith and credit of the United States.  If the Settlements are finally approved, any interest earned thereon (together with the Settlement Amounts) will become part of the Settlement Fund.  (Dkt. Nos. 3861, 3875.)

In addition, most of the Proposed Settlements contain cooperation provisions requiring Settling Defendants to provide specified cooperation to IPPs in the prosecution of any continuing litigation.  The cooperation provisions are material and valuable terms of the settlements.  They enhanced the settlement prospects with the remaining defendants because they obligated Settling Defendants, to varying degrees, to provide cooperation to the IPPs in prosecuting the remaining Defendants, including authentication of documents, producing witnesses for interviews, and depositions and/or trial, as well as other assistance. *Id.*

**C.      Releases**

As is common in class action settlements, in exchange for their settlement payments Defendants requested "global peace" in the form of a release by all class members of all claims they have brought, or could have brought, based on the conduct alleged in this litigation.  This desire for global peace is a legitimate concern and courts routinely permit the release of all actual and potential claims, regardless of each claim's individual value, as part of a settlement class.[7]

IPPs agreed to the following global release:

---

[7] *Sullivan v. DB Investments Inc.,* 667 F.3d 273 (3d Cir. 2011) (acknowledging settling defendants' interest in seeking global peace as part of class action settlement); *see also Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1287 (9th Cir. 1992) ("a federal court may release not only those claims alleged in the complaint, but also a claim 'based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented *and might not have been presentable in the class action*'") (citation omitted) (emphasis in original).

any and all claims, demands, judgments, actions, suits, causes of action, whether class, individual, or otherwise (whether or not any Class Member has objected to the settlement or makes a claim upon or participates in the Settlement Fund, whether directly, representatively, derivatively, or in any other capacity) that Releasors, or each of them, ever had, now has, or hereafter can, shall, or may have on account of, or in any way arising out of, any and all known and unknown, foreseen and unforeseen, suspected or unsuspected injuries, damages, and consequences thereof in any way arising out of or relating in any way to any act or omission of the Panasonic Releasees (or any of them) or any other entity concerning the manufacture, supply, distribution, sale or pricing of CRT Products up to the date of execution of this Agreement, including but not limited to any conduct alleged, and causes of action asserted or that could have been alleged or asserted, in complaints filed in this Action, including those arising under any federal, state, or foreign antitrust, unfair competition, unfair practices, price discrimination, unitary pricing, unjust enrichment, contract, or trade practice law (the "Released Claims").

Panasonic Settlement Agreement, ¶ 13 (Dkt. No. 3862-2).  The releases in all of the Settlement Agreements are identical.

Thus, IPPs and class members will release all federal and state-law claims against a Settling Defendant whose settlement becomes final, "concerning the manufacture, supply, distribution, sales or pricing of CRT Products . . . ."  (*Id.*; Dkt. No. 3875.)  The release does not include claims for product defect, personal injury or breach of contract.  (*Id.*)  Class members release their claims for injunctive relief through the Execution Dates of the Proposed Settlement Agreements only.

### **PROCEDURAL HISTORY**[8]

IPPs filed their motions for preliminary approval of the Proposed Settlements on May 29, 2015.  (Dkt. No. 3861.)  The Court granted preliminary approval on July 9, 2015.  (Dkt. No. 3906.) Notice was thereafter published in accordance with the Preliminary Approval Order.  Publication consisted of the following actions:

- direct mailed/emailed notice to more than ten million unique addresses (including many of the largest institutional end-users of CRTs);

- publication notice in magazines and newspapers with collective readership of more

---

[8] A complete description of the history of this litigation is contained in the Declaration of Mario N. Alioto in Support of Indirect Purchaser Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses and Incentive Awards for Class Representatives, Dkt. No. 4071-1 ("Alioto Fee Decl. I").

than 150 million;

- digital notice via paid advertisements on Google, Facebook, and other popular websites;

- English and Spanish press releases carried by almost 300 domestic and foreign websites with a total potential audience of approximately 72 million; and

- Publication on the CRT settlement website, which has received more than 537,000 unique visitors.

Collectively, these efforts reached an estimated 83% of class members with an estimated frequency of 3.1, which is well-within the acceptable range. *See generally* Declaration of Joseph M. Fisher Reporting on the Class Notice Program ("Fisher Decl. II").

Eleven objections on behalf of 22 objectors have been filed. Five requests for exclusion have been received. *Id*. ¶ 19, Ex. Y (exclusion letters). Lead Counsel has provided Defendants with a list of these requests for exclusion.[9]

## ARGUMENT

## I.     THE SETTLEMENTS WARRANT FINAL APPROVAL

### A.     Class Action Settlement Procedure

A class action may not be dismissed, compromised or settled without the express approval of the Court. *See* Fed. R. Civ. P. 23(e). Approval is a three-step process: (1) certification of a settlement class and preliminary approval of the proposed settlement; (2) notice to the class; and (3) final approval at a Fairness Hearing, following notice. *See Nguyen v. Radient Pharmaceuticals Corp.,* No. SACV 11–00406 DOC (MLGx), 2014 WL 1802293, at *1 (C.D. Cal. May 6, 2014); 4 Newberg on Class Actions §§ 13:1, *et seq.* (5th ed. 2015) ("*Newberg*") (describing class action settlement procedure). This process safeguards class members' procedural due process rights and enables the Court to fulfill its role as the guardian of class interests.

---

[9] Declaration of Mario N. Alioto In Support of Indirect Purchaser Plaintiffs' Motion for Final Approval of Settlements with Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, Thomson and TDA Defendants ("Alioto Settl. Decl. II"), ¶ 4.

The Court completed the first step in the settlement approval process when it granted preliminary approval to the Proposed Settlements.  As discussed below, the second step in the process has been completed as well: the Court-approved Notice plan was fully implemented.  IPPs now request that the Court take the final steps of holding a formal Fairness Hearing, granting final approval of the Proposed Settlements, and entering Final Judgment.

**B.     The Notice Plan Comports with Due Process**

Federal Rule of Civil Procedure 23(e) and due process require that Class Members be given "reasonable" notice of a proposed settlement and the right to be heard at the fairness hearing to determine whether final approval of a settlement should be granted. *See* Fed. R. Civ. P. 23(e); *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 113-14 (2d Cir. 2005).  Notice is satisfied if it "generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Village LLC v. General Electric,* 361 F.3d 566, 575 (9th Cir. 2004).  This standard does not require perfection in delivering notice, but rather reasonable efforts to reach as many class members as possible through either individual or publication means. *See, e.g.,* Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010) ("FJC Checklist"), at 3 ("It is reasonable to reach between 70-95%."); *Silber v. Mabon,* 18 F.3d 1449, 1454 (9th Cir. 1994).

The Court has held that the notice program proposed by IPP Counsel—which included published notice, the posting of notice on the website established for this case, and other steps including direct mailing to targeted individuals and entities—"constitutes the best notice practicable under the circumstances, is due and sufficient notice to the Indirect Purchaser Settlement Class and complies fully with the requirements of Federal Rule of Civil Procedure 23 and the due process requirements of the Constitution of the United States."  Preliminary Approval Order, ¶ 13.

Indeed, the implemented CRT notice program meets – and in many respects exceeds – these standards. *See* Fisher Decl. II (summarizing notice program).  As the Fisher Declaration explains, CRT class members were notified through a carefully-designed combination of (i) direct mailed/emailed notice to more than ten million unique addresses (including many of the largest institutional end-users of CRTs) (*Id.* ¶¶ 8-9); (ii) publication notice in magazines and newspapers

9

with collective readership of more than 150 million (*Id.* ¶ 10); (iii) digital notice via paid advertisements on Google, Facebook, and other popular websites (*Id.* ¶¶ 11-12); (iv) English and Spanish press releases carried by almost 300 domestic and foreign websites with a total potential audience of over 72 million; and (v) the CRT settlement website, which has received more than 537,000 unique visitors.  Collectively, these efforts reached an estimated 83% of Class Members with an estimated frequency of 3.1 (*id.* ¶ 18d), which is well-within the acceptable range.[10]

Moreover, as a practical matter, the reach and frequency of the notice to Class Members was effectively greater than these numbers imply since the calculated numbers ignore so-called "organic" notices that cannot be directly traced to a paid activity.  For example, a search result showing the CRT Settlement Website as a paid advertisement would be included in the calculated reach; but a search result showing the CRT Settlement Website as an unpaid search result is not included in the calculated reach.  Both results effectively reach the viewer, but only the paid search result is counted.  *See further* Fisher Decl. II ¶ 18e and Ex. X.

The notice program comports with due process and was the best notice practicable under the circumstances.

**C.    The Court Should Finally Certify the Settlement Class**

The Court provisionally certified the Settlement Class in the Preliminary Approval Order. All of the grounds for certification articulated then apply with equal force now, and final certification is warranted.   The Court has already finally approved an identical Settlement Class when it approved IPPs' prior settlement with LG. (Dkt. No. 2542.)  The Court has also certified 22 indirect purchaser state classes which are defined similarly to the Indirect Purchaser State Classes proposed here.  (Dkt. No. 1950 p. 23; Dkt. No. 1742 p. 40-47.)

---

[10] The notice program also comports with the plans approved in similar matters.  *See, e.g., In re TFT-LCD Antitrust Litig.*, No. 07-cv-10827, Dkt. No. 5600-3 (N.D. Cal. 2012) (describing final indirect purchaser notice plan); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, MDL No. 1486, Dkt. No. 2147 (N.D. Cal. 2013) (same).  The publication and digital outreach programs in *CRT* were comparable in scope and focus to those in *TFT-LCD* and *DRAM*.   The *TFT-LCD* program did include television advertising as an additional form of outreach—which was not done here for cost/benefit reasons—but in other respects the *CRT* program went beyond *TFT-LCD* and *DRAM* by including a substantial direct mail/email component, which was not done in the other cases.

1    The Court may certify a settlement class where plaintiffs demonstrate that the proposed class

2    and proposed class representatives meet the four prerequisites listed in Rule 23(a)—numerosity,

3    commonality, typicality and adequacy of representation—and one of the three requirements of Rule

4    23(b).  *See* Fed. R. Civ. P. 23; *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir. 1998).

5    Certification of a class action  under Rule 23(b)(3) requires a showing that "questions of law and fact

6    common to the members of the class predominate over any questions affecting only individual

7    members, and that a class action is superior to other available methods for the fair and efficient

8    adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

9    In certifying a settlement class, the Court is not required to determine whether the action, if

10   tried, would present intractable management problems, "for the proposal is that there be no trial."

11   *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 620 (1997).  As Judge Posner has explained,

12   manageability concerns that might preclude certification of a litigated class may be disregarded with

13   a settlement class "because the settlement might eliminate all the thorny issues that the court would

14   have to resolve if the parties fought out the case."  *Carnegie v. Household Int'l Inc.,* 376 F.3d 656,

15   660 (7th Cir. 2004) (*citing Amchem,* 521 U.S. at 620); *see also In re IPO Secs. Litig.,* 226 F.R.D.

16   186, 190, 195 (S.D.N.Y. 2005) (settlement class may be broader than litigated class because

17   settlement resolves manageability and predominance concerns).

18   Here, the Settlement Class meets the requirements of Rule 23(a) and (b) of the Federal Rules

19   of Civil Procedure and should be certified, as shown below.

20                          **1.      Numerosity**

21   It is undisputed that millions of people in the United States purchased CRT Products during

22   the class period, and that the class readily satisfies the numerosity requirements of Rule 23.[11]

23                          **2.      Commonality**

24   There are questions of law and fact common to the Class, including, among others, whether

25   Defendants conspired to fix the prices of CRTs; whether Defendants violated Section 1 of the

26

27   [11] *See* Dkt. Nos., 1742 (Report and Recommendation Granting Class Certification) ("Class R&R") p.
     15 (finding that the 22 Indirect Purchaser State Classes satisfied Rule 23's numerosity requirement),
28   and 1950 (Order Adopting Class R&R) ("Class Order"), p. 6 (noting that Defendants did not
     challenge the Special Master's ruling on numerosity).

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

Sherman Act as well as the state antitrust and unfair competition laws identified in the Complaint; and the extent to which Defendants' conduct injured the class members.[12]  "Antitrust, price fixing conspiracy cases, by their nature, deal with common legal and factual questions about the existence, scope and effect of the alleged conspiracy.  Whether defendants participated in the actions alleged is a common question." *In re Linerboard Antitrust Litig.,* 203 F.R.D. 197, 206 (E.D. Pa. 2001) (citation and quotation marks omitted).

### 3.    Typicality

IPPs' claims are also typical, as this Court has already found. *See* Class R&R, p.19.  Indeed, each named plaintiff indirectly purchased CRT Products during the relevant time period, and alleges that Defendants engaged in an anti-competitive conspiracy.  *See also In re Static Random Access Memory (SRAM) Antitrust Litig.,* 264 F.R.D. 603, 609 (N.D. Cal. 2009) ("the overarching price fixing scheme is the linchpin of [Plaintiffs'] complaint, 'regardless of the product purchased, the market involved or the price ultimately paid'"; plaintiffs' claims typical although they may have used different purchasing procedures, purchased different quantities or a different mix of products, or received different prices than other class members) (citation omitted).  Because the same is true here, the typicality requirement is met.

### 4.    Adequacy of Representation

Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  To satisfy constitutional due process concerns, absent class members must be afforded adequate representation before entry of a judgment which binds them.  Class representation is adequate if (1) no conflicts of interest exist between class counsel or class representatives and class members; and (2) class counsel and class representatives will "prosecute the action vigorously on behalf of the class."

As evidenced by the history of the litigation and the findings of the Court, IPPs and their counsel have fairly and adequately represented and protected the interests of all Class members.  *See*

---

[12] *See* Class R&R, p. 16-17 (finding common questions of law and fact).

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN SUPPORT THEREOF - Master File No. CV-07-5944-JST

1   Class R&R, p.17 ("plaintiffs' counsel are qualified and competent to litigate this case;" p.19

2   ("putative Class Representatives satisfy the adequacy requirement of Fed. R. Civ.P. 23(a)(4)").

### 5.   Predominance

In addition to the prerequisites of Rule 23(a), the Settlement Class also satisfies the

prerequisites of Rule 23(b)(3), namely: (1) questions of law or fact common to Class members must

predominate over any questions affecting only individual members; and (2) the class action must be

superior to other available methods for the fair and efficient adjudication of the matter.

The Rule 23(b) predominance inquiry is "readily met in certain cases alleging violations of

the antitrust laws." *Amchem,* 521 U.S. at 625; *see also Thomas & Thomas Rodmakers, Inc. v.*

*Newport Adhesives and Composites, Inc.*, 209 F.R.D. 159, 167 (C.D. Cal. 2002). "The . . . inquiry

tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."

*Amchem*, 521 U.S. at 623. Predominance is satisfied "unless it is clear that individual issues will

overwhelm the common questions and render the class action valueless." *In re Market-Makers*

*Antitrust Litig.*, 169 F.R.D. 493, 517-18 (S.D.N.Y. 1996). Individual issues in this case will not

overwhelm the common questions of law or fact, because the central question is whether Defendants

conspired to improperly raise the prices of CRTs.[13] Moreover, the fact that individual Class

members' damages may vary due to quantity or types of purchases or types of CRT Product

purchased, or the relief available, does not defeat predominance. *See, e.g., In re Master Key*

*Antitrust Litig.*, 528 F.2d 5, 12 n.11 (2d Cir. 1975); *Sullivan v. DB Investments, Inc.,* 667 F.3d 273,

299-300 (3d Cir. 2011); *In re Indus. Diamonds Antitrust Litig.,* 167 F.R.D. 374, 383 (S.D.N.Y.

1996) (citing cases).

### 6.   Superiority

With respect to the superiority requirement, a court must consider the following factors: (A)

the interest of members of the class in individually controlling the prosecution or defense of separate

actions; (B) the extent and nature of any litigation concerning the controversy already commenced

---

[13] *See* Class R&R, p. 38 (finding that common questions of law and fact predominated over
individual questions and granting class certification of very similarly defined classes); Class Order,
p. 23. *See also SRAM*, 264 F.R.D. at 611.

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.  *See* Fed. R. Civ. P. 23(b)(3).

The damages of most individual Class members are relatively small compared to the cost of litigation.  There is no problem in consolidating the litigation here, nor will any unusual difficulties be encountered.  Members of the Class, therefore, have no real interest in controlling the prosecution of individual actions, and effectively would be unable to adjudicate their claims individually.  Even if they were able to do so, the court system would be overwhelmed by the burden of hundreds of thousands of separate actions.  For these reasons, it is highly desirable to concentrate these claims in this Court.  *See* Class R&R, p. 38-39; Class Order, p. 6; *see also SRAM,* 264 F.R.D. at 615.

### D.    The Proposed Settlements Should Be Finally Approved

This Court is entitled to exercise its "sound discretion" when deciding whether to grant final approval.  *See Ellis v. Naval Air Rework Facility,* 87 F.R.D. 15, 18 (N.D. Cal. 1980), *affd,* 661 F.2d 939 (9th Cir. 1981) ("Dismissal or compromise of a class action is left to the sound discretion of the trial judge").  In doing so, "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable, and adequate to all concerned."  *Officers for Justice v. Civil Serv. Comm'n,* 688 F.2d 615, 625 (9th Cir. 1982).

It is also well established in the Ninth Circuit that "voluntary conciliation and settlement are the preferred means of dispute resolution."  *Id.*  "[T]here is an overriding public interest in settling and quieting litigation" and this is "particularly true in class action suits." *Van Bronkhorst v. Safeco Corp.,* 529 F.2d 943, 950 (9th Cir. 1976).  A "presumption in favor of voluntary settlement agreements" exists, and "'this presumption is especially strong in class actions and other complex cases . . . because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by the federal courts.'" *Sullivan v. DB Investments,* 667 F.3d at 311.

When considering final approval, courts consider the following factors:

14

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of class members to the proposed settlement.

*Churchill,* 361 F.3d at 575.  In addition, the settlement may not evidence collusion among the settling parties.  *Id.*

The Proposed Settlements meet these standards.[14]

## 1.      Strength of IPPs' Case

IPPs would have faced substantial hurdles had the litigation not settled, including proof of certain Defendants' participation in the conspiracy; proof of injury and damages on a class-wide basis; proof that the conspiracy had an impact in the United States; application of the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"); withdrawal and statutes of limitations defenses; and uncertainty over trial structure (i.e., whether IPPs' claims and the claims of DAPs would be tried separately or together).  Alioto Fee Decl. I, ¶¶ 6-8.

## 2.      Risk, Expense and Complexity of the Litigation

"'An antitrust class action is arguably the most complex action to prosecute . . . .  The legal and factual issues involved are always numerous and uncertain in outcome.'"  *In re Linerboard Antitrust Litig.,* No. A-98-5055, MDL No. 1261, 2004 WL 1221350, at *10 (E.D. Pa. June 2, 2004) (citations omitted).  This case represents antitrust litigation, and multi-district litigation, at its most complex.  This litigation, spanning eight years and several continents, and alleging a global conspiracy that began more than 20 years ago, demanded a massive effort.

- ***Discovery***.  This litigation demanded tremendous discovery efforts at both class certification and merits stages, requiring the review of millions of pages (many of which were in Korean, Japanese or Chinese and required certified translations); ongoing meet and confers with Defendants; the coordination of discovery with

---

[14] IPPs' papers filed in support of their motion for attorneys' fees address these factors in detail.  *See* Dkt. Nos. 4071 (Motion) & 4071-1 (Alioto Declaration in support thereof ("Alioto Fee Decl. I")).

15

other parties in the MDL; and extensive expert discovery relating to 17 expert witnesses.  Alioto Fee Decl. I, ¶¶ 25-65.

- **Class certification**.  Preparation for class certification took over two years.  It involved the taking of over 50 depositions (including depositions of class representatives, Defendants, third-parties and experts); the translation, review and analysis of thousands of documents relating specifically to impact and other Rule 23 requirements; and the work of experts conducting highly sophisticated economic analyses of Defendants' and third parties' data.  In addition to moving for class certification, IPPs also had to defend against Defendants' motion to strike IPPs' expert reports.  All told, the parties' briefings and expert reports consisted of over 6,000 pages.  The motions themselves took over a year to resolve.  *Id.* ¶¶ 66-72.

- **Summary judgment**.  At the summary judgment stage, Defendants filed 36 motions.  Eleven of them were directed at IPPs.  However, IPPs also had to coordinate with other plaintiff groups on responses to the remaining motions, because rulings on these motions could have affected IPPs' case.[15]  These motions raised difficult and complex legal and factual issues regarding the FTAIA, antitrust standing, withdrawal from the conspiracy, and other dispositive issues.  The complete record on the summary judgment motions directed at IPPs totaled over 22,000 pages.  *Id.* ¶¶ 73-80.

As for the risks of continued litigation, these were enormous.  "Antitrust litigation in general, and class action litigation in particular, is unpredictable."  *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 475 (S.D.N.Y. 1998).  "The 'best' case can be lost and the 'worst' case can be won, and juries may find liability but no damages.  None of these risks should be underestimated."  *In re Superior Beverage/Glass Container Consol. Pretrial*, 133 F.R.D. 119, 127

---

[15] For example, Defendants filed separate motions against IPPs and certain DAPs based on the FTAIA.  Defendants also filed motions against certain DAPs regarding state law claims that overlapped with IPPs' claims.

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN SUPPORT THEREOF - Master File No. CV-07-5944-JST

1    (N.D. Ill. 1990).  Moreover, there is always the risk that the law may change in unfavorable ways.

2    In this case, due to the complexities and difficulties described above, as well as the long duration of

3    the case, the risks assumed were enormous.

4    · **_Establishing liability_**.  Liability was by no means a foregone conclusion.  The

5    information provided by Chunghwa was limited.  It lacked evidence of a

6    conspiracy on large CPTs (Color Picture Tubes) sold in or into the United States

7    market, and the United States CRT market in general.  This limitation allowed

8    Defendants to argue that the United States market was not part of the conspiracy,

9    and also supported Defendants' FTAIA defense.  *See* Alioto Fee Decl. I ¶¶ 102-

10   103.  Further, only one defendant pled guilty to conspiring to fix the prices of

11   CRTs, and for only one type of CRT sold to four U.S. customers.  All of the other

12   defendants strenuously denied their participation in the alleged global CRT

13   conspiracy and its impact on the United States.  They were aided in these denials

14   by the facts that the DOJ had dropped its investigation of them without

15   indictment; that many of the relevant documents had been destroyed; and that

16   knowledgeable witnesses were long-gone.  *Id.* ¶ 6.

17   · **_Risk of unsettled legal precedent_**.  The law on class certification and the FTAIA,

18   two of the major, case-dispositive issues in the case, was the subject of several

19   important rulings by the Supreme Court and several Courts of Appeals during the

20   litigation.  Some of these rulings were unfavorable to indirect purchasers.[16]  These

21   rulings magnified the large risk for IPPs already existing on class certification and

22   FTAIA issues.

23

24

25

---

26   [16] *See, e.g., Comcast Corp. v. Behrend,* 133 S. Ct. 1426 (2013) (vacating order granting class
      certification); *In re Rail Freight Fuel Surcharge Antitrust Litig.,* 725 F.3d 244, 255 (D.C. Cir. 2013)

27   (vacating district court's grant of class certification and remanding for further proceedings in light of
      *Comcast,* 133 S. Ct. 1426); *Motorola Mobility LLC v. AU Optronics Corp.,* 773 F.3d 826 (7th Cir.

28   2014), *withdrawn and superseded by,* 775 F.3d 816 (7th Cir. 2015) (dismissing plaintiff Motorola's
      claims as barred under the FTAIA and the indirect purchaser doctrine in *Illinois Brick*).

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

- Similarly, Special Master Legge issued rulings unfavorable to the Direct Purchaser Plaintiffs ("DPPs") and the Direct Action Plaintiffs ("DAPs").[17]  These rulings, if approved by the Court, would have almost completely eliminated the direct purchaser claims against Defendants, and could have negatively impacted IPPs' case.  For example, the ruling that the DAPs lacked antitrust standing was arguably directly applicable to many of IPPs' claims and therefore threatened the viability of those claims.  Alioto Fee Decl. I ¶ 126.

- ***Risk of recovering nothing at trial***.  The risk that IPPs would recover nothing had they taken this case to trial was significant.  In *LCD*, for example, the direct purchaser class plaintiffs went to trial against Toshiba.  The jury returned a favorable verdict for the plaintiffs on liability, but only awarded $87 million in damages.  The plaintiffs already had obtained over $443 million in settlements from other defendants, and Toshiba was entitled to offset that sum against the damages award.  As a result, the plaintiffs recovered nothing on behalf of the direct purchaser class.  Likewise, one of the DAPs in *LCD*, Best Buy, went to trial against two defendants: Toshiba and Hannstar Display Corporation.  Like the direct purchaser plaintiffs, Best Buy also recovered nothing.  The jury found that Toshiba did not participate in the conspiracy and awarded only $7.5 million against Hannstar.  Once Best Buy's settlements with the other defendants in *LCD* had been offset, Hannstar owed nothing to Best Buy.  *Id.* ¶ 93.

- ***The long duration of this case***.  This case has been ongoing for eight years, with only two very small settlements (a total of $35 million obtained from Chunghwa and LG) in the bank.  The other, substantial settlements did not materialize until early 2015, on the eve of trial.

---

[17] *See, e.g.,* Report and Recommendation Regarding Defendants' Joint Motion for Summary Judgment (May 31, 2012) (Dkt. No. 1221) (recommending dismissal of the direct purchaser claims under the indirect purchaser rule in *Illinois Brick*); Report and Recommendations Regarding Defendants' Motions to Dismiss Direct Action Plaintiffs' Complaints (May 2, 2013) (Dkt. No. 1664) (recommending dismissal of DAPs' claims for lack of antitrust standing).

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN SUPPORT THEREOF - Master File No. CV-07-5944-JST

- ***Strong defense teams.***  Defendants are represented by highly respected counsel who would have aggressively defended this action throughout trial and appeal. The Proposed Settlements eliminate significant risks that IPPs would otherwise face at trial.

### 3. Risk of Maintaining Class Action Status

The risk that the Court would deny certification of the 22 indirect purchaser state classes (21 states, plus the District of Columbia) was substantial.  Courts in this District have denied class certification in several similar indirect purchaser cases.[18]  And even after the Court granted class certification of the IPP classes, the possibility of decertification existed.  Indeed, certain Defendants filed a motion for decertification on ascertainability grounds on the eve of trial.  (*See* Dkt. No. 3585.)

### 4. Amount Offered in Settlement

As discussed above, the $541,750,000 in cash consideration is one of the largest cash recoveries ever obtained on behalf of indirect purchasers.  This is an extraordinary recovery for the class.  In addition, IPPs obtained highly valuable cooperation from Defendants, in varying degrees, enabling them to prosecute the action against, and obtain higher recoveries from, the remaining Defendants.  *See* Alioto Fee Decl. I ¶ 31.

### 5. Extent of Discovery and Stage of Proceedings

Significant discovery was already completed by the time the parties settled.  IPPs and their experts had searched, reviewed and analyzed millions of pages of documents and voluminous data sets produced by Defendants, the DAPs and third parties.  In addition, over 250 depositions were taken by the various parties to the litigation.[19]  Accordingly, there was ample time for all settling parties to evaluate the case.

---

[18] *See, e.g.*, In re Graphics Processing Units Antitrust Litig., 253 F.R.D. 478, 508 (N.D. Cal. 2008) (denying certification of indirect purchaser class); *In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081, at *19 (N.D. Cal. June 9, 2010) (same); *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311 (N.D. Cal. 2014) (same).

[19] *See further,* Alioto Fee Decl. I, ¶¶ 44, 51-53, 64, 69, Exs. 5-7 and 9-10.

IPPs began preparing for trial (originally scheduled to begin on March 9, 2015[20]) in late 2013.  The parties exchanged expert reports on liability and damages starting in April 2014 and continuing through September 2014.  These included opening, opposition, rebuttal and sur-rebuttal reports from 17 expert witnesses, all of whom were deposed, often multiple times, regarding their reports.  Alioto Decl. Fee I ¶ 16.  Merits discovery closed on September 5, 2014, but some discovery continued after the September 5 discovery cut-off.  In particular, several depositions were scheduled after September 5 and contention interrogatories propounded by the plaintiffs led IPPs to file several motions to compel further responses from certain defendants.  *Id.* ¶ 17.  On November 7, 2014, the Defendants filed 36 motions for summary judgment.  Eleven of these were directed specifically at IPPs' claims.  These motions were fully briefed before the Proposed Settlements were executed. The motions have been withdrawn in light of the Settlements.  *Id.* ¶ 18.

In anticipation of trial, the parties also exchanged trial exhibit lists, witness lists, deposition designations, jury instructions and special verdict forms, and filed 64 motions *in limine* and other pretrial motions.  These motions were briefed in varying degrees before the Proposed Settlements were executed.   Pursuant to the Proposed Settlements, the Settling Defendants have provisionally withdrawn all of the motions pending against IPPs. (Dkt. Nos. 3801, 3802, 3812, 3851, 3852; *see also* Alioto Settl. Decl. I ¶ 19.

## 6.    Experience and Views of Lead Counsel

Lead Counsel and counsel for Defendants are experienced litigators.  (*See* Dkt. No. 4073-1; Alioto Fee Decl. I ¶ 107-112.)  Lead Counsel also oversaw and was involved in every aspect of this litigation, and had a thorough understanding of the evidence, and all of the claims and defenses.  *See id.* ¶ 2.  In addition, a number of settlement negotiations benefited from the assistance of retired District Judges: the Hon. Vaughn Walker and the Hon. Fern Smith.  *Id.* ¶¶ 107-112.  The Proposed Settlements are the products of intense and thorough arm's-length negotiations conducted by experienced and informed counsel.  The negotiations occurred throughout the litigation and were

---

[20] By Order dated February 9, 2015, the Court vacated the trial date (Dkt. No. 3515).

highly contested.  They were conducted in the utmost good faith and the settlements are appropriate in light of the evidence against Defendants. *Id.*

"[T]he fact that experienced counsel involved in the case approved the settlement after hard-fought negotiations is entitled to considerable weight." *Ellis,* 87 F.R.D. at 18.  *See also In re Heritage Bond Litig.,* MDL No. 02-ML-1475 DT, 2005 WL 1594403, at *9 (C.D. Cal. June 10, 2005) ("'Where, as here, a proposed class settlement has been reached after meaningful discovery, after arm's-length negotiation, conducted by capable counsel, it is presumptively fair'") (citation omitted).

Likewise, Lead Counsel's belief that the Proposed Settlements are in the best interest of the Class is entitled to "great weight." *In re Paine Webber Partnerships Litig.,* 171 F.R.D. 104, 125 (S.D.N.Y. 1997) (citation omitted), *aff'd* 117 F.3d 721 (2d Cir. 1997); *accord Nat'l Rural Telecomms. Coop. v. DIRECTV Inc.,* 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("'Great weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation.").

### 7.    Government Participation

The Department of Justice and all state attorneys general have received CAFA notices of these settlements from each of the settling defendants.  Other than the California Attorney General ("CA AG"), who has filed a Statement of Interest, no other governmental official has raised any concern regarding the settlements.  This fact favors the settlements.  *See In re Linkedin User Privacy Litig.*, -- F.R.D. --, 2015 WL 5440975, at *10 (N.D. Cal. Sept. 15, 2015) (fact that no governmental official objected to settlement upon receiving CAFA notice was factor in favor of settlement approval).

### 8.    Reaction of Class Members to the Proposed Settlements

IPPs' Notice program reached millions of consumers who purchased CRT televisions and computers.  *See* Fisher Decl. II, ¶ 18.  The Claims Administrator published notice in various newspapers and magazines and on the website.  *Id.* ¶¶ 10, 13.  Digital notice was provided through paid advertisements on Google, Facebook, and other popular websites.  *Id.* ¶¶ 11-12.  He also mailed

and emailed notice to more than ten million possible claimants.  *Id.* ¶¶ 8-9.  Only 11 objections were received.

### 9.    Exclusion Requests

Only five requests for exclusion were received out of a class comprising millions of purchasers of CRT Products.  Two of the requests for exclusion were by DAPs that are already pursuing their own cases.  Thus, there are actually only three requests for exclusions.  Pursuant to the Settlement Agreements, IPP Counsel has provided the list of exclusions to Defendants.  Alioto Settl. Decl. II ¶ 4.

In summary, all these factors establish that the Proposed Settlements are fair, reasonable and adequate.  The Court should grant final approval.

## II.    THE COURT SHOULD APPROVE THE PLAN OF DISTRIBUTION

A plan of distribution of class settlement funds is subject to the "fair, reasonable and adequate" standard that applies to approval of class settlements.[21]  "It is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits."  *In re Omnivision Technologies, Inc.*, 559 F. Supp. 2d 1036, 1045 N.D. Cal. 2008).  "*[A] pro-rata* allocation has been used in many antitrust cases including in this District."  *LCD*, MDL No. 1827, 2011 WL 7575004, at *4 (N.D. Cal. Dec. 27, 2011) (citations omitted).[22]  The proposed Plan of Distribution proposed here uses such a pro-rata approach.  It should be approved.

### A.    Compensation to Indirect Purchaser State Class Members

As discussed in IPPs' preliminary approval papers, IPPs have proposed to compensate members of the Indirect Purchaser State Classes according to a plan of distribution providing that qualifying claimants will be eligible to claim their pro-rata share of the Settlement Fund based on the

---

[21] *In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001).

[22] "*See also, e.g., In re Vitamins Antitrust Litig.*, No. 99–197 TFH, 2000 WL 1737867, at *6 (D.D.C. Mar. 31, 2000) ("Settlement distributions, such as this one, that apportions funds according to the relative amount of damages suffered by class members, have repeatedly been deemed fair and reasonable."); *In re Lloyds' Am. Trust Fund Litig.*, No. 96 Civ.1262 RWS, 2002 WL 31663577, at *19 (S.D.N.Y. Nov. 26, 2002) ("*pro rata* allocations provided in the Stipulation are not only reasonable and rational, but appear to be the fairest method of allocating the settlement benefits.").

number of valid claims filed, and the number and type of CRT Products each claimant purchased during the class period.  Alioto Settl. Decl. I ¶ 43.

### B.    Treatment of Nationwide Class Members

The Plan of Distribution does not contemplate compensation to Nationwide Class Members who are not members of one of the IP State Classes.  There is good reason for this.  As discussed below in response to the objectors' challenges, the equitable and damages claims being released by these purchasers have no value.  Courts often approve plans of allocation providing no compensation for the release of "nuisance" claims.  *See, e.g., Nguyen,* 2014 WL 1802293, at *7 (approving a settlement and plan of allocation in a securities class action over an objection that the settlement contemplated the release of certain claims without compensation, and noting: "'It is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits.' [internal citations omitted].  The record shows that it is very unlikely that the in-and-out traders could have proved recoverable damages.").

It is the opinion of Lead Counsel here that the proposed allocations will most fairly compensate the claimants.  That conclusion should be adopted.  "Counsel has also litigated this case thoroughly and aggressively from the start and utilized expert input to determine the extent of damage and calculation of the instant settlement.  The Court sees no reason to disagree with their judgment of their own case."  *Id.*, at *8 (finding plan of allocation reasonable, fair and adequate).

## III.    THE COURT SHOULD OVERRULE THE OBJECTIONS TO THE SETTLEMENTS

In determining the fairness and adequacy of a proposed settlement, this Court should consider "the reaction of the Class Members to the proposed settlement."[23]  The fact that only eleven objections have been received raises a reasonable inference that the Proposed Settlements are fair, reasonable and adequate.  *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1291-96 (9th Cir. 1992); *Nat'l Rural Telecomm. Coop.*, 221 F.R.D. at 529 ("It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms

---

[23] *Churchill Village, L.L.C.,* 361 F.3d at 575; *Hanlon v. Chrysler Corp.,* 150 F.3d at 1026.

of a proposed class settlement action are favorable to the class members").[24]  The inference of class

support due to the absence of objectors is even stronger when, as here, a large portion of the

Settlement Class consists of sophisticated business entities.[25]

In addition, every attorney general in the United States, as well as the DOJ, received notice

of the settlements from Defendants pursuant to the Class Action Fairness Act ("CAFA").  *See* 28

U.S.C. § 1715(b).  Significantly, ***only one has appeared***—the CA AG—and none has objected.[26]

"Although CAFA does not create an affirmative duty for either state or federal officials to take any

action in response to a class action settlement, CAFA presumes that, once put on notice, state or

federal officials will raise any concerns that they may have during the normal course of the class

action settlement procedures."  *Garner v. State Farm Mut. Auto. Ins. Co.,* No. CV 09 1365 CW,

2010 WL 1687832, at *14 (N.D. Cal. Apr. 22, 2010).

### A.     Only 11 Objections Were Filed, and Two Have Already Been Withdrawn

Objections were due on October 8, 2015.  (*See* Preliminary Approval Order ¶18.)  The

October 8, 2015 deadline was clearly stated in the published notice and posted on the opening page

of the settlement website, www.crtclaims.com.  As of that date, a mere 11 objections by 22 objectors

had been filed.[27]  Of these 11 objections—a minute number given the size the Class—three are

driven by disgruntled attorneys in this litigation (the "**Insider Objectors**") who refused Lead

Counsel's requests that they reduce their lodestar following the Audit Committee's review of their

---

[24] *See also Pallas v. Pacific Bell,* No. C-89-2373 DLJ, 1999 WL 1209495, at *8 (N.D. Cal. July 13, 1999) ("The small percentage—less than one percent—of persons raising objections is a factor weighing in favor of approval of the settlement.").

[25] *See In re Linerboard Antitrust Litig.,* 321 F. Supp. 2d 619, 629 (E.D. Pa. 2004) ("the class in this cases [sic] involves many of the largest corporations in America-entities that are hardly unfamiliar with civil litigation").

[26] The CA AG's Statement of Interest contains a "conditional objection" to the notice program subject to her receiving more information and assurances that the interests of California natural persons are being protected.  *See* Dkt. No. 4118.  IPP Counsel is working with the CA AG to provide this information.

[27] To put this number in perspective, the 22 objectors are less than .0003 percent of the number of class members that received direct mail notice – and a much smaller percentage of all the class members that have received notice in one or more of the forms approved by the Court.

24

daily time records:[28]

| COUNSEL | OBJECTOR | DOCKET NO. |
|---|---|---|
| 1.  Robert Bonsignore | Anthony Gianasca, Gloria Comeaux, Mina Ashkannejhad individually and/or as Administrator of the Estate of the Late R. Deryl Edwards, Jr., Jeffrey Speaect, Rosemary Ciccone, and Jeff Craig[29] | 4119 |
| 2.  Theresa Moore | Rockhurst University, Gary Talewski, Harry Garavanian | 4113 |
| 3.  Francis Scarpulla and Josef Cooper | No client is named | 4115, 4116 |

Seven additional objections[30] were filed or orchestrated behind the scenes by so-called "professional objectors"—attorneys who routinely represent objectors challenging class action settlements with frivolous objections in the hopes of extorting a fee for themselves (the "**Professional Objectors**").[31]  Many have been reprimanded by courts for seeking personal gain at the expense of class members.[32]  Two of these objectors, Paul Palmer and Gordon Morgan, have moved to withdraw their objections.  (*See* Dkt. Nos. 4130 and 4165.)

---

[28] Lead Counsel implemented a number of measures to ensure the lodestar is fair and reasonable.  Alioto Settl. Decl. II, ¶ 15.  One of these measures was the formation of an Audit Committee to conduct an in-depth review of IPP Counsel's time records.  *Id.*  All firms were audited and most firms' lodestars were reduced.  The Insider Objectors ignored Lead Counsel's instructions for calculating their lodestars and failed to implement the Audit Committee's proposed cuts.  *Id.*

[29] Bonsignore objectors Comeaux and Speaect are named class representatives.  "As to the effect of the possible recalcitrance of one named class representative one need look no further than *Saylor v. Lindsley,* 456 F.2d 896 (2d Cir.1972) where it was held that opposition by a named plaintiff is not a sufficient reason to disapprove a settlement.  As the Second Circuit explained, 'A contrary view would put too much power in a wishful thinker or a spite-monger to thwart a result that is in the best interests of the [class].'"  *Bennett v. Behring Corp.*, 96 F.R.D. 343, 353 (S.D. Fla. 1982) (citation omitted).

[30] Two of these, the Palmer and St. John objections, are directed at fees only—not the settlements.

[31] *See infra* and Appendices A-N attached to the Additional Declaration of Robert J. Gralewski, Jr. In Support of Indirect Purchaser Plaintiffs' Motion For Final Approval of Class Action Settlements With Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, Thomson, and TDA Defendants ("Gralewski Settl. Decl.").

[32] *See id.*

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN SUPPORT THEREOF - Master File No. CV-07-5944-JST

| COUNSEL | OBJECTOR | DOCKET NO. |
|---|---|---|
| 4.  Chris Bandas, Timothy Hanigan | Sean Hall, Gordon Morgan | 4101 |
| 5.  Darrell Palmer | Paul Palmer | 4120 |
| 6.  Jonathan Fortman, Steve Miller, and John Kress | Laura Townsend Fortman, John Finn | 4111 |
| 7.  Joseph Scott St. John and Andrea Valdez | Douglas St. John | 4106 |
| 8.  Jan Westfall | Donnie Clifton | 4099 |
| 9.  In pro per[33] | Josie Saik | 4140 |
| 10. In pro per[34] | Elizabeth Johnson | 4128 |

The remaining objection was filed by the following:

| COUNSEL | OBJECTOR | DOCKET NO. |
|---|---|---|
| 11. Paul Justi | Dan L. Williams & Co. | 4112 |

Lastly, the CA AG has filed a Statement of Interest requesting additional information concerning the notice program and the claims made by California natural persons.[35]  (*See* Dkt No. 4118.)

### B.    Objectors Bear the Burden of Establishing Unfairness

"[The] preliminary determination [of settlement approval] establishes an initial presumption of fairness. . . ." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (quoting *In re General Motors Corp.*, 55 F.3d 768, 784 (3d Cir.1995) ("This preliminary determination establishes an initial presumption of fairness when the court finds that: (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the

---

[33] Although Ms. Saik's objection states she is proceeding *in pro per*, attorney Edward Cochran filed her objection, has filed a notice of appearance on her behalf, and defended her deposition.  Mr. Cochran is a well-known professional objector.  *See* Gralewski Settl. Decl., Appendix H.

[34] Like Ms. Saik, although Ms. Johnson purports to be representing herself *in pro per*, she states that her fiancé Charles M. Thompson helped prepare her objection, and he is a well-known professional objector.  *See* Gralewski Settl. Decl., Appendix G.

[35] IPPs are working with the CA AG to provide the requested information.

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN SUPPORT THEREOF - Master File No. CV-07-5944-JST

settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.").

In light of this presumption, objectors to a class action settlement bear the burden of establishing that a settlement is not fair, reasonable or adequate. *See United States v. Oregon*, 913 F.2d 576, 581 (9th Cir.1990) ("In this circuit, we have usually imposed the burden on the party objecting to a class action settlement"). The objectors have failed to carry their burden.[36]

## C. The Objections Driven by Disgruntled "Insider Objectors" Lack Merit

### 1. Cooper and Scarpulla Have No Standing to Object to the Proposed Settlements

Messrs. Cooper and Scarpulla have no standing to object to the Proposed Settlements. Only members of the class may object to a class action settlement. *See, e.g., In re TracFone Unlimited Serv. Plan Litig.*, --- F.Supp.3d --- (2015), 2015 WL 4051882, at *11 (N.D. Cal. July 2, 2015) (objector has no legal standing to object to a settlement unless he can demonstrate he is an aggrieved class member).[37] Their objections are not filed on behalf of any class member and they do not claim to be class members themselves. Instead, they have filed objections on behalf of the "Indirect Purchaser Plaintiffs" as a whole. *See* Dkt. Nos. 4115, 4116. These lawyers have no authority to object on behalf of IPPs or the Class as a whole. They are not Lead Counsel.[38]

---

[36] Several objectors seek to incorporate by reference "all other objections" in this matter. *See, e.g.,* Moore Objection, at 10. These purported joinders should be stricken as improper attempts to enlarge the grounds for possible appeal. *See, e.g., Darwich v. city of Dearborn,* No. 13-10254, 2014 WL 4600902, at *1 (E.D. Mich. Sept. 15, 2014) ("In order for this court to apply meaningful *de novo* review, it is insufficient for the objecting party to simply incorporate by reference earlier pleadings or reproduce an earlier unsuccessful motion for dismissal or judgment (or response to the other party's dispositive motion). Insufficient objections to a magistrate judge's analysis will ordinarily be treated by the court as an unavailing general objection.").

[37] *See also In re Sunrise Secs. Litig.*, 131 F.R.D. 450, 459 (E.D. Pa. 1990) (Rejecting objections to a class action settlement raised by various state Attorneys Generals because the AGs were not class members. The court noted that "as a general rule, only class members have standing to object to a proposed class settlement.")

[38] *See* Dkt. No. 47 (Order Appointing Interim Lead Counsel), p. 5 (appointing Mario N. Alioto and Trump, Alioto, Trump & Prescott, LLP as sole Interim Lead Counsel for the Indirect Purchaser Plaintiffs); Class R&R, p. 49 (recommending appointment of Trump, Alioto, Trump & Prescott, LLP as Class Counsel for the Indirect Purchaser Plaintiffs) and Class Order (adopting Class R&R in full).

Since they do not purport to assert objections on behalf of a client-class member, and have no authority to file on behalf of IPPs or the Class as a whole, Cooper and Scarpulla lack standing to object to the Proposed Settlements.  Their objections must therefore be stricken.[39]

2.      **The Timing and Motivations Behind the Insider Objectors' Objections Are Highly Suspect**

The timing and motivations behind the Insider Objectors' objections are highly suspect. Despite having notice of the terms of the settlements and the notice program for many months, and many opportunities to raise their concerns with Lead Counsel, these objectors only voiced their concerns after the Audit Committee made cuts to their lodestars.  Alioto Settl. Decl. II ¶¶ 7-9, 12-13.

In addition, IPPs' papers in support of preliminary approval, once filed on May 29, 2015, clearly explained the settlement terms, the notice program, and the plan of distribution.  (*See* Dkt. No. 3861.)  Thus, the Insider Objectors, all of whom receive notice of electronic filings in this case through the Court's ECF notices, were able to review the proposed settlements and the proposed notice plan.  None of them contacted Lead Counsel to voice concerns.  Alioto Settl. Decl. II ¶ 11.

Indeed, Messrs. Scarpulla and Cooper clearly read and paid close attention to the Proposed Settlement terms and the motion for preliminary approval, because they filed "conditional objections" to the Proposed Settlements and the motion for preliminary approval.  (Dkt. Nos. 3874 & 3880.)  But these conditional objections focused solely on the allocation of any prospective fee award by Lead Counsel.  They raised none of the supposedly fundamental problems they now raise regarding the settlement class definition, the notice program or the plan of distribution.  (*Id.*) That is because the issues they raise are not fundamental problems.  They are manufactured objections designed to delay approval of the settlements.

Similarly, Mr. Bonsignore and Ms. Moore never informed Lead Counsel of their objections to the settlements until they filed those objections with the Court.  In addition to being served with the preliminary approval papers, both Mr. Bonsignore and Ms. Moore were in contact with Lead Counsel and/or members of the Audit Committee on multiple occasions during the auditing

---

[39] Striking Cooper and Scarpulla's objections will not prejudice the Class because other objectors raise similar objections.

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN SUPPORT THEREOF - Master File No. CV-07-5944-JST

1  process.[40]  They had many opportunities to voice the concerns they now raise.  Yet neither gave any

2  indication that they planned to object to the Proposed Settlements until after they were informed that

3  their lodestars had been substantially reduced by the Audit Committee.  (Alioto Settl. Decl. II ¶ 13.)

4  Their objections too are simply an afterthought designed to delay the settlements.[41]

5          As class counsel, the Insider Objectors have fiduciary duty to act in the best interests of the

6  class.  If they truly believed there were problems with the Proposed Settlements and the notice

7  program, they should have raised them with Lead Counsel long before now and worked together to

8  resolve any problems before notice was given to the class.  For this reason and the more substantive

9  reasons given below, the Insider Objectors' objections should be overruled.

10         **D.      The Objections by Professional Objectors Should be Treated with Skepticism**

11         Seven objections on behalf of nine objectors are driven by lawyers whose practice is to file

12  professional objections.  Attorneys Miller, Kress, Fortman, Bandas, Hanigan, Palmer, Thompson,

13  Westfall, Cochran and St. John routinely represent objectors challenging class action settlements by

14  filing canned objections.  In this very litigation, Sean Hull (who is represented by Bandas) filed an

15  objection to the Chunghwa settlement.  Upon review of the objection, the Special Master's Report

16  and Recommendation concluded "from the record before the Court that Mr. Hull has been evasive,

17  has attempted to avoid process from this Court, is deliberately stalling the Court procedures—all in

18  an attempt to maintain his status as an objector for his own personal gain and not for the benefit of

19  the class."  (Dkt. No. 1233, p.2.)

20         Although Hull initially claimed to represent himself *in pro per*, Darrell Palmer appeared on

21  his behalf (Dkt. No. 1222) to respond to the Special Master's Order to Show Cause Regarding

22

---

23  [40] Indeed, before Lead Counsel made the cuts to Ms. Moore's lodestar, she indicated to Lead
    Counsel that she approved the Proposed Settlements.  In an email to Lead Counsel dated July 29,
24  2015 (after she had reviewed the motion for preliminary approval on several occasions), Ms. Moore
    stated: "Thanks [sic] you very much, Congratulations and thank you for all your hard work over this
25  extended period of time. Great job."  Alioto Settl. Decl. II, ¶ 32, Ex. F-3.  Likewise, on August 31,
    2015, Mr. Bonsignore posted information on his firm's website endorsing the Proposed Settlements
26  and providing instructions for filing a claim.  *Id.* ¶ 26, Ex. D.  The Audit Committee informed Mr.
    Bonsignore of the cuts to his lodestar on September 16, 2015.  *Id.*

27  [41] With respect to Mr. Bonsignore, *see* Alioto Settl. Decl. II ¶ 29, Ex. E (Order for Sanctions Under
    CCP 2023.030).  The order sanctioning Mr. Bonsignore requires him to disclose in a *Pro Hac Vice*
28  application that he has been subject to disciplinary action by a California court.  Mr. Bonsignore
    failed to comply with this order in this case. *Id.*

29

1   Finding of Civil Contempt and Award of Sanctions Against Objector Sean Hull.  (Dkt. No. 1210).

2   IPPs also suspected that Bandas orchestrated the objection since it was mailed from Corpus Christi,

3   TX, where Bandas is located, while Hull lives in Colorado.  According to the Special Master, IPPs

4   demonstrated that Hull was previously represented by Attorney Bandas in another objection to a

5   class settlement, and noted that "Bandas routinely represents objectors purporting to challenge class

6   action settlements, and does not do so to effectuate changes to settlements, but does so for his own

7   personal financial gain." (Dkt. No. 1150, approved by the Court, Dkt. No. 1155 p.4.)  Hull filed an

8   appeal in the Ninth Circuit, which he subsequently withdrew.  (*See* Case No. 12-15760, Dkt. No.

9   12.)

10       Darrell Palmer, who represents his father Paul Palmer in this round of objections (and who

11   has moved for withdrawal of the objection), has repeatedly filed objections in MDLs.  So have Chris

12   Bandas and Timothy Hanigan, who represent Sean Hull and Gordon Morgan (who has also moved to

13   withdraw his objection).  The same is true for Steve Miller, Jonathan Fortman and John Kress who

14   represent Laura Townsend Fortman (Mr. Fortman's wife) and John Finn.  Objector Elizabeth

15   Kimberly Johnson declares that Charles M. Thompson, her fiancé and another repeat objector in

16   MDLs, assisted her in the preparation of her objection.  Jan Westfall, who represents objector

17   Donnie Clifton, is connected to Darrell Palmer.  Ms. Westfall was co-counsel with Mr. Palmer in an

18   objection to another class settlement.  In still another case, she represented Deliris Palmer, Darrell

19   Palmer's sister-in-law.  She voluntarily withdrew the objection when class counsel in that case

20   identified her relationship with Palmer.  Lastly, Joseph Scott St. John and Andrea Valdez, who

21   represent Mr. St. John's father, Douglas St. John, are related to professional objector Theodore

22   Frank.  Mr. St. John's wife, Anna St. John, works with Mr. Frank.[42]

23       It is well-established that "serial" or "professional" objectors routinely file objections to class

24   action settlements, not to improve the settlements, but to extract payments from parties or counsel in

25   the litigation to avoid years of delay associated with their settlement objections:

26

27   [42] *See* Gralewski Settl. Decl., Appx. J; *see also id.,* Appendices A-N (compendium of class action settlements to which these attorneys filed objections, which the courts overruled and/or found frivolous, and which were later withdrawn, abandoned or dismissed without any apparent benefit to

28   the class in question).

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

> Repeat objectors to class action settlements can make a living simply by filing
> frivolous appeals and thereby slowing down the execution of settlements. The
> larger the settlement, the more cost-effective it is to pay the objectors rather than
> suffer the delay of waiting for an appeal to be resolved (even an expedited
> appeal).  Because of these economic realities, professional objectors can levy
> what is effectively a tax on class action settlements, a tax that has no benefit to
> anyone other than to the objectors.  Literally nothing is gained from the cost:
> Settlements are not restructured and the class, on whose behalf the appeal is
> purportedly raised, gains nothing.

*Barnes v. FleetBoston Fin. Corp.*, No. 01-10395-NG, 2006 WL 6916834, at, *1 (D. Mass. Aug. 22,

2006).  Thus, the Court should view the objections filed by these Professional Objectors with

skepticism.

### E.    The Objections to the Scope of the Release Lack Merit

Several objectors contend that the Proposed Settlements are not fair, reasonable and adequate

to those members of the Nationwide Class who are not also members of the 22 Indirect Purchaser

State Classes, because the settlements require these members to release their claims for injunctive

relief and damages without obtaining any consideration in return.[43]

As further explained below, these claims are not viable and are completely speculative.

Therefore, they have no settlement value.  Releasing these valueless claims for no financial

compensation as part of a global release is common in class action settlements and entirely

appropriate, because no class member is being treated unfairly, and the release of all actual and

potential claims—even if some of those claims are valueless—is the only way to give Defendants

complete, iron-clad assurance that they will receive the benefit of their bargain and be spared from

duplicative future litigation.  Indeed, not allowing Defendants to obtain the release of all claims,

regardless of value, would chill class action settlements by making them less attractive.

Further, "it is well established that 'parties to a suit have the right to agree to anything they

please in reference to the subject matter of their litigation, and the court, when applied to, will

ordinarily give effect to their agreement, if it comes within the general scope of the case made by the

pleadings.'"  *Sullivan,* 667 F.3d at 317 (citations omitted).  The releases given here come squarely

1    within the general scope of the pleadings.  *See* Fourth Consolidated Amended Complaint.  And as

2    noted, the LG Settlement contains nearly identical release provisions.  No one objected to those

3    provisions, and the Court granted final approval.  (*See* Dkt. No. 2542.)

4            1.      **The Release of Injunctive Relief Claims**

5            Under the terms of the release provisions, class members in the 22 Indirect Purchaser State

6    Classes give up their injunctive relief claims.  No one has objected to that.  Several objectors

7    complain, however, that the Proposed Settlements also release the injunctive relief claims of

8    claimants in the other 29 states, and do so for no consideration.

9            As an initial matter, this was equally true of IPPs' settlement with LG.  That settlement has

10   been finally approved by the Court. *See* Dkt. No. 2542 (Order finally approving LG settlement).  The

11   LG settlement involved an identical Settlement Class and an identical release of all claims,

12   nationwide.  In addition, the court-approved notice informed class members that only members of

13   the 22 Indirect Purchaser States Classes would be eligible to submit claims for monetary relief.  (*See*

14   Dkt. No. 2511.)

15          The fact that no financial compensation will be awarded to class members for the release of

16   their injunctive relief claims is entirely fair, reasonable, and adequate, because those claims are not

17   viable.  No one disputes that the CRT market is dying and almost all manufacturers, including all of

18   the alleged conspirators, have left the market, making it very unlikely that the alleged conduct could

19   recur in the future.  Indeed even some objectors acknowledge as much.[44]

20          Thus, the injunction claims are properly treated as valueless for purposes of these

21   settlements.  Indeed, courts often approve settlements releasing worthless claims without providing

22   compensation to the releasors.  *See, e.g., Parker v. Time Warner Entertainment Co., LP,* 631 F.

23   Supp. 2d 242, 262 (E.D.N.Y. 2009) ("A claim which cannot be proven is worth essentially nothing.

24   Consideration of nothing for releasing a worthless claim is therefore fair, reasonable, and

25   adequate."); *Nguyen*, 2014 WL 1802293, at *7 (approving a settlement and plan of allocation in a

26

27   [43] *See* Cooper/Scarpulla Objections at 2-5; Moore Objection at 3-5; Bonsignore Objection at 4-5;
     Finn/Fortman Objection at 2-6; Hull/Morgan Objection at 4-5.

28   [44] *See* Finn/Fortman objection at 5.

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

securities class action over an objection that the settlement contemplated the release of certain claims

without compensation, and noting: "'It is reasonable to allocate the settlement funds to class

members based on the extent of their injuries or the strength of their claims on the merits.' [internal

citations omitted].  The record shows that it is very unlikely that the in-and-out traders could have

proved recoverable damages.").  As the *Nguyen* court explained:

> Counsel has also litigated this case thoroughly and aggressively from the start and utilized expert input to determine the extent of damage and calculation of the instant settlement.  The Court sees no reason to disagree with their judgment of their own case on this record, and finds it is highly unlikely the in-and-out traders could prove any damages caused by Radient's alleged misrepresentation.  ***The Objector is correct that proving in-and-out claims is not impossible, but there is no evidence that the in-and-out traders*** in this case [emphasis in original] ***could have done so. On this basis, the plan of allocation reasonably does not include values for in-and-out shares. The plan of allocation reasonably and fairly represents injuries and claims on the merits***.

*Id.* at *8 (emphasis added).  Here, proving the injunction claims *is* likely impossible.  So even

though the injunction claims of the 29 states are being released, this group is losing nothing.

Moreover, despite the fact that these claims are properly treated as valueless for settlement

purposes, this does not guarantee that an aggressive future litigant would not attempt to bring a

frivolous injunctive relief claim based on the conduct alleged in this case in hopes of extracting an

improper nuisance settlement.  It is entirely appropriate, then, for Defendants to be concerned by this

prospect and to request a global release of all claims, regardless of value.[45]  Accordingly, as noted,

courts—*including this Court in this case*—have approved such releases, acknowledging that settling

defendants have a legitimate interest in seeking global peace.[46]

---

[45] *See, e.g., Mirfasihi v. Fleet Mortg. Corp.,* 551 F.3d 682, 685-686 (7th Cir. 2008) (approving securities class action settlement following determination that certain released claims were "worthless," and noting that "even if the settlement is merely a nuisance settlement, such settlements are permitted; defendants can be trusted to make such settlements only if it is in their best interest to do so").

[46] *See* Dkt. No. 2542 (Order finally approving LG settlement).  *See also Sullivan,* 667 F.3d at 310 ("Finally, were we to mandate that a class include only those alleging 'colorable' claims, we would effectively rule out the ability of a defendant to achieve "global peace" by obtaining releases from all those who might wish to assert claims, meritorious or not. . . ."); *In re IPO Secs. Litig.,* 226 F.R.D. 186, 194 (S.D.N.Y. 2005), citing *Wal-Mart Stores, Inc.,* 396 F.3d at 121-22 ("[C]lass action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability.").

## 2.      The Release of Potential Damages Claims

Objectors also complain that the Proposed Settlements release potential damages claims under the laws of the 29 states for no consideration.  However, these potential damages claims are not viable and are therefore worthless as well.

The vast majority of the 29 states are what is known as "non-repealer" states.  Under the "*Illinois Brick*" doctrine, indirect purchasers lack standing to seek damages for violations of the federal antitrust laws.  *See Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  Certain states have enacted statutes, known as repealer statutes, that reject the *Illinois Brick* doctrine and grant standing to indirect purchasers to sue for antitrust violations under those states' antitrust laws.  Others, referred to as non-repealer states, have not done so, meaning that indirect purchasers may not bring claims for damages under those states' laws.  As is true for the injunctive relief claims, IPPs have determined that these potential damages claims are worthless, and objectors have not shown otherwise.  *See generally Nguyen,* 2014 WL 1802293, at *7-8.  Releasing these claims for no consideration is therefore fair, reasonable and adequate.  *Id.*

To the extent any of the 29 states allow indirect purchasers to bring claims for damages, IPPs have determined that these claims have long been barred by their respective statutes of limitations and are completely speculative.[47]  Thus, these claims are also worthless and can fairly be released as part of these Proposed Settlements.

Scarpulla and Cooper note that in *LCD,* the settlements "carved out" the potential damages claims held by purchasers in states that could not share in the Settlement Fund.[48]  The *LCD* "carve out" referenced by Mr. Cooper and Mr. Scarpulla is not necessary here.  The circumstances in *LCD* were unique.  In that case, both class plaintiffs and various state attorneys general filed complaints in which they sought to represent the interests of indirect purchasers from their states (through statutory

---

[47] For example, the Massachusetts Consumer Protection Statute, Mass. Gen. Laws Ch. 93A, has a four year statute of limitations.  *See* Mass. Gen. Laws Ch. 260, § 5A (2012).  The Missouri Merchandising Practices Act (the "MMPA") has a five year statute of limitations.  *See Boulds v. Chase Auto Finance Corporation*, 266 S.W. 847, 851 (Mo. App. 2008).  New Hampshire's Consumer Protection Act (N.H. Rev. Stat. § 358-A:2) has a three year statute of limitations.  *See* N.H. Rev. Stat. § 358-A:3.  Claims under these statutes are now time-barred.

[48] Cooper/Scarpulla Objection at 3, n.7.

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN SUPPORT THEREOF - Master File No. CV-07-5944-JST

authority or common law *parens patriae* powers).  In addition, separate actions by several state attorneys general were pending in state courts.  The *LCD* court's "carve out" helped to delineate which consumers would recover compensation through their state attorneys general and which consumers would receive compensation directly from the class settlement fund pursuant to the agreement of all parties.  It also ensured that the state law claims pending in other courts were not released.  Although the situation in *LCD* may have compelled a carve out, it is not appropriate here.

Just as in *LCD*, all CRT indirect purchasers whose damages claims have been asserted in a representative complaint—here the Fourth Consolidated Amended Complaint—can receive compensation pursuant to the final settlement.  However, unlike in *LCD*, no other plaintiff groups may claim money from the CRT IPP settlement, including the attorneys general.[49]

---

[49] The cases cited by the Cooper/Scarpulla are distinguishable as well.  *See Amchem Products v. Windsor,* 521 U.S. 591 (1997); *Yoshioka v. Charles Schwab Corp.*, No. C-11-1625, 2011 WL 6748984 (N.D. Cal. Dec. 22, 2011); *Daniels v. Aéropostale West, Inc.*, No. C-12-05755, 2014 WL 2215708 (N.D. Cal. May 29, 2014).  In *Amchem,* the "sprawling" settlement class included class members exposed to different asbestos products, in different ways, alleging a wide range of unique personal injury claims; some were already afflicted with disease, while others had been exposed but had not yet manifested physical injuries ("exposure-only" class members).  *Amchem,* 521 U.S. at 610.  Finding significant uncommon questions—and a concrete risk that the *viable* claims of future asbestos claimants were not properly compensated by the settlements, the Court concluded that the predominance and adequacy of representation prongs of Rule 23 were not satisfied.  *Id.* at 624-626.  Here, all class members were affected by the price-fixing conspiracy in the same way.  In addition, the proposed settlement in *Amchem* compromised future, as yet-unknown claims of the exposure-only class members and denied compensation to class members with various valid and valuable claims.  *Id.* at 626-627.  That is not the case here.  As explained above, the equitable and monetary claims of class members in the 29 states are not viable and are therefore worthless.

In *Yoshioka*, the plaintiffs, IRA account holders, alleged that defendant financial institutions took security interests and liens in their IRA assets, and that these liens were prohibited transactions that caused the IRAs to lose their tax-exempt status.  Plaintiffs entered into a settlement that provided no monetary recovery for the class.  The value of the relief was entirely based on a retroactive amendment to plaintiffs' account agreement intended to preclude the courts from determining that a prohibited transaction had occurred; but whether the proposed amended language (and thus the settlement) would protect the class members was highly speculative.  *See Yoshioka*, at *9.  It was this "uncertain value of the settlement" that the court deemed problematic.  *Id.* at *12.  Here, the value of the consideration from Defendants is unquestionable, and unlike in *Yoshioka*, the claims of these Nationwide Class members have no value.

Similarly in *Daniels*, the plaintiffs moved for preliminary approval of a collective-action settlement.  The members would give a release and covenant not to sue defendants, but the vast majority (ninety percent) would receive nothing or virtually nothing.  *See Daniels*, 2014 WL 2215708, at * 3.  Here, the settlements release damages claims in exchange for more than $500 million for the class.

---

35

### F.  Massachusetts, Missouri and New Hampshire Were Not Wrongly Excluded

Several objectors contend that certain states which allow indirect purchasers to bring claims for damages, namely Missouri, Massachusetts and New Hampshire, were wrongly excluded from this case and indirect purchasers in those states should be allowed to file claims for compensation.[50] These objections are refuted below in turn.

#### 1.   Massachusetts

IPPs asserted a Massachusetts claim under the Massachusetts Consumer Protection Statute, Mass. Gen. Laws Ch. 93A, but it was dismissed with prejudice on procedural grounds.[51]

The ruling by Judge Legge did not preclude suit by another Massachusetts purchaser or by the Massachusetts Attorney General.[52]  For example, Mr. Bonsignore and Ms. Moore, who both claim to have represented Massachusetts clients, could have filed cases for these clients at any time.[53]  Instead, they took no action.  They should not now be allowed to complain.

---

[50] Moore Objection at 6-8; Bonsignore Objection at 4.

[51] *See* Dkt. No. 768 (Report, Recommendations and Tentative Rulings Regarding Defendants' Joint Motion to Dismiss the Second Consolidated Amended Complaint of the Indirect Purchaser Plaintiffs, dated September 30, 2010); and Dkt. No. 799 (Stipulation and Order Modifying and Adopting Report, Recommendations and Tentative Rulings, dated October 27, 2010).  Special Master Legge dismissed the Massachusetts claim because IPPs did not wait 30 days after serving a demand letter on Defendants.  IPPs did not believe it was necessary to wait 30 days because doing so served no practical purpose in this case—by that time (May 2010), Defendants had had notice of IPPs' Massachusetts claim since for 2 ½ years and had not made a settlement offer.  The purpose of a Chapter 93A demand letter is to encourage negotiation and settlement of claims arising from allegedly unlawful conduct and to allow the defendant to limit the damages a plaintiff might recover by making a reasonable offer of settlement.  *See Billingham v. Dornemann*, 447 Mass. 1113 (2006).  No Defendant expressed any interest in discussing settlement and no Defendant requested more time to do so after receiving the demand letter.

[52] Special Master Legge left this option open: "[C]ertainly no procedural dismissal of this nature should bar the filing of a truly new suit. . . ."  R&R at 13.

[53] Mr. Bonsignore claims that his client Mr. Gianasca was "vetted [and] ready to serve" as the Massachusetts representative.  (Dkt. No. 4144, at p. 4.)  This claim is disingenuous at best.  After the filing of the initial complaints, Mr. Gianasca and Mr. Bonsignore never responded to Lead Counsel's requests for information necessary for initial disclosures and failed to complete the questionnaire designed to vet potential class representatives.  They failed to even provide Lead Counsel with basic information regarding Mr. Gianasca's claimed purchase of a CRT product.  As a result, Mr. Gianasca was not named in the consolidated amended complaint.  Lead Counsel assumed Mr. Gianasca no longer wished to serve as the Massachusetts representative and Mr. Bonsignore never informed him otherwise.  Alioto Settl. Decl. II, ¶ 37.  Similarly, Ms. Moore never informed Lead Counsel that she had a Massachusetts client.  *Id.* ¶ 38.

By the time IPPs moved for approval of the Chunghwa Settlement in March 2011, the Massachusetts claim was not part of this case.[54]  Significantly, and contrary to objectors' claims, purchasers in Massachusetts knew that they would not be receiving any money from the Chunghwa Settlement.  The Chunghwa settlement notice clearly listed the states whose purchasers would be able to file claims, and that list did not include Massachusetts.[55]

IPPs also notified purchasers in Massachusetts that they would not be receiving money from the LG Settlement, and that a Massachusetts class was not certified as part of the litigated class certification motion.[56]  All of these notices were provided to Massachusetts purchasers well within the statutory time limit to bring a Massachusetts claim.  But no Massachusetts plaintiff objected and no one stepped forward to represent the Massachusetts class. The statute of limitations has now run on that claim.

## 2.    Missouri

IPPs never asserted a Missouri claim because no Missouri plaintiff came forward to represent a Missouri class, and the law of the case prevented Lead Counsel from asserting a Missouri claim without a Missouri class representative.[57]

Mr. Bonsignore's claims that he presented Lead Counsel with a viable Missouri class representative in March 2012 are highly questionable.  At the outset, Lead Counsel has no record of these communications.[58]  Nothing indicates the authenticity of the email attached to Mr. Bonsignore's supplemental filing in support of his clients' objections (Dkt. No. 4144-5).  More substantively, the email itself contains no information regarding Mr. Perriman and his suitability as a

---

[54] The Chunghwa Settlement defines the Settlement Class as "defined by Plaintiffs' operative complaint *at the time this Agreement is presented for preliminary approval*."  (Dkt. No. 884-1, p. 2; emphasis added.)  The operative complaint in March 2011 was the Third Consolidated Amended Complaint (Dkt. No. 827), which alleged a nationwide injunctive relief class and 22 statewide damages classes.  It did not include a Massachusetts claim.

[55] *See* Dkt. Nos. 1063-1 (published Chunghwa detailed notice), and 1063-2 (published Chunghwa summary notice).

[56] *See* Dkt. Nos. 2511 (published LG detailed notice), and 2512 (published LG summary notice).

[57] *See* Dkt. No. 768, p.5-6 (R&R dismissing state law claims were no plaintiff resided); and Dkt. No. 799 (Order adopting R&R).

[58] Alioto Settl. Decl. II ¶ 40.

1   class representative or his claimed television purchase.  For example, at a minimum, class

2   representatives had to have proof of purchase.

3           Further, Lead Counsel's previous experience with Mr. Bonsignore in this case indicated his

4   claims that he represented possible class representatives were unreliable.  At the beginning of this

5   case, Mr. Bonsignore claimed to represent class representatives for Arizona, Massachusetts,

6   Mississippi and Rhode Island.  But when Lead Counsel asked Mr. Bonsignore to provide

7   information from these plaintiffs necessary for initial disclosures, and to complete a questionnaire

8   designed to vet them for inclusion in the consolidated amended complaint, Mr. Bonsignore failed to

9   respond.[59]  As a result, none of these plaintiffs were included in the consolidated amended

10  complaint.  In any event, even if it were true that Mr. Bonsignore had a viable Missouri class

11  representative in 2012, there was nothing to stop Mr. Bonsignore from filing a case on behalf of

12  Missouri.  He failed to do so, thus any Missouri claims are now long time-barred.[60]

13                      **3.      New Hampshire**

14          As with the Missouri claim, IPPs never asserted a New Hampshire claim.  No New

15  Hampshire plaintiff came forward to represent a New Hampshire class, and the law of the case

16  prevented Lead Counsel from asserting a New Hampshire claim without a New Hampshire class

17  representative.  Mr. Bonsignore's claims that he notified Lead Counsel of a viable New Hampshire

18  class representative[61] are highly questionable for the same reasons applicable to his assertion

19  regarding a Missouri representative.  Indeed, the email from Ms. Jorgenson (cited by Mr.

20  Bonsignore) indicates that she did *not* have proof of purchase.  In any event, by the time of these

21  purported emails in March 2012, the 3-year statute of limitations on the New Hampshire's Consumer

22  Protection Act (N.H. Rev. Stat. § 358-A:2) had run.  *See, e.g.,* N.H. Rev. Stat. § 358-A:3.

23

24

25

---

26  [59] *See* Alioto Settl. Decl. II ¶ 41.

27  [60] *See Boulds v. Chase Auto Finance Corporation*, 266 S.W. 847, 851 (Mo. App. 2008) (five year
    statute of limitation for MMPA claims).

28  [61] *See* Dkt. No. 4144-3.

### G.    Weighting Claims According to the Perceived Strength of the States' Laws Would Be Speculative and Contrary to the Evidence

Objector Clifton, a California resident, argues that the settlements are unfair to class members residing in states with strong consumer protection laws, such as California, because they treat all members of the Indirect Purchaser State Classes equally.  Instead of a distribution to all Indirect Purchaser State Class members on a pro rata basis, he argues that "the settlement fund here should be allocated in a way that tracks the differences in various states' consumer protection and antitrust laws" just as the court did in *In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005).[62]

Several courts have expressly rejected Clifton's "weighting" objection.  In *DRAM*, the court found that "any weighted distribution plan may ultimately turn on subjective views as to the relative merits and relative importance of aspects of the totality of a class member's released claims, and spawn an ancillary round of litigation among class member objectors about who should get how much and on what basis."[63]  Likewise, the Third Circuit in *Sullivan*, handed down after *Relafen*, concluded that neither law nor fundamental fairness mandates a weighted recovery based on perceived strength of state law claims.  *See Sullivan*, 667 F.3d at 327-28.  Like the settlement here, the settlements at issue in *DRAM* and *Sullivan* provided for a pro rata distribution to all class members without distinguishing based on perceived strength of applicable state laws.  *Id*. at 327.[64]

In this case, among the 22 Indirect Purchaser State Classes, there are no "stronger" or "weaker" damages claims.  All damages class members had similar claims under similar statutes that permit indirect purchasers to recover the same or similar damages.  In addition, according to the evidence developed by IPPs, all of these class members were overcharged in the same amount.

---

[62] Clifton Objection at 3-4.  Mr. Clifton also objects to the requested attorney fee award.  The fee objections are addressed in IPPs' Reply Re: Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards for Class Representatives.

[63] *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M-02-1486, 2013 U.S. Dist. LEXIS 188116, at *320-21 (N.D. Cal. Jan. 8, 2013) (summarizing Special Master's Report, Part I).

[64] The remaining authorities cited by objector Clifton are distinguishable.  *In re Heritage Bond Litig.*, 2005 WL 1594403, *In re Bankamerica Corp. Secs. Litig.*, 210 F.R.D. 694 (E.D. Mo. 2002) and *In re Oracle Secs. Litig.*, No. C-90-0931, 1994 WL 502054 (N.D. Cal. 1994) are not antitrust cases.  They are securities cases that appear to have implemented weighted distribution plans tied to evidence that securities purchasers during certain time periods suffered greater injury than others.  Whatever the basis in those cases was for determining that some claims were "stronger" than others, it was not based on the relative strength of the state's *Illinois Brick* repealer statutes.

39

1    Therefore, weighting their claims according to the perceived strength of the state law claims would

2    be speculative and contrary to the evidence.  And as the *DRAM* court noted, it would likely spawn

3    further litigation among the class members.  Many courts have approved plans of distribution for

4    antitrust settlements that, like here, strive to the maximum extent practicable to treat all class

5    members alike.[65]

6         Clifton also believes that the purported "single damages class claims" are not common or

7    typical and that subclasses should have been used.  (Clifton Objection at 5; *see also* Bonsignore

8    Objection at 3-4.)  But there has never been a "single damages class" in this litigation.  The Court

9    certified 22 statewide damages classes and appointed at least one class representative for each state

10   who represents the interests of similarly situated class members in that state.[66]

11        Further, IPPs are now proposing that the Court certify the same 22 Indirect Purchaser State

12   Classes with the same 22 court-approved class representatives.  As explained in IPPs' motion for

13   preliminary approval, the definitions of the 22 Indirect Purchaser State Classes are very similar to

14   the litigated classes except that class members do not need to be a resident of one of the 22 states;

15   they need only have purchased the CRT Product in that state.  This definition is consistent with the

16   various state laws, since none of them contains a residency requirement, and it has the benefit of

17   allowing more people to receive compensation.  In fact, the Court already certified identical

18   statewide damages classes when it granted final approval to IPPs' settlement with LG.  (*See* Dkt. No.

19   2542.)  Accordingly, Clifton's objections should be rejected.

20

21

22

---

23   [65] *See, e.g., In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, 1999 U.S. Dist.
     LEXIS 12936 (N.D. Ill. Aug. 17, 1999) (approving a *pro rata* distribution in a case involving class
24   member pharmacies of all sizes, ranging from small, independent pharmacies to large chain
     pharmacies, including CVS, Walgreens and Walmart); *In re Airline Ticket Commission Antitrust*
25   *Litig.*, 953 F. Supp. 280, 284-85 (D. Minn. 1997) (proposed *pro rata* distribution plan was "cost-
     effective, simple and fundamentally fair"); *In re Corrugated Container Antitrust Litig.*, 556 F. Supp.
26   1117, 1129 (S.D. Tex. 1982) *aff'd*, 687 F.2d 52 (5th Cir.1982) (approval of class action settlement
     that provided for *pro rata* distribution based upon valid claims of allowable purchases).

27   [66] *See* Order and Report & Recommendation on class certification (Dkt. No. 1950 p.23; Dkt. No.
     1742 pp.40-47.)  The Nationwide Class for injunctive relief was not included in the order on class
28   certification.  *Id.*

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

1

### H.  The Nationwide Class Was Adequately Represented

2       A number of objectors argue that the Indirect Purchaser State Classes and the Nationwide

3   Class were not adequately represented by the class representatives and IPP Counsel.[67]  The objectors

4   are wrong.

5       "Adequacy does not require complete identity of claims or interests between the proposed

6   representative and the class.  All that is required—as the phrase 'absence of conflict' suggests—is

7   sufficient similarity of interest such that there is no affirmative antagonism between the

8   representative and the class."  Newberg on Class Actions § 3:58 (5th ed.); *see also Amchem,* 521

9   U.S. at 594-95 (a class representative "must be part of the class and possess the same interest and

10  suffer the same injury as the class members.").[68]  That is the case here.

11      The objector in *Nguyen* raised the very same argument of inadequate representation made by

12  objectors here.  The court summarily disposed of the objection:

13              At the last minute, the Objector adds a brief argument that class counsel is
                inadequate under *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 619–22,
14              117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).  First, the Court already engaged
                in this analysis at the certification stage, and counsel did not raise this
15              previously.  Second, the Court finds no basis to deny the settlement on the
                basis of inadequate representation.  The lead plaintiffs held in-and-out
16              shares, and so had an interest in those shares being compensated.
                Certainly their interests were not so opposed to render them in conflict
17

18

19

20  [67] Clifton Objection at 5-7; Hull/Morgan Objection at 4-5; Moore Objection at 3-7.

21  [68] *Amchem* is factually distinguishable, as noted above.  There, the Supreme Court held that a group
    of plaintiffs who had suffered present injury from their exposure to asbestos could not adequately
22  represent a class that included members who were not presently injured but who might develop
    exposure-related injuries in the future.  *See* 521 U.S. at 625-27.  The interests of the presently injured
23  plaintiffs were in conflict with exposure-only class members because, in negotiating a settlement
    with the defendant, the former had an interest in maximizing immediate payouts, while the interests
24  of the latter lay in preserving the largest possible portion of the settlement funds for future claims.
    *Id.*  Thus, by maximizing their own interests, the putative representatives would necessarily undercut
25  the interests of another portion of the class.  *Id.*  Here, the class representatives are all members of
    both the Indirect Purchaser State Classes and the putative Nationwide Class.  There is no conflict,
26  and the objectors have shown no affirmative antagonism between the class representatives and the
    nationwide class.  The representatives of the Indirect Purchaser State Classes had an equal interest in
27  pursuing injunctive relief claims while those claims were still viable. The nationwide class members
    never had a claim for damages (the claim is for injunctive relief only), thus the economic relief
28  available to the Indirect Purchaser State Classes does not in any way undermine or reduce the claims
    of the Nationwide Class members.

1    with any other class members.  The Court finds nothing in the Objector's

2    arguments that supports reversing the Court's earlier determination.

3    *Nguyen,* 2014 WL 1802293, at *8.  As in *Nguyen*, the objectors here have never before voiced

4    concerns about the adequacy of Lead Counsel's representation—concerns which in any event are

5    belied by the results obtained for the Class.  And as in *Nguyen*, the interests of the named plaintiffs

6    here were not in conflict with those of the Nationwide Class.  The named plaintiffs are all members

7    of the Nationwide Class and receive no compensation for their release of injunctive claims either; all

8    members of the Nationwide Class are treated equally.[69]

9    Objector Saik also contends that the settlements' fee provisions create a conflict of interest.

10   (Objection at p.1.)  While the basis of the objection is not entirely clear, she appears to believe that

11   the settling parties have agreed on an amount of attorneys' fees for IPP Counsel; and that the fee

12   provisions in the Proposed Settlements are immune from review by the Court and thus improper.

13   (*Id*. at pp. 4-5.)  Of course, that is not the case.  The parties have merely agreed that Defendants

14   would not oppose an application for "an award of attorneys' fees not in excess of one-third of the

15   Settlement Fund" (*see, e.g.,* Dkt. No. 3862-5, Samsung SDI Settlement Agreement, ¶ 23(a)).  Such

16   provisions are typical in settlement agreements and they appear in the IPP settlements already

17   approved by the Court in this case.[70]  It is for the Court to decide the appropriate amount of the fee

18   award with respect to these Proposed Settlements, and the Court can satisfy itself based on the

19   record in this case that the settlements are fair to the Class.

20   Finally, objectors contend there is a conflict of interest between Lead Counsel and the

21   members of the putative Nationwide Class who are not being compensated.  Again, these purchasers

22   are not releasing anything of value, and ***all*** class members had the same injunctive relief claims so

23

24
---

25   [69] Objector Clifton's argument that given the claimed differences between the state laws, class
representatives could not adequately represent the interests of other state claimants, must be rejected.
Objectors in *Relafen* raised the same argument there that intra-class conflicts existed.  *See Relafen,*

26   231 F.R.D. at 69-70.  But as discussed above, courts have not followed that decision on the question
of weighting of state claims.

27   [70] *See* IPPs' settlement agreements with Chunghwa (Dkt. No. 931-1, at ¶ 23) and with LG (Dkt. No.

28   1933-1, at ¶ 22), both stating that defendants shall not oppose an application for "an award of
attorneys' fees not in excess of one-third of the Settlement Fund."

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

1   no one in this class is receiving an unfair advantage.  There was no conflict of interest between the

2   Nationwide Class and either the Indirect Purchaser State Classes or Lead Counsel.[71]

3       **I.      The Notice Program Was the Best Notice Practicable Under the
             Circumstances**

4

5       Objectors raise several issues with the notice program, including (1) the age and income

6   profile of recipients (Cooper/Scarpulla, Bonsignore, Moore); (2) notice to foreign residents

7   (Cooper/Scarpulla, Bonsignore, Moore, Hull/Morgan); (3) notice to non-English speakers

8   (Cooper/Scarpulla, Bonsignore); (4) the supposed need for televised notice (Cooper/Scarpulla,

9   Bonsignore, Moore); (5) the sending of direct notice to "only" 10,082,690 unique addresses

10  (Finn/Fortman); and (6) the terms of the notice provided to the nationwide class (Moore, Johnson).

11  Each of these objections lacks merit and should be overruled.

12      Objectors' contentions regarding the reach of the notice program are baseless.  Every notice-

13  related objection is raised in cursory and unsupported fashion – which is not enough.  *See, e.g., In re*

14  *Google Referrer Header Privacy Litig.*, 87 F. Supp. 3d 1122, 1137 (N.D. Cal. 2015) ("objectors to a

15  class action settlement bear the burden of proving any assertions they raise").  More fundamentally,

16  the objectors are wrong to suggest that certain subsets of class members – older individuals, those

17  with lower incomes, non-English speakers, foreign residents, non-Internet users, residents of states

18  excluded from the damage recovery, etc. – somehow were ignored by the notice program.  That is

19  incorrect.  Each category of class members mentioned by Objectors received fair and adequate

20  notice through a host of means, as described in more detail below.

21      Moreover, the bulk of notice-related objections are raised by the Insider Objectors

22  (Scarpulla/Cooper, Bonsignore, Moore) notwithstanding their assent to the previous notice plans

23  approved in connection with the Chunghwa settlement (Dkt. No. 992) and the LG settlement (Dkt.

24  ─────────────────────

25  [71] Certain objectors criticize Lead Counsel for failing to approach attorneys general of these other
    states.  Lead Counsel was appointed to represent the interests of purchasers in the 22 indirect

26  purchaser state classes.  He has no duty to represent purchasers in other states, and the objectors cite
    to no law requiring Lead Counsel to approach state attorneys general with regard to the claims of

27  those states' residents.  Nonetheless, Lead Counsel in fact notified several attorneys general when
    the complaints were filed, and when IPPs entered into settlements with Chunghwa and LG, those

28  Defendants sent notice to all state attorneys general pursuant to the Class Action Fairness Act of
    2005, 28 U.S.C. § 1332(d).  Alioto Settl. Decl. II ¶ 44.

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

No. 2542).  This is now the *third* and most comprehensive notice issued in the case, and it is revealing that only now, in the context of a collateral dispute over lodestar issues, have the Insiders decided to object.  In any event, the various notice-related arguments are meritless.

*First,* lower-income and/or older class members were notified.  Neither group was excluded from the direct notice mailings and, moreover, these individuals read newspapers, magazines, and websites just like everyone else.  *See* Declaration of Joseph M. Fisher Re: Objections to Notice ("Fisher Decl. III") ¶ 5b (various publications included in the notice program have significant low-income readership).  Finally, lower-income and older CRT purchasers were notified extensively by the combination of outreach described above.[72]

*Second*, the foreign resident objections lack merit.  To the extent foreign residents were in a position to purchase CRT products in the United States, such individuals are squarely within the scope of the notice efforts.  The Summary Notice, for example, was published as a press release in 78 foreign-based media outlets in 15 countries, including Canada and Mexico.  *See* Fisher Decl. III ¶ 3.  In addition, nonresidents living in border regions – particularly those capable of entering the United States *for purposes of purchasing a television or computer* -  are likely to use the internet just like everyone else, and hence were subject to digital outreach.  Nor have the objectors introduced any "evidence regarding how many of these [foreign resident] persons" exist, *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 335 (N.D. Ga. 1993), and there is no reason to believe they represent a large portion of the class.  In all events, the "notice approved by the Court was provided in places where it was logical to assume, based on class definition and other circumstances, that a significant percentage of class members would reside" – and therefore was reasonable and

---

[72] Objectors' argument to the contrary rests on their misunderstanding of the notice plan's efforts to "target" certain age and income demographics.  *See* Dkt. No. 3863, Fisher Declaration (summarizing age and income data for CRT purchasers and explaining that certain notice efforts would target the key demographics, particularly the top 75% of income earners).  The fact that certain notice efforts "targeted" the demographics most likely to include class members – which of course is a sensible and recommended approach, see FJC Pocket Guide at 2 – does not mean other groups somehow got short shrift.  As described above, they did not.  The notice program simultaneously directed certain efforts at the most likely CRT purchasers while, as a whole, providing fair notice to *all* class members no matter their income, age or other characteristics.  Objectors make no factual showing to the contrary.

1    appropriate under the circumstances.  *Id.  See also* Fisher Decl. III ¶ 3 (claims have been submitted

2    by many foreign residents worldwide, confirming that notice was disseminated effectively abroad).

3         *Third*, efforts were made to notify non-English speaking class members.  A Spanish language

4    version of the Summary Notice was disseminated widely as a press release and was picked up by 81

5    media outlets in the U.S. and abroad.  *Id.* ¶ 5d.  Other outreach included advertisements on Google

6    Spanish, which generated over 33 million impressions across the Google ad-serving network.  *Id*.

7    The settlement website likewise provided notice and claim form documents in Spanish.  *Id.*

8    Moreover, many foreign language speakers residing in the United States are fully or partially

9    bilingual; thus, they were notified in a reasonable way by the English language aspects of the plan.

10   *See, e.g.*, *New York Times*, "More Latinos Consume News in English, Report Finds" (July 23, 2013)

11   ("Eighty two percent of Latino adults surveyed said that at least some of the news they followed in

12   2012 was in English.") (discussing research findings by Pew Hispanic Center).[73]

13        *Fourth*, televised notice was unnecessary given the broad scope of direct, publication, and

14   digital notice.  *See* Fisher Decl. III ¶ 5c.  While the *TFT-LCD* litigation did incorporate televised

15   notice, the *CRT* notice program goes far beyond the *TFT-LCD* program in other key respects,

16   including the direct mail/email program. *Id.* ¶ 6a.  *Compare TFT-LCD*, No. 07-cv-1827, Dkt. No.

17   5600-3 (publication and televised notice program without any direct mailings).  The considered

18   judgment of Class Counsel and The Notice Company—reflected in the plan approved by the Court

19   at the preliminary approval stage—was that the costs of televised notice would far outweigh any

20   marginal benefits, and no objector offers any evidence to the contrary.  *See In re Google Referrer*

21   *Header Privacy Litig.*, 87 F. Supp. 3d at 1138 (rejecting objections that "describe alternative ways

22   that notice could have been provided to the class.  It may be true that other methods of notice exist.

23   But here, the court approved one specific plan that satisfied the standard" of Rule 23(c)(2)(B) such

24   that objectors' alternatives were "not required").  *Cf.* American Law Institute, *Principles of the Law*

25

26

---

27   [73] The Scarpulla objection offers no evidence in support of the argument that notice was required in
     Mandarin, Korean, or Japanese print media.  In any event, perfection is not the standard with respect

28   to quibbling of this nature.  *See, e.g., In re Google Referrer Header Privacy Litig.*, 87 F. Supp. 3d at
     1138; Fisher Decl. III ¶ 7g.

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

1    *of Aggregate Litigation* § 3.04 (Comment) (2015) ("The object is to make notice both effective and

2    reasonable in terms of cost.").

3        *Fifth*, the Finn/Fortman objection notes in passing (at 2) that direct notice was mailed or

4    emailed to "only" 10,082,690 unique addresses.  This figure, however, goes far above and beyond

5    the typical direct mailing in indirect purchaser cases.  Fisher Decl. III ¶ 6a.  *Compare TFT-LCD*,

6    *supra* (publication notice without any direct mailings).  The Finn/Fortman objection does not say

7    what more could or should have been done or otherwise elaborate on this cursory assertion.[74]

8        *Sixth*, the Moore Objection recasts its argument on the nationwide injunctive class release as

9    a notice issue.  The notice, however, clearly explained (1) the class definitions for both the

10   "Statewide Damages Classes" and the "Nationwide Class"; (2) the nature of the "release [of] the

11   injunctive relief claims of consumers . . . [in] the Nationwide Class"; and (3) that "[o]nly members

12   of the Statewide Damages Classes are eligible to receive a payment."  *See* Detailed Notice at 1, 6, 7.

13   There is no notice issue here at all.  What remains is simply Moore's general objection to the

14   nationwide release, an argument to which IPPs respond in Section E, *supra*.

15       Finally, objector Johnson claims she did not understand the notice principally because she is

16   not sure, at this stage, how much money she will receive and how the mechanics of the claims

17   process will work.  That, however, is not the function of the notice.  *In re Online DVD-Rental*

18   *Antitrust Litig.*, 779 F.3d 934, 946 (9th Cir. 2015) (rejecting similar objections).   The point of the

19   notice is to state in plain, concise language the essential information required under Rule

20   23(c)(2)(B), so that class members understand their basic rights and know where to turn for

21   additional information.  *Id.*; *see also* Fed. R. Civ. P. 23(c)(2)(B).  The notice should not, however,

22   include "everything but the kitchen sink" because "excess information" – for example the type of

23   information sought by Johnson – tends to result in "reader burnout . . . and claims are largely

24   deterred."  FJC Checklist, at 5.  The notice in this case met these standards in every respect:

25   conveying essential information in a clear and simple way while directing class members to the

---

[74] To the extent Finn/Fortman's complaint is that "class members in 22 states are not receiving any notice at all" (at 2), that is factually incorrect.  Notice was provided in every state through a variety of means. *See* Fisher Decl. III ¶ 6b.

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

1  settlement website and/or the claims administrator to the extent additional claims-related questions

2  arise.  Indeed, if Johnson still needs help with respect to the claims process, the claims administrator

3  and class counsel are happy to provide it.  The Johnson objection should be overruled.  *In re Online*

4  *DVD-Rental Antitrust Litig.*, 779 F.3d at 946.

5   **J.**   **The Total Settlement Amount is More than Fair, Reasonable and Adequate**

6

7    Tellingly, only two objectors argue that the total settlement amount is not adequate.  Cooper

8  and Scarpulla weakly suggest that the settlement amounts could have been higher because they claim

9  that Lead Counsel did not begin settlement negotiations with Defendants until after Judge Walker

10  issued his Report and Recommendation "("R&R") proposing that the Court appoint Messrs. Cooper

11  and Scarpulla as co-lead counsel to assist with settlement.[75]  (Dkt. No. 3200.)  They offer no support

12  for this assertion, which is belied by the extraordinary results achieved on behalf of the class.[76]

13  Contrary to their claims, Lead Counsel engaged in settlement negotiations with Defendants

14  throughout the litigation.  At the time of Judge Walker's R&R, Lead Counsel had settled with three

15  Defendants and was actively negotiating with others.  All of the settlement negotiations were hard-

16  fought and conducted before Judge Walker or Judge Fern Smith.  Alioto Settl. Decl. II ¶ 45.

17    Cooper and Scarpulla further argue that Lead Counsel's "unnecessary fight" with the CA AG

18  "*might* have lowered the total amount both received for their Class members."  This argument is

19  meritless.  Lead Counsel was forced to intervene in the CA AG's case because Philips took the

20  position that its settlement with the AG released the claims of California natural persons in this case.

21  Had Lead Counsel not challenged the approval of that settlement, Philips would have had a strong

22  argument at summary judgment that those claims were released.[77]  Lead Counsel's ultimate

23

24  [75] In fact, the Court never adopted this R&R, and the matter never went any further.  *See* Dkt. No. 3376.

25  [76] With respect to the objectors' aspersions on Lead Counsel's leadership and experience, class
26  counsel who performed a significant amount of work in this litigation have filed declarations attesting to the efficient and cohesive management of this litigation.  *See* Compendium of Declarations filed herewith.

27  [77] Philips moved for summary judgment on California natural persons' claims, arguing that the judgment approving its settlement with the California Attorney General released those claims.  (*See*
28  Dkt. No. 3034.)

1    settlement of $175 million from Philips supports the merits of IPPs' position vis-à-vis Philips,

2    namely that the release of California natural persons' claims for less than $500,000 was not fair,

3    reasonable or adequate.  It cannot seriously be disputed that Lead Counsel's actions preserved the

4    claims of California natural persons and increased the ultimate consideration obtained from Philips.

5          The Moore objectors also argue that the total settlement amount should be evaluated against

6    the treble damages amount.  But courts do not agree with this premise.[78]  IPPs will obtain a

7    tremendous recovery through the Proposed Settlements, not simply in terms of the absolute amount

8    of monies paid by Defendants, but relative to recoveries in other indirect purchaser cases.

9                    **K.     The CA AG's Statement of Interest**

10         The CA AG has filed a "Statement of Interest."  She does not object to the reasonableness of

11   the settlements.  She contends that the settling parties have not disclosed enough information to

12   enable her to assess whether the interests of California natural persons have been satisfied with

13   respect to notice and distribution.  She also argues that a *cy pres* program should be in place to deal

14   with residue funds.

15         IPPs are working with the CA AG to resolve any issues.  In addition, the following should be

16   noted.  First, the Court approved IPPs' proposed notice and distribution program at the preliminary

17   approval stage.  The AG did not raise any concerns at that time.  She also did not object to the notice

18   disseminated regarding the LG settlement or the notice provided in the *LCD* case – the notice

19   program here is more extensive than both of these other notice programs.   The AG also fails to

20   articulate exactly what was wrong with the notice here, save for a vague concern as to whether

21   California purchasers would have a sufficient opportunity to claim monies relative to non-

22   Californians.

23         Second, to the extent the CA AG raises a "weighting" argument (*See* Dkt. No. 4118 at p.3), it

24   should be rejected.  *See supra*, Section G.  And regarding her suggestion that some of the settlement

25   

26   [78] *See Rodriguez v. West Publishing Corp.,* 563 F.3d 948, 964 (9th Cir.2009) (rejecting objector's
     argument that consideration of only single damages was legal error); *see also, e.g., City of Detroit v.*
27   *Grinnell Corp.,* 495 F.2d 448, 458–59 (2d Cir.1974) ("[T]he vast majority of courts which have
     approved settlements . . . have given their approval . . . based on an estimate of single damages
28   only."), *overruled on other grounds as recognized by U.S. Football League v. Nat'l Football*
     *League,* 887 F.2d 408, 415–16 (2d Cir.1989).

monies be distributed *cy pres*, IPPs plan to distribute all net settlement funds directly to class members, as was done in *LCD*.  Thus, IPPs are not contemplating any *cy pres* distribution in this case.

Finally, the CA AG is on record stating that she is not seeking to recover individual damages in her related *parens patriae* action against Philips.  Alioto Settl. Decl. II ¶ 48, Ex. G.  Accordingly, the CA AG's interests in notice and distribution issues with respect to California consumers are limited, particularly as Lead Counsel already has a fiduciary duty to zealously guard the interests of class members.  *See Radcliffe v. Experian Information Solutions, Inc.,* 715 F.3d 1157, 1167 (9th Cir. 2013) ("Class counsel has a fiduciary duty to the class as a whole").

## L.    Unsatisfied Objectors Could Have Opted Out

With respect to all these objections, it bears mention that members of a proposed settlement class who are unhappy with the settlement terms have a remedy—they may opt out.  Courts consistently recognize the value of this option.  *See, e.g., Eisen v. Porsche Cars N. Am., Inc.*, No. 2:11-CV-09405-CAS, 2014 WL 43900, at *7 (C.D. Cal. Jan. 30, 2014), *appeal dismissed* (Sept. 22, 2014) ("In any event, class members could have opted out if they objected to the benefits offered by the settlement.  [Internal citation omitted.]  Federal courts routinely hold that the opt-out remedy is sufficient to protect class members who are unhappy with the negotiated class action settlement terms.") (citing cases).[79]

Objectors unhappy with the terms of the Proposed Settlements had the opportunity to opt out, but chose not to do so.

## **CONCLUSION**

Based on the foregoing, IPPs respectfully request that the Court:  (1) grant final approval of the seven proposed settlements; (2) certify the proposed Settlement Class; (3) grant final approval of

---

[79] *See also, e.g., Milligan v. Toyota,* No. 3:09–cv–05418–RS, slip op. at 13 (N.D. Cal. Jan. 6, 2012) (overruling multiple objections to a class action settlement, noting that objectors "could have simply opted out"); *Klee v. Nissan N. Am., Inc.,* No. CV-12-08238, 2015 WL 4538426, at *8 (C.D. Cal. July 7, 2015) (*appeal filed*) ("Moreover, to the extent that class members were unsatisfied with the settlement, they were provided the opportunity to opt out if they desired to seek greater compensation.  *Eisen,* 2014 WL 439006, at *7.  As a result, the court finds that the amount of the settlement weighs in favor of approval.").

49

the proposed plan of distribution and the proposed claim form; (4) and enter judgment against the Settling Defendants.

Dated:  November 19, 2015

Respectfully submitted,

 */s/ Mario N. Alioto*

Mario N. Alioto (56433)
malioto@tatp.com
Joseph M. Patane (72202)
jpatane@tatp.com
Lauren C. Capurro (241151)
laurenrussell@tatp.com
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123
Telephone: 415-563-7200
Facsimile: 415-346-0679

*Lead Counsel for Indirect Purchaser Plaintiffs*

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

# EXHIBIT 2

JOSEF D. COOPER (CASB No. 53015)
TRACY R. KIRKHAM (CASB No. 69912)
JOHN D. BOGDANOV (CASB No. 215830)
COOPER & KIRKHAM, P.C.
357 Tehama Street, Second Floor
San Francisco, CA  94103
Telephone:  (415) 788-3030
Facsimile:  (415) 882-7040
jdc@coopkirk.com
trk@coopkirk.com
jdb@coopkirk.com

FRANCIS O. SCARPULLA (CASB No. 41059)
PATRICK B. CLAYTON (CASB No. 240191)
LAW OFFICES OF FRANCIS O. SCARPULLA
456 Montgomery Street, 17th Floor
San Francisco, CA  94111
Telephone:  (415) 788-7210
Facsimile:   (415) 788-0706
fos@scarpullalaw.com
pbc@scarpullalaw.com

*Counsel for Indirect-Purchaser Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:  CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION. | **Master File No. 3:07-cv-5944 JST** |
| | **MDL No. 1917** |
| This Document Relates to: | **REPLY IN SUPPORT OF OBJECTIONS TO INDIRECT-PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENTS WITH PHILIPS, PANASONIC, HITACHI, TOSHIBA, SAMSUNG SDI, TECHNICOLOR, AND TECHNOLOGIES DISPLAYS AMERICAS DEFENDANTS** |
| All Indirect-Purchaser Actions. | |
| | Date:          March 15, 2016 |
| | Time:          2:00 p.m. |
| | Judge:        The Hon. Jon S. Tigar |
| | Courtroom: 9, 19th Floor |
| | Before:  Special Master Martin Quinn |

<u>TABLE OF CONTENTS</u>

Page No.

I.     THE UNDERSIGNED ARE CLASS COUNSEL WITH BOTH "STANDING"
       AND AN OBLIGATION TO RAISE SETTLEMENT APPROVAL ISSUES
       WITH THE COURT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    THE FAIRNESS AND ADEQUACY OF THE SETTLEMENT FOR THE
       NATIONAL CLASS TURNS ON ACCEPTANCE OF LEAD COUNSEL'S
       ERRONEOUS ASSERTION THAT THEIR CLAIMS HAVE NO VALUE
       UNLESS THEY ARE ALSO MEMBERS OF ONE OF THE STATE
       DAMAGE CLASSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

       A.     The Absence of a Record Showing that the Interests of All Members of
              the Proposed Nationwide Class were Represented in the Settlement Process
              and the Lack of Evidence Supporting the Reasonableness of Providing
              Nothing to Certain Class Members Precludes the Approval of the
              Proposed Settlements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

       B.     The Proposed Nationwide Class's Claims Arising Under Section of the
              Sherman Act are Both Viable and Valuable. . . . . . . . . . . . . . . . . . . . . . . . 11

              1.     Claims for Injunctive Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

              2.     Claims for Equitable Monetary Relief . . . . . . . . . . . . . . . . . . . . . 12

              3.     Claims for Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

       C.     Lead Counsel Has Not Made a Record Upon Which The Special Master
              Could Conclude That The State Law Damage Claims Being Released
              By The Nationwide Class Members Who Are Not Being Compensated
              Are Worthless. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III.   THE PROPOSED PLAN OF DISTRIBUTION FAILS TO ACCOUNT FOR
       TERMS AND CONDITIONS OF THE CHUNGHWA SETTLEMENT AND
       CANNOT BE APPROVED FOR THIS REASON AS WELL . . . . . . . . . . . . . . . . 24

IV.    THE NOTICE TO THE CLASSES APPEARS TO HAVE BEEN FLAWED
       AND LEAD COUNSEL HAS NOT DEMONSTRATED OTHERWISE  . . . . . . . . 27

V.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

TABLE OF AUTHORITIES

Cases                                                                     Page No.

*Basic Inc. v. Levinson*,
     485 U.S. 224 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*Ehrheart v. Verizon Wireless*,
     609 F.3d 590 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*FTC v. Cephalon, Inc.*, No. 2:08-CV-2141, 2015 U.S. Dist. LEXIS 49333,
     2015 WL 1724597, (E.D. Pa. Apr. 15, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*FTC v. Cephalon, Inc.*,
     No. 2:08- CV-2141 (E.D. Pa. May 28, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*FTC v. Cephalon, Inc.*,
     No. 2:08-CV-2141 (E.D. Pa. June 17, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Gerlinger v. Amazon.com Inc.*,
     526 F.3d 1253 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*Greenfield v. Villager Indus., Inc.*,
     483 F.2d 824 (3d Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Halliburton Co. v. Erica P. John Fund, Inc.*,
     134 S. Ct. 2398, 2407 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Hammes v. AAMCO Transmissions, Inc.*,
     33 F.3d 774, 778 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*,
     392 U.S. 481 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Hansberry v. Lee*,
     311 U.S. 32 (1940). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Illinois Brick Co. v. Illinois*,
     431 U.S. 720 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*In re Community. Bank of N. Va. & Guaranty Nat'l Bank of Tallahassee
     Second Mortg. Loan Litig.*,
     622 F.3d 275 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 15

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*,
     Master File No. M-02-1486-PJH (MDL No. 148),
     2013 U.S. Dist. LEXIS 188116 (N.D. Cal. January 8, 2013) . . . . . . . . . . . . . . *passim*

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
     55 F.3d 768 (3d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 15

*In re Literary Works in Elec. Databases Copyright Litigation*,
     654 F.3d 242 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Page No.

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
    998 F.2d 1144 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*In re Pet Food Products Liability Litigation*,
    629 F.3d 333 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5, 13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    2013 U.S. Dist. LEXIS 49885, at *56 (N.D. Cal. Apr. 3, 2013) . . . . . . . . . . . 13, 21, 23

*Kansas v. Nebraska*,
    135 S. Ct. 1042 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Kaufman v. Am. Express Travel Related Services, Inc.*,
    No. 07-C-1707 (N.D. Ill. Aug. 8, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Oregon v. AU Optronics Corp. (In re TFT-LCD (Flat Panel) Antitrust Litig.)*,
    MDL No. 1827, No. C 10-4346 SI, 2011 U.S. Dist. LEXIS 76562
    (N.D. Cal. July 11, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Palmyra Park Hosp. Inc. v. Phoebe Putney Memorial Hosp.*,
    604 F.3d 1291 (11th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Porter v. Warner Holding Co.*,
    328 U.S. 395 (1946)*Reynolds v. Beneficial Nat'l Bank*,
    288 F.3d 277 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Rodriguez v. West Publishing Corp.*,
    2007 U.S. Dist. LEXIS 74767, at *43 (C.D. Cal. Sept. 10, 2007) . . . . . . . . . . . . . . . .5

*Rodriguez v. West Publishing Corp.*,
    563 F.3d 948 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Staton v. Boeing Co.*,
    327 F.3d 938 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Sullivan v. DB Investments, Inc.*,
    667 F.3d 273 (3d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Morgan Stanley*,
    881 F. Supp. 2d 563 (S.D.N.Y. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*United States v. Paramount Pictures, Inc.*,
    334 U.S. 131 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. United Shoe Machinery Corp.*,
    391 U.S. 244 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

Page No.

*United States of America v. Keyspan Corporation,*
    763 F. Supp. 2d 633 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,*
    396 F.3d 96 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Walter v. Hughes Communications, Inc.,*
    No. 09-2136-SC, 2011 WL 2650711 (N.D. Cal. July 6, 2011) . . . . . . . . . . . . . . . . . .28

<u>Federal Statutes</u>

15 U.S.C. §1, Sherman Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Class Action Fairness Act of 2005 (CAFA), 28 U.S.C. §§ 1332(d)(3), 1453,
    and 1711–1715, Pub. L. No. 109-2, 119 Stat. 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

<u>Federal Rules</u>

Federal Rules of Civil Procedure, Rule 11(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Federal Rules of Civil Procedure, Rule 23(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Federal Rules of Civil Procedure, Rule 23(g)(1)(A)(i). . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

2003 Advisory Committee Notes, Fed. R. Civ. P. 23(g) . . . . . . . . . . . . . . . . . . . . . . . . . . 3

<u>Other Authorities</u>

*Antitrust and Unfair Competition Law Section*, The State Bar of California,
    California Antitrust and Unfair Competition Law, Revised Edition
    (Cheryl Lee Johnson, ed., Matthew Bender & Co. 2014) . . . . . . . . . . . . . . . . . . . . . 13

*Antitrust Law*, Areeda & Hovenkamp,
    ¶ 346k, at 189 (3d ed. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Illinois Brick: A Look Back and a Look Ahead*, Edward D. Cavanagh,
    17 LOY. CONSUMER L. REV. 1, 30 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

"Judges' Class Action Notice and Claims Process Checklist and Plain Language
    Guide" ("Notice and Claims Process Checklist"), Federal Judicial Center (2010) . .28

*Manual for Complex Litigation*, Fourth
    § 21.641 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Newberg on Class Actions*, Alba Conte and Herbert B. Newberg, (4th ed. 2002)
    § 11:65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

"Procedural Guidance for Class Action Settlements,"
http://www.cand.uscourts.gov/ClassActionSettlementGuidance . . . . . . . . . . . . . . . . . *passim*

Page No.

*Pro-Sys Consultants Ltd v. Microsoft Corporation* [2013]
      3 SCR 477, 2013 SCC 57 (CanLII) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*Rebuilding Illinois Brick: A Functionalist Approach to the Indirect Purchaser Rule,*
      Barak D. Richman & Christopher R. Murray, 81 S. CAL. L. REV. 69 (2007) . . 20

*Statement of the Commission, Withdrawal of the Commission's Policy Statement*
      *on Monetary Equitable Remedies in Competition Cases,* (Jul. 31, 2012) . . . . . . .14

www.oxforddictionaries.com/us/definition/american_english/doctrine . . . . . . . . . . . . . 16

I. **THE UNDERSIGNED ARE CLASS COUNSEL WITH BOTH "STANDING" AND AN OBLIGATION TO RAISE SETTLEMENT APPROVAL ISSUES WITH THE COURT**

Lead Counsel has responded to the objections raised by Class Counsel Francis O. Scarpulla and Josef D. Cooper with several arguments that have nothing to do with the merits of the settlements.  These arguments are that: (1) the undersigned's "objections must be stricken for lack of standing because they were not submitted on behalf of any class member;"[1] (2) "these objections . . . are suspicious" because they were submitted only after "IPP Counsel's Audit Committee reviewed their timesheets and made cuts to their lodestars;"[2] and (3) these objections were not raised prior to preliminary approval of the current settlements.[3]

First, as to "standing," Lead Counsel's own statement answers this argument, when he concedes that "[a]s class counsel, the Insider Objectors have fiduciary duty to act in the best interests of the class."[4]  That is absolutely true, and this duty alone is sufficient to convey "standing" on the undersigned to speak out and direct the Special Master's attention to aspects of the proposed settlements, plan of distribution and notice program that are or may be inadequate, unreasonable or unfair.  The undersigned are signatories to the operative Fourth Amended Complaint (Dkt. No. 1526).  They represent named plaintiffs in this litigation.  The fact that they did not specifically identify their clients in their objections is irrelevant.[5]  It is well settled that

---

[1]  "Indirect Purchaser Plaintiffs' Motion for Final Approval of Settlements with the Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, Technicolor, and Technologies Displays Americas Defendants; Memorandum in Support Thereof," dated November 19, 2015; Memorandum of Points and Authorities, at page 2 (hereinafter cited as "Lead Counsel's Memo at ___").  *See also*, Lead Counsel's Memo at 27 ("Messers. Cooper and Scarpulla have no standing to object to the Proposed Settlements.  Only members of the class may object to a class action settlement. [citation omitted] Their objections are not filed on behalf of any class member and they do not claim to be class members themselves.")

[2]  *Id. See also*, Lead Counsel's Memo at 24-25 ("[T]hree [objections] are driven by disgruntled attorneys in this litigation (the **Insider Objectors**") who refused Lead Counsel's request that they reduce their lodestar following the Audit Committee's review of their daily time records.") (emphasis in original), and at 28 ("The timing and motivations behind the Insider Objectors' objections are highly suspect . . . these objectors only voiced their concerns after the Audit Committee made cuts to their lodestars.")

[3]  *Id*. at 2 and 28.

[4]  Lead Counsel's Memo at 29.

[5]  The standing requirements and procedures for absent class member objectors and their counsel are

1   "class counsel ultimately owe their fiduciary responsibility to the class as a whole and are

2   therefore not bound by the views of the named plaintiffs regarding any settlement."  *Staton v.*

3   *Boeing Co.,* 327 F.3d 938, 960 (9th Cir. 2003).  *See Rodriguez v. West Publishing Corp.,* 2007

4   U.S. Dist. LEXIS 74767, at *43 (C.D. Cal. Sept. 10, 2007), *aff'd in part and rev'd on other*

5   *grounds by Rodriguez v. West Publishing Corp.,* 563 F.3d 948 (9th Cir. 2009) (in exercising its

6   fiduciary duty, class counsel must "represent the entire class as it believes appropriate"); *see also*

7   *id.* (quoting Alba Conte and Herbert B. Newberg, *Newberg on Class Actions* § 11:65 (4th ed.

8   2002)) ("general rule is that the named plaintiff and counsel bringing the action stand as

9   fiduciaries for the entire class, commencing with the filing of a class complaint"); *Greenfield v.*

10  *Villager Indus., Inc.,* 483 F.2d 824, 832 (3d Cir. 1973) ("class action counsel possess, in a very

11  real sense, fiduciary obligations to those not before the court" and "[I]t is counsel for the class

12  representatives, and not the named parties, who direct and manage these [class] actions.  Every

13  experienced federal judge knows that any statements to the contrary is sheer sophistry").

14          Second, as to the undersigned's objections being motivated by Audit Committee cuts to

15  their lodestars, Lead Counsel never questioned a minute of the time submitted by Cooper &

16  Kirkham, P.C.  It is true that Mr. Scarpulla had a dispute with Lead Counsel regarding submission

17  of his time records relating his attempt, at Special Master Vaughn Walker's request, to resolve

18  Lead Counsel's dispute with the California Attorney General.[6]  However, as Lead Counsel

19  affirms at paragraph 35 of the declaration he submitted in support of the requested aggregate fee

20  award: "[t]he Audit Committee did not make any cuts to Mr. Cooper's firm's lodestar."[7]  Indeed,

21  

22  designed to ensure that objections are received only from persons and entities who have a justiciable "case
23  or controversy," i.e., they qualify for class membership and have not exercised their right to exclude
    themselves.  Not only is this a jurisdictional requirement, it is necessary to ensure that objectors share a
24  common interest with the class or classes which they purport to benefit by raising their objections.
    Obviously, this is not relevant to counsel who already have a fiduciary duty to the class.

25  [6]  *See,* Special Master's Report and Recommendation re Settlement, Dkt. 3200.

26  [7]   Declaration of Mario N. Alioto in Support of Indirect Purchaser Plaintiffs' Motion for Final Approval of
    Class Action Settlements with the Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, Technicolor, and
27  Technologies Displays Americas Defendants, filed November 20, 2015, at ¶35.

28

1    Cooper & Kirkham has the sixth largest lodestar in this litigation, which at Lead Counsel's

2    requested 2.33 multiplier would provide a payment of approximately $7 million to the firm.[8]

3    Clearly, it would be in Mr. Cooper's personal best interests to sit down and shut up and allow the

4    settlement approval process to proceed as smoothly and expeditiously as possible.  However, he

5    and his partners have a fiduciary responsibility to the proposed Nationwide Class that trumps their

6    personal interests and requires them to speak out about inadequacies in the proposed settlements.

7    This fiduciary responsibility is individual and discrete.  Each class counsel has an

8    independent duty to determine whether or not a settlement proposal is fair, adequate and

9    reasonable, and therefore in the best interests of the class: "Class counsel must make their own

10   determination about the appropriate course of action, taking full account of their fiduciary

11   obligation to the class as a whole." *Rodriguez, supra,* 2007 U.S. Dist. LEXIS 74767, at *44; 2003

12   Advisory Committee Notes, Fed. R. Civ. P. 23(g) (because "class representatives [or class

13   counsel] cannot command [other] class counsel to accept or reject a settlement proposal, . . . class

14   counsel must determine whether seeking a court's approval of a settlement would be in the best

15   interests of the class as a whole . . . .").

16   Lead Counsel asserts that he alone has authority to speak for the class as a whole with

17   regard to the terms of settlements that he negotiated.  Lead Counsel's Memo at 27 asserts: "These

18   lawyers [the undersigned] have no authority to object on behalf of IPPs or the Class as a whole.

19   They are not Lead Counsel."  Not surprisingly, Lead Counsel cites nothing in support of the

20   proposition that the appointment of a lead counsel in a class action divests or relieves all other

21   class counsel of their fiduciary duty to protect the interests of the class as a whole.

22   To the contrary, the fiduciary obligations of each class counsel are ongoing and should be

23   constantly reassessed in light of changing circumstances.  The Due Process Clause "requires that

24

25   _____

26   [8]  "Compendium of IPP Counsel Declarations in Support of Motion for Attorneys' Fees and
     Reimbursement of Expenses and Incentive Awards," at pg. 1 (Dkt. 4073) and "Indirect Purchaser
     Plaintiffs' Notice of Motion and Motion for Award of Attorneys' Fees Reimbursement of Expenses and
27   Incentive Awards to Class Representatives," at Memorandum, pg. 1 (Dkt. 4071),

28

REPLY BRIEF IN SUPPORT OF OBJECTIONS TO     - 3 -        Master File No. 3:07-cv5944 JST
FINAL APPROVAL OF SETTLEMENTS                            MDL 1917

1    the named plaintiffs" (and hence class counsel) "*at all times* adequately represent the interests of

2    the absent class members." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812 (1985) (citing

3    *Hansberry v. Lee,* 311 U.S. 32, 42-43, 45 (1940)) (emphasis added).[9]

4           Finally, Lead Counsel suggests that because the undersigned did not raise objections to the

5    scope of the settlement releases or the plan of distribution prior to or at the time he moved for

6    preliminary approval, those objections now should be disregarded as "manufactured" or untimely.

7    Lead Counsel's Memo at 28.  It is true that the first time the undersigned raised the issue that the

8    proposed release encompassed the claims of millions of class members for whom the proposed

9    settlement distribution provides no consideration was not at preliminary approval, but rather, in a

10   letter to Lead Counsel and the Settling Defendants' counsel dated October 1, 2015.[10]

11          Lead Counsel appears to have lost sight of the fact that we all – the undersigned, Lead

12   Counsel, the Special Master and the Court – are playing for the same team.  In the context of a

13   class action settlement approval motion, everyone acts as a fiduciary for the class, and courts do

14   not function as they do in adversarial litigation, where the timeliness of arguments or the failure to

15   raise points and authorities in some particular context might determine which advocate wins or

16   loses.  Here, there can be only one winner, and it is the class as a whole.

17          As the Third Circuit held in *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir.

18   2010) (emphasis added):

19          Under FED.R.CIV.P. 23(e), a district court's primary role is to determine whether

20   _____

21   [9]  The *Manual for Complex Litigation, Fourth,* §21.641 (footnotes omitted), states:

22          Attorneys representing a class are responsible for communicating a settlement offer to the
             class representatives and ultimately to the members of the class.  But the attorneys are also
23          responsible for protecting the interests of the class as a whole, even in circumstances where
             the class representatives [or class counsel] take a position that counsel consider contrary to
24          the interests of absent class members.  Class counsel must discuss with the class
             representatives the terms of any settlement offered to the class.  Approval or rejection of
25          the offer by the representatives [or other counsel], however, does not end the attorneys'
             obligations, because they must act in the best interests of the class as a whole.

26
27   [10]  This letter was copied contemporaneously to the Special Master.  It is also in the record at Dkt. 4116-1,
     Exhibit B.

28

---

1
2

> the settlement is fundamentally fair, reasonable and adequate. [Citation omitted.] The purpose of Rule 23(e) is to protect the unnamed members of the class. [Citation omitted.] *Under Rule 23(e), a district court acts as a fiduciary, guarding the claims and rights of the absent class members.* [Citations omitted.]

3   As a fiduciary for absent class members, a district court (or a special master acting for the court)

4   cannot ignore any issue relevant to the determination of whether a proposed settlement by any

5   plaintiff's counsel is fair, reasonable and adequate.  As articulated by the Third Circuit in *In re*

6   *Community Bank of N. Va. & Guaranty Nat'l Bank of Tallahassee Second Mortg. Loan Litig.,* 622

7   F.3d 275, 291 (3d Cir. 2010) (quoting *In re General Motors Corp. Pick-Up Truck Fuel Tank*

8   *Prods. Liab. Litig.*, 55 F.3d 768, 799 (3d Cir. 1995), "Rule 23 is designed to assure *that courts will*

9   *identify the common interests of class members* and evaluate [(1)] the named plaintiffs' and [(2)]

10  counsel's ability to fairly and adequately protect class interests."  (Emphasis added.)  *Accord, In re*

11  *Pet Food Products Liability Litigation*, 629 F.3d 333, 349-350 (3d Cir. 2010) ("Under Rule 23(e),

12  trial judges bear the important responsibility of protecting absent class members").

13      Indeed, courts have the obligation to raise issues *sua sponte*, when no party before it has done

14  so, if this is necessary to the performance of its duty as fiduciary of the class whose claims are

15  being compromised.  As the *Pet Food* Court noted, because of district courts' independent

16  fiduciary duty to the class, "the court cannot substitute the parties' assurances or conclusory

17  statements for its independent analysis of the settlement terms. *Cf. Reynolds v. Beneficial Nat'l*

18  *Bank*, 288 F.3d 277, 283 (7th Cir. 2002) (cautioning against 'paint[ing] with too broad a brush

19  [and] substituting intuition for . . . evidence and careful analysis'). When the parties have not

20  supplied the information needed for the court to determine whether the settlement is fair,

21  reasonable, and adequate, the court may affirmatively seek out such information." *In re Pet Food*

22  *Prods.*, 629 F.3d at 350-351 (citation omitted.)

23      Accordingly, all aspects of the settlements proposed here must be considered regardless of

24  the mechanism by which arguments or evidence are brought to the court's attention.  Lead

25  Counsel's "standing" and "procedural" arguments against consideration of the issues raised by the

26  undersigned must be rejected.

27

28

**II.     THE FAIRNESS AND ADEQUACY OF THE SETTLEMENT FOR THE NATIONAL CLASS TURNS ON ACCEPTANCE OF LEAD COUNSEL'S ERRONEOUS ASSERTION THAT THEIR CLAIMS HAVE NO VALUE UNLESS THEY ARE ALSO MEMBERS OF ONE OF THE STATE DAMAGE CLASSES**

**A.     The Absence of a Record Showing That the Interests of All Members of the Proposed Nationwide Class Were Represented In the Settlement Process and the Lack of Evidence Supporting the Reasonableness of Providing Nothing to Certain Class Members Precludes the Approval of the Proposed Settlements**

Lead Counsel asserts, albeit repeatedly, a single basis for his decision to provide Settling Defendants with releases of all injunctive and monetary claims held by all members of the proposed Nationwide Class, while obtaining consideration for only those class members who are also in one or more of the "22 Indirect Purchaser State Classes."   That basis is the bald assertion that the released claims of the purchasers in the rest of the country have no settlement value.  At page 2 of Lead Counsel's Memo, he states (emphasis added):

> [T]he CRT market is dying and almost all manufacturers, including all of the alleged conspirators, have left the market, making it very unlikely that the alleged conduct could recur in the future.  A stipulated injunction with Defendants would therefore not be meaningful.  And because *the injunctive relief claims are not viable*, releasing these claims without financial compensation as part of a global release is fair, reasonable and adequate.
>
>        The release of potential damage claims of purchasers outside the 22 Indirect Purchaser State Classes is also fair, reasonable and adequate.  *The damages claims for these states are not viable* and are completely speculative.

At page 3, he asserts: "*the release of valueless claims* satisfies Defendants' desire to forstall the defense of nuisance claims in the future.  At the same time, the release does not prejudice class members who *give up nothing of value*." (Emphasis added.)  Likewise, Lead Counsel's Memo at page 23, after conceding that "the Plan of Distribution does not contemplate compensation to Nationwide Class Members who are not members of one of the IP State Classes," defends this allocation of the settlement proceeds on the grounds that "the equitable and damages claims being released by these purchasers *have no value*." (Emphasis added.)[11]

---

[11]   *See also*, Lead Counsel's Memo at 31 ("these claims are not viable and are completely speculative."); at 32 ("The fact that no financial compensation will be awarded to class members for the release of their injunctive relief claims is entirely fair, reasonable and adequate, because those claims are not viable."); at 33 ("Here, proving the injunction claims *is* likely impossible.  So even though the injunction claims of 29

1    For all of this repetition, there is no discussion in Lead Counsel's Memo of the process by

2    which the proposed division of the settlement proceeds came about, or the basis upon which he

3    concluded that the claims of purchasers in a majority of states should be weighted at zero.  The

4    only explanation for the asserted lack of any value for the proposed Nationwide Class's claims

5    arising under Section 1 of the Sherman Act, is that the CRT market is dying.  On this basis alone,

6    Lead Counsel concludes that injunctive relief would be "impossible."[12]   Similarly, the sum total

7    of discussion regarding the determination that the state law damage claims of more than half the

8    Nationwide Class are "worthless as well" is that "[t]he vast majority of the 29 states are what is

9    known as 'non-repealer' states."[13]  Lead Counsel then offers this explanation: "Under the 'Illinois

10   Brick' doctrine, indirect purchasers lack standing to seek damages for violations of the federal

11   antitrust laws.  [Citation omitted.]  Certain states have enacted statutes, known as repealer statutes,

12   that reject the Illinois Brick doctrine and grant standing to indirect purchasers to sue for antitrust

13   violations under those states' antitrust laws.  Others, referred to as non-repealer states have not

14

15   _____

16   states are being released, this group is losing nothing." (emphasis in original)); at 34 ("these potential
     damage claims are not viable and are therefore worthless as well." ); at fn. 49 ("the claims of these
17   Nationwide Class members have no value."); and, finally, at 42 ("Again, these purchasers are not releasing
     anything of value").
18
     Lead Counsel also asserts that the proposed release of these claims is reasonable because "this Court
19   has already finally approved an identical release in conjunction with IPP's settlement with LG Electronics,
     Inc. ("LG") (Dkt. No. 3542.)  However, none of the motion papers and Court Orders regarding the LG
20   settlement contained any indication that some members of the Nationwide Class would be allocated no
     compensation for the release of their claims.  The preliminary approval motion (Dkt. No. 1933) and Order
21   (Dkt. No. 2248) propose and provide that allocation and distribution issues be deferred until there are
     additional settlements in the litigation.  The form of notice likewise told class members that there would not
22   be a distribution until after other settlements were achieved.  (Dkt. No. 1933, Exhibit 2).  Both the final
     approval motion (Dkt. No. 2510) and the final approval Order (Dkt. No. 2542) are silent on the subject of
23   the allocation and distribution of the LG settlement.  Accordingly, the finality of the release in the LG
     settlement is an additional reason the proposed Plan of Distribution cannot be approved since it would
24   retroactively strip s of members of the Nationwide Class certified in connection with that settlement of
     benefits they were led to believe were being obtained.
25

26   [12] Lead Counsel's Memo at 33.

27   [13] *Id*. at 34.  Actually, since the settlements carve purchasers in Illinois, Oregon and Washington out of the
     Nationwide Class, the state count here should be 26, not 29.

28

1  done so, meaning that indirect purchasers may not bring claims for damages under those states'

2  laws."[14]

3         That is the extent of Lead Counsel's analysis – the CRT market is dying so there is no

4  point in obtaining injunctive relief, and the vast majority of the "29" excluded states are non-

5  repealer states, so it is fair to deny their citizens any recovery.  This is not sufficient.  Did any of

6  the class members in those excluded states have representation in the decision-making process

7  leading up to the adoption of this scheme?  Did anyone perform any sort of due diligence to

8  ascertain whether some or all of the claims these class members will be releasing for no

9  consideration might actually be viable, and thus have settlement value?  It is impossible to answer

10 these fundamental questions from Lead Counsel's Memo or his supporting declaration.[15]

11        Indeed, one cannot determine from either Lead Counsel's preliminary or final approval

12 motions exactly what are the specific claims that have been determined to be valueless.  They are

13 never defined or discussed beyond the statement that they arise under federal and state antitrust

14 laws.  This lack of specificity is directly contrary to the Northern District's "Procedural Guidance

15 for Class Action Settlements,"[16] which requires that the proponents of a settlement include in their

16 approval papers a statement of "[t]he likely recovery per plaintiff under the terms of the settlement

17 and the potential recovery if plaintiffs were to prevail *on each of their claims*."[17]  The Court in this

18 _____

19 [14] *Id.*

20 [15] It does seem apparent, however, that there was no contribution to the settlement amounts based on the allegedly valueless claims of purchasers in the non-repealer states.  The obvious follow-up question is whether the proposed settlement amounts are adequate if the claims from the non-repealer states are

21 appropriately valued.  Common sense would seem to answer this question in the negative.  See, e.g., *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 313, fn. 44 (3d Cir. 2011), where Judge Rendell, writing for

22 the *en banc* majority opines that had no recovery been obtained for the non-repealer state purchasers, "we seriously doubt that the Indirect Purchaser settlement fund would still be $272.5 million."

23 [16] Available at http://www.cand.uscourts.gov/ClassActionSettlementGuidance ("Procedural Guidance").

24 [17] (Emphasis added.)  Although couched as "guidance," it states that "[f]ailure to address all of the issues

25 discussed below may result in unnecessary delay, or even failure, of approval."  We note that Lead Counsel has not provided this information for the claims being compensated and released by the 22 statewide

26 damage classes either.  However, it may be that he is waiting for the claims period to close on December 7, 2015, so that the settlement recovery per class member can be estimated with more precision.  The claims

27 experience, obviously, is not relevant to the members of the Nationwide Class who are recovering nothing from the settlement.  If Lead Counsel fails to provide this information voluntarily, we urge the Special

28

_____

1   matter referenced this "potential recovery" provision of the Procedural Guidance, and ordered the

2   direct-purchaser plaintiffs to comply with it before a ruling on their request for final approval of

3   their settlements will be made.[18]

4        This absence of an adequate showing by Lead Counsel that the process through which the

5   determination to obtain no compensation in return for the releases of millions of class members

6   satisfies due process is, without more, sufficient grounds to compel the Special Master to reject the

7   proposed settlements.  *See, e.g., In re Literary Works in Elec. Databases Copyright Litigation*, 654

8   F.3d 242, 251-53 (2d Cir. 2011), where the court remanded a plan of distribution for further

9   findings, even though there was no determinative evidence that one group of claimants within the

10   settlement class had in fact been discriminated against, simply because the record provided no

11   basis from which to determine that the proposed reduction in value to be applied to their claims

12   was the product of an allocation process that fairly protected their interests.

13        When a plan of distribution does not propose to pay all claimants on a purely *pro rata*

14   basis, but contains the provision for an allocation or weighting of claims between or among groups

15   of class members, due process and fundamental fairness require that the competing interests thus

16   created (whether or not they are recognized by formal subclasses) must be the subject of

17   independent representation and vigorous advocacy.  For example, in *In re Dynamic Random*

18   *Access Memory (DRAM) Antitrust Litigation*, Master File No. M-02-1486-PJH (MDL No. 148),

19   2013 U.S. Dist. LEXIS 188116 (N.D. Cal. January 8, 2013) (hereinafter cited as "*DRAM*"), which

20   involved the allocation of settlement proceeds among reseller and end-user members of a single

21   nationwide settlement class, Special Master Charles B. Renfrew appointed the law firm of Berman

22   DeValero to serve as Allocation Counsel for reseller class members since "the private plaintiffs'

23   litigation strategy had been to focus on the claims of end-buyers."  *DRAM* at *280.[19]

24   Master to request it.

25   [18]  *See* Order Re Direct Purchaser Pltfs' Settlement with Thomson Defendants (Dkt. 4194, Nov. 18, 2015)

26   (citing "Procedural Guidance for Class Action Settlements" and *In re Omnivision Techs. Inc.*, 559
F.Supp.2d 1036, 1042 (N.D. Cal. 2008).

27   [19]  Like DRAM, the focus of this litigation has shifted from the claims of all indirect purchasers to those of

28

1    Thereafter, a lengthy process ensued before the Special Master in which each of the

2  relevant contingencies held a place at the table.  Based upon the work of experts and evidence

3  adduced during discovery, agreement was reached in *DRAM* as to a fair and reasonable allocation

4  of the settlement proceeds.  As Judge Renfrew concluded (*id* at *286):

> 5    The process by which the parties ultimately reached an agreement on a proposed
> plan of distribution of the settlement proceeds was an adversarial process involving
> 6    the Indirect Purchaser Plaintiffs' Co-Lead Counsel, the Attorneys General, acting
> as *parens patriae*, counsel for Celestica, resellers' Allocation Counsel, and to a
> 7    more limited extent, counsel for Settling Defendants.  The process was rigorous
> and the result of persuasive advocacy.  The outcome was a recommended plan of
> 8    distribution that is well-grounded in market facts, fairly accounts for the conflicting
> evidence of the relative injury suffered by resellers and end-buyers, and recognizes
> 9    the practicalities of distributing funds to a large nationwide settlement class.

10  *See, DRAM* at *287-317 for a complete description of the evidentiary and advocacy process

11  underlying the allocation.

12    *Sullivan v. DB Investments Inc.*, like DRAM, required an allocation of settlement proceeds

13  between resellers and end-buyers on the basis of the strength of their damage claims.  There, no

14  agreement was reached, and therefore, "[a]fter two years of proceedings," involving separate

15  counsel for each constituency, and "[a]fter reviewing the record, the competing econometric

16  reports furnished by several experts, and other reliable data, the Special Master recommended that

17  . . . the Indirect Purchaser Settlement Fund of $272.5 million should be allocated 50.3%,

18  approximately $137.1 million, to the Resellers Subclass, and 49.7%, approximately $135.4

19  million, to the Consumers Subclass."  *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 289-90 (3d

20  Cir. 2011) (footnotes omitted).

21    Conversely, here, there is the complete absence of evidence that the decision to give

22  nothing to class-member purchasers in a majority of states was reached after a full and fair

23  consideration of their claims and interests.  Indeed, there is actually evidence that their interests

_____

25  end-buyers.  However, unlike DRAM, where the reseller claims were also settled, only one of the
settlement agreements here, the first settlement with Defendant Chunghwa, includes the claims of resellers.
26  As will be discussed below, the obligations and expectations created by that settlement and the subsequent
dissemination of a notice that informed resellers that they are members of a settlement class appear to have
27  been abandoned and forgotten by Lead Counsel.

28

---

REPLY BRIEF IN SUPPORT OF OBJECTIONS TO    - 10 -    Master File No. 3:07-cv5944 JST
FINAL APPROVAL OF SETTLEMENTS    MDL 1917

were completely unrepresented in the decision making process.  There is no suggestion that the proposed Plan of Distribution was the work product of anyone except Lead Counsel.  In footnote 71, at page 43 of Lead Counsel's Memo, Mr. Alioto affirmatively asserts that *he did not advance the interests* of those Nationwide Class members to whom he intends to give nothing in connection with the proposed settlements:

> Lead Counsel was appointed to represent the interests of purchasers in the 22 indirect purchaser state classes.  *He has no duty to represent purchasers in other states*."  (Emphasis added.)

If he has no duty to represent them, then he has no business sacrificing their claims to achieve a settlement favorable to the 22 indirect purchaser state classes.  On this basis alone, final approval of the settlements must be denied.

**B.** **The Proposed Nationwide Class's Claims Arising Under Section 1 of the Sherman Act Are Both Viable and Valuable**

Lead Counsel asserts that the proposed Nationwide Class satisfies the Rule 23 requirement of commonality because each class member has alleged that "Defendants conspired to fix the prices of CRTs . . . and violated Section 1 of the Sherman Act."[20]  The operative Fourth Amended Complaint specifically requests, in addition to injunctive relief, that "Plaintiffs and the Classes be awarded restitution, including disgorgement of profits by Defendants as a result of acts of unfair competition and unfair enrichment," and that "the Court award Plaintiffs and the Classes they represent such further relief as may be necessary and appropriate."  (Dkt. No. 1526.)  Accordingly, all possible claims arising from the Nationwide Class's allegations of Section 1 violations have been preserved.  These claims fall into three categories:  injunctive relief, equitable monetary relief and damages.  To approve the proposed settlements and Plan of Distribution, the Court must conclude, among other things, that none of these claims is sufficiently viable to carry any settlement value whatsoever.

---

[20]   Lead Counsel Memo at 12.

### 1. Claims for Injunctive Relief

No one disputes that the remaining market in this country for CRT televisions, monitors and other equipment is considerably smaller than the market for flat screen panels.  However, that is not a sufficient basis to conclude that injunctive relief of any nature is impossible.  The defendants are still in business here, even if they are not selling many or any CRT televisions in the United States.  In DRAM, for example, one of the provisions of the injunctive relief obtained in settlement was that the defendants establish and/or maintain a compliance program or programs for their officers and employees with responsibility for pricing and sales in and to the United States regarding the legal standards imposed by federal and state antitrust laws for a period of three years from the execution of the agreement.  *DRAM*, *supra*, 2013 U.S. Dist. LEXIS 188116 at *129.  Similar compliance provisions were negotiated with the settling defendants in LCD.  *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 49885, at *56 (N.D. Cal. Apr. 3, 2013) (granting final approval to settlements with multi-year antitrust compliance and reporting requirements).  The Settling Defendants are large companies, many with multiple product lines sold in this country.  Surely, educating their employees about the United States antitrust and state competition laws would assist in preventing future anticompetitive abuses.

### 2. Claims for Equitable Monetary Relief

As noted above, in the Fourth Amended Complaint, Lead Counsel sought the remedies of restitution and disgorgement on behalf of all of "the Classes" pleaded therein, although these claims were never pursued during the litigation.  While there is no reference to them in Lead Counsel's Memo, one must assume that they are included in the body of unspecified claims belonging to the class members from the non-repealer states that have been deemed worthless and not viable by Lead Counsel.  Indeed, standing alone, the fact that Lead Counsel failed to present any discussion of the valuation process for these claims precludes the approval of the settlements.  *See, e.g., Pet Food, supra*, 629 F.3d at 353, where the Third Circuit vacated a final approval order and remanded for further proceedings because, as Lead Counsel has done here, "the settling parties did not discuss the merits of the Purchase Claims, how the parties' valued the Purchase

1    Claims, or why the parties capped the Purchase Claims at $250,000 . . . [and] offered no analysis

2    of the merits or value of the Purchase Claims and did not explain why the Purchase Claims were

3    capped at $250,000 out of a $24 million settlement."

4        Valuing the Nationwide Class's equitable monetary claims at zero ignores the growing

5    body of law recognizing the viability of Clayton Act equitable monetary claims for indirect

6    purchasers arising from violations of Section 1 of the Sherman Act. *See, United States of America*

7    *v. Keyspan Corporation*, *supra*, 763 F. Supp. 2d 633 (S.D.N.Y. 2011); *Oregon v. AU Optronics*

8    *Corp. (In re TFT-LCD (Flat Panel) Antitrust Litig.),* MDL No. 1827, No. C 10-4346 SI, 2011 U.S.

9    Dist. LEXIS 76562 (N.D. Cal. July 11, 2011) (Judge Susan Illston held that disgorgement of ill-

10   gotten gains from defendants' anti-competitive conduct was a proper remedy for indirect

11   purchasers under the Oregon Antitrust Act, and supported the Oregon Attorney General's state law

12   claim for unjust enrichment, based in part on *Keyspan*); and *DRAM, supra*, 2013 U.S. LEXIS

13   188116 at *190, *207.  A discussion of this remedy was recently added to Chapter 23 of the 2015

14   edition of the California State Bar's Antitrust and Unfair Competition Law Treatise:

15       Historically, the United States Supreme Court has held that disgorgement is
         available as part of the inherent equitable powers of the courts under the Sherman
16       Act. *See*, *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 250 (1968)
         ("upon appropriate findings of violation [of § 2], it is the *duty* of the court to
17       prescribe relief which will ... deny to the defendant the fruits of its statutory
         violation.") (emphasis added); *United States v. Paramount Pictures, Inc.*, 334 U.S.
18       131, 171-72 (1948) ("the requirement that the defendants restore what they
         unlawfully obtained is no more punishment than the familiar remedy of
19       restitution."); *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) ("unless
         otherwise provided by statute, all the inherent equitable powers of the District
20       Court are available for the proper and complete exercise of that jurisdiction.").

21       Under federal law, disgorgement of profits may take various forms. Thus, for
         example, where injunctive relief is not available (such as where it is moot),
22       disgorgement of *all* profits of a company engaged in illegal conduct (as opposed to
         the damages or overcharges resulting from the illegal conduct) is particularly
23       appropriate (*see Kansas v. Nebraska*, 135 S. Ct. 1042, 1056-59 (2015)) , especially
         to restore the *status quo ante* as to competition (*see, e.g., Keyspan*, 763 F. Supp. 2d
24       at 636-37, 639-41) . Where injunctive relief is available, disgorgement of profits
         and overcharges arising from the illegal conduct is available as *ancillary* relief that
25       can be obtained in addition to any other remedies, such as an order barring future
         misconduct by a defendant. *See, e.g., FTC v. Cephalon, Inc.*, No. 2:08-CV-2141,
26       2015 U.S. Dist. LEXIS 49333, at *13-18, 2015 WL 1724597, *3-4 (E.D. Pa. Apr.
         15, 2015); Stipulated Order for Permanent Injunction and Equitable Relief at 10-11
27       & Exh. A at ii-iv, *FTC v. Cephalon, Inc.*, No. 2:08-CV-2141 (E.D. Pa. June 17,
         2015), *available at*
28

---

REPLY BRIEF IN SUPPORT OF OBJECTIONS TO    - 13 -        Master File No. 3:07-cv5944 JST
FINAL APPROVAL OF SETTLEMENTS                            MDL 1917

1

https://www.ftc.gov/system/files/documents/cases/150617cephalonstip.pdf and Statement of the Commission at 3-4, *FTC v. Cephalon, Inc.*, No. 2:08- CV-2141 (E.D. Pa. May 28, 2015), *available at* https://www.ftc.gov/system/files/documents/cases/150528cephalonstatement.pdf. [21]

2

3    See also, *United States v. Morgan Stanley*, 881 F. Supp. 2d 563, 568 (S.D.N.Y. 2012).  In 2013,

4    the Federal Trade Commission also signaled its belief that it is entitled to seek disgorgement as

5    part of any injunctive relief that a court may order in any conduct case that does not involve a

6    "stand-alone" Section 5 case (e.g., a Section 5 case that is not tethered to a violation of the

7    antitrust laws) by withdrawing its 2003 Policy Statement on Restitution. Statement of the

8    Commission, Withdrawal of the Commission's Policy Statement on Monetary Equitable Remedies

9    in Competition Cases, 1-2, n.6 (Jul. 31, 2012), http://www.ftc.gov/os/2012/07/

10   120731commissionstatement.pdf.

11       The Nationwide Class's claims for equitable monetary relief do not fall under the bar of

12   *Illinois Brick* because they do not implicate proof of pass-on damages for indirect purchaser

13   recovery.[22]  In *DRAM*, Judge Renfrew relied on the fact that regardless of residency in an *Illinois*

14   *Brick* repealer or non-repealer state, all class members there had federal equitable monetary claims

15   for restitution and disgorgement as a basis for his recommendation that Chief Judge Hamilton

16   adopt a plan of distribution that paid out the settlement fund *pro rata* to all members of the

17   nationwide settlement class.  *DRAM* at *339-40.   Lead Counsel apparently considered only a

18   single criteria – CRT Product purchases in *Illinois Brick* non-repealer states – in deciding that the

19   claims of class members in those states are worthless.  Accordingly, that determination cannot as a

20   matter of law or fact serve as a justification for the release of class members' federal equitable

21   monetary claims without compensation.

22       It appears that Lead Counsel either ignored or forgot about alleging restitution and

23   disgorgement as a basis for recovery in the Fourth Amended Complaint.  In addition to evidencing

24   the unfairness of these settlements, this lapse raises questions of adequacy of Lead Counsel's

25   _____

26   [21]  The Treatise is available on LEXIS at 1-23 CA Antitrust and Unfair Competition Law § 23.02

27   [22]  See discussion of *Illinois Brick, infra.*

28

1   representation of the Nationwide Class that must be addressed.  *See, e.g., In re Community. Bank*

2   *of N. Va. & Guaranty Nat'l Bank of Tallahassee Second Mortg. Loan Litig., supra,* 622 F.3d 275,

3   304 ("*Community Bank*").  After cautioning that a disagreement among class counsel or with other

4   plaintiffs' counsel not appointed as class counsel about a decision to "bring some, but not other,

5   potentially colorable claims on behalf of the class," does not in and of itself establish inadequacy

6   of representation, the Third Circuit remanded the settlement (*inter alia*) for further consideration

7   of the adequacy issue:

8           As Rule 23 makes clear, however, "the work counsel has done in identifying or
            investigating potential claims in the action" is an important factor when evaluating
9           class counsel's adequacy. Fed. R. Civ. P. 23(g)(1)(A)(i). Though we certainly agree
            that class counsel is not inadequate simply because they have not asserted every
10          claim that could theoretically be pled against a defendant, *cf. Wal-Mart Stores, Inc.*
            *v. Visa U.S.A. Inc.*, 396 F.3d 96, 113 (2d Cir. 2005), neither is the decision
11          regarding the claims to assert in the action totally shielded from judicial scrutiny.
            [Footnote omitted] In particular, where class counsel's proffered reasons for the
12          "strategic" decision not to bring certain claims--i.e., obstacles faced by the claims,
            either as to certification or proof--also apply to the claims that have been asserted, a
13          district court may have reason to question whether class counsel has "vigorously
            prosecuted the action" on behalf of the class. *General Motors*, 55 F.3d at 801.

14

15          **3.      Claims for Damages**

16          Lead Counsel's valuation of the damage claims of the purchasers in the "non-repealer"

17  states who will recover nothing is based up two faulty assumptions.  The first is that *Illinois*

18  *Brick*[23] is a "doctrine" that eliminates an indirect purchaser's "standing to seek damages for

19  violations of the federal antitrust laws."  Lead Counsel's Memo at 34.   The second flows from the

20  first, and is the assumption that therefore all one needs to know to determine that an indirect

21  purchaser "may not bring [a] claim[] for damages" under federal law is that the purchase was not

22  made from one of the defendants.  *Id*.

23          To begin, there is no such thing as "the *Illinois Brick* doctrine."[24]  A doctrine is either a

24  belief or set of beliefs held and taught by a church, political party or other group, or a stated

25  _____

26  [23]  *Illinois Brick v. Illinois*, 431 U.S. 720 (1977) ("*Illinois Brick*")

27  [24]  Lead Counsel's Memo at 34.

28

---

REPLY BRIEF IN SUPPORT OF OBJECTIONS TO    - 15 -       Master File No. 3:07-cv5944 JST
FINAL APPROVAL OF SETTLEMENTS                            MDL 1917

principle of government policy, mainly in foreign or military affairs.[25]  *Illinois Brick* is merely a 38 year-old decision of the United States Supreme Court, which, as will be discussed below, can, and many believe should, be reconsidered and modified or rejected by that Court.  Second, and more importantly, determining whether application of the holding in *Illinois Brick* prevents an indirect purchaser from recovering damages under federal law is not as simple as asking from whom the allegedly price-fixed product was purchased.[26]

In *Illinois Brick*, the Supreme Court applied the prohibition on the "defensive" use of pass-on proof of damages enunciated in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), to also prohibit the "offensive" use of pass-on evidence to establish the fact of damage component of antitrust liability.  After *Illinois Brick*, a downstream customer under most circumstances was not permitted to show antitrust injury using proof that the illegal overcharge he paid was passed-on to him by an intermediary purchaser of the defendants' product, just as *Hanover Shoe* prevented a defendant from defending an antitrust claim with evidence that the plaintiff had passed on the alleged overcharge to its downstream customers.  The Supreme Court felt that fairness dictated that permitting antitrust recovery through proof of pass-on damages would require it to overrule *Hanover Shoe,* and held the rationale of *Hanover Shoe* "that the attempt to trace the complex economic adjustments to a change in the cost of a particular factor of production would greatly complicate and reduce the effectiveness of already protracted treble-damages proceedings applies with no less force to the assertion of pass-on theories by plaintiffs than it does to the assertion by defendants." *Illinois Brick,* 431 U.S. at 729.  No one denies that the effect of *Illinois Brick* was to eliminate federal antitrust recovery for the vast majority of indirect purchasers of price-fixed goods and services.

Nonetheless, this does not convert *Illinois Brick* into a government doctrine of hostility toward consumers and end-buyers victimized by price-fixing.  Nor does it bar them from the

---

[25]  *See,* www.oxforddictionaries.com/us/definition/american_english/doctrine.

[26]  Or in the case of state law antitrust claims, asking from whom and in what state the product was purchased.

1  courthouse as a matter of standing.  Rather, as the Third Circuit sitting *en banc* in *Sullivan v. DB*

2  *Investments, Inc*., *supra*, 667 F.3d 273, 313 ("*Sullivan*"), held, the impediment to indirect

3  purchaser recovery in *Illinois Brick* is fundamentally a rule of proof and "does not reflect a

4  categorical policy judgment that indirect purchasers do not merit antitrust protection."  The

5  *Sullivan* Court noted that in *Illinois Brick,* the Supreme Court articulated its holding as

6  "declin[ing] to construe § 4 to permit offensive use of a pass-on theory against an alleged violator

7  that could not use the same theory as a defense in an action by direct purchasers."  *Illinois Brick,*

8  431 U.S. at 735.

9       Thus, *Illinois Brick* created a fact-specific impediment to establishing certain claims of

10  antitrust injury.[27]  Indeed, the *Illinois Brick* Court carefully drew the distinction between proof of

11  injury and standing: "Because we find *Hanover Shoe* dispositive here, *we do not address the*

12  *standing issue*, except to note, as did the Court of Appeals below, 536 F. 2d at 1166, that the

13  question of which persons have been injured by an illegal overcharge for purposes of § 4 is

14  analytically distinct from the question of which persons have sustained injuries too remote to give

15  them standing to sue for damages under § 4."  *Id*. at 728 n.7.

16       Despite the Supreme Court's clear statement that *Illinois Brick* is not a "standing" case, the

17  *Illinois Brick* prohibition on establishing injury with proof of pass-on damages is "often

18  confusingly" referred to as the failure of "a statutory standing requirement."  *Sullivan*, 667 F.3d at

19  307.  From this confusion comes the belief articulated by Lead Counsel that *Illinois Brick*

---

21  [27]  As if to underscore the fact-specific nature of the inquiry, the *Illinois Brick* Court provided two
examples of situations that fall outside of its scope: where the indirect purchaser had "a preexisting cost-

22  plus contract" and "where the direct purchaser is owned or controlled by its customer," and left open the
door for courts to permit recovery in "[a]nother situation in which market forces have been superseded" so

23  that traditional notions of "pass-on" are not required to demonstrate injury to the indirect purchaser.  *Id*. at
736 and n.16.

24       Since 1977, there have been numerous examples of cases adjudicating the application of *Illinois
Brick* to the claims of various individuals and putative classes.  See, e.g., *Palmyra Park Hosp. Inc. v.*

25  *Phoebe Putney Memorial Hosp*., 604 F.3d 1291, 1303-07 (11th Cir. 2010) (holding that the plaintiff, a
competitor of the defendant, had standing to assert a Section 2 claim even though the plaintiff never dealt

26  directly with the defendant); *In re Lower Lake Erie Iron Ore Antitrust Litig*., 998 F.2d 1144, 1167-68 &
n.21 (3d Cir. 1993) (holding that *Illinois Brick* does not "announc[e] a strict prohibition against recovery by

27  indirect purchasers" and proceeding with a fact-based inquiry into its applicability in that case).

28

"mean[s] that indirect purchasers *may not bring claims* for damages under [federal and non-repealer] states' laws."[28]

This is not true.  As the *Sullivan* Court noted, the many cases adjudicating *Illinois Brick's* application to individual fact patterns demonstrate that the potential inability to prove injury under *Illinois Brick* does not prevent an indirect purchaser from "establish[ing] a justiciable case or controversy" in a federal or non-repealer state court.  *Sullivan* at 307.  *Illinois Brick* "affects a plaintiff's ability to recover, but does not implicate the subject matter jurisdiction of the court," (citing *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008)), it is "simply another element of proof for an antitrust claim."  *Sullivan* at 307, quoting *Hammes v. AAMCO Transmissions*, *Inc.,* 33 F.3d 774, 778 (7th Cir. 1994) ("[D]espite the suggestive terminology, 'antitrust standing' is not a jurisdictional requirement").  Accordingly, a determination here that all Nationwide Class members who purchased outside of repealer states are simply releasing claims that they "may not bring" is far too simplistic, and cannot support a finding that a settlement that does not compensate them for those releases is fair, reasonable and adequate.

Not only do these class members have standing to assert that their claims fall into an exception to *Illinois Brick*, they also have standing to argue that *Illinois Brick* should be reconsidered in light of 38 years of developments in the law, economic theory and the analytical tools available to demonstrate pass-on damages.  No one denies, and indeed, Lead Counsel affirmatively asserts, that the Nationwide Class members in the non-repealer states, purchased CRT products at prices inflated by the Settling Defendants' illegal conspiracy.  Indeed, this is the *sin qua non* of class membership.   Therefore, having satisfied the factual basis for alleging antitrust injury, these class members are entitled to advance the argument that the current law, i.e., *Illinois Brick*, should be "extended, modified or reversed" to permit them to recover for the economic injury they suffered.  Fed. R. Civ. P. 11(b)(2).

---

[28] Lead Counsel's Memo at 34 (emphasis added).

1    While the doctrine of *stare decisis* carries great weight, it does not insulate Supreme Court

2    decisions from review or reversal.  If it did, then *Plessey v. Ferguson*'s holding that racially

3    segregated schools are Constitutional as long as they are "separate but equal" would still be the

4    law of the land.  Indeed, the Roberts Court recently agreed to "reconsider the presumption of

5    reliance for securities fraud claims the we adopted in Basic [Inc. v. Levinson, 485 U.S. 224

6    (1988)]."  *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014).  Each of the

7    class members in this case has a claim that could be the one that persuades the Supreme Court to

8    reconsider *Illinois Brick*.  These claims cannot be said to be "valueless claims" or "nuisance

9    claims" solely on the grounds that they belong to indirect purchasers.[29]

10    Neither the rationale nor the practical utility of *Illinois Brick* is undisputed.  A leading

11    antitrust treatise opposes *Illinois Brick*, because consumers "are injured, often more than the

12    intermediary, who may also be injured but for whom recovery of the entire overcharge is typically

13    a windfall.  Thus the indirect purchaser rule greatly overcompensates intermediaries and greatly

14    undercompensates consumers . . . ."  IIA Areeda & Hovenkamp, *Antitrust Law* ¶ 346k (4th ed.

15    2011).  Two years ago, the Supreme Court of Canada, after an in depth exploration of the benefits

16    and detriments of prohibiting proof of pass-on damages, determined not to enunciate an *Illinois*

17    *Brick* rule for the Canadian antitrust laws.  *Pro-Sys Consultants Ltd v. Microsoft Corporation*

18    [2013] 3 SCR 477, 2013 SCC 57 (CanLII).[30]  It rejected the basic rational of the United States

19    Supreme Court that prohibiting offensive pass-on proof was a "necessary corollary" to

20    maintaining the prohibition on defensive pass-on.  Further, it held that in the years since the

21    *Illinois Brick* Court considered the question, it has been shown that courts are very able to

22    developed sufficient protections to shield defendants from the risk of "duplicative recovery"

23    without crippling the ability of consumers to vindicate their rights to participate in markets that are

24    free from price-fixing and other anticompetitive conduct.

25    _____

26    [29]  Lead Counsel's Memo at 3.

27    [30]  This decision can be found at http://www.canlii.org/en/ca/scc/doc/2013/2013scc57/2013scc57.html

28

1    Nor is *Illinois Brick* a practical success.  Almost half of the state legislatures in this country

2    and several additional state courts have rejected *Illinois Brick*.[31]  Now, since enactment of the

3    Class Action Fairness Act of 2005,[32] federal courts have jurisdiction over the vast majority of

4    antitrust class actions brought pursuant to "repealer" state laws, and thus must entertain the exact

5    pass-on damage proof that *Illinois Brick* sought to banish.   Moreover, in the pre-*Illinois Brick* era,

6    the principal claims being litigated in federal courts were Sherman Act violations governed by a

7    single body of federal law, to which the state law antitrust claims were pendent.   Presently,

8    antitrust class actions routinely present a situation that requires federal courts to apply the entire

9    panorama of often-undeveloped repealer state antitrust law to multidistrict indirect purchaser suits.

10   "This proliferation of litigation of indirect purchaser cases involving a common nucleus of

11   operative fact with cases pending in federal court has created a logistical nightmare for the courts."

12   Edward D. Cavanagh, *Illinois Brick: A Look Back and a Look Ahead*, 17 LOY. CONSUMER L. REV.

13   1, 30 (2004); *see also* Barak D. Richman & Christopher R. Murray, *Rebuilding Illinois Brick: A*

14   *Functionalist Approach to the Indirect Purchaser Rule*, 81 S. CAL. L. REV. 69, 99 (2007)

15   (criticizing *Illinois Brick* for "creating a confusing mosaic of antitrust litigation.").

16       Lead Counsel acknowledges that, in *LCD*, another case in which there were separate

17   damage classes for purchasers in *Illinois Brick* repealer states, the monetary-relief claims of

18   residents in "non-repealer" states were preserved.[33]  Lead Counsel's Memo at p. 34.  However, he

19   suggests that this has no relevance here because the carve-out of these claims from the *LCD*

20   release was done to avoid conflict with pending State Attorney General actions, and that such a

21   concern is not present here.  *Id.*  This is inaccurate.  The *LCD* settlements included the

22   participation of eight Attorneys General (including the California Attorney General), who resolved

23   their civil penalty and *parens patriae* claims under the settlements.  *See generally, In re TFT-LCD*

---

[31]  See, discussion *infra*.

[32]  Pub. L. No. 109-2, 119 Stat. 4, 28 U.S.C. Sections 1332(d), 1453, and 1711–1715.

[33]  Their injunctive claims were released in return for a settlement injunction.

*(Flat Panel) Antitrust Litig.*, No. M-07-1827, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) (order granting final approval).  No consumer received payment from their Attorney General; all payments were made from the settlement fund.  Lead Counsel's assertion that the *LCD* carve out was done simply to appease various Attorneys General (as opposed to being done because it would have been inappropriate to release monetary claims for no consideration) is belied by the fact that at least three Attorneys General (Illinois, Washington, and South Carolina) appeared and objected to the *LCD* settlements, even with the carve-out.  *See TFT-LCD*, 2013 WL 1365900 at *5.  In other words, the *LCD* carve-outs were included not because they made things "easy" (they did not), but because preserving their monetary claims was the right thing to do for class members.  Thus, the truly "unique" situation lies here, where Lead Counsel has decided to simply give away a release on behalf of residents in non-repealer states, for no consideration.

### C.    Lead Counsel Has Not Made a Record Upon Which the Special Master Could Conclude That the State Law Damage Claims Being Released by the Nationwide Class Members Who Are Not Being Compensated Are Worthless

There is not sufficient time to conduct a review of the antitrust and consumer protection laws of each of the 29 states that Lead Counsel has concluded provide no possible recovery for their purchasers.  Moreover, this is not necessary since these class members' claims under federal law have sufficient settlement value to preclude a finding that the global release without compensation proposed by Lead Counsel is fair and reasonable.  Accordingly, this discussion will relate to some general observations about the efficacy of a settlement such as that negotiated by Lead Counsel that is grounded in a valuation of class members' respective state law claims based solely on whether they purchased in an *Illinois Brick* repealer or non-repealer state.

First, we note that all of the discussion above concerning the viability of federal indirect purchaser damage claims post-*Illinois Brick* applies with equal force to antitrust damages claims under state law.  Indeed, that was the context in which the *Sullivan* Court discussed the case.  In *Sullivan,* class counsel proposed certification of a single indirect purchaser nationwide settlement class (divided into reseller and consumer subclasses) and a plan of distribution that would pay the claims in each of the subclasses on a *pro rata* basis regardless of whether the class member

---

1   purchased in a repealer or non-repealer state.   The district court certified the class and adopted the

2   proposed plan of distribution over multiple objections that the plan of distribution was unfair and

3   the settlement class could not satisfy the predominance test of Rule 23(b)(3) because it contained

4   putative members whose residency in non-repealer states established that they could not bring

5   claims for antitrust violations.

6        The *Sullivan* objectors advanced, and the two dissenting judges accepted the same

7   simplistic analysis of the value of class members' claims employed here by Lead Counsel in

8   negotiating the proposed settlements.   The majority of the Third Circuit *en banc* panel, however,

9   rejected the *Illinois Brick* repealer vs. non-repealer state method of determining whether an

10  indirect purchaser antitrust claim was or was not viable:

11      The dissent describes this requirement in varied ways: under their view, class members
        who, "according to the plain terms of controlling law have no claim at all" (Dissenting Op.
12      at 16 n. 11), have "no legal claim" (Id. at 1), have "no cause of action," (Id. at 4), have a
        claim "clearly lacking a colorable basis" (Id. at 15), or have a claim "nonexistent as a
13      matter of substantive law" (Id. at 13), are barred from partaking in this class action
        settlement. The problem with this requirement, however, is that in order to separate class
14      members possessing an "existent" legal claim from those possessing a "nonexistent" one,
        district courts would have to perform a Rule 12(b)(6) inquiry into each class member's
15      claim.

16  *Sullivan*, *supra,* 667 F.3d at 308.  This inability to look at a class members' state and determine if

17  she possesses a viable claim was echoed by Judge Sirica's concurrence:

18      Objectors view the indirect purchaser class as composed of members who either
        have valid claims under the laws of states with *Illinois Brick* repealers or
19      members who have invalid claims under the laws of non-repealer states. But a
        claim cannot be declared invalid without proper analysis, which would require a
20      choice-of-law examination for each class member's claim. Such analyses may
        pose difficulties in cases where the residence of the class member is not the sole
21      consideration; modern choice-of-law standards often consider an array of factors
        particular to individual plaintiffs. Consequently, individual 12(b)(6) inquiries for
22      settlement class certification could present serious difficulties in administration
        and greatly increase costs and fees, and may deplete rather than increase the
23      recovery of even successful plaintiffs.

24  *Sullivan*, *supra,* 667 F.3d ar 337 (Sirica, J., concurring)

25        Lead Counsel contends that claims held by residents in non-repealer states are time-barred,

26  citing the statutes of limitations for consumer protection claims in Massachusetts, Missouri, and

27  New Hampshire.  Lead Counsel's Memo at p. 34, n.47.  To begin, as discussed above, the

28

1  operative complaint pleads that each and every member of the Nationwide Class was injured in

2  his/hers/its business and property by defendants' conspiracy to artificially raise, fix and stabilize

3  the prices of CRT Products, and requests all such relief that would flow from proof of these

4  allegations.  No motion for certification of the Nationwide Class has ever been filed.  Therefore,

5  unless there is a settlement, these putative class members are entitled to make a motion to proceed

6  as a class action to try these claims.

7          There is a reason why Lead Counsel cited to the claims of purchasers in Massachusetts,

8  Missouri and New Hampshire.  Although these are generally considered "repealer" states, Lead

9  Counsel chose not to include claims under their state statutes in the operative Fourth Consolidated

10  Amended Complaint.  (A previously-asserted claim under the Massachusetts statute was dismissed

11  simply for failure to provide a pre-suit demand letter, a defect easily cured but, inexplicably, never

12  pursued.  *See* Order Re Motions To Dismiss (Dkt. 665, Mar. 30, 2010) (dismissing Massachusetts

13  consumer protection claim, "with leave to amend")).  These choices, however unwise, are not

14  dispositive of these claims.  The purchasers in these states are included in the definition of the

15  Nationwide Class.

16          Even if the Court were to conclude that the Fourth Consolidated Amended Complaint's

17  general request for all relief flowing from proof of the factual allegations were not sufficient to

18  plead the relevant state law claims, class action litigants regularly amend complaints to add related

19  claims that then relate back to the original filing date, and courts always retain the power to

20  conform judgments to the evidence presented.  *See* Fed. R. Civ. P. 15(c)(1)(B) (relating

21  amendment back to date of original filing where new claim arises out of the same conduct,

22  transaction, or occurrence of the original pleading); Fed. R. Civ. P. 15(b) (permitting pleadings to

23  be conformed to evidence presented at trial).  *See also In re TFT-LCD (Flat Panel) Antitrust*

24  *Litig.*, No. M-07-1827 (N.D. Cal. Apr. 12, 2011) (granting leave for indirect purchasers to add

25  four new state law claims).  Clearly, these arguments are a sufficient threat to defendants to

26  establish that these state law damage claims have *settlement* value.  Lead Counsel's proposed

27

28

REPLY BRIEF IN SUPPORT OF OBJECTIONS TO   - 23 -     Master File No. 3:07-cv5944 JST
FINAL APPROVAL OF SETTLEMENTS                        MDL 1917

1    settlements, which are predicated on his evaluation that they are "worthless," are not fair or

2    reasonable or adequate to support the scope of the releases therein.

3    **III.    THE PROPOSED PLAN OF DISTRIBUTION FAILS TO ACCOUNT FOR THE TERMS AND CONDITIONS OF THE CHUNGHWA SETTLEMENT AND CANNOT BE APPROVED FOR THIS REASON AS WELL**

4

5         Early in this case, Lead Counsel negotiated a settlement with defendant Chunghwa Picture

6    Tubes, Ltd ("Chunghwa").  In his motion for preliminary approval of the Chunghwa settlement,

7    Lead Counsel "propose[d] that distribution of settlement funds be deferred until the termination of

8    the case" and that Lead Counsel would "address any allocation issues which arise at that time as

9    well."  Dkt. 884, at 18.  The preliminary approval Order reiterates that "[t]he distribution of the

10   Net Settlement Fund[34] shall be deferred until a later date" and that "Plaintiffs shall propose a

11   method of distribution at that time, which shall be subject to court approval."  Dkt. 993, at ¶11.

12   The Order granting final approval is silent on this issue.  *See, gen.,* "Order Granting Final

13   Approval of Settlement with Chunghwa Picture Tubes, Ltd." (Dkt. 1105) ("Chunghwa Final

14   Approval Order").

15        Presumably, the day for Lead Counsel to propose distribution of the Chunghwa settlement

16   has now arrived, and indeed, Class Counsel has proposed a plan of distribution that includes the

17   proceeds of the Chunghwa settlement.  However, there are key terms of the settlement agreement

18

19

20   _____

21   [34] The "Net Settlement Fund" is defined as "the $10,000,00 settlement amount, plus interest, minus 25% for attorneys' fees, reimbursement of expenses, $2.5 million for a costs set-aside,

22   including the costs of giving notice to class members and administration of the settlement fund, all of which shall be subject to court approval.  The Net Settlement Fund shall be no less than $5

23   million."  Dkt. 993, at 4 n.2.

24   It should be noted that unlike the current request for attorney fees not to exceed 33.3%, notice was sent to the class that under the Chunghwa settlement, Lead Counsel would request a maximum fee

25   award of 25%.  *See* Long Form Notice, Exhibit A, Declaration of Joseph M. Fisher Reporting on the Class Notice Program for Settlement with Defendant Chunghwa Picture Tubes, Ltd." (Dkt.

26   1063) ("Fisher Chunghwa Notice Declaration") at 8 ("**17.  How will the lawyers be paid?** …. At a future time, Interim Lead Class Counsel will ask the Court for attorneys' fees not to exceed

27   twenty five percent (25%) of the $10,000,000 Settlement Fund, plus reimbursement of their costs and expenses, in accordance with the provisions of the Settlement.")

28

with Chunghwa, terms that were noticed to Class members and incorporated into the Court's final approval order, that are irreconcilable with the currently proposed Plan of Distribution.[35]

To begin, the currently proposed settlements, like the settlement class certified for the LG settlement, defines membership in the Nationwide Class and in the Indirect Purchaser State Classes as indirect purchasers, who or which purchased CRT Products "*for their own use* and not for resale."[36]  Chunghwa, however, negotiated a release on behalf of a Nationwide Class of indirect purchasers that includes *resellers* as well as end-buyers. Dkt. 884-1 at Exhibit 1, ¶1.  The Class released by the Chunghwa settlement is defined as that in IPPs' Third Amended Complaint "except that 'the Class' shall include all indirect purchasers of CRT Products during the Class Period who could assert antitrust or similar claims against Chunghwa under the laws of the United States or any State."[37]  *Id.*  The published Notice of the Chunghwa settlement clearly explained that "[b]oth consumers *and resellers are included* in the Settlement."  Exhibit B, Fisher Chunghwa Notice Declaration (Dkt. 1063) (emphasis added); *see also* Chunghwa Final Approval Order (Dkt. 1105), ¶6 (determining the adequacy of the notice).[38]  Clearly, nothing is contemplated in the currently-proposed Plan of Distribution to compensate resellers.  However, releases of the

---

[35]  This may be why Lead Counsel repeatedly points out that the currently proposed Nationwide Class is the same as the class approved by the Court in the prior settlement with LG, but completely ignores the Nationwide Class certified to implement the settlement with Chunghwa.

[36]  Lead Counsel's Memo at 3.

[37]  As a result of further negotiations with the States of Illinois, Oregon and Washington, the Settlement Class was ultimately defined as: "All persons and or entities who or which indirectly purchased in the United States CRT Products manufactured and/or sold by the Defendants … except, for purposes of claims on behalf of Illinois persons (as defined by 740 ILCS 10/4) under 740 Ill. Comp. Stat. § 10/7(2) and Oregon natural persons under ORS §§ 646.780(5)(a).  Such Illinois and Oregon persons (as identified in the preceding sentence) shall instead be represented by the Attorney General of their state pursuant to the *parens patriae* authority granted to each Attorney General by those statutes.  Specifically excluded from this Class are claims on behalf of Washington residents …."  Chunghwa Final Approval Order, Dkt. 1105, at ¶3.

[38]  *See also* Long Form Notice at Exhibit A, Fisher Chunghwa Notice Declaration, p. 4 ("**7. How do I know if I am one of the Settlors?**  The Settlement Class ('Settlors') includes any person or business that indirectly bought in the U.S. (excluding claims under the Washington Unfair Business Practices and Consumer Protection Act) from March 1, 1995 through November 25, 2007, any CRT Product made by the Defendants.  *Both consumers and resellers are included in the Settlement Class.*  Also excluded are governmental entities.") (Italic emphasis added.)

---

1   resellers' claims against Chunghwa have been obtained.  Lead Counsel simply ignores this reality,

2   presumably hoping that everyone else will as well.

3       Second, under the proposed Plan of Distribution "[c]lass members are being compensated

4   according to a generally-accepted pro-rata approach taking into account the value of their claims."

5   See Lead Counsel's Memo at 1.  By this, Lead Counsel means that class members in the 22

6   damage state classes will all be treated the same when it comes to distributing the settlement

7   money.  However, in connection with the Chunghwa settlement, the Court finally *approved* an

8   incongruent, competing plan of distribution, which does not provide that funds will be distributed

9   pro rata to all claimants, but rather that "[e]ach *State* listed in the operative complaint for which

10  damage claims are being asserted, *plus the states of Illinois and Oregon*, shall receive a *pro rata*

11  share of the Net Settlement Fund."  Chunghwa Preliminary Approval Order (adopting Special

12  Master Legge's Report & Recommendation) (Dkt. 993), at ¶10 (emphasis added).  The Order

13  continues that "[e]ach state's pro rata share shall be determined by computing its population as a

14  percentage of the total population of all states," which allocations are listed on a chart printed on

15  the Order.  *Id.*  This competing plan of distribution purports to allocate the Net Settlement Fund on

16  a percentage basis to the enumerated States using figures derived from the 2000 U.S. Census,

17  concluding that "[e]ach of the states *shall receive* its allocable share at a future date to be approved

18  by the Court."  *Id.* (emphasis added.)  The Notice to class members explains:

19          **10.  When can I get a payment?**  No money will be distributed to
            Settlors yet.  The lawyers will pursue the lawsuit against the Non-
20          Settling Defendants to see if any future settlements or judgments can
            be obtained in the case and then be distributed together to reduce
21          expenses.  It is possible that money will be distributed to
            organizations who are, as nearly as practicable, representative of the
22          interests of indirect purchasers of CRT Products instead of the
            Settlors themselves if the cost to process claims would result in
23          small payments to Settlors.  *Regardless of whether the money is
            distributed to organizations or the Settlors themselves, the money
24          will first be allocated amongst the 24 states listed on page 1 of this
            notice, so that each state receives its pro rata share.  Each state's
25          pro rata share shall be determined by computing its population as a
            percentage of the total population of all 24 states using census
26          figures from the year 2000.*"  (Italic emphasis added.)

27  Long Form Notice, Exhibit A, Fisher Chunghwa Notice Declaration, at 4.

28

---

In contrast, the current Plan of Distribution makes no such geographical distinctions. Rather, it provides that "qualifying claimants will be eligible to claim their pro-rata share of the Settlement Fund based on the number of valid claims filed, and the number and type of CRT Products each claimant purchased during the class period." Lead Counsel's Memo at 22-23. Adding to the confusion is that despite the fact that the claims of Illinois, Oregon and Washington residents are specifically excluded from the current Nationwide Class (Lead Counsel's Memo at 2-3), the Court has ordered that the states of Illinois and Oregon are to be allocated 8.59% and 2.37% of the Chunghwa Net Settlement Fund.  See Dkt. 993, at ¶10.

The undersigned recognize that the Chunghwa settlement constitutes a relatively small percentage of the total settlement funds in this case.  However, that does not mean that Lead Counsel can simply pretend that the Chunghwa agreement and the orders and notices disseminated implementing it do not exist.  Barring renegotiation of the settlement with Chunghwa, re-notice to the members of the Chunghwa settlement classes, and vacating of the Court's orders and judgment in favor of Chunghwa, it is incumbent on Lead Counsel to derive a method of satisfying the noticed and finally-approved terms of the Chunghwa settlement agreement.  The current Plan of Distribution fails to do so and, therefore, cannot be given final approval.

## IV.   THE NOTICE TO THE CLASSES APPEARS TO HAVE BEEN FLAWED AND LEAD COUNSEL HAS NOT DEMONSTRATED OTHERWISE

The notice program designed by Lead Counsel's notice administrator, Joseph M. Fisher, appears to have significant deficiencies in reach and effectiveness.  Mr. Fisher's declaration, filed in connection with Lead Counsel's motion for preliminary approval, stated that the paid print-media portion of the notice plan would reach only 58% of the target group of potential class members.  *See* Decl. of Joseph M. Fisher Re: Notice Program (Dkt. 3863) at page 11 ("Fisher Decl.") ("It is estimated that the paid print media notices, excluding paid Internet advertising, will have a reach of approximately 58%").  This level of reach is inadequate to satisfy Rule 23 and due process.  "The lynchpin in an objective determination of the adequacy of a proposed notice effort

1   is whether all the notice efforts together will reach a high percentage of the class.  It is reasonable

2   to reach between 70-95%."[39]

3          To supplement the inadequate reach of the paid print-media component of notice, Mr.

4   Fisher proposed to use "paid Internet advertising," consisting of "ads, in the form of a web banner

5   or text, on content-targeted website and distribution networks."  Fisher Decl. at 11.  Mr. Fisher

6   stated that "[t]he combination of print media *plus* digital advertisements is expected to reach

7   approximately 80%" of the target audience.  *Id*. at 12 (emphasis in original).  The sole authority

8   for Mr. Fisher's conclusion that the paid Internet advertising component would augment the

9   overall reach to the target audience by 22% is footnote stating that, "[a]nalysis of digital media

10  was made utilizing comScore, a leading technology company that measures Internet activity."  *Id*.

11  at n.19.

12         In connection with final approval, Mr. Fisher submitted a declaration stating that, "[w]hen

13  digital and print media results are combined, the result is an estimated 83% of [the target

14  audience] have been reached . . .".  *See* Decl. of Joseph M. Fisher Reporting On Class Notice

15  (lodged Nov. 20, 2015) at page 14 ("Fisher Decl. II").  The sole support for Mr. Fisher's estimate

16  of the reach of the paid Internet advertising is, again, "comScore," and the sole documentation of

17  this advertising is a single table contained in Exhibit U to his declaration listing seven digital

18  networks and the number of impressions for each network.  *See* Ex. U to Fisher Decl. II, Section

19  (D), "Web Ads & Search."  This contrasts sharply with the documentation concerning the paid

20  print media portion, which includes affidavits or tearsheets from each publication documenting the

21  reach obtained.  *See id.*, Section (A), "Print Media."

22

23  _____

24  [39]  "Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide" ("Notice and
      Claims Process Checklist"), Federal Judicial Center (2010), at 3 (available at

25  http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf).  *See also Walter v. Hughes
      Communications, Inc.*, No. 09-2136-SC, 2011 WL 2650711 at *15 (N.D. Cal. July 6, 2011) (citing

26  "Notice and Claims Process Checklist" in rejecting a proposed notice plan as inadequate).

27

28

_____

REPLY BRIEF IN SUPPORT OF OBJECTIONS TO     - 28 -          Master File No. 3:07-cv5944 JST
FINAL APPROVAL OF SETTLEMENTS                               MDL 1917

The Federal Judicial Center cautions district courts to be wary of the often-flimsy data supporting the "impressions" of Internet-based notice programs, and observes that such notice programs usually lead to very low response rates:

> Audiences of Internet websites are measured by "impressions." Total, or "gross," impressions of the entire website do not reveal how many people will view the notice "ad" appearing periodically on a particular page. *Inflated audience data via Internet ads is common.* It is very expensive to reach a significant percentage of a mass audience with Internet banner ads. *Watch for suggestions that Internet ads and social network usage can replace all other methods. Reach, awareness, and claims will likely be very low when such a program is complete.*

Notice and Claims Process Checklist, at 4 (emphasis added).

Moreover, Mr. Fisher has made no attempt to identify or measure any potential overlap between the paid print media and paid Internet advertising portions. Instead, he appears to have taken his documented paid print-media reach of approximately 58%, and simply added "impressions" from the paid Internet advertising portion until he arrived at a total "reach" of more than 80%. This specific tactic has been identified as a "red flag" by the Federal Judicial Center: "Circulation figures for separate dissemination methods cannot simply be added to determine reach . . . *Be sure the reach calculation removes overlap between those people exposed to two or more dissemination methods* (e.g., a person who receives a mailing may also be exposed to the notice in a publication)." *Id.* at p. 3 (emphasis added).

Thus, Mr. Fisher has not provided the necessary information to support his calculation that the paid Internet advertising portion of the notice program augmented the reach of the paid print media portion. His declaration materials therefore show a reach of approximately 58% of the target audience through paid print media, and nothing more. On the basis of this evidence, the Special Master cannot conclude that adequate Constitutional notice was given.

Another problem with the notice is the weak correlation between the demographic groups targeted by the notice plan, and actual members of the classes to be noticed. Mr. Fisher stated that, with respect to the "consumer email" campaign, the notice plan targeted persons who were at least 18 years of age as of 2007. *See* Fisher Decl. II at 7. In other words, this demographic group is defined by those who were only six years old at the start of the class period in 1995. While Mr.

1  Fisher specifically responds that this criticism "improperly ignores the 12-year span of the Class

2  Period," he fails to explain how the length of the class period makes his demographic targeting

3  decisions any more appropriate.  Decl. of Joseph M. Fisher Re Objections To Notice (lodged Nov.

4  20, 2015) at page 11 ("Fisher Decl. III").  Those who purchased a CRT Product in 1995 at age 50,

5  for example, are now 70 years old, and were given notice by email, without any discussion or

6  consideration as to whether this demographic age group relies on the Internet for this kind of

7  information.

8        Similar problems exist with the paid print-media demographics.  Mr. Fisher states that the

9  paid print-media portion of the notice program reached "an estimated 57% of persons at least aged

10 30+ who own TVs or computers with a household income of at least $60,000."  Fisher Decl. II at

11 13.  This means the demographic group includes those who were ten years old at the start of the

12 class period and 22 years old at the end, but no explanation is given as to why this is an

13 appropriate demographic in this case, or why, if it is, the appropriate and effective method of

14 reaching this demographic is print media (as opposed to television).  *Cf*. Notice and Claims

15 Process Checklist, at p. 2 ("The notice plan should include an analysis of the makeup of the class. .

16 . . Each audience can be matched with the most efficient and effective methods of notice for

17 reaching those people").

18       Mr. Fisher's selective disclosure of the claims experience so far should also raise serious

19 concerns about the effectiveness of the notice program.  In his declaration directed at the

20 objections to the notice program, Mr. Fisher reveals, in a footnote, that claimants have submitted

21 claims for "more than 13.5 million 'CRT equivalent' units" as of November 16, 2015.  Fisher

22 Decl. III at n.6.  But, the number of "CRT equivalent units" submitted provides no information

23 about how many class members have filed claims.  Indeed, a few large corporate purchasers can

24 easily account for the vast majority of CRT equivalent units referenced by Mr. Fisher, making it

25 all the more imperative that Mr. Fisher provide a complete description of the claims experience so

26 far.

27

28

1          The significant deficiencies in the notice program here make it difficult for the Special

2    Master and the Court to approve the settlements.  "Where notice to a class has been inadequate, it

3    may be appropriate to reject the settlement in its entirety."  *Kaufman v. Am. Express Travel*

4    *Related Services, Inc.*, 283 F.R.D. 404, 408 (N.D. Ill. 2012).  In *Kaufman*, the district court

5    observed that a weak notice program, combined with a "very low" response rate, put the grant of

6    final approval in jeopardy.  Instead of taking the "drastic step" of denying final approval, however,

7    the *Kaufman* court, "as advised by the Federal Judicial Center's Class Action Checklist 2010,"

8    appointed an expert in class notification to report on the previously employed plan and

9    recommend additional steps to notify the class.  *Id*.  The expert initially selected by the *Kaufman*

10   court was Shannon R. Wheatman, Ph.D. of Kinsella Media.  However, due to her unavailability at

11   that time, the court then selected Todd Hilsee of Hilsee Group.  *Kaufman v. Am. Express Travel*

12   *Related Services, Inc.*, No. 07-C-1707 (N.D. Ill. Aug. 8, 2012) (minute order appointing Todd

13   Hilsee of Hilsee Group).

14         The undersigned note that both Dr. Wheatman and Mr. Hilsee are well-recognized experts

15   in class notice, and respectfully suggest that the Special Master and the Court would benefit from

16   engaging either one of them to report on the effectiveness of the notice given in this litigation, and

17   whether there is the need for additional steps to be taken in order that notice be given in an manner

18   compliant with Rule 23 and due process.[40]

19   ///

20   ///

21   ///

22   ///

23   ///

24

25

26   [40]  In making this suggestion, however, it should be noted that the undersigned are in no way suggesting
     that curing defects in the notice would permit a finding that the settlements and/or proposed plan of
     distribution is fair, reasonable and adequate to the proposed Nationwide Settlement Class as a whole, or to
     the previously certified Chunghwa and LG Nationwide Settlement Classes.

27

28

---

REPLY BRIEF IN SUPPORT OF OBJECTIONS TO      - 31 -          Master File No. 3:07-cv5944 JST
FINAL APPROVAL OF SETTLEMENTS                             MDL 1917

V.     **CONCLUSION**

For all of the above-stated reasons, the proposed settlements cannot be given final approval.

Dated:  December 9, 2015                    /s/ Tracy R. Kirkham

JOSEF D. COOPER (CASB No. 53015)
TRACY R. KIRKHAM (CASB No. 69912)
JOHN D. BOGDANOV (CASB No. 215830)
COOPER & KIRKHAM, P.C.
357 Tehama Street, Second Floor
San Francisco, CA  94103
Telephone:  (415) 788-3030
Facsimile:  (415) 882-7040
jdc@coopkirk.com
trk@coopkirk.com
jdb@coopkirk.com


FRANCIS O. SCARPULLA (CASB No. 41059)
PATRICK B. CLAYTON (CASB No. 240191)
LAW OFFICES OF FRANCIS O. SCARPULLA
456 Montgomery Street, 17th Floor
San Francisco, CA 94104
Telephone: 415-788-7210
Facsimile: 415-788-0706
fos@scarpullalaw.com
pbc@scarpullalaw.com

PROOF OF SERVICE

On December, 9, 2015, I caused the following:

**REPLY IN SUPPORT OF OBJECTIONS TO INDIRECT-PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENTS WITH PHILIPS, PANASONIC, HITACHI, TOSHIBA, SAMSUNG SDI, TECHNICOLOR, AND TECHNOLOGIES DISPLAYS AMERICAS DEFENDANTS**

to be electronically filed with the JAMS Electronic Filing System.  All counsel of record

associated with this matter before JAMS will be notified of this filing through the JAMS

Electronic Filing System.

/s/ John D. Bogdanov_____
John D. Bogdanov

# EXHIBIT 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

IN RE PARKING HEATERS                MEMORANDUM
ANTITRUST LITIGATION                 AND ORDER

This Document Relates To:            15-MC-0940 (JG) (JO)
ALL ACTIONS
--------------------------------------------------------X

James Orenstein, Magistrate Judge:

 The plaintiffs in these eleven consolidated actions, each acting on behalf of a putative class of

direct or indirect purchasers of parking heaters, have all asserted claims relating to the alleged existence

of a price fixing conspiracy in the sale of parking heaters for commercial vehicles in the aftermarket.

*See* Docket Entry ("DE") 1 (consolidation order).[1] Several parties now seek to appoint interim lead

class counsel for the putative classes of direct and indirect purchasers, respectively.[2] For the reasons

set forth below, I now appoint the firms of Hausfeld LLP ("Hausfeld") and Roberts Law Firm P.A.

("Roberts") as co-lead interim counsel for the putative class of direct purchasers and the Law Offices

of Francis O. Scarpulla and Cooper & Kirkham (collectively, "Scarpulla and Cooper") as co-lead

interim counsel for the putative class of indirect purchasers; I accordingly deny the remaining motions

seeking the appointment of others as interim lead class counsel.

---

[1] The direct purchaser actions include *Triple Cities Acquisition LLC v. Espar Inc.*, 15-CV-1343 (JG) (JO); *Nat'l Trucking Reclamation Fin. Svcs. v. Espar Inc.*, 15-CV-2310 (JG) (JO); *Trailer Craft Inc. v. Espar Inc.*, 15-CV-2411 (JG) (JO); *Guay Bros. Co. v. Espar Inc.*, 15-CV-3225 (JG) (JO); *Advance Diesel Svc. v. Espar Inc.*, 15-CV-4350 (JG) (JO); and *Myers Equip. Corp. v. Espar Inc.*, 15-CV-3872 (JG) (JO). The indirect purchaser actions include *Reg'l Int'l Corp. v. Espar Inc.*, 15-CV-1798 (JG) (JO); *Raccoon Valley Transp. Inc. v. Espar Inc.*, 15-CV-1338 (JG) (JO); *Johnson v. Espar Inc.*, 15-CV-3174 (JG) (JO); *Davidson Transfer, LLC v. Espar Inc.*, 15-CV-3005 (JG) (JO); and *N. Jersey Truck Ctr., Inc. v. Espar Inc.*, 15-CV-3290 (JG) (JO). Unless otherwise noted, all docket citations refer to the consolidated docket.

[2] *See* 15-CV-1343 (JG) (JO), DE 14 (Hausfeld's motion for appointment as interim lead class counsel for direct purchasers); 15-CV-2310 (JG) (JO), DE 10 (Roberts' motion of for same); 15-CV-2411 (JG) (JO), DE 9 (motion of Cera LLP ("Cera") for same); 15-CV-3225, DE 8 (motion of Kaplan Fox & Kilsheimer LLP ("Kaplan") for same); 15-CV-1338 (JG) (JO), DE 17 (motion of Hagens Berman Sobol Shapiro LLP ("Hagens Berman") for appointment as interim lead class counsel for indirect purchasers); 15-CV-1798 (JG) (JO), DE 17 (Scarpulla and Cooper's motion for same).

I.     Background

On March 16, 2015, Triple Cities Acquisition LLC ("Triple Cities") (a direct purchaser of

parking heaters, represented by Hausfeld) and Raccoon Valley Transport, Inc. ("Raccoon Valley") (an

indirect purchaser, represented by Hagens Berman) separately filed the first two of eleven class action

lawsuits brought to date accusing an array of defendants of participating in a conspiracy to suppress

and eliminate competition in the sale of parking heaters for commercial vehicles in the aftermarket.

The defendants in the various actions include Espar Inc. ("Espar"), two of its executives, and its

related companies; Webasto Products North America, Inc. ("Webasto"), along with its related

companies; Proheat Mechanical Systems Inc. and its related companies; Marine Canada Acquisition

Inc.; and other as-yet unidentified co-conspirators.

Several motions for appointment as interim lead class counsel were filed between April 15 and

May 18, 2015. At a conference on May 22, 2015, I encouraged the parties to confer further about the

motions in an attempt to resolve the matter consensually. 15-CV-1343 (JG) (JO), DE 27 (minute

entry).

On June 5, 2015, the direct purchaser plaintiffs reported that they had agreed on an executive

committee consisting of four firms, one of which would later be appointed as its chair: Hausfeld,

Roberts, Cera and Kaplan. DE 9. That proposal collapsed over disagreements about which firm

should lead the committee. The four firms then made separate proposals: Kaplan moved to be

appointed sole or co-lead counsel, Hausfeld and Roberts proposed to be co-leaders together, and Cera

renewed its application for a four-firm committee, with the chair to be selected by the court. DE 25;

DE 28; DE 30. In addition to the support of their own clients, Hausfeld and Roberts also have the

support of plaintiff Myers Equipment Corp., represented by the firm of Steyer Lowenthal Boodrookas

Alvarez & Smith LLP. DE 35.

The indirect purchaser plaintiffs similarly could not reach any agreement. *See* DE 6.

Accordingly, Scarpulla and Cooper reinstated their request to serve as co-lead counsel, now supported

by all of the other indirect purchaser plaintiffs in the consolidated cases except Raccoon Valley, and

added a request that Steven Williams of Cochett, Pitre & McCarthy be appointed as liaison counsel for

the group to coordinate administrative matters with the court. *See* DE 26; *see also* Federal Judicial

Center, *Manual For Complex Litigation* (the "*Manual*") § 10.221 (4th ed. 2004). Hagens Berman likewise

renewed its motion to serve as lead counsel for the indirect purchasers.

II.    Discussion

A court "may designate interim counsel to act on behalf of a putative class before determining

whether to certify the action as a class action." Fed. R. Civ. P. 23(g)(3). The role of such counsel is to

"fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(4). Appointing lead

counsel helps to promote efficiency and avoid unruly proceedings. *See Farber v. Riker-Maxson Corp.*, 442

F.2d 457, 459 (2d. Cir. 1971); *MacAlister v. Guterma*, 263 F.2d 65, 68-69 (2d Cir. 1958). An interim

appointment at this stage, while not required, can help "clarif[y] responsibility for protecting the

interests of the class during precertification activities, such as making and responding to motions,

conducting any necessary discovery, moving for class certification, and negotiating settlement."

*Manual* § 21.11.

A court considering the appointment of interim lead class counsel should consider the same

factors that a court appointing lead counsel for a certified class must consider, including the

candidates' qualifications and competence, their ability to fairly represent diverse interests, and their

attorneys' ability "to command the respect of their colleagues and work cooperatively with opposing

counsel and the court." *Manual* § 10.224; *see* Fed. R. Civ. P. Rule 23(g)(1)(C). Also appropriate for

consideration is anything else that is "pertinent to counsel's ability to fairly and adequately represent

the interests of the class," Fed. R. Civ. P. 23(g)(1)(B), including "(1) the quality of the pleadings; (2) the

vigorousness of the prosecution of the lawsuits; and (3) the capabilities of counsel." *In re Converse Tech.,*

*Inc. Derivative Litig.*, 2006 WL 3761986, at \*2-3 (E.D.N.Y. Sept. 22, 2006). Ultimately, the court's task in

deciding these motions is "to protect the interests of the plaintiffs, not their lawyers." *In re Payment Card*

*Interchange Fee & Merch. Disc. Antitrust Litig.* ("*Interchange*"), 2006 WL 2038650, at \*4 (E.D.N.Y. Feb. 24,

2006).

At the outset, I note that the factors relating to the qualifications and competence of counsel

and the quality of their work are in equipoise: all of the movants appear eminently qualified and I am

confident that each candidate would serve the putative classes quite ably in the litigation of these

consolidated actions. Thus, while the matter is unquestionably an important one for all concerned, I

have no doubt that in a very important sense any resolution of the instant motions could easily be seen

as serving each putative class's best interests. But in the absence of agreement, I must necessarily try to

discern, at this early stage of the litigation, which of several very good choices will be the best for the

putative classes. In attempting to make that decision, I offer no view of the merits of the parties'

substantive legal and factual disputes, which are irrelevant to the analysis of the instant motions.

A.     Direct Purchasers

I conclude that Hausfeld and Roberts are in the best position to represent the interests of the

direct purchaser class. Both firms have already demonstrated their ability to work cooperatively with

each other, with the court, and most importantly, with the other attorneys representing plaintiffs with

significant interests in this litigation. They have ample resources to conduct the litigation and a wealth

of experience in this district. Hausfeld has also already demonstrated its leadership by filing the first

direct purchaser complaint. Both firms have conducted thorough and extensive pre-filing

investigations and have shown their legal work to be detailed and high quality, and their joint application has the support of another plaintiff.[3]

The choice between the two competing candidates for lead counsel is a close one. To be sure, Kaplan has likewise performed a thorough investigation. It learned that the Justice Department had granted conditional leniency to Webasto and was the first plaintiff to name two former Espar officers as individual defendants. I conclude that the more widespread support for Hausfeld and Roberts makes their leadership preferable for sophisticated plaintiffs who presumably are in the best position to assess their best interests.

I also conclude that appointing Hausfeld and Roberts is preferable to the four-firm committee that Cera proposes. The parties themselves were unable to reach a consensus about how to make such a leadership structure work, and I doubt that judicial fiat will succeed in creating a workable committee where the parties themselves did not. Moreover, particularly in light of the extent to which prior proceedings may have clarified some of the issues in dispute in these consolidated cases, there seems no need for the inevitable redundancies and inefficiencies attendant to a four-firm leadership structure.[4] While I am confident that Hausfeld and Roberts will welcome the input and participation of all of the plaintiffs' attorneys in deciding how best to advance the interests of the putative class, I conclude there is no need for all of them to be included in the putative class's interim leadership.

---

[3] In the parties' written submissions, Hausfeld noted that its client, Triple Cities, was the only plaintiff to whom the United States Department of Justice had thus far provided notice that it was a victim of the alleged anticompetitive conduct. *See* DE 28 at 3. While that would provide it with an advantage that other named plaintiffs lack in terms of positioning itself as an adequate class representative, I have assumed that advantage would be a transient one. At oral argument on August 7, 2015 (the proceedings of which have yet to be transcribed), Cera reported that its client Trailer Craft had received a similar notification.

[4] For example, at least one of the defendants has admitted the existence of the alleged conspiracy. *See*, *e.g.*, 15-CV-1343 (JG) (JO) DE 1 ¶ 5 (Triple Cities' Complaint) (citing *United States of America v. Espar Inc.*, 15-CR-0028 (JG), DE 16 ¶ 2 (E.D.N.Y. Mar. 12, 2015) (Espar's Plea Agreement, admitting to participation in criminal antitrust conspiracy)).

B.    Indirect Purchasers

I conclude for similar reasons that Scarpulla and Cooper are in the best position to represent the interests of the indirect purchase plaintiff class. Scarpulla and Cooper have the support of all of the other named indirect purchaser plaintiffs other than Hagens Berman's clients. They have already demonstrated their ability to work cooperatively with the court and with the other non-lead counsel, they have the support of a larger and more diverse group of clients, and those clients collectively advance a broader array of the legal theories at issue in this litigation.

Hagens Berman offers several arguments in opposition to the Scarpulla and Cooper proposal. First, it contends that only one lead counsel is necessary and that a joint leadership structure would be "overkill, inefficient and promote attorney lodestar over maximizing class member recovery." DE 31 at 3. They are of course correct that, as noted above, there are features of this case that render it less complex than it might otherwise be. But the difference between one law firm and two as leaders seems ultimately a minor one – in either case, multiple attorneys (either in one firm or in more) would necessarily perform litigation tasks and make tactical and strategic decisions for the class. A variety of voices is beneficial for the class, so long as it produces neither paralysis nor inefficiency. The fact that all of the other plaintiffs favor the appointment of Scarpulla and Cooper over Hagens Berman persuades me that those who are best informed and have the greatest incentive to keep attorney fees in check have decided that the risk of inefficiency attendant to the proposed two-firm leadership is an acceptable one.

Second, Hagens Berman notes that it was the first firm to file any case against Espar, the first firm to move for interim lead counsel, the first firm to propose case management procedures and the first firm to propose document production and confidentiality orders. DE 31 at 5. Those are all factors in the firm's favor, but only to a point. They certainly show that Hagens Berman can be a valuable

member of any team of lawyers representing the putative class. But the fact that the firm would consider withholding its expertise from the class leadership if it is not appointed by itself to that role – a threat Hagens Berman made explicit at oral argument – raises some doubts about how well the firm would represent the interests of class members other than its own clients if given such exclusive authority. While the efficiency of a sole leader may have its advantages, they appear in this case to be outweighed by the risk of internal strife within the putative class if Hagens Berman is appointed interim lead counsel, and alleviated by the explicit commitment made by Scarpulla and Cooper at oral argument to solicit the views of other putative class members.

Finally, Hagens Berman asserts that no firm should be appointed as interim lead counsel for a putative class of all indirect purchasers, on the ground that the mix of resellers and end users within that group will necessarily create a disabling conflict of interest. *See* 15-CV-1798, DE 22 at 4; DE 31 at 2. I disagree. As Scarpulla and Cooper argue in opposition, it may well be preferable, and entirely proper, for a putative class of indirect purchasers to try to maximize its collective recovery and then divvy up the spoils among themselves pursuant to judicially supervised procedures. DE 29 at 2-3. Indeed, in articulating the factors to consider in appointing interim lead class counsel, the *Manual* notes the inevitability that some class members will have interests that may ultimately diverge in some ways from those of other members, and cites as a positive attribute a lawyer's ability to fairly represent such diverse interests. *See Manual* § 10.224.

In any event, whichever side is correct about the significance of the existence of different types of indirect purchasers in that putative class, I am satisfied that the record does not yet establish that any actual conflict exists, or that any potential conflict cannot be waived. I therefore conclude that the instant motions can and should be decided without first fully determining the nature and extent of any such conflict. That issue can be addressed, if it ripens, in the context of a motion to disqualify interim

lead class counsel, or in the context of a motion to certify a class defined to include both end users and resellers of parking heaters.

III.    Conclusion

For the reasons set forth above, I appoint the Hausfeld and Roberts firms as co-lead interim counsel for the putative class of direct purchasers, the Scarpulla and Cooper firms as co-lead interim counsel for the putative class of indirect purchasers, and Steven Williams as liaison counsel for the indirect purchasers; I accordingly deny the remaining motions seeking the appointment of others as interim lead class counsel.

SO ORDERED.

Dated:  Brooklyn, New York
        August 11, 2015

                              _____/s/_____
                              JAMES ORENSTEIN
                              U.S. Magistrate Judge

# EXHIBIT 4

1   Vaughn R Walker
    Law Office of Vaughn R Walker
2   P O Box 26250
    San Francisco, CA  94126
3   Tel: (415) 871-2888
    Fax: (415) 871-2890
4   vrw@judgewalker.com
5
6
7
8
                IN THE UNITED STATES DISTRICT COURT
9
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
11  IN RE CATHODE RAY TUBE (CRT) ANTITRUST        MDL No 1917
12  LITIGATION                                    Master Case No 3:07-cv-05944SC
13
    This Relates to:                              **SPECIAL MASTER'S REPORT AND
14                                                RECOMMENDATION RE SETTLEMENT**
15  Order Filed 11/17/2014
16
17
18
19
20
21
22
23
24
25
26
27
28

In accordance with the mandate of the *Manual for Complex Litigation 4th*, ¶10.13 at 12 (Federal Judicial Center 2004) "periodically [to] monitor[] the progress of the litigation" and the court's case management authority to "facilitat[e] settlement" pursuant to FRCP 16(a)(5), the court has directed the undersigned to report on the status of settlement efforts in the above litigation and to make such recommendations that may assist the parties in reaching settlements where appropriate. Order filed 11/17/14, Doc 3118. This responds to that directive.

Presently, the court and parties face imminent dates for hearing and reaching decisions on a large number of summary judgment motions accompanied by voluminous submissions as well as pretrial and trial dates shortly after the first of the year. Many additional pretrial motions, such as motions *in limine*, trial scheduling and bifurcation of issues and parties can be expected and, if filed, will have to be argued and decided. In addition, numerous discovery issues remain to be resolved and discovery continues even though the discovery cut-off has passed. The task ahead for both the parties and the court is daunting. Although settlements are unlikely to resolve all claims and issues in this massive litigation, settlements of some claims should streamline the litigation that remains.

Some significant settlements have already been achieved. The direct purchaser plaintiff ("DPP") class have resolved substantially all their claims. Final approval for all but two defendants and the claims process has been granted by the court. Unfortunately, some of the DPP settlements have been complicated by uncertainty about membership in the class, an issue now before the court and one that could lead to appellate review. Nonetheless, the DPP settlements have materially reduced the scope of this litigation. For purposes of this report, the significance of the DPP settlements is that despite the complex fact issues in the DPP litigation and the legal uncertainties the parties in all the CRT cases face, about which more will be said presently, experienced and highly competent counsel on both sides of the DPP cases have been able to work through these difficult issues to a resolution.

In addition, some of the direct action plaintiff ("DAP") cases have settled and counsel in a number of DAP cases are fruitfully engaged in settlement discussions. Achieving settlements of the indirect purchaser plaintiff ("IPP") class cases has proven more difficult. Two

problems, in particular, have been obstacles to settlement in the IPP cases. Both issues are matters that have already come to the court's attention, although perhaps in different contexts and, therefore, the implications of these developments for settlement may not have been apparent to the court.

First, as previously related directly to the court, there has been a lack of "meaningful coordination" of fact and expert discovery by the IPPs' lead counsel and the California Attorney General's Office ("Cal AG"). *See e g, In re CRT Antitrust Litigation*, No 3:07-cv-5944-SC, MDL No 1917, Varanini Declaration, Doc 2859 at 2-3, filed September 18, 2014 (ND Cal). The Cal AG is pursuing *parens patriae* claims on behalf of California "natural persons" in San Francisco superior court against essentially the same defendants as are named in this court by the IPPs. *See* Cal Bus & Prof Code, §16760. In most instances, where there has been parallel *parens patriae* litigation brought by the Cal AG and indirect purchaser class litigation, the Cal AG has been able to coordinate her litigation in state court with litigation on behalf of the IPPs in federal court thereby avoiding duplication of effort and unnecessary expense.[1]

In this litigation, however, the Cal AG and IPPs' lead counsel have been unable to reach an accommodation to avoid these difficulties. Hence the extent of releases afforded by settlement of the Cal AG's claims is a matter in dispute. The Cal AG and IPPs' lead counsel are presently litigating these issues in state court with attendant distraction of their respective efforts.[2] These issues have already been presented to this court. But the point for purposes of this report is that the inability of IPP lead counsel and counsel for the Cal AG to resolve their respective responsibilities has opened up a new front of conflict that in most cases involving indirect purchaser and *parens patriae* claims has been avoided.

Coordination of the *parens patriae* action would assist not only this court, but would assist the state court, as well. See, e g, the state court's case management order, dated

---

[1] *See e g, In re TFT-LCD (Flat Panel) Antitrust Litigation*, No 3:07-md-1827SI, Indirect Purchaser Plaintiffs' and Settling States' Joint Motion to Appoint Fund Administrator and Distribute Settlement Fund, Doc 9217, filed 9/12/14 (ND Cal 2014), Attachment A.

[2] *See e g, The State of California et al v Chungwha Picture Tubes Ltd*, No CGC-11-515786, Sur-Reply of Objector Figone in Opposition to Motion for Final Approval of Philips Settlement, filed 11/27/13 (Superior Court for the State of California), Attachment B.

November 12, 2014, Attachment C.  Uncertainty about the relationship of the *parens patriae*
claims and the IPP claims has been exacerbated by the Ninth Circuit's recent decision in
*California v Intelligender, LLC*, __ F3d __, 2014 WL 5786718 (9 Cir 2014), thus compounding the
difficulties created by the lack of coordination between IPP lead counsel and the Cal AG.

 Second, preparing for trial of the IPP claims is particularly complex, involving as it
does the sometimes inconsistent laws of many states and the problems of tracing alleged
damages through the distribution chain to the indirect purchasers.  It is understandable that
attention of IPP lead counsel to settlement may have taken a back seat to trial preparation.  By
the same token, fast approaching pretrial and trial dates, as those in this litigation, are usually
conducive to settlements or, at least, serious settlement discussions.  With one notable
exception, however, IPP lead counsel has made little progress in the face of these looming
deadlines.  Furthermore, the IPP settlement discussions that the undersigned has been privy to
do not appear to have been pursued with the degree of earnestness required to produce
results.  This most likely is the product not of a lack of good intentions, but rather of the IPP
settlement team being understaffed in the face of the demands of getting ready for trial.

 Hence, the undersigned recommends that the IPP team be augmented to
explore settlement and to resolve the outstanding issues with the Cal AG.  Although IPP lead
counsel should welcome the needed assistance, he may well oppose this recommendation as it
would represent a dilution of his hitherto undiluted authority over the IPP cases.  Should that
occur, the court should most certainly fully hear IPP lead counsel and consider his views
thoughtfully.  A prior draft of this recommendation was furnished IPP lead counsel on
November 19, 2014.  All other parties should also be invited to weigh in on this
recommendation.

 Notwithstanding possible opposition by IPP lead counsel and possibly others, the
undersigned believes that the appointment of a committee of IPP counsel to deal with
settlement is warranted.  Such a committee is particularly called for where, as here, "group
members' interests and positions are sufficiently dissimilar to justify giving them representation
in decision making." *Manual for Complex Litigation, 4th*, ¶10.221 at 25.  Perhaps as many as
fifty counsel have brought IPP claims.  Achieving consensus among that number of lawyers with

widely disparate client interests requires coordination beyond the time and capability of any one lawyer, despite that lawyer's capability and dedication. This recommendation does not entail replacing lead IPP counsel, but rather calls for augmenting the IPP team so that adequate attention and effort can be devoted to settlement.

Accordingly, in order for the settlement process to move forward, the undersigned RECOMMENDS that the court appoint additional lawyers from the ranks of those who represent IPPs to assume the laboring oar in seeking to coordinate IPP claims with the *parens patriae* claims of the Cal AG and in settlement negotiations. Because of the obvious need to coordinate settlement efforts with trial preparation and because of the substantial experience and efforts of IPP lead counsel, the undersigned RECOMMENDS that two experienced and able counsel representing indirect purchaser plaintiffs be assigned to work with IPP lead counsel. Two such counsel have presented themselves and expressed willingness to assume these responsibilities: Francis O Scarpulla and Josef D Cooper. Both are well known to the undersigned through many years of experience in the antitrust bar and have already done substantial work in this litigation. Messrs Scarpulla and Cooper participated constructively and effectively in negotiating settlements on behalf of indirect purchasers in the TFT-LCD litigation before Judge Illston, which the undersigned mediated and in the DRAM Litigation before Judge Hamilton. It is recommended that Messrs Scarpulla and Cooper work with IPP lead counsel as a three-person committee to deal with settlement and coordination with the Cal AG.

The undersigned has considered alternatives to this recommendation. One such alternative would be for the court to order the parties to mediation. While that sometimes proves effective in other cases, its effectiveness in this litigation is questionable. The number of lawyers who play important roles and their various client interests would make omnibus mandated mediation sessions unwieldy and not likely to prove fruitful. Furthermore, of course, a mandated mediation will not likely resolve the lack of coordination between IPP lead counsel and the Cal AG. Another alternative would be for the court simply to push ahead with trial preparation and let settlements take their own course. In addition to complicating the court's case management tasks, such an approach would disserve the parties. The claims at bar are

substantial, the facts out of which they arose are complex and the applicable laws are manifold and, in some significant respects, unsettled. Compare, *Motorola Mobility LLC v AU Optronics Corp*, ___ F3d ___ 2014 WL 6678622 (7 Cir 2014) with *In re TFT-LCD (Flat Panel) Antitrust Litigation*, 2012-2 Trade Cases ¶78,031, 2012 WL 3276932 (N D Cal 2012). These are circumstances that often make settlement sensible for parties on both sides of a case. Hence, I believe there are realistic prospects for significant settlements in this litigation. It would be unfortunate for those prospects not to be energetically pursued by lawyers who have demonstrated the capability to achieve significant settlements in similar litigation and to work cooperatively with the Cal AG.

IT IS THEREFORE RECOMMENDED that Francis O Scarpulla and Josef D Cooper be designated as co-lead counsel for the IPPs to work with IPPs' lead counsel as a committee for the purpose of assisting in the coordination of this litigation with related state court litigation and in negotiation of settlement of such actions as appropriate and to assist IPPs' lead counsel in his trial preparation efforts. The court should invite IPP lead counsel and any party that wishes to do so to comment on or oppose this recommendation within a time period convenient to the court's schedule and, of course, to consider any such views that are presented.

IT IS SO RECOMMENDED.

DATED: December 12, 2014

_____
Vaughn R Walker
Special Master, United States District Judge (Ret)

SPECIAL MASTER'S REPORT AND RECOMMENDATION RE SETTLEMENT

Page **6** of 6

# EXHIBIT 5

# Cooper & Kirkham, P.C.

*357 Tehama Street*
*Second Floor*
*San Francisco, California 94111*
*Telephone:  (415) 788-3030*
*Facsimile:  (415)882-7040*

FIRM PROFILE

        Cooper & Kirkham, P.C. is a small AV-rated litigation firm, nationally regarded as an expert in antitrust and class action litigation.  The firm has extensive experience representing both plaintiffs and defendants in complex commercial cases, with an emphasis on antitrust, unfair competition, securities fraud and class action litigation.  Cooper & Kirkham has participated in the litigation of many of the nation's major cases in these areas of the law, which have resulted in precedent-setting decisions and landmark recoveries for plaintiffs and class members.

        Senior partner **Josef D. Cooper** began his career in complex litigation immediately upon his graduation from The University of Chicago Law School in June 1964, when he became a staff attorney for the Coordinating Committee for Multiple Litigation of the United States Courts.  During that time, he participated in drafting the first edition of the *Manual for Complex Litigation* and the legislation to permit the transfer of related actions among federal districts for pretrial purposes, which was enacted as 28 U.S.C. §1407.  In 1966, the Committee assigned him to serve as a Special Assistant to the Honorable Martin Pence, United States District Court Judge, District of Hawaii, who was presiding over the *West Coast Pipe Litigation*, the first consolidated pre-trial proceedings conducted by a single judge for a group of related actions pending in numerous federal district courts.

        Upon leaving Judge Pence in March 1969, Mr. Cooper entered private practice.  Since then, he has specialized in complex business and class action litigation, particularly in the antitrust, securities fraud and energy regulation areas of practice.  Upon entering private practice, he was first associated with the Chicago law firm of Freidman & Koven.  In August 1972, he relocated to San Francisco, California and at all times thereafter he has either been the sole principal or the senior partner of the firm which is now known as Cooper & Kirkham, A Professional Corporation.

        Mr. Cooper has been listed in the California Business Litigation section of *The Best Lawyers in America* for twenty-five years, and has been recognized as "one of a distinguished

groups of attorneys" who has been listed in *Best Lawyers* for more than twenty years. Mr. Cooper is also listed as a Northern California Super Lawyer. Mr. Cooper is the past chairman of the Private Litigation Committee of the Antitrust Section of the American Bar Association ("A.B.A."), and a past member of the A.B.A. Antitrust Section Monograph Committee. He has testified before the Judiciary Committee of the United States Senate on proposed legislation to reverse the Supreme Court's decision in *Illinois Brick Company v. State of Illinois*, 431 U.S. 720 (1977), and on proposed legislation to establish a right to contribution among antitrust defendants. He has lectured before the A.B.A.'s Antitrust and Litigation Sections, The Practicing Law Institute, the *New York Law Journal*, the Association of Trial Lawyers of America and the California Trial Lawyers' Association. He has participated in American Bar Association National Institutes on "Preventative Antitrust" and the "Use of Computers in Litigation." He is the author of: "Structuring the Antitrust Case," 15 *Trial* 30 (April, 1979); co-author with Kirk A. McKinney of "Fifth Amendment Rights in Private Treble Damage Litigation," 48 *Antitrust L.J.* 1381 (1980); co-author with Tracy R. Kirkham of "Class Action Conflicts," 7 *Litigation*, No. 2, Winter, 1981; and author of "Settlement Considerations and Attorneys' Fees in Class Actions," 50 *Antitrust L.J.* (1981). He also authored and recorded "How To Recognize An Antitrust Case" for the ATLA Cassette-of-the-Month series in 1981.

Partner **Tracy R. Kirkham** graduated *cum laude* from the Washington College of Law of the American University in 1975, where she received American Jurisprudence awards in Evidence and Civil Procedure, and was admitted to practice in the States of Pennsylvania and New Jersey that year. She has also been admitted to practice in the State of California (1976) and before numerous federal courts including the Northern District of California (1976), Ninth Circuit Court of Appeals (1980), the Third Circuit Court of Appeals (2009) and the Central District of California (1981). After graduating from law school, Ms. Kirkham worked briefly as a staff attorney at the United States Department of Energy. Since entering private practice, she has specialized in complex business and class action litigation, particularly in antitrust, securities and energy regulation. Ms. Kirkham joined Cooper & Scarpulla, a predecessor to Cooper & Kirkham, as an associate in 1975, and practiced as an associate and later as a partner with Mr. Cooper until 1986. She then joined the Los Angeles firm of Hennigan & Mercer. In January 1992, Ms. Kirkham returned to San Francisco to form Cooper & Kirkham, P.C.

Ms. Kirkham participated in the writing of "Alternatives to Conventional Adjudication," Volumes I, II and III, by the Institute of Studies in Justice and Social Behavior, The American University, which was published as a report of The National Institute for Law Enforcement, United States Department of Justice. She assisted Mr. Cooper in writing "Structuring

the Antitrust Case," 15 *Trial* 30, April, 1979, is the co-author with him of "Class Action Conflicts," 7 *Litigation*, No. 2, Winter, 1981, and authored "Taming Documents in Complex Litigation," 5 *The Practical Litigator*, No. 4, July 1994.  Ms. Kirkham is recognized as a leader in the area of electronic discovery and electronic document management in large commercial cases.  She has lectured on the subject of computerized document management in litigation before the Association of Trial Lawyers of America and the American Bar Association, Young Lawyer's Division.

Partner **John D. Bogdanov** was admitted to the bar of the State of California in 2001 and is admitted to practice before the Ninth Circuit Court of Appeals and the U.S. District Courts for the Northern and Southern Districts of California.  He holds a degree in journalism from the University of Missouri (*magna cum laude*, 1991) and a law degree from the University of California, Hastings College of Law (2001) where he received American Jurisprudence/Witkin Awards for Legal Writing & Research and Negotiation & Settlement.  Mr. Bogdanov's entire legal practice has been in the area of antitrust and consumer class actions.

## LITIGATION PROFILE

Cooper & Kirkham, P.C. is nationally regarded as an expert in antitrust and class action litigation, and has held leadership positions in dozens of class actions that have resulted in billions of dollars in recovery for class members.  For example, beginning in the 1970's, Cooper & Kirkham served as:  (1) Plaintiffs' Liaison Counsel in *In re Sugar Industry Antitrust Litig.*, M.D.L. No. 201 (N.D. Cal.), price-fixing actions brought on behalf of private classes of sugar purchasers in the Western United States; (2) Chairman of the Plaintiffs' Briefing Committee in *In re Folding Carton Antitrust Litig.*, M.D.L. No. 250 (N.D. Ill.), litigation brought on behalf of a national class of folding cardboard box purchasers; and (c) Plaintiffs' Co-Lead Counsel in *In re Cement and Concrete Antitrust Litig.*, M.D.L. No. 296 (D. Ariz.), price-fixing litigation brought on behalf of a national class of cement purchasers and an Arizona class of ready-mix purchasers.  Each of these cases resulted in multi-million dollar recoveries for the classes.

More recently, Cooper & Kirkham was: (1) Plaintiffs' Liaison Counsel in *In re California X-ray Film Antitrust Litig.*, (San Francisco Super. Ct.), price-fixing action brought on behalf of purchasers of x-ray film products; (2) a member of Plaintiffs' Executive Committee in *Vitamin Cases*, J.C.C.P. No. 4076 (San Francisco Super. Ct.), a price-fixing action brought on behalf of a classes of California purchasers of vitamin products; actions settled for $96 million; and (3) a member of the Executive Committee in *Microsoft I-V Cases*, J.C.C.P. No. 4106 (San Francisco Super. Ct.), where a California class of indirect purchasers of Microsoft operating system and applications software settled for over $1.1 billion.

Cooper & Kirkham is currently serving as Co-Lead Counsel for indirect purchaser plaintiffs in *In Re Parking Heaters Antitrust Litigation* (E.D.N.Y.), price-fixing litigation against the manufacturers of after-market parking heaters, and *In Re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, MDL 1486 (N.D.Cal.), price-fixing litigation against the major international manufacturers of DRAM.   The indirect purchasers in *DRAM* have entered into settlements of over $310 million.  It was also one of the chief counsel prosecuting *Sullivan et. al. v. DeBeers*, C.A. No. 3:05-516 (D.N.J.), a class action against the world's leading supplier of diamonds, alleging that it violated various federal and state antitrust and unfair competition laws. Following the settlement of the action for $295 million and injunctive relief, Cooper & Kirkham was appointed to represent the consumer subclass in allocating and distributing the settlement proceeds.  The firm was instrumental in securing a rehearing *en banc* by the Third Circuit Court of Appeals which resulted in an opinion affirming the district court's approval of the settlement and setting out comprehensive guide lines for the certification of settlement classes in multi-state antitrust and consumer protection class actions.

## REPRESENTATIVE CLIENTS

In its non-class action complex litigation and hourly commercial litigation practice, Cooper & Kirkham has represented many substantial businesses and governmental entities, including: Safeway Stores, Inc., the Oakland Tribune, Inc., Bandag, Inc., MacFARMS International, Inc., Gold Fields Mining Company, The Bank of New England, The Gas Company (Honolulu, Hawaii), Pankow Builders, Inc., The San Francisco Bay Guardian, Yeung Chi Shing Estates, Ltd. (Hong Kong), the States of Nevada, Arizona and Oregon (Public Employees' Pension Fund), the City and County of Honolulu, Hawaii, the City of Austin, Texas, and Contra Costa County, California.

The following is a partial list of major commercial actions (class and non-class) in which the firm (or its predecessors) represent or represented the plaintiff(s), a plaintiff class or the defendant(s) since Mr. Cooper opened his practice in San Francisco in 1972:

1.  *San Francisco Bay Guardian v. San Francisco Chronicle, et al.*, 344 F. Supp. 1155 (N.D. Cal. 1971) – Represented plaintiff in action brought against competing newspapers for alleged monopolistic practices.   Settlement obtained for plaintiff.

2.  *In re Gypsum Wallboard Cases*, 1974-2 Trade Cases ¶75, 272 (N.D. Cal. 1974) – Represented national class of governmental bodies in multidistrict price-fixing action. Settlement achieved for class.

3.  *Love's WoodPit Barbecue v. Bell Brand Foods, Inc., et al.*, 1974 (CCH) Trade Cases ¶74,905 (S.D. Cal. 1974) – Represented plaintiff class of restaurants in price-fixing

litigation brought against potato processors.   Settlement achieved for class.

4.   *Prescottano v. Koracorp Industries, Inc.* (N.D. Cal.) - Co-lead Counsel representing class of shareholders alleging securities fraud.  Settlement achieved for class.

5.   *Spinetti, et al. v. Atlantic Richfield Company* (N.D. Cal.) – Represented plaintiffs in action brought by petroleum wholesale distributors against their supplier for violations of the federal energy laws.   Settlement achieved for plaintiffs.

6.   *In re Folding Carton Antitrust Litigation* M.D.L. 250 (N.D. Ill.) – Represented national class of folding cardboard box purchasers in price-fixing action.   Settlement achieved for class.

7.   *In re THC Financial Litigation*, 86 F.R.D. 721 (D. Hawaii 1980) - Co-lead Counsel in securities fraud class action brought on behalf of the holders of investment certificates and debentures in THC Financial Corporation.  Settlement achieved for class.

8.   *In re Hawaii Beer Litigation* (D. Hawaii) – Co-lead Counsel in price-fixing action brought on behalf of private classes of beer purchasers in the State of Hawaii.   Settlement achieved for class.

9.   *In re Sugar Industry Antitrust Litigation*, M.D.L. 201 (N.D. Cal.) – Plaintiffs' Liaison Counsel in price-fixing action brought on behalf of private classes of sugar purchasers in the Western United States.   Settlement achieved for classes.

10.   *Standard Glass Co. v. Universal Waste Control, et al.* (Sup. Ct., Maricopa County, Arizona) – Co-Lead Counsel in price-fixing class action brought on behalf of Phoenix area users of refuse services.   Settlement achieved for class.

11.   *Carr v. Toyota Motor Sales, Inc.* (N.D. Cal.) – Represented plaintiff class in price-fixing class action brought on behalf of purchasers of Toyota motor vehicles in five states. Settlement achieved for class.

12.   *Presidio Golf Club of S.F. v. National Linen Supply Corp.*, 1976-2 (CCH) Trade Cases ¶61,221 (N.D. Cal. 1976) – Represented class in action for antitrust violations in the rental of linen supplies.   Settlement achieved for class.

13.   *Bulzan v. Atlantic Richfield Co.* (620 F.2d 278 (T.E.C.A. 1980) – Represented plaintiff in action brought by wholesale petroleum distributor against its supplier for violations of federal energy laws.  Settlement achieved for plaintiff.

14.   *City and County of Honolulu v. Hawaii Newspaper Agency, Inc., et al.* (D. Hawaii) – Represented Honolulu and plaintiff class in price-fixing action brought on behalf of all purchasers of advertising in Honolulu daily newspapers.

15.   *Van Vranken, et al. v. The Atlantic Richfield Company*, (N.D. Cal.) – Lead Counsel in action brought on behalf of a class of purchasers of refined petroleum products for price overcharges in violation of federal energy laws.   Trial verdict and settlement of $75 million

achieved for class.

16. *Muller, et al. v. Sambo's Restaurants Inc., et al.* (C.D. Cal.) - Co-lead Counsel in securities fraud action on behalf of class of investors in general partnership restaurant joint ventures. Settlement achieved for class.

17. *Evans, et al. v. Circle S Ranch, Inc., et al.* (Sup. Ct., Maricopa County, Ariz.) – Represented class of emotionally disturbed children committed by State to treatment facility in action for violations of their civil rights, assault, and intentional infliction of emotional distress.   Settlement obtained for class during jury trial.

18. *Richards v. American Veterinary Medical Association, et al.*, SAW (N.D. Cal.) - Represented eleven defendants in a group boycott antitrust action.  Defense verdict obtain at trial.

19. *In re Arizona Escrow Fee Antitrust Litigation* (D. Ariz.) – Represented plaintiff class in escrow rate-fixing action brought on behalf of purchasers of escrow services in Arizona. Settlement achieved for class.

20. *Andersen Construction Co. v. The Prescon Corp., et al.* (D. Colo.) – Represented plaintiff class price-fixing action brought on behalf of purchasers of post-tension concrete construction in the Rocky Mountain States.   Settlement achieved for class.

21. *Safeway Stores, Inc. v. Roblin Industries, Inc., et al.* (N.D. Cal.) – Represented plaintiff price-fixing action brought against manufacturers of shopping carts.   Settlement achieved for plaintiff.

22. *Burlingame Imports Inc. v. Alfa Romeo, Inc.* (San Mateo, California, Municipal Ct.) – Represented defendant Alfa Romeo for alleged breach of contract and warranty.

23. *Autopacific, Inc. v. Alfa Romeo, Inc.* (San Francisco Municipal Court) – Represented defendant Alfa Romeo for alleged fraud and breach of warranty.

24. *In re Cement and Concrete Antitrust Litigation*, M.D.L. 296 (D. Ariz.) – Co-Lead Counsel in price-fixing action brought on behalf of a national class of cement purchasers and an Arizona class of ready-mix purchasers.   Settlements achieved for classes.

25. *In re Chicken Antitrust Litigation* (N.D. Ga.) - Represented class members Safeway Stores, Inc., The Great Atlantic and Pacific Tea Company, Inc., The Grand Union Company, Jewel Companies, Inc., Winn-Dixie Stores, Inc., and Giant Foods, Inc. in price fixing action against producers of poultry products.   Settlement achieved for class.

26. *In re Corn Derivatives Antitrust Litigation*, M.D.L. 414, (D.N.J.) - Represented class members Safeway Stores, Inc., Lucky Stores, Inc., Great Atlantic and Pacific Tea Co., Carnation Co., The Jewel Companies, Fred Meyer, Inc., and Bonneau Products Co., Inc. in price fixing action against manufacturers of corn derivative products.   Settlement achieved for class.

27.     *In the Matter of Safeway Stores, Inc.* (Board of Agriculture, State of Hawaii, and D. Ha.) - Represented Safeway Stores, Inc. in application for a license to sell fresh milk in Hawaii and in related Federal Court action challenging constitutionality of Hawaii regulatory statute.  Statute declared unconstitutional and license obtained.

28.     *Contra Costa Medical Systems, Inc. v. County of Contra Costa, et al.* (N.D. Cal.) - Represented defendant county in action alleging that ordinance regulating ambulance services violates the antitrust laws.

29.     *Tom Lazio Fish Co. Inc. v. Castle & Cooke, Inc., et al.* (Superior Court San Francisco) - Represented defendant Western Fishboat Owners Association in action for alleged price fixing conspiracy.

30.     *Isabel E. Masket v. United States Surgical Corporation, et al.* (Superior Court County of Marin) - Represented defendant U.S. Surgical Corporation in action for breach of contract resulting from dealer termination.

31.     *Oakland Tribune, Inc. v. Chronicle Publishing Company, et al.* (N.D. Cal.) - Represented plaintiff newspaper in antitrust monopolization action against competing daily newspapers. Settlement achieved for plaintiff.

32.     *In Re Convergent Technologies Securities Litigation* (N.D. Cal.) - Co-lead Counsel in representation of shareholders in class action alleging fraud in the sale of securities. Settlement achieved for class.

33.     *In re Crocker Shareholder Litigation* (N.D. Cal.) - Plaintiffs' Liaison Counsel in securities fraud action by shareholders of Crocker National Bank.   Settlement achieved for class.

34.     *In Re UniOil Securities Litigation* (C.D. Cal.) - Represented officer and director defendants in securities fraud action by shareholder class.   Summary judgment granted for clients.

35.     *In Re Castle & Cooke Derivative Shareholder Litigation* (N.D. Cal.) – Represented shareholders in class action alleging violations of federal securities laws and breach of fiduciary duties of directors arising from stock repurchase and merger agreement. Settlement achieved for class.

36.     *Byrum* v. *Amerco* (D. Ariz.) - Co-lead Counsel in representation of class of purchasers of investment contracts in U-Haul recreational vehicle partnerships.   Settlement achieved for class.

37.     *National Union Fire Insurance Bond Cases* (Los Angeles Superior Court) - Represented class of investors in action alleging violations of federal securities laws and state laws arising out of alleged "ponzi" scheme.   Settlement achieved for class.

38.     *In re MiniScribe Securities Litigation* (D. Colo.) - Co-lead Counsel in securities fraud action by shareholders of MiniScribe Corporation.   Settlement achieved for class.

39. *Specialty Food Distributors, Inc. v. MacFARMS International, Inc., et al.* (N.D., Cal.), and *Doris Sternberg, v. MacFARMS International, Inc., et al.* (California Superior Court) - Represented defendant producer of macadamia nuts in federal and state class actions brought by purchasers of nut products for alleged price-fixing conspiracy; and *McCaffrey v. MacFARMS International, Inc., et al.* (California Superior Court), related suit by ex-employee for wrongful termination.

40. *In re California X-ray Film Antitrust Litigation* (California Superior Court) -Plaintiffs' Liaison Counsel in price-fixing action brought on behalf of class of California purchasers of x-ray film products.  Settlement of approximately $4 million achieved for the class.

41. *In re: Industrial Diamonds Antitrust Litigation* (S.D.N.Y.) - Represented nationwide class of purchasers of industrial diamond products alleging price-fixing conspiracy.  Settlement of approximately $25 million in cash plus in kind distribution achieved for the class.

42. *Sullivan et.al. v. DB Investments, Inc., et. al.,* Civil Action Index No. 04-02819 (SRC) (D. N.J.) and *Anco Industrial Diamond Corp. v. DB Investments, Inc.* (D.N.J.) Representing class of gem-quality diamond purchasers in actions against De Beers for monopolization and price fixing.  Settlement of over $295 million achieved for the class.

43. *Millar v. Pearce Systems, et al.* (California Superior Court) – Lead counsel for class of purchasers of securities in initial public offering for alleged violations of state securities laws.  Settlement achieved for the class.

44. *Cloverdale Meadows v. Kaiser Sand & Gravel Company, Inc., et al.* (California Superior Court) - Represented class of Northern California purchasers of concrete and rock products alleging price-fixing conspiracy.  Settlement achieved for the class.

45. *Azizian et. al. v. Federated Department Stores, et. al.* Civ. No. C 03 3359 SBA (N.D. Ca.) and *Coordination Proceeding Special Title (Rule 1550(b)) COSMETICS CASES* (California Superior Court) – Member of Plaintiffs' Executive Committee in an action on behalf of a nationwide class of purchasers of cosmetics products alleging a conspiracy among manufacturers and retailers of department store cosmetics, including Federated Department Stores and Estee Lauder Corporation, to prevent discounting from list prices. Settlement valued at $175 million, plus $24 million in attorneys' fees and costs given final approval by District Court.

46. *Coordination Proceeding Special Title (Rule 1550(b)) VITAMIN CASES* (California Superior Court) – Member of Plaintiffs' Executive Committee in price-fixing  action brought on behalf of a class of California purchasers of vitamin products.  Settlement of over $100 million achieved for the classes.

47. *In Re Sorbates Direct Purchaser Antitrust Litigation,* Master File No. C 98-4886 CAL (N.D. Cal.) – Represented class of sorbates purchasers in price-fixing action.  Settlement of approximately $92 million achieved for the class.

48. *The State Of Oregon, By And Through The Oregon Public Employees Retirement Board v.*

*McKesson HBOC, Inc., et. al.,* Master File No. 307619 (California Superior Court) – Representing governmental entity plaintiff in securities fraud case arising from merger of the McKesson Corporation with HBOC, Inc.  Settlement achieved.

49.   *Coordination Proceedings Special Title (Rule 1550(B), MICROSOFT CASES,* Case No. J.C.C.P. No. 4106 (California Superior Court) – Member of Plaintiffs' Executive Committee in monopolization case brought on behalf of a certified class of indirect purchasers of Microsoft operating system and applications software.  Settlement of $1.1 billion plus $101 million in attorneys' fees and costs approved by Superior Court.

56.   *Coordination Proceedings Special Title (Rule 1550(B), DRAM CASES,* Case No. J.C.C.P. No. 4265 (California Superior Court) – Liaison Counsel in price-fixing case brought on behalf of a nationwide class of indirect purchasers of random access memory chips. Settlements of approximately $300 million achieved pending court approval (see, no. 62, below.)

57.   *Coordination Proceedings Special Title (Rule 1550(B), POLYESTER STAPLE CASES,* Case No. J.C.C.P. No. 4278 (California Superior Court) – Member of Plaintiffs' Executive Committee in price-fixing case brought on behalf of a California class of indirect purchasers of polyester staple.  Settlement achieved.

58.   *Coordination Proceedings Special Title (Rule 1550(B), AUTOMOBILE ANTITRUST CASES, I, II,* Case No. J.C.C.P. Nos. 4298 and 4303 (California Superior Court) – Member of Plaintiffs' Executive Committee in price-fixing case brought on behalf of a California class of indirect purchasers.

59.   *Hayward Area Planning Association, et. al. v. Gale Norton, as Secretary of the Interior, et. al.,* Case No. c 00-04211 SI (N.D.Ca.)  - Represented real party in interest Hayward 1900, Inc., the owner and developer of a approximately 2000 acre tract of land on Walpert Ridge in an action brought under the Environmental Protection Act challenging the biological opinion and incidental take permits for the project.

60.   *Hayward Area Planning Association et. al. v. City of Hayward et. al.,* Case No. 2002069185 (Alameda County Superior Court) - Represented real party in interest Hayward 1900, Inc., the owner and developer of a approximately 2000 acre tract of land on Walpert Ridge in an action brought under the California Environmental Quality Act challenging the City of Hayward's EIR and development agreement with Hayward 1900.

61.   *Fairhaven Power Company v. Encana Corporation, et.al.,* Civ. F-04-6256 OWW LJO (E.D. Cal.) – Representing class of purchasers of natural gas in price-fixing action.  Settlement achieved.

62.   *In Re Dynamic Access Memory (DRAM) Antitrust Litigation,* MDL 1486 (N.D.Cal.), Plaintiffs' Co-Lead Counsel in price-fixing litigation against the major international manufacturers of DRAM.  The indirect purchasers have entered into settlements of approximately $300 million with defendants.

63.   *In Re Static Random Access Memory (SRAM) Antitrust Litigation,* MDL 1819 (N.D. Cal.),

9

member of Plaintiffs' Executive Committee in indirect purchaser price-fixing class action against the major international manufacturers of SRAM.

64.   *In Re TFT-LCD (Flat Panel) Antitrust Litigation,* MDL 1827 (N.D. Cal.), member of Plaintiffs' Executive Committee in indirect purchaser price-fixing class action litigation against the major international manufacturers of TFT-LCD Flat Panel screens.

65.   *In Re Flash Memory Antitrust Litigation,* MDL 1852 (N.D. Cal.), member of Plaintiffs' Executive Committee in indirect purchaser price-fixing class action litigation against the major international manufacturers of Flash Memory devices.

66.   *Stonebrae L.P. v. Toll Bros, Inc., et al.,* Case No. 08-CV-00221 EMC (N.D. Cal.), representing plaintiff in litigation involving real estate development of over 2,000 acres overlooking San Francisco Bay

67.   *In Re Parking Heaters Antitrust Litigation,* Case No. 15-MC-00940-JG-JO (E.D.N.Y.), Plaintiffs' Co-Lead Counsel in price-fixing litigation against the manufacturers of after-market parking heaters.