**Pages 1 - 67**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

|  |  |
|---|---|
| MDL No. 1917 Re: Cathode Ray Tube (CRT) Antitrust Litigation | )<br>)<br>)  Case No. CV 07-5944-JST<br>)<br>)<br>) |

San Francisco, California
Tuesday, December 15, 2015

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Indirect Purchaser Plaintiffs:
                        LAW OFFICES OF FRANCIS O. SCARPULLA
                        456 Montgomery Street - 17th Floor
                        San Francisco, CA  94104
                   **BY:  FRANCIS SCARPULLA**

                        COOPER & KIRKHAM, P.C.
                        357 Tehama Street - Second Floor
                        San Francisco, CA  94103
                   **BY:  JOSEPH COOPER**
                        **TRACY KIRKHAM**

                        TRUMP, ALIOTO & TRUMP
                        2280 Union Street
                        San Francisco, CA  94123
                   **BY:  MARIO N. ALIOTO**

Reported By:        Pamela A. Batalo, CSR No. 3593, RMR, FCRR,
                    Official Reporter

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

1    **APPEARANCES**:   (CONTINUED)

2    For Direct Purchaser Plaintiffs:
                         PEARSON, SIMON & WARSHAW, LLP
3                        44 Montgomery Street -- Suite 2450
                         San Francisco, CA  94104
4                 BY:  **BRUCE SIMON**

5                        COTCHETT, PINE & MCCARTHY, LLP
                         840 Malcolm Road -- Suite 200
6                        Burlingame, CA  94010
                  BY:  **STEVEN N. WILLIAMS**
7
                         STEYER, LOWENTHAL, BOODROOKAS, LLP
8                        One California Street -- Suite 2200
                         San Francisco, CA  94111
9                 BY:  **ALLAN STEYER**

10                       SAVERI & SAVERI, INC.
                         706 Sansome Street
11                       San Francisco, California  94111
                  BY:  **R. ALEXANDER SAVERI**
12                       GEOFFREY C. RUSHING

13                       COTCHETT, PITRE & MCCARTHY, LLP
                         840 Malcom Road
14                       Burlingame, CA  94010
                  BY:  **JOSEPH W. COTCHETT**
15
                         BOIES, SCHILLER & FLEXNER, LLP
16                       5301 Wisconsin Avenue, N.W.
                         Washington, D.C.  20015
17                BY:  **KYLE SMITH**

18                       BOEIS, SCHILLER & FLEXNER, LLP
                         30 South Pearl Street -- 11th Floor
19                       Albany, NY  12207
                  BY:  **PHILIP J. IOVIENO**
20

21                       LIEFF, CABRASER, HEIMANN & BERNSTEIN
                         275 Battery Street, 30th Fl.
22                       San Francisco, California  94111
                  BY:  **ERIC B. FASTIFF**
23

24

25

```
 1   APPEARANCES:   (CONTINUED)

 2   For Indirect Purchaser Plaintiffs:
                              HAUSFELD LLP
 3                            600 Montgomery Street -- Suite 3200
                              San Francisco, CA  94111
 4                       BY:  MICHAEL P. LEHMANN

 5   For Indirect Purchaser Plaintiffs/Objectors Rockhurst,
     Garavanian, Talewsky:
 6                            ALIOTO LAW FIRM
                              One Sansome Street -- 35th Floor
 7                            San Francisco, CA  94104
                         BY:  THERESA D. MOORE
 8
     For Plaintiff Best Buy/CRT:
 9                            ROBINS KAPLAN, LLP
                              2049 Century Park East -- Suite 3400
10                            Los Angeles, CA  90067
                         BY:  DAVID MARTINEZ
11
     For Plaintiff Viewsonic Corporation:
12                            CROWELL MORING
                              515 S. Flower Street -- 40th Floor
13                            Los Angeles, CA  90071
                         BY:  JASON C. MURRAY
14                            JEROME A. MURPHY

15   For Plaintiff Sharp:
                              PAUL WEISS RIFKIND WHARTON & GARRISON
16                            2001 K Street, N.W.
                              Washington, DC  20006
17                       BY:  KENNETH A. GALLO

18                            PAUL WEISS RIFKIND WHARTON & GARRISON
                              1285 Avenue of the Americas
19                            New York, NY  10019
                         BY:  KIRA A.DAVIS

20

21

22

23

24

25
```

1    **APPEARANCES**:   **(CONTINUED)**

2    For Plaintiff Dell:

                               ALSTON & BIRD, LLP
3                              One Atlantic Center
                               1201 West Peachtree Street
4                              Atlanta, GA  30309
                         BY:  **MICHAEL P. KENNY**
5

     For Plaintiff Costco:
6                              ALSTON & BIRD, LLP
                               One Atlantic Center
7                              1201 West Peachtree Street
                               Atlanta, GA  30309
8                        BY:  **MICHAEL P. KENNY**
                              **DEBRA D. BERNSTEIN**
9
                               PERKINS COIE
10                             1201 Third Avenue -- Suite 4900
                               Seattle, WA  98101
11                       BY:  **CORI G. MOORE**

12   For Sears, Roebuck and Co./KMart Corporation:
                               KENNY NACHWALTER
13                             1100 Miami Center
                               201 South Biscayne Boulevard
14                             Miami, Florida  33131
                         BY:  **WILLIAM J. BLECHMAN**
15                            **SAM RANDALL**

16   For Plaintiff Tech Data Corporation:
                               BILZIN SUMBERG BAENA PRICE & AXELROD
17                             200 South Biscayne Boulevard
                               Miami, FL  33131
18                       BY:  **ROBERT TURKEN**
                              **SCOTT N. WAGNER**
19
     For Objector Douglas W. St. John:
20                             JOSEPH SCOTT S. JOHN
                               514 Mockingbird Drive
21                             Long Beach, MS  39560
                         BY:  **JOSEPH SCOTT ST. JOHN**
22
     For Phillips Defendants:
23                             BAKER BOTTS, LLP
                               1299 Pennsylvania Avenue, NW
24                             Washington, DC  20004
                         BY:  **ERIK T. KOONS**
25                            **JOHN M. TALADAY**

<u>APPEARANCES</u>:   **(CONTINUED)**

For Samsung SDI Co., Ltd.:
                        SHEPPARD MULLIN & RICHTER
                        4 Embarcadero Center
                        San Francisco, CA  94111
                   BY:  **JAMES MCGINNIS**

For Technologies Displays Americas, LLC:
                        SQUIRE PATTON BOGGS
                        1 E. Washington Street
                        Phoenix, AZ  85004
                   BY:  **DONALD A. WALL**

                        CURTIS, MALLET-PREVOST, COLT & MOSLE
                        1717 Pennsylvania Avenue, N.W.
                        Washington, DC  20006
                   BY:  **JEFFREY I. ZUCKERMAN**

For Thomson Defendants:
                        FAEGRE BAKER DANIELS
                        300 N. Meridian Street -- Suite 2700
                        Indianapolis, IN  46204
                   BY:  **KATHY L. OSBORN**
                        **RYAN M. HURLEY**

For Toshiba Defendants:
                        WHITE & CASE, LLP
                        701 Thirteenth Street, NW
                        Washington, DC  20005
                   BY:  **CHRISTOPHER M. CURRAN**
                        **DANA E. FOSTER**

For Chunghwa Defendants:
                        GIBSON, DUNN & CRUTCHER, LLP
                        555 Mission Street
                        San Francisco, CA  94105
                   BY:  **JOEL S. SANDERS**
                        **RACHEL S. BRASS**

For Hitachi Defendants:
                        KIRKLAND & ELLIS, LLP
                        300 N. LaSalle
                        Chicago, IL  60654
                   BY:  **JAMES H. MUTCHNIK**

```
1   APPEARANCES:   (CONTINUED)

2

3   For LGE Electronics:
                        MUNGER, TOLLES & OLSON, LLP
4                       355 S. Grand Avenue -- 35th Floor
                        Los Angeles, CA  90071
5            BY:   BRAD D. BRIAN
                   E. MARTIN ESTRADA
6                  SUSAN E. NASH

7   For Mitsubishi Defendants:
                        JENNER & BLOCK
8                       353 N. Clark Street
                        Chicago, IL  60654
9            BY:   TERRENCE J. TRUAX
                   MICHAEL T. BRODY
10                 GABRIEL A. FUENTES

11                      QUINN EMANUEL URQUHART & SULLIVAN, LLP
                        865 S. Figueroa Street -- 10th Floor
12                      Los Angeles, CA  90017
             BY:   KEVIN Y. TERUYA

13  For Panasonic Defendants:
                        WINSTON & STRAWN
14                      200 Park Avenue
                        New York, NY  10166
15           BY:   JEFFREY L. KESSLER

16                      WEIL, GOTSHAL & MANGES, LLP
                        1300 Eye Street NW -- Suite 900
17                      Washington, DC  20005
             BY:   KEVIN B. GOLDSTEIN

18

19

20

21

22

23

24

25
```

Tuesday, December 15, 2015                               9:30 a.m.

**P R O C E E D I N G S**

---000---

**THE CLERK:**  Calling CV 07-5944-JST, MDL No. 1917 In Re:  Cathode Ray Tube (CRT) Antitrust Litigation.

**THE COURT:**  Good morning.  It's a lot of people.  I went on TripAdvisor this morning, if you know that website.  I went to the San Francisco page.  It wouldn't even load.  Now I know why.

As I said at an earlier hearing, which was the only other hearing that I've held in this case since I took the case over, welcome to Cathode Ray Tube Antitrust Litigation 2.0.

I'm looking forward to working on this case.  I'm glad you all brought this case here.

I did something this morning that's making it a little harder for those of you at the counsel table.  I put boxes of paper on the table.  And that makes it difficult because it's a big case and you brought notebooks and laptops and things and there is less room for those things.

Why would I do that?  Because the boxes contain the motions that are currently under submission, that were under submission when I took this case over.  And I thought it would be helpful to describe that visually as opposed to just tell you about it.

I'm prepared to work really hard on this case.  I'm

1    prepared to do that actually in a kind of duck-below-the-water

2    way, and I'm going to do things periodically to show you that

3    I'm working hard on your case and that I take your claims and

4    defenses seriously.

5        But I need everybody in the room to understand the

6    opportunity cost of time.  We have a few examples of things

7    we'll talk about this morning, in a light way.

8        That means time in court, like today.  That means time

9    litigating motions, deciding when something needs a motion,

10   deciding how to brief it, deciding what's chicken and what's

11   chicken salad, what really do you need to fight about.  I like

12   fighting, honestly.  I mean, that didn't come out right, but --

13   right?

14       I was a lawyer.  I get it.  I like my job.  I don't want

15   everything to settle.  I like fighting.  But I have some other

16   things to do.  I have more than a couple hundred other cases

17   besides the 68 or whatever it was that you all just brought me.

18       So that means that allocation of time is important here.

19   And that's not just my time.  It's the time of my chambers

20   staff, too.

21       So if you all bear that in mind, we're going to get along

22   great because this is one of the most interesting things I have

23   in chambers right now.  I'm looking forward to working on it.

24       We have several items to talk about today.  Let me just

25   tell you the main things that are on my list and then I'll

invite you to tell me, without arguing the merits of the thing, whether there are other things that should be on my list.

First, we have on calendar this morning the final approval hearing on the direct purchaser plaintiff settlement and the attorneys' fees and expenses request in connection with that settlement.

There is a motion to amend the order of appointment for Martin Quinn, as to which I want to take a very few minutes of argument on either side.  I think that issue is fully briefed.

There is a question of scheduling.  And scheduling really has, I would say, two parts.  I anticipate setting oral argument with regard to most or all of the summary judgment motions that are currently under submission, none of which, by the way, I currently plan to decide before the IPP settlements have been ruled on.  I say *currently*.  It's not a commitment, but that was a request made in a recent case management statement and there are sensible reasons for that.

But nonetheless, so that I'm prepared to rule on them, I would like to schedule oral argument, and unlike my predecessor, I like oral argument and it's helpful to me and so I want to talk about the scheduling of some hearing dates.  And I can throw out some hard dates and we'll talk about which motions are argued when.

As you know, we're going to have a trial scheduling conference next spring, but in advance of that, I'd like to

1    tentatively throw out some dates this morning for trials.  I'd

2    like to -- the joint case management statement took a run at

3    trying to persuade me to abandon the structure that

4    contemplated that the Sharp case would be tried separately, so

5    we'll discuss how successful that was.

6         But I want to throw out dates now because if I wait until

7    the spring and the dates are relatively close, I'm likely to

8    get, for valid reasons, counsel saying that date doesn't work

9    for me, that sort of thing.

10        Look around the room.  I actually would like each of you

11   at some point this morning to look around the room and just see

12   how many lawyers are here.

13        That's just not going to work.  For the most part, I'm

14   going to have to find room on my calendar and tell you when

15   things are going to happen, not because I'm not respectful of

16   your time, but because I just don't think there's another way.

17        And so I want to give you as much notice as I can always

18   and so I would like to start today talking about potential

19   trial dates.  And then I've got a few kind of housekeeping

20   things.

21        Are there other items on anybody's agenda today that they

22   were hoping to discuss?  Would you raise your hand if there

23   are?  I don't see any hands.  Okay.

24        Let's talk about the direct purchaser plaintiffs'

25   settlement.

1     Madame Reporter, from now on I will just say *DPP*.

2     The Court's tentative ruling is to approve that settlement

3 and to take under submission the question of fees and expenses.

4 I have some comments about expenses I'll make in just a moment,

5 but coming about back to the merits of the settlement itself,

6 there were only 16 requests for exclusion and no one has

7 objected to the settlement.  And so I don't have anything

8 further to say from the bench this morning.

9     Would anyone like to make argument or is there anyone

10 present in court this morning who came to object to that

11 settlement?  Would you identify yourself if you wish to address

12 the Court about that settlement.

13     After a respectful pause, no one has raised his hand and

14 no one has come forward, and so the record will reflect there

15 continue not to be any objections to that settlement.  The

16 Court will take that issue under submission and I expect to get

17 an order out very shortly.

18     Let me talk a little bit about expenses.  It isn't my

19 favorite thing to do.  It's probably not your favorite thing to

20 talk about either.  I think it's easy for a judge talking about

21 expenses to look like he or she's off in the weeds.  Why are

22 you, a federal judge, talking about this expense that only cost

23 $55 or whatever it is.  I think about it the other way.  If

24 it's only $55, why didn't you just pay it yourself?

25     And I imagine what if I, because I'm the only thing

standing between the class and the expense request -- what if I

selected 100 class members to come to court and they could sit

here.  I'd have to have a bigger courtroom today, but they

would just be sitting here and then the lawyer who put in the

expense request would explain to them you would be getting this

money yourself, but I'm going to get it.  And the reason I'm

going to get it is because I incurred an expense that I needed

to incur to represent you in the case.  And that would be the

burden of persuasion.

     But of course we don't do it that way because that's --

I'm supposed to be the representative of those people.  So I

just wanted to mention a few examples of things I saw going

through and then I'll invite some comment from the group about

how I deal with the issue of expenses on a going-forward basis.

     So first I would say as a relatively minor number but as

something that I noticed, that people like mini bars in their

hotel rooms, which is fine.  But I just think you'd have a

tough time convincing a class member that they ought to pay for

it.

     I thought about identifying firm names because I have that

in my notes.  I'm not going to do that.

     I have $106 at the Tonga Room.  I've been to the Tonga

Room.  I don't know if the rain thing still happens.

     I have a bill -- someone put in a travel reimbursement,

transportation, 515, fine.  Room, 335.69, fine.  Meals, $1,196

and they spent it in a night at Ruth's Chris.  I'm not
criticizing the choice.  I like Ruth's Chris.

There's a private club in San Francisco called the Villa,
V-I-L-L-A, Taverna, T-A-V-E-R-N-A.  A lot of you know what I'm
talking about because you've eaten there, I know.  A large
percentage, as far as I can tell, of some people's meals over
this period of time have been eaten at Villa Taverna.  The dues
for that club appear as a charge.

A bottle of wine at that restaurant called Etude,
E-T-U-D-E, Heirloom, H-E-I-R-L-O-O-M. appears on a charge.
It's a good wine.  Robert Parker gave that wine a 93.  I looked
it up.  It's a Pinot, so if you are having a steak at Ruth's
Chris, you wouldn't order that wine.

I have a $3,800 hotel room in Taipei.  I know it's
expensive.  I've got to believe there's a room that costs less
than $3,800.

I have some laundry charges.  I have a couple bottles of a
Brunello di Montalcino, if you want something with a little
more zip than a Pinot.

I have $600 dinner charges, $400 dinner charges.

First class, a couple first class airfare tickets.

I have a private plane to Modesto, which I actually think
is okay, because I did the math.  I know the lawyer.  The
lawyer is here in the room.  I think the lawyer actually saved
more time in attorneys' fees by taking the plane because it

1   only cost 400 bucks, so that one actually is okay.

2       Individual meal expenses meaning, as far as I can tell,

3   one person, one meal at a time on a trip, 288, 166, 286.

4       A bill for a Chicago firm, drinks with co-counsel in their

5   hometown.  Look, I like cocktails too, occasionally.

6       I could go on.  I'm not going to.  I operate under the

7   time constraints that I briefly and inartfully described

8   earlier, so my question is what do I do?  What do I do?  I'm

9   not going to a approve all of them.  I'm not going to say fine

10  and sign off.  What do I do?  Does anyone want to make a

11  suggestion?

12      Mr. Cotchett.

13      Madame Reporter, Joseph Cotchett.

14      **MR. COTCHETT:**   I think it's your duty to not only

15  disapprove them, I think you ought to write an order and single

16  them out.  That's the only way you are going to stop that.

17      I might be on there.  I might be one of those you just

18  listed, but the only way Your Honor is going to stop that

19  nonsense -- and it's pure nonsense -- is to write an order and

20  single out the firms.

21      **THE COURT:**  But my problem, Mr. Cotchett, is I'm not

22  sure I have the time to attack --

23      **MR. COTCHETT:**   I understand.

24      **THE COURT:**  Please don't speak over me.

25      **MR. COTCHETT:**   I apologize.

1    **THE COURT:**  I'm not sure I have the time to address

2    the issue with the degree of granularity that you're

3    describing.  I agree it might deserve it and maybe that's the

4    only way.  I don't know.  I'm wondering if there mightn't be a

5    different approach, but what you say has some merit.

6    **MR. COTCHETT:**  If you do it one time, it will stop.

7    **THE COURT:**  Madame Reporter, R. Alexander Saveri.

8    Mr. Saveri.

9    **MR. SAVERI:**  Your Honor, may it please the Court, Rick

10   Saveri on behalf of the direct purchaser, the plaintiffs, the

11   class action.

12   One thing that may be done, Your Honor, which may help

13   Your Honor in time as well as to send a message -- and I

14   appreciate what you said and I know I'm -- the Villa Taverna

15   was my firm, Your Honor, and that was one, and we saw the error

16   of the dues charge and we took that out.

17   **THE COURT:**  I see.  I just have the receipts.  Am I

18   meant to go back and correlate the receipts you submitted with

19   other pieces of paper I have somewhere else?  I mean, I'm sorry

20   that I came after -- although I didn't name your firm, I'm

21   sorry I mentioned a dues thing that you think you took out, but

22   why do I have the receipt in front of me?  I don't know what to

23   do with that.

24   **MR. SAVERI:**  Your Honor, what has been done in other

25   cases like this, in DRAM and others, what judges have done,

1     just because there may be errors like the one we did, or things

2     that -- first class, they'll just take a percentage right off

3     the top, whether it's 10, 15, 20 or cut it in half.

4     **THE COURT:** There are firms like this for whom I

5     didn't find any of these.  Some firms were more frequent

6     offenders.  If I applied a cut across the board -- I mean, I

7     hear what you're saying.

8     **MR. SAVERI:** It's a way, I think, that is also -- that

9     allows also the plaintiff to police itself so that it doesn't

10     happen in the future, Your Honor, too, and so that the

11     accounting that takes place here is appropriate.

12     **THE COURT:** Thank you.

13     Does anyone have anything else to add on this point?  All

14     right.  I'm going to leave it this way.

15     If anyone wishes to submit a further revised expense

16     request, he or she may do so by December 22nd.  I'm sorry to

17     put it so close to the holiday, but I would like to get this

18     behind me.

19     If you don't and I find something that's difficult to

20     explain, I'll address it in a way that I think is fair.

21     Okay.  There also is on calendar this morning objector

22     Douglas W. St. John's notice of motion and motion to amend the

23     order appointing Special Master Quinn.

24     The order appointing Mr. Quinn appears on the docket at

25     4077 and the motion appears at 4203.

1    Is a lawyer for Mr. St. John here?

2         **MR. ST. JOHN:**  Yes, Your Honor.  Joseph Scott St. John

3    for the objector.

4         **THE COURT:**  Mr. St. John, on the electronic docket,

5    you are listed as being affiliated with the Covington & Burling

6    law firm, but that's not true, is it?

7         **MR. ST. JOHN:**  It was true until June, Your Honor.

8         **THE COURT:**  I see.  All right.  Well, we'll fix that.

9    And who would like to argue the other side of this motion?

10   Would someone step forward to assume that role.

11        **MR. ALIOTO:**  Good morning, Your Honor.  Mario Alioto

12   on behalf of the indirect purchaser class.

13        **THE COURT:**  Good morning, Mr. Alioto.

14   Well, let me say what I think the issues in the motion

15   are, tell you tentatively how I'm likely to rule and give you

16   each five minutes to persuade me to keep my tentative or

17   abandon it, as the case may be.

18   The motion makes three requests.  One is that I modify the

19   structure for the payment of Mr. Quinn's fees.  The second --

20   and on the grounds that it's not fair, the existing structure

21   is not fair.

22   Secondly, that I provide for *de novo* review rather than

23   what's provided for in the order because not all parties

24   affected by the order stipulated to it pursuant to Rule 53.

25   And lastly, that I amend the schedule to provide for

1   discovery on the part of the objectors.

2       I am likely to amend the fee structure so that it is not a

3   50/50 division -- and I apologize.  I have so many pieces of

4   paper up here -- here we go.  But to order that the cost will

5   be equal unless the special master or the Court directs

6   otherwise and that the special master and the Court can

7   consider, among other things, the proportional role of any

8   given party or objector and whether counsel for certain parties

9   have already represented to the Court that they would pay for

10  the entirety of a given matter or issue so that there was

11  discretion to make adjustment.

12      On the issue of *de novo* review, I'm likely to provide that

13  there is *de novo* review.  It's against myself selfish interests

14  obviously to do that, but I have to say I think the language of

15  the rule is very clear, and the ideas that the objectors are

16  not "parties," in quotation marks, I think has no bearing on

17  the outcome.

18      I think you cannot say that you have certain rights in a

19  litigation forum and the rights can only be taken away from you

20  if you agree, which is essentially what Rule 53 says with

21  regard to *de novo* review, and that somehow the objectors don't

22  have this right, even though a fundamental purpose of

23  Mr. Quinn's work is to deal with the adversarial issues that

24  involve objectors.

25      I just think it's basic fairness, and obviously as a judge

1    who comes to the dispute after Mr. Quinn, it would make my life

2    easier if you didn't have to have *de novo* review, but I think

3    that's what the rule requires, so that's the Court's tentative

4    there.

5        And lastly, I'm not inclined to further amend the

6    scheduling order to provide for discovery or in any other way,

7    and any questions about this can be directed to Mr. Quinn.

8        Mr. St. John, it's your motion.  You can go first.

9        **MR. ST. JOHN:**  Thank you, Your Honor.

10       I would like to focus on a couple of narrow issues.

11       The Court has a fiduciary obligation broadly to ensure

12   that the class is afforded the opportunity to represent its own

13   interests.  And the Ninth Circuit in *Mercury Interactive* makes

14   a specific application of that related to the timing.

15       Here the way the fee structure is set up, it is

16   effectively an impediment.  It's a direct impediment to the

17   class members asserting their own interests.  It's a

18   pay-to-play issue.

19       The Court does not have the time or really the capacity to

20   focus on settlements and attorneys fee motions the way an

21   objector can.

22       And so objectors help the Court.  In Judge Posner's words,

23   they smell a rat and they speak up, and here there are

24   certainly a couple of objectors that have smelled rats,

25   including one of IPP counsel's own colleagues.

1    So what are the consequences of requiring objectors to pay

2 to play?  One, there's likely a paradoxical result in that the

3 best objections, the ones that actually take time for the

4 special master or the Court to deal with are the ones that are

5 going to be billed the most.

6    The borderline frivolous objection, certainly the way most

7 courts handle them, is they say all the other objections are

8 meritless.  It takes a few minutes.  The serious objections

9 will be the ones that are billed.

10    **THE COURT:**  I so wish in my job as a federal job that

11 the relationship between the use of my time and the merits of

12 people's arguments were as direct as you say, I have to say.

13    **MR. ST. JOHN:**  That would be ideal, Your Honor.

14    **THE COURT:**  It would.  I'm not sure it actually plays

15 out that way in practice, but I hear what you're saying.

16    **MR. ST. JOHN:**  The longer term effects, if the Court

17 comes out this way, in every single class action going forward,

18 after the notice has gone out, the class counsel will say, *In*

19 *my experience, we're going to have a ton of objectors and,*

20 *Your Honor, we should appoint a special master and they should*

21 *bear 50 percent of the fees.*  No objector is going to even have

22 heard of the class action yet, which is the case here.

23    **THE COURT:**  In the next case, Mr. St. John, I'll do it

24 from scratch.

25    **MR. ST. JOHN:**  Yes, Your Honor.

1        **THE COURT:**  Do you, understand what I'm saying?

2        **MR. ST. JOHN:**  I do, Your Honor.

3     I don't think the class members should be penalized for

4    advocating their own interests.  They help the Court.  That's

5    generally recognized.  And it's in the class interests, the

6    classes' interests, quite frankly, to make sure that there are

7    objections there.

8        **THE COURT:**  Are there any circumstances in which you

9    think it would be appropriate for objectors to pay any portion

10   of the special master's fee?

11       **MR. ST. JOHN:**  Yes, Your Honor.  If an objection was

12   found frivolous, certainly that has, in the very rare

13   circumstances where a third party -- a court has required a

14   third party to pay compensation to a special master, it's

15   either involved the third party's consent or it was a sanction

16   for vexatious conduct, somebody issued a subpoena and there was

17   an insane resistance.  So I think that's the circumstance where

18   it's justified, Your Honor.

19       **THE COURT:**  All right.  Thank you.

20     Mr. Alioto.

21       **MR. ALIOTO:**  Thank you, Your Honor.  Mario Alioto for

22   the indirect purchasers.

23     We have no objection to your tentative order, Your Honor.

24   If you would like me to address the comments of Mr. St. John, I

25   will, but --

1    **THE COURT:**  I wish you would.

2    **MR. ALIOTO:**  With respect to the sharing in the costs

3    and paying the pro rata share of the costs, whatever that may

4    be and whenever that may be, I think that the order affords

5    enough protection to the objector.

6    First of all, you have Special Master Quinn making that

7    determination in the first instance as to how costs ought to be

8    apportioned, and in the second instance, Your Honor -- as

9    Your Honor indicated in your order setting up this hearing, you

10   would also be reviewing again any cost shifting that went on

11   before the special master.

12   So we have two levels of review.  I think the procedure is

13   fair.  There may never be any cost shifted.  But I think we

14   need to keep the -- need to have a procedure in place that in

15   the event it is appropriate to allocate the costs, that the

16   special master can do so.

17   Thank you, Your Honor.

18   **THE COURT:**  All right.  Thank you.

19   Thank you, gentlemen.  I will take that under submission.

20   I omitted something.  I omitted something in my list

21   earlier of the things we have to talk about.

22   I issued an order recently inviting comment on whether

23   there were other motions that might need supplemental briefing

24   and I have would like to add that to the list and I would like

25   to do that now.  I don't know if you have had a chance to talk

1    amongst yourselves about who might take the lead on this issue.

2         Let me also say I grouped the motions for summary judgment

3    into the following categories, and hopefully you have the same

4    categories, but if not, you will tell me.  Your categories are

5    likely to be better than mine.

6         There is the Foreign Trade Antitrust Improvement Act,

7    which we call the FTAIA.  There are five motions I would put in

8    the category of unresolved ownership or control issues.  There

9    are about seven motions that talk about the absence of evidence

10   of liability as to specific defendant entities.  There are four

11   motions that talk about withdrawal from the alleged conspiracy.

12   There are two motions on standing.  There's a motion on statute

13   of limitations.  And then there are at least five motions about

14   state law claims.

15        I'm not, in this list, discussing motions to exclude

16   expert testimony or motions in limine.  I see that as work that

17   I could schedule later.

18        Let me make another comment, actually.  I've not done so

19   much table setting except -- I've not done as much table

20   setting as I might.

21        I hope one of these cases tries.  I don't care which one.

22   We don't try enough cases.  We really don't try enough cases in

23   the federal court.  We don't try enough cases anywhere.  You

24   will never at any time hear me pressure you to settle this or

25   any other case.  I love being in trial.

1    But I know that most cases do settle, and so my job as a

2 case manager in part is to give you information about case

3 value in as prompt a way as I can so that you can all make

4 decisions about whether or not to continue to litigate or try

5 the case, because it's all about opportunity costs.

6    So if you -- you can be explicit about that.  You can just

7 say, *Your Honor, I really wish you would schedule this first*

8 *and postpone this other thing and then we can do this because*

9 *then the parties will have more information about claim value*

10 *and then we can go on and mediate or whatever we're going to*

11 *do.*  I welcome that.

12    So not just with regard to the scheduling discussion, but

13 as we go forward in the case, I hope you'll give me those

14 pointers when you think they would be useful.

15    Okay.  Oh, and let me also say I have some tentative dates

16 on which we might have these hearings.  I wish I had more

17 flexibility in my schedule.

18    I asked my chief judge if I could just do your case for a

19 while and she said no.

20    I would like to have hearings on January 13th and 20th,

21 which are not very far away.  I had originally thought to have

22 the FTAIA hearing first, but I just asked for some supplemental

23 briefing on that, so the 13th doesn't really work for me.  But

24 we could do -- these are tentative.  We could do control on the

25 13th.  We could do the FTAIA on the 20th.  We could have

1   another hearing on January 27th.  We could have another hearing

2   on February 9th.  We could have another one on February 23rd

3   and we could have one on March 7th.

4        Counsel?

5        **MR. BRIAN:**  Your Honor, Brad Brian for LG.

6        Thank you for those tentative dates.  We appreciate the

7   opportunity to argue these motions.

8        You asked whether we had a request for additional briefing

9   on anything else.  We met and conferred with respect to the

10   FTAIA.  We agree with Your Honor.  Some additional briefing

11   there would be helpful and we proposed a schedule.  I think we

12   suggested 30 days from today's date.

13        With respect to the other motions, assuming there's no new

14   law or some fact that comes up in the next few weeks, we don't

15   see any need for additional briefing on any of the other

16   pending summary judgment motions.  We conferred with plaintiffs

17   and I believe they share that opinion.

18        **THE COURT:**  Counsel.

19        **MR. IOVIENO:**  Phil Iovieno for Boies Schiller, liaison

20   counsel for the direct action plaintiffs.

21        We did meet and confer and we do agree that no additional

22   briefing is necessary, barring, as Mr. Brian said, no

23   additional case law or facts that come to light.

24        There is some limited discovery that is going forward with

25   respect to one of the defendants, Mitsubishi, that the class is

1    pursuing.  It is relevant to one of the motions, 3048.

2         **THE COURT:**  Would you tell me what that 3048 relates

3    to, please.

4         **MR. IOVIENO:**  Yeah.  It relates to liability as to two

5    subsidiaries to Mitsubishi.  As we sit here today, Your Honor,

6    we put in our opposition to that motion that we -- we noted

7    that discovery was continuing.  This was in December of last

8    year.  There was 17,000 documents produced since then.  As we

9    sit here today, we have no intent to supplement, but I do note

10   that discovery -- there is some limited discovery still going

11   forward.

12        **THE COURT:**  I see.  I don't know what you mean by

13   anything that you just said because I don't know the facts of

14   the case well enough.  I feel like I have opened the book to

15   Chapter 31, you know, and I'm in the middle.  The guy is hiding

16   out in a phone booth somewhere.  Who is he running from?  I

17   mean, I don't -- did everything that you just say mean that you

18   don't want to put in any more briefs?

19        **MR. IOVIENO:**  Correct.

20        **THE COURT:**  There we go.  Okay.  See, it is the

21   holiday season.  Something for your judge.  Only supplemental

22   briefs on the FTAIA.

23        **MR. BRIAN:**  Your Honor, Brad Brian again.

24        The only other thing I would note -- I appreciate your

25   categorizing the motions.  We actually tried to do something

1 like that to help the Court's understanding on September 25.

2 We actually filed a document, document entry 4078, that put the

3 motions into seven buckets.  They are pretty similar, but a

4 little bit different than the buckets you just identified, but

5 I would invite Your Honor to take a look on that.  It does help

6 organize the motions.

7     **THE COURT:**  Let me ask you this because I'm truly

8 agnostic about this.  Do you think that -- I think, first of

9 all, there should be something in writing that's authoritative

10 about what the buckets are.  Everyone needs that, not just the

11 Court.  Counsel also need it.

12     Do the lawyers like their buckets better?  That's the

13 first question.  And then the second question is if you don't

14 care or you think the Court's buckets are fine, should I issue

15 something, just a -- I don't know what you would call it, a

16 minute order, something that just identifies the buckets that's

17 just sitting on the docket so people know?

18     **MR. BRIAN:**  My answer to the second question is yes.

19 I think it would be very helpful to have a common understanding

20 about how the motions should be grouped.

21     **THE COURT:**  Yes.  And -- well, okay.

22     We'll --

23     **MR. BRIAN:**  I don't think --

24     **THE COURT:**  I'm such a scheduling genius, I put a

25 patent claim construction hearing on my calendar this

afternoon.  So whether this gets done this afternoon, I don't

know.  But we'll get something out very shortly that makes this

clear.

            **MR. BRIAN:**  Thank you, Your Honor.

            **THE COURT:**  Okay.  Thanks.

            **MR. IOVIENO:**  Thank you, Your Honor.

            **THE COURT:**  All right.  Thank you.

    Okay.  And does anyone want to express a view about the

order in which these motions are decided?  Does anyone have a

strong view on that?  It's a quieter group than I expected.

Was I too astringent when I took the bench?  I feel sheepish

now.

            **MR. KESSLER:**  Good morning, Your Honor.  Jeffrey

Kessler for the Panasonic defendants.

    I think we agree on the defense side that the FTAIA

motions should be decided earlier in the schedule.  We

understand the 13th would not be appropriate, especially in

light of the fact that we've just proposed a supplemental

briefing schedule.

    But we think those are motions, particularly the two that

are directed commonly across almost all of the plaintiffs,

although you might want to hear all of them on the same day,

there are three that are individual --

            **THE COURT:**  You are preaching to the choir on this.

Just the effect on value one way or the another of a decision

1    on those motions is obvious.  They really cry out, I think, for

2    early resolution.

3         **MR. KESSLER:**  So I think that is one.  And the other

4    one that I think has great value significance are the ownership

5    and control motions because they either keep in or take out

6    very large portions of commerce, just like the FTAIA motions

7    do.

8         **THE COURT:**  Okay.  That's helpful.

9         **MR. GALLO:**  Good morning, Your Honor.  Ken Gallo from

10   Paul Weiss for the Sharp plaintiffs.

11       I only wanted to make an observation, not so much about

12   the order in which the Court chooses to do it.

13       There are eight motions for summary judgment that are

14   relevant to the Sharp case.  There are 29 motions for summary

15   judgment in total.  So when Your Honor is thinking about

16   buckets, it occurs to me if you were inclined to have the Sharp

17   case go earlier and alone, then there are -- one category might

18   be the motions that are related to the Sharp case.  I just put

19   it there for the Court's consideration.

20       **THE COURT:**  I'm not sure what people think *early* is.

21   I will talk about hard dates in a second because I gave some

22   thought to that, but my own tentative order, taking the bench,

23   was to do as I think I said a second ago originally, FTAIA and

24   then ownership control, but now I have to flip that order, but

25   to get those two done first.

1   After that, does Sharp have a request as to the order in

2   which the remaining motions are decided?  I don't have -- in my

3   mind, the loose groupings that I have don't include your

4   client.

5   **MR. GALLO:**  It's not so much a request.  I just didn't

6   know how you were thinking about your workload, and it occurred

7   to me --

8   **THE COURT:**  With gusto.

9   **MR. GALLO:**  I'm sorry?  I didn't --

10   **THE COURT:**  With gusto.

11   **MR. GALLO:**  Right.

12   It's not a request.  It was just an observation for you so

13   that you are aware of the fact that if you were to focus on a

14   Sharp trial, there would be 8 of the 29 motions related to

15   that, and if you thought it would be of assistance to the Court

16   to focus on those, that's all.  I just wanted you to be aware

17   of that.  I'm not advocating for anything.

18   And then I had one --

19   **THE COURT:**  Then let me frame the question in a

20   different way; see if I can get you to bite.

21   What if I really wanted to do the thing you're asking me

22   to.  How would I?  Because I don't know -- I still don't

23   know -- what are the Sharp motions?  Let's say I had said,

24   *Wow, that Gallo, he nailed it*.  I turn to my law clerks and

25   say, *We got to get these Sharp motions done*.  And they say,

*Which ones?*  And I say, *I don't know.  I asked Gallo a couple*

*times.  He wouldn't tell me.*

  **MR. GALLO:**  I'm happy to tell you.  Happy to tell you

the eight Sharp motions.  They are ECF number 2981, 2984, 2995,

3001, 3027, 3040, 3044, and 3086.

 And what I mean by that is those are motions for summary

judgment by the defendants directed at claims that Sharp

brings, not alone, not alone --

  **THE COURT:**  Right.  And I know you're really indulging

me.  I appreciate that.  You've been all ordered to file so

many different charts and that sort of thing, but if I just

wanted to Control F through the docket, I'm only going to get

the filing party.  I'm not going to pick up Sharp in that way,

so this is a helpful list.

  **MR. GALLO:**  That was my only point.  Right.  I

understand that, Your Honor.

 The only thing I wanted to just bring to the Court's

attention, there was an omission on Exhibit B that may -- it

relates to this issue of supplement representation.  There is a

motion for summary judgment, 2981, which is a Thomson consumer

motion for summary judgment.

 Exhibit B fails to tell the Court that there was a

supplemental brief filed at Docket 3506 with respect to that

motion.  So if you looked at Exhibit B, you wouldn't know that

there's an additional brief 3506 which was a supplemental

brief.

        **THE COURT:**  Right.  Okay.  Okay.

        **MR. GALLO:**  Thank you, Your Honor.  Appreciate it.

        **THE COURT:**  So from time to time, I'll think of something that might be helpful.  Hopefully I'm not trespassing on anybody's time too much.  This discussion I just had with Mr. Gallo makes me think of such a point.

    Judges -- most judges that I know love having a plan.  I'm not quite where I want to be on your case yet.  I'll get there. I would like to be able to see it the way you pick something up and hold it and you know what the other side looks like even if you're not looking at it yet.  I'm not there yet.  I'll get there.

    But if you want to tell me what the plan is, what you think the plan is from time to time, you'll have an opportunity to do that.  That's the discussion I just had with Mr. Gallo. He very respectfully urged on me something that he thought would be helpful to the case in general and coincidentally it will help his client also.  I appreciate when counsel do that.

        **MR. BRIAN:**  Your Honor, Brad Brian for LG.  One other point.

    There was some correspondence with the Court a few months ago before you were assigned this case in which the defense asked that certain motions not be decided by you but be decided by the remand court in part because -- really for two reasons.

1      One is the law in some areas is different outside the

2  Ninth Circuit, and with respect to some of those motions, it

3  was felt that it might be more appropriate for the remand court

4  to decide.

5      There was another practical consideration, to be candid,

6  which is there was so many motions pending that had been

7  sitting around for a long time that we felt we would ease the

8  burden a little bit on the judge to whom those cases were then

9  assigned.

10      One of the motions that Mr. Gallo identified was a statute

11  of limitations motion.  That's 3044.  That motion pertains both

12  to Sharp and Dell.  We have settled with Sharp so we're no

13  longer in that matter.  But we are in the matter with -- the

14  Dell matter, which ultimately will be remanded.

15      We would ask the Court, pursuant to its authority as the

16  MDL judge, to take up that motion at the same time it takes up

17  the Sharp motion.  The issues are very similar.

18      **THE COURT:**  So as to the -- just for the clarity of

19  the transcript, as to that motion, you are withdrawing your

20  request that the motion be remanded?

21      **MR. BRIAN:**  We are.

22      **THE COURT:**  I will say I've not thought through -- I'm

23  glad you raised this issue.  I haven't thought through the

24  question of remand carefully and I don't have anything

25  authoritative or dispositive to say about it.

1     In general, my instincts tell me at least to wait before

2  deciding to remand something, and I can see the advantages of

3  both sides.  You just explained the advantage of one side.  I

4  can see the advantages of holding on to these motions, too,

5  and --

6         MR. BRIAN:  And I would -- I would suggest you need

7  not decide that today and it -- the Court has some authority

8  and has some discretion and it might depend on the particular

9  motion.

10         THE COURT:  I think it might very much depend on the

11  particular motion, whether there actually is a significant

12  difference of authority and the jurisdiction to which the case

13  will be remanded.  But honestly, even if there is a significant

14  difference of authority, I might decide it.

15     I think there can sometimes be compelling reasons on both

16  sides.  And a strong case manager will sometimes decide every

17  motion in front of him and then very often frankly the parties

18  will settle their case and they're not going to go off to the

19  remand district and keep fighting.  They have enough

20  information about the value of the case.

21     So anyway, those decisions I know will be made later.

22         MR. BRIAN:  Thank you.

23         THE COURT:  Okay.  Thank you.

24     Yes?

25         MR. CURRAN:  Your Honor, Christopher Curran

1   representing Toshiba.

2        Your Honor, my client, Toshiba, is one of the defendants

3   in the Sharp case.  In a little while perhaps, Your Honor will

4   entertain argument as to why that case should not be tried

5   separately.

6        But assuming it is tried separately -- and first I would

7   like to add another motion to Mr. Gallo's list.  The motion I

8   would like to identify for possible early consideration by the

9   Court is Docket Number 3591.  It is a motion in limine, not a

10  motion for summary judgment.

11       But I mention it because, as Your Honor knows, sometimes

12  motions in limine have a pretty material effect on the value of

13  the case.

14       That motion in limine may be one such motion.

15            THE COURT:  What does it concern?

16       MR. CURRAN:  It concerns whether Sharp's economic

17  expert may testify about certain areas, and specifically Sharp

18  has, we say, late in the game modified their claim from a

19  per se price fixing violation to a rule of reason analysis.  We

20  think that that change came too late in the game.

21            THE COURT:  Okay.  I got it.  Let's not have argument.

22  I understand what the motion is about.

23       If I decide the motion tomorrow, will you settle your

24  case?

25            MR. CURRAN:  Probably not, Your Honor.

1          **THE COURT:**  Okay.  Then it's going to go in the bucket

2     with the other motions in limine.  I mean, I'll look at it, but

3     I'm just saying a kind of one-off motion in limine, you got a

4     high hill to climb.

5          **MR. CURRAN:**  Thank you, Your Honor.

6          **THE COURT:**  Okay.  Thank you.

7     Let's talk about -- this would be a good time for me to

8     thank you all for your flexibility.  I said here are some

9     dates.  Everyone just said fine.  What order do you want to put

10    these in?  Pretty much the first two that I said I wanted to do

11    first, you said let's do those first, and then for the rest of

12    them, whatever I want.  So I know that that will put some

13    burdens on all of you and I appreciate your flexibility.

14    Let's talk about trial scheduling now.  So Mr. Curran

15    anticipated one of the two main issues:  Who gets tried first

16    and who is separate, who is together.  The other is when.

17    So I didn't bring your statement up here with me.  I just

18    brought my notes.  So if I make a mistake, you'll tell me.

19    But there is a question of Sharp, the remaining direct

20    action plaintiffs, and then some leftover direct purchaser

21    plaintiffs whose cases will not be resolved by the settlement

22    we discussed earlier today.

23    There is a question about whether Sharp is tried

24    separately.  There's a question about with the DAP's, the

25    remaining DPPs, do they all have to be on the same pretrial

schedule or not.  I think these are the issues.

I can't meet any of your proposals with regard to scheduling.  There's just too much.  There isn't room at the end.  But I could do something like the following.

We could begin jury selection in the Sharp case on September the 6th.  We would have two full days of pretrial in August on the 10th and 11th.  I would contemplate continuing to have Sharp be tried separately for reasons I'll describe in a moment but which you already know because that's the existing structure.

I would anticipate putting the DAPs and the DPPs on a consolidated pretrial schedule because their trials are not going to be that far apart.  I'm just not persuaded by the burden argument here.

Assuming that things took as long as people seem to think they were going to take, we would pick a jury in the direct action plaintiffs' case on November the 7th and in the remaining DPP January 9th.  That's all we would do here for a while in this room, is we would just try cartel cases.  It will be like the Battle of the Somme; you know, people will write poems about it.

I haven't thought about what pretrial conference dates we would have in the DAP or DPP cases.  I have tried to figure that out with regard to Sharp.  We have some time.  I'm just trying to size the bubble.

1     Why would I adopt that schedule?  Why would I adopt that

2     structure besides the fact that we already -- Judge Conti

3     already has -- I have to believe that the settlement-promoting

4     effect of the Sharp trial is significant, and so balancing that

5     against the additional time required to try all the cases

6     together, I just think it's a -- it's a worthwhile -- that's a

7     worthwhile time and resource tradeoff.

8         Sharp makes a good point about how certain evidence would

9     be admissible in a joint trial that wouldn't be admissible in

10    its trial, and the people opposing that argument place an awful

11    lot of weight on the magic of a good jury instruction.  You

12    know, one of these things where you say to the jury I have a

13    gun that still has smoke coming out of it in the front, but

14    it's only admissible against one party.  So when you go back in

15    the jury room, definitely when you're talking about the one

16    person, don't talk about the gun that still has smoke coming

17    out of the front.

18        You know, for some things, those instructions are

19    appropriate.  I'm not, as I sit here now -- this is tentative.

20    I'm not persuaded that that would work here.  So these are my

21    tentative thoughts.

22        Who wants to tell me that the structure is wrong or that

23    the schedule is unworkable?  Anyone?  Mr. Curran?

24        **MR. CURRAN:**  Your Honor, I have no complaint about any

25    of the dates or anything else.  The only thing I'd like to take

1   a run at with Your Honor is the idea of Sharp being tried

2   separate from the other group.

3        Our position has been all along that interests of

4   efficiency mandate that this all be tried together.

5            **THE COURT:**  Yes.

6        **MR. CURRAN:**  We continue to have that view.  And let

7   me maybe put a couple concrete examples of why we think that's

8   the case.

9        In the Sharp case, as in, say, the DPP case -- and my

10  client is in both, so this is a question of whether we try the

11  case once or multiple times.

12           **THE COURT:**  Right.

13       **MR. CURRAN:**  The core issue will be whether there was

14  a conspiracy, whether Toshiba was in it and what the other

15  terms of the conspiracy were.  We are going to have to try that

16  twice.  We are going to have to bring witnesses from Japan over

17  in September and then bring them back in November.  We are

18  going to have to cross-examine any witnesses that Sharp and the

19  DAPs have stating that Toshiba was a conspirator.  We are going

20  to have to cross-examine them once in September and then again

21  in November.

22           **THE COURT:**  Do you think they will say something

23  different the second time?

24       **MR. CURRAN:**  Well, I don't know, but I hope they come

25  because a lot of these witnesses are nonparty witnesses over

1    whom we don't have control.

2              THE COURT:  Yes.

3         MR. CURRAN:  It's hard to try a case twice.  It's hard

4    to put on a show like that twice --

5              THE COURT:  Why will you need to?  Let me explain what

6    I mean.

7         I was on the state court for 11 years.  There are a

8    hundred people in the room who have already Googled me.  They

9    know that already.  You also know that.

10             MR. CURRAN:  I do.

11             THE COURT:  The most common case in the state court is

12   a negligence case, a tort case.  The most common negligence

13   case is an automobile accident case.  Some of them are tried.

14   The overwhelming number of them are not because there's

15   nothing -- there is no information that will arise from a trial

16   that people don't already have.  They say we could try this

17   case in which this kind of accident happened and these kind of

18   injuries were sustained, but we've seen so many such cases

19   tried already that we have a fairly reliable range of predicted

20   outcomes.  So if we tried the case, we would spend money to get

21   information that we already have which is not economically

22   rational, and so people settle.

23        Sometimes people try their cases because they're just

24   being obstinate or they have a hard time accepting the fact.

25   This is probably the most common.  But often they try their

1   cases because they don't have that information.  They say *I*
2   *don't have good enough information.  I need a jury or judge to*
3   *tell me.*

4       So my question for you is let's live in the world you're
5   now describing where you just tried a Sharp case and, as you
6   say, almost all of the issues that would arise in the second
7   trial have just been tried.  What is it that you don't know?

8       **MR. CURRAN:**  Well, what I don't know is how the jury
9   is going to reach the decision in the second trial.  Juries are
10  not predictable in that sense, Your Honor.  You know that after
11  11 years on the state court bench.

12      Having tried the Sharp case will inform but not dictate
13  what the outcome might be in the -- in a subsequent DAP case.

14      And, Your Honor, you referred to an automobile case.  As
15  Your Honor knows, in a case like this, a price-fixing case, we
16  are dealing with joint and several liability as well; right?

17      So in Sharp, even though there are only a handful of
18  remaining defendants in the Sharp case, Sharp still has to
19  prove that the conspiracy included all eight or so of the
20  alleged co-conspirators.

21      So it's basically -- it's a very similar exercise as it
22  will be in November, two months later, when different DAPs put
23  on the same evidence to a different jury to establish the same
24  point.

25      That's inefficiency.  And, Your Honor, the reason we have

1    MDLs like this, the reason the Class Action Fairness Act brings

2    state laws claims into this courtroom with a liberal

3    interpretation of diversity jurisdiction is so that cases like

4    this can be tried together.

5         And federal law and state law also say that courts should

6    take every opportunity to minimize the chances of duplicative

7    liability.

8         So while Sharp points out that they're in a different part

9    of the distribution chain than the other DAPs, we think of that

10   as a reason for a unified trial, not for a separate trial

11   because when you separate those elements in the distribution

12   chain, that encourages the possibility, it introduces the

13   possibility of duplicative damages.

14        And, Your Honor, I wasn't sure what you were referring to

15   when you talked about the smoking gun and Sharp evidence being

16   kept out.  You might have been talking about the fact that

17   Sharp has a guilty plea.  They're a convicted felon in the LCD

18   case.

19             **THE COURT:**  It was an extremely poor analogy, the

20   first of many in the case, I'm afraid.

21             **MR. CURRAN:**  Well, if I --

22             **THE COURT:**  And really -- you and I are not doing the

23   rest of the room any favors by even bringing it back up again,

24   but anyway . . .

25             **MR. CURRAN:**  Well, if I inferred correctly that the

smoking gun is Sharp's conviction in the LCD case, I suggest to

Your Honor that smoking gun probably is going to come in no

matter what case gets tried because LCD is a substitute for

CRTs, and it strikes me that in any CRT case, the fact that

the -- a plaintiff is convicted of price fixing a substitute

good is going to come in, at least as to economic impact and

damages.

**THE COURT:**  Sort of a *once a price fixer always a*

*price fixer* kind of thing?

**MR. CURRAN:**  Maybe.  Maybe.  Well, no, no, no.

**THE COURT:**  We'll see how that goes.

**MR. CURRAN:**  Maybe I didn't explain that correctly.

No.  Good question.  Here is my answer to that.

If you are price fixing a substitute good, that can effect

the damages of alleged price fixing on an alternative

substitute.

**THE COURT:**  Yes.

**MR. CURRAN:**  Okay.

**THE COURT:**  Assuming --

**MR. CURRAN:**  That's why it's relevant to --

**THE COURT:**  Assuming --

**MR. CURRAN:**  I'm sorry.

**THE COURT:**  No.  I should apologize.  I spoke over

you.

As a matter of Economics 101, what you say has some merit,

1  assuming that the substitutes are sufficiently close.  If I

2  went out on the sidewalk today and I were hawking cathode ray

3  tubes as a substitute for anything, I don't know how far I

4  would get, but I hear what you're saying.

5      **MR. CURRAN:**  The alleged conspiracy starts in 1999

6  when these were very close substitutes, Your Honor.

7      Anyway, the bottom line is we're going to be here

8  whether -- you know, whenever Your Honor calls the jury, we're

9  going to be here whether it's in the Sharp case or the Best Buy

10  case.  We think we and you ought to do it just once.  And

11  Your Honor referred to the settlement-inducing effect of

12  setting a trial date.

13      **THE COURT:**  I'm a rational economic actor, too.  If

14  only my time were at issue, I would try everybody together.

15      **MR. CURRAN:**  Well, I suggest to Your Honor that

16  interests of efficiency and fairness suggests that a unified

17  trial is preferable.

18      Thank you for hearing me out.

19      **THE COURT:**  Thank you.

20      Mr. Gallo.

21      **MR. GALLO:**  Thank you, Your Honor.  I'll take the

22  points as you addressed them Your Honor.

23      On settlement, I agree with the Court.  I think it will be

24  very instructive.  It's going to make a big difference to

25  Mr. Curran and his client and to Thomson in the subsequent

1    settlements the outcome of our case.  It will send a message to

2    everybody in the rest of the cases.  They will watch the trial

3    and they will see the outcome and it will inform settlement

4    positions.  It seems impossible to conclude otherwise on that

5    point.

6        But more importantly from my perspective is the

7    prejudicial effect of the pass-on evidence.  If we're in a case

8    with other plaintiffs and there is evidence that manufacturers

9    like Sharp pass on a significant part of the overcharge, it

10   will have a very negative effect on my client.

11       **THE COURT:**  Yes.  I had that in mind.  I had that more

12   in mind than the guilty plea.  I don't -- I've not read -- I've

13   not read enough -- I've not read anything beyond what is in the

14   case management statement so I don't know what the law is

15   actually with regard to the admissibility of that guilty plea

16   or whether other courts have faced similar enough

17   circumstances.

18       I do tend to think that there is at least a nonfrivolous

19   concern that that evidence is more prejudicial than probative,

20   but much more important in my thinking was this question of the

21   pass-on evidence and my worry that the jury might conclude that

22   you didn't have any damages.

23       **MR. GALLO:**  Your Honor, I know that that's what would

24   happen and I'll tell you how I know, because I go -- do the

25   same kind of jury research that Mr. Curran does.  And he knows

it will happen, too.  Because every time you try one of these

antitrust cases to a mock jury, they go back in the room and

the first thing that comes out of their mouth is you know,

we're the ones that are getting hurt here because all those

big corporations pass it down the line and we, the consumer,

ending up paying the price.

    That's the first thing that's in the jury's mind, and

that's -- *Hanover Shoe* says the jury is not allowed to consider

that.  And if I'm in a trial and passover evidence comes --

pass-through evidence comes in, the jury is going to not give

Sharp damages and Mr. Curran knows that and I know that and

that's the problem.

    Just one word on this guilty plea thing.  I have to make

the point.

    Different corporation, Japanese corporation, pled

guilty --

            **THE COURT:**  Or not.  Or you don't need to.

        **MR. GALLO:**  Okay.  May I say one thing?

    Toshiba pled guilty and they are saying that they are --

            **THE COURT:**  Please stop.

        **MR. GALLO:**  All right.  Thank you.

            **THE COURT:**  Really, really.

    So Mr. Curran has already gotten this comment when he was

here before, which had a mixed effect, by the way.  Because

what happened at the prior hearing was he convinced me to undue

1    something that had already been done in the case.  So this is

2    sort of -- this is on me; right?

3        But I said to him, as I would now say to you, his worthy

4    opponent, you can throw a hard punch, can't you?  And when I

5    said that to Mr. Curran, he said *yes and take one* and then he

6    sat down.

7        We'll have many occasions here with so many of you where

8    someone has said something that you can feel makes your pulse

9    quicken.  *That can't be right*.  *Judge Tigar cannot leave the*

10   *bench thinking that this is the state of affairs.*

11       Judge Tigar isn't thinking about it at all.  I have 172

12   decisions to make every day in this case.  I'm just trying to

13   make most of them.

14       Things that aren't before me today, when your opponent

15   rises and gets up and calls you a name and says that you

16   didn't -- that you were a price-fixer or you didn't actually

17   have any damages or your witnesses were liars or whatever they

18   say, it just goes in one ear and out the other.

19       I wouldn't worry about what Mr. Curran said.

20       Thank you, Mr. Gallo.

21       Mr. Curran, do you have something else to raise?

22           **MR. CURRAN:**  This will probably go in one ear and out

23   the other.

24           **THE COURT:**  Are you going to say it anyway?

25           **MR. CURRAN:**  I feel I must.

1          THE COURT:  The room is waiting.

2          MR. CURRAN:  Because Mr. Gallo just said Toshiba pled

3  guilty as well.  Toshiba never pled guilty --

4          THE COURT:  No.  You have to stop.  No.  Now you have

5  to sit down.  Are you honestly responding to something that I

6  wouldn't let him finish?  Please, sit down.  Please, sit down.

7          MR. CURRAN:  He finished.

8          THE COURT:  Please, please, please sit down.  We are

9  done talking about that.  All right.  Obviously I did not make

10  my other point in a clear enough way.

11      Let's move on.

12          MR. KESSLER:  Your Honor --

13          THE COURT:  Say your name again.

14          MR. KESSLER:  Jeffrey Kessler for the Panasonic

15  defendants.

16      Also on this issue, speaking for LG and Mitsubishi as

17  well -- and I promise I won't say anything nasty about anybody

18  else in the room.

19          THE COURT:  Yes.

20          MR. KESSLER:  Your Honor, on the issue of the Sharp

21  trial, we agree completely with Your Honor's tentative for

22  these three defendants.  I just want to add in one more

23  consideration.

24          THE COURT:  Yes.

25          MR. KESSLER:  Which is that our defendants settled

with Sharp and we are very concerned about the prejudicial

effect of having those settlements come in in a case where

we're contesting liability and the inability of jury

instructions to deal with that, so that's just one more factor

for all the ones that you mention.

We think that Judge Conti got this one right when he said

putting it all together is going to be a big mess.  We think

it's hard enough for the jury to try these complicated cases in

bites, and we would suggest you stand by your tentative

decision.

Thank you.

**THE COURT:**  Thank you for those comments.  That point

was made in the joint case management statement and it was one

of the reasons for my tentative.

Good morning.

**MS. OSBORN:**  Good morning.  Kathy Osborn for the

Thomson defendants.

**THE COURT:**  Would you say your last name again.

**MS. OSBORN:**  Osborn.

If I may, Your Honor, I just want to make a couple of

points on this issue and actually invoke some law on the issue.

**THE COURT:**  This is the issue of which defendants get

tried together and separately?

**MS. OSBORN:**  Correct.  Correct.  And the Thomson

defendants are one of the defendants still left with the Sharp

1    plaintiffs who have not settled, so I agree with everything

2    Mr. Curran said.

3        I wanted to add as well that with regard to the concerns

4    about pass-on evidence being presented and the concern about

5    settlements coming in, those concerns are going to be at play

6    in a DAP trial as well, direct action plaintiff trial

7    because --

8            **THE COURT:**  Someone's phone is going off, which is --

9    that happens.  It's so many people.

10           **MR. CURRAN:**  Your Honor, it was mine.  I apologize.

11           **THE COURT:**  This is my reminder to you:  Hey, check

12   the phone.  I don't have the thing like they have in the movie

13   where they have the funny trailer with the cartoon characters

14   and somebody's phone goes off and everyone says *oh, yeah*, and

15   they turn their phones off.  Just do it now.

16       Go ahead.

17           **MS. OLSON:**  Your Honor, by my calculation, there are

18   only three California direct action plaintiffs left in the

19   case, setting aside Sharp.  That would be Best Buy,

20   Sears/K-Mart and Viewsonic.

21       Every one of the defendants in those cases who are still

22   left have settled with other of the plaintiffs still left.  So

23   there is going to be settlement evidence come into the DAP

24   trial no matter what we do.

25       In addition, I think the law is clear in this situation

1  for the efficiency, cost reasons that Mr. Curran raises, that

2  it is the goal of our law to have joint trials where possible.

3  In fact, our United States Supreme Court spoke on this and

4  said, "Joint trials serve important interests by reducing the

5  risk of inconsistent verdicts and the unfairness inherent in

6  serial trials, lighten the burden on witnesses, increase

7  sufficiency, and conserve scarce judicial resources."

8       Another court said, "Any risk of prejudice in a joint

9  trial are presumptively outweighed by the conservation of time,

10  money and scarce judicial resources that a joint trial

11  permits."

12       And the Central District of California has said, "That

13  juries are commonly required to examine different damages

14  theories and could do so here with the proper jury

15  instructions."

16       One of my concerns as a representative of the Thomson

17  defendants is that right now, the schedule you propose has the

18  Sharp and DAP trials back to back within a month of one

19  another.  I have a lean core team because of the Thomson

20  financial issues that were presented to you in the DPP approval

21  papers.

22          **THE COURT:**  Yes.  I actually am quite familiar with

23  those issues because of that purpose of this morning's hearing.

24          **MS. OSBORN:**  So my personal concern is that I will be

25  defending my client in a trial against Sharp, feverishly

1    working on that case day and night, as you know as these things

2    go, while my colleagues are preparing for the DAP trial that

3    will occur on the heels of Sharp trial, and that my client will

4    be prejudiced and unduly burdened because we can't

5    significantly participate in that last month or two trial

6    planning that's going on for the DAP trial.

7         And I might add that of course my --

8         THE COURT:  Can't you just scare these DAP plaintiffs

9    the way you did the DPP plaintiff that you don't have any money

10   and that they should take pennies on the dollar?

11        MS. OLSON:  I'm working on that, Your Honor, but so

12   far it has not been successful.

13        THE COURT:  There you go.

14        MS. OLSON:  One other point I wanted to make is of

15   course my esteemed defense colleagues and the other plaintiffs

16   want these trials separate because they will be able to come

17   and observe this trial, send their attorneys to observe what we

18   are doing, learn from our mistakes and our successes, and then

19   be better prepared for the second trial which we are not going

20   to be able to sufficiently prepare for because my core team

21   will be defending the Sharp trial.

22        THE COURT:  Thank you, Ms. Osborn.

23        MS. OSBORN:  Thank you, Your Honor.

24        THE COURT:  That brings me to something I wish I said

25   earlier about the DPP settlement.  It's a minor point.  Because

it's minor, I'm likely to put in a footnote, but I just thought

I would say something in court about it because often in these

settlements orders, people are just looking at the last page

because it has the word *approved* or *not approved* on it.

In the motion, the plaintiffs say this was a good result

for the plaintiffs.  And they cite a 1985 case from the Eastern

District of Pennsylvania.

I try to be a close reader when I can be.  I thought I

wonder if that's the best evidence on whether this is a good

result.  Surely there must have been a price-fixing case since

1985 or one that was decided geographically closer to where I

am than the Eastern District of Pennsylvania.

I don't want to belabor the point.  A year or two ago,

Professor Lande and Professor Connor actually published in the

Iowa Law Review -- I found this on Westlaw -- a survey of the

results, settlement results of 71 cartel cases that they had

been able to identify.  I don't have the citation with me, but

it will be in the order.  I'll make mention of it.

You can read the article for yourself and you can decide

what percentage you think represents a good result for

plaintiffs.  There's a table there.

So anyway just a point that I care a lot about your work.

I try to read it closely.  That's all.

I have a very few housekeeping things.  Are there other

things that folks came to discuss?  Something come up for you

today?  No?  Okay.

**MR. KESSLER:**  Your Honor --

**THE COURT:**  Mr. Kessler.

**MR. KESSLER:**  I'm just going to provide some information for the Court which you may or may not find useful or not useful, which is that as you're scheduling on your dates for the various arguments --

**THE COURT:**  Yes.

**MR. KESSLER:**  -- January 13th actually right next door in Judge Donato's courtroom In the Capacitor's MDL is going to be the summary judgments on the FTAIA issues which, one, may be of use to this Court if the opinion is actually issued rather promptly, which I think Judge Donato's practice is to move fairly quickly, but second, it would be another reason not to schedule FTAIA issues, if possible, on the 13th.

**THE COURT:**  I'm not going to do that.  As I said earlier, just because we've got these supplemental briefs coming in and I'm not going to have enough time to really read those and think about those if I put the argument on the 13th.

**MR. KESSLER:**  And then of a similar vein, on January 20th, happens to be the -- every quarter there is a meeting of the auto parts MDL, which a number of counsel are also involved in on both sides here which -- and I'm not suggesting you alter your January 20th date at all, but it might affect which motions to schedule that -- if there happens

1    to be one schedule that counsel has a commitment in that other

2    MDL that just happens to be on the same date.  I just wanted to

3    advise the Court about that.

4          **THE COURT:**  I appreciate that.  I'm sensing some

5    opportunities for junior lawyers all of a sudden, which will be

6    good for all of us.

7          Mr. Gallo.

8          **MR. GALLO:**  One similar housekeeping issue.  On the

9    March 7 date if it would be possible for the Court not to

10   schedule the eight -- the motions, the eight motions that are

11   directed at Sharp on March 7th, it would be helpful.  The three

12   most senior people on -- at Paul Weiss on the case are all in

13   different trials on March 7th.  Thank you.

14         **THE COURT:**  Thank you.

15         And, again, just so everyone knows, what's happening here

16   is of course I want not to make the case harder for you than it

17   needs to be.  That's my default.  So if you make a request and

18   I can do it, of course I'll do it.  Always.  And I'll give you

19   as much notice as I can before I'm going to do something if I

20   can.

21         But I'm also trying to manage your expectations when you

22   make the request so you won't be disappointed if I have to deny

23   it.  That's what we are doing now.

24         Please.

25         **MR. TRUAX:**  Good morning, Your Honor.  It's Terry

1    Truax on behalf of the Mitsubishi Electric defendants.

2         Your Honor, we are a defendant in a few of the DAP cases.

3    Most of them have been resolved.  The one case in the DAP arena

4    that is left is the Best Buy case that we remain a defendant

5    in.

6         I wanted to just address as a housekeeping matter our

7    involvement in the DPP class case.  We're the only defendant in

8    that case.  And I -- in the joint case management scheduling

9    that we submitted to the Court, there were sort of dueling

10   schedules, if you will, that were submitted by both the

11   plaintiffs class lawyers as well as Mitsubishi Electric, and I

12   don't know that Your Honor wants to get into the granularity of

13   that now, but I wonder --

14             **THE COURT:**  No.  Please, say what you came to say.

15             **MR. TRUAX:**  Well, on that point, Your Honor, I think

16   we can -- what I would suggest is giving Your Honor direction

17   that you would be looking to perhaps have the DPP case resolved

18   or tried in early January of 2017.  What I would suggest is

19   that we leave this hearing today and that I confer with class

20   counsel about working out a schedule that backs its way out

21   from January of 2017 because there are dates in there, for

22   example, Your Honor, where we had some very strong disagreement

23   around experts, for example.  They have a proposal to submit

24   expert reports and giving us only a month to respond to that,

25   and we felt that that wasn't appropriate, but some of that was

1    a result of compression of schedule.  You've now given us some

2    suggestions.  I would suggest that I confer with Mr. Saveri and

3    work out a schedule that makes sense.

4            **THE COURT:**  Okay.  That sounds good.

5        Mr. Saveri.

6            **MR. SAVERI:**  That is agreeable with the class

7    plaintiffs, Your Honor.  Now that we have the trial date,

8    that's great, and we will work back a schedule.

9            **THE COURT:**  These dates are not -- they are meant to

10   be as firm as they can be, but they're not quite firm.

11           **MR. SAVERI:**  No.  That's fine, Your Honor.  It was

12   mentioned earlier and I just want to bring it up now.  First of

13   all, none of these motions are in our case.  So that's one of

14   the things we've got to unfortunately, Your Honor -- not that

15   you want more motions in our case and we only have one

16   defendant left, which is Mitsubishi, and we've --

17           **THE COURT:**  You mean you might file some more motions?

18   That's fine.

19           **MR. SAVERI:**  Maybe, Your Honor.  But down the road.

20       The other thing is this:  We are the only group that is

21   currently doing fact discovery.  So there's -- Judge Walker has

22   a bunch of motions over there.  There's a spoliation motion.

23   So I agree with Mr. Truax, we will get our date and get a

24   schedule and work back, Your Honor.

25           **THE COURT:**  Thank you.

1          **MR. TRUAX:**  Your Honor, may I ask also one

2    housekeeping issue.  With respect to your inclination to set

3    dates for arguments on summary judgment, we had prioritized

4    motions relating to Mitsubishi Electric among the list that

5    were submitted to the Court.

6          Is it your intention, for example, on the issues of

7    liability -- that was one of the buckets -- that you would hear

8    argument from each of the defendants individually or how would

9    you anticipate the proceeding on whatever date is set would

10   unfold?

11          **THE COURT:**  I don't know.

12          **MR. TRUAX:**  We would request, I think, and I

13   suspect -- I haven't conferred with the other defendants, but I

14   suspect many of them would be in the same place -- that we

15   would like an opportunity at least on those individuals motions

16   to have an opportunity to address that.  I'm confident we can

17   do it efficiently and succinctly, but there is certainly

18   arguments that I think the Court would benefit from,

19   particularly given the breadth of this record that Your Honor

20   has very well displayed to us this morning as we walked into

21   the courtroom.

22          **THE COURT:**  That was nice but undeserved on my part,

23   what you just said.

24          So I say I don't know because the challenge of this case

25   is making sure that everyone has an opportunity to be heard and

that they are seen to have had an opportunity to be heard.  So
you can go to your clients.  If your clients feel we got our
oar in the water on this before Judge Tigar made a decision,
it's difficult.

I had a hearing the other day.  It was a very large
privacy case.  For all I know, one of your -- I'm sure at least
some of the firms in the room are in that case, too.  It has to
do with the iPhone and that sort of thing.

There were five different defendants who wanted to argue
on one side and then the plaintiffs just on the other.  I said
I'm going to give you an hour.  The plaintiffs can have 25
minutes and the defendants can have 7 minutes each.  And if you
don't tell me how you're going to use it, you're going to use
it in this way.  You're going to argue in this order.  Person
one, person two, etc.  And I'm not going to keep track of your
time except for the 35.  So if the person in front of you eats
your time, that's not my problem.  Now, I know that sounds
harsh, but I just gave you twice -- I just gave you twice as
much time as we gave the lawyers when I sat by designation on
the Ninth Circuit two weeks ago.  What else am I going to do?

So I say *I don't know* not because it's not important, but
because on all the dates -- that's not true.  On almost all the
dates I just mentioned, we have more than one motion.  The
issues are common.  And everyone will be anxious to say his or
her piece.  What will I do?  I don't know.  Let's wait until

1    the day comes.

2        If counsel stand up and say all of us on both sides have

3    spoken and we have a sensible way to use an amount of time that

4    we know will appeal to Your Honor, well, probably I'll do that.

5    It rarely happens.  So then I'll think of something.

6            **MR. TRUAX:**  Understood.

7            **MR. SAVERI:**  Thank you, Your Honor.

8            **THE COURT:**  Thank you.

9        Yes?

10           **MR. BLECHMAN:**  Thank you, Your Honor.  William

11   Blechman on behalf of plaintiff Sears and K-Mart and speaking

12   on behalf of the direct action plaintiffs who are in the

13   Northern District of California.

14       On the subject of a plan and housekeeping, one point only.

15   That in connection with the preparation for the trial dates

16   that Your Honor has tentatively proposed, we suggest that the

17   Court consider a unified pretrial schedule with respect to

18   pretrial milestones with respect to the Sharp and the other

19   direct action plaintiffs' cases in the Northern District of

20   California.

21       We have operated effectively *de facto* in that way to now.

22   We have done an enormous amount of the work already, including,

23   for example, exhibit lists, witness lists, deposition

24   designations.  To be sure, Your Honor, there is additional work

25   to be done.

1    But we think the interests of efficiency, both for the

2   litigants and for the Court, are best served if we are able to

3   prepare on parallel tracks together in a coordinated way for

4   those milestones.

5    We have made suggestions in the joint statement that we

6   submitted to the Court.  Those dates perhaps would be moved

7   back consistent with whatever trial date the Court selects, the

8   tentative date or others.  But we -- I just want to put a

9   placeholder in or a pitch under the guise of housekeeping that

10   that sort of scheduling be done because we think it serves the

11   interests of everyone.

12    **THE COURT:**  Thank you, Mr. Blechman.

13    Rather than take comments with regard to the -- and I'm

14   going to have to get off the bench in just a moment because

15   there's a criminal case that needs my attention.  I have just

16   gotten a note.

17    But rather than say too much about that now, let me say

18   something that I think will be helpful on that point.

19    It's Mr. Blechman; correct?

20    **MR. BLECHMAN:**  Yes, Your Honor.

21    **THE COURT:**  Mr. Blechman, I really like -- first of

22   all, I didn't say anything beyond giving you these tentative

23   dates about pretrial scheduling because I knew I was setting

24   dates that were different than the ones you gave me that gave

25   you more time and that the use of that time probably should be

```
1    subject to negotiation, not in-court discussion at this point.

2    So I hope that will happen.

3         And you'll be able to advance the view you advanced, and

4    some others may say we want different tracks and the parties

5    can start to try to work that out.

6         When it comes time to do that scheduling, and that will

7    come probably pretty soon, I am likely to decide that issue as

8    I decide many things in a baseball arbitration way.

9         I love baseball arbitration so much.  Not because I know

10   so much about baseball.  I don't.  It penalizes excessive

11   positional bargaining and it rewards compromise.  Probably you

12   all know how baseball arbitration works, but I'm just going to

13   assume for the sake of argument that one of you doesn't and if

14   the rest of you will humor me, I'm going to explained it to

15   that person.

16        As I understand it, when a baseball player and the owner

17   get into a salary dispute, it goes to arbitration, to a

18   specialty arbitration for baseball salaries.  The owner puts in

19   a number and the player puts in a number.  The arbitrator has

20   to pick one of those numbers.  The effect of that is to greatly

21   incentivize a reasonable -- reasonable proposals and to

22   penalize unreasonable proposals.  And I'll give you an example.

23        Let's say that I am a baseball player and I believe I

24   should be paid five million dollars.  Well, I believe I should

25   be paid ten, but I tell the arbitrators five.  The owner
```

doesn't want to pay me more than a million dollars and in fact that's what the owner says to the arbitrator, *Tigar should get a million*.

The arbitrators are specialists and they know that in the market for a baseball player's services, I'm worth four.  They give me the five because they would rather -- because, first of all, it's closer to the market -- it's closer to the market price.  And they would rather overpay me by a million than underpay me by three million, and those are the choices they have.

I like it so much that I put it in a footnote in another case and then I wrote a note to West saying *would you please index this order.*  So I could say, as I say to you now, that if you go on Westlaw and you type Judge, left parentheses, Tigar, close parentheses, and quotation mark, baseball arbitration, close quote, only one thing will come up and it will be this thing.

So when you come to me and you say *I would like a schedule in my case,* I will try very, very hard not to go a third way.

If you come to me and say, *Oh, it turns out there's a little discovery left to be done; we agree on that but we don't agree on what it is,* and you -- one side says *I think the discovery should be this* and the other side says *I think it should be that,* I will try very, very hard to pick one of those proposals, even though I know I'm injuring somebody's interests

1   when I do it.

2       This predisposition on my part plays out in other ways,

3   too, but we'll -- we'll see that as we go along.

4       To your point, I think the parties should continue to

5   talk.

6       Mr. Brian.

7       **MR. BRIAN:**  Your Honor, with respect to that on that

8   point, I agree with Your Honor's suggestion that we meet and

9   confer.  Should we take it up at one of those dates that you

10  scheduled?

11      **THE COURT:**  Well, this is on my list, what's the next

12  case management conference.  This has been useful.  Probably we

13  could use a little more.  I wonder what the burn rate is in

14  this room right now.

15      Why don't counsel meet and confer actually, and I would

16  appreciate getting a proposal for which there is no deadline,

17  but a joint proposal only as to what a sensible case management

18  schedule would be.  Do we have them at the motion hearings, do

19  we need something else?

20      **MR. BRIAN:**  We will do that --

21      **THE COURT:**  Is that adequate to the task, this

22  suggestion that I'm making, or do I need to give people more

23  direction?

24      **MR. BRIAN:**  No.  This is a mature crowd, Your Honor.

25  We understand.

1          **THE COURT:**  All right.  Very good.

2          I do need to get off the bench.  I apologize.  Let me make

3     these few comments and then we will conclude today's

4     proceedings.

5          Please consider whether you continue to feel good about

6     all of the papers that you have filed for the Court's

7     consideration.  I will give you just one example.

8          ECF No. 3451, we have 73 distinct objections to the

9     evidence that was submitted in connection with a single motion

10    for summary judgment.  The motion in question appears at 2974.

11    That's the sealed edition, but presumably you all have access

12    to that.  The unsealed -- excuse me.  The redacted and so forth

13    is at 2976.  I've not read all the objections, the 73 distinct

14    objections.  I didn't go back for each one and see what they're

15    objecting to, but I was curious.

16         Oh, here it is.  Okay.  It's this.  Just holding up a

17    table.  That's the whole objection.  Declaration of so and so,

18    exhibit so and so.  Objection, hearsay, 802.

19         So then I went to the evidence, the exhibit to this

20    declaration of Anderson.  The exhibit itself turns out to be a

21    declaration from somebody.

22         Someone is making a hearsay objection to a written

23    declaration that was submitted in connection with the summary

24    judgment motion.  Who did that?

25         Now, I could be missing something.  Please, when you go

back and you look up 3451, which I know you're all going to do,

consider that I might be wrong and unfair to that person.   I

did this in haste, but it seems at least possible that a very

junior lawyer was put in a room and asked to gin up some

objections.   And he got a declaration and he said well, it's an

out-of-court statement.   It's being offered for the truth.

Hearsay.

These things happen.   It would be tough if we couldn't use

declarations and summary judgment motions, wouldn't it?   It

would.

So, please, please, for the sake of your credibility on a

going-forward basis with the Court, which is an item that will

fluctuate in this case, consider whether there is anything that

you would like to withdraw.   This is not a request for further

briefing.   We have lots of briefs.   Okay.   That's the first

thing.

Secondly, we have rules about font and that sort of thing

in the local rules.   Twelve point font.   How many lines.   Why

do we have that?   Well, the font has to be big enough that I

can read it.   You see I use reading glasses.   There is that.

Also it's a way of making sure that we place limits on the

amount of text that people are giving us because we can't just

read unlimited things.

We don't have a prohibition on the amount of footnotes

that people do.   *Do* is the wrong verb.   But we all know that

1   footnotes are in single space so if you had a brief that had,

2   say, 40 to 80 footnotes in it, which is not an exaggeration in

3   this case, it would have the effect, number one, of making your

4   argument chaotic and difficult to follow so that's not going to

5   help you win.  And number two, it might look as though you were

6   trying to evade the local rules.

7       Why would you do that?  Why would you try to convince a

8   judge of something at the same time that you appear to be

9   trying to evade the rules that govern his court?  I don't know.

10      It's not the Northern District Law Review.  We don't need

11   40 footnotes.  We definitely don't need them in single space

12   type.  Please.

13      My colleague just -- Judge Freeman was just in the news,

14   by the way, about footnotes and issued an order for this very

15   reason.  So it's something we pay attention to.  All right.

16   That's a little schoolmarmish, but those are my last two

17   things.

18      Thank you all very much.  This hearing is adjourned.

19             (Proceedings adjourned at 11:06 a.m.)

20                      ---oOo---

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4           I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Thursday, December 17, 2015

8

9

10

11   *Pamela A. Batalo*

12   _____
     Pamela A. Batalo, CSR No. 3593, RMR, FCRR
13   U.S. Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25