# EXHIBIT 2

**Robert J. Bonsignore, Esq.**
**BONSIGNORE TRIAL LAWYERS, PLLC**
**3771 Meadowcrest Drive**
**Las Vegas, NV 89121**
**Phone: 781-856-7650**
**Email: rbonsignore@classactions.us**

*Counsel for Indirect Purchaser Plaintiffs*


# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** | Case No. 3:07-cv-5944<br>MDL No. 1917 |
| | **CLASS ACTION** |
| This Document Relates to:<br><br>All Indirect Purchaser Actions | **MOTION FOR PERMISSION TO FILE REPLY IN SUPPORT OF OBJECTIONS TO LEAD COUNSEL'S MOTIONS FOR FINAL APPROVAL AND ATTORNEYS' FEES** |

1    Pursuant to Federal Rule of Civil Procedure 6 and Local Rule 6-3, this Motion for

2    Permission to File Reply in Support of Objections to Lead Counsel's Motions for Final Approval

3    and Attorneys' Fees is submitted by class members and indirect purchasers of Cathode Ray Tube,

4    Anthony Gianasca, Gloria Comeaux, Mina Ashkannejhad individually and/or as Administrator of

5    the Estate of the Late R. Deryl Edwards, Jr., Jeffrey Speaect, Rosemary Ciccone and Jeff Craig

6    (the "Plaintiffs"), through their counsel Bonsignore Trial Lawyers, PLLC.[1]  In support of this

7    Motion, Plaintiffs state:

8         This and the accompanying papers are respectfully submitted in reply to Lead Counsel's

9    Motions for Final Approval and for Attorneys' Fees. The Reply was to be filed via the JAMS

10   Electronic Filing System by December 9, 2015. Plaintiffs' Gianasca and Ashkannejhad were not

11   timely provided with copies of their deposition transcripts and full attachments through no fault of

12   their own.  In fact, Ms. Ashkannejhad still has not received a copy of her October 29, 2015

13   deposition or its exhibits.

14        Pursuant to Federal Rule of Civil Procedure 6(b)(1)(B), when a party moves the Court to

15   accept a filing after a deadline, the court may do so "where the failure to [file before the deadline]

16   was the result of excusable neglect."  The standard for determining excusable neglect is set by

17   balancing the following five factors:  (1) the danger of prejudice to the nonmoving party; (2) the

18   length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay;

19   (4) whether the delay was within the reasonable control of the moving party; and (5) whether the

20   late-filing party acted in good faith.  *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507

21   U.S. 380, 395 (1993).

22        Here, the filing of Plaintiffs' Reply will harm neither the Defendants nor Lead Counsel by

23   leave of Court.  If the Court permits Plaintiffs' Motion there will be no impact upon any

24   proceedings.  The delay in the filing is less than one week and will therefore not impact the

25   hearing scheduled for March 15, 2015 on Lead Counsel's motions or any further related filing.

26

27   _____

[1] Moving counsel has requested that Lead Counsel stipulate to this request and will promptly
28   advise if an assent is granted.

1

MOTION FOR PERMISSION TO FILE REPLY IN SUPPORT OF OBJECTIONS TO LEAD COUNSEL'S

1     Although the widow Ashkannejhad is prejudice by the fact she does not have the benefit of her

2     deposition, she has approved this filing because she has no reasonable alternative. The delay was

3     not the result of any manipulation, animus or bad faith on her part. At best it was inadvertence on

4     the part of another who she has no control over.  The production and timing of the receipt of the

5     Gianasca deposition[2] was also not within the control of Plaintiffs. Indirect purchasers of Cathode

6     Ray Tube, Anthony Gianasca, Gloria Comeaux, Mina Ashkannejhad individually and/or as

7     Administrator of the Estate of the Late R. Deryl Edwards, Jr., Jeffrey Speaect, Rosemary Ciccone

8     and Jeff Craig contend the delay was not carried out by them in bad faith and is excusable.

9         Accordingly, Plaintiffs request that permission to file a reply in support of their objections

10     to lead counsel's motions for file approval and attorneys' fees in the form attached hereto as

11     Exhibit A be granted and that the Order attached hereto as Exhibit B be entered in this case.

12

13     Dated:  December 15, 2015              Robert J. Bonsignore

14

15                                      /s/ Robert J. Bonsignore

16                                      Robert J. Bonsignore (NH 21241)

17                                      Bonsignore Trial Lawyers, PLLC

                                     3771 Meadowcrest Drive

18                                      Las Vegas, NV 89121

19                                      Telephone:  (781) 856-7650

                                     rbonsignore@class-actions.us

20

21

22

23

24

25

26

27     [2] The Gianasca deposition contains transcription errors and the attachments returned do not match
    the record of what was produced. While these discrepancies can be worked through, they took time

28     to sort out.

MOTION FOR PERMISSION TO FILE REPLY IN SUPPORT OF OBJECTIONS TO LEAD COUNSEL'S

1

2

3

## CERTIFICATE OF SERVICE

I, Robert J. Bonsignore, hereby certify that on this 15th day of December 2015, I caused the foregoing to be electronically filed with the JAMS Electronic Filing ("JAMS") System, which will send a notice of electronic filing to all parties registered with the JAMS system in the above-captioned matter.  A copy will be forwarded via first class mail, postage prepaid, to those parties not electronically registered.

/s/ Robert J. Bonsignore
Robert J. Bonsignore

3

# EXHIBIT A

1  **Robert J. Bonsignore, Esq.**
   **BONSIGNORE TRIAL LAWYERS, PLLC**
2  **3771 Meadowcrest Drive**
   **Las Vegas, NV 89121**
3  **Phone: 781-856-7650**
   **Email: rbonsignore@classactions.us**
4
   *Counsel for Indirect Purchaser Plaintiffs*
5

6

7                    **UNITED STATES DISTRICT COURT**

8                   **NORTHERN DISTRICT OF CALIFORNIA**

                        **SAN FRANCISCO DIVISION**
9

10 **IN RE: CATHODE RAY TUBE (CRT)**     Case No. 3:07-cv-5944
   **ANTITRUST LITIGATION**             MDL No. 1917

11                                       **CLASS ACTION**

12                                       **DECLARATION OF ROBERT J.**
   This Document Relates to:             **BONSIGNORE IN SUPPORT OF MOTION**
13                                       **FOR PERMISSION TO FILE REPLY IN**
   All Indirect Purchaser Actions        **SUPPORT OF OBJECTIONS TO LEAD**
14                                       **COUNSEL'S MOTIONS FOR FINAL**
                                         **APPROVAL AND ATTORNEYS' FEES**
15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    I, Robert J. Bonsignore, pursuant to 28 U.S.C. § 1746 hereby declare:

2        1.      I am a member of the bars of the states of New Hampshire and Massachusetts  and

3    have been admitted *pro hac vice* to this Court.  I am a partner in the firm Bonsignore, LLC,

4    Counsel for the Indirect Purchaser Plaintiffs in the above-captioned matter.  I have personal

5    knowledge of the facts stated below and with the proceedings in this case.

6        2.      I submit this Declaration in support of this Motion for Permission to File Reply in

7    Support of Objections to Lead Counsel's Motions for Final Approval and Attorneys' Fees

8    submitted by class members and indirect purchasers of Cathode Ray Tube, Anthony Gianasca,

9    Gloria Comeaux, Mina Ashkannejhad individually and/or as Administrator of the Estate of the

10   Late R. Deryl Edwards, Jr., Jeffrey Speaect, Rosemary Ciccone and Jeff Craig (the "Plaintiffs"),

11   through their counsel Bonsignore Trial Lawyers, PLLC.

12       3.      Replies to Lead Counsel's Motions for Final Approval and for Attorneys' Fees

13   were to be filed via the JAMS Electronic Filing System by December 9, 2015.

14       4.      Although work had begun on a reply, Counsel did not timely receive the Gianasca

15   deposition transcript and when it was received the attachments did not match what we had record

16   of turning over to defense counsel. The discrepancies took time to work out and required the

17   involvement of the Plaintiff who had commitments and otherwise required time to locate his notes

18   and consider what was produced as compared to what he recalled was produced. As an aside, Mr.

19   Gianasca was selected as an electrician for Ben Affleck's movie and the job required extensive

20   hours and was a big boost for his company. Mina Ashkannejhad individually and/or as

21   Administrator of the Estate of the Late R. Deryl Edwards, Jr., has still not received a copy of her

22   deposition transcript or its attachments.

23       5.      Counsel for Plaintiffs has requested a stipulation from Lead Counsel and will

24   promptly notify this Honorable Arbitrator if Lead Counsel assents.

25       6.      There have been no previous requests for time modifications by Plaintiffs in this

26   case.

27       7.      The requested allowance of permission to file the attached Reply brief will have no

28

1

DECLARATION OF ROBERT J. BONSIGNORE IN SUPPORT OF MOTION FOR PERMISSION TO FILE
REPLY IN SUPPORT OF OBJECTIONS TO LEAD COUNSEL'S MOTIONS FOR FINAL APPROVAL AND

1   effect whatsoever upon the schedule for the case as it largely joins in the other arguments advance

2   by co-counsel and adds a mere several pages of argument.

3          8.      The request for permission to file a reply was due solely to circumstances beyond

4   the Plaintiffs' control and is not due to any extent upon manipulation, malice or bad faith.

5          9.      I respectfully request that Plaintiffs, who have not contributed to this inadvertence,

6   be permitted to file a reply brief.

7          I declare under penalty of perjury under the laws of the United States of America that the

8   foregoing is true and correct.

9          Executed on this 15th day of December 2015.

10

11                                          /s/ Robert J. Bonsignore
                                            Robert J. Bonsignore (MA No. 547880)
12                                          Bonsignore Trial Lawyers, PLLC
                                            3771 Meadowcrest Drive
13                                          Las Vegas, NV 89121
                                            Telephone: (781) 856-7650
14                                          rbonsignore@class-actions.us

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                            2
       DECLARATION OF ROBERT J. BONSIGNORE IN SUPPORT OF MOTION FOR PERMISSION TO FILE

1

2

## CERTIFICATE OF SERVICE

3    I, Robert J. Bonsignore, hereby certify that on this 15th day of December 2015, I caused the

4    foregoing to be electronically filed with the JAMS Electronic Filing ("JAMS") System, which will

5    send a notice of electronic filing to all parties registered with the JAMS system in the above-

6    captioned matter.  A copy will be forwarded via first class mail, postage prepaid, to those parties

7    not electronically registered.

8

9

10                                               */s/ Robert J. Bonsignore*
                                                 Robert J. Bonsignore

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ROBERT J. BONSIGNORE IN SUPPORT OF MOTION FOR PERMISSION TO FILE

# EXHIBIT B

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE TUBE (CRT) ANTITRUST LITIGATION | Case No. 3:07-cv-5944-JST |
| | MDL No. 1917 |
| This Document Relates To: | **CLASS ACTION** |
| All Indirect Purchaser Actions | |

## [PROPOSED] ORDER GRANTING LEAVE TO FILE LATE REPLY

IT IS HEREBY ORDERED that Plaintiffs' Motion for Permission to File Reply in Support of Objections to Lead Counsel's Motions for Final Approval and Attorneys' Fees, is granted.


_____
Martin Quinn, Special Master

**Robert J. Bonsignore, Esq.**
**BONSIGNORE TRIAL LAWYERS, PLLC**
**3771 Meadowcrest Drive**
**Las Vegas, NV 89121**
**Phone: 781-856-7650**
**Email: rbonsignore@classactions.us**

*Counsel for Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** | Case No. 3:07-cv-5944 <br> MDL No. 1917 <br><br> **CLASS ACTION** |
| This Document Relates to: <br><br> All Indirect Purchaser Actions | **JOINDER AND REPLY IN SUPPORT OF OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT AND MOTION FOR ATTORNEYS' FEES** <br><br> Hearing:        2:00 P.M., March 15, 2016 <br> Judge:          Hon. Jon S. Tigar <br> Courtroom:    9, 19th Floor <br> Special Master:  Martin Quinn, JAMS |

1    This Joinder and Reply Memorandum is submitted by class members and indirect

2    purchasers of Cathode Ray Tube, Anthony Gianasca, Gloria Comeaux, Mina Ashkannejhad

3    individually and/or as Administrator of the Estate of the Late R. Deryl Edwards, Jr., Jeffrey

4    Speaect, Rosemary Ciccone and Jeff Craig (the "Excluded Plaintiffs"), through their counsel

5    Bonsignore Trial Lawyers, PLLC, and in support of their objection to the proposed Settlement

6    Agreement and Lead Counsel's Motion for Attorneys' Fees.

7                                    **ARGUMENT**

8    As detailed in their prior filings (MDL Doc. Nos. 4119, 4144), the Excluded Plaintiffs

9    object to the proposed settlement agreement (the "Settlement Agreement") as it will, *inter alia*,

10   strip indirect purchasers in the states of Massachusetts, Missouri, and New Hampshire of any

11   rights to recovery against the Defendants without giving them anything in exchange.  The

12   Excluded Plaintiffs further have objected to the Motion for Attorneys' Fees submitted by Lead

13   Counsel as inappropriate.  (MDL Doc. Nos. 4119, 4144).  The Excluded Plaintiffs have reviewed

14   the reply briefs filed in this action and agree and support the matters set forth therein.[1]  For this

15   reason and in the interest of avoiding overburdening the Court with repetitive filings, the Excluded

16   Plaintiffs join in, and hereby incorporate by reference, the arguments made in those Replies.

17   Nevertheless, several matters merit highlighting.

18   In its Motion for Final Approval, rather than address the substantive shortcomings in the

19   Settlement Agreement identified by the Excluded Plaintiffs which bar its final approval, Lead

20   Counsel for the Indirect Purchaser Plaintiffs ("IPPs") engages in a campaign to condemn the

---

[1] In particular, the Excluded Plaintiffs join in and incorporate by reference (1) Reply Brief in
Support of Objections to Final Approval of Settlements filed by Cooper & Kirkham, P.C. and the
Law Offices of Francis O. Scarpulla, dated December 9, 2015; (2) the Reply Brief in Support of
Objections to Indirect-Purchaser Plaintiffs' Motion for Award of Attorneys' Fees, Reimbursement
of Litigation Expenses, and Incentive Rewards to Class Representatives, filed by the Law Offices
of Francis O. Scarpulla and Cooper & Kirkham, P.C., dated December 9, 2015; and (3) the Reply
in Support of Objection to the Proposed Class Action Settlement Agreement and Motion for
Attorney Fees by Objector Rockhurst University, Objector Gary Talewsky, and Objector Harry
Garavanian, Filed by Theresa D. Moore, dated December 9, 2015 (collectively, the "Replies").

JOINDER AND REPLY IN SUPPORT OF OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT AND

1   Excluded Plaintiffs individuals, to which he owed a fiduciary duty, and to malign those Plaintiffs'

2   attorneys' personal integrity.  The objections advanced are not personal. Indirect purchasers who

3   were involved in the litigation have found themselves and others similarly situated excluded. They

4   are fighting to participate in a settlement they should not have been excluded from.

5          Setting aside Lead Counsel's diversionary tactics, the fact remains that he has offered no

6   valid support for his abandonment of those victims of the Defendants' wrongful conduct, the cost

7   of which the Settlement Agreement itself values at over half a billion dollars, who have the

8   misfortune of residing in states whose claims Lead Counsel did not choose to vigorously pursue.

9          It is beyond cavil that Lead Counsel in a nationwide class action is obligated to represent

10  the interests of all class plaintiffs, including the named and unnamed plaintiffs in each and every

11  state encompassed within the class he or she has undertaken to represent.  *See Radcliffe v.*

12  *Experian Info. Sols. Inc.*, 715 F.3d 1157, 1167 (9th Cir. 2013) (citation omitted).  Lead Counsel

13  did not do so here.  All of his baseless finger pointing does not override his failure to satisfy those

14  duties.  The sacrificed plaintiffs should not be forced to forfeit their valid rights for the benefit of

15  Lead Counsel's chosen minority.  Because the Settlement Agreement does so, it is not fair and

16  does not merit final approval as detailed in the Replies.  In addition, in arguing specifically that the

17  Excluded Plaintiffs residing in Massachusetts, Missouri and New Hampshire were not wrongly

18  excluded, Lead Counsel Mario Alioto attempts to shift responsibility for his failure to file claims

19  on their behalf to, *inter alia*, the Excluded Plaintiffs' attorney, Robert Bonsignore.  His efforts are

20  futile. While there if no debate that he excluded Mr. Bonsignore from leadership after being

21  appointed lead, the fact is that he was Lead Counsel and possessed sole authority to direct the

22  course of the litigation and sole authority to enter into settlement agreements.

23         As Lead Counsel, Mr. Alioto had a duty to vigorously pursue all class members' claims,

24  including those class members residing in Massachusetts, Missouri and New Hampshire.  *See*

25  *Hesse v. Sprint Corp.*, 598 F.3d 581, 589 (9th Cir. 2010) ("Class representation is inadequate if the

26  named plaintiff fails to prosecute the action vigorously on behalf of the entire class or has an

27  insurmountable conflict of interest with other class members.").  His attempt to sidestep

28  responsibility to those class members by claiming it was Mr. Bonsignore's job to file claims for

them are thus irrelevant. As previously objectively evidenced, Lead Counsel Alioto was provided with the names and supporting documents of the putative Massachusetts, Missouri and New Hampshire class representatives. *See* Declaration of Robert J. Bonsignore, dated December 15, 2015, filed herewith, attaching and addressing Attachments 12; 3A and 4 to the Supplemental Objection (Doc. 4144).

Second, the documentary evidence submitted with the Excluded Plaintiffs' Supplemental Objection flatly contradict his protestations that he did not know of any plaintiffs from those states and that Mr. Bonsignore never informed him of them. *Id.* Mr. Alioto was well aware of plaintiffs in those states who were vetted and willing to serve as named plaintiffs and assured Mr. Bonsignore that he had the matter in hand. In fact, Mr. Gianasca personally retained Mr. Alioto and his feeble attempt to deny a duty to zealously represent his client bizarre. *See,* December 15, 2015 Declaration Of Robert J. Bonsignore Attachment 1 – Gianasca Retention Agreement dated March 20, 2008. Thus, Mr. Alioto's attempts to cast the blame for the non-filing of suits onto Mr. Bonsignore are not supported by the facts. Moreover, Mr. Alioto asked Mr. Bonsignore to do him a favor and put his name on the Massachusetts client's retainer.

Third, Lead Counsel incorrectly touts the statutes of limitations as barring suits in Massachusetts, Missouri and New Hampshire and thus absolving him from his duty to pursue them. *See* Motion for Final Approval at 34, 37-38. Any addition of state law claims would have related back to the filing of the class complaint. *See Crown, Cork Seal Company, Inc v. Parker*, 462 U.S. 345, 350 (1983) ("[t]he filing of a class action tolls the statute of limitations 'as to all asserted members of the class'") (citation omitted). In addition, Mr. Alioto himself relied upon a fraudulent concealment tolling argument, which could have been relied upon in connection with those claims.

Fourth, Mr. Alioto's attempts to convert these proceedings into a personal stone-throwing contest are indefensible and low browed. In his Motion for Final Approval, Mr. Alioto slips in a reference to a proceeding in the California courts that he alleges Mr. Bonsignore failed to reveal to this Court and that allegedly establish Mr. Bonsignore was sanctioned there. This thinly veiled attempt to discredit Mr. Bonsignore is incomplete and misleading. As described in his declaration

3

1   attached hereto, Mr. Bonsignore was the victim of malpractice in that proceeding and Mr. Alioto's

2   below-the-belt strikes attempt to victimize Mr. Bonsignore once again and do not serve the

3   interests of Mr. Alioto's unnamed clients, the Excluded Plaintiffs.[2]

4          Finally, in the event that the Court rejects the Settlement Agreement, it would be

5   unnecessary for it to address the Motion for Attorneys' Fee at this time.  *See In re Gen. Motors*

6   *Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 779 (3d Cir. 1995).

7          Prior to formal class certification, there is an even greater potential for a breach of fiduciary

8   duty owed the class during settlement.  Accordingly, such agreements must withstand an even

9   higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily

10   required under Rule 23(e) before securing the court's approval as fair.  *In re Bluetooth Headset*

11   *Products Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011).  When evaluating a settlement class,

12   "[c]ourts must be alert for "more subtle signs that class counsel have allowed pursuit of their own

13   self-interests and that of certain class members to infect the negotiations." *Id.* at 947.  Although

14   the benefits of allowing settlement classes are well-documented, "their use has not been problem-

15   free, provoking a barrage of criticism that the device is a vehicle for collusive settlements that

16   primarily serve the interests of defendants—by granting expansive protection from law suits—and

17   of plaintiffs' counsel—by generating large fees gladly paid by defendants as a quid pro quo for

18   finally disposing of many troublesome claims." *In re Gen. Motors Corp. Pick-Up Truck Fuel*

19   *Tank Products Liab. Litig.*, 55 F.3d 768, 778 (3d Cir.) (disparity in treatment of settlement classes

20   implicated adequacy of counsel and approval rejected), *cert. denied*, 516 U.S. 824 (1995).  The

21   Settlement Agreement is the result of these feared abuses.

22          Here, Lead Counsel violated his duties and obligations by entering into an agreement by

23   which the Excluded State Plaintiffs claims have been abandoned in favor of his favored State Class

24   Plaintiffs.  Indeed, "a settlement that offers considerably more value to one class of plaintiffs than

25   to another may be trading the claims of the latter group away in order to enrich the former group."

26

27

28   [2] Indeed, Alioto's credibility is subject to scrutiny in view of his past fee-related behavior. See

1  *Id.* at 797 (setting aside settlement not meeting adequacy of representation standards). "The

2  responsibility of class counsel to absent class members whose control over their attorneys is

3  limited does not permit even the appearance of divided loyalties of counsel." *Kayes v. Pac.*

4  *Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir. 1995) (citation omitted).

5

6                                        **CONCLUSION**

7          The Settlement Agreement is patently unfair and Lead Counsel has not performed

8  adequately his fiduciary duties.  Accordingly, the Motions for Final Approval and for Attorneys

9  Fees should be denied.  Wherefore in addition to the other relief requested, demand is made that

10  the Agreement's Economic Class be redefined, notice be re-given, Lead Counsel have his lodestar

11  and expenses opened for scrutiny, and that his firm be denied a multiplier.

12

13

14  Dated:  December 15, 2015                    Robert J. Bonsignore

15

16                                             /s/ Robert J. Bonsignore
                                               Robert J. Bonsignore (NH No. 21241)
17                                             Bonsignore Trial Lawyers, PLLC
                                               3771 Meadowcrest Drive
18                                             Las Vegas, NV 89121
                                               Telephone:  (781) 856-7650
19                                             rbonsignore@class-actions.us

20

21

22

23

24

25

26

27  _____

28  December 15, 2015 Declaration of Robert J Bonsignore - Attachments 2-6.

                                               5

1

2

# <u>CERTIFICATE OF SERVICE</u>

3

   I, Robert J. Bonsignore, hereby certify that on this 15th day of December 2015, I caused the

4

foregoing to be electronically filed with the JAMS Electronic Filing ("JAMS") System, which will

5

send a notice of electronic filing to all parties registered with the JAMS system in the above-

6

captioned matter.  A copy will be forwarded via first class mail, postage prepaid, to those parties

7

not electronically registered.

8

9

10
                                           */s/ Robert J. Bonsignore*
                                           Robert J. Bonsignore

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Robert J. Bonsignore, Esq.**
**BONSIGNORE TRIAL LAWYERS, PLLC**
**3771 Meadowcrest Drive**
**Las Vegas, NV 89121**
**Phone: 781-856-7650**
**Email: rbonsignore@classactions.us**

*Counsel for Indirect Purchaser Plaintiffs*

### UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** | Case No. 3:07-cv-5944<br>MDL No. 1917<br><br>**CLASS ACTION** |
| This Document Relates to:<br><br>All Indirect Purchaser Actions | **DECLARATION OF ROBERT J. BONSIGNORE IN SUPPORT OF JOINDER AND REPLY OF OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT AND MOTION FOR ATTORNEYS' FEES**<br><br>Judge: Honorable Samuel Conti<br>Courtroom One, 17th Floor |

I, Robert J. Bonsignore, declare as follows:

1.      I am an attorney licensed to practice before the courts of New Hampshire and Massachusetts, as well as federal courts throughout the country. I am a partner in the law firm BONSIGNORE TRIAL LAWYERS, PLLC and have personal knowledge of the facts stated in this declaration and, if called as a witness, I could and would testify competently to them.  I make this declaration in support of my firm's Joinder and Reply in Support of Objection to Proposed Class Action Settlement and Motion for Attorneys' Fees.

2.      My firm is counsel of record in this case, and represents named plaintiff(s) Gloria Comeaux, Jeff Speaect, Rosemary Ciccone, Anthony Gianasca, Jeff Craig, and Mina Ashkannejhad individually and/or as Administrator of the Estate of the Late R. Deryl Edwards, Jr. The following are true and accurate copies that were kept in the ordinary course of business:

3.      Attachment 1 – A Gianasca Retention Agreement dated March 20, 2008. Mr. Alioto asked at the time for me to "do him a favor" and add his name to the retention agreement, which I did without hesitation.

4.      Attachment 2 – *Fulton, Mehring & Hauser Co., Inc., et al. v. The Stanley Works, et al.,* Case No. 90-0987-C(5), Memorandum of Points and Authorities in Opposition to the Motion of Trump, Alioto & Trump for an Order Requiring Meet and Confer of Plaintiffs' Counsel and for other Relief.

5.      Attachment 3 – *In Re California Indirect-Purchaser X-Ray Film Antitrust Litigation*, Master File No. 960886, Memorandum of Points and Authorities in Opposition to Trump, Alioto, Trump & Prescott's Motion for an Accounting and Reallocation of Attorneys Fees.

6.      Attachment 4 – *Ernest M. Thayer et al, v. Wells Fargo Bank, N.A.*, Case No. A090429, Case Summary.

7.      Attachment 5 – *Eric Livingston and Stephen Grosse, et al. v. Toyota Motor Sales USA, Inc., et a.*, Case No. C-94-1377-MHP, *Nancy Wolf v. Toyota Motor Sales USA, Inc., et al.*, Case No. C-94-1359 MHP and *Shellie Hackworth v. Toyota Motor Sales USA, Inc. et al.*, Case No. C-94-1960 MHP, Order of Special Master Awarding Attorneys' Fees and Costs.

8. Attachment 6 – Coordination Proceeding Special Title (Rule 1550 (b)), Minute Order, Master File No. 39693, JCCP No. 3261.

9. Attachment 7 (a)-(g) – Pages 21-24, 29-30, 34-35, 37-38, 46-48, 52, 59, 60, 63, 65, and Attachments 4 of the November 3, 2015 Deposition of Massachusetts Putative Class Representative Anthony Gianasca.[1]

10. Attachment 8 – Chain of emails between Bonsignore and Alioto dated March 1, 2012.

11. Attachment 9 Photographs of CRT devices produced by the estate of the Late Deryl Edwards thus far by the Estate of the Late Deryl Edwards evidencing his purchases. The estate has advised me that although much has been thrown out, a dusty warehouse can be searched for more purchases. Although her deposition has not been provided to her, his widow, Mina Ashkannejhad testified at deposition that Mr. Edwards spoke of the CRT case and made related purchases.

12. Attachment 10 (a)-(c) – Email to Lead Counsel Alioto dated November 9, 2015 and photos of a Gianasca TV.

13. Attachment 11 – Email to Lead Counsel Alioto dated December 15, 2015.

14. Attachment 12 – Exhibit 3A and Attachment 4 to the Supplemental Objection (Doc. 4144).

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15th day of December 15, 2015, in Las Vegas, Nevada.

/s/ Robert J. Bonsignore
Robert J. Bonsignore, Esq.

---

[1] The attachments to the Gianasca deposition were incomplete. Bonsignore PLLC still has not received the deposition transcript or attachments for the Putative Missouri class Representative Mina Ashkannejhad individually and/or as Administrator of the Estate of the Late R. Deryl Edwards, Jr. This attachment will be filed separately. As of today, neither the Plaintiff nor the counsel has received the deposition transcripts and/or exhibits. Despite the fact that it has been requested several times and it has been over two months since the deposition was taken.

2

DECLARATION OF ROBERT J. BONSIGNORE IN SUPPORT OF JOINDER AND REPLY OF OBJECTION TO

1

2

**<u>CERTIFICATE OF SERVICE</u>**

3       I, Robert J. Bonsignore, hereby certify that on this 15th day of December 2015, I caused the

4  foregoing to be electronically filed with the JAMS Electronic Filing ("JAMS") System, which will

5  send a notice of electronic filing to all parties registered with the JAMS system in the above-

6  captioned matter.  A copy will be forwarded via first class mail, postage prepaid, to those parties

7  not electronically registered.

8

9

10                                              */s/ Robert J. Bonsignore*
                                                Robert J. Bonsignore
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

DECLARATION OF ROBERT J. BONSIGNORE IN SUPPORT OF JOINDER AND REPLY OF OBJECTION TO





# ATTACHMENT 2



























































# ATTACHMENT 3



























# ATTACHMENT 4

92 Cal.App.4th 819, 112 Cal.Rptr.2d 284, 01 Cal. Daily Op. Serv. 8622, 01 Cal. Daily Op. Serv. 9207, 2001 Daily Journal D.A.R. 10,653

ERNEST M. THAYER et al., Plaintiffs and Respondents,

v.

WELLS FARGO BANK, N.A., Defendant and Appellant.

No. A090429.
Court of Appeal, First District, Division 2, California.
Oct. 2, 2001.

## SUMMARY

In one of five coordinated class actions by banking customers against a bank that notified the customers that their checking accounts would become subject to monthly fees, in which the issues were resolved by settlement agreement, the trial court awarded attorney fees and costs to plaintiffs' attorney under Code Civ. Proc., § 1021.5 (private attorney general doctrine), using an enhanced lodestar calculation. (Superior Court of the City and County of San Francisco, No. 996446, John J. Conway, Judge.)

The Court of Appeal reversed the judgment and remanded the matter for further proceedings. The court held that the attorney was not entitled to an award of fees using an enhanced lodestar calculation. The bank never contested plaintiffs' legal claims or their right to reasonable fees under Code Civ. Proc., § 1021.5, and communicated a desire to settle the cases and to pay reasonable fees almost immediately after the complaints were filed. Also, the litigation was not novel or complicated. Nor was enhancement of the lodestar fee justified by the role the attorney played in persuading the trial court to initiate coordinated proceedings, or by the results obtained. Finally, there were no continuing obligations of plaintiffs' counsel that justified a fee enhancement. The court also held that the duplication of work by the attorney required a negative multiplier decreasing the lodestar calculation for his attorney fees. The attorney not only duplicated the work of counsel for plaintiffs in other cases, but he was the only attorney to regularly appear at hearings with cocounsel, and the two attorneys duplicated each other's work. The court further held that the trial court was not required to increase the basic lodestar of the attorney with a positive multiplier to ensure that the fee awarded would be within the range of fees freely negotiated in the legal marketplace in comparable litigation. (Opinion by Kline, P. J., with Haerle and Ruvolo, JJ., concurring.)

## HEADNOTES

### Classified to California Digest of Official Reports

([1])
Costs § 35--Attorney Fees--Review of Awards.
Where the sole issue before the appellate court is the amount of attorney fees awarded, the court's review is deferential. The experienced trial judge is the best judge of the value of professional services rendered in the trial court, and while the trial judge's judgment is subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong-meaning that it abused its discretion. The scope of discretion always resides in the particular law being applied, i.e., in the legal principles governing the subject of the action. Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and such action is termed an abuse of discretion.

([2])
Costs § 29--Attorney Fees--Procedure--Hearing and Determination-- Lodestar Method.
In fee shifting cases, in which the responsibility to pay attorney fees is statutorily or otherwise transferred from the prevailing plaintiff or class to the defendant, the primary method for establishing the amount of reasonable attorney fees is the lodestar method. The lodestar (or touchstone) is produced by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate. Once the court has fixed the lodestar, it may increase or decrease that amount by applying a positive

or negative multiplier to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented. The purpose of adjustment is to fix a fee at the fair market value for the particular action. In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services. Under certain circumstances, a lodestar calculation may be enhanced on the basis of a percentage-of-the-benefit analysis.

(<sup>3a, 3b</sup>)

Costs § 19--Attorney Fees--Private Attorney General Doctrine-- Lodestar Calculation--Class Action by Banking Customers to Challenge Imposition of Checking Account Fees.

In one of five class actions by banking customers against a bank that notified the customers that their checking accounts would become subject to monthly fees, in which the issues were resolved by settlement, plaintiffs' attorney was not entitled to an award of attorney fees using an enhanced lodestar calculation. The bank never contested plaintiffs' legal claims or their right to reasonable fees under Code Civ. Proc., § 1021.5 (private attorney general doctrine), and communicated a desire to settle the cases and to pay reasonable fees almost immediately after the complaints were filed. Also, the litigation was not novel or complicated. Nor was enhancement of the lodestar fee justified by the role the attorney played in persuading the trial court to initiate coordinated proceedings. The record failed to show that coordination facilitated settlement or achieved any other useful purpose. Enhancement of fees on the basis of the results obtained also was unjustified. It was questionable whether the protracted negotiations that delayed execution of the settlement agreement added substantial value to the settlement. Neither the demands of the litigation nor the quality of the work performed by the attorney justified enhancement of his lodestar fee due to the results obtained. Finally, there were no continuing obligations of plaintiffs' counsel that justified a fee enhancement.

[See 7 Witkin, Cal. Procedure (4th ed. 1997) Judgment, § 225 et seq.; West's Key Number Digest, Banks and Banking k. 231.]

(<sup>4</sup>)

Costs § 17--Attorney Fees--Private Attorney General Doctrine--Factors.

Where a trial court, in deciding the amount of attorney fees to award, determines that a percentage fee is inappropriate, either because the value cannot easily or accurately be monetized, or for some other reason, it must be careful not to use the results obtained factor to enhance a lodestar simply because a settlement conferred a significant benefit on a large group of people, as the latter factor is under Code Civ. Proc., § 1021.5 (private attorney general doctrine), relevant only to the entitlement to fees in the first instance, not to the amount of those fees. Whether an award is justified and what amount that award should be are two distinct questions, and the factors relating to each must not be intertwined or merged. The results obtained factor can properly be used to enhance a lodestar calculation where an exceptional effort produced an exceptional benefit.

(<sup>5</sup>)

Costs § 19--Attorney Fees--Private Attorney General Doctrine--Lodestar Calculation--Class Action by Banking Customers--Challenging Imposition of Checking Account Fees--Decreased Award Based on Duplication of Work.

In one of five class actions by banking customers against a bank that notified the customers that their checking accounts would become subject to monthly fees, in which the issues were resolved by settlement, the duplication of work by plaintiffs' attorney required a negative multiplier decreasing the lodestar calculation for his attorney fees. Absent a lack of confidence in the competence in the ability of counsel in the first filed case to maintain this class action, which did not appear in the record, it was difficult to find any need for the filing of so many essentially duplicative actions. The attorney not only duplicated the work of counsel for plaintiffs in other cases, but he was the only attorney to regularly appear at hearings with cocounsel, and the two attorneys duplicated each other's work. Because of this duplication, the attorney and his cocounsel received a larger award than any of the other attorneys. The lodestar consists of the number of hours reasonably expended multiplied by the reasonable hourly rate. Since there was no reasonable basis for the award that the attorney sought and received, the trial court abused its discretion in making the award.

(<sup>6</sup>)

Costs § 19--Attorney Fees--Private Attorney General Doctrine--Lodestar Calculation--Class Action by Banking Customers--Challenging Imposition of Checking Account Fees--Positive Multiplier.

In a class action by banking customers against a bank pertaining to monthly checking account fees, in which the issues were resolved by settlement, the trial court was not required to increase the basic lodestar of one of the plaintiffs' attorneys with a positive multiplier to ensure that the fee awarded would be within the range of fees freely negotiated in the legal marketplace in comparable litigation. Attorney fee awards calculated under the lodestar methodology need not be measured by a percentage-of-the-benefit yardstick whenever a class recovery can be determined with a reasonable degree of certainty. This judicial authority is discretionary, and is limited to cases in which a lodestar award would not produce a fee that is within the range of fees freely negotiated in the legal marketplace and it is not otherwise inappropriate to increase the basic lodestar. A percentage-of-the-benefit approach in this case would have been inappropriate, since the trial court's increase of the attorney's lodestar for duplicative work was an abuse of discretion. Also, the attorney failed to show that the lodestar would not produce a fee within the range of fees freely negotiated in the marketplace, and none of the attorneys representing other plaintiffs made similar requests. The predicate of any attorney fee award is the necessity and usefulness of the conduct. The attorney's duplicative work was neither difficult nor particularly productive, involved little or no risk, and may have delayed settlement.

COUNSEL
Brobeck, Phleger & Harrison, Daniel G. Lamb and Brian D. Martin for Defendant and Appellant.
Sherman Kassof and Daniel U. Smith for Plaintiffs and Respondents. **\*823**

**KLINE, P. J.**

Appellant Wells Fargo Bank, N.A. (hereafter Wells Fargo or Bank), challenges a trial court order awarding attorney fees and costs in the amount of $215,460 to Attorney Sherman Kassof, cocounsel for respondent Ernest M. Thayer in one of five coordinated class actions that, as to the underlying issues, have all been resolved on the basis of a settlement agreement. The total amount awarded by the trial court to the nine law firms, including Kassof's, which represented plaintiffs in the coordinated actions was approximately $1.1 million. After the appeal was filed, Wells Fargo entered into settlement agreements regarding all individual attorney fee awards except that to Kassof. The amount of the fee awarded Kassof's cocounsel, Mario Alioto, was among those compromised by settlement, so that the award to Kassof is therefore the only one here at issue.

In a cross-appeal, Kassof claims the fee awarded him was too low.[1] In his view, the trial court abused its discretion by refusing to consider the value of the benefit conferred on Wells Fargo's customers by the litigation and to enhance the lodestar more than it did by applying a multiplier reflecting a percentage-of-the-benefit analysis.

**Facts and Proceedings Below**

On May 28, 1998, Wells Fargo sent a letter to approximately 164,000 customers whose checking accounts were not subjected to service fees notifying them that, as of their next statement, their accounts would be subject to regular monthly service and maintenance fees (the May 28th letter) Most of the accounts at issue had been acquired by Wells Fargo from other banks that had been merged into Wells Fargo and the accounts met none of Wells Fargo's criteria for free checking.

In its final order awarding attorney fees and costs, the trial court divided the litigation that arose from the May 28th letter into four historical periods, increasing the fee award by a multiplier of two for work carried out during the first and third periods and awarding an unenhanced lodestar fee for work done during the second and fourth periods. The facts relevant to this appeal will be set forth in the context of these periods.

***Period 1: June 1, 1998, through November 24, 1998.***

On June 4, 1998, less than a week after the May 28th letter, Gary J. Phebus filed a class action complaint against Wells Fargo in the San Diego **\*824** Superior Court (the *Phebus* case) in which he was represented by two law firms: Milberg Weiss Bershad Hynes & Lerach and Finkelstein & Krinsk. The next day, June 5, Fred Stiesberg filed a substantially identical class action complaint in the same court (the *Stiesberg* case) in which he was also represented by two law firms: the Law Offices of James V. Parziale and Gerard & Associates. Three days later, on June 8, Barry M. Greenberg filed another virtually identical class action complaint against the Bank in the Los Angeles Superior Court (the *Greenberg* case) in which he was represented by Attorney William Sobel. (Plaintiff Greenberg, an attorney, later associated himself in as cocounsel in his case.) On June 22, 1998, the fourth class action complaint against Wells Fargo was filed in the San Francisco Superior Court by Jesse L. Judnick and others (the *Judnick* case) in which the plaintiffs were represented by Lieff, Cabraser, Heimann & Bernstein as well as the Law Offices of James V. Parziale and Gerard & Associates. Finally, on July 13, 1998, Kassof filed the fifth and last class action complaint against Wells Fargo in the San Francisco Superior Court on behalf of plaintiff Ernest M. Thayer (the *Thayer* case). Attorney Mario Alioto of the firm of Trump, Alioto, Trump & Prescott later joined Kassof as cocounsel in

the *Thayer* case. Previously, on June 8, 1998, Kassof had filed a similar complaint in behalf of Thayer in the San Francisco Municipal Court. This municipal court action was never actively pursued and was not among the class actions coordinated in the San Francisco Superior Court in December 1998, but at Kassof's request it was subsequently included in the coordination on July 2, 1999, after the parties had agreed on settlement terms and turned their attention to the question of attorney fees.

Though there were some minor differences, the five superior court complaints, prepared by a total of nine law firms, were substantially the same. All sought to protect Wells Fargo customers entitled to free checking accounts who had been notified by the May 28th letter of the Bank's intention to impose service and maintenance fees, and all sought relief under the Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.) and the unfair competition law (Bus. & Prof. Code, § 17200 et seq.); breach of contract and other common law causes of action were also included in some of the complaints.

On July 14, 1998, Kassof and his cocounsel filed a petition to coordinate the five superior court cases in San Francisco pursuant to Code of Civil Procedure section 404. Wells Fargo originally opposed the petition because it believed this would unnecessarily delay settlement, which the Bank was **\*825** by then actively pursuing in conversations with counsel.[2] On July 24, when it began answering the complaints, Wells Fargo informed plaintiffs and their counsel that it had changed its position on the underlying fee issue and that "all customers who have or had impacted accounts ... have been or will be notified either that Wells Fargo will retain the fee waiver on their account for the life of the account or that upon their request Wells Fargo will reinstate their account with a fee waiver for the life of the accounts."

Six days later, on July 30, counsel in the *Phebus* case proposed terms for the settlement of all five cases. On August 3, before it responded to the proposal, Wells Fargo mailed a letter to all 164,000 customers who had received the May 28th letter informing them that, despite the earlier letter, Wells Fargo had "decided to reinstate the fee waiver for the life of the account" without proof of a promise of such a benefit. No service or maintenance fees have ever been imposed on the checking accounts at issue.

On August 14 Wells Fargo provided all parties a revised version of the settlement agreement proposed by counsel in the *Phebus* case. The most important modification the Bank sought was a provision requiring the parties to immediately file a joint application for dismissal of all five actions with prejudice without the necessity and expense of class notice. Thereafter, for a period of about three months, counsel for the parties negotiated the relatively insubstantial changes proposed by the Bank.

On November 12 Wells Fargo withdrew its opposition to the petition for coordination, because settlement discussions were becoming so protracted it felt "coordination would not significantly delay the process, and having all of the matters in front of one judge might facilitate the finalization of the settlement."

The activities just described, which resulted in agreement in principle as to the terms of settlement, took place during a six-month period in which no **\*826** discovery took place, no substantive motion was filed by any party, and no trial date was set.

The total amount of attorney fees awarded to counsel for plaintiffs in all five coordinated cases for work performed during period 1, which was $503,998.76, was calculated by using a multiplier of two for each individual award. The award of fees to Attorneys Alioto and Kassof, who jointly represented plaintiffs in the *Thayer* case, was $151,770, of which $67,200 was awarded Kassof.


### Period 2: November 25, 1998, through March 1, 1999.

On December 16, 1998, the parties appeared before San Francisco Superior Court Judge Diane E. Wick, the coordination motion judge. Among other things, counsel for plaintiffs in each of the five cases represented to Judge Wick that the parties had reached a settlement of all substantive issues and that the only remaining question was that of attorney fees. After two subsequent hearings, Judge Wick ordered the actions coordinated and the coordinated proceeding was assigned to her by the Chief Justice. On January 21, 1999, plaintiff in the *Greenberg* case challenged Judge Wick (Code Civ. Proc., § 170.6) and two weeks later San Francisco Superior Court Judge John J. Conway was appointed to replace her as coordination trial judge.

Wells Fargo states in its opening brief, and it is not disputed, that the debate necessitating three hearings before Judge Wick was solely between Kassof and Alioto, who wanted the case coordinated in San Francisco, and lawyers for plaintiffs in all the other cases, who argued that the five actions should simply be dismissed and refiled as a single action in San Diego, where the already agreed-upon settlement could then be submitted to and approved by the court.

The total award of counsel fees to all plaintiffs' counsel for work performed during period 2 was $60,773.88. Of this amount, $25,995 was awarded counsel in the *Thayer* case: $9,975 to Alioto and $16,020 to Kassof.

### *Period 3: March 2, 1999, through June 15, 1999.*

Prior to a status conference held on March 5, 1999, counsel for plaintiffs informed Judge Conway, as they had Judge Wick, that the parties had reached agreement as to the substantive issues in dispute, and that the only remaining issues were attorney fees and costs. At the conference, however, counsel in the *Judnick* case claimed Wells Fargo had notified certain customers who had not received the May 28th letter that their checking accounts **\*827** might also be subject to maintenance and service fees commencing in April 1999 and that this conflicted with representations previously made by the Bank. Counsel for Wells Fargo, who received no notice this claim would be made, agreed to investigate the matter and, if necessary, take appropriate corrective action. He reaffirmed, however, that the claims of the 164,000 customers who had received the May 28th letter "have been fully compromised and settled and that the only unresolved issue before the Court was plaintiffs' entitlement to the reimbursement of attorneys fees and costs."

The court directed Wells Fargo to investigate the new claim and provide plaintiffs' counsel specified information enabling them to independently determine whether the Bank had or planned to impose fees on the checking accounts at issue. After the Bank produced the specified information, plaintiffs' counsel insisted, and the Bank agreed, that the settlement agreement be renegotiated with respect to so-called Paragraph 20 Accounts, pertaining to a portion of the proposed settlement agreement which refers to approximately 500,000 checking accounts Wells Fargo had reviewed when it selected the 164,000 customers who received the May 28th letter, because it was not apparent to the Bank why those customers were also receiving free checking. The Bank claims there is no evidence that, either before it sent the May 28th letter or at any time thereafter, it ever intended to impose maintenance or service charges on this larger number of customers, and this claim is not here contested. Nevertheless, the Bank agreed to a new provision in the settlement agreement providing that if it ever in the future decided to revoke fee waivers regarding these accounts it would provide such customers advance notice so that customers "may notify Wells Fargo in writing within 30 days of such notice of his/her good faith belief that his/her Fee Waiver may not be revoked for the life of the checking account and the documentary basis for such belief." Wells Fargo claims it agreed to this provision-which, it says, insured no more than is required by federal law-in order to end meaningless negotiations exposing it to "ever-increasing attorneys' fees."

The trial court awarded plaintiffs' counsel fees for 100 percent of the hours they claimed they devoted to the coordinated cases during period 3, and a multiplier of two, which resulted in a total fee award to counsel in all five cases of $346,287.52 for this three-month period. Kassof and his cocounsel were awarded $135,120 for their representation in the *Thayer* case, of which Kassof received $83,220.

### *Period 4: June 16, 1999, through December 15, 1999.*

At the outset of the fourth period it appeared that the only unresolved issue was the amount of attorney fees the court would award plaintiffs' **\*828** counsel. Resolution of this question was, however, delayed by several nominally unrelated issues raised by counsel for certain plaintiffs.

The first was the "Seymour Rose problem." During the summer of 1999, Rose, a named plaintiff in the *Judnick* case, discovered Wells Fargo had begun imposing fees on his checking account. His lead counsel, Barry Himmelstein, claimed this showed the Bank could not be trusted to comply with the settlement agreement and on this ground refused to support the revised agreement the parties intended to submit to the court at a hearing scheduled for July 15, 1999. After investigating the matter, Wells Fargo's counsel wrote Rose's attorney, explaining that fees had been properly imposed on Rose's account because he gave up his fee waiver in 1995 by voluntarily converting to a Wells Fargo Gold Account, which did not carry a fee waiver, but which provided additional benefits such as free travelers checks. Rose apparently received a "promotional" fee waiver on his new account, which expired in October of 1998. Because he converted to a Gold Account, Rose was not among the 164,000 customers who received the May 28th letter, nor was he a member of the larger group of 500,000 Paragraph 20 Accounts. Although for these reasons the Bank believed Rose was not a member of a putative class alleged in any of the coordinated actions and therefore not a proper plaintiff, it claims it nevertheless granted him a life-of-the-account fee waiver simply in order to "get on with the settlement." Apparently for this reason, Rose's counsel did not pursue the matter further.

For work performed during the fourth period, the trial court awarded plaintiffs' counsel unenhanced lodestar fees totaling $188,644.75. Respondent's two attorneys were awarded $90,105, of which Kassof received $49,020.

### *The Award of Attorney Fees.*

At the hearing on attorney fees and costs conducted on December 15, 1999, the court observed that it had received and reviewed a "shopping cart" of memoranda in support of and in opposition to fees as well as voluminous declarations of counsel as to their credentials and the amount of work they devoted to the coordinated cases. The Bank conceded plaintiffs' counsel were entitled to fees under Code of Civil Procedure section 1021.5; the sole issue at the hearing was the *amount* of the fees that would be awarded.

Wells Fargo's position in the court below, revived here, is summed up in the opening paragraphs of its opposition to the applications of plaintiffs' counsel: "Not since *Jarndyce v. Jarndyce* have rapacious lawyers so prolonged a lawsuit with pointless legal skirmishing. The attorneys Charles Dickens created in *Bleak House* lawyered the *Jarndyce* case to death; plaintiffs counsel in these cases are dancing on the grave of a lawsuit that was all **\*829** but stillborn. As the briefs of plaintiffs' counsel make clear, these lawsuits were moot two months after they were filed, when Wells Fargo retracted its notice to 164,000 account holders that service fees would be imposed on their accounts, and granted life-of-the-account free checking to every account holder who had received the notice. [¶] For the past fourteen months, plaintiffs' lawyers have attempted to breathe life into this lawsuit by pointless and redundant legal maneuvering. Now they seek truly exorbitant fees for the time spent manufacturing new issues and negotiating with each other. The result is that instead of being rewarded for quickly revoking the action which led to these lawsuits and creating new benefit for its account holders, Wells Fargo Bank's quick decision to resolve this dispute has only whetted plaintiffs' appetites by giving them a risk-free shot at a fee reward. They have spent the last fourteen months attempting to enhance that fee award, despite the almost complete absence of any additional benefit to the classes they purport to represent." For these reasons, the Bank asked the court to reduce the lodestar figures proposed by plaintiffs' counsel and to reject the multiplier they requested.

Alioto and Kassof indignantly disputed the Bank's charges. According to them, the cases "were resolved relatively quickly and in an efficient manner" and the fees they sought were "modest in relation to the amount involved and the relief obtained." Asserting that they and lawyers for the other plaintiffs were "highly experienced in cases of this nature," the two attorneys stated that they did not undertake a massive review of documents, which would have consumed "hundreds of hours of attorney time," resolved many disagreements with the Bank without recourse to the court, did not seek class certification, which "would have involved expert testimony, substantial briefing and extended hearing," and quickly resolved disagreements they had with counsel for other plaintiffs. According to Alioto and Kassof, the Bank itself was responsible for any unnecessary delay that may have occurred. They claimed the Bank's initial opposition to their request for coordination was unjustified and time consuming, and that the Bank never asked the court to appoint liaison counsel (Cal. Rules of Court, rule 1506), which would have simplified negotiations and expedited settlement.[3] In respondent's counsels' view, "[t]he Bank was content to deal with the various plaintiffs' lawyers in piecemeal fashion, [which] would allow the Bank to negotiate individual settlements and pick the settlement terms most favorable to it." **\*830**

Kassof filed a one-page declaration in support of his petition for an award of attorney fees and costs. After authenticating the attached statement of his "litigation background" and daily time records, the declaration simply states that Kassof's current billing rate for legal work performed on a daily basis is $350 per hour, that he worked a total of 434.1 hours on this case, and that, therefore, "the lodestar for my services is $151,935.00."

At the hearing on December 15th, the trial court heard from lawyers representing plaintiffs in each of the coordinated actions. Attorneys Alioto and Kassof, who spoke last, focused their attention on the value of the settlement. Kassof noted that respondent's expert placed a value to the putative class of $90 million over 10 years and $110 million over 20 years, even without considering the value received by the 500,000 other Bank customers who benefited from the settlement, and that the fees awarded all plaintiffs' counsel should represent a percentage of these two figures, without specifying which one. Cocounsel Mario Alioto also emphasized the value of the settlement and again urged the court to take "a percentage approach" to the fee award.

Counsel for Wells Fargo argued that plaintiffs' counsel achieved nothing of value after August 3, 1998, the date the Bank retracted the May 28th letter and agreed that the 164,000 customers who received it could have free checking for the life of their accounts without proof of entitlement. He claimed that addition of paragraph 20 to the settlement agreement provided no needed protection to any of its customers, as the account holders referred to therein were never threatened with the loss of any right and federal banking laws obliged the Bank to give the notice redundantly required by paragraph 20.

The Bank also claimed that Kassof and his cocounsel, the only attorneys seeking a percentage fee, were least entitled to even a lodestar award. It argued that even if they spent the hours on the case they claimed, the basic lodestar they proposed, let alone any enhancement, was excessive when measured by their contribution to the settlement and the benefit it conferred on the class they purported to represent. The Bank pointed out that the amount of the lodestar fees sought by Kassof and Alioto was approximately twice that sought by counsel in any of the other coordinated cases and argued that their contribution was not twice that of other plaintiffs' counsel. On the contrary, the Bank maintained, respondent's lawyers not only duplicated the work of counsel for other plaintiffs, but duplicated each other's work. Whereas only one lawyer usually appeared for the other plaintiffs, Kassof and Alioto invariably both made court appearances and participated in settlement discussions and usually one simply repeated the representations of the other. In light of the multiplicity of cases and lawyers and resultant **\*831** duplication of effort, the Bank argued that the lodestar fees sought by *all* lawyers were unreasonable, but suggested Kassof and Alioto were less efficient than counsel for the other plaintiffs and the fees they sought therefore most egregiously excessive. The Bank's attorney noted that total counsel fees incurred by Wells Fargo up to the motions for attorney fees were $232,000, which was about one-fourth the total lodestar fees sought by plaintiffs' attorneys for work done during the same time, and that this disparity was "strongly probative" of the duplication of effort on the part of plaintiffs' counsel.

At the close of the hearing, the court adopted the proposal of counsel in the *Phebus* case to divide the history of the litigation into four periods and apply a multiplier only to work performed during the first and third periods, in which the parties negotiated the substantive terms of the settlement agreement. In the final order granting fees, the court observed that an award of reasonable attorney fees and costs under Code of Civil Procedure section 1021.5 was "appropriate," and Wells Fargo did not contend otherwise, and determined that, because the settlement agreement did not create a common fund, "the appropriate method to calculate an award of attorneys' fees is pursuant to the lodestar method." Based on its review of the time records submitted by plaintiffs' counsel, which resulted in no reduction of number of hours for which counsel sought compensation, the court calculated and set forth a basic lodestar award for each of the nine law firms representing plaintiffs.

The order goes on to find that the efforts of plaintiffs' counsel during certain periods of time conferred greater benefits upon Wells Fargo account holders than work performed during other periods, and on that basis increased the lodestar amounts of the fees incurred for work performed during the first and third periods by a multiplier of two.[4] The court found that lodestar awards and use of a multiplier was "appropriate ... in light of the results obtained, the contingent nature of the case, the novelty and complexity of the litigation, the skill displayed in fashioning an appropriate remedy, and the continuing obligations of Plaintiffs' counsel."

The lodestar award to Kassof, which was based on an hourly fee of $300 rather than the $350 he sought, totaled $140,250, and consisted of $33,600 **\*832** for period 1, $16,020 for period 2, $41,610 for period 3, and $49,020 for period 4. After applying a multiplier of two for the amounts awarded for the first and third periods, Kassof's total fee award amounted to $215,460. The total fee award to all counsel after application of multipliers was $1,099,704.90. The final enhanced award in each case and the amount awarded each of the nine firms are as follows:[5]

| *Greenberg Case* | |
|---|---|
| William Sobel, Esq. | $ 5,735.64 |
| Barry Greenberg, Esq. (pro. per.) | $ 85,452.52 |
| Total | $ 91,188.16 |
| *Stiesberg Case* | |
| Gerard & Associates | $ 61,970.00 |
| Law Offices of James Parziale | $ 84,328.00 |
| Total | $146,298.00 |

| *Phebus Case* | |
|---|---|
| Finkelstein & Krinsk | $275,034.75 |
| Milberg, Weiss, Bershad, Hynes & Lerach | $ 27,450.00 |
| Total | $302,484.75 |
| | *Judnick Case* |
| Lieff, Cabraser, Heimann & Bernstein | $156,744.00 |
| Total | $156,744.00 |
| | *Thayer Case* |
| Trump, Alioto, Trump & Prescott | $187,530.00 |
| Sherman Kassof, Esq. | $215,460.00 |
| Total | $402,990.00 |

## Discussion

([1]) Because the sole issue before us on both the appeal and the cross-appeal is the amount of fees awarded, our review is deferential. " 'The " experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong"-meaning that it abused its discretion.' " (*PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1095 [95 Cal.Rptr. 2d 198, 997 P.2d 511], quoting *Serrano v. Priest* (1977) 20 Cal.3d 25, 49 [141 Cal.Rptr. 315, 569 P.2d 1303] (*Serrano III*) and citing *Fed-Mart Corp. v. Pell Enterprises, Inc.* (1980) 111 Cal.App.3d 215, 228 [168 Cal.Rptr. 525] [an appellate court will interfere with a determination of reasonable attorney fees "only where there **833** has been a manifest abuse of discretion"].) As we recently pointed out in a case in which the reasonableness of an attorney fee award was under review, " '[t]he scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action ...." Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we

call such action an "abuse" of discretion.' " (*Lealao v. Beneficial California, Inc.* (2000) 82 Cal.App.4th 19, 25 [97 Cal.Rptr. 2d 797] (*Lealao*), quoting *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297 [255 Cal.Rptr. 704]; see also *Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 621-622 [98 Cal.Rptr.2d 388].)

### A. *Wells Fargo's Appeal*

([2]) The use of the lodestar method for calculating attorney fees was established in California in *Serrano III*. As we recently noted, "[i]n so-called fee shifting cases, in which the responsibility to pay attorney fees is statutorily or otherwise transferred from the prevailing plaintiff or class to the defendant, the primary method for establishing the amount of 'reasonable' attorney fees is the lodestar method. The lodestar (or touchstone) is produced by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate. Once the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative 'multiplier' to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented." (*Lealao, supra,* 82 Cal.App.4th 19, 26.) "The purpose of such adjustment is to fix a fee at the fair market value for the particular action. In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 [104 Cal.Rptr.2d 377, 17 P.3d 735].) Under certain circumstances, a lodestar calculation may be enhanced on the basis of a percentage-of-the-benefit analysis. (*Lealao, supra*, at pp. 49-50.)

([3a]) Wells Fargo did not below and does not now question the accuracy of Kassof's representations (or those of any other attorney for plaintiffs) as to the number of hours he devoted to the litigation; nor does it challenge the reasonableness of the hourly fee ($300) used by the court in calculating his **834** lodestar.[6] The Bank's argument is that the amount of time Kassof spent on the case was unreasonable in the circumstances and unproductive, and that even before it was enhanced by the application of a multiplier, the lodestar calculation produced a manifestly unjustified award. In effect, the Bank claims not only that the factors justifying use of a multiplier to enhance the lodestar figures are wholly missing, but that the unjustified duplication of work that took place requires a *negative* multiplier *decreasing* the lodestar. We agree.

### 1.

There is no hard-and-fast rule limiting the factors that may justify an exercise of judicial discretion to increase or decrease a lodestar calculation. (*Lealao, supra,* 82 Cal.App.4th at p. 40.) In *Serrano III* the Supreme Court identified seven factors as "among" those the trial court in that case properly considered. Three of those factors are inapplicable to the present case, as unlike *Serrano III*, this case was not against a public entity, the responsibility to pay a fee award would not fall upon the taxpayers, the plaintiffs were not represented by a nonprofit public interest law firm or a government funded legal services program, and monies awarded would inure to the individual benefit of the plaintiffs' attorneys.[7] (See *Serrano III, supra,* 20 Cal.3d at p. 49.) The remaining four factors were (1) "the novelty and difficulty of the questions involved, and the skill displayed in presenting them"; (2) "the extent to which the nature of the litigation precluded other employment by the attorneys"; (3) "the contingent nature of the fee award, both from the point of view of eventual victory on the merits and the point of view of establishing eligibility for an award"; and (4) "the fact that in the court's view the two [plaintiffs'] law firms involved had approximately an equal share in the success of the litigation." (*Ibid.*)

In the present case, the trial court justified its application of a multiplier increasing the nine lodestar awards on the basis of two of the factors mentioned in *Serrano III*, stating in its order that it found it appropriate to apply multipliers in light of "the contingent nature of the case, the novelty **835** and complexity of the litigation, [and] the skill displayed in fashioning an appropriate remedy ...." The court additionally considered "the results obtained" and "the continuing obligations of Plaintiffs' counsel." While these two factors were not specifically referred to in *Serrano III*, we believe they deserve consideration and in appropriate cases may justify increasing a lodestar, and Wells Fargo does not argue otherwise.

The problem in this case is not the use by the trial court of factors that cannot be considered; rather it is the absence in the record of any justification for increasing Kassof's lodestar award, either on the basis of the factors identified by the trial court or any other factors.

As in *Ramos v. Countrywide Home Loans, Inc., supra,* 82 Cal.App.4th 615, "the terse nature of the trial court's ruling ... gives virtually no explanation for the basis of the substantially enhanced award of fees and costs here. Because it merely lists the enhancement factors used, without a more complete explanation of their applicability in this context, the order is subject to question regarding the factual basis of the exercise of discretion made." (*Id.* at p. 624.) Nor can we find the requisite factual basis in the record.

The trial court's conclusion that the outcome in this case was genuinely questionable, or "contingent"-either because there was doubt as to whether plaintiffs would prevail on the merits or, if they did, whether the trial court would award fees to counsel for the prevailing parties-seems to us without basis. As we have explained, the Bank never contested plaintiffs' legal claims or their right to reasonable fees under Code of Civil Procedure section 1021.5, and communicated a desire to settle the cases and to pay reasonable attorney fees almost immediately after the complaints were filed. This speedy capitulation could not have surprised plaintiffs' counsel, as the astonishing speed of the race to the courthouse by such an extraordinary number of lawyers reflects their confidence they would not only prevail on the merits but be remunerated for their efforts.

Nor was the litigation novel or complicated.[8] The central theory of all the coordinated actions is that either Wells Fargo or a predecessor bank offered **\*836** members of the putative class one or more checking accounts free of monthly service charges during the life of the account and that members of the class accepted these offers, providing valuable consideration to the offeror bank. Thus, at bottom, the coordinated cases rest not on new or complicated theories under the Consumers Legal Remedies Act or sections 17200 and 17500 et seq. of the Business and Professions Code (although those laws may well have been violated), but simply on anticipatory breach of contract. The simplicity and strength of this claim is evidenced by the terms of the contracts at issue, some of which were annexed to several complaints.

Attempting to persuade us he displayed skill in addressing complex or novel issues, which justified application of a positive multiplier, Kassof focuses on his efforts to protect the interests of approximately 500,000 Bank customers whose interests were addressed in paragraph 20 of the settlement agreement.

Although Kassof has not rebutted the Bank's assertions that paragraph 20 is meaningless-as the customers it refers to were never threatened with the loss of fee waivers, and this portion of the agreement obliges the Bank to do no more than comply with existing law-we agree that roughly 500,000 Wells Fargo customers benefited from paragraph 20, which requires the Bank to provide them advance notice of any possible retraction of their fee waivers and an opportunity to show an entitlement to the waiver. But it was counsel in the *Judnick* and *Stiesberg* cases, not Kassof (or his cocounsel), who first raised this issue and took the lead in fashioning a remedy. **\*837** Moreover, neither the problem nor the remedy was so complex as to seriously tax the ingenuity or resources of any of the attorneys involved.

Kassof also claims that enhancement of his lodestar fee is justified by the singular role he played in persuading the trial court to initiate coordinated proceedings.

As we have explained, Wells Fargo initially opposed Kassof's motion to coordinate because it had by then already informed each of the 164,000 customers whose accounts were then at issue that his or her checking account would remain free of monthly service fees for the life of the account, had issued a press release to that effect, and had provided all of this information in writing to counsel in all five cases, and for these reasons justifiably expected that the cases would settle promptly. The Bank felt coordination unnecessary because "[a]s a result of Well's Fargo's decision not to revoke fee waivers on the impacted accounts, no injunctive relief is necessary or available to plaintiffs, plaintiffs and the putative class members have suffered no damages, and no controversy exists to be resolved by the courts. No depositions or written discovery is necessary. All that remains is for the courts to approve dismissal of the cases and possibly award attorneys' fees to plaintiffs' counsel in one or more of the actions." "Therefore," the Bank concluded, "not only will coordination serve no purpose, it could easily delay resolution of these cases, unnecessarily adding expense and consuming judicial resources." As earlier noted, when the cases did not promptly settle, the Bank dropped its opposition to coordination in the hope it might facilitate that unexpectedly elusive goal.

Counsel for plaintiffs in the four other cases neither supported nor opposed Kassof's motion to coordinate. Barry Himmelstein of Lieff, Cabraser, Heimann & Bernstein, counsel in the *Judnick* case, was the only plaintiffs' attorney other than Kassof willing to speak to the issue at the hearing on the motion. Indicating that the parties were well along in their discussions of a consolidated settlement of all of the actions and predicting they would also be able to quickly resolve the issues of fees, Himmelstein stated he was "indifferent to the coordination." It is hard to know whether, as the Bank claims, coordination hindered settlement, by, for example, leading to a time-consuming dispute between and among plaintiffs' counsel as to the county in which the cases would be coordinated. However, as we shall later discuss, the record also does not show that coordination facilitated settlement or achieved any other useful purpose. Nor does the record explain the belated inclusion in the coordinated proceeding of the action Kassof filed on behalf of Thayer (but never pursued) in the San Francisco Municipal Court before he commenced the present class action in behalf of the same named **\*838** plaintiff in the San Francisco Superior Court. So far as we can tell, the only purpose that may have been served by including the municipal court action in the coordinated proceeding was to buttress the fee requests of counsel in the duplicative *Thayer* cases. In short, Kassof's successful effort to coordinate the five actions against the Bank provides no reason to increase his lodestar award.

Enhancement of fees on the basis of "the results obtained" also seems unjustified. Kassof argues that the high dollar value of the settlement, which he claims can easily and accurately be monetized, justified a percentage fee but could alternatively be used to justify a multiplier increasing the lodestar. The only evidence in the record as to the value of the settlement is the

declaration of Herb Liebowitz, a tax planner who performs "actuarial calculations relating to the present value of future gifts, and to anticipated periodic contribution rates for funding complex pension plans," submitted by Kassof in support of his request for a percentage fee. Liebowitz opined that the present value of the checking account services provided by the Bank under the settlement for the first year was $16,821,437 and that the present value of the services provided for 30 years was $111,056,525. Because it refused to award percentage fees (which were not sought by counsel for the other plaintiffs, but only by Kassof and Alioto) the trial court apparently concluded it was unnecessary to determine the dollar value of the settlement, invited no inquiry as to this matter and made no finding on the issue. Nor did Kassof, Alioto or counsel for any other party specifically request such a finding.

([4]) Where a trial court determines that a percentage fee is inappropriate, either because the value cannot easily or accurately be monetized, or for some other reason, it must be careful not to use the "results obtained" factor to enhance a lodestar simply because the settlement conferred a "significant benefit" on a large group of people, as the latter factor is under Code of Civil Procedure section 1021.5 relevant only to the entitlement to fees in the first instance, not to the amount of those fees. "Whether an award is justified and what amount that award should be are two distinct questions, and the factors relating to each must not be intertwined or merged." (*Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629, 647 [71 Cal.Rptr.2d 632].) The "results obtained" factor can properly be used to enhance a lodestar calculation where an exceptional effort produced an exceptional benefit. In other words, as stated by a leading treatise, "[t]he California cases appear to incorporate the 'results obtained' factor into the 'quality' factor: *i.e.*, high-quality work may produce greater results in less time than would work of average quality, thus justifying a multiplier." (Pearl, Cal. Attorney Fee Awards (Cont.Ed.Bar 2d ed. 1998) § 13.6, p. 327.) ([3b]) The defendant in **\*839** this case never disputed plaintiffs' factual or legal claims and promptly capitulated after the mere filing of the complaints. It is questionable whether the protracted negotiations that delayed execution of the settlement agreement added substantial value to the settlement. Neither the demands of the litigation nor the quality of the work performed by Kassof justifies enhancement of his lodestar fee due to the "results obtained."

Finally, we do not understand why "the continuing obligations of Plaintiffs' counsel" should justify a fee enhancement. The trial court never indicated the nature of any such obligations, Kassof does not discuss them in his brief and no continuing obligations are imposed on plaintiffs' counsel under the settlement agreement.

This court is sensitive to the need to encourage "private attorneys general" willing to challenge injustices in our society. Adequate fee awards are perhaps the most effective means of achieving this salutary goal. Courts should not be indifferent to the realities of the legal marketplace or unduly parsimonious in the calculation of such fees. For example, given the number of separate actions coordinated here, a certain amount of inefficiency, waste, duplication and even competition in the representation of the plaintiff class was inevitable and, at least in the beginning, tolerable. (See *Liebman v. J.W. Petersen Coal & Oil Co.* (N.D.Ill. 1974) 63 F.R.D. 684, 690.) Compensation should not be strictly limited to efforts that were demonstrably productive. "Lawyers for plaintiffs and objectors in derivative or class actions, no less than other litigators, must evaluate, accept and prosecute suits on the basis of the entire spectrum of theories that show early promise of vindicating their clients' rights. Every lawyer, indeed every judge, has pursued blind alleys that initially seemed reasonable or even professionally obligatory. To reward only the pursuit of a successful theory in cases such as this undercompensates the inevitable exploratory phases of litigation, and may also invite overly conservative tactics or even prohibit some high-risk but deserving actions entirely." (*Seigal v. Merrick* (2d Cir. 1980) 619 F.2d 160, 164-165.)

However, while meager fee awards to successful counsel may discourage able counsel from engaging in many forms of public interest litigation that should be encouraged, the *unquestioning* award of generous fees may encourage duplicative and superfluous litigation and other conduct deserving no such favor. This case simply does not present the level of risk or any other circumstances that would warrant enhancement of the basic lodestar fees. The prospect of actual litigation never really existed, and the fee rates and hours allowed by the trial court were certainly ample and arguably **\*840** magnanimous.[9] As the propriety of fees awarded counsel other than Kassof are not at issue here, the record is not as fully informative as it might otherwise be as to whether any of the plaintiffs' lawyers made such a notable contribution as to justify the increases that were made in their basic lodestars. But the record is clear that Kassof made no such contribution.

We turn to the related question whether, as the Bank maintains, Kassof's lodestar fee should have been *decreased*.

## 2.

([5]) Although discussions in the case law of the use of multipliers to adjust a lodestar figure relate primarily to the use of multipliers to increase fees, our Supreme Court has repeatedly observed that a lodestar figure may be adjusted not just upward but also, where appropriate, *downward*. (See, e.g., *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1294 [240 Cal.Rptr. 872, 743 P.2d 932] ["The touchstone figure may be increased or decreased by the trial court depending on other factors involved in the lawsuit."]; *Ketchum v. Moses, supra,* 24 Cal.4th at p. 1134.) The Bank maintained below that, because the duplication

of effort by plaintiffs' many counsel needlessly increased attorney fees, the court should apply a negative multiplier of 0.5. Having settled its dispute on this issue with all other counsel for plaintiffs, the Bank renews this argument here solely with respect to Kassof.

Duplication was, indeed, the hallmark of the coordinated proceeding. Absent a lack of confidence in the competence of counsel in the first filed **\*841** *Phebus* to maintain this class action-which does not appear-it is difficult to find any need for the filing of so many essentially duplicative actions in the first place. Had the four actions filed after *Phebus* not been commenced, the plaintiffs in those cases would have been included in the class alleged in *Phebus*. While it is therefore impossible to conclude that the filing of so many nearly identical actions significantly increased the value of this litigation to any customers of the Bank, it did substantially increase the Bank's exposure to large attorney fee awards. For example, as the Bank points out, plaintiffs' counsels' time records show that 384 hours (approximately 20 percent of the total hours claimed) was spent in correspondence and phone calls between and among the nine law firms representing the various plaintiffs, which is more than twice the hours plaintiffs' counsel spent communicating with the Bank and the trial court.

Federal case law raises the question whether it is appropriate at all to award attorney fees "in tag-along actions-representative lawsuits brought with different named plaintiffs which substantially track actions previously brought." (*Lewis v. Teleprompter Corp.* (S.D.N.Y. 1980) 88 F.R.D. 11, 17.) As the Second Circuit Court of Appeals has pointed out, "[w]hile there is no first-in-time rule governing the award of counsel fees where multiple litigation is brought, a duplicative action which contributes virtually nothing to the ultimate result cannot justify an award of counsel fees.... [Citation.] Where [the] goal [of the litigation] is fully achieved by a single well-managed action, an award of compensation to latecomers who add nothing of value would encourage the bringing of superfluous litigation solely for an award of fees." (*Gerena-Valentin v. Koch* (2d Cir. 1984) 739 F.2d 755, 759; see also *Donovan v. CSEA Local Union 1000* (2d Cir. 1985) 784 F.2d 98, 106; *In re Metropolitan Life Derivative Litigation* (S.D.N.Y. 1996) 935 F.Supp. 286, 288 ["six law suits were filed when only one was necessary"]; *Skelton v. General Motors Corp.* (N.D.Ill. 1987) 661 F.Supp. 1368, 1387; *In re Agent Orange Product Liability Litigation* (D.C.N.Y. 1985) 611 F.Supp. 1296, 1307; *In re Penn Cent. Securities Litigation* (E.D.Pa. 1976) 416 F.Supp. 907, 916, revd. on other grounds (3d Cir. 1977) 560 F.2d 1138.)

Kassof concedes there was some unnecessary duplication of work by plaintiffs' numerous counsel during the coordination proceedings, but lays this problem almost entirely at the feet of the Bank. He argues in his brief that had the Bank "moved for an order appointing 'lead counsel' to represent all plaintiffs, what Wells Fargo now characterizes as 'duplicative' work by plaintiffs' attorneys would have been avoided. Instead, Wells Fargo chose to negotiate separately with individual parties, thereby requiring substantial additional work by all concerned." The argument is wholly unjustified.

First of all, in his petition for coordination Kassof requested that *he* be appointed liaison counsel unless counsel in the other actions all agreed upon **\*842** someone else. Plaintiffs' counsel apparently never selected one of their number to serve as liaison counsel, and Kassof never pursued the matter. But Wells Fargo certainly did so. After the Bank dropped its opposition to coordination it repeatedly asked the court to appoint liaison counsel, because it thought that might solve the problems it was experiencing in dealing with numerous lawyers representing different clients. For example, at one hearing counsel for the Bank expressed frustration at his inability to prevail upon plaintiffs' counsel to appoint one of their number as liaison counsel, asking the court to appreciate "what it's like being in my position having to deal with, how many do we have, seven or eight lawyers assembled here, each of which have different ideas and different views. And I know, I've been in these cases before, and I know its not uncommon, in fact it's usual, I believe, to appoint a liaison counsel. So if we can give some attention to that at some point during the proceedings, it would certainly make life easier for me, your Honor." Despite his initial request for the appointment of liaison counsel, Kassof did not support any of the Bank's requests for such an order. In the circumstances, it would be unfair to hold the Bank responsible for the trial court's regrettable failure to appoint liaison counsel and to exercise stronger control over the proceedings.[10]

Despite the absence of liaison counsel, the law firms representing plaintiffs in the *Phebus*, *Stiesberg*, and *Judnick* actions did designate one of their number to speak for the named plaintiff in each of these actions.

Plaintiffs in the *Phebus* case were represented by five lawyers associated with two law firms, but designated only one attorney, Mark L. Knutson, to make court appearances on behalf of all. Similarly, plaintiffs in the *Judnick* and *Stiesberg* cases were represented by seven lawyers associated with three law firms, but usually designated just one attorney, Barry Himmelstein, to appear and speak for all plaintiffs in those two cases. Knutson and Himmelstein, who appear to have collaborated, shouldered the laboring oars **\*843** throughout this litigation. After the actions were coordinated, counsel in *Thayer* and *Greenberg*-apparently the only cases in which the named plaintiffs were themselves attorneys[11] -were largely content to follow the crowd.[12] The status conference held before Judge Conway on April 16, 1999, provides a good example. Barry Himmelstein appeared on behalf of all plaintiffs in the *Stiesberg* and *Judnick* cases, Knutson appeared for plaintiffs in the *Phebus* case, plaintiff Greenberg participated by telephone on behalf of himself, and Alioto and Kassof both personally appeared on behalf of Thayer. The subject of the lengthy hearing was the adequacy of the Bank's response to a pretrial order regarding the Paragraph 20 Accounts. The proceeding consisted almost entirely of a comprehensive analysis of the issues by

Himmelstein and response thereto by counsel for the Bank. After Himmelstein spoke, Knutson advised the court that "Mr. Himmelstein has pretty much addressed everything." The court inquired whether Kassof wished to add anything, and Kassof answered that "Mr. Alioto is going to be stating our position." Alioto briefly reiterated one of Himmelstein's points and agreed that, as Himmelstein had previously made clear, plaintiffs' counsel would honor the confidentiality of information supplied by the Bank. Kassof then observed that the disclosure plaintiffs' counsel all sought "goes to the very essence of the case" and that there needed to be clarity as to this. Alioto and Kassof respectively sought and received compensation for almost 10 hours for work performed on April 16 in connection with this conference, which appears to have lasted about an hour.

This is not an isolated example of the manner in which Kassof and Alioto not only duplicated the work of counsel for plaintiffs in other cases but **\*844** duplicated each other's work. At virtually every hearing that took place after coordination was ordered, plaintiffs in the other cases were invariably represented by a single attorney and either Himmelstein or Knutson, and sometimes both, made the bulk of the plaintiffs' presentation, and Alioto and Kassof both appeared to separately express their concurrence. Because of this duplication, and the approval by the trial court of all the hours they claimed, Kassof and Alioto received a combined fee of $402,990 for representing Thayer-which was more than 36 percent of the total fees awarded all counsel for plaintiffs in all five coordinated cases. No single attorney received an award larger than that made to Kassof. Finkelstein & Krinsk was the only law firm that received an enhanced fee award larger than that made to Kassof, but that award, $275,034, was for work performed by *three* lawyers, one of whom was Knutson. Because Knutson performed the bulk of the work in the *Phebus* case, cocounsel in that case, Milberg, Weiss, Bershad, Hynes & Lerach, devoted just 53.25 hours to the matter, for which it received an award of only $27,450. Himmelstein's firm, Lieff, Cabraser, Heimann & Bernstein, received $156,744 for work performed by three lawyers.

In light of the foregoing considerations, we do not believe the hours for which Kassof sought compensation in attorney fees were "reasonably spent." Because there is no "reasonable basis" for the award he sought and received, as required (*Ketchum v. Moses, supra*, 24 Cal.4th at p. 1133; *Westside Community for Independent Living, Inc. v. Obledo* (1983) 33 Cal.3d 348, 355 [188 Cal.Rptr. 873, 657 P.2d 365]; *Serrano v. Unruh* (1982) 32 Cal.3d 621, 639 [186 Cal.Rptr. 754, 652 P.2d 985]; *Feminist Women's Health Center v. Blythe* (1995) 32 Cal.App.4th 1641, 1666 [39 Cal.Rptr.2d 189]), the making of that award was an abuse of judicial discretion. This conclusion deprives Kassof not only of the right to any enhancement of his lodestar fee, but to the lodestar award he received, which was calculated on the basis of all of the hours he claimed. As our Supreme Court has repeatedly made clear, the lodestar consists of "the number of hours *reasonably expended* multiplied by the reasonable hourly rate...." (*PLCM Group, Inc. v. Drexler, supra*, 22 Cal.4th 1084, 1095, italics added; *Ketchum v. Moses, supra*, 24 Cal.4th at p. 1134.)

While we believe a substantial reduction in the number of hours for which Kassof deserves compensation, or application of a negative multiplier reducing his basic lodestar award, is therefore warranted, in the absence of a fuller factual inquiry than was made by the trial court we are loath to ourselves **\*845** determine the precise amount of the appropriate reduction.[13] Kassof will on remand have an opportunity to demonstrate, if he can, the productive time he necessarily spent on this case, keeping in mind the substantial contributions made by able counsel representing plaintiffs in identical actions that were previously filed.

### B. *Kassof's Appeal*

([6]) In a cross-appeal resting entirely on our opinion in *Lealao, supra*, 82 Cal.App.4th 19, Kassof argues that because the value of the class recovery can be monetized with a reasonable degree of certainty, the trial court could have increased his basic lodestar with a positive multiplier "to ensure that the fee awarded is within the range of fees freely negotiated in the legal marketplace in comparable litigation." (*Id.* at p. 50.) According to Kassof, the multiplier applied by the trial court was not sufficient to bring his fee within this range, the trial court's refusal to further enhance his fee therefore constituted an abuse of discretion, and the matter must therefore be remanded to the trial court for a reassessment that "must result in a dramatic increase, not a decrease, in the size of his award." In light of what we have already said, we need spend little time on this contention, which, if this were the Federal Circuit, would qualify for a "chutzpah award." (See, e.g., *Dainippon Screen Mfg. Co., Ltd. v. CFMT, Inc.* (Fed.Cir. 1998) 142 F.3d 1266, 1271.)

First of all, *Lealao* certainly does not mandate that attorney fee awards calculated under the lodestar methodology *must* be measured by a percentage-of-the-benefit yardstick whenever a class recovery can be monetized with a reasonable degree of certainty. This judicial authority is fundamentally discretionary and, is limited to cases in which a lodestar award would not produce a fee that is within the range of fees freely negotiated in the legal marketplace and "it is not otherwise inappropriate" to increase the basic lodestar. (*Lealao, supra*, 82 Cal.App.4th at p. 49.) For a variety of reasons, most of which are obvious, a percentage-of-the-benefit approach to **\*846** the calculation of Kassof's fee would be wholly inappropriate. As we have seen, the trial court *did* increase Kassof's lodestar, and the reasons we have found that to be an abuse of discretion would apply with even greater force to a greater increase. Additionally, and putting aside for the moment the considerations that have led

us to order a decrease in Kassof's basic lodestar, Kassof has not shown that that lodestar-which is based on $300 per hour for the full amount of hours he claimed-would not produce a fee within the range of fees freely negotiated in the marketplace. Furthermore, even indulging the assumptions the class recovery here can be easily monetized, which the trial court did not determine, and that a percentage-of-the-benefit approach could be justified, none of the attorneys representing other plaintiffs requested the court to apply a multiplier based on that methodology, and for this reason alone it would be inappropriate to do so in behalf of a single lawyer who was not singularly instrumental to the successful resolution of the litigation.

Nothing we have said in this opinion signals any retreat from our firm and continuing commitment to the settled principle that attorneys entitled to fee awards for advancing important public interests must be fully and fairly compensated, so as to encourage the provision of such legal assistance. However, the predicate of *any* attorney fee award, whether based on a percentage-of-the-benefit or a lodestar calculation, is the necessity and usefulness of the conduct for which compensation is sought. To award an attorney a premium for duplicative work that was neither difficult nor particularly productive, involved little or no risk, may well have delayed settlement, and seems to have been primarily designed to line counsel's pockets, would reward behavior which it is in the public interest (and as well the special interest of the legal profession) to strongly discourage.

**Disposition**

The judgment is reversed and the matter remanded for further proceedings consistent with this opinion. Appellant Wells Fargo is awarded costs on appeal.

Haerle, J., and Ruvolo, J., concurred.

On October 25, 2001, the opinion was modified to read as printed above. **\*847**

| Footnotes | |
|---|---|
| 1 | Although the respondent in this appeal is nominally Thayer, not Kassof, the latter is more directly interested and is in a practical sense arguing in his own behalf. We shall in this opinion therefore identify Kassof rather than Thayer as the claimant. |
| 2 | In its September 2, 1998 opposition to the motion to coordinate, the Bank represented to the coordination motion judge that the cases "have become moot because Wells Fargo reversed its decision to revoke these fee waivers. Wells Fargo has not revoked any of the fee waivers at issue and has decided to maintain these fee waivers for the life of the impacted accounts. Further, Wells Fargo has written to each impacted account holder, including plaintiffs, notifying him/her of this decision. [¶] Because no fees were charged by Wells Fargo on the impacted accounts and Wells Fargo has informed customers in writing that it will not revoke the fee waivers on the impacted accounts, the courts where these [five] cases are pending should dismiss them. Wells Fargo and plaintiffs recognize this fact and are working together to develop a joint dismissal application. If the effort to develop a universal joint dismissal application is not successful, Wells Fargo may reach agreement with individual plaintiffs, or Wells Fargo will unilaterally request dismissal of each of the cases based on the absence of any threatened conduct or damages. [¶] For these reasons, coordination is not necessary for prompt resolution of the cases. In fact, waiting for coordination will likely delay dismissal and therefore coordination does not promote the ends of justice." |
| 3 | Rule 1501(*l*) defines "liaison counsel" as "an attorney of record for a party to a ... coordinated action who has been appointed by an assigned judge to serve as representative of all parties on a side with the following powers and duties, as appropriate: (1) to receive on behalf of and promptly distribute to the parties for whom he acts notices and other documents from the court; (2) to act as spokesman for the side which he represents at all proceedings set on notice before trial subject to the right of each party to present individual or divergent positions; (3) to call meetings of counsel for the purpose of proposing joint action" |
| 4 | The order states that, "For example, the Court finds that time expended in the preparation and filing the complaints and negotiating the substantive provisions of the settlement agreement ultimately reached with Wells Fargo (the period from June 1, 1998 through November 24, 1998 (period 1) and from March 2, 1999 through June 15, [1999 period 3)) provided greater benefit and involved a different level of activity than time expended in pursuing non-substantive or collateral settlement matters, or the negotiating and, thereafter, briefing of Plaintiffs' counsel's respective fee and expense motions (the periods from November 25, 1998 through March 1, 1999 (period 2) and from June 16, 1999 through December 15, 1999 (period 4))." |
| 5 | The basic lodestar calculations for each of the nine law firms is set forth, *post*, at footnote 9. |

| 6 | At the hearing on attorney fees, counsel for Wells Fargo confirmed that the Bank "didn't contest line items in the bills. We didn't say that phone call was too long [or] didn't happen. Well, the reason for that is because Wells Fargo is not suggesting that any of these lawyers are lying. We're not suggesting that they didn't spend the time they claimed to have spent. What we're saying is that given what was accomplished in this case, that kind of a Lodestar number is an unreasonable number." |
|---|---|
| 7 | These factors were "the fact that an award against the state would ultimately fall upon the taxpayers; the fact that the attorneys in question received public and charitable funding for the purpose of bringing law suits of the character here involved"; and "the fact that the monies awarded would inure not to the individual benefit of the attorneys involved but the organizations by which they are employed." (*Serrano III, supra,* 20 Cal.3d at p. 49.) |
| 8 | Though Kassof does not advance the argument, it could be maintained that since coordination under Code of Civil procedure section 404 is limited to "complex" cases (cf. Code Civ. Proc., § 403, relating to the coordination of cases that are "not complex"), the coordinated actions are by definition difficult or novel. Such an argument would not be persuasive. The criteria that determine whether actions are "complex" within the meaning of section 404 are set forth in the California Rules of Court, which defines a "complex case" as "an action that requires exceptional judicial management to avoid placing unnecessary burdens on the court or the litigants and to expedite the case, keep costs reasonable, and promote effective decision making by the court, the parties, and counsel." (Cal. Rules of Court, rule 1800(a).) In deciding whether actions are "complex," the trial court must consider "whether the action is likely to involve: [¶] (1) Numerous pretrial motions raising difficult or novel legal issues that will be time-consuming to resolve; [¶] (2) Management of a large number of witnesses or a substantial amount of documentary evidence; [¶] (3) Management of a large number of separately represented parties; [¶] (4) Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court; or [¶] (5) Substantial postjudgment judicial supervision." (*Id.,* rule 1800(b).)<br><br>The coordinated actions with which we are here concerned are "complex" within the meaning of this rule only because of the large number of represented parties in related actions pending in different counties. The court did not address the difficulty or novelty of the substantive legal issues presented because the petition to coordinate made no such claim. Kassof sought coordination solely on the grounds the actions "are brought on behalf of overlapping classes, alleging virtually identical facts and legal theories, and involve the same defendant," and that coordination "would advance the convenience of the parties, witnesses and counsel" and thereby "promote the efficient utilization of judicial facilities and manpower ... avoid the risk of duplicative and inconsistent rulings ... [and] increase the possibility of settlement ...." Kassof did not allege, and the court did not find or even imply that the actions sought to be coordinated present "difficult or novel legal issues that will be time-consuming to resolve ...." (Cal. Rules of Court, rule 1800(b)(1).) |
| 9 | The lodestar calculations for each of the nine law firms based on these rates and hours are as follows:<br><br>*Greenberg Case* |

| William Sobel, Esq. | $ 3,253.76 |
|---|---|

| Barry Greenberg, Esq. (pro. per.) | $ 55,385.01 |
|---|---|

| Total | $ 58,638.77 |
|---|---|

| *Stiesberg Case* | |
|---|---|

| Gerard & Associates | $ 33,702.50 |
|---|---|

| | |
|---|---|
| Law Offices of James Parziale | $ 45,468.50 |

| | |
|---|---|
| Total | $ 79,171.00 |

| | |
|---|---|
| *Phebus Case* | |

| | |
|---|---|
| Finkelstein & Krinsk | $163,296.00 |

| | |
|---|---|
| Milberg, Weiss, Bershad, Hynes & Lerach | $ 15,975.00 |

| | |
|---|---|
| Total | $179,271.00 |

| | |
|---|---|
| *Judnick Case* | |

| | |
|---|---|
| Lieff, Cabraser, Heimann & Bernstein | $ 97,936.00 |

| | |
|---|---|
| Total | $ 97,936.00 |

| | |
|---|---|
| *Thayer Case* | |

| | |
|---|---|
| Trump, Alioto, Trump & Prescott | $119,295.00 |

| | |
|---|---|
| Sherman Kassof, Esq. | $140,250.00 |

| | |
|---|---|
| Total | $259,545.00 |

| 10 | A 1980 report to the Federal Judicial Center on attorney fees in class actions acknowledged some duplication may be inevitable in complex cases involving large numbers of parties and lawyers, particularly in the early stages before the cases are combined. The report emphasized, however, that "[d]uplication of effort can best be minimized by careful judicial observation and control during the case. The object would be to assure coordination of effort by the various plaintiffs' attorneys. In appropriate cases appointment of lead or liaison counsel, together with a warning that duplication will not be tolerated, may go a long way toward minimizing the risk. If duplication is not controlled during the case it may be too late to do anything effective about it when the fee petitions are filed. At that point the only remedy is to reduce the hours to be included in the lodestar to compensate for the duplication. Although this may be necessary to protect the class from excessive fee awards, it is less than satisfactory for two reasons. First, at best the reduction will be an approximation. Second, it is harsh on the attorneys who actually may have invested the time in good faith." (Miller, Attorneys' Fees in Class Actions, Rep. to Federal Judicial Center (1980) pp. 274-275, fns. omitted; see also *Liebman v. J. W. Petersen Coal & Oil Co., supra,* 63 F.R.D. at p. 690.) |
|---|---|
| 11 | Plaintiff Barry M. Greenberg was initially represented by Attorney William A. Sobel but at some point after his challenge to Judge Wick substituted himself in as in propria persona counsel. Greenberg received a fee award of approximately $85,452.52; Sobel received an award of $5,735.64. |
| 12 | There were, however, a few times during the proceedings in which Kassof and Alioto went a separate way, most notably by petitioning for coordination. None of their other independent efforts succeeded, however. One related to the manner in which fees should be calculated. Alone among plaintiffs' counsel, Alioto and Kassof urged a percentage-of-the-benefit approach, which, as we discuss separately below, the court properly rejected. <br><br> Another example was Alioto and Kassof's attempt to pursue the "Seymour Rose problem," which was initiated by counsel for plaintiffs in the *Judnick* case, in which Rose was a named plaintiff. As earlier described, it was discovered that Rose had given up a free checking account in order to obtain a Gold Account in which fees had been waived only for a limited period, which had expired, and was therefore not a member of any putative class alleged in any coordinated action. Despite the Bank's insistence on the propriety of its treatment of Rose and other similarly situated customers, and the willingness of all other plaintiffs' counsel to drop the issue, Kassof and Alioto persuaded the trial court to continue the proceedings to provide them an opportunity to extract a concession from the Bank. At that point counsel for all of the other parties agreed to language in a proposed pretrial order that would authorize the Bank to enter a settlement with plaintiffs in all of the coordinated actions other than *Thayer*. Before this language was considered by the court, Kassof and Alioto abandoned their demand for additional concessions and the proposed order was dropped. |
| 13 | In *California Public Interest Research Group v. Shell Oil Co.* (N.D.Cal. 1996) 1996 WL 33982, the court concluded that "where the attorneys filing a second, identical suit play an almost entirely passive or duplicative role, and fail to make a distinct contribution to either the litigation effort, a settlement, or the results achieved, they fail to satisfy the 'appropriate' standard set forth in 33 U.S.C. § 1365(d) [,]" and may therefore be denied *any* fee. (*Id.*, at pp. *3-4; accord, *Gerena-Valentin v. Koch, supra,* 739 F.2d 755, 759; *In re Agent Orange Product Liability Litigation, supra,* 611 F.Supp 1296, 1307; see also *Lewis v. Teleprompter Corp., supra,* 88 F.R.D. 11, 17.) We foreclose that option here only because the Bank did not at trial claim Kassof should be denied any fee whatsoever, nor does it make that claim here. |

| **End of Document** | © 2014 Thomson Reuters. No claim to original U.S. Government Works. |

# ATTACHMENT 5