**Pages 1 - 66**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

MDL NO. 1917 IN RE:  CATHODE      )
RAY TUBE( CRT) ANTITRUST          )
LITIATION                         )      Case No. CV 07-5944-JST
_____ )

San Francisco, California
Wednesday, January 13, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Dell Plaintiffs:
          ALSTON & BIRD, LLP
          One Atlantic Center
          1201 West Peachtree Street
          Atlanta, GA  30309
      **BY:  MICHAEL P. KENNY, ATTORNEY AT LAW**

For DAP Plaintiffs:
          BOIES, SCHILLER & FLEXNER, LLP
          30 South Pearl Street - 11th Floor
          Albany, NY  12207
      **BY:  PHILIP J. IOVIENO, ATTORNEY AT LAW**

For Viewsonic Plaintiffs:
          CROWELL MORING
          1001 Pennsylvania Avenue, N.W.
          Washington, DC  20004
      **BY:  MATTHEW J. MCBURNEY, ATTORNEY AT LAW**

For Best Buy Plaintiffs:
          ROBINS KAPLAN, LLP
          2049 Century Park East - Suite 3400
          Los Angeles, CA  90067
      **BY:  ROMAN M. SILBERFELD, ATTORNEY AT LAW**

Reported By:      Pamela A. Batalo , CSR No. 3593, RMR FCRR
             Official Reporter

APPEARANCES CONTINUED:

For Toshiba Defendants:
                        WHITE & CASE
                        701 Thirteenth Street, NW
                        Washington, DC  20005
                BY:  **CHRISTOPHER M. CURRAN, ATTORNEY AT LAW**


For Panasonic Defendants:
                        WEIL, GOTSHAL & MANGES, LLP
                        767 Fifth Avenue
                        New York, NY  10153
                BY:  **DAVID L. YOHAI, ATTORNEY AT LAW**


For Samsung SDI Defendants:
                        SHEPPARD MULLIN RICHTER & HAMPTON, LLP
                        Four Embarcadero Center - 17th Floor
                        San Francisco, CA  94111
                BY:  **JAMES L. MCGINNIS, ATTORNEY AT LAW**


For LG Electronics Defendants:
                        MUNGER, TOLLES & OLSON, LLP
                        355 South Grand Avenue - 35th Floor
                        Los Angeles, CA  90071
                BY:  **SUSAN E. NASH, ATTORNEY AT LAW**


For Chunghwa Defendants:
                        GIBSON, DUNN & CRUTCHER, LLP
                        555 Mission Street
                        San Francisco, CA  94105
                BY:  **JOEL S. SANDERS, ATTORNEY AT LAW**


(Multiple other counsel present as reflecting on the Court's
Minute Order)

**Wednesday - January 13, 2016**                              **9:30 a.m.**

                        P R O C E E D I N G S

                             ---oOo---

         **THE CLERK:**  Calling CV 07-5944-JST, MDL No. 1917 In

Re: Cathode Ray Tube (CRT) Antitrust Litigation.

         Your Honor, appearances were already taken.

         **THE COURT:**  Thank you.

         Several motions for summary judgment, all relating to the

control exception to the rule in *Illinois Brick* are on calendar

today.  The Court previously issued an order regarding oral

argument on these summary judgment motions.  The order was

issued on January 6.

         The order set out a series of questions with time limits

pertaining to the argument of each question, and I know the

parties have examined that order and structured their arguments

accordingly.

         I just want to say, before we get going, that even though

normally I'm terrible at following my own time limits because I

like oral argument so much, today I'm likely to do a pretty

good job.

         Secondly, I recognize that the amount of time that I have

given to each of these questions is maybe not as long as you

would like or, frankly, as long as I would like, but the

circumstances that we all find ourselves in is that there are

29 motions for summary judgment under submission in this case

1   that I received only recently.  And then once those are

2   decided, there are in order of magnitude 80 *Daubert* motions and

3   motions in limine that have to be resolved.

4       So in order to give you the customer service that I think

5   you deserve and that your clients deserve, which is to try to

6   resolve this case in some reasonable time frame, I have to have

7   hearings like this where I'm able to give less airtime to

8   questions than I might otherwise.  But I know having said all

9   that, that still makes the arguments shorter than you want them

10  to be, so in advance, I appreciate your indulgence.

11      Let's go ahead and get going.  The first question

12  identified in the Court's prior order is the identification of

13  the appropriate test for the determination of control.  My

14  understanding is that with the first five questions, the

15  defendants will be arguing first.  So, counsel.

16      **MS. NASH:**  Good morning, Your Honor.  Susan Nash of

17  Munger, Tolles & Olson on behalf of defendant LG Electronics.

18      The defendants have divided the questions up among them,

19  and I will be taking Question 1.  I'm going to save 90 seconds

20  of my time for rebuttal.

21      The Court has asked whether the test for the control

22  exception should be whether ownership or control forecloses a

23  realistic possibility of suit by the direct purchaser, and our

24  answer to that is no, we do not believe that is the right test.

25      I would like to propose a framework to the Court that I

1    believe is both narrower and, in one respect, broader than the

2    test as articulated by the Court's question.

3        We know that the concept of suit being foreclosed by a

4    direct purchaser due to control comes from the decision in

5    *Royal Printing*, and we know that the Court applied that

6    exception when control existed at the time of the sale and at

7    the time the lawsuit was filed.  We know that because the case

8    makes no sense otherwise.

9        So it is our position that the ownership interest by the

10   conspirator and control over litigation decisions, as

11   articulated in *Royal Printing*, can only -- must -- the

12   exception can only apply when that control exists throughout

13   the conspiracy and when the claim becomes known.

14       Now, we know, Your Honor, from *ATM Fee* and *Utilicorp*, that

15   to expand the exception beyond that found in *Royal Printing*

16   would violate the Supreme Court's instruction in *Utilicorp*, and

17   we know from *Royal Printing*, that simply finding lack of a

18   realistic possibility of suit is insufficient for the Court to

19   apply the exception.

20       So that's why I believe that even if you tie the lack of a

21   realistic possibility of suit to control, you still have to put

22   bounds around the exception to be consistent with the exception

23   as applied in *Royal Printing* and to avoid violating the

24   instruction in *Utilicorp*.

25           **THE COURT:**  May I ask you a question?

1      **MS. NASH:**  Of course.

2      **THE COURT:**  So this is similar to the argument made in

3  the briefs.  Let's take, as one case, a situation in which

4  control does not exist during the conspiracy period but it

5  exists at the time that the claim becomes known and thereafter.

6      In that situation, isn't the lack of likelihood of

7  bringing suit exactly the same?  So if that's your concern,

8  isn't the concern the same?

9      **MS. NASH:**  Your Honor, I would suggest to the Court

10  that that is not the right way to approach the case.

11      **THE COURT:**  It might not be, but it's my question.

12      **MS. NASH:**  Okay.  Well, then --

13      **THE COURT:**  I'm just trying to figure out where are

14  the holes, so can we agree on that?

15      **MS. NASH:**  Right.

16      **THE COURT:**  At least if that's your concern, the

17  concern is the same because in both instances, the likelihood

18  of suit is equally high or equally low.

19      **MS. NASH:**  We can agree that after -- that when --

20  when a direct purchaser is later controlled, that its

21  litigation decisions might be subject to -- not be -- not be

22  made on its own.  We can agree with that.

23      **THE COURT:**  So then it gets to your other point, which

24  is that if you were to adopt a definition which permitted a

25  control exception in the circumstances I just described, you

1    would be violating what you described as the Supreme Court's

2    prohibition.  And I gather you mean the prohibition on creating

3    new exceptions to *Illinois Brick*.

4           **MS. NASH:**  That is correct, Your Honor.

5           **THE COURT:**  Okay.  I mean, I guess -- I would say this

6    to everybody on the defense side because a lot of you make that

7    argument in one way or another.

8        If the contours of an exception haven't previously been

9    defined in the case law, does it expand the number of

10   exceptions to say this is how I'm going to define one of them?

11   I mean, there's -- it's not -- *semantics* isn't exactly the

12   right word, but that's the battle that I see being waged.

13          **MS. NASH:**  Your Honor, there is no case in the Ninth

14   Circuit that applies the control exception based solely on a

15   situation where the direct purchaser is controlled after the

16   conspiracy ended.  That was not the case in *Royal Printing*.

17   That is not the case in *Freeman*.  So when I say to the Court

18   that you cannot expand the exception, I mean that when you look

19   at the two times that the Ninth Circuit has allowed standing,

20   in both of those situations, the control existed through --

21   during the conspiracy and afterwards.  And that's why I say it

22   would be an expansion to apply it in any other situation.

23       I would like to suggest to the Court, though, that there

24   is another situation in which you need to evaluate control, and

25   that's what I meant about suggesting a framework to the Court

1    that was broader than what the Court had said.  And that takes

2    into account what *Royal Printing* said and what *Illinois Brick*

3    said where the control is such that the effect of the

4    overcharge is determined in advance.

5        The Court has alluded to this type of an exception in its

6    Questions 3 and 5 that we'll get to, but I think in order to

7    put these cases in a framework, you need to cover both the

8    situation where litigation decisions are controlled during and

9    at the time of, as I've said, and where pricing decisions,

10   downstream pricing decisions, are controlled during the

11   conspiracy.

12       And the only -- that's why, Your Honor, I would describe

13   the ownership control exception as follows, and I would like to

14   read this for the Court.  I will say, that Your Honor, what I'm

15   about to read I have many copies of, if it would be helpful to

16   the Court.  I'm going to say what will be in the transcript,

17   but I'd be happy to hand this up.

18            **THE COURT:**  Sure.  Why don't you do that later.

19            **MS. NASH:**  Would that be useful?

20            **THE COURT:**  You have seconds, you know.  You are at

21   the level of such small increments of time, I would just go

22   ahead and talk.

23            **MS. NASH:**  Okay.  Your Honor, we have articulated the

24   exception as written down in the paper I've given you.

25   Basically it's *Royal Printing*:

1          "When there is control over litigation decisions during

2     and at the time of or when there is control over the direct

3     purchasers' pricing decisions during the conspiracy such that

4     market forces are superseded."

5          And that's an alternative test, and I think that takes

6     into account the case law because *Illinois Brick* created the

7     concept of a possible exception.  Didn't apply it in that case,

8     but created the concept of that when market forces are

9     superseded.

10         *Royal Printing* said, as the Court knows, we don't find

11    that here.  We are going to create a new exception.  So I think

12    to analyze it, you need to look at both of those concepts.

13         And, Your Honor, I would also say that when you answer the

14    question this way, which I think is the only way that is

15    consistent with precedent, it drives the other issues here.  It

16    drives the timing determination, as I've explained, and it

17    drives directionality because it makes absolutely no sense to

18    say that if the direct purchaser owns the conspirator, these

19    exceptions apply because the direct purchaser controls its own

20    pricing decisions.  And it makes no sense to apply the

21    exception if the direct purchaser owns the conspirator because

22    the direct purchaser controls its own litigation decisions.

23         That's why I think our formulation is consistent with

24    precedent, and it will help the Court, I hope, answer the

25    questions.

1    I will reserve the remainder of my time.

2         **THE COURT:**  Thank you, Ms. Nash.

3         **MR. IOVIENO:**  Your Honor, Phil Iovieno for the

4    plaintiffs.

5    We agree with the formulation of the standard as set forth

6    in Question 1, that the test for control should be whether or

7    not ownership or control forecloses a realistic possibility of

8    suit by the direct purchaser.  And what I would say to begin

9    with is I think this standard flows directly from the language

10   used in *ATM Fee* where at page 756, *ATM Fee* specifically says, I

11   quote, "Whether a realistic possibility of suit exists depends

12   on the existence of ownership or control between" -- "between

13   the direct purchaser and the seller."

14   It's a very straightforward test.  It comes right from *ATM*

15   *Fee*, and it's citing importantly -- harmonizing and citing both

16   *Royal Printing* and *Freeman*.

17   So under this formulation, if you have more than a

18   minority interest, you're analyzing the exception under the

19   ownership prong, and if you have any minority interest, you're

20   analyzing the exception under the control prong.

21   I would like to take a minute because after *ATM Fee* was

22   decided, there has been four courts that have construed the

23   meaning of *ATM Fee*, and I just want to take a minute to go

24   through quickly, because we think each one of these courts has

25   properly articulated the standard.

1    So the first one is in the *LCD* litigation in a decision

2  November 19, 2012 Judge Illston.  This is 212 WL 5869588 where

3  she specifically states, "The *ATM Fee* opinion never suggested

4  any intention to alter the standard in *Royal Printing*.  The *ATM*

5  *Fee* discussion recognized that the touchstone question is

6  ownership or control and clarified that the realistic

7  possibility of suit inquiry outlined in *Royal Printing* is not a

8  separate exception.  It is an analysis to be done in connection

9  with the ownership and control exception.  As the Court noted,

10  *Freeman* outlines that whether realistic possibility of suit

11  exists depends on the ownership or control between the direct

12  purchaser and the seller."

13    And we believe that that is a correct

14  application/interpretation of the *ATM Fee* standard.  Again, she

15  reiterates -- Judge Illston reiterates this in another decision

16  later in December.  This is 2012 WL 7062366, in which she says,

17  "The Court noted that *Freeman* outlines that whether a realistic

18  possibility of suit exists depends on the ownership or control

19  between the direct purchaser and the seller.  And the Court

20  expressly declined to extend the realistic possibility of suit

21  exception to situations outside of the ownership or control

22  context."

23    So this issue has also come up in this litigation.

24  Judge Conti had an initial summary judgment motion that he

25  decided after *ATM Fee*.  This is Docket No. 1470, and at page

19 -- I'm sorry -- page 20 of Judge Conti's decision, he says,
"Defendants characterized the named DPP citation of *Freeman* and
the two-thirds circuit cases as an impermissible attempt to
fashion a new exception to *Illinois Brick*.  That
characterization is inaccurate.  As discussed earlier, *Freeman*
and *Sugar* are applications, not expansions, of the ownership
and control exception already set forth in *Royal Printing*."

Again, it's our position that is again a correct
interpretation and application of the *ATM Fee* standard, of the
*ATM Fee* construction of the exception.

And lastly, I just want to cite to you quickly Judge Jones
in the Western District of Washington, his decision from
September of 2014.  This is --

**THE COURT:**  You *AU Optronics*?

**MR. IOVIENO:**  Correct.  Correct.

What he says here -- and I'm just going to read a few of
his quotes -- "Without exception, there would be no realistic
possibility of private antitrust enforcement, and without an
exception, price fixers and other anti-competitive entities
could evade liability simply by incorporating subsidiaries to
purchase and distribute their goods to the consuming public."

He goes on to say in *ATM Fee*, "The Court concluded that
the *no realistic possibility of suit rule* from *Freeman* was
merely a different way to express the control exception.  The
question that determines the applicability of the control

1    exception, as both the MDL court and *ATM Fee* court articulated

2    is whether, because of control between a direct purchaser and a

3    price fixer, there is no realistic possibility that the direct

4    purchaser will sue the price fixer."

5        So the reason I took my time, my limited time, to go

6    through those four cases is because I see a marked consistency

7    in the way each one of those courts understood and applied the

8    standard that first came down in *Royal Printing* and was further

9    confirmed in *ATM Fee*.

10       I don't have much time left.  What I do want to do is just

11   talk briefly about an issue that comes up in the briefs

12   regarding the direction in which the control must flow.

13       The defendants take the position that it can only be a

14   one-way street, that the control has to exist from the

15   conspiring seller down to the direct purchaser.  It's our

16   position that that's just wrong.  It's inconsistent with the

17   *ATM Fee* standard.

18       First of all -- for two reasons.  First of all, the *ATM*

19   *Fee* standard specifically said that the inquiry that is -- that

20   needs to be done, the dispositive inquiry, is whether ownership

21   and control exists between -- between the direct purchaser and

22   the seller.

23       And then if you take -- you take that standard, what's

24   equally important from our perspective is that the *ATM Fee* --

25   the Ninth Circuit takes that standard and then it analyzes the

1    control relationships in *ATM Fee* both ways.  If you take a look

2    at -- in that case STAR was the conspiring seller; the bank

3    defendants were the direct purchasers.

4        You take a look at the *ATM Fee* decision, the first -- and

5    Headnote 17 -- this is page 757 of the opinion -- "The Court

6    notes that plaintiffs do not allege that STAR, the conspiring

7    seller, owns or controls the bank defendants."  Okay.  "Thus,

8    this case does not involve the lack -- does not involve a lack

9    of a realistic possibility of suit because of the seller STAR

10   prohibiting the direct purchasers bank defendants from suing

11   through its ownership or control as found in *Royal Printing* and

12   *Freeman*."

13       Now, if the defendants' articulation of the standard was

14   correct and it was just a top-down relationship, the decision

15   would have ended right there.  That's the end of the inquiry.

16   They did the top-down analysis and plaintiffs weren't even

17   alleging, but of course the decision doesn't end there.  It

18   goes on in two more paragraphs.

19       "To specifically analyze whether the bank defendants owned

20   or controlled STAR."  So they're analyzing whether, in this

21   situation, the direct purchasers owned or controlled the

22   conspiring seller.

23       And they conclude that in this situation, they didn't.

24   But the point is that the standard that *ATM Fee* articulates,

25   one in which you look at relationships between the seller and

1    direct purchaser, establishes that it can't be one way, and

2    then if you take a look at the reasoning of *ATM Fee*, it shows

3    that that was not their intent at all.

4        And I would just end with this issue came up before

5    Judge Illston and Judge Jones and they both agreed with our

6    position that the inquiry is not one way.

7        **MS. NASH:**  Your Honor, plaintiffs are trying to

8    stretch *ATM Fee* in two directions, both to say the control

9    after the conspiracy is enough and that control between direct

10   purchaser and conspirator is enough.

11       Both of these -- I would point out, Your Honor, that *ATM*

12   *Fee*, first of all, denied standing, so whatever *ATM Fee* says,

13   you cannot say that *ATM Fee* created a new version of the

14   exception.  It found no exception applicable.

15       Second, I would submit respectfully that Judge Illston and

16   the other courts got it wrong.  And I would ask the Court to

17   look very closely at *ATM Fee* if his Honor is even thinking

18   about applying this exception in the reverse direction.

19       *ATM Fee* sets -- states its holding very clearly.  "We

20   decline to extend the exception noted in *Royal Printing* and

21   *Freeman* to situations where the seller does not own or control

22   the direct purchaser.  That's the holding.

23       Then the Court goes on to address the plaintiffs'

24   argument, which I would submit is dicta.  The Court has to

25   address plaintiff's arguments.  That's what courts do.  But the

1    Court goes on to a long discussion of the reverse

2    directionality, whether the plaintiff -- the bank defendants

3    own STAR, and it says in Footnote 10 that even that control is

4    not sufficient, and I would urge the Court to look at Footnote

5    10 because that precludes finding that direct purchaser control

6    of a conspirator is enough.

7         THE COURT:  Thank you have.

8         MR. CURRAN:  Thank you, Your Honor.  Your Honor,

9    Christopher Curran for Toshiba addressing Question 2.  Question

10   2, of course, Your Honor, deals with control, and you asked

11   specifically what degree of control and what factors are

12   relevant to that inquiry.  And I submit to Your Honor that the

13   answer to both of those inquiries is found in *ATM Fee* itself.

14        THE COURT:  Mr. Curran, I just want to interrupt you

15   to say -- and to remaining counsel -- it may be in between

16   questions, I want to take a minute to make some notes, so I

17   would appreciate the opportunity to actually announce to the

18   room when we'll be moving to the next question.

19        Mr. Noble, please give Mr. Curran 10 additional seconds.

20        Go ahead.

21        MR. CURRAN:  Thank you, Your Honor.  May I proceed?

22        THE COURT:  You may.

23        MR. CURRAN:  Well, I submit, Your Honor, that the

24   penultimate paragraph of I *ATM Fee* supplies the answer,

25   certainly the framework, to the questions Your Honor has raised

1    because *ATM Fee* in that paragraph instructs us to look at the

2    law of state of incorporation.  There the relevant law was

3    Delaware.  And to consider what is necessary to control the

4    management of the company in question.

5        And under Delaware law, of course, as the *ATM Fee* court

6    concluded, the question is do you have the requisite number of

7    votes on the board of directors to determine the management of

8    the company.  And ordinarily that will be a majority of the

9    board of directors.

10       So the first question is -- and the fundamental question

11   is does one company control the majority of the board of

12   directors of the other company?

13       **THE COURT:**  Why, as a matter of policy, is that the

14   best test?  I mean, we're not doing -- this is a proxy for

15   something else.  This is a proxy for this -- you know, these

16   factors and are a proxy for the question of the difficulty in

17   allocating antitrust damages, the importance of providing

18   redress to persons who have been injured by antitrust

19   conspiracies, and a whole host of other factors.

20       We're not doing corporations law, except indirectly, so my

21   question is why is this the best test for achieving whatever

22   conflicting policy also are in front of us?

23       **MR. CURRAN:**  Because fundamentally the policy concern

24   that is addressed in *Illinois Brick* and in *Royal Printing* is

25   who controls the pricing and the litigation decision.  And

1    those two decision points are made at the board of directors.

2    And perhaps instructing management on what to do.

3        And *ATM Fee*, of course, certainly could have concluded

4    that we should look at a whole panoply of issues to determine

5    whether there is influence or input or other degrees of weight

6    less than decisive control of the board of directors.

7        In fact, Your Honor, the *Sun Corporation* case that is

8    cited in some of the briefs here suggested that maybe you look

9    at some of -- some lesser factors, and *ATM Fee* did not adopt

10   that approach.   *ATM Fee* took a somewhat literal approach to

11   control.  And that approach, that literal approach, that narrow

12   approach, is supported by *Utilicorp* because, after all -- and I

13   know this is kind of getting back to your preface of today's

14   proceeding about how do you define a relevant exception, but

15   *Utilicorp* is pretty clear, citing we should not be creative in

16   coming up with new exceptions and we should not expand existing

17   exceptions, and *ATM Fee* was emphatic in following that

18   instruction from the Supreme Court.  And I think that idea

19   underlies *ATM Fee*'s miserly interpretation of what constitutes

20   control.

21       And, Your Honor, you know from the facts in *ATM Fee* some

22   of the things that are not sufficient, right?  In *ATM Fee*, the

23   CEO from STAR, who was appointed by the banks, was carried

24   over.  That wasn't sufficient.  That CEO was put on the board

25   of directors.  That wasn't sufficient.

1    There was an advisory committee created, and it got -- it

2 was guaranteed input into the decision-making by STAR.  That

3 wasn't sufficient.  The banks own 10 percent of the parent

4 company of STAR.  That wasn't sufficient.  There was a contract

5 saying that STAR should consider the interests of the bank.

6 That wasn't sufficient.

7    And *ATM Fee* addressed those points and found that

8 individually and collectively that wasn't enough for control

9 because you need to control the majority -- the majority of the

10 board of directors.

11    I should add also, it's not always the case that a

12 majority shareholding is necessary or sufficient for control of

13 the board of directors.  There could be situations where super

14 majority provisions are in play.  There could be situations

15 where there are staggered board of directors such that a new

16 majority shareholder doesn't have instantaneous control.

17    One does have to look at the details, but the fundamental

18 touchstone is do you control the necessary votes on the board

19 of directors to determine management.

20    I will reserve the rest of my time, unless Your Honor has

21 any questions.

22         **THE COURT:**  Thank you.

23    Plaintiffs?

24    **MR. KENNY:**  Good morning, Your Honor.  May it please

25 the Court, Michael Kenny on behalf of Dell.  I'm taking

1    response for the DAPS.

2         The answer to your question, Your Honor, specifically is

3    control sufficient, for the fact-finder could conclude that

4    there is no reasonable possibility that the direct purchaser

5    would sue the conspiring seller with which it has a controlling

6    relationship.

7         That answer is guided and informed by three decisions from

8    the Ninth Circuit.  And I want to quote from all three because

9    I think it really goes to the heart of your question.

10        The first is *Royal Printing* itself at 621 F.2d at 325, 26

11   where the Ninth Circuit observed, "The thread of private treble

12   damages suit is so vital to the enforcement of the antitrust

13   laws it was the Supreme Court's purpose in *Hanover Shoe* and

14   *Illinois Brick* to increase the effectiveness and deterrent

15   power of such suits.  It was not the purpose to immunize price

16   fixers."

17        Then in *Freeman vs. San Diego Association of Realtors*, 322

18   F.3d at 1145, the Ninth Circuit, in the context of an ownership

19   or control analysis, held that, quote, indirect purchasers can

20   sue for damages if there is no realistic possibility that the

21   direct purchasers will sue its supplier over the antitrust

22   violation.

23            **THE COURT:**  Mr. Kenny, can I ask you a question that

24   will seem like a quibble, but you used the word that in my own

25   notes I started to use in this case in describing language from

1    other opinions, whether there is no reasonable possibility of

2    suit, but that's not what the case says.  It says no *realistic*

3    *possibility* and the things are very different.  Perhaps if I

4    were writing the opinion, I would say *reasonable*.  We know what

5    that means as lawyers.  But isn't the right word *realistic*?

6         **MR. KENNY:**  It is.  I misspoke.  I'm sorry,

7    Your Honor, but you're right.

8         Then finally in *ATM Fee*, the Ninth Circuit observed that

9    *Royal Printing* created the ownership or control exception

10   because if you had -- in that case, if they had applied

11   *Illinois Brick*, it would have eliminated the threat of private

12   enforcement and close off every avenue of private enforcement.

13   And in *ATM Fee*, the Ninth Circuit was clear, as Mr. Iovieno has

14   already pointed out, "Whether a realistic possibility of such

15   suit exists depends on the existence of ownership and control

16   between the direct purchaser and seller."

17        The bottom line, Your Honor, is that there is no

18   bright-line test for degree of control, either qualitative or

19   quantitative.  Indeed, the very two-part ordinary language

20   dictionary definition of *control* adopted by the *ATM Fee* court

21   underscores both the flexibility of the test and the

22   fact-intensive nature of the inquiry.

23        And so in every case, the courts begin the inquiry by

24   analyzing the particular relationship between the two entities

25   to determine if there is in fact a control relationship.

1       And that takes us -- the inquiry, Your Honor, to your

2    Question 2-B, and the unqualified answer to 2-B is yes, the

3    courts should follow the lead of the courts in the Ninth

4    Circuit and consider any factor that is probative of control as

5    defined by *ATM Fee*.

6       And that's precisely what courts in this district have

7    done from *LCD* and *Costco* and *Sun Microsystems* that we've cited

8    and the Seventh Circuit case in *Brand Name Prescription Drugs*.

9    There is no particular litmus test.  The courts have looked at

10   interlocking directorates, minority stock ownership, loan

11   agreements, trust agreements, volume of sales by the seller to

12   the direct purchaser, intertwined economic interests.

13      And the courts have emphasized that these are just

14   examples of factors that could be probative of control and have

15   emphasized there could be other modes of control separate from

16   the ownership of majority of stock.

17      The fact is, Your Honor, the defendants simply can't get

18   around the point that the Ninth Circuit in *ATM* specifically

19   took the word *control* and said how are we going to define it?

20   What guidance will we give lower courts to figure out control?

21      They didn't choose 50 percent ownership.  They didn't

22   choose control of the board.  They didn't choose any particular

23   litmus test.  They articulated a general standard that would be

24   applied in particular cases.  And the animating force of all of

25   these cases is to determine whether a fact-finder could

1    conclude that there is a realistic possibility of suit.

2        Because the whole point of *Hanover Shoe* and *Illinois Brick*

3    was to reinvigorate enforcement of the antitrust laws, not to

4    immunize price fixers, and they did not, so the *ATM Fee* court

5    did not come up with a test that acts as a straightjacket on

6    the district courts in their evaluation of control, but rather,

7    they recognized that this is open-ended.  There could be all

8    kinds of ways one company could control another.

9        They didn't focus on pricing decisions or litigation

10   decisions.  It's much more open-ended.  And the goal, though,

11   is to figure out, just as Your Honor put your finger on,

12   whether a fact-finder could conclude that there is a realistic

13   possibility of suit.  And if the answer is no, then indirect

14   purchasers may proceed and have standing.

15           **THE COURT:**  Thank you.

16       Mr. Curran.

17           **MR. CURRAN:**  Your Honor, Mr. Kenny's wide-ranging

18   formulation of what constitutes control, that just cannot be

19   squared with *ATM Fee*.  *ATM Fee* is diligent and single-minded in

20   its analysis of control of the board of directors.  That

21   penultimate paragraph that I referred to concludes by saying,

22   "To control STAR, the bank defendants must have had control of

23   Concord's board of directors, which is not demonstrated here."

24       That's the touchstone.  That's the only thing that is

25   appropriate for this Court to look at.  The other cases,

1    including the Northern District of Illinois case that Mr. Kenny

2    referred to, is not controlling law here.

3        *ATM Fee* is the controlling case.  It is the Ninth Circuit

4    case that instructs us as to what to look for, and it's pretty

5    clear.  I mean, it not only says it, but it cites Delaware

6    state cases.  It provides parentheticals of those Delaware

7    state cases.  It's pretty unmistakable in indicating that

8    control of the board of directors is what matters.

9        And Mr. Kenny also said at the beginning and the close of

10   his comments that otherwise there is an immunity for price

11   fixers.  That's pretty rhetorical, I guess, and pretty

12   baseless.

13           **THE COURT:**  That will happen in oral argument

14   sometimes.

15           **MR. CURRAN:**  I'm probably guilty of that myself at

16   times.

17       But I point out, Your Honor, that like Best Buy, one of

18   the DAPS here, they have got state law claims as well as

19   federal claims.  Right?

20       When *Royal Printing* was decided it wasn't at all clear

21   that there could be state law indirect claims.  The clarity for

22   that only came with the *ARC* decision later by the Supreme

23   Court.

24       So now the notion that price-fixers are going to get off

25   scot-free if you do a faithful interpretation of the control

exception, that's historical fantasy.  That's just not the

case.  And that's demonstrated by the claims in this case.

**THE COURT:**  Thank you.

**MR. CURRAN:**  Thank you, Your Honor.

**THE COURT:**  Let's turn to Question 3.

Ms. Nash?

**MS. NASH:**  Your Honor, in Question 3, the Court has

asked what it means for market forces to be superseded by

control.  The answer to that is relatively simple.  It means

that market forces -- the conspiring seller controlled the

downstream price so that the finished product was not subject

to the laws of supply and demand.

So in this case, Your Honor, it would mean that the

plaintiffs would have to show that the downstream prices they

paid for finished TV's and finished computer monitors were not

subject to the law of supply and demand.  That's how it would

play out here.

And the difficulty of showing that a downstream price is

not subject to market forces in a component case is exactly why

*Illinois Brick* created the bright line direct purchaser rule.

The second part of the Court's question is why does this

happen?  What are the mechanisms by which control can cause

market forces to be superseded, and does the Court do to

determine that?

We have two examples from *Illinois Brick*.  First we have a

1    cost-plus contract where the direct purchaser doesn't have to

2    cope with the law of supply and demand, and the Court explained

3    that the direct purchaser is insulated from a decrease in its

4    sales as a result of the overcharge because its customer is

5    committed.  That's an example of something where -- of a

6    situation where the direct purchaser is not going to have to

7    cope with or compete in the downstream market.

8        A second example described in *Illinois Brick* was where the

9    direct purchaser of the price-fixed product is controlled by

10   its customer.  The Court gave that as an example in a footnote.

11       *Royal Printing* looked at that and said well, what the

12   Court is really talking about here, the real exception -- and

13   this is another footnote, Footnote 4 of *Royal Printing* -- the

14   Court said what the Court is getting at is that the effect of

15   the overcharge is essentially determined in advance without

16   reference to the interaction of supply and demand.

17       So this Court, to answer the second part of your

18   question -- this Court would have to look and see if there was

19   some kind of control mechanism in place that effectively

20   predetermined the prices of those finished TVs and those

21   finished monitors in order to find that market forces were

22   superseded.

23       There is no theory in this case by --

24       THE COURT:  Can you give me an example in a

25   non-cost-plus case that would be an example of that kind of

1    predetermination?  I have a very good understanding of --

2    working understanding of microeconomics, so feel free to get as

3    technical as you like.

4          **MS. NASH:**  Well, Your Honor, I was a political science

5    major, so I don't think I'm going to take that on, but I would

6    say, Your Honor, that if the direct purchaser has entered into

7    some -- cost-plus really is the best example.  I would say that

8    if the direct purchaser has perhaps pre -- the direct purchaser

9    has taken the position that it is not going to sell at some

10   sort of lesser price, if the direct purchaser itself is only

11   going to buy products if it knows it can sell them at a certain

12   price and the direct purchaser is not going to go ahead and buy

13   those price-fixed products if it doesn't -- if it has to

14   compete in the finished product market --

15         **THE COURT:**  The problem I have -- *problem* is the wrong

16   word.  An open question for me is whether there could ever be

17   such an a example, given the defendants' formulation of this,

18   because otherwise, the example is illusory.

19        Demand curves slope downward.  That's how they work.  And

20   so if you have two sellers, one sells to the other and then the

21   seller sells to the buyer and because supply curves go upward,

22   unless you're prepared to make the assumption that the

23   intermediate seller is prepared to accept a negative rate of

24   return, by definition, something less than all of the

25   overcharges is going to get passed on.

1      The cost-plus example is the only perfect example I can

2  think of where there is a one hundred percent pass-through.  I

3  don't know if I did a good job of explaining that.  The thing I

4  just said might have been wrong.  But this is a concern I have.

5  Is this other example something more than just theoretical?

6          **MS. NASH:**  Well, Your Honor, first, I would -- I think

7  that's a good point.  *Illinois Brick* said this might be the

8  case, and Judge Posner says in another concept *might be* is not

9  *is*.  The *Illinois Brick* says this might be an exception.  It

10 doesn't go on to say that there is such an exception.

11     But you could consider a case where there was a flat-fee

12 arrangement where the direct purchaser was going to pay a flat

13 fee for -- I'm sorry.  I really think the cost-plus example is

14 the best example.

15     And I -- but I don't think the Court should be troubled by

16 that because *Illinois Brick* itself did not say that this

17 exception would definitely apply.  It went on to cite some

18 examples, but if you look at the case law, there is no clear

19 example, and that's why the Court -- if it can't find an

20 example, the Court can't apply the exception in that way.

21 Okay.

22     The Court has also asked why it is the case that if market

23 forces are superseded, it does not need conduct pass-on

24 calculations because the entirety of the overcharge is passed

25 on to the indirect purchasers, and, Your Honor, that is the

1    case because in that -- where market forces are superseded, the

2    direct purchaser is not injured.  The direct purchaser has not

3    been forced to compete.  The direct purchaser has passed on all

4    of the overcharges --

5      **THE COURT:**  I wish I could draw this for you.  The

6    entirety of the overcharge isn't passed on.  I just don't think

7    it is.  And let me --

8      And, Mr. Noble, add two minutes to this lawyer's time,

9    please.

10      Here is the problem.  So you have a supply curve that goes

11    up.  And I sell -- Tigar Co. sells its good to Smith Co. and

12    then Smith Co. sells them to the indirect purchaser.

13      Smith Co. has to pay for its warehouse and its employees

14    and all this sort of thing.  So even if Smith Co. gets no rate

15    of return at all, which is not rational, but even if we were to

16    make that assumption, just to add on the cost of covering its

17    expenses, the price has to go up.  The price paid by the

18    indirect purchaser has to go up.  And because demand curves

19    slope downward, when the price goes up, fewer of the goods will

20    be purchased.

21      I just don't see, just doing the geometry on the supply

22    and demand curves, how the entirety of the overcharge could

23    ever be passed on.  I don't see how that test could ever be

24    satisfied, and maybe I'm missing something.

25      **MS. NASH:**  I don't think that you are missing

anything, Your Honor.  I think that is why we only see one example given in *Hanover Shoe* and *Illinois Brick*.  I think that is exactly -- these complexities that you are talking about is exactly why *Illinois Brick* drew a bright line at the direct purchaser level.  You are -- we can go into microeconomics, but that's not go -- that's going to illustrate exactly why we have the rule.

**THE COURT:**  Thank you.

**MS. NASH:**  Finally, the Court has asked why -- the Court has asked whether the Ninth Circuit's application of control exception, even though it found that market forces had not been superseded, how we reconcile that with our position because then Your Honor is entirely correct.

In *Royal Printing*, we agree with the Court, the Court did not find that market forces had been superseded.  It says that quite clearly in the opinion.  Instead, *Royal Printing* put aside that consideration and it created a new exception involving the hundred percent ownership of the direct purchaser during the conspiracy and at the time of suit.  So *Royal Printing* created a new exception separate and apart from *Illinois Brick*, which is why we think our formulation of the test is correct.

**THE COURT:**  Thank you.

**MR. SILBERFELD:**  Good morning, Your Honor.  Roman Silberfeld for Best Buy on behalf of the direct action

1  plaintiffs.  I will respond on our behalf with regard to

2  Question No. 3.

3      I won't repeat the elements that Mr. Kenny spoke of, but I

4  was going to speak about those as well, as to the sorts of

5  market forces that are implicated where there is control and

6  how that control has the tendency to skew the behavior of

7  market participants.  But among them are certainly supply and

8  demand.  Levels of competition matter.  Resort to the legal

9  system matters, and this gets to the realistic possibility of

10  suit --

11      **THE COURT:**  What does *level of competition* mean?  How

12  do you measure it?

13      **MR. SILBERFELD:**  How many participants there are in

14  the market, few vs. many.  These are obviously very

15  fact-intensive considerations.

16      Another market force is whether there is more than one

17  kind of relationship between a supplier and a customer.  And to

18  answer some of these questions, we went back and looked at

19  Footnote 16 in *Illinois Brick* and looked at in detail the two

20  cases that the Supreme Court cited.  One of them was *Perkins*

21  and the other was *In Re Western Liquid Asphalt* antitrust cases.

22      Those two cases, one of them, *Western Liquid*, is a Ninth

23  Circuit case.  They obviously both predate *Illinois Brick*, but

24  they are both very instructive on this question of control and

25  market forces.  And I want to just briefly touch on that.

1    But to answer the Court's other questions before I do,

2    courts, when they make these determinations, obviously look at

3    the facts specifically and perhaps look at the *but for* world

4    and the actual world to see how these relationships might

5    differ but for some intervening act, whether it's a legal

6    acquisition of a customer by a supplier or an illegal

7    combination that might amount to an antitrust or a price-fixing

8    conspiracy.

9    But those things, based on the facts and the evidence in

10   the case and perhaps with resort to experts who might explain

11   why certain things have happened, is how a court, I think,

12   properly answers these questions.

13   But the answer about what control means in this context is

14   really found in *Perkins* and in *Western Liquid*.  *Perkins* is a

15   395 US 642.  It's a 1969 case.  It was decided the year after

16   *Hanover Shoe*, and the Supreme Court in *Perkins* was faced with

17   the following facts.

18   Mr. Perkins was a gas station operator.  He bought his gas

19   from the defendant, Standard Oil.  Standard Oil supplied gas

20   not only to Perkins, but to a Perkins' competitor, a gasoline

21   company called Regal.  Because of a relationship that Standard

22   Oil had with its petroleum supplier, its crude oil supplier, a

23   company called Signal, Signal got a preferential price, a

24   better price than Perkins would have gotten because Signal had

25   a distributor, an intermediary called Western Highway, and

1    Western Highway had ownership in the gas station entities.

2        So the flow of gasoline from Standard to Regal, the

3    competitor, Mr. Perkins, was at a far lower price than Perkins

4    got and Perkins was driven out of business essentially.  He

5    sued.  He sued Standard Oil.  And the Supreme Court --

6        **THE COURT:**  Maybe I haven't been paying attention, not

7    because there was a price-fixing conspiracy, but because there

8    was some illegal tying arrangement?  What was the problem?

9        **MR. SILBERFELD:**  Differential in price.  It was

10   Robinson-Patman basically was the issue.  But the Court in --

11   the Supreme Court in Perkins said we're going to allow

12   Mr. Perkins to proceed, even though there was a fair amount of

13   attenuation between Standard Oil and Regal, the competitor of

14   Mr. Perkins.

15       And one of the things they said as an incidence of market

16   forces at work was -- and this is at page 648 of the opinion --

17   had Signal -- that was the distributor of the gasoline -- sold

18   its gas directly to Regal, given Regal stations a competitive

19   advantage, there would be no question but that the case could

20   proceed.  I'm paraphrasing.

21       However, Signal owned 60 percent of the stock of Western

22   Highway, the intermediate distributor, and Western Highway in

23   turn owned 55 percent of the stock of Regal.  And moreover,

24   Signal furnished Standard Oil its gas on a -- pardon me -- its

25   petroleum, its crude oil, on a favorable basis --

1    **THE COURT:**  Wasn't there -- wasn't there -- I'm not

2    familiar with the case, as I'm sure you figured out, but is

3    there in every instance a majority ownership all the way along

4    the chain?

5    **MR. SILBERFELD:**  In Perkins?

6    **THE COURT:**  Yes.

7    **MR. SILBERFELD:**  There is the 60 percent of the 55

8    percent ownership.

9    **THE COURT:**  Right.

10   **MR. SILBERFELD:**  Of different entities.

11   **THE COURT:**  Yes.

12   **MR. SILBERFELD:**  Yes.  So *Perkins* at least gives us

13   one market force, the two-sided relationship between a supplier

14   and a customer because the customer is also a supplier back to

15   the original supplier of the price-fixed goods.

16   Now, *In Re Western Liquid Asphalt* is also quite an

17   interesting case from the standpoint of what market forces are

18   involved.  And both in the reply brief that Panasonic filed and

19   something Ms. Nash said earlier this morning -- I'll just read

20   what Panasonic had to say.  This is at page 3 of the reply

21   brief:  "Plaintiffs do not and cannot point to a single Ninth

22   Circuit case holding that the ownership and control exception

23   was met on facts where there was no ownership relationship

24   during the conspiracy period."  Not true.  *Western Liquid*

25   *Asphalt* is that case.

1          In *Western Liquid Asphalt*, which is at 487 F.2d 191.  It's

2     a 1973 case.  In *Western Liquid*, a number of municipalities and

3     states sued asphalt contractors and -- pardon me.  They sued

4     asphalt suppliers, and the asphalt -- for price fixing, and the

5     asphalt suppliers responded by saying you don't have a suit and

6     you don't have standing, you can't sue because only our direct

7     purchaser customer, the contractor, may sue.  And the Ninth

8     Circuit in that case had no problem finding that the case could

9     proceed.  Here's what they said.

10         "We do not have" -- in this *Western Liquid* case, this is

11    at page 198.  "We do not have a case of consumers who have only

12    a miniscule interest in the outcome of the litigation.

13    Instead, appellants, namely, the states and entities, are a

14    large number of public consumers of liquid asphalt who allege

15    that illegal overcharges by appellees resulted in unlawfully

16    high prices to them for there about three million tons of

17    asphalt purchased in some 37,000 contracts.  To permit so large

18    a fish to escape its nets is unthinkable."

19         I just --

20              **THE COURT:**  Thank you.

21         **MR. SILBERFELD:**  I just want to refer the Court to the

22    elements that are beyond that at page 198 of the opinion where

23    they talk about --

24              **THE COURT:**  Mr. Silberfeld, your time has elapsed.

25              **MR. SILBERFELD:**  Thank you, Your Honor.

1          **THE CLERK:**  You have 90 seconds.

2          **MS. NASH:**  Your Honor, I would like to direct the

3   Court to an example of another situation where market forces

4   were superseded and that would be the *Toilet Seat* case at 1977

5   Westlaw 1453, Eastern District of Michigan, August 1977, and in

6   that case, the direct purchaser charged a flat fee when it

7   resold to the indirect purchaser.  So the Court concluded that

8   where the plaintiff engaged the agent for a flat monthly fee,

9   that fee bore no relationship to the quantity of goods

10  supplied.

11         **THE COURT:**  You are arousing the Court's curiosity as

12  to one how would charge a flat monthly fee for a toilet seat,

13  because I have not ever seen anyone rent them before.  I will

14  look the case up.

15         **MS. NASH:**  There are people, Your Honor, who own

16  multiple houses and perhaps they need multiple toilet seats.  I

17  don't really have a further opinion on that.

18         **THE COURT:**  I promise you, I will read the case.

19         **MS. NASH:**  Thank you, Your Honor.  I just wanted to

20  give the Court one more example.

21         With respect to the *Western Asphalt* case, that is a case

22  that is a Ninth Circuit case that predates *Illinois Brick*.  But

23  the allegation in that case was that the contractors were the

24  control, the intermediators were controlled, so I believe our

25  position is consistent and that there is no basis, as Panasonic

1    said in their brief, for finding an exception when that is not

2    the case.

3            **THE COURT:**  Very good.

4            **MS. NASH:**  Thank you.

5            **THE COURT:**  Thank you.  All right.  Let's turn to

6    Question 4.

7        Madame reporter, Mr. Sanders.

8            **MR. SANDERS:**  Good morning, Your Honor.  I represent

9    the Chunghwa defendants.  I'm hoping to use less than my full

10   eight minutes and reserve the remainder for rebuttal.  Let's

11   see how it goes.

12       In Question 4 you asked whether the focus of the inquiry

13   should be exclusively on the litigation decision or whether one

14   should look more generally at whether control makes suit by the

15   direct purchaser unlikely.  And the answer is no, you should

16   not go beyond the litigation decision.

17       But in analyzing that, of course the starting point is the

18   *Royal Printing* decision.  As has been said several times now

19   here today, *Royal Printing* was motivated, in the words of the

20   Ninth Circuit, by a concern about the situation where, quote,

21   the co-conspirator parent will forbid its subsidiary or

22   division to bring a lawsuit.

23       The Ninth Circuit talked about the possibility or the

24   danger of eliminating the threat of private enforcement.  So in

25   *Royal Printing*, the Court was focused on the litigation

1   decision.  And there are a number of reasons why the inquiry

2   should not expand beyond control over the litigation decision.

3   It would be -- doing so, we submit, would be inconsistent with

4   *Utilicorp*, *Illinois Brick* and *ATM Fee*.

5        *Utilicorp*, of course, has come up a number of times today,

6   and as we all know at this point, *Utilicorp* instructs that

7   exceptions to *Illinois Brick* should be construed narrowly.  We

8   submit that this would be an expansion of *Royal Printing*.

9        Second, *Illinois Brick* talked about the importance of

10  bright-line tests in this area.  *Illinois Brick* itself sought

11  to establish a bright-line test.  *Illinois Brick* talked about

12  the importance of avoiding complex issues of proof in this

13  area.

14       The question of whether there is control over the

15  litigation decision, actual control, as opposed to whether

16  there is control that makes a lawsuit unlikely, that question

17  is one that is generally -- generally can be answered by fairly

18  objective evidence.  Is there a majority ownership?  Is there a

19  majority of directors?  Factors like that that one can readily

20  easily ascertain.

21       When you move into the area of whether there is sufficient

22  control to make a lawsuit unlikely, you're into a much murkier

23  inquiry.  You are, I think, looking at the totality of the

24  business relationship between these two companies.

25       You know, what if, for example, there is not a history of

1   lawsuits between these two companies, but they do have a

2   history of resolving their disputes without resort to

3   litigation.  There are many ways by which companies with

4   ongoing business relationships can compensate each other for

5   perceived wrongs.  And litigation is not the only avenue.

6       But you're embarking on a much more complicated, a much

7   murkier inquiry if you go down that road, and you are going a

8   long way from the sort of bright-line test that *Illinois Brick*

9   said was important.

10      Finally, *ATM Fee* is instructive here as well.  *ATM Fee*

11  interpreted for us what the *Freeman* case actually meant.  And,

12  you know, according to the *ATM Fee* court, *Freeman*, quote, found

13  no realistic possibility of a suit because the associations

14  owned and controlled the direct purchasers.  In fact, *ATM Fee*

15  favorably cited Professor Areeda for the proposition that the

16  Supreme Court is, quote, indifferent to the question of whether

17  the direct purchaser is likely to sue.

18      We think, you know, for all of these reasons, it would be

19  a mistake to go down the road of looking at whether there's

20  sufficient control to merely make a lawsuit unlikely.  Case law

21  talks about foreclosing the possibility, eliminating the

22  possibility, and that requires control over litigation

23  decisions.

24      Now, you've also asked whether the exception can apply

25  where there is an absence of control after the conspiracy, but

1    control during the conspiracy.  And the short answer is no, it

2    cannot apply, and it's just a matter of logic here.

3        If the critical inquiry under *Royal Printing* is whether

4    the conspirator can prohibit the direct purchaser from suing,

5    if there is no control at the time one would be making the

6    decisions about the litigation, there is no ability to

7    foreclose the possibility of the lawsuit, regardless of whether

8    there was control during the conspiracy period.

9        Now, you've also asked the question about what if there is

10   control during the conspiracy period -- I'm sorry, what if

11   there is an absence of control during the conspiracy period,

12   but control later on.  That is a question that counsel for

13   Panasonic, Mr. Yohai, will be addressing in response to

14   Question No. 5.

15       If there is no questions, I will reserve the remainder of

16   my time.

17       **THE COURT:**  Thank you.

18       For plaintiffs, Mr. Kenny.

19       **MR. KENNY:**  Good morning again, Your Honor.  I'm going

20   to take 4-A.  Mr. Silberfeld will take 4-B.

21       The answer to your question is really answered by the

22   second question in 4-A, and that is, the Court should look at

23   other factors besides an exclusive focus on litigation

24   decisions.

25       To start with, I'm not even sure what *focus on litigation*

1    *decisions* means.  I don't even know how that would be

2    implemented, but regardless, *ATM Fee* had the question before

3    it.  Control.  We've got to give guidance to the lower courts

4    as to what does control mean.

5        It could have -- it could have said *control* means control

6    over the litigation decision to file a lawsuit against the

7    conspiring seller.  It could have done that.  It did not.  It

8    went in a very different direction.  It went to the dictionary

9    and it adopted ordinary language -- a two-part definition of

10   control.  That should end the inquiry.

11       And then in *ATM Fee*, when *ATM Fee* tried to analyze or did

12   analyze the control relationship between the bank defendants

13   and the STAR network, it could have held well, we're going to

14   try to figure out whether there is control over a litigation

15   decision.  That was not the analysis it undertook.

16       The point -- in point of fact, Your Honor, in this

17   jurisdiction, *LCD* and *Costco*, *ATM Fee* itself, *Freeman*, the

18   Seventh Circuit's *Brand Name Prescription Drug* case has been

19   cited as looking -- the enumerated factors.  Nowhere do any of

20   those courts adopt a single focus test to determine control.

21   It's not sanctioned by the language of *ATM Fee*.  It's not

22   sanctioned by what *ATM Fee* did.  And no court in the Ninth

23   Circuit has done it.  So the answer to your 4-A question is

24   your second question in 4-A.

25               **THE COURT:**  Thank you.

1    Mr. Silberfeld.

2         **MR. SILBERFELD:**  Your Honor, with respect to the

3    second question, the simple and straightforward answer is it

4    can go both ways.  In other words, the control exception can

5    apply with respect to litigation decisions if the control

6    existed both during and after the conspiracy, and there is a

7    simple logical answer why.  Because claims have a tendency to

8    follow breaches.  Claims have statutes of limitations, which

9    can sometimes run for years.

10        And in this context, if there was control during or after

11   or both, the litigation decision and the control exception can

12   easily be seen to apply and effect the decision about whether

13   to bring suit.

14        **THE COURT:**  Let me give you a hypothetical.  I don't

15   know that I really thought about this one quite so hard before

16   I took the bench.  Just picking up on some comments that

17   Mr. Sanders made.

18        And that is with regard to the case in which there is

19   control during the conspiracy period but not after.  So during

20   the time that any litigation would be likely to be brought,

21   there is no control.

22        Now, I'm sure you could construct a hypothetical in which

23   a claim is just as unlikely there as where a control existed

24   throughout.

25        But I want to give you a hypothetical in which a larger

```
1    company spins off the direct purchaser.  Okay.  And after
2    the -- immediately after the completion of the conspiracy, the
3    direct purchaser is acquired by a private equity firm that has
4    no ongoing relationship whatsoever with the conspirator.  Why
5    wouldn't that private equity firm authorize its lawyers to file
6    suit if the damages were high enough?  What would -- why
7    wouldn't they?
8            MR. SILBERFELD:  Well, it might, but it also might
9    not, depending upon whether there are any ongoing
10   relationships, any reps and warranties in the sale documents,
11   for example, any promises made as between the parent who spun
12   off the direct purchaser and the private equity firm that came
13   in and acquired it.  I mean, there is much to know that is not
14   exactly in the hypothetical --
15           THE COURT:  I want you to assume, with regard to all
16   of your questions, answers that are as generous to Mr. Sanders
17   as possible.
18           MR. SILBERFELD:  Okay.  In that context, there
19   wouldn't be a reason for the private equity not to authorize
20   its lawyers to bring suit.
21           THE COURT:  But nonetheless, if I adopt the test you
22   are urging me to adopt, the purchaser, the indirect purchaser,
23   would also have standing to bring the same suit; right?
24           MR. SILBERFELD:  Yes.
25           THE COURT:  Why shouldn't I be worried about that?
```

```
1          MR. SILBERFELD:   The Court can deal with duplicative

2    recovery if it arises, when it arises.   That's the answer

3    there.

4          But I want to return just quickly to Western Liquid on

5    this point, on the question of litigation decisions.   What

6    the -- what the Ninth Circuit said was -- this is again at page

7    198 -- moreover most of the contractors -- these were the

8    customers of the asphalt suppliers.   They were not controlled

9    by them, they were not owned by them.   They were customers.

10   Most of the contractors who purchased from the suppliers and

11   resold to the appellants had not come forward to challenge

12   these alleged violations.

13         Counsel, at oral argument in that case, pointed out that

14   only one contractor in California and three in Oregon had sued.

15   A very small percentage of those involved.   No contractors had

16   sued in other states.

17         "It is understandable," the Court said, "that contractors

18   might not sue, in view of their alleged dependence upon

19   appellees for their supply of asphalt, for example, the

20   possibility -- the possibility, rather, that they earned a

21   percentage profit on the overcharges, and the control and

22   interdependence alleged between appellees and the contractors.

23   Thus, the Court found, if the present appellants, namely, the

24   municipal entities and states, could establish antitrust

25   violations but were precluded from recovering, no one else
```

1   would sue.  And appellees would retain their assumedly illegal
2   profits."
3       So I think that there are mechanisms, at least under
4   Minnesota law, which is my client's focus -- I know that there
5   are provisions for the Court in the subsequent proceeding to
6   deal with the issue of potential double recovery, but that is
7   an issue that can be dealt with at the time and after a trial.
8           **THE COURT:**  Thank you.
9       Mr. Sanders.
10          **MR. SANDERS:**  Thank you.
11          **THE CLERK:**  You have approximately two minutes.
12          **MR. SANDERS:**  Thank you.
13      Your Honor, as I was listening to Mr. Kenny, I had the
14  feeling that we were ships passing in the night.  He focused on
15  the question of litigation control almost exclusively.  I moved
16  on and talked about the second part of the question about
17  control making litigation unlikely.
18      But going to the first part, the part that Mr. Kenny did
19  talk about, certainly if there is not an ability to control the
20  litigation decision, the concerns motivating *Royal Printing*
21  never come into play.
22      Now, I'm not arguing that if -- if the conspirator
23  controls the board of directors and has majority ownership that
24  in most cases they don't have the ability to control
25  litigation, I think they probably did do.  I'm not taking on

1    that burden.  There may be exceptions, as Mr. Curran discussed,

2    but that's not the issue.

3         The issue is whether in the absence of that type of

4    corporate control, in the absence of it, the Court should look

5    at whether there is a more general sort of control that makes

6    litigation unlikely.

7         That is certainly not the test.  That's what would be

8    inconsistent with *Royal Printing*, *ATM Fee*, *Utilicorp*, and

9    *Illinois Brick*.

10        **THE COURT:**  Thank you.  Before we move on to the next

11   question, we are going to take a ten-minute recess.

12                   (Recess taken at 10:39 a.m.)

13                (Proceedings resumed at 10:51 a.m.)

14        **THE CLERK:**  Remain seated and come to order.  Court is

15   now in session.

16        **THE COURT:**  All right.  Let's turn to Question 5.

17        **MR. YOHAI:**  Good morning, Your Honor.  David Yohai for

18   the Panasonic defendants.

19        Your Honor, I'm going to address Question 5.  Question 5

20   deals with the question of pricing control, and your question

21   was whether defendants' argument that that should be the only

22   inquiry is correct and why.

23        I start from the premise that my colleague laid out that a

24   complete absence of ownership or control during the conspiracy

25   period should defeat the ownership or control exception.

1    *Royal Printing* was a different case.  *Royal Printing*, as
2    you know, was a case where there was full ownership or control
3    of litigation decisions, both during the conspiracy period and
4    after.

5        In the absence of a *Royal Printing* situation where you do
6    have full control, both during the conspiracy and after, I
7    think the Court has to revert back to the principles of
8    *Illinois Brick*.  And *Illinois Brick*'s principles were concerned
9    with this issue of pricing control.

10       The issue and the policy reason, which Your Honor also
11   asked about, why should we be concerned only about pricing
12   control, is that the Court did not want folks to have to figure
13   out whether or not, when costs were passed on -- how much of
14   that, how much of those costs were passed on, and to have to go
15   through that tracing inquiry, as Your Honor knows.

16       That was the principle of *Illinois Brick*, and to the
17   extent that *Royal Printing* was focused on litigation decisions,
18   it was only in the context of where there could be no realistic
19   possibility of suit because there was full control both
20   after -- both during and after.

21       The cases that Your Honor has before you here and my
22   client's case, the Sanyo case, doesn't even present as far as a
23   question for Your Honor.  Your Honor asked what if there was no
24   control during the conspiracy period but there was control
25   after.

1    In the case of Sanyo, for two years Panasonic did not

2 control Sanyo.  So there was someone who could sue.  Sanyo

3 could have sued for two years.  So the full realistic

4 possibility of suit, there was a time when Panasonic could --

5 when Sanyo could have sued and that was a realistic

6 possibility, and I believe that in and of itself takes you out

7 of the *Royal Printing* scenario.

8    Once you're out of the *Royal Printing* scenario, why would

9 the courts focus on pricing control?  It's because of the

10 principle of *Illinois Brick*.  You have case after case.  The

11 *Sun Microsystems* case, which described the focus on whether

12 there has effectively been one sale.

13    Your Honor was concerned and asked the question what would

14 be the other examples, other than cost plus where market forces

15 could be superseded.  I'll give you one other example I can

16 think of.  If you have a situation where the parent and the

17 subsidiary -- subsidiary file consolidated financial

18 statements, it may be in the overall interests of the parent

19 for the sub to take a loss if it is somehow making it back on

20 the front end.  That's the positing of the situation --

21    **THE COURT:**  Well, if you are in a situation where the

22 parent is in a situation to dictate the financial results of

23 the subsidiary, I don't think I even get to these other

24 questions, do I?

25    **MR. YOHAI:**  That's probably true as well, Your Honor.

1    But anyway, the point that I'm making here is there could

2    be such situations, but I don't know that we have to even worry

3    so much about that because *Illinois Brick* was saying well, here

4    is one possible exception and *Utilicorp* is saying we're not

5    going to create other possible exceptions.  So, if anything,

6    the Court's focus should be on not creating additional

7    exceptions and not thinking about other exceptions that would

8    apply, not in creating new exceptions or new scenarios.

9    And, again, that's why I think you see so much focus in

10   the cases on the issue of price and one sale.  That was the

11   issue in *TFT* litigation.  Judge Illston also was focused on

12   that question.  And that was also the case in the *P.C. Richard*

13   case.

14   Obviously in a *Utilicorp* world where we're not creating

15   new exceptions, the principals of *Illinois Brick* are what

16   control and that should be the only focus.  That's why we

17   argued what we did, because we are not in a *Royal Printing*

18   world, not with Sanyo.

19   Another point, *ATM Fee* -- *ATM Fee* recognized that the

20   realistic possibility of suit exception has not been recognized

21   by the Supreme Court as a separate exception and has not been

22   applied in any situations where there was not control both

23   during the conspiracy period and after.  And so I think you see

24   that again reinforced in *ATM Fee*.

25   Plaintiffs cite to the *Costco* decision in *LCD*, but in

there, there was evidence of ownership, both during the

conspiracy and after, but in the case of -- that was in the

case of certain entities like JDC, but in the case of Acer and

Gateway, there was no ownership during the conspiracy period.

Judge Illston did not apply the exception in that case.  So I

think she -- she saw the relevant issues and she addressed them

appropriately when you're not in a *Royal Printing* world, when

the facts don't put you in a *Royal Printing* world.

At the end of the day, in the situations that we have -- I

think the only relevant ones are Sanyo, which I have described,

and Mitsubishi's situation.  In those situations, you have one

where there was control of litigation decisions, both during

and after, and that's why we're not in a *Royal Printing* world

and that's why the pricing control issue is paramount.

I will reserve the rest my time.

**THE COURT:**  Thank you, Mr. Yohai.

For the plaintiffs.

**MR. IOVIENO:**  Your Honor, Phil Iovieno for the

plaintiffs.

On the pricing standard, I think it's that -- the main

theme that I want to bring out is that it's not a bright-line

rule.  *ATM Fee* did not set a bright-line rule.  *Royal Printing*

did not set a bright-line rule.  And I want to talk about that

not only in the context of the pricing issue, but also in the

context of the timing issue, and particularly in the context of

the hypothetical that you put out to my colleague,
Mr. Silberfeld regarding the hedge fund.

So I want to start with just whether the Court should look
exclusively at pricing.  Okay.  And it's very clear that *ATM
Fee*, *Royal Printing*, those courts did not do that.  They looked
at pricing as one of many factors that was certainly relevant.
There was no bright-line rule.  Same with *LCD*, the *LCD*
decisions by Judge Illston; pricing was certainly a factor that
was looked at but was not dispositive.

I think with respect to *ATM Fee*, Mr. Kenny had cited for
you the very broad definition that *ATM Fee* had put forth as to
what is control, and I think it's very noteworthy that *ATM Fee*
specifically analyzes whether there was control over the
interchange fee set by STAR.  It analyzed the pricing, but it
also analyzed other factors as well.  And -- and in the context
of analyzing the pricing, it formulated a standard that did not
in any way focus solely on pricing, but rather, focused on any
factor that would be relevant to control.

And I'll just cite to you in the *ATM Fee* because I think
if you look at the opinion, it follows through very simply:
"The standard that they set out, the applicable statute does
not define control; therefore, we construe it in its ordinary,
contemporary and common meaning.  *Control* means to exercise
restraint or direction over, dominate, regulate or command or
to have the power or authority to guide or manage."

1    And under that statute -- under that standard, the Court

2    then looks at a multitude of factors, one of which is pricing,

3    and in this situation, the Court found that there was just --

4    I'll quote directly from the Court.  "However, input on

5    policies and pricing issues by interested members does not

6    constitute the type of control necessary to meet the exception

7    to *Illinois Brick*."

8    So it didn't formulate a bright-line rule.  It looked at

9    all the factors, including pricing, and it reached a

10   determination.  We think that's the correct way.  And, indeed,

11   I think a bright-line rule results in -- would result in

12   decisions that would not promote the policies that we're

13   looking to promote but actually would frustrate them.  If we go

14   to *Royal Printing*, we all know -- and there has been a lot of

15   talk today about the fact that there was not control over

16   pricing there.

17   If you were to have a bright-line rule and apply it in the

18   *Royal Printing* case, the exception wouldn't apply.  So I think

19   that for that reason, *Royal Printing* didn't do a bright-line

20   rule, *ATM Fee* hasn't done a bright-line rule, and that's why a

21   bright-line rule, in our view, just isn't correct.

22   On the timing, I want to spend the rest of my time on the

23   timing because I think it's an interesting and important issue.

24   Mr. Silberfeld said that the timing is relevant either

25   during the conspiracy, after, or both.  And I think that that's

1    right.  And I think again the key thing here is that there

2    shouldn't be a bright-line rule.

3        Your hypothetical is a perfect hypothetical on one side.

4    Absolutely under your hypothetical in that situation where the

5    conspirator spins off the direct purchaser after the conspiracy

6    to a hedge fund, that -- it's highly likely that that direct

7    purchaser is going to sue.

8        I will tell you that several of our clients are owned by

9    hedge funds and obviously they will sue, and under that

10   situation, I think absolutely there would be a suit.  However,

11   what I want to do is walk through because this issue came up in

12   the *Costco* case, okay.  And I want to run through -- because

13   Judge Jones grappled with this issue, and I think, in our view,

14   from the plaintiffs' perspective, reached the correct decision,

15   holding that there is no bright-line rule.

16       So if you just bear with me, it's a fairly long --

17           **THE COURT:**  Is this the case in which Judge Jones

18   expresses the concern that if he doesn't rule as he did, that

19   defendants will manipulate their corporate structure so as to

20   escape liability?

21           **MR. IOVIENO:**  Correct.

22           **THE COURT:**  So I'm not saying that I would adopt such

23   a test, but isn't that then the inquiry?  I mean, you know what

24   I mean?  Instead of just lowering the bar for everybody, should

25   there be some showing of manipulation by the defendant to

1    which, by the way, I would expect defendants to say well, now

2    you're introducing even more complexity in an area where the

3    Supreme Court says you should be introducing less.  These are

4    the thoughts I had during my ten-minute break.

5        **MR. IOVIENO:**  Yeah.  I think absolutely it's a factor

6    that should be considered either way.  I don't think a

7    bright-line rule that just focuses exclusively on whether or

8    not there is has been manipulation is the right way to go, but

9    I think the way Judge Jones says it is the timing of control is

10   perhaps relevant to that question, but not always dispositive,

11   and he sets out that hypothetical that you absolutely -- you

12   absolutely mentioned.  But to me, the key thing is you need to

13   look at each and every situation individually.

14       **THE COURT:**  What if they both filed suit?  Let's take

15   my hypothetical.

16       **MR. IOVIENO:**  Okay.

17       **THE COURT:**  That you're running with.  And the direct

18   purchaser brings suit for the reasons we've been discussing.

19   There is not control anymore.  The conspiracy has ended.  But

20   the indirect purchaser also wants to bring suit because I've

21   adopted a rule, the rule that is being urged on me this morning

22   that it doesn't matter that control has ended.  And now they

23   both file a lawsuit.  Then what?

24       **MR. IOVIENO:**  I disagree with if -- it's an not an

25   apportionment issue, then that's an issue you have to decide

1    there, whether or not *Royal Printing* would apply, and I

2    would --

3            **THE COURT:**  At that point, I just dismiss the indirect

4    purchaser, don't I, if that happens?

5            **MR. IOVIENO:**  Barring some other fact that I can't

6    think of right now, I think that would be the correct ruling in

7    that situation.

8            **THE COURT:**  Okay.

9            **MR. IOVIENO:**  And, again, going back to bright-line

10   rules in these situations don't work and that's why you see

11   where *ATM Fee* was very careful to be broad and apply

12   fact-intensive inquiry.  *Royal Printing* was.  And we believe

13   that's the correct thing.  And that also goes to the timing

14   issue.

15       And I would note that there is no lawsuits that were

16   brought by any of the subsidiaries of the defendants in -- not

17   only in this case, but in *LCD* or any of the other cases that

18   are pending in the various courts here.

19       Thank you, Your Honor.

20           **THE COURT:**  Mr. Yohai?

21           **THE CLERK:**  You have two minutes remaining.

22           **MR. YOHAI:**  Thank you.

23       Your Honor, I think, anticipated part of what I was going

24   to say which is that is *Illinois Brick* tried to set a

25   bright-line rule and said if we are going to have any

1    exceptions, we are going to have this narrow one, cost plus and

2    so forth, and said we really want to stick to that bright-line

3    rule because we don't want to get into all these other issues.

4         So I think a bright-line rule is exactly consistent with

5    Supreme Court precedent and *Royal Printing* should be limited to

6    its facts.

7         Your Honor posited a situation well, what if they both

8    sued.  That could have happened here.  Sanyo could have sued

9    and then the indirects could have sued.  I suppose Your Honor

10   is right, you could have dismissed one or the other, but why

11   would the result be different there?  If theoretically there

12   was a possibility of suit, Sanyo could have brought the suit,

13   and the fact that they chose not to I don't think should change

14   the results here.  They had -- there was an avenue, it wasn't

15   foreclosed, and that's the point.  Where there is an avenue and

16   it's not foreclosed, you are not in a *Royal Printing* world.

17        Counsel made one other point -- Mr. Silberfeld made a

18   point about the *Western Liquid Asphalt* cases that I wanted

19   to -- he said there was no other case in the Ninth Circuit --

20        **THE COURT:**  You know, this is really anecdotal or

21   maybe atmospheric, but plaintiffs' counsel a moment ago said in

22   this group of cases to which he was referring there wasn't any

23   instance of -- just staying with my hypothetical for a moment,

24   there wasn't any instance in which both the direct purchaser

25   and the downstream indirect purchaser had sued.  Can you think

1  of one?

2          **MR. YOHAI:**  Well, I thought that was my example of

3  Sanyo where the direct --

4          **THE COURT:**  No.  They didn't sue.

5          **MR. YOHAI:**  They didn't, but they could have, I guess

6  is my point.

7          **THE COURT:**  Potentiality is ambient.  I want to know

8  if there is -- such a thing has ever happened in reality?

9          **MR. YOHAI:**  I understand your question.  I can't think

10  of one, Your Honor.  It doesn't mean there isn't one.  I can't

11  think of one standing here.

12      Last point about the *Western Liquid Asphalt* case, that

13  Ninth Circuit case that Mr. Silberfeld discussed at some

14  length, that was decided before *Illinois Brick*, and so I don't

15  think it's at all appropriate --

16          **THE COURT:**  I haven't read *Western Asphalt*, but wasn't

17  it cited by *Illinois Brick*?

18          **MR. YOHAI:**  Yes.  But the rule changed in *Illinois*

19  *Brick* to make this bright-line rule.  If that's the case, I

20  can't see how that would be particularly applicable.

21      Thank you, Your Honor.

22          **THE COURT:**  Thank you.  Let's turn to Question 6.

23          **MR. KENNY:**  Good morning again, Your Honor.

24      Your question is is it DAPS' position that

25  cross-shareholdings by Samsung Electronics, when combined with

1  Samsung Electronic's 20 percent direct ownership interest

2  amount to a greater than 50 percent ownership in SDI.

3      Your Honor the short answer is no, that is not the DAPS'

4  position.  I don't know if you want to hear any further

5  argument or you just want an answer to that question.  I don't

6  want to presume --

7          **THE COURT:**  No.  It's a -- that's fine.  I think I

8  actually get your argument, which is that -- and you'll correct

9  me if I'm wrong -- that applying the relatively broad test of

10  control that plaintiffs are urging the Court to apply, which is

11  simply to look at whether, under all the facts before the

12  Court, there is control, that -- and I don't know how to

13  pronounce that Korean word that is so central to your motion --

14          **MR. KENNY:**  Chaebol.

15          **THE COURT:**  That in a Korean chaebol, there is such

16  control, and that Dr. Haggard simply lists the facts that

17  manifest that control, but it's not necessary for the Court to

18  apply Korean law.  That these are simply factual assertions

19  that Dr. Haggard is making as a matter of expert opinion and

20  that it's not majority ownership.  It's control.

21          **MR. KENNY:**  That's precisely our view, Your Honor.

22          **THE COURT:**  Thanks.

23          **MR. MCGINNIS:**  Your Honor, James McGinnis for Samsung

24  SDI, and given what Mr. Kenny said, I'm worried that I don't

25  get to say anything, but I'll say very little.

1    **THE COURT:**  I think the opposite.  You have eight

2    minutes after your opponent said virtually nothing.  It's like

3    having the ball all to yourself at the end of the basketball

4    court.

5    **MR. MCGINNIS:**  Let's just put it this way.  I fully

6    endorse Mr. Kenny's answer.  But I also do need to just, for

7    the record -- do need to tell you that I'm here speaking just

8    in the remand cases because we have settled all the cases that

9    are here before you for trial.  So I'm just a remand guy.

10   I suppose I should also say, because there is perhaps some

11   significance to that, Mr. Kenny in various other circumstances,

12   has expressed enthusiasm for Ninth Circuit law.  I'm

13   enthusiastic about Ninth Circuit law, took --

14   **THE COURT:**  Let me get on board with the two of you,

15   then.  I'm enthusiastic about Ninth Circuit law, too, and I

16   think I'm second to no one in the room, and I'm not just saying

17   that because they're probably going to review all my decisions

18   in the case.

19   **MR. MCGINNIS:**  Well, then, Your Honor I have to say

20   this.  The remand cases, including the one in which Mr. Kenny's

21   client resides, are not in the Ninth Circuit and have not

22   adopted *Royal Printing*, *ATM Fee* or anything like that.

23   So whether those courts would look to *ATM Fee* and *Royal*

24   *Printing* is an open question.  In fact, I think they would look

25   to *Utilicorp*, and the leading case in the Fifth Circuit is a

1  case by the late Judge Wisdom, *In Re Beef*, 600 F.2d something

2  or another.  I have the cite.  Okay.  So I think the law is

3  different there.

4           **THE COURT:**  You're raising a really interesting point

5  about the remand cases generally that I haven't had to grapple

6  with yet, and that is this is not the only example of an

7  instance where a defendant can legitimately say to me that I

8  should withhold making a decision or I should even apply the

9  law of some other circuit or -- anyway.  So I hadn't really --

10  I haven't even really started thinking seriously about that

11  question yet.

12          **MR. MCGINNIS:**  Before I make sure I don't get the

13  Court off on the wrong road, one of the remand cases is in the

14  Ninth Circuit.  The rest are in the Fifth Circuit, the Eleventh

15  Circuit, and the Second Circuit.  But the *Costco* case, for

16  example, is --

17          **THE COURT:**  Is that Wisdom case a Fifth Circuit case

18  before the Eleventh Circuit split, so it would govern your

19  Eleventh Circuit Case?

20          **MR. MCGINNIS:**  Yes, Your Honor, it was.

21          **THE COURT:**  I knew that Eleventh Circuit clerkship was

22  going to help me at some point.

23          **MR. MCGINNIS:**  Yes, Your Honor.  I can also tell you

24  and maybe peak your interest a little bit, there are exactly

25  two sentences about ownership and control in the *Beef* case.

1          **THE COURT:**  Interesting.  Now, we are just talking

2     about things that are academically interesting to the two of

3     us, but has that *Beef* case been the subject of a lot of further

4     exposition in the Fifth Circuit?

5          **MR. MCGINNIS:**  No.

6          **THE COURT:**  It has not?

7          **MR. MCGINNIS:**  No.  At least that's what my brain

8     trust assures me in my own excursions through the Fifth Circuit

9     and Eleventh Circuit law.

10         **THE COURT:**  That's interesting.

11         **MR. MCGINNIS:**  Let me make one other comment, if I

12    may, because I do have a little bit of time here.  What

13    struck me -- two things struck me about all the arguments I

14    heard from the plaintiffs.

15         One is this they are arguing for the slipperiest of

16    slopes.  According to them, there is apparently no case in

17    which you could grant summary judgment.  There is none.  And

18    the fact is there clearly are because Judge Illston who,

19    frankly, we disagree with much of what she did, if not all of

20    it -- she did grant summary judgment.  Okay?  So there are some

21    cases in which there could be summary judgment.

22         And she looked at -- primarily at ownership and control

23    and particularly ownership.  In fact, there was -- there was

24    a -- in one of her cases in the very end of the decision, the

25    2012 decision, she said, "Sorry, this is too attenuated.  The

relationships that you are -- are arguing for are too
attenuated," and so she granted summary judgment.

So summary judgment is possible and it's appropriate in
cases, and -- and I'm most familiar with the facts in my own
case.  There is no case anywhere that has supported --
supported proceeding on the facts that are before you.  None.

And maybe -- maybe I'll -- I'm -- you know, I'm sure I'm
going to get bricks thrown at me from the other side of the
table, but we've been talking as if -- the issue with *Illinois
Brick* is enforcement, not whether everybody gets all of their
damages.  In fact, they understand that not everybody gets all
of their damages.

Thank you.

**THE COURT:**  Thank you.

Ms. Nash.

**MS. NASH:**  Your Honor, using the remaining time, just
to clarify, when the Court gets to the point of deciding
whether or not it should remand the cases or not, I want to
clarify that all five of the pending motions related to
ownership or control must be decided by the Court because they
all relate to damages in the cases that will be tried here.
The question for the Court is whether it wants to limit its
decisions to those -- those cases and send the motions back to
the remand courts to be decided.  So I just wanted to clarify
that and also I would say we believe we win under *Royal*

1   *Printing* anyway but that is the issue before the Court.  Not do

2   you decide some motion ands not others.

3           **THE COURT:**  Thank you.

4           **MR. KENNY:**  Very briefly, Your Honor.  Michael Kenny.

5       I agree with everything Ms. Nash said except for the

6   prediction of victory.

7           **THE COURT:**  I'm aware that I have to decide these

8   cases.  I was speaking to a more general point that didn't

9   pertain these motions actually in my discussions with Mr.

10  McGinnis.

11          **MR. KENNY:**  The only thing I want to point out, at

12  least with regard to the Fifth Circuit where my client would go

13  back, there is no conflict in the Fifth Circuit with Ninth

14  Circuit law.

15          **THE COURT:**  I have to read that *Beef* case then.

16      Let's turn to Question 7.

17          **MR. MCBURNEY:**  Your Honor, Matthew McBurney on behalf

18  of Viewsonic Corporation.

19      In response to Question 7, I would like to just clarify

20  that when we refer to Tatung Company in our briefing, we are

21  referring to TCO only and not TUS.  And the reason for that,

22  Your Honor, is that -- the reason why we didn't address

23  ownership or control with respect to TUS is because the persons

24  at issue for Viewsonic are only with respect to TCO and Jean

25  Co.  So we didn't -- so we opposed the brief with respect to

1    those two companies -- but we did not oppose with respect to

2    TUS because there are no purchases at issue, Your Honor.

3            **THE COURT:**  Thanks.

4        Mr. Sanders.

5            **MR. SANDERS:**  You may be wondering why I am standing

6    up to say anything in reply to that.

7            **THE COURT:**  I have too much respect for your -- the

8    quality of your judgment.

9            **MR. SANDERS:**  Well --

10           **THE COURT:**  Well, maybe I thought about it a little

11   bit, actually.

12           **MR. SANDERS:**  I am standing up because it gives me an

13   opportunity to say something else about Tatung US.  And you

14   asked an earlier question of Mr. Yohai if he could think of any

15   examples where someone subject to an ownership and control

16   claim filed suit and its customer also filed suit.

17           **THE COURT:**  I did ask that question.

18           **MR. SANDERS:**  And I've got something close for you

19   involving Tatung US.  Tatung US Pams was a member of the class

20   in the LCD litigation and submitted a claim and received

21   compensation as part of that.  And plaintiffs in the LCD

22   litigation claimed damages for customers of Tatung US under the

23   ownership and control exception.

24           **THE COURT:**  Were you involved in that case?

25           **MR. SANDERS:**  I was.

1              THE COURT:  Were you in that case?

2              MR. SANDERS:  I was.

3              THE COURT:  Did anybody do anything about that?

4              MR. SANDERS:  You know, I was trying to remember -- we

5    certainly -- the issue was raised, and I was trying to

6    remember.

7              THE COURT:  You scrape all this away, the bottom line

8    is if you are representing a defendant, you are trying to pay

9    as little money as possible, whatever the case is about, and

10   here it sounds like a situation where the defendant paid twice

11   on the same claim if what you're telling me is true.  Didn't

12   somebody object?

13             MR. SANDERS:  My problem is that we settled those

14   cases where early, the class cases.  I just don't remember,

15   because we were not involved, what happened on the ownership

16   and control issue --

17             THE COURT:  I see.

18             MR. SANDERS:  -- with regard to Tatung US.

19             THE COURT:  Well, that's a matter of some historical

20   interest, maybe, and actual interest to the Court.  Does

21   anybody know what happened in the case?  It's the last

22   question.  Of the morning, I mean.  No?  Okay.  Lost to the

23   sands of time.  Thank you all for your arguments this morning.

24             (Proceedings adjourned at 11:19 a.m.)

25

1

2                         CERTIFICATE OF REPORTER

3              I certify that the foregoing is a correct transcript

4       from the record of proceedings in the above-entitled matter.

5

6       DATE:   Thursday, January 14, 2016

7

8       *Pamela A. Batalo*

9       _____
        Pamela A. Batalo, CSR No. 3593, RMR, FCRR
10      U.S. Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25