**Pages 1 - 65**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

```
MDL NO. 1917 IN RE:  CATHODE   )
RAY TUBE( CRT) ANTITRUST       )
LITIATION                      )      Case No. CV 07-5944-JST
_____ )
```

San Francisco, California
Wednesday, January 20, 2016

<u>**TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>:


For DAP Plaintiffs:

        BOIES, SCHILLER & FLEXNER, LLP
        30 South Pearl Street - 11th Floor
        Albany, NY  12207
    **BY:  PHILIP J. IOVIENO, ATTORNEY AT LAW**

For Sears Plaintiffs:

        KENNY NACHWALTER
        1100 Miami Center
        201 South Biscayne Boulevard
        Miami, FL  33131
    **BY:  SAMUEL RANDALL, ATTORNEY AT LAW**


For Costco Plaintiffs:

        PERKINS COIE
        1201 Third Avenue - Suite 4900
        Seattle, WA  98101
    **BY:  CORI GORDON MOORE, ATTORNEY AT LAW**

Reported By:     Pamela A. Batalo , CSR No. 3593, RMR FCRR
            Official Reporter

APPEARANCES CONTINUED:

For Toshiba Defendants:

                WHITE & CASE
                701 Thirteenth Street, NW
                Washington, DC  20005
      BY:  **CHRISTOPHER M. CURRAN, ATTORNEY AT LAW**
            **LUCIUS B. LAU, ATTORNEY AT LAW**


For Panasonic Defendants:

                WEIL, GOTSHAL & MANGES, LLP
                767 Fifth Avenue
                New York, NY  10153
      BY:  **DAVID YOLKUT, ATTORNEY AT LAW**


(Multiple other counsel present as reflected on the Court's
Minute Order)

| | |
|---|---|
| 1 | **Wednesday - January 20, 2016**                    **9:36 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---oOo---** |
| 4 | **THE CLERK:**  Calling Civil Case 07-5944-JST, MDL No. |
| 5 | 1917 In Re: Cathode Ray Tube (CRT) Antitrust Litigation. |
| 6 | Your Honor, appearances have already been taken. |
| 7 | **THE COURT:**  Very good.  Good morning. |
| 8 | We have another set of summary judgment motions on |
| 9 | calendar this morning.  One of them pertains to an entity known |
| 10 | as MARTA, M-A-R-T-A, and the other one is a summary judgment |
| 11 | motion for lack of antitrust injury. |
| 12 | I think the MARTA motion raises more issues.  I want to |
| 13 | spend more time on that.  As always, I wish my time were |
| 14 | unlimited, but as always, it's not, so we're going to spend |
| 15 | about 30 minutes a side on the MARTA motion and about 15 |
| 16 | minutes a side on the other motion.  After our court reporter |
| 17 | takes a break and that sort of thing, we'll wind up having been |
| 18 | together for a couple of hours if we do it that way. |
| 19 | I will have some questions as we go along.  I wouldn't say |
| 20 | these are tentative rulings, but I would say probably the |
| 21 | plaintiffs have a little more to worry about from the MARTA |
| 22 | motion than the other one.  I think that would be fair to say. |
| 23 | Who will argue the MARTA motion first? |
| 24 | **MR. CURRAN:**  Your Honor, Christopher Curran for |
| 25 | Toshiba.  My colleague, Mr. Lau, L-A-U, will be arguing the |

1   MARTA motion.

2         **THE COURT:**  Very good.  He was on the brief.  Yes.

3      Mr. Lau.

4         **MR. LAU:**  Good morning, Your Honor.  And may it please

5   the Court, my name is Lucius Lau.  I'm from White & Case.  I

6   represent the Toshiba defendants.  I'm here today to argue the

7   defendants' joint motion for summary judgment with respect to

8   MARTA.

9      Your Honor, our motion is based on two separate theories.

10  One derives from the Supreme Court's ruling in *Associated*

11  *General Contractors* and the second derives from Footnote 16 of

12  the Supreme Court's decision in *Illinois Brick*.

13     I would like to note, Your Honor, that these are separate

14  and distinct arguments.

15     The inquiry under Footnote 16 is whether the indirect

16  purchaser owns and controls the direct purchaser to such a an

17  extent that the indirect purchaser is the proper plaintiff to

18  bring any Sherman Act claim.

19     The *AGC* analysis, though, that pertains to a question of

20  standing.  Standing, Your Honor, is a threshold inquiry that

21  must be addressed by a federal court first in every case,

22  including here.

23     It's separate from the *Illinois Brick* analysis in the

24  sense of whereas *Illinois Brick* asks the question as between

25  the direct purchaser and the indirect purchaser, who is the

proper plaintiff to bring a Sherman Act claim, *AGC* asks an

entirely separate question; that is, who has standing to bring

a claim.   And specifically as relevant to the MARTA motion,

does MARTA suffer antitrust injury.

Antitrust injury, Your Honor, is a necessary but not

sufficient component of antitrust standing, and MARTA doesn't

reach that threshold inquiry.   And I would like to explain why.

Your Honor, in its briefs, MARTA portrays the argument as

whether MARTA is a direct purchaser or an indirect purchaser,

and that's not the inquiry.   Our position, Your Honor, is MARTA

is not a purchaser at all.   And that's an important part for --

**THE COURT:**   Isn't that more an agency theory?   I mean,

the briefs don't really squarely address this, but if MARTA is

purchasing CRTs as an agent on behalf of its principals only

and not all of its principals, which raises a separate problem

for plaintiffs, because if you give the money to MARTA and they

simply distribute it to their members based on shareholding,

some of the people that weren't injured at all because they

didn't buy CRTs will get the money, but I digress.

If they're purchasing CRTs solely as an agent on behalf of

their principals, then I wonder, picking up on the point that

you just started to make, whether MARTA is a purchaser at all

and aren't MARTA's members the direct purchasers?

**MR. LAU:**   The answer to your first question, no, MARTA

is not a purchaser.   Rather -- to your second question, the

1    purchaser, the direct purchasers here, are MARTA's members.

2         Your Honor, when we think about the stream of commerce,

3    when we think about goods as they flow through the stream of

4    commerce, yes, at one point in time we can identify a direct

5    purchaser and at other points in time we can identify perhaps

6    one or more indirect purchasers, but the universe is not set up

7    where you're either a direct purchaser or an indirect

8    purchaser.  There are other entities who are participating in

9    the stream of commerce who might suffer some sort of

10   consequential harm, but that doesn't make them a direct

11   purchaser or indirect purchaser.

12        **THE COURT:**  Doesn't MARTA take a percentage of its

13   purchases as a fee?

14        **MR. LAU:**  Correct, Your Honor.

15        **THE COURT:**  And so I understand your side to be

16   arguing, that as the price of the underlying good goes up, that

17   its fee on a per item basis goes up; right?

18        **MR. LAU:**  Correct.

19        **THE COURT:**  But also isn't it the case that as the

20   price of something goes up, the quantity sold goes down and so

21   to know whether MARTA suffered any injury, you would have to

22   know something about the price elasticity of demand; right?

23   It's possible that the price could go up, but demand would fall

24   by more than the rise in price, and so at the end of the day,

25   MARTA comes up short.  Couldn't that happen?

1          **MR. LAU:**  Theoretically, yes, Your Honor.  That's not

2     the argument that MARTA is making here.

3          And in any event, I don't believe that's material to the

4     analysis.  There are -- for example, we think of the that labor

5     union involved in *Associated General Contractors* -- the labor

6     union asserted that it was injured as a result of the alleged

7     antitrust violation, and the Supreme Court recognized that,

8     yes, you might have a -- you, the labor union, might suffer

9     some sort of consequential harm, but you're not the proper

10    party to bring this lawsuit.  There is another party out there

11    who is more directly injured by the purported violation.

12    That's the entity that has suffered antitrust injury.  That's

13    the entry that has standing to bring this lawsuit.

14         So when we think about the fixed fee -- and it is a fixed

15    fee, Your Honor.  The MARTA Rule 30(b)(6) deponent was clear

16    that MARTA followed a formula with respect to every sale.  The

17    fact that it's possible that the quantities may have been

18    reduced by a result of an alleged overcharge, it's not material

19    because MARTA never -- was never the direct purchaser to begin

20    with.

21         Why do we know that MARTA was not the direct purchaser to

22    begin with and not really a purchaser at all?  MARTA always

23    acted at the behest of its members.  And this is probably the

24    most key point I would make on this point, that when a MARTA

25    member submitted an order to a vendor -- remember, the order

1   was placed directly with the vendor first, not with MARTA, but

2   with the vendor -- MARTA had no discretion to refuse the order.

3        That, Your Honor, more than anything else shows that

4   the -- the relationship between the MARTA members and MARTA is

5   not one of buyer and seller, but, rather, it's one of principal

6   and agent, because if you're an agent and your principal tells

7   you to do something, you have no discretion to refuse.

8        Contrast that example, Your Honor, with a bona fide

9   buyer/seller relationship.  You, the buyer, may say *yes, I*

10  *would like to purchase that television*, but the seller, as an

11  independent agency -- independent entity has the discretion to

12  say no.  *Thank you, no, I'm not interested in selling*.

13       MARTA could never say no.  Pursuant to its agreement with

14  the members, MARTA had to fulfill the order.  The only criteria

15  was with the -- so long as the member had to have sufficient

16  credit.  But so long as sufficient credit existed, MARTA had to

17  complete the order.

18       So it did not have -- it does not have the hallmarks of

19  what we would consider a purchaser would have; that's the

20  ability to act independently.  It never held inventory.

21  Purchasers always hold inventory because you never know when

22  the next sale is going to come.

23       And just to clarify, Your Honor, the record does show that

24  during the very early part of the period, maybe 1995, 1996,

25  there was a very limited inventory, 95 percent for appliances,

1   not electronics, and these were for opportunity buys, but this

2   program -- that stopped in about 1996.

3       So for the vast majority of the relevant period -- and

4   MARTA concedes this -- MARTA held no inventory.  And MARTA

5   didn't need to hold any inventory because once the member

6   placed the order with the vendor, the vendor would ship the

7   merchandise directly to the member.  That's the relationship.

8   The vendor is the seller and the member is the direct

9   purchaser --

10          **THE COURT:**  What is the case support for the Court's

11  reliance on those two factors as leading to a decision in your

12  favor?

13          **MR. LAU:**  I would look to the *In Re Toilet Seat* case,

14  Judge -- Your Honor, that described the difference between --

15  on very similar facts, and the Court said it really appears

16  what's going on here is that it's really a buyer -- it's not a

17  buyer/seller relationship.  It's really an agent --

18  relationship of principal and agent.  And that's what we have

19  here.  MARTA is an agent.

20      Thinking about these issues in preparation for the

21  argument today, Your Honor, I tried to think of examples of a

22  principal/agent relationship that we would all agree there is

23  no purchase.

24      Suppose it's a Saturday morning and I want to go buy a

25  television --

1          **THE COURT:**  Well, the hypothetical that I'm going to

2     pose to your opponent is what about Amazon or Rakuten, which is

3     the Japanese Amazon, where you have third-party vendors selling

4     their items through Amazon, and Amazon might collect a

5     commission on the sale, but -- and the sellers are using their

6     platform.  It's not as though the goods and the money never

7     touch Amazon, but Amazon is not really the purchaser and it's

8     not actually really the seller.  It's a platform, and it takes

9     a fee for that.

10         **MR. LAU:**  Excellent example, Your Honor.

11         **THE COURT:**  So that's the hypothetical that I want.

12    So now they have advance notice of the hypothetical.

13         **MR. LAU:**  Amazon is providing a service to the

14    companies that use its platform, as well as users like you and

15    I.  It's facilitating a transaction, but I don't think anyone

16    would seriously argue that when I buy some golf balls off of

17    Amazon, that Amazon is the purchaser, not I.  I am the

18    purchaser.

19         So that's how we look at the issue of *AGC* and antitrust

20    injury.  Remember, the labor union may have suffered -- and *AGC*

21    may have suffered consequential harm, but the Supreme Court

22    said that's not enough.  That's not the type of direct harm

23    that must be alleged and proven in order to have standing under

24    the Sherman Act.

25         Here we take the position that based on the sworn

1   testimony of MARTA's Rule 30(b)(6) deponent, that there was

2   never any injury at all.  Because of the rigid formula applied

3   by MARTA each and every time it made a sale, if there were an

4   overcharge, that only meant more administrative fees and

5   roundup for MARTA.

6        So before I move on to the second -- the second argument,

7   Your Honor, I want to address a couple more points that MARTA

8   makes in support of its position that it's the real purchaser.

9        MARTA says, *Look to our corporate documents.  Our*

10  *corporate documents say that we are a wholesaler* --

11       **THE COURT:**  You are clearly very well prepared for

12  this morning's argument and you're certainly capable of making

13  your own time-management decisions, but in light of the

14  comments that I made, I expect plaintiffs to come out swinging

15  in a minute, and you might want to be mindful about reserving

16  some time.

17       **MR. LAU:**  Yes, Your Honor, I understand.

18       Let's move quickly to the second argument, Footnote 16 of

19  *Illinois Brick*.

20       **THE COURT:**  All right.

21       **MR. LAU:**  In that footnote, the Supreme Court

22  recognized there might be instances where an indirect purchaser

23  owned or controlled the direct purchaser such that market

24  forces are superseded.  And in that instance, it's the -- only

25  the indirect purchaser that has a claim under the Sherman Act.

1    We argue that if the Court disagrees -- disagrees with us

2  on issue one, on the standing issue, that the MARTA members

3  did, in fact, own or control MARTA to such an extent that

4  market forces were superseded and that only the MARTA members

5  have a claim under the Sherman Act.

6    MARTA is owned exclusively by its members.  The MARTA

7  board of directors consists exclusively --

8         **THE COURT:**  For that, doesn't the quantity purchased

9  by the indirect purchasers have to be predetermined?

10        **MR. LAU:**  No.  That's for the cost -- I believe for

11  the cost-plus exception to *Illinois Brick*.

12        **THE COURT:**  Yes.

13        **MR. LAU:**  For the ownership and control -- well,

14  there -- arguably we have a cost-plus argument here based on

15  the rigid formula applied by --

16        **THE COURT:**  It will be useful to the progress of the

17  case, now that the defendants are using these exceptions

18  defensively, to be extremely clear about the circumstances in

19  which they apply.

20        **MR. LAU:**  Thank you, Your Honor.

21    And the defendants' position, to be extremely clear, we

22  think there are limited exceptions under *Illinois Brick*, and

23  those exceptions should not be extended.  The one exception is

24  the preexisting cost-plus contract discussed by *Illinois Brick*,

25  and arguably that exists here, but even if the Court disagrees

1   on that, certainly the Footnote 16, ownership or control of the

2   direct purchaser by the indirect purchaser, that certainly

3   exists.

4       MARTA is and was a nonprofit corporation that existed for

5   the benefit of its members.  No one else owned MARTA.  No one

6   else was on the MARTA board of directors.

7       I understand that Judge Illston considered these facts and

8   reached a different conclusion, but we respectfully disagree

9   with her analysis.  We don't think she gave enough time and

10   attention to these issues, and if she did, we believe that she

11   would have reached what we believe is the correct conclusion

12   which is yes, indeed, MARTA was owned and controlled by its

13   members such that Footnote 16 applies.

14       So those are the basic arguments I have, Your Honor.

15   Unless you have any questions, I would like to reserve the

16   remainder of my time for rebuttal.

17           **THE COURT:**  Thank you.

18           **MR. LAU:**  Thank you, Your Honor.

19           **THE COURT:**  Who will argue this motion for the

20   plaintiffs.  Mr.-- is it Iovieno?

21           **MR. IOVIENO:**  Correct, Your Honor.

22           **THE COURT:**  Very good.  It's nice when I can finally

23   start to learn the names and faces.

24      Mr. Iovieno.

25           **MR. IOVIENO:**  Thank you, Your Honor.

1       And you're right.  I am going to come out swinging.  But

2   let me just start, I think this whole motion turns on the

3   facts, and I'm going to spend a lot of my time on the facts.

4   We can get into the law, too, if you have particular questions,

5   but let me just react to the defendants' argument first in a

6   summary, and then I want to get into my argument.

7       First of all, their position is basically that MARTA is

8   just a passive agent.  They say MARTA acted at the behest of

9   its members and had no ability to reject its orders.  That's

10  wrong, and I'm going to get into that in detail.

11      Basically they said they could never say no.  That's

12  wrong, and we are going to get into that.

13      They say the *Toilet Seat* case is on point.  It's the only

14  case law they cite.  The *Toilet Seat* case --

15          **THE COURT:**  We have a developing requirement that that

16  case be cited at every hearing.

17          **MR. IOVIENO:**  It's a lot -- a lot more interesting

18  than *ATM Fee*.

19      But that case is different fundamentally.  I'm going to

20  get into that.

21      I do want to obviously address your Amazon hypothetical,

22  which I'm going to explain to you why that is different than

23  MARTA's situation as well.

24      But to get to my prepared argument, and then I'll address

25  these throughout, essentially our position is the law is very

clear.  Bedrock antitrust law is that the direct purchaser has
suffered a per se antitrust injury, regardless of whether that
direct purchaser even passed on a hundred percent of the
overcharge.  And in this case, MARTA was the direct purchaser
for the reasons I'm going to get into right now.

The facts are critical with respect to MARTA, and I think
they've been misrepresented by the defendants in their briefs,
and I want to take some time to really go through them.

MARTA is the direct purchaser in this case.  MARTA is the
only party with a contractual relationship with the defendants,
with the vendors.  Okay?

MARTA negotiates the prices that the manufacturers will
charge for the products that are ordered by MARTA members
through MARTA.  Okay?  The members have absolutely no input
whatsoever, zero, into any of those negotiations.  Okay?

Second key, key point is the only party that is
contractually responsible for any of these purchases is MARTA.
The only recourse that anyone has, that any of the
manufacturers have with respect to the financial transaction
for these purchases is MARTA.

The next critical fact -- and I want to get into this in a
little bit more detail, but I'm just going to lay the fact out
right now -- is that MARTA fully controlled the price that its
members paid for these products, and it was not a -- just a
set, fixed formula.  There was a formula.  It had various

1  factors that were adjusted on a product-by-product basis, which

2  I'm going to get into, but the key point here is that MARTA --

3  what the members ultimately paid was controlled by MARTA, not

4  by the members.  And they had no input into it.  They had no --

5  they had an input.  They didn't have -- and I'm going to get

6  into this.  They didn't have the -- the decision was made by

7  MARTA.  Okay?

8      And the last point, which is critical, is that final

9  approval for every purchase was made by MARTA.  MARTA had an

10  approval -- the ability to accept or reject any purchase

11  requests by its members.

12      **THE COURT:**  Is there evidence in the record that such

13  rejections actually took place?

14      **MR. IOVIENO:**  There's not.  And Bob Thompson said that

15  he couldn't recall a situation where that happened, but I'm

16  going to -- and I could just jump to it right now.

17      **THE COURT:**  No.  I like the structure of your

18  argument.  I --

19      **MR. IOVIENO:**  Because we are going to --

20      **THE COURT:**  You will get to this -- I just wanted to

21  remember to ask you that.  If you want to walk through these

22  factors in the order you've got them written down in your

23  notes, that's fine.

24      **MR. IOVIENO:**  Okay.  So, again, now I'm going to get

25  into the facts, but at the end of the day, what we're saying

1  here is MARTA is the direct purchaser.  It is the first

2  purchase outside of the conspiracy.  Regardless of whether they

3  passed on a hundred percent, they're the direct purchaser.

4      Okay.  Here -- here is the way -- let's start with the

5  pricing, because the pricing is really important.  Okay?  So

6  here's what happens.

7      MARTA, as I said, negotiates the prices with the vendors,

8  with the defendants in this case.  They get to a fixed price

9  that the vendor is going to charge -- charge MARTA.

10     Now, let me read you something here quickly.  This is a

11 quote from -- this is a quote from MARTA's executive director

12 Warren Mann.  This is Exhibit 5.  This is page 118.  He is

13 talking about the members, and he's talking about the

14 defendants, and this is -- and the pricing, the pricing between

15 MARTA and the defendants.

16     "The reason we," MARTA, "got favorable pricing and

17 programs was because the manager had one place to send the bill

18 to.  They knew they'd get paid even if the dealer went out of

19 business and they knew that it was a tacit endorsement from the

20 group for that brand, so we could usually extract some

21 benefit."

22     Okay.  Well, that's why MARTA exists.  MARTA is doing it

23 for the members.  It starts off there's only --

24         **THE COURT:**  What's the antitrust injury?

25         **MR. IOVIENO:**  Okay.  So the antitrust injury comes

1   next.  Okay.

2       So you start off with price negotiations between MARTA and

3   the defendants, and then they come to a fixed price.  Then

4   MARTA's members say *okay, well, I want* -- there's a particular

5   member will say *I want to buy a hundred of those TVs*.  Okay?

6   That request is sent to the manufacturer, but it is also sent

7   to MARTA, and the manufacturer will not issue any prices until

8   that request is approved of by MARTA.  That's in the record as

9   well.  I'm going to read to you right now from Bob Thompson.

10          **THE COURT:**  Would you do, please, as you did a moment

11  ago and give me the exhibit number and that sort of thing so it

12  will be easy to find.

13          **MR. IOVIENO:**  It's Exhibit 2 to my declaration.  This

14  is page 94 and 95 of his deposition, so Exhibit 2, pages 94 and

15  95.

16          **THE COURT:**  Yes.

17          **MR. IOVIENO:**  So question -- it starts off, "We took a

18  little detour there on inventory.  Let's go back to central

19  billing.  So we talked about the various steps that occur when

20  a member decides to make a purchase.  A member submits the

21  purchase order to the vendor.  The vendor notifies MARTA of the

22  purchase order.  We think that this was done through EDI

23  throughout the entire relevant time period.  Then MARTA would

24  evaluate the credit -- creditworthiness of the member and then,

25  if appropriate, notify the member -- the vendor that the member

1   is authorized to make a sale and would assign a J number and

2   that would indicate, yes, this is an authorized sale.  Do I

3   have the sequence incorrect?"  Okay.  That's the question being

4   asked of the executive director of MARTA during the relevant

5   time period, much of the relevant time period, and the answer

6   is yes, because that's the way it worked.  That's the way it

7   worked.

8        A member could not just call up Toshiba and say *send me a*

9   *hundred TVs at the MARTA price*.  But, Judge, do you know what

10  the member could do and this is critical?  The member could

11  call up Toshiba and say *give me a hundred TVs at your standard*

12  *price.*  And they did it.  These members bought products on

13  their own and they bought it through MARTA.  That is a critical

14  fact.  Okay?

15       But if they wanted to come through MARTA to get all those

16  benefits that Mr. Mann just testified about that I told you,

17  they had to come through MARTA and MARTA had to approve it.

18       And why did MARTA care about the creditworthiness?  Why?

19  Because MARTA was on the hook, not the member.  MARTA bore all

20  the risk, period, full stop.

21       **THE COURT:**  How does that distinguish this situation

22  from -- I'm not sure what the analogies are.  I feel confident

23  you don't like Amazon.  But let's take a cost-plus contract,

24  which we know -- this is sort of in a reverse -- this is a

25  defensive use of something that looks like a cost-plus

1    contract.  How is it different?

2        I mean, in a cost-plus contract in certain situations,

3    putting aside mechanic's liens and things like that, the

4    risk -- there is a shift in the creditworthiness risk and that

5    kind of thing.  Maybe there is pricing available that wouldn't

6    otherwise be available, that sort of thing.

7        How do the things that you're talking about take us out of

8    that cost-plus world?  If that's the right question.

9        **MR. IOVIENO:**  It's a great question.  And I'm going to

10   answer it in three ways.  The first way is not a direct answer,

11   but I'm just going to answer it.

12       There's a reason the defendants' motion does not seek

13   relief under the cost-plus exception, because from a legal

14   standpoint, it doesn't apply.  Okay.  There's a legal reason

15   why it's different and there's an economic reason.  I'm going

16   to start with the legal reason.

17       The legal standard is very clear, to have a cost-plus

18   contract, it's not just a cost -- it's not just a fixed markup.

19   It also has to be for a specific quantity.

20       **THE COURT:**  Right.

21       **MR. IOVIENO:**  And that's not here, and that's why

22   their motion doesn't seek any relief under the cost-plus

23   contract and they're coming up with creative antitrust injury

24   arguments.

25       Now, from an economic standpoint, it's also fundamentally

1    different because -- and I hadn't gotten to it yet, but I'm

2    going to get to it right now, which was the next part of my

3    outline, which was how does MARTA price?  Okay?  There's a

4    formula, but it is not just a fixed markup.  Okay?

5        The way it works, it's very simple -- and we're going to

6    go through the testimony.  But there's three components.  You

7    have the vendor invoice price.  Okay?  So the price that

8    Toshiba is charging for the television, that price that MARTA

9    negotiated with Toshiba.  Okay?  There's an administrative fee,

10   okay, that MARTA -- that's how MARTA is making money.  And then

11   the third component is there is -- it's called either a roundup

12   or a holdback.  Okay.  And here it is.  It's very simple.

13       All it means is that MARTA would raise the price of some

14   products, decrease the prices of other products, based on

15   supply and demand factors.  And what they would do, okay --

16   because, again, MARTA is not just selling TVs.  They've got

17   members who sell only appliances.  They've got members who sell

18   appliances and TVs, and they've got members who sell just TVs.

19   This a very diverse group.  They all have different interests.

20       What's MARTA trying to do?  MARTA is trying to sell the

21   most product it can at any given time.  Right?  So what it does

22   is it identifies products that it views as core products at a

23   particular time period based on supply and demand, and non-core

24   products --

25           **THE COURT:**  Okay.  So let's hang with this

hypothetical for a minute, and let's imagine that Smith
Corporation is a MARTA member and they want to buy some
televisions.

MARTA is not going to Toshiba and negotiating the price of
televisions and applying this formula and then going to Smith
Co. and saying, *I got a lot of televisions in the back; do you
want some televisions,* are they?  They're waiting for Smith Co.
to place an order for some televisions.  Smith Co. knows kind
of what the rack rate is.  They know what everybody else is
paying.  They want to find out what the MARTA price is, but
MARTA is running this formula only as to the number of
televisions that it knows Smith Co. wants; right?

**MR. IOVIENO:**  Okay.  What it's doing is it's defining
a core product, okay, and it's running -- so if Smith Co. is
buying -- let's just say there's this CRT 19-inch TV from
Toshiba and it's defined as a core product.  What MARTA will do
with that product is it will decrease the price.  It will go
Toshiba price, MARTA administrative fee, decrease because we
want to move those things, we want to incent sales of those.

**THE COURT:**  We want to cause Smith Co. to order more?

**MR. IOVIENO:**  Smith Co. to order more, other members
to order more, get run rates going, sell more of those.  And
what does it do on the flip side?  It may take an appliance and
increase the price of that, and that's how it balances itself,
but that's how the prices are changing.

1      I have some deposition transcripts on this that I was

2  going to read to you, if that's helpful.

3          **THE COURT:**  It might be.

4          **MR. IOVIENO:**  Let's just go through it quickly.

5      But the point is we're not fighting the notion that there

6  is a formula.  There is a formula.  It's just changing.  And

7  who's changing it?  Not the members?  MARTA.  MARTA.  And I

8  will get into that, too.  There is a formula.  It's applied,

9  but this price is being adjusted all the time based on MARTA.

10 Okay.

11     Let's go to the pricing, and then I'll -- let's start with

12 Bob Thompson, and then -- this is Exhibit 2, pages 78 and 79.

13     "Mr. Thompson, for the two percent administrative fee,

14 whatever the amount actually was, was any portion of that

15 amount passed along to the members?

16     "Yes.  A portion of that was utilized to develop core

17 model discounts that were passed on to the members.

18     "All right.  What proportion?

19     "It varied slightly.  It was referred to as a roundup.

20 And in the simplest way to describe it, we would take the

21 program deductions that were negotiated in our program with a

22 vendor, and we'd come to a price that we would ultimately pay

23 the vendor, and then we would -- that price was typically -- it

24 would not end in an even dollar.  It might be 200 or

25 $201.53" --

1          **MR. CURRAN:**  251.

2          **MR. IOVIENO:**  Right.

3      "251.53, and we would then take the amount and round it up

4  to, say, 254, and that would be the price we would pass along

5  to the members.  The difference would be -- of that roundup

6  money would go into a merchandising budget that would -- that

7  we would use to put a core model discount to our members.

8      "What is a core model?

9      "It's a model that was determined by the director to be,

10  A, after the core model discount was applied to it, a

11  profitable, a profit opportunity for the member to compete in

12  the marketplace.

13      Question: "So if I understand this correctly, the roundup

14  money, that would apply to everything, and it would result in a

15  pool of money in MARTA's merchandise budget, and then MARTA

16  would utilize this pool of money to reduce the price of certain

17  core models to its members?

18      Answer: "Yes."

19      Now, someone else, a fact witness, testified, Amy Fields,

20  who was involved in the same process -- here is her testimony.

21  This is Exhibit 4, page 128, 129.

22      Question: "Do you have an understanding as to the meaning

23  of the word *holdback* as it was used by MARTA?

24      Answer: "Yes, generally.

25      Question:  "And what does that term mean to you?

1    Answer:  "To me it represents the difference between what

2    MARTA paid the vendor and what we charged our members.  And

3    sometimes these hold --

4    Question: "And sometimes these holdbacks -- and sometimes

5    these holdbacks were sometimes positive; correct?

6    Answer:  "Correct.

7    "And sometimes these holdbacks were negative; correct?

8    Answer:  "Correct.

9    "And sometimes the holdback would equal zero; is that

10   correct?

11   Answer:  "I think apparently it did, but I don't think

12   very often that they would be zero.

13   Question:  "So when a transaction has a negative holdback,

14   that means that the member is paying more than MARTA; correct?

15   Answer:  "Correct.

16   "When the" -- question, "when the transaction has as

17   positive holdback, that means the member is paying less than

18   MARTA; correct?

19   Answer:  "Correct."

20   It's just a simple point -- is that they're moving the

21   price all around based on supply and demand factors.  And the

22   members have no input in it.  I'm going to get to that next.

23   Why don't the members -- I'm sorry.  I misspoke again.

24   It's not that they don't have any input.  They don't make the

25   decision.  They do have input.  There is a board of directors

1    and the members sit on that.  But who ultimately decides it,

2    it's MARTA, and the reason is -- and I'm going to get to the

3    testimony in a second -- like I said before, MARTA has some

4    members that just sell appliances.  Well, you could think about

5    where their incentive would be.  Which products do you think

6    they want the core models to be?  You have some members who

7    just sell TVs and some who sell both.  It's all over the place.

8         So now I'm going to get --

9         **THE COURT:**  If you have a situation in which an

10   executive director appears to be favoring a sector of the

11   membership or a particular member in a way that is out of size

12   relative to that sector's membership or that individual

13   member's participation, the executive director is not going to

14   last very long; right?  I mean, this is effectively -- it

15   may -- and some of what I'm saying is devil's advocacy.  I'm

16   not saying this is true.  I'm saying *might this be true*.

17        But there is not -- so it's not a dividend situation.  The

18   members don't own stock.  I mean, they do own shares, but in a

19   way that's not like corporate shareholder ownership.  I

20   understand that.

21        But there's -- there's a sort of -- a very small amount of

22   redistribution at the margins, but ultimately if people feel

23   that the redistribution is not proceeding fairly, isn't it a

24   reasonable assumption the executive director is going to be

25   looking for a new job.  So isn't it sort of a quasi dividend?

1      **MR. IOVIENO:**  No.  Because he was asked questions on

2  this so let's listen to what he has to say and then I'll

3  respond, but at the end of the day what he is doing because his

4  interest is MARTA -- and what he is trying to do is look at the

5  different supply and demand factors.  How is MARTA making

6  money?

7      MARTA is making money by selling the most products at any

8  given time.  That's how they are making money.  So he's trying

9  to react to the supply and demand factors in the market and use

10  the pricing to pulse and try to sell more products where he --

11  like he said, where he sees there is a profit opportunity.

12      Now, to your point, which is a very good one, he has a

13  tough job.  Right?  He's got a tough job.  Let's hear him talk

14  about it, because he is very blunt about it.

15      All right.  Exhibit 2.  This is page 08.

16      "Would the" -- question, "Would the director designate a

17  core model by himself or would he do so in consultation with

18  committee members?

19      Answer:  "Well, ultimately the committee members would

20  want core model allowances.  You might have five guys and might

21  have five different suggestions.  And the director would have

22  to process all of this input and determine what's the most

23  effective use of that money.  And it wasn't -- and it wasn't

24  enough money to put it on all five models.  You had to make a

25  decision to put it on one model and then how much."  Okay.

1   And then he also -- this is the same exhibit he is asked

2   about it later in his deposition.  He gives a little more

3   lengthy -- this is page 186 and 187, Exhibit 2.

4   Question:  "Now for the core models.  Who decided what

5   qualified as a core model?

6   Answer:  "Ultimately the director decided which was the

7   model.  He would also get input from the vendor and then, of

8   course, you'd get input from some of the committee members.

9   Question:  "Can you think of an instance where the

10  director designated something as a core model contrary to the

11  wishes of committee members?

12  Answer:  "All the time.

13  Question:  "Would that be -- would that be specific

14  committee members had different interests in mind in terms of

15  what they wanted to promote?

16  Answer:  "I guess I should probably say earlier we looked

17  and we saw a list of, like, eight or nine people on the

18  committee.  If you asked eight or nine people which model

19  should be core models, you would probably get eight different

20  answers, so the director had to process all of this information

21  and make a judgment on what he felt was the best direction to

22  go and you're not going to please everybody.  You want to

23  please as many people as you can so you can sell as much

24  product.  That's just one piece of it.  Here is another piece."

25  That's one piece.  And then he goes on to say -- this is

1    him talking -- "you also had the vendor that you had to satisfy

2    because if you created too much demand on a model, the vendor

3    might not be able to provide the amount of supply to our

4    members.  So it was a balancing act.  But the director was in

5    the middle and had to make the final call."

6      So let's just go back to where I started.  They are not a

7    passive agent.  They are in the middle.  They are the direct

8    purchaser.  They are making the decisions.  They're dictating

9    pricing.  They're responding to supply and demand.  Okay?

10      The members -- they got a great deal.  They're part of

11    this cooperative and they're benefiting from MARTA, but MARTA

12    is the one on the hook, MARTA is the one making the decisions.

13    Yes, there's input.  Yes, there's input, but MARTA is the one

14    who is making the purchases.  In fact --

15      **THE COURT:**  Do you think it's true that market forces

16    have not been superseded with regard to these transactions?

17      **MR. IOVIENO:**  No, I don't.  I don't at all.

18      **THE COURT:**  I asked you in a double-negative way, in a

19    way that was good for you and you just disagreed with me, so

20    maybe I didn't say what I thought I said or maybe you didn't

21    hear what I said.

22      I said do you think it's true that market forces are not

23    superseded?

24      **MR. IOVIENO:**  Are not -- yes.  That's correct.

25      **THE COURT:**  Why aren't they?

1     **MR. IOVIENO:**  So what's happening here is -- let's go

2   back to your hypothetical earlier because it's really -- it's a

3   key one where you were talking about isn't MARTA -- you know,

4   if --

5     **THE COURT:**  Isn't MARTA Amazon, that one, or a

6   different one?

7     **MR. IOVIENO:**  No.  The one about okay, if the

8   conspiracy raises the price too high, couldn't they sell --

9   wouldn't they sell less product and therefore be harmed in that

10   way.  Absolutely, and that's what MARTA is trying to do in

11   responding to the supply and demand factors at any given time.

12     If a conspiracy is raising the price -- it's the demand

13   curve we talked about last week -- to a level that's too high,

14   they are going to sell less.  That administrative fee and all

15   that, that's all going to be less.

16     **THE COURT:**  But this is a cooperative.  It's not a

17   for-profit corporation.  So when we talk about injury to MARTA,

18   what does that mean?  So they sell less?  I mean, there is a

19   judicial way of -- there just be a judicial way of saying *so*

20   *what*, but whatever that is, so what?

21     **MR. IOVIENO:**  So MARTA is in a very competitive space.

22   Okay?  And it has to use the monies that it has to try to

23   promote products, give members its benefits.  Hold on.  The

24   more it sells --

25     **THE COURT:**  Yes?

1    **MR. IOVIENO:**  -- the more leverage it has with the

2    vendors, the defendants, to negotiate better deals for its

3    members and therefore attract more, so it's all -- and, again,

4    it's all --

5        **THE COURT:**  But it sounds like sociology to me, the

6    thing you just said.  I mean, because it's a cooperative.  So

7    this is not a situation like a financial services firm that

8    takes a percentage of the assets of its clients as a fee so

9    that the more members you attract, the greater your fee income

10   is.

11       My understanding about MARTA is they pay their executive

12   director and his staff, if he has one, a salary and, you know,

13   they pay rent on wherever the chairs are that these folks are

14   sitting and then they kind of call it a day; right?  They're

15   not keeping profit at the end of the day.

16       **MR. IOVIENO:**  A hundred percent correct, and I concede

17   that.  And what I would say to that -- it's a hundred percent

18   correct.

19       What I would say to that is what we're really talking

20   about here is, what the law is looking at is the economic

21   substance of the transaction and who's the direct purchaser,

22   and just because MARTA is a not-for-profit doesn't change the

23   economic substance of the transaction which is they're

24   negotiating the price.

25       They're the only ones contractually responsible if the

1    member doesn't pay.  They're the ones paying the defendant.

2    They're -- they're dictating the price the members pay.  Okay?

3    And they're -- and they're authorizing the -- they're

4    authorizing the sales.  The member cannot purchase anything

5    without MARTA's authorization.

6        Under all those situations if you look at all the case

7    law -- and I would tell you -- I mean, look, all these cases

8    are supportive of our position.  I think *iTunes* -- if you want

9    to see where a case says it the best, in my view, it's the

10   *iTunes* case.

11       **THE COURT:**  I always want to see where a case says it

12   the best.  I frequently ask lawyers in a hearing, although I

13   haven't done it in this case yet, *one case*.  You can cite one

14   case.

15       **MR. IOVIENO:**  So here it is.

16       **THE COURT:**  And I promise I'll read it.  But I'm not

17   making you that promise.  But I am interested when someone says

18   *I got one case.  It's death in the water.  You got to love this*

19   *case*.  What's the case?

20       **MR. IOVIENO:**  I do think the others are consistent.

21   This one says it the best, in my view.  This is the *iTunes*

22   case, 2011 WL5864036 2001.  And this is at Star 4.

23       It says, "Further, the Court finds that defendants'

24   contention that resellers are different -- differently situated

25   from end users insofar as they, quote, benefit from higher

1   retail prices, unquote, is misguided.  As a matter of antitrust

2   law, quote, when a seller overcharges a buyer, the fact that

3   the buyer raises the price for its own product, thereby passing

4   on the overcharge to its customers and avoiding a loss in

5   profit has no bearing on the issue of whether the buyer has

6   suffered an injury and thus has a right to recover damages from

7   the seller."

8          **THE COURT:**  Yes.  I agree with that.  And the

9   defendants are very careful here not to say *pass on*.  I get

10  that.

11         I think for me analytically -- there are a lot of

12  questions in these motions that need to be answered.  But for

13  me, the dominant one at the moment is are you different?  Is

14  MARTA different from its members as a matter of agency law?

15  And when I figure the out the answer to that question, it's

16  going to help me, I think, resolve the motion.

17         **MR. IOVIENO:**  I think if you look at the -- let me

18  make two points on the agency question.  One is a factual one.

19  I think if you look at the record, you're going to see that

20  MARTA is not acting, as Mr. Lau said, at the behest of its

21  members.  In fact, it's the other way around.  MARTA is calling

22  all the shots.

23         **THE COURT:**  My courtroom deputy thinks you have about

24  three minutes left.

25         **MR. IOVIENO:**  Okay.  That's perfect.

1      **THE COURT:**  I want to hear why you're not Amazon in

2  the three minutes.

3      **MR. IOVIENO:**  I'll do two things.  I want to talk

4  about the *Toilet Seat* case for one second and then I'll do

5  Amazon and I'll be done.

6      **THE COURT:**  If I leave the bench without your having

7  answered Amazon, it's at your peril.

8      **MR. IOVIENO:**  Okay.  I'll do *Toilet Seat* first.

9     *Toilet Seat* is very, very clear -- if you look at the

10  case -- okay.  Star 2.  On Star 2, they're talking about the --

11  the -- Harvey, in the situation, controlled Biddle's actions.

12  Biddle was being paid a flat monthly fee, regardless of volume.

13  Okay?  It's the converse of your hypothetical.  Okay?  And

14  that's what's leading your hypothetical before, isn't it true

15  that if the conspiracy raises the price, MARTA is going to sell

16  less and be injured?  Of course.

17     This is the converse.  They were just being paid a fixed

18  monthly fee, regardless of quantity, to order these products.

19  And that's what's leading the court to say later on, "Biddle's

20  actions regarding purchases made on Harvey's behalf were

21  controlled by Harvey."  Harvey was calling all the shots.

22  Biddle was just getting a fixed monthly fee, period.  Totally

23  different scenario.

24     All right.  Amazon.  So this is the way I would address

25  Amazon because I think it is fundamentally different.  Amazon

is just sitting in the middle between a vendor and Phil Iovieno

buying a new case for his iPhone.  They're not adjusting the

price that that vendor pays up or down.  They're not

contractually on the hook with the vendor, the relationship.

They're just sitting in the middle.

What you have with MARTA is fundamentally different.  You

have a relationship --

**THE COURT:**  I think Amazon is contractually on the

hook, but go ahead.  If they didn't send me my stuff that I

ordered through their platform and I sued them, I'd win.

**MR. IOVIENO:**  But with MARTA -- first of all -- but

Amazon is not adjusting the prices that that vendor is selling.

Amazon is sitting in the middle and just is just a vehicle for

which Phil Iovieno can buy from, you know, Mophie this new case

he wants to get because his iPhone doesn't hold a charge

anymore.

At the end of the day with MARTA, you have it different in

two respects.  There is contractual relationships between MARTA

and the defendants, the vendors here, in this case Amazon and

Mophie, and then you have contractual relationships on the

other end between MARTA and its members, and MARTA is adjusting

the prices, MARTA is approving the purchases.

Amazon is not saying, *Oh, Phil Iovieno, send me your*

*creditworthiness and I will tell you whether you can buy that*

*Mophie case*.  No.  They are just saying, *Okay, great*.  *It's*

1    *another one for the list.*

2         So MARTA is fundamentally in a different position.  It's

3    got a lot more control, and it's -- it's adjusting prices on

4    both ends.

5         **THE COURT:**  If your credit card was not approved in

6    the transaction, Amazon would not complete it, but I take your

7    point.

8         **MR. IOVIENO:**  That's true.

9         **THE COURT:**  They are not checking it in advance

10   because they know it's going to work out at the point of sale.

11        **MR. IOVIENO:**  I'm just saying they have no control.

12   They're not providing that same function.  They don't have the

13   same level of control that MARTA does over these transactions.

14        **THE COURT:**  Yes.

15        **MR. IOVIENO:**  I think my three minutes are -- unless

16   you have something more.

17        **THE COURT:**  No.  I'm enjoying our conversation, but I

18   have other things I have to do in the world, so I will hear

19   from Mr. Lau.

20        **THE CLERK:**  Mr. Lau, you have approximately 16 minutes

21   remaining.

22        **MR. LAU:**  Thank you, Your Honor.

23        I would like to respond to seven points made by my

24   colleague, Mr. Iovieno.  I think I can do this in about five

25   minutes.

1    Mr. Iovieno stated that MARTA had the final approval to

2    either accept or reject orders placed by its members, and I

3    respectfully disagree with that point, but I need my book.

4    If we look at Exhibit C, Your Honor, and this is the MARTA

5    cooperative -- cooperative plan.  It is a document that was

6    adopted and ratified by the board of directors.  Paragraph A

7    states, "Company as purchasing agent."  I'm just going to read

8    it to you because I think this squarely addresses and answers

9    the question.

10   Quote, the company shall act as and shall be a

11   nonexclusive purchasing agent for each and every shareholder of

12   the company.  The placing of an order with or through the

13   company shall be binding upon the shareholder placing such

14   order and shall require the shareholder to purchase such

15   merchandise from the company and the company to sell such

16   merchandise to the shareholder, provided, however, that said

17   obligation shall be void if said order cannot be completed with

18   less than a reasonable variance therefrom, end quote.

19   MARTA had no discretion to accept or reject an order.  It

20   had to --

21        **THE COURT:**  Well, the language that you just read me

22   suggests that the purchaser, the member, doesn't have the

23   ability to back out of a transaction, but where, in what you

24   just read me, does it say that MARTA doesn't have approval

25   authority or rejection authority --

1        **MR. LAU:** So MARTA, in this paragraph, is the company.

2   Quote, and the company to sell such merchandise to the

3   shareholder.  That's the language that binds MARTA to sell the

4   merchandise to the shareholder.

5        **THE COURT:** I see.  Okay.

6        **MR. LAU:** It was a long paragraph, but that's the

7   point --

8        **THE COURT:** No.  You're giving me credit.  I was --

9   yeah.  Okay.

10        **MR. LAU:** So that's point number one.

11        Point number two, Mr. Iovieno said that the -- the only

12   party contractually responsible financially was MARTA.  That

13   point, Your Honor, is neither here nor there.  If I, after this

14   argument, go to a sandwich shop and order a sandwich, I'm going

15   to use my credit card to pay for that sandwich.  And the -- by

16   making that purchase, the credit card is financially obligated

17   to pay the sandwich shop the seven, eight bucks for the

18   sandwich, even if I don't pay the credit card ultimately.

19        And no one would argue that the credit card company is a

20   purchaser.  No.  The credit card company is like Amazon, like

21   MARTA.  It's an entity that is providing a service to

22   facilitate the transaction.  That's point number two.

23        Point number three --

24        **THE COURT:** Isn't it also true, though, that a really

25   aggrieved sandwich seller with a lot of time on her hands could

1    actually sue you if, for some reason, the credit card company

2    didn't pay her if they went belly-up.  This happened in 2008,

3    2009.  There were issuers that just went up, belly-up.  She

4    could sue you for the sandwich.  You would be contractually

5    liable also.

6            MR. LAU:  But -- and this goes --

7            THE COURT:  Actually I don't think that changes your

8    argument, so never mind.

9            MR. LAU:  There was reference to the testimony of

10   Warren Mann.  And Mr. Iovieno said well, the Mann testimony

11   stands for the proposition that the manufacturer had one place

12   to send the bill and that gave the manufacturers a lot of

13   comfort that they would be paid.

14       So, too, with a credit card transaction.  The sandwich

15   shop doesn't know who the heck Mr. Lau is, but they know

16   MasterCard or Visa or American Express.  They will make the

17   sale to me.  That card gives them comfort, just like MARTA gave

18   its vendors comfort.

19       Point number four, MARTA bore the risk of loss.  I would

20   cite again -- refer again to the credit card example.  Credit

21   card companies do the same thing.

22       Point number five, Mr. Iovieno made reference to arguments

23   based on supply and demand.  You will look long and hard

24   through the deposition testimony, Your Honor.  You won't see

25   any reference to supply and demand arguments made by either the

1    30(b)(6) witness or other deponents.  That's simply a lawyer

2    argument that is not supported by the facts of this case.

3        Point number six, Mr. Iovieno argues that aside from the

4    administrative fee and the roundup, that the formula was

5    changing due to the core model discounts.

6            THE COURT:  Yes.  That one I'm still processing.

7            MR. LAU:  Again, it's one of those *neither here nor*

8    *there* arguments, Your Honor.  When I do -- use a transaction

9    with my credit card, the credit card will charge the sandwich

10   shop the seven or eight bucks for the cost of the sandwich plus

11   about a two percent fee.  And that's on the sandwich-shop side.

12       Separately, the credit card company, like my credit card

13   company, like a lot of credit card companies, they have a

14   program to incentivize me to use the credit card more often.  I

15   get discounts.  I get one percent on every purchase I make, but

16   sometimes if I make certain purchases, be it at a certain

17   grocery store or a certain gas station, I get two percent.  And

18   we see this often in the credit card industry.

19       So the fact that there -- the credit card company is

20   not -- it has a fixed formula on the one hand, but is offering

21   discounts to me, the purchaser, on the other hand.  That

22   doesn't make the credit card company a direct purchaser,

23   indirect purchaser, a purchaser at all.  That's just the nature

24   of the service it's providing.  It's trying to incentivize me

25   to use the services in a certain manner.  That's point number

1    six.

2        And now we go to point number seven, and I have already

3    used the five minutes I said I would use, so I will make this

4    quick.

5        The scenario that Mr. Iovieno described with respect to

6    what the executive director was doing in terms of identifying

7    models to promote through the core model program, remember, the

8    executive director was appointed by the board of directors, and

9    the board of directors consisted entirely of MARTA's

10   memberships.  So the MARTA members control the board, and this

11   is a straight-out application of *ATM Fee* which we believe is

12   central for *Illinois Brick* purposes.  The members control the

13   board.  The board controls the executive director; ergo, the

14   members indirectly control the executive director.

15       This analysis, Your Honor, fits squarely within

16   Footnote 16 of *Illinois Brick*, so even if Your Honor were to

17   disagree with our position with respect to antitrust injury, we

18   request that Your Honor conclude that the MARTA members

19   controlled and owned MARTA such that the Footnote 16 exception

20   applies.

21       So unless Your Honor has any other questions, that's all

22   for me today.  Thank you very much, Your Honor.

23           **THE COURT:**  Thank you.

24       Before we address the next motion, we are going to take a

25   ten-minute break.  Thank you.

```
1              (Recess taken at 10:31 a.m.)

2           (Proceedings resumed at 10:42 a.m.)

3        THE COURT:  All right.  Let's go back on the record in

4   the CRT Antitrust cases.

5        The next motion is a motion for partial summary judgment

6   against certain direct action purchasers for lack of antitrust

7   injury.

8        Who will argue for the defendants?

9        MR. YOLKUT:  David Yolkut, Your Honor, Weil Gotshal.

10       THE COURT:  Very good.

11       MR. YOLKUT:  Your Honor, may I proceed?

12       THE COURT:  Please.

13       MR. YOLKUT:  May it please the Court.

14       Your Honor, this joint motion originally sought summary

15  judgment on the federal and certain state law claims of both

16  the indirect purchaser class and many of the direct action

17  plaintiffs for failure to demonstrate antitrust injury under

18  Associated General Contractors and, hence, antitrust standing.

19       As Your Honor is aware, since the time of the briefing of

20  our motion, the IPP's case has been resolved by pending

21  settlements and the DAPs have largely withdrawn their state law

22  claims.  So our motion is now focused solely on the DAPs'

23  federal claims and Costco's California state law claim, which

24  has not been withdrawn.

25       Now, it's a federal doctrine.  AGC obviously applies to
```

1   the DAPs' federal claims, and Judge Conti has previously held,

2   the DAPs have previously conceded that *AGC* also applies to the

3   Cartwright Act.

4        The Court can perhaps thankfully then set aside the

5   parties' lengthy briefing with respect to whether *AGC* applies

6   to the various states previously at issue.

7        And at the outset, as Mr. Lau also mentions, let me be

8   clear that this motion concerns a separate analytical doctrine

9   from *Illinois Brick*.  The case law makes very clear that

10  antitrust injury under *AGC* is a separate, distinct analytical

11  issue.

12       *Illinois Brick* itself observed in Footnote 7 that they

13  were not passing on the question of whether injury -- whether

14  plaintiff sustained injuries too remote to give them standing

15  to sue for damages, which is the *AGC* direct injury inquiry.  In

16  other words, *Illinois Brick*'s categorical bar on indirect

17  purchasers suits doesn't answer the separate question of

18  whether there was proximate cause.

19       Now, that question was answered in *AGC* where the court

20  identified five factor that are relevant in determining

21  antitrust standing.  This motion addresses the first most

22  critical and essential of those, which is antitrust injury.

23  And the court from the Supreme Court and the Ninth Circuit,

24  there is clear case law that plaintiffs must prove antitrust

25  injury, that a showing of antitrust injury is necessary, but

not always sufficient to establish standing.  That was the
Supreme Court in *Cargill*.

The Ninth Circuit has interpreted that principle to
require market participation.  That would be the *Bhan* case, 772
F.2d 1467; *America Ad Management,* 190 F.3d 1051, and their
progeny.

Indeed, the Ninth Circuit's *Bhan* case solely concerned the
issue of antitrust injury.  If plaintiffs can't prove it,
that's the end of the inquiry.

This motion is not brought on a blank slate.  Like much
else in this case, there is some back story here.  Back in
2011, the DAPs had previously pled a fictitious conspiracy
regarding CRT products which was an artificial term of art that
included both the CRT tubes and the CRT finished products.
Those allegations have now been withdrawn.  That is Exhibit 3
to the Yohai declaration.

That's a critical point because the only allegations here
are that the DAPs purchased CRT finished products, not the
tubes that are subject to the price fixing, and they bring
damages based on that -- that fundamentally different product.

**THE COURT:**  Does ruling in your favor require me to
reject or reconsider Judge Conti's prior ruling on this area of
the law as it was raised at the motion to dismiss stage?

**MR. YOLKUT:**  Not at all, Your Honor.  Judge Conti's
2012 summary judgment decision may have removed the *Illinois*

*Brick* barrier, but it not did address the separate bar posed by *AGC*.

I note there is a Seventh Circuit case cited by plaintiffs, *Loeb Industries vs. Sumitomo*, 306 F.3d 469, at page 18 of their opposition, where the court found that *Illinois Brick* may have posed no bar to of plaintiffs, but they still lacked standing under *AGC*.  That was in the scrap copper market.

So our prior motion solely concerned *Illinois Brick*.  That was the motion that was directed to Judge Conti.  *AGC* was never mentioned a single time in that briefing and in argument, and conversely, the papers here don't address *Illinois Brick*. These are separate inquiries.

Now, the record with respect to market participation we would argue is undisputed.  Plaintiffs essentially concede on page 13 of their opposition that the linchpin of our argument is true, that they have not shown either cross elasticity of demands --

**THE COURT:**  You don't need to spend any time on that. No one is talking about -- they're not talking about it.  It's just not -- it's something that will receive little, if any, discussion in whatever order is issued.

**MR. YOLKUT:**  I appreciate that, Your Honor.  We do think it is appropriate with respect to how they satisfy the market participation test.

1    So plaintiffs, instead of looking to the *Bhan* principles,

2    the reasonable interchangeability, they instead say that

3    because the markets are purportedly woven together,

4    inextricably linked, therefore, they have satisfied their

5    burden on summary judgment.

6    We would suggest that they have completely misread the

7    case law that established that narrow exception to the market

8    participant standard, which is the *McCready* case, Supreme Court

9    1982 case, 457 U.S. 465, and the Ninth Circuit's *Ostroff* case.

10   Those cases stand for a very limited principle that antitrust

11   standing can be conferred on consumers -- on plaintiffs that

12   are neither consumers nor competitors in the relevant market if

13   they can show they are the direct victim of the conspiracy or

14   the actual means by which the conspiracy was effectuated.

15   We would submit that plaintiffs haven't shown that either

16   exception is met here, and we would start with the *McCready*

17   decision.

18   *McCready* was a case in which the plaintiff was a health

19   plan subscriber who sued Blue Shield, her health plan provider,

20   for refusing to reimburse subscribers of psychologists.  The

21   allegations were that Blue Shield acted in concert with

22   psychiatrists to harm the psychologists.  *McCready* stood

23   directly in the middle of that harm.  Without injuring

24   subscribers, such as Plaintiff McCready, by not reimbursing

25   them for psychotherapy services by psychologists, there was no

1    conspiracy.

2         By contrast here, the indirect purchaser retailers always

3    stand several levels removed from the manufacturer price

4    fixers.  That's the plaintiffs' words on their opposition at

5    page 15.  And what's more, we have many deposition testimony

6    that the plaintiffs did not act in the relevant market.  They

7    admitted during their depositions that they didn't know the

8    identity of the tube maker, not the price, not the

9    specifications.  None of these things mattered to them.

10        And the reason that's important is that because there are

11   other purchasers that bought CRT tubes from defendants or

12   subsidiaries directly.  These include Sharp, IBM, many members

13   of the direct purchaser class.  It is these companies that --

14        **THE COURT:**  I want to go back to something I asked you

15   earlier.  I asked you if ruling in your favor required me to

16   reconsider or reject any of Judge Conti's prior rulings, and

17   you said -- you referred to a summary judgment ruling in which

18   he didn't address *AGC*, and I think my question was not

19   sufficiently specific.

20        In Footnote 3 of the plaintiffs' opposition, they refer to

21   Judge Conti's prior rulings on this question of *AGC*, and in

22   those orders -- and, by the way, were I writing those orders, I

23   don't think I would have used the word *valueless*, which creates

24   some other problems.  I don't think that's actually what

25   Judge Conti meant.

1    But my question is with regard to those orders, would

2    ruling in your favor require this Court to reconsider or reject

3    them?

4        **MR. YOLKUT:**  Thank you, Your Honor.  We don't believe

5    so.

6        To be clear, Judge Conti allowed DAPs' claims to survive a

7    motion to dismiss and noted that the antitrust injury factor

8    only slightly favored standing with respect to the pleading

9    stage.  Judge Conti therefore declined to issue an order that

10   Special Master Legge had actually ruled on in our favor in this

11   case with respect to five of the state laws that had previously

12   been at issue.

13       Now, the reason that we don't believe that Judge Conti's

14   motion to dismiss ruling is applicable here is because he was

15   dealing with the question of the pleadings rather than the

16   evidence, and, again, we don't believe that plaintiffs have

17   shown any inextricably intertwined injuries, which is what the

18   *McCready* case requires.  Inextricably intertwined injuries

19   rather than inextricably intertwined markets, which is what

20   Judge Conti had previously looked at.  That is what the *GPU*

21   case looked at.  That is what *LCD* looked at.  That is what

22   *Batteries* looked at.  We would submit that all of these courts

23   got it wrong.  *DRAM*, which is extensive, careful, and learned,

24   in the words of the *Batteries* court --

25       **THE COURT:**  Also lonely, but I take your point.

1     **MR. YOLKUT:**  So with respect to -- with respect to

2   Judge Conti's decision, we don't believe that the pleading

3   stage ruling necessarily still applies right now.  It was not

4   as dispositive or definitive as plaintiffs might have it.  It

5   was a pleading stage order.

6        And, again, none of these sister court decisions are

7   per -- are necessarily controlling on Your Honor.  We need --

8   you would need to look to the *Bhan* case, the *American Ad*

9   *Management* case, Ninth Circuit opinion that would be

10   controlling.

11        And here is why we think that Chief Judge Hamilton's

12   decision in *DRAM* got this exactly right.  I won't belabor the

13   point, but in that case, Judge Hamilton twice found that

14   plaintiffs who bought products containing the DRAM chips rather

15   than DRAM itself purchased in a secondary market, and she

16   rejected the same argument that is posed by plaintiffs here on

17   extreme allegations of interdependence that even surpassed

18   those that are found here.

19        **THE COURT:**  In what ways did they surpass them?  In

20   the percentage for the underlying product as --

21        **MR. YOLKUT:**  Well, for example --

22        **THE COURT:**  Excuse me.

23        **MR. YOLKUT:**  Sorry.

24        **THE COURT:**  I know our time is limited.  And

25   Ms. Batalo is a very good court reporter, but she's incapable

1    of taking down two people at once.

2         My question is, is that because the percentage of the

3    finished product comprised of the underlying price-fixed

4    component is larger in *DRAM*?

5         **MR. YOLKUT:**  No, Your Honor.  I was pointing to a

6    separate allegation that increases in the price of DRAM lead to

7    quick, corresponding increases at the OEM and retail levels for

8    computers.  We don't have evidence on this record of any

9    increases in the price of CRT leading to quick corresponding

10   increases at the finished products level.

11        **THE COURT:**  But don't we have deposition testimony --

12   and I'm sorry; I don't have it at my fingerprints -- that the

13   price paid for the CRT might be more than 50 percent of the

14   total price of the finished propertied?

15        **MR. YOLKUT:**  We would actually note, Your Honor, the

16   record is frankly all over the map on this point if you look

17   at --

18        **THE COURT:**  Yes.  I know.  It's summary judgment.

19   It's not trial.

20        So the record gets to be all over the map.  It's only when

21   it's not all over the map, that's when summary judgment gets

22   granted.  Is the answer to my question that there is such

23   evidence in the record?

24        **MR. YOLKUT:**  There is evidence that the CRT goes from

25   anywhere from 33 percent to, I believe, 60 percent of the

1  finished product.  That's in the record.

2       Now, we would also note that the allegations in some of

3  these other cases, not just *DRAM* but *Flash*, for example, are

4  also different.  *Flash* -- the Court found cross-elasticity of

5  demand between the flash memory and the products containing the

6  flash memory.

7       And some of the cases, frankly, are rather cursory.  The

8  *GPU* case did not cite any of the governing market participation

9  requirements of the Ninth Circuit.  And the *Batteries* court

10  again noted that some of these courts simply refused to engage

11  in the *DRAM* analysis.

12       Now, *LCD* is the only decision that we're aware of that

13  applied the inextricably linked markets theory as opposed to

14  inextricably linked injuries, which is the *McCready* exception

15  on summary judgment.  But we would submit that Judge Illston

16  misapplied that narrow exception because she looked only at

17  will markets rather than injuries.

18       There is a CF citation to *McCready* in Judge Illston's

19  summary judgment opinions, but no analysis that shows how the

20  *LCD* plaintiffs' injuries mirrored those found in *McCready*.

21       I will reserve the rest of my time, Your Honor.

22            **THE COURT:**  Thank you.

23            **MR. RANDALL:**  If I may begin.  Samuel Randall, Your

24  Honor, from Kenny Nachwalter.  I represent Sears and K-Mart,

25  and I'm speaking on behalf of all retailers with respect to the

Sherman Act claims.

I would like to reserve a minute or two for Ms. Moore to speak on the issue of the application to the Costco's California claim --

**THE COURT:**  Okay.

**MR. RANDALL:**  -- the at end.

We have three points, Your Honor, as to why the defendants' construction of standing is wrong in this case.

First, the injury that we're seeking to recover on is precisely the type of injury that the antitrust laws are designed to protect against.

Second, the case law, including the law of this case, compels the conclusion that the retailers in this case have standing under the Sherman Act.

And third, it would promote sound policy and indeed the purpose of the Sherman Act to give retailers standing in this case.  So for all of those reasons, we -- the defendants arguments in this case is just wrong.

Now, the defendants have limited their discussion of *Associated General Contractors* to the antitrust injury prong of the analysis so they're not proceeding on directness or the speculative nature of the harm or duplicative recovery issues.  They are effectively conceding that those prongs of the analysis don't need to be discussed by the Court.

Now, what we're talking about here is a concrete antitrust

1    injury.  The retailers in this case purchased approximately $16

2    billion of products from entities that were only controlled by

3    the cartel subject to the same ownership and control as cartel

4    entities that were not priced competitively because of this

5    conspiracy.  That is approximately 50 percent of all CRT

6    product purchases that the retailers made.  So we're talking

7    about $16 billion in commerce that the defendants are asking

8    this Court to exempt from application of the Sherman Act.

9           THE COURT:  Can I make sure that I'm following you?

10   There's $16 billion that was purchased by entities owned or

11   controlled by the defendants, and so those purchases come

12   within the ownership and control exception.  And then there is

13   $16 billion that wasn't purchased from such entities.

14          MR. RANDALL:  Correct, Your Honor.  So the retailers

15   in this case purchased $16 billion of finished products from

16   owned and controlled entities where they are proceeding on the

17   *Illinois Brick* exception.  There is then another $16 billion of

18   commerce that we are not seeking to --

19          THE COURT:  Why is that a good policy argument?

20   Because anytime someone buys some things that is subject

21   to ownership -- the ownership control is an exception.

22      Anyway, I guess what I'm saying is just the fact that it's

23   a lot of money doesn't mean that --

24          MR. RANDALL:  What we are talking about -- the point

25   is the percentage of the market.  We're talking about 50

1   percent of the CRT market in the United States --

2          **THE COURT:**  Yes.

3          **MR. RANDALL:**  -- that would not be subject to

4   antitrust regulation.

5          **THE COURT:**  Yes.

6          **MR. RANDALL:**  -- if we were denied standing.  The

7   defendants make the point that there are upstream entities that

8   are capable of vindicating the Sherman Act, like Dell and

9   Sharp, but -- so we're talking about this $16 billion of

10  commerce where in the distribution chain, Dell and Sharp, for

11  all intents and purposes, don't exist.  So 50 percent of the

12  market would be exempt from regulation under the antitrust

13  laws --

14         **THE COURT:**  I take your point.

15         **MR. RANDALL:**  Thank you, Your Honor.

16     (Continuing) -- if the defendants standing argument were

17  accepted.

18     Now, every single -- tens of millions of dollars of

19  products -- every single one of these sales of CRTs at super

20  competitive levels and CRT products at super competitive levels

21  is, in the words of the Supreme Court, a blow to the free

22  enterprise system that builds our free -- that builds our

23  economy.

24     The purpose of the antitrust laws is to deputize private

25  attorneys general to vindicate those interests.  And so under

1    the antitrust injury prong, the question is, is that an injury

2    that the Sherman Act and the federal antitrust laws are

3    designed to protect.

4         In this case, we're talking about an overcharge resulting

5    from a horizontal agreement among competitors to fix prices.

6    That's exactly the type of injury that the antitrust laws are

7    designed to protect.

8         So based on that simple question, we do have antitrust

9    standing because we are seeking to vindicate an injury

10   recognized and protected by the Sherman Act.

11        Now, as Your Honor described it, the one case the

12   defendants are relying on is very lonely.  And we would submit

13   that the *DRAM* case is not still good law after the Supreme

14   Court's decision until *Lexmark*.

15        Basically all the cases that have reached this issue, save

16   for *DRAM*, have determined that the purchasers of finished

17   products that include a price-fixed component, have an

18   inextricably intertwined injury.  *DRAM* is really the notable

19   outlier here.

20        Judge Hamilton's concern in *DRAM* was that we are going --

21   if we recognize the -- if we give standing to finished-product

22   purchasers, we are going to open up the floodgates to antitrust

23   litigation because every market services another.  That's her

24   concern.

25        In *Lexmark*, the Supreme Court dealt with exactly that type

of case.  *Lexmark* makes printer cartridges, and there is a whole secondary market of people who try to manufacture cartridges that are compatible with Lexmark computers.  Static Control, the plaintiff in the case, manufactured a component of like a chip for these printer cartridges.

Prior to *Lexmark*, the Ninth Circuit, under the Lanham Act, had a direct competitor requirement.  You had to be an actual competitor to bring -- of the -- of the -- of the defendant to bring a claim under the Lanham Act.  So the Ninth Circuit had this bright-line room limiting standing under *Associated General Contractors*.

The Supreme Court rejected that and said that the fact that -- that static control is in a market that services the Lexmark market, the Lexmark printer market is not a barrier to standing under the Lanham Act because you can't -- is not a barrier to standing period because -- the question is proximate causation.  Does the plaintiff have an injury that was proximately caused by the defendants' conduct?

And so this bright-line rule that the defendants are applying here is just -- it's not good law, and Judge Hamilton's analysis doesn't survive *Lexmark* because you are dealing in that case with a secondary market that services the primary market.  So the Supreme Court clearly isn't concerned by this, and so there's no way to -- to -- for Judge Hamilton's analysis and the concern that she has to survive *Lexmark*.

1    Now, on top of that, it's -- even before *Lexmark*,

2    Judge Conti, as Your Honor acknowledged, entered a ruling on

3    the August 21, 2013 Docket Entry 1856 in the MDL where he used

4    the *virtually valueless* language.  And that was sort of a

5    corollary to Judge Illston's summary judgment opinion involving

6    basically the same parties here, a number of the same

7    defendants, and the same retailers that are subject to this

8    motion.  Judge Illston used the language *no independent*

9    *utility*, and I think they are sort of synonymous.

10         **THE COURT:**  I think that second phrasing more

11   accurately captures the concept.

12         **MR. RANDALL:**  I would agree, and I understand what

13   Judge Conti is referring to.

14         **THE COURT:**  So do I.

15         **MR. RANDALL:**  It's there by themselves having no

16   purpose, but they do have value.

17         So I think we've made that showing.  I don't think the

18   defendants dispute that CRTs by themselves have no independent

19   utility, that, you know, there's no purpose for them in the

20   market if they're not incorporated into televisions or computer

21   monitors.

22         On top of that, the defendants -- Judge Conti said that so

23   long as the overcharge on the finished product is traceable in

24   some way to the overcharge on the component, on the price-fixed

25   component, then you would have a showing of inextricably

1    intertwined injury.

2        We have made exactly such a showing.  The retailers'

3    primary damages expert, Dr. Allan Frankel, traces the

4    overcharge on the CRT to the overcharge paid by the retailers

5    for the finished products.  He makes a clear temporal link

6    based on record evidence that the overcharge on a finished

7    product occurs one quarter after the overcharge on the

8    component.  That's how long it takes for the product to be

9    assembled and be sold to a retailer.

10        The defendants do not challenge Dr. Frankel's analysis on

11   *Daubert* grounds, so I don't think there is any dispute at this

12   stage --

13           **THE COURT:**  I was also interested in some deposition

14   testimony that the plaintiffs put in front of the Court about a

15   recognition on the part of the CRT manufacturers that they had

16   to do things so that the price could be incorporated in the

17   finished good.

18           **MR. RANDALL:**  That's right, Your Honor.

19           **THE COURT:**  They had to give them notice *we are going*

20   *to raise the price in this way so you can raise your prices in*

21   *that way*.

22           **MR. RANDALL:**  That's right, Your Honor.  I think the

23   evidence shows and the evidence we've cited in our motions

24   shows that the CRT manufacturers were tracking straight prices

25   so that because -- you know, they recognize that without --

1    without the retailers to buy these products, that there would

2    be no market.  If you didn't have a consumer of these products,

3    there would be no market.

4         And that's actually the same result reached recently in

5    two cases from the Southern District of New York by Judge

6    Forrest, both antitrust cases that were decided after briefing

7    finished in this case.  The first is *In Re Aluminum*

8    *Warehousing*.  And they're essentially companion cases, as

9    similar as *LCD* and *CRT*, I think, where you had a group of

10   banks, the commodity trading arms of banks, that were using

11   their control over warehousing for aluminum and zinc.  They

12   were manipulating these indexes, these indices, that were used

13   to price aluminum and zinc respectively.

14        And so the plaintiffs in this case didn't actually

15   purchase directly -- for the most part, did not purchase

16   directly from the defendants, the conspirators, who were

17   manipulating the price, but they were the first-level

18   purchasers of zinc and aluminum in the real world.

19        And so even without an *Illinois Brick* analysis, Judge

20   Forrest determined that that was sufficient for *Associated*

21   *General Contractors*' purposes, that these -- these first-level

22   purchasers, which is what the retailers are in this universe of

23   claims, was -- had suffered a concrete injury, and without the

24   injury suffered by these first-level purchasers, there would be

25   no -- the conspiracy would not have operated.

And so that's -- it's the same -- zinc and aluminum are directly on point in this regard, that without a market for CRT products by consumers and by retailers, this conspiracy just would not have worked because no one would have bought these products.

On top of that, the issue -- the defendants make a big deal about the varying percentage of the finished products CRT that -- CRT product that the CRT makes up, and it does vary. But that's not a barrier here because Dr. Frankel's analysis does account for that. The injury is very directly traceable in this case based on sound economic practices because when a retailer buys a CRT product, they're --

**THE COURT:** You might want to let your colleague come and take her two minutes.

**MR. RANDALL:** I think I will. I will pass the mic. Thank you, Your Honor.

**THE COURT:** Thank you.

**MS. MOORE:** Good morning, Your Honor. Corie Gordon Moore with Perkins Coie for Costco.

A very brief point, and that is Costco's California law claim under the Cartwright Act is the only remaining state law claim that is the subject to this motion. But assuming that California follows the federal antitrust injury test as to the Cartwright Act claim, the result is the same for the reasons identified by my colleague, and that is that Costco's antitrust

1    injury and Costco's participation in the market is the same

2    whether its claim is being pursued under federal law or under

3    the Cartwright Act.

4         So for purposes of this motion, the California law claim

5    should be denied for the same reasons the federal law claim

6    should be denied.

7         **THE COURT:**  I'm doing this from memory.  I don't have

8    this in my notes so if I get this wrong, you will tell me.

9         It's Ms. Moore; is that correct?

10        **MS. MOORE:**  That is correct.

11        **THE COURT:**  Ms. Moore, my recollection is that your

12   opponents cite a decision by my colleague, Judge Gonzalez

13   Rogers, to the effect that California would not follow the same

14   rule, and you don't like that case and you give some reasons

15   why I shouldn't do the same thing Judge Gonzalez Rogers did.

16        My question is do you have friends within the district or

17   within other districts within the circuit that have said

18   that -- well, I guess it would have to be within one of the

19   California districts -- that have said that the California

20   Supreme Court would follow the rule that Judge Gonzalez Rogers

21   rejected?

22        **MS. MOORE:**  Well, first, my first response to that is

23   I don't think you need to decide that because I think even if

24   the California courts would follow the federal -- the federal

25   standing, the same result as to the California claim should

1  occur.  However, I'm not aware of the California Supreme Court

2  saying that, yes, we're going to follow federal law on

3  antitrust injury and apply it to claims under the Cartwright

4  Act.

5          THE COURT:  Very good.  Thank you.  Rebuttal?

6          THE CLERK:  You have three minutes.

7          MR. YOLKUT:  I'm going to try to make four points in

8  three minutes.

9      With respect to whether there is significant commerce that

10  has fallen outside of the Sherman Act, we think that that is --

11  that -- that the Supreme Court in *AGC* has made a policy

12  decision --

13          THE COURT:  Just remember it's not how fast you talk.

14  It's how fast she can type, because I'm going to read the

15  transcript.  Go ahead.

16          MR. YOLKUT:  That the Supreme Court in *AGC* made the

17  policy decision that some injuries are too remote for purposes

18  of the federal antitrust laws --

19          THE COURT:  Seriously, you have to slow down.  I said

20  it in gentle way.  You can't talk that fast.

21          MR. YOLKUT:  We aren't creating a huge gap in

22  enforcement here as plaintiffs would have it in their first

23  point because the direct purchasers of the CRT tube, such as

24  Sharp, HP, IBM and many others, are already providing a

25  deterrence function as private plaintiffs.

1    There are also various state attorneys general in Oregon

2    Washington, California, and elsewhere that have also brought

3    actions which serve as a further deterrence.  There is also, of

4    course, the potential criminal deterrence, and that's exactly

5    what happened in the *DRAM* case where there were over a billion

6    dollars in settlements in criminal fines with respect to direct

7    purchasers.

8    With respect to whether *DRAM* is lonely or not, the *Lexmark*

9    case -- it was really not cited, frankly, in plaintiffs'

10   briefing.  This is a new argument.  But we think that the

11   *Lexmark* case, which is a Lanham Act case, actually supports us

12   because it collapses the *AGC* inquiry into whether or not there

13   was a zone of interest with respect to statutory standing and

14   whether there is proximate causation.  We would submit that

15   plaintiffs have shown neither because of the policy directives

16   of *AGC*.

17   With respect to Judge Forrest decision, we would submit

18   again this is not controlling on Your Honor.  It's an SDNY

19   decision.  We also think that it's distinguishable on its

20   facts.  There the plaintiffs were found to meet the *McCready*

21   exception because plaintiffs were the central -- they are the

22   fulcrum to the creation of the market opportunity underlying

23   both metal storage and warrant trading for aluminum, which

24   is -- which is different from the plaintiffs here, whereby we

25   have an alleged conspiracy that could have been fully effective

1    without the presence of the retailer plaintiffs further down

2    the line.

3         Finally --

4              **THE COURT:**  That's interesting.

5         Mr. Noble, add a minute.

6         How is that possible?  Do you mean to tell me it would

7    be -- you just said, "We have an alleged conspiracy that could

8    have been fully effective without the presence of the retailer

9    plaintiffs further down the line."  How?

10             **MR. YOLKUT:**  Yes, Your Honor.  Because the plaintiffs

11   have withdrawn any allegations in a CRT finished products

12   conspiracy.  The conspiracy, the alleged conspiracy, took place

13   in the primary CRT tube market, and therefore there could have

14   been zero pass-through, but yet conspiracy could have been a

15   hundred percent effective in that market, which is a

16   significant market, and we would point to Exhibit 4 of

17   defendants' -- defendants' declaration, which is Professor

18   Ordover's analysis with respect to the complex chain of the CRT

19   tubes, and you will see that there are many purchasers that

20   come well before the retailer plaintiffs.

21        And finally with -- sorry if I'm going to too fast.  With

22   respect to the Cartwright Act claim, we would submit that

23   Judge Conti has already found that *AGC*'s standing principles

24   applies to the Cartwright Act claim, notwithstanding the

25   *Batteries* case because the *Batteries* case only looked to a 2013

1   decision *Aryeh*, but the *Aryeh* decision didn't concern antitrust

2   injury or *AGC* in any way.  It only questioned whether or not

3   federal interpretations of standing -- it said that it is

4   instructive but not conclusive, but *Aryeh* didn't cite *AGC*,

5   whereas we have an intermediate appellate authority from

6   California which does in fact cite *AGC* with respect to indirect

7   purchaser claims.

8        And I would submit on that, Your Honor.

9        **THE COURT:**  Thank you very much.  Well, as always, the

10  arguments in this case are very interesting.  Thank you.  Both

11  of these motions are now under submission.

12                   (Proceedings adjourned at 11:14 a.m.)

13

14

15                   CERTIFICATE OF REPORTER

16        I certify that the foregoing is a correct transcript

17  from the record of proceedings in the above-entitled matter.

18

19  DATE:   Monday, January 25, 2016

20

21  *Pamela A. Batalo*

22  _____
    Pamela A. Batalo, CSR No. 3593, RMR, FCRR
    U.S. Court Reporter
23

24

25