1  MARTIN QUINN
2  JAMS
   Two Embarcadero Center
   Suite 1500
3  San Francisco, CA 94111
   Phone:  415-982-5267
4  Fax:  415-982-5287

5

6  SPECIAL MASTER

7

8                     UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11

12

13  In re: CATHODE RAY TUBE (CRT)          Master File No. 3:07-cv-5944 JST
14  ANTITRUST LITIGATION.
                                           MDL No. 1917
15

16  This Document Relates to:              REPORT AND RECOMMENDATION OF
                                           SPECIAL MASTER RE MOTIONS (1) TO
17  All Indirect-Purchaser Actions.        APPROVE INDIRECT PURCHASER
                                           PLAINTIFFS' SETTLEMENTS WITH
18                                         THE PHILLIPS, PANASONIC, HITACHI,
                                           TOSHIBA, SAMSUNG SDI,
19                                         TECHNICOLOR, AND TECHNOLOGIES
                                           DISPLAYS AMERICAS DEFENDANTS,
20                                         AND (2) FOR AWARD OF ATTORNEYS'
                                           FEES, REIMBURSEMENT OF
21                                         LITIGATION EXPENSES, AND
                                           INCENTIVE AWARDS TO CLASS
22                                         REPRESENTATIVES
23

24

25

26

27

28

                                        i

## TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................... 1

II.  REFERENCE TO THE SPECIAL MASTER ........................................................... 3

III.  SUMMARY OF CONCLUSIONS .......................................................................... 4

IV.  FACTUAL AND PROCEDURAL HISTORY .......................................................... 5

    A.  Litigation History ........................................................................................... 5

    B.  Department of Justice Activity ....................................................................... 8

    C.  Other Regulatory Action ................................................................................ 8

    D.  Settlement Activity .......................................................................................... 9

    E.  Procedures Before the Special Master ........................................................... 10

V.  TERMS OF SETTLEMENT AGREEMENTS ........................................................ 13

VI.  CERTIFICATION OF SETTLEMENT CLASS ...................................................... 17

VII.  APPROVAL OF PROPOSED SETTLEMENTS ..................................................... 21

    A.  Fairness of Compensation to Class ................................................................ 21

        1.  Strength of IPP's Case ............................................................................ 22

        2.  Risk, Expense and Complexity of the Litigation ................................... 22

        3.  Amount Offered in Settlement ............................................................... 24

        4.  Extent of Discovery and Stage of Proceedings ..................................... 25

        5.  Experience and Views of Lead Counsel ................................................ 25

        6.  Government Participation ........................................................................ 26

        7.  Reaction of Class Members to the Proposed Settlements ...................... 28

        8.  The Proposed Settlements are Fair, Reasonable and Adequate .............. 29

    B.  Fairness of Allocation Plan ............................................................................. 29

        1.  Summary of Allocation Plan ................................................................... 30

        2.  Treatment of Class Members in the Non-Repealer States ..................... 31

        3.  Treatment of Class Members in Omitted Repealer States: Massachusetts, Missouri, New Hampshire ................................................................................................. 39

4. The Plan of Allocation with Regard to the Members of the Nationwide Class Who Are Not Members of the Indirect Purchaser State Classes is Fair, Adequate and Reasonable ........................................................................................... 41

5. Objections to Plan of Allocation Based on Chunghwa Settlement ............................. 42

C. Reasonableness of Notice Plan ............................................................................. 47

D. Other Objections to Approval ............................................................................... 51

1. Objection Based on Perceived Strength of State Laws ............................................. 51

2. Objections based on Inadequate Representation ........................................................ 52

VIII. APPROVAL OF REQUEST FOR ATTORNEYS' FEES ........................................... 53

A. Request for Attorneys' Fees ................................................................................. 53

B. Methodology for Reviewing Request .................................................................... 54

C. Legal Standards for Approval ............................................................................... 56

1. Results Achieved for the Class, Including Non-Cash Benefits ................................. 56

2. Risk, Expense and Complexity of Case .................................................................... 59

3. Quality of Representation, Plaintiff and Defense ..................................................... 60

4. Contingent Nature of Fees ........................................................................................ 66

5. Fees Awarded in Comparable Cases ......................................................................... 67

D. Lodestar Comparison ............................................................................................ 70

1. Billing Rates ............................................................................................................. 70

2. Hours ......................................................................................................................... 70

IX. APPROVAL OF REQUEST FOR LITIGATION EXPENSES .................................. 74

X. APPROVAL OF INCENTIVE AWARDS TO CLASS REPRESENTATIVES ........ 75

XI. CONCLUSION ...............…………….....………………………………………………76

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Aikens v. Microsoft Corp.*, 159 Fed. Appx. 471 (4th Cir. 2005)....................................................36

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997)................................................17, 19, 20

*Banas v. Volcano Corp.*, 47 F.Supp. 3d 957 (N.D.Cal 2014)........................................................70

*Bayat v. Bank of the W.*, 2015 WL 1744342 (N.D.Cal. Apr. 15, 2015) .......................................24

*Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245 (N.D.Cal. 2015) ......................................25

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980)..........................................................................53

*Booth v. Strategic Realty Trust, Inc.*, No. 13-cv-04921, 2015 WL 6002919 (N.D.Cal. Oct. 15,
     2015) ........................................................................................................................................37

*Ching v. Siemens Indus.*, Inc., 2014 WL 2926210 (N.D.Cal. June 27, 2014) .............................23

*Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 556 (9th Cir. 2004)................................................21

*Class Plaintiffs v. Seattle*, 955 F.2d 1268 (9th Cir. 1992) ..........................................................22

*Comcast v. Behrend*, 133 S.Ct. 1426 (2013)................................................................................59

*Ehrheart v. Verizon Wireless*, 609 F.3d 590 (3d Cir. 2010) .......................................................13

*Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15 (N.D.Cal. 1980) <u>aff'd</u>, 661 F.2d 939 (9th Cir.
     1981) ...........................................................................................................................21, 25, 28

*Fischer v. Equitable Life Assur.* Soc., 307 F.3d 997 (9th Cir.2002)............................................55

*Garner v. State Farm Mutual Automobile Ins. Co.*, 2010 WL 1687832 (N.D.Cal. Apr. 22, 2010)
     ..................................................................................................................................................26

*Gutierrez v. Wells Fargo Bank*, 2015 WL 2438274 (N.D.Cal. May 21, 2015)...................68, 74

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir.1998) ...........................................................53

*Hensley v. Echerhart*, 461 U.S. 424 (1983)................................................................................56

*Hopson v. Hanesbrands Inc.*, 2009 WL 928133 (N.D.Cal. Apr. 3, 2009) ..................................53

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ...............................................................passim

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011).........................passim

*In re Cendant Corp PRIDES* Litig., 243 F.3d 722 (3d Cir. 2001)................................................68

*In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330 (S.D.Fla. 2011)......................67

*In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 115 (N.D.Cal. 2001) ...................................... 29

*In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 1179 (N.D.Cal. 2009).............................. 36

*In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297 (N.D.Ga. 1993)...................... 50, 67

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, Master File No. M-02-1486-PJH (MDL No. 148) .................................................................................. passim

*In re Flash Memory Antitrust Litig.*, 2010 W.L. 233208 (N.D.Cal.June 9, 2010) ...................... 60

*In re General Motors Corp.*, 55 F.3d 768 (3d Cir. 1995)........................................................ 29

*In re Google Referrer Header Privacy Litig.*, 87 F. Supp. 3d 1122 (N.D.Cal. 2015) ........... 27, 48

*In re Graphics Processing Antitrust Litig.*, 253 F.R.D. 478 (N.D.Cal. 2008) ........................... 60

*In re Groupon Mktg. Sales Practices Litig.*, 593 Fed. App. 699 (9th Cir.2015) ........................ 46

*In re Heritage Bond Litig.*, 2005 WL 1594403 (C.D.Cal. June 10, 2005) ................................. 29

*In re High-Tech Employees Antitrust Litig.*, 2015 WL 5158730 (N.D.Cal. Sept. 2, 2015) .................................................................................................................. 68, 69, 74

*In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305 (3d Cir. 2008)................................. 17

*In re Initial Pub. Offerings Secs. Litig.*, 471 F.3d 24 (2d Cir. 2006).............................................. 17

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir.2009).......................................... 19

*In re IPO Secs. Litig.*, 672 F. Supp. 2d 467 (D. Del.2009)....................................................... 67

*In re K-Dur Antitrust Litigation*, No. CIV.A. 01-1652 (JAG), 2008 WL 2660780 (D.N.J. Feb. 28, 2008) ................................................................................................................ 36

*In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619 (E.D. Pa. 2004)...................................... 28

*In re LinkedIn User Privacy Litig.*, 2015 WL 5440975 (N.D.Cal. Sept. 15, 2015).................... 26

*In re Lloyds' Am. Trust Fund Litig.*, 2002 WL 31663577 (S.D.N.Y. Nov.26, 2002)................. 29

*In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21 (1st Cir.2012)................................. 28

*In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.d. 465 (S.D.N.Y. 1998) .................. 23, 68

*In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F.Supp.2d 160 (D.Me.2004). 36

*In re Omnivision Technologies, Inc.*, 559 F.Supp.2d 1036 (N.D.Cal. 2008)....................... passim

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934 (9th Cir.2015) ............................... 50, 54

*In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311 (N.D.Cal. 2014) ............................... 60

*In re PaineWebber Inc. Ltd. Partnerships Litig.*, 117 F.3d 721 (2d Cir.1997) .......................... 26

*In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104 (S.D.N.Y.1997) ................... 26, 29

*In re Pet Food Products Liab. Litig.* 629 F.3d 333 (3d Cir. 2010).......................... 13, 19

*In re Rail Freight Fuel Surcharge Antitrust Litig.*, 735 F.3d 244 (D.C. Cir. 2013) ................... 59

*In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005) ........................................ 52

*In re Superior Beverage/Glass Container Consol. Pretrial*, 133 F.R.D. 119 (N.D.Ill. 1990)..... 23

*In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078 (N.D.Cal. 2007).................................. 29

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 2790179 (N.D.Cal. July 12, 2011)......36

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 7575004 (N.D.Cal. Dec. 27, 2011)..... 29

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900 (N.D.Cal. Apr. 3, 2013) ........70

*In re TracFone Unlimited Serv. Plan. Litig.*, 2015 WL 4051882 (N.D.Cal. July 2, 2015)......... 12

*In re Vitamins Antitrust Litig.,* 2000 WL 1737867 (D.D.C. Mar. 31, 2000) ............................... 29

*In re Vitamins Antitrust Litig.*, 2001 WL 34312839 (D.D.C. July 16, 2001) .......................... 67

*In Re: Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F.Supp.2d 1011 (N.D.Cal. 2010)............ 15

*Keirsay v. eBay, Inc.*, 2014 WL 644738 (N.D.Cal., Feb. 18, 2014) ........................................... 54

*Kerr v. Screen Actors Guild,* Inc., 526 F.2d 67 (9th Cir.1975)..................................................... 55

*Klee v. Nissan N. Am., Inc.,* 2015 WL 4538426 (C.D.Cal. July 7, 2015)..................................... 41

*LaGarde v. Support.com, Inc.,* 2013 WL 1283325 (N.D.Cal. Mar. 26, 2013) ............................ 23

*Larsen v. Trader Joe's Company,* 2014 WL 3404531 (N.D.Cal. July 11, 2014) ........................ 25

*Masters v. Wilhelmina Model Agency, Inc.,* 473 F.3d 423 (2d Cir.2007) ............................ 27, 28

*McGee v. China Electric Motor, Inc.,* slip opn. at p. 6, No. 13-56903, Jan. 15, 2016 ......... passim

*Moore v. Verizon Communications, Inc.,* 2013 WL 4610764 (N.D.Cal. Aug. 28, 2013) ........... 76

*Motorola Mobility LLC v. AU Optronics Corp.,* 775 F.3d 816 (7th Cir. 2015) .......................... 60

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523 (C.D.Cal.2004) ............. 21, 28

*Nguyen v. Radient Pharmaceuticals Corp.*, 2014 WL 1802293 (C.D.Cal. May 6, 2014)
....................................................................................................................................... 34, 37, 38

*O'Bannon v. Natl. Collegiate Athletic Assn.*, 2015 WL 4274370 (N.D.Cal.July 13, 2015)
....................................................................................................................................... 70, 73

*Officers for Justice v. Civil Serv. Comm'n of the City and Cnty. of San Francisco*, 688 F.2d 615
     (9th Cir. 1982)............................................................................................ 21, 22, 29

*Parker v. Time Warner Entm't Co., L.P.*, 631 F. Supp. 2d 242 (E.D.N.Y. 2009) ................ 34, 37

*Rannis v. Recchia*, 380 Fed.Appx. 646 (9th Cir. 2010) ........................................................ 47

*Rodriguez v. Disner*, 688 F.3d 645 (9th Cir.2012) ............................................................... 13

*Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir.2009) ....................................... 25

*Sickles v. Cabot Corp.*, 877 A.2d 267 (N.J.Super.Ct. 2005)................................................. 36

*Silber v. Mabon*, 18 F.3d 1449 (9th Cir. 1994)............................................................. 47, 49

*Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301 (9th Cir. 1990).......................... 54

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir.2003) .............................................................. 13

*Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir.2011) ...................................... passim

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives and Composites, Inc.*, 209 F.R.D. 159
     (C.D.Cal. 2002)..................................................................................................... 20

*Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370 (9th Cir. 1993)............................................ 22

*United States v. Keyspan Corp.*, 763 F. Supp. 2d 633 (S.D.N.Y. 2011) .................................... 36

*United States v. Or. State Med. Soc'y*, 343 U.S. 326 (1952) ................................................... 35

*United States v. Oregon*, 913 F.2d 576 (9th Cir.1990) .............................................. 29, 48, 52

*Vichi v. Koninklijke Philips Elec., N.V.*, 84 A.3d 725 (Del. Ch. 2014) ................................. 58

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir.2002)........................................... passim

*Wal-Mart Stores, Inc. v. Dukes*, —— U.S. ——, 131 S.Ct. 2541 (2011) ............................. 17

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir.2005) ............................. 67, 68

*Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288 (1st Cir. 2000)................................... 20

*Wynn v. Chanos*, 2015 U.S. Dist. Lexis 80062 (N.D.Cal. June 19, 2015) ................................ 70

## Rules

Fed.R.Civ.P. 23 ................................................................................................... passim

Fed.R.Civ.P. 30(b)(6)............................................................................................... 7

Fed.R.Civ.P. 53 ........................................................................................................ 3

1

## Statutes

2   28 U.S.C. § 1715 ................................................................................................ 26

3   740 Ill. Comp. Stat § 10/7(2) ............................................................................ 14

4   15 U.S.C. § 26 .................................................................................................... 33

5   N.H. Rev. Stat. § 358-A:2 ................................................................................... 41

6   ORS § 646.775(1) ............................................................................................... 14

7

8

## Other Authorities

9   Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J.

10      Empirical L. Stud. 811, 838-839, 842-844 (2010) .................................... 67

11   "Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide,"

12      Federal Judicial Center (2010) .................................................................. 49

13   Theodore Eisenberg & Geoffrey P. Miller, *Attorneys Fees and Expenses in Class Action*

14      *Settlements: 1993-2008*, 7 J. Empirical L. Stud. 248 (2010) .................... 67

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.   INTRODUCTION

Faced with evaluating a settlement for an all-cash, no-reversion fund of $576,750,000, by all accounts the second-largest indirect purchaser settlement ever, it is tempting to wave a broad brush of approval over the terms and to humbly bless counsel's request for fees.  Instead, the Special Master has required extensive briefing, conducted oral argument, and reviewed hundreds of pages of fee and expense billings.  Faults were found, and these recommendations reflect both the features of this settlement to be applauded and those to be criticized.

Indirect Purchaser Plaintiffs ("Plaintiffs" or "IPPs") in this matter are seeking an order approving class action settlements with the Phillips,[1] Panasonic,[2] Hitachi,[3] Toshiba,[4] Samsung SDI[5] and Thomson and TDA Defendants[6] (the "Settling Defendants") totaling $541,750,000 pursuant to Rule 23(e) of the Federal Rules of Civil Procedure (the "Proposed Settlements"), which states:

> "(e) SETTLEMENT, VOLUNTARY DISMISSAL, OR COMPROMISE. The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:
>
> "(1) The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

---

[1] The settling Philips entities include Koninklijke Philips N.V. (f/n/a Koninklijke Philips Electronics N.V.), Philips Electronics North America Corporation, Philips Taiwan Limited (f/n/a Philips Electronics Industries (Taiwan), Ltd.), and Philips do Brasil Ltda. (f/n/a Philips da Amazonia Industria Electronica Ltda.)

[2] The settling Panasonic entities include Panasonic Corporation (f/k/a Matsushita Electric Industrial Co., Ltd.), Panasonic Corporation of North America, and MT Picture Display Co., Ltd.

[3] The settling Hitachi entities include Hitachi, Ltd., Hitachi Asia, Ltd., Hitachi America, Ltd., Hitachi Electronic Devices (USA), Inc., and Hitachi Displays, Ltd. (n/k/a Japan Display Inc.).

[4] The settling Toshiba entities include Toshiba Corporation, Toshiba America, Inc., Toshiba America Information Systems, Inc., Toshiba America Consumer Products, L.L.C., and Toshiba America Electronic Components, Inc.

[5] The settling Samsung entities include Samsung SDI Co. Ltd., Samsung SDI America, Inc., Samsung SDI Brasil, Ltd., Tianjin Samsung SDI Co. Ltd., Shenzhen Samsung SDI Co., Ltd., SDI Malaysia Sdn. Bhd., and SDI Mexico S.A. de C.V.

[6] The settling Thomson and TDA entities include Technicolor SA (f/k/a Thomson SA) and Technicolor USA, Inc. (f/k/a Thomson Consumer Electronics, Inc.) and Technologies Displays Americas LLC (f/k/a Thomson Displays Americas LLC).

1

2

3

"(2) If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

4

"(3) The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

5

6

7

8

"(4) If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

9

10

"(5) Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval."

11

12   Fed.R.Civ.P. Rule 23(e). Plaintiffs filed a Motion for Preliminary Approval of Class Action

13   Settlement on May 29, 2015, which the Court granted on July 9, 2015.[7] Docket Nos. 3861,

14   3906. Specifically, the Court granted Plaintiffs' motion for preliminary approval of the

15   settlement, it preliminarily certified the Settlement Class, it preliminarily found that the

16   prerequisites to a class action under Rule 23 were satisfied, it preliminarily approved the plan of

17   distribution, and it approved the form of notice. Plaintiffs then filed a Motion for Award of

18   Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards to Class

19   Representatives on September 23, 2015. Docket No. 4071.

20         If approved, these settlements will resolve all federal and state-law claims against the

21   Settling Defendants of all indirect purchasers of CRTs in the United States during the period

22   March 1, 1995 through November 25, 2007. These claims stem from an alleged conspiracy to

23   fix prices for CRT products indirectly purchased from Defendants. CRT products are defined in

24   the Settlement Agreements to mean cathode ray tubes of any type, (*i.e.*, color display tubes,

25   color picture tubes and monochrome display tubes) and products containing cathode ray tubes.

26   A CRT is a display technology used in televisions, computer monitors and other specialized

27

28   [7] This motion and court order did not include the Thomson and TDA settlement since that settlement was not entered into until June 10, 2015, after the motion for preliminary approval was filed.

1   applications. Color display tubes ("CDTs") were used to manufacture computer monitors while

2   color picture tubes ("CPTs") were used to manufacture televisions.

3        The Proposed Settlements are contingent upon the certification by the Court of a

4   Settlement Class, which, as proposed by Plaintiffs, includes a "Nationwide Class" of indirect

5   purchasers of CRT products and "Statewide Damages Classes" of indirect purchasers of CRT

6   products seeking money damages under the laws of 21 states and the District of Columbia

7   (collectively the "Settlement Class"). Approval of the Proposed Settlements also involves

8   approval of the IPPs plan of allocation.

9   **II.    REFERENCE TO THE SPECIAL MASTER**

10       On September 24, 2015, the Court, pursuant to Federal Rule of Civil Procedure 53,

11  appointed the Special Master "to supervise and preside over all 'designated post-trial matters,'"

12  including "assisting the Court with the approval of the pending settlements in the Indirect-

13  Purchaser Cases, the determination of a fair, reasonable, and adequate aggregate award of

14  attorneys' fees and the reimbursement of expenses to all plaintiffs' counsel, a fair and

15  reasonable division of the aggregate award among plaintiffs' counsel, and service awards to the

16  named plaintiffs, including any objections to these matters, and dealing with any other matters

17  that the Court may direct him to undertake." Order Appointing Special Master, pp. 2, 3 (Docket

18  No. 4077) ["Appointment Order"]. In the Appointment Order, the Court provided the Special

19  Master with the following authority under Rule 53(c): setting "the date, time and place for all

20  hearings, [] presid[ing] over hearings (whether telephonic or in-person), [] tak[ing] evidence, []

21  conduct[ing] telephonic conferences to resolve disputes arising during depositions, []

22  recommend[ing] contempt sanctions to the Court, and [] issu[ing] orders awarding non-

23  contempt sanctions, including, without limitation, the award of attorneys' fees, as provided by

24  Rules 37 and 45." *Id.*, p.5. The Court also ordered that the Special Master "file any written

25  orders, findings, and/or recommendations with the Court via the Court's Electronic Case Filing

26  ('ECF'), and that such filing "shall fulfill the Special Master's duty to serve his orders on the

27  parties." *Id.*, p.6.

28

III.   **SUMMARY OF CONCLUSIONS**

1. The Court should approve certification of the settlement class.

2. The compensation to the class is fair, reasonable and adequate.

3. The Plan of Allocation is fair, reasonable and adequate as to class members in the Statewide Damages Classes.

4. The Plan of Allocation is fair, reasonable and adequate as to class members in the Nationwide Class from non-repealer states even though they receive no monetary compensation.

5. The Plan of Allocation is fair, reasonable and adequate as to class members in the Nationwide Class from the three omitted repealer states (Massachusetts, Missouri and New Hampshire) even though they receive no monetary compensation.

6. The Plan of Allocation is **not** fair, reasonable and adequate insofar as it fails to address satisfaction of the terms of the Chunghwa settlement. Lead Counsel is directed to submit a plan that addresses how to correct the identified due process problem, what, if any, additional notice may be required, and a timeline for the Court to address this problem.

7. Notice to the class was reasonable, appropriate under the circumstances, and met due process standards.

8. All objections other than those with respect to the treatment of the Chunghwa settlement are overruled.

9. Attorneys' fees should be awarded to IPP counsel in the amount of $173,250,000, which is equal to 30% of the settlement fund. Class counsel's lodestars should be computed at current billing rates which total $90,075,076.90. Their lodestars should be reduced by 10% across-the-board to account for inefficiencies and work that did not benefit the class, which results in an adjusted lodestar of $81,067,569. The resulting lodestar multiplier is just under 2.14.

10. The request for approval of litigation expenses in the amount of $7,634,372.50 should be approved.

11.  Incentive awards should be approved in the amounts of $15,000 for the 25 court-approved Class Representatives and $5,000 for an additional 15 persons who were not approved by the court but acted as state representatives for a period of time.

## IV.   FACTUAL AND PROCEDURAL HISTORY[8]

### A.  Litigation History

Plaintiffs filed their original complaints in various federal courts throughout the country in late 2007 and early 2008. The Judicial Panel on Multidistrict Litigation transferred all related indirect purchaser actions to the Northern District of California, where they were consolidated with similar class actions by direct purchaser plaintiffs. On May 9, 2008 the Court appointed Mario N. Alioto of Trump, Alioto, Trump & Prescott, LLP as Interim Lead Counsel. Docket No. 47.

The United States Department of Justice ("DOJ") intervened early in the case and requested a stay of all merits discovery pending its criminal investigation. The parties negotiated a Stipulated Order with the DOJ that provided for a stay of all merits discovery until September 12, 2009. Docket No. 379. Pursuant to the DOJ's requests, this stay was extended on several occasions. Docket Nos. 425, 590, 798.

Plaintiffs filed their consolidated amended complaint on March 16, 2009. Docket No. 437. The Defendants filed motions to dismiss that were denied in part and granted in part, with leave to amend certain state law claims. Docket No. 665. On May 10, 2010, Plaintiffs filed their Second Consolidated Amended Complaint. Docket No. 716. Defendants filed a joint motion to dismiss on various state-law grounds that was denied in part and granted in part, with leave to amend certain state law claims. Docket No. 799. On December 11, 2010, Plaintiffs filed their Third Consolidated Amended Complaint. Docket No. 827. Defendants answered Plaintiffs' complaint on January 26, 2011.  Plaintiffs filed their Fourth Consolidated Amended Complaint on January 10, 2013. Docket No. 1526.

---

[8] The following factual and procedural recitation is relevant to the discussion of both approval of the settlement and the request for fees and expenses.

On April 20, 2011, Defendants and Plaintiffs filed a stipulation providing that Plaintiffs would withdraw the finished-CRT-products-conspiracy allegations from their complaint. Docket No. 895. The Court entered an order to that effect on April 22, 2011. Docket No. 904.

The DOJ's stay of merits discovery was partially lifted on March 8, 2010 and Defendants began their rolling production of documents. Most of the Defendant groups comprise multiple entities located around the world. Because many of the Defendants are no longer involved in the CRT business, Plaintiffs traveled to several storage facilities both in the United States and abroad to manually search Defendants' paper records for relevant documents and employed technical experts to restore backup tapes and servers containing relevant information. Plaintiffs also subpoenaed documents and data from the U.S. and Dutch bankruptcy trustees of a former manufacturer of CRTs – LG Philips Displays. In addition, Plaintiffs subpoenaed and negotiated productions of documents and data from over 50 third party retailers, distributors and CRT television and monitor manufacturers.  (Alioto Decl. dtd. 5/29/15 in Support of Motion for Preliminary Approval of Settlements, ¶11, Docket No. 3862) ["Alioto Decl. I"]

In response to discovery requests, Defendants produced millions of documents and voluminous data sets. These were loaded into a web-based electronic database and reviewed and analyzed by a team of over 50 attorneys, including attorneys fluent in Korean, Chinese, Japanese and Dutch. In order to use these foreign language documents in the litigation, Plaintiffs obtained certified translations and addressed Defendants' objections to the certified translations. Plaintiffs also retained economists to review and analyze the documents and data and prepare expert reports in support of class certification, liability and damages.  Alioto Decl. I, ¶12.

Plaintiffs filed their motion for class certification, along with the Declaration of Janet S. Netz, Ph.D., on October 1, 2012. Docket No. 1388. The Special Master held a hearing on the motion and recommended that the Court grant Plaintiffs' motion for class certification and deny Defendants' motion to strike Dr. Netz' expert report. Docket Nos. 1742, 1743. On September 24, 2013, the Honorable Samuel Conti adopted the Special Master's Reports and Recommendations and certified 22 state-wide classes of indirect purchasers of CRTs. Docket

1  No. 1950. The Ninth Circuit Court of Appeals denied the Defendants' petition to appeal the

2  District Court's order. Docket No. 2283.

3        Merits depositions began in December, 2012. Each of the 24 class representatives was

4  deposed by Defendants, and Plaintiffs took over 30 depositions of Defendants under F.R.C.P.

5  30(b)(6) as well as over 70 merits depositions of defense witnesses. Several of these depositions

6  took place in Taiwan, Korea, Mexico and England. There have also been numerous other

7  depositions of expert witnesses, third party resellers of finished products containing CRTs and

8  witnesses for the Direct Action Plaintiffs ("DAPs").[9] Dr. Netz, Plaintiffs' expert economist, was

9  deposed five times during the course of the litigation.  Alioto Decl. I, ¶15.

10        Plaintiffs thereafter began preparing for trial, which was originally scheduled to begin on

11  March 9, 2015.[10] The parties exchanged expert reports on liability and damages starting in

12  April, 2014 and continuing through September, 2014. These included opening, opposition,

13  rebuttal and sur-rebuttal reports from 17 expert witnesses, all of whom were deposed, some

14  multiple times, regarding their reports. Merits discovery closed on September 5, 2014 but some

15  discovery continued after that cut-off date.

16        On November 7, 2014, the Defendants filed 36 motions for summary judgment. Eleven

17  of those were directed specifically at Plaintiffs' claims. These motions were fully briefed before

18  the Proposed Settlements were executed. The motions have been withdrawn in light of the

19  Settlements.

20        The parties then also exchanged trial exhibit lists, witness lists, deposition designations,

21  jury instructions and special verdict forms. They also filed 64 motions *in limine* and other

22  pretrial motions. These motions were briefed in varying degrees before the Proposed

23  Settlements were executed. Pursuant to the Proposed Settlements, the Settling Defendants have

24  provisionally withdrawn all of the motions pending against Plaintiffs. Docket Nos. 3801, 3802,

25  3812, 3851, 3852.  Alioto Decl. I, ¶16-19.

26

27  [9] The DAPs are another group of plaintiffs in this case that purchased CRT Products directly from defendants. They
include computer and television manufacturers such as Dell and Sharp and retailers such as Target, Best Buy and

28  Costco. The DAPs joined this litigation between 2011 and 2014.
[10] By Order dated February 9, 2015, the Court vacated the trial date. Docket No. 3515.

1

B.  Other Regulatory Action

B.  <u>Department of Justice Activity</u>

2    The purported underlying global conspiracy that formed the basis of the Proposed

3    Settlements was investigated by the Antitrust Division of the United States Department of

4    Justice ("DOJ"). On February 10, 2009, a federal grand jury in San Francisco issued a two-

5    count indictment against C.Y. Lin, the former Chairman and CEO of Defendant Chunghwa

6    Picture Tubes, Ltd., for his participation in a global conspiracy to fix the prices of CRTs used in

7    computer monitors and televisions. That was the first indictment to be issued in the DOJ's

8    investigation into the CRT industry.

9    The Department of Justice also entered into a criminal plea agreement with Samsung

10   SDI that resulted in a $32 million criminal fine. This agreement encompassed only one type of

11   CRT, however (CDTs for monitors), that was sold to four U.S. customers during a portion of the

12   alleged class period.

13   C.  <u>Other Regulatory Action</u>

14   A multinational investigation into defendants' purported price fixing also commenced in

15   November 2007. For example, on November 8, 2007, antitrust authorities in Europe, Japan and

16   South Korea raided the offices of manufacturers of CRTs as part of an international

17   investigation of alleged price fixing. And MT Picture Display Co., Ltd., the CRT unit of

18   Defendant Panasonic, was raided by Japan's Fair Trade Commission in November, 2007.

19   Defendant Samsung SDI Co., Ltd. was also raided by South Korea's Fair Trade Commission,

20   which started an investigation into Samsung's CRT business. On November 21, 2007,

21   Defendant Royal Philips publicly disclosed that it too was subject to one or more investigations

22   into anticompetitive conduct in the CRT industry.

23   In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being

24   investigated by the [European] Commission and/or the U.S. Department of Justice for potential

25   violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes

26   (CRT) and heavy electrical equipment." And on May 6, 2008, the Hungarian Competition

27   Authority ("HCA") announced its own investigation into the purported CRT cartel.

28

1    On October 19, 2013, the European Commission issued findings in a Summary Decision

2 pertaining to its CRT price fixing investigations. These findings were made available to the

3 public on December 23, 2014.

4    D.   Settlement Activity

5    Throughout the litigation, the parties engaged in settlement negotiations. On April 18,

6 2011, Plaintiffs entered into a settlement with Chunghwa Picture Tubes, Ltd. for $10,000,000

7 cash. The Court granted Preliminary Approval of this settlement on August 9, 2011 and Final

8 Approval on March 22, 2012. Docket Nos. 992, 1105. Pursuant to this settlement's terms,

9 Chunghwa's counsel provided IPP Counsel with information regarding the conspiracy during a

10 series of in-person meetings in February, 2009.  Alioto Decl. dtd. 9/23/15, Docket No. 4071-1,

11 ¶101 ["Alioto Decl. II"]

12    On May 18, 2013, Plaintiffs entered into a settlement with LG Electronics, Inc. and LG

13 Electronics USA, Inc. for $25,000,000 cash. The Court granted Preliminary Approval of this

14 settlement on December 9, 2013 and Final Approval on April 18, 2014. Docket Nos. 2248,

15 2542. Pursuant to this settlement, LG's counsel provided IPP Counsel with an oral proffer of

16 evidence. In addition, IPP counsel interviewed two cooperating LG witnesses.  Alioto Decl. II,

17 ¶105.

18    Plaintiffs then entered into settlements with additional Settling Defendants as follows:

19 Phillips on January 26, 2015 for $175,000,000, Panasonic on January 28, 2015 for $70,000,000,

20 Hitachi on February 19, 2015 for $28,000,000, Toshiba on March 6, 2015 for $30,000,000,

21 Samsung SDI on April 1, 2015 for $225,000,000, and Thomson and TDA on June 10, 2015 for

22 $13,750,000. The specific terms of each of these settlements will be discussed in more detail

23 below.

24    These settlements were reached in a year of negotiations commencing in early 2014.

25 Two skilled mediators assisted the parties – the Honorable Vaughn Walker (Ret.) and the

26 Honorable Fern Smith (Ret.). The total Settlement Fund recovered on behalf of the IPP class

27 members is $576,750,000 plus accrued interest. There are no coupons or vouchers and there will

28

1    be no reversion or refund to any defendant under any circumstances. In addition, no *cy pres*

2    distribution is contemplated. Alioto Decl. II, ¶107-112.

3           IPPs filed their motions for preliminary approval of the Proposed Settlements on May

4    29, 2015. Docket No. 3861. The Court granted preliminary approval on July 9, 2015. Docket

5    No. 3906.

6           Notice was thereafter published in accordance with the Preliminary Approval Order,

7    which consisted of the following actions:

8                  Direct mailed/emailed notice to more than ten million unique addresses;

9                  Publication notice in magazines and newspapers;

10                 Digital notice via paid advertisements on Google, Facebook, and other popular

11                 websites;

12                 English and Spanish press releases carried by almost 300 domestic and foreign

13                 websites;

14                 Notice to the Attorney General of the United States and the Attorneys General of all

15                 50 states;

16                 Publication on the CRT settlement website.  Alioto Decl. I, ¶38-42, Exh. F & G.

17       E.  Procedures Before the Special Master

18          As noted, *supra*, the Special Master was appointed on September 24, 2015. Thereafter,

19   multiple iterations of scheduling orders were set forth, but the following schedule for filing

20   motions, objections, responses thereto, the Special Master's Report and Recommendation, and

21   other pleadings was ultimately stipulated to and approved:

22          (1)    October 6, 2015: all objections to Proposed Settlements and attorneys' fees to be

23                 submitted to the Court

24          (2)    November 20, 2015:[11] submission of all briefs in opposition to the objections

25

26   _____

27   [11] On November 18, 2015, the Court issued an order reminding the parties that, pursuant to the Court's previous
     order at page 6 of Docket No. 4077, "motions and other papers directed to the attention of the Special Master are to
     be served on him but not, in the first instance, to be filed with the Court." Docket No. 4195. Following that Order,

28   the Special Master arranged for all communications, other than routine e-mails about ministerial matters, to be filed
     with him using the JAMS Electronic Filing System called "Case Anywhere." Docket No. 4201.

(3)  December 9, 2015: submission of all Objectors' reply briefs to opposition[12]

(4)  December 22, 2015: submission of Lead Counsel's response to Objectors' reply briefs[13]

(5)  December 29, 2015: submission of Lead Counsel's response to California Attorney General's Supplemental Statement of Interest

(6)  January 4, 2016: submission of California Attorney General's reply to Lead Counsel's response to Supplemental Statement of Interest

(7)  January 5, 2016 at 10:00 a.m.: oral argument before Special Master at the San Francisco office of JAMS

(8)  January 13, 2016 at 12:00 p.m.: submission of briefs pertaining to issues concerning the Chunghwa settlement and other issues raised at and after the January 5, 2016 hearing

(9)  January 29, 2016: deadline for the Special Master to file Report & Recommendation

(10)  February 12, 2016: deadline for objections to Report & Recommendation

(11)  February 23, 2016: Deadline for oppositions to objections

(12)  March 15, 2016: hearing on final approval of settlement and aggregate attorneys' fees/costs and incentive awards.[14]

---

[12] On December 11, 2015, objectors Josef Cooper and Francis Scarpulla filed a motion with the Court asking to be appointed Co-Lead Counsel in this case to represent all consumers with claims in the "non-repealer" states. Docket No. 4241. At the January 5, 2016 hearing, when asked about this motion and whether it could render the Special Master's Report and Recommendation moot if granted, Messrs. Cooper and Scarpulla represented that this should not be the case since, if their request is granted, they envisioned only making the same arguments that they have made here in the context of their objections but now they would merely be making those arguments in their new capacity. The Court is scheduled to hear this motion on February 18, 2016.

[13] Reply briefs from Lead Counsel were not considered in the Court's original scheduling order. *See* Docket No. 4185. However, Lead Counsel requested the opportunity to file a reply briefs on December 13, 2015 because the Objectors' reply briefs had gone "far beyond replying to the IPP's initial submissions and raise[d] a number of new matters." The Special Master granted Lead Counsel's request on December 14, 2015, permitting Lead Counsel to file responsive briefs, not to exceed 20 pages, by December 23, 2015. In that order, the Special Master delineated the five specific issues that Lead Counsel could address in his responsive briefing. On December 14, 2015, Mr. Scarpulla requested that he be allowed to file a sur-reply if Lead Counsel were to be permitted to submit further reply briefs. The Special Master denied Mr. Scarpulla's request.

[14] The Special Master reserved jurisdiction on the issue of allocation of attorneys' fees to decide after the Court issues its final award on approval of the settlement and attorneys' fees/costs and incentive awards.

Eleven objections were filed with regard to the Proposed Settlements and attorneys' fees as was one supplemental objection. Docket Nos. 4099, 4101/4125, 4106, 4111, 4112, 4113, 4115/4116, 4119, 4120, 4128, and 4144.[15] Two objectors later moved to withdraw their objections. Docket Nos. 4130, 4165.[16]

On November 20, 2015, IPPs submitted two briefs: (1) IPP's Motion for Final Approval of Settlements; and (2) IPP's Reply Re: Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses and Incentive Awards to Class Representatives, in which Counsel for the IPPs seeks to reduce the Proposed Settlements by $192,250,000 for payment of attorneys' fees, $7,670,525.57 for payment of litigation expenses, and $450,000 for payment of incentive awards to the Class Representatives and additional named plaintiffs. No *cy pres* payments are contemplated in the Proposed Settlements. Each of these briefs was accompanied by various declarations and exhibits.

Multiple reply briefs were filed by the Objectors on December 9, 2015 as was a Supplemental Statement of Interest by the California Attorney General seeking to, *inter alia,* move the deadline for filing claims in IPP settlement from December 7, 2015 to June 30, 2016. One late reply brief was filed on December 15, 2015, but the Special Master denied this objector's motion for leave to file this late reply. Docket No. 4263, affirmed by the Court at Docket No. 4274. As noted, *supra*, because some of the replies raised new issues that were not raised in the previously-filed objections, the Special Master permitted Lead Counsel to file a responsive brief on December 23, 2015 pertaining to the following five specific issues: (1) the release without compensation of class members in certain states (section II of the Cooper/Scarpulla brief)[17]; (2) issues relating to the Chungwa settlement (section III of the

---

[15] One Supplemental Objection was filed at Docket 4144 by the same objectors who filed an objection at Docket 4119.

[16] One objection, by Objector Johnson (Docket No. 4128), was received on 10/16/15 after the 10/9/15 deadline. The Special Master has considered it notwithstanding the late filing. The objection of Saik (Docket No. 4140) was filed late, on 10/24/15, but admissible evidence confirmed that it was delivered to the Clerk's office on 10/9/15.

[17] Lead Counsel contends that Messrs. Scarpulla and Cooper lack standing to object to the Proposed Settlements since they are not members of the class and they are bringing the objections on behalf of the IPPs as a whole rather than on behalf of an individual class member client. Messrs. Scarpulla and Cooper contend that as class counsel they have standing in light of their fiduciary duty to act in the best interests of the class. *See In re TracFone Unlimited Serv. Plan. Litig.*, 2015 WL 4051882, at *11 (N.D.Cal. July 2, 2015) (objector has no legal standing to

1    Cooper/Scarpulla brief, and section B.2 of the St. John brief); (3) alleged defects in notice

2    (section IV in the Cooper/Scarpulla brief); (4) the disproportionate size of the Samsung and

3    Phillips settlements (section C of the St. John brief); and (5) the failure to pursue claims of class

4    members in Massachusetts and Missouri (section II.C of the Moore brief). Lead Counsel was

5    also permitted to respond to the California Attorney General's Supplemental Statement of

6    Interest on December 29, 2015. On January 4, 2016, the Attorney General filed a Reply and a

7    supporting supplemental declaration.

8            On January 5, 2016, the Special Master heard oral argument on the pending motions and

9    objections. At that argument, several new issues were raised and various issues were

10   complicated by new and additional argument. The Special Master therefore requested that Lead

11   Counsel and some of the objectors make certain submissions in order to supplement the record.

12          All proceedings before the Special Master have been filed on Case Anywhere, the JAMS

13   e-filing program, in accordance with the Court's order, with a few inadvertent immaterial

14   exceptions and routine e-mails about scheduling and other ministerial matters. The Special

15   Master's orders have also been filed on the Court's ECF system. The Special Master has had

16   conversations with Lead Counsel, the California Attorney General's counsel and certain

17   objector counsel concerning such issues as scheduling, procedures, and supplying material for

18   the Special Master's review.

19   **V.    TERMS OF SETTLEMENT AGREEMENTS**

20          The Proposed Settlements resolve all federal and state-law claims brought by Plaintiffs

21   against the Settling Defendants stemming from the Settling Defendants' alleged conspiracy to

22   fix prices for CRT Products indirectly purchased from them. The Proposed Settlements would

23

24   object to a settlement unless he can demonstrate that he is an aggrieved class member); *but see Staton v. Boeing

25   Co.*, 327 F.3d 938, 960 (9th Cir. 2003) ("class counsel ultimately owe their fiduciary responsibility to the class as a
     whole and are therefore not bound by the views of the named plaintiffs regarding any settlement"). The Special
     Master concludes that the proper approach is to consider the arguments set forth in their briefs in furtherance of the

26   Court's fiduciary duty to the class to assure that the settlement is fair. *See Rodriguez v. Disner*, 688 F.3d 645, 656
     (9th Cir. 2012); *In re Pet Food Products Liab. Litig.* 629 F.3d 333, 349 (3d Cir. 2010) ["trial judges bear the

27   important responsibility of protecting absent class members," and must be "assur[ed] that the settlement represents
     adequate compensation for the release of the class claims."]; *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d

28   Cir. 2010) [stressing that "[t]he purpose of Rule 23(e) is to protect the unnamed members of the class," and that a
     "district court acts as a fiduciary" for absent class members].

1  obligate the Settling Defendants to pay a total of $541,750,000. If approved, these six Proposed

2  Settlements – along with the two previously-approved settlements– would result in the

3  Defendants making total settlement payments of $576,750,000 to indirect purchasers of CRTs.[18]

4  Most of the Proposed Settlements also contain cooperation provisions. These provisions would

5  require Settling Defendants to provided specified cooperation to IPPs in the prosecution of any

6  continuing litigation.

7          The Proposed Settlements are contingent upon the certification by the Court of a

8  Settlement Class, which, as proposed by Plaintiffs, includes a "Nationwide Class" of indirect

9  purchasers of CRT Products and "Statewide Damages Classes" of indirect purchasers of CRT

10  Products seeking money damages under the laws of 21 states and the District of Columbia

11  (collectively the "Settlement Class").

12          Specifically, the Proposed Settlements defines the Settlement Classes as follows:[19]

13  NATIONWIDE CLASS

14  All persons and or entities who or which indirectly purchased in the United States
    for their own use and not for resale, CRT Products manufactured and/or sold by
15  the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at
    any time during the period from March 1, 1995 through November 25, 2007.
16  Specifically excluded from this Class are claims on behalf of Illinois persons (as
    defined by 740 ILCS 10/4) for purposes of claims under 740 Ill. Comp. Stat §
17  10/7(2), Oregon natural persons (as defined by ORS 646.705 (2)) for purposes of
    claims under ORS § 646.775(1), and Washington persons (as defined by RCW
18  19.86.080) for purposes of claims under RCW 19.86.080 (1). Also specifically
    excluded from this Class are the Defendants; the officers, directors or employees
19  of any Defendant; any entity in which any Defendant has a controlling interest;
    and, any affiliate, legal representative, heir or assign of any Defendant. Also
20  excluded are named co-conspirators, any federal, state or local government
    entities, any judicial officer presiding over this action and the members of his/her
21  immediate family and judicial staff, and any juror assigned to this action.[20]

22

23

24  ────────────
    [18] The Settlement Amounts have been deposited into an escrow account and invested. If the Settlements are finally
25  approved, any interested earned thereon (together with the Settlement Amounts) will become part of the Settlement
    Fund.
26  [19] It should be noted that the Proposed Settlement Class is identical to the class preliminarily approved by the Court
    with respect to the settlements at issue here (Docket No. 3906) as well as the Settlement Class finally approved by
27  the Court in conjunction with IPP's settlement with LG (Docket No. 2542). The LG Court-approved settlement also
    involved an identical release of all claims nationwide.
28  [20] Residents of Illinois, Oregon and Washington are excluded from the Nationwide Class because the Attorneys
    General of those states are suing the Defendants on behalf of residents of those states.

INDIRECT PURCHASER STATE CLASSES:[21]

All persons and or entities in Arizona, California, District of Columbia, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin who or which indirectly purchased for their own use and not for resale, CRT Products manufactured and/or sold by the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time during the period from March 1, 1995 through November 25, 2007.

All persons and entities in Hawaii who or which indirectly purchased for their own use and not for resale CRT Products manufactured and/or sold by the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time from June 25, 2002 through November 25, 2007.

All persons and entities in Nebraska who or which indirectly purchased for their own use and not for resale CRT Products manufactured and/or sold by the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time from July 20, 2002 through November 25, 2007.

All persons and entities in Nevada who or which indirectly purchased for their own use and not for resale CRT Products manufactured and/or sold by the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time from February 4, 1999 through November 25, 2007.

Specifically excluded from these Classes are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and, any affiliate, legal representative, heir or assign of any Defendant. Also excluded are named co-conspirators, any federal, state or local government entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.[22]

---

[21] All of the Indirect Purchaser State Classes are the same except that three states – Hawaii, Nebraska and Nevada — have slightly shorter damages periods because the statutes allowing indirect purchasers to bring an antitrust claim for damages in these three states were enacted after March 1, 1995, the beginning of the alleged Class Period. The Court dismissed claims based on purchases made prior to the enactment of these statutes on the grounds that the state legislatures did not intend the statutes to apply retroactively. *See In Re: Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F.Supp.2d 1011, 1025-26 (N.D.Cal. 2010).

[22] It should be noted that the Court has already certified 22 indirect purchaser state classes which are defined similarly to the Indirect Purchaser State Classes proposed here (Docket Nos. 1742 and 1950). The Settlement Class proposed here is different in that the Class that was already certified: (1) requires that the Indirect Purchaser State Class Members be residents of the respective States, whereas here, the Settlement Class requires only that the purchase was made in one of the States; (2) is limited to televisions and monitors containing CRTs, whereas the Settlement Class here includes CRTs, televisions and monitors containing CRT and other products containing CRTs; and (3) consists of the Indirect Purchaser State Classes defined above, whereas the Settlement Class here also includes the Nationwide Class.

1    Plaintiffs propose to compensate members of the Indirect Purchaser State Class from the

2    $541,750,000 Settlement Fund according to the proposed plan of distribution under which

3    qualifying claimants are eligible to receive a distribution from the Settlement Fund based on the

4    number and type of CRT Products purchased, as documented in the proposed claim form. In

5    exchange for this compensation under the Proposed Settlements, IPPs agreed to the following

6    global release:

7       "Any and all claims, demands, judgments, actions, suits, causes of action, whether
        class, individual, or otherwise (whether or not any Class Member has objected to
8       the settlement or makes a claim upon or participates in the Settlement Fund,
        whether directly, representatively, derivatively, or in any other capacity) that
9       Releasors, or each of them, ever had, now has, or hereafter can, shall, or may have
        on account of, or in any way arising out of, any and all known and unknown,
10      foreseen and unforeseen, suspected or unsuspected injuries, damages, and
        consequences thereof in any way arising out of or relating in any way to any act
11      or omission of the Panasonic Releases (or any of them) or any other entity
        concerning the manufacture, supply, distribution, sale or pricing of CRT Products
12      up to the date of execution of this Agreement, including but not limited to any
        conduct alleged, and causes of action asserted or that could have been alleged or
13      asserted, in complaints filed in this Action, including those arising under any
        federal, state, or foreign antitrust, unfair competition, unfair practices, price
14      discrimination, unitary pricing, unjust enrichment, contract, or trade practice law
        (the "Released Claims")."
15

16

17   Thus, IPPs and class members will release all federal and state-law claims against a

18   Settling Defendant whose settlement becomes final, "concerning the manufacture, supply,

19   distribution, sales or pricing of CRT Products…", although the release does not include claims

20   for product defect, personal injury or breach of contract. Class members release their claims for

21   injunctive relief through the Execution Dates of the Proposed Settlements Agreements only.

22   And as will be discussed in more detail, members of the Nationwide Class who are not also

23   members of any Statewide Damages Class will not receive any monetary compensation.

24   Plaintiffs also propose that notice to Class members would be accomplished by a notice

25   program designed by Joseph Fisher ("Fisher") of The Notice Company. The notice program

26   includes direct mail and e-mail notice to millions of corporations and individual consumers, as

27   well as published notice in newspapers, magazines and online. The notice also directs interested

28

1   persons to the website, www.CRTclaims.com, where they can find additional detailed

2   information. *See*, *infra at VII.C*, for detailed description of Notice Program.

3   **VI.   CERTIFICATION OF SETTLEMENT CLASS**

4          Before deciding whether the Proposed Settlements should be approved, the Court must

5   first decide whether to finally certify the Settlement Classes. In order to certify a class, the

6   proposed class and proposed class representatives must meet the four prerequisites listed in Rule

7   23(a) – numerosity, commonality, typicality and adequacy of representation. They must also

8   meet one of the three requirements set forth in Rule 23(b).

9          There is a key difference in this Rule 23 evaluation when certifying a class for the

10  purpose of litigating claims and when certifying a class for purposes of settlement, as is the case

11  here. As was pointed out in the Report and Recommendation in *In re Dynamic Random Access*

12  *Memory (DRAM) Antitrust Litigation*, Master File No. M-02-1486-PJH (MDL No. 148), *DRAM*

13  Docket No. 2132, (N.D.Cal. January 8, 2013):[23]

14             Because of the pivotal role and ensuing consequences of the class
               certification decision, trial courts must conduct a "rigorous
15             analysis" of Rule 23's prerequisites. *Wal-Mart Stores, Inc. v.
               Dukes,* ⎯ *U.S.* ⎯, 131 S.Ct. 2541, 2551–52, 180 L.Ed.2d 374
16             (2011); *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305,
               315–21 (3d Cir. 2008); *In re Initial Pub. Offerings Secs. Litig.,* 471
17             F.3d 24, 31–42 (2d Cir. 2006). The same analytical rigor is
               required for litigation and settlement certification, but some
18             inquiries essential to litigation class certification are no longer
               problematic in the settlement context. A key question in a litigation
19             class action is manageability—how the case will or can be tried,
               and whether there are questions of fact or law that are capable of
20             common proof. But the settlement class presents no management
               problems because the case will not be tried. Conversely, other
21             inquiries assume heightened importance and heightened scrutiny
               because of the danger of conflicts of interest, collusion, and unfair
22             allocation. *See Amchem,* 521 U.S. at 620, 117 S.Ct. 2231 ("[O]ther
               specifications of the Rule [23]—those designed to protect
23             absentees by blocking unwarranted or overbroad class
               definitions—demand undiluted, even heightened, attention in the
24             settlement context.").

25

26

27  _____

28  [23] Neither the Report & Recommendation in *DRAM* nor the Court's approval of that Report & Recommendation can be found on Westlaw. The Special Master will therefore cite directly from the docket version of this document throughout this Report & Recommendation.

1    *Id.* at p.59 (quoting *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 334-35 (3d Cir. 2011).

2         None of the objectors, except Donnie Clifton, (Docket No. 4099, pp.5-7), directly

3    challenges the first three prerequisites set forth in Rule 23(a). Indeed, there is really no legal

4    basis for such a challenge since (1) it is undisputed that millions of people in the United States

5    purchased CRT Products during the class period; thus, the Class readily satisfies the numerosity

6    requirements of Rule 23; (2) there are undeniably questions of law and fact common to the

7    Class, including whether the Defendants engaged in a price-fixing conspiracy that injured

8    Plaintiffs when they paid more for CRT Products than they would have absent the alleged price-

9    fixing conspiracy; thus, the commonality prong of Rule 23(a) has been satisfied; and (3) it is

10   clear that the claims of the representative Plaintiffs are typical of the claims of the class

11   members because they all indirectly purchased CRT Products at supra-competitive levels as a

12   result of the alleged price-fixing conspiracy during the relevant time period. In fact, the Special

13   Master has already found as much in his previous Report and Recommendation to the Court on

14   class certification, which involved classes similar in composition to the Settlement Class, and

15   the Court subsequently adopted that Report on Recommendation on September 19, 2013. *See*

16   Class R&R, pp. 15-17, 19, Docket No. 1742; *see also* Docket No. 1950 (Order adopting Class

17   R&R).

18        Some objectors have directly challenged the fourth prong of Rule 23(e) – adequacy of

19   the representation. These objectors are not arguing that there was any collusion in reaching the

20   Proposed Settlement, but, for example, in their objections, Rockhurst University, Gary

21   Talewsky, and Harry Garavanian contend that Class Counsel "failed to adequately represent the

22   Nationwide Class's interests in securing any value for the release of their claims, and in fact

23   seems to have had a conflict with multiple states, or with at least the Massachusetts and

24   Missouri classes." Docket No. 4113, p.7.  Laura Townsend Fortman and John Finn also argued

25   in their objections that there is a conflict of interest between Lead Counsel and the Nationwide

26   Class because Lead Counsel settled claims on behalf of the damages states but then agreed to a

27   broad release of the claims of class members in non-damage states who receive no

28   consideration. (Docket No. 4111); *see also* Clifton Reply to Opposition to Objections, p.2

("class counsel abandoned all efforts to represent them [all class members] in the settlement negotiations").

While these objections will be addressed in more detail below, it is at least worth briefly mentioning at this juncture that the Special Master has seen nothing in the abundance of evidence that has been introduced in these approval proceedings or through his copious interactions with Class Counsel to indicate that Class Counsel, and in particular Lead Counsel, has failed to provide all Class Members adequate representation, that Class Counsel has any conflict of interest, or that the Class Representatives are not part of the class or that they do not possess the same interest and suffer the same injury as the class members. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 594-95 (1997). Indeed, as noted, *supra*, the representative plaintiffs' interests are directly aligned with those of other members of the Class – the representative plaintiffs were damaged as a result of defendants' allegedly unlawful conduct, and the plaintiffs would have had to prove the same wrongdoing as the absent class members to establish liability. *See Pet Food*, 629 F.3d at 349.

The mere fact that "relief varie[s] among the different groups of class members [does] not demonstrate . . . conflicting or antagonistic interests within the class" or adequacy of representation issues. *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 272 (3d Cir. 2009). Nor does the fact that the settlement fund allocates a larger percentage of the settlement to certain class members. "Instead, the different allocations reflect the relative value of the different claims." *See Pet Food*, 629 F.3d at 347. The Special Master is therefore satisfied that this prerequisite has been met. The objectors have failed to demonstrate inadequate representation or any conflict of interest.[24]

---

[24] Objectors Scarpulla and Cooper point to language in Lead Counsel's November 19, 2015, motion brief in which Lead Counsel stated that "Lead Counsel was appointed to represent the interests of purchasers in the 22 indirect purchaser state classes. He has no duty to represent purchasers in other states." Motion for Final Approval, p. 43, n.71. Objectors take this quote out of context. Lead Counsel was not stating that he never advanced the interests of the Nationwide Class in this litigation. Instead, he was merely explaining that, during the litigation phase of the case, he had "no duty to represent" members of the Nationwide Class for purposes of approaching attorneys general about pursuing potential *parens patriae* actions. Lead Counsel sufficiently explained this distinction in his Reply brief. There, he notes that at the settlement stage, he had a duty to represent all members of the proposed settlement class vigorously which, as the Special Master has observed, is exactly what Lead Counsel did.

IPPs have also satisfied Rule 23(b)(3)'s predominance and superiority criteria. The Rule 23(b) predominance inquiry is "readily met in certain cases alleging violations of the antitrust laws." *Amchem*, 521 U.S. at 615 (quoting Fed.R.Civ.P. 23(b)(3)). Indeed, "[i]n price-fixing cases, courts repeatedly have held that the existence of the conspiracy is the predominant issue and warrants certification even where significant individual issues are present." *Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives and Composites, Inc.*, 209 F.R.D. 159, 167 (C.D.Cal. 2002).

Such is the case here where the existence of an alleged CRT conspiracy and defendants' acts in furtherance of the alleged conspiracy are the predominant common questions. The existence of potential individualized damage issues does not alter this fact since courts in this district have recognized that "classes were certified . . . regardless whether some members of the class negotiated price individually, or whether – as here – differences among product type, customer class, and method of purchase existed." *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 2006 WL 1530166, at *9 (N.D.Cal. June 5, 2006). This is true even if there are individual state law issues, as long as the common issues still outweigh the individual ones. *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296 (1st Cir. 2000); *see also Sullivan*, 667 F.3d at 301, 303 ("predominance is not considered deficient merely because claims were subject to the [varying] laws of fifty states . . ."; instead, "in the settlement context, variations in state antitrust, consumer protection and unjust enrichment laws did not present the types of insuperable obstacles that could render class litigation unmanageable . . . since a settlement would eliminate the principal burden of establishing the elements of liability under disparate laws." (internal quotations omitted).

Here, issues that are common to the class predominate – all IPPs are alleged to have paid overcharges that were caused by the defendants' alleged price-fixing activities. This militates in favor of final certification of the Settlement Class.

With regard to superiority, there is no doubt that the damages of most individual class members are relatively small compared to the cost of litigation, making it difficult for individual class members to adjudicate their claims individually. And even if plaintiffs were to individually

1    proceed to litigation, the court system would then be overwhelmed by the burden of hundreds of

2    thousands of separate actions. IPPs, therefore, have met their burden with regard to the

3    requirements of Rule 23(b).

4         In light of the above, the Special Master recommends that the Court finally approve the

5    Settlement Classes. All of the prerequisites to a class action under Federal Rule of Civil

6    Procedure 23 are satisfied for settlement purposes.

7    **VII.   APPROVAL OF PROPOSED SETTLEMENTS**

8         A.    Fairness of Compensation to Class

9         A class action may not be dismissed, compromised or settled without the express

10   approval of the Court. Fed.R.Civ.P. 23(e). Approval is a three-step process: (1) certification of a

11   settlement class and preliminary approval of the Proposed Settlements; (2) notice to the class;

12   and (3) final approval at a Fairness Hearing, following notice, left to the sound discretion of the

13   trial judge. *See Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,* 221 F.R.D. 523, 525 (C.D.Cal.

14   2004); *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D.Cal. 1980) aff'd, 661 F.2d 939

15   (9th Cir. 1981). The Court may issue final approval of a class settlement "only after a hearing

16   and on finding that it is fair, reasonable, and adequate." Fed.R.Civ.P. 23(e)(2); *In re Bluetooth*

17   *Headset Prods. Liab. Litig.,* 654 F.3d 935, 946 (9th Cir. 2011). Rule 23(e)'s primary concern is

18   "the protection of those class members, including the named plaintiffs, whose rights may not

19   have been given due regard by the negotiating parties." *Officers for Justice v. Civil Serv.*

20   *Comm'n of the City and Cnty. of San Francisco,* 688 F.2d 615, 624 (9th Cir. 1982).

21        In considering final approval of a proposed settlement the Court's discretion is guided by

22   the following factors: (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity,

23   and likely duration of further litigation; (3) the risk of maintaining class action status throughout

24   the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the

25   stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a

26   governmental participant; and (8) the reaction of class members to the Proposed Settlements.

27   *Churchill Vill., LLC v. Gen. Elec.,* 361 F.3d 556, 575 (9th Cir. 2004). "This list is not

28   exhaustive, and different factors may predominate in different factual contexts." *Torrisi v.*

*Tucson Elec. Power Co.,* 8 F.3d 1370, 1376 (9th Cir. 1993). Indeed, the Ninth Circuit has

observed that the district court's determination in approving a settlement is nothing more than

"an amalgam of delicate balancing, gross approximations and rough justice." *Officers for*

*Justice,* 688 F.2d at 625. But in general, there is a strong judicial policy favoring class

settlements. *Class Plaintiffs v. Seattle,* 955 F.2d 1268, 1276 (9th Cir. 1992). Voluntary

conciliation and settlement are the preferred means of dispute resolution. *Officers for Justice,*

688 F.2d at 625.

   Looking at the Proposed Settlements through this legal lens, the Special Master is

satisfied that they meet these standards.

      1.  Strength of IPP's Case

   While a proposed settlement is not to be judged against a hypothetical or speculative

measure of what might have been achieved by the negotiators in this case, *see Officers for*

*Justice,* 688 F.2d at 625, there is no doubt that the IPPs would have faced substantial hurdles

had the parties not agreed to settlement. Not only would IPPs have had to prove that certain

Defendants participated in the conspiracy, they would have also had to prove injury and

damages on a class-wide basis. In addition, IPPs would have had to prove that the conspiracy

had an impact in the United States; they would have had to show application of the Foreign

Trade Antitrust Improvements Act of 1982; and they would have had to address withdrawal and

statutes of limitations defenses.  Many of these issues are unsettled and contested.  This is not to

say that the IPPs would not have prevailed, but their burden would have been an onerous one, to

say the least. This factor, therefore, weighs strongly in favor of approving the Proposed

Settlements.

      2.  Risk, Expense and Complexity of the Litigation

   The record is clear that this antitrust litigation, which has spanned eight years and

several continents, alleging a global conspiracy that began more than 20 years ago, has required

great effort, expense and risk to the IPPs and their counsel. As noted, *supra,* class counsel

engaged in extensive discovery efforts at both the class certification and merits stages. These

efforts included ongoing meet and confers, expert discovery involving 17 expert witnesses, and

1   the review of millions of pages of documents, many of which were in Korean, Japanese or

2   Chinese and required certified translations.

3           Class certification was also quite arduous, complex and time-consuming, taking more

4   than two years. And not only did Class Counsel have to take depositions, review documents and

5   work with experts during this time frame, they also had to defend against Defendants' Daubert

6   motion to strike IPP's expert reports.

7           And finally, at the summary judgment stage, the IPPs had to respond to the eleven

8   motions (out of 36) that Defendants had filed against them, and they had to coordinate with

9   other plaintiff groups on responses to the other motions that remained. These motions raised

10  difficult and complex legal and factual issues regarding the FTIA, antitrust standing, withdrawal

11  from the conspiracy and other dispositive issues.

12          There was obviously great risk to IPPs in continuing with this litigation. "Antitrust

13  litigation in general, and class action litigation in particular, is unpredictable." *In re NASDAQ*

14  *Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 475 (S.D.N.Y. 1998). "The 'best' case can be lost

15  and the 'worst' case can be won, and juries may find liability but no damages. None of these

16  risks should be underestimated." *In re Superior Beverage/Glass Container Consol. Pretrial*, 133

17  F.R.D. 119, 127 (N.D.Ill. 1990). IPPs faced the risk of losing this litigation since proving

18  liability was going to be complicated. This amplified the risk that IPPs might not recover

19  anything for their efforts.

20          "Generally, unless the settlement is clearly inadequate, its acceptance and approval are

21  preferable to lengthy and expensive litigation with uncertain results." *Ching v. Siemens Indus.,*

22  *Inc.*, 2014 WL 2926210, at *4 (N.D.Cal. June 27, 2014). Immediate receipt of money through

23  settlement, even if lower than what could potentially be achieved through ultimate success on

24  the merits, has value to a class, especially when compared to risky and costly continued

25  litigation. *See LaGarde v. Support.com, Inc.,* 2013 WL 1283325, at *4 (N.D.Cal. Mar. 26,

26  2013).

27

28

1    While collection may not have been as high a hurdle here given the size and wealth of

2    the Settling Defendants, they are foreign companies against whom collection efforts may be

3    complex and expensive.

4    The Special Master is satisfied that the factor of risk and complexity weighs in favor of

5    settlement.

6    3.    Amount Offered in Settlement

7    This factor is generally considered the most important because the critical component of

8    any settlement is the amount of relief obtained by the class. *Bayat v. Bank of the W.*, 2015 WL

9    1744342, at *4 (N.D.Cal. Apr. 15, 2015).

10    Here, as cash consideration for the Proposed Settlements, Defendants have deposited

11    $541,750,000 into an escrow account. The Chunghwa and LG settlements bring that total to

12    $576,750,000.  No objector has disputed that this may well be the second largest cash recovery

13    ever obtained on behalf of indirect purchasers. In addition, IPPs obtained valuable cooperation

14    from Defendants, in varying degrees, that will potentially enable them to prosecute the action

15    against, and obtain higher recoveries from the remaining Defendants. This factor favors

16    approval of the Proposed Settlements considerably.

17    Objector Douglas W. St. John argues that the "vastly disproportionate size of the

18    Samsung and Philips settlements," demonstrates that the smaller settlements against other

19    defendants were unfair.  St. John Reply in Support of Objection, pp. 9-11. While St. John

20    attempts to cast this argument in terms of the settlement's fairness, it is really a challenge to

21    Lead Counsel's request for attorneys' fees and is addressed head-on *infra* at VIII.B.3.  To the

22    extent that this objection challenges the adequacy of the settlement, the Special Master rejects it.

23    Lead Counsel has provided evidence that the market shares of both Samsung and Philips

24    increased during the litigation and that their settlement amounts are roughly proportionate to

25    their market shares, their core roles in the conspiracy and the evidence against them.  IPP Reply

26    re Final Approval of Settlements, dtd. 12/23/15, p. 17. (filed on Case Anywhere).

27

28

1

          4.    Extent of Discovery and Stage of Proceedings

2

       This factor "evaluates whether 'the parties have sufficient information to make an

3

informed decision about settlement.'" *Larsen v. Trader Joe's Company,* 2014 WL 3404531, at

4

*5 (N.D.Cal. July 11, 2014). Formal discovery is not a requirement for final settlement

5

approval; "[r]ather, the court's focus is on whether the parties carefully investigated the claims

6

before reaching a resolution." *Bellinghausen v. Tractor Supply Co.,* 306 F.R.D. 245, 257

7

(N.D.Cal. 2015).

8

       Here, significant discovery was already completed by the time the parties reached their

9

settlement agreements. IPPs and their experts had already searched, reviewed and analyzed

10

millions of pages of documents and voluminous data sets produced by defendants, the DAPs

11

and third parties, and various parties to the litigation had already taken over 250 depositions. In

12

addition, the parties had already exchanged expert reports on liability and damages, including

13

opening, opposition, rebuttal and sur-rebuttal reports from 17 expert witnesses, all of whom

14

were deposed, often multiple times, regarding the reports that they had prepared.

15

       In anticipation of trial, the parties had also exchanged trial exhibit lists, witness lists,

16

deposition designations, jury instructions and special verdict forms. They had also filed 64

17

motions *in limine* and other pretrial motions. These motions were briefed in varying degrees

18

before the Proposed Settlements were executed.

19

       In light of this extensive discovery (and preparation for trial), IPP counsel were in a solid

20

position to assess the value of the case.  This factor weighs heavily in favor of settlement.

21

          5.    Experience and Views of Lead Counsel

22

       "Parties represented by competent counsel are better positioned than courts to produce a

23

settlement that fairly reflects each party's expected outcome in litigation." *Rodriguez v. West*

24

*Publishing Corp.,* 563 F.3d 948, 967 (9th Cir. 2009). Consequently, "'[t]he recommendations of

25

plaintiffs' counsel should be given a presumption of reasonableness.'" *In re Omnivision Techns.,*

26

*Inc.,* 559 F.Supp.2d 1036, 1043 (N.D.Cal. 2008); *Ellis,* 87 F.R.D. at 18 ("[T]he fact that

27

experienced counsel involved in the case approved the settlement after hard-fought negotiations

28

is entitled to considerable weight" when approving a settlement agreement); *see also In re*

1   *PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y.) aff'd sub nom. *In re*

2   *PaineWebber Inc. Ltd. Partnerships Litig.*, 117 F.3d 721 (2d Cir. 1997).

3          Here, it is undisputed that Lead Counsel and counsel for Defendants are experienced

4   litigators, that Lead Counsel oversaw and was involved in every aspect of this litigation and that

5   Lead Counsel had a thorough understanding of the evidence and all of the claims and defenses

6   involved in this case. *See* Docket 4073-1 (Lead Counsel CV).  It engenders further confidence

7   that Hon. Vaughn Walker and Hon. Fern Smith provided their experienced input into the

8   parties' settlement negotiations.

9          This factor therefore militates in favor of approval of the Proposed Settlements.

10                 6.    Government Participation

11         The Class Action Fairness Act, or "CAFA," requires that notice of a settlement be given

12   to state and federal officials and provides those officials a window of time to comment. 28

13   U.S.C. § 1715(b). "Although CAFA does not create an affirmative duty for either state or

14   federal officials to take any action in response to a class action settlement, CAFA presumes that

15   once put on notice, state or federal officials will raise any concerns that they may have during

16   the normal course of the class action settlement procedures." *Garner v. State Farm Mutual*

17   *Automobile Ins. Co.,* 2010 WL 1687832, at *14 (N.D.Cal. Apr. 22, 2010).

18         Here, the Department of Justice and all state attorneys general received CAFA

19   notices of these settlements from each of the settling defendants. Other than the California

20   Attorney General, who filed a Statement of Interest asserting various conditional objections, no

21   other governmental official has raised any concern regarding the settlements. This fact favors

22   approval of the Proposed Settlements. *See In re LinkedIn User Privacy Litig.*, 2015 WL

23   5440975, at *1 (N.D.Cal. Sept. 15, 2015).

24         With regard to the California Attorney General's Statement of Interest, which the

25   Attorney General supplemented on December 9, 2015, the Attorney General raised the

26   following concerns:  (1) the notice program that IPPs implemented was insufficient to assure

27   that California natural persons had a fair and equitable opportunity to claim from the Proposed

28   Settlements, particularly since the notice program did not utilize television advertising; (2)

1  reimbursement on claims should be capped at single rather than trebled damages; (3) a residual

2  *cy pres* fund should be established for the benefit of natural persons in the state-specific

3  damages classes; and (4) the final date for filing claims should be extended to June 30, 2016 in

4  order to increase claims from natural persons and efficiently coordinate California state and

5  federal proceedings.

6       With regard to extension of the claim deadline, the Special Master issued a Report and

7  Recommendation on January 6, 2016 (Docket No. 4281), recommending that the Court extend

8  the claim deadline for California natural persons only to June 30, 2016, and that Lead Counsel

9  for the IPP's give notice of such extension on the IPP claim website. With regard to the

10  concerns about the adequacy of notice, at the January 5, 2016, hearing the Special Master

11  ordered Lead Counsel to produce data concerning claims that have been received to date.

12       The Special Master rejects the requests of the Attorney General as to inadequacy of

13  notice, establishment of a *cy pres* fund, and applying a damage cap based on single rather than

14  treble damages. As to notice, the Attorney General acknowledges that the notice program

15  satisfied due process and Rule 23. While the Attorney General advocates for a more "optimal"

16  notice program that would have included television advertising, the Attorney General has cited

17  no persuasive authority for the proposition that television advertising is required, particularly

18  when the rest of the notice program had a sufficiently expansive reach. *See In re Google*

19  *Referrer Header Privacy Litig.*, 87 F.Supp.3d 1122, 1138 (N.D.Cal. 2015).

20       As to *cy pres* the Second Circuit in *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d

21  423 (2d Cir. 2007) rejected an approach similar to the Attorney General's proposal. The Second

22  Circuit found that the district court had erred in allowing a *cy pres* distribution without

23  considering a distribution of excess funds as treble damages to the class. *Id.* at 436. The

24  Attorney General has cited no case that holds that *cy pres* should take precedence over treble

25  damages.

26       As to capping claims at single rather than treble damages, the Attorney General relies on

27  *In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21, 26 (1st Cir. 2012) but *Lupron* is

28  plainly distinguishable. In *Lupron*, the court approved the district court's decision to make a *cy*

1   *pres* distribution instead of using the residual funds to award treble damages. *Id.* at 34.  But in

2   that case claimants had already received distributions of 167% of their damages.  In the end,

3   whether to pay residual funds as treble damages to claimants, or to create a *cy pres* fund, is

4   within the discretion of class counsel and ultimately the Court.  Where in doubt, it is proper to

5   favor payment of residual sums to class members. *Masters*, 473 F.3d at 436.

6   7.     Reaction of Class Members to the Proposed Settlements

7           IPP's Notice Program reached millions of consumers who purchased CRT televisions

8   and computers. *See* Fisher Decl., ¶18. Only 11 objections (with a total of 22 individual

9   objectors) and five requests for exclusion were received. Two objections have since been

10  withdrawn, and two of the requests for exclusion were by DAPs that are already pursuing their

11  own cases.  Moreover, two of the objections – those from Paul Palmer (which was withdrawn)

12  and Douglas St. John – are directed at fees only; they do not challenge the sufficiency of the

13  settlement.

14          These numbers strongly favor approval of the settlement. While a settlement may be

15  approved even if a large number of class members object, when objections come from only a

16  smattering of class members this provides strong support for the fairness of its terms. *See Ellis*,

17  87 F.R.D. at 18; *see also Nat'l Rural Telecomm. Coop.*, 221 F.R.D. at 529 ("It is established that

18  the absence of a large number of objections to a proposed class action settlement raises a strong

19  presumption that the terms of a proposed class settlement action are favorable to the class

20  members."). Further, when the class involves large corporations that are intimately familiar with

21  civil litigation, the inference of class support when there are only a few objectors is enhanced.

22  *See In re Linerboard Antitrust Litig.*, 321 F.Supp.2d 619, 629 (E.D.Pa. 2004).

23  8.     The Proposed Settlements are Fair, Reasonable and Adequate

24          In summary, the Special Master is satisfied that all criteria for evaluating the Proposed

25  Settlements have been satisfied, and concludes that the terms of the Proposed Settlements are

26  fair, reasonable and adequate. The proposals were not hastily arrived at and there is not a shred

27  of evidence in the record suggesting the existence of collusion between the negotiators. *See*

28  *Officers for Justice*, 688 F.2d at 627. Further, the Proposed Settlements have been reached after

1  meaningful discovery and after arms-length negotiations that were conducted by capable

2  counsel. They are, therefore, presumptively fair. *See In re Heritage Bond Litig.*, 2005 WL

3  1594403, at *9 (C.D.Cal. June 10, 2005); *In re Tableware Antitrust Litig.*, 484 F.Supp.2d 1078,

4  1079 (N.D.Cal. 2007) (quoting *In re General Motors Corp.*, 55 F.3d 768, 784 (3d Cir. 1995)

5  ("This preliminary determination establishes an initial presumption of fairness.")  Therefore,

6  objectors bear the burden of establishing that the settlement is not fair, reasonable and adequate.

7  *See United States v. Oregon,* 913 F.2d 576, 581 (9th Cir. 1990).  Objectors have not come close

8  to carrying that burden.

9  The Special Master now addresses the proposed plan of allocation.

10  B.    Fairness of Allocation Plan

11  Approving a plan for the allocation of a class settlement fund is governed by the same

12  legal standards that apply to approving the settlement terms: the distribution plan must be "fair,

13  reasonable and adequate." *In re Citric Acid Antitrust Litig.,* 145 F.Supp.2d 1152, 1154

14  (N.D.Cal. 2001) A plan of allocation that reimburses class members based on the type and

15  extent of their injuries is generally reasonable. *See id.*; *Omnivision*, 559 F.Supp.2d at 1045.

16  Indeed, in this District, a "*pro-rata* [plan] for allocation has been used in many antitrust cases."

17  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 7575004, at *4 (N.D.Cal. Dec. 27, 2011);

18  *see also In re Vitamins Antitrust Litig.,* 2000 WL 1737867, at *6 (D.D.C. Mar.31, 2000); *In re*

19  *Lloyds' Am. Trust Fund Litig.,* 2002 WL 31663577, at *19 (S.D.N.Y. Nov.26, 2002);

20  *PaineWebber,* 171 F.R.D. at 135.

21  1.    Summary of Allocation Plan

22  IPP class members will of course obtain compensation only for the overcharges they

23  paid on CRT products, not for the entire purchase price.  IPPs propose to compensate members

24  of the Indirect Purchaser State Class according to a plan of distribution that allows qualifying

25  claimants to claim their pro-rata share of the Settlement Fund based on the total number of valid

26  claims filed and on the number and type of CRT Products that each claimant purchased during

27

28

the class period.[26] For example, the Settlement Administrator will initially compute the straight pro-rata distribution of the available Settlement Fund among all claims product purchases, with claims for Standard CRT Televisions (televisions with a screen size of less than 30 inches) receiving a weight of 1, Large CRT Televisions (televisions with a screen size of 30 inches or larger) receiving a weight of 4.3, and CRT Computer Monitors receiving a weight of 3. As Lead Counsel explains, the weighting of the different CRT Products in this manner is necessary to reflect the relative harm to purchasers of those products as set forth by the data produced by Plaintiffs' expert, Dr. Janet Netz.  Alioto Decl. I, ¶¶ 44-45.

For example, the data produced in this case shows that the CRTs used in televisions with a screen size of 30 inches or larger were significantly more expensive than the CRTs used in televisions less than 30 inches. *Id.*, ¶¶44, 45. It therefore became necessary to create two categories for CRT televisions (Standard CRT Televisions and Large CRT Televisions) to ensure that purchasers of Large CRT Televisions are properly compensated. *Id.*, ¶45. In addition, based on Dr. Netz' findings that the overcharge on monitor tubes was more than twice the overcharge on television tubes, it is appropriate to give greater weight to CRT Computer Monitors than Standard CRT televisions. *Id.*, ¶46. However, the data produced in this case also shows that Large CRT Televisions contain the largest, most expensive CRTs. On average, they are approximately twice the size and four times the price of CRTs used in monitors. So, even though Dr. Netz found the overcharge percentage on television tubes to be less than for monitor tubes, the average dollar overcharge is greater for Large CRT Televisions than for CRT Computer Monitors. *Id.*, ¶47.

When allocating the settlement funds, the Settlement Administrator will also determine a minimum payment amount. Lead Counsel contends that, based on historical claim rates, it is expected that there will be sufficient funds to distribute a minimum payment of at least $25 to

---

[26] All Statewide Damages class members will be required to complete a claim form containing: (i) contact information; (ii) verification of membership in one of the Statewide Damages Classes; (iii) the number and type of each CRT Product purchased during the class period; and (iv) an attestation under penalty of perjury that the information provided is accurate. All claimants will be subject to auditing and requests for documentation of purchases by the Settlement Administrator.

1  eligible class members who submit a valid claim form. This will incentivize small purchasers to

2  file a claim despite the fact that their straight pro-rata distribution amount would be relatively

3  small and will ensure that small claimants (*i.e.*, most individual consumers) receive meaningful

4  compensation for their participation in the claims process. Lead Counsel contends that he will

5  seek the Court's approval for the minimum payment amount when the data from the actual

6  claims process is available. *Id.*, ¶48.

7       The Settlement Administrator will also apply a maximum payment amount of three

8  times the estimated money damages per claimant, thereby recognizing the potential that the IPP

9  class may have obtained an award of treble damages.

10       Upon final approval, none of the Settlement Fund will revert to any defendant. And as

11  discussed further below, members of the Nationwide Class who are not also members of any

12  Statewide Damages Class will not receive any monetary compensation. *Id.*, ¶50.

13              2.   Treatment of Class Members in the Non-Repealer States

14       Basically, only claimants from the 21 states and District of Columbia in the Indirect

15  Purchaser State Classes will get money.  Members of the Nationwide Class who are not also

16  members of the 22 State Classes will release their claims for injunctive relief, equitable

17  monetary relief and damages without obtaining any monetary consideration.   Several objectors

18  contend that this arrangement is not fair, reasonable and adequate. *See* Docket No. 4111

19  (Fortman/Finn objection), pp.2-6; Docket No. 4112 (Williams), pp.11-12; Docket No. 4116

20  (Cooper/Scarpulla objection), pp.2-5; Docket No. 4144 (Gianasca, *et al* objection), pp.3-5. Lead

21  Counsel maintains that releasing these claims is appropriate because they are either completely

22  speculative or have absolutely no value. This is a highly contentious issue that warrants

23  significant attention.

24       As the Court well knows, non-repealer states are states that have failed to enact repealer

25  statutes to reject the holding of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). In *Illinois*

26  *Brick*, almost 40 years ago the Supreme Court prohibited the "offensive" use of pass-on

27  evidence to establish antitrust liability, which has effectively barred a downstream customer

28  from showing under federal law that he had paid an illegal overcharge passed-on to him by an

upstream purchaser of the defendants' product. Following *Illinois Brick*, approximately half the states by either statutes or court decisions re-conferred on indirect purchasers the right to recover for pass-on overcharges under state antitrust laws and/or consumer protection statutes. States that have passed such laws are known in the trade as "repealer" states, while the remaining states are known as "non-repealer" states. Here, 26 of the 29 states that are excluded from the Indirect Purchaser State Classes are non-repealer states. The other three states – Massachusetts, New Hampshire and Missouri — are repealer states that were omitted from the State Classes for various reasons. They will be addressed separately.

> a.   Claims raised in the operative Fourth Consolidated Amended Complaint

Objectors contend that Class Counsel made but failed to pursue claims for various kinds of relief on behalf of class members in non-repealer states. Lead Counsel responds that claims for monetary compensation for non-repealer states were never asserted. Thus, we begin by examining the claims actually asserted.

Plaintiffs representing the 22 Indirect Purchaser State Classes filed their consolidated amended complaint on March 16, 2009. On May 10, 2010, Plaintiffs filed their Second Consolidated Amended Complaint, and on December 11, 2010, Plaintiffs filed their Third Consolidated Amended Complaint. Plaintiffs filed their Fourth Consolidated Amended Complaint on January 10, 2013, the currently operative complaint.

In their Fourth Consolidated Amended Complaint, Plaintiffs brought the following claims on behalf of themselves, the Indirect Purchaser State Classes, and the Nationwide Class. Docket No. 1526, ¶¶243-244. (1) Violation of Section 1 of the Sherman Act, seeking injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26 on behalf of Plaintiffs and the Nationwide Class, *id.*, ¶¶247-256; (2) Violation of State Antitrust Statutes, seeking "all forms of relief available" under each state's statute for Plaintiffs and the members of each State Class, *id.* ¶¶257-278; (3) Violation of State Consumer Protection and Unfair Competition Statutes, seeking relief for (a) Plaintiffs and members of the Indirect Purchaser Class from Florida, Hawaii, Nebraska, New Mexico, North Carolina and Vermont for "all relief available" under these state's statues, *id.* ¶¶282-285, 287-288; (b) equitable relief, such as restitution and

1   disgorgement, for California plaintiffs and the members of the California Indirect Purchaser

2   Class, *id.*, ¶281; (c) "actual damages" for injuries to New York plaintiffs and members of the

3   New York Indirect Purchaser Class, *id.*, ¶286; and (4) Unjust Enrichment and Disgorgement of

4   Profits, seeking disgorgement of profits resulting from overpayments and establishment of a

5   constructive trust for plaintiffs and members of the Indirect Purchaser Class from Arizona,

6   California, District of Columbia, Iowa, Maine, Michigan, New Mexico and South Dakota. *Id.*,

7   ¶¶289-292.

8       The prayer for relief seeks to "recover damages, as provided by the state antitrust,

9   consumer protection, and unfair competition laws alleged herein, and that a joint and several

10   judgments in favor of Plaintiffs and the Classes be entered against the Defendants in an amount

11   to be trebled in accordance with such laws." *Id.*, p.95.C. "Plaintiffs and the Classes" also seek to

12   "be awarded restitution, including disgorgement of profits obtained by Defendants as a result of

13   its acts of unfair competition and acts of unjust enrichment." *Id.*, p.96.E.

14       The parties dispute whether the Fourth Amended Consolidated Complaint alleged a

15   nationwide disgorgement and unjust enrichment claim. Plaintiffs point to the specific language

16   in the Fourth Claim for Relief that limited such relief to class members from the enumerated

17   eight states. *See id.*, ¶¶289-292.  Objectors Scarpulla and Cooper, however, point to the broader

18   language in the prayer for relief, which states that "Plaintiffs and the Classes" seek restitution,

19   including disgorgement of profits..." *Id.*, p.96.E (emphasis added).  The Special Master

20   concludes that the better reading of these conflicting allegations is to allow the specific to

21   govern the general — the intent of the pleaders seems clearly to have been to limit the equitable

22   relief to the eight listed states, but by mistake they did not conform the broad language of the

23   prayer accordingly.  However, as shown below, this argument is unimportant because, whether

24   or not claims for equitable monetary relief were asserted on behalf of class members in non-

25   repealer states, such claims are valueless.

26

27

28

b.     Release of injunctive relief claims

The Proposed Settlement releases all claims for injunctive relief on behalf of the Nationwide Class.  Thus, class members in the 26 non-repealer states (and the 3 omitted repealer states discussed below) release their injunctive relief claims for no consideration.

The Special Master notes out of the box that the Court has already approved an identical release of all claims nationwide in connection with the earlier IPP settlement with LG. *See* Docket Nos. 2542, 2511.  No objections were raised to that release.  This precedent is certainly instructive.

Lead Counsel argues that the release of non-repealer state class members' injunctive relief claims without payment is fair, reasonable and adequate since those claims are not viable.  The Special Master agrees.  As IPPs explain, "[n]o one disputes that the CRT market is dying and almost all manufacturers, including all of the alleged conspirators, have left the market, making it very unlikely that the alleged conduct could recur in the future."  Motion for Final Approval of Settlements, p.32.  The unlikelihood of future violations makes an injunction basically worthless, and probably impossible to obtain.  *See Parker v. Time Warner Entm't Co., L.P.*, 631 F.Supp.2d 242, 262 (E.D.N.Y. 2009) ["A claim which cannot be proven is worth essentially nothing. Consideration of nothing for releasing a worthless claim is therefore fair, reasonable, and adequate."]; *Nguyen v. Radient Pharmaceuticals Corp.*, 2014 WL 1802293, at *7 (C.D.Cal. May 6, 2014) [approving plan of allocation in a securities class action over objection that certain claims were released without compensation].  As this case progressed it became clear that (1) the conspiracy was no longer in effect, and (2) the conduct was unlikely to recur because Defendants no longer made or sold any meaningful volume of CRT products in the United States. An antitrust injunction, therefore, would have had little or no practical value to class members. Moreover, an antitrust injunction would have been difficult to obtain since IPPs could not show a likelihood of future harm.  *See United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333-34 (1952) ["The sole function of an action for injunction is to forestall future violations . . . We agree with the trial court that conduct discontinued in 1941 does not warrant issuance of an injunction in 1949."]  Although the injunctive relief claims here were essentially

1    valueless, defendants are legitimately entitled to a global release from any potential injunctive

2    relief-styled "nuisance" claim. *See Sullivan*, 667 F.3d at 310.

3        Messrs. Scarpulla and Cooper also suggest that, as in *DRAM*, Lead Counsel could have

4    sought an injunction requiring Defendants to establish a compliance program for their officers

5    and employees regarding U.S. federal and state antitrust laws. *See* Scarpulla/Cooper 12/9/15

6    Reply Br., p. 12 (citing *DRAM*, Docket No. 2132, *supra*, pp. 32-33). Such an education

7    program 20 years after this conspiracy began would have been of little practical value to the

8    class. Class Counsel here did not seek such transparently useless relief, and under the

9    circumstances — particularly since the Court has already approved without objection a

10   settlement on the same terms — release of such claims for non-repealer state class members

11   without monetary consideration was fair, reasonable and adequate.

12          c.    Release of claims for equitable monetary relief

13        As discussed above, the Special Master thinks that a fair reading of the Fourth

14   Complaint is that it did not assert a claim for restitution or disgorgement under state laws on

15   behalf of the non-repealer states. But whether the Fourth Complaint asserted such claim or not,

16   the same question remains: Is it fair to have not asserted or released such claims on behalf of

17   the non-repealer states without monetary compensation? The answer turns on whether such a

18   state law claim would have been viable in light of *Illinois Brick* and its progeny.

19        Everyone here agrees that "the effect of *Illinois Brick* was to eliminate federal antitrust

20   recovery for the vast majority of indirect purchasers of price-fixed goods and services." *See*

21   Scarpulla/Cooper Reply in Support of Objections, p.16; *see also DRAM*, Docket No. 2132, p.82.

22   The issue is whether a state law claim for equitable relief can replace the federal claim barred by

23   *Illinois Brick*.

24        The case law is clear and consistent in holding that such state law claims are not

25   permissible in indirect purchaser cases. *In re Digital Music Antitrust Litig.*, 812 F.Supp.2d

26   1179, 1192 (N.D.Cal. 2009) [unjust enrichment claims under Arkansas, Virginia, Montana and

27   Puerto Rico law barred]; *In re K-Dur Antitrust Litigation*, No. CIV.A. 01-1652 (JAG), 2008 WL

28   2660780, at *5 (D.N.J. Feb. 28, 2008) [unjust enrichment claim barred because it was based on

the same facts and as the state antitrust claims which were not permitted under Pennsylvania, New Jersey or Delaware law]; *Aikens v. Microsoft Corp.*, 159 Fed. Appx. 471, 477 (4th Cir. 2005) [unjust enrichment claim barred as attempt to circumvent the prohibition against indirect purchaser claims under Louisiana antitrust law]; *Sickles v. Cabot Corp.*, 877 A.2d 267, 277 (N.J.Super.Ct. 2005) ["[T]o permit an indirect purchaser . . . to recast his antitrust claim as a consumer fraud violation would undermine the standing requirements of the ATA and would 'essentially permit an end run around the policies allowing only direct purchasers to recover under the Antitrust Act.'"]. Finally, in *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F.Supp.2d 160 (D.Me. 2004), the court opined: "For those states that have maintained the *Illinois Brick* prohibition on indirect purchaser recovery, I conclude that it would subvert the statutory scheme to allow these same indirect purchasers to secure, for the statutory violation, restitutionary relief at common law (or in equity)."). *Id.* at 211.

Scarpulla and Cooper contend that there is a "growing body of law recognizing the viability of Clayton Act equitable monetary claims for indirect purchasers arising from violations of Section 1 of the Sherman Act." However, their "growing body" of law consists of two cases that are plainly distinguishable and a misreading of a Special Master's report in *DRAM*.

In *United States v. Keyspan Corp.*, 763 F.Supp.2d 633 (S.D.N.Y. 2011), the Department of Justice was permitted to seek disgorgement of revenues as a remedy for Sherman Action violations as part of a consent decree because "absent disgorgement, the Government is without recourse to remedy *Keyspan's* anticompetitive conduct." *Id.* at 638-640. And in *TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 10-4346 SI, 2011 WL 2790179, at *4 (N.D.Cal. July 12, 2011), the court, relying on *Keyspan*, concluded that disgorgement was available to the State of Oregon in its indirect purchaser case given "the expansive grant of authority to seek equitable relief under the Oregon Antitrust Statute." Both these cases involve governmental enforcement efforts and are thus distinguishable from the private indirect purchaser action here. Objectors' reliance on these cases is therefore unpersuasive.

In *DRAM*, Special Master Renfrew concluded that "the presence of purchasers with claims arising under both repealer and non-repealer state antitrust and consumer protection statutes presents no impediment to a finding that common questions predominate and the Indirect Purchaser Settlement Class satisfies the requirements of Rule 23(b)(3)." *DRAM*, Docket No. 2132, p.84. Special Master Renfrew did not analyze whether non-repealer state consumer protection claims for equitable relief were <u>viable</u>. He merely said that lumping together claims of class members from both repealer and non-repealer states did not destroy predominance. Objectors' reliance on Judge Renfrew's allusion to *Illinois Brick* in *DRAM*, therefore, assumes too much and is unpersuasive.

As with the injunctive claims, the LG settlement released without monetary compensation any equitable monetary relief claims for non-repealer state class members. No objection was raised. Docket Nos. 2542, 2511. This strongly supports the appropriateness of the same ruling with respect to the Proposed Settlements.

Faced with the overwhelming case law barring state law claims for equitable relief that attempt to evade *Illinois Brick* and state laws barring such antitrust claims, Class Counsel reasonably concluded that actively pursuing such a claim would have been quixotic. If such claims were worth little or nothing, releasing them without compensation does not render the Proposed Settlements unfair, unreasonable or inadequate. *Parker*, 631 F.Supp.2d at 262 ["A claim which cannot be proven is worth essentially nothing. Consideration of nothing for releasing a worthless claim is therefore fair, reasonable, and adequate."]; *Omnivision*, 559 F.Supp.2d at 1045 ["It is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of the claims on the merits."]; *Booth v. Strategic Realty Trust, Inc.*, No. 13-cv-04921, 2015 WL 6002919, at *7 (N.D.Cal. Oct. 15, 2015) (Tigar, J.) (same). *See also Nguyen*, 14 WL 1802293, in which the court approved a plan of allocation although certain claims were released without compensation, noting: "It is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits. The record shows that it is very unlikely that the in-and-out traders

could have proved recoverable damages." (internal citations omitted). As the *Nguyen* court explained:

> "Counsel has also litigated this case thoroughly and aggressively from the start and utilized expert input to determine the extent of damage and calculation of the instant settlement. The Court sees no reason to disagree with their judgment of their own case on this record, and finds it is highly unlikely the in-and-out traders could prove any damages caused by Radient's alleged misrepresentation. *The Objector is correct that proving in-and-out claims is not impossible, but there is no evidence that the in-and-out traders in this case could have done so. On this basis, the plan of allocation reasonably does not include values for in-and-out shares. The plan of allocation reasonably and fairly represents injuries and claims on the merits.*"

*Id.* at *8 (emphasis added)

For these reasons the Special Master concludes that Class Counsel made a justifiable decision to exclude or at least not to actively pursue claims of equitable monetary belief on behalf of non-repealer state class members. The Nationwide Class' release of these claims is fair, adequate and reasonable.

### d.   Release of claims for damages

Objectors also challenge Lead Counsel's valuation of the damage claims of the purchasers in the non-repealer states. They argue that, "[n]ot only do these class members have standing to assert that their claims fall into an exception to *Illinois Brick*, they also have standing to argue that *Illinois Brick* should be reconsidered in light of 38 years of developments in the law, economic theory and the analytical tools available to demonstrate pass-on damages." *Id.*

Objectors' position fails for two reasons. First, they do not explain, or cite to any persuasive legal authority that explains, what an "exception" to *Illinois Brick* would be. Second, assessing value to a claim based on the hope that the Supreme Court may reverse 38 years of jurisprudence is to chase an illusion. Lead Counsel had no duty to assert frivolous, hypothetical claims foreclosed by existing law because someday maybe the law will change. As was noted at the January 5, 2016 hearing, while Objectors' arguments provide fascinating speculation for a

1    law review article,[27] they do not realistically inform the very practical decision in a class action

2    which claims have merit. The Nationwide Class' release of claims for monetary damages is fair,

3    reasonable and adequate.

3.    Treatment of Class Members in Omitted Repealer States: Massachusetts,

Missouri, New Hampshire

6    Various Objectors challenge the fairness of the Plan of Allocation because Nationwide

7    Class members from Massachusetts, Missouri and New Hampshire were not included in the

8    Indirect Purchaser State Classes.  The situation in each state is now addressed.

a.    Massachusetts

10   Massachusetts plaintiffs were initially part of the State Damage Class.  They asserted a

11   claim under the Massachusetts Consumer Protection Statute, Mass. Gen. Laws Ch. 93A.

12   However, on February 5, 2010, Special Master Legge found that plaintiffs had failed to plead an

13   essential element of prior notification of defendants, and dismissed the claims with leave to

14   amend.  Docket No. 597, pp.29-30.  Class Counsel's Second Amended Complaint again failed

15   to plead this element (presumably because no notification had been given), and Special Master

16   Legge dismissed the claim with prejudice in October 2010. Docket Nos. 716, 768, pp.12-14,

17   796.  Massachusetts was omitted from subsequent complaints.  Docket Nos. 827, 1526.

18   Attorneys Bonsignore and Moore, on behalf of their Objector clients, contend (1) that

19   Lead Counsel should have advised potential Massachusetts plaintiffs that their claims had been

20   dismissed so they could file Direct Action Suits, and (2) that they represented Massachusetts

21   clients who could have served as class representatives.  As to notice, Lead Counsel did provide

22   adequate notification in the settlement notices that were sent for both the Chunghwa and LG

23   settlements. *See* Docket Nos. 1063-1, 1063-2, 2511, 2512.  As to potential clients who did not

24   assert claims, nothing prevented Mr. Bonsignore or Ms. Moore from proffering fully vetted and

25   qualified plaintiffs to serve as class representatives.  If Lead Counsel failed to include their

26   proffered clients, they could themselves, within the almost two years remaining in the

27

28

[27] *See, e.g.*, Objectors' law review-styled discussion at pages 18-20 of their December 9, 2015 Reply brief.

1    limitations period, have initiated direct actions that could have been joined with the MDL.  Mr.

2    Bonsignore claims that his client Gianasca was truly "vetted [and] ready to serve" as a

3    representative plaintiff.  Docket No. 4144, p.4.  Mr. Alioto swears that he "never refused to add

4    a viable plaintiff to this case.  I have never excluded a viable plaintiff from this case.  I have

5    never committed to add a viable plaintiff to this case and then not done so." Alioto Decl in

6    Support of IPP Motion for Final Approval, dtd. 11/19/15, ¶28 (filed on Case Anywhere.)

7    ["Alioto Decl. III"] Having reviewed the documents claiming to show that Mr. Bonsignore

8    proffered a viable plaintiff, the Special Master concludes that Mr. Alioto's version of the facts is

9    more credible.

10         Since Massachusetts claims are now barred by the applicable statute of limitations, no

11    claims can now be added.

12                b.    <u>Missouri</u>

13         In Missouri, IPPs never asserted a claim because, according to Lead Counsel, no

14    Missouri plaintiff came forward to represent a Missouri class.  Special Master Legge had

15    already ruled that each state-specific class must have a named plaintiff in order to proceed. *See*

16    Docket No. 768, pp.5-6; Docket No. 799 (Order adopting R&R).  Mr. Bonsignore again claims

17    that he presented Lead Counsel with a viable Missouri class representative in March 2012.

18    Lead Counsel states that he has no record of these communications. Alioto Decl. III, ¶40.  Mr.

19    Bonsignore's supplemental filing attached an e-mail purporting to offer a Mr. Perriman as a

20    client.  But the document was not authenticated and lacks any indication that Perriman ever

21    purchased any CRT products.  Docket No. 4144-5.  Once again, the Special Master concludes

22    that Lead Counsel's recitation is more credible.

23                c.    <u>New Hampshire</u>

24         As with the Missouri claim, IPPs never asserted a New Hampshire claim because no

25    New Hampshire plaintiff came forward to represent a New Hampshire class. *See* Docket No.

26    768, pp.5-6; Docket No. 799 (Order adopting R&R).  Moreover, another e-mail that Mr.

27    Bonsignore provides to demonstrate that he notified Lead Counsel of a viable New Hampshire

28    class representative contains no showing of when the possible client bought a CRT product or

1    that she had proof of purchase.  Docket No. 4144-3.  Moreover, the e-mails are dated March,

2    2012 by which time the 3-year statute of limitations on the New Hampshire Consumer

3    Protection Act (N.H. Rev. Stat. § 358-A:2) had run.

4                              d.    Summary

5          In the end, it is hypothetically possible that Lead Counsel could have scoured these three

6    states to dredge up a plaintiff, although the Special Master does not believe that was his duty.

7    But the explanation of the difficulties of locating viable plaintiffs is plausible, and counsel for

8    Objectors do not explain why they did not institute direct actions if Lead Counsel indeed failed

9    or refused to join viable plaintiffs.  The objections to the settlement on this basis are without

10   merit.

11                      4.    The Plan of Allocation with Regard to the Members of the Nationwide

12                            Class Who Are Not Members of the Indirect Purchaser State Classes is

13                            Fair, Adequate and Reasonable

14         This plan of allocation is fair, reasonable and adequate as to these members of the

15   Nationwide Class who are not eligible for monetary compensation because Lead Counsel made

16   reasonable, rational, good-faith valuations of the strength of potential claims in non-repealer

17   states based on governing law, and as to the omitted repealer states Lead Counsel did not fail in

18   his responsibilities to pursue any viable claims from those states.  This plan of allocation was

19   already approved by this Court without objection in the LG settlement.   Class members in these

20   categories who are unsatisfied with the Proposed Settlements had the opportunity to opt out and

21   pursue their own legal remedies.  Courts routinely hold that the opt-out remedy is sufficient to

22   protect class members who are unhappy with the negotiated class action settlement terms. *Klee*

23   *v. Nissan N. Am., Inc.,* 2015 WL 4538426, at *8 (C.D.Cal. July 7, 2015).

24                      5.    Objections to Plan of Allocation Based on Chunghwa Settlement

25         Plaintiffs entered into a settlement with Chunghwa Picture Tubes, Ltd. for $10,000,000

26   cash. The Court granted preliminary approval of that settlement on August 9, 2011 and final

27   approval on March 22, 2012. Docket Nos. 992, 1105.  Although the Chunghwa settlement

28   constitutes a tiny percentage of the total settlement funds in this case, Objectors have raised two

1    troublesome due process issues as to whether the terms of the Chunghwa settlement conflict

2    with the current proposed Plan of Allocation.  Cooper/Scarpulla Reply in Support of Objections

3    to IPP Plaintiffs' Motion for Approval of Settlements, dtd. 12/9/15, pp. 24-27 (filed on Case

4    Anywhere).  The two purported conflicts are: (1) the Chunghwa settlement permits resellers of

5    CRT products to recover damages but the current Plan of Allocation does not, and (2) the

6    Chunghwa settlement distributes the net settlement proceeds to 24 states pro rata in accordance

7    with their respective populations in 2000, but the current Plan of Allocation distributes funds

8    pro rata to all eligible claimants without regard to state populations.

9         Lead Counsel's motion for preliminary approval of the Chunghwa settlement

10   "propose[d] that distribution of settlement funds be deferred until the termination of the case"

11   and that Lead Counsel would "address any allocation issues which arise at that time as well."

12   Docket No. 884, at 18. The preliminary approval Order for the Chunghwa settlement states that

13   "[t]he distribution of the Net Settlement Fund shall be deferred until a later date" and that

14   "Plaintiffs shall propose a method of distribution at that time, which shall be subject to court

15   approval." Docket No. 993, at ¶11. The long form notice of the Chunghwa settlement under

16   heading 10 ("When can I get a payment?") reads as follows:

17            "No money will be distributed to Settlors yet. The lawyers will
              pursue the lawsuit against the Non-Settling Defendants to see if
18            any future settlements or judgments can be obtained in the case
              and then be distributed together to reduce expenses. It is possible
19            that money will be distributed to organizations who are, as nearly
              as practicable, representatives of the interests of indirect
20            purchasers of CRT Products instead of Settlors themselves if the
              cost to process claims would result in small payments to Settlors."
21

22   Chunghwa Notice, p.4, Q.10.

23            Notice was duly given to the Chunghwa Class that stated, as detailed below, that the net

24   funds after payment of attorney's fees and costs would be distributed to all indirect purchasers,

25   including resellers, and to the states pro rata based on their populations.  Ultimately, the Final

26   Judgment confirmed the terms of the settlement and stated,

27            "Without affecting the finality of this Judgment in any way, this
              Court retains continuing jurisdiction over: (a) implementation of
28            this settlement and any distribution to Class Members pursuant to

1    further orders of this Court; and (b) disposition of the Settlement
2    Fund…" Docket 1106, ¶10.

3         The currently proposed settlements define members in the Nationwide Class and in the

4    Indirect Purchaser State Classes as indirect purchasers who purchased CRT Products "for their

5    own use and not for resale. (emphasis added)". Chunghwa, however, negotiated a release on

6    behalf of a Nationwide Class of indirect purchasers that includes resellers as well as end-buyers.

7    Docket No. 884-1 at Ex. 1, ¶1; see also Long Form of Notice at Exhibit A, Fisher Chunghwa

8    Notice Declaration, p. 4:

9         **"7. How do I know if I am one of the Settlors?** The Settlement Class
          ('Settlors') includes any person or business that indirectly bought in the
10        U.S. (excluding claims under the Washington Unfair Business Practices
          and Consumer Protection Act) from March 1, 1995 through November 25,
11        2007, any CRT Product made by the Defendants. Both consumers and
          resellers are included in the Settlement Class… (emphasis added)."
12

13   Long and Short Forms of Notice at Exhibits A & B of Fisher Chunghwa Notice

14   Declaration, Docket No. 1063.

15        In addition, the current proposed Plan of Allocation compensates class members using a

16   pro-rata approach per claim. That is, class members in the 22 Indirect Purchaser States will all

17   be treated the same when it comes to distributing the settlement money. However, in Chunghwa

18   funds will be distributed on a pro rata basis to "[e]ach State listed in the operative complaint for

19   which damage claims are being asserted, plus the states of Illinois and Oregon." Docket No.

20   993, ¶10, Chunghwa Preliminary Approval Order. The Order continues, stating: "[e]ach state's

21   pro rata share will be determined by computing its population as a percentage of the total

22   population of all states," and "[e]ach of the states shall receive its allocable share at a future date

23   to be approved by the Court." Id. The Order contains a chart listing the percentage of the Net

24   Settlement Fund to be distributed to each state.[28] Similarly, the Chunghwa Notice to class

25   members explains the following: "Regardless of whether the money is distributed to

26   organizations or the Settlors themselves, the money will first be allocated amongst the 24 states

27

28   [28] The Net Settlement Fund consists of the $10 million total, less 25% for attorneys' fees, litigation expenses, notice
     and claim expenses. The Net Settlement Fund is to be a minimum of $5 million.

1    listed on page 1 of this notice, so that each state receives its pro rata share. Each state's pro rata

2    share shall be determined by computing its population as a percentage of the total population of

3    all 24 states using census figures from the year 2000." Long Form Notice, Ex. A, Fisher

4    Chunghwa Notice Declaration, at 4, Docket No. 1063.

5         In contrast, the current Plan of Allocation makes no such geographical distinctions.

6    Rather, it provides that "qualifying claimants will be eligible to claim their pro-rata share of the

7    Settlement Fund based on the number of valid claims filed, and the number and type of CRT

8    Products each claimant purchased during the class period." Lead Counsel's Memo, pp.22-23.

9    Further, the current settlement excludes payment of the claims of Illinois, Oregon and

10   Washington on behalf of their residents, but in Chunghwa the Court ordered that the states of

11   Illinois and Oregon are to be allocated 8.59% and 2.37% of the Chunghwa Net Settlement Fund.

12   Docket No. 993, at ¶10.

13        These apparent inconsistencies are relevant to the question of whether the plan of

14   allocation satisfies due process concerns.  The Court has finally approved and entered final

15   judgment on the Chunghwa settlement that provides approximately $5,000,000 in

16   compensation, in part for resellers and pursuant to a state-by-state pro rata distribution.  Notice

17   has been given of that settlement.   IPP counsel now ask the Court to approve a settlement that

18   pays nothing to resellers and distributes all funds, including the Chunghwa Net Settlement Fund,

19   pro rata to all claimants.  This discrepancy raises due process concerns as to both the Chunghwa

20   class and the current Settlement class.  The Chunghwa class has been told that their settlement

21   funds will be distributed in part to resellers and pro rata by state.  But if the current Plan of

22   Allocation is adopted, the Chunghwa notice will have been inaccurate.  The current Proposed

23   Settlement class has been told that all $576,750,000, net of fees and expenses, will be

24   distributed to them pro rata by claimant.  Thus, it will contradict that notice if, as Lead Counsel

25   may be proposing (see below), $5 million or any sum were carved out of the $576,500,000 to

26   compensate the Chunghwa class.

27        Lead Counsel contends there is no fatal inconsistency between the two settlements.

28   First, he notes that the last sentence of the Chunghwa Long Form Notice tells Chunghwa class

1  members that they may ultimately receive nothing.  ("It is possible that money will be

2  distributed to organizations who are, as nearly as practicable, representatives of the interests of

3  indirect purchasers of CRT Products instead of Settlors themselves if the cost to process claims

4  would result in small payments to Settlors.")  But that sentence clearly contemplates that class

5  members would receive nothing if a *cy pres* distribution were made.  No *cy pres* payment is

6  currently contemplated.  Therefore, that sentence cannot be considered adequate notice to the

7  Chunghwa class that their distribution scheme may simply change.

8        Second, Lead Counsel notes that resellers along with everyone else got notice of the

9  current settlement but that no resellers (who tend to be large, sophisticated corporations) have

10  objected to the current settlement.  That is a fair point, but the absence of an objection does not

11  cure a due process problem if one exists.

12        Third, Lead Counsel seems to intend somehow to carve out funds from the current

13  settlement to comply with the terms of the Chunghwa settlement.  In briefing on this issue, he

14  states,

15            "Once the final Chunghwa Net Settlement Fund is known, the
          money will be allocated amongst the 24 states in accordance with
16            Paragraph 10 of the Chunghwa Preliminary Approval Order.  The
          Illinois and Oregon AGs will receive their states' pro rata shares
17            (based on a Net Settlement Fund of $5 million, their shares will be
          $429,500 and $118,500 respectively).  The other 22 states will
18            receive their pro rata shares as part of the pro rata distribution to
          claimants in those states."  Alioto ltr. of 1/13/16 to Special Master,
19            p. 5, fn. 12 (filed on Case Anywhere)

20

21        But this falls well short of providing a satisfactory solution.  It does not address the

22  problem that the current settlement class will be shortchanged by whatever amount is carved out

23  to satisfy the Chunghwa settlement terms.  And it is unclear as to whether there is to be a carve

24  out for the 22 states other than Illinois and Oregon, or whether their Chunghwa compensation

25  will be deemed to have been received by the contemplated pro rata distribution to all claimants.

26  More clarity is needed.

27        The Special Master has tried hard to find a solution to these Chunghwa issues that will

28  not disrupt approval of this settlement.  It is absurd to allow a $5,000,000 tail (the Chunghwa

1    Net Settlement Fund) to wag a $576,750,000 dog.  After all, we are talking about .8% of the

2    current settlement fund.  However, due process is due process, and final judgments cannot

3    simply be ignored.  One approach would be to rely on the language in the Chunghwa final

4    judgment in which the Court reserved jurisdiction to order how the Chunghwa settlement funds

5    are to be distributed.  However, the Special Master cannot in good conscience recommend that

6    the Court rely on this linguistic wiggle room to simply wipe out significant features of the

7    Chunghwa allocation plan.  Another approach would be to rely on the case law that permits a

8    district court to make *de minimis* alterations in a class settlement allocation plan without

9    providing additional notice.  *In re Groupon Mktg. Sales Practices Litig.*, 593 Fed. App. 699,701

10   (9th Cir. 2015) [court permitted to eliminate a $75,000 *cy pres* contribution from an $8.5

11   settlement fund without further notice].  However, again the Special Master does not think that

12   disregarding material terms of a prior noticed and finally approved settlement can fairly be

13   termed *de minimis*, even though the amount at issue here is small in relation to the total

14   settlement.

15        Accordingly, the allocation plan must be disapproved until the Chunghwa problem is

16   corrected.  Lead Counsel is directed to propose a detailed plan to correct the due process

17   problems discussed above:  a plan that makes crystal clear how he proposes to satisfy the terms

18   of the Chunghwa settlement, what (if any) corrective notice he intends to provide and to whom,

19   and a timeline for the Court to deal with this problem.

20        C.    Reasonableness of Notice Plan

21        Objectors raised several issues with regard to the notice program, including (1) the age

22   and income profile of recipients (Cooper/Scarpulla – Docket No. 4115, Gianasca, *et al* – Docket

23   No. 4119, Rockhurst University, *et al* – Docket No. 4113); (2)   notice to foreign residents

24   (Cooper/Scarpulla – Docket No. 4115, Gianasca, *et al* – Docket No. 4119, Rockhurst

25   University, *et al*; (3) notice to non-English speakers (Cooper/Scarpulla – Docket No. 4115,

26   Gianasca, *et al* – Docket No. 4119); (4) the supposed need for televised notice

27   (Cooper/Scarpulla – Docket No. 4115, Gianasca, *et al* – Docket No. 4119, Rockhurst

28   University, *et al* – Docket No. 4113); and (5) the terms of the notice provided to the nationwide

class (Rockhurst University, *et al* – Docket No. 4113, Johnson – Docket No. 4128). The California Attorney General also raised a concern about the adequacy of notice to California natural persons, which was discussed at VII.A.6 above.

Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed.R.Civ.P. 23(c)(2)(B). Such notice must "clearly and concisely state in plain, easily understood language," the nature of the action, the class definition, and class members' right to exclude themselves from the class, among other things. Fed.R.Civ.P. 23(c)(2)(B). Further, before granting final approval to a proposed class settlement, the court must "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed.R.Civ.P. 23(e)(1). While Rule 23 requires that reasonable efforts be made to reach all class members, it does not require that each individual actually receive notice. *Silber v. Mabon,* 18 F.3d 1449, 1454 (9th Cir. 1994); *see also Rannis v. Recchia,* 380 Fed. Appx. 646, 650 (9th Cir. 2010). The Notice Program for the Proposed Settlements meets these standards.

Credible evidence demonstrates that older individuals, those with lower incomes, non-English speakers, foreign residents, non-Internet users, residents of states excluded from the damage recovery, etc. – were not ignored by the Notice Program. Lower-income and/or older class members were notified by way of newspapers, magazine, and website announcements. Joseph Fisher specifically explains how publications that were included in the Notice Program have significant low-income readership. Fisher Decl., ¶5b (*TV Guide* where 30% of readers have incomes less than $30,000 and *Parade Magazine*, where 21% of readers have incomes less than $30,000). Non-Internet users were also sufficiently notified by publishing in *TV Guide, Parade, American Profile, The Wall Street Journal, USA Today, The New York Times, San Francisco Chronicle, El Nueva Dia, People, Time,* and *Sports Illustrated.* Fisher Decl. Reporting on Class Notice, pp. 8-9.

Foreign residents who were in a position to purchase CRT products in the United States during the Class Period fall squarely within the notice efforts. The Summary Notice was published as a press release in 78 foreign-based media outlets in 15 countries, including Canada

1    and Mexico. *See* Fisher Decl., ¶3. Nonresidents living in border regions – particularly those

2    capable of entering the United States for purposes of purchasing a television or computer – are

3    likely to use the internet just like everyone else; thus, they were subject to digital outreach. The

4    impact of these efforts is demonstrated by the fact that claims have already been submitted in

5    this Proposed Settlements by non-U.S. persons with addresses in numerous foreign countries

6    including Canada, Costa Rica, Germany, Great Britain, Israel, Iceland and Spain. *Id.*, ¶3c.

7    Specific efforts were made to notify non-English speaking class members. A Spanish

8    language version of the Summary Notice just discussed was disseminated and picked up by 81

9    media outlets in the United States and abroad. *Id.*, ¶5d. And over 33 million impressions were

10   generated across the Google ad-serving network from advertisements on Google Spanish. *Id.*

11   Objectors also criticize the lack of televised notice. However, IPPs explain there was

12   good reason to forego television advertising. "As television viewership becomes increasingly

13   fragmented over hundreds of alternative television stations, with many viewers 'cutting their

14   cords' to cable altogether and downloading their television content commercial free via the

15   internet, the choice to use alternative forms of media to reach indirect purchasers of CRT

16   Products is an entirely defensible decision." IPPs Response to Cal. Att. Gen., p.4.  In short, on a

17   cost-benefit basis the decision to replace television ads with alternative effective methods was

18   entirely defensible. *See U.S. v. Oregon*, 913 F.2d at 581.

19   Courts acknowledge that, while there will always be alternative ways to provide notice

20   to a class, all methods of notice are not required in all cases. *See Google Referrer Header*

21   *Privacy Litig.*, 87 F.Supp.3d at 1138. Thus, Rockhurst University's belief that "a New Media

22   notice campaign may not be the appropriate manner to notice the claimant class herein" does not

23   mean that its proposed "Old Media" campaign is better or legally required. *See id*. Perfection is

24   not the standard when it comes to delivering notice of a class action settlement. Rather, Rule 23

25   merely requires "reasonable efforts to reach as many class members as possible through either

26   individual or publication means." *Silber*, 18 F.3d at 1454.

27   This was accomplished here. As the Fisher Declaration explains, CRT class members

28   were notified through a carefully designed combination of (1) direct mailed/emailed notice to

more than ten million unique addresses (including many of the largest institutional end-users of CRTs) (Fisher Decl., ¶¶8-9; (2) publication notice in magazines and newspapers with collective readership of more than 150 million (*id.*, ¶10); (3) digital notice via paid advertisements on Google, Facebook, and other popular websites (*id.*, ¶¶ 11-12); (4) English and Spanish press releases carried by almost 300 domestic and foreign websites with a total potential audience of over 72 million; and (5) the CRT settlement website, which has received more than 537,000 unique visitors. Collectively, these efforts reached an estimated 83% of class members with an estimated frequency of 3.1 (*id.*, ¶18d), which is well-within the acceptable range. *See* "Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide," Federal Judicial Center (2010) at 3 (available at http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf (explaining that a court should consider "whether all the notice efforts together will reach a high percentage of the class.").

Objectors Scarpulla and Cooper challenge Fisher's contention the notice campaign reached approximately 83% of class members.  They claim that the paid print-media portion of the notice plan would reach only 58% of the target group of potential class members.  But Mr. Fisher persuasively explained that his reach and frequency calculations for print media were based on survey data from *GfK MRI,* and for digital media were based on survey data from *comScore.* Fisher Decl., ¶3. No legitimate argument has been proffered that challenges the legitimacy of these two data sources.  Moreover, Fisher explains that his calculation properly adjusted for the estimated overlap between print and digital media. The estimated reach for the class demographic for print media was 57% and the estimated reach for digital media was 61%. The two percentages were not added together as objectors maintain.  Rather, the overlap between print and digital was eliminated, resulting in a net reach of 83%. *Id.*

Cooper and Scarpulla also asked the Special Master to engage a neutral expert to report on the effectiveness of the notice given in this litigation. The Special Master finds this unnecessary in light of the persuasive evidence before him to conclude that the Notice Program that has been implemented is fair, adequate and reasonable under the tenets of Rule 23.

1  Objectors could have, but did not, submit any contrary expert evidence. "In all cases the court

2  should strike an appropriate balance [in determining the type of notice] between protecting class

3  members and making Rule 23 workable." *In re Domestic Air Transp. Antitrust Litig.*, 148

4  F.R.D. 297, 335 (N.D.Ga. 1993). The notice program appropriately achieved that balance.

5  　　　Rockhurst University and Johnson challenge the clarity of the notice's wording. Docket

6  Nos. 4113 and 4128. The Special Master finds these objections unpersuasive. The notice clearly

7  explained (1) the class definitions for both the "Statewide Damages Classes" and the

8  "Nationwide Class"; (2) the nature of the "release [of] the injunctive relief claims of consumers

9  . . . [in] the Nationwide Class; and (3) that "[o]nly members of the Statewide Damages Classes

10  are eligible to receive a payment." *See* Notice at 1, 6, 7. Therefore, Rockhurst University's

11  objection is without merit. Johnson's complaints that the notice did not adequately set forth

12  with precision every mechanic of the claims process and state exactly how much money each

13  class member would receive are misplaced. Rule 23 requires only that notice provide sufficient

14  detail "to alert those with adverse viewpoints to investigate and to come forward and be heard."

15  *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 946 (9th Cir. 2015). The Detailed

16  Notice here accomplished that. Section 9 of the Detailed Notice states:

17  　　　　　　"Payments will be determined on a pro rata basis. This means that
          payment amounts will be based on the number of valid claims
18          filed, as well as on the number and type of CRT Product(s)
          purchased: Standard CRT Television (screen size of less than 30
19          inches); Large CRT Television (screen size of 30 inches or larger);
          or CRT Computer Monitor."
20
21  　　　　　　　　　　　　　　　　***

22  　　　　　　"At this time, it is unknown how much money each Class Member
          will recover. It is expected that a minimum payment of $25 will be
23          made to all Statewide Damages Class Members who submit a valid
          claim. The maximum payment will be three times the estimated
24          money damages for each claimant."

25  *Id.*, ¶9.

26  　　　The settlement website – www.CRTclaims.com – questions 12 and 13 of

27  the "Frequently Asked Questions" state:

28

FAQ 12: "Do I need to supply documentation or proof of what I purchased?"

Answer:      "Not with your original claim submission, but the Settlement Administrator may request it at a later time, so save any documentation/proof of purchase."

FAQ 13: "What if I don't have any documentation?"

Answer:      "You don't need any documentation to file your claim. So don't let that stop you. Only if the Settlement Administrator ever asks for documentation will you need to provide it. The Settlement Administrator understands the difficulty of maintaining records from more than a decade ago. If the Settlement Administrator does request documentation, you can send a letter explaining what proof if any you have of the purchases you've claimed and it will be reviewed on a case-by-case basis. There is a chance that you may still get paid even if you don't have any documentation."

*Id.*

The Special Master recommends that all notice objections be overruled.

D.      Other Objections to Approval

1.      Objection Based on Perceived Strength of State Laws

Objector Clifton argues that the settlements are unfair because they fail to give preference to class members residing in states with strong consumer protection laws, such as California.  He argues that the settlement fund should be distributed not pro rata, but instead "should be allocated in a way that tracks the differences in various states' consumer protection and antitrust laws," citing *In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D.Mass. 2005). Docket No. 4099, pp.3-4.

The problem with Clifton's objection is that this approach was expressly rejected in *Sullivan*, 667 F.3d at 327-28.  There, the Third Circuit agreed that there would be substantial imprecision "in weighing class member claims based on the relative strength of different state law claims." *Id.* (internal quotations omitted). The court added: "[i]t may be entirely reasonable to apply the same damages calculation to claimants from all states because . . . it is purely speculative that claimants from indirect purchaser states could anticipate a greater recovery than

1  claimants from other states." (*Id.* (internal quotations omitted). "We can find no support in our

2  case law for differentiating within a class based on the strength or weakness of the theories of

3  recovery." *Id.*

4      Moreover, as in *Sullivan*, each class member here suffered the same injury (*i.e.*,

5  overcharging), so a pro rata distribution makes sense. *See also DRAM*, Docket No. 2132 ["any

6  weighted distribution plan may ultimately turn on subjective views as to the relative merits and

7  relative importance of aspects of the totality of a class member's released claims, and spawn an

8  ancillary round of litigation among class member objectors about who should get how much and

9  on what basis."].

10     Clifton also asserts that the state-specific class representatives did not advocate for

11 compensation based "on the relative strengths of their states' consumer protection laws." Docket

12 No. 4099, p.5. But he does not dispute that every class representative was represented by

13 counsel whose adequacy he does not challenge.  Clifton has not met his burden of proving his

14 assertions challenging the reasonableness of this class action settlement. *See Oregon,* 913 F.2d

15 at 581.

16     In light of the above, the Special Master recommends that Clifton's objections relating to

17 the perceived strength of various States' laws be OVERRULED.

18         2.    Objections based on Inadequate Representation

19     Various objectors argue that the Indirect Purchaser State Classes and the Nationwide

20 Class were not adequately represented by the class representatives and IPP Counsel. *See* Docket

21 No. 4113 (Rockhurst Univ., *et al* Objection, pp. 3-7); *see also* Scarpulla/Cooper Reply, 12/9/15.

22 However, evidence and persuasive legal authority in support of their position is lacking.

23     To satisfy constitutional due process concerns, absent class members must be afforded

24 adequate representation before entry of a judgment that binds them. *Hanlon v. Chrysler Corp.*,

25 150 F.3d 1011, 1020 (9th Cir. 1998). The fulcrum of the adequacy requirement is an alignment

26 of interests and incentives between the representative plaintiffs, counsel, and the absent class

27 members. *See Hopson v. Hanesbrands Inc.*, 2009 WL 928133, at *4 ["Representation is

28 adequate if: (1) the class representative and counsel do not have any conflicts of interest with

1 | other class members; and (2) the representative plaintiff and counsel will prosecute the action

2 | vigorously on behalf of the class."].

3 |      For the reasons stated, the Special Master concludes that Class Counsel and the class

4 | representatives all provided adequate representation, and there was no conflict of interest

5 | requiring the creation of subclasses or separate counsel. The Special Master recommends that

6 | all objections to the Proposed Settlements on these grounds be OVERRULED.

7 | **VIII.   APPROVAL OF REQUEST FOR ATTORNEYS' FEES**

8 |      A.   <u>Request for Attorneys' Fees</u>

9 |      IPP class counsel ask the court to follow a percentage-of-the-fund approach and approve

10 | an award of $192,250,000, which is one-third (33%) of the $576,750,000 settlement fund. They

11 | have incurred a lodestar at historic billing rates of $83,753,999.05 ($90,075,076.90 at current

12 | billing rates). Therefore, the requested fee award represents a multiplier of approximately 2.3.

13 | [IPP Fee Motion, p. 1 [Dkt. 4071]; Compendium of IPP Counsel Declarations, pp. 1-2 [Dkt.

14 | 4073]

15 |      The following objections were made to the fee request: (1) Docket No. 4099 – objection

16 | by Donnie Clifton; (2) Docket No. 4106 – objection by Douglas St. John; (3) Docket No. 4111 –

17 | objection by John Finn and Laura Townsend Fortman; (4) Docket No. 4112 – objection by Dan

18 | L. Williams & Co.; (5) Docket No. 4115: -- objection by Francis Scarpulla and Josef Cooper;

19 | (6) Docket No. 4119 – objection by Anthony Gianasca, *et al*; (7) Docket No. 4128 – by

20 | Elizabeth Kimberly Johnson; (8) Docket No. 4140 – by Josie Saik.

21 |      B.   <u>Methodology for Reviewing Request</u>

22 |      The "common fund doctrine" permits attorneys who recover a fund for the benefit of the

23 | class to obtain "a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van*

24 | *Gemert*, 444 U.S. 472, 478 (1980). The court has the independent obligation to ensure that the

25 | award of fees, as well as the settlement itself, is reasonable. *In re Bluetooth.* 654 F.3d at 949.

26 |      In the Ninth Circuit a court may apply either a lodestar or a percentage-of-the-fund

27 | method in calculating the appropriate fee award. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043

28 | (9th Cir. 2002); *In re Bluetooth*, 654 F.3d at 942; *McGee v. China Electric Motor, Inc.*, slip opn.

at p. 6, No. 13-56903, 1/15/2016.  In common fund cases there are cogent advantages to using the percentage-of-the-fund method in view of the subjectivity of a lodestar and the tendency of a pure lodestar approach to create incentives for counsel to spend unnecessary time on a case. The lodestar figure is calculated by multiplying the reasonable number of hours spent and adequately documented by prevailing counsel times a reasonable hourly rate.  Using the percentage calculation, the court typically begins with the 9th Circuit "benchmark" of 25%, and then explains what special circumstances justify a deviation upward or downward from that benchmark.  *In re Bluetooth*, 654 F.3d at 942; *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.3d 1301, 1311 (9th Cir. 1990); *Keirsay v. eBay, Inc.*, 2014 WL 644738 (N.D.Cal. Feb. 18, 2014) [Tigar, J.]  Courts are further encouraged to guard against unreasonable results by cross-checking the method used against a second method.  *Vizcaino*, 290 F.3d at 1050; *In re Bluetooth*, 654 F.3d at 944.  The Ninth Circuit has repeatedly approved beginning with a percentage analysis and cross-checking it against a lodestar with a multiplier if appropriate. *Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 955 (9th Cir. 2015); *Vizcaino*, 290 F.3d at 1050.

Objectors Scarpulla and Cooper (Docket No. 4115 and Reply dtd. 12/9/15, e-filed with JAMS] argue that the court should apply a pure lodestar approach because there are "serious problems with time and expenses."  They make four arguments.  First, they maintain that a percentage approach will unduly reward inefficient counsel and those who lack experience in antitrust class actions, while a lodestar approach will properly reward skilled firms and penalize those who were "learning on the job" or did not put funds at risk to cover ongoing expenses. Second, they argue that the billing records here show sloppy and potentially inaccurate timekeeping practices (e.g., block billing, use of minimum quarter-hour increments, handwritten entries), which call for an across-the-board reduction in the lodestar.  Third, they argue that Lead Counsel used poor judgment in engaging three firms in Fall 2014 as special trial counsel to prepare and try the case commencing in March 2015.  Fourth, they argue that Lead Counsel wasted time and resources in an unnecessary dispute with the California Attorney General

1    regarding discovery and the settlement with Phillips in California's *parens patriae* case in state

2    court.

3            None of the Scarpulla/Cooper objections are a basis to employ a pure lodestar approach.

4    Indeed, if their criticisms of billing practices in this case were correct, the court should be

5    reluctant to rely entirely on allegedly inaccurate and padded billing records that contain charges

6    for unproductive time.  Their objections are, however, a good reason to use a lodestar as a check

7    against a percentage of the fund — with appropriate scrutiny of the billing records.  As

8    discussed in detail below, the Special Master agrees that the total lodestar and the requested

9    percentage should be adjusted downward because of various factors.  Moreover, when it comes

10   to allocating the total approved fee among the various class counsel firms, more meticulous

11   scrutiny to each firm's billing will take note of a particular firm's inefficiency, inexperience or

12   bad judgment.

13           Therefore, the Special Master concludes that the proper approach to assessing the total

14   attorney's fee award in this case is to begin with the 9th Circuit benchmark of 25%, to

15   determine whether there are grounds to adjust it upwards as IPP Counsel request, or downward

16   based on Objectors' criticisms, and to cross-check the resulting percentage against the lodestar

17   after adjusting it for any factors such as inefficiency.  The Special Master also follows the Ninth

18   Circuit's direction to apply current, not historic, rates in order to account for the delay of up to

19   eight years for some firms in receiving payment.  *Fischer v. Equitable Life Assur.* Soc., 307

20   F.3d 997 (9th Cir. 2002); *McGee* at p. 10.

21           C.      Legal Standards for Approval

22           Although expressed in different terms in various 9th Circuit cases, it is accepted that a

23   court should employ the following criteria to determine the fairness of a requested fee award in

24   a common fund case:  the results achieved for the class; the complexity of the case and the risk

25   and expense to counsel of litigating it; the skill, experience and performance of counsel, both

26   plaintiff and defense; the contingent nature of the fee and the fees awarded in comparable cases.

27   *Vizcaino*, 290 F.3d at 1048-1049; *In re Bluetooth*, 654 F.3d at 942; *see also Kerr v. Screen*

28   *Actors Guild,* Inc., 526 F.2d 67, 70 (9th Cir. 1975) [listing the "Kerr factors"]  Failure to

consider the Kerr factors, which are the same as those in *Vizcaino* and *Bluetooth* in different words, is an abuse of discretion. *McGee* at p. 9. The most critical factor in evaluating the reasonableness of a fee request is the degree of success in achieving results for the class. *Hensley v. Echerhart*, 461 U.S. 424, 434-436 (1983); *In re Bluetooth*, 645 F.3d at 942. The Special Master now examines how each of those factors weighs in this case with respect to a deviation from the 25% benchmark.

1.    Results Achieved for the Class, Including Non-Cash Benefits

IPP counsel note that the settlement amount of $576,750,000 is the second-largest monetary recovery in any indirect purchaser price fixing case (after the *LCD* case). No one disputes that characterization. This entire sum, net of fees, incentive payments and expenses, will be paid *pro rata* to class members filing proper claims. There will be no reversion of surplus funds to defendants. There will be no *cy pres* distribution. The settlement also provides for non-monetary compensation in the form of cooperation agreements which will assist IPP counsel in concluding their actions against remaining defendants. Alioto Decl. II, ¶31

Three benchmarks offer enlightening comparisons to the result obtained by IPP counsel. First, the settlement amount is about 20% of the potential damages of $2.78 billion as estimated by plaintiff's expert, Dr. Netz. It is approximately nine times the $61 million estimate by one defense expert. (The other defense experts estimated damages at zero.) Alioto Decl. II, ¶34. Given the risks and the complexity of the case (see VIII.C.2 below and VII.A.1 & 2 above), and in particular the challenge of formulating a credible calculation of pass-through overcharges, the settlement represents an extraordinary achievement. Second, the settlement amount dwarfs the $32 million criminal fine obtained by the Department of Justice against Samsung, the only party against whom DOJ brought a criminal proceeding. Third, the settlement measures up well against the $1.1 billion settlement achieved by the IPP's in the *LCD* case, where the conspiracy was of more recent origin, not decades old, and the DOJ obtained criminal fines of about $894 million against many defendants who pleaded guilty.

Certain objectors are critical of the settlement amount. They note that it is only 20% of the damage estimate by IPP's expert, and only about 7% of that amount trebled. They compare

1   that result to the $1.1 billion IPP settlement in *LCD* which was closer to 50% of its expert's

2   damage figure. But *LCD* and this case are only partially comparable. The *LCD* conspiracy was

3   much more recent, so proof problems were far easier. And the Justice Department obtained

4   dozens of guilty pleas, which eased the path to finding of liability for the IPP's. In the end, the

5   $576,000,000 figure speaks for itself. Only one other price fixing case has settled for more.

6       Objector St. John belittles the result on two grounds: first, the result was in large part

7   attributable not to the efforts of IPP counsel, but to the Chunghwa settlement, the Samsung

8   guilty plea and factual findings entered by the European Commission, and second, the very

9   large settlement obtained from Samsung and LPD (a combination of Philips and LG) shows that

10  the settlements with other defendants for much lower amounts were inadequate. St. John

11  Objection Docket No. 4106, and Reply, e-filed with JAMS 12/9/15, pp. 4-11.

12      Chunghwa: The IPPs settled with Chunghwa in April 2009 for $10 million in cash.

13  Alioto Decl. II, ¶10. In moving for approval IPP counsel represented that Chunghwa's

14  agreement to cooperate was of great value, and St. John argues that IPP counsel is judicially

15  estopped from claiming that Chunghwa's cooperation was of minimal help. St. John's position

16  is without merit. IPP counsel persuasively demonstrated that, while it appeared in 2009 that the

17  cooperation might be of great help, circumstances changed as discovery progressed. Chunghwa

18  could provide little information about large CPTs or about the circumstances of the conspiracy

19  in the United States, and many of the Chunghwa meeting reports proved unhelpful. IPP Reply

20  II, e-filed with JAMS 12/23/15, pp. 13-14. It is noteworthy that it took four years after the

21  Chunghwa settlement for IPPs to obtain another settlement, which suggests that Chunghwa's

22  cooperation was not of overwhelming assistance.

23      Samsung guilty plea: Samsung pled guilty in 2011. This plea established the existence

24  of the conspiracy. But it did nothing to lessen IPP's challenges to obtain class certification,

25  obtain, translate and organize evidence from many foreign defendants, beat back repeated legal

26  motions, and prove pass-through and a credible damage claim. To suggest that the Samsung

27

28

1   guilty plea meaningfully detracts from the quality of IPP counsel's efforts to produce the

2   settlement is ludicrous.[29]

3       European Commission:  St. John argues that the European Commission's adoption of a

4   Statement of Objections in 2009 and its Summary Decision in 2013 provided the real impetus

5   for defendants to settle.  He argues that a 2014 Delaware state court decision, *Vichi v.*

6   *Koninklijke Philips Elec., N.V.*, 84 A.3d 725 (Del.Ch. 2014), accepted EC findings as

7   preclusive.  IPP counsel cogently refute this argument.  The evidentiary value of a Statement of

8   Objections is highly debatable, and the Summary Decision which might have been of value was

9   not made public until December 2014, only a few months before the conclusion of the

10  settlements.  Moreover, IPP counsel correctly note critical distinguishing factors in *Vichi*:  it was

11  a fraud case not an antitrust case; it involved conduct in Europe not the United States.

12      In summary, in any long complex litigation each day brings either good news — and

13  surely the Chunghwa settlement, the guilty plea and the EC rulings count as good news for the

14  IPP's — or bad news.  But such news, good or bad, rarely replaces or significantly detracts from

15  the effort and skill that litigation counsel must employ to produce an extraordinary result.  It is

16  the height of Monday-morning quarterbacking, not sound legal analysis or common sense, for

17  St. John to suggest that IPP's result was generated in a meaningful way by these three factors as

18  opposed to counsel's eight-year sustained efforts.

19      Disproportionate Samsung/Philips Settlements:  Samsung settled for $225,000,000;

20  Philips[30] settled for $175,000,000.  The remaining defendants settled for amounts between $10-

21  70 million.  Lead Counsel responds to this objection by pointing to the market shares of

22  Samsung and Philips.  By 2004 Samsung held 29% of the CRT market and 42% of the CDT

23  market.  Philips/LPD's market share was 27% for CRTs and 32% for CDTs.  Their shares of the

24  U.S. market were even higher," and lead Counsel believes there was strong evidence of their

25  conspiratorial activity within the U.S.  These factors account for the higher settlement amounts.

26

27  [29] IPP counsel notes correctly that a DOJ prosecution of one defendant actually helps other defendants who argue
    that their non-prosecution demonstrates their innocence.  Alioto Reply Decl. ¶4.

28  [30] The settling entity was actually LPD, a combination of Philips and LG, whom the IPPs held responsible for
    Philips's liability.

There is no evidence that, because whopping settlements were obtained against two defendants, Class Counsel sold out the class by agreeing to lowball settlements with the others. Class Counsel would have no incentive to act in such a fashion. The settlements were mediated by two respected experienced mediators who were former federal judges. St. John's objection lacks any factual basis or common sense.

**Given the extraordinarily large settlement amount, this factor weighs <u>heavily</u> in favor of an upward adjustment of the Ninth Circuit 25% benchmark for attorneys' fees.**

### 2.   Risk, Expense and Complexity of Case

No objector seriously questions the risk and complexity of the IPP case. Most notably, the alleged conspiracy was 20 years old, which greatly complicated the obtaining of evidence. Storage facilities with paper documents had to be searched in a number of countries; backup tapes had to be restored; witnesses were dead or unavailable; one defendant had been in bankruptcy. Since most of the evidence consisted of foreign language documents, IPP's had to arrange for certified translations. Each deposition of a foreign language witness was twice as long as normal because of the need for translation.

Class certification, particularly given recent appellate decisions[31], is a severe hurdle. Demonstrating that the IPPs' expert had a valid methodology for proving overcharges generally, and pass-through damages in particular, on a class-wide basis is fraught with risk. Several class actions in the Northern District have failed to obtain certification based on comparable problems, two of them rejecting the analysis of Dr. Janet Netz, IPPs' expert in this case. [32]

IPPs faced also a Daubert motion that challenged the methodology of their key expert, Dr. Netz. Although they prevailed, doing so was far from certain. The Special Master recalls well the briefing and hearing of that motion, during which defendants made exceedingly persuasive arguments for disallowing the testimony.

---

[31] *Comcast v. Behrend*, 133 S.Ct. 1426 (2013); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 735 F.3d 244 (D.C. Cir. 2013) [vacating class certification in light of *Comcast*]

[32] *In re Graphics Processing Antitrust Litig.*, 253 F.R.D. 478 (N.D.Cal. 2008) (Alsup, J.) [Neff analysis rejected]; *In re Flash Memory Antitrust Litig.*, 2010 W.L. 233208 (N.D.Cal., C070086, 6/9/10) (Armstrong, J.) [Neff analysis rejected]; *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311 (N.D.Cal. 2014) (Seeborg, J.)

1    Litigation involving international price-fixing cartels has become more challenging in

2  light of the FTAIA, which has also been the subject of recent appellate rulings not favorable to

3  plaintiffs.[33]

4    IPPs took about 100 depositions of defendants and defended 24 depositions of their class

5  representatives.  Millions of pages of documents were produced.

6    As trial approached, defendants filed 36 summary judgment motions, of which 11 were

7  directed at the IPP case.  All motions had to be coordinated with other MDL plaintiffs.  Dozens

8  of motions in limine were filed.

9    As for expense, 28 class counsel firms paid assessments to the fund for managing the

10  case.  Objector Scarpulla notes that they also made use of funds from the Chunghwa and LG

11  settlements that occurred early on.  Nonetheless, $2,405,000 was contributed from the pockets

12  of class counsel to litigate the case, every dollar of which was at risk if they were unsuccessful.

13    **Some of the risk and complexity here go with the territory in any price-fixing class**

14  **action.  However, given the age of the conspiracy and the recent unfavorable appellate**

15  **precedents, this factor weighs <u>slightly</u> in favor of an upward adjustment of the 25% Ninth**

16  **Circuit benchmark for attorney's fees.**

17        3.    Quality of Representation, Plaintiff and Defense

18    Notwithstanding the criticisms leveled at Lead Counsel by several objectors, the Special

19  Master concludes that the entire record of the litigation viewed fairly demonstrates that Class

20  Counsel managed this case diligently and efficiently for the benefit of the class, with the

21  exceptions noted below.

22    Several objectors claimed that Lead Counsel, Mario Alioto, lacked experience as a lead

23  counsel and had never tried an antitrust case.  Mr. Alioto provided ample evidence of his 30

24  years of experience in antitrust cases, including acting as lead counsel and in trials.  Alioto Decl.

25  II, 11/19/15, ¶21.  There is substantial evidence, most persuasively from the other highly

26

27

28

---

[33] E.g., *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816 (7th Cir. 2015)

experienced class counsel who worked with him for eight years, that Mr. Alioto managed the case effectively.

The prosecution of the case was divided in a sensible way among class counsel firms, both by defendant and by task. A few examples will suffice. Straus & Boies led the foreign language team to organize the translation and review of the thousands of foreign language documents and also was responsible for discovery against Samsung. Kirby McInerney defended all discovery against class representatives, as well as taking 12 Samsung depositions and leading discovery against Direct Action Plaintiffs. Zelle Hofmann managed discovery against Panasonic/MTPD. Andrew Anderson handled Hitachi discovery; Bramson Plutzik managed Toshiba discovery; Cooper & Kirkham managed Philips discovery; Glancy Prongay & Murray handled LG Electronics discovery. Document review was similarly coordinated among a number of firms. (Alioto Decl. III, ¶8-14). And so on. As much as is reasonably possible in such a complex case, this division of labor tended to reduce duplication.

According to his co-counsel, Lead Counsel was superb at coordinating the class effort so that the team remained united in its objectives, and avoided squabbling over strategy, finances, personalities, and the like. For example:

> Donald Perelman, Fine, Kaplan and Black: "…Fine Kaplan was in a unique position to evaluate the quality, organization and cohesiveness of the law firms that put together this case. In short, we were extremely impressed…. On the most important front, the quality of the work product was outstanding…. From an organizational standpoint, the case was effectively managed…. Finally, the CRT team was cohesive. Lead counsel clearly was in charge but the other firms had the freedom and confidence to innovate, rather than simply follow order. This level of collegiality and cooperation does not always exist in case like this…." IPP Reply Re: Motion for Award of Attorneys' Fees, etc., dtd. 11/15/15, Exh. A.

> Paul Novak, Milberg LLP: Throughout the course of this litigation, my observations are that IPP Counsel constructively and cohesively worked together…. IPP Reply, Exh. B

> Robert J. Gralewski, Kirby McInerney: I can attest that Lead Counsel ran the CRT case extremely capably and economically….In terms of costs, I have never worked on a case

where Lead Counsel was more careful to avoid excessive or unnecessary litigation expenses....Lead Counsel was laser-focused on the CRT case and its intricate legal issues from the case's inception to its conclusion....During settlement negotiations, I believe Lead Counsel sought to extract maximum value from the remaining Defendants....IPPs' core team included some of the finest antitrust class action lawyers in the country." IPP Reply, Exh. D.

Nathan Cihlar, Straus & Boies: [Lead Counsel's firm] effectively managed this litigation and met the case needs by identifying and working with a core group of experienced counsel. A network that was established that facilitated the constant exchange of information and routed assignments to firms depending on who was in the best position to assist. From beginning to end, firms were called upon to fill roles within their expertise. The management system ensured that each assignment was done efficiently.... IPP Reply, Exh. E.

The ability to lead a cohesive and collaborative team is the single most important attribute of a Lead Counsel in a huge MDL litigation. Lead Counsel need not be Clarence Darrow reborn — plenty of skilled courtroom lawyers will step forward to try the case. Lead Counsel must instead embody General Eisenhower who succeeded at Normandy because he could shape the disparate American, English, French and other forces and huge egos into a cohesive force with a common objective. The evidence is overwhelming that Lead Counsel pulled this off.

Before addressing the Objectors' criticisms, the Special Master notes that three troublesome issues have arisen with Class Counsel's plan of allocation: the limitation of monetary compensation to class members from *Illinois Brick* repealer states; the failure to obtain class representatives from three repealer states, Massachusetts, Missouri and New Hampshire; and disparities between the allocation plan for these Proposed Settlements and the Chungwa allocation plan. The Special Master has concluded that the first two problems are surmountable. But the Chunghwa situation needs to be corrected. It is hard to avoid the conclusion that more attention to detail and foresight on the part of Lead Counsel might have averted or mitigated at least some of these problems. No one is perfect, particularly with the clarity of hindsight looking back over eight fraught years of difficult litigation. The Special

1  Master has been clear that the fact these issues arose does not mean that the representation of the

2  IPP class was ineffective or infected with conflicts of interest.  It was not.  But these factors do

3  tarnish somewhat the glow of success that Lead Counsel might otherwise bathe in.

4       Objectors criticize the quality of the representation for the following basic reasons:  Lead

5  Counsel engaged three "trial" firms in the last months of the case to lead the trial team; Lead

6  Counsel wasted time arguing with the California Attorney General; monetary compensation was

7  restricted to the Statewide Litigation class of 22 states; too many class counsel firms were

8  joined.

9       Three "Trial" Firms

10      In approximately October 2014 Lead Counsel engaged three very experienced antitrust

11  trial counsel:  Freedman Boyd et. al.; Fine Kaplan and Black; and Hulett Harper Stewart.  Joe

12  Goldberg of Freedman Boyd had just completed his work as lead trial counsel in the *Urethanes*

13  *Antitrust Litigation*, one of the very few price fixing cases to go to trial, which brought home a

14  verdict of over $1 billion.  Fine Kaplan was co-lead counsel in that case.  Alioto Decl. III, ¶22.

15  Mr. Alioto states that he made "a reasoned judgment" that additional trial expertise was needed,

16  that he saved money by engaging the firms only in the last five months before trial, and that

17  doing so enhanced settlement leverage with defendants who could see that Class Counsel would

18  be ready for trial.  (Alioto Decl. III, ¶¶22-23).  Objector Scarpulla is highly critical of this

19  decision, noting that other experienced trial counsel were on the team and that getting the three

20  new firms up to speed wasted money.

21      The Special Master has examined the time records of the three "trial" firms.  The

22  records, both the summaries attached to their declarations and the raw contemporaneous billing

23  entries, do not exhibit undue wasted or unproductive time.

24  Freedman Boyd:  88% of the time was recorded by Joe Goldberg himself (42% of the
25  time @ $425/hr.), two other lawyers (28% of the time @ $275 and $250/hr.), and one paralegal
    (18% of the time @ $100/hr.).  The total time was 1,734 hours at a total charge of $554,666, at
26  an average billing rate of $319/hr.  Mr. Goldberg worked basically full time (734 hours) for 4
    months, with support from two other lawyers and a paralegal.  Getting the full attention of a
27  senior courtroom trial lawyer with part-time support of two other lawyers and a paralegal is as
    efficient as legal staffing gets.
28

Fine Kaplan:  Staffing here was broader:  about 5 partners billing $450-750/hr, two associates billing $250/hr. and a paralegal.  They recorded 5,382 hours at a charge of $2.625 million at an average billing rate of $487/hr.  This firm did the workhorse part of trial preparation:  selecting exhibits, motions in limine, assembling deposition testimony, and the like.

Hulett Harper:  Very lean staffing:  one partner at $675/hr. and one associate at $475/hr. recorded 80% of the time.  The total time was 1,141 hours at a total charge of $634,696, at an average billing rate of $556/hr.  The work focused on selecting deposition excerpts and preparing legal briefs.

The trial preparation that these three firms did would have had to be done by some other lawyers had they not been on board.  And their "getting up to speed" recorded time was actually quite minimal.  The firms each started working about October 10, 2014, and by early to mid-November they were performing hard-core trial preparation, not "getting up to speed."  A reasonable estimate would be that each of the firms expended about 50-75 hours in "getting up to speed."  Given the added focus, intensity and recent trial experience they brought to the potential trial, the Special Master concludes that Mr. Alioto's "reasoned judgment" was appropriate.  After all, no one would accuse British barristers who practice in precisely this model — entering a case near trial with their sole obligation being to prepare the case for courtroom presentation — of "wasting" resources.

Dispute with California AG

Objector Scarpulla is also critical of Lead Counsel for an overall failure to cooperate with the California Attorney General, and specifically for a dispute that arose over the California AG's settlement with Philips in the state court *parens* action.  As to the purported broader breakdown in cooperation, Mr. Scarpulla provided no details except to refer to Special Master Vaughn Walker's suggestion that Mr. Scarpulla try to mediate the relationship between Mr. Alioto and the California AG.  Neither Mr. Scarpulla nor Asst. Attorney General Varanini provided any further details.  So the Special Master cannot give credence to a criticism that is not backed up by factual detail in the record.

The dispute over the Philips settlement was real, but it demonstrates appropriate caution rather than incompetence or poor judgment by Lead Counsel.  Philips took the position that its

settlement in the state *parens* case would estop California members of the IPP class from obtaining relief against it in the federal case. No one — not Lead Counsel nor the California AG — thought this position had any merit. The California AG promised to represent in court that no estoppel would result. But Mr. Alioto concluded he needed to file a formal objection in state court to the Philips settlement to obtain a ruling from the California court that no estoppel would result. In the end, the state judge refused to issue such an "advisory opinion," and the federal case proceeded without disruption to settlement against Philips for the second largest amount of all the defendants.

In hindsight, could this dispute have been avoided or handled more adroitly with some saving of attorney time? Perhaps. But facing a potential loss of any damages attributable to California purchasers from a key target defendant, Lead Counsel acted prudently in taking every step to avoid an estoppel result. Whether this was "belt and suspenders" activity, or legitimate prudence, falls under the heading of reasonable litigation judgment. The Special Master will not engage in 20-20 hindsight to criticize Lead Counsel's actions here.

No monetary compensation to Nationwide Class

For the reasons discussed in detail, *infra.* at VII.B.2, the Special Master concludes that Lead Counsel made a legitimate decision, solidly based in law, to limit monetary compensation to class members from *Illinois Brick* repealer states. Certainly it is possible for an adroit legal mind to concoct a legal pathway for class members in non-repealer states to recover some claim for monetary relief. Certainly it is possible that, if pressed harder, defendants might have agreed to larger settlements to effectuate a nationwide monetary recovery. But relying on abstract legal ingenuity unsupported by existing case law and second-guessing settlement negotiations are not solid bases on which to criticize a perfectly well-founded decision by Lead Counsel that non-repealer class members had no viable claim. The Special Master concludes this was not a failure of effective representation, and it did not create a conflict of interest for Lead Counsel.

Too many class counsel

There were about 50 class counsel firms in this case. In *LCD* there were 116 firms. A large number were basically local counsel for class representatives from the 22 repealer states

1    and District of Columbia.  The rest were an assortment of the country's leading antitrust firms

2    who commonly appear in MDL price fixing cases.  As noted above, regardless of the number of

3    firms, the case was managed efficiently and cost-effectively.  This criticism of Lead Counsel's

4    representation has no merit.

5    **This factor does not weigh in favor of an increase or decrease from the Ninth**

6    **Circuit 25% benchmark for attorney's fees.**

7    4.    Contingent Nature of Fees

8    There is no dispute that IPP counsel's compensation for eight years of work on this case

9    was entirely contingent.  They received not a dollar of compensation in the interim for 183,000

10   hours of work, and they were at continuous risk of receiving little or nothing had the result

11   proved unfavorable.  As a reminder, in the *LCD* case direct action plaintiff Best Buy went to

12   trial against Toshiba and recovered a small verdict which was entirely offset by Toshiba's prior

13   settlements.  Thus, Best Buy recovered nothing and its counsel's fees were dramatically reduced

14   by the court to a figure far below their lodestar.  Alioto Decl. I, ¶93.  This same risk of a zero

15   recovery was borne for up to eight years by IPP counsel here.

16   The Ninth Circuit has directed courts to account for the delay class counsel experience in

17   receiving their fees.  There are two methods of doing this: (1) apply current rather than historic

18   billing rates, or (2) apply historic rates with a prime interest rate adjustment.  *McGee* at p. 11.

19   Here the Special Master elects to apply current billing rates.  Therefore, the applicable lodestar

20   requested by class counsel is $90,075,076.90.

21   Not only did IPP counsel risk receiving no compensation for many years, but they put at

22   risk $2,405,000 of their own money in assessments paid to the Litigation Expense Fund to cover

23   the enormous expense of experts, translation and the like.  See Section IX below.

24   Courts have repeatedly recognized that to induce attorneys to accept the risk of little or

25   no recovery it is appropriate to award reasonable fees that often include a multiplier over their

26   lodestar.  *Omnivision.*, 559 F.Supp.2d at 1047.

27

28

1      **Given the 8-year duration of the case, the significant out-of-pocket expense at risk,**

2   **and the risks of non-recovery noted above, this factor weighs strongly in favor of an**

3   **increase from the Ninth Circuit 25% benchmark for attorney's fees.**

4              5.      Fees Awarded in Comparable Cases

5          Comparing the percentages and the lodestar multipliers awarded to counsel in other

6   cases turns out to be far less useful as a metric than one might imagine. Plaintiffs such as class

7   counsel here can list a number of cases with awards in the 25-35% range with multipliers all

8   over the lot. *In re Vitamins Antitrust Litig.*, 2001 WL 34312839, at *10 (D.D.C. July 16, 2001)

9   [34.06% of $359,438,032]; *In re IPO Secs. Litig.*, 672 F.Supp.2d 467, 516 (D.Del. 2009) [1/3 of

10  $510,253,000]; *In re Checking Account Overdraft Litig.*, 830 F.Supp.2d 1330, 1367 (S.D.Fla.

11  2011). And objectors have their own list of cases with awards being reduced to 6-12%. *E.g.,*

12  *Wal-Mart Stores, Inc. v. Visa U.S.A.,* Inc., 396 F.3d 96 (2d Cir. 2005) [reduced fee from 18% to

13  6.5%]; *Domestic Air Transport*, 148 F.R.D. 297 [6-10% appropriate in megafund case]. Both

14  sides cite to scholarly studies of fee awards. Brian T. Fitzpatrick, *An Empirical Study of Class*

15  *Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811, 838-839, 842-844 (2010)

16  ["Fitzpatrick"]; Theodore Eisenberg & Geoffrey P. Miller, *Attorneys Fees and Expenses in*

17  *Class Action Settlements: 1993-2008*, 7 J. Empirical L. Stud. 248 (2010) ["Eisenberg"]. IPP's

18  expert, Richard Pearl, has offered his opinions. Decl. of Richard Pearl, ¶21. Docket No. 4071-

19  15. Upon close examination, many of the cases are significantly distinguishable on their facts

20  from this case. Some of the decisions that are trotted out repeatedly are now 10-15 years old or

21  from other jurisdictions with differing perspectives toward fee awards. Therefore, the Special

22  Master has endeavored to focus on decisions from the Ninth Circuit and when possible from the

23  Northern District, in reasonably similar cases from fairly recent years.

24         This case presents the familiar problem of how to determine a reasonable fee award in a

25  megafund case, that is one with a recovery of $100 million to over $1 billion. Some cases,

26  though not in the Ninth Circuit, prescribe the use of an inverse scale: the higher the megafund,

27  the lower the percentage for the fee. However, the Ninth Circuit has expressly rejected any hard

28  rule that megafund cases are to be treated differently, although size of the fund is one factor the

court should consider. *Vizcaino*, 290 F.3d at 1047 [declining to accept the principle that the award decreases as the fund increases]. The most effective way to control a percentage recovery in a megafund case is to compare it to the lodestar multiplier that it would generate. For example, in *Gutierrez v. Wells Fargo Bank*, 2015 WL 2438274 (N.D.Cal., C-07-5923, May 21, 2015), Judge Alsup reduced a fee request from 25% of the $203 million fund to 9% because the 25% benchmark percentage would have yielded a multiplier of 10.38, which Judge Alsup termed "ridiculous." The result was to approve a 9% award that gave the two class firms multipliers of 2 and 5.5. Similarly, in *Wal-Mart Stores* 396 F.3d 96, the court reduced an award from the requested percentage of 18% to 6.5% on a $3.05 billion fund, largely because the 18% fee would have represented a multiplier of 9.68, which the court found excessive. The resulting 6.5% fee produced a 3.5 multiplier, which the Second Circuit concluded compared favorably with other awards, citing *In re Cendant Corp PRIDES* Litig., 243 F.3d 722, 742 (3d Cir. 2001) [multiplier of 1.35-2.99 common in megafunds] and *NASDAQ Market-Makers*, 187 F.R.D. at 489 [multipliers of 3-4.5 are common].

The recent thorough discussion of fee awards by Judge Koh in *In re High-Tech Employees Antitrust Litig.*, 2015 WL 5158730 (N.D.Cal. No. 11-cv-2509, Sept. 2, 2015) is highly instructive. The settlement in that case produced a common fund of $415 million, plus $20 million in prior settlements. Two groups of law firms together asked for an award of $90.6 million in fees (including $5 million awarded from prior settlements). The requests together amounted to 20.8% of the total $435 million in settlements. The lodestar was $18.2 million, so the fee request would have produced a 4.97 multiplier. Judge Koh decided to use a lodestar approach, with a percentage cross-check.[34] She reasoned that anything close to the 25% benchmark would grant the lawyers a multiplier at levels above 4 which she found to be "unusual" and "far from the norm". *Id.* at *8. Also, having supervised the case for four years Judge Koh was in a good position to examine and adjust the billings as appropriate.

---

[34] The truth is that whether to start with a lodestar and use a percentage cross-check, or to proceed vice versa, is truly a matter of comfort and gut sense for the particular case rather than a real methodological difference.

1    Judge Koh ultimately adjusted billings, and allowed a fee of $45 million, which

2    produced a 2.5 multiplier. She noted that was well within the range of 1-4 in which 83% of the

3    24 class settlements discussed in *Vizcaino* fell. *See Vizcaino*, 290 F.3d at 1051 n. 6; *High-Tech*,

4    2015 WL 5158730, at *11. She then proceeded to perform a percentage check. The approved

5    fee amounted to 10.5% of the settlement, which Judge Koh found to be within the reasonable

6    ranges calculated by the two leading academic studies, *Fitzpatrick* [mean and median

7    percentages for $250-500 million settlements were 17.8% and 19.5%] and *Eisenberg* [mean and

8    median figures were 12% and 10.2].

9    Closer to home Judge Tigar has just approved an award of fees to the Direct Purchaser

10   class counsel in this very case that represents 30% of the settlement amount. [Dkt. 4311].

11   In summary, there is solid authority that a 25% award is presumptively reasonable; that

12   many cases — including megafunds — award fees in the 25-33% range; that many others award

13   fees in the 8-12% range; and that academic studies show mean and median ranges of 10-20%.

14   Here three factors point strongly in favor of a fee somewhat in excess of the 25% benchmark:

15   the 8-year duration of the case, the extraordinary risk undertaken by any group of indirect

16   purchaser class counsel in the present uncertain state of antitrust and class action law, and the

17   unarguably superb result of recovering for the indirect purchasers the second largest indirect

18   purchaser price fixing settlement in history. Having performed the required analysis and

19   considered the relevant authorities, the Special Master concludes that a fee award of 30% of the

20   settlement fund, or $173,025,000, is appropriate.

21       D.    Lodestar Comparison

22            1.    Billing Rates

23   The average billing rate for all class counsel at current rates is $492/hr. ($90,075,076 ÷

24   183,000 hrs.). The billing rate would be $450 at historic rates.[35] After the recommended

25   lodestar 10% adjustment, *infra* at pp. 73-74, the billing rate would be only $443 at current rates

26   ($81,067,569.20 ÷ 183,000 hrs.) and $412 at historic rates ($75,378,559 ÷ 183,000 hrs.).

---

[35] Objector Westfall said that the average billing rate of $879 was excessive, but he used the wrong number for total recorded hours.

1  Lead Counsel arbitrarily capped the rate for document review at $350 per hour and $400

2  for foreign language documents. Alioto Decl. I, ¶118.

3  It requires little discussion to conclude that these billing rates are reasonable and

4  responsible. Lead Counsel began billing at $875 in 2015, but from 2007 forward he billed at

5  $750/hr. Compared to the rates charged by counsel for defendants (e.g., Gibson Dunn, White &

6  Case, Sheppard Mullin, Baker Botts, Winston & Strawn, Cooley), Lead Counsel's rates were

7  low. Pearl Supp. Decl., dtd. 11/6/15, ¶10,11. With the exception of a very few lawyers, class

8  counsel's billing rates did not exceed $800, and never exceeded $1,000. Courts in the Northern

9  District have repeatedly approved billing rates in the range seen in this case. *O'Bannon v. Natl.*

10 *Collegiate Athletic Assn.*, 2015 WL 4274370 [approving rates of $370-985 for attorneys]; *Wynn*

11 *v. Chanos*, 2015 U.S. Dist. Lexis 80062 (N.D.Cal. June 19, 2015) [approving rates of $570-1085

12 for attorneys]; *Banas v. Volcano Corp.*, 47 F.Supp.3d 957 (N.D.Cal 2014) [approving rates of

13 $355-1095]; *TFT-LCD*, 2013 WL 1365900, at *7 (N.D.Cal. Apr. 3, 2013) [approving rates of

14 $417-1000]. See Pearl Decl., ¶28-37, surveying cases and firms.

15 The Special Master recommends that the objections to the billing rates of Class Counsel

16 be overruled.

17  2.  Hours

18 IPP counsel recorded 183,000 hours in this case through May 2015. Although Lead

19 Counsel and a handful of other firms have and will invest many hundreds of uncompensated

20 hours after May 2015 in obtaining approval of the settlement, administering the distribution of

21 funds, dealing with objectors, and other post-settlement tasks, Lead Counsel determined to

22 request fees only through May 2015. Providing compensation adequate to cover hours after

23 May 2015 is necessary in determining a fair fee.

24 All 183,000 hours are detailed in declarations submitted by each of the 50 class counsel

25 firms. Those declarations break down the hours by year, by timekeeper, and into 12 categories

26 of activities (research, motions, depositions, trial preparation, etc.) In addition, the Special

27 Master has been provided the raw billing entries for every firm. The Special Master has

28

1    carefully reviewed every declaration, and has reviewed a sample of about 50 months of

2    contemporaneous billing entries from a range of about eight class counsel firms.

3            Objectors assert without much in the way of evidence or authority that 183,000 hours

4    was excessive for a case that settled on the courthouse steps after eight years.  Lead Counsel has

5    explained in convincing detail the effort necessary.  Alioto Decl. I.  This explanation is

6    supported by the lists of 11 motions to dismiss, 51 third-party subpoenas, 21 discovery motions,

7    25 class representative depositions, 72 percipient defendant depositions, 68 third-party and DAP

8    depositions, 31 expert depositions, 32 Rule 30(b)(6) depositions, 36 summary judgment

9    motions, 64 motions in limine, 17 experts, four groups of plaintiffs (IPP, DPP, Attorney

10   General, and Direct Action).   Alioto Decl. II, Exs. 1-12.  In comparison, counsel in *LCD*

11   expended 313,000 hours over six years, or about 70% more time.  [Alioto Decl. I, ¶16]

12           The Special Master concludes from his review of declarations and time entries that time

13   was recorded in a professional, detailed manner by almost all lawyers.  One does observe that,

14   as the age of the lawyer increases (and approaches the age of the Special Master), the time

15   recording habits deteriorate.  Thus, almost every entry for one respected senior attorney reads

16   merely "trial prep."  Another lawyer with many decades of experience made handwritten time

17   entries which appear a trifle haphazard.  However, these are isolated cases, and the Special

18   Master has no reason to believe that there was any widespread padding of time or failure to keep

19   contemporaneous records.  Objector Bonsignore has offered unsupported hearsay that Mr.

20   Alioto told him that he did not keep contemporaneous records.  Mr. Alioto has denied this (*see*

21   Alioto Supp. Decl. in Support of IPP Motion for Award of Fees, dtd. 11/19/15, ¶27), and his

22   daily billing entries, albeit handwritten, give every impression of having been made

23   contemporaneously.

24           Lead Counsel appointed an Audit Committee of a few leading class counsel to review

25   the time of every firm.  As a result, the time of some firms was reduced.  The Special Master

26   deems it unnecessary to review the work of the Audit Committee since he reviewed declarations

27   and raw billing records.

28

Lead Counsel gave direction that lawyers were not to record time for in-house multi-lawyer conferences. Alioto Decl. II, ¶118. However, many of the billing records contain entries for just such conferences. It is simply unreasonable to expect a case of this nature to be litigated for eight years without conferences among counsel, and there is no reason to think such conferences did not generally benefit the class. Nonetheless, class counsel on occasion clearly did not follow this rule.

In evaluating attorney time entries, the two most telling factors are the number of attorneys from a single firm performing the majority of the work, and the evidence of unnecessary duplication of effort (multiple lawyers attending a deposition, excessive number of document reviewers, etc.). The billing entries here showed that for the most part the case was staffed in a reasonably "lean and mean" manner. For most firms, 75% or more of the work was performed by 2-3 lawyers consistently over the eight years. As noted above, Lead Counsel divided tasks so that each of the core firms had responsibility for a defendant or for an activity (e.g., foreign language translation). Duplication of efforts was thus minimized. Thirteen firms did virtually nothing, billing less than $75,000 each. Another nineteen firms billed less than $1 million. Thus, the real work of the case was limited to about sixteen firms that billed over $2 million. This management of attorney time compares favorably with the division of labor in *LCD* based on the Special Master's involvement in that case.

Objector Williams criticizes the lodestar because depositions were stayed for about two years at the request of the Department of Justice. Docket No. 4112. The time records show a significant drop in billings during the stay, in many firms to almost nothing, so there is no indication that counsel were padding their bills while the case was stayed. Also, the stay ultimately increased the challenges of obtaining documents and finding witnesses who could remember anything.

Objector Scarpulla maintains that the categories into which time entries were broken down are too broad. But the exact same categories were used in *LCD* where Mr. Scarpulla was co-lead counsel.

Objector Scarpulla also criticized the use of block billing[36] and quarter-hour increments to record time.   As to block billing, the Special Master's review of actual billing entries shows that this occurred but not to any egregious extent.   Having himself recorded time for almost 50 years, the Special Master is aware how silly it is to insist (as insurance companies sometimes do) on showing a specific amount of time on each action taken during a day.   *See O'Bannon* 2015 WL 4274370, at *6-7 [refusing to reduce fee for block billing, noting that "[b]lock billing is a typical practice in this district, and blocked bills have been found to provide a sufficient basis for calculating a fee award."]   As to quarter-hour increments, this is also a common practice that *O'Bannon* said had been allowed by courts in the Ninth Circuit.   *Id.* at *7-8

Objector St. John criticized billing contract attorneys at market rates applicable to permanently hired attorneys, the application of a multiplier to their time, and the lack of resumes for some contract attorneys at Lead Counsel's firm.   [Docket No. 4106, at 19].   Lead Counsel responded adequately to these points.   First, contract attorneys on this case were largely fluent in Chinese, Japanese or Korean and were essential for reviewing and selecting documents and providing backup translation at depositions.   In any event, the legal community now commonly uses contract attorneys.   There is not the slightest justification to downgrade their billing rates or not apply a multiplier to them.   Lead Counsel has provided the missing resumes for contract lawyers from his firm.   Alioto Decl. III.

In summary, the Special Master finds that class counsel's billing records appear highly reliable and detailed and that the time spent and the rates charges were reasonable for a case of this complexity.   However, in any case of this length and magnitude there are bound to be inefficiencies and wasted time for which it is appropriate to make an across-the-board reduction to the lodestar.   (IPP counsel in the *LCD* case self-imposed a 20% reduction across-the-board.)   Moreover, as noted above, some criticism is merited for a rocky relationship between IPP counsel and the California Attorney General and for features of the allocation plan that have provoked controversy.   Accordingly, to ensure that the lodestar truly represents hard

---

[36] Block billing is the inclusion in a single time entry of multiple activities during a single day without breaking out how much time the attorney spent on each activity.

1  compensable time expended for the benefit of the class, the Special Master concludes that an

2  across-the-board reduction of 10% should be applied.  This reduces the lodestar at current rates

3  from $90,075,076.90 to $81,067,569.20.

4       The resulting multiplier ($173,250,000 ÷ $81,067,569) is just under 2.14.  It is below the

5  2.5 multiplier approved by Judge Koh in *High-Tech*.  It is also well within the 1-4 range in the

6  *Vizcaino* survey of 24 decisions.  290 F.3d at 1052-1054.  It is within the range of the 2 and 5

7  multipliers used by Judge Alsup in *Gutierrez*.  And most importantly, this multiplier represents

8  a fair but not a windfall return for the generally superb job done by IPP counsel in this case.

9  **IX.     APPROVAL OF REQUEST FOR LITIGATION EXPENSES**

10      IPP's ask for approval of reimbursement to counsel of $7,634,372.50.  This total consists

11  of three categories:  $2,405,000 contributed to the Litigation Expense Fund by assessments on

12  class counsel, $733,494.48 in individual firm unreimbursed expenses, and approval of the

13  expenditure of an additional $4,495,878.02 from settlement proceeds placed in the Future

14  Expense Fund.  IPP's original request for reimbursement was reduced by the elimination of

15  $36,153.07 of unreimbursed expenses claimed by class counsel pursuant to a recent re-audit of

16  those expenses as described below.  The amounts spent and to be spent from the Litigation

17  Expense Fund and the Future Expense Fund cover expert fees, reporter fees, translation costs

18  and the like.  Reimbursable expenses incurred by class counsel consist of copying charges,

19  travel expenses, legal research, etc.

20      No one has objected to approval of these expenses.  Notwithstanding the absence of

21  objection, the Special Master has performed a sufficient review to satisfy himself of the

22  appropriateness of the request.

23      The categories of expenses are listed in detail.  Compendium of Attorney Declarations,

24  Docket No. 4073; Alioto Decl. II, ¶¶130, 134.

25      Lead Counsel appointed an Audit Committee of several firms to review and verify the

26  expenses, assisted by an accounting firm Alioto Decl. IV, ¶27.

27      More recently, now cognizant of the scrupulous review that the court gave to the

28  expense request of Direct Purchasers, Lead Counsel conducted another review of all the expense

1   requests of every class counsel firm and eliminated questionable items.  Examples of those are:

2   first and business class airfare, charges for more leg room on a flight, alcoholic beverage

3   charges, amounts with no backup invoices, copying charges exceeding $.20/page, amounts not

4   matching invoices.  It appears to the Special Master that the review was meticulous and

5   conservative — more conservative, in fact, than he would have been in assessing the same

6   expenses.  Alioto ltr. dtd. 1/7/16 to Special Master, e-filed at JAMS.

7       Lead Counsel have offered to provide the Special Master with all the backup expense

8   invoices, or to sample them.  But given the review conducted by Lead Counsel, the lack of any

9   objection and the cost-benefit calculation of investing that time, the Special Master declined to

10  conduct a more in-depth review.

11      The Special Master recommends that the request to approve reimbursement to counsel

12  and the expenditure of settlement proceeds for legitimate litigation expenses be approved.

13  **X.    APPROVAL OF INCENTIVE AWARDS TO CLASS REPRESENTATIVES**

14      IPP's request incentive awards of $15,000 to all 25 court-appointed Class

15  Representatives[37], and $5,000 for an additional 15 named plaintiffs who were not appointed by

16  the court but acted as state representatives for a period of time[38].  The total requested incentive

17  award is $450,000, which is .07% of the settlement fund.

18      No one has objected to this request.

19      These requested awards are within the range commonly approved in this District.  *See*

20  *Moore v. Verizon Communications, Inc.*, 2013 WL 4610764, No. C-09-1823 SBA, at *15

21  (N.D.Cal. Aug. 28, 2013) ["[i]n this district, a $5,000 payment is presumptively reasonable."]

22  The non-appointed state representatives maintained claims for several years until they were

23  replaced for strategic reasons.  Some (e.g., Frank Warner and Samuel Nasto) were deposed, and

24

25  _____
[37] Brian Luscher, Jeffrey Figone, Steven Ganz, Lawyer's Choice Suites, Inc., David Rooks, Daniel Riebow, Travis
26  Burau, Southern Office Supply, Inc., Kerry Lee Hall, Lisa Reynolds, David Norby, Barry Kushner, Charles
    Jenkins, Steven Fink, Gloria Comeaux, Craig Stephenson, Janet Ackerman, Louise Wood, Patricia Andrews, Gary
27  Hanson, Jeff Speaect, Albert Sidney Crigler, Margaret Slagle, John Larch, and Brigid Terry.
    [38] Frank Warner, Samuel Nasto, Carman Gonzales, Dana Ross, Ryan Rizzo, Misti Walker, Conrad Carty, Bedrock
28  Management Company, Inc., Brady Lane Cotton, Colleen Sobotka, Steven Hawley, Daniel Hergert, Chad Klebs,
    Donna Marie Ellingson, and Jerry Cook.

all searched for documentation and worked on discovery responses. *See, LCD III*, 2013 WL 1365900, at *17 [granting incentive payments of $7,500 to non-appointed representatives]. The Court-appointed representatives, both individuals and small businesses, all gave depositions, all produced documents, all responded to written discovery, some submitted declarations, and some worked with counsel to prepare trial testimony. A $15,000 award is entirely reasonable. *See, LCD I*, 2011 WL 7575003, at *2 [granting incentive payments of $15,000 to Court-appointed representatives].

The Special Master recommends approval of the requested incentive awards.

## XI.   CONCLUSION

Good cause appearing, the Special Master recommends that the Court order as follows:

1.  Approve certification of the settlement class.

2.  Find that the compensation to the certified IPP class is fair, reasonable and adequate.

3.  Find that the plan of allocation is fair, reasonable and adequate as to class members in the Statewide Damages Classes.

4.  Find that the plan of allocation is fair, reasonable and adequate as to class members in the Nationwide Class from non-repealer states even though they receive no monetary compensation.

5.  Find that the plan of allocation is fair, reasonable and adequate as to class members in the Nationwide Class from the three omitted repealer states (Massachusetts, Missouri and New Hampshire) even though they receive no monetary compensation.

6.  Find that the plan of allocation is **not** fair, reasonable and adequate insofar as it fails to address satisfaction of the terms of the Chunghwa settlement. Direct Lead Counsel to submit a plan that addresses how to correct the identified due process problem, what, if any, additional notice may be required, and a timeline for the Court to address this problem.

7.  Find that notice to the class was reasonable, appropriate under the circumstances, and met due process standards.

8. Overrule all objections other than those with respect to the treatment of the Chunghwa settlement.

9. Award attorneys' fees to IPP counsel in the amount of $173,250,000, which is equal to 30% of the settlement fund.  Compute class counsel's lodestars at current billing rates which total $90,075,076.90.  Reduce class counsel's lodestars by 10% across-the-board to account for inefficiencies and work that did not benefit the class, which results in an adjusted lodestar of $81,067,569 and a multiplier of just under 2.14.

10. Approve the request for approval of litigation expenses in the amount of $7,634,372.50.

11. Approve incentive awards in the amounts of $15,000 for the 25 court-approved Class Representatives and $5,000 for an additional 15 representatives who were not approved by the Court but acted for a period of time.

DATED:  JANUARY 28, 2016

MARTIN QUINN
SPECIAL MASTER