Pages 1 - 107

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JON S. TIGAR, JUDGE

MDL NO. 1917 IN RE:  CATHODE    )
RAY TUBE (CRT) ANTITRUST        )
LITIGATION                      )      Case No. CV 07-5944-JST
_____ )

San Francisco, California
Wednesday, January 27, 2016

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:


For DAP Plaintiffs:
                          BOIES, SCHILLER & FLEXNER, LLP
                          30 South Pearl Street - 11th Floor
                          Albany, New York  12207
                    BY:  **PHILIP J. IOVIENO, ATTORNEY AT LAW**

For Plaintiff Best Buy:
                          Robins Kaplan
                          2049 Century Park East, Suite 3400
                          Los Angeles, California  90067
                    BY:  **DAVID MARTINEZ, ATTORNEY AT LAW**

For Plaintiff Dell:
                          ALSTON & BIRD LLP
                          One Atlantic Center
                          1201 West Peachtree Street
                          Atlanta, Georgia  30309
                    BY:  **DEBRA D. BERNSTEIN, ATTORNEY AT LAW**


(Appearances continued on next page)




**Reported By:**    *Katherine Powell Sullivan, CSR #5812, RPR, CRR*
                 *Official Reporter - U.S. District Court*

**APPEARANCES (CONTINUED):**

For Plaintiff ViewSonic:
>              CROWELL & MORING LLP
>              515 South Flower Street, 40th Floor
>              Los Angeles, California  90071-2258
>        **BY:  JASON C. MURRAY, ATTORNEY AT LAW**

For Toshiba Defendants:
>              WHITE & CASE
>              701 Thirteenth Street, NW
>              Washington, DC  20005
>        **BY:  CHRISTOPHER M. CURRAN, ATTORNEY AT LAW**

For Defendant LG Electronics:
>              MUNGER, TOLLES & OLSON
>              355 South Grand Avenue, 35th Floor
>              Los Angeles, California  90071-1560
>        **BY:  E. MARTIN ESTRADA, ATTORNEY AT LAW**

For Defendant Chunghwa Picture Tubes LTD.:
>              GIBSON, DUNN & CRUTCHER LLP
>              555 Mission Street
>              San Francisco, California  94105
>        **BY:  JOEL S. SANDERS, ATTORNEY AT LAW**

For Panasonic Defendants:
>              WINSTON & STRAWN
>              200 Park Avenue
>              New York, New York  10166
>        **BY:  JEFFREY L. KESSLER, ATTORNEY AT LAW**


(Multiple other counsel present as reflected on the minutes.)

| | |
|---|---|
| 1 | Wednesday, January 27, 2016                     9:45 a.m. |

 2          **P-R-O-C-E-E-D-I-N-G-S**

 3              **---oOo---**

 4          **THE CLERK:**  Calling Civil Case 07-5944, MDL No. 1917,

 5   In re Cathode Ray Tube (CRT) Antitrust Litigation.

 6      Your Honor, appearances have already been taken.

 7          **THE COURT:**  Thank you, Mr. Noble.

 8      Good morning.

 9      (Counsel greet the Court.)

10          **THE COURT:**  This is the next in our series of hearings

11   to try to get through the many summary judgment motions that

12   had become ripe before I took this case over.  And today's

13   motions focus on the FTAIA.

14      There are five motions on calendar.  Some of them present

15   issues that are unique to a given motion.  The Dell motion, for

16   example.  The ViewSonic motion.  But many of the motions

17   present issues that are repeated throughout the motions.  So I

18   really struggled to figure out how to use our time this

19   morning.

20      As always, we are not going to have the time together this

21   morning that I would like to have.  We're going to have a

22   couple of hours, which is plenty from the judge's point of

23   view, as you'll take turns talking for a few minutes.  But I'm

24   just going to try to listen and think about what you're saying

25   continuously.  So I promise you that's about the limit of my

1  ability to do this in one fell swoop

2      But a couple of hours divided over those motions is not

3  going to leave very much time for each motion.  I thought about

4  dividing up the time on an issue-by-issue basis, but I couldn't

5  figure out -- I didn't do it far enough in advance to give you

6  a chance to divide up the argument time among the lawyers.  And

7  doing it from the bench this morning would have created more

8  chaos than it would have created order

9      So here's what we're going to do:  I'm going to tell you

10  the motions by docket number and party that I want to hear and

11  in what order.  I'm going to set stingy time limits for each

12  one, on top of which I'll probably interrupt you while you're

13  arguing.  That will eat further into your time.

14      I'll ask you some questions about the motions or make a

15  few observations that in most cases will be global -- they'll

16  apply to more than one motion -- so that when it gets time to

17  argue that motion you'll know what some of the issues are that

18  I'm paying particular attention to.

19      Usually it's my practice, if I've set a certain amount of

20  time aside on a per-motion basis, that if the lawyers arguing

21  the first motion in sequence don't use all their time, that

22  time does not roll forward.  But today it will.

23      I'm planning on spending a couple of hours up here.

24  Ms. Sullivan and I are going to both need to take a break at

25  some point in the middle so I can rest my brain and she can

1    rest her fingers.  Even though I'm planning on being up here

2    until about noon

3          As always, by the way, I'm not chumming the water.  That

4    doesn't mean everybody has to use every minute that the Court

5    is allocating

6          I want to start with motion 3006, which is the Toshiba

7    motion.  Lawyers can have 15 minutes a side on that motion

8          I want to go next to the Philips motion, which is 3003.

9    Also 15 minutes a side

10         I want to go next to 3032, the LG motion.  I think it's

11   LG.  It's a Munger, Tolles brief.  That's all 15 minutes a side

12         I'll express some scepticism now about whether the

13   plaintiffs need to show the effect of the conspiracy on a

14   transaction-by-transaction basis.  You know, it's a Munger,

15   Tolles product, so it's a beautiful brief, really, but, you

16   know, constructed, as far as I can tell, out of thin air.  So

17   maybe you can turn me around on that.

18         Next will be the Jenner & Block motion, which is 3108.

19   That's eight minutes a side.  That's the ViewSonic motion.

20         I've read the briefs.  I'm not all the way into the weeds

21   yet on the underlying facts.  This dispute about the

22   information that has been presented by ViewSonic, how good is

23   it?  How granular is it?  How granular does it need to be?

24         I've read arguments in the briefs.  Today is your

25   chance -- and I'll say this about the ViewSonic motion, but

1    I'll make this point generally.

2        I'm going to do a lot of spot auditing.  You're going to

3    tell me six things today.  I'm going to go look up the support

4    for one of them.  If it's wrong, we've got a lot of time

5    together.  We have a lot of time together.  People can be very

6    elastic in their briefs.  Today I need people to be clear with

7    me.

8        And it will help you a lot today if your opponent says

9    they kind of exaggerated something in your brief, for you to

10   say -- you know, you're not going to use the word "exaggerate"

11   to describe your own conduct, but today would be a great day to

12   fess up to it and that advice really applies to the way I

13   decide cases generally, honestly.

14       You can imagine -- if you were at the first case

15   management conference when I took over, you saw the volume of

16   paper I'm plowing through.  The ability to trust people goes a

17   long way.  In this case it goes further in this case

18       Anyway the last motion is 3008.  That's the Panasonic

19   motion.  That's also eight minutes a side.

20       Let me make a few comments and then we'll get going

21       First, I continue to be aware of the parties' request that

22   I not actually issue any written rulings on these motions until

23   the IPP settlements have either been approved or disapproved.

24   And that continues to be my intent.

25       However, it's also possible, verging on likely, people

1   will take away from today's hearing some information about my

2   tentative leanings on things.

3        I don't always ask a lot of devil's advocacy questions.

4   I'm not always telegraphing where I'm really likely to go

5   because that's not -- that's not something that helps me as a

6   judge.

7        So I think, given -- given my assumption about where

8   settlement discussions are likely to be and how long the case

9   has been pending, although I wouldn't usually say this, if you

10  want to just ask me where is the Court tentatively, if I have

11  information I'm comfortable giving you today I'll do it.  I've

12  never said that before, but today it seems to make sense.

13       Someone could confirm or deny to me that all the motions

14  today relate to cases not subject to remand outside the Ninth

15  Circuit.  That would be helpful.

16       If any party disputes that I'm required to apply the law

17  of the Ninth Circuit, that would be helpful.  Which tells you

18  something about what I think about *Motorola*.  There's your

19  first piece of information.

20       I don't want to hear arguments today regarding the state

21  law claims.  Not because it's not important, but I have to get

22  through these other things first before I get to state law

23  claims.  So no one needs to refer to state law today

24       With regard to the defendants who will make what I will

25  call *Comcast* arguments about the defendants' experts, can

1    anyone cite me a case that applied *Comcast* outside the class

2    context?  I think of that as a class certification case.  And

3    I've decided *Comcast* issues here, but always in that context.

4         All the cases that are likely to remain before the Court,

5    if the pending settlements are approved, are single-plaintiff

6    cases.

7         So assuming the Court finds today that there remains a

8    dispute of material fact regarding whether the subject

9    transactions satisfy the import commerce or domestic effects

10   test, what is the defendants' best authority for the

11   proposition that the plaintiffs' experts are required now --

12   now, not because of some motion in limine or pretrial

13   conference or what have you -- now to provide damages models

14   that exclude some of those transactions?

15        The plaintiffs argue -- they've used this phrase more than

16   once -- that all of the DAPs' purchases at issue were made by

17   the DAPs themselves, in the United States, directly from

18   defendants or their subsidiaries and affiliates.  Excludes

19   Dell.

20        So I have two questions about that.  First, is that wrong

21   as a matter of law?

22        Today is as a matter-of-law day.  Summary judgment day.

23        So, in other words, is there irrefutable evidence that

24   there are DAP purchases that that statement does not describe?

25        Subsidiary to that, so what?  You go to trial.  Some of

1    the purchases don't fit that description.  Some of them do.

2    Anyway, so -- that wasn't meant to say judgment as a matter of

3    law because some of their purchases don't satisfy that test?

4        I haven't really gotten my arms around that.  Frankly, I

5    don't think the briefing has either.  But is there such

6    irrefutable evidence?  Where is that evidence located?

7        By "Where is that evidence located?" I mean I want the

8    person who's answering that question -- if someone does -- to

9    say here's the docket number and here's the page number.  And

10   just list it.  So when I get the transcript -- which I will

11   do -- when I want to do my auditing I can find it very quickly.

12       When I say what's your best authority for the proposition,

13   I don't want you to tell me it's located in 23 pages of your

14   brief or cite 12 cases.

15       Best authority means if I go read this case -- which I

16   will do if you say it's this case -- you win.  If you don't

17   have that case, I don't know how helpful that response will be.

18   That's what I'm looking for.

19       Anyway, the second question about these -- this

20   representation by the DAPs about their purchases is, do

21   purchases from subsidiaries and affiliates not count.  Right?

22       This is DAPs describe the purchases as having been made

23   from their defendants or their subsidiaries or affiliates.

24       There's a suggestion in some of the briefing that when you

25   say "subsidiaries and affiliates" somehow you're conflating

1   *Illinois Brick* and *Illinois Brick* exceptions with the FTAIA.

2       Again, maybe it's my hasty reading, but the authority that

3   I would cite, if I did, for the proposition that purchases from

4   subsidiaries and affiliates don't count right now is not

5   closely at hand.

6       So for the defendants, what's your best authority for that

7   position?

8       And then to the DAPs, what's your best authority for the

9   proposition that they do count?

10      I don't know how to pronounce H-s-i-u-n-g, so I'll say

11  *Hsiung*.

12      I would say the shadow of the *Hsiung* amended opinion from

13  January 30th, 2015, hangs heavily over the proceedings this

14  morning.

15      Let's start with motion 3006.  I'll hear from Toshiba.

16      **MR. CURRAN:**  Good morning, Your Honor.  Christopher

17  Curran for Toshiba.

18      Your Honor, I'd like to begin by first talking a little

19  bit about what this motion is about.  And I'm hesitant to even

20  describe it because I might violate one of your commandments

21  about not referring to state law.

22      But this motion relates to how the FTAIA relates to

23  certain claims being made under state law.  So maybe there's a

24  corollary to the commandment.

25      Your Honor, footnote 4 of the plaintiffs' supplemental

1  brief to Your Honor from just the last week or so states that

2  the only remaining plaintiffs who assert state law claims are

3  Best Buy, BrandsMart and Office Depot.

4      That's footnote 4, which is right towards the beginning of

5  that supplemental submission.

6          **THE COURT:**  Yes.

7          **MR. CURRAN:**  So it identifies those three plaintiffs.

8      Your Honor may have noticed that yesterday you received a

9  stipulation from the parties under which BrandsMart and Office

10 Depot are dropping their state law claims.  So piecing those

11 together, I believe this motion relates to Best Buy and only

12 Best Buy.

13     Now, the reason I'm somewhat equivocal in saying it like

14 that is I actually thought that Costco still had a state law

15 claim.  But -- and if I'm right about that, we'll hear from the

16 plaintiffs, I think.  But, in any event, I don't think that

17 that concern of mine affects the substance of the arguments.

18     So, now, what type of commerce are we talking about in

19 this motion?  It's something very specific.

20     So Best Buy, of course, is a retailer.  It's a U.S.

21 retailer.  It did not purchase CRTs, tubes, from any of the

22 defendants.  It bought only finished products.

23     And our motion relates to a particular type of commerce.

24 It relates to a situation where the tube was manufactured by a

25 defendant, an alleged co-conspirator, and sold overseas to a --

1   an unaffiliated third party.  Someone who's neither a defendant

2   or alleged co-conspirator or a plaintiff.

3           THE COURT:  Or a subsidiary or an affiliate.

4           MR. CURRAN:  Correct.

5           THE COURT:  So falling outside the shadow --

6           MR. CURRAN:  That's right.

7           THE COURT:  -- of the description I read a moment ago.

8           MR. CURRAN:  That's right.  We're talking about an

9   independent third party.  Full stop.

10      And then that independent third party, or others in the

11  distribution chain, take that tube, make a finished product or

12  otherwise sell the finished product down the chain.  And,

13  ultimately, it is sold to Best Buy and then put on its shelves

14  for sale to customers.

15      So the reason I'm, kind of, stringing out the chain like

16  that is I distinguish that from a situation where a defendant

17  or a defendant subsidiary sold a finished product to Best Buy.

18  Because in that situation, Your Honor, Best Buy is making a

19  federal claim invoking the *Royal Printing* situation.

20      So here we are, kind of by definition, speaking only about

21  sales that were not from a defendant or co-conspirator to

22  Best Buy but, instead, had some third party in the middle of

23  the transaction.

24      Now, our position, of course, in our papers is that that

25  distribution chain, that transaction chain that I've described

1    does not provide a basis for Best Buy to have a claim against

2    the defendants.

3        And there are various elements to this.  I guess the first

4    element is, well, does the FTAIA constrain state law at all?  I

5    don't plan on addressing that very long.

6        **THE COURT:**  So let me ask you about this:  I have

7    Judge McCune's opinion in *Hsiung* -- madam reporter, 778 F.3d

8    738 -- in front of me.  I don't have the internal pin cites.  I

9    can't see them very well.  But, anyway, I think this discussion

10   begins on page 758.

11       In that opinion Judge McCune says the government's expert

12   at trial admitted that there wasn't good data on how the

13   price-fixed panels in that case wound up in finished consumer

14   goods sold in the United States.

15       And on appeal the defendant said, We don't think that the

16   testimony about direct effects was sufficient to uphold the

17   verdict.

18       And I don't want to oversimplify Judge McCune's opinion.

19   And you'll correct me if I've done that, but she says,

20   essentially, even, for example, where -- where Dell might have

21   somebody else put together a monitor, and this panel goes off

22   to an assembler somewhere -- which I gather is similar to the

23   situation you're describing for me -- if the product eventually

24   comes into the U.S., or if some of the products come into the

25   U.S. -- I think her opinion might be susceptible to that

1  reading -- the domestic effects test is satisfied.  And in a

2  criminal case the jury had enough evidence to find that beyond

3  a reasonable doubt.

4          **MR. CURRAN:**  I have a couple of responses to that.

5      One is, I think it's important to distinguish between

6  criminal cases and civil cases for damages.  Right?  And I

7  think the courts have done that pretty regularly.  Right?

8          **THE COURT:**  Yes.  The burden is higher in a criminal

9  case.

10         **MR. CURRAN:**  No, no, no, if you mean because of beyond

11  a reasonable doubt.  So the evidentiary proof might be higher,

12  but the courts are definitely more lenient in allowing the

13  government to make a foreign commerce claim than a private

14  plaintiff.

15     Justice Breyer says that in *Empagran*.  I think the Ninth

16  Circuit says that in *Hsiung*.  *Hsiung*.  *Hsiung*.

17     I think -- I think that's -- I think, certainly, Judge

18  Posner says that in *Motorola*.  And I think that that's a

19  principled position.

20     Well -- so while the burden, the evidentiary burden is

21  higher in the sense of the weight of the evidence, it makes

22  sense to be a little bit more lenient on the government than on

23  a private party because the FTAIA, to begin with, is animated

24  by concerns about international friction.

25     And the courts have acknowledged --

1          **THE COURT:**  And you think that what you said just a

2     moment ago accurately summarizes the standard even in the

3     context of a summary judgment motion?  So that it would be

4     fair -- it's a fair outcome to impose a higher burden.  It

5     would be -- well, I don't want to try to unpack what I just

6     said.  I think you take my point.

7          **MR. CURRAN:**  Well, and let me answer it this way:

8     Here's why I think we win on summary judgment.  Because I

9     look -- I focus on the *Hsiung* case.  And I think Your Honor, of

10    course, has to focus on that when we're considering the

11    domestic effects exception, because that's -- right now, that's

12    the controlling law.

13         **THE COURT:**  Yes.  I like getting reversed at least as

14    much as the next person.  Or at least as little.

15         **MR. CURRAN:**  Right.  And I think the crucial segment

16    of the *Hsiung* case is that the two paragraphs -- the first

17    paragraph begins with a reference to the constellation of

18    evidence before the court.  I think that's what Your Honor has

19    to focus on.  And I know the plaintiffs agree with that because

20    that's what their briefs focus on.

21         But I suggest to Your Honor that those paragraphs, the

22    description of the evidence there, supports us and not them.

23    And here's why:

24         In that case the -- which, of course, dealt with LCD, the

25    evidence that the Ninth Circuit focused on was evidence that

1   showed that the defendants and the U.S. victims -- I'll say

2   "victims" because they're not plaintiffs in the criminal case,

3   right, but they were basically counter-parties to a

4   transaction.

5       We had a situation -- it was either an import -- it's kind

6   of interesting.  In *Hsiung*, first of all, they rely on the

7   import exception.  And then they say, oh, by the way, the

8   direct effects exception applies too.  But then they rely on

9   imports to support that.  And then they book end it at the end

10  by saying, in any event, there's a lot of imports.  Right?

11      So it's clear that the presence of imports into the U.S.

12  was driving a significant part of the decision there.  But the

13  Court in *Hsiung* goes on further and they say there are some

14  other pieces of evidence that we look at here too.

15      And they refer to, I believe, Dell by name.  And they

16  refer to a situation where Dell was either buying products

17  directly or was closely supervising a systems integrator.

18  Those are situations where the U.S. victim is either literally

19  a party or is right there at the time of the transaction of the

20  price-fixed good.

21      Compare that to what we're dealing with right here in this

22  motion I'm arguing; the Best Buy situation.  Best Buy does not

23  allege, at all, that there's any evidence that they were a

24  party or close to being a party to the purchase of a CRT tube.

25      In fact, Your Honor, in this case they have disclaimed --

1          **THE COURT:**  I take that as a given.

2          **MR. CURRAN:**  Okay.  They have disclaimed any such role

3   to avoid discovery into such things.

4          **THE COURT:**  Yes.  I bought some things at Best Buy, by

5   the way, but none of them have CRTs in them, as far as I can

6   tell.

7          (Laughter)

8          **MR. CURRAN:**  For a while, Best Buy was selling a lot

9   of products that had CRTs in them.  Maybe that was a decade ago

10  or so.

11         **THE COURT:**  Yes.

12      So do you contend that *Hsiung* -- I like your pronunciation

13  better -- that in *Hsiung* all of the transactions that led the

14  court to conclude that the domestic effects test had been

15  satisfied fit within the description you just gave, where, for

16  example, Dell is working hand in hand with a systems integrator

17  and that none of them fit the -- an accurate description of

18  whatever transactions Best Buy was involved in?

19         **MR. CURRAN:**  Yes.  I believe it's notable that *Hsiung*

20  doesn't refer to any retailers being victims.  That's one.

21      Two, the Court decision begins by talking about a

22  constellation, okay.  That maybe isn't helpful when we're

23  trying to figure out what's the decisive fact.

24      But when it describes the elements in the constellation,

25  it seems to be that the North Star in that constellation is

1   whether or not the U.S. party was a counter-party to the

2   price-fixing transaction or was sitting at the table.

3           **THE COURT:**  Yes.

4           **MR. CURRAN:**  Okay.  I think that that's why we win.

5   Because Best Buy does not have any evidence like that.

6   Best Buy doesn't have any claim that it imported -- that it was

7   the purchaser of imports of CRT tubes that were price fixed.

8   And it doesn't allege -- unlike Dell and *Motorola*, too, by the

9   way.  It was very similar to the situation to Dell.  *Motorola*

10  from the Seventh Circuit decision, *Motorola* had its

11  subsidiaries doing the purchasing of LCD panels.  Right.

12          **THE COURT:**  *Motorola* was the same case as *Hsiung*.

13          **MR. CURRAN:**  Right.  Right.

14          **THE COURT:**  These are different branches of the same

15  tree.

16          **MR. CURRAN:**  That's kind of my point.  And *Motorola*

17  was at the table in a way similar to Dell as described in the

18  *Hsiung* opinion.

19      So those cases stand in stark contrast to a Best Buy

20  situation.  Best Buy is more attenuated than somebody like a

21  Dell or a Motorola that makes finished products and buys the

22  component part.

23          **THE COURT:**  Is the evidence undisputed that Best Buy

24  did not buy any products at all from any defendant, subsidiary

25  or affiliate?

1          **MR. CURRAN:**  As to the state law claims, yes because

2   if they had done such a purchase, that goes in the federal law

3   hopper because they rely on *Royal Printing*.  Right?

4       That's, kind of, why I say -- I win, kind of, by

5   definition here.  We're talking about a line of commerce where

6   Best Buy was not dealing with a defendant or co-conspirator.

7          **THE COURT:**  You'll have to remind me, does Best Buy

8   have any federal law claims?

9          **MR. CURRAN:**  Yes, they do.  They sure do.

10         **THE COURT:**  So they have a bunch -- okay.

11         **MR. CURRAN:**  Yeah.

12         **THE COURT:**  So they have a bunch of purchases.

13         **MR. CURRAN:**  Yeah.

14         **THE COURT:**  And some of them --

15         **MR. CURRAN:**  Some of them are based on federal law.

16   Some of their claims --

17         **THE COURT:**  I'm sorry, I don't have realtime.  I want

18   to go back and look at the question I asked you a second ago.

19       Ms. Sullivan, would you say out loud the question I asked

20   Mr. Curran a moment ago.

21         (Record read:

22         "Is the evidence undisputed that Best Buy did not buy

23         any products at all from any defendant subsidiary or

24         affiliate?")

25         **THE COURT:**  And I'm not accepting your limitation

```
1    about some things are state law claims and some things are

2    federal law claims.  I just want my question to be

3    freestanding.

4        Did Best Buy buy anything from a defendant or subsidiary

5    or affiliate and put that transaction at issue in this case in

6    any way?

7            MR. CURRAN:  Yes.  Those claims, those situations,

8    every single one of those applies to a federal claim, not a

9    state claim.  Our motion is dealing only with state claims.

10       So by definition, every transaction, every distribution

11   chain I'm attacking in my motion, was a situation where

12   Best Buy was not dealing with a defendant or co-conspirator.

13           THE COURT:  I get it now.

14           MR. CURRAN:  That's why we win.

15           THE COURT:  They have no evidence as to these state

16   law claims?

17           MR. CURRAN:  That's right.

18           THE COURT:  Because the state law claims need to be --

19           MR. CURRAN:  That's right.

20       And they also have no evidence that they were sitting at

21   the table or otherwise directing people as to what CRTs to buy.

22           THE COURT:  I'm not expecting to go hear any argument

23   on that point this morning.

24           MR. CURRAN:  Okay.  If I'm wrong --

25           THE COURT:  I don't mean from you.  I mean from them.
```

1          **MR. CURRAN:**  If I'm wrong, I hope they'll identify the

2     evidence to you.  Because I've looked.

3          **THE COURT:**  Okay.

4          **MR. CURRAN:**  All right.  I'm told I've got two minutes

5     left.  But I've made my essential point, what I wanted to make.

6     And that is that *Hsiung* and the constellation paragraphs help

7     us -- not them -- because we're dealing with Best Buy, a

8     retailer, and we're dealing with state law claims and a

9     distribution chain that involved no interaction between

10    Best Buy and any alleged co-conspirator.

11         Thank you, Your Honor.

12         **THE COURT:**  Thank you.

13         **MR. MARTINEZ:**  Good morning, Your Honor.  David

14    Martinez of Robins Kaplan on behalf of Best Buy.

15         Initially, a point about the state law claims that are at

16    issue.  Certainly, Best Buy's state law claim under the

17    Minnesota antitrust act is at issue.  But, also, Mr. Curran is

18    right, Costco's state law claim under the Cartright Act is at

19    issue.  So you've got Costco's California claim and Best Buy's

20    Minnesota claim.

21         Mr. Curran is also right that this motion addresses only

22    indirect purchases under the state law of those two states, and

23    not Shermann Act claims.

24         And I had intended to address my remarks to Your Honor in

25    three buckets.  And let me tell you what those are.  And you

1    tell me which ones you want me to address first.

2         First of all, there's an issue as to whether the FTAIA

3    applies to state law.  Specifically California and Minnesota.

4    And our position is that it does not.  And there are several

5    reasons why that holds true.

6         Second, even if the FTAIA does apply, these indirect

7    purchases fall within the import commerce exception to the

8    FTAIA -- excuse me, the import commerce exclusion to the FTAIA,

9    as well as the domestic effects exception.

10        So those are the three buckets.  Does the Court wish me to

11   address any one in particular first?

12             **THE COURT:**  I think I spoke a little bit too quickly

13   about not talking about state law.

14        Conceptually, I have some difficulty with the idea that

15   the FTAIA doesn't apply to state law claims.  Does the state

16   somehow have the power to expand the scope of antitrust

17   liability?  That's a tough one for me.

18             **MR. MARTINEZ:**  So -- and that's a very good question,

19   Your Honor.  And we address it in our papers in the context of

20   three overarching themes.

21        First of all, what does the statute say?  Second, what is

22   the legislative history behind the statute?  And, third, what

23   are the principles of statutory construction that we should

24   follow in analyzing the statute?

25        We know what the statute says.  On its face, it applies

1    only to Shermann Act claims.  It does not apply to state law

2    claims.

3        We also know what the legislative history shows.  There's

4    not an iota of legislative history suggesting that Congress

5    intended for the FTAIA to apply to state law claims.  In fact,

6    the opposite holds true.  We cite that in our brief -- and I'll

7    quote it -- from one of the Congressional hearings.  Quote:

8            "The intent of the new Section 7 is to establish that

9        the prescriptions of the Shermann Act do not apply to

10       export or foreign commerce."

11       We also know that the FTAIA was one of several provisions

12   in an omnibus bill.  Two of those other provisions related to

13   antitrust issues.

14           **THE COURT:**  Right.

15       **MR. MARTINEZ:**  And in those provisions, Congress

16   specifically defined antitrust law to include state law.  It

17   didn't do so with respect to the FTAIA.

18           **THE COURT:**  So if the goods came in and they qualify

19   as import commerce, you and I can agree the FTAIA is not

20   implicated at all.  Right?

21           **MR. MARTINEZ:**  Correct.

22           **THE COURT:**  So then we don't need to worry about

23   whether the FTAIA applies to state law claims.

24           **MR. MARTINEZ:**  Very well.

25           **THE COURT:**  So now we're talking about transactions

1  that did not result in the importation of goods directly into

2  the United States.

3      And what is the best policy argument you can make for

4  allowing the legislature of Minnesota or Iowa or Rhode Island

5  to attach liability to conduct for transactions that didn't

6  occur within their borders; that didn't occur within the

7  borders of the United States; that weren't imported into the

8  U.S.?  What is the best policy rationale for that?

9          **MR. MARTINEZ:**  Initially, Your Honor, we don't agree

10  that this does not involve import Congress.  And I can explain.

11          **THE COURT:**  No, I understand that.  So that's why I

12  gave you the first question.  That was the softball part of my

13  question.

14          **MR. MARTINEZ:**  Thank you for that.

15          **THE COURT:**  That was the good part for you.  Now we're

16  on the other part.

17      What's the good policy reason where you can satisfy that

18  test why the Court should expand -- give a state the power to

19  do something that the federal government itself has decided not

20  to do?

21          **MR. MARTINEZ:**  The policy reason is this, Your Honor:

22  States have the right, under their traditional police powers,

23  to take steps to protect citizens from conduct that harms them,

24  including conduct that occurs overseas, so long as it has an

25  effect in the state of Minnesota and affects citizens in the

1   state of Minnesota.  We contend that it does.

2       Best Buy bought an enormous amount of products indirectly,

3   not directly from the defendants but indirectly through other

4   companies like ViewSonic and Sharp and others.  And when it did

5   so, it paid a supercompetitive price.  That was harm that

6   occurred in Minnesota.  And the State of Minnesota has a right

7   to do that, and so does the State of California.

8       **THE COURT:**  Aren't you arguing that you can satisfy

9   the FTAIA if it does apply to your state law claims?

10      **MR. MARTINEZ:**  Yes.  Yes, Your Honor.  And I think --

11      **THE COURT:**  So I actually asked a bad question.  Why

12  should Minnesota be able to attach liability even when it can't

13  satisfy the FTAIA?  What does that even mean?

14      Identify for me a transaction that you think Best Buy

15  engaged in that doesn't satisfy the domestic effects test.  In

16  other words, how does it hurt Best Buy if I decide that the

17  FTAIA applies to state law claims?  What do you lose?

18      **MR. MARTINEZ:**  It doesn't, Your Honor, so long as you

19  conclude -- and I don't want to spend all my time talking about

20  the preemption issue or the question of whether it applies.

21      **THE COURT:**  Fair enough.

22      **MR. MARTINEZ:**  But it does not hurt Best Buy if you

23  conclude that the commerce was import commerce or that it

24  caused domestic effects in the United States.

25      **THE COURT:**  Okay.  Let's move on to the other two

1  things.

2      **MR. MARTINEZ:**  Okay.  So let's start with the import

3  commerce exclusion.  And let's start, again, with the statute

4  itself to see what it says.  The statute says as follows.  It

5  says that:

6      "The Shermann Act shall not apply to conduct involving

7      trade or commerce other than import trade or commerce."

8  It doesn't say "conduct consisting exclusively of import."

9  Says "conduct involving import trade or commerce."

10  You asked me for my best authority.  Apart from the

11  statute, the best authority is what I like to call the AUL

12  amended opinion because I don't know how to pronounce that name

13  either.

14      **THE COURT:**  I think *Hsiung* is, sort of, the custom for

15  this morning's proceedings.

16      **MR. MARTINEZ:**  The *Hsiung* opinion, Your Honor.  And in

17  particular, footnote 8.  Forgive me, but I'm going to quote it

18  because I think it's important.  It says, quote:

19      "The Third Circuit also addressed the import trade

20      exclusion holding that it applies to importers and to

21      defendants whose conduct is directed at a U.S. import

22      market, even if the defendants did not engage in

23      importation of products into the United States."

24  And the Court goes on.  And here's the important part:

25      "We need not determine the outer bounds of import

1      trade by considering whether commerce directed at but not

2      consummated within an import market is also outside the

3      scope of the FTAIA's import provisions because at least a

4      portion of the transactions here involve the heartland

5      situation of the direct importation of foreign goods into

6      the United States."

7      So what the Ninth Circuit is saying is when you have that

8 situation, you have conduct that involves import commerce.  So

9 if a conspiracy involves --

10      **THE COURT:**  Do you think any portion is big enough?

11 Can I take the footnote literally in that way?  What if it's

12 1 percent?

13      **MR. MARTINEZ:**  I think 1 percent would not be

14 sufficient, Your Honor.  But in this case, we have massive

15 importation of CRTs and CRT products.

16      So you don't -- if you have a conspiracy that involves

17 import commerce, certainly under the facts in this case, where

18 the importation is massive, the import commerce is not removed

19 from the ambit -- excuse me, if the conspiracy involves import

20 commerce and is thus removed from the ambit of the FTAIA, that

21 happens when a portion of the defendants' activity involves

22 import commerce.  So it doesn't have to be exclusively import

23 commerce.  If the conspiracy involves import commerce, the

24 FTAIA applies.

25      This concept that Best Buy has to prove on a

```
1    panel-by-panel basis -- on a tube-by-tube basis, excuse me, the
2    path that it took overseas before it got to Best Buy's stores
3    is unsupported by the law.  And what that essentially would
4    entail or result in is the elimination of indirect claims.
5         Because although this motion --
6         THE COURT:  The fact that, to my knowledge -- and I
7    think the defendants concede this -- no court has ever granted
8    summary judgment on this basis that you're now discussing
9    weighs very heavily in your favor.
10        And if what I said is wrong, the defendants will tell me
11   at some point this morning.
12        MR. MARTINEZ:  Thank you, Your Honor.
13        Let me move on to the domestic effects exception.  And I
14   want to talk about the constellation of events because I
15   couldn't disagree more with Mr. Curran.  I don't interpret it
16   at all the way that he does.  I interpret it the way I think
17   that the Court was suggesting.
18        And I want to use my time to talk about what the
19   constellation of events is or was in *Hsiung*, because it's
20   remarkably identical to the constellation of effects at issue
21   here.
22        I'm going to read from the opinion.  The Court says:
23             "To begin with, the TFT LCDs are a substantial cost
24        component of the finished product.  70 to 80 percent in
25        the case of monitors.  30 to 40 percent for notebook
```

computers.  As noted before, some of the panels were
imported directly into the United States."  Some of the
panels.  "Other panels were sold overseas, often to
foreign subsidiaries of American companies or to system
integrators, and then incorporated into finished
products."

The Court goes on:

"It was well understood that a substantial number of
finished products were designed for the United States and
that the practical upshot of the conspiracy would be and
was increased prices to customers in the United States."

The Court says "customers."  It doesn't say people or
entities identified specifically in the opinion, like Dell.
It's talking to customers.  Certainly, Best Buy was one of
those customers.

The Court goes on as the Court suggested earlier:

"There were a variety of arrangements in terms of
incorporating the panels into the finished products."

And the Court goes on to describe a wide variety of
arrangements as part of the constellation of factors that
established domestic effects.  And then it continues.

"By one estimate" --

**THE COURT:**  Let me ask you a question.  Going off
script a little bit here.

But let's say I get to that part of the opinion where I'm

```
 1   describing the various requests for entry of judgment, summary
 2   judgment on import commerce.  And I say a transaction qualifies
 3   as import commerce if...  How do I finish the sentence?
 4        MR. MARTINEZ:  If at least a portion of the overseas
 5   conduct involved import commerce.  And under the facts of this
 6   case, a substantial portion.
 7        THE COURT:  Okay.
 8        MR. MARTINEZ:  Let me rephrase that.  If at least a
 9   portion of the defendants' conduct constituted was the
10   importation into the United States -- not involved but it was
11   actually the importation -- if that's the case then you've got
12   conduct that involves import commerce that falls within the
13   import commerce exclusion.
14        THE COURT:  Question is open for -- anybody can answer
15   that question today.
16     Okay.  Thanks.
17        MR. MARTINEZ:  Unless the Court has questions, Your
18   Honor, those are all my remarks.  And I'll yield the rest of my
19   time to my colleagues behind me.
20        THE COURT:  Thank you, Mr. Martinez.  Very helpful.
21        MR. MARTINEZ:  Thank you, sir.
22        THE COURT:  Good.
23     Mr. Curran, what's the test?
24        THE CLERK:  You have one minute.
25        MR. CURRAN:  I have one minute, Your Honor.
```

1        Well, I don't know what the test is, but Your Honor asked,

2   Are there any other summary judgment motions?

3        Of course there are.  *Motorola* is very close to the motion

4   that I'm arguing right now.  *Motorola* involved a purchase of

5   the allegedly price-fixed component overseas.  The Seventh

6   Circuit, reversing this court which ruled otherwise on summary

7   judgment, found that that claim did not satisfy the FTAIA.

8        This is very similar.  It's -- it's a situation like

9   *Motorola* except --

10       **THE COURT:**  I'm sorry, I don't have in mind which

11  question that I asked or statement I made you're responding to.

12       **MR. CURRAN:**  I'm -- I'm just trying to deal with what

13  Mr. Martinez said and your exchange with him.

14       **THE COURT:**  Right.  I've said more than once this

15  morning, Do you have a case that says X?

16       I know you're telling me that the *Motorola* case is such a

17  case.  I just don't remember which one of my questions you're

18  responding to.

19       **MR. CURRAN:**  One of the assertions you made to

20  Mr. Martinez was:  I believe there are no cases granting

21  summary judgment in the history of the world and defendants can

22  tell me if I'm wrong.

23       **THE COURT:**  Yeah.

24       **MR. CURRAN:**  Okay.  *Motorola* is one.

25       **THE COURT:**  I'm going to say that more often.  "In the

1  history of the world."

2      (Laughter)

3          THE COURT:  I didn't actually say it, but the way you

4  say it sounds good.

5          MR. CURRAN:  *Motorola* is in the history of the world.

6      And our case is more attenuated from *Motorola*; right?

7  *Motorola* actually purchased -- my time is up.  May I continue

8  the sentence?

9          THE COURT:  Please.

10          MR. CURRAN:  *Motorola* purchased the allegedly

11  price-fixed product.  They're like the Sharp or ViewSonic that

12  Mr. Martinez is talking about.  That transaction, there's no

13  way that overseas purchase can give rise to a Shermann Act

14  claim.  No way.  Purely foreign commerce.

15      And they're saying that when it gets resold by some

16  independent third party down the distribution chain, aha, now

17  you have a Shermann Act claim.

18          THE COURT:  Yes.  That's true.  That's what *Motorola*

19  said.  Thank you.

20          MR. CURRAN:  Thank you, Your Honor.

21          MR. MARTINEZ:  Your Honor, may I just have one minute

22  to respond?

23          THE COURT:  No.

24          MR. MARTINEZ:  Thank you.

25          THE COURT:  Let's turn to motion 3003.  Sorry to be

1    abrupt.   Opportunity cost of our time is high this morning.

2        This is the Baker Botts motion on behalf of Philips.

3        **MR. ESTRADA:**  Good morning, Your Honor.  Martin

4    Estrada on behalf of LG Electronics, defendant in this case.

5        **THE COURT:**  You're from Baker Botts?

6        **MR. ESTRADA:**  I'm not, Your Honor.  But Baker Botts, I

7    understand, settled the case.  But we are still in the Dell

8    case.

9        **THE COURT:**  Oh, I see.  Okay.  Very good.

10       **MR. ESTRADA:**  Your Honor, in our view, this motion is

11   hopefully the most straightforward application of the FTAIA.

12   And that's because what we're dealing with here are monitors

13   that were purchased by Dell's foreign affiliates.  And these

14   monitors were purchased abroad, then received abroad, and then

15   further sold abroad.

16       And, in our view, the case law is strong in terms of

17   supporting the fact that that doesn't satisfy the FTAIA in

18   terms of a valid claim.

19       In particular, we cite the *Motorola* case, which has been

20   mentioned earlier today.  But with regard to the *Motorola* case

21   I think --

22       **THE COURT:**  The genesis of that *Motorola* opinion was a

23   district court judge in Illinois said that he was going to

24   reverse a decision of my colleague's, Judge Illston, because,

25   in the view of that Illinois judge, she had committed clear

 1    error.  And then the case went up to the Ninth Circuit.  Excuse

 2    me, to the Seventh Circuit.  And the Seventh Circuit embraced

 3    the position taken by the Northern District of Illinois.

 4        This chain of events is only possible because there was a

 5    remand outside the circuit.  I know what *Motorola* says -- and

 6    I'm not saying people aren't free to argue it, counsel aren't

 7    free to argue it.  I'm just saying that it would be -- I'm

 8    answerable to the Ninth Circuit.

 9        So people who rest heavily on *Motorola* should tell me why

10    they think the Ninth Circuit, if I were to apply *Motorola* in

11    this case, in light of what the Ninth Circuit has said in

12    *Hsiung*, would, nonetheless, affirm a ruling that I made.

13    That's comfort that you could be giving me this morning if you

14    think *Motorola* is helpful to the Court.

15            **MR. ESTRADA:**  Yes, Your Honor.

16        And I think it would stand in the Ninth Circuit because I

17    think its reasoning is sound.  Let me explain that.

18        In *Motorola*, the Court held that foreign subsidiaries

19    couldn't sue for harm suffered overseas.  And they focused on

20    the give-rise-to prong of the FTAIA.

21        And I know the Court's very familiar with *Motorola*.  But I

22    want to emphasize a distinction in this case where we're

23    actually two levels removed from *Motorola* in terms of being

24    more foreign.

25        In *Motorola*, the foreign subsidiaries actually bought the

1  price-fixed panels, incorporated them into cell phones and then

2  distributed them.

3        **THE COURT:**  Is this the brief that -- and I apologize

4  for not having this all straight in my head.  This is the brief

5  that makes the the-harm-is-suffered-when-the-money-is-paid-not-

6  when-the-price-is-negotiated argument, isn't it?

7        **MR. ESTRADA:**  Yes, that's part of the argument, Your

8  Honor.

9        **THE COURT:**  Not a bad argument.

10        **MR. ESTRADA:**  And there's a little bit more to it.

11  But, yes, that's it in a nutshell.

12        But I want to emphasize that in *Motorola* there was a

13  purchase of the price-fixed goods.  Here there's no purchase of

14  the price-fixed goods.

15        The Dell affiliates purchased finished products.  Those

16  finished products contained the price-fixed good, but they were

17  first sold to monitor makers, who then distributed them to the

18  foreign affiliates.

19        It's also another level removed because in *Motorola* the

20  Court emphasized that there are three categories of damages.

21  It stated that 1 percent of the damages were panels that were

22  sold to Motorola in the U.S.  42 percent of the damages were

23  panels that were sold to foreign affiliates of Motorola and

24  then sold to Motorola in the U.S.  57 percent of the damages

25  were panels that were first sold to Motorola's foreign

1   affiliates and then never made it into the United States.   They

2   were sold abroad.   That's this case.

3       And I want to emphasize that in *Motorola* the Court's

4   opinion stated that both the second and third categories

5   weren't recoverable.   But most of its analysis focused on the

6   42 percent.   The 57 percent, in the court's words, can't

7   possibly support a Shermann Act claim.   That's at pinpoint 817

8   to 818.

9       And it also went on to say that the panels, 57 percent of

10  the total, that never entered the United States neither

11  affected domestic U.S. commerce nor gave rise to a cause of

12  action under the Shermann Act.   That's at 818 to 819.

13      And that's what we're dealing with here in terms of the

14  damages that are the focus of this motion.

15      The Court mentioned *Motorola* and --

16          THE COURT:   Would it be an accurate statement of your

17  position that with regard just to these what you would describe

18  as wholly foreign transactions and the way they would be

19  treated under *Motorola*, at pages 817 through 818, that there's

20  nothing inconsistent between *Hsiung* and that specific portion

21  of *Motorola*, because *Hsiung* was not presented with those facts?

22          MR. ESTRADA:   Correct, Your Honor.

23          THE COURT:   Okay.

24          MR. ESTRADA:   In addition, there's a Fifth Circuit

25  case that I think is important.   Sometimes gets lost in the

1   shuffle.  But it's the *Den Norske* case.  And for the benefit of

2   the court reporter and your clerks it's 241 F.3d 420.

3       And under multi-district litigation law that decision in

4   the Fifth Circuit, as a remand court, bears at least close

5   consideration.

6       In that case, we dealt with a global price-fixing

7   conspiracy regarding heavy lift barge services.  They were

8   effects that occurred in U.S. waters.  There were also effects

9   from that price-fixing conspiracy abroad.

10      The plaintiff was a Norwegian company that sued.  And the

11  Fifth Circuit held that it couldn't sue for its harm suffered

12  abroad because the harm occurred when the foreign plaintiff

13  purchased the heavy lift barge services in the North Sea,

14  abroad.

15      And the Court has language which I think is pertinent

16  here.  At 428 of that opinion it held that:

17          "The FTAIA precludes suit, quote, by foreign

18      plaintiffs against defendants where the situs of the

19      injury is overseas and that injury arises from effects in

20      a nondomestic market."

21      I think those cases are very important in terms of

22  highlighting the problems with what Dell is doing here.

23      Now, I think Dell streamlined and focused on their

24  argument in the supplemental briefs that the Court requested.

25  And it makes this point about assignment.  But assignment, in

our view, doesn't solve the issue.  Because with assignment you
simply stand in the shoes of the foreign subsidiaries.

    **THE COURT:**  Yes.  I think the clearest way of -- I'm
just going to say this back to you, just to make sure that I
understand what you're saying.

    The best analogy might be that if someone with a purely
domestic claim in France, who suffered an injury in France, at
the hands of a French defendant, whose claim could concededly
only be brought in French court, could assign the claim to me
in San Francisco, it wouldn't give me the right to bring the
claim in the United States court.  It would give me the same
standing in the French court as the person who suffered the
injury.

    **MR. ESTRADA:**  Correct, Your Honor.  So I don't think
that gets around *Den Norske*.  It doesn't get around *Empagran* 1.
It doesn't get around *Motorola*.

    But, also, I know the Court emphasized that *Motorola* had a
different procedural posture.  But I would want to point out
that the District Court in *Motorola* --

    **THE COURT:**  I just think we all have to be
intellectually honest this morning about the extent to which
*Hsiung* and *Motorola* are not reconcilable.

    In this district we're located in the Ninth Circuit.  So
someone who comes in -- a lawyer who tells me that I should
apply *Motorola* in all respects is going to have a tough time.

1    That's why I asked you the question I did a moment ago about

2    your argument based on pages 817 to 818.

3           MR. ESTRADA:  Certainly, Your Honor.  And in this

4    context, because we're dealing with the give-rise-to prong,

5    there's no conflict whatsoever between the *Hsiung* case and

6    *Motorola*.

7           I would want to point out that the *Motorola* District Court

8    did deal with this assignment argument.  I'm quoting from its

9    opinion at Westlaw cite 1.  It said that:

10          "That the foreign affiliates have assigned their

11          claims to a parent company that happens to be a U.S.

12          corporation makes it no more likely that it was a domestic

13          effect, rather than the overall price-fixing conspiracy

14          itself, that proximately caused the harm" because, of

15          course, as we mentioned, the plaintiff would stand in the

16          shoes of the foreign affiliate.

17          Now, I want to reserve a couple of minutes of rebuttal if

18   possible, Your Honor.  But I would like to address the -- Judge

19   Illston's ruling in the *In re LCD* case.

20          In our view, Your Honor, the facts in that case are very

21   different from the facts here.  The Court in that case

22   stated -- and that's at 958 of that opinion -- that Dell was a

23   direct purchaser of both LCD panels and the finished products.

24   It also stated that:

25          "The transactions at issue were, quote, transactions

1          between defendants and certain of Dell's foreign

2          affiliates."

3      We don't have that situation here.

4          **THE COURT:**  Say the second part of what you said,

5  again please.

6          **MR. ESTRADA:**  Yes.  The Court stated at page 960:

7          "The transactions at issue were, quote, transactions

8          between defendants and certain of Dell's foreign

9          affiliates."

10     We don't have that situation here because Dell was not a

11  direct purchaser of tubes.  It only bought the finished

12  products, the monitors.

13     Moreover, the transactions that Dell was involved with

14  were with the finished product makers, the monitor makers, not

15  with the makers of the price-fixed good.

16         **THE COURT:**  And those were not affiliates or

17  subsidiaries of the defendants?  Picking up on Judge Illston's

18  language.

19         **MR. ESTRADA:**  In Judge Illston's language she stated

20  that the Dell-purchased panels --

21         **THE COURT:**  I see.  The affiliates were Dell's foreign

22  affiliates, not the defendants'.

23         **MR. ESTRADA:**  Yes, Your Honor.

24         **THE COURT:**  Why is that distinction important this

25  morning?

1    **MR. ESTRADA:**  I think it's important because the Court

2    emphasized that the negotiation of prices were a direct effect.

3    And that effect gave rise to the claim.

4        But here, because the negotiation, the MPAs in this case,

5    covered the finished products, the monitors, that was not a

6    direct effect of the price-fixing conspiracy which occurs

7    earlier in the sale --

8        **THE COURT:**  I think that's a tougher argument for you.

9    I think under *Hsiung* that's a tougher argument.

10       I would have to decide as a matter of law that any

11   intervention between the conspirator defendant and the

12   allegedly injured plaintiff was sufficient to destroy the

13   domestic effects -- was sufficient to destroy any possibility

14   of the domestic effects test and that a jury should not be

15   allowed to decide that question.

16       That argument is made by all the defendants this morning.

17       **MR. ESTRADA:**  Yes, Your Honor.

18       **THE COURT:**  That's a different argument than the one

19   you are making about where the injury in this particular Dell

20   situation is felt.

21       **MR. ESTRADA:**  The *Hsiung* case, Your Honor, doesn't

22   answer this question because the *Hsiung* case dealt with a

23   criminal case in which it talked about the direct effects test

24   but didn't really talk about the give-rise-to prong.  Because,

25   obviously, in a criminal case the government doesn't need to

1    prove damages in order to recover.

2        Here what we're talking about are damages.  And the

3    give-rise-to prong is all about that injury and the damages.

4    And that's the point that we're trying to make.

5            **THE COURT:**  Well, they don't have to prove the amount

6    of damages.  Although, they might choose to do that in case --

7    in a criminal case in which there's a restitution order or

8    something.

9        But they need to prove the fact of injury.  If they can't

10   satisfy the test of injury in the first place, then they can't

11   get a conviction.

12       This is what *Hsiung* is about, isn't it?

13           **MR. ESTRADA:**  It is, Your Honor.  But the *Hsiung* case

14   also didn't deal with the factual scenario we're dealing with

15   here, where the foreign affiliates purchased the product which

16   is not the actual price-fixed product and then sell them

17   abroad.

18       *Hsiung* made very clear that the effects, the products were

19   being sent into the United States.  We don't have that

20   situation here.

21       I would also point out that, with regard to Judge

22   Illston's decision, she declined to follow another Northern

23   District of California case, *Sun Microsystems v. Hynix*, which

24   we do believe is persuasive.  And that's at 534 F.Supp 2d 1101.

25       And in that case -- I see I have two minutes remaining.  I

 1   will briefly finish this point, Your Honor.

 2        In that case, the plaintiff argued, in effect, based on

 3   prices negotiated in the United States.  And the Court made

 4   clear that it's at the point of payment that any antitrust

 5   injury occurs.  Because the negotiation of a contract --

 6        **THE COURT:**  I'll tell you what.  Why don't you save

 7   your time for rebuttal.  You might wish you'd done that.

 8        What's the pin cite on this point from the *Hynix* case?

 9        **MR. ESTRADA:**  The pinpoint cite is 1115.

10        **THE COURT:**  Okay. Thanks.

11        I got this point you were just making.  Let's hear from

12   your opponent.

13        Who will argue on the other side of this motion?

14        **MS. BERNSTEIN:**  Good morning, Your Honor.

15        **THE COURT:**  Good morning.

16        **MS. BERNSTEIN:**  My name is Debra Bernstein, and I

17   represent Dell.

18        I have a couple of exhibits I'd like to pass up, if that

19   would be okay.

20        **THE COURT:**  Okay.  Have your opponents seen these

21   already?

22        **MS. BERNSTEIN:**  Yes, Your Honor.

23        **MR. ESTRADA:**  We've seen these this morning, Your

24   Honor.

25        **MS. BERNSTEIN:**  Apologize for blocking counsel.

1          THE COURT:  Okay.

2          MS. BERNSTEIN:  The consequence of defendants'

3     argument is that they can fix prices to a plaintiff in the

4     United States; and because the sales were abroad, the plaintiff

5     can never satisfy the domestic effects exception and can never

6     bring a claim under the Shermann Act.

7          THE COURT:  What the defendants would say is they

8     would alter what you said slightly to say they can fix prices

9     to a foreign defendant whose corporate status was an election

10    on the part of a conglomerate like Dell, and that they are

11    seeking the benefit of the -- you know, they're seeking the tax

12    or the benefit of a separate corporate structure.  And if they

13    want all the injury to be located in one place, they wouldn't

14    have done that.

15         MS. BERNSTEIN:  Well, we do not believe, Your Honor,

16    that the FTAIA provides them that immunization.

17         The FTAIA provides an exception to the general rule that

18    the Shermann Act will not apply to conduct involving trade or

19    commerce with foreign nations except for import trade and

20    import commerce.

21         The exception is consistent with the Clayton Act's

22    expansive creation of a private right of action for any person,

23    including foreign corporations who are injured in their

24    business or property as a result of an antitrust violation.

25         The defendants' argument is effectively trying to write

1    that exception out of the book.  Now, the FTAIA is an element

2    of the Shermann Act.

3        And we created a board to talk about it.

4        The Shermann Act applies to conduct involving trade or

5    commerce with foreign nations where the conduct, one, has a

6    direct, substantial, and reasonably foreseeable effect on

7    domestic commerce; and, two, such effect gives rise to a

8    Shermann Act claim.

9        These facts meet this test, Your Honor.

10       Now, you asked --

11           **THE COURT:**  Is judge Illston's Dell opinion the best

12   case for you?

13           **MS. BERNSTEIN:**  Yes, Your Honor.

14       She analyzed the exact same facts and came to the

15   conclusion --

16           **THE COURT:**  Why don't you use your time to talk about

17   something else.

18       I always want to know what someone's best case is.  For

19   you it's easy.

20           **MS. BERNSTEIN:**  Yes, Your Honor.

21       To answer your question, though, about *Motorola* and would

22   it stand in the Ninth Circuit, the answer is no.

23       The Seventh Circuit, Your Honor, held that U.S. antitrust

24   laws are not to be used for injury to foreign customers.  And

25   then they go on to say having submitted to foreign

jurisdictions and creating a corporation abroad if you get hurt

abroad, well, then you should just sue abroad.

What the Seventh Circuit did not do is they did not apply

the domestic effects exception.  There was no analysis about

whether the domestic conduct of the defendants proximately

caused the injury abroad.

The question that the defendants are posing is:  Can a

foreign company who buys goods abroad and is injured abroad

ever sue under the Shermann Act?  And the United States Supreme

Court in *Empagran* said yes.

**THE COURT:**  So to my earlier point about defendants'

argument that Dell wants to have its cake and eat it too, a

little bit, I understand the response to that, which, is,

essentially, so what?  The FTAIA makes this kind of conduct

actionable.  And it doesn't have anything to do with what

corporate status someone chooses.  I get that.

What's the response to the Seventh Circuit's concern that

if I go down the path you're asking me to follow, there

essentially is no limit, ever, to the amount of foreign

commercial activity that could be a basis for treble damages

under the United States antitrust laws?

**MS. BERNSTEIN:**  Well, I don't think that's correct,

Your Honor.  The slippery slope argument is not true.

Judge Illston issued her opinion in 2011.  We're the only

plaintiff in any MDL in this court to assert this fact pattern.

1          We're very unique in the fact that we have a master

2    purchase agreement that specifically provides that they would

3    set a single worldwide price to Dell; that that worldwide price

4    would apply to every purchase in the world.

5          So that is a very unique aspect of the Dell case because

6    the defendants chose to negotiate with Dell in the

7    United States; set an illegal price that they knew would apply

8    to every purchase Dell's foreign subsidiaries made in the world

9    and in the United States.

10         So it's not going to open up the floodgates of litigation

11   to every foreign purchase.  There are a lot of cases where the

12   plaintiff cannot show that their harm is dependent on the

13   domestic effect and the conduct in the United States.

14         We are not that case.  We can demonstrate that we're

15   incredibly unique.  And so far no other plaintiff has even

16   attempted to make that showing.

17         Now, the big question that comes up from *Motorola*, Your

18   Honor, is, can a foreign plaintiff sue in the United States?

19         And, as I said, the United States Supreme Court in

20   *Empagran* specifically said that the house judiciary changed the

21   language from just referring to export trade or expert commerce

22   to adding, quote, trade or commerce.  And they held:

23             "It did so deliberately to include commerce that did

24         not involve American exports," what was wholly foreign.

25         In *Empagran*, it was a foreign company buying vitamins from

 1    the defendants abroad, for sale abroad.  And the Court could

 2    have said:  Look, end of story.  You know, we just think this

 3    is too many foreign companies; you don't have standing; you

 4    can't come into the United States.

 5         That's not what they said.  What they said was:  Do you

 6    meet the domestic effects exception?

 7         They specifically remanded it to determine if *Empagran*

 8    could show that the harm that they incurred abroad, in a

 9    foreign jurisdiction, was independent or dependent on the

10    conduct in the United States.

11         Same thing in *DRAM* in the Ninth Circuit, Your Honor.  *DRAM*

12    was Cenerprise, a British manufacturer who bought DRAM abroad,

13    paid for it abroad, incorporated it into computers to sell

14    abroad.

15         And the Ninth Circuit didn't say, well, we don't like this

16    whole foreign corporations coming into the United States.

17    Nothing affected U.S. commerce on the sales.  No purchases were

18    made in the U.S.

19         And the Ninth Circuit said no, we're going to apply the

20    test.  The question in *DRAM*, that they asked were:  Did the

21    higher prices in the United States proximately cause the higher

22    prices to Centerprise abroad?

23         And that is what the test is in the Ninth Circuit, Your

24    Honor.  We do recognize that foreign corporations can bring an

25    action if they can meet this test.

1      Now, the defendants don't dispute that their

2  anti-competitive conduct had a direct, substantial and

3  reasonably foreseeable effect on domestic commerce.

4      Samsung SDI pled guilty with other major CRT producers to

5  price-fixing from March 1st, 1995 to November 25, 2007.  They

6  admit that they had multi-lateral and bilateral meetings in the

7  United States and around the world, and that agreements were

8  reached to fix prices, reduce output, and allocate market

9  shares of CDTs sold in the U.S. and elsewhere.

10      The United States Department of Justice said that

11  countless American consumers were harmed by this conspiracy.

12      Judge Conti held the U.S. market was the most significant

13  for the CRT and CRT product market to most of the defendants,

14  and that the co-conspirators coordinated their pricing in U.S.

15  dollars.

16      As we discussed, Your Honor, defendants also have a

17  direct, substantial and reasonably foreseeable effect on Dell

18  specifically in the United States.

19      As we discussed, there was a master purchase agreement.

20  And this is what Judge Illston held was the domestic effect

21  that proximately caused Dell's harm abroad.  They knowingly

22  came in and negotiated a single worldwide price.  Now, one of

23  the -- with Dell.

24      The evidence in the record is undisputed, Your Honor, that

25  the price set in the United States was the price that the

1    foreign company subsidiaries paid.

2        And that's the only issue on the table right now.  Dell's

3    U.S. purchases are not at issue.  This motion solely deals with

4    purchases made by Dell's foreign subsidiaries that they

5    assigned to Dell.

6        The record is undisputed that once the price was set in

7    the United States by the worldwide procurement team, it could

8    not be changed.  It was not changed.  And that was the price

9    that the foreign affiliates paid.

10        Judge Illston held, quote:

11            "An important domestic effect was the setting of a

12        global price for all TFT-LCD products purchased from

13        defendants, negotiated at Dell's Texas headquarters."

14        Defendants argue it has to be paid for in the

15    United States in order to constitute a domestic effect.  They

16    don't cite a single case to support that holding.  And they

17    ignore the fact that there are two judges in this district who

18    specifically held otherwise.

19        Judge Illston specifically held that the setting of an

20    illegal price to Dell worldwide was a domestic effect.

21        And Judge Hamilton, in *Sun 2* -- the defendants argued the

22    exact same thing had to be paid for.  She noted they also did

23    not cite a single case.  And then she said:

24            "Where Sun alleged their domestic effect was that they

25        entered into contractual agreements in the United States

1          to pay too much for DRAM worldwide..." she held that,

2          quote, "the FTAIA uses the term 'domestic effect' not

3          'domestic injury.'  To limit this term to the payment of

4          higher prices would be, in the Court's view, an improper

5          interpretation of the statutory language."

6       And then she goes on to say that she believes in *Empagran*

7    the Supreme Court was talking about higher prices in the U.S.

8    and not payment of those prices.

9       And, indeed, in *Empagran* the Supreme Court noted that the

10   plaintiffs never asserted that they purchased any vitamins in

11   the United States or in transactions in United States commerce.

12   And the question presented assumes the relevant transactions

13   occurred entirely outside of U.S. commerce.

14      Then the question becomes did the domestic effect

15   proximately cause Dell's injury?  And, more specifically, did

16   the higher prices charged to Dell in the United States

17   proximately cause the injury to the foreign subsidiaries?  And

18   the answer is yes.

19      And, as you noted, Judge Illston addressed this very same

20   fact pattern.  And she specifically found that the negotiated

21   worldwide price applied to all TFT-LCD products wherever

22   purchased and was binding on Dell and its subsidiaries.

23          "These allegations establish a concrete link between

24       defendants' conduct, its domestic effects, and Dell's

25       foreign injury that is far stronger than the tenuous

1    arbitrage theory rejected in the cases above."

2         Dell's MPAs and subsequent price negotiations were a

3    domestic effect of defendants' anti-competitive conspiracy that

4    proximately caused Dell's injury abroad, Dell's foreign injury

5    under the FTAIA.

6         And in *Sun 2*, Your Honor, Judge Hamilton also addressed

7    the same allegations by Sun that they set a single worldwide

8    price in the United States.  And she held:

9         "Because the same price agreement governs domestic and

10        foreign purchases here, the adverse foreign effect is not

11        independent of any adverse domestic effect as was the case

12        in *Empagran*."

13        **THE COURT:**  Ms. Sullivan, Ms. Bernstein is referring

14   to a case called *Sun*, S-u-n, as opposed to *Hsiung*, which we

15   were talking about earlier.

16        Ms. Bernstein.

17        **MS. BERNSTEIN:**  Your Honor, I just want to briefly

18   address the *Den Norske* decision that counsel raised.

19        That case predates *Empagran*.  And what was -- and actually

20   was mentioned in the *Empagran* decision.  And they specifically

21   held that the injury arose from effects not in the U.S. market.

22        And that was the problem.  They could not show that there

23   was conduct in the United States that caused their injury.

24   They were saying that the conduct was foreign.  And so that is

25   why they failed the test in that case.

1          The other issue that they raised, Your Honor, was that LCD

2     is different from this case.

3          It's the exact same situation, Your Honor.  Dell is

4     buying -- is only seeking to recover for purchases it made from

5     defendants or their affiliates or companies that are owned or

6     controlled by them.

7          We're not seeking any damages for purchases made from

8     third-party companies or unaffiliated companies.  It is the

9     exact same analysis that Judge Illston did for *TFT-LCD* and LCD

10    products.  And those issues are obviously pending before this

11    court already on ownership and control.

12         As far as Philips goes, we have named the monitor maker

13    and the tube maker as codefendants.  So every single company

14    from Philips is a defendant in this case.

15         And from Samsung we treat them as a single sale based on

16    the arguments we presented to the Court earlier.

17         Your Honor, we respectfully submit that if there were ever

18    facts that were going to meet the exception, this is that case,

19    and, at a minimus, that there are questions of fact to be

20    decided by the jury.

21         **THE COURT:**  Thank you very much.

22         **MS. BERNSTEIN:**  Thank you very much.

23         **THE COURT:**  Mr. Noble, before you start the clock,

24    let's wait until these exhibits are down.

25         All right.

1           **MR. ESTRADA:**  Your Honor, there is no conflict between

2     Ninth Circuit law and the law outside the Ninth Circuit.

3           Counsel mentioned the *Sun* case.  And she's correct in the

4     language she quoted.  But the *Sun* case found that there was a

5     direct effect, but not that that effect gave rise to the harm.

6     And that's the focus of this motion.  Not the direct effect

7     but, rather, the give-rise-to prong.

8           And in the context of a private lawsuit, not a criminal

9     lawsuit, there has to be a showing that a claim, which would be

10    the damages, the payment of an overcharge, has an effect that

11    gives rise to it.  A domestic effect that gives rise to it.

12          And that's why the *Den Norske* case is appropriate, which

13    has not been questioned by any circuit.

14          In addition, in regard to those slides, there's something

15    that's inaccurate about those slides, especially in the context

16    of Judge Illston's decision.  It talks about a single worldwide

17    price that was set.  But it doesn't talk about what product.

18          In this case, it wasn't the CRTs, it wasn't the tubes that

19    had any single worldwide price.  It was monitors.  And those

20    monitor makers are not part of the conspiracy.

21          We talked about subsidiaries, affiliates.  The cases are

22    strong that a corporation is not responsible for antitrust

23    violations by its subsidiaries or its parent corporation unless

24    there's some showing of collusion.  There's no such showing of

25    collusion here.

1    In this case, Dell's foreign affiliates bought from

2 subsidiaries of the defendants in this case.  And that

3 distinguishes it, in our view, from Judge Illston's decision.

4    I don't want to keep harping on the distinction between

5 *Hsiung* and *Motorola*, but I believe they are very distinct given

6 the context.  And, also, I'll note that they refer to each

7 other.

8    *Motorola* referred to -- excuse me, *Hsiung* referred to

9 *Motorola* and described the different requirements in a private

10 lawsuit; which is that there has to be a showing of damages,

11 and an effect that gives rise to those damages.

12    Unless the Court has any further questions, I would submit

13 on that.

14         **THE COURT:**  No.  Thank you.

15         **MR. ESTRADA:**  Thank you, Your Honor.

16         **THE COURT:**  This seems like a good time to take a

17 break.  So that's what we are going to do.  The Court will be

18 in recess for ten minutes.

19    Thank you.

20         **THE CLERK:**  All rise.

21    (Recess taken from 10:59 to 11:13 a.m.)

22         **THE COURT:**  All right.  Let's turn to motion 3032.

23         **MR. ESTRADA:**  Your Honor, good morning.  Martin

24 Estrada on behalf of LG Electronics.  And I am from Munger,

25 Tolles & Olson, which wrote the brief in this case.

1          I would like to start out by discussing the import

2     commerce exclusion and its non-applicability before getting

3     into the substance of the motion.

4          With regard to the import commerce exclusion, the

5     inapplicability of that is based largely on the *Hsiung* case,

6     which the Court has mentioned.

7          In *Hsiung*, the court stated and defined import commerce

8     as, quote, transactions between the foreign producers of the

9     price-fixed goods and purchasers located in the United States.

10    That's what it stated.

11         It's also important what the Court actually did in that

12    case.  Because what the Court did is it treated the types of

13    facts we have here, which would be foreign sales of a

14    price-fixed good which allegedly inflate a finished product

15    which ultimately makes it to the United States, it treated that

16    not under the analysis of import commerce but, rather, under

17    the analysis of a domestic effect test.

18         And that can be seen at page 75 of that opinion.  Also,

19    757 through 759 of that opinion.

20         Defendants urge the Court to adopt the Third Circuit's

21    position in *Animal Science*.  And I'll also point out that

22    *Hsiung* poses problems for that.

23         In *Animal Science*, the Court stated that the exclusion,

24    the import commerce exclusion, can be met so long as, quote,

25    the defendants' conduct targets import goods or services.

1         The problem is in *Hsiung*, at 756 of that opinion, it

2   stated that targeting is not a legal element of a Shermann Act

3   claim.

4         So it would be problematic to adopt the Third Circuit's

5   position.  And the Court in *Hsiung* did not adopt the Third

6   Circuit's position.

7         Plaintiffs also in their briefing, especially in the

8   supplemental briefing, seek to collapse the makers of the tubes

9   and the finished product makers into one entity to say they

10  purchased CRT products.

11        But, as I said earlier, with regard to corporations and

12  subsidiaries, the distinctions matter.  And I think *Motorola*

13  points that out, the distinctions between a subsidiary and a

14  parent are important.  And the case law holds that true.  I'll

15  give the Court a cite for that.

16        That is *HG Inc*.  And the cite for that is 867 F.2d 1531,

17  at pinpoint 1539.

18        That case relies on the Ninth Circuit case *Watson vs. Gulf*

19  *and Western Industries*, which is at 650 F.2d 990, pinpoint 993.

20        You can't collapse one subsidiary and a parent to say that

21  you're purchasing from that -- from that -- from the defendant,

22  the tube maker, because they are separate for purposes of

23  antitrust liability.

24        Now, with regards to the motion -- and I know the Court

25  expressed some doubt about the motion, so I'll try to clarify

1    as much as I can.

2             **THE COURT:**  Regarding the transaction-by-transaction

3    point?

4             **MR. ESTRADA:**  Yes, Your Honor.

5             **THE COURT:**  I said "regarding."  I meant referring to.

6             **MR. ESTRADA:**  Yes, Your Honor.

7             **THE COURT:**  Yes, I feel I would be going out on a limb

8    a little bit if I did that.

9             **MR. ESTRADA:**  The point of this motion, Your Honor,

10   is, again as with the Dell motion, not the domestic-effect

11   prong of the FTAIA but, rather, the give-rise-to prong of the

12   FTAIA.

13        In our earlier discussion we talked about the *Hsiung* case

14   and about the distinctions between criminal and civil cases.

15        I neglected to point out, but should have, that in a

16   criminal case injury is not a component.  As the Court is well

17   aware, in criminal cases a defendant can be sentenced based on

18   intended harm under Sentencing Guideline 2B1.1.

19        So it's very different from the private context, where you

20   have to show an injury.  One of the elements is damages.  And

21   that's why the give-rise-to prong is so important when it comes

22   to a private action such as this one.

23        Now, the motion that I'm arguing here focuses on the

24   give-rise-to prong.  And the point of this motion is really

25   that plaintiffs can't show that they paid any overcharge.  In

1    order for them to have a claim, there has to be an overcharge

2    which gives rise to their damages, injury.

3        And I know the Court is dubious of the

4    transaction-by-transaction analysis, but on any transaction,

5    under their analysis, they can't show an overcharge.  And the

6    reason for that is because they rely on these average numbers

7    and this aggregate data.

8        The analysis they use to come up with an overcharge rate

9    relies on global transaction prices.  And that's in Exhibit 3

10   to our motion, McClave's rebuttal report.

11       They then come up, use these global transaction prices,

12   and multiply the overcharge rate by a weighted average price.

13          THE COURT:  What level of granularity would be legally

14   sufficient?

15          MR. ESTRADA:  In our view, what is necessary is for

16   plaintiffs to show that they were, in fact, overcharged by

17   using their own data.  Which plaintiffs didn't do in this case.

18   Their own purchase data.

19       And that could be done in a regression model to show the

20   prices you paid before, during and after conspiracy.  The way

21   the regression analysis worked in this case and the way it

22   would work in that scenario --

23          THE COURT:  Maybe I didn't ask the question in a good

24   way.

25       You take the position that using average overcharges,

1    average overcharge is not sufficient.  We discussed a moment

2    ago whether the plaintiffs had to go transaction by

3    transaction.

4         My question about granularity is:  At what level of

5    specificity does the overcharge need to be calculated?

6         You might say, for example, at one end, as to each

7    individual monitor or other CRT-containing product, they need

8    to be able to show for that individual monitor what the

9    overcharge was.

10        You might say, well, let's say that they sell ten

11   different kinds of LG monitors.  They need to show maybe not

12   for each individual actual monitor that a customer walks out

13   the door with, but for every specific LG model they need to

14   calculate at that level.  Or perhaps you might say that

15   monitors can be categorized in a particular way.

16        I was never that knowledgeable about CRT monitors to begin

17   with.  And now the technology is obsolete, so I'm not going to

18   be able to give you examples of ways these monitors can be

19   categorized.

20        But you might say there is such a way they can be

21   categorized, and it's that level of granularity.

22        Do you follow my question?  Could I make the question

23   clearer in any way?  It's important to me.

24             **MR. ESTRADA:**  Perhaps, Your honor, if you could.  I'm

25   not entirely following.

1    If your question is whether we stand by the

2  transaction-by-transaction argument?

3          **THE COURT:**  Yeah.

4          **MR. ESTRADA:**  I think we do stand by that because

5  there is support in the case law.  But beyond --

6          **THE COURT:**  At any other level of granularity or

7  generality the overcharge evidence would be legally

8  insufficient?

9          **MR. ESTRADA:**  Under that analysis.

10    But even if the Court disagrees, it still needs to be

11  found that there was, in fact, an antitrust injury; some

12  overcharge.

13    The problem with using the average numbers that we have

14  here is that because the only specifics that come from

15  plaintiffs are the units purchased, they could recover damages

16  even if they suffered no overcharge because they're using

17  average numbers.  And that's the fundamental problem here.

18    We cite the *Optical Disk Drive* case.  I know it's a

19  different context; the certification-of-a-class context.  But

20  the Court points out this problem, that an overcharge is

21  assumed.

22          **THE COURT:**  This is Judge Seeborg's case?

23          **MR. ESTRADA:**  Yes, Your Honor.

24    In that case, the Court pointed out that an overcharge is

25  assumed as to the various members of the class.  That's what we

1    have here, is an assumption of an overcharge without analyzing

2    prices paid.  And then there's damages that result from that.

3         And that's --

4              **THE COURT:**  It's a class certification case, isn't it?

5              **MR. ESTRADA:**  It was a class certification case.

6              **THE COURT:**  He denied certification.

7              **MR. ESTRADA:**  Denied certification, yes.

8              **THE COURT:**  These are individual plaintiffs.

9              **MR. ESTRADA:**  Which couldn't show injury.  There were

10   no common issues as to antitrust injury.

11        And that's the focus of this motion here; that there's no

12   showing of any actual antitrust injury.

13        Unless the Court has further questions, I would reserve

14   the balance of my time if I could.

15             **THE COURT:**  Thank you.

16             **MR. ESTRADA:**  Thank you.

17             **MR. IOVIENO:**  Good morning, Your Honor.

18             **THE COURT:**  Madam reporter, Philip Iovieno of Boies,

19   Schiller.

20        Go ahead.

21             **MR. IOVIENO:**  Thank you, Your Honor.

22        I think I'm going to use the beginning of my time to

23   address -- you had a number of questions to begin with in the

24   hearing.  And I think that I agree with you that answers to

25   those questions are subsumed within many of these motions and

1    actually address the issues.  And then I would get to the

2    transaction-by-transaction point.

3         And I want to start with, you said is it -- is it really

4    undisputed that the plaintiffs are purchasing directly from the

5    defendants in the United States?

6         So I want to start with, What are our claims?  What is

7    before you with respect to this motion?

8         And what is before you with respect to this motion are the

9    DAPs' purchases of finished products in the United States

10   directly from the defendants and their subsidiaries and

11   affiliates who we allege they either owned or controlled and,

12   thus, satisfy the exception to *Illinois Brick*.

13        Now, I want to start with what's the support we have for

14   that.  And I want to direct you to page 10 of our brief.

15        **THE COURT:**  I'm going to give you a chance to make a

16   concession that will enhance your credibility.  If the

17   information is there.  I don't know if it is.

18        Are you aware of any case -- this is on the point that the

19   defendants make that your side is conflating *Illinois Brick* and

20   the control exceptions, and so forth, with FTAIA.

21        Are you aware of any case that goes against you on this

22   point?  And that is where a purchaser's -- purchases were made

23   from defendants or their subsidiaries or their affiliates and

24   brought into the United States, and they were found not to

25   either satisfy import commerce or domestic effects test because

1   the purchases were not made directly from the defendants

2   themselves?

3            MR. IOVIENO:  I'm not aware of any such case, because

4   there is none.

5            THE COURT:  I'm not aware of one either.

6            MR. IOVIENO:  And I was going to address that point

7   next.

8            THE COURT:  Okay.  You should stick with your outline.

9            MR. IOVIENO:  But I want to get to that point because

10  I think that's an absolute crucial/critical point of -- like

11  you say, it goes through all these motions.

12       But I think you can understand that point better when you

13  start with, what is before you?

14       You have finished-product purchasers in the United States

15  buying TVs and monitors directly from the defendants and their

16  owned or controlled subsidiaries or affiliates.

17       If you go to page 10 of our brief, okay, you'll see it

18  laid out.  And then you'll see footnote 14.

19       And there's a declaration from every single plaintiff in

20  this case, with respect to their federal claims, laying out

21  exactly how they purchased and citing their deposition

22  transcripts in a lot of cases which we also attached.

23       And what do all those declarations show?  They show the

24  following things:

25       These plaintiffs were buying CRT-finished products that

 1   contained the tubes that we claim are price-fixed.  They were

 2   buying these finished products in the United States.  They were

 3   buying them from the defendants and their owned or controlled

 4   affiliates.  That's our allegation which we intend to prove at

 5   trial.  But that's who we bought from.

 6       And in those declarations you'll see lists of all the

 7   people we were buying from, all the -- all the entities we were

 8   buying from, okay.

 9       The defendants or their owned or controlled subs were

10   importing those products into the United States.  We were

11   paying for those products in the United States.  We were taking

12   delivery in the United States.

13       So what the facts show is that we were the first purchaser

14   outside of the conspiracy.  We're buying either from a

15   defendant or from an entity, we claim there's an exception to

16   the *Illinois Brick* rule.  Okay.  And all of these purchases are

17   in the United States.  Okay.

18       So now let's jump to your second question, okay.  We claim

19   that --

20           **THE COURT:**  And the "we" you're excepting Dell.  Dell

21   has its own factual -- its own set of facts.

22           **MR. IOVIENO:**  It does.  But Dell also has facts that

23   fall into this motion, but it also has the separate facts which

24   you already dealt with.

25           **THE COURT:**  Right.  Okay.  Right.

1          **MR. IOVIENO:**  So we claim under the FTAIA, first of

2     all, that a clear application of the import commerce test

3     applies to us.

4          **THE COURT:**  Would it be true, in your view, if the

5     plaintiffs prevailed on all of their claims and the facts were

6     exactly as plaintiffs represent them to be, that the jury might

7     not even reach the domestic effects test because they would

8     find that all the transactions, save and exception maybe for

9     this group of Dell claims we're discussing, met the import

10    commerce test?

11         **MR. IOVIENO:**  Correct.  That's our primary --

12         **THE COURT:**  That's your position.

13         **MR. IOVIENO:**  That's our position.  We use domestic

14    effects as a fallback.  But we think we come squarely within

15    the import commerce exclusion, okay.

16      And, I think, if you look at the *Hsiung* case -- I want to

17    just -- I'm going to address your subsidiary point in a minute,

18    but I think it's really important to -- let's look at what they

19    say.  This is at page 754 to 755 of the opinion.

20         "Although our circuit has not defined import trade for

21         purposes of the FTAIA, not much imagination is required to

22         say that this phrase means precisely what it says."

23      And it goes on to -- you can read it.  It goes on to cite

24    the *Minn-Chem* case and other cases.  But it is applying a

25    common sense term.  Common sense application.

1      Okay.  The defendants have two arguments why they claim we

2  don't satisfy the import commerce exception.  First, they say

3  that, well, you're not buying, really, from the defendants.

4  You're buying from their owned or controlled subsidiaries.  And

5  that's different.

6      And, secondly, they say, well, you're not buying the

7  price-fixed product.  You're buying the price-fixed product as

8  part of a finished product.

9      So let's deal with the one you raised first, okay.  Let's

10  deal with the sub point.  Okay.

11      **THE COURT:**  I think you should jump to the second

12  point, honestly.  Use your time however you like.

13      **MR. IOVIENO:**  Okay.  So --

14      **THE COURT:**  Let's go to the finished product point

15  though.

16      **MR. IOVIENO:**  The -- oh, okay.  Right.

17      **THE COURT:**  The second of the two points you just

18  made.

19      **MR. IOVIENO:**  That's fine.

20      Can I just make one point about the --

21      **THE COURT:**  Yes.

22      **MR. IOVIENO:**  On the fact that the defendants -- I'd

23  like to hand up to the Court a transcript that was -- came from

24  the *Capacitors* case that was argued just two weeks ago, where

25  some of the defendants who were in this case actually take the

1    position -- and I can read it or hand it up -- that when you're

2    buying from a subsidiary, that that qualifies for the import

3    commerce.  I just want to read, just because it's not in the

4    papers.

5            **THE COURT:**  You mean the same lawyers or the same

6    parties?

7            **MR. IOVIENO:**  Same parties.  And it's Panasonic's

8    counsel.

9            **THE COURT:**  That's fine.  Lawyers doesn't count.

10   Different lawyers can take different positions for different

11   clients.  That's how it works.  But if it's the same parties,

12   I'll hear what you have to say.

13           **MR. IOVIENO:**  Right.  Judge Donato says:

14       "Judge Illston, my neighbor, held just two short years

15       ago, persuasively in my view, that even though the order

16       might have been placed overseas, if the defendant shipped

17       it directly to the United States that's within import

18       commerce.  Our colleagues in the Eastern District of

19       New York also held that.  So what is wrong with that?"

20       Panasonic's counsel responded:

21       "Okay.  Your Honor, in many cases the shipment to the

22       United States, if you have a sale overseas, is not going

23       to be the type of shipments Judge Illston was talking

24       about.  What Judge Illston was talking about, if I

25       understand correctly from LCDs, were cases where the

 1          defendants shipped the products, for example, to their

 2          U.S. subsidiaries, and their U.S. subsidiaries then sold

 3          the products in U.S. commerce.  That we have no problem.

 4          That would be import commerce transaction."

 5          So I'll hand that up.  And I'll give a copy to the

 6    defendants.

 7          But to us that deals with the second point.  There's no

 8    case that ever said if you're buying from an owned or

 9    controlled affiliate that it wouldn't count.

10          **THE COURT:**  Maybe I wasn't paying attention.  I

11    thought the quote you just read dealt with the subsidiary of

12    the purchaser, not the subsidiary of the seller.

13          **MR. IOVIENO:**  No.  It's dealing with --

14          **THE COURT:**  All right.  Why don't you hand it up.  Our

15    time is limited.  I can read it in a heartbeat.

16          (Document provided to the Court.)

17          **THE COURT:**  Wow.

18          **MR. KESSLER:**  This is my quote.  I can answer a

19    question.

20          **THE COURT:**  The thing that just got handed up to me is

21    very long.  What page is it on?

22          **MR. IOVIENO:**  Page 9.

23          **THE COURT:**  Thank you.

24          **MR. IOVIENO:**  So if you want, I'll move on to the

25    second point.

1          **THE COURT:**  Sure.

2          **MR. IOVIENO:**  So on the second point, Your Honor, that

3    we're buying the finished product and not the price-fixed good,

4    our position on that is, first of all, Your Honor, there is no

5    case that has held that you have to buy the price-fixed good;

6    that if it's contained as a component in the finished product

7    that it was somehow not being imported.

8          We're buying from the defendants or their owned or

9    controlled affiliates.  The price-fixed component is being

10   imported into the United States as part of a finished product.

11   And who's importing it?  The defendants or their owned or

12   controlled affiliates, in our view.  So it's a distinction

13   without a difference.

14         Now, I'll move on quickly to the transaction-by-

15   transaction points, if Your Honor doesn't have any more

16   questions.

17         I think it's helpful, you have to start with what happened

18   here, okay.  Put aside the transaction by transaction.  We'll

19   get to that in one second.

20         This was a worldwide conspiracy.  All the evidence, the

21   factual evidence we cited in our brief at page 6 --

22         **THE COURT:**  Right.  There's a lot of atmospherics

23   about that.

24         What's the best case for you on this point?  I read the

25   case, I say, Mr. Iovieno wins.

 1              **MR. IOVIENO:**  The best case is *LCD*, frankly.  It's the

 2     same exact situation, where you don't have --

 3              **THE COURT:**  Would you say what the beginning of that

 4     case is?

 5         Judge Illston was very prolific.  People say, you know,

 6     "In the *LCD* case."  And there are so many of them.

 7              **MR. IOVIENO:**  Let me just read to you, Your Honor.

 8              **THE COURT:**  People say, "The *LCD* case at page 11," and

 9     I think, oh, my goodness.

10              **MR. IOVIENO:**  Just give me one second, Your Honor.

11         So this is at page 29 of our brief.  This is 2012

12     WL555090.

13         The same argument, the transaction-by-transaction

14     argument, importantly, you'll see in the record of this case

15     was the same in the record of that case.  There was not data

16     that was kept on the transaction level.  It was a worldwide

17     price fix.

18              **THE COURT:**  Yes.

19              **MR. IOVIENO:**  So -- and this is Judge Illston:

20          "The Court rejects the standard articulated by

21          defendants.  Plaintiffs need not identify the overcharge

22          on each and every panel sold to direct purchasers, and

23          they need not trace the specific overcharge through the

24          manufacturing and retail chains to the ultimate purchaser.

25          The fact that plaintiffs lack perfect proof does not mean

1        the plaintiffs lack any proof at all."

2            **THE COURT:**  How specific are you required to be?

3        This is the question I asked your opponent.  Is each of

4    you going to run to the opposite end of the spectrum on this?

5            **MR. IOVIENO:**  I don't think so.

6        I think what our expert did was analyze the global sales

7    data to determine what the overcharge was on a worldwide basis

8    because all the evidence establishes that that's what the

9    defendants were trying to do.  They were trying to fix prices

10   worldwide.

11       They weren't geographically changing their overcharges.

12   Someone in Europe wasn't -- the overcharges weren't different

13   than someone in the United States.

14       So on the level --

15           **THE COURT:**  Is the theory of the damages model that

16   the prices of CRTs as a component were inflated by a particular

17   percentage, and so it's appropriate to import some version of

18   that percentage into your analysis of the finished product

19   prices and calculate damages that way?

20           **MR. IOVIENO:**  Correct.  Based on -- on size

21   essentially.

22           **THE COURT:**  Okay.

23           **MR. IOVIENO:**  Size and time period.

24           **THE COURT:**  All right.

25           **MR. IOVIENO:**  And it's a standard before-and-after

1    analysis.  A standard econometric analysis.  And the only thing

2    the defendants are taking issue with is that it was done using

3    global sales data.

4        And we think it's entirely appropriate in this case to use

5    global sales data, first of all, because that's the way the

6    conspiracy operated.  And, second of all, there's not

7    transaction-level data anyway to analyze the conspiracy in a

8    systemic way on the transaction level.

9        And I'll point you to our brief where that evidence is

10   established too.  Page 30 in our brief.  And all the evidence,

11   the discovery we took is in footnote 37.

12       So, Your Honor, I think -- I don't know how much time I

13   have left, but that's essentially what I would say about the

14   transaction level.

15           **THE COURT:**  Thank you.

16       Rebuttal.

17           **THE CLERK:**  You have five minutes.

18           **MR. ESTRADA:**  Thank you.  Thank you, Your Honor.

19       Briefly, I want to cover the import commerce exclusion.

20       One of the points -- and I see the point is actually more

21   clear now than it was in the supplemental brief -- is the

22   attempt to collapse these different entities; the makers of the

23   tubes and the makers of the finished products.

24       I cited case law in which you can't collapse them for

25   antitrust purposes.

1            THE COURT:  Let me ask you about that.

2            MR. ESTRADA:  Yes.

3            THE COURT:  *HG Inc.*; right?

4            MR. ESTRADA:  Yes.

5            THE COURT:  867 F.2d, et cetera.

6       What year and circuit was that case from?

7            MR. ESTRADA:  That was the Eighth Circuit, 1989.

8            THE COURT:  So did that court have occasion to

9   consider the argument that the entity from which the purchase

10  was made was owned or controlled by a conspirator such that the

11  owned-or-controlled exception to *Illinois Brick* applies?

12           MR. ESTRADA:  No, Your Honor.  That was not at issue.

13      And I'm glad you mentioned that because --

14           THE COURT:  Isn't that where the rubber meets the road

15  this morning?

16           MR. ESTRADA:  Let's talk about that.

17           THE COURT:  Okay.

18           MR. ESTRADA:  With regard to *Royal Printing* -- and

19  that's how they're trying to collapse the two.  I want to make

20  clear *Royal Printing* is limited.  It's a standing case.  Did

21  not deal with foreign commerce.  It was decided before the

22  FTAIA.  FTAIA was 1982.  This decision *Royal Printing* was 1980.

23           THE COURT:  I want to ask you a really clear question.

24  Probably the first time I've done that this morning.  And we'll

25  see if it even happens.

1        Do you take the position that a plaintiff who gets the

2   benefit of the *Royal Printing* exception has a lesser ability to

3   claim damages than a different kind of plaintiff because that

4   plaintiff is not entitled to invoke the FTAIA?

5        **MR. ESTRADA:**  If I understand your question, yes.

6   Because there's a collision between the FTAIA and *Royal*

7   *Printing* when you get into this context.

8        I think *Royal Printing* is not helpful to the plaintiffs in

9   this context.  And the reason for that is because the *Royal*

10  *Printing* is an exception to the *Illinois Brick* rule which

11  essentially says because the direct purchaser would not sue,

12  the indirect purchaser is permitted to sue in order to not

13  frustrate U.S. antitrust law.

14       But that rationale wouldn't apply here because the direct

15  purchaser in this instance, the finished product maker, could

16  not have sued.

17       **THE COURT:**  The concern behind any exception to

18  *Illinois Brick* is that if you don't have the exception, the

19  price fixer might get away with it.  Right?

20       I mean, not to put too fine a point on it.  That's the

21  evil to be avoided; right?

22       **MR. ESTRADA:**  Right.

23       **THE COURT:**  So why is that evil less manifest in the

24  situation where somebody wants the benefit of *Royal Printing*

25  and they also want to invoke the FTAIA?  I don't understand

1  that.

2          **MR. ESTRADA:**  Because you stand --

3          **THE COURT:**  It's not a windfall case.

4          **MR. ESTRADA:**  Because the purchaser in the U.S., the

5  purchaser down the line, stands in the shoes of the direct

6  purchaser, the finished product maker.

7          **THE COURT:**  Yes.

8          **MR. ESTRADA:**  And the finished product maker who's

9  abroad would not be permitted to sue in the United States

10  because it would be foreign commerce.

11     So our position is that *Royal Printing* shouldn't be

12  applied in this context.  But if you go down that road, it

13  results in things that, I think, plaintiff would not like.

14     In terms of our motion, I got some notes.  Apparently, I

15  wasn't very clear about how I was explaining how damages were

16  calculated.

17     When I talked about global sales data --

18          **THE COURT:**  I've enjoyed your argument so far this

19  morning very, very much.  You're very good on your feet.

20          **MR. ESTRADA:**  Thank you, Your Honor.

21          **THE COURT:**  Regardless of what Mr. Brian may have told

22  you at the break.

23     (Laughter)

24          **MR. ESTRADA:**  Well, I just need to explain myself

25  more.  Which is, the global sales data we're referring to is

1  global sales data of CRTs.  We're not talking about the

2  plaintiffs' purchase data.

3      And at the very least, even if the Court disagrees with a

4  transaction-by-transaction basis, the damages should be

5  specific to a plaintiff.

6      What we're doing here, in terms of their damages analysis,

7  is global sales data of CRTs, then a weighted average price of

8  CRTs.  That comes up with an amount of overcharge.  Then

9  there's nothing specific to plaintiffs except when they

10 multiply their units.

11     Under that scenario, you could have a situation where they

12 got the product for free, but they would still get damages

13 under this model.

14         **THE COURT:**  Yes.  Let's take a situation in which

15 there is a -- an agreement to fix prices among the providers of

16 inns and beds and breakfasts, and that sort of thing, in a

17 given area.

18     Do you follow me?

19         **MR. ESTRADA:**  Yes.

20         **THE COURT:**  And they have a meeting at the local

21 Rotary Club.  And they say, "We're all going to charge higher

22 prices.  And people who want to come to this area will have to

23 pay more.  There's nothing they can do about it."

24     In that situation, some of the beds and breakfasts will be

25 located in less desirable places and they will -- their prices

1   will be lower because people will be willing to pay less to go

2   to that particular area.  And some of the beds and breakfast

3   will -- they'll have better amenities.  Closer to hiking; nicer

4   part of town.  That sort of thing.  They will be able to charge

5   higher prices.

6        So in some cases, if you used an average across the board,

7   some plaintiffs would get a haircut on their damages and some

8   might get a slight windfall.

9        Isn't this something that experts can fight about and

10   explain to juries and say -- I mean, presumably, unless only

11   the people who got a windfall are suing you, some of them

12   actually got hurt; some of the plaintiffs get hurt by the use

13   of an average.

14        I guess I'm not seeing what the problem is.

15        MR. ESTRADA:  But that's what we don't know because of

16   the way they do their calculation.  We don't know if anyone got

17   a windfall.  We don't know if anyone was injured.

18        THE COURT:  We all agree that there was an overcharge

19   in that case; right?  We agree on that?

20        MR. ESTRADA:  Yes.

21        THE COURT:  There was a conspiracy.

22        MR. ESTRADA:  There was a conspiracy.

23        THE COURT:  Prices got fixed that raised the cost of

24   CRTs as a product.  And then, because economics work, finished

25   products got more expensive.  Right?

1          **MR. ESTRADA:**  Well, that's one of the questions,

2    because there are two levels --

3          **THE COURT:**  Do you seriously -- my tone was not

4    captured on the transcript fortunately.

5          **MR. ESTRADA:**  "Harsh tone" can be added.

6          **THE COURT:**  Tone was not harsh.

7      (Laughter)

8          **THE COURT:**  We have to have at least a reasonable

9    dispute, dispute of material fact on that.  Arch.  I would go

10   with "arch."

11        But, anyway, do you seriously contend it is open to

12   question whether finished products that incorporated cathode

13   ray tubes as to which the price was concededly fixed, that

14   there's an open question as to whether there was an upward

15   effect on the price of the finished products?  Do you think

16   that's open to dispute?

17        I'm not talking about amount.  I'm talking about the fact

18   of increase.  Do you think that's up for debate?

19        **MR. ESTRADA:**  Yes.  Because what we have here are two

20   levels.  We have the finished product makers which were subject

21   to their own competitive pressures and couldn't necessarily

22   pass on the increased cost of the component.  Then we had

23   different purchasers.

24        In your bed and breakfast example, it's not a small bed

25   and breakfast.  We have the Hilton.  We have Marriott.  We have

1   very sophisticated companies, large companies with large

2   negotiating power that had the ability to reduce or potentially

3   eliminate those overcharges as it's filtered down.

4        And that's the crux of the problem, that we don't know at

5   the very end whether these plaintiffs were actually injured.

6        **THE COURT:**  Aren't these the sorts of things -- aren't

7   the things you and I are talking about the sorts of things that

8   expert witnesses look at and say, well, this finished product

9   manufacturer was -- honestly, I'm having a hard time

10  constructing the hypothetical because, as I understand, CRTs

11  were such a large component of the price of the finished

12  product.

13       But let's reduce the percentage.  Let's say it's, you

14  know, 2 percent of the total amount of the finished product.

15  In that situation, because there's competitive pressure from

16  other kinds of monitors, and so forth, they couldn't pass on

17  the overcharge.

18       But this is the sort of thing your expert will say; right?

19       **MR. ESTRADA:**  And there will be a dispute about pass

20  on in terms of how much of any overcharge is passed on.

21       But the point of our analysis is that the best way to

22  figure out if there's an injury is to use plaintiffs' own

23  purchase data.  They didn't use that at all.  They didn't use

24  the data that showed what they paid for products.

25       They could have done that.  With a regression analysis you

1   can show what you paid before and after the conspiracy period;

2   what you paid during.  And that would be the most precise way

3   of showing whether you were actually damaged and the amount of

4   that.  But we don't have that here.

5       I see my time is up.  I appreciate it, Your Honor.  Thank

6   you.

7           **THE COURT:**  Thank you.

8       I'm accumulating too much paper.  Hang on a second.

9       Are we on 3108?  Is that where we've arrived?

10          **MR. SANDERS:**  Yeah.

11          **THE COURT:**  Very good.  All right.

12          **MR. SANDERS:**  Good morning, Your Honor.  Joel Sanders

13  on the ViewSonic motion.  I represent Chunghwa Picture Tubes.

14      You commented before that the briefing was done by Jenner

15  & Block.  Not my law firm of course.  That's correct.

16      I'm arguing because my client is the last remaining

17  defendant in the ViewSonic case, so it has fallen to me.

18      And I did take seriously some of your comments earlier

19  today.  And, frankly, I don't want to argue the issue in the

20  papers.  And I'll rest on the papers with regard to the issue

21  of whether the evidence is sufficient to show that the monitors

22  were purchased by ViewSonic America as opposed to VSI, the

23  Taiwanese entity.

24      What I would prefer to use my limited time on is to focus

25  on the question of location of injury, which I think can be

addressed regardless of whether one thinks there's sufficient

evidence that ViewSonic of America, as opposed to the Taiwan

entity, made the purchase.

       **THE COURT:**  Okay.

       **MR. SANDERS:**  The key here is that on at least this

point, and I think other points, the evidence is entirely

consistent that ViewSonic took possession, took ownership, took

title of the monitors that it purchased in Asia, in the country

of origin where they were manufactured.

      Let me briefly walk through the evidence on this.  I'm

happy to give you the cites.

      There are two master purchase agreements in the record.

One with Matsushita and the other with LG.  They are Vanhorn

Exhibits 10 and 11.

      Both of these master purchase agreements specify that the

monitors will be delivered FOB at the port in the country of

the manufacturers' home.  Japan in the case of Matsushita.

Korea in the case of LG.

      There are a grand total of 11 purchase orders before you.

That's it.  The rest, apparently, do not exist.

      Every one of those purchase orders shows that the monitors

are to be delivered FOB in these cases in Taiwan because they

were purchases from a Taiwanese entity.

      The declaration of Rose Yang, which the plaintiffs

submitted with their opposition, is silent on this point.  Says

 1   nothing.  It does not address it.

 2        There are no purchase orders or other documents or any

 3   deposition testimony that is inconsistent with this.  There is

 4   simply no evidence at all that even suggests that any monitors

 5   were ever delivered to ViewSonic in any form other than FOB in

 6   the country of origin.

 7        Now, our view is that that provides a relatively

 8   straightforward path to granting the motion, consistent with

 9   the *Hsiung* decision and other Ninth Circuit precedent.

10        Because title passed in Asia, it was the plaintiff, not

11   the defendant, that imported the finished products, the

12   monitors, into the United States.  That takes it out of the

13   import commerce exclusion.

14             **THE COURT:**  Tentatively, I think that's right.

15             **MR. SANDERS:**  Pardon?

16             **THE COURT:**  Tentatively, I think that's right.  The

17   domestic effects question; right?

18             **MR. SANDERS:**  Okay.  On the domestic effects question

19   that's a different question.

20             **THE COURT:**  Well, I should say tentatively I think

21   that's right.  But I think that weakly.  There's some

22   questions -- you may want to rest on the papers on some of

23   this.  VSI's role in this could be characterized in so many

24   different ways.

25        And, as I said earlier in the hearing -- I'm sorry to be

1    trespassing on your time so much, but, you know, I read all

2    these briefs so I could get ready for this morning.  And I

3    haven't really audited the factual record -- I read Ms. Yang's

4    declaration, but I haven't audited the details as much as I

5    would have liked.

6         I don't have a clear characterization of VSI's role in my

7    own mind.  So my thoughts about the import exception are very

8    tentative.  But I agree that, for this morning's purposes, the

9    domestic effects test is where the action is.

10        **MR. SANDERS:**  And I would tell you that, for purposes

11   of this argument, you don't even need to look at VSI.  You

12   could even assume that it was always ViewSonic America because

13   all the evidence shows that even ViewSonic America took an FOB

14   in the country of origin.

15        **THE COURT:**  Well, but that sort of begs the question,

16   because let's say -- let's say that you're a maker of monitors,

17   and I'm a seller of monitors in the United States.  And we'll

18   just put the finished product question to one side for a

19   moment.

20        And I say to you, "I want to buy these monitors you're

21   selling so I can sell them here in the United States."  And you

22   say, "Well, that's fine.  You know, sort of the shipping part

23   of this, the kind of nitty-gritty details I don't really like

24   shipping.  I'm not into shipping.  So I want you to make

25   arrangements with a third party, which would be your affiliate.

1   Or I don't really care.  It can be Amazon or it can be DHL.

2   But you've got to figure out a way to get the monitors into the

3   U.S."

4        Is that -- is that, as a matter of law, not import

5   commerce?  I see your position.  I'm just saying it's not --

6   that's not rock solid for me.

7              MR. SANDERS:  Let me tell you, in footnote 8 of the

8   *Hsiung* decision --

9              THE COURT:  Yes.

10             MR. SANDERS:  -- the Ninth Circuit says we don't need

11  to go there.  The Ninth Circuit describes the heartland

12  situation.

13             THE COURT:  Yes, they do do that.

14             MR. SANDERS:  And they say the Third Circuit has gone

15  a little broader.  They talk about targeting import commerce.

16       We don't need to go there.  We don't have to decide that.

17  Acknowledge that's left open in footnote 8.

18       And we would submit that in the absence of controlling

19  Ninth Circuit authority, the Seventh Circuit's reasoning is

20  persuasive on this.

21       The Seventh Circuit in *Motorola*, of course, said -- you

22  know, my words; not theirs -- but this area could benefit from

23  some clarity.

24             THE COURT:  Right.

25             MR. SANDERS:  Some bright lines.  And this is one

1    thing that we can be clear about.  Where the plaintiff imports

2    it, it's not the import commerce exclusion.

3              THE COURT:  Okay.

4         MR. SANDERS:  I've got two minutes left so I'll go to

5    direct effects.  And it's location of injury.  It's a question

6    of where it's arising question.

7              THE COURT:  Yes.

8         MR. SANDERS:  And here --

9              THE COURT:  Mr. Noble, add two minutes to Mr. Sanders'

10   time.

11        Go ahead.

12        MR. SANDERS:  The *Hsiung* decision is silent on this

13   because they didn't have to address it in that case.

14        In that case, for the criminal case, it was sufficient

15   that consumers in the United States purchased finished products

16   at inflated prices.  And at the end of the day, that's what

17   they say; that was a direct effect.  And they didn't need to

18   look at the question of whether a plaintiffs' claim arose

19   from -- from a domestic effect.

20        Here -- and we would submit, again, that the reasoning of

21   the Seventh Circuit, while not controlling, is persuasive that

22   when you complete the purchase outside the United States, that

23   effect is suffered outside the United States.  And the

24   plaintiff --

25             THE COURT:  By "complete" you mean place of

1    performance?

2              **MR. SANDERS:**  Yes.

3              **THE COURT:**  Like we do in contract law?  ViewSonic is

4    sitting right here in the U.S.  I think these facts are not

5    disputed.  This is a U.S. company buying products which they

6    intend to import into the U.S.  We're going to put targeting to

7    one side.  We already talked about that.  But they're going to

8    import them into the U.S.  They're going to sell them here.

9    But we say place of performance of the contract governs?

10             **MR. SANDERS:**  Yes.

11         It was a contract they entered into.  These are terms that

12   they entered into with many suppliers.  It was their choice.

13   They could have brought their claim in Taiwan, for example,

14   with regard to my client and our purchases.  And there's a

15   remedy there.  They have antitrust law there.  They have

16   private actions there.

17         And that's -- you know, we think that Judge Posner, in the

18   Seventh Circuit, got that right.  It is not addressed in

19   *Hsiung*.  It is alluded to in the Ninth Circuit's *DRAM* decision.

20   But, candidly, those facts are different.  But, certainly, it's

21   entirely consistent with that *DRAM* decision.

22             **THE COURT:**  Very good.

23             **MR. SANDERS:**  Thank you.

24             **THE COURT:**  Thank you, Mr. Sanders.

25             **MR. MURRAY:**  Good morning, Your Honor.  Jason Murray

1   from Crowell & Moring for ViewSonic Corporation.

2      Let me maybe step back for a second.  I want to deal

3   explicitly with the FOB issue that the Court is focused on and

4   also with the claim that the *Motorola* decision is somehow

5   persuasive here.  It couldn't be less so.  The facts here are

6   too different from the *Motorola* case.  But let me leave that

7   for the moment.

8      I'd like to just back up quickly -- and feel free, of

9   course, Your Honor, to interrupt me if you have specific

10   questions.

11      **THE COURT:**  I think the record demonstrates that I

12   will do that.

13      **MR. MURRAY:**  It does, but I was trying to read you.

14      First, as we've said, it's not disputed that ViewSonic is

15   a U.S. corporation which negotiates its prices from the U.S.,

16   and that the sales in this case -- not the sales of its

17   Taiwanese subsidiary, that supposedly it could pursue against

18   Chunghwa in Taiwan -- the only sales at issue in this case are

19   those made -- or purchases, rather, made by ViewSonic America

20   sitting in formerly Walnut, California, now Brea, California.

21      It's also not disputed that ViewSonic America issued the

22   purchase orders to the foreign defendants here, the cartel

23   members or their subsidiaries and affiliates, co-conspirators,

24   from Walnut, California.  They paid the invoices from Walnut,

25   California with respect to VSA purchases.

1    And the products -- and there are some purchase orders, by

2    the way, in the record, that we provided.  Please understand,

3    some of these damages go back 22 years.  There aren't perfect

4    records.  But we've included with the McBurney declaration, at

5    Exhibit 5, examples of VSA invoices.  And they say bill to

6    Walnut; ship to Long Beach, California.

7    Now, to focus solely, in the face of all of those facts

8    establishing, I would submit, clear import commerce, therefore

9    exclusion under *Hsiung* or -- I beg your pardon, *Hsiung* or even

10   *Motorola* --

11   **THE COURT:**  Why do you say that?  I get the domestic

12   effects argument that you are making.  Or you make in the

13   brief.  But why do you say under *Hsiung* you win on import

14   commerce?

15   I think Mr. Sanders, well, first of all, I think, took

16   very seriously my admonition from earlier this morning about

17   not sailing too close to the wind at argument regardless of

18   what happened in the brief.  And I appreciate that.  I think

19   he's right about footnote 8.  And after he said that, I opened

20   it back up again.

21   And the Court just comes right out and says we're not

22   going to determine whether commerce that was directed but not

23   consummated within an import market falls within this import

24   commerce.

25   So I don't think *Hsiung* gets you there.  And the question

1    I have is, in light of that footnote, what is there within the

2    Ninth Circuit or even the district courts within the Ninth

3    Circuit that would convince that me that on these facts you win

4    on import commerce also?

5            MR. MURRAY:  Well, let me address that directly but

6    also note that you're right.  You're really relying on the

7    domestic effects exception.  We think this is a very easy case

8    for that.

9        And if a U.S. purchaser purchasing and paying for, from

10   the U.S., products for sale into the U.S., that are shipped to

11   the U.S., can't recover under the domestic effects exception

12   then there is no domestic effects exception.

13       So let me table that for a moment and answer your direct

14   question.

15           THE COURT:  Yeah.

16           MR. MURRAY:  Why the import commerce exclusion?  Well,

17   the Ninth Circuit also said, excuse me, in the *Hsiung* case,

18   quoting from the Seventh Circuit in *Minn-Chem* -- this is at 778

19   F.3d 738 at 755:

20           "Transactions that are directly between the U.S.

21       plaintiff purchasers" -- ViewSonic here -- "and the

22       defendant cartel members are the import commerce of the

23       United States."

24       And there is not a single case that I'm aware of that says

25   shipping details somehow alter that; that they're a factor in

1    determining what impacts the import commerce of the

2    United States.

3        I could also quote you from the *Motorola* decision, Your

4    Honor, a decision I disagree with but I think is about as

5    defendant friendly as the decisions have come in this area,

6    where Judge Posner sets aside the 1 percent of purchases.

7    They're not even at issue.  They've stipulated that those, of

8    course, come within the Shermann Act.  Where Motorola was the

9    U.S. purchaser for products being shipped to the United States

10   and sold in the United States.

11       Now, none of those cases talks about, you know, whether

12   FOB Asia or whatever other commercial shipping terms apply.

13   And, again, the evidence in this case, the purchase orders that

14   we've put in, show that when ViewSonic America made a purchase

15   or submitted a purchase order to one of the defendants, Taiwan,

16   Korea, wherever, it said bill to Walnut; ship to Long Beach.

17       I want to make one other point about these master purchase

18   agreements.  And Mr. Sanders pointed to --

19           **THE COURT:**  Here comes a softball.

20           **MR. MURRAY:**  Okay.  Great.

21           **THE COURT:**  Isn't this question of taking of title

22   just a question of things like liability for loss in transit,

23   and things like that, that have actually very little, if any,

24   effect on the characterization of the underlying commercial

25   transaction?

1    I mean, I'm thinking now about -- so I used to represent

2  American Honda a long time ago in an MDL, actually, while we're

3  on the subject of MDLs.  So I got to learn a lot about the car

4  business.

5    If I am importing a car -- and let's lose the Honda

6  analogy because the corporate structure makes it complicated.

7  But if I'm importing some large good from another country, I'm

8  going to bring it into the U.S.  I'm going to pay somebody

9  abroad for it.  I'm going to bring it into the U.S., resell it

10  here, pocket the profits.  That's my business.  The question of

11  where title is taken or where I legally take possession, which

12  by itself is a legal construct, I'm not going to go to Berlin

13  or Taipei, you know, I'm not going to personally take

14  possession.  It's a legal construct.

15    That, it seems to me, has more to do with who bears the

16  risk of loss in transit.  There might be some choice of law

17  effect.  But the fact of it being imported in here, the fact of

18  the good being imported to the United States can't change just

19  based on that.

20    Here's the softball:  Is that your argument?

21        **MR. MURRAY:**  Yes, Your Honor.

22        **THE COURT:**  Okay.

23    (Laughter)

24        **MR. MURRAY:**  You made it far better than I.  Thank

25  you.

1          **THE COURT:**  What's Joel Sanders' best case on this

2     point?  Is it *Motorola*?

3          **MR. MURRAY:**  I don't think he has one.  Well, if it's

4     *Motorola*, then let me take that down very quickly.

5          **THE COURT:**  No, no, no.  That's not the point of my

6     question.  I'm just trying to grind this point as hard as I

7     possibly can because it's interesting.

8          **MR. MURRAY:**  Sure.

9          **THE COURT:**  And it's unique to these ViewSonic

10    transactions.

11         **MR. MURRAY:**  Sure.  I know I've stated this once, but

12    if I might just try the Court's patience.  Again, domestic

13    effects exception, this is an easy one.

14       But for purposes of answering the Court's question, is

15    this import commerce?  It has to be.  Risk of loss and whatever

16    shipping terms and where title passes are simply not part of

17    the FTAIA analysis.  The question is, is the defendant's

18    conduct involving import commerce for purposes of the

19    exclusion?

20       It absolutely has to be where it is fulfilling an order

21    and sending a shipment to a U.S. customer and then taking the

22    money from that U.S. customer in payment of that shipment.

23       That looks like import commerce to us, Your Honor.

24         **THE COURT:**  Yes.

25         **MR. MURRAY:**  Unless the Court has further questions.

1          **THE COURT:**  I don't.  Thank you.

2          **MR. MURRAY:**  Thank you.

3          **THE CLERK:**  You have two minutes.

4          **THE COURT:**  So, now, you know -- I might have figured

5     something out when your opponent was at the microphone.  You've

6     got to talk me out of that.  Get me out of that tree, if I'm up

7     in one.

8          **MR. SANDERS:**  Well, the FTAIA is, in some respects, a

9     choice of law statute.  And what you're talking about here, it

10    may be a legal concept --

11         **THE COURT:**  -- choice of law --

12         **MR. SANDERS:**  -- does have choice of law issues.

13         **THE COURT:**  That's interesting.  I don't know if you

14    will get to this point.  FTAIA is maybe barely a choice of law

15    statute.  Because choice of law usually limits your relief to a

16    particular forum.

17         And what the FTAIA says is, even foreign transactions,

18    under some circumstances, that might be actionable in other

19    jurisdictions become actionable in the United States provided

20    the right test is satisfied; right?  So it's sort of additive.

21         **MR. SANDERS:**  It is additive in that sense.  But it

22    also is, I think, as every court has looked at it has

23    recognized, it's also a limitation.

24         **THE COURT:**  Yes, it is.

25         **MR. SANDERS:**  And you can talk about legal constructs

1    but that's -- that's what we're dealing with here today.

2    That's what a lot of these arguments have been about: legal

3    constructs.

4           **THE COURT:**  Yes.

5           **MR. SANDERS:**  And they matter in the law.

6        Now, with regard to domestic effects, I do think that

7    where the transaction is completed is where the injury is

8    suffered.  That's -- that's the nub of it.

9           Parties contracted to complete their transaction outside

10   the United States.  It's at that location that the injury is

11   suffered.

12       And, yes, I don't back away from *Motorola* on that point.

13   I think there's nothing in the Ninth Circuit that is

14   inconsistent with it on these points.  And I think the

15   reasoning is sound.

16          **THE COURT:**  Very good.  Thank you.

17          **MR. SANDERS:**  Thank you.

18          **THE COURT:**  All right.  3008.

19          **MR. KESSLER:**  Good morning, Your Honor.  Jeffrey

20   Kessler for Winston & Strawn.

21       I'm going to address a motion for summary judgment because

22   of a failure to provide the jury with a reasonable basis to

23   determine damages.

24       My argument, Your Honor, is only based on Ninth Circuit

25   law or law in this district.  I am not relying on *Motorola*.

1   Excuse me.

2       And the outcome of my motion should be a granting no

3   matter how you rule on each of the other four motions that

4   preceded me.  And I will explain why.

5       First, let me start with a question Your Honor asked,

6   which is that *Comcast* is a class action decision.  And you

7   said, Has it ever been applied in summary judgment context; and

8   what is my authority for applying that concept in summary

9   judgment?

10      **THE COURT:**  I think the question that I started to ask

11  or that I asked primarily was:  Has it been applied in a

12  single-plaintiff context?

13      I'm sure -- I wouldn't be surprised if you told me there's

14  a class action case where it's been applied at summary judgment

15  because the Court might conclude that -- that having considered

16  all -- you know, that they wanted more evidence before it

17  reached this *Comcast* question in a class case.  But has it been

18  applied in a single-plaintiff case?  That's my question.

19      **MR. KESSLER:**  And the answer to that, Your Honor, is I

20  am not aware of a case citing *Comcast* for this proposition, but

21  I am aware of two Ninth Circuit decisions squarely on point

22  that predated *Comcast* and applied the exact same principle to

23  grant summary judgment in a single-plaintiff case.

24      So the Ninth Circuit actually was prescient in

25  anticipating *Comcast*.  Those cases are *City of Vernon vs.*

 1   *Southern-California Edison Company*, 955 F.2d 1361.  And the

 2   second case, which is very important, is *McGlinchy*.

 3   M-c-G-l-i-n-c-h-y.  845 F.2d at 808.

 4       And what those cases state, both Ninth Circuit authority,

 5   is that the plaintiffs have a burden in an antitrust case to

 6   segregate in their damages proof injury attributable to what

 7   could be a violation from conduct which could not be a

 8   violation.

 9       **THE COURT:**  Don't they contend -- this goes back to

10   another question I asked.

11       They contend that all of the transactions that they have

12   identified are the basis of a legally cognizable injury; right?

13   I'm not saying you agree with that assertion.

14       Isn't that the assertion?

15       **MR. KESSLER:**  No, Your Honor.  Let me explain.  This

16   is my next key point.  I hope, Your Honor, that this clears

17   away all the rubble in this case.

18       Every plaintiff would agree, I believe, and has not taken

19   a contrary position, that if there was a foreign sale of a CRT,

20   let's say in France, to a French television manufacturer who

21   then sells the TV only in France, it never comes into the

22   United States, no plaintiff is contending that is not excluded

23   by the FTAIA.

24       **THE COURT:**  Where is the plaintiff in your

25   hypothetical?  Where -- how is one of these plaintiffs involved

1    in that French transaction?

2              MR. KESSLER:  Okay.  Now I'm getting to that.

3         Their expert, Dr. McClave, used all those foreign

4    transactions to calculate the overcharge.  Let me be very clear

5    about this.  This is undisputed.

6         So when he took, for example, Panasonic's CRT global sales

7    data --

8              THE COURT:  Let me ask you about that, because I think

9    I'm following you.

10        So the expert witness, the economist or economists hired

11   by the plaintiffs assumed that the percentage of the overcharge

12   on these products was the same in all markets; right?

13             MR. KESSLER:  That's what --

14             THE COURT:  It's the same in France as it is in -- in

15   South Africa, as it is in the United States?

16             MR. KESSLER:  He calculated a one global overcharge

17   rate by -- by putting that together.  But he doesn't make your

18   assumption.  I'll explain why.

19        He agrees it could be all different, but that he says it's

20   appropriate to average that altogether to come up with a global

21   rate.

22        So he does not say --

23             THE COURT:  Okay.  Now I need to ask you a question to

24   clarify what you just said.

25        Does he say, "It is, in fact, different; and I know it's

1    different"?  Or does he say, "It might be different, but that's

2    not the assumption that I'm -- I'm not assuming that it's

3    materially different, so I'm just going to average it"?

4         MR. KESSLER:  The way this came up in his

5    deposition -- and we've cited it.

6         THE COURT:  What's the name of the expert in question,

7    please?

8         MR. KESSLER:  Dr. McClave.

9         THE COURT:  All right.  Dr. McClave.

10        MR. KESSLER:  And he did this for all of the

11   individual plaintiffs except for Dell.  Dell has their own

12   expert.

13        THE COURT:  Yes.

14        MR. KESSLER:  And we asked him:

15        "If the Court were going to rule that you had to look

16       at not all the transactions together but that you had to

17       break it up to look just in the United States or just

18       those that met some standard, could you do that now?"

19        And he said no.  In other words, he couldn't use the

20   uniform rate.  He said:  "I would have to do a new analysis."

21   Because he recognized -- he did a regression analysis.  Under

22   the regression, each transaction has a separate value.  None of

23   them -- it's a pure coincidence if anyone has the same value.

24   They're all different values.  They are put together and

25   generate by merging all these transactions together.  One, this

1  would be the market and this is what the actual single average

2  price was.

3          **THE COURT:**  Can I ask you a question?

4          **MR. KESSLER:**  Yes.

5          **THE COURT:**  Is the point of this motion that the

6  plaintiffs did not suffer -- that there's no dispute of

7  material fact about whether the plaintiffs suffered an

8  overcharge?

9          **MR. KESSLER:**  No, that is not the point of the motion.

10          **THE COURT:**  Okay.  So then my question is:  What does

11  the summary judgment order say?  What does it say?

12          **MR. KESSLER:**  The summary judgment motion says --

13  that's why I cited the controlling cases, I believe, of

14  *McGlinchy* and of *City of Vernon*, that the plaintiffs' experts

15  and the plaintiffs have failed to provide a nonspeculative way

16  for the jury to determine how much is the overcharge or any

17  injury at all to these specific plaintiffs.

18      And that's exactly what those cases say.  So, for example,

19  there you had some conduct was an antitrust violation; other

20  conduct was not.  Here we say there is some transactions in the

21  calculation that are not under U.S. antitrust laws.

22      They said by mixing it together a jury would just have to

23  speculate and say, well, maybe the French transactions or the

24  Vietnamese transactions or the Japan transactions had a

25  different overcharge rate than to these plaintiffs in the

1    United States.  Let's guess.

2        You can't guess.  That's what the Ninth Circuit ruled.

3    It's a failure of proof.  And it's a summary judgment decision,

4    not an in limine decision.  Not a decision.  You have to find,

5    have they provided a reasonable nonspeculative way to break out

6    this data?

7        And by the way --

8            **THE COURT:**  Did Dr. McClave --

9        **MR. KESSLER:**  Yes.

10           **THE COURT:**  -- take any position on whether the global

11   overcharge is a reasonable approximation of the overcharge in

12   the United States?

13       **MR. KESSLER:**  Dr. McClave would say, I believe, that

14   this is a reasonable way to measure damages in this case.  So I

15   think he would probably say yes.

16       The problem is what the Ninth Circuit said, because the

17   experts in those cases --

18           **THE COURT:**  Yes.  I'm going to read those cases.

19       What do the experts say was the amount -- the defendants'

20   experts say was the overcharge in the United States?

21       **MR. KESSLER:**  The defense experts did not offer their

22   own damages study, but did look at various criticisms and

23   issues.

24       And on this issue, they looked at what would happen if you

25   looked at just U.S. transactions, for example.  And they found

1   a completely different overcharge rate using Dr. McClave's

2   model.

3           **THE COURT:**  Did your side of this case file a *Daubert*

4   motion with respect to Dr. McClave?

5           **MR. KESSLER:**  We did not file a *Daubert* motion with

6   respect to Dr. McClave.  I don't think so.  I don't believe so,

7   no.

8        But I would say, Your Honor, while we could do this

9   through a *Daubert* motion --

10          **THE COURT:**  I'm not inviting one.

11       (Laughter)

12          **THE COURT:**  We've got a lot of motions.

13          **MR. KESSLER:**  I'm just saying summary judgment is the

14   appropriate way to do this because of that controlling Ninth

15   Circuit authority.  And the burden they have -- and, by the

16   way, they knew about this issue because we raised this at their

17   very first depositions.  Our experts said this is a fundamental

18   error because it's going to vary.

19       So it's not like they haven't had a chance.  They could

20   have done an alternative analysis and say let's just look at

21   excluding those transactions.

22       Now, they say, well, that's very difficult; our data isn't

23   so good for that.  But, again, the cases here in the Ninth

24   Circuit say it's still their burden.  The fact the data doesn't

25   exist from 14 years ago to make it easy doesn't relieve them of

1    their burden.

2         **THE COURT:**  That is interesting.  I know your time is

3    up, but I'm going to ask you this question:

4         One of their responses is the data does not exist to meet

5    the standard of damages model that Mr. Kessler is advocating

6    for; true?  That's one thing they say?

7         **MR. KESSLER:**  Yes, they do, Your Honor.

8         **THE COURT:**  So in an antitrust case, where there was a

9    price-fixing conspiracy and the conduct occurred more than a

10   dozen years ago, the plaintiffs lose because the data no longer

11   exists.  Is that true?

12        **MR. KESSLER:**  It could be, Your Honor.  I'll give you

13   an example.

14        Let's say there was a claim of a conspiracy and everybody

15   is dead because it's 20 years ago and there are no documents.

16   If the plaintiffs just got up and said, "I believe there's a

17   conspiracy, but I have no evidence" Your Honor would have to

18   grant summary judgment.

19        But more profoundly here --

20        **THE COURT:**  Yeah.

21        **MR. KESSLER:**  -- they could have taken the U.S. sales

22   data -- there were sales of CRTs in this country -- and focused

23   on that database.  And we believe the reason they did not do

24   that is because they know it would show very different results.

25   And so they mixed it all together in order to try to get the

highest possible result.

Which, by the way, is not surprising because most of the evidence in this case, when Your Honor becomes familiar with the details of the conspiracy, have to do with fixing prices overseas; not this country.  I'm not saying there's nothing here.  I'm saying most of it has to do with other conduct.

So what they did is they deliberately mixed it all together.  They didn't look at the U.S. data.  And what the Ninth Circuit says is, that's not enough.

**THE COURT:**  I've gone past your time to ask you a question.  I think you've answered.  Thank you.

**MR. KESSLER:**  Thank you.  I appreciate that, Your Honor.

**THE COURT:**  So, Mr. Iovieno, I haven't read these two Ninth Circuit cases, but I will.

I would say, putting those cases to one side you're ahead on points.  This sounds like a *Daubert* motion to me, honestly.

**MR. IOVIENO:**  A hundred percent.

**THE COURT:**  But only you know -- or maybe you don't know -- whether these Ninth Circuit cases are problematic for you.

If they're as good for Mr. Kessler says, then you ought to preemptively talk me out of agreeing with him about those cases.

**MR. IOVIENO:**  They're not, Your Honor.  And let me

1  just -- I think it's important to understand what happened here

2  because it's being mischaracterized.

3       Really, what you just heard is what defendants' expert

4  says from an econometrics standpoint is wrong with what

5  Dr. McClave did.  And it's a battle of the experts.

6       And what Dr. McClave did -- let me just be very clear --

7  he took the worldwide global sales data because it was a

8  worldwide conspiracy.  They didn't fix the prices for tubes

9  being sold into the U.S. independently of tubes being sold

10 anywhere else.  That's why he didn't use the U.S. data.

11      He was asked this in his deposition.  They said,

12 "Dr. McClave" -- and this is all in the record on Exhibit 19.

13 And you can read it.  But they asked him:

14           "What would be your best estimate for the overcharge

15      to a purchaser outside the U.S.?"

16      And he answered it repeatedly.

17           "It would be my overcharge.  It's the average

18      overcharge on a worlds wide basis."

19      That's what he applied to our purchases in the

20 United States, the worldwide overcharge, because it was a

21 worldwide conspiracy.  That's even before you get to the fact

22 that the data doesn't exist to do what they say our expert

23 should have done.

24      And on the case law, it's the same thing that came up in

25 *LCD*.  Again, if you were to ask me, "What's your best case?"  I

 1    would say go right back to Judge Illston.  It's the same thing.

 2    It's heads we win; tails you lose.  Okay.

 3        The record, page 30 of our brief, footnote 37, we did

 4    extensive discovery, extensive discovery.  Defendants, give us

 5    any evidence that you have that can identify the tubes in the

 6    products we purchased.

 7        You'll see in footnote 37 they all uniformly answer --

 8             **THE COURT:**  Yes, I recall the brief on this point.

 9             **MR. IOVIENO:**  So, again, I think at best what you're

10    talking about here is a battle of the experts.  It's a *Daubert*

11    motion at best.  And it's improper in the summary judgment

12    context.

13             **THE COURT:**  Thank you, Mr. Iovieno.

14        Mr. Kessler, last word of the day.

15             **MR. KESSLER:**  Thank you, Your Honor.

16        I would just say we're not contesting that the sales

17    they're talking about are the right sales in this motion.

18    That's not our argument in this motion, the sales in the U.S.

19        What we're contesting is that the way in which they did

20    their damage study indisputably includes significant sales that

21    no one would contend are actionable.

22        And by doing that, they haven't given the jury a

23    nonspeculative way to calculate their damages, which the Ninth

24    Circuit says is fatal.

25        And *Comcast* reiterates that principle in a different

1    context, but it's the same principle in context as the Ninth

2    Circuit wrote in *City of Vernon* and in *McGlinchy*.

3        And that's it, Your Honor, for me.

4            **THE COURT:**  Thank you.

5            **MR. KESSLER:**  Thank you.

6            **THE COURT:**  Thank you, all, very much.

7        Thank you, Ms. Sullivan, for your lengthy reporting this

8    morning.

9        The Court is in recess.

10           **THE CLERK:**  All rise.

11       (At 12:22 p.m. the proceedings were adjourned.)

12                      -   -   -   -

13

14                  <u>**CERTIFICATE OF REPORTER**</u>

15       I certify that the foregoing is a correct transcript

16   from the record of proceedings in the above-entitled matter.

17

18   DATE:   Friday, January 29, 2016

19

20

21                    *Katherine Sullivan*

22   _____

23        Katherine Powell Sullivan, CSR #5812, RMR, CRR
                    U.S. Court Reporter

24

25