APPENDIX OF DOCUMENTS CITED IN SPECIAL MASTER'S REPORT AND
RECOMMENDATION THAT WERE E-FILED WITH JAMS

1) Indirect Purchaser Plaintiffs' Motion for Final Approval of Settlements with the Phillips, Panasonic, Hitachi, Toshiba, Samsung SDI, Technicolor and Techologies Displays Americas Defendants -- 11/20/15; **to be filed on ECF by Trump, Alioto, Trump & Prescott**

2) Indirect Purchaser Plaintiffs' Reply Re: Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards to Class Representatives -- 11/20/15; **to be filed on ECF by Trump, Alioto, Trump & Prescott**

3) Supplemental Statement of Interest of the State of California -- 12/9/15 by Office of the Attorney General

4) Reply to Motion for Final Approval of Settlement -- 12/9/15 by Kress Law Firm

5) Reply Brief in Support of Objections to Indirect-Purchaser Plaintiffs' Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses and Incentive Awards to Class Representatives -- 12/9/15 by Law Offices of Francis Scarpulla

6) D.W. St. John's Reply ISO Objection -- 12/9/15 by Joseph St. John

7) Reply in Support of Objections to Indirect-Purchaser Plaintiffs' Motion for Final Approval of Settlements with Phillips, Panasonic, Hitachi, Toshiba, Samsung SDI, Technicolor and Technologies Displays Americas Defendants -- 12/9/15 by Cooper & Kirkham

8) Reply in Support of Objection to the Proposed Class Action Settlement Agreement and Motion for Attorney Fees by Objector Rockhurst University, Objector Gary Talewsky, and Objector Harry Garavanian -- 12/9/15 by Teresa Moore

9) Objector Donnie Clifton's Reply to Opposition to Objections and Motion for Final Approval -- 12/9/15 by Jan Westfall

10) Letter to Special Master Quinn from Mario Alioto -- 12/13/15

11) Letter to Special Master Quinn -- 12/14/15 -- Law Offices of Francis Scarpulla

12) Special Master's Order Re (1) Lead Counsel's Request for Further Briefing; (2) Hearing for Oral Argument; (3) Objectors Finn/Fortman Motion for Production of Fee Agreements -- 12/14/15

13) Motion for Permission to File Reply in Support of Objections to Lead Counsel's Motions for Final Approval and Attorneys' Fees -- 12/15/15 by Bonsignore Trial Lawyers

14) Indirect Purchaser Plaintiffs' Reply Re: Final Approval of Settlements with the Phillips, Panasonic, Hitachi, Toshiba, Samsung SDI, Technicolor, and Technologies Displays Americas Defendants -- 12/23/15

15) Declaration of Joseph M. Fisher Re: Cooper/Scarpulla Objection -- 12/23/15

16) Indirect Purchaser Plaintiffs' Response to the California Attorney General's Statement of Interest -- 12/29/15

17) Reply in Support of Supplemental Statement of Interest of the State of California -- 1/4/16

18) Indirect Purchaser Plaintiff's Letter Brief Regarding Chunghwa Settlement -- 1/13/16

19) Letter Brief to Special Master Quinn re Conflicts Between Terms of Approved Chunghwa Settlement/Distribution Plan and Proposed Terms of and Plan of Distribution for Subsequent Settlements -- 1/13/16 by Cooper & Kirkham P.C.

1   KAMALA D. HARRIS
    Attorney General of California
2   MARK BRECKLER
    Chief Assistant Attorney General
3   KATHLEEN E. FOOTE
    Senior Assistant Attorney General
4   State Bar No. 65819
    ESTHER LA
5   State Bar No. 160706
    PAMELA PHAM
6   State Bar No. 235493
    EMILIO VARANINI
7   State Bar No. 163952
    Deputy Attorneys General
8     455 Golden Gate Avenue, Suite 11000
      San Francisco, CA  94102-7004
9   Telephone:  (415) 703-5908
    Fax:  (415) 703-5480
10  E-mail:  Emilio.Varanini@doj.ca.gov

11  *Attorneys for the State of California*

12              IN THE UNITED STATES DISTRICT COURT

13          FOR THE NORTHERN DISTRICT OF CALIFORNIA

14                  SAN FRANCISCO DIVISION

15

16  | IN RE:  CATHODE RAY TUBE (CRT) | Master File No. 3:07-cv-05944-JST |
    | ANTITRUST LITIGATION,          |                                   |

17                                   MDL No. 1917

18                                   **SUPPLEMENTAL STATEMENT OF**
                                     **INTEREST OF THE STATE OF**
19                                   **CALIFORNIA**

20  This Documents Relates To:      Hearing Date:  March 15, 2015
                                    Time:          2 P.M.
21  ALL ACTIONS                     Courtroom:     Courtroom 9, 19th Floor
                                    Judge:         Honorable Jon S. Tigar
22                                  Special Master: Martin Quinn, JAMS

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 3

I.    The role of the Attorney General in exercising oversight on behalf of
natural persons under both the CAFA and California statutory and common
law as it pertains to her input into these proceedings................................................. 3

    A.    The role and powers of the Attorney General in exercising
oversight under the class action fairness act ............................................... 3

    B.    The role and powers of the Attorney General in exercising
oversight under her federally recognized *parens* authority........................ 7

II.    The allocation plan, as carried out through the notice and claims process, is
sufficiently unfair and inequitable to natural persons on its face to warrant
modification, and to warrant the Attorney General's receipt and review of
claims and notice data, prior to final approval ......................................................... 8

III.    The final date for filing claims should be extended to June 30, 2016 as it
would help increase claims from natural persons and would efficiently
coordinate state and federal proceedings ............................................................... 16

    A.    The case law, and precedent from similar cases, supports extending
the claims date for all claimants past the date for the final approval
hearing to June 30, 2016 ........................................................................ 17

    B.    The need to coordinate state and federal proceeding also supports
extension of the final date for submitting claims for all claimants to
June 30, 2016 ........................................................................................ 17

CONCLUSION ................................................................................................................ 20

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Consumer Cause, Inc. v. Mrs. Gooch's Natural Food Markets, Inc.*
127 Cal.App.4th 387 (2005) ..................................................................................13

*Consumer Defense Group v. Rental Housing Industry Members*
137 Cal.App.4th 1185 (2006) ................................................................................13

*Diakos v. HSS Systems*
2015 WL 5921585 (S.D. Fla. Sept. 29, 2015) ........................................................2

*Garcia v. World Sav., FSB*
183 Cal.App.4th 1031 (2010) ..........................................................................1, 19

*Gebser v. Lago Vista Independent School Dist.*
524 U.S. 274 (1998) ................................................................................................6

*Grimes v. Vitalink Communications*
17 F.3d 1553 (3d Cir.1994) ....................................................................................8

*In re Cendant Corp. Prides Litig.*
233 F.3d 188 (3rd Cir. 2000) ............................................................................8, 17

*In re DRAM Antitrust Litig, Report and Recommendation, Part I*
(Jan. 8, 2013) ................................................................................................ passim

*In re DRAM Antitrust Litig, Report and Recommendation, Part II*
(June 24, 2013) ................................................................................................9, 10

*In re DRAM Antitrust Litig, Report and Recommendation, Part III*
(Nov. 5, 2013) ......................................................................................................11

*In re Lupron Marketing and Sales Practices Litig.*
677 F.3d 21 (1st Cir. 2012) ............................................................................13, 15

*In re Music Compact Disc Minimum Advertised Price Antitrust Litig.*
236 F.R.D. 48 (D. Maine May 25, 2006) ..............................................................15

*In re TFT-LCD (Flat Panel) Antitrust Litig., Second Amended Order Granting Final Approval*
(Apr. 3, 2013) ..........................................................................................................9

*Lee v. Ocwen Loan Servicing LLC*
2015 WL 5449813 (S.D. Fl. Sept. 14, 2015) ....................................................6, 17

ii

# TABLE OF AUTHORITIES
### (continued)

**Page**

M'Culloch v. Maryland
    17 U.S. 316 (1819) ...................................................................5

Marshall v. Holiday Magic, Inc.
    550 F.2d 1173 (9th Cir. 1977) ...............................................5, 9

Moore v. Verizon Comm'ncs
    2013 WL 4610764 (N.D. Cal. 2013) .........................................6

Nakkhumpun v. Taylor
    2015 WL 6889399 (D. Colo. Nov. 3, 2015) ..............................2

Ortiz v. Fiberboard
    527 U.S. 815 (1999) ................................................................5

Stahlman v. FCC
    126 F.2d 124 (D.C. Cir. 1942) .................................................6

State of Georgia v. Pennsylvania R. Co.
    325 U.S. 439 (1945) ................................................................7

States of Washington & California v. Chimei Innolux Corp. et al.
    659 F.3d 842 (9th Cir. 2011) ...................................................7

Sullivan v. DB Investments, Inc.
    667 F.3d 273 (3d Cir. 2011) (en banc) ......................................6

Thompson v. Key Health Medical Solutions
    2015 WL 1292228 (M.D.N.C. Mar. 23, 2015) ........................19

Willner v. Manpower
    2015 WL 3863625 (N.D. Cal. June 22, 2015) (Tigar, J.) ...........13, 15

**STATUTES**

15 U.S.C.
    § 15c(a)(1) ..............................................................................7

28 U.S.C.
    § 1715 .....................................................................................2
    § 1715(b) .................................................................................3
    § 1715(d) .................................................................................6
    § 1715(f) ..................................................................................5

2 Am. Jur. 2d, Administrative Law, § 57 (2004) ...........................5

iii

# TABLE OF AUTHORITIES
(continued)

**Page**

Cal. Bus. & Prof. Code § 16760(a)(1) ...................................................................7

Class Act. Fair. Act Legis. His. 31-B &32-B. Arnold & Porter LLP Legislative
History p. L. 109-2, Class Action Fairness Act .........................................4

**COURT RULES**

Federal Rule of Civil Procedure Rule 23 ............................................................9, 11

**OTHER AUTHORITIES**

Federal Judicial Center, MANUAL FOR COMPLEX LITIGATION, FOURTH, § 20.32
(2004) ......................................................................................................18

NEWBERG ON CLASS ACTIONS, § 8.18 (5th ed. 2015) ..........................................5

S. REP. 109-14, 5, 2005 U.S.C.C.A.N. 3 ....................................................4, 7, 13

Emilio Varanini, *Exiting the Fun House of Mirrors: Clayworth v. Pfizer and the
Handling of Pass-On in Post-Trial Allocation Proceedings in State and
Federal Court*, 20 COMPETITION: J. ANTI & UNFAIR COMP. L. SEC. ST. B. CAL.
28, 34-35 (2011) .......................................................................................8

Federal Judicial Center & National Center for State Judges, COORDINATING
MULTIDISTRICT LITIGATION, A POCKET GUIDE FOR JUDGES, 11 (2013) ................18

Federal Judicial Center, MANUAL FOR COMPLEX LITIGATION, FOURTH, § 20.32,
235-38 (2004) .........................................................................................18

# INTRODUCTION

On October 8, 2015, the Attorney General of the State of California filed a statement of interest asserting conditional objections on behalf of California natural persons concerning potential deficiencies with the proposed allocation plan (including the notice/claims process) of the Indirect Purchaser Plaintiffs' settlements. Dkt. No. 4811. The Attorney General filed in exercise of the oversight role over class settlements given expressly to her by Congress under the Class Action Fairness Act ("CAFA") and as protector of the interests of California natural persons as *parens patriae* under California law. The first of these two oversight roles is important because the Attorney General has regularly played a special role in protecting the interests of natural persons so that they may have as fair an opportunity as corporate claimants to be compensated for their claims, a role confirmed by the CAFA. The latter role is important here as well because the Attorney General has filed a *parens patriae* lawsuit in a parallel state proceeding that not only has been closely coordinated with this proceeding but in which the Attorney General relied on statements made by counsel for the Indirect Purchaser Plaintiffs in settling her case.

Based on experience in similar cases, the Attorney General cited possible deficiencies in the allocation plan, as carried out in the notice and claims process, for which she sought notice and claims data. With that data, the Attorney General expected to offer the Special Master, and counsel for the Indirect Purchaser Plaintiffs, more measured advice on that plan to ensure a proper balancing of the interests of natural persons and corporate claimants. In response, although Lead Counsel for the Indirect Purchaser Plaintiffs initially stated, at three different points in his motion for final approval, that he was working to produce this data to the Attorney General, 11/20/15 Indirect Purchaser Plaintiffs Motion for Final Approval, pp. 24 n.25, 26 n.35, 48:18, he then at the eleventh hour refused to produce that data.[1] Decl. of Emilio E. Varanini

---

[1] This Office relied on these promises in continuing to engage in negotiations with the Indirect Purchaser Plaintiffs in lieu of filing a motion with the Special Master to require production of that data (assuming such a motion were required). *See, e.g.,* 11/20/15 Indirect Purchaser Plaintiffs' Motion for Final Approval, Decl. of Mario Alioto, ¶ 47 (disclosing these discussions). To the extent that counsel for the Indirect Purchaser Plaintiffs may argue that such a motion is now required, and is out-of-time, they should be estopped from doing so given the Attorney General's detrimental reliance on those statements. *See, e.g., Garcia v. World Sav., FSB,*
(continued...)

1

1   ("Varanini Decl."), ¶¶ 5-7.  The Attorney General thus files this supplemental statement of

2   interest expanding on the concerns presented in her original statement.[2]

3       This supplemental statement first discusses the Attorney General's standing to be heard in

4   these proceedings.  It next offers more detail as to why the proposed allocation plan is inequitable

5   in its treatment of natural persons in the state-specific damage classes generally, and California

6   natural persons in particular.  *See, e.g., infra,* pp. 9-12, 15-17 (discussing lack of television

7   advertising and local media targeting to ensure natural persons are on the same footing as

8   corporate claimants, using trebled damages in lieu of single damages as the cap for claims, and

9   failing to allow for *cy pres* distribution of any residue).   Finally, to the extent questions have

10  been raised by others regarding whether counsel for the Indirect Purchasers Plaintiffs' request for

11  a very high 33 1/3% of the entire settlement fund for fees may include reimbursement of a

12  challenge directed against the Attorney General that may not have served the public interest, the

13  Attorney General provides the Court with a factual summary.  *See infra,* pp. 12-14.

14      The Attorney General also respectfully requests that the Special Master recommend that the

15  final date for the submission of claims be moved from December 7, 2015 to June 30, 2016, a few

16  months past the final approval hearing in this case.[3]  Moving the final claims date is well within

17  the equity powers of the Court and reflects the case law's encouragement of the submission of

18  (…continued)

19  183 Cal.App.4th 1031, 1040-41 (2010) (explaining doctrine of promissory estoppel under California law and noting that the doctrine does not require consideration to have been given in exchange for a promise).

20  [2] To the extent that counsel for the Indirect Purchaser Plaintiffs maintains these objections should have been raised at preliminary approval, see 11/20/15 Indirect Purchaser Plaintiffs'

21  Motion for Final Approval at 48, the Attorney General points out that such is not required as the whole point of preliminary approval is to determine whether notice should issue so that objections

22  may be heard at final approval. .  *See, e.g., Nakkhumpun v. Taylor,* 2015 WL 6889399, *3 (D.

23  Colo. Nov. 3, 2015) (citing and discussing NEWBERG ON CLASS ACTIONS § 13:12 (5th ed. 2015)); *Diakos v. HSS Systems,* 2015 WL 5921585, *6 (S.D. Fla. Sept. 29, 2015).  Moreover, the CAFA

24  expressly contemplates that a state attorney general may object at final approval, after receipt of information from Defendants, without expressly or implicitly conditioning that objection on first objecting at the preliminary approval stage. *See* 28 U.S.C. § 1715.

25  [3] This Office had believed that the failure to move the final date for the submission of claims at the same time that the date for the final approval hearing was moved to be clerical error

26  given that it has been her experience that the claims period is often left open past the final approval hearing and that late claims tend to be honored. *See* Varanini Decl., ¶¶ 8-9.  However,

27  at the eleventh hour, Lead Counsel for the Indirect Purchaser Plaintiffs informed the Attorney General that he was not amenable to moving the date. *Id.* ¶ 8.

28

1    claims so that these settlements may be seen to have value. Moreover, as discussed *infra* at pp.

2    19-21, the Attorney General will be moving for preliminary approval of several settlements of

3    *parens patriae* claims in the parallel proceeding in state court on January 27, 2015.  Varanini

4    Decl., ¶ 11.  In the notice regarding the release of *parens* claims, this Office would like to direct

5    California natural persons to the claims website of the Indirect Purchaser Plaintiffs so that these

6    natural persons can recover directly for their claims from the settlement funds of the Indirect

7    Purchaser Plaintiffs. *Id.* at ¶¶ 18, 20.  By being able to issue such a simple *parens* notice, the

8    Attorney General would receive the benefit of relying on statements made by Lead Counsel for

9    the Indirect Purchaser Plaintiffs, and on the understanding reached with Settling Defendants, that

10   the primary remedy for California natural persons to make direct claims to obtain reimbursement

11   for their damages should be the federal class settlement fund. *Id.* at ¶ 19.  As the Special Master

12   may be aware, the Attorney General has endeavored to keep her state case closely coordinated

13   with the federal MDL on a wide variety of fronts, including discovery and settlement through the

14   use of the same mediator. *Id.* at ¶ 1.[4]

## ARGUMENT

15

16   **I.    THE ROLE OF THE ATTORNEY GENERAL IN EXERCISING OVERSIGHT ON BEHALF
       OF NATURAL PERSONS UNDER BOTH THE CAFA AND CALIFORNIA STATUTORY AND
17       COMMON LAW AS IT PERTAINS TO HER INPUT INTO THESE PROCEEDINGS**

18       **A.    The Role and Powers of the Attorney General in Exercising Oversight
            under the Class Action Fairness Act**

19

20       The CAFA expressly requires that the Attorney General be furnished with information

21   enumerated in the statute so that she may make an informed objection if she chooses where a

22   class settlement involves natural persons in her state. 28 U.S.C. § 1715(b).  It further provides

23   that a sufficient amount of time must pass before final approval so as to afford the Attorney

24   General the opportunity to object. *Id.* As Congress has explained, the primary purpose of

25   _____

26   [4] The Attorney General's requests for the notice and claims data, and for the moving of
     the claims date, do require action that, to keep to the tight schedule in the state and federal cases
27   without moving the final approval date, takes place as soon as possible.  If this supplemental
     statement of interest proves to be insufficient to resolve these requests, the Attorney General
28   would file motions on one or both subjects with the Special Master and/or with the Court.

1   "requiring that notice of class action settlements be sent to appropriate state and federal officials

2   [is] so that they may voice concerns if they believe that the class action is not in the best interest

3   of their citizens." S. REP. 109-14, 5, 2005 U.S.C.C.A.N. 3, 6. "[N]otifying the appropriate state

4   and federal officials of proposed class action settlements will provide a check against inequitable

5   settlements in these cases" and "will also deter collusion between class counsel and defendants to

6   craft settlements that do not benefit the injured parties." *See* S. REP. 109-14, 14-20, 28, 32-33,

7   35, 2005 U.S.C.C.A.N. 3, 17-21, 28, 31-32, 34.  It is plain that Congress believed that an

8   inequitable settlement could include a disproportionate amount of the fees allocated out of the

9   settlement funds.  *See* S. REP. 109-14, 14-20, 28, 32-33, 35, 2005 U.S.C.C.A.N. 3, 17-21, 28, 31-

10  32, 34 (regarding CAFA's aim to eradicate disproportionate allocation of the settlement fund as

11  fees).  The CAFA thus envisions that the Attorney General can exercise oversight over class

12  settlements by making her views known to the Court as to any potential unfairness or inequity

13  involving those settlements. *See, e.g.,* Class Act. Fair. Act Legis. His. 32-B. Arnold & Porter LLP

14  Legislative History P.L. 109-2, Class Action Fairness Act, Debate, Congressional Record –

15  Senate (February 9, 2005), *29 (remarks of Sen. Dianne Feinstein of California) ("And [the

16  CAFA] provides that State attorneys general can review settlements involving plaintiffs");[5] Class

17  Act. Fair. Act Legis. His. 31-B. Arnold & Porter LLP Legislative History P.L. 109-2, Class

18  Action Fairness Act, Debate, Congressional Record – Senate (February 8, 2005) at *21 (remarks

19  of Sen. Chuck Grassley of Iowa) ("Then our bill required the State attorneys general or other

20  responsible State government officials be notified of any proposed class settlement that would

21  affect the residents of their States. We included this provision to help protect class members

22  because such notice would provide State officials with an opportunity to object if the settlement

23  terms are unfair to their citizens.");[6] *id.* at *35 (remarks of Sen. Herb Kohl of Wisconsin) (". .

24  .this bill provides that state  attorneys general are notified of proposed class action settlements.

25  This encourages a neutral third party to weigh in on whether a settlement is fair for the plaintiffs

---

26  [5] This legislative history is attached as Exhibit A to the Varanini Decl., *see* Varanini Decl.,
    ¶ 21.

27  [6] This legislative history is attached as Exhibit B to the Varanini Decl., *see* Varanini Decl.,
    ¶ 22.

28

4

1  and to alert the court if they do not believe that it is."); NEWBERG ON CLASS ACTIONS, §8.18 (5th

2  ed. 2015) (construing the provisions of the CAFA, including the provision imposing a mandatory

3  delay of 90 days between service of the required notice on state attorneys general and the grant of

4  final approval, as "spurring governmental, but nonjudicial, oversight of class action

5  settlements.").[7]  And it has been long-standing law in this Circuit that, when the Attorney General

6  of a state such as California does so object on behalf of her natural persons in seeking a more

7  equitable settlement, "[t]he participation of a government agency serves to protect the interests of

8  the class members, particularly absentees, and approval by the agency is an important factor for

9  the court's consideration." *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977).

10  However, this raises the question of whether the Attorney General also enjoys any implied

11  powers necessary to discharge her duties if, as here, the proposed allocation plan appears on its

12  face to be inequitable.  It is hornbook law that when a statute such as the CAFA grants to a

13  government agency the power to act, the statute includes (unless otherwise prohibited by its

14  express terms) all of the powers necessary to carry out the goals of the statute in question. *See,*

15  *e.g.,* 2 Am. Jur. 2d, Administrative Law, § 57 (2004) ("Generally, administrative agencies have

16  the implied or incidental powers necessary in order to carry out the powers expressly granted.

17  The reason for implied powers is that, as a practical matter, the legislature cannot foresee all of

18  the problems incidental to carrying out the duties and responsibilities of the agency." [Internal

19  footnotes omitted]); *see also M'Culloch v. Maryland*, 17 U.S. 316, 323-24 (1819) (finding that

20  the grant of express powers under the Constitution to the government, such as to Congress,

21  necessarily included all implied powers to carry those express powers out even absent the general

22  clause of the Constitution).)

23

24        [7] Although 28 U.S.C. § 1715(f) states that the CAFA does not expand the authority of, or

25  impose any duties on, state attorneys general, that provision merely avoids either the CAFA
conferring duties as a federal matter on a state attorney general that a state attorney general may

26  lack under his or her own state laws—*see Printz v. United States*, 521 U.S. 898, 905-925 (1997)
(unconstitutional to require state officials to execute obligations under federal law)— or the

27  CAFA notices being used to bind state attorneys general as non-parties to class settlements—
*Ortiz v. Fiberboard*, 527 U.S. 815, 845-47 (1999)  (aggregating non-parties into a mandatory

28  class action that they cannot opt out of violates due process).

1    Nothing in the CAFA's text bars the Attorney General from requesting relevant notice and

2    claims information and data from *counsel for class plaintiffs* as well, at least upon the filing of

3    conditional objections, so that she may discharge her duties to the Court contemplated by the

4    CAFA.  The CAFA accordingly can and should be interpreted as giving a state attorney general

5    furnished with notice the implied power to make such a request upon the filing of conditional

6    objections and upon production of that information, to be able to use it in offering meaningful

7    input before final approval is to be granted.  *See Gebser v. Lago Vista Independent School Dist.*,

8    524 U.S. 274, 284-85 (1998) (in determining judicially implied private right of action as well as

9    its scope in a statute, court "shapes a sensible remedial scheme that best comports with the

10   statute" and that is not "at odds" with "the statutory structure and purpose"); *cf. Stahlman v. FCC*,

11   126 F.2d 124, 127-28 (D.C. Cir. 1942) (power of FCC to grant licenses or to revoke licenses, and

12   to make regulations, necessarily implies the grant of all implied powers necessary to discharge its

13   express powers, including obtaining information from newspapers since the FCC was not aiming

14   at an objective outside the bounds of its authorizing act).[8]

15   Moreover, the CAFA itself sets out that final approval must be delayed so that state

16   attorneys general may analyze information received from defendants and meaningfully comment

17   on a class settlement. 28 U.S.C. § 1715(d).  Given that receiving information from plaintiffs is a

18   necessary but implied power to enable state attorneys general to comment meaningfully on a class

19

20   [8] The request for such data is certainly germane to the Special Master's crafting of
     recommendations on the reasonableness of the proposed allocation plan. Provisional claims
21   information, for example, has been provided before a final hearing on a class settlement to
     support a finding that the allocation plan is fair and equitable. *See, e.g., Lee v. Ocwen Loan
22   Servicing LLC*, 2015 WL 5449813, *22 (S.D. Fl. Sept. 14, 2015), *appeal filed* Oct. 14, 2015;
     *Moore v. Verizon Comm'ncs*, 2013 WL 4610764, * 8 & n.11 (N.D. Cal. 2013). The better the
23   notice provided in ensuring that the disparate groups of the state-specific damages classes had a
     fair and equitable opportunity to claim, the less the actual claims rate may matter at the end all
24   other things being equal. *See, e.g., Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 329 n.60 (3d
     Cir. 2011) (*en banc*) (claims rates in consumer class actions "rarely exceed seven percent even
25   with the most extensive notice campaigns").  But that explains why the Attorney General has
     requested both notice and claims data.  And the reference to "all other things being equal" is not
26   unimportant; allowing for a distribution of residual funds *cy pres* for example in lieu of
     overpaying claimants responds to the objection that millions of people will not benefit from a
27   settlement at all no matter how extensive is the notice campaign by providing an indirect benefit
     to the class. *Cf. id.* at 328-29 (referring to injunctive relief as playing a similar role in responding
28   to such an objection).

6

1   settlement, it logically follows that a federal court can and should delay final approval of the

2   allocation plan, if need be, to afford the Attorney General sufficient time to analyze the data and

3   offer meaningful, tailored advice to the Court in line with the CAFA's goals.  *See* S. REP. 109-

4   14, 32, 2005 U.S.C.C.A.N. 3, 32 (The notice provision of the CAFA "is designed to ensure that a

5   responsible state and/or federal official receives information about proposed class action

6   settlements and is in a position to react if the settlement appears unfair to some or all class

7   members or inconsistent with applicable regulatory policies.").

8       **B.    The Role and Powers of the Attorney General in Exercising Oversight
                 under Her Federally Recognized *Parens* Authority**
9

10      California has conferred on the Attorney General the statutory power to file a *parens*

11  *patriae* claim for compensatory damages on behalf of natural persons, Cal. Bus. & Prof. Code

12  §16760(a)(1), as she has done in her state case that was filed parallel to this federal action and

13  was coordinated with this federal action for certain purposes.  Varanini Decl., ¶ 1.  The Attorney

14  General's unique *parens* role in federal proceedings in acting on behalf of the People of her state

15  has been recognized and blessed by federal courts, *see, e.g., State of Georgia v. Pennsylvania R.*

16  *Co.*, 325 U.S. 439, 447-48 (1945), and by Congress, *see* 15 U.S.C. § 15c(a)(1) (Hart-Scott-

17  Rodino Act authorized *parens patriae* suits for damages under federal law).

18      In filing and maintaining *parens* actions, the Attorney General acts in the public interest.

19  *See, e.g., States of Washington & California v. Chimei Innolux Corp. et al.*, 659 F.3d 842, 848

20  (9th Cir. 2011).  Thus, when faced with parallel litigation involving her law enforcement case in

21  state court on behalf of natural persons and government entities, and a federal case filed by

22  private class counsel on behalf of natural persons in California (among others), the Attorney

23  General has sought as here to coordinate as closely as possible with private counsel in order to

24  serve the public interest most efficiently.  *See* Varanini Decl., ¶ 13.  That coordination can

25  involve, among other things, avoiding duplication by letting counsel for such private plaintiffs

26  take the lead in securing direct compensation (absent obstacles that may arise in federal court

27  such as a refusal to certify a class or a wholly inadequate recovery) while the Attorney General

28  ensures that the interests of natural persons are protected in that process.  *See id.*  The Attorney

7

1  General accomplishes this goal by, among other measures, making suggestions on the notice and

2  claims process to ensure natural persons are not at a disadvantage vis-à-vis corporate entities and

3  by adding *cy pres* protections so that the vast mass of natural persons receive at least some

4  indirect benefit from the settlements. *See id.* Indeed, as discussed below, the *parens* settlements

5  negotiated by this Office in this case reflect such coordination in reliance upon statements made

6  by counsel for the Indirect Purchaser Plaintiffs.

7  **II.  THE ALLOCATION PLAN, AS CARRIED OUT THROUGH THE NOTICE AND CLAIMS
       PROCESS, IS SUFFICIENTLY UNFAIR AND INEQUITABLE TO NATURAL PERSONS ON**
8  **ITS FACE TO WARRANT MODIFICATION, AND TO WARRANT THE ATTORNEY
       GENERAL'S RECEIPT AND REVIEW OF CLAIMS AND NOTICE DATA, PRIOR TO FINAL**
9  **APPROVAL**

10  Allocation plans are reviewed by a federal court for fairness and reasonableness. However,

11  given that the review of allocation plans involve an equity proceeding in which the federal court

12  has discretion, the court can consider whether disparate groups within a settlement class are being

13  treated fairly and equitably—though without having to go through the formal process of

14  appointing separate counsel. *See, e.g.,* Report and Recommendation of Special Master, Part I, pp.

15  87-89, 144-45, 146-47, MDL No. 1486, *In re DRAM Antitrust Litig* (Jan. 8, 2013) (collecting and

16  discussing cases);[9] *see also In re Cendant Corp. Prides Litig.*, 233 F.3d 188, 194 n. 7 (3rd Cir.

17  2000) ("Indeed, we have remarked in another context that class actions themselves are grounded

18  in equity. *See, e.g., Grimes v. Vitalink Communications,* 17 F.3d 1553, 1570 (3d Cir.1994)

19  ('[E]quity's long experience with the administration of estates commonly requiring resolution of

20  competing claims to a res among various kinds of creditors and classes of beneficiaries provide[s]

21  an additional underpinning for the remedy of class relief with its origin in equity.')".); Emilio

22  Varanini, *Exiting the Fun House of Mirrors: Clayworth v. Pfizer and the Handling of Pass-On in*

23  *Post-Trial Allocation Proceedings in State and Federal Court*, 20 COMPETITION: J. ANTI &

24  UNFAIR COMP. L. SEC. ST. B. CAL. 28, 34-35 (2011) (discussing how the partition of a settlement

25  _____

26  [9] The Reports and Recommendations are available at 2013 U.S. Dist. LEXIS 188116.
     These reports were approved by the United States District Court for the Northern District in both

27  a preliminary approval order dated and a final approval order dated June 27, 2014. The last
     appeal of the final approval order was dismissed on December 1, 2015. The orders can be

28  provided upon request.

fund is an equitable issue).  On that subject, it is highly germane that the Attorney General has in

similar cases such as *DRAM* and *LCDs* played an important role in ensuring that natural persons

are treated fairly and equitably in allocation plans vis-à-vis corporate claimants.  *See, e.g.,* Report

and Recommendation of Special Master, Part I, pp. 2, 14-15, 20, 88-89, 120, 130, 142, 151-52,

MDL No. 1486, *In re DRAM Antitrust Litig* (Jan. 8, 2013).  Accordingly, the Attorney General

would respectfully urge the Special Master to regard her input as an important factor in this

Court's consideration of the reasonableness of the proposed allocation plan at bar.  *See Marshall*,

550 F.2d at 1178.

The class at issue here involves, in an overall general sense, every natural adult person who

was a resident in a state-specific damage class in the relevant period and who bought either a

television or a computer monitor containing CRTs.  Given the popularity of televisions and

computers then and now, it is fair to use cases such as *DRAM* and *LCDs*,[10] involving the price-

fixing of components in popular consumer products such as computers, computer monitors, and

televisions by similarly large percentages of the U.S. population, as benchmarks to judge if facial

concerns present themselves as to whether the notice plan affords an equal opportunity for natural

persons to claim along with corporations.

In contrast to the case at bar, cases such as *DRAM* and *LCDs* involved notice campaigns

that included television advertisements precisely to ensure adequate reach for claim purposes to

natural persons, who, after all, are in a very large group and bought the very same products that

would now serve as a medium for their notification.  *See, e.g.,* Report and Recommendation of

Special Master, Part II, pp. 5-6, 23-24, MDL No. 1486, *In re DRAM Antitrust Litig* (June 24,

2013); Appendix to Report and Recommendation of Special Master, Part II, Exh. 53, pp. 5-7

[Decl. of Shannon Wheatman at 4-6], MDL No. 1486, *In re DRAM Antitrust Litig* (June 24,

---

[10] *See, e.g.,* Report and Recommendation of Special Master, Part II, p. 22, MDL No. 1486, *In re DRAM Antitrust Litig* (June 24, 2013).  The Attorney General was deeply involved in both cases and thus is in a position to comment on the applicability of those cases to the issues she has raised as to the equities involved with the allocation plan.  Varanini Decl., ¶¶ 1,14; *see, e.g.,* Second Amended Order Granting Final Approval of Combined Class, Parens Patriae, and Governmental Entity Settlements, MDL No. 1827, *In re TFT-LCD (Flat Panel)* Antitrust Litig. (Apr. 3, 2013), *available at* https://lcdclass.com/Portals/0/Documents/4-03-13%202nd%20Am%20Order% 20Final%20Approval.pdf, *last appeal dismissed* 2014.

2013)[11]; *id*, pp. 32-34 [Exh. 1 to Decl. of Shannon Wheatman at 22-23]; Decl. of Kathy Kinsella

at 3, ¶ 6, MDL No. 1827, *In re TFT-LCD (Flat Panel) Antitrust Litig.* (November 15, 2012),

*available at* https://lcdclass.com/Portals/0/Documents/2-7158%20Decl.%20Of%20

Katherine%20Kinsella%20re%20Implementation%20%20Of%20Second%20Ntc%20Program.pd

f; Decl. of Kathy Kinsella at 3, ¶ 10, MDL No. 1827, *In re TFT-LCD (Flat Panel) Antitrust Litig.*

(July 12, 2012), *available at* https://lcdclass.com/Portals/0/Documents/

20120712%20Dec%20of%20Katherine%20Kinsella%20Re-Second%20Notice%

20with%20Exhibits.pdf. In contrast to the case at bar, cases such as *DRAM* and *LCDs* involved

more targeted outreach to local communities with such measures as local press releases and print

ads. *See, e.g.,* Report and Recommendation of Special Master, Part II, pp. 5-6, MDL No. 1486,

*In re DRAM Antitrust Litig* (June 24, 2013); Appendix to Report and Recommendation of Special

Master, Part II, Exh. 53, pp. 5-7 [Decl. of Shannon Wheatman at 4-6] (June 24, 2013); *id*, pp. 39-

40 [Exh. 1 to Decl. of Shannon Wheatman at 29-30]; Decl. of Kathy Kinsella at 3, ¶ 6, MDL No.

1827, *In re TFT-LCD (Flat Panel) Antitrust Litig.* (November 15, 2012); Decl. of Kathy Kinsella

at 3, ¶ 6, MDL No. 1827, *In re TFT-LCD (Flat Panel) Antitrust Litig.* (Nov. 15, 2012); Decl. of

Kathy Kinsella at 3, ¶ 8, MDL No. 1827, *In re TFT-LCD (Flat Panel) Antitrust Litig.* (July 12,

2012).[12]

　　　　Other features of the proposed allocation plan work in concert with the gaps in the notice

plan to lessen the confidence that natural persons have had a fair and equitable opportunity to

claim or otherwise benefit from these settlements.  Most importantly, counsel for the Indirect

Purchaser Plaintiffs has disclaimed the need to do television ads on the ground of cost and

presumably would use the same rationale in explaining the lack of more targeted outreach to local

---

[11] Because the Attorney General does not believe that the Special Master has access to this Appendix as opposed to the other DRAM documents cited herein, it is attached as Exhibit D to the Varanini Declaration, *see* Varanini Decl., ¶ 25

[12] The Attorney General is not objecting on the ground that the notice itself is insufficient for due process or for Federal Rule of Civil Procedure Rule 23 opt-out/objection purposes because it did not include these advertisements. Varanini Decl., ¶ 2. But the absence of such notice in these circumstances means that the allocation plan did not give natural persons a sufficiently fair and equitable chance to claim *vis-à-vis* corporations. *Id.; see id.,* ¶¶ 22-24 & Exh. C (statement from well-respected notice expert in class cases that use of notice to stimulate claims is different than use of notice for due process and Rule 23 purposes).

communities. *See, e.g.*, 11/20/15 Indirect Purchaser Plaintiffs' Motion for Final Approval at 45-46; *but see, e.g., id.* Exh. C (statement of notice class expert that expending monies to stimulate claims is different than spending money to ensure notice is adequate for due process and Rule 23 purposes). However, Lead Counsel for the Indirect Purchaser Plaintiffs ("Lead Counsel") is, in the same breadth, claiming 33 1/3% of the common fund for attorneys' fees. That percentage is quite high when compared to cases of similar size and scope such as *DRAM* and *LCDs*. *See, e.g.*, Report and Recommendation, Part III, MDL No. 1486, *In re DRAM Antitrust Litig* (Nov. 5, 2013) (explaining why class counsel and the Attorneys General were asking for only 25% in attorneys' fees via discussion of the case law and the 25% benchmark that applies in the Ninth Circuit); Indirect Purchaser Class Plaintiffs' Notice of Motion and Motion for Attorneys' Fees and Incentive Awards at 5-6, 19-20, 21-22, 27-29, 30-31, MDL No. 1827, *In re TFT-LCD (Flat Panel) Antitrust Litig.* (September 7, 2012), *available at* https://lcdclass.com/Portals/0/Documents/1.%20Notice%20of%20Motion%20and%20Motion%20for%20Attorneys'%20Fees%20and%20Incentive%20Awards.pdf (explaining why class counsel were entitled to 28.5% of the common fund for their fees "as a historic result" when the benchmark in the Ninth Circuit is 25%). Objectors have questioned activities used to justify the request as not having been carried out by Lead Counsel for the benefit of the public interest, with one example possibly being the excessive litigation he conducted to overturn the Attorney General's early *parens* settlements in state court.

To inform the Court, the Attorney General accordingly presents the following factual summary as it may impact allocation. Lead Counsel's appearances, briefings, and ultimately his appeal of settlements in the Attorney General's state case could be questioned given the following:

(1) Before seeking preliminary approval of her *parens patriae* claims, the Attorney General agreed to state, and stated on the record multiple times at preliminary and final approval, that a *parens* release could not supplant or estop a parallel federal class case from going forward once a

class had been certified;[13]

      (2) The state court found, and Lead Counsel conceded, that he was seeking an advisory opinion given any state court ruling on potential estoppel effects could not bind the federal courts, thus suggesting that Lead Counsel's extended litigation in state court may have been ill-considered;[14]

      (3) Lead Counsel relied on the representations of the Attorney General, which they urged the federal court to treat as persuasive, in opposing a motion from Defendant Philips as to their representation of California natural persons, suggesting those representations had value;[15] and

---

[13] *See* Varanini Decl., ¶ 15; *id.* Exh. E [Reporter's Transcript at 28-32, 87-88, 181-82, 212-14]; *id.* Exh. F [October 29, 2013 Reply Brief Regarding Final Approval of Philips' Settlement at 16:22-23]. Counsel for the Indirect Purchaser Plaintiffs' statements on the record show he well understood the import of the representations made by the Attorney General. *See* Varanini Decl., Exh. E [Reporter's Transcript at 22-23, 122-123 and 195:8-17].

[14] *See, e.g.,* Varanini Decl., Exh. E [Reporter's Transcript at 172:3-177:23] (Lead Counsel acknowledges he is seeking an advisory opinion); *id.* Exh. E [Reporter's Transcript at 242:2-243:10] (state court finds that to rule on the issue of whether a *parens* settlement estops a federal class from pursuing relief on behalf of California natural persons constitutes an advisory opinion). Lead Counsel claims that he had to appear in the Attorney General's state court case (and by implication engage in the extensive activity therein in opposition to the Philips settlement) because "Philips took the position that its $500,000 settlement with the AG released the claims of California natural persons [in the federal class action]." 11/20/15 IPP Reply Re: Fees Motion at 24:14-16. However, Philips also stated that the resolution in state court of the question of whether a *parens* release and *parens* settlement estops further federal class proceedings for California natural persons constituted an advisory opinion that could not bind the federal court. *See* Varanini Decl., Exh. E [Reporter's Transcript at 49:3-50:12, 70:5-72:13, 182:20-184:1].) Thus, the extended efforts of Lead Counsel in what was an advisory proceeding could be considered to be extremely disproportionate to the representation that they needed, and obtained early in the state court proceedings, from the Attorney General. Throughout all of the proceedings in state court, counsel for both sides had to file a dozen or so briefs (containing hundreds of pages of filings), go through four court appearances, and endure numerous court conferences, all directed at the Attorney General's settlement with just one Defendant—Philips. *See* Varanini Decl., Exhs. E and G [Register of Action and Reporter's Transcript]. Moreover, of the 250 pages of hearing transcript prepared on the Attorney General's case, the views of Lead Counsel occupy more than 89 pages while the remaining 161 pages were shared by the court, counsel for the Attorney General, counsel for Philips, and counsel for the other early Settling Defendant, Chunghwa. *See* Varanini Decl. Exh. E [Reporter's Transcript].) In fact, the state court and the settling parties had to spend a considerable amount of time at each hearing walking Lead Counsel through the relevant laws concerning the interplay between *parens patriae* and class actions as well as on jurisdiction and contract interpretation. *See, e.g.,* Varanini Decl. Exh. E [Reporter's Transcript at 148:9-148:18, 154:18-155:1, 159:23-160:6, 123:24-124:6, 150:20-151:12, 172:3-177:23].)

[15] *Compare* Dkt. 3034 (motion for summary judgment filed by Philips against Indirect Purchaser Plaintiffs based on Attorney General early settlement with Philips in state court) *with* Dkt. 3247 at 3-4 (referencing representations of Attorney General); *id.* at 7 (same); *id.* at 10 n.10 (referencing that the interpretation of the Attorney General as to the scope of her own parens powers should be accorded great weight).

12

1    (4) Lead Counsel settled with Philips following the submission of that opposition for the

2    sum of $175 million, thus further suggesting that the representations made by the Attorney

3    General had substantial worth.[16]

4        The Attorney General is not objecting to the size of the requested percentage of the

5    common fund for fees as such (*see* Dkt. No. 4811 n.3) because that requires consideration of a

6    myriad of factors that pertain to the Court's fiduciary assessment of that request.  Yet, the size of

7    this common fund request should not be used to obviate expending a reasonable amount of costs

8    in line with past similar cases to ensure natural persons have a fair and equitable opportunity to

9    make claims for damages they suffered, especially when that common fund fees request may

10   include expenditures that others have questioned as to their value to the public interest.[17]  *See*

11   *Willner v. Manpower*, 2015 WL 3863625, *6-7 (N.D. Cal. June 22, 2015) (Tigar, J.) (part of

12   monies requested in attorneys' fee request redirected in favor of an additional pro rata distribution

13   to claimants because of the  questionable value of a policy change resulting from the attorneys'

14   efforts); *see also, e.g.,* S. Rep. 109-14, 14-20, 28, 32-33, 35, 2005 U.S.C.C.A.N. 3, 17-21, 28, 31-

15   32, 34 (the Class Action Fairness Act, 28 U.S.C. § 1715, aims to eradicate the disproportionate

16   allocation of the settlement fund as fees).

17       A separate question concerns the wisdom of a trebled damages cap as such a cap

18   overcompensates existing claimants, especially corporate claims that tend to be much larger than

19   natural person claims.  While case law supported counsel for the Indirect Purchaser Plaintiffs

20   choosing a cap of single damages on claims filed by individual claimants and by corporations, *see*

21   *In re Lupron Marketing and Sales Practices Litig.*, 677 F.3d 21, 34-35 (1st Cir. 2012) (payment

22   of residual funds to *cy pres* recipients preferable to payment of trebled damages as such trebled

23   payment is overcompensation); *see also, e.g.,* Report and Recommendation of Special Master,

24   ─────────────
     [16] *See* 11/19/2015 Decl. of Mario Alioto in Support of Final Approval, ¶ 46 & n.5.
     [17] There is support in the case law for the notion that these disproportionate efforts
25   engendered by Lead Counsel can be viewed as not being in the public interest.  *See, e.g.,*
     *Consumer Defense Group v. Rental Housing Industry Members*, 137 Cal.App.4th 1185, 1219-
26   1220 (2006); *Consumer Cause, Inc. v. Mrs. Gooch's Natural Food Markets, Inc.*, 127
     Cal.App.4th 387, 399 (2005); *see also, e.g.,* Dkt. No. 4211 at 2:2-8 (noting the possibility that the
27   Indirect Purchaser Plaintiffs "mismanaged the case by ... (2) engaging in a contentious dispute
     with the California Attorney General").
28

SUPPLEMENTAL STATEMENT OF INTEREST OF THE STATE OF CALIFORNIA
(Master File No. CV-07-5944-JST)

1    Part I, pp. 151-52, 156-57, MDL No. 1486, *In re DRAM Antitrust Litig* (Jan. 8, 2013)

2    (summarizing case law supporting the imposition of a single damages cap in *DRAM* as a means of

3    balancing out the interests of small claimants against corporate claims), counsel for the Indirect

4    Purchaser Plaintiffs instead chose a cap of *trebled* damages on claims actually filed.  This means

5    that, rather than a corporate or individual claimant being paid only in full for the damages they

6    suffered from purchasing CRT products as part of any *pro rata* distribution of settlement funds,

7    they would receive trebled damages.  The payment of *trebled* damages may be justified in cases

8    such as *LCDs*, *see, e.g.,* Indirect Purchaser Plaintiffs' and Settling States' Joint Notice of Motion

9    and Motion for Final Approval of Combined Class, *Parens Patriae*, and Governmental Entity

10   Settlements at 12:5-9 (Nov. 15, 2012), *available at* https://lcdclass.com/Portals/0/Documents/1-

11   7158%20Copy%20of.pdf, in which optimal notice strategies were employed to reach as many

12   natural persons as possible even if additional costs had to be expended (*see, e.g.,* Decl. of Kathy

13   Kinsella at 3, ¶ 6, MDL No. 1827, *In re TFT-LCD (Flat Panel) Antitrust Litig.* (November 15,

14   2012)), and where counsel for the class displayed sensitivity to not requesting a (potentially) too

15   high a percentage of the common fund in fees (*see, e.g.,* Indirect Purchaser Class Plaintiffs'

16   Notice of Motion and Motion for Attorneys' Fees and Incentive Awards at 5, MDL No. 1827, *In*

17   *re TFT-LCD (Flat Panel) Antitrust Litig.* (September 7, 2012)). It certainly is not justified where

18   neither set of circumstances is present such as here.

19       On a related point, even if, at the end of the day, Lead Counsel can justify the refusal to

20   spend money on what has been standard notice in other comparable cases, the Attorney General

21   questions whether their desire—to avoid the creation of a residual fund from which *cy pres*

22   distributions may be made for the indirect benefit of natural persons—is an appropriate one.

23   The *cy pres* distribution of substantial proceeds has been blessed by precedent in this Circuit and

24   elsewhere, *see* Report and Recommendation of Special Master, Part I, pp. 157-62, MDL No.

25   1486, *In re DRAM Antitrust Litig* (Jan. 8, 2013) (collecting and discussing cases), let alone the

26   distribution of residual funds for which *cy pres* is universally accepted.  *See id.* (collecting and

27   discussing cases); *see also, e.g.,* Second Amended Order Granting Final Approval of Combined

28   Class, Parens Patriae, and Governmental Entity Settlements at 8, MDL No. 1827, *In re TFT-LCD*

1   *(Flat Panel) Antitrust Litig.* (Apr. 3, 2013) (noting that the distribution of residual funds

2   remaining at the end of court discretion may be subject to distribution in the court's discretion);

3   Order re: Indirect Purchaser Plaintiffs and State Attorneys General's Joint Motion for Interim

4   Reimbursement of Expenses at 3, MDL No. 1827, *In re TFT-LCD (Flat Panel) Antitrust Litig.*

5   (October 20, 2014), *available at* https://lcdclass.com/Portals/0/Documents/ 9273%20

6   Indirect%20Purchaser%20Plantiffs'...pdf. *Cy pres* distribution is an important component of state

7   laws in jurisdictions such as California, *see, e.g.,* Report and Recommendation of Special Master,

8   Part I, pp. 162-66, MDL No. 1486, *In re DRAM Antitrust Litig* (Jan. 8, 2013) (discussing

9   submission of California Attorney General on case law in California), and the Attorney General

10  has taken the position that state law in jurisdictions like California should control whether *cy pres*

11  distribution is appropriate, *see id.* at 166 n.231 (discussing position but finding that this issue

12  need not be addressed).  Should counsel for the Indirect Purchaser Plaintiffs satisfy the Special

13  Master that purchasing television and radio ads is just too costly even for the purpose of

14  increasing claims, then  the Attorney General would respectfully urge that reimbursement on

15  claims be capped at single damages, *see, e.g., In re Lupron Marketing and Sales Practices Litig.*,

16  677 F.3d at 34-35—or that the percentage of the common fund for fees be reduced, *see, e.g.,*

17  *Willner*, 2015 WL 3863625 at *6-7—so as to enable the creation of a residual fund to be

18  distributed *cy pres* for the indirect benefit of natural persons in the state-specific damages

19  classes.[18]

20      The information provided to date by counsel for the Indirect Purchaser Plaintiffs does not

21  provide reassurance that natural persons received fair and equitable treatment in the

22  implementation of the allocation plan.  For example, although counsel for the Indirect Purchaser

23

24  [18] As an alternative to *cy pres* distribution, the Attorney General would support such
    residual funds being distributed *pro rata* to the state attorneys general of those states for which
    there are state-specific damage classes—see *In re Music Compact Disc Minimum Advertised*

25  *Price Antitrust Litig.*, 236 F.R.D. 48, 52-53 (D. Maine May 25, 2006), or if the amount of residual
    funds is simply too small for any feasible state-specific distribution at all, the Attorney General

26  would support the designation of one or more nationwide *cy pres* recipients by the Court—*see In*
    *re Lupron Marketing and Sales Practices Litig.*, 677 F.3d at 34-35; see also In re Music Compact

27  Disc, 236 F.R.D. at 52-53 (discussing distribution of left-over product to nationwide *cy pres*
    recipient—United Service Organization).

28

15

1   Plaintiffs reveal that they sent out 10 million e-mails to natural persons, we do not know how

2   many of those e-mails were opened, how many recipients clicked on the link provided by those e-

3   mail to the claims site, how many filed claims, and with respect to all of these figures, how many

4   of them were or might be California residents.  And, of course, no data has been provided to date

5   as to the actual claims rate, including the claims rate from natural persons versus corporate

6   claimants, or the claims rate from California natural person residents.  Given the repeated

7   representations made in the Indirect Purchaser Plaintiffs' motion for final approval that they

8   would work with the Attorney General to provide the notice and claims data requested by the

9   Attorney General, they should be ordered to provide this data immediately.

10  III.   THE FINAL DATE FOR FILING CLAIMS SHOULD BE EXTENDED TO JUNE 30, 2016 AS
        IT WOULD HELP INCREASE CLAIMS FROM NATURAL PERSONS AND WOULD
11      EFFICIENTLY COORDINATE STATE AND FEDERAL PROCEEDINGS

12          Although the hearing date for final approval of the Indirect Purchaser Plaintiffs' settlements

13  has been moved to March 15, 2016, the date for the final submission of claims has not been so

14  moved.  Previously, the Attorney General had no reason to believe that the failure to move the

15  final date for submitting claims in tandem with moving the date for final approval was anything

16  other than clerical.  Varanini Decl., ¶¶ 8-9.  However, at the eleventh hour, counsel stated that

17  they would not move the date.  *Id.*  The Attorney General respectfully requests that the Special

18  Master recommend the final date for the submission of claims for *all* claimants be moved from

19  December 7, 2015 to June 30, 2016 for the following reasons: (1) the court has the power at

20  equity to move the final date for the submission of claims to match the practice of similar cases;

21  (2) extending the date for the final submission of claims in fact could have a salutary effect in

22  encouraging more claims in this case so as to make sure that the settlement funds are given back

23  to as wide a group of claimants as possible; and (3) to extend this date would allow for the

24  efficient coordination of this federal settlement process with the upcoming approval process in

25  state court for the Attorney General's settlement proceedings.

26          ///

27          ///

28                                          16

**A.      The Case Law, and Precedent From Similar Cases, Supports Extending the Claims Date for all Claimants Past the Date for the Final Approval Hearing to June 30, 2016**

Generally, the case law encourages the submission of claims against a settlement fund to ensure that as many eligible individuals and corporations can be compensated for the injury inflicted on them by the illegal acts of defendants, here the payment of overcharges arising from Defendant's cartel.  Accordingly, the United States Court of Appeals for the Third Circuit found that a district court has the discretion as an equitable matter to move the final date for submitting claims so as to allow late claims even faced with an argument from a defendant that such an extension violated the settlement agreement. *In re Cendant*, 233 F.3d at 190-91, 192-95.  Other courts have remarked that extending the claims date at least a couple of months after the final approval date can have the salutary effect of ensuring a sufficient claims rate to give value back to the class for the settlement obtained by class counsel.  *See, e.g., Lee v. Ocwen Loan Servicing LLC*, 2015 WL 5449813, *22-23 (S.D. Fl. Sept. 14, 2015), *appeal filed* Oct. 14, 2015 (observing that the claims deadline being set after the final approval hearing has the "salutary" effect of "maximizing the claims period's duration" and that class counsel expects the claims rate will range between 10 to 15% by the end of the claims period).  And in the *DRAM* and *LCDs* cases, claims were accepted *at least* a few months after the deadline for final approval precisely to ensure a sufficient claims rate to give such value back to the class. *See, e.g.,* Order re: Indirect Purchaser Plaintiffs and State Attorneys General's Joint Motion for Interim Reimbursement of Expenses at 2, MDL No. 1827, *In re TFT-LCD (Flat Panel) Antitrust Litig.* (October 20, 2014) (claims filed up to June 6, 2014 were paid even though the final approval order issued April 3, 2013).   Given this case law and precedent, the Special Master can recommend the Court use its power at equity to move the claims date out a few months past the final approval hearing to June 30, 2016 as that will serve the best interests of the class as a whole in the federal proceedings.

**B.      The Need to Coordinate State and Federal Proceeding Also Supports Extension of the Final Date for Submitting Claims for all Claimants to June 30, 2016**

Coordination of parallel state and federal proceedings is an important goal of federal complex case management (as it is for state complex case management). *See* Federal Judicial

17

Center & National Center for State Judges, COORDINATING MULTIDISTRICT LITIGATION, A POCKET GUIDE FOR JUDGES, 11 (2013) ("Coordination among courts is particularly beneficial as the parties approach settlement."); Federal Judicial Center, MANUAL FOR COMPLEX LITIGATION, FOURTH, § 20.32, 235-38 (2004) (encouraging the coordination of state and federal cases, including in the context of settlement). The Attorney General will be moving for preliminary approval of her settlements on January 27, 2016. Varanini Decl., ¶ 11. The Attorney General entered into these settlements in reliance on California natural persons being able to primarily look to any settlements or any trial verdict achieved by counsel for the Indirect Purchaser Plaintiffs for direct relief with the Attorney General protecting the interests of these natural persons by weighing in on any allocation plan. *Id.* ¶¶ 17-20.

More specifically, in the wake of Lead Counsel's prolonged litigation in state court against the Attorney General's early *Philips* settlement described above, the Attorney General sought to restore the traditional close coordination of private plaintiffs with the Attorney General by agreeing to add specific language suggested by Lead Counsel to her later-in-time settlements with defendants in her state proceeding. *See* Varanini Decl., ¶ 16. That language, as set out in three later-in-time settlements, Panasonic, Toshiba, and Samsung,[19] states that the release of *parens patriae* claims will not operate to displace or supplant the claims of the Indirect Purchaser Plaintiffs. *Id.* ¶ 17. And all of the later-in-time settlement agreements contain the understanding of the Settling Defendants and the Attorney General that, while the Attorney General could oppose a distribution/allocation plan proposed by the Indirect Purchaser Plaintiffs, she would not oppose the underlying settlements in and of themselves between those defendants and the Indirect Purchaser Plaintiffs. *Id.* ¶ 17. Consequently, the language in these later-in-time settlement agreements, when considered in their totality, reflects the Attorney General's traditional practice of working with private counsel for the Indirect Purchaser Plaintiffs to aid them in recovering large sums of monies that can be used for a direct distribution plan to natural persons and

---

[19] The settlement with Samsung is still an oral settlement-in-principle awaiting Attorney General approval. The parties have, however, begun to negotiate a written settlement agreement in the meantime. Varanini Decl., ¶ 17 n.1.

1   corporations while weighing in on the proposed distribution/allocation plan, as in *DRAM* and

2   *LCDs*, to ensure that natural persons receive fair and equitable treatment in that plan.  *Id.* ¶ 17.

3       In reliance on this understanding of this practice all of the parties, including Lead Counsel,

4   the Attorney General bargained for cash portions of her settlements that permit only a small

5   residue to be distributed *cy pres* for the indirect benefit of the California natural persons she

6   represents.  *Id.* ¶ 18.  Accordingly, for the Attorney General to obtain the benefit of her reliance

7   on the request of Lead Counsel, and on the understanding of all of the parties, it is important that

8   there be the opportunity to direct California natural persons to the fund created by the settlements

9   of counsel for the Indirect Purchaser Plaintiffs for direct relief by filing claims that will be treated

10   as being valid.  *Id.*  Should the Office be able to craft a *parens* notice that simply allows

11   California natural persons the opportunity to file claims against the federal settlement fund, the

12   Attorney General will have received the benefit of the bargain with counsel for the Indirect

13   Purchaser Plaintiffs. If not, California natural persons will face a confusing and highly uncertain

14   notice and objection process with unanswered questions and for at least some a lost opportunity to

15   file a claim. It is thus much more workable for the final claims submission date for all claimants

16   to be moved to June 30, 2016 so that the Attorney General may state in the *parens* notice that

17   natural persons wishing to recover monies for damages suffered can validly file a claim in the

18   parallel federal action and provide the appropriate links.  Varanini Decl., ¶ 20.  Indeed, insofar as

19   moving the claims date can be analogized to seeking a stay, such a move is appropriate to show

20   comity vis-à-vis the Attorney General's upcoming state settlement proceedings so that the state

21   and federal proceedings may remain closely coordinated as they have been throughout these

22   proceedings. *See Thompson v. Key Health Medical Solutions*, 2015 WL 1292228, *12-13

23   (M.D.N.C. Mar. 23, 2015) (staying federal class certification proceedings to accommodate state

24   class settlement proceedings in California).[20]

25       To move the final date for submitting claims to June 30, 2016 does not unduly favor

26   California natural persons, who will be receiving *parens* notice in the intervening time period.

27       [20] The course of conduct here raises promissory estoppel concerns (*see, e.g., Garcia*, 183

28   Cal.App.4th at 1040-41) that also support the positions being taken here by the Attorney General.

1   The new date for submitting claims would apply to all claimants.  Further, providing the extra

2   time can allow for additional nationwide measures to be taken as to notice so as to maximize

3   potentially the claims rate and give value back to the class such as (but not limited to) those

4   suggested herein.

5                                   **CONCLUSION**

6          The Attorney General respectfully requests that the Special Master take account of this

7   supplemental memorandum in crafting his recommendations, including whether additional notice

8   should be required in accordance with similar cases and whether certain aspects of the proposed

9   allocation plan should be redone to make more monies available for notice, for claims, and for a

10  *cy pres* distribution of residue.  The Attorney General also respectfully requests that this Special

11  Master order counsel for the Indirect Purchaser Plaintiffs to provide immediately notice and

12  claims data (along with a meaningful opportunity to respond) so that these  suggestions on the

13  allocation plan can be refined.  Finally, to remedy what appears to be a clerical error that has

14  important ramifications for providing an adequate opportunity for natural persons to make claims

15  and for coordinating state and federal proceedings, the Attorney General requests that the Special

16  Master recommend moving the final date for submitting claims for all claimants as soon as

17  possible (subject to the input of the Court) to June 30, 2016.

18

19  Dated:  December 9, 2015                        Respectfully submitted,

20                                                  KAMALA D. HARRIS
                                                    Attorney General of California
21

22                                                   */s/ Emilio E. Varanini*
                                                    EMILIO E. VARANINI
23                                                  Deputy Attorney General
                                                    *Attorneys for the State of California*
24

25  SF2011203501
    41432130.doc
26

27

28

                                           20

Steve A. Miller (State Bar No. 171815)
Steve A. Miller, PC
1625 Larimer Street, No. 2905
Denver, CO 80202
Ph# 303-892-9933
Fax: 303-892-8925
Email: sampc01@gmail.com

Jonathan E. Fortman (40319MO)
Law Office of Jonathan E. Fortman, LLC
250 St. Catherine Street
Florissant, MO 63031
Ph# (314) 522-2312
Fax: (314) 524-1519
Email: jef@fortmanlaw.com

John C. Kress
The Kress Law Firm, LLC
4247 S. Grand Blvd
St. Louis, MO 63111
Ph.#: (314) 631-3883
Fax: (314) 332-1534
Email: jckress@thekresslawfirm.com

Attorneys for Objectors John Finn and
Laura Townsend Fortman

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. CV-07-5944 SC; No. CV-13-03234 SC MDL No. 1917 |
| This Document Relates to: | REPLY TO MOTION FOR FINAL APPROVAL OF SETTLEMENT |
| All Indirect-Purchaser Class Actions *Luscher et al v. Videocon Industries Limited, et al.* | Judge: Honorable Jon S. Tigar Special Master Martin Quinn |

On October 18, 2015, Objectors Finn and Fortman filed their objection to this settlement asserting that Lead Counsel has a conflict of interest.  The basis for that conflict is that Lead Counsel settled claims on behalf of the damages states but then agreed to a broad release of the claims of class members in non-damage states who receive no consideration. On November 19, 2015, Lead Counsel on behalf of himself and the other class counsel filed the "Motion for Final Approval", which included responses to the objections.  However, out of the 57 pages of text devoted to convincing this Court to approve the proposed settlement, roughly two (2) pages is given to addressing the objections of Finn and Fortman (Mtn for Final Approval, p. 36-38).

Quite simply, Class Counsel has elected to ignore the issues presented to this Court, failing to even address the conflict of interest issue.  Instead, Lead Counsel blames the citizens of Missouri and the other Omitted States for not "stepping forward" to become named plaintiffs in this litigation that spanned almost a decade:

> IPPs never asserted a Missouri claim because no Missouri plaintiff came forward to represent a Missouri class, and the law of the case prevented Lead Counsel from asserting a Missouri claim without a Missouri class representative.
> -----
> But no Massachusetts plaintiff objected and no one stepped forward to represent the Massachusetts class.
> -----
> No New Hampshire plaintiff came forward to represent a New Hampshire class . . .

(Mtn for final approval, p. 37, lines 9-11;13-15; p. 38, lines 14-15). Incredibly, Lead Counsel blames his inability to follow-through on the claims of Missouri, Massachusetts and New Hampshire Citizens on the bombastic premise that no one was willing to step forward to take on such position.

It appears that Lead Counsel's strategy for securing fees on behalf of the IPP class is essentially blaming the very same class members he abandoned and then released for a windfall of unearned fees by claiming no one wanted to be the named plaintiff in the Omitted States. And then

Lead Counsel spends the rest of his efforts blaming co-counsel, Mr. Bonsignore for not providing him with plaintiffs for the Omitted States of Missouri, New Hampshire, and Massachusetts then shrugging off the monumental failure by claiming such persons did not have receipts or proof of purchase (Mtn for final approval, p. 37, lines 16-20; p. 38). Lead Counsel sums up his response to such objections by conveniently shifting blame to other persons, such as claiming Bonsignore could have filed an action in Missouri, "failed to to so, thus any Missouri claims are now long time –barred." (Mtn for final approval, p. 38, line 12). Again, this is from "Lead Counsel." Mr. Bonsignore again is blamed by Lead Counsel for the failure to file and proceed with claims in Massachusetts. Lead Counsel has admitted that the claims for the Omitted States have now run, and there is nothing that can be done to bring them relief.

Lead Counsel's position is not a defense or a legal argument. It is Lead Counsel trying to explain away malpractice.

Lead Counsel has already admitted he does not believe he was responsible for litigating, or protecting the interests of the persons in the Omitted States. Moreover, Lead Counsel's position with Finn and Fortman's Objections is essentially "that was someone else's fault." This Court should not permit Lead Counsel to continue to direct the course of this litigation on behalf of the IPP's and, at minimum, should issue an order that he step aside and permit other persons to attempt to conduct a course of corrective action that may permit this settlement to survive scrutiny from this Court.

In a similar vein, Lead Counsel has responded to the allegations that the release of the Omitted States for no consideration "is fair, reasonable and adequate." (Mtn for Final Approval, p. 34, lines 13-14). Lead Counsel bases such conclusion on his analysis that "these potential damages claims are not viable and therefore worthless as well." (Id. at lines 3-4). The extent, and scope of the malpractice is evident from the sweeping statement of Lead Counsel:

> To the extent any of the 29 states allow indirect purchasers to
> bring claims for damages, IPP's have determined that these claims
> have long been barred by their respective statutes of limitations and
> are completely speculative. Thus, these claims are also worthless
> and can fairly be released as part of these Proposed Settlements.

(Id. at lines 15-18).  Essentially, it is Lead Counsel's position that this Court should not be

concerned with the Omitted States, because they get nothing, and would not receive anything.

Which begs the question:  then why release those class members claims from the Omitted States?

When did Lead Counsel reach the conclusion that the Omitted States were not worth pursuing?

In Rodriguez v. Disner, the court reaffirmed that "simultaneous representation of clients

with conflicting interest (and without informed consent) is an automatic ethics violation in

California and grounds for disqualification and that an attorney cannot recover fees for such

conflicting representation." Rodriguez v. Disner, 688 F.3d 645, 651 (9th Cir. 2012). Notable, Lead

Counsel has failed to challenge the legal authority previously cited by Objectors Fortman and

Finn, and has never bothered to address the conflict of interest issue with this Court.

Lead Counsel is ignoring the issue but this Court should not.  It is therefore incumbent

upon this Court to remedy this situation before entertaining any proposed settlement in order to

determine whether other Class Counsel who do not have or share such conflict are in a position to

negotiate some type of monetary compensation for the Omitted States.  Previously, Special Master

Walker suggested that Josef Cooper and Francis O. Scarpula be permitted to participate in

negotiations on behalf of the class.  Objectors submit that this Court should embrace that concept.

The conduct of Lead Counsel cannot support an award of attorney's fees given the

existence of such conflict:

> In determining what fees are reasonable, a district court may
> consider a lawyer's misconduct, which affects the value of the
> lawyer's services. A court has broad equitable power to deny
> attorneys' fees ( or to require an attorney to disgorge fees already
> received) when an attorney represents clients with conflicting
> interests. See, e.g., Silbiger v. Prudence Bonds Corp., 180 F.2d 917,

1

2

3

4

> *920 (2nd Cir. 1950)* ("Certainly by the beginning of the Seventeenth
> Century it had become a common-place that an attorney must not
> represent opposed interests; and the usual consequence has been that
> he is debarred from receiving any fee from either client, no matter
> how successful his labors.").

5

6

7

8

9

10

<u>Rodriguez</u>, 688 F.3d at 653 (other internal citations omitted). Here, it is clear that Lead Counsel's conduct is negatively impacting the value of his services to the Omitted States. Put another way, if the Omitted States were not so critical to the settlement of the IPP case, then why include them in the release with the states that were not omitted and receiving payment? Why not just settle the claims of the states that had claims? Why represent states that you appear to have no intention of zealously representing?

11

12

13

14

15

16

17

It is settled law that Lead Counsel is barred from receiving any fees in the IPP settlement, because he did not pursue recovery for the Omitted States. The 9th Circuit has already reasoned that "payment is not due for services not properly performed." <u>*Id.*</u> *at 654.* Furthermore, it "compounds injustice" to allow the attorney to recover fees from the very party injured by the ethical violation." <u>*Id.*</u> The Omitted States were harmed by Lead Counsel's conduct- or perhaps lack of conduct in question.

18

19

20

Lead Counsel cannot reconcile the allegations of Objector Fortman and Finn and must concede that he has a conflict of interest with the Omitted States.

21

<u>Conclusion</u>

22

23

WHEREFORE, for the foregoing reasons, and for the reasons set forth in their Objections, Class Members John Finn and Laura Fortman request that this settlement not be approved.

24

25

26

27

28

Respectfully submitted,


/s/ Steve A. Miller
Steve A. Miller (SBN 171815)
Steve A. Miller, PC
1625 Larimer Street, No. 2905
Denver, CO 80202
Ph# 303-892-9933
Fax: 303-892-8925
Email: sampc01@gmail.com


Jonathan E. Fortman (40319MO)
Law Office of Jonathan E. Fortman, LLC
250 St. Catherine Street
Florissant, MO 63031
Ph# (314) 522-2312
Fax: (314) 524-1519
Email: jef@fortmanlaw.com


John C. Kress
The Kress Law Firm, LLC
4247 S. Grand Blvd
St. Louis, MO 63111
Ph.#: (314) 631-3883
Fax: (314) 332-1534
Email: jckress@thekresslawfirm.com

Attorneys for Objectors John Finn and Laura
Townsend Fortman

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing has been served upon all parties via the JAMS' ECF system this 9th day of December, 2015.


/s/ Steve A. Miller
Steve A. Miller

1  FRANCIS O. SCARPULLA (CASB No. 41059)
   PATRICK B. CLAYTON (CASB No. 240191)
2  LAW OFFICES OF FRANCIS O. SCARPULLA
   456 Montgomery Street, 17th Floor
3  San Francisco, CA  94111
   Telephone:  (415) 788-7210
4  Facsimile:   (415) 788-0706
   fos@scarpullalaw.com
5  pbc@scarpullalaw.com

6  JOSEF D. COOPER (CASB No. 53015)
   TRACY R. KIRKHAM (CASB No. 69912)
7  JOHN D. BOGDANOV (CASB No. 215830)
   COOPER & KIRKHAM, P.C.
8  357 Tehama Street, Second Floor
   San Francisco, CA  94103
9  Telephone:  (415) 788-3030
   Facsimile:  (415) 882-7040
10 jdc@coopkirk.com
   trk@coopkirk.com
11 jdb@coopkirk.com

12 *Counsel for Indirect-Purchaser Plaintiffs*

13

14

15                 UNITED STATES DISTRICT COURT

16                 NORTHERN DISTRICT OF CALIFORNIA

17                    SAN FRANCISCO DIVISION

18 In re:  CATHODE RAY TUBE (CRT)        **Master File No. 3:07-cv-5944 JST**
   ANTITRUST LITIGATION.
19                                        **MDL No. 1917**

20 This Document Relates to:            **REPLY BRIEF IN SUPPORT OF**
                                         **OBJECTIONS TO INDIRECT-**
21 All Indirect-Purchaser Actions.      **PURCHASER PLAINTIFFS' MOTION**
                                         **FOR AWARD OF ATTORNEYS' FEES,**
22                                        **REIMBURSEMENT OF LITIGATION**
                                         **EXPENSES, AND INCENTIVE AWARDS**
23                                        **TO CLASS REPRESENTATIVES**

24                                        Date:        March 15, 2016
25                                        Time:        2:00 p.m.
                                          Judge:       The Hon. Jon S. Tigar
26                                        Courtroom: 9, 19th Floor

27                                        Before:  Special Master Martin Quinn

28

I.   **INTRODUCTION**

The undersigned filed objections to the proposed settlements, and to Lead Counsel's fee motion.[1]  This reply is made in further support of the objections to the fee motion.  (A separate reply in further support of the objections to the proposed settlements is filed concurrently.) In connection with these objections, the undersigned moved the Special Master to order Lead Counsel to produce original time records from Lead Counsel and three additional firms associated into the case as trial counsel (the so-called "Late-Added Three").[2]  The Special Master granted the request in part, ordering the confidential production of Lead Counsel's time records for 2014-15, and production of time records for the Late-Added Three, to the undersigned only.[3]

As explained below, the rushed review of the available time records raises significant concerns about the billing practices and strategic decisions of Lead Counsel.  It also confirms that the Late-Added Three billed their way into familiarity with the case, without even attempting to coordinate with or benefit from co-counsel who had been with this case from the start.  The class should not have to fund this careless approach to case management.

Applying a percentage-of-the-fund approach to fees here would be not only improper but also impractical, as no meaningful cross-check can be achieved where the billing records produced thus far show such a lack of coordination and billing judgment.  Instead, the undersigned respectfully request that the Special Master review each firm's time records and make an award based on that lodestar review, or alternatively, engage the services of an outside audit firm to review the time records and render any fee awards on the basis of such audited time records.

---

[1]  Objection to Proposed Settlement (Dkt. 4116); Objections To (1) Settlements and (2) Attorneys' Fees (Dkt. 4115).

[2]  Dkt. 4191 (identifying the "Late-Added Three" as the firms Fine Kaplan, Hulett Harper, and Freedman Boyd).

[3]  Dkt. 4211.  Consistent with the Special Master's order, the undersigned have confined themselves in this brief to a general analysis of the time spent as documented in the billing records, and do not reveal any privileged and/or attorney work-product materials.

## II.   LEAD COUNSEL'S TIME RECORDS

As a preliminary matter, a review of the limited time records produced by Lead Counsel calls into question whether Lead Counsel itself complied with the time-recording requirements of the Court's appointment order,[4] or Lead Counsel's own directives regarding timekeeping and exclusion of time spent on internal case-management.[5]  Some of the timekeeper reports produced by Lead Counsel are in electronic format, but appear to be dated the day of production to the undersigned (as opposed to contemporaneously-made originals).  Other timekeepers, notably Mr. Mario Alioto, appear to have recorded their time by hand.  However, it is unclear how these hand written entries were summarized into the billing charts transmitted to the accountancy firm hired by Lead Counsel to receive such reports.[6]  These issues warrant further investigation by the Special Master, especially in light of sworn statements in the record which question whether Mr. Alioto kept contemporaneously recorded time.[7]

Moreover, there is widespread use of block-billing[8] and quarter-hour increments[9] by various timekeepers at Lead Counsel's firm.  These practices serve to obscure, not clarify, whether

---

[4]  *See* Order Appointing Interim Lead Counsel (Dkt. 282) at pp. 5 – 6 (vesting interim counsel with responsibility for "the orderly and efficient conduct of this litigation and to avoid unnecessary duplication and unproductive efforts").

[5]  *See* IPP Mot. for Attys' Fees, (Dkt. 4071), at p. 26 (describing Lead Counsel's requirement that "IPP Counsel" periodically submit contemporaneous time records, and requiring "all firms" to exclude time spent on internal case management).

[6]  The accountancy firm was identified only by an email address, "sipcpa@earthlink.net," but Lead Counsel has not provided any additional information about the firm.

[7]  *See* Decl. of Robert J. Bonsignore, (Dkt. 4072) at p. 6 (stating under oath that Mr. Alioto said he does not keep contemporaneous time records).

[8]  "Block billing" refers to "the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." *Mendez v. County of San Bernardino*, 540 F.3d 1109, 1129 n.2 (9th Cir. 2008) (quoting *Welch v. Met. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007)).  Generally, courts have discretion to reduce block-billed hours because the nature of these time entries renders it difficult to determine whether fees are unnecessarily duplicative or unreasonable. *See Welch*, 480 F.3d at 948.  This is so because it is "more difficult to determine how much time was spent on particular activities." *Id.*

[9]  *See, e.g., Rosales v. El Rancho Farms*, 2015 WL 4460635 at *30 (E.D. Cal. July 21, 2015)

1    time spent on various tasks was reasonable, and for that reason have come under withering

2    criticism in this and other districts.[10]  These criticisms are well-founded here because, for instance,

3    it appears that Mr. Alioto reviewed virtually every email, letter and pleading filed in the case,

4    charging in quarter-hour increments each time.  Moreover, from January 2014 through March 9,

5    2015, Lead Counsel's time records show no fewer than 107 separate intra-office conferences

6    involving Mr. Alioto and other lawyers in his firm, despite Lead Counsel's directive that such

7    internal case-management time should not be included in the fee submission.[11]

8         The appropriate remedy in this situation is to apply across-the-board reductions to the

9    hours affected by these practices.  Notably, such a reduction was voluntarily applied to all time

10

11

_____

12   (reducing time entries billed in quarter-hour increments by 20%); *see also Prudential Ins. Co. v.*

13   *Remington*, 2014 WL 294989 (E.D. Cal. Jan. 24, 2014) (same); *Robinson v. Plourde*, 717 F. Supp.
     2d 1092, 1100-01 (D. Haw. 2010) (same).

14
     [10]  *See, e.g., Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 968 (N.D. Cal. 2014) ("I am reducing
15   Volcano's bill by 20% for block billing."); *Apple, Inc. v. Samsung Electronics Co.*, 2012 WL
     5451411, at *5 (N.D. Cal. Nov. 7, 2012) ("in light of the evidence that block-billing inflates hours
16   by between 10% and 30%, the court trims 20% from the block-billed hours in Samsung's
     request"); *Hajro v. U.S. Citizenship & Immigration Servs.*, 900 F. Supp. 2d 1034, 1053
17   (N.D.Cal.2012) ( "the court exercises its discretion to reduce the hours for these block-billed
     entries by twenty percent, the amount noted by the Ninth Circuit as the middle range for time
18   increases that occurs through block-billing"); *Yeager v. Bowlin*, 2010 WL 1689225, at *1 (E.D.
     Cal. Apr. 26, 2010) ("block billing thereby forces the court to take a 'shot in the dark' and guess
19   whether the hours expended were reasonable, which is precisely the opposite of the methodical
     calculations the lodestar method requires"); *Lil' Joe Wein Music, Inc. v. Jackson*, 2008 WL
20   2688117, at *13 (S.D. Fla. July 1, 2008) (20% across the board reduction because "[i]t is
     impossible to ascertain from the block billing entries whether the amount of time spent on any
21   separate task performed was reasonable"); *Aiello v. Town of Brookhaven*, 2005 WL 1397202, at
     *3 (E.D.N.Y. June 13, 2005) ("because block billing renders it difficult to determine whether,
22   and/or the extent to which, the work done by attorneys is duplicative or unnecessary, courts apply
23   percentage cuts where there is a substantial amount of block billing in a fee request") (citations
     and internal punctuation omitted).  *But see O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 2015 WL
24   4274370 at *6 (N.D. Cal. July 13, 2015) (finding that block-billed entries contained enough
     specificity as to individual tasks to ascertain whether the amount of time spent performing them
25   was reasonable).

26
     [11]  IPP Mot. for Attys' Fees, (Dkt. 4071), at p. 26 (noting that Lead Counsel directed "all firms" to
27   exclude time spent on internal case management from the fee petition).

28

_____

submitted in *LCD*.[12]  Here, Lead Counsel has not instituted such across-the-board reductions, and Lead Counsel's "Audit Committee" did not recommend any reduction to Lead Counsel's time, despite the questionable billing practices identified herein.

In addition to the significant issues identified with Lead Counsel's manner of recording time, larger questions remain concerning Lead Counsel's strategic decisions in the case – and who should pay for them.  The conflict between Mr. Alioto and the California Attorney General's Office is but the most glaring example.  Despite warnings from the undersigned,[13] Mr. Alioto fostered a combative and unproductive relationship with the California AG.  This kind of behavior is not new for Mr. Alioto.[14]  But rather than follow the advice of his co-counsel, or of Special Master Hon. Vaughn Walker,[15] Mr. Alioto refused to commit to coordinating the indirect-purchaser class action with the California AG's separate case, leading to predictable conflict.  This approach did not benefit class members, and it is inappropriate for the classes to pay for Mr. Alioto's decision to pick an unnecessary fight with the California AG.

---

[12] *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M-07-1827, 2013 WL 1365900 at *8 (N.D. Cal. Apr. 3, 2013) (noting 20% reduction in claimed hours for possible inefficiencies).

[13] *See* Letter from F. Scarpulla, et al, to M. Alioto (Oct. 2, 2014), attached as Ex. A to Decl. of John D. Bogdanov In Support of Reply Re Motion To Compel Lead Counsel To Produce Certain IPP Time-and-Expense Reports (lodged with JAMS on Nov. 24, 2015) ("We see from the public record the contentious relationship that has arisen between the IPPs and the California Attorney General, and imagine that this is likely hindering IPPs' efforts to settle.").

[14] *See Thayer v. Wells Fargo Bank*, 92 Cal. App. 4th 819, 829 (2001) (finding that Mr. Alioto and his then co-counsel, Sherman Kassof [who is also co-counsel with Mr. Alioto on their complaint filed in this action], engaged in pointless and redundant legal maneuvering and "seek[s] exorbitant fees for time spent manufacturing new issues. . ."  That is exactly what Mr. Alioto did here by engaging the California Attorney General in an unnecessarily contentious relationship from the outset of the case.).

[15] *See* Report and Recommendation Re Settlement (Dkt. 3200) at p. 3 ("First, as previously related directly to the court, there has been a lack of 'meaningful coordination' of fact and expert discovery by the IPPs' lead counsel and the California attorney General's Office . . . In most instances, where there has been parallel *parens patriae* litigation brought by the Cal AG and indirect purchaser class litigation, the Cal AG has been able to coordinate her litigation in state court with litigation on behalf of the IPPs in federal court thereby avoiding duplication of effort and unnecessary expense.  In this litigation, however, the Cal AG and IPPs' lead counsel have been unable to reach an accommodation to avoid these difficulties.").

---

1   **III.    LATE-ADDED THREE TIME RECORDS**

2          Relatedly, Lead Counsel's decision to associate into the case as trial counsel three firms

3   that previously had no involvement in the case should invite additional scrutiny by the Special

4   Master and the Court.  A review of the time records produced by the Late-Added Three reveals

5   almost no coordination of efforts of the new "trial counsel" with the work already performed by

6   counsel who had been with this case from the beginning.[16]  The question then becomes, who

7   should pay?

8          Almost all of the time recorded by the Late-Added Three falls into the

9   "Motions/Pleadings" and "Trial" categories.  These entries, generating a total lodestar of $3.8

10  million for these three firms, show that hundreds of hours of entries were spent by legions of

11  lawyers from these firms simply familiarizing themselves with the facts of the case.  It appears as

12  though these newly added firms started from scratch rather than working cooperatively with the

13  many counsel who had been developing evidence and prosecuting the case for almost ten years.

14         Without a doubt, the Late-Added Three were invited to incur this time by Lead Counsel.

15  Therefore, in arriving at an appropriate fee award, the Special Master must consider two

16  independent issues:  (1) the value that the Late-Added Three contributed to the litigation; and (2)

17  whether it is appropriate for payment for any contribution they made to come from the classes, or

18  if it should be the responsibility of Lead Counsel to compensate the firms he "hired" to try this

19  class action.

20  //

21  //

22  //

23  //

24  //

25

26

27
_____

[16] Time records for the Late-Added Three also indicate the use of block-billing.

28

1  III.   **CONCLUSION**

2        The undersigned respectfully suggest their review of the time records demonstrates why

3  the Special Master should, in this case because of its particular circumstances, award any fees to

4  counsel based on a review of each lawyer's contemporaneously-maintained timesheets, with each

5  lawyer justifying the time spent and the amount charged.[17]   The percentage-of-the-fund approach

6  here is not justified as it has increased potential to compensate for duplication, reward poor

7  decision making, and create a windfall for certain counsel who did nothing of significance in this

8  case.

9

10  Dated:  December 9, 2015                        _____/s/ Francis O. Scarpulla_____

11                                             FRANCIS O. SCARPULLA (CASB No. 41059)
                                               PATRICK B. CLAYTON (CASB No. 240191)
12                                             LAW OFFICES OF FRANCIS O. SCARPULLA
                                               456 Montgomery Street, 17th Floor
13                                             San Francisco, CA 94104
                                               Telephone: 415-788-7210
14                                             Facsimile:  415-788-0706
                                               fos@scarpullalaw.com
15                                             pbc@scarpullalaw.com

16
                                               JOSEF D. COOPER (CASB No. 53015)
17                                             TRACY R. KIRKHAM (CASB No. 69912)
                                               JOHN D. BOGDANOV (CASB No. 215830)
18                                             COOPER & KIRKHAM, P.C.
                                               357 Tehama Street, Second Floor
19                                             San Francisco, CA  94103
                                               Telephone:  (415) 788-3030
20                                             Facsimile:  (415) 882-7040
                                               jdc@coopkirk.com
21                                             trk@coopkirk.com
                                               jdb@coopkirk.com
22

23

24

25

26  _____

27  [17]  *See* Order to Show Cause with Respect to Attorneys' Fees and Incentive Awards (Dkt. 4182)
     (requiring Direct-Purchaser Plaintiffs' Counsel to produce time records for select time periods).
28

1

## PROOF OF SERVICE

2

On December, 9, 2015, I caused the following:

3
4
5

## REPLY BRIEF IN SUPPORT OF OBJECTIONS TO INDIRECT-PURCHASER PLAINTIFFS' MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS TO CLASS REPRESENTATIVES

6

to be electronically filed with the JAMS Electronic Filing System.  All counsel of record

7

associated with this matter before JAMS will be notified of this filing through the JAMS

8

Electronic Filing System.

9

/s/ C.P. Cusick
C.P. Cusick

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1   ANDREA VALDEZ (Cal. Bar No. 239082)
    530 S. Lake Avenue, No. 574
2   Pasadena, CA 91101
    Tel: (626) 817-6547
3   andrea.valdez.esq@gmail.com

4   JOSEPH SCOTT ST. JOHN (*pro hac vice*)
    514 Mockingbird Drive
5   Long Beach, MS 39560
    Tel: 410-212-3475
6   jscottstjohnpublic@gmail.com

7   *Attorneys for Objector Douglas W. St. John*

8

9                  UNITED STATES DISTRICT COURT

10                NORTHERN DISTRICT OF CALIFORNIA

11                  SAN FRANCISCO DIVISION

12  **IN RE CATHODE RAY TUBE (CRT)**       Master File No. 3:07-cv-5944 JST
    **ANTITRUST LITIGATION**
13                                          MDL No. 1917

14                                          **OBJECTOR DOUGLAS W. ST. JOHN'S**
                                            **REPLY IN SUPPORT OF OBJECTION**
15

16
    This Document Relates To:               Judge: Hon. Jon S. Tigar
17  All Indirect Purchaser Actions
                                            Special Master: Hon. Martin Quinn
18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. 1

TABLE OF AUTHORITIES ........................................................................................... 3

I.     IPP COUNSEL FAILED TO ESTABLISH THE REASONABLENESS OF
       THEIR REQUESTED FEES. .............................................................................. 1

       A.     IPP Counsel do not dispute that they failed to submit background data
              necessary for the Court and the class to evaluate their claimed fees. ............... 1

       B.     IPP Counsel improperly identified contract attorneys as associates, but
              selectively failed to provide background information on those
              attorneys. ............................................................................................. 2

II.    IPP COUNSEL FAIL TO REBUT THAT MUCH OF THE SETTLMENT
       FUND IS ATTRIBUTABLE TO FACTORS OTHER THAN IPP
       COUNSEL'S EFFORTS. ....................................................................................... 4

       A.     As a matter of law, IPP Counsel cannot be awarded fees for portions of
              the settlement fund attributable to the efforts of others. ................................... 4

       B.     At least $170 million of the settlement fund is not attributable to IPP
              Counsel. ................................................................................................. 5

              1.     IPP Counsel do not contest that the CRT conspiracies were
                     uncovered by regulators, or that they piggybacked on those
                     governmental efforts. ............................................................... 5

              2.     IPP Counsel are judicially estopped from contesting the
                     substantial and redounding value of the Chunghwa settlement. .......... 5

              3.     IPP Counsel fail to rebut the significant value of Samsung
                     SDI's guilty plea and the associated investigation by DOJ. ................. 6

              4.     The European Commission Decision was relevant, admissible,
                     and likely preclusive. ............................................................... 7

       C.     IPP Counsel offer no real explanation for the vastly disproportionate
              size of the Samsung and Philips settlements. ..................................................... 9

III.  IPP COUNSEL FAIL TO ESTABLISH THAT THEIR REQUEST FOR
      OVER $192 MILLION IN FEES IS REASONABLE. ................................. 11

      A.   IPP Counsel improperly tie their request to the entirety of the $576
           million megafund. ................................................................. 11

      B.   IPP Counsel fail to rebut the significant evidence of lodestar inflation. .......... 12

      C.   The Supplemental Declaration of Richard Pearl makes clear that he is
           not qualified to opine on the reasonableness of expending 183,000
           hours. ...................................................................................... 13

      D.   No multiplier is warranted .......................................................... 14

IV.   IPP COUNSEL'S REMAINING ARGUMENTS ARE MERITLESS ...................... 15

# TABLE OF AUTHORITIES

**Cases**

*Antoninetti v. Chipotle Mex. Grill, Inc.*, 2012 WL 2923310 (S.D. Cal. July 17, 2012) .................................13

*Blum v. Stephenson*, 465 U.S. 886 (1984) .................................................................................................2

*Brown v. Stackler*, 612 F.2d 1057 (7th Cir. 1980) ....................................................................................3

*Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973 (9th Cir. 2008) ..............................................................2

*Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039 (N.D. Cal. 2010) ......................................2

*First State Ins. Grp. v. Nationwide Mut. Ins.*, 402 F.3d 43 (1st Cir. 2005) ............................................3

*Gauchat-Hargis v. Forrest River, Inc.*, 2013 WL 4828594 (E.D. Cal. Sept. 9, 2013) ...........................13

*Goffstein v. State Farm Fire & Casualty Co.*, 764 F.2d 522 (8th Cir. 1985) ...........................................7

*In re Auction Houses Antitrust Litig.*, 2001 WL 210697 (S.D.N.Y. Feb. 26, 2001) ...................... 12, 14

*In re Auto. Parts Antitrust Litig.*, 2014 WL 1746121 (E.D. Mich. Apr. 30, 2014) ..................................6

*In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752 (S.D. Ohio 2007) ......................................5

*In re Cendant Corp. PRIDES Litigation*, 243 F.3d 722 (3d Cir. 2001) ............................................ 5, 11

*In re Citigroup Sec. Litig.*, 965 F. Supp. 2d 369 (S.D.N.Y. 2013) ........................................................13

*In re Corrugated Container Antitrust Litig.*, 643 F.2d 195 (5th Cir. 1981) ..........................................11

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141 (D. Conn. 2009)...7

*In re Mercury Interactive Sec. Litig.*, 618 F.3d 988  (9th Cir. 2010) ............................................. 1, 13

*In re Prudential Insurance Co. of America Sales Litigation*, 148 F.3d 283 (3d Cir. 1998) ............... 4, 11

*In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448 (D.P.R. 2011) .................................5

*Local Union No. 490 v. Kirkhill Rubber Co.*, 367 F.2d 956 (9th Cir. 1966) .........................................10

*Lola v. Skadden, Arps, Slate, Meagher, & Flom LLP*, 2015 WL 4476828 (2d Cir. July 23, 2015) ...............3

*Lopez v. San Francisco Unified Sch. Dist.*, 385 F. Supp. 2d 981 (N.D. Cal. 2005) ................................2

*Monterrubio v. Best Buy Stores, LP*, 291 F.R.D. 443 (E.D. Cal. 2013) ..................................................2

*Navarro v. Gen. Nut. Corp.*, 2004 WL 2648373 (N.D. Cal. Nov. 19, 2004) ..........................................3

*Navarro v. Gen. Nut. Corp.*, 2005 WL 2333803 (N.D. Cal. Sept. 22, 2005) .................................... 2, 3

*Rissetto v. Plumbers and Steamfitters Local 343*, 94 F. 3d 597 (9th Cir. 1996) .....................................6

*Ruyle v. Continental Oil Co.*, 44 F.3d 837 (10th Cir. 1994) ...................................................................9

1    *Sartor v. Ark. Nat. Gas Corp.*, 321 U.S. 620 (1944) ................................................10

2    *Thayer v. Wells Fargo Bank*, 92 Cal. App. 4th 819 (2001) .....................................13

3    *True v. Am. Honda Mot. Co.*, 749 F. Supp. 2d 1052 (C.D. Cal. 2010) ..........................15

4    *Vichi v. Koninklijke Philips Elec., N.V.*, 85 A.3d 725 (Del. Ch. 2014).................. 8, 9, 11

5    *Young v. Covington & Burling LLP*, 846 F. Supp. 2d 141 (D.D.C. 2012) .....................3

6    **Other Authorities**

7    Noam Scheiber, *The Last Days of Big Law*, THE NEW REPUBLIC (July 21, 2013) .......................3

8    **Rules**

9    Fed. R. Civ. P. 23(h) ........................................................................1

10    **Treatises**

11    5 Moore's Fed. Practice. § 23.124[4] (3d ed. 2015) .....................................1

12    Alba Conte, 1 *Attorney Fee Awards* § 2.05..............................................4

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

I.   **IPP COUNSEL FAILED TO ESTABLISH THE REASONABLENESS OF THEIR REQUESTED FEES.**

   A.   **IPP Counsel do not dispute that they failed to submit background data necessary for the Court and the class to evaluate their claimed fees.**

In his objection, Mr. St. John expressly identified two IPP Counsel firms—Trump, Alioto, Trump & Prescott LLP ("TATP") and Lovell Stewart Halebian and Jacobson LLP—that failed to support their fee request with information about some or all of their timekeepers. D. St. John Obj. (D.E. 4106) at 21-23. At least TATP has now filed an additional declaration supporting its fee request. Consideration of that declaration—filed non-publicly with JAMS weeks after the deadline for objections—in ruling on IPP Counsel's fee motion is not permissible. Fed. R. Civ. P. 23(h); *see also In re Mercury Interactive Sec. Litig.*, 618 F.3d 988, 994-95 (9th Cir. 2010) (vacating and remanding: "When the district court sets a schedule that denies the class an adequate opportunity to review and prepare objections to class counsel's *completed* fee motion, it fails to fulfill its fiduciary responsibilities to the class."); 5 Moore's Fed. Practice. § 23.124[4] (3d ed. 2015) ("Any objection deadline set by the court should provide the eligible parties with an adequate opportunity to review *all of the materials* that may have been submitted in support of the motion . . . .").

Mr. St. John made clear that his identification of TATP and Lovell Stewart were only exemplary. D. St. John Obj. at 23 ("TATP is not alone in its deficiencies. IPP Counsel's fee requests are replete with attorneys with only a name disclosed . . . . For example, Lovell Stewart . . . ."). At least **20** firms seek fees for attorneys for whom they provide no experience, skill, and reputation information. Six of those firms did not provide background information on *any* attorney.[1,2] And while some of those firms submitted additional—but still improper—declarations in support of IPP Counsel's fee motion, they did not even attempt to cure their deficient fee requests.

---

[1]   Firms that did not submit background information for any of their attorneys: Lovell, Stewart, Halebian and Jacobson LLP; Milberg LLP; Frankovitch, Anetakis, Colantonio & Simon; Kirkpatrick & Goldsborough; McCallum, Hoaglund, Cook & Irby LLP; Wyatt & Blake LLP.

[2]   Firms that did not submit background information for some of their attorneys: Trump Alioto, Trump & Prescott LLP; Zelle Hofmann Voelbel & Mason LLP; Straus & Boies, LLP; Green & Noblin, P.C.; Andrus Anderson LLP; Fine, Kaplan and Black RPC; Miller Law LLC; Law Offices of Sherman Kassof; Goldman, Scarlato, Karon, & Paenny P.C.; Glancy, Prongay & Murray LLP; Karon LLC; Mansfield, Tanick, & Cohen PA / Foley & Mansfield PLLP; McManis Faulkner; Whitfield Bryson & Mason Mason LLP.

As fee applicants, IPP Counsel "bear[] the burden of demonstrating that 'the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.'" *Monterrubio v. Best Buy Stores, LP*, 291 F.R.D. 443, 459 (E.D. Cal. 2013) (quoting *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008)). To meet their burden, IPP Counsel were required to provide the Court with the information necessary to properly evaluate their requested fees. *Navarro v. Gen. Nut. Corp.*, 2005 WL 2333803, at *7-9 (N.D. Cal. Sept. 22, 2005); *see also Blum v. Stephenson*, 465 U.S. 886, 895 n.11 (1984). They failed to do so.

For timekeepers for whom IPP Counsel failed to provide background information, the Court has no basis to award anything other than a minimal hourly rate. *See Navarro*, 2005 WL 2333803, at *10; *Lopez v. San Francisco Unified Sch. Dist.*, 385 F. Supp. 2d 981, 990, 992 (N.D. Cal. 2005) (awarding the lowest rate sought due to the absence of background information to distinguish timekeepers). Assuming *arguendo* that white shoe law firms are the appropriate comparable, non-contract attorneys for whom no background information was provided should receive only the lower of their requested hourly rate or the rate of a first year associate, i.e., $250-$300 per hour. *See, e.g.*, *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1068 (N.D. Cal. 2010). The Court need not construct a spreadsheet: a significant across-the-board reduction is appropriate.

**B.     IPP Counsel improperly identified contract attorneys as associates, but selectively failed to provide background information on those attorneys.**

Several firms provided detailed background information for partners and associates, but omitted such information for attorneys who—although labelled associates—were actually contract attorneys. The example of Natalia Kabsakalian suggests that the selective omission was a conscious decision: she apparently worked for three firms as a contract attorney, but was improperly identified by each as an associate. Alioto Dec. (D.E. 4073-1); Karon Dec. (4073-15); Karon Dec. (4073-27).

The issue is not—as IPP Counsel suggest—whether contract attorneys can ethically be billed at market rates. The issue is the market rate for the contract attorneys in this case. Contrary to IPP Counsels' suggestion, many of the contract attorneys were not "highly skilled and experienced." Opp. at 21. For example, one contract attorney for the Law Offices of Sherman Kassof graduated—apparently without distinction—from an unexceptional law school, and he had no significant legal

experience prior to conducting document review in this case. J. St. John Dec. II Ex. 1. Mr. Kassof

paid that contract attorney $25-$30 per hour, but seeks to charge the class $350 per hour for his

work. *See* J. St. John Dec. II at ¶ 13; Kassof Dec. (D.E. 4073-14). Such individuals are not "lawyers

of reasonably comparable skill, experience and reputation" vis-à-vis the white-shoe associates IPP

Counsel proffer for comparison. And the only record evidence of the market rate for

undifferentiated contract attorneys is the $47-$125 cited in Mr. St. John's objection.[3]

A fee motion is not a "heads class counsel wins, tails we try again" proposition. *See, e.g., First State Ins. Grp. v. Nationwide Mut. Ins.*, 402 F.3d 43, 43 (1st Cir. 2005). IPP Counsel mislabeled contract attorneys as associates, then selectively failed to disclose background information that would have made the mislabeling apparent. Courts have handled contract attorney fee awards in different ways. D. St. John Obj. at 22. But IPP Counsel should not be permitted to hide the issue, then suffer only a reduction of their fee to what the Court would have granted if the facts were properly disclosed. *See Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980). Rather, "a severer reaction is needful." *Id.*

If TATP is awarded the low-end of the undifferentiated contract attorney rate, i.e. $47 per hour, its lodestar will be reduced by $2.61 million, i.e., about 16.6%. Other firms, such as the Law Office of Sherman Kassof, may have a substantially greater portion of their claimed fee attributable to contract attorneys, but neither the Court nor the class can evaluate that question due to the lack of attorney background information. Taking into account the need for a "severer reaction," an across-the-board reduction of IPP Counsel's lodestar by at least 15% is appropriate, in addition to any across-the board reduction due to the lack of background information for regular attorneys.

---

[3]     "Lawyers at an elite firm . . . have typically spent their lives amassing intellectual credentials. They are high-school valedictorians and graduates of elite universities, with mantles full of Latin honors. They have made law review at top law schools and clerked for federal judges." Noam Scheiber, *The Last Days of Big Law*, THE NEW REPUBLIC (July 21, 2013). Such attorneys simply are not "lawyers of reasonably comparable skill, experience and reputation" for attorneys whose legal experience consists of performing document review for a year or two after graduating from an undistinguished law school. *See, e.g., Lola v. Skadden, Arps, Slate, Meagher, & Flom LLP*, No. 14-3845, 2015 WL 4476828, at *6 (2d Cir. July 23, 2015) (applying North Carolina law: document review may not constitute the practice of law); *Young v. Covington & Burling LLP*, 846 F. Supp. 2d 141, 147-48, 155 (D.D.C. 2012) (describing the lesser qualifications and responsibilities of "staff attorneys" performing document review as compared to associates); *cf. Navarro v. Gen. Nut. Corp.*, 2004 WL 2648373, at *4 (N.D. Cal. Nov. 19, 2004), *reviewed in-part de novo*, 2005 WL 2333803 (N.D. Cal. Sept. 22, 2005) (rates of opposing counsel "are evidence of th[o]se attorneys' own skill, experience, and reputation, and say little about" the appropriate rate for the fee applicant).

## II. IPP COUNSEL FAIL TO REBUT THAT MUCH OF THE SETTLMENT FUND IS ATTRIBUTABLE TO FACTORS OTHER THAN IPP COUNSEL'S EFFORTS.

### A. As a matter of law, IPP Counsel cannot be awarded fees for portions of the settlement fund attributable to the efforts of others.

A common fund fee award is based in equity, and it is tied to the benefit the applicant provided to the fund. IPP Counsel can thus only be awarded fees based on the portion of the settlement fund attributable to their own efforts, as distinguished from the efforts of others, such as government agencies. Mr. St. John cited *In re Prudential Insurance Co. of America Sales Litigation*, 148 F.3d 283 (3d Cir. 1998), for that proposition. IPP Counsel argue for a more limited reading: "that courts *can* consider any assistance class counsel received from public agencies when awarding attorneys fees." Opp. at 12 n.27. IPP Counsel are not correct. As *In re Prudential* makes clear, "it is *essential* to separate out the benefits attributable to class counsel" before proceeding to the fee analysis. 148 F.3d at 342.

To wit: the *In re Prudential* class action was litigated parallel to with a Multi-State Life Insurance Task Force examination of Prudential's sales practices. *Id.* at 292. The Task Force compiled a report and recommended a remediation plan. *Id.* at 291. "Forty-three states and the District of Columbia [then] signed a Consent Order adopting the Task Force Plan . . . ." *Id.* at 291-92. After extensive discovery, the class action settled. *Id.* at 294 & n.12, 319 & n.64. That settlement included significant improvements over the Task Force's remediation plan. *Id.* at 296-97. The district court awarded attorney fees to class counsel based on the common fund doctrine, and it used the percentage-of-recovery method to set the amount of the award. *Id.* at 336. But the district court based its fee calculation on "the entire value of the settlement, including any portion which would have been provided to the class under the Task Force Plan." *Id.* at 330. That was error. *Id.* at 338.

As the Third Circuit explained, ""[n]umerous courts have concluded that the amount of the benefit conferred logically is the appropriate benchmark against which a reasonable common fund fee charge should be assessed." *Id.* (quoting Alba Conte, 1 *Attorney Fee Awards* § 2.05, at 37). The trial court was thus required to distinguish "benefits created by class counsel from the benefits created under the Task Force Plan." *Id.* Indeed, doing so "is especially crucial in consumer class actions where federal or state agencies . . . have conducted their own investigations of wrongdoing." *Id.*

The principle underlying *In re Prudential* was further elucidated in *In re Cendant Corp. PRIDES Litigation*, 243 F.3d 722 (3d Cir. 2001). In that case, the class action was filed after the defendant disclosed accounting irregularities, and it settled after less than nine months of litigation. 243 F.3d at 725. The Third Circuit found that the district court abused its discretion by awarding 5.7% of the common fund as fees, pointing to its warning in *In re Prudential* against overemphasizing class counsel's role in a recovery. *Id.* at 741. The court the presence of similar concerns because "Cendant's liability . . . had been conceded at the outset" of the controversy, and class counsel could not claim fees by freeriding on the efforts of others. *Id.*

Applied here, several factors inflated the settlement fund independent of the efforts of IPP Counsel: the antitrust violations were initially detected by regulators; Chunghwa applied to the DOJ amnesty program, and it consequently agreed to an early settlement and to provide cooperation; Samsung SDI pled guilty to violating the Sherman Act; and the European Commission issued detailed factual findings that were relevant, admissible, and likely preclusive against the defendants.[4]

**B.     At least $170 million of the settlement fund is not attributable to IPP Counsel.**

**1.     IPP Counsel do not contest that the CRT conspiracies were uncovered by regulators, or that they piggybacked on those governmental efforts.**

IPP Counsel do not contest that they piggybacked on the efforts public regulators who actually uncovered the CRT price-fixing conspiracies. Nor can they: the initial complaint cited foreign and DOJ investigations in support of its allegations. Complaint (D.E. 1) at ¶ 94.

**2.     IPP Counsel are judicially estopped from contesting the substantial and redounding value of the Chunghwa settlement.**

In addition to IPP Counsel's general free riding on the conspiracy identification efforts of the DOJ et al, IPP Counsel specifically benefitted from Chunghwa's participation in the DOJ amnesty program. IPP Counsel do not argue that Chunghwa's early settlement of IPPs' claims and its cooperation with IPPs were anything other than a direct consequence of Chunghwa's amnesty

---

[4]     As IPP Counsel concede, Opp. at 5, these facts may also impact the multifactor fee analysis. *See, e.g., In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 460 (D.P.R. 2011) (class counsel's risk was "minimal" where complaint was filed after DOJ announced investigation and various executives later pled guilty to violating the Sherman Act); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 766 (S.D. Ohio 2007) ("Lead Counsel faced less risk than in other securities cases because it piggybacked on the success of a prior SEC investigation.").

application. *Cf., e.g., Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177, 179 (3d Cir. 2006) (noting that the DOJ amnesty program requires the amnesty applicant to confess to illegal anticompetitive conduct); ACPERA, Pub. L. No. 108-237, 118 Stat. 661, 666-67 § 213 (June 22, 2004) (amnesty applicant's liability limited to actual damages only if applicant cooperates with civil plaintiffs).

IPP Counsel do, however, attempt to minimize the value of Chunghwa' early settlement. Opp. at 10-11. But in asking this Court to approve the early, low-dollar settlement, IPP Counsel represented that Chunghwa's "early cooperation proved ***invaluable***, as it gave Plaintiffs ***detailed information*** about the conspiratorial 'Glass Meetings,' including the identities of the participants, the time, place and agenda of such meetings, as well as the type of price-fixing agreements reached at such meetings." IPP Mot. Prelim. Approval (D.E. 884) at 1 (emphasis added). IPP Counsel also emphasized the redounding benefit of the Chunghwa settlement to the class—despite its relatively low cash value—as an "ice-breaker" that would drive other settlements. *Id.* Having successfully urged the Court to approve the Chunghwa settlement based on those arguments, IPP Counsel cannot simply reverse course now that the same arguments negatively impact their fee request. *See, e.g., Rissetto v. Plumbers and Steamfitters Local 343*, 94 F. 3d 597, 606 (9th Cir. 1996) ("[H]aving obtained a favorable settlement based on her assertion that she could not work, plaintiff was estopped from claiming that she was performing her job adequately.").

### 3.   IPP Counsel fail to rebut the significant value of Samsung SDI's guilty plea and the associated investigation by DOJ.

IPP Counsel also attempt to minimize the value of the DOJ criminal investigation, denigrating the government's efforts as "limited" and "narrow". Opp. at 9-10. But multiple executives—including executives from at least Chunghwa, Samsung SDI, and LG Philips Display—were indicted in connection with the CDT and CPT conspiracies. J. St. John Dec. Ex. 5 (D.E. 4108-5), Ex. 9 (D.E. 4108-9). And defendant Samsung SDI itself pled guilty. *Id.* Ex. 13 (D.E. 4108-13).

As IPP Counsel themselves explained to the Court, "[the] guilty plea establishes the existence of the conspiracy, but does not set boundaries confining the scope or time frame." IPP Mot. (D.E. 3553) (quoting *In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2014 WL 1746121, at *7 (E.D. Mich. Apr. 30, 2014)). Samsung SDI pled guilty in 2011, i.e., well before it settled. IPP

Counsel do not dispute that Samsung SDI's guilty plea is preclusive, or that it was valuable and admissible evidence against alleged co-conspirators. Nor do they argue that sophisticated litigants—like Samsung SDI and the other defendants—would not consider those facts in evaluating settlement. IPP Counsel nevertheless attempt to avoid the resulting impact to their fee request.

*First*, IPP Counsel claim that Samsung SDI "aggressively den[ied] both its participation in the alleged conspiracy and the existence of any U.S. effects, right through the eve of trial." Opp. at 9-10. IPP Counsel cite no documents in support of that claim, and the argument is meritless regardless of who made it. Not only did Samsung SDI plead guilty, it specifically admitted to participating "in a conspiracy . . . the primary purpose of which was to fix prices, reduce output, and allocate market shares of CDTs sold in the United States . . . ." J. St. John Dec. Ex. 10 (D.E. 4108-10) at ¶ 4. Samsung SDI further admitted to actually making sales of CDTs "directly affected by the conspiracy" to customers in the United States. *Id.* Indeed, Samsung SDI even admitted that "[a]cts in furtherance of th[e] conspiracy were carried out within the Northern District of California." *Id.*

*Second*, IPP Counsel suggest that the Samsung SDI guilty plea allowed other defendants to argue "that the failure of DOJ to prosecute them demonstrated their innocence . . . ." Opp. at 10. That argument too is meritless, regardless of who made it. Turning again to IPP Counsel's own words: "[A]s a general rule, evidence that criminal charges were not brought is inadmissible in a civil case arising out of the same events as the criminal charges." IPP Mot. Lim. (D.E. 3544) at 2 (quoting *Goffstein v. State Farm Fire & Casualty Co.*, 764 F.2d 522, 524 (8th Cir. 1985)).

### 4. The European Commission Decision was relevant, admissible, and likely preclusive.

*First*, IPP Counsel err in suggesting that the first relevant Commission document was the Summary Decision issued in 2013. The Commission adopted a Statement of Objections in late 2009. J. St. John Dec. Ex. 14 (D.E 4108-14) at C303/7. As Mr. St. John argued in his objection, at least one U.S. court found a Statement of Objections to be admissible evidence of liability. St. John Obj. at 11 (citing *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 159, 180 (D. Conn. 2009)). IPP Counsel offer no real argument to the contrary.

*Second*, IPP Counsel err in arguing that the Commission Decision was not relevant and was not available during this litigation. The Commission issued its Decision on December 5, 2012. The DAPs then moved to compel defendants to produce the Decision. In reviewing that motion, this Court expressly concluded that the Decision was "relevant because . . . plaintiffs' allegations in this case have always concerned the international character of the alleged CRT conspiracy," but it declined to compel production for reasons of international comity. Order (D.E. 2463) at 5, 7. When the DAPs renewed their motion in late 2014, this Court found that "the Decision . . . remains important to this litigation" and, despite the "extensive discovery [that] has taken place to date, the factual detail contained in the Decision is likely to be of significant value" to plaintiffs. Order (D.E. 3133) at 5. Nevertheless, the Court again declined to compel production for reasons of international comity. *Id.* at 6. In doing so, the Court expressly noted that the production the Decision in the *Vichi* litigation suggested means of accessing the Decision that would avoid concerns with international comity. *Id.* at 7. That IPP Counsel failed to obtain the Decision prior to its public release reflects more on their judgment and skills as litigators than on its lack of value to the class.

*Third*, IPP Counsel are simply wrong in claiming that "[t]he EC findings addressed only the cartel's activities . . . in Europe." The Commission repeatedly stated that the conspiracies were global in nature, and *therefore* impacted Europe. *E.g.* J. St. John Dec. Ex. 16 at ¶¶ 259, 271, 272, 302, 307, 314. Moreover, the Commission made multiple references to agreements and price impacts in the American market. For example, the European Commission stated that

> On 27 October 1999, Chunghwa, SDI, LGE, [CPT producers] met in Thailand. The participants *agreed* on the 14" and 20" CPT prices for five of their customers and *agreed* to maintain the current prices for the first quarter 2000. Furthermore, they discussed Europe and were happy to report of a "price-up trend in European & *American market*" thanks to capacity reduction in Asia".

*Id.* at ¶ 290 (emphasis added; bracketed text in original); *see also, e.g., id.* at ¶¶ 268, 388, 439. And the global nature and impact of the conspiracies was actually litigated. *See id.* at ¶¶ 259, 262, 268-69, 471-90. IPP Counsel's arguments to the contrary are either disingenuous or reflect a disturbing lack of familiarity with material that this Court found relevant and important.

*Fourth*, even if the Commission Decision was not available before the close of discovery, it was available—with preclusive or at least evidentiary value—*at the time most defendants settled*

in 2015. IPP Counsel admit that the Commission Decision was publicly available by December 23, 2014. Opp. at 13. At that point, IPP Counsel and the defendants knew the substance of the Decision, and that a Delaware court had found parts of the Decision to be preclusive against Philips. Later settlements by sophisticated litigants—Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, and Thomson—presumably took those facts into account. Indeed, it is noteworthy that after over 7 years of litigation, Philips agreed to settle 34 days after the Commission Decision became publicly available, and it did so for **6.5 times** its earlier settlement in the supposedly easier DPP action.[5]

### C.    IPP Counsel offer no real explanation for the vastly disproportionate size of the Samsung and Philips settlements.

In his objection, Mr. St. John pointed to the disproportionate size of the Samsung SDI and Philips settlements vis-à-vis their market shares as suggesting that the size of those settlements was attributable to factors other than IPP Counsel, i.e., Samsung SDI's guilty plea and the European Commission together with the preclusiveness holding in *Vichi*. In support, Mr. St. John attached two documents showing CRT market share data from the relevant time frame. One document was a report by the Oregon Department of Environmental Quality. J. St. John Dec. Ex. 18 (D.E. 4018-18). IPP Counsel offer no challenge to that document. The other document was a presentation titled "Royal Philips Electronics Annual Results 2000." J. St. John Dec. Ex. 17 (D.E. 4108-17). As the Court can verify, that document was obtained directly from Philips. J. St. John Dec. (D.E. 4108) at ¶ 23 (internet link). IPP Counsel nevertheless denigrate the Philips presentation as "questionable" and "suspect" without further explanation. Opp. at 14 n.31.

The Oregon report states that as of 1997, Philips was responsible for 5-10% of the CRT market and Samsung SDI was responsible for 10-15% of the CRT market. J. St. John Dec. Ex. 18

---

[5]      IPP Counsel try to avoid the impact of the Commission Decision by arguing that "because EC appeals remained pending at the time of the IPP settlements, it is unlikely that any EC findings could have been admitted at trial and even less likely that they would have been given any preclusive effect." Opp. at 13-14. They cite no law for either point, and the latter is simply wrong: the preclusive effect of a judgment is determined as of the time of the later action, regardless of whether any appeal is possible. *E.g. Ruyle v. Continental Oil Co.*, 44 F.3d 837, 846 (10th Cir. 1994). More to the point, the risk the Court would find preclusion or admit the Commission Decision as substantive evidence was sufficiently high that sophisticated litigants—such as defendants—would have taken it into account in entering a settlement.

(D.E. 4018-18) at 8-9 & Table CRT8. The Philips presentation similarly indicates that as of 2001, Philips was responsible for 13% of the CRT market and Samsung SDI was responsible for 15% of the CRT market. *Id.* Ex. 17 (D.E. 4108-17) at 13. But the Philips and Samsung SDI settlements represent 69.3% of the total IPP settlement fund, i.e., a discrepancy of over 40% compared to their market shares as shown in the Oregon report and the Philips presentation. Moreover, those settlements appear to be at a substantial premium vis-à-vis the settlements in the supposedly easier DPP action: five of the IPP settlements were for multiples of $1.0 - 2.2$ over the corresponding DPP settlements, and one was for a multiple of 4.0. In contrast, the Philips IPP settlement was **6.5** times its DPP settlement, and the Samsung SDI IPP settlement was **6.8** times its DPP settlement.

| | DIRECT PURCHASERS | | INDIRECT PURCHASERS | | | |
|---|---|---|---|---|---|---|
| DEFENDANT | DATE | AMOUNT | DATE | AMOUNT | % | M |
| Chunghwa | 04/08/2009 | $10,000,000 | 04/08/2009 | $10,000,000 | 1.7 | 1.0 |
| Philips | 02/01/2012 | $27,000,000 | 01/26/2015 | $175,000,000 | 30.3 | 6.5 |
| Panasonic | 06/04/2012 | $17,500,000 | 01/28/2015 | $70,000,000 | 12.1 | 4.0 |
| LG | 08/13/2012 | $25,000,000 | 05/28/2013 | $25,000,000 | 4.3 | 1.0 |
| Toshiba | 02/06/2013 | $13,500,000 | 03/06/2015 | $30,000,000 | 5.2 | 2.2 |
| Hitachi | 11/29/2013 | $13,450,000 | 02/19/2015 | $28,000,000 | 4.8 | 2.1 |
| Samsung SDI | 02/11/2014 | $33,000,000 | 04/01/2015 | $225,000,000 | 39.0 | 6.8 |
| Thomson | 02/06/2015 | $9,750,000 | 06/10/2015 | $13,750,000 | 2.4 | 1.4 |
| TOTAL | | $149,200,000 | | $576,750,000 | | |

    In response to this evidence, IPP Counsel provide only the declaration of IPP Lead Counsel Mario Alioto that "[b]ased upon [his] review, the Defendants' market shares changed fundamentally in the early 2000's . . . ." But a declaration "[b]ased upon [Mr. Alioto's] review" of unidentified sources is not evidence based on Mr. Alioto's personal knowledge. It is no evidence at all. *See Local Union No. 490 v. Kirkhill Rubber Co.*, 367 F.2d 956, 958 (9th Cir. 1966) (citing *Sartor v. Ark. Nat. Gas Corp.*, 321 U.S. 620, 624-25 (1944)). IPP Counsel doubtless prepared a detailed year-by-year analysis of market share, total market volume, and class damages. *See* Opp. at 7. That IPP Counsel failed to

1  provide that analysis—or even attach the sources Mr. Alioto reviewed—rather than dubious cherry-

2  picked numbers does have evidentiary value in-of-itself.[6]

3      Absent explanation, wildly differing settlements raise doubt as to the fairness of the smaller

4  settlements. *See In re Corrugated Container Antitrust Litig.*, 643 F. 2d 195, 218 (5th Cir. 1981). IPP

5  Counsel try to avoid that result by averring that "unlike some of the other Defendants, IPPs had

6  strong evidence of [Samsung SDI's and Philips's] conspiratorial activities here in the U.S." Alioto

7  Dec. at ¶ 4. But that proves too much: as part of its plea agreement, Samsung SDI admitted that

8  "acts in furtherance of [the CDT] conspiracy were carried out within the [U.S.]." J. St. John Dec. Ex.

9  10 (D.E. 4108-10) at ¶ 4(e). And the Commission Decision makes clear that Samsung SDI's and

10 Philips's unlawful activities expressly targeted the United States. The points to which IPP Counsel

11 attribute value were thus established by the efforts of the DOJ, the Commission, and—less

12 directly—the *Vichi* plaintiff. If the Samsung SDI and Philips settlements were not greater based on

13 these facts, that too would raise fairness issues.

14 **III.    IPP COUNSEL FAIL TO ESTABLISH THAT THEIR REQUEST FOR OVER
   $192 MILLION IN FEES IS REASONABLE.**

15      **A.    IPP Counsel improperly tie their request to the entirety of the $576 million
   megafund.**

16

17      IPP Counsel do not dispute that their fee request is tied to the entirety of the $576 million

18 settlement fund. But IPP Counsel's role in obtaining the $10 million Chunghwa settlement was

19 limited to the ministerial effort of filing a complaint and settling claims for which Chunghwa had

20 already admitted liability. The record also suggests that at least 40% of the Philips and Samsung SDI

21 settlements, i.e., $160 million, is attributable to the efforts of the DOJ, the European Commission,

22 _____

23      [6]    The risk of relying on a declaration by counsel to establish contested facts is
   illustrated by the Special Master's Opinion on certification, where he specifically relied on IPP
24 Counsel' declaration to find that "class members can identify the tube manufacturer . . . by
   referencing the product model number printed on the outside of the unit" or by "by removing the
25 screws from the back of the product and viewing the name of the tube maker or tube number . . . ."
   R&R on Cert. (D.E. 1742) at 14-15. Mr. St. John—an electrical engineer with over 31 years of
26 relevant experience—testified that IPP Counsel's arguments on these points were misleading given
   the information in repair manuals, the warnings in consumer manuals and on televisions themselves,
27 and the substantial risk of shock that opening a television may entail even after it is unplugged. J. St.
   John Dec II Ex. 2 at 87:1-89:24; *see also id.* at 6:20-7:9 (background); 80:11-86:22 (identification of
28 warnings); 89:25-97:8 (background and opinion); J. St. John Dec. II Exs. 8-14.

and the *Vichi* plaintiff. Consistent with *In re Prudential* and *Cendant PRIDES*, IPP Counsel can only claim a *de minimis* portion of those portions of the settlement fund. That the Chunghwa settlement yielded "invaluable" and redounding benefits to the class through cooperation and icebreaking implicates a significant negative impact on the entirety of IPP Counsel's fee request.

### B.   IPP Counsel fail to rebut the significant evidence of lodestar inflation.

IPP Counsel attempt to justify having **49** law firms dabble in this litigation by emphasizing that many of the firms "were the private lawyers for the more than 40 plaintiffs." Opp. at 16 n. 36. Consistent with IPP Counsels' statement, very high percentages of the work by firms with small lodestars appears to have been limited to providing services to individual plaintiffs. But such work on behalf of individual plaintiffs does not benefit the class, and it is not compensable. *E.g., In re Auction Houses Antitrust Litig.,* 2001 WL 210697, at *4 (S.D.N.Y. Feb. 26, 2001) ("If individual class members wished to have the services of individual counsel in addition to class counsel, they should bear the expense themselves."). The class similarly should not be charged for IPP Lead Counsel's inefficiently doling out to such firms *de minimis* levels of substantive work as a back-scratching exercise. The total lodestar for firms billing less than $200 thousand is $1.54 million. That amount should be deducted in its entirety from IPP Counsels' fee request.

Seeking to deflect attention from having **17** law firms claim lodestars of over $1 million, IPP Counsel suggest that objectors cannot refute "declarations describing in detail the work performed." Opp. at 12. But the vast majority of those declarations are anything but "detailed," and are instead replete with vague references to "participating," "coordinating," and "reviewing" vaguely described tasks. In cases where detail can be teased out, duplication and padding are apparent:

- Staffing the litigation with at least **36** lawyers claiming rates of $700 per hour or more.
- Having **3** entirely new firms join the litigation in late 2014, with a combined lodestar of over $3.8 million. *Cf., e.g.,* Stewart Dec. (D.E. 4073-22) at ¶ 4 (fees include work for "reviewing discovery and pre-trial materials sufficiently to familiarize ourselves . . . .").[7]
- Having a senior attorney second chair 10 depositions at up to $600 per hour. *See* Cooper Dec. (D.E. 4073-6) at ¶ 6C & Ex. 2.

---

[7]   IPP Counsel's suggestion that additional, more experienced counsel were necessary to "demonstrate to the Defendants that IPPs were ready to go to trial," Opp. at 23, raises significant questions as to the quality of IPP Counsel's representation of the class and significantly undermines the support for their claim of white-shoe fees.

1      Such examples are particularly troubling given the known penchant of certain IPP Counsel

2   to pad their bills. *See In re Citigroup Sec. Litig.*, 965 F. Supp. 2d 369, 393 (S.D.N.Y. 2013) (criticizing

3   Kirby McInerney LLP's fee request); *Thayer v. Wells Fargo Bank*, 92 Cal. App. 4th 819, 843-44 (2001)

4   ("This is not an isolated example of the manner in which [Sherman] Kassof and [Mario] Alioto not

5   only duplicated the work of counsel for plaintiffs in other cases but duplicated each other's work.").

6   The Court need not, however, take a gimlet-eyed view of IPP Counsel's fee request. An additional

7   across-the-board cut of at least 10% is appropriate. *See, e.g., In re Citigroup*, 965 F. Supp. 2d at 393.

8

**C.    The Supplemental Declaration of Richard Pearl makes clear that he is not**
9        **qualified to opine on the reasonableness of expending 183,000 hours.**

10      The supplemental declaration of IPP Counsels' proffered fee expert—Richard Pearl—

11  should not be considered. *In re Mercury Interactive*, 618 F.3d at 994-95. Nevertheless, Mr. Pearl's

12  response to having his qualifications challenged amply demonstrates his lack of experience to opine

13  on the reasonableness of expending 183,000 hours on this litigation. Mr. Pearl points to a single sex-

14  discrimination case ***thirty-four years ago*** as his actual experience with large litigations. Pearl Dec. II

15  at ¶ 6. But in the very next paragraph, Mr. Pearl dismisses the relevance of two antitrust class actions

16  cited by Mr. St. John because they were not indirect purchaser antitrust actions specifically involving

17  *inter alia*, multiple foreign defendants and foreign language issues. *Id.* at ¶ 7. The relevance of Mr.

18  Pearl's limited—and dated—experience thus fails by his own logic. All that remains is Mr. Pearl's

19  self-licking ice cream cone. In short, Mr. Pearl has no qualification to opine on the reasonableness of

20  expending any particular amount of time in this case.

21      Seeking to salvage his declaration, Mr. Pearl avers that his "qualification to testify as an

22  expert on the reasonableness of attorneys' fees has never been rejected." Pearl Dec. II at ¶ 3. Mr.

23  Pearl's testimony has, however, been found "irrelevant" because he made the basic mistake of

24  relying on rates for non-comparable attorneys from the wrong locality. *Gauchat-Hargis v. Forrest River,*

25  *Inc.*, 2013 WL 4828594, at *9 (E.D. Cal. Sept. 9, 2013). Needless to say, the court cut the $700 hourly

26  rate advocated by Mr. Pearl to $300. *Id.* at *10. Nor was that the first time Mr. Pearl's testimony was

27  discredited. *Antoninetti v. Chipotle Mex. Grill, Inc.*, 2012 WL 2923310, at *6 (S.D. Cal. July 17, 2012)

28  (cutting requested rate from $620 to $375: Mr. Pearl's declaration does not "introduce evidence

supporting Plaintiff's contention that the requested rates are the prevailing rates in San Diego for ADA and CDPA lawsuits brought by lawyers of similar skill and experience."). Mr. Pearl's insistence that contract attorneys with no substantive legal experience are comparable to mid-level associates at white shoe firms makes clear that he is again repeating the same basic error.

### D.   No multiplier is warranted

IPP Counsel mistakenly proceed from the assumption that they are entitled to a multiplier.

*First*, there is no real dispute that settlement was entirely predictable. *See* Opp. at 23 n.57 ("Antitrust cases rarely go to trial."). And the risk of no recovery was minimal given the investigations cited in the complaint. *See In re Auction Houses*, 2001 WL 210697, at *3 (awarding no multiplier: "*The New York* Times broke the story that Christies had disclosed to the [DOJ] that it had engaged with Sotheby's in the conspiracy . . . . From that moment, there was no risk of non-recovery on the plaintiffs' side of this controversy. The first class action was filed the following day. * * * * This was . . . like finding a pot of gold in the middle of the sidewalk. * * * * [R]esolution, even at a high price, was almost inevitable."). That remains true despite any issues with damages. *See id.*

*Second*, even if the Court concludes a risk multiplier is warranted, not all IPP Counsel should receive that multiplier. IPP Counsel that entered the litigation after the 2009 Chunghwa settlement had a very different risk profile than those who started the litigation in 2007. *See* Part II, *supra*. The risk was further lessened by Samsung SDI's guilty plea and the European Commission Decision.

*Third*, the results are not particularly exceptional. IPP Counsel don't dispute that the size of the settlements were largely driven by the fact that one of the products in question—TVs—were found in 98% of American homes throughout the class period, and another product—computer monitors—was rapidly being acquired. Nor do IPP Counsel dispute that defendants' exposure to statutory penalties in Mississippi alone is equivalent to over 80% of the entire megafund settlement.

*Fourth*, IPP Counsel do not dispute that their claimed hourly rates fall squarely within the range of fees of white shoe law firms for whom exceptional results in highly complex litigation are the expectation. IPP Counsel proffer the rates of such firms as the relevant comparison. That lawyers who are extraordinary even by those standards may command even higher fees than IPP

1 Counsel are seeking does not change that fact. Thus, even if the Court concludes that the results in

2 this case are exceptional, that result is already incorporated into IPP Counsel's claimed fees.

3 **IV.   IPP COUNSEL'S REMAINING ARGUMENTS ARE MERITLESS**

4 After seeking leave for an overlength brief, IPP Counsel spend pages engaging in irrelevant

5 *ad hominem* attacks against objectors and their counsel. *Cf. True v. Am. Honda Mot. Co.*, 749 F. Supp.

6 2d 1052, 1079 (C.D. Cal. 2010) ("Plaintiffs attack many of the objectors counsel because they have

7 represented objectors in other actions in the past. This has no greater bearing on the merits of the

8 objections raised than a plaintiff's counsel's experience in filing class action suits speaks to the merits

9 of claims he brings."). And in the case of Mr. St. John's counsel, the attack is demonstrably false.[8]

10 IPP Counsel also argue that the limited number of objections suggests a positive response

11 from the class. But IPP Counsel's claim administrator avers that the number of claims made by class

12 members—or lack thereof—does not reflect on the adequacy of the notice program because "class

13 members who receive notice are not obliged to file a claim; they may elect to prioritize their time

14 and attention elsewhere." Fisher Dec. ISO Reply at ¶ 5(a). Indeed, Mr. Fisher explained that "[e]ven

15 large and legally sophisticated financial institutions often fail to submit claims." *Id.* If a suboptimal

16 number of *claims* is justifiable due to class members electing to "prioritize their time and attention

17 elsewhere," the same analysis applies in spades to the greater burden of filing an objection.[9]

---

19 [8]     IPP Counsel assert that "[s]even of the objections were filed by 'serial' or 'professional' class-action objectors who file boilerplate objections and subsequent appeals in order to extract a pay-off to drop appeals," and "[attorney] . . . St. John routinely represent[s] objectors challenging class action settlements by filing canned objections . . . ." Opp. at 2; *see also* Alioto Supp. Dec. at ¶ 3 & n.2. Objector Douglas St. John's lead counsel—Joseph St. John—practiced at Covington & Burling LLP until June, and prior to that he served as a law clerk for the U.S. Court of Appeals for the Federal Circuit. *See* J. St. John Supp. Dec. at ¶ 6. Joseph St. John has *never* previously served as counsel in connection with a class action objection, and he has *never* filed an objection on his own behalf. *Id.* at ¶¶ 7-8; *see also* Valdez Dec. at ¶¶ 6-9. While IPP Counsel's *ad hominem* attack is irrelevant to the issues before the Court, the sloppiness and factual inaccuracy of their assertions does reflect on the quality of IPP Counsel's legal services, the overall credibility of declarant Mario Alioto, and the related question of the reasonableness of their claimed hourly rates.

26 [9]     Subsequent to the filing of Mr. St. John's objection, the Court suggested that objectors were on notice of potential liability for part of the Special Master's compensation. *See* Order (D.E. 4206). Mr. St. John respectfully disagrees. But to the extent the Court concludes objectors had such notice, the fact that multiple class members objected—thereby risking liability for several thousand dollars in special master fees over far smaller claims—indicates an overwhelmingly negative response from the class.

1    Dated: December 9, 2015                    Respectfully submitted,

2                                               /s/ Joseph Scott St. John

3                                               ANDREA VALDEZ (Cal. Bar No. 239082)
                                                530 S. Lake Avenue, No. 574
4                                               Pasadena, CA 91101
                                                Tel: (626) 817-6547
5                                               andrea.valdez.esq@gmail.com

6                                               JOSEPH SCOTT ST. JOHN (*pro hac vice*)
                                                514 Mockingbird Drive
7                                               Long Beach, MS 39560
                                                Tel: 410-212-3475
8                                               jscottstjohnpublic@gmail.com

9                                               *Attorneys for Objector Douglas W. St. John*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28