JOSEF D. COOPER (CASB No. 53015)
TRACY R. KIRKHAM (CASB No. 69912)
JOHN D. BOGDANOV (CASB No. 215830)
COOPER & KIRKHAM, P.C.
357 Tehama Street, Second Floor
San Francisco, CA  94103
Telephone:  (415) 788-3030
Facsimile:  (415) 882-7040
jdc@coopkirk.com
trk@coopkirk.com
jdb@coopkirk.com

FRANCIS O. SCARPULLA (CASB No. 41059)
PATRICK B. CLAYTON (CASB No. 240191)
LAW OFFICES OF FRANCIS O. SCARPULLA
456 Montgomery Street, 17th Floor
San Francisco, CA  94111
Telephone:  (415) 788-7210
Facsimile:  (415) 788-0706
fos@scarpullalaw.com
pbc@scarpullalaw.com

*Counsel for Indirect-Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:  CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION. | **Master File No. 3:07-cv-5944 JST**<br><br>**MDL No. 1917** |
| This Document Relates to:<br><br>All Indirect-Purchaser Actions. | **REPLY IN SUPPORT OF OBJECTIONS TO INDIRECT-PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENTS WITH PHILIPS, PANASONIC, HITACHI, TOSHIBA, SAMSUNG SDI, TECHNICOLOR, AND TECHNOLOGIES DISPLAYS AMERICAS DEFENDANTS**<br><br>Date:          March 15, 2016<br>Time:          2:00 p.m.<br>Judge:         The Hon. Jon S. Tigar<br>Courtroom:  9, 19th Floor<br><br>Before:  Special Master Martin Quinn |

# TABLE OF CONTENTS

Page No.

I.  THE UNDERSIGNED ARE CLASS COUNSEL WITH BOTH "STANDING" AND AN OBLIGATION TO RAISE SETTLEMENT APPROVAL ISSUES WITH THE COURT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  THE FAIRNESS AND ADEQUACY OF THE SETTLEMENT FOR THE NATIONAL CLASS TURNS ON ACCEPTANCE OF LEAD COUNSEL'S ERRONEOUS ASSERTION THAT THEIR CLAIMS HAVE NO VALUE UNLESS THEY ARE ALSO MEMBERS OF ONE OF THE STATE DAMAGE CLASSES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

A.  The Absence of a Record Showing that the Interests of All Members of the Proposed Nationwide Class were Represented in the Settlement Process and the Lack of Evidence Supporting the Reasonableness of Providing Nothing to Certain Class Members Precludes the Approval of the Proposed Settlements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

B.  The Proposed Nationwide Class's Claims Arising Under Section of the Sherman Act are Both Viable and Valuable. . . . . . . . . . . . . . . . . . . . . . . . . 11

   1.  Claims for Injunctive Relief. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

   2.  Claims for Equitable Monetary Relief . . . . . . . . . . . . . . . . . . . . . . . 12

   3.  Claims for Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

C.  Lead Counsel Has Not Made a Record Upon Which The Special Master Could Conclude That The State Law Damage Claims Being Released By The Nationwide Class Members Who Are Not Being Compensated Are Worthless. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

III.  THE PROPOSED PLAN OF DISTRIBUTION FAILS TO ACCOUNT FOR TERMS AND CONDITIONS OF THE CHUNGHWA SETTLEMENT AND CANNOT BE APPROVED FOR THIS REASON AS WELL . . . . . . . . . . . . . . . . 24

IV.  THE NOTICE TO THE CLASSES APPEARS TO HAVE BEEN FLAWED AND LEAD COUNSEL HAS NOT DEMONSTRATED OTHERWISE . . . . . . . . 27

V.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                                    Page No.

*Basic Inc. v. Levinson,*
        485 U.S. 224 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*Ehrheart v. Verizon Wireless,*
        609 F.3d 590 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*FTC v. Cephalon, Inc.,* No. 2:08-CV-2141, 2015 U.S. Dist. LEXIS 49333,
        2015 WL 1724597, (E.D. Pa. Apr. 15, 2015) . . . . . . . . . . . . . . . . . . . . . . . 14

*FTC v. Cephalon, Inc.,*
        No. 2:08- CV-2141 (E.D. Pa. May 28, 2015) . . . . . . . . . . . . . . . . . . . . . . . . 14

*FTC v. Cephalon, Inc.,*
        No. 2:08-CV-2141 (E.D. Pa. June 17, 2015) . . . . . . . . . . . . . . . . . . . . . . . . 14

*Gerlinger v. Amazon.com Inc.,*
        526 F.3d 1253 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*Greenfield v. Villager Indus., Inc.,*
        483 F.2d 824 (3d Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Halliburton Co. v. Erica P. John Fund, Inc.,*
        134 S. Ct. 2398, 2407 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Hammes v. AAMCO Transmissions, Inc.,*
        33 F.3d 774, 778 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.,*
        392 U.S. 481 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Hansberry v. Lee,*
        311 U.S. 32 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Illinois Brick Co. v. Illinois,*
        431 U.S. 720 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*In re Community. Bank of N. Va. & Guaranty Nat'l Bank of Tallahassee*
        *Second Mortg. Loan Litig.,*
        622 F.3d 275 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 15

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation,*
        Master File No. M-02-1486-PJH (MDL No. 148),
        2013 U.S. Dist. LEXIS 188116 (N.D. Cal. January 8, 2013) . . . . . . . . . . . . *passim*

*In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
        55 F.3d 768 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 15

*In re Literary Works in Elec. Databases Copyright Litigation,*
        654 F.3d 242 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Page No.

*In re Lower Lake Erie Iron Ore Antitrust Litig.*,
     998 F.2d 1144 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*In re Pet Food Products Liability Litigation*,
     629 F.3d 333 (3d Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5, 13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
     2013 U.S. Dist. LEXIS 49885, at *56 (N.D. Cal. Apr. 3, 2013) . . . . . . . . . . . . 13, 21, 23

*Kansas v. Nebraska*,
     135 S. Ct. 1042 (2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Kaufman v. Am. Express Travel Related Services, Inc.*,
     No. 07-C-1707 (N.D. Ill. Aug. 8, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Oregon v. AU Optronics Corp. (In re TFT-LCD (Flat Panel) Antitrust Litig.)*,
     MDL No. 1827, No. C 10-4346 SI, 2011 U.S. Dist. LEXIS 76562
     (N.D. Cal. July 11, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Palmyra Park Hosp. Inc. v. Phoebe Putney Memorial Hosp.*,
     604 F.3d 1291 (11th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

*Phillips Petroleum Co. v. Shutts*,
     472 U.S. 797 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Porter v. Warner Holding Co.*,
     328 U.S. 395 (1946)*Reynolds v. Beneficial Nat'l Bank*,
     288 F.3d 277 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Rodriguez v. West Publishing Corp.*,
     2007 U.S. Dist. LEXIS 74767, at *43 (C.D. Cal. Sept. 10, 2007) . . . . . . . . . . . . . . .5

*Rodriguez v. West Publishing Corp.*,
     563 F.3d 948 (9th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2, 3

*Staton v. Boeing Co.*,
     327 F.3d 938 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Sullivan v. DB Investments, Inc.*,
     667 F.3d 273 (3d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . *passim*

*United States v. Morgan Stanley*,
     881 F. Supp. 2d 563 (S.D.N.Y. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*United States v. Paramount Pictures, Inc.*,
     334 U.S. 131 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*United States v. United Shoe Machinery Corp.*,
     391 U.S. 244 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

Page No.

*United States of America v. Keyspan Corporation,*
    763 F. Supp. 2d 633 (S.D.N.Y. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,*
    396 F.3d 96 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Walter v. Hughes Communications, Inc.,*
    No. 09-2136-SC, 2011 WL 2650711 (N.D. Cal. July 6, 2011) . . . . . . . . . . . . . . . . . .28

Federal Statutes

15 U.S.C. §1, Sherman Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Class Action Fairness Act of 2005 (CAFA), 28 U.S.C. §§ 1332(d)(3), 1453,
    and 1711–1715, Pub. L. No. 109-2, 119 Stat. 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Federal Rules

Federal Rules of Civil Procedure, Rule 11(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Federal Rules of Civil Procedure, Rule 23(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Federal Rules of Civil Procedure, Rule 23(g)(1)(A)(i). . . . . . . . . . . . . . . . . . . . . . . . 15

2003 Advisory Committee Notes, Fed. R. Civ. P. 23(g) . . . . . . . . . . . . . . . . . . . . . . . 3

Other Authorities

*Antitrust and Unfair Competition Law Section,* The State Bar of California,
    California Antitrust and Unfair Competition Law, Revised Edition
    (Cheryl Lee Johnson, ed., Matthew Bender & Co. 2014) . . . . . . . . . . . . . . . . . . . . . 13

*Antitrust Law,* Areeda & Hovenkamp,
    ¶ 346k, at 189 (3d ed. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Illinois Brick: A Look Back and a Look Ahead,* Edward D. Cavanagh,
    17 LOY. CONSUMER L. REV. 1, 30 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

"Judges' Class Action Notice and Claims Process Checklist and Plain Language
    Guide" ("Notice and Claims Process Checklist"), Federal Judicial Center (2010) . .28

*Manual for Complex Litigation,* Fourth
    § 21.641 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Newberg on Class Actions,* Alba Conte and Herbert B. Newberg, (4th ed. 2002)
    § 11:65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

"Procedural Guidance for Class Action Settlements,"
    http://www.cand.uscourts.gov/ClassActionSettlementGuidance . . . . . . . . . . . . . . . . . *passim*

Page No.

*Pro-Sys Consultants Ltd v. Microsoft Corporation* [2013]
    3 SCR 477, 2013 SCC 57 (CanLII) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .19

*Rebuilding Illinois Brick: A Functionalist Approach to the Indirect Purchaser Rule,*
    Barak D. Richman & Christopher R. Murray, 81 S. CAL. L. REV. 69 (2007) . . 20

*Statement of the Commission, Withdrawal of the Commission's Policy Statement*
    *on Monetary Equitable Remedies in Competition Cases,* (Jul. 31, 2012) . . . . . . .14

www.oxforddictionaries.com/us/definition/american_english/doctrine . . . . . . . . . . . . . . 16

1

## I.  THE UNDERSIGNED ARE CLASS COUNSEL WITH BOTH "STANDING" AND AN OBLIGATION TO RAISE SETTLEMENT APPROVAL ISSUES WITH THE COURT

2

3      Lead Counsel has responded to the objections raised by Class Counsel Francis O.

4  Scarpulla and Josef D. Cooper with several arguments that have nothing to do with the merits of

5  the settlements.  These arguments are that: (1) the undersigned's "objections must be stricken for

6  lack of standing because they were not submitted on behalf of any class member;"[1] (2) "these

7  objections . . . are suspicious" because they were submitted only after "IPP Counsel's Audit

8  Committee reviewed their timesheets and made cuts to their lodestars;"[2] and (3) these objections

9  were not raised prior to preliminary approval of the current settlements.[3]

10      First, as to "standing," Lead Counsel's own statement answers this argument, when he

11  concedes that "[a]s class counsel, the Insider Objectors have fiduciary duty to act in the best

12  interests of the class."[4]  That is absolutely true, and this duty alone is sufficient to convey

13  "standing" on the undersigned to speak out and direct the Special Master's attention to aspects of

14  the proposed settlements, plan of distribution and notice program that are or may be inadequate,

15  unreasonable or unfair.  The undersigned are signatories to the operative Fourth Amended

16  Complaint (Dkt. No. 1526).  They represent named plaintiffs in this litigation.  The fact that they

17  did not specifically identify their clients in their objections is irrelevant.[5]  It is well settled that

18  _____

19  [1]  "Indirect Purchaser Plaintiffs' Motion for Final Approval of Settlements with the Philips, Panasonic,
   Hitachi, Toshiba, Samsung SDI, Technicolor, and Technologies Displays Americas Defendants;

20  Memorandum in Support Thereof," dated November 19, 2015; Memorandum of Points and Authorities, at
   page 2 (hereinafter cited as "Lead Counsel's Memo at ___").  *See also*, Lead Counsel's Memo at 27

21  ("Messers. Cooper and Scarpulla have no standing to object to the Proposed Settlements.  Only members of
   the class may object to a class action settlement. [citation omitted] Their objections are not filed on behalf

22  of any class member and they do not claim to be class members themselves.")

23  [2]  *Id. See also*, Lead Counsel's Memo at 24-25 ("[T]hree [objections] are driven by disgruntled attorneys in
   this litigation (the "**Insider Objectors**") who refused Lead Counsel's request that they reduce their lodestar

24  following the Audit Committee's review of their daily time records.") (emphasis in original), and at 28
   ("The timing and motivations behind the Insider Objectors' objections are highly suspect . . . these

25  objectors only voiced their concerns after the Audit Committee made cuts to their lodestars.")

26  [3]  *Id.* at 2 and 28.

27  [4]  Lead Counsel's Memo at 29.

   [5]  The standing requirements and procedures for absent class member objectors and their counsel are

28  _____

REPLY BRIEF IN SUPPORT OF OBJECTIONS TO      - 1 -      Master File No. 3:07-cv5944 JST
FINAL APPROVAL OF SETTLEMENTS                                    MDL 1917

1   "class counsel ultimately owe their fiduciary responsibility to the class as a whole and are

2   therefore not bound by the views of the named plaintiffs regarding any settlement." *Staton v.*

3   *Boeing Co.*, 327 F.3d 938, 960 (9th Cir. 2003).  *See Rodriguez v. West Publishing Corp.*, 2007

4   U.S. Dist. LEXIS 74767, at *43 (C.D. Cal. Sept. 10, 2007), *aff'd in part and rev'd on other*

5   *grounds by Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009) (in exercising its

6   fiduciary duty, class counsel must "represent the entire class as it believes appropriate"); *see also*

7   *id.* (quoting Alba Conte and Herbert B. Newberg, *Newberg on Class Actions* § 11:65 (4th ed.

8   2002)) ("general rule is that the named plaintiff and counsel bringing the action stand as

9   fiduciaries for the entire class, commencing with the filing of a class complaint"); *Greenfield v.*

10  *Villager Indus., Inc.*, 483 F.2d 824, 832 (3d Cir. 1973) ("class action counsel possess, in a very

11  real sense, fiduciary obligations to those not before the court" and "[I]t is counsel for the class

12  representatives, and not the named parties, who direct and manage these [class] actions.  Every

13  experienced federal judge knows that any statements to the contrary is sheer sophistry").

14        Second, as to the undersigned's objections being motivated by Audit Committee cuts to

15  their lodestars, Lead Counsel never questioned a minute of the time submitted by Cooper &

16  Kirkham, P.C.  It is true that Mr. Scarpulla had a dispute with Lead Counsel regarding submission

17  of his time records relating his attempt, at Special Master Vaughn Walker's request, to resolve

18  Lead Counsel's dispute with the California Attorney General.[6]  However, as Lead Counsel

19  affirms at paragraph 35 of the declaration he submitted in support of the requested aggregate fee

20  award: "[t]he Audit Committee did not make any cuts to Mr. Cooper's firm's lodestar."[7]  Indeed,

21

22

_____

23  designed to ensure that objections are received only from persons and entities who have a justiciable "case or controversy," i.e., they qualify for class membership and have not exercised their right to exclude themselves.  Not only is this a jurisdictional requirement, it is necessary to ensure that objectors share a

24  common interest with the class or classes which they purport to benefit by raising their objections. Obviously, this is not relevant to counsel who already have a fiduciary duty to the class.

25  [6] *See,* Special Master's Report and Recommendation re Settlement, Dkt. 3200.

26  [7]  Declaration of Mario N. Alioto in Support of Indirect Purchaser Plaintiffs' Motion for Final Approval of Class Action Settlements with the Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, Technicolor, and

27  Technologies Displays Americas Defendants, filed November 20, 2015, at ¶35.

28

1  Cooper & Kirkham has the sixth largest lodestar in this litigation, which at Lead Counsel's

2  requested 2.33 multiplier would provide a payment of approximately $7 million to the firm.[8]

3  Clearly, it would be in Mr. Cooper's personal best interests to sit down and shut up and allow the

4  settlement approval process to proceed as smoothly and expeditiously as possible.  However, he

5  and his partners have a fiduciary responsibility to the proposed Nationwide Class that trumps their

6  personal interests and requires them to speak out about inadequacies in the proposed settlements.

7          This fiduciary responsibility is individual and discrete.  Each class counsel has an

8  independent duty to determine whether or not a settlement proposal is fair, adequate and

9  reasonable, and therefore in the best interests of the class: "Class counsel must make their own

10 determination about the appropriate course of action, taking full account of their fiduciary

11 obligation to the class as a whole." *Rodriguez, supra,* 2007 U.S. Dist. LEXIS 74767, at *44; 2003

12 Advisory Committee Notes, Fed. R. Civ. P. 23(g) (because "class representatives [or class

13 counsel] cannot command [other] class counsel to accept or reject a settlement proposal, . . . class

14 counsel must determine whether seeking a court's approval of a settlement would be in the best

15 interests of the class as a whole . . . .").

16          Lead Counsel asserts that he alone has authority to speak for the class as a whole with

17 regard to the terms of settlements that he negotiated.  Lead Counsel's Memo at 27 asserts: "These

18 lawyers [the undersigned] have no authority to object on behalf of IPPs or the Class as a whole.

19 They are not Lead Counsel."  Not surprisingly, Lead Counsel cites nothing in support of the

20 proposition that the appointment of a lead counsel in a class action divests or relieves all other

21 class counsel of their fiduciary duty to protect the interests of the class as a whole.

22          To the contrary, the fiduciary obligations of each class counsel are ongoing and should be

23 constantly reassessed in light of changing circumstances.  The Due Process Clause "requires that

24

25

---

[8] "Compendium of IPP Counsel Declarations in Support of Motion for Attorneys' Fees and
26 Reimbursement of Expenses and Incentive Awards," at pg. 1 (Dkt. 4073) and "Indirect Purchaser
Plaintiffs' Notice of Motion and Motion for Award of Attorneys' Fees Reimbursement of Expenses and
27 Incentive Awards to Class Representatives," at Memorandum, pg. 1 (Dkt. 4071),

28

1   the named plaintiffs" (and hence class counsel) *"at all times* adequately represent the interests of

2   the absent class members." *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 812 (1985) (citing

3   *Hansberry v. Lee,* 311 U.S. 32, 42-43, 45 (1940)) (emphasis added).[9]

4         Finally, Lead Counsel suggests that because the undersigned did not raise objections to the

5   scope of the settlement releases or the plan of distribution prior to or at the time he moved for

6   preliminary approval, those objections now should be disregarded as "manufactured" or untimely.

7   Lead Counsel's Memo at 28.  It is true that the first time the undersigned raised the issue that the

8   proposed release encompassed the claims of millions of class members for whom the proposed

9   settlement distribution provides no consideration was not at preliminary approval, but rather, in a

10  letter to Lead Counsel and the Settling Defendants' counsel dated October 1, 2015.[10]

11        Lead Counsel appears to have lost sight of the fact that we all – the undersigned, Lead

12  Counsel, the Special Master and the Court – are playing for the same team.  In the context of a

13  class action settlement approval motion, everyone acts as a fiduciary for the class, and courts do

14  not function as they do in adversarial litigation, where the timeliness of arguments or the failure to

15  raise points and authorities in some particular context might determine which advocate wins or

16  loses.  Here, there can be only one winner, and it is the class as a whole.

17        As the Third Circuit held in *Ehrheart v. Verizon Wireless,* 609 F.3d 590, 593 (3d Cir.

18  2010) (emphasis added):

19        Under FED.R.CIV.P. 23(e), a district court's primary role is to determine whether

20  ─────────────────

21  [9]  The *Manual for Complex Litigation, Fourth,* §21.641 (footnotes omitted), states:

22        Attorneys representing a class are responsible for communicating a settlement offer to the
        class representatives and ultimately to the members of the class. But the attorneys are also
        responsible for protecting the interests of the class as a whole, even in circumstances where
23        the class representatives [or class counsel] take a position that counsel consider contrary to
        the interests of absent class members.  Class counsel must discuss with the class
24        representatives the terms of any settlement offered to the class.  Approval or rejection of
        the offer by the representatives [or other counsel], however, does not end the attorneys'
25        obligations, because they must act in the best interests of the class as a whole.

26

27  [10]  This letter was copied contemporaneously to the Special Master.  It is also in the record at Dkt. 4116-1,
     Exhibit B.

28

REPLY BRIEF IN SUPPORT OF OBJECTIONS TO       - 4 -          Master File No. 3:07-cv5944 JST
FINAL APPROVAL OF SETTLEMENTS                                MDL 1917

1   the settlement is fundamentally fair, reasonable and adequate. [Citation omitted.]
    The purpose of Rule 23(e) is to protect the unnamed members of the class.
2   [Citation omitted.] *Under Rule 23(e), a district court acts as a fiduciary, guarding the claims and rights of the absent class members.* [Citations omitted.]

3   As a fiduciary for absent class members, a district court (or a special master acting for the court)

4   cannot ignore any issue relevant to the determination of whether a proposed settlement by any

5   plaintiff's counsel is fair, reasonable and adequate.  As articulated by the Third Circuit in *In re*

6   *Community Bank of N. Va. & Guaranty Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 622

7   F.3d 275, 291 (3d Cir. 2010) (quoting *In re General Motors Corp. Pick-Up Truck Fuel Tank*

8   *Prods. Liab. Litig.*, 55 F.3d 768, 799 (3d Cir. 1995), "Rule 23 is designed to assure *that courts will*

9   *identify the common interests of class members* and evaluate [(1)] the named plaintiffs' and [(2)]

10  counsel's ability to fairly and adequately protect class interests." (Emphasis added.)  *Accord, In re*

11  *Pet Food Products Liability Litigation*, 629 F.3d 333, 349-350 (3d Cir. 2010) ("Under Rule 23(e),

12  trial judges bear the important responsibility of protecting absent class members").

13       Indeed, courts have the obligation to raise issues *sua sponte*, when no party before it has done

14  so, if this is necessary to the performance of its duty as fiduciary of the class whose claims are

15  being compromised.  As the *Pet Food* Court noted, because of district courts' independent

16  fiduciary duty to the class, "the court cannot substitute the parties' assurances or conclusory

17  statements for its independent analysis of the settlement terms. *Cf. Reynolds v. Beneficial Nat'l*

18  *Bank*, 288 F.3d 277, 283 (7th Cir. 2002) (cautioning against 'paint[ing] with too broad a brush

19  [and] substituting intuition for . . . evidence and careful analysis'). When the parties have not

20  supplied the information needed for the court to determine whether the settlement is fair,

21  reasonable, and adequate, the court may affirmatively seek out such information." *In re Pet Food*

22  *Prods.*, 629 F.3d at 350-351 (citation omitted.)

23       Accordingly, all aspects of the settlements proposed here must be considered regardless of

24  the mechanism by which arguments or evidence are brought to the court's attention.  Lead

25  Counsel's "standing" and "procedural" arguments against consideration of the issues raised by the

26  undersigned must be rejected.

27

28

## II. THE FAIRNESS AND ADEQUACY OF THE SETTLEMENT FOR THE NATIONAL CLASS TURNS ON ACCEPTANCE OF LEAD COUNSEL'S ERRONEOUS ASSERTION THAT THEIR CLAIMS HAVE NO VALUE UNLESS THEY ARE ALSO MEMBERS OF ONE OF THE STATE DAMAGE CLASSES

### A. The Absence of a Record Showing That the Interests of All Members of the Proposed Nationwide Class Were Represented In the Settlement Process and the Lack of Evidence Supporting the Reasonableness of Providing Nothing to Certain Class Members Precludes the Approval of the Proposed Settlements

Lead Counsel asserts, albeit repeatedly, a single basis for his decision to provide Settling Defendants with releases of all injunctive and monetary claims held by all members of the proposed Nationwide Class, while obtaining consideration for only those class members who are also in one or more of the "22 Indirect Purchaser State Classes."   That basis is the bald assertion that the released claims of the purchasers in the rest of the country have no settlement value.  At page 2 of Lead Counsel's Memo, he states (emphasis added):

> [T]he CRT market is dying and almost all manufacturers, including all of the alleged conspirators, have left the market, making it very unlikely that the alleged conduct could recur in the future.  A stipulated injunction with Defendants would therefore not be meaningful.  And because *the injunctive relief claims are not viable*, releasing these claims without financial compensation as part of a global release is fair, reasonable and adequate.

> The release of potential damage claims of purchasers outside the 22 Indirect Purchaser State Classes is also fair, reasonable and adequate.  *The damages claims for these states are not viable* and are completely speculative.

At page 3, he asserts: "*the release of valueless claims* satisfies Defendants' desire to forstall the defense of nuisance claims in the future.  At the same time, the release does not prejudice class members who *give up nothing of value*." (Emphasis added.)  Likewise, Lead Counsel's Memo at page 23, after conceding that "the Plan of Distribution does not contemplate compensation to Nationwide Class Members who are not members of one of the IP State Classes," defends this allocation of the settlement proceeds on the grounds that "the equitable and damages claims being released by these purchasers *have no value*." (Emphasis added.)[11]

---

[11] *See also*, Lead Counsel's Memo at 31 ("these claims are not viable and are completely speculative."); at 32 ("The fact that no financial compensation will be awarded to class members for the release of their injunctive relief claims is entirely fair, reasonable and adequate, because those claims are not viable."); at 33 ("Here, proving the injunction claims *is* likely impossible.  So even though the injunction claims of 29

1    For all of this repetition, there is no discussion in Lead Counsel's Memo of the process by

2   which the proposed division of the settlement proceeds came about, or the basis upon which he

3   concluded that the claims of purchasers in a majority of states should be weighted at zero.  The

4   only explanation for the asserted lack of any value for the proposed Nationwide Class's claims

5   arising under Section 1 of the Sherman Act, is that the CRT market is dying.  On this basis alone,

6   Lead Counsel concludes that injunctive relief would be "impossible."[12]   Similarly, the sum total

7   of discussion regarding the determination that the state law damage claims of more than half the

8   Nationwide Class are "worthless as well" is that "[t]he vast majority of the 29 states are what is

9   known as 'non-repealer' states."[13]   Lead Counsel then offers this explanation: "Under the 'Illinois

10  Brick' doctrine, indirect purchasers lack standing to seek damages for violations of the federal

11  antitrust laws.  [Citation omitted.]  Certain states have enacted statutes, known as repealer statutes,

12  that reject the Illinois Brick doctrine and grant standing to indirect purchasers to sue for antitrust

13  violations under those states' antitrust laws.  Others, referred to as non-repealer states have not

14

15

16
     states are being released, this group is losing nothing." (emphasis in original)); at 34 ("these potential
17   damage claims are not viable and are therefore worthless as well." ); at fn. 49 ("the claims of these
     Nationwide Class members have no value."); and, finally, at 42 ("Again, these purchasers are not releasing
18   anything of value").

19   Lead Counsel also asserts that the proposed release of these claims is reasonable because "this Court
     has already finally approved an identical release in conjunction with IPP's settlement with LG Electronics,
20   Inc. ("LG") (Dkt. No. 3542.)  However, none of the motion papers and Court Orders regarding the LG
     settlement contained any indication that some members of the Nationwide Class would be allocated no
21   compensation for the release of their claims.  The preliminary approval motion (Dkt. No. 1933) and Order
     (Dkt. No. 2248) propose and provide that allocation and distribution issues be deferred until there are
22   additional settlements in the litigation.  The form of notice likewise told class members that there would not
     be a distribution until after other settlements were achieved.  (Dkt. No. 1933, Exhibit 2).  Both the final
23   approval motion (Dkt. No. 2510) and the final approval Order (Dkt. No. 2542) are silent on the subject of
     the allocation and distribution of the LG settlement.  Accordingly, the finality of the release in the LG
24   settlement is an additional reason the proposed Plan of Distribution cannot be approved since it would
     retroactively strip s of members of the Nationwide Class certified in connection with that settlement of
25   benefits they were led to believe were being obtained.

26   [12]  Lead Counsel's Memo at 33.

27   [13]  *Id*. at 34.  Actually, since the settlements carve purchasers in Illinois, Oregon and Washington out of the
     Nationwide Class, the state count here should be 26, not 29.

28

1  done so, meaning that indirect purchasers may not bring claims for damages under those states'

2  laws."[14]

3       That is the extent of Lead Counsel's analysis – the CRT market is dying so there is no

4  point in obtaining injunctive relief, and the vast majority of the "29" excluded states are non-

5  repealer states, so it is fair to deny their citizens any recovery.  This is not sufficient.  Did any of

6  the class members in those excluded states have representation in the decision-making process

7  leading up to the adoption of this scheme?  Did anyone perform any sort of due diligence to

8  ascertain whether some or all of the claims these class members will be releasing for no

9  consideration might actually be viable, and thus have settlement value?  It is impossible to answer

10  these fundamental questions from Lead Counsel's Memo or his supporting declaration.[15]

11       Indeed, one cannot determine from either Lead Counsel's preliminary or final approval

12  motions exactly what are the specific claims that have been determined to be valueless.  They are

13  never defined or discussed beyond the statement that they arise under federal and state antitrust

14  laws.  This lack of specificity is directly contrary to the Northern District's "Procedural Guidance

15  for Class Action Settlements,"[16] which requires that the proponents of a settlement include in their

16  approval papers a statement of "[t]he likely recovery per plaintiff under the terms of the settlement

17  and the potential recovery if plaintiffs were to prevail *on each of their claims*."[17]  The Court in this

---

[14] *Id.*

[15] It does seem apparent, however, that there was no contribution to the settlement amounts based on the allegedly valueless claims of purchasers in the non-repealer states.  The obvious follow-up question is whether the proposed settlement amounts are adequate if the claims from the non-repealer states are appropriately valued.  Common sense would seem to answer this question in the negative.  See, e.g., *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 313, fn. 44 (3d Cir. 2011), where Judge Rendell, writing for the *en banc* majority opines that had no recovery been obtained for the non-repealer state purchasers, "we seriously doubt that the Indirect Purchaser settlement fund would still be $272.5 million."

[16] Available at http://www.cand.uscourts.gov/ClassActionSettlementGuidance ("Procedural Guidance").

[17] (Emphasis added.)  Although couched as "guidance," it states that "[f]ailure to address all of the issues discussed below may result in unnecessary delay, or even failure, of approval."  We note that Lead Counsel has not provided this information for the claims being compensated and released by the 22 statewide damage classes either.  However, it may be that he is waiting for the claims period to close on December 7, 2015, so that the settlement recovery per class member can be estimated with more precision.  The claims experience, obviously, is not relevant to the members of the Nationwide Class who are recovering nothing from the settlement.  If Lead Counsel fails to provide this information voluntarily, we urge the Special

---

1  matter referenced this "potential recovery" provision of the Procedural Guidance, and ordered the

2  direct-purchaser plaintiffs to comply with it before a ruling on their request for final approval of

3  their settlements will be made.[18]

4        This absence of an adequate showing by Lead Counsel that the process through which the

5  determination to obtain no compensation in return for the releases of millions of class members

6  satisfies due process is, without more, sufficient grounds to compel the Special Master to reject the

7  proposed settlements. *See, e.g., In re Literary Works in Elec. Databases Copyright Litigation*, 654

8  F.3d 242, 251-53 (2d Cir. 2011), where the court remanded a plan of distribution for further

9  findings, even though there was no determinative evidence that one group of claimants within the

10  settlement class had in fact been discriminated against, simply because the record provided no

11  basis from which to determine that the proposed reduction in value to be applied to their claims

12  was the product of an allocation process that fairly protected their interests.

13        When a plan of distribution does not propose to pay all claimants on a purely *pro rata*

14  basis, but contains the provision for an allocation or weighting of claims between or among groups

15  of class members, due process and fundamental fairness require that the competing interests thus

16  created (whether or not they are recognized by formal subclasses) must be the subject of

17  independent representation and vigorous advocacy.  For example, in *In re Dynamic Random*

18  *Access Memory (DRAM) Antitrust Litigation*, Master File No. M-02-1486-PJH (MDL No. 148),

19  2013 U.S. Dist. LEXIS 188116 (N.D. Cal. January 8, 2013) (hereinafter cited as "*DRAM*"), which

20  involved the allocation of settlement proceeds among reseller and end-user members of a single

21  nationwide settlement class, Special Master Charles B. Renfrew appointed the law firm of Berman

22  DeValero to serve as Allocation Counsel for reseller class members since "the private plaintiffs'

23  litigation strategy had been to focus on the claims of end-buyers." *DRAM* at *280.[19]

24  _____

25  Master to request it.

26  [18] *See* Order Re Direct Purchaser Pltfs' Settlement with Thomson Defendants (Dkt. 4194, Nov. 18, 2015) (citing "Procedural Guidance for Class Action Settlements" and *In re Omnivision Techs. Inc.*, 559 F.Supp.2d 1036, 1042 (N.D. Cal. 2008).

27  [19] Like DRAM, the focus of this litigation has shifted from the claims of all indirect purchasers to those of

28

1    Thereafter, a lengthy process ensued before the Special Master in which each of the

2 relevant contingencies held a place at the table.  Based upon the work of experts and evidence

3 adduced during discovery, agreement was reached in *DRAM* as to a fair and reasonable allocation

4 of the settlement proceeds.  As Judge Renfrew concluded (*id* at *286):

> The process by which the parties ultimately reached an agreement on a proposed
> plan of distribution of the settlement proceeds was an adversarial process involving
> the Indirect Purchaser Plaintiffs' Co-Lead Counsel, the Attorneys General, acting
> as *parens patriae*, counsel for Celestica, resellers' Allocation Counsel, and to a
> more limited extent, counsel for Settling Defendants.  The process was rigorous
> and the result of persuasive advocacy.  The outcome was a recommended plan of
> distribution that is well-grounded in market facts, fairly accounts for the conflicting
> evidence of the relative injury suffered by resellers and end-buyers, and recognizes
> the practicalities of distributing funds to a large nationwide settlement class.

10 *See, DRAM* at *287-317 for a complete description of the evidentiary and advocacy process

11 underlying the allocation.

12    *Sullivan v. DB Investments Inc.*, like DRAM, required an allocation of settlement proceeds

13 between resellers and end-buyers on the basis of the strength of their damage claims.  There, no

14 agreement was reached, and therefore, "[a]fter two years of proceedings," involving separate

15 counsel for each constituency, and "[a]fter reviewing the record, the competing econometric

16 reports furnished by several experts, and other reliable data, the Special Master recommended that

17 . . . the Indirect Purchaser Settlement Fund of $272.5 million should be allocated 50.3%,

18 approximately $137.1 million, to the Resellers Subclass, and 49.7%, approximately $135.4

19 million, to the Consumers Subclass." *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 289-90 (3d

20 Cir. 2011) (footnotes omitted).

21    Conversely, here, there is the complete absence of evidence that the decision to give

22 nothing to class-member purchasers in a majority of states was reached after a full and fair

23 consideration of their claims and interests.  Indeed, there is actually evidence that their interests

24 _____

25 end-buyers.  However, unlike DRAM, where the reseller claims were also settled, only one of the
settlement agreements here, the first settlement with Defendant Chunghwa, includes the claims of resellers.

26 As will be discussed below, the obligations and expectations created by that settlement and the subsequent
dissemination of a notice that informed resellers that they are members of a settlement class appear to have

27 been abandoned and forgotten by Lead Counsel.

28

1  were completely unrepresented in the decision making process.  There is no suggestion that the

2  proposed Plan of Distribution was the work product of anyone except Lead Counsel.  In footnote

3  71, at page 43 of Lead Counsel's Memo, Mr. Alioto affirmatively asserts that *he did not advance*

4  *the interests* of those Nationwide Class members to whom he intends to give nothing in

5  connection with the proposed settlements:

6
> Lead Counsel was appointed to represent the interests of purchasers in the 22
7  > indirect purchaser state classes.  *He has no duty to represent purchasers in other*
> *states.*"  (Emphasis added.)
8

9  If he has no duty to represent them, then he has no business sacrificing their claims to achieve a

10  settlement favorable to the 22 indirect purchaser state classes.  On this basis alone, final approval

11  of the settlements must be denied.

12  **B.    The Proposed Nationwide Class's Claims Arising Under Section 1 of the**
**Sherman Act Are Both Viable and Valuable**
13
Lead Counsel asserts that the proposed Nationwide Class satisfies the Rule 23 requirement
14
of commonality because each class member has alleged that "Defendants conspired to fix the
15
prices of CRTs . . . and violated Section 1 of the Sherman Act."[20]  The operative Fourth Amended
16
Complaint specifically requests, in addition to injunctive relief, that "Plaintiffs and the Classes be
17
awarded restitution, including disgorgement of profits by Defendants as a result of acts of unfair
18
competition and unfair enrichment," and that "the Court award Plaintiffs and the Classes they
19
represent such further relief as may be necessary and appropriate."  (Dkt. No. 1526.)
20
Accordingly, all possible claims arising from the Nationwide Class's allegations of Section 1
21
violations have been preserved.  These claims fall into three categories:  injunctive relief, equitable
22
monetary relief and damages.  To approve the proposed settlements and Plan of Distribution, the
23
Court must conclude, among other things, that none of these claims is sufficiently viable to carry
24
any settlement value whatsoever.
25

26
_____

27  [20]   Lead Counsel Memo at 12.

28

1    1.    <u>Claims for Injunctive Relief</u>

2        No one disputes that the remaining market in this country for CRT televisions, monitors and

3    other equipment is considerably smaller than the market for flat screen panels.  However, that is

4    not a sufficient basis to conclude that injunctive relief of any nature is impossible.  The defendants

5    are still in business here, even if they are not selling many or any CRT televisions in the United

6    States.  In DRAM, for example, one of the provisions of the injunctive relief obtained in

7    settlement was that the defendants establish and/or maintain a compliance program or programs

8    for their officers and employees with responsibility for pricing and sales in and to the United

9    States regarding the legal standards imposed by federal and state antitrust laws for a period of

10   three years from the execution of the agreement.  *DRAM, supra*, 2013 U.S. Dist. LEXIS 188116 at

11   *129.  Similar compliance provisions were negotiated with the settling defendants in LCD.  *See In*

12   *re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 49885, at *56 (N.D. Cal. Apr. 3,

13   2013) (granting final approval to settlements with multi-year antitrust compliance and reporting

14   requirements).  The Settling Defendants are large companies, many with multiple product lines

15   sold in this country.  Surely, educating their employees about the United States antitrust and state

16   competition laws would assist in preventing future anticompetitive abuses.

17   2.    <u>Claims for Equitable Monetary Relief</u>

18        As noted above, in the Fourth Amended Complaint, Lead Counsel sought the remedies of

19   restitution and disgorgement on behalf of all of "the Classes" pleaded therein, although these

20   claims were never pursued during the litigation.  While there is no reference to them in Lead

21   Counsel's Memo, one must assume that they are included in the body of unspecified claims

22   belonging to the class members from the non-repealer states that have been deemed worthless and

23   not viable by Lead Counsel.  Indeed, standing alone, the fact that Lead Counsel failed to present

24   any discussion of the valuation process for these claims precludes the approval of the settlements.

25   *See, e.g., Pet Food, supra*, 629 F.3d at 353, where the Third Circuit vacated a final approval order

26   and remanded for further proceedings because, as Lead Counsel has done here, "the settling

27   parties did not discuss the merits of the Purchase Claims, how the parties' valued the Purchase

28

1  Claims, or why the parties capped the Purchase Claims at $250,000 . . . [and] offered no analysis

2  of the merits or value of the Purchase Claims and did not explain why the Purchase Claims were

3  capped at $250,000 out of a $24 million settlement."

4       Valuing the Nationwide Class's equitable monetary claims at zero ignores the growing

5  body of law recognizing the viability of Clayton Act equitable monetary claims for indirect

6  purchasers arising from violations of Section 1 of the Sherman Act. *See, United States of America*

7  *v. Keyspan Corporation, supra,* 763 F. Supp. 2d 633 (S.D.N.Y. 2011); *Oregon v. AU Optronics*

8  *Corp. (In re TFT-LCD (Flat Panel) Antitrust Litig.),* MDL No. 1827, No. C 10-4346 SI, 2011 U.S.

9  Dist. LEXIS 76562 (N.D. Cal. July 11, 2011) (Judge Susan Illston held that disgorgement of ill-

10  gotten gains from defendants' anti-competitive conduct was a proper remedy for indirect

11  purchasers under the Oregon Antitrust Act, and supported the Oregon Attorney General's state law

12  claim for unjust enrichment, based in part on *Keyspan*); and *DRAM, supra,* 2013 U.S. LEXIS

13  188116 at *190, *207.  A discussion of this remedy was recently added to Chapter 23 of the 2015

14  edition of the California State Bar's Antitrust and Unfair Competition Law Treatise:

> 15  Historically, the United States Supreme Court has held that disgorgement is
> 16  available as part of the inherent equitable powers of the courts under the Sherman
> Act. *See, United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 250 (1968)
> ("upon appropriate findings of violation [of § 2], it is the *duty* of the court to
> 17  prescribe relief which will ... deny to the defendant the fruits of its statutory
> violation.") (emphasis added); *United States v. Paramount Pictures, Inc.*, 334 U.S.
> 18  131, 171-72 (1948) ("the requirement that the defendants restore what they
> unlawfully obtained is no more punishment than the familiar remedy of
> 19  restitution."); *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) ("unless
> otherwise provided by statute, all the inherent equitable powers of the District
> 20  Court are available for the proper and complete exercise of that jurisdiction.").
>
> 21  Under federal law, disgorgement of profits may take various forms. Thus, for
> example, where injunctive relief is not available (such as where it is moot),
> 22  disgorgement of *all* profits of a company engaged in illegal conduct (as opposed to
> the damages or overcharges resulting from the illegal conduct) is particularly
> 23  appropriate (*see Kansas v. Nebraska*, 135 S. Ct. 1042, 1056-59 (2015)) , especially
> to restore the *status quo ante* as to competition (*see, e.g., Keyspan*, 763 F. Supp. 2d
> 24  at 636-37, 639-41) . Where injunctive relief is available, disgorgement of profits
> and overcharges arising from the illegal conduct is available as *ancillary* relief that
> 25  can be obtained in addition to any other remedies, such as an order barring future
> misconduct by a defendant. *See, e.g., FTC v. Cephalon, Inc.*, No. 2:08-CV-2141,
> 26  2015 U.S. Dist. LEXIS 49333, at *13-18, 2015 WL 1724597, *3-4 (E.D. Pa. Apr.
> 15, 2015); Stipulated Order for Permanent Injunction and Equitable Relief at 10-11
> 27  & Exh. A at ii-iv, *FTC v. Cephalon, Inc.*, No. 2:08-CV-2141 (E.D. Pa. June 17,
> 2015), *available at*

28

1   https://www.ftc.gov/system/files/documents/cases/150617cephalonstip.pdf and
Statement of the Commission at 3-4, *FTC v. Cephalon, Inc.*, No. 2:08- CV-2141

2   (E.D. Pa. May 28, 2015), *available at*
https://www.ftc.gov/system/files/documents/cases/150528cephalonstatement.pdf. [21]

3   See also, *United States v. Morgan Stanley*, 881 F. Supp. 2d 563, 568 (S.D.N.Y. 2012).  In 2013,

4   the Federal Trade Commission also signaled its belief that it is entitled to seek disgorgement as

5   part of any injunctive relief that a court may order in any conduct case that does not involve a

6   "stand-alone" Section 5 case (e.g., a Section 5 case that is not tethered to a violation of the

7   antitrust laws) by withdrawing its 2003 Policy Statement on Restitution. Statement of the

8   Commission, Withdrawal of the Commission's Policy Statement on Monetary Equitable Remedies

9   in Competition Cases, 1-2, n.6 (Jul. 31, 2012), http://www.ftc.gov/os/2012/07/

10  120731commissionstatement.pdf.

11      The Nationwide Class's claims for equitable monetary relief do not fall under the bar of

12  *Illinois Brick* because they do not implicate proof of pass-on damages for indirect purchaser

13  recovery.[22]  In *DRAM*, Judge Renfrew relied on the fact that regardless of residency in an *Illinois*

14  *Brick* repealer or non-repealer state, all class members there had federal equitable monetary claims

15  for restitution and disgorgement as a basis for his recommendation that Chief Judge Hamilton

16  adopt a plan of distribution that paid out the settlement fund *pro rata* to all members of the

17  nationwide settlement class.  *DRAM* at *339-40.   Lead Counsel apparently considered only a

18  single criteria – CRT Product purchases in *Illinois Brick* non-repealer states – in deciding that the

19  claims of class members in those states are worthless.  Accordingly, that determination cannot as a

20  matter of law or fact serve as a justification for the release of class members' federal equitable

21  monetary claims without compensation.

22      It appears that Lead Counsel either ignored or forgot about alleging restitution and

23  disgorgement as a basis for recovery in the Fourth Amended Complaint.  In addition to evidencing

24  the unfairness of these settlements, this lapse raises questions of adequacy of Lead Counsel's

25  _____

26  [21] The Treatise is available on LEXIS at 1-23 CA Antitrust and Unfair Competition Law § 23.02

27  [22] See discussion of *Illinois Brick, infra.*

28

REPLY BRIEF IN SUPPORT OF OBJECTIONS TO    - 14 -        Master File No. 3:07-cv5944 JST
FINAL APPROVAL OF SETTLEMENTS                                           MDL 1917

1   representation of the Nationwide Class that must be addressed.  *See, e.g., In re Community. Bank*

2   *of N. Va. & Guaranty Nat'l Bank of Tallahassee Second Mortg. Loan Litig., supra*, 622 F.3d 275,

3   304 ("*Community Bank*").  After cautioning that a disagreement among class counsel or with other

4   plaintiffs' counsel not appointed as class counsel about a decision to "bring some, but not other,

5   potentially colorable claims on behalf of the class," does not in and of itself establish inadequacy

6   of representation, the Third Circuit remanded the settlement (*inter alia*) for further consideration

7   of the adequacy issue:

8           As Rule 23 makes clear, however, "the work counsel has done in identifying or
        investigating potential claims in the action" is an important factor when evaluating
9       class counsel's adequacy. Fed. R. Civ. P. 23(g)(1)(A)(i). Though we certainly agree
        that class counsel is not inadequate simply because they have not asserted every
10      claim that could theoretically be pled against a defendant, *cf. Wal-Mart Stores, Inc.
        v. Visa U.S.A. Inc.*, 396 F.3d 96, 113 (2d Cir. 2005), neither is the decision
11      regarding the claims to assert in the action totally shielded from judicial scrutiny.
        [Footnote omitted] In particular, where class counsel's proffered reasons for the
12      "strategic" decision not to bring certain claims--i.e., obstacles faced by the claims,
        either as to certification or proof--also apply to the claims that have been asserted, a
13      district court may have reason to question whether class counsel has "vigorously
        prosecuted the action" on behalf of the class. *General Motors*, 55 F.3d at 801.
14

15          **3.      Claims for Damages**

16          Lead Counsel's valuation of the damage claims of the purchasers in the "non-repealer"

17  states who will recover nothing is based up two faulty assumptions.  The first is that *Illinois*

18  *Brick*[23] is a "doctrine" that eliminates an indirect purchaser's "standing to seek damages for

19  violations of the federal antitrust laws." Lead Counsel's Memo at 34.   The second flows from the

20  first, and is the assumption that therefore all one needs to know to determine that an indirect

21  purchaser "may not bring [a] claim[] for damages" under federal law is that the purchase was not

22  made from one of the defendants. *Id*.

23          To begin, there is no such thing as "the *Illinois Brick* doctrine."[24]  A doctrine is either a

24  belief or set of beliefs held and taught by a church, political party or other group, or a stated

25  _____

26  [23]   *Illinois Brick v. Illinois*, 431 U.S. 720 (1977) ("*Illinois Brick*")

27  [24]   Lead Counsel's Memo at 34.

28

1   principle of government policy, mainly in foreign or military affairs.[25]  *Illinois Brick* is merely a

2   38 year-old decision of the United States Supreme Court, which, as will be discussed below, can,

3   and many believe should, be reconsidered and modified or rejected by that Court.  Second, and

4   more importantly, determining whether application of the holding in *Illinois Brick* prevents an

5   indirect purchaser from recovering damages under federal law is not as simple as asking from

6   whom the allegedly price-fixed product was purchased.[26]

7         In *Illinois Brick*, the Supreme Court applied the prohibition on the "defensive" use of pass-

8   on proof of damages enunciated in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S.

9   481 (1968), to also prohibit the "offensive" use of pass-on evidence to establish the fact of damage

10  component of antitrust liability.  After *Illinois Brick*, a downstream customer under most

11  circumstances was not permitted to show antitrust injury using proof that the illegal overcharge he

12  paid was passed-on to him by an intermediary purchaser of the defendants' product, just as

13  *Hanover Shoe* prevented a defendant from defending an antitrust claim with evidence that the

14  plaintiff had passed on the alleged overcharge to its downstream customers.  The Supreme Court

15  felt that fairness dictated that permitting antitrust recovery through proof of pass-on damages

16  would require it to overrule *Hanover Shoe,* and held the rationale of *Hanover Shoe* "that the

17  attempt to trace the complex economic adjustments to a change in the cost of a particular factor of

18  production would greatly complicate and reduce the effectiveness of already protracted treble-

19  damages proceedings applies with no less force to the assertion of pass-on theories by plaintiffs

20  than it does to the assertion by defendants." *Illinois Brick,* 431 U.S. at 729.  No one denies that

21  the effect of *Illinois Brick* was to eliminate federal antitrust recovery for the vast majority of

22  indirect purchasers of price-fixed goods and services.

23        Nonetheless, this does not convert *Illinois Brick* into a government doctrine of hostility

24  toward consumers and end-buyers victimized by price-fixing.  Nor does it bar them from the

25  _____

26  [25]  *See,* www.oxforddictionaries.com/us/definition/american_english/doctrine.

27  [26]  Or in the case of state law antitrust claims, asking from whom and in what state the product was purchased.

28

courthouse as a matter of standing.  Rather, as the Third Circuit sitting *en banc* in *Sullivan v. DB*

*Investments, Inc., supra*, 667 F.3d 273, 313 ("*Sullivan*"), held, the impediment to indirect

purchaser recovery in *Illinois Brick* is fundamentally a rule of proof and "does not reflect a

categorical policy judgment that indirect purchasers do not merit antitrust protection."  The

*Sullivan* Court noted that in *Illinois Brick*, the Supreme Court articulated its holding as

"declin[ing] to construe § 4 to permit offensive use of a pass-on theory against an alleged violator

that could not use the same theory as a defense in an action by direct purchasers."  *Illinois Brick*,

431 U.S. at 735.

Thus, *Illinois Brick* created a fact-specific impediment to establishing certain claims of

antitrust injury.[27]  Indeed, the *Illinois Brick* Court carefully drew the distinction between proof of

injury and standing: "Because we find *Hanover Shoe* dispositive here, *we do not address the*

*standing issue*, except to note, as did the Court of Appeals below, 536 F. 2d at 1166, that the

question of which persons have been injured by an illegal overcharge for purposes of § 4 is

analytically distinct from the question of which persons have sustained injuries too remote to give

them standing to sue for damages under § 4."  *Id.* at 728 n.7.

Despite the Supreme Court's clear statement that *Illinois Brick* is not a "standing" case, the

*Illinois Brick* prohibition on establishing injury with proof of pass-on damages is "often

confusingly" referred to as the failure of "a statutory standing requirement."  *Sullivan*, 667 F.3d at

307.  From this confusion comes the belief articulated by Lead Counsel that *Illinois Brick*

---

[27] As if to underscore the fact-specific nature of the inquiry, the *Illinois Brick* Court provided two examples of situations that fall outside of its scope: where the indirect purchaser had "a preexisting cost-plus contract" and "where the direct purchaser is owned or controlled by its customer," and left open the door for courts to permit recovery in "[a]nother situation in which market forces have been superseded" so that traditional notions of "pass-on" are not required to demonstrate injury to the indirect purchaser.  *Id.* at 736 and n.16.

Since 1977, there have been numerous examples of cases adjudicating the application of *Illinois Brick* to the claims of various individuals and putative classes.  See, e.g., *Palmyra Park Hosp. Inc. v. Phoebe Putney Memorial Hosp.*, 604 F.3d 1291, 1303-07 (11th Cir. 2010) (holding that the plaintiff, a competitor of the defendant, had standing to assert a Section 2 claim even though the plaintiff never dealt directly with the defendant); *In re Lower Lake Erie Iron Ore Antitrust Litig.*, 998 F.2d 1144, 1167-68 & n.21 (3d Cir. 1993) (holding that *Illinois Brick* does not "announc[e] a strict prohibition against recovery by indirect purchasers" and proceeding with a fact-based inquiry into its applicability in that case).

---

1   "mean[s] that indirect purchasers *may not bring claims* for damages under [federal and non-

2   repealer] states' laws."[28]

3        This is not true. As the *Sullivan* Court noted, the many cases adjudicating *Illinois Brick's*

4   application to individual fact patterns demonstrate that the potential inability to prove injury under

5   *Illinois Brick* does not prevent an indirect purchaser from "establish[ing] a justiciable case or

6   controversy" in a federal or non-repealer state court. *Sullivan* at 307. *Illinois Brick* "affects a

7   plaintiff's ability to recover, but does not implicate the subject matter jurisdiction of the court,"

8   (citing *Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1256 (9th Cir. 2008)), it is "simply another

9   element of proof for an antitrust claim." *Sullivan* at 307, quoting *Hammes v. AAMCO*

10   *Transmissions, Inc.,* 33 F.3d 774, 778 (7th Cir. 1994) ("[D]espite the suggestive terminology,

11   'antitrust standing' is not a jurisdictional requirement"). Accordingly, a determination here that all

12   Nationwide Class members who purchased outside of repealer states are simply releasing claims

13   that they "may not bring" is far too simplistic, and cannot support a finding that a settlement that

14   does not compensate them for those releases is fair, reasonable and adequate.

15        Not only do these class members have standing to assert that their claims fall into an

16   exception to *Illinois Brick*, they also have standing to argue that *Illinois Brick* should be

17   reconsidered in light of 38 years of developments in the law, economic theory and the analytical

18   tools available to demonstrate pass-on damages. No one denies, and indeed, Lead Counsel

19   affirmatively asserts, that the Nationwide Class members in the non-repealer states, purchased

20   CRT products at prices inflated by the Settling Defendants' illegal conspiracy. Indeed, this is the

21   *sin qua non* of class membership. Therefore, having satisfied the factual basis for alleging

22   antitrust injury, these class members are entitled to advance the argument that the current law, i.e.,

23   *Illinois Brick*, should be "extended, modified or reversed" to permit them to recover for the

24   economic injury they suffered. Fed. R. Civ. P. 11(b)(2).

25

26   ————————————

27   [28] Lead Counsel's Memo at 34 (emphasis added).

28

1    While the doctrine of *stare decisis* carries great weight, it does not insulate Supreme Court

2 decisions from review or reversal.  If it did, then *Plessey v. Ferguson*'s holding that racially

3 segregated schools are Constitutional as long as they are "separate but equal" would still be the

4 law of the land.  Indeed, the Roberts Court recently agreed to "reconsider the presumption of

5 reliance for securities fraud claims the we adopted in Basic [Inc. v. Levinson, 485 U.S. 224

6 (1988)]." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2407 (2014).  Each of the

7 class members in this case has a claim that could be the one that persuades the Supreme Court to

8 reconsider *Illinois Brick*.  These claims cannot be said to be "valueless claims" or "nuisance

9 claims" solely on the grounds that they belong to indirect purchasers.[29]

10    Neither the rationale nor the practical utility of *Illinois Brick* is undisputed.  A leading

11 antitrust treatise opposes *Illinois Brick*, because consumers "are injured, often more than the

12 intermediary, who may also be injured but for whom recovery of the entire overcharge is typically

13 a windfall.  Thus the indirect purchaser rule greatly overcompensates intermediaries and greatly

14 undercompensates consumers . . . ." IIA Areeda & Hovenkamp, *Antitrust Law* ¶ 346k (4th ed.

15 2011).  Two years ago, the Supreme Court of Canada, after an in depth exploration of the benefits

16 and detriments of prohibiting proof of pass-on damages, determined not to enunciate an *Illinois*

17 *Brick* rule for the Canadian antitrust laws.  *Pro-Sys Consultants Ltd v. Microsoft Corporation*

18 [2013] 3 SCR 477, 2013 SCC 57 (CanLII).[30]  It rejected the basic rational of the United States

19 Supreme Court that prohibiting offensive pass-on proof was a "necessary corollary" to

20 maintaining the prohibition on defensive pass-on.  Further, it held that in the years since the

21 *Illinois Brick* Court considered the question, it has been shown that courts are very able to

22 developed sufficient protections to shield defendants from the risk of "duplicative recovery"

23 without crippling the ability of consumers to vindicate their rights to participate in markets that are

24 free from price-fixing and other anticompetitive conduct.

25

26 [29]  Lead Counsel's Memo at 3.

27 [30]  This decision can be found at http://www.canlii.org/en/ca/scc/doc/2013/2013scc57/2013scc57.html

28

1    Nor is *Illinois Brick* a practical success.  Almost half of the state legislatures in this country

2   and several additional state courts have rejected *Illinois Brick*.[31]  Now, since enactment of the

3   Class Action Fairness Act of 2005,[32] federal courts have jurisdiction over the vast majority of

4   antitrust class actions brought pursuant to "repealer" state laws, and thus must entertain the exact

5   pass-on damage proof that *Illinois Brick* sought to banish.   Moreover, in the pre-*Illinois Brick* era,

6   the principal claims being litigated in federal courts were Sherman Act violations governed by a

7   single body of federal law, to which the state law antitrust claims were pendent.   Presently,

8   antitrust class actions routinely present a situation that requires federal courts to apply the entire

9   panorama of often-undeveloped repealer state antitrust law to multidistrict indirect purchaser suits.

10  "This proliferation of litigation of indirect purchaser cases involving a common nucleus of

11  operative fact with cases pending in federal court has created a logistical nightmare for the courts."

12  Edward D. Cavanagh, *Illinois Brick: A Look Back and a Look Ahead*, 17 Loy. Consumer L. Rev.

13  1, 30 (2004); *see also* Barak D. Richman & Christopher R. Murray, *Rebuilding Illinois Brick: A*

14  *Functionalist Approach to the Indirect Purchaser Rule*, 81 S. Cal. L. Rev. 69, 99 (2007)

15  (criticizing *Illinois Brick* for "creating a confusing mosaic of antitrust litigation.").

16    Lead Counsel acknowledges that, in *LCD*, another case in which there were separate

17  damage classes for purchasers in *Illinois Brick* repealer states, the monetary-relief claims of

18  residents in "non-repealer" states were preserved.[33]  Lead Counsel's Memo at p. 34.  However, he

19  suggests that this has no relevance here because the carve-out of these claims from the *LCD*

20  release was done to avoid conflict with pending State Attorney General actions, and that such a

21  concern is not present here.  *Id.*  This is inaccurate.  The *LCD* settlements included the

22  participation of eight Attorneys General (including the California Attorney General), who resolved

23  their civil penalty and *parens patriae* claims under the settlements.  *See generally, In re TFT-LCD*

24

25  _____

    [31]  See, discussion *infra.*

26  [32]  Pub. L. No. 109-2, 119 Stat. 4, 28 U.S.C. Sections 1332(d), 1453, and 1711–1715.

27  [33]  Their injunctive claims were released in return for a settlement injunction.

28

1  *(Flat Panel) Antitrust Litig.*, No. M-07-1827, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) (order

2  granting final approval). No consumer received payment from their Attorney General; all

3  payments were made from the settlement fund. Lead Counsel's assertion that the *LCD* carve out

4  was done simply to appease various Attorneys General (as opposed to being done because it

5  would have been inappropriate to release monetary claims for no consideration) is belied by the

6  fact that at least three Attorneys General (Illinois, Washington, and South Carolina) appeared and

7  objected to the *LCD* settlements, even with the carve-out. *See TFT-LCD*, 2013 WL 1365900 at

8  *5. In other words, the *LCD* carve-outs were included not because they made things "easy" (they

9  did not), but because preserving their monetary claims was the right thing to do for class members.

10  Thus, the truly "unique" situation lies here, where Lead Counsel has decided to simply give away

11  a release on behalf of residents in non-repealer states, for no consideration.

12      **C.    Lead Counsel Has Not Made a Record Upon Which the Special Master Could
13             Conclude That the State Law Damage Claims Being Released by the Nationwide
           Class Members Who Are Not Being Compensated Are Worthless**

14        There is not sufficient time to conduct a review of the antitrust and consumer protection

15  laws of each of the 29 states that Lead Counsel has concluded provide no possible recovery for

16  their purchasers. Moreover, this is not necessary since these class members' claims under federal

17  law have sufficient settlement value to preclude a finding that the global release without

18  compensation proposed by Lead Counsel is fair and reasonable. Accordingly, this discussion will

19  relate to some general observations about the efficacy of a settlement such as that negotiated by

20  Lead Counsel that is grounded in a valuation of class members' respective state law claims based

21  solely on whether they purchased in an *Illinois Brick* repealer or non-repealer state.

22        First, we note that all of the discussion above concerning the viability of federal indirect

23  purchaser damage claims post-*Illinois Brick* applies with equal force to antitrust damages claims

24  under state law. Indeed, that was the context in which the *Sullivan* Court discussed the case. In

25  *Sullivan*, class counsel proposed certification of a single indirect purchaser nationwide settlement

26  class (divided into reseller and consumer subclasses) and a plan of distribution that would pay the

27  claims in each of the subclasses on a *pro rata* basis regardless of whether the class member

28

---

REPLY BRIEF IN SUPPORT OF OBJECTIONS TO   - 21 -      Master File No. 3:07-cv5944 JST
FINAL APPROVAL OF SETTLEMENTS                 MDL 1917

purchased in a repealer or non-repealer state.  The district court certified the class and adopted the

proposed plan of distribution over multiple objections that the plan of distribution was unfair and

the settlement class could not satisfy the predominance test of Rule 23(b)(3) because it contained

putative members whose residency in non-repealer states established that they could not bring

claims for antitrust violations.

The *Sullivan* objectors advanced, and the two dissenting judges accepted the same

simplistic analysis of the value of class members' claims employed here by Lead Counsel in

negotiating the proposed settlements.  The majority of the Third Circuit *en banc* panel, however,

rejected the *Illinois Brick* repealer vs. non-repealer state method of determining whether an

indirect purchaser antitrust claim was or was not viable:

> The dissent describes this requirement in varied ways: under their view, class members who, "according to the plain terms of controlling law have no claim at all" (Dissenting Op. at 16 n. 11), have "no legal claim" (Id. at 1), have "no cause of action," (Id. at 4), have a claim "clearly lacking a colorable basis" (Id. at 15), or have a claim "nonexistent as a matter of substantive law" (Id. at 13), are barred from partaking in this class action settlement. The problem with this requirement, however, is that in order to separate class members possessing an "existent" legal claim from those possessing a "nonexistent" one, district courts would have to perform a Rule 12(b)(6) inquiry into each class member's claim.

*Sullivan, supra,* 667 F.3d at 308.  This inability to look at a class members' state and determine if

she possesses a viable claim was echoed by Judge Sirica's concurrence:

> Objectors view the indirect purchaser class as composed of members who either have valid claims under the laws of states with *Illinois Brick* repealers or members who have invalid claims under the laws of non-repealer states. But a claim cannot be declared invalid without proper analysis, which would require a choice-of-law examination for each class member's claim. Such analyses may pose difficulties in cases where the residence of the class member is not the sole consideration; modern choice-of-law standards often consider an array of factors particular to individual plaintiffs. Consequently, individual 12(b)(6) inquiries for settlement class certification could present serious difficulties in administration and greatly increase costs and fees, and may deplete rather than increase the recovery of even successful plaintiffs.

*Sullivan, supra,* 667 F.3d ar 337 (Sirica, J., concurring)

Lead Counsel contends that claims held by residents in non-repealer states are time-barred,

citing the statutes of limitations for consumer protection claims in Massachusetts, Missouri, and

New Hampshire.  Lead Counsel's Memo at p. 34, n.47.  To begin, as discussed above, the

1 operative complaint pleads that each and every member of the Nationwide Class was injured in

2 his/hers/its business and property by defendants' conspiracy to artificially raise, fix and stabilize

3 the prices of CRT Products, and requests all such relief that would flow from proof of these

4 allegations.  No motion for certification of the Nationwide Class has ever been filed.  Therefore,

5 unless there is a settlement, these putative class members are entitled to make a motion to proceed

6 as a class action to try these claims.

7      There is a reason why Lead Counsel cited to the claims of purchasers in Massachusetts,

8 Missouri and New Hampshire.  Although these are generally considered "repealer" states, Lead

9 Counsel chose not to include claims under their state statutes in the operative Fourth Consolidated

10 Amended Complaint.  (A previously-asserted claim under the Massachusetts statute was dismissed

11 simply for failure to provide a pre-suit demand letter, a defect easily cured but, inexplicably, never

12 pursued. *See* Order Re Motions To Dismiss (Dkt. 665, Mar. 30, 2010) (dismissing Massachusetts

13 consumer protection claim, "with leave to amend")).  These choices, however unwise, are not

14 dispositive of these claims.  The purchasers in these states are included in the definition of the

15 Nationwide Class.

16      Even if the Court were to conclude that the Fourth Consolidated Amended Complaint's

17 general request for all relief flowing from proof of the factual allegations were not sufficient to

18 plead the relevant state law claims, class action litigants regularly amend complaints to add related

19 claims that then relate back to the original filing date, and courts always retain the power to

20 conform judgments to the evidence presented. *See* Fed. R. Civ. P. 15(c)(1)(B) (relating

21 amendment back to date of original filing where new claim arises out of the same conduct,

22 transaction, or occurrence of the original pleading); Fed. R. Civ. P. 15(b) (permitting pleadings to

23 be conformed to evidence presented at trial). *See also In re TFT-LCD (Flat Panel) Antitrust*

24 *Litig.*, No. M-07-1827 (N.D. Cal. Apr. 12, 2011) (granting leave for indirect purchasers to add

25 four new state law claims).  Clearly, these arguments are a sufficient threat to defendants to

26 establish that these state law damage claims have *settlement* value.  Lead Counsel's proposed

27

28

1   settlements, which are predicated on his evaluation that they are "worthless," are not fair or

2   reasonable or adequate to support the scope of the releases therein.

3   **III.    THE PROPOSED PLAN OF DISTRIBUTION FAILS TO ACCOUNT FOR THE**
    **TERMS AND CONDITIONS OF THE CHUNGHWA SETTLEMENT AND**
4   **CANNOT BE APPROVED FOR THIS REASON AS WELL**

5           Early in this case, Lead Counsel negotiated a settlement with defendant Chunghwa Picture

6   Tubes, Ltd ("Chunghwa").  In his motion for preliminary approval of the Chunghwa settlement,

7   Lead Counsel "propose[d] that distribution of settlement funds be deferred until the termination of

8   the case" and that Lead Counsel would "address any allocation issues which arise at that time as

9   well." Dkt. 884, at 18.  The preliminary approval Order reiterates that "[t]he distribution of the

10  Net Settlement Fund[34] shall be deferred until a later date" and that "Plaintiffs shall propose a

11  method of distribution at that time, which shall be subject to court approval." Dkt. 993, at ¶11.

12  The Order granting final approval is silent on this issue. *See, gen.,* "Order Granting Final

13  Approval of Settlement with Chunghwa Picture Tubes, Ltd." (Dkt. 1105) ("Chunghwa Final

14  Approval Order").

15          Presumably, the day for Lead Counsel to propose distribution of the Chunghwa settlement

16  has now arrived, and indeed, Class Counsel has proposed a plan of distribution that includes the

17  proceeds of the Chunghwa settlement.  However, there are key terms of the settlement agreement

18

19

20

21  [34] The "Net Settlement Fund" is defined as "the $10,000,00 settlement amount, plus interest,
    minus 25% for attorneys' fees, reimbursement of expenses, $2.5 million for a costs set-aside,
22  including the costs of giving notice to class members and administration of the settlement fund, all
    of which shall be subject to court approval.  The Net Settlement Fund shall be no less than $5
23  million." Dkt. 993, at 4 n.2.

    It should be noted that unlike the current request for attorney fees not to exceed 33.3%, notice was
24  sent to the class that under the Chunghwa settlement, Lead Counsel would request a maximum fee
    award of 25%. *See* Long Form Notice, Exhibit A, Declaration of Joseph M. Fisher Reporting on
25  the Class Notice Program for Settlement with Defendant Chunghwa Picture Tubes, Ltd." (Dkt.
    1063) ("Fisher Chunghwa Notice Declaration") at 8 ("**17.   How will the lawyers be paid?** …. At
26  a future time, Interim Lead Class Counsel will ask the Court for attorneys' fees not to exceed
    twenty five percent (25%) of the $10,000,000 Settlement Fund, plus reimbursement of their costs
27  and expenses, in accordance with the provisions of the Settlement.")

28

1   with Chunghwa, terms that were noticed to Class members and incorporated into the Court's final

2   approval order, that are irreconcilable with the currently proposed Plan of Distribution.[35]

3         To begin, the currently proposed settlements, like the settlement class certified for the LG

4   settlement, defines membership in the Nationwide Class and in the Indirect Purchaser State

5   Classes as indirect purchasers, who or which purchased CRT Products *"for their own use* and not

6   for resale."[36]  Chunghwa, however, negotiated a release on behalf of a Nationwide Class of

7   indirect purchasers that includes *resellers* as well as end-buyers. Dkt. 884-1 at Exhibit 1, ¶1. The

8   Class released by the Chunghwa settlement is defined as that in IPPs' Third Amended Complaint

9   "except that 'the Class' shall include all indirect purchasers of CRT Products during the Class

10  Period who could assert antitrust or similar claims against Chunghwa under the laws of the United

11  States or any State."[37]  *Id.*  The published Notice of the Chunghwa settlement clearly explained

12  that "[b]oth consumers *and resellers are included* in the Settlement." Exhibit B, Fisher Chunghwa

13  Notice Declaration (Dkt. 1063) (emphasis added); *see also* Chunghwa Final Approval Order (Dkt.

14  1105), ¶6 (determining the adequacy of the notice).[38]  Clearly, nothing is contemplated in the

15  currently-proposed Plan of Distribution to compensate resellers.  However, releases of the

16

_____

17  [35] This may be why Lead Counsel repeatedly points out that the currently proposed Nationwide
    Class is the same as the class approved by the Court in the prior settlement with LG, but
18  completely ignores the Nationwide Class certified to implement the settlement with Chunghwa.

19  [36]  Lead Counsel's Memo at 3.

20  [37]  As a result of further negotiations with the States of Illinois, Oregon and Washington, the
    Settlement Class was ultimately defined as: "All persons and or entities who or which indirectly
21  purchased in the United States CRT Products manufactured and/or sold by the Defendants …
    except, for purposes of claims on behalf of Illinois persons (as defined by 740 ILCS 10/4) under
22  740 Ill. Comp. Stat. § 10/7(2) and Oregon natural persons under ORS §§ 646.780(5)(a).  Such
    Illinois and Oregon persons (as identified in the preceding sentence) shall instead be represented
23  by the Attorney General of their state pursuant to the *parens patriae* authority granted to each
    Attorney General by those statutes.  Specifically excluded from this Class are claims on behalf of
24  Washington residents …."  Chunghwa Final Approval Order, Dkt. 1105, at ¶3.

    [38] *See also* Long Form Notice at Exhibit A, Fisher Chunghwa Notice Declaration, p. 4 ("**7. How**
25  **do I know if I am one of the Settlors?**  The Settlement Class ('Settlors') includes any person or
    business that indirectly bought in the U.S. (excluding claims under the Washington Unfair
26  Business Practices and Consumer Protection Act) from March 1, 1995 through November 25,
    2007, any CRT Product made by the Defendants.  *Both consumers and resellers are included in*
27  *the Settlement Class.  Also excluded are governmental entities.") (Italic emphasis added.)

28

_____

1    resellers' claims against Chunghwa have been obtained.  Lead Counsel simply ignores this reality,

2    presumably hoping that everyone else will as well.

3          Second, under the proposed Plan of Distribution "[c]lass members are being compensated

4    according to a generally-accepted pro-rata approach taking into account the value of their claims."

5    See Lead Counsel's Memo at 1.  By this, Lead Counsel means that class members in the 22

6    damage state classes will all be treated the same when it comes to distributing the settlement

7    money.  However, in connection with the Chunghwa settlement, the Court finally *approved* an

8    incongruent, competing plan of distribution, which does not provide that funds will be distributed

9    pro rata to all claimants, but rather that "[e]ach *State* listed in the operative complaint for which

10   damage claims are being asserted, *plus the states of Illinois and Oregon*, shall receive a *pro rata*

11   share of the Net Settlement Fund."  Chunghwa Preliminary Approval Order (adopting Special

12   Master Legge's Report & Recommendation) (Dkt. 993), at ¶10 (emphasis added).  The Order

13   continues that "[e]ach state's pro rata share shall be determined by computing its population as a

14   percentage of the total population of all states," which allocations are listed on a chart printed on

15   the Order.  *Id.*  This competing plan of distribution purports to allocate the Net Settlement Fund on

16   a percentage basis to the enumerated States using figures derived from the 2000 U.S. Census,

17   concluding that "[e]ach of the states *shall receive* its allocable share at a future date to be approved

18   by the Court."  *Id.* (emphasis added.)  The Notice to class members explains:

19          **10.  When can I get a payment?**  No money will be distributed to
     Settlors yet.  The lawyers will pursue the lawsuit against the Non-
20   Settling Defendants to see if any future settlements or judgments can
     be obtained in the case and then be distributed together to reduce
21   expenses.  It is possible that money will be distributed to
     organizations who are, as nearly as practicable, representative of the
22   interests of indirect purchasers of CRT Products instead of the
     Settlors themselves if the cost to process claims would result in
23   small payments to Settlors.  *Regardless of whether the money is
     distributed to organizations or the Settlors themselves, the money
24   will first be allocated amongst the 24 states listed on page 1 of this
     notice, so that each state receives its pro rata share.  Each state's
25   pro rata share shall be determined by computing its population as a
     percentage of the total population of all 24 states using census
26   figures from the year 2000.*"  (Italic emphasis added.)

27   Long Form Notice, Exhibit A, Fisher Chunghwa Notice Declaration, at 4.

28

1    In contrast, the current Plan of Distribution makes no such geographical distinctions.

2  Rather, it provides that "qualifying claimants will be eligible to claim their pro-rata share of the

3  Settlement Fund based on the number of valid claims filed, and the number and type of CRT

4  Products each claimant purchased during the class period." Lead Counsel's Memo at 22-23.

5  Adding to the confusion is that despite the fact that the claims of Illinois, Oregon and Washington

6  residents are specifically excluded from the current Nationwide Class (Lead Counsel's Memo at 2-

7  3), the Court has ordered that the states of Illinois and Oregon are to be allocated 8.59% and

8  2.37% of the Chunghwa Net Settlement Fund. See Dkt. 993, at ¶10.

9    The undersigned recognize that the Chunghwa settlement constitutes a relatively small

10  percentage of the total settlement funds in this case. However, that does not mean that Lead

11  Counsel can simply pretend that the Chunghwa agreement and the orders and notices disseminated

12  implementing it do not exist. Barring renegotiation of the settlement with Chunghwa, re-notice to

13  the members of the Chunghwa settlement classes, and vacating of the Court's orders and judgment

14  in favor of Chunghwa, it is incumbent on Lead Counsel to derive a method of satisfying the

15  noticed and finally-approved terms of the Chunghwa settlement agreement. The current Plan of

16  Distribution fails to do so and, therefore, cannot be given final approval.

17  **IV.    THE NOTICE TO THE CLASSES APPEARS TO HAVE BEEN FLAWED AND
        LEAD COUNSEL HAS NOT DEMONSTRATED OTHERWISE**

18

19    The notice program designed by Lead Counsel's notice administrator, Joseph M. Fisher,

20  appears to have significant deficiencies in reach and effectiveness. Mr. Fisher's declaration, filed

21  in connection with Lead Counsel's motion for preliminary approval, stated that the paid print-

22  media portion of the notice plan would reach only 58% of the target group of potential class

23  members. *See* Decl. of Joseph M. Fisher Re: Notice Program (Dkt. 3863) at page 11 ("Fisher

24  Decl.") ("It is estimated that the paid print media notices, excluding paid Internet advertising, will

25  have a reach of approximately 58%"). This level of reach is inadequate to satisfy Rule 23 and due

26  process. "The lynchpin in an objective determination of the adequacy of a proposed notice effort

27

28

1   is whether all the notice efforts together will reach a high percentage of the class.  It is reasonable

2   to reach between 70-95%."[39]

3          To supplement the inadequate reach of the paid print-media component of notice, Mr.

4   Fisher proposed to use "paid Internet advertising," consisting of "ads, in the form of a web banner

5   or text, on content-targeted website and distribution networks."  Fisher Decl. at 11.  Mr. Fisher

6   stated that "[t]he combination of print media *plus* digital advertisements is expected to reach

7   approximately 80%" of the target audience.  *Id.* at 12 (emphasis in original).  The sole authority

8   for Mr. Fisher's conclusion that the paid Internet advertising component would augment the

9   overall reach to the target audience by 22% is footnote stating that, "[a]nalysis of digital media

10  was made utilizing comScore, a leading technology company that measures Internet activity."  *Id.*

11  at n.19.

12         In connection with final approval, Mr. Fisher submitted a declaration stating that, "[w]hen

13  digital and print media results are combined, the result is an estimated 83% of [the target

14  audience] have been reached . . .".  *See* Decl. of Joseph M. Fisher Reporting On Class Notice

15  (lodged Nov. 20, 2015) at page 14 ("Fisher Decl. II").  The sole support for Mr. Fisher's estimate

16  of the reach of the paid Internet advertising is, again, "comScore," and the sole documentation of

17  this advertising is a single table contained in Exhibit U to his declaration listing seven digital

18  networks and the number of impressions for each network.  *See* Ex. U to Fisher Decl. II, Section

19  (D), "Web Ads & Search."  This contrasts sharply with the documentation concerning the paid

20  print media portion, which includes affidavits or tearsheets from each publication documenting the

21  reach obtained.  *See id.*, Section (A), "Print Media."

22

23  _____

24  [39]  "Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide" ("Notice and
      Claims Process Checklist"), Federal Judicial Center (2010), at 3 (available at

25  http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf).  *See also Walter v. Hughes
      Communications, Inc.*, No. 09-2136-SC, 2011 WL 2650711 at *15 (N.D. Cal. July 6, 2011) (citing

26  "Notice and Claims Process Checklist" in rejecting a proposed notice plan as inadequate).

27

28

1    The Federal Judicial Center cautions district courts to be wary of the often-flimsy data

2    supporting the "impressions" of Internet-based notice programs, and observes that such notice

3    programs usually lead to very low response rates:

4         Audiences of Internet websites are measured by "impressions." Total, or "gross,"
          impressions of the entire website do not reveal how many people will view the
5         notice "ad" appearing periodically on a particular page. *Inflated audience data via
          Internet ads is common.* It is very expensive to reach a significant percentage of a
6         mass audience with Internet banner ads. *Watch for suggestions that Internet ads
          and social network usage can replace all other methods. Reach, awareness, and*
7         *claims will likely be very low when such a program is complete.*

8    Notice and Claims Process Checklist, at 4 (emphasis added).

9    Moreover, Mr. Fisher has made no attempt to identify or measure any potential overlap

10   between the paid print media and paid Internet advertising portions.  Instead, he appears to have

11   taken his documented paid print-media reach of approximately 58%, and simply added

12   "impressions" from the paid Internet advertising portion until he arrived at a total "reach" of more

13   than 80%.  This specific tactic has been identified as a "red flag" by the Federal Judicial Center:

14   "Circulation figures for separate dissemination methods cannot simply be added to determine

15   reach . . . *Be sure the reach calculation removes overlap between those people exposed to two or*

16   *more dissemination methods* (e.g., a person who receives a mailing may also be exposed to the

17   notice in a publication)." *Id.* at p. 3 (emphasis added).

18   Thus, Mr. Fisher has not provided the necessary information to support his calculation that

19   the paid Internet advertising portion of the notice program augmented the reach of the paid print

20   media portion.  His declaration materials therefore show a reach of approximately 58% of the

21   target audience through paid print media, and nothing more.  On the basis of this evidence, the

22   Special Master cannot conclude that adequate Constitutional notice was given.

23   Another problem with the notice is the weak correlation between the demographic groups

24   targeted by the notice plan, and actual members of the classes to be noticed.  Mr. Fisher stated

25   that, with respect to the "consumer email" campaign, the notice plan targeted persons who were at

26   least 18 years of age as of 2007.  *See* Fisher Decl. II at 7.  In other words, this demographic group

27   is defined by those who were only six years old at the start of the class period in 1995.  While Mr.

28

1   Fisher specifically responds that this criticism "improperly ignores the 12-year span of the Class
2   Period," he fails to explain how the length of the class period makes his demographic targeting
3   decisions any more appropriate. Decl. of Joseph M. Fisher Re Objections To Notice (lodged Nov.
4   20, 2015) at page 11 ("Fisher Decl. III"). Those who purchased a CRT Product in 1995 at age 50,
5   for example, are now 70 years old, and were given notice by email, without any discussion or
6   consideration as to whether this demographic age group relies on the Internet for this kind of
7   information.

8           Similar problems exist with the paid print-media demographics. Mr. Fisher states that the
9   paid print-media portion of the notice program reached "an estimated 57% of persons at least aged
10  30+ who own TVs or computers with a household income of at least $60,000." Fisher Decl. II at
11  13. This means the demographic group includes those who were ten years old at the start of the
12  class period and 22 years old at the end, but no explanation is given as to why this is an
13  appropriate demographic in this case, or why, if it is, the appropriate and effective method of
14  reaching this demographic is print media (as opposed to television). *Cf.* Notice and Claims
15  Process Checklist, at p. 2 ("The notice plan should include an analysis of the makeup of the class. .
16  . . Each audience can be matched with the most efficient and effective methods of notice for
17  reaching those people").

18          Mr. Fisher's selective disclosure of the claims experience so far should also raise serious
19  concerns about the effectiveness of the notice program. In his declaration directed at the
20  objections to the notice program, Mr. Fisher reveals, in a footnote, that claimants have submitted
21  claims for "more than 13.5 million 'CRT equivalent' units" as of November 16, 2015. Fisher
22  Decl. III at n.6. But, the number of "CRT equivalent units" submitted provides no information
23  about how many class members have filed claims. Indeed, a few large corporate purchasers can
24  easily account for the vast majority of CRT equivalent units referenced by Mr. Fisher, making it
25  all the more imperative that Mr. Fisher provide a complete description of the claims experience so
26  far.

27

28

1     The significant deficiencies in the notice program here make it difficult for the Special

2  Master and the Court to approve the settlements.  "Where notice to a class has been inadequate, it

3  may be appropriate to reject the settlement in its entirety."  *Kaufman v. Am. Express Travel*

4  *Related Services, Inc.*, 283 F.R.D. 404, 408 (N.D. Ill. 2012).  In *Kaufman*, the district court

5  observed that a weak notice program, combined with a "very low" response rate, put the grant of

6  final approval in jeopardy.  Instead of taking the "drastic step" of denying final approval, however,

7  the *Kaufman* court, "as advised by the Federal Judicial Center's Class Action Checklist 2010,"

8  appointed an expert in class notification to report on the previously employed plan and

9  recommend additional steps to notify the class.  *Id.*  The expert initially selected by the *Kaufman*

10  court was Shannon R. Wheatman, Ph.D. of Kinsella Media.  However, due to her unavailability at

11  that time, the court then selected Todd Hilsee of Hilsee Group.  *Kaufman v. Am. Express Travel*

12  *Related Services, Inc.*, No. 07-C-1707 (N.D. Ill. Aug. 8, 2012) (minute order appointing Todd

13  Hilsee of Hilsee Group).

14     The undersigned note that both Dr. Wheatman and Mr. Hilsee are well-recognized experts

15  in class notice, and respectfully suggest that the Special Master and the Court would benefit from

16  engaging either one of them to report on the effectiveness of the notice given in this litigation, and

17  whether there is the need for additional steps to be taken in order that notice be given in an manner

18  compliant with Rule 23 and due process.[40]

19  ///

20  ///

21  ///

22  ///

23  ///

24

25  _____

26  [40]  In making this suggestion, however, it should be noted that the undersigned are in no way suggesting
that curing defects in the notice would permit a finding that the settlements and/or proposed plan of

27  distribution is fair, reasonable and adequate to the proposed Nationwide Settlement Class as a whole, or to
the previously certified Chunghwa and LG Nationwide Settlement Classes.

28

## V.   CONCLUSION

For all of the above-stated reasons, the proposed settlements cannot be given final approval.

Dated:  December 9, 2015                                  /s/ Tracy R. Kirkham

JOSEF D. COOPER (CASB No. 53015)
TRACY R. KIRKHAM (CASB No. 69912)
JOHN D. BOGDANOV (CASB No. 215830)
COOPER & KIRKHAM, P.C.
357 Tehama Street, Second Floor
San Francisco, CA  94103
Telephone:  (415) 788-3030
Facsimile:  (415) 882-7040
jdc@coopkirk.com
trk@coopkirk.com
jdb@coopkirk.com


FRANCIS O. SCARPULLA (CASB No. 41059)
PATRICK B. CLAYTON (CASB No. 240191)
LAW OFFICES OF FRANCIS O. SCARPULLA
456 Montgomery Street, 17th Floor
San Francisco, CA 94104
Telephone: 415-788-7210
Facsimile:  415-788-0706
fos@scarpullalaw.com
pbc@scarpullalaw.com

1

<u>PROOF OF SERVICE</u>

2

On December, 9, 2015, I caused the following:

3

**REPLY IN SUPPORT OF OBJECTIONS TO INDIRECT-PURCHASER PLAINTIFFS'**
**MOTION FOR FINAL APPROVAL OF SETTLEMENTS WITH PHILIPS, PANASONIC,**

4

**HITACHI, TOSHIBA, SAMSUNG SDI, TECHNICOLOR, AND TECHNOLOGIES**
**DISPLAYS AMERICAS DEFENDANTS**

5

6

to be electronically filed with the JAMS Electronic Filing System.  All counsel of record

7

associated with this matter before JAMS will be notified of this filing through the JAMS

8

Electronic Filing System.

9

/s/ John D. Bogdanov
John D. Bogdanov

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28