Jan L. Westfall
29896 Blue Water Way
Menifee, CA 92584
Tel: 619-940-2880
Email: jlwestfall.esq@gmail.com

*Attorney for Objector Donnie G. Clifton*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. CV-07-5944-JST |
| | MDL No. 1917 |
| This Document Relates to: | **OBJECTOR DONNIE CLIFTON'S REPLY TO OPPOSITION TO OBJECTIONS AND MOTION FOR FINAL APPROVAL** |
| ALL INDIRECT PURCHASER ACTIONS | Hearing: 2 P.M., March 15, 2015 |
| | Judge: Hon. Jon S. Tigar |
| | Courtroom 9, 19th Floor |
| | Special Master: Martin Quinn, JAMS |

## I.    INTRODUCTION

Indirect Purchaser Plaintiffs' Motion For Final Approval Of Settlements; Memorandum

In Support Thereof ("MFA") and IPPs' Reply Re: Motion For Award Of Attorneys' Fees

("Reply") again claim IPPs have achieved "an extraordinary result" and seek to discredit

objectors either because they are "insiders" or "professionals"– while minimizing, misstating or

ignoring the substantive issues they raised.  Objectors, those remaining in the case despite

Plaintiffs' aggressive use of discovery to discourage their participation, see it differently.  Class

counsel have not achieved an extraordinary result for the class; instead they piggybacked on the

results of criminal antitrust enforcement actions in the United States and Europe, achieved a settlement that only tangentially reflects class member damages, and have compromised the claims of millions of consumers for nothing.  In short, this result is not extraordinary. [1]

The settlement is objectionable because class members were not adequately represented by named plaintiffs or class counsel, and the resulting settlement is unfair to all class members – particularly those who will receive nothing from this settlement – but also for members of the damages class, because class counsel abandoned all efforts to represent them in the settlement negotiations.  The unfair settlement is compounded (and explained by) class counsel's unreasonable fee request.  Fed.R.Civ.P. 23(e) requires that "A class action shall not be dismissed or compromised without the approval of the court."  The procedures of Rule 23 should prevent the approval of unfair settlements where the interests of named representatives and class counsel are given preference over the interests of absent class members.  Moreover, where inadequate representation is found in the procedural history of a settlement, the fee request should be looked at with heightened scrutiny. [2]

## II.    ARGUMENT

### A. Lack of Adequate Representation is a Fatal Flaw

Mr. Clifton, along with certain other objectors, described the flaw in the settlement as a problem of inadequate representation. [3]  Both the history of the litigation and the terms of the

---

1 See Dkt. 1526, Fourth Amended Complaint, ¶¶192 – noting that "Until the last few years, CRTs were the dominant technology used in displays, including television and computer monitors. . . this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits."

[2] See, e.g., American Law Institute, Principles of the Law of Aggregate Litigation § 3.05, comment b at 208 (2010) ("a proposed settlement in which the class receives an insubstantial payment while the fees requested by counsel are substantial could raise fairness concerns").

[3] See Objection of Donnie Clifton, Dkt. 4099, page 5, Section II.A.3 (arguing "the settlement improperly treats dissimilar claims as equivalent based in part on a lack of adequate representation. ").  See also Objection of John Finn and Laura Townsend Fortman, Dkt. 4111,  pages 7-11, and Objection of Josie Saik, Dkt. 4140-3, page 5.

settlement point to the lack of adequate representation.  This was particularly true for residents of

the "omitted states".  Prior to the settlement, the residents of these states received no

representation at all.[4]  Class Counsel has even conceded this point:

> [71] Certain objectors criticize Lead Counsel for failing to approach attorneys general of
> these other states. Lead Counsel was appointed to represent the interests of purchasers in
> the 22 indirect purchaser state classes. He has no duty to represent purchasers in other
> states . . .

MFA, fn. 71, page 43.  Despite the fact that IPP counsel did not represent the interests of

purchasers in the omitted states, it was decided that those consumers should be included in a

nationwide class, have their claims released, and get nothing.  This is a startling result.  What

happened here underscores the importance of the procedural safeguards of Rule 23, particularly

the need to assure class members are adequately represented as required by Rule 23(a)(4).

Ninth Circuit precedent is clear: adequate representation is an essential prerequisite to a

court's release of absent class members' claims.  *See, e.g., Hanlon v. Chrysler Corp.*, 150 F.3d

1011, 1020 (9th Cir.1998) ("To satisfy constitutional due process concerns, absent class

members must be afforded adequate representation before entry of a judgment which binds

them") *and Brown v. Ticor Title Ins. Co.*, 982 F.2d 386, 390 (9th Cir.1992) ("[I]f the plaintiff

was not adequately represented in the prior action, or there was a denial of due process, then the

prior decision has no preclusive effect.").

The Ninth Circuit considered the effect of a settlement where certain types of claims had

not been adequately represented in *Hess v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010).  In

*Hess*, the court determined an earlier class action in Kansas had not achieved a release as to the

---

[4] No representative plaintiff pursued the interests of Alabama consumers, or Alaska consumers, or
Arkansas consumers, let alone consumers in Colorado, Connecticut, Delaware, Georgia, Indiana,
Kentucky, Louisiana, Maryland, Massachusetts, New Hampshire, New Jersey, Ohio, Oklahoma, Rhode
Island, South Carolina, Texas, Utah, or Virginia.  Nor is this a case where a few representative plaintiffs
were to represent multiple states; there were plaintiffs from all of the states that are members of the
damages class, but none from the omitted states. *See* Fourth Amended Complaint, Dkt. 1526, ¶¶ 19 – 49.

REPLY TO OPPOSITION TO OBJECTIONS AND MOTION FOR FINAL APPROVAL
(Master File No. CV-07-5944-JST)

Washington claims because the plaintiffs in Kansas had not provided adequate representation --

so finding the Kansas action preclusive would violate due process. "Without adequate

representation, a court order approving a claim-preclusive class action settlement agreement

cannot satisfy due process as to all members of the class." *Hess*, 598 F.3d at 588 – 589, *citing*

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) ("[T]he Due Process Clause ...

requires that the named plaintiff at all times adequately represent the interests of the absent class

members."). The due process concerns expressed by the Court in *Hess* are identical to those at

issue here. The settlement purports to release the claims of residents of half the states in this

country although they were not represented.[5]

 Mr. Clifton also pointed out that even state classes that were represented prior to

settlement appear to not have had separate representation in the settlement negotiation, as a lack

of adequate representation is reflected in the terms of the settlement. The unitary damages

scheme agreed to for residents of *Illinois Brick* repealer states suggests this: If a class

representative had adequately represented the interests of California residents, differences in

California law would no doubt be reflected in the settlement.[6]  Plaintiffs characterize Mr.

Clifton's concerns related to the allocation of the settlement as a request for "weighting" of the

settlement. This focuses only on the *effect* of the lack of adequate representation, and ignores the

importance of the procedural safeguards of Rule 23. These requirements are designed to ensure

that class action settlements are both *procedurally and substantively* fair.

 Plaintiffs attempt to counter Mr. Clifton's argument based on dicta in this court's holding

---

[5] See Objection of John Finn and Laura Townsend Fortman, Dkt. 4111, at 2.

[6] Although Class Counsel purports to be seeking certification of 22 indirect purchaser state classes, "All of the Statewide Damages Classes are the same except that three states, Hawaii, Nebraska and Nevada, have slightly shorter damages periods."  Declaration of Joseph M. Fisher Reporting on Class Notice, page 3 (emphasis added).

REPLY TO OPPOSITION TO OBJECTIONS AND MOTION FOR FINAL APPROVAL

(Master File No. CV-07-5944-JST)

in *DRAM* [7] and in *Sullivan v. DB Investments, Inc.*, 66 F. 3d 273 (3rd Cir. 2011).  Class counsel's reliance on *DRAM* and *Sullivan* to support the settlement here is curious, however, as in both of those cases residents of *all* states – both *Illinois Brick* repealer and non-repealer states – were treated equally.  Class counsel essentially rejected the approach taken in those cases by not pursuing damages for residents of all 50 states.  So on the one hand class counsel chose not to provide recovery to residents of all states, but on the other hand rejects the suggestion that distinctions should be made based on the strength of various state law claims.  If no distinctions need be made, then why not compensate the claims of residents of all states?  If it is fair to provide equal recovery to all class members because they have all suffered the same injury, then class members in the omitted states should be compensated.  If not, then Class counsel's approach is not right either.  At any rate, neither *Sullivan* nor *DRAM* are binding on this court, and this remains an unsettled area of law.  Given this, it is especially important that courts ensure the procedural safeguards of Rule 23 are observed.  Here, while the adequacy of representation of the statewide classes is at least debatable, there can be no argument that the omitted states lacked adequate representation, as they had **no** representation.

## B. The Attorneys Fees Requested are Too High

As noted by class counsel, "'the overall result and benefit to the class from the litigation' is typically considered 'the most critical factor in granting a fee award'." Reply, page 4, *citing In re Omnivision Technologies*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008).  If the court does choose to approve this settlement, it must recognize that this is a fee driven case where recovery for the class and protection from future harm mattered less than achieving a settlement that would compensate class counsel.  The attorneys' fees award must reflect this.

---

[7] *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M-02-1486, 2013 U.S. Dist. LEXIS 188116, at *320-21 (N.D. Cal. Jan. 8, 2013) (summarizing Special Master's Report, Part I).

Mr. Clifton's principal objection to the fee request is that 33 1/3 percent is too high in light of the factors discussed above.[8] As for the specifics of the fee request, objectors pointed out that both case law and empirical research support fee awards well below the 25% benchmark in a megafund case such as this, particularly where the size of the fund can be attributed to factors other than the efforts of class counsel.

### 1. *Regulatory bodies in the U.S. and Europe contributed significantly to the outcome of this litigation.*

One of the reasons the fee request is unreasonable is that it does not acknowledge the degree to which class counsel was able to bootstrap the work of others. As Objector St. John pointed out, the settlements with Samsung SDI and Philips account for 69.3% of the total settlement fund, although these two defendants accounted for only 28% of the market for CRTs, and settlement funds were contributed by eight defendants. Dkt. 4106, page 12. The outsize contribution of these two defendants indicates the work of regulatory bodies played a more important role in this litigation than acknowledged by class counsel.[9]

Class counsel's fees should be reduced accordingly. If class counsel were to receive a 10% fee for the 69.3% of the settlement fund that must at least partly be attributed to the work of government agencies (a reasonable percentage in such circumstances), and the benchmark fee of

---

[8] The Reply correctly pointed out an error in the Clifton objection related to the hourly fees requested by class counsel. In calculating the average hourly rate requested by IPP counsel, we incorrectly entered the total number of hours DPP Plaintiffs claimed to have spent prosecuting this action (95,229.33) (See DPP NOMAM for an Award of Attorney's Fees, Dkt. 4055, Page 21), rather than the 183,000 hours Indirect Purchaser Plaintiffs claim to have spent prosecuting this action, yielding an average hourly rate of $879.50 rather than the correct average hourly rate claimed of $457.67 (as noted by class counsel in the Reply at page 18). Accordingly, Mr. Clifton withdraws his statement as to the inappropriateness of the average hourly rate. The focus of Mr. Clifton's objection, however, was on the percentage award requested, i.e., that 33 1/3 % is too high a percentage award, and he renews that objection.

[9] Class Counsel also claim the timing of the EC's decision proves it had no impact on the instant litigation, noting "the EC's Summary Decision regarding the CRT conspiracy was not issued until October 19, 2013—six years after this litigation began." But the EC's press release announcing fines of €1,470,515,000 related to price-fixing in the CRT sector was issued on December 5, 2012 – early enough to have had a significant impact on the settlement.

6

REPLY TO OPPOSITION TO OBJECTIONS AND MOTION FOR FINAL APPROVAL
(Master File No. CV-07-5944-JST)

25% for the remaining 30.7% of the fund contributed by other defendants, the total fee would be reduced by more than $100 million. (More precisely, the current fee request of $192,250.00 minus $84,234,337.50 would yield ***$106,573,787.50 in additional funds for the class***.) The following table summarizes this proposal:

| Attribution | Total Settlement | % | Value of Attributed Share of Settlement | Proposed Fee % | Fee Award |
|---|---|---|---|---|---|
| U.S and EC Regulators | $576,750,000 | 69.3 | $399,687,750 | 0.10 | $39,968,775.00 |
| Class Counsel | $576,750,000 | 30.7 | $177,062,250 | 0.30 | $44,265,562.50.00 |
| **Total Proposed Fee** | | | | | **$84,234,337.50** |

Interestingly, this proposed fee award is extremely close to class counsel's asserted lodestar of $83,753,999.05 – an amount considered presumptively reasonable in statutory fee shifting cases. *See, e.g., Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010) (in a civil rights case finding "the lodestar method yields a fee that is presumptively sufficient").

### 2. *The percentage fee award requested by class counsel is unreasonable, and a 2.3 lodestar multiplier does not make 33 1/3 percent reasonable.*

Class counsel seek to discredit the objections by claiming objectors erroneously claim there is a "categorical megafund rule" and argue the case law and empirical studies "automatically call for [a] lower percentage award[s]". Reply, page 5. These arguments misrepresent the objections: Mr. Clifton did not argue for a mechanical application of a rule, but instead analyzed both case law and empirical research regarding reasonable fee awards — relevant information that should be taken into account.

It is clear that class counsel's fee request of 33 1/3 % is well beyond the Ninth Circuit's benchmark, and even higher than the fees requested in *In re TFT-LDC (Flat Panel) Antitrust Litig.*, No. 07-md-01827, 2013 WL 1365900 (N.D. Cal. Apr. 3 2013) (awarding a 28.5% fee) and

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M-02-1486-PJH, 2007 WL 2416513 (N.D. Cal. Aug. 16, 2007) (awarding a 25% fee).

Make no mistake, we are not arguing fees above 25% are inappropriate in all large fund cases. *Vizcaino v. Microsoft*, 290 F.3d 1043 (9th Cir. 2002) provides an example of the kind of exceptional work that may be rewarded with fees above the benchmark. At 28%, the percentage fee award in *Vizcaino* was slightly above the 25% benchmark, and also included a multiplier of 3.65, higher than that sought here. *Vizcaino* involved exceptional circumstances, however, that are not present in this case. Among the multiple factors weighing in favor of the high fee award, for example, was the fact that the litigation "generated benefits beyond the cash settlement fund." *Id.* at 1049. In particular the court noted, "During the litigation Microsoft agreed to hire roughly 3000 class members as regular employees and to change its personnel classification policies, a benefit counsel valued at $101.48 million during the 1999-2001 period alone." *Id.* The litigation thus generated substantial monetary benefits to class members aside from the settlement fund itself. The result in *Vizcaino* differs sharply from the result here, where the benefits achieved for the statewide damages classes should be discounted by the *detriment* to class members in the omitted states whose rights are being compromised without consideration.

Class counsel further insist the percentage fee requested is reasonable because the multiplier (2.3) is reasonable. First, class counsel appear to have erroneously cited Brian Fitzpatrick's work regarding lodestar multipliers. *See* Reply, Footnote 11, citing Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL L. STUD. 811, 834 (2010) and stating that on page 834 Fitzpatrick described 14 settlements of $250 million or more in which the average and median lodestar multipliers were 3.48 and 3.11. Respectfully, we do not see this information on the page referenced. On the

REPLY TO OPPOSITION TO OBJECTIONS AND MOTION FOR FINAL APPROVAL
(Master File No. CV-07-5944-JST)

contrary, Fitzpatrick states that while lodestar multipliers ranged from 0.07 to 10.3, the mean multiplier was 1.65 and the median was 1.34, and "the bulk of the range [was] not much above 1.0." While a different iteration of Fitzpatrick's work may have included the statistics referenced by class counsel, in general Fitzpatrick's research supports awarding a much lower multiplier than that requested here. In addition, class counsel's assertions regarding reasonable multipliers fall flat because in larger cases higher multiples may sometimes be warranted to prevent an extraordinarily low percentage award. *See, e.g., In re High-Tech Employee Antitrust Litigation,* (2015) No. 11 cv-02509, 2015 WL 5158730, at *10-11, 16 (N.D. Cal. Sept. 2, 2015), where the court's fee award included a multiplier of 2.2 to 2.5, but the percentage fee award was only 10.5% of a total fund of $435,000,000.00 – *one third* the percentage requested here.

At the very least, if the Special Master finds a multiplier of 2.3 reasonable for lead counsel's work, the multipliers should be reduced for firms that took on less responsibility in the case or shouldered less risk, in keeping with the approach taken in *In re TFT-LDC (Flat Panel) Antitrust Litigation, supra.* The adjustment of multipliers based on complexity of work and role in advancing the litigation offers a reasonable compromise that would result in additional savings to the class.

## C. The Special Master should closely scrutinize the Requests for Expenses

We have argued that class counsel should not receive a commission on his own expenses, although we recognize that in *In re Online DVD-Rental Antitrust Litig.*, 779 F. 3d 934 (9th Cir. 2015), the Ninth Circuit upheld a district court's decision to include expenses in calculating attorneys' fees. *Staton v. Boeing Co.*, 327 F.3d 938 (2003) has also been read to support this approach, although it is important to note that in *Staton* the court found certain expenses incurred were not for the benefit of the class, and did not include those expenses in the common fund. As

REPLY TO OPPOSITION TO OBJECTIONS AND MOTION FOR FINAL APPROVAL
(Master File No. CV-07-5944-JST)

class counsel no doubt incurred significant expenses in deposing objectors, we would like to point out that expenses incurred to protect a fee award should not be charged to the class. Respectfully, we request the Special Master's vigilance in ensuring they are not.

More generally, we renew our argument that including expenses as the denominator in the fee request is unfair to the class and creates perverse incentives by effectively enabling class counsel to receive a commission on monies paid to third parties. If attorneys' fees are paid only on what the class receives, class counsel will be appropriately incentivized to monitor costs. We believe this is approach is reasonable, and it is well within the court's discretion to exclude expenses in calculating the attorneys' fees.

## III. Conclusion

Plaintiffs seek to discredit objectors because they are "insiders" or "professionals" rather than addressing the substantive issues they raised. At the same time, class counsel claims to have achieved an extraordinary result for the class. This is simply not true. This is an unfair settlement, and its unfairness is compounded by an unreasonable fee request. The Court and the Special Master must find that class members in the omitted states had no representation and so must reject the settlement. In the alternative, the Special Master should at least recommend a sharply reduced fee award to reflect the inadequacies of the settlement.

Dated:   December 9, 2015                    Respectfully submitted,

                                             __/s/ Jan L. Westfall_____
                                             Jan L. Westfall
                                             *Counsel for Objector Donnie G. Clifton*

REPLY TO OPPOSITION TO OBJECTIONS AND MOTION FOR FINAL APPROVAL
(Master File No. CV-07-5944-JST)

*Trump Alioto Trump & Prescott*
ATTORNEYS LLP
2280 Union Street
San Francisco, California 94123
(415) 563-7200
FAX (415) 346-0679

December 13, 2015

**VIA JAMS E-FILING**

Martin Quinn, Special Master
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111

Re:    *In Re: Cathode Ray Tubes (CRT) Antitrust Litigation,*
       **Case No. 07-cv-5944 JST, MDL 1917**

Dear Special Master Quinn:

We received on December 9, 2015 a series of briefs and declarations relating to approval of the settlements and the Indirect Purchaser Plaintiffs' ("IPPs") request for attorneys' fees.

We have now had a chance to review these submissions.  The submissions go far beyond replying to the IPPs' initial submissions and raise a number of new matters.

The IPPs, as the moving parties on the underlying motions, request an opportunity to respond to these new matters.  We request an opportunity to reply on the settlements (not to exceed 15 pages), and an opportunity to reply on attorneys' fees (not to exceed 10 pages).

This further briefing will complete the record and, we believe, facilitate your decision in this matter.

Respectfully submitted,

*/s/ Mario N. Alioto*
Mario N. Alioto

Lead Counsel for the Indirect Purchaser Plaintiffs

| Law Offices of Francis O. Scarpulla | Cooper & Kirkham, PC |
|---|---|
| 456 Montgomery Street, 17th Floor | 357 Tehama Street, Second Floor |
| San Francisco, CA 94104 | San Francisco, CA 94105 |
| Telephone: (415) 788-7210 | Telephone: (415) 788-3030 |
| Facsimile: (415) 788-0706 | Facsimile: (415) 882-7040 |

December 14, 2015

*Via* JAMS ELECTRONIC Filing System

The Honorable Martin Quinn
Special Master
Judicial Arbitration & Mediation Services
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111

      Re:    In re: Cathode Ray Tube (CRT) Antitrust Litigation
                Case No. 3:07-cv-5944 JST

Dear Special Master Quinn:

    We have been served with Mr. Alioto's request that Lead Counsel be permitted to file supplemental memoranda. If Your Honor grants Mr. Alioto's application, we respectfully request that we be permitted the opportunity to file sur-reply briefs.

                    Respectfully yours,

                    /s/ Francis O. Scarpulla
                    Francis O. Scarpulla

                    /s/ Josef D. Cooper
                    Josef D. Cooper

FOS/JDC/cpc

Martin Quinn
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111
Telephone: (415) 774-2669
Fax: (415) 982-5287
Special Master

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | MDL No. 1917 |
| | Case No. C-07-5944-SC |
| This Document Relates to: ALL ACTIONS | **SPECIAL MASTER'S ORDER RE (1) LEAD COUNSEL'S REQUEST FOR FURTHER BRIEFING; (2) HEARING FOR ORAL ARGUMENT; (3) OBJECTORS FINN/FORTMAN MOTION FOR PRODUCTION OF FEE AGREEMENTS** |

1. <u>Request for Further Briefing</u>.  By letter dated December 13, 2015, Lead Counsel asks to be permitted to file a responsive brief to Objectors' Reply Briefs on the ground that Objectors raised new issues for the first time.  As sure as night follows day, Class Counsel Scarpulla by letter dated December 14, 2015 requested leave to file a sur-Reply.  The Special Master has reviewed the Reply Briefs, and they indeed raise for the first time a few issues and discuss issues previously mentioned far more thoroughly than they did in their original Objections.  The Special Master is reluctant to extend the briefing period because it reduces the time he has to

1   prepare his Report and Recommendation which is due January 15, 2016. However, he concludes

2   that his Report will benefit from obtaining Lead Counsel's further views on certain issues.

3       Therefore, Lead Counsel's request is GRANTED. Lead Counsel shall file a further

4   Response not exceeding 20 pages by **December 23, 2015** to the following issues: the release

5   without compensation of class members in certain states (section II of the Cooper/Scarpulla

6   brief); issues relating to the Chungwa settlement (section III of the Cooper/Scarpulla brief, and

7   section B.2 of the St. John brief); alleged defects in notice (section IV in the Cooper/Scarpulla

8   brief); the disproportionate size of the Samsung and Phillips settlements (section C of the St.

9   John brief); and the failure to pursue claims of class members in Massachusetts and Missouri

10  (section II.C of the Moore brief). The request to submit a sur-Reply is DENIED.

11      2. <u>Oral Argument</u>. A hearing is set for **Tuesday, January 5, 2016** at 10:00 AM at

12  JAMS San Francisco for oral argument on the issues of approval of the settlement and award of

13  attorneys' fees. Counsel may attend in person or by telephone. Lead Counsel shall provide a

14  court reporter for that hearing.

15      3. <u>Motion re Fee Agreements</u>. Objectors Finn and Fortman move for an order requiring

16  Lead Counsel to produce copies of all fee agreements of class counsel. The motion contends that

17  the Court must scrutinize any fee agreements among class counsel, notes that none have been

18  filed with the Court, and assumes without evidence that some such agreements must exist. The

19  Special Master concludes that Objectors have not shown good cause for production to them of

20  fee agreements, and accordingly DENIES the motion. However, the Special Master ORDERS

21  that all fee agreements among class counsel relating to a division or treatment of fees to be

22  awarded IPP Counsel be filed with the Special Master forthwith.

23

24

25  Dated: December 14, 2015

                                       Martin Quinn

26                                         Special Master

27

28

1  Robert J. Bonsignore, Esq.
   **BONSIGNORE TRIAL LAWYERS, PLLC**
2  **3771 Meadowcrest Drive**
   **Las Vegas, NV 89121**
3  **Phone: 781-856-7650**
   **Email: rbonsignore@classactions.us**
4
   *Counsel for Indirect Purchaser Plaintiffs*
5

6

7                    **UNITED STATES DISTRICT COURT**

8                    **NORTHERN DISTRICT OF CALIFORNIA**

9                        **SAN FRANCISCO DIVISION**

10 **IN RE: CATHODE RAY TUBE (CRT)**      Case No. 3:07-cv-5944
   **ANTITRUST LITIGATION**             MDL No. 1917

11                                        **CLASS ACTION**

12                                        **MOTION FOR PERMISSION TO FILE**
   This Document Relates to:            **REPLY IN SUPPORT OF OBJECTIONS TO**
13                                        **LEAD COUNSEL'S MOTIONS FOR FINAL**
   All Indirect Purchaser Actions       **APPROVAL AND ATTORNEYS' FEES**
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Pursuant to Federal Rule of Civil Procedure 6 and Local Rule 6-3, this Motion for

2    Permission to File Reply in Support of Objections to Lead Counsel's Motions for Final Approval

3    and Attorneys' Fees is submitted by class members and indirect purchasers of Cathode Ray Tube,

4    Anthony Gianasca, Gloria Comeaux, Mina Ashkannejhad individually and/or as Administrator of

5    the Estate of the Late R. Deryl Edwards, Jr., Jeffrey Speaect, Rosemary Ciccone and Jeff Craig

6    (the "Plaintiffs"), through their counsel Bonsignore Trial Lawyers, PLLC.[1]  In support of this

7    Motion, Plaintiffs state:

8        This and the accompanying papers are respectfully submitted in reply to Lead Counsel's

9    Motions for Final Approval and for Attorneys' Fees. The Reply was to be filed via the JAMS

10   Electronic Filing System by December 9, 2015. Plaintiffs' Gianasca and Ashkannejhad were not

11   timely provided with copies of their deposition transcripts and full attachments through no fault of

12   their own.  In fact, Ms. Ashkannejhad still has not received a copy of her October 29, 2015

13   deposition or its exhibits.

14       Pursuant to Federal Rule of Civil Procedure 6(b)(1)(B), when a party moves the Court to

15   accept a filing after a deadline, the court may do so "where the failure to [file before the deadline]

16   was the result of excusable neglect."  The standard for determining excusable neglect is set by

17   balancing the following five factors:  (1) the danger of prejudice to the nonmoving party; (2) the

18   length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay;

19   (4) whether the delay was within the reasonable control of the moving party; and (5) whether the

20   late-filing party acted in good faith. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507

21   U.S. 380, 395 (1993).

22       Here, the filing of Plaintiffs' Reply will harm neither the Defendants nor Lead Counsel by

23   leave of Court.  If the Court permits Plaintiffs' Motion there will be no impact upon any

24   proceedings.  The delay in the filing is less than one week and will therefore not impact the

25   hearing scheduled for March 15, 2015 on Lead Counsel's motions or any further related filing.

26

27   _____

28   [1] Moving counsel has requested that Lead Counsel stipulate to this request and will promptly
     advise if an assent is granted.

1   Although the widow Ashkannejhad is prejudice by the fact she does not have the benefit of her

2   deposition, she has approved this filing because she has no reasonable alternative. The delay was

3   not the result of any manipulation, animus or bad faith on her part. At best it was inadvertence on

4   the part of another who she has no control over.  The production and timing of the receipt of the

5   Gianasca deposition[2] was also not within the control of Plaintiffs. Indirect purchasers of Cathode

6   Ray Tube, Anthony Gianasca, Gloria Comeaux, Mina Ashkannejhad individually and/or as

7   Administrator of the Estate of the Late R. Deryl Edwards, Jr., Jeffrey Speaect, Rosemary Ciccone

8   and Jeff Craig contend the delay was not carried out by them in bad faith and is excusable.

9           Accordingly, Plaintiffs request that permission to file a reply in support of their objections

10   to lead counsel's motions for file approval and attorneys' fees in the form attached hereto as

11   Exhibit A be granted and that the Order attached hereto as Exhibit B be entered in this case.

12   Dated:  December 15, 2015                     Robert J. Bonsignore

13

14

15                                            /s/ Robert J. Bonsignore
                                             Robert J. Bonsignore (NH 21241)
16                                            Bonsignore Trial Lawyers, PLLC
                                             3771 Meadowcrest Drive
17                                            Las Vegas, NV 89121
                                             Telephone:  (781) 856-7650
18                                            rbonsignore@class-actions.us

19

20

21

22

23

24

25

26

27   [2] The Gianasca deposition contains transcription errors and the attachments returned do not match
     the record of what was produced. While these discrepancies can be worked through, they took time
28   to sort out.

2

MOTION FOR PERMISSION TO FILE REPLY IN SUPPORT OF OBJECTIONS TO LEAD COUNSEL'S
MOTIONS FOR FINAL APPROVAL AND ATTORNEYS' FEES - Case No. 3:07-cv-5944, MDL No. 1917

1

## CERTIFICATE OF SERVICE

2

3      I, Robert J. Bonsignore, hereby certify that on this 15th day of December 2015, I caused the

4  foregoing to be electronically filed with the JAMS Electronic Filing ("JAMS") System, which will

5  send a notice of electronic filing to all parties registered with the JAMS system in the above-

6  captioned matter.  A copy will be forwarded via first class mail, postage prepaid, to those parties

7

8  not electronically registered.

9

10                                        /s/ Robert J. Bonsignore
                                          Robert J. Bonsignore

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR PERMISSION TO FILE REPLY IN SUPPORT OF OBJECTIONS TO LEAD COUNSEL'S
MOTIONS FOR FINAL APPROVAL AND ATTORNEYS' FEES - Case No. 3:07-cv-5944, MDL No. 1917

1  Mario N. Alioto (56433)
   Joseph M. Patane (72202)
2  Lauren C. Capurro (241151)
   TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
3  2280 Union Street
   San Francisco, CA 94123
4  Telephone: 415-563-7200
   Facsimile: 415- 346-0679
5  Email: malioto@tatp.com
   jpatane@tatp.com
6  laurenrussell@tatp.com

7  *Lead Counsel for the*
   *Indirect Purchaser Plaintiffs*

8

9

                    UNITED STATES DISTRICT COURT
10
                    NORTHERN DISTRICT OF CALIFORNIA
11
                    SAN FRANCISCO DIVISION
12

13  IN RE: CATHODE RAY TUBE (CRT)          Master File No. CV-07-5944-JST;
    ANTITRUST LITIGATION                   No. CV-13-03234-JST

14                                         MDL No. 1917

15
    This Document Relates to:             **INDIRECT PURCHASER PLAINTIFFS'**
16                                        **REPLY RE: FINAL APPROVAL OF**
    All Indirect Purchaser Actions        **SETTLEMENTS WITH THE PHILIPS,**
17                                        **PANASONIC, HITACHI, TOSHIBA,**
                                          **SAMSUNG SDI, TECHNICOLOR, AND**
18                                        **TECHNOLOGIES DISPLAYS AMERICAS**
                                          **DEFENDANTS**
19
                                          Hearing Date: January 5, 2016
20                                        Time: 10:00 am
                                          Court: JAMS
21                                        Special Master: Martin Quinn, JAMS

22                                        Judge:  Hon. Jon S. Tigar

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................1

ARGUMENT ..................................................................................................................3

I.       THE SETTLEMENTS SHOULD BE APPROVED.................................................3

     A.       A Nationwide Release of Claims That Were or Could Have Been Brought in Class Litigation—Including Class Member Claims with Little or No Substantive Merit—Is Reasonable and Appropriate Under Rule 23. ......................................3

     B.       By the Time of the Settlements, There Was Essentially No Merit to—or Practical Need For—the Class Claims for Injunctive Relief. ...........................................5

     C.       Nationwide Class Members Were Adequately Represented ................................6

     D.       The Authorities Cited by Objectors Are Distinguishable. ..................................7

     E.       The Settlements Should be Approved...................................................................9

II.      THE PLAN OF DISTRIBUTION IS REASONABLE.............................................9

     A.       Valuation of Equitable Disgorgement or Damages Claims for Class Members in States Lacking *Illinois Brick* Repealer Laws...............................................10

     B.       Valuation of Damages/Disgorgement Claims Arising Under Massachusetts, Missouri, and New Hampshire Law...............................................................12

III.     CHUNGHWA SETTLEMENT ...........................................................................13

     A.       Release of Reseller Claims .............................................................................13

     B.       Plan of Distribution of Chunghwa Settlement ................................................13

     C.       St. John Arguments on Chunghwa Settlement and Attorney's Fees ...........................13

IV.      CLASS NOTICE ..............................................................................................14

V.       THE SAMSUNG SDI AND PHILIPS SETTLEMENTS......................................16

     A.       The Consideration Paid by Samsung SDI and Philips Is Consistent with These Defendants' Market Shares...........................................................................16

     B.       The Consideration Paid by Samsung and Philips is also Consistent with their Core Roles in the Conspiracy and the Evidence Developed by IPPs .......................17

VI.      NEW COOPER/SCARPULLA ARGUMENTS ON FEES...................................19

CONCLUSION..............................................................................................................20

i

# TABLE OF AUTHORITIES

**Cases**

*Booth v. Strategic Realty Trust, Inc.*, No. 13-CV-04921-JST , 2015 WL 6002919
(N.D. Cal. Oct. 15, 2015)............................................................................................. 2, 9

*Charron v. Wiener*, 731 F.3d 241 (2d Cir. 2013) ............................................................. 4

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) ..................................... 3

*Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 771 F. Supp. 2d 1195 (N.D. Cal. 2011) 10

*Dunleavy v. Nadler*, 213 F.3d 454 (9th Cir. 2000)........................................................10

*Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000)........................... 20

*In re Activision Sec. Litig.*, 723 F. Supp. 1373 (N.D. Cal. 1989) ................................... 20

*In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229 (2d Cir. 2012) .................................. 3

*In re Cendant Corp. Secs. Litig.*, 109 F. Supp. 2d 235 (D.N.J. 2000), aff'd, 264 F.3d 201 (3d Cir.),
cert. denied, 535 U.S. 929 (2002)................................................................................ 10

*In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390 (S.D.N.Y. 2011) ...................... 11

*In re Dynamic Random Access Memory Antitrust Litig. ("DRAM")*, 516 F. Supp. 2d 1072
(N.D. Cal. 2007) .......................................................................................................... 8

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009)............................... 6, 7

*In re K-Dur Antitrust Litigation*, No. CIV.A. 01-1652 (JAG), 2008 WL 2660780 (D.N.J. Feb. 28,
2008) ......................................................................................................................... 11

*In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011).................... 7

*In re Mego Financial Corp. Secs. Litig.*, 213 F.3d 454 (9th Cir. 2000) ......................... 4, 10

*In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231 (9th Cir. 1976)............................. 10

*In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160 (D. Me. 2004).... 11

*In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008)....................... passim

*In re Patriot American Hospitality Inc. Sec. Litig.*, No. MDL C-00-0875 VRW, 2005 WL 3801594
(N.D. Cal. Nov. 30, 2005)............................................................................................. 9

*In re Pet Food Products Liability Litig.*, 629 F.3d 333 (3d Cir. 2010)....................... passim

*In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294 (3d Cir. 2005).......................................... 20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179 (N.D. Cal. 2009) ...................... 11

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 787 F. Supp. 2d 1036 (N.D. Cal. 2011) ..................... 10

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-md-01827-SI, 2013 WL 1365900 (N.D. Cal. April 3, 2013)......................................................................................................................... 12

*In re UnitedHealth Group Incorporated PSLRA Litig.*, 643 F. Supp.2d, 1094 (D. Minn. 2009)....... 10

*In re Warfarin Sodium Antitrust Litig. 212 F.R.D. 231 (E.D. Del. 2002)* ........................................ 10

*In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005) ........................................ 10

*Int'l Union United Auto., Aerospace & Agr. Implement Workers v. GMC*, 497 F.3d 615 (6th Cir. 2007) ........................................................................................................................................ 6

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970 (9th Cir. 1991) ........................................ 6

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-CV-00302 MRP , 2013 WL 6577020 (C.D. Cal. Dec. 5 2013) ........................................................................................................ 4, 6

*Nguyen v. Radient Pharm. Corp.*, No. SACV 11-00406 DOC, 2014 WL 1802293 (C.D. Cal. May 6, 2014) ........................................................................................................................................ 4

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*, No. 09-CV-03329-CW (NC), 2015 WL 4274370 (N.D. Cal. July 13, 2015) ................................................................................................................. 19

*PQ Labs, Inc. v. Qi*, No. 12–cv–00450 CW, 2015 WL 224970 (N.D. Cal. Jan. 16, 2015)............... 19

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741 (9th Cir. 2006)......................................... 3

*Rieckborn v. Velti PLC*, No. 13-CV-03889-WHO, 2015 WL 468329 (N.D. Cal. Feb. 3, 2015) ... 4, 10

*Stonebrae, L.P. v. Toll Bros., Inc.*, No. 08–cv–00221 EMC, 2011 WL 1334444, (N.D. Cal. Apr. 7, 2011) ...................................................................................................................................... 19

*Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011) ......................................................... 3

*United States v. Or. State Med. Soc'y*, 343 U.S. 326 (1952)............................................................... 5

*Vizcaino v. Microsoft Corp.*, 290 F.3d at 1043 (9th Cir. 2002) ....................................................... 20

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969)............................................... 5

**Rules**

Fed. R. Civ. P. 23(e) ............................................................................................................ 1, 2, 9, 10

**Other Authorities**

5 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 16:7 (4th ed. 2007) ....................... 3

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: FINAL APPROVAL OF CLASS SETTLEMENTS
- Master File No. CV-07-5944-JST

Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide" ("Notice and Claims Process Checklist"), Federal Judicial Center (2010) (available at http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf.............................. 15

1      Indirect Purchaser Plaintiffs ("IPPs") respond as follows to the Special Master's Order dated

2  December 14, 2015.

3                                    **INTRODUCTION**

4      The central question before the Special Master is whether the IPP settlements, considered as

5  a whole, are fair, reasonable, and adequate.  Fed. R. Civ. P. 23(e).  The answer is yes.  After years of

6  litigation and exhaustive arm's-length settlement negotiations supervised by experienced mediators,

7  the IPP settlements deliver an extraordinary recovery for the class while avoiding the serious risks of

8  continued litigation.  Considering the record, the risks, the recovery, and class interests as a whole,

9  the settlements should be approved.

10     If the Special Master finds the settlements to be fair, reasonable, and adequate, a secondary

11  question is the allocation of settlement funds among class members, an issue "governed by the same

12  standards of review applicable to approval of the settlement as a whole:  the plan must be fair,

13  reasonable, and adequate." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1045 (N.D. Cal.

14  2008) (Conti, J.).  The issues of settlement approval and allocation are distinct but Objectors have

15  conflated them, seeking to transform allocation disputes into broader challenges to settlement

16  fairness and adequacy of representation for certain class members.

17     Objectors are wrong in all respects. *First,* there is no settlement fairness or adequacy of

18  representation issue.  The settlements were negotiated vigorously and at arm's length by experienced

19  counsel with one central goal in mind, namely, maximizing the total relief for *all* class members

20  while mitigating the risks of trial and appeal.  Class/lawyer interests were squarely aligned at all

21  relevant times, and, by any objective measure, IPP Counsel delivered an excellent result.  Nor is the

22  validity of the settlements—or the adequacy of class representation—called into question simply

23  because IPP Counsel have proposed allocating settlement funds based on the relative strength of

24  class member claims.  Courts have rejected this argument time and again. *See, e.g., In re Pet Food

25  Products Liability Litig.*, 629 F.3d 333, 346-47 (3d Cir. 2010) ("varied relief among class members

26  with differing claims in class settlements is not unusual"; "do[es] not, without more demonstrate"

27  intra-class conflicts, inadequate representation, or the need for subclasses; and such objections are

28

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: FINAL APPROVAL OF CLASS SETTLEMENTS

1   "more appropriately addressed as a Rule 23(e) adequacy of allocation question, rather than [an]

2   adequacy of representation question"); Part I, *infra* (collecting many similar cases).

3         *Second*, with respect to the Plan of Distribution, Lead Counsel followed settled Rule 23

4   authority in proposing to distribute funds based on the relative strength of class member claims. *See*

5   *Omnivision*, 559 F. Supp. 2d at 1045 ("It is reasonable to allocate the settlement funds to class

6   members based on the extent of their injuries or the strength of the claims on the merits."); *Booth v.*

7   *Strategic Realty Trust, Inc.*, No. 13-cv-04921, 2015 WL 6002919, at *7 (N.D. Cal. Oct. 15, 2015)

8   (Tigar, J.) (same).  In doing so, it was fair and appropriate for Lead Counsel to value meritless

9   claims at zero. *See* p. 4 & n. 6, *infra* (collecting cases).  And Lead Counsel continues to believe that

10  the best and most reasonable framework is to allocate the common fund recovery to those class

11  members with substantively viable damages claims, *i.e.*, those claims arising in the 22 *Illinois Brick*

12  repealer states certified for trial by the District Court.  No Objector makes a remotely persuasive

13  case that any other category of claim is viable on the merits.  *See* Part II, *infra*.

14        For all of these reasons, the Objections concerning (1) the nationwide settlements and

15  release, (2) the distribution of the Chunghwa settlement funds, and (3) the recovery for class

16  members in Massachusetts/Missouri/New Hampshire, are properly viewed as Plan of Distribution

17  issues and should be resolved as such.  The other arguments raised by Objectors—concerning class

18  notice and the relative size of the Samsung/Philips settlements—are meritless and should be

19  overruled.

20

21

22

23

24

25

26

27

28

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: FINAL APPROVAL OF CLASS SETTLEMENTS

15

**ARGUMENT**

**I. THE SETTLEMENTS SHOULD BE APPROVED.**

    **A. A Nationwide Release of Claims That Were or Could Have Been Brought in Class Litigation—Including Class Member Claims with No Substantive Merit— Is Reasonable and Appropriate Under Rule 23.**

To the extent the objections bear on settlement approval, Objectors' position is that, because class members in certain states are not scheduled to recover funds under the Plan of Distribution and do not receive injunctive relief, the settlements are necessarily unfair as to those class members. *See, e.g.,* Cooper/Scarpulla Reply at 6 (characterizing the issue as a failure of "consideration"). Objectors also believe this situation casts doubt on adequacy of representation.

The law, however, is to the contrary. There is nothing unusual or improper about a settlement in which all claims that were *or could have been* brought by class members are released, including the release of meritless, speculative claims held by class members nationwide. Release terms of this nature are standard and unobjectionable features of many Rule 23 settlement classes, and, indeed, comport with Rule 23's core goal of facilitating global peace. *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287 (9th Cir. 1992) (approving releases in class action settlements of "not only those claims alleged in the complaint, but also a claim 'based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented *and might not have been presentable in the class action.* '") (citation omitted) (emphasis in original); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 748 (9th Cir. 2006) (same); *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 310 (3d Cir. 2011) (en banc) (approving nationwide settlement structured "to achieve global peace by obtaining releases from all those who might wish to assert claims, meritorious or not").[1]

---

[1] *See also* 5 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 16:7 (4th ed. 2007) ("It is well-settled that in order to achieve a comprehensive settlement . . . a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action."); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 243 (2d Cir. 2012) ("Defendants in class action suits are entitled to settle claims pending against them on a class-wide basis even if a court believes that those claims may be meritless" in order to achieve "global peace[.]").

3

1    Moreover, class action settlements routinely encompass a variety of claims of varying

2    strength on the merits.  *See, e.g., Pet Food*, 629 F.3d at 346 ("varied relief among class members

3    with differing claims in class settlements is not unusual").  This reality often results in the allocation

4    of *zero* relief for subgroups of class members with demonstrably meritless claims—yet that does not

5    defeat the fairness of the class-wide settlement for lack of consideration.  *See, e.g., In re Mego*

6    *Financial Corp. Sec. Litig.*, 213 F.3d 454, 460-61 (9th Cir. 2000) (approving settlement that "left a

7    large portion of the class without a recovery"); *Omnivision*, 559 F. Supp. 2d at 1045-46 (Conti, J.)

8    (approving settlement providing recovery to just one of three groups of class members because they

9    were the only ones with valid claims on the merits).[2]

10    With respect to the *ex ante* valuation of the claims Objectors now say were undervalued by

11    the settlements, several points bear emphasis.  First, as noted, Lead Counsel's interest in settlement

12    negotiations was to bargain as hard as possible to maximize total recovery for *all* the claims.  As a

13    result, the settlements are reasonable as a whole irrespective of any *post hoc* allocation disputes over

14    the value of particular claims.

15    Second, the settlement terms do not address allocation or distribution issues at all.  Rather,

16    they secure lump-sum consideration for *all* releases being granted, highlighting that Objectors'

17    arguments go to allocation, not settlement fairness.  Third, "[a]ll class settlements value some claims

18    more highly than others, based on their perceived merits, and strike compromises based on

19    probabilistic assessments . . . . If these types of compromises automatically created subclasses that

20    required separate representation, the class action procedure would become even more cumbersome

21    than it already is, and would create even more transaction costs[.]"  *Charron v. Wiener*, 731 F.3d

22    241, 253-54 (2d Cir. 2013).

23

24    [2] *See also Rieckborn v. Velti PLC*, No. 13-cv-03889, 2015 WL 468329, at *8-10 (N.D. Cal. Feb. 3,
      2015) (approving settlement and plan of distribution under which class members would recover

25    based on relative strength of claims, with some receiving nothing); *Nguyen v. Radient Pharm. Corp.*,
      No. SACV 11-00406, 2014 WL 1802293, at *7 (C.D. Cal. May 6, 2014) ("The Objector argues that

26    any settlement that releases any claim without compensation is per se unreasonable, but the
      Objector's authority does not bear this out."); *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No.

27    2:10–CV–00302, 2013 WL 6577020, at *17-18 (C.D. Cal. Dec. 5 2013) ("That a plan of allocation
      distributes proceeds based on the relative strength and weaknesses of a claim does not, itself, render

28    a proposed settlement unfair.") (collecting cases).

Fourth, Lead Counsel's valuation of the claims cited by Objectors was reasonable and supported by relevant law and facts. *See* Part I.B., *infra* (injunctive relief claims); Part II, *infra* (addressing the value of nationwide monetary claims for plan of allocation purposes).

**B.   By the Time of the Settlements, There Was No Merit to—or Practical Need For—the Class Claims for Injunctive Relief.**

The absence of injunctive relief does not counsel against settlement approval. The original IPP complaint included a claim for nationwide injunctive relief, namely, an injunction restraining any ongoing conspiratorial conduct impacting the domestic market for CRTs. (*See* Dkt. No. 436.) As the case progressed, however, discovery revealed that (1) the CRT conspiracy was no longer in effect and (2) the conduct was unlikely to recur because Defendants no longer made or sold any meaningful volume of CRT products in the United States. In other words, the CRT cartel had been exposed and the industry was dying or dead, making it doubtful that the class could prevail on its claim for injunctive relief. *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969) (antitrust injunction requires showing of "significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue to recur").

No Objector disputes that the CRT cartel was publicly exposed nearly a decade ago or that the industry subsequently collapsed and is essentially defunct today. Furthermore, by the time of settlement negotiations, Lead Counsel understood better than anyone—based on years of litigation and the discovery record—that the conspiratorial conduct was unlikely to recur. Not only had Defendants ceased to manufacture CRTs, but the individual conspirators had retired or moved on to other jobs, and nothing in discovery suggested ongoing violations at the time of settlement negotiations. What interest, in that situation, would the class have had in pursuing a litigated injunction on the merits through trial and appeal? Any such claim would have been of little practical utility to class members, and would have faced dubious prospects on the merits. *See Zenith Radio, supra, see also United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333-34 (1952) ("The sole function of an action for injunction is to forestall future violations . . . We agree with the trial court that conduct discontinued in 1941 does not warrant issuance of an injunction in 1949.").

In response, Cooper and Scarpulla speculate (Reply at 12) that the settlements nevertheless could have included terms requiring Defendants to "educate" their employees generally about

5

1  antitrust compliance. But "[i]njunctive relief . . . must be tailored to remedy the specific harm

2  alleged," *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991), and that was

3  never the type of relief sought in the case. In any event, it would afford trivial class benefits. (*See*

4  Dkt. No. 1526, ¶¶ 247-256 (injunction sought to enjoin the *specific* conspiratorial conduct alleged in

5  the CRT market, not to educate defendant employees generally about antitrust compliance).)[3]

6       For all of these reasons, Lead Counsel's judgment was, and remains, that the injunctive relief

7  claims had no value for the class at the time of settlement negotiations. This assessment is

8  reasonable in light of the relevant law and facts.

9       **C.    Nationwide Class Members Were Adequately Represented**

10      Objectors are wrong to suggest adequacy of representation issues concerning the nationwide

11  settlements. The mere fact that "relief varie[s] among the different groups of class members [does]

12  not demonstrate . . . conflicting or antagonistic interests within the class" or adequacy of

13  representation issues. *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 272 (3d Cir. 2009).

14  *Accord Pet Food*, 629 F.3d at 347 ("The fact that the settlement fund allocates a larger percentage of

15  the settlement to [certain] class members does not demonstrate a conflict between groups,"

16  inadequate representation, or the need for subclasses. "Instead, the different allocations reflect the

17  relative value of the different claims."); *Charron*, 731 F.3d at 253-54 (rejecting need for subclasses

18  and separate representation).[4]

19      The issue for purposes of settlement approval is simply whether counsel acted reasonably—

20  and adequately—in negotiating fair settlements for the class as a whole. That is precisely what Lead

21  Counsel did. Consistent with the interests of *all* class members, the goal throughout settlement

22

23

24  [3] Notably, injunctive relief claims were released in similar fashion in connection with the LG
    settlement approved by the Court in 2014. (Dkt. No. 2542.) Moreover, the notice clearly informed

25  class members that only members of the 22 Indirect Purchaser States Classes would be eligible to
    submit claims for monetary relief. (*See* Dkt. No. 2511.) That settlement was approved without a

26  word of objection from the Insider Objectors, further underscoring the questionable *post hoc* nature
    of their current position.

27
    [4] *See also Maine State Ret. Sys.*, 2013 WL 6577020 (rejecting similar adequacy of representation and

28  subclass arguments and noting that "if every difference among class members 'required a new
    subclass, class counsel would need to confine settlement terms to the simplest imaginable or risk

                                                    6

1    negotiations was to extract maximum total value from the Defendants, which, with the supervision

2    and extensive mediation of the court-appointed mediators, is just what the settlements achieved.  The

3    bottom line results of that process speak for themselves, and at this stage it is "not enough for

4    objectors to point to differences in claims, allocation amounts, or state laws without identifying how

5    such differences demonstrate a conflict of interest."  *Pet Food*, 629 F.3d at 349.

6         Objectors also misrepresent Lead Counsel's statement that, *during the litigation phase of the*

7    *case*, Class Counsel had "no duty to represent" members of the nationwide class for purposes of

8    approaching attorneys general about pursuing potential *parens patriae* actions.  *See*

9    Cooper/Scarpulla Reply at 11 (quoting Final App. Mot., at 43 n.71).  That was certainly true at the

10   time:  The Court had certified a 22-state class for litigation on the merits, and that was the class to

11   whom Class Counsel's duties flowed for purposes of coordinating litigation issues such as whether

12   (or not) to work with state attorneys general on various aspects of the case.  *At the settlement stage*,

13   however, it goes without saying that Lead Counsel had a duty to represent all members of the

14   proposed settlement class vigorously and adequately, including class members not included in the

15   litigation class, and that is exactly what Lead Counsel did.  (*See* Dkt. No. 4071-1 ("Alioto Fee Decl.

16   I) (describing vigorous advocacy and adequate representation of *all* nationwide class members on all

17   issues relating to settlement).)

18        **D.    The Authorities Cited by Objectors Are Distinguishable.**

19        Objectors cite *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 251-

20   53 (2d Cir. 2011) for the proposition that separate representation is required for certain class

21   members in order for the Special Master to make the appropriate findings concerning the fairness

22   and adequacy of the settlement and the plan of distribution.  But that is not the law.  Instead, the

23   question whether to appoint separate counsel for allocation purposes is a case- and fact-specific

24   determination committed to the sound discretion of the district court.  *In re Ins. Brokerage Antitrust*

25   *Litig.*, 579 F.3d at 271-72.  And here, unlike the factually complex allocation dispute in *Literary*

26   *Works*, the CRT allocation issues are relatively straightforward and can be resolved in a fair and

27

28   fragmenting the class beyond repair'") (quoting *Int'l Union United Auto., Aerospace & Agr.*
     *Implement Workers v. GMC*, 497 F.3d 615, 629 (6th Cir. 2007)).

1   reasonable way on the existing record, without the need for protracted allocation proceedings that

2   would serve merely to delay the case (and class recovery) unnecessarily. *See also* Part II, *infra*.

3        Objectors' reliance on *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*

4   ("*DRAM*") is similarly misplaced. No litigation classes were certified in that case; rather, it was

5   dismissed at the pleading stage. *See* 516 F. Supp. 2d 1072, 1093 (N.D. Cal. 2007). As such, there

6   was no eight-year factual and procedural record to inform litigation and settlement valuations for the

7   class. Moreover, while it is true that *DRAM* allocation proceedings required the appointment of

8   separate counsel to resolve a uniquely complex and fact-bound allocation issue concerning "reseller"

9   versus consumer claimants, the more pertinent point is that *DRAM* lead counsel (including Cooper)

10   represented all  consumer class members in both repealer *and* non-repealer states for settlement and

11   allocation purposes, notwithstanding the variation in strength among those categories of claims.

12   *DRAM* thus confirms that it is appropriate for lead counsel to represent a nationwide class of IPP

13   end-user consumers for purposes of proposing a reasonable plan of allocation.[5]

14        In the end, *DRAM* stands simply for the proposition that separate counsel *sometimes* may be

15   required (at the trial court's discretion) to resolve particularly complex allocation disputes that arise

16   among reseller versus consumer types of claims.   But *DRAM* does not hold or imply that the types

17   of  allocation arguments raised here require such procedures.

18        Cooper and Scarpulla also rely on the Third Circuit decisions in *Sullivan*, 667 F.3d 273, and

19   *Pet Food*, 629 F.3d 333, but neither case supports their position. The *Sullivan* court *approved* a

20   nationwide settlement and broad general release of claims of varying strength and merit,

21   emphasizing the important benefits of "global peace" and that "an important byproduct of the class

22   action device—settlement of all potential claims—supports the decision we reach here." 667 F.3d at

23   297. The court also rejected the need for "an intensive, fifty-state cataloguing of differences in state

24

---

25   [5] The issue that called for separate allocation counsel in *DRAM* was that the settlement encompassed

26   both end-user and "reseller" indirect purchasers, whose claims to the settlement funds are in direct conflict due to the question of "pass-through" of the overcharge. *See DRAM* R&R ¶¶ 207-254

27   (describing pass through issue and appointment of reseller counsel). Here, in contrast, this issue does not exist at all for the settlements under consideration for final approval because resellers are

28   not covered by the settlements. (The Chunghwa settlement does include resellers, an issue discussed separately below in connection with the distribution plan.)

1   law" to evaluate settlement fairness. *Id.* at 308. It is true, as Objectors note, that *Sullivan* (like

2   *DRAM*) also involved fiercely-contested allocation issues between "reseller" and "consumer"

3   subclasses, but as in *DRAM* that was a uniquely complex and case-specific issue. *Id.* at 290. The

4   *Sullivan* court did not remotely suggest that other cases would require the same procedures (or

5   subclasses).

6       *Pet Food* is even less helpful to Objectors. That case held squarely that (1) class settlements

7   and allocations can value class member claims differently based on their relative strength on the

8   merits; and (2) such differences do not cast doubt on settlement fairness or adequacy of

9   representation, and *do not* require subclasses. *See* 629 F.3d at 346-347. The *Pet Food* settlement

10  was approved in these circumstances over objections along the lines of those raised here, with the

11  court of appeals simply remanding for additional fact-finding on a particular allocation issue that had

12  not been addressed by the parties below. *Id.* at 356. Here, unlike *Pet Food*, the allocation disputes

13  have been presented squarely by the parties and the record includes sufficient information with

14  which to resolve them, as discussed in more detail below. *See* Part II, *infra*.

15      **E.    The Settlements Should be Approved.**

16      To summarize, the mere fact that a class action settlement includes a nationwide release

17  covering a subset of meritless claims does not cast doubt on the overall fairness of the settlement, the

18  adequacy of counsel's representation, or the "consideration" received for the class. Accordingly, the

19  settlements should be approved and the objections concerning recovery for certain nationwide class

20  members should be "appropriately addressed as a Rule 23(e) adequacy of allocation question, rather

21  than a Rule 23(a) adequacy of representation question." *Pet Food*, 629 F.3d at 348.

22  **II.    THE PLAN OF DISTRIBUTION IS REASONABLE**

23      The law is settled that "it is reasonable to allocate the settlement funds to class members

24  based on the extent of their injuries or the strength of their claims on the merits." *In re Omnivision*,

25  559 F. Supp. 2d at 1045. *Accord Booth*, 2015 WL 6002919, *7[6]

26  _____

27  [6] *See also* p. 4 & n.2, *supra* (collecting many cases, including cases in which certain class members
    received no recovery under the plan of allocation). *Accord In re Patriot American Hospitality Inc.*

28  *Sec. Litig.*, No. MDL C-00-1300 VRW, 2005 WL 3801594 at *3 (N.D. Cal. Nov. 30, 2005)
    (approving plan of allocation even though it "extinguishes the claims of a large number of class

9

1    The Special Master's allocation analysis "is governed by the same standards of review

2  applicable to approval of the settlement as a whole:  the plan must be fair, reasonable and adequate."

3  *Omnivision*, 559 F. Supp. 2d at 1045.  "Courts recognize that an allocation formula need only have a

4  reasonable, rational basis, particularly if recommended by experienced and competent counsel."

5  *Rieckborn*, 2015 WL 468329, at *8.[7]

6    The following sections provide additional information on the law and facts supporting Lead

7  Counsel's views on the various categories of monetary relief claims raised by Objectors.

8    **A.    Valuation of Equitable Disgorgement or Damages Claims for Class Members in States Lacking *Illinois Brick* Repealer Laws**

9

10    Cooper and Scarpulla devote substantial space (Reply at 12-21) to the argument that class

11  members in non-repealer states hold viable claims for restitution/disgorgement or damages

12  notwithstanding *Illinois Brick*.  But literally decades of authority holds otherwise.

13    *First*, private plaintiffs cannot pursue restitution or disgorgement claims under the federal

14  antitrust laws, as clear authority holds.  *See In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231,

15  234 (9th Cir. 1976); *Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 771 F. Supp. 2d

16  1195, 1202 (N.D. Cal. 2011) ("Such relief is unavailable under Section 16."); *see also In re TFT-*

17  *LCD (Flat Panel) Antitrust Litig.*, 787 F. Supp. 2d 1036, 1040 n.2 (N.D. Cal. 2011) (state AGs

18

19  ——————————————

20  members in exchange for zero recovery"); *In re UnitedHealth Group Incorporated PSLRA Litig.*, 643 F. Supp.2d, 1094, 1101 (D. Minn. 2009)  (approving allocation under which those "who

21  sustained losses due to the conduct at issue in this litigation will be compensated; those who did not, will not.");  *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 343 (S.D.N.Y. 2005) (approving

22  plan of allocation that did not compensate all class members where certain class members' claims would have been "extraordinarily difficult" to prove.)

23  [7] As Cooper/Scarpulla stated in seeking final approval in *DRAM* (Dkt. No. 2215 at 3-4): "[D]istrict

24  courts enjoy broad supervisory powers over the administration of class action settlements to allocate the proceeds among the claiming class members equitably.  *Dunleavy v. Nadler (In re Mego Fin.*

25  *Corp. Secs. Litig.)*, 213 F.3d 454 (9th Cir. 2000). . . ..  Moreover, by any objective measure, 'a Plan of Allocation need not be, and cannot be, perfect.'  *In re Cendant Corp. Secs. Litig.*, 109 F. Supp. 2d

26  235, 272 (D.N.J. 2000), *aff'd*, 264 F.3d 201 (3d Cir.), *cert. denied*, 535 U.S. 929 (2002).  Neither

27  need, nor can, a plan of distribution be optimal from the perspective of each and every individual potential claimant.  In many cases, if not in most cases, perfection to everyone's satisfaction is

28  unattainable.  *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 258 (E.D. Del. 2002), *aff'd*, 391 F.3d 516, 534 (3d Cir. 2004)."

——————————————

10

1   conceding claims for disgorgement "would be barred" under federal law and withdrawing such

2   claims).[8]

3       *Second*, for the states lacking repealer laws, *Illinois Brick* serves as a bar to any and all

4   monetary recovery by indirect purchasers, whether based on state law damage *or* equitable

5   restitution/disgorgement/unjust enrichment theories.  *See, e.g., In re Digital Music Antitrust Litig.*,

6   812 F. Supp. 2d 390, 413 (S.D.N.Y. 2011) ("Indirect purchasers . . . may not recover restitution in

7   states that follow the rule of *Illinois Brick*) (collecting cases); *In re TFT-LCD (Flat Panel) Antitrust*

8   *Litig.*, 599 F. Supp. 2d 1179, 1192 (N.D. Cal. 2009) ("permitting such [unjust enrichment] claims

9   would allow plaintiffs to circumvent limitations of state antitrust laws" in states that follow *Illinois*

10  *Brick*); *In re K-Dur Antitrust Litigation*, No. CIV.A. 01-1652 (JAG), 2008 WL 2660780, at *5

11  (D.N.J. Feb. 28, 2008) ("where the applicable state law bars antitrust actions for damages by indirect

12  purchasers . . . a plaintiff cannot circumvent the statutory framework by recasting an antitrust claim

13  as one for unjust enrichment"); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F.

14  Supp. 2d 160, 211 (D. Me. 2004) ("For those states that have maintained the *Illinois Brick*

15  prohibition on indirect purchaser recovery, I conclude that it would subvert the statutory scheme to

16  allow these same indirect purchasers to secure . . . restitutionary relief at common law (or in

17  equity)").

18      The case law, in short, overwhelmingly establishes that neither damage nor equitable

19  disgorgement-type claims are viable in non-repealer states.  That is precisely why such unjust

20  enrichment/disgorgement claims were not included in the operative amended IPP complaint.[9]  The

21  Insider Objectors are of course fully aware of this authority, so instead of addressing it, they pivot to

22  argue that even if claims are squarely barred by *Illinois Brick*, such claims should be treated as

23

24  [8] The "growing body of law" cited by Cooper and Scarpulla on this issue (Reply at 13-14) focuses

25  on disgorgement remedies that arguably might be available in certain *government* enforcement
    actions, and is thus inapposite.  The rule against disgorgement remedies for private plaintiffs is clear

26  as a matter of federal law, as the cases cited above reflect.

27  [9] Cooper and Scarpulla misleadingly suggest that nationwide disgorgement and unjust enrichment
    claims were alleged in the operative complaint (Reply at 14), but in fact such claims were limited to

28  only eight states (*see* Dkt. No. 1526, ¶¶ 291-292) because of a prior ruling in the case *rejecting* that
    type of claim.  (Dkt. No. 768.)

valuable because the Supreme Court someday might change its mind (Reply at 18). That is creative, but fanciful. By Objectors' reasoning, Lead Counsel should have held out to recover for all manner of frivolous, hypothetical claims foreclosed by existing law, because someday maybe the law will change.

That is not how it works. Lead Counsel's job was to make reasonable, rational, good-faith valuations about the strength of the claims at issue based on governing law as it actually stands, not as plaintiffs' lawyers might wish it to be. Judgment calls were necessarily involved. But where, as here, experienced indirect purchaser counsel was highly motivated to secure the maximum possible relief for the class and did so with skill, vigor, and without conflict throughout the settlement process, it is not enough for Objectors to second-guess the results based on theoretical (and often spurious) arguments about the value of claims that, by any objective measure, had exceedingly little chance of ever prevailing on the merits.

### B. Valuation of Damages/Disgorgement Claims Arising Under Massachusetts, Missouri, and New Hampshire Law

Massachusetts, Missouri, and New Hampshire claims are a somewhat different case because, in theory, these states allow indirect purchasers to recover damages. But as Lead Counsel has explained, these claims were not part of the case at the time of the settlements because class representatives did not step forward to press these claims.[10] As a result, the statutes of limitations have now run, rendering the claims valueless.

That no plaintiff stepped forward is nobody's fault. But given the facts at the time the plan of allocation was developed, these claims were reasonably viewed as having no merit.

For all of these reasons, it is Lead Counsel's opinion that the proposed allocations will most fairly compensate all members of the nationwide class.

---

[10] It is common in indirect purchaser cases for some repealer states to be excluded from the litigation and/or the monetary recovery due to no class representative or negative rulings by the court. For example, in *LCD*, the 24 states included Massachusetts and Missouri but excluded New Hampshire. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-md-01827-SI, 2013 WL 1365900, at *1, *4 (N.D. Cal. April 3, 2013)(listing states and approving plan of distribution that allowed only residents of those states to make a claim).

1

## III.   CHUNGHWA SETTLEMENT

2

### A.   Release of Reseller Claims

3

Cooper and Scarpulla object to the release of reseller claims under the Chunghwa settlement

4

approved in March 2012 because "resellers" are not scheduled to recover under the proposed plan of

5

allocation. But the Chunghwa notice informed class members that (due to the large size of the class

6

and the relatively small settlement amount) they might not receive any money under the settlement.

7

(*See* Dkt. No. 993-1, Section 10.) No reseller objected to the Chunghwa settlement or the plan of

8

allocation, and both were finally approved almost four years ago.

9

### B.   Plan of Distribution of Chunghwa Settlement

10

Cooper and Scarpulla also suggest that the plan of distribution approved for the Chunghwa

11

settlement conflicts with the present plan of distribution, but no conflict exists. The notice correctly

12

explained the plan of distribution on the pending settlements. *See* Declaration of Joseph M. Fisher

13

Reporting on Class Notice, Exhibit A (Detailed Notice at p. 7, Section 8: "The combined Settlement

14

Fund totaling $576,750,000 will be used to pay eligible claimants in the states involved in this

15

litigation."). The plan includes the distribution to the 24 states contemplated under the Chunghwa

16

settlement as well as the *pro rata* distribution to indirect purchasers under the other settlements.

17

### C.   St. John Arguments on Chunghwa Settlement and Attorneys' Fees

18

St. John incorrectly argues that IPP Counsel should be judicially estopped from stating that

19

Chunghwa's cooperation was of limited value because in moving for preliminary approval of the

20

Chunghwa settlement, IPP Counsel stated that Chunghwa's cooperation was "invaluable" and the

21

settlement an "ice-breaker." (St. John Reply at 6.)

22

IPP Counsel's statements regarding the value of Chunghwa's cooperation are not

23

inconsistent. At the time of the Chunghwa settlement (executed in April 2009), discovery was

24

stayed and the IPP conspiracy case was in its infancy. (*See* Alioto Fee Decl. I, ¶ 26.) Chunghwa's

25

cooperation was indeed invaluable at that stage and, at the time, provided IPPs with detailed and

26

previously-unknown information about certain aspects of the conspiracy. But it is equally true that

27

as the case progressed, it became clear that Chunghwa's information was limited in that it provided

28

virtually no information about large CPTs, the conspiracy in the United States, or its impact in the

13

1    domestic market—evidence essential to proving the IPP case on the merits. (*See id.* ¶¶ 102-103;

2    IPPs' Fee Reply at 10-11.)  Closer examination of the Chunghwa meeting reports also revealed

3    many that were not helpful to IPPs' case. (*See id.* at 11; Alioto Fee Decl. II ¶ 5.)[11]

4        Moreover, as IPPs previously noted, the DOJ had equal access to Chunghwa's information,

5    yet obtained only one limited guilty plea and dropped its investigations against all other Defendants.

6    (IPPs' Fee Reply at 11.) St. John fails to explain how this fact comports with his claim that

7    Chunghwa delivered the case to IPPs on a silver platter.  At bottom, St. John misapprehends the

8    massive scope of this case and the myriad complex issues that IPPs had to address.  This was a

9    multi-faceted, global price-fixing conspiracy that spanned 13 years, several continents, multiple

10   different products and over 48 defendant entities.  It would have been impossible for one Defendant

11   to provide all of the information required to successfully prosecute this case.

12       Finally, even if Chunghwa had provided comprehensive evidence of the conspiracy, that

13   would "not equate to a finding of liability to indirect purchasers of products containing CRTs." *See*

14   *In re TFT-LCD*, Dkt. No. 7127, at p. 10. The indirect plaintiffs in *LCD* received very similar

15   cooperation from Chunghwa (in addition to guilty pleas from most of the defendants) yet the court

16   awarded plaintiffs' counsel 30% of the $1.08 billion settlement.[12]

17   **IV.    CLASS NOTICE**

18       The most recent notice Objections are meritless. First, Objectors suggest that paid print

19   media notice is the *only* type of notice relevant to whether Constitutional reach requirements have

20

21   [11] IPP Counsel also hoped the Chunghwa settlement would be an "icebreaker settlement," as early

22   settlements often are, but no other settlements followed until class certification in 2013, further
     highlighting the limited value of Chunghwa's cooperation in terms of driving other settlements.

23   [12] Objectors also claim that the attorneys' fee should be limited to 25% on the Chunghwa settlement.

24   The Chunghwa notice provides: "At a future time, Interim Lead Class Counsel will ask the Court for
     attorneys' fees not to exceed 25% of the $10,000,000 settlement fund, plus reimbursement of their

25   costs and expenses, in accordance with the provisions of the Settlement."  The Settlement provides
     that "Class Counsel may apply for a fee not in excess of one-third of the Settlement Fund."

26   Chunghwa Settlement Agreement, ¶ 23a.  The Settlement further provides that Class Counsel

27   reserve the right to make additional applications for fees and expenses. *Id.*  The present fee request,
     due notice of which was given to class members, is thus in accordance with the Chunghwa notice

28   and Settlement Agreement.  However, IPP Counsel intend to limit their fee request as to the
     Chunghwa settlement to 25% of the $10 million Chunghwa portion of the total recovery.

1    been met. (Cooper/Scarpulla Reply at 27-28.) But the notice publication they cite from the Federal

2    Judicial Center actually makes clear that the court should consider "whether *all the notice efforts*

3    *together* will reach a high percentage of the class."[13]  And the notice program here involved far more

4    than just paid print media.

5        The paid print media reach of 57% cannot be viewed in isolation.  IPPs have demonstrated

6    that they provided notice through multiple channels, which *together* reached 83% of the class.[14]

7    Moreover, contrary to objectors' claims, The Notice Company's reach calculations properly adjusted

8    for the estimated overlap between the different types of notice.  *See* Fisher Decl. IV, ¶ 3.

9        Objectors next say the Court should be "wary of the often-flimsy data" used to support

10   "Internet-based notice programs," and emphasize that the Court should "[w]atch for suggestions that

11   Internet ads and social network usage can replace all other methods." (Reply at 28, citing FJC.)  But

12   those problems do not exist here.  IPPs have never asserted that internet ads and social network

13   usage can replace all other methods of notice, which is why the notice program in fact included paid-

14   print media and direct mail/email notice, among other means.  *See* Fisher Decl. II, ¶¶ 7-16.  And, the

15   backup data from *comScore* is consistent with the forms of backup customarily employed by notice

16   experts, including the experts objectors recommend to the Court.  *See* Fisher Decl. IV, ¶ 3.

17       Objectors also contend that IPPs failed to analyze the class demographics or explain why the

18   notices targeted a particular demographic.  This is false.  In connection with preliminary approval,

19   The Notice Company analyzed the class demographics in detail and concluded that 90% of the class

20   are 30+ years old and have an income of $60,000 or more.  *See* Decl. of Joseph M. Fisher Re: Notice

21   Program (Dkt. No. 3863) ("Fisher Decl. I") ¶ 9.  This declaration also explained how each of the

22   proposed methods of providing notice was tailored to the class demographics.  *See id.* ¶¶ 10-15; 18,

23   20-21; 24.  The Court clearly found these analyses sufficient in approving the proposed notice

24

25

---

26   [13] "Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide" ("Notice and Claims Process Checklist"), Federal Judicial Center (2010), at 3 (available at

27   http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf) (emphasis added).

     [14] *See* Decl. of Joseph M. Fisher Reporting On Class Notice (filed Nov. 20, 2015) at p. 14 ("Fisher

28   Decl. III"), and the Decl. of Joseph M. Fisher Re: Cooper/Scarpulla Objections to Notice ("Fisher Decl. IV," filed herewith).

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: FINAL APPROVAL OF CLASS SETTLEMENTS

1    program.  Thus, it is untrue that IPPs have failed to explain or justify the targeted demographic for

2    the paid-print media or the consumer email notice.

3        Moreover, in criticizing the age demographics used for the consumer email notice, they

4    ignore that those notices were not just sent to randomly-selected consumers.  Rather, they were

5    directly targeted at "individual consumers with interests in computers, televisions and consumer

6    electronics in general." Fisher Decl. I, ¶ 13.  Because these consumers were more likely than the

7    general public to have made a qualifying purchase, it was appropriate to include everyone who was

8    at least 18 years old in 2007 (the last year of the class period).  *See* Fisher Decl. IV, ¶ 4.

9        The concerns objectors raise regarding email notice to seniors are similarly unfounded.

10   Studies show that close to 90% of seniors use email.  *See id.* And in any event, the direct email

11   notice was but one of the many methods of providing notice to seniors.  *Id.*

12       In sum, IPPs have demonstrated that the notice program was the best notice practicable under

13   the circumstances.  Objectors' criticisms lack foundation and must be rejected.

14   **V.      THE SAMSUNG SDI AND PHILIPS SETTLEMENTS**

15       Objectors also contend that "IPP counsel offer no real explanation for the vastly

16   disproportionate size of the Samsung and Philips settlements." (St. John at 9.)  To the contrary, the

17   consideration paid by Samsung and Philips is consistent with their market shares and the core roles

18   they played in the CRT conspiracy.  Samsung also faced the additional pressure of being the last

19   major defendant to settle, a "last man standing" dynamic that often leads to a higher recovery.

20       **A.      The Consideration Paid by Samsung SDI and Philips Is Consistent with These
             Defendants' Market Shares**

21

22       The consideration paid by Samsung and Philips is consistent with their market shares.

23   Instead of examining market shares for the entire *thirteen* year class period, St. John relies upon two

24   documents from only the first half of the class period: 1997 (Oregon CRT report (Dkt. No. 4108-18))

25   and 2000 (Philips Annual Report (Dkt. No. 4108-17)), ignoring the fact that the conspiracy

26

27

28

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: FINAL APPROVAL OF CLASS SETTLEMENTS

1  continued for another *seven years*.  Further, Samsung's and Philips' market shares ballooned in the

2  early 2000's as a result of industry restructuring.[15]

3       As a result of this market consolidation, Samsung's global market share was 29% in 2004,

4  and LPD's (for whose conduct Philips was responsible) was 27%. (*See* Declaration of Mario N.

5  Alioto ISO IPPs' Reply Re: Final Approval ("Alioto Reply Decl.") ¶ 2, Ex. 1.)  Their shares of the

6  CDT market were even higher: 42% (SDI) and 32% (LPD). (*Id.* ¶ 3, Ex. 2.)  Indeed, for the last four

7  years of the class period, Samsung, LPD and Chunghwa accounted for almost 100% of the global

8  CDT market.  (*Id.* ¶ 4, Ex. 3.)  This was significant because the evidence of Defendants' conspiracy

9  regarding CDTs was more extensive than for CPTs, and IPPs' expert found that the overcharge on

10  CDTs was more than double the overcharge on CPTs (22% vs. 9.8%, respectively).  *See* Expert

11  Report of Janet S. Netz Ph.D, at 6. (Dkt. No. 3281-9.)

12       In addition, Samsung and Philips/LPD held even higher shares of the North American CRT

13  market than the global CRT market, and manufactured many of the large CPTs destined for the U.S.

14  television market.[16]  It was therefore appropriate for these Defendants to pay a greater proportion of

15  the total settlement fund than their share of the overall CRT market.

16       In short, the market share data for the entire 13-year class period show that the consideration

17  paid by Samsung SDI and Philips is entirely consistent with their market shares.

18      **B.**    **The Consideration Paid by Samsung and Philips is also Consistent with their
19           Core Roles in the Conspiracy and the Evidence Developed by IPPs**

20       Independent of the DOJ (*see* IPP Fee Reply at 9-12) and long before the EC Decision and

21  *Vichi* were issued in 2014, IPPs developed evidence showing that Samsung and Philips were two of

22

23

24  [15] *See* Dkt. No. 3001, at 4 (Panasonic exited the CDT business in 2000); Dkt. No. 817 (Hitachi
25  exited the CDT market in 2001 and the CPT market in 2002); Dkt. No. 2981 (Thomson exited the
    CPT business in 2004); Dkt. No. 3027 (Philips and LG formed LG.Philips Displays ("LPD") in June
26  2001); Dkt. No. 2995 (Toshiba and Panasonic formed MT Picture Display Co., Ltd. in 2003).

27  [16] *See* Alioto Reply Decl. ¶ 5, Ex. 4 (In 1997, Samsung SDI held a 35.8% share of the North
    American CDT market compared to 13.8% globally, and was projected to increase that share to
28  50.6% in 1998); ¶ 6, Ex. 5 (Philips held 21% of the North American CPT market in 2001); ¶ 7, Ex. 6
(in 2001, Samsung SDI held a 28.9% share of the North American CPT market, which was projected
to increase to 31.9% in 2002); ¶ 8, Ex. 7 (LPD held 35% of the Americas CPT market by 2005).

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: FINAL APPROVAL OF CLASS SETTLEMENTS

1    the core members of the CRT conspiracy.[17] Indeed, they were two of the founders of the conspiracy

2    and often led the group meetings. (*See, e.g.,* Alioto Reply Decl. ¶¶ 9-10, Exs. 8-9.) And, unlike some

3    other Defendants (*e.g.* Hitachi, Thomson), both Samsung and Philips (through LPD) participated in

4    the conspiracy for the entire class period.

5          The evidence rebutting Samsung's and Philips' FTAIA defense was also stronger than the

6    evidence relating to the other defendants. Each had CRT factories in North America and

7    manufactured large quantities of large CPTs for the U.S. television market. *See supra* n. 16; Alioto

8    Reply Decl. ¶ 11, Ex. 10. IPPs also developed substantial evidence of their participation in

9    conspiracy meetings held in North America, specifically targeting U.S. consumers. *See, e.g., id.* ¶¶

10   12-14, Exs. 11-13. Moreover, none of this FTAIA evidence which would have had a particularly

11   strong appeal to an American jury came from the DOJ, the EC Decision or *Vichi.*[18]

12          Given Samsung and Philips' role in the conspiracy, the strength of the evidence against them,

13   and the fact that IPPs took these large and culpable Defendants to the brink of trial, putting them at

14   imminent risk of treble damage liability, it stands to reason that they would pay substantially more

15   than the remaining, non-core members of the conspiracy.

16          At bottom, St. John's argument rests on the flawed premise that a finding of antitrust liability

17   by a governmental authority is a *fait accompli* for IPPs. "But a finding of criminal guilt does not

18   equate to liability for damages to indirect purchasers of products containing [CRTs]." *LCD R&R* at

19   p. 10; *see also In re TFT-LCD,* 2013 WL 1365900, at \*7. And as explained in IPPs' Reply, the risks

20   were greater here than in *LCD. See* IPP Reply at pp. 7-8. IPP Counsel are singularly responsible for

21   the size of the Samsung/Philips settlements and should be rewarded rather than punished for

22   securing that type of favorable recovery for the class. The St. John objection should be overruled.

23

24

---

25   [17] The other core members were Chunghwa, LG, Orion and after 2001, LPD. Orion and LPD both
26   entered bankruptcy before this case began, so IPPs could not collect damages from them. Chunghwa
     and LG settled early and paid less than their market shares and roles in the conspiracy would
27   otherwise have demanded. Samsung and Philips were the only core participants left in the case.

     [18] In fact, there are no references to the U.S. CRT market in *Vichi.* And the EC Decision makes no
28   *findings* regarding the impact of the conspiracy in the United States. It merely recites the content of
     certain meeting reports (of which IPPs were already aware) that mention the United States.

## VI.    NEW COOPER/SCARPULLA ARGUMENTS ON FEES

Finally, Lead Counsel is compelled to respond briefly to several new and baseless arguments raised in the Cooper/Scarpulla reply on fees.

Cooper and Scarpulla advance a litany of new assertions concerning Lead Counsel's time records, all of which are factually and/or legally incorrect.[19] (*See* Alioto Reply Decl. ¶ 15 (responding topic-by-topic).) As for their claim that the trial started from scratch and did not work cooperatively with existing counsel, Lead Counsel can state unequivocally that this is false. *All* members of the trial team—including those added in the Fall of 2014—worked closely and cooperatively throughout, not to learn the case from scratch, *but to boil it down for trial.*[20] (*See id.* ¶ 16.) In fact, the CRT trial team worked much more efficiently in the four months running up to trial than the *LCD* trial team.[21]

Lead Counsel welcomes the opportunity (at the scheduled hearing or otherwise) to explain the circumstances surrounding the addition of the "Late-Added Three" and address precisely the value they contributed to the litigation (Cooper/Scarpulla Fee Reply at 5). Their value to the Class was exceptional, as was that of many others who built the case from the ground up. (*See id.* ¶ 17.)

---

[19] *See O'Bannon v. Nat'l Collegiate Athletic Ass'n,* No. 09-CV-03329-CW (NC), 2015 WL 4274370, at *6-7 (N.D. Cal. July 13, 2015) (refusing to reduce fee for block billing and noting that "[b]lock-billing is a typical practice in this district, and blocked bills have been found to provide a sufficient basis for calculating a fee award."), citing *PQ Labs, Inc. v. Qi,* No. 12–cv–00450 CW, 2015 WL 224970, at *3 (N.D. Cal. Jan. 16, 2015) and *Stonebrae, L.P. v. Toll Bros., Inc.,* No. 08–cv–00221 EMC, 2011 WL 1334444, at *8 (N.D. Cal. Apr. 7, 2011). *O'Bannon* also noted that courts in the Ninth Circuit have allowed billing in quarter hour increments. *Id.* at*7-8. Here, Lead Counsel's time records contain more than enough detail to allow the Special Master to conclude that the time spent by Lead Counsel is commensurate with the work done.

[20] Consider the tip of the iceberg for trial-related preparation:  identifying trial-worthy exhibits and witnesses from an eight-year litigation record, cataloguing and addressing admissibility issues, designating and counter-designating thousands of pages of witness testimony, reviewing and cutting witness video, preparing experts and fact witnesses, preparing the named plaintiffs, preparing cross-examination outlines, mock trials and theme testing, graphic and demonstrative work, trial logistics and vendors, exhaustive pretrial briefing and evidentiary negotiations, pretrial conferences, overall strategy and order-of-proof development, and on and on—all of which was done while briefing a mountain of summary judgment, FTAIA, and other important pre-trial issues.

[21] The lodestar incurred by IPP counsel in the last four months before the settlements was $11,453,589.20 versus $18,701,878.75 incurred by the top 26 firms in *LCD* for the same four month period before settlement.  (Alioto Reply Decl. ¶ 18.)

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: FINAL APPROVAL OF CLASS SETTLEMENTS

1    In all events, the most sensible approach on fees at this stage is to (1) award the aggregate fee

2  based on a straightforward percentage plus lodestar "cross-check" analysis, which will allow for

3  prompt calculation (and hopefully prompt distribution) of the net settlement fund to the class;[22]

4  while (2) deferring fee allocation issues until later in the case.[23]

5                                         **CONCLUSION**

6        Based on the foregoing, IPPs respectfully request that the Special Master recommend that the

7  Court:  (1) grant final approval of the seven proposed settlements; (2) certify the proposed

8  Settlement Class; (3) grant final approval of the notice plan, the proposed plan of distribution and the

9  proposed claim form; (4) and enter judgment against the Settling Defendants.

10  Dated:  December 23, 2015

11                                        Respectfully submitted,

12                                        /s/ Mario N. Alioto

13                                        Mario N. Alioto (56433)
                                          malioto@tatp.com
14                                        Joseph M. Patane (72202)
                                          jpatane@tatp.com
15                                        Lauren C. Capurro (241151)
                                          laurenrussell@tatp.com
16                                        TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
                                          2280 Union Street
17                                        San Francisco, CA 94123
                                          Telephone: 415-563-7200
18                                        Facsimile: 415-346-0679

19                                        *Lead Counsel for Indirect Purchaser Plaintiffs*

20

21

22  [22] *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002) (approving percentage
    method plus lodestar cross-check); *In re Activision Securities Litig.*, 723 F. Supp. 1373 (N.D. Cal.
23  1989) (explaining advantages of the percentage method), *cited with approval by In re Omnivision
    Technologies, Inc.*, 559 F. Supp. 2d at 1046 ("The Court finds [the] advantages persuasive [.]");
24  *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) ("where used as a mere
    cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district
25  court"); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d at 306-07 (3d Cir. 2005) ("The lodestar cross-
    check calculation need entail neither mathematical precision nor bean-counting.  The district courts
26  may rely on summaries submitted by the attorneys and need not review actual billing records.").

27  [23] After the aggregate fee is awarded, it is typically Lead Counsel's job to propose the fee allocation
    in the first instance, consistent with various firms' overall contributions to the case.  *See* IPP Fee
28  Reply, at 28, n. 73.

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: FINAL APPROVAL OF CLASS SETTLEMENTS