Mario N. Alioto (56433)
Joseph M. Patane (72202)
Lauren C. Capurro (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123
Telephone: 415-563-7200
Facsimile: 415- 346-0679
Email: malioto@tatp.com
jpatane@tatp.com
laurenrussell@tatp.com

*Class Counsel for the*
*Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. CV-07-5944-JST |
| | MDL No. 1917 |
| | **DECLARATION OF JOSEPH M. FISHER RE: COOPER/SCARPULLA OBJECTION** |
| This Document Relates to: | |
| All Indirect Purchaser Actions | |

DECLARATION OF JOSEPH M. FISHER RE: COOPER/SCARPULLA OBJECTION – Master File No. CV-07-5944-JST

I, Joseph M. Fisher, declare:

## INTRODUCTION

1.      Identification.  I am the president of The Notice Company, Inc., a Massachusetts corporation with offices at 94 Station Street, Hingham, MA 02043 ("The Notice Company"). The Notice Company is principally engaged in the administration of class action settlements and lawsuits pending in courts around the United States, including the dissemination of notice to class members, administering the claims process, and distributing the proceeds of the litigation to the class.  I have over a decade of experience assisting attorneys with class action notices and claims administration.  I am also a member in good standing of the bars of the Commonwealth of Massachusetts, the District of Columbia, and the Commonwealth of Virginia.  I am over 21 years of age and not a party to this action.  I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify thereto under oath. The Notice Company developed the Notice Program for use in these proposed Settlements.

2.      Response to Cooper/Scarpulla Reply.  I have reviewed the Reply dated December 9, 2015, submitted by Cooper & Kirkham, P.C. and the Law Offices of Francis O. Scarpulla (the "Cooper/Scarpulla Reply") in support of their objections to the proposed Settlements.  Section IV of the Cooper/Scarpulla Reply asserts: "The Notice to the Classes appears to have been flawed and Lead Counsel has not demonstrated otherwise."  I address the issues raised in Section IV of the Cooper/Scarpulla Reply concerning notice to the Class.  This current Declaration supplements my two earlier Declarations, each dated November 17, 2015, reporting on Class Notice (the "Fisher Decl. II"), and responding to the objections to notice (the "Fisher Decl. III").[1]

3.      Calculation of Reach and Overlap for Print and Other Media was Proper.  In my Fisher Decl. II, at paragraph 18.d., I reported: "When digital and print media results are combined, the result is an estimated 83% of persons aged 30+ who own a TV or computer with household income of $60,000 have been reached, with an estimated frequency of 3.1."  Reach and frequency

---

[1] I also provided a Declaration regarding the proposed notice program at the preliminary approval stage.  (*See* Dkt. No. 3863 ("Fisher Decl. I").)

1  calculations for print media were based on survey data from *GfK MRI* and, for digital media, were

2  based on survey data from *comScore*. Contrary to the assertions in the Cooper/Scarpulla Reply, my

3  reported calculation properly adjusted for the estimated overlap between print and digital media.

4  The estimated reach for the Class demographic for print media was 57% and the estimated reach for

5  digital media was 61%. The two percentages were not added together; instead, the overlap between

6  print and digital was eliminated, resulting in a net reach of 83%. In addition, the "backup"

7  information that I utilized in my Declarations is consistent with the forms of backup customarily

8  employed by notice experts.[2]

9     4.   The Appropriate Age Demographics Were Utilized. The Cooper/Scarpulla Reply

10  expresses concern about the age group that I targeted for the consumer email campaign, which

11  involved sending approximately 6.4 million emails[3] to persons aged 26 and older. This age

12  demographic was selected because all of these persons would have been 18 years of age or older as

13  of 2007, which was the last year of the Class Period.[4] Cooper/Scarpulla point out that the youngest

14  of such persons would have been only six years of age in 1995, which was the first year of the Class

15  Period. However, email notices are equally proper when sent to an 18-year old purchaser of a CRT

16  computer monitor from 2007 (who would be aged 26 today) and to an 18-year old purchaser from

17  1995 (who would be aged 38 today). Both purchasers are class members. The Cooper/Scarpulla

18  Reply then jumps to the older demographic, questioning whether it was appropriate to employ

19

20  [2] See, for example, Exhibit 2 of the Declaration of Shannon R. Wheatman regarding Implementation

21  and Adequacy of Notice Plan for the Sony Gaming Networks settlement (*In re Sony Gaming
   Networks & Customer Data Sec. Breach Litig.*, 996 F. Supp. 2d 942 (S.D. Cal. 2014)) (Case 3:11-

22  md-02258-AJB-MDD, Document 204-4, filed 04/03/15), compared to Exhibit U of Fisher Decl. II.
   Further, in Attachment B to Fisher Decl. III, I included some examples of digital ads that were

23  displayed on the Google network. If Cooper/Scarpulla are concerned about the size of those digital
   ads, then I attach hereto as **Exhibit A** samples of the various size of ads that were displayed on the

24  Google and Facebook networks.

25  [3] "After allowing for bounced or undeliverable emails, the net number of emails delivered to
   consumers was 6,309,674." See paragraph 9.a of Fisher Decl. III.

26  [4] Fisher Decl. I provides, at Paragraph 9, the statistical basis for my estimate that approximately 90%
   of individual Class Members are 30+ years of age, and approximately 80% are aged 35+. It also

27  provides the statistical basis for my estimate that persons in the top three quintiles of income (60%
   of the population with incomes in excess of $56,000) accounted for approximately 75% of

28  expenditures on televisions during the Class Period.

DECLARATION OF JOSEPH M. FISHER RE: COOPER/SCARPULLA OBJECTION
Master File No. CV-07-5944-JST

1  emails as a means of communicating notice to senior citizens.   Cooper/Scarpulla's argument misses

2  two points:  (A) Contrary to Cooper/Scarpulla's position, communication by email is an appropriate

3  means of providing notices to seniors.[5]  (B) Direct notice by email was but one of many tools

4  utilized by The Notice Company in its Notice Plan.[6]  I did not rely exclusively on email

5  communications, but it would have been remiss to ignore email as a tool for communicating notice.

6          5.    <u>There have been Substantial Claims Filed</u>.  Finally, the Cooper/Scarpulla Reply asks

7  about the number of CRT claims filed to date.  In Fisher Decl. III, at footnote 6, I reported on a

8  preliminary basis that claims had been submitted seeking compensation for more than 13.5 million

9  "CRT equivalent" units, where the "equivalent" count allows for the aggregation of different

10  products utilizing weights consistent with the terms of the Settlement.[7]   The claims deadline was

11  December 7, 2015; a substantial number of claims were filed prior to and at the deadline. We are still

12  inputting those claims. I will provide updated information on claims in a subsequent declaration.

13          I declare under penalty of perjury under the laws of the United States that the foregoing is

14  true and correct to the best of my knowledge.

15          Executed at Hingham, Massachusetts, this 23rd day of December, 2015.

16

17

18                                                          JOSEPH M. FISHER

19

20  [5] "There is a common misconception that senior citizens are not actively using email or are less
21  likely to use technology to communicate. In reality, seniors are tapping into technology more than
    ever. As more and more seniors integrate the Internet into their daily lives, digital communications is
22  becoming the most efficient way to engage and inform. Studies show that senior citizens are fast
    adopting email as one of their primary methods of digital interaction and communication. According
23  to the Pew Internet and American Life Project, 87% of senior citizens use email and search engines,
    while the Nielsen Company found that checking email was the primary online activity for 88.6% of
24  seniors. With these statistics, it is clear government organizations could benefit greatly by reaching
    out to seniors via email." Report of *GovDelivery*, a government consulting group, available at
25  https://www.govdelivery.com/blog/e-government/tech-savvy-senior-citizens-on-the-rise/
    (2012/07/17).

26  [6] See paragraph 7 of Fisher Decl. II, which lists the forms of notice as including direct notice by mail
    and email, paid print media, online media, earned media and social media.

27  [7] Standard CRT televisions will be weighted as 1, large CRT televisions will be weighted as 4.3, and
28  CRT computer monitors will be weighted as 3.

# DECLARATION OF JOSEPH M. FISHER

# EXHIBIT A

https://adwords-displayads.googleusercontent.com/da/b/dabAdPreview?templateId=456&outputFormat=HTML5&width=900&height=250&visibleUrl=crtcla...

320 x 50



468 x 60



970 x 90



**Demanda Colectiva de Monitores CRT**
Si compraste un monitor CRT, pudes calificar para un pago.

Saber Mas

**Google Display Ads**
**(Spanish)**

**Various Sizes**

**300 x 250**



**300 x 600**



**336 x 280**



**120 x 600**



**160 x 600**



**Facebook
Ads
(English)**

**CRTclaims.com**

**Multiple Graphics and Sizes**



Mario N. Alioto (56433)
Joseph M. Patane (72202)
Lauren C. Capurro (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123
Telephone: 415-563-7200
Facsimile: 415- 346-0679
Email: malioto@tatp.com
jpatane@tatp.com
laurenrussell@tatp.com

*Lead Counsel for*
*Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. CV-07-5944-JST |
| | MDL No. 1917 |
| This Document Relates to: | **INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE CALIFORNIA ATTORNEY GENERAL'S STATEMENTS OF INTEREST** |
| All Indirect Purchaser Actions | |
| | Hearing Date: January 5, 2016<br>Time: 10:00 am<br>Court: JAMS<br>Special Master: Martin Quinn, JAMS |
| | Judge:  Hon. Jon S. Tigar |

1  Class Counsel for the Indirect Purchaser Plaintiffs ("IPP Counsel" or "IPPs") submit this

2  memorandum in response to the California Attorney General ("AG")'s October 8, 2015

3  Statement of Interest ( "AG Statement," Dkt. No. 4118) and December 9, 2015 Supplemental

4  Statement of Interest ("AG Supp. Statement"), lodged with the Special Master.

5  **I.   Introduction**

6  State Attorneys General often provide an invaluable function as it relates to the review

7  and critique of proposed class action settlements.  And the legislative history of the Class Action

8  Fairness Act ("CAFA") supports the proposition that attorneys general may object when

9  inadequate, collusive settlements are reached or where class lawyers do not meet their fiduciary

10  obligations.

11  But none of these issues is presented here.  No one reasonably questions whether IPP

12  Counsel zealously and vigorously fought for the class over the thoroughly contested, eight-year

13  litigation history of this case.  Indeed, the comments submitted by the AG reinforce a number of

14  fundamental points *supporting* approval of the settlements.

15  First, far from being a collusive settlement entered at the expense of the class, the

16  aggregate value of $576,750,000, is clearly fair, reasonable and adequate. The AG does not

17  contend to the contrary. (*See*, AG Statement at 2 ("the Attorney General does not object to the

18  reasonableness of the settlements in the aggregate. . . .").)

19  Second, IPPs presented a notice plan when seeking preliminary approval of these

20  settlements.  That notice plan was approved by the Court and has now been implemented.  IPPs

21  submitted at the preliminary approval stage, and reiterate now, that the notice plan met the Fed.

22  R. Civ. P 23(c)(2)(B) requirement that the notice be the "best notice that is practicable under the

23  circumstances . . . ." The AG does not appear to dispute this point. (*See*, AG Supp. Statement at

24  10, n.12 (the AG "is not objecting on the ground that the notice itself is insufficient for due

25  process or for Federal Rule of Civil Procedure Rule 23 opt-out/objection purposes. . . .").)

26  Third, IPPs have submitted a fee application to the Court seeking a 33% fee award for the

27  exemplary settlement results obtained on behalf of the class.  The AG does not oppose this fee

28  award. (AG Supp. Statement at 13 (the AG "is not objecting to the size of the requested

1

1  percentage of the common fund for fees . . .").)

2       So if the aggregate settlement figure of $576 million was (clearly) adequate, notice to the

3  class met the requirements of Rule 23, and the contingent fee sought by Class Counsel is not

4  objectionable, what is the AG's objection?  In sifting through the AG's statements, two themes

5  emerge: (1) the allocation plan is purportedly unfair to natural persons because the notice plan

6  has not given them a "fair and equitable opportunity to claim" vis-à-vis business claimants; and

7  (2) the claim submission deadline of December 7, 2015 should be extended to facilitate

8  coordination with the AG's notice of her separate *parens patriae* settlement in a state court case.

9       To bolster these unsupported arguments, the AG seeks production of detailed claims data

10  to create a new evidentiary record.  That record would have been unavailable when the original

11  notice plan was submitted and approved for implementation by the Court at the preliminary

12  approval hearing. This type of retroactive litigation regarding the adequacy of notice would set a

13  dangerous precedent.  It would reopen litigation of notice campaigns after they have been

14  implemented, and enable hindsight critiques of notice implementation by objectors armed with

15  claims data that is unavailable when notice plans are being devised and implemented.  IPPs

16  respectfully submit that, once a Court determines that a notice plan meets the due process and

17  procedural requirements of Rule 23 (as conceded here by the AG), inquiries regarding notice

18  adequacy are at an end.  The AG has cited no authority to the contrary.

19       As set forth below, although these objections may be well-intentioned, they are not well-

20  founded in the procedural requirements of Rule 23 or related class action settlement

21  jurisprudence, and they should be rejected.

22  **II.   California's Recitations of CAFA and *Parens Patriae* Authority Have Nothing to do**
23  **With the Criteria for Evaluating Whether the Proposed Settlements Are Fair,**
       **Reasonable and Adequate.**

24       "Although Rule 23(e) is silent respecting the standard by which a proposed settlement is

25  to be evaluated, the universally applied standard is whether the settlement is fundamentally fair,

26  adequate and reasonable." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir.

27  1982).

28

INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE CALIFORNIA ATTORNEY GENERAL'S

1   The AG discusses—at length—the legislative history of the CAFA, and her *parens*

2   *patriae* authority.  Neither modifies the "fair, reasonable and adequate" standard under which the

3   Special Master, and ultimately the Court, are to determine whether to approve the proposed

4   settlements.  The AG recognizes, albeit in a footnote, that CAFA does not expand her authorities.

5   (*See*, 28 U.S.C.A. §1715(f); AG Supp. Statement at 5, n.7.)  And the reference to federal *parens*

6   *patriae* authority conferred pursuant to 15 U.S.C. §15c(a)(1) for Sherman Act violations is

7   confusing given that no one, including the AG, contends that federal law confers a *parens*

8   *patriae* cause of action for damages for indirect purchasers.

9   Ultimately, the Special Master and the Court should evaluate the proposed settlements on

10   the basis of whether they are fair, reasonable and adequate,[1] and the AG's lengthy recitation of

11   CAFA and *parens* authority does nothing to modify that standard.

12   **III.   The Proposed Plan of Distribution is Fair, Reasonable and Adequate.**

13   "A district court's 'principal obligation' in approving a plan of allocation 'is simply to

14   ensure that the fund distribution is fair and reasonable as to all participants in the fund.'" *In re*

15   *Dynamic Random Access Memory (DRAM) Antitrust Litig.*, MDL No. 02-1486, 2013 U.S. Dist.

16   LEXIS 188116, at *330-31 (N.D. Cal. Jan. 8, 2013) (citations omitted).  The Plan of Distribution

17   in this case proposes a threshold minimum recovery for any qualified claimant from one of the

18   Indirect Purchaser States Classes.  For all claimants damaged above this minimum threshold, all

19   remaining net settlement funds will be distributed on a *pro rata* basis based upon the claimants'

20   total purchases of CRT Products.[2]  The AG does not object to the proposed *pro rata* method of

21   allocation, which is the preferred method of distributing settlement proceeds.[3]

22

---

23   [1] The "fair, reasonable and adequate" standard is evaluated at length in IPPs' Memorandum in
24   Support of Final Approval, submitted November 20, 2015, at 14-22.

25   [2] *See* IPPs' Motion for Preliminary Approval of Class Action Settlements with Philips,
     Panasonic, Hitachi, Toshiba and Samsung SDI Defendants (Dkt. No. 3861), at 26-29; IPPs'
26   Memorandum in Support of Final Approval, submitted November 20, 2015, at 22-23.

27   [3] *See, e.g., DRAM,* 2013 U.S. Dist. Lexis 188116, at 349 ("the proposed plan of distribution here
     is grounded in the educated prediction that all or virtually all of the settlement proceeds will be
28   paid out *pro rata* to class members based upon the extent of damages suffered, which all counsel
     recognize as the preferred option in damage claim class action settlements.").

3

INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE CALIFORNIA ATTORNEY GENERAL'S
STATEMENTS OF INTEREST – Master File No. CV-07-5944-JST

1    However, without any evidentiary basis for doing so, the AG posits a question "as to

2    whether the notice plan affords an equal opportunity for natural persons to claim along with

3    corporations." (AG Supp. Statement, at 9.)  In support of this question, the AG notes that in other

4    settlements (notably *DRAM* and *LCD*) the notice campaign included television advertising;

5    whereas in this case, notice was effectuated primarily via print media, internet banner

6    advertising, and direct mail/email notification.[4] *Id.*  As television viewership becomes

7    increasingly fragmented over hundreds of alternative television stations, with many viewers

8    "cutting their cords" to cable altogether and downloading their television content commercial

9    free via the internet, the choice to use alternative forms of media to reach indirect purchasers of

10   CRT Products is an entirely defensible decision.

11    The AG argues that the use of these alternative forms of notice somehow placed the

12   individual claimants at unfair disadvantage vis-à-vis corporate claimants.  But the AG provides

13   no evidence that any particular medium used to effectuate notice (print, television, radio, email,

14   internet banner ad, etc.) disproportionately favors one type of claimant (corporation vs. natural

15   person) over the other.

16    As set forth in the Federal Judicial Center's guidance documents on the subject, a notice

17   should have an effective "reach" to its target audience of 70-95%.  *See* Federal Judicial Center,

18   *Managing Class Action Litigation: A Pocket Guide for Judges.* 3d ed. p. 27 (2010),

19   http://www.fjc.gov/public/pdf.nsf/lookup/ClassGd3.pdf/$file/ClassGd3.pdf; *see also Swift v.*

20   *Direct Buy, Inc.,* No. 2:11-cv-401-TLS, 2013 WL 5770633, at *3 (N.D. Ind. Oct. 24, 2013)

21   ("The Federal Judicial Center's checklist on class notice instructs that class notice should strive

22   to reach between 70% and 95% of the class.").  The only record evidence submitted

23   demonstrates that the net reach of the notice campaign implemented here was 83%, well within

24

25   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [4] Although the AG places great emphasis on the "coordination" of the AG's state court case with
26   this action, she fails to explain why the AG's suggestions were not provided at the preliminary
     approval stage so they could be considered *before* notice was implemented.  The AG received
27   notice of the entire notice plan in late May 2015, when it was submitted as part of the motion for
     preliminary approval of the settlements, but she waited until after notice was implemented to
28   raise the substantive critiques presented in the AG's Statements of Interest.  This is neither
     coordinated, nor efficient.

INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE CALIFORNIA ATTORNEY GENERAL'S
STATEMENTS OF INTEREST – Master File No. CV-07-5944-JST

1  the Federal Judicial Center's target range. (*See* Declaration of Joseph M. Fisher Re:

2  Cooper/Scarpulla Objection, ¶ 3, submitted to the Special Master on December 23, 2015.) The

3  *DRAM* notice campaign, which the AG suggests should have been emulated, had a virtually

4  identical reach of 84.2%.[5] The AG fails to explain how the 1.2% differential between the reach

5  statistics obtained in the *CRT* notice plan, as compared to the *DRAM* notice plan, somehow

6  deprived natural persons of an "equal opportunity" to claim vis-à-vis corporations. Both notice

7  campaigns meet the Federal Judicial Center's target range. Thus, the pending settlements should

8  be approved.

9          Finally, the AG suggests that if a distribution to claimants exceeds their single damages,

10  any amount in excess of single damages should be distributed *cy pres* instead of directly to

11  claimants. Although claims administration work is not yet complete, it appears based upon the

12  claims that have been processed to date that claimants in this case will receive a distribution

13  much closer to single than treble damages, potentially mooting the AG's argument. But even if

14  the distribution were theoretically closer to trebled damages, the AG recognizes that treble-

15  damage based distributions were allowed in the *LCD* claims administration process. (*See* AG

16  Supp. Statement, at 14.)

17  **IV.    The Claims Submission Deadline Should Not Be Extended Simply to Enable the AG**

18  **to Provide Supplemental Notice in Her Unrelated *Parens* Settlements.**

19          The AG also requests that the claims submission deadline be extended so that, when she

20  implements notice of her settlements in her state court action, she may inform California natural

21  persons that they may submit a claim for damages in *this* case. To be clear, none of the money

22  recovered under the AG's settlements will be paid to California consumers. However, she wants

23  to give notice to California consumers that they can nevertheless obtain money by making a

24  claim against the settlement fund in this case. Arguing that the December 7, 2015 deadline was a

25  "clerical error" (AG Supp. Statement, at 16), she seeks extension of the deadline to June 30,

26  2016 for this purpose (even though preliminary approval of her separate state court settlements

27  has not yet been obtained).

28  ─────────────────────
[5] *See* Declaration of Shannon R. Wheatman, ¶18, attached as Exhibit D to the Declaration of Emilio Varanini in Support of Supplemental Statement of Interest.

5

INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE CALIFORNIA ATTORNEY GENERAL'S
STATEMENTS OF INTEREST – Master File No. CV-07-5944-JST

First, there is no basis to conclude that the establishment of the December 7, 2015 claims submission deadline was a "clerical error," as suggested by the AG. The December 7 deadline, 120 days after publication of notice, was specifically ordered by the Court on July 9, 2015. *See* Dkt. No. 3906, ¶ 19 ("The Notices shall inform putative members of the Settlement Classes that the deadline for the submission of Claim Forms is 120 days from the Notice Publication Date."). In accordance with the Court's Order, notices were mailed, emailed, posted in internet banner advertising and published in paid print advertising across the country within 30 days of the Court's Order.[6]

Moreover, although the AG points to instances where claims submission deadlines extend beyond the final approval hearing date, many class action settlements present claim submission deadlines that *precede, or are coterminous with,* final approval.[7]

But perhaps the single biggest reason to adhere to the existing claims submission deadline is that an extension of that deadline could result in a skewing of additional claims in favor of corporate claimants, to the detriment of existing timely claims submitted by both natural person and corporate claimants. If the claims submission deadline is extended, with no corresponding notice of that extension provided to potential claimants (beyond the AG's notice to California natural persons), it stands to reason that consumers will be largely unaware that the deadline has been extended, resulting in only minimal additional consumer claimants.

That will not be the case for large corporate claimants. There is a robust claims administration "aggregator" market that frequently targets such large corporate claimants and

---

[6] *See* Declaration of Joseph M. Fisher Reporting on Class Notice, submitted November 20, 2015, ¶¶ 8-16.

[7] District Courts for the Northern District of California have readily approved settlement approval motions proposing claim deadlines that preceded the final approval hearing. *See, e.g., In re Abbott Labs. Norvir Anti-Trust Litig.,* Docket No. 04-CV-1511-CW (August 6, 2009 settlement approval hearing; July 24, 2009 claim deadline); *In re VeriFone Holdings, Inc. Secs. Litig.,* Master File No. 3:07-cv-06140-EMC (February 6, 2014 settlement approval hearing; January 29, 2014 claim deadline) ($95,000,000 settlement); *Rosenbaum Capital, LLC, v. McNulty,* No. 07-CV-0392-SC, (Conti J.) (June 26, 2009 settlement approval hearing; April 25, 2009 claim deadline); *In re Clarent Corp. Secs. Litig.,* No. C 01-03361 CRB (JCS) (March 25, 2005 first settlement approval hearing; March 4, 2005 claim deadline / July 14, 2005 second settlement approval hearing; July 6, 2005 claim deadline).

6

1  offers to submit claims on their behalf in exchange for a fee.  To the extent that such aggregators

2  stimulate the submission of substantial additional large corporate claims, with no similar

3  stimulation of additional consumer claims, the AG's requested extension may create precisely

4  the consequence of which she currently complains; large corporate claims will be spurred to the

5  detriment of consumer claimants, and will unfairly dominate the claims process.

6      The AG may respond that the claims submission deadline could be extended only for

7  natural persons, and not businesses.  But such a modification would open up the settlement

8  administration process to objectors, who could claim that such a one-sided extension is unfair to

9  corporate claimants.  Or, the AG could suggest that only California claimants should receive an

10 extension, but a non-California objector could then challenge the one-sided extension as being

11 skewed against claims submission in their respective states. ("Why do California claimants get

12 an extension but not claimants from my state?")  Indeed, the AG's current proposal—to extend

13 the claims deadline but only give notice to California natural persons—also exposes IPPs to

14 objections that Californians are being favored over other states.  While the AG's duty is only to

15 California natural persons, IPP Counsel have a fiduciary duty to protect the interests of *all* class

16 members, and cannot be seen to favor Californians over class members in other states.

17     "In designing a plan of distribution for a settlement such as this involving a large number

18 of different products and millions of class members, a delicate balance must be achieved

19 between precision and administrative feasibility." *DRAM*, 2013 U.S. Dist. LEXIS 188116, at

20 *330.  The notice plan submitted at the preliminary approval stage, and approved and

21 implemented by the Court, was delicately balanced to facilitate the submission of *both* consumer

22 and business claimants in *all* states by the December 7, 2015 deadline.  Modifying that plan, or

23 the claims administration deadline that was communicated to *both* consumer and business

24 claimants in conjunction with it—in accordance with the AG's request— may skew the claims

25 distribution process in unintended ways; expose the settlement administration process to *new*

26 class action objectors (whether their objections are legitimate or not); and may delay settlement

27 approval and implementation.

28

INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE CALIFORNIA ATTORNEY GENERAL'S
STATEMENTS OF INTEREST – Master File No. CV-07-5944-JST

1    For these reasons, although IPP Counsel were originally hopeful that they could

2    accommodate the AG's requests, it now appears that such accommodation would be prejudicial

3    to the prompt approval of the pending settlements.

4    **V.    Conclusion**

5    The notice process submitted to the Court at the preliminary approval stage of these

6    proceedings was approved by the Court.  As implemented, it: (1) provided the "best notice

7    practicable," in conformity with Rule 23 and due process considerations; (2) exceeded the

8    minimum "reach" percentages specified by the Federal Judicial Center; and (3) enabled *both*

9    consumer *and* business claimants from *all* states to submit requests for compensation from the

10   net settlement fund by December 7, 2015.

11   The AG has not submitted an evidentiary basis for her challenge of the effectiveness of

12   the notice campaign or the claims administration process.  The only other reason articulated by

13   the AG for delaying the notice and claims administration process is to enable her to provide

14   additional notice to California natural persons in order to generate more claims, as part of a

15   separate state *parens* settlement that has yet to receive even preliminary approval from the state

16   court.  This is not a sound basis to delay a 22-state claims administration process, and potentially

17   open that administration process up to additional objections and litigation.

18   The IPPs have vigorously litigated this case and obtained an exemplary result for the

19   class.  The settlements should be approved, and no relief that could threaten or delay that

20   approval should be granted to the AG.

21   Dated:  December 29, 2015

22                                   Respectfully submitted,

23                                   */s/ Mario N. Alioto*

24                                   Mario N. Alioto (56433)
                                     malioto@tatp.com
25                                   Joseph M. Patane (72202)
                                     jpatane@tatp.com
26                                   Lauren C. Capurro (241151)
                                     laurenrussell@tatp.com
27                                   TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
                                     2280 Union Street
28                                   San Francisco, CA 94123

INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO THE CALIFORNIA ATTORNEY GENERAL'S
STATEMENTS OF INTEREST  Master File No. CV 07 5044 IST

Telephone: 415-563-7200
Facsimile: 415-346-0679

***Lead Counsel for Indirect Purchaser Plaintiffs***

9

1  KAMALA D. HARRIS
   Attorney General of California
2  MARK BRECKLER
   Chief Assistant Attorney General
3  KATHLEEN E. FOOTE (State Bar No. 65819)
   Senior Assistant Attorney General
4  ESTHER LA (State Bar No. 160706)
   PAMELA PHAM (State Bar No. 235493)
5  EMILIO VARANINI
   State Bar No. 163952
6  Deputy Attorneys General
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-7004
     Telephone: (415) 703-5908
8    Fax: (415) 703-5480
     E-mail: Emilio.Varanini@doj.ca.gov
9
   *Attorneys for the State of California*
10

11                    IN THE UNITED STATES DISTRICT COURT

12                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                          SAN FRANCISCO DIVISION

14

15

| | |
|---|---|
| 16 **IN RE: CATHODE RAY TUBE (CRT)** | Master File No. 3:07-cv-05944-JST |
| 17 **ANTITRUST LITIGATION,** | MDL No. 1917 |
| 18 | **REPLY IN SUPPORT OF** |
| | **SUPPLEMENTAL STATEMENT OF** |
| 19 | **INTEREST OF THE STATE OF** |
| | **CALIFORNIA** |
| 20 | |
| | Hearing Date: January 5, 2016 |
| 21 **This Document Relates To:** | Time:         10:00 a.m. |
| **ALL ACTIONS** | Courtroom:   JAMS |
| 22 | Special Master: Martin Quinn, JAMS |
| 23 | Judge:        Honorable Jon S. Tigar |

24

25

26

27

28

1

**INTRODUCTION**

2   Ultimately, the Indirect Purchaser Plaintiffs ("IPPs") have failed to show why the Special

3   Master should not recommend the extension of the claims deadline.  In the first instance, the

4   Special Master can simply recommend that the claims deadline be extended as to California

5   natural persons because only those claimants are *additionally* covered by the Attorney General's

6   *parens patriae* claim in state court.  As previously discussed in the Attorney General's

7   Supplemental Statement of Interest (AG Suppl. Stmt. at 17-20), the extension of time would serve

8   the important interests of coordinating the settlement of the Attorney General's case with the

9   IPPs' settlement to the benefit of California citizens.

10   Alternatively, the Special Master can recommend that the claims deadline be extended as to

11   all claimants.  Though the IPPs speculate, without providing any evidentiary support, that such an

12   extension would inure to the benefit of corporations at the expense of natural persons outside of

13   California, the Attorney General respectfully sets out two measures that the Special Master may

14   adopt to militate against such an outcome.  First, the Special Master can recommend that the IPPs

15   provide the supplemental notice called for by the Attorney General in her Supplemental

16   Statement of Interest.  AG Suppl. Stmt. at 9-11 & n.12.  Second, the Special Master can

17   recommend that the Office of the California Attorney General contact the state attorneys general

18   in those states covered by the IPPs' state-specific damages classes to encourage those state

19   attorneys general to notify their citizens if they determine it to be in the public interest.

20   Significantly, the IPPs' response to the Supplemental Statement of Interest does not argue

21   that any of the evidence submitted by the Attorney General on the issue of extending the claims

22   date is inadmissible nor does it seek to controvert that evidence.  The Special Master may

23   therefore credit that evidence.  *See* Fed. R. Evid. 103(a)(1)(A*); see also, e.g., Fisher Studio v.*

24   *Loew's Inc.,* 232 F.2d 199, 203 (2d Cir. 1956).

25   Moreover, their response does not argue that the Special Master may not, as a matter of

26   law, recommend an extension of the claims date.  The Special Master may therefore regard the

27

28

1

1   IPPs as having admitted this point.  *See* Fed. R. Civ. P. 46; *see also, e.g.,* Arthur Miller, 9B Fed.

2   Prac. & Proc. Civ., Trials § 2472 (3d ed. 2015).[1]

3        Because the Special Master allowed the Attorney General the opportunity to file a reply—

4   though only as to the extension of the claims deadline[2]—the Attorney General submits this reply

5   to respond more fully to the very narrow arguments made by the IPPs that (1) to extend the

6   claims deadline as to *all* claimants could be unfair to natural persons because corporations would

7   be better placed to take advantage of the extension vis-à-vis natural persons (IPP Resp. at 6-7);

8   and (2) to extend the claims deadline as to California natural persons only will raise the question

9   as to why *only* California natural persons should be given an extension of the claims date (IPP

10  Resp. at 7:9-12).

11  **ARGUMENT**

12  I.   **THE SPECIAL MASTER CAN RECOMMEND THE EXTENSION OF THE CLAIMS DATE
        AS TO CALIFORNIA NATURAL PERSONS BECAUSE THE ATTORNEY GENERAL'S**
13      ***PARENS PATRIAE* CLAIM UNIQUELY DISTINGUISHES THEM FROM ALL OTHER
        CLAIMANTS**
14

15       Among all of the claimants in the states covered by a state-specific damages class in the

16  IPPs' proposed settlements, California natural persons can be distinguished in that they alone are

17  also represented by their state attorney general acting in a *parens patriae* capacity. *See* Suppl.

18  Declaration of Emilio E Varanini at ¶¶ 2-3 (hereinafter "Suppl. Varanini Decl."); *see also* Cal.

19  Bus. & Prof. Code § 16760(a)(1). Based on this fact, the Special Master can recommend at the

20  very least that the claims deadline be extended as to California natural persons.

21       Generally speaking, courts often accept filed late claims as to some claimants but not

22  others, the practical outcome of an extension of the claims deadline as to those claimants, after

23  _____

24      [1] Lead Counsel for IPPs does point in passing to cases in which the claims deadline dates
    may have pre-dated the final approval hearing. *See* IPP Response at 6 n.7.  However, the IPPs do

25  not supply any details on how these cases may be more relevant than the *DRAM* and *LCDs* cases
    cited by the Attorney General. *Compare* IPP Response at 6 & n.7 *with, e.g.,* AG Suppl. Stmt. at

26  17.  The extremely cursory citation to these cases should not detain the Special Master long in
    crafting his recommendations on this issue. *See Independent Towers of Washington v.*

27  *Washington,* 350 F.3d 925, 929 (9th Cir. 2003).
        [2] The December 17, 2015 Order of the Special Master permitted the IPPs to file a response

28  on December 29 and the Attorney General to file a reply, as to the extension issue, by January 4.

2

1   assessing the equities involved. *See, e.g. In re Gypsum Antitrust Cases,* 565 F.2d 1123, 1127-28

2   (9th Cir. 1977) (discussing cases and Federal Rules of Civil Procedure 6(b)(2), 23, & 60); *see*

3   *also, e.g., In re Orthopedic Bone Screw Prods. Liability Litig.,* 246 F.3d 315, 316-17 (3d Cir.

4   2001); *In re Cendant Corp. Prides Litig.,* 233 F.3d 188, 195-96 (3d Cir. 2000). As long as

5   similarly situated claimants are not being treated inconsistently, to allow just some late claims to

6   be accepted does not constitute an abuse of discretion. *Gypsum,* 565 F.2d at 1128. In fact,

7   differing facts underlying differing claims can warrant even a different payout on claims—though

8   an extension of the claims date as to some claims is not a different payout as such as to those

9   claims. *See, e.g., In re Insurance Brokerage Antitrust Litig.,* 579 F.3d 241, 270-71 (3d Cir. 2009)

10  (payout on claims can vary with the type of insurance policy purchased).

11       Allowing the submission of claims from California natural persons pursuant to an extension

12  of the claims deadline for them alone does not constitute inconsistent treatment of similarly

13  situated claims. Rather, it recognizes that the claims of California natural persons require a

14  specific accommodation to harmonize parallel federal and state settlement and notification

15  processes. *See* AG Suppl. Stmt. at 18-20.[3]

16  **II.   IN THE ALTERNATIVE, THE EXTENSION OF THE CLAIMS DATE AS TO ALL**
    **CLAIMANTS CAN BE ACCOMPLISHED IN A MANNER THAT DOES NOT UNDULY**
17  **FAVOR CORPORATIONS EVEN ASSUMING LEAD COUNSEL'S UNSUBSTANTIATED**
    **ASSERTIONS WERE GIVEN CREDENCE**
18

19       The Special Master can, however, equally decide simply to recommend that the claims

20  deadline be extended as to all claimants. Though Lead Counsel for the IPPs fears that such a

21  measure will cause claims aggregators to rush in to file claims on behalf of corporations at the

22  expense of natural persons outside of California—IPP Resp. at 6-7, that fear is an unsupported

23       [3] In the end, a constricted view of Federal Rule of Civil Procedure 23 should not be
    employed to limit or abridge the state substantive rights of California natural persons. 28 U.S.C.
24  § 2072; *see, e.g., Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.,* 559 U.S. 393, 417
    (2010) (Stevens, J., concurring). The ability of the Attorney General to pursue *parens* claims on
25  behalf of California natural persons defines the scope of those natural persons' substantive rights
    as it makes it easier for them to obtain compensation. *See Shady Grove,* 559 U.S. at 420-21
26  (Stevens, J., concurring). Accordingly, to extend the claims date would be to recognize, and then
    harmonize with these proceedings, the fact that the California Legislature has made a deliberate
27  choice to give California natural persons multiple vehicles to obtain reimbursement for their
    claims of overcharges. *See id.* at 420.
28

3

1    one.  Lead Counsel does not offer any evidence either to explain either how he knows of

2    additional eligible corporations that missed the original deadline or how he knows that claims

3    aggregators will rush in *only* with claims for corporations.  It has been the experience of the

4    undersigned, for example, that claims aggregators can reach out to natural persons as well in these

5    large, nationwide price-fixing settlements.  Suppl. Varanini Decl. at ¶¶ 1, 4.  Thus, at the onset,

6    the Special Master can reject Lead Counsel's claim here on the ground that it is unsupported by

7    the evidence.  *Cf., e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 324-26 (1986) (nonmoving party

8    facing summary judgment must show through affidavits or other evidence that there is a genuine

9    triable issue of material fact).

10       Moreover, the Special Master could recommend two ancillary measures be taken that

11   would militate against such an alleged disproportionate effect.  First, as set out in the Attorney

12   General's supplemental statement, the IPPs could balance the ledger by engaging in supplemental

13   notice of the type routinely done in similar nationwide price-fixing cases in order to increase

14   claims from natural persons in the state-specific damages class.  *See* AG Suppl. Stmt. at 9-11 &

15   n.12.  The IPPs disclaimed the need for such customary notice because of cost—though they did

16   not provide any specifics.  *See id.* at 10.  In their response, the IPPs have doubled-down on that

17   refusal to provide specifics.  *Compare* IPP Resp. at 4-5 *with* AG Suppl. Stmt. at 11, 13-14.  The

18   Special Master can treat the refusal to provide specifics as cutting against the credibility of Lead

19   Counsel on the issue of costs in then finding that the IPPs themselves can mitigate any presumed

20   prejudice from an extension by conducting such a supplemental notice campaign.  *Cf. Biao Yang*

21   *v. Gonzales,* 496 F.3d 268, 273 (2d Cir. 2007) (*per curiam*) (an applicant's failure to corroborate

22   her testimony may bear on credibility).

23       Second, the Office of the Attorney General could aid the IPPs in trying to ensure natural

24   persons in other states received notice of the extension of the claims date through the following

25   expedient.  The Office could contact the offices of her sister state attorneys general in those states

26   and encourage them to provide press letting their citizens know of the extended opportunity to

27   make claims.  *See* Suppl. Varanini Decl. at ¶¶ 1-2, 5-6.  It has been the experience of the

28   undersigned that press releases from state attorneys general in these price-fixing cases can

4

1   generate favorable local press coverage that can in turn raise the claims rate from their local

2   residents. *Id.* at ¶6.  Though a state attorney general cannot be required to issue such press as

3   states are sovereign entities, *see U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 838-40 (1995)

4   (Kennedy, J., concurring), it still follows that these state attorneys general are best placed to

5   decide in the public interest as chief law enforcement officers of their states, *see, e.g.,* N.Y.

6   Executive Law § 63, whether their citizens need to be notified of an extended opportunity to

7   claim.  *See* Suppl. Varanini Decl. at ¶¶ 5-7.   In turn, deference may be given to their decisions in

8   that regard.  *See Heckler v. Chaney,* 470 U.S. 821, 831-33 (1985) (a decision of an executive

9   agency, granted discretion, to refuse to undertake an enforcement action or institute proceedings

10  is generally unsuitable for judicial review); *see also* Suppl. Varanini Decl. at ¶ 7.

11                                      **CONCLUSION**

12          Based on the foregoing, the Attorney General respectfully renews her request that the

13  Special Master recommend moving the final date for submitting claims, either for California

14  natural persons only or for all claimants, to June 30, 2016.

15  Dated:  January 4, 2016                      Respectfully Submitted,

16                                               KAMALA D. HARRIS
                                                 Attorney General of California
17

18

19                                               */s/ Emilio E. Varanini*
                                                 EMILIO VARANINI
20                                               Deputy Attorney General
                                                 *Attorneys for Plaintiffs*
21                                               *General Fund - Legal/Case Work*

22  SF2011203501
    41443225.doc
23

24

25

26

27

28                                           5

*Trump Alioto Trump & Prescott*
ATTORNEYS LLP
2280 Union Street
San Francisco, California 94123
(415) 563-7200
FAX (415) 346-0679

January 13, 2016

**VIA JAMS E-FILING**

Martin Quinn, Special Master
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111

**Re:**   ***In Re: Cathode Ray Tubes (CRT) Antitrust Litigation, 07-cv-5944 JST***

Dear Special Master Quinn:

As you requested at the January 5, 2016 hearing, I write regarding the claimed "inconsistencies" between the proposed Plan of Distribution and the Court-approved plan of distribution for the Chunghwa Net Settlement Fund.[1]  As I stated at the hearing, there are no such inconsistencies.

**I.   Resellers**

Messrs. Cooper and Scarpulla contend that the proposed Plan of Distribution is inconsistent with the Chunghwa plan of distribution because the Chunghwa plan provided for payment to resellers and the current plan does not.  They further contend that "the Chunghwa notice told resellers they would be paid at a later date" (January 5, 2016 Hearing Tr., 89:14-15), and that "there was a final judgment approving the settlement with Chunghwa which provided for a payment to resellers." *Id.*, 92:15-18. They are wrong.

First, Objectors are wrong that the notice of the Chunghwa settlement (ECF No. 1063-1) "told resellers they will be paid at a later date."  To the contrary, the notice clearly informed resellers that there may *not* be a distribution in the future, and that the question would be determined later in light of any additional settlements.  *See* Chunghwa Notice at p.4, Q.10:

---

[1] The Net Settlement Fund is defined as "the $10,000,000 settlement amount, plus interest, minus 25% for attorneys' fees, reimbursement of expenses, $2.5 million for a costs set-aside, including the costs of giving notice to class members and administration of the settlement fund, all of which shall be subject to court approval.  The Net Settlement Fund shall be no less than $5 million."  Order Granting Preliminary Approval of Class Action Settlement with Defendant Chunghwa Picture Tubes, Ltd. (ECF No. 993) ("Preliminary Approval Order"), ¶10. The Court granted IPPs' request to use $2.5 million of the Chunghwa settlement to fund the litigation.  *See* ECF No. 1334.

> No money will be distributed to Settlors yet. The lawyers will pursue the lawsuit against the Non-Settling Defendants to see if any future settlements or judgments can be obtained in the case and then be distributed together to reduce expenses. It is possible that money will be distributed to organizations who are, as nearly as practicable, representative of the interests of indirect purchasers of CRT Products instead of Settlors themselves if the cost to process claims would result in small payments to Settlors.[2]

In other words, the Chunghwa notice clearly informed resellers that (1) they might not get any money; (2) they would not know until after final approval of the Chunghwa settlement whether they were getting any money; and (3) if they didn't like that plan, they should opt out or object. A number of resellers opted out of the Chunghwa settlement, but none objected.[3]

Second, neither the Chunghwa Settlement Agreement (ECF No. 884-1), nor the plan of distribution, nor any Chunghwa-related settlement approval order requires payment to resellers. The Settlement Agreement itself says nothing about the plan of distribution, let alone whether resellers are to receive any of the settlement funds. The Chunghwa plan of distribution is set forth in Paragraph 10 of the Chunghwa Preliminary Approval Order (ECF No. 993), and it too makes no mention of payment to resellers. Instead, the Order stated explicitly that the details of any future distribution of Chunghwa funds would be "deferred until a later date when there might be additional settlement funds." *Id.* at ¶ 11.[4]

Third, and contrary to Mr. Scarpulla's claims at the hearing, neither the Final Approval Order (ECF No. 1105) nor the Final Judgment (ECF No. 1106) says anything about distributing the settlement funds to resellers. The Final Judgment merely reserves "continuing jurisdiction over . . . any distribution to Class Members pursuant to further

---

[2] *See also id.* at p.3, Q.4 ("Additional money *may* become available in the future as a result of a trial or future settlements, *but there is no guarantee that this will happen.*") (emphasis added); p. 4, Q.6 ("*If* the Plaintiffs obtain additional money or benefits as a result of a trial or future settlement(s), you will be notified about how to ask for a share or what your other options are at that time. *These things are not known right now.*") (emphasis added).

[3] *See* Order Granting Final Approval of Settlement with Chunghwa Picture Tubes, Ltd., Exhibit 1 (ECF No. 1105) (listing reseller entities that excluded themselves from the Chunghwa settlement).

[4] Far from requiring payment to resellers, the focus of the Chunghwa plan of distribution was simply on the state-by-state allocation of funds—whether through *cy pres* distributions or a future class member claims process. *Id.* at ¶ 10. This state-by-state allocation is not inconsistent with the proposed Plan of Distribution. *See* Section II, *infra.*

orders of this Court" (*id.* ¶10(a)), explicitly reserving the issue for later consideration – which is precisely what we are doing now.

In sum, none of the Chunghwa settlement documents provides for payment to resellers. Thus, there is no inconsistency between the proposed Plan of Distribution and the Chunghwa plan of distribution.

Nor is it unfair or unreasonable to exclude resellers from the Plan of Distribution.[5] In proposing the Plan of Distribution, Lead Counsel considered the following factors and concluded, in the exercise of his judgment, that excluding resellers was consistent with the law and the facts:[6]

1. The Chunghwa settlement is the only settlement that includes resellers. As a result, only a very small amount of funds (the $5 million Net Settlement Fund minus amounts payable to consumers) would be potentially available for distribution to resellers. The cost involved to calculate the allocation to resellers vs. consumers and conduct a claims process would far outweigh the small benefit (if any) that resellers would receive. This is particularly true given the evidence that resellers were not injured by the CRT conspiracy because they passed on the overcharges to consumers.[7]

2. Resellers received fair notice that they may not recover from the Chunghwa fund and that a specific plan of distribution would be proposed later in the case—a proposal to which no reseller objected at the time.

3. Resellers that were interested in this case opted out of the Chunghwa settlement and pursued their own actions, and most of them voluntarily dismissed their indirect purchaser claims due to the problem of proving pass-through. *See, e.g.*, ECF Nos. 3406, 3527.

4. Because resellers were not included in the settlements with the other Defendants, they were free to bring their own actions against those Defendants and hold them jointly and severally liable.

5. Resellers that remained part of the Chunghwa settlement class received the benefit of Chunghwa's proffer – a benefit which is commensurate with the value of their claims.

---

[5] The plan of distribution is "governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable, and adequate." *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008) (Conti, J.).

[6] *See Rieckborn v. Velti PLC*, No. 13-cv-03889, 2015 WL 468329, at *8 (N.D. Cal. Feb. 3, 2015) ("Courts recognize that an allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel.")

[7] *See In re Omnivision*, 559 F. Supp. 2d at 1045 ("it is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits.")

Finally, the Chunghwa notice also advised class members that "[i]mportant information about the case will be posted on the website. . . .  Please check the website to be kept informed about any future developments." ECF No. 1063-1, at p. 4, Q.6. Resellers were therefore on notice that they should check the website regarding any future allocation of the Chunghwa settlement proceeds.  Moreover, IPPs gave extensive notice of the proposed Plan of Distribution, including direct mail and/or email notice to millions of companies, some of which are sophisticated companies that likely resold CRT Products.[8]  The notice is clear that only consumers may make a claim under the proposed Plan of Distribution (*see id.*, Exhibit A (Detailed Notice)), yet no reseller has objected to it.

In light of the foregoing, no changes to the Plan of Distribution to compensate resellers are warranted.

## II.    Allocation to States

Messrs. Cooper and Scarpulla also contend that the proposed Plan of Distribution does not account for the Chunghwa state-by-state plan of distribution, which requires that the Chunghwa settlement funds be allocated pro rata amongst 24 states before any distribution to individual claimants. *See* Preliminary Approval Order, ¶10. This too is incorrect.

The Chunghwa plan of distribution was the result of objections to the Chunghwa settlement filed by the Attorneys General of Illinois, Oregon and Washington. *See* ECF Nos. 909-1, 922.  Under the direction of Special Master Legge, Lead Counsel negotiated a resolution of the State AG's objections, which involved allocating the Chunghwa settlement funds amongst the 22 states alleged in the operative complaint, Illinois and Oregon.[9]  The Chunghwa notice clearly described this plan of distribution to class members,[10] there were no objections to it, and the plan is now final.

Because class members had already been given notice of the Chunghwa plan of distribution and it had already been finally approved, it was not necessary to spell it out again in the current Detailed Notice.  The current Detailed Notice is not, however, inconsistent with the Chunghwa plan of distribution and does not ignore it.  The notice

---

[8] *See* Declaration of Joseph M. Fisher Reporting on Class Notice (referred to in the settlement approval papers as "Fisher Decl. II"), ¶¶ 7-16 (describing comprehensive notice plan, including direct mail notice to every Fortune 500 company nationwide for each year of the class period).

[9] IPPs were unable to reach an agreement with the Washington AG.

[10] *See* Chunghwa Notice (ECF No. 1063-1), at p.5, Q.10 ("[T]he money from the current settlement, will first be allocated amongst the 24 states listed on page 1 of this notice, so that each state receives its pro rata share. Each state's pro rata share shall be determined by computing its population as a percentage of the total population of all 24 states using census figures from the year 2000.")

states: "The combined Settlement Fund totaling $576,750,000 will be used to pay eligible claimants *in the states involved in this litigation*."[11]  Pursuant to the Chunghwa Preliminary Approval Order, the "states involved in this litigation" include Illinois, Oregon and the 22 Indirect Purchaser State Classes.[12]

Moreover, nowhere in the current Detailed Notice does it state that the entire $576,750,000 will be distributed pro rata to individual claimants.  In fact, the Detailed Notice is clear that the amount of the net settlement fund available for distribution is inherently uncertain.[13]  Thus, carving out the payments to Illinois and Oregon (approximately $600,000) in accordance with the Chunghwa Preliminary Approval Order will not require additional notice.[14]

In short, the claimed "inconsistencies" between the proposed Plan of Distribution and the Chunghwa plan of distribution are not borne out by the facts.  The mere fact that the current Detailed Notice did not set forth the Chunghwa plan of distribution in detail is not sufficient to require additional notice – particularly when class members already received adequate notice of the Chunghwa plan and it has been finally approved.

The proposed Plan of Distribution is fair, adequate and reasonable and should be approved.

Respectfully submitted,

Mario N. Alioto

Lead Counsel for the Indirect Purchaser Plaintiffs

---

[11] *See* Fisher Decl. II, Exhibit A (Detailed Notice at p. 7, Q. 8) (emphasis added).

[12] Once the final Chunghwa Net Settlement Fund is known, the money will be allocated amongst the 24 states in accordance with Paragraph 10 of the Chunghwa Preliminary Approval Order.  The Illinois and Oregon AGs will receive their states' pro rata shares (based on a Net Settlement Fund of $5 million, their shares will be $429,500 and $118,500, respectively).  The other 22 states will receive their pro rata shares as part of the pro rata distribution to claimants in those states.

[13] *See* Detailed Notice at p. 7, Q.8 (informing class members that unknown amounts for "the cost to administer the Settlements as well as attorneys' fees, litigation expenses and payments to the Class Representatives will come out of the combined Settlement Fund" before any distribution is made); *id.* at Q.9 ("At this time, it is unknown how much money each Class Member will recover.")

[14] *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 946 (9th Cir. 2015) (adequate notice does not require "provid[ing] an exact forecast of how much each class member would receive").

Law Offices
## COOPER & KIRKHAM, P.C.
357 TEHAMA STREET, SECOND FLOOR
SAN FRANCISCO, CALIFORNIA 94103
(415) 788-3030
FAX (415) 882-7040

WRITER'S DIRECT CONTACT
(415) 788-3030 ext. 305
jdc@coopkirk.com

January 13, 2016

**VIA EMAIL**

Martin Quinn, Special Master
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111

    Re:    *In re: Cathode Ray Tubes (CRT) Antitrust Litig.*, Case No. 07-cv-5944 JST

Dear Special Master Quinn:

    At the January 5, 2016 hearing, you requested letter briefs to further address the issues arising from conflicts between the terms of the approved settlement/distribution plan for the Chunghwa settlement and the proposed terms of and plan of distribution for subsequent settlements. This letter provides an analysis of the situation created by the unique terms of the Chunghwa settlement, and potential options available at this juncture. We wish there was an easy, inexpensive and expeditious fix for the problems presented by the conflict. However, we can find no solution that does not involve another round of class notice and re-opening the claims period to allow resellers in 23 states and the District of Columbia to submit claims against the proceeds of the Chunghwa settlement.

## I.  CONFLICT BETWEEN PROPOSED PLAN OF DISTRIBUTION AND INCLUSION OF RESELLERS IN THE CHUNGHWA SETTLEMENT CLASS

    The currently proposed settlements, and the plan for distributing the proceeds of all settlements would confine compensation from the Chunghwa settlement to members of the Indirect Purchaser State Classes ("the damage state classes") who purchased CRT Products *"for their own use* and not for resale." Lead Counsel's Memo,[1] at 3. The Chunghwa settlement, however, settled claims of both resellers and consumers, and pursuant thereto, notice was

---

[1] "Indirect Purchaser Plaintiffs' Motion for Final Approval of Settlements with the Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, Technicolor, and Technologies Displays Americas Defendants," dated November 20, 2015 (hereinafter "Lead Counsel's Memo").

disseminated that promised compensation to resellers in the damage state classes, who did not exclude themselves from the settlement.

On August 10, 2011, Judge Conti gave preliminary approval to the Chunghwa settlement by adopting a proposed order ("Preliminary Approval Order") submitted by the Hon. Charles A. Legge (Ret.), acting as a Special Master. Dkt. 993. Attached to that Order were two exhibits, a long form (Exhibit A) (Dkt. 993-1), and a short publication form (Exhibit B) (Dkt. 993-2) of class notice. On March 22, 2012, Judge Conti confirmed that notice had been given "in accordance with this Court's Order Granting Preliminary Approval of Class Action Settlement with Chunghwa Picture Tubes, Ltd. *See* DE 993." Dkt. 1105 ("Final Approval Order").

## A.    The Long Form of Notice (Dkt. 993-1)

The long form notice reproduces in pertinent part the settlement class definition contained in the Preliminary Approval Order, defining class membership under heading "7. How do I know if I am one of the Settlors?" That question is answered as follows (emphasis added):

> The Settlors includes any person or business that indirectly bought in the U.S. (excluding claims under the Washington Unfair Business Practices and Consumer Protection Act) from March 1, 1995 through November 25, 2007, any CRT Product made by Defendants. *Both consumers and resellers are included in the Settlement Class.*

A paragraph under subsequent heading "9. What does the Settlement provide?" informs readers that it "provides for the payment by Settling Defendant of $10,000,000 in cash, plus interest, to Settlors" without distinguishing between consumer and reseller "Settlors." The language in response to question 9 also notes that "part of the $10 million settlement fund may be used to pay expenses incurred in the litigation."

The final portion of the long form notice pertinent to the rights of resellers is the description of the distribution of the settlement funds. This appears under heading 10, "When can I get a payment?" The pertinent part of that section reads as follows (emphasis added):

> No money will be distributed to Settlors yet. The lawyers will pursue the lawsuit against the Non-Settling Defendants to see if any future settlements or judgments can be obtained in the case and then be distributed together to reduce expenses. *It is possible that money will be distributed to organizations who are, as nearly as practicable, representatives of the interests of indirect purchasers of CRT Products instead of Settlors themselves if the cost to process claims would result in small payments to Settlors.*

## B.    The Short Form of Notice (Dkt. 993-2)

The publication notice contains language nearly identical to that of the long form notice, defining "Who is Included" in the litigation with the explicit statement that "[b]oth consumers and resellers are included in the Settlement." It also repeats the language quoted above about

distribution of the funds, including the statement in italics regarding the potential for a *cy pres* distribution.

Stated simply, approximately four years ago, the Court ordered the dissemination of notice informing persons and entities who indirectly purchased CRT Products for resale, as well as for their own use, that unless they timely excluded themselves from the settlement, their claims against Chunghwa would be released in exchange for a payment of $10 million.  They were told that "part" of Chunghwa's payment could be used for litigation expenses, but that the balance would be paid to them if they purchased in one of the "24 states" listed in the long form notice.  (The states listed on page 1 of the notice are the 22 damage "states," one of which is the District of Columbia, whose purchasers are included *pro rata* in the distribution plan currently proposed, plus Illinois and Oregon.)  The only exception to this promise would occur "if the cost to process claims would result in small payments to Settlors."  Then, instead of paying "Settlors themselves," payment might be made to "organizations who are, as nearly as practicable, representatives of the interests of indirect purchasers of CRT Products."

## C.    Lead Counsel's Position is Unconstitutional

In a written response, as well as at the January 5th hearing, Lead Counsel has dismissed the undersigned's objection which raises the conflict between the Chunghwa settlement class, notices and orders and the proposed plan of distribution for the Chunghwa settlement money as being of no moment.  Lead Counsel asserts that denying resellers compensation is permissible because the Chunghwa notice "informed class members that (due to the large size of the class and the relatively small settlement amount) they might not receive any money under the settlement.  (See Dkt. No. 993-1, Section 10)."  [Lead Counsel's Reply Brief at 5].  Allegedly, having forewarned resellers that they might not get any money from the Chunghwa settlement, it is permissible to now give their share of the money to consumers.

There are several critical problems with this facile solution.  Most importantly, the Chunghwa notice did not tell class members that some decision that Lead Counsel or the Court might make in the future could deny them a recovery.  Rather, the Chunghwa notices very specifically discuss the alternative of a *cy pres* distribution as their recovery.  But, Lead Counsel is not proposing that the resellers' share of the Chunghwa settlement be distributed *cy pres*.  He is proposing that it be given directly to other class members.  In fact, he has repeatedly asserted that "[n]o *cy pres* distribution is contemplated" in the currently proposed plan of distribution, (Lead Counsel's Memo at 1), and emphasized that the "IPPs plan to distribute all net settlement funds directly to class members, as was done in *LCD*." *Id.* at 48-49.  *See also* Indirect Purchaser Plaintiffs' Response to the California Attorney General's Statement of Interest, lodged December 29, 2015, at 3 ("The Plan of Distribution in this case proposes a threshold minimum recovery for any qualified claimant from one of the Indirect Purchaser States Classes.  For all claimants damaged above this minimum threshold, all remaining net settlement funds will be distributed on a *pro rata* basis based upon the total purchases of CRT Products.")

Moreover, the Chunghwa notice was very specific as the conditions that have to occur in order to deny a direct monetary payment to Settlors – that is "the cost to process claims would result in small payments to Settlors."  However, as contemplated by the Chunghwa settlement,

claims processing costs are being shared by the totality of the settlements, and, therefore, will not deplete or reduce any single fund to where individual distribution is infeasible or impracticable. Indeed, the Preliminary Approval Order prohibits the disproportionate allocation of claims processing costs to the Chunghwa fund. It provides that "[t]he Net Settlement Fund means the $10,000,000 settlement amount, plus interest, minus 25% for attorneys' fees, reimbursement of expenses, $2.5 million for a costs set-aside, including the costs of giving notice to class members and *administration of the settlement fund,* all of which shall be subject to court approval. *The Net Settlement Fund shall be no less than $5 million.*" Dkt. 993, pg. 4, fn. 2 (emphasis added).

Lead Counsel plans to take the money that would go to resellers in a *pro rata* distribution and give it all to consumers. The representations in the notices clearly do not contemplate this situation. Rather, the notice is explicit about how the money is to be paid out if not "to Settlors." That is a *cy pres* distribution "*to organizations who are, as nearly as practicable, representatives of the interests of indirect purchasers of CRT Products.*" Dkt. 993-1 (emphasis added). Notices disseminated in federal class actions are communications from district courts, and most contain statements that they are official documents. For example, the Chunghwa long form notice states, "*A Federal Court authorized this Notice.*" Dkt. 993-1 (emphasis in original). Similarly, the publication notice begins with the words, "LEGAL NOTICE." Due process considerations require that court ordered settlement notices adequately explain the benefits and detriments that will accrue to those persons who elect to remain in the settlement class. For Chunghwa class members, that election is now final. Chunghwa has received the benefit of the releases of all resellers, other than the ten who excluded themselves, based upon the representation that resellers in the 24 damages states would receive direct monetary compensation unless the court orders a *cy pres* distribution.

As the Special Master observed, the issue of reseller compensation from the Chunghwa settlement is a $10 million tail wagging a $500+ million dog. However, it is a Constitutional tail that cannot be ignored. No matter how we have analyzed it, the issue of reseller compensation from the Chunghwa settlement is a question of Constitutional due process. Regardless of the amount of money involved, it is simply not possible to make a material change in noticed settlement terms to eliminate benefits post-finality for a segment of a certified class. The money involved may be "small," and one may reasonably predict that none of the resellers whose rights Lead Counsel proposes to ignore would have opted-out had they been told that all the settlement money was going to consumers. However, due process remains due process, and close adherence to its principles is the cornerstone of judicial integrity. Accordingly, since there is no Constitutionally-permitted way for Lead Counsel to avoid the obligation to resellers created by the Chunghwa settlement and notices, the Chunghwa fund must be segregated, the claims period re-opened for resellers in the 22 damage states, and new notice disseminated that invites reseller claims and informs class members that contrary to the last notice, consumers will not be getting all of the Chunghwa settlement money.

## II. CONFLICT BETWEEN THE PROPSED PLAN OF DISTRIBUTION AND THE ALLOCATION FORMULA FOR THE CHUNGHWA SETTLEMENT

Special Master Martin Quinn
JAMS
January 13, 2016
Page 5 of 5

The court-approved Chunghwa plan of distribution does not allow for the funds to be distributed *pro rata* to all claimants. Rather, the plan provides that "[e]ach state listed in the operative complaint . . . shall receive  a *pro rata* share" determined by its "population as a percentage of the total population of all states." Dkt. 993.  The allocations for each state are listed in the Order.  *Id.*  This distribution plan was described with specificity in the long form of notice, and adds that "[e]ach state's pro rata share *shall be determined by computing its population as a percentage of the population of all 24 states* using census figures from the year 2000." Dkt. 993-1 (emphasis added).  Under this plan, the variables determining any claimant's individual recovery would be the population in 2000 of his/her/its state of residence and the number of valid claims received from that state.  This is very different than the *pro rata* distribution currently proposed in which all of the settlement money is aggregated and distributed based upon the totality of valid claims received from residents of all twenty-two damage class states.

At the January 5th hearing, Lead Counsel asserted that the population-based division of the Chunghwa settlement proceeds into state sub-funds applied only to the money going to Illinois and Oregon, and represented that the appropriate calculation for these states would be made.  He denied being obligated to allocate the Chunghwa money to any other states on a population basis.  That is clearly not correct.

The question of whether a noticed settlement provision can be altered by subsequent order of the court, without giving notice, depends upon whether the alteration is "*de minimis.*" *Ferreira v. Browne (In re Groupon Mktg. & Sales Practices Litig.)*, 593 Fed. Appx. 699, 701 (9th Cir. 2015) ("[W]e conclude that the *de minimis* changes made to the settlement in response to the district court's initial disapproval did not require sending a new notice to the class.")  Here, there is substantial question whether the differences in the approved Chunghwa and currently proposed distributions are *de minimis*, and the problem is compounded by the fact that final judgment has been entered on the Chunghwa settlement.  Moreover, since Lead Counsel needs to break out the Chunghwa money in order to compute and make population-based payments to the Illinois and Oregon Attorneys General, creating separate population-based "pots" of money for reseller and consumer claimants in each state is the safer course of action, and potentially simpler than adjudicating whether the difference between the two distribution methods is *de minimis*.

Respectfully submitted,

/s/ Josef D. Cooper
Josef D. Cooper

/s/  Francis O. Scarpulla
Francis O. Scarpulla

Cc:  All Counsel via JAMS Case Anywhere Service