# EXHIBIT
# 3

1    ANDREA VALDEZ (Cal. Bar No. 239082)
     530 S. Lake Avenue, No. 574
2    Pasadena, CA 91101
     Tel: (626) 817-6547
3    andrea.valdez.esq@gmail.com

4    JOSEPH SCOTT ST. JOHN (*pro hac vice*)
     514 Mockingbird Drive
5    Long Beach, MS 39560
     Tel: 410-212-3475
6    jscottstjohnpublic@gmail.com

7    *Attorneys for Objector Douglas W. St. John*

8

9                    UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                      SAN FRANCISCO DIVISION

12   **IN RE CATHODE RAY TUBE (CRT)**          Master File No. 3:07-cv-5944 JST
     **ANTITRUST LITIGATION**
13                                             MDL No. 1917

14                                             **OBJECTOR DOUGLAS W. ST. JOHN'S**
                                               **REPLY IN SUPPORT OF OBJECTION**
15

16
     This Document Relates To:
17   All Indirect Purchaser Actions             Judge: Hon. Jon S. Tigar

18                                              Special Master: Hon. Martin Quinn

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................... 1

TABLE OF AUTHORITIES ..................................................................................... 3

I.  IPP COUNSEL FAILED TO ESTABLISH THE REASONABLENESS OF THEIR REQUESTED FEES. ............................................................................ 1

    A.  IPP Counsel do not dispute that they failed to submit background data necessary for the Court and the class to evaluate their claimed fees. ................ 1

    B.  IPP Counsel improperly identified contract attorneys as associates, but selectively failed to provide background information on those attorneys. ...................................................................................................... 2

II.  IPP COUNSEL FAIL TO REBUT THAT MUCH OF THE SETTLMENT FUND IS ATTRIBUTABLE TO FACTORS OTHER THAN IPP COUNSEL'S EFFORTS. ........................................................................... 4

    A.  As a matter of law, IPP Counsel cannot be awarded fees for portions of the settlement fund attributable to the efforts of others. .................................. 4

    B.  At least $170 million of the settlement fund is not attributable to IPP Counsel. ...................................................................................................... 5

        1.  IPP Counsel do not contest that the CRT conspiracies were uncovered by regulators, or that they piggybacked on those governmental efforts. ......................................................................... 5

        2.  IPP Counsel are judicially estopped from contesting the substantial and redounding value of the Chunghwa settlement. .......... 5

        3.  IPP Counsel fail to rebut the significant value of Samsung SDI's guilty plea and the associated investigation by DOJ. ................. 6

        4.  The European Commission Decision was relevant, admissible, and likely preclusive. ....................................................................... 7

    C.  IPP Counsel offer no real explanation for the vastly disproportionate size of the Samsung and Philips settlements. ....................................................... 9

III.   IPP COUNSEL FAIL TO ESTABLISH THAT THEIR REQUEST FOR
       OVER $192 MILLION IN FEES IS REASONABLE. ................................. 11

       A.   IPP Counsel improperly tie their request to the entirety of the $576
            million megafund. ............................................................................. 11

       B.   IPP Counsel fail to rebut the significant evidence of lodestar inflation. .......... 12

       C.   The Supplemental Declaration of Richard Pearl makes clear that he is
            not qualified to opine on the reasonableness of expending 183,000
            hours. ............................................................................................... 13

       D.   No multiplier is warranted ................................................................ 14

IV.    IPP COUNSEL'S REMAINING ARGUMENTS ARE MERITLESS ...................... 15

# TABLE OF AUTHORITIES

**Cases**

*Antoninetti v. Chipotle Mex. Grill, Inc.*, 2012 WL 2923310 (S.D. Cal. July 17, 2012) ...............13

*Blum v. Stephenson*, 465 U.S. 886 (1984).............................................................................2

*Brown v. Stackler*, 612 F.2d 1057 (7th Cir. 1980) ................................................................3

*Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973 (9th Cir. 2008) ..........................................2

*Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039 (N.D. Cal. 2010)........................2

*First State Ins. Grp. v. Nationwide Mut. Ins.*, 402 F.3d 43 (1st Cir. 2005) ...........................3

*Gauchat-Hargis v. Forrest River, Inc.*, 2013 WL 4828594 (E.D. Cal. Sept. 9, 2013) ...............13

*Goffstein v. State Farm Fire & Casualty Co.*, 764 F.2d 522 (8th Cir. 1985) ...........................7

*In re Auction Houses Antitrust Litig.*, 2001 WL 210697 (S.D.N.Y. Feb. 26, 2001)............................ 12, 14

*In re Auto. Parts Antitrust Litig.*, 2014 WL 1746121 (E.D. Mich. Apr. 30, 2014) ....................6

*In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752 (S.D. Ohio 2007) ........................5

*In re Cendant Corp. PRIDES Litigation*, 243 F.3d 722 (3d Cir. 2001).......................... 5, 11

*In re Citigroup Sec. Litig.*, 965 F. Supp. 2d 369 (S.D.N.Y. 2013) .......................................13

*In re Corrugated Container Antitrust Litig.*, 643 F. 2d 195 (5th Cir. 1981)............................11

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141 (D. Conn. 2009)...7

*In re Mercury Interactive Sec. Litig.*, 618 F.3d 988  (9th Cir. 2010) ...........................1, 13

*In re Prudential Insurance Co. of America Sales Litigation*, 148 F.3d 283 (3d Cir. 1998) ..........4, 11

*In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448 (D.P.R. 2011)........................5

*Local Union No. 490 v. Kirkhill Rubber Co.*, 367 F.2d 956 (9th Cir. 1966) ...............................10

*Lola v. Skadden, Arps, Slate, Meagher, & Flom LLP*, 2015 WL 4476828 (2d Cir. July 23, 2015)..............3

*Lopez v. San Francisco Unified Sch. Dist.*, 385 F. Supp. 2d 981 (N.D. Cal. 2005)........................2

*Monterrubio v. Best Buy Stores, LP*, 291 F.R.D. 443 (E.D. Cal. 2013) ..................................2

*Navarro v. Gen. Nut. Corp.*, 2004 WL 2648373 (N.D. Cal. Nov. 19, 2004)........................3

*Navarro v. Gen. Nut. Corp.*, 2005 WL 2333803 (N.D. Cal. Sept. 22, 2005) ..........................2, 3

*Rissetto v. Plumbers and Steamfitters Local 343*, 94 F. 3d 597 (9th Cir. 1996)........................6

*Ruyle v. Continental Oil Co.*, 44 F.3d 837 (10th Cir. 1994) .............................................9

*Sartor v. Ark. Nat. Gas Corp.*, 321 U.S. 620 (1944) ........................................................10

*Thayer v. Wells Fargo Bank*, 92 Cal. App. 4th 819 (2001) ..............................................13

*True v. Am. Honda Mot. Co.*, 749 F. Supp. 2d 1052 (C.D. Cal. 2010) .............................15

*Vichi v. Koninklijke Philips Elec., N.V.*, 85 A.3d 725 (Del. Ch. 2014)..........................8, 9, 11

*Young v. Covington & Burling LLP*, 846 F. Supp. 2d 141 (D.D.C. 2012) .........................3

**Other Authorities**

Noam Scheiber, *The Last Days of Big Law*, THE NEW REPUBLIC (July 21, 2013) .....................3

**Rules**

Fed. R. Civ. P. 23(h) ........................................................................................................1

**Treatises**

5 Moore's Fed. Practice. § 23.124[4] (3d ed. 2015) ........................................................1

Alba Conte, 1 *Attorney Fee Awards* § 2.05..................................................................4

I.    **IPP COUNSEL FAILED TO ESTABLISH THE REASONABLENESS OF THEIR REQUESTED FEES.**

A.    **IPP Counsel do not dispute that they failed to submit background data necessary for the Court and the class to evaluate their claimed fees.**

In his objection, Mr. St. John expressly identified two IPP Counsel firms—Trump, Alioto, Trump & Prescott LLP ("TATP") and Lovell Stewart Halebian and Jacobson LLP—that failed to support their fee request with information about some or all of their timekeepers. D. St. John Obj. (D.E. 4106) at 21-23. At least TATP has now filed an additional declaration supporting its fee request. Consideration of that declaration—filed non-publicly with JAMS weeks after the deadline for objections—in ruling on IPP Counsel's fee motion is not permissible. Fed. R. Civ. P. 23(h); *see also In re Mercury Interactive Sec. Litig.*, 618 F.3d 988, 994-95 (9th Cir. 2010) (vacating and remanding: "When the district court sets a schedule that denies the class an adequate opportunity to review and prepare objections to class counsel's *completed* fee motion, it fails to fulfill its fiduciary responsibilities to the class."); 5 Moore's Fed. Practice. § 23.124[4] (3d ed. 2015) ("Any objection deadline set by the court should provide the eligible parties with an adequate opportunity to review *all of the materials* that may have been submitted in support of the motion . . . .").

Mr. St. John made clear that his identification of TATP and Lovell Stewart were only exemplary. D. St. John Obj. at 23 ("TATP is not alone in its deficiencies. IPP Counsel's fee requests are replete with attorneys with only a name disclosed . . . . For example, Lovell Stewart . . . ."). At least **20** firms seek fees for attorneys for whom they provide no experience, skill, and reputation information. Six of those firms did not provide background information on *any* attorney.[1, 2] And while some of those firms submitted additional—but still improper—declarations in support of IPP Counsel's fee motion, they did not even attempt to cure their deficient fee requests.

---

[1]    Firms that did not submit background information for any of their attorneys: Lovell, Stewart, Halebian and Jacobson LLP; Milberg LLP; Frankovitch, Anetakis, Colantonio & Simon; Kirkpatrick & Goldsborough; McCallum, Hoaglund, Cook & Irby LLP; Wyatt & Blake LLP.

[2]    Firms that did not submit background information for some of their attorneys: Trump Alioto, Trump & Prescott LLP; Zelle Hofmann Voelbel & Mason LLP; Straus & Boies, LLP; Green & Noblin, P.C.; Andrus Anderson LLP; Fine, Kaplan and Black RPC; Miller Law LLC; Law Offices of Sherman Kassof; Goldman, Scarlato, Karon, & Paenny P.C.; Glancy, Prongay & Murray LLP; Karon LLC; Mansfield, Tanick, & Cohen PA / Foley & Mansfield PLLP; McManis Faulkner; Whitfield  Bryson & Mason Mason LLP.

As fee applicants, IPP Counsel "bear[] the burden of demonstrating that 'the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.'" *Monterrubio v. Best Buy Stores, LP*, 291 F.R.D. 443, 459 (E.D. Cal. 2013) (quoting *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008)). To meet their burden, IPP Counsel were required to provide the Court with the information necessary to properly evaluate their requested fees. *Navarro v. Gen. Nut. Corp.*, 2005 WL 2333803, at *7-9 (N.D. Cal. Sept. 22, 2005); *see also Blum v. Stephenson*, 465 U.S. 886, 895 n.11 (1984). They failed to do so.

For timekeepers for whom IPP Counsel failed to provide background information, the Court has no basis to award anything other than a minimal hourly rate. *See Navarro*, 2005 WL 2333803, at *10; *Lopez v. San Francisco Unified Sch. Dist.*, 385 F. Supp. 2d 981, 990, 992 (N.D. Cal. 2005) (awarding the lowest rate sought due to the absence of background information to distinguish timekeepers). Assuming *arguendo* that white shoe law firms are the appropriate comparable, non-contract attorneys for whom no background information was provided should receive only the lower of their requested hourly rate or the rate of a first year associate, i.e., $250-$300 per hour. *See, e.g., Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1068 (N.D. Cal. 2010). The Court need not construct a spreadsheet: a significant across-the-board reduction is appropriate.

### B.    IPP Counsel improperly identified contract attorneys as associates, but selectively failed to provide background information on those attorneys.

Several firms provided detailed background information for partners and associates, but omitted such information for attorneys who—although labelled associates—were actually contract attorneys. The example of Natalia Kabsakalian suggests that the selective omission was a conscious decision: she apparently worked for three firms as a contract attorney, but was improperly identified by each as an associate. Alioto Dec. (D.E. 4073-1); Karon Dec. (4073-15); Karon Dec. (4073-27).

The issue is not—as IPP Counsel suggest—whether contract attorneys can ethically be billed at market rates. The issue is the market rate for the contract attorneys in this case. Contrary to IPP Counsels' suggestion, many of the contract attorneys were not "highly skilled and experienced." Opp. at 21. For example, one contract attorney for the Law Offices of Sherman Kassof graduated—apparently without distinction—from an unexceptional law school, and he had no significant legal

experience prior to conducting document review in this case. J. St. John Dec. II Ex. 1. Mr. Kassof

paid that contract attorney $25-$30 per hour, but seeks to charge the class $350 per hour for his

work. *See* J. St. John Dec. II at ¶ 13; Kassof Dec. (D.E. 4073-14). Such individuals are not "lawyers

of reasonably comparable skill, experience and reputation" vis-à-vis the white-shoe associates IPP

Counsel proffer for comparison. And the only record evidence of the market rate for

undifferentiated contract attorneys is the $47-$125 cited in Mr. St. John's objection.[3]

A fee motion is not a "heads class counsel wins, tails we try again" proposition. *See, e.g., First

State Ins. Grp. v. Nationwide Mut. Ins.*, 402 F.3d 43, 43 (1st Cir. 2005). IPP Counsel mislabeled contract

attorneys as associates, then selectively failed to disclose background information that would have

made the mislabeling apparent. Courts have handled contract attorney fee awards in different ways.

D. St. John Obj. at 22. But IPP Counsel should not be permitted to hide the issue, then suffer only a

reduction of their fee to what the Court would have granted if the facts were properly disclosed. *See

Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980). Rather, "a severer reaction is needful." *Id.*

If TATP is awarded the low-end of the undifferentiated contract attorney rate, i.e. $47 per

hour, its lodestar will be reduced by $2.61 million, i.e., about 16.6%. Other firms, such as the Law

Office of Sherman Kassof, may have a substantially greater portion of their claimed fee attributable

to contract attorneys, but neither the Court nor the class can evaluate that question due to the lack

of attorney background information. Taking into account the need for a "severer reaction," an

across-the-board reduction of IPP Counsel's lodestar by at least 15% is appropriate, in addition to

any across-the board reduction due to the lack of background information for regular attorneys.

---

[3]      "Lawyers at an elite firm . . . have typically spent their lives amassing intellectual
credentials. They are high-school valedictorians and graduates of elite universities, with mantles full
of Latin honors. They have made law review at top law schools and clerked for federal judges."
Noam Scheiber, *The Last Days of Big Law*, THE NEW REPUBLIC (July 21, 2013). Such attorneys simply
are not "lawyers of reasonably comparable skill, experience and reputation" for attorneys whose
legal experience consists of performing document review for a year or two after graduating from an
undistinguished law school. *See, e.g., Lola v. Skadden, Arps, Slate, Meagher, & Flom LLP*, No. 14-3845,
2015 WL 4476828, at *6 (2d Cir. July 23, 2015) (applying North Carolina law: document review may
not constitute the practice of law); *Young v. Covington & Burling LLP*, 846 F. Supp. 2d 141, 147-48,
155 (D.D.C. 2012) (describing the lesser qualifications and responsibilities of "staff attorneys"
performing document review as compared to associates); *cf. Navarro v. Gen. Nut. Corp.*, 2004 WL
2648373, at *4 (N.D. Cal. Nov. 19, 2004), *reviewed in-part de novo*, 2005 WL 2333803 (N.D. Cal. Sept.
22, 2005) (rates of opposing counsel "are evidence of th[o]se attorneys' own skill, experience, and
reputation, and say little about" the appropriate rate for the fee applicant).

## II. IPP COUNSEL FAIL TO REBUT THAT MUCH OF THE SETTLEMENT FUND IS ATTRIBUTABLE TO FACTORS OTHER THAN IPP COUNSEL'S EFFORTS.

### A. As a matter of law, IPP Counsel cannot be awarded fees for portions of the settlement fund attributable to the efforts of others.

A common fund fee award is based in equity, and it is tied to the benefit the applicant provided to the fund. IPP Counsel can thus only be awarded fees based on the portion of the settlement fund attributable to their own efforts, as distinguished from the efforts of others, such as government agencies. Mr. St. John cited *In re Prudential Insurance Co. of America Sales Litigation*, 148 F.3d 283 (3d Cir. 1998), for that proposition. IPP Counsel argue for a more limited reading: "that courts **can** consider any assistance class counsel received from public agencies when awarding attorneys fees." Opp. at 12 n.27. IPP Counsel are not correct. As *In re Prudential* makes clear, "it is **essential** to separate out the benefits attributable to class counsel" before proceeding to the fee analysis. 148 F.3d at 342.

To wit: the *In re Prudential* class action was litigated parallel to with a Multi-State Life Insurance Task Force examination of Prudential's sales practices. *Id.* at 292. The Task Force compiled a report and recommended a remediation plan. *Id.* at 291. "Forty-three states and the District of Columbia [then] signed a Consent Order adopting the Task Force Plan . . . ." *Id.* at 291-92. After extensive discovery, the class action settled. *Id.* at 294 & n.12, 319 & n.64. That settlement included significant improvements over the Task Force's remediation plan. *Id.* at 296-97. The district court awarded attorney fees to class counsel based on the common fund doctrine, and it used the percentage-of-recovery method to set the amount of the award. *Id.* at 336. But the district court based its fee calculation on "the entire value of the settlement, including any portion which would have been provided to the class under the Task Force Plan." *Id.* at 330. That was error. *Id.* at 338.

As the Third Circuit explained, ""[n]umerous courts have concluded that the amount of the benefit conferred logically is the appropriate benchmark against which a reasonable common fund fee charge should be assessed." *Id.* (quoting Alba Conte, 1 *Attorney Fee Awards* § 2.05, at 37). The trial court was thus required to distinguish "benefits created by class counsel from the benefits created under the Task Force Plan." *Id.* Indeed, doing so "is especially crucial in consumer class actions where federal or state agencies . . . have conducted their own investigations of wrongdoing." *Id.*

The principle underlying *In re Prudential* was further elucidated in *In re Cendant Corp. PRIDES Litigation*, 243 F.3d 722 (3d Cir. 2001). In that case, the class action was filed after the defendant disclosed accounting irregularities, and it settled after less than nine months of litigation. 243 F.3d at 725. The Third Circuit found that the district court abused its discretion by awarding 5.7% of the common fund as fees, pointing to its warning in *In re Prudential* against overemphasizing class counsel's role in a recovery. *Id.* at 741. The court the presence of similar concerns because "Cendant's liability . . . had been conceded at the outset" of the controversy, and class counsel could not claim fees by freeriding on the efforts of others. *Id.*

Applied here, several factors inflated the settlement fund independent of the efforts of IPP Counsel: the antitrust violations were initially detected by regulators; Chunghwa applied to the DOJ amnesty program, and it consequently agreed to an early settlement and to provide cooperation; Samsung SDI pled guilty to violating the Sherman Act; and the European Commission issued detailed factual findings that were relevant, admissible, and likely preclusive against the defendants.[4]

**B.    At least $170 million of the settlement fund is not attributable to IPP Counsel.**

**1.    IPP Counsel do not contest that the CRT conspiracies were uncovered by regulators, or that they piggybacked on those governmental efforts.**

IPP Counsel do not contest that they piggybacked on the efforts public regulators who actually uncovered the CRT price-fixing conspiracies. Nor can they: the initial complaint cited foreign and DOJ investigations in support of its allegations. Complaint (D.E. 1) at ¶ 94.

**2.    IPP Counsel are judicially estopped from contesting the substantial and redounding value of the Chunghwa settlement.**

In addition to IPP Counsel's general free riding on the conspiracy identification efforts of the DOJ et al, IPP Counsel specifically benefitted from Chunghwa's participation in the DOJ amnesty program. IPP Counsel do not argue that Chunghwa's early settlement of IPPs' claims and its cooperation with IPPs were anything other than a direct consequence of Chunghwa's amnesty

---

[4]     As IPP Counsel concede, Opp. at 5, these facts may also impact the multifactor fee analysis. *See, e.g.*, *In re Puerto Rican Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 460 (D.P.R. 2011) (class counsel's risk was "minimal" where complaint was filed after DOJ announced investigation and various executives later pled guilty to violating the Sherman Act); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 766 (S.D. Ohio 2007) ("Lead Counsel faced less risk than in other securities cases because it piggybacked on the success of a prior SEC investigation.").

1   application. *Cf., e.g., Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177, 179 (3d Cir. 2006) (noting that

2   the DOJ amnesty program requires the amnesty applicant to confess to illegal anticompetitive

3   conduct); ACPERA, Pub. L. No. 108-237, 118 Stat. 661, 666-67 § 213 (June 22, 2004) (amnesty

4   applicant's liability limited to actual damages only if applicant cooperates with civil plaintiffs).

5   IPP Counsel do, however, attempt to minimize the value of Chunghwa' early settlement. Opp. at 10-

6   11. But in asking this Court to approve the early, low-dollar settlement, IPP Counsel represented

7   that Chunghwa's "early cooperation proved **invaluable**, as it gave Plaintiffs **detailed information**

8   about the conspiratorial 'Glass Meetings,' including the identities of the participants, the time, place

9   and agenda of such meetings, as well as the type of price-fixing agreements reached at such

10  meetings." IPP Mot. Prelim. Approval (D.E. 884) at 1 (emphasis added). IPP Counsel also

11  emphasized the redounding benefit of the Chunghwa settlement to the class—despite its relatively

12  low cash value—as an "ice-breaker" that would drive other settlements. *Id.*  Having successfully

13  urged the Court to approve the Chunghwa settlement based on those arguments, IPP Counsel

14  cannot simply reverse course now that the same arguments negatively impact their fee request. *See,*

15  *e.g., Rissetto v. Plumbers and Steamfitters Local 343*, 94 F. 3d 597, 606 (9th Cir. 1996) ("[H]aving obtained

16  a favorable settlement based on her assertion that she could not work, plaintiff was estopped from

17  claiming that she was performing her job adequately.").

### 3.   IPP Counsel fail to rebut the significant value of Samsung SDI's guilty plea and the associated investigation by DOJ.

20  IPP Counsel also attempt to minimize the value of the DOJ criminal investigation,

21  denigrating the government's efforts as "limited" and "narrow". Opp. at 9-10. But multiple

22  executives—including executives from at least Chunghwa, Samsung SDI, and LG Philips Display—

23  were indicted in connection with the CDT and CPT conspiracies. J. St. John Dec. Ex. 5 (D.E. 4108-

24  5), Ex. 9 (D.E. 4108-9). And defendant Samsung SDI itself pled guilty. *Id.* Ex. 13 (D.E. 4108-13).

25  As IPP Counsel themselves explained to the Court, "[the] guilty plea establishes the

26  existence of the conspiracy, but does not set boundaries confining the scope or time frame." IPP

27  Mot. (D.E. 3553) (quoting *In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2014 WL 1746121, at

28  *7 (E.D. Mich. Apr. 30, 2014)). Samsung SDI pled guilty in 2011, i.e., well before it settled. IPP

Counsel do not dispute that Samsung SDI's guilty plea is preclusive, or that it was valuable and admissible evidence against alleged co-conspirators. Nor do they argue that sophisticated litigants—like Samsung SDI and the other defendants—would not consider those facts in evaluating settlement. IPP Counsel nevertheless attempt to avoid the resulting impact to their fee request.

*First*, IPP Counsel claim that Samsung SDI "aggressively den[ied] both its participation in the alleged conspiracy and the existence of any U.S. effects, right through the eve of trial." Opp. at 9-10. IPP Counsel cite no documents in support of that claim, and the argument is meritless regardless of who made it. Not only did Samsung SDI plead guilty, it specifically admitted to participating "in a conspiracy . . . the primary purpose of which was to fix prices, reduce output, and allocate market shares of CDTs sold in the United States . . . ." J. St. John Dec. Ex. 10 (D.E. 4108-10) at ¶ 4. Samsung SDI further admitted to actually making sales of CDTs "directly affected by the conspiracy" to customers in the United States. *Id.* Indeed, Samsung SDI even admitted that "[a]cts in furtherance of th[e] conspiracy were carried out within the Northern District of California." *Id.*

*Second*, IPP Counsel suggest that the Samsung SDI guilty plea allowed other defendants to argue "that the failure of DOJ to prosecute them demonstrated their innocence . . . ." Opp. at 10. That argument too is meritless, regardless of who made it. Turning again to IPP Counsel's own words: "[A]s a general rule, evidence that criminal charges were not brought is inadmissible in a civil case arising out of the same events as the criminal charges." IPP Mot. Lim. (D.E. 3544) at 2 (quoting *Goffstein v. State Farm Fire & Casualty Co.*, 764 F.2d 522, 524 (8th Cir. 1985)).

> **4.     The European Commission Decision was relevant, admissible, and likely preclusive.**

*First*, IPP Counsel err in suggesting that the first relevant Commission document was the Summary Decision issued in 2013. The Commission adopted a Statement of Objections in late 2009. J. St. John Dec. Ex. 14 (D.E 4108-14) at C303/7. As Mr. St. John argued in his objection, at least one U.S. court found a Statement of Objections to be admissible evidence of liability. St. John Obj. at 11 (citing *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 159, 180 (D. Conn. 2009)). IPP Counsel offer no real argument to the contrary.

*Second*, IPP Counsel err in arguing that the Commission Decision was not relevant and was not available during this litigation. The Commission issued its Decision on December 5, 2012. The DAPs then moved to compel defendants to produce the Decision. In reviewing that motion, this Court expressly concluded that the Decision was "relevant because . . . plaintiffs' allegations in this case have always concerned the international character of the alleged CRT conspiracy," but it declined to compel production for reasons of international comity. Order (D.E. 2463) at 5, 7. When the DAPs renewed their motion in late 2014, this Court found that "the Decision . . . remains important to this litigation" and, despite the "extensive discovery [that] has taken place to date, the factual detail contained in the Decision is likely to be of significant value" to plaintiffs. Order (D.E. 3133) at 5. Nevertheless, the Court again declined to compel production for reasons of international comity. *Id.* at 6. In doing so, the Court expressly noted that the production the Decision in the *Vichi* litigation suggested means of accessing the Decision that would avoid concerns with international comity. *Id.* at 7. That IPP Counsel failed to obtain the Decision prior to its public release reflects more on their judgment and skills as litigators than on its lack of value to the class.

*Third*, IPP Counsel are simply wrong in claiming that "[t]he EC findings addressed only the cartel's activities . . . in Europe." The Commission repeatedly stated that the conspiracies were global in nature, and **therefore** impacted Europe. *E.g.* J. St. John Dec. Ex. 16 at ¶¶ 259, 271, 272, 302, 307, 314. Moreover, the Commission made multiple references to agreements and price impacts in the American market. For example, the European Commission stated that

> On 27 October 1999, Chunghwa, SDI, LGE, [CPT producers] met in Thailand. The participants **agreed** on the 14" and 20" CPT prices for five of their customers and **agreed** to maintain the current prices for the first quarter 2000. Furthermore, they discussed Europe and were happy to report of a "price-up trend in European & **American market**" thanks to capacity reduction in Asia".

*Id.* at ¶ 290 (emphasis added; bracketed text in original); *see also, e.g., id.* at ¶¶ 268, 388, 439. And the global nature and impact of the conspiracies was actually litigated. *See id.* at ¶¶ 259, 262, 268-69, 471-90. IPP Counsel's arguments to the contrary are either disingenuous or reflect a disturbing lack of familiarity with material that this Court found relevant and important.

*Fourth*, even if the Commission Decision was not available before the close of discovery, it was available—with preclusive or at least evidentiary value—**at the time most defendants settled**

in 2015. IPP Counsel admit that the Commission Decision was publicly available by December 23, 2014. Opp. at 13. At that point, IPP Counsel and the defendants knew the substance of the Decision, and that a Delaware court had found parts of the Decision to be preclusive against Philips. Later settlements by sophisticated litigants—Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, and Thomson—presumably took those facts into account. Indeed, it is noteworthy that after over 7 years of litigation, Philips agreed to settle 34 days after the Commission Decision became publicly available, and it did so for **6.5 times** its earlier settlement in the supposedly easier DPP action.[5]

## C.    IPP Counsel offer no real explanation for the vastly disproportionate size of the Samsung and Philips settlements.

In his objection, Mr. St. John pointed to the disproportionate size of the Samsung SDI and Philips settlements vis-à-vis their market shares as suggesting that the size of those settlements was attributable to factors other than IPP Counsel, i.e., Samsung SDI's guilty plea and the European Commission together with the preclusiveness holding in *Vichi*. In support, Mr. St. John attached two documents showing CRT market share data from the relevant time frame. One document was a report by the Oregon Department of Environmental Quality. J. St. John Dec. Ex. 18 (D.E. 4018-18). IPP Counsel offer no challenge to that document. The other document was a presentation titled "Royal Philips Electronics Annual Results 2000." J. St. John Dec. Ex. 17 (D.E. 4108-17). As the Court can verify, that document was obtained directly from Philips. J. St. John Dec. (D.E. 4108) at ¶ 23 (internet link). IPP Counsel nevertheless denigrate the Philips presentation as "questionable" and "suspect" without further explanation. Opp. at 14 n.31.

The Oregon report states that as of 1997, Philips was responsible for 5-10% of the CRT market and Samsung SDI was responsible for 10-15% of the CRT market. J. St. John Dec. Ex. 18

---

[5]    IPP Counsel try to avoid the impact of the Commission Decision by arguing that "because EC appeals remained pending at the time of the IPP settlements, it is unlikely that any EC findings could have been admitted at trial and even less likely that they would have been given any preclusive effect." Opp. at 13-14. They cite no law for either point, and the latter is simply wrong: the preclusive effect of a judgment is determined as of the time of the later action, regardless of whether any appeal is possible. *E.g. Ruyle v. Continental Oil Co.*, 44 F.3d 837, 846 (10th Cir. 1994). More to the point, the risk the Court would find preclusion or admit the Commission Decision as substantive evidence was sufficiently high that sophisticated litigants—such as defendants—would have taken it into account in entering a settlement.

(D.E. 4018-18) at 8-9 & Table CRT8. The Philips presentation similarly indicates that as of 2001, Philips was responsible for 13% of the CRT market and Samsung SDI was responsible for 15% of the CRT market. *Id.* Ex. 17 (D.E. 4108-17) at 13. But the Philips and Samsung SDI settlements represent 69.3% of the total IPP settlement fund, i.e., a discrepancy of over 40% compared to their market shares as shown in the Oregon report and the Philips presentation. Moreover, those settlements appear to be at a substantial premium vis-à-vis the settlements in the supposedly easier DPP action: five of the IPP settlements were for multiples of 1.0 – 2.2 over the corresponding DPP settlements, and one was for a multiple of 4.0. In contrast, the Philips IPP settlement was **6.5** times its DPP settlement, and the Samsung SDI IPP settlement was **6.8** times its DPP settlement.

| | DIRECT PURCHASERS | | INDIRECT PURCHASERS | | | |
|---|---|---|---|---|---|---|
| DEFENDANT | DATE | AMOUNT | DATE | AMOUNT | % | M |
| Chunghwa | 04/08/2009 | $10,000,000 | 04/08/2009 | $10,000,000 | 1.7 | 1.0 |
| Philips | 02/01/2012 | $27,000,000 | 01/26/2015 | $175,000,000 | 30.3 | 6.5 |
| Panasonic | 06/04/2012 | $17,500,000 | 01/28/2015 | $70,000,000 | 12.1 | 4.0 |
| LG | 08/13/2012 | $25,000,000 | 05/28/2013 | $25,000,000 | 4.3 | 1.0 |
| Toshiba | 02/06/2013 | $13,500,000 | 03/06/2015 | $30,000,000 | 5.2 | 2.2 |
| Hitachi | 11/29/2013 | $13,450,000 | 02/19/2015 | $28,000,000 | 4.8 | 2.1 |
| Samsung SDI | 02/11/2014 | $33,000,000 | 04/01/2015 | $225,000,000 | 39.0 | 6.8 |
| Thomson | 02/06/2015 | $9,750,000 | 06/10/2015 | $13,750,000 | 2.4 | 1.4 |
| TOTAL | | $149,200,000 | | $576,750,000 | | |

    In response to this evidence, IPP Counsel provide only the declaration of IPP Lead Counsel Mario Alioto that "[b]ased upon [his] review, the Defendants' market shares changed fundamentally in the early 2000's . . . ." But a declaration "[b]ased upon [Mr. Alioto's] review" of unidentified sources is not evidence based on Mr. Alioto's personal knowledge. It is no evidence at all. *See Local Union No. 490 v. Kirkhill Rubber Co.*, 367 F.2d 956, 958 (9th Cir. 1966) (citing *Sartor v. Ark. Nat. Gas Corp.*, 321 U.S. 620, 624-25 (1944)). IPP Counsel doubtless prepared a detailed year-by-year analysis of market share, total market volume, and class damages. *See* Opp. at 7. That IPP Counsel failed to

provide that analysis—or even attach the sources Mr. Alioto reviewed—rather than dubious cherry-picked numbers does have evidentiary value in-of-itself.[6]

Absent explanation, wildly differing settlements raise doubt as to the fairness of the smaller settlements. *See In re Corrugated Container Antitrust Litig.*, 643 F. 2d 195, 218 (5th Cir. 1981). IPP Counsel try to avoid that result by averring that "unlike some of the other Defendants, IPPs had strong evidence of [Samsung SDI's and Philips's] conspiratorial activities here in the U.S." Alioto Dec. at ¶ 4. But that proves too much: as part of its plea agreement, Samsung SDI admitted that "acts in furtherance of [the CDT] conspiracy were carried out within the [U.S.]." J. St. John Dec. Ex. 10 (D.E. 4108-10) at ¶ 4(e). And the Commission Decision makes clear that Samsung SDI's and Philips's unlawful activities expressly targeted the United States. The points to which IPP Counsel attribute value were thus established by the efforts of the DOJ, the Commission, and—less directly—the *Vichi* plaintiff. If the Samsung SDI and Philips settlements were not greater based on these facts, that too would raise fairness issues.

## III. IPP COUNSEL FAIL TO ESTABLISH THAT THEIR REQUEST FOR OVER $192 MILLION IN FEES IS REASONABLE.

### A. IPP Counsel improperly tie their request to the entirety of the $576 million megafund.

IPP Counsel do not dispute that their fee request is tied to the entirety of the $576 million settlement fund. But IPP Counsel's role in obtaining the $10 million Chunghwa settlement was limited to the ministerial effort of filing a complaint and settling claims for which Chunghwa had already admitted liability. The record also suggests that at least 40% of the Philips and Samsung SDI settlements, i.e., $160 million, is attributable to the efforts of the DOJ, the European Commission,

---

[6]    The risk of relying on a declaration by counsel to establish contested facts is illustrated by the Special Master's Opinion on certification, where he specifically relied on IPP Counsel' declaration to find that "class members can identify the tube manufacturer . . . by referencing the product model number printed on the outside of the unit" or by "by removing the screws from the back of the product and viewing the name of the tube maker or tube number . . . ." R&R on Cert. (D.E. 1742) at 14-15. Mr. St. John—an electrical engineer with over 31 years of relevant experience—testified that IPP Counsel's arguments on these points were misleading given the information in repair manuals, the warnings in consumer manuals and on televisions themselves, and the substantial risk of shock that opening a television may entail even after it is unplugged. J. St. John Dec II Ex. 2 at 87:1-89:24; *see also id.* at 6:20-7:9 (background); 80:11-86:22 (identification of warnings); 89:25-97:8 (background and opinion); J. St. John Dec. II Exs. 8-14.

and the *Vichi* plaintiff. Consistent with *In re Prudential* and *Cendant PRIDES*, IPP Counsel can only claim a *de minimis* portion of those portions of the settlement fund. That the Chunghwa settlement yielded "invaluable" and redounding benefits to the class through cooperation and icebreaking implicates a significant negative impact on the entirety of IPP Counsel's fee request.

### B.    IPP Counsel fail to rebut the significant evidence of lodestar inflation.

IPP Counsel attempt to justify having **49** law firms dabble in this litigation by emphasizing that many of the firms "were the private lawyers for the more than 40 plaintiffs." Opp. at 16 n. 36. Consistent with IPP Counsels' statement, very high percentages of the work by firms with small lodestars appears to have been limited to providing services to individual plaintiffs. But such work on behalf of individual plaintiffs does not benefit the class, and it is not compensable. *E.g.*, *In re Auction Houses Antitrust Litig.*, 2001 WL 210697, at *4 (S.D.N.Y. Feb. 26, 2001) ("If individual class members wished to have the services of individual counsel in addition to class counsel, they should bear the expense themselves."). The class similarly should not be charged for IPP Lead Counsel's inefficiently doling out to such firms *de minimis* levels of substantive work as a back-scratching exercise. The total lodestar for firms billing less than $200 thousand is $1.54 million. That amount should be deducted in its entirety from IPP Counsels' fee request.

Seeking to deflect attention from having **17** law firms claim lodestars of over $1 million, IPP Counsel suggest that objectors cannot refute "declarations describing in detail the work performed." Opp. at 12. But the vast majority of those declarations are anything but "detailed," and are instead replete with vague references to "participating," "coordinating," and "reviewing" vaguely described tasks. In cases where detail can be teased out, duplication and padding are apparent:

- Staffing the litigation with at least **36** lawyers claiming rates of $700 per hour or more.
- Having **3** entirely new firms join the litigation in late 2014, with a combined lodestar of over $3.8 million. *Cf., e.g.*, Stewart Dec. (D.E. 4073-22) at ¶ 4 (fees include work for "reviewing discovery and pre-trial materials sufficiently to familiarize ourselves . . . .").[7]
- Having a senior attorney second chair 10 depositions at up to $600 per hour. *See* Cooper Dec. (D.E. 4073-6) at ¶ 6C & Ex. 2.

---

[7]    IPP Counsel's suggestion that additional, more experienced counsel were necessary to "demonstrate to the Defendants that IPPs were ready to go to trial," Opp. at 23, raises significant questions as to the quality of IPP Counsel's representation of the class and significantly undermines the support for their claim of white-shoe fees.

Such examples are particularly troubling given the known penchant of certain IPP Counsel to pad their bills. *See In re Citigroup Sec. Litig.*, 965 F. Supp. 2d 369, 393 (S.D.N.Y. 2013) (criticizing Kirby McInerney LLP's fee request); *Thayer v. Wells Fargo Bank*, 92 Cal. App. 4th 819, 843-44 (2001) ("This is not an isolated example of the manner in which [Sherman] Kassof and [Mario] Alioto not only duplicated the work of counsel for plaintiffs in other cases but duplicated each other's work."). The Court need not, however, take a gimlet-eyed view of IPP Counsel's fee request. An additional across-the-board cut of at least 10% is appropriate. *See, e.g.*, *In re Citigroup*, 965 F. Supp. 2d at 393.

## C. The Supplemental Declaration of Richard Pearl makes clear that he is not qualified to opine on the reasonableness of expending 183,000 hours.

The supplemental declaration of IPP Counsels' proffered fee expert—Richard Pearl— should not be considered. *In re Mercury Interactive*, 618 F.3d at 994-95. Nevertheless, Mr. Pearl's response to having his qualifications challenged amply demonstrates his lack of experience to opine on the reasonableness of expending 183,000 hours on this litigation. Mr. Pearl points to a single sex-discrimination case **thirty-four years ago** as his actual experience with large litigations. Pearl Dec. II at ¶ 6. But in the very next paragraph, Mr. Pearl dismisses the relevance of two antitrust class actions cited by Mr. St. John because they were not indirect purchaser antitrust actions specifically involving, *inter alia*, multiple foreign defendants and foreign language issues. *Id.* at ¶ 7. The relevance of Mr. Pearl's limited—and dated—experience thus fails by his own logic. All that remains is Mr. Pearl's self-licking ice cream cone. In short, Mr. Pearl has no qualification to opine on the reasonableness of expending any particular amount of time in this case.

Seeking to salvage his declaration, Mr. Pearl avers that his "qualification to testify as an expert on the reasonableness of attorneys' fees has never been rejected." Pearl Dec. II at ¶ 3. Mr. Pearl's testimony has, however, been found "irrelevant" because he made the basic mistake of relying on rates for non-comparable attorneys from the wrong locality. *Gauchat-Hargis v. Forrest River, Inc.*, 2013 WL 4828594, at *9 (E.D. Cal. Sept. 9, 2013). Needless to say, the court cut the $700 hourly rate advocated by Mr. Pearl to $300. *Id.* at *10. Nor was that the first time Mr. Pearl's testimony was discredited. *Antoninetti v. Chipotle Mex. Grill, Inc.*, 2012 WL 2923310, at *6 (S.D. Cal. July 17, 2012) (cutting requested rate from $620 to $375: Mr. Pearl's declaration does not "introduce evidence

supporting Plaintiff's contention that the requested rates are the prevailing rates in San Diego for ADA and CDPA lawsuits brought by lawyers of similar skill and experience."). Mr. Pearl's insistence that contract attorneys with no substantive legal experience are comparable to mid-level associates at white shoe firms makes clear that he is again repeating the same basic error.

### D.      No multiplier is warranted

IPP Counsel mistakenly proceed from the assumption that they are entitled to a multiplier.

*First*, there is no real dispute that settlement was entirely predictable. *See* Opp. at 23 n.57 ("Antitrust cases rarely go to trial."). And the risk of no recovery was minimal given the investigations cited in the complaint. *See In re Auction Houses*, 2001 WL 210697, at *3 (awarding no multiplier: "*The New York* Times broke the story that Christies had disclosed to the [DOJ] that it had engaged with Sotheby's in the conspiracy . . . . From that moment, there was no risk of non-recovery on the plaintiffs' side of this controversy. The first class action was filed the following day. * * * * This was . . . like finding a pot of gold in the middle of the sidewalk. * * * * [R]esolution, even at a high price, was almost inevitable."). That remains true despite any issues with damages. *See id.*

*Second*, even if the Court concludes a risk multiplier is warranted, not all IPP Counsel should receive that multiplier. IPP Counsel that entered the litigation after the 2009 Chunghwa settlement had a very different risk profile than those who started the litigation in 2007. *See* Part II, *supra*. The risk was further lessened by Samsung SDI's guilty plea and the European Commission Decision.

*Third*, the results are not particularly exceptional. IPP Counsel don't dispute that the size of the settlements were largely driven by the fact that one of the products in question—TVs—were found in 98% of American homes throughout the class period, and another product—computer monitors—was rapidly being acquired. Nor do IPP Counsel dispute that defendants' exposure to statutory penalties in Mississippi alone is equivalent to over 80% of the entire megafund settlement.

*Fourth*, IPP Counsel do not dispute that their claimed hourly rates fall squarely within the range of fees of white shoe law firms for whom exceptional results in highly complex litigation are the expectation. IPP Counsel proffer the rates of such firms as the relevant comparison. That lawyers who are extraordinary even by those standards may command even higher fees than IPP

1   Counsel are seeking does not change that fact. Thus, even if the Court concludes that the results in

2   this case are exceptional, that result is already incorporated into IPP Counsel's claimed fees.

3   **IV.   IPP COUNSEL'S REMAINING ARGUMENTS ARE MERITLESS**

4           After seeking leave for an overlength brief, IPP Counsel spend pages engaging in irrelevant

5   *ad hominem* attacks against objectors and their counsel. *Cf. True v. Am. Honda Mot. Co.*, 749 F. Supp.

6   2d 1052, 1079 (C.D. Cal. 2010) ("Plaintiffs attack many of the objectors counsel because they have

7   represented objectors in other actions in the past. This has no greater bearing on the merits of the

8   objections raised than a plaintiff's counsel's experience in filing class action suits speaks to the merits

9   of claims he brings."). And in the case of Mr. St. John's counsel, the attack is demonstrably false.[8]

10          IPP Counsel also argue that the limited number of objections suggests a positive response

11  from the class. But IPP Counsel's claim administrator avers that the number of claims made by class

12  members—or lack thereof—does not reflect on the adequacy of the notice program because "class

13  members who receive notice are not obliged to file a claim; they may elect to prioritize their time

14  and attention elsewhere." Fisher Dec. ISO Reply at ¶ 5(a). Indeed, Mr. Fisher explained that "[e]ven

15  large and legally sophisticated financial institutions often fail to submit claims." *Id.* If a suboptimal

16  number of ***claims*** is justifiable due to class members electing to "prioritize their time and attention

17  elsewhere," the same analysis applies in spades to the greater burden of filing an objection.[9]

---

18

19          [8]     IPP Counsel assert that "[s]even of the objections were filed by 'serial' or

20  'professional' class-action objectors who file boilerplate objections and subsequent appeals in order
    to extract a pay-off to drop appeals," and "[attorney] . . . St. John routinely represent[s] objectors

21  challenging class action settlements by filing canned objections . . . ." Opp. at 2; *see also* Alioto Supp.
    Dec. at ¶ 3 & n.2. Objector Douglas St. John's lead counsel—Joseph St. John—practiced at

22  Covington & Burling LLP until June, and prior to that he served as a law clerk for the U.S. Court of
    Appeals for the Federal Circuit. *See* J. St. John Supp. Dec. at ¶ 6. Joseph St. John has ***never***

23  previously served as counsel in connection with a class action objection, and he has ***never*** filed an
    objection on his own behalf. *Id.* at ¶¶ 7-8; *see also* Valdez Dec. at ¶¶ 6-9. While IPP Counsel's *ad*

24  *hominem* attack is irrelevant to the issues before the Court, the sloppiness and factual inaccuracy of
    their assertions does reflect on the quality of IPP Counsel's legal services, the overall credibility of

25  declarant Mario Alioto, and the related question of the reasonableness of their claimed hourly rates.

26          [9]     Subsequent to the filing of Mr. St. John's objection, the Court suggested that
    objectors were on notice of potential liability for part of the Special Master's compensation. *See*

27  Order (D.E. 4206). Mr. St. John respectfully disagrees. But to the extent the Court concludes
    objectors had such notice, the fact that multiple class members objected—thereby risking liability

28  for several thousand dollars in special master fees over far smaller claims—indicates an
    overwhelmingly negative response from the class.

Dated: December 9, 2015                    Respectfully submitted,

/s/ Joseph Scott St. John

ANDREA VALDEZ (Cal. Bar No. 239082)
530 S. Lake Avenue, No. 574
Pasadena, CA 91101
Tel: (626) 817-6547
andrea.valdez.esq@gmail.com

JOSEPH SCOTT ST. JOHN (*pro hac vice*)
514 Mockingbird Drive
Long Beach, MS 39560
Tel: 410-212-3475
jscottstjohnpublic@gmail.com

*Attorneys for Objector Douglas W. St. John*