# EXHIBIT
# 9

Mario N. Alioto (56433)
Joseph M. Patane (72202)
Lauren C. Capurro (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123
Telephone: 415-563-7200
Facsimile: 415- 346-0679
Email: malioto@tatp.com
jpatane@tatp.com
laurenrussell@tatp.com

*Lead Counsel for the*
*Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. CV-07-5944-JST; No. CV-13-03234-JST |
| | MDL No. 1917 |
| This Document Relates to: | **INDIRECT PURCHASER PLAINTIFFS' REPLY RE: FINAL APPROVAL OF SETTLEMENTS WITH THE PHILIPS, PANASONIC, HITACHI, TOSHIBA, SAMSUNG SDI, TECHNICOLOR, AND TECHNOLOGIES DISPLAYS AMERICAS DEFENDANTS** |
| All Indirect Purchaser Actions | Hearing Date: January 5, 2016 Time: 10:00 am Court: JAMS Special Master: Martin Quinn, JAMS |
| | Judge:  Hon. Jon S. Tigar |

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

ARGUMENT .......................................................................................................................... 3

I.      THE SETTLEMENTS SHOULD BE APPROVED .................................................. 3

        A.      A Nationwide Release of Claims That Were or Could Have Been Brought in Class
                Litigation—Including Class Member Claims with Little or No Substantive Merit—Is
                Reasonable and Appropriate Under Rule 23. ............................................................. 3

        B.      By the Time of the Settlements, There Was Essentially No Merit to—or Practical
                Need For—the Class Claims for Injunctive Relief. .................................................. 5

        C.      Nationwide Class Members Were Adequately Represented ..................................... 6

        D.      The Authorities Cited by Objectors Are Distinguishable. ........................................ 7

        E.      The Settlements Should be Approved ....................................................................... 9

II.     THE PLAN OF DISTRIBUTION IS REASONABLE ............................................. 9

        A.      Valuation of Equitable Disgorgement or Damages Claims for Class Members in States
                Lacking *Illinois Brick* Repealer Laws ..................................................................... 10

        B.      Valuation of Damages/Disgorgement Claims Arising Under Massachusetts, Missouri,
                and New Hampshire Law ......................................................................................... 12

III.    CHUNGHWA SETTLEMENT ............................................................................... 13

        A.      Release of Reseller Claims ...................................................................................... 13

        B.      Plan of Distribution of Chunghwa Settlement ........................................................ 13

        C.      St. John Arguments on Chunghwa Settlement and Attorney's Fees ........................ 13

IV.     CLASS NOTICE ...................................................................................................... 14

V.      THE SAMSUNG SDI AND PHILIPS SETTLEMENTS ........................................ 16

        A.      The Consideration Paid by Samsung SDI and Philips Is Consistent with These
                Defendants' Market Shares ...................................................................................... 16

        B.      The Consideration Paid by Samsung and Philips is also Consistent with their Core
                Roles in the Conspiracy and the Evidence Developed by IPPs ................................ 17

VI.     NEW COOPER/SCARPULLA ARGUMENTS ON FEES ..................................... 19

CONCLUSION ...................................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Cases**

*Booth v. Strategic Realty Trust, Inc.*, No. 13-CV-04921-JST , 2015 WL 6002919
(N.D. Cal. Oct. 15, 2015) .......................................................................................... 2, 9

*Charron v. Wiener*, 731 F.3d 241 (2d Cir. 2013) ............................................................. 4

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) ................................... 3

*Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 771 F. Supp. 2d 1195 (N.D. Cal. 2011)  10

*Dunleavy v. Nadler,* 213 F.3d 454 (9th Cir. 2000)......................................................... 10

*Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000) ......................... 20

*In re Activision Sec. Litig.*, 723 F. Supp. 1373 (N.D. Cal. 1989) ................................. 20

*In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229 (2d Cir. 2012) .................................. 3

*In re Cendant Corp. Secs. Litig.*, 109 F. Supp. 2d 235 (D.N.J. 2000), aff'd, 264 F.3d 201 (3d Cir.),
cert. denied, 535 U.S. 929 (2002) .............................................................................. 10

*In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390 (S.D.N.Y. 2011) ................. 11

*In re Dynamic Random Access Memory Antitrust Litig. ("DRAM")*, 516 F. Supp. 2d 1072
(N.D. Cal. 2007) ........................................................................................................... 8

*In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009)............................. 6, 7

*In re K-Dur Antitrust Litigation*, No. CIV.A. 01-1652 (JAG), 2008 WL 2660780 (D.N.J. Feb. 28,
2008) .......................................................................................................................... 11

*In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242 (2d Cir. 2011).................... 7

*In re Mego Financial Corp. Secs. Litig.*, 213 F.3d 454 (9th Cir. 2000) ..................... 4, 10

*In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231 (9th Cir. 1976)....................... 10

*In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160 (D. Me. 2004).... 11

*In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008)...................... passim

*In re Patriot American Hospitality Inc. Sec. Litig.*, No. MDL C-00-0875 VRW, 2005 WL 3801594
(N.D. Cal. Nov. 30, 2005)............................................................................................ 9

*In re Pet Food Products Liability Litig.*, 629 F.3d 333 (3d Cir. 2010)...................... passim

*In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294 (3d Cir. 2005)..................................... 20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179 (N.D. Cal. 2009) ................... 11

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 787 F. Supp. 2d 1036 (N.D. Cal. 2011) ...................... 10

*In re TFT-LCD (Flat Panel) Antitrust Litig.,* No. 07-md-01827-SI, 2013 WL 1365900 (N.D. Cal. April 3, 2013)............................................................................................................................. 12

*In re UnitedHealth Group Incorporated PSLRA Litig.*, 643 F. Supp.2d, 1094 (D. Minn. 2009)....... 10

*In re Warfarin Sodium Antitrust Litig. 212 F.R.D. 231 (E.D. Del. 2002)* ........................................ 10

*In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005) .......................................... 10

*Int'l Union United Auto., Aerospace & Agr. Implement Workers v. GMC*, 497 F.3d 615 (6th Cir. 2007) .......................................................................................................................................... 6

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970 (9th Cir. 1991) .......................................... 6

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10-CV-00302 MRP , 2013 WL 6577020 (C.D. Cal. Dec. 5 2013) ............................................................................................................ 4, 6

*Nguyen v. Radient Pharm. Corp.*, No. SACV 11-00406 DOC, 2014 WL 1802293 (C.D. Cal. May 6, 2014) .......................................................................................................................................... 4

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*, No. 09-CV-03329-CW (NC), 2015 WL 4274370 (N.D. Cal. July 13, 2015)..................................................................................................................... 19

*PQ Labs, Inc. v. Qi*, No. 12–cv–00450 CW, 2015 WL 224970 (N.D. Cal. Jan. 16, 2015)............... 19

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.,* 442 F.3d 741 (9th Cir. 2006)........................................... 3

*Rieckborn v. Velti PLC*, No. 13-CV-03889-WHO, 2015 WL 468329 (N.D. Cal. Feb. 3, 2015) ... 4, 10

*Stonebrae, L.P. v. Toll Bros., Inc.*, No. 08–cv–00221 EMC, 2011 WL 1334444, (N.D. Cal. Apr. 7, 2011) ........................................................................................................................................ 19

*Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011) ......................................................... 3

*United States v. Or. State Med. Soc'y,* 343 U.S. 326 (1952)............................................................... 5

*Vizcaino v. Microsoft Corp.*, 290 F.3d at 1043 (9th Cir. 2002)........................................................ 20

*Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100 (1969)................................................ 5

**Rules**

Fed. R. Civ. P. 23(e) ..................................................................................................... 1, 2, 9, 10

**Other Authorities**

5 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 16:7 (4th ed. 2007) ........................ 3

Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide" ("Notice and Claims Process Checklist"), Federal Judicial Center (2010) (available at http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf..............................15

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: FINAL APPROVAL OF CLASS SETTLEMENTS
- Master File No. CV-07-5944-JST

Indirect Purchaser Plaintiffs ("IPPs") respond as follows to the Special Master's Order dated December 14, 2015.

## INTRODUCTION

The central question before the Special Master is whether the IPP settlements, considered as a whole, are fair, reasonable, and adequate.  Fed. R. Civ. P. 23(e).  The answer is yes.  After years of litigation and exhaustive arm's-length settlement negotiations supervised by experienced mediators, the IPP settlements deliver an extraordinary recovery for the class while avoiding the serious risks of continued litigation.  Considering the record, the risks, the recovery, and class interests as a whole, the settlements should be approved.

If the Special Master finds the settlements to be fair, reasonable, and adequate, a secondary question is the allocation of settlement funds among class members, an issue "governed by the same standards of review applicable to approval of the settlement as a whole:  the plan must be fair, reasonable, and adequate."  *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008) (Conti, J.).  The issues of settlement approval and allocation are distinct but Objectors have conflated them, seeking to transform allocation disputes into broader challenges to settlement fairness and adequacy of representation for certain class members.

Objectors are wrong in all respects.  *First*, there is no settlement fairness or adequacy of representation issue.  The settlements were negotiated vigorously and at arm's length by experienced counsel with one central goal in mind, namely, maximizing the total relief for *all* class members while mitigating the risks of trial and appeal.  Class/lawyer interests were squarely aligned at all relevant times, and, by any objective measure, IPP Counsel delivered an excellent result.  Nor is the validity of the settlements—or the adequacy of class representation—called into question simply because IPP Counsel have proposed allocating settlement funds based on the relative strength of class member claims.  Courts have rejected this argument time and again.  *See, e.g., In re Pet Food Products Liability Litig.*, 629 F.3d 333, 346-47 (3d Cir. 2010) ("varied relief among class members with differing claims in class settlements is not unusual"; "do[es] not, without more demonstrate" intra-class conflicts, inadequate representation, or the need for subclasses; and such objections are

1   "more appropriately addressed as a Rule 23(e) adequacy of allocation question, rather than [an]

2   adequacy of representation question"); Part I, *infra* (collecting many similar cases).

3        *Second*, with respect to the Plan of Distribution, Lead Counsel followed settled Rule 23

4   authority in proposing to distribute funds based on the relative strength of class member claims.  *See*

5   *Omnivision*, 559 F. Supp. 2d at 1045 ("It is reasonable to allocate the settlement funds to class

6   members based on the extent of their injuries or the strength of the claims on the merits."); *Booth v.*

7   *Strategic Realty Trust, Inc.*, No. 13-cv-04921, 2015 WL 6002919, at *7 (N.D. Cal. Oct. 15, 2015)

8   (Tigar, J.) (same).  In doing so, it was fair and appropriate for Lead Counsel to value meritless

9   claims at zero.  *See* p. 4 & n. 6, *infra* (collecting cases).  And Lead Counsel continues to believe that

10  the best and most reasonable framework is to allocate the common fund recovery to those class

11  members with substantively viable damages claims, *i.e.*, those claims arising in the 22 *Illinois Brick*

12  repealer states certified for trial by the District Court.  No Objector makes a remotely persuasive

13  case that any other category of claim is viable on the merits.  *See* Part II, *infra*.

14       For all of these reasons, the Objections concerning (1) the nationwide settlements and

15  release, (2) the distribution of the Chunghwa settlement funds, and (3) the recovery for class

16  members in Massachusetts/Missouri/New Hampshire, are properly viewed as Plan of Distribution

17  issues and should be resolved as such.  The other arguments raised by Objectors—concerning class

18  notice and the relative size of the Samsung/Philips settlements—are meritless and should be

19  overruled.

20

21

22

23

24

25

26

27

28

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: FINAL APPROVAL OF CLASS SETTLEMENTS
- Master File No. CV-07-5944-JST

# ARGUMENT

## I.    THE SETTLEMENTS SHOULD BE APPROVED.

### A.    A Nationwide Release of Claims That Were or Could Have Been Brought in Class Litigation—Including Class Member Claims with No Substantive Merit— Is Reasonable and Appropriate Under Rule 23.

To the extent the objections bear on settlement approval, Objectors' position is that, because class members in certain states are not scheduled to recover funds under the Plan of Distribution and do not receive injunctive relief, the settlements are necessarily unfair as to those class members. *See, e.g.*, Cooper/Scarpulla Reply at 6 (characterizing the issue as a failure of "consideration"). Objectors also believe this situation casts doubt on adequacy of representation.

The law, however, is to the contrary.  There is nothing unusual or improper about a settlement in which all claims that were *or could have been* brought by class members are released, including the release of meritless, speculative claims held by class members nationwide.  Release terms of this nature are standard and unobjectionable features of many Rule 23 settlement classes, and, indeed, comport with Rule 23's core goal of facilitating global peace.  *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287 (9th Cir. 1992) (approving releases in class action settlements of "not only those claims alleged in the complaint, but also a claim 'based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented *and might not have been presentable in the class action*.'") (citation omitted) (emphasis in original); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 748 (9th Cir. 2006) (same); *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 310 (3d Cir. 2011) (en banc) (approving nationwide settlement structured "to achieve global peace by obtaining releases from all those who might wish to assert claims, meritorious or not").[1]

---

[1] *See also* 5 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 16:7 (4th ed. 2007) ("It is well-settled that in order to achieve a comprehensive settlement . . . a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the class action even though the claim was not presented and might not have been presentable in the class action."); *In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 243 (2d Cir. 2012) ("Defendants in class action suits are entitled to settle claims pending against them on a class-wide basis even if a court believes that those claims may be meritless" in order to achieve "global peace[.]").

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: FINAL APPROVAL OF CLASS SETTLEMENTS
- Master File No. CV-07-5944-JST

1    Moreover, class action settlements routinely encompass a variety of claims of varying

2    strength on the merits.  *See, e.g., Pet Food*, 629 F.3d at 346 ("varied relief among class members

3    with differing claims in class settlements is not unusual").  This reality often results in the allocation

4    of *zero* relief for subgroups of class members with demonstrably meritless claims—yet that does not

5    defeat the fairness of the class-wide settlement for lack of consideration.  *See, e.g., In re Mego*

6    *Financial Corp. Sec. Litig.*, 213 F.3d 454, 460-61 (9th Cir. 2000) (approving settlement that "left a

7    large portion of the class without a recovery"); *Omnivision*, 559 F. Supp. 2d at 1045-46 (Conti, J.)

8    (approving settlement providing recovery to just one of three groups of class members because they

9    were the only ones with valid claims on the merits).[2]

10    With respect to the *ex ante* valuation of the claims Objectors now say were undervalued by

11    the settlements, several points bear emphasis.  First, as noted, Lead Counsel's interest in settlement

12    negotiations was to bargain as hard as possible to maximize total recovery for *all* the claims.  As a

13    result, the settlements are reasonable as a whole irrespective of any *post hoc* allocation disputes over

14    the value of particular claims.

15    Second, the settlement terms do not address allocation or distribution issues at all. Rather,

16    they secure lump-sum consideration for *all* releases being granted, highlighting that Objectors'

17    arguments go to allocation, not settlement fairness.  Third, "[a]ll class settlements value some claims

18    more highly than others, based on their perceived merits, and strike compromises based on

19    probabilistic assessments . . . . If these types of compromises automatically created subclasses that

20    required separate representation, the class action procedure would become even more cumbersome

21    than it already is, and would create even more transaction costs[.]"  *Charron v. Wiener*, 731 F.3d

22    241, 253-54 (2d Cir. 2013).

23    

24    [2] *See also Rieckborn v. Velti PLC*, No. 13-cv-03889, 2015 WL 468329, at *8-10 (N.D. Cal. Feb. 3, 2015) (approving settlement and plan of distribution under which class members would recover

25    based on relative strength of claims, with some receiving nothing); *Nguyen v. Radient Pharm. Corp.*, No. SACV 11-00406, 2014 WL 1802293, at *7 (C.D. Cal. May 6, 2014) ("The Objector argues that

26    any settlement that releases any claim without compensation is per se unreasonable, but the Objector's authority does not bear this out."); *Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No.

27    2:10–CV–00302, 2013 WL 6577020, at *17-18 (C.D. Cal. Dec. 5 2013) ("That a plan of allocation distributes proceeds based on the relative strength and weaknesses of a claim does not, itself, render

28    a proposed settlement unfair.") (collecting cases).

Fourth, Lead Counsel's valuation of the claims cited by Objectors was reasonable and supported by relevant law and facts.  *See* Part I.B., *infra* (injunctive relief claims); Part II, *infra* (addressing the value of nationwide monetary claims for plan of allocation purposes).

**B.      By the Time of the Settlements, There Was No Merit to—or Practical Need For—the Class Claims for Injunctive Relief.**

The absence of injunctive relief does not counsel against settlement approval.  The original IPP complaint included a claim for nationwide injunctive relief, namely, an injunction restraining any ongoing conspiratorial conduct impacting the domestic market for CRTs.  (*See* Dkt. No. 436.)  As the case progressed, however, discovery revealed that (1) the CRT conspiracy was no longer in effect and (2) the conduct was unlikely to recur because Defendants no longer made or sold any meaningful volume of CRT products in the United States.  In other words, the CRT cartel had been exposed and the industry was dying or dead, making it doubtful that the class could prevail on its claim for injunctive relief.  *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969) (antitrust injunction requires showing of "significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue to recur").

No Objector disputes that the CRT cartel was publicly exposed nearly a decade ago or that the industry subsequently collapsed and is essentially defunct today.  Furthermore, by the time of settlement negotiations, Lead Counsel understood better than anyone—based on years of litigation and the discovery record—that the conspiratorial conduct was unlikely to recur.  Not only had Defendants ceased to manufacture CRTs, but the individual conspirators had retired or moved on to other jobs, and nothing in discovery suggested ongoing violations at the time of settlement negotiations.  What interest, in that situation, would the class have had in pursuing a litigated injunction on the merits through trial and appeal?  Any such claim would have been of little practical utility to class members, and would have faced dubious prospects on the merits.  *See Zenith Radio*, *supra, see also United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333-34 (1952) ("The sole function of an action for injunction is to forestall future violations . . . We agree with the trial court that conduct discontinued in 1941 does not warrant issuance of an injunction in 1949.").

In response, Cooper and Scarpulla speculate (Reply at 12) that the settlements nevertheless could have included terms requiring Defendants to "educate" their employees generally about

1   antitrust compliance.  But "[i]njunctive relief . . . must be tailored to remedy the specific harm

2   alleged," *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991), and that was

3   never the type of relief sought in the case.  In any event, it would afford trivial class benefits.  (*See*

4   Dkt. No. 1526, ¶¶ 247-256 (injunction sought to enjoin the *specific* conspiratorial conduct alleged in

5   the CRT market, not to educate defendant employees generally about antitrust compliance).)[3]

6       For all of these reasons, Lead Counsel's judgment was, and remains, that the injunctive relief

7   claims had no value for the class at the time of settlement negotiations.  This assessment is

8   reasonable in light of the relevant law and facts.

9       **C.    Nationwide Class Members Were Adequately Represented**

10      Objectors are wrong to suggest adequacy of representation issues concerning the nationwide

11  settlements.  The mere fact that "relief varie[s] among the different groups of class members [does]

12  not demonstrate . . . conflicting or antagonistic interests within the class" or adequacy of

13  representation issues.  *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 272 (3d Cir. 2009).

14  *Accord Pet Food*, 629 F.3d at 347 ("The fact that the settlement fund allocates a larger percentage of

15  the settlement to [certain] class members does not demonstrate a conflict between groups,"

16  inadequate representation, or the need for subclasses.  "Instead, the different allocations reflect the

17  relative value of the different claims."); *Charron*, 731 F.3d at 253-54 (rejecting need for subclasses

18  and separate representation).[4]

19      The issue for purposes of settlement approval is simply whether counsel acted reasonably—

20  and adequately—in negotiating fair settlements for the class as a whole.  That is precisely what Lead

21  Counsel did.  Consistent with the interests of *all* class members, the goal throughout settlement

22

23  _____

24  [3] Notably, injunctive relief claims were released in similar fashion in connection with the LG
    settlement approved by the Court in 2014.  (Dkt. No. 2542.)  Moreover, the notice clearly informed

25  class members that only members of the 22 Indirect Purchaser States Classes would be eligible to
    submit claims for monetary relief. (*See* Dkt. No. 2511.) That settlement was approved without a

26  word of objection from the Insider Objectors, further underscoring the questionable *post hoc* nature
    of their current position.

27
28  [4] *See also Maine State Ret. Sys.*, 2013 WL 6577020 (rejecting similar adequacy of representation and
    subclass arguments and noting that "if every difference among class members 'required a new
    subclass, class counsel would need to confine settlement terms to the simplest imaginable or risk

6
INDIRECT PURCHASER PLAINTIFFS' REPLY RE: FINAL APPROVAL OF CLASS SETTLEMENTS
- Master File No. CV-07-5944-JST

1   negotiations was to extract maximum total value from the Defendants, which, with the supervision

2   and extensive mediation of the court-appointed mediators, is just what the settlements achieved.  The

3   bottom line results of that process speak for themselves, and at this stage it is "not enough for

4   objectors to point to differences in claims, allocation amounts, or state laws without identifying how

5   such differences demonstrate a conflict of interest."  *Pet Food*, 629 F.3d at 349.

6         Objectors also misrepresent Lead Counsel's statement that, *during the litigation phase of the*

7   *case*, Class Counsel had "no duty to represent" members of the nationwide class for purposes of

8   approaching attorneys general about pursuing potential *parens patriae* actions.  *See*

9   Cooper/Scarpulla Reply at 11 (quoting Final App. Mot., at 43 n.71).  That was certainly true at the

10  time:  The Court had certified a 22-state class for litigation on the merits, and that was the class to

11  whom Class Counsel's duties flowed for purposes of coordinating litigation issues such as whether

12  (or not) to work with state attorneys general on various aspects of the case.  *At the settlement stage*,

13  however, it goes without saying that Lead Counsel had a duty to represent all members of the

14  proposed settlement class vigorously and adequately, including class members not included in the

15  litigation class, and that is exactly what Lead Counsel did.  (*See* Dkt. No. 4071-1 ("Alioto Fee Decl.

16  I) (describing vigorous advocacy and adequate representation of *all* nationwide class members on all

17  issues relating to settlement).)

18        **D.**    **The Authorities Cited by Objectors Are Distinguishable.**

19        Objectors cite *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 251-

20  53 (2d Cir. 2011) for the proposition that separate representation is required for certain class

21  members in order for the Special Master to make the appropriate findings concerning the fairness

22  and adequacy of the settlement and the plan of distribution.  But that is not the law.  Instead, the

23  question whether to appoint separate counsel for allocation purposes is a case- and fact-specific

24  determination committed to the sound discretion of the district court.  *In re Ins. Brokerage Antitrust*

25  *Litig.*, 579 F.3d at 271-72.  And here, unlike the factually complex allocation dispute in *Literary*

26  *Works*, the CRT allocation issues are relatively straightforward and can be resolved in a fair and

27

28  fragmenting the class beyond repair'") (quoting *Int'l Union United Auto., Aerospace & Agr.*
*Implement Workers v. GMC*, 497 F.3d 615, 629 (6th Cir. 2007)).

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: FINAL APPROVAL OF CLASS SETTLEMENTS
- Master File No. CV-07-5944-JST

1   reasonable way on the existing record, without the need for protracted allocation proceedings that

2   would serve merely to delay the case (and class recovery) unnecessarily.  *See also* Part II, *infra*.

3           Objectors' reliance on *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*

4   ("*DRAM*") is similarly misplaced.  No litigation classes were certified in that case; rather, it was

5   dismissed at the pleading stage.  *See* 516 F. Supp. 2d 1072, 1093 (N.D. Cal. 2007).  As such, there

6   was no eight-year factual and procedural record to inform litigation and settlement valuations for the

7   class.  Moreover, while it is true that *DRAM* allocation proceedings required the appointment of

8   separate counsel to resolve a uniquely complex and fact-bound allocation issue concerning "reseller"

9   versus consumer claimants, the more pertinent point is that *DRAM* lead counsel (including Cooper)

10  represented all  consumer class members in both repealer *and* non-repealer states for settlement and

11  allocation purposes, notwithstanding the variation in strength among those categories of claims.

12  *DRAM* thus confirms that it is appropriate for lead counsel to represent a nationwide class of IPP

13  end-user consumers for purposes of proposing a reasonable plan of allocation.[5]

14          In the end, *DRAM* stands simply for the proposition that separate counsel *sometimes* may be

15  required (at the trial court's discretion) to resolve particularly complex allocation disputes that arise

16  among reseller versus consumer types of claims.   But *DRAM* does not hold or imply that the types

17  of  allocation arguments raised here require such procedures.

18          Cooper and Scarpulla also rely on the Third Circuit decisions in *Sullivan*, 667 F.3d 273, and

19  *Pet Food*, 629 F.3d 333, but neither case supports their position.  The *Sullivan* court *approved* a

20  nationwide settlement and broad general release of claims of varying strength and merit,

21  emphasizing the important benefits of "global peace" and that "an important byproduct of the class

22  action device—settlement of all potential claims—supports the decision we reach here."  667 F.3d at

23  297.  The court also rejected the need for "an intensive, fifty-state cataloguing of differences in state

24  _____

25  [5] The issue that called for separate allocation counsel in *DRAM* was that the settlement encompassed
    both end-user and "reseller" indirect purchasers, whose claims to the settlement funds are in direct

26  conflict due to the question of "pass-through" of the overcharge.  *See DRAM* R&R ¶¶ 207-254
    (describing pass through issue and appointment of reseller counsel).  Here, in contrast, this issue

27  does not exist at all for the settlements under consideration for final approval because resellers are
    not covered by the settlements.  (The Chunghwa settlement does include resellers, an issue discussed

28  separately below in connection with the distribution plan.)

law" to evaluate settlement fairness. *Id.* at 308. It is true, as Objectors note, that *Sullivan* (like *DRAM*) also involved fiercely-contested allocation issues between "reseller" and "consumer" subclasses, but as in *DRAM* that was a uniquely complex and case-specific issue. *Id.* at 290. The *Sullivan* court did not remotely suggest that other cases would require the same procedures (or subclasses).

*Pet Food* is even less helpful to Objectors. That case held squarely that (1) class settlements and allocations can value class member claims differently based on their relative strength on the merits; and (2) such differences do not cast doubt on settlement fairness or adequacy of representation, and *do not* require subclasses. *See* 629 F.3d at 346-347. The *Pet Food* settlement was approved in these circumstances over objections along the lines of those raised here, with the court of appeals simply remanding for additional fact-finding on a particular allocation issue that had not been addressed by the parties below. *Id.* at 356. Here, unlike *Pet Food*, the allocation disputes have been presented squarely by the parties and the record includes sufficient information with which to resolve them, as discussed in more detail below. *See* Part II, *infra*.

### E.   The Settlements Should be Approved.

To summarize, the mere fact that a class action settlement includes a nationwide release covering a subset of meritless claims does not cast doubt on the overall fairness of the settlement, the adequacy of counsel's representation, or the "consideration" received for the class. Accordingly, the settlements should be approved and the objections concerning recovery for certain nationwide class members should be "appropriately addressed as a Rule 23(e) adequacy of allocation question, rather than a Rule 23(a) adequacy of representation question." *Pet Food*, 629 F.3d at 348.

## II.   THE PLAN OF DISTRIBUTION IS REASONABLE

The law is settled that "it is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits." *In re Omnivision*, 559 F. Supp. 2d at 1045. *Accord Booth*, 2015 WL 6002919, *7[6]

---

[6] *See also* p. 4 & n.2, *supra* (collecting many cases, including cases in which certain class members received no recovery under the plan of allocation). *Accord In re Patriot American Hospitality Inc. Sec. Litig.*, No. MDL C-00-1300 VRW, 2005 WL 3801594 at *3 (N.D. Cal. Nov. 30, 2005) (approving plan of allocation even though it "extinguishes the claims of a large number of class

9

1    The Special Master's allocation analysis "is governed by the same standards of review

2    applicable to approval of the settlement as a whole:  the plan must be fair, reasonable and adequate."

3    *Omnivision*, 559 F. Supp. 2d at 1045.  "Courts recognize that an allocation formula need only have a

4    reasonable, rational basis, particularly if recommended by experienced and competent counsel."

5    *Rieckborn*, 2015 WL 468329, at *8.[7]

6    The following sections provide additional information on the law and facts supporting Lead

7    Counsel's views on the various categories of monetary relief claims raised by Objectors.

8        A.    **Valuation of Equitable Disgorgement or Damages Claims for Class Members in**
               **States Lacking *Illinois Brick* Repealer Laws**

9

10   Cooper and Scarpulla devote substantial space (Reply at 12-21) to the argument that class

11   members in non-repeater states hold viable claims for restitution/disgorgement or damages

12   notwithstanding *Illinois Brick*.  But literally decades of authority holds otherwise.

13   *First*, private plaintiffs cannot pursue restitution or disgorgement claims under the federal

14   antitrust laws, as clear authority holds.  *See In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231,

15   234 (9th Cir. 1976); *Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 771 F. Supp. 2d

16   1195, 1202 (N.D. Cal. 2011) ("Such relief is unavailable under Section 16."); *see also In re TFT-*

17   *LCD (Flat Panel) Antitrust Litig.*, 787 F. Supp. 2d 1036, 1040 n.2 (N.D. Cal. 2011) (state AGs

18

19   _____

20   members in exchange for zero recovery"); *In re UnitedHealth Group Incorporated PSLRA Litig.*,
     643 F. Supp.2d, 1094, 1101 (D. Minn. 2009)  (approving allocation under which those "who

21   sustained losses due to the conduct at issue in this litigation will be compensated; those who did not,
     will not.");  *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 343 (S.D.N.Y. 2005) (approving

22   plan of allocation that did not compensate all class members where certain class members' claims
     would have been "extraordinarily difficult" to prove.).

23   [7] As Cooper/Scarpulla stated in seeking final approval in *DRAM* (Dkt. No. 2215 at 3-4):  "[D]istrict

24   courts enjoy broad supervisory powers over the administration of class action settlements to allocate
     the proceeds among the claiming class members equitably.  *Dunleavy v. Nadler (In re Mego Fin.*

25   *Corp. Secs. Litig.)*, 213 F.3d 454 (9th Cir. 2000). . . ..  Moreover, by any objective measure, 'a Plan
     of Allocation need not be, and cannot be, perfect.'  *In re Cendant Corp. Secs. Litig.*, 109 F. Supp. 2d

26   235, 272 (D.N.J. 2000), *aff'd*, 264 F.3d 201 (3d Cir.), *cert. denied*, 535 U.S. 929 (2002).  Neither
     need, nor can, a plan of distribution be optimal from the perspective of each and every individual

27   potential claimant.  In many cases, if not in most cases, perfection to everyone's satisfaction is
     unattainable*. In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 258 (E.D. Del. 2002), *aff'd*,

28   391 F.3d 516, 534 (3d Cir. 2004)."

conceding claims for disgorgement "would be barred" under federal law and withdrawing such claims).[8]

*Second*, for the states lacking repealer laws, *Illinois Brick* serves as a bar to any and all monetary recovery by indirect purchasers, whether based on state law damage *or* equitable restitution/disgorgement/unjust enrichment theories. *See, e.g., In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 413 (S.D.N.Y. 2011) ("Indirect purchasers . . . may not recover restitution in states that follow the rule of *Illinois Brick*) (collecting cases; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1192 (N.D. Cal. 2009) ("permitting such [unjust enrichment] claims would allow plaintiffs to circumvent limitations of state antitrust laws" in states that follow *Illinois Brick*); *In re K-Dur Antitrust Litigation*, No. CIV.A. 01-1652 (JAG), 2008 WL 2660780, at *5 (D.N.J. Feb. 28, 2008) ("where the applicable state law bars antitrust actions for damages by indirect purchasers . . . a plaintiff cannot circumvent the statutory framework by recasting an antitrust claim as one for unjust enrichment"); *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 350 F. Supp. 2d 160, 211 (D. Me. 2004) ("For those states that have maintained the *Illinois Brick* prohibition on indirect purchaser recovery, I conclude that it would subvert the statutory scheme to allow these same indirect purchasers to secure . . . restitutionary relief at common law (or in equity)").

The case law, in short, overwhelmingly establishes that neither damage nor equitable disgorgement-type claims are viable in non-repealer states.  That is precisely why such unjust enrichment/disgorgement claims were not included in the operative amended IPP complaint.[9]  The Insider Objectors are of course fully aware of this authority, so instead of addressing it, they pivot to argue that even if claims are squarely barred by *Illinois Brick*, such claims should be treated as

---

[8] The "growing body of law" cited by Cooper and Scarpulla on this issue (Reply at 13-14) focuses on disgorgement remedies that arguably might be available in certain *government* enforcement actions, and is thus inapposite.  The rule against disgorgement remedies for private plaintiffs is clear as a matter of federal law, as the cases cited above reflect.

[9] Cooper and Scarpulla misleadingly suggest that nationwide disgorgement and unjust enrichment claims were alleged in the operative complaint (Reply at 14), but in fact such claims were limited to only eight states (*see* Dkt. No. 1526, ¶¶ 291-292) because of a prior ruling in the case *rejecting* that type of claim.  (Dkt. No. 768.)

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: FINAL APPROVAL OF CLASS SETTLEMENTS
- Master File No. CV-07-5944-JST

valuable because the Supreme Court someday might change its mind (Reply at 18).  That is creative, but fanciful.  By Objectors' reasoning, Lead Counsel should have held out to recover for all manner of frivolous, hypothetical claims foreclosed by existing law, because someday maybe the law will change.

That is not how it works.  Lead Counsel's job was to make reasonable, rational, good-faith valuations about the strength of the claims at issue based on governing law as it actually stands, not as plaintiffs' lawyers might wish it to be.  Judgment calls were necessarily involved.  But where, as here, experienced indirect purchaser counsel was highly motivated to secure the maximum possible relief for the class and did so with skill, vigor, and without conflict throughout the settlement process, it is not enough for Objectors to second-guess the results based on theoretical (and often spurious) arguments about the value of claims that, by any objective measure, had exceedingly little chance of ever prevailing on the merits.

**B.    Valuation of Damages/Disgorgement Claims Arising Under Massachusetts, Missouri, and New Hampshire Law**

Massachusetts, Missouri, and New Hampshire claims are a somewhat different case because, in theory, these states allow indirect purchasers to recover damages.  But as Lead Counsel has explained, these claims were not part of the case at the time of the settlements because class representatives did not step forward to press these claims.[10] As a result, the statutes of limitations have now run, rendering the claims valueless.

That no plaintiff stepped forward is nobody's fault.  But given the facts at the time the plan of allocation was developed, these claims were reasonably viewed as having no merit.

For all of these reasons, it is Lead Counsel's opinion that the proposed allocations will most fairly compensate all members of the nationwide class.

---

[10] It is common in indirect purchaser cases for some repealer states to be excluded from the litigation and/or the monetary recovery due to no class representative or negative rulings by the court.  For example, in *LCD*, the 24 states included Massachusetts and Missouri but excluded New Hampshire. *See In re TFT-LCD (Flat Panel) Antitrust Litig.,* No. 07-md-01827-SI, 2013 WL 1365900, at *1, *4 (N.D. Cal. April 3, 2013)(listing states and approving plan of distribution that allowed only residents of those states to make a claim).

## III.   CHUNGHWA SETTLEMENT

### A.   Release of Reseller Claims

Cooper and Scarpulla object to the release of reseller claims under the Chunghwa settlement approved in March 2012 because "resellers" are not scheduled to recover under the proposed plan of allocation.  But the Chunghwa notice informed class members that (due to the large size of the class and the relatively small settlement amount) they might not receive any money under the settlement. (*See* Dkt. No. 993-1, Section 10.)  No reseller objected to the Chunghwa settlement or the plan of allocation, and both were finally approved almost four years ago.

### B.   Plan of Distribution of Chunghwa Settlement

Cooper and Scarpulla also suggest that the plan of distribution approved for the Chunghwa settlement conflicts with the present plan of distribution, but no conflict exists.  The notice correctly explained the plan of distribution on the pending settlements.  *See* Declaration of Joseph M. Fisher Reporting on Class Notice, Exhibit A (Detailed Notice at p. 7, Section 8: "The combined Settlement Fund totaling $576,750,000 will be used to pay eligible claimants in the states involved in this litigation.").  The plan includes the distribution to the 24 states contemplated under the Chunghwa settlement as well as the *pro rata* distribution to indirect purchasers under the other settlements.

### C.   St. John Arguments on Chunghwa Settlement and Attorneys' Fees

St. John incorrectly argues that IPP Counsel should be judicially estopped from stating that Chunghwa's cooperation was of limited value because in moving for preliminary approval of the Chunghwa settlement, IPP Counsel stated that Chunghwa's cooperation was "invaluable" and the settlement an "ice-breaker."  (St. John Reply at 6.)

IPP Counsel's statements regarding the value of Chunghwa's cooperation are not inconsistent.  At the time of the Chunghwa settlement (executed in April 2009), discovery was stayed and the IPP conspiracy case was in its infancy.  (*See* Alioto Fee Decl. I, ¶ 26.)  Chunghwa's cooperation was indeed invaluable at that stage and, at the time, provided IPPs with detailed and previously-unknown information about certain aspects of the conspiracy.  But it is equally true that as the case progressed, it became clear that Chunghwa's information was limited in that it provided virtually no information about large CPTs, the conspiracy in the United States, or its impact in the

1    domestic market—evidence essential to proving the IPP case on the merits.  (*See id.* ¶¶ 102-103;

2    IPPs' Fee Reply at 10-11.)  Closer examination of the Chunghwa meeting reports also revealed

3    many that were not helpful to IPPs' case.  (*See id.* at 11; Alioto Fee Decl. II ¶ 5.)[11]

4            Moreover, as IPPs previously noted, the DOJ had equal access to Chunghwa's information,

5    yet obtained only one limited guilty plea and dropped its investigations against all other Defendants.

6    (IPPs' Fee Reply at 11.) St. John fails to explain how this fact comports with his claim that

7    Chunghwa delivered the case to IPPs on a silver platter.  At bottom, St. John misapprehends the

8    massive scope of this case and the myriad complex issues that IPPs had to address.  This was a

9    multi-faceted, global price-fixing conspiracy that spanned 13 years, several continents, multiple

10   different products and over 48 defendant entities.  It would have been impossible for one Defendant

11   to provide all of the information required to successfully prosecute this case.

12           Finally, even if Chunghwa had provided comprehensive evidence of the conspiracy, that

13   would "not equate to a finding of liability to indirect purchasers of products containing CRTs." *See*

14   *In re TFT-LCD*, Dkt. No. 7127, at p. 10. The indirect plaintiffs in *LCD* received very similar

15   cooperation from Chunghwa (in addition to guilty pleas from most of the defendants) yet the court

16   awarded plaintiffs' counsel 30% of the $1.08 billion settlement.[12]

17   **IV.   CLASS NOTICE**

18           The most recent notice Objections are meritless.  First, Objectors suggest that paid print

19   media notice is the *only* type of notice relevant to whether Constitutional reach requirements have

20

21   [11] IPP Counsel also hoped the Chunghwa settlement would be an "icebreaker settlement," as early
     settlements often are, but no other settlements followed until class certification in 2013, further
22   highlighting the limited value of Chunghwa's cooperation in terms of driving other settlements.

23   [12] Objectors also claim that the attorneys' fee should be limited to 25% on the Chunghwa settlement.
     The Chunghwa notice provides: "At a future time, Interim Lead Class Counsel will ask the Court for
24   attorneys' fees not to exceed 25% of the $10,000,000 settlement fund, plus reimbursement of their
     costs and expenses, in accordance with the provisions of the Settlement."  The Settlement provides
25   that "Class Counsel may apply for a fee not in excess of one-third of the Settlement Fund." *Id.*
     Chunghwa Settlement Agreement, ¶ 23a.  The Settlement further provides that Class Counsel
26   reserve the right to make additional applications for fees and expenses. *Id.*  The present fee request,
     due notice of which was given to class members, is thus in accordance with the Chunghwa notice
27   and Settlement Agreement.  However, IPP Counsel intend to limit their fee request as to the
     Chunghwa settlement to 25% of the $10 million Chunghwa portion of the total recovery.

28

been met.  (Cooper/Scarpulla Reply at 27-28.)  But the notice publication they cite from the Federal Judicial Center actually makes clear that the court should consider "whether *all the notice efforts together* will reach a high percentage of the class."[13]  And the notice program here involved far more than just paid print media.

The paid print media reach of 57% cannot be viewed in isolation.  IPPs have demonstrated that they provided notice through multiple channels, which *together* reached 83% of the class.[14]  Moreover, contrary to objectors' claims, The Notice Company's reach calculations properly adjusted for the estimated overlap between the different types of notice.  *See* Fisher Decl. IV, ¶ 3.

Objectors next say the Court should be "wary of the often-flimsy data" used to support "Internet-based notice programs," and emphasize that the Court should "[w]atch for suggestions that Internet ads and social network usage can replace all other methods." (Reply at 28, citing FJC.)  But those problems do not exist here.  IPPs have never asserted that internet ads and social network usage can replace all other methods of notice, which is why the notice program in fact included paid-print media and direct mail/email notice, among other means.  *See* Fisher Decl. II, ¶¶ 7-16.  And, the backup data from *comScore* is consistent with the forms of backup customarily employed by notice experts, including the experts objectors recommend to the Court.  *See* Fisher Decl. IV, ¶ 3.

Objectors also contend that IPPs failed to analyze the class demographics or explain why the notices targeted a particular demographic.  This is false.  In connection with preliminary approval, The Notice Company analyzed the class demographics in detail and concluded that 90% of the class are 30+ years old and have an income of $60,000 or more.  *See* Decl. of Joseph M. Fisher Re: Notice Program (Dkt. No. 3863) ("Fisher Decl. I") ¶ 9.  This declaration also explained how each of the proposed methods of providing notice was tailored to the class demographics.  *See id.* ¶¶ 10-15; 18, 20-21; 24.  The Court clearly found these analyses sufficient in approving the proposed notice

---

[13] "Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide" ("Notice and Claims Process Checklist"), Federal Judicial Center (2010), at 3 (available at http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf) (emphasis added).

[14] *See* Decl. of Joseph M. Fisher Reporting On Class Notice (filed Nov. 20, 2015) at p. 14 ("Fisher Decl. III"), and the Decl. of Joseph M. Fisher Re: Cooper/Scarpulla Objections to Notice ("Fisher Decl. IV," filed herewith).

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: FINAL APPROVAL OF CLASS SETTLEMENTS
- Master File No. CV-07-5944-JST

1  program.  Thus, it is untrue that IPPs have failed to explain or justify the targeted demographic for

2  the paid-print media or the consumer email notice.

3  Moreover, in criticizing the age demographics used for the consumer email notice, they

4  ignore that those notices were not just sent to randomly-selected consumers.  Rather, they were

5  directly targeted at "individual consumers with interests in computers, televisions and consumer

6  electronics in general."  Fisher Decl. I, ¶ 13.  Because these consumers were more likely than the

7  general public to have made a qualifying purchase, it was appropriate to include everyone who was

8  at least 18 years old in 2007 (the last year of the class period).  *See* Fisher Decl. IV, ¶ 4.

9  The concerns objectors raise regarding email notice to seniors are similarly unfounded.

10  Studies show that close to 90% of seniors use email.  *See id.* And in any event, the direct email

11  notice was but one of the many methods of providing notice to seniors.  *Id.*

12  In sum, IPPs have demonstrated that the notice program was the best notice practicable under

13  the circumstances.  Objectors' criticisms lack foundation and must be rejected.

14  **V.      THE SAMSUNG SDI AND PHILIPS SETTLEMENTS**

15  Objectors also contend that "IPP counsel offer no real explanation for the vastly

16  disproportionate size of the Samsung and Philips settlements."  (St. John at 9.)  To the contrary, the

17  consideration paid by Samsung and Philips is consistent with their market shares and the core roles

18  they played in the CRT conspiracy.  Samsung also faced the additional pressure of being the last

19  major defendant to settle, a "last man standing" dynamic that often leads to a higher recovery.

20  **A.      The Consideration Paid by Samsung SDI and Philips Is Consistent with These
         Defendants' Market Shares**

21

22  The consideration paid by Samsung and Philips is consistent with their market shares.

23  Instead of examining market shares for the entire *thirteen* year class period, St. John relies upon two

24  documents from only the first half of the class period: 1997 (Oregon CRT report (Dkt. No. 4108-18))

25  and 2000 (Philips Annual Report (Dkt. No. 4108-17)), ignoring the fact that the conspiracy

26

27

28

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: FINAL APPROVAL OF CLASS SETTLEMENTS
- Master File No. CV-07-5944-JST

continued for another *seven years.*  Further, Samsung's and Philips' market shares ballooned in the early 2000's as a result of industry restructuring.[15]

As a result of this market consolidation, Samsung's global market share was 29% in 2004, and LPD's (for whose conduct Philips was responsible) was 27%. (*See* Declaration of Mario N. Alioto ISO IPPs' Reply Re: Final Approval ("Alioto Reply Decl.") ¶ 2, Ex. 1.)  Their shares of the CDT market were even higher: 42% (SDI) and 32% (LPD). (*Id.* ¶ 3, Ex. 2.)  Indeed, for the last four years of the class period, Samsung, LPD and Chunghwa accounted for almost 100% of the global CDT market.  (*Id.* ¶ 4, Ex. 3.)  This was significant because the evidence of Defendants' conspiracy regarding CDTs was more extensive than for CPTs, and IPPs' expert found that the overcharge on CDTs was more than double the overcharge on CPTs (22% vs. 9.8%, respectively).  *See* Expert Report of Janet S. Netz Ph.D, at 6. (Dkt. No. 3281-9.)

In addition, Samsung and Philips/LPD held even higher shares of the North American CRT market than the global CRT market, and manufactured many of the large CPTs destined for the U.S. television market.[16]  It was therefore appropriate for these Defendants to pay a greater proportion of the total settlement fund than their share of the overall CRT market.

In short, the market share data for the entire 13-year class period show that the consideration paid by Samsung SDI and Philips is entirely consistent with their market shares.

**B.    The Consideration Paid by Samsung and Philips is also Consistent with their Core Roles in the Conspiracy and the Evidence Developed by IPPs**

Independent of the DOJ (*see* IPP Fee Reply at 9-12) and long before the EC Decision and *Vichi* were issued in 2014, IPPs developed evidence showing that Samsung and Philips were two of

---

[15] *See* Dkt. No. 3001, at 4 (Panasonic exited the CDT business in 2000); Dkt. No. 817 (Hitachi exited the CDT market in 2001 and the CPT market in 2002); Dkt. No. 2981 (Thomson exited the CPT business in 2004); Dkt. No. 3027 (Philips and LG formed LG.Philips Displays ("LPD") in June 2001); Dkt. No. 2995 (Toshiba and Panasonic formed MT Picture Display Co., Ltd. in 2003).

[16] *See* Alioto Reply Decl. ¶ 5, Ex. 4 (In 1997, Samsung SDI held a 35.8% share of the North American CDT market compared to 13.8% globally, and was projected to increase that share to 50.6% in 1998); ¶ 6, Ex. 5 (Philips held 21% of the North American CPT market in 2001); ¶ 7, Ex. 6 (in 2001, Samsung SDI held a 28.9% share of the North American CPT market, which was projected to increase to 31.9% in 2002); ¶ 8, Ex. 7 (LPD held 35% of the Americas CPT market by 2005).

1   the core members of the CRT conspiracy.[17] Indeed, they were two of the founders of the conspiracy

2   and often led the group meetings. (*See*, *e.g.,* Alioto Reply Decl. ¶¶ 9-10, Exs. 8-9.) And, unlike some

3   other Defendants (*e.g.* Hitachi, Thomson), both Samsung and Philips (through LPD) participated in

4   the conspiracy for the entire class period.

5          The evidence rebutting Samsung's and Philips' FTAIA defense was also stronger than the

6   evidence relating to the other defendants.  Each had CRT factories in North America and

7   manufactured large quantities of large CPTs for the U.S. television market.  *See supra* n. 16; Alioto

8   Reply Decl. ¶ 11, Ex. 10.   IPPs also developed substantial evidence of their participation in

9   conspiracy meetings held in North America, specifically targeting U.S. consumers.  *See, e.g., id.* ¶¶

10  12-14, Exs. 11-13.  Moreover, none of this FTAIA evidence which would have had a particularly

11  strong appeal to an American jury came from the DOJ, the EC Decision or *Vichi*.[18]

12         Given Samsung and Philips' role in the conspiracy, the strength of the evidence against them,

13  and the fact that IPPs took these large and culpable Defendants to the brink of trial, putting them at

14  imminent risk of treble damage liability, it stands to reason that they would pay substantially more

15  than the remaining, non-core members of the conspiracy.

16         At bottom, St. John's argument rests on the flawed premise that a finding of antitrust liability

17  by a governmental authority is a *fait accompli* for IPPs.  "But a finding of criminal guilt does not

18  equate to liability for damages to indirect purchasers of products containing [CRTs]."  *LCD R&R* at

19  p. 10; *see also In re TFT-LCD,* 2013 WL 1365900, at *7. And as explained in IPPs' Reply, the risks

20  were greater here than in *LCD.  See* IPP Reply at pp. 7-8.  IPP Counsel are singularly responsible for

21  the size of the Samsung/Philips settlements and should be rewarded rather than punished for

22  securing that type of favorable recovery for the class.  The St. John objection should be overruled.

23

24

----

25  [17] The other core members were Chunghwa, LG, Orion and after 2001, LPD.  Orion and LPD both
26  entered bankruptcy before this case began, so IPPs could not collect damages from them.  Chunghwa
    and LG settled early and paid less than their market shares and roles in the conspiracy would
27  otherwise have demanded.  Samsung and Philips were the only core participants left in the case.

28  [18] In fact, there are no references to the U.S. CRT market in *Vichi*.  And the EC Decision makes no
    *findings* regarding the impact of the conspiracy in the United States.  It merely recites the content of
    certain meeting reports (of which IPPs were already aware) that mention the United States.

## VI.   NEW COOPER/SCARPULLA ARGUMENTS ON FEES

Finally, Lead Counsel is compelled to respond briefly to several new and baseless arguments raised in the Cooper/Scarpulla reply on fees.

Cooper and Scarpulla advance a litany of new assertions concerning Lead Counsel's time records, all of which are factually and/or legally incorrect.[19]  (*See* Alioto Reply Decl. ¶ 15 (responding topic-by-topic).)  As for their claim that the trial started from scratch and did not work cooperatively with existing counsel, Lead Counsel can state unequivocally that this is false.  *All* members of the trial team—including those added in the Fall of 2014—worked closely and cooperatively throughout, not to learn the case from scratch, *but to boil it down for trial.*[20]  (*See id.* ¶ 16.)  In fact, the CRT trial team worked much more efficiently in the four months running up to trial than the *LCD* trial team.[21]

Lead Counsel welcomes the opportunity (at the scheduled hearing or otherwise) to explain the circumstances surrounding the addition of the "Late-Added Three" and address precisely the value they contributed to the litigation (Cooper/Scarpulla Fee Reply at 5).  Their value to the Class was exceptional, as was that of many others who built the case from the ground up. (*See id.* ¶ 17.)

---

[19] *See O'Bannon v. Nat'l Collegiate Athletic Ass'n*, No. 09-CV-03329-CW (NC), 2015 WL 4274370, at *6-7 (N.D. Cal. July 13, 2015) (refusing to reduce fee for block billing and noting that "[b]lock-billing is a typical practice in this district, and blocked bills have been found to provide a sufficient basis for calculating a fee award."), citing *PQ Labs, Inc. v. Qi*, No. 12–cv–00450 CW, 2015 WL 224970, at *3 (N.D. Cal. Jan. 16, 2015) and *Stonebrae, L.P. v. Toll Bros., Inc.*, No. 08–cv–00221 EMC, 2011 WL 1334444, at *8 (N.D. Cal. Apr. 7, 2011). *O'Bannon* also noted that courts in the Ninth Circuit have allowed billing in quarter hour increments. *Id.* at*7-8.  Here, Lead Counsel's time records contain more than enough detail to allow the Special Master to conclude that the time spent by Lead Counsel is commensurate with the work done.

[20] Consider the tip of the iceberg for trial-related preparation:  identifying trial-worthy exhibits and witnesses from an eight-year litigation record, cataloguing and addressing admissibility issues, designating and counter-designating thousands of pages of witness testimony, reviewing and cutting witness video, preparing experts and fact witnesses, preparing the named plaintiffs, preparing cross-examination outlines, mock trials and theme testing, graphic and demonstrative work, trial logistics and vendors, exhaustive pretrial briefing and evidentiary negotiations, pretrial conferences, overall strategy and order-of-proof development, and on and on—all of which was done while briefing a mountain of summary judgment, FTAIA, and other important pre-trial issues.

[21] The lodestar incurred by IPP counsel in the last four months before the settlements was $11,453,589.20 versus $18,701,878.75  incurred by the top 26 firms in *LCD* for the same four month period before settlement.  (Alioto Reply Decl. ¶ 18.)

1    In all events, the most sensible approach on fees at this stage is to (1) award the aggregate fee

2    based on a straightforward percentage plus lodestar "cross-check" analysis, which will allow for

3    prompt calculation (and hopefully prompt distribution) of the net settlement fund to the class;[22]

4    while (2) deferring fee allocation issues until later in the case.[23]

5    ### CONCLUSION

6    Based on the foregoing, IPPs respectfully request that the Special Master recommend that the

7    Court:  (1) grant final approval of the seven proposed settlements; (2) certify the proposed

8    Settlement Class; (3) grant final approval of the notice plan, the proposed plan of distribution and the

9    proposed claim form; (4) and enter judgment against the Settling Defendants.

10   Dated:  December 23, 2015

Respectfully submitted,

11
  /s/ Mario N. Alioto

12
Mario N. Alioto (56433)
13   malioto@tatp.com
Joseph M. Patane (72202)
14   jpatane@tatp.com
Lauren C. Capurro (241151)
15   laurenrussell@tatp.com
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
16   2280 Union Street
San Francisco, CA 94123
17   Telephone: 415-563-7200
Facsimile: 415-346-0679

18
*Lead Counsel for Indirect Purchaser Plaintiffs*

19

20

21   _____

22   [22] *See Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1051 (9th Cir. 2002) (approving percentage
method plus lodestar cross-check); *In re Activision Securities Litig.*, 723 F. Supp. 1373 (N.D. Cal.
23   1989) (explaining advantages of the percentage method), *cited with approval by In re Omnivision
Technologies, Inc.*, 559 F. Supp. 2d at 1046 ("The Court finds [the] advantages persuasive [.]");
24   *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) ("where used as a mere
cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district
25   court"); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d at 306-07 (3d Cir. 2005) ("The lodestar cross-
check calculation need entail neither mathematical precision nor bean-counting.  The district courts
26   may rely on summaries submitted by the attorneys and need not review actual billing records.").

27   [23] After the aggregate fee is awarded, it is typically Lead Counsel's job to propose the fee allocation
in the first instance, consistent with various firms' overall contributions to the case.  *See* IPP Fee
28   Reply, at 28, n. 73.