Mario N. Alioto (56433)
Joseph M. Patane (72202)
Lauren C. Capurro (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123
Telephone: 415-563-7200
Facsimile: 415- 346-0679
Email: malioto@tatp.com
jpatane@tatp.com
laurenrussell@tatp.com

*Lead Counsel for the*
*Indirect Purchaser Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. CV-07-5944-JST; No. CV-13-03234-JST |
| | MDL No. 1917 |
| This Document Relates to:<br><br>All Indirect Purchaser Actions | **INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF SETTLEMENTS WITH THE PHILIPS, PANASONIC, HITACHI, TOSHIBA, SAMSUNG SDI, TECHNICOLOR, AND TECHNOLOGIES DISPLAYS AMERICAS DEFENDANTS; MEMORANDUM IN SUPPORT THEREOF**<br><br>Hearing Date:  March 15, 2016<br>Time: 2:00 p.m.<br>Judge: Honorable Jon S. Tigar<br>Court: Courtroom 9, 19th Floor<br>Special Master: Martin Quinn, JAMS |

1

**TABLE OF CONTENT**

2   INTRODUCTION ..........................................................................................................1

3   SUMMARY OF SETTLEMENT TERMS............................................................................3

4       A.      The Proposed Settlements...........................................................................3

5       B.      Consideration...............................................................................................5

6       C.      Releases.......................................................................................................6

7   PROCEDURAL HISTORY...............................................................................................7

8   ARGUMENT...................................................................................................................8

9   I.      THE SETTLEMENTS WARRANT FINAL APPROVAL ..........................................8

10      A.      Class Action Settlement Procedure............................................................8

11      B.      The Notice Plan Comports with Due Process.............................................9

12      C.      The Court Should Finally Certify the Settlement Class............................10

13          1.      Numerosity.....................................................................................11

14          2.      Commonality..................................................................................11

15          3.      Typicality.......................................................................................12

16          4.      Adequacy of Representation ..........................................................12

17          5.      Predominance.................................................................................13

18          6.      Superiority......................................................................................13

19      D.      The Proposed Settlements Should Be Finally Approved..........................14

20          1.      Strength of IPPs' Case...................................................................15

21          2.      Risk, Expense and Complexity of the Litigation..........................15

22          3.      Risk of Maintaining Class Action Status......................................19

23          4.      Amount Offered in Settlement.......................................................19

24          5.      Extent of Discovery and Stage of Proceedings.............................19

25          6.      Experience and Views of Lead Counsel........................................20

26          7.      Government Participation...............................................................21

27          8.      Reaction of Class Members to the Proposed Settlements.............21

28

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

9.      Exclusion Requests ...................................................................22

II.   THE COURT SHOULD APPROVE THE PLAN OF DISTRIBUTION ...........................22

     A.      Compensation to Indirect Purchaser State Class Members.........................22

     B.      Treatment of Nationwide Class Members ...................................................23

III.   THE COURT SHOULD OVERRULE THE OBJECTIONS TO THE SETTLEMENTS ...........................................................................................23

     A.      Only 11 Objections Were Filed, and Two Have Already Been Withdrawn................24

     B.      Objectors Bear the Burden of Establishing Unfairness.................................26

     C.      The Objections Driven by Disgruntled "Insider Objectors" Lack Merit.....................27

         1.      Cooper and Scarpulla Have No Standing to Object to the Proposed Settlements ...................................................................27

         2.      The Timing and Motivations Behind the Insider Objectors' Objections Are Highly Suspect ...................................................................28

     D.      The Objections by Professional Objectors Should be Treated with Skepticism .........29

     E.      The Objections to the Scope of the Release Lack Merit...............................31

         1.      The Release of Injunctive Relief Claims .........................................32

         2.      The Release of Potential Damages Claims .......................................34

     F.      Massachusetts, Missouri and New Hampshire Were Not Wrongly Excluded ...........36

         1.      Massachusetts................................................................36

         2.      Missouri......................................................................37

         3.      New Hampshire..............................................................38

     G.      Weighting Claims According to the Perceived Strength of the States' Laws Would Be Speculative and Contrary to the Evidence..............................39

     H.      The Nationwide Class Was Adequately Represented.................................41

     I.      The Notice Program Was the Best Notice Practicable Under the Circumstances.......43

     J.      The Total Settlement Amount is More than Fair, Reasonable and Adequate.............47

     K.      The CA AG's Statement of Interest ................................................48

     L.      Unsatisfied Objectors Could Have Opted Out.........................................49

CONCLUSION.........................................................................................49

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN SUPPORT THEREOF - Master File No. CV-07-5944-JST

1

## TABLE OF AUTHORITIES

2

<u>Cases</u>

3

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997) ............................................................ passim

4

*Barnes v. FleetBoston Fin. Corp.*, No. 01-10395-NG, 2006 WL 6916834

5

(D. Mass. Aug. 22, 2006) ..................................................................................................31

6

*Bennett v. Behring Corp.*, 96 F.R.D. 343 (S.D. Fla. 1982) ........................................................25

7

*Billingham v. Dornemann*, 447 Mass. 1113 (2006) ..................................................................36

8

*Boulds v. Chase Auto Finance Corporation*, 266 S.W. 847 (Mo. App. 2008) ...........................34, 38

9

*Carnegie v. Household Int'l Inc.*, 376 F.3d 656 (7th Cir. 2004) ................................................11

10

*Churchill Village LLC v. General Electric*, 361 F.3d 566 (9th Cir. 2004) ..............................9, 15, 23

11

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir.1974) ..................................................48

12

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) ............................................6, 23

13

*Comcast Corp. v. Behrend*, 133 S. Ct. 1426 (2013) ..................................................................17

14

*Daniels v. Aéropostale West, Inc.*, No. C-12-05755, 2014 WL 2215708

15

(N.D. Cal. May 29, 2014) ..................................................................................................35

*Darwich v. city of Dearborn*, No. 13-10254, 2014 WL 4600902 (E.D. Mich. Sept. 15, 2014)..........27

16

*Eisen v. Porsche Cars N. Am., Inc.*, No. 2:11-CV-09405-CAS, 2014 WL 43900

17

(C.D. Cal. Jan. 30, 2014), *appeal dismissed* (Sept. 22, 2014) ...............................................49

18

*Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15 (N.D. Cal. 1980), *affd*, 661 F.2d 939

19

(9th Cir. 1981) ..................................................................................................................14, 21

20

*Garner v. State Farm Mut. Auto. Ins. Co.*, No. CV 09 1365 CW, 2010 WL 1687832

(D. Cal. Apr. 22, 2010) ......................................................................................................24

21

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) .........................................................11, 23

22

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ..........................................................17, 18, 34, 39

23

*In re Airline Ticket Commission Antitrust Litig.*, 953 F. Supp. 280 (D. Minn. 1997) ....................40

24

*In re Bankamerica Corp. Secs. Litig.*, 210 F.R.D. 694 (E.D. Mo. 2002) .....................................39

25

*In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897,

26

1999 U.S. Dist. LEXIS 12936 (N.D. Ill. Aug. 17, 1999)......................................................40

27

*In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152 (N.D. Cal. 2001) .................................22

28

iv

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

*In re Corrugated Container Antitrust Litig.*, 556 F. Supp. 1117 (S.D. Tex. 1982)
*aff'd*, 687 F.2d 52 (5th Cir.1982) ................................................................40

*In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297 (N.D. Ga. 1993)..................................44

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M-02-1486, 2013 U.S. Dist. LEXIS 188116 (N.D. Cal. Jan. 8, 2013)................................................................39

*In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010)................................................................19

*In re General Motors Corp.*, 55 F.3d 768 (3d Cir.1995) ................................................................26

*In re Google Referrer Header Privacy Litig.*, 87 F. Supp. 3d 1122 (N.D. Cal. 2015) .................43, 45

*In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008)..........................19

*In re Heritage Bond Litig.,* MDL No. 02-ML-1475 DT, 2005 WL 1594403
(C.D. Cal. June 10, 2005) ................................................................21, 39

*In re Indus. Diamonds Antitrust Litig.,* 167 F.R.D. 374 (S.D.N.Y. 1996)..........................................13

*In re IPO Secs. Litig.,* 226 F.R.D. 186  (S.D.N.Y. 2005) ............................................................11, 33

*In re Linerboard Antitrust Litig.,* 203 F.R.D. 197 (E.D. Pa. 2001) ..................................................12

*In re Linerboard Antitrust Litig.,* No. A-98-5055, MDL No. 1261, 2004 WL 1221350
(E.D. Pa. June 2, 2004) ................................................................15

*In re Linerboard Antitrust Litig.,* 321 F. Supp. 2d 619 (E.D. Pa. 2004)...........................................24

*In re Linkedin User Privacy Litig.,* -- F.R.D. --, 2015 WL 5440975 (N.D. Cal. Sept. 15, 2015)........21

*In re Lloyds' Am. Trust Fund Litig.*, No. 96 Civ.1262 RWS, 2002 WL 31663577
(S.D.N.Y. Nov. 26, 2002) ................................................................22

*In re Market-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996) ..........................................13

*In re Master Key Antitrust Litig.*, 528 F.2d 5 (2d Cir. 1975).............................................................13

*In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998)................................16

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934 (9th Cir. 2015)......................................46, 47

*In re Omnivision Technologies, Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008)..................................22

*In re Optical Disk Drive Antitrust Litig.,* 303 F.R.D. 311 (N.D. Cal. 2014).......................................19

*In re Oracle Secs. Litig.*, No. C-90-0931, 1994 WL 502054 (N.D. Cal. 1994)..................................39

*In re Paine Webber Partnerships Litig.,* 171 F.R.D. 104 (S.D.N.Y. 1997),
*aff'd* 117 F.3d 721 (2d Cir. 1997)................................................................21

v

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN SUPPORT THEREOF - Master File No. CV-07-5944-JST

1    *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244 (D.C. Cir. 2013) ..........................17

2    *In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005) .......................................................39, 42

3    *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603
4    (N.D. Cal. 2009)..........................................................................................................................12, 13, 14

5    *In re Sunrise Secs. Litig.*, 131 F.R.D. 450 (E.D. Pa. 1990)..................................................................27

6    *In re Superior Beverage/Glass Container Consol. Pretrial*, 133 F.R.D. 119 (N.D. Ill. 1990)...........16

7    *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078 (N.D. Cal. 2007)...........................................26

8    *In re TFT-LCD Antitrust Litig.*, MDL No. 1827, 2011 WL 7575004  (N.D. Cal. Dec. 27, 2011)....22

9    *In re TracFone Unlimited Serv. Plan Litig.*, --- F.Supp.3d --- (2015), 2015 WL 4051882
10   (N.D. Cal. July 2, 2015).......................................................................................................................27

11   *In Re: Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F.Supp.2d 1011 (N.D. Cal. 2010) ...................4

12   *In re Vitamins Antitrust Litig.*, No. 99–197 TFH, 2000 WL 1737867 (D.D.C. Mar. 31, 2000).........22

13   *Klee v. Nissan N. Am., Inc.*, No. CV-12-08238, 2015 WL 4538426
14   (C.D. Cal. July 7, 2015) (*appeal filed*) .............................................................................................49

15   *Milligan v. Toyota,* No. 3:09–cv–05418–RS, slip op. at 13 (N.D. Cal. Jan. 6, 2012) ........................49

16   *Mirfasihi v. Fleet Mortg. Corp.*, 551 F.3d 682 (7th Cir. 2008) ...........................................................33

17   *Motorola Mobility LLC v. AU Optronics Corp.*, 773 F.3d 826 (7th Cir. 2014), *withdrawn and superseded by,* 775 F.3d 816 (7th Cir. 2015)......................................................................................17

18   *Nat'l Rural Telecomms. Coop. v. DIRECTV Inc.*, 221 F.R.D. 523 (C.D. Cal. 2004)..................21, 23

19   *Nguyen v. Radient Pharmaceuticals Corp.*, No. SACV 11–00406 DOC (MLGx),
20   2014 WL 1802293 (C.D. Cal. May 6, 2014) ............................................................................ passim

21   *Pallas v. Pacific Bell,* No. C-89-2373 DLJ, 1999 WL 1209495 (N.D. Cal. July 13, 1999)...............24

22   *Parker v. Time Warner Entertainment Co., LP,* 631 F. Supp. 2d 242 (E.D.N.Y. 2009)....................32

23   *Officers for Justice v. Civil Serv. Comm'n,* 688 F.2d 615 (9th Cir. 1982) .........................................14

24   *Radcliffe v. Experian Information Solutions, Inc.*, 715 F.3d 1157 (9th Cir. 2013)............................49

25   *Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir.2009)....................................................48

26   *Saylor v. Lindsley,* 456 F.2d 896 (2d Cir.1972)..................................................................................25

27   *Silber v. Mabon*, 18 F.3d 1449 (9th Cir. 1994)......................................................................................9

28   *Sullivan v. DB Investments Inc.*, 667 F.3d 273 (3d Cir. 2011) ................................................. passim

vi

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN SUPPORT THEREOF - Master File No. CV-07-5944-JST

*Thomas & Thomas Rodmakers, Inc. v. Newport Adhesives and Composites, Inc.*, 209 F.R.D. 159 (C.D. Cal. 2002)....................................................................................................................13

*U.S. Football League v. Nat'l Football League*, 887 F.2d 408 (2d Cir.1989)....................................48

*United States v. Oregon*, 913 F.2d 576 (9th Cir.1990) .....................................................................27

*Van Bronkhorst v. Safeco Corp.,* 529 F.2d 943 (9th Cir. 1976) .......................................................14

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96 (2d Cir. 2005) ........................................9, 33

*Yoshioka v. Charles Schwab Corp.*, No. C-11-1625, 2011 WL 6748984 (N.D. Cal. Dec. 22, 2011) .........................................................................................................35

<u>Statutes</u>

28 U.S.C. § 1332(d) (Class Action Fairness Act of 2005) ...............................................................43

28 U.S.C. § 1715(b) .........................................................................................................................24

Fed. R. Civ. P. 23...........................................................................................................................9, 11

Fed. R. Civ. P. 23(a) .............................................................................................................11, 12, 13

Fed. R. Civ. P. 23(b) ................................................................................................................. passim

Fed. R. Civ. P. 23(c) .........................................................................................................................46

Fed. R. Civ. P. 23(e) .......................................................................................................................8, 9

Mass. Gen. Laws Ch. 260, § 5A (2012)...........................................................................................34

N.H. Rev. Stat. § 358-A:3 ...........................................................................................................34, 38

<u>Other Authorities</u>

4 Newberg on Class Actions §§ 13:1, §§ 3:58, *et seq.* (5th ed. 2015)...........................................8, 41

American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.04 (Comment) (2015) ....................................................................................................................46

Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010) ("FJC Checklist") ...................................................................................9

United States; application of the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA")....................................................................................................................15, 16

vii

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN SUPPORT THEREOF - Master File No. CV-07-5944-JST

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## <u>INTRODUCTION</u>

Indirect Purchaser Plaintiffs ("IPPs") move for final approval of their settlements with the Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, Technicolor, and Technologies Displays Americas Defendants (the "Proposed Settlements").

IPPs submit this Memorandum pursuant to the Court's July 9, 2015 Order granting preliminary approval of these seven settlements (the "Preliminary Approval Order").  (Dkt. No. 3906.)  In the Preliminary Approval Order, the Court provisionally certified the Settlement Class, preliminarily approved the Settlements and the Plan of Distribution, and ordered dissemination of notice to Class Members regarding the preliminary approval of the Settlements, the Fairness Hearing, and rights to submit objections and requests for exclusion.

Notice was provided in accordance with the Preliminary Approval Order.  Out of millions of indirect purchaser class members, only 11 objections were filed by 22 objectors, and two of them have already been withdrawn (subject to Court approval).  Only five requests for exclusion were received.

Under the Proposed Settlements, IPPs have recovered ***$541,750,000*** on behalf of a proposed Settlement Class that includes a Nationwide Class and 22 Indirect Purchaser State Classes (including the District of Columbia).  The total amount recovered, adding in monies recovered under previously approved settlements, is ***$576,750,000***.  This is an extraordinary result. Indeed, it is one of the largest recoveries ever on behalf of indirect purchaser plaintiffs.  There are no coupons or vouchers and there will be no reversion or refund to any Defendant under any circumstances.  As for the Plan of Distribution, it is fair, reasonable and adequate.  No *cy pres* distribution is contemplated, and Class members are being compensated according to a generally-accepted pro-rata approach taking into account the value of their claims.

The eleven objections to the Proposed Settlements should be overruled.  To begin, the objections are suspect.  Three of the objections were lodged by four attorneys who have represented class members in this litigation (the "Insider Objectors")—attorneys who have had notice of the settlement terms and the notice program *at least* since the filing of IPPs' motion for preliminary

<hr>

1

1   approval, and yet only voiced concerns after IPP Counsel's Audit Committee reviewed their

2   timesheets and made cuts to their lodestars.[1]  Thus, the motivation behind these objections, and their

3   timing, are suspicious.  In addition, the Cooper/Scarpulla objections must be stricken for lack of

4   standing because they were not submitted on behalf of any class member.  Seven other objections

5   were filed by "serial" or "professional" class-action objectors whose motivations are likewise

6   suspect.[2]  In the end, this leaves only one objection (filed by an attorney acquainted with one of the

7   Insider Objectors)[3], along with a "Statement of Interest" filed by the California Attorney General.

8   (Dkt. No. 4118.)

9        Moreover, the objections lack substance.  Most of the objections focus on the lack of

10   financial compensation to members of the Nationwide Class who release (1) their claims for

11   injunctive relief, and (2) all claims that "were or could have been" asserted in this litigation—a

12   standard release in a settlement agreement.  Indeed, this Court has already finally approved an

13   identical release in conjunction with IPPs' settlement with defendant LG Electronics, Inc. ("LG").

14   (Dkt. No. 2542.)

15        The Proposed Settlements do not provide injunctive relief for the Nationwide Class.  The

16   reason is that the CRT market is dying and almost all manufacturers, including all of the alleged

17   conspirators, have left the market, making it very unlikely that the alleged conduct could recur in the

18   future.  A stipulated injunction with Defendants would therefore not be meaningful.  And, because

19   the injunctive relief claims are not viable, releasing these claims without financial compensation as

20   part of a global release is fair, reasonable and adequate.

21        The release of potential damages claims of purchasers outside the 22 Indirect Purchaser State

22   Classes is also fair, reasonable and adequate.  The damages claims for these states are not viable and

23   are completely speculative.

24

---

25   [1] Josef Cooper and Francis Scarpulla (Dkt. Nos. 4115 and 4116); Robert Bonsignore (Dkt. Nos.
26   4119 and 4144); Theresa Moore (Dkt. No. 4113).

   [2] Donnie Clifton (Dkt. No. 4099); Sean Hull, Gordon Morgan (Dkt. No. 4101); Douglas St. John
27   (Dkt. No. 4106); John Finn, Laura Townsend Fortman (Dkt. No. 4111); Paul Palmer (Dkt. No.
   4120); Josie Saik (Dkt. No. 4140-3); and Elizabeth Johnson (Dkt. No. 4128).

28   [3] Dan L. Williams & Co. (Dkt. No. 4112).

2

1    Lastly, in view of the magnitude of the settlement amounts, Defendants' insistence on global

2 releases is understandable.  The release of valueless claims satisfies Defendants' desire to forestall

3 the defense of nuisance claims in the future.  At the same time, the release does not prejudice class

4 members who give up nothing of value.

5    The other objections to the settlements, such as inadequate representation and inadequate

6 notice, are likewise meritless and should be overruled.  All of the class representatives are members

7 of both the Indirect Purchaser State Classes and the putative Nationwide Class, so there is no

8 conflict.  In addition, IPPs' comprehensive notice program reached an estimated 83% of class

9 members, which is well within the acceptable range.  The notice provided to class members was the

10 best notice practicable under the circumstances, and comports with due process.

11    In sum, the Court should find that the Proposed Settlements are fair, reasonable and

12 adequate, and grant final approval.

13                          **SUMMARY OF SETTLEMENT TERMS**

14    As detailed in IPPs' preliminary approval papers (*see* Dkt. Nos. 3861 and 3875), IPPs have

15 entered into settlements (collectively the "Settlement Agreements") with the remaining seven groups

16 of Defendants in their case.

17    **A.    The Proposed Settlements**

18    The Proposed Settlements resolve all claims against Defendants stemming from an alleged

19 conspiracy to fix prices for CRT Products[4] indirectly purchased from Defendants.  The proposed

20 Settlement Class is defined as follows:

21 NATIONWIDE CLASS

22    All persons and or entities who or which indirectly purchased in the United States for
   their own use and not for resale, CRT Products manufactured and/or sold by the
23   Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time
   during the period from March 1, 1995 through November 25, 2007.  Specifically
24   excluded from this Class are claims on behalf of Illinois persons (as defined by 740
   ILCS 10/4) for purposes of claims under 740 Ill. Comp. Stat § 10/7(2), Oregon
25

26

27 [4] CRT Products are defined in the Settlement Agreements to mean Cathode Ray Tubes of any type
   (e.g. color display tubes, color picture tubes and monochrome display tubes) and products containing
28 Cathode Ray Tubes.  Color Display Tubes ("CDTs") were used to manufacture computer monitors.
   Color Picture Tubes ("CPTs") were used to manufacture televisions.

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

natural persons (as defined by ORS 646.705 (2)) for purposes of claims under ORS § 646.775(1), and Washington persons (as defined by RCW 19.86.080) for purposes of claims under RCW 19.86.080 (1).  Also specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and, any affiliate, legal representative, heir or assign of any Defendant.  Also excluded are named co-conspirators, any federal, state or local government entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.[5]

INDIRECT PURCHASER STATE CLASSES:[6]

All persons and or entities in Arizona, California, District of Columbia, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin who or which indirectly purchased for their own use and not for resale, CRT Products manufactured and/or sold by the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time during the period from March 1, 1995 through November 25, 2007.

All persons and entities in Hawaii who or which indirectly purchased for their own use and not for resale CRT Products manufactured and/or sold by  the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time from June 25, 2002 through November 25, 2007.

All persons and entities in Nebraska who or which indirectly purchased for their own use and not for resale CRT Products manufactured and/or sold by the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time from July 20, 2002 through November 25, 2007.

All persons and entities in Nevada who or which indirectly purchased for their own use and not for resale CRT Products manufactured and/or sold by  the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time from February 4, 1999 through November 25, 2007.

Specifically excluded from these Classes are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and, any affiliate, legal representative, heir or assign of any Defendant.  Also excluded are named co-conspirators, any federal, state or local government entities,

---

[5] Residents of Illinois, Oregon and Washington are excluded from the Nationwide Class because the Attorneys General of those states are suing the Defendants on behalf of residents of those states.

[6] All of the Indirect Purchaser State Classes are the same except that three states, Hawaii, Nebraska and Nevada, have slightly shorter damages periods.  This is because the statutes allowing indirect purchasers to bring an antitrust claim for damages in Hawaii, Nebraska and Nevada were enacted after March 1, 1995, the beginning of the alleged Class Period.  This Court dismissed claims based on purchases made prior to the enactment of these statutes on the grounds that the state legislatures did not intend the statutes to apply retroactively.  *In Re: Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F.Supp.2d 1011, 1025-26 (N.D. Cal. 2010).

4

any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

This proposed Settlement Class is identical to the class preliminarily approved by the Court with respect to the settlements at issue (Dkt. No. 3906), as well as the Settlement Class finally approved by the Court in conjunction with IPPs' settlement with LG (Dkt. No. 2542). The Court has also certified 22 indirect purchaser state classes which are defined similarly to the Indirect Purchaser State Classes proposed here (the "Certified Class") (Dkt. Nos. 1742 and 1950.) The Settlement Class is broader than the Certified Class in the following respects: (1) the Certified Class requires that the Indirect Purchaser State Class Members be residents of the respective States, whereas the Settlement Class requires only that the purchase was made in one of the States; (2) the Certified Class is limited to televisions and monitors containing CRTs, whereas the Settlement Class includes CRTs, televisions and monitors containing CRTs, and other products containing CRTs; and (3) the Certified Class consists of the Indirect Purchaser State Classes defined above, while the Settlement Class also includes the Nationwide Class. The broader class definition provides complete peace to Settling Defendants and will allow more purchasers of CRT Products to receive compensation.

**B.    Consideration**

Under the Proposed Settlements, the Settling Defendants have paid a total of $541,750,000 in cash to settle all indirect purchaser claims against them. (*See* Dkt. Nos. 3861, 3875.) Together with the two previously approved settlements with Defendants Chunghwa Picture Tubes, Ltd. ("Chunghwa") and LG Electronics, Inc. ("LG"), the total Settlement Fund is $576,750,000. The payments are summarized in the chart below:

| DEFENDANT | TOTAL SETTLEMENT |
|---|---|
| Philips | $ 175,000,000 |
| Panasonic | $  70,000,000 |
| Hitachi | $  28,000,000 |
| Toshiba | $  30,000,000 |
| Samsung SDI | $ 225,000,000 |
| Thomson and TDA | $  13,750,000 |
| **Total of seven currently proposed settlements** | **$ 541,750,000** |
| Chunghwa | $  10,000,000 |
| LG | $  25,000,000 |

5

| Total of two previously approved settlements | $  35,000,000 |
|---|---|
| **Grand total of all settlements** | **$ 576,750,000** |

The Settlement Amounts have been deposited into an escrow account and have been invested in United States Treasury bills and other instruments insured or guaranteed by the full faith and credit of the United States.  If the Settlements are finally approved, any interest earned thereon (together with the Settlement Amounts) will become part of the Settlement Fund.  (Dkt. Nos. 3861, 3875.)

In addition, most of the Proposed Settlements contain cooperation provisions requiring Settling Defendants to provide specified cooperation to IPPs in the prosecution of any continuing litigation.  The cooperation provisions are material and valuable terms of the settlements.  They enhanced the settlement prospects with the remaining defendants because they obligated Settling Defendants, to varying degrees, to provide cooperation to the IPPs in prosecuting the remaining Defendants, including authentication of documents, producing witnesses for interviews, and depositions and/or trial, as well as other assistance. *Id.*

## C.    Releases

As is common in class action settlements, in exchange for their settlement payments Defendants requested "global peace" in the form of a release by all class members of all claims they have brought, or could have brought, based on the conduct alleged in this litigation.  This desire for global peace is a legitimate concern and courts routinely permit the release of all actual and potential claims, regardless of each claim's individual value, as part of a settlement class.[7]

IPPs agreed to the following global release:

---

[7] *Sullivan v. DB Investments Inc.,* 667 F.3d 273 (3d Cir. 2011) (acknowledging settling defendants' interest in seeking global peace as part of class action settlement); *see also Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1287 (9th Cir. 1992) ("a federal court may release not only those claims alleged in the complaint, but also a claim 'based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented *and might not have been presentable in the class action*'") (citation omitted) (emphasis in original).

any and all claims, demands, judgments, actions, suits, causes of action, whether class, individual, or otherwise (whether or not any Class Member has objected to the settlement or makes a claim upon or participates in the Settlement Fund, whether directly, representatively, derivatively, or in any other capacity) that Releasors, or each of them, ever had, now has, or hereafter can, shall, or may have on account of, or in any way arising out of, any and all known and unknown, foreseen and unforeseen, suspected or unsuspected injuries, damages, and consequences thereof in any way arising out of or relating in any way to any act or omission of the Panasonic Releasees (or any of them) or any other entity concerning the manufacture, supply, distribution, sale or pricing of CRT Products up to the date of execution of this Agreement, including but not limited to any conduct alleged, and causes of action asserted or that could have been alleged or asserted, in complaints filed in this Action, including those arising under any federal, state, or foreign antitrust, unfair competition, unfair practices, price discrimination, unitary pricing, unjust enrichment, contract, or trade practice law (the "Released Claims").

Panasonic Settlement Agreement, ¶ 13 (Dkt. No. 3862-2).  The releases in all of the Settlement Agreements are identical.

Thus, IPPs and class members will release all federal and state-law claims against a Settling Defendant whose settlement becomes final, "concerning the manufacture, supply, distribution, sales or pricing of CRT Products . . . ." (*Id.*; Dkt. No. 3875.)  The release does not include claims for product defect, personal injury or breach of contract.  (*Id.*)  Class members release their claims for injunctive relief through the Execution Dates of the Proposed Settlement Agreements only.

## **PROCEDURAL HISTORY**[8]

IPPs filed their motions for preliminary approval of the Proposed Settlements on May 29, 2015.  (Dkt. No. 3861.)  The Court granted preliminary approval on July 9, 2015.  (Dkt. No. 3906.)  Notice was thereafter published in accordance with the Preliminary Approval Order.  Publication consisted of the following actions:

- direct mailed/emailed notice to more than ten million unique addresses (including many of the largest institutional end-users of CRTs);

- publication notice in magazines and newspapers with collective readership of more

---

[8] A complete description of the history of this litigation is contained in the Declaration of Mario N. Alioto in Support of Indirect Purchaser Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses and Incentive Awards for Class Representatives, Dkt. No. 4071-1 ("Alioto Fee Decl. I").

than 150 million;

- digital notice via paid advertisements on Google, Facebook, and other popular websites;

- English and Spanish press releases carried by almost 300 domestic and foreign websites with a total potential audience of approximately 72 million; and

- Publication on the CRT settlement website, which has received more than 537,000 unique visitors.

Collectively, these efforts reached an estimated 83% of class members with an estimated frequency of 3.1, which is well-within the acceptable range. *See generally* Declaration of Joseph M. Fisher Reporting on the Class Notice Program ("Fisher Decl. II").

Eleven objections on behalf of 22 objectors have been filed. Five requests for exclusion have been received. *Id*. ¶ 19, Ex. Y (exclusion letters). Lead Counsel has provided Defendants with a list of these requests for exclusion.[9]

## ARGUMENT

## I. THE SETTLEMENTS WARRANT FINAL APPROVAL

### A. Class Action Settlement Procedure

A class action may not be dismissed, compromised or settled without the express approval of the Court. *See* Fed. R. Civ. P. 23(e). Approval is a three-step process: (1) certification of a settlement class and preliminary approval of the proposed settlement; (2) notice to the class; and (3) final approval at a Fairness Hearing, following notice. *See Nguyen v. Radient Pharmaceuticals Corp.,* No. SACV 11–00406 DOC (MLGx), 2014 WL 1802293, at *1 (C.D. Cal. May 6, 2014); 4 Newberg on Class Actions §§ 13:1, *et seq*. (5th ed. 2015) ("*Newberg*") (describing class action settlement procedure). This process safeguards class members' procedural due process rights and enables the Court to fulfill its role as the guardian of class interests.

---

[9] Declaration of Mario N. Alioto In Support of Indirect Purchaser Plaintiffs' Motion for Final Approval of Settlements with Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, Thomson and TDA Defendants ("Alioto Settl. Decl. II"), ¶ 4.

1    The Court completed the first step in the settlement approval process when it granted

2    preliminary approval to the Proposed Settlements.  As discussed below, the second step in the

3    process has been completed as well: the Court-approved Notice plan was fully implemented.  IPPs

4    now request that the Court take the final steps of holding a formal Fairness Hearing, granting final

5    approval of the Proposed Settlements, and entering Final Judgment.

6    **B.    The Notice Plan Comports with Due Process**

7    Federal Rule of Civil Procedure 23(e) and due process require that Class Members be given

8    "reasonable" notice of a proposed settlement and the right to be heard at the fairness hearing to

9    determine whether final approval of a settlement should be granted.  *See* Fed. R. Civ. P. 23(e); *Wal-*

10   *Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 113-14 (2d Cir. 2005).  Notice is satisfied if it

11   "generally describes the terms of the settlement in sufficient detail to alert those with adverse

12   viewpoints to investigate and to come forward and be heard."  *Churchill Village LLC v. General*

13   *Electric,* 361 F.3d 566, 575 (9th Cir. 2004).  This standard does not require perfection in delivering

14   notice, but rather reasonable efforts to reach as many class members as possible through either

15   individual or publication means.  *See, e.g.,* Federal Judicial Center, *Judges' Class Action Notice and*

16   *Claims Process Checklist and Plain Language Guide* (2010) ("FJC Checklist"), at 3 ("It is

17   reasonable to reach between 70-95%."); *Silber v. Mabon,* 18 F.3d 1449, 1454 (9th Cir. 1994).

18   The Court has held that the notice program proposed by IPP Counsel—which included

19   published notice, the posting of notice on the website established for this case, and other steps

20   including direct mailing to targeted individuals and entities—"constitutes the best notice practicable

21   under the circumstances, is due and sufficient notice to the Indirect Purchaser Settlement Class and

22   complies fully with the requirements of Federal Rule of Civil Procedure 23 and the due process

23   requirements of the Constitution of the United States."  Preliminary Approval Order, ¶ 13.

24   Indeed, the implemented CRT notice program meets – and in many respects exceeds – these

25   standards.  *See* Fisher Decl. II (summarizing notice program).  As the Fisher Declaration explains,

26   CRT class members were notified through a carefully-designed combination of (i) direct

27   mailed/emailed notice to more than ten million unique addresses (including many of the largest

28   institutional end-users of CRTs) (*Id.* ¶¶ 8-9); (ii) publication notice in magazines and newspapers

9

with collective readership of more than 150 million (*Id.* ¶ 10); (iii) digital notice via paid

advertisements on Google, Facebook, and other popular websites (*Id.* ¶¶ 11-12); (iv) English and

Spanish press releases carried by almost 300 domestic and foreign websites with a total potential

audience of over 72 million; and (v) the CRT settlement website, which has received more than

537,000 unique visitors.  Collectively, these efforts reached an estimated 83% of Class Members

with an estimated frequency of 3.1 (*id.* ¶ 18d), which is well-within the acceptable range.[10]

Moreover, as a practical matter, the reach and frequency of the notice to Class Members was

effectively greater than these numbers imply since the calculated numbers ignore so-called "organic"

notices that cannot be directly traced to a paid activity.  For example, a search result showing the

CRT Settlement Website as a paid advertisement would be included in the calculated reach; but a

search result showing the CRT Settlement Website as an unpaid search result is not included in the

calculated reach.  Both results effectively reach the viewer, but only the paid search result is

counted.  *See further* Fisher Decl. II ¶ 18e and Ex. X.

The notice program comports with due process and was the best notice practicable under the

circumstances.

**C.    The Court Should Finally Certify the Settlement Class**

The Court provisionally certified the Settlement Class in the Preliminary Approval Order.

All of the grounds for certification articulated then apply with equal force now, and final

certification is warranted.   The Court has already finally approved an identical Settlement Class

when it approved IPPs' prior settlement with LG. (Dkt. No. 2542.)  The Court has also certified 22

indirect purchaser state classes which are defined similarly to the Indirect Purchaser State Classes

proposed here.  (Dkt. No. 1950 p. 23; Dkt. No. 1742 p. 40-47.)

---

[10] The notice program also comports with the plans approved in similar matters.  *See, e.g., In re TFT-LCD Antitrust Litig.*, No. 07-cv-10827, Dkt. No. 5600-3 (N.D. Cal. 2012) (describing final indirect purchaser notice plan); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, MDL No. 1486, Dkt. No. 2147 (N.D. Cal. 2013) (same).  The publication and digital outreach programs in *CRT* were comparable in scope and focus to those in *TFT-LCD* and *DRAM*.   The *TFT-LCD* program did include television advertising as an additional form of outreach—which was not done here for cost/benefit reasons—but in other respects the *CRT* program went beyond *TFT-LCD* and *DRAM* by including a substantial direct mail/email component, which was not done in the other cases.

1    The Court may certify a settlement class where plaintiffs demonstrate that the proposed class

2    and proposed class representatives meet the four prerequisites listed in Rule 23(a)—numerosity,

3    commonality, typicality and adequacy of representation—and one of the three requirements of Rule

4    23(b).  *See* Fed. R. Civ. P. 23; *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir. 1998).

5    Certification of a class action  under Rule 23(b)(3) requires a showing that "questions of law and fact

6    common to the members of the class predominate over any questions affecting only individual

7    members, and that a class action is superior to other available methods for the fair and efficient

8    adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).

9        In certifying a settlement class, the Court is not required to determine whether the action, if

10   tried, would present intractable management problems, "for the proposal is that there be no trial."

11   *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 620 (1997).  As Judge Posner has explained,

12   manageability concerns that might preclude certification of a litigated class may be disregarded with

13   a settlement class "because the settlement might eliminate all the thorny issues that the court would

14   have to resolve if the parties fought out the case."  *Carnegie v. Household Int'l Inc.,* 376 F.3d 656,

15   660 (7th Cir. 2004) (*citing Amchem,* 521 U.S. at 620); *see also In re IPO Secs. Litig.,* 226 F.R.D.

16   186, 190, 195 (S.D.N.Y. 2005) (settlement class may be broader than litigated class because

17   settlement resolves manageability and predominance concerns).

18       Here, the Settlement Class meets the requirements of Rule 23(a) and (b) of the Federal Rules

19   of Civil Procedure and should be certified, as shown below.

20              **1.    Numerosity**

21       It is undisputed that millions of people in the United States purchased CRT Products during

22   the class period, and that the class readily satisfies the numerosity requirements of Rule 23.[11]

23              **2.    Commonality**

24       There are questions of law and fact common to the Class, including, among others, whether

25   Defendants conspired to fix the prices of CRTs; whether Defendants violated Section 1 of the

---

27   [11] *See* Dkt. Nos., 1742 (Report and Recommendation Granting Class Certification) ("Class R&R") p.
28   15 (finding that the 22 Indirect Purchaser State Classes satisfied Rule 23's numerosity requirement),
     and 1950 (Order Adopting Class R&R) ("Class Order"), p. 6 (noting that Defendants did not
     challenge the Special Master's ruling on numerosity).

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

1   Sherman Act as well as the state antitrust and unfair competition laws identified in the Complaint;

2   and the extent to which Defendants' conduct injured the class members.[12]  "Antitrust, price fixing

3   conspiracy cases, by their nature, deal with common legal and factual questions about the existence,

4   scope and effect of the alleged conspiracy.  Whether defendants participated in the actions alleged is

5   a common question." *In re Linerboard Antitrust Litig.,* 203 F.R.D. 197, 206 (E.D. Pa. 2001)

6   (citation and quotation marks omitted).

7           **3.**      **Typicality**

8         IPPs' claims are also typical, as this Court has already found. *See* Class R&R, p.19.  Indeed,

9   each named plaintiff indirectly purchased CRT Products during the relevant time period, and alleges

10   that Defendants engaged in an anti-competitive conspiracy.  *See also In re Static Random Access*

11   *Memory (SRAM) Antitrust Litig.,* 264 F.R.D. 603, 609 (N.D. Cal. 2009) ("the overarching price

12   fixing scheme is the linchpin of [Plaintiffs'] complaint, 'regardless of the product purchased, the

13   market involved or the price ultimately paid'"; plaintiffs' claims typical although they may have

14   used different purchasing procedures, purchased different quantities or a different mix of products,

15   or received different prices than other class members) (citation omitted).  Because the same is true

16   here, the typicality requirement is met.

17           **4.**      **Adequacy of Representation**

18         Rule 23(a) requires that "the representative parties will fairly and adequately protect the

19   interests of the class." Fed. R. Civ. P. 23(a)(4).  To satisfy constitutional due process concerns,

20   absent class members must be afforded adequate representation before entry of a judgment which

21   binds them.  Class representation is adequate if (1) no conflicts of interest exist between class

22   counsel or class representatives and class members; and (2) class counsel and class representatives

23   will "prosecute the action vigorously on behalf of the class."

24         As evidenced by the history of the litigation and the findings of the Court, IPPs and their

25   counsel have fairly and adequately represented and protected the interests of all Class members.  *See*

26

27

28       [12] *See* Class R&R, p. 16-17 (finding common questions of law and fact).

12

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

1   Class R&R, p.17 ("plaintiffs' counsel are qualified and competent to litigate this case;" p.19

2   ("putative Class Representatives satisfy the adequacy requirement of Fed. R. Civ.P. 23(a)(4)").

3           **5.   Predominance**

4        In addition to the prerequisites of Rule 23(a), the Settlement Class also satisfies the

5   prerequisites of Rule 23(b)(3), namely: (1) questions of law or fact common to Class members must

6   predominate over any questions affecting only individual members; and (2) the class action must be

7   superior to other available methods for the fair and efficient adjudication of the matter.

8        The Rule 23(b) predominance inquiry is "readily met in certain cases alleging violations of

9   the antitrust laws." *Amchem,* 521 U.S. at 625; *see also Thomas & Thomas Rodmakers, Inc. v.*

10   *Newport Adhesives and Composites, Inc.*, 209 F.R.D. 159, 167 (C.D. Cal. 2002). "The . . . inquiry

11   tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."

12   *Amchem*, 521 U.S. at 623.  Predominance is satisfied "unless it is clear that individual issues will

13   overwhelm the common questions and render the class action valueless." *In re Market-Makers*

14   *Antitrust Litig.*, 169 F.R.D. 493, 517-18 (S.D.N.Y. 1996).  Individual issues in this case will not

15   overwhelm the common questions of law or fact, because the central question is whether Defendants

16   conspired to improperly raise the prices of CRTs.[13]  Moreover, the fact that individual Class

17   members' damages may vary due to quantity or types of purchases or types of CRT Product

18   purchased, or the relief available, does not defeat predominance.  *See, e.g., In re Master Key*

19   *Antitrust Litig.*, 528 F.2d 5, 12 n.11 (2d Cir. 1975); *Sullivan v. DB Investments, Inc.,* 667 F.3d 273,

20   299-300 (3d Cir. 2011); *In re Indus. Diamonds Antitrust Litig.,* 167 F.R.D. 374, 383 (S.D.N.Y.

21   1996) (citing cases).

22           **6.   Superiority**

23        With respect to the superiority requirement, a court must consider the following factors: (A)

24   the interest of members of the class in individually controlling the prosecution or defense of separate

25   actions; (B) the extent and nature of any litigation concerning the controversy already commenced

26

27   [13] *See* Class R&R, p. 38 (finding that common questions of law and fact predominated over

28   individual questions and granting class certification of very similarly defined classes); Class Order, p. 23.  *See also SRAM*, 264 F.R.D. at 611.

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

1    by or against members of the class; (C) the desirability or undesirability of concentrating the

2    litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the

3    management of a class action.  *See* Fed. R. Civ. P. 23(b)(3).

4         The damages of most individual Class members are relatively small compared to the cost of

5    litigation.  There is no problem in consolidating the litigation here, nor will any unusual difficulties

6    be encountered.  Members of the Class, therefore, have no real interest in controlling the prosecution

7    of individual actions, and effectively would be unable to adjudicate their claims individually.  Even

8    if they were able to do so, the court system would be overwhelmed by the burden of hundreds of

9    thousands of separate actions.  For these reasons, it is highly desirable to concentrate these claims in

10   this Court.  *See* Class R&R, p. 38-39; Class Order, p. 6; *see also SRAM,* 264 F.R.D. at 615.

11        **D.    The Proposed Settlements Should Be Finally Approved**

12        This Court is entitled to exercise its "sound discretion" when deciding whether to grant final

13   approval.  *See Ellis v. Naval Air Rework Facility,* 87 F.R.D. 15, 18 (N.D. Cal. 1980), *affd,* 661 F.2d

14   939 (9th Cir. 1981) ("Dismissal or compromise of a class action is left to the sound discretion of the

15   trial judge").  In doing so, "the court's intrusion upon what is otherwise a private consensual

16   agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to

17   reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or

18   collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair,

19   reasonable, and adequate to all concerned."  *Officers for Justice v. Civil Serv. Comm'n,* 688 F.2d

20   615, 625 (9th Cir. 1982).

21        It is also well established in the Ninth Circuit that "voluntary conciliation and settlement are

22   the preferred means of dispute resolution."  *Id.*  "[T]here is an overriding public interest in settling

23   and quieting litigation" and this is "particularly true in class action suits."  *Van Bronkhorst v. Safeco*

24   *Corp.,* 529 F.2d 943, 950 (9th Cir. 1976).  A "presumption in favor of voluntary settlement

25   agreements" exists, and "'this presumption is especially strong in class actions and other complex

26   cases . . . because they promote the amicable resolution of disputes and lighten the increasing load of

27   litigation faced by the federal courts.'"  *Sullivan v. DB Investments,* 667 F.3d at 311.

28        When considering final approval, courts consider the following factors:

14

(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of class members to the proposed settlement.

*Churchill,* 361 F.3d at 575.  In addition, the settlement may not evidence collusion among the settling parties.  *Id.*

The Proposed Settlements meet these standards.[14]

### 1.      Strength of IPPs' Case

IPPs would have faced substantial hurdles had the litigation not settled, including proof of certain Defendants' participation in the conspiracy; proof of injury and damages on a class-wide basis; proof that the conspiracy had an impact in the United States; application of the Foreign Trade Antitrust Improvements Act of 1982 ("FTAIA"); withdrawal and statutes of limitations defenses; and uncertainty over trial structure (i.e., whether IPPs' claims and the claims of DAPs would be tried separately or together).  Alioto Fee Decl. I, ¶¶ 6-8.

### 2.      Risk, Expense and Complexity of the Litigation

"'An antitrust class action is arguably the most complex action to prosecute . . . .  The legal and factual issues involved are always numerous and uncertain in outcome.'"  *In re Linerboard Antitrust Litig.,* No. A-98-5055, MDL No. 1261, 2004 WL 1221350, at *10 (E.D. Pa. June 2, 2004) (citations omitted).  This case represents antitrust litigation, and multi-district litigation, at its most complex.  This litigation, spanning eight years and several continents, and alleging a global conspiracy that began more than 20 years ago, demanded a massive effort.

- *Discovery*.  This litigation demanded tremendous discovery efforts at both class certification and merits stages, requiring the review of millions of pages (many of which were in Korean, Japanese or Chinese and required certified translations); ongoing meet and confers with Defendants; the coordination of discovery with

---

[14] IPPs' papers filed in support of their motion for attorneys' fees address these factors in detail.  *See* Dkt. Nos. 4071 (Motion) & 4071-1 (Alioto Declaration in support thereof ("Alioto Fee Decl. I")).

15

1   other parties in the MDL; and extensive expert discovery relating to 17 expert

2   witnesses.  Alioto Fee Decl. I, ¶¶ 25-65.

3   • **Class certification**.  Preparation for class certification took over two years.  It

4   involved the taking of over 50 depositions (including depositions of class

5   representatives, Defendants, third-parties and experts); the translation, review and

6   analysis of thousands of documents relating specifically to impact and other Rule

7   23 requirements; and the work of experts conducting highly sophisticated

8   economic analyses of Defendants' and third parties' data.  In addition to moving

9   for class certification, IPPs also had to defend against Defendants' motion to

10  strike IPPs' expert reports.  All told, the parties' briefings and expert reports

11  consisted of over 6,000 pages.  The motions themselves took over a year to

12  resolve.  *Id.* ¶¶ 66-72.

13  • **Summary judgment**.  At the summary judgment stage, Defendants filed 36

14  motions.  Eleven of them were directed at IPPs.  However, IPPs also had to

15  coordinate with other plaintiff groups on responses to the remaining motions,

16  because rulings on these motions could have affected IPPs' case.[15]  These motions

17  raised difficult and complex legal and factual issues regarding the FTAIA,

18  antitrust standing, withdrawal from the conspiracy, and other dispositive issues.

19  The complete record on the summary judgment motions directed at IPPs totaled

20  over 22,000 pages.  *Id.* ¶¶ 73-80.

21      As for the risks of continued litigation, these were enormous.  "Antitrust litigation in general,

22  and class action litigation in particular, is unpredictable."  *In re NASDAQ Mkt.-Makers Antitrust*

23  *Litig.*, 187 F.R.D. 465, 475 (S.D.N.Y. 1998).  "The 'best' case can be lost and the 'worst' case can

24  be won, and juries may find liability but no damages.  None of these risks should be

25  underestimated."  *In re Superior Beverage/Glass Container Consol. Pretrial*, 133 F.R.D. 119, 127

26

27  ---

[15] For example, Defendants filed separate motions against IPPs and certain DAPs based on the
28  FTAIA.  Defendants also filed motions against certain DAPs regarding state law claims that
overlapped with IPPs' claims.

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

1    (N.D. Ill. 1990).  Moreover, there is always the risk that the law may change in unfavorable ways.

2    In this case, due to the complexities and difficulties described above, as well as the long duration of

3    the case, the risks assumed were enormous.

4    • ***Establishing liability***.  Liability was by no means a foregone conclusion.  The

5    information provided by Chunghwa was limited.  It lacked evidence of a

6    conspiracy on large CPTs (Color Picture Tubes) sold in or into the United States

7    market, and the United States CRT market in general.  This limitation allowed

8    Defendants to argue that the United States market was not part of the conspiracy,

9    and also supported Defendants' FTAIA defense.  *See* Alioto Fee Decl. I ¶¶ 102-

10   103.  Further, only one defendant pled guilty to conspiring to fix the prices of

11   CRTs, and for only one type of CRT sold to four U.S. customers.  All of the other

12   defendants strenuously denied their participation in the alleged global CRT

13   conspiracy and its impact on the United States.  They were aided in these denials

14   by the facts that the DOJ had dropped its investigation of them without

15   indictment; that many of the relevant documents had been destroyed; and that

16   knowledgeable witnesses were long-gone.  *Id.* ¶ 6.

17   • ***Risk of unsettled legal precedent***.  The law on class certification and the FTAIA,

18   two of the major, case-dispositive issues in the case, was the subject of several

19   important rulings by the Supreme Court and several Courts of Appeals during the

20   litigation.  Some of these rulings were unfavorable to indirect purchasers.[16]  These

21   rulings magnified the large risk for IPPs already existing on class certification and

22   FTAIA issues.

23

24

25

26   [16] *See, e.g., Comcast Corp. v. Behrend,* 133 S. Ct. 1426 (2013) (vacating order granting class
     certification); *In re Rail Freight Fuel Surcharge Antitrust Litig.,* 725 F.3d 244, 255 (D.C. Cir. 2013)
27   (vacating district court's grant of class certification and remanding for further proceedings in light of
     *Comcast,* 133 S. Ct. 1426); *Motorola Mobility LLC v. AU Optronics Corp.,* 773 F.3d 826 (7th Cir.
28   2014), *withdrawn and superseded by,* 775 F.3d 816 (7th Cir. 2015) (dismissing plaintiff Motorola's
     claims as barred under the FTAIA and the indirect purchaser doctrine in *Illinois Brick*).

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

1
2
3
4
5
6
7

- Similarly, Special Master Legge issued rulings unfavorable to the Direct Purchaser Plaintiffs ("DPPs") and the Direct Action Plaintiffs ("DAPs").[17]  These rulings, if approved by the Court, would have almost completely eliminated the direct purchaser claims against Defendants, and could have negatively impacted IPPs' case.  For example, the ruling that the DAPs lacked antitrust standing was arguably directly applicable to many of IPPs' claims and therefore threatened the viability of those claims.  Alioto Fee Decl. I ¶ 126.

8
9
10
11
12
13
14
15
16
17
18
19
20

- ***Risk of recovering nothing at trial***.  The risk that IPPs would recover nothing had they taken this case to trial was significant.  In *LCD*, for example, the direct purchaser class plaintiffs went to trial against Toshiba.  The jury returned a favorable verdict for the plaintiffs on liability, but only awarded $87 million in damages.  The plaintiffs already had obtained over $443 million in settlements from other defendants, and Toshiba was entitled to offset that sum against the damages award.  As a result, the plaintiffs recovered nothing on behalf of the direct purchaser class.  Likewise, one of the DAPs in *LCD*, Best Buy, went to trial against two defendants: Toshiba and Hannstar Display Corporation.  Like the direct purchaser plaintiffs, Best Buy also recovered nothing.  The jury found that Toshiba did not participate in the conspiracy and awarded only $7.5 million against Hannstar.  Once Best Buy's settlements with the other defendants in *LCD* had been offset, Hannstar owed nothing to Best Buy.  *Id.* ¶ 93.

21
22
23
24

- ***The long duration of this case***.  This case has been ongoing for eight years, with only two very small settlements (a total of $35 million obtained from Chunghwa and LG) in the bank.  The other, substantial settlements did not materialize until early 2015, on the eve of trial.

25
26
27
28

---

[17] *See, e.g.,* Report and Recommendation Regarding Defendants' Joint Motion for Summary Judgment (May 31, 2012) (Dkt. No. 1221) (recommending dismissal of the direct purchaser claims under the indirect purchaser rule in *Illinois Brick*); Report and Recommendations Regarding Defendants' Motions to Dismiss Direct Action Plaintiffs' Complaints (May 2, 2013) (Dkt. No. 1664) (recommending dismissal of DAPs' claims for lack of antitrust standing).

18

- ***Strong defense teams.*** Defendants are represented by highly respected counsel who would have aggressively defended this action throughout trial and appeal. The Proposed Settlements eliminate significant risks that IPPs would otherwise face at trial.

### 3. Risk of Maintaining Class Action Status

The risk that the Court would deny certification of the 22 indirect purchaser state classes (21 states, plus the District of Columbia) was substantial. Courts in this District have denied class certification in several similar indirect purchaser cases.[18] And even after the Court granted class certification of the IPP classes, the possibility of decertification existed. Indeed, certain Defendants filed a motion for decertification on ascertainability grounds on the eve of trial. (*See* Dkt. No. 3585.)

### 4. Amount Offered in Settlement

As discussed above, the $541,750,000 in cash consideration is one of the largest cash recoveries ever obtained on behalf of indirect purchasers. This is an extraordinary recovery for the class. In addition, IPPs obtained highly valuable cooperation from Defendants, in varying degrees, enabling them to prosecute the action against, and obtain higher recoveries from, the remaining Defendants. *See* Alioto Fee Decl. I ¶ 31.

### 5. Extent of Discovery and Stage of Proceedings

Significant discovery was already completed by the time the parties settled. IPPs and their experts had searched, reviewed and analyzed millions of pages of documents and voluminous data sets produced by Defendants, the DAPs and third parties. In addition, over 250 depositions were taken by the various parties to the litigation.[19] Accordingly, there was ample time for all settling parties to evaluate the case.

---

[18] *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 508 (N.D. Cal. 2008) (denying certification of indirect purchaser class); *In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081, at *19 (N.D. Cal. June 9, 2010) (same); *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311 (N.D. Cal. 2014) (same).

[19] *See further,* Alioto Fee Decl. I, ¶¶ 44, 51-53, 64, 69, Exs. 5-7 and 9-10.

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN SUPPORT THEREOF - Master File No. CV-07-5944-JST

IPPs began preparing for trial (originally scheduled to begin on March 9, 2015[20]) in late 2013.  The parties exchanged expert reports on liability and damages starting in April 2014 and continuing through September 2014.  These included opening, opposition, rebuttal and sur-rebuttal reports from 17 expert witnesses, all of whom were deposed, often multiple times, regarding their reports.  Alioto Decl. Fee I ¶ 16.  Merits discovery closed on September 5, 2014, but some discovery continued after the September 5 discovery cut-off.  In particular, several depositions were scheduled after September 5 and contention interrogatories propounded by the plaintiffs led IPPs to file several motions to compel further responses from certain defendants.  *Id.* ¶ 17.  On November 7, 2014, the Defendants filed 36 motions for summary judgment.  Eleven of these were directed specifically at IPPs' claims.  These motions were fully briefed before the Proposed Settlements were executed.  The motions have been withdrawn in light of the Settlements.  *Id.* ¶ 18.

In anticipation of trial, the parties also exchanged trial exhibit lists, witness lists, deposition designations, jury instructions and special verdict forms, and filed 64 motions *in limine* and other pretrial motions.  These motions were briefed in varying degrees before the Proposed Settlements were executed.   Pursuant to the Proposed Settlements, the Settling Defendants have provisionally withdrawn all of the motions pending against IPPs. (Dkt. Nos. 3801, 3802, 3812, 3851, 3852; *see also* Alioto Settl. Decl. I ¶ 19.

**6.    Experience and Views of Lead Counsel**

Lead Counsel and counsel for Defendants are experienced litigators.  (*See* Dkt. No. 4073-1; Alioto Fee Decl. I ¶ 107-112.)  Lead Counsel also oversaw and was involved in every aspect of this litigation, and had a thorough understanding of the evidence, and all of the claims and defenses.  *See id.* ¶ 2.  In addition, a number of settlement negotiations benefited from the assistance of retired District Judges: the Hon. Vaughn Walker and the Hon. Fern Smith.  *Id.* ¶¶ 107-112.  The Proposed Settlements are the products of intense and thorough arm's-length negotiations conducted by experienced and informed counsel.  The negotiations occurred throughout the litigation and were

---

[20] By Order dated February 9, 2015, the Court vacated the trial date (Dkt. No. 3515).

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN SUPPORT THEREOF - Master File No. CV-07-5944-JST

1  highly contested.  They were conducted in the utmost good faith and the settlements are appropriate

2  in light of the evidence against Defendants. *Id.*

3      "[T]he fact that experienced counsel involved in the case approved the settlement after hard-

4  fought negotiations is entitled to considerable weight." *Ellis,* 87 F.R.D. at 18.  *See also In re*

5  *Heritage Bond Litig.,* MDL No. 02-ML-1475 DT, 2005 WL 1594403, at *9 (C.D. Cal. June 10,

6  2005) ("'Where, as here, a proposed class settlement has been reached after meaningful discovery,

7  after arm's-length negotiation, conducted by capable counsel, it is presumptively fair'") (citation

8  omitted).

9      Likewise, Lead Counsel's belief that the Proposed Settlements are in the best interest of the

10  Class is entitled to "great weight."  *In re Paine Webber Partnerships Litig.,* 171 F.R.D. 104, 125

11  (S.D.N.Y. 1997) (citation omitted), *aff'd* 117 F.3d 721 (2d Cir. 1997); *accord Nat'l Rural*

12  *Telecomms. Coop. v. DIRECTV Inc.,* 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("'Great weight' is

13  accorded to the recommendation of counsel, who are most closely acquainted with the facts of the

14  underlying litigation.").

15              **7.    Government Participation**

16      The Department of Justice and all state attorneys general have received CAFA notices of

17  these settlements from each of the settling defendants.  Other than the California Attorney General

18  ("CA AG"), who has filed a Statement of Interest, no other governmental official has raised any

19  concern regarding the settlements.  This fact favors the settlements.  *See In re Linkedin User Privacy*

20  *Litig.*, -- F.R.D. --, 2015 WL 5440975, at *10 (N.D. Cal. Sept. 15, 2015) (fact that no governmental

21  official objected to settlement upon receiving CAFA notice was factor in favor of settlement

22  approval).

23              **8.    Reaction of Class Members to the Proposed Settlements**

24      IPPs' Notice program reached millions of consumers who purchased CRT televisions and

25  computers.  *See* Fisher Decl. II, ¶ 18.  The Claims Administrator published notice in various

26  newspapers and magazines and on the website.  *Id.* ¶¶ 10, 13.  Digital notice was provided through

27  paid advertisements on Google, Facebook, and other popular websites.  *Id.* ¶¶ 11-12.  He also mailed

28

1  and emailed notice to more than ten million possible claimants. *Id.* ¶¶ 8-9.  Only 11 objections were

2  received.

3              **9.     Exclusion Requests**

4              Only five requests for exclusion were received out of a class comprising millions of

5  purchasers of CRT Products.  Two of the requests for exclusion were by DAPs that are already

6  pursuing their own cases.  Thus, there are actually only three requests for exclusions.  Pursuant to the

7  Settlement Agreements, IPP Counsel has provided the list of exclusions to Defendants.  Alioto Settl.

8  Decl. II ¶ 4.

9              In summary, all these factors establish that the Proposed Settlements are fair, reasonable and

10  adequate.  The Court should grant final approval.

11  **II.    THE COURT SHOULD APPROVE THE PLAN OF DISTRIBUTION**

12             A plan of distribution of class settlement funds is subject to the "fair, reasonable and

13  adequate" standard that applies to approval of class settlements.[21]  "It is reasonable to allocate the

14  settlement funds to class members based on the extent of their injuries or the strength of their claims

15  on the merits."  *In re Omnivision Technologies, Inc.*, 559 F. Supp. 2d 1036, 1045 N.D. Cal. 2008).

16  "*[A] pro-rata* allocation has been used in many antitrust cases including in this District."  *LCD,*

17  MDL No. 1827, 2011 WL 7575004, at *4 (N.D. Cal. Dec. 27, 2011) (citations omitted).[22]  The

18  proposed Plan of Distribution proposed here uses such a pro-rata approach.  It should be approved.

19             **A.     Compensation to Indirect Purchaser State Class Members**

20             As discussed in IPPs' preliminary approval papers, IPPs have proposed to compensate

21  members of the Indirect Purchaser State Classes according to a plan of distribution providing that

22  qualifying claimants will be eligible to claim their pro-rata share of the Settlement Fund based on the

23

24

25  [21] *In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001).

26  [22] "*See also, e.g., In re Vitamins Antitrust Litig.*, No. 99–197 TFH, 2000 WL 1737867, at *6 (D.D.C.
Mar. 31, 2000) ("Settlement distributions, such as this one, that apportions funds according to the
relative amount of damages suffered by class members, have repeatedly been deemed fair and
27  reasonable."); *In re Lloyds' Am. Trust Fund Litig.*, No. 96 Civ.1262 RWS, 2002 WL 31663577, at
*19 (S.D.N.Y. Nov. 26, 2002) ("*pro rata* allocations provided in the Stipulation are not only
28  reasonable and rational, but appear to be the fairest method of allocating the settlement benefits.").

1    number of valid claims filed, and the number and type of CRT Products each claimant purchased

2    during the class period.  Alioto Settl. Decl. I ¶ 43.

3        **B.    Treatment of Nationwide Class Members**

4            The Plan of Distribution does not contemplate compensation to Nationwide Class Members

5    who are not members of one of the IP State Classes.  There is good reason for this.  As discussed

6    below in response to the objectors' challenges, the equitable and damages claims being released by

7    these purchasers have no value.  Courts often approve plans of allocation providing no compensation

8    for the release of "nuisance" claims.  *See, e.g., Nguyen,* 2014 WL 1802293, at *7 (approving a

9    settlement and plan of allocation in a securities class action over an objection that the settlement

10   contemplated the release of certain claims without compensation, and noting: "'It is reasonable to

11   allocate the settlement funds to class members based on the extent of their injuries or the strength of

12   their claims on the merits.' [internal citations omitted].  The record shows that it is very unlikely that

13   the in-and-out traders could have proved recoverable damages.").

14           It is the opinion of Lead Counsel here that the proposed allocations will most fairly

15   compensate the claimants.  That conclusion should be adopted.  "Counsel has also litigated this case

16   thoroughly and aggressively from the start and utilized expert input to determine the extent of

17   damage and calculation of the instant settlement.  The Court sees no reason to disagree with their

18   judgment of their own case."  *Id.*, at *8 (finding plan of allocation reasonable, fair and adequate).

19   **III.    THE COURT SHOULD OVERRULE THE OBJECTIONS TO THE SETTLEMENTS**

20           In determining the fairness and adequacy of a proposed settlement, this Court should

21   consider "the reaction of the Class Members to the proposed settlement."[23]  The fact that only eleven

22   objections have been received raises a reasonable inference that the Proposed Settlements are fair,

23   reasonable and adequate.  *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1291-96 (9th Cir.

24   1992); *Nat'l Rural Telecomm. Coop.*, 221 F.R.D. at 529 ("It is established that the absence of a large

25   number of objections to a proposed class action settlement raises a strong presumption that the terms

26

27

28   [23] *Churchill Village, L.L.C.*, 361 F.3d at 575; *Hanlon v. Chrysler Corp.*, 150 F.3d at 1026.

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

1    of a proposed class settlement action are favorable to the class members").[24]  The inference of class

2    support due to the absence of objectors is even stronger when, as here, a large portion of the

3    Settlement Class consists of sophisticated business entities.[25]

4           In addition, every attorney general in the United States, as well as the DOJ, received notice

5    of the settlements from Defendants pursuant to the Class Action Fairness Act ("CAFA").  *See* 28

6    U.S.C. § 1715(b).  Significantly, ***only one has appeared***—the CA AG—and none has objected.[26]

7    "Although CAFA does not create an affirmative duty for either state or federal officials to take any

8    action in response to a class action settlement, CAFA presumes that, once put on notice, state or

9    federal officials will raise any concerns that they may have during the normal course of the class

10   action settlement procedures."  *Garner v. State Farm Mut. Auto. Ins. Co.,* No. CV 09 1365 CW,

11   2010 WL 1687832, at *14 (N.D. Cal. Apr. 22, 2010).

12          **A.     Only 11 Objections Were Filed, and Two Have Already Been Withdrawn**

13          Objections were due on October 8, 2015.  (*See* Preliminary Approval Order ¶18.)  The

14   October 8, 2015 deadline was clearly stated in the published notice and posted on the opening page

15   of the settlement website, www.crtclaims.com.  As of that date, a mere 11 objections by 22 objectors

16   had been filed.[27]  Of these 11 objections—a minute number given the size the Class—three are

17   driven by disgruntled attorneys in this litigation (the "**Insider Objectors**") who refused Lead

18   Counsel's requests that they reduce their lodestar following the Audit Committee's review of their

19

20

21

22   [24] *See also Pallas v. Pacific Bell,* No. C-89-2373 DLJ, 1999 WL 1209495, at *8 (N.D. Cal. July 13, 1999) ("The small percentage—less than one percent—of persons raising objections is a factor weighing in favor of approval of the settlement.").

23

24   [25] *See In re Linerboard Antitrust Litig.,* 321 F. Supp. 2d 619, 629 (E.D. Pa. 2004) ("the class in this cases [sic] involves many of the largest corporations in America-entities that are hardly unfamiliar with civil litigation").

25   [26] The CA AG's Statement of Interest contains a "conditional objection" to the notice program subject to her receiving more information and assurances that the interests of California natural persons are being protected.  *See* Dkt. No. 4118.  IPP Counsel is working with the CA AG to provide this information.

26

27   [27] To put this number in perspective, the 22 objectors are less than .0003 percent of the number of class members that received direct mail notice – and a much smaller percentage of all the class members that have received notice in one or more of the forms approved by the Court.

28

daily time records:[28]

| COUNSEL | OBJECTOR | DOCKET NO. |
|---|---|---|
| 1.  Robert Bonsignore | Anthony Gianasca, Gloria Comeaux, Mina Ashkannejhad individually and/or as Administrator of the Estate of the Late R. Deryl Edwards, Jr., Jeffrey Speaect, Rosemary Ciccone, and Jeff Craig[29] | 4119 |
| 2.  Theresa Moore | Rockhurst University, Gary Talewski, Harry Garavanian | 4113 |
| 3.  Francis Scarpulla and Josef Cooper | No client is named | 4115, 4116 |

Seven additional objections[30] were filed or orchestrated behind the scenes by so-called "professional objectors"—attorneys who routinely represent objectors challenging class action settlements with frivolous objections in the hopes of extorting a fee for themselves (the "**Professional Objectors**").[31]  Many have been reprimanded by courts for seeking personal gain at the expense of class members.[32]  Two of these objectors, Paul Palmer and Gordon Morgan, have moved to withdraw their objections.  (*See* Dkt. Nos. 4130 and 4165.)

---

[28] Lead Counsel implemented a number of measures to ensure the lodestar is fair and reasonable. Alioto Settl. Decl. II, ¶ 15.  One of these measures was the formation of an Audit Committee to conduct an in-depth review of IPP Counsel's time records.  *Id.*  All firms were audited and most firms' lodestars were reduced.  The Insider Objectors ignored Lead Counsel's instructions for calculating their lodestars and failed to implement the Audit Committee's proposed cuts.  *Id.*

[29] Bonsignore objectors Comeaux and Speaect are named class representatives.  "As to the effect of the possible recalcitrance of one named class representative one need look no further than *Saylor v. Lindsley*, 456 F.2d 896 (2d Cir.1972) where it was held that opposition by a named plaintiff is not a sufficient reason to disapprove a settlement.  As the Second Circuit explained, 'A contrary view would put too much power in a wishful thinker or a spite-monger to thwart a result that is in the best interests of the [class].'"  *Bennett v. Behring Corp.*, 96 F.R.D. 343, 353 (S.D. Fla. 1982) (citation omitted).

[30] Two of these, the Palmer and St. John objections, are directed at fees only—not the settlements.

[31] *See infra* and Appendices A-N attached to the Additional Declaration of Robert J. Gralewski, Jr. In Support of Indirect Purchaser Plaintiffs' Motion For Final Approval of Class Action Settlements With Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, Thomson, and TDA Defendants ("Gralewski Settl. Decl.").

[32] *See id.*

| COUNSEL | OBJECTOR | DOCKET NO. |
|---|---|---|
| 4. Chris Bandas, Timothy Hanigan | Sean Hall, Gordon Morgan | 4101 |
| 5. Darrell Palmer | Paul Palmer | 4120 |
| 6. Jonathan Fortman, Steve Miller, and John Kress | Laura Townsend Fortman , John Finn | 4111 |
| 7. Joseph Scott St. John and Andrea Valdez | Douglas St. John | 4106 |
| 8. Jan Westfall | Donnie Clifton | 4099 |
| 9. In pro per[33] | Josie Saik | 4140 |
| 10. In pro per[34] | Elizabeth Johnson | 4128 |

The remaining objection was filed by the following:

| COUNSEL | OBJECTOR | DOCKET NO. |
|---|---|---|
| 11. Paul Justi | Dan L. Williams & Co. | 4112 |

Lastly, the CA AG has filed a Statement of Interest requesting additional information concerning the notice program and the claims made by California natural persons.[35]  (*See* Dkt No. 4118.)

## B.   Objectors Bear the Burden of Establishing Unfairness

"[The] preliminary determination [of settlement approval] establishes an initial presumption of fairness. . . ." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (quoting *In re General Motors Corp.,* 55 F.3d 768, 784 (3d Cir.1995) ("This preliminary determination establishes an initial presumption of fairness when the court finds that: (1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the

---

[33] Although Ms. Saik's objection states she is proceeding *in pro per*, attorney Edward Cochran filed her objection, has filed a notice of appearance on her behalf, and defended her deposition.  Mr. Cochran is a well-known professional objector.  *See* Gralewski Settl. Decl., Appendix H.

[34] Like Ms. Saik, although Ms. Johnson purports to be representing herself *in pro per*, she states that her fiancé Charles M. Thompson helped prepare her objection, and he is a well-known professional objector.  *See* Gralewski Settl. Decl., Appendix G.

[35] IPPs are working with the CA AG to provide the requested information.

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN SUPPORT THEREOF - Master File No. CV-07-5944-JST

1    settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.").

2         In light of this presumption, objectors to a class action settlement bear the burden of

3    establishing that a settlement is not fair, reasonable or adequate. *See United States v. Oregon*, 913

4    F.2d 576, 581 (9th Cir.1990) ("In this circuit, we have usually imposed the burden on the party

5    objecting to a class action settlement"). The objectors have failed to carry their burden.[36]

6         **C.    The Objections Driven by Disgruntled "Insider Objectors" Lack Merit**

7              **1.    Cooper and Scarpulla Have No Standing to Object to the Proposed
                       Settlements**

8

9         Messrs. Cooper and Scarpulla have no standing to object to the Proposed Settlements. Only

10   members of the class may object to a class action settlement. *See, e.g., In re TracFone Unlimited*

11   *Serv. Plan Litig.*, --- F.Supp.3d --- (2015), 2015 WL 4051882, at *11 (N.D. Cal. July 2, 2015)

12   (objector has no legal standing to object to a settlement unless he can demonstrate he is an aggrieved

13   class member).[37] Their objections are not filed on behalf of any class member and they do not claim

14   to be class members themselves. Instead, they have filed objections on behalf of the "Indirect

15   Purchaser Plaintiffs" as a whole. *See* Dkt. Nos. 4115, 4116. These lawyers have no authority to

16   object on behalf of IPPs or the Class as a whole. They are not Lead Counsel.[38]

17

18

19   _____

20   [36] Several objectors seek to incorporate by reference "all other objections" in this matter. *See, e.g.,*
     Moore Objection, at 10. These purported joinders should be stricken as improper attempts to enlarge
21   the grounds for possible appeal. *See, e.g., Darwich v. city of Dearborn,* No. 13-10254, 2014 WL
     4600902, at *1 (E.D. Mich. Sept. 15, 2014) ("In order for this court to apply meaningful *de novo*
22   review, it is insufficient for the objecting party to simply incorporate by reference earlier pleadings
     or reproduce an earlier unsuccessful motion for dismissal or judgment (or response to the other
23   party's dispositive motion). Insufficient objections to a magistrate judge's analysis will ordinarily be
     treated by the court as an unavailing general objection.").
24
     [37] *See also In re Sunrise Secs. Litig.*, 131 F.R.D. 450, 459 (E.D. Pa. 1990) (Rejecting objections to a
25   class action settlement raised by various state Attorneys Generals because the AGs were not class
     members. The court noted that "as a general rule, only class members have standing to object to a
26   proposed class settlement.")

27   [38] *See* Dkt. No. 47 (Order Appointing Interim Lead Counsel), p. 5 (appointing Mario N. Alioto and
     Trump, Alioto, Trump & Prescott, LLP as sole Interim Lead Counsel for the Indirect Purchaser
28   Plaintiffs); Class R&R, p. 49 (recommending appointment of Trump, Alioto, Trump & Prescott, LLP
     as Class Counsel for the Indirect Purchaser Plaintiffs) and Class Order (adopting Class R&R in full).

Since they do not purport to assert objections on behalf of a client-class member, and have no authority to file on behalf of IPPs or the Class as a whole, Cooper and Scarpulla lack standing to object to the Proposed Settlements.  Their objections must therefore be stricken.[39]

### 2.    The Timing and Motivations Behind the Insider Objectors' Objections Are Highly Suspect

The timing and motivations behind the Insider Objectors' objections are highly suspect. Despite having notice of the terms of the settlements and the notice program for many months, and many opportunities to raise their concerns with Lead Counsel, these objectors only voiced their concerns after the Audit Committee made cuts to their lodestars.  Alioto Settl. Decl. II ¶¶ 7-9, 12-13.

In addition, IPPs' papers in support of preliminary approval, once filed on May 29, 2015, clearly explained the settlement terms, the notice program, and the plan of distribution.  (*See* Dkt. No. 3861.)  Thus, the Insider Objectors, all of whom receive notice of electronic filings in this case through the Court's ECF notices, were able to review the proposed settlements and the proposed notice plan.  None of them contacted Lead Counsel to voice concerns.  Alioto Settl. Decl. II ¶ 11.

Indeed, Messrs. Scarpulla and Cooper clearly read and paid close attention to the Proposed Settlement terms and the motion for preliminary approval, because they filed "conditional objections" to the Proposed Settlements and the motion for preliminary approval.  (Dkt. Nos. 3874 & 3880.)  But these conditional objections focused solely on the allocation of any prospective fee award by Lead Counsel.  They raised none of the supposedly fundamental problems they now raise regarding the settlement class definition, the notice program or the plan of distribution.  (*Id.*) That is because the issues they raise are not fundamental problems.  They are manufactured objections designed to delay approval of the settlements.

Similarly, Mr. Bonsignore and Ms. Moore never informed Lead Counsel of their objections to the settlements until they filed those objections with the Court.  In addition to being served with the preliminary approval papers, both Mr. Bonsignore and Ms. Moore were in contact with Lead Counsel and/or members of the Audit Committee on multiple occasions during the auditing

---

[39] Striking Cooper and Scarpulla's objections will not prejudice the Class because other objectors raise similar objections.

1    process.[40]  They had many opportunities to voice the concerns they now raise.  Yet neither gave any

2    indication that they planned to object to the Proposed Settlements until after they were informed that

3    their lodestars had been substantially reduced by the Audit Committee.  (Alioto Settl. Decl. II ¶ 13.)

4    Their objections too are simply an afterthought designed to delay the settlements.[41]

5           As class counsel, the Insider Objectors have fiduciary duty to act in the best interests of the

6    class.  If they truly believed there were problems with the Proposed Settlements and the notice

7    program, they should have raised them with Lead Counsel long before now and worked together to

8    resolve any problems before notice was given to the class.  For this reason and the more substantive

9    reasons given below, the Insider Objectors' objections should be overruled.

10          **D.     The Objections by Professional Objectors Should be Treated with Skepticism**

11          Seven objections on behalf of nine objectors are driven by lawyers whose practice is to file

12   professional objections.  Attorneys Miller, Kress, Fortman, Bandas, Hanigan, Palmer, Thompson,

13   Westfall, Cochran and St. John routinely represent objectors challenging class action settlements by

14   filing canned objections.  In this very litigation, Sean Hull (who is represented by Bandas) filed an

15   objection to the Chunghwa settlement.  Upon review of the objection, the Special Master's Report

16   and Recommendation concluded "from the record before the Court that Mr. Hull has been evasive,

17   has attempted to avoid process from this Court, is deliberately stalling the Court procedures—all in

18   an attempt to maintain his status as an objector for his own personal gain and not for the benefit of

19   the class."  (Dkt. No. 1233, p.2.)

20          Although Hull initially claimed to represent himself *in pro per*, Darrell Palmer appeared on

21   his behalf (Dkt. No. 1222) to respond to the Special Master's Order to Show Cause Regarding

22

23   [40] Indeed, before Lead Counsel made the cuts to Ms. Moore's lodestar, she indicated to Lead
     Counsel that she approved the Proposed Settlements.  In an email to Lead Counsel dated July 29,
24   2015 (after she had reviewed the motion for preliminary approval on several occasions), Ms. Moore
     stated: "Thanks [sic] you very much, Congratulations and thank you for all your hard work over this
25   extended period of time. Great job."  Alioto Settl. Decl. II, ¶ 32, Ex. F-3.  Likewise, on August 31,
     2015, Mr. Bonsignore posted information on his firm's website endorsing the Proposed Settlements
26   and providing instructions for filing a claim.  *Id.* ¶ 26, Ex. D.  The Audit Committee informed Mr.
     Bonsignore of the cuts to his lodestar on September 16, 2015.  *Id.*

27   [41] With respect to Mr. Bonsignore, *see* Alioto Settl. Decl. II ¶ 29, Ex. E (Order for Sanctions Under
     CCP 2023.030).  The order sanctioning Mr. Bonsignore requires him to disclose in a *Pro Hac Vice*
28   application that he has been subject to disciplinary action by a California court.  Mr. Bonsignore
     failed to comply with this order in this case. *Id.*

29

1   Finding of Civil Contempt and Award of Sanctions Against Objector Sean Hull.  (Dkt. No. 1210).

2   IPPs also suspected that Bandas orchestrated the objection since it was mailed from Corpus Christi,

3   TX, where Bandas is located, while Hull lives in Colorado.  According to the Special Master, IPPs

4   demonstrated that Hull was previously represented by Attorney Bandas in another objection to a

5   class settlement, and noted that "Bandas routinely represents objectors purporting to challenge class

6   action settlements, and does not do so to effectuate changes to settlements, but does so for his own

7   personal financial gain." (Dkt. No. 1150, approved by the Court, Dkt. No. 1155 p.4.)  Hull filed an

8   appeal in the Ninth Circuit, which he subsequently withdrew.  (*See* Case No. 12-15760, Dkt. No.

9   12.)

10          Darrell Palmer, who represents his father Paul Palmer in this round of objections (and who

11   has moved for withdrawal of the objection), has repeatedly filed objections in MDLs.  So have Chris

12   Bandas and Timothy Hanigan, who represent Sean Hull and Gordon Morgan (who has also moved to

13   withdraw his objection).  The same is true for Steve Miller, Jonathan Fortman and John Kress who

14   represent Laura Townsend Fortman (Mr. Fortman's wife) and John Finn.  Objector Elizabeth

15   Kimberly Johnson declares that Charles M. Thompson, her fiancé and another repeat objector in

16   MDLs, assisted her in the preparation of her objection.  Jan Westfall, who represents objector

17   Donnie Clifton, is connected to Darrell Palmer.  Ms. Westfall was co-counsel with Mr. Palmer in an

18   objection to another class settlement.  In still another case, she represented Deliris Palmer, Darrell

19   Palmer's sister-in-law.  She voluntarily withdrew the objection when class counsel in that case

20   identified her relationship with Palmer.  Lastly, Joseph Scott St. John and Andrea Valdez, who

21   represent Mr. St. John's father, Douglas St. John, are related to professional objector Theodore

22   Frank.  Mr. St. John's wife, Anna St. John, works with Mr. Frank.[42]

23          It is well-established that "serial" or "professional" objectors routinely file objections to class

24   action settlements, not to improve the settlements, but to extract payments from parties or counsel in

25   the litigation to avoid years of delay associated with their settlement objections:

26   _____

27   [42] *See* Gralewski Settl. Decl., Appx. J; *see also id.,* Appendices A-N (compendium of class action settlements to which these attorneys filed objections, which the courts overruled and/or found frivolous, and which were later withdrawn, abandoned or dismissed without any apparent benefit to

28   the class in question).

> Repeat objectors to class action settlements can make a living simply by filing
> frivolous appeals and thereby slowing down the execution of settlements. The
> larger the settlement, the more cost-effective it is to pay the objectors rather than
> suffer the delay of waiting for an appeal to be resolved (even an expedited
> appeal).  Because of these economic realities, professional objectors can levy
> what is effectively a tax on class action settlements, a tax that has no benefit to
> anyone other than to the objectors.  Literally nothing is gained from the cost:
> Settlements are not restructured and the class, on whose behalf the appeal is
> purportedly raised, gains nothing.

*Barnes v. FleetBoston Fin. Corp.*, No. 01-10395-NG, 2006 WL 6916834, at, *1 (D. Mass. Aug. 22, 2006).  Thus, the Court should view the objections filed by these Professional Objectors with skepticism.

### E.    The Objections to the Scope of the Release Lack Merit

Several objectors contend that the Proposed Settlements are not fair, reasonable and adequate to those members of the Nationwide Class who are not also members of the 22 Indirect Purchaser State Classes, because the settlements require these members to release their claims for injunctive relief and damages without obtaining any consideration in return.[43]

As further explained below, these claims are not viable and are completely speculative. Therefore, they have no settlement value.  Releasing these valueless claims for no financial compensation as part of a global release is common in class action settlements and entirely appropriate, because no class member is being treated unfairly, and the release of all actual and potential claims—even if some of those claims are valueless—is the only way to give Defendants complete, iron-clad assurance that they will receive the benefit of their bargain and be spared from duplicative future litigation.  Indeed, not allowing Defendants to obtain the release of all claims, regardless of value, would chill class action settlements by making them less attractive.

Further, "it is well established that 'parties to a suit have the right to agree to anything they please in reference to the subject matter of their litigation, and the court, when applied to, will ordinarily give effect to their agreement, if it comes within the general scope of the case made by the pleadings.'"  *Sullivan,* 667 F.3d at 317 (citations omitted).  The releases given here come squarely

1    within the general scope of the pleadings.  *See* Fourth Consolidated Amended Complaint.  And as

2    noted, the LG Settlement contains nearly identical release provisions.  No one objected to those

3    provisions, and the Court granted final approval.  (*See* Dkt. No. 2542.)

4              1.      **The Release of Injunctive Relief Claims**

5              Under the terms of the release provisions, class members in the 22 Indirect Purchaser State

6    Classes give up their injunctive relief claims.  No one has objected to that.  Several objectors

7    complain, however, that the Proposed Settlements also release the injunctive relief claims of

8    claimants in the other 29 states, and do so for no consideration.

9              As an initial matter, this was equally true of IPPs' settlement with LG.  That settlement has

10   been finally approved by the Court. *See* Dkt. No. 2542 (Order finally approving LG settlement).  The

11   LG settlement involved an identical Settlement Class and an identical release of all claims,

12   nationwide.  In addition, the court-approved notice informed class members that only members of

13   the 22 Indirect Purchaser States Classes would be eligible to submit claims for monetary relief.  (*See*

14   Dkt. No. 2511.)

15             The fact that no financial compensation will be awarded to class members for the release of

16   their injunctive relief claims is entirely fair, reasonable, and adequate, because those claims are not

17   viable.  No one disputes that the CRT market is dying and almost all manufacturers, including all of

18   the alleged conspirators, have left the market, making it very unlikely that the alleged conduct could

19   recur in the future.  Indeed even some objectors acknowledge as much.[44]

20             Thus, the injunction claims are properly treated as valueless for purposes of these

21   settlements.  Indeed, courts often approve settlements releasing worthless claims without providing

22   compensation to the releasors.  *See, e.g., Parker v. Time Warner Entertainment Co., LP,* 631 F.

23   Supp. 2d 242, 262 (E.D.N.Y. 2009) ("A claim which cannot be proven is worth essentially nothing.

24   Consideration of nothing for releasing a worthless claim is therefore fair, reasonable, and

25   adequate."); *Nguyen*, 2014 WL 1802293, at *7 (approving a settlement and plan of allocation in a

---

27   [43] *See* Cooper/Scarpulla Objections at 2-5; Moore Objection at 3-5; Bonsignore Objection at 4-5;
     Finn/Fortman Objection at 2-6; Hull/Morgan Objection at 4-5.

28   [44] *See* Finn/Fortman objection at 5.

securities class action over an objection that the settlement contemplated the release of certain claims

without compensation, and noting: "'It is reasonable to allocate the settlement funds to class

members based on the extent of their injuries or the strength of their claims on the merits.' [internal

citations omitted].  The record shows that it is very unlikely that the in-and-out traders could have

proved recoverable damages."). As the *Nguyen* court explained:

> Counsel has also litigated this case thoroughly and aggressively from the start and utilized expert input to determine the extent of damage and calculation of the instant settlement.  The Court sees no reason to disagree with their judgment of their own case on this record, and finds it is highly unlikely the in-and-out traders could prove any damages caused by Radient's alleged misrepresentation. ***The Objector is correct that proving in-and-out claims is not impossible, but there is no evidence that the in-and-out traders* in this case** [emphasis in original] ***could have done so. On this basis, the plan of allocation reasonably does not include values for in-and-out shares. The plan of allocation reasonably and fairly represents injuries and claims on the merits***.

*Id.* at *8 (emphasis added).  Here, proving the injunction claims *is* likely impossible.  So even

though the injunction claims of the 29 states are being released, this group is losing nothing.

Moreover, despite the fact that these claims are properly treated as valueless for settlement

purposes, this does not guarantee that an aggressive future litigant would not attempt to bring a

frivolous injunctive relief claim based on the conduct alleged in this case in hopes of extracting an

improper nuisance settlement.  It is entirely appropriate, then, for Defendants to be concerned by this

prospect and to request a global release of all claims, regardless of value.[45]  Accordingly, as noted,

courts—*including this Court in this case*—have approved such releases, acknowledging that settling

defendants have a legitimate interest in seeking global peace.[46]

---

[45] *See, e.g., Mirfasihi v. Fleet Mortg. Corp.,* 551 F.3d 682, 685-686 (7th Cir. 2008) (approving securities class action settlement following determination that certain released claims were "worthless," and noting that "even if the settlement is merely a nuisance settlement, such settlements are permitted; defendants can be trusted to make such settlements only if it is in their best interest to do so").

[46] *See* Dkt. No. 2542 (Order finally approving LG settlement).  *See also Sullivan,* 667 F.3d at 310 ("Finally, were we to mandate that a class include only those alleging 'colorable' claims, we would effectively rule out the ability of a defendant to achieve "global peace" by obtaining releases from all those who might wish to assert claims, meritorious or not. . . ."); *In re IPO Secs. Litig.,* 226 F.R.D. 186, 194 (S.D.N.Y. 2005), citing *Wal-Mart Stores, Inc.,* 396 F.3d at 121-22 ("[C]lass action settlements simply will not occur if the parties cannot set definitive limits on defendants' liability.").

## 2.    The Release of Potential Damages Claims

Objectors also complain that the Proposed Settlements release potential damages claims under the laws of the 29 states for no consideration.  However, these potential damages claims are not viable and are therefore worthless as well.

The vast majority of the 29 states are what is known as "non-repealer" states.  Under the "*Illinois Brick*" doctrine, indirect purchasers lack standing to seek damages for violations of the federal antitrust laws.  *See Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  Certain states have enacted statutes, known as repealer statutes, that reject the *Illinois Brick* doctrine and grant standing to indirect purchasers to sue for antitrust violations under those states' antitrust laws.  Others, referred to as non-repealer states, have not done so, meaning that indirect purchasers may not bring claims for damages under those states' laws.  As is true for the injunctive relief claims, IPPs have determined that these potential damages claims are worthless, and objectors have not shown otherwise.  *See generally Nguyen,* 2014 WL 1802293, at *7-8.  Releasing these claims for no consideration is therefore fair, reasonable and adequate.  *Id.*

To the extent any of the 29 states allow indirect purchasers to bring claims for damages, IPPs have determined that these claims have long been barred by their respective statutes of limitations and are completely speculative.[47]  Thus, these claims are also worthless and can fairly be released as part of these Proposed Settlements.

Scarpulla and Cooper note that in *LCD,* the settlements "carved out" the potential damages claims held by purchasers in states that could not share in the Settlement Fund.[48]  The *LCD* "carve out" referenced by Mr. Cooper and Mr. Scarpulla is not necessary here.  The circumstances in *LCD* were unique.  In that case, both class plaintiffs and various state attorneys general filed complaints in which they sought to represent the interests of indirect purchasers from their states (through statutory

---

[47] For example, the Massachusetts Consumer Protection Statute, Mass. Gen. Laws Ch. 93A, has a four year statute of limitations.  *See* Mass. Gen. Laws Ch. 260, § 5A (2012).  The Missouri Merchandising Practices Act (the "MMPA") has a five year statute of limitations.  *See Boulds v. Chase Auto Finance Corporation*, 266 S.W. 847, 851 (Mo. App. 2008).  New Hampshire's Consumer Protection Act (N.H. Rev. Stat. § 358-A:2) has a three year statute of limitations.  *See* N.H. Rev. Stat. § 358-A:3.  Claims under these statutes are now time-barred.

[48] Cooper/Scarpulla Objection at 3, n.7.

34

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN SUPPORT THEREOF - Master File No. CV-07-5944-JST

authority or common law *parens patriae* powers).  In addition, separate actions by several state attorneys general were pending in state courts.  The *LCD* court's "carve out" helped to delineate which consumers would recover compensation through their state attorneys general and which consumers would receive compensation directly from the class settlement fund pursuant to the agreement of all parties.  It also ensured that the state law claims pending in other courts were not released.  Although the situation in *LCD* may have compelled a carve out, it is not appropriate here.

Just as in *LCD*, all CRT indirect purchasers whose damages claims have been asserted in a representative complaint—here the Fourth Consolidated Amended Complaint—can receive compensation pursuant to the final settlement.  However, unlike in *LCD*, no other plaintiff groups may claim money from the CRT IPP settlement, including the attorneys general.[49]

---

[49] The cases cited by the Cooper/Scarpulla are distinguishable as well.  *See Amchem Products v. Windsor,* 521 U.S. 591 (1997); *Yoshioka v. Charles Schwab Corp.*, No. C-11-1625, 2011 WL 6748984 (N.D. Cal. Dec. 22, 2011); *Daniels v. Aéropostale West, Inc.*, No. C-12-05755, 2014 WL 2215708 (N.D. Cal. May 29, 2014).  In *Amchem*, the "sprawling" settlement class included class members exposed to different asbestos products, in different ways, alleging a wide range of unique personal injury claims; some were already afflicted with disease, while others had been exposed but had not yet manifested physical injuries ("exposure-only" class members).  *Amchem,* 521 U.S. at 610.  Finding significant uncommon questions—and a concrete risk that the *viable* claims of future asbestos claimants were not properly compensated by the settlements, the Court concluded that the predominance and adequacy of representation prongs of Rule 23 were not satisfied.  *Id.* at 624-626.  Here, all class members were affected by the price-fixing conspiracy in the same way.  In addition, the proposed settlement in *Amchem* compromised future, as yet-unknown claims of the exposure-only class members and denied compensation to class members with various valid and valuable claims.  *Id.* at 626-627.  That is not the case here. As explained above, the equitable and monetary claims of class members in the 29 states are not viable and are therefore worthless.

In *Yoshioka*, the plaintiffs, IRA account holders, alleged that defendant financial institutions took security interests and liens in their IRA assets, and that these liens were prohibited transactions that caused the IRAs to lose their tax-exempt status.  Plaintiffs entered into a settlement that provided no monetary recovery for the class.  The value of the relief was entirely based on a retroactive amendment to plaintiffs' account agreement intended to preclude the courts from determining that a prohibited transaction had occurred; but whether the proposed amended language (and thus the settlement) would protect the class members was highly speculative.  *See Yoshioka*, at *9.  It was this "uncertain value of the settlement" that the court deemed problematic.  *Id.* at *12.  Here, the value of the consideration from Defendants is unquestionable, and unlike in *Yoshioka*, the claims of these Nationwide Class members have no value.

Similarly in *Daniels*, the plaintiffs moved for preliminary approval of a collective-action settlement.  The members would give a release and covenant not to sue defendants, but the vast majority (ninety percent) would receive nothing or virtually nothing.  *See Daniels*, 2014 WL 2215708, at * 3.  Here, the settlements release damages claims in exchange for more than $500 million for the class.

---

35

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

1

## F.  Massachusetts, Missouri and New Hampshire Were Not Wrongly Excluded

2          Several objectors contend that certain states which allow indirect purchasers to bring claims

3    for damages, namely Missouri, Massachusetts and New Hampshire, were wrongly excluded from

4    this case and indirect purchasers in those states should be allowed to file claims for compensation.[50]

5    These objections are refuted below in turn.

6          ### 1.     Massachusetts

7          IPPs asserted a Massachusetts claim under the Massachusetts Consumer Protection Statute,

8    Mass. Gen. Laws Ch. 93A, but it was dismissed with prejudice on procedural grounds.[51]

9          The ruling by Judge Legge did not preclude suit by another Massachusetts purchaser or by

10   the Massachusetts Attorney General.[52]  For example, Mr. Bonsignore and Ms. Moore, who both

11   claim to have represented Massachusetts clients, could have filed cases for these clients at any

12   time.[53]  Instead, they took no action.  They should not now be allowed to complain.

13

---

14   [50] Moore Objection at 6-8; Bonsignore Objection at 4.

15   [51] See Dkt. No. 768 (Report, Recommendations and Tentative Rulings Regarding Defendants' Joint Motion to Dismiss the Second Consolidated Amended Complaint of the Indirect Purchaser
16   Plaintiffs, dated September 30, 2010); and Dkt. No. 799 (Stipulation and Order Modifying and Adopting Report, Recommendations and Tentative Rulings, dated October 27, 2010).  Special
17   Master Legge dismissed the Massachusetts claim because IPPs did not wait 30 days after serving a demand letter on Defendants.  IPPs did not believe it was necessary to wait 30 days because doing so
18   served no practical purpose in this case—by that time (May 2010), Defendants had had notice of IPPs' Massachusetts claim since for 2 ½ years and had not made a settlement offer.  The purpose of
19   a Chapter 93A demand letter is to encourage negotiation and settlement of claims arising from allegedly unlawful conduct and to allow the defendant to limit the damages a plaintiff might recover
20   by making a reasonable offer of settlement.  See Billingham v. Dornemann, 447 Mass. 1113 (2006). No Defendant expressed any interest in discussing settlement and no Defendant requested more time
21   to do so after receiving the demand letter.

22   [52] Special Master Legge left this option open: "[C]ertainly no procedural dismissal of this nature
23   should bar the filing of a truly new suit. . . ."  R&R at 13.

24   [53] Mr. Bonsignore claims that his client Mr. Gianasca was "vetted [and] ready to serve" as the Massachusetts representative.  (Dkt. No. 4144, at p. 4.)  This claim is disingenuous at best.  After the
25   filing of the initial complaints, Mr. Gianasca and Mr. Bonsignore never responded to Lead Counsel's requests for information necessary for initial disclosures and failed to complete the questionnaire
26   designed to vet potential class representatives.  They failed to even provide Lead Counsel with basic information regarding Mr. Gianasca's claimed purchase of a CRT product.  As a result, Mr.
27   Gianasca was not named in the consolidated amended complaint.  Lead Counsel assumed Mr. Gianasca no longer wished to serve as the Massachusetts representative and Mr. Bonsignore never
28   informed him otherwise.  Alioto Settl. Decl. II, ¶ 37.  Similarly, Ms. Moore never informed Lead Counsel that she had a Massachusetts client.  Id. ¶ 38.

36

By the time IPPs moved for approval of the Chunghwa Settlement in March 2011, the Massachusetts claim was not part of this case.[54]  Significantly, and contrary to objectors' claims, purchasers in Massachusetts knew that they would not be receiving any money from the Chunghwa Settlement.  The Chunghwa settlement notice clearly listed the states whose purchasers would be able to file claims, and that list did not include Massachusetts.[55]

IPPs also notified purchasers in Massachusetts that they would not be receiving money from the LG Settlement, and that a Massachusetts class was not certified as part of the litigated class certification motion.[56]  All of these notices were provided to Massachusetts purchasers well within the statutory time limit to bring a Massachusetts claim.  But no Massachusetts plaintiff objected and no one stepped forward to represent the Massachusetts class. The statute of limitations has now run on that claim.

## 2. Missouri

IPPs never asserted a Missouri claim because no Missouri plaintiff came forward to represent a Missouri class, and the law of the case prevented Lead Counsel from asserting a Missouri claim without a Missouri class representative.[57]

Mr. Bonsignore's claims that he presented Lead Counsel with a viable Missouri class representative in March 2012 are highly questionable.  At the outset, Lead Counsel has no record of these communications.[58]  Nothing indicates the authenticity of the email attached to Mr. Bonsignore's supplemental filing in support of his clients' objections (Dkt. No. 4144-5).  More substantively, the email itself contains no information regarding Mr. Perriman and his suitability as a

---

[54] The Chunghwa Settlement defines the Settlement Class as "defined by Plaintiffs' operative complaint *at the time this Agreement is presented for preliminary approval*."  (Dkt. No. 884-1, p. 2; emphasis added.)  The operative complaint in March 2011 was the Third Consolidated Amended Complaint (Dkt. No. 827), which alleged a nationwide injunctive relief class and 22 statewide damages classes.  It did not include a Massachusetts claim.

[55] *See* Dkt. Nos. 1063-1 (published Chunghwa detailed notice), and 1063-2 (published Chunghwa summary notice).

[56] *See* Dkt. Nos. 2511 (published LG detailed notice), and 2512 (published LG summary notice).

[57] *See* Dkt. No. 768, p.5-6 (R&R dismissing state law claims were no plaintiff resided); and Dkt. No. 799 (Order adopting R&R).

[58] Alioto Settl. Decl. II ¶ 40.

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN SUPPORT THEREOF - Master File No. CV-07-5944-JST

1    class representative or his claimed television purchase.  For example, at a minimum, class

2    representatives had to have proof of purchase.

3         Further, Lead Counsel's previous experience with Mr. Bonsignore in this case indicated his

4    claims that he represented possible class representatives were unreliable.  At the beginning of this

5    case, Mr. Bonsignore claimed to represent class representatives for Arizona, Massachusetts,

6    Mississippi and Rhode Island.  But when Lead Counsel asked Mr. Bonsignore to provide

7    information from these plaintiffs necessary for initial disclosures, and to complete a questionnaire

8    designed to vet them for inclusion in the consolidated amended complaint, Mr. Bonsignore failed to

9    respond.[59]  As a result, none of these plaintiffs were included in the consolidated amended

10   complaint.  In any event, even if it were true that Mr. Bonsignore had a viable Missouri class

11   representative in 2012, there was nothing to stop Mr. Bonsignore from filing a case on behalf of

12   Missouri.  He failed to do so, thus any Missouri claims are now long time-barred.[60]

13                  **3.    New Hampshire**

14        As with the Missouri claim, IPPs never asserted a New Hampshire claim.  No New

15   Hampshire plaintiff came forward to represent a New Hampshire class, and the law of the case

16   prevented Lead Counsel from asserting a New Hampshire claim without a New Hampshire class

17   representative.  Mr. Bonsignore's claims that he notified Lead Counsel of a viable New Hampshire

18   class representative[61] are highly questionable for the same reasons applicable to his assertion

19   regarding a Missouri representative.  Indeed, the email from Ms. Jorgenson (cited by Mr.

20   Bonsignore) indicates that she did *not* have proof of purchase.  In any event, by the time of these

21   purported emails in March 2012, the 3-year statute of limitations on the New Hampshire's Consumer

22   Protection Act (N.H. Rev. Stat. § 358-A:2) had run.  *See, e.g.,* N.H. Rev. Stat. § 358-A:3.

23

24

25

26   [59] *See* Alioto Settl. Decl. II ¶ 41.

27   [60] *See Boulds v. Chase Auto Finance Corporation*, 266 S.W. 847, 851 (Mo. App. 2008) (five year
     statute of limitation for MMPA claims).

28   [61] *See* Dkt. No. 4144-3.

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

G.     **Weighting Claims According to the Perceived Strength of the States' Laws Would Be Speculative and Contrary to the Evidence**

Objector Clifton, a California resident, argues that the settlements are unfair to class members residing in states with strong consumer protection laws, such as California, because they treat all members of the Indirect Purchaser State Classes equally.  Instead of a distribution to all Indirect Purchaser State Class members on a pro rata basis, he argues that "the settlement fund here should be allocated in a way that tracks the differences in various states' consumer protection and antitrust laws" just as the court did in *In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005).[62]

Several courts have expressly rejected Clifton's "weighting" objection.  In *DRAM*, the court found that "any weighted distribution plan may ultimately turn on subjective views as to the relative merits and relative importance of aspects of the totality of a class member's released claims, and spawn an ancillary round of litigation among class member objectors about who should get how much and on what basis."[63]  Likewise, the Third Circuit in *Sullivan*, handed down after *Relafen*, concluded that neither law nor fundamental fairness mandates a weighted recovery based on perceived strength of state law claims.  *See Sullivan*, 667 F.3d at 327-28.  Like the settlement here, the settlements at issue in *DRAM* and *Sullivan* provided for a pro rata distribution to all class members without distinguishing based on perceived strength of applicable state laws.  *Id*. at 327.[64]

In this case, among the 22 Indirect Purchaser State Classes, there are no "stronger" or "weaker" damages claims.  All damages class members had similar claims under similar statutes that permit indirect purchasers to recover the same or similar damages.  In addition, according to the evidence developed by IPPs, all of these class members were overcharged in the same amount.

---

[62] Clifton Objection at 3-4.  Mr. Clifton also objects to the requested attorney fee award.  The fee objections are addressed in IPPs' Reply Re: Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards for Class Representatives.

[63] *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M-02-1486, 2013 U.S. Dist. LEXIS 188116, at *320-21 (N.D. Cal. Jan. 8, 2013) (summarizing Special Master's Report, Part I).

[64] The remaining authorities cited by objector Clifton are distinguishable.  *In re Heritage Bond Litig.*, 2005 WL 1594403, *In re Bankamerica Corp. Secs. Litig.*, 210 F.R.D. 694 (E.D. Mo. 2002) and *In re Oracle Secs. Litig.*, No. C-90-0931, 1994 WL 502054 (N.D. Cal. 1994) are not antitrust cases.  They are securities cases that appear to have implemented weighted distribution plans tied to evidence that securities purchasers during certain time periods suffered greater injury than others.  Whatever the basis in those cases was for determining that some claims were "stronger" than others, it was not based on the relative strength of the state's *Illinois Brick* repealer statutes.

1    Therefore, weighting their claims according to the perceived strength of the state law claims would

2    be speculative and contrary to the evidence.  And as the *DRAM* court noted, it would likely spawn

3    further litigation among the class members.  Many courts have approved plans of distribution for

4    antitrust settlements that, like here, strive to the maximum extent practicable to treat all class

5    members alike.[65]

6          Clifton also believes that the purported "single damages class claims" are not common or

7    typical and that subclasses should have been used.  (Clifton Objection at 5; *see also* Bonsignore

8    Objection at 3-4.)  But there has never been a "single damages class" in this litigation.  The Court

9    certified 22 statewide damages classes and appointed at least one class representative for each state

10   who represents the interests of similarly situated class members in that state.[66]

11         Further, IPPs are now proposing that the Court certify the same 22 Indirect Purchaser State

12   Classes with the same 22 court-approved class representatives.  As explained in IPPs' motion for

13   preliminary approval, the definitions of the 22 Indirect Purchaser State Classes are very similar to

14   the litigated classes except that class members do not need to be a resident of one of the 22 states;

15   they need only have purchased the CRT Product in that state.  This definition is consistent with the

16   various state laws, since none of them contains a residency requirement, and it has the benefit of

17   allowing more people to receive compensation.  In fact, the Court already certified identical

18   statewide damages classes when it granted final approval to IPPs' settlement with LG.  (*See* Dkt. No.

19   2542.)  Accordingly, Clifton's objections should be rejected.

20

21

22

---

23   [65] *See, e.g., In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, 1999 U.S. Dist.
     LEXIS 12936 (N.D. Ill. Aug. 17, 1999) (approving a *pro rata* distribution in a case involving class

24   member pharmacies of all sizes, ranging from small, independent pharmacies to large chain
     pharmacies, including CVS, Walgreens and Walmart); *In re Airline Ticket Commission Antitrust*

25   *Litig.*, 953 F. Supp. 280, 284-85 (D. Minn. 1997) (proposed *pro rata* distribution plan was "cost-
     effective, simple and fundamentally fair"); *In re Corrugated Container Antitrust Litig.*, 556 F. Supp.

26   1117, 1129 (S.D. Tex. 1982) *aff'd*, 687 F.2d 52 (5th Cir.1982) (approval of class action settlement
     that provided for *pro rata* distribution based upon valid claims of allowable purchases).

27   [66] *See* Order and Report & Recommendation on class certification (Dkt. No. 1950 p.23; Dkt. No.

28   1742 pp.40-47.)  The Nationwide Class for injunctive relief was not included in the order on class
     certification.  *Id.*

---

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

### H.  The Nationwide Class Was Adequately Represented

A number of objectors argue that the Indirect Purchaser State Classes and the Nationwide Class were not adequately represented by the class representatives and IPP Counsel.[67]  The objectors are wrong.

"Adequacy does not require complete identity of claims or interests between the proposed representative and the class.  All that is required—as the phrase 'absence of conflict' suggests—is sufficient similarity of interest such that there is no affirmative antagonism between the representative and the class."  Newberg on Class Actions § 3:58 (5th ed.); *see also Amchem,* 521 U.S. at 594-95 (a class representative "must be part of the class and possess the same interest and suffer the same injury as the class members.").[68]  That is the case here.

The objector in *Nguyen* raised the very same argument of inadequate representation made by objectors here.  The court summarily disposed of the objection:

> At the last minute, the Objector adds a brief argument that class counsel is inadequate under *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 619–22, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).  First, the Court already engaged in this analysis at the certification stage, and counsel did not raise this previously.  Second, the Court finds no basis to deny the settlement on the basis of inadequate representation.  The lead plaintiffs held in-and-out shares, and so had an interest in those shares being compensated. Certainly their interests were not so opposed to render them in conflict

---

[67] Clifton Objection at 5-7; Hull/Morgan Objection at 4-5; Moore Objection at 3-7.

[68] *Amchem* is factually distinguishable, as noted above.  There, the Supreme Court held that a group of plaintiffs who had suffered present injury from their exposure to asbestos could not adequately represent a class that included members who were not presently injured but who might develop exposure-related injuries in the future.  *See* 521 U.S. at 625-27.  The interests of the presently injured plaintiffs were in conflict with exposure-only class members because, in negotiating a settlement with the defendant, the former had an interest in maximizing immediate payouts, while the interests of the latter lay in preserving the largest possible portion of the settlement funds for future claims. *Id.*  Thus, by maximizing their own interests, the putative representatives would necessarily undercut the interests of another portion of the class. *Id.*  Here, the class representatives are all members of both the Indirect Purchaser State Classes and the putative Nationwide Class.  There is no conflict, and the objectors have shown no affirmative antagonism between the class representatives and the nationwide class.  The representatives of the Indirect Purchaser State Classes had an equal interest in pursuing injunctive relief claims while those claims were still viable.  The nationwide class members never had a claim for damages (the claim is for injunctive relief only), thus the economic relief available to the Indirect Purchaser State Classes does not in any way undermine or reduce the claims of the Nationwide Class members.

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN SUPPORT THEREOF - Master File No. CV-07-5944-JST

with any other class members.  The Court finds nothing in the Objector's
arguments that supports reversing the Court's earlier determination.

*Nguyen,* 2014 WL 1802293, at *8.  As in *Nguyen,* the objectors here have never before voiced concerns about the adequacy of Lead Counsel's representation—concerns which in any event are belied by the results obtained for the Class.  And as in *Nguyen,* the interests of the named plaintiffs here were not in conflict with those of the Nationwide Class.  The named plaintiffs are all members of the Nationwide Class and receive no compensation for their release of injunctive claims either; all members of the Nationwide Class are treated equally.[69]

Objector Saik also contends that the settlements' fee provisions create a conflict of interest. (Objection at p.1.)  While the basis of the objection is not entirely clear, she appears to believe that the settling parties have agreed on an amount of attorneys' fees for IPP Counsel; and that the fee provisions in the Proposed Settlements are immune from review by the Court and thus improper. (*Id.* at pp. 4-5.)  Of course, that is not the case.  The parties have merely agreed that Defendants would not oppose an application for "an award of attorneys' fees not in excess of one-third of the Settlement Fund" (*see, e.g.,* Dkt. No. 3862-5, Samsung SDI Settlement Agreement, ¶ 23(a)).  Such provisions are typical in settlement agreements and they appear in the IPP settlements already approved by the Court in this case.[70]  It is for the Court to decide the appropriate amount of the fee award with respect to these Proposed Settlements, and the Court can satisfy itself based on the record in this case that the settlements are fair to the Class.

Finally, objectors contend there is a conflict of interest between Lead Counsel and the members of the putative Nationwide Class who are not being compensated.  Again, these purchasers are not releasing anything of value, and ***all*** class members had the same injunctive relief claims so

---

[69] Objector Clifton's argument that given the claimed differences between the state laws, class representatives could not adequately represent the interests of other state claimants, must be rejected. Objectors in *Relafen* raised the same argument there that intra-class conflicts existed.  *See Relafen,* 231 F.R.D. at 69-70.  But as discussed above, courts have not followed that decision on the question of weighting of state claims.

[70] *See* IPPs' settlement agreements with Chunghwa (Dkt. No. 931-1, at ¶ 23) and with LG (Dkt. No. 1933-1, at ¶ 22), both stating that defendants shall not oppose an application for "an award of attorneys' fees not in excess of one-third of the Settlement Fund."

1   no one in this class is receiving an unfair advantage.  There was no conflict of interest between the

2   Nationwide Class and either the Indirect Purchaser State Classes or Lead Counsel.[71]

3   **I.      The Notice Program Was the Best Notice Practicable Under the
           Circumstances**

4

5       Objectors raise several issues with the notice program, including (1) the age and income

6   profile of recipients (Cooper/Scarpulla, Bonsignore, Moore); (2) notice to foreign residents

7   (Cooper/Scarpulla, Bonsignore, Moore, Hull/Morgan); (3) notice to non-English speakers

8   (Cooper/Scarpulla, Bonsignore); (4) the supposed need for televised notice (Cooper/Scarpulla,

9   Bonsignore, Moore); (5) the sending of direct notice to "only" 10,082,690 unique addresses

10  (Finn/Fortman); and (6) the terms of the notice provided to the nationwide class (Moore, Johnson).

11  Each of these objections lacks merit and should be overruled.

12      Objectors' contentions regarding the reach of the notice program are baseless.  Every notice-

13  related objection is raised in cursory and unsupported fashion – which is not enough.  *See, e.g., In re*

14  *Google Referrer Header Privacy Litig.*, 87 F. Supp. 3d 1122, 1137 (N.D. Cal. 2015) ("objectors to a

15  class action settlement bear the burden of proving any assertions they raise").  More fundamentally,

16  the objectors are wrong to suggest that certain subsets of class members – older individuals, those

17  with lower incomes, non-English speakers, foreign residents, non-Internet users, residents of states

18  excluded from the damage recovery, etc. – somehow were ignored by the notice program.  That is

19  incorrect.  Each category of class members mentioned by Objectors received fair and adequate

20  notice through a host of means, as described in more detail below.

21      Moreover, the bulk of notice-related objections are raised by the Insider Objectors

22  (Scarpulla/Cooper, Bonsignore, Moore) notwithstanding their assent to the previous notice plans

23  approved in connection with the Chunghwa settlement (Dkt. No. 992) and the LG settlement (Dkt.

24  ———————————

25  [71] Certain objectors criticize Lead Counsel for failing to approach attorneys general of these other
    states.  Lead Counsel was appointed to represent the interests of purchasers in the 22 indirect
26  purchaser state classes.  He has no duty to represent purchasers in other states, and the objectors cite
    to no law requiring Lead Counsel to approach state attorneys general with regard to the claims of
27  those states' residents.  Nonetheless, Lead Counsel in fact notified several attorneys general when
    the complaints were filed, and when IPPs entered into settlements with Chunghwa and LG, those
28  Defendants sent notice to all state attorneys general pursuant to the Class Action Fairness Act of
    2005, 28 U.S.C. § 1332(d).  Alioto Settl. Decl. II ¶ 44.

43

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

1   No. 2542).  This is now the *third* and most comprehensive notice issued in the case, and it is

2   revealing that only now, in the context of a collateral dispute over lodestar issues, have the Insiders

3   decided to object.  In any event, the various notice-related arguments are meritless.

4          *First,* lower-income and/or older class members were notified.  Neither group was excluded

5   from the direct notice mailings and, moreover, these individuals read newspapers, magazines, and

6   websites just like everyone else.  *See* Declaration of Joseph M. Fisher Re: Objections to Notice

7   ("Fisher Decl. III") ¶ 5b (various publications included in the notice program have significant low-

8   income readership).  Finally, lower-income and older CRT purchasers were notified extensively by

9   the combination of outreach described above.[72]

10         *Second*, the foreign resident objections lack merit.  To the extent foreign residents were in a

11  position to purchase CRT products in the United States, such individuals are squarely within the

12  scope of the notice efforts.  The Summary Notice, for example, was published as a press release in

13  78 foreign-based media outlets in 15 countries, including Canada and Mexico.  *See* Fisher Decl. III ¶

14  3.  In addition, nonresidents living in border regions – particularly those capable of entering the

15  United States *for purposes of purchasing a television or computer* -  are likely to use the internet just

16  like everyone else, and hence were subject to digital outreach.  Nor have the objectors introduced

17  any "evidence regarding how many of these [foreign resident] persons" exist, *In re Domestic Air*

18  *Transp. Antitrust Litig.*, 148 F.R.D. 297, 335 (N.D. Ga. 1993), and there is no reason to believe they

19  represent a large portion of the class.  In all events, the "notice approved by the Court was provided

20  in places where it was logical to assume, based on class definition and other circumstances, that a

21  significant percentage of class members would reside" – and therefore was reasonable and

22

23  _____

24  [72] Objectors' argument to the contrary rests on their misunderstanding of the notice plan's efforts to
    "target" certain age and income demographics.  *See* Dkt. No. 3863, Fisher Declaration (summarizing
25  age and income data for CRT purchasers and explaining that certain notice efforts would target the
    key demographics, particularly the top 75% of income earners).  The fact that certain notice efforts
26  "targeted" the demographics most likely to include class members – which of course is a sensible
    and recommended approach, see FJC Pocket Guide at 2 – does not mean other groups somehow got
27  short shrift.  As described above, they did not.  The notice program simultaneously directed certain
    efforts at the most likely CRT purchasers while, as a whole, providing fair notice to *all* class
28  members no matter their income, age or other characteristics.  Objectors make no factual showing to
    the contrary.

44

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

1    appropriate under the circumstances.  *Id.  See also* Fisher Decl. III ¶ 3 (claims have been submitted

2    by many foreign residents worldwide, confirming that notice was disseminated effectively abroad).

3    　　　*Third*, efforts were made to notify non-English speaking class members.  A Spanish language

4    version of the Summary Notice was disseminated widely as a press release and was picked up by 81

5    media outlets in the U.S. and abroad.  *Id.* ¶ 5d.  Other outreach included advertisements on Google

6    Spanish, which generated over 33 million impressions across the Google ad-serving network.  *Id.*

7    The settlement website likewise provided notice and claim form documents in Spanish.  *Id.*

8    Moreover, many foreign language speakers residing in the United States are fully or partially

9    bilingual; thus, they were notified in a reasonable way by the English language aspects of the plan.

10   *See, e.g.*, *New York Times*, "More Latinos Consume News in English, Report Finds" (July 23, 2013)

11   ("Eighty two percent of Latino adults surveyed said that at least some of the news they followed in

12   2012 was in English.") (discussing research findings by Pew Hispanic Center).[73]

13   　　　*Fourth*, televised notice was unnecessary given the broad scope of direct, publication, and

14   digital notice.  *See* Fisher Decl. III ¶ 5c.  While the *TFT-LCD* litigation did incorporate televised

15   notice, the *CRT* notice program goes far beyond the *TFT-LCD* program in other key respects,

16   including the direct mail/email program. *Id.* ¶ 6a. *Compare TFT-LCD*, No. 07-cv-1827, Dkt. No.

17   5600-3 (publication and televised notice program without any direct mailings).  The considered

18   judgment of Class Counsel and The Notice Company—reflected in the plan approved by the Court

19   at the preliminary approval stage—was that the costs of televised notice would far outweigh any

20   marginal benefits, and no objector offers any evidence to the contrary.  *See In re Google Referrer*

21   *Header Privacy Litig.*, 87 F. Supp. 3d at 1138 (rejecting objections that "describe alternative ways

22   that notice could have been provided to the class.  It may be true that other methods of notice exist.

23   But here, the court approved one specific plan that satisfied the standard" of Rule 23(c)(2)(B) such

24   that objectors' alternatives were "not required").  *Cf.* American Law Institute, *Principles of the Law*

25

26

---

27   [73] The Scarpulla objection offers no evidence in support of the argument that notice was required in
     Mandarin, Korean, or Japanese print media.  In any event, perfection is not the standard with respect
28   to quibbling of this nature.  *See, e.g., In re Google Referrer Header Privacy Litig.*, 87 F. Supp. 3d at
     1138; Fisher Decl. III ¶ 7g.

1  *of Aggregate Litigation* § 3.04 (Comment) (2015) ("The object is to make notice both effective and

2  reasonable in terms of cost.").

3        *Fifth*, the Finn/Fortman objection notes in passing (at 2) that direct notice was mailed or

4  emailed to "only" 10,082,690 unique addresses.  This figure, however, goes far above and beyond

5  the typical direct mailing in indirect purchaser cases.  Fisher Decl. III ¶ 6a.  *Compare TFT-LCD*,

6  *supra* (publication notice without any direct mailings).  The Finn/Fortman objection does not say

7  what more could or should have been done or otherwise elaborate on this cursory assertion.[74]

8        *Sixth*, the Moore Objection recasts its argument on the nationwide injunctive class release as

9  a notice issue.  The notice, however, clearly explained (1) the class definitions for both the

10  "Statewide Damages Classes" and the "Nationwide Class"; (2) the nature of the "release [of] the

11  injunctive relief claims of consumers . . . [in] the Nationwide Class"; and (3) that "[o]nly members

12  of the Statewide Damages Classes are eligible to receive a payment."  *See* Detailed Notice at 1, 6, 7.

13  There is no notice issue here at all.  What remains is simply Moore's general objection to the

14  nationwide release, an argument to which IPPs respond in Section E, *supra*.

15        Finally, objector Johnson claims she did not understand the notice principally because she is

16  not sure, at this stage, how much money she will receive and how the mechanics of the claims

17  process will work.  That, however, is not the function of the notice.  *In re Online DVD-Rental*

18  *Antitrust Litig.*, 779 F.3d 934, 946 (9th Cir. 2015) (rejecting similar objections).   The point of the

19  notice is to state in plain, concise language the essential information required under Rule

20  23(c)(2)(B), so that class members understand their basic rights and know where to turn for

21  additional information.  *Id.*; *see also* Fed. R. Civ. P. 23(c)(2)(B).  The notice should not, however,

22  include "everything but the kitchen sink" because "excess information" – for example the type of

23  information sought by Johnson – tends to result in "reader burnout . . . and claims are largely

24  deterred."  FJC Checklist, at 5.  The notice in this case met these standards in every respect:

25  conveying essential information in a clear and simple way while directing class members to the

---

[74] To the extent Finn/Fortman's complaint is that "class members in 22 states are not receiving any
notice at all" (at 2), that is factually incorrect.  Notice was provided in every state through a variety
of means. *See* Fisher Decl. III ¶ 6b.

1   settlement website and/or the claims administrator to the extent additional claims-related questions

2   arise.  Indeed, if Johnson still needs help with respect to the claims process, the claims administrator

3   and class counsel are happy to provide it.  The Johnson objection should be overruled.  *In re Online*

4   *DVD-Rental Antitrust Litig.*, 779 F.3d at 946.

5              J.      **The Total Settlement Amount is More than Fair, Reasonable and
                       Adequate**

6

7              Tellingly, only two objectors argue that the total settlement amount is not adequate.  Cooper

8   and Scarpulla weakly suggest that the settlement amounts could have been higher because they claim

9   that Lead Counsel did not begin settlement negotiations with Defendants until after Judge Walker

10  issued his Report and Recommendation "("R&R") proposing that the Court appoint Messrs. Cooper

11  and Scarpulla as co-lead counsel to assist with settlement.[75]  (Dkt. No. 3200.)  They offer no support

12  for this assertion, which is belied by the extraordinary results achieved on behalf of the class.[76]

13  Contrary to their claims, Lead Counsel engaged in settlement negotiations with Defendants

14  throughout the litigation.  At the time of Judge Walker's R&R, Lead Counsel had settled with three

15  Defendants and was actively negotiating with others.  All of the settlement negotiations were hard-

16  fought and conducted before Judge Walker or Judge Fern Smith.  Alioto Settl. Decl. II ¶ 45.

17             Cooper and Scarpulla further argue that Lead Counsel's "unnecessary fight" with the CA AG

18  "*might* have lowered the total amount both received for their Class members."  This argument is

19  meritless.  Lead Counsel was forced to intervene in the CA AG's case because Philips took the

20  position that its settlement with the AG released the claims of California natural persons in this case.

21  Had Lead Counsel not challenged the approval of that settlement, Philips would have had a strong

22  argument at summary judgment that those claims were released.[77]  Lead Counsel's ultimate

23  _____

24  [75] In fact, the Court never adopted this R&R, and the matter never went any further.  *See* Dkt. No.
    3376.

25  [76] With respect to the objectors' aspersions on Lead Counsel's leadership and experience, class
    counsel who performed a significant amount of work in this litigation have filed declarations
26  attesting to the efficient and cohesive management of this litigation.  *See* Compendium of
    Declarations filed herewith.

27  [77] Philips moved for summary judgment on California natural persons' claims, arguing that the
    judgment approving its settlement with the California Attorney General released those claims.  (*See*
28  Dkt. No. 3034.)

1   settlement of $175 million from Philips supports the merits of IPPs' position vis-à-vis Philips,

2   namely that the release of California natural persons' claims for less than $500,000 was not fair,

3   reasonable or adequate.  It cannot seriously be disputed that Lead Counsel's actions preserved the

4   claims of California natural persons and increased the ultimate consideration obtained from Philips.

5          The Moore objectors also argue that the total settlement amount should be evaluated against

6   the treble damages amount.  But courts do not agree with this premise.[78]  IPPs will obtain a

7   tremendous recovery through the Proposed Settlements, not simply in terms of the absolute amount

8   of monies paid by Defendants, but relative to recoveries in other indirect purchaser cases.

9                          **K.   The CA AG's Statement of Interest**

10          The CA AG has filed a "Statement of Interest."  She does not object to the reasonableness of

11   the settlements.  She contends that the settling parties have not disclosed enough information to

12   enable her to assess whether the interests of California natural persons have been satisfied with

13   respect to notice and distribution.  She also argues that a *cy pres* program should be in place to deal

14   with residue funds.

15          IPPs are working with the CA AG to resolve any issues.  In addition, the following should be

16   noted.  First, the Court approved IPPs' proposed notice and distribution program at the preliminary

17   approval stage.  The AG did not raise any concerns at that time.  She also did not object to the notice

18   disseminated regarding the LG settlement or the notice provided in the *LCD* case – the notice

19   program here is more extensive than both of these other notice programs.   The AG also fails to

20   articulate exactly what was wrong with the notice here, save for a vague concern as to whether

21   California purchasers would have a sufficient opportunity to claim monies relative to non-

22   Californians.

23          Second, to the extent the CA AG raises a "weighting" argument (*See* Dkt. No. 4118 at p.3), it

24   should be rejected.  *See supra*, Section G.  And regarding her suggestion that some of the settlement

25   _____

26   [78] *See Rodriguez v. West Publishing Corp.,* 563 F.3d 948, 964 (9th Cir.2009) (rejecting objector's argument that consideration of only single damages was legal error); *see also, e.g., City of Detroit v.*

27   *Grinnell Corp.,* 495 F.2d 448, 458–59 (2d Cir.1974) ("[T]he vast majority of courts which have approved settlements . . . have given their approval . . . based on an estimate of single damages

28   only."), *overruled on other grounds as recognized by U.S. Football League v. Nat'l Football League,* 887 F.2d 408, 415–16 (2d Cir.1989).

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST

monies be distributed *cy pres*, IPPs plan to distribute all net settlement funds directly to class members, as was done in *LCD*.  Thus, IPPs are not contemplating any *cy pres* distribution in this case.

Finally, the CA AG is on record stating that she is not seeking to recover individual damages in her related *parens patriae* action against Philips.  Alioto Settl. Decl. II ¶ 48, Ex. G.  Accordingly, the CA AG's interests in notice and distribution issues with respect to California consumers are limited, particularly as Lead Counsel already has a fiduciary duty to zealously guard the interests of class members.  *See Radcliffe v. Experian Information Solutions, Inc.,* 715 F.3d 1157, 1167 (9th Cir. 2013) ("Class counsel has a fiduciary duty to the class as a whole").

### L.    Unsatisfied Objectors Could Have Opted Out

With respect to all these objections, it bears mention that members of a proposed settlement class who are unhappy with the settlement terms have a remedy—they may opt out.  Courts consistently recognize the value of this option.  *See, e.g., Eisen v. Porsche Cars N. Am., Inc.*, No. 2:11-CV-09405-CAS, 2014 WL 43900, at *7 (C.D. Cal. Jan. 30, 2014), *appeal dismissed* (Sept. 22, 2014) ("In any event, class members could have opted out if they objected to the benefits offered by the settlement.  [Internal citation omitted.]  Federal courts routinely hold that the opt-out remedy is sufficient to protect class members who are unhappy with the negotiated class action settlement terms.") (citing cases).[79]

Objectors unhappy with the terms of the Proposed Settlements had the opportunity to opt out, but chose not to do so.

### **CONCLUSION**

Based on the foregoing, IPPs respectfully request that the Court:  (1) grant final approval of the seven proposed settlements; (2) certify the proposed Settlement Class; (3) grant final approval of

---

[79] *See also, e.g., Milligan v. Toyota,* No. 3:09–cv–05418–RS, slip op. at 13 (N.D. Cal. Jan. 6, 2012) (overruling multiple objections to a class action settlement, noting that objectors "could have simply opted out"); *Klee v. Nissan N. Am., Inc.*, No. CV-12-08238, 2015 WL 4538426, at *8 (C.D. Cal. July 7, 2015) (*appeal filed*) ("Moreover, to the extent that class members were unsatisfied with the settlement, they were provided the opportunity to opt out if they desired to seek greater compensation.  *Eisen,* 2014 WL 439006, at *7.  As a result, the court finds that the amount of the settlement weighs in favor of approval.").

49

1    the proposed plan of distribution and the proposed claim form; (4) and enter judgment against the

2    Settling Defendants.

3    Dated:  November 19, 2015

4                                              Respectfully submitted,

5                                              /s/ Mario N. Alioto

6                                              Mario N. Alioto (56433)
                                               malioto@tatp.com
7                                              Joseph M. Patane (72202)
                                               jpatane@tatp.com
8                                              Lauren C. Capurro (241151)
                                               laurenrussell@tatp.com
9                                              TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
                                               2280 Union Street
10                                             San Francisco, CA 94123
                                               Telephone: 415-563-7200
11                                             Facsimile: 415-346-0679

12                                             Lead Counsel for Indirect Purchaser Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INDIRECT PURCHASER PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENTS; MPA IN
SUPPORT THEREOF - Master File No. CV-07-5944-JST