# DECLARATION OF JOSEPH M. FISHER

# EXHIBIT N

**The New York Times**
620 8TH AVENUE • NEW YORK, NY 10018

B5

## CERTIFICATION OF PUBLICATION

AUG 0 6 2015          20 ___

I, _Alice Weber_ , in my capacity as a Principal Clerk of the Publisher of **The New York Times** a daily newspaper of general circulation printed and published in the City, County and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of **The New York Times** on the following date or dates, to wit on

_____

_____

AUG 0 2 2015          20 ___

_[signature]_

Approved:

_Maria Pannullo_

THIS CERTIFICATION NOT VALID WITHOUT NYT RAISED SEAL

---

**LEGAL NOTICE**

### You Bought Televisions, Computer Monitors or Other Products Containing Cathode Ray Tubes

### Money from $576.75 Million Settlements

### Simple Online Claim Form

**Class action settlements** have been reached involving Cathode Ray Tubes ("CRTs"), a display device that was sold by itself or as the main component in TVs and computer monitors. The lawsuit claims that the Defendants fixed the prices of CRTs causing consumers to pay more for CRTs and products containing CRTs, such as TVs and computer monitors (collectively "CRT Products"). The Defendants deny Plaintiffs' allegations.

**Who is included in the Settlements?**
Individuals and businesses that:
- Purchased a CRT or a product containing a CRT, such as a TV or computer monitor, in the United States (except Illinois, Washington and Oregon) between March 1, 1995, and November 25, 2007;
- For their own use and not for resale.

Purchases made directly from a defendant or alleged co-conspirator are not included (see the list of defendants and alleged co-conspirators at www.CRTclaims.com or by calling 1-800-649-0963).

**What do the Settlements provide?**
There are seven new Settlements totaling $541.75 million. Together with the two previously-approved settlements, the Settlement Fund is $576.75 million. Only individuals and businesses who purchased CRT Products in AZ, CA, FL, HI, IA, KS, ME, MI, MN, MS, NE, NV, NM, NY, NC, ND, SD, TN, VT, WV, WI, or the District of Columbia, are eligible to file a claim for money. HI, NE and NV have shorter claims periods. The purchase must have been made in one of the foregoing states, but you do not have to be a resident of one of these states. The Settlements release the injunctive relief claims of purchasers of CRT Products nationwide.

The amount of money you will receive depends on the type and quantity of CRT Products you purchased and the total number of claims made. Eligible individuals and businesses are expected to get a minimum payment of $25. Large purchasers could recover many thousands of dollars.

**How can I get a payment?**
Claim online or by mail by **December 7, 2015**. The simple online Claim Form only takes 3-5 minutes for most individuals.

**What are my rights?**
If you do nothing you will be bound by the Court's decisions. If you want to keep your right to sue the Defendants, you must exclude yourself from the Settlement Class by **October 8, 2015**. If you stay in the Settlement Class, you may object to the Settlements by **October 8, 2015**.

The Court will hold a hearing on **November 13, 2015 at 10:00**

**FAIR GAME** | GRETCHEN MORGENSON

# A Slack Lifeline for Homeowners

CONTINUED FROM PAGE 1

America, said that two-thirds of the applications made under the Treasury program did not qualify, but "in the end, 83 percent of more than one million customers whose HAMP applications were reviewed by Bank of America — five out of six — avoided foreclosure through either a modification or another solution."

But Ms. Romero, whose title is special inspector general of the Troubled Asset Relief Program, said the high rejection rates her office found pointed to problems at the banks, not with borrowers.

"We've always known that a lot of people were being denied for loan modifications," Ms. Romero said. "When we started looking at these numbers — 80 percent or more at the larger servicers — it's so telling that something is not right in these operations."

As the report noted, Treasury has a responsibility to ensure that the banks involved in the program are not wrongfully rejecting homeowners for a modification. But that's not happening, Ms. Romero said.

"We are constantly seeing problems with the way servicers are treating homeowners and not following the rules," Ms. Romero said in an interview on Wednesday. "I don't understand why there hasn't been a stronger policing from Treasury on servicers."

In response to the report, Mark McArdle, chief of Treasury's Homeownership Preservation Office, said the agency had "robust compliance procedures" to test whether banks were improperly denying loan modification applicants. That process, he said, indicates that improper rejections are uncommon. In a statement, he added, "Since 2011, we have seen significant improvement in servicers' compliance with program guidelines, including proper evaluation and denial decisions."

Ms. Romero doesn't buy the notion that improper rejections are rare. And neither do legal aid lawyers representing troubled borrowers. On the front lines in the foreclosure process, the lawyers say they've seen all manner of bad behavior from the banks on loan modifications.

"Virtually never does one get a loan-mod application properly evaluated the first time," said Jacob Inwald, director of foreclosure prevention at Legal Services NYC, which provides legal representation to troubled borrowers. "We deal with these issues every single day. It requires constant pushback and challenging wrongful denials."

He said he was swamped with such cases. It took him about two minutes to locate and send me court documents showing the abusive tactics seven borrowers in New York recently faced trying to get a loan modification under the Treasury program. He says these cases are just a small sample demonstrating that the banks are not complying with the rules.

*Participating banks have rejected 72% of borrowers' applications since the process began.*

It is never wise to exclude incompetence as a reason for the trouble that borrowers may be having with loan modifications. But Mr. Inwald said there could be a financial motivation as well. Delaying a borrower's loan modification request can be profitable for a bank; extra time for the bank means more interest and fees can be charged to the borrower, increasing the amount owed on the mortgage.

In a case last year involving America's Servicing Company, a unit of Wells Fargo, the bank improperly denied a borrower's loan modification request four times over almost two years, adding $40,000 to the amount he owed, New York State court documents show.

At one point, the bank claimed that the borrower did not live in the home that was facing foreclosure, which was untrue. At another, it incorrectly calculated the borrower's income and denied the loan modification.

The bank's conduct "evinces a disregard for the settlement negotiation process that delayed and prevented any possible resolution of the action and, among other consequences, substantially increased the balance owed" by the borrower, the appellate court ruled. It barred the bank from recovering the $40,000 incurred during the protracted modification process.

Tom Goyda, a Wells Fargo spokesman, said the New York court case "does not reflect the experience of the vast majority of the Wells Fargo customers who remain in their homes today as the result of a mortgage modification."

Ms. Circe's efforts to modify her loan took a number of twists and turns. A year after she applied for the modification, in October 2013, Bank of America denied her application, saying "all borrowers are unemployed," even though Ms. Circe's Social Security disability insurance and rental income on the house were more than enough to support a modified payment.

Jessica Radbord, her lawyer at Vermont Legal Aid in Burlington, kept battling on her behalf.

Finally, in April, Bank of America agreed to modify Ms. Circe's loan.

"It's kind of stunning when they come back with all these strange reasons for denials," Ms. Radbord said. "What really bothers me is, how on earth would a homeowner be able do this on their own?"

Homeowners wouldn't be, and the government isn't helping them much. That goes a long way toward explaining how a program intended to help four million troubled borrowers instead gave them the boot.

---

MATTHEW RYAN WILLIAMS FOR THE NEW YORK TIMES
Maisey McMaster quit Gravity, saying the salary was unfair to more experienced workers.

could make an enormous difference in someone's emotional well-being by easing nagging financial stress.

He might have also considered the parable of the workers in the vineyard from the Gospel of St. Matthew, where the laborers hired at sunup were upset that their pay was the same as those who showed up right before quitting time. Early adopters and latecomers may be equally welcomed in the Kingdom of Heaven, but not necessarily in the earthly realm, where rewards are generally bestowed in paycheck form.

As for the raw feelings of friends or staff members, Mr. Price readily admits that he can be contentious, even censorious. A disagreement often comes across as a personal attack. "It's just as painful for me as anyone else," he said.

Mr. Price, who extolled Ms. McMaster's talents, said he didn't think she, Mr. Moran or even Rush Limbaugh was wrong. "There's no perfect way to do this and no way to handle complex workplace issues that doesn't have any downsides or tradeoffs," he said. When other entrepreneurs suggested that stock options or profit-sharing would have been a better approach, he said that's the way capitalism works: Everyone tries to invent the best mousetrap. "I came up with the best solution I could."

And the publicity surrounding it has generated tangible benefits. Three months before the announcement, the firm had been adding 200 clients a month. In June, 350 signed up.

That new business won't start paying off for 12 to 18 months, however, Mr. Price said, and in the meantime, he is contending with the lawsuit brought by his brother. Lucas Price owns about 30 percent of their company, although he has not actively been involved in day-to-day operations for several years. There had been tensions between the two long before the new pay plan, and Lucas is demanding that Dan buy him out for an unspecified amount, plus damages.

Lucas, who lives in Seattle, declined to be interviewed but wrote in an email: "Dan has taken millions of dollars out of the company for himself while denying me the benefits of the ownership of my shares, and otherwise favoring his own interests as the majority shareholder over my interests." He said his complaints predated the pay raises.

Even so, they clearly are critical to the outcome. With profits, at least in the short term, shifted to salaries, there is little left over to buy out his brother, let alone pay the legal bills or make longer-term capital

**A lawsuit by the C.E.O.'s brother has the company scrambling for legal fees.**

improvements in the company, Dan said.

Flabbergasted when the suit arrived, Dan said he was puzzled by the accusations, saying that Lucas agreed to his $1.1 million salary and bonus package, instituted for 2012.

Family fighting over a business can be ugly and is often about more than just money. Dan conceded he may have previously given short shrift to Lucas's contributions. "Who knows if I would have had the opportunity to build the company without him helping me out in the first couple of years?" he said.

Lucas was the best man at his wedding, and the two, close friends, often hiked, surfed and attended ballgames together. By the end, "being in business together was the worst thing for our relationship," Dan said. After the lawsuit was filed, he said he called the rest of his family and told them to offer "unconditional love and support" to both Lucas and him. (Their younger brother Alex, 23, also works at the company.)

While it is upsetting to see two of his sons at odds, Ron Price said, "their mother and me don't lose sleep over it. I think they'll get it sorted out."

Dan Price, who estimated his current net worth, including his home, at about $3 million, said he had offered to "give up everything I have personally and everything I'll have for years to come." A court date has been set for May.

FOR NOW, at least, Mr. Price has undoubtedly made an immediate difference in the lives of many of his employees. José Garcia, 30, who supervises an equipment team, was able to afford to move into the city and replace the worn tires on his car. Ms. Ortiz, who was briefly homeless as a child, can now visit her family in Burlington, Vt. Cody Boorman, 22, who handles operations out of his eastern Washington home, said he and his wife finally felt financially secure enough to start a family.

There have been other ripples. Mario Zahariev, who runs Pop's Pizza & Pasta, switched to Gravity after seeing Mr. Price on the news. When he learned his monthly processing fees would drop to $900 from $1,700, Mr. Zahariev decided, "I was not going to keep the difference for myself." He used the savings to raise the salaries of his eight employees.

Pop's Pizza aside, Mr. Price's plan is not easily replicated, said Nick Hanauer, a Seattle venture capitalist and an early promoter of the city's $15 minimum wage law. Still, he noted, "These individual acts can create a new kind of perception of what's possible and what's righteous." After all, he said, two years ago, no one would ever have guessed higher minimum wage laws would be catching fire in cities around the country. "Who can tell what that last thing is that catalyzes big change?"

In that sense, Mr. Price's foray into the public debate on wages is not unlike his newfound passion of wake surfing. Cruising atop the curl of a wave created by a motorboat isn't easy. Lean too far ahead of the swell or drift behind it and you wipe out. For the moment, he is balancing on the crest, enjoying the ride and doing his best to keep from falling off.

---

LEGAL NOTICE

**If You Bought Televisions, Computer Monitors or Other Products Containing Cathode Ray Tubes Get Money from $576.75 *Million* in Settlements**

**Simple Online Claim Form Takes 3-5 Minutes**

**Class action settlements** have been reached involving Cathode Ray Tubes ("CRTs"), a display device that was sold by itself or as the main component in TVs and computer monitors. The lawsuit claims that the Defendants fixed the prices of CRTs causing consumers to pay more for CRTs and products containing CRTs, such as TVs and computer monitors (collectively "CRT Products"). The Defendants deny Plaintiffs' allegations.

**Who is included in the Settlements?**
Individuals and businesses that:
- Purchased a CRT or a product containing a CRT, such as a TV or computer monitor, in the United States (except Illinois, Washington and Oregon) between March 1, 1995, and November 25, 2007;
- For their own use and not for resale.

Purchases made directly from a defendant or alleged co-conspirator are not included (see the list of defendants and alleged co-conspirators at **www.CRTclaims.com** or by calling 1-800-649-0963).

**What do the Settlements provide?**
There are seven new Settlements totaling $541.75 million. Together with the two previously-approved settlements, the Settlement Fund is $576.75 million. Only individuals and businesses who purchased CRT Products in AZ, CA, FL, HI, IA, KS, ME, MI, MN, MS, NE, NV, NM, NY, NC, ND, SD, TN, UT, WV, WI, or the District of Columbia, are eligible to file a claim for money. HI, NE and NV have shorter claims periods. The purchase must have been made in one of the foregoing states, but you do not have to be a resident of one of these states. The Settlements release the injunctive relief claims of purchasers of CRT Products nationwide.

The amount of money you will receive depends on the type and quantity of CRT Products you purchased and the total number of claims made. Eligible individuals and businesses are expected to get a minimum payment of $25. Large purchasers could recover many thousands of dollars.

**How can I get a payment?**
Claim online or by mail by **December 7, 2015**. The simple online Claim Form only takes 3-5 minutes for most individuals.

**What are my rights?**
If you do nothing you will be bound by the Court's decisions. If you want to keep your right to sue the Defendants, you must exclude yourself from the Settlement Class by **October 8, 2015**. If you stay in the Settlement Class, you may object to the Settlements by **October 8, 2015**.

The Court will hold a hearing on **November 13, 2015 at 10:00 a.m.** to consider whether to approve the Settlements and a request for attorneys' fees plus reimbursement of litigation expenses and awards to Class Representatives. The total attorney fee request for all Plaintiffs' counsel shall not exceed one-third of the $576.75 million Settlement Fund. The hearing date may change so please check the website. You or your own lawyer may appear and speak at the hearing at your own expense.

**For more Information:**
1-800-649-0963
www.CRTclaims.com
Text: "CRTclaims" to 97000 (text messaging rates may apply)
PLEASE DO NOT CONTACT THE COURT