Mario N. Alioto (56433)
Joseph M. Patane (72202)
Lauren C. Capurro (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123
Telephone: 415-563-7200
Facsimile: 415- 346-0679
Email: malioto@tatp.com
jpatane@tatp.com
laurenrussell@tatp.com

*Lead Counsel for the*
*Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. CV-07-5944-JST |
| | MDL No. 1917 |
| This Document Relates to: | **INDIRECT PURCHASER PLAINTIFFS' REPLY RE: MOTION FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS TO CLASS REPRESENTATIVES** |
| All Indirect Purchaser Actions | |
| | Hearing Date:  March 15, 2016 |
| | Time: 2:00 p.m. |
| | Judge: Honorable Jon S. Tigar |
| | Court: Courtroom 9, 19th Floor |
| | Before: Special Master Martin Quinn, JAMS |

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.   THE COURT SHOULD OVERRULE THE OBJECTIONS TO THE FEE REQUEST ......... 3

    A.   The Requested Fee Percentage and Lodestar Multiplier Are Reasonable and
        Appropriate ................................................................................................. 3

        1.   Objectors Misapprehend the Law ................................................. 4

        2.   Extensive Authority Supports the Requested Award ......................... 6

    B.   Objectors Misapprehend the Role of Government and Other Proceedings ................ 9

        1.   The DOJ Criminal Prosecution Was Limited ................................... 9

        2.   Neither the European Commission Nor the *Vichi* Case Materially
            Advanced the IPP Claims ........................................................ 12

    C.   IPP Counsel's Lodestar Is Reasonable ............................................................. 15

        1.   The Number of Law Firms Was Reasonable Given the 40 Named
            Plaintiffs Representing 22 States ................................................ 15

        2.   183,000 hours is Not "Grossly Excessive" Given the Complexity of this
            Case, the Number of Parties, and its Eight-Year Duration ..................... 16

        3.   The Hourly Rates are Reasonable ............................................... 18

        4.   Objectors' Criticism of Richard Pearl is Baseless ............................ 20

        5.   Billing Contract Attorneys at Market Rates is Legal, Ethical, and
            Appropriate. ........................................................................ 20

        6.   Additional Counsel Were Enlisted for Trial, Delivering Substantial
            Benefits to the Class .............................................................. 22

        7.   Time Spent on the CRT Finished Product Conspiracy Claims Benefitted
            the Class ............................................................................ 23

        8.   The Cooper/Scarpulla Lodestar Objections Are Meritless ................... 24

        9.   Bonsignore's Description of Lead Counsel's Timekeeping Practices and
            Other Inflammatory Statements are Demonstrably False ....................... 25

        10.  Time Record Discovery Is Unnecessary and Should be Denied ............. 26

    D.   The Cooper/Scarpulla Fee Allocation Proposal is Premature, and Wrong in
        Substance .............................................................................................. 27

i

III.      THERE ARE NO OBJECTIONS TO THE AMOUNT OF EXPENSES OR INCENTIVE AWARDS ....................................................................................29

IV.      CONCLUSION ...........................................................................................29

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-JST

# TABLE OF AUTHORITIES

<u>Cases</u>

*Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) ............................. 7

*Boeing Co. v. Van Gamert*, 444 U.S. 472 (1980) ............................................................. 1

*Carlson v. Xerox Corp.,* 596 F. Supp. 2d 400 (D. Conn. 2009) ........................................ 22

*Comcast Corp. v. Behrend,* 133 S.Ct. 1426 (2013) ......................................................... 12

*Craft v. County of San Bernardino*, 624 F.Supp.2d 1113 (C.D. Cal. 2008) ...................... 19

*F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223, 186 L. Ed. 2d 343 (2013) ................................ 16

*Fischel v. Equitable Life Assur. Soc'y of U.S.*, 307 F.3d 997 (9th Cir. 2002) ................... 19

*Florin v. Nationsbank of Georgia, N.A.*, 60 F.3d 1245 (7th Cir. 1995) ............................. 8

*Fox v. Vice*, 131 S.Ct. 2205 (2011) ........................................................................ 26, 27

*Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000) ........................... 27

*Gutierrez v. Wells Fargo Bank, N.A.*, No. 07-cv-05923-WHA, 2015 WL 2438274
    (N.D. Cal. May 21, 2015) ......................................................................... 4, 8, 19

*In re Activision Securities Litig.*, 723 F. Supp. 1373 (N.D. Cal. 1989), ......................... 27

*In re Amino Acid Lysine Antitrust Litig.*, 918 F. Supp. 1190 (N.D. Ill. 1996) ................... 6

*In re Automotive Refinishing Paint Antitrust Litig.*, No. MDL 1426, 2008 WL 63269
    (E.D. Pa. Jan. 3, 2008) .................................................................................. 28

*In re Bluetooth Headset Prods. Liability Litig.*, 654 F.3d 935 (9th Cir. 2010) ................... 4

*In re Cardinal Health Inc. Sec. Litig.,* 528 F. Supp. 752 (S.D. Ohio 2007) ..................... 12

*In re Cendant Corp. Prides Litig.*, 243 F.3d 722 (3d Cir. 2001) ................................... 4,12

*In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011) ............ 5,7

*In re Coordinated Pretrial Proceedings in Petroleum Products*, 109 F.3d 602 (9th Cir. 1997) ....... 23

*In re Currency Conversion Antitrust Litig.*, 263 F.R.D. 110 (S.D.N.Y. 2009) ................... 17

*In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) ...... 21, 22

*In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA, 2010 WL 2332081
    (N.D. Cal. June 9, 2010) ................................................................................. 12

*In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739 (E.D. Pa. 2013) ............................... 7

*In re Genetically Modified Rice Litig.*, 764 F.3d 864 (8th Cir. 2014) ............................. 26

iii

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF
LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-JST

*In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478 (N.D. Cal. 2008) .......................12

*In re High Tech. Employees Antitrust Litig.*, Case No. 11–CV–02509–LHK, 2015 WL 5158730
     (N.D. Cal. Sept. 2, 2015) ...........................................................................................................passim

*In Re IDB Communication Group, Inc., Sec. Litig.*, No. 94–3618 (C.D. Cal. Jan. 17, 1997) ..........19

*In re Initial Pub. Off. Sec. Litig.*, 671 F. Supp. 2d 467 (S.D.N.Y. 2009) ...........................................7

*In re Linerboard Antitrust Litig.*, MDL No. 1261, 2004 WL 1221350 (E.D. Pa. June 2, 2004)........9

*In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-02420 YGR, 2013 WL 2237887
     (N.D. Cal. May 21, 2013) ..................................................................................................................16

*In re NASDAQ Market Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) ..........................10

*In re Omnivision Technologies*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008 ........................................4,27

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934 (9th Cir. 2015) .................................1,3,4,5

*In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311 (N.D. Cal. 2014) ....................................12

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 991 F. Supp. 2d 437
     (E.D.N.Y. 2014)....................................................................................................................................7

*In re Processed Egg Products Antitrust Litigation*, No. 08-2002, 2015 WL 5544524
     (E.D. Pa. Sept. 18, 2015) ...................................................................................................................12

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d at 283 (3d. Cir. 1998).............12,19

*In re Quintus Securities Litig.*, 148 F. Supp. 2d 967 (N.D. Cal. 2001) ..............................................6

*In re Rite Aid Corp. Secs. Litig.*, 396 F.3d 294 (3d Cir. 2005)......................................................5, 27

*In re Skelaxin Antitrust Litig.*, 2014 WL 2946459 (E.D. Tenn. Jun. 30, 2014)...................................7

*In re Southeastern Milk Antitrust Litig.*, No. 2:08–MD–1000, 2013 WL 2155387
     (E.D. Tenn. May 17, 2013) ...............................................................................................................7, 9

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-md-01827-SI, 2013 WL 1365900
     (N.D. Cal. April 3, 2013).................................................................................................................passim

*In re Titanium Dioxide Antitrust Litig.*, 10–CV–00318(RDB), 2013 WL 6577029
     (D. Md. Dec. 13, 2013) .........................................................................................................................7

*In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-00340, Dkt. No. 543 (D. Del. 2009)........7

*In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249 (D.N.H. 2007) ...............................21

*In re Vitamins Antitrust Litig.*, No. Misc. 99-197 (TFH), 2001 WL 34312839
     (D.D.C. July 16, 2001)...........................................................................................................................7

*In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516 (3d Cir. 2004)...............................................28

iv

*In re: Dynamic Random Access Memory (DRAM) Antitrust Litig.*, Case No. 4:02-md-01486-PJH, Dkt. No. 2183 (N.D. Cal 2014) ................................................................................. 15

*In re: Static Random Access Memory (SRAM) Antitrust Litig.*, MDL No. 1819 (N.D. Cal) ............ 15

*Lobatz v. U.S. W. Cellular of California, Inc.*, 222 F.3d 1142 (9th Cir. 2000) ................................. 26

*Maley v. Del Global Technologies Corp.*, 186 F.Supp.2d 358 (S.D.N.Y. 2002) .............................. 19

*Margolin v. Regional Planning Com.*, 134 Cal. App. 3d 999, 1004-1005 (1982) ............................. 22

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) .............................. 9

*Shaffer v. Superior Court*, 33 Cal. App. 4th 993 (1995) ................................................................... 22

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. 03-4578, 2005 WL 1213926 (E.D. Pa. May 19, 2005) ...................................................................................................... 8

*Syverson v. International Business Machines, Corp.*, 472 F.3d 1072, l078 (9th Cir. 2006) ............. 14

*Panasonic Corp. and MT Picture Display v. Commission,* Case T-82/13 (EU:T:2015:612) ............ 13

*Toshiba Corp. v. Commission,* Case T-104/13 (EU:T:2015:610) ..................................................... 13

*Third Circuit Task Force on the Selection of Class Counsel,* 208 F.R.D. 340 (2002) ........................ 6

*Van Vranken v. Atlantic Richfield Co.*, 901 F.Supp. 294 (N.D. Cal. 1995) ...................................... 19

*Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725 (Del. Ch. 2014) .................................... 13, 14

*Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002 .................................................... passim

*Wal-Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541 (201102 ................................................................ 12

*Walmart Stores, Inc. v. Visa U.S.A.*, 396 F.3d 96 (2d Cir. 2005) ....................................................... 8

Rules

Fed. R. Civ. P. 23(h) .......................................................................................................................... 1

Other Authorities

Alba Conte and Herbert B. Newberg, *Newberg on Class Actions* (4th ed. 2009) .............................. 4

Alba Conte and Herbert B. Newberg, *Newberg on Class Actions* (5th ed. 2011) .............................. 5

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) ("Fitzpatrick") .................................................................. 5

Communication from the Commission — Guidelines on the Applicability of Article 101 of the Treaty on the Functioning of the European Union to Horizontal Cooperation Agreements, OJ C 11, 14.1.2011 ........................................................................................................................... 13

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-JST

Kathryn M. Fenton, *Use of Temporary or Contract Attorneys.* 13–FALL Antitrust 23 (1998)........22

Legal Ethics, Law. Deskbk. Prof. Resp. (2015-2016 ed.) ................................................21

Manual for Complex Litigation, Fourth (2004)........................................17

Ronald W. Davis, Amchem and Antitrust: *Have the Ground Rules for Antitrust Class Actions Changed?*, 12 Antitrust 39 (Fall 1997)........................................12

Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248 (2010) ("Eisenberg") ................................5

IIA Areeda et al., Antitrust Law (3d ed. 2006)........................................12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-JST

1   **I.     INTRODUCTION**

2          Indirect Purchaser Plaintiffs ("IPPs") submit this reply in support of their motion for

3   attorneys' fees, reimbursement of litigation expenses and incentive awards for class representatives

4   (Dkt. No. 4107) ("Fee Motion"), and in response to the objections to the requested attorneys' fees.[1]

5          This is a case in which (1) there were enormous risks to IPPs' Counsel, (2) the protracted,

6   eight-year case was characterized by nearly constant and intensive litigation with a battalion of some

7   of the most experienced antitrust defense counsel in the country, but notwithstanding (3) IPP

8   Counsel obtained an outstanding recovery – one of the largest in indirect purchaser litigation – that

9   provides real benefit to the class.  In these circumstances, IPP Counsel's fee request is reasonable

10  and well-supported by the Ninth Circuit law and other precedent.

11         The Supreme Court "has recognized consistently that a [lawyer] who recovers a common

12  fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's

13  fee from the fund as a whole."  *Boeing Co. v. Van Gamert*, 444 U.S. 472, 478 (1980).  *See also* Fed.

14  R. Civ. P. 23(h) (authorizing reasonable fee award).  To assess the reasonableness of a fee award,

15  courts in this Circuit consider the totality of the circumstances, including the work done, risks borne,

16  and results achieved for the class.  *See In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954-

17  55 (9th Cir. 2015).

18         All of these factors—and more—support the reasonableness of the fee request.  The $576.75

19  million recovery is one of the largest in the history of indirect purchaser litigation.  More than 4,000

20  docket entries highlight the years of work that led to this result, from dispositive motions to

21  worldwide discovery, class certification, FTAIA challenges, summary judgment, trial preparation,

22  settlement negotiations, and more.  IPPs' claims were opposed at every turn by the most

23  sophisticated (and well-compensated) defense lawyers in the country, making the case unusually

24  protracted, risky, and expensive.  IPP Counsel in turn committed almost $2.5 million and tens of

25

26

---

27  [1] Notice was provided in accordance with the Preliminary Approval Order.  Class members were
    clearly informed that IPP Counsel would move for an award of attorneys' fees of up to one-third of

28  the Settlement Fund.  The Fee Motion was also posted on the website more than 14 days before
    objections were due.  Supplemental Declaration of Mario N. Alioto in Support of Indirect Purchaser

---

1

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF
LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-JST

millions of dollars of professional time to prosecute the claims, all on contingency.  The time and

money advanced on class members' behalf, without any guarantee of a return, was at risk for many

years.  In these circumstances, the proposed one-third fee award—representing a reasonable 2.3

multiplier on IPP Counsel's time—is fair and appropriate compensation for the work done and

results achieved.

Only nine objections to the attorney fee request were filed by a total of ten objectors, out of

millions of indirect purchaser class members.[2]  Seven of the objections were filed by "serial" or

"professional" class-action objectors who file boilerplate objections and subsequent appeals in order

to extract a pay-off to drop the appeals.[3]  Another of the objections was filed by two attorneys from

this case, whose motivations are similarly suspect.[4]  And IPP Counsel believes the final objection

(Williams) was filed at the behest of another attorney from this case who has objected to the

Proposed Settlements.[5]

None of the objections has merit.  First, objectors misapprehend the law on attorneys' fees

with their argument that percentage fees must be lower in cases involving large recoveries.  No such

rule exists.  Instead, district courts enjoy considerable discretion to award fees based on all the

circumstances, including, as described below, case-specific risks, results, complexity, duration,

---

Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive
Awards for Class Representatives ("Alioto Fee Decl. II") ¶ 2.

[2] Objections were filed by Donnie Clifton (Dkt. No. 4099); Sean Hull, Gordon Morgan (Dkt. No.
4101); Douglas St. John (Dkt. No. 4106); John Finn, Laura Townsend Fortman (Dkt. No. 4111);
Dan L. Williams & Co. (Dkt. No. 4112); Francis Scarpulla and Josef Cooper (Dkt. No. 4115); Paul
Palmer (Dkt. No. 4120); Josie Saik (Dkt. No. 4140-3); and Elizabeth Johnson (Dkt. No. 4128).

[3] Attorneys Miller, Kress, Fortman, Bandas, Hanigan, Palmer, Thompson, Westfall, Cochran and St.
John routinely represent objectors challenging class action settlements by filing canned objections.
*See* IPPs' Mot. For Final Approval of Class Action Settlements with Defendants ("Final App. Mot.")
and Additional Declaration of Robert J. Gralewski in Support of IPPs' Mot. for Final Approval of
Class Action Settlements with Defendants, and Appendices A through N.  Mr. Palmer has already
moved to withdraw his objection (Dkt. No. 4130), and Messrs. Bandas and Hanigan have moved to
withdraw the objection of one of their clients, Gordon Morgan (Dkt. No. 4165).

[4] *See further* Final App. Mot.; Declaration of Mario N. Alioto in Support of Indirect Purchaser
Plaintiffs' Motion for Final Approval of Settlements ("Alioto Settl. Decl. II.").

[5] Objector Williams' counsel, Paul Justi, is acquainted with Theresa Moore, who is counsel of record
in this case and has objected to the Proposed Settlements.  Mr. Justi and Ms. Moore have been co-
counsel on several cases.  *Id.*

\\

2

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF
LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-JST

1    resources expended, quality of representation, awards in similar matters, and other relevant factors.

2    *See* Section II.A, *infra*.  Whether the litigation involves a "megafund" recovery or not, the fee award

3    should neither grant a windfall to the attorneys nor deny them fair compensation.  The requested fee

4    strikes the right balance here.

5         The other arguments raised by objectors rest on a series of misunderstandings about the risks

6    borne by IPP Counsel; the costs, amount, and quality of work required to do the job right; and the

7    exceptional nature of the recovery for the class.  Lead Counsel's 50-page declaration filed in support

8    of this motion details the eight-year history of the case, including all of the work done to

9    successfully prosecute this exceptionally complex matter up to the eve of trial, and the steps taken by

10   Lead Counsel to manage the case efficiently and avoid duplication of effort.[6]  The Alioto

11   Declaration also confirmed that approximately $2.5 million of IPP Counsel's own funds were used

12   to finance the litigation, all of which was at risk for the duration of the case.  In addition to the

13   Alioto Declaration, 45 IPP firms each filed a declaration summarizing the work done over the past

14   eight years.  (*See* Dkt. 4073.)  And even a cursory review of the docket rebuts the central premise of

15   objectors' position, that somehow these settlements came easily.  They did not.

16        The objections should be overruled.  Having performed a tremendous amount of work and

17   secured an extraordinary recovery for the class, IPP Counsel are entitled to a reasonable fee for their

18   effort.  A one-third fee and 2.3 multiplier is fair and appropriate.

19   **II.    THE COURT SHOULD OVERRULE THE OBJECTIONS TO THE FEE REQUEST**

20        **A.    The Requested Fee Percentage and Lodestar Multiplier Are Reasonable and
             Appropriate**

21

22        IPP Counsel's opening brief explained that common fund attorneys' fees—particularly in

23   complex antitrust cases—typically are calculated using some combination of "percentage-of-

24   recovery" and "lodestar cross-check" analysis.  *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at

25   949.  "[I]n this circuit, the benchmark percentage is 25%," which provides "a helpful 'starting

26   point'" for court review.  *Id.* at 949, 955 (quoting *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048

27

28   [6] *See* Declaration of Mario N. Alioto in Support of Indirect Purchaser Plaintiffs' Motion for
     Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards for Class
     Representatives, Dkt. No. 4071-1 ("Alioto Fee Decl. I").

1   (9th Cir. 2002)).  Typical lodestar cross-check "multipliers" range from 1-4, with the higher end

2   generally being awarded in a successful case.[7]

3          In assessing whether to depart upward or downward from these benchmarks, courts consider

4   a variety of case-specific factors, including the risks, results, amount and quality of work, the

5   contingent nature and financial burdens of the litigation, and awards in similar matters.  *See* Fee

6   Motion at 9-27 (surveying these factors at length); *see generally In re Online DVD-Rental Antitrust*

7   *Litig.*, 779 F.3d at 954-55; *Vizcaino*, 290 F.3d at 1048-50.  Of these, "the overall result and benefit to

8   the class from the litigation" is typically considered "the most critical factor in granting a fee

9   award."  *In re Omnivision Technologies*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008) (Conti, J.).

10  *See also In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-md-01827-SI, 2013 WL 1365900, at

11  *7-8 (N.D. Cal. April 3, 2013) ("*LCD II*") ("excellent result" strongly supports requested fee).

12                 **1.      Objectors Misapprehend the Law**

13         Objectors' principal argument is that *some* courts have awarded lower percentage fee awards

14  in megafund cases, and/or cases in which the government did the heavy lifting, in order to avoid

15  conferring a windfall on class counsel.  *See, e.g.*, St. John at 2 (citing *In re Bluetooth Headset Prods.*

16  *Liability Litig.*, 654 F.3d 935, 942 (9th Cir. 2010)).  But that is undisputed.  Nobody disagrees that

17  courts sometimes adjust fees upward or downward to avoid unreasonableness.  Examples cited by

18  objectors include cases in which settlements delivered little if any benefit to the class, *In re*

19  *Bluetooth*, 654 F.3d at 945; cases that settled early, with little time, risk, or expense borne by class

20  counsel, *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722 (3d Cir. 2001); and cases in which the

21  multiplier sought unreasonably exceeded the typical 1-4 range.  *See, e.g., Gutierrez v. Wells Fargo*

22  *Bank, N.A.*, No. 07-cv-05923-WHA, 2015 WL 2438274, at *4 (N.D. Cal. May 21, 2015) (refusing to

23  award 25% where multiplier would exceed 10).  Sometimes, moreover, fees have been cut simply

24  because class counsel did a poor job.  *Id.* at *7 (awarding 5.5 multiplier to one lead counsel firm but

25  cutting multiplier to 2 for another based on poor quality work).  None of these scenarios exists here.

26  ───────────────

27  [7] *See, e.g., Vizcaino*, 290 F.3d at 1051 (awarding 3.65 multiplier from $96.9 million settlement fund
    and noting standard 1-4 range); *Newberg on Class Actions* § 14.6 (4th ed. 2009) ("multiples ranging
28  from one to four frequently are awarded in common fund cases when the lodestar method is
    applied").

1    While trial courts have ample discretion to adjust fees upward or downward as appropriate,

2    objectors are wrong to suggest that cases with large dollar common funds and/or parallel government

3    proceedings automatically call for lower percentage awards.[8]  Any such rule would be squarely

4    contrary to Ninth Circuit law, which, again, requires a more comprehensive analysis.  *See Vizcaino*,

5    290 F.3d at 1047 (rejecting categorical "megafund" rule); *In re Online DVD-Rental Antitrust Litig.*,

6    779 F.3d at 949 (courts should avoid "mechanical or formulaic" rules in awarding fees in favor of

7    totality of circumstances analysis); *LCD II*, 2013 WL 1365900, at *8 (rejecting similar megafund

8    objections).[9]

9    Objectors' emphasis on empirical studies of class action fee awards is equally misplaced.[10]

10   Again, nobody disagrees that different courts have awarded different fees based on different facts.

11   Nor is there any dispute that empirical studies can illuminate the range and median of typical fee

12   awards.  But to cite such authority for the proposition that the average or median percentage fee

13   should be applied mechanically—without due consideration of case-specific risks, results, costs,

14   quality of work, delay, etc.—is to ignore the controlling Ninth Circuit law set forth above.  In many

15   respects, moreover, the empirical studies *support* IPP Counsel's requested fee award.[11]

16

17

18

19

---

[8] *See, e.g.,* St. John Objection at 11-15; Williams Objection at 5-8; Clifton Objection at 7-11; Fortman/Finn Objection at 15; Hull/Morgan Objection at 5-6; Johnson Objection at 2; Saik Objection at 6-11.

[9] *See also Newberg on Class Actions* § 15:80 (5th ed.) (criticizing megafund "sliding scale" approach as "lack[ing] rigor," as being inappropriate in "high fund cases [that] involve significant risks," and for "creat[ing] perverse incentives" for class counsel); *In re Rite Aid Corp. Secs. Litig.*, 396 F.3d 294, 302-03 (3d Cir. 2005) ("there is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizeable fund"); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1367 (S.D. Fla. 2011) ("the sliding scale approach creates the perverse incentive for Class Counsel to settle too early for too little").

[10] *See, e.g.,* St. John Objection at 14-15, Clifton Objection at 10, Saik Objection at 8 *citing* Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248 (2010) ("Eisenberg"); and Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) ("Fitzpatrick").

[11] *See* Fitzpatrick at 834 (reviewing 14 settlements of $250 million or more in which the average and median lodestar multipliers were 3.48 and 3.11).

5

1    The lead counsel "auction" cases cited by objectors are even less relevant.[12]  Auctions were

2    an experiment undertaken by a handful of district judges in the early-2000s in an effort to bring

3    competitive bidding to the lead counsel selection process.  But the experiment largely failed because

4    the auctions created a powerful (and unfortunate) incentive to (1) secure lead counsel positions by

5    submitting lowball percentage fee proposals in the hopes of (2) settling the case fast and cheap in

6    order to collect a quick, risk-free fee award.  That is the opposite of a sensible fee structure, and the

7    auction model has been rejected definitively by courts and commentators alike.  *See Third Circuit*

8    *Task Force on the Selection of Class Counsel*, 208 F.R.D. 340, 376 (2002) ("Unfortunately, the

9    bidding process will often result in the lowest bidder having negative financial incentives, contrary

10   to the interest of the class in maximizing recovery.").

11       Thus, neither average fee awards nor auction cases should be viewed as the governing metric.

12   Instead, as the Third Circuit task force explained, a "percentage fee, *tailored to the realities of the*

13   *particular case*, remains superior to any other means of determining a reasonable fee for class

14   counsel.  In setting a percentage fee, the court should avoid rigid adherence to a 'benchmark.'"  *Id.* at

15   355 (emphasis added).  This context-specific approach is precisely what Ninth Circuit law demands.

16   *See Vizcaino*, 290 F.3d at 1048.

17              **2.    Extensive Authority Supports the Requested Award**

18       Applying these standards, courts in this district and elsewhere routinely award fees of 30% or

19   more and/or multipliers in the 2-4 range when the record shows that class counsel bore substantial

20   risks and delivered outstanding results—including in "megafund" cases.  *See* Fee Mot. at 24-25 &

21   n.33; *In re TFT-LCD Antitrust Litig.*, No. 07-md-01827, 2011 WL 7575003 (N.D. Cal. Dec. 27,

22   2011) ("*LCD I*") (30% fee from $405 million fund in case with significantly more guilty pleas and

23   criminal fines than CRT); *LCD II*, 2013 WL 1365900, at *8 & n.11 (30% fee to all counsel, and

24

25

26

27

---

28   [12] *See* St. John Objection at 15-16 (citing *In re Quintus Securities Litigation*, 148 F. Supp. 2d 967 (N.D. Cal. 2001); *In re Amino Acid Lysine Antitrust Litigation*, 918 F. Supp. 1190 (N.D. Ill. 1996)).

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-JST

private counsel multiplier of 2.4 (on current rates) and 2.6 (on historical rates) from $1.08 billion fund).[13]

The *LCD II* case is instructive.  IPPs here faced the same obstacles noted by the Court in *LCD II* and then some.[14]  All of the complexities and risks identified by Special Master Quinn in *LCD II* are present here:  multiple motions to dismiss; voluminous document discovery in foreign languages requiring translations (that were often vigorously contested); extensive discovery relevant to class certification and challenges in certifying nearly two dozen statewide classes, including a Rule 23(f) petition and decertification motion; myriad discovery motions and depositions, many taken in foreign languages and some taken abroad; waves of summary judgment motions; and preparation of the case for trial.  *Compare* Alioto Fee Decl. I ¶¶ 5-8 (listing almost identical case complexities and risks as those found in the *LCD R&R* and approved in *LCD II*).

The *CRT* case also presented additional obstacles, including (1) the fact that the Department of Justice dropped its criminal investigation of all but one Defendant, whereas *LCD* involved a large number of guilty pleas and criminal fines that dwarfed those in CRT; (2) the rapid decline of CRT technology, prices and profits during the class period, raising statistical modeling issues on impact and damages, and which Defendants emphasized to argue that the conspiracy was completely

---

[13] *See also, e.g., In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 991 F. Supp. 2d 437, 448 (E.D.N.Y. 2014) ($544.8 million fee and 3.41 multiplier in megafund case with parallel government proceeding); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d at 1367 (30% fee from $410 million fund, explaining that "courts nationwide have repeatedly awarded fees of 30 percent or higher in so-called 'megafund' settlements") (collecting cases); *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006) (31.33% fee from $1.06 billion megafund); *In re Vitamins Antitrust Litig.*, No. Misc. 99-197(TFH), 2001 WL 34312839, at *10, *14 (D.D.C. July 16, 2001) (34% fee from $359 million settlement fund in cartel case with parallel criminal proceedings); *In re Initial Pub. Off. Sec. Litig.*, 671 F. Supp. 2d 467 (S.D.N.Y. 2009) (one-third fee from $510 million settlement fund); *In re Flonase Antitrust Litig.*, 951 F. Supp. 2d 739, 750-51 (E.D. Pa. 2013) (one-third fee and 2.99 multiplier from $150 million fund, explaining that 1-4 is the standard multiplier range); *In re Southeastern Milk Antitrust Litig.*, No. 2:08–MD–1000, 2013 WL 2155387, *8 (E.D. Tenn. May 17, 2013) (one-third fee from $158.6 million fund); *In re Titanium Dioxide Antitrust Litig.*, 10–CV–00318(RDB), 2013 WL 6577029, *1 (D. Md. Dec. 13, 2013) (one-third fee from $163.5 million fund); *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-cv-00340, Dkt. No. 543 (D. Del. 2009) (one-third fee and 3.93 multiplier from $250 million fund); *In re Skelaxin Antitrust Litig.*, 2014 WL 2946459, *2 (E.D. Tenn. Jun. 30, 2014) (one-third fee and "multiplier between 2.1 and 2.5," which is "reasonable in light of what has been routinely accepted as fair and reasonable in complex matters such as this one") (collecting cases).

[14] Special Master Quinn issued a Report and Recommendation regarding the indirect purchaser plaintiffs' motion for attorneys' fees (*see In re TFT-LCD*, Dkt. No. 7127 ("*LCD R&R*")), which was adopted by the District Court.  *See LCD II*, 2013 WL 1365900, at *8 & n.11.

1  ineffective; and (3) the reality that many participants in the CRT conspiracy were either out of

2  business or bankrupt because of these market trends, raising complex issues of successor/affiliate

3  liability as well as problems with unavailable witnesses and documents and jury presentation

4  issues.[15] This case also lasted two years longer than *LCD II* (six years in *LCD II* versus eight years

5  here).

6        The *CRT* settlements are an outstanding result given these obstacles.  In similar

7  circumstances, the *LCD II* court awarded the indirect purchasers and states a total of 30% of the

8  $1.082 billion settlement fund, for a multiplier of 2.6.  The additional complexities and risks in this

9  case, as well as its extended duration, justify IPP Counsel's fee request here—a slightly higher one-

10  third percentage resulting in a slightly lower 2.3 multiplier.

11        The other cases cited in passing by objectors are not to the contrary, and indeed many

12  support the requested fee.  In *Walmart Stores, Inc. v. Visa U.S.A.,* 396 F.3d 96 (2d Cir. 2005), for

13  example, the court rejected class counsel's request for a $609 million fee and a 9.68 multiplier, but

14  affirmed the district court's decision to award $220 million and a ***3.5 multiplier***.[16]  The weight of

15  common fund authority is clear, in short, that a "total multiplier of 2.5 for Class Counsel is wholly

16  consistent with the megafund multipliers cited by the Ninth Circuit."  *High Tech Employees*, 2015

17  WL 5158730, at *11.

18        Finally, reasonable lodestar multipliers are important not only to compensate counsel for

19  case-specific risks (and payment delay), but also to "sustain the incentive for attorneys to continue to

20  represent such clients on an 'inescapably contingent' basis."  *Florin v. Nationsbank of Georgia,*

21  *N.A.*, 60 F.3d 1245, 1247 (7th Cir. 1995).  "[F]ailing to fully compensate counsel for the excellent

22

23  [15] *See further* Fee Motion at 11, 16-17; Alioto Fee Decl. I ¶¶ 99.

24  [16] Other decisions noted by objectors are similar.  *See, e.g., Gutierrez*, 2015 WL 2438274, * 4, *7
(rejecting requested 25% fee because it would have amounted to a **10.38** multiplier, and awarding a **2**
25  multiplier to one firm (in spite of "padded time sheets" and "outrageous line items") and a **5.5**
multiplier to another firm that had performed well); *In re High Tech. Employees Antitrust Litig.*,
26  Case No. 11–CV–02509–LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) (rejecting requested
19.5% fee because it would have amounted to a **4.8** multiplier, and instead awarding a total
27  multiplier of **2.5**); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. 03-4578, 2005
WL 1213926, at *15 (E.D. Pa. May 19, 2005) (rejecting requested 30% fee because it would have
28  amounted to a **23.59** multiplier, and instead awarding a multiplier of **15.6** based on percentage of the
fund method).

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF
LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-JST

1    work done and the various substantial risks taken [in these types of cases] would undermine

2    society's interest in the private litigation of antitrust cases.  Society's interests are clearly furthered

3    by the private prosecution of civil cases which further important public policy goals, such as

4    vigorous competition by marketplace competitors." *In re Southeastern Milk Antitrust Litig.*, 2013

5    WL 2155387, at *5 (awarding one-third fee and 1.9 multiplier).[17]

6          The question, in the end, is whether a particular fee award is justified by the totality of the

7    circumstances. *Vizcaino*, 290 F.3d at 1048.  And here the facts, risks, and results support the

8    requested fee.  The risks were enormous; the case did not settle fast, easy, or cheap, instead requiring

9    eight years of skilled advocacy.  The results speak for themselves, and the requested percentage fee

10   and lodestar multiplier fall well-within the accepted range.  There is no windfall considering "all the

11   circumstances." *Vizcaino*, 290 F.3d at 1048.

12         **B.    Objectors Misapprehend the Role of Government and Other Proceedings**

13              **1.    The Criminal Prosecution Was Limited**

14         Several objectors assert that the government's criminal plea agreement with a single CRT

15   defendant, Samsung SDI, somehow delivered the IPP case on a silver platter.  But that is incorrect.

16   The Samsung guilty plea was narrow—encompassing only one type of CRT (CDTs for monitors)

17   sold to four U.S. customers during a portion of the alleged class period.  The plea agreement did not

18   require Samsung SDI's cooperation with IPPs, or describe any particulars about the cartel's means

19   and methods, or identify any of Samsung SDI's co-conspirators.

20         The limited scope of the plea deal (and relatively small $32 million criminal fine) also

21   allowed Samsung SDI and other Defendants to argue that the conspiracy was much more limited in

22   scope than IPPs alleged and, indeed, in many respects this fact emboldened Samsung to aggressively

23   deny both its participation in the alleged conspiracy and the existence of *any* U.S. effects, right up

24   _____

25   [17] *See generally Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 635 (1985)
     ( "[w]ithout doubt, the private cause of action plays a central role in enforcing this [antitrust]
26   regime."); *In re Linerboard Antitrust Litigation*, MDL No. 1261, 2004 WL 1221350, *16 (E.D. Pa.
     June 2, 2004) (awarding 30% fee and 2.66 multiplier from $202.6 million settlement fund to "reflect
27   the risks of nonpayment facing counsel, to serve as an incentive for counsel to undertake socially
     beneficial litigation" and "as a reward to counsel for an extraordinary result"). *See also*
28   Supplemental Declaration of Richard Pearl ISO IPPs' Request for Attorneys' Fees, Reimbursement
     of Litigation Expenses and Incentive Awards for Class Representatives ("Pearl Decl. II") ¶¶ 21-24.

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF
LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-JST

1    through the eve of trial.  The history of the litigation shows that—even with respect to Samsung

2    SDI—the criminal proceeding was far from dispositive.  *See generally In re NASDAQ Market*

3    *Makers Antitrust Litig.*, 187 F.R.D. 465, 475-76 (S.D.N.Y. 1998) ("Antitrust litigation in general,

4    and class action litigation in particular, is unpredictable . . . . Indeed, the history of antitrust litigation

5    is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no

6    damages, or only negligible damages, at trial, or on appeal.").[18]

7           The emboldening effect on the other ten Defendant groups was even more pronounced.  They

8    argued that the failure of the DOJ to prosecute them demonstrated their innocence and/or the alleged

9    conspiracy's lack of impact in the United States market.  The failure of the DOJ to prosecute these

10   Defendants also bolstered their FTAIA defense, which was one of the most serious challenges the

11   IPPs faced.  Had the case gone to trial, these Defendants would have attempted to introduce evidence

12   of their non-prosecution as evidence of both non-participation and lack of U.S. effects, a potentially

13   powerful jury argument as Toshiba showed in the *LCD* trial.[19]  These facts of *non-prosecution* made

14   IPPs' trial preparation and settlement negotiations far more difficult.[20]   On balance and contrary to

15   objectors' argument, the Samsung SDI criminal plea agreement was probably more helpful to

16   Defendants than to IPPs.

17          Objectors also exaggerate the role of Chunghwa's amnesty application.  As explained in

18   IPPs' opening papers, the information provided by Chunghwa was limited in scope.  It included

19   virtually nothing about Defendants' unlawful activities in the United States, or the conspiracy's

20   impact on customers here—evidence critical to proving a violation of federal and state antitrust laws.

21   Likewise, Chunghwa provided no evidence regarding large CPTs manufactured primarily for sale in

22

23   ───────────────

     [18] *See also* Alioto Fee Decl. I ¶ 93 (describing how two plaintiffs in the *LCD* litigation went to trial

24   and recovered nothing despite most of the defendants having pled guilty to their participation in the
     LCD conspiracy).

25   [19] In the *LCD* litigation, Best Buy went to trial against Toshiba.  During the trial, Toshiba presented
     evidence of its non-prosecution by the DOJ as part of its defense.  The jury returned a defense

26   verdict in favor of Toshiba.  Alioto Fee. Decl. II ¶ 4.

27   [20] The criminal case hindered the IPPs in other respects, particularly with respect to the
     government's insistence on a stay of civil discovery, which stalled the IPP claims for years.  The

28   stay allowed several important players in the conspiracy to leave their jobs with Defendants, making
     it difficult (in some cases impossible) to find and depose them.  Alioto Fee Decl. I ¶ 48.

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF
LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-JST

1    the United States.  IPP Counsel had to develop all of this critical evidence independently.[21]   Further,

2    other Defendants used the Chunghwa evidence affirmatively to argue that the conspiracy was more

3    limited than IPPs alleged (*e.g.*, that it did not include large CPTs, that the cartel was focused on the

4    Asian market, not the United States, etc.).  The limited aspects of Chunghwa's information also

5    facilitated Defendants' FTAIA defense, which, again, was one of the greatest risks to IPPs' case.

6            Moreover, objectors never analyzed the 500 meeting reports provided by Chunghwa.  Many

7    of the reports are duplicates of the same meeting and while some of the meeting reports were

8    helpful, many others were not.  Many of the reports showed that (1) the Defendants did not reach

9    agreements on CRT prices; (2) the prices agreed to at the meetings were not implemented by the

10   Defendants; and (3) several of the Defendants did not participate in the meetings and/or they

11   consistently undercut their competitors.[22]  Notably, the government had equal access to Chunghwa

12   materials, yet obtained only one limited guilty plea and dropped its investigations against all other

13   Defendants, further highlighting the marginal nature of Chunghwa's help.[23]

14           Finally—and critically—the criminal proceedings did nothing whatsoever to assist the IPPs

15   with respect to *any* of the key elements of injury, damages, and class certification.  Criminal antitrust

16   liability arises purely from a conspiracy violation; the government need not prove antitrust injury or

17   damages, as the IPPs were required to do.  It thus fell squarely on IPP Counsel to retain experts, take

18   voluminous discovery, prevail at class certification, and develop a reliable methodology for proving

19   injury, damages, and FTAIA compliance on a class-wide basis at trial.[24]  *See, e.g., LCD II*, 2013 WL

20   1365900 at *7 (explaining that even though almost every *LCD* defendant pleaded guilty, indirect

21   purchasers faced substantial risks and complexities with respect to proving injury, damages, and

22   right to recover under FTAIA).  The risks on these issues cannot be minimized, especially in light of

23

24

25

26   [21] *See* Alioto Fee Decl. I ¶¶ 26-37, 46-65, 102-104.

27   [22] *See* Alioto Fee Decl. II ¶ 5.

     [23] *See* Alioto Fee Decl. I ¶¶ 102-104.

28   [24] *See id.* ¶¶ 6, 7, 14, 30, 49, 55, 69, 73, 76 and 103.

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF
LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-JST

1  recent Supreme Court decisions on class certification.  *See e.g., Wal-Mart Stores, Inc. v. Dukes*, 131

2  S.Ct. 2541 (2011); *Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013).[25]

3       Far from having the case delivered by the government, each and every issue described

4  above—from Samsung SDI's liability, to conspiracy liability for the non-prosecuted Defendants, to

5  the FTAIA issues, to class-wide injury, damages, and class certification—involved serious risk and

6  work at every step.  Only after running the full litigation gauntlet did the IPPs ultimately secure a

7  recovery that dwarfs both the $32 million criminal fine obtained by the government and the

8  settlements by the direct purchaser class.[26]  By any reasonable measure, this recovery emphasizes the

9  value added by IPP Counsel over eight years of hard-fought litigation.  *Compare TFT-LCD* (whereas

10  the *CRT* settlement dwarfs the criminal fines, the civil IPP settlement in *LCD* was smaller than the

11  total criminal fines secured by the government ($1.08 billion vs. $1.39 billion)).

12       It is unclear whether Objectors ignore or are simply unaware of this history.  Either way,

13  their contention that the IPP claims were "largely established" by others (St. John at 3) cannot be

14  squared with the record and, accordingly, should be overruled as a basis for reducing the fee.[27]

15

16       **2.    Neither the European Commission Nor the *Vichi* Case Materially
Advanced the IPP Claims**

17

18  [25] The class certification risks are underscored by several recent indirect purchaser cases.  *See, e.g.*,
*In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 508 (N.D. Cal 2008) (denying

19  certification of indirect purchaser class); *In re Flash Memory Antitrust Litig.*, No. C 07-0086 SBA,
2010 WL 2332081, at *19 (N.D. Cal. June 9, 2010) (same); *In re Optical Disk Drive Antitrust Litig.*,

20  303 F.R.D. 311 (N.D. Cal. 2014) (same).

21  [26] It is notable that the IPPs recovered *four times* as much as the CRT direct purchaser class
notwithstanding the additional hurdles associated with indirect purchaser claims. *See, e.g.*, IIA

22  Areeda et al., Antitrust Law ¶ 396 (3d ed. 2006) (discussing the "complexity" and "practical
problems of proof" in indirect purchaser suits); Ronald W. Davis, Amchem *and Antitrust: Have the*

23  *Ground Rules for Antitrust Class Actions Changed?*, 12 Antitrust 39, 44 (Fall 1997) ("[T]he cold
fact remains that, in order to recover, the indirect purchasers must prove something about the facts

24  and/or the law which . . . direct purchasing . . . class members do not need to prove.  That means the
indirect purchaser has a harder row to hoe than the direct purchaser.").

25  [27] The cases cited by St. John are not to the contrary.  *See* St. John Br. at 12, citing *In re Cendant*

26  *Corp. Prides Litig.*, 243 F.3d 722 (3d Cir. 2001), *In re Prudential Ins. Co. of Am. Sales Practices*
*Litig.*, 148 F.3d 283 (3d Cir. 1998) and *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752

27  (S.D. Ohio 2007).  These cases merely stand for the general proposition that courts can consider any
assistance class counsel received from public agencies when awarding attorneys' fees.  To the extent

28  this consideration is relevant, the fact remains that IPP Counsel received very little assistance from
public agencies relative to the work that  IPP Counsel did on their own.

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF
LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-JST

1    Certain objectors make secondary arguments to the effect that the IPP case was bolstered by

2    (supposedly) preclusive findings issued in 2013 by the European Commission ("EC") and in 2014 by

3    a Delaware state court in a non-antitrust case, *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725

4    (Del. Ch. 2014).  *See* St. John at 11-12.  These arguments are wrong.  First, it is factually incorrect

5    that the EC and Delaware state court proceedings assisted the IPPs in any meaningful way.  Second,

6    Objectors misapprehend the relevant rules of evidence and preclusion.

7        To begin with, the EC's Summary Decision regarding the CRT conspiracy was not issued

8    until October 19, 2013—six years after this litigation began.  And the provisional, heavily redacted

9    version of the EC's full Decision was only made available to the public on December 23, 2014,

10   several months *after* the close of discovery on September 5, 2014 and less than three months before

11   the scheduled trial.  IPPs had already developed their entire case on the merits before the EC

12   Decision came down.  The EC's findings regarding the CRT conspiracy also stopped far short of

13   establishing antitrust liability against the Defendants in the United States.  The EC findings

14   addressed only the cartel's activities, and/or the impact of those activities, in Europe.[28]  The findings

15   did not demonstrate the existence of a CRT conspiracy in the United States let alone its impact here,

16   proof of which was essential to IPPs' case.

17       Moreover, the admissibility of the EC findings was highly questionable.  Because the EC

18   investigation and findings are based upon procedural and substantive laws that differ significantly

19   from the laws governing U.S. proceedings,[29] and because EC appeals remained pending at the time

20   of the IPP settlements,[30] it is unlikely that any EC findings could have been admitted at trial and

---

[28] *See* Article 101 of the Treaty on the Functioning of the European Union.

[29] For example, the EC considers information exchanges between competitors of data regarding intended future prices or quantities to be akin to a *per se* violation of their competition laws.  *See* Communication from the Commission — Guidelines on the Applicability of Article 101 of the Treaty on the Functioning of the European Union to Horizontal Cooperation Agreements, OJ C 11, 14.1.2011, at 1-17, § 74) (stating that "private exchanges between competitors of their individualised intentions regarding future prices or quantities would normally be considered and fined as cartels because they generally have the object of fixing prices or quantities.").  U.S. federal and state antitrust laws, in contrast, require an *agreement* to fix prices or otherwise restrain trade or commerce.

[30] *See* Case T-82/13, *Panasonic Corp. and MT Picture Display Co. Ltd. v. Comm'n*; Case T-104/13, *Toshiba Corp. v. Comm'n*.  Defendants Panasonic and Toshiba both had their fines reduced by the European Court of Justice as a result of these appeals.

1    even less likely that they would have been given any preclusive effect.  And even if the EC findings

2    had been admitted and credited by the jury, IPPs would still have had to prove, *inter alia,* that

3    Defendants' conduct also violated federal and state antitrust laws; that the Defendants targeted U.S.

4    customers in satisfaction of the FTAIA; that certain Defendants did not withdraw from the

5    conspiracy; and that Defendants' conduct caused antitrust injury and damages to indirect purchaser

6    class members on a class-wide basis in the United States.

7            For all of these reasons—the belated timing of the EC report, the EC's focus on the

8    conspiracy's conduct and impact in Europe, the serious admissibility issues, and the limited

9    substantive value of the EC analysis—the European regulators contributed no value to the IPP case.

10           The same is true of the *Vichi* decision in Delaware (*Vichi v. Koninklijke Philips Elecs., N.V.*,

11   85 A.3d 725 (Del. Ch. 2014)), which did not involve a U.S. antitrust claim at all.  *Vichi* was a fraud

12   case alleging that Philips N.V. fraudulently induced Vichi to lend money to its CRT joint venture

13   with LG Electronics, LG.Philips Displays ("LPD"), by misrepresenting the joint venture's financial

14   condition and prospects at a time when Philips and LPD were engaged in the CRT price-fixing

15   conspiracy.  Vichi was an Italian company, and the loan was negotiated in Europe.  Thus, the EC's

16   findings regarding LPD's and Philips' participation in the CRT conspiracy *in Europe*, and their

17   violation of *European law*, were deemed relevant, admissible, and preclusive by the Delaware court.

18   But whether Philips and LPD violated *U.S. antitrust laws* was not at issue in *Vichi*.   As a result,

19   Objectors' suggestion that the relevant findings could have been used offensively by IPPs is

20   incorrect.  *See, e.g., Syverson v. International Business Machines, Corp.*, 472 F.3d 1072, l078 (9th

21   Cir. 2006) (explaining narrow doctrine of "offensive nonmutual issue preclusion" and requirement

22   that *identical* issue must have been actually litigated and resolved in the prior case).  Regardless, the

23   *Vichi* case, like the EC proceeding, was not an important part of the IPP case.[31]

24
     _____

25   [31] St. John questions what he terms the "disproportionate contributions of Samsung SDI and Philips"
     to the total settlement fund, and concludes they must be attributable to Samsung SDI's guilty plea
26   and the issue preclusion holding against Philips N.V. in *Vichi*.  (St. John Obj. at 12.)  His flawed
     conclusions are based on a document found on the internet purporting to contain information
27   regarding the market shares of Samsung SDI and Philips.  Setting aside its questionable reliability,
     this document only purports to reflect market shares as of 2000.  The conspiracy continued for
28   another *seven years* after that.  Moreover, Defendants' market shares changed fundamentally in the
     early 2000's as a result of Panasonic's exit from the CDT business; the formation of LPD by LG and

                                              14

C.     IPP Counsel's Lodestar Is Reasonable

1.     The Number of Law Firms Was Reasonable Given the Complexity of the Litigation and 40 Named Plaintiffs Representing 22 States

Objector St. John (and others) argues that 49 law firms working on this case was inefficient and asserts, without factual support, that IPP Counsel's lodestar should be "reduced dramatically."[32] This case required the resources assembled, and was efficiently managed by Lead Counsel to reach its successful conclusion. St. John's argument ignores the real-world of indirect purchaser litigation, in which MDL cases invariably—and appropriately—involve consolidated efforts by a large team of lawyers representing dozens of class representatives nationwide. It is therefore not surprising that the number of law firms involved was consistent with—and in some cases lower than—similar indirect purchaser matters. For example, in the indirect purchaser *LCD* case, there were 116 firms[33]; in the indirect purchaser *DRAM* case, there were 63 firms[34]; and in the indirect purchaser *SRAM* case, there were 70 firms.[35]

In all events, the number of law firms is less important than the efficiency and effectiveness with which they worked. An examination of the lodestars of each firm and the declarations filed in support thereof establishes that Lead Counsel managed this case very efficiently. Each firm's lodestar is consistent with the work assignments made by Lead Counsel. Only four firms recorded

---

Philips in 2001; Hitachi's exit from the CRT market in 2002; the formation of MTPD by Panasonic and Toshiba in 2003; and Thomson's exit from the CRT business in 2004. As a result of this market consolidation, Samsung SDI's overall CRT market share in 2004 was 29%, and LPD's (for which IPPs held Philips responsible) was 27%. Their shares of the CDT market were even higher: 42% (SDI) and 32% (LPD). In addition, each held even higher shares of the U.S. CRT market and, unlike some of the other defendants, IPPs had strong evidence of their conspiratorial activities here in the U.S. The settlement amounts paid by Samsung SDI and Philips are entirely consistent with their market shares and the liability evidence. Alioto Fee Decl. II ¶ 6.

[32] *See also* Hull/Morgan Objection, at 7; Williams Objection, at 8.

[33] *See LCD II,* 2013 WL 1365900, at *9.

[34] *See In re: Dynamic Random Access Memory (DRAM) Antitrust Litig.*, Case No. 4:02-md-01486-PJH, Dkt. No. 2183 (N.D. Cal 2014).

[35] *In re: Static Random Access Memory (SRAM) Antitrust Litig.*, MDL No. 1819, U.S. District Court, Northern District of California.

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-JST

1  very significant lodestars, and less than two dozen firms did the overwhelming amount of the work.

2  None of it was duplicative or unnecessary.[36]

3  Objectors make no attempt to actually discuss the time and tasks reported in the declarations

4  or the thousands of docket entries IPP Counsel's work product addressed.  Viewed in context, there

5  was nothing inappropriate or excessive about the work IPP Counsel did in this unusually large,

6  complex, and protracted litigation.

7  2.    **183,000 hours is Not "Grossly Excessive" Given the Complexity of this**
        **Case, the Number of Parties, and its Eight-Year Duration**

8

9  Likewise, the 183,000 hours billed by IPP Counsel is not a "grossly excessive" number given

10  the complexity of this case, its eight-year duration, the number of parties (40 named indirect

11  plaintiffs, 48 separate defendants, 13 Direct Purchaser Plaintiffs ("DPPs"), 13 Direct Action

12  Plaintiffs ("DAPs") and five Attorneys General), the millions of pages of foreign documents

13  reviewed, the 250 depositions taken, and the enormous amount of preparation necessary for trial.

14  Objectors' contention that IPP Counsel offer "no support" beyond the Pearl Declaration for

15  the 183,000 hours spent on this case is false.  *See generally* Alioto Fee Decl. I (describing in detail

16  all of the work performed by IPP Counsel).  Lead Counsel also submitted 45 individual firm

17  declarations describing in detail the work performed, along with charts summarizing and

18  categorizing the hours spent on each task.  Objectors either have not read these declarations or

19  recognize they cannot refute their content, because they fail to discuss the actual record in any

20  meaningful way.

21  These declarations show that almost 73,000 hours were spent searching, reviewing and

22  analyzing eight million pages of Defendants' documents (averaging more than 100 pages per hour).

23  It is widely recognized by courts and commentators that antitrust cases require extensive discovery.[37]

24  _____

25  [36] *See further,* Alioto Fee Decl. II, ¶¶ 7-14. Fifteen firms had minimal involvement, averaging less
    than $15,000 in lodestar per year.  Many of these firms were the private lawyers for the more than 40
26  plaintiffs representing 22 states in the actions consolidated in this court pursuant to the Class Action
    Fairness Act of 2005. *Id.* ¶ 15.

27  [37] *See, e.g., F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223, 2247, 186 L. Ed. 2d 343 (2013) (Roberts, J.,
    dissenting) ("[A]ntitrust law [has] famously burdensome discovery."); *In re Lithium Ion Batteries*
28  *Antitrust Litig.*, No. 13-MD-02420 YGR, 2013 WL 2237887, at *2 (N.D. Cal. May 21, 2013).
    ("Courts acknowledge that antitrust discovery can be enormously expensive and burdensome.")

1   This observation is particularly apt here.  IPPs needed to conduct worldwide discovery regarding a

2   conspiracy spanning almost 13 years and involving 48 Defendants located across the globe.  *See*

3   Alioto Fee Decl. I ¶¶ 25-65.  The additional time required to identify, analyze and translate the

4   foreign language documents, enter the translations in the record, address the translation objections,

5   and take depositions in foreign languages, cannot be overstated.  *See id.* ¶¶ 40-41.

6        The presence of four discrete plaintiff groups (IPPs, DPPs, DAPs, and Attorneys General)

7   also contributed to the significant time expenditure.  For example, many of the 250 depositions

8   lasted at least two days, and foreign language depositions lasted four days to allow all parties to

9   question the witness; the parties produced expert reports from 17 expert witnesses, each of whom

10  was deposed multiple times regarding their reports; and the plaintiffs had to coordinate responses to

11  36 summary judgment motions.  *Id.* ¶¶ 52; 60-64; 74.  In addition, almost all of the Special Masters'

12  rulings were appealed to the District Court.  This meant that already complex dispositive motions

13  like motions to dismiss and class certification took much longer to resolve than in an average case.

14  *Id.* ¶¶ 14-18 (the motions to dismiss took 1 ½ years to resolve); *id.* ¶ 72 (the motion for class

15  certification took more than one year to resolve).

16       The "comparable cases" cited by objectors are anything but.  *In re Currency Conversion*

17  *Antitrust Litig.*, 263 F.R.D. 110 (S.D.N.Y. 2009) was a five-year case (not an eight-year case as

18  claimed by St. John)[38] involving only domestic defendants and no foreign language issues.  *Id.* It

19  also settled before summary judgment and it was not an indirect purchaser case involving numerous

20  class representatives and differing state laws.  Likewise, *High Tech Employees* was not an indirect

21  purchaser case.  It alleged only Sherman Act claims and California antitrust and unfair competition

22  law claims.  The case was actively litigated for less than four years against only seven domestic

23  defendants, three of whom settled very early in the case, and it involved no foreign language

24

25

26  Manual for Complex Litigation, Fourth, § 30, p. 519 (2004) (describing extensive scope of discovery
    in antitrust cases).

27  [38] Although the order awarding fees issued in 2009, the case was only actively litigated for five
    years.  It was filed in February 2001, transferred to the Southern District of New York in August

28  2001, and settled in July 2006.  *In re Currency Conversion,* at 116.

17

1    issues.[39]  Thus, neither case provides a helpful comparison for the Court regarding the

2    reasonableness of IPP Counsel's total hours.

3         This case is more properly compared to other post-CAFA indirect purchaser antitrust class

4    actions litigated in federal court.  In the indirect purchaser *LCD* case, counsel billed 313,000 hours

5    over six years (two years less than this case) and, like here, the case settled just before trial.  In the

6    indirect purchaser *DRAM* case, counsel billed 152,349 hours.  The indirect purchaser *DRAM* case

7    began in late 2004 but slowed in mid-2007 when the court granted a motion for judgment on the

8    pleadings, and was stayed in 2009 pending an appeal.  No litigation class was certified and the

9    parties never reached summary judgment. *See* Alioto Fee Decl. II ¶ 16.  The 183,000 hours logged

10   by IPP Counsel here is more than reasonable.

### 3.    The Hourly Rates are Reasonable

12        St. John contends that IPP Counsel are not entitled to a multiplier because they are

13   purportedly seeking higher rates than "the nation's premier white shoe law firms."  The only

14   example St. John gives is Mr. Scarpulla's $1250 hourly rate.  But Mr. Scarpulla's rate is not part of

15   IPP Counsel's joint fee request.  Lead Counsel *agrees* with Mr. St. John that $1250 is too high.  As

16   further explained in the motion for final approval, Mr. Scarpulla's refusal to reduce his rate is one of

17   the main reasons that Lead Counsel did not include his declaration in the joint motion.  Instead, Lead

18   Counsel included a much-reduced lodestar for Mr. Scarpulla calculated using his more reasonable

19   historical rates.  *See further* Alioto Settl. Decl. II.  Moreover, IPP Counsel's rates are, in general,

20   significantly *lower* than large firm rates.[40]  Thus, Mr. St. John's argument regarding IPP Counsel's

21   rates should be disregarded.

22        Objector Clifton's contentions regarding IPP Counsel's rates are likewise flawed.  Clifton

23   miscalculates IPP Counsel's average hourly rate as $879.50.  IPP Counsel's average hourly rate is

24

---

25   [39] *See In re High Tech. Employees Antitrust Litig.*, 2015 WL 5158730, at *2.  Despite *High Tech
26   Employees* being less complex and less risky than this case, and class counsel had to wait only five
     years for payment versus eight years here, the court still awarded a higher overall multiplier than IPP
     Counsel are requesting here (2.5 versus 2.3).  *Id.* at *11.

27   [40] *See further* Pearl Decl. II ¶¶ 10-13 (explaining that IPP Counsel are entitled to similar rates as
28   defense counsel, but even so, IPP Counsel's rates are generally much lower than "the nation's white
     shoe law firms" and are very reasonable).

18

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF
LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-JST

1  $457.67 ($83,753,999.05 total lodestar/183,000 hours = $457.67), which is more than reasonable.

2  *See* Pearl Decl. II ¶ 11.

3       IPP Counsel's rates also compare reasonably to the rates found reasonable in the cases cited

4  by objectors.  *See, e.g., Gutierrez*, 2015 WL 2438274, at*5, *7 (approving billing rates for partners

5  ranging from $475 to $975; $300 to $490 for associates; and $150 to $430 for support staff, and

6  applying a 5.5 multiplier to those rates); and *In re High Tech. Employees,* 2015 WL 5158730, at *9

7  (approving billing rates for partners ranging from $490 to $975; $310 to $800 for associates, with

8  most below $500; and $190 to $430 for support staff, with most in the $300 range, and applying a

9  2.2 multiplier to those rates).[41]  Indeed, as *Gutierrez* recognized, "[i]t would be unusual not to apply

10  a risk multiplier when (1) the attorneys reasonably take a case with the expectation that they will

11  receive a risk enhancement if they prevail, (2) their hourly rates do not reflect that risk, and (3) there

12  is evidence that the case was indeed risky." *Gutierrez,* 2015 WL 2438274, at *7, citing *Fischel v.*

13  *Equitable Life Assur. Soc'y of U.S.*, 307 F.3d 997, 1008 (9th Cir. 2002).

14       Here, IPP Counsel reasonably expected a multiplier on their lodestar in the event they

15  prevailed on IPPs' claims.  The risks of *not* prevailing were enormous.[42]  And as in *Gutierrez*, IPP

16  Counsel's hourly rates do not reflect that risk.[43]  A multiplier is thus warranted.[44]

17       Lastly, it bears noting that objectors have nothing to say about the hourly rates of Mario

18  Alioto, Joseph Patane or Lauren Capurro, whose time accounts for almost 79% of Lead Counsel's

19  fee request.  Mr. Alioto has more than 40 years' experience litigating antitrust cases.  He ran this

---

[41] *See further* Pearl Decl. II ¶ 13.

[42] *See* Fee Motion at 20-23; Alioto Fee Decl. I ¶¶ 3; 6-8; 93.

[43] *See* Pearl Decl. II ¶ 23 (comparing the rates charged by IPP Counsel to rates charged by other firms and concluding that IPP Counsel's rates are non-contingent rates).

[44] *See Vizcaino*, 290 F.3d 1043 (awarded 3.65 multiplier and finding 83% of common fund cases had multipliers ranging from 1.0 – 4.0 and 54% had multipliers ranging from 1.5 – 3.0); *Van Vranken v. Atlantic Richfield Co.*, 901 F.Supp. 294, 298 (N.D. Cal. 1995) (awarding 3.6 multiplier and noting "multipliers in the 3 – 4 range are common in lodestar awards for lengthy and complex class action litigation"); *In re Prudential Ins.*, 148 F.3d at 341 (Multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied"); *Craft v. County of San Bernardino*, 624 F.Supp.2d 1113, 1125 (C.D. Cal. 2008) (awarded multiplier of 5.2); *Maley v. Del Global Technologies Corp.*, 186 F.Supp.2d 358, 371 (S.D.N.Y. 2002) ("modest" multiplier of 4.65 "fair and reasonable"); *In Re IDB Communication Group, Inc.,* Sec. Litig., No. 94–3618 (C.D. Cal. Jan. 17, 1997) (Hupp, J.); cited at 19 Class Action Reports 472–73 (1996) (awarded 6.2 multiplier).

19

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-JST

entire case for eight years and successfully negotiated the second-largest settlement fund in the history of indirect purchaser cases.  Yet his rates are well below market.[45]  In fact, Lead Counsel's total lodestar is much less than that of other firms who have served as Lead Counsel in similar cases.[46]

### 4.      Objectors' Criticism of Richard Pearl is Baseless

Objector St. John attacks IPPs' expert, Richard Pearl, arguing that his opinion is not probative on the reasonableness of IPP Counsel's hours because "he has been a sole practitioner since 1987" and has no experience managing large litigation.[47]  As established by Mr. Pearl's Supplemental Declaration, Mr. Pearl *has* managed large class actions.  Moreover, as an attorneys' fee specialist, he has also reviewed and testified in numerous cases of comparable complexity, including the fee requests in *LCD* and in class actions against Microsoft, RJ Reynolds, Pacific Bell, and other large companies and/or government entities.  This experience provides a solid basis for Mr. Pearl's opinion that the number of hours claimed here is reasonable.[48]

### 5.      Billing Contract Attorneys at Market Rates is Legal, Ethical, and Appropriate.

Objector St. John criticizes Lead Counsel's use of contract attorneys and the billing of those attorneys at market rates and argues that no multiplier should be applied to their time.[49]  To the

---

[45] *See* Pearl Decl. II ¶ 11.

[46] In the indirect *LCD* case, there were two co-lead counsel and one liaison counsel.  Lead Counsel's performed all the same duties that these firms performed, yet its lodestar in this case is less than each of the co-lead firms in *LCD* – Zelle Hofmann's lodestar was $22,269,333.50 and Joseph Alioto's lodestar was $18,126,945.80.  In the indirect *DRAM* case, there are four co-lead firms and one liaison counsel.  The total lodestar for all five firms was $42,278,894. Lead Counsel's lodestar is only slightly more than that of Lead Counsel for the DPPs in this case ($14,073,846.00 vs. $15,745,591.25) even though the DPPs settled with most of the Defendants before merits depositions began.  Alioto Fee Decl. II ¶ 17.

[47] St. John Objection at 19.

[48] *See* Pearl Decl. II ¶¶ 3, 6.

[49] St. John Objection at 21-22.  He also criticizes Lead Counsel for not providing resumes for these attorneys.  Lead Counsel is providing herewith resumes for the contract attorneys whose time is included in Lead Counsel's fee request.  *See* Alioto Fee Decl. II ¶ 18, Ex. A.  These resumes show that while these attorneys are not permanent employees of Trump, Alioto, Trump & Prescott, LLP, they are highly skilled and experienced.  Moreover, as further demonstrated below, they performed very valuable work in this case.  Lovell Stewart Halebian is also filing a separate supplemental declaration containing resumes for all attorneys from that firm who worked on this case.

1   contrary, billing contract attorneys at market rates is legal and ethical.  In addition, given the volume

2   of foreign language documents in this case, the use of contract attorneys was both necessary and

3   reasonable.

4   Most of the contract attorneys hired to work on this case were fluent in Chinese, Japanese or

5   Korean because the vast majority of the important documents in this case were in these three foreign

6   languages.[50]  In addition to their language skills, the contract attorneys hired by Lead Counsel were

7   highly skilled and experienced.[51]  Lead Counsel and other IPP firms also closely supervised the work

8   of these attorneys.[52]  Lastly, because most of the contract attorneys performed primarily document

9   review, their rates were capped at $350 for English document reviewers and $400 for foreign

10  language reviewers.  These rates are lower than the billing rates for associates of similar

11  experience.[53]  Given their level of experience and the type and quality of the work performed, the

12  rates charged for these attorneys are more than reasonable.

13  More generally, the use of contract attorneys in complex litigation is widely-accepted and

14  necessary, particularly where (as here) the contract attorney possesses a specialized skill.  The ABA

15  accepts both the use of contract attorneys and billing for those lawyers at market rates, emphasizing

16  that "if the contract lawyer is billed as just another lawyer whose work makes up the fee for the

17  matter, the firm may bill the client any reasonable rate for the services just as it does for one of its

18  associates."[54] Many federal courts are in accord.[55]

19

20  [50] *See* Fee Motion at 3, 18; *see further* Alioto Fee Decl. II ¶ 18.

21  [51] *Id.* ¶ 19.

22  [52] *See Enron*, 586 F. Supp. at 783 (Noting that "under ABA Formal Opinion No. 00–420, an attorney
    may bill the contract attorney's charges to the client as fees rather than costs when 'the client's
23  reasonable expectation is that the retaining lawyer has supervised the work of the contract lawyer or
    adopted that work as her own.'" (citations omitted)).  *See also* Alioto Fee Decl. II, ¶ 20(describing
    how Lead Counsel closely supervised the work of their contract attorneys).

24  [53] *See further* Alioto Fee Decl. II ¶ 21 (detailing the level of work performed and rates charged for
    certain contract attorneys); Pearl Decl. ¶¶ 14-17 (citing cases supporting the use of market rates and
25  declaring that "virtually every law firm I know of bills private clients for contract attorneys at *market*
    rates – *i.e.*, the rates charged for attorneys of comparable experience, and expertise for comparable
26  work.")

27  [54] Legal Ethics, Law. Deskbk. Prof. Resp. § 1.5-4(e) (2015-2016 ed.).

28  [55] *See, e.g., In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 272 (D.N.H. 2007) ("An
    attorney, regardless of whether she is an associate with steady employment or a contract attorney
    whose job ends upon completion of a particular document review project, is still an attorney.  It is

1      Finally, the St. John objection also conflicts with California law on this issue, which holds

2 that billing for contract attorneys at market rates is perfectly legal and ethical.  In *Shaffer v. Superior*

3 *Court*, 33 Cal. App. 4th 993 (1995), the court held defendant did not have to disclose the hourly rate

4 it paid a contract attorney in a dispute regarding attorneys' fees, because it was "simply a part of

5 defendant's costs and is not relevant" to the determination of the reasonably hourly rate.  *Id.* at 996.

6 As the court noted:

7      Examination of profits would penalize law firms which are able to produce at
     costs substantially less than their competitors.  It would unfairly penalize the

8      efficient and reward the inefficient.  Additionally, it would place courts in the
     position of supervising attorney fees on the basis of individual profit margins

9      instead of the going market price for given services.  This would be an
     unwarranted burden and bad public policy.

10

11 *Id.* at 1003.[56]

12      In sum, the use of contract attorneys in this complex litigation was perfectly legal, ethical and

13 appropriate.

14      **6.**     **Additional Counsel Were Enlisted for Trial, Delivering Substantial
     Benefits to the Class**

15

16      In the exercise of the discretion conferred on Lead Counsel by the Court to make decisions

17 about the efficient and effective management of this case, it was Lead Counsel's reasoned judgment

18 that it was necessary to bring additional experienced trial counsel into this case.  While Lead

19 Counsel and some of the other attorneys already in the case have tried antitrust cases, this was a

20 massive and highly complicated case involving 22 certified classes.  In fact, Lead Counsel is not

21

22 therefore appropriate to bill a contract attorney's time at market rates and count these time charges
toward the lodestar."); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 783

23 (S.D. Tex. 2008) (Rejecting objections to the use of contract attorneys and their rates, and noting that
"'[t]oday it is not uncommon for an employing law firm to pay the temporary lawyer at one rate and

24 charge that lawyer's services to the client at a higher rate that covers overhead and a contribution to
firm profits.'" (citing Kathryn M. Fenton, *Use of Temporary or Contract Attorneys.* 13–FALL

25 Antitrust 23, 24 (1998)); *Carlson v. Xerox Corp.,* 596 F. Supp. 2d 400, 409-410 (D. Conn. 2009)

26 (adopting the reasoning of *Tyco* and *Enron*, and rejecting objectors' argument that class counsel
should not get a multiplier on time billed by contract attorneys)

27 [56] *See also Margolin v. Regional Planning Com.,* 134 Cal. App. 3d 999, 1004-1005 (1982)
(Rejecting the contention that the salaries paid by a law firm to its associates were in any way

28 relevant to an award of reasonable attorney fees: "California courts have consistently held that a
computation of time spent on a case and *the reasonable value of that time* is fundamental to a

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF
LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-JST

aware of the trial of any post-CAFA case of this nature and magnitude.  Lead Counsel therefore

believed it was in the best interests of the class to bring on board some of the only lawyers in the

country who have successfully tried a complex national direct purchaser class action.[57]

The three trial firms did excellent work in a short amount of time to prepare the case for trial.

They were ably assisted by Lead Counsel and the core firms who had been involved in the case all

along.  Indeed, by waiting until only five months before trial to bring these firms on board, Lead

Counsel saved the Class money while at the same time ensuring that the case was properly prepared

for trial.  In the opinion of Lead Counsel, bringing these three firms into the case, and demonstrating

to the Defendants that IPPs were ready to go to trial, significantly improved the settlement value of

this case with Defendants.  *See* Alioto Fee Decl. II ¶ 23.

### 7.    Time Spent on the CRT Finished Product Conspiracy Claims Benefitted the Class

Objector St. John also argues that Lead Counsel should not be allowed to recover fees

incurred in connection with claims of a CRT finished product conspiracy because these claims were

withdrawn in the face of a Rule 11 motion.[58]  But the filing of a Rule 11 motion by Defendants does

not, in and of itself, demonstrate that the time spent on those claims was unreasonably spent or did

not benefit the class.[59]

In fact, this time was reasonably spent and did benefit the Class.  For example, discovery

regarding the claims of a CRT finished product conspiracy was also relevant to pass-through of the

---

determination of an appropriate attorneys'fee award.  [Citations omitted]  *Consideration of the cost of providing services has no place in that formula.*") (Emphasis added).

[57] Antitrust cases rarely go to trial.  Joe Goldberg of Freedman Boyd was trial counsel and Fine Kaplan & Black was co-lead counsel in one of the few antitrust cases in recent years to go to trial. The *Urethanes Antitrust Litigation* was tried in the District of Kansas in early 2013.  The four week *Urethanes* trial resulted in a judgment of over $1 billion, which is believed to be the largest price-fixing verdict ever.  Alioto Fee Decl. II ¶ 22.

[58] St. John Objection at 23 (citing *In re Coordinated Pretrial Proceedings in Petroleum Products*, 109 F.3d 602, 608 (9th Cir. 1997): "[A] lawyer is not entitled . . . to compensation for hours a reasonable lawyer would not have spent, hours unreasonably spent, or work done so badly it is of no value to the common fund beneficiaries.")

[59] *Id.* ("This is not to say that if a lawyer writes a well-founded motion that a prudent lawyer would have written but it is denied, or takes a deposition of a witness who turns out not to be helpful, that the beneficiaries of the common fund need not pay for the effort.  *Good legal representation regularly includes some work which does not bear fruit.*") (emphasis added).

23

1    overcharge from CRTs to purchasers of CRT finished products, which remained an important part of

2    IPPs' case.  Thus, the time spent on these claims benefitted the Class and is properly included in IPP

3    Counsel's lodestar.

4              **8.      The Cooper/Scarpulla Lodestar Objections Are Meritless**

5              Objectors Cooper and Scarpulla make various vague contentions about "serious problems"

6    with the time and expense reporting by IPP Counsel.[60]  They provide zero support for their claims of

7    duplicative and wasteful work, unnecessary contentiousness, and significant time logged by

8    attorneys with no antitrust experience.  The only examples they provide are readily disproven.

9              First, their claim that Mr. Alioto lacks experience and has never tried an antitrust case before

10   is flatly contradicted by Mr. Alioto's *Curriculum Vitae*.[61]  Second, the three trial firms began work

11   on this case in early October 2014, not the last two weeks of December 2014.  The reasons for

12   bringing these firms into the case are addressed in Subsection 6, *infra*.  Third, the time categories

13   used by IPP Counsel are the same time categories used and approved in the indirect purchaser *LCD*

14   case, where Mr. Scarpulla was lead counsel.[62]  Finally, Lead Counsel was forced to intervene in the

15   California Attorney General's case because Philips took the position that its $500,000 settlement

16   with the AG released the claims of California natural persons in this case.  Had Lead Counsel not

17   challenged the approval of that settlement, Philips would have had a strong argument at summary

18   judgment that those claims had been released.[63]  Lead Counsel's ultimate settlement of $175 million

19   from Philips supports the merits of IPPs' position vis-à-vis Philips, namely that the release of

20   California natural persons' claims for less than $500,000 was not fair, adequate or reasonable.  (*See*

21   Alioto Fee Decl. II ¶¶ 25.)  IPP Counsel's efforts benefited the class by preserving the claims of

22   California natural persons.  Fees incurred in connection with this dispute are properly included in

23   IPP Counsel's lodestar.

24   _____

25   [60] *See* Cooper/Scarpulla Objection at 5-7.

26   [61] *See* Dkt. No. 4073-1, Ex. 1.

     [62] *See* Alioto Fee Decl. II ¶ 24.

27   [63] Philips moved for summary judgment on California natural persons' claims, arguing that the

28   judgment approving its settlement with the California Attorney General released those claims.  (*See* Dkt. No. 3034.)

1      Lead Counsel was involved in and oversaw every aspect of this litigation.[64]  Lead Counsel

2 has also conducted an audit of all firms' time records and cut duplicative and unnecessary time.[65]  In

3 contrast, objectors Scarpulla and Cooper had only very small roles in this case.  In the entire eight-

4 year duration of this case, Mr. Cooper never submitted any time to Lead Counsel,[66] and Mr.

5 Scarpulla was completely absent for most of 2010 through 2012 due to his lead role in the *LCD*

6 case.[67]  They have no personal knowledge of the work done in this case by any firm other than their

7 own, and no basis to make any of these spurious accusations.[68]  Finally, attorneys in other IPP firms

8 who worked extensively on this case refute Messrs. Cooper's and Scarpulla's mischaracterizations

9 of the management of this case.[69]

10              **9.**        **Bonsignore's Description of Lead Counsel's Timekeeping Practices and**

11                       **Other Inflammatory Statements are Demonstrably False**

12      Mr. Bonsignore is disgruntled because his fee declaration was not included in the joint fee

13 motion.  The Audit Committee determined that it could not submit certain items of Bonsignore's

14 time and expenses to the Court as part of the joint lodestar.  Mr. Bonsignore did not try to support his

15 questioned time and expenses.  Instead, he has embarked on a campaign of false and inflammatory

16

17 ---

[64] *See generally* Alioto Fee Decl. I (describing Lead Counsel's involvement in and supervision of all
aspects of this case).

18
[65] Lead Counsel will make the Audit Committee's notes and communications regarding this audit

19 available to the Special Master upon request.  *See* Alioto Fee Decl. II ¶ 27.

20 [66] Mr. Cooper's then associate (now partner) John Bogdanov billed a substantial number of hours in
this case.  His role was limited, however, to discovery related to two defendants (Philips and LPD).

21 *See* Alioto Settl.  Decl. II.

22 [67] *See* Alioto Settl. Decl. II.  Mr. Scarpulla did almost no substantive work in this case.  The
substantive work of his former firm, Zelle Hofmann, was performed by other capable partners and

23 associates at that firm, including Craig Corbitt, Christopher Micheletti, Judith Zahid and Qianwei
Fu.  The majority of Mr. Scarpulla's time appears to have been spent discussing the case with other

24 members of his firm (which is of questionable value given that the case was already well-staffed by
senior Zelle partners), and most often with Assistant California Attorney General, Emilio Varanini.

25 *Id*.

[68] Cooper and Scarpulla cite generally to *In re High Tech. Employees Antitrust Litig.,* 2015 WL

26 5158730 in support of using the lodestar approach here.  But in that case, class counsel requested a
multiplier of more than double what IPP Counsel are seeking here (4.8 vs. 2.3).  *Id.* at *7.  In

27 addition, two of the lead firms questioned the reliability and accuracy of the third lead firm's time
records.  And unlike here, the third lead firm made several adjustments to its billings indicating that

28 its co-leads had some basis for their concerns.  Thus, a detailed review of counsels' time records
appears to have been warranted there.  The same cannot be said here.

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF
LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-JST

1   statements.  He has a track record of disruptive behavior in other cases as well.  *See* Alioto Fee Decl.

2   II ¶ 26, Ex. B.

3        Lead Counsel has maintained contemporaneous time records throughout this litigation.

4   These time records will be made available to the Special Master upon request.  *Id.* ¶ 27.  The other

5   inflammatory allegations of Bonsignore are addressed in the Alioto Declaration in support of IPPs'

6   motion for final approval of the settlements.

7        **10.    Time Record Discovery Is Unnecessary and Should be Denied**

8        "[T]he determination of [attorney's] fees should not result in a second major litigation," *Fox*

9   *v. Vice*, 131 S.Ct. 2205, 2210 (2011), yet that is what objectors have in mind with their request to

10  review "all counsel's timesheets."[70]  To be clear, IPP Counsel are happy to submit additional time

11  detail for *in camera* review if the Court believes such information would be helpful.  But discovery

12  on these issues is neither necessary nor wise.  *Lobatz v. U.S. W. Cellular of California, Inc.*, 222

13  F.3d 1142, 1148 (9th Cir. 2000) (affirming denial of "request for discovery of class counsel's

14  contemporaneous time records"); *In re Genetically Modified Rice Litig.*, 764 F.3d 864, 872 (8th Cir.

15  2014) ("discovery in connection with fee motions is rarely permitted") (citations omitted).

16       As *Lobatz* explains, the discovery sought by objectors often "impose[s] on district courts, as

17  well as litigants, a rigid process . . . of little benefit" in evaluating the reasonableness of a fee award.

18  222 F.3d at 1148.  That is particularly so where, as here, the objectors fail "to show any legitimate

19  need for the records[.]"  *Id.*  No objector in this case has explained why discovery of class counsel's

20  time detail—as opposed to prompt *in camera* review by an experienced Special Master—is

21  necessary or appropriate.  This is nothing more than a fishing expedition.

22       Time record discovery is all the more unwarranted in light of the preference for the

23  percentage plus lodestar cross-check method typically employed in this type of case. *See Vizcaino*,

24  290 F.3d at 1051; Fee Motion, at 10 (collecting many cases).  The percentage plus multiplier cross-

25  check method not only aligns class/lawyer interests in a sensible way, but avoids precisely the type

---

27  [69] *See* Declarations of certain IPP firms submitted herewith (attesting to the efficient management of this case, and the collegiality among IPP Counsel).

28  [70] *See* Cooper/Scarpulla Objection at 4-5; Bonsignore Objection at 7.

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF
LITIGATION EXPENSES, AND INCENTIVE AWARDS — Master File No. CV-07-5944-JST

1    of time entry-parsing in which objectors seek to engage.  *See In re Activision Securities Litig.*, 723 F.

2    Supp. 1373 (N.D. Cal. 1989), *cited with approval by In re Omnivision Technologies, Inc.*, 559 F.

3    Supp. 2d at 1046 ("The Court finds [the] advantages persuasive, and adopts the percentage method

4    in this matter.").

5         Nor will discovery contribute anything of value to the court's lodestar "cross check" analysis.

6    As it stands, IPP Counsel have requested a 2.3 multiplier on counsel's historical lodestar of $83.8

7    million.  That proposed multiplier falls well within the standard range, *see Vizcaino*, 290 F.3d at

8    1051, and no amount of line-by-line examination by objectors will have any material bearing on the

9    Court's analysis.  For example, even a reduction of the lodestar by twenty percent (which is in no

10   way warranted) would result in a multiplier of less than 3.  This would still be within the standard

11   and acceptable range.  *See* Fee Motion, at 25 (collecting cases).[71]

12        In all events, the experienced Special Master is more than capable of reviewing class

13   counsel's time records.  Objector discovery adds no value to the process, is a recipe for protracted

14   and irrelevant sideshow disputes, and accordingly should be denied.[72]

15        **D.    The Cooper/Scarpulla Fee Allocation Proposal is Premature, and Wrong in Substance**

16

17        Messrs. Cooper and Scarpulla also assert that the Court should impose a hard and fast rule

18   barring "firms that did not contribute any of their own funds to the plaintiffs' Litigation Expense

19   Fund . . . and therefore had no financial risks" from receiving any type of "enhanced award" on their

20   lodestar amount.  *See* Cooper/Scarpulla Objection at 5.  This argument is wrong for at least three

21   reasons.

22

23   [71] *See generally Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 50 (2d Cir. 2000) ("where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court"); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d at 306-07 ("The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting.  The district courts may rely on summaries submitted by the attorneys and need not review actual billing records.").

24

25   [72] The cases cited in this section also answer objectors' suggestion that the court should ignore the percentage method in favor of a strict lodestar analysis.  *See* Cooper/Scarpulla at 4; St. John at 17-24.  There is a clear preference in the Ninth Circuit and elsewhere for using the percentage method in combination with a simple lodestar cross-check, which is a framework that makes perfect sense here for all the reasons described above.  *See generally Fox*, 131 S.Ct. at 2216 (in performing lodestar analyses, "courts need not, and indeed should not, become green-eyeshade accountants" because the goal "is to do rough justice, not to achieve auditing perfection").

26

27

28

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-JST

1    First, the emphasis on fee allocation issues is premature.  It is for Lead Counsel to propose

2    the fee allocation in the first instance based on each firm's overall contribution to the case, but that

3    has yet to occur.[73]  If and when an allocation framework is proposed, objections can be addressed by

4    the Court as appropriate.  But now is not the time.  The focus for now should remain on establishing

5    the overall fee award, which in turn will allow for distribution of money to the class as promptly as

6    possible.  The lawyers, including Cooper and Scarpulla, will have plenty of time to argue about their

7    share after the real work is done.

8    Second, the fee award for any particular law firm should be a function of that firm's *overall*

9    contribution to the case and the class, and the factors bearing on that question are not limited to

10   litigation financing.[74]  There is no basis for short-circuiting the proper analysis with a rule focused

11   solely on cash contributions to the case.[75]

12   Third, the premise of these objectors' contention—that only those who contributed cash bore

13   financial risk on behalf of the class— is demonstrably false.  Time is money.  And every IPP lawyer

14   in the case devoted time and professional resources to the litigation, all on a contingency basis.  This

15   of course was a significant financial risk, and attorneys should be compensated in a manner

16   commensurate with each firm's overall contributions as described above.

17   Cooper and Scarpulla's arbitrary fee allocation proposal should be rejected as both premature

18   and wrong in substance.

---

[73] *See, e.g., In re Automotive Refinishing Paint Antitrust Litig.*, No. MDL 1426, 2008 WL 63269, at *7 (E.D. Pa. Jan. 3, 2008) ("Courts generally approve joint fee applications which request a single aggregate fee award with allocations to specific firms to be determined by Co-Lead Counsel, who are most familiar with the work done by each firm and each firm's overall contribution to the litigation."); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 533 n.15 (3d Cir. 2004) (noting "the accepted practice of allowing counsel to apportion fees among themselves").

[74] *See, e.g., LCD II*, 2013 WL 1365900, at *9  (approving Special Master's consideration of additional factors including "contribution to the joint IPP effort, as opposed to work performed solely for an individual client; performing higher-skill tasks (e.g., taking depositions) . . . demonstrating efficiency; high quality of work as reported to the Special Master by lead and liaison counsel"; etc.).

[75] The court in the very case Messrs. Cooper and Scarpulla cite applied a positive multiplier to the lodestar of an attorney who had not advanced any monies for payment of expenses.  *See In re High Tech. Employees Antitrust Litig.*, 2015 WL 5158730, at *11-12.

1

**III.   THERE ARE NO OBJECTIONS TO THE AMOUNT OF EXPENSES OR
          INCENTIVE AWARDS**

2

3          There are no objections to the amount of litigation expenses that IPP Counsel have identified

4    for reimbursement,[76] or to the requested class representative incentive awards.  IPP Counsel

5    respectfully requests that the Court order reimbursement in full and grant the awards to the class

6    representatives in accordance with as requested in the Fee Motion.

7    **IV.   CONCLUSION**

8          For all the foregoing reasons, the Court should overrule the objections to IPP Counsel's

9    requested fee of one-third of the Settlement Fund, and grant IPPs' motion.

10   Dated:  November 20, 2015                  Respectfully submitted,

11                                               */s/ Mario N. Alioto*
                                                Mario N. Alioto (56433)
12                                               malioto@tatp.com
                                                Joseph M. Patane (72202)
13                                               jpatane@tatp.com
                                                Lauren C. Capurro (241151)
14                                               laurenrussell@tatp.com
                                                TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
15                                               2280 Union Street
                                                San Francisco, CA 94123
16                                               Telephone: 415-563-7200
                                                Facsimile: 415-346-0679
17
                                                *Lead Counsel for Indirect Purchaser*
18                                               *Plaintiffs*

19

20

21

22

23

24

25

26

27
---
28
[76] Certain objectors have requested Lead Counsel's accounting records.  There is no basis to provide
these records to the objectors.  Lead Counsel will provide them to the Special Master upon request.

INDIRECT PURCHASER PLAINTIFFS' REPLY RE: MOTION FOR ATTORNEYS' FEES, REIMBURSEMENT OF
LITIGATION EXPENSES, AND INCENTIVE AWARDS – Master File No. CV-07-5944-JST