Paul B. Justi (SBN124727)
LAW OFFICES OF PAUL B. JUSTI
1981 North Broadway, Suite 250
Walnut Creek, CA 94596
T: 925.256.7900
F: 925. 256.9204
pbjusti@comcast.net

Attorneys for Class Member and Objector
Dan L. Williams & Co.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: CATHODE RAY TUBE (CRT) ANTI-TRUST LITIGATION | MDL No. 1917 |
| | Case No. C-07-5944-JST |
| This Document Relates to: | **OBJECTOR DAN L. WILLIAMS & CO.'S OBJECTIONS TO SPECIAL MASTER'S REPORT AND RECOMMENDATIONS** |
| ALL ACTIONS | |

Class member Dan L. Williams & Co. (Objector, Williams), objects to the report and recommendation of the Special Master filed on January 28, 2016 (Dk 4351), respecting both the approval of the proposed settlements and the award of attorneys' fees and related expenses.

PRIOR OBJECTIONS TO THE PROPOSED CLASS ACTION SETTLEMENT

On October 8, 2015, Williams filed objections to the proposed class action settlement. (Dk 4112). These objections were three-fold: *First*, the amount of attorney's fees that Class Counsel sought from the class fund was excessive. *Second*, the scope of the releases included in the Class Settlement was overly broad and improperly released claims that were otherwise viable. *Third*, the notice campaign preliminarily approved by the Court was inadequate.

The Special Master recognized Williams' objections in-part, but did nothing to remedy any of the inadequacies that led Williams to file these initial objections. Accordingly, Williams incorporates by reference his original objections (Dk 4112) and furthers them with reference to the Special Master's January 28, 2016 report.

OVERVIEW OF OBJECTIONS TO THE REPORT & RECOMMENDATION

1. Williams is a class member, residing at 4834 Metropolitan Avenue, Kansas City, KS, 66106. Williams' claim form states that he purchased one Philips cathode ray tube computer monitor during the period March 1, 1995 to November 25, 2007. The claim form for this Objector is attached as Exhibit A.[1]

2. *Attorneys' Fees and Related Expenses*: Class Counsel sought a fee of $192.25 million dollars, *i.e.*, 33% of the total settlement fund. The Special Master has recommended a slightly-reduced fee of $173.25 million dollars. Nevertheless, this recommended fee still amounts to 30% of what the Special Master has repeatedly noted is the second-largest indirect purchaser antitrust settlement in history.

---

[1] Williams also testified and produced evidence at deposition in response to a subpoena that he purchased three CRT monitors during the class period, one of which was likely purchased in Missouri and the other two in Kansas. (Deposition of Dan L. Williams & Co., Oct. 30, 2015, at pps. 43-44).

3.    However, the excessive amount of attorneys' fees that private counsel for the plaintiff class is seeking from the settlement fund is not mitigated by the cosmetics of a 10% across-the-board reduction, as R&R proposes.  Even according to the Special Master's calculation, this adjusted sum is still a percentage of the fund award that results in a multiplier of approximately 2.14 on Class Counsel's $81,067,569.20 lodestar.

4.    In this megafund case, the Court should apply the "megafund" principle—applied by other federal circuit courts—that in order for class members to benefit from economies of scale fee awards to class counsel should generally decline when class funds exceed $100 million.   Application of the megafund principle reduces the benchmark percentage that class attorneys are permitted to claim against settlement funds in excess of $100,000,000 to a percentage below the percentage that Class Counsel seek for this proposed Class Settlement—a sum that is still 5% above the 25% benchmark the Ninth Circuit adopted for a *non*-megafund case.

5.    The special master's conclusion that his recommendation is supported by *High-Tech*[2] is not plausible. There, the percentage of the fund was drastically lower (10.5%), so the lodestar multiplier aligned with a sensible aggregate fee for a total fund of $415 million.  *High-Tech* demonstrates the inverse of the logic applied by the special master. A functional cross-check does not assume that the percentage request is reasonable, because such an approach assumes that both the quantum of hours and the presumed fairness of the percentage of the fund recovery are reasonable.

---

[2] *In re High-Tech Employees Antitrust Litig.*, 2015 WL 5158730 (N.D. Cal. No.-11-cv-2509, Sept. 2, 2015).

DAN L. WILLIAMS & CO. OBJ. TO SPECIAL MASTER'S R&R – 3

6.      The Special Master relied almost entirely upon Class Counsel's own declarations in determining that counsel's time was reasonable and reliable.  While the Special Master stated that he spot-checked these declarations by reviewing contemporaneous billing entries, his review was admittedly limited to only 8 of the 50 firms involved.  Thus, for 42 of the class firms, the Special Master's review went no further than reviewing the firm's own declaration. Further, although recognizing that Lead Counsel appointed an Audit Committee to review Class Counsel's time, the Special Master did not even review the committee's work—deciding instead that his limited review of some firm's actual billings was a reliable substitute.

7.      Thus, to the extent the Court decides to buttress its fee award determination with the Special Master's recommended lodestar of $81,067,569.20 (and a multiplier of 2.14), Objector Williams conditionally moves to intervene and for leave to conduct limited discovery.   Williams would seek production of all time records in searchable, electronic format; sufficient time to review and analyze those records; and then sufficient time to depose appropriate counsel; and then to prepare any papers regarding the true reasonableness of the lodestar claimed.  Without at least limited discovery, there is no meaningful "cross-check," as nothing is actually checked other than arithmetic applied to an asserted lodestar.

8.      While Class Counsel may—in asserting that the benefit to the class is the full sum being paid by the defendants—argue that "[n]o cy pres distribution is contemplated," it is hard to imagine that all funds will be claimed, or that a pro-rata distribution of unclaimed funds will not result in a windfall—the result being that the supposedly uncontemplated will unavoidably occur.  With regard to this issue, we respectfully

acknowledge the Ninth Circuit's precedent in *Staton v. Boeing Co.*, 327 F.3d 938, 959–61 (9th Cir. 2003), that allows courts to credit cy pres monies, but urge for en banc and Supreme Court preservation purposes that the contrary rule in *Redman v. RadioShack*, 768 F.3d 622 (7th Cir. 2014) is the more appropriate.

9.      Beyond this, we acknowledge the decisions in *Williams v. MGM–Pathe Comm-c'ns Co.*, 129 F.3d 1026, 1027 (9th Cir.1997), *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1295 (11th Cir.1999); and *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2d Cir. 2007), that permit fee awards based on the total sum available to class members, rather than the sums actually claimed and received, but submit for en banc and Supreme Court preservation purposes that the contrary rule in *Redman* is the more appropriate one.

10.     The Report Would Release All Missouri Claims (Which Are Actionable Under Missouri Law) Without Compensation: The special master's R&R does not solve the point of the objection made that the scope of the releases included in the Class Settlement is overly broad because the releases (as in the case of the Philips Settlement quoted below) state that the settling defendants will be released of, among other things, all claims:

> arising out of or relating in any way to any act or omission of the Philips Releasees (or any of them) concerning the manufacture, supply, distribution, sale or pricing of CRT Products up to the date of execution of this Agreement, including but not limited to any conduct alleged, and causes of action asserted or that could have been alleged or asserted, in any class action complaints filed in the Action, including those arising under any federal or state antitrust, unfair competition, unfair practices, price discrimination, unitary pricing, or trade practice law.

Philips Settlement Agreement §13 [Dkt. 3862-1]. This language is broad enough to release claims of claimants in states that are not even defined to be part of the class— including claimants who reside in states like Missouri, or those who purchased products in Missouri, but may reside in states included within the class definition, like Williams, a resident of Kansas.

11.     Missouri law provides consumer remedies for price-fixing to its citizens and others who were indirect purchasers of products in Missouri, such as the conduct alleged in this Litigation, and for which Missouri indirect purchaser claimants recovered in the parallel LCD litigation in the same court. *See In re TFT-LCD (Flat Panel) Antitrust Litigation,* Case No. 3:07-MD-1827 SI (N.D. Cal. 2014). The fact that these legitimate claims (for purchases made in Missouri) are given up without compensation does not comport with due process and is a formidable taking without just compensation of valuable interests. Even assuming it to be factually accurate that IPP Class Counsel made diligent efforts to obtain a subclass representative for Missouri claims, there is no legal authority (and none is cited by the Special Master) for extinguishing these valuable property rights without compensation. The payment of claims from the fund is not apportioned by states, so that there seems to have been no logical reason, let alone a legal one, to insist on a subclass representative for claims from purchases in Missouri.

12.     The Notice Campaign Is Inadequate: The notice campaign does not appear to meet the federal standard of "the best practicable notice" pursuant to Federal Rule of Civil Procedure 23.

13.     At the outset, it is telling that although the deadline for disclosure has passed, we still have absolutely no information regarding the actual claims yield.  Based upon the

assorted problems with the notice campaign, Williams anticipates a claims rate so low as to require the appointment of an independent expert to analyze the results of the notice campaign. The Court should require that the number of claimants (including the number of CRTs per claimant) be disclosed to help determine whether the notice campaign was adequate. Therefore, Objector preserves this objection in anticipation of a low response rate to notification of the existence of this class, particularly among individual claimants and small business.

## ARGUMENT

### OBJECTION 1:
### THE MEGA FUND CLASS ACTION PRINCIPLE SHOULD REDUCE THE PERCENTAGE OF THE FUND RECOVERY THAT WOULD OTHERWISE CONSTITUTE AN ABUSE OF DISCRETION AT THE PERCENTAGE OF THE FUND SOUGHT

The Special Master noted that this case "presents the familiar problem of how to determine a reasonable fee award in a megafund case." (Dk 4351 pg. 67). He even went so far as to explain the purpose of the megafund principle, stating that courts from around the nation "prescribe the use of an inverse scale: the higher the megafund, the lower the percentage for the fee." *Id.* However, once this groundwork was laid, the Special Master just as quickly brushed it aside, concluding that the Ninth Circuit has "expressly rejected any hard rule that megafund cases are to be treated differently." *Id.*

Although the Ninth Circuit has not mandated that megafund cases be treated differently, this does not prohibit the Court from drawing upon the majority rule and applying the rationale of the megafund case law analysis in this instance. Given that this multi-district case involves a settlement fund of over $575 million dollars, if this case had been consolidated in a megafund jurisdiction, this caselaw would certainly be applicable.

In megafund class actions, the percentage of recovery should be inversely related to the size of the settlement fund, especially where the case settles before trial, and there is no appeal. This principle should be applied in this case as it generally is in other megafund cases.  There is certainly no reason to deviate, where the fund is so great, from the 25% benchmark percentage of the fund awarded as fees in non-megafund cases.  *In re Coordinated Pretrial Proceedings in Petrol. Prods Antitrust Lit.*, 109 F.3d 602, 607 (9th Cir. 1997) (citing *In re Washington Pub. Power Supply Sys. Sec. Lit.,* 19 F.3d 1291, 1294-95 n.2, 1295, 1297 (9th Cir.1994)) (*WPPSL).* ("A 25% benchmark might be reasonable in some cases, but arbitrary if the fund were extremely large."); *see also In re Bluetooth Headset Products Liability Lit.*, 654 F.3d 935, 942-43 (9th Cir. 2011) ("[W]here awarding 25% of a 'megafund' would yield windfall profits for class counsel in light of the hours spent on the case, courts should adjust the benchmark percentage or employ the lodestar method instead.")

A majority trend exists that percentage of the fund awards in megafund cases (over $100 million) are awarded at a lesser percentage than "non-mega"common fund cases.  Treatises have tracked and considered the award of fees to class counsel in common fund cases. 4 NEWBERG ON CLASS ACTIONS § 14.6 (4th ed.) ("Some courts utilize a lower percentage when common funds are very large, finding that a lower percentage sufficiently rewards class counsel in such 'mega-fund' cases."); ANN. MANUAL COMPLEX LIT. §14.121 (2012 ed.) ("Accordingly, in 'mega-cases' in which large settlements or awards serve as the basis for calculating a percentage, courts have often found considerably lower percentages of recovery to be appropriate.")

IPP counsel are well aware of this trend, given that several of them used as their expert in another recent matter in this district (the LCD litigation), Brian Fitzpatrick, whose review of megafund fee awards (and super megafund fee awards) demonstrated that these awards have

commonly been nowhere *near* 30% of the fund.  In his "An Empirical Study of Class Action Settlements and their Fee Awards," he explained:

> [F]ee percentages tended to drift lower at a fairly slow pace until a settlement of $100 million was reached, at which point the fee percentages plunged well below 20%, and by the time $500,000 million was reached, they plunged well below 15%, with most awards at that level under even 10%.

Fitzpatrick's Study finding drastically *lower* percentage awards in megafund cases has been prominently utilized:

> According to one study, in cases involving common funds "from $500 million to $1 billion" in 2006 and 2007, "the mean and median awards were both 12.9%" of the fund. *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F.Supp.2d at 1033 (citing Brian T. Fitzpatrick, An Empirical Study of Class Action Settlements and Their Fee Awards, 7 J. Empirical Legal Stud. 811, 839 (2010)).

*In re Black Farmers Discrimination Lit.*, 953 F.Supp.2d 82, 98  (D.C.D.C 2013) (July 11, 2013) (awarding 7.4 percent of the fund award constituting $90,835,000); *see also Wal–Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 106 (2d Cir. 1995) (antitrust megafund ($3.383 billion) class action in which lawyers who had "achieved extraordinary results" awarded 6.5% of the fund).  The percentage of fees recommended by the Special Master is thus too great and should be adjusted downward to an appropriate percentage.

In a case such as this, the reduction of the percentage fund recovered is particularly important because Class Counsel's fee derives from the fund and their fees directly reduce the amount of recovery to the class.   Thus, unlike where the fee award is discrete, undetermined, and to be separately paid by the defendants subject to court approval, here the class suffers directly from the award of a percentage of the fund that that would exceed that generally provided for in megafund cases as seen in the majority of jurisdictions.

To the extent that the Ninth Circuit has not followed the principle that would presumptively reduce the percentage of the fund recovered in a megafund case, it should adopt that approach here.  Application of the megafund rule would be particularly wise in light of the fact that this multi-district matter could have been consolidated elsewhere; the class contains members from numerous other states territorially within the bounds of other federal circuits, where fees in megafund cases have been returned in percentages well below the 30% recommended by the Special Master, let alone the 25% benchmark approved by the Ninth Circuit for non-megafund cases.

Moreover, the benchmark guideline of 25% recommended by the Ninth Circuit is well surpassed by the exorbitant percentage recovery requested and recommended. While that benchmark is not under guiding precedent an established norm for megafund cases, nonetheless it, too, is exceeded by the largesse of the the Special Master's recommended fee award to Class Counsel. Indeed, the Special Master's analysis references a recent case from this district in which the percentage of the fund was vastly smaller that that recommended here, as well as cases from other jurisdictions where that is the result. (D. 4351:67-69). The case provides more reason, not less, to apply a megafund reduction to this percentage of the fund recovery.

Rather than proving the validity of the percentage of the fund award proposed, this demonstrates that the court should reduce the percentage award of attorneys' fees by applying the principle, as has been done regularly in other federal circuits.  This megafund principle reduces the benchmark percentages that class attorneys are permitted to claim against settlement funds in excess of $100,000,000 to a percentage below the percentage class counsel are seeking in the Class Settlement. Objector believes that the attorney's fee award in this case should be calculated based on the majority rule that the percentage of a class fund awarded to counsel

generally declines from the benchmark percentage in megafund cases like this—especially one that settled without any trial or any appeal.

Additionally, as explained in objection 3, because the notice campaign is likely fatally flawed (and the Special Master has cited no actual evidence to refute this hypothesis), we anticipate that the actual claims rate (once produced) will be very low, and, thus, it is unlikely that the entirety of the settlement fund will be distributed (or could be distributed without resulting in a substantial windfall for each of the claimants who made claims).  Thus, although we recognize that the Ninth Circuit—in *Staton v. Boeing Co.*, 327 F.3d 938, 959–61 (9th Cir. 2003)—stated that *cy pres* funds may be taken into account when determining appropriate attorney's fees, we argue, for preservation purposes, that the more logical rule was set forth in *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014), in which the Seventh Circuit explained that attorney's fees should be predicated on the actual benefit conferred on the class. ("The ratio that is relevant to assessing the reasonableness of the attorneys' fee that the parties agreed to is the ratio of (1) the fee to (2) the fee plus what the class members received."); *see also Pearson v. NBTY, Inc.*, 772 F.3d 778, 781-783 (7th Cir. 2014) (applying *Redman* to reverse approved settlement for reconsideration).

THE CLAIMED LODESTAR IS OF SUCH MAGNITUDE THAT IT WOULD REQUIRE A SIGNIFICANT AMOUNT OF TIME, DISCOVERY AND ANALYSIS TO JUSTIFY

The Objector also contends that the claimed $83,753,999.05 lodestar (trimmed slightly by the Special Master to $81,067,569.20)  should not be used to justify the fee award—especially not without a genuine and sufficient opportunity to analyze that lodestar and conduct appropriate discovery.

The Special Master elected to use a percentage-of-the-fund method to determine appropriate fees for class counsel.  He elected to cross-check this analysis against a lodestar with a multiplier.  Notably, the Special Master did not pre-determine the appropriate multiplier based upon the unique attributes of the litigation, but instead used the percentage-of-the-fund analysis to back out a multiplier, which he then subjected to review.[3]

Class Counsel claimed a pre-trial lodestar of $83,753,999.05. After concluding that the lodestar should be calculated using current billing rates and, thereby, bumping up Class Counsel's lodestar to $90,075,076.90, the Special Master arbitrarily cut Class Counsel's lodestar by 10% to $81,067,569.20.

This arbitrary 10% reduction does not, however, remedy the problems that render the Special Master's lodestar analysis an unfit cross-check on the utterly excessive 30%-of-the-fund fee award.  The root of the problem is that a cross-check is only as accurate as the billing records on which it is premised, and there are serious concerns that the claimed lodestar is not accurate.

There is good reason to doubt the reasonableness of the claimed pre-trial lodestar.  By way of example, these reasons include:

 a. The United States Department of Justice (DOJ) moved for a stay of all discovery in July, 2008, pending its criminal investigation into the CRT conspiracy.  *See* DE 4071-01_Declaration of Mario N. Alioto ¶ 26. Discovery was stayed until almost

---

[3] Williams submits that the Court should apply the percentage-of-fund approach to determine the fees to be awarded here, but only do so cognizant of the declination in percentage appropriately awarded in a case where the settlement well exceeds $100,000,000. If the Court were to ignore megafund principles when undertaking a percentage-of-fund analysis, a more searching analysis of the reasonableness of the hours performed must be engaged in.  Without such analysis, what is left is no more than a reverse-engineered result: a percentage of the fund has been identified by Class Counsel, and the multiplier for the lodestar has been calculated simply as a product of dividing the percentage of the fund proclaimed as reasonable by the hours submitted. This is not a meaningful approach to cross-checking the percentage of the fund that was preselected.

two years later - March 12, 2010, for all document discovery, and the stay on deposition discovery lasted even a year longer, until March 1, 2011. (*Id.*) Thus, merits discovery was formally stayed between February 2008 and March 2010; that is, for over two years.   In fact, deposition discovery was stayed as to defendants and their employees until March 11, 2011, just over three years from the initial stay.  Moreover, according to Class Counsel, merits depositions did not commence until December 2012.  Id. ¶ 47.

b. Indeed, without the need for any merits discovery, Class Counsel for plaintiffs reached one settlement in mid-2009. Id. ¶ 101. The next settlement was achieved in May, 2013, barely five months into merits discovery. ¶ 105.[4]

c. While proclaiming their excellent result for those within the defined class, Class Counsel ignore deviations from practice such as that identified in our second Objection. Unlike a previous matter in this district, this class omitted at least some of those indirect purchasers who may have had claims for damages in states such as Missouri.

d. These exemplar arguments demonstrate that the lodestar proposed as reasonable by Class Counsel is not a reliable source on which to bolster a percentage-of-fund recovery approach that, in a megafund situation, well-exceeds the Ninth Circuit's 25% benchmark for lesser funds—here by asking for a 33.88% percentage fee (and being recommended a 30% fee) on an almost $580 million fund. The lodestar should not be assumed reasonable based either upon the work performed relevant

---

[4] We note that although the Special Master found that the hiatus in discovery did not lead to any padding of the lodestar, the Special Master's conclusions on this point suffer from the same shortfalls that are listed below regarding his review of the billings at issue.

to the results achieved, or in relation to an inflated percentage of the fund recovery, or because *lead class counsel* have reviewed the time submitted and excluded some uncertain amount of it from their aggregate lodestar.  It is, therefore, not an effectual cross-check on the percentage recovery demanded.

Moreover, the Special Master essentially adopted Class Counsel's recitation of the appropriate lodestar—as set forth in the form of Class Counsel's declarations regarding time billed—without undertaking any meaningful review of the actual records produced.  The Special Master explained that his review of Class Counsel's declarations of the time billed went no further than reviewing (a subset of) the actual billing records from only 8 of the 50 firms involved.  Although the Special Master acknowledged that Lead Counsel appointed an Audit Committee to review Class Counsel's time, the Special Master chose to ignore the committee's work, relying instead on his limited review of a subset of some firm's actual billings.  Aside from this very limited review (a peek behind the curtain really), the Special Master rubber-stamped Class Counsel's reported time.

We acknowledge that to evaluate sufficiently the claimed $83,753,999.05 lodestar would require an enormous amount of time and effort, and that the amount of time between class notice and the objection deadline is patently inadequate to do so.  Indeed, to evaluate such a claimed lodestar would require a continuance of at least six months, so that all time records could be fully analyzed and all necessary discovery--including depositions of counsel claiming significant time--could be conducted.  The law firms claiming the reasonableness of this lodestar should be ordered to produce all of their time records in searchable, electronic format, *if* the Court is to rely on that lodestar as a cross-check on the percentage of fund sought in this case. At a bare minimum, all of these records should be produced so that the Court can at least spot-

check the time records and allow some depositions regarding the spot-check.  Such an alternative approach would require much less time, albeit it would not be as robust as the primary approach proposed.

For the Court to rely on the claimed lodestar to justify the fee award from the class would deny due process unless there is a sufficient continuance for analysis and discovery.  But in order to avoid unnecessary waste and delay, class action fee proceedings should not become major litigation in and of themselves.  Given the stunning enormity of the pre-trial lodestar claimed by the proponents of the proposed class action settlement (and the Special Master's recommended lodestar), any meaningful analysis of that claimed lodestar would require a tremendous--and tremendously wasteful--amount of ancillary litigation that most class members who object to the requested attorneys' fees lack the resources to afford.  However, expense of review cannot insulate the claimed lodestar in this case from meaningful scrutiny *if* the Court is going to rely on that claimed lodestar to bolster the percentage of fund recovery demanded in excess of the percentage awarded in many other megafund cases, let alone the benchmark guidance established by the Ninth Circuit for lesser funds.  We thus suggest that the fee request in a common fund case of this magnitude should be evaluated on a pure percentage of fund basis, and adjusted for the stage of the litigation when the case settled, the caliber of the representation, the risks of representation, the results obtained, and any other factor bearing on an appropriate percentage—specifically including the megafund rule.

Finally, we must add that the quality of Class Counsel's representation is tarnished by our point in Objection 2 below—the settlement agreement too broadly releases claims for those who purchased products in states not within the class—and that any determination of the appropriate fee award in this case should account for that shortcoming.

OBJECTION 2:

THE SETTLEMENT AGREEMENT TOO BROADLY RELEASES CLAIMS FOR THOSE WHO
PURCHASED PRODUCTS IN STATES NOT WITHIN THE STATE CLASSES

As noted above, as one exemplar of the several settlements reached, the Philips Settlement Agreement §13 [Dkt. 3862-1] broadly releases all claims, including those for claimants in states that are not even defined as a state class, including claimants who reside in states such as Missouri, or those who purchased products in Missouri, but may reside in states included within the state class definition, such as Williams.  Any class member, such as this Objector, may under Rule 23(e)(5) protest the exclusion of these compensatory claims from the defined class.

Initially, this Court certified 22 indirect purchaser state classes.  (Dkts. 1742 and 1950).  To be deemed a member of one of these classes, an individual would need to be a resident of one of the 22 named states.  This list of state classes included Kansas—where Williams resides.

The Proposed Settlements are now contingent upon a newly defined Settlement Class.  This Settlement Class encompasses the same 22 states that were initially named as state classes and includes a newly formed nationwide, but diverges from the initial certification in a major way: instead of basing class membership on residency within one of the named states, the Settlement Class requires only that an individual made a purchase within one of the named states.

While the purpose of this alteration was likely to broaden the scope of potential claims, it has had unintended consequences.  Namely, (1) that individuals who reside in class-certified states, but who made purchases in non-class-certified states may no longer have valid claims and (2) that individuals who reside outside of a class-certified state, but who made a purchase in a class-certified state may now have valid claims.

While this dichotomous treatment may in-and-of itself raise due process concerns, what is clear is that the Settlement Class may now reduce the valid claims of Williams, who made a qualifying purchase in Kansas, but also made a purchase in Missouri—a state not included in the Settlement Class. The exclusion of Missouri from the Settlement Class is fundamentally erroneous.[5]

Missouri law provides potent consumer remedies for price-fixing to its citizens and others who were indirect purchasers of products in Missouri. Missouri indirect purchaser claimants recovered for like claims in the parallel litigation in this Division. *See In re TFT-LCD (Flat Panel) Antitrust Litigation,* Case No. 3:07-MD-1827 SI (N.D. Cal.). According to filings in that case from no less a source than the Attorney General of Missouri, that state's Supreme Court has authorized indirect purchasers to maintain private actions under Missouri's Merchandising Practices Act ("MMPA"). Mo. Rev. Stat. § 407.020 *et seq.* (Supp. 2010). *See also In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014) at * 19 (recognizing validity of indirect purchaser plaintiff cause of action under MMPA despite Missouri's being a non-repealer antitrust state jurisdiction).

The Special Master concluded that Missouri's exclusion from the Settlement Class was appropriate because there was no Missouri class representative. In support of his conclusion that the existence of a class representative is a prerequisite to certification as a sub-class within the Settlement Class, the Special Master asserts that "Special Master Legge had already ruled that each state-specific class must have a named plaintiff in order to proceed." (Dkt. 4351, pg. 40).

---

[5] Specifically, the release of claims from states that were not included in the list of state classes encompassed by the proposed Settlement Class—like Missouri—are accomplished through the proposed Nationwide Class. The Nationwide Class consists of all persons who indirectly purchased in the United States CRT Products.

Although citing Special Master Legge's order as an absolute bar to Missouri claims, a review of that order (issued in 2010—long before any class was certified) reflects that it was entered in response to a motion to dismiss and centered on whether residents in a state without a class representative had standing to pursue relief.  While Special Master Legge's conclusion may be true with respect to subclasses proceeding to a trial on the merits (where it could be necessary to prove that the Defendants violated each state-specific sub-class's antitrust or consumer protection statute), that analysis does not apply with force to a Settlement Class that is not based on the merits, or on any potential variations in state law remedies.

Indeed, a review of the Proposed Settlement makes clear that no subclasses are necessary. The payment of claims from the fund is not apportioned by states, so that there seems to have been no logical reason in the first place, and certainly none in retrospect, to insist on a subclass representative for claims from purchases in Missouri.  A subclass representative is required when a subclass is necessary to establish recoveries for class members that may have disparate or conflicting interests with other members of the overall class.  NEWBERG ON CLASS ACTIONS § 7:31 (5th ed.) ("If two parts of a single class have significantly conflicting interests and cannot be adequately represented by a single representative or counsel, the class may be split into multiple subclasses, each with its own class representative and counsel, and the litigation may proceed accordingly.").  Here, there is no rationale for requiring a subclass representative for purchases made in Missouri (or any other state).  The Settlement Class could simply include all individuals that made qualifying purchases in any state that would allow antitrust relief through state antitrust laws or their counterpart consumer protection statutes.  The Court has the power to change the class definition.  *Mazur v. eBay Inc.*, 257 F.R.D. 563, 568 (N.D. Cal. 2009) ("the court has the power to modify proposed class definitions to make them sufficiently definite").  It

is completely unreasonable to release viable Missouri damages claims without any compensation simply for want of a class representative whose absence has nothing to do with the viability of claims under the Settlement Class as defined.

However, even assuming that a subclass representative was necessary to pursue damages based on purchases made in Missouri, and even assuming that IPP Class Counsel—despite diligent efforts—failed to obtain a subclass representative for Missouri claims, there is still no legal authority cited by the Special Master for extinguishing these valuable property rights without compensation.

Here, a procedural lapse (even assuming good faith efforts) in producing a class representative cannot comport with due process in the distribution of this fund. If the interests of those individuals who made purchases in Missouri conflict with those of other class members, then the proper remedy would be to create a Missouri-purchaser subclass, not to summarily release all claims for purchases in Missouri without compensation. A district court can divide a class into subclasses on its own volition. *Santillan v. Gonzales*, 388 F. Supp. 2d 1065, 1072 (N.D. Cal. 2005) ("A court may divide a class into subclasses on motion of either party, or sua sponte."). Moreover, a court can subdivide a class after settlement has been reached. Rule 23's advisory note makes this clear, stating that "[s]ettlement review . . . may provide an occasion to review the cogency of the initial class definition," as the settlement terms or objections "may reveal divergent interests of class members and demonstrate the need . . . to designate subclasses."

Regardless of whether subclasses are necessary, the Proposed Settlement releases valid Missouri claims without compensation. The constitutionality of class action representation turns on the absent class members being adequately represented. *Hansberry v. Lee*, 311 U.S. 32, 43,

(1940).  Creating a Nationwide Class and, thereby, releasing all Missouri claims without any any appropriate representation from a Missouri claimant constitutes a due process violation.   Thus, the Proposed Plan of Allocation is patently unfair. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 627 (1997) "[W]here differences among members of a class are such that subclasses must be established, we know of no authority that permits a court to approve a settlement without creating subclasses on the basis of consents by members of a unitary class, some of whom happen to be members of the distinct subgroups. The class representatives may well have thought that the Settlement serves the aggregate interests of the entire class. But the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups.")

OBJECTION 3:

THE NOTICE CAMPAIGN WILL LIKELY NOT CONSTITUTE THE BEST NOTICE PRACTICABLE
UNDER THE CIRCUMSTANCES TO ABSENT CLASS MEMBERS

There is absolutely no discussion of the actual claims data *anywhere* in the Special Master's report on the adequacy of notice—much less mention that any such data was ever produced.  In fact, it can be inferred from its conspicuous absence that no claim data was actually disclosed.

In the absence of actual claims data, the Special Master relies almost entirely on the representations set forth in the affidavit of Lead Counsel's notice expert, Fisher, to determine whether the notice campaign satisfies Rule 23.  Based upon that "persuasive evidence" that the notice campaign was fair, reasonable, and adequate, the Special Master denied a request (from Cooper and Scarpulla) for a neutral expert to report on the efficacy of the notice campaign.  As explained below, we also previously stated that the appointment of a neutral expert would likely

be appropriate.  However, as we stated previously, we contend that such appointment should be made once the actual claims data is produced.  We reiterate that request here, if it comes to light that the claims rate is low, as we anticipate it will be.

If the court certifies a class under Rule 23(b)(3), it "must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed.R.Civ.P. 23(c)(2)(B). *See also Silber v. Mabon*, 18 F.3d 1449, 1454 (9th Cir. 1994) (best notice practicable notice under the circumstances is standard that applies to absent class members and consists of "what notice is reasonably certain  to inform the absent members of the plaintiff class") (internal quote omitted). Rule 23(c)(2) governs both the form and content of a proposed notice.

The notice campaign that has now been blessed by the Special Master appears inadequate to inform all class members of the pendency of the settlement, and thus of their rights to make claims, opt out, or object to the settlement. Thus, the notice campaign does not appear to meet the federal standard of "the best practicable notice" pursuant to Federal Rule of Civil Procedure 23. Objector anticipates a claims rate so low as to require the appointment of an independent expert to analyze the results of the notice campaign.  Indeed, the only hard data cited by the Special Master in its report supports the premise that the claims data will show a very low claims rate.  The Special Master notes (approvingly) that 537,000 unique visitors have gone to the settlement administrator's web-site.  However, given that the settlement class includes many millions of members in 22 states, and class counsel apparently relied primarily on electronic notice—meaning that relatively few class members received notices and claims forms in the regular mail—this would seem to be a very low number of visitors. In all likelihood,the rate of people who actually submitted claims will be substantially lower than 100% of all visitors.

Thus, the only actual piece of data relating to the *actual* claims experience relied on by the Special Master is a strong indicator that the claims yield will prove to be weak.

Where notice to a class is inadequate because it results in a subpar response in claims, the court may reject the settlement or examine ways in which to find the best practicable notice that Rule 23 requires. *Kaufman v. American Express Travel Related Services, Inc.*, 283 F.R.D. 404, 408 (N.D. Ill. 2012). In order to accomplish this obligation the court may appoint an expert in class notification, who will prepare a report on how best to undertake better notification efforts. *Id.*

Therefore, Objector preserves this objection and proposed procedure to remedy it, in anticipation of this low response rate to the notice.

ADOPTION OF OTHER OBJECTIONS

The Objectors hereby adopt and incorporate herein all other objections lodged with the Court with regard to the proposed settlement, to the extent such objections are not inconsistent with the objections raised herein.

Conclusion

The Court should not approve the settlement as proposed and should require that any final settlement remedy the shortcomings identified above.  To the extent, if any, the Court relies in the lodestar that Class Counsel claim, the Court should allow sufficient discovery to ascertain and verify the true reasonable lodestar in this case; at a minimum, the Court should conduct a

///

///

///

///

1  substantial spot-check of the time records submitted and allow sufficient verifying depositions.

2  DATED: February 12, 2016               Respectfully submitted,

3

4                                          LAW OFFICES OF PAUL B. JUSTI

5                                          _____/s/ Paul B. Justi_____
6                                                    Paul B. Justi

7                                          Attorneys for Class Member and Objector
8                                          DAN L. WILLIAMS & CO.