Pages 1 – 102

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JON S. TIGAR, JUDGE

IN RE CATHODE RAY TUBE            )
ANTITRUST LITIGATION              )          MDL NO. 1917
                                             CASE NO. C 07-5944 SC

                                             San Francisco, California
                                             Tuesday
                                             February 9, 2016
                                             9:36 a.m.


                      TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:          TAYLOR & COMPANY, LLP
                         One Ferry Building
                         Suite 355
                         San Francisco, California  94111
                   BY:   CHERYL A. GALVIN, ESQ.
                         STEPHEN E. TAYLOR, ESQ.


                         ROBINS KAPLAN MILLER & CERISI LLP
                         2049 Century Park East
                         Suite 3400
                         Los Angeles, California  90067-3211
                   BY:   DAVID MARTINEZ, ESQ.


                         BOIES SCHILLER & FLEXNER LLP
                         30 South Pearl Street
                         Albany, New York  12207
                   BY:   KYLE SMITH, ESQ.
                         PHILIP J. IOVIENO, ESQ.

Reported by:             BELLE BALL, CSR #8785, CRR, RDR
                         Official Reporter, U.S. District Court

 (Appearances continued, next page)

APPEARANCES, CONTINUED:


For Plaintiffs:

                        KENNY NACHWALTER
                        1100 Miami Center
                        201 South Biscayne Boulevard
                        Miami, Florida  33131-4327
                   BY:  KEVIN J. MURRY, ESQ.
                        SAMUEL J. RANDALL, ESQ.
                        WILLIAM J. BLECHMAN, ESQ. (Telephonic)


                        PAUL, WEISS, RIFKIND,
                          WHARTON & GARRISON LLP
                        2001 K Street, N.W.
                        Washington, D.C.  20006-1047
                   BY:  CRAIG BENSON, ESQ.
                        KENNETH A. GALLO, ESQ.
                        KIRA A. DAVIS, ESQ.


                        KERR & WAGSTAFFE LLP
                        100 Spear Street
                        Suite 1800
                        San Francisco, California  94105
                   BY:  JAMES M. WAGSTAFFE, ESQ.


                        ALSTON & BIRD, LLP
                        One Atlantic Center
                        1201 West Peachtree Street
                        Atlanta, Georgia  30309-3424
                   BY:  MICHAEL P. KENNY, ESQ.
                        DEBRA D. BERNSTEIN, ESQ.
                        MATTHEW D. KENT, ESQ.


For Defendant Chunghwa Picture Tubes, Ltd.:
                        GIBSON, DUNN & CRUTCHER, LLP
                        555 Mission Street
                        San Francisco, California  94105-2933
                   BY:  JOEL S. SANDERS, ESQ.

 (Appearances continued, next page)

```
APPEARANCES, CONTINUED:


For Defendants Koninklijke Philips N.V. and Philips
Electronics North America Corporation:
                         BAKER BOTTS, LLP
                         The Warner
                         1299 Pennsylvania Avenue, N.W.
                         Washington, D.C.  20004-2400
                  BY:  ERIK T. KOONS, ESQ.


For Multiple Defendants:
                         WHITE & CASE, LLP
                         701 Thirteenth Street, N.W.
                         Washington, D.C.  20005-3807
                  BY:  CHRISTOPHER M. CURRAN, ESQ.


For LG Defendants:       MUNGER, TOLLES & OLSON, LLP
                         355 South Grand Avenue
                         35th Floor
                         Los Angeles, California  90071-1560
                  BY:  BRAD D. BRIAN, ESQ.
                         SUSAN E. NASH, ESQ.
                         and
                         MUNGER, TOLLES & OLSON, LLP
                         560 Mission Street
                         27th Floor
                         San Francisco, California  94105-2907
                  BY:  CATHLEEN H. HARTGE, ESQ.
                         MIRIAM KIM, ESQ.


For Interested Party Mitsubishi:
                         JENNER & BLOCK LLC
                         353 North Clark Street
                         Chicago, Illinois  60654-3456
                  BY:  GABRIEL A. FUENTES, ESQ.

For the Thomson Defendants:
                         FAEGRE BAKER DANIELS LLP
                         300 North Meridian Street
                         Suite 2700
                         Indianapolis, Indiana  46204
                  BY:  RYAN M. HURLEY, ESQ.
                         KATHY L. OSBORN, ESQ. (Telephonic)
```

```
1    TUESDAY, FEBRUARY 9, 2016                           9:36 A.M.

2                        P R O C E E D I N G S

3         THE CLERK:  Calling Civil Case 07-5944, MDL No. 1917,

4    In Re:  Cathode Ray Tube Antitrust Litigation.

5       Your Honor, appearances have already been taken.

6         THE COURT:  Thank you.  Well, this is the

7    semi-monthly meeting of the antitrust bar.

8       We have several motions on calendar today.  There is no

9    magic to this order.  The order is essentially random.  But I

10   think we have five motions on today.  And so unless someone

11   wants to suggest a different order, unless the parties have

12   talked about this beforehand, we'll take argument in the

13   following order.

14      Hitachi Defendants' motion for summary judgment based on

15   withdrawal and the statute of limitations, the Toshiba

16   Defendants' motion for summary judgment concerning withdrawal,

17   Defendant LG Electronic Inc's motion for partial summary

18   judgment on withdrawal grounds, the Philips Electronics

19   subsidiaries' motion for partial summary judgment, and then

20   lastly the motion for partial summary judgment against Dell

21   and Sharp on statute of limitations grounds.

22      If you just divide up a couple of hours among five

23   motions, you come up with a number of 12 minutes a side.  So

24   that's what we'll do.  That will probably fluctuate slightly

25   as it has in prior hearings but you should expect, unless I
```

1  order differently from the bench, that those time limits will

2  be enforced.

3      I may have a few questions as we go along.  Sometimes

4  before we start a motion, I may put some questions on the

5  table.

6      Let's go ahead and start with the Hitachi motion.

7          **MS. HARTGE:**  Good morning, Your Honor.  My name is

8  Cathleen Hartge.  I'm with Munger Tolls and Olson, for LG

9  Electronics.  And I'll be arguing the withdrawal motion filed

10  by the five Hitachi Defendants, because even though they have

11  since settled out of the case, a finding that they withdrew

12  would have a couple of effects on damages.

13      First, it would reduce the overall --

14          **THE COURT:**  May I ask you a question?

15          **MS. HARTGE:**  Sure, Your Honor.

16          **THE COURT:**  Can you cite a case to me that finds

17  withdrawal as a matter of law -- which is what you are asking

18  me to find -- where the Defendant continued to hold stock in a

19  conspiring corporation?

20          **MS. HARTGE:**  Your Honor --

21          **THE COURT:**  You don't have to answer that question

22  this moment, but at some part in your argument it would be

23  very helpful to your position if you were able to cite such a

24  case.

25          **MS. HARTGE:**  Understood, Your Honor.

1    **THE COURT:**  Also if you could provide further

2    information about the agreement that HED(US) made with

3    Thomson, in which HED(US) agreed that Hitachi Shenzhen would

4    stay out of the North American CRT market.  If I knew more

5    about the terms of that agreement it might be helpful because

6    I would like to know how it was that HED(US) was able to bind

7    Hitachi Shenzhen and then there was testimony by someone named

8    Lloyd Thomas Heiser, whoever that is, that Mr. Toniguchi, who

9    was an employee of HED(US), was in charge of manufacturing,

10   production or engineering at Hitachi Shenzhen.

11        If you could explain that arrangement if you know the

12   details of it, and explain what, if anything, that has to do

13   with the motions that are in front of the Court today, that

14   would also be helpful.  Those are my questions.

15        **MS. HARTGE:**  Sure, Your Honor.  I'll go ahead and

16   address them in order.

17        First, as to your question about cases where withdrawal is

18   found as a matter of law, where there is continued share

19   ownership.  We have not identified such cases at this point.

20   But what's important is that no case has held that mere share

21   ownership, in and of itself, can preclude summary judgment.

22   And that's critical because both the withdrawal standard and

23   fundamental principles of corporate separateness make clear

24   that that cannot be the law.

25        Taking corporate separateness first.  The United States

1    Supreme Court has emphasized repeatedly that mere shareholder

2    status without more cannot mean that a company that holds

3    stock in another company can be held liable for the latter's

4    acts.

5         **THE COURT:**  I sort of get it on that argument, right?

6    Let's say that I own one share of Ford Motor Company, and Ford

7    conspires with another automobile manufacturer to artificially

8    maintain the price of cars.  I, Jon Tigar, am not liable for

9    Ford's participation in the antitrust conspiracy.  I get that.

10        But that's -- I mean, there's a very important predicate

11   fact that that argument kind of elides over, which was:  If I

12   personally participated in the antitrust conspiracy then I

13   have somehow -- you know, and that affected my relationship as

14   a shareholder to Ford, that's really the predicate fact that

15   that argument kind of skips over.

16        That's what I need help with.

17        **MS. HARTGE:**  Right.  And that's where the withdrawal

18   standard comes in, Your Honor.  Sounds like we are in

19   agreement on the fundamental principle there.  But as to the

20   withdrawal standard, the Supreme Court laid out a two part

21   test in *United States versus US Gypsum*, with just two parts:

22   Affirmative acts inconsistent with the object of the

23   conspiracy, and communication in a manner reasonably

24   calculated to notify co-conspirators.  That's it.

25        And so any argument that mere shareholder status precludes

1  withdrawal is fundamentally at odds with that standard as

2  enunciated by the Supreme Court in *Gypsum*.  And that's

3  bolstered by the corporate separateness point the Defendants

4  keep making, because it is a fundamental point.

5      And so there is no doubt here that the Hitachi Defendants

6  meet that test, where they undertook inconsistent acts that

7  are fundamentally at odds with the conspiracy, where they

8  stopped selling tubes, and in fact they had divested their

9  tube-making assets to other companies.  And so they stopped

10 making tubes in the process.  And they communicated that exit

11 to the world.

12     And there is just no genuine issue of material fact as to

13 those undisputed facts, Your Honor.  And because of that,

14 there is -- you can't point to the 25 percent share in SEG and

15 say that fact precludes withdrawal, without more.

16         **THE COURT:**  It's not a question of precluding.

17 You're the one who wants summary judgment.  Right?  I mean,

18 it's not -- anyway.  I don't mean to be arguing with you.  I'm

19 not sure what the question was that I thought I was starting

20 to ask.

21         **MS. HARTGE:**  So, the reason that summary judgment

22 cannot preclude withdrawal -- and of course the Defendants do

23 not dispute that it's their burden -- is that the Defendants

24 have met the test.  Where they undertook affirmative acts that

25 are inconsistent with the object of the conspiracy.

1        The Hitachi Defendants got rid of their tube-making

2   assets.  They could not sell tubes -- they could not make

3   tubes anymore after March 20, 2003.  They didn't sell any more

4   tubes.

5        So this is not simply a case where they stopped

6   participating in the conspiracy or they didn't attend meetings

7   anymore, or they said:  Oh, we're not price fixing anymore.

8   This isn't that case.  They undertook affirmative acts that

9   are inconsistent with the object of the conspiracy.

10       And so the point of the continued share ownership is

11   simply that pointing to that share ownership without more

12   cannot create a genuine issue of material fact.

13       And that takes me into your remaining questions,

14   Your Honor.  First of all, that of the agreement between the

15   -- the head U.S. entity and Thomson.  And the agreement itself

16   was not provided in evidence in the motion for -- in

17   Plaintiffs' opposition to the motion.  And so the details just

18   aren't here for the motion.  And so it's not at all clear that

19   that agreement did bind any other entity other than the

20   Hitachi Defendants.  And there's nothing inappropriate about

21   the Hitachi -- if the Hitachi Defendants did enter into a

22   noncompete agreement with Thomson, that's a totally

23   appropriate term of an agreement to sell assets to another

24   company.

25       Now, as to your reference to Mr. Toniguchi, there, the

1   background to that testimony in Mr. Heiser's deposition is

2   that he was presented with an undated list of names.  And he

3   was -- he made clear that he wasn't really familiar with who

4   was on that list, and that he thought that Mr. Toniguchi was

5   someone who had been with the Hitachi U.S. entity, but then

6   who may have later been at SEG.

7        And so even on that score there's no evidence -- and

8   contrast that deposition testimony with that of Mr. Barrett,

9   which stated unequivocally that the Hitachi -- the one Hitachi

10  Defendant that continued to own a 25 percent share in SEG had

11  no ability to direct tube production or tube prices by SEG.

12       So if there's any question on that score, it's just so

13  clear from Mr. Barrett's testimony that that's the case,

14  whereas Mr. Heiser did not have the proper foundation to be

15  discussing these individuals.

16            **THE COURT:**  Are you saying that Mr. Heiser's

17  testimony is inadmissible on this motion?

18            **MS. HARTGE:**  Um, is it inadmissible on this motion?

19  Yes, because he did not have the proper foundation.

20            **THE COURT:**  Was an objection made on that ground?

21            **MS. HARTGE:**  I can check right now if that's okay,

22  Your Honor, or --

23            **THE COURT:**  Assume for a moment that it's admissible.

24  Is it not credible?  Is that what's going on?

25            **MS. HARTGE:**  Well, Mr. Heiser doesn't even say that

1   this was someone who was at Hitachi U.S. --

2           **THE COURT:**   The question is:  Is the testimony not

3   credible?  Is that what you are telling me?

4           **MS. HARTGE:**   I have no reason to think that

5   Mr. Heiser is not a credible witness.

6           **THE COURT:**   Because I think -- the reason I'm asking

7   you that question is that's what I'm hearing, which is:  You

8   know, Mr. Heiser, his testimony is not credible because he

9   didn't know enough about it.

10      And that's -- isn't that something -- the reason I'm

11  asking that question is:  Isn't that something that I have to

12  let a jury decide?

13      In other words, unless you're telling me that what

14  Mr. Heiser said is essentially -- and I just -- I was curious

15  about what he said because I wanted to know more about

16  Mr. Toniguchi's arrangement.  I'm not meaning to make

17  Mr. Heiser's testimony the centerpiece of this morning's

18  hearing.

19      But, but, but since we are talking about it, I hear you

20  saying:  Well, we have one witness that says this; I have

21  another witness that says the opposite.  And the witness that

22  says the first thing is really the less believable.

23      And my question is:  Isn't that something I have to let a

24  jury decide?

25          **MS. HARTGE:**   Your Honor, apologies if I was being

```
 1  unclear.  Backing up to Mr. Heiser's testimony, he never said
 2  that this is someone who was at Hitachi U.S. and at SEG at the
 3  same time.  That's not how I read his testimony.  And so that
 4  is not something that I would take to be in tension with
 5  Mr. Barrett's testimony.  So I apologize if I was unclear on
 6  that score.
 7      So all I'm saying is that to the extent that that point
 8  might have been unclear, any such ambiguity -- which I
 9  personally do not believe is there -- is resolved by looking
10  to Mr. Barrett's clear testimony as making clear that the
11  Hitachi Defendants did not have such influence or control or
12  ability to direct tube pricing and production.
13      Your Honor, I see I have two minutes left.  So unless you
14  have further questions, I would like to save the remainder of
15  my time for rebuttal.
16          THE COURT:  Very good.  Thank you.
17          MS. HARTGE:  Thank you, Your Honor.
18          MR. RANDALL:  Good morning, Your Honor, Samuel
19  Randall from Kenny Nachwalter on behalf of Sears and KMart.
20  I'll be arguing the opposition to the Hitachi withdrawal
21  motion.
22          THE COURT:  Very good.
23          MR. RANDALL:  Your Honor, in planning my argument
24  outline I addressed the same issues that Your Honor picked up
25  on.  I think we have four crucial facts here, any one of which
```

 1   would preclude a finding that Hitachi withdrew from this

 2   conspiracy as a matter of law.

 3       The first is a --

 4           **THE COURT:**  You say Hitachi, but we have five

 5   different separate corporate entities.  True?

 6           **MR. RANDALL:**  Yes.

 7           **THE COURT:**  And so there's evidence that HDP and HED

 8   took certain actions after March, 2003.  You list those in

 9   your opposition.

10       What evidence is there that HTL or HAS or HAL took any

11   action after March, 2003 that demonstrates the involvement of

12   that entity in the conspiracy or in the CRT industry?

13           **MR. RANDALL:**  I don't think that question is directly

14   relevant to this motion, Your Honor, because we're not -- the

15   only relevance of this motion, given that Hitachi has settled

16   out, is whether direct action purchaser -- Plaintiffs'

17   purchases from the Hitachi owned and controlled subsidiary are

18   part of their Sherman Act claim.

19       And so I would submit that so long as one Hitachi entity

20   continued -- failed to withdraw from the conspiracy, then

21   given Hitachi's corporate structure, any purchase from a

22   downstream Hitachi subsidiary would render those purchases

23   part of the Sherman Act claim.  So I don't think the Court

24   even needs to reach that issue.

25       But, but beyond that, the way Hitachi functions --

 1        **THE COURT:**  Is the answer to my question, which I

 2   continue to want an answer to -- is the answer to my question:

 3   We don't have any but it doesn't matter?

 4      I'm going to write something about those three entities.

 5        **MR. RANDALL:**  Okay.

 6        **THE COURT:**  This is your chance to have some input

 7   into what that is.

 8        **MR. RANDALL:**  We submit that Hitachi functioned as a

 9   single entity.  And so setting apart corporate separateness,

10   that all five of these entities did in fact join this

11   conspiracy.

12      And so you have at the top, you have Hitachi Limited which

13   owns 100 percent of every single one of these entities that

14   we're talking about, appoints all of the board members.  You

15   know, the information flows up to Hitachi Limited.

16      So I would submit that when -- if -- if a wholly-owned

17   subsidiary of Hitachi Limited is taking continued conduct in

18   furtherance of a conspiracy, then that fact negates withdrawal

19   for Hitachi Limited, the parent corporation.

20        **THE COURT:**  On what legal theory?

21        **MR. RANDALL:**  I think the Defendants are conflating

22   two standards here.  You have the standard for finding that

23   Hitachi participated in the conspiracy on the front end.  And

24   you have the standard for withdrawal.  And so, passive

25   activity does not constitute withdrawal.  I don't think we

```
 1    have to show affirmative action -- affirmative acts in
 2    furtherance of the conspiracy by every single entity after
 3    April, 2003.  What I think we have to show is that, viewing
 4    these facts together, Hitachi Limited, taking that, taking the
 5    parent corporation as an example, that Hitachi Limited didn't
 6    take acts inconsistent with the purchase -- with the purpose
 7    of the conspiracy.
 8              THE COURT:  Okay.
 9              MR. RANDALL:  And so even if there's no evidence that
10    Hitachi Limited itself did not take acts in furtherance of the
11    conspiracy after 2003, that's not a relevant factor for the
12    purposes of the withdrawal motion.  Because we're not putting
13    forth an alter-ego theory of liability for Hitachi post-2003.
14    We're just saying that Hitachi did not withdraw from the
15    conspiracy.
16       And I think there's a difference.  The Defendants would
17    seem to require us to establish an alter-ego theory of
18    liability for each Hitachi entity after 2003.  And I don't
19    think the law requires that.
20              THE COURT:  Okay.
21              MR. RANDALL:  On top of that, Your Honor, the act
22    that the Defendants maintain constituted Hitachi's withdrawal
23    from the conspiracy was the sale of CRT manufacturing
24    equipment to a co-conspirator.  And I don't think that act in
25    this context, in the conspiracy not to compete, is an act
```

1   inconsistent with the purpose of the conspiracy sufficient to

2   constitute withdrawal as a matter of law.  That -- all of

3   these cases, there's -- all of these cases say, collectively,

4   you have to do something inconsistent with the purpose of the

5   conspiracy.  The purpose of this conspiracy is to not compete,

6   in order to raise the price of CRTs.

7       So the fact Hitachi entities, these five Hitachi entities

8   did not continue to manufacture CRTs after 2003 is wholly

9   consistent with the purpose of the conspiracy.  It makes the

10  conspiracy more effective.

11      And that's a fact that was acknowledged by Hitachi in its

12  briefing, that the other members of the conspiracy commented

13  that Hitachi's exit from the industry made the conspiracy --

14  made the industry more concentrated, and it made the

15  conspiracy, I think, more effective.

16      Now, so, the -- there's actually a case that I think

17  addresses this.  In *United States versus Sax*, which is a

18  Seventh Circuit case, that's 39 F.3d, 1380, the Seventh

19  Circuit said that sale to a co-conspirator, you know --

20          **THE COURT:**  Is it Second or Seventh?

21          **MR. RANDALL:**  Seventh.

22          **THE COURT:**  Thank you.

23          **MR. RANDALL:**  Sale to a co-conspirator is not enough

24  to establish withdrawal as a matter of law.  That it's -- it

25  did nothing to defeat the purposes of the conspiracy.  It was

1   a different conspiracy in that case, that was a drug

2   conspiracy.

3        But the idea is the same.  That if you do something, if

4   your exit -- if your supposed exit from the conspiracy is an

5   act that makes the conspiracy in this case more effective,

6   that's -- that doesn't do anything to defeat the purposes of

7   the conspiracy.  Which is what *Gypsum* does require.

8        The second point is, which Your Honor picked up on, is

9   that Hitachi Displays continued ownership in Hitachi Shenzhen,

10   the 25 percent stake.  And given Hitachi's corporate

11   structure, Hitachi Displays is 100 percent owned by Hitachi

12   Limited.  So, Hitachi Limited has a 25 percent indirect

13   ownership stake in Hitachi Shenzhen, which is an entity that

14   no one disputes continues to participate in this conspiracy.

15        So, so, you do have continued stock ownership, albeit

16   indirect continued stock ownership.

17             **THE COURT:**  What if a different entity owned HTL?

18   Would it be liable?  Under that theory?  Why wouldn't it?

19        **MR. RANDALL:**  If that entity had participated in the

20   conspiracy at the outset, I would say yes, that that fact

21   would defeat withdrawal.

22             **THE COURT:**  And on and on.

23        **MR. RANDALL:**  And on and on.

24             **THE COURT:**  I could keep asking that hypothetical,

25   and the answer would keep being yes.

1        **MR. RANDALL:**  Yeah, I would submit yes, Your Honor,

2   because in this case you have -- Hitachi Displays was spun off

3   from Hitachi Limited around 2002, just created as a new

4   company to supervise certain Hitachi subsidiaries.

5        **THE COURT:**  What's your best case on that point?

6        **MR. RANDALL:**  Spinning off to creating a new company?

7        **THE COURT:**  Yes.  The sort of ownership -- in support

8   of the point that you -- well, you weren't making the point;

9   you were answering my question.  But in support of the answer

10  that you just gave, that we could keep going on and on and on,

11  that --

12       **MR. RANDALL:**  I have four cases cited in my brief

13  that supports the idea that stock ownership defeats

14  withdrawal.

15       **THE COURT:**  Well, *Antar* and *Reisman*.

16       **MR. RANDALL:**  Right.

17       **THE COURT:**  At the most basic level, that's a given.

18       **MR. RANDALL:**  So to answer Your Honor's question, if

19  you could just create enough companies in between you and the

20  conspiring entity, why would any defendant not do that?

21     I mean, Hitachi -- it doesn't really change anything.

22  They can create ten shell companies in between themselves and

23  Shenzhen, and all of a sudden create a situation where their

24  ability to control Shenzhen isn't any different, their ability

25  -- and the important fact here is their ability to receive

```
 1    proceeds from the conspiracy doesn't change.

 2         So, so why would any defendant, why would any member of a

 3    conspiracy in that position not just create the requisite

 4    number of shell corporations in between themselves, and

 5    isolate themselves from liability in the conspiracy?  I think

 6    as a matter of policy, that would defeat the purposes of

 7    withdrawal and the four-year statute of limitations under the

 8    Sherman Act.  And the purpose of allowing a conspiracy that's

 9    been fraudulently concealed from Plaintiffs to be actionable

10    more than four years after the fact.

11              THE COURT:  Well, that is a separate point, right?

12    You could lose on these other things that we are talking about

13    and win on the last, because of fraudulent concealment.

14              MR. RANDALL:  Actually, as to -- for all the other,

15    all these other motions, yes.  As to Hitachi, I think the law

16    -- I think I would have to concede that if Hitachi -- for the

17    limited purpose that we're considering this issue for, if

18    Hitachi withdrew, if Your Honor found as a matter of law that

19    Hitachi withdrew, then the purchases from -- as I understand

20    it, and I invite any -- if I'm wrong on that.  But as I

21    understand it, that the purchases from that downstream Hitachi

22    entity would not then be part of the Sherman Act claim.

23         So that, considering this is just a very limited issue

24    that Your Honor now has to decide, it's not a

25    statute-of-limitations issue anymore, that -- that would
```

1   affect whether downstream Hitachi purchases were actionable.

2       As to the other issue Your Honor picked up on, Hitachi did

3   continue to -- had -- had meetings with members of the

4   conspiracy after 2003.  And the important fact, the document

5   Your Honor referenced, Exhibit 9 says that there is a two-year

6   agreement between Hitachi and Thomson where it doesn't specify

7   any Hitachi entity, wherein Hitachi won't import 34-inch

8   cathode ray tubes, computer -- television tubes into the

9   United States, into North America.  Forgive me.

10      That agreement extended beyond Hitachi's supposed exit

11  from the -- from the cartel.  And the only entity that

12  continued to produce cathode ray tubes for the bulk of this

13  conspiracy was Hitachi Shenzhen.  And so I think that fact

14  communicates to other members of the cartel that Hitachi is

15  willing to negotiate for -- you know, allow conspiracy

16  agreements to affect Hitachi Shenzhen's production

17  capabilities.

18      And I think that's consistent with the evidence that we

19  have cited, is that Hitachi as a corporate structure

20  maintained a one-foot-in-and-one-foot-out approach to the CRT

21  industry.

22          **THE COURT:**  I have it in my notes that that agreement

23  that you are referring to is -- has as its Hitachi party

24  Hitachi Electronic Devices, USA, Inc.  And you just said that

25  the Hitachi entity is not specified.

1        Are my notes incorrect?  Or did I mishear you?

2            **MR. RANDALL:**  I believe that -- I would have to

3   double-check the document.  I thought it was a letter, the

4   letter in question comes from Hitachi Displays to Hitachi

5   Shenzhen.  I don't think it would make sense that it would be

6   a Hitachi Displays U.S. agreement because they are a U.S.

7   affiliate.  And so, you know, they don't -- whether or not --

8   they're, you know, a wholly-owned subsidiary.  Whether or not

9   Hitachi Shenzhen is importing into North America I don't think

10  would concern by itself, Hitachi Electronic Displays U.S.  I

11  think it was Hitachi Displays that wrote the document.

12       And we submit that, viewing the facts in the light most

13  favorable to our position, that it applies to all Hitachi

14  entities.

15       Your Honor, my time is up.  So, unless you have any more

16  questions, I'll sit down now.

17            **THE COURT:**  Thank you.

18            **MR. RANDALL:**  Thank you.

19            **THE CLERK:**  You have three minutes remaining.

20            **MS. HARTGE:**  Thank you.

21       A couple of points in response, Your Honor.  One is that

22  Mr. Randall had stated that it's wholly consistent with the

23  object of the conspiracy to stop making or selling the product

24  and to sell your assets off.  That turns the withdrawal

25  standard on its head.

1    Any time -- Mr. Randall is basically saying that any time

2    you stop in the industry in question, that you are supporting

3    the conspiracy by reducing capacity in that industry.  And

4    that just can't be right.

5         **THE COURT:**  Well, he did make that point, but he also

6    made a somewhat finer point, which is that sale to a

7    co-conspirator as opposed to just any sale ought somehow to be

8    treated differently.  And he cited this *United States versus*

9    *Sax* case from the Seventh Circuit.

10    Do you want to respond to that point?

11        **MS. HARTGE:**  Yes, yes.  That was going to be my next

12   point.

13    And *Sax* is distinguishable for a couple of reasons.

14   There, it wasn't that the Court found that Sax had failed to

15   withdraw by virtue of having sold assets to a co-conspirator.

16   The issue there was that Sax continued to launder money for

17   the drug conspiracy, which is an absolutely unquestionably

18   illegal act that helped to -- that was -- knowingly involved

19   these drug proceeds.  And also, payment to Sax for the illegal

20   business was contingent on future drug sales.

21    So these are the facts on which the Court deemed that Sax

22   had failed to withdraw.  It wasn't the sale of assets to a

23   co-conspirator.

24        **THE COURT:**  So, you would summarize that case, it

25   sounds like, by saying that the sale of this business did not

1    meaningfully diminish the Defendant's participation in this

2    illegal conspiracy.

3              **MS. HARTGE:**   That's correct, Your Honor.

4              **THE COURT:**   Uh-huh.

5              **MS. HARTGE:**   And neither *Morton's Market*, which is

6    the case in which the dairy owner sold the dairy and was

7    deemed to have withdrawn, nor any other case analyzes to whom

8    the conspiring business is sold.  Because that simply is not

9    relevant to the inquiry.  Once you have satisfied the two-part

10   *Gypsum* test, that's all that you need to do.

11       And the other point that I wanted to mention, Your Honor,

12   I wanted to touch briefly upon *Reisman* and *Antar*, which in

13   this past discussion it sounded like the Plaintiffs are saying

14   that those cases suggest that mere ownership in and of itself

15   precludes a withdrawal finding.  And in those cases, the

16   critical finding was that those Defendants had failed to take

17   any acts that were inconsistent with the object of the

18   conspiracy.

19       And here, where the Defendants have taken such action,

20   those cases are clearly distinguishable from the Hitachi

21   Defendants.

22       Now at bottom, the Plaintiffs are asking you to carve out

23   a special rule for minority shareholding, and disregard both

24   withdrawal and corporate separateness standards.  They're

25   asking you to make an exception to the bedrock corporate

```
 1    separateness principle that a stockholder cannot be liable for
 2    the acts of a company in which it holds stock.  And that's
 3    wholly unsupported by Supreme Court Ninth Circuit law.
 4         (Reporter interruption)
 5         MS. HARTGE:  And they're asking to you do the same
 6    thing on the withdrawal side.  They're asking you to graft a
 7    special requirement onto this two-part standard, saying that
 8    even if you've met the test, if you still have any shares in
 9    any conspiring company, then the finding of withdrawal is
10    defeated.
11      But both standards make clear that a -- that ownership,
12    mere shareholder status, without more, cannot create a genuine
13    issue of material fact.
14      And for these reasons, Defendants request that this Court
15    grant partial summary judgment in their favor on this motion.
16         THE COURT:  Thank you.
17         MS. HARTGE:   Thank you, Your Honor.
18         THE COURT:  Let's turn to the Toshiba Defendants'
19    motion, Mr. Curran.
20      Madam Reporter, Chris Curran.
21         MR. CURRAN:  Yes.  Your Honor, I've learned in the
22    past not to start until you give a direct go-ahead, but I take
23    that as a direct go ahead.
24         THE COURT:  That's a go-ahead.
25         MR. CURRAN:  Yeah.  Your Honor, applying the *U.S.*
```

 1    *Gypsum* test here, on March 31st, 2003, Toshiba took

 2    affirmative acts inconsistent with the object of the alleged

 3    conspiracy, and communicated those acts to -- in a manner

 4    reasonably calculated to reach the co-conspirators.

 5        On that date, Toshiba divested itself of the assets and

 6    personnel necessary for the continued sale of CRTs for

 7    application in color televisions and computer monitors.  At

 8    that same time, in the same agreement, the BIA, Toshiba agreed

 9    to a noncompete.  And in that noncompete, Toshiba

10    contractually bound itself not to participate in the sale of

11    CRTs for application for color televisions and computer

12    monitors.

13        That act and press releases associated with that, and the

14    press reports, satisfy *U.S. Gypsum* as to Toshiba.

15        Now, given your exchange with counsel who have appeared

16    already, I can anticipate some questions.  And I'll just kind

17    of dive into those.

18        **THE COURT:**  Yes.  And the questions concern

19    Matsushita Toshiba Picture Display.

20        **MR. CURRAN:**  Yeah.

21        **THE COURT:**  And you probably do know what the

22    questions are.

23        **MR. CURRAN:**  Yeah, I'll permit you to ask the

24    question, but I don't need it because I can just jump right to

25    it.  Okay.

1          **THE COURT:**  Well, let's save time.

2          **MR. CURRAN:**  Yeah, I hope so.  So, some of these

3    cases that Your Honor has been referencing talk about a

4    situation where an enterprise is involved in a conspiracy and

5    then maybe somebody leaves it.  The enterprise continues.

6    Does the individual withdraw under those circumstances?

7          Well, maybe you look at whether there's continued stock

8    ownership and other ties.  Okay.  That situation is

9    analytically very distinct from the Toshiba situation.

10   Toshiba is alleged to have been a conspirator.  Okay.  Alleged

11   to be supportive of the object of the conspiracy.

12         But on March 31st, 2003, it divested all of its assets and

13   personnel and so forth, not to any co-conspirator who had been

14   involved in the conspiracy.  No.  And Toshiba did not retain

15   any interest in any co-conspirator that had already been in

16   the conspiracy.  That didn't happen.  Those facts are

17   distinct.

18         Here, Toshiba divested its assets and its personnel to a

19   new entity.  That entity wasn't born a co-conspirator.  That

20   entity is alleged to have subsequently joined the conspiracy,

21   but that was after Toshiba divested itself.

22         And Your Honor, the Plaintiffs' own -- let's talk about

23   the Plaintiffs' evidence, because Your Honor made a number of

24   references to facts for the jury and so forth.  Yeah, all

25   facts are for the jury.  But, to get to the jury, the

1    Plaintiffs have to raise a genuine issue of material fact.

2    Otherwise Your Honor can reject the claim.

3        Here, the Plaintiff spent a fair bit of time on the facts

4    in their brief against our motion.  But those facts I think

5    can fairly be put into two buckets.  Bucket one, they spent a

6    lot of time raising a genuine issue of material fact as to

7    whether Toshiba was in the conspiracy to begin with.  Okay?

8        Our motion, of course, kind of presupposes such a fact

9    dispute.  And for purposes of this motion, I'm not disputing

10   that.  They have raised a genuine issue of material fact as to

11   whether Toshiba was in.  We'll take that on at trial.  We

12   might ask Your Honor for judgment as a matter of law at that

13   time.  For purposes of this motion I'll concede that.

14       (Reporter interruption)

15           **MR. CURRAN:**  I'm sorry, Ms. Ball; getting too excited

16   here.

17       But I'll also conceded that the Plaintiffs in their motion

18   establish a genuine issue of material fact that MTPD

19   subsequently joined the conspiracy.

20       But there's a lot of stuff that the Plaintiffs did not

21   raise a genuine issue of material fact as to.  Number one,

22   that Panasonic was ever in the conspiracy.  You know, that

23   opposition must say half a dozen times that Toshiba joined

24   forces with a co-conspirator and -- going forward.  There's

25   not a single fact in that motion that suggests that Panasonic

1   was a co-conspirator.

2      Number two, there is no evidence that MTPD was formed by

3   Toshiba and Panasonic as some sort of a vehicle to continue in

4   the conspiracy.  No evidence to that.  And in fact,

5   Your Honor, the Plaintiffs' own evidence refutes that

6   possibility.  It's Exhibit 16 in the Plaintiffs' declaration.

7   Where they attach the testimony of Mr. Kawano.  Mr. Kawano was

8   a former employee of Toshiba who went over to MTPD.  And he

9   talks in that testimony that the Plaintiffs attach about

10  MTPD's decision to meet with competitors after MTPD was up and

11  running.

12     That means, Your Honor, that MTPD was not continuing in

13  the conspiracy as in the *Reisman* case, as in *Antar* and as in

14  other cases the Plaintiffs are relying on.

15     Toshiba divested its assets to a new entity.  The fact

16  that entity later joined the conspiracy may make that entity

17  on the hook.  The Plaintiffs can sue them, and they have.  And

18  they can pursue damages from that entity.  But they cannot

19  attribute that company's decision to Toshiba.

20     And Your Honor, speaking of other things that the

21  Plaintiffs have not raised a genuine issue of material fact as

22  to, there are no facts in that opposition about Toshiba doing

23  anything improper after it divested the assets.  There are no

24  facts raised about Toshiba doing anything to support the

25  conspiracy or directing MTPD to do anything with respect to

1   the conspiracy.

2        So Your Honor, the facts here, as presented in the motion

3   papers to Your Honor, establish that Toshiba satisfies the

4   *U.S. Gypsum* case, and there are no countervailing

5   considerations such as the sale to a co-conspirator, whether

6   or not Mr. Randall is right about that point.

7        There's no evidence of Toshiba selling to or joining

8   forces with a co-conspirator, and there's no evidence that

9   Toshiba retained an interest in an entity or an enterprise

10  that was continuing in the conspiracy.

11       A couple of quick points on fraudulent concealment.  Here,

12  the Plaintiffs have not raised factual issues that satisfy the

13  *Conmar* case or the *Volk* case to -- to suggest at all that

14  Toshiba did anything that was in the nature of an affirmative

15  representation to the Plaintiffs that Toshiba was not in the

16  conspiracy.

17       There -- the Plaintiffs raise evidence of concealment,

18  they talk about destruction of documents or "Please destroy

19  after reading," they talk about erasing a blackboard, and they

20  talk about meeting in a hotel.  None of those are

21  representations to the Plaintiffs.  None of those come close

22  to satisfying the standards in *Conmar*, if I'm saying that case

23  name correctly.

24            **THE COURT:**  Is it possible that Judge Conti in this

25  case held differently in 2014?

 1          **MR. CURRAN:**  Well, Judge Conti's rulings on the

 2    pleadings have no bearing on whether there is evidence on the

 3    record now sufficient to raise a genuine issue of material

 4    fact as to fraudulent concealment.

 5          **THE COURT:**  Well, "no bearing" is pretty strong.  Is

 6    it possible that if you found that the allegations of the

 7    complaint were sufficient to plead fraudulent concealment,

 8    that if there was evidence to support those allegations, that

 9    his prior ruling might have some bearing on what I do here?

10          **MR. CURRAN:**  Well, I suppose under principles of law

11    of the case, it's possible.  Although I think there's also

12    Ninth Circuit precedent saying that the law of the case

13    doesn't even apply to a new judge who's come in.

14       But in any event, it might have some weight, but I suggest

15    to Your Honor that the Plaintiffs' facts -- and we're of

16    course at the fact stage now -- don't fully support their

17    confident allegations in the complaint.  That's kind of --

18    that's kind of a fundamental point here.  The Plaintiffs can't

19    rely on the pleading any more.

20          **THE COURT:**  Well, I mean, fundamentally, the reason

21    that I ask the question is that you are suggesting that none

22    of these activities -- as I understand your argument -- and

23    you'll correct me, I know, if I'm wrong about this.

24       But as I understand your argument, that there weren't

25    representations to the Plaintiffs.  That these actions that

1  you've summarized are alleged in evidence, secret meetings in

2  hotels, recording information on a blackboard, et cetera, the

3  things you were just mentioning.  That because these aren't

4  representations to the Plaintiff, somehow they're not

5  fraudulent concealment.

6       **MR. CURRAN:**  Well, I think in *Conmar* --

7       **THE COURT:**  And that's a very broad question.  And --

8  and didn't Judge Conti already resolve that question?  And is

9  he wrong in the way he resolved it?

10      **MR. CURRAN:**  Well, frankly, I don't remember Judge

11 Conti's specific words, but I do remember *Conmar*, the Ninth

12 Circuit case that said even a light-handed denial in response

13 to an inquiry is not enough, but that a public assertion of

14 innocence directed to the Plaintiffs is enough.

15     So I suggest under that standard, which I think the

16 Plaintiffs have embraced in their briefing, the facts in the

17 Plaintiffs' motion -- in the Plaintiffs' opposition don't

18 satisfy the standard that they adopt.

19     I'll save the rest of my time, Your Honor, for rebuttal,

20 unless you have any questions you'd like me to address now.

21      **THE COURT:**  I don't.  Thank you.

22      **MR. CURRAN:**  Thank you.

23      **MS. DAVIS:**  Good morning, Your Honor.  Kira Davis

24 from Paul Weiss, representing Sharp Electronics Corporation

25 and Sharp Electronics Manufacturing Company of America.

1      One overarching response to Toshiba's argument is that I

2  don't think Toshiba has come anywhere close to meeting its

3  burden on this motion.  Because Toshiba has the ultimate

4  burden of proof on its affirmative defense of withdrawal in

5  order to succeed on this motion, Toshiba has to show that the

6  evidence that it withdrew is so powerful that no reasonable

7  jury would be free to disbelieve it.

8      And I don't think Toshiba has done that.  Toshiba has not

9  pointed to any cases involving a joint venture for purposes of

10  finding that withdrawal was established as a matter of law.

11      Toshiba indicated that there is nothing in the briefs on

12  the subject of the fact that Panasonic was a co-conspirator.

13  That is because Toshiba in its motion does not raise a

14  question as to whether or not Toshiba was a conspirator -- or

15  Panasonic, Matsushita.

16      And so in order for that point to be relevant, I think

17  Toshiba would have had to argue affirmatively that, you know,

18  it withdrew because it wasn't selling to a co-conspirator, it

19  was selling to some third party.  They obviously did not raise

20  that argument that Panasonic is alleged to be a co-conspirator

21  in this case.

22      We may even have submitted documents that mention

23  Panasonic.  We admittedly did not draw attention to it, but I

24  believe some of the exhibits may discuss that.

25      I also want to turn to the test for withdrawal.  In the

1    briefs, Toshiba had made a significant point over the *Reisman*

2    standard.  And I did not hear Mr. Curran address this, but

3    just briefly since we didn't get a surreply, the -- in

4    Toshiba's reply they had argued that the *Reisman* standard was

5    overruled.  That's not correct.  The Supreme Court most

6    recently in *Smith v. United States* in 2013 reiterated that

7    passive non-participation --

8        (Reporter interruption)

9            **MS. DAVIS:**  Quoting, yes (As read):

10           "Passive non-participation in the continuing scheme

11           is not enough to sever the meeting of the minds that

12           constitutes the conspiracy.  To avert a continuing

13           criminality, there must be affirmative action to

14           disavow or defeat the purpose of the conspiracy."

15   So that's the Supreme Court in 2013.  So I think the

16   *Reisman* case, while it was before *United States v. U.S.*

17   *Gypsum*, the disavow-or-defeat test remains the law.

18           **THE COURT:**  And isn't that your point here, that this

19   moving of the CRT operations into MTPD -- I want to get the

20   letters right -- that that's a question for the jury, to

21   decide whether that really was withdrawal and whether the

22   communications surrounding the movement of those operations

23   really constituted disavowal.

24           **MS. DAVIS:**  Yes, Your Honor.  That is essentially the

25   argument.  That, you know, the arguments that Toshiba is

34

```
 1   making here today, Toshiba is free to make to a jury.  But the
 2   case law, there's no case coming anywhere close to finding
 3   withdrawal as a matter of law in circumstances like these.
 4          THE COURT:  What is your worst case on this point?  I
 5   have never asked anybody that question before.  I like to ask
 6   people what their best case is, and then they smile and they
 7   are excited that I asked them.
 8      What's your worst case?  What's Mr. Curran -- because he's
 9   going to tell me a case.  What is he going to tell me?
10          MS. DAVIS:  I think Morton's Market, the Eleventh
11   Circuit case involving the dairy.  The Court there held that
12   the dairy in question, Pet, had withdrawn based on the sale.
13          THE COURT:  But there was no allegation in that case,
14   was there, that there was continuing involvement of any kind?
15          MS. DAVIS:  Correct.
16          THE COURT:  By the selling dairy.
17          MS. DAVIS:  There was not.  And the Court noted
18   that -- I think the words the Court said were that: "Pet sold
19   its dairy and walked away."
20          THE COURT:  Right.
21          MS. DAVIS:  And so I think that is the difference
22   between the cases that Toshiba relies on and the factual
23   situation here, which is that Toshiba retained a 35.5 percent
24   interest in a party that it admits for purposes of this motion
25   was a co-conspirator.
```

| | |
|---|---|
| 1 | **THE COURT:**  I suspect you might actually be citing a |
| 2 | case that is pretty good for you, and then distinguishing it |
| 3 | in a way to make a point.  But we'll find out when Mr. Curran |
| 4 | stands up in a minute, won't we? |
| 5 | **MS. DAVIS:**  Yes.  It is a case Mr. Curran cites. |
| 6 | But, so under the *Morton's Market* standard, which *Morton's* |
| 7 | *Market* itself cites the disavow-or-defeat language.  So it's |
| 8 | just a gloss on that; it's not necessarily a different test. |
| 9 | But even under that test which Toshiba has relied on |
| 10 | extensively, Toshiba was required to show that it severed all |
| 11 | ties to the business.  And that additionally, it deprived the |
| 12 | remaining conspirator group of the services which they had |
| 13 | provided.  Toshiba hasn't shown either.  You know, again, |
| 14 | *Morton's Market* and many other cases that the conspirator's |
| 15 | break with the other conspirators must be clean and permanent. |
| 16 | Toshiba says in its papers certainly that -- well, it |
| 17 | didn't have control.  But the test for withdrawal is not about |
| 18 | whether or not you lost a degree of control.  To the contrary. |
| 19 | The cases are crystal clear that passive non-participation |
| 20 | does not constitute withdrawal.  And I think passive |
| 21 | non-participation is clearly not control.  And so those |
| 22 | parties are held not to withdraw. |
| 23 | **THE COURT:**  This is a digression from your argument, |
| 24 | and I apologize.  Mr. Curran really likes *Conmar*.  Which I |
| 25 | haven't read yet.  Although it sounds like that's a specific |

1    case I need to read.

2        You cite that case in your brief.  And the parenthetical

3    says (As read):

4        "Finding genuine issues of material fact whether public

5    information was enough to put Plaintiff on notice of its claim

6    despite Defendant's efforts to conceal a conspiracy."

7            On this question of fraudulent concealment, though,

8    this is -- Mr. Curran speaks highly of this case.  What were

9    the facts of *Conmar*, if you know?

10       **MS. DAVIS:**  I admit, Your Honor, the facts are not

11   fresh because in preparing for this, I did not see that

12   particular argument to be advanced aggressively.  And, and the

13   *Conmar* case, my understanding --

14       **THE COURT:**  It goes your way.  The case goes your

15   way, right?

16       **MS. DAVIS:**  Yes.

17       **THE COURT:**  According to your parenthetical.

18       **MS. DAVIS:**  Which I believe to be correct.  The law

19   on fraudulent concealment at summary judgment, I think the law

20   is clear that it is a jury issue where you have evidence like

21   the evidence we have pointed to regarding document destruction

22   and regarding, you know, the in-person meetings in a hotel,

23   even when you're in the city where the companies have offices,

24   that there -- there are cases holding that that is evidence of

25   fraudulent concealment, certainly sufficient to take this to

the jury.

We haven't moved affirmatively to decide today that there was fraudulent concealment.  It is Toshiba moving to take that away from the jury.  And there are plenty of cases holding that evidence of that type suffices.

I think the -- in particular, you know, at summary judgment, there are cases explicitly holding that a defendant has an extremely difficult burden to show that fraudulent concealment allegations are barred as a matter of law.  And that's this case, that Toshiba has not denied for purposes of this motion that it does have the e-mails labeled "Destroy after reading."

And they have indicated --

**THE COURT:**  Let me ask you -- I know the clock is ticking.  Let me ask you a different question:  Why should I treat all five Toshiba entities as a single entity?

**MS. DAVIS:**  The very short answer is that Toshiba did.  So the Toshiba motion makes no distinctions among the Toshiba entities.

We have pointed to specific evidence following the formation of Matsushita Toshiba Display regarding Toshiba Corporation, itself.  That it appointed board members, that it appointed a VP.  That it had the right, for instance, to weigh in on the closing of the Horseheads plant.  And then otherwise, Toshiba has not tried to draw any distinctions

1    among any of the entities.

2         So that would be the short version of that, Your Honor.

3         I think, returning to the issue of whether or not

4    retaining an interest, the 35.5 interest is sufficient.  In

5    one case that it sounds like the Court is very well aware of,

6    the *Antar* case.  And I think there the court -- the court held

7    that there had not been even a prima facie showing with an

8    individual who did completely sever all ties other than stock

9    ownership.

10        One point that Toshiba makes frequently is that we haven't

11   shown that it definitely did benefit.  And *Antar* specifically

12   addressed that.  Albeit in a footnote, but noting that it

13   didn't matter whether or not the stock price of the stock that

14   the allegedly withdrawing defendant held, whether or not it

15   went down such that he wouldn't actually have benefited.

16        The court said it was enough that he could have benefited,

17   had the fraud there been more successful.  And so, I think to

18   the extent that there is any case that has the closest facts,

19   it would be that case.

20        And again, it's the youngest, the younger brother, so I

21   don't -- he wasn't a majority shareholder.  It is a minority

22   shareholder who withdraws completely.  But just mere

23   shareholdership enough was -- was enough to find no prima

24   facie showing of withdrawal.

25        So I think with cases like that, it is very difficult to

1   see how Toshiba could prevail as a matter of law today.  The

2   Defendant there didn't meet its prima facie showing.

3       Another argument that Toshiba makes frequently is that it

4   was incapable of participating in the conspiracy.  And on that

5   issue, I think that for Toshiba to argue at summary judgment

6   that it was entirely incapable of assisting the conspiracy,

7   Toshiba would have had to show much more that it did.  It

8   would have had to rule out every single possibility, which it

9   has not done.  The employees who went to MTPD, Toshiba agrees

10  that for the first year they were on a secondment from

11  Toshiba.

12      So, you know, Toshiba takes issue with the fact that we

13  have referred to the employees as a loan, but at least for one

14  year, they are on something that is very, very similar to a

15  loan.

16      Toshiba had input, as I mentioned, into the closing of the

17  Horseheads plant.  So for Toshiba to say it was -- it deserves

18  summary judgment on its affirmative defense because it was

19  incapable of participating in the conspiracy would require

20  significantly more in the way of evidence from Toshiba.  And

21  they have not met that burden.

22      I believe that my time is about to expire.  So unless

23  there are any questions, Your Honor.

24          **THE COURT:**  I don't.

25          **MS. DAVIS:**  I'll sit down.

```
 1            THE COURT:   Thank you.
 2       Mr. Curran.
 3            THE CLERK:   You have two minutes.
 4            MR. CURRAN:   Your Honor, Ms. Davis I think was fair
 5   in saying Morton's Market is probably our best case.  And I
 6   think she was also fair in her point about we don't draw a
 7   distinction between the Toshiba entities.
 8       I think, however, her argument fails in that she did not
 9   refute my basic point about that Toshiba did not sell to a
10   co-conspirator, or retain an interest in a co-conspirator with
11   it.
12            THE COURT:   She says it doesn't matter.  She says
13   that there's -- she said there is no case -- this isn't a
14   quote but it's close -- there's no case in which -- now I'm
15   going to mess it up.  Let me go back in my notes.
16            MR. CURRAN:   Your Honor, there's no case in which a
17   company has been held liable for an antitrust violation simply
18   by virtue of having a 35 percent minority share in an entity
19   that became a conspirator.  There is no such case.
20       And it is kind of similar to the hypothetical Your Honor
21   was talking about before.  I forget who, what company you
22   owned stock in, was it -- Intel or somebody?
23            THE COURT:   That was -- in the hypothetical it was
24   Ford Motor company.
25            MR. CURRAN:   Ford Motor Company.  Okay, well, just
```

```
 1   like a shareholder in Ford Motor Company, Toshiba shouldn't be

 2   held liable for an antitrust violation by a company it owned

 3   35 percent in, especially when the other shareholder owned

 4   65 percent.

 5       Your Honor, Ms. Davis also suggested --

 6           THE COURT:  What is the amount of time between when

 7   the joint venture was formed and the time at which the joint

 8   venture allegedly began to participate in the conspiracy?

 9           MR. CURRAN:  Not much time at all.  Not much time at

10   all, but it was a decision.

11           THE COURT:  Give me -- you know "not much" is an

12   elastic term.  Can you be more specific?

13           MR. CURRAN:  In the first month.  If you look at

14   Exhibit 16 of the Plaintiffs' submission, in the first month

15   of operation at MTPD, MTPD decided on its own, no Toshiba in

16   the room, decided to meet --

17           THE COURT:  Would it be an unfair characterization of

18   the evidence that has been cited to me this morning to say

19   that during a period of time when Toshiba employees were on

20   secondment to a joint venture in which it owned 35 percent,

21   that within the first month of that time, that this joint

22   venture decided to participate in a price fixing conspiracy?

23       Could a reasonable jury find that those were the facts?

24           MR. CURRAN:  Yes, but a reasonable jury could not

25   infer from that that Toshiba is on the hook for that conduct
```

1   by that independent entity.  And Your Honor, the notion that

2   it's up to us to disprove that Panasonic was a conspirator is

3   too much.  I think the Plaintiffs bear the burden of

4   establishing the complicity of anybody.  The *U.S. Gypsum*

5   standard is still very much alive.  *Smith versus the United*

6   *States* doesn't change that at all.

7        And Judge Conti, his decision, which I have reviewed the

8   relevant language on fraudulent concealment, he is plainly

9   wrong, Your Honor.  The idea that conspirators getting

10  together and deciding to keep their conspiracy secret is

11  enough for fraudulent concealment, there's no way that that

12  can be the law.  That would eliminate the statute of

13  limitations for all antitrust -- beyond that, all conspiracy

14  claims, altogether.  And Your Honor's not bound by that.

15            **THE COURT:**  What were the facts of *Conmar*?

16       Madam Reporter, C-O-N-M-A-R.

17            **MR. CURRAN:**  Yeah.  Well the facts of *Conmar* -- and

18  the crucial ones are on Page 505 of it.  And there, the Ninth

19  Circuit said that (As read):

20            "This is not a situation in which Mitsui simply

21            failed to own up to illegal conduct upon a timid

22            inquiry from the already-suspicious plaintiff..."

23       Citing *Pocahontas*.

24            "...but rather, a direct public denial of any

25            wrongdoing before sufficient facts existed to make

1           Conmar suspicious."

2           **THE COURT:**  Yes, but isn't there a vast difference?

3    I mean in that case, summary judgment was denied, as I

4    understand it from your opponent's parenthetical.

5        So isn't there a vast difference between saying a public

6    denial is sufficient, and saying a public denial is required,

7    which is what you're telling me?

8        Do you have a case that says a public denial is required?

9           **MR. CURRAN:**  I think *Conmar* comes pretty close to

10   saying that, because it says what happened here is sufficient,

11   but it contrasts the *Pocahontas* case, where it was a failure

12   to own up to the illegal conduct, upon a timid inquiry from

13   the suspicious plaintiff.

14       So we know that the *Pocahontas* case, the Ninth Circuit

15   finds that the facts there were not sufficient to establish

16   fraudulent concealment.  So basically both goalposts are set

17   in *Conmar*.

18       I'm sorry, Your Honor.

19          **THE COURT:**  What is your best case in which summary

20   judgment was granted on this point?

21          **MR. CURRAN:**  Well, *Pocahontas*.  *Pocahontas*, which is

22   embraced in *Conmar*.  I also think the *Volk* case, although I

23   don't remember whether -- the procedural posture in that case.

24   The *Volk* case is also cited in *Conmar*.

25          **THE COURT:**  Thank you.

1    **MR. CURRAN:**  I see my time is up Your Honor, unless

2    you have any other questions I'll sit down.

3        **THE COURT:**  Thank you, Mr. Curran.  I should say to

4    everyone I wish all these arguments could go longer.  Some of

5    you are probably hoping they would go shorter but I like them.

6    I wish we had more time.

7        All right, let's do one more and then we'll take a short

8    break, so Ms. Ball can rest her fingers.  Let's do the LG

9    motion.

10       **MS. KIM:**  Good morning, Your Honor.  My name is

11   Miriam Kim of Munger Tolles and Olson.  Counsel for LG

12   Electronics.

13       **THE COURT:**  Would you hold on just a moment?  This

14   won't count against your time.

15       Mr. Noble, I don't have Ms. Kim on my list.  Oh, I do.

16   Never mind.  I beg your pardon.

17       There you are.  Ms. Kim, go ahead.

18       **MS. KIM:**  We have already covered a lot of ground

19   today.  But I would like to emphasize and echo the comments of

20   my colleague Ms. Hartge, that the withdrawal analysis needs to

21   be understood in the broader context of the corporate

22   separateness doctrine.

23       Finding that a company withdrew by selling a business and

24   exiting the industry under controlling Supreme Court precedent

25   lines up exactly with the law of corporate separateness, that

1    owning shares absent sufficient acts or active influence in

2    the violations committed by the business precludes a finding

3    of liability.

4        And I understand we have the burden on withdrawal.  And I

5    understand and agree with Ms. Hartge we don't have a case we

6    can cite where summary judgment was granted as a matter of

7    law.  But if you look at the standard under *Gypsum*, under

8    *Smith versus United States*, that was just stated by one of the

9    DAPS counsel, LG has met that standard.  Affirmative acts

10   inconsistent with the object of the conspiracy, affirmative

11   acts to disavow or defeat the purpose of the conspiracy, and

12   communication of the withdrawal in a manner reasonably

13   calculated to reach co-conspirators.

14       For LG Electronics, as you may know, on July 1, 2001, it

15   divested its assets into a joint venture, LG Philips Display.

16   As of that date, it no longer had factories, it no longer had

17   personnel, it no longer had assets to make or sell the

18   products that it was now accused of price fixing.

19       So, we respectfully submit, Your Honor, that those are

20   affirmative acts that do meet the test.  And like Toshiba,

21   like Mr. Curran stated, in the LPD joint venture agreement

22   there was also a non-compete provision.  That was

23   Article 10.1, which is part of the agreement, in Exhibit 10 to

24   the Hartge declaration, where both LG Electronics and Philips

25   agreed that they would not compete with LPD in the field of

```
 1   cathode ray tubes.  So they affirmatively not only divested,

 2   they affirmatively agreed not to compete.  And in the case of

 3   LG, they also in their position as a purchaser negotiated

 4   fiercely for lower prices.

 5       I mean, you know, as a Korean American I can tell you, it

 6   was a delight to read these e-mails in Korean and English.

 7   And we have put many of them into the record.  To see the

 8   employees, they were really, they were pushing down.  They

 9   were trying to get LPG to meet the SCI prices.  They were

10   trying to get SDI to meet the LPD prices.  They were trying to

11   get Chunghwa to, you know, lower its prices.  These were

12   affirmative acts inconsistent with the purpose of the

13   conspiracy to keep prices high.

14       So this is not a case of mere cessation.  This is not a

15   case of passive nonparticipation.  This is a case of

16   affirmative acts inconsistent with the object of the

17   conspiracy.

18       There has been a lot of discussion today about a company's

19   continuing shareholder interest.  We are not aware of any case

20   that states that mere shareholder status is sufficient to

21   preclude summary judgment in a case like this where there is

22   no evidence that has been presented that the company has --

23   there's no evidence that LG continued to participate in the

24   conspiracy, no evidence that LG has directed or controlled

25   LPD's participation in the conspiracy.  Instead, the evidence
```

```
 1    shows that LG took decisive steps to disassociate itself and

 2    make sure that it was getting lower prices for the tubes.

 3        I'm surprised you haven't asked any questions, but I will

 4    continue on.

 5              THE COURT:  Do you want me to?

 6              MS. KIM:  No.  It's fine.

 7              THE COURT:  I have some.

 8              MS. KIM:  I will also --

 9              THE COURT:  We can all agree, can't we, that LG did

10    not sever its ties with the CRT industry?  We can agree on

11    that, can't we?

12              MS. KIM:  We can agree that it was a customer.

13              THE COURT:  It's a yes-or-no question, and "yes" or

14    "no" can be followed by an explanation.  Do you agree that LG

15    did not sever its ties with the CRT industry?  That is my

16    first question.

17              MS. KIM:  Yes, but I would say it has severed its

18    ties with the CRT manufacturing business.  It's very

19    important, Your Honor, to consider what is the business at

20    issue here.  The business at issue is the making of the tubes.

21    The Plaintiffs have not alleged a conspiracy with respect to

22    the finished product.

23        Yes, LG continued to purchase tubes and put them into TVs

24    and monitors it was selling.  But that is not -- that is not

25    the industry that is subject to the conspiracy allegations in
```

```
 1  this case.  So, yes, it did sever its ties from the CRT

 2  manufacturing business.  But if you frame the business more

 3  broadly like your question did, then I have to say no, it did

 4  not sever its ties.

 5          THE COURT:  Do you think that as a matter of law,

 6  LG's public communications constituted a disavowal?  Did they

 7  make it clear to the public that they were exiting the CRT

 8  industry?  Or did they instead say to the public or could a

 9  reasonable jury find that they said to the public:  We're

10  essentially simply moving our operations into this joint

11  venture that we're doing with Philips?

12          MS. KIM:  I do think a reasonable jury could find

13  that.  However, the test again is not what they communicated

14  to the public.  The test is:  Did they communicate in a manner

15  reasonably calculated to reach co-conspirators.

16      Now, if you remember that is the test, then I think yes,

17  clearly, anyone who is in the industry understood that once

18  you divest your factories, your personnel and all of your

19  other assets, you do not have the ability to make or price-fix

20  tubes.

21      And that -- I mean, if there was any doubt of that

22  whatsoever in the minds of the co-conspirators, those doubts

23  were eliminated once they're on the opposite side of the

24  negotiating table.  LG's no longer attending the meetings with

25  competitors because they are not a competitor.  And, they are
```

1    demanding lower prices.

2         **THE COURT:**  All right.

3         **MS. KIM:**  All right.  So, I would also like to just

4    briefly emphasize that there were some allegations by the

5    Plaintiffs made that, you know -- and like you said, that LPD

6    may have been a continuation of LG's business.  But we do want

7    to emphasize that LPD was a distinct company.  And that under

8    *Morton's Market*, which we also agree is one of our best cases,

9    if you look there in *Morton's Market* in a footnote --

10        **THE COURT:**  Would you explain what you mean by

11   "distinct company"?  Because your opponent in just a moment is

12   going to say that LGE had the right to appoint three members

13   to LPD's six-member supervisory board, LGE held 50 percent of

14   LPD's shares, minus one share, and that they supplied LPD with

15   three-eighths of $1 billion in financing.  So they'll say a

16   reasonable jury could say that's not distinct.

17        What do you mean by "distinct"?

18        **MS. KIM:**  What I mean by "distinct" is that it was a

19   different company with a different corporate entity.

20   Plaintiffs have not claimed any sort of alter ego or agency or

21   vicarious liability theory and have expressly waived such a

22   theory in the motion to dismiss proceedings.

23        So when I say --

24        **THE COURT:**  But *Antar* and *Reisman* don't require a

25   finding of alter ego.  In fact, that's a sort of -- it's a

1    distinct line of cases.

2         **MS. KIM:**  Yes, but *Antar* and *Reisman* both do find

3    that affirmative actions inconsistent with the object of

4    conspiracy would be sufficient.

5         It's important to note in both of those cases what the

6    courts were saying.  In *Reisman*, there, the Court did not say

7    he failed to meet the standard simply because he was a major

8    shareholder.  The Ninth Circuit said he had taken no

9    affirmative action to disavow or defeat the conspiracy.  And

10   that reading of *Reisman* was reaffirmed by the Ninth Circuit in

11   *United States versus Lothian*.

12        Similarly, in *Antar*, there the Court said if the Defendant

13   fails to make a prima facie case of withdrawal because of a

14   continuing interest, then it must show that it gave notice or

15   took affirmative actions.  And here, we have a case where LG

16   Electronics did that.

17        Just noting my time here.  I think I have one more minute.

18   So I do want to address on the supervisory point, Your Honor,

19   that you raised, that again the right to appoint members to

20   the supervisory board cannot preclude a finding of withdrawal

21   here on summary judgment.  I mean, that again -- I know we had

22   the discussion, you had the discussion earlier with Ms. Hartge

23   about corporate separateness.  But the right of a major

24   shareholder to appoint members to a board cannot be enough

25   without more.  Otherwise, you would have many wealthy people

 1   who would be in a difficult situation.  And that's not the

 2   case.

 3       There are many major shareholders, both individuals and

 4   corporations, that have the right to appoint two or three

 5   members to a board.  And yet under the corporate separateness

 6   doctrine, that by itself is not enough.

 7       And it's our position that Plaintiffs have not presented

 8   evidence to raise a triable issue with respect to the

 9   withdrawal finding.

10       Thank you, Your Honor.  I will reserve the remainder of my

11   time for rebuttal.

12           **THE COURT:**  Thank you.

13           **MR. KENT:**  Good morning, Your Honor.  Matthew Kent

14   from Alston and Bird on behalf of the Dell Plaintiffs.  Are

15   you ready for me to proceed?

16           **THE COURT:**  Yes.

17           **MR. KENT:**  Well, you asked Ms. Kim a very telling

18   question about whether or not LGE severed its ties completely

19   to the CRT industry.  And I found it curious that she said

20   yes, and went on with that broad explanation.

21       Plaintiffs contend it's clear, Your Honor, LGE did not

22   sever its ties with the CRT industry, including the CRT tube

23   industry.  It had a 50 percent interest Your Honor in LPD,

24   which again continued in this conspiracy seamlessly.

25       LGE's motion asked this Court to rule as a matter of law

1   that LG withdrew from this conspiracy that it participated in

2   when it came together with Philips, a co-conspirator, and

3   established the world's largest CRT maker.

4       But establishing a joint venture to create CRT tubes with

5   your co-conspirator is not an affirmative act that is

6   inconsistent with the conspiracy.  In many respects it made it

7   easier for the conspiracy to continue because you had two of

8   the largest players coming together, which meant it was a more

9   consolidated industry with fewer participants.

10      And I really want to focus, there's been a lot of

11  discussion this morning about the standard and the burden.

12      (Reporter interruption)

13          **MR. KENT:**  There's been a lot of discussion about the

14  legal standard and the burden.  But I want to focus on the

15  very first question that you asked this morning, which is

16  about ownership and whether or not that controls the question

17  because Plaintiffs submit that in this motion, it certainly

18  does.

19      In the Ninth Circuit when a defendant has a continuing

20  ownership interest in the conspiracy, summary judgment is

21  inappropriate as a matter of law.  Now, *Reisman* has been

22  talked about extensively, but I think it is our best case on

23  this particular motion.  And the reason for that -- and

24  *Reisman*, it's *United States versus Reisman*, 409, F.2d, 789.

25  And the reason that *Reisman* is the best case is that that was

1    a mail fraud case, and the defendant appealed the conviction.

2        And it's really important to look at the facts of that

3    case because in *Reisman*, he came forward with facts and he

4    said "I resigned from the president of the company, I resigned

5    from the board of directors.  I didn't have involvement in the

6    day-to-day operations."  But the Court found, the Ninth

7    Circuit affirmed the conviction and found that he was a major

8    stockholder.  And that he took no affirmative action to

9    disavow or defeat the promotional activities which he joined.

10       And we know that *Reisman* is still good law because the

11   Ninth Circuit in 1992 in the *Lothian* case, which is 976 F.2d

12   at 1257, they talk about *Reisman*.  And here's what they said.

13   And I think it is important to read, and I'll just quote from

14   the Court (As read):

15            "The Defendant in *Reisman* had not taken definite,

16            decisive and positive steps to disassociate himself

17            from the scheme because he remained a major

18            stockholder.  Thus, he continued participating in the

19            scheme through his ownership interest."

20       And the pin cite there is 1264, Your Honor.

21       Now, here, LGE, it's not disputed.  They were a major

22   shareholder of LPD.  They had 50 percent.  And like *Reisman*,

23   LGE continued to participate in the conspiracy through its

24   ownership interest in LPD.

25       And the other thing that we've heard this morning, we've

heard a discussion of a number of these cases, but the Ninth

Circuit isn't alone in looking at ownership interests or

financial interests and whether or not you have an ownership

or financial interest in the conspiracy going forward.  *United*

*States versus Sax*, that's a Seventh Circuit case.  The *United*

*States versus Antar,* that's a Third Circuit case.  *The United*

*States versus Eisen*.  That's a Second Circuit case.  The

*Morton's Market* case which we've heard about this morning, an

Eleventh Circuit case.  And all of these cases confirm exactly

what you had in your first question, which is that when you

have an ongoing ownership or financial interest, then there is

no withdrawal.

Now, here, the Plaintiffs have an even better record for

LGE, better than *Reisman*.  Because not only do we have

ownership, we also have control (Indicating).  And we have set

forth a number of exhibits that show the level of control that

LGE exercised over LPD.

It had, as you said, Your Honor, three -- the ability to

appoint three of the six seats on the supervisory board.  It

had the ability to appoint five of the ten members of the

board of management.  The supervisory board meeting minutes

indicate that there was a push for LGE to purchase all of the

tubes that they needed from there.  As Your Honor mentioned,

there are capital infusions of $375 million.  So we go so far

beyond the *Reisman* test, which is just ownership.  We really

1    have a question of fact as to control as well.

2         Now, LGE curiously argues that it affirmatively disavows

3    the conspiracy because it became a purchaser, and that it

4    negotiated hard, and it claims that that was an inconsistent

5    act with the conspiracy.  And Your Honor, we would submit that

6    that argument's a red herring for three reasons.

7         First, when you look at the case law and how it's

8    developed, it requires a resumption of competitive activities.

9    Here, there was no resumption of competitive activities.  LPD

10   seamlessly continued to conspire.

11        And to answer your question, as you will recall, LGE and

12   Philips formed LPD in June of 2001, and so they're requesting

13   July 1st, 2001 be the date of their withdrawal.  Well,

14   Exhibit 24 of the Defendants' opposition brief shows a meeting

15   on July 24, 2001.  So it was seamless.  There was no -- there

16   was no hiccup in the participation.  The same individuals that

17   attended on behalf of LGE as a CRT maker before June 2001

18   continued to participate in the conspiracy when they were

19   transferred as employees to LPD.  The participation there was

20   seamless.

21        Second, this argument also ignores a very critical fact.

22   LGE did not become a purchaser.  They had always been a

23   purchaser of CRT tubes.  Before 2001, June, 2001, LGE was both

24   a maker of the CRT tubes and it was a purchaser, Your Honor.

25   And when you consider that LGE decided to conspire during that

1   period –– and we have cited extensive evidence about its

2   participation from 1995 to 2001 –– then it's curious that the

3   economics would suddenly change and shift as of the formation

4   of the joint venture.

5        And under the Ninth Circuit law in *Lothian*, the standard

6   is that they have to either disavow the unlawful goal of the

7   conspiracy or affirmatively act to defeat the purpose of the

8   conspiracy.  LGE continuing to buy tubes was not a change in

9   its behavior.  It was a mere continuation of what it had

10  always done, even before 2001.

11       And then third, Your Honor, LGE's efforts to negotiate

12  good prices for the CRTs they purchased is simply not

13  inconsistent with a CRT price-fixing conspiracy.  Of course,

14  one would expect that LGE as the parent of LPD might receive

15  preferential pricing and supply of the tubes.  But at the same

16  time, it could confirm that all of the other monitor makers

17  were going to have to pay the inflated prices that its 50/50

18  joint venture was charging, and the other co-conspirators.

19       So on the record here, a jury could easily conclude that

20  not only was this affirmative pricing what they would call an

21  affirmative act inconsistent with the conspiracy, not only was

22  it –– was it –– it was consistent with the conspiracy because

23  they could –– they could reap more benefits.

24       Now, a related argument –– and this is something that is a

25  theme throughout the Defendants' presentation –– is about

1   corporate separateness.  And Your Honor asked a question

2   earlier, and it's -- I think it's critical when you look at

3   all those cases, they do stand for a very general and what I

4   would call an unremarkable proposition, that normally a parent

5   can't be held liable for the acts of its subsidiary

6   (Indicating).  Absent exceptional circumstance.

7       But here, the Plaintiffs are not trying to hold LGE liable

8   vicariously for the acts of its subsidiary.  The question and

9   the evidence shows that LGE participated in that conspiracy

10  from 1995 to 2001, so the only question is whether or not it

11  has withdrawn.  And the Plaintiffs respectfully submit that

12  there haven't been those affirmative acts inconsistent with

13  the conspiracy.

14      Now I want to turn to the notice because I think it is

15  also worth spending some time here.  That is a separate

16  element that is required that the Defendants have to satisfy.

17  And, the notice requirement says that they have to provide

18  notice to the co-conspirators in a reasonable manner.  And

19  when you look at the evidence that LGE has cited in its motion

20  to establish that it provided notice, they're primarily press

21  releases and news articles about the formation of the joint

22  venture.

23      But what's interesting when you look at those articles,

24  they don't talk about LGE severing ties with the CRT tube

25  maker.  They don't talk about LGE getting out of the CRT tube

business as was the case in *Morton's Market*.  They don't talk

about LGE stopping producing tubes.  No, what they say is that

LGE and Philips were going to come together and they were

going to form a super conspirator that was going to continue

to make the tubes.

     And in those press releases you see that they talk about

how the alliance will create the world's largest producer of

CRT's and TVs.  For TVs and computer monitors and you see how

it talks about the global demand for those monitors as well.

     And Ms. Kim made the point:  Well, you really shouldn't

look at those press releases and news articles, you should

look at what the conspirators thought.

     (Reporter interruption)

          **MR. KENT:**  I think we should talk about what the

conspirators thought.  The evidence in the record -- and we

have cited extensive minutes from the conspiracy meetings from

both LGE and -- from both LGE's time and LPD's time.  But what

you see when you review that evidence is that the same LGE

employees that were participating in the CRT price-fixing

conspiracy continued seamlessly to participate on the behalf

of LPD.  And we've listed out those individuals, Mr. P.J. Lee,

Mr. S.Y. Choi, Mr. K.Y. Ko, Mr. S.K. Lee, Mr. Quin Choi.  So

the idea that the conspirators would have been on notice that

LGE was withdrawing and severing ties and not going to be

involved in this conspiracy, we think that there's a question

1    of material fact that a jury could look at there as well.

2        Thank you, Your Honor.  I'm happy to answer any questions

3    you have.

4            **THE COURT:**  I don't have any.  Thank you.

5            **MS. KIM:**  Your Honor, I would like to note that

6    Mr. Kent reaffirmed that the Plaintiffs are not pursuing an

7    argument that LG Electronics was an alter ego or agent or

8    otherwise vicariously liable for LPG's conduct.  Therefore its

9    arguments that LG had a right to appoint members to the

10   supervisory board, or invested capital, those are not legally

11   relevant to this motion.  To hold otherwise would be

12   inconsistent with the corporate separateness doctrine.

13       Where absent sufficient acts to create liability or active

14   influence --

15           **THE COURT:**  Can we agree -- can we agree that in

16   light of *Reisman*, that share ownership is relevant?  Not

17   dispositive, but that the question of share ownership is

18   relevant?

19           **MS. KIM:**  Yes.  I agree it's relevant but it is

20   important to --

21           **THE COURT:**  Then why are these other things that you

22   have just mentioned not relevant?  Isn't share ownership just

23   an indicia of control?  It's sort of a devil's advocacy

24   question, I'm not stating it conclusively, but it is an

25   important question this morning.

1           MS. KIM:   I think shareholder ownership by itself is

2    not relevant unless there's evidence of active influence or

3    control.  Not of the entity, but of the violations committed

4    by the entity.  I think that's the important distinction.

5    It's not enough to show that a major shareholder, like Carl

6    Icahn had said, that he can appoint three members to a board.

7    You have to show that he actively influenced the violations

8    committed by the company in which he owns stock.  That is the

9    distinction.

10          THE COURT:   Even if he was a participant in the

11   conspiracy before he purchased the stock?

12          MS. KIM:   Yes.

13          THE COURT:   That's what this morning's motions are

14   about.

15          MS. KIM:   Yes.  In fact -- I'm sorry.

16          THE COURT:   No, no, go ahead.

17          MS. KIM:   In fact, the fact that LG transferred its

18   employees -- and that is really -- when they say "continuing

19   participation," they are talking about LG employees who left

20   LG, became employees of a new company, LPD, and continued to

21   go to these meetings.

22       Our position, Your Honor, is that that supports a

23   withdrawal finding.  If you look at *Morton's Market*, the

24   Defendant there actually did the same thing.  Footnote 25 of

25   *Morton's Market*, 198 F.3d at 838, Footnote 25.  The Defendant

 1  was found to have effectively withdrawn, even though it sold

 2  its dairy but left in place the principal conspirators who

 3  continued to fix milk prices for the new owners.

 4          **THE COURT:**  Were those conspirators former employees

 5  of Morton's?  If it's as direct an analogy as you are saying,

 6  wouldn't that have to be the case?

 7          **MS. KIM:**  Yes.  That is true.  I don't know if they

 8  were actually employees.  But they were alleged to have left

 9  them in place.  And they continued to engage in it.

10  Similarly, here, I mean the fact that the employees continued

11  to do it, that does not preclude a withdrawal finding.  If

12  anything, it supports a withdrawal finding, that they were no

13  longer employed by LG Electronics, they were part of this new

14  entity.

15      I would also like to just note for *Reisman*, I know we have

16  talked about it at length today, but I'm not sure that anyone

17  has pointed out that there the conspiracy was an illicit

18  enterprise in and of itself, it was a fraudulent land sale

19  scheme.  There was no legitimate purpose to that enterprise.

20  So the fact that Mr. Reisman was a major shareholder there is

21  distinct from here, where LPD -- there's no allegation that

22  LPD itself was in an illicit enterprise itself with no

23  legitimate purpose whatsoever.

24      And finally I would like to address Mr. Kent's point that

25  LG became a purchaser.  Yes, it is true that LG did purchase

1    tubes before it formed LPD.  But the important point is that

2    it was no longer in a position to set the prices of tubes or

3    limit the production of tubes as of July 1st, 2001.

4        Unless Your Honor has questions, I will submit otherwise

5    on the papers.

6              **THE COURT:**  Thank you.

7          **MS. KIM:**  Thank you.

8              **THE COURT:**  I don't have any more questions.  Thank

9    you all.  We are going to go ahead and take that ten-minute

10   recess.

11             **THE CLERK:**  All rise.

12       (Recess taken from 11:02 a.m. to 11:16 a.m.)

13             **THE CLERK:**  Remain seated and come to order.  Court

14   is now in session.

15             **THE COURT:**  All right, let's do the Philips motion,

16   please.  Good morning.

17         **MR. KOONS:**  Good morning, Your Honor.  My name is

18   Erik Koons from the law firm of Baker Botts, on behalf of the

19   Philips Defendants.  I'm going to try to speak up.  I had a

20   recent voice-loss episode that I'll try to overcome,

21   Your Honor.

22             **THE COURT:**  I'm sorry.  I have some cough drops here

23   if that would help you.

24         **MR. KOONS:**  Right now I think I'm okay, but if you

25   think I'm straining I'll take one.

1       Your Honor, I want to set the stage a little bit for you

2   as far as what's before Your Honor with our motion.  Our

3   motion is a motion on behalf of the Philips subsidiaries.

4   That is a term that was coined in the opposition that we have

5   embraced.  That means all of the Philips Defendants, aside

6   from KPNV or Royal Philips.

7       And what I think is important about that is two things.

8   One, it puts us squarely in line with the *Morton's Market*

9   case, Your Honor.  And I think it means that we satisfy the

10  *Gypsum* standard with none of the problems of the questions

11  that you have asked some of the others.

12      Let me be a little bit more specific.  Your Honor, if you

13  look at -- I'm not asking you to do so now, but I think it is

14  important that if you note that the statements of undisputed

15  fact that the Philips subsidiaries laid out in their affirming

16  motion, SUF 1 through 4, 8, 10, 11 and 13-14, they all stand

17  for what I would call the first and second propositions of

18  *Gypsum*.  That is affirmative acts inconsistent with the object

19  of the conspiracy.  The Plaintiffs do not dispute any of those

20  SUFs, Your Honor, and I think because of that, the Philips

21  subsidiaries win.

22      Specifically, there is no dispute that in June, 2001, the

23  Philips subsidiaries had extracted from them all of the

24  manufacturing assets, all of the other things.  You have heard

25  this.  I won't belabor this point.  But a critical point there

1    is that all of the -- what I'll call the levers of ability to

2    participate in the conspiracy were taken away from Philips.

3    The ability to set prices, the ability to determine what

4    volumes would be produced, who to sell to, how to sell,

5    et cetera.

6         There is no dispute about that total exit by the Philips

7    subsidiaries, Your Honor.  They were no longer a competitor

8    and couldn't control those levers.  They were only purchasers.

9    There is also, I think, no credible dispute that no Philips

10   subsidiary employee ever attended any meeting, reached any

11   agreements, did anything that's alleged to be unlawful in this

12   lawsuit.  And, with those undisputed facts, Your Honor I would

13   submit that under *Morton's Market* we have established the

14   first *Gypsum* element.

15        Now, the second element, which is communication, there's

16   been a lot of discussion about whether or not communication

17   was appropriate here, and I'm kind of surprised by that

18   because I don't think that the Plaintiffs have a legitimate

19   criticism of the communication that's at issue here for the

20   Philips subsidiaries.  In *Morton's Market*, Your Honor, what

21   happened was factually similar at least for the first prong,

22   that the Pet dairy was just gone.  And similarly with the

23   subsidiaries, all of those assets were gone.

24        *Morton's Market*, the Pet dairy didn't even, you know,

25   issue any press releases.  It didn't do anything.  The press

1    independently picked that up and ran the stories, and that was

2    considered to be reasonable communications of co-conspirators.

3    What we have here is a whole lot more.  We've got that too.

4    Press independently picked that up.  *Wall Street Journal*, *New*

5    *York Times*, *Reuters*, Asian newspapers, all of the big boys and

6    a lot of the small ones.

7        We also have financial disclosures to the SEC, to the

8    lending community.  And one thing that has not really been the

9    focus today is that we took care in all of the depositions to

10   ask witnesses questions:  Did you know whether or not Philips

11   subsidiaries withdrew?  And was the LPD entity a separate

12   entity?  Of all the witnesses that we asked those questions,

13   uniformly they said:  Yeah, of course.

14       Now, what --

15           **THE COURT:**  You probably have the ability this

16   morning, uniquely among the lawyers on your side of the

17   courtroom, to save more time for rebuttal.

18           **MR. KOONS:**  Okay.  I will only make one additional

19   point, then, Your Honor and then I will stop.

20       On the issue of benefit, the Plaintiffs don't plausibly

21   put forward a benefit argument as to these subsidiaries,

22   Your Honor.  What they say is that the Philips subsidiaries

23   sat idly by and did nothing.  They didn't report it to the

24   antitrust authorities.

25       *Morton's Market* is clear that that's not required at

1   Page 839.  And they say that there was a pass-through of

2   overcharges, and therefore somehow that was a benefit.  That's

3   an expert issue that they have raised.  I don't think it's

4   credible, Your Honor.  And I do think that certainly, if the

5   Philips subsidiaries are viewed as being the direct purchaser,

6   whereas the DAPs are going to be the next down in the chain of

7   command, it cannot be said that somehow, that the direct

8   purchaser presumably would be hurt more than the subsequent

9   link in the chain, that somehow that equates to benefit for us

10  unless you are going to concede that the DAPs somehow benefit

11  from this conspiracy as well, which I don't think they are

12  going to do.

13       Unless you have any other questions, I'll reserve my time.

14            **THE COURT:**  Thank you.

15       (Reporter interruption)

16            **THE COURT:**  Madam Reporter, in this case, there are

17  direct action purchasers which people call DAPs, and indirect

18  purchasers that they call IPPs.

19            **MR. IOVIENO:**  Good morning, Your Honor.  Phil Iovieno

20  from Boies Schiller for numerous DAPs.

21       We have talked a lot about withdrawal.  We have talked a

22  lot about legal standard today.  I'm not going to reiterate it

23  but I want to make a couple of points that I think, the way I

24  look at the standard, I do think are relevant to this

25  particular motion.

1    The *Gypsum* two-part test, there's been a lot of talk about

2    that, obviously.  Both parts I think are critical to this

3    particular motion.  And I'm going to go through the facts as

4    to why I think the Philips subsidiaries don't satisfy them.  I

5    also think that under *Morton's Market* that standard is also

6    not satisfied.

7        The *Sax* case at 386 said (As read):

8            "Withdrawal from a conspiracy is easier to state than

9            to achieve."

10   In talking about the standard.

11       And I think that that's apt when we're talking about what

12   we're doing here at summary judgment.  When you look at the

13   standards, when you look at *Gypsum*, when you look at *Morton's*

14   *Market*, my takeaway from these standards are two things.

15   Withdrawing from a conspiracy as a matter of law is a high

16   standard to achieve.  And the standards that have been

17   articulated by these courts are particularly fact-intensive.

18       So, I think at the summary-judgment stage, you have to

19   really look at the facts.  And I'm going to walk through the

20   facts with respect to the Philips subsidiaries, the key facts

21   that we think establish that in this case withdrawal has not

22   been satisfied.

23       Before I get to those facts I want to make one other quick

24   point and we'll get back to this in a minute but I think it is

25   important to recognize that no case has said that the sale of

1    a business or transfer of assets, standing alone, will

2    establish withdrawal.

3         There is no case that's been cited by anybody, Plaintiffs

4    or Defendants, that establish that the sale of a business or

5    transfer of assets standing alone will establish withdrawal.

6    You have to get into the *Gypsum* standard and apply that

7    standard to the facts.  And that's what I want to do here.

8         There's two basic points that I'm going to make with

9    respect to the Philips subsidiaries.  The first one is, both

10   are first -- the fact that after the transfer of the assets to

11   LPD, it's our contention that the facts bear out that the

12   Phillips subsidiaries facilitated and assisted the objects of

13   the conspiracy.  They did not take affirmative acts

14   inconsistent with the object of the conspiracy.

15        Indeed, the facts show the exact opposite.  That what they

16   were doing was assisting the conspiracy.  And at the very

17   least, it is a question of fact on that point.  And separately

18   I want to talk about the transfer to a new conspirator.

19        But on the assisting and facilitating the conspiracy, from

20   1995 to '01, PENAC was a conspirator.  That's the allegations,

21   that's what the facts show.  So again, with all of the motions

22   here we're not talking about alter ego or vicarious liability.

23   We're talking about an alleged conspirator over a six-year

24   time period and whether the transfer of its assets to an

25   entity that immediately started to conspire after the transfer

1     is sufficient for withdrawal.

2         One of the major goals, one of the obvious major goals of

3     the conspiracy was to sell price-fixed --

4             **THE COURT:**  You just said PENAC, is that right?

5         Madam Reporter, P-E-N-A-C.

6             **MR. IOVIENO:**  Philips subsidiary.  One the major

7     goals of the conspiracy obviously was to sell CRT tubes at

8     inflated prices.  After the transfer, the evidence in the

9     record, particularly Exhibits 52 and 69 show this, that after

10    the transfer, PENAC was directed to exclusively source all the

11    tubes it was buying for all the finished products it was

12    making and selling, exclusively from LPD, one of the

13    conspirators.

14        This was contrary to the corporate policy of Philips.  If

15    you take a look at those e-mails, it shows that this

16    exclusivity (Indicating quotation marks) was contrary to the

17    second-source policy that they usually implemented.  And the

18    bottom line is they were never going outside the conspiracy,

19    after the transfer.  They were buying all their tubes from

20    LPD.  What does that do?  That is furthering, that is giving

21    the conspirators a ready, dedicated market.  They have no fear

22    that one of these major purchasers --

23            **THE COURT:**  What would the Plaintiffs have had them

24    do in that circumstance?  They are a wholly-owned subsidiary.

25    The company that owns them tells them to do something.  What

1   are -- what -- how does their doing that constitute an

2   affirmative act within this conspiracy?

3        **MR. IOVIENO:**  Look, I agree on the one side it's

4   like:  Look, corporate separateness.  This company is

5   completely separate.  You can't mix and match.  On the other

6   side you have Royal Philips dictating to PENAC and the other

7   subsidiaries to buy everything.

8        **THE COURT:**  Right.  Why isn't that a Royal Philips

9   problem?

10       In other words, these cases ask the question:  When you

11  purportedly withdrew from the conspiracy, then what did you

12  do?  Did you do X?  Or did you do Y?  Did you do X or not X?

13       My question for you is in this circumstance, what's the

14  not X?  Their -- their owners tell them to do a certain thing.

15  What were they supposed to do?

16       **MR. IOVIENO:**  Right.  So they're an independent

17  conspirator.  Let's start with that.  They conspired.  And the

18  law says that you as an individual -- putting aside Royal

19  Philips, PENAC, we have a claim, a conspiracy claim against

20  PENAC for their participation from '95 to '01.

21       The law says:  Okay.  You were a conspirator from that

22  time period.  What do you have to withdraw from your

23  liability, on the ongoing nature of your liability throughout

24  the balance of the conspiracy?  You have to take affirmative

25  acts inconsistent with the object of the conspiracy.

1      And by saying, PENAC, regardless of who's directing them,

2  but by saying:  Listen, we're not going to buy tubes from

3  anyone but the conspiracy... And they know there's

4  non-conspirators.  We're not going to try to fight on price.

5  We're not going to try to find cheaper tubes.  We're solely

6  sourcing.  Not only are we solely sourcing, this is

7  inconsistent with our corporate policies.

8      Look at those e-mails, Exhibit 52 and 69.  It is very

9  clear it is coming from the absolute top of Royal Philips --

10      (Reporter interruption)

11          **MR. IOVIENO:**  Okay.  The general policy is to seek

12  second sources.  Why?  To get cheaper prices.  We're not doing

13  that here.  Why?  Because we own a conspirator.  So if you're

14  asking me what would PENAC have to have done to effectively

15  withdraw --

16          **THE COURT:**  Let me ask you a question.

17          **MR. IOVIENO:**  Go ahead.

18          **THE COURT:**  Let's say that we were dealing with a

19  Philips subsidiary that had never been a conspirator and it

20  was directed by Royal Philips to purchase products only from

21  conspirators.  You're shaking your head no.  It was just a

22  hypothetical.

23          **MR. IOVIENO:**  Yeah, no, I know.

24          **THE COURT:**  Okay.  Would that entity thereby have

25  become a conspirator?

1          **MR. IOVIENO:**  I was shaking my head by saying no.

2     That entity wouldn't have been a conspirator.

3          **THE COURT:**  Is it assisting the conspiracy?

4          **MR. IOVIENO:**  I would have to think about that.

5          **THE COURT:**  Your answer has to be yes to support the

6     argument you just made, I think.

7          **MR. IOVIENO:**  See, I don't think so.  I think if you

8     have what -- the way I look at it is very -- I'll think about

9     the hypothetical more.  But the way I think about it --

10         **THE COURT:**  How is it different?  Because at one

11    point some executives within the subsidiary had an evil mind?

12         **MR. IOVIENO:**  No, because it's very different because

13    what you have is from 1995 to '01, you have clear evidence of

14    PENAC employees participating in the conspiracy, going to the

15    meetings, agreeing on price.  Okay?  They are fully liable

16    individually.  So the law, it's a high standard (Indicating

17    quotation marks).  Once you're in for part of the conspiracy,

18    you're in for the balance.  Okay?  The only way you get out

19    you have to meet this high standard.

20       That's what I'm saying, from my perspective, that is key

21    to what we are doing here today, not just with respect to the

22    Philips motions, but all of them.  To establish as a matter of

23    law, withdrawal.

24         **THE COURT:**  Okay, I have a different hypothetical.

25         **MR. IOVIENO:**  Okay.

1    **THE COURT:**  Let's say that they stopped buying CRT

2    products of any kind.  Then, then what would that result be?

3    **MR. IOVIENO:**  Okay.  So if they stopped, take away --

4    they didn't buy any --

5    **THE COURT:**  This hypothetical tests a number of

6    things.  But one of the things it tests is:  How important do

7    you think this fact is?

8    **MR. IOVIENO:**  Then you're going to fall back to the

9    second argument which I haven't gotten to yet, which is

10   whether or not standing alone --

11   **THE COURT:**  Oh no, we're going to get there.  But

12   first we're going to answer my question.

13   **MR. IOVIENO:**  Okay.  I thought I was.

14   **THE COURT:**  Stop buying CRTs, okay, totally.

15   **MR. IOVIENO:**  Right.

16   **THE COURT:**  Now, do Defendants' -- is the Philips

17   subsidiary's summary-judgment motion granted?

18   **MR. IOVIENO:**  No, because I don't think transfer to

19   another conspirator is sufficient standing alone.  But the

20   argument I'm making now, about them continuing to assist the

21   conspiracy by purchasing, goes away.

22   I think they lose for two reasons.  I think they lose, A,

23   because they sourced solely from conspirators.  Contrary to

24   corporate policy.  And that creates a question of fact that a

25   jury could decide that they did not take affirmative acts

1    inconsistent with the conspiracy.

2          **THE COURT:**  Wait a second.  You say they acted

3    inconsistently with corporate policy because the managers of

4    the corporation that had that policy told them to do

5    something.

6          **MR. IOVIENO:**  Right.

7          **THE COURT:**  And so somehow a Philips corporate policy

8    rises to a level of law, to a level of law, and supervenes

9    direct command of a Philips manager?  I don't --

10          **MR. IOVIENO:**  What I'm saying is if PENAC wants to

11    withdraw, wants to get the benefits of withdrawal, it has to

12    take action, it has to take acts, affirmative acts that are

13    inconsistent with the object of the conspiracy by solely

14    sourcing tubes from the conspiracy.  They can't satisfy that

15    standard.  Regardless of whether it was their own independent

16    decision or it came down from Royal Philips.  And at the very

17    least, it is creating a question of fact on that point.

18          I think that the fact that they are being commanded, that

19    Royal Philips is controlling them to do it I really think is

20    irrelevant, because it all goes back to the base line point

21    which is:  Their liability is not flowing from Royal Philips.

22    They have independent liability.  They were PENAC employees

23    who participated in the conspiracy from '95 to '01.

24          How did they end their liability in '01?  They

25    independently have to take action.  And if -- inconsistent

1    with the object of the conspiracy.  And by just agreeing to

2    solely source all tubes from the conspiracy, not try to drive

3    down the prices in any way, through competitive pricing, I

4    don't think they satisfy that standard.

5         THE COURT:  What if they bought ten monitors from

6    someone who is not a conspirator?  Would that be enough?

7         MR. IOVIENO:  That is a great hypothetical because it

8    goes to my main point.  I think it is a fact-intensive

9    inquiry, very hard to establish.  And as a matter of law,

10   ten -- I think I would have a hard time convincing a jury that

11   a company as big as PENAC buying as many tubes as they're

12   buying, ten was really material to the overall conspiracy.

13        THE COURT:  So the standard that you're urging me to

14   adopt is that they have to -- they would have had to purchase

15   a material number of products from a non-conspirator.

16        MR. IOVIENO:  No.

17        THE COURT:  What am I supposed to tell the jury?

18        MR. IOVIENO:  I'm saying something a little

19   different.  And maybe I'm not being clear.  What I'm saying is

20   they have to establish that they took affirmative acts --

21        THE COURT:  I get that.

22        MR. IOVIENO:  And I'm saying by solely sourcing that

23   they are facilitating the conspiracy and not essentially

24   disavowing or defeating it, doing anything inconsistent.  And

25   the jury could draw that inference from those facts.

1          **THE COURT:**  Yes.  And I'm the one who is repeating

2     myself, so I'll say this just one time and then I promise I'll

3     stop.  But that is:  You're using the language of affirmative

4     choice and the language of affirmative action.  And the

5     difficulty that I'm having is that they were directed to do

6     this by the very people who had the legal right to tell them

7     what to do in the marketplace, and all they did was follow

8     those instructions.

9          And what you have said back to me is that those

10    instructions were contrary to a corporate policy.  But whether

11    or not that corporate policy is binding in any way is also

12    totally up to the people who had gave them that direction.

13    And so, that's -- I get sort of stuck in the mud there.

14         **MR. IOVIENO:**  I do see what you are saying,

15    completely.  You are saying it is irrelevant, they have no

16    choice.  And what I'm saying is you can't have it both ways.

17    They are an independent participant in the conspiracy.  They

18    have independent liability.  They can't cut that off by

19    saying, "I was directed by Royal Philips" because at the end

20    of the day, if they really wanted to withdraw, they had to

21    completely disassociate themselves from the conspiracy.  And

22    they haven't done that.

23         I only have two minutes, so we've really got to -- I had a

24    number other points-- Can I just go --

25         (Reporter interruption)

 1          **MR. IOVIENO:**  I'll rely on our brief.  I think

 2     putting aside the sole sourcing, transfer of these assets to a

 3     clear major participant in the conspiracy, LPD in this

 4     situation, at the very least creates a question of fact on the

 5     standard.  Separate and apart from the sourcing.

 6          And when you get to notice, this does not come up and --

 7          **THE COURT:**  Transfer without ownership?  What is your

 8     best case on that?

 9          **MR. IOVIENO:**  I'm sorry?

10          **THE COURT:**  This is not *Antar* or *Reisman*.  This is

11     transfer without continuing ownership.  What is your best case

12     on that point?

13          **MR. IOVIENO:**  So what I would say on that is *Gypsum*

14     is saying you have to take affirmative acts, as we said, and

15     you have to communicate the abandonment in a manner reasonably

16     calculated to inform the conspirators' notice.  What you'll

17     see in the record, particularly Exhibit 44 from S.J. Yang, is

18     that none of the conspirators appreciated any difference in

19     the conspiracy.

20          S.J. Yang, and I can read it to you, he said:  After the

21     transfer, we didn't notice any difference in the participation

22     of Philips or LG.  Okay.  So, what --

23          **THE COURT:**  You mean the Philips subsidiaries?

24          **MR. IOVIENO:**  He did not make any distinction at all.

25     Let me read it to you.

1      **THE COURT:**  Well, the motion that's on the calendar

2   this morning makes the distinction.

3      **MR. IOVIENO:**  It does.  And here's the question to

4   Mr. Yang (As read):

5          **"QUESTION:**  And after LPD was formed, Philips

6          no longer manufactured CRTs, correct?"

7          **"ANSWER:**  I think Philips as well as LG no

8          longer manufactured CRTs after LPD was

9          created.  But the existing factories continue

10         with maybe old Philips management people

11         under the new name LPD.  What I want to say

12         is, as your question, LG Philips no more

13         produced CRT.  LG also no more produced CRT.

14         But those who produce CRT, the company name

15         they call LPD but actually the owner, the

16         people, the location and the worker mostly

17         are the same.  Just that they changed the

18         company name."

19   He didn't say:  Oh, well, the subsidiaries disassociated

20   themselves, it was just the Royal Philips people that

21   continued.  It was the same operation of the conspiracy before

22   and after, nothing changed.  It was just transferring assets

23   from the Philips sub to this new conspirator.  And at the very

24   least, our contention is it's creating a question of fact

25   under the standard and on notice.

1      THE COURT:  Would you cite, give me the cite to that

2  testimony again.

3      MR. IOVIENO:  Yes.  This is -- hang on a second,

4  Exhibit 44, S.J. Yang.  I read from Pages 451 and 452.

5      Thank you, Your Honor.

6      THE COURT:  Thank you, Mr. Iovieno.

7      MR. KOONS:  Your Honor, briefly, I think you touched

8  in the last round of questioning on what's maybe most

9  important, given what I understand the Court's concerns to be

10  about this motion.  And that is the transfer that we're

11  talking about of the CRT assets here was not a transfer by the

12  subsidiaries, it was a transfer by Royal Philips or KPNV.  And

13  that's a distinction with huge implications.

14      The directive that Mr. Iovieno spoke of that came from

15  KPNV, I want to clarify one thing.  I think that Your Honor's

16  questions indicate appropriate skepticism about whether or not

17  the top entity in the corporate structure directs someone to

18  do something, whether that can be deemed an act consistent

19  with the conspiracy.  But factually, I want to clarify

20  something because Mr. Iovieno said --

21      THE COURT:  Well, and just so that you don't read too

22  much into my devil's advocacy, I'm sure there are situations

23  in which it can be so read.

24      You know, if I were to take the most obvious sort of

25  ham-handed example, if I said:  Mr. Koons, I want you to go

1   into the audience there and conspire with Mr. Sanders to fix

2   legal fees in the Bay area, well, then, obviously you are

3   doing something in furtherance of the conspiracy and you

4   individually might be liable.  So I'm sure it's possible.  The

5   question is:  Is it so in this case?

6        **MR. KOONS:**  And I think clearly not in this case,

7   because that extreme example is nowhere present here.  But my

8   point also, Your Honor, is that it didn't actually happen as

9   described.

10       If you look at -- this is not a fact that's material

11   that's in dispute because if you look at the Plaintiffs' own

12   opposition brief at Footnote 87, Mr. Iovieno said that after

13   the directive came down in 2003, all of the Philips entities,

14   the subsidiaries only bought from LPD.  Not true.

15       Their footnote says that from 2004 to 2007, for example --

16   this is Page 17 -- the Philips purchased approximately 77 to

17   80 percent from LPD.  What I read that to say is that for that

18   vast period of time, at least a third of the tubes were

19   sourced from other suppliers.  And we know that to be true

20   from the data as well.

21       This is maybe a minor point, Your Honor, but I didn't want

22   it to go unnoticed that somehow this 100 percent purchase

23   policy actually happened, because it didn't.  It was a

24   directive with no teeth.

25       The last point I want to make, Your Honor, is related to

1   KPNV.  This is a motion on behalf of the Philips subsidiaries,

2   but I just want to point out that Footnote 1 in our brief does

3   say that there is another motion that KPNV has filed.

4        THE COURT:  Yes, it's at Docket No. 3040.  I looked

5   at it this morning.

6        MR. KOONS:  I don't dispute that, but I can confirm

7   that.  You're ahead of me.

8        THE COURT:  I'm aware there's a separate motion in

9   there, there's a footnote, I think.  The Plaintiffs wanted to

10  file a consolidated reply, et cetera.

11       MR. KOONS:  Yes.

12       THE COURT:  I know that some time in my future I have

13  another motion to look at.

14       MR. KOONS:  Two week's time, Your Honor.  Yes.

15       THE COURT:  There we go.

16       MR. KOONS:  You can look forward to that.  My only

17  point from that, Your Honor, aside from what's in the papers,

18  is that because of the arguments that we're making as to KPNV,

19  I think the cases that we have talked a lot about today --

20  *Antar*, *Lothian*, *Reisman* -- they just don't apply.  They don't

21  apply to the Philips parties.

22     Unless you have other questions, that's what I have.

23       THE COURT:  I don't.  Thanks.

24       MR. KOONS:  Thank you, Your Honor.

25       THE COURT:  All right.  The summary judgment -- hold

1   on just a moment, please.

2       The motion for summary judgment against Dell and Sharp, on

3   statute of limitations grounds.

4           **MR. BRIAN:**  Good morning, Your Honor.  Brad Brian,

5   Munger, Tolles & Olson.  I'm going to be arguing that portion

6   of the motion that applies to Dell, but because we settled

7   with Sharp, Thomson's counsel's going to do that part of the

8   motion.  Together, we would like to reserve two minutes for a

9   rebuttal.

10          **THE COURT:**  All right.

11          **MR. BRIAN:**  I want to start with the burden of proof

12  because I think it really helps the Court decide this motion.

13      On summary judgment, of course we have the burden of

14  coming forth with evidence, either to show that Dell had

15  actual knowledge of the price fixing or, to quote from the

16  *Conmar* case, that it should have been alerted to facts that

17  following duly diligent inquiry could have advised it of its

18  claim.

19      Having framed it that way, I want to turn to what I think

20  is a misstatement in Dell's brief which I think was repeated

21  by counsel this morning in response to Toshiba's motion.  And

22  that is that the Plaintiffs can meet their burden of showing

23  fraudulent concealment just by citing to the fact that there

24  were secret meetings, there were instructions to throw away

25  e-mails.  Regardless of what knowledge of the facts they

 1   actually had.  That is not the law.

 2          THE COURT:  Do you -- if I ask Mr. Curran about this,

 3   what he thought his best cases were on this point, do you

 4   agree with his list?

 5          MR. BRIAN:  I forgot what cases he gave.  I'll give

 6   you my list.

 7          THE COURT:  *Pocahontas*, *Conmar* and one other one, I

 8   forget what it was.

 9          MR. BRIAN:  My best case on this, or two, *Go Computer*

10   which is a Fourth Circuit case which is cited in the briefs,

11   and it's cited with approval in the *Hexcel* case, in the Ninth

12   Circuit case, where they state (As read):

13              "Fraud by its nature is something perpetrators take

14              pains to disguise, and Plaintiffs' notice (sic) that

15              alleged concealed fraud excuses the need for a

16              diligence on Plaintiff's part would permit statutory

17              periods to be tolled indefinitely."

18   And the second case is a case that unfortunately neither

19   side cited, *Global Services* out of this District Court by

20   Judge White, the cite is 2011 Westlaw, 6182425 at Page 4.

21   Both those cases are cited for the I think undisputed legal

22   principle that if there are suspicions, if there's knowledge,

23   you have a duty to inquire and you can't just sit back because

24   the plaintiff -- because the defendants took pains to try to

25   disguise their fraud.

1    So the question is on the record here:  What did Dell

2  actually know?  We have prepared a slide deck which with the

3  Court's permission I would like my colleague Ms. Nash to give

4  to you, that kind of summarizes the key exhibits on this

5  point.  I don't have time to go through them all.

6    With the Court's permission, she'll pass them out to your

7  clerks.

8         **THE COURT:**  Have your opponents seen this?

9         **MR. BRIAN:**  Yes. We provided those to counsel.

10         **THE COURT:**  Fine.

11  (Document handed up)

12        **MR. BRIAN:**  When you look at the first slide, Page 2,

13  it's Slides Exhibit 8, and these are -- cite exhibits to our

14  papers.  Where there's also a Dell exhibit number, we've given

15  you both.

16    Exhibits 8, 17, 21, 14 and 19, those are internal Dell

17  documents that talk about price fixing, secretly working to

18  fix price, collusion, and consortiums.  All of those, at a

19  minimum, we think create constructive knowledge and a duty to

20  inquire.

21    So then the question is:  Well, what did they do?  That

22  goes to the next slide.  Which is the Slide 3.  And there, the

23  documents are interesting.  Exhibit 12 is a Dell document

24  which discusses a newspaper report.  And they say -- this

25  newspaper report said that the cartel had failed to increase

1    pricing.

2        What the e-mails say is that Dell concluded that they

3    found that article inaccurate.  They found it inaccurate that

4    the cartel had failed to increase pricing.

5        Then you go to Exhibit 13, which is on that slide, and is

6    also in your slide deck at Page 10, an e-mail from a Dell

7    employee named Eric Korman which says he is not so sure that

8    the newspaper report is accurate, because he has met with

9    representatives LPD and Samsung, and learned, and I quote:

10           "They still plan to increase prices..."

11       He goes on to say, quote:

12           "Please keep SDI's comments internal."

13       Then you go to Defendant's Exhibit 9, another e-mail from

14   Mr. Korman in which he says as a result of his inquiry, it

15   seems that the CRT makers are still trying to increase the

16   price despite the article in the *Commercial Times*.  They have

17   obvious red flags, based on their own document.

18       What do they do?  Do they inquire further?  Do they file a

19   lawsuit?  Do they go to the Department of Justice?  No.  What

20   Mr. Korman's documents indicate, they decided to keep it

21   internal.  Why?  That is answered by Defendant's Exhibit 18,

22   which is also in your slide deck at Page 12 of the deck, when

23   one of the individuals writes the e-mail and says that they

24   are going to do a little "cartel breaking," unquote.

25       What Dell has decided to do is faced with the knowledge

1    that the manufacturers are getting together to fix prices,

2    they're going to negotiate separately so as to get better

3    prices than their own competitors have to pay.  That's what

4    they decide to do.

5        Now, Dell argues:  Well -- there's others we cited.  I

6    just don't have time to go through them.  They're in your

7    slide deck.  They say:  Well, there is a facts question

8    because the Dell employees at depositions have denied knowing

9    that there was price fixing.

10       Well, first of all, not all of them said that.  Some

11   actually said "I don't recall," and the law is very clear that

12   a failure to recall does nothing to create a fact question.

13       But more importantly, look at Slides 15 and 16 of the deck

14   we gave you.  Those are excerpts of the deposition testimony

15   of a Mr. Garvin, a Dell vice-president, in which he admits

16   twice -- twice he admits, under oath, that they suspected

17   price fixing and collusion.  That's what he said.

18       That is an admission that puts them on notice and

19   obligates them to conduct an investigation.  And they don't do

20   it, and instead, they decide to negotiate prices separately to

21   try to get a better deal.

22       Now, Dell also argues that the documents are ambiguous,

23   that some of them talk about the LCD price fixing.  None of

24   that matters.  Because the point is once they're on notice and

25   they have that duty to inquire, they cannot sit back.  That's

1    the holding of the *XL* case (Phonetic), that's *Go Computer*,

2    that's *Global Services*, that's the *AMP* case.  Those are our

3    four best cases.

4        Finally, I just want to say one thing.  They cannot have

5    it both ways.  They argue in their papers at Page 22 of their

6    opposition brief, both that they acted diligently and that

7    they had no knowledge, actual or constructive.  They can't

8    have it both ways.  Because you can't say:  Well, I knew

9    nothing but I investigated anyway.  The fact is they were put

10   on notice, and they chose not to do anything more than is

11   reflected on those documents.

12       I would like to save the rest of my time, Your Honor.

13            **THE COURT:**  Thank you.

14            **MR. HURLEY:**  Your Honor, Ryan Hurley with Faegre

15   Baker Daniels for the Thomson Defendants.  I only have a

16   couple of minutes to focus on the Sharp portion.

17       Like Dell, there is evidence in the record demonstrating

18   that Sharp had actual, or at minimum, constructive knowledge

19   of the facts giving rise to its claim by November 2002.

20            **THE COURT:**  Now, isn't the evidence a little --

21   somewhat weaker with regard to Sharp than it is to Dell?

22   There's not -- you know, if I had an e-mail that said "cartel

23   breaking" I would put it up front like Mr. Brian did.  But you

24   don't have that.  You have:  We have suspicions, there's a

25   possibility.  That kind of thing.  And isn't there a law that

1   says suspicions and that sort of thing isn't enough?

2        MR. HURLEY:  Well, Your Honor, I would agree that the

3   volume of evidence is different, and perhaps even the nature

4   of it is slightly different than Dell.  I will agree to that

5   much.

6        As to the legal standard, I would cite to *Conmar* which was

7   a media publication case.  It went against the defendants

8   there.  But they cited favorably to a Sixth Circuit case which

9   says something that excites one's suspicions is the same as

10  actual knowledge.

11       And we've pointed to the report to President Harada of the

12  Sharp SEMA entity, a Plaintiff here, where his parents

13  corporation, Sharp Corporation is pointing to the possibility

14  that Samsung and LGPD are colluding.  Not only that, but then

15  advocating that they take a different negotiation tactic,

16  namely diverting purchases to my client, Thomson.

17       The other thing I would say just about the nature of

18  Sharp's claim, which gets to the other exhibits that are

19  reproduced on Pages 14 to 16 of the brief, is that Sharp is

20  advancing an alternative rule of reason information exchange

21  claim.

22       Now, there's motions that Your Honor will need to address

23  down the line.  We dispute whether they -- that theory was

24  disclosed in time.  But for purposes of today, I will treat it

25  as still in play.

1      And the reasons that that is important is Sharp is

2  pointing to documents the Defendants have produced as evidence

3  of information exchange, which they claim is unlawful.  But

4  we've shown that by November, 2002, Sharp had available to it

5  two documents that are substantially similar.  You can just

6  look at them on their face; they're reproduced in the briefs.

7      But you can't argue on the one hand that this is evidence

8  that -- of the information exchange conspiracy, but on the

9  other hand claim that:  We had no knowledge of this

10 information that would put us on notice of our claim.

11     Unless you have questions, I'll reserve the rest for

12 rebuttal.

13          **THE COURT:**  I don't.  Thank you.

14          **MR. HURLEY:**  Thank you.

15          **MR. KENNY:**  Good morning, Your Honor.  May it please

16 the Court, Michael Kenny on behalf of Dell.  I'm going to take

17 six minutes, and Sharp's counsel will take six minutes.

18     You heard Mr. Brian give a lot of lawyer argument.  And

19 that is all he gave you, was lawyer argument about some

20 documents.  You have admonished the lawyers over the course of

21 these proceedings:  Come in with your best case and tell me

22 why I win.

23     I've got 1A and I've got 1B.  It was a toss-up.  1A is a

24 Ninth Circuit.  It is *Conmar versus Mitsui*.  It's an antitrust

25 conspiracy case.  And following the Ninth Circuit's own *Volk*

1  *v. Davidson* decision, it denied a motion for summary judgment

2  on fraudulent concealment in the antitrust conspiracy case.

3      Your Honor, this is the standard.  There can be no doubt.

4  Quote --

5          **THE COURT:**  Are the facts as good for you here as

6  they were in *Conmar*?

7          **MR. KENNY:**  I think so.  And I'll get to that,

8  Your Honor.  I think our facts are much better than the *Conmar*

9  facts.  The standard.  Summary judgment on fraudulent

10  concealment on an antitrust case is appropriate if and only

11  if, quote (As read):

12          "...the uncontroverted evidence irrefutably

13          demonstrates that a plaintiff discovered or should

14          have discovered the cause of action but failed to

15          file a timely complaint."

16  858 F.2d at 502.

17      Your Honor will recall the *ATM Fees* case, where ATM

18  defined the word "control" for purposes of *Illinois Brick*,

19  what's it mean.  It went to the dictionary.  I took a page out

20  of the Ninth Circuit's book and went to the dictionary.

21  "Uncontroverted."  Here's the definition (As read):

22          "Of which the truth or validity is not disputed or

23          denied.  Irrefutable.  Impossible to deny or

24          disprove.  Cannot be refuted or disproved."

25      And that's why in the Ninth Circuit's *Volk* decision, it

1    said that when it comes to a summary-judgment motion on

2    fraudulent concealment the test is, quote, "extremely

3    difficult burden."  816 F.2d at 1406.

4         And in *Conmar*, going back to *Conmar*, the Ninth Circuit

5    also held that, quote (As read):

6              "Because we find there is a genuine issue of material

7              fact whether the facts publicly available were

8              sufficient to excite Conmar's inquiry, then no due

9              diligence need be demonstrated for Conmar to survive

10             summary judgment."

11        858 F.2d at 504-05.

12        When Your Honor applies the *Conmar* test to this case --

13   this is 1B -- I think you will do just what Judge Illston did

14   in the *LCD* case when she denied the Defendants' partial motion

15   for summary judgment as to fraudulent concealment against

16   Dell.  She said both parties submitted conflicting evidence;

17   this cannot be decided on summary judgment following *Conmar*.

18        So the evidence in this case, quickly, let's start with

19   the elephant that's -- the evidentiary elephant that's in this

20   room.  They deposed ten Dell employees, including senior

21   executives from the procurement department over the course of

22   70 hours, Your Honor.  These witnesses were asked point-blank

23   questions about their knowledge or suspicions.  Most of them

24   said:  I have no knowledge of any price fixing activity.

25        I especially ask Your Honor to read Glenn Neland's

1    deposition, it's Exhibit 30 at Pages 246 to 250, where he

2    explains why they did not have any concerns about cartel

3    activities in the CRT industry.  The tube makers.  It's very

4    compelling.

5        These witnesses at point-blank on cross-examination also

6    said they had no suspicions.  Mr. Brian quoted from a passage

7    of Marty Garvin's deposition testimony about suspicions.  He

8    said -- they didn't give you the full page cite.  We've put it

9    in our brief.  He said:  I don't recall.

10       The "cartel breaking" e-mail -- and we'll get to the

11   e-mails, but the "cartel breaking" e-mail, Mr. Garvin

12   testified that was about LCD.  It was a specific mention about

13   flat panels.  Flat panels are LCDs.  It wasn't even an issue

14   with regard to CRT.

15       And in all of these e-mails, where they've come up with

16   this human highlight film for you, there was about 16 of them.

17   Thirteen of them, the authors of the e-mails weren't even

18   deposed.  We don't even know what the authors had to say.

19   Many of the emails, the witnesses were asked questions about

20   these e-mails, and they denied essentially the lawyer argument

21   that's being made here, being made in this court and being

22   made in the briefs.

23       But what's also not in these e-mails?  What are the facts

24   that are in the e-mails?  If Your Honor will read Dell's

25   complaint, Your Honor knows that there were a series of

1    last-minute meetings, minutes taken.  It's a rich tapestry of

2    anti-competitive conduct and price fixing that is in this

3    complaint.

4        Contrast that with what's in the e-mails.  There's nothing

5    like that in the e-mails.  There aren't facts that identify

6    meeting participant, meeting minutes, discussion of the prices

7    that were reached, actual agreements that were reached.  Dell

8    simply was not on notice of a cause of action that it could

9    have brought.

10       And what was it supposed to do?  To go to the Department

11   of Justice and say:  Well, we have some e-mails, where some

12   people have referred, shorthand reference to this oligopoly

13   industry as a cartel or consortium, or a club.

14       All that is is an alliterative noun.  There's no

15   explanation in these e-mails for why the conclusion was

16   reached that there was a consortium or there was a cartel.

17       And Your Honor, this conspiracy -- and the word

18   "conspiracy" doesn't appear in any of these e-mails -- it went

19   undetected for more than ten years.  What was Dell supposed to

20   say to the Department of Justice?  "I've got some guy who

21   refers to an oligopoly as a cartel or an a consortium"?

22       And there's a reason why it went undetected for ten years.

23   It was affirmatively concealed.  We laid it out in Pages 3 and

24   4 of our brief, Your Honor.

25       And there are cases from the Ninth Circuit, *In Re Rubber*

1    *Chemical Antitrust Litigation*, a case that says when you have

2    affirmative concealment, that otherwise obviates any

3    due-diligence requirement.

4        And the policy reason for that is pretty simple.  The

5    policy reason for that is because by its nature, when the

6    Defendants cover it up, it's going to be extraordinarily

7    difficult to ever discover that.

8        And that's what's happened, Your Honor.  There are four

9    cases that they like.  They don't cite Judge Illston's

10   decision.  It's not in their opening brief; it's not in the

11   reply brief.  That is the most factually analogous case that

12   you can find.  And she denied the summary judgment on

13   fraudulent concealment.

14       The *Go Computer* case versus Microsoft out of the Fourth

15   Circuit, that's one of those -- are you kidding me?  There was

16   a Federal Trade Commission investigation of Microsoft.  The

17   plaintiff went to the Federal Trade Commission, met with the

18   Federal Trade Commission.  The Federal Trade Commission said:

19   Looks like a textbook case of monopoly to me.  The plaintiff

20   wrote a book about Microsoft's restrictive licensing

21   agreements and anti-competitive practices.  I mean, that case

22   is so factually distinct.

23       The case that they just cited, I haven't read it because

24   they didn't put it in their brief, so I don't know what that

25   one is about.  The *Volk* case, that was a RICO and securities

1   fraud case out of the Ninth Circuit, that was in 1987.  That's

2   where the standard, the uncontroverted evidence must

3   irrefutably demonstrate, that was first announced or

4   articulated in the *Volk* decision.

5           **THE COURT:**  Please slow down just a tad.

6           **MR. KENNY:**  Sorry.

7       But in that case, the fraudulent, the plaintiff claimed

8   fraudulent concealment, limited investors in a partnership

9   over coal mining.  They sued the general partner.  The general

10  partner sent them the annual report and a subsequent letter

11  that says:  The instruments that you have invested in, these

12  coal reserves, the coal is not mineable, it's not commercially

13  operable.  Bingo, you have your cause of action and your

14  damages.  You have got a worthless investment.  You were told

15  that.

16          **THE COURT:**  Your argument is that at best, these Dell

17  materials show suspicion, which is enough -- which is not

18  enough.

19          **MR. KENNY:**  We don't think it shows suspicion.  The

20  ten witnesses have denied suspicion.  At a very, very minimum,

21  Your Honor, in their best case, we have got conflicting

22  inferences in the record.  With conflicting inferences in the

23  record, that does not meet this very high standard of

24  uncontroverted evidence that irrefutably demonstrates.

25      Thank you.

```
 1          THE COURT:   Thank you.

 2          MR. BENSON:   Good morning, Your Honor, Craig Benson

 3   from the Paul Weiss law firm for Plaintiffs Sharp Electronics

 4   Corporation or SEC, and Sharp Electronics Manufacturing

 5   Company of America, or SEMA.

 6          Before I forget, I want to start by agreeing with

 7   Your Honor that the controlling law in the Ninth Circuit is

 8   that suspicion is indeed not enough to excite inquiry.  That's

 9   the Mount Hood case, 555 F.2d at 698, which states (As read):

10               "Suspicion will not substitute for knowledge or facts

11               from which fraud could be reasonably inferred."

12          That is supported by the Conmar case.  It is supported by

13   the Petroleum Products case where courts made clear that one

14   must possess facts in order to have inquiry incited.  And

15   beyond that, and this is something that Defendants have not

16   addressed in their briefs, Defendants must irrefutably prove

17   that diligent inquiry following that excited inquiry, would

18   have turned up facts that could give rise to the claim.  That

19   is -- that is a burden that Defendants haven't event started

20   to address in their briefs.

21          There are three documents that the Defendants cite that

22   they claim put SEMA and SEC on constructive or actual notice.

23   I'll address each in turn.  The first is Exhibit 3620.  This

24   fails to meet the burden Defendants have on summary judgment

25   for a number of reasons.
```

1          Number one, there's no evidence at all in the record that

2     one of the Plaintiffs, SEC, ever saw or had access to this

3     document.  Defendants concede that in their brief on Page 23.

4     They tie it only to one plaintiff, SEMA.

5          As to SEMA, the record reflects that there are material

6     disputes about how one would -- can I -- is that accurate?

7     Six minutes?

8               THE CLERK:  You have two minutes in total for your

9     side.

10              MR. BENSON:  Okay.  The testimony in the record as to

11    SEMA shows that there is a sharp dispute about whether this

12    document would ever have been sufficient to place SEMA on

13    notice.

14         What Mr. Nakanishi who is the head of procurement for SEMA

15    testifies is that this document was created by personnel of

16    Sharp Corporation, a non-party in Japan, that their

17    speculation that SPI -- yeah, that SDI and LPD were conspiring

18    was based on the fact that they observed that two prices

19    appeared to be the same for a single product.  He also

20    testified that those prices were in fact different for reasons

21    that people in Japan would not be sensitive to, having to do

22    with the delivery terms and who had responsibility for

23    covering customs and delivery costs.  So that document would

24    not have been sufficient to put a reasonable person on notice

25    of a conspiracy.

1      The other two documents, Exhibit 3621 and 3622, are

2 actually part of the same document.  If you look at the

3 metadata, one is the embedded Excel spreadsheet that was

4 contained in the PowerPoint presentation.  Defendants have not

5 met their burden to show that this document would provoke

6 inquiry by SEC or SEMA for, again, a number of reasons.

7      First, there is no evidence in the record that this

8 document was ever in the possession of anyone at SEC or SEMA.

9 The only testimony in the record is to the contrary, the

10 testimony of Mr. San Pietro (Phonetic) and Mr. Nakanishi.  The

11 document was from a custodian from Sharp Corporation in Japan.

12 It was produced because at an earlier time in the case there

13 were certain intercompany purchases that had flowed through

14 Sharp Corporation.  Those purchases are no longer at issue in

15 the case.

16      Defendants have not argued any basis for constructive

17 knowledge or piercing the corporate veil or arguing agency

18 with respect to these admittedly separate corporate entities.

19      Also, the record does not support a finding that anything

20 in those documents would have placed anyone at SEC or SEMA on

21 inquiry notice.

22      The Defendants, themselves -- and you heard it here

23 today -- say only that this would have or should have placed

24 SEC or SEMA on notice because it was similar to a document

25 that SEC and SEMA identified in a -- an interrogatory response

1     as -- as evidence of the conspiracy.

2         In fact, if you look at those documents, they are

3     materially different.  The document that SEC and SEMA cited is

4     attached to minutes of an in-person meeting between Matsushita

5     and its competitor, Samsung SDI, reflecting an exchange of

6     information.  This is Docket No. 3044-2, Exhibit 1.

7         The chart which is the third page of -- I'm sorry --

8         **THE COURT:**  You may finish your sentence.

9         **MR. BENSON:**  The chart which is the third page of

10    this document identifies the source for the information as

11    Matsushita.  That is in stark contrast to the other documents

12    that Defendants have identified, which doesn't attribute the

13    information in the chart to anybody.

14        **THE COURT:**  Thank you, Mr. Benson.

15        **MR. BENSON:**  Thank you.

16        **THE CLERK:**  You have two minutes in total.

17    (Reporter interruption)

18        **MR. BRIAN:**  I'll take a minute and a half and give

19    thirty seconds to my colleague.

20        Your Honor, I want to start by reminding the Court of

21    Exhibit 18.  Counsel stood up and said:  Well, they were

22    talking about LCD, not CRTs.  That's not correct.  Because

23    Garvin's e-mail responds to an e-mail by Ratley (Phonetic).

24    And I'm quoting from his email (As read):

25            "All of suppliers are reporting that CRT inventory is

1          building."

2      They are talking about CRT. Then there's Exhibit 13. That

3  is the Korman e-mail where he says:  I'm not so sure the

4  article was accurate.  The article that said they were not

5  going to increase prices.  He says they still planned to

6  increase prices, and please keep SCI's comments confidential.

7      Judge Illston's decision in the *LCD* was different.  Those

8  dealt with different documents.  You didn't have Mr. Garvin's

9  admissions that we have here.  You had a credibility issue

10 there, in a declaration.  We don't have that.

11     They come back and say:  Well, Mr. Garvin added, I don't

12 recall.

13     The *Robnet versus Blodgett* case (Phonetic) which is

14 91-35397, 1992 Westlaw, 280980 at 2 says:  A failure to recall

15 does not create a factual issue.

16     I started with the burden of proof for a reason.  Counsel

17 for Sharp got up and misstated the burden of proof.  It goes

18 back to *Celotex*.  Our burden is to come forth with evidence of

19 actual knowledge, or essentially a knowledge that they were

20 put on notice, giving rise to a duty to inquire.  Then the

21 burden shifts to Dell.  They have to come forward with

22 evidence from which a reasonable juror could conclude they had

23 no actual knowledge, or they had no constructive knowledge.

24 They have not met their burden, Your Honor.

25          **THE COURT:**  Thank you.

1      **MR. HURLEY:**  Your Honor two points.  On Exhibit 3620,

2  Mr. Nakanishi is clearly speculating about that document.  He

3  said he wasn't sure he had ever seen it before.  And so, his

4  speculation when he doesn't recall the document isn't enough

5  to create a fact issue.

6      On the two other documents, 3621 and 3622, these

7  Plaintiffs came into this Court asserting claims based on

8  transactions by their corporate parent, Sharp Corp.  They made

9  a strategic decision late in the case to abandon those claims.

10     But having come into this Court in the first place

11 asserting those claims producing this information, it's too

12 late now for them to say that this information isn't enough to

13 put them on notice of the facts supporting their claims back

14 in 2002.

15     Thanks.

16     **THE COURT:**  Thank you.  Well, thank you all.  We have

17 arrived at the end of our lengthy motion calendar this

18 morning.  I really did enjoy all the arguments this morning.

19     I just want to say a word about the argument and that is

20 that they're all fantastic.  We had some younger lawyers

21 arguing today.  We have had at prior hearings; I would say a

22 little more today.

23     And I think anybody who is sitting in the courtroom,

24 whether you're involved in this case or not, would agree that

25 the younger lawyers made up in enthusiasm and preparation

1   whatever they lacked in experience.

2       And I don't want to interfere with the staffing decisions

3   made by the very fine law firms that are involved in this

4   case.  That is not the purpose of these comments.  I know I

5   can look forward to continuing to hear the arguments of

6   experienced counsel as the case goes forward, and I'm going to

7   enjoy those arguments.  But I thought it was important for

8   those same firms to know that arguments by younger lawyers

9   have their own advantages.

10      Thank you.

11          **MR. BRIAN:**  Thank you.

12          **THE CLERK:**  All rise.

13      (Proceedings concluded)

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                       **CERTIFICATE OF REPORTER**

5           I, BELLE BALL, Official Reporter for the United

6   States Court, Northern District of California, hereby certify

7   that the foregoing is a correct transcript from the record of

8   proceedings in the above-entitled matter.

9

10          /s/  Belle Ball_____

11                  Friday, February 12, 2016

12              Belle Ball, CSR 8785, CRR, RDR

13

14

15

16

17

18

19

20

21

22

23

24

25