JOSEF D. COOPER (53015)
TRACY R. KIRKHAM (69912)
JOHN D. BOGDANOV (215830)
COOPER & KIRKHAM, P.C.
357 Tehama Street, Second Floor
San Francisco, CA  94103
Telephone:  (415) 788-3030
Facsimile:  (415) 882-7040
jdc@coopkirk.com
trk@coopkirk.com
jdb@coopkirk.com


FRANCIS O. SCARPULLA (41059)
PATRICK B. CLAYTON (240191)
LAW OFFICES OF FRANCIS O. SCARPULLA
456 Montgomery Street, 17th Floor
San Francisco, CA  94111
Telephone:  (415) 788-7210
Facsimile:   (415) 788-0706
fos@scarpullalaw.com
pbc@scarpullalaw.com

*Counsel for Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:  CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION <br><br> This Document Relates to: <br><br> All Indirect-Purchaser Actions | **Master File No. 3:07-cv-5944 JST** <br><br> **MDL No. 1917** <br><br> **OBJECTIONS TO REPORT AND RECOMMENDATION OF SPECIAL MASTER RE MOTIONS (1) TO APPROVE INDIRECT PURCHASER PLAINTIFFS' SETTLEMENTS AND (2) FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS TO CLASS REPRESENTATIVES** <br><br> Hearing Date: March 15, 2016 <br> Time:  2:00 p.m. <br> Courtroom:  9, 19th Floor <br> Judge: Honorable Jon S. Tigar |

**TABLE OF CONTENTS** <u>Page</u>

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     RELEASING CLAIMS OF NON-REPEALER-STATE CLASS MEMBERS
        WITHOUT CONSIDERATION IS ERROR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

        A.      The Claims of the Non-Repealer State Members of the Nationwide Class
                are Not Being Settled, They are Being Dismissed with Prejudice . . . . . . . . . 2

        B.      The Special Master Failed to Properly Evaluate the Non-Repealer Class
                Members' Federal Equitable Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

                1.  The Claims for Equitable Monetary Relief . . . . . . . . . . . . . . . . . . . . . 5

                2.  The Claims for Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        C.      This Court's Awarding Disgorgement Would be Consistent with the
                Letter and Spirit of the Federal Antitrust Laws . . . . . . . . . . . . . . . . . . . . . . 14

III.    THE NOTICE PROGRAM FAILED TO PROVIDE ADEQUATE
        NOTICE TO AN ACCEPTABLE PERCENTAGE OF CLASS MEMBERS . . . . . . 18

IV.     THE SPECIAL MASTER ERRED IN AWARDING A PERCENTAGE-OF-THE-FUND
        AS ATTORNEYS' FEES, AND FAILED TO PROPERLY ADJUST THE
        LODESTAR FOR WORK THAT DID NOT BENEFIT THE CLASS . . . . . . . . . . 21

        A.      The Special Master Erred In Applying The Percentage-Of-The-Fund Method
                Instead Of An Adjusted Lodestar In The First Instance . . . . . . . . . . . . . . . . . 22

        B.      The Special Master Erred In Failing To Apply An Appropriate
                Fee Reduction Based On Billing Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

        C.      The Special Master Erred In Failing To Apply An Appropriate
                Fee Reduction For Duplicative Trial Preparation . . . . . . . . . . . . . . . . . . . . . . 26

        D.      The Special Master Failed To Apply An Appropriate Fee Reduction For
                Unnecessary Disputes With the California Attorney General . . . . . . . . . . . . . 26

V.      THE SPECIAL MASTER ERRED IN FAILING TO ADDRESS OBJECTIONS
        TO EXPENSES, COMPLIANCE WITH THIS DISTRICT'S GUIDANCE ON
        CLASS ACTION APPROVAL, AND FAILED TO PROVIDE A COMPLETE
        RECORD TO THE COURT AND THE PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . 27

        A.      The Special Master Failed To Address Objections To The Expense Request . . 27

        B.      Lead Counsel and the Special Master Have Failed To Address
                This District's Guidance On Class Action Approval . . . . . . . . . . . . . . .. . . . . 28

        C.      The Special Master Relied Upon Documents And Ex Parte
                Communications Not Contained In The Record . . . . . . . . . . . . . . . . .. . . . . . . 29

VI.     CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**TABLE OF AUTHORITIES**                                                   <u>Page</u>

<u>Cases</u>

*Anderson v. Beland (In re Am. Express Fin. Advisors Secs. Litig.)*
    672 F.3d 113 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

*Apple, Inc. v. Samsung Electronics Co.*
    2012 WL 5451411 (N.D. Cal. Nov. 7, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Banas v. Volcano Corp.*
    47 F.Supp.3d 957 (N.D. Cal. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*California v. American Stores Co.*
    495 U.S. 271 (1990).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*California v. ARC America Corp.*
    490 U.S. 93 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Class Plaintiffs v. Seattle*
    955 F.2d 1268 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

*Collins v. Thompson*
    679 F.2d 168 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

*EEOC v. US Steel Corp.*
    2012 U.S. Dist. LEXIS 49167 (W.D. Pa. April 5, 2012) . . . . . . . . . . . . . . . . . . . . . . 30

*Ehrheart v. Verizon Wireless*
    609 F.3d 590 (3d Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

*Evans v. Jeff D.*
    475 U.S. 717 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*FTC v. Amy Travel Service, Inc.*
    875 F.2d 564 (7th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*FTC v. Gem Merchandising Corp.*
    87 F.3d 466 (11th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*FTC v. H. N. Singer, Inc.*
    668 F.2d 1107 (9th Cir.1982. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*FTC v. Security Rare Coin & Bullion Corp.*
    931 F.2d 1312 (8th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*FTC v. Southwest Sunsites, Inc.*
    665 F.2d 711 (5th Cir.) (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

*FTC v. United States Oil & Gas Corp.*
    748 F.2d 1431 (11th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Glass v. UBS Fin. Servs.*
    2007 U.S. Dist. LEXIS 8476 (N.D. Cal. Jan. 26, 2007) . . . . . . . . . . . . . . . . . . . . . . 29

*Hajro v. U.S. Citizenship & Immigration Servs.*
    900 F.Supp.2d 1034 (N.D. Cal. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.*
    392 U.S. 481 (1968). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Illinois Brick Co. v. Illinois*
    431 U.S. 720 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*
    Master File No. M-02-1486-PJH (MDL No. 1486),
    2013 U.S. Dist. LEXIS 188116  (N.D. Cal. Jan. 8, 2013). . . . . . . . . . . . . . . . . . 10, 12, 13

*In re High-Tech Employee Antitrust Litig.*
    Case No. 11-CV-2509-LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015). . . . . . . . . . 22

*In re Lorazepam & Clorazepate Antitrust Litig.*
    205 F.R.D. 369 (D.D.C. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re Syncor ERISA Litig.*
    516 F.3d 1095 (9th Cir. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

*In re Toys 'R' Us Antitrust Litig.*
    191 F.R.D. 347 (E.D.N.Y. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*
    396 F.3d 922 (8th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

*Kaufman v. Am. Express Travel Related Services, Inc.*
    283 F.R.D. 404 (N.D. Ill. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

*Kaufman v. Am. Express Travel Related Services, Inc.*
    No. 07-C-1707 (N.D. Ill. Aug. 8, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Lucas Automotive Engineering Inc. v. Bridgestone/Firestone Inc.*
    140 F.3d 1228 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

*Midwest Paper Prods. Co. v. Cont'l Group*
    596 F.2d 573 (3d Cir. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*
    2015 WL 4274370 (N.D. Cal. July 13, 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .25

*Oregon v. AU Optronics Corp. (In re TFT-LCD (Flat Panel) Antitrust Litig.)*
    MDL No. 1827, No. C 10-4346 SI, 2011 U.S. Dist. LEXIS 76562,
    2011 WL 2790179 (N.D. Cal. July 11, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . .9, 11

*Porter v. Warner Holding Co.*
    328 U.S. 395 (U.S. 1946). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Sullivan v. DB Investments, Inc.*
    667 F.3d 273 (3rd Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14, 15

*United States v. Keyspan Corp.*
    763 F. Supp. 2d 633 (S.D.N.Y. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8, 9

*United States Gypsum Co. v. Indiana Gas Co.*
    350 F.3d 623 (7th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

*Walter v. Hughes Communications, Inc.*
    No. 09-2136-SC, 2011 WL 2650711 (N.D. Cal. July 6, 2011). . . . . . . . . . . . . . . . . . .19

*Welch v. Metropolitan Life Ins. Co.*
    480 F.3d 942 (9th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .24

## RULES

Federal Rules of Civil Procedure

        Rule 23(c)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

        Rule 53(b)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

        Rule 53(b)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .29

## STATUTES

15 U.S.C. § 26. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1, 2

## OTHER AUTHORITIES

Antitrust and Unfair Competition Law Treatise
    California State Bar, Chapter 23  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

Judges' Class Action Notice and Claims Process Checklist and Plain Language
    Guide (hereinafter, "Notice and Claims Process Checklist"),
    Federal Judicial Center (2010), at 3 (available at
    http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf) . . . . . 19

Procedural Guidance for Class Action Settlements (N.D. Cal.),
    (available at http://www.cand.uscourts.gov/ClassActionSettlementGuidance) . . . . . .28

*Restatement (Second) of Contracts*, § 71 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

## I.     INTRODUCTION

Pursuant to Rule 53(f)(1), Federal Rules of Civil Procedure, the undersigned object to Special Master Martin Quinn's Report and Recommendation[1] on the grounds that these settlements are not fair, reasonable, and adequate because: (1) releasing the claims of the class members in "non-repealer" states was improper; (2) the notice program was flawed; (3) the award of a percentage-of-the-fund as attorneys' fees is unwarranted in this case; and (4) the Special Master ignored objections made to the expense award, failed to address compliance with the Northern District's guidance on class action settlement procedure, and improperly relied upon *ex parte* communications not made available to this Court and the parties.

## II.     RELEASING CLAIMS OF NON-REPEALER-STATE CLASS MEMBERS WITHOUT CONSIDERATION IS ERROR

It is undisputed that Lead Counsel negotiated the Proposed Settlements on the assumption that the claims of over one half of the putative Nationwide Class have absolutely no monetary value because they are state law claims which are foreclosed by the Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).  Therefore, he agreed to release all claims for those class members without any consideration at all.   However, the primary claims of the uncompensated members of the Nationwide Class are federal equitable claims that **do not arise under state law, and do not present any issue involving *Illinois Brick.***

The claims at issue in this objection are those that have been asserted under Section 16 of the Clayton Act, 15 U.S.C. § 26, on behalf of all indirect purchasers in a putative nationwide litigation class.[2]  The law has been well-settled since 1979, when the Third Circuit decided

---

[1]  "Report and Recommendation of Special Master re Motions (1) to Approve Indirect Purchaser Plaintiffs' Settlements with the Phillips, Panasonic, Hitachi, Toshiba, Samsung SDI, Technicolor, and Technologies Displays Americas Defendants, and (2) for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards to Class Representatives," Dkt. 4351 (hereinafter, "R&R").  In this brief, page references to a document filed on ECF are to the page number in the ECF header.

[2]  *See* IPP 4th Consol. Am. Cmpl. (Dkt. 1526) ¶¶ 5, 247-256 ("First Claim for Relief: Violation of Section 1 of the Sherman Act").  Section 16 provides that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States

---

*Midwest Paper Prods. Co. v. Cont'l Group*, 596 F.2d 573, 594 (3d Cir. 1979), that the concerns expressed by the Supreme Court in *Illinois Brick* have no relevance to indirect purchasers seeking relief under Section 16 of the Clayton Act for Sherman Act violations. *See, e.g., United States Gypsum Co. v. Indiana Gas Co*., 350 F.3d 623, 627 (7th Cir. 2003) ("the direct-purchaser doctrine does not foreclose equitable relief").

### A.   The Claims of the Non-Repealer State Members of the Nationwide Class are Not Being Settled, They Are Being Dismissed With Prejudice

As the Special Master found, the sole factor distinguishing those members of the Nationwide Class who are slated to receive compensation in the Proposed Settlements from those whose claims are being dismissed without consideration is *Illinois Brick*, *i.e.,* whether a particular class member purchased CRT Products in a "repealer" or "non-repealer" state.  R&R, Dkt. 4351 at 40.[3]  With three exceptions (Massachusetts, Missouri and New Hampshire), purchasers in all repealer states are members of one of 22 statewide settlement classes for which certification is also requested, and to whom the monetary settlement proceeds will be paid.

There are no other differences, such as buying patterns, or the prices paid for CRTs, or questions of the efficiency of the conspiracy, that affect whether a putative Nationwide Class member will or will not be compensated for the release of claims.  Indeed, all members of the proposed Nationwide Class alleged the identical factual predicate for their claims.  They each charged that the Settling Defendants entered into a conspiracy to fix the prices of cathode ray tubes, and that this conduct caused them to pay illegally high prices for CRT products, and unless enjoined, would continue to cause them such injury in the future.  *See, e.g.,* R&R, Dkt. 4351 at 26

having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, . . . under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity . . . ."  15 U.S.C. § 26.

[3]  "Repealer state" is a commonly used term for a state whose judiciary or legislature has declined to follow *Illinois Brick,* and therefore permits a plaintiff to establish antitrust injury through the use of evidence that an illegally inflated price was passed down to him along the chain of distribution.  "Non-repealer state" is the term applied to those states whose antitrust laws incorporate *Illinois Brick*'s prohibition of pass-on evidence.

1  and 28 ("all IPPs [Indirect Purchaser Plaintiffs] are alleged to have paid overcharges that were

2  caused by the defendants' alleged price-fixing activities").

3      Despite the fact that all putative Nationwide Class members alleged claims arising from

4  the same factual predicate, the Special Master concluded that denying half the class consideration

5  for their releases was fair, and under the Rule 23 criteria, the settlements should be approved.  This

6  conclusion was grounded on a single foundation, which is the belief that application of *Illinois*

7  *Brick* means that no purchaser in a non-repealer state has a viable or valuable claim that was or

8  could have been asserted in this litigation.  *See, e.g.,* R&R, Dkt 4351 at 41.[4]

9      The Special Master spent a significant portion of his analysis of this issue discussing a

10 non-issue, which is Lead Counsel's assertion that "claims for monetary compensation for non-

11 repealer states were never asserted."  R&R, Dkt. 4351 at 40.  The Special Master essentially

12 agreed with that characterization, finding that all monetary claims in the consolidated amended

13 complaints, whether equitable or for damages, were filed by "[p]laintiffs representing the 22

14 Indirect Purchaser State Classes" (i.e., the repealer state purchasers).  *Id.*  However, this discussion

15 is irrelevant to the objection raised to the dismissal of the non-repealer state class members'

16 equitable claims, for two reasons.  The first, which will be discussed in the next section, is that the

17 monetary claims at issue are ancillary to the pleading of the non-repealer state class members'

18 entitlement to injunctive relief pursuant to Section 16 of the Clayton Act, and no one disputes that

19 such claims were alleged.  The second reason that this discussion is irrelevant is the fact that,

20 pleaded or not, these claims are being released by the Proposed Settlements, and therefore must be

21 valued as part of the approval process.

22     In general, "[t]he weight of authority holds that a federal court may release not only those

23 claims alleged in the complaint, but also a claim based on the identical factual predicate as that

24 _____

25 [4]  However, as will be demonstrated below, a viable federal claim can be made for equitable
   monetary relief, a claim for which *Illinois Brick* is not a factor.  Accordingly, the *Illinois Brick*
26 based distinction relied upon by the Special Master fails to support the fairness, reasonableness
   and adequacy of the disparate treatment of Nationwide Class members embodied in the Proposed
27 Settlements and Plan of Distribution.

28

1    underlying the claims in the settled class action even though the claim was not presented and

2    might not have been presentable in the class action." *Class Plaintiffs v. Seattle*, 955 F.2d 1268,

3    1287 (9th Cir. 1992) (internal citation and quotation marks omitted).  For the approximately half

4    of the proposed Nationwide Class who are purchasers from repealer states and, as members of the

5    22 statewide classes, will divide up the settlement proceeds, their inclusion in the releases to be

6    given by the proposed Nationwide Class is a meaningless redundancy that affords them no

7    additional rights or obligations under the Proposed Settlements.

8            However, the other half of the Nationwide Class are purchasers from non-repealer states

9    (as well as Massachusetts, Missouri and New Hampshire), who are not members of any of the 22

10   State Classes.  These parties, who will receive no benefit or compensation from the Proposed

11   Settlements, would not be included absent certification of the Nationwide Class.  No other case

12   comes to mind where millions of people are being brought into a "settlement" class for the **sole**

13   **purpose** of having their unadjudicated and uncompensated claims dismissed with prejudice.

14   Indeed, under general tenants of contract law, this "agreement," in which no consideration is being

15   offered to these class members, does not constitute a "settlement" with them at all.

16           It has long been a guiding principle of federal law that "a class action settlement is a

17   private contract negotiated between the parties."  *In re Wireless Tel. Fed. Cost Recovery Fees*

18   *Litig.*, 396 F.3d 922, 934 (8th Cir. 2005).  *See also*, *In re Syncor ERISA Litig.*, 516 F.3d 1095,

19   1100 (9th Cir. 2008) ("The requirement that a district court review and approve a class action

20   settlement before it binds all class members does not affect the binding nature of the parties'

21   underlying agreement."), and *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 593 (3d Cir. 2010)

22   ("Put another way, judicial approval of a class action settlement is a condition subsequent to the

23   contract and does not affect the legality of the proposed settlement agreement.") (citing *Collins v.*

24   *Thompson*, 679 F.2d 168, 172 (9th Cir. 1982)).

25           Accordingly, "the starting point for interpreting settlement agreements is general contract-

26   law principles."  *Anderson v. Beland (In re Am. Express Fin. Advisors Secs. Litig.)*, 672 F.3d 113,

27   136 (2d Cir. 2011).  Under general contract law principles, **the exchange of consideration is a**

28

**fundamental requirement of contract formation**.  As stated in *Restatement (Second) of Contracts*, § 71 (emphasis added):

> In the typical bargain, the consideration and the promise bear a reciprocal relation of motive or inducement: *the consideration induces the making of the promise and the promise induces the furnishing of the consideration.*  \*\*\*But it is not enough that the promise induces the conduct of the promisee or that the conduct of the promisee induces the making of the promise; both elements must be present, or there is no bargain.  Moreover, *a mere pretense of bargain does not suffice, as where there is a false recital of consideration or where the purported consideration is merely nominal*.  In such cases there is no consideration and the promise is enforced, if at all, as a promise binding without consideration under §§ 82-94. See Comments b and c to § 87.[5]

While it is true that in a class action the adequacy of consideration is analyzed on the basis of an exchange between the defendants and the class as a whole, here, the idea that the Nationwide Class as a whole is being offered consideration is a fallacy.  The only consideration offered in the Proposed Settlements is being given to the members of a different class, actually 22 different classes.  The fact that the Nationwide Class is defined to include all of the members of these 22 other classes does not mean that there is settlement consideration flowing to the Nationwide Class as a whole.  Indeed, there is no reason vis-à-vis the members of the repealer State Classes to certify a nationwide class at all.  It affords them nothing.  Certification of the Nationwide Class is solely to create a vehicle for delivering the releases of the non-repealer state class members' claims, and the lack of any consideration running to those class members makes this procedure fundamentally a dismissal with prejudice, without due process, not a settlement.

**B.  The Special Master Failed to Properly Evaluate the Non-Repealer Class Members' Federal Equitable Claims**

**1.  The Claims for Equitable Monetary Relief**

The lynchpin of the Special Master's conclusion that the Proposed Settlements and Plan of Distribution are fair, reasonable and adequate is that all of the claims that will be released without

---

[5]  The principal basis for such enforcement is detrimental reliance and/or unjust enrichment, which are not applicable here.

consideration are valueless because the states in which these putative class members purchased have adopted *Illinois Brick*, which means any monetary claims they might try to assert are not viable. This analysis is incorrect.

First, as stated above, the most valuable claims of the non-repealer state class members do not arise under their state laws at all. They arise under federal law. It is well settled that an indirect purchaser may bring a claim for equitable relief under Section 16 of the Clayton Act, and there is no issue that such claims were asserted in this case on behalf of a nationwide class of purchasers from both repealer and non-repealer states. *See, e.g., Lucas Automotive Engineering Inc. v. Bridgestone/Firestone Inc.*, 140 F.3d 1228, 1235 (9th Cir. 1998) ("[I]ndirect purchasers are not barred from bringing an antitrust claim for injunctive relief against manufacturers."). As will be explained below, the non-repealer state class members have asserted a claim with the potential to afford them equitable monetary relief in the form of restitution and disgorgement of money that the defendants acquired illegally as a result of their Sherman Act violations. The Special Master failed to properly evaluate the viability of these claims. Accordingly, the issues before this Court are: (1) what is the scope of equitable relief potentially available as a result of the non-repealer state class member's Section 16 claims; and (2) is a "settlement" fair, reasonable and adequate that provides no compensation for the release of these Section 16 claims.

Common law and statutory interpretation have long held that where a person is entitled to invoke the equitable jurisdiction of a federal court, such court possesses inherent powers to fashion and afford that litigant the full measure of relief available at equity, including monetary remedies such as restitution and disgorgement. Thus, other statutes, which like Section 16 of the Clayton Act authorize a party to seek an injunction to compel or forestall behavior, have been construed to trigger the availability of a much broader range of equitable relief. This concept is neither new, nor controversial.

The seminal decision on this issue is *Porter v. Warner Holding Co.*, 328 U.S. 395 (U.S. 1946). In *Porter*, the Administrator of the Office of Price Administration brought an action to enjoin a landlord who allegedly violated a World War II federal rent control law from charging

rents in excess of the permitted maximum.  *Id.* at 396.  The statute under which the action was

initiated provided that "the Administrator . . . may make application . . . for an order enjoining

such acts or practices [in violation of the Emergency Price Control Act of 1942]."  *Id* at 397.   In

addition to an injunction, the Administrator sought an order that the defendant disgorge the illegal

rents that it had collected.  The Supreme Court agreed that a disgorgement order was within the

scope of the district courts' equitable powers, despite the fact that the remedy was not specifically

provided in the Price Control Act:

> Thus the Administrator invoked the jurisdiction of the District Court to enjoin acts
> and practices made illegal by the Act and to enforce compliance with the Act.
> Such a jurisdiction is an equitable one.  Unless otherwise provided by statute, all
> the inherent equitable powers of the District Court are available for the proper and
> complete exercise of that jurisdiction.

*Id* at 387-98.  As the Supreme Court explained, this includes the power to order the payment of

money:

> Moreover, the comprehensiveness of this equitable jurisdiction is not to be denied
> or limited in the absence of a clear and valid legislative command. *Unless a
> statute in so many words, or by a necessary and inescapable inference, restricts
> the court's jurisdiction in equity, the full scope of that jurisdiction is to be
> recognized and applied.*  "The great principles of equity, securing complete
> justice, should not be yielded to light inferences, or doubtful construction."
> *Brown v. Swann*, 10 Pet. 497, 503.  * * * [*W]here, as here, the equitable
> jurisdiction of the court has properly been invoked for injunctive purposes, the
> court has the power* to decide all relevant matters in dispute and *to award
> complete relief even though the decree includes that which might be conferred by
> a court of law. Alexander v. Hillman*, 296 U.S. 222, 241-242.

*Id.* at 399 (emphasis added).

Relying on *Porter,* the Ninth Circuit has similarly construed Section 13(b) of the Federal

Trade Commission Act[6] (which authorizes the FTC to seek preliminary and permanent injunctions

against practices that violate any of the laws enforced by the Commission), holding that a request

---

[6]  Section 13(b) provides, in relevant part: "Whenever the Commission has reason to believe--(1)
that any person, partnership, or corporation is violating, or is about to violate, any provision of law
enforced by the Federal Trade Commission, and (2) that the enjoining thereof . . . would be in the
interest of the public--the Commission . . . may bring suit in a district court of the United States to
enjoin any such act or practice." 15 U.S.C. § 53(b).

for injunctive relief is sufficient to trigger the full panoply of a district court's equitable powers. In reviewing a pretrial order of the district court freezing the assets of an alleged violator of the FTC's Franchise Rule, 16 C.F.R. Part 436, the Ninth Circuit held that because Section 13(b) "gives the court authority to grant a permanent injunction, *it also by implication gives the court authority to afford all necessary ancillary relief, including rescission of contracts and restitution. The power to enjoin is part of what used to be the jurisdiction of equity.*" *FTC v. H. N. Singer, Inc.*, 668 F.2d 1107, 1112 (9th Cir.1982) (emphasis added).

Numerous other Circuit Courts of Appeal have agreed. *See, e.g., FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 571-72 (7th Cir.) (in a proceeding under section 13(b), district court has the "power to order any ancillary equitable relief necessary to effectuate" its grant of authority), *cert. denied*, 493 U.S. 954, (1989); *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 717-19 (5th Cir.), *cert. denied*, 456 U.S. 973, (1982); *FTC v. United States Oil & Gas Corp.*, 748 F.2d 1431, 1433-34 (11th Cir. 1984) (absent a clear command to the contrary, the district court's equitable powers are extensive, including the power to grant restitution and disgorgement); *see also*, *FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 468-469 (11th Cir. 1996); and *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991) ("where Congress allows resort to equity for the enforcement of a statute, all the inherent equitable powers of the district court are available for the proper and complete exercise of the court's equitable jurisdiction, unless the statute explicitly, or by a necessary and inescapable inference, limits the scope of that jurisdiction").

In 2011, the District Court for the Southern District of New York in *United States v. Keyspan Corp.*, 763 F. Supp. 2d 633, 639 (S.D.N.Y. 2011), applied the rationale of *Porter v. Warner Holding Co., supra*, to the grant of disgorgement as ancillary equitable relief for a violation of Section 1 of the Sherman Act, pursuant to Section 4 of the Act:

> As to equity jurisdiction, "[u]nless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S. Ct. 1086, 90 L. Ed. 1332 (1946); see *Mitchell v. Robert DeMario Jewelry. Inc.*, 361 U.S. 288, 291, 80 S. Ct. 332, 4 L. Ed. 2d 323 (1960) ("'Unless a statute in so many words, or by a necessary and inescapable inference, restricts the

court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.'" (quoting *Porter*, 328 U.S. at 398)); *Fed. Trade Comm'n v. Mylan Labs., Inc.*, 62 F. Supp. 2d 25, 37 (D.D.C. 1999) ("The comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command." (quoting *Porter*, 328 U.S. at 398)). Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Section 4 invests a district court with "jurisdiction to prevent and restrain" § 1 violations, and charges "the Attorney General[] [with the duty] to institute proceedings in equity to prevent and restrain such violations." 15 U.S.C. § 4 (emphasis added). These provisions are broad and contain no language divesting a court of its "inherent equitable powers." See *Porter*, 328 U.S. at 398.

The *Keyspan* court went on to find that the equitable remedy of disgorgement is particularly in harmony with the principles underlying the antitrust laws:

> [D]isgorgement comports with established principles of antitrust law. When fashioning a consent decree in an antitrust action, district courts "are invested with large discretion to model their judgments to fit the exigencies of the particular case." *Int'l Boxing Club of N.Y., Inc. v. United States*, 358 U.S. 242, 253, 79 S. Ct. 245, 3 L. Ed. 2d 270 (1959) (quotations omitted). A consent decree should, among other things, "deprive the antitrust defendants of the benefits of their conspiracy." *Int'l Boxing Club*, 358 U.S. at 253 (quotations omitted); see also *United States v. Grinnell Corp*., 384 U.S. 563, 577, 86 S. Ct. 1698, 16 L. Ed. 2d 778 (1966) ("[A]dequate relief in a monopolization case should put an end to the combination and deprive the defendants of [**16] any of the benefits of the illegal conduct . . . ."); *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 368, 81 S. Ct. 1243, 6 L. Ed. 2d 318 (1961) ("Those who violate the Act may not reap the benefits of their violations ...." (quotations omitted)). Disgorgement accomplishes that goal.

*Id.* at 639-640.

Subsequently, in *Oregon v. AU Optronics Corp. (In re TFT-LCD (Flat Panel) Antitrust Litig.)*, MDL No. 1827, No. C 10-4346 SI, 2011 U.S. Dist. LEXIS 76562, 2011 WL 2790179 (N.D. Cal. July 11, 2011), Judge Illston held that disgorgement of ill-gotten gains from defendants' anti-competitive conduct was an available equitable remedy for an indirect purchaser in a private action. There, the court was considering equitable claims brought under the Oregon Antitrust Act. However, the court's decision was grounded on a "determin[ation] that federal courts retain the power to order disgorgement under the Sherman Act," and the fact that the Oregon Antitrust Statue contains a similarly expansive grant of equitable authority.

Thereafter, Judge Charles B. Renfrew (Ret.), acting as a Special Master in *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, Master File No. M-02-1486-PJH (MDL No. 1486), 2013 U.S. Dist. LEXIS 188116 at *190, *207 (N.D. Cal. Jan. 8, 2013) found that all indirect purchasers in the proposed nationwide settlement class had alleged colorable federal equitable monetary claims for restitution and disgorgement.  This finding formed a basis for recommendations, adopted by Chief Judge Hamilton, that certification of a single nationwide settlement class satisfied Rule 23 and that a plan of distribution that paid out the settlement fund *pro rata* without regard to repealer vs. non-repealer state status was fair, reasonable and adequate. *DRAM* at *339-40.

Finally, a discussion of the availability of disgorgement as a remedy where a court's inherent equitable powers are invoked was recently added to Chapter 23 of the 2015 edition of the California State Bar's Antitrust and Unfair Competition Law Treatise:

> Under federal law, disgorgement of profits may take various forms. Thus, for example, where injunctive relief is not available (such as where it is moot), disgorgement of *all* profits of a company engaged in illegal conduct (as opposed to the damages or overcharges resulting from the illegal conduct) is particularly appropriate (*see Kansas v. Nebraska*, 135 S. Ct. 1042, 1056-59 (2015)) , especially to restore the *status quo ante* as to competition (*see, e.g., Keyspan*, 763 F. Supp. 2d at 636-37, 639-41) . Where injunctive relief is available, disgorgement of profits and overcharges arising from the illegal conduct is available as *ancillary* relief that can be obtained in addition to any other remedies, such as an order barring future misconduct by a defendant. *See, e.g., FTC v. Cephalon, Inc.*, No. 2:08-CV-2141, 2015 U.S. Dist. LEXIS 49333, at *13-18, 2015 WL 1724597, *3-4 (E.D. Pa. Apr. 15, 2015); Stipulated Order for Permanent Injunction and Equitable Relief at 10-11 & Exh. A at ii-iv, *FTC v. Cephalon, Inc.*, No. 2:08-CV-2141 (E.D. Pa. June 17, 2015) [futher citation omitted]. [7]

The Special Master improperly found that no viable claim for disgorgement could be made here.  He dismissed *Keyspan* and *TFT-LCD* as authority for the existence of equitable monetary claims by members of the proposed Nationwide Class on the grounds that "[b]oth these cases involve government enforcement efforts and are thus distinguishable for the private indirect purchaser action here."  R&R, Dkt. 4351 at 44.  That statement is factually incorrect with regard to

---

[7]  The Treatise is available on LEXIS at 1-23 CA Antitrust and Unfair Competition Law § 23.02

*TFT-LCD,* where the State of Oregon was not exercising its police powers to secure enforcement of its antitrust laws, but was in federal court acting as a private plaintiff.[8]  As Judge Ilston noted, "[t]he State of Oregon ("Oregon") filed this antitrust action in 2010, seeking to recover for damages caused by a global price-fixing conspiracy allegedly perpetrated by the major manufacturers of liquid-crystal display ("LCD") panels. Oregon brought suit on behalf of itself, 'its agencies, political subdivisions, and local governments, and all natural persons residing in Oregon who were indirect purchasers of . . . products containing LCD panels . . . .' See Complaint, ¶1."  *TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 U.S. Dist. LEXIS at *52.[9]   Moreover, the basis for the availability of equitable monetary relief is a district court's inherent powers, which, as Judge Illston found, are present not as a result of anything about the identity of the plaintiff, but rather "[b]ecause chancery courts possessed the power to order equitable disgorgement in the

---

[8]  The Clayton Act, pursuant to which Oregon's action was in federal court, applies the same standard to state governments seeking damages or equitable relief as it applies to all other proprietary litigations.  For example, when the State of California challenged the merger of American Stores and its largest competitor, the State sought divestiture pursuant to Section 16 of the Clayton Act, like any private citizen, not pursuant to Section 15, which is reserved to the federal government.  *California v. American Stores Co.*, 495 U.S. 271 (1990).

[9]  Interestingly, at the January 5, 2016 hearing, the question of the capacity in which Oregon brought its claims in *TFT-LCD* was raised, and the Special Master (who had also acted as a Special Master in that case) agreed that Oregon was simply a private plaintiff seeking redress for its purchases (and those of its citizens):

> MS. KIRKHAM:  I also would just like to mention that in LCD, Oregon was acting as a private plaintiff.
>
> SPECIAL MASTER:  Right.
>
> MS. KIRKHAM:  It had a *parens patriae* claim.  It was not acting –
>
> SPECIAL MASTER:  Okay.
>
> MS. KIRKHAM:  You know that.
>
> SPECIAL MASTER:  I do know that.

p.66:13-20.  A true and correct copy of the transcript of the oral argument before the Special Master on January 5, 2016, is attached to the Declaration of Tracy R Kirkham, filed concurrently herewith.

eighteenth century." *Id* at *61.  For this reason, "contemporary federal courts are vested with the same authority by the Constitution and the Judiciary Act." *Ibid*.

As the Supreme Court made clear in *Porter*, all federal district courts possess the power to order disgorgement or restitution, ancillary to the power to enjoin violation of law.  This power is only circumscribed where the statute authorizing the injunctive relief in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity.  Nothing about whether the plaintiff in a particular case is a governmental entity acting in a compliance capacity, or a governmental entity acting as a private party, or a non-governmental entity has the power to enlarge or reduce a federal district court's inherent powers.

The Special Master seems to have missed completely the references in Judge Renfrew's Report and Recommendations in *DRAM* regarding the availability of a claim for equitable monetary relief under federal law, and focused solely on the state law consumer protection claims asserted in *DRAM*, when he said that "Special Master Renfrew did not analyze whether non-repealer state consumer protection claims for equitable relief were <u>viable</u>.  He simply said that lumping together claims for class members from both repealer and non-repealer states did not destroy predominance."  R&R, Dkt. 4351 at 45 (emphasis in original).   That is not accurate. Judge Renfrew accepted the existence of "all injunctive claims," highlighting those asserted "under the federal antitrust laws, including the entire range of relief that can be obtained as part of such claims [citing *Keyspan*, *supra*, and *TFT-LCD*, *supra*]."  He then explicitly found that: "Under the particular facts and circumstances of this case, the injunctive claims are *sufficiently viable* such that the certification of a nationwide class under Rule 23(b)(2) in order to execute a global release is appropriate."  *DRAM, supra*, 2013 U.S. Dist. LEXIS 188116, at *190 (emphasis added).

Further evidence that Judge Renfrew was considering equitable monetary claims is the fact that he then continued by discussing whether the Supreme Court's decision in *Wal-Mart Stores v. Dukes*, 564 U.S. 338 (2011) required that class treatment of the equitable claims for "an ancillary order for relief requiring disgorgement or restitution" be analyzed pursuant to Rule 23(b)(3) rather

than Rule 23(b)(2).  *Id.* at *191.  While Judge Renfrew specifically noted that he was making "no determination as to whether any Plaintiff of class member would ultimately prevail on any request for specified equitable relief in litigating the injunctive claims," it is clear that he considered these claims to be a viable basis for the inclusion of class members from non-repealer states in the *DRAM* nationwide settlement class.  *Id.  See also, id.* at *274 (Judge Renfrew's discussion of the fairness of an unweighted *pro rata* distribution to all nationwide class members: "[T]he Indirect Purchaser Settlement Class includes persons and entities that have . . . federal injunctive claims, *federal common law* and California common law *disgorgement claims* . . . ."  (emphasis added)).

### 2.  The Claims for Injunctive Relief

The Special Master accepted Lead Counsel's representation that it was not possible to fashion meaningful injunctive relief because CRTs are an outmoded technology and "the unlikelihood of future violations makes an injunction basically worthless and probably impossible to obtain."  R&R, Dkt. 4351, at 42.  He dismissed the undersigned's suggestion for an injunction requiring antitrust compliance training for the defendants' employees as having "little practical value to the class" because it would occur "20 years after this conspiracy began."  *Id.* at 43.  This is a non-sequitur.  Even if they are not selling many or any CRT televisions or monitors in the United States, the defendants are still in business here, with the same sales departments who master-minded the CRT conspiracy marketing other products.  Surely, educating their employees about the United States antitrust and state competition laws would assist in preventing future anticompetitive abuses.

The Special Master's conclusion that the non-repealer state putative Nationwide Class members have no viable or valuable monetary or injunctive equitable claims was grounded on a misconstruction of the relevant claims asserted and a mis-reading of the applicable law.  Accordingly, his conclusion that the Proposed Settlements are fair, reasonable and adequate should be rejected.

**C.     This Court's Awarding Disgorgement Would be Consistent With the Letter and Spirit of the Federal Antitrust Laws**

As stated above, the Special Master's principle rationale for rejecting the viability of a federal law claim for equitable monetary relief was a discussion of various state court rulings in which unjust enrichment claims were disallowed as an "attempt to circumvent" *Illinois Brick*.  No federal court has ever made such a ruling with regard to the application of its ancillary equitable powers in an antitrust context, nor would such a ruling be appropriate.

To begin, *Illinois Brick* is not the expression of a public policy of hostility to the concept of compensating indirect purchasers who are victimized by violations of the antitrust laws. Neither does it represent a determination that such injury is too remote to be cognizable by antitrust enforcement.  Rather, as the Third Circuit, sitting *en banc*, recognized in *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 313 (3rd Cir. 2011), *Illinois Brick* is essentially a rule of evidence.

In *Illinois Brick*, the Supreme Court applied the prohibition on the "defensive" use of pass-on proof of damages enunciated in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), to also prohibit the "offensive" use of pass-on evidence to establish the fact of damage component of antitrust liability.  After *Illinois Brick*, a downstream customer under most circumstances was not permitted to show antitrust injury using proof that the illegal overcharge he paid was passed-on to him by an intermediary purchaser of the defendants' product, just as *Hanover Shoe* prevented a defendant from defending an antitrust claim with evidence that the plaintiff had passed on the alleged overcharge to its downstream customers.  The Supreme Court felt that fairness dictated that permitting antitrust recovery through proof of pass-on damages would require it to overrule *Hanover Shoe,* which adherence to *stare decisis* made it hesitant to do. *Illinois Brick* was also a pragmatic attempt to continue what the Supreme Court believed to be the benefit to the federal judiciary of *Hanover Shoe's* simplification of evidence and inquiry in antitrust cases.  The Court held that the rationale of *Hanover Shoe* "applies with no less force to the assertion of pass-on theories by plaintiffs than it does to the assertion by defendants."  *Illinois Brick,* 431 U.S. at 729.

Neither the remedy of restitution nor disgorgement relies on proof of the amount of damages passed-on to the plaintiff.  Accordingly, neither triggers the need for a determination of the portion of an illegal overcharge that moves down a product's chain of distribution, subject to complex economic forces that are independent of the workings of the price-fixing conspiracy.  Therefore, these equitable forms of relief do not implicate the prohibition on pass-on proof that is the holding of *Illinois Brick*.

In addition, providing these equitable remedies to indirect purchasers in no way constitutes an "end-run" around *Illinois Brick*, or in any way contravenes its rationale.  In the past thirty-eight years, the name *Illinois Brick* has become a shorthand for the denial of antitrust recovery to consumers and end-users injured by price-fixing.  Consequently, any mechanism that would provide recompense to consumers has been subject to condemnation as an attempt to circumvent, or make an "end-run" around *Illinois Brick*.   However, this view is based on a mis-reading of the Supreme Court.  The impediment to indirect purchaser recovery in *Illinois Brick* "does not reflect a categorical policy judgment that indirect purchasers do not merit antitrust protection." *Sullivan v. DB Investments, Inc., supra*, 667 F.3d at 313.  Neither the purpose nor the rationale of *Illinois Brick* was disenfranchising consumers or insulating price-fixers from their reach.

This can be seen from the fact that the *Illinois Brick* decision itself invites "end-runs," carving out exceptions to the prohibition on pass-on recovery in situations where the complexity of the proof would be demonstrably lessened, such as where there is a pre-existing cost-plus contract between the direct and indirect purchasers, and "where the direct purchaser is owned or controlled by its customer." *Illinois Brick, supra*, 431 U.S. at 736 and n. 16.  In fact, the Supreme Court left open the door for courts to permit recovery in "[a]nother situation in which market forces have been superseded" so that traditional notions of pass-on of overcharges are not required to demonstrate injury to the indirect purchaser.  *Id.* at 736 and n.16.

The fact that the Supreme Court did not intend to foreclose antitrust recovery by consumers is further demonstrated by its decision in *California v. ARC America Corp.,* 490 U.S. 93 (1979), which considered whether the ultimate "end run" on *Illinois Brick* – the California

legislature's amendment of the Cartwright Act to explicitly permit recovery of pass-on damages – was pre-empted by federal law.  The Ninth Circuit had applied pre-emption, concluding that the amendment to the Cartwright Act stood "as an obstacle to effectuating the congressional purposes and policies identified in *Hanover Shoe* and *Illinois Brick*."  *Id.* at 102.  However, the Supreme Court disagreed, stating: "[i]n this respect, the Court of Appeals has misunderstood both *Hanover Shoe* and *Illinois Brick*."  *Id.*  The Supreme Court rejected each of the Ninth Circuit's reasons for pre-empting the Cartwright Act amendment, including the concepts that *Illinois Brick* enunciated a policy that indirect purchaser recovery was to be prohibited because it would "reduce the incentives of direct purchasers to bring antitrust actions by reducing their potential recoveries," or "subject antitrust defendants to multiple liability, in contravention of the 'express federal policy' condemning multiple liability."  *Id.* at 104, 105.

Similarly, there is no rationale for applying the "spirit" of *Illinois Brick* to deny consumers and other indirect purchasers the full scope of this Court's equitable powers available under Section 16.  The express prohibition of *Illinois Brick* is not triggered because disgorgement and restitution do not require evidence of the amount of damage passed on to consumers, and thus, none of the concerns about burdening federal courts with the need to adjudicate complex econometric proof are implicated.[10]  As far as potential exposure of defendants to "multiple liability" is concerned, this provides no reason to categorically foreclose indirect purchasers from seeking equitable monetary relief.  Sitting in equity, district courts are entitled to consider a wide variety of factors in determining to grant and fashion relief.  One of these certainly could be whether the indirect purchaser's request for equitable monetary compensation was coming after the defendants had already paid full treble damages to direct purchasers, which is the only situation in which true "multiple liability" could occur.

---

[10]  In any event, this benefit of the *Illinois Brick* direct purchaser rule was obliterated by the passage of the Class Action Fairness Act, which permits the removal of virtually all repealer state antitrust law class actions to federal courts, and has resulted in many such cases being initiated in federal court in the first instance.

1    Conversely, antitrust case law and public policy provide a substantial equitable rationale

2    for affording indirect purchasers monetary relief in the form of disgorgement and restitution.  The

3    *Illinois Brick* dissent, written by Justice Brennan and joined by Justices Marshall and Blackmun,

4    provides a primer in the long history of Congressional objectives and intent that the federal

5    antitrust laws protect the rights of consumers, and provide a remedy "'open[ing] the doors of

6    justice to every man, whenever he may be injured by those who violate the antitrust laws . . . .'

7    [citations omitted]."  The dissent also recognized the "paramount role in the enforcement of the

8    fundamental economic policy of the nation" that is played by private antitrust litigants.  *See,*

9    *Illinois Brick, supra*, 431 U.S. at 755-758.  Further, as the 2015 edition of the California State

10   Bar's Antitrust and Unfair Competition Law Treatise recognizes in Chapter 23, these remedies are

11   of particular moment in situations such as Lead Counsel contends is present here, where

12   circumstances have rendered injunctive relief moot.

13   It cannot be said that *Illinois Brick* forecloses the non-repealer state members of the

14   proposed Nationwide Class from asserting viable claims for equitable monetary relief.  Neither

15   was it proper for the Special Master to conclude that the practical settlement value of these claims

16   is zero.   The question arose at the hearing before the Special Master whether this objection raised

17   essentially an issue of the allocation of the settlement proceeds and therefore could be cured by the

18   Court ordering that the distribution be made to all members of the Nationwide Settlement Class.

19   There are several problems with this approach, beginning with the fact that this Court's

20   role in approving a class action settlement does not extend to the ability to re-write its terms.

21   *Evans v. Jeff D.,* 475 U.S. 717, 106 (1986).  The record is clear that the $576,750,000 in settlement

22   consideration was negotiated by Lead Counsel on the basis of the commerce and alleged

23   overcharges solely for the 22 damage class states.  It represents about 20% of the estimated

24   damages for these classes, according to plaintiffs' expert, Dr. Janet Netz.  R&R, Dkt. 4351, at 64.

25   While the Special Master notes that the settlement represents nine times the damages calculated by

26   one defense expert and that other defendants contended that there were no damages at all (*ibid*.),

27   the fact remains that the defendants were willing to pay this amount without regard to the potential

28

OBJECTIONS TO REPORT AND                    - 17 -        Master File No. 3:07-cv5944 JST
RECOMMENDATION OF SPECIAL MASTER                          MDL 1917

that other class members could seek additional monetary relief.  Simply put, the record before this Court on final approval is devoid of any evidence from which it would be reasonable to conclude that the current settlement consideration would be fair, reasonable and adequate if the claims of all members of the Nationwide Class were appropriately valued.   The proposed settlement should be denied final approval.

**III.     THE NOTICE PROGRAM FAILED TO PROVIDE ADEQUATE NOTICE TO AN ACCEPTABLE PERCENTAGE OF CLASS MEMBERS**

The undersigned raised objections to the adequacy of the notice plan utilized in connection with the settlements subject to final approval.  *See* Dkt. 4115 at 3 - 4 (objections to notice).  In particular, the undersigned questioned the demographic audience targeted by the notice administrator, as well as the notice administrator's calculation of the percentage of that target demographic reached by the notice plan.  *See* Dkt. 4364 at 33 - 37 (reply in support of objections to notice).  In response, the notice administrator, Joseph M. Fisher, lodged a supplemental declaration contending that his calculation of reach of so-called "digital notice" was accurate, and further defending his target demographic choices.  *See* Dkt. 4368 at 1 - 8 (Decl. of Joseph M. Fisher Re: Cooper/Scarpulla Objections).  The notice administrator's supplemental declaration included, for the first time, examples of the "digital notices" displayed on the Internet.  *Id* at 8. The Special Master relied upon this supplemental declaration to recommend overruling all objections to the notice program raised by the undersigned.  R&R, Dkt. 4351 at 54-59.

The Due Process Clause of the Constitution may be summarized as follows:  If notice is a person's due, due process requires proper notice.  Rule 23(c)(2)(B), Federal Rules of Civil Procedure, defines the requirements for proper notice to class members:

> For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.  The notice must clearly and concisely state in plain, easily understood language:
> (i)     the nature of the action;
> (ii)    the definition of the class certified;
> (iii)   the class claims, issues, or defenses;

(iv)  that a class member may enter an appearance through an attorney if the members so desires;

(v)  that the court will exclude from the class any member who requests exclusion;

(vi)  the time and manner for requesting exclusion; and

(vii)  the binding effect of a class judgment on members under Rule 23(c)(3).

The notice plan here included publication of a court-approved "short form" notice, which informs class members of the essential "who, what, and how" details of making a claim or opting out of the action. *See* Dkt. 3863-3 (Decl. of Joseph M. Fisher Re: Notice Program, Ex. C - Summary Notice). According to Mr. Fisher, the paid publication of the court-approved short-form notice reached 57% of the targeted demographic (*i.e.*, persons aged at least 30 who own TVs or computers with a household income of at least $60,000). *See* Dkt. 4371 at 13, ¶ 18 c (Decl. of Joseph M. Fisher Reporting on Class Notice). This level of reach, standing alone, is plainly inadequate to satisfy the Constitutional due-process notice requirements embodied in Rule 23. *See* Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide (hereinafter, "Notice and Claims Process Checklist"), Federal Judicial Center (2010), at 3 (available at http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf) ("The lynchpin in an objective determination of the adequacy of a proposed notice effort is whether all the notice efforts together will reach a high percentage of the class. It is reasonable to reach between 70-95%."); *see also Walter v. Hughes Communications, Inc.*, No. 09-2136-SC, 2011 WL 2650711 at *15 (N.D. Cal. July 6, 2011) (citing "Notice and Claims Process Checklist" in rejecting a proposed notice plan as inadequate).

To augment the inadequate reach of the paid publication notice, the notice administrator also undertook a "digital" notice campaign. *See* Dkt. 4371 at 10, ¶ 11 ("The Notice Company has utilized paid digital media on an ongoing bases for the dual purposes of providing notice and encouraging qualifying Class Member to submit claims."). These "digital" notices, which were never submitted to, or approved by, the Court beforehand, supposedly combined with the Court-approved print-media short-form notice to achieve an 83% reach of the targeted demographic. *Id* at 14, ¶ 18 d.

The undersigned raised objections to the notice administrator's calculation of the combined reach of the print and digital media campaigns, leading to the submission of Mr. Fisher's supplemental declaration.  The Special Master denied the undersigned the opportunity to respond to this supplemental declaration.  *See* Dkt. 4367 at 13 (Special Master's Order Re Lead Counsel's Request For Further Briefing).  In his supplemental declaration, Mr. Fisher included – for the first time – exemplars of the digital notices used.  *See* Dkt. 4368 at 8 (Ex. A, "Facebook Ads (English)").  These 16 exemplar "banner ads" have various amounts of text.  The briefest of them state:  "Did YOU have a Cathode Ray Tube TV or Computer Monitor?  CRTclaims.com."  *Id*. The lengthiest of them state:  "Did YOU have a Cathode Ray Tube TV or Computer Monitor? FILE A CLAIM! $576 Million, Learn More CRT Claims.com, Authorized by U.S. District Court."  *Id*.  These advertisements may be a way to encourage the submission of claims.  But, they are not adequate to satisfy Rule 23.  The digital media campaign here is not class notice and cannot be relied upon as having provided the requisite Rule 23-compliant *notice* of the settlements and the binding effect of a class member's failure to act.  Therefore, with respect to Rule 23-compliant notice, the most that can be said is that 57% of the targeted demographic was reached with a Court-approved notice.  This level of reach cannot support the Special Master's conclusion that the notice program here was "the best notice that is practicable under the circumstances."

"Where notice to a class has been inadequate, it may be appropriate to reject the settlement in its entirety."  *Kaufman v. Am. Express Travel Related Services, Inc.*, 283 F.R.D. 404, 408 (N.D. Ill. 2012).  In *Kaufman*, the district court observed that a weak notice program, combined with a "very low" response rate, put the grant of final approval in jeopardy.[11]  Instead of

---

[11] The response rate here has remained shrouded in mystery, but the little information that has been provided suggests that it is weak.  On January 15, 2016, Lead Counsel lodged with the Special Master a "Declaration of Joseph M. Fisher Reporting on Claims Submissions."  The document was not filed on this Court's ECF system, but is included as an exhibit to the Declaration of Tracy R. Kirkham in Support of Objections to Report and Recommendation of Special Master ("Kirkham Decl."), filed herewith.  In his declaration, Mr. Fisher reports, at ¶4, that as of the December 7, 2015 deadline, he has received 109,709 timely claims, with no discussion of whether any claims have been rejected as invalid.  As a point of comparison, in the *LCD* case, the settlement administrator reported receiving 233,473 valid claims.  *See* Declaration

---

taking the "drastic step" of denying final approval, however, the *Kaufman* court, "as advised by the Federal Judicial Center's Class Action Checklist 2010," appointed an expert in class notification to report on the previous plan and recommend additional steps to notify the class.  *Id.* The expert initially selected by the *Kaufman* court was Shannon R. Wheatman, Ph.D. of Kinsella Media.  Due to her unavailability at that time, the court then selected Todd Hilsee of Hilsee Group. *Kaufman v. Am. Express Travel Related Services, Inc.*, No. 07-C-1707 (N.D. Ill. Aug. 8, 2012) (Dkt. 398) (minute order appointing Todd Hilsee of Hilsee Group).[12]

The undersigned noted that both Dr. Wheatman and Mr. Hilsee are well-recognized experts in class notice, and suggested to the Special Master that he would benefit from engaging either one of them to report on the effectiveness of the notice plan and the additional steps needed to make the notice plan compliant with Rule 23 and due process.  In the event the proposed settlements are approved, and given the failure of the existing notice program to meet the minimum requirements of Rule 23, and the fact that the Special Master has already recognized that Lead Counsel's plan of allocation is defective and requires corrective notice and a re-opened claims period in connection with the Chunghwa settlement, the undersigned renew their request that the Court engage the services of a nationally-recognized expert to provide the Court with an assessment of the deficiencies in the existing notice program and recommendations as to how to correct these deficiencies.

**IV.     THE SPECIAL MASTER ERRED IN AWARDING A PERCENTAGE-OF-THE-FUND AS ATTORNEYS' FEES, AND FAILED TO PROPERLY ADJUST THE LODESTAR FOR WORK THAT DID NOT BENEFIT THE CLASS**

With respect to Lead Counsel's application for an award of attorneys' fees and expenses, the undersigned raised the following objections before the Special Master:  (1) that fees in this case should be awarded based on the lodestar method and not the percentage-of-the-fund approach

---

of John D. Bogdanov in Support of Request for Judicial Notice ("Bogdanov Decl."), Exhibit A, filed herewith.  Thus, the response rate here, as measured by CRT claims submitted, is just 47% of the number of claims approved after audit in *LCD*.

[12] *See* Bogdanov Decl. at Exhibit B.

1   because of significant non-compensable time billed to the case; (2) that the undersigned's review

2   of a limited universe of billing records has demonstrated that certain practices such as block-

3   billing, use of quarter-hour increments, and excess staffing were rife and required an across-the-

4   board percentage reduction; (3) that Lead Counsel's addition of trial counsel resulted in

5   duplicative and excess billing; and (4) that Lead Counsel's needless disputes with the California

6   Attorney General resulted in excess billing.  *See* Dkt. 4115 (objections to fee request); Dkt. 4211

7   (Special Master's Order Re Mot. To Compel Lead Counsel To Produce IPP Counsel's Time-And-

8   Expense Reports);[13] Dkt. 4363 at 33 - 40 (reply in support of objections to fee request).

9           Special Master Quinn's Report and Recommendation is largely in agreement with the

10   undersigned's objections:  the Special Master found excess billing (R&R, Dkt. 4351 at 80),

11   problematic record-keeping practices (*id*. at 79), dubious staffing decisions (*id*. at 80), and a

12   "rocky" relationship with the California AG (*id*. at 81).  Yet the sole remedy applied by the

13   Special Master was to award 30% of the fund as fees instead of the requested 33%.  This was

14   error.  The proper approach in this case is to use the lodestar method to award any fees, after

15   adjusting the lodestar amount to reflect a reasonable number of hours in light of the Special

16   Master's findings.  *Accord In re High-Tech Employee Antitrust Litig.*, Case No. 11-CV-2509-

17   LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) (rejecting percentage-of-the-fund approach and

18   awarding fees based on an adjusted lodestar).

19           **A.     The Special Master Erred In Applying The Percentage-Of-The-Fund Method**
            **Instead Of An Adjusted Lodestar In The First Instance**

20

21           Lead Counsel moved for an award of one-third (33%) of the settlement fund, equal to a fee

22   award of $192,250,000.  Lead Counsel advocated for the application of a percentage-of-the-fund

23   method, under which, they contend, the court should start from a 25% benchmark and then adjust

24   the percentage upward to 33% based on the unique circumstances of the case.  Under a lodestar

25   _____

26   [13]   In order to preserve the confidentiality of such time records, the Special Master did not order
    them to be filed and therefore they are not in the record.  They should be filed under seal now for
27   the Court's inspection.  *See* Dkt. 4182 (ordering direct-purchaser class plaintiffs to lodge certain
    billing and expense records with the Court for review).

28

1   "cross-check," Lead Counsel reported that the total number of hours recorded by all IPP counsel in

2   the case is 183,000, and that at current rates the lodestar for those hours is $90,075,077.  Thus,

3   Lead Counsel sought a multiplier of 2.13 on their reported lodestar.

4          The Special Master applied, in the first instance and over the objections of the

5   undersigned, Lead Counsel's preferred percentage-of-the-fund method.  R&R, Dkt. 4351 at 63.

6   The Special Master started at a 25% benchmark, ultimately adjusting the percentage upward to

7   30% based upon three features of the case:  the results obtained (*id*. at 67); the risk[14] and

8   complexity of the case (*id*. at 68); and the eight-year duration of the case (*id*. at 75).  The Special

9   Master then performed a lodestar cross check of the resulting $173,025,000 recommended award.

10  The Special Master applied a 10% across-the-board reduction to the current-rate lodestar for

11  presumed inefficiency and waste, resulting in an "adjusted" lodestar of $81,067,569.  *Id*. at 81-82.

12  Notably, the Special Master's reductions to the percentage of the recommended fee award and to

13  the lodestar amount offset each other, producing a recommended multiplier of 2.13, unchanged

14  from Lead Counsel's original request.  *Id*.

15         Though he declined the undersigned's request to use a lodestar method in the first instance,

16  the Special Master did note that "when it comes to allocating the total approved fee among the

17  various class counsel firms, more meticulous scrutiny to each firm's billing will take note of a

18  particular firm's inefficiency, inexperience or bad judgment."  R&R, Dkt. 4351 at 63.  In other

19  words, the Special Master applied a percentage-of-the-fund approach in determining an aggregate

20  award, and intends on using a more-searching lodestar method when it comes time to allocate that

21  award to individual firms.

22         This approach, however, locks in an aggregate fee based in part on work that demonstrates

23  "inefficiency, inexperience or bad judgment," (R&R, Dkt. 4351 at 63), and only promises to

25  [14]  The Special Master's "risk" conclusion does not appear to take into account the fact that many

26  firms did not place any of their own funds at risk, and that much of the litigation was funded

27  through the early settlements.  *See* Dkt. 4115 at 7-8 (objection to application of risk multiplier to
    firms that did not make a financial contribution).

1    identify such unreasonable and noncompensable work at the allocation phase.  But if time is non-

2    compensable in an allocation proceeding, how can that same time be used to support an aggregate

3    fee award?  These are not hypothetical concerns.  The Special Master, in observing that 50 firms

4    recorded time for the IPPs in this matter, noted that "[t]hirteen firms did virtually nothing, billing

5    less than $75,000 each.  Another nineteen firms billed less than $1 million.  Thus, the real work of

6    the case was limited to about sixteen firms that billed over $2 million." *Id*. at 80.  Though the

7    Special Master ultimately awarded about $19 million less than Lead Counsel initially sought, that

8    reduction (from 33% to 30% of the settlement fund) is insufficient to address the manifest

9    inefficiencies and non-compensable time identified by the Special Master.

10        **B.    The Special Master Erred In Failing To Apply An Appropriate Fee Reduction Based On Billing Records**

11

12           By order of the Special Master, the undersigned received copies of a limited universe of

13    billing records for Lead Counsel and three firms associated into the case for purposes of trial.  *See*

14    Dkt. 4211 (Special Master's Order Re Mot. To Compel Lead Counsel To Produce IPP Counsel's

15    Time-And-Expense Reports).  The Special Master received the entire universe of billing records

16    for all IPP firms, and conducted a "spot check" of records in connection with his Report and

17    Recommendation.  R&R, Dkt. 4351 at 78-79.

18           The undersigned's brief review of the limited records made available to them revealed the

19    widespread use of block-billing and quarter-hour increments, practices which have come in for

20    criticism in this judicial district and circuit.  *See, e.g., Banas v. Volcano Corp.*, 47 F.Supp.3d 957,

21    968 (N.D. Cal. 2014) ("If block billing is still a 'typical practice' in this District, which I doubt, it

22    flies in the face of repeated criticism by courts throughout the country, *including in this District*."

23    (emphasis in original)); *Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007)

24    (affirming a reduction to time billed in quarter-hour increments because it inflates the time

25    recorded).  The undersigned's review also indicated the widespread billing for attorney

26    conferences, despite Lead Counsel's statements that such conferences were not included in the fee

27    request.  *See* R&R, Dkt. 4351 at 80 ("Lead Counsel gave direction that lawyers were not to record

28

1    time for in-house multi-lawyer conferences. [citation omitted]  However, many of the billing

2    records contain entries for just such conferences.").

3           The R&R confirms that the use of questionable billing practices was rife, though the

4    Special Master couches these findings in euphemisms.  As to block-billing, the Special Master

5    concedes that it "occurred," "but not to any egregious extent," while as to quarter-hour increments,

6    the Special Master opined that "this is also a common practice that *O'Bannon* said had been

7    allowed by courts in the Ninth Circuit."  R&R, Dkt. 4351 at 81.  However, the Special Master's

8    reliance on *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 2015 WL 4274370 at *6 (N.D. Cal. July

9    13, 2015), as a blanket approval of block-billing and quarter-hour increments is misplaced.  The

10   *O'Bannon* court ultimately rejected a request to reduce a fee award due to the use of block billing

11   because the entries at issue were "adequately detailed to permit the Court to assess the

12   reasonableness of the hours expended."  *Id*. at *7.  The Special Master did not make such a finding

13   here.  And as to quarter-hour billing, the *O'Bannon* court did not "bless" the practice, but instead

14   applied a 5% reduction to all such entries.  *Id*. at *8.

15          The Special Master did apply a 10% across-the-board lodestar reduction (R&R, Dkt. 4351

16   at 81-82), but this modest reduction is not attributed to any particular billing practice.  This was

17   error.  Courts generally apply separate reductions, well in excess of 10%, to fee applications that

18   contain problematic billing practices.  *See, e.g., Apple, Inc. v. Samsung Electronics Co.*, 2012 WL

19   5451411, at *5 (N.D. Cal. Nov. 7, 2012) ("in light of the evidence that block-billing inflates hours

20   by between 10% and 30%, the court trims 20% from the block-billed hours in Samsung's

21   request"); *Hajro v. U.S. Citizenship & Immigration Servs.*, 900 F.Supp.2d 1034, 1053 (N.D. Cal.

22   2012) ("the court exercises its discretion to reduce the hours for these block-billed entries by

23   twenty percent, the amount noted by the Ninth Circuit as the middle range for time increases that

24   occurs through block-billing").

25          Here, however, the Special Master's modest reduction serves as the sole remedy for the

26   Special Master's observations that there was block billing, use of quarter-hour increments, and

27   most troublingly, his observation that there is "evidence of unnecessary duplication of effort

28

---

1  (multiple lawyers attending a deposition, excessive number of document reviewers, etc.)."  R&R,

2  Dkt. 4351 at 80.  In other words, the Special Master acknowledged all of the problems raised by

3  the undersigned with respect to the billing records, but failed to take action and apply an

4  appropriate reduction to the lodestar amount.  This was error.

5         **C.**      **The Special Master Erred In Failing To Apply An Appropriate Fee Reduction**
                **For Duplicative Trial Preparation**

6

7            The undersigned raised the additional objection that Lead Counsel's decision to associate

8  into the case, on the eve of trial, three additional firms as "trial counsel" was yet another example

9  of wasteful staffing decisions.  The Special Master reviewed the records of these firms, and found

10  that, as to each individual firm, the billing records did not exhibit wasteful or excess billing.  *See*

11  R&R, Dkt. 4351 at 71-72.  The Special Master observed that "[t]he trial preparation that these

12  three firms did would have had to be done by some other lawyers had they not been on board."  *Id.*

13  at 72.  But this observation, coupled with the Special Master's conclusion that there is evidence of

14  "unnecessary duplication of effort" (*id.* at 80) in this case, only raises the question of whether the

15  IPP class members are being asked to pay for the same trial-preparation twice (if not more).

16         **D.**      **The Special Master Failed To Apply An Appropriate Fee Reduction For**
                **Unnecessary Disputes With the California Attorney General**

17            The unusually contentious and "rocky" (R&R, Dkt. 4351 at 81) relationship in this case

18  between Lead Counsel and the California Attorney General is plain for all to see:  in what is only

19  the latest chapter, the California AG has been forced to file briefs challenging the adequacy of the

20  notice plan and has successfully moved (over the opposition of Lead Counsel) to extend the

21  claims-filing deadline.  *See* Dkt 4339 (Order Re Request For Extension of Claims Submission

22  Deadline).  The Special Master focused on a separate, earlier dispute between the California AG

23  and Lead Counsel concerning the Philips settlement, concluding that he could not "give credence"

24  (R&R, Dkt. 4351 at 72) to the undersigned's criticism, because all that the Special Master had

25  before him on this issue was the Report and Recommendation of former Chief Judge Vaughn

26  Walker (Dkt. 3200), detailing the ways in which the relationship between Lead Counsel and the

27  California AG had deteriorated.  (Query what further quantum of evidence would be required to

28

---

1  demonstrate that there has been an extraordinary breakdown in the relationship between Lead

2  Counsel and the California AG.)

3         However, when the undersigned asked for all of Lead Counsel's time reports to show the

4  total number of unnecessarily spent hours on this issue, the Special Master refused to order them

5  produced.  *See* Dkt. 4211 (ordering production of limited time records to the undersigned).

6  The significance of this deterioration is that members of the IPP class are being asked to

7  compensate Lead Counsel for time spent creating an unnecessary conflict where none need have

8  developed.  The need for cooperation and coordination among the private plaintiffs' antitrust bar

9  and the Attorneys General is simply a fact of life for consumer antitrust cases, and such

10  cooperation is an important factor in the approval of any consumer settlement.  *See, e.g., In re*

11  *Toys 'R' Us Antitrust Litig.*, 191 F.R.D. 347, 351 (E.D.N.Y. 2000) ("participation of the State

12  Attorneys General furnishes extra assurance that consumers' interest are protected."); *In re*

13  *Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 380 (D.D.C. 2002) (citing same).  The

14  Special Master's failure to recommend any reduction in the fee award for the mismanagement of

15  this vital relationship is error, and sends the wrong message about the need for coordination

16  among private plaintiffs and governmental agencies.

17  **V.    THE SPECIAL MASTER ERRED IN FAILING TO ADDRESS OBJECTIONS TO**
       **EXPENSES, COMPLIANCE WITH THIS DISTRICT'S GUIDANCE ON CLASS**
18      **ACTION APPROVAL, AND FAILED TO PROVIDE A COMPLETE RECORD TO**
       **THE COURT AND THE PARTIES**
19

20         Several issues raised before the Special Master were never addressed in the Report and

21  Recommendation.  Additionally, it appears that the Court and the parties do not have a complete

22  record of the documents upon which the Special Master based his Report and Recommendation.

23         **A.    The Special Master Failed To Address Objections To The Expense Request**

24         The Special Master recommends approval of $7,634,372.50 in expenses to Lead Counsel.

25  R&R, Dkt. 4351 at 82 – 83.  The Special Master states that, "[n]o one has objected to approval of

26  these expenses."  *Id*. at 82.  This is error.  The undersigned specifically raised as an objection the

27  reimbursement of expenses without a proper accounting.  *See* Dkt. 4115 at 7 – 8 (objection to

28  reimbursement of expenses).  In particular, the undersigned noted that without an accounting to

1   show when certain firms contributed to the litigation fund, the Special Master could not make an

2   informed determination as to the appropriateness of applying a risk multiplier to the attorney-fee

3   request.  That is, if assessments were paid only after it was obvious this case was heading for

4   settlement, then there was no real financial risk to the paying firm.  *Id.*

5       Moreover, $4,495,878.02 of this expense award is described as "settlement proceeds

6   placed in the Future Expense Fund."  R&R, Dkt. 4351 at 82.  That money was deducted by Lead

7   Counsel from the Chunghwa and LG settlements and represents class money, not funds that

8   belong to the lawyers in this case.  That money rightfully belongs to the class members and

9   awarding it to Lead Counsel is error.

10      **B.      Lead Counsel and the Special Master Have Failed To Address This District's
            Guidance On Class Action Approval**

12      As noted in the undersigned's objections before the Special Master, Lead Counsel has

13  failed to comply with the Northern District's "Procedural Guidance for Class Action Settlements,"

14  (available at  http://www.cand.uscourts.gov/ClassActionSettlementGuidance), directing the

15  proponents of a settlement releasing class claims to include with such settlement approval papers,

16  *inter alia*, "[t]he likely recovery per plaintiff under the terms of the settlement and the potential

17  recovery if plaintiffs were to prevail on each of their claims."  *See* Dkt. 4364 at 14 – 15 (reply in

18  support of objections).

19      This Court, in connection with settlements in the direct-purchaser action, has referenced

20  this "potential recovery" provision of the Procedural Guidance, and has ordered compliance with it

21  before ruling on a request for final approval.  *See* Order Re Direct Purchaser Pltfs' Settlement with

22  Thomson Defendants (Dkt. 4194, Nov. 18, 2015) (citing "Procedural Guidance for Class Action

23  Settlements" and *In re Omnivision Techs. Inc.*, 559 F.Supp.2d 1036, 1042 (N.D. Cal. 2008), to

24  order direct-purchaser plaintiffs to file a supplemental brief addressing the potential recovery of

25  plaintiffs if they prevailed on their claims).

26      Lead Counsel has not complied with the Northern District's "Procedural Guidance" in the

27  preliminary approval motions for any of the settlements or in any of the final approval briefing.

28  Lead Counsel should furnish the information required by the "Procedural Guidance" (and already

---

1  demanded of the direct-purchaser plaintiffs) before requesting final approval.  The Special

2  Master's failure to address this point in the R&R was error.

3      **C.      The Special Master Relied Upon Documents And Ex Parte Communications
           Not Contained In The Record**

4          Rule 53(b)(2)(C) of the Federal Rules of Civil Procedure ("Rule") requires that the order

5  appointing a special master state "the nature of the materials to be preserved and filed as the

6  record of the master's activities[.]"  *Glass v. UBS Fin. Servs.,* 15 Wage & Hour Cas. 2d (BNA)

7  1330, 2007 U.S. Dist. LEXIS 8476, at *34 (N.D. Cal. Jan. 26, 2007).  The Order appointing

8  Special Master Quinn specifies that the Special Master "maintain orderly files consisting of all

9  documents submitted to him by the parties and of any of his written orders, findings and/or

10 recommendations."  Order Appointing Special Master (Dkt. 4077) at ¶ 4 a.  "A basic requirement"

11 of Rule 53 "is that the master must make and file a complete record of the evidence considered in

12 making or recommending findings of fact on the basis of evidence."  Notes of Advisory

13 Committee on 2003 Amendments to Rule 53.

14         The appointing order also must state "the circumstances, if any, in which the master may

15 communicate *ex parte* with the court or a party[.]"  Fed. R. Civ. Proc. 53(b)(2)(B); *Glass*, 2007

16 U.S. Dist. LEXIS 8476, at *34.  The Order appointing Special Master Quinn establishes the

17 parameters of *ex parte* communications between him and Counsel:

18              Generally, the Special Master shall not communicate ex parte with
19              any party without first providing notice to, and receiving consent
                from, Plaintiffs' Lead Counsel and Counsel for any other interested
20              party.  However, without providing notice or obtaining consent, the
                Special Master may communicate ex parte with a party for the
21              limited purposes of administrative matters such as scheduling
                hearings, telephone calls or briefing, if such arrangements cannot be
22              made in a timely manner by contacting the Special Master's
                administrative assistant.

23 Dkt. 4077 at ¶ 6.  The Notes of the Advisory Committee on the 2003 Amendments to Rule 53

24 further state that "difficult questions surround ex parte communications between a master and the

25

26

27

28

1   parties" and that "[i]n most settings, [] ex parte communications with the parties should be

2   discouraged or prohibited."[15]

3          At the January 5, 2016 hearing before Special Master Quinn, the undersigned noted that

4   certain emails concerning the issues that would be considered at the hearing had not been sent to

5   all counsel and raised concerns regarding the protocols for communication with the Special

6   Master.  *See* 1/5/16 JAMS Hearing Tr. at 118:15-23, Kirkham Decl., Exhibit 1.  The emails in

7   question were dated December 31, 2015.  An incomplete version of the email string was posted on

8   Case Anywhere on January 4, 2016, the day before the JAMS hearing.  *See* Kirkham Decl.,

9   Exhibit 2.  The Special Master acknowledged the communications had not been generally

10  disseminated, concluding that "from now on any email exchange with me, either email or letter

11  exchange with me should be posted on Case Anywhere on the JAMS website…."  1/5/16 Hearing

12  Tr. at 119:13-15, Kirkham Decl., Exhibit 1; *see also id.* at 22:23 ("Any communications with me

13  should be [] posted on the Case Anywhere.").

14         The Special Master stated in his Report and Recommendation that all proceedings before

15  him have been filed on Case Anywhere "with a few inadvertent immaterial exceptions and routine

16  e-mails about scheduling and other ministerial matters."  R&R, Dkt. 4351 at 21.  Unfortunately,

17  that does not appear to be the case:

18         1)  At pages 81-83 of his Report and Recommendation, the Special Master explains that

19             IPPs' original request for reimbursement of costs was reduced by $36,153.07 as a
               result of a re-audit of those expenses.  The Special Master then wrote that it appeared

20             to him that the supplemental review of expenses "was meticulous and conservative –
               more conservative, in fact, than [the Special Master] would have been in assessing the

21             same expenses."  R&R, Dkt. 4351 at 83.  The Special Master then cites to "Alioto Ltr.
               Dtd. 1/7/16 to Special Master, e-filed at JAMS."  *Id.*  The Alioto letter has not been

22             posted on the JAMS Case Anywhere site.  Neither is this letter included among the 19

23

24  [15] *C.f. EEOC v. US Steel Corp.,* 2012 U.S. Dist. LEXIS 49167, at *26-27 (W.D. Pa. April 5, 2012)

25  (a judge may "when circumstances require it, permit ex parte communication for scheduling,
    administrative, or emergency purposes, but only if the ex parte communication does not address

26  substantive matters and the judge reasonably believes that no party will gain a procedural,
    substantive, or tactical advantage as a result of the ex parte communication") (quoting Code of

27  Conduct for U.S. Judges Canon 2 § (A)(1)(a)).

28

documents produced as exhibits to the "Appendix of Documents Cited in Special Master's Report and Recommendation that were Filed with JAMS," Dkts. 4363-4368, filed on February 5, 2016.

2) The December 31, 2015 email from the Special Master referenced above, which was posted on January 4, 2016, concludes: "I believe Mr. Alioto is having his accountants perform a more detailed audit of the expense requests, and I will want to see the results of that early next week." *See* Kirkham Decl., Exhibit 2. Prior to this email, the undersigned had no notice whether, or to what extent, communications occurred between Lead Counsel and the Special Master on this topic. The Report and Recommendation states: "Lead Counsel have offered to provide the Special Master with all the backup expenses invoices, or to sample them. But given the review conducted by Lead Counsel, the lack of an objection and the cost-benefit calculation of investing that time, the Special Master declined to conduct a more in-depth review." R&R, Dkt. 4351 at 83. There is no email or letter regarding the communication of this "offer" or follow-up communication posted on Case Anywhere, nor have counsel been notified or allowed the opportunity to voice consent regarding these communications.

3) A January 7, 2016 email posted on Case Anywhere from the Special Master to Lauren Capurro (an attorney with the office of Lead Counsel) requested a sample of billing records for seven randomly selected firms for any two months per year for 2012, 2013 and 2014. *See* Kirkham Decl., Exhibit 3. The Special Master asked Ms. Capurro to "let me know if this is feasible, whether you have any questions, whether a change in my format would make production quicker and easier, and when you can get this material to me." *Id.* No further communications where filed on Case Anywhere, nor was any notice or consent requested regarding related *ex parte* communications. The topic only publically arose again three weeks later when the Special Master noted in his Report and Recommendation that "the Special Master has been provided the raw billing entries for every firm" (R&R, Dkt. 4351 at 78), rather than a random sample of time records.

The aforementioned examples indicate that not all documents submitted to the Special Master by the parties have been disclosed on the record and that non-administrative *ex parte* communications between the Special Master, Lead Counsel and perhaps others have occurred without notice or consent from all interested parties. Accordingly, the undersigned respectfully request that the "Alioto Ltr. Dtd. 1/7/16 to Special Master," referenced at ECF page 83 of the Report and Recommendation, be posted to the record. In addition, we respectfully request that: (a) all additional materials submitted to or considered by the Special Master and all communications between the Special Master and Counsel in the case, including records of all letters and emails between the Special Master and Counsel which have not been posted on the Case Anywhere system; and (b) all notes and entries in the Special Master's time records which memorialize in-

1   person or telephonic communications with Counsel, should be produced to the Court prior to the

2   March 15, 2016 Fairness Hearing for the Court to verify that the record is complete in accordance

3   with Rule 53 and to evaluate the substance of any *ex parte* communications.

4   **VI.    CONCLUSION**

5           For all of the foregoing reasons, the undersigned respectfully urge the Court to sustain their

6   objections to the R&R and disapprove the Proposed Settlements.

7   Dated: February 12, 2016                    Respectfully submitted,

8                                                _/s/ Josef D. Cooper_____
                                                     Josef D. Cooper
9
10                                               Josef D. Cooper (53015)
                                                 Tracy R. Kirkham (69912)
                                                 John D. Bogdanov (215830)
11                                               COOPER & KIRKHAM, P.C.
                                                 357 Tehama Street, Second Floor
12                                               San Francisco, CA 94103
                                                 Telephone: (415) 788-3030
13                                               Facsimile: (415) 882-7040
                                                 Email:  jdc@coopkirk.com
14

15                                               _/s/  Francis O. Scarpulla_____
                                                     Francis O. Scarpulla
16
17                                               Francis O. Scarpulla (41059)
                                                 Patrick B. Clayton (240191)
18                                               LAW OFFICES OF FRANCIS O. SCARPULLA
                                                 456 Montgomery Street, 17th Floor
19                                               San Francisco, CA 94104
                                                 Telephone: 415-788-7210
20                                               Facsimile:  415-788-0706
                                                 fos@scarpullalaw.com
21
           Pursuant to Civil L.R. 5-1(i), the filer attests that the concurrence in the filing of this
22
    document has been obtained from each of the above signatories.
23

24

25

26

27

28