JOSEF D. COOPER (CASB No. 53015)
TRACY R. KIRKHAM (CASB No. 69912)
JOHN D. BOGDANOV (CASB No. 215830)
COOPER & KIRKHAM, P.C.
357 Tehama Street, Second Floor
San Francisco, CA  94103
Telephone:  (415) 788-3030
Facsimile:  (415) 882-7040
jdc@coopkirk.com
trk@coopkirk.com
jdb@coopkirk.com

FRANCIS O. SCARPULLA (CASB No. 41059)
PATRICK B. CLAYTON (CASB No. 240191)
LAW OFFICES OF FRANCIS O. SCARPULLA
456 Montgomery Street, 17th Floor
San Francisco, CA  94111
Telephone:  (415) 788-7210
Facsimile:  (415) 788-0706
fos@scarpullalaw.com
pbc@scarpullalaw.com

*Counsel for Indirect-Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:  CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION. | **Master File No. 3:07-cv-5944 JST** **MDL No. 1917** |
| This Document Relates to:<br><br>All Indirect-Purchaser Action | **DECLARATION OF TRACY R. KIRKHAM IN SUPPORT OF OBJECTIONS TO REPORT AND RECOMMENDATION OF SPECIAL MASTER**<br><br>Hearing Date: March 15, 2016<br>Time:  2:00 p.m.<br>Courtroom:  9, 19th Floor<br>Judge: Honorable Jon S. Tigar |

I, Tracy R. Kirkham, declare as follows:

1.     I am a member in good standing of the State Bar of California, and licensed to practice in the states of California, Pennsylvania and New Jersey.  I am a Principal in Cooper & Kirkham, P.C.  I have personal knowledge of the facts stated in this Declaration and, if called as a witness, I could and would testify competently to them.

2.     Attached hereto as Exhibit 1 is a true and correct copy of the transcript of a hearing that I attended before Special Master Quinn on January 5, 2016, at JAMS, Two Embarcadero Center, Suite 1500, San Francisco, California.

3.     Attached hereto as Exhibit 2 is a true and correct copy of an email from Special Master Martin Quinn to Lead Counsel Mario Alioto with copies to others having the subject heading "Re: CRT/Hearing on January 5, 2016", dated December 31, 2015, and lodged on the JAMS Case Anywhere system on January 4, 2016.

4.     Attached hereto as Exhibit 3 is a true and correct copy of an email dated January 7, 2016 from Special Master Martin Quinn to Lauren Capurro, Esq. with copies to others having the subject heading "CRT: Production of billing records" lodged on the JAMS Case Anywhere system.

5.     Attached hereto as Exhibit 4 is a true and correct copy of the "Declaration of Joseph M. Fisher Reporting On Claim Submissions" dated January 15, 2016, and lodged on the JAMS Case Anywhere system.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 12th day of February, 2016, in San Francisco, California.

　　　　　 /s/ Tracy R. Kirkham　　　　　
　　　　　　　 Tracy R. Kirkham

DECLARATION OF TRACY R. KIRKHAM IN
SUPPORT OF OBJECTIONS TO REPORT AND
RECOMMENDATIONS OF SPECIAL MASTER

- 1 -

Master File No. 3:07-cv5944 JST
MDL 1917

# EXHIBIT 1

Page 1

1            UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3

4    _____

                                    )
5    IN RE:  CATHODE RAY TUBE       )
     (CRT) ANTITRUST LITIGATION     )
6    _____)  No. 3:07-cv-05944-SC
                                    )  MDL No. 1917
7    This Document Relates to:      )
                                    )
8    ALL ACTIONS                    )
     _____)

9

10

11

12

13

14

15              ORAL ARGUMENT HEARING

16            San Francisco, California

17            Tuesday, January 5, 2016

18

19

20

21

22

     Reported by:
23   SUZANNE F. BOSCHETTI
     CSR No. 5111

24

25

Page 2

1              UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3

4    _____

                                     )

5    IN RE:  CATHODE RAY TUBE         )

     (CRT) ANTITRUST LITIGATION       )

6    _____ )   No. 3:07-cv-05944-SC

                                     )   MDL No. 1917

7    This Document Relates to:        )

                                     )

8    ALL ACTIONS                      )

     _____ )

9

10

11

12

13

14

15         ORAL ARGUMENT HEARING held before Special

16    Master Martin Quinn, at JAMS, 2 Embarcadero

17    Center, Suite 1500, San Francisco, California,

18    beginning at 9:55 a.m. and ending at 1:17 p.m.,

19    on Tuesday, January 5, 2015, before SUZANNE F.

20    BOSCHETTI, Certified Shorthand Reporter No.

21    5111.

22

23

24

25

Page 3

1   APPEARANCES:

2

3       JAMS

4       BY:  MARTIN QUINN, SPECIAL MASTER

5       2 Embarcadero Center, Suite 1500

6       San Francisco, California 94111

7       (415) 982-5267

8

9

10   For the Indirect Purchaser Plaintiffs Class:

11       TRUMP ALIOTO TRUMP & PRESCOTT, ATTORNEYS LLP

12       BY:  MARIO N. ALIOTO, ESQ.

13       BY:  LAUREN C. CAPURRO, ESQ.

14       2280 Union Street

15       San Francisco, California 94123

16       (415) 563-7200

17       marioalioto@tatp.com

18       laurenrussell@tatp.com

19

20

21

22

23

24

25

Page 4

1    APPEARANCES (Continued):

2

3        FINE, KAPLAN AND BLACK, R.P.C.

4        BY:  MATTHEW DUNCAN, ESQ.

5        BY:  DONALD L. PERELMAN, ESQ.

6        1 South Broad Street, 23rd Floor

7        Philadelphia, Pennsylvania 19107

8        (215) 567-6565

9        mduncan@finekaplan.com

10       dperelman@finekaplan.com

11

12       FREEDMAN BOYD HOLLANDER GOLDBERG URIAS & WARD P.A.

13       BY:  JOSEPH GOLDBERG, ESQ.

14       20 First Plaza, Suite 700

15       Albuquerque, New Mexio 87102

16       (505) 244-7520

17       jg@fbdlaw.com

18

19       KIRBY McINERNEY LLP

20       BY:  ROBERT J. GRALEWSKI, JR., ESQ.

21       600 B Street, Suite 1900

22       San Diego, California 92101

23       (619) 398-4340

24       bgralewski@kmllp.com

25

Page 5

1    APPEARANCES (Continued):

2

3       ZELLE HOFMANN VOELBEL & MASON LLP

4       BY:  CRAIG C. CORBITT, ESQ.

5       BY:  CHRISTOPHER T. MICHELETTI, ESQ.

6       44 Montgomery Street, Suite 3400

7       San Francisco California 94104

8       (415) 693-0700

9       ccorbitt@zelle.com

10      cmicheletti@zelle.com

11

12      STRAUS & BOIES, LLP

13      BY:  NATHAN CIHLAR, ESQ.

14      4041 University Drive, Fifth Floor

15      Fairfax Virginia 22030

16      (703) 764-8700

17      ncihlar@straus-boies.com

18

19      MILBERG LLP

20      BY:  PAUL F. NOVAK

21      719 Griswold, Suite 620

22      Detroit, Michigan 48226

23      (313) 309-1761

24      pnovak@milberg.com

25

Page 6

1   APPEARANCES (Continued):

2

3      KAG LAW GROUP

4      BY:  SYLVIE K. KERN, ESQ.

5      2532 Lake Street

6      San Francisco California 94121

7      (415) 221-5763

8      sylviekern@yahoo.com

9

10     ANDRUS ANDERSON LLP

11     BY:  JENNIE LEE ANDERSON (By telephone)

12     155 Montgomery Street, Suite 900

13     San Francisco, California 94114

14     (415) 986-1400

15     jennie@andrusanderson.com

16

17     BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER

18     BY:  DANIEL E. BIRKHAUSER (By telephone)

19     2125 Oak Grove Road, Suite 120

20     Walnut Creek, California 94598

21     (925) 945-0200

22     dbirkhaeuser@bramsonplutzik.com

23

24

25

Page 7

1    APPEARANCES (Continued):

2

3    For Objecting IPPs:

4       COOPER & KIRKHAM, P.C.

5       BY:   JOSEF COOPER, ESQ.

6       BY:   TRACY KIRKHAM, ESQ.

7       BY:   JOHN D. BOGDANOV, ESQ.

8       357 Tehama Street, 2nd Floor

9       San Francisco, California 94103

10      (415) 788-3030

11      jdc@coopkirk.com

12      trk@coopkirk.com

13

14      LAW OFFICES OF FRANCIS O. SCARPULLA

15      BY:   FRANCIS O. SCARPULLA, ESQ.

16      BY:   PATRICK CLAYTON, ESQ.

17      456 Montgomery Street, 17th Floor

18      San Francisco California 94104

19      (415) 788-7210

20      fos@scarpullalaw.com

21

22

23

24

25

Page 8

1    APPEARANCES (Continued):

2    For Excluded IPPs:

3       BONSIGNORE TRIAL LAWYERS, PLLC

4       BY:  ROBERT J. BONSIGNORE, ESQ.

5       3771 Meadowcrest Drive

6       Las Vegas, Nevada 89121

7       (781) 350-0000

8       rbonsignore@classactions.us

9

10   For Objectors Rockhurst University, Harry Garavanian and

11   Gary Talewsky:

12      THERESA D. MOORE, ATTORNEY AT LAW

13      BY:  THERESA D. MOORE, ESQ.

14      One Sansome Street, 35th Floor

15      San Francisco, CA 94104

16      (415) 434-8900

17      tmoore@aliotolaw.com

18

19   For Objector Douglas St. John:

20      JOSEPH S. ST. JOHN, ATTORNEY AT LAW

21      BY:  JOSEPH S. ST. JOHN, ESQ.

22      514 Mockingbird Lane

23      Long Beach, Mississippi 39560

24      (410) 212-3475

25      j.scott.stjohn.public@gmail.com

```
                                              Page 9

 1   APPEARANCES (Continued):

 2

 3   For Objectors John Finn and Laura Fortman:

 4      THE KRESS LAW FIRM LLC

 5      BY:  JOHN KRESS, ESQ. (By telephone)

 6      4247 South Grand Boulevard

 7      St. Louis, Missouri 63111

 8      (314) 631-3883

 9      jckress@thekresslawfirm.com

10

11      STEVE A. MILLER, ATTORNEY AT LAW (By telephone)

12      1625 Larimer St., No. 2905

13      Denver, CO 80202-1539

14      sampco1@gmail.com

15

16   For Objector Sean Hull:

17      BANDAS LAW FIRM, P.C.

18      BY:  CHRISTOPHER A. BANDAS, ESQ. (By telephone)

19      500 N. Shoreline Boulevard, Suite 1020

20      Corpus Christi, Texas 78401

21      (361) 698-5200

22      cbandas@bandaslawfirm.com

23

24

25
```

Page 10

```
 1   APPEARANCES (Continued):
 2   For Hitachi Defendants:
 3     KIRKLAND & ELLIS LLP
 4     BY:  ELIOT A. ADELSON, ESQ.
 5     555 California Street
 6     San Francisco California 94104
 7     (415) 439-1313
 8     eadelson@kirkland.com
 9
10   For Samsung SDI Defendants:
11     SHEPPARD MULLIN RICHTER & HAMPTON LLP
12     BY:  MICHAEL W. SCARBOROUGH, ESQ.
13     Four Embarcadero Center, 17th Floor
14     San Francisco California 94111-4109
15     (415) 434-9100
16     mscarborough@sheppardmullin.com
17
18   For Philips Defendants:
19     BAKER BOTTS LLP
20     BY:  ERIK T. KOONS, ESQ.
21     BY:  JOHN TALADAY, ESQ. (By telephone)
22     1299 Pennsylvania Avenue, NW
23     Washington, D.C. 40004-2400
24     erik.koons@bakerbotts.com
25     john.taladay@bakerbotts.com
```

Page 11

1   APPEARANCES (Continued):

2   For Panasonic Defendants:

3     WINSTON & STRAWN LLP

4     BY:  MARTIN C. GEAGAN, ESQ.

5     200 Park Avenue

6     New York, New York 10166

7     (212) 294-4615

8     mgeagan@winston.com

9

10  For Thomson Defendants:

11    FAEGRE BAKER DANIELS LLP

12    BY:  KATHY L. OSBORN, ESQ. (By telephone)

13    300 N. Meridian Street, Suite 2700

14    Indianapolis, Indiana 46204

15    (317) 237-8562

16    kathy.osborn@faegrebd.com

17

18  For Toshiba Defendants:

19    WHITE & CASE LLP

20    BY:  CHRISTOPHER M. CURRAN, ESQ. (By telephone)

21    BY:  J. MARK GIDLEY, ESQ. (By telephone)

22    701 Thirteenth Street, NW

23    Washington D.C. 20005-3807

24    (202 )626-3609

25    ccurran@whitecase.com

1    APPEARANCES (Continued):

2

3    For Chunghwa Picture Tube Defendants:

4       GIBSON DUNN & CRUTCHER LLP

5       BY:  RACHEL S. BRASS, ESQ. (By telephone)

6       555 Mission Street

7       San Francisco, California 94105--0921

8       (415) 393-8293

9       rbrass@gibsondunn.com

10

11   For the State of California:

12      DEPARTMENT OF JUSTICE

13      OFFICE OF THE ATTORNEY GENERAL

14      BY:  EMILIO VARANINI, ESQ.

15      455 Golden Gate Avenue, Suite 11000

16      San Francisco California 94102-7002

17      (415) 703-5908

18      emilio.varanini@doj.ca.gov

19

20

21

22

23

24

25

```
                                              Page 13

 1    APPEARANCES (Continued):

 2

 3   For Direct Purchaser Plaintiffs Class:

 4      SAVERI & SAVERI, INC.

 5      BY:  GUIDO SAVERI, ESQ.

 6      706 Sansome Street

 7      San Francisco, California 94111

 8      (415) 217-6810

 9      guido@saveri.com

10

11   Also Present:

12      MARLA COHEN, ESQ.:  Research Attorney

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
                                                    Page 14
 1      San Francisco, California; Tuesday, January 5, 2016
 2                          10:09 a.m.
 3                          ---o0o---
 4
 5          SPECIAL MASTER:  Good morning.  I'd like you to
 6      identify yourselves for my benefit if not the court
 7      reporter's.  That would be good.
 8              MR. ALIOTO:  Good morning.  Mario Alioto, lead
 9      counsel for the indirect purchasers.
10              SPECIAL MASTER:  Okay.  And everyone has to
11      speak up, you know, without yelling at each other.  But
12      we have to almost yell at each other because we not only
13      have to be sure Ms. Cohen and I hear, but the people on
14      the phone have to hear.
15              MS. CAPURRO:  Good morning, Your Honor.  Lauren
16      Capurro for the indirect purchaser plaintiffs.
17              MR. DUNCAN:  Good morning, Your Honor.  Matthew
18      Duncan from Fine, Kaplan and Black in Philadelphia for
19      the IPPs.
20              MR. GOLDBERG:  Good morning, Mr. Quinn.  My
21      name is Joe Goldberg from Freedman Boyd Hollander
22      Goldberg Urias & Ward in Albuquerque, New Mexico, for
23      the IPPs.
24              SPECIAL MASTER:  I was just there.
25              MR. GOLDBERG:  So was I.
```

Page 15

1          MS. KIRKHAM:  Good morning.  Tracy Kirkham of

2     Cooper & Kirkham on behalf of the objecting indirect

3     purchaser plaintiffs.

4          MR. COOPER:  Josef Cooper, the second half of

5     the firm.

6          MR. SCARPULLA:  Francis Scarpulla, Your Honor,

7     from the Law Offices of Francis Scarpulla in

8     San Francisco for the same objectors.

9          MR. BONSIGNORE:  Robert Bonsignore on behalf of

10    the excluded plaintiffs.  Excuse me for yelling.

11         MR. ADELSON:  Eliot Adelson of Kirkland & Ellis

12    for Hitachi.

13         MR. SCARBOROUGH:  Michael Scarborough of

14    Shepard Mullin for the Samsung SDI defendants.

15         MR. KOONS:  Erik Koons, Baker Botts, on behalf

16    of Philips defendants.

17         MR. GEAGAN:  Martin Geagan, Winston & Strawn,

18    on behalf of the Panasonic defendants.

19         MR. CORBITT:  Good morning, Your Honor.  Craig

20    Corbitt for the IPPs.

21         MR. CIHLAR:  Nathan Cihlar from Straus & Boies

22    for the IPPs.

23         MR. NOVAK:  Paul Novak of Milberg for the IPPs.

24         MR. ST. JOHN:  Joseph St. John for objector

25    Douglas St. John.

1          MS. MOORE:   Theresa Moore for objectors

2     Rockhurst University, Garavanian and Talewsky.

3          MR. VARANINI:   Emilio Varanini on behalf of the

4     California Attorney General's Office.

5          MR. SAVERI:   Guido Saveri.  I'm the lead

6     counsel for the direct purchasers.  I do not intend to

7     participate.  I'm here just as an observer, but I see a

8     lot of my friends here that I haven't seen for years.

9     Mr. Goldberg and the whole crowd, it's nice to see you.

10    Nice to see you again.  You have your problems.  The

11    direct purchase plaintiffs, as you know, are all

12    finished, and we're here to see what's going on.

13          SPECIAL MASTER:   Thank you.

14          MR. SAVERI:   Nice to see you.  I'd like to see

15    several of you later and renew old acquaintances.

16          SPECIAL MASTER:   We appreciate the support.

17          MS. KERN:   Sylvie Kern for the indirect

18    purchaser plaintiffs.

19          MR. GRALEWSKI:   Bob Gralewski, Kirby McInerney,

20    on behalf of the indirect purchaser plaintiffs.

21          MR. MICHELETTI:   Chris Micheletti with Zelle on

22    behalf of the IPPs.

23          MR. PERELMAN:   Don Perelman, Fine, Kaplan and

24    Black, for the IPPs.

25          MR. BOGDANOV:   John Bogdanov with Cooper &

Page 17

1    Kirkham, objecting IPPs.

2            MR. CLAYTON:  And Patrick Clayton from the Law

3    Offices of Francis O. Scarpulla for the objecting IPPs.

4            SPECIAL MASTER:  All right.  And on the phone,

5    if you could announce yourselves.

6            MR. BANDAS:  Chris Bandas for objector Sean

7    Hull.

8            MS. OSBORN:  This is Kathy Osborn for

9    defendants, the Thomson defendants.

10           MS. BRASS:  This is Rachel Brass for the

11   Chunghwa Picture Tube defendants.

12           SPECIAL MASTER:  Thank you.

13           MR. HOAG:  You have Frank Hogue and Chris

14   Curran from White & Case on behalf of the Toshiba

15   defendants.

16           MR. TALADAY:  John Taladay from Baker Botts on

17   behalf of the Philips defendants.

18           MR. KRESS:  John Kress on behalf of John Finn

19   and Laura Fortman.

20           SPECIAL MASTER:  Mr. Kress, who are you

21   representing?

22           MR. KRESS:  John Finn and Laura Fortman.

23           SPECIAL MASTER:  All right.

24           MR. BIRKHAEUSER:  One more, Your Honor.  Dan

25   Birkhauser of Bramson, Plutzik, Mahler & Birkhaeuser on

Page 18

1    behalf of the IPPs.

2            MS. ANDERSON:  And Jennie Lee Anderson of

3    Andrus Anderson on behalf of IPPs.

4            MR. MILLER:  And Steve Miller, co-counsel with

5    John Kress on behalf of Finn and Fortman.

6            SPECIAL MASTER:  All right.  Anyone else on the

7    phone who has not announced himself or herself?

8            All right.  Here comes the email address from

9    the court reporter.

10           (Reporter complies.)

11           SPECIAL MASTER:  Did everyone get that?

12           All right.  So there is no perfect way to run a

13   hearing like this.  I think what I'd like to do is go

14   issue by issue and take up, you know, the various issues

15   that are on my mind, and then at the end give you an

16   opportunity to raise any issues that we haven't covered.

17   And in no particular order, I've just jotted down five

18   issues that I'd like to cover.

19           First, the first is an issue that nobody raised

20   except me, which is is it premature for the special

21   master to be issuing a report and recommendation on the

22   appropriateness of the settlement when there's a motion

23   pending to appoint co-lead counsel that would

24   potentially impact that -- that -- you know, the

25   fairness and reasonableness of the settlement.

Page 19

1           Second, the issue of the appropriateness of

2      releasing the class members in non-repealer states and

3      releasing the class members in the three repealer states

4      that were omitted from the litigation class.

5           Third, the issue of the adequacy of the notice.

6           Fourth, issues that have been raised by

7      objectors relating to the Chunghwa settlement.

8           And fifth, the issue raised by the Attorney

9      General of -- as to whether the claim deadline should be

10     extended and other issues that the Attorney General has

11     raised in her statement of interest.

12          So those are the top items on my hit list, and

13     then we can certainly discuss anything after that.  For

14     those who haven't appeared before me, I mean, just

15     realize that Ms. Cohen and I have read all the briefs.

16     I get sort of restive when people repeat what's in their

17     briefs, particularly if they do so at great length.  So

18     please, you know, try to keep your -- your comments

19     succinct.

20          There are a lot of people who probably want to

21     talk today, and I want to have the chance to give

22     everybody a full and fair hearing.  On the other hand,

23     we have a lot to do to get this report and

24     recommendation in shape, and I don't want to spend an

25     unreasonable amount of time in an oral hearing.  So

Page 20

1    that's just words of caution.

2          So I guess I'd like to ask Mr. Cooper and/or

3    Mr. Scarpulla, is it premature for me to submit a report

4    and recommendation on these issues on the 15th when you

5    are going to have a hearing, I believe on January 17, on

6    your motion to be appointed co-lead counsel to represent

7    the interests of class members in -- in non-repealer

8    states?

9          MR. COOPER:  I guess we have debated that issue

10   back and forth, Your Honor, as to what to do before we

11   filed.  We debated that question before we filed a

12   motion.  And we know the schedule is the one that is

13   set, and we have not asked the court to change the

14   schedule or asked you to change the schedule.  We do not

15   have any intention, if appointed co-lead counsel, of

16   doing anything other than proceeding with the objections

17   which have been advanced.

18          So we would be proceeding with those objections

19   with or without the designation.  The defendants raised

20   the question in response to the motion to be appointed

21   as to whether we would be withdrawing from the

22   settlements.  And we said, you know, finally we filed

23   that we can't withdraw from a contract that Mr. Alioto

24   entered into.

25          We can object, and we can be the court

1    designated people to actually advance and advocate for

2    this group, this large group of people, the non-repealer

3    states that have not had anyone advocating for them

4    where their rights and the interests have been

5    abandoned.  We think that the objections would be the

6    same.  So I don't think it would make any difference

7    whether you delayed or didn't delay.  You would be

8    facing the same questions and issues.

9            SPECIAL MASTER:  Well, I mean, hypothetically

10   -- and I appreciate this isn't an issue for me, it's for

11   Judge Tigar, but hypothetically, if you were appointed

12   in some capacity, co-lead counsel or allocation counsel

13   or something, you know, would you want to do due

14   diligence?  Would you want to do discovery?  Would you

15   want to say to the court we object to the special

16   master's report and recommendation that just came out

17   two days ago and we essentially want a do-over?

18           MR. COOPER:  Well, we have -- we have a

19   schedule for objecting if necessary or we decide to, you

20   know, report recommendations.  The objections that we've

21   logged are the same.  It's showing that as has been made

22   by Mr. Alioto with regard to the propriety and adequacy

23   of the settlement is presumably the same.

24           We've asked for discovery with regard to the

25   fee matters, and I realize we're not doing that.  I

Page 22

1    believe some people have asked for discovery.  But

2    there's been a showing, such as it is, with regard to

3    the adequacy of the settlement and why nothing is being

4    recovered in any way, shape or form for the non-repealer

5    state people.  Those arguments are the same whether we

6    have the designation of co-lead counsel or not.

7             SPECIAL MASTER:  Okay.  So I take it your

8    answer is, to my question is no.  It's not premature.  I

9    should go ahead and issue the report and the

10   recommendation on the -- on the same schedule?

11            MR. COOPER:  I guess that's the answer, yes.

12   Yes, it might be premature for other reasons.  For

13   example, we've suggested with regard to the notice that

14   you ought to have an independent expert who can

15   actually, from an expert's perspective, evaluate the

16   notice issues that, to my knowledge, we've not acted on

17   that in any way.  So that might be one reason why you

18   would -- it would be appropriate to do it.

19            But I guess what I'm trying to say is the

20   objections are the objections.  If you feel that there's

21   a reason why designation as co-lead counsel -- and the

22   co-lead was to be Mr. Scarpulla and myself for this

23   group of people.  It wasn't that we would be co-lead

24   with Mr. Alioto for the entire --

25            SPECIAL MASTER:  I understand.

Page 23

```
 1              MR. COOPER:  Yeah.
 2              SPECIAL MASTER:  Mr. Scarpulla?
 3              MR. SCARPULLA:  Yes, Your Honor, just to follow
 4    up on that.  It probably makes a difference what Judge
 5    Tigar does in terms of the responsibilities of any
 6    co-leads if he decides to appoint them.  So it might be
 7    a good idea to ask him what -- what he wants.
 8              MR. COOPER:  I think it's clear from our answer
 9    to your question, Your Honor, that there's some
10    ambivalence about that question which, as I said when we
11    started, we debated about as to whether that would or
12    would not be the appropriate way.  And we came down on
13    the side of not asking the schedule be changed.
14              SPECIAL MASTER:  Okay.
15              MR. COOPER:  But we're acknowledging, I guess,
16    the legitimacy of your inquiry.
17              SPECIAL MASTER:  Okay.  Thank you.
18              Mr. Alioto?
19              MR. ALIOTO:  Yes, thank you, Your Honor.
20    There's no ambivalence on our side.  This matter is
21    squarely before Your Honor.  There's a court order
22    scheduled in place.  There's been no request for relief
23    to delay things.  A lot of this matter is going to have
24    to be reviewed again by Judge Tigar de novo.  The matter
25    is ripe.  The matter is tee'd up.  No ambivalence at all
```

Page 24

1    about it.  We need to address the issues right now.

2              SPECIAL MASTER:  All right.  Thank you.  At the

3    end of the table?

4              MR. BONSIGNORE:  Can you hear me?

5              SPECIAL MASTER:   Mr. Bonsignore, yes.

6              MR. BONSIGNORE:  Okay.  I didn't want to yell

7    again.  My name is Robert Bonsignore, and I also put in

8    a request to be appointed co-lead.  I would say that it

9    is premature because once the co-leads are appointed,

10   they have an interest to streamline the issues and also

11   to revisit what's been filed.  Also a lot of things

12   weren't done.  I personally think that it's premature,

13   especially given the authority that Judge Tigar is

14   likely, given the typical powers of appointment, the

15   powers that Judge Tigar is likely to give the co-leads

16   for these excluded plaintiffs.

17             So I take the opposite position of Mr. Cooper.

18   In framing the issue, you listed everything that I would

19   have put out there, and so I'm not going to bother

20   repeating myself -- yourself, rather.

21             SPECIAL MASTER:  And just remind me.  When did

22   you make this request to be appointed co-lead counsel?

23             MR. BONSIGNORE:  Just -- I'll pull it up.

24             SPECIAL MASTER:  So it was --  it was in --

25             MR. COOPER:  It was in a reply brief.

Page 25

1          MS. KIRKHAM:  It was on the schedule for the

2    opposition/response, that it was a joinder and request

3    -- a joinder in our motion and request to be added as

4    another lead counsel.

5          MR. BONSIGNORE:  It was either December 24th or

6    25th because I remember the preparation was less

7    than popular in my office.

8          MR. COOPER:  It was December 28th.  It was

9    December 28th, the due date for the oppositions.

10          MS. MOORE:  Your Honor?

11          SPECIAL MASTER:  Ms. Moore.

12          MS. MOORE:  First of all, I think the court has

13    changed the date of the hearing on the motion for

14    co-lead counsel to the 21st.  So there's a little bit

15    more time.  And I think that the court would be --

16          SPECIAL MASTER:  There's more time for the

17    judge.  There's not more time for me.

18          MS. MOORE:  No more time for you.

19          It seems to me the judge would be interested in

20    hearing or seeing your report, and I think that that

21    would inform him on the motion.

22          SPECIAL MASTER:  All right.  Anyone else have

23    any thoughts on this before we get down --

24          MR. BONSIGNORE:  I object to her logic.  I

25    think it's self-serving and makes no sense to me.

1          SPECIAL MASTER:  Noted.

2          All right.  All right.  Let's move on then.

3     Thank you for that.  Let's move on then to the issue of

4     the appropriateness of -- well, let me first ask a

5     preliminary question.

6          Mr. Alioto seemed to suggest in I think his

7     most recent filing that it might be possible to separate

8     the approval of the settlement amount with the

9     defendants, that is, the approval of the total amount of

10    the settlement as being fair, adequate and reasonable

11    and somehow separate or defer -- I wasn't quite sure

12    what was being suggested -- the issue of the fairness,

13    reasonableness and adequacy of the allocation plan.

14         Mr. Alioto, just before we get to the merits of

15    that issue, what did you have in mind there?

16         MR. ALIOTO:  Well, what I had in mind was this,

17    Your Honor.  The starting point for these settlements is

18    the settlement agreements themselves.  That sets out all

19    of the essential terms of the settlements.  That's what

20    we referred to as the settlement.

21         The plan of allocation is something that we,

22    the indirect purchaser lawyers, have put together.  It's

23    something that in our best judgment will effectuate the

24    settlements.  This is not all spelled out.  This plan of

25    allocations, the releases, the notice provisions, the

Page 27

1   various -- the various terms attendant to the underlying

2   settlements, they're not set out anywhere.  This is a

3   plan devised by indirect purchaser counsel in

4   consultation with experts and notice experts.

5           And what I meant to suggest there is that this

6   plan of allocation is reasonable.  This plan is

7   sustainable.  This plan ought to be implemented.  $576

8   million ought to be distributed to the claimants, but

9   our broader goal is to get something done.  And to the

10  extent Your Honor feels that yes, it's reasonable, but

11  I'd like to adopt plan B, which is also reasonable, or

12  plan C, which is also reasonable -- I have no pride of

13  authorship here.  I'm not dug in.  My goal is to get

14  this settlement approved.

15          That's what the thought is there when we cited

16  that law to you that says there's the underlying

17  settlements and there's the plan.  There may be

18  different ways to get this done to get everybody happy.

19  I don't -- I certainly am not advocating for these other

20  ways, but if those other ways meet due process and

21  they're fair and reasonable and we can accommodate

22  somebody's concerns, we're more than willing to do that

23  to get this done.

24          SPECIAL MASTER:  So hypothetically, and I

25  really mean hypothetically, would it create any problems

Page 28

1    in your mind if -- if I were to say all right, the
2    settlement vis-à-vis the defendants is fair, adequate
3    and reasonable.  $576 million, given all the factors
4    that you're supposed to consider, is an appropriate
5    settlement, but the plan of allocation proposed is
6    faulty in these ways.  That would have the result of not
7    sending you back to the negotiation table with the
8    defendants, but it would require you to do some in-house
9    tinkering perhaps with the allocation plan.
10           And I -- by suggesting it, I do not mean to
11   suggest I am headed in that direction.  I just throw
12   that out -- I just want to know if -- would that create
13   any procedural or legal problems if I were to proceed
14   that way?
15           MR. ALIOTO:  Yes.  No, that would be welcome.
16   One part of that would not be welcome was -- would be if
17   you were to come to the conclusion that our proposal was
18   not reasonable and not adequate, that -- that would
19   cause some concern.
20           But to the extent you felt that there were
21   other reasonable ways to approach this or other ways to
22   get this settlement approved and accommodate the
23   interests of objectors and the attorney general, we
24   would be open to that, and we would welcome this kind of
25   piecemeal approach, the underlying settlement approved,

```
                                                        Page 29
 1    then get on to the approval of the allocation.  And I'm
 2    not saying that has to be months apart.  But --
 3              SPECIAL MASTER:  Well, the settlement
 4    officially as proposed under this hypothetical would not
 5    be approved.  The terms of the settlement vis-à-vis the
 6    defendants would be approved, but you would have to go
 7    back and propose another plan of allocation to fix
 8    whatever defects I found.
 9              MR. ALIOTO:  Yes.  And again, I don't know that
10    you have to determine that they are defects.  I think
11    you could -- you could identify matters that could be
12    addressed and solved in different ways.  And I'm sure we
13    could put our heads together and come up with something
14    that's very close to what we proposed and that would
15    moot concerns.
16              SPECIAL MASTER:  Okay.
17              MR. ALIOTO:  I mean --
18              SPECIAL MASTER:  So I don't -- anyone else have
19    any thoughts about this?  What about the defendants?  If
20    I were to proceed that way, would that cause any
21    heartburn for the defendants?
22              MR. SCARBOROUGH:  Your Honor, Mike Scarborough
23    for the Samsung SDI defendants, and I'll attempt to
24    articulate a general defense consensus.
25              I think what Your Honor outlined would be
```

Page 30

1    constructive, and I think it would be welcome for our

2    side.  Our primary interest is in getting the

3    agreements, the contracts that we entered into approved

4    in terms of the amount of money being paid collectively

5    and the releases that we bargained for being approved as

6    fair, adequate and reasonable.

7          And we do believe that the allocation issues

8    logically can come later, later down the line.  And so

9    we would like to get at least past that first hurdle of

10   the underlying agreements vis-à-vis the defendants are

11   fair, adequate and reasonable and deserving of a final

12   approval.

13         And we do view many of the objections as really

14   going to allocation issues, and as a general matter we

15   don't have a problem with some tinkering being done to

16   the plan of allocation proposed by lead counsel.

17         SPECIAL MASTER:  Okay.  Mr. Scarpulla.

18         MR. SCARPULLA:  Yes, Your Honor.  On that --

19   first of all, I think I heard Mr. Scarborough say

20   something about the releases.  That's a different issue

21   than the amount of money because the releases, of

22   course, release claims by half the country for zero

23   consideration.

24         SPECIAL MASTER:  No, but -- I'm sorry to

25   interrupt.  But I mean hypothetically, you could say the

                                                             Page 31

1    releases are appropriate, but there's got to be some

2    compensation paid to those people --

3              MR. SCARPULLA:  Correct.

4              SPECIAL MASTER:  -- which is not an issue, I

5    take it, that would bother the defendants.  They don't

6    care how the money -- to whom the money is paid, they

7    just want their releases.

8              MR. SCARPULLA:  Yes, Your Honor, that is

9    correct, and I was getting to that point, which would

10   mean that the amount of money is therefore not

11   sufficient because you'd be spreading it out -- if they

12   settle for half the country, not the whole country, then

13   you'd be spreading it out over the whole country.  You'd

14   have to give new notice to everybody.  I mean, there are

15   all those issues.

16             And remember, as Your Honor may recall in LCDs,

17   we settled that case, including for the states,

18   $1.1 billion.  The conspiracy here was of longer

19   duration.  There were hundreds of meetings throughout

20   the world.  Hundreds more than in LCDs.  The affected

21   commerce was much larger, and the settlement was half

22   that amount and excluded three repealer states.  So if

23   you include them in, you'll have to get more money from

24   somewhere, Your Honor, to --

25             SPECIAL MASTER:  Okay.  Got it.

Page 32

1          MR. COOPER:  Can I supplement?  Maybe I'm

2     saying the same thing in a different way.  In order to

3     --

4          SPECIAL MASTER:  Try not to.

5          MR. COOPER:  In order to rule on the adequacy

6     of a settlement, you have to know what claims you're

7     settling.  Here we know that the claims of over half the

8     country were valued at zero.  And it seems very clear

9     from everything that's gone on, the amount of money that

10    was paid was paid for those claims which Mr. Alioto felt

11    had merit.  Nothing was paid for those claims which had

12    no merit in Mr. Alioto's view.

13         So if you're now going to pay money to those

14    people, you've got to take it away under that procedure

15    from the claimants whose claims were being settled for a

16    fixed amount of money, which reduces it by $1 or more,

17    reduces the amount available.

18         There's been however many notices that have

19    gone out that have told people if you're not in those 21

20    jurisdictions, you're not going to get paid.  You'd have

21    to be renoticing, seeing what objections there would be.

22         Now it might be possible to say that amount of

23    money takes care of the claims in 22 jurisdictions and

24    get rid of the national class and leave those

25    non-repealer people on to their own devices, to have a

1    different counsel represent them, attempt to get class

2    certification or whatever went on; to litigate the

3    issues of whether they have claims, or, as Mr. Alioto

4    says, they have no claim.

5          But to try to separate them here without

6    knowing how much money that's going to go to those

7    people, whether that now leaves an adequate amount for

8    the non-repealer states and for the repealer states --

9    you know, are they going to get one dollar, are they

10   going to get 50 percent of the money.  You'd need to

11   know all of those issues to be able to evaluate the

12   adequacy of the settlement.  So what claims are being

13   settled is the first question.

14          SPECIAL MASTER:  Okay.  I don't want to spend

15   any more time on this.  Anyone have something new that

16   hasn't been said before?

17          Ms. Moore.

18          MS. MOORE:  Your Honor, in order to approve the

19   settlement, there's certain foundational evidence that

20   needs to be in the record, and one of the things that

21   needs to be is that everything is valued, and not all

22   the claims are valued.

23          There was nothing in the record that any of

24   these other claims were valued, any of these states that

25   were left out or any of these non-repealer or repealer

Page 34

1   states that were left out.  There was no evidence that

2   they were considered and valued.  Not until later on in

3   the reply after it was attacked did they say oh, there

4   was no value.

5          So essentially they didn't consider them at

6   all, which makes the $576 million completely

7   inappropriate.  And so you can't approve the settlement

8   at that amount when all of these people being released

9   were never even looked at and valued.

10          SPECIAL MASTER:  Okay.

11          MR. SCARPULLA:  Excuse me.  There's one other

12   thing I think that Judge Tigar raised in the directs

13   maybe about evidence of what each class member would get

14   if there had been a successful trial as opposed to how

15   much they get in this settlement.  And I don't recall

16   seeing that in the record yet.

17          MS.  MOORE:  No, it has not come up in the

18   record, and we've asked multiple times.  In LCD we knew

19   exactly what each panel -- the damages were for each

20   panel, for each claimant.  So knowing the claims rate

21   and knowing the value of each is vitally important to

22   valuing the settlement.  And you can't approve the

23   settlement without that information.  And to this day,

24   it's still not in the record.  But we know that when

25   Janet Netz made her expert report and valued the whole

Page 35

1   case at $2.7 billion, there must have been an individual

2   damage analysis, which I know there was in LCD.

3           SPECIAL MASTER:  Did you want to respond to

4   that?

5           MR. ALIOTO:  Well, no.  We have certain issues

6   that we came prepared to address, and one of the things

7   that has not been addressed by objectors is the amount

8   of the settlement and the comparability to LCD and did

9   we get enough money.  I just want to note for the record

10  we -- we have enough issues to discuss here today.

11  That's something that has not been raised.

12          SPECIAL MASTER:  But the point --

13          MS. MOORE:  Well, it was raised.

14          SPECIAL MASTER:  Wait, wait.  The point that's

15  being made by Ms. Moore is you can't just -- the court

16  can't just say:  Okay, 576 million, that's a lot of

17  money, that's okay.

18          You have to know or have some sense of the

19  range of the value of each individual class member's

20  claim.  And they may be different values depending on

21  how they're situated and what they're going to get in

22  the settlement so that you can compare what a class

23  member would have gotten if they went to trial with what

24  they're getting in the settlement.  And Ms. Moore says

25  there's nothing to that effect in the record.

Page 36

1        MR. ALIOTO:  I'm pretty sure there is, Your

2    Honor.  And I know this for a fact, that we did that

3    analysis.  Our expert Janet Netz did that analysis.

4    What was the overcharge on tubes and monitors?  It was a

5    higher overcharge.  What was the overcharge on tubes in

6    small televisions?  What was the overcharge on tubes in

7    large televisions?  All of that analysis was done.

8        SPECIAL MASTER:  And is in her report --

9        MR. ALIOTO:  Yes.

10        SPECIAL MASTER:  -- which is in the record.

11        MR. ALIOTO:  Is in the record.  And it may have

12    also been cited when we filed our motion for preliminary

13    approval -- I'm going back a little ways here, but in

14    the northern district there is a rule that as part of a

15    preliminary approval motion, you have to make a -- as

16    part of your prove-up you have to show the damages and

17    the range of damages, and I'm quite sure that that

18    showing was made in our original papers.

19        SPECIAL MASTER:  All right.

20        MS. MOORE:  Your Honor --

21        MR. ALIOTO:  That's our response to that.

22        MS. MOORE:  It wasn't -- it's the panel --

23        SPECIAL MASTER:  You know, we've got to get on

24    with the meat of the objections here.

25        MS. MOORE:  Actually --

Page 37

```
 1              SPECIAL MASTER:  I don't want to go on much
 2     longer on this.
 3              MS. MOORE:  May I say one thing?
 4              SPECIAL MASTER:  Yes.
 5              MS. MOORE:  It is important to this meet the
 6     settlement.  You need the dollar amount per panel.  So
 7     we know that for a panel it was $65 in damages in LCD.
 8     We don't have that number in this case, so we can't
 9     evaluate it.
10              MR. COOPER:  I would just request that Mr.
11     Alioto -- we're not aware of where Ms. Netz's report,
12     damage study report for trial is in the record.  So I'm
13     not certain what he's referring to.
14              SPECIAL MASTER:  Was her -- wait, please.
15              Was her deposition taken?
16              MR. ALIOTO:  Yes.
17              MR. COOPER:  And filed -- they're not filed.
18     They're not in the clerk's office.  They weren't filed.
19     They're not available to generally -- generally to
20     people.  We never saw them.  We're lawyers in the case,
21     and we weren't allowed to see them.
22              SPECIAL MASTER:  Was her report not made an
23     exhibit to her deposition?
24              MR. ALIOTO:  It was -- it was an exhibit to her
25     deposition.
```

                                                     Page 38

1              MR. COOPER:  The deposition was confidential.

2              MR. ALIOTO:  But they're counsel of record.

3    They've signed the protective order.

4              SPECIAL MASTER:  All right.

5              MS. CAPURRO:  It's also in the record.  It was

6    filed as part of our opposition to summary judgment.

7              MR. COOPER:  Not an unredacted --

8              SPECIAL MASTER:  Was there a -- was there a --

9              MS. CAPURRO:  And it's also referenced in --

10             SPECIAL MASTER:  Was there a Daubert motion?

11             MR. ALIOTO:  Yes.

12             SPECIAL MASTER:  There was a Daubert motion.

13   So guess who ruled on it?  And so I certainly saw her

14   report.

15             MR. ALIOTO:  And when those are filed, Your

16   Honor, they're not in the court record, they're under

17   seal in the court record, but they go by separate email

18   to all of the indirect purchaser counsel because they're

19   parties to the protective order.  So these folks have

20   all that information.

21             SPECIAL MASTER:  Okay.

22             MR. BONSIGNORE:  I just -- make -- I did not

23   get it by email at all.  The information that would be

24   helpful to me in relationship to a case that I had that

25   was -- that we actually succeeded in doing what you're

Page 39

1    proposing was the claims rate.  We don't have any

2    information yet on the claims rate.  We don't know if

3    there's a surplus or whether people will get a cut down.

4    The excluded states, according to the terms of the

5    settlement agreement, you'd have to very carefully craft

6    language that would not cause them to waive their rights

7    to proceed in economic recovery.  And I'm just going to

8    cut it there.

9            Just with a grain of salt, I approached Mr.

10   Alioto at least a dozen times before today and asked him

11   to let's talk about it.  And although he's wide open to

12   the suggestion today, which is very positive, very good,

13   maybe it was something that you said, but before today,

14   he had dug in and wasn't going to change anything.  So

15   this is -- you've already made progress.

16            SPECIAL MASTER:  All right.  So the next issue

17   really I want to talk about is the merits of the -- are

18   the merits of the objections that have been raised to

19   the failure of the allocation plan with any monetary

20   compensation to the residents or the purchasers in the

21   non-repealer states and the three omitted repealer

22   states.

23            So I really don't need all those arguments

24   repeated, but if there's someone has something eloquent

25   to say -- Ms. Kirkham, I see you're raising your hand.

1          MS. KIRKHAM:  I'll work on eloquent here and

2     brevity.  Brevity perhaps more important than eloquence.

3          In the adequacy -- the adequacy of the

4     settlement with regard to the non-repealer state claims,

5     where we begin is with lead counsel's repeated

6     statements that they value the claims as zero.  So I

7     think we can agree that that's been established as a

8     fact.

9          We know that, for example, the 500 plus million

10    dollar settlement is compared in their papers to Dr.

11    Netz's $2.8 billion damage number.  That number is for

12    the 21 damage class states.  So those are the purchases

13    that occurred in those states.  We don't know -- we

14    could compute it if we actually had a per panel and some

15    information about sales of what it is in the other

16    states, but I don't believe Dr. Netz ever did that.

17          So we have, so we're beginning with the idea

18    that what we have, what you have before you and the real

19    fundamental question you have before you really is are

20    those claims valueless.  Are they meritless.  And are

21    they so demonstratively meritless that without affording

22    the possessors of those claims, the due process under

23    Rules 12 or 56, you can say that they should be released

24    here.  They should be dismissed with prejudice because

25    the effect of approving this settlement is exactly the

                                                    Page 41

1    same effect as a ruling on summary judgment on those

2    claims or a ruling on Rule 12 on those claims.

3            So that's essentially what you're doing, but

4    not in -- not affording them the due process of those

5    procedures.  So the claims have to be pretty

6    fundamentally meritless at the courthouse door for that

7    determination not to be made.

8            Now I'm not saying that determination is

9    impossible in a class action settlement, but generally

10   where you find judges and special masters being willing

11   to do that is where you have a situation in which you

12   have a factual disparity between two purported class

13   members so that you can look at one and you say you

14   bought the price fixed product.  And in a period that we

15   have evidence that the price was artificially inflated

16   and therefore we say -- I can look at you and say -- for

17   settlement purposes certainly I can say you were

18   injured.

19           And you over here, Mr. Jones, you bought the

20   product, or if it's a securities case, you traded the

21   security during the period that the evidence suggests

22   that the price was in fact competitive.  Maybe the

23   conspiracy was still going on, but it fell apart during

24   that period.  There's some evidence in the case, some

25   way the person purchased, some evidence that those

Page 42

1    purchasers did not damage the individual.

2         Now we come to the situation that we have

3    here -- and I really think that if you read the Sullivan

4    case, you can see that the third circuit was coming to

5    grips with this idea.  Is what we have here is a

6    situation in which you have two class members for whom

7    you can say they bought the same product under the same

8    circumstances, inflated the same way.  The only

9    difference is that they're standing on opposite sides of

10   a geographic boundary called a state line.  And on the

11   one side of the state line it's we're home free, and on

12   the other side of the state line you say you, because of

13   that, despite your factual claim, you can't possibly

14   recover under the factual claim.

15        We don't have that situation here.  Illinois

16   Brick doesn't do that.  Illinois Brick is a rule of

17   evidence fundamentally.  The Supreme Court was faced

18   with the choice it felt of overruling Hanover Shoe and

19   allowing defendants to put in evidence of passthrough or

20   enunciating a rule that said what's sauce for the goose

21   is sauce for the gander, and the plaintiffs can't put

22   that evidence into.

23        So if you are a plaintiff and you need evidence

24   of passthrough in order to establish your claim, you're

25   probably out of luck under Illinois Brick.  You still

1    actually have the right to come into court and attempt

2    to show why it doesn't apply to you.  It is not a rule

3    of standing.  It does not bar people at the courthouse

4    door, nor is it the indirect purchaser hostility act.

5            SPECIAL MASTER:  But why wouldn't it apply --

6    you know, assuming it's sound law and the Supreme Court

7    doesn't change its mind, why wouldn't it apply to all

8    the class members in these states?  What would be a

9    ground for someone saying I am --

10           MS. KIRKHAM:  It would --

11           SPECIAL MASTER:  -- I am entitled to make a

12   claim as an exception to Illinois Brick?

13           MS. KIRKHAM:  We're not -- we're not suggesting

14   exceptions to Illinois Brick.  We're not suggesting

15   claims and exceptions to Illinois Brick.  We're just

16   suggesting claims that fall outside of Illinois Brick.

17           SPECIAL MASTER:  All right.  Such as?

18           MS. KIRKHAM:  Okay.  Such as the claims for

19   equitable monetary relief.  They do not require proof of

20   pass on, and as soon as you have a claim that does not

21   require proof of pass on, Illinois Brick becomes a case

22   that sits over here and applies to other people.

23           What that is is a situation in which there is

24   the inherent power of the federal court to award in a

25   situation in which a person proves that the factual

Page 44

1    predicate of recovery, any recovery which appears in law

2    or in equity.  The Clayton Act specifically talks about

3    affording a recovery that is reversing, undoing the

4    overcharges the defendants collected.  There is

5    nothing -- the Ninth Circuit has never suggested -- in

6    fact, the Ninth Circuit has explicitly endorsed that

7    that is one of the policies of the antitrust laws.

8          The antitrust laws also -- there are tomes that

9    talk about the benefits that the antitrust laws convey

10   on society as a whole and the benefits of private

11   enforcement of those laws convey on society as a whole.

12         So there's not been probably a better situation

13   where someone is set up to make an equitable claim for

14   monetary relief than someone who is acting as a, quote,

15   private attorneys general and coming in and vindicating

16   a critical tenet of American not only jurisprudence, but

17   indeed of American economic theory and practice, and

18   that is competition.

19         SPECIAL MASTER:  Can I just interrupt a minute?

20   Am I correct that the state of the law on recovery of

21   equitable monetary relief in non-repealer states is

22   number one, everyone agrees there is no federal right to

23   such damage?

24         MS. KIRKHAM:  No, there is.

25         SPECIAL MASTER:  You're saying there is under

Page 45

1    the --

2           MS. KIRKHAM:  We're talking -- I'm talking

3    about someone who comes into federal court and alleges a

4    violation of the Sherman Act.

5           SPECIAL MASTER:  Okay.

6           MS. KIRKHAM:  Yes.

7           SPECIAL MASTER:  And then there are also -- you

8    maintain there would be cognizable state law claims for

9    equitable monetary relief in these non-repealer states,

10   yes?

11          MS. KIRKHAM:  Umm --

12          SPECIAL MASTER:  No?

13          MS. KIRKHAM:  Probably not in the non-repealer

14   states, only because a lot of their state courts have

15   said that -- well, let's put it this way:  There

16   wouldn't be unjust enrichment.  Whether there would be

17   the same kind of equitable monetary relief granted

18   simply for proof of the violation of the state law,

19   because the same argument about Illinois Brick that it's

20   a rule of evidence applies when it's applied in state

21   court to state law as well as when it's applied in

22   federal court to federal law.

23          But we're not talking -- there are a lot of

24   cases -- the cases that Mr. Alioto is citing about

25   unjust enrichment, we agree that they go the way they

```
                                                    Page 46

 1    go.

 2            When Illinois Brick first came down, lawyers

 3    for plaintiffs tried to avoid Illinois Brick by pleading

 4    unjust enrichment claims under state common law and

 5    unjust enrichment, and the state court said hmm-mm,

 6    we're not going to let you do that.  We're not going to

 7    let you just recast an antitrust claim as an unjust

 8    enrichment claim.

 9            I'm not talking about going back and trying to

10    do that, to get that reversed, and I am focused and we

11    are focused on the federal recovery -- federal monetary

12    recovery that the court in KeySpan talked about and that

13    the court in LCDs, Judge Illston, talked about when she

14    first analyzed that there's a federal right to this.

15    And therefore, the state of Oregon, which was saying we

16    can do it under a state law, she then leapt over and

17    said your state law follows federal law.  I think

18    there's a federal right.  Then I think there's probably

19    a state right.  And that was her decision on that

20    subject.  That's why she talks about Oregon law.

21            But she's not -- her analysis doesn't begin

22    with Oregon law, it begins with KeySpan, it begins with

23    a federal right that arises under the antitrust laws

24    that if I prove a violation of the antitrust laws, I

25    might not be able to prove pass-on because Illinois
```

1    Brick says I can't.  But if I prove this violation, I

2    can ask the court to give me a monetary equitable remedy

3    that is disgorgement or restitution.

4             SPECIAL MASTER:  Okay.  I can see that this

5    argument and this line of thought would be a wonderful

6    law review article, but is there any authority out there

7    that says in the federal context that there -- despite

8    Illinois Brick, we are going to allow you to pursue a

9    federal claim for equitable monetary relief?

10            MS. KIRKHAM:  There is the KeySpan case which

11   dealt with a governmental entity, and there is Judge

12   Illston's decision in LCDs.  There is judge -- the

13   adoption by Chief Judge Hamilton of Judge Renfrew's

14   report and recommendation in DRAM.  And then there are

15   the cases that we cited and the development of the law

16   this way that we cited in our brief from the antitrust

17   treatise that actually Mr. Varanini knows more about

18   than I do, since he was one of the editors or authors or

19   both.

20            SPECIAL MASTER:  And that's it?

21            MS. KIRKHAM:  And so far that's it.

22            SPECIAL MASTER:  Okay.

23            MS. KIRKHAM:  However, Your Honor, the decision

24   you're making is, is that enough that you can say all of

25   that goes away and zero is the right number, or does

1   that raise the question that the claim is valuable?

2           SPECIAL MASTER:  You're saying, I guess, that

3   there is a legitimate split of authority on this issue,

4   and, therefore, if there's a split of authority, you

5   can't say the claims are worth zero?

6           MS. KIRKHAM:  Actually, there's nothing against

7   it.  It's just not been litigated.  The authority is

8   actually all on the side of the claim.  The cases that

9   are cited against it in the briefs are not considering

10  it.

11          SPECIAL MASTER:  They're dealing with state

12  law.

13          MS. KIRKHAM:  They're dealing with state law

14  unjust enrichment claims or there -- there is the Ninth

15  Circuit case that wouldn't give the certain kind of

16  relief in the motor vehicles case that got cited down

17  the line for people saying so if you can't give federal

18  disgorgement, but when you read the motor vehicles case,

19  that's not what the Ninth Circuit was saying.  On -- it

20  wasn't considering this kind of question, and it wasn't

21  saying you can never get money in an equitable situation

22  if you're an antitrust plaintiff.

23          SPECIAL MASTER:  Okay.  Before I leave you and

24  hear from other people, you cited Judge Renfrew's report

25  and recommendation and you cited like page 300 and

Page 49

1    something.  And the report and recommendation that I

2    have from Judge Renfrew only goes up to page 200.

3           Are you referring to some other report.

4           MS. KIRKHAM:  Yes, the Lexis -- I'm citing to

5    the pages of the -- of Judge Hamilton's order adopting

6    it, which attached the whole thing.  So the paging is

7    off.  If you've got one from him, you have what he filed

8    in federal court, so you'd have what it looks like in

9    the docket.  What I was citing to is a brief.  I'm sorry

10   for the confusion -- was a Lexis.

11          SPECIAL MASTER:  Okay.

12          MS. KIRKHAM:  So everyone would be able to have

13   it because you'd have to otherwise go to the DRAM

14   docket.

15          SPECIAL MASTER:  Okay.  Just for everybody's

16   information, I have access to Westlaw.  I do not have

17   easy access to Lexis.  Just --

18          MS. KIRKHAM:  We'll send -- Your Honor --

19          SPECIAL MASTER:  -- limited resources at JAMS.

20          MS. KIRKHAM:  -- I will submit a letter that

21   redoes the citations to the -- I don't know if it's

22   still on Westlaw, but to the docket version, the DRAM

23   docket version of the report and recommendation.

24          SPECIAL MASTER:  All right.  Thank you.

25          Now, on this issue, does anyone else have

Page 50

1    anything to say?  I presume the answer is yes.

2            MS. MOORE:  I just wanted to point out that in

3    the original settlement in this case with Chunghwa, I

4    believe in their paper -- in the defendants' papers

5    where they were arguing for final approval, they argued

6    what is essentially the equitable monetary relief.

7            SPECIAL MASTER:  Who argued it?

8            MS. MOORE:  Chunghwa, and they said there was a

9    colorable federal claim in all 50 states, and they --

10   and the papers indicated that everybody would get paid,

11   which is why now here we are years and years and years

12   later and that's not happening.

13           So they -- they filed a -- it was the

14   plaintiffs who filed the motion for final approval, and

15   I think there were objections, and the defendants filed

16   an opposition or a reply to those objections, and it's

17   in those papers.  I can find them if you want.  They're

18   quoted in my original objection papers here, and then I

19   can find them for you if you want.

20           SPECIAL MASTER:  All right.  All right.  Mr.

21   Bonsignore.

22           MR. BONSIGNORE:  Briefly, Your Honor, there are

23   statutory claims in Massachusetts and New Hampshire,

24   although the New Hampshire ones might have postdated

25   prior to the settlements.  New Hampshire also had and

```
                                                    Page 51
 1   Massachusetts also have common law claims under their
 2   consumer protection statutes.  I cited those in the
 3   brief.  In fact, I was involved in both cases, and so I
 4   know them very well.
 5           With regard to Missouri, Missouri was in a
 6   similar situation as Massachusetts and New Hampshire was
 7   before the supreme court addressed it.  And, in fact,
 8   the attorney general of Missouri has taken a position
 9   that indirect purchaser claims are allowed under those
10   states.
11           SPECIAL MASTER:  Missouri is a repealer state,
12   isn't it?
13           MR. BONSIGNORE:  Yes, it shouldn't be a
14   problem, but if I got to beat a dead horse, I'll beat a
15   dead horse briefly.
16           SPECIAL MASTER:  All right.  Consider it
17   beaten.
18           MR. BONSIGNORE:  Briefly.
19           SPECIAL MASTER:  Did you want to respond on
20   this issue?  I don't know who is going to do it from
21   your side.
22           MR. ALIOTO:  I'm going to address it, if you
23   don't mind, Your Honor.
24           SPECIAL MASTER:  Before we -- before I give Mr.
25   Alioto a full -- full reign here, wasn't there some
```

Page 52

1    suggestion in one of the briefs that in the LG release

2    settlement, that the same type of release, same scope of

3    release was -- was given to LG that was given to the

4    defendants in these settlements and nobody raised a

5    peep.  Is that true or untrue?

6            MR. ALIOTO:  That's correct.

7            SPECIAL MASTER:  Okay.

8            MS. MOORE:  Your Honor, it becomes more obvious

9    at the time of distribution.  A lot of times it's not

10   obvious until we get to distribution and then you

11   realize there are issues.

12           MR. BONSIGNORE:  I was told by Mr. Alioto -- I

13   put it in my papers.  I was told repeatedly that my

14   states would be taken care of at the end.  And if I

15   hadn't heard that, I would have been jumping up and down

16   filing, objecting, going and zealously representing my

17   clients.  It's horrible that those states are left out,

18   especially Massachusetts, because our law is stronger

19   than the California law.  I know it's a debate, but I

20   always say it, and I'm going to say it now.  To leave

21   out those states is no excuse.  And once the mistake was

22   caught, it should have been corrected instantly.  I

23   don't know what someone is thinking to think that that's

24   the way it should go through.

25           SPECIAL MASTER:  Okay.  I really think I need

Page 53

1    to give Mr. Alioto a chance here or his designee.

2              MR. ALIOTO:   Okay.   Thank you, Your Honor.

3    Just for the record, Mr. Bonsignore's --

4              SPECIAL MASTER:   And let me focus your --

5              MR. ALIOTO:   -- statements about what I said

6    and what I didn't say, I'm not going to go into that.

7    It's not evidence, but I want the record to be clear on

8    that.   But go ahead, Your Honor, excuse me.

9              SPECIAL MASTER:   Yeah, I mean the -- I really

10   understand all the arguments you've raised, but the core

11   question is is there a split of authority here, a

12   legitimate, not concocted, but a legitimate split of

13   authority as to whether there is a federal right of

14   action that indirect purchasers in non-repealer states

15   could pursue?   And if there is that split of authority,

16   how -- how is it reasonable to value the claims at zero.

17             MR. ALIOTO:   All right.   Thank you, Your Honor.

18   I'd like to answer that, but I'd like to give Your Honor

19   the full picture of how these cases get settled and how

20   lead counsel in the exercise of his discretion --

21             MR. SCARPULLA:   We cannot hear down here, Mr.

22   Alioto.   I'm sorry.   He has to speak up.

23             MR. ALIOTO:   I think it would be important to

24   -- for Your Honor to hear the complete facts because

25   when we settle one of these cases, it's based certainly

1   on the underlying law, the viability of claims.  It's

2   based on the statute of limitations.  It's based on

3   other things as well, and this is very important.  This

4   is -- we're going to talk about notice or maybe we're

5   not going on talk about notice.

6           SPECIAL MASTER:  Yes, we are.

7           MR. ALIOTO:  We are going to talk about.  Well,

8   maybe I can -- I can give a little preview on the notice

9   because it really has to do with the valuation of claims

10  and how we arrived at this settlement.  And I know this

11  is all in the papers, but it's -- it's not -- maybe it's

12  not as clear as it can be how this notice program and

13  how the history of this case informed my decision to

14  settle on the basis that we did.

15          And by that I mean this:  There have been three

16  nationwide notices in this case: Chunghwa, LG -- the LG

17  was actually a combined notice of the LG settlement and

18  a notice of class certification, but that was a separate

19  nationwide notice.  Very similar to this third notice

20  when all the bells and whistles, newspaper, Internet,

21  email, very, very extensive.  Three programs, massive

22  notice programs.

23          The direct purchasers, they may have even given

24  more notices because I think they did their settlements

25  differently.  They may have had separate settlements,

Page 55

1    and they didn't lump them.  And there were at least

2    three notices in the direct case.

3            Now those notices were targeted at direct

4    purchasers, but they were nationwide in scope.  There's

5    publication in the Wall Street Journal, there's

6    publication in other publications.  There's wide

7    dissemination.  So you have six notices.

8            These claims and these cases, and these -- this

9    litigation against these defendants for these products,

10   it's no secret.  This has been going on for eight years.

11           There's also reference in the brief to

12   something known as a CAFA notice, and we just kind of --

13   kind of make passing mention to this.  This is really

14   not part of our notice program.  It's something that

15   defendants are required to do under the Class Action

16   Fairness Act.  Every time there's a preliminary approval

17   in one of these indirect purchaser cases, each defendant

18   who has settled and is going to be -- and their

19   settlement is going to be proposed for preliminary

20   approval, they prepare a CAFA notice.  This is what one

21   looks like.

22           It's very comprehensive.  It sends the attorney

23   general, attorneys general, all 50 of them all of the

24   important documents in the case: the notices, the

25   evidence, the rulings, the classes certified, the

Page 56

1    classes not certified, who the claimants are.  It's a

2    very comprehensive report by 52 -- by the defendant to

3    52 attorneys general and the Department of Justice.

4           I'll just hand that up to you for your

5    reference.

6           The point I want to make there, Your Honor, is

7    that in this case, there have been nine settlements, so

8    nine defendants, if my math is right, each of those nine

9    defendants sent out 51 CAFA notices.  Each defendant

10   notified every state attorney general in the United

11   States, and each defendant notified the Department of

12   Justice.  By my calculation that's 459 CAFA notices to

13   the highest ranking law enforcement officials in every

14   state.

15          Where are the attorney generals saying there's

16   viable law and I'm going to bring a case?  Where are the

17   attorneys general, people, law enforcement officers, not

18   people with axes to grind or not people with agendas,

19   law enforcement officers, where is the response to those

20   CAFA notices?

21          Well, one response is Mr. Varanini.  He's in

22   here, but he doesn't have any problem with the issues

23   that are being raised by these objectors.  I just want

24   Your Honor to be aware of these issues.  They're out

25   there.  They're out in the public domain, notices given

1   to the people that are charged with making these

2   decisions.  And when you don't hear anything from any AG

3   and there's no reaction and no -- certainly no contest

4   or no challenge by those law enforcement officers, that

5   really weighs heavily in my decision.

6           Let me add to that this:  Let's not forget the

7   importance of opt-outs.  Is there someone -- of course

8   this debate is not about, as you say, it's not a law

9   review debate.  It's not about these claims and are they

10  viable and is there -- is there law.  This is not an

11  academic debate.  This is a debate about is there a

12  client out there with a lawyer who wants to bring a

13  claim or is sitting on the sidelines thinking about

14  bringing a claim and we're wiping his rights out.

15  That's the issue.

16          It is highly, highly, highly improbable that

17  someone is going to step forward and assert some claim

18  against these defendants for a global cartel and seek to

19  establish damages on an individual basis and probably

20  even more difficult on a class basis for -- for one

21  state.

22          These kinds of things go into my analysis as

23  lead counsel in consultation with people that I'm

24  working with in the case, which are some of the best

25  people you can possibly work with in these cases.  This

Page 58

1    is what goes into my analysis.

2              So is it science?  Yes, it's science.  We

3    review the law.  We look at the standing issues.  We

4    look at statute of limitations issues.  We also take

5    this pragmatic approach:  What is the -- what is the

6    risk or what is the chance that after this case has been

7    around for eight years with multiple notices, with 459

8    notices to the attorneys general and the Department of

9    Justice, what's the chance that there is a live claim

10   somewhere out there that's being compromised?  Almost

11   nil, Your Honor.  You can't say zero, you can never say

12   zero, but I would say it's close to zero as you could

13   possibly get.

14             SPECIAL MASTER:  Okay.  So -- but you have to

15   notice that the difference between what was done here

16   and what was done in LCD, accepting your point that

17   claims by -- for any kind of monetary relief by people

18   in non-repealer states would be very challenging, would

19   be an uphill battle, accepting that, still the

20   defendants in this case I take it insisted on a release,

21   whereas in LCD those claims, as I remember, were not

22   released; that is, whatever claims, weak or strong, that

23   people in non-repealer states had for monetary relief,

24   were -- were not released in the settlement.

25             I don't know if my memory is right, but I think

Page 59

1    that's the case.

2              MS. KIRKHAM:  Yes.

3              MR. GOLDBERG:  That's correct.

4              MR. ALIOTO:  Yeah.  Now, LCD here --

5              SPECIAL MASTER:  So here the defendants got

6    releases, in LCD they didn't.  There could have been a

7    thousand reasons for that.  And it's -- I don't want to

8    go into them but...

9              MR. ALIOTO:  Well, I don't know that there's a

10   thousand, but there are different -- there were

11   different reasons because you had claims by AGs in that

12   case, actual pending claims that were different from

13   claims that were alleged as the classes, and there were

14   viable pending claims.  But when you come right down to

15   it, the question is was it reasonable to settle these

16   claims.  And I want to just focus on this distinction

17   for a minute because this is very important.

18             SPECIAL MASTER:  Before you take another

19   breath, how is the court reporter doing?

20             THE REPORTER:  I'm okay.

21             MR. ALIOTO:  Okay.  Remember, we throw these

22   terms around loosely or I try not to throw these terms

23   around loosely, but I want to focus on viable claim.

24   Viable claim means you analyze something, and that means

25   that if someone can provide the facts, the law will

Page 60

1    afford him a remedy.  That's what we're referring to

2    here.  Viable.  Does the law support the claims if the

3    facts bear it out.

4           That concept gets lost and gets confused with

5    this question of nuisance claims or -- or these un- --

6    unproven claims.  Nuisance claims.  And I -- I don't

7    think it's a good idea, and I don't think the class

8    action law in fashioning these settlements ought to be

9    giving consideration to be giving payments to claimants

10   for nuisance claims because sometimes you can get

11   payment on a claim if it's not viable.

12          So to the extent that's being suggested, and I

13   think it is.  Look, don't wash those claims out for

14   nothing because those people could have asserted these

15   claims and they could have gotten something.  Well, they

16   could have gotten something, but it would have been on a

17   nuisance basis.  I think that's very important to keep

18   that distinction.

19          The other -- not to repeat what's in the

20   briefs, but recently Judge Tigar in approving the

21   settlements in the direct purchaser case, he took note

22   of and was very important factors for him the number of

23   objectors and the number of opt-outs.

24          Here we have a very small number of objectors

25   and we've given you some background on those objectors,

Page 61

1    where they're coming from, and a couple of those

2    objectors have already dropped their objections.  But

3    you have a pretty good record on what those objectors

4    are about.  We have three opt-outs in this case after

5    eight years, after multiple notices, after 459 CAFA

6    notices.

7            SPECIAL MASTER:  Were any of those in --  were

8    any of those in non-repealer states?

9            MR. ALIOTO:  I don't know the answer to that

10   question.

11           SPECIAL MASTER:  Okay.

12           MR. ALIOTO:  But I want to emphasize this

13   opt-out mechanism because it's very important.  That's

14   what protects someone who thinks they have a claim or

15   that wants to make new law or wants to go off on

16   unproven ground and assert something.  They have the

17   opportunity to do that, and you can't just pooh-pooh it.

18           SPECIAL MASTER:  Fair point.  I think I know

19   the impact of opt-outs.

20           MR. ALIOTO:  All right.  So that's the notice

21   component, but it also bears on the -- on the releases.

22   This class has had probably unprecedented notice with

23   multiple -- with multiple notifications.  That's

24   important.  So how did we come to the -- our conclusion?

25   It's all in the brief.  The injunctive relief, not

Page 62

1    viable.  They're out of the business.  Sure, I could

2    have gone to the defendants and said --

3              SPECIAL MASTER:  I get injunctive relief.

4              MR. ALIOTO:  Okay.

5              SPECIAL MASTER:  The real -- again, just

6    tentatively, I'm not so troubled by the injunctive

7    relief issue.  I'm not so troubled by the damage issue.

8    The issue that is more troublesome is this one of

9    equitable monetary relief.

10             MR. ALIOTO:  Yes, and Your Honor, I'll just say

11   this -- it's in my papers -- it's completely

12   speculative.  There is no claim.  There is no client.

13   There is no lawyer.  There is no lawsuit.

14             SPECIAL MASTER:  Was a claim -- I -- it would

15   be helpful to me, Lauren, if you could see that I get

16   copies of or give me the docket numbers or something so

17   I can easily find copies of the four complaints in this

18   case, because I want to know what -- what was actually

19   alleged.  Was there ever a claim either for injunctive

20   relief or equitable relief or damages asserted on behalf

21   of the people in either the non-repealer states or the

22   three omitted repealer states?  Was there ever a claim

23   asserted and was it ultimately dismissed?  What happened

24   to it?

25             MR. ALIOTO:  Yes, it was asserted.  It was

```
 1   never formally dismissed.  It -- it -- it lingered on

 2   through the life of the case.

 3             SPECIAL MASTER:  So if I look in the fourth

 4   amended complaint, will I find it?

 5             MR. ALIOTO:  Yes.

 6             MR. COOPER:  It's pending is the answer.

 7             SPECIAL MASTER:  So it's there.

 8             MR. COOPER:  It's pending.

 9             SPECIAL MASTER:  It's in the works.  It was

10   never --

11             MR. ALIOTO:  It's an allegation.

12             SPECIAL MASTER:  Right.

13             MS. CAPURRO:  There was no injunctive relief

14   class certified at the class certification.

15             SPECIAL MASTER:  Right.  Okay.

16             MR. COOPER:  It was pending.

17             SPECIAL MASTER:  Mr. Bonsignore, you're just

18   going to have to chill down there and sit down.  I'll

19   get to you.

20             MR. ALIOTO:  All right.  Your Honor, if you

21   don't mind, I'd just like to have my colleague make just

22   a couple of remarks on this maybe to just sharpen some

23   of these issues up, Mr. Duncan.

24             MR. DUNCAN:  Your Honor, just very briefly, I

25   want to cut to the chase on the Illinois Brick
```

Page 64

1    question --

2              SPECIAL MASTER:  Oh, don't do that.

3              MR. DUNCAN:  -- and the federal disgorgement

4    claim.  So the question is whether there's a split of

5    authority, whether it's in some sense viable.  The

6    answer's no.  There's not a split of authority.  At most

7    it's a hypothetical law review article that someone

8    might want to write.

9              The Illinois Brick is the law of the land.

10   It's been the law of the land for 40 years.  If you

11   could end run Illinois Brick simply by filing a federal

12   disgorgement claim, Illinois Brick wouldn't exist, and

13   people would do that.  That's the way these cases would

14   be litigated.

15             SPECIAL MASTER:  Did any court ever say that?

16             MR. DUNCAN:  Absolutely.  We've cited one case,

17   a Ninth Circuit case that's controlling that says there

18   is no disgorgement remedy under a private plaintiff

19   under a federal law.

20             SPECIAL MASTER:  Okay.

21             MR. DUNCAN:  That's in our most recent reply

22   brief.  There's a Northern District of California case

23   to the same effect.  If you went around the country,

24   every time someone has tried to end run Illinois Brick

25   in this fashion, I'm aware of no case where a private

Page 65

1    class or private plaintiff have been allowed to pursue

2    those claims.

3             SPECIAL MASTER:  Okay.

4             MR. DUNCAN:  Now the objectors have stated that

5    governments -- it's arguably an open question whether a

6    government body can make use of a disgorgement remedy.

7    Private plaintiff --

8             SPECIAL MASTER:  So it's the State of Oregon?

9             MR. DUNCAN:  Correct.

10            SPECIAL MASTER:  Okay.  I thought I heard

11   Ms. Kirkham suggest that there were cases that said no

12   end run with respect to state law.

13            MR. DUNCAN:  That's absolutely true also.

14            SPECIAL MASTER:  But that there were no cases

15   with respect to the federal Clayton Act, Sherman Act.

16            MR. DUNCAN:  That's not true.  The cases hold

17   to the contrary.

18            SPECIAL MASTER:  And you've cited those in your

19   --

20            MR. DUNCAN:  Some of them, and there are others

21   in other circuits.  We've cited the Ninth Circuit law.

22            MS. KIRKHAM:  Your Honor, this is an

23   interesting point.  You're saying that there is a case

24   in which an antitrust price fixing class or plaintiff

25   tried to bring an equitable monetary claim, and the

Page 66

1   Ninth Circuit said Illinois Brick barred that claim
2   because you cannot end run --
3          MR. DUNCAN:  That's not what I said.  What the
4   Ninth Circuit held is that there is no disgorgement
5   remedy for a private plaintiff, not a class case.  We're
6   not talking about class action.  No private plaintiff
7   has a disgorgement remedy under Section 16, period.
8   It's a square hole, and there's -- the law is uniform on
9   that point nationwide.
10         SPECIAL MASTER:  Okay.  I don't want any more
11  argument about what the case says because we can read
12  it, so -- and make our own judgment for better or worse.
13         MS. KIRKHAM:  I also would just like to mention
14  that in LCD Oregon was acting as a private plaintiff.
15         SPECIAL MASTER:  Right.
16         MS. KIRKHAM:  It had a parens patriac claim.
17  It was not acting --
18         SPECIAL MASTER:  Okay.
19         MS. KIRKHAM:  You know that.
20         SPECIAL MASTER:  I do know that.
21         Okay.  I'm thinking of taking a break if we
22  have beaten this issue to death.  If there are other
23  people in the room who have something to say on the
24  repealer, you know, non-repealer issue and it's not too
25  long, let's get it out.

1           Mr. Bonsignore, you've been very active down

2     there.

3           MR. BONSIGNORE:  As to the allegation that

4     there was a nuisance claim with regard to the three

5     excluded states, there were no nuisance claims involved.

6     The Massachusetts statute allows for treble damages and

7     attorneys fees.  The New Hampshire allows for punitive

8     damages and attorneys fees.  I'm less familiar with

9     Missouri, but I'll rely on those two.

10          Mr. Alioto seeks to personalize the issues and

11    play the blame game, blaming the victims for not

12    objecting, blaming lawyers for not being present, and I

13    would like to remind him that lead counsel in a

14    nationwide class action is obligated to represent the

15    interests of all class plaintiffs including the named

16    and unnamed plaintiffs in each and every state

17    encompassed within the class they seek to represent.

18    That's Radcliffe, 715 F.3d 1.57 at 1167.

19          SPECIAL MASTER:  These points have been made

20    very cogently and repeatedly in the briefs.

21          MR. BONSIGNORE:  Okay.  Then I would -- then

22    I'll -- I'll just skip over the law.  I'm sure you've

23    read it.

24          As to the statements that Mr. Alioto was making

25    that there were no lawyers and no plaintiffs available

Page 68

1    to him, I became apoplectic, as you noticed.  I request

2    only to be able to supplement the record based on his

3    statements.  I submitted evidence, unequivocal evidence

4    that Mr. Alioto was aware of plaintiffs in Massachusetts

5    and New Hampshire and Missouri and that he ignored them.

6    He wasn't even aware that he was aware.  There were

7    emails to him.  After he was reminded, they changed

8    their argument in their reply brief.

9          So in light of the fact that he made an

10   absolute false statement that can be objectively blown

11   up with the allowance of my supplement, I would request

12   that formally.

13          SPECIAL MASTER:  Okay.  Any requests to

14   supplement the record should be made in writing.

15          Yes, sir?

16          MR. SCARBOROUGH:  Yes, Your Honor, again Mike

17   Scarborough for the Samsung SDI defendants.

18          With respect to Massachusetts just, you know,

19   this case goes a long way back.  There was a claim on

20   behalf of Massachusetts consumers originally brought in

21   the case.  We filed, defendants, multiple motions to

22   dismiss, and we had very able opposition to those

23   motions from lead counsel.  Those were hard fought

24   battles, and ultimately I believe it was two different

25   rounds of motions to dismiss, and we had various attacks

Page 69

1   on that claim mostly on procedural bases.  Defendants

2   won.  So it was a claim that was litigated extensively

3   and that was thrown out, and defendants prevailed on a

4   motion to dismiss.

5           MR. BONSIGNORE:  In response, Your Honor --

6           SPECIAL MASTER:  Wait, wait, wait.

7           MR. BONSIGNORE:  Okay.

8           SPECIAL MASTER:  I just need to do this one by

9   one.  As I understand it, Judge Legge finally lost

10  patience and dismissed the claim for failure to make

11  some what he considered necessary allegation.  The

12  defendants prevailed.  The claim was gone.  But Judge

13  Legge said in his -- in his decision this would not bar,

14  you know, the bringing of a valid claim later on.

15          Do I have it right.

16          MR. SCARBOROUGH:  I'm not -- again, it's been a

17  while since I looked at these papers.

18          SPECIAL MASTER:  That's just what --

19          MR. SCARBOROUGH:  I don't know if that last

20  part is correct necessarily, but I don't think it was

21  necessarily an invitation for lead counsel to pursue

22  such a claim.

23          SPECIAL MASTER:  Okay.

24          MR. BONSIGNORE:  Your Honor, lead counsel is

25  the only person who has the responsibility to do that.

Page 70

1   And beyond that on that point, it was a procedural issue

2   that could have been corrected in three seconds by the

3   issuance of a subsequent demand letter, and it would be

4   totaling, it would go back, and that would be that.

5           And I will also point to Kayes versus Pacific

6   Lumber Company 51 F.3d 1449 --

7           SPECIAL MASTER:  We can't -- if you're citing

8   cases that aren't in your brief, I --

9           MR. BONSIGNORE:  No, they're in the brief.  I'm

10  just reminding -- I'm highlighting them.  Kayes versus

11  Pac. Lumber, 51 F.3d 1449.  The responsibility of class

12  counsel to absent class members whose control over their

13  attorneys is limited.  And that's the point that I'm

14  making.  The class members, lawyers other than lead

15  counsel, and more in this case than any other case I've

16  been in, had no sway whatsoever.  He ran it like a

17  dictatorship.  We had no control.  All we could do was

18  argue and complain.

19          SPECIAL MASTER:  All right.  Thank you.

20          Ms. Moore, final, final, yes.

21          MS. MOORE:  With regards to Massachusetts, Your

22  Honor, an error was made.  An error was made two times.

23  It could -- Massachusetts could still have been valued

24  and put in the settlement and was not.  And this is a

25  case in LCD.  We just -- between Massachusetts and

Page 71

1    Missouri, my partial investigation -- I haven't talked

2    to all the aggregators, but there was 41 and a half

3    million dollars distributed in LCD between those two

4    states alone.

5              SPECIAL MASTER:  Okay.  Well, let me --

6              MS. MOORE:  So this is a valuable case that

7    they could have valued and put in the settlement and

8    they chose not to.

9              SPECIAL MASTER:  Okay.  Is it the duty of lead

10   counsel -- and I know we have a number of people in the

11   room who have served as lead counsel.  Is it the duty of

12   lead counsel to go around to every state and phone

13   lawyers and say, you know, go make a claim, go scrounge

14   around and get a class representative.  Is that part of

15   the fiduciary duty of lead counsel?

16             No, Mr. Bonsignore.

17             Go ahead.

18             MS. MOORE:  Yes, Your Honor, I think he's

19   putative counsel -- he's counsel -- lead counsel is

20   appointed and is given this duty, and it is his

21   responsibility to make sure that these claims are

22   pursued.  And I do think he has a right to make sure --

23             SPECIAL MASTER:  But is it his duty --

24             MS. MOORE:  -- that people are not left out.

25             SPECIAL MASTER:  Is it his duty to find claims,

Page 72

```
 1    to unearth claims, to create claims?

 2              MS. MOORE:  Well, actually, even in this case

 3    it isn't even relevant because we had plaintiffs.  But

 4    yes, I do think he should do that, and, in fact, there's

 5    law that --

 6              SPECIAL MASTER:  You had plaintiffs in

 7    Massachusetts.  Did you have plaintiffs in New Hampshire

 8    and Missouri?

 9              MS. MOORE:  Yes.

10              SPECIAL MASTER:  Okay.

11              MS. MOORE:  They existed.

12              SPECIAL MASTER:  And what happened to them?

13              MS. MOORE:  They just were never pursued.  They

14    were just abandoned.

15              SPECIAL MASTER:  Okay.

16              MR. SCARBOROUGH:  Your Honor, just one very

17    quick point to add on Massachusetts.  As I recall, there

18    were attempts to cure the defect with the -- it was

19    basically sending a demand letter, and lead counsel did,

20    and whatever associated Massachusetts counsel did try

21    and fix that defect.  The defendants argued at that

22    point you couldn't do it.  You couldn't fix it.  This

23    was not a problem that could be remediated, and the

24    claim had to be thrown out.

25              And as I recall it, that was the view that
```

Page 73

```
 1    prevailed with Judge Legge.  So these arguments to the
 2    contrary that hey, this was simply send a later demand
 3    letter and it can all be fixed is just not true, it's
 4    just not what Judge Legge found.
 5            SPECIAL MASTER:  I'm going to ask and then
 6    we're going to take a break.  I want someone to tell me
 7    dispassionately without a lot of adjectives and
 8    invective what happened in New Hampshire and what
 9    happened in Missouri.
10            No, I'm going to get another volunteer, Mr.
11    Bonsignore.
12            MS. MOORE:  The claims were never filed.  There
13    was never a claim filed --
14            SPECIAL MASTER:  Okay.  I'm going to ask --
15            MS. MOORE:  -- by lead counsel.
16            SPECIAL MASTER:  Ms. Moore, thank you.
17            Go ahead.
18            MR. ALIOTO:  Thank you, Your Honor.  From lead
19    counsel's perspective, you can only bring claims for
20    those people who stepped forward and wanted to assert a
21    claim.  We gathered all of the claims, all of the
22    complaints that were filed at the institution of the
23    case.  We reviewed those.  Some -- there was an
24    extensive vetting process that went on for months.  Some
25    claimants survived that process.  Others didn't.
```

Page 74

1        There were also discussions as the case went on

2    to -- to the later years of the case.  There were

3    discussions about other class representatives,

4    discussions with lawyers who thought they had clients,

5    and those were vetted up the line and eventually to me,

6    and decisions were made as to the viability of

7    plaintiffs.

8            SPECIAL MASTER:  So what happened in New

9    Hampshire and Missouri?

10           MR. ALIOTO:  There was never any plaintiff that

11   I -- certainly I didn't represent anyone, and no

12   plaintiff in Missouri was ever brought to my attention

13   as being out there and wanting to press a suit.  That is

14   the absolute fact.

15           It was, as is the case in a lot of these

16   multistate cases, sometimes there are not claimants for

17   these states.  This is a big responsibility, Your Honor,

18   to step up in one of these cases.  You know what goes

19   into that.

20           SPECIAL MASTER:  Okay.  What about New

21   Hampshire?

22           MR. ALIOTO:  I don't believe there was ever a

23   client proffered.  Mr. Bonsignore has mentioned

24   something in his papers about late in the game that

25   there was a -- he had someone and someone was ready to

Page 75

1    go.  I viewed that with extreme caution because when you

2    make a decision like that to put somebody forward for a

3    state, it's very important.  It's not only important for

4    that state, it's important for the whole case.

5            SPECIAL MASTER:  I remember your briefing on

6    this point now.

7            MR. ALIOTO:  The statute had run.  The simple

8    answer is without the invectives, the statute had run at

9    the time he brought that up.

10           SPECIAL MASTER:  Okay.

11           MR. ALIOTO:  But can I make one point without

12   invective or adjective?  We have quite a different view

13   about abandoning and not representing and, you know,

14   sloughing people off.  But, you know, the simple answer

15   to that is Ms. Moore and Mr. Bonsignore and all these

16   other people after the fact, you got the papers.  You

17   know what classes are represented and are not

18   represented.  Go out to the federal courthouse.  File a

19   complaint.  The complaint will be transferred into this

20   district, and we would love nothing more for them to

21   have done that at the time.

22           I can't dictate to them.  If they had a client

23   and they felt strongly about this, file a case, it will

24   be transferred in, and we'll deal with it.  But after

25   the fact, you know, after the money is in the bank and

Page 76

1   Mr. Alioto, you didn't do this and Mr. Alioto, you

2   didn't do that, well, we did $576 million worth of right

3   things.  And that's what we're trying to get approved.

4   And this is -- with all due respect to these objectors,

5   this is just -- let me say it's a side show.  Thank you.

6           SPECIAL MASTER:  Okay.  We're going to take a

7   break now for like ten minutes, and then we'll come back

8   and deal with the other issues.  Thank you.

9           (Recess 11:34 a.m. to 11:47 a.m.)

10          SPECIAL MASTER:  I'd like to move on to the

11  notice issue.  If anybody has anything more to say on

12  this repealer issue, you can say it at the end when I

13  give you a chance to raise any issues that haven't

14  otherwise been raised.  But we need to cover the

15  waterfront here, so I'd like to move on to the issue of

16  whether the notice was adequate again.

17          I've read the briefs, I understand the problems

18  that have been raised with the notice.  I understand the

19  responses of lead counsel and the declaration -- various

20  declarations of Mr. Fisher.  So, you know, I think I'm

21  pretty well up to speed on this, but I'd like to hear --

22  give you a chance to say anything that needs saying.

23          Anyone from the objectors side like to be heard

24  on this issue?

25          MR. SCARPULLA:  Francis Scarpulla, Your Honor.

1    I think we said it pretty much in our brief, and I am

2    not going to repeat that.  We just would urge that Your

3    Honor may wish to consider hiring an independent expert

4    to opine on it.

5             Now I've done a hundred-plus notices, and so

6    when you see one where the only evidence -- where the

7    only hard evidence you have is a reach of 58 percent,

8    then there is a problem, especially since as Mr. Fisher

9    points out, if you use the early years, the class

10   members were between six years old at the start of the

11   period and 18 at the end of it if you use his early

12   years.  I don't even think they had -- even at the end

13   of the period, 18 year olds don't have the right to form

14   contracts.  Put that aside.

15            If you use his later years, then it's 12 to 22.

16   I'm sorry, 10 to 22.  Those are -- that's the ages of

17   the people that he targeted during the -- during the

18   period of the -- of the price fixing.

19            And again, those TVs as -- as the LCDs came

20   into the market, there was a great decline in the sales

21   of CRTs, and they were being bought by individual family

22   units that didn't have a lot of money because they were

23   much cheaper than the LCDs.  And to target someone who

24   had income of 60,000 or more misses a whole group of

25   those individual class members.

1           And one thing that Your Honor may ask for,

2    which I have not been able to get, I don't know the

3    number of individuals, human beings who have made

4    claims, and that's something that I would respectfully

5    suggest Your Honor may wish to find out.

6           Now we know that there are the big corporations

7    that put in claims, but the question is how many natural

8    persons put in claims.  So I'm not going to repeat

9    anything else in the brief.

10           SPECIAL MASTER:  Okay.  You said the only hard

11    evidence is that the reach was 58 percent.  I mean Mr.

12    Fisher says it was 83 percent.  Why is that not hard

13    evidence?

14           MR. SCARPULLA:  Because he's saying -- he's

15    saying I think our Internet reached so many people, but

16    there's nothing -- you have no hard evidence that

17    anybody saw it or that they did anything about it.

18           SPECIAL MASTER:  So I don't know how many

19    clicks and so on?

20           MR. SCARPULLA:  You have no idea.

21           SPECIAL MASTER:  All right.

22           MR. SCARPULLA:  And in fact, Your Honor, they

23    had to come to the DRAM database and get that database

24    from us to send out supplemental notices because the

25    notice program was so -- was so flawed.

1          SPECIAL MASTER:  Good.  Anyone else have

2     anything to add on this issue?

3          Mr. Alioto, why would it not be interesting to

4     know this data:  How many claims have been submitted,

5     what's the dollar volume, what's the -- where are they

6     from, how many are natural individuals, how many are

7     from the state of California to satisfy the attorney

8     general?  Why would it not be interesting to know that

9     and evidently has not been made available?

10          MR. ALIOTO:  Yes, thank you, Your Honor.  Mr.

11     Duncan and Mr. Novak are going to be responding to those

12     notice issues.

13          SPECIAL MASTER:  Okay.  Mr. Duncan.

14          MR. DUNCAN:  Sure.  Your Honor, Matthew Duncan

15     from Fine Kaplan again.

16          I think -- I think in a vacuum that information

17     will be interesting.  The problem -- the issue is that

18     the process is ongoing.  Claims are still -- many were

19     received at the end.  The claims administrator is still

20     processing that and then certainly that information is

21     going to be known to the court.  The issue is that it's

22     not -- it's not germane to settlement approval and

23     whether the standard for notice is met ex ante.

24          So bear in mind, the extent to which all of

25     these issues were considered exhaustively at the

Page 80

1    preliminary approval stage.  Everything that was going

2    to be done notice-wise was vetted then.  It was done.

3    There's an extensive record at this point about

4    everything that was done and the effectiveness of it.

5            To speak briefly to the point that there's no

6    hard evidence about the reach statistic, that's just

7    wrong.  I mean, Mr. Fisher's declaration includes

8    exhibits that say, you know, for the digital outreach

9    precisely what was done, the number of impressions.

10   Google, for example.  Google is the search engine.

11   There were Google banner ads done throughout the Google

12   ad network.  Google search results, paid search results

13   were returned.  This is just one example of the digital

14   outreach.  Two hundred million plus impressions on that

15   kind of thing.  And the data is in Mr. Fisher's

16   declaration.

17           SPECIAL MASTER:  By impressions, what do you

18   mean?

19           MR. DUNCAN:  Well, by impressions, that means

20   that when something in the Google network, in the Google

21   ad network website is visited, there's a banner ad that

22   someone sees.  Now whether they actually click on that,

23   you don't know.  We don't have that data.  But you know

24   that someone saw the banner ad within the network.  And

25   so that's what the impression data does.  And there's a

1    long list of digital outreach that was done.  We have

2    the impression data for all of that.  And then what Mr.

3    Fisher does is feed that data into the comScore system,

4    which is what marketing professionals and everyone else

5    uses to do this, to calculate the reach.

6            So at the end of the day, Mr. Fisher has

7    explained what he did.  He's given you the data that

8    went into comScore and then the comScore is the upshot

9    of all of that.  And nobody has really -- it's the way

10   it's done, and nobody has shown otherwise in any of the

11   projections.

12           So the reach is the reach.  It's well within

13   the standard.  It's -- it's best -- best practicable

14   notice for all of those reasons, and we think the record

15   is more than robust to find the notice requirements have

16   been met.

17           SPECIAL MASTER:  So when -- when would you

18   expect to provide this information to the court assuming

19   I don't tell you to do it sooner at the -- at the time

20   the final papers are filed on the motion for final

21   approval?

22           MR. DUNCAN:  I think Mr. Alioto probably knows

23   a little bit more about this than I do.  But

24   conceptually, I mean, that's part of the claims process

25   reporting that would happen at the allocation phase.

1          MR. ALIOTO:  We intend to be doing that,

2     although there is this issue raised by the state of

3     California about extending the deadline, so to the

4     extent it's extended, you won't have it complete until

5     that deadline runs.

6          SPECIAL MASTER:  But can't we know how things

7     stand now?  I mean, I understand the argument that a

8     court has to evaluate a notice program ex ante before it

9     knows how it's actually going to work and make a

10    decision as to whether it's the best practicable.  And

11    the court here has done that.  But gosh, just common

12    sense tells you it might be nice to see what the results

13    are.

14          MR. ALIOTO:  I will check with the

15    administrator today and report on where he is and

16    whether and when that information can be made available.

17          SPECIAL MASTER:  And if it's robust, I should

18    think you'd be the first one to be trotting it out

19    there.

20          Okay.  Anything else on notice?  Let's see if I

21    have any questions.

22          MR. COOPER:  Your Honor, I assume that our

23    suggestion about an independent expert is something

24    you're considering?  I mean, I'm not asking for a

25    response.  I just -- you haven't rejected it?

Page 83

1            SPECIAL MASTER:  I know -- I have not rejected

2    it.

3            MR. COOPER:  Right.

4            SPECIAL MASTER:  I mean -- say I were to do

5    that.  What -- what different information would they --

6    I mean I guess they might provide an opinion that's

7    different than Mr. Fisher's opinion, but then I just

8    have a battle of experts, and how has the ball been

9    advanced?

10            MR. DUNCAN:  Your Honor, that's a good point

11    and it is -- Mr. Fisher is an expert.  He's done this

12    many times.  His CV is in the record.  Everything he's

13    done is in the record, and all of this would lead at

14    most to quibbling about how a different expert might do

15    something slightly differently at the margin.  And

16    that's not the standard for whether notice is

17    reasonable.  The standard is whether it's reasonable on

18    its own terms, not whether different lawyers might have

19    done something differently on margin or whatever.

20            SPECIAL MASTER:  Okay.  Mr. Scarpulla or Mr.

21    Cooper, or you can both speak at once.

22            MR. SCARPULLA:  Yes, Your Honor, the reason

23    that you -- the reason for an independent expert is so

24    that he or she can tell you the flaws in the notice

25    program that Fisher -- Fisher is --

Page 84

1           SPECIAL MASTER:  Or the absence of flaws.  If I

2    hire an independent expert --

3           MR. SCARPULLA:  -- or absence of it.

4           SPECIAL MASTER:  -- not one that you suggested,

5    if I hire an independent expert --

6           MR. SCARPULLA:  Correct.

7           SPECIAL MASTER:  -- he might say or she might

8    say everything is dandy.

9           MR. SCARPULLA:  You're absolutely right.

10          SPECIAL MASTER:  Is that correct?

11          MR. SCARPULLA:  That's absolutely correct.  And

12   then you -- Mr. Fisher was a former lawyer who didn't

13   make it in the practice of law and decided to go into

14   this business.  You can't do --

15          SPECIAL MASTER:  We all make life choices.

16          MR. SCARPULLA:  You can't do nationwide notice

17   of any significance for $1.5 million.  That's not

18   possible.

19          SPECIAL MASTER:  I noted that figure.

20          MR. SCARPULLA:  It would cost at least 4 or 5

21   million to get the kind of reach to 80 or plus percent,

22   and that's the whole point of having an independent

23   expert.

24          MR. COOPER:  I would just say, Your Honor, that

25   I think you put your finger on it.  This is an

Page 85

```
 1    independent expert, someone that works for the court
 2    who's not in an advocacy position.  It's not like you
 3    get two sides putting up their own experts who are
 4    advocating for the two sides.  This is someone who would
 5    evaluate it, and give you an independent view.  And I
 6    think that's a totally different thing.  You'd have
 7    to -- they might say it was fabulous and put an end to
 8    all these questions about notice.
 9              SPECIAL MASTER:  Or they might be competitors
10    of Mr. Fisher and love to get a whack at him, you know,
11    so...
12              MR. COOPER:  Well, I guess that's a theoretical
13    possibility but...
14              MR. ALIOTO:  Your Honor, let's not forget, when
15    we were working on the schedule, and the objectors
16    needed all of this time and this elongated schedule,
17    there were statements made by Mr. Scarpulla that he
18    needed time to retain an expert.  Well, he got the time,
19    but he has not retained an expert.  Instead, he's come
20    in and said well, we're not going to retain anybody.  We
21    want you to go get an independent expert.  There's no
22    basis on this record to do that, especially after he
23    initially indicated that he was going to pursue that
24    himself.
25              SPECIAL MASTER:  Okay.  Mr. Bonsignore?
```

1          MR. BONSIGNORE:  Yes.  Mr. Alioto is entitled

2     to an opinion, but so is Mr. Scarpulla and the other

3     objectors.  It was one option to hire the excluded

4     plaintiffs' reviewer.  The smarter option is to have the

5     court hire their own because then it's absolutely

6     independent and it wipes out the argument oh, it's a

7     battle of the experts.  That's gone.  So you're

8     presented only with -- I'll summarize my -- so you're

9     presented only with someone who you hired and the

10     argument that it's a battle of the experts is entirely

11     eliminated.  Thank you.

12          SPECIAL MASTER:  All right.  The next issue

13     that is on my mind is this -- the impact of the Chunghwa

14     settlement.  And I confess to be confused as to what the

15     objectors are really saying is the problem created for

16     this settlement by the terms of the Chunghwa settlement.

17     I forget who -- whether it was Ms. Moore who -- go

18     ahead, Mr. Cooper --

19          MR. COOPER:  I think --

20          SPECIAL MASTER:  -- or Ms. Kirkham.  Either

21     one.

22          MR. COOPER:  Go ahead.

23          MS. KIRKHAM:  We didn't say that it was a

24     problem for the settlement approval.  We said it was a

25     problem for the approval of the plan of allocation

Page 87

1   because the plan of allocation ignores the existence of

2   the Chunghwa settlement.  And the Chunghwa settlement

3   has some very specific terms in it about how the money

4   is to be paid out and to whom.  So that was what we

5   raised.

6          We simply said that it was -- that the problem

7   was that the Chunghwa settlement, which is final,

8   provides a plan of allocation.  That plan of allocation

9   is not incorporated into this plan of allocation, and

10  this plan of allocation would -- is inconsistent with

11  that plan of allocation.

12          SPECIAL MASTER:  How?

13          MS. KIRKHAM:  Okay.  The Chunghwa --

14          THE WITNESS:  I know your brief said this but I

15  --

16          MS. KIRKHAM:  That's okay.  I can go through it

17  fairly quickly.

18          The Chunghwa allocation provides for the

19  settlement money to be divided up among certain states

20  with -- proportionate to census data.  So they would --

21  so it creates pots that are fixed amounts.  Then claims

22  would be solicited.  So -- as opposed to a pro rata

23  among all of the people that the plan of allocation

24  deemed entitled to receive money, which is the current

25  plan, you can see there'd be a real difference if

Page 88

1   there's $10 million in California's pot and $7 million

2   in Arizona's, or $5 million or -- well, some other

3   state.  Arizona is not a good, actually, example.

4           MR. COOPER:  It also includes Illinois, Oregon

5   and Washington.

6           MS. KIRKHAM:  Right, it does include Illinois,

7   but the point I'm trying to make --

8           MR. COOPER:  It generally includes

9   distributions to Illinois, Washington and Oregon who are

10  excluded --

11          (Reporter clarification).

12          The distribution in the judgment includes

13  payments to Illinois, Oregon and Washington AGs who are

14  not in these settlements.  But there is no provision for

15  that coming out.  And also that class, that settlement

16  class includes resellers of product.

17          SPECIAL MASTER:  So what should we do?

18          MR. COOPER:  I think it's a problem.

19          SPECIAL MASTER:  Okay.

20          MR. COOPER:  You have to re-notice.

21          SPECIAL MASTER:  Thank you.  But what do I do

22  about it?

23          MR. COOPER:  Well, you disapprove it, is what

24  you do.  You've got to re-notice people in other states.

25  You've got to carve out the money.  You have to tell

Page 89

 1    people what's happening.  I just don't -- you can't just

 2    ignore it.

 3              SPECIAL MASTER:  Okay.  I'm sorry to be

 4    plodding here.  But to whom do we have to give notice

 5    now?

 6              MR. COOPER:  Well, if the class includes

 7    resellers, you have to now have a notice which says that

 8    resellers can claim against this pie.

 9              SPECIAL MASTER:  Okay.  Because the Chunghwa

10    settlement includes payments, potential payments to

11    resellers --

12              MR. COOPER:  Right.

13              SPECIAL MASTER:  -- whereas this one doesn't.

14              MS. KIRKHAM:  Doesn't.  And the Chunghwa notice

15    told resellers they would be paid at a later date.

16              SPECIAL MASTER:  Okay.  So let me see if I get

17    it.  You're saying there are two significant differences

18    between the allocation plan in Chunghwa and this

19    allocation plan.  One is resellers get money from

20    Chunghwa.  They don't here.

21              Number two is there's a different formula for

22    distributing money state by state in Chunghwa than the

23    pro rata plan that is proposed here.

24              MS. KIRKHAM:  Yes, yes.

25              SPECIAL MASTER:  I got it.

1          Mr. Alioto.

2          MR. ALIOTO:  Yes.  There's no inconsistency.

3     First of all, with respect to resellers, the notice

4     that's in our brief, the notice is quite clear that

5     because of the relatively small amount of money paid

6     under the Chunghwa settlement, that would be the

7     settlement for the ten million dollars plus the proffer.

8     Because of that small amount, it would not have been

9     practicable to actually allocate money.  And the notice

10    recites -- I'll try to find that cite in the brief, but

11    -- it's in our most recent brief.  We cite to the notice

12    that says resellers, you may not get money.  And that

13    was put in there because of the small amount of the

14    settlement.

15          And so there's never been any expectation or

16    promise that they would get money as part of that

17    Chunghwa settlement.

18          SPECIAL MASTER:  But I'm being told there was

19    final approval of the Chunghwa settlement, and in that

20    settlement was a provision for giving money to

21    resellers.

22          MR. ALIOTO:  Well, I would have to see that.

23          SPECIAL MASTER:  Isn't that a final judgment?

24          MR. ALIOTO:  Well, that's -- no, I think what

25    they're saying is in that -- they're referring to orders

1   that there was a provision to give money to states.

2        There's two issues here.  One is resellers.

3   That issue, I submit, is very straightforward.  Because

4   of the small amount, we recognized at the time that

5   there might not be money to distribute.

6        SPECIAL MASTER:  Well, it may be a small

7   amount, but we have the small issue of a final judgment

8   that says they get money.

9        MR. ALIOTO:  I don't believe that's recited in

10  the final judgment, Your Honor.  It's been quite a while

11  since I've seen that, and we'll check that.  But the

12  notice, the document that actually went to class members

13  said you're not -- you may not get anything.  That's

14  quite clear, and that's cited in our brief.  Now whether

15  there's some -- some mention to the contrary in the

16  judgment, I just don't know from memory, but I will

17  check that.  The notice, the crucial document that was

18  sent to the class member that they read and relied on

19  had that provision.

20        SPECIAL MASTER:  Okay.  So your -- your

21  position is that any inconsistency with respect to the

22  treatment of resellers or other class members in

23  Chunghwa and this case is cured by the "new

24  comprehensive," in quotes, notice, that you gave in this

25  case, and that notice in effect says oops, actually

Page 92

1    you're not getting any money?

2              MR. ALIOTO:  Yeah, and I'm not so sure that

3    there is any inconsistency.

4              SPECIAL MASTER:  Well, resellers get money,

5    resellers don't get money.  That sounds like an

6    inconsistency.

7              MR. ALIOTO:  Yeah, but what are they referring

8    to -- I mean, I'm going on arguments that have been

9    made.  What are they -- I'm trying to respond to an

10   argument, but I'm not exactly sure what the argument is.

11   The argument is that there was something in the final

12   judgment in the --

13             SPECIAL MASTER:  In the -- I am being -- wait.

14             Okay.  Mr. Scarpulla.

15             MR. SCARPULLA:  Your Honor, there was a final

16   judgment approving the settlement with Chunghwa which

17   provided for a payment to resellers.  It's in there.

18   It's final.

19             SPECIAL MASTER:  Okay.  All right.

20             MR. SCARPULLA:  Period.  And then there was

21   also a provision in there which provided that the money

22   would be divided certain percentages by state.  That's

23   gone too.

24             SPECIAL MASTER:  Okay.

25             MR. ALIOTO:  All right.

Page 93

1          SPECIAL MASTER:  Let's be practical here.  We

2     don't want a $10 million tail to wag the $576 million

3     dog.  So this is a problem that I would like to find a

4     way to cure and not have it be a reason to foul up a

5     settlement.

6          MR. SCARPULLA:  But that's a big problem, Your

7     Honor, because it's constitutional issues of due

8     process.

9          SPECIAL MASTER:  I get it.  If it's a problem,

10     it's a problem.

11          MR. ALIOTO:  And what that settlement provided

12     for -- and here's -- I think I get the gist of the

13     argument.  When we sought approval of that Chunghwa

14     settlement, certain attorneys general appeared.  They

15     got the notice, and they got the CAFA notice, and they

16     stood up for their rights.

17          And Washington said we want to go our own way.

18     And Oregon and Illinois said we want to go our own way

19     in the future, but thanks a lot for getting this

20     settlement and we should get this money.  We -- and that

21     issue was tee'd up in front of Judge Legge.  And Judge

22     Legge ruled yes, they're entitled as AGs to that money,

23     and the judgment and the preliminary approval order

24     recited that.  That was a ruling by Judge Legge.  Not a

25     contractual arrangement or deal, it was a -- it was a

Page 94

1     contested matter and a ruling by the judge.

2          I think where the confusion comes in, Your

3     Honor, is the amount of the settlement that was

4     allocated to Illinois and Oregon was based on a

5     population allocation.  That population allocation is

6     set out in the order, and it says Illinois and Oregon

7     are going to get X amount based on this population

8     calculation.  It was like setting forth the background

9     of the calculation.

10         What the objectors are saying is that that

11    background of the allocation to Illinois and Oregon,

12    that meant that all those other states had to get money.

13    That's not the case.  The listing of all those other

14    states was just for the purpose of showing how we

15    arrived at the allocation figure from Washington and

16    Oregon.  No inconsistency.  Money is going to be paid to

17    those states.  Matter of fact, I just spoke with Blake

18    Harrop (phonetic) the other day, a couple of days ago

19    confirming that with him.  That settlement is over, it's

20    done, and those terms are going to be honored as part of

21    this larger package.

22         SPECIAL MASTER:  What do you mean they're going

23    to be honored?

24         MR. ALIOTO:  There's a provision in the

25    Chunghwa settlement per Judge Legge's ruling that a

Page 95

1    certain -- certain percentages of money must be paid to

2    the state of Illinois and the state of Oregon.  And

3    those payments will be made because that was part of

4    that settlement approval.

5              SPECIAL MASTER:  So you will carve out an

6    exception to the pro rata distribution to take care of

7    Oregon and Illinois?

8              MR. ALIOTO:  Precisely.

9              MR. COOPER:  And the amount of money that will

10   be distributed pro rata will be the amount of money you

11   think is involved less the amounts that go to those AGs.

12   So all the notice that says this is the amount you're

13   going to share pro rata is incorrect by the amount.  It

14   may not be a large amount, but it's incorrect, and

15   there's been nowhere in all the presentations about

16   this, any acknowledgment until we brought it up of the

17   problems with what exists with regard to the commitments

18   made in connection with the Chunghwa settlement.

19              Look at the -- look at the order of

20   preliminarily approving the Chunghwa settlement.  That's

21   where the chart of states and percentages is attached.

22              SPECIAL MASTER:  What about resellers, Mr.

23   Alioto?  What --

24              MR. ALIOTO:  There will be -- there's no

25   payment contemplated to the resellers, Your Honor.

Page 96

1              SPECIAL MASTER:  But how -- if there was a

2       final approval by the district court of a settlement

3       that provided money going to resellers, how do we ignore

4       that?

5              MR. ALIOTO:  Well, I'm going to have to check

6       that final judgment, Your Honor.

7              MR. COOPER:  Well, the class includes

8       resellers, Your Honor.  The settlement class includes

9       resellers.

10             MR. ALIOTO:  I will say --

11             SPECIAL MASTER:  Did you have -- you're shaking

12      your head.  Do you have something of wisdom to add?  No?

13      All right.

14             MR. ALIOTO:  Keep in mind that this is --

15             SPECIAL MASTER:  Look, this is a small issue in

16      magnitude, but it's troubling, and I don't have any of

17      the -- I mean, they're all in the record.  But nobody

18      has really thoroughly briefed this.  Nobody has given me

19      a stack of material I should look at like the language

20      of the Chunghwa settlement, the -- the orders approving

21      it and so on.  And there's not a lot of time between now

22      and January 15.

23             MR. COOPER:  We'll pull them together and send

24      them to you, Your Honor.  We'll send the list that we're

25      going to send to Mr. Alioto in advance of sending it to

Page 97

1    you in case he wants to add something to the list.

2         MS. MOORE:  Just a point that I believe now

3    that everyone can make a claim, there's no place on the

4    website to actually make a claim for resellers.

5         SPECIAL MASTER:  Yeah, I mean, resellers have

6    been excluded from this settlement.  I understand.

7         Yes, Mr. Bonsignore?

8         MR. BONSIGNORE:  Very briefly Your Honor, you

9    might find 55 F.3d 768, 797.  It's a third circuit case

10   cert. denied, 516 U.S. 824 of interest and when you're

11   evaluating this specific issue.

12        SPECIAL MASTER:  Give me the name of the case.

13        MR. BONSIGNORE:  In re General Motors Corp

14   Pickup Truck Fuel Tank Products Liability Litigation.

15        SPECIAL MASTER:  And is that cited in your

16   brief somewhere?

17        MR. BONSIGNORE:  Yes.

18        SPECIAL MASTER:  Thank you.

19        Sir.

20        MR. ST. JOHN:  This strikes me as someone

21   representing a client who is potentially impacted by

22   this as an unforced error by class counsel.  And I agree

23   with Your Honor that it shouldn't wag the dog.  I think

24   the solution is that the party that's responsible for

25   the unforced error should pay for it.  Deduct the cost

1      from class counsel's fees.

2                 SPECIAL MASTER:  Deduct what costs?

3                 MR. ST. JOHN:  Whatever additional notice and

4      whatever it costs to fix payments for resellers and

5      payments to the states in question.  Mr. Alioto made the

6      mistake.  There's a term for that, but Mr. Alioto should

7      be responsible for fixing it.  And you can fix it

8      without -- and resolve these problems.

9                 MR. ALIOTO:  We'll determine that when Your

10     Honor has the full records and you can make that

11     determination.

12                SPECIAL MASTER:  All right.  Before we leave,

13     I'll set up an additional briefing schedule on this

14     issue.

15                Now, that brings us to Mr. Varanini.  And you

16     want to extend the claim deadline?

17                MR. VARANINI:  Yes.  But --

18                SPECIAL MASTER:  And I am told by your

19     colleagues on the other side that doing so will create

20     all sorts of claims of disparate treatment.  California

21     residents will be claimed to be given a longer time to

22     make claims than other people and so on.  Before you get

23     into your argument, let me ask you:  What happens if the

24     court says no?  What happens down in the California

25     state court if the court says no, we're not going to

Page 99

```
 1   extend the deadline?  Sorry, deadline is a deadline.

 2               MR. VARANINI:  Well then --

 3               SPECIAL MASTER:  What do you do practically?

 4               MR. VARANINI:  Practically that's a difficult

 5   question because we have to figure out what to tell

 6   California and actual people.

 7               SPECIAL MASTER:  They now have settled or --

 8   their parens patriae --

 9               MR. VARANINI:  Yes.

10               SPECIAL MASTER:  -- their claims that you

11   brought on their behalf.  Where do they make claims?

12               MR. VARANINI:  Well, they can't.  We didn't --

13   this is set out in our briefing, so if Your Honor

14   doesn't mind my summarizing the briefing, that's fine,

15   but I would encourage Your Honor to look at it.

16               When we settled these cases, we did so based on

17   having had discussions with the indirect purchaser

18   plaintiffs trying to fix a situation that occurred

19   within early settlement.  And as part of that, the

20   amounts that we negotiated for were done with the view

21   that the indirect purchaser plaintiffs were out there.

22   They were in federal court.  They were ahead of us going

23   to trial.

24               Traditionally, you know, private plaintiffs are

25   good at getting monetary relief, and we tend to focus on
```

1    sort of the residue that can help those folks who don't

2    file claims as far as injunctive relief.  And so we

3    agreed if we can persuade defendants to insert language

4    that would make it crystal clear, even though this has

5    always been our position, that we were not out there to

6    supplant or replace class claims.

7            There's a price for that.  Because we can't

8    give defendants exclusivity.  We can't say okay, we can

9    give you a release which would eliminate Mr. Alioto's

10   claim 'cause we don't do that.  They're not going to pay

11   us a lot of money because Mr. Alioto is the one who can

12   come in there and say I've got these big claims.

13   They're worth a lot of money.  This is -- this is what I

14   bring to the table.

15           So we didn't negotiate for the kinds of sums of

16   money that would allow us to run a direct recovery

17   program where people could make claims against our pot,

18   even leaving aside the other claims that we have in our

19   case, because we do have other claims aside from natural

20   people.  So that's what we relied on.

21           Traditionally the way we work is we come in at

22   the allocation stage, like we have here.  Usually this

23   is behind the scenes because we have joint settlements.

24   Here it's not behind the scenes, so this makes it

25   different.  But we come in, and we give advice on

                                                            Page 101

1      allocation.  We say okay, we as AGs really care about

2      natural people.  Not to say private plaintiffs don't,

3      but we really care about them.  They're our citizens,

4      they're going to complain to us if there's a problem.

5      They're not going to go complain to you.

6                 SPECIAL MASTER:  Might even vote you out of

7      office.

8                 MR. VARANINI:  Right.  They might vote her out

9      of office or hypothetically they might decide not to

10     promote her to the next office that's coming up.  So we

11     take --

12                MR. GOLDBERG:  We have that on the record.

13                MR. VARANINI:  I'm aware of that.  I hope the

14     general looks favorably on me for having said it.  But

15     be that as it may, we're the ones who are going to get

16     the criticism.  So when we send out a notice that would

17     say -- and we can't because we don't agree with it --

18     that would say California natural people, you can't file

19     claims.  You're going to have to live with what we can

20     give you on cy pres, meaning sort of this indirect

21     relief where we give money for the indirect benefit of

22     the class.  Just making sure there's a complete record.

23     I know Your Honor is very well aware of this.  We're the

24     ones who are going to get criticized.  And this is -- we

25     negotiate these settlements in reliance on this

                                                    Page 102

1    understanding that we tried to implement to move

2    forward.

3              SPECIAL MASTER:  But let me just --

4              MR. VARANINI:  Sure.

5              SPECIAL MASTER:  All the natural people in

6    California whom you represent have already gotten the

7    federal notices.

8              MR. VARANINI:  Correct.

9              SPECIAL MASTER:  They've already had an

10   opportunity up until December 7 to submit claims.

11   You're kind of saying they should -- because we have a

12   parens patriae claim on their behalf, they should get a

13   second whack at the Apple?

14             MR. VARANINI:  Not exactly, Your Honor.  We're

15   saying one of two things here.  Okay?  This shades into

16   the other issues.  So we believe that for allocation

17   purposes, for allocation purposes from what we can see

18   from the face of what was done, because that's all we

19   have -- we don't have access to the notice and claims

20   data -- so what we can see from the face of things is we

21   believe there are deficiencies where natural people

22   didn't get their fair shot.

23             In the context of allocation there is notice.

24   Notice as you've heard these gentlemen and lady talking

25   about have to do with reach, right?  How many eyeballs

Page 103

1    literally saw the advertisement.  That's important for

2    opt-out purposes.  It's important for due process

3    purposes.  But that's different than generating claims

4    to make sure that, for example, natural people had their

5    fair shot.  Based on the face of what we're seeing, we

6    don't believe for reasons that we've already said in our

7    brief that natural people had their fair shot.

8            Now we asked for notice and claims data to give

9    a more refined -- more refined analysis for the benefit

10   of Your Honor.  And that was ultimately denied, as Your

11   Honor is well aware.  And it's now pending in front of

12   Your Honor.  So absent that, all we have to go on is

13   what's on the face of it, and we believe that's

14   insufficient.

15           So how this plays in the state court because

16   Your Honor asked.  This is in the papers, so I apologize

17   for repeating it.  But how it plays in state court is we

18   can't put in a notice that we think California natural

19   people already had their opportunity to claim and that's

20   it because we don't believe it.  So -- but on the other

21   hand, the claim's deadline has closed, so do we tell

22   people:  Well, go ahead and file a claim and maybe it

23   will be honored and maybe it won't?  Do I tell people

24   well, the special master has recommended against it, so

25   you could file it, but we plan to make an objection to

Page 104

1   the court?

2          It puts us in a really sticky situation.  So

3   one of -- we proposed one of two paths.  Either -- you

4   know, either reform the claims process as part of the

5   allocation plan, which Mr. Alioto has referred to he may

6   be open to, or extend the claims deadline so that we can

7   tell California natural persons they have an opportunity

8   to claim.

9          Now one final point.  We have said that Your

10  Honor, even on that point, extending the claims

11  deadline, that Your Honor has a choice.  You can do that

12  as to California natural people only because we and we

13  alone of all the groups of claimants have this parens

14  claim that's out there for them.  And that is unique,

15  and that is something that the court can use to make a

16  difference.  And we've given Your Honor cases and

17  argument on that.  Or Your Honor can extend it as to

18  everybody.

19         And on that point, Mr. Alioto has expressed his

20  fears about corporations being unfairly advantaged as

21  part of that.  We responded to that.  We believe there's

22  no evidence to back that up.  But more importantly, we

23  believe there's a couple of constructive solutions that

24  Your Honor can recommend to deal with that if Your Honor

25  feels it's more appropriate to extend the claims

Page 105

1    deadline as to everyone.

2          SPECIAL MASTER:  So Mr. Alioto, why isn't an

3    easy solution to do what Mr. Varanini says?  California

4    natural persons are special because they're the only

5    ones for whom a parens claim was brought.  They need to

6    be given a fair opportunity to file claims under the

7    parens lawsuit, extend the deadline for California

8    natural people.  And if anybody -- if anybody objects to

9    it as being improper disparate treatment, we say sorry,

10   they're the only ones who have a parens claim.  Done,

11   easy, fix.  Right?  Wrong?

12         MR. ALIOTO:  Mr. Paul Novak has been working

13   with the AG.  He'll respond.

14         MR. NOVAK:  Over here.  Paul Novak of the

15   Milberg firm.

16         Let me first identify a couple of points in Mr.

17   Varanini's presentation and his papers that I think we

18   agree with.  The first is I think he is accurate in

19   distinguishing the posture of California natural

20   claimants vis-à-vis other class claimants in that they

21   are the only ones with the companion parens patriae suit

22   that has also been pending and litigated, albeit in the

23   separate form at the same time.  We recognize that

24   distinction.

25         He also is accurate that the district court

Page 106

1    possesses equitable discretion to extend claim deadlines

2    generally.  We don't contest that.  We don't believe it

3    is necessary given the adequacy in our view of the

4    notice that has been implemented to California claimants

5    that a -- that a deadline extension is necessary, or

6    that an extension of that deadline would be necessary

7    for purposes of issuing final approval of our

8    settlement.  But we recognize the sensitivities that are

9    associated with the parens case pending at the same

10   time.  And if that's the solution that the court

11   imposes, so be it based upon that distinguished posture.

12            SPECIAL MASTER:  But what's the downside?

13            MR. NOVAK:  Our primary concern is the exposure

14   to the types of objections that might come from other --

15   from other corners or other angles.  But aside from --

16   that's our primary concern, and -- and if the court

17   doesn't find that concern to be one that's particularly

18   persuasive, I don't -- I don't think we otherwise have

19   an issue with it.

20            SPECIAL MASTER:  Well, I mean, I was contacted

21   by an enterprising aggregator directly on the afternoon

22   of December 6th asking me to do something to facilitate

23   his ability to file claims.  And -- you know, so I'm

24   aware that there is that -- you know, there is that

25   industry out there which -- but...

Page 107

1           I don't know.  I'm feeling as if I'm not

2   hearing any serious downside to extending the deadline

3   -- recommending to Judge Tigar that he extend the

4   deadline for California natural persons except that you

5   might get a lot of objections from people that, you

6   know, I think we could deal with.  I don't want to do

7   anything that has unfortunate consequences, you know,

8   unforeseen consequences, so -- but I'm not hearing any

9   except the objections that might come in.

10          MR. NOVAK:  I -- I think that's probably an

11  accurate characterization.

12          SPECIAL MASTER:  Okay.  Mr. Varanini, as long

13  as you're on a roll here, what -- you had some other

14  issues.  You raised the issue of cy pres.  You said

15  there's no cy pres provision in the -- in this

16  settlement.

17          MR. VARANINI:  Correct.

18          SPECIAL MASTER:  The contemplation is

19  everything would be distributed pro rata, but how does

20  that disadvantage your California natural people?

21          MR. VARANINI:  Well, there are two parts to

22  that.  One is we don't know if it's -- we don't have

23  anything in the record that says that it's all going to

24  be distributed.  We have statements being made in

25  briefing, but we don't actually have the claims data

Page 108

1    with the projection, which in other cases that's been

2    provided.

3            But let's assume for the sake of argument,

4    because I'm not trying to evade the question, that

5    that's what is going to happen; that at the end of the

6    day, leaving aside this issue of giving people treble

7    payment, let's say based on single damages just for the

8    sake of the argument for a moment.  So that's the idea

9    that people at the maximum, if they filed the claim,

10   they're only going to get back their single damages.

11           And let's assume that exhausts the fund

12   entirely.  Well, if it's single damages, that's okay

13   because there is a preference for direct distribution.

14   So if you have a fund, and assuming Your Honor is

15   otherwise okay with the allocation plan, and, you know,

16   the money that was set aside for people to file claims,

17   both people and corporations, you give them single

18   damages, the money is completely run out, there isn't a

19   cent left -- and this includes issues with people having

20   moved; you can't give them checks.  This includes trying

21   to track people down and you don't succeed.  Let's just

22   assume for the sake of argument there isn't even that

23   ghost of a residue left.

24           Agreed -- I would agree based on federal law

25   without respect to California law, I would agree cy pres

Page 109

1     is not an issue.  Okay?  But then -- and again, we're

2     only looking at the face of the notice plan and the

3     allocation plan because we don't have the data.  Data

4     would allow us to give a more refined perspective than

5     we can give.  Here we're talking treble damages.  Okay?

6     So this is the idea that corporations and individuals

7     not only should get the full value of their claims, but

8     that that should be trebled.

9          And so the question that's in front of Your

10    Honor, again in the absence of additional data, is is it

11    appropriate for those folks to get three times the value

12    of their claim or is that a windfall.  And if it's a

13    windfall, should that extra money go cy pres or should

14    there be at least notice to try to find additional

15    claimants first.

16          We've proposed both as potential alternatives

17    for the court.  So we said well, we think based on other

18    cases there's sort of obvious additional notice that

19    could be done to gin up claims.  And because we don't

20    have the data, we don't know whether those obvious

21    additional notice that was done in other cases could be

22    done here or not.

23          All we can do is point to the other cases, and

24    then Your Honor has to make whatever decision Your Honor

25    feels is appropriate.  Or we said -- let's say it did

Page 110

1    not turn out to be the case, that the indirect purchaser

2    plaintiffs come back and say look, this really would

3    cost us way too much money, and it's just not going to

4    gin up claims, okay?  Well, then we said well, wait a

5    minute, then if there is this windfall, why not leave

6    some money left over for cy pres after everybody gets

7    the value of their claims in full.  Then that way we

8    know everyone in the classes of the different state

9    specific damage classes gets some sort of benefit.  It

10   may be indirect, but they're going to get a benefit.

11           And as long as everyone follows the proper

12   protocol that's been set out in Ninth Circuit cases, a

13   protocol we're very experienced with, there shouldn't be

14   the kinds of issues that have arisen in other cases such

15   as Kellogg, the Ninth Circuit case.  So that's why we

16   thought there's this sort of interplay between claims

17   and cy pres.

18           SPECIAL MASTER:  Okay.

19           MR. NOVAK:  May I respond to that?  Again, Mr.

20   Novak on behalf of the IPPs.

21           Let me make a couple observations with respect

22   to the plan of allocation, its relationship to notice,

23   and the issue of single versus treble damages.

24           First, as has already been discussed, the

25   adequacy of the notice plan has already been touched

Page 111

1   upon.  I think even the California attorney general

2   recognizes that the notice plan as implemented meets the

3   due process requirements and Rule 23 requirements.

4   Exhibit C of his declaration, the claim stimulation

5   document that references the notice plan, states, quote:

6           "Due process notice programs must adhere

7        to the requirements of Rule 23 claim

8        stimulation programs.  Unshackled from these

9        requirements allow us to think outside the

10       box."

11          So what Mr. Varanini is discussing is something

12   that exceeds the requirements that class counsel has for

13   purposes of creating and submitting and implementing the

14   notice plan that then informs the claims administration

15   process.

16          As it relates to claims administration,

17   although we don't have final data, and in the event that

18   the court extends the deadline for the submission of

19   claims, won't have the deadline -- won't have the data

20   for an even greater period of time, but what we think is

21   going to happen with -- based simply upon the claims

22   that have been submitted to date is that claimants are

23   going to receive much closer to single damages than they

24   will to treble damages.

25          And we note that there are a number of other

Page 112

1   cases where treble damages as the cap was acceptable to

2   the court for purposes of issuing final approval, but

3   also even to the California attorney general for

4   purposes of obtaining final approval on some of those

5   settlements.

6           SPECIAL MASTER:  In LCD there was a treble

7   damage cap.

8           MR. NOVAK:  LCD had a treble damage cap.

9           SPECIAL MASTER:  Did the California attorney

10  general complain about that there?

11          MR. VARANINI:  No, we did not.

12          SPECIAL MASTER:  Of course, there was more

13  money.

14          MR. VARANINI:  Well, if -- if I may, aside from

15  the issue of whether there was more money or not, and we

16  were working with other states and so had to compromise,

17  there were two key distinguishing factors about LCDs, at

18  least we thought.  Now Your Honor may disagree with

19  that.  One of those -- one of the distinguishing factors

20  was there was a more extensive notice campaign done for

21  purposes of ginning up claims than is being done here.

22          SPECIAL MASTER:  Right.

23          MR. VARANINI:  The second distinguishing

24  factors are the amount of the fees claims were lower, so

25  there was more money in the pot.

1           SPECIAL MASTER:  Not a lot.

2           MR. VARANINI:  Not a lot.  And there was -- in

3    LCDs there was a reversionary -- there was -- sorry,

4    reversionary is the wrong term.  There was a clause that

5    said if there was any money left over, it would go to

6    our cy pres.  So there were distinguishing features of

7    LCDs that we could say well, maybe -- look, in a perfect

8    world -- you get the point.

9           SPECIAL MASTER:  Fair enough.  Go ahead.

10          (Electronic interruption.)

11          MR. NOVAK:  The other point I wanted to make,

12   and this is with respect to at what point does a court

13   make a determination.  We've given enough money to

14   claimants.  Let's proceed to distribute the remaining

15   money on a cy pres basis.

16          I brought to Mr. Varanini's attention this

17   morning when we were discussing these issues that some

18   of the other circuits -- the Ninth Circuit hasn't spoken

19   on this issue or, for that matter, any court in the

20   Ninth Circuit that I'm aware of.  Other circuits have

21   addressed the issue of at what point do you go to cy

22   pres.

23          And in the Second Circuit, specifically in the

24   Masters versus Wilhelmina modelling case, it's 473 F.3d

25   423.  The second circuit actually found it to be an

Page 114

1    abuse of discretion to consider cy pres distribution

2    before making a treble damage allocation to the

3    claimants.

4            And I think a couple of other courts have come

5    to a similar conclusion, although not probably as

6    clearly as the Masters decision.  One is a Bank America

7    decision 775 F.3d 1060.  I'm not going to suggest that

8    it went as far as Masters versus Wilhelmina, but it

9    cited language from that decision on the cy pres issue

10   and the treble damages issue approvingly.  That's from

11   the Eighth Circuit.  There's also an in re publication

12   paper --

13           SPECIAL MASTER:  You know what, I'm going to

14   ask you to do the same.

15           MR. NOVAK:  I'll submit --

16           SPECIAL MASTER:  If you could just submit a

17   letter with any citations you wanted.

18           MR. NOVAK:  Okay.  Particularly that one

19   because I've only got a Lexis cite for it, and you'll

20   need it in Westlaw.

21           SPECIAL MASTER:  All right.

22           MR. NOVAK:  So other courts that have looked at

23   that issue have explicitly found that it's okay to go up

24   to a full treble damage, and in some instances have said

25   it was an abuse of discretion not to go first to treble

Page 115

1    damages.  The Lupron marketing decision that Mr.

2    Varanini pointed to actually had a 1.67 multiple of

3    damages for claimants as -- as the cut off in that

4    settlement, and it was a cut off that had been

5    negotiated.

6            What happened in that case is plaintiffs

7    originally had a 100 percent allocation plan.  You had

8    some objectors come in and say hey, we should receive

9    more than 100 percent before cy pres distributions are

10   made.  And so a negotiation to revise the settlement to

11   increase it to 1.67 times was made.

12           And then at that point, the court said because

13   the objectors settled with that revision to the

14   settlement and then came back later and argued about it,

15   and the court said you've -- you've waived your

16   arguments with respect to getting even more than 1.67

17   times your damages because you obtained consideration

18   for it when you revised the settlement agreement.

19           So basically I think the case law certainly

20   allows for distributions to go up to treble damages, if

21   not require it, particularly in an instance where as

22   here it's not contested that the notice plan meets due

23   process and Rule 23 requirements for being the best

24   practicable notice.  And for those reasons we don't

25   think that the modifications to the allocation plan are

Page 116

1    appropriate.

2            And let me make one final observation.   And

3    that is that this whole idea that we need to go until

4    the very end of the claims distribution process when all

5    of this data has been submitted and make the

6    determination based on that, if we continue to extend

7    the claims deadline, it has the problem of continually

8    forestalling the distribution of money to claimants,

9    which given the amount of time between the beginning of

10   the class period -- oh, that actually reminds me of one

11   other thing.

12           And that is there -- if you had actually

13   obtained these damages back when these purchases were

14   initially made at the beginning of the damage period,

15   and didn't have the time value of that money for what's

16   near 20 years, that makes treble damages all the more

17   appropriate, even though I don't think any claimants are

18   going to be getting it based on the claims data that's

19   been submitted.

20           SPECIAL MASTER:  You're worried that people may

21   have been eight years old when the claim period started,

22   but they may be 80 before they get any money.

23           Mr. Varanini, I'm worried about your practical

24   problem here.  Let's say I recommend next week that the

25   claim deadline be extended.  Nothing is going to happen

1    on that until March 15 unless I ask Judge Tigar to rule

2    separately on that issue quickly.

3            MR. VARANINI:  Well, there are -- sorry.

4            SPECIAL MASTER:  And you've got a January 27

5    hearing.

6            MR. VARANINI:  Yes.

7            SPECIAL MASTER:  And you've got to give notice.

8            MR. VARANINI:  Yes.  There are three responses

9    to that.  First of all, if nothing else, we could at

10   least say that Your Honor has in your report and

11   recommendation recommended the extension of claims

12   deadline.  That would be positive encouragement that we

13   could point out to people to submit claims, even if

14   ultimately the court retains the discretion to say no,

15   and we would have to say something about that to be

16   frank.

17           The second point is that as Your Honor

18   indicated, Your Honor could recommend to Judge Tigar to

19   rule quickly on this one issue so we would have an

20   answer before the hearing.

21           The third possibility is that we do have

22   pursuant to the proposal we had made to extend the

23   claims deadline, we've left some water in there.  So if

24   something happened, we could -- we could, for example,

25   move the hearing back by a week or two and still have

Page 118

1    more than enough time for people to get notice and still

2    not leave things out of sync with the final approval

3    hearing.

4           At some point we do recognize that if things

5    get pushed back far enough, that's on us.  So we want to

6    have the preliminary approval hearing very soon, and we

7    prefer to have it on the date that we set, but we did

8    leave a little bit of water in our proposal to move it

9    forward to June 30th so that we would have the ability

10   to deal with these kinds of circumstances.

11          SPECIAL MASTER:  Okay.  So I've covered my

12   agenda.  Is there anyone who has anything remaining that

13   they think should be brought to my attention?

14          Mr. Cooper.

15          MR. COOPER:  This doesn't actually have to do

16   with any of the substance we've been talking about.  One

17   of my questions relates to the protocols for getting

18   notices and distributions.  You posted yesterday an

19   email exchange that apparently you had with Mr. Alioto,

20   and I'm not certain with Mr. Scarpulla or not, which set

21   out the issues you wanted to talk about today.  The

22   original emails and your email responding were not sent

23   to all counsel, and so --

24          SPECIAL MASTER:  My bad.

25          MR. COOPER:  Well, apparently Mr. Alioto's --

Page 119

1        SPECIAL MASTER:  I apologize.

2        MR. COOPER:  -- directly going to you initially

3    was not sent over yesterday.  So my question is what are

4    the protocols so we can all be getting timely notice of

5    what's going on?

6        SPECIAL MASTER:  Okay.  The Order of Reference

7    allows me to have ex parte conversations with counsel on

8    procedural issues.  I keep it -- try to keep it to a

9    minimum.  At the very beginning when we were getting

10   organized, Mr. Alioto and I talked quite a bit as we've

11   gotten into this.  I've tried to keep it more formal and

12   more transparent.

13        So I think that from now on any email exchange

14   with me, either email or letter exchange with me should

15   be posted on Case Anywhere on the JAMS website, and I

16   failed to do that.  I was actually on vacation, and

17   that's just my mistake.

18        And -- I mean I think I sent it to the people I

19   thought would have the most interest in it, Mr. Varanini

20   and Mr. Scarpulla and Mr. Alioto.  So I apologize to

21   everyone else.  But I think that's the way we should do

22   it.  Any communications with me should be -- should be

23   posted on the Case Anywhere.

24        You know, I suppose something could come up

25   that would be incredibly urgent, a procedural matter

1    that someone would just have to call me on the phone.  I

2    would really like to avoid that, but, you know, if

3    circumstances demand it, my Order of Reference permits

4    it.

5         MR. COOPER:  I was aware of what it says in the

6    Order of Reference about ex parte communications,

7    although I do believe the word was "scheduling" and not

8    "procedural" but I'm not quibbling -- I'm not quibbling

9    about that.  But this particular email seemed not to be

10   in that category where you've talked substantively about

11   what's going to happen, and that's why I'm bringing it

12   up, so...

13        SPECIAL MASTER:  I've already apologized.  I

14   don't know what more I can do.

15        MR. COOPER:  I'm not trying to beat it up

16   anymore.

17        My second question was during the discussion

18   you were having with regard to notice and claims in the

19   discussions, particularly about the claims rates and

20   what the experience has been, you made a statement, and

21   I wrote the words down, and I believe it's a question to

22   Mr. Alioto with regard to the information about the

23   claims experiences.  And you said:  Would that be the

24   end of the, quote, "final" -- or when, quote, "the final

25   papers are filed."

1          And that confused me because I thought that the

2     only papers that are yet to be filed is your report and

3     objections and responses to that, and I didn't know what

4     you were referring to by final papers.

5          SPECIAL MASTER:  I don't either.  But I take it

6     what would normally happen is that there'd be an ongoing

7     reporting to the court of the progress of the claim

8     process to allow the court to confirm that the claim

9     process was being carried out the way it was supposed to

10    be carried out.  So...

11         MR. COOPER:  Well, I just wasn't certain if

12    there was some briefing schedule that I wasn't aware of.

13         SPECIAL MASTER:  No, no.

14         All right.  Anything else?  I have a couple of

15    things to say at the end, but --

16         MR. ALIOTO:  Two points, Your Honor.

17         SPECIAL MASTER:  Mr. St. John.

18         MR. ST. JOHN:  Your Honor, do you want any

19    argument on the issues raised in IPP counsel's surreply?

20         SPECIAL MASTER:  Well, what are you referring

21    to?

22         MR. ST. JOHN:  The judicial estoppel vis-à-vis

23    Chunghwa and the Philips and Samsung settlements.

24         SPECIAL MASTER:  The point on Philips and

25    Samsung I think that you made was they're so big there

Page 122

1    must be something out of whack.

2            MR. ST. JOHN:  Correct, Your Honor.

3            SPECIAL MASTER:  The others must be too small.

4    Words to that effect.

5            MR. ST. JOHN:  More that the size is

6    attributable to factors other than class counsel's

7    efforts such that they're not properly -- that the

8    entirety of those settlements are not properly

9    includable in the fee base.

10           SPECIAL MASTER:  I think I have your arguments

11   on that.  I mean -- I mean I may not totally remember

12   them now, but I remember reading them and understanding

13   them when I read them.

14           MR. ST. JOHN:  Fair enough, Your Honor.

15           SPECIAL MASTER:  Did I see other hands?  Mr. --

16           MR. SCARPULLA:  I just have a quick question,

17   Your Honor.  To the extent that Your Honor is going to

18   have a hearing on fees, will you let us know that or if

19   you're not --

20           SPECIAL MASTER:  No, it will be held secretly.

21   No.

22           You mean a hearing on the allocation of fees,

23   or the hearing on the total amount of fees?

24           MR. SCARPULLA:  Well --

25           SPECIAL MASTER:  Oh, I see what you're

Page 123

1    saying -- no.  What I said in that email was that I

2    wanted to focus this hearing on the issues that we've

3    already talked about.

4            MR. SCARPULLA:  Correct.

5            SPECIAL MASTER:  I am not excluding -- you may

6    say anything you want to about fees now.  I mean I think

7    I understand all the arguments you've made.  I have them

8    in mind, and we'll consider them.  If there's anything

9    more anybody wants to say about the fee request or the

10   expense request, you may do so.  If you were sandbagged

11   and thought that wasn't going to come up today, you

12   know, I'm -- I'm -- I don't know what to say.  I don't

13   have time to set another oral argument.  But you're free

14   to say anything you want now.

15           MR. SCARPULLA:  Well, I think it's all in the

16   briefs, and I wasn't -- but I wasn't sure whether Your

17   Honor was going to have that as a separate hearing from

18   this one.

19           SPECIAL MASTER:  No.  I think what I said was I

20   think I have enough in the briefing and in the

21   declarations from the various attorneys and so on and so

22   on to make hopefully an intelligent ruling on that.

23           MR. SCARPULLA:  Right.

24           SPECIAL MASTER:  Sir.

25           MR. ST. JOHN:  Your Honor, I apologize.  I do

Page 124

1   want to briefly address, if now is the time, arguments

2   made in surreply about Chunghwa and judicial estoppel.

3            SPECIAL MASTER:  Sure.

4            MR. ST. JOHN:  Class counsel is playing fast

5   and loose with the idea that small -- small settlement,

6   their words, was invaluable and an icebreaker.  And

7   there's no dispute that those words were represented to

8   the court, and there's still no dispute that Chunghwa's

9   assistance was invaluable.  That's at page 13 of the

10  surreply.

11           What they try to do is limit that value in the

12  early stage of litigation.  But class counsel disposed

13  of the class claims for again a small settlement and

14  made those representations, and the fact that it causes

15  litigation regrets, that's precisely what judicial

16  estoppel targets.

17           Class counsel argues or they try to minimize

18  the value of the Chunghwa settlement by emphasizing that

19  DOJ only prosecuted one corporate defendant.  I don't

20  think that's particularly uncommon.  The DOJ has limited

21  resources.  They prosecute a small number of defendants

22  to bust the settlement -- or bust the conspiracy and

23  then leave the rest to private litigants.  That's

24  precisely what DOJ did here.

25           SPECIAL MASTER:  What is -- your point about

Page 125

1    the Chunghwa settlement is what?

2            MR. ST. JOHN:  The Chunghwa settlement created

3    a lot of value beyond its $10 million.

4            SPECIAL MASTER:  Okay.

5            MR. ST. JOHN:  And that value is not really

6    attributable to class counsel.

7            SPECIAL MASTER:  So we should reduce the fee

8    request to reflect that?

9            MR. ST. JOHN:  Correct, Your Honor.

10           SPECIAL MASTER:  Okay.

11           MR. ST. JOHN:  It's the first stage of the

12   rocket.

13           SPECIAL MASTER:  Okay.

14           MR. ALIOTO:  Two final points, Your Honor, and

15   I'll be very brief.

16           One, there was a statement earlier about

17   further notice to an additional group.  There's nothing

18   in the papers about this.  I want to just make sure this

19   is focused up.

20           After the formal notice program, our claim

21   administrator was able to get an email list of claimants

22   in the DRAM case, people who had actually made claims in

23   the DRAM case.  And our claims administrator arranged

24   for direct email notice to be sent to those claimants.

25   It was a supplement to the notice.  It wasn't something

Page 126

1   we did because we were having a problem or having

2   trouble.  We did it as a supplement to the notice to

3   spur claims.  And you can imagine that was effective

4   because these are people who had claimed before, and

5   they were -- they would be motivated to claim again.

6          The other argument I want to make and just a

7   sentence or two is we have made in our papers a standing

8   argument with respect to Mr. Scarpulla and Cooper.

9   There's nothing been said about that in these

10  proceedings.  We have no intention of waiving that.  We

11  think it's a very important issue that counsel should

12  not be able to come in and make all kinds of claims in

13  settlement approval hearings.

14         They certainly have the right to do that under

15  Rule 23, but the crucial point is you have to have a

16  client.  You can't just come in off the street or on a

17  volunteer basis or on an intermeddler basis and make

18  these arguments because these have consequences for us.

19         We're going to be briefing these questions.  We

20  may have appeals.  It's a very time-consuming, expensive

21  process, and you have to meet that threshold requirement

22  of representing a client.  The cases are clear on that.

23  And the cases cited by the objectors do not provide any

24  support for these objections on behalf of indirect

25  purchasers.  There's absolutely no basis for doing so.

Page 127

1                    SPECIAL MASTER:  Okay.

2                    MR. ALIOTO:  Thank you.

3                    SPECIAL MASTER:  Glad you brought that up.  Mr.

4        -- just start with Mr. Cooper because you're closest.

5                    As I understand the papers, you and your firm

6        currently represent a named or formerly named class

7        representative, correct?

8                    MR. COOPER:  That is correct, Your Honor, but I

9        believe in addition we are counsel of record for the

10       entire class.

11                   SPECIAL MASTER:  I know.  One question at a

12       time.  Okay?  So you actually may represent a named

13       member of the class?

14                   MR. COOPER:  We do.

15                   SPECIAL MASTER:  Okay.  Mr. Scarpulla, you did

16       represent a named class representative when you were

17       with the Zelle firm.  What is your status now?

18                   MR. SCARPULLA:  As part of my agreement leaving

19       Zelle, I was made a -- another lawyer of record for

20       those -- for that client.  However, I was told by Zelle

21       that the client does not -- does not approve of my

22       objections.

23                   SPECIAL MASTER:  Okay.  So -- but officially

24       you are still counsel of record for a client in this

25       case?

Page 128

1          MR. SCARPULLA:  That is correct.

2          SPECIAL MASTER:  Okay.  But in bringing these

3     objections that you both have made, you are not bringing

4     them on behalf of your clients, you are bringing them in

5     your capacity as class counsel in furtherance of your

6     fiduciary duties, correct?

7          MR. SCARPULLA:  I think Mr. Cooper is bringing

8     it on behalf of his clients.

9          MR. COOPER:  No, I think that's a fair

10    statement from me.

11         MS. CAPURRO:  That's not what their papers said

12    when they filed their objection.

13         SPECIAL MASTER:  Well, their papers --

14         MS. CAPURRO:  None of their papers have said

15    that today.

16         SPECIAL MASTER:  No, none of their papers name

17    a client on whose behalf they're bringing the objection.

18    As I understand it, they are bringing it in their

19    capacity as class counsel, not on behalf of a client.

20    And that is your standing.

21         MR. ALIOTO:  We would just ask you to look at

22    the authorities on that, Your Honor.  We think it's an

23    important point --

24         SPECIAL MASTER:  Okay.

25         MR. ALIOTO:  -- and that we'd like you to

```
 1   consider.

 2          SPECIAL MASTER:  Ms. Capurro.

 3          MS. CAPURRO:  If I may just briefly, I have

 4   look extensively at the law on this, and I can find

 5   absolutely no case that permits counsel in a case who

 6   are not court appointed class counsel.  The cases that

 7   they cite in their brief -- and they're not court

 8   appointed class counsel to bring an objection to a class

 9   action settlement and oppose the position of the court

10   appointed class counsel.

11          SPECIAL MASTER:  Why are they not court

12   appointed class counsel the same as all the other

13   lawyers in the --

14          MS. CAPURRO:  Mr. Alioto was the only court

15   appointed class counsel.  All of the case law that they

16   cite in their brief, those cases when they refer to

17   class counsel, they refer to the court appointed class

18   counsel.  If you have a situation where every -- every

19   lawyer in an MDL case, which is potentially hundreds of

20   lawyers, is able to speak on behalf of the entire class,

21   I mean if you take that to its logical conclusion, how

22   do you run the case?

23          I mean Mr. Alioto would be saying one thing,

24   and they can pipe up and say something else.  How do the

25   defendants know who to deal with?  How does the court
```

1    know who to deal with?  What's the point of even having

2    an order appointing lead counsel if they're able to do

3    that?

4                SPECIAL MASTER:  Well --

5                MS. CAPURRO:  And this is not a procedural

6    issue, Your Honor, this is jurisdictional.  And the fact

7    that they have filed this motion to be appointed as

8    co-lead counsel actually shows that they recognize they

9    have a standing problem.  That's -- they're trying to

10   bootstrap themselves in here to get the court's nod to

11   give them the voice, you know, to be able to speak on

12   behalf of these objecting plaintiffs who they've never

13   identified.

14               SPECIAL MASTER:  Well, you know, I'm -- I'm

15   cognizant also the court has an independent fiduciary

16   duty to protect the interest of the class.  And if

17   information is brought to the court from any source, I

18   sort of think the court has an obligation to consider

19   it.  But I -- I need to look at the authorities you've

20   cited with care.

21               MS. CAPURRO:  I submit there is no law, and

22   they have cited to none, and it is their burden to show

23   standing.  They have not cited to one case --

24               SPECIAL MASTER:  Okay.

25               MS. CAPURRO:  -- that gives them standing.

Page 131

1              SPECIAL MASTER:  I get it.

2              Is there -- Ms. Kirkham.  You have your hand

3      up.  Ms. Kirkham.

4              MS. KIRKHAM:  Okay.  I know I'm pointing out

5      the obvious, but if there was one lead counsel and all

6      other counsel are silenced by that appointment, and that

7      lead counsel recommends a settlement --

8              SPECIAL MASTER:  Who is going to object.

9              MS. KIRKHAM:  -- you have an issue there.

10             SPECIAL MASTER:  Okay.  Mr. Bonsignore, I saw

11     some activity down there.

12             MR. BONSIGNORE:  Yes, Your Honor, very briefly

13     I represent six plaintiffs, two of which were named

14     plaintiffs in the settlement class, and we joined and

15     adopted their arguments in my paper.  I do agree that

16     they do have separate standing, but in the event --

17     thank you.

18             SPECIAL MASTER:  Good.

19             Mr. St. John.

20             MR. ST. JOHN:  Your Honor, the argument you

21     just made is precisely the holding of Zucker v

22     Occidental Petroleum Corporation.  I don't have the

23     cite, but it was Case No. 9756270 decided by the Ninth

24     Circuit on October 19th, 1999.  The court has an

25     independent obligation to consider whatever information

Page 132

1   is before it regardless of standing.

2         MS. CAPURRO:  We're not disputing that.  That's

3   not the argument.

4         SPECIAL MASTER:  I think I understand the

5   argument.

6         MR. COOPER:  You have briefing on all of this,

7   Your Honor.

8         SPECIAL MASTER:  I do.  I do.

9         MR. SCARBOROUGH:  Your Honor, if we're down to

10  sort of parting remarks here, I just want to say from

11  the defendants' perspective, you know, we have put a

12  tremendous pot of money into escrow.  As I think lead

13  counsel pointed out may be the second largest indirect

14  purchaser settlement ever.  So a tremendous amount of

15  money that they have already paid, it's already sitting

16  in escrow and has been for some time.

17         That money was put there to buy global peace

18  for this litigation for IPP claims with the same factual

19  predicate.  So that's what we want.  That's what LG

20  already got.  They already paid a considerably smaller

21  amount of money for the exact same release that we are

22  asking for here.  So what we would like to see is at

23  least to get past that first threshold, that the money

24  that was paid, this extraordinarily large amount of

25  money that was paid is sufficient for the global

1   release.

2          Just in the same way that the issues with the

3   LG settlement, none of these objections were raised

4   during the final approval of that settlement, the final

5   judgment entered there.  It's understandable that there

6   could be some quibbles with allocation.  What's going to

7   happen with that LG money?  And that's fine, and that

8   can apply more broadly to the settlements that are now

9   before Your Honor for final approval.

10          As a general principle, I don't think

11   defendants have a problem if we tweak the allocation

12   plan.  If notice is perhaps sent out again, as long as

13   it's done in a responsible, comprehensive fashion that's

14   really going to lead to final approval, I don't think we

15   have a problem with some of that being done.  But we

16   want our deal, which we think is fundamentally sound,

17   approved now.  And it's time to do that.

18          SPECIAL MASTER:  Okay.  I would like to just

19   take a minute and talk to Ms. Cohen.  Give us two

20   minutes and we'll be right back.

21          (Recess 1:03 p.m. to 1:07 p.m.)

22          SPECIAL MASTER:  Okay.  Let me ask -- I'm not

23   sure whom -- a question.  Mr. Alioto, I guess, you

24   talked about dealing with the Illinois and Washington

25   issues by sort of carving out of your pro rata scheme a

Page 134

1    separate allocation scheme for them.

2           THE WITNESS:  Yes.

3           SPECIAL MASTER:  Correct?

4           MR. ALIOTO:  Yes.

5           SPECIAL MASTER:  Could the same kind of

6    arrangement be made to accommodate the -- the Chunghwa

7    settlement if -- if there are disparities between the

8    distribution scheme that was approved by the court in

9    Chunghwa and your distribution scheme?  I mean it sort

10   of as a practical matter, you only have $10 million.

11   What's the practical usefulness of giving notice to all

12   the resellers saying oh, you can now submit claims?

13           I mean I'm trying to find a solution to this

14   Chunghwa problem if it turns out there is one.

15           MR. ALIOTO:  Well, certainly to -- to the

16   extent that they were given notice that they weren't

17   going to get anything, and if it turns out that in fact

18   they're not going to be getting anything, that's

19   consistent.  And -- and do you have to send another

20   notice to them?  I don't think so.

21           But the big question is is there some

22   unfairness there, and is there some inconsistencies, the

23   objector says.  I would like to address that first and

24   be absolutely certain.  You know, that settlement was

25   many, many years ago, and I don't have the judgment

1    memorized, but I'm going to certainly be looking at it.

2            I think maybe the better course there, Your

3    Honor, would be to let us review some of these points

4    that they made and try and identify the problem and then

5    respond to you with this next round of briefing.

6            SPECIAL MASTER:  We're not -- we're not talking

7    rounds of briefing here.  I mean --

8            MR. COOPER:  What next round of briefing?

9            MR. ALIOTO:  Well, with this next submission, I

10   suspect, is probably a better choice of words.

11           MR. COOPER:  What next submission?  I thought

12   we went through this.  There are no next submissions.

13           SPECIAL MASTER:  Well, I'm concerned that I do

14   not have the full picture on Chunghwa, and I'm not about

15   to issue a report and recommendation on something I

16   don't feel comfortable that I have the full picture

17   about.

18           MR. COOPER:  Well, I did offer, Your Honor, to

19   send you the documents in consultation with Mr. Alioto

20   what documents you should see.

21           SPECIAL MASTER:  Yes.

22           MR. COOPER:  I'm not certain if that helps you

23   or solves the issues, or if you want them to go together

24   with some five-page letter or something not to exceed

25   five pages.  I'm sure we can do that relatively quickly.

Page 136

1    But when I hear discussions of future rounds of

2    briefings, I mean that's why I asked the question

3    before.  I though it was confusing.

4             SPECIAL MASTER:  Well, I mean, I guess if

5    this -- if I'm going to hew to the court's schedule,

6    then I'm going to need by Thursday some material, and

7    I'll finish with Chunghwa -- just some other material.

8    I'm going to need -- somebody mentioned cases regarding

9    treble -- I'm going to need any cases that you want us

10   to look at that you -- I didn't give you a chance to

11   give me the citations of today -- the docket numbers for

12   the four complaints in this case so we can easily find

13   them and look at what was alleged or not alleged.

14            We're having a handwriting problem.

15            Oh, Ms. Kirkham was going to give me an

16   additional cite to the -- a reference that she made to

17   the Renfrew's report and recommendation.

18            And then information about -- I'd like -- I'd

19   like Mr. Fisher to provide an additional declaration

20   with the updated status of the claim process in as much

21   specificity as he, you know, reasonably and

22   professionally can.

23            And finally we get to Chunghwa, and I -- we

24   definitely need copies of all the relevant documents

25   that allow us to see what was settled and what was

1    ordered there.  The question is whether we also need

2    briefing, and I'd like to say no, but I think -- I think

3    -- I think I do.  I mean, I think I need something like

4    a three to five pages from the Cooper group explaining

5    why this is a problem and hopefully maybe suggesting

6    what to do about it, and a brief from Mr. Alioto.  Now,

7    I think what we should do is maybe have those

8    simultaneous briefs.

9            Can we get those in by Friday?

10           MR. COOPER:  That's fine, Your Honor.  We will

11   send to Mr. Alioto today the list of documents that we

12   think we need to send you copies of starting with the

13   settlement agreement.  Whatever is relevant regarding

14   preliminary approval, final approval and judgments, and

15   we can agree on what documents you should be looking at.

16   And a brief not to exceed five pages -- simultaneous

17   briefs not to exceed five pages by Friday?

18           SPECIAL MASTER:  Yes.  Can we -- Ms. Cohen is

19   asking for noon on Friday.

20           MR. COOPER:  Sure.  How about Thursday?

21           MS. COHEN:  I would love it.

22           SPECIAL MASTER:  Thursday would be great.

23   You've got a lot -- I mean, particularly Mr. Alioto has

24   more on his plate than you do.  We're really under the

25   gun here, so Thursday would be very helpful.

1            MR. COOPER:  I'm sure we can do it.  That's

2    three days.

3            SPECIAL MASTER:  But Friday at noon for sure.

4            MR. ALIOTO:  Friday at noon.

5            SPECIAL MASTER:  Mr. Bonsignore.

6            MR. BONSIGNORE:  Yes, I mentioned that I have

7    objective evidence that some of the critical and

8    decisive points that Mr. Alioto raised were not true.

9            SPECIAL MASTER:  You wanted to augment the

10   record, as I recall.

11           MR. BONSIGNORE:  Yes, I have emails to him

12   providing information regarding the Massachusetts and

13   the testimony.

14           SPECIAL MASTER:  You're going to have to file a

15   motion to augment the record.

16           MR. BONSIGNORE:  Okay.  I'm just wondering

17   why --

18           SPECIAL MASTER:  I'm not going to give you

19   leave to do that here.

20           MR. BONSIGNORE:  Okay.  I'm just wondering why

21   that's treated differently than the other evidence that

22   you said would complete your picture?  What we have is

23   a --

24           SPECIAL MASTER:  Because I think that's fair

25   and just, and I have constraints, the date on which I

Page 139

1  have to get my report and recommendation in.

2          MR. BONSIGNORE:  I can provide the emails

3  today.

4          SPECIAL MASTER:  You may do so.  You may file

5  the motion today and I'll consider it.

6          Mr. Goldberg.

7          MR. GOLDBERG:  Joseph Goldberg for the IPP.  I

8  don't want to file anything.

9          Before the very first break when you asked a

10 question, and I just want to make sure that the record

11 is clear as to the answer.  You asked about what were

12 the pending claims in the operative, which I believe is

13 the fourth amended complaint.  And I just want to make

14 sure that as I understand it, the record is clear, and

15 you're going to get the docket cites for all of these

16 and you're going to look at it, and I think I'm

17 accurately reporting.

18          In the operative complaint, the fourth amended

19 complaint, any pending -- any pending damages claimed is

20 limited to the 22 class jurisdictions.  That is the 21

21 states and the District of Columbia.  There is no

22 pending damages claim in the operative complaint beyond

23 those 22 jurisdictions.  I believe when you review the

24 complaint, you'll see that's correct.  I think that's

25 what you were asking, and I just want to make sure that

Page 140

1    the record is clear as to what the answer is.  Thank

2    you.

3              SPECIAL MASTER:  All right.  Thank you,

4    everybody.  This was not the two hours I hoped for, but

5    it was three hours and 15 minutes, and you're to be

6    congratulated for that.

7              Mr. Cooper.

8              MR. COOPER:  I'm confused about whether the

9    simultaneous admissions about Chunghwa is to be Thursday

10   at 5 o'clock or Friday at noon.

11             MR. GOLDBERG:  Yours is Thursday and his is

12   Friday.

13             MR. ALIOTO:  I need time.  I need a little

14   time.

15             SPECIAL MASTER:  Friday -- Friday noon.

16             MR. COOPER:  Okay.

17             SPECIAL MASTER:  Friday noon.  If you get it by

18   Thursday, you get a gold star.

19             MR. COOPER:  But they can't be simultaneous.

20             SPECIAL MASTER:  All right.  We're off the

21   record.  Thank you very much.

22             (TIME NOTED: 1:17 p.m.)

23

24

25

Page 141

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby certify:

3          That the foregoing proceedings were taken

4     before me at the time and place herein set forth; that

5     any witnesses in the foregoing proceedings, prior to

6     testifying, were duly sworn; that a record of the

7     proceedings was made by me using machine shorthand which

8     was thereafter transcribed under my direction; that the

9     foregoing transcript is a true record of the testimony

10    given.

11         Further, that if the foregoing pertains to the

12    original transcript of a deposition in a Federal Case,

13    before completion of the proceedings, review of the

14    transcript [ ] was [ ] was not requested.

15         I further, certify I am neither financially

16    interested in the action nor a relative or employee of

17    any attorney or party to this action.

18         IN WITNESS WHEREOF, I have this date subscribed

19    my name.

20    Dated: 1/10/16.

21                         *Suzanne F. Boschetti*

22

              SUZANNE F. BOSCHETTI

23            CSR No. 5111

24

25

**[& - 764-8700]**

| & |
| --- |
| **&**   3:11 4:12 5:3,12 6:17 7:4 10:3,11 11:3,19 12:4 13:4 14:22 15:2,11,17,21 16:25 17:14,25 |

| 0 |
| --- |
| **05944**   1:6 2:6 **0921**   12:7 |

| 1 |
| --- |
| **1**   4:6 32:16 **1.1**   31:18 **1.5**   84:17 **1.57**   67:18 **1.67**   115:2,11,16 **1/10/16**   141:20 **10**   77:16 88:1 93:2 125:3 134:10 **100**   115:7,9 **10166**   11:6 **1020**   9:19 **1060**   114:7 **10:09**   14:2 **11000**   12:15 **1167**   67:18 **11:34**   76:9 **11:47**   76:9 **12**   40:23 41:2 77:15 **120**   6:19 **1299**   10:22 **13**   124:9 **1449**   70:6,11 **15**   96:22 117:1 140:5 **1500**   2:17 3:5 **155**   6:12 **15th**   20:4 **16**   66:7 **1625**   9:12 **17**   20:5 **17th**   7:17 10:13 **18**   77:11,13 |

| 2 |
| --- |
| **1900**   4:21 **19107**   4:7 **1917**   1:6 2:6 **1999**   131:24 **19th**   131:24 **1:03**   133:21 **1:07**   133:21 **1:17**   2:18 140:22 |

| 2 |
| --- |
| **2**   2:16 3:5 **2.7**   35:1 **2.8**   40:11 **20**   4:14 116:16 **200**   11:5 49:2 **20005-3807**   11:23 **2015**   2:19 **2016**   1:17 14:1 **202**   11:24 **21**   32:19 40:12 139:20 **212**   11:7 **212-3475**   8:24 **2125**   6:19 **215**   4:8 **217-6810**   13:8 **21st**   25:14 **22**   32:23 77:15,16 139:20,23 **22030**   5:15 **221-5763**   6:7 **2280**   3:14 **23**   111:3,7 115:23 126:15 **237-8562**   11:15 **23rd**   4:6 **244-7520**   4:16 **24th**   25:5 **2532**   6:5 **25th**   25:6 **27**   117:4 **2700**   11:13 **28th**   25:8,9 **2905**   9:12 |

| 3 |
| --- |
| **294-4615**   11:7 **2nd**   7:8 |

| 3 |
| --- |
| **300**   11:13 48:25 **309-1761**   5:23 **30th**   118:9 **313**   5:23 **314**   9:8 **317**   11:15 **3400**   5:6 **350-0000**   8:7 **357**   7:8 **35th**   8:14 **361**   9:21 **3771**   8:5 **393-8293**   12:8 **39560**   8:23 **398-4340**   4:23 **3:07**   1:6 2:6 |

| 4 |
| --- |
| **4**   84:20 **40**   64:10 **40004-2400**   10:23 **4041**   5:14 **41**   71:2 **410**   8:24 **415**   3:7,16 5:8 6:7 6:14 7:10,19 8:16 10:7,15 12:8,17 13:8 **423**   113:25 **4247**   9:6 **434-8900**   8:16 **434-9100**   10:15 **439-1313**   10:7 **44**   5:6 **455**   12:15 **456**   7:17 **459**   56:12 58:7 61:5 **46204**   11:14 **473**   113:24 **48226**   5:22 |

| 5 |
| --- |
| **5**   1:17 2:19 14:1 84:20 88:2 140:10 **50**   33:10 50:9 55:23 **500**   9:19 40:9 **505**   4:16 **51**   56:9 70:6,11 **5111**   1:23 2:21 141:23 **514**   8:22 **516**   97:10 **52**   56:2,3 **55**   97:9 **555**   10:5 12:6 **56**   40:23 **563-7200**   3:16 **567-6565**   4:8 **576**   27:7 28:3 34:6 35:16 76:2 93:2 **58**   77:7 78:11 |

| 6 |
| --- |
| **60,000**   77:24 **600**   4:21 **619**   4:23 **620**   5:21 **626-3609**   11:24 **631-3883**   9:8 **63111**   9:7 **65**   37:7 **693-0700**   5:8 **698-5200**   9:21 **6th**   106:22 |

| 7 |
| --- |
| **7**   88:1 102:10 **700**   4:14 **701**   11:22 **703**   5:16 **703-5908**   12:17 **706**   13:6 **715**   67:18 **719**   5:21 **764-8700**   5:16 |

**[768 - alioto]**                                                                Page 2

**768**  97:9
**775**  114:7
**781**  8:7
**78401**  9:20
**788-3030**  7:10
**788-7210**  7:19
**797**  97:9

**8**

**80**  84:21 116:22
**80202-1539**  9:13
**824**  97:10
**83**  78:12
**87102**  4:15
**89121**  8:6

**9**

**900**  6:12
**92101**  4:22
**925**  6:21
**94102-7002**  12:16
**94103**  7:9
**94104**  5:7 7:18 8:15
  10:6
**94105**  12:7
**94111**  3:6 13:7
**94111-4109**  10:14
**94114**  6:13
**94121**  6:6
**94123**  3:15
**945-0200**  6:21
**94598**  6:20
**9756270**  131:23
**982-5267**  3:7
**986-1400**  6:14
**9:55**  2:18

**a**

**a.m.**  2:18 14:2 76:9
  76:9
**abandoned**  21:5
  72:14
**abandoning**  75:13
**ability**  106:23 118:9
**able**  33:11 46:25
  49:12 68:2,22 78:2

125:21 126:12
  129:20 130:2,11
**absence**  84:1,3
  109:10
**absent**  70:12 103:12
**absolute**  68:10
  74:14
**absolutely**  64:16
  65:13 84:9,11 86:5
  126:25 129:5
  134:24
**abuse**  114:1,25
**academic**  57:11
**acceptable**  112:1
**accepting**  58:16,19
**access**  49:16,17
  102:19
**accommodate**  27:21
  28:22 134:6
**accurate**  105:18,25
  107:11
**accurately**  139:17
**acknowledging**
  23:15
**acknowledgment**
  95:16
**acquaintances**
  16:15
**act**  43:4 44:2 45:4
  55:16 65:15,15
**acted**  22:16
**acting**  44:14 66:14
  66:17
**action**  41:9 53:14
  55:15 60:8 66:6
  67:14 129:9 141:16
  141:17
**actions**  1:8 2:8
**active**  67:1
**activity**  131:11
**actual**  59:12 99:6
**ad**  80:12,21,21,24
**add**  57:6 72:17 79:2
  96:12 97:1

**added**  25:3
**addition**  127:9
**additional**  98:3,13
  109:10,14,18,21
  125:17 136:16,19
**address**  18:8 24:1
  35:6 51:22 124:1
  134:23
**addressed**  29:12
  35:7 51:7 113:21
**adelson**  10:4 15:11
  15:11
**adequacy**  19:5
  21:22 22:3 26:13
  32:5 33:12 40:3,3
  106:3 110:25
**adequate**  26:10 28:2
  28:18 30:6,11 33:7
  76:16
**adhere**  111:6
**adjective**  75:12
**adjectives**  73:7
**administration**
  111:14,16
**administrator**  79:19
  82:15 125:21,23
**admissions**  140:9
**adopt**  27:11
**adopted**  131:15
**adopting**  49:5
**adoption**  47:13
**ads**  80:11
**advance**  21:1 96:25
**advanced**  20:17
  83:9
**advantaged**  104:20
**advertisement**
  103:1
**advice**  100:25
**advocacy**  85:2
**advocate**  21:1
**advocating**  21:3
  27:19 85:4
**afford**  60:1

**affording**  40:21
  41:4 44:3
**afternoon**  106:21
**ag**  57:2 105:13
**agenda**  118:12
**agendas**  56:18
**ages**  77:16
**aggregator**  106:21
**aggregators**  71:2
**ago**  21:17 94:18
  134:25
**agree**  40:7 45:25
  97:22 101:17
  105:18 108:24,25
  131:15 137:15
**agreed**  100:3 108:24
**agreement**  39:5
  115:18 127:18
  137:13
**agreements**  26:18
  30:3,10
**agrees**  44:22
**ags**  59:11 88:13
  93:22 95:11 101:1
**ahead**  22:9 53:8
  71:17 73:17 86:18
  86:22 99:22 103:22
  113:9
**albeit**  105:22
**albuquerque**  4:15
  14:22
**alioto**  3:11,12 14:8,8
  20:23 21:22 22:24
  23:18,19 26:6,14,16
  28:15 29:9,17 32:10
  33:3 35:5 36:1,9,11
  36:21 37:11,16,24
  38:2,11,15 39:10
  45:24 51:22,25 52:6
  52:12 53:1,2,5,17
  53:22,23 54:7 59:4
  59:9,21 61:9,12,20
  62:4,10,25 63:5,11
  63:20 67:10,24 68:4
  73:18 74:10,22 75:7

**[alioto - article]** Page 3

75:11 76:1,1 79:3
79:10 81:22 82:1,14
85:14 86:1 90:1,2
90:22,24 91:9 92:2
92:7,25 93:11 94:24
95:8,23,24 96:5,10
96:14,25 98:5,6,9
100:11 104:5,19
105:2,12 118:19
119:10,20 120:22
121:16 125:14
127:2 128:21,25
129:14,23 133:23
134:4,15 135:9,19
137:6,11,23 138:4,8
140:13
**alioto's** 32:12 100:9
118:25
**aliotolaw.com** 8:17
**allegation** 63:11
67:3 69:11
**alleged** 59:13 62:19
136:13,13
**alleges** 45:3
**allocate** 90:9
**allocated** 94:4
**allocation** 21:12
26:13,21 27:6 28:5
28:9 29:1,7 30:7,14
30:16 39:19 81:25
86:25 87:1,8,8,9,10
87:11,18,23 89:18
89:19 94:5,5,11,15
100:22 101:1
102:16,17,23 104:5
108:15 109:3
110:22 114:2 115:7
115:25 122:22
133:6,11 134:1
**allocations** 26:25
**allow** 47:8 100:16
109:4 111:9 121:8
136:25
**allowance** 68:11

**allowed** 37:21 51:9
65:1
**allowing** 42:19
**allows** 67:6,7 115:20
119:7
**alternatives** 109:16
**ambivalence** 23:10
23:20,25
**amended** 63:4
139:13,18
**america** 114:6
**american** 44:16,17
**amount** 19:25 26:8
26:9 30:4,21 31:10
31:22 32:9,16,17,22
33:7 34:8 35:7 37:6
90:5,8,13 91:4,7
94:3,7 95:9,10,12
95:13,14 112:24
116:9 122:23
132:14,21,24
**amounts** 87:21
95:11 99:20
**analysis** 35:2 36:3,3
36:7 46:21 57:22
58:1 103:9
**analyze** 59:24
**analyzed** 46:14
**anderson** 6:10,11
18:2,2,3
**andrus** 6:10 18:3
**andrusanderson.c...**
6:15
**angles** 106:15
**announce** 17:5
**announced** 18:7
**answer** 22:8,11 23:8
50:1 53:18 61:9
63:6 75:8,14 117:20
139:11 140:1
**answer's** 64:6
**ante** 79:23 82:8
**antitrust** 1:5 2:5
44:7,8,9 46:7,23,24
47:16 48:22 65:24

**anybody** 76:11
78:17 85:20 105:8,8
123:9
**anymore** 120:16
**apart** 29:2 41:23
**apologize** 103:16
119:1,20 123:25
**apologized** 120:13
**apoplectic** 68:1
**apparently** 118:19
118:25
**appeals** 126:20
**appearances** 3:1 4:1
5:1 6:1 7:1 8:1 9:1
10:1 11:1 12:1 13:1
**appeared** 19:14
93:14
**appears** 44:1
**apple** 102:13
**applied** 45:20,21
**applies** 43:22 45:20
**apply** 43:2,5,7 133:8
**appoint** 18:23 23:6
**appointed** 20:6,15
20:20 21:11 24:8,9
24:22 71:20 129:6,8
129:10,12,15,17
130:7
**appointing** 130:2
**appointment** 24:14
131:6
**appreciate** 16:16
21:10
**approach** 28:21,25
58:5
**approached** 39:9
**appropriate** 22:18
23:12 28:4 31:1
104:25 109:11,25
116:1,17
**appropriateness**
18:22 19:1 26:4
**approval** 26:8,9
29:1 30:12 36:13,15
50:5,14 55:16,20

79:22 80:1 81:21
86:24,25 90:19
93:13,23 95:4 96:2
106:7 112:2,4 118:2
118:6 126:13 133:4
133:9,14 137:14,14
**approve** 33:18 34:7
34:22 127:21
**approved** 27:14
28:22,25 29:5,6
30:3,5 76:3 133:17
134:8
**approving** 40:25
60:20 92:16 95:20
96:20
**approvingly** 114:10
**arguably** 65:5
**argue** 70:18
**argued** 50:5,7 72:21
115:14
**argues** 124:17
**arguing** 50:5
**argument** 1:15 2:15
45:19 47:5 66:11
68:8 82:7 86:6,10
92:10,10,11 93:13
98:23 104:17 108:3
108:8,22 121:19
123:13 126:6,8
131:20 132:3,5
**arguments** 22:5
39:23 53:10 73:1
92:8 115:16 122:10
123:7 124:1 126:18
131:15
**arisen** 110:14
**arises** 46:23
**arizona** 88:3
**arizona's** 88:2
**arranged** 125:23
**arrangement** 93:25
134:6
**arrived** 54:10 94:15
**article** 47:6 64:7

**articulate** 29:24
**artificially** 41:15
**aside** 77:14 100:18
  100:19 106:15
  108:6,16 112:14
**asked** 20:13,14
  21:24 22:1 34:18
  39:10 103:8,16
  136:2 139:9,11
**asking** 23:13 82:24
  106:22 132:22
  137:19 139:25
**assert** 57:17 61:16
  73:20
**asserted** 60:14
  62:20,23,25
**assistance** 124:9
**associated** 72:20
  106:9
**assume** 82:22 108:3
  108:11,22
**assuming** 43:6
  81:18 108:14
**attached** 49:6 95:21
**attacked** 34:3
**attacks** 68:25
**attempt** 29:23 33:1
  43:1
**attempts** 72:18
**attendant** 27:1
**attention** 74:12
  113:16 118:13
**attorney** 8:12,20
  9:11 12:13 13:12
  16:4 19:8,10 28:23
  51:8 55:22 56:10,15
  79:7 111:1 112:3,9
  141:17
**attorneys** 3:11
  44:15 55:23 56:3,17
  58:8 67:7,8 70:13
  93:14 123:21
**attributable** 122:6
  125:6

**augment** 138:9,15
**authorities** 128:22
  130:19
**authority** 24:13
  47:6 48:3,4,7 53:11
  53:13,15 64:5,6
**authors** 47:18
**authorship** 27:13
**available** 32:17
  37:19 67:25 79:9
  82:16
**avenue** 10:22 11:5
  12:15
**avoid** 46:3 120:2
**award** 43:24
**aware** 37:11 56:24
  64:25 68:4,6,6
  101:13,23 103:11
  106:24 113:20
  120:5 121:12
**axes** 56:18

**b**

**b** 4:21 27:11
**back** 20:10 28:7
  29:7 36:13 46:9
  68:19 70:4 76:7
  104:22 108:10
  110:2 115:14
  116:13 117:25
  118:5 133:20
**background** 60:25
  94:8,11
**bad** 118:24
**baker** 10:19 11:11
  15:15 17:16
**bakerbotts.com**
  10:24,25
**ball** 83:8
**bandas** 9:17,18 17:6
  17:6
**bandaslawfirm.com**
  9:22
**bank** 75:25 114:6

**banner** 80:11,21,24
**bar** 43:3 69:13
**bargained** 30:5
**barred** 66:1
**base** 122:9
**based** 53:25 54:2,2
  68:2 94:4,7 99:16
  103:5 106:11 108:7
  108:24 109:17
  111:21 116:6,18
**bases** 69:1
**basically** 72:19
  115:19
**basis** 54:14 57:19,20
  60:17 85:22 113:15
  126:17,17,25
**battle** 58:19 83:8
  86:7,10
**battles** 68:24
**beach** 8:23
**bear** 60:3 79:24
**bears** 61:21
**beat** 51:14,14
  120:15
**beaten** 51:17 66:22
**beginning** 2:18
  40:17 116:9,14
  119:9
**begins** 46:22,22
**behalf** 15:2,9,15,18
  16:3,20,22 17:14,17
  17:18 18:1,3,5
  62:20 68:20 99:11
  102:12 110:20
  126:24 128:4,8,17
  128:19 129:20
  130:12
**beings** 78:3
**believe** 20:5 22:1
  30:7 40:16 50:4
  68:24 74:22 91:9
  97:2 102:16,21
  103:6,13,20 104:21
  104:23 106:2 120:7
  120:21 127:9

139:12,23
**bells** 54:20
**benefit** 14:6 101:21
  103:9 110:9,10
**benefits** 44:9,10
**best** 26:23 57:24
  81:13,13 82:10
  115:23
**better** 44:12 66:12
  135:2,10
**beyond** 70:1 125:3
  139:22
**bgralewski** 4:24
**big** 74:17 78:6 93:6
  100:12 121:25
  134:21
**billion** 31:18 35:1
  40:11
**birkhaeuser** 6:17
  17:24,25
**birkhauser** 6:18
  17:25
**bit** 25:14 81:23
  118:8 119:10
**black** 4:3 14:18
  16:24
**blake** 94:17
**blame** 67:11
**blaming** 67:11,12
**blown** 68:10
**bob** 16:19
**body** 65:6
**bogdanov** 7:7 16:25
  16:25
**boies** 5:12 15:21
**boies.com** 5:17
**bonsignore** 8:3,4
  15:9,9 24:4,5,6,7,23
  25:5,24 38:22 50:21
  50:22 51:13,18
  52:12 63:17 67:1,3
  67:21 69:5,7,24
  70:9 71:16 73:11
  74:23 75:15 85:25
  86:1 97:7,8,13,17

131:10,12 138:5,6
138:11,16,20 139:2
**bonsignore's** 53:3
**bootstrap** 130:10
**boschetti** 1:23 2:20
141:22
**bother** 24:19 31:5
**botts** 10:19 15:15
17:16
**bought** 41:14,19
42:7 77:21
**boulevard** 9:6,19
**boundary** 42:10
**box** 111:10
**boyd** 4:12 14:21
**bramson** 6:17 17:25
**bramsonplutzik.co...**
6:22
**brass** 12:5 17:10,10
**break** 66:21 73:6
76:7 139:9
**breath** 59:19
**brevity** 40:2,2
**brick** 42:16,16,25
43:12,14,15,16,21
45:19 46:2,3 47:1,8
63:25 64:9,11,12,24
66:1
**brief** 24:25 47:16
49:9 51:3 55:11
61:25 64:22 68:8
70:8,9 77:1 78:9
87:14 90:4,10,11
91:14 97:16 103:7
125:15 129:7,16
137:6,16
**briefed** 96:18
**briefing** 75:5 98:13
99:13,14 107:25
121:12 123:20
126:19 132:6 135:5
135:7,8 137:2
**briefings** 136:2
**briefly** 50:22 51:15
51:18 63:24 80:5

97:8 124:1 129:3
131:12
**briefs** 19:15,17 48:9
52:1 60:20 67:20
76:17 123:16 137:8
137:17
**bring** 56:16 57:12
65:25 73:19 100:14
129:8
**bringing** 57:14
69:14 120:11 128:2
128:3,4,7,17,18
**brings** 98:15
**broad** 4:6
**broader** 27:9
**broadly** 133:8
**brought** 68:20 74:12
75:9 95:16 99:11
105:5 113:16
118:13 127:3
130:17
**burden** 130:22
**business** 62:1 84:14
**bust** 124:22,22
**buy** 132:17

**c**

**c** 3:13 5:4 11:4
27:12 111:4
**ca** 8:15
**cafa** 55:12,20 56:9
56:12,20 61:5 93:15
**calculate** 81:5
**calculation** 56:12
94:8,9
**california** 1:2,16 2:2
2:17 3:6,15 4:22 5:7
6:6,13,20 7:9,18
10:5,6,14 12:7,11
12:16 13:7 14:1
16:4 52:19 64:22
79:7 82:3 98:20,24
99:6 101:18 102:6
103:18 104:7,12
105:3,7,19 106:4

107:4,20 108:25
111:1 112:3,9 141:2
**california's** 88:1
**call** 120:1
**called** 42:10
**campaign** 112:20
**cap** 112:1,7,8
**capacity** 21:12
128:5,19
**capurro** 3:13 14:15
14:16 38:5,9 63:13
128:11,14 129:2,3
129:14 130:5,21,25
132:2
**care** 31:6 32:23
52:14 95:6 101:1,3
130:20
**carefully** 39:5
**carried** 121:9,10
**cartel** 57:18
**carve** 88:25 95:5
**carving** 133:25
**case** 11:19 17:14
31:17 35:1 37:8,20
38:24 41:20,24 42:4
43:21 47:10 48:15
48:16,18 50:3 54:13
54:16 55:2,24 56:7
56:16 57:24 58:6,20
59:1,12 60:21 61:4
62:18 63:2 64:16,17
64:22,25 65:23 66:5
66:11 68:19,21
70:15,15,25 71:6
72:2 73:23 74:1,2
74:15 75:4,23 91:23
91:25 94:13 97:1,9
97:12 100:19 106:9
110:1,15 113:24
115:6,19 119:15,23
125:22,23 127:25
129:5,5,15,19,22
130:23 131:23
136:12 141:12

**cases** 45:24,24 47:15
48:8 51:3 53:19,25
55:8,17 57:25 64:13
65:11,14,16 70:8
74:16,18 99:16
104:16 108:1
109:18,21,23
110:12,14 112:1
126:22,23 129:6,16
136:8,9
**category** 120:10
**cathode** 1:5 2:5
**caught** 52:22
**cause** 28:19 29:20
39:6 100:10
**causes** 124:14
**caution** 20:1 75:1
**cbandas** 9:22
**ccorbitt** 5:9
**ccurran** 11:25
**census** 87:20
**cent** 108:19
**center** 2:17 3:5
10:13
**cert** 97:10
**certain** 33:19 35:5
37:13 48:15 87:19
92:22 93:14 95:1,1
118:20 121:11
134:24 135:22
**certainly** 19:13
27:19 38:13 41:17
53:25 57:3 74:11
79:20 115:19
126:14 134:15
135:1
**certification** 33:2
54:18 63:14
**certified** 2:20 55:25
56:1 63:14 141:1
**certify** 141:2,15
**challenge** 57:4
**challenging** 58:18
**chance** 19:21 53:1
58:6,9 76:13,22

136:10
change   20:13,14
  39:14 43:7
changed   23:13
  25:13 68:7
characterization
  107:11
charged   57:1
chart   95:21
chase   63:25
cheaper   77:23
check   82:14 91:11
  91:17 96:5
checks   108:20
chief   47:13
chill   63:18
choice   42:18 104:11
  135:10
choices   84:15
chose   71:8
chris   16:21 17:6,13
christi   9:20
christopher   5:5 9:18
  11:20
chunghwa   12:3
  17:11 19:7 50:3,8
  54:16 86:13,16 87:2
  87:2,7,13,18 89:9
  89:14,18,20,22 90:6
  90:17,19 91:23
  92:16 93:13 94:25
  95:18,20 96:20
  121:23 124:2,18
  125:1,2 134:6,9,14
  135:14 136:7,23
  140:9
chunghwa's   124:8
cihlar   5:13 15:21,21
circuit   42:4 44:5,6
  48:15,19 64:17
  65:21 66:1,4 97:9
  110:12,15 113:18
  113:20,23,25
  114:11 131:24

circuits   65:21
  113:18,20
circumstances   42:8
  118:10 120:3
citations   49:21
  114:17 136:11
cite   90:10,11 114:19
  129:7,16 131:23
  136:16
cited   27:15 36:12
  47:15,16 48:9,16,24
  48:25 51:2 64:16
  65:18,21 91:14
  97:15 114:9 126:23
  130:20,22,23
cites   139:15
citing   45:24 49:4,9
  70:7
citizens   101:3
claim   19:9 33:4
  35:20 42:13,14,24
  43:12,20 44:13 46:7
  46:8 47:9 48:1,8
  50:9 57:13,14,17
  58:9 59:23,24 60:11
  61:14 62:12,14,19
  62:22 64:4,12 65:25
  66:1,16 67:4 68:19
  69:1,2,10,12,14,22
  71:13 72:24 73:13
  73:21 89:8 97:3,4
  98:16 100:10
  102:12 103:19,22
  104:8,14 105:5,10
  106:1 108:9 109:12
  111:4,7 116:21,25
  121:7,8 125:20
  126:5 136:20
  139:22
claim's   103:21
claimant   34:20
claimants   27:8
  32:15 56:1 60:9
  73:25 74:16 104:13
  105:20,20 106:4

109:15 111:22
  113:14 114:3 115:3
  116:8,17 125:21,24
claimed   98:21 126:4
  139:19
claims   30:22 32:6,7
  32:10,11,15,23 33:3
  33:12,22,24 34:20
  39:1,2 40:4,6,20,22
  41:2,2,5 43:15,16
  43:18 45:8 46:4
  48:5,14 50:23 51:1
  51:9 53:16 54:1,9
  55:8 57:9 58:17,21
  58:22 59:11,12,13
  59:14,16 60:2,5,6,6
  60:10,13,15 65:2
  67:5 71:21,25 72:1
  72:1 73:12,19,21
  78:4,7,8 79:4,18,19
  81:24 87:21 98:20
  98:22 99:10,11
  100:2,6,12,17,18,19
  101:19 102:10,19
  103:3,8 104:4,6,10
  104:25 105:6
  106:23 107:25
  108:16 109:7,19
  110:4,7,16 111:14
  111:16,19,21
  112:21,24 116:4,7
  116:18 117:11,13
  117:23 120:18,19
  120:23 124:13
  125:22,23 126:3,12
  132:18 134:12
  139:12
clarification   88:11
class   3:10 13:3 19:2
  19:3,4 20:7 32:24
  33:1 34:13 35:19,22
  40:12 41:9,12 42:6
  43:8 54:18 55:15
  57:20 60:7 61:22
  63:14,14 65:1,24

66:5,6 67:14,15,17
  70:11,12,14 71:14
  74:3 77:9,25 88:15
  88:16 89:6 91:12,18
  91:22 96:7,8 97:22
  98:1 100:6 101:22
  105:20 111:12
  116:10 122:6 124:4
  124:12,13,17 125:6
  127:6,10,13,16
  128:5,19 129:6,8,8
  129:10,12,15,17,17
  129:20 130:16
  131:14 139:20
classactions.us   8:8
classes   55:25 56:1
  59:13 75:17 110:8,9
clause   113:4
clayton   7:16 17:2,2
  44:2 65:15
clear   23:8 32:8 53:7
  54:12 90:4 91:14
  100:4 126:22
  139:11,14 140:1
clearly   114:6
clerk's   37:18
click   80:22
clicks   78:19
client   57:12 62:12
  74:23 75:22 97:21
  126:16,22 127:20
  127:21,24 128:17
  128:19
clients   52:17 74:4
  128:4,8
close   29:14 58:12
closed   103:21
closer   111:23
closest   127:4
cmicheletti   5:10
cogently   67:20
cognizable   45:8
cognizant   130:15
cohen   13:12 14:13
  19:15 133:19

137:18,21
colleague 63:21
colleagues 98:19
collected 44:4
collectively 30:4
colorable 50:9
columbia 139:21
combined 54:17
come 28:17 29:13
  30:8 34:17 42:2
  43:1 59:14 61:24
  76:7 78:23 85:19
  100:12,21,25
  106:14 107:9 110:2
  114:4 115:8 119:24
  123:11 126:12,16
comes 18:8 45:3
  94:2
comfortable 135:16
coming 42:4 44:15
  61:1 88:15 101:10
comments 19:18
commerce 31:21
commitments 95:17
common 46:4 51:1
  82:11
communications
  119:22 120:6
companion 105:21
company 70:6
comparability 35:8
compare 35:22
compared 40:10
compensation 31:2
  39:20
competition 44:18
competitive 41:22
competitors 85:9
complain 70:18
  101:4,5 112:10
complaint 63:4
  75:19,19 139:13,18
  139:19,22,24
complaints 62:17
  73:22 136:12

complete 53:24 82:4
  101:22 138:22
completely 34:6
  62:11 108:18
completion 141:13
complies 18:10
component 61:21
comprehensive
  55:22 56:2 91:24
  133:13
compromise 112:16
compromised 58:10
compute 40:14
comscore 81:3,8,8
concept 60:4
conceptually 81:24
concern 28:19
  106:13,16,17
concerned 135:13
concerns 27:22
  29:15
conclusion 28:17
  61:24 114:5 129:21
concocted 53:12
confess 86:14
confidential 38:1
confirm 121:8
confirming 94:19
confused 60:4 86:14
  121:1 140:8
confusing 136:3
confusion 49:10
  94:2
congratulated 140:6
connection 95:18
consensus 29:24
consequences 107:7
  107:8 126:18
consider 28:4 34:5
  51:16 77:3 114:1
  123:8 129:1 130:18
  131:25 139:5
considerably 132:20
consideration 30:23
  60:9 115:17

considered 34:2
  69:11 79:25
considering 48:9,20
  82:24
consistent 134:19
conspiracy 31:18
  41:23 124:22
constitutional 93:7
constraints 138:25
constructive 30:1
  104:23
consultation 27:4
  57:23 135:19
consumer 51:2
consumers 68:20
consuming 126:20
contacted 106:20
contemplated 95:25
contemplation
  107:18
contest 57:3 106:2
contested 94:1
  115:22
context 47:7 102:23
continually 116:7
continue 116:6
continued 4:1 5:1
  6:1 7:1 8:1 9:1 10:1
  11:1 12:1 13:1
contract 20:23
contracts 30:3 77:14
contractual 93:25
contrary 65:17 73:2
  91:15
control 70:12,17
controlling 64:17
conversations 119:7
convey 44:9,11
cooper 7:4,5 15:2,4
  15:4 16:25 20:2,9
  21:18 22:11 23:1,8
  23:15 24:17,25 25:8
  32:1,5 37:10,17
  38:1,7 63:6,8,16
  82:22 83:3,21 84:24

85:12 86:18,19,22
  88:4,8,18,20,23
  89:6,12 95:9 96:7
  96:23 118:14,15,25
  119:2 120:5,15
  121:11 126:8 127:4
  127:8,14 128:7,9
  132:6 135:8,11,18
  135:22 137:4,10,20
  138:1 140:7,8,16,19
coopkirk.com 7:11
  7:12
copies 62:16,17
  136:24 137:12
corbitt 5:4 15:19,20
core 53:10
corners 106:15
corp 97:13
corporate 124:19
corporation 131:22
corporations 78:6
  104:20 108:17
  109:6
corpus 9:20
correct 31:3,9 44:20
  52:6 59:3 65:9
  69:20 84:6,10,11
  102:8 107:17 122:2
  123:4 125:9 127:7,8
  128:1,6 134:3
  139:24
corrected 52:22
  70:2
cost 84:20 97:25
  110:3
costs 98:2,4
counsel 14:9 16:6
  18:4,23 20:6,15
  21:12,12 22:6,21
  24:22 25:4,14 27:3
  30:16 33:1 38:2,18
  53:20 57:23 67:13
  68:23 69:21,24
  70:12,15 71:10,11
  71:12,15,19,19,19

72:19,20 73:15
76:19 97:22 111:12
118:23 119:7 124:4
124:12,17 125:6
126:11 127:9,24
128:5,19 129:5,6,8
129:10,12,15,17,18
130:2,8 131:5,6,7
132:13
**counsel's** 40:5 73:19
98:1 121:19 122:6
**country** 30:22 31:12
31:12,13 32:8 64:23
**couple** 61:1 63:22
94:18 104:23
105:16 110:21
114:4 121:14
**course** 30:22 57:7
112:12 135:2
**court** 1:1 2:1 14:6
18:9 20:13,25 21:15
23:21 25:12,15
35:15 38:16,17
42:17 43:1,6,24
45:3,21,22 46:5,12
46:13 47:2 49:8
51:7 59:19 64:15
79:21 81:18 82:8,11
85:1 86:5 96:2
98:24,25,25 99:22
103:15,17 104:1,15
105:25 106:10,16
109:17 111:18
112:2 113:12,19
115:12,15 117:14
121:7,8 124:8 129:6
129:7,9,11,14,17,25
130:15,17,18
131:24 134:8
**court's** 130:10 136:5
**courthouse** 41:6
43:3 75:18
**courts** 45:14 114:4
114:22

**cover** 18:18 76:14
**covered** 18:16
118:11
**craft** 39:5
**craig** 5:4 15:19
**create** 27:25 28:12
72:1 98:19
**created** 86:15 125:2
**creates** 87:21
**creating** 111:13
**creek** 6:20
**critical** 44:16 138:7
**criticism** 101:16
**criticized** 101:24
**crowd** 16:9
**crt** 1:5 2:5
**crts** 77:21
**crucial** 91:17 126:15
**crutcher** 12:4
**crystal** 100:4
**csr** 1:23 141:23
**cure** 72:18 93:4
**cured** 91:23
**curran** 11:20 17:14
**current** 87:24
**currently** 127:6
**cut** 39:3,8 63:25
115:3,4
**cv** 1:6 2:6 83:12
**cy** 101:20 107:14,15
108:25 109:13
110:6,17 113:6,15
113:21 114:1,9
115:9

**d**

**d** 7:7 8:12,13
**d.c.** 10:23 11:23
**damage** 35:2 37:12
40:11,12 42:1 44:23
62:7 110:9 112:7,8
114:2,24 116:14
**damages** 34:19
36:16,17 37:7 57:19
62:20 67:6,8 108:7

108:10,12,18 109:5
110:23 111:23,24
112:1 114:10 115:1
115:3,17,20 116:13
116:16 139:19,22
**dan** 17:24
**dandy** 84:8
**daniel** 6:18
**daniels** 11:11
**data** 79:4 80:15,23
80:25 81:2,3,7
87:20 102:20 103:8
107:25 109:3,3,10
109:20 111:17,19
116:5,18
**database** 78:23,23
**date** 25:9,13 89:15
111:22 118:7
138:25 141:18
**dated** 141:20
**daubert** 38:10,12
**day** 34:23 81:6
94:18 108:6
**days** 21:17 94:18
138:2
**dbirkhaeuser** 6:22
**de** 23:24
**dead** 51:14,15
**deadline** 19:9 82:3,5
98:16 99:1,1,1
103:21 104:6,11
105:1,7 106:5,6
107:2,4 111:18,19
116:7,25 117:12,23
**deadlines** 106:1
**deal** 75:24 76:8
93:25 104:24 107:6
118:10 129:25
130:1 133:16
**dealing** 48:11,13
133:24
**dealt** 47:11
**death** 66:22
**debate** 52:19 57:8,9
57:11,11

**debated** 20:9,11
23:11
**december** 25:5,8,9
102:10 106:22
**decide** 21:19 101:9
**decided** 84:13
131:23
**decides** 23:6
**decision** 46:19 47:12
47:23 54:13 57:5
69:13 75:2 82:10
109:24 114:6,7,9
115:1
**decisions** 57:2 74:6
**decisive** 138:8
**declaration** 76:19
80:7,16 111:4
136:19
**declarations** 76:20
123:21
**decline** 77:20
**deduct** 97:25 98:2
**deemed** 87:24
**defect** 72:18,21
**defects** 29:8,10
**defendant** 55:17
56:2,9,11 124:19
**defendants** 10:2,10
10:18 11:2,10,18
12:3 15:14,16,18
17:9,9,11,15,17
20:19 26:9 28:2,8
29:6,19,21,23 30:10
31:5 42:19 44:4
50:4,15 52:4 55:9
55:15 56:8,9 57:18
58:20 59:5 62:2
68:17,21 69:1,3,12
72:21 100:3,8
124:21 129:25
132:11 133:11
**defense** 29:24
**defer** 26:11
**deficiencies** 102:21

**definitely** 136:24
**delay** 21:7 23:23
**delayed** 21:7
**demand** 70:3 72:19
  73:2 120:3
**demonstratively**
  40:21
**denied** 97:10 103:10
**denver** 9:13
**department** 12:12
  56:3,11 58:8
**depending** 35:20
**deposition** 37:15,23
  37:25 38:1 141:12
**deserving** 30:11
**designated** 21:1
**designation** 20:19
  22:6,21
**designee** 53:1
**despite** 42:13 47:7
**determination** 41:7
  41:8 98:11 113:13
  116:6
**determine** 29:10
  98:9
**detroit** 5:22
**development** 47:15
**devices** 32:25
**devised** 27:3
**dictate** 75:22
**dictatorship** 70:17
**diego** 4:22
**difference** 21:6 23:4
  42:9 58:15 87:25
  104:16
**differences** 89:17
**different** 27:18
  29:12 30:20 32:2
  33:1 35:20 59:10,11
  59:12 68:24 75:12
  83:5,7,14,18 85:6
  89:21 100:25 103:3
  110:8
**differently** 54:25
  83:15,19 138:21

**difficult** 57:20 99:4
**digital** 80:8,13 81:1
**diligence** 21:14
**direct** 13:3 16:6,11
  54:23 55:2,3 60:21
  100:16 108:13
  125:24
**direction** 28:11
  141:8
**directly** 106:21
  119:2
**directs** 34:12
**disadvantage**
  107:20
**disagree** 112:18
**disapprove** 88:23
**discovery** 21:14,24
  22:1
**discretion** 53:20
  106:1 114:1,25
  117:14
**discuss** 19:13 35:10
**discussed** 110:24
**discussing** 111:11
  113:17
**discussion** 120:17
**discussions** 74:1,3,4
  99:17 120:19 136:1
**disgorgement** 47:3
  48:18 64:3,12,18
  65:6 66:4,7
**dismiss** 68:22,25
  69:4
**dismissed** 40:24
  62:23 63:1 69:10
**disparate** 98:20
  105:9
**disparities** 134:7
**disparity** 41:12
**dispassionately** 73:7
**disposed** 124:12
**dispute** 124:7,8
**disputing** 132:2
**dissemination** 55:7

**distinction** 59:16
  60:18 105:24
**distinguished**
  106:11
**distinguishing**
  105:19 112:17,19
  112:23 113:6
**distribute** 91:5
  113:14
**distributed** 27:8
  71:3 95:10 107:19
  107:24
**distributing** 89:22
**distribution** 52:9,10
  88:12 95:6 108:13
  114:1 116:4,8 134:8
  134:9
**distributions** 88:9
  115:9,20 118:18
**district** 1:1,2 2:1,2
  36:14 64:22 75:20
  96:2 105:25 139:21
**divided** 87:19 92:22
**docket** 49:9,14,22
  49:23 62:16 136:11
  139:15
**document** 1:7 2:7
  91:12,17 111:5
**documents** 55:24
  135:19,20 136:24
  137:11,15
**dog** 93:3 97:23
**doing** 20:16 21:25
  38:25 41:3 59:19
  82:1 98:19 126:25
**doj** 124:19,20,24
**doj.ca.gov** 12:18
**dollar** 33:9 37:6
  40:10 79:5
**dollars** 71:3 90:7
**domain** 56:25
**don** 16:23
**donald** 4:5
**door** 41:6 43:4

**douglas** 8:19 15:25
**downside** 106:12
  107:2
**dozen** 39:10
**dperelman** 4:10
**dr** 40:10,16
**dram** 47:14 49:13
  49:22 78:23 125:22
  125:23
**drive** 5:14 8:5
**dropped** 61:2
**due** 21:13 25:9
  27:20 40:22 41:4
  76:4 93:7 103:2
  111:3,6 115:22
**dug** 27:13 39:14
**duly** 141:6
**duncan** 4:4 14:17,18
  63:23,24 64:3,16,21
  65:4,9,13,16,20
  66:3 79:11,13,14,14
  80:19 81:22 83:10
**dunn** 12:4
**duration** 31:19
**duties** 128:6
**duty** 71:9,11,15,20
  71:23,25 130:16

e

**e** 6:18
**eadelson** 10:8
**earlier** 125:16
**early** 77:9,11 99:19
  124:12
**easily** 62:17 136:12
**easy** 49:17 105:3,11
**economic** 39:7
  44:17
**editors** 47:18
**effect** 35:25 40:25
  41:1 64:23 91:25
  122:4
**effective** 126:3
**effectiveness** 80:4

**effectuate** 26:23
**efforts** 122:7
**eight** 55:10 58:7
  61:5 116:21
**eighth** 114:11
**either** 25:5 62:19,21
  86:20 104:3,4
  119:14 121:5
**electronic** 113:10
**eliminate** 100:9
**eliminated** 86:11
**eliot** 10:4 15:11
**ellis** 10:3 15:11
**elongated** 85:16
**eloquence** 40:2
**eloquent** 39:24 40:1
**email** 18:8 38:17,23
  54:21 118:19,22
  119:13,14 120:9
  123:1 125:21,24
**emails** 68:7 118:22
  138:11 139:2
**embarcadero** 2:16
  3:5 10:13
**emilio** 12:14 16:3
**emilio.varanini**
  12:18
**emphasize** 61:12
**emphasizing** 124:18
**employee** 141:16
**encompassed** 67:17
**encourage** 99:15
**encouragement**
  117:12
**endorsed** 44:6
**enforcement** 44:11
  56:13,17,19 57:4
**engine** 80:10
**enrichment** 45:16
  45:25 46:4,5,8
  48:14
**entered** 20:24 30:3
  133:5
**enterprising** 106:21

**entire** 22:24 127:10
  129:20
**entirely** 86:10
  108:12
**entirety** 122:8
**entitled** 43:11 86:1
  87:24 93:22
**entity** 47:11
**enunciating** 42:20
**equitable** 43:19
  44:13,21 45:9,17
  47:2,9 48:21 50:6
  62:9,20 65:25 106:1
**equity** 44:2
**erik** 10:20 15:15
**erik.koons** 10:24
**error** 70:22,22
  97:22,25
**escrow** 132:12,16
**especially** 24:13
  52:18 77:8 85:22
**esq** 3:12,13 4:4,5,13
  4:20 5:4,5,13 6:4
  7:5,6,7,15,16 8:4,13
  8:21 9:5,18 10:4,12
  10:20,21 11:4,12,20
  11:21 12:5,14 13:5
  13:12
**essential** 26:19
**essentially** 21:17
  34:5 41:3 50:6
**establish** 42:24
  57:19
**established** 40:7
**estoppel** 121:22
  124:2,16
**evade** 108:4
**evaluate** 22:15
  33:11 37:9 82:8
  85:5
**evaluating** 97:11
**event** 111:17 131:16
**eventually** 74:5
**everybody** 19:22
  27:18 31:14 50:10

104:18 110:6 140:4
**everybody's** 49:15
**evidence** 33:19 34:1
  34:13 41:15,21,24
  41:25 42:17,19,22
  42:23 45:20 53:7
  55:25 68:3,3 77:6,7
  78:11,13,16 80:6
  104:22 138:7,21
**evidently** 79:9
**ex** 79:23 82:8 119:7
  120:6
**exact** 132:21
**exactly** 34:19 40:25
  92:10 102:14
**example** 22:13 40:9
  80:10,13 88:3 103:4
  117:24
**exceed** 135:24
  137:16,17
**exceeds** 111:12
**exception** 43:12
  95:6
**exceptions** 43:14,15
**exchange** 118:19
  119:13,14
**excluded** 8:2 15:10
  24:16 31:22 39:4
  67:5 86:3 88:10
  97:6
**excluding** 123:5
**exclusivity** 100:8
**excuse** 15:10 34:11
  52:21 53:8
**exercise** 53:20
**exhaustively** 79:25
**exhausts** 108:11
**exhibit** 37:23,24
  111:4
**exhibits** 80:8
**exist** 64:12
**existed** 72:11
**existence** 87:1
**exists** 95:17

**expect** 81:18
**expectation** 90:15
**expense** 123:10
**expensive** 126:20
**experience** 120:20
**experienced** 110:13
**experiences** 120:23
**expert** 22:14 34:25
  36:3 77:3 82:23
  83:11,14,23 84:2,5
  84:23 85:1,18,19,21
**expert's** 22:15
**experts** 27:4,4 83:8
  85:3 86:7,10
**explained** 81:7
**explaining** 137:4
**explicitly** 44:6
  114:23
**exposure** 106:13
**expressed** 104:19
**extend** 98:16 99:1
  104:6,17,25 105:7
  106:1 107:3 116:6
  117:22
**extended** 19:10 82:4
  116:25
**extending** 82:3
  104:10 107:2
**extends** 111:18
**extension** 106:5,6
  117:11
**extensive** 54:21
  73:24 80:3 112:20
**extensively** 69:2
  129:4
**extent** 27:10 28:20
  60:12 79:24 82:4
  122:17 134:16
**extra** 109:13
**extraordinarily**
  132:24
**extreme** 75:1
**eyeballs** 102:25

**f**

**f** 1:23 2:19 5:20
    141:22
**f.3d** 67:18 70:6,11
    97:9 113:24 114:7
**fabulous** 85:7
**face** 102:18,20 103:5
    103:13 109:2
**faced** 42:17
**facilitate** 106:22
**facing** 21:8
**fact** 36:2 40:8 41:22
    44:6 51:3,7 68:9
    72:4 74:14 75:16,25
    78:22 94:17 124:14
    130:6 134:17
**factors** 28:3 60:22
    112:17,19,24 122:6
**facts** 53:24 59:25
    60:3
**factual** 41:12 42:13
    42:14 43:25 132:18
**faegre** 11:11
**faegrebd.com** 11:16
**failed** 119:16
**failure** 39:19 69:10
**fair** 19:22 26:10
    27:21 28:2 30:6,11
    61:18 102:22 103:5
    103:7 105:6 113:9
    122:14 128:9
    138:24
**fairfax** 5:15
**fairly** 87:17
**fairness** 18:25 26:12
    55:16
**fall** 43:16
**false** 68:10
**familiar** 67:8
**family** 77:21
**far** 47:21 100:2
    114:8 118:5
**fashion** 64:25
    133:13

**fashioning** 60:8
**fast** 124:4
**faulty** 28:6
**favorably** 101:14
**fbdlaw.com** 4:17
**fears** 104:20
**features** 113:6
**federal** 43:24 44:22
    45:3,22,22 46:11,11
    46:14,17,18,23 47:7
    47:9 48:17 49:8
    50:9 53:13 64:3,11
    64:19 65:15 75:18
    99:22 102:7 108:24
    141:12
**fee** 21:25 122:9
    123:9 125:7
**feed** 81:3
**feel** 22:20 135:16
**feeling** 107:1
**feels** 27:10 104:25
    109:25
**fees** 67:7,8 98:1
    112:24 122:18,22
    122:23 123:25
**fell** 41:23
**felt** 28:20 32:10
    42:18 75:23
**fiduciary** 71:15
    128:6 130:15
**fifth** 5:14 19:8
**figure** 84:19 94:15
    99:5
**file** 75:18,23 100:2
    101:18 103:22,25
    105:6 106:23
    108:16 138:14
    139:4,8
**filed** 20:11,11,22
    24:11 36:12 37:17
    37:17,18 38:6,15
    49:7 50:13,14,15
    68:21 73:12,13,22
    81:20 108:9 120:25
    121:2 128:12 130:7

**filing** 26:7 52:16
    64:11
**final** 30:11 50:5,14
    70:20,20 81:20,20
    87:7 90:19,23 91:7
    91:10 92:11,15,18
    96:2,6 104:9 106:7
    111:17 112:2,4
    116:2 118:2 120:24
    120:24 121:4
    125:14 133:4,4,9,14
    137:14
**finally** 20:22 69:9
    136:23
**financially** 141:15
**find** 41:10 50:17,19
    62:17 63:4 71:25
    78:5 81:15 90:10
    93:3 97:9 106:17
    109:14 129:4
    134:13 136:12
**fine** 4:3 14:18 16:23
    79:15 99:14 133:7
    137:10
**finekaplan.com** 4:9
    4:10
**finger** 84:25
**finish** 136:7
**finished** 16:12
**finn** 9:3 17:18,22
    18:5
**firm** 9:4,17 15:5
    105:15 127:5,17
**first** 4:14 18:19,19
    25:12 26:4 30:9,19
    33:13 46:2,14 82:18
    90:3 105:16,18
    109:15 110:24
    114:25 117:9
    125:11 132:23
    134:23 139:9
**fisher** 76:20 77:8
    78:12 81:3,6 83:11
    83:25,25 84:12
    85:10 136:19

**fisher's** 80:7,15 83:7
**five** 18:17 135:24,25
    137:4,16,17
**fix** 29:7 72:21,22
    98:4,7 99:18 105:11
**fixed** 32:16 41:14
    73:3 87:21
**fixing** 65:24 77:18
    98:7
**flawed** 78:25
**flaws** 83:24 84:1
**floor** 4:6 5:14 7:8,17
    8:14 10:13
**focus** 53:4 59:16,23
    99:25 123:2
**focused** 46:10,11
    125:19
**folks** 38:19 100:1
    109:11
**follow** 23:3
**follows** 46:17
    110:11
**foregoing** 141:3,5,9
    141:11
**forestalling** 116:8
**forget** 57:6 85:14
    86:17
**form** 22:4 77:13
    105:23
**formal** 119:11
    125:20
**formally** 63:1 68:12
**former** 84:12
**formerly** 127:6
**formula** 89:21
**forth** 20:10 94:8
    141:4
**fortman** 9:3 17:19
    17:22 18:5
**forward** 57:17
    73:20 75:2 102:2
    118:9
**fos** 7:20
**fought** 68:23

**[foul - ground]**

**foul** 93:4
**found** 29:8 73:4
  113:25 114:23
**foundational** 33:19
**four** 10:13 62:17
  136:12
**fourth** 19:6 63:3
  139:13,18
**framing** 24:18
**francis** 7:14,15 15:6
  15:7 17:3 76:25
**francisco** 1:16 2:17
  3:6,15 5:7 6:6,13
  7:9,18 8:15 10:6,14
  12:7,16 13:7 14:1
  15:8
**frank** 17:13 117:16
**free** 42:11 123:13
**freedman** 4:12
  14:21
**friday** 137:9,17,19
  138:3,4 140:10,12
  140:15,15,17
**friends** 16:8
**front** 93:21 103:11
  109:9
**fuel** 97:14
**full** 19:22 51:25,25
  53:19 98:10 109:7
  110:7 114:24
  135:14,16
**fund** 108:11,14
**fundamental** 40:19
**fundamentally** 41:6
  42:17 133:16
**further** 125:17
  141:11,15
**furtherance** 128:5
**future** 93:19 136:1

**g**

**game** 67:11 74:24
**gander** 42:21
**garavanian** 8:10
  16:2

**gary** 8:11
**gate** 12:15
**gathered** 73:21
**geagan** 11:4 15:17
  15:17
**general** 12:13 19:9
  19:10 28:23 29:24
  30:14 44:15 51:8
  55:23,23 56:3,10,17
  58:8 79:8 93:14
  97:13 101:14 111:1
  112:3,10 133:10
**general's** 16:4
**generally** 37:19,19
  41:9 88:8 106:2
**generals** 56:15
**generating** 103:3
**gentlemen** 102:24
**geographic** 42:10
**germane** 79:22
**getting** 30:2 31:9
  35:24 92:1 93:19
  99:25 115:16
  116:18 118:17
  119:4,9 134:18
**ghost** 108:23
**gibson** 12:4
**gibsondunn.com**
  12:9
**gidley** 11:21
**gin** 109:19 110:4
**ginning** 112:21
**gist** 93:12
**give** 18:15 19:21
  24:15 31:14 47:2
  48:15,17 51:24 53:1
  53:18 54:8 62:16
  76:13,22 85:5 89:4
  91:1 97:12 100:8,9
  100:25 101:20,21
  103:8 108:17,20
  109:4,5 117:7
  130:11 133:19
  136:10,11,15
  138:18

**given** 24:13,14 28:3
  52:3,3 54:23 56:25
  60:25 71:20 81:7
  96:18 98:21 104:16
  105:6 106:3 113:13
  116:9 134:16
  141:10
**gives** 130:25
**giving** 60:9,9 90:20
  108:6 134:11
**glad** 127:3
**global** 57:18 132:17
  132:25
**gmail.com** 8:25 9:14
**go** 18:13 22:9 29:6
  33:6 37:1 38:17
  45:25 46:1 49:13
  52:24 53:6,8 57:22
  59:8 61:15 70:4
  71:12,13,13,17
  73:17 75:1,18 84:13
  85:21 86:17,22
  87:16 93:17,18
  95:11 101:5 103:12
  103:22 109:13
  113:5,9,21 114:23
  114:25 115:20
  116:3 135:23
**goal** 27:9,13
**goes** 47:25 49:2 58:1
  68:19 74:18
**going** 16:12 20:5
  23:23 24:19 30:14
  32:13,20 33:6,9,10
  35:21 36:13 39:7,14
  41:23 46:6,6,9 47:8
  51:20,22 52:16,20
  53:6 54:4,5,7 55:10
  55:18,19 56:16
  57:17 63:18 73:5,6
  73:10,14 76:6 77:2
  78:8 79:11,21 80:1
  82:9 85:20,23 92:8
  94:7,16,20,22 95:13
  96:3,5,25 98:25

99:22 100:10 101:4
  101:5,15,19,24
  107:23 108:5,10
  110:3,10 111:21,23
  114:7,13 116:18,25
  119:2,5 120:11
  122:17 123:11,17
  126:19 131:8 133:6
  133:14 134:17,18
  135:1 136:5,6,8,9
  136:15 138:14,18
  139:15,16
**gold** 140:18
**goldberg** 4:12,13
  14:20,21,22,25 16:9
  59:3 101:12 139:6,7
  139:7 140:11
**golden** 12:15
**good** 14:5,7,8,15,17
  14:20 15:1,19 23:7
  39:12 60:7 61:3
  79:1 83:10 88:3
  99:25 131:18
**google** 80:10,10,11
  80:11,12,20,20
**goose** 42:20
**gosh** 82:11
**gotten** 35:23 60:15
  60:16 102:6 119:11
**government** 65:6
**governmental** 47:11
**governments** 65:5
**grain** 39:9
**gralewski** 4:20
  16:19,19
**grand** 9:6
**granted** 45:17
**great** 19:17 77:20
  137:22
**greater** 111:20
**grind** 56:18
**grips** 42:5
**griswold** 5:21
**ground** 43:9 61:16

**group** 6:3 21:2,2
  22:23 77:24 125:17
  137:4
**groups** 104:13
**grove** 6:19
**guess** 20:2,9 22:11
  22:19 23:15 38:13
  48:2 83:6 85:12
  133:23 136:4
**guido** 13:5,9 16:5
**gun** 137:25

**h**

**half** 15:4 30:22
  31:12,21 32:7 71:2
**hamilton** 47:13
**hamilton's** 49:5
**hampshire** 50:23,24
  50:25 51:6 67:7
  68:5 72:7 73:8 74:9
  74:21
**hampton** 10:11
**hand** 19:22 39:25
  56:4 103:21 131:2
**hands** 122:15
**handwriting** 136:14
**hanover** 42:18
**happen** 81:25 108:5
  111:21 116:25
  120:11 121:6 133:7
**happened** 62:23
  72:12 73:8,9 74:8
  115:6 117:24
**happening** 50:12
  89:1
**happens** 98:23,24
**happy** 27:18
**hard** 68:23 77:7
  78:10,12,16 80:6
**harrop** 94:18
**harry** 8:10
**he'll** 105:13
**head** 96:12
**headed** 28:11

**heads** 29:13
**hear** 14:13,14 24:4
  48:24 53:21,24 57:2
  76:21 136:1
**heard** 30:19 52:15
  65:10 76:23 102:24
**hearing** 1:15 2:15
  18:13 19:22,25 20:5
  25:13,20 107:2,8
  117:5,20,25 118:3,6
  122:18,22,23 123:2
  123:17
**hearings** 126:13
**heartburn** 29:21
**heavily** 57:5
**held** 2:15 66:4
  122:20
**help** 100:1
**helpful** 38:24 62:15
  137:25
**helps** 135:22
**hew** 136:5
**hey** 73:2 115:8
**higher** 36:5
**highest** 56:13
**highlighting** 70:10
**highly** 57:16,16,16
**hire** 84:2,5 86:3,5
**hired** 86:9
**hiring** 77:3
**history** 54:13
**hit** 19:12
**hitachi** 10:2 15:12
**hmm** 46:5
**hoag** 17:13
**hofmann** 5:3
**hogue** 17:13
**hold** 65:16
**holding** 131:21
**hole** 66:8
**hollander** 4:12
  14:21
**home** 42:11
**honor** 14:15,17 15:6
  15:19 17:24 20:10

23:3,9,19,21 25:10
  26:17 27:10 29:22
  29:25 30:18 31:8,16
  31:24 33:18 36:2,20
  38:16 47:23 49:18
  50:22 51:23 52:8
  53:2,8,17,18,24
  56:6,24 58:11 62:10
  63:20,24 65:22
  68:16 69:5,24 70:22
  71:18 72:16 73:18
  74:17 76:25 77:3
  78:1,5,22 79:10,14
  82:22 83:10,22
  84:24 85:14 91:10
  92:15 93:7 94:3
  95:25 96:6,8,24
  97:8,23 98:10 99:13
  99:15 101:23
  102:14 103:10,11
  103:12,16 104:10
  104:11,16,17,24,24
  108:14 109:10,24
  109:24 112:18
  117:10,17,18
  121:16,18 122:2,14
  122:17,17 123:17
  123:25 125:9,14
  127:8 128:22 130:6
  131:12,20 132:7,9
  133:9 135:3,18
  137:10
**honored** 94:20,23
  103:23
**hope** 101:13
**hoped** 140:4
**hopefully** 123:22
  137:5
**horrible** 52:17
**horse** 51:14,15
**hostility** 43:4
**hours** 140:4,5
**house** 28:8
**hull** 9:16 17:7

**human** 78:3
**hundred** 77:5 80:14
**hundreds** 31:19,20
  129:19
**hurdle** 30:9
**hypothetical** 29:4
  64:7
**hypothetically** 21:9
  21:11 27:24,25
  30:25 101:9

**i**

**icebreaker** 124:6
**idea** 23:7 40:17 42:5
  60:7 78:20 108:8
  109:6 116:3 124:5
**identified** 130:13
**identify** 14:6 29:11
  105:16 135:4
**ignore** 89:2 96:3
**ignored** 68:5
**ignores** 87:1
**illinois** 42:15,16,25
  43:12,14,15,16,21
  45:19 46:2,3,25
  47:8 63:25 64:9,11
  64:12,24 66:1 88:4
  88:6,9,13 93:18
  94:4,6,11 95:2,7
  133:24
**illston** 46:13
**illston's** 47:12
**imagine** 126:3
**impact** 18:24 61:19
  86:13
**impacted** 97:21
**implement** 102:1
**implemented** 27:7
  106:4 111:2
**implementing**
  111:13
**importance** 57:7
**important** 34:21
  37:5 40:2 53:23
  54:3 55:24 59:17

60:17,22 61:13,24
75:3,3,4 103:1,2
126:11 128:23
**importantly** 104:22
**imposes** 106:11
**impossible** 41:9
**impression** 80:25
81:2
**impressions** 80:9,14
80:17,19
**improbable** 57:16
**improper** 105:9
**inappropriate** 34:7
**includable** 122:9
**include** 31:23 88:6
**includes** 80:7 88:4,8
88:12,16 89:6,10
96:7,8 108:19,20
**including** 31:17
67:15
**income** 77:24
**inconsistencies**
134:22
**inconsistency** 90:2
91:21 92:3,6 94:16
**inconsistent** 87:10
**incorporated** 87:9
**incorrect** 95:13,14
**increase** 115:11
**incredibly** 119:25
**independent** 22:14
77:3 82:23 83:23
84:2,5,22 85:1,5,21
86:6 130:15 131:25
**indiana** 11:14
**indianapolis** 11:14
**indicated** 50:10
85:23 117:18
**indirect** 3:10 14:9
14:16 15:2 16:17,20
26:22 27:3 38:18
43:4 51:9 53:14
55:17 99:17,21
101:20,21 110:1,10
126:24 132:13

**individual** 35:1,19
42:1 57:19 77:21,25
**individuals** 78:3
79:6 109:6
**industry** 106:25
**inflated** 41:15 42:8
**inform** 25:21
**information** 34:23
38:20,23 39:2 40:15
49:16 79:16,20
81:18 82:16 83:5
120:22 130:17
131:25 136:18
138:12
**informed** 54:13
**informs** 111:14
**inherent** 43:24
**initially** 85:23
116:14 119:2
**injunctive** 61:25
62:3,6,19 63:13
100:2
**injured** 41:18
**inquiry** 23:16
**insert** 100:3
**insisted** 58:20
**instance** 115:21
**instances** 114:24
**instantly** 52:22
**institution** 73:22
**insufficient** 103:14
**intelligent** 123:22
**intend** 16:6 82:1
**intention** 20:15
126:10
**interest** 19:11 24:10
30:2 97:10 119:19
130:16
**interested** 25:19
141:16
**interesting** 65:23
79:3,8,17
**interests** 20:7 21:4
28:23 67:15

**intermeddler**
126:17
**internet** 54:20 78:15
**interplay** 110:16
**interrupt** 30:25
44:19
**interruption** 113:10
**invaluable** 124:6,9
**invective** 73:8 75:12
**invectives** 75:8
**investigation** 71:1
**invitation** 69:21
**involved** 51:3 67:5
95:11
**ipp** 121:19 132:18
139:7
**ipps** 7:3 8:2 14:19
14:23 15:20,22,23
16:22,24 17:1,3
18:1,3 110:20
**issuance** 70:3
**issue** 18:14,14,19
19:1,5,8 20:9 21:10
22:9 24:18 26:3,12
26:15 30:20 31:4
39:16 48:3 49:25
51:20 57:15 62:7,7
62:8 66:22,24 70:1
76:11,12,15,24 79:2
79:17,21 82:2 86:12
91:3,7 93:21 96:15
97:11 98:14 106:19
107:14 108:6 109:1
110:23 112:15
113:19,21 114:9,10
114:23 117:2,19
126:11 130:6 131:9
135:15
**issues** 18:14,16,18
19:6,10 20:4 21:8
22:16 24:1,10 30:7
30:14 31:15 33:3,11
35:5,10 52:11 56:22
56:24 58:3,4 63:23
67:10 76:8,13 79:12

79:25 91:2 93:7
102:16 107:14
108:19 110:14
113:17 118:21
119:8 121:19 123:2
133:2,25 135:23
**issuing** 18:21 106:7
112:2
**items** 19:12

**j**

**j** 4:20 8:4 11:21
**j.scott.stjohn.public**
8:25
**jams** 2:16 3:3 49:19
119:15
**janet** 34:25 36:3
**january** 1:17 2:19
14:1 20:5 96:22
117:4
**jckress** 9:9
**jdc** 7:11
**jennie** 6:11,15 18:2
**jg** 4:17
**joe** 14:21
**john** 7:7 8:19,20,21
9:3,5 10:21 15:24
15:24,25 16:25
17:16,18,18,22 18:5
97:20 98:3 121:17
121:18,22 122:2,5
122:14 123:25
124:4 125:2,5,9,11
131:19,20
**john.taladay** 10:25
**joinder** 25:2,3
**joined** 131:14
**joint** 100:23
**jones** 41:19
**josef** 7:5 15:4
**joseph** 4:13 8:20,21
15:24 139:7
**jotted** 18:17
**journal** 55:5

**jr** 4:20
**judge** 21:11 23:4,24
  24:13,15 25:17,19
  34:12 46:13 47:11
  47:12,13,13 48:24
  49:2,5 60:20 69:9
  69:12 73:1,4 93:21
  93:21,24 94:1,25
  107:3 117:1,18
**judges** 41:10
**judgment** 26:23
  38:6 41:1 66:12
  88:12 90:23 91:7,10
  91:16 92:12,16
  93:23 96:6 133:5
  134:25
**judgments** 137:14
**judicial** 121:22
  124:2,15
**jumping** 52:15
**june** 118:9
**jurisdictional** 130:6
**jurisdictions** 32:20
  32:23 139:20,23
**jurisprudence** 44:16
**justice** 12:12 56:3
  56:12 58:9

**k**

**k** 6:4
**kag** 6:3
**kaplan** 4:3 14:18
  16:23 79:15
**kathy** 11:12 17:8
**kathy.osborn** 11:16
**kayes** 70:5,10
**keep** 19:18 60:17
  96:14 119:8,8,11
**kellogg** 110:15
**kern** 6:4 16:17,17
**key** 112:17
**keyspan** 46:12,22
  47:10
**kind** 28:24 45:17
  48:15,20 55:12,13

58:17 80:15 84:21
  102:11 134:5
**kinds** 57:22 100:15
  110:14 118:10
  126:12
**kirby** 4:19 16:19
**kirkham** 7:4,6 15:1
  15:1,2 17:1 25:1
  39:25 40:1 43:10,13
  43:18 44:24 45:2,6
  45:11,13 47:10,21
  47:23 48:6,13 49:4
  49:12,18,20 59:2
  65:11,22 66:13,16
  66:19 86:20,23
  87:13,16 88:6 89:14
  89:24 131:2,3,4,9
  136:15
**kirkland** 10:3 15:11
**kirkland.com** 10:8
**kmllp.com** 4:24
**knew** 34:18
**know** 14:11 16:11
  18:14,24 19:18
  20:12,22 21:13,20
  28:12 29:9 32:6,7
  33:9,11 34:24 35:2
  35:18 36:2,23 37:7
  39:2 40:9,13 43:6
  49:21 51:4,20 52:19
  52:23 54:10 58:25
  59:9 61:9,18 62:18
  66:19,20,24 68:18
  69:14,19 71:10,13
  74:18 75:13,14,17
  75:25 76:20 78:2,6
  78:18 79:4,8 80:8
  80:23,23 82:6 83:1
  85:10 87:14 91:16
  99:24 101:23 104:4
  106:23,24 107:1,6,7
  107:22 108:15
  109:20 110:8
  114:13 119:24
  120:2,14 121:3

122:18 123:12,12
  127:11 129:25
  130:1,11,14 131:4
  132:11 134:24
  136:21
**knowing** 33:6 34:20
  34:21
**knowledge** 22:16
**known** 55:12 79:21
**knows** 47:17 81:22
  82:9
**koons** 10:20 15:15
  15:15
**kress** 9:4,5 17:18,18
  17:20,22 18:5

**l**

**l** 4:5 11:12
**lady** 102:24
**lake** 6:5
**land** 64:9,10
**lane** 8:22
**language** 39:6 96:19
  100:3 114:9
**large** 21:2 36:7
  95:14 132:24
**larger** 31:21 94:21
**largest** 132:13
**larimer** 9:12
**las** 8:6
**late** 74:24
**laura** 9:3 17:19,22
**lauren** 3:13 14:15
  62:15
**laurenrussell** 3:18
**law** 6:3 7:14 8:12,20
  9:4,11,17 15:7 17:2
  27:16 43:6 44:1,20
  45:8,18,21,22 46:4
  46:16,17,17,20,22
  47:6,15 48:12,13
  51:1 52:18,19 54:1
  56:13,16,17,19 57:4
  57:8,10 58:3 59:25
  60:2,8 61:15 64:7,9

64:10,19 65:12,21
  66:8 67:22 72:5
  84:13 108:24,25
  115:19 129:4,15
  130:21
**laws** 44:7,8,9,11
  46:23,24
**lawsuit** 62:13 105:7
**lawyer** 57:12 62:13
  84:12 127:19
  129:19
**lawyers** 8:3 26:22
  37:20 46:2 67:12,25
  70:14 71:13 74:4
  83:18 129:13,20
**lcd** 34:18 35:2,8
  37:7 58:16,21 59:4
  59:6 66:14 70:25
  71:3 112:6,8
**lcds** 31:16,20 46:13
  47:12 77:19,23
  112:17 113:3,7
**lead** 14:8 16:5 18:23
  20:6,15 21:12 22:6
  22:21,22,23 24:8,22
  25:4,14 30:16 40:5
  53:20 57:23 67:13
  68:23 69:21,24
  70:14 71:9,11,12,15
  71:19 72:19 73:15
  73:18 76:19 83:13
  130:2,8 131:5,7
  132:12 133:14
**leads** 23:6 24:9,15
**leapt** 46:16
**leave** 32:24 48:23
  52:20 98:12 110:5
  118:2,8 124:23
  138:19
**leaves** 33:7
**leaving** 100:18
  108:6 127:18
**lee** 6:11 18:2
**left** 33:25 34:1 52:17
  71:24 108:19,23

110:6 113:5 117:23
**legal**   28:13
**legge**   69:9,13 73:1,4
    93:21,22,24
**legge's**   94:25
**legitimacy**   23:16
**legitimate**   48:3
    53:12,12
**length**   19:17
**letter**   49:20 70:3
    72:19 73:3 114:17
    119:14 135:24
**lexis**   49:4,10,17
    114:19
**lg**   52:1,3 54:16,16
    54:17 132:19 133:3
    133:7
**liability**   97:14
**life**   63:2 84:15
**light**   68:9
**limit**   124:11
**limitations**   54:2
    58:4
**limited**   49:19 70:13
    124:20 139:20
**line**   30:8 42:10,11
    42:12 47:5 48:17
    74:5
**lingered**   63:1
**list**   19:12 81:1 96:24
    97:1 125:21 137:11
**listed**   24:18
**listing**   94:13
**literally**   103:1
**litigants**   124:23
**litigate**   33:2
**litigated**   48:7 64:14
    69:2 105:22
**litigation**   1:5 2:5
    19:4 55:9 97:14
    124:12,15 132:18
**little**   25:14 36:13
    54:8 81:23 118:8
    140:13

**live**   58:9 101:19
**llc**   9:4
**llp**   3:11 4:19 5:3,12
    5:19 6:10 10:3,11
    10:19 11:3,11,11
    12:4
**logged**   21:21
**logic**   25:24
**logical**   129:21
**logically**   30:8
**long**   8:23 66:25
    68:19 81:1 107:12
    110:11 133:12
**longer**   31:18 37:2
    98:21
**look**   41:13,16 58:3,4
    60:13 63:3 95:19,19
    96:15,19 99:15
    110:2 113:7 128:21
    129:4 130:19
    136:10,13 139:16
**looked**   34:9 69:17
    114:22
**looking**   109:2 135:1
    137:15
**looks**   49:8 55:21
    101:14
**loose**   124:5
**loosely**   59:22,23
**lost**   60:4 69:9
**lot**   16:8 19:20,23
    23:23 24:11 35:16
    45:14,23 52:9 73:7
    74:15 77:22 93:19
    96:21 100:11,13
    107:5 113:1,2 125:3
    137:23
**louis**   9:7
**love**   75:20 85:10
    137:21
**lower**   112:24
**luck**   42:25
**lumber**   70:6,11
**lump**   55:1

**lupron**   115:1

**m**

**m**   11:20
**machine**   141:7
**magnitude**   96:16
**mahler**   6:17 17:25
**maintain**   45:8
**making**   47:24 57:1
    67:24 70:14 101:22
    114:2
**march**   117:1
**margin**   83:15,19
**mario**   3:12 14:8
**marioalioto**   3:17
**mark**   11:21
**market**   77:20
**marketing**   81:4
    115:1
**marla**   13:12
**martin**   2:16 3:4 11:4
    15:17
**mason**   5:3
**massachusetts**
    50:23 51:1,6 52:18
    67:6 68:4,18,20
    70:21,23,25 72:7,17
    72:20 138:12
**massive**   54:21
**master**   2:16 3:4 14:5
    14:10,24 16:13,16
    17:4,12,20,23 18:6
    18:11,21 21:9 22:7
    22:25 23:2,14,17
    24:2,5,21,24 25:11
    25:16,22 26:1 27:24
    29:3,16,18 30:17,24
    31:4,25 32:4 33:14
    34:10 35:3,12,14
    36:8,10,19,23 37:1
    37:4,14,22 38:4,8
    38:10,12,21 39:16
    43:5,11,17 44:19,25
    45:5,7,12 47:4,20
    47:22 48:2,11,23

49:11,15,19,24 50:7
50:20 51:11,16,19
51:24 52:7,25 53:4
53:9 54:6 58:14
59:5,18 61:7,11,18
62:3,5,14 63:3,7,9
63:12,15,17 64:2,15
64:20 65:3,8,10,14
65:18 66:10,15,18
66:20 67:19 68:13
69:6,8,18,23 70:7
70:19 71:5,9,23,25
72:6,10,12,15 73:5
73:14,16 74:8,20
75:5,10 76:6,10
78:10,18,21 79:1,13
80:17 81:17 82:6,17
83:1,4,20 84:1,4,7
84:10,15,19 85:9,25
86:12,20 87:12
88:17,19,21 89:3,9
89:13,16,25 90:18
90:23 91:6,20 92:4
92:13,19,24 93:1,9
94:22 95:5,22 96:1
96:11,15 97:5,12,15
97:18 98:2,12,18
99:3,7,10 101:6
102:3,5,9 103:24
105:2 106:12,20
107:12,18 110:18
112:6,9,12,22 113:1
113:9 114:13,16,21
116:20 117:4,7
118:11,24 119:1,6
120:13 121:5,13,17
121:20,24 122:3,10
122:15,20,25 123:5
123:19,24 124:3,25
125:4,7,10,13 127:1
127:3,11,15,23
128:2,13,16,24
129:2,11 130:4,14
130:24 131:1,8,10
131:18 132:4,8

133:18,22 134:3,5
135:6,13,21 136:4
137:18,22 138:3,5,9
138:14,18,24 139:4
140:3,15,17,20
**master's** 21:16
**masters** 41:10
113:24 114:6,8
**material** 96:19
136:6,7
**math** 56:8
**matter** 23:20,23,24
23:25 30:14 94:1,17
113:19 119:25
134:10
**matters** 21:25 29:11
**matthew** 4:4 14:17
79:14
**maximum** 108:9
**mcinerney** 4:19
16:19
**mdl** 1:6 2:6 129:19
**mduncan** 4:9
**meadowcrest** 8:5
**mean** 19:14 21:9
27:25 28:10 29:17
30:25 31:10,14 53:9
54:15 78:11 80:7,18
81:24 82:7,24 83:4
83:6 92:8 94:22
96:17 97:5 106:20
119:18 122:11,11
122:22 123:6
129:21,23 134:9,13
135:7 136:2,4 137:3
137:23
**meaning** 101:20
**means** 59:24,24
80:19
**meant** 27:5 94:12
**meat** 36:24
**mechanism** 61:13
**meet** 27:20 37:5
126:21

**meetings** 31:19
**meets** 111:2 115:22
**member** 34:13
35:23 91:18 127:13
**member's** 35:19
**members** 19:2,3
20:7 41:13 42:6
43:8 70:12,14 77:10
77:25 91:12,22
**memorized** 135:1
**memory** 58:25
91:16
**mention** 55:13
66:13 91:15
**mentioned** 74:23
136:8 138:6
**meridian** 11:13
**merit** 32:11,12
**meritless** 40:20,21
41:6
**merits** 26:14 39:17
39:18
**met** 79:23 81:16
**mexico** 14:22
**mexio** 4:15
**mgeagan** 11:8
**michael** 10:12 15:13
**micheletti** 5:5 16:21
16:21
**michigan** 5:22
**mike** 29:22 68:16
**milberg** 5:19 15:23
105:15
**milberg.com** 5:24
**miller** 9:11 18:4,4
**million** 27:8 28:3
34:6 35:16 40:9
71:3 76:2 80:14
84:17,21 88:1,1,2
90:7 93:2,2 125:3
134:10
**mind** 18:15 26:15,16
28:1 43:7 51:23
63:21 79:24 86:13
96:14 99:14 123:8

**minimize** 124:17
**minimum** 119:9
**minute** 44:19 59:17
110:5 133:19
**minutes** 76:7 133:20
140:5
**misses** 77:24
**mission** 12:6
**mississippi** 8:23
**missouri** 9:7 51:5,5
51:8,11 67:9 68:5
71:1 72:8 73:9 74:9
74:12
**mistake** 52:21 98:6
119:17
**mm** 46:5
**mockingbird** 8:22
**modelling** 113:24
**modifications**
115:25
**moment** 108:8
**monetary** 39:19
43:19 44:14,21 45:9
45:17 46:11 47:2,9
50:6 58:17,23 62:9
65:25 99:25
**money** 30:4,21 31:6
31:6,10,23 32:9,13
32:16,23 33:6,10
35:9,17 48:21 75:25
77:22 87:3,19,24
88:25 89:19,22 90:5
90:9,12,16,20 91:1
91:5,8 92:1,4,5,21
93:20,22 94:12,16
95:1,9,10 96:3
100:11,13,16
101:21 108:16,18
109:13 110:3,6
112:13,15,25 113:5
113:13,15 116:8,15
116:22 132:12,15
132:17,21,23,25
133:7

**monitors** 36:4
**montgomery** 5:6
6:12 7:17
**months** 29:2 73:24
**moore** 8:12,13 16:1
16:1 25:10,11,12,18
33:17,18 34:17
35:13,15,24 36:20
36:22,25 37:3,5
50:2,8 52:8 70:20
70:21 71:6,18,24
72:2,9,11,13 73:12
73:15,16 75:15
86:17 97:2
**moot** 29:15
**morning** 14:5,8,15
14:17,20 15:1,19
113:17
**motion** 18:22 20:6
20:12,20 25:3,13,21
36:12,15 38:10,12
50:14 69:4 81:20
130:7 138:15 139:5
**motions** 68:21,23,25
**motivated** 126:5
**motor** 48:16,18
**motors** 97:13
**move** 26:2,3 76:10
76:15 102:1 117:25
118:8
**moved** 108:20
**mscarborough**
10:16
**mullin** 10:11 15:14
**multiple** 34:18 58:7
61:5,23,23 68:21
115:2
**multistate** 74:16

**n**

**n** 3:12 9:19 11:13
**name** 14:21 24:7
97:12 128:16
141:19

**named** 67:15 127:6
127:6,12,16 131:13
**nathan** 5:13 15:21
**national** 32:24
**nationwide** 54:16,19
55:4 66:9 67:14
84:16
**natural** 78:7 79:6
100:19 101:2,18
102:5,21 103:4,7,18
104:7,12 105:4,8,19
107:4,20
**ncihlar** 5:17
**near** 116:16
**necessarily** 69:20,21
**necessary** 21:19
69:11 106:3,5,6
**need** 24:1 33:10
37:6 39:23 42:23
52:25 69:8 76:14
105:5 114:20 116:3
130:19 136:6,8,9,24
137:1,3,12 140:13
140:13
**needed** 85:16,18
**needs** 33:20,21
76:22
**negotiate** 100:15
101:25
**negotiated** 99:20
115:5
**negotiation** 28:7
115:10
**neither** 141:15
**network** 80:12,20
80:21,24
**netz** 34:25 36:3
40:16
**netz's** 37:11 40:11
**nevada** 8:6
**never** 34:9 37:20
44:5 48:21 58:11
63:1,10 72:13 73:12
73:13 74:10 90:15
130:12

**new** 4:15 11:6,6
14:22 31:14 33:15
50:23,24,25 51:6
61:15 67:7 68:5
72:7 73:8 74:8,20
91:23
**newspaper** 54:20
**nice** 16:9,10,14
82:12
**nil** 58:11
**nine** 56:7,8,8
**ninth** 44:5,6 48:14
48:19 64:17 65:21
66:1,4 110:12,15
113:18,20 131:23
**nod** 130:10
**non** 19:2 20:7 21:2
22:4 32:25 33:8,25
39:21 40:4 44:21
45:9,13 53:14 58:18
58:23 61:8 62:21
66:24
**noon** 137:19 138:3,4
140:10,15,17
**normally** 121:6
**northern** 1:2 2:2
36:14 64:22
**note** 35:9 60:21
111:25
**noted** 26:1 84:19
140:22
**notice** 19:5 22:13,16
26:25 27:4 31:14
54:4,5,8,12,17,18,19
54:19,22 55:12,14
55:20 58:15 61:20
61:22 76:11,16,18
78:25 79:12,23 80:2
81:14,15 82:8,20
83:16,24 84:16 85:8
88:20,24 89:4,7,14
90:3,4,9,11 91:12
91:17,24,25 93:15
93:15 95:12 98:3
101:16 102:19,23

102:24 103:8,18
106:4 109:2,14,18
109:21 110:22,25
111:2,5,6,14 112:20
115:22,24 117:7
118:1 119:4 120:18
125:17,20,24,25
126:2 133:12
134:11,16,20
**noticed** 68:1
**notices** 32:18 54:16
54:24 55:2,3,7,24
56:9,12,20,25 58:7
58:8 61:5,6 77:5
78:24 102:7 118:18
**notifications** 61:23
**notified** 56:10,11
**novak** 5:20 15:23,23
79:11 105:12,14,14
106:13 107:10
110:19,20 112:8
113:11 114:15,18
114:22
**novo** 23:24
**nuisance** 60:5,6,10
60:17 67:4,5
**number** 37:8 40:11
40:11 44:22 47:25
60:22,23,24 71:10
78:3 80:9 89:21
111:25 124:21
**numbers** 62:16
136:11
**nw** 10:22 11:22

**o**

**o** 7:14,15 17:3
**o'clock** 140:10
**o0o** 14:3
**oak** 6:19
**object** 20:25 21:15
25:24 131:8
**objecting** 7:3 15:2
17:1,3 21:19 52:16
67:12 130:12

**objection** 50:18
103:25 128:12,17
129:8
**objections** 20:16,18
21:5,20 22:20,20
30:13 32:21 36:24
39:18 50:15,16 61:2
106:14 107:5,9
121:3 126:24
127:22 128:3 133:3
**objective** 138:7
**objectively** 68:10
**objector** 8:19 9:16
15:24 17:6 134:23
**objectors** 8:10 9:3
15:8 16:1 19:7
28:23 35:7 56:23
60:23,24,25 61:2,3
65:4 76:4,23 85:15
86:3,15 94:10 115:8
115:13 126:23
**objects** 105:8
**obligated** 67:14
**obligation** 130:18
131:25
**observation** 116:2
**observations** 110:21
**observer** 16:7
**obtained** 115:17
116:13
**obtaining** 112:4
**obvious** 52:8,10
109:18,20 131:5
**occidental** 131:22
**occurred** 40:13
99:18
**october** 131:24
**offer** 135:18
**office** 12:13 16:4
25:7 37:18 101:7,9
101:10
**officers** 56:17,19
57:4
**offices** 7:14 15:7
17:3

**officially** 29:4 127:23
**officials** 56:13
**oh** 34:3 64:2 86:6 116:10 122:25 134:12 136:15
**okay** 14:10 22:7 23:14,17 24:6 29:16 30:17 31:25 33:14 34:10 35:16,17 38:21 43:18 45:5 47:4,22 48:23 49:11 49:15 52:7,25 53:2 58:14 59:20,21 61:11 62:4 63:15 64:20 65:3,10 66:10 66:18,21 67:21 68:13 69:7,23 71:5 71:9 72:10,15 73:14 74:20 75:10 76:6 78:10 79:13 82:20 83:20 85:25 87:13 87:16 88:19 89:3,9 89:16 91:20 92:14 92:19,24 100:8 101:1 102:15 107:12 108:12,15 109:1,5 110:4,18 114:18,23 118:11 119:6 125:4,10,13 127:1,12,15,23 128:2,24 130:24 131:4,10 133:18,22 138:16,20 140:16
**old** 16:15 77:10 116:21
**olds** 77:13
**omitted** 19:4 39:21 62:22
**once** 24:9 52:21 83:21
**ones** 50:24 101:15 101:24 105:5,10,21
**ongoing** 79:18 121:6

**oops** 91:25
**open** 28:24 39:11 65:5 104:6
**operative** 139:12,18 139:22
**opine** 77:4
**opinion** 83:6,7 86:2
**opportunity** 18:16 61:17 102:10 103:19 104:7 105:6
**oppose** 129:9
**opposed** 34:14 87:22
**opposite** 24:17 42:9
**opposition** 25:2 38:6 50:16 68:22
**oppositions** 25:9
**opt** 57:7 60:23 61:4 61:13,19 103:2
**option** 86:3,4
**oral** 1:15 2:15 19:25 123:13
**order** 18:17 23:21 32:2,5 33:18 38:3 38:19 42:24 49:5 93:23 94:6 95:19 119:6 120:3,6 130:2
**ordered** 137:1
**orders** 90:25 96:20
**oregon** 46:15,20,22 65:8 66:14 88:4,9 88:13 93:18 94:4,6 94:11,16 95:2,7
**organized** 119:10
**original** 36:18 50:3 50:18 118:22 141:12
**originally** 68:20 115:7
**osborn** 11:12 17:8,8
**ought** 22:14 27:7,8 60:8
**outlined** 29:25
**outreach** 80:8,14 81:1

**outs** 57:7 60:23 61:4 61:19
**outside** 43:16 111:9
**overcharge** 36:4,5,5 36:6
**overcharges** 44:4
**overruling** 42:18

## p

**p.a.** 4:12
**p.c.** 7:4 9:17
**p.m.** 2:18 133:21,21 140:22
**pac** 70:11
**pacific** 70:5
**package** 94:21
**page** 48:25 49:2 124:9 135:24
**pages** 49:5 135:25 137:4,16,17
**paging** 49:6
**paid** 30:4 31:2,6 32:10,10,11,20 50:10 80:12 87:4 89:15 90:5 94:16 95:1 132:15,20,24 132:25
**panasonic** 11:2 15:18
**panel** 34:19,20 36:22 37:6,7 40:14
**paper** 50:4 114:12 131:15
**papers** 36:18 40:10 50:4,10,17,18 52:13 54:11 62:11 69:17 74:24 75:16 81:20 103:16 105:17 120:25 121:2,4 125:18 126:7 127:5 128:11,13,14,16
**parens** 66:16 99:8 102:12 104:13 105:5,7,10,21 106:9

**park** 11:5
**part** 28:16 36:14,16 38:6 55:14 69:20 71:14 81:24 90:16 94:20 95:3 99:19 104:4,21 127:18
**parte** 119:7 120:6
**partial** 71:1
**participate** 16:7
**particular** 18:17 120:9
**particularly** 19:17 106:17 114:18 115:21 120:19 124:20 137:23
**parties** 38:19
**parting** 132:10
**parts** 107:21
**party** 97:24 141:17
**pass** 43:20,21 46:25
**passing** 55:13
**passthrough** 42:19 42:24
**paths** 104:3
**patience** 69:10
**patriac** 66:16
**patriae** 99:8 102:12 105:21
**patrick** 7:16 17:2
**paul** 5:20 15:23 105:12,14
**pay** 32:13 97:25 100:10
**payment** 60:11 92:17 95:25 108:7
**payments** 60:9 88:13 89:10,10 95:3 98:4,5
**peace** 132:17
**peep** 52:5
**pending** 18:23 59:12 59:14 63:6,8,16 103:11 105:22 106:9 139:12,19,19 139:22

**pennsylvania** 4:7 10:22

**people** 14:13 19:16 19:20 21:1,2 22:1,5 22:23 31:2 32:14,19 32:25 33:7 34:8 37:20 39:3 43:3,22 48:17,24 56:17,18 56:18 57:1,23,25 58:17,23 60:14 62:21 64:13 66:23 71:10,24 73:20 75:14,16 77:17 78:15 87:23 88:24 89:1 98:22 99:6 100:17,20 101:2,18 102:5,21 103:4,7,19 103:22,23 104:12 105:8 107:5,20 108:6,9,16,17,19,21 116:20 117:13 118:1 119:18 125:22 126:4

**percent** 33:10 77:7 78:11,12 84:21 115:7,9

**percentages** 92:22 95:1,21

**perelman** 4:5 16:23 16:23

**perfect** 18:12 113:7

**period** 41:14,21,24 66:7 77:11,13,18 92:20 111:20 116:10,14,21

**permits** 120:3 129:5

**person** 41:25 43:25 69:25

**personalize** 67:10

**personally** 24:12

**persons** 78:8 104:7 105:4 107:4

**perspective** 22:15 73:19 109:4 132:11

**persuade** 100:3

**persuasive** 106:18

**pertains** 141:11

**petroleum** 131:22

**phase** 81:25

**philadelphia** 4:7 14:18

**philips** 10:18 15:16 17:17 121:23,24

**phone** 14:14 17:4 18:7 71:12 120:1

**phonetic** 94:18

**pickup** 97:14

**picture** 12:3 17:11 53:19 135:14,16 138:22

**pie** 89:8

**piecemeal** 28:25

**pipe** 129:24

**place** 23:22 97:3 141:4

**plaintiff** 42:23 48:22 64:18 65:1,7,24 66:5,6,14 74:10,12

**plaintiffs** 3:10 13:3 14:16 15:3,10 16:11 16:18,20 24:16 42:21 46:3 50:14 67:15,16,25 68:4 72:3,6,7 74:7 86:4 99:18,21,24 101:2 110:2 115:6 130:12 131:13,14

**plan** 26:13,21,24 27:3,6,6,7,11,12,17 28:5,9 29:7 30:16 39:19 86:25 87:1,8 87:8,9,10,11,23,25 89:18,19,23 103:25 104:5 108:15 109:2 109:3 110:22,25 111:2,5,14 115:7,22 115:25 133:12

**plate** 137:24

**play** 67:11

**playing** 124:4

**plays** 103:15,17

**plaza** 4:14

**pleading** 46:3

**please** 19:18 37:14

**pllc** 8:3

**plodding** 89:4

**plus** 40:9 77:5 80:14 84:21 90:7

**plutzik** 6:17 17:25

**pnovak** 5:24

**point** 26:17 31:9 35:12,14 50:2 56:6 58:16 61:18 65:23 66:9 70:1,5,13 72:17,22 75:6,11 80:3,5 83:10 84:22 88:7 97:2 104:9,10 104:19 109:23 113:8,11,12,21 115:12 117:13,17 118:4 121:24 124:25 126:15 128:23 130:1

**pointed** 115:2 132:13

**pointing** 131:4

**points** 67:19 77:9 105:16 121:16 125:14 135:3 138:8

**policies** 44:7

**pooh** 61:17,17

**popular** 25:7

**population** 94:5,5,7

**position** 24:17 51:8 85:2 91:21 100:5 129:9

**positive** 39:12 117:12

**possesses** 106:1

**possessors** 40:22

**possibility** 85:13 117:21

**possible** 26:7 32:22 84:18

**possibly** 42:13 57:25 58:13

**postdated** 50:24

**posted** 118:18 119:15,23

**posture** 105:19 106:11

**pot** 88:1 100:17 112:25 132:12

**potential** 89:10 109:16

**potentially** 18:24 97:21 129:19

**pots** 87:21

**power** 43:24

**powers** 24:14,15

**practicable** 81:13 82:10 90:9 115:24

**practical** 93:1 116:23 134:10,11

**practically** 99:3,4

**practice** 44:17 84:13

**pragmatic** 58:5

**precisely** 80:9 95:8 124:15,24 131:21

**predicate** 44:1 132:19

**prefer** 118:7

**preference** 108:13

**prejudice** 40:24

**preliminarily** 95:20

**preliminary** 36:5 36:12,15 55:16,19 80:1 93:23 118:6 137:14

**premature** 18:20 20:3 22:8,12 24:9 24:12

**preparation** 25:6

**prepare** 55:20

**prepared** 35:6

**pres** 101:20 107:14 107:15 108:25

109:13 110:6,17
113:6,15,22 114:1,9
115:9
**prescott** 3:11
**present** 13:11 67:12
**presentation** 105:17
**presentations** 95:15
**presented** 86:8,9
**press** 74:13
**presumably** 21:23
**presume** 50:1
**pretty** 36:1 41:5
61:3 76:21 77:1
**prevailed** 69:3,12
73:1
**preview** 54:8
**price** 41:14,15,22
65:24 77:18 100:7
**pride** 27:12
**primary** 30:2
106:13,16
**principle** 133:10
**prior** 50:25 141:5
**private** 44:10,15
64:18,25 65:1,7
66:5,6,14 99:24
101:2 124:23
**pro** 87:22 89:23
95:6,10,13 107:19
133:25
**probably** 19:20 23:4
42:25 44:12 45:13
46:18 57:19 61:22
81:22 107:10 114:5
135:10
**problem** 30:15
51:14 56:22 72:23
77:8 79:17 86:15,24
86:25 87:6 88:18
93:3,6,9,10 101:4
116:7,24 126:1
130:9 133:11,15
134:14 135:4
136:14 137:5

**problems** 16:10
27:25 28:13 76:17
95:17 98:8
**procedural** 28:13
69:1 70:1 119:8,25
120:8 130:5
**procedure** 32:14
**procedures** 41:5
**proceed** 28:13 29:20
39:7 113:14
**proceeding** 20:16,18
**proceedings** 126:10
141:3,5,7,13
**process** 27:20 40:22
41:4 73:24,25 79:18
81:24 93:8 103:2
104:4 111:3,6,15
115:23 116:4 121:8
121:9 126:21
136:20
**processing** 79:20
**product** 41:14,20
42:7 88:16
**products** 55:9 97:14
**professionally**
136:22
**professionals** 81:4
**proffer** 90:7
**proffered** 74:23
**program** 54:12
55:14 78:25 82:8
83:25 100:17
125:20
**programs** 54:21,22
111:6,8
**progress** 39:15
121:7
**projection** 108:1
**projections** 81:11
**promise** 90:16
**promote** 101:10
**proof** 43:19,21
45:18
**proper** 110:11

**properly** 122:7,8
**proportionate** 87:20
**proposal** 28:17
117:22 118:8
**propose** 29:7
**proposed** 28:5 29:4
29:14 30:16 55:19
89:23 104:3 109:16
**proposing** 39:1
**propriety** 21:22
**prosecute** 124:21
**prosecuted** 124:19
**protect** 130:16
**protection** 51:2
**protective** 38:3,19
**protects** 61:14
**protocol** 110:12,13
**protocols** 118:17
119:4
**prove** 36:16 46:24
46:25 47:1
**proves** 43:25
**provide** 59:25 81:18
83:6 126:23 136:19
139:2
**provided** 92:17,21
93:11 96:3 108:2
**provides** 87:8,18
**providing** 138:12
**provision** 88:14
90:20 91:1,19 92:21
94:24 107:15
**provisions** 26:25
**public** 56:25
**publication** 55:5,6
114:11
**publications** 55:6
**pull** 24:23 96:23
**punitive** 67:7
**purchase** 16:11
**purchased** 41:25
**purchaser** 3:10 13:3
14:16 15:3 16:18,20
26:22 27:3 38:18
43:4 51:9 55:17

60:21 99:17,21
110:1 132:14
**purchasers** 14:9
16:6 39:20 42:1
53:14 54:23 55:4
126:25
**purchases** 40:12
116:13
**purported** 41:12
**purpose** 94:14
**purposes** 41:17
102:17,17 103:2,3
106:7 111:13 112:2
112:4,21
**pursuant** 117:22
**pursue** 47:8 53:15
65:1 69:21 85:23
**pursued** 71:22
72:13
**pushed** 118:5
**put** 24:7,19 26:22
29:13 42:19,21
45:15 52:13 70:24
71:7 75:2 77:14
78:7,8 84:25 85:7
90:13 103:18
132:11,17
**putative** 71:19
**puts** 104:2
**putting** 85:3

**q**

**question** 20:11,20
22:8 23:9,10 26:5
33:13 40:19 48:1,20
53:11 59:15 60:5
61:10 64:1,4 65:5
78:7 98:5 99:5
108:4 109:9 119:3
120:17,21 122:16
127:11 133:23
134:21 136:2 137:1
139:10
**questions** 21:8
82:21 85:8 118:17

126:19
**quibbles** 133:6
**quibbling** 83:14
120:8,8
**quick** 72:17 122:16
**quickly** 87:17 117:2
117:19 135:25
**quinn** 2:16 3:4
14:20
**quite** 26:11 36:17
75:12 90:4 91:10,14
119:10
**quote** 44:14 111:5
120:24,24
**quoted** 50:18
**quotes** 91:24

**r**

**r.p.c.** 4:3
**rachel** 12:5 17:10
**radcliffe** 67:18
**raise** 18:16 48:1
76:13
**raised** 18:19 19:6,8
19:11 20:19 34:12
35:11,13 39:18 52:4
53:10 56:23 76:14
76:18 82:2 87:5
107:14 121:19
133:3 138:8
**raising** 39:25
**ran** 70:16
**range** 35:19 36:17
**ranking** 56:13
**rata** 87:22 89:23
95:6,10,13 107:19
133:25
**rate** 34:20 39:1,2
**rates** 120:19
**ray** 1:5 2:5
**rbonsignore** 8:8
**rbrass** 12:9
**reach** 77:7 78:11
80:6 81:5,12,12
84:21 102:25

**reached** 78:15
**reaction** 57:3
**read** 19:15 42:3
48:18 66:11 67:23
76:17 91:18 122:13
**reading** 122:12
**ready** 74:25
**real** 40:18 62:5
87:25
**realize** 19:15 21:25
52:11
**really** 27:25 30:13
39:17,23 40:19 42:3
52:25 53:9 54:9
55:13 57:5 81:9
86:15 96:18 101:1,3
104:2 110:2 120:2
125:5 133:14
137:24
**reason** 22:17,21
83:22,23 93:4
**reasonable** 26:10
27:6,10,11,12,21
28:3,18,21 30:6,11
53:16 59:15 83:17
83:17
**reasonableness**
18:25 26:13
**reasonably** 136:21
**reasons** 22:12 59:7
59:11 81:14 103:6
115:24
**recall** 31:16 34:15
72:17,25 138:10
**recast** 46:7
**receive** 87:24
111:23 115:8
**received** 79:19
**recess** 76:9 133:21
**recited** 91:9 93:24
**recites** 90:10
**recognize** 105:23
106:8 118:4 130:8
**recognized** 91:4

**recognizes** 111:2
**recommend** 104:24
116:24 117:18
**recommendation**
18:21 19:24 20:4
21:16 22:10 47:14
48:25 49:1,23
117:11 135:15
136:17 139:1
**recommendations**
21:20
**recommended**
103:24 117:11
**recommending**
107:3
**recommends** 131:7
**record** 33:20,23
34:16,18,24 35:9,25
36:10,11 37:12 38:2
38:5,16,17 53:3,7
61:3 68:2,14 80:3
81:14 83:12,13
85:22 96:17 101:12
101:22 107:23
127:9,19,24 138:10
138:15 139:10,14
140:1,21 141:6,9
**records** 98:10
**recover** 42:14
**recovered** 22:4
**recovery** 39:7 44:1,1
44:3,20 46:11,12
100:16
**redoes** 49:21
**reduce** 125:7
**reduces** 32:16,17
**refer** 129:16,17
**reference** 55:11
56:5 119:6 120:3,6
136:16
**referenced** 38:9
**references** 111:5
**referred** 26:20
104:5

**referring** 37:13 49:3
60:1 90:25 92:7
121:4,20
**refined** 103:9,9
109:4
**reflect** 125:8
**reform** 104:4
**regard** 21:22,24
22:2,13 40:4 51:5
67:4 95:17 120:18
120:22
**regarding** 136:8
137:13 138:12
**regardless** 132:1
**regards** 70:21
**regrets** 124:15
**reign** 51:25
**rejected** 82:25 83:1
**relates** 1:7 2:7
111:16 118:17
**relating** 19:7
**relationship** 38:24
110:22
**relative** 141:16
**relatively** 90:5
135:25
**release** 30:22 52:1,2
52:3 58:20 100:9
132:21 133:1
**released** 34:8 40:23
58:22,24
**releases** 26:25 30:5
30:20,21 31:1,7
59:6 61:21
**releasing** 19:2,3
**relevant** 72:3
136:24 137:13
**reliance** 101:25
**relied** 91:18 100:20
**relief** 23:22 43:19
44:14,21 45:9,17
47:9 48:16 50:6
58:17,23 61:25 62:3
62:7,9,20,20 63:13
99:25 100:2 101:21

rely 67:9
remaining 113:14
  118:12
remarks 63:22
  132:10
remediated 72:23
remedy 47:2 60:1
  64:18 65:6 66:5,7
remember 25:6
  31:16 58:21 59:21
  75:5 122:11,12
remind 24:21 67:13
reminded 68:7
reminding 70:10
reminds 116:10
renew 16:15
renfrew 49:2
renfrew's 47:13
  48:24 136:17
renoticing 32:21
repealer 19:2,3 20:7
  21:2 22:4 31:22
  32:25 33:8,8,25,25
  39:21,21 40:4 44:21
  45:9,13 51:11 53:14
  58:18,23 61:8 62:21
  62:22 66:24,24
  76:12
repeat 19:16 60:19
  77:2 78:8
repeated 39:24 40:5
repeatedly 52:13
  67:20
repeating 24:20
  103:17
replace 100:6
reply 24:25 34:3
  50:16 64:21 68:8
report 18:21 19:23
  20:3 21:16,20 22:9
  25:20 34:25 36:8
  37:11,12,22 38:14
  47:14 48:24 49:1,3
  49:23 56:2 82:15
  117:10 121:2

135:15 136:17
  139:1
reported 1:22
reporter 2:20 18:9
  18:10 59:19,20
  88:11 141:2
reporter's 14:7
reporting 81:25
  121:7 139:17
represent 20:6 33:1
  67:14,17 74:11
  102:6 127:6,12,16
  131:13
representations
  124:14
representative
  71:14 127:7,16
representatives 74:3
represented 75:17
  75:18 124:7
representing 17:21
  52:16 75:13 97:21
  126:22
request 23:22 24:8
  24:22 25:2,3 37:10
  68:1,11 123:9,10
  125:8
requested 141:14
requests 68:13
require 28:8 43:19
  43:21 115:21
required 55:15
requirement 126:21
requirements 81:15
  111:3,3,7,9,12
  115:23
research 13:12
resellers 88:16 89:7
  89:8,11,15,19 90:3
  90:12,21 91:2,22
  92:4,5,17 95:22,25
  96:3,8,9 97:4,5 98:4
  134:12
residents 39:20
  98:21

residue 100:1
  108:23
resolve 98:8
resources 49:19
  124:21
respect 65:12,15
  68:18 76:4 90:3
  91:21 108:25
  110:21 113:12
  115:16 126:8
respectfully 78:4
respond 35:3 51:19
  92:9 105:13 110:19
  135:5
responded 104:21
responding 79:11
  118:22
response 20:20 25:2
  36:21 56:19,21 69:5
  82:25
responses 76:19
  117:8 121:3
responsibilities 23:5
responsibility 69:25
  70:11 71:21 74:17
responsible 97:24
  98:7 133:13
rest 124:23
restitution 47:3
restive 19:16
result 28:6
results 80:12,12
  82:12
retain 85:18,20
retained 85:19
retains 117:14
returned 80:13
reversed 46:10
reversing 44:3
reversionary 113:3
  113:4
review 47:6 57:9
  58:3 64:7 135:3
  139:23 141:13

reviewed 23:24
  73:23
reviewer 86:4
revise 115:10
revised 115:18
revision 115:13
revisit 24:11
richter 10:11
rid 32:24
right 17:4,23 18:6,8
  18:12 24:1,2 25:22
  26:2,2 28:1 36:19
  38:4 39:16 43:1,17
  44:22 46:14,18,19
  46:23 47:25 49:24
  50:20,20 51:16
  53:13,17 56:8 58:25
  59:14 61:20 63:12
  63:15,20 66:15
  69:15 70:19 71:22
  76:2 77:13 78:21
  83:3 84:9 86:12
  88:6 89:12 92:19,25
  96:13 98:12 101:8
  102:25 105:11
  112:22 114:21
  121:14 123:23
  126:14 133:20
  140:3,20
rights 21:4 39:6
  57:14 93:16
ripe 23:25
risk 58:6
road 6:19
robert 4:20 8:4 15:9
  24:7
robust 81:15 82:17
rocket 125:12
rockhurst 8:10 16:2
roll 107:13
room 66:23 71:11
round 135:5,8
rounds 68:25 135:7
  136:1

**rule** 32:5 36:14 41:2
  42:16,20 43:2 45:20
  111:3,7 115:23
  117:1,19 126:15
**ruled** 38:13 93:22
**rules** 40:23
**ruling** 41:1,2 93:24
  94:1,25 123:22
**rulings** 55:25
**run** 18:12 64:11,24
  65:12 66:2 75:7,8
  100:16 108:18
  129:22
**runs** 82:5

**s**

**s** 8:20,21 12:5
**sake** 108:3,8,22
**sales** 40:15 77:20
**salt** 39:9
**sampco1** 9:14
**samsung** 10:10
  15:14 29:23 68:17
  121:23,25
**san** 1:16 2:17 3:6,15
  4:22 5:7 6:6,13 7:9
  7:18 8:15 10:6,14
  12:7,16 13:7 14:1
  15:8
**sandbagged** 123:10
**sansome** 8:14 13:6
**satisfy** 79:7
**sauce** 42:20,21
**saveri** 13:4,4,5 16:5
  16:5,14
**saveri.com** 13:9
**saw** 37:20 38:13
  78:17 80:24 103:1
  131:10
**saying** 29:2 32:2
  41:8 43:9 44:25
  46:15 48:2,17,19,21
  56:15 65:23 76:22
  78:14,15 86:15
  89:17 90:25 94:10

102:11,15 123:1
  129:23 134:12
**says** 27:16 33:4
  35:24 47:1,7 64:17
  66:11 78:12 89:7
  90:12 91:8,25 94:6
  95:12 98:24,25
  105:3 107:23 120:5
  134:23
**sc** 1:6 2:6
**scarborough** 10:12
  15:13,13 29:22,22
  30:19 68:16,17
  69:16,19 72:16
  132:9
**scarpulla** 7:14,15
  15:6,6,7 17:3 20:3
  22:22 23:2,3 30:17
  30:18 31:3,8 34:11
  53:21 76:25,25
  78:14,20,22 83:20
  83:22 84:3,6,9,11
  84:16,20 85:17 86:2
  92:14,15,20 93:6
  118:20 119:20
  122:16,24 123:4,15
  123:23 126:8
  127:15,18 128:1,7
**scarpullalaw.com**
  7:20
**scenes** 100:23,24
**schedule** 20:12,14
  20:14 21:19 22:10
  23:13 25:1 85:15,16
  98:13 121:12 136:5
**scheduled** 23:22
**scheduling** 120:7
**scheme** 133:25
  134:1,8,9
**science** 58:2,2
**scope** 52:2 55:4
**scrounge** 71:13
**sdi** 10:10 15:14
  29:23 68:17

**seal** 38:17
**sean** 9:16 17:6
**search** 80:10,12,12
**second** 15:4 19:1
  102:13 112:23
  113:23,25 117:17
  120:17 132:13
**seconds** 70:2
**secret** 55:10
**secretly** 122:20
**section** 66:7
**securities** 41:20
**security** 41:21
**see** 16:7,9,10,12,14
  16:14 37:21 39:25
  42:4 47:4 62:15
  77:6 82:12,20 87:25
  89:16 90:22 102:17
  102:20 122:15,25
  132:22 135:20
  136:25 139:24
**seeing** 25:20 32:21
  34:16 103:5
**seek** 57:18 67:17
**seeks** 67:10
**seen** 16:8 91:11
**sees** 80:22
**self** 25:25
**send** 49:18 73:2
  78:24 96:23,24,25
  101:16 134:19
  135:19 137:11,12
**sending** 28:7 72:19
  96:25
**sends** 55:22
**sense** 25:25 35:18
  64:5 82:12
**sensitivities** 106:8
**sent** 56:9 91:18
  118:22 119:3,18
  125:24 133:12
**sentence** 126:7
**separate** 26:7,11
  33:5 38:17 54:18,25
  105:23 123:17

131:16 134:1
**separately** 117:2
**serious** 107:2
**served** 71:11
**serving** 25:25
**set** 20:13 27:2 44:13
  94:6 98:13 99:13
  108:16 110:12
  118:7,20 123:13
  141:4
**sets** 26:18
**setting** 94:8
**settle** 31:12 53:25
  54:14 59:15
**settled** 31:17 32:15
  33:13 53:19 55:18
  99:7,16 115:13
  136:25
**settlement** 18:22,25
  19:7 21:23 22:3
  26:8,10,18,20 27:14
  28:2,5,22,25 29:3,5
  31:21 32:6 33:12,19
  34:7,15,22,23 35:8
  35:22,24 37:6 39:5
  40:4,10,25 41:9,17
  50:3 52:2 54:10,17
  55:19 58:24 70:24
  71:7 79:22 86:14,16
  86:16,24 87:2,2,7
  87:19 88:15 89:10
  90:6,7,14,17,19,20
  92:16 93:5,11,14,20
  94:3,19,25 95:4,18
  95:20 96:2,8,20
  97:6 99:19 106:8
  107:16 115:4,10,14
  115:18 124:5,13,18
  124:22 125:1,2
  126:13 129:9 131:7
  131:14 132:14
  133:3,4 134:7,24
  137:13
**settlements** 20:22
  26:17,19,24 27:2,17

50:25 52:4 54:24,25
56:7 60:8,21 88:14
100:23 101:25
112:5 121:23 122:8
133:8
**settling**  32:7
**shades**  102:15
**shaking**  96:11
**shape**  19:24 22:4
**share**  95:13
**sharpen**  63:22
**shepard**  15:14
**sheppard**  10:11
**sheppardmullin.co...**
10:16
**sherman**  45:4 65:15
**shoe**  42:18
**shoreline**  9:19
**shorthand**  2:20
141:1,7
**shot**  102:22 103:5,7
**show**  36:16 43:2
76:5 130:22
**showing**  21:21 22:2
36:18 94:14
**shown**  81:10
**shows**  130:8
**side**  23:13,20 30:2
42:11,12 48:8 51:21
76:5,23 98:19
**sidelines**  57:13
**sides**  42:9 85:3,4
**signature**  141:22
**signed**  38:3
**significance**  84:17
**significant**  89:17
**silenced**  131:6
**similar**  51:6 54:19
114:5
**simple**  75:7,14
**simply**  45:18 64:11
73:2 87:6 111:21
**simultaneous**  137:8
137:16 140:9,19

**single**  108:7,10,12
108:17 110:23
111:23
**sir**  68:15 97:19
123:24
**sit**  63:18
**sits**  43:22
**sitting**  57:13 132:15
**situated**  35:21
**situation**  41:11 42:2
42:6,15 43:23,25
44:12 48:21 51:6
99:18 104:2 129:18
**six**  55:7 77:10
131:13
**size**  122:5
**skip**  67:22
**slightly**  83:15
**sloughing**  75:14
**small**  36:6 60:24
90:5,8,13 91:4,6,7
96:15 122:3 124:5,5
124:13,21
**smaller**  132:20
**smarter**  86:4
**society**  44:10,11
**solicited**  87:22
**solution**  97:24 105:3
106:10 134:13
**solutions**  104:23
**solved**  29:12
**solves**  135:23
**somebody**  75:2
136:8
**somebody's**  27:22
**soon**  43:20 118:6
**sooner**  81:19
**sorry**  30:24 49:9
53:22 77:16 89:3
99:1 105:9 113:3
117:3
**sort**  19:16 100:1
101:20 109:18
110:9,16 130:18
132:10 133:25

134:9
**sorts**  98:20
**sought**  93:13
**sound**  43:6 133:16
**sounds**  92:5
**source**  130:17
**south**  4:6 9:6
**speak**  14:11 53:22
80:5 83:21 129:20
130:11
**special**  2:15 3:4 14:5
14:10,24 16:13,16
17:4,12,20,23 18:6
18:11,20 21:9,15
22:7,25 23:2,14,17
24:2,5,21,24 25:11
25:16,22 26:1 27:24
29:3,16,18 30:17,24
31:4,25 32:4 33:14
34:10 35:3,12,14
36:8,10,19,23 37:1
37:4,14,22 38:4,8
38:10,12,21 39:16
41:10 43:5,11,17
44:19,25 45:5,7,12
47:4,20,22 48:2,11
48:23 49:11,15,19
49:24 50:7,20 51:11
51:16,19,24 52:7,25
53:4,9 54:6 58:14
59:5,18 61:7,11,18
62:3,5,14 63:3,7,9
63:12,15,17 64:2,15
64:20 65:3,8,10,14
65:18 66:10,15,18
66:20 67:19 68:13
69:6,8,18,23 70:7
70:19 71:5,9,23,25
72:6,10,12,15 73:5
73:14,16 74:8,20
75:5,10 76:6,10
78:10,18,21 79:1,13
80:17 81:17 82:6,17
83:1,4,20 84:1,4,7
84:15,15,19 85:9,25

86:12,20 87:12
88:17,19,21 89:3,9
89:13,16,25 90:18
90:23 91:6,20 92:4
92:13,19,24 93:1,9
94:22 95:5,22 96:1
96:11,15 97:5,12,15
97:18 98:2,12,18
99:3,7,10 101:6
102:3,5,9 103:24
105:2,4 106:12,20
107:12,18 110:18
112:6,9,12,22 113:1
113:9 114:13,16,21
116:20 117:4,7
118:11,24 119:1,6
120:13 121:5,13,17
121:20,24 122:3,10
122:15,20,25 123:5
123:19,24 124:3,25
125:4,7,10,13 127:1
127:3,11,15,23
128:2,13,16,24
129:2,11 130:4,14
130:24 131:1,8,10
131:18 132:4,8
133:18,22 134:3,5
135:6,13,21 136:4
137:18,22 138:3,5,9
138:14,18,24 139:4
140:3,15,17,20
**specific**  87:3 97:11
110:9
**specifically**  44:2
113:23
**specificity**  136:21
**speculative**  62:12
**speed**  76:21
**spelled**  26:24
**spend**  19:24 33:14
**split**  48:3,4 53:11,12
53:15 64:4,6
**spoke**  94:17
**spoken**  113:18

**spreading** 31:11,13
**spur** 126:3
**square** 66:8
**squarely** 23:21
**st** 8:19,20,21 9:7,12
    15:24,24,25 97:20
    98:3 121:17,18,22
    122:2,5,14 123:25
    124:4 125:2,5,9,11
    131:19,20
**stack** 96:19
**stage** 80:1 100:22
    124:12 125:11
**stand** 82:7
**standard** 79:23
    81:13 83:16,17
**standing** 42:9 43:3
    58:3 126:7 128:20
    130:9,23,25 131:16
    132:1
**star** 140:18
**start** 77:10 127:4
**started** 23:11
    116:21
**starting** 26:17
    137:12
**state** 12:11 22:5
    40:4 42:10,11,12
    44:20 45:8,14,18,20
    45:21 46:4,5,15,16
    46:17,19 48:11,13
    51:11 56:10,14
    57:21 65:8,12 67:16
    71:12 75:3,4 79:7
    82:2 88:3 89:22,22
    92:22 95:2,2 98:25
    103:15,17 110:8
    141:2
**stated** 65:4
**statement** 19:11
    68:10 120:20
    125:16 128:10
**statements** 40:6
    53:5 67:24 68:3
    85:17 107:24

**states** 1:1 2:1 19:2,3
    20:8 21:3 31:17,22
    33:8,8,24 34:1 39:4
    39:21,22 40:12,13
    40:16 43:8 44:21
    45:9,14 50:9 51:10
    52:14,17,21 53:14
    56:11 58:18,23 61:8
    62:21,22 67:5 71:4
    74:17 87:19 88:24
    91:1 94:12,14,17
    95:21 98:5 111:5
    112:16 139:21
**statistic** 80:6
**status** 127:17
    136:20
**statute** 54:2 58:4
    67:6 75:7,8
**statutes** 51:2
**statutory** 50:23
**step** 57:17 74:18
**stepped** 73:20
**steve** 9:11 18:4
**sticky** 104:2
**stimulation** 111:4,8
**stood** 93:16
**straightforward**
    91:3
**straus** 5:12,17 15:21
**strawn** 11:3 15:17
**streamline** 24:10
**street** 3:14 4:6,21
    5:6 6:5,12 7:8,17
    8:14 10:5 11:13,22
    12:6 13:6 55:5
    126:16
**strikes** 97:20
**strong** 58:22
**stronger** 52:18
**strongly** 75:23
**study** 37:12
**subject** 46:20
**submission** 111:18
    135:9,11

**submissions** 135:12
**submit** 20:3 49:20
    91:3 102:10 114:15
    114:16 117:13
    130:21 134:12
**submitted** 68:3 79:4
    111:22 116:5,19
**submitting** 111:13
**subscribed** 141:18
**subsequent** 70:3
**substance** 118:16
**substantively**
    120:10
**succeed** 108:21
**succeeded** 38:25
**successful** 34:14
**succinct** 19:19
**sufficient** 31:11
    132:25
**suggest** 26:6 27:5
    28:11 65:11 78:5
    114:7
**suggested** 22:13
    26:12 44:5 60:12
    84:4
**suggesting** 28:10
    43:13,14,16 137:5
**suggestion** 39:12
    52:1 82:23
**suggests** 41:21
**suit** 74:13 105:21
**suite** 2:17 3:5 4:14
    4:21 5:6,21 6:12,19
    9:19 11:13 12:15
**sullivan** 42:3
**summarize** 86:8
**summarizing** 99:14
**summary** 38:6 41:1
**sums** 100:15
**supplant** 100:6
**supplement** 32:1
    68:2,11,14 125:25
    126:2
**supplemental** 78:24

**support** 16:16 60:2
    126:24
**suppose** 119:24
**supposed** 28:4 121:9
**supreme** 42:17 43:6
    51:7
**sure** 14:13 26:11
    29:12 36:1,17 62:1
    67:22 71:21,22
    79:14 92:2,10
    101:22 102:4 103:4
    123:16 124:3
    125:18 133:23
    135:25 137:20
    138:1,3 139:10,14
    139:25
**surplus** 39:3
**surreply** 121:19
    124:2,10
**survived** 73:25
**suspect** 135:10
**sustainable** 27:7
**suzanne** 1:23 2:19
    141:22
**sway** 70:16
**sworn** 141:6
**sylvie** 6:4 16:17
**sylviekern** 6:8
**sync** 118:2
**system** 81:3

**t**

**t** 5:5 10:20
**table** 24:3 28:7
    100:14
**tail** 93:2
**take** 18:14 22:7
    24:17 31:5 32:14
    58:4,20 59:18 73:6
    76:6 95:6 101:11
    121:5 129:21
    133:19
**taken** 37:15 51:8
    52:14 141:3

| | | | |
|---|---|---|---|
| takes 32:23 | 73:16,18 76:5,8 | 134:20 135:2 137:2 | 132:16 133:17 |
| taladay 10:21 17:16 | 79:10 86:11 88:21 | 137:2,3,3,7,12 | 140:13,14,22 141:4 |
| 17:16 | 97:18 127:2 131:17 | 138:24 139:16,24 | timely 119:4 |
| talewsky 8:11 16:2 | 140:1,3,21 | thinking 52:23 | times 34:18 39:10 |
| talk 19:21 39:11,17 | thanks 93:19 | 57:13 66:21 | 52:9 70:22 83:12 |
| 44:9 54:4,5,7 | thekresslawfirm.c... | thinks 61:14 | 109:11 115:11,17 |
| 118:21 133:19 | 9:9 | third 19:5 42:4 | tinkering 28:9 30:15 |
| talked 46:12,13 71:1 | theoretical 85:12 | 54:19 97:9 117:21 | tmoore 8:17 |
| 119:10 120:10 | theory 44:17 | thirteenth 11:22 | today 19:21 35:10 |
| 123:3 133:24 | theresa 8:12,13 16:1 | thomson 11:10 17:9 | 39:10,12,13 82:15 |
| talking 45:2,2,23 | thing 32:2 34:12 | thoroughly 96:18 | 118:21 123:11 |
| 46:9 66:6 102:24 | 37:3 49:6 78:1 | thought 27:15 47:5 | 128:15 136:11 |
| 109:5 118:16 135:6 | 80:15 85:6 116:11 | 65:10 74:4 110:16 | 137:11 139:3,5 |
| talks 44:2 46:20 | 129:23 | 112:18 119:19 | told 32:19 52:12,13 |
| tank 97:14 | things 23:23 24:11 | 121:1 123:11 | 89:15 90:18 98:18 |
| target 77:23 | 33:20 35:6 54:3 | 135:11 | 127:20 |
| targeted 55:3 77:17 | 57:22 76:3 82:6 | thoughts 25:23 | tomes 44:8 |
| targets 124:16 | 102:15,20 118:2,4 | 29:19 | top 19:12 |
| tatp.com 3:17,18 | 121:15 | thousand 59:7,10 | toshiba 11:18 17:14 |
| tee'd 23:25 93:21 | think 18:13 21:5,6 | three 19:3 31:22 | total 26:9 122:23 |
| tehama 7:8 | 23:8 24:12 25:12,15 | 39:21 54:15,21 55:2 | totaling 70:4 |
| telephone 6:11,18 | 25:20,25 26:6 29:10 | 61:4 62:22 67:4 | totally 85:6 122:11 |
| 9:5,11,18 10:21 | 29:25 30:1,19 34:12 | 70:2 109:11 117:8 | touched 110:25 |
| 11:12,20,21 12:5 | 40:7 42:3 46:17,18 | 137:4 138:2 140:5 | track 108:21 |
| televisions 36:6,7 | 50:15 52:23,25 | threshold 126:21 | tracy 7:6 15:1 |
| tell 73:6 81:19 83:24 | 53:23 54:24 58:25 | 132:23 | traded 41:20 |
| 88:25 99:5 103:21 | 60:7,7,13,17 61:18 | throw 28:11 59:21 | traditionally 99:24 |
| 103:23 104:7 | 69:20 71:18,22 72:4 | 59:22 | 100:21 |
| tells 82:12 | 76:20 77:1,12 78:15 | thrown 69:3 72:24 | transcribed 141:8 |
| ten 76:7 90:7 | 79:16,16 81:14,22 | thursday 136:6 | transcript 141:9,12 |
| tend 99:25 | 82:18 84:25 85:6 | 137:20,22,25 140:9 | 141:14 |
| tenet 44:16 | 86:19 88:18 90:24 | 140:11,18 | transferred 75:19 |
| tentatively 62:6 | 93:12 94:2 95:11 | tigar 21:11 23:5,24 | 75:24 |
| term 98:6 113:4 | 97:23 103:18 | 24:13,15 34:12 | transparent 119:12 |
| terms 23:5 26:19 | 105:17,18 106:18 | 60:20 107:3 117:1 | treated 138:21 |
| 27:1 29:5 30:4 39:4 | 107:6,10 109:17 | 117:18 | treatise 47:17 |
| 59:22,22 83:18 | 111:1,9,20 114:4 | time 19:25 25:15,16 | treatment 91:22 |
| 86:16 87:3 94:20 | 115:19,25 116:17 | 25:17,18 33:15 52:9 | 98:20 105:9 |
| testifying 141:6 | 118:13 119:13,18 | 55:16 64:24 75:9,21 | treble 67:6 108:6 |
| testimony 138:13 | 119:21 121:25 | 81:19 85:16,18,18 | 109:5 110:23 |
| 141:9 | 122:10 123:6,15,19 | 91:4 96:21 98:21 | 111:24 112:1,6,8 |
| texas 9:20 | 123:20 124:20 | 105:23 106:10 | 114:2,10,24,25 |
| thank 16:13 17:12 | 126:11 128:7,9,22 | 111:20 116:9,15 | 115:20 116:16 |
| 23:17,19 24:2 26:3 | 130:18 132:4,12 | 118:6 123:13 124:1 | 136:9 |
| 49:24 53:2,17 70:19 | 133:10,14,16 | 126:20 127:12 | |

**trebled** 109:8

**tremendous** 132:12
132:14

**trial** 8:3 34:14 35:23
37:12 99:23

**tried** 46:3 64:24
65:25 102:1 119:11

**trk** 7:12

**trotting** 82:18

**trouble** 126:2

**troubled** 62:6,7

**troublesome** 62:8

**troubling** 96:16

**truck** 97:14

**true** 52:5 65:13,16
73:3 138:8 141:9

**trump** 3:11,11

**try** 19:18 32:4 33:5
59:22 72:20 90:10
109:14 119:8
124:11,17 135:4

**trying** 22:19 46:9
76:3 88:7 92:9
99:18 108:4,20
120:15 130:9
134:13

**tube** 1:5 2:5 12:3
17:11

**tubes** 36:4,5,6

**tuesday** 1:17 2:19
14:1

**turn** 110:1

**turns** 134:14,17

**tvs** 77:19

**tweak** 133:11

**two** 21:17 41:12
42:6 67:9 68:24
70:22 71:3 80:14
85:3,4 89:17,21
91:2 102:15 104:3
107:21 112:17
117:25 121:16
125:14 126:7
131:13 133:19
140:4

**type** 52:2

**types** 106:14

**typical** 24:14

**u**

**u.s.** 97:10

**ultimately** 62:23
68:24 103:10
117:14

**umm** 45:11

**un** 60:5

**uncommon** 124:20

**underlying** 27:1,16
28:25 30:10 54:1

**undersigned** 141:1

**understand** 22:25
53:10 69:9 76:17,18
82:7 97:6 123:7
127:5 128:18 132:4
139:14

**understandable**
133:5

**understanding**
102:1 122:12

**undoing** 44:3

**unearth** 72:1

**unequivocal** 68:3

**unfairly** 104:20

**unfairness** 134:22

**unforced** 97:22,25

**unforeseen** 107:8

**unfortunate** 107:7

**uniform** 66:8

**union** 3:14

**unique** 104:14

**united** 1:1 2:1 56:10

**units** 77:22

**university** 5:14 8:10
16:2

**unjust** 45:16,25
46:4,5,7 48:14

**unnamed** 67:16

**unprecedented**
61:22

**unproven** 60:6
61:16

**unreasonable** 19:25

**unredacted** 38:7

**unshackled** 111:8

**untrue** 52:5

**updated** 136:20

**uphill** 58:19

**upshot** 81:8

**urge** 77:2

**urgent** 119:25

**urias** 4:12 14:22

**use** 65:6 77:9,11,15
104:15

**usefulness** 134:11

**uses** 81:5

**usually** 100:22

**v**

**v** 131:21

**vacation** 119:16

**vacuum** 79:16

**valid** 69:14

**valuable** 48:1 71:6

**valuation** 54:9

**value** 34:4,21 35:19
40:6 53:16 109:7,11
110:7 116:15
124:11,18 125:3,5

**valued** 32:8 33:21
33:22,24 34:2,9,25
70:23 71:7

**valueless** 40:20

**values** 35:20

**valuing** 34:22

**varanini** 12:14 16:3
16:3 47:17 56:21
98:15,17 99:2,4,9
99:12 101:8,13
102:4,8,14 105:3
107:12,17,21
111:11 112:11,14
112:23 113:2 115:2
116:23 117:3,6,8
119:19

**varanini's** 105:17
113:16

**various** 18:14 27:1,1
68:25 76:19 123:21

**vegas** 8:6

**vehicles** 48:16,18

**version** 49:22,23

**versus** 70:5,10
110:23 113:24
114:8

**vetted** 74:5 80:2

**vetting** 73:24

**viability** 54:1 74:6

**viable** 56:16 57:10
59:14,23,24 60:2,11
62:1 64:5

**victims** 67:11

**view** 30:13 32:12
72:25 75:12 85:5
99:20 106:3

**viewed** 75:1

**vindicating** 44:15

**violation** 45:4,18
46:24 47:1

**virginia** 5:15

**vis** 28:2,2 29:5,5
30:10,10 105:20,20
121:22,22

**visited** 80:21

**vitally** 34:21

**voelbel** 5:3

**voice** 130:11

**volume** 79:5

**volunteer** 73:10
126:17

**vote** 101:6,8

**w**

**w** 10:12

**wag** 93:2 97:23

**wait** 35:14,14 37:14
69:6,6,6 92:13
110:4

**waive** 39:6

waived 115:15
waiving 126:10
wall 55:5
walnut 6:20
want 19:20,21,24
 21:13,14,15,17 24:6
 28:12 31:7 33:14
 35:3,9 37:1 39:17
 50:17,19 51:19 53:7
 56:6,23 59:7,16,23
 61:12 62:18 63:25
 64:8 66:10 73:6
 85:21 93:2,17,18
 98:16 107:6 118:5
 121:18 123:6,14
 124:1 125:18 126:6
 132:10,19 133:16
 135:23 136:9 139:8
 139:10,13,25
wanted 50:2 73:20
 113:11 114:17
 118:21 123:2 138:9
wanting 74:13
wants 23:7 57:12
 61:15,15 97:1 123:9
ward 4:12 14:22
wash 60:13
washington 10:23
 11:23 88:5,9,13
 93:17 94:15 133:24
water 117:23 118:8
waterfront 76:15
way 18:12 22:4,17
 23:12 28:14 29:20
 32:2 41:25 42:8
 45:15,25 47:16
 52:24 64:13 68:19
 81:9 93:4,17,18
 100:21 110:3,7
 119:21 121:9 133:2
ways 27:18,20,20
 28:6,21,21 29:12
 36:13
we've 21:20,24
 22:13,16 34:18

36:23 60:25 64:16
 65:21 103:6 104:16
 109:16 113:13
 117:23 118:16
 119:10 123:2
weak 58:22
website 80:21 97:4
 119:15
week 116:24 117:25
weighs 57:5
welcome 28:15,16
 28:24 30:1
went 33:2 35:23
 64:23 73:24 74:1
 81:8 91:12 114:8
 135:12
westlaw 49:16,22
 114:20
whack 85:10 102:13
 122:1
whatsoever 70:16
whereof 141:18
whistles 54:20
white 11:19 17:14
whitecase.com
 11:25
wide 39:11 55:6
wilhelmina 113:24
 114:8
willing 27:22 41:10
windfall 109:12,13
 110:5
winston 11:3 15:17
winston.com 11:8
wipes 86:6
wiping 57:14
wisdom 96:12
wise 80:2
wish 77:3 78:5
withdraw 20:23
withdrawing 20:21
witness 87:14 134:2
 141:18
witnesses 141:5

won 69:2
wonderful 47:5
wondering 138:16
 138:20
word 120:7
words 20:1 120:21
 122:4 124:6,7
 135:10
work 40:1 57:25
 82:9 100:21
working 57:24
 85:15 105:12
 112:16
works 63:9 85:1
world 31:20 113:8
worried 116:20,23
worse 66:12
worth 48:5 76:2
 100:13
write 64:8
writing 68:14
wrong 80:7 105:11
 113:4
wrote 120:21

| x |
| --- |

x 94:7

| y |
| --- |

yahoo.com 6:8
yeah 23:1 53:9 59:4
 92:2,7 97:5
year 77:13
years 16:8 50:11,11
 50:11 55:10 58:7
 61:5 64:10 74:2
 77:9,10,12,15
 116:16,21 134:25
yell 14:12 24:6
yelling 14:11 15:10
yesterday 118:18
 119:3
york 11:6,6

| z |
| --- |

zealously 52:16
zelle 5:3 16:21
 127:17,19,20
zelle.com 5:9,10
zero 30:22 32:8 40:6
 47:25 48:5 53:16
 58:11,12,12
zucker 131:21

| à |
| --- |

à 28:2 29:5 30:10
 105:20 121:22

# EXHIBIT 2

**Sandra Chan**

| | |
|---|---|
| **From:** | MARTIN QUINN <mq1942@me.com> |
| **Sent:** | Thursday, December 31, 2015 12:41 PM |
| **To:** | Mario Alioto |
| **Cc:** | Francis Scarpulla; Sandra Chan; Emilio Varanini; Marlo Cohen |
| **Subject:** | Re: CRT/Hearing on January 5, 2016 |

Dear Counsel:  I have Mr. Scarpulla's letter e-filed with JAMS and Mr. Alioto's e-mail asking about procedure for the January 5 hearing.  Mr. Scarpulla's letter also asks for the production of material prior to the hearing relating to expenses and fee calculations.  I will issue an order on Mr. Scarpulla's requests, but wanted to let you know now my preferences.

First as to the hearing, it matters not to me how many firms want to participate in person or by telephone.  However, I envision the hearing lasting about 2 hours max, so I would like some coordination among counsel as to who takes the lead in speaking.  I really don't need to hear the same arguments from 5 different lawyers.  There will be no formal examination or cross-examination.  This is an opportunity for reasoned legal argument.  I would like to hear first from whatever counsel are speaking for the objectors, basically responding to the points made in Lead Counsel's Reply Brief.

The principal issues that concern me are the objections raised on the basis that all the national class is not receiving compensation, the viability of an indirect purchaser claim in a non-repealer state, the reasons for not having representatives from the three repealer states, the propriety of the notice.  I am far less interested in hearing argument about attorney fees and expenses, not because those issues aren't significant, but because I can make reasoned judgments on those issues without more argument.  That doesn't mean I won't hear anything on those issues — just keep it to a minimum.

As to Mr. Scarpulla's requests for production, I am not going to grant them.  None of the material he asks for seems to me necessary for me to make a reasoned decision on the request for total fees.  They may become more relevant to the allocation phase, but I have quite enough material now to rely on for this phase.  I believe Mr. Alioto is having his accountants perform a more detailed audit of the expense requests, and I will want to see the results of that early next week.

Martin Quinn
Special Master

MARTIN QUINN
JAMS
Two Embarcadero Center, #1500
San Francisco, CA  94111
415-774-2669
mq1942@me.com

On Dec 31, 2015, at 1:20 PM, Mario Alioto <MAlioto@TATP.com> wrote:

# EXHIBIT 3

# CRT: Production of billing records

**MARTIN QUINN [mq1942@me.com]**

**Sent:** Thursday, January 07, 2016 4:13 PM
**To:** Lauren Capurro (Russell) [LaurenRussell@tatp.com]
**Cc:** Mario Alioto [MAlioto@TATP.com]; Sandra Chan; Marlo Cohen [marlojams@yahoo.com]

Ms. Capurro… as if you didn't have enough to do, I have a further request.  On November 28, 2015, I ordered that copies of all billing records of class counsel be produced to me.  I now consider that unnecessarily burdensome for Lead Counsel and for me, and unnecessary for me to perform an adequate check of the reliability of those records.  You have already provided me with the 2014-2015 billing records of Trump, Alioto; Fine Kaplan; Freedman Boyd; and Hulett Harper.  I would like you to provide me in a similarly convenient Dropbox format, if possible, copies of the billing records for any two months per year for 2012, 2013 and 2014 for the following seven randomly selected firms:  Lovell, Green & Noblin, Miller Law, Sherman Kassof, Sharp McQueen, Frankovitch, Wyatt & Blake.  I have chosen a mix of firms with large, medium and small lodestars.  That is a total of 42 months of class counsel billing records, which I consider a representative sample.

Please let me know if this is feasible, whether you have any questions, whether a change in my format would make production quicker and easier, and when you can get this material to me.

Thank you as always for your good cooperation.

Martin Quinn
Special Master

TO BE POSTED ON CASE ANYWHERE

MARTIN QUINN

JAMS

Two Embarcadero Center, #1500

San Francisco, CA  94111

415-774-2669

mq1942@me.com

# EXHIBIT 4

MARIO N. ALIOTO, ESQ. (56433)
LAUREN C. CAPURRO, ESQ. (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA  94123
Telephone:  (415) 563-7200
Facsimile: (415) 346-0679
E-mail: malioto@tatp.com
laurenrussell@tatp.com

*Lead Counsel for the*
*Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** | ) Master File No. CV-07-5944 JST |
| | ) |
| | ) MDL No. 1917 |
| | ) |
| | ) **DECLARATION OF JOSEPH M. FISHER** |
| | ) **REPORTING ON CLAIM SUBMISSIONS** |
| | ) |
| | ) |
| | ) |
| **This document relates to:** | ) |
| | ) |
| **ALL INDIRECT PURCHASER ACTIONS** | ) |
| | ) |
| | ) |
| | ) |

1

1       I, Joseph M. Fisher, declare:

2       1.     I am the president of The Notice Company, Inc., a Massachusetts corporation with

3 offices at 94 Station Street, Hingham, MA 02043 ("The Notice Company"). The Notice

4 Company is principally engaged in the administration of class action settlements and lawsuits

5 pending in courts around the United States, including the dissemination of notice to class

6 members, administering the claims process, and distributing the proceeds of the litigation to the

7 class. I have over a decade of experience assisting attorneys with class action notices and claims

8 administration. I am also a member in good standing of the bars of the Commonwealth of

9 Massachusetts, the District of Columbia, and the Commonwealth of Virginia. I am over 21 years

10 of age and not a party to this action. The Notice Company is the Claims Administrator,

11 responsible for receiving and processing claims in these Settlements. I have personal knowledge

12 of the facts set forth herein and, if called as a witness, could and would testify thereto under oath.

13       2.     Class Counsel has asked me to provide a report on claims received to date.

14       3.     The information provided in this Declaration will be subject to change based on

15 (a) ongoing claims processing and auditing being performed by The Notice Company; (b) Court

16 rulings on pending matters such as Class Counsel's request for attorneys' fees and litigation

17 expenses; and (c) interest and future expenses relating to claims administration and taxes.

18       4.     The deadline to submit claims in these settlements was December 7, 2015. The

19 Notice Company received 109,709 timely claims submissions. As of the date hereof, The Notice

20 Company has:

21       a.   processed 107,499 claims;

22       b.   calculated that for the 107,499 processed claims, the total number of CRT units

23           claimed was 19,933,103;

24       c.   applied the weighting formula reflected in the Detailed Notice (where a weight of

25           1 is applied to a standard CRT TV , a weight of 4.3 is applied to a large CRT TV,

26           and a weight of 3 is applied to a computer CRT monitor) to calculate that the

27           number of "CRT Equivalent" units claimed was 58,955,056; and

28

d.  calculated that the number of claims submitted that were incomplete was 1,733.

5.  As of the date hereof, The Notice Company has received 1,060 claims that were submitted after the deadline of December 7, 2015.

6.  The Notice Company has not yet prepared tables categorizing claims by number of CRT products purchased by each claimant or the total number of CRT products purchased by claimants, by quantity and type of CRT product.  The Notice Company could provide this information if requested to do so.

7.  In order to estimate aggregate payments to claimants under the plan of distribution, I would need to know two figures: (1) the amount available for distribution, and (2) the quantity of CRT products purchased by claimants, based on the weighting formula set out in paragraph 4.c. above.

8.  Neither of the figures referenced in paragraph 7 above can be estimated with precision at this time.  The amount available for distribution is dependent upon the amount awarded for attorneys' fees, expenses, and incentive awards.  It will also be dependent on further expenses incurred in claim administration and the distribution of funds to claimants.  Taxes, accounting, other professional services, and interest on the settlement funds and other items will also affect the amount available for distribution.

9.  For the purpose of developing an estimate in this Declaration, and subject to the reservations set forth herein, I estimate that the following amount would be available for distribution:

| | |
|---|---|
| $576,750,000 | Total Settlements |
| $191,866,667 | Requested attorneys' fees and incentive awards |
| $7,660,000 | Requested litigation expenses |
| $5,400,000 | Approximate cost of notice programs and estimated cost of claims administration |
| $548,000 | Payments to Illinois and Oregon Attorneys General |
| $371,275,333 | Estimated amount available for distribution. |

3

10.     The Notice Company's calculation of the quantity of CRT products purchased by claimants is also subject to change.  The auditing of claims and the finalizing of incomplete claims will affect the total quantity of claims.  So too would the possible inclusion of late claims, as well as claims that might be generated by any notice to be given by the California Attorney General in her separate lawsuit.

11.     For purposes of presenting an estimate in this Declaration, subject to the reservations set forth herein, and without factoring in the payment of an expected minimum amount to claimants, below is an estimate of the estimated payout amounts to claimants:

| | |
|---|---|
| $371,275,333 | Estimated amount available for distribution (¶ 9 above) |
| 58,955,056 | Weighted number of CRT products purchased by claimants (¶ 4.c. above) |
| $6.30 | Estimated payment per Standard CRT Television |
| $27.09 | Estimated payment per Large CRT Television |
| $18.90 | Estimated payment per CRT Computer Monitor |

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed at Hingham, Massachusetts, this 15th day of January, 2016.

_____
JOSEPH M. FISHER

**DECLARATION OF JOSEPH M. FISHER REPORTING ON CLAIM SUBMISSIONS**