**Robert J. Bonsignore, Esq.**
**BONSIGNORE TRIAL LAWYERS, PLLC**
**3771 Meadowcrest Drive**
**Las Vegas, NV 89121**
**Phone: 781-856-7650**
**Facsimile: 702-852-5726**
**Email: rbonsignore@classactions.us**

*Counsel for Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** | Case No. 3:07-cv-5944 MDL No. 1917 |
| | **CLASS ACTION** |
| This Document Relates to: | **OBJECTION TO SPECIAL MASTER'S REPORT AND RECOMMENDATION ON FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND AWARD OF ATTORNEYS' FEES AND OTHER EXPENSES AND AWARDS AND REQUEST FOR DE NOVO ORDER** |
| All Indirect Purchaser Actions | |
| | Hearing Date: March 15, 2016 Time Set: 2:00 p.m. Judge: Honorable John S. Tigar Courtroom: 9-19th Floor Special Master: Martin Quinn, JAMS |

**Table of Contents**

Page(s)

STANDARD OF REVIEW ............................................................................. 3

INTRODUCTION ........................................................................................... 4

OBJECTION 1

THE SPECIAL MASTER INCORRECTLY FOUND THAT THE SETTLEMENT
AGREEMENT WAS FAIR DESPITE THE RELEASE OF ALL RIGHTS AND TOTAL
ABSENCE OF AN ECONOMIC RECOVERY BY THE EXCLUDED PLAINTIFFS ............... 8

    A.    The Special Master Erred In Concluding That The Settlement's Treatment
of Identical Class Members Differently Satisfied Rule 23's Fairness
Requirements ............................................................................. 10

    B.    The Special Master Erred In Concluding That Lead Counsel's Failure
To Pursue The Claims of Class Members In The Excluded States Was Fair,
Adequate and Reasonable ............................................................ 12

    C.    The Special Master Erred In Concluding That Lead Counsel's Declaration
That He Was Unaware Of Any Viable Plaintiffs In The Three Excluded
States Was Sufficient To Validate His Breach Of Duty To Vigorously
Represent Their Class And His "Unawareness" Is Disproven By The Record
............................................................................................. 18

        1.    Massachusetts ................................................................. 19

        2.    Missouri ......................................................................... 22

        3.    New Hampshire ............................................................... 23

    D.    The Special Master Erred In Concluding That Lead Counsel's Failure
To Pursue The Excluded State Claims Should Have Been Remedied By
Other Attorneys ........................................................................ 24

    E.    The Statutes of Limitations Provide No Safe Harbor For Lead Counsel's
Failure To Pursue The Excluded States' Claims ............................... 25

OBJECTION 2

THE SPECIAL MASTER INCORRECTLY FOUND THAT
THE NOTICE PLAN WAS REASONABLE ........................................................ 26

    A.    The Notice Plan Was Inadequate ................................................ 27

ii

B.   The Master's Failure To Engage A Neutral Expert To Evaluate The Notice Program Renders His Determination That It Was Reasonable Defective ............ 32

OBJECTION 3

THE SPECIAL MASTER'S ATTORNEYS' FEES AWARD WAS NOT SUPPORTED BY ADEQUATE EVIDENCE OF HOURLY RECORD KEEPING .................................................. 33

OBJECTION 4

THE SPECIAL MASTER ERRED IN FAILING TO INCLUDE THE EXCLUDED PLAINTIFFS IN THE AWARD OF INCENTIVE FEES ........................................................... 35

OBJECTION 5

THE SPECIAL MASTER ERRED IN FINDING THAT LEAD COUNSEL COULD CORRECT THE DUE PROCESS VIOLATIONS COMMITTED BY DEVISING AN ALLOCATION PLAN THAT ABANDONED CHUNGHWA CLASS MEMBERS ................ 36

CONCLUSION ............................................................................................................. 43

**Table of Authorities**

<u>Case</u>                                                                                    <u>Page</u>

*Aiello v. Town of Brookhaven,* No. 94-CV-2622 (FB)(WDW). 2005 WL 1397202
(E.D.N.Y. June 13, 2005) ........................................................................................ 35

*Apple, Inc. v. Samsung Elecs. Co.*, No. C 11–1846 LHK (PSG).2012 WL 5451411
(N.D. Cal. Nov. 7, 2012) ......................................................................................... 35

*Banas v. Volcano Corp.*, 47 F. Supp. 3d 957 (N.D. Cal. 2014) ................................. 35

*Bartholomew v. Sisto*, No. CIV S-09-0882-JAM, 2012 WL 691708,
(E.D. Cal. Mar. 2, 2012), *report and recommendation adopted,*
No. CIV S-09-0882-JAM, 2012 WL 1413959 (E.D. Cal. Apr. 20, 2012) ................... 24

*Birmingham Steel Corp. v. Tennessee Valley Auth.*, 353 F.3d 1331 (11th Cir. 2003) .............. 14

*Campbell v. Hope Community Credit U.*, No. 10–2649–STA, 2012 WL 2395180
(W.D. Tenn. June 25, 2012) ...................................................................................... 14

*Crown, Cork Seal Company, Inc v. Parker*, 462 U.S. 345 (1983) .............................. 26

*Daniels v. Aeropostale West Inc.*, No. 12-05755-WHA, 2014 WL 2215708
(N.D. Cal. May 29, 2014) ......................................................................................... 10

*Hajro v. U.S. Citizenship & Immigration Servs.*, 900 F. Supp. 2d 1034
(N.D. Cal.2012) ...................................................................................................... 34

*Henson v. Fid. Nat. Fin. Inc.*, No. 2:14-CV-01240-ODW, 2014 WL 1246222
(C.D. Cal. Mar. 21, 2014) ........................................................................................ 26

*Hesse v. Sprint Corp.*, 598 F.3d 581 (9th Cir.), *cert. denied*, 562 U.S. 1003 (2010).................. 11

*In re Avon Securities Litigation*, No. 91 CIV. 2287(LMM), 1998 WL 834366
(S.D.N.Y. Nov. 30, 1998) .................................................................................... 13, 14

*In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ........................... 17

*In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013) ..................................... 11

*In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*,
55 F.3d 768 (3d Cir.), *cert. denied*, 516 U.S. 824 (1995) ..................................... 12, 17

*In re Initial Pub. Offering Secs. Litig.*, 224 F.R.D. 550 (S.D.N.Y. 2004) ................... 14

*In re Ivan F. Boesky Secs. Litig.*, 948 F.2d 1358 (2d Cir. 1991)................................. 25

*In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1103-05 (5th Cir.1977) .................. 40

*In re Northwest Airlines Corp. Antitrust Litig.*, 221 F.R.D. 593 (E.D. Mich. 2004) .................. 14

*Kaufman v. American Express Travel Related Servs., Inc.*, 283 F.R.D. 404
(N.D. Ill. 2012) .......................................................................................................... 32, 33

*Kayes v. Pac. Lumber Co.*, 51 F.3d 1449 (9th Cir. 1995) ................................... 12, 25, 41

*Lil' Joe Wein Music, Inc. v. Jackson*, No. 06-20079-CIV. 2008 WL 2688117
(S.D. Fla. July 1, 2008) ........................................................................................... 35

*Matter of Yagman,* 796 F.2d 1165 (9th Cir. 1986) ............................................................ 15

*Mendez v. County of San Bernardino*, 540 F.3d 1109, 1129 n.2 (9th Cir. 2008) ....................... 34

*Molski v. Evergreen Dynasty Corp.,* 500 F.3d 1047, 1065 (9th Cir. 2007) .............................. 15

*O'Bannon v. National Collegiate Athletic Ass'n,*, Case No. 09–cv–03329–CW (NC),
2015 WL 4274370 (N.D. Cal. July 13, 2015) .......................................................... 35

*Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157 (9th Cir. 2013) ............................ 11

*Reynolds v. Beneficial Natl. Bank*, 288 F.3d 277 (7th Cir. 2002) ................................. 10

*Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181 (D.D.C. 2013) ............................... 11

*Stahl v. MasTec, Inc.*, No. 8:05-CV-1265-T-27TGW, 2008 WL 2267469
(M.D. Fla. May 20, 2008) ......................................................................................... 14

*Sullivan v. DV Invs., Inc.*, 667 F.3d 273 (3d Cir. 2010), *cert. denied sub nom.*,
*Murray v. Sullivan*, 132 S. Ct. 1876 (2012) ........................................................... 10, 18

*Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222 (11th Cir. 1998) ................................... 40

*UAW v. General Motors Corp.,* 235 F.R.D. 383 (E.D. Mich. 2006) ................................. 22, 33

*Union Assets Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632 (5th Cir. 2012) ................. 22, 33

*U.S. v. Thoreen,* 653 F.2d 1332 (9th Cir. 1981) ......................................................... 15

*Welch v. Met. Life Ins. Co.*, 480 F.3d 942 (9th Cir. 2007)), *overruled on other grounds,*
*Arizona v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014) ........................................ 34

*Yeager v. Bowlin,*, No. CIV. 2:08–102 WBS JFM, 2010 WL 1689225
(E.D. Cal. Apr. 26, 2010) ......................................................................................... 35

*Yoshioka v. Charles Swab Corp.*, No. 11-1625-EMC, 2011 WL 6748984
(N.D. Cal. Dec. 22, 2011) ......................................................................................... 10

<u>Statutes and Rules</u>

ABA Model Rule 1.5, comment 5 ................................................................................. 33

California Rules of Professional Conduct 3-500 .......................................................... 15

California Rules of Professional Conduct 3-510 .......................................................... 15

Fed. R. Civ. P. 23 .............................................................................. 7, 21, 26, 40

Fed. R. Civ. P. 53 ........................................................................................... 3

N.D. Cal. Local R. 7-3(c) .............................................................................. 24

<u>Other Authority</u>

*Manual for Complex Litigation (Third)*, § 30.16 ..................................................... 14

*Manual for Complex Litigation (Second)* § 20.221 .................................................. 25

Class members and indirect purchasers of Cathode Ray Tubes, Anthony Gianasca, Gloria Comeaux, Mina Ashkannejhad individually and/or as Administrator of the Estate of the Late R. Deryl Edwards, Jr., Jeffrey Speaect, Rosemary Ciccone and Jeff Craig, (the "Excluded Plaintiffs") by and through their counsel Bonsignore Trial Lawyers, PLLC, pursuant to Fed. R. Civ. P. 53(f)(2) and this Court's orders (*See* Doc. Nos. 4286, 4298), file this Objection ("Objection") to Special Master Martin Quinn's Report and Recommendation Re Motions (1) To Approve Indirect Purchaser Plaintiffs' Settlements with the Phillips, Panasonic, Hitachi, Toshiba, Samsung SDI, Technicolor, and Technologies Displays Americas Defendants (the "Settlement Agreement"), and (2) For Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards to Class Representatives (the "Report").  Plaintiffs request that this Court order:

1.    Monetary compensation, re-notice and an extension of the claims period for the so-called Chunghwa Settlement Class;

2.    Monetary compensation, re-notice and an extension of the claims period for the so-called Excluded Massachusetts Settlement Class;

3.    Monetary compensation, re-notice and an extension of the claims period for the so-called Excluded Missouri Settlement Class;

4.    Monetary compensation, re-notice and an extension of the claims period for the so-called Excluded New Hampshire Settlement Class;[1]

5.    The appointment by this Court of a qualified expert on class action notice programs and claims rates so that a full evaluation of the notice program, including claims rates, can be carried out to protect the interests of absent or excluded class members.  The Excluded Plaintiffs request that this Court give serious consideration to appointing the Hilsee Group as an independent evaluator of the class notice program and the claims rate.  *See* Attachment 1 to Affidavit of Robert J. Bonsignore - Hilsee Group Website, http://www.hilseegroup.org/contact.php;[2]

6.    Lead Counsel and the claims administrator to immediately make full and complete disclosure of all claims rate data, the parameters and details of the class notice, and any and all other information deemed necessary and reasonable by a court-

---

[1] A request to extend the time period to make a claim has been granted by the Special Master at the request of the California Attorney General's office.

[2] Among other things apparent by their website and independent review, the Hilsee Group collaborated with the Federal Judicial Center to create a judges' checklist for class action notice campaigns.

appointed qualified expert on class action notice programs and claims rates so that a full evaluation of the notice program and claims rate can be carried out on behalf of absent or excluded class members;[3]

7.   In the alternative, grant full disclosure of the underlying data and time for a retained expert to prepare a related report for objecting class members, including the Excluded Plaintiffs and class counsel.  Specifically, if this Court will not retain the Hilsee Group as an independent evaluator of the class notice program and the claims rate, allow the objecting class members, including the Excluded Plaintiffs and class counsel, to hire an expert and provide them with sufficient data to perform such an evaluation;

8.   Re-notice and an extension of the claims period for the entire "Economic Recovery Class" using an experienced and qualified claims administrator and a notice plan that satisfies the Federal Judicial Center's criteria and otherwise addresses the deficiencies raised by the objecting class members, including the Excluded Plaintiffs and Class Counsel;
*See* Attachment 2 to Affidavit of Robert J. Bonsignore – Federal Judicial Center Judge's Class Action Notice and Claims Process Checklist and Plain Language Guide Process(http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf;

9.   Otherwise, that the objectively unacceptable claims rate be investigated and addressed after full disclosure of the underlying data is provided to the objecting class members, including the Excluded Plaintiffs and class counsel (*see* Attachment 3 to Affidavit of Robert J. Bonsignore – Shannon Wheatman, *Accurately Reporting Notice Results to Courts,* Rust Kinsella Consulting Media, December 2015);

10.  Lead Counsel to provide to all objecting class members, including the Excluded Plaintiffs and class counsel, full and complete time, billing and expense records for the entire period for which compensation is claimed[4];

11.  The Court will carry out a full, detailed review of the Indirect Purchaser Plaintiffs Counsels' time records and expenses in accordance with the ABA Attorney Billing Guidelines;

---

[3] At the insistence of the Excluded Plaintiffs and other objecting class members, including class counsel, the Special Master compelled Lead Counsel and the claims administrator to provide their first claims report.  *See* Attachment 9 to Affidavit of Robert J. Bonsignore - JAMS Hearing Transcript, dated January 5, 2016 ("Hearing Tr.") at 136:18-22.  The resulting disclosure was an incomplete and unworkable reporting of stray data.  *See* Doc. No. 4371.

[4] The Special Master ordered billing and expense records to be produced.  It was error, however, to limit the production to only Attorneys Scarpulla and Cooper.  It was also error to limit the production in size, scope and time period, especially in light of the fact that points, defects and objections raised by the objecting class members, including the Excluded Plaintiffs and class counsel, were not provided for in the Special Masters related order.  *See* Doc. No. 4211.

2

12.     Incentive award granted to the Excluded Plaintiff Anthony Gianasca because he was originally named and was arbitrarily and capriciously excluded despite having brought a benefit to the class;

13.     Incentive awards for the Excluded Plaintiffs because their good faith objection has brought about a benefit to the class; and

14.     Attorneys' fees and costs for the Excluded Plaintiffs because their good faith objection has brought about a benefit to the class.

In support hereof, the Excluded Plaintiffs state as follows:

On January 13, 2016, this Court ordered that objections to the Master's Report and Recommendations will be reviewed de novo.  *See* Doc. No. 4298 at 3.  The Report and Recommendation of the Special Master was filed on January 28, 2016.  *See* Doc. No. 4351.  This Court previously ordered that objections to such Report be filed by February 12, 2016.  *See* Doc No. 4286.  The Excluded Plaintiffs object to the Report on multiple grounds, as detailed herein and request de novo review.  To avoid repetition to the greatest degree possible under the circumstances, rather than repeat argument, the Excluded Plaintiffs join in and incorporate by reference the objections to the Report filed by the other objectors to the extent that they supplement and do not conflict with the arguments presented herein.

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure permit a party to file objections to a special master's order, report, or recommendations.  *See* Fed. R. Civ. P. 53(f)(2).  Under Rule 53(f), a court must review the factual findings and legal conclusions of a special master *de novo* absent stipulation to the contrary.  *See* Fed. R. Civ. P. 53(f)(3)-(4).  The Court must "give the parties notice and an opportunity to be heard" and "may receive evidence; and may adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions."  Fed. R. Civ. P. 53(f)(1).

Here, the Excluded Plaintiffs object to the Special Master's Report and certain of his factual findings and legal conclusions and request pursuant to this Court's Amended Order Appointing Special Master Quinn de novo review by this Court.  *See* Doc. No. 4298 at 3.

## INTRODUCTION

This Court is presented with a settlement agreement that, despite its creation of a nearly

3

$577 million settlement fund, indisputably disregards the concededly valid damages claims of end use indirect purchaser class members in three states - Massachusetts, Missouri and New Hampshire - and indirect resellers in a previous settlement.  This patently unfair and disparate treatment is a direct result of the literal abandonment of those class members by lead counsel Mario Alioto and his firm ("Lead Counsel").  Well-established legal precedent defines this as a blatant violation of a lead counsel's fiduciary duty to absent class members.

The analysis here begins and ends with a review of Lead Counsel's performance of his duties to all class members, and the Special Master's reliance on speculative conclusions as to what other counsel may or may not have done was an error of law.  Importantly, the absent class members who comprise the classes here number far in excess of those who presented or attempted to present themselves to Lead Counsel.  It is their rights that this Court is responsible to protect. Additionally, Lead Counsel in a class action setting cannot be allowed to adopt a course of conduct where he or she is aware of putative class members from a jurisdiction that allows for an economic recovery for similarly situated persons, chooses not to pursue their claims, and then, at the end of the litigation, reach back to include them in a settlement that provides them with no benefits while at the same time releasing their related rights.

Moreover, the duties of full and zealous representation possessed by lead counsel in a class action to unnamed class members is a cornerstone of class litigation.  Here, Lead Counsel does not dispute that class members from the Excluded States possess claims that are as equally valid under the law as the class members in the other "repealer" states.  Yet he seeks to be relieved of any duty to pursue their damages claims by trumpeting that no fully vetted, "viable" representative from those three states appeared at his doorstep.  The singular duty of lead counsel to vigorously pursue unnamed class members rights does not countenance such passive representation.  Lead Counsel knew equally valid damages claim existed in the three Excluded States and it was his obligation to at least make an attempt – which Lead Counsel has never represented he made – to identify a class representative prior to sacrificing their claims.  His only arguable efforts, with regard to the Massachusetts absent class members alone, were that he opted to engage in a futile fight to avoid

4

the state statutory prerequisite 30-day demand letter.  Two other foolproof courses of action existed:  1) not filing his action until the demand requirement was satisfied, 2) dismissing and re-filing after the demand requirement was satisfied, or 3) filing with a new plaintiff who satisfied the demand requirement.[5]  The failure to pursue the claims for the Excluded States constitutes disparate treatment of class members and has created a conflict of interest between Lead Counsel and certain members of the Settlement Class.

Yet another particularly egregious circumstance exists here:  willing and viable class representatives did appear at his doorstep.  With respect to Massachusetts, Lead Counsel actually named a putative Massachusetts class representative in one of the class complaints.  That individual's claim was later challenged for failure to accomplish a simple legal formality of a prior demand letter, and as described above, rather than serve the mandatory letter, Lead Counsel simply dropped him and abandoned his claim without communicating that fact to him.  Remarkably, Lead Counsel named a subsequent Massachusetts end use putative class representative and again did not ensure during the required vetting process that she satisfied the pre-suit Chapter 93A demand requirement, and her claim was dismissed.  Lead Counsel did not take any of the corrective actions available to him to protect the rights of these absent class members but instead, abruptly abandoned the Massachusetts absent class members.

With respect to both Missouri and New Hampshire, Lead Counsel was provided with the names of individuals willing to serve and particulars of their purchases.  Lead Counsel also was provided with access to purchase records and motivated local counsel.  In violation of his duty to protect the interests of the class, Lead Counsel failed to follow up in any way.

Lead Counsel's fast and loose claims[6] of unawareness of "viable" representatives was thus the direct result of his failure to attempt to determine the viability of individuals standing in front

---

[5] Lead Counsel also had the option to condition an extension on the time the Defendants had to answer on a waiver of the 93A pre-suit demand, or to not waive affirmative defenses not timely raised.  Other options were also available to Lead Counsel.

[6] Lead Counsel does not deny he was made aware of putative class representatives.  *See* Attachment 9 of Affidavit of Robert J. Bonsignore - Hearing Tr. at 53:5-8.

1   of him.  The defects in this Settlement Agreement are a direct result of Lead Counsel's

2   abandonment of the absent class members he proclaims to represent.  Granting final approval

3   would be error because, among other things, it would serve to obliterate the protections mandated

4   by Rule 23.  Rule 23 final approval is not available by right.  It can only be granted after a court

5   has satisfied its responsibilities to safeguard the rights of absent class members.

6        The notice program provided for by Lead Counsel was also deficient.  The pathetic claims

7   rate supports this conclusion and is buttressed at this point by the slick, deficient reporting by the

8   claims administrator.  As detailed below and by other objectors, the notice program fails on

9   multiple fronts to achieve sufficient reach and effectiveness.  It does not satisfy the standards for

10  acceptable notice under the Federal Rules of Civil Procedure and due process.  In light of the low

11  claims rate, the fact that its demographic detail remains undisclosed, the significant monetary

12  recovery and the forfeiture of considerable rights, the notice program requires evaluation by an

13  expert.  The Excluded Plaintiffs prefer a court-appointed neutral because it will eliminate "battle of

14  the experts" arguments.  *See* Hearing Tr. at 86:1-11.  Indeed, pleas for such a review were

15  disregarded by the Special Master who refused to order Lead Counsel or the claims administrator

16  to produce claims and notice data until it was too late for the Excluded Plaintiffs or the other

17  objectors to do anything with the data.  Compounding the problem, the order of the Special Master

18  was amorphous and the result was a deficient report with self-serving parameters that provided

19  very little to no useful evaluative data.  Hearing Tr. at 138:18-22.  Under the present

20  circumstances, the notice program and claims rate cannot be fully considered or determined to be

21  reasonable as required by the Federal Rules.  The relief requested herein directly addresses and

22  provides a cure.

23        The attorneys' fees award sought by Lead Counsel should also be rejected by this Court.

24  The presence of block billing and non-contemporaneously kept time records in Lead Counsel's

25  submissions directly violate well-established billing and documentation requirements.  Despite the

26  availability of well-established criteria by which attorney time and billing must be reviewed, and

27  the express language of Rule 53 that makes clear that a Special Master is appointed to fill the need

28

6

1   to perform an accounting or resolve a difficult computation of damages, the Special Master here

2   chose expediency over the thorough review required.  *See* Fed. R. Civ. P. 23(a)(1)(B)(ii).  His

3   "random sample" approach was of his own invention, with no mathematical or statistical basis or

4   validity.  Moreover, the Master did not address the specific concerns raised by objectors to the

5   Settlement, limited the production of time and billing records for review by objectors' counsel in

6   time and by party to the point of defeating its purpose, and limited that production to only two of

7   the many objectors' counsels.  Finally, under the circumstances, it is error to award attorneys' fees

8   prior to final approval.  As such, the Special Master's award must be dismissed out of hand and

9   recalculated after final approval and only after the level of detailed review required by the Ninth

10  Circuit.

11          In addition, the incentive award provisions in the Master's Report should be amended to

12  include the Excluded Plaintiffs.  Excluded Plaintiff Anthony Gianasca should be awarded a $5000

13  incentive award because he was originally named in this action and provided testimony similar to

14  the efforts of the non-court appointed, named state representatives receiving those awards.  He was

15  arbitrarily and capriciously excluded despite having brought a benefit to the class.  The other

16  Excluded Plaintiffs also deserve a $5000 incentive award for their efforts and for objecting to the

17  Settlement Agreement which has benefitted the class.

18          Finally, the Settlement Agreement must be rejected as a result of another defect once again

19  created by Lead Counsel's single-minded pursuit of settlement with the Defendants at all costs.  In

20  addition to his abandonment of the Excluded Plaintiffs, Lead Counsel similarly disregarded certain

21  claims to a portion of the settlement proceeds that he himself previously negotiated for from

22  defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa"), noticed and sought court approval.  His

23  failure to make provisions for the proper distribution of that portion of the Settlement Agreement

24  funds renders the distribution plan defective and the proposed notice inaccurate.  The breaches of

25  fiduciary duty engaged in by Lead Counsel and the violations of certain class members' due

26  process rights it has created dictate the wholesale rejection of the Settlement Agreement.  Lead

27  Counsel cannot have it both ways.  Final Approval of the Settlement will irreparably harm the

28

1   Excluded Plaintiffs, the Chunghwa plaintiffs and those similarly situated.  It would be patently

2   unfair to allow the arbitrary and capricious whim, or poor choices, of Lead Counsel to override the

3   best interests of the Excluded Plaintiffs, particularly because their claims were brought to his

4   attention multiple times.

## OBJECTION 1

### THE SPECIAL MASTER INCORRECTLY FOUND THAT THE SETTLEMENT AGREEMENT WAS FAIR DESPITE THE RELEASE OF ALL RIGHTS AND TOTAL ABSENCE OF AN ECONOMIC RECOVERY BY THE EXCLUDED PLAINTIFFS

In his Report, the Special Master found that the Settlement Agreement was fair despite its release of the Excluded Plaintiff and Chunghwa Plaintiff class members' rights, including those of the Excluded Plaintiffs, against certain manufacturer defendants who fixed prices for a nearly 25-year period, without any economic recovery whatsoever.[7]  The Settlement Agreement excludes those Plaintiffs from any right to the $541,750,000 settlement fund that will be paid out under it to other class members who possess identical claims.[8]  The Excluded Plaintiffs object to the Special Master's factual findings and conclusions of law that purportedly justified his endorsement of the omission of their valid damages claims from the Agreement and request that after this Court completes its de novo review it grant their requests for relief.

As the Master's Report accurately describes, the Settlement Agreement provides for the release of all consumer claims by any indirect purchaser of a CRT product across the nation against the Defendants.  *See* Report at 2.  The consideration received for the granting of that release depends upon a class member's category under the terms of the Settlement Agreement.  If an individual or entity purchased a CRT-containing product during the class period (1995-2007) in one of 21 repealer states selected by Lead Counsel, or the District of Columbia, (the "Repealer States"), regardless of where that person or entity resided, she or he was qualified under the

---

[7] The Defendants included in the Settlement Agreement and who will benefit from the release are Philips, Panasonic, Hitachi, Toshiba, Samsung, SDI, Thompson and TDA (the "Defendants").

1    proposed Settlement as a state damages class member (the "State Damages Class").  If a class

2    member resided in Massachusetts, Missouri or New Hampshire, they were excluded despite the

3    fact that there is no dispute that those states are also "Repealer" states.  State Damages Class

4    members are entitled to share in the nearly $577 million total settlement fund.  By contrast,

5    individuals and entities who are not purchasers in the Lead Counsel-chosen Repealer States are

6    condemned under the terms of the Settlement Agreement to be members of the nationwide class

7    (the "Nationwide Class").  Being cast as a member of the Nationwide Class entitles them to

8    absolutely nothing in exchange for a release of all related rights upon this Court's granting of final

9    approval of the Settlement.  The reason offered for the disparate treatment by Lead Counsel was

10   that the law in the non-Repealer States does not allow for the recovery of damages by an end user

11   purchaser and thus the members of the Nationwide Class alone were not giving up anything.

12   Nevertheless, Lead Counsel concedes that the states of Massachusetts, Missouri, or New

13   Hampshire (the "Excluded States") all permit damage actions by indirect purchasers and thus

14   qualify as repealer states.[9]  *See* Indirect Purchaser Plaintiffs' Reply Re: Final Approval Of Class

15   Settlements, dated December 23, 2015, filed on JAMS, at 12 ("Massachusetts, Missouri, and New

16   Hampshire claims are a somewhat different case because, in theory, these states allow indirect

17   purchasers to recover damages.").

18       As demonstrated below, there is no legal or factual basis here that supports the highly

19   disfavored and unlawful disparate treatment of the Excluded Plaintiffs who reside and made

20   purchases in the Excluded States or the abandonment of their valid claims by Lead Counsel.  The

21

22

23

---

[8] The total settlement fund, which includes the $35,000 fund created with defendants Chunghwa and LG, is $576,750.  Given the pathetic claims rate and low payout, the rationale of Lead Counsel in digging in, rather than correcting the error is not apparent.

[9] The Excluded Plaintiffs do not address here Lead Counsel's position that the claims of the individuals in the non-repealer states were invalid because there is no dispute that the Excluded States allowed for the recovery of monetary damages by such Plaintiffs.  Nevertheless, the Excluded Plaintiffs join in the arguments of the other objections to the Report that those claims were indeed valid and should have been pursued.

9

proposed settlement simply does not represent adequate compensation for the release of the class.[10]

The failure of Lead Counsel to include their claims in the State Damages Class renders the

Settlement Agreement unjustifiable, unfair, unreasonable and inadequate in violation of Rule 23.[11]

Only the intervention of this Court in the exercise of its responsibility to protect absent class

members will prevent the Excluded Plaintiffs from giving a release and covenant not to sue in

exchange for nothing.

**A.      The Special Master Erred In Concluding That The Settlement's Treatment of Identical Class Members Differently Satisfied Rule 23's Fairness Requirements**

"[T]rial judges bear the important responsibility for protecting absent class members," and

must be "assured that the settlement represents adequate compensation for the release of the class

claims." *Sullivan v. DV Invs., Inc.*, 667 F.3d 273, 319 (3d Cir. 2010), *cert. denied sub nom.*,

*Murray v. Sullivan*, 132 S. Ct. 1876 (2012).  A settlement that releases the claims of class members

without consideration or for lack of value exchanged is unreasonable, unfair and inadequate.  *See*

*Reynolds v. Beneficial Natl. Bank*, 288 F.3d 277, 282-284 (7th Cir. 2002); *see, e.g.*, *Yoshioka v.*

*Charles Swab Corp.*, No. 11-1625-EMC, 2011 WL 6748984, at *12 (N.D. Cal. Dec. 22, 2011)

("uncertain value of the settlement ma[de] the release given in exchange therefore problematic"

and final settlement approval denied); *Daniels v. Aeropostale West Inc.*, No. 12-05755-WHA,

2014 WL 2215708, at *3 (N.D. Cal. May 29, 2014) ("[n]o one should have to give a release and

covenant not to sue in exchange for [nothing]").

Here, absent this Court's intervention, the Excluded Plaintiffs and the absent similarly

situated class members will be forced to release their claims without the monetary compensation

for which their states, as a matter of public policy, provided.  The mere fact that an injunction

---

[10] In *LCD*, another case in which there were separate damages classes for purchasers in *Illinois Brick* repeater states, the monetary claims for purchasers in non-repeater states were preserved. Their injunction claims were released in return for a settlement injunction.  The same is true for countless other settled cases, including countless Ninth Circuit and Northern District of California cases. In fact, the instant agreement sticks out like a sore thumb.

[11] It is worth noting the Defendants are on the record as having no objection to "tweaking the settlement" to make accommodations for the Excluded Plaintiffs.  *See* Attachment 9 of Affidavit of Robert J. Bonsignore - Hearing Tr. at 29:18-25; 30:1-16; 133:10-14.

10

1   against the Defendant's future misconduct will be entered is insufficient to justify the release of

2   their viable money damages claims.  As advanced by Lead Counsel, the injunctive relief provided

3   to the Defendants has no value to current class members as it will only benefit *future* purchasers,

4   not *past* purchasers.  It is not disputed that CRT's are effectively discontinued products worldwide.

5   Thus, the imposition of the release is without consideration received and invalid which alone

6   renders the Settlement Agreement unfair.  *See Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d

7   181, 198-99 (D.D.C. 2013).

8         The Settlement Agreement is fatally flawed for the additional reason that it treats the State

9   Damage Class members more favorably than the Excluded Plaintiffs and those similarly situated

10   class members with respect to claims that were equally valid.  *See In re Dry Max Pampers Litig.*,

11   724 F.3d 713, 718 (6th Cir. 2013) (vacating class action settlement approval and certification of a

12   settlement class that treated named plaintiffs  more favorably than other class members who

13   received "nearly worthless" injunctive relief).  There can be no acceptable justification for this

14   differential treatment.  Faced with a Settlement Agreement that trades away the claims of the

15   Excluded Plaintiffs for nothing while securing over half a billion dollar settlement fund for other,

16   identical class members, this Court should hold fast to its responsibility to the Excluded Plaintiffs

17   and those similarly situated class members to ensure that the Settlement is fair and reasonable as to

18   them and deny Final Approval.  The only cure is to (i) include them in the State Damages Class;

19   (ii)  allow them eligibility to a monetary recovery; (iii) re-notice the class, and (iv) extend the

20   claim period.

21

22

23

24

25

26

27

28

**B.    The Special Master Erred In Concluding That Lead Counsel's Failure To Pursue The Claims of Class Members In The Excluded States Was Fair, Adequate and Reasonable**

It is beyond cavil that Lead Counsel in a nationwide class action is obligated to represent the interests of all class plaintiffs, including the named and unnamed plaintiffs in each and every state encompassed within the class he or she has undertaken to represent. *See Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1167 (9th Cir. 2013) (citation omitted). As such, it was Lead Counsel Alioto's duty to vigorously pursue all class members' claims here, including those class members residing in Massachusetts, Missouri and New Hampshire. "Class representation is inadequate if the named plaintiff fails to prosecute the action vigorously on behalf of the entire class or has an insurmountable conflict of interest with other class members." *Hesse v. Sprint Corp.*, 598 F.3d 581, 589 (9th Cir.), *cert. denied*, 562 U.S. 1003 (2010).

Here, Lead Counsel violated his duties and obligations to the Excluded Plaintiffs and the similarly situated absent class members by entering into an agreement by which the Excluded Plaintiffs' claims have been traded away in favor of his favored State Damages Class members. Indeed, "a settlement that offers considerably more value to one class of plaintiffs than to another may be trading the claims of the latter group away in order to enrich the former group." *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 797 (3d Cir.) (setting aside settlement not meeting adequacy of representation standards), *cert. denied*, 516 U.S. 824 (1995). "The responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel." *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir. 1995) (citation omitted); *see also General Motors*, 55 F.3d at 801 (representation inadequate under Rule 23(a)(4) due to "conspicuous evidence of . . . an intra-class conflict in the very terms of this settlement"). It is an indisputable fact that Lead Counsel here entered into a nationwide pre-certification Settlement Agreement that overwhelmingly favored one class of plaintiffs to the complete disregard of another and consequently secured himself a massive attorneys' fee.

1        The Special Master erred in finding that Lead Counsel's abandonment of the Excluded

2    Plaintiffs' claim was proper partly because he did not focus his evaluation on the conduct of Lead

3    Counsel.  In abandoning the Excluded Plaintiffs' state law claims, Lead Counsel did not

4    adequately perform his fiduciary duty to vigorously represent them.  Indeed, Lead Counsel takes

5    the position, which the Special Master adopted, that Lead Counsel owed no duty to represent those

6    class members with respect to their damages claims at all.  Rather, he asserts that it was incumbent

7    upon the class members in those states to shore up a class representative if they wanted their right

8    to damages to be pursued.  This position obviously conflicts with the realities of class

9    representation.  In actuality there is no collective body acting to make sure all their rights are

10    pursued -- that is precisely the role of Lead Counsel, one which was envisioned and accepted by

11    Mario Alioto and his firm within this Court's appointment order.  *See* Doc. No. 282 (Order

12    Appointing Interim Lead Counsel).  That order specifically imposed the following responsibilities

13    upon Mr. Alioto:

14           •  "To otherwise advance and protect the interests of the putative class in all respects
               and to honor all of its responsibilities";

15

16           •  "[T]o be the primary spokesperson for the putative class";

17           •  "To initiate and conduct all discovery proceedings"; and

18           •  "To coordinate all motions, requests for discovery, experts, and other pretrial
               proceedings regarding the position of all Plaintiffs".

19   *See id.* at 5-6.

20        These duties coincide with the fiduciary duties borne by lead counsel to a nationwide class.

21    Lead counsel to a class simply may not sit back and passively wait for a viable class representative

22    to appear before him.  Such passive representation is in direct breach of their fiduciary duty.  The

23    case *In re Avon Securities Litigation*, No. 91 CIV. 2287(LMM), 1998 WL 834366 (S.D.N.Y. Nov.

24    30, 1998) epitomizes the required efforts and duties of lead counsel to locate a representative for

25    the class it has undertaken to represent.  There, after the withdrawal of the lead named

26    representative, lead counsel for the putative class "undertook efforts to locate substitute class

27

28

representatives."[12]  In rejecting an attack upon lead counsel's vigorous pursuit of suitable representatives, the district court stated

> in the class action context, particularly in a situation such as this involving the withdrawal of the sole class representative after a motion for class certification has been filed, "solicitation" of parties to intervene as substitute class representatives may be entirely appropriate, if not required as part of class counsel's fiduciary duty to the class.

*Id.* at 10 (footnote omitted).  Indeed, the condemnation of the passive representation advocated by Lead Counsel is confirmed in the venerated treatise on class action lawsuits, the *Manual for Complex Litigation (Third).  See id.*, § 30.16 at 222 (noting that if replacement of class representative is required, "[t]o protect the interests of the class, class counsel should make reasonable efforts to recruit a new representative").  Indeed, courts routinely note the extraordinary efforts of lead counsel to locate suitable class representatives, even for a subclass. *See In re Northwest Airlines Corp. Antitrust Litig.*, 221 F.R.D. 593 (E.D. Mich. 2004) (court held that creation of subclasses was necessary and it "instruct[ed] Plaintiffs' counsel to promptly identify representatives for each of these subclasses"); *In re Initial Pub. Offering Secs. Litig.*, 224 F.R.D. 550, 553 (S.D.N.Y. 2004) (finding efforts of plaintiffs' counsel reasonable where it had searched for more than a year for class representative); *Campbell v. Hope Community Credit U.*, No. 10–2649–STA, 2012 WL 2395180, at *7 (W.D. Tenn. June 25, 2012) (when representative for subclass needed, "[i]t will fall to Plaintiff and class counsel to identify class members who are able and willing to act as class representatives) *cf. Birmingham Steel Corp. v. Tennessee Valley Auth.*, 353 F.3d 1331, 1342 (11th Cir. 2003) (class counsel actively sought time to locate new class representative and  circuit court rejected district court's refusal to grant it); ); *Stahl v. MasTec, Inc.*, No. 8:05-CV-1265-T-27TGW, 2008 WL 2267469, at *1 (M.D. Fla. May 20, 2008) (when granting fee petition of class counsel court noted the efforts taken as follows:  "It was necessary for Plaintiffs' counsel to locate and interview potential representative plaintiffs in eleven states,

---

[12] Such efforts are detailed at length in that case.  Lead counsel actually called an eventual class representative, who was not aware of the litigation, personally approached another, and contacted the financial advisor of two others (who also were not aware of the litigation) in its attempt to ensure the interests of the class were pursued.  *Id.* at 3.

14

1   conduct extensive research regarding the laws of those states ).  Thus, it is incumbent upon lead

2   counsel, in its vigorous pursuit of the right of the unnamed class members it has sought and agreed

3   to represent, to make at least reasonable efforts to identify a representative for their claims.

4          In addition to well-established case law on the responsibilities and obligations of appointed

5   Lead Counsel, Mr. Alioto was required to follow the California Rules of Professional Conduct

6   with regard to his representation of the Excluded Class members and the Chunghwa class members

7   and the absent class members that were similarly situated.  The California Rules of Professional

8   Conduct provide in Rule 3-500, that:

9

10              A member shall keep a client reasonably informed about
                significant developments relating to the employment or
11              representation, including promptly complying with reasonable
                requests for information and copies of significant documents when
12              necessary to keep the client so informed.

13         Rule 3-510 also provides that:

14

15              (A) A member shall promptly communicate to the member's
                    client: (1) All terms and conditions of any offer made to the
16                  client in a criminal matter; and (2) All amounts, terms, and
                    conditions of any written offer of settlement made to the
17                  client in all other matters.

18              (B)  As used in this rule, "client" includes a person who possesses
                    the authority to accept an offer of settlement or plea, or, in a
19                  class action, all the named representatives of the class.

20         Cases interpreting the rules have made clear that Counsel also has a duty of zealous

21   representation.  *See U.S. v. Thoreen,* 653 F.2d 1332, 1339 (9th Cir. 1981) ("counsel should

22   represent his client vigorously"); *Molski v. Evergreen Dynasty Corp.,* 500 F.3d 1047, 1065 (9th

23   Cir. 2007) ("Lawyers are required to give their clients' interests zealous advocacy"); *Matter of

24   Yagman,* 796 F.2d 1165, 1182 (9th Cir. 1986) ("We embrace the fact that zealous advocacy is the

25   attorney's ideal.  Hard-fought, energetic and honest representation is at the bedrock of our judicial

26   process").

27         In his Report, the Special Master justified Lead Counsel's failure to include the Excluded

28

1   States in the State Damages Class on the basis of Lead Counsel's protestations that no plaintiff

2   ever came forward to represent the class, refusing to place the duty upon him to "scou[r] these

3   three states to dredge up a plaintiff."  *See* Report at 39-41.  In the first place, this evaluation criteria

4   is incorrect.  The analysis begins and ends with what Lead Counsel did or did not due.

5        The simplest search would have involved asking lawyers in the case.  Mr. Alioto has

6   identified himself as a well-known class action practitioner with years of experience in the class

7   action setting and presumably many contacts.  *See* Docket No. 90 at 7-8.  The search required by

8   the California Rules of Professional Responsibility would have been satisfied by his contacting his

9   existing clients, such as putative class member Anthony Gianasca whom he named in an initial

10  class complaint, or Barbara Caldwell whom he named in the Second Consolidated Amended

11  Complaint.  *See* Doc. No. 4144, Attachment 2, ¶ 12 (class action complaint in case 3:08-cv-01559-

12  8 naming Gianasca); Doc. No. 716, ¶ 31 (naming Caldwell).  The record establishes that Lead

13  Counsel Alioto never did any of this.[13]  Indeed, as further detailed below, counsel in this very case

14  from the three states at issue were counsel of record and a simple phone call could have given him

15  the needed contact to prevent the forfeiture of the claims of the very class members he sought and

16  agreed to represent.  The documentary record establishes that Alioto received contact information

17  and chose to ignore it or not follow through.

18       Significantly, the Special Master was presented with documentary support and a sworn

19  declaration by counsel of record in this case that he provided Lead Counsel with viable individuals

20  to represent the states at issue.  *See* Doc. No. 4144 and attachments; *see also* discussion *infra*.

21  Moreover there were dozens of law firms actively participating and Lead Counsel did not act to

22  engage them in a related search.  To put it bluntly, finding an end use purchaser of a TV over a 25-

23  year period in a particular state poses no difficulty, is an easily accomplished proposition, and is

24  not a search for the Holy Grail as Lead Counsel attempts to advance.  The Special Master's

25

---

26  [13] *See, e.g.,* Kathryn Honecker, "Class Actions 101: A Primer on Finding Plaintiffs for Your Class Action . . . Ethically",

27  http://apps.americanbar.org/litigation/committees/classactions/articles/summer2013-0913-primer-on-finding-plaintiffs-for-your-class-action-ethically.html.

28

1   misplaced focus has resulted in a total disregard for the rights of the class members in the

2   Excluded States to millions of dollars in damages in deference to the comparatively slight burden

3   upon Lead Counsel to identify a representative for them.  It should not be endorsed by this Court

4   and his Report should be rejected.

5        In a case, such as here, where settlement is reached prior to formal full class certification,

6   the concerns for conflicts of interest and potential breaches of fiduciary duties owed to the class

7   that may have infected the negotiation process soar.  *In re Bluetooth Headset Products Liab. Litig.*,

8   654 F.3d 935, 946 (9th Cir. 2011).  Accordingly, such agreements must withstand an even higher

9   level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required

10  under Rule 23(e) before securing the court's approval as fair.  *Id.*

11       When evaluating a settlement class, "[c]ourts must be alert for "more subtle signs that class

12  counsel have allowed pursuit of their own self-interests and that of certain class members to infect

13  the negotiations." *Id.* at 947.  Although the benefits of allowing settlement classes are well-

14  documented, "their use has not been problem-free, provoking a barrage of criticism that the device

15  is a vehicle for collusive settlements that primarily serve the interests of defendants—by granting

16  expansive protection from law suits—and of plaintiffs' counsel—by generating large fees gladly

17  paid by defendants as a quid pro quo for finally disposing of many troublesome claims." *In re*

18  *Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 778 (3d Cir.)

19  (disparity in treatment of settlement classes implicated adequacy of counsel and approval rejected),

20  *cert. denied*, 516 U.S. 824 (1995).  The Settlement Agreement is the result of these feared abuses

21  and must be rejected.

22       In endorsing Lead Counsel's actions, the Special Master ignores that Mr. Alioto was Lead

23  Counsel to a Nationwide Class, which included all the class members in the Excluded States.  As

24  their undeniable fiduciary representative, it was incumbent upon him to vigorously pursue their

25  claims, including their state law-based money damages claims.  Not to do so creates the exact

26  conflict identified above.  In addition to being speculative, the Master's position does not take into

27  account this Court's responsibility to absent class members.  *Sullivan v. DV Invs., Inc.*, 667 F.3d

28

273, 319 (3d Cir. 2010), *cert. denied sub nom.*, *Murray v. Sullivan*, 132 S. Ct. 1876 (2012).

This is true regardless of Lead Counsel's actual knowledge of particular viable representatives in the Excluded States in this case because he has conceded that he had knowledge that class members in those states possessed viable damages claims against the Defendants. *See* Indirect Purchaser Plaintiffs' Reply Re: Final Approval Of Class Settlements, dated December 23, 2015, filed on JAMS, at p.12 ("Massachusetts, Missouri, and New Hampshire claims are a somewhat different case because, in theory, these states allow indirect purchasers to recover damages."). It was therefore his affirmative duty to vigorously pursue those class members' claims and take the necessary steps to identify a suitable representative for them. His failure to execute even the most basic steps in performing that duty renders the Settlement Agreement defective.[14] In the alternative, Lead Counsel cannot ignore a potential Repealer state seeking economic damages and then later include that Repealer State in a non-economic recovery settlement class.

**C.      The Special Master Erred In Concluding That Lead Counsel's Declaration That He Was Unaware Of Any Viable Plaintiffs In The Three Excluded States Was Sufficient To Validate His Breach Of Duty To Vigorously Represent Their Class And His "Unawareness" Is Disproven By The Record**

To the extent that Lead Counsel's failure to pursue identifying any class representatives for the Excluded States is somehow deemed insufficient to breach his duty to those class members, the Special Master's finding that Lead Counsel was in fact not aware of any viable plaintiffs is not only bereft of support in the record, but flatly contradicted by it. *See* Report at 40-41. To arrive at his conclusion, the Master relied on Lead Counsel's "attorney" argument to the exclusion of facts in the record.

The sole evidentiary basis for the Master's finding is a self-serving declaration submitted by Lead Counsel denying that any viable plaintiffs *came forward* in such states. *See* Report at 40,

---

[14] Although the Report states that "the explanation of the difficulties of locating viable plaintiffs is plausible", none of those difficulties were discussed or even identified in the Report. *See* Report at 41. There is no evidence Lead Counsel ever claimed such difficulties even existed.

18

1    *citing* Alioto Decl in Support of IPP Motion for Final Approval, dated 11/19/15, ¶¶ 28, 40.  That

2    declaration was entirely insufficient to conclusively establish Lead Counsel's lack of knowledge

3    and excuse him from his duty to those class members.  Lead Counsel did not state that he was

4    unaware of any of the individual plaintiffs identified to him by the Excluded Plaintiffs' counsel,

5    Bonsignore, but merely that he was unaware of their viability.  *Id.*  This is a critical distinction.

6    The identification of potentially viable candidates at a minimum imposed upon him the duty to

7    investigate their claims.  *See* Doc. No. 282 (order appointing interim lead counsel), at 6

8    (responsibility of Alioto "[t]o otherwise advance and protect the interests of the putative class in

9    all respects"); *see* discussion in Objection 1.B, *supra*.  Merely throwing up his hands and declaring

10   that he did not know if their claims were viable, without his having conducted any inquiry into

11   their viability, was in complete derogation of his duty and responsibility to every class member in

12   those states to pursue their claims.

13       Additionally, as further detailed below, documentary evidence in the record with respect to

14   each of the Excluded States flatly contradicts the notions that Lead Counsel was unaware of viable

15   or potentially viable plaintiffs and that none ever came forward.[15]  As such, his declaration does

16   not confer upon him the absolution granted by the Special Master.

17       **1.    Massachusetts**

18       It was not difficult or burdensome to identify a representative plaintiff in Massachusetts

19   given the fact that Lead Counsel represented two.  Mr. Gianasca, a Massachusetts resident, is a

20   named plaintiff in a tag along complaint filed by Alioto and therefore was his undeniable client.

21   *See* Doc. No. 4144, Attachment 2, ¶ 12 (Complaint in case 3:08-cv-01559-8).  Barbara Caldwell,

22   another Massachusetts resident, is a named plaintiff in Lead Counsel's Second Consolidated

23   Amended Complaint.  *See* Doc. No. 716, ¶ 31  The Special Master accurately found that those

24   plaintiffs were included in a complaint filed by Alioto, dismissed from those complaints for failure

25   to satisfy notice pleading requirements of Massachusetts Chapter 93A, and thereafter excluded

26

27

28

from the action.  *See* Report at 39; *see also* Doc. No. 597 at 29-30 (Report and Recommendation dismissing claims); Doc. No. 665 at 24 (court dismissal).  There is no explanation given as to why they were initially deemed by Lead Counsel as viable enough to be included in the initial complaint, but thereafter transformed into an unviable plaintiffs.

No valid explanation can lie in the mere fact that a notice letter under the Massachusetts Consumer Law, Chapter 93A was not sent prior to the lawsuit because that failing is Lead Counsel's, not Mr. Gianasca's or Ms. Caldwell's.  Both the filed complaints as well as Alioto's appointment as Lead Counsel to the Nationwide Class establish that Lead Counsel Alioto was indeed their counsel.[16]  It was incumbent upon Lead Counsel to do the required due diligence under the Federal Rules of Civil Procedure prior to filing those lawsuits to vet his clients.  *See* Fed. R. Civ. P. 11(b).  To do otherwise is malpractice.  The vetting process with respect to a Massachusetts plaintiff was as simple as 1-2-3:  (1) determine the state of residence; (2) require proof of purchase of a qualifying CRT product; and (3) determine if a Chapter 93A demand letter was sent.

Here, Mr. Alioto filed suit without having determined if a pre-suit Chapter 93A demand had been served on Mr. Gianasca's or Ms. Caldwell's behalf.  He did not do so himself.  Lead Counsel Alioto alone made the decision to file without ensuring the pre-suit demand required by Massachusetts General Laws 93A was sent.[17]  When his failing resulted in a dismissal, he alone, not with the consultation of the client or any Massachusetts lawyer, chose not to remedy the error. The record establishes that (1) Lead Counsel did not contact Gianasca to advise him that the Defendants were seeking to dismiss his claims because a statutory demand letter was not sent prior

---

[15] To dispense of Lead Counsels half hearted assertion that the Emails containing information about putative Class Representatives and their purchases were "cut and paste" they are resubmitted in their entirety from a production carried out by Bonsignore, PLLC 's IT consultant.

[16] An attorney-client relationship is memorialized in a written agreement executed by Alioto and Gianasca.  Evidence of that document was incorrectly excluded by the Special Master at the fairness hearing and it is properly before this Court in considering this Objection.  *See* attachment 4 to Affidavit of Robert J. Bonsignore - GIANASCA FEE AGREEMENT and depo testimony.

[17] After Mr. Alioto was appointed Lead Counsel he effectively excluded Massachusetts counsel from the case.  *See* Declaration of Robert Bonsignore, dated September 23, 2015 at ¶ 11.

20

to the filing of suit; (2) Lead Counsel did not keep him informed or consult with him during the process as his claim was being challenged; and (3) Lead Counsel did not reach out to Mr. Gianasca to inform him that his case had been dismissed and that he had no intention of pursuing Massachusetts claims subsequent to the dismissal.  Any of these efforts would at the very least have opened the discussion.  He also did not seek to cure the defect by serving a demand, did not seek alternative putative class representatives, did not pursue and appeal or request direct review by the local appellate authority, and did not require that they be included in the money damages class in exchange for the final resolution sought by the Defendants.[18]

Any plaintiff from Massachusetts would have been subject to the identical legal requirement of sending a demand letter.  Lead Counsel Alito's reliance on a vetting process must apply to his own duly selected putative class representatives.  Most generally, a vetted Massachusetts MGL Chapter 93A class representative must have resided or purchased a subject property in the Commonwealth of Massachusetts during the class period for end use and not for resale and have issued a statutory 30-day Chapter 93A demand prior to filing suit.  Even excusing Lead Counsel Alioto's lack of due diligence prior to naming Giansaca as his Massachusetts putative class representative, he must be held to have carried out the bare minimum due diligence by the time he named Barbara Caldwell in his Second Consolidated Amended Complaint.  Guidance through procedural pitfalls is a critical reason why a plaintiff retains legal counsel.  Disqualification of the entire Massachusetts state class as viable based upon the fact that Lead Counsel needed to satisfy the most basic formality of a pre suit demand letter is patently illogical.  The Special Master's endorsement of Mr. Alioto's statement that he "never excluded a viable plaintiff from this case" may in a stretch be technically correct, but it is otherwise wrong and evidences an incorrect legal analysis.  The plain fact is that Alioto was aware of plaintiffs who met the purchase requirements and who only needed Alioto's legal guidance, and the representation he

---

[18] The Defendants' position on settlement is clear.  They sought final resolution for a fixed price and remained flexible on allocation.  *See* Attachment 9 of Affidavit of Robert J. Bonsignore - Hearing Tr. at 29:18- 25; 30:1-16; 32:4-7; 133:10-14.

1  was obligated to perform as class counsel, to become fully viable.[19]

2      **2.**     **Missouri**

3      The Special Master similarly based his endorsement of the discarding of the Missouri class

4  members conceded right to damages upon Lead Counsel's misleading declaration stating that no

5  viable candidate came forward.  *See* Report at 40.  However, documentary evidence existed

6  establishing that Alioto was indeed informed about a Missouri individual who possessed a vetted

7  claim as well as the related purchase records.  *See* Doc. No. 4144, Attachment 4 (email from

8  Bonsignore to Alioto identifying client).  The Special Master disregarded that email as

9  "unauthenticated" and lacking indication that the client purchased any CRT products.  Report at

10  40.  However, the Federal Rules of Evidence do not apply at a Fairness Hearing.  *UAW v. General*

11  *Motors Corp.,* 235 F.R.D. 383, 386-87 (E.D. Mich. 2006) (class action fairness hearing not subject

12  to rule of evidence because it is not a trial); *Union Assets Mgmt. Holding A.G. v. Dell, Inc.*, 669

13  F.3d 632 (5th Cir. 2012) ("fairness hearing is not a trial" and citing evidentiary requirement are

14  relaxed).  In addition, to the extent that identification of a potential plaintiff by Alioto was

15  insufficient, viability was also established by that document; the Special Master ignored the

16  presence of a pdf file at the bottom of the email referring the product purchased.  The Special

17  Master's reliance upon Alioto's bare declaration over the documentary evidence submitted by the

18  Excluded Plaintiffs in the form of emails and a sworn attorney declaration should be discarded.

19  Again to address the perceived deficiencies in the documentary evidence Bonsignore PLLC has

20  requested an IT specialist to retrieve archived records. *See* Attachment 5 to Affidavit of Robert J.

21  Bonsignore – Declaration of Josh Mansfield Re: Archive Emails.

22      **3.**     **New Hampshire**

23      Once again, the Special Master dismissed email evidence identifying a New Hampshire

---

[19] In addition, the Special Master found that Lead Counsel gave adequate notification of settlement and the forfeiture of their damages claims to the Massachusetts plaintiffs through the vehicle of the Chunghwa and LG settlements.  *See* Report at 39.  There is nothing in the Federal Rules of Civil Procedure that releases the obligation to give class members notice of a class action settlement based upon a notice provided in another separate settlement.  *See* Fed. R. Civ. P. 23.  The Master's finding was thus erroneous.

1  plaintiff to Alioto and concluded that no New Hampshire plaintiff came forward.  *See* Report at 40.

2  The Master faults the email as not showing "when the possible client bought a CRT product or that

3  she had proof of purchase."  *See* Report at 40-41.  For the same reasons given above, that email

4  was sufficient to place a duty upon Alioto to investigate her claim regardless of the proof supplied.

5  This Court is squarely presented with a plaintiff that was ready and willing to serve as the

6  representative of the New Hampshire class.  Lead Counsel's protest that he was not aware of her

7  viability is his failing – one that could have been remedied by a simple inquiry – not the

8  representative's.  The Special Master's overlooking of Lead Counsel's duties and failures was

9  improper.  To address the perceived deficiencies in the documentary evidence Bonsignore PLLC

10  has requested an IT specialist to retrieve archived records.  *See* Attachment 5 to Affidavit of

11  Robert J. Bonsignore – Declaration of Josh Mansfield Exhibits 1-4.

12          With respect to all the Excluded States, the simple fact is that Lead Counsel cannot ignore

13  a potential claimant who seeks to represent a Repealer state and seek economic damages and then

14  later include that Repealer state in a non-economic recovery settlement class.  If someone from a

15  Repealer State appeared, Lead Counsel had a duty to "advance and protect" his or her interest as a

16  member of the putative class.  *See* Doc. No. 282 at 6.  The record in this case contains no evidence

17  whatsoever that Lead Counsel lifted a finger to assist or vet any potential plaintiffs from the

18  Excluded States.  As Lead Counsel, he was in control of all the facts regarding the requirements of

19  being a class representative and only he can vet potential representatives.  Lead Counsel utterly

20  failed to fulfill that role here.

21          The frailty of the Master's findings is further underscored by the fact that he incorrectly

22  refused to permit rebuttal evidence at the Final Approval Hearing regarding Alioto's claims of

23  unawareness despite the Master's heavy reliance upon Alioto's declaration to brush aside the

24  Excluded Plaintiffs' claims.  At that Hearing, counsel requested permission to submit critical

25  documentary evidence that directly contradicted Alioto's sworn statement that he never excluded a

26  viable plaintiff, including a written retention agreement executed by Lead Counsel with

27  Massachusetts plaintiff Gianasca and deposition transcripts in which Mr. Gianasca states that he

28

1  provided Alioto with evidence of his valid purchases.[20]  The Special Master refused to accept it at

2  that time, directing counsel to instead file a motion requesting the acceptance of such evidence.[21]

3  That motion was denied and the Master did not consider this conclusive evidence.  The Master's

4  failure to compile a full record was a disregard of the duty to ensure that a pre-certification

5  settlement agreement is fair, adequate and reasonable.  It simply was not.

6

7  **D.  The Special Master Erred In Concluding That Lead Counsel's Failure To Pursue The Excluded State Claims Should Have Been Remedied By Other Attorneys**

8  The Special Master erred in finding that Lead Counsel's abandonment of the Excluded

9  Plaintiffs' and other similarly situated class members' claims was proper in part because he did not

10  focus his evaluation on the conduct of Lead Counsel and instead based his ruling on speculation as

11  to what other counsel could or should have done.  In particular, the Special Master gave Lead

12  Counsel Alioto a pass on his failure to include the Excluded Plaintiffs in the State Damages Class

13  because either Attorney Bonsignore or Attorney Moore could "have initiated direct actions that

14  could have been joined with the MDL."  *See* Report at 39-41.  There is no legal principle that

15  allows a court to substitute in a speculative course of action by someone other than Lead Counsel

16  ────────────────

17  [20] Also included in that Request were further emails and photographs of CRT products to support the viability of the claims of the identified representatives.

18  [21] In compliance with that explicit direction, counsel filed a request to submit supplemental

19  evidence and attached those documents.  *See* Attachment 9 of Affidavit of Robert J. Bonsignore - Hearing Tr. at 122:23-24 (Master stating, "You're going to have to file a  motion to augment the

20  record." and "You may do so.  You may file the motion today and I'll consider it."); Request to Submit Supplemental Evidence Rebutting New Argument Raised by Lead Counsel Alioto's

21  During Hearing, dated January 6, 2016, filed on JAMS.  Despite the Master's instruction as to the proper procedure and statement that he would accept the request, that request was denied and

22  counsel was inexplicably held responsible for the Master's costs of considering the request he himself stated he would accept.  The Master's grounds for the refusal to admit those documents is

23  not clear.  Although it is true that those documents were attached to a prior submission that was not permitted by the Master due to his refusal to permit a late-filed reply brief, a reply brief is

24  optional and its non-filing does not operate to waive arguments made in an initial brief.  *See* N.D. Cal. Local R. 7-3(c) (providing that "[a]ny reply to an opposition may include . . ."); *see also*

25  *Bartholomew v. Sisto*, No. CIV S-09-0882-JAM, 2012 WL 691708, at *1, n.1 (E.D. Cal. Mar. 2, 2012), *report and recommendation adopted*, No. CIV S-09-0882-JAM, 2012 WL 1413959 (E.D.

26  Cal. Apr. 20, 2012) ("A reply brief is an optional pleading, and a failure to file a reply brief does not constitute grounds for denying the motion or entering judgment for the plaintiff.").  Those

27  documents supported the arguments in the Excluded Plaintiffs' initial briefs and thus were a proper subject for evidence at the final approval hearing.  They are therefore incorporated by reference

28  here.

24

1  to excuse a breach of Lead Counsel's fiduciary duty to his class by shifting responsibility for the

2  performance of his duties to other counsel.  Indeed, black letter law provides that Lead Counsel

3  controls the class litigation, not the individual attorneys.  *See In re Ivan F. Boesky Secs. Litig.,* 948

4  F.2d 1358, 1365 (2d Cir. 1991) ("Lead counsel ordinarily have major responsibility for

5  formulating and presenting positions of substantive and procedural issues during the litigation.

6  Typically they act for the group") (quoting *Manual for Complex Litigation (Second)* § 20.221).

7  Bonsignore and Moore were powerless to file an amended class action complaint in the MDL to

8  have the Excluded Plaintiffs' claims included.  *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449 (9th Cir.)

9  (responsibility of class counsel to absent class members whose control over the attorneys is

10  limited), *cert. denied*, 516 U.S. 914 (1995)  In addition, the availability of a direct action outside

11  the MDL is a red herring.

12        The possibility that other means existed to help address the blatant breach of duty

13  committed by Lead Counsel does not override his direct duty to the Excluded Plaintiffs in this

14  case.  In any event, there was documentary evidence submitted demonstrating that Lead Counsel

15  had provided continued assurances to outside counsel that he was indeed pursuing the Excluded

16  Plaintiffs claims and that he had the matter in hand, obviating the need for a direct action.  *See*

17  Doc. No. 4144.  Thus, the Special Master's attempts to cast the blame for the non-filing of suits

18  onto Mr. Bonsignore or Ms. Moore is not supported by the law or the facts.

19  **E.     The Statutes of Limitations Provide No Safe Harbor For Lead Counsel's Failure To**
         **Pursue The Excluded States' Claims**
20

21        The Special Master incorrectly concluded that the statutes of limitations as barred suits in

22  Massachusetts, Missouri and New Hampshire and thus absolve Lead Counsel from his duty to

23  pursue them.  *See* Report at 39-41.  The actions of the Defendants were fraudulently concealed.

   *See* Doc. No. 1 (3:08-cv-01559-JST), ¶¶ 155-58; Doc. No. 437 (3:07-cv-05944-SC), ¶¶ 288-91;
24

25  Doc. No. 716 (3:07-cv-05944-SC), ¶¶ 290-93; Doc. No. 827 (3:07-cv-05944-SC), ¶¶ 284-87; Doc.

26  No. 1526 (3:07-cv-05944-SC), ¶¶ 293-96.  Antitrust-based litigants routinely amend complaints to

27  add related claims that then relate back to the original filing date, and courts always retain the

28  power to conform judgments to the evidence presented.  *See*  Fed. R. Civ. P. 15(b) and (c)(1)(B).

1    Any addition of state law claims would have related back to the filing of the class complaint.  *See*

2    *Crown, Cork Seal Company, Inc v. Parker*, 462 U.S. 345, 350 (1983) ("[t]he filing of a class action

3    tolls the statute of limitations 'as to all asserted members of the class'") (citation omitted); *see also*

4    *Henson v. Fid. Nat. Fin. Inc.*, No. 2:14-CV-01240-ODW, 2014 WL 1246222, at *5 (C.D. Cal.

5    Mar. 21, 2014) (finding that a putative class action tolls the statute of limitations for putative class

6    members until the trial court denies class certification, dismisses the lawsuit, or otherwise strips

7    the action of its putative-class-action status).  In addition, Mr. Alioto himself relied upon a

8    fraudulent concealment tolling argument in the Complaint, which could have been relied upon in

9    connection with those claims.

10                                    **OBJECTION 2**

11            **THE SPECIAL MASTER INCORRECTLY FOUND THAT**
12            **THE NOTICE PLAN WAS REASONABLE**

13            In his Report, the Special Master incorrectly found that the notice program through which

14    notice of the Settlement Agreement (the "Notice") was issued to the Class (the "Notice Program")

15    was reasonable.  He did so by disregarding the unacceptedably low notice reach rate, defective

16    reach criteria, and the unacceptably low claims rate.  As to requests for an independent review, the

17    Master kept open his review of the request for the appointment of an independent notice and

18    claims expert through and following the date of his fairness hearing. *See* Hearing Tr. 82:22-25;

19    83:1-2.  Even setting aside the obvious fact that an unproven class administrator who

20    independently utterly lacked the experience and capacity to handle what lead counsel referred to as

21    the second largest IPP settlement in United States history *(See* Hearing Tr. 132:12-16), the

22    Program was inadequate in reach and effectiveness and did not satisfy the standards for acceptable

23    notice under the Federal Rules of Civil Procedure and due process.  In addition, although specific

24    objections were filed by the Excluded Plaintiffs challenging the Program's adequacy, the Special

25    Master refused to order Lead Counsel or the claims administrator to produce claims and notice

26    data until it was too late to provide same to a neutral expert to test the self-interested defense of the

27    Program provided by Lead Counsel's notice company.  Moreover, the retention of a neutral was

28

1   specifically left to the Master to avoid a needless battle of the experts.  *See* Hearing Tr. 86:1-11.

2   The refusal to obtain timely neutral expert testimony was unjustified and fatally hindered the

3   Master's full consideration of the Notice Program's reasonableness.  This Court should reject the

4   Report and require re-noticing of the Settlement Agreement.

5          Pursuant to Federal Rule of Civil Procedure 23(c)(2)(B), "the best notice that is practicable

6   under the circumstances, including individual notice to all members who can be identified through

7   reasonable effort," must be given.  Fed. R. Civ. P. 23(c)(2)(B).  In his Report, the Special Master

8   found that the Notice Program complied with that standard in exclusive reliance upon a declaration

9   filed by Fisher.  *See* Report at 46.  That finding and exclusive reliance were in error.

10         While only a look at the pathetic claims rate objectively supports that conclusion, there is

11   much more, including the following points.

12   **A.**    **The Notice Plan Was Inadequate**

13         The Notice Program was defective in several key respects and the evidence provided by

14   Joseph Fisher of Lead Counsel's notice provider, The Notice Company ("TNC"), of its

15   reasonableness was insufficient.  *See* Decl. of Joseph M. Fisher Re: Notice Program (Doc. No.

16   3863) ("Fisher Decl.").  First, Mr. Fisher claims that the print Notice reached 58% of class

17   members over the age of 30 who own televisions or computers with household incomes of at least

18   $60,000.  That reach is insufficient to satisfy Rule 23 and due process.  "The lynchpin in an

19   objective determination of the adequacy of a proposed notice effort is whether all notice efforts

20   together will reach a high percentage of the class.  It is reasonable to reach between 70-95%."[22]

21   To reach that reasonableness standard, Mr. Fisher represents that "paid Internet advertising"

22   consisting of digital advertisements will increase the Notice's reach to 80% of the target audience.

23   *See* Fisher Decl. at 11, ¶ 24.  That bold claim is unsupportable.

24         Mr. Fisher's opinion was offered with an insufficient and defective foundation and

25

26

27  [22] "Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide" ("Notice and Claims Process Checklist"), Federal Judicial Center (2010), at 3 (available at

28  http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf).  *See also Walter v.*

provides conclusory supporting evidence for his assertion.  *See* Fisher Decl. at 12, n.9.  To support

the additional 22% of target audience reach, Mr. Fisher provides a footnote, stating that,

"[a]nalysis of digital media was made utilizing comScore, a leading technology company that

measures Internet activity."  *Id.*  However, this form of data regarding Internet-based notice

programs has been subject to criticism and such programs are observed to yield very low response

rates.  The Federal Judicial Center cautions courts that

> [a]udiences of Internet websites are measured by "impressions."  Total, or "gross,"
> impressions of the entire website do not reveal how many people will view the
> notice "ad" appearing periodically on a particular page.  Inflated audience data via
> Internet ads is common.  It is very expensive to reach a significant percentage of a
> mass audience with Internet banner ads.  Watch for suggestions that Internet ads
> and social network usage can replace all other methods.  Reach, awareness, and
> claims will likely be very low when such a  program is complete.

Notice and Claims Process Checklist at 4  Moreover, Mr. Fisher's 22% figure fails to take into

account the overlap between print media and paid Internet advertising.  The Federal Judicial

Center specifically instructs courts to ensure that such calculations remove any overlap caused by

individuals being "exposed to two or more dissemination methods."  *See id.* at 3.

Due to these deficiencies, Mr. Fisher's assertion that 80% of the target audience will be

reached should have been disregarded.  The proper method for determining if the Notice Program

was sufficient is for the claims administrator to state the current number of individual claims

received to date (both by natural persons and by business entities, separately).  As such, the Notice

Program was inadequate and insufficient.

Review by an independent claims expert is required here because of the major faults

highlighted herein and by other objecting class members including class counsel, and because the

Notice or Claim Program, or both failed as objectively evidenced by the reported claims rate.  The

Excluded Plaintiffs and the other objectors, including Class Counsel, request that this Court

appoint an independent and further request it give serious consideration to appointing the Hilsee

Group as an independent evaluator of the class notice program and the claims rate.  *See*

---

*Hughes Communications, Inc.*, No. 09-2136-SC, 2011 WL 2650711 at *15 (N.D. Cal. July 6,

1   Attachment 1 to Affidavit of Robert J. Bonsignore - Hilsee Group Website,

2   http://www.hilseegroup.org/contact.php.[23]  There are few experts in this area.  Rust and Kinsella

3   Communications are conflicted out.  Through this date it is the understanding of the Excluded

4   Plaintiffs that the Hilsee Group, the entity who worked with the Federal Judicial Center to prepare

5   the judicial resources this and other federal courts across the United States rely on, remain open,

6   independent and not retained by any party.  The appointment of an independent expert who

7   answers only to this Court will eliminate further briefing as well as the thorny "battle of experts"

8   argument.

9          The Federal Judicial Center's Notice Checklist recommends that judges critically review a

10  proposed notice program and ask: "Do you have unbiased evidence supporting the plan's

11  adequacy?"[24]  Among the questions the Independent should be asked to answer are:

12              •   What target audience is being used for measurement?

13              •   What tools or software are being used to evaluate reach and frequency?

14              •   Does the plan provide a mix of media?

15              •   Does the plan include reach from a press release, search ads, or other online
16                  media where reach cannot be measured?

17              •   Does the plan factor out duplication?

18              •   How was the reach of Internet components calculated?

19              •   Did the reach meet what was represented and if not, why?

20              •   What was the actual reach of the Notice?

21              •   Did the Notice reach the proper target market (MDL 1917 class members)?

22

23  _____

24  2011).

25  [23] Among other things apparent by their website and independent review, the Hilsee Group
    collaborated with the Federal Judicial Center to create a judges' checklist for class action notice
26  campaigns.

27  [24] Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain
    Language Guide, available at http://www.fjc.gov/public/pdf.nsf/lookup/Not-
28  Check.pdf/$file/NotCheck.pdf, at 2

- Was the language in the Notice such that it facilitated the class members understanding of the litigation and their legal rights?

- Was the Notice sufficient?

- Was the claims rate sufficient and if not, why?

- If the reach was insufficient what should be done during a re-notice program to insure its correct?

Objectively, there is no evidence in the record that Fisher had the capacity and experience to handle this job.  Most counsel in this case wonder where Lead Counsel Alioto found him, and why he chose him to undertake a Program that is not questioned to have been beyond his internal capacity and prior experience.  Mr. Fisher does not even rank among the credible and experienced notice providers and claims administrators available in the United States.  Yet he was chosen to administer notice and claims in what Mr. Alioto advances is one of the largest IPP settlements in U.S. history.  Under the totality of the circumstances an independent view by an expert is required to protect the interests of the millions of absent class members. Such a review can expeditiously be performed, and the related costs is contextually de-minimus.

Second, the Notice Program was also flawed because the targeted demographic was not the primary purchasers of CRT TVs, which were products at the low-end of the television market during the Class Period.  The Notice was directed to households with adults aged 30+ years old at the start of the Class Period.  This is obviously and objectively the incorrect demographic because the targets of the Notice are now over 50 years old with an average $60,000 in household income.  Nevertheless, lower-income families were not targeted by the MDL 1917 Notice Program.  Mr. Fisher offered no justification for why the basic adjustments were not made and the Notice was not aimed at the undisputed target market.  Fisher and Lead Counsel provide no reliable evidence establishing that the undisputed demographic *at the time of purchase* likely received notice as a result of the Notice Program that took no account of the passage of up to 25 years.  Thus, it is a mere guess, and a factually unsupported and counter-intuitive one at that, that the MDL 1917 class members received adequate notice.  It cannot be objectively, or reasonably advanced that MDL 1917 Notice was designed to reach them, because it was aimed at a demographic that was no

30

1   longer valid.  As the record does not adequately support the conclusion that this significant

2   segment of the putative class received notice, this Court must exercise its fiduciary duty and

3   protect the absent class members.

4        In addition, no explanation is given as to why the class member demographic was not the

5   starting point from which the Notice Program was designed.  For example, Mr. Fisher states that

6   the Program's "consumer email" campaign targeted persons who were at least 18 years of age as

7   of 2007, thus targeting persons who were only six years old at the beginning of the class period in

8   1995. *See* Decl. of Joseph M. Fisher Reporting on Class Notice (filed Nov. 20, 2015) ("Fisher

9   Decl. II") at 7. By contrast, those who purchased CRT products in 1995 when they were 50, are

10  now 70 years old.  Notably, there is no indication that the email notice to such persons under the

11  Notice Program will effectively reach this age group.  The evidence was inadequate to support the

12  demographics targeted by the Notice Program.

13       Third, the means of notice excluded a critical outlet.  Given the CRT product in issue,

14  television is obviously among most likely sources of Notice to reach a class of TV purchasers.

15  There was no evidence in the record that established that Notice was published on TV.  While this

16  flaw may be mind numbing, Fisher's lack of experience and the absolute absence in the record of

17  evidence that a scientific or valid demographic or statistical analysis and approach was taken

18  requires this Court intervene and take a fresh look.

19       Fourth, a large segment of the putative class did not speak English as a first language.

20  There is no evidence in the record that establishes that Notice was given in any language but

21  English, or that it was even considered.  Given the economic recovery and the great number of

22  non-English speaking members of the putative class, the countervailing cost consideration does not

23  outweigh the right of the members of the putative class to receive notice.

24       Fifth, there is insufficient evidence that the Notice reached foreign residents.  To establish

25  the Notice sufficiently reached them, the Master relied upon the Fisher representation that claims

26  by non-United States residents had been submitted.  *See* Report at 48.  The mere fact that some

27  persons in a certain foreign country received Notice simply is not dispositive evidence that the

28

Notice reached any sizable segment of that population.  The Master's conclusory finding to the

contrary should be discarded.

"Where notice to a class has been inadequate, it may be appropriate to reject the settlement

in its entirety."  *Kaufman v. American Express Travel Related Servs., Inc.*, 283 F.R.D. 404, 408

(N.D. Ill. 2012).  Such is the precise case here, and the Settlement Agreement should be rejected.

**B.      The Master's Failure To Engage A Neutral Expert To Evaluate The Notice Program Renders His Determination That It Was Reasonable Defective**

The Excluded Plaintiffs specifically objected to the representations made by Fisher,

provided detailed descriptions of the flaws in the Notice Program, and sought a neutral expert to be

appointed to support their objections.  *See* Doc. No. 4119.  That request was not granted, and the

Master issued the Report discounting their objections and finding an expert to be "unnecessary in

light of the persuasive evidence before him" and finding notice to be reasonable without the

benefit of a contrary view.[25]  *See* Report at 49.  Incredibly, on the Report's very next page, the

Master faults the objectors for not providing expert testimony, stating that "Objectors could have,

but did not, submit any contrary expert evidence."  *See* Report at 50; *compare with* Special

Master's position in Hearing Tr. at 82:22-25; 83:1-2.

The responsibilities and fiduciary duty this Court has toward absent class members is well-

established and previously addressed in detail.  This Court cannot repeat the mistake of the Master

because it must serve as the last shield and sword of  absent class members.  The Master's Report

itself acknowledges the importance that expert testimony had and could have had upon his

endorsement of the Notice Program.  *See, e.g.*, *Kaufman v. Am. Exp. Travel Related Servs., Inc.*,

---

[25] The Special Master delayed the request to hire a neutral expert to evaluate the Notice Program
until it was too late for the Excluded Plaintiffs to react and respond.  *See* Attachment 9 to Affidavit
of Robert J. Bonsignore - Hearing Tr. 82:11-25; 83:1-2.  The order of the Special Master was
amorphous and the result was a deficient report with self-serving parameters that provided very
little to no useful evaluative data.  *See* Attachment 9 to Affidavit of Robert J. Bonsignore - Hearing
Tr. 136:18-22.  Immediately upon Lead Counsel's release of the incomplete but pathetic claims
rate, counsel for the Excluded Plaintiffs requested permission to [do it ourselves].  The Special
Master denied that request on the grounds that it was too late.  JAMS Docket, Special Master's
Corrected Report and Recommendation Re: Outstanding Motions, dated January 21, 2016 at 4-5.
After that Scarpulla and Cooper sent an email advising the Master they intended to address

283 F.R.D. 404, 405 (N.D. Ill. 2012) (court appointed expert in class notification to analyze report).  This acknowledgement should be viewed as an endorsement of the appointment of an independent.  His failure to engage a neutral expert to assist him in that analysis was a fatal error.  This Court should not repeat that error and the only way to avoid it is to engage an independent.

### OBJECTION 3

### THE SPECIAL MASTER'S ATTORNEYS' FEES AWARD WAS NOT SUPPORTED BY ADEQUATE EVIDENCE OF HOURLY RECORD KEEPING

In recommending approval of the attorneys' fees award requested by Lead Counsel, the Special Master specifically endorsed class counsel's billing records as "highly reliable and detailed."  *See* Report at 73.  That finding was in error.

The Master endorsed the billing records of Lead Counsel Alioto despite evidence that he admitted that he did not keep contemporaneous records of the time spent on his work.  *See id.* at 71.  In particular, counsel for the Excluded Plaintiffs Bonsignore submitted a declaration stating that Alioto expressly told him that he did not perform that task.  The Special Master brushed aside his declaration, finding it to be "unsupported hearsay."  However, the Federal Rules of Evidence do not apply at a fairness hearing.  *UAW v. General Motors Corp.,* 235 F.R.D. 383, 386-87 (E.D. Mich. 2006); *Union Assets Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632 (5th Cir. 2012).  Notably, Lead Counsel has stated that it required all indirect product purchaser counsel to submit contemporaneously made time entries.  *See* IPP Mot. for Attorneys' Fees (Doc. No. 4071) at 26.  Thus, the basis of Special Master's discounting of that testimony was as an erroneous application of the controlling law as was his finding that block billing and sampling of attorney time submissions that were not related to the objections raised or otherwise mathematically or statistically sound was perfectly proper.  His amused observation that time entry habits deteriorated as the age of the lawyers increased does not excuse any lawyer, whatever his or her age, from the duty to maintain contemporaneous, detailed time entries.  It certainly does not lift the

---

Chunghwa.  Out of the blue, that Master authorized further briefing on February 8, 2016, ordering it due on February 12.  The time is now too short to get an expert opinion testimony.

1   responsibilities this Court has to protect the interests of the class or absent class members.

2   Lead Counsel's failures merit the denial of his fee request.  Lead Counsel and so-called

3   trial counsel have demanded a significant multiplier.  Lead Counsel did not do his job because he

4   excluded absent class members from an economic recovery class and because he did not manage

5   the litigation excellently as otherwise detailed by the Excluded Plaintiffs and the other objecting

6   class members.  For example, Lead Counsel needlessly called in trial counsel when other counsel

7   in the case where familiar with the case and highly competent to bring the matter to trial.  The

8   Special Master's conclusion that any lawyer trying the case would have to have had gotten up to

9   speed and would have taken equal time to prepare ignores the staggering amount billed as well as

10   the fact that the alternative trial lawyers in the case were already up to speed.  In addition, Lead

11   Counsel's unnecessary use of outside counsel was at direct odds with this Court's appointment

12   order in which it specifically appointed Alioto's firm instead of a large law firm since "only a

13   handful" of attorneys from a firm would be working on the case.  *See* Doc. No. 282.

14   The Special Master erroneously permitted block billing as an endorsed practice.  *See*

15   Report at 73.  "Block billing" is defined as "the time-keeping method by which each lawyer and

16   legal assistant enters the total daily time spent working on a case, rather than itemizing the time

17   expended on specific tasks."  *Mendez v. County of San Bernardino*, 540 F.3d 1109, 1129 n.2 (9th

18   Cir. 2008) (quoting *Welch v. Met. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007)), *overruled on*

19   *other grounds, Arizona v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014).  Generally, courts have

20   discretion to reduce block billed hours because the nature of these time entries renders it difficult

21   to determine whether fees are unnecessarily duplicative or unreasonable.  *See Welch*, 480 F.3d at

22   948.  This is so because it is "more difficult to determine how much time was spent on particular

23   activities."  *Id*.  Indeed, the Ninth Circuit has noted that a 20% increase is the mid-range increase

24   in time caused by block billing.  *See Hajro v. U.S. Citizenship & Immigration Servs.*, 900 F. Supp.

25   2d 1034, 1053 (N.D. Cal.2012).  For this reason, block billing is disfavored and routinely reduced

26

27

28

1   by courts.[26]

2        Despite this criticism, the Special Master found it "silly" to require a lawyer to show the

3   specific amount of time spent on each action during the day.  *See* Report at 73.  Despite his

4   personal disregard for that practice, it is routinely engaged by present day attorneys and a required

5   practice for class action lawyers.  It is indeed disfavored and grounds to reject a fee request for

6   Lead Counsel here.  *See* ABA Model Rule 1.5, comment 5 ("A lawyer should not exploit a fee

7   arrangement based primarily on hourly charges by using wasteful procedures.").

8                                  **OBJECTION 4**

9   **THE SPECIAL MASTER ERRED IN FAILING TO INCLUDE THE EXCLUDED**
10                  **PLAINTIFFS IN THE AWARD OF INCENTIVE FEES**

11        The Special Master awarded two types of incentive payments:  $25,000 to the 25 court-

12  appointed class representatives and $5000 to an additional 15 individuals who were not appointed

13  by the court but  had been named plaintiffs for various states for a period of time.  *See* Report at

14  75.  His award to the non-appointed state representatives was apparently based upon the more than

15  perfunctory efforts they undertook in connection with this case.  There is no objection to those

16  awards; however, it was improper for the Master to exclude Massachusetts state representative

17  Anthony Gianasca from the $5000 award group.  Mr. Gianasca was a named plaintiff in Lead

18

19  _____

    [26] *See, e.g., Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 968 (N.D. Cal. 2014) ("I am reducing
20  Volcano's bill by 20% for block billing."); *Apple, Inc. v. Samsung Elecs. Co.*, No. C 11–1846
    LHK (PSG).2012 WL 5451411, at *5 (N.D. Cal. Nov. 7, 2012) ("in light of the evidence that
21  block-billing inflates hours by between 10% and 30%, the court trims 20% from the block-billed
    hours"); *Yeager v. Bowlin,*, No. CIV. 2:08–102 WBS JFM, 2010 WL 1689225, at *1 (E.D. Cal.
22  Apr. 26, 2010) ("block billing thereby forces the court to take a 'shot in the dark' and guess
    whether the hours expended were reasonable, which is precisely the opposite of the methodical
23  calculations the lodestar method requires"); *Lil' Joe Wein Music, Inc. v. Jackson*, No. 06-20079-
    CIV. 2008 WL 2688117, at *13 (S.D. Fla. July 1, 2008) (20% across the board reduction because
24  "[i]t is impossible to ascertain from the block billing entries whether the amount of time spent on
    any separate task performed was reasonable"); *Aiello v. Town of Brookhaven*, No. 94-CV-2622
25  (FB)(WDW). 2005 WL 1397202, at *3 (E.D.N.Y. June 13, 2005) ("because block billing renders
    it difficult to determine whether, and/or the extent to which, the work done by attorneys is
26  duplicative or unnecessary, courts apply percentage cuts where there is a substantial amount of
    block billing in a fee request") (citations and internal punctuation omitted).  *But see O'Bannon v.
27  National Collegiate Athletic Ass'n,*, Case No. 09–cv–03329–CW (NC), 2015 WL 4274370, at *6
    (N.D. Cal. July 13, 2015) (finding that block-billed entries contained enough specificity as to
28  individual tasks to ascertain whether the amount of time spent performing them was reasonable).

35

Counsel Alioto's Class Action Complaint.  *See* Doc. No. 4144, Attachment 2, ¶ 12 .

Like all other non-appointed state representatives who received an award, he "searched for documentation and worked on discovery responses."  *See* Report at 75-76.  Significantly, he also was of the several individuals who was deposed.  *Id.* (citing two individuals as examples of some that had been deposed to justify their awards).  Mr. Gianasca should be treated equally with the other non-appointed state representatives who expended significant efforts in connection with this litigation.  He also gave sworn testimony.  An incentive award of $5000 to him is thus appropriate.

In addition, the remaining Excluded Plaintiffs also deserve $5000 incentive awards for their effort in bringing similarly situated class members' interests before this Court.

## OBJECTION 5

### THE SPECIAL MASTER ERRED IN FINDING THAT LEAD COUNSEL COULD CORRECT THE DUE PROCESS VIOLATIONS COMMITTED BY DEVISING AN ALLOCATION PLAN THAT ABANDONED CHUNGHWA CLASS MEMBERS

In his Report, the Special Master correctly found that the Settlement Agreement's plan of allocation violated the due process rights of both the classes included in the present Agreement and the broader class included in the earlier settlement with defendant Chunghwa Picture Tubes, Ltd. ("Chunghwa").  *See* Report at 44.  However, the Special Master then committed legal error in concluding that Lead Counsel can correct the defects by using an approach that would result in those Chunghwa class members being treated differently than others.[27]  The complete abandonment of the Chunghwa class members (the "Chunghwa Class") is further evidence of Lead Counsel's willingness to do whatever it took to secure the lucrative Settlement Agreement with the Defendants.  That breach of his fiduciary duty, and the violations of due process it has created, dictate the wholesale rejection of the Settlement Agreement.[28]  Setting aside arguments related to

---

[27] Report at 45-46 ("It is absurd to allow a $5,000,000 tail (the Chunghwa Net Settlement Fund) to wag a $576,750,000 dog."); *see also* Hearing Tr. at 134:5-25.

[28] In the alternative, the Excluded Plaintiffs request this Court order:1) the Chunghwa and Excluded Plaintiffs from Massachusetts, Missouri, and New Hampshire be included in the monetary recovery distribution; 2) re-notice; 3) the claim period be extended.  This approach does not conflict with the following position Defendants:  "we do view many of the objections as really

36

1   the adequacy of the gross Settlement amount, it is worth noting that while the Defendants were

2   open to "tinkering with the plan of allocation," Lead Counsel's steadfast refusal to open a dialogue

3   focused on correcting the obvious defects in the Settlement is driving the instant controversy.  *See*

4   Hearing Tr. at 30:13-16; 39:9-15; *see also* Hearing Tr. at 133:10-14 (noting Defendants'

5   willingness to "tweak" plan).  The willful choice of excluding monetary recovery to those entitled

6   to it under the law has created an obvious and irreparable conflict between Lead Counsel and yet

7   another group of absent class members.  Releasing all rights and claims they may have "adds icing

8   to the cake" and makes rejection of the Settlement unavoidable.

9       In particular, prior to reaching the current Settlement Agreement with the Defendants, Lead

10   Counsel negotiated a settlement with defendant Chunghwa providing for the creation of a net

11   settlement fund of no less than $5 million.[29]  In line, the current Settlement Agreement includes

12   that $5 million within its plan of distribution and allocates it in the same manner as the funds

13   received from the Defendants.  However, the terms of the Chunghwa settlement (the "Chunghwa

14   Agreement") and the current Settlement Agreement differ in two key respects.

15       First, the agreements bind and benefit different classes of indirect purchasers.  The

16   Settlement Agreement defines its classes, both the Nationwide Class and the State Damages Class,

17   as including indirect purchasers of CRT products bought only "for their own use and not for

18   resale."  *See* Report at 43.  This directly conflicts with the terms of the Chunghwa Agreement,

19   which includes payment terms for *all* indirect purchasers, including both end-users *and resellers*.

20   *See* Doc. No. 884-1 at Exhibit 1, ¶ 1 (emphasis added).  Notably, the court-approved notice

21   published for the Chunghwa Agreement (the "Chunghwa Notice") explicitly stated that "[b]oth

22

23   going to allocation issues, and as a general matter we don't have a problem with some tinkering
    being done to the plan of allocation proposed by lead counsel."  See Attachment 9 of Affidavit of

24   Robert J. Bonsignore - Hearing Tr. at 30:13-16.

25   [29] The total settlement amount was $10 million from which the net settlement fund of at least $5
    million was derived.  The "Net Settlement Fund" is defined as "the $10,000,000 settlement

26   amount, plus interest, minus 25% for attorneys' fees, reimbursement of expenses, $2.5 million for
    costs set-aside, including the costs of giving notice to class members and administration of the

27   settlement fund, all of which shall be subject to court approval.  The Net Settlement Fund shall be
    no less than $5 million."  *See* Doc. No. 993, at 4 n.2.

28

37

1    consumers and resellers are included in the Settlement Class."[30]  *See* Doc. No. 1063, Exhibit B

2    (Fisher Chunghwa Notice Decl.); *see also* Doc. No. 1105, ¶ 6 (Chunghwa Final Approval Order).

3    Thus, the Chunghwa Agreement applies, binds, and benefits a class of indirect purchasers that are

4    not included in the current Settlement Agreement, namely resellers.  Also, the Chunghwa

5    Agreement includes two additional states, Illinois and Oregon, in its damages distribution that are

6    not included in the Settlement Agreement's State Damages Class.  *See* Docket No. 993, ¶ 10

7    (damages distributed to "[e]ach State listed in the operative complaint for which damage claims

8    are being asserted, plus the states of Illinois and Oregon").

9         Second, the method of dividing up the settlement funds is defined differently by each

10   settlement.  The current Settlement Agreement's plan of distribution provides for a pro-rata

11   division by claim; whereas under the court-approved Chunghwa plan,

12         [e]ach State listed in the operative complaint for which damage claims are being
          asserted, plus the states of Illinois and Oregon, shall receive a pro rata share of the
13        Net Settlement Fund.  Each state's pro rata share shall be determined by computing
          its population as a percentage of the total population of all states.
14

15   *See* Doc. No. 993 (Chunghwa Preliminary Approval Order) at ¶ 10.  A chart is provided that lists

16   the percent allocation of the fund for each state.  *Id.*  Once again, the court-approved notice to class

17   members explicitly stated that this method of distribution was going to be employed:

18         **10.  When can I get a payment?**  No money will be distributed to Settlors
19        yet.  The lawyers will pursued the lawsuit against the Non-Settling
          Defendants to see if any future settlements or judgments can be obtained in
20        the case and then be distributed together to reduce expenses.  It is possible
          that money will be distributed to organizations who are, as nearly as
21        practicable, representative of the interests of the indirect purchasers of CRT
          Products instead of the Settlors themselves if the cost to process claims
22        would result in small payments to Settlors.  Regardless of whether the
          money is distributed to organizations or the Settlors themselves, the money
23

24   ─────────────────────────

25   [30] The full notice provision provides in relevant part as follows:  "**7.  How do I know if I am one
     of the Settlors?**  The Settlement Class ("Settlors") includes any person or business that indirectly
26   bought in the U.S. (excluding claims under the Washington Unfair Business Practices and
     Consumer Protection Act) from March 1, 1995 through November 25, 2007, any CRT Product
27   made by the Defendants.  Both consumers and resellers are included in the Settlement Class."
     Doc. No. 1063 (Long and Short Forms of Notice at Exhibits A & B of Fisher Chunghwa Notice
28   Decl.).

1

2

3

> will first be allocated amongst the 24 states listed on page 1 o this notice, so
> that each state receives its pro rata share.  Each state's pro rata share shall be
> determined by computing its populations as a percentage of the total
> population of all 24 states using census figures from the year 2000."

4  Doc. No. 1063 (Long Form Notice, Exhibit A, Fisher Chunghwa Notice Decl.) at 4.  Significantly,

5  consistent with the inclusion of Illinois and Oregon in its damages class, the court has ordered that

6  those states are to receive 8.59% and 2.37% of the $5 million settlement fund, respectively.  Doc.

7  No. 993, ¶ 10.

8       The Chunghwa Agreement received final approval on March 22, 2012.  *See* Doc. No. 1105.

9  Although final approval was silent on the issue, the preliminary approval order and Lead

10  Counsel's motion for preliminary approval both represented that distribution of the settlement fund

11  would occur at a later date, such as the termination of the case, and that plaintiffs would propose a

12  method of distribution at that time.  *See* Doc. No. 884, at 18 (motion for preliminary approval);

13  Doc. No. 993, at ¶ 11 (preliminary approval order).

14       The current Settlement Agreement indeed provides for the distribution of the Chunghwa

15  settlement proceeds – but not to the resellers or residents of Illinois or Oregon who will receive no

16  monetary benefits.  Unfortunately, that plan of distribution is inconsistent with the Chunghwa

17  Class Notice and directly violates the terms pursuant to which the Chunghwa settlement was

18  reached and approved by the court.

19       If the Settlement Agreement's plan is approved, resellers of CRT products who released all

20  their rights against Chunghwa in exchange for the right to share in the $5 million settlement fund

21  will be stripped of that right and receive nothing.  All indirect purchasers, both consumers and

22  resellers, in the states of Illinois and Oregon will receive nothing despite their entitlement to

23  damages under Chunghwa's terms.  For those Chunghwa Class members lucky enough to qualify

24  for damages under the current Settlement Agreement, their bargained-for state-based pro rata share

25  in the $5 million settlement proceeds will be discarded and a new pro-rata by total claims rate of

26  compensation imposed upon them.  Adding insult to injury, all of the foregoing will be imposed in

27  direct derogation of the notice given to the Chunghwa Class members and approved by the

28

1    Court.[31]

2          The Special Master correctly found that Lead Counsel's explanation as to how the

3    Chunghwa Notice was adequate fails to demonstrate that the interests of the absent class members

4    were adequately protected.  Specifically, Lead Counsel advanced that "Objectors are wrong that

5    the notice of the Chunghwa settlement (Doc. No. 1063-1) 'told resellers they will be paid at a later

6    date.'"  *See* letter from Lead Counsel Alioto to Special Master Martin Quinn, filed on JAMS and

7    dated January 13, 2016 (the "Alioto Letter") at 1.  He then engaged in a tortured reading and

8    interpretation of that Notice to conclude that it "clearly" informed resellers "that (1) they might not

9    get any money; (2) they would not know until after final approval of the Chunghwa settlement

10   whether they were getting any money; and (3) if they didn't like that plan, they should opt out or

11   object."  *See id.* at 1-2.  At hearing he appeared not to know the terms of the settlement or the

12   implications to the absent class members.  Hearing Tr. at 90-92.

13         Class notice is not to be a game of words between Lead Counsel and the class they

14   represent.  It is to be in clear, concise, plain language that is easy to understand.  *See* Fed. R. Civ.

15   Pro. 23(c)(2)(B).[32]  "It must also contain an adequate description of the proceedings written in

16   objective, neutral terms, that, insofar as possible, may be understood by the average absentee class

17   member."  *Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222, 1227 (11th Cir. 1998), *quoting In re*

18   *Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1103-05 (5th Cir.1977).  The strained

19   interpretation offered by Lead Counsel was bizarre.  More importantly, the Chunghwa Notice was

20   not clear and in hindsight, at best, misdirected the class.

---

[31] Of particular concern, the Notice of the Settlement Agreement was not devised with the intent of reaching the reseller market and no analysis of such reach was presented by Lead Counsel or performed by the Special Master.

[32] *See also*
http://www.fjc.gov/public/home.nsfhttp://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/

40

1
2
3
4
5
6
7
8

Alioto's forceful position that "Resellers received fair notice that they may not recover from the Chunghwa fund and that a specific plan of distribution would be proposed later in the case" is inconsistent with a plain reading of the Chunghwa Class Notice.  *See* Alioto Letter at 3. The Notice, among other things, contained text that defined the conditions precedent to the class members not receiving an economic recovery.  Significantly, the Notice specifically stated that there will be no distribution "*yet.*"  *See* Doc. No. 1063 (Long Form Notice, Exhibit A, Fisher Chunghwa Notice Decl.) at 4, *supra* (emphasis added).

9
10
11
12
13
14
15

The Chunghwa Notice also makes clear that "[t]he lawyers will pursue the lawsuit against the Non-Settling Defendants to see if any future settlements or judgments can be obtained in the case and then be distributed together to reduce expenses." *See id.*  Indeed, more settlements were in fact reached and the express condition that was given in exchange for the delay in the immediate receipt of an economic recovery - reduced expenses related to the issuance of payments and so, a higher recovery for the class members- was met.

16
17
18
19
20
21
22
23
24
25

Lead Counsel Alioto's representation of a class in one settlement and abandonment of them in another, all in the same case, is indefensible.  Well-settled, and basic, class action precedent establishes that Lead Counsel is charged with representing all members of the class, including absent class members, and that Lead Counsel cannot favor one segment of the class over another. *See* Objection 1, *supra*.  Once represented by an appointed lead counsel, class members have little to no control over the litigation and are entitled to rely on lead counsel to look out for their best interests.  "The responsibility of class counsel to absent class members whose control over their attorneys is limited does not permit even the appearance of divided loyalties of counsel." *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir.), *cert. denied*, 516 U.S. 914 (1995).  The bottom

26
27
28

NotCheck.pdf/autoframe?openform&url_l=/public/home.nsf/inavgeneral?openpage&url_r=/public/home.nsf/pages/376)

line is that in addition to his duty as Lead Counsel to zealously represent them, Alioto expressly advised the members of the Chunghwa Class that he was in fact doing just that.  Class members were entitled to rely both on his ethical duty and his express representations as set forth in the Chunghwa Notice.  In entering into the current Settlement Agreement, Lead Counsel violated his duties and his express representations.

Lead Counsel's willingness to sacrifice the rights of any class segment that stand in the way of his $277 million settlement cannot be seriously questioned.  Just as he was willing to abandon the indisputable right to a recovery of economic damages by every absent class member in the states of Massachusetts, Missouri and New Hampshire, he has also abandoned every reseller/absent class member on whose behalf he negotiated away the right to assert a claim against Chunghwa but who did not fit neatly into his lucrative package with the Defendants.  Although the monetary value of the abandoned Chunghwa class's claim may pale in comparison to the current settlement fund at issue, that point is not the evaluative fulcrum.  The blatant violation of due process and fiduciary duties committed by Lead Counsel are the beginning and end of the analysis and cannot be overemphasized.  The impermissible conflicts of interests that infected the allocation plan extend to each part of the Settlement Agreement and cannot be remedied by a mere adjustment to the distribution of the $5 million Chunghwa funds or a re-noticing.  The due process violations and fiduciary duty breaches at issue dictate as wholesale rejection of the Settlement Agreement.

1

## <u>CONCLUSION</u>

2      For the foregoing reasons, Plaintiffs request the Court reject the Special Master's Report

3  and Recommendation and reject the proposed Settlement Agreement, reduce or reject Lead

4  Counsel's fee application, and, further order:

5      1.      Monetary compensation, re-notice and an extension of the claims period for the so-

6              called Chunghwa Settlement Class;

7      2.      Monetary compensation, re-notice and an extension of the claims period for the so-

8              called Excluded Massachusetts Settlement Class;

9      3.      Monetary compensation, re-notice and an extension of the claims period for the so-

10             called Excluded Missouri Class Settlement Class;

11     4.      Monetary compensation, re-notice and an extension of the claims period for the so-

12             called Excluded New Hampshire Settlement Class;

13     5.      The appointment by this Court of a qualified expert on class action notice programs

14             and claims rates so that a full evaluation of the Notice Program including claims

15             rates can be carried out to protect the interests of absent or excluded class members.

16             The Excluded Plaintiffs request this Court give serious consideration to appointing

17             the Hilsee Group as an independent evaluator of the Class Notice program and the

18             claims rate.  *See* http://www.hilseegroup.org/contact.php;

19     6.      Lead Counsel and the claims administrator to immediately disclose full and

20             complete disclosure of all claims rate data, the parameters and details of the Class

21             Notice, and any and all other information deemed necessary and reasonable by a

22             court appointed qualified expert on class action notice programs and claims rates so

23             that a full evaluation of the Notice Program and claims rate can be carried out on

24             behalf of absent or excluded class members;

25     7.      In the alternative grant, the authority, full disclosure of the underlying data, and

26             time for a retained expert to prepare a related report objecting class members,

27             including the Excluded Plaintiffs and Class Counsel.  Specifically, if this Court will

28

1    not retain the Hilsee Group as an independent evaluator of the Class Notice

2    program and the claims rate, allow the objecting class members, including the

3    Excluded Plaintiffs and Class Counsel, to hire an expert and provide them with

4    sufficient data to perform an evaluation ;

5    8.    Re-notice and an extension of the claims period for the entire "Economic Recovery

6    Class" using an experienced and qualified claims administrator and a notice plan

7    that satisfies the Federal Judicial Center's criteria and otherwise addresses the

8    deficiencies raised by the objecting class members, including the Excluded

9    Plaintiffs and Class Counsel;

10    *See* Attachment 2 to Affidavit of Robert J. Bonsignore -

11    http://www.fjc.gov/public/home.nsf/autoframe?openform&url_l=/public/home.nsf/i

12    navgeneral?openpage&url_r=/public/home.nsf/pages/376;

13    9.    Otherwise, that the objectively unacceptable claims rate be investigated and

14    addressed after full disclosure of the underlying data is provided to the objecting

15    class members, including the Excluded Plaintiffs and Class Counsel (*see*

16    Attachment 3 – Shannon Wheatman, *Accurately Reporting Notice Results to*

17    *Courts,* Rust Kinsella Consulting Media, December 2015);

18    10.    Lead Counsel to provide to all objecting class members, including the Excluded

19    Plaintiffs and Class Counsel, full and complete time, billing and expense records for

20    the entire period for which compensation is claimed;

21    11.    The Court will carry out a full detailed review of the IPP Counsels' time records

22    and expenses in accordance with the ABA Attorney Billing Guidelines;

23    12.    Incentive award granted to the Excluded Plaintiff Anthony Gianasca because he

24    was originally named and was arbitrarily and capriciously excluded despite having

25    brought a benefit to the class;

26
27    13.    Incentive awards for the Excluded Plaintiffs because their good faith objection has

28    brought about a benefit to the class; and

44

14.   Attorney fees and costs for the Excluded Plaintiffs because their good faith objection has brought about a benefit to the class.

and grant such further and other relief as this Court deems just and proper.

Dated:  February 12, 2016                    Robert J. Bonsignore

/s/ Robert J. Bonsignore
Robert J. Bonsignore (NH No. 21241)
Bonsignore Trial Lawyers, PLLC
3771 Meadowcrest Drive
Las Vegas, NV 89121
Telephone:  (781) 856-7650
Facsimile: (702) 852-5726
Email: rbonsignore@class-actions.us

1

## **CERTIFICATE OF SERVICE**

2

3    I, Robert J. Bonsignore, hereby certify that on this 12th day of February, 2016, I caused the

4  foregoing to be electronically filed with the Clerk of the Court by using the Case

5  Management/Electronic Case Filing (CM/ECF) system, which will send a notice of electronic

6  filing to all parties registered with the CM/ECF system in the above-captioned matter.  A copy will

7  be forwarded via first class mail, postage prepaid, to those parties not electronically registered.

8

9                                         */s/ Robert J. Bonsignore*

10                                         Robert J. Bonsignore

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28