1  ANDREA VALDEZ (Cal. Bar No. 239082)
   530 S. Lake Avenue, No. 574
2  Pasadena, CA 91101
   Tel: (626) 817-6547
3  andrea.valdez.esq@gmail.com

4  JOSEPH SCOTT ST. JOHN (*pro hac vice*)
   514 Mockingbird Drive
5  Long Beach, MS 39560
   Tel: 410-212-3475
6  jscottstjohnpublic@gmail.com

7  *Attorneys for Objector Douglas W. St. John*

8

9                    UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                       SAN FRANCISCO DIVISION

12  **IN RE CATHODE RAY TUBE (CRT)**        Master File No. 3:07-cv-5944 JST
    **ANTITRUST LITIGATION**
13                                          MDL No. 1917

14                                          **OBJECTOR DOUGLAS W. ST. JOHN'S**
                                            **OBJECTION TO REPORT &**
15                                          **RECOMMENDATION RE**
                                            **SETTLEMENTS AND FEES (D.E. 4351)**
16

17                                          Date: March 15, 2016
                                            Time: 2:00 p.m.
18                                          Courtroom: 9, 19th Floor
    This Document Relates To:              Judge: Hon. Jon S. Tigar
19  All Indirect Purchaser Actions          Special Master: Hon. Martin Quinn

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**TABLE OF CONTENTS** ................................................................................. 1

**TABLE OF AUTHORITIES** ........................................................................... 4

**INTRODUCTION** ......................................................................................... 1

**STANDARD OF REVIEW** ............................................................................. 2

**ARGUMENT** ................................................................................................ 2

I.   IPP COUNSEL FAILED TO MAKE A PRIMA FACIE CASE FOR A
     SIGNIFICANT PORTION THEIR REQUESTED FEES, AND ANY
     AWARD MUST BE REDUCED ACCORDINGLY. ........................................ 2

     A.   At least 20 firms failed to make a *prima facie* case for their requested
          fees, including 6 firms that failed to provide skill and experience
          information for *any* attorney. .......................................................... 2

     B.   The Special Master clearly erred in recommending that IPP Counsel
          receive $350-$400/hour i.e., a 1000+% markup, plus a multiplier for
          contract attorneys for whom no skill or experience information was
          provided. ....................................................................................... 4

          1.   IPP Counsel mislabeled contract attorneys as associates and
               selectively omitted information on their skill and experience. .............. 4

          2.   Awarding $350-$400 per hour for work performed by IPP
               Counsel's contract attorneys would be an abuse of discretion. ............. 4

          3.   The record and public policy support reducing IPP Counsel's
               fee request by at least 15% to account for their mislabeling of
               contract attorneys and their failure to supply skill and
               experience information. ................................................................. 6

II.  THE RECOMMENDED FEE AWARD IS EXCESSIVE. .................................... 7

     A.   IPP Counsel made multiple errors in pursuing this litigation. ..................... 8

     B.   Even assuming that the quality of representation was high, the
          litigation was handled efficiently, the case was exceptionally complex,

and the results were extraordinary, those facts are already accounted

for in the white-shoe rates sought by IPP Counsel, such that little or no

multiplier is appropriate. ............................................................. 9

III.   THE SPECIAL MASTER MADE MULTIPLE FACTUAL AND LEGAL

ERRORS IN AWARDING FEES BASED ON THE SAMSUNG SDI AND

PHILIPS SETTLEMENTS. .................................................. 10

A.   Fees can only be awarded based on the benefit conferred by class

counsel, which does not include value attributable to the efforts of

others. ....................................................................... 10

B.   The Special Master failed to account for the value of regulators

uncovering the CRT conspiracies. .................................... 12

C.   At least $10 million of the settlement fund is attributable to the efforts

of the DOJ, not IPP Counsel. ......................................... 12

1.   The $10 million Chunghwa settlement is almost entirely

attributable to the efforts of the DOJ. .......................... 12

2.   IPP Counsel should be judicially estopped from arguing that

the Chunghwa settlement did not have additional, redounding

benefit to the class. ................................................ 13

D.   The Special Master clearly erred in concluding that Samsung SDI's

guilty plea and the European Commission Decision had no impact on

the settlement value of this litigation. ................................ 15

1.   The Special Master's conclusions regarding the impact of the

Samsung SDI settlement rely on legal errors and factual

findings that are clearly erroneous, and he applied an incorrect

standard in awarding IPP Counsel fees based on the entirety of

the Samsung SDI settlement. ..................................... 15

2.   The Special Master's assigning zero value to the European

Commission Decision and the subsequent issue preclusion

holding in *Vichi* is illogical and is inconsistent with Judge
Conti's findings..........................................................................18

3.   The Samsung SDI guilty plea and the European Commission
Decision account for $160 million of the settlement fund. ...................21

IV.   THE SETTLEMENT SHOULD BE APPROVED, WITH THE COST OF
RESOLVING ISSUES RELATED TO THE INCONSISTENT
CHUNGHWA SETTLEMENT DEDUCTED FROM CLASS COUNSEL'S
FEE AWARD..........................................................................................24

CONCLUSION ............................................................................................................25

1
## <u>TABLE OF AUTHORITIES</u>

2
**Cases**

3
*Am. Home Assur. Co. v. Sunshine Supermarket, Inc.*, 753 F.2d 321 (3d Cir. 1985)......................................17

4
*Antoninetti v. Chipotle Mex.Grill, Inc.*, 2012 WL 2923310 (S.D. Cal. July 17, 2012) ...............................6

5
*Apple, Inc. v. Samsung Elec. Co.*, 2012 U.S. Dist. LEXIS 160668 (N.D. Cal. Nov. 7, 2012) ....................6

6
*Banas v. Volcano Corp.*, 47 F. Supp. 3d 957 (N.D. Cal. 2014)....................................................................6

7
*Baughman v. Walt Disney World Co.*, 685 F. 3d 1131 (9th Cir. 2012)........................................................14

8
*Blum v. Stephenson*, 465 U.S. 886 (1984).....................................................................................................2

9
*Brown v. Stackler*, 612 F.2d 1057 (7th Cir. 1980) .......................................................................................7

10
*Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973 (9th Cir. 2008) ................................................................2

11
*City of Burbank v. Gen. Elec. Corp.*, 329 F.2d 825 (9th Cir. 1964) ..........................................................15

12
*Class Plaintiffs v. Jaffe & Schlesinger, PA*, 19 F. 3d 1306 (9th Cir. 1994) ................................................2

13
*Darensburg v. Metro. Transp. Com'n*, 636 F. 3d 511 (9th Cir. 2011) .............................................3, 5, 23

14
*First State Ins. Grp. v. Nationwide Mut. Ins.*, 402 F.3d 43 (1st Cir. 2005) .................................................7

15
*Gauchat-Hargis v. Forrest River, Inc.*, 2013 WL 4828594 (E.D. Cal. Sept. 9, 2013) ...............................6

16
*Goffstein v. State Farm Fire & Casualty Co.*, 764 F.2d 522 (8th Cir. 1985) ............................................16

17
*Heckler v Chaney*, 470 U.S. 821 (1985) ....................................................................................................17

18
*In re Auction Houses Antitrust Litig.*, 2001 WL 210697 (S.D.N.Y. Feb. 26, 2001) ..................................11

19
*In re Auto. Parts Antitrust Litig.*, 2014 WL 1746121 (E.D. Mich. Apr. 30, 2014) ..................................15

20
*In re Beacon Assocs. Litig.*, 2013 WL 2450960 ..........................................................................................7

21
*In re Bluetooth Headset Prods. Liability Litig.*, 654 F.3d 935 (9th Cir. 2011) ..........................................2

22
*In re Cendant Corp. PRIDES Litigation*, 243 F.3d 722 (3d Cir. 2001)...........................................11, 13

23
*In re Coordinated Pretrial Proceedings*, 109 F.3d 602 (9th Cir. 1997) ...................................................10

24
*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141 (D. Conn. 2009).20

25
*In re Mercury Interactive Sec. Litig.*, 618 F.3d 988 (9th Cir. 2010) .......................................................3, 4

26
*In re Pac. Enter. Sec. Litig.*, 47 F.3d 373  (9th Cir. 1995)........................................................................10

27
*In re Polyurethane Foam Antitrust Litig.*, 2016 WL 320182 (N.D. Ohio Jan. 27, 2016)...........................7

28
*In re Prudential Insurance Company of America Sales Litigation*, 148 F.3d 283 (3d Cir. 1998) .........11, 12, 17

1   *In re Wash. Pub. Power Sup. Sys. Lit.,* 19 F. 3d 1291 (9th Cir. 1994) ..........................................23

2   *In re Weatherford Int'l Sec. Litig.,* 2015 U.S. Dist. LEXIS 3370 (S.D.N.Y. Jan. 5, 2015) ..........7

3   *Interstate Circuit, Inc. v. United States,* 306 U.S. 208 (1939) ..........................................23

4   *J.W. v. City of Oxnard,* 2008 WL 4810298 (C.D. Cal. Oct. 27, 2008)..........................................17

5   *Kremer v. Chem. Constr. Corp.,* 456 U.S. 461 (1982)..........................................19

6   *Local Union No. 490 v. Kirkhill Rubber Co.,* 367 F.2d 956 (9th Cir. 1966..........................................22

7   *Lola v. Skadden, Arps, Slate, Meagher, & Flom LLP,* 2015 WL 4476828 (2d Cir. July 23, 2015)..............6

8   *Lopez v. San Francisco Unified Sch. Dist.,* 385 F. Supp. 2d 981 (N.D. Cal. 2005)..........................................3

9   *Loretz v. Regal Stone Ltd.,* 756 F. Supp. 2d 1203 (N.D. Cal. 2010) ..........................................10

10  *Meredith Corp. v. SESAC LLC,* 87 F.Supp.3d 650 (S.D.N.Y. 2015)..........................................12

11  *Monterrubio v. Best Buy Stores, LP,* 291 F.R.D. 443 (E.D. Cal. 2013) ..........................................2

12  *Navarro v. Gen. Nut. Corp.,* 2004 WL 2648373 (N.D. Cal. Nov. 19, 2004)..........................................6

13  *Navarro v. Gen. Nut. Corp.,* 2005 WL 2333803 (N.D. Cal. Sept. 22, 2005) ..........................................2, 3, 5

14  *Norton v. Sup. Ct.,* 24 Cal. App. 4th 1750 (1994)..........................................25

15  *Rissetto v. Plumbers and Steamfitters Local 343,* 94 F. 3d 597 (9th Cir. 1996)..........................................15

16  *Sartor v. Ark. Nat. Gas Corp.,* 321 U.S. 620 (1944)..........................................22

17  *Stolt-Nielsen, S.A. v. United States,* 442 F.3d 177 (3d Cir. 2006) ..........................................12

18  *United States v. $31,697.59 Cash,* 665 F.2d 903 (9th Cir. 1982)..........................................15

19  *United States v. Hinkson,* 585 F.3d 1247 (9th Cir. 2009) (en banc) ..........................................2

20  *Vichi v. Koninklijke Philips Elec., N.V.,* 85 A.3d 725 (Del. Ch. 2014)..........................................19, 21

21  *Washington Public Power System Securities Litigation,* 779 F. Supp. 1056 (D. Ariz. 1991) ..........................................10

22  *Young v. Covington & Burling LLP,* 846 F. Supp. 2d 141 (D.D.C. 2012)..........................................6

23  **Statutes**

24  28 U. S. C. § 1738..........................................19

25  ACPERA, Pub. L. No. 108-237, 118 Stat. 661 (June 22, 2004) ..........................................13

26  Miss. Code Ann. § 75-21-9 (2015)..........................................9

27

28

**Other Authorities**

Noam Scheiber, *The Last Days of Big Law*, THE NEW REPUBLIC (July 21, 2013) ....................................6

Theodore Eisenberg & Geoffrey Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. Empirical L. Stud. 248 (2010) ..........................................................................8

**Rules**

Fed. R. Civ. P. 23 ..................................................................................................................................5

Fed. R. Civ. P. 23, 2003 Advisory Committee Notes .........................................................................5

Fed. R. Civ. P. 53 ..................................................................................................................................2

Fed. R. Evid. 803 ................................................................................................................................20

N.D. Cal. Civ. L. R. 54-5 ......................................................................................................................2

**Treatises**

Albert A. Foer & Rand Stutz, eds. *Private Enforcement of Antitrust Law in the United States* (2012) ........13

Alba Conte, 1 *Attorney Fee Awards* .......................................................................................... 10, 11

## **INTRODUCTION**

Significant errors pervade the Special Master's Report and Recommendation. At least **20** firms failed to make a *prima facie* case for their requested fees, including **6** firms that failed to provide skill and experience information for ***any*** attorney. At least some of those omissions appear to have been intentional efforts to hide the use of contract attorneys for whom fees were sought at associate rates, including some for which a **1000+%** markup is sought. IPP Counsel even seek to further inflate through a multiplier. In responding to Mr. St. John's objection on these points, the Special Master reversed the applicable burden, concluding that Mr. St. John had not justified reducing the claimed billing rates. That was legal error and an abuse of discretion.

The recommended fee award—30% of the entire settlement fund, totaling over $173 million—is a significant outlier. In order to justify that award, the Special Master undersold serious defects in IPP Counsel's conduct of the litigation. Those defects include being forced to with claims in the face of a Rule 11 motion, having claims by Massachusetts class members dismissed with prejudice due to IPP Counsel's uncorrected pleading failures, having Judge Walker recommend that lead counsel be "augmented" to facilitate settlement, and entering settlement agreements that are inconsistent with the earlier Chunghwa settlement. Despite those missteps, the Special Master accepted IPP's claim of white shoe rates and further increased those rates by a multiplier. The Special Master did so despite case law suggesting that the factors typically supporting a multiplier are already included in already-high white shoe rates.

Finally, the Special Master found that Chunghwa's early settlement and cooperation, Samsung SDI's guilty plea, and a European Commission Decision assessing over $1.9 billion in fines against the defendants for conduct that Judge Conti found "indisputably overlaps" the conduct at issue here had no impact on settlement value. That conclusion defies common sense, and can only be reached through a deference to IPP Counsel's assertions that the Ninth Circuit has indicated is inappropriate in the conflicted context of fee awards.

**STANDARD OF REVIEW**

Absent a contrary stipulation by the parties, "[t]he court must decide de novo all objections to findings of fact made or recommended by a master . . . ." Fed. R. Civ. P. 53(f)(3); *see also* Order (D.E. 4298) at 3. "The court must decide de novo all objections to conclusions of law made or recommended by a master." Fed. R. Civ. P. 53(f)(4).

The Ninth Circuit reviews a district court's award of fees and costs to class counsel for abuse of discretion. *In re Bluetooth Headset Prods. Liability Litig.*, 654 F.3d 935, 940 (9th Cir. 2011). The underlying findings of fact are reviewed for clear error. *Id.* Whether the district court applied the correct legal standard in awarding fees is reviewed de novo. *Class Plaintiffs v. Jaffe & Schlesinger, PA*, 19 F. 3d 1306, 1308 (9th Cir. 1994); *see also United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc) ("[T]he first step of our abuse of discretion test is to determine de novo whether the trial court identified the correct legal rule to apply to the relief requested. If the trial court failed to do so, we must conclude it abused its discretion.")

**ARGUMENT**

I.   **IPP COUNSEL FAILED TO MAKE A PRIMA FACIE CASE FOR A SIGNIFICANT PORTION THEIR REQUESTED FEES, AND ANY AWARD MUST BE REDUCED ACCORDINGLY.**

A.   **At least 20 firms failed to make a *prima facie* case for their requested fees, including 6 firms that failed to provide skill and experience information for *any* attorney.**

As fee applicants, IPP Counsel bore the burden of "produc[ing] satisfactory evidence — in addition to [their] own affidavits — that the requested rates are in line for those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stephenson*, 465 U.S. 886, 895 n.11 (1984); *see also Monterrubio v. Best Buy Stores, LP*, 291 F.R.D. 443, 459 (E.D. Cal. 2013) (quoting *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008)); *Navarro v. Gen. Nut. Corp.*, 2005 WL 2333803, at *7-9 (N.D. Cal. Sept. 22, 2005). Consistent with that burden, this Court's local rules expressly require fee motions to "be supported by declarations or affidavits containing . . . [a] brief description of relevant qualifications and experience" for each attorney for whom fees are claimed. N.D. Cal. Civ. L. R. 54-5(b).

Here, at least **20** firms seek fees for attorneys for whom they provide no experience, skill, and reputation information. Of those, **6** firms did not provide background information for ***any*** attorney.[1,2] The Special Master's acceptance of rates of up to $875 per hour in calculating a fee award for attorneys for whom no background information was provided has no support in the record, and was therefore clearly erroneous. *E.g.*, *In re Mercury Interactive Sec. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010) ("A district court abuses its discretion if . . . the record contains no evidence on which it rationally could have based its decision."); *see also Darensburg v. Metro. Transp. Com'n*, 636 F. 3d 511, 522 (9th Cir. 2011) (finding clear error: "Plaintiffs' data is insufficient to . . . permit a court to reach either conclusion.").

For timekeepers for whom IPP Counsel failed to provide background information, the Court has no basis to award anything other than a minimal fee. *See Navarro v. Gen. Nut. Corp.*, 2005 WL 2333803, at *10 (N.D. Cal. Sept. 22, 2005) (awarding minimal hourly rate where fee applicant failed to provide education, litigation experience, skill, or reputation information); *Lopez v. San Francisco Unified Sch. Dist.*, 385 F. Supp. 2d 981, 990, 992 (N.D. Cal. 2005) (awarding the lowest rate sought due to the absence of background information to distinguish timekeepers). An across-the-board reduction is therefore appropriate.

---

[1]     Firms that did not submit background information for any of their attorneys: Lovell, Stewart, Halebian and Jacobson LLP; Milberg LLP; Frankovitch, Anetakis, Colantonio & Simon; Kirkpatrick & Goldsborough; McCallum, Hoaglund, Cook & Irby LLP; Wyatt & Blake LLP.

[2]     Firms that did not submit background information for some of their attorneys: Trump Alioto, Trump & Prescott LLP; Zelle Hofmann Voelbel & Mason LLP; Straus & Boies, LLP; Green & Noblin, P.C.; Andrus Anderson LLP; Fine, Kaplan and Black RPC; Miller Law LLC; Law Offices of Sherman Kassof; Goldman, Scarlato, Karon & Paenny P.C.; Glancy, Prongay & Murray LLP; Karon LLC; Mansfield, Tanick, & Cohen PA / Foley & Mansfield PLLP; McManis Faulkner; Whitfield Bryson & Mason Mason LLP.

**B.**  **The Special Master clearly erred in recommending that IPP Counsel receive $350-$400/hour i.e., a 1000+% markup, plus a multiplier for contract attorneys for whom no skill or experience information was provided**.

      **1.**  **IPP Counsel mislabeled contract attorneys as associates and selectively omitted information on their skill and experience.**

A number of IPP Counsel firms oddly submitted skill and experience information for some attorneys, while omitting that information for others. In at least some cases, the attorneys for whom information was omitted were labelled "associates" in IPP Counsel's fee application, but were actually contract attorneys. Mr. St. John identified lead counsel's firm, Trump, Alioto, Trump & Prescott LLP ("TATP") as an example. TATP submitted skill and experience information for three attorneys, but failed to provide that information for ten attorneys labelled as "associates" in their fee application. *See* Alioto Dec. (D.E. 4073-1). Mr. St. John determined that at least two of those "associates" were actually contract attorneys, and TATP subsequently conceded as much vis-à-vis all ten. *See* Alioto Dec. (D.E. 4373-1) at ¶ 18. The example of TATP contract attorney Natalia Kabsakalian suggests that the mislabeling and selective omission was a conscious and organized effort: she apparently worked as a contract attorney for three IPP Counsel firms, but she was improperly identified as an associate by each of those firms, with none providing information on her skill and experience. *See* Alioto Dec. (D.E. 4073-1); Karon Dec. (4073-15); Karon Dec. (4073-27).

      **2.**  **Awarding $350-$400 per hour for work performed by IPP Counsel's contract attorneys would be an abuse of discretion.**

Having failed to make a prima facie case for fees with its motion, TATP submitted resumes for the ten contract attorneys identified by Mr. St. John with its opposition. IPP Counsel then asserted that "[m]ost of the contract attorneys hired to work on this case were fluent in Chinese, Japanese or Korean," an otherwise unsupported claim that the Special Master adopted verbatim as the apparent basis for awarding $350-$400/hour for their work. *Compare* R&R (D.E. 4351) at 73 *with* Alioto Dec. (D.E. 4373-1) at ¶ 18. The Special Master's analysis on this issue is replete with errors, including improperly placing the burden of justifying fees on Mr. St. John.

*First*, the Special Master's consideration of TATP's tardy resumes—part of IPP Counsel's prima facie case for fees that should have been publicly filed with their original motion—was legal error. Fed. R. Civ. P 23(h); *see also, e.g.*, *In re Mercury Interactive*, 618 F.3d at 993 (finding legal error and

1   potential due process violation where absent class members were not provided complete fee motion

2   and supporting materials in advance of objection deadline); Fed. R. Civ. P. 23, 2003 Advisory

3   Committee Notes ("In setting the date objections are due, the court should provide sufficient time

4   after the **full fee motion** is on file to enable potential objectors to examine the motion."(emphasis

5   added)).

6       *Second*, there is no reason to believe that the resumes submitted by TATP are representative

7   of the unknown number of mislabeled contract attorneys for whom IPP Counsel claim white shoe

8   rates. *See Darensburg*, 636 F.3d at 522 (finding clear error and an abuse of discretion where district

9   court's inference was based on an inappropriate statistical measure). Indeed, Mr. St. John submitted

10  evidence that one of the contract attorneys for whom IPP Counsel seek $350/hour was a recent and

11  undistinguished graduate of an undistinguished law school who had no substantive legal experience.

12  J. St. John Obj. Dec. Ex. 2-1. The Special Master simply ignored that evidence.

13      *Third*, despite IPP Counsel's failure to submit background information for their contract

14  attorneys, the Special Master concluded that "there is not the slightest justification to downgrade

15  [the claimed] billing rates." R&R (D.E. 4351) at 73. In doing so, he misplaced the applicable burden.

16  The burden is not on Mr. St. John to demonstrate a "justification to downgrade [the claimed] billing

17  rates." The burden is on IPP Counsel—as the fee applicants—to justify those rates. *E.g.*, *Navarro*,

18  2005 WL 2333803, at *8 ("[I]t is clearly established in the Ninth Circuit that it is the applicant's

19  burden to produce specific evidence . . . that the requested rates are in line with those prevailing in

20  the community for lawyers with comparable skill and reputation. The burden does not shift to [an

21  opponent] to produce rebuttal evidence unless and until Plaintiff meets her initial burden."). By

22  failing to submit the skill and experience information that the law and Local Rule 54-5(b) require,

23  IPP Counsel failed to meet their burden of justifying the very high claimed rates. *See id.* at *10.

24      Notably, the $350-$400/hour sought for IPP Counsel's contract document reviewers is

25  significantly higher than the rates of junior associates at some of the white shoe law firms that IPP

26  Counsel suggest as comparables. For example, IPP Counsel's fee expert identifies the "lowest

27  associate" rate at Covington & Burling LLP as $230/hour, at Kirkland & Ellis LLP as $235/hour,

28  and at Morrison & Foerster LLP as $230/hour, in each case for 2013. Pearl Dec. (D.E. 4071-15) at

31, 34, 35. More to the point, there no reason to believe that associates at such firms are "lawyers of reasonably comparable skill, experience, and reputation" vis-a-vis the contract document reviewers hired by IPP Counsel. The only indication in the record of the market rate for undifferentiated contract attorneys in the Bay Area is the $47-$125 cited by Mr. St. John. *See* St. John Obj. (D.E. 4106) at 22 (citing *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 970 (N.D. Cal. 2014) (noting rates of $47 and $59 per hour for contract attorneys) and *Apple, Inc. v. Samsung Elec. Co.*, 2012 U.S. Dist. LEXIS 160668 at *26 Table (N.D. Cal. Nov. 7, 2012) (noting rate of $125 per hour for contract attorneys)). [3, 4]

### 3. The record and public policy support reducing IPP Counsel's fee request by at least 15% to account for their mislabeling of contract attorneys and their failure to supply skill and experience information.

IPP Counsel are seeking markups in excess **1000%** over the $25-$30/hour that they paid contract document reviewers, which they seek to further increase by use of a multiplier. *Compare* Kassof Dec. (D.E. 4073-14) (seeking $350/hour) *with* J. St. John Obj. Dec. Ex. 2 at ¶ 11 (same contract attorney was paid $25-$30/hour). Courts have repeatedly rejected attempts by class counsel

---

[3]    "Lawyers at an elite firm . . . have typically spent their lives amassing intellectual credentials. They are high-school valedictorians and graduates of elite universities, with mantles full of Latin honors. They have made law review at top law schools and clerked for federal judges." Noam Scheiber, *The Last Days of Big Law*, THE NEW REPUBLIC (July 21, 2013). Such white-shoe attorneys simply are not "lawyers of reasonably comparable skill, experience and reputation" for attorneys whose legal experience consists of performing document review for a year or two after graduating from an undistinguished law school. *See, e.g., Lola v. Skadden, Arps, Slate, Meagher, & Flom LLP*, No. 14-3845, 2015 WL 4476828, at *6 (2d Cir. July 23, 2015) (applying North Carolina law: document review may not constitute the practice of law); *Young v. Covington & Burling LLP*, 846 F. Supp. 2d 141, 147-48, 155 (D.D.C.  2012) (describing the lesser qualifications and responsibilities of "staff attorneys" performing document review as compared to associates); *cf. Navarro v. Gen. Nut. Corp.*, 2004 WL 2648373, at *4 (N.D. Cal. Nov. 19, 2004), *reviewed-in-part de novo* 2005 WL 2333803 (N.D. Cal. Sept. 22, 2005) (rates of opposing counsel "are evidence of th[o]se attorneys' own skill, experience, and reputation, and say little about" the appropriate rate for the fee applicant).

[4]    The testimony of IPP Counsel's proffered fee expert, Richard Pearl, has previously been found "irrelevant" because he made the basic mistake of relying on rates for non-comparable attorneys from the wrong locality. *Gauchat-Hargis v. Forrest River, Inc.*,2013 WL 4828594,at *9-10 (E.D. Cal. Sept. 9, 2013) (cutting $700/hour rate advocated by Mr. Pearl to $300); *see also Antoninetti v. Chipotle Mex.Grill, Inc.*, 2012 WL 2923310, at *6 (S.D. Cal. July 17, 2012) (cutting requested rate from $620 to $375; Mr. Pearl's declaration does not "introduce evidence supporting Plaintiff's contention that the requested rates are the prevailing rates in San Diego for ADA and CDPA lawsuits brought by lawyers of similar skill and experience."). To the extent Mr. Pearl suggests that contract attorneys with no substantive legal experience are comparable to mid-level associates at white shoe firms, he is repeating the same basic error.

to bill the class hundreds of dollars per hour for contract attorneys. *E.g., In re Beacon Assocs. Litig.*, 2013 WL 2450960, at *18 (S.D.N.Y. May 9, 2013) ("[T]here is absolutely no excuse for paying those temporary, low-overhead [contract attorneys] $40 or $50 an hour and then marking up their pay ten times for billing purposes."); *see also In re Weatherford Int'l Sec. Litig.*, 2015 U.S. Dist. LEXIS 3370, at *5 (S.D.N.Y. Jan. 5, 2015) (noting lack of persuasive evidence justifying over 600% markup of "staff attorney" rates to $375-$395 per hour). One court recently noted that class counsel's markup of contract attorney rates gave the court "the greatest concern" vis-à-vis the fee petition, and accordingly cut the requested fees by 12%. *In re Polyurethane Foam Antitrust Litig.*, 2016 WL 320182, at *22 (N.D. Ohio Jan. 27, 2016).

This Court need not enter the fray on unreasonable markups for work performed by contract attorneys. IPP Counsel's failure to meet their burden of supplying skill and experience information for those contract attorneys gives the Court a more-than-adequate basis to deny the requested fees of $350-$400/hour. If TATP is awarded the low-end of the undifferentiated contract attorney rate, i.e. $47 per hour, its lodestar will be reduced by $2.61 million, i.e., about 16.6%. Taking TATP as an example, Mr. St. John respectfully submits that a 15% across-the-board deduction from IPP Counsel's fee request would adequately account for IPP Counsel's failure to submit information necessary for their prima facie case. Doing so would be consistent with the 12% cut recently applied in the *Polyurethane Foam* litigation. It would also be consistent with the public policy of responding to excessive or unsupported fee requests with a "severer reaction," *Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980), rather than permitting attorneys to submit fee motions on a "heads we win, tails we try again" basis, *see, e.g., First State Ins. Grp. v. Nationwide Mut. Ins.*, 402 F.3d 43, 43 (1st Cir. 2005).

## II.      THE RECOMMENDED FEE AWARD IS EXCESSIVE.

There is no doubt that awarding 30% of the settlement fund, i.e., over $173 million, would be an outlier in cases of this size. The Special Master implicitly acknowledged as much. *See* R&R (D.E. 4351) at 69. Indeed, in a study of 689 common fund cases reported between 1993 and 2008, in the highest decile of recoveries analyzed, i.e., the 68 cases with recoveries greater than $175.5 million, the mean fee percentage was 12.0% and the median fee percentage was 10.2%. Theodore

1    Eisenberg & Geoffrey Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J.

2    Empirical L. Stud. 248, 265 Table 7 (2010). The facts of this case—which benefitted from the

3    efforts of the DOJ and foreign antitrust authorities and settled before summary judgment rulings

4    were issued—do not support the outlying award recommended by the Special Master.

5         **A.      IPP Counsel made multiple errors in pursuing this litigation**.

6         The Special Master noted that there are "troublesome issues" with IPP Counsel's

7    performance, but he ultimately concluded that those issues do not warrant a downward adjustment

8    to IPP Counsel's fee request. R&R (D.E. 4351) at 60, 66. The Special Master's conclusion

9    significantly undersells the problems identified by various objectors.

10        *First*, IPP Counsel were forced to withdraw a significant portion of IPP's claims in the face

11   of a Rule 11 motion. *See* Alioto Dec. (D.E. 4071-1) at ¶¶ 22-24. They nevertheless seek fees for

12   those efforts

13        *Second*, claims for Massachusetts class members were dismissed with prejudice because IPP

14   Counsel failed to plead compliance with a statutory predicate, despite the Court giving them an

15   opportunity to do so. *See* R&R (D.E 4351) at 39-40. Those claims are now valueless because the

16   statute of limitations has expired. *Id.* at 40. But the claims were dismissed only because of IPP

17   Counsel's negligence. As a result, overall settlement value was reduced, and Massachusetts class

18   members will likely receive no compensation for the harm they suffered.

19        *Third*, in what was effectively a vote of no confidence, retired Judge Vaughan Walker (acting

20   as Special Master), recommended that lead counsel "be augmented" by "appointment of a

21   committee of IPP Counsel" "so that adequate attention and effort can be devoted to settlement."

22   R&R (D.E. 3200) at 4-5.

23        *Fourth*, shortly following Judge Walker's recommendation, IPP Counsel entered settlements

24   with class definitions that are facially inconsistent with the already-approved Chunghwa settlement

25   class, thereby complicating and delaying resolution of this case. *See* R&R (D.E. 4351) at 41-46.

26        *Fifth*, in what is—to IPP Counsel—the most important part of the case, i.e., the part where

27   they get paid, IPP Counsel failed to make a prima facie case for a significant part of their requested

28   fees. *See* Part I, *supra*. They then responded to Mr. St. John's challenge to a large portion of their fees

with an inadmissible declaration by lead counsel rather than developing an evidentiary record. *See* Part III, *infra.*

Such procedural and evidentiary failures should not be viewed in isolation. Rather, they should be viewed as illustrative examples of IPP Counsel's litigation conduct that are visible to the Court. The most reasonable inference is that the class could have had greater success at lower cost if IPP Counsel were better-performing.[5]

**B.      Even assuming that the quality of representation was high, the litigation was handled efficiently, the case was exceptionally complex, and the results were extraordinary, those facts are already accounted for in the white-shoe rates sought by IPP Counsel, such that little or no multiplier is appropriate.**

The Special Master concluded that the settlement amount and the complexity of the case support an upward adjustment in IPP Counsel's fees. R&R (D.E. 4351) at 59, 60. He also suggests that the results justify the corresponding lodestar multiplier. *Id.* at 74. But IPP Counsel claim very high "reasonable hourly rates" of up to $1,250 per hour, with no less than **36** lawyers claiming rates of $700 per hour or more. *See, e.g.*, Scarpulla Dec. (D.E. 4069) at ¶ 7. IPP Counsel's proffered expert, Mr. Richard Pearl, compares the claimed hourly rates to similar—but frequently lower—rates charged by the nation's premier white shoe law firms. Pearl Dec. (D.E. 4071-15) at ¶ 34. Clients do not retain such firms—or pay those rates—with the expectation of obtaining anything less than extraordinary results in exceptionally complex cases.

---

[5]      Those examples bring into sharp focus the not-particularly-extraordinary results of this case: settlements amounting to only 20% of untrebled damages, and only about 25% greater than the statutory penalties in the small state of Mississippi alone. To wit: Mississippi law permits a party injured by a violation of its antitrust laws to "recover all damages of every kind sustained by him or it and in addition a penalty of five hundred dollars," and the "penalty may be recovered in each instance of injury." Miss. Code Ann. § 75-21-9 (2015). The 2000 U.S. Census enumerated 1,046,434 households in Mississippi. J. St. John Dec. Ex. 21 (D.E. 4108-21) at 4. Environmental regulators have estimated the lifespan of a CRT TV at 6-7 years. *Id.* Ex. 18 (D.E. 4108-18) at 4. And IPPs successfully asserted that "defendants controlled approximately 90% of the CRT commerce worldwide" such that "approximately 9 out of every 10 finished CRT products sold in the United States contained a CRT made by one of the defendants or their co-conspirators . . . ." R&R (D.E. 1742) at 15, *adopted in full* (D.E. 1950) at 2. Accepting those statistics, and inferring from the CRT TV's limited lifespan that household with TVs purchased at least one CRT TV during the class period, defendants were potentially liable for over $462 million (1,046,434 x 0.982 x 0.9 x $500) in statutory penalties—plus actual damages—in Mississippi alone. That estimate obviously does not include the impact of households that purchased multiple TVs, households that purchased a computer monitor, or CRT TVs and computer monitors purchased by businesses.

The problem with using a results multiplier on white shoe rates was cogently addressed in *Washington Public Power System Securities Litigation*, 779 F. Supp. 1056 (D. Ariz. 1991), *affirmed in relevant part and vacated on other grounds* 19 F.3d 1291 (9th Cir. 1994). Noting that the plaintiffs' counsel in that case "represent[ed] the highest echelon in the securities litigation bar" and "their stature is linked to past success," the court concluded that "[t]heir hourly rates necessarily reflect the same component." 779 F. Supp. at 1061-62. The court then explained that "[c]ommensurate with their skill and reputation comes an expectancy of results that exceed average levels." *Id.* at 1062. Those "[c]ounsel demand and receive the highest fees *because* they obtain extraordinary results." *Id.* (emphasis in original). And because "[t]hose very fees formed the basis of [the] court's lodestar calculation," the court declined to award a results multiplier because the results did not "exceed the extraordinary." *Id.* The *Polyurethane Foam* court recently applied a similar analysis. 2016 WL 320182, at *21-22 (accepting high rates as reasonable "with the understanding that they are already "calculated to account for litigation risk"). This Court did as well in *Loretz v. Regal Stone Ltd.*, 756 F. Supp. 2d 1203, 1216 (N.D. Cal. 2010) (Conti, J.). It should do so again: IPP Counsel can have their white shoe rates or they can have their multiplier. A reasonable fee does not include both.

## III.   THE SPECIAL MASTER MADE MULTIPLE FACTUAL AND LEGAL ERRORS IN AWARDING FEES BASED ON THE SAMSUNG SDI AND PHILIPS SETTLEMENTS.

### A.   Fees can only be awarded based on the benefit conferred by class counsel, which does not include value attributable to the efforts of others.

"An attorney's right to common fund fees arises from equitable principles of restitution." *In re Coordinated Pretrial Proceedings*, 109 F.3d 602, 609 (9th Cir. 1997). Accordingly, "[n]umerous courts have concluded that the amount of the *benefit conferred* logically is the appropriate benchmark against which a reasonable common fund fee charge should be assessed." Alba Conte, 1 *Attorney Fee Awards* § 2.05, at 37. The benefit conferred is not, however, necessarily coextensive with the value of the settlement fund. *See, e.g.*, *In re Pac. Enter. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (suggesting that non-monetary benefit supported fee award). Rather, portions of the settlement fund attributable to the efforts of persons other than class counsel must be excluded from the calculation of any fee award.

---

The leading case on this issue is *In re Prudential Insurance Company of America Sales Litigation*, 148 F.3d 283 (3d Cir. 1998). The *In re Prudential* class action was litigated in parallel with a Multi-State Life Insurance Task Force examination of Prudential's sales practices. *Id.* at 292. The Task Force compiled a report and recommended a remediation plan. *Id.* at 291. "Forty-three states and the District of Columbia [then] signed a Consent Order adopting the Task Force Plan . . . ." *Id.* at 291-92. After extensive discovery, the class action settled. *Id.* at 294 & n.12, 319 & n.64. The class action settlement included significant improvements over the Task Force's remediation plan. *Id.* at 296-97. The district court awarded fees to class counsel based on the common fund doctrine, and it used the percentage-of-recovery method to set the amount of the award. *Id.* at 336. But the district court based its fee calculation on "the entire value of the settlement, including any portion which would have been provided to the class under the Task Force Plan." *Id.* at 330. That was error. *Id.* at 338. The Third Circuit explained that "[n]umerous courts have concluded that the amount of the benefit conferred logically is the appropriate benchmark against which a reasonable common fund fee charge should be assessed." *Id.* (quoting Conte, 1 *Attorney Fee Awards* § 2.05, at 37). The trial court was thus required to distinguish "benefits created by class counsel from the benefits created under the Task Force Plan." *Id.* That distinction "is especially crucial in consumer class actions where federal or state agencies . . . have conducted their own investigations of wrongdoing." *Id.*

The principle underlying *In re Prudential* was further elucidated in *In re Cendant Corp. PRIDES Litigation*, 243 F.3d 722 (3d Cir. 2001). In that case, the class action was filed after the defendant disclosed accounting irregularities, and it settled after less than nine months of litigation. 243 F.3d at 725. The Third Circuit found that the district court abused its discretion by awarding 5.7% of the common fund as fees, pointing to its warning in *In re Prudential* against overemphasizing class counsel's role in a recovery. *Id.* at 741. Indeed, the court emphasized that "Cendant's liability . . . had been conceded at the outset" of the controversy, and class counsel could not claim fees by freeriding on the efforts of others. *Id.* [6]

---

[6]    Government investigations may also impact the multifactor fee analysis. *See, e.g.*, *In re Auction Houses Antitrust Litig.*, 2001 WL 210697, at *3 (S.D.N.Y. Feb. 26, 2001) (awarding no multiplier because settlement was inevitable once defendant admitted conspiracy to DOJ).

**B.  The Special Master failed to account for the value of regulators uncovering the CRT conspiracies.**

IPP Counsel do not contest that they piggybacked on the efforts public regulators who actually uncovered the CRT price-fixing conspiracies. Nor can they: the initial complaint cited foreign and DOJ investigations in support of its allegations. Complaint (D.E. 1) at ¶ 94. Such piggybacking negatively impacts any fee award. *Compare In re Prudential*, 148 F.3d at 337 ("Allowing private counsel to receive fees based on the benefits created by public agencies would undermine the equitable principles which underlie the concept of the common fund, and would create an incentive for plaintiffs attorneys to minimize the costs of failure by free riding on the monitoring efforts of others.") *with Meredith Corp. v. SESAC LLC*, 87 F.Supp.3d 650, 670 (S.D.N.Y. 2015) (awarding 20.1% of $58.5 million fund: "[U]nlike in many class actions, the case against SESAC was not built on following, or piggybacking on, regulatory investigation or settlement."). The Special Master nevertheless failed to account for the value attributable to the DOJ's and European Commission's exposing the CRT conspiracies.

**C.  At least $10 million of the settlement fund is attributable to the efforts of the DOJ, not IPP Counsel.**

**1.  The $10 million Chunghwa settlement is almost entirely attributable to the efforts of the DOJ.**

Chunghwa was a participant in the DOJ Leniency Program, and there is no suggestion that the Chunghwa settlement was not directly attributable to Chunghwa's participation in that program. Indeed, Chunghwa's participation required a corporate admission of illegal anticompetitive conduct. *See Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177, 179 (3d Cir. 2006); *cf.* St. John Obj. (D.E. 4106) at 7 (citing authorities and noting that many of the state law claims at issue in this case directly parallel federal antitrust law with the exception of permitting suits by indirect purchasers). And "satisfactory cooperation" with civil plaintiffs was a statutory predicate for the limitation on civil liability that

Chunghwa received as a benefit of its participation. *See* ACPERA, Pub. L. No. 108-237, 118 Stat. 661, 666-67 § 213 (June 22, 2004). Early settlement with IPPs was the entirely foreseeable result.[7]

The Special Master reached no contrary conclusion. *See* R & R (D.E. 4351) at 57. His inclusion of the $10 million Chunghwa settlement in the benefit attributable to the efforts of IPP Counsel was thus without support. Indeed, the Chunghwa settlement is a quintessential example of a settlement attributable to the efforts of government investigators rather than IPP Counsel, such that IPP Counsel should receive only a *de minimis* fee for the formality of filing a complaint that could survive a motion to dismiss. *See In re Cendant Corp.*, 243 F.3d at 741 (finding award of 5.7% of the common fund excessive where liability was conceded at the outset).

> **2.      IPP Counsel should be judicially estopped from arguing that the Chunghwa settlement did not have additional, redounding benefit to the class.**

IPP Counsel sought to limit the impact of the Chunghwa settlement on the remainder of their fee request by denigrating the value of Chunghwa's cooperation. *See* IPP Response (D.E. 4373) at 10-11. But in asking this Court to approve the early, low-dollar Chunghwa settlement, IPP Counsel expressly represented that Chunghwa's "early cooperation ***proved invaluable***, as it gave Plaintiffs ***detailed*** information about the conspiratorial 'Glass Meetings,' including the identities of

---

[7]      As one treatise explained:

> In situations where the DOJ has brought a criminal indictment, or there is public information about an ongoing grand jury investigation with allegations of market collusion, early settlement strategies are easier to formulate. In that circumstance, often there is a cooperating defendant that has come forward to assist the government in its investigation in exchange for amnesty . . . . The amnesty recipient is often a ripe candidate for early settlement discussions, because the guilty plea will typically carry a collateral estoppel effect on liability as to the timing and products alleged by the DOJ.  * * * * Under ACPERA, an amnesty recipient is also given immunity from treble damages provisions of the federal antitrust laws. Accordingly, the "threat" of a large treble judgment as leverage in settlement negotiations is somewhat lessened. However, the negative value of this diminished leverage, along with potentially lower monetary recoupment, is usually more than offset by the tremendous advantages that can be obtained from cooperation . . . . Indeed, the main value of an early settlement with an amnesty applicant is usually the information provided to lay out a roadmap of whatever conspiracy or violation is alleged.

Albert A. Foer & Rand Stutz, eds. *Private Enforcement of Antitrust Law in the United States* § 12.04.1(A) (2012).

the participants, the time, place and agenda of such meetings, as well as the type of price-fixing agreements reached at such meetings." IPP Mot. Prelim. Approval (D.E. 884) at 1 (emphasis added). Notably, those representations were made in the past tense, indicating that IPP Counsel had received and evaluated Chunghwa's cooperation at the time IPP Counsel made them to the Court. Indeed, when IPP Counsel repeated those same representations in their Motion for Final approval, they clarified that Chunghwa "has agreed to provide (*and has provided*) Plaintiffs with *significant and valuable cooperation* in the prosecution of the case against the remaining defendants." IPP Mot. Final Approval (D.E. 1062) at 1, 5 (emphasis added). The Special Master nevertheless accepted IPP Counsel's convenient and *ipse dixit* assertion that "while it appeared in 2009 that the co-operation [from Chunghwa] might be of great help, circumstances changed as discovery progressed." R & R (D.E. 4351) at 57.

There is no question that IPP Counsel are now advocating a position wholly inconsistent with the position they advocated in seeking approval of the Chunghwa settlement. Moreover, in seeking approval of that settlement, IPP Counsel emphasized the "great weight" to which their opinion was entitled, and urged that "the trial judge . . . should be hesitant to substitute [his] own judgment for that of [class] counsel." IPP Mot. Final Approval (D.E. 1062) at 11. This Court approved the Chunghwa settlement as a result. Indeed, arguments made in IPP Counsel's motion were even incorporated by reference in the Court's approval order. *See* Order Granting Final Approval (D.E. 1105) at ¶ 7. IPP Counsel then took an early benefit from the Chunghwa settlement, obtaining a $2.5 million cash infusion to cover their expenses. *See* Order (D.E. 1334).

"Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position . . . ." *Baughman v. Walt Disney World Co.*, 685 F. 3d 1131, 1133 (9th Cir. 2012) (citation omitted). The purpose of this prohibition "is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *Id.* The facts here—where IPP Counsel emphasized the "great deference" owed their opinion and induced the Court to approve a low-dollar settlement based on their representations that the class was receiving additional value in the form of help in litigating the remaining claims—

1    present a strong case for judicial estoppel. *See, e.g.*, *Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.

2    3d 597, 606 (9th Cir. 1996) ("[H]aving obtained a favorable settlement based on her assertion that

3    she could not work, plaintiff was estopped from claiming that she was performing her job

4    adequately."). IPP Counsel should not be permitted to blow hot and cold, to the consistent

5    detriment of the class. That IPP Counsel accrued a $2.5 million benefit for themselves as a result of

6    the Chunghwa settlement reinforces the case for judicial estoppel.

       **D.   The Special Master clearly erred in concluding that Samsung SDI's guilty
              plea and the European Commission Decision had no impact on the
              settlement value of this litigation.**

9         There can be no serious doubt that the settlement value of this litigation was increased by

10   Samsung SDI's pleading guilty to a Sherman Act violation in connection with the CDT conspiracy,

11   as well as the European Commission's findings of anticompetitive conduct in the CRT industry. IPP

12   Counsel even titled a section of their certification brief "The Results of Numerous Government

13   Investigations Also Support the Existence of a Conspiracy," citing both the guilty plea and the

14   European Commission's investigation. Mem. ISO IPP Class Cert. (D.E. 1531) at 7. As detailed

15   below, the Special Master's conclusion that Samsung SDI's guilty plea and the European

16   Commission Decision had no meaningful impact on the settlement value of this litigation is factually

17   unsupported, and is inconsistent with Judge Conti's findings regarding discovery of the Commission

18   Decision. Rather, the real question is how to quantify the value of the benefit obtained by the class

19   as a result of those judgments.

       **1.   The Special Master's conclusions regarding the impact of the
              Samsung SDI settlement rely on legal errors and factual findings that
              are clearly erroneous, and he applied an incorrect standard in awarding
              IPP Counsel fees based on the entirety of the Samsung SDI settlement.**

22        There is no dispute that Samsung SDI pled guilty to violating the Sherman Act in

23   connection with the CDT conspiracy. That guilty plea is preclusive as to Samsung SDI's violation of

24   the Sherman Act. *See, e.g.*, *United States v. $31,697.59 Cash*, 665 F.2d 903, 906 (9th Cir. 1982); *City of

25   Burbank v. Gen. Elec. Corp.*, 329 F.2d 825, 834 (9th Cir. 1964). Indeed, IPP Counsel correctly argued

26   that "[the] guilty plea establishes the existence of the conspiracy . . . ." IPP Mot. (D.E. 3553)

27   (quoting *In re Auto. Parts Antitrust Litig.*, 2014 WL 1746121, at *7 (E.D. Mich. Apr. 30, 2014).

Moreover, Samsung SDI specifically admitted to participating "in a conspiracy . . . the primary purpose of which was to fix prices, reduce output, and allocate market shares of CDTs sold in the United States . . . ." J. St. John Dec. Ex. 10 (D.E. 4108- 10) at ¶ 4. Samsung SDI even admitted that it made sales of CDTs "directly affected by the conspiracy" to customers in the United States and that "[a]cts in furtherance of th[e] conspiracy were carried out within the Northern District of California." *Id.*

Despite these clear admissions, IPP Counsel urged that Samsung SDI's guilty plea "allowed Samsung SDI and other Defendants to argue that the conspiracy was much more limited in scope than IPPs alleged and, indeed, in many respects this fact emboldened Samsung to aggressively deny both its participation in the alleged conspiracy and the existence of any U.S. effects, right up through the eve of trial." IPP Reply (D.E. 4373) at 9-10. IPP Counsel have not identified a single brief in which defendants made such an argument. They instead rely only on the self-serving declaration of lead counsel. *See id.* The Special Master nevertheless uncritically accepted that argument, stating that IPP "[C]ounsel correctly notes that a DOJ prosecution of one defendant actually <u>helps</u> the other defendants who argue that their non-prosecution demonstrates their innocence." R & R (D.E. 4351) at 58 n.29 (emphasis in original). In the same stroke, the Special Master concluded that "[t]o suggest that the Samsung guilty plea meaningfully detracts from the quality of IPP [C]ounsel's efforts to produce the settlement is ludicrous." *Id.* at 57-58. Those conclusions are wrong on both the facts and the law.

*First*, neither the Special Master nor IPP Counsel grapple with the inadmissibility of DOJ's decision not to prosecute some of the corporate defendants. Turning to IPP Counsel's own words: "[A]s a general rule, evidence that criminal charges were not brought is inadmissible in a civil case arising out of the same events as the criminal charges." IPP Mot. Lim. (D.E. 3544) at 2 (quoting *Goffstein v. State Farm Fire & Casualty Co.*, 764 F.2d 522, 524 (8th Cir. 1985)). Neither IPP Counsel nor the Special Master identify any contrary legal authority.

*Second*, IPP Counsel's "limited prosecution" precept is contradicted by the record: the DOJ engagee in a broad prosecutorial effort targeting executives from Chunghwa, Samsung SDI, and LG Philips Display. Mem. ISO IPP Class Cert. (D.E. 1531) at 7-8; *see also* J. St. John Dec. Ex. 5 (D.E.

1   4108-5) & Ex. 9 (D.E. 4108-9). A prosecution is not limited simply because the government focused

2   its resources on individuals rather than pursuing every corporate defendant.[8]

3       *Third*, the Special Master's conclusion that Samsung SDI's guilty plea "did nothing to lessen

4   IPP's challenges to obtain class certification," R&R (D.E. 4351) at 57, is contradicted by IPP

5   Counsel's certification briefing, which expressly referenced that plea in the section titled "The

6   Results of Numerous Government Investigations Also Support the Existence of a Conspiracy,"

7   Mem. ISO IPP Class Cert. (D.E. 1531) at 7. The existence of a conspiracy—a fact preclusively

8   established by Samsung SDI's guilty plea—was even cited by IPP Counsel as an issue of common

9   proof warranting class certification. *Id.* at 15.

10       *Finally*, and most importantly, the standard for measuring an award of fees is ***not*** the value or

11   "quality of IPP Counsel's ***efforts***," as the Special Master implies. R&R (D.E. 4351) at 57-58. Rather,

12   the standard for awarding fees is the value of the ***benefit*** to the common fund directly attributable

13   to those efforts. *In re Prudential*, 148 F.3d at 338. Here, Samsung SDI's liability—as well as the

14   existence of the conspiracy and its U.S. impact—were conclusively established by the efforts of the

15   DOJ, not by any duplicative efforts of class counsel. That additional efforts by IPP Counsel may

16   have been necessary to take full advantage of that fact is beside the point. In calculating the value of

17   the benefits IPP Counsel provided to the class, the value of the DOJ's establishing Samsung SDI's

---

18

19       [8]    Turning to IPP Counsel's cogent arguments in a Motion in Limine (D.E. 3544):

20       The "decision not to prosecute is highly discretionary and demonstrates nothing more than
the opinion of the prosecutor . . . [which] has no probative value." *J.W. v. City of Oxnard*, 2008 WL
4810298, at *22 (C.D. Cal. Oct. 27, 2008). This stands to reason. "[P]rosecutorial discretion may

21   take into account many other factors not relevant in a civil suit." *Am. Home Assur. Co.* [*v. Sunshine
Supermarket, Inc.*, 753 F.2d 321, 325 (3d Cir. 1985)]. As explained in *Heckler v Chaney*, 470 U.S. 821,

22   831 (1985):

23       [A]n agency decision not to enforce often involves a complicated balancing of a
number of factors which are peculiarly within its expertise. Thus, the agency must

24       not only assess whether a violation has occurred, but whether agency resources are
best spent on this violation or another, whether the agency is likely to succeed if it
acts, whether the particular enforcement action requested best fits the agency's

25       overall policies, and, indeed, whether the agency has enough resources to undertake
the action at all. An agency generally cannot act against each technical violation of

26       the statute it is charged with enforcing.

27   In other words, the DOJ's motivations are unknown and its decision not to indict or otherwise
sanction certain of the Defendants tells us nothing about whether these Defendants participated in

28   the alleged price-fixing conspiracy.

liability must be subtracted from the overall value of the settlement fund. The Special Master's

refusal to do so—particularly to the extent based on application of an incorrect standard—was an

abuse of discretion.

        **2.**        **The Special Master's assigning zero value to the European Commission Decision and the subsequent issue preclusion holding in *Vichi* is illogical and is inconsistent with Judge Conti's findings.**

        **a)**        **The European Commission Decision**

The European Commission investigated the CPT and CDT conspiracies at issue in this

litigation, adopted initial findings regarding those conspiracies in a Statement of Objections, then

issued a comprehensive 340 page Commission Decision in 2012 assessing approximately $1.9 billion

in fines. A Summary of [the] Commission Decision was then issued in late 2013. J. St. John Dec. Ex.

15 (D.E. 4108-15). A redacted version of the full Commission Decision was made public on

December 5, 2014. J. St. John Dec. Ex. 16 (D.E. 4108-16). [9]

The Commission Decision repeatedly noted that the CRT conspiracies were global, and it

characterized the impact on Europe as a regional consequence. *E.g.*, J. St. John Dec. Ex. 16 (D.E.

4108-16) at ¶¶ 259, 271, 272, 302, 307, 314. Consistent with the global nature of the conspiracies,

the Commission made multiple references to agreements and price impacts in the American market.

For example, the Commission Decision noted that

> On 27 October 1999, Chunghwa, SDI, LGE, [CPT producers] met in Thailand. The participants ***agreed*** on the 14" and 20" CPT prices for five of their customers and ***agreed*** to maintain the current prices for the first quarter 2000. Furthermore, they discussed Europe and were happy to report of a "price-up trend in European & ***American market*** thanks to capacity reduction in Asia".

Id.at ¶ 290 (emphasis added); *see also, e.g., id.* at ¶¶ 268, 388, 439. Significantly for purposes of issue

preclusion, the global nature and impact of the conspiracies was actually litigated in the Commission

proceedings. *See id.* at ¶¶ 259, 262,268-69,471- 90. The Commission Decision was subsequently

affirmed on appeal vis-à-vis Samsung SDI, LG Electronics, and Philips.[10]

---

[9]    The Special Master appears to confuse a Summary of Decision issued in 2013 with the actual Commission Decision issued in 2012. *See* R & R (D.E. 4351) at 58.

[10]    *See* General Court of the European Union Press Release (with links to individual appellate judgments) available at http://curia.europa.eu/jcms/upload/docs/application/pdf/2015-09/cp150097en.pdf.

    **b)**  **The Commission Decision was found to be preclusive in *Vichi***

  In *Vichi v. Koninklijke Philips Elec., N.V.*, 85 A.3d 725 (Del. Ch. 2014), a multi-hundred million dollar fraud case in which Philips was a defendant, the Delaware Chancery Court held that the Commission Decision was preclusive as to*:*

  • [the] participation [of LG.Philips Displays Holdings B.V. ("LPD"), a joint venture between Philips Electronics and LG Electronics] in a CRT price fixing cartel;

  • the price fixing conduct of LPD and the CRT subsidiaries that preceded it; and

  • its determination that certain Philips N.V. CRT subsidiaries engaged in illegal price fixing before the formation of LPD.

85 A.3d 725, 783-84 & n. 370 (Del. Ch. 2014). Of course, the Delaware court's holding that the Commission Decision has issue preclusive effect may itself be preclusive. 28 U. S. C. § 1738; *see also Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 485 (1982).

    **c)**  **Judge Conti found the Commission Decision to be "relevant" and "important to this litigation," noting that the conduct at issue "indisputably overlaps".**

  Judge Conti twice addressed the relevance and importance of the Commission Decision. In March 2014, he found that the Commission Decision was "relevant because . . . plaintiffs' allegations in this case have always concerned the international character of the alleged CRT conspiracy . . . ." Order (D.E. 2463) at 5, 7. Then, in November 2014, Judge Conti found that "the Decision . . . remain[ed] important to this litigation," and despite the "extensive discovery [that] has taken place to date, the factual detail contained in the Decision is likely to be of significant value" to plaintiffs. Order (D.E. 3133) at 5. Indeed, Judge Conti found that "regardless of how the [European Commission] refers to the conspiracies in the Decision, the underlying conduct—price fixing in the CRT [sic] and CPT markets—***indisputably overlaps*** with the conduct at issue" in this litigation. *Id.* at 5 (emphasis added). In both orders, however, he declined to compel production of the non-public Commission Decision for reasons of international comity.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**d)   The Special Master's finding that the settlement value in this litigation was not impacted "in a meaningful way" by the Commission Decision is illogical and inconsistent with Judge Conti's findings made just <u>15 days</u> before the Decision issued.**

Despite Judge Conti's findings that the Commission Decision was "relevant" and "important to this litigation" because it proceeded from a theory identical to that urged by the plaintiffs and involved conduct that "indisputably overlaps" with the conduct at issue in this litigation, the Special Master concluded that the settlement in this case "was [not] generated in a meaningful way" by the Commission Decision. R & R (D.E. 4351) at 58. Once again, the Special Master's analysis is unmoored from the record and replete with errors.

*First*, the Special Master accepts IPP Counsel's wholly unsupported argument that "[t]he evidentiary value of a State of Objections is highly debatable." At least one federal court has accepted a Statement of Objections as substantive evidence of liability, and neither IPP Counsel nor the Special Master identify any authority to the contrary. *See In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 159, 180 (D. Conn. 2009) (holding that Commission "statement of objections" is admissible under Fed. R. Evid. 803(8)(C)). It is enough that precedent exists for admitting such findings and that sophisticated litigants—such as the defendants—would take that possibility into account in ascertaining settlement value. Moreover, the ***evidentiary*** value of a Statement of Objections says little about the ***preclusive*** value of the subsequent Commission Decision, which the Delaware Chancery Court did, in fact, find to be preclusive vis-a-vis the existence of the CRT conspiracy and Philips's involvement.

*Second*, after apparently confusing the Summary Decision with the Commission Decision, the Special Master suggests that the Commission Decision had limited value because it was not made public until December 5, 2014. R&R (D.E. 4351) at 58. Of course, that was a mere 15 days after Judge Conti had found the Commission Decision "remain[ed] important to this litigation" and was "likely to be of significant value . . . ." Order (D.E. 3133) at 5. Particularly in view of Judge Conti's findings, it is illogical to suggest that the settlement value of this litigation was not impacted by the publication of the Commission Decision. Indeed, it is noteworthy that after over 7 years of

litigation, Philips agreed to settle **34 days** after the Commission Decision became publicly available, and it did so for **6.5 times** its earlier settlement in the supposedly easier DPP action.

3. **The Samsung SDI guilty plea and the European Commission Decision account for $160 million of the settlement fund.**

a) **The Samsung SDI and Philips settlements account for a vastly disproportionate share of the settlement fund, and those settlements are at vastly higher multiples of the DPP settlements compared to other IPP settlements.**

In his objection, Mr. St. John pointed to the disproportionate size of the Samsung SDI and Philips settlements vis-à-vis their market shares as suggesting that the size of those settlements is attributable to factors other than IPP Counsel, i.e., Samsung SDI's guilty plea and the European Commission Decision, together with the preclusiveness holding in *Vichi*. In support, Mr. St. John attached two documents showing CRT market share data from the relevant time frame. One document was a report by the Oregon Department of Environmental Quality. J. St. John Dec. Ex. 18 (D.E. 4018-18). The other document was a presentation titled "Royal Philips Electronics Annual Results 2000." J. St. John Dec. Ex. 17 (D.E. 4108-17). That document was obtained directly from Philips. J. St. John Dec. (D.E. 4108) at ¶ 23 (internet link).

The Oregon report states that as of 1997, Philips was responsible for 5-10% of the CRT market and Samsung SDI was responsible for 10-15% of the CRT market. J. St. John Dec. Ex. 18 (D.E. 4018-18) at 8-9 & Table CRT8. The Philips presentation similarly indicates that as of 2001, Philips was responsible for 13% of the CRT market and Samsung SDI was responsible for 15% of the CRT market. *Id.* Ex. 17 (D.E. 4108-17) at 13. But the Philips and Samsung SDI settlements represent 69.3% of the total IPP settlement fund, i.e., a discrepancy of over 40% compared to their market shares as shown in the Oregon report and the Philips presentation. That discrepancy suggests that approximately 40% of the Samsung SDI and Philips settlements, i.e., approximately $160 million, is attributable to factors such as the guilty plea and the European Commission Decision.

Consistent with inflation of those settlements by factors exogenous to IPP Counsel's conduct of this litigation, the Samsung SDI and Philips settlements are also at a substantial premium vis-à-vis the settlements in the supposedly easier DPP action: five of the IPP settlements were for

multiples of 1.0 – 2.2 over the corresponding DPP settlements, and one was for a multiple of 4.0. In contrast, Philips's IPP settlement was **6.5** times its DPP settlement, and the Samsung SDI IPP settlement was **6.8** times its DPP settlement. Of course, the DPP settlements presumably took into account the differences in the strength of the cases against the various defendants as well as their differing market shares, leaving the outlier Philips and Samsung SDI multiples unexplained.

| DEFENDANT | DIRECT PURCHASERS | | INDIRECT PURCHASERS | | | |
|-----------|-------|--------|-------|--------|-----|-----|
| | DATE | AMOUNT | DATE | AMOUNT | % | M |
| Chunghwa | 04/08/2009 | $10,000,000 | 04/08/2009 | $10,000,000 | 1.7 | 1.0 |
| Philips | 02/01/2012 | $27,000,000 | 01/26/2015 | $175,000,000 | **30.3** | **6.5** |
| Panasonic | 06/04/2012 | $17,500,000 | 01/28/2015 | $70,000,000 | 12.1 | 4.0 |
| LG | 08/13/2012 | $25,000,000 | 05/28/2013 | $25,000,000 | 4.3 | 1.0 |
| Toshiba | 02/06/2013 | $13,500,000 | 03/06/2015 | $30,000,000 | 5.2 | 2.2 |
| Hitachi | 11/29/2013 | $13,450,000 | 02/19/2015 | $28,000,000 | 4.8 | 2.1 |
| Samsung SDI | 02/11/2014 | $33,000,000 | 04/01/2015 | $225,000,000 | **39.0** | **6.8** |
| Thomson | 02/06/2015 | $9,750,000 | 06/10/2015 | $13,750,000 | 2.4 | 1.4 |
| TOTAL | | $149,200,000 | | $576,750,000 | | |

       **b)**       **The Special Master abused his discretion by relying on Lead Counsel's hearsay review of unidentified sources to account for the disproportionate size of the Samsung SDI and Philips settlements.**

In attempting to overcome the evidence submitted by Mr. St. John, IPP Counsel submitted only a declaration by Lead Counsel Mario Alioto that "[b]ased upon [his] review, the Defendants' market shares changed fundamentally in the early 2000's . . . ." Alioto Supp. Dec. (D.E. 4373-1) at ¶ 6. But as Mr. St. John explained in his reply, declaration "[b]ased upon [Mr. Alioto's] review" of unidentified sources is not evidence based on Mr. Alioto's personal knowledge. It is no evidence at all. J. St. John Obj. Dec. Ex. 1 (citing *Local Union No. 490 v. Kirkhill Rubber Co.*, 367 F.2d 956, 958 (9th Cir. 1966) and *Sartor v. Ark. Nat. Gas Corp.*, 321 U.S. 620, 624-25 (1944)). The Special Master nevertheless quoted IPP Counsel unsupported briefing on this point, and pointed to the fact that

1   "[L]ead Counsel believes there was strong evidence of their conspiratorial activity within the U.S.,"

2   i.e., a fact admitted by Samsung SDI in connection with its guilty plea, before concluding that

3   "[t]hese factors account for the higher settlement amount." R&R (D.E. 4351) at 58. Such an

4   unsupported conclusion is an abuse of discretion. *E.g.*, *Darensburg*, 636 F. 3d at 522; *see also In re*

5   *Wash. Pub. Power Sup. Sys. Lit.*, 19 F. 3d 1291, 1302 (9th Cir. 1994) (discounting class counsel's

6   uncontroverted affidavits based on conflict with the class at the fee stage). Even were the Court to

7   accept Mr. Alioto's declaration, IPP Counsel's argument would still be lacking.

8        *First*, Mr. Alioto's declaration curiously provides market share data only from 2004, i.e., very

9   late in the class period, when the overall CRT market was in free fall. Alioto Supp. Dec. (D.E. 4373-

10  1) at ¶ 6. Uniquely, IPP Counsel appear to have historic market share data for the defendants. Order

11  (D.E. 1950) at 6 (noting Dr. Netz's finding that "collectively, Defendants had a ninety-percent

12  market share"); *compare* Netz Dec. (D.E.1527-1) at 36 & Exs. 1, 5, 10, 12 (discussing and illustrating

13  Defendants' combined market share throughout the class period) *with* Fee Mot. (D.E. 4071) at 17

14  (stating that "third party data providers of industry information, such as Display Search and iSupply,

15  no longer had data on the CRT industry"). Given IPP Counsel's unique access to that data, there is

16  significant evidentiary value in IPP Counsel's decision to proffer cherry-picked data points from late

17  in the class period rather than more complete market share data or defendant-specific damage

18  calculations. *E.g., Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226 (1939) ("The production of

19  weak evidence when strong is available can lead only to the conclusion that the strong would have

20  been adverse.").

21       *Second*, Mr. Alioto's declaration avers that "[t]he settlement amounts paid by Samsung SDI

22  and Philips are entirely consistent with their market shares and the liability evidence." Alioto Supp.

23  Dec. (D.E. 4373-1) at ¶ 6. But there is no dispute that the liability case against Samsung SDI and

24  Philips was stronger: Samsung SDI pled guilty to violating the Sherman Act, and it expressly

25  admitted to relevant U.S. activities and impact. *See* J. St. John Dec. Ex. 10 (D.E. 4108- 10) at ¶ 4.

26  And both Samsung SDI and Philips had been found by the European Commission to be

27  participants in the global CRT conspiracies, with an American court holding that at least some of the

28  Commission's findings were preclusive against Philips. Given that history, it would be problematic if

1   the Samsung SDI and Philips settlements were ***not*** larger than the other settlements. But it does not

2   follow that IPP Counsel can obtain fees based on the increased settlement value attributable to the

3   efforts of the DOJ and the European Commission.

4          *Third*, given that the DPP settlements presumably took into account the defendants differing

5   market share and the variations in liability evidence that are properly attributable to plaintiffs'

6   counsel, Mr. Alioto's averments do nothing to explain the much larger multiples of the Samsung

7   SDI and Philips settlements over their corresponding DPP settlements as compared to the other

8   defendants. The timing of those larger settlements—each about a month after the European

9   Commission Decision became public, after more than 7 years of litigation—indicates that the

10  Commission Decision was a significant factor. [11]

11  **IV.    THE SETTLEMENT SHOULD BE APPROVED, WITH THE COST OF
12          RESOLVING ISSUES RELATED TO THE INCONSISTENT CHUNGHWA
        SETTLEMENT DEDUCTED FROM CLASS COUNSEL'S FEE AWARD.**

13         The Special Master found that the terms of the approved Chunghwa settlement are

14  inconsistent with the later settlements and the plan of distribution proposed by IPP Counsel. *See*

15  R&R (D.E. 4351) at 41-46. He therefore recommended that the Court disapprove the proposed plan

16  of allocation. *Id.* at 46.

17         The Chunghwa settlement includes resellers who were not included in the settlement class

18  for the other settlements or in the proposed plan of allocation. The amount involved must be

19  relatively small—obviously less than the $5 million to be distributed from the Chunghwa

20  settlement—but any distribution to resellers would reduce the funds available for consumers.

21  Structuring the Chunghwa settlement as a separate distribution is undesirable: it would increase

22  administrative costs, again reducing the funds available for consumers. And any additional notice

23  program would delay distribution of the settlement funds.

24         Given the relatively small amount of money involved, the need to minimize administrative

25  costs, and the preference for expeditious distribution of settlement funds, Mr. St. John respectfully

26

27         [11]    The Special Master correctly did not rely on evidence submitted with IPP Counsel's
28  surreply, which Mr. St. John has moved to strike. *See* Objection to R&R (D.E. 4369).

suggests that the Court authorize prompt distribution of the settlement funds to consumer claimants, and deduct any reseller claims from IPP Counsel's fee award. That result is fair given that the issue arose only because IPP Counsel—the employment of whom absent class members had no say in—entered inconsistent settlement agreements. *Cf. Norton v. Sup. Ct.*, 24 Cal. App. 4th 1750, 1758 (1994) (noting that the measure of damages for attorney errors is the difference between what was recovered and what would have been recovered but-for the error). To the extent additional notice is required or administrative costs are incurred, those too should be deducted from IPP Counsel's fee award. *See* Manual for Complex Litigation, Fourth § 21.313 (regarding additional notice: "Those who made the misstatements should bear the cost of a notice to correct misstatements.").

**<u>CONCLUSION</u>**

Both courts and the public have expressed concern with the routine overcompensation of class action lawyers. On the facts of this case, the recommended fee award is excessive, and appropriate reduction is necessary.

Dated: February 12, 2016                    Respectfully submitted,

                                            /s/ Joseph Scott St. John

                                            ANDREA VALDEZ (Cal. Bar No. 239082)
                                            530 S. Lake Avenue, No. 574
                                            Pasadena, CA 91101
                                            Tel: (626) 817-6547
                                            andrea.valdez.esq@gmail.com

                                            JOSEPH SCOTT ST. JOHN (*pro hac vice*)
                                            514 Mockingbird Drive
                                            Long Beach, MS 39560
                                            Tel: 410-212-3475
                                            jscottstjohnpublic@gmail.com

                                            *Attorneys for Objector Douglas W. St. John*