# EXHIBIT 4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION )

No. 3:07-cv-05944-SC
MDL No. 1917

This Document Relates to:

ALL ACTIONS

ORAL ARGUMENT HEARING
San Francisco, California
Tuesday, January 5, 2016

Reported by:
SUZANNE F. BOSCHETTI
CSR No. 5111

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

______________________________
)
IN RE: CATHODE RAY TUBE )
(CRT) ANTITRUST LITIGATION )
______________________________) No. 3:07-cv-05944-SC
) MDL No. 1917
This Document Relates to: )
)
ALL ACTIONS )
______________________________)

ORAL ARGUMENT HEARING held before Special Master Martin Quinn, at JAMS, 2 Embarcadero Center, Suite 1500, San Francisco, California, beginning at 9:55 a.m. and ending at 1:17 p.m., on Tuesday, January 5, 2015, before SUZANNE F. BOSCHETTI, Certified Shorthand Reporter No. 5111.

APPEARANCES:

JAMS
BY: MARTIN QUINN, SPECIAL MASTER
2 Embarcadero Center, Suite 1500
San Francisco, California 94111
(415) 982-5267

For the Indirect Purchaser Plaintiffs Class:
TRUMP ALIOTO TRUMP & PRESCOTT, ATTORNEYS LLP
BY: MARIO N. ALIOTO, ESQ.
BY: LAUREN C. CAPURRO, ESQ.
2280 Union Street
San Francisco, California 94123
(415) 563-7200
marioalioto@tatp.com
laurenrussell@tatp.com

APPEARANCES (Continued):

FINE, KAPLAN AND BLACK, R.P.C.
BY: MATTHEW DUNCAN, ESQ.
BY: DONALD L. PERELMAN, ESQ.
1 South Broad Street, 23rd Floor
Philadelphia, Pennsylvania 19107
(215) 567-6565
mduncan@finekaplan.com
dperelman@finekaplan.com

FREEDMAN BOYD HOLLANDER GOLDBERG URIAS & WARD P.A.
BY: JOSEPH GOLDBERG, ESQ.
20 First Plaza, Suite 700
Albuquerque, New Mexio 87102
(505) 244-7520
jg@fbdlaw.com

KIRBY McINERNEY LLP
BY: ROBERT J. GRALEWSKI, JR., ESQ.
600 B Street, Suite 1900
San Diego, California 92101
(619) 398-4340
bgralewski@kmllp.com

APPEARANCES (Continued):

ZELLE HOFMANN VOELBEL & MASON LLP
BY: CRAIG C. CORBITT, ESQ.
BY: CHRISTOPHER T. MICHELETTI, ESQ.
44 Montgomery Street, Suite 3400
San Francisco California 94104
(415) 693-0700
ccorbitt@zelle.com
cmicheletti@zelle.com

STRAUS & BOIES, LLP
BY: NATHAN CIHLAR, ESQ.
4041 University Drive, Fifth Floor
Fairfax Virginia 22030
(703) 764-8700
ncihlar@straus-boies.com

MILBERG LLP
BY: PAUL F. NOVAK
719 Griswold, Suite 620
Detroit, Michigan 48226
(313) 309-1761
pnovak@milberg.com

Page 6

APPEARANCES (Continued):

KAG LAW GROUP
BY: SYLVIE K. KERN, ESQ.
2532 Lake Street
San Francisco California 94121
(415) 221-5763
sylviekern@yahoo.com

ANDRUS ANDERSON LLP
BY: JENNIE LEE ANDERSON (By telephone)
155 Montgomery Street, Suite 900
San Francisco, California 94114
(415) 986-1400
jennie@andrusanderson.com

BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER
BY: DANIEL E. BIRKHAUSER (By telephone)
2125 Oak Grove Road, Suite 120
Walnut Creek, California 94598
(925) 945-0200
dbirkhaeuser@bramsonplutzik.com

Page 7

APPEARANCES (Continued):

For Objecting IPPs:
COOPER & KIRKHAM, P.C.
BY: JOSEF COOPER, ESQ.
BY: TRACY KIRKHAM, ESQ.
BY: JOHN D. BOGDANOV, ESQ.
357 Tehama Street, 2nd Floor
San Francisco, California 94103
(415) 788-3030
jdc@coopkirk.com
trk@coopkirk.com

LAW OFFICES OF FRANCIS O. SCARPULLA
BY: FRANCIS O. SCARPULLA, ESQ.
BY: PATRICK CLAYTON, ESQ.
456 Montgomery Street, 17th Floor
San Francisco California 94104
(415) 788-7210
fos@scarpullalaw.com

Page 8

APPEARANCES (Continued):
For Excluded IPPs:
BONSIGNORE TRIAL LAWYERS, PLLC
BY: ROBERT J. BONSIGNORE, ESQ.
3771 Meadowcrest Drive
Las Vegas, Nevada 89121
(781) 350-0000
rbonsignore@classactions.us

For Objectors Rockhurst University, Harry Garavanian and Gary Talewsky:
THERESA D. MOORE, ATTORNEY AT LAW
BY: THERESA D. MOORE, ESQ.
One Sansome Street, 35th Floor
San Francisco, CA 94104
(415) 434-8900
tmoore@aliotolaw.com

For Objector Douglas St. John:
JOSEPH S. ST. JOHN, ATTORNEY AT LAW
BY: JOSEPH S. ST. JOHN, ESQ.
514 Mockingbird Lane
Long Beach, Mississippi 39560
(410) 212-3475
j.scott.stjohn.public@gmail.com

Page 9

APPEARANCES (Continued):

For Objectors John Finn and Laura Fortman:
THE KRESS LAW FIRM LLC
BY: JOHN KRESS, ESQ. (By telephone)
4247 South Grand Boulevard
St. Louis, Missouri 63111
(314) 631-3883
jckress@thekresslawfirm.com

STEVE A. MILLER, ATTORNEY AT LAW (By telephone)
1625 Larimer St., No. 2905
Denver, CO 80202-1539
sampco1@gmail.com

For Objector Sean Hull:
BANDAS LAW FIRM, P.C.
BY: CHRISTOPHER A. BANDAS, ESQ. (By telephone)
500 N. Shoreline Boulevard, Suite 1020
Corpus Christi, Texas 78401
(361) 698-5200
cbandas@bandaslawfirm.com

APPEARANCES (Continued):

For Hitachi Defendants:

KIRKLAND & ELLIS LLP
BY: ELIOT A. ADELSON, ESQ.
555 California Street
San Francisco California 94104
(415) 439-1313
eadelson@kirkland.com

For Samsung SDI Defendants:

SHEPPARD MULLIN RICHTER & HAMPTON LLP
BY: MICHAEL W. SCARBOROUGH, ESQ.
Four Embarcadero Center, 17th Floor
San Francisco California 94111-4109
(415) 434-9100
mscarborough@sheppardmullin.com

For Philips Defendants:

BAKER BOTTS LLP
BY: ERIK T. KOONS, ESQ.
BY: JOHN TALADAY, ESQ. (By telephone)
1299 Pennsylvania Avenue, NW
Washington, D.C. 40004-2400
erik.koons@bakerbotts.com
john.taladay@bakerbotts.com

APPEARANCES (Continued):

For Panasonic Defendants:

WINSTON & STRAWN LLP
BY: MARTIN C. GEAGAN, ESQ.
200 Park Avenue
New York, New York 10166
(212) 294-4615
mgeagan@winston.com

For Thomson Defendants:

FAEGRE BAKER DANIELS LLP
BY: KATHY L. OSBORN, ESQ. (By telephone)
300 N. Meridian Street, Suite 2700
Indianapolis, Indiana 46204
(317) 237-8562
kathy.osborn@faegrebd.com

For Toshiba Defendants:

WHITE & CASE LLP
BY: CHRISTOPHER M. CURRAN, ESQ. (By telephone)
BY: J. MARK GIDLEY, ESQ. (By telephone)
701 Thirteenth Street, NW
Washington D.C. 20005-3807
(202 )626-3609
ccurran@whitecase.com

APPEARANCES (Continued):

For Chunghwa Picture Tube Defendants:

GIBSON DUNN & CRUTCHER LLP
BY: RACHEL S. BRASS, ESQ. (By telephone)
555 Mission Street
San Francisco, California 94105--0921
(415) 393-8293
rbrass@gibsondunn.com

For the State of California:

DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
BY: EMILIO VARANINI, ESQ.
455 Golden Gate Avenue, Suite 11000
San Francisco California 94102-7002
(415) 703-5908
emilio.varanini@doj.ca.gov

APPEARANCES (Continued):

For Direct Purchaser Plaintiffs Class:

SAVERI & SAVERI, INC.
BY: GUIDO SAVERI, ESQ.
706 Sansome Street
San Francisco, California 94111
(415) 217-6810
guido@saveri.com

Also Present:

MARLA COHEN, ESQ.: Research Attorney

Page 14

San Francisco, California; Tuesday, January 5, 2016

10:09 a.m.

---o0o---

SPECIAL MASTER: Good morning. I'd like you to identify yourselves for my benefit if not the court reporter's. That would be good.

MR. ALIOTO: Good morning. Mario Alioto, lead counsel for the indirect purchasers.

SPECIAL MASTER: Okay. And everyone has to speak up, you know, without yelling at each other. But we have to almost yell at each other because we not only have to be sure Ms. Cohen and I hear, but the people on the phone have to hear.

MS. CAPURRO: Good morning, Your Honor. Lauren Capurro for the indirect purchaser plaintiffs.

MR. DUNCAN: Good morning, Your Honor. Matthew Duncan from Fine, Kaplan and Black in Philadelphia for the IPPs.

MR. GOLDBERG: Good morning, Mr. Quinn. My name is Joe Goldberg from Freedman Boyd Hollander Goldberg Urias & Ward in Albuquerque, New Mexico, for the IPPs.

SPECIAL MASTER: I was just there.

MR. GOLDBERG: So was I.

Page 15

MS. KIRKHAM: Good morning. Tracy Kirkham of Cooper & Kirkham on behalf of the objecting indirect purchaser plaintiffs.

MR. COOPER: Josef Cooper, the second half of the firm.

MR. SCARPULLA: Francis Scarpulla, Your Honor, from the Law Offices of Francis Scarpulla in San Francisco for the same objectors.

MR. BONSIGNORE: Robert Bonsignore on behalf of the excluded plaintiffs. Excuse me for yelling.

MR. ADELSON: Eliot Adelson of Kirkland & Ellis for Hitachi.

MR. SCARBOROUGH: Michael Scarborough of Shepard Mullin for the Samsung SDI defendants.

MR. KOONS: Erik Koons, Baker Botts, on behalf of Philips defendants.

MR. GEAGAN: Martin Geagan, Winston & Strawn, on behalf of the Panasonic defendants.

MR. CORBITT: Good morning, Your Honor. Craig Corbitt for the IPPs.

MR. CIHLAR: Nathan Cihlar from Straus & Boies for the IPPs.

MR. NOVAK: Paul Novak of Milberg for the IPPs.

MR. ST. JOHN: Joseph St. John for objector Douglas St. John.

Page 16

MS. MOORE: Theresa Moore for objectors Rockhurst University, Garavanian and Talewsky.

MR. VARANINI: Emilio Varanini on behalf of the California Attorney General's Office.

MR. SAVERI: Guido Saveri. I'm the lead counsel for the direct purchasers. I do not intend to participate. I'm here just as an observer, but I see a lot of my friends here that I haven't seen for years. Mr. Goldberg and the whole crowd, it's nice to see you. Nice to see you again. You have your problems. The direct purchase plaintiffs, as you know, are all finished, and we're here to see what's going on.

SPECIAL MASTER: Thank you.

MR. SAVERI: Nice to see you. I'd like to see several of you later and renew old acquaintances.

SPECIAL MASTER: We appreciate the support.

MS. KERN: Sylvie Kern for the indirect purchaser plaintiffs.

MR. GRALEWSKI: Bob Gralewski, Kirby McInerney, on behalf of the indirect purchaser plaintiffs.

MR. MICHELETTI: Chris Micheletti with Zelle on behalf of the IPPs.

MR. PERELMAN: Don Perelman, Fine, Kaplan and Black, for the IPPs.

MR. BOGDANOV: John Bogdanov with Cooper &

Page 17

Kirkham, objecting IPPs.

MR. CLAYTON: And Patrick Clayton from the Law Offices of Francis O. Scarpulla for the objecting IPPs.

SPECIAL MASTER: All right. And on the phone, if you could announce yourselves.

MR. BANDAS: Chris Bandas for objector Sean Hull.

MS. OSBORN: This is Kathy Osborn for defendants, the Thomson defendants.

MS. BRASS: This is Rachel Brass for the Chunghwa Picture Tube defendants.

SPECIAL MASTER: Thank you.

MR. HOAG: You have Frank Hogue and Chris Curran from White & Case on behalf of the Toshiba defendants.

MR. TALADAY: John Taladay from Baker Botts on behalf of the Philips defendants.

MR. KRESS: John Kress on behalf of John Finn and Laura Fortman.

SPECIAL MASTER: Mr. Kress, who are you representing?

MR. KRESS: John Finn and Laura Fortman.

SPECIAL MASTER: All right.

MR. BIRKHAEUSER: One more, Your Honor. Dan Birkhauser of Bramson, Plutzik, Mahler & Birkhaeuser on

Page 18

behalf of the IPPs.

MS. ANDERSON: And Jennie Lee Anderson of Andrus Anderson on behalf of IPPs.

MR. MILLER: And Steve Miller, co-counsel with John Kress on behalf of Finn and Fortman.

SPECIAL MASTER: All right. Anyone else on the phone who has not announced himself or herself?

All right. Here comes the email address from the court reporter.

(Reporter complies.)

SPECIAL MASTER: Did everyone get that?

All right. So there is no perfect way to run a hearing like this. I think what I'd like to do is go issue by issue and take up, you know, the various issues that are on my mind, and then at the end give you an opportunity to raise any issues that we haven't covered. And in no particular order, I've just jotted down five issues that I'd like to cover.

First, the first is an issue that nobody raised except me, which is is it premature for the special master to be issuing a report and recommendation on the appropriateness of the settlement when there's a motion pending to appoint co-lead counsel that would potentially impact that -- that -- you know, the fairness and reasonableness of the settlement.

Page 19

Second, the issue of the appropriateness of releasing the class members in non-repealer states and releasing the class members in the three repealer states that were omitted from the litigation class.

Third, the issue of the adequacy of the notice.

Fourth, issues that have been raised by objectors relating to the Chunghwa settlement.

And fifth, the issue raised by the Attorney General of -- as to whether the claim deadline should be extended and other issues that the Attorney General has raised in her statement of interest.

So those are the top items on my hit list, and then we can certainly discuss anything after that. For those who haven't appeared before me, I mean, just realize that Ms. Cohen and I have read all the briefs. I get sort of restive when people repeat what's in their briefs, particularly if they do so at great length. So please, you know, try to keep your -- your comments succinct.

There are a lot of people who probably want to talk today, and I want to have the chance to give everybody a full and fair hearing. On the other hand, we have a lot to do to get this report and recommendation in shape, and I don't want to spend an unreasonable amount of time in an oral hearing. So

Page 20

that's just words of caution.

So I guess I'd like to ask Mr. Cooper and/or Mr. Scarpulla, is it premature for me to submit a report and recommendation on these issues on the 15th when you are going to have a hearing, I believe on January 17, on your motion to be appointed co-lead counsel to represent the interests of class members in -- in non-repealer states?

MR. COOPER: I guess we have debated that issue back and forth, Your Honor, as to what to do before we filed. We debated that question before we filed a motion. And we know the schedule is the one that is set, and we have not asked the court to change the schedule or asked you to change the schedule. We do not have any intention, if appointed co-lead counsel, of doing anything other than proceeding with the objections which have been advanced.

So we would be proceeding with those objections with or without the designation. The defendants raised the question in response to the motion to be appointed as to whether we would be withdrawing from the settlements. And we said, you know, finally we filed that we can't withdraw from a contract that Mr. Alioto entered into.

We can object, and we can be the court

Page 21

designated people to actually advance and advocate for this group, this large group of people, the non-repealer states that have not had anyone advocating for them where their rights and the interests have been abandoned. We think that the objections would be the same. So I don't think it would make any difference whether you delayed or didn't delay. You would be facing the same questions and issues.

SPECIAL MASTER: Well, I mean, hypothetically -- and I appreciate this isn't an issue for me, it's for Judge Tigar, but hypothetically, if you were appointed in some capacity, co-lead counsel or allocation counsel or something, you know, would you want to do due diligence? Would you want to do discovery? Would you want to say to the court we object to the special master's report and recommendation that just came out two days ago and we essentially want a do-over?

MR. COOPER: Well, we have -- we have a schedule for objecting if necessary or we decide to, you know, report recommendations. The objections that we've logged are the same. It's showing that as has been made by Mr. Alioto with regard to the propriety and adequacy of the settlement is presumably the same.

We've asked for discovery with regard to the fee matters, and I realize we're not doing that. I

Page 22

believe some people have asked for discovery. But there's been a showing, such as it is, with regard to the adequacy of the settlement and why nothing is being recovered in any way, shape or form for the non-repealer state people. Those arguments are the same whether we have the designation of co-lead counsel or not.

SPECIAL MASTER: Okay. So I take it your answer is, to my question is no. It's not premature. I should go ahead and issue the report and the recommendation on the -- on the same schedule?

MR. COOPER: I guess that's the answer, yes. Yes, it might be premature for other reasons. For example, we've suggested with regard to the notice that you ought to have an independent expert who can actually, from an expert's perspective, evaluate the notice issues that, to my knowledge, we've not acted on that in any way. So that might be one reason why you would -- it would be appropriate to do it.

But I guess what I'm trying to say is the objections are the objections. If you feel that there's a reason why designation as co-lead counsel -- and the co-lead was to be Mr. Scarpulla and myself for this group of people. It wasn't that we would be co-lead with Mr. Alioto for the entire --

SPECIAL MASTER: I understand.

Page 23

MR. COOPER: Yeah.

SPECIAL MASTER: Mr. Scarpulla?

MR. SCARPULLA: Yes, Your Honor, just to follow up on that. It probably makes a difference what Judge Tigar does in terms of the responsibilities of any co-leads if he decides to appoint them. So it might be a good idea to ask him what -- what he wants.

MR. COOPER: I think it's clear from our answer to your question, Your Honor, that there's some ambivalence about that question which, as I said when we started, we debated about as to whether that would or would not be the appropriate way. And we came down on the side of not asking the schedule be changed.

SPECIAL MASTER: Okay.

MR. COOPER: But we're acknowledging, I guess, the legitimacy of your inquiry.

SPECIAL MASTER: Okay. Thank you.

Mr. Alioto?

MR. ALIOTO: Yes, thank you, Your Honor. There's no ambivalence on our side. This matter is squarely before Your Honor. There's a court order scheduled in place. There's been no request for relief to delay things. A lot of this matter is going to have to be reviewed again by Judge Tigar de novo. The matter is ripe. The matter is tee'd up. No ambivalence at all

Page 24

about it. We need to address the issues right now.

SPECIAL MASTER: All right. Thank you. At the end of the table?

MR. BONSIGNORE: Can you hear me?

SPECIAL MASTER: Mr. Bonsignore, yes.

MR. BONSIGNORE: Okay. I didn't want to yell again. My name is Robert Bonsignore, and I also put in a request to be appointed co-lead. I would say that it is premature because once the co-leads are appointed, they have an interest to streamline the issues and also to revisit what's been filed. Also a lot of things weren't done. I personally think that it's premature, especially given the authority that Judge Tigar is likely, given the typical powers of appointment, the powers that Judge Tigar is likely to give the co-leads for these excluded plaintiffs.

So I take the opposite position of Mr. Cooper. In framing the issue, you listed everything that I would have put out there, and so I'm not going to bother repeating myself -- yourself, rather.

SPECIAL MASTER: And just remind me. When did you make this request to be appointed co-lead counsel?

MR. BONSIGNORE: Just -- I'll pull it up.

SPECIAL MASTER: So it was -- it was in --

MR. COOPER: It was in a reply brief.

Page 25

MS. KIRKHAM: It was on the schedule for the opposition/response, that it was a joinder and request -- a joinder in our motion and request to be added as another lead counsel.

MR. BONSIGNORE: It was either December 24th or 25th because I remember the preparation was less than popular in my office.

MR. COOPER: It was December 28th. It was December 28th, the due date for the oppositions.

MS. MOORE: Your Honor?

SPECIAL MASTER: Ms. Moore.

MS. MOORE: First of all, I think the court has changed the date of the hearing on the motion for co-lead counsel to the 21st. So there's a little bit more time. And I think that the court would be --

SPECIAL MASTER: There's more time for the judge. There's not more time for me.

MS. MOORE: No more time for you.

It seems to me the judge would be interested in hearing or seeing your report, and I think that that would inform him on the motion.

SPECIAL MASTER: All right. Anyone else have any thoughts on this before we get down --

MR. BONSIGNORE: I object to her logic. I think it's self-serving and makes no sense to me.

SPECIAL MASTER: Noted.

All right. All right. Let's move on then. Thank you for that. Let's move on then to the issue of the appropriateness of -- well, let me first ask a preliminary question.

Mr. Alioto seemed to suggest in I think his most recent filing that it might be possible to separate the approval of the settlement amount with the defendants, that is, the approval of the total amount of the settlement as being fair, adequate and reasonable and somehow separate or defer -- I wasn't quite sure what was being suggested -- the issue of the fairness, reasonableness and adequacy of the allocation plan.

Mr. Alioto, just before we get to the merits of that issue, what did you have in mind there?

MR. ALIOTO: Well, what I had in mind was this, Your Honor. The starting point for these settlements is the settlement agreements themselves. That sets out all of the essential terms of the settlements. That's what we referred to as the settlement.

The plan of allocation is something that we, the indirect purchaser lawyers, have put together. It's something that in our best judgment will effectuate the settlements. This is not all spelled out. This plan of allocations, the releases, the notice provisions, the

various -- the various terms attendant to the underlying settlements, they're not set out anywhere. This is a plan devised by indirect purchaser counsel in consultation with experts and notice experts.

And what I meant to suggest there is that this plan of allocation is reasonable. This plan is sustainable. This plan ought to be implemented. $576 million ought to be distributed to the claimants, but our broader goal is to get something done. And to the extent Your Honor feels that yes, it's reasonable, but I'd like to adopt plan B, which is also reasonable, or plan C, which is also reasonable -- I have no pride of authorship here. I'm not dug in. My goal is to get this settlement approved.

That's what the thought is there when we cited that law to you that says there's the underlying settlements and there's the plan. There may be different ways to get this done to get everybody happy. I don't -- I certainly am not advocating for these other ways, but if those other ways meet due process and they're fair and reasonable and we can accommodate somebody's concerns, we're more than willing to do that to get this done.

SPECIAL MASTER: So hypothetically, and I really mean hypothetically, would it create any problems

in your mind if -- if I were to say all right, the settlement vis-à-vis the defendants is fair, adequate and reasonable. $576 million, given all the factors that you're supposed to consider, is an appropriate settlement, but the plan of allocation proposed is faulty in these ways. That would have the result of not sending you back to the negotiation table with the defendants, but it would require you to do some in-house tinkering perhaps with the allocation plan.

And I -- by suggesting it, I do not mean to suggest I am headed in that direction. I just throw that out -- I just want to know if -- would that create any procedural or legal problems if I were to proceed that way?

MR. ALIOTO: Yes. No, that would be welcome. One part of that would not be welcome was -- would be if you were to come to the conclusion that our proposal was not reasonable and not adequate, that -- that would cause some concern.

But to the extent you felt that there were other reasonable ways to approach this or other ways to get this settlement approved and accommodate the interests of objectors and the attorney general, we would be open to that, and we would welcome this kind of piecemeal approach, the underlying settlement approved,

then get on to the approval of the allocation. And I'm not saying that has to be months apart. But --

SPECIAL MASTER: Well, the settlement officially as proposed under this hypothetical would not be approved. The terms of the settlement vis-à-vis the defendants would be approved, but you would have to go back and propose another plan of allocation to fix whatever defects I found.

MR. ALIOTO: Yes. And again, I don't know that you have to determine that they are defects. I think you could -- you could identify matters that could be addressed and solved in different ways. And I'm sure we could put our heads together and come up with something that's very close to what we proposed and that would moot concerns.

SPECIAL MASTER: Okay.

MR. ALIOTO: I mean --

SPECIAL MASTER: So I don't -- anyone else have any thoughts about this? What about the defendants? If I were to proceed that way, would that cause any heartburn for the defendants?

MR. SCARBOROUGH: Your Honor, Mike Scarborough for the Samsung SDI defendants, and I'll attempt to articulate a general defense consensus.

I think what Your Honor outlined would be

constructive, and I think it would be welcome for our side. Our primary interest is in getting the agreements, the contracts that we entered into approved in terms of the amount of money being paid collectively and the releases that we bargained for being approved as fair, adequate and reasonable.

And we do believe that the allocation issues logically can come later, later down the line. And so we would like to get at least past that first hurdle of the underlying agreements vis-à-vis the defendants are fair, adequate and reasonable and deserving of a final approval.

And we do view many of the objections as really going to allocation issues, and as a general matter we don't have a problem with some tinkering being done to the plan of allocation proposed by lead counsel.

SPECIAL MASTER: Okay. Mr. Scarpulla.

MR. SCARPULLA: Yes, Your Honor. On that -- first of all, I think I heard Mr. Scarborough say something about the releases. That's a different issue than the amount of money because the releases, of course, release claims by half the country for zero consideration.

SPECIAL MASTER: No, but -- I'm sorry to interrupt. But I mean hypothetically, you could say the

releases are appropriate, but there's got to be some compensation paid to those people --

MR. SCARPULLA: Correct.

SPECIAL MASTER: -- which is not an issue, I take it, that would bother the defendants. They don't care how the money -- to whom the money is paid, they just want their releases.

MR. SCARPULLA: Yes, Your Honor, that is correct, and I was getting to that point, which would mean that the amount of money is therefore not sufficient because you'd be spreading it out -- if they settle for half the country, not the whole country, then you'd be spreading it out over the whole country. You'd have to give new notice to everybody. I mean, there are all those issues.

And remember, as Your Honor may recall in LCDs, we settled that case, including for the states, $1.1 billion. The conspiracy here was of longer duration. There were hundreds of meetings throughout the world. Hundreds more than in LCDs. The affected commerce was much larger, and the settlement was half that amount and excluded three repealer states. So if you include them in, you'll have to get more money from somewhere, Your Honor, to --

SPECIAL MASTER: Okay. Got it.

MR. COOPER: Can I supplement? Maybe I'm saying the same thing in a different way. In order to --

SPECIAL MASTER: Try not to.

MR. COOPER: In order to rule on the adequacy of a settlement, you have to know what claims you're settling. Here we know that the claims of over half the country were valued at zero. And it seems very clear from everything that's gone on, the amount of money that was paid was paid for those claims which Mr. Alioto felt had merit. Nothing was paid for those claims which had no merit in Mr. Alioto's view.

So if you're now going to pay money to those people, you've got to take it away under that procedure from the claimants whose claims were being settled for a fixed amount of money, which reduces it by $1 or more, reduces the amount available.

There's been however many notices that have gone out that have told people if you're not in those 21 jurisdictions, you're not going to get paid. You'd have to be renoticing, seeing what objections there would be.

Now it might be possible to say that amount of money takes care of the claims in 22 jurisdictions and get rid of the national class and leave those non-repealer people on to their own devices, to have a

different counsel represent them, attempt to get class certification or whatever went on; to litigate the issues of whether they have claims, or, as Mr. Alioto says, they have no claim.

But to try to separate them here without knowing how much money that's going to go to those people, whether that now leaves an adequate amount for the non-repealer states and for the repealer states -- you know, are they going to get one dollar, are they going to get 50 percent of the money. You'd need to know all of those issues to be able to evaluate the adequacy of the settlement. So what claims are being settled is the first question.

SPECIAL MASTER: Okay. I don't want to spend any more time on this. Anyone have something new that hasn't been said before?

Ms. Moore.

MS. MOORE: Your Honor, in order to approve the settlement, there's certain foundational evidence that needs to be in the record, and one of the things that needs to be is that everything is valued, and not all the claims are valued.

There was nothing in the record that any of these other claims were valued, any of these states that were left out or any of these non-repealer or repealer

states that were left out. There was no evidence that they were considered and valued. Not until later on in the reply after it was attacked did they say oh, there was no value.

So essentially they didn't consider them at all, which makes the $576 million completely inappropriate. And so you can't approve the settlement at that amount when all of these people being released were never even looked at and valued.

SPECIAL MASTER: Okay.

MR. SCARPULLA: Excuse me. There's one other thing I think that Judge Tigar raised in the directs maybe about evidence of what each class member would get if there had been a successful trial as opposed to how much they get in this settlement. And I don't recall seeing that in the record yet.

MS. MOORE: No, it has not come up in the record, and we've asked multiple times. In LCD we knew exactly what each panel -- the damages were for each panel, for each claimant. So knowing the claims rate and knowing the value of each is vitally important to valuing the settlement. And you can't approve the settlement without that information. And to this day, it's still not in the record. But we know that when Janet Netz made her expert report and valued the whole

case at $2.7 billion, there must have been an individual damage analysis, which I know there was in LCD.

SPECIAL MASTER: Did you want to respond to that?

MR. ALIOTO: Well, no. We have certain issues that we came prepared to address, and one of the things that has not been addressed by objectors is the amount of the settlement and the comparability to LCD and did we get enough money. I just want to note for the record we -- we have enough issues to discuss here today. That's something that has not been raised.

SPECIAL MASTER: But the point --

MS. MOORE: Well, it was raised.

SPECIAL MASTER: Wait, wait. The point that's being made by Ms. Moore is you can't just -- the court can't just say: Okay, 576 million, that's a lot of money, that's okay.

You have to know or have some sense of the range of the value of each individual class member's claim. And they may be different values depending on how they're situated and what they're going to get in the settlement so that you can compare what a class member would have gotten if they went to trial with what they're getting in the settlement. And Ms. Moore says there's nothing to that effect in the record.

MR. ALIOTO: I'm pretty sure there is, Your Honor. And I know this for a fact, that we did that analysis. Our expert Janet Netz did that analysis. What was the overcharge on tubes and monitors? It was a higher overcharge. What was the overcharge on tubes in small televisions? What was the overcharge on tubes in large televisions? All of that analysis was done.

SPECIAL MASTER: And is in her report --

MR. ALIOTO: Yes.

SPECIAL MASTER: -- which is in the record.

MR. ALIOTO: Is in the record. And it may have also been cited when we filed our motion for preliminary approval -- I'm going back a little ways here, but in the northern district there is a rule that as part of a preliminary approval motion, you have to make a -- as part of your prove-up you have to show the damages and the range of damages, and I'm quite sure that that showing was made in our original papers.

SPECIAL MASTER: All right.

MS. MOORE: Your Honor --

MR. ALIOTO: That's our response to that.

MS. MOORE: It wasn't -- it's the panel --

SPECIAL MASTER: You know, we've got to get on with the meat of the objections here.

MS. MOORE: Actually --

SPECIAL MASTER: I don't want to go on much longer on this.

MS. MOORE: May I say one thing?

SPECIAL MASTER: Yes.

MS. MOORE: It is important to this meet the settlement. You need the dollar amount per panel. So we know that for a panel it was $65 in damages in LCD. We don't have that number in this case, so we can't evaluate it.

MR. COOPER: I would just request that Mr. Alioto -- we're not aware of where Ms. Netz's report, damage study report for trial is in the record. So I'm not certain what he's referring to.

SPECIAL MASTER: Was her -- wait, please.

Was her deposition taken?

MR. ALIOTO: Yes.

MR. COOPER: And filed -- they're not filed. They're not in the clerk's office. They weren't filed. They're not available to generally -- generally to people. We never saw them. We're lawyers in the case, and we weren't allowed to see them.

SPECIAL MASTER: Was her report not made an exhibit to her deposition?

MR. ALIOTO: It was -- it was an exhibit to her deposition.

MR. COOPER: The deposition was confidential.

MR. ALIOTO: But they're counsel of record. They've signed the protective order.

SPECIAL MASTER: All right.

MS. CAPURRO: It's also in the record. It was filed as part of our opposition to summary judgment.

MR. COOPER: Not an unredacted --

SPECIAL MASTER: Was there a -- was there a --

MS. CAPURRO: And it's also referenced in --

SPECIAL MASTER: Was there a Daubert motion?

MR. ALIOTO: Yes.

SPECIAL MASTER: There was a Daubert motion. So guess who ruled on it? And so I certainly saw her report.

MR. ALIOTO: And when those are filed, Your Honor, they're not in the court record, they're under seal in the court record, but they go by separate email to all of the indirect purchaser counsel because they're parties to the protective order. So these folks have all that information.

SPECIAL MASTER: Okay.

MR. BONSIGNORE: I just -- make -- I did not get it by email at all. The information that would be helpful to me in relationship to a case that I had that was -- that we actually succeeded in doing what you're

proposing was the claims rate. We don't have any information yet on the claims rate. We don't know if there's a surplus or whether people will get a cut down. The excluded states, according to the terms of the settlement agreement, you'd have to very carefully craft language that would not cause them to waive their rights to proceed in economic recovery. And I'm just going to cut it there.

Just with a grain of salt, I approached Mr. Alioto at least a dozen times before today and asked him to let's talk about it. And although he's wide open to the suggestion today, which is very positive, very good, maybe it was something that you said, but before today, he had dug in and wasn't going to change anything. So this is -- you've already made progress.

SPECIAL MASTER: All right. So the next issue really I want to talk about is the merits of the -- are the merits of the objections that have been raised to the failure of the allocation plan with any monetary compensation to the residents or the purchasers in the non-repealer states and the three omitted repealer states.

So I really don't need all those arguments repeated, but if there's someone has something eloquent to say -- Ms. Kirkham, I see you're raising your hand.

MS. KIRKHAM: I'll work on eloquent here and brevity. Brevity perhaps more important than eloquence.

In the adequacy -- the adequacy of the settlement with regard to the non-repealer state claims, where we begin is with lead counsel's repeated statements that they value the claims as zero. So I think we can agree that that's been established as a fact.

We know that, for example, the 500 plus million dollar settlement is compared in their papers to Dr. Netz's $2.8 billion damage number. That number is for the 21 damage class states. So those are the purchases that occurred in those states. We don't know -- we could compute it if we actually had a per panel and some information about sales of what it is in the other states, but I don't believe Dr. Netz ever did that.

So we have, so we're beginning with the idea that what we have, what you have before you and the real fundamental question you have before you really is are those claims valueless. Are they meritless. And are they so demonstratively meritless that without affording the possessors of those claims, the due process under Rules 12 or 56, you can say that they should be released here. They should be dismissed with prejudice because the effect of approving this settlement is exactly the

same effect as a ruling on summary judgment on those claims or a ruling on Rule 12 on those claims.

So that's essentially what you're doing, but not in -- not affording them the due process of those procedures. So the claims have to be pretty fundamentally meritless at the courthouse door for that determination not to be made.

Now I'm not saying that determination is impossible in a class action settlement, but generally where you find judges and special masters being willing to do that is where you have a situation in which you have a factual disparity between two purported class members so that you can look at one and you say you bought the price fixed product. And in a period that we have evidence that the price was artificially inflated and therefore we say -- I can look at you and say -- for settlement purposes certainly I can say you were injured.

And you over here, Mr. Jones, you bought the product, or if it's a securities case, you traded the security during the period that the evidence suggests that the price was in fact competitive. Maybe the conspiracy was still going on, but it fell apart during that period. There's some evidence in the case, some way the person purchased, some evidence that those

purchasers did not damage the individual.

Now we come to the situation that we have here -- and I really think that if you read the Sullivan case, you can see that the third circuit was coming to grips with this idea. Is what we have here is a situation in which you have two class members for whom you can say they bought the same product under the same circumstances, inflated the same way. The only difference is that they're standing on opposite sides of a geographic boundary called a state line. And on the one side of the state line it's we're home free, and on the other side of the state line you say you, because of that, despite your factual claim, you can't possibly recover under the factual claim.

We don't have that situation here. Illinois Brick doesn't do that. Illinois Brick is a rule of evidence fundamentally. The Supreme Court was faced with the choice it felt of overruling Hanover Shoe and allowing defendants to put in evidence of passthrough or enunciating a rule that said what's sauce for the goose is sauce for the gander, and the plaintiffs can't put that evidence into.

So if you are a plaintiff and you need evidence of passthrough in order to establish your claim, you're probably out of luck under Illinois Brick. You still

actually have the right to come into court and attempt to show why it doesn't apply to you. It is not a rule of standing. It does not bar people at the courthouse door, nor is it the indirect purchaser hostility act.

SPECIAL MASTER: But why wouldn't it apply -- you know, assuming it's sound law and the Supreme Court doesn't change its mind, why wouldn't it apply to all the class members in these states? What would be a ground for someone saying I am --

MS. KIRKHAM: It would --

SPECIAL MASTER: -- I am entitled to make a claim as an exception to Illinois Brick?

MS. KIRKHAM: We're not -- we're not suggesting exceptions to Illinois Brick. We're not suggesting claims and exceptions to Illinois Brick. We're just suggesting claims that fall outside of Illinois Brick.

SPECIAL MASTER: All right. Such as?

MS. KIRKHAM: Okay. Such as the claims for equitable monetary relief. They do not require proof of pass on, and as soon as you have a claim that does not require proof of pass on, Illinois Brick becomes a case that sits over here and applies to other people.

What that is is a situation in which there is the inherent power of the federal court to award in a situation in which a person proves that the factual

predicate of recovery, any recovery which appears in law or in equity. The Clayton Act specifically talks about affording a recovery that is reversing, undoing the overcharges the defendants collected. There is nothing -- the Ninth Circuit has never suggested -- in fact, the Ninth Circuit has explicitly endorsed that that is one of the policies of the antitrust laws.

The antitrust laws also -- there are tomes that talk about the benefits that the antitrust laws convey on society as a whole and the benefits of private enforcement of those laws convey on society as a whole.

So there's not been probably a better situation where someone is set up to make an equitable claim for monetary relief than someone who is acting as a, quote, private attorneys general and coming in and vindicating a critical tenet of American not only jurisprudence, but indeed of American economic theory and practice, and that is competition.

SPECIAL MASTER: Can I just interrupt a minute? Am I correct that the state of the law on recovery of equitable monetary relief in non-repealer states is number one, everyone agrees there is no federal right to such damage?

MS. KIRKHAM: No, there is.

SPECIAL MASTER: You're saying there is under

the --

MS. KIRKHAM: We're talking -- I'm talking about someone who comes into federal court and alleges a violation of the Sherman Act.

SPECIAL MASTER: Okay.

MS. KIRKHAM: Yes.

SPECIAL MASTER: And then there are also -- you maintain there would be cognizable state law claims for equitable monetary relief in these non-repealer states, yes?

MS. KIRKHAM: Umm --

SPECIAL MASTER: No?

MS. KIRKHAM: Probably not in the non-repealer states, only because a lot of their state courts have said that -- well, let's put it this way: There wouldn't be unjust enrichment. Whether there would be the same kind of equitable monetary relief granted simply for proof of the violation of the state law, because the same argument about Illinois Brick that it's a rule of evidence applies when it's applied in state court to state law as well as when it's applied in federal court to federal law.

But we're not talking -- there are a lot of cases -- the cases that Mr. Alioto is citing about unjust enrichment, we agree that they go the way they

Page 46

go.

When Illinois Brick first came down, lawyers for plaintiffs tried to avoid Illinois Brick by pleading unjust enrichment claims under state common law and unjust enrichment, and the state court said hmm-mm, we're not going to let you do that. We're not going to let you just recast an antitrust claim as an unjust enrichment claim.

I'm not talking about going back and trying to do that, to get that reversed, and I am focused and we are focused on the federal recovery -- federal monetary recovery that the court in KeySpan talked about and that the court in LCDs, Judge Illston, talked about when she first analyzed that there's a federal right to this. And therefore, the state of Oregon, which was saying we can do it under a state law, she then leapt over and said your state law follows federal law. I think there's a federal right. Then I think there's probably a state right. And that was her decision on that subject. That's why she talks about Oregon law.

But she's not -- her analysis doesn't begin with Oregon law, it begins with KeySpan, it begins with a federal right that arises under the antitrust laws that if I prove a violation of the antitrust laws, I might not be able to prove pass-on because Illinois

Page 47

Brick says I can't. But if I prove this violation, I can ask the court to give me a monetary equitable remedy that is disgorgement or restitution.

SPECIAL MASTER: Okay. I can see that this argument and this line of thought would be a wonderful law review article, but is there any authority out there that says in the federal context that there -- despite Illinois Brick, we are going to allow you to pursue a federal claim for equitable monetary relief?

MS. KIRKHAM: There is the KeySpan case which dealt with a governmental entity, and there is Judge Illston's decision in LCDs. There is judge -- the adoption by Chief Judge Hamilton of Judge Renfrew's report and recommendation in DRAM. And then there are the cases that we cited and the development of the law this way that we cited in our brief from the antitrust treatise that actually Mr. Varanini knows more about than I do, since he was one of the editors or authors or both.

SPECIAL MASTER: And that's it?

MS. KIRKHAM: And so far that's it.

SPECIAL MASTER: Okay.

MS. KIRKHAM: However, Your Honor, the decision you're making is, is that enough that you can say all of that goes away and zero is the right number, or does

Page 48

that raise the question that the claim is valuable?

SPECIAL MASTER: You're saying, I guess, that there is a legitimate split of authority on this issue, and, therefore, if there's a split of authority, you can't say the claims are worth zero?

MS. KIRKHAM: Actually, there's nothing against it. It's just not been litigated. The authority is actually all on the side of the claim. The cases that are cited against it in the briefs are not considering it.

SPECIAL MASTER: They're dealing with state law.

MS. KIRKHAM: They're dealing with state law unjust enrichment claims or there -- there is the Ninth Circuit case that wouldn't give the certain kind of relief in the motor vehicles case that got cited down the line for people saying so if you can't give federal disgorgement, but when you read the motor vehicles case, that's not what the Ninth Circuit was saying. On -- it wasn't considering this kind of question, and it wasn't saying you can never get money in an equitable situation if you're an antitrust plaintiff.

SPECIAL MASTER: Okay. Before I leave you and hear from other people, you cited Judge Renfrew's report and recommendation and you cited like page 300 and

Page 49

something. And the report and recommendation that I have from Judge Renfrew only goes up to page 200.

Are you referring to some other report.

MS. KIRKHAM: Yes, the Lexis -- I'm citing to the pages of the -- of Judge Hamilton's order adopting it, which attached the whole thing. So the paging is off. If you've got one from him, you have what he filed in federal court, so you'd have what it looks like in the docket. What I was citing to is a brief. I'm sorry for the confusion -- was a Lexis.

SPECIAL MASTER: Okay.

MS. KIRKHAM: So everyone would be able to have it because you'd have to otherwise go to the DRAM docket.

SPECIAL MASTER: Okay. Just for everybody's information, I have access to Westlaw. I do not have easy access to Lexis. Just --

MS. KIRKHAM: We'll send -- Your Honor --

SPECIAL MASTER: -- limited resources at JAMS.

MS. KIRKHAM: -- I will submit a letter that redoes the citations to the -- I don't know if it's still on Westlaw, but to the docket version, the DRAM docket version of the report and recommendation.

SPECIAL MASTER: All right. Thank you.

Now, on this issue, does anyone else have

anything to say? I presume the answer is yes.

MS. MOORE: I just wanted to point out that in the original settlement in this case with Chunghwa, I believe in their paper -- in the defendants' papers where they were arguing for final approval, they argued what is essentially the equitable monetary relief.

SPECIAL MASTER: Who argued it?

MS. MOORE: Chunghwa, and they said there was a colorable federal claim in all 50 states, and they -- and the papers indicated that everybody would get paid, which is why now here we are years and years and years later and that's not happening.

So they -- they filed a -- it was the plaintiffs who filed the motion for final approval, and I think there were objections, and the defendants filed an opposition or a reply to those objections, and it's in those papers. I can find them if you want. They're quoted in my original objection papers here, and then I can find them for you if you want.

SPECIAL MASTER: All right. All right. Mr. Bonsignore.

MR. BONSIGNORE: Briefly, Your Honor, there are statutory claims in Massachusetts and New Hampshire, although the New Hampshire ones might have postdated prior to the settlements. New Hampshire also had and

Massachusetts also have common law claims under their consumer protection statutes. I cited those in the brief. In fact, I was involved in both cases, and so I know them very well.

With regard to Missouri, Missouri was in a similar situation as Massachusetts and New Hampshire was before the supreme court addressed it. And, in fact, the attorney general of Missouri has taken a position that indirect purchaser claims are allowed under those states.

SPECIAL MASTER: Missouri is a repealer state, isn't it?

MR. BONSIGNORE: Yes, it shouldn't be a problem, but if I got to beat a dead horse, I'll beat a dead horse briefly.

SPECIAL MASTER: All right. Consider it beaten.

MR. BONSIGNORE: Briefly.

SPECIAL MASTER: Did you want to respond on this issue? I don't know who is going to do it from your side.

MR. ALIOTO: I'm going to address it, if you don't mind, Your Honor.

SPECIAL MASTER: Before we -- before I give Mr. Alioto a full -- full reign here, wasn't there some

suggestion in one of the briefs that in the LG release settlement, that the same type of release, same scope of release was -- was given to LG that was given to the defendants in these settlements and nobody raised a peep. Is that true or untrue?

MR. ALIOTO: That's correct.

SPECIAL MASTER: Okay.

MS. MOORE: Your Honor, it becomes more obvious at the time of distribution. A lot of times it's not obvious until we get to distribution and then you realize there are issues.

MR. BONSIGNORE: I was told by Mr. Alioto -- I put it in my papers. I was told repeatedly that my states would be taken care of at the end. And if I hadn't heard that, I would have been jumping up and down filing, objecting, going and zealously representing my clients. It's horrible that those states are left out, especially Massachusetts, because our law is stronger than the California law. I know it's a debate, but I always say it, and I'm going to say it now. To leave out those states is no excuse. And once the mistake was caught, it should have been corrected instantly. I don't know what someone is thinking to think that that's the way it should go through.

SPECIAL MASTER: Okay. I really think I need

to give Mr. Alioto a chance here or his designee.

MR. ALIOTO: Okay. Thank you, Your Honor. Just for the record, Mr. Bonsignore's --

SPECIAL MASTER: And let me focus your --

MR. ALIOTO: -- statements about what I said and what I didn't say, I'm not going to go into that. It's not evidence, but I want the record to be clear on that. But go ahead, Your Honor, excuse me.

SPECIAL MASTER: Yeah, I mean the -- I really understand all the arguments you've raised, but the core question is is there a split of authority here, a legitimate, not concocted, but a legitimate split of authority as to whether there is a federal right of action that indirect purchasers in non-repealer states could pursue? And if there is that split of authority, how -- how is it reasonable to value the claims at zero.

MR. ALIOTO: All right. Thank you, Your Honor. I'd like to answer that, but I'd like to give Your Honor the full picture of how these cases get settled and how lead counsel in the exercise of his discretion --

MR. SCARPULLA: We cannot hear down here, Mr. Alioto. I'm sorry. He has to speak up.

MR. ALIOTO: I think it would be important to -- for Your Honor to hear the complete facts because when we settle one of these cases, it's based certainly

on the underlying law, the viability of claims. It's based on the statute of limitations. It's based on other things as well, and this is very important. This is -- we're going to talk about notice or maybe we're not going on talk about notice.

SPECIAL MASTER: Yes, we are.

MR. ALIOTO: We are going to talk about. Well, maybe I can -- I can give a little preview on the notice because it really has to do with the valuation of claims and how we arrived at this settlement. And I know this is all in the papers, but it's -- it's not -- maybe it's not as clear as it can be how this notice program and how the history of this case informed my decision to settle on the basis that we did.

And by that I mean this: There have been three nationwide notices in this case: Chunghwa, LG -- the LG was actually a combined notice of the LG settlement and a notice of class certification, but that was a separate nationwide notice. Very similar to this third notice when all the bells and whistles, newspaper, Internet, email, very, very extensive. Three programs, massive notice programs.

The direct purchasers, they may have even given more notices because I think they did their settlements differently. They may have had separate settlements,

and they didn't lump them. And there were at least three notices in the direct case.

Now those notices were targeted at direct purchasers, but they were nationwide in scope. There's publication in the Wall Street Journal, there's publication in other publications. There's wide dissemination. So you have six notices.

These claims and these cases, and these -- this litigation against these defendants for these products, it's no secret. This has been going on for eight years.

There's also reference in the brief to something known as a CAFA notice, and we just kind of -- kind of make passing mention to this. This is really not part of our notice program. It's something that defendants are required to do under the Class Action Fairness Act. Every time there's a preliminary approval in one of these indirect purchaser cases, each defendant who has settled and is going to be -- and their settlement is going to be proposed for preliminary approval, they prepare a CAFA notice. This is what one looks like.

It's very comprehensive. It sends the attorney general, attorneys general, all 50 of them all of the important documents in the case: the notices, the evidence, the rulings, the classes certified, the

classes not certified, who the claimants are. It's a very comprehensive report by 52 -- by the defendant to 52 attorneys general and the Department of Justice.

I'll just hand that up to you for your reference.

The point I want to make there, Your Honor, is that in this case, there have been nine settlements, so nine defendants, if my math is right, each of those nine defendants sent out 51 CAFA notices. Each defendant notified every state attorney general in the United States, and each defendant notified the Department of Justice. By my calculation that's 459 CAFA notices to the highest ranking law enforcement officials in every state.

Where are the attorney generals saying there's viable law and I'm going to bring a case? Where are the attorneys general, people, law enforcement officers, not people with axes to grind or not people with agendas, law enforcement officers, where is the response to those CAFA notices?

Well, one response is Mr. Varanini. He's in here, but he doesn't have any problem with the issues that are being raised by these objectors. I just want Your Honor to be aware of these issues. They're out there. They're out in the public domain, notices given

to the people that are charged with making these decisions. And when you don't hear anything from any AG and there's no reaction and no -- certainly no contest or no challenge by those law enforcement officers, that really weighs heavily in my decision.

Let me add to that this: Let's not forget the importance of opt-outs. Is there someone -- of course this debate is not about, as you say, it's not a law review debate. It's not about these claims and are they viable and is there -- is there law. This is not an academic debate. This is a debate about is there a client out there with a lawyer who wants to bring a claim or is sitting on the sidelines thinking about bringing a claim and we're wiping his rights out. That's the issue.

It is highly, highly, highly improbable that someone is going to step forward and assert some claim against these defendants for a global cartel and seek to establish damages on an individual basis and probably even more difficult on a class basis for -- for one state.

These kinds of things go into my analysis as lead counsel in consultation with people that I'm working with in the case, which are some of the best people you can possibly work with in these cases. This

Page 58

is what goes into my analysis.

So is it science? Yes, it's science. We review the law. We look at the standing issues. We look at statute of limitations issues. We also take this pragmatic approach: What is the -- what is the risk or what is the chance that after this case has been around for eight years with multiple notices, with 459 notices to the attorneys general and the Department of Justice, what's the chance that there is a live claim somewhere out there that's being compromised? Almost nil, Your Honor. You can't say zero, you can never say zero, but I would say it's close to zero as you could possibly get.

SPECIAL MASTER: Okay. So -- but you have to notice that the difference between what was done here and what was done in LCD, accepting your point that claims by -- for any kind of monetary relief by people in non-repealer states would be very challenging, would be an uphill battle, accepting that, still the defendants in this case I take it insisted on a release, whereas in LCD those claims, as I remember, were not released; that is, whatever claims, weak or strong, that people in non-repealer states had for monetary relief, were -- were not released in the settlement.

I don't know if my memory is right, but I think

Page 59

that's the case.

MS. KIRKHAM: Yes.

MR. GOLDBERG: That's correct.

MR. ALIOTO: Yeah. Now, LCD here --

SPECIAL MASTER: So here the defendants got releases, in LCD they didn't. There could have been a thousand reasons for that. And it's -- I don't want to go into them but...

MR. ALIOTO: Well, I don't know that there's a thousand, but there are different -- there were different reasons because you had claims by AGs in that case, actual pending claims that were different from claims that were alleged as the classes, and there were viable pending claims. But when you come right down to it, the question is was it reasonable to settle these claims. And I want to just focus on this distinction for a minute because this is very important.

SPECIAL MASTER: Before you take another breath, how is the court reporter doing?

THE REPORTER: I'm okay.

MR. ALIOTO: Okay. Remember, we throw these terms around loosely or I try not to throw these terms around loosely, but I want to focus on viable claim. Viable claim means you analyze something, and that means that if someone can provide the facts, the law will

Page 60

afford him a remedy. That's what we're referring to here. Viable. Does the law support the claims if the facts bear it out.

That concept gets lost and gets confused with this question of nuisance claims or -- or these un- -- unproven claims. Nuisance claims. And I -- I don't think it's a good idea, and I don't think the class action law in fashioning these settlements ought to be giving consideration to be giving payments to claimants for nuisance claims because sometimes you can get payment on a claim if it's not viable.

So to the extent that's being suggested, and I think it is. Look, don't wash those claims out for nothing because those people could have asserted these claims and they could have gotten something. Well, they could have gotten something, but it would have been on a nuisance basis. I think that's very important to keep that distinction.

The other -- not to repeat what's in the briefs, but recently Judge Tigar in approving the settlements in the direct purchaser case, he took note of and was very important factors for him the number of objectors and the number of opt-outs.

Here we have a very small number of objectors and we've given you some background on those objectors,

Page 61

where they're coming from, and a couple of those objectors have already dropped their objections. But you have a pretty good record on what those objectors are about. We have three opt-outs in this case after eight years, after multiple notices, after 459 CAFA notices.

SPECIAL MASTER: Were any of those in -- were any of those in non-repealer states?

MR. ALIOTO: I don't know the answer to that question.

SPECIAL MASTER: Okay.

MR. ALIOTO: But I want to emphasize this opt-out mechanism because it's very important. That's what protects someone who thinks they have a claim or that wants to make new law or wants to go off on unproven ground and assert something. They have the opportunity to do that, and you can't just pooh-pooh it.

SPECIAL MASTER: Fair point. I think I know the impact of opt-outs.

MR. ALIOTO: All right. So that's the notice component, but it also bears on the -- on the releases. This class has had probably unprecedented notice with multiple -- with multiple notifications. That's important. So how did we come to the -- our conclusion? It's all in the brief. The injunctive relief, not

viable. They're out of the business. Sure, I could have gone to the defendants and said --

SPECIAL MASTER: I get injunctive relief.

MR. ALIOTO: Okay.

SPECIAL MASTER: The real -- again, just tentatively, I'm not so troubled by the injunctive relief issue. I'm not so troubled by the damage issue. The issue that is more troublesome is this one of equitable monetary relief.

MR. ALIOTO: Yes, and Your Honor, I'll just say this -- it's in my papers -- it's completely speculative. There is no claim. There is no client. There is no lawyer. There is no lawsuit.

SPECIAL MASTER: Was a claim -- I -- it would be helpful to me, Lauren, if you could see that I get copies of or give me the docket numbers or something so I can easily find copies of the four complaints in this case, because I want to know what -- what was actually alleged. Was there ever a claim either for injunctive relief or equitable relief or damages asserted on behalf of the people in either the non-repealer states or the three omitted repealer states? Was there ever a claim asserted and was it ultimately dismissed? What happened to it?

MR. ALIOTO: Yes, it was asserted. It was

never formally dismissed. It -- it -- it lingered on through the life of the case.

SPECIAL MASTER: So if I look in the fourth amended complaint, will I find it?

MR. ALIOTO: Yes.

MR. COOPER: It's pending is the answer.

SPECIAL MASTER: So it's there.

MR. COOPER: It's pending.

SPECIAL MASTER: It's in the works. It was never --

MR. ALIOTO: It's an allegation.

SPECIAL MASTER: Right.

MS. CAPURRO: There was no injunctive relief class certified at the class certification.

SPECIAL MASTER: Right. Okay.

MR. COOPER: It was pending.

SPECIAL MASTER: Mr. Bonsignore, you're just going to have to chill down there and sit down. I'll get to you.

MR. ALIOTO: All right. Your Honor, if you don't mind, I'd just like to have my colleague make just a couple of remarks on this maybe to just sharpen some of these issues up, Mr. Duncan.

MR. DUNCAN: Your Honor, just very briefly, I want to cut to the chase on the Illinois Brick

question --

SPECIAL MASTER: Oh, don't do that.

MR. DUNCAN: -- and the federal disgorgement claim. So the question is whether there's a split of authority, whether it's in some sense viable. The answer's no. There's not a split of authority. At most it's a hypothetical law review article that someone might want to write.

The Illinois Brick is the law of the land. It's been the law of the land for 40 years. If you could end run Illinois Brick simply by filing a federal disgorgement claim, Illinois Brick wouldn't exist, and people would do that. That's the way these cases would be litigated.

SPECIAL MASTER: Did any court ever say that?

MR. DUNCAN: Absolutely. We've cited one case, a Ninth Circuit case that's controlling that says there is no disgorgement remedy under a private plaintiff under a federal law.

SPECIAL MASTER: Okay.

MR. DUNCAN: That's in our most recent reply brief. There's a Northern District of California case to the same effect. If you went around the country, every time someone has tried to end run Illinois Brick in this fashion, I'm aware of no case where a private

class or private plaintiff have been allowed to pursue those claims.

SPECIAL MASTER: Okay.

MR. DUNCAN: Now the objectors have stated that governments -- it's arguably an open question whether a government body can make use of a disgorgement remedy. Private plaintiff --

SPECIAL MASTER: So it's the State of Oregon?

MR. DUNCAN: Correct.

SPECIAL MASTER: Okay. I thought I heard Ms. Kirkham suggest that there were cases that said no end run with respect to state law.

MR. DUNCAN: That's absolutely true also.

SPECIAL MASTER: But that there were no cases with respect to the federal Clayton Act, Sherman Act.

MR. DUNCAN: That's not true. The cases hold to the contrary.

SPECIAL MASTER: And you've cited those in your --

MR. DUNCAN: Some of them, and there are others in other circuits. We've cited the Ninth Circuit law.

MS. KIRKHAM: Your Honor, this is an interesting point. You're saying that there is a case in which an antitrust price fixing class or plaintiff tried to bring an equitable monetary claim, and the

Page 66

Ninth Circuit said Illinois Brick barred that claim because you cannot end run --

MR. DUNCAN: That's not what I said. What the Ninth Circuit held is that there is no disgorgement remedy for a private plaintiff, not a class case. We're not talking about class action. No private plaintiff has a disgorgement remedy under Section 16, period. It's a square hole, and there's -- the law is uniform on that point nationwide.

SPECIAL MASTER: Okay. I don't want any more argument about what the case says because we can read it, so -- and make our own judgment for better or worse.

MS. KIRKHAM: I also would just like to mention that in LCD Oregon was acting as a private plaintiff.

SPECIAL MASTER: Right.

MS. KIRKHAM: It had a parens patriac claim. It was not acting --

SPECIAL MASTER: Okay.

MS. KIRKHAM: You know that.

SPECIAL MASTER: I do know that.

Okay. I'm thinking of taking a break if we have beaten this issue to death. If there are other people in the room who have something to say on the repealer, you know, non-repealer issue and it's not too long, let's get it out.

Page 67

Mr. Bonsignore, you've been very active down there.

MR. BONSIGNORE: As to the allegation that there was a nuisance claim with regard to the three excluded states, there were no nuisance claims involved. The Massachusetts statute allows for treble damages and attorneys fees. The New Hampshire allows for punitive damages and attorneys fees. I'm less familiar with Missouri, but I'll rely on those two.

Mr. Alioto seeks to personalize the issues and play the blame game, blaming the victims for not objecting, blaming lawyers for not being present, and I would like to remind him that lead counsel in a nationwide class action is obligated to represent the interests of all class plaintiffs including the named and unnamed plaintiffs in each and every state encompassed within the class they seek to represent. That's Radcliffe, 715 F.3d 1.57 at 1167.

SPECIAL MASTER: These points have been made very cogently and repeatedly in the briefs.

MR. BONSIGNORE: Okay. Then I would -- then I'll -- I'll just skip over the law. I'm sure you've read it.

As to the statements that Mr. Alioto was making that there were no lawyers and no plaintiffs available

Page 68

to him, I became apoplectic, as you noticed. I request only to be able to supplement the record based on his statements. I submitted evidence, unequivocal evidence that Mr. Alioto was aware of plaintiffs in Massachusetts and New Hampshire and Missouri and that he ignored them. He wasn't even aware that he was aware. There were emails to him. After he was reminded, they changed their argument in their reply brief.

So in light of the fact that he made an absolute false statement that can be objectively blown up with the allowance of my supplement, I would request that formally.

SPECIAL MASTER: Okay. Any requests to supplement the record should be made in writing.

Yes, sir?

MR. SCARBOROUGH: Yes, Your Honor, again Mike Scarborough for the Samsung SDI defendants.

With respect to Massachusetts just, you know, this case goes a long way back. There was a claim on behalf of Massachusetts consumers originally brought in the case. We filed, defendants, multiple motions to dismiss, and we had very able opposition to those motions from lead counsel. Those were hard fought battles, and ultimately I believe it was two different rounds of motions to dismiss, and we had various attacks

Page 69

on that claim mostly on procedural bases. Defendants won. So it was a claim that was litigated extensively and that was thrown out, and defendants prevailed on a motion to dismiss.

MR. BONSIGNORE: In response, Your Honor --

SPECIAL MASTER: Wait, wait, wait.

MR. BONSIGNORE: Okay.

SPECIAL MASTER: I just need to do this one by one. As I understand it, Judge Legge finally lost patience and dismissed the claim for failure to make some what he considered necessary allegation. The defendants prevailed. The claim was gone. But Judge Legge said in his -- in his decision this would not bar, you know, the bringing of a valid claim later on.

Do I have it right.

MR. SCARBOROUGH: I'm not -- again, it's been a while since I looked at these papers.

SPECIAL MASTER: That's just what --

MR. SCARBOROUGH: I don't know if that last part is correct necessarily, but I don't think it was necessarily an invitation for lead counsel to pursue such a claim.

SPECIAL MASTER: Okay.

MR. BONSIGNORE: Your Honor, lead counsel is the only person who has the responsibility to do that.

Page 70

And beyond that on that point, it was a procedural issue that could have been corrected in three seconds by the issuance of a subsequent demand letter, and it would be totaling, it would go back, and that would be that.

And I will also point to Kayes versus Pacific Lumber Company 51 F.3d 1449 --

SPECIAL MASTER: We can't -- if you're citing cases that aren't in your brief, I --

MR. BONSIGNORE: No, they're in the brief. I'm just reminding -- I'm highlighting them. Kayes versus Pac. Lumber, 51 F.3d 1449. The responsibility of class counsel to absent class members whose control over their attorneys is limited. And that's the point that I'm making. The class members, lawyers other than lead counsel, and more in this case than any other case I've been in, had no sway whatsoever. He ran it like a dictatorship. We had no control. All we could do was argue and complain.

SPECIAL MASTER: All right. Thank you.

Ms. Moore, final, final, yes.

MS. MOORE: With regards to Massachusetts, Your Honor, an error was made. An error was made two times. It could -- Massachusetts could still have been valued and put in the settlement and was not. And this is a case in LCD. We just -- between Massachusetts and

Page 71

Missouri, my partial investigation -- I haven't talked to all the aggregators, but there was 41 and a half million dollars distributed in LCD between those two states alone.

SPECIAL MASTER: Okay. Well, let me --

MS. MOORE: So this is a valuable case that they could have valued and put in the settlement and they chose not to.

SPECIAL MASTER: Okay. Is it the duty of lead counsel -- and I know we have a number of people in the room who have served as lead counsel. Is it the duty of lead counsel to go around to every state and phone lawyers and say, you know, go make a claim, go scrounge around and get a class representative. Is that part of the fiduciary duty of lead counsel?

No, Mr. Bonsignore.

Go ahead.

MS. MOORE: Yes, Your Honor, I think he's putative counsel -- he's counsel -- lead counsel is appointed and is given this duty, and it is his responsibility to make sure that these claims are pursued. And I do think he has a right to make sure --

SPECIAL MASTER: But is it his duty --

MS. MOORE: -- that people are not left out.

SPECIAL MASTER: Is it his duty to find claims,

Page 72

to unearth claims, to create claims?

MS. MOORE: Well, actually, even in this case it isn't even relevant because we had plaintiffs. But yes, I do think he should do that, and, in fact, there's law that --

SPECIAL MASTER: You had plaintiffs in Massachusetts. Did you have plaintiffs in New Hampshire and Missouri?

MS. MOORE: Yes.

SPECIAL MASTER: Okay.

MS. MOORE: They existed.

SPECIAL MASTER: And what happened to them?

MS. MOORE: They just were never pursued. They were just abandoned.

SPECIAL MASTER: Okay.

MR. SCARBOROUGH: Your Honor, just one very quick point to add on Massachusetts. As I recall, there were attempts to cure the defect with the -- it was basically sending a demand letter, and lead counsel did, and whatever associated Massachusetts counsel did try and fix that defect. The defendants argued at that point you couldn't do it. You couldn't fix it. This was not a problem that could be remediated, and the claim had to be thrown out.

And as I recall it, that was the view that

Page 73

prevailed with Judge Legge. So these arguments to the contrary that hey, this was simply send a later demand letter and it can all be fixed is just not true, it's just not what Judge Legge found.

SPECIAL MASTER: I'm going to ask and then we're going to take a break. I want someone to tell me dispassionately without a lot of adjectives and invective what happened in New Hampshire and what happened in Missouri.

No, I'm going to get another volunteer, Mr. Bonsignore.

MS. MOORE: The claims were never filed. There was never a claim filed --

SPECIAL MASTER: Okay. I'm going to ask --

MS. MOORE: -- by lead counsel.

SPECIAL MASTER: Ms. Moore, thank you.

Go ahead.

MR. ALIOTO: Thank you, Your Honor. From lead counsel's perspective, you can only bring claims for those people who stepped forward and wanted to assert a claim. We gathered all of the claims, all of the complaints that were filed at the institution of the case. We reviewed those. Some -- there was an extensive vetting process that went on for months. Some claimants survived that process. Others didn't.

Page 74

There were also discussions as the case went on to -- to the later years of the case. There were discussions about other class representatives, discussions with lawyers who thought they had clients, and those were vetted up the line and eventually to me, and decisions were made as to the viability of plaintiffs.

SPECIAL MASTER: So what happened in New Hampshire and Missouri?

MR. ALIOTO: There was never any plaintiff that I -- certainly I didn't represent anyone, and no plaintiff in Missouri was ever brought to my attention as being out there and wanting to press a suit. That is the absolute fact.

It was, as is the case in a lot of these multistate cases, sometimes there are not claimants for these states. This is a big responsibility, Your Honor, to step up in one of these cases. You know what goes into that.

SPECIAL MASTER: Okay. What about New Hampshire?

MR. ALIOTO: I don't believe there was ever a client proffered. Mr. Bonsignore has mentioned something in his papers about late in the game that there was a -- he had someone and someone was ready to

Page 75

go. I viewed that with extreme caution because when you make a decision like that to put somebody forward for a state, it's very important. It's not only important for that state, it's important for the whole case.

SPECIAL MASTER: I remember your briefing on this point now.

MR. ALIOTO: The statute had run. The simple answer is without the invectives, the statute had run at the time he brought that up.

SPECIAL MASTER: Okay.

MR. ALIOTO: But can I make one point without invective or adjective? We have quite a different view about abandoning and not representing and, you know, sloughing people off. But, you know, the simple answer to that is Ms. Moore and Mr. Bonsignore and all these other people after the fact, you got the papers. You know what classes are represented and are not represented. Go out to the federal courthouse. File a complaint. The complaint will be transferred into this district, and we would love nothing more for them to have done that at the time.

I can't dictate to them. If they had a client and they felt strongly about this, file a case, it will be transferred in, and we'll deal with it. But after the fact, you know, after the money is in the bank and

Page 76

Mr. Alioto, you didn't do this and Mr. Alioto, you didn't do that, well, we did $576 million worth of right things. And that's what we're trying to get approved. And this is -- with all due respect to these objectors, this is just -- let me say it's a side show. Thank you.

SPECIAL MASTER: Okay. We're going to take a break now for like ten minutes, and then we'll come back and deal with the other issues. Thank you.

(Recess 11:34 a.m. to 11:47 a.m.)

SPECIAL MASTER: I'd like to move on to the notice issue. If anybody has anything more to say on this repealer issue, you can say it at the end when I give you a chance to raise any issues that haven't otherwise been raised. But we need to cover the waterfront here, so I'd like to move on to the issue of whether the notice was adequate again.

I've read the briefs, I understand the problems that have been raised with the notice. I understand the responses of lead counsel and the declaration -- various declarations of Mr. Fisher. So, you know, I think I'm pretty well up to speed on this, but I'd like to hear -- give you a chance to say anything that needs saying.

Anyone from the objectors side like to be heard on this issue?

MR. SCARPULLA: Francis Scarpulla, Your Honor.

Page 77

I think we said it pretty much in our brief, and I am not going to repeat that. We just would urge that Your Honor may wish to consider hiring an independent expert to opine on it.

Now I've done a hundred-plus notices, and so when you see one where the only evidence -- where the only hard evidence you have is a reach of 58 percent, then there is a problem, especially since as Mr. Fisher points out, if you use the early years, the class members were between six years old at the start of the period and 18 at the end of it if you use his early years. I don't even think they had -- even at the end of the period, 18 year olds don't have the right to form contracts. Put that aside.

If you use his later years, then it's 12 to 22. I'm sorry, 10 to 22. Those are -- that's the ages of the people that he targeted during the -- during the period of the -- of the price fixing.

And again, those TVs as -- as the LCDs came into the market, there was a great decline in the sales of CRTs, and they were being bought by individual family units that didn't have a lot of money because they were much cheaper than the LCDs. And to target someone who had income of 60,000 or more misses a whole group of those individual class members.

And one thing that Your Honor may ask for, which I have not been able to get, I don't know the number of individuals, human beings who have made claims, and that's something that I would respectfully suggest Your Honor may wish to find out.

Now we know that there are the big corporations that put in claims, but the question is how many natural persons put in claims. So I'm not going to repeat anything else in the brief.

SPECIAL MASTER: Okay. You said the only hard evidence is that the reach was 58 percent. I mean Mr. Fisher says it was 83 percent. Why is that not hard evidence?

MR. SCARPULLA: Because he's saying -- he's saying I think our Internet reached so many people, but there's nothing -- you have no hard evidence that anybody saw it or that they did anything about it.

SPECIAL MASTER: So I don't know how many clicks and so on?

MR. SCARPULLA: You have no idea.

SPECIAL MASTER: All right.

MR. SCARPULLA: And in fact, Your Honor, they had to come to the DRAM database and get that database from us to send out supplemental notices because the notice program was so -- was so flawed.

SPECIAL MASTER: Good. Anyone else have anything to add on this issue?

Mr. Alioto, why would it not be interesting to know this data: How many claims have been submitted, what's the dollar volume, what's the -- where are they from, how many are natural individuals, how many are from the state of California to satisfy the attorney general? Why would it not be interesting to know that and evidently has not been made available?

MR. ALIOTO: Yes, thank you, Your Honor. Mr. Duncan and Mr. Novak are going to be responding to those notice issues.

SPECIAL MASTER: Okay. Mr. Duncan.

MR. DUNCAN: Sure. Your Honor, Matthew Duncan from Fine Kaplan again.

I think -- I think in a vacuum that information will be interesting. The problem -- the issue is that the process is ongoing. Claims are still -- many were received at the end. The claims administrator is still processing that and then certainly that information is going to be known to the court. The issue is that it's not -- it's not germane to settlement approval and whether the standard for notice is met ex ante.

So bear in mind, the extent to which all of these issues were considered exhaustively at the

preliminary approval stage. Everything that was going to be done notice-wise was vetted then. It was done. There's an extensive record at this point about everything that was done and the effectiveness of it.

To speak briefly to the point that there's no hard evidence about the reach statistic, that's just wrong. I mean, Mr. Fisher's declaration includes exhibits that say, you know, for the digital outreach precisely what was done, the number of impressions. Google, for example. Google is the search engine. There were Google banner ads done throughout the Google ad network. Google search results, paid search results were returned. This is just one example of the digital outreach. Two hundred million plus impressions on that kind of thing. And the data is in Mr. Fisher's declaration.

SPECIAL MASTER: By impressions, what do you mean?

MR. DUNCAN: Well, by impressions, that means that when something in the Google network, in the Google ad network website is visited, there's a banner ad that someone sees. Now whether they actually click on that, you don't know. We don't have that data. But you know that someone saw the banner ad within the network. And so that's what the impression data does. And there's a

long list of digital outreach that was done. We have the impression data for all of that. And then what Mr. Fisher does is feed that data into the comScore system, which is what marketing professionals and everyone else uses to do this, to calculate the reach.

So at the end of the day, Mr. Fisher has explained what he did. He's given you the data that went into comScore and then the comScore is the upshot of all of that. And nobody has really -- it's the way it's done, and nobody has shown otherwise in any of the projections.

So the reach is the reach. It's well within the standard. It's -- it's best -- best practicable notice for all of those reasons, and we think the record is more than robust to find the notice requirements have been met.

SPECIAL MASTER: So when -- when would you expect to provide this information to the court assuming I don't tell you to do it sooner at the -- at the time the final papers are filed on the motion for final approval?

MR. DUNCAN: I think Mr. Alioto probably knows a little bit more about this than I do. But conceptually, I mean, that's part of the claims process reporting that would happen at the allocation phase.

MR. ALIOTO: We intend to be doing that, although there is this issue raised by the state of California about extending the deadline, so to the extent it's extended, you won't have it complete until that deadline runs.

SPECIAL MASTER: But can't we know how things stand now? I mean, I understand the argument that a court has to evaluate a notice program ex ante before it knows how it's actually going to work and make a decision as to whether it's the best practicable. And the court here has done that. But gosh, just common sense tells you it might be nice to see what the results are.

MR. ALIOTO: I will check with the administrator today and report on where he is and whether and when that information can be made available.

SPECIAL MASTER: And if it's robust, I should think you'd be the first one to be trotting it out there.

Okay. Anything else on notice? Let's see if I have any questions.

MR. COOPER: Your Honor, I assume that our suggestion about an independent expert is something you're considering? I mean, I'm not asking for a response. I just -- you haven't rejected it?

SPECIAL MASTER: I know -- I have not rejected it.

MR. COOPER: Right.

SPECIAL MASTER: I mean -- say I were to do that. What -- what different information would they -- I mean I guess they might provide an opinion that's different than Mr. Fisher's opinion, but then I just have a battle of experts, and how has the ball been advanced?

MR. DUNCAN: Your Honor, that's a good point and it is -- Mr. Fisher is an expert. He's done this many times. His CV is in the record. Everything he's done is in the record, and all of this would lead at most to quibbling about how a different expert might do something slightly differently at the margin. And that's not the standard for whether notice is reasonable. The standard is whether it's reasonable on its own terms, not whether different lawyers might have done something differently on margin or whatever.

SPECIAL MASTER: Okay. Mr. Scarpulla or Mr. Cooper, or you can both speak at once.

MR. SCARPULLA: Yes, Your Honor, the reason that you -- the reason for an independent expert is so that he or she can tell you the flaws in the notice program that Fisher -- Fisher is --

SPECIAL MASTER: Or the absence of flaws. If I hire an independent expert --

MR. SCARPULLA: -- or absence of it.

SPECIAL MASTER: -- not one that you suggested, if I hire an independent expert --

MR. SCARPULLA: Correct.

SPECIAL MASTER: -- he might say or she might say everything is dandy.

MR. SCARPULLA: You're absolutely right.

SPECIAL MASTER: Is that correct?

MR. SCARPULLA: That's absolutely correct. And then you -- Mr. Fisher was a former lawyer who didn't make it in the practice of law and decided to go into this business. You can't do --

SPECIAL MASTER: We all make life choices.

MR. SCARPULLA: You can't do nationwide notice of any significance for $1.5 million. That's not possible.

SPECIAL MASTER: I noted that figure.

MR. SCARPULLA: It would cost at least 4 or 5 million to get the kind of reach to 80 or plus percent, and that's the whole point of having an independent expert.

MR. COOPER: I would just say, Your Honor, that I think you put your finger on it. This is an

independent expert, someone that works for the court who's not in an advocacy position. It's not like you get two sides putting up their own experts who are advocating for the two sides. This is someone who would evaluate it, and give you an independent view. And I think that's a totally different thing. You'd have to -- they might say it was fabulous and put an end to all these questions about notice.

SPECIAL MASTER: Or they might be competitors of Mr. Fisher and love to get a whack at him, you know, so...

MR. COOPER: Well, I guess that's a theoretical possibility but...

MR. ALIOTO: Your Honor, let's not forget, when we were working on the schedule, and the objectors needed all of this time and this elongated schedule, there were statements made by Mr. Scarpulla that he needed time to retain an expert. Well, he got the time, but he has not retained an expert. Instead, he's come in and said well, we're not going to retain anybody. We want you to go get an independent expert. There's no basis on this record to do that, especially after he initially indicated that he was going to pursue that himself.

SPECIAL MASTER: Okay. Mr. Bonsignore?

MR. BONSIGNORE: Yes. Mr. Alioto is entitled to an opinion, but so is Mr. Scarpulla and the other objectors. It was one option to hire the excluded plaintiffs' reviewer. The smarter option is to have the court hire their own because then it's absolutely independent and it wipes out the argument oh, it's a battle of the experts. That's gone. So you're presented only with -- I'll summarize my -- so you're presented only with someone who you hired and the argument that it's a battle of the experts is entirely eliminated. Thank you.

SPECIAL MASTER: All right. The next issue that is on my mind is this -- the impact of the Chunghwa settlement. And I confess to be confused as to what the objectors are really saying is the problem created for this settlement by the terms of the Chunghwa settlement. I forget who -- whether it was Ms. Moore who -- go ahead, Mr. Cooper --

MR. COOPER: I think --

SPECIAL MASTER: -- or Ms. Kirkham. Either one.

MR. COOPER: Go ahead.

MS. KIRKHAM: We didn't say that it was a problem for the settlement approval. We said it was a problem for the approval of the plan of allocation

because the plan of allocation ignores the existence of the Chunghwa settlement. And the Chunghwa settlement has some very specific terms in it about how the money is to be paid out and to whom. So that was what we raised.

We simply said that it was -- that the problem was that the Chunghwa settlement, which is final, provides a plan of allocation. That plan of allocation is not incorporated into this plan of allocation, and this plan of allocation would -- is inconsistent with that plan of allocation.

SPECIAL MASTER: How?

MS. KIRKHAM: Okay. The Chunghwa --

THE WITNESS: I know your brief said this but I --

MS. KIRKHAM: That's okay. I can go through it fairly quickly.

The Chunghwa allocation provides for the settlement money to be divided up among certain states with -- proportionate to census data. So they would -- so it creates pots that are fixed amounts. Then claims would be solicited. So -- as opposed to a pro rata among all of the people that the plan of allocation deemed entitled to receive money, which is the current plan, you can see there'd be a real difference if

there's $10 million in California's pot and $7 million in Arizona's, or $5 million or -- well, some other state. Arizona is not a good, actually, example.

MR. COOPER: It also includes Illinois, Oregon and Washington.

MS. KIRKHAM: Right, it does include Illinois, but the point I'm trying to make --

MR. COOPER: It generally includes distributions to Illinois, Washington and Oregon who are excluded --

(Reporter clarification).

The distribution in the judgment includes payments to Illinois, Oregon and Washington AGs who are not in these settlements. But there is no provision for that coming out. And also that class, that settlement class includes resellers of product.

SPECIAL MASTER: So what should we do?

MR. COOPER: I think it's a problem.

SPECIAL MASTER: Okay.

MR. COOPER: You have to re-notice.

SPECIAL MASTER: Thank you. But what do I do about it?

MR. COOPER: Well, you disapprove it, is what you do. You've got to re-notice people in other states. You've got to carve out the money. You have to tell

people what's happening. I just don't -- you can't just ignore it.

SPECIAL MASTER: Okay. I'm sorry to be plodding here. But to whom do we have to give notice now?

MR. COOPER: Well, if the class includes resellers, you have to now have a notice which says that resellers can claim against this pie.

SPECIAL MASTER: Okay. Because the Chunghwa settlement includes payments, potential payments to resellers --

MR. COOPER: Right.

SPECIAL MASTER: -- whereas this one doesn't.

MS. KIRKHAM: Doesn't. And the Chunghwa notice told resellers they would be paid at a later date.

SPECIAL MASTER: Okay. So let me see if I get it. You're saying there are two significant differences between the allocation plan in Chunghwa and this allocation plan. One is resellers get money from Chunghwa. They don't here.

Number two is there's a different formula for distributing money state by state in Chunghwa than the pro rata plan that is proposed here.

MS. KIRKHAM: Yes, yes.

SPECIAL MASTER: I got it.

Page 90

Mr. Alioto.

MR. ALIOTO: Yes. There's no inconsistency. First of all, with respect to resellers, the notice that's in our brief, the notice is quite clear that because of the relatively small amount of money paid under the Chunghwa settlement, that would be the settlement for the ten million dollars plus the proffer. Because of that small amount, it would not have been practicable to actually allocate money. And the notice recites -- I'll try to find that cite in the brief, but -- it's in our most recent brief. We cite to the notice that says resellers, you may not get money. And that was put in there because of the small amount of the settlement.

And so there's never been any expectation or promise that they would get money as part of that Chunghwa settlement.

SPECIAL MASTER: But I'm being told there was final approval of the Chunghwa settlement, and in that settlement was a provision for giving money to resellers.

MR. ALIOTO: Well, I would have to see that.

SPECIAL MASTER: Isn't that a final judgment?

MR. ALIOTO: Well, that's -- no, I think what they're saying is in that -- they're referring to orders

Page 91

that there was a provision to give money to states.

There's two issues here. One is resellers. That issue, I submit, is very straightforward. Because of the small amount, we recognized at the time that there might not be money to distribute.

SPECIAL MASTER: Well, it may be a small amount, but we have the small issue of a final judgment that says they get money.

MR. ALIOTO: I don't believe that's recited in the final judgment, Your Honor. It's been quite a while since I've seen that, and we'll check that. But the notice, the document that actually went to class members said you're not -- you may not get anything. That's quite clear, and that's cited in our brief. Now whether there's some -- some mention to the contrary in the judgment, I just don't know from memory, but I will check that. The notice, the crucial document that was sent to the class member that they read and relied on had that provision.

SPECIAL MASTER: Okay. So your -- your position is that any inconsistency with respect to the treatment of resellers or other class members in Chunghwa and this case is cured by the "new comprehensive," in quotes, notice, that you gave in this case, and that notice in effect says oops, actually

Page 92

you're not getting any money?

MR. ALIOTO: Yeah, and I'm not so sure that there is any inconsistency.

SPECIAL MASTER: Well, resellers get money, resellers don't get money. That sounds like an inconsistency.

MR. ALIOTO: Yeah, but what are they referring to -- I mean, I'm going on arguments that have been made. What are they -- I'm trying to respond to an argument, but I'm not exactly sure what the argument is. The argument is that there was something in the final judgment in the --

SPECIAL MASTER: In the -- I am being -- wait.

Okay. Mr. Scarpulla.

MR. SCARPULLA: Your Honor, there was a final judgment approving the settlement with Chunghwa which provided for a payment to resellers. It's in there. It's final.

SPECIAL MASTER: Okay. All right.

MR. SCARPULLA: Period. And then there was also a provision in there which provided that the money would be divided certain percentages by state. That's gone too.

SPECIAL MASTER: Okay.

MR. ALIOTO: All right.

Page 93

SPECIAL MASTER: Let's be practical here. We don't want a $10 million tail to wag the $576 million dog. So this is a problem that I would like to find a way to cure and not have it be a reason to foul up a settlement.

MR. SCARPULLA: But that's a big problem, Your Honor, because it's constitutional issues of due process.

SPECIAL MASTER: I get it. If it's a problem, it's a problem.

MR. ALIOTO: And what that settlement provided for -- and here's -- I think I get the gist of the argument. When we sought approval of that Chunghwa settlement, certain attorneys general appeared. They got the notice, and they got the CAFA notice, and they stood up for their rights.

And Washington said we want to go our own way. And Oregon and Illinois said we want to go our own way in the future, but thanks a lot for getting this settlement and we should get this money. We -- and that issue was tee'd up in front of Judge Legge. And Judge Legge ruled yes, they're entitled as AGs to that money, and the judgment and the preliminary approval order recited that. That was a ruling by Judge Legge. Not a contractual arrangement or deal, it was a -- it was a

Page 94

contested matter and a ruling by the judge.

I think where the confusion comes in, Your Honor, is the amount of the settlement that was allocated to Illinois and Oregon was based on a population allocation. That population allocation is set out in the order, and it says Illinois and Oregon are going to get X amount based on this population calculation. It was like setting forth the background of the calculation.

What the objectors are saying is that that background of the allocation to Illinois and Oregon, that meant that all those other states had to get money. That's not the case. The listing of all those other states was just for the purpose of showing how we arrived at the allocation figure from Washington and Oregon. No inconsistency. Money is going to be paid to those states. Matter of fact, I just spoke with Blake Harrop (phonetic) the other day, a couple of days ago confirming that with him. That settlement is over, it's done, and those terms are going to be honored as part of this larger package.

SPECIAL MASTER: What do you mean they're going to be honored?

MR. ALIOTO: There's a provision in the Chunghwa settlement per Judge Legge's ruling that a

Page 95

certain -- certain percentages of money must be paid to the state of Illinois and the state of Oregon. And those payments will be made because that was part of that settlement approval.

SPECIAL MASTER: So you will carve out an exception to the pro rata distribution to take care of Oregon and Illinois?

MR. ALIOTO: Precisely.

MR. COOPER: And the amount of money that will be distributed pro rata will be the amount of money you think is involved less the amounts that go to those AGs. So all the notice that says this is the amount you're going to share pro rata is incorrect by the amount. It may not be a large amount, but it's incorrect, and there's been nowhere in all the presentations about this, any acknowledgment until we brought it up of the problems with what exists with regard to the commitments made in connection with the Chunghwa settlement.

Look at the -- look at the order of preliminarily approving the Chunghwa settlement. That's where the chart of states and percentages is attached.

SPECIAL MASTER: What about resellers, Mr. Alioto? What --

MR. ALIOTO: There will be -- there's no payment contemplated to the resellers, Your Honor.

Page 96

SPECIAL MASTER: But how -- if there was a final approval by the district court of a settlement that provided money going to resellers, how do we ignore that?

MR. ALIOTO: Well, I'm going to have to check that final judgment, Your Honor.

MR. COOPER: Well, the class includes resellers, Your Honor. The settlement class includes resellers.

MR. ALIOTO: I will say --

SPECIAL MASTER: Did you have -- you're shaking your head. Do you have something of wisdom to add? No? All right.

MR. ALIOTO: Keep in mind that this is --

SPECIAL MASTER: Look, this is a small issue in magnitude, but it's troubling, and I don't have any of the -- I mean, they're all in the record. But nobody has really thoroughly briefed this. Nobody has given me a stack of material I should look at like the language of the Chunghwa settlement, the -- the orders approving it and so on. And there's not a lot of time between now and January 15.

MR. COOPER: We'll pull them together and send them to you, Your Honor. We'll send the list that we're going to send to Mr. Alioto in advance of sending it to

Page 97

you in case he wants to add something to the list.

MS. MOORE: Just a point that I believe now that everyone can make a claim, there's no place on the website to actually make a claim for resellers.

SPECIAL MASTER: Yeah, I mean, resellers have been excluded from this settlement. I understand.

Yes, Mr. Bonsignore?

MR. BONSIGNORE: Very briefly Your Honor, you might find 55 F.3d 768, 797. It's a third circuit case cert. denied, 516 U.S. 824 of interest and when you're evaluating this specific issue.

SPECIAL MASTER: Give me the name of the case.

MR. BONSIGNORE: In re General Motors Corp Pickup Truck Fuel Tank Products Liability Litigation.

SPECIAL MASTER: And is that cited in your brief somewhere?

MR. BONSIGNORE: Yes.

SPECIAL MASTER: Thank you.

Sir.

MR. ST. JOHN: This strikes me as someone representing a client who is potentially impacted by this as an unforced error by class counsel. And I agree with Your Honor that it shouldn't wag the dog. I think the solution is that the party that's responsible for the unforced error should pay for it. Deduct the cost

Page 98

from class counsel's fees.

SPECIAL MASTER: Deduct what costs?

MR. ST. JOHN: Whatever additional notice and whatever it costs to fix payments for resellers and payments to the states in question. Mr. Alioto made the mistake. There's a term for that, but Mr. Alioto should be responsible for fixing it. And you can fix it without -- and resolve these problems.

MR. ALIOTO: We'll determine that when Your Honor has the full records and you can make that determination.

SPECIAL MASTER: All right. Before we leave, I'll set up an additional briefing schedule on this issue.

Now, that brings us to Mr. Varanini. And you want to extend the claim deadline?

MR. VARANINI: Yes. But --

SPECIAL MASTER: And I am told by your colleagues on the other side that doing so will create all sorts of claims of disparate treatment. California residents will be claimed to be given a longer time to make claims than other people and so on. Before you get into your argument, let me ask you: What happens if the court says no? What happens down in the California state court if the court says no, we're not going to

Page 99

extend the deadline? Sorry, deadline is a deadline.

MR. VARANINI: Well then --

SPECIAL MASTER: What do you do practically?

MR. VARANINI: Practically that's a difficult question because we have to figure out what to tell California and actual people.

SPECIAL MASTER: They now have settled or -- their parens patriae --

MR. VARANINI: Yes.

SPECIAL MASTER: -- their claims that you brought on their behalf. Where do they make claims?

MR. VARANINI: Well, they can't. We didn't -- this is set out in our briefing, so if Your Honor doesn't mind my summarizing the briefing, that's fine, but I would encourage Your Honor to look at it.

When we settled these cases, we did so based on having had discussions with the indirect purchaser plaintiffs trying to fix a situation that occurred within early settlement. And as part of that, the amounts that we negotiated for were done with the view that the indirect purchaser plaintiffs were out there. They were in federal court. They were ahead of us going to trial.

Traditionally, you know, private plaintiffs are good at getting monetary relief, and we tend to focus on

Page 100

sort of the residue that can help those folks who don't file claims as far as injunctive relief. And so we agreed if we can persuade defendants to insert language that would make it crystal clear, even though this has always been our position, that we were not out there to supplant or replace class claims.

There's a price for that. Because we can't give defendants exclusivity. We can't say okay, we can give you a release which would eliminate Mr. Alioto's claim 'cause we don't do that. They're not going to pay us a lot of money because Mr. Alioto is the one who can come in there and say I've got these big claims. They're worth a lot of money. This is -- this is what I bring to the table.

So we didn't negotiate for the kinds of sums of money that would allow us to run a direct recovery program where people could make claims against our pot, even leaving aside the other claims that we have in our case, because we do have other claims aside from natural people. So that's what we relied on.

Traditionally the way we work is we come in at the allocation stage, like we have here. Usually this is behind the scenes because we have joint settlements. Here it's not behind the scenes, so this makes it different. But we come in, and we give advice on

Page 101

allocation. We say okay, we as AGs really care about natural people. Not to say private plaintiffs don't, but we really care about them. They're our citizens, they're going to complain to us if there's a problem. They're not going to go complain to you.

SPECIAL MASTER: Might even vote you out of office.

MR. VARANINI: Right. They might vote her out of office or hypothetically they might decide not to promote her to the next office that's coming up. So we take --

MR. GOLDBERG: We have that on the record.

MR. VARANINI: I'm aware of that. I hope the general looks favorably on me for having said it. But be that as it may, we're the ones who are going to get the criticism. So when we send out a notice that would say -- and we can't because we don't agree with it -- that would say California natural people, you can't file claims. You're going to have to live with what we can give you on cy pres, meaning sort of this indirect relief where we give money for the indirect benefit of the class. Just making sure there's a complete record. I know Your Honor is very well aware of this. We're the ones who are going to get criticized. And this is -- we negotiate these settlements in reliance on this

understanding that we tried to implement to move forward.

SPECIAL MASTER: But let me just --

MR. VARANINI: Sure.

SPECIAL MASTER: All the natural people in California whom you represent have already gotten the federal notices.

MR. VARANINI: Correct.

SPECIAL MASTER: They've already had an opportunity up until December 7 to submit claims. You're kind of saying they should -- because we have a parens patriae claim on their behalf, they should get a second whack at the Apple?

MR. VARANINI: Not exactly, Your Honor. We're saying one of two things here. Okay? This shades into the other issues. So we believe that for allocation purposes, for allocation purposes from what we can see from the face of what was done, because that's all we have -- we don't have access to the notice and claims data -- so what we can see from the face of things is we believe there are deficiencies where natural people didn't get their fair shot.

In the context of allocation there is notice. Notice as you've heard these gentlemen and lady talking about have to do with reach, right? How many eyeballs

literally saw the advertisement. That's important for opt-out purposes. It's important for due process purposes. But that's different than generating claims to make sure that, for example, natural people had their fair shot. Based on the face of what we're seeing, we don't believe for reasons that we've already said in our brief that natural people had their fair shot.

Now we asked for notice and claims data to give a more refined -- more refined analysis for the benefit of Your Honor. And that was ultimately denied, as Your Honor is well aware. And it's now pending in front of Your Honor. So absent that, all we have to go on is what's on the face of it, and we believe that's insufficient.

So how this plays in the state court because Your Honor asked. This is in the papers, so I apologize for repeating it. But how it plays in state court is we can't put in a notice that we think California natural people already had their opportunity to claim and that's it because we don't believe it. So -- but on the other hand, the claim's deadline has closed, so do we tell people: Well, go ahead and file a claim and maybe it will be honored and maybe it won't? Do I tell people well, the special master has recommended against it, so you could file it, but we plan to make an objection to

the court?

It puts us in a really sticky situation. So one of -- we proposed one of two paths. Either -- you know, either reform the claims process as part of the allocation plan, which Mr. Alioto has referred to he may be open to, or extend the claims deadline so that we can tell California natural persons they have an opportunity to claim.

Now one final point. We have said that Your Honor, even on that point, extending the claims deadline, that Your Honor has a choice. You can do that as to California natural people only because we and we alone of all the groups of claimants have this parens claim that's out there for them. And that is unique, and that is something that the court can use to make a difference. And we've given Your Honor cases and argument on that. Or Your Honor can extend it as to everybody.

And on that point, Mr. Alioto has expressed his fears about corporations being unfairly advantaged as part of that. We responded to that. We believe there's no evidence to back that up. But more importantly, we believe there's a couple of constructive solutions that Your Honor can recommend to deal with that if Your Honor feels it's more appropriate to extend the claims

deadline as to everyone.

SPECIAL MASTER: So Mr. Alioto, why isn't an easy solution to do what Mr. Varanini says? California natural persons are special because they're the only ones for whom a parens claim was brought. They need to be given a fair opportunity to file claims under the parens lawsuit, extend the deadline for California natural people. And if anybody -- if anybody objects to it as being improper disparate treatment, we say sorry, they're the only ones who have a parens claim. Done, easy, fix. Right? Wrong?

MR. ALIOTO: Mr. Paul Novak has been working with the AG. He'll respond.

MR. NOVAK: Over here. Paul Novak of the Milberg firm.

Let me first identify a couple of points in Mr. Varanini's presentation and his papers that I think we agree with. The first is I think he is accurate in distinguishing the posture of California natural claimants vis-à-vis other class claimants in that they are the only ones with the companion parens patriae suit that has also been pending and litigated, albeit in the separate form at the same time. We recognize that distinction.

He also is accurate that the district court

possesses equitable discretion to extend claim deadlines generally. We don't contest that. We don't believe it is necessary given the adequacy in our view of the notice that has been implemented to California claimants that a -- that a deadline extension is necessary, or that an extension of that deadline would be necessary for purposes of issuing final approval of our settlement. But we recognize the sensitivities that are associated with the parens case pending at the same time. And if that's the solution that the court imposes, so be it based upon that distinguished posture.

SPECIAL MASTER: But what's the downside?

MR. NOVAK: Our primary concern is the exposure to the types of objections that might come from other -- from other corners or other angles. But aside from -- that's our primary concern, and -- and if the court doesn't find that concern to be one that's particularly persuasive, I don't -- I don't think we otherwise have an issue with it.

SPECIAL MASTER: Well, I mean, I was contacted by an enterprising aggregator directly on the afternoon of December 6th asking me to do something to facilitate his ability to file claims. And -- you know, so I'm aware that there is that -- you know, there is that industry out there which -- but...

I don't know. I'm feeling as if I'm not hearing any serious downside to extending the deadline -- recommending to Judge Tigar that he extend the deadline for California natural persons except that you might get a lot of objections from people that, you know, I think we could deal with. I don't want to do anything that has unfortunate consequences, you know, unforeseen consequences, so -- but I'm not hearing any except the objections that might come in.

MR. NOVAK: I -- I think that's probably an accurate characterization.

SPECIAL MASTER: Okay. Mr. Varanini, as long as you're on a roll here, what -- you had some other issues. You raised the issue of cy pres. You said there's no cy pres provision in the -- in this settlement.

MR. VARANINI: Correct.

SPECIAL MASTER: The contemplation is everything would be distributed pro rata, but how does that disadvantage your California natural people?

MR. VARANINI: Well, there are two parts to that. One is we don't know if it's -- we don't have anything in the record that says that it's all going to be distributed. We have statements being made in briefing, but we don't actually have the claims data

with the projection, which in other cases that's been provided.

But let's assume for the sake of argument, because I'm not trying to evade the question, that that's what is going to happen; that at the end of the day, leaving aside this issue of giving people treble payment, let's say based on single damages just for the sake of the argument for a moment. So that's the idea that people at the maximum, if they filed the claim, they're only going to get back their single damages.

And let's assume that exhausts the fund entirely. Well, if it's single damages, that's okay because there is a preference for direct distribution. So if you have a fund, and assuming Your Honor is otherwise okay with the allocation plan, and, you know, the money that was set aside for people to file claims, both people and corporations, you give them single damages, the money is completely run out, there isn't a cent left -- and this includes issues with people having moved; you can't give them checks. This includes trying to track people down and you don't succeed. Let's just assume for the sake of argument there isn't even that ghost of a residue left.

Agreed -- I would agree based on federal law without respect to California law, I would agree cy pres

is not an issue. Okay? But then -- and again, we're only looking at the face of the notice plan and the allocation plan because we don't have the data. Data would allow us to give a more refined perspective than we can give. Here we're talking treble damages. Okay? So this is the idea that corporations and individuals not only should get the full value of their claims, but that that should be trebled.

And so the question that's in front of Your Honor, again in the absence of additional data, is is it appropriate for those folks to get three times the value of their claim or is that a windfall. And if it's a windfall, should that extra money go cy pres or should there be at least notice to try to find additional claimants first.

We've proposed both as potential alternatives for the court. So we said well, we think based on other cases there's sort of obvious additional notice that could be done to gin up claims. And because we don't have the data, we don't know whether those obvious additional notice that was done in other cases could be done here or not.

All we can do is point to the other cases, and then Your Honor has to make whatever decision Your Honor feels is appropriate. Or we said -- let's say it did

not turn out to be the case, that the indirect purchaser plaintiffs come back and say look, this really would cost us way too much money, and it's just not going to gin up claims, okay? Well, then we said well, wait a minute, then if there is this windfall, why not leave some money left over for cy pres after everybody gets the value of their claims in full. Then that way we know everyone in the classes of the different state specific damage classes gets some sort of benefit. It may be indirect, but they're going to get a benefit.

And as long as everyone follows the proper protocol that's been set out in Ninth Circuit cases, a protocol we're very experienced with, there shouldn't be the kinds of issues that have arisen in other cases such as Kellogg, the Ninth Circuit case. So that's why we thought there's this sort of interplay between claims and cy pres.

SPECIAL MASTER: Okay.

MR. NOVAK: May I respond to that? Again, Mr. Novak on behalf of the IPPs.

Let me make a couple observations with respect to the plan of allocation, its relationship to notice, and the issue of single versus treble damages.

First, as has already been discussed, the adequacy of the notice plan has already been touched



upon. I think even the California attorney general recognizes that the notice plan as implemented meets the due process requirements and Rule 23 requirements. Exhibit C of his declaration, the claim stimulation document that references the notice plan, states, quote:

"Due process notice programs must adhere to the requirements of Rule 23 claim stimulation programs. Unshackled from these requirements allow us to think outside the box."

So what Mr. Varanini is discussing is something that exceeds the requirements that class counsel has for purposes of creating and submitting and implementing the notice plan that then informs the claims administration process.

As it relates to claims administration, although we don't have final data, and in the event that the court extends the deadline for the submission of claims, won't have the deadline -- won't have the data for an even greater period of time, but what we think is going to happen with -- based simply upon the claims that have been submitted to date is that claimants are going to receive much closer to single damages than they will to treble damages.

And we note that there are a number of other



cases where treble damages as the cap was acceptable to the court for purposes of issuing final approval, but also even to the California attorney general for purposes of obtaining final approval on some of those settlements.

SPECIAL MASTER: In LCD there was a treble damage cap.

MR. NOVAK: LCD had a treble damage cap.

SPECIAL MASTER: Did the California attorney general complain about that there?

MR. VARANINI: No, we did not.

SPECIAL MASTER: Of course, there was more money.

MR. VARANINI: Well, if -- if I may, aside from the issue of whether there was more money or not, and we were working with other states and so had to compromise, there were two key distinguishing factors about LCDs, at least we thought. Now Your Honor may disagree with that. One of those -- one of the distinguishing factors was there was a more extensive notice campaign done for purposes of ginning up claims than is being done here.

SPECIAL MASTER: Right.

MR. VARANINI: The second distinguishing factors are the amount of the fees claims were lower, so there was more money in the pot.



SPECIAL MASTER: Not a lot.

MR. VARANINI: Not a lot. And there was -- in LCDs there was a reversionary -- there was -- sorry, reversionary is the wrong term. There was a clause that said if there was any money left over, it would go to our cy pres. So there were distinguishing features of LCDs that we could say well, maybe -- look, in a perfect world -- you get the point.

SPECIAL MASTER: Fair enough. Go ahead.

(Electronic interruption.)

MR. NOVAK: The other point I wanted to make, and this is with respect to at what point does a court make a determination. We've given enough money to claimants. Let's proceed to distribute the remaining money on a cy pres basis.

I brought to Mr. Varanini's attention this morning when we were discussing these issues that some of the other circuits -- the Ninth Circuit hasn't spoken on this issue or, for that matter, any court in the Ninth Circuit that I'm aware of. Other circuits have addressed the issue of at what point do you go to cy pres.

And in the Second Circuit, specifically in the Masters versus Wilhelmina modelling case, it's 473 F.3d 423. The second circuit actually found it to be an

abuse of discretion to consider cy pres distribution before making a treble damage allocation to the claimants.

And I think a couple of other courts have come to a similar conclusion, although not probably as clearly as the Masters decision. One is a Bank America decision 775 F.3d 1060. I'm not going to suggest that it went as far as Masters versus Wilhelmina, but it cited language from that decision on the cy pres issue and the treble damages issue approvingly. That's from the Eighth Circuit. There's also an in re publication paper --

SPECIAL MASTER: You know what, I'm going to ask you to do the same.

MR. NOVAK: I'll submit --

SPECIAL MASTER: If you could just submit a letter with any citations you wanted.

MR. NOVAK: Okay. Particularly that one because I've only got a Lexis cite for it, and you'll need it in Westlaw.

SPECIAL MASTER: All right.

MR. NOVAK: So other courts that have looked at that issue have explicitly found that it's okay to go up to a full treble damage, and in some instances have said it was an abuse of discretion not to go first to treble

damages. The Lupron marketing decision that Mr. Varanini pointed to actually had a 1.67 multiple of damages for claimants as -- as the cut off in that settlement, and it was a cut off that had been negotiated.

What happened in that case is plaintiffs originally had a 100 percent allocation plan. You had some objectors come in and say hey, we should receive more than 100 percent before cy pres distributions are made. And so a negotiation to revise the settlement to increase it to 1.67 times was made.

And then at that point, the court said because the objectors settled with that revision to the settlement and then came back later and argued about it, and the court said you've -- you've waived your arguments with respect to getting even more than 1.67 times your damages because you obtained consideration for it when you revised the settlement agreement.

So basically I think the case law certainly allows for distributions to go up to treble damages, if not require it, particularly in an instance where as here it's not contested that the notice plan meets due process and Rule 23 requirements for being the best practicable notice. And for those reasons we don't think that the modifications to the allocation plan are

appropriate.

And let me make one final observation. And that is that this whole idea that we need to go until the very end of the claims distribution process when all of this data has been submitted and make the determination based on that, if we continue to extend the claims deadline, it has the problem of continually forestalling the distribution of money to claimants, which given the amount of time between the beginning of the class period -- oh, that actually reminds me of one other thing.

And that is there -- if you had actually obtained these damages back when these purchases were initially made at the beginning of the damage period, and didn't have the time value of that money for what's near 20 years, that makes treble damages all the more appropriate, even though I don't think any claimants are going to be getting it based on the claims data that's been submitted.

SPECIAL MASTER: You're worried that people may have been eight years old when the claim period started, but they may be 80 before they get any money.

Mr. Varanini, I'm worried about your practical problem here. Let's say I recommend next week that the claim deadline be extended. Nothing is going to happen

on that until March 15 unless I ask Judge Tigar to rule separately on that issue quickly.

MR. VARANINI: Well, there are -- sorry.

SPECIAL MASTER: And you've got a January 27 hearing.

MR. VARANINI: Yes.

SPECIAL MASTER: And you've got to give notice.

MR. VARANINI: Yes. There are three responses to that. First of all, if nothing else, we could at least say that Your Honor has in your report and recommendation recommended the extension of claims deadline. That would be positive encouragement that we could point out to people to submit claims, even if ultimately the court retains the discretion to say no, and we would have to say something about that to be frank.

The second point is that as Your Honor indicated, Your Honor could recommend to Judge Tigar to rule quickly on this one issue so we would have an answer before the hearing.

The third possibility is that we do have pursuant to the proposal we had made to extend the claims deadline, we've left some water in there. So if something happened, we could -- we could, for example, move the hearing back by a week or two and still have

Page 118

more than enough time for people to get notice and still not leave things out of sync with the final approval hearing.

At some point we do recognize that if things get pushed back far enough, that's on us. So we want to have the preliminary approval hearing very soon, and we prefer to have it on the date that we set, but we did leave a little bit of water in our proposal to move it forward to June 30th so that we would have the ability to deal with these kinds of circumstances.

SPECIAL MASTER: Okay. So I've covered my agenda. Is there anyone who has anything remaining that they think should be brought to my attention?

Mr. Cooper.

MR. COOPER: This doesn't actually have to do with any of the substance we've been talking about. One of my questions relates to the protocols for getting notices and distributions. You posted yesterday an email exchange that apparently you had with Mr. Alioto, and I'm not certain with Mr. Scarpulla or not, which set out the issues you wanted to talk about today. The original emails and your email responding were not sent to all counsel, and so --

SPECIAL MASTER: My bad.

MR. COOPER: Well, apparently Mr. Alioto's --

Page 119

SPECIAL MASTER: I apologize.

MR. COOPER: -- directly going to you initially was not sent over yesterday. So my question is what are the protocols so we can all be getting timely notice of what's going on?

SPECIAL MASTER: Okay. The Order of Reference allows me to have ex parte conversations with counsel on procedural issues. I keep it -- try to keep it to a minimum. At the very beginning when we were getting organized, Mr. Alioto and I talked quite a bit as we've gotten into this. I've tried to keep it more formal and more transparent.

So I think that from now on any email exchange with me, either email or letter exchange with me should be posted on Case Anywhere on the JAMS website, and I failed to do that. I was actually on vacation, and that's just my mistake.

And -- I mean I think I sent it to the people I thought would have the most interest in it, Mr. Varanini and Mr. Scarpulla and Mr. Alioto. So I apologize to everyone else. But I think that's the way we should do it. Any communications with me should be -- should be posted on the Case Anywhere.

You know, I suppose something could come up that would be incredibly urgent, a procedural matter

Page 120

that someone would just have to call me on the phone. I would really like to avoid that, but, you know, if circumstances demand it, my Order of Reference permits it.

MR. COOPER: I was aware of what it says in the Order of Reference about ex parte communications, although I do believe the word was "scheduling" and not "procedural" but I'm not quibbling -- I'm not quibbling about that. But this particular email seemed not to be in that category where you've talked substantively about what's going to happen, and that's why I'm bringing it up, so...

SPECIAL MASTER: I've already apologized. I don't know what more I can do.

MR. COOPER: I'm not trying to beat it up anymore.

My second question was during the discussion you were having with regard to notice and claims in the discussions, particularly about the claims rates and what the experience has been, you made a statement, and I wrote the words down, and I believe it's a question to Mr. Alioto with regard to the information about the claims experiences. And you said: Would that be the end of the, quote, "final" -- or when, quote, "the final papers are filed."

Page 121

And that confused me because I thought that the only papers that are yet to be filed is your report and objections and responses to that, and I didn't know what you were referring to by final papers.

SPECIAL MASTER: I don't either. But I take it what would normally happen is that there'd be an ongoing reporting to the court of the progress of the claim process to allow the court to confirm that the claim process was being carried out the way it was supposed to be carried out. So...

MR. COOPER: Well, I just wasn't certain if there was some briefing schedule that I wasn't aware of.

SPECIAL MASTER: No, no.

All right. Anything else? I have a couple of things to say at the end, but --

MR. ALIOTO: Two points, Your Honor.

SPECIAL MASTER: Mr. St. John.

MR. ST. JOHN: Your Honor, do you want any argument on the issues raised in IPP counsel's surreply?

SPECIAL MASTER: Well, what are you referring to?

MR. ST. JOHN: The judicial estoppel vis-à-vis Chunghwa and the Philips and Samsung settlements.

SPECIAL MASTER: The point on Philips and Samsung I think that you made was they're so big there

Page 122

must be something out of whack.

MR. ST. JOHN: Correct, Your Honor.

SPECIAL MASTER: The others must be too small. Words to that effect.

MR. ST. JOHN: More that the size is attributable to factors other than class counsel's efforts such that they're not properly -- that the entirety of those settlements are not properly includable in the fee base.

SPECIAL MASTER: I think I have your arguments on that. I mean -- I mean I may not totally remember them now, but I remember reading them and understanding them when I read them.

MR. ST. JOHN: Fair enough, Your Honor.

SPECIAL MASTER: Did I see other hands? Mr. --

MR. SCARPULLA: I just have a quick question, Your Honor. To the extent that Your Honor is going to have a hearing on fees, will you let us know that or if you're not --

SPECIAL MASTER: No, it will be held secretly. No.

You mean a hearing on the allocation of fees, or the hearing on the total amount of fees?

MR. SCARPULLA: Well --

SPECIAL MASTER: Oh, I see what you're

Page 123

saying -- no. What I said in that email was that I wanted to focus this hearing on the issues that we've already talked about.

MR. SCARPULLA: Correct.

SPECIAL MASTER: I am not excluding -- you may say anything you want to about fees now. I mean I think I understand all the arguments you've made. I have them in mind, and we'll consider them. If there's anything more anybody wants to say about the fee request or the expense request, you may do so. If you were sandbagged and thought that wasn't going to come up today, you know, I'm -- I'm -- I don't know what to say. I don't have time to set another oral argument. But you're free to say anything you want now.

MR. SCARPULLA: Well, I think it's all in the briefs, and I wasn't -- but I wasn't sure whether Your Honor was going to have that as a separate hearing from this one.

SPECIAL MASTER: No. I think what I said was I think I have enough in the briefing and in the declarations from the various attorneys and so on and so on to make hopefully an intelligent ruling on that.

MR. SCARPULLA: Right.

SPECIAL MASTER: Sir.

MR. ST. JOHN: Your Honor, I apologize. I do

Page 124

want to briefly address, if now is the time, arguments made in surreply about Chunghwa and judicial estoppel.

SPECIAL MASTER: Sure.

MR. ST. JOHN: Class counsel is playing fast and loose with the idea that small -- small settlement, their words, was invaluable and an icebreaker. And there's no dispute that those words were represented to the court, and there's still no dispute that Chunghwa's assistance was invaluable. That's at page 13 of the surreply.

What they try to do is limit that value in the early stage of litigation. But class counsel disposed of the class claims for again a small settlement and made those representations, and the fact that it causes litigation regrets, that's precisely what judicial estoppel targets.

Class counsel argues or they try to minimize the value of the Chunghwa settlement by emphasizing that DOJ only prosecuted one corporate defendant. I don't think that's particularly uncommon. The DOJ has limited resources. They prosecute a small number of defendants to bust the settlement -- or bust the conspiracy and then leave the rest to private litigants. That's precisely what DOJ did here.

SPECIAL MASTER: What is -- your point about

Page 125

the Chunghwa settlement is what?

MR. ST. JOHN: The Chunghwa settlement created a lot of value beyond its $10 million.

SPECIAL MASTER: Okay.

MR. ST. JOHN: And that value is not really attributable to class counsel.

SPECIAL MASTER: So we should reduce the fee request to reflect that?

MR. ST. JOHN: Correct, Your Honor.

SPECIAL MASTER: Okay.

MR. ST. JOHN: It's the first stage of the rocket.

SPECIAL MASTER: Okay.

MR. ALIOTO: Two final points, Your Honor, and I'll be very brief.

One, there was a statement earlier about further notice to an additional group. There's nothing in the papers about this. I want to just make sure this is focused up.

After the formal notice program, our claim administrator was able to get an email list of claimants in the DRAM case, people who had actually made claims in the DRAM case. And our claims administrator arranged for direct email notice to be sent to those claimants. It was a supplement to the notice. It wasn't something

we did because we were having a problem or having trouble. We did it as a supplement to the notice to spur claims. And you can imagine that was effective because these are people who had claimed before, and they were -- they would be motivated to claim again.

The other argument I want to make and just a sentence or two is we have made in our papers a standing argument with respect to Mr. Scarpulla and Cooper. There's nothing been said about that in these proceedings. We have no intention of waiving that. We think it's a very important issue that counsel should not be able to come in and make all kinds of claims in settlement approval hearings.

They certainly have the right to do that under Rule 23, but the crucial point is you have to have a client. You can't just come in off the street or on a volunteer basis or on an intermeddler basis and make these arguments because these have consequences for us.

We're going to be briefing these questions. We may have appeals. It's a very time-consuming, expensive process, and you have to meet that threshold requirement of representing a client. The cases are clear on that. And the cases cited by the objectors do not provide any support for these objections on behalf of indirect purchasers. There's absolutely no basis for doing so.

SPECIAL MASTER: Okay.

MR. ALIOTO: Thank you.

SPECIAL MASTER: Glad you brought that up. Mr. -- just start with Mr. Cooper because you're closest.

As I understand the papers, you and your firm currently represent a named or formerly named class representative, correct?

MR. COOPER: That is correct, Your Honor, but I believe in addition we are counsel of record for the entire class.

SPECIAL MASTER: I know. One question at a time. Okay? So you actually may represent a named member of the class?

MR. COOPER: We do.

SPECIAL MASTER: Okay. Mr. Scarpulla, you did represent a named class representative when you were with the Zelle firm. What is your status now?

MR. SCARPULLA: As part of my agreement leaving Zelle, I was made a -- another lawyer of record for those -- for that client. However, I was told by Zelle that the client does not -- does not approve of my objections.

SPECIAL MASTER: Okay. So -- but officially you are still counsel of record for a client in this case?

MR. SCARPULLA: That is correct.

SPECIAL MASTER: Okay. But in bringing these objections that you both have made, you are not bringing them on behalf of your clients, you are bringing them in your capacity as class counsel in furtherance of your fiduciary duties, correct?

MR. SCARPULLA: I think Mr. Cooper is bringing it on behalf of his clients.

MR. COOPER: No, I think that's a fair statement from me.

MS. CAPURRO: That's not what their papers said when they filed their objection.

SPECIAL MASTER: Well, their papers --

MS. CAPURRO: None of their papers have said that today.

SPECIAL MASTER: No, none of their papers name a client on whose behalf they're bringing the objection. As I understand it, they are bringing it in their capacity as class counsel, not on behalf of a client. And that is your standing.

MR. ALIOTO: We would just ask you to look at the authorities on that, Your Honor. We think it's an important point --

SPECIAL MASTER: Okay.

MR. ALIOTO: -- and that we'd like you to

consider.

SPECIAL MASTER: Ms. Capurro.

MS. CAPURRO: If I may just briefly, I have look extensively at the law on this, and I can find absolutely no case that permits counsel in a case who are not court appointed class counsel. The cases that they cite in their brief -- and they're not court appointed class counsel to bring an objection to a class action settlement and oppose the position of the court appointed class counsel.

SPECIAL MASTER: Why are they not court appointed class counsel the same as all the other lawyers in the --

MS. CAPURRO: Mr. Alioto was the only court appointed class counsel. All of the case law that they cite in their brief, those cases when they refer to class counsel, they refer to the court appointed class counsel. If you have a situation where every -- every lawyer in an MDL case, which is potentially hundreds of lawyers, is able to speak on behalf of the entire class, I mean if you take that to its logical conclusion, how do you run the case?

I mean Mr. Alioto would be saying one thing, and they can pipe up and say something else. How do the defendants know who to deal with? How does the court

Page 130

know who to deal with? What's the point of even having an order appointing lead counsel if they're able to do that?

SPECIAL MASTER: Well --

MS. CAPURRO: And this is not a procedural issue, Your Honor, this is jurisdictional. And the fact that they have filed this motion to be appointed as co-lead counsel actually shows that they recognize they have a standing problem. That's -- they're trying to bootstrap themselves in here to get the court's nod to give them the voice, you know, to be able to speak on behalf of these objecting plaintiffs who they've never identified.

SPECIAL MASTER: Well, you know, I'm -- I'm cognizant also the court has an independent fiduciary duty to protect the interest of the class. And if information is brought to the court from any source, I sort of think the court has an obligation to consider it. But I -- I need to look at the authorities you've cited with care.

MS. CAPURRO: I submit there is no law, and they have cited to none, and it is their burden to show standing. They have not cited to one case --

SPECIAL MASTER: Okay.

MS. CAPURRO: -- that gives them standing.

Page 131

SPECIAL MASTER: I get it.

Is there -- Ms. Kirkham. You have your hand up. Ms. Kirkham.

MS. KIRKHAM: Okay. I know I'm pointing out the obvious, but if there was one lead counsel and all other counsel are silenced by that appointment, and that lead counsel recommends a settlement --

SPECIAL MASTER: Who is going to object.

MS. KIRKHAM: -- you have an issue there.

SPECIAL MASTER: Okay. Mr. Bonsignore, I saw some activity down there.

MR. BONSIGNORE: Yes, Your Honor, very briefly I represent six plaintiffs, two of which were named plaintiffs in the settlement class, and we joined and adopted their arguments in my paper. I do agree that they do have separate standing, but in the event -- thank you.

SPECIAL MASTER: Good.

Mr. St. John.

MR. ST. JOHN: Your Honor, the argument you just made is precisely the holding of Zucker v Occidental Petroleum Corporation. I don't have the cite, but it was Case No. 9756270 decided by the Ninth Circuit on October 19th, 1999. The court has an independent obligation to consider whatever information

Page 132

is before it regardless of standing.

MS. CAPURRO: We're not disputing that. That's not the argument.

SPECIAL MASTER: I think I understand the argument.

MR. COOPER: You have briefing on all of this, Your Honor.

SPECIAL MASTER: I do. I do.

MR. SCARBOROUGH: Your Honor, if we're down to sort of parting remarks here, I just want to say from the defendants' perspective, you know, we have put a tremendous pot of money into escrow. As I think lead counsel pointed out may be the second largest indirect purchaser settlement ever. So a tremendous amount of money that they have already paid, it's already sitting in escrow and has been for some time.

That money was put there to buy global peace for this litigation for IPP claims with the same factual predicate. So that's what we want. That's what LG already got. They already paid a considerably smaller amount of money for the exact same release that we are asking for here. So what we would like to see is at least to get past that first threshold, that the money that was paid, this extraordinarily large amount of money that was paid is sufficient for the global

Page 133

release.

Just in the same way that the issues with the LG settlement, none of these objections were raised during the final approval of that settlement, the final judgment entered there. It's understandable that there could be some quibbles with allocation. What's going to happen with that LG money? And that's fine, and that can apply more broadly to the settlements that are now before Your Honor for final approval.

As a general principle, I don't think defendants have a problem if we tweak the allocation plan. If notice is perhaps sent out again, as long as it's done in a responsible, comprehensive fashion that's really going to lead to final approval, I don't think we have a problem with some of that being done. But we want our deal, which we think is fundamentally sound, approved now. And it's time to do that.

SPECIAL MASTER: Okay. I would like to just take a minute and talk to Ms. Cohen. Give us two minutes and we'll be right back.

(Recess 1:03 p.m. to 1:07 p.m.)

SPECIAL MASTER: Okay. Let me ask -- I'm not sure whom -- a question. Mr. Alioto, I guess, you talked about dealing with the Illinois and Washington issues by sort of carving out of your pro rata scheme a

separate allocation scheme for them.

THE WITNESS: Yes.

SPECIAL MASTER: Correct?

MR. ALIOTO: Yes.

SPECIAL MASTER: Could the same kind of arrangement be made to accommodate the -- the Chunghwa settlement if -- if there are disparities between the distribution scheme that was approved by the court in Chunghwa and your distribution scheme? I mean it sort of as a practical matter, you only have $10 million. What's the practical usefulness of giving notice to all the resellers saying oh, you can now submit claims?

I mean I'm trying to find a solution to this Chunghwa problem if it turns out there is one.

MR. ALIOTO: Well, certainly to -- to the extent that they were given notice that they weren't going to get anything, and if it turns out that in fact they're not going to be getting anything, that's consistent. And -- and do you have to send another notice to them? I don't think so.

But the big question is is there some unfairness there, and is there some inconsistencies, the objector says. I would like to address that first and be absolutely certain. You know, that settlement was many, many years ago, and I don't have the judgment

memorized, but I'm going to certainly be looking at it.

I think maybe the better course there, Your Honor, would be to let us review some of these points that they made and try and identify the problem and then respond to you with this next round of briefing.

SPECIAL MASTER: We're not -- we're not talking rounds of briefing here. I mean --

MR. COOPER: What next round of briefing?

MR. ALIOTO: Well, with this next submission, I suspect, is probably a better choice of words.

MR. COOPER: What next submission? I thought we went through this. There are no next submissions.

SPECIAL MASTER: Well, I'm concerned that I do not have the full picture on Chunghwa, and I'm not about to issue a report and recommendation on something I don't feel comfortable that I have the full picture about.

MR. COOPER: Well, I did offer, Your Honor, to send you the documents in consultation with Mr. Alioto what documents you should see.

SPECIAL MASTER: Yes.

MR. COOPER: I'm not certain if that helps you or solves the issues, or if you want them to go together with some five-page letter or something not to exceed five pages. I'm sure we can do that relatively quickly.

But when I hear discussions of future rounds of briefings, I mean that's why I asked the question before. I though it was confusing.

SPECIAL MASTER: Well, I mean, I guess if this -- if I'm going to hew to the court's schedule, then I'm going to need by Thursday some material, and I'll finish with Chunghwa -- just some other material. I'm going to need -- somebody mentioned cases regarding treble -- I'm going to need any cases that you want us to look at that you -- I didn't give you a chance to give me the citations of today -- the docket numbers for the four complaints in this case so we can easily find them and look at what was alleged or not alleged.

We're having a handwriting problem.

Oh, Ms. Kirkham was going to give me an additional cite to the -- a reference that she made to the Renfrew's report and recommendation.

And then information about -- I'd like -- I'd like Mr. Fisher to provide an additional declaration with the updated status of the claim process in as much specificity as he, you know, reasonably and professionally can.

And finally we get to Chunghwa, and I -- we definitely need copies of all the relevant documents that allow us to see what was settled and what was

ordered there. The question is whether we also need briefing, and I'd like to say no, but I think -- I think -- I think I do. I mean, I think I need something like a three to five pages from the Cooper group explaining why this is a problem and hopefully maybe suggesting what to do about it, and a brief from Mr. Alioto. Now, I think what we should do is maybe have those simultaneous briefs.

Can we get those in by Friday?

MR. COOPER: That's fine, Your Honor. We will send to Mr. Alioto today the list of documents that we think we need to send you copies of starting with the settlement agreement. Whatever is relevant regarding preliminary approval, final approval and judgments, and we can agree on what documents you should be looking at. And a brief not to exceed five pages -- simultaneous briefs not to exceed five pages by Friday?

SPECIAL MASTER: Yes. Can we -- Ms. Cohen is asking for noon on Friday.

MR. COOPER: Sure. How about Thursday?

MS. COHEN: I would love it.

SPECIAL MASTER: Thursday would be great. You've got a lot -- I mean, particularly Mr. Alioto has more on his plate than you do. We're really under the gun here, so Thursday would be very helpful.

Page 138

MR. COOPER: I'm sure we can do it. That's three days.

SPECIAL MASTER: But Friday at noon for sure.

MR. ALIOTO: Friday at noon.

SPECIAL MASTER: Mr. Bonsignore.

MR. BONSIGNORE: Yes, I mentioned that I have objective evidence that some of the critical and decisive points that Mr. Alioto raised were not true.

SPECIAL MASTER: You wanted to augment the record, as I recall.

MR. BONSIGNORE: Yes, I have emails to him providing information regarding the Massachusetts and the testimony.

SPECIAL MASTER: You're going to have to file a motion to augment the record.

MR. BONSIGNORE: Okay. I'm just wondering why --

SPECIAL MASTER: I'm not going to give you leave to do that here.

MR. BONSIGNORE: Okay. I'm just wondering why that's treated differently than the other evidence that you said would complete your picture? What we have is a --

SPECIAL MASTER: Because I think that's fair and just, and I have constraints, the date on which I

Page 139

have to get my report and recommendation in.

MR. BONSIGNORE: I can provide the emails today.

SPECIAL MASTER: You may do so. You may file the motion today and I'll consider it.

Mr. Goldberg.

MR. GOLDBERG: Joseph Goldberg for the IPP. I don't want to file anything.

Before the very first break when you asked a question, and I just want to make sure that the record is clear as to the answer. You asked about what were the pending claims in the operative, which I believe is the fourth amended complaint. And I just want to make sure that as I understand it, the record is clear, and you're going to get the docket cites for all of these and you're going to look at it, and I think I'm accurately reporting.

In the operative complaint, the fourth amended complaint, any pending -- any pending damages claimed is limited to the 22 class jurisdictions. That is the 21 states and the District of Columbia. There is no pending damages claim in the operative complaint beyond those 22 jurisdictions. I believe when you review the complaint, you'll see that's correct. I think that's what you were asking, and I just want to make sure that

Page 140

the record is clear as to what the answer is. Thank you.

SPECIAL MASTER: All right. Thank you, everybody. This was not the two hours I hoped for, but it was three hours and 15 minutes, and you're to be congratulated for that.

Mr. Cooper.

MR. COOPER: I'm confused about whether the simultaneous admissions about Chunghwa is to be Thursday at 5 o'clock or Friday at noon.

MR. GOLDBERG: Yours is Thursday and his is Friday.

MR. ALIOTO: I need time. I need a little time.

SPECIAL MASTER: Friday -- Friday noon.

MR. COOPER: Okay.

SPECIAL MASTER: Friday noon. If you get it by Thursday, you get a gold star.

MR. COOPER: But they can't be simultaneous.

SPECIAL MASTER: All right. We're off the record. Thank you very much.

(TIME NOTED: 1:17 p.m.)

Page 141

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ ] was not requested.

I further, certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 1/10/16.

Suzanne F. Boschetti

SUZANNE F. BOSCHETTI
CSR No. 5111

**&**

**&** 3:11 4:12 5:3,12 6:17 7:4 10:3,11 11:3,19 12:4 13:4 14:22 15:2,11,17,21 16:25 17:14,25

**0**

**05944** 1:6 2:6
**0921** 12:7

**1**

**1** 4:6 32:16
**1.1** 31:18
**1.5** 84:17
**1.57** 67:18
**1.67** 115:2,11,16
**1/10/16** 141:20
**10** 77:16 88:1 93:2 125:3 134:10
**100** 115:7,9
**10166** 11:6
**1020** 9:19
**1060** 114:7
**10:09** 14:2
**11000** 12:15
**1167** 67:18
**11:34** 76:9
**11:47** 76:9
**12** 40:23 41:2 77:15
**120** 6:19
**1299** 10:22
**13** 124:9
**1449** 70:6,11
**15** 96:22 117:1 140:5
**1500** 2:17 3:5
**155** 6:12
**15th** 20:4
**16** 66:7
**1625** 9:12
**17** 20:5
**17th** 7:17 10:13
**18** 77:11,13
**1900** 4:21
**19107** 4:7
**1917** 1:6 2:6
**1999** 131:24
**19th** 131:24
**1:03** 133:21
**1:07** 133:21
**1:17** 2:18 140:22

**2**

**2** 2:16 3:5
**2.7** 35:1
**2.8** 40:11
**20** 4:14 116:16
**200** 11:5 49:2
**20005-3807** 11:23
**2015** 2:19
**2016** 1:17 14:1
**202** 11:24
**21** 32:19 40:12 139:20
**212** 11:7
**212-3475** 8:24
**2125** 6:19
**215** 4:8
**217-6810** 13:8
**21st** 25:14
**22** 32:23 77:15,16 139:20,23
**22030** 5:15
**221-5763** 6:7
**2280** 3:14
**23** 111:3,7 115:23 126:15
**237-8562** 11:15
**23rd** 4:6
**244-7520** 4:16
**24th** 25:5
**2532** 6:5
**25th** 25:6
**27** 117:4
**2700** 11:13
**28th** 25:8,9
**2905** 9:12
**294-4615** 11:7
**2nd** 7:8

**3**

**300** 11:13 48:25
**309-1761** 5:23
**30th** 118:9
**313** 5:23
**314** 9:8
**317** 11:15
**3400** 5:6
**350-0000** 8:7
**357** 7:8
**35th** 8:14
**361** 9:21
**3771** 8:5
**393-8293** 12:8
**39560** 8:23
**398-4340** 4:23
**3:07** 1:6 2:6

**4**

**4** 84:20
**40** 64:10
**40004-2400** 10:23
**4041** 5:14
**41** 71:2
**410** 8:24
**415** 3:7,16 5:8 6:7 6:14 7:10,19 8:16 10:7,15 12:8,17 13:8
**423** 113:25
**4247** 9:6
**434-8900** 8:16
**434-9100** 10:15
**439-1313** 10:7
**44** 5:6
**455** 12:15
**456** 7:17
**459** 56:12 58:7 61:5
**46204** 11:14
**473** 113:24
**48226** 5:22

**5**

**5** 1:17 2:19 14:1 84:20 88:2 140:10
**50** 33:10 50:9 55:23
**500** 9:19 40:9
**505** 4:16
**51** 56:9 70:6,11
**5111** 1:23 2:21 141:23
**514** 8:22
**516** 97:10
**52** 56:2,3
**55** 97:9
**555** 10:5 12:6
**56** 40:23
**563-7200** 3:16
**567-6565** 4:8
**576** 27:7 28:3 34:6 35:16 76:2 93:2
**58** 77:7 78:11

**6**

**60,000** 77:24
**600** 4:21
**619** 4:23
**620** 5:21
**626-3609** 11:24
**631-3883** 9:8
**63111** 9:7
**65** 37:7
**693-0700** 5:8
**698-5200** 9:21
**6th** 106:22

**7**

**7** 88:1 102:10
**700** 4:14
**701** 11:22
**703** 5:16
**703-5908** 12:17
**706** 13:6
**715** 67:18
**719** 5:21
**764-8700** 5:16

**768** 97:9
**775** 114:7
**781** 8:7
**78401** 9:20
**788-3030** 7:10
**788-7210** 7:19
**797** 97:9

**8**

**80** 84:21 116:22
**80202-1539** 9:13
**824** 97:10
**83** 78:12
**87102** 4:15
**89121** 8:6

**9**

**900** 6:12
**92101** 4:22
**925** 6:21
**94102-7002** 12:16
**94103** 7:9
**94104** 5:7 7:18 8:15
10:6
**94105** 12:7
**94111** 3:6 13:7
**94111-4109** 10:14
**94114** 6:13
**94121** 6:6
**94123** 3:15
**945-0200** 6:21
**94598** 6:20
**9756270** 131:23
**982-5267** 3:7
**986-1400** 6:14
**9:55** 2:18

**a**

**a.m.** 2:18 14:2 76:9
76:9
**abandoned** 21:5
72:14
**abandoning** 75:13
**ability** 106:23 118:9
**able** 33:11 46:25
49:12 68:2,22 78:2

125:21 126:12
129:20 130:2,11
**absence** 84:1,3
109:10
**absent** 70:12 103:12
**absolute** 68:10
74:14
**absolutely** 64:16
65:13 84:9,11 86:5
126:25 129:5
134:24
**abuse** 114:1,25
**academic** 57:11
**acceptable** 112:1
**accepting** 58:16,19
**access** 49:16,17
102:19
**accommodate** 27:21
28:22 134:6
**accurate** 105:18,25
107:11
**accurately** 139:17
**acknowledging**
23:15
**acknowledgment**
95:16
**acquaintances**
16:15
**act** 43:4 44:2 45:4
55:16 65:15,15
**acted** 22:16
**acting** 44:14 66:14
66:17
**action** 41:9 53:14
55:15 60:8 66:6
67:14 129:9 141:16
141:17
**actions** 1:8 2:8
**active** 67:1
**activity** 131:11
**actual** 59:12 99:6
**ad** 80:12,21,21,24
**add** 57:6 72:17 79:2
96:12 97:1

**added** 25:3
**addition** 127:9
**additional** 98:3,13
109:10,14,18,21
125:17 136:16,19
**address** 18:8 24:1
35:6 51:22 124:1
134:23
**addressed** 29:12
35:7 51:7 113:21
**adelson** 10:4 15:11
15:11
**adequacy** 19:5
21:22 22:3 26:13
32:5 33:12 40:3,3
106:3 110:25
**adequate** 26:10 28:2
28:18 30:6,11 33:7
76:16
**adhere** 111:6
**adjective** 75:12
**adjectives** 73:7
**administration**
111:14,16
**administrator** 79:19
82:15 125:21,23
**admissions** 140:9
**adopt** 27:11
**adopted** 131:15
**adopting** 49:5
**adoption** 47:13
**ads** 80:11
**advance** 21:1 96:25
**advanced** 20:17
83:9
**advantaged** 104:20
**advertisement**
103:1
**advice** 100:25
**advocacy** 85:2
**advocate** 21:1
**advocating** 21:3
27:19 85:4
**afford** 60:1

**affording** 40:21
41:4 44:3
**afternoon** 106:21
**ag** 57:2 105:13
**agenda** 118:12
**agendas** 56:18
**ages** 77:16
**aggregator** 106:21
**aggregators** 71:2
**ago** 21:17 94:18
134:25
**agree** 40:7 45:25
97:22 101:17
105:18 108:24,25
131:15 137:15
**agreed** 100:3 108:24
**agreement** 39:5
115:18 127:18
137:13
**agreements** 26:18
30:3,10
**agrees** 44:22
**ags** 59:11 88:13
93:22 95:11 101:1
**ahead** 22:9 53:8
71:17 73:17 86:18
86:22 99:22 103:22
113:9
**albeit** 105:22
**albuquerque** 4:15
14:22
**alioto** 3:11,12 14:8,8
20:23 21:22 22:24
23:18,19 26:6,14,16
28:15 29:9,17 32:10
33:3 35:5 36:1,9,11
36:21 37:11,16,24
38:2,11,15 39:10
45:24 51:22,25 52:6
52:12 53:1,2,5,17
53:22,23 54:7 59:4
59:9,21 61:9,12,20
62:4,10,25 63:5,11
63:20 67:10,24 68:4
73:18 74:10,22 75:7

75:11 76:1,1 79:3 79:10 81:22 82:1,14 85:14 86:1 90:1,2 90:22,24 91:9 92:2 92:7,25 93:11 94:24 95:8,23,24 96:5,10 96:14,25 98:5,6,9 100:11 104:5,19 105:2,12 118:19 119:10,20 120:22 121:16 125:14 127:2 128:21,25 129:14,23 133:23 134:4,15 135:9,19 137:6,11,23 138:4,8 140:13
**alioto's** 32:12 100:9 118:25
**aliotolaw.com** 8:17
**allegation** 63:11 67:3 69:11
**alleged** 59:13 62:19 136:13,13
**alleges** 45:3
**allocate** 90:9
**allocated** 94:4
**allocation** 21:12 26:13,21 27:6 28:5 28:9 29:1,7 30:7,14 30:16 39:19 81:25 86:25 87:1,8,8,9,10 87:11,18,23 89:18 89:19 94:5,5,11,15 100:22 101:1 102:16,17,23 104:5 108:15 109:3 110:22 114:2 115:7 115:25 122:22 133:6,11 134:1
**allocations** 26:25
**allow** 47:8 100:16 109:4 111:9 121:8 136:25
**allowance** 68:11
**allowed** 37:21 51:9 65:1
**allowing** 42:19
**allows** 67:6,7 115:20 119:7
**alternatives** 109:16
**ambivalence** 23:10 23:20,25
**amended** 63:4 139:13,18
**america** 114:6
**american** 44:16,17
**amount** 19:25 26:8 26:9 30:4,21 31:10 31:22 32:9,16,17,22 33:7 34:8 35:7 37:6 90:5,8,13 91:4,7 94:3,7 95:9,10,12 95:13,14 112:24 116:9 122:23 132:14,21,24
**amounts** 87:21 95:11 99:20
**analysis** 35:2 36:3,3 36:7 46:21 57:22 58:1 103:9
**analyze** 59:24
**analyzed** 46:14
**anderson** 6:10,11 18:2,2,3
**andrus** 6:10 18:3
**andrusanderson.c...** 6:15
**angles** 106:15
**announce** 17:5
**announced** 18:7
**answer** 22:8,11 23:8 50:1 53:18 61:9 63:6 75:8,14 117:20 139:11 140:1
**answer's** 64:6
**ante** 79:23 82:8
**antitrust** 1:5 2:5 44:7,8,9 46:7,23,24 47:16 48:22 65:24
**anybody** 76:11 78:17 85:20 105:8,8 123:9
**anymore** 120:16
**apart** 29:2 41:23
**apologize** 103:16 119:1,20 123:25
**apologized** 120:13
**apoplectic** 68:1
**apparently** 118:19 118:25
**appeals** 126:20
**appearances** 3:1 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1
**appeared** 19:14 93:14
**appears** 44:1
**apple** 102:13
**applied** 45:20,21
**applies** 43:22 45:20
**apply** 43:2,5,7 133:8
**appoint** 18:23 23:6
**appointed** 20:6,15 20:20 21:11 24:8,9 24:22 71:20 129:6,8 129:10,12,15,17 130:7
**appointing** 130:2
**appointment** 24:14 131:6
**appreciate** 16:16 21:10
**approach** 28:21,25 58:5
**approached** 39:9
**appropriate** 22:18 23:12 28:4 31:1 104:25 109:11,25 116:1,17
**appropriateness** 18:22 19:1 26:4
**approval** 26:8,9 29:1 30:12 36:13,15 50:5,14 55:16,20 79:22 80:1 81:21 86:24,25 90:19 93:13,23 95:4 96:2 106:7 112:2,4 118:2 118:6 126:13 133:4 133:9,14 137:14,14
**approve** 33:18 34:7 34:22 127:21
**approved** 27:14 28:22,25 29:5,6 30:3,5 76:3 133:17 134:8
**approving** 40:25 60:20 92:16 95:20 96:20
**approvingly** 114:10
**arguably** 65:5
**argue** 70:18
**argued** 50:5,7 72:21 115:14
**argues** 124:17
**arguing** 50:5
**argument** 1:15 2:15 45:19 47:5 66:11 68:8 82:7 86:6,10 92:10,10,11 93:13 98:23 104:17 108:3 108:8,22 121:19 123:13 126:6,8 131:20 132:3,5
**arguments** 22:5 39:23 53:10 73:1 92:8 115:16 122:10 123:7 124:1 126:18 131:15
**arisen** 110:14
**arises** 46:23
**arizona** 88:3
**arizona's** 88:2
**arranged** 125:23
**arrangement** 93:25 134:6
**arrived** 54:10 94:15
**article** 47:6 64:7

**articulate** 29:24
**artificially** 41:15
**aside** 77:14 100:18 100:19 106:15 108:6,16 112:14
**asked** 20:13,14 21:24 22:1 34:18 39:10 103:8,16 136:2 139:9,11
**asking** 23:13 82:24 106:22 132:22 137:19 139:25
**assert** 57:17 61:16 73:20
**asserted** 60:14 62:20,23,25
**assistance** 124:9
**associated** 72:20 106:9
**assume** 82:22 108:3 108:11,22
**assuming** 43:6 81:18 108:14
**attached** 49:6 95:21
**attacked** 34:3
**attacks** 68:25
**attempt** 29:23 33:1 43:1
**attempts** 72:18
**attendant** 27:1
**attention** 74:12 113:16 118:13
**attorney** 8:12,20 9:11 12:13 13:12 16:4 19:8,10 28:23 51:8 55:22 56:10,15 79:7 111:1 112:3,9 141:17
**attorneys** 3:11 44:15 55:23 56:3,17 58:8 67:7,8 70:13 93:14 123:21
**attributable** 122:6 125:6
**augment** 138:9,15
**authorities** 128:22 130:19
**authority** 24:13 47:6 48:3,4,7 53:11 53:13,15 64:5,6
**authors** 47:18
**authorship** 27:13
**available** 32:17 37:19 67:25 79:9 82:16
**avenue** 10:22 11:5 12:15
**avoid** 46:3 120:2
**award** 43:24
**aware** 37:11 56:24 64:25 68:4,6,6 101:13,23 103:11 106:24 113:20 120:5 121:12
**axes** 56:18

**b**

**b** 4:21 27:11
**back** 20:10 28:7 29:7 36:13 46:9 68:19 70:4 76:7 104:22 108:10 110:2 115:14 116:13 117:25 118:5 133:20
**background** 60:25 94:8,11
**bad** 118:24
**baker** 10:19 11:11 15:15 17:16
**bakerbotts.com** 10:24,25
**ball** 83:8
**bandas** 9:17,18 17:6 17:6
**bandaslawfirm.com** 9:22
**bank** 75:25 114:6
**banner** 80:11,21,24
**bar** 43:3 69:13
**bargained** 30:5
**barred** 66:1
**base** 122:9
**based** 53:25 54:2,2 68:2 94:4,7 99:16 103:5 106:11 108:7 108:24 109:17 111:21 116:6,18
**bases** 69:1
**basically** 72:19 115:19
**basis** 54:14 57:19,20 60:17 85:22 113:15 126:17,17,25
**battle** 58:19 83:8 86:7,10
**battles** 68:24
**beach** 8:23
**bear** 60:3 79:24
**bears** 61:21
**beat** 51:14,14 120:15
**beaten** 51:17 66:22
**beginning** 2:18 40:17 116:9,14 119:9
**begins** 46:22,22
**behalf** 15:2,9,15,18 16:3,20,22 17:14,17 17:18 18:1,3,5 62:20 68:20 99:11 102:12 110:20 126:24 128:4,8,17 128:19 129:20 130:12
**beings** 78:3
**believe** 20:5 22:1 30:7 40:16 50:4 68:24 74:22 91:9 97:2 102:16,21 103:6,13,20 104:21 104:23 106:2 120:7 120:21 127:9
139:12,23
**bells** 54:20
**benefit** 14:6 101:21 103:9 110:9,10
**benefits** 44:9,10
**best** 26:23 57:24 81:13,13 82:10 115:23
**better** 44:12 66:12 135:2,10
**beyond** 70:1 125:3 139:22
**bgralewski** 4:24
**big** 74:17 78:6 93:6 100:12 121:25 134:21
**billion** 31:18 35:1 40:11
**birkhaeuser** 6:17 17:24,25
**birkhauser** 6:18 17:25
**bit** 25:14 81:23 118:8 119:10
**black** 4:3 14:18 16:24
**blake** 94:17
**blame** 67:11
**blaming** 67:11,12
**blown** 68:10
**bob** 16:19
**body** 65:6
**bogdanov** 7:7 16:25 16:25
**boies** 5:12 15:21
**boies.com** 5:17
**bonsignore** 8:3,4 15:9,9 24:4,5,6,7,23 25:5,24 38:22 50:21 50:22 51:13,18 52:12 63:17 67:1,3 67:21 69:5,7,24 70:9 71:16 73:11 74:23 75:15 85:25 86:1 97:7,8,13,17

131:10,12 138:5,6
138:11,16,20 139:2
**bonsignore's** 53:3
**bootstrap** 130:10
**boschetti** 1:23 2:20
141:22
**bother** 24:19 31:5
**botts** 10:19 15:15
17:16
**bought** 41:14,19
42:7 77:21
**boulevard** 9:6,19
**boundary** 42:10
**box** 111:10
**boyd** 4:12 14:21
**bramson** 6:17 17:25
**bramsonplutzik.co...**
6:22
**brass** 12:5 17:10,10
**break** 66:21 73:6
76:7 139:9
**breath** 59:19
**brevity** 40:2,2
**brick** 42:16,16,25
43:12,14,15,16,21
45:19 46:2,3 47:1,8
63:25 64:9,11,12,24
66:1
**brief** 24:25 47:16
49:9 51:3 55:11
61:25 64:22 68:8
70:8,9 77:1 78:9
87:14 90:4,10,11
91:14 97:16 103:7
125:15 129:7,16
137:6,16
**briefed** 96:18
**briefing** 75:5 98:13
99:13,14 107:25
121:12 123:20
126:19 132:6 135:5
135:7,8 137:2
**briefings** 136:2
**briefly** 50:22 51:15
51:18 63:24 80:5

97:8 124:1 129:3
131:12
**briefs** 19:15,17 48:9
52:1 60:20 67:20
76:17 123:16 137:8
137:17
**bring** 56:16 57:12
65:25 73:19 100:14
129:8
**bringing** 57:14
69:14 120:11 128:2
128:3,4,7,17,18
**brings** 98:15
**broad** 4:6
**broader** 27:9
**broadly** 133:8
**brought** 68:20 74:12
75:9 95:16 99:11
105:5 113:16
118:13 127:3
130:17
**burden** 130:22
**business** 62:1 84:14
**bust** 124:22,22
**buy** 132:17

**c**

**c** 3:13 5:4 11:4
27:12 111:4
**ca** 8:15
**cafa** 55:12,20 56:9
56:12,20 61:5 93:15
**calculate** 81:5
**calculation** 56:12
94:8,9
**california** 1:2,16 2:2
2:17 3:6,15 4:22 5:7
6:6,13,20 7:9,18
10:5,6,14 12:7,11
12:16 13:7 14:1
16:4 52:19 64:22
79:7 82:3 98:20,24
99:6 101:18 102:6
103:18 104:7,12
105:3,7,19 106:4

107:4,20 108:25
111:1 112:3,9 141:2
**california's** 88:1
**call** 120:1
**called** 42:10
**campaign** 112:20
**cap** 112:1,7,8
**capacity** 21:12
128:5,19
**capurro** 3:13 14:15
14:16 38:5,9 63:13
128:11,14 129:2,3
129:14 130:5,21,25
132:2
**care** 31:6 32:23
52:14 95:6 101:1,3
130:20
**carefully** 39:5
**carried** 121:9,10
**cartel** 57:18
**carve** 88:25 95:5
**carving** 133:25
**case** 11:19 17:14
31:17 35:1 37:8,20
38:24 41:20,24 42:4
43:21 47:10 48:15
48:16,18 50:3 54:13
54:16 55:2,24 56:7
56:16 57:24 58:6,20
59:1,12 60:21 61:4
62:18 63:2 64:16,17
64:22,25 65:23 66:5
66:11 68:19,21
70:15,15,25 71:6
72:2 73:23 74:1,2
74:15 75:4,23 91:23
91:25 94:13 97:1,9
97:12 100:19 106:9
110:1,15 113:24
115:6,19 119:15,23
125:22,23 127:25
129:5,5,15,19,22
130:23 131:23
136:12 141:12

**cases** 45:24,24 47:15
48:8 51:3 53:19,25
55:8,17 57:25 64:13
65:11,14,16 70:8
74:16,18 99:16
104:16 108:1
109:18,21,23
110:12,14 112:1
126:22,23 129:6,16
136:8,9
**category** 120:10
**cathode** 1:5 2:5
**caught** 52:22
**cause** 28:19 29:20
39:6 100:10
**causes** 124:14
**caution** 20:1 75:1
**cbandas** 9:22
**ccorbitt** 5:9
**ccurran** 11:25
**census** 87:20
**cent** 108:19
**center** 2:17 3:5
10:13
**cert** 97:10
**certain** 33:19 35:5
37:13 48:15 87:19
92:22 93:14 95:1,1
118:20 121:11
134:24 135:22
**certainly** 19:13
27:19 38:13 41:17
53:25 57:3 74:11
79:20 115:19
126:14 134:15
135:1
**certification** 33:2
54:18 63:14
**certified** 2:20 55:25
56:1 63:14 141:1
**certify** 141:2,15
**challenge** 57:4
**challenging** 58:18
**chance** 19:21 53:1
58:6,9 76:13,22

136:10
**change** 20:13,14 39:14 43:7
**changed** 23:13 25:13 68:7
**characterization** 107:11
**charged** 57:1
**chart** 95:21
**chase** 63:25
**cheaper** 77:23
**check** 82:14 91:11 91:17 96:5
**checks** 108:20
**chief** 47:13
**chill** 63:18
**choice** 42:18 104:11 135:10
**choices** 84:15
**chose** 71:8
**chris** 16:21 17:6,13
**christi** 9:20
**christopher** 5:5 9:18 11:20
**chunghwa** 12:3 17:11 19:7 50:3,8 54:16 86:13,16 87:2 87:2,7,13,18 89:9 89:14,18,20,22 90:6 90:17,19 91:23 92:16 93:13 94:25 95:18,20 96:20 121:23 124:2,18 125:1,2 134:6,9,14 135:14 136:7,23 140:9
**chunghwa's** 124:8
**cihlar** 5:13 15:21,21
**circuit** 42:4 44:5,6 48:15,19 64:17 65:21 66:1,4 97:9 110:12,15 113:18 113:20,23,25 114:11 131:24
**circuits** 65:21 113:18,20
**circumstances** 42:8 118:10 120:3
**citations** 49:21 114:17 136:11
**cite** 90:10,11 114:19 129:7,16 131:23 136:16
**cited** 27:15 36:12 47:15,16 48:9,16,24 48:25 51:2 64:16 65:18,21 91:14 97:15 114:9 126:23 130:20,22,23
**cites** 139:15
**citing** 45:24 49:4,9 70:7
**citizens** 101:3
**claim** 19:9 33:4 35:20 42:13,14,24 43:12,20 44:13 46:7 46:8 47:9 48:1,8 50:9 57:13,14,17 58:9 59:23,24 60:11 61:14 62:12,14,19 62:22 64:4,12 65:25 66:1,16 67:4 68:19 69:1,2,10,12,14,22 71:13 72:24 73:13 73:21 89:8 97:3,4 98:16 100:10 102:12 103:19,22 104:8,14 105:5,10 106:1 108:9 109:12 111:4,7 116:21,25 121:7,8 125:20 126:5 136:20 139:22
**claim's** 103:21
**claimant** 34:20
**claimants** 27:8 32:15 56:1 60:9 73:25 74:16 104:13 105:20,20 106:4 109:15 111:22 113:14 114:3 115:3 116:8,17 125:21,24
**claimed** 98:21 126:4 139:19
**claims** 30:22 32:6,7 32:10,11,15,23 33:3 33:12,22,24 34:20 39:1,2 40:4,6,20,22 41:2,2,5 43:15,16 43:18 45:8 46:4 48:5,14 50:23 51:1 51:9 53:16 54:1,9 55:8 57:9 58:17,21 58:22 59:11,12,13 59:14,16 60:2,5,6,6 60:10,13,15 65:2 67:5 71:21,25 72:1 72:1 73:12,19,21 78:4,7,8 79:4,18,19 81:24 87:21 98:20 98:22 99:10,11 100:2,6,12,17,18,19 101:19 102:10,19 103:3,8 104:4,6,10 104:25 105:6 106:23 107:25 108:16 109:7,19 110:4,7,16 111:14 111:16,19,21 112:21,24 116:4,7 116:18 117:11,13 117:23 120:18,19 120:23 124:13 125:22,23 126:3,12 132:18 134:12 139:12
**clarification** 88:11
**class** 3:10 13:3 19:2 19:3,4 20:7 32:24 33:1 34:13 35:19,22 40:12 41:9,12 42:6 43:8 54:18 55:15 57:20 60:7 61:22 63:14,14 65:1,24 66:5,6 67:14,15,17 70:11,12,14 71:14 74:3 77:9,25 88:15 88:16 89:6 91:12,18 91:22 96:7,8 97:22 98:1 100:6 101:22 105:20 111:12 116:10 122:6 124:4 124:12,13,17 125:6 127:6,10,13,16 128:5,19 129:6,8,8 129:10,12,15,17,17 129:20 130:16 131:14 139:20
**classactions.us** 8:8
**classes** 55:25 56:1 59:13 75:17 110:8,9
**clause** 113:4
**clayton** 7:16 17:2,2 44:2 65:15
**clear** 23:8 32:8 53:7 54:12 90:4 91:14 100:4 126:22 139:11,14 140:1
**clearly** 114:6
**clerk's** 37:18
**click** 80:22
**clicks** 78:19
**client** 57:12 62:12 74:23 75:22 97:21 126:16,22 127:20 127:21,24 128:17 128:19
**clients** 52:17 74:4 128:4,8
**close** 29:14 58:12
**closed** 103:21
**closer** 111:23
**closest** 127:4
**cmicheletti** 5:10
**cogently** 67:20
**cognizable** 45:8
**cognizant** 130:15
**cohen** 13:12 14:13 19:15 133:19

137:18,21
**colleague** 63:21
**colleagues** 98:19
**collected** 44:4
**collectively** 30:4
**colorable** 50:9
**columbia** 139:21
**combined** 54:17
**come** 28:17 29:13
  30:8 34:17 42:2
  43:1 59:14 61:24
  76:7 78:23 85:19
  100:12,21,25
  106:14 107:9 110:2
  114:4 115:8 119:24
  123:11 126:12,16
**comes** 18:8 45:3
  94:2
**comfortable** 135:16
**coming** 42:4 44:15
  61:1 88:15 101:10
**comments** 19:18
**commerce** 31:21
**commitments** 95:17
**common** 46:4 51:1
  82:11
**communications**
  119:22 120:6
**companion** 105:21
**company** 70:6
**comparability** 35:8
**compare** 35:22
**compared** 40:10
**compensation** 31:2
  39:20
**competition** 44:18
**competitive** 41:22
**competitors** 85:9
**complain** 70:18
  101:4,5 112:10
**complaint** 63:4
  75:19,19 139:13,18
  139:19,22,24
**complaints** 62:17
  73:22 136:12

**complete** 53:24 82:4
  101:22 138:22
**completely** 34:6
  62:11 108:18
**completion** 141:13
**complies** 18:10
**component** 61:21
**comprehensive**
  55:22 56:2 91:24
  133:13
**compromise** 112:16
**compromised** 58:10
**compute** 40:14
**comscore** 81:3,8,8
**concept** 60:4
**conceptually** 81:24
**concern** 28:19
  106:13,16,17
**concerned** 135:13
**concerns** 27:22
  29:15
**conclusion** 28:17
  61:24 114:5 129:21
**concocted** 53:12
**confess** 86:14
**confidential** 38:1
**confirm** 121:8
**confirming** 94:19
**confused** 60:4 86:14
  121:1 140:8
**confusing** 136:3
**confusion** 49:10
  94:2
**congratulated** 140:6
**connection** 95:18
**consensus** 29:24
**consequences** 107:7
  107:8 126:18
**consider** 28:4 34:5
  51:16 77:3 114:1
  123:8 129:1 130:18
  131:25 139:5
**considerably** 132:20
**consideration** 30:23
  60:9 115:17

**considered** 34:2
  69:11 79:25
**considering** 48:9,20
  82:24
**consistent** 134:19
**conspiracy** 31:18
  41:23 124:22
**constitutional** 93:7
**constraints** 138:25
**constructive** 30:1
  104:23
**consultation** 27:4
  57:23 135:19
**consumer** 51:2
**consumers** 68:20
**consuming** 126:20
**contacted** 106:20
**contemplated** 95:25
**contemplation**
  107:18
**contest** 57:3 106:2
**contested** 94:1
  115:22
**context** 47:7 102:23
**continually** 116:7
**continue** 116:6
**continued** 4:1 5:1
  6:1 7:1 8:1 9:1 10:1
  11:1 12:1 13:1
**contract** 20:23
**contracts** 30:3 77:14
**contractual** 93:25
**contrary** 65:17 73:2
  91:15
**control** 70:12,17
**controlling** 64:17
**conversations** 119:7
**convey** 44:9,11
**cooper** 7:4,5 15:2,4
  15:4 16:25 20:2,9
  21:18 22:11 23:1,8
  23:15 24:17,25 25:8
  32:1,5 37:10,17
  38:1,7 63:6,8,16
  82:22 83:3,21 84:24

85:12 86:18,19,22
  88:4,8,18,20,23
  89:6,12 95:9 96:7
  96:23 118:14,15,25
  119:2 120:5,15
  121:11 126:8 127:4
  127:8,14 128:7,9
  132:6 135:8,11,18
  135:22 137:4,10,20
  138:1 140:7,8,16,19
**coopkirk.com** 7:11
  7:12
**copies** 62:16,17
  136:24 137:12
**corbitt** 5:4 15:19,20
**core** 53:10
**corners** 106:15
**corp** 97:13
**corporate** 124:19
**corporation** 131:22
**corporations** 78:6
  104:20 108:17
  109:6
**corpus** 9:20
**correct** 31:3,9 44:20
  52:6 59:3 65:9
  69:20 84:6,10,11
  102:8 107:17 122:2
  123:4 125:9 127:7,8
  128:1,6 134:3
  139:24
**corrected** 52:22
  70:2
**cost** 84:20 97:25
  110:3
**costs** 98:2,4
**counsel** 14:9 16:6
  18:4,23 20:6,15
  21:12,12 22:6,21
  24:22 25:4,14 27:3
  30:16 33:1 38:2,18
  53:20 57:23 67:13
  68:23 69:21,24
  70:12,15 71:10,11
  71:12,15,19,19,19

72:19,20 73:15
76:19 97:22 111:12
118:23 119:7 124:4
124:12,17 125:6
126:11 127:9,24
128:5,19 129:5,6,8
129:10,12,15,17,18
130:2,8 131:5,6,7
132:13
**counsel's**  40:5 73:19
98:1 121:19 122:6
**country**  30:22 31:12
31:12,13 32:8 64:23
**couple**  61:1 63:22
94:18 104:23
105:16 110:21
114:4 121:14
**course**  30:22 57:7
112:12 135:2
**court**  1:1 2:1 14:6
18:9 20:13,25 21:15
23:21 25:12,15
35:15 38:16,17
42:17 43:1,6,24
45:3,21,22 46:5,12
46:13 47:2 49:8
51:7 59:19 64:15
79:21 81:18 82:8,11
85:1 86:5 96:2
98:24,25,25 99:22
103:15,17 104:1,15
105:25 106:10,16
109:17 111:18
112:2 113:12,19
115:12,15 117:14
121:7,8 124:8 129:6
129:7,9,11,14,17,25
130:15,17,18
131:24 134:8
**court's**  130:10 136:5
**courthouse**  41:6
43:3 75:18
**courts**  45:14 114:4
114:22

**cover**  18:18 76:14
**covered**  18:16
118:11
**craft**  39:5
**craig**  5:4 15:19
**create**  27:25 28:12
72:1 98:19
**created**  86:15 125:2
**creates**  87:21
**creating**  111:13
**creek**  6:20
**critical**  44:16 138:7
**criticism**  101:16
**criticized**  101:24
**crowd**  16:9
**crt**  1:5 2:5
**crts**  77:21
**crucial**  91:17 126:15
**crutcher**  12:4
**crystal**  100:4
**csr**  1:23 141:23
**cure**  72:18 93:4
**cured**  91:23
**curran**  11:20 17:14
**current**  87:24
**currently**  127:6
**cut**  39:3,8 63:25
115:3,4
**cv**  1:6 2:6 83:12
**cy**  101:20 107:14,15
108:25 109:13
110:6,17 113:6,15
113:21 114:1,9
115:9

**d**

**d**  7:7 8:12,13
**d.c.**  10:23 11:23
**damage**  35:2 37:12
40:11,12 42:1 44:23
62:7 110:9 112:7,8
114:2,24 116:14
**damages**  34:19
36:16,17 37:7 57:19
62:20 67:6,8 108:7

108:10,12,18 109:5
110:23 111:23,24
112:1 114:10 115:1
115:3,17,20 116:13
116:16 139:19,22
**dan**  17:24
**dandy**  84:8
**daniel**  6:18
**daniels**  11:11
**data**  79:4 80:15,23
80:25 81:2,3,7
87:20 102:20 103:8
107:25 109:3,3,10
109:20 111:17,19
116:5,18
**database**  78:23,23
**date**  25:9,13 89:15
111:22 118:7
138:25 141:18
**dated**  141:20
**daubert**  38:10,12
**day**  34:23 81:6
94:18 108:6
**days**  21:17 94:18
138:2
**dbirkhaeuser**  6:22
**de**  23:24
**dead**  51:14,15
**deadline**  19:9 82:3,5
98:16 99:1,1,1
103:21 104:6,11
105:1,7 106:5,6
107:2,4 111:18,19
116:7,25 117:12,23
**deadlines**  106:1
**deal**  75:24 76:8
93:25 104:24 107:6
118:10 129:25
130:1 133:16
**dealing**  48:11,13
133:24
**dealt**  47:11
**death**  66:22
**debate**  52:19 57:8,9
57:11,11

**debated**  20:9,11
23:11
**december**  25:5,8,9
102:10 106:22
**decide**  21:19 101:9
**decided**  84:13
131:23
**decides**  23:6
**decision**  46:19 47:12
47:23 54:13 57:5
69:13 75:2 82:10
109:24 114:6,7,9
115:1
**decisions**  57:2 74:6
**decisive**  138:8
**declaration**  76:19
80:7,16 111:4
136:19
**declarations**  76:20
123:21
**decline**  77:20
**deduct**  97:25 98:2
**deemed**  87:24
**defect**  72:18,21
**defects**  29:8,10
**defendant**  55:17
56:2,9,11 124:19
**defendants**  10:2,10
10:18 11:2,10,18
12:3 15:14,16,18
17:9,9,11,15,17
20:19 26:9 28:2,8
29:6,19,21,23 30:10
31:5 42:19 44:4
50:4,15 52:4 55:9
55:15 56:8,9 57:18
58:20 59:5 62:2
68:17,21 69:1,3,12
72:21 100:3,8
124:21 129:25
132:11 133:11
**defense**  29:24
**defer**  26:11
**deficiencies**  102:21

**definitely** 136:24
**delay** 21:7 23:23
**delayed** 21:7
**demand** 70:3 72:19 73:2 120:3
**demonstratively** 40:21
**denied** 97:10 103:10
**denver** 9:13
**department** 12:12 56:3,11 58:8
**depending** 35:20
**deposition** 37:15,23 37:25 38:1 141:12
**deserving** 30:11
**designated** 21:1
**designation** 20:19 22:6,21
**designee** 53:1
**despite** 42:13 47:7
**determination** 41:7 41:8 98:11 113:13 116:6
**determine** 29:10 98:9
**detroit** 5:22
**development** 47:15
**devices** 32:25
**devised** 27:3
**dictate** 75:22
**dictatorship** 70:17
**diego** 4:22
**difference** 21:6 23:4 42:9 58:15 87:25 104:16
**differences** 89:17
**different** 27:18 29:12 30:20 32:2 33:1 35:20 59:10,11 59:12 68:24 75:12 83:5,7,14,18 85:6 89:21 100:25 103:3 110:8
**differently** 54:25 83:15,19 138:21
**difficult** 57:20 99:4
**digital** 80:8,13 81:1
**diligence** 21:14
**direct** 13:3 16:6,11 54:23 55:2,3 60:21 100:16 108:13 125:24
**direction** 28:11 141:8
**directly** 106:21 119:2
**directs** 34:12
**disadvantage** 107:20
**disagree** 112:18
**disapprove** 88:23
**discovery** 21:14,24 22:1
**discretion** 53:20 106:1 114:1,25 117:14
**discuss** 19:13 35:10
**discussed** 110:24
**discussing** 111:11 113:17
**discussion** 120:17
**discussions** 74:1,3,4 99:17 120:19 136:1
**disgorgement** 47:3 48:18 64:3,12,18 65:6 66:4,7
**dismiss** 68:22,25 69:4
**dismissed** 40:24 62:23 63:1 69:10
**disparate** 98:20 105:9
**disparities** 134:7
**disparity** 41:12
**dispassionately** 73:7
**disposed** 124:12
**dispute** 124:7,8
**disputing** 132:2
**dissemination** 55:7
**distinction** 59:16 60:18 105:24
**distinguished** 106:11
**distinguishing** 105:19 112:17,19 112:23 113:6
**distribute** 91:5 113:14
**distributed** 27:8 71:3 95:10 107:19 107:24
**distributing** 89:22
**distribution** 52:9,10 88:12 95:6 108:13 114:1 116:4,8 134:8 134:9
**distributions** 88:9 115:9,20 118:18
**district** 1:1,2 2:1,2 36:14 64:22 75:20 96:2 105:25 139:21
**divided** 87:19 92:22
**docket** 49:9,14,22 49:23 62:16 136:11 139:15
**document** 1:7 2:7 91:12,17 111:5
**documents** 55:24 135:19,20 136:24 137:11,15
**dog** 93:3 97:23
**doing** 20:16 21:25 38:25 41:3 59:19 82:1 98:19 126:25
**doj** 124:19,20,24
**doj.ca.gov** 12:18
**dollar** 33:9 37:6 40:10 79:5
**dollars** 71:3 90:7
**domain** 56:25
**don** 16:23
**donald** 4:5
**door** 41:6 43:4
**douglas** 8:19 15:25
**downside** 106:12 107:2
**dozen** 39:10
**dperelman** 4:10
**dr** 40:10,16
**dram** 47:14 49:13 49:22 78:23 125:22 125:23
**drive** 5:14 8:5
**dropped** 61:2
**due** 21:13 25:9 27:20 40:22 41:4 76:4 93:7 103:2 111:3,6 115:22
**dug** 27:13 39:14
**duly** 141:6
**duncan** 4:4 14:17,18 63:23,24 64:3,16,21 65:4,9,13,16,20 66:3 79:11,13,14,14 80:19 81:22 83:10
**dunn** 12:4
**duration** 31:19
**duties** 128:6
**duty** 71:9,11,15,20 71:23,25 130:16

**e**

**e** 6:18
**eadelson** 10:8
**earlier** 125:16
**early** 77:9,11 99:19 124:12
**easily** 62:17 136:12
**easy** 49:17 105:3,11
**economic** 39:7 44:17
**editors** 47:18
**effect** 35:25 40:25 41:1 64:23 91:25 122:4
**effective** 126:3
**effectiveness** 80:4

**effectuate** 26:23
**efforts** 122:7
**eight** 55:10 58:7
   61:5 116:21
**eighth** 114:11
**either** 25:5 62:19,21
   86:20 104:3,4
   119:14 121:5
**electronic** 113:10
**eliminate** 100:9
**eliminated** 86:11
**eliot** 10:4 15:11
**ellis** 10:3 15:11
**elongated** 85:16
**eloquence** 40:2
**eloquent** 39:24 40:1
**email** 18:8 38:17,23
   54:21 118:19,22
   119:13,14 120:9
   123:1 125:21,24
**emails** 68:7 118:22
   138:11 139:2
**embarcadero** 2:16
   3:5 10:13
**emilio** 12:14 16:3
**emilio.varanini**
   12:18
**emphasize** 61:12
**emphasizing** 124:18
**employee** 141:16
**encompassed** 67:17
**encourage** 99:15
**encouragement**
   117:12
**endorsed** 44:6
**enforcement** 44:11
   56:13,17,19 57:4
**engine** 80:10
**enrichment** 45:16
   45:25 46:4,5,8
   48:14
**entered** 20:24 30:3
   133:5
**enterprising** 106:21

**entire** 22:24 127:10
   129:20
**entirely** 86:10
   108:12
**entirety** 122:8
**entitled** 43:11 86:1
   87:24 93:22
**entity** 47:11
**enunciating** 42:20
**equitable** 43:19
   44:13,21 45:9,17
   47:2,9 48:21 50:6
   62:9,20 65:25 106:1
**equity** 44:2
**erik** 10:20 15:15
**erik.koons** 10:24
**error** 70:22,22
   97:22,25
**escrow** 132:12,16
**especially** 24:13
   52:18 77:8 85:22
**esq** 3:12,13 4:4,5,13
   4:20 5:4,5,13 6:4
   7:5,6,7,15,16 8:4,13
   8:21 9:5,18 10:4,12
   10:20,21 11:4,12,20
   11:21 12:5,14 13:5
   13:12
**essential** 26:19
**essentially** 21:17
   34:5 41:3 50:6
**establish** 42:24
   57:19
**established** 40:7
**estoppel** 121:22
   124:2,16
**evade** 108:4
**evaluate** 22:15
   33:11 37:9 82:8
   85:5
**evaluating** 97:11
**event** 111:17 131:16
**eventually** 74:5
**everybody** 19:22
   27:18 31:14 50:10

104:18 110:6 140:4
**everybody's** 49:15
**evidence** 33:19 34:1
   34:13 41:15,21,24
   41:25 42:17,19,22
   42:23 45:20 53:7
   55:25 68:3,3 77:6,7
   78:11,13,16 80:6
   104:22 138:7,21
**evidently** 79:9
**ex** 79:23 82:8 119:7
   120:6
**exact** 132:21
**exactly** 34:19 40:25
   92:10 102:14
**example** 22:13 40:9
   80:10,13 88:3 103:4
   117:24
**exceed** 135:24
   137:16,17
**exceeds** 111:12
**exception** 43:12
   95:6
**exceptions** 43:14,15
**exchange** 118:19
   119:13,14
**excluded** 8:2 15:10
   24:16 31:22 39:4
   67:5 86:3 88:10
   97:6
**excluding** 123:5
**exclusivity** 100:8
**excuse** 15:10 34:11
   52:21 53:8
**exercise** 53:20
**exhaustively** 79:25
**exhausts** 108:11
**exhibit** 37:23,24
   111:4
**exhibits** 80:8
**exist** 64:12
**existed** 72:11
**existence** 87:1
**exists** 95:17

**expect** 81:18
**expectation** 90:15
**expense** 123:10
**expensive** 126:20
**experience** 120:20
**experienced** 110:13
**experiences** 120:23
**expert** 22:14 34:25
   36:3 77:3 82:23
   83:11,14,23 84:2,5
   84:23 85:1,18,19,21
**expert's** 22:15
**experts** 27:4,4 83:8
   85:3 86:7,10
**explained** 81:7
**explaining** 137:4
**explicitly** 44:6
   114:23
**exposure** 106:13
**expressed** 104:19
**extend** 98:16 99:1
   104:6,17,25 105:7
   106:1 107:3 116:6
   117:22
**extended** 19:10 82:4
   116:25
**extending** 82:3
   104:10 107:2
**extends** 111:18
**extension** 106:5,6
   117:11
**extensive** 54:21
   73:24 80:3 112:20
**extensively** 69:2
   129:4
**extent** 27:10 28:20
   60:12 79:24 82:4
   122:17 134:16
**extra** 109:13
**extraordinarily**
   132:24
**extreme** 75:1
**eyeballs** 102:25

f

**f** 1:23 2:19 5:20 141:22
**f.3d** 67:18 70:6,11 97:9 113:24 114:7
**fabulous** 85:7
**face** 102:18,20 103:5 103:13 109:2
**faced** 42:17
**facilitate** 106:22
**facing** 21:8
**fact** 36:2 40:8 41:22 44:6 51:3,7 68:9 72:4 74:14 75:16,25 78:22 94:17 124:14 130:6 134:17
**factors** 28:3 60:22 112:17,19,24 122:6
**facts** 53:24 59:25 60:3
**factual** 41:12 42:13 42:14 43:25 132:18
**faegre** 11:11
**faegrebd.com** 11:16
**failed** 119:16
**failure** 39:19 69:10
**fair** 19:22 26:10 27:21 28:2 30:6,11 61:18 102:22 103:5 103:7 105:6 113:9 122:14 128:9 138:24
**fairfax** 5:15
**fairly** 87:17
**fairness** 18:25 26:12 55:16
**fall** 43:16
**false** 68:10
**familiar** 67:8
**family** 77:21
**far** 47:21 100:2 114:8 118:5
**fashion** 64:25 133:13
**fashioning** 60:8
**fast** 124:4
**faulty** 28:6
**favorably** 101:14
**fbdlaw.com** 4:17
**fears** 104:20
**features** 113:6
**federal** 43:24 44:22 45:3,22,22 46:11,11 46:14,17,18,23 47:7 47:9 48:17 49:8 50:9 53:13 64:3,11 64:19 65:15 75:18 99:22 102:7 108:24 141:12
**fee** 21:25 122:9 123:9 125:7
**feed** 81:3
**feel** 22:20 135:16
**feeling** 107:1
**feels** 27:10 104:25 109:25
**fees** 67:7,8 98:1 112:24 122:18,22 122:23 123:6
**fell** 41:23
**felt** 28:20 32:10 42:18 75:23
**fiduciary** 71:15 128:6 130:15
**fifth** 5:14 19:8
**figure** 84:19 94:15 99:5
**file** 75:18,23 100:2 101:18 103:22,25 105:6 106:23 108:16 138:14 139:4,8
**filed** 20:11,11,22 24:11 36:12 37:17 37:17,18 38:6,15 49:7 50:13,14,15 68:21 73:12,13,22 81:20 108:9 120:25 121:2 128:12 130:7
**filing** 26:7 52:16 64:11
**final** 30:11 50:5,14 70:20,20 81:20,20 87:7 90:19,23 91:7 91:10 92:11,15,18 96:2,6 104:9 106:7 111:17 112:2,4 116:2 118:2 120:24 120:24 121:4 125:14 133:4,4,9,14 137:14
**finally** 20:22 69:9 136:23
**financially** 141:15
**find** 41:10 50:17,19 62:17 63:4 71:25 78:5 81:15 90:10 93:3 97:9 106:17 109:14 129:4 134:13 136:12
**fine** 4:3 14:18 16:23 79:15 99:14 133:7 137:10
**finekaplan.com** 4:9 4:10
**finger** 84:25
**finish** 136:7
**finished** 16:12
**finn** 9:3 17:18,22 18:5
**firm** 9:4,17 15:5 105:15 127:5,17
**first** 4:14 18:19,19 25:12 26:4 30:9,19 33:13 46:2,14 82:18 90:3 105:16,18 109:15 110:24 114:25 117:9 125:11 132:23 134:23 139:9
**fisher** 76:20 77:8 78:12 81:3,6 83:11 83:25,25 84:12 85:10 136:19
**fisher's** 80:7,15 83:7
**five** 18:17 135:24,25 137:4,16,17
**fix** 29:7 72:21,22 98:4,7 99:18 105:11
**fixed** 32:16 41:14 73:3 87:21
**fixing** 65:24 77:18 98:7
**flawed** 78:25
**flaws** 83:24 84:1
**floor** 4:6 5:14 7:8,17 8:14 10:13
**focus** 53:4 59:16,23 99:25 123:2
**focused** 46:10,11 125:19
**folks** 38:19 100:1 109:11
**follow** 23:3
**follows** 46:17 110:11
**foregoing** 141:3,5,9 141:11
**forestalling** 116:8
**forget** 57:6 85:14 86:17
**form** 22:4 77:13 105:23
**formal** 119:11 125:20
**formally** 63:1 68:12
**former** 84:12
**formerly** 127:6
**formula** 89:21
**forth** 20:10 94:8 141:4
**fortman** 9:3 17:19 17:22 18:5
**forward** 57:17 73:20 75:2 102:2 118:9
**fos** 7:20
**fought** 68:23

**foul** 93:4
**found** 29:8 73:4 113:25 114:23
**foundational** 33:19
**four** 10:13 62:17 136:12
**fourth** 19:6 63:3 139:13,18
**framing** 24:18
**francis** 7:14,15 15:6 15:7 17:3 76:25
**francisco** 1:16 2:17 3:6,15 5:7 6:6,13 7:9,18 8:15 10:6,14 12:7,16 13:7 14:1 15:8
**frank** 17:13 117:16
**free** 42:11 123:13
**freedman** 4:12 14:21
**friday** 137:9,17,19 138:3,4 140:10,12 140:15,15,17
**friends** 16:8
**front** 93:21 103:11 109:9
**fuel** 97:14
**full** 19:22 51:25,25 53:19 98:10 109:7 110:7 114:24 135:14,16
**fund** 108:11,14
**fundamental** 40:19
**fundamentally** 41:6 42:17 133:16
**further** 125:17 141:11,15
**furtherance** 128:5
**future** 93:19 136:1

**g**

**game** 67:11 74:24
**gander** 42:21
**garavanian** 8:10 16:2
**gary** 8:11
**gate** 12:15
**gathered** 73:21
**geagan** 11:4 15:17 15:17
**general** 12:13 19:9 19:10 28:23 29:24 30:14 44:15 51:8 55:23,23 56:3,10,17 58:8 79:8 93:14 97:13 101:14 111:1 112:3,10 133:10
**general's** 16:4
**generally** 37:19,19 41:9 88:8 106:2
**generals** 56:15
**generating** 103:3
**gentlemen** 102:24
**geographic** 42:10
**germane** 79:22
**getting** 30:2 31:9 35:24 92:1 93:19 99:25 115:16 116:18 118:17 119:4,9 134:18
**ghost** 108:23
**gibson** 12:4
**gibsondunn.com** 12:9
**gidley** 11:21
**gin** 109:19 110:4
**ginning** 112:21
**gist** 93:12
**give** 18:15 19:21 24:15 31:14 47:2 48:15,17 51:24 53:1 53:18 54:8 62:16 76:13,22 85:5 89:4 91:1 97:12 100:8,9 100:25 101:20,21 103:8 108:17,20 109:4,5 117:7 130:11 133:19 136:10,11,15 138:18
**given** 24:13,14 28:3 52:3,3 54:23 56:25 60:25 71:20 81:7 96:18 98:21 104:16 105:6 106:3 113:13 116:9 134:16 141:10
**gives** 130:25
**giving** 60:9,9 90:20 108:6 134:11
**glad** 127:3
**global** 57:18 132:17 132:25
**gmail.com** 8:25 9:14
**go** 18:13 22:9 29:6 33:6 37:1 38:17 45:25 46:1 49:13 52:24 53:6,8 57:22 59:8 61:15 70:4 71:12,13,13,17 73:17 75:1,18 84:13 85:21 86:17,22 87:16 93:17,18 95:11 101:5 103:12 103:22 109:13 113:5,9,21 114:23 114:25 115:20 116:3 135:23
**goal** 27:9,13
**goes** 47:25 49:2 58:1 68:19 74:18
**going** 16:12 20:5 23:23 24:19 30:14 32:13,20 33:6,9,10 35:21 36:13 39:7,14 41:23 46:6,6,9 47:8 51:20,22 52:16,20 53:6 54:4,5,7 55:10 55:18,19 56:16 57:17 63:18 73:5,6 73:10,14 76:6 77:2 78:8 79:11,21 80:1 82:9 85:20,23 92:8 94:7,16,20,22 95:13 96:3,5,25 98:25 99:22 100:10 101:4 101:5,15,19,24 107:23 108:5,10 110:3,10 111:21,23 114:7,13 116:18,25 119:2,5 120:11 122:17 123:11,17 126:19 131:8 133:6 133:14 134:17,18 135:1 136:5,6,8,9 136:15 138:14,18 139:15,16
**gold** 140:18
**goldberg** 4:12,13 14:20,21,22,25 16:9 59:3 101:12 139:6,7 139:7 140:11
**golden** 12:15
**good** 14:5,7,8,15,17 14:20 15:1,19 23:7 39:12 60:7 61:3 79:1 83:10 88:3 99:25 131:18
**google** 80:10,10,11 80:11,12,20,20
**goose** 42:20
**gosh** 82:11
**gotten** 35:23 60:15 60:16 102:6 119:11
**government** 65:6
**governmental** 47:11
**governments** 65:5
**grain** 39:9
**gralewski** 4:20 16:19,19
**grand** 9:6
**granted** 45:17
**great** 19:17 77:20 137:22
**greater** 111:20
**grind** 56:18
**grips** 42:5
**griswold** 5:21
**ground** 43:9 61:16

**group** 6:3 21:2,2
22:23 77:24 125:17
137:4
**groups** 104:13
**grove** 6:19
**guess** 20:2,9 22:11
22:19 23:15 38:13
48:2 83:6 85:12
133:23 136:4
**guido** 13:5,9 16:5
**gun** 137:25

**h**

**half** 15:4 30:22
31:12,21 32:7 71:2
**hamilton** 47:13
**hamilton's** 49:5
**hampshire** 50:23,24
50:25 51:6 67:7
68:5 72:7 73:8 74:9
74:21
**hampton** 10:11
**hand** 19:22 39:25
56:4 103:21 131:2
**hands** 122:15
**handwriting** 136:14
**hanover** 42:18
**happen** 81:25 108:5
111:21 116:25
120:11 121:6 133:7
**happened** 62:23
72:12 73:8,9 74:8
115:6 117:24
**happening** 50:12
89:1
**happens** 98:23,24
**happy** 27:18
**hard** 68:23 77:7
78:10,12,16 80:6
**harrop** 94:18
**harry** 8:10
**he'll** 105:13
**head** 96:12
**headed** 28:11

**heads** 29:13
**hear** 14:13,14 24:4
48:24 53:21,24 57:2
76:21 136:1
**heard** 30:19 52:15
65:10 76:23 102:24
**hearing** 1:15 2:15
18:13 19:22,25 20:5
25:13,20 107:2,8
117:5,20,25 118:3,6
122:18,22,23 123:2
123:17
**hearings** 126:13
**heartburn** 29:21
**heavily** 57:5
**held** 2:15 66:4
122:20
**help** 100:1
**helpful** 38:24 62:15
137:25
**helps** 135:22
**hew** 136:5
**hey** 73:2 115:8
**higher** 36:5
**highest** 56:13
**highlighting** 70:10
**highly** 57:16,16,16
**hire** 84:2,5 86:3,5
**hired** 86:9
**hiring** 77:3
**history** 54:13
**hit** 19:12
**hitachi** 10:2 15:12
**hmm** 46:5
**hoag** 17:13
**hofmann** 5:3
**hogue** 17:13
**hold** 65:16
**holding** 131:21
**hole** 66:8
**hollander** 4:12
14:21
**home** 42:11
**honor** 14:15,17 15:6
15:19 17:24 20:10

23:3,9,19,21 25:10
26:17 27:10 29:22
29:25 30:18 31:8,16
31:24 33:18 36:2,20
38:16 47:23 49:18
50:22 51:23 52:8
53:2,8,17,18,24
56:6,24 58:11 62:10
63:20,24 65:22
68:16 69:5,24 70:22
71:18 72:16 73:18
74:17 76:25 77:3
78:1,5,22 79:10,14
82:22 83:10,22
84:24 85:14 91:10
92:15 93:7 94:3
95:25 96:6,8,24
97:8,23 98:10 99:13
99:15 101:23
102:14 103:10,11
103:12,16 104:10
104:11,16,17,24,24
108:14 109:10,24
109:24 112:18
117:10,17,18
121:16,18 122:2,14
122:17,17 123:17
123:25 125:9,14
127:8 128:22 130:6
131:12,20 132:7,9
133:9 135:3,18
137:10
**honored** 94:20,23
103:23
**hope** 101:13
**hoped** 140:4
**hopefully** 123:22
137:5
**horrible** 52:17
**horse** 51:14,15
**hostility** 43:4
**hours** 140:4,5
**house** 28:8
**hull** 9:16 17:7

**human** 78:3
**hundred** 77:5 80:14
**hundreds** 31:19,20
129:19
**hurdle** 30:9
**hypothetical** 29:4
64:7
**hypothetically** 21:9
21:11 27:24,25
30:25 101:9

**i**

**icebreaker** 124:6
**idea** 23:7 40:17 42:5
60:7 78:20 108:8
109:6 116:3 124:5
**identified** 130:13
**identify** 14:6 29:11
105:16 135:4
**ignore** 89:2 96:3
**ignored** 68:5
**ignores** 87:1
**illinois** 42:15,16,25
43:12,14,15,16,21
45:19 46:2,3,25
47:8 63:25 64:9,11
64:12,24 66:1 88:4
88:6,9,13 93:18
94:4,6,11 95:2,7
133:24
**illston** 46:13
**illston's** 47:12
**imagine** 126:3
**impact** 18:24 61:19
86:13
**impacted** 97:21
**implement** 102:1
**implemented** 27:7
106:4 111:2
**implementing**
111:13
**importance** 57:7
**important** 34:21
37:5 40:2 53:23
54:3 55:24 59:17

60:17,22 61:13,24 75:3,3,4 103:1,2 126:11 128:23
**importantly** 104:22
**imposes** 106:11
**impossible** 41:9
**impression** 80:25 81:2
**impressions** 80:9,14 80:17,19
**improbable** 57:16
**improper** 105:9
**inappropriate** 34:7
**includable** 122:9
**include** 31:23 88:6
**includes** 80:7 88:4,8 88:12,16 89:6,10 96:7,8 108:19,20
**including** 31:17 67:15
**income** 77:24
**inconsistencies** 134:22
**inconsistency** 90:2 91:21 92:3,6 94:16
**inconsistent** 87:10
**incorporated** 87:9
**incorrect** 95:13,14
**increase** 115:11
**incredibly** 119:25
**independent** 22:14 77:3 82:23 83:23 84:2,5,22 85:1,5,21 86:6 130:15 131:25
**indiana** 11:14
**indianapolis** 11:14
**indicated** 50:10 85:23 117:18
**indirect** 3:10 14:9 14:16 15:2 16:17,20 26:22 27:3 38:18 43:4 51:9 53:14 55:17 99:17,21 101:20,21 110:1,10 126:24 132:13
**individual** 35:1,19 42:1 57:19 77:21,25
**individuals** 78:3 79:6 109:6
**industry** 106:25
**inflated** 41:15 42:8
**inform** 25:21
**information** 34:23 38:20,23 39:2 40:15 49:16 79:16,20 81:18 82:16 83:5 120:22 130:17 131:25 136:18 138:12
**informed** 54:13
**informs** 111:14
**inherent** 43:24
**initially** 85:23 116:14 119:2
**injunctive** 61:25 62:3,6,19 63:13 100:2
**injured** 41:18
**inquiry** 23:16
**insert** 100:3
**insisted** 58:20
**instance** 115:21
**instances** 114:24
**instantly** 52:22
**institution** 73:22
**insufficient** 103:14
**intelligent** 123:22
**intend** 16:6 82:1
**intention** 20:15 126:10
**interest** 19:11 24:10 30:2 97:10 119:19 130:16
**interested** 25:19 141:16
**interesting** 65:23 79:3,8,17
**interests** 20:7 21:4 28:23 67:15
**intermeddler** 126:17
**internet** 54:20 78:15
**interplay** 110:16
**interrupt** 30:25 44:19
**interruption** 113:10
**invaluable** 124:6,9
**invective** 73:8 75:12
**invectives** 75:8
**investigation** 71:1
**invitation** 69:21
**involved** 51:3 67:5 95:11
**ipp** 121:19 132:18 139:7
**ipps** 7:3 8:2 14:19 14:23 15:20,22,23 16:22,24 17:1,3 18:1,3 110:20
**issuance** 70:3
**issue** 18:14,14,19 19:1,5,8 20:9 21:10 22:9 24:18 26:3,12 26:15 30:20 31:4 39:16 48:3 49:25 51:20 57:15 62:7,7 62:8 66:22,24 70:1 76:11,12,15,24 79:2 79:17,21 82:2 86:12 91:3,7 93:21 96:15 97:11 98:14 106:19 107:14 108:6 109:1 110:23 112:15 113:19,21 114:9,10 114:23 117:2,19 126:11 130:6 131:9 135:15
**issues** 18:14,16,18 19:6,10 20:4 21:8 22:16 24:1,10 30:7 30:14 31:15 33:3,11 35:5,10 52:11 56:22 56:24 58:3,4 63:23 67:10 76:8,13 79:12 79:25 91:2 93:7 102:16 107:14 108:19 110:14 113:17 118:21 119:8 121:19 123:2 133:2,25 135:23
**issuing** 18:21 106:7 112:2
**items** 19:12

**j**

**j** 4:20 8:4 11:21
**j.scott.stjohn.public** 8:25
**jams** 2:16 3:3 49:19 119:15
**janet** 34:25 36:3
**january** 1:17 2:19 14:1 20:5 96:22 117:4
**jckress** 9:9
**jdc** 7:11
**jennie** 6:11,15 18:2
**jg** 4:17
**joe** 14:21
**john** 7:7 8:19,20,21 9:3,5 10:21 15:24 15:24,25 16:25 17:16,18,18,22 18:5 97:20 98:3 121:17 121:18,22 122:2,5 122:14 123:25 124:4 125:2,5,9,11 131:19,20
**john.taladay** 10:25
**joinder** 25:2,3
**joined** 131:14
**joint** 100:23
**jones** 41:19
**josef** 7:5 15:4
**joseph** 4:13 8:20,21 15:24 139:7
**jotted** 18:17
**journal** 55:5

**jr** 4:20
**judge** 21:11 23:4,24 24:13,15 25:17,19 34:12 46:13 47:11 47:12,13,13 48:24 49:2,5 60:20 69:9 69:12 73:1,4 93:21 93:21,24 94:1,25 107:3 117:1,18
**judges** 41:10
**judgment** 26:23 38:6 41:1 66:12 88:12 90:23 91:7,10 91:16 92:12,16 93:23 96:6 133:5 134:25
**judgments** 137:14
**judicial** 121:22 124:2,15
**jumping** 52:15
**june** 118:9
**jurisdictional** 130:6
**jurisdictions** 32:20 32:23 139:20,23
**jurisprudence** 44:16
**justice** 12:12 56:3 56:12 58:9

**k**

**k** 6:4
**kag** 6:3
**kaplan** 4:3 14:18 16:23 79:15
**kathy** 11:12 17:8
**kathy.osborn** 11:16
**kayes** 70:5,10
**keep** 19:18 60:17 96:14 119:8,8,11
**kellogg** 110:15
**kern** 6:4 16:17,17
**key** 112:17
**keyspan** 46:12,22 47:10
**kind** 28:24 45:17 48:15,20 55:12,13 58:17 80:15 84:21 102:11 134:5
**kinds** 57:22 100:15 110:14 118:10 126:12
**kirby** 4:19 16:19
**kirkham** 7:4,6 15:1 15:1,2 17:1 25:1 39:25 40:1 43:10,13 43:18 44:24 45:2,6 45:11,13 47:10,21 47:23 48:6,13 49:4 49:12,18,20 59:2 65:11,22 66:13,16 66:19 86:20,23 87:13,16 88:6 89:14 89:24 131:2,3,4,9 136:15
**kirkland** 10:3 15:11
**kirkland.com** 10:8
**kmllp.com** 4:24
**knew** 34:18
**know** 14:11 16:11 18:14,24 19:18 20:12,22 21:13,20 28:12 29:9 32:6,7 33:9,11 34:24 35:2 35:18 36:2,23 37:7 39:2 40:9,13 43:6 49:21 51:4,20 52:19 52:23 54:10 58:25 59:9 61:9,18 62:18 66:19,20,24 68:18 69:14,19 71:10,13 74:18 75:13,14,17 75:25 76:20 78:2,6 78:18 79:4,8 80:8 80:23,23 82:6 83:1 85:10 87:14 91:16 99:24 101:23 104:4 106:23,24 107:1,6,7 107:22 108:15 109:20 110:8 114:13 119:24 120:2,14 121:3 122:18 123:12,12 127:11 129:25 130:1,11,14 131:4 132:11 134:24 136:21
**knowing** 33:6 34:20 34:21
**knowledge** 22:16
**known** 55:12 79:21
**knows** 47:17 81:22 82:9
**koons** 10:20 15:15 15:15
**kress** 9:4,5 17:18,18 17:20,22 18:5

**l**

**l** 4:5 11:12
**lady** 102:24
**lake** 6:5
**land** 64:9,10
**lane** 8:22
**language** 39:6 96:19 100:3 114:9
**large** 21:2 36:7 95:14 132:24
**larger** 31:21 94:21
**largest** 132:13
**larimer** 9:12
**las** 8:6
**late** 74:24
**laura** 9:3 17:19,22
**lauren** 3:13 14:15 62:15
**laurenrussell** 3:18
**law** 6:3 7:14 8:12,20 9:4,11,17 15:7 17:2 27:16 43:6 44:1,20 45:8,18,21,22 46:4 46:16,17,20,22 47:6,15 48:12,13 51:1 52:18,19 54:1 56:13,16,17,19 57:4 57:8,10 58:3 59:25 60:2,8 61:15 64:7,9 64:10,19 65:12,21 66:8 67:22 72:5 84:13 108:24,25 115:19 129:4,15 130:21
**laws** 44:7,8,9,11 46:23,24
**lawsuit** 62:13 105:7
**lawyer** 57:12 62:13 84:12 127:19 129:19
**lawyers** 8:3 26:22 37:20 46:2 67:12,25 70:14 71:13 74:4 83:18 129:13,20
**lcd** 34:18 35:2,8 37:7 58:16,21 59:4 59:6 66:14 70:25 71:3 112:6,8
**lcds** 31:16,20 46:13 47:12 77:19,23 112:17 113:3,7
**lead** 14:8 16:5 18:23 20:6,15 21:12 22:6 22:21,22,23 24:8,22 25:4,14 30:16 40:5 53:20 57:23 67:13 68:23 69:21,24 70:14 71:9,11,12,15 71:19 72:19 73:15 73:18 76:19 83:13 130:2,8 131:5,7 132:12 133:14
**leads** 23:6 24:9,15
**leapt** 46:16
**leave** 32:24 48:23 52:20 98:12 110:5 118:2,8 124:23 138:19
**leaves** 33:7
**leaving** 100:18 108:6 127:18
**lee** 6:11 18:2
**left** 33:25 34:1 52:17 71:24 108:19,23

110:6 113:5 117:23
**legal**  28:13
**legge**  69:9,13 73:1,4
93:21,22,24
**legge's**  94:25
**legitimacy**  23:16
**legitimate**  48:3
53:12,12
**length**  19:17
**letter**  49:20 70:3
72:19 73:3 114:17
119:14 135:24
**lexis**  49:4,10,17
114:19
**lg**  52:1,3 54:16,16
54:17 132:19 133:3
133:7
**liability**  97:14
**life**  63:2 84:15
**light**  68:9
**limit**  124:11
**limitations**  54:2
58:4
**limited**  49:19 70:13
124:20 139:20
**line**  30:8 42:10,11
42:12 47:5 48:17
74:5
**lingered**  63:1
**list**  19:12 81:1 96:24
97:1 125:21 137:11
**listed**  24:18
**listing**  94:13
**literally**  103:1
**litigants**  124:23
**litigate**  33:2
**litigated**  48:7 64:14
69:2 105:22
**litigation**  1:5 2:5
19:4 55:9 97:14
124:12,15 132:18
**little**  25:14 36:13
54:8 81:23 118:8
140:13

**live**  58:9 101:19
**llc**  9:4
**llp**  3:11 4:19 5:3,12
5:19 6:10 10:3,11
10:19 11:3,11,19
12:4
**logged**  21:21
**logic**  25:24
**logical**  129:21
**logically**  30:8
**long**  8:23 66:25
68:19 81:1 107:12
110:11 133:12
**longer**  31:18 37:2
98:21
**look**  41:13,16 58:3,4
60:13 63:3 95:19,19
96:15,19 99:15
110:2 113:7 128:21
129:4 130:19
136:10,13 139:16
**looked**  34:9 69:17
114:22
**looking**  109:2 135:1
137:15
**looks**  49:8 55:21
101:14
**loose**  124:5
**loosely**  59:22,23
**lost**  60:4 69:9
**lot**  16:8 19:20,23
23:23 24:11 35:16
45:14,23 52:9 73:7
74:15 77:22 93:19
96:21 100:11,13
107:5 113:1,2 125:3
137:23
**louis**  9:7
**love**  75:20 85:10
137:21
**lower**  112:24
**luck**  42:25
**lumber**  70:6,11
**lump**  55:1

**lupron**  115:1

**m**

**m**  11:20
**machine**  141:7
**magnitude**  96:16
**mahler**  6:17 17:25
**maintain**  45:8
**making**  47:24 57:1
67:24 70:14 101:22
114:2
**march**  117:1
**margin**  83:15,19
**mario**  3:12 14:8
**marioalioto**  3:17
**mark**  11:21
**market**  77:20
**marketing**  81:4
115:1
**marla**  13:12
**martin**  2:16 3:4 11:4
15:17
**mason**  5:3
**massachusetts**
50:23 51:1,6 52:18
67:6 68:4,18,20
70:21,23,25 72:7,17
72:20 138:12
**massive**  54:21
**master**  2:16 3:4 14:5
14:10,24 16:13,16
17:4,12,20,23 18:6
18:11,21 21:9 22:7
22:25 23:2,14,17
24:2,5,21,24 25:11
25:16,22 26:1 27:24
29:3,16,18 30:17,24
31:4,25 32:4 33:14
34:10 35:3,12,14
36:8,10,19,23 37:1
37:4,14,22 38:4,8
38:10,12,21 39:16
43:5,11,17 44:19,25
45:5,7,12 47:4,20
47:22 48:2,11,23

49:11,15,19,24 50:7
50:20 51:11,16,19
51:24 52:7,25 53:4
53:9 54:6 58:14
59:5,18 61:7,11,18
62:3,5,14 63:3,7,9
63:12,15,17 64:2,15
64:20 65:3,8,10,14
65:18 66:10,15,18
66:20 67:19 68:13
69:6,8,18,23 70:7
70:19 71:5,9,23,25
72:6,10,12,15 73:5
73:14,16 74:8,20
75:5,10 76:6,10
78:10,18,21 79:1,13
80:17 81:17 82:6,17
83:1,4,20 84:1,4,7
84:10,15,19 85:9,25
86:12,20 87:12
88:17,19,21 89:3,9
89:13,16,25 90:18
90:23 91:6,20 92:4
92:13,19,24 93:1,9
94:22 95:5,22 96:1
96:11,15 97:5,12,15
97:18 98:2,12,18
99:3,7,10 101:6
102:3,5,9 103:24
105:2 106:12,20
107:12,18 110:18
112:6,9,12,22 113:1
113:9 114:13,16,21
116:20 117:4,7
118:11,24 119:1,6
120:13 121:5,13,17
121:20,24 122:3,10
122:15,20,25 123:5
123:19,24 124:3,25
125:4,7,10,13 127:1
127:3,11,15,23
128:2,13,16,24
129:2,11 130:4,14
130:24 131:1,8,10
131:18 132:4,8

133:18,22 134:3,5
135:6,13,21 136:4
137:18,22 138:3,5,9
138:14,18,24 139:4
140:3,15,17,20
**master's** 21:16
**masters** 41:10
113:24 114:6,8
**material** 96:19
136:6,7
**math** 56:8
**matter** 23:20,23,24
23:25 30:14 94:1,17
113:19 119:25
134:10
**matters** 21:25 29:11
**matthew** 4:4 14:17
79:14
**maximum** 108:9
**mcinerney** 4:19
16:19
**mdl** 1:6 2:6 129:19
**mduncan** 4:9
**meadowcrest** 8:5
**mean** 19:14 21:9
27:25 28:10 29:17
30:25 31:10,14 53:9
54:15 78:11 80:7,18
81:24 82:7,24 83:4
83:6 92:8 94:22
96:17 97:5 106:20
119:18 122:11,11
122:22 123:6
129:21,23 134:9,13
135:7 136:2,4 137:3
137:23
**meaning** 101:20
**means** 59:24,24
80:19
**meant** 27:5 94:12
**meat** 36:24
**mechanism** 61:13
**meet** 27:20 37:5
126:21

**meetings** 31:19
**meets** 111:2 115:22
**member** 34:13
35:23 91:18 127:13
**member's** 35:19
**members** 19:2,3
20:7 41:13 42:6
43:8 70:12,14 77:10
77:25 91:12,22
**memorized** 135:1
**memory** 58:25
91:16
**mention** 55:13
66:13 91:15
**mentioned** 74:23
136:8 138:6
**meridian** 11:13
**merit** 32:11,12
**meritless** 40:20,21
41:6
**merits** 26:14 39:17
39:18
**met** 79:23 81:16
**mexico** 14:22
**mexio** 4:15
**mgeagan** 11:8
**michael** 10:12 15:13
**micheletti** 5:5 16:21
16:21
**michigan** 5:22
**mike** 29:22 68:16
**milberg** 5:19 15:23
105:15
**milberg.com** 5:24
**miller** 9:11 18:4,4
**million** 27:8 28:3
34:6 35:16 40:9
71:3 76:2 80:14
84:17,21 88:1,1,2
90:7 93:2,2 125:3
134:10
**mind** 18:15 26:15,16
28:1 43:7 51:23
63:21 79:24 86:13
96:14 99:14 123:8

**minimize** 124:17
**minimum** 119:9
**minute** 44:19 59:17
110:5 133:19
**minutes** 76:7 133:20
140:5
**misses** 77:24
**mission** 12:6
**mississippi** 8:23
**missouri** 9:7 51:5,5
51:8,11 67:9 68:5
71:1 72:8 73:9 74:9
74:12
**mistake** 52:21 98:6
119:17
**mm** 46:5
**mockingbird** 8:22
**modelling** 113:24
**modifications**
115:25
**moment** 108:8
**monetary** 39:19
43:19 44:14,21 45:9
45:17 46:11 47:2,9
50:6 58:17,23 62:9
65:25 99:25
**money** 30:4,21 31:6
31:6,10,23 32:9,13
32:16,23 33:6,10
35:9,17 48:21 75:25
77:22 87:3,19,24
88:25 89:19,22 90:5
90:9,12,16,20 91:1
91:5,8 92:1,4,5,21
93:20,22 94:12,16
95:1,9,10 96:3
100:11,13,16
101:21 108:16,18
109:13 110:3,6
112:13,15,25 113:5
113:13,15 116:8,15
116:22 132:12,15
132:17,21,23,25
133:7

**monitors** 36:4
**montgomery** 5:6
6:12 7:17
**months** 29:2 73:24
**moore** 8:12,13 16:1
16:1 25:10,11,12,18
33:17,18 34:17
35:13,15,24 36:20
36:22,25 37:3,5
50:2,8 52:8 70:20
70:21 71:6,18,24
72:2,9,11,13 73:12
73:15,16 75:15
86:17 97:2
**moot** 29:15
**morning** 14:5,8,15
14:17,20 15:1,19
113:17
**motion** 18:22 20:6
20:12,20 25:3,13,21
36:12,15 38:10,12
50:14 69:4 81:20
130:7 138:15 139:5
**motions** 68:21,23,25
**motivated** 126:5
**motor** 48:16,18
**motors** 97:13
**move** 26:2,3 76:10
76:15 102:1 117:25
118:8
**moved** 108:20
**mscarborough**
10:16
**mullin** 10:11 15:14
**multiple** 34:18 58:7
61:5,23,23 68:21
115:2
**multistate** 74:16

**n**

**n** 3:12 9:19 11:13
**name** 14:21 24:7
97:12 128:16
141:19

**named** 67:15 127:6
  127:6,12,16 131:13
**nathan** 5:13 15:21
**national** 32:24
**nationwide** 54:16,19
  55:4 66:9 67:14
  84:16
**natural** 78:7 79:6
  100:19 101:2,18
  102:5,21 103:4,7,18
  104:7,12 105:4,8,19
  107:4,20
**ncihlar** 5:17
**near** 116:16
**necessarily** 69:20,21
**necessary** 21:19
  69:11 106:3,5,6
**need** 24:1 33:10
  37:6 39:23 42:23
  52:25 69:8 76:14
  105:5 114:20 116:3
  130:19 136:6,8,9,24
  137:1,3,12 140:13
  140:13
**needed** 85:16,18
**needs** 33:20,21
  76:22
**negotiate** 100:15
  101:25
**negotiated** 99:20
  115:5
**negotiation** 28:7
  115:10
**neither** 141:15
**network** 80:12,20
  80:21,24
**netz** 34:25 36:3
  40:16
**netz's** 37:11 40:11
**nevada** 8:6
**never** 34:9 37:20
  44:5 48:21 58:11
  63:1,10 72:13 73:12
  73:13 74:10 90:15
  130:12

**new** 4:15 11:6,6
  14:22 31:14 33:15
  50:23,24,25 51:6
  61:15 67:7 68:5
  72:7 73:8 74:8,20
  91:23
**newspaper** 54:20
**nice** 16:9,10,14
  82:12
**nil** 58:11
**nine** 56:7,8,8
**ninth** 44:5,6 48:14
  48:19 64:17 65:21
  66:1,4 110:12,15
  113:18,20 131:23
**nod** 130:10
**non** 19:2 20:7 21:2
  22:4 32:25 33:8,25
  39:21 40:4 44:21
  45:9,13 53:14 58:18
  58:23 61:8 62:21
  66:24
**noon** 137:19 138:3,4
  140:10,15,17
**normally** 121:6
**northern** 1:2 2:2
  36:14 64:22
**note** 35:9 60:21
  111:25
**noted** 26:1 84:19
  140:22
**notice** 19:5 22:13,16
  26:25 27:4 31:14
  54:4,5,8,12,17,18,19
  54:19,22 55:12,14
  55:20 58:15 61:20
  61:22 76:11,16,18
  78:25 79:12,23 80:2
  81:14,15 82:8,20
  83:16,24 84:16 85:8
  88:20,24 89:4,7,14
  90:3,4,9,11 91:12
  91:17,24,25 93:15
  93:15 95:12 98:3
  101:16 102:19,23

102:24 103:8,18
  106:4 109:2,14,18
  109:21 110:22,25
  111:2,5,6,14 112:20
  115:22,24 117:7
  118:1 119:4 120:18
  125:17,20,24,25
  126:2 133:12
  134:11,16,20
**noticed** 68:1
**notices** 32:18 54:16
  54:24 55:2,3,7,24
  56:9,12,20,25 58:7
  58:8 61:5,6 77:5
  78:24 102:7 118:18
**notifications** 61:23
**notified** 56:10,11
**novak** 5:20 15:23,23
  79:11 105:12,14,14
  106:13 107:10
  110:19,20 112:8
  113:11 114:15,18
  114:22
**novo** 23:24
**nuisance** 60:5,6,10
  60:17 67:4,5
**number** 37:8 40:11
  40:11 44:22 47:25
  60:22,23,24 71:10
  78:3 80:9 89:21
  111:25 124:21
**numbers** 62:16
  136:11
**nw** 10:22 11:22

**o**

**o** 7:14,15 17:3
**o'clock** 140:10
**o0o** 14:3
**oak** 6:19
**object** 20:25 21:15
  25:24 131:8
**objecting** 7:3 15:2
  17:1,3 21:19 52:16
  67:12 130:12

**objection** 50:18
  103:25 128:12,17
  129:8
**objections** 20:16,18
  21:5,20 22:20,20
  30:13 32:21 36:24
  39:18 50:15,16 61:2
  106:14 107:5,9
  121:3 126:24
  127:22 128:3 133:3
**objective** 138:7
**objectively** 68:10
**objector** 8:19 9:16
  15:24 17:6 134:23
**objectors** 8:10 9:3
  15:8 16:1 19:7
  28:23 35:7 56:23
  60:23,24,25 61:2,3
  65:4 76:4,23 85:15
  86:3,15 94:10 115:8
  115:13 126:23
**objects** 105:8
**obligated** 67:14
**obligation** 130:18
  131:25
**observation** 116:2
**observations** 110:21
**observer** 16:7
**obtained** 115:17
  116:13
**obtaining** 112:4
**obvious** 52:8,10
  109:18,20 131:5
**occidental** 131:22
**occurred** 40:13
  99:18
**october** 131:24
**offer** 135:18
**office** 12:13 16:4
  25:7 37:18 101:7,9
  101:10
**officers** 56:17,19
  57:4
**offices** 7:14 15:7
  17:3

**officially** 29:4 127:23
**officials** 56:13
**oh** 34:3 64:2 86:6 116:10 122:25 134:12 136:15
**okay** 14:10 22:7 23:14,17 24:6 29:16 30:17 31:25 33:14 34:10 35:16,17 38:21 43:18 45:5 47:4,22 48:23 49:11 49:15 52:7,25 53:2 58:14 59:20,21 61:11 62:4 63:15 64:20 65:3,10 66:10 66:18,21 67:21 68:13 69:7,23 71:5 71:9 72:10,15 73:14 74:20 75:10 76:6 78:10 79:13 82:20 83:20 85:25 87:13 87:16 88:19 89:3,9 89:16 91:20 92:14 92:19,24 100:8 101:1 102:15 107:12 108:12,15 109:1,5 110:4,18 114:18,23 118:11 119:6 125:4,10,13 127:1,12,15,23 128:2,24 130:24 131:4,10 133:18,22 138:16,20 140:16
**old** 16:15 77:10 116:21
**olds** 77:13
**omitted** 19:4 39:21 62:22
**once** 24:9 52:21 83:21
**ones** 50:24 101:15 101:24 105:5,10,21
**ongoing** 79:18 121:6
**oops** 91:25
**open** 28:24 39:11 65:5 104:6
**operative** 139:12,18 139:22
**opine** 77:4
**opinion** 83:6,7 86:2
**opportunity** 18:16 61:17 102:10 103:19 104:7 105:6
**oppose** 129:9
**opposed** 34:14 87:22
**opposite** 24:17 42:9
**opposition** 25:2 38:6 50:16 68:22
**oppositions** 25:9
**opt** 57:7 60:23 61:4 61:13,19 103:2
**option** 86:3,4
**oral** 1:15 2:15 19:25 123:13
**order** 18:17 23:21 32:2,5 33:18 38:3 38:19 42:24 49:5 93:23 94:6 95:19 119:6 120:3,6 130:2
**ordered** 137:1
**orders** 90:25 96:20
**oregon** 46:15,20,22 65:8 66:14 88:4,9 88:13 93:18 94:4,6 94:11,16 95:2,7
**organized** 119:10
**original** 36:18 50:3 50:18 118:22 141:12
**originally** 68:20 115:7
**osborn** 11:12 17:8,8
**ought** 22:14 27:7,8 60:8
**outlined** 29:25
**outreach** 80:8,14 81:1
**outs** 57:7 60:23 61:4 61:19
**outside** 43:16 111:9
**overcharge** 36:4,5,5 36:6
**overcharges** 44:4
**overruling** 42:18

**p**

**p.a.** 4:12
**p.c.** 7:4 9:17
**p.m.** 2:18 133:21,21 140:22
**pac** 70:11
**pacific** 70:5
**package** 94:21
**page** 48:25 49:2 124:9 135:24
**pages** 49:5 135:25 137:4,16,17
**paging** 49:6
**paid** 30:4 31:2,6 32:10,10,11,20 50:10 80:12 87:4 89:15 90:5 94:16 95:1 132:15,20,24 132:25
**panasonic** 11:2 15:18
**panel** 34:19,20 36:22 37:6,7 40:14
**paper** 50:4 114:12 131:15
**papers** 36:18 40:10 50:4,10,17,18 52:13 54:11 62:11 69:17 74:24 75:16 81:20 103:16 105:17 120:25 121:2,4 125:18 126:7 127:5 128:11,13,14,16
**parens** 66:16 99:8 102:12 104:13 105:5,7,10,21 106:9
**park** 11:5
**part** 28:16 36:14,16 38:6 55:14 69:20 71:14 81:24 90:16 94:20 95:3 99:19 104:4,21 127:18
**parte** 119:7 120:6
**partial** 71:1
**participate** 16:7
**particular** 18:17 120:9
**particularly** 19:17 106:17 114:18 115:21 120:19 124:20 137:23
**parties** 38:19
**parting** 132:10
**parts** 107:21
**party** 97:24 141:17
**pass** 43:20,21 46:25
**passing** 55:13
**passthrough** 42:19 42:24
**paths** 104:3
**patience** 69:10
**patriac** 66:16
**patriae** 99:8 102:12 105:21
**patrick** 7:16 17:2
**paul** 5:20 15:23 105:12,14
**pay** 32:13 97:25 100:10
**payment** 60:11 92:17 95:25 108:7
**payments** 60:9 88:13 89:10,10 95:3 98:4,5
**peace** 132:17
**peep** 52:5
**pending** 18:23 59:12 59:14 63:6,8,16 103:11 105:22 106:9 139:12,19,19 139:22

**pennsylvania** 4:7
  10:22
**people** 14:13 19:16
  19:20 21:1,2 22:1,5
  22:23 31:2 32:14,19
  32:25 33:7 34:8
  37:20 39:3 43:3,22
  48:17,24 56:17,18
  56:18 57:1,23,25
  58:17,23 60:14
  62:21 64:13 66:23
  71:10,24 73:20
  75:14,16 77:17
  78:15 87:23 88:24
  89:1 98:22 99:6
  100:17,20 101:2,18
  102:5,21 103:4,7,19
  103:22,23 104:12
  105:8 107:5,20
  108:6,9,16,17,19,21
  116:20 117:13
  118:1 119:18
  125:22 126:4
**percent** 33:10 77:7
  78:11,12 84:21
  115:7,9
**percentages** 92:22
  95:1,21
**perelman** 4:5 16:23
  16:23
**perfect** 18:12 113:7
**period** 41:14,21,24
  66:7 77:11,13,18
  92:20 111:20
  116:10,14,21
**permits** 120:3 129:5
**person** 41:25 43:25
  69:25
**personalize** 67:10
**personally** 24:12
**persons** 78:8 104:7
  105:4 107:4
**perspective** 22:15
  73:19 109:4 132:11

**persuade** 100:3
**persuasive** 106:18
**pertains** 141:11
**petroleum** 131:22
**phase** 81:25
**philadelphia** 4:7
  14:18
**philips** 10:18 15:16
  17:17 121:23,24
**phone** 14:14 17:4
  18:7 71:12 120:1
**phonetic** 94:18
**pickup** 97:14
**picture** 12:3 17:11
  53:19 135:14,16
  138:22
**pie** 89:8
**piecemeal** 28:25
**pipe** 129:24
**place** 23:22 97:3
  141:4
**plaintiff** 42:23 48:22
  64:18 65:1,7,24
  66:5,6,14 74:10,12
**plaintiffs** 3:10 13:3
  14:16 15:3,10 16:11
  16:18,20 24:16
  42:21 46:3 50:14
  67:15,16,25 68:4
  72:3,6,7 74:7 86:4
  99:18,21,24 101:2
  110:2 115:6 130:12
  131:13,14
**plan** 26:13,21,24
  27:3,6,6,7,11,12,17
  28:5,9 29:7 30:16
  39:19 86:25 87:1,8
  87:8,9,10,11,23,25
  89:18,19,23 103:25
  104:5 108:15 109:2
  109:3 110:22,25
  111:2,5,14 115:7,22
  115:25 133:12
**plate** 137:24

**play** 67:11
**playing** 124:4
**plays** 103:15,17
**plaza** 4:14
**pleading** 46:3
**please** 19:18 37:14
**pllc** 8:3
**plodding** 89:4
**plus** 40:9 77:5 80:14
  84:21 90:7
**plutzik** 6:17 17:25
**pnovak** 5:24
**point** 26:17 31:9
  35:12,14 50:2 56:6
  58:16 61:18 65:23
  66:9 70:1,5,13
  72:17,22 75:6,11
  80:3,5 83:10 84:22
  88:7 97:2 104:9,10
  104:19 109:23
  113:8,11,12,21
  115:12 117:13,17
  118:4 121:24
  124:25 126:15
  128:23 130:1
**pointed** 115:2
  132:13
**pointing** 131:4
**points** 67:19 77:9
  105:16 121:16
  125:14 135:3 138:8
**policies** 44:7
**pooh** 61:17,17
**popular** 25:7
**population** 94:5,5,7
**position** 24:17 51:8
  85:2 91:21 100:5
  129:9
**positive** 39:12
  117:12
**possesses** 106:1
**possessors** 40:22
**possibility** 85:13
  117:21

**possible** 26:7 32:22
  84:18
**possibly** 42:13 57:25
  58:13
**postdated** 50:24
**posted** 118:18
  119:15,23
**posture** 105:19
  106:11
**pot** 88:1 100:17
  112:25 132:12
**potential** 89:10
  109:16
**potentially** 18:24
  97:21 129:19
**pots** 87:21
**power** 43:24
**powers** 24:14,15
**practicable** 81:13
  82:10 90:9 115:24
**practical** 93:1
  116:23 134:10,11
**practically** 99:3,4
**practice** 44:17 84:13
**pragmatic** 58:5
**precisely** 80:9 95:8
  124:15,24 131:21
**predicate** 44:1
  132:19
**prefer** 118:7
**preference** 108:13
**prejudice** 40:24
**preliminarily** 95:20
**preliminary** 26:5
  36:12,15 55:16,19
  80:1 93:23 118:6
  137:14
**premature** 18:20
  20:3 22:8,12 24:9
  24:12
**preparation** 25:6
**prepare** 55:20
**prepared** 35:6
**pres** 101:20 107:14
  107:15 108:25

109:13 110:6,17
  113:6,15,22 114:1,9
  115:9
**prescott**  3:11
**present**  13:11 67:12
**presentation**  105:17
**presentations**  95:15
**presented**  86:8,9
**press**  74:13
**presumably**  21:23
**presume**  50:1
**pretty**  36:1 41:5
  61:3 76:21 77:1
**prevailed**  69:3,12
  73:1
**preview**  54:8
**price**  41:14,15,22
  65:24 77:18 100:7
**pride**  27:12
**primary**  30:2
  106:13,16
**principle**  133:10
**prior**  50:25 141:5
**private**  44:10,15
  64:18,25 65:1,7
  66:5,6,14 99:24
  101:2 124:23
**pro**  87:22 89:23
  95:6,10,13 107:19
  133:25
**probably**  19:20 23:4
  42:25 44:12 45:13
  46:18 57:19 61:22
  81:22 107:10 114:5
  135:10
**problem**  30:15
  51:14 56:22 72:23
  77:8 79:17 86:15,24
  86:25 87:6 88:18
  93:3,6,9,10 101:4
  116:7,24 126:1
  130:9 133:11,15
  134:14 135:4
  136:14 137:5

**problems**  16:10
  27:25 28:13 76:17
  95:17 98:8
**procedural**  28:13
  69:1 70:1 119:8,25
  120:8 130:5
**procedure**  32:14
**procedures**  41:5
**proceed**  28:13 29:20
  39:7 113:14
**proceeding**  20:16,18
**proceedings**  126:10
  141:3,5,7,13
**process**  27:20 40:22
  41:4 73:24,25 79:18
  81:24 93:8 103:2
  104:4 111:3,6,15
  115:23 116:4 121:8
  121:9 126:21
  136:20
**processing**  79:20
**product**  41:14,20
  42:7 88:16
**products**  55:9 97:14
**professionally**
  136:22
**professionals**  81:4
**proffer**  90:7
**proffered**  74:23
**program**  54:12
  55:14 78:25 82:8
  83:25 100:17
  125:20
**programs**  54:21,22
  111:6,8
**progress**  39:15
  121:7
**projection**  108:1
**projections**  81:11
**promise**  90:16
**promote**  101:10
**proof**  43:19,21
  45:18
**proper**  110:11

**properly**  122:7,8
**proportionate**  87:20
**proposal**  28:17
  117:22 118:8
**propose**  29:7
**proposed**  28:5 29:4
  29:14 30:16 55:19
  89:23 104:3 109:16
**proposing**  39:1
**propriety**  21:22
**prosecute**  124:21
**prosecuted**  124:19
**protect**  130:16
**protection**  51:2
**protective**  38:3,19
**protects**  61:14
**protocol**  110:12,13
**protocols**  118:17
  119:4
**prove**  36:16 46:24
  46:25 47:1
**proves**  43:25
**provide**  59:25 81:18
  83:6 126:23 136:19
  139:2
**provided**  92:17,21
  93:11 96:3 108:2
**provides**  87:8,18
**providing**  138:12
**provision**  88:14
  90:20 91:1,19 92:21
  94:24 107:15
**provisions**  26:25
**public**  56:25
**publication**  55:5,6
  114:11
**publications**  55:6
**pull**  24:23 96:23
**punitive**  67:7
**purchase**  16:11
**purchased**  41:25
**purchaser**  3:10 13:3
  14:16 15:3 16:18,20
  26:22 27:3 38:18
  43:4 51:9 55:17

60:21 99:17,21
  110:1 132:14
**purchasers**  14:9
  16:6 39:20 42:1
  53:14 54:23 55:4
  126:25
**purchases**  40:12
  116:13
**purported**  41:12
**purpose**  94:14
**purposes**  41:17
  102:17,17 103:2,3
  106:7 111:13 112:2
  112:4,21
**pursuant**  117:22
**pursue**  47:8 53:15
  65:1 69:21 85:23
**pursued**  71:22
  72:13
**pushed**  118:5
**put**  24:7,19 26:22
  29:13 42:19,21
  45:15 52:13 70:24
  71:7 75:2 77:14
  78:7,8 84:25 85:7
  90:13 103:18
  132:11,17
**putative**  71:19
**puts**  104:2
**putting**  85:3

**q**

**question**  20:11,20
  22:8 23:9,10 26:5
  33:13 40:19 48:1,20
  53:11 59:15 60:5
  61:10 64:1,4 65:5
  78:7 98:5 99:5
  108:4 109:9 119:3
  120:17,21 122:16
  127:11 133:23
  134:21 136:2 137:1
  139:10
**questions**  21:8
  82:21 85:8 118:17

126:19
**quibbles** 133:6
**quibbling** 83:14
  120:8,8
**quick** 72:17 122:16
**quickly** 87:17 117:2
  117:19 135:25
**quinn** 2:16 3:4
  14:20
**quite** 26:11 36:17
  75:12 90:4 91:10,14
  119:10
**quote** 44:14 111:5
  120:24,24
**quoted** 50:18
**quotes** 91:24

**r**

**r.p.c.** 4:3
**rachel** 12:5 17:10
**radcliffe** 67:18
**raise** 18:16 48:1
  76:13
**raised** 18:19 19:6,8
  19:11 20:19 34:12
  35:11,13 39:18 52:4
  53:10 56:23 76:14
  76:18 82:2 87:5
  107:14 121:19
  133:3 138:8
**raising** 39:25
**ran** 70:16
**range** 35:19 36:17
**ranking** 56:13
**rata** 87:22 89:23
  95:6,10,13 107:19
  133:25
**rate** 34:20 39:1,2
**rates** 120:19
**ray** 1:5 2:5
**rbonsignore** 8:8
**rbrass** 12:9
**reach** 77:7 78:11
  80:6 81:5,12,12
  84:21 102:25

**reached** 78:15
**reaction** 57:3
**read** 19:15 42:3
  48:18 66:11 67:23
  76:17 91:18 122:13
**reading** 122:12
**ready** 74:25
**real** 40:18 62:5
  87:25
**realize** 19:15 21:25
  52:11
**really** 27:25 30:13
  39:17,23 40:19 42:3
  52:25 53:9 54:9
  55:13 57:5 81:9
  86:15 96:18 101:1,3
  104:2 110:2 120:2
  125:5 133:14
  137:24
**reason** 22:17,21
  83:22,23 93:4
**reasonable** 26:10
  27:6,10,11,12,21
  28:3,18,21 30:6,11
  53:16 59:15 83:17
  83:17
**reasonableness**
  18:25 26:13
**reasonably** 136:21
**reasons** 22:12 59:7
  59:11 81:14 103:6
  115:24
**recall** 31:16 34:15
  72:17,25 138:10
**recast** 46:7
**receive** 87:24
  111:23 115:8
**received** 79:19
**recess** 76:9 133:21
**recited** 91:9 93:24
**recites** 90:10
**recognize** 105:23
  106:8 118:4 130:8
**recognized** 91:4

**recognizes** 111:2
**recommend** 104:24
  116:24 117:18
**recommendation**
  18:21 19:24 20:4
  21:16 22:10 47:14
  48:25 49:1,23
  117:11 135:15
  136:17 139:1
**recommendations**
  21:20
**recommended**
  103:24 117:11
**recommending**
  107:3
**recommends** 131:7
**record** 33:20,23
  34:16,18,24 35:9,25
  36:10,11 37:12 38:2
  38:5,16,17 53:3,7
  61:3 68:2,14 80:3
  81:14 83:12,13
  85:22 96:17 101:12
  101:22 107:23
  127:9,19,24 138:10
  138:15 139:10,14
  140:1,21 141:6,9
**records** 98:10
**recover** 42:14
**recovered** 22:4
**recovery** 39:7 44:1,1
  44:3,20 46:11,12
  100:16
**redoes** 49:21
**reduce** 125:7
**reduces** 32:16,17
**refer** 129:16,17
**reference** 55:11
  56:5 119:6 120:3,6
  136:16
**referenced** 38:9
**references** 111:5
**referred** 26:20
  104:5

**referring** 37:13 49:3
  60:1 90:25 92:7
  121:4,20
**refined** 103:9,9
  109:4
**reflect** 125:8
**reform** 104:4
**regard** 21:22,24
  22:2,13 40:4 51:5
  67:4 95:17 120:18
  120:22
**regarding** 136:8
  137:13 138:12
**regardless** 132:1
**regards** 70:21
**regrets** 124:15
**reign** 51:25
**rejected** 82:25 83:1
**relates** 1:7 2:7
  111:16 118:17
**relating** 19:7
**relationship** 38:24
  110:22
**relative** 141:16
**relatively** 90:5
  135:25
**release** 30:22 52:1,2
  52:3 58:20 100:9
  132:21 133:1
**released** 34:8 40:23
  58:22,24
**releases** 26:25 30:5
  30:20,21 31:1,7
  59:6 61:21
**releasing** 19:2,3
**relevant** 72:3
  136:24 137:13
**reliance** 101:25
**relied** 91:18 100:20
**relief** 23:22 43:19
  44:14,21 45:9,17
  47:9 48:16 50:6
  58:17,23 61:25 62:3
  62:7,9,20,20 63:13
  99:25 100:2 101:21

**rely** 67:9
**remaining** 113:14 118:12
**remarks** 63:22 132:10
**remediated** 72:23
**remedy** 47:2 60:1 64:18 65:6 66:5,7
**remember** 25:6 31:16 58:21 59:21 75:5 122:11,12
**remind** 24:21 67:13
**reminded** 68:7
**reminding** 70:10
**reminds** 116:10
**renew** 16:15
**renfrew** 49:2
**renfrew's** 47:13 48:24 136:17
**renoticing** 32:21
**repealer** 19:2,3 20:7 21:2 22:4 31:22 32:25 33:8,8,25,25 39:21,21 40:4 44:21 45:9,13 51:11 53:14 58:18,23 61:8 62:21 62:22 66:24,24 76:12
**repeat** 19:16 60:19 77:2 78:8
**repeated** 39:24 40:5
**repeatedly** 52:13 67:20
**repeating** 24:20 103:17
**replace** 100:6
**reply** 24:25 34:3 50:16 64:21 68:8
**report** 18:21 19:23 20:3 21:16,20 22:9 25:20 34:25 36:8 37:11,12,22 38:14 47:14 48:24 49:1,3 49:23 56:2 82:15 117:10 121:2 135:15 136:17 139:1
**reported** 1:22
**reporter** 2:20 18:9 18:10 59:19,20 88:11 141:2
**reporter's** 14:7
**reporting** 81:25 121:7 139:17
**represent** 20:6 33:1 67:14,17 74:11 102:6 127:6,12,16 131:13
**representations** 124:14
**representative** 71:14 127:7,16
**representatives** 74:3
**represented** 75:17 75:18 124:7
**representing** 17:21 52:16 75:13 97:21 126:22
**request** 23:22 24:8 24:22 25:2,3 37:10 68:1,11 123:9,10 125:8
**requested** 141:14
**requests** 68:13
**require** 28:8 43:19 43:21 115:21
**required** 55:15
**requirement** 126:21
**requirements** 81:15 111:3,3,7,9,12 115:23
**research** 13:12
**resellers** 88:16 89:7 89:8,11,15,19 90:3 90:12,21 91:2,22 92:4,5,17 95:22,25 96:3,8,9 97:4,5 98:4 134:12
**residents** 39:20 98:21
**residue** 100:1 108:23
**resolve** 98:8
**resources** 49:19 124:21
**respect** 65:12,15 68:18 76:4 90:3 91:21 108:25 110:21 113:12 115:16 126:8
**respectfully** 78:4
**respond** 35:3 51:19 92:9 105:13 110:19 135:5
**responded** 104:21
**responding** 79:11 118:22
**response** 20:20 25:2 36:21 56:19,21 69:5 82:25
**responses** 76:19 117:8 121:3
**responsibilities** 23:5
**responsibility** 69:25 70:11 71:21 74:17
**responsible** 97:24 98:7 133:13
**rest** 124:23
**restitution** 47:3
**restive** 19:16
**result** 28:6
**results** 80:12,12 82:12
**retain** 85:18,20
**retained** 85:19
**retains** 117:14
**returned** 80:13
**reversed** 46:10
**reversing** 44:3
**reversionary** 113:3 113:4
**review** 47:6 57:9 58:3 64:7 135:3 139:23 141:13
**reviewed** 23:24 73:23
**reviewer** 86:4
**revise** 115:10
**revised** 115:18
**revision** 115:13
**revisit** 24:11
**richter** 10:11
**rid** 32:24
**right** 17:4,23 18:6,8 18:12 24:1,2 25:22 26:2,2 28:1 36:19 38:4 39:16 43:1,17 44:22 46:14,18,19 46:23 47:25 49:24 50:20,20 51:16 53:13,17 56:8 58:25 59:14 61:20 63:12 63:15,20 66:15 69:15 70:19 71:22 76:2 77:13 78:21 83:3 84:9 86:12 88:6 89:12 92:19,25 96:13 98:12 101:8 102:25 105:11 112:22 114:21 121:14 123:23 126:14 133:20 140:3,20
**rights** 21:4 39:6 57:14 93:16
**ripe** 23:25
**risk** 58:6
**road** 6:19
**robert** 4:20 8:4 15:9 24:7
**robust** 81:15 82:17
**rocket** 125:12
**rockhurst** 8:10 16:2
**roll** 107:13
**room** 66:23 71:11
**round** 135:5,8
**rounds** 68:25 135:7 136:1

**rule**  32:5 36:14 41:2
  42:16,20 43:2 45:20
  111:3,7 115:23
  117:1,19 126:15
**ruled**  38:13 93:22
**rules**  40:23
**ruling**  41:1,2 93:24
  94:1,25 123:22
**rulings**  55:25
**run**  18:12 64:11,24
  65:12 66:2 75:7,8
  100:16 108:18
  129:22
**runs**  82:5

**s**

**s**  8:20,21 12:5
**sake**  108:3,8,22
**sales**  40:15 77:20
**salt**  39:9
**sampco1**  9:14
**samsung**  10:10
  15:14 29:23 68:17
  121:23,25
**san**  1:16 2:17 3:6,15
  4:22 5:7 6:6,13 7:9
  7:18 8:15 10:6,14
  12:7,16 13:7 14:1
  15:8
**sandbagged**  123:10
**sansome**  8:14 13:6
**satisfy**  79:7
**sauce**  42:20,21
**saveri**  13:4,4,5 16:5
  16:5,14
**saveri.com**  13:9
**saw**  37:20 38:13
  78:17 80:24 103:1
  131:10
**saying**  29:2 32:2
  41:8 43:9 44:25
  46:15 48:2,17,19,21
  56:15 65:23 76:22
  78:14,15 86:15
  89:17 90:25 94:10

102:11,15 123:1
  129:23 134:12
**says**  27:16 33:4
  35:24 47:1,7 64:17
  66:11 78:12 89:7
  90:12 91:8,25 94:6
  95:12 98:24,25
  105:3 107:23 120:5
  134:23
**sc**  1:6 2:6
**scarborough**  10:12
  15:13,13 29:22,22
  30:19 68:16,17
  69:16,19 72:16
  132:9
**scarpulla**  7:14,15
  15:6,6,7 17:3 20:3
  22:22 23:2,3 30:17
  30:18 31:3,8 34:11
  53:21 76:25,25
  78:14,20,22 83:20
  83:22 84:3,6,9,11
  84:16,20 85:17 86:2
  92:14,15,20 93:6
  118:20 119:20
  122:16,24 123:4,15
  123:23 126:8
  127:15,18 128:1,7
**scarpullalaw.com**
  7:20
**scenes**  100:23,24
**schedule**  20:12,14
  20:14 21:19 22:10
  23:13 25:1 85:15,16
  98:13 121:12 136:5
**scheduled**  23:22
**scheduling**  120:7
**scheme**  133:25
  134:1,8,9
**science**  58:2,2
**scope**  52:2 55:4
**scrounge**  71:13
**sdi**  10:10 15:14
  29:23 68:17

**seal**  38:17
**sean**  9:16 17:6
**search**  80:10,12,12
**second**  15:4 19:1
  102:13 112:23
  113:23,25 117:17
  120:17 132:13
**seconds**  70:2
**secret**  55:10
**secretly**  122:20
**section**  66:7
**securities**  41:20
**security**  41:21
**see**  16:7,9,10,12,14
  16:14 37:21 39:25
  42:4 47:4 62:15
  77:6 82:12,20 87:25
  89:16 90:22 102:17
  102:20 122:15,25
  132:22 135:20
  136:25 139:24
**seeing**  25:20 32:21
  34:16 103:5
**seek**  57:18 67:17
**seeks**  67:10
**seen**  16:8 91:11
**sees**  80:22
**self**  25:25
**send**  49:18 73:2
  78:24 96:23,24,25
  101:16 134:19
  135:19 137:11,12
**sending**  28:7 72:19
  96:25
**sends**  55:22
**sense**  25:25 35:18
  64:5 82:12
**sensitivities**  106:8
**sent**  56:9 91:18
  118:22 119:3,18
  125:24 133:12
**sentence**  126:7
**separate**  26:7,11
  33:5 38:17 54:18,25
  105:23 123:17

131:16 134:1
**separately**  117:2
**serious**  107:2
**served**  71:11
**serving**  25:25
**set**  20:13 27:2 44:13
  94:6 98:13 99:13
  108:16 110:12
  118:7,20 123:13
  141:4
**sets**  26:18
**setting**  94:8
**settle**  31:12 53:25
  54:14 59:15
**settled**  31:17 32:15
  33:13 53:19 55:18
  99:7,16 115:13
  136:25
**settlement**  18:22,25
  19:7 21:23 22:3
  26:8,10,18,20 27:14
  28:2,5,22,25 29:3,5
  31:21 32:6 33:12,19
  34:7,15,22,23 35:8
  35:22,24 37:6 39:5
  40:4,10,25 41:9,17
  50:3 52:2 54:10,17
  55:19 58:24 70:24
  71:7 79:22 86:14,16
  86:16,24 87:2,2,7
  87:19 88:15 89:10
  90:6,7,14,17,19,20
  92:16 93:5,11,14,20
  94:3,19,25 95:4,18
  95:20 96:2,8,20
  97:6 99:19 106:8
  107:16 115:4,10,14
  115:18 124:5,13,18
  124:22 125:1,2
  126:13 129:9 131:7
  131:14 132:14
  133:3,4 134:7,24
  137:13
**settlements**  20:22
  26:17,19,24 27:2,17

50:25 52:4 54:24,25
56:7 60:8,21 88:14
100:23 101:25
112:5 121:23 122:8
133:8
**settling** 32:7
**shades** 102:15
**shaking** 96:11
**shape** 19:24 22:4
**share** 95:13
**sharpen** 63:22
**shepard** 15:14
**sheppard** 10:11
**sheppardmullin.co...**
10:16
**sherman** 45:4 65:15
**shoe** 42:18
**shoreline** 9:19
**shorthand** 2:20
141:1,7
**shot** 102:22 103:5,7
**show** 36:16 43:2
76:5 130:22
**showing** 21:21 22:2
36:18 94:14
**shown** 81:10
**shows** 130:8
**side** 23:13,20 30:2
42:11,12 48:8 51:21
76:5,23 98:19
**sidelines** 57:13
**sides** 42:9 85:3,4
**signature** 141:22
**signed** 38:3
**significance** 84:17
**significant** 89:17
**silenced** 131:6
**similar** 51:6 54:19
114:5
**simple** 75:7,14
**simply** 45:18 64:11
73:2 87:6 111:21
**simultaneous** 137:8
137:16 140:9,19

**single** 108:7,10,12
108:17 110:23
111:23
**sir** 68:15 97:19
123:24
**sit** 63:18
**sits** 43:22
**sitting** 57:13 132:15
**situated** 35:21
**situation** 41:11 42:2
42:6,15 43:23,25
44:12 48:21 51:6
99:18 104:2 129:18
**six** 55:7 77:10
131:13
**size** 122:5
**skip** 67:22
**slightly** 83:15
**sloughing** 75:14
**small** 36:6 60:24
90:5,8,13 91:4,6,7
96:15 122:3 124:5,5
124:13,21
**smaller** 132:20
**smarter** 86:4
**society** 44:10,11
**solicited** 87:22
**solution** 97:24 105:3
106:10 134:13
**solutions** 104:23
**solved** 29:12
**solves** 135:23
**somebody** 75:2
136:8
**somebody's** 27:22
**soon** 43:20 118:6
**sooner** 81:19
**sorry** 30:24 49:9
53:22 77:16 89:3
99:1 105:9 113:3
117:3
**sort** 19:16 100:1
101:20 109:18
110:9,16 130:18
132:10 133:25

134:9
**sorts** 98:20
**sought** 93:13
**sound** 43:6 133:16
**sounds** 92:5
**source** 130:17
**south** 4:6 9:6
**speak** 14:11 53:22
80:5 83:21 129:20
130:11
**special** 2:15 3:4 14:5
14:10,24 16:13,16
17:4,12,20,23 18:6
18:11,20 21:9,15
22:7,25 23:2,14,17
24:2,5,21,24 25:11
25:16,22 26:1 27:24
29:3,16,18 30:17,24
31:4,25 32:4 33:14
34:10 35:3,12,14
36:8,10,19,23 37:1
37:4,14,22 38:4,8
38:10,12,21 39:16
41:10 43:5,11,17
44:19,25 45:5,7,12
47:4,20,22 48:2,11
48:23 49:11,15,19
49:24 50:7,20 51:11
51:16,19,24 52:7,25
53:4,9 54:6 58:14
59:5,18 61:7,11,18
62:3,5,14 63:3,7,9
63:12,15,17 64:2,15
64:20 65:3,8,10,14
65:18 66:10,15,18
66:20 67:19 68:13
69:6,8,18,23 70:7
70:19 71:5,9,23,25
72:6,10,12,15 73:5
73:14,16 74:8,20
75:5,10 76:6,10
78:10,18,21 79:1,13
80:17 81:17 82:6,17
83:1,4,20 84:1,4,7
84:10,15,19 85:9,25

86:12,20 87:12
88:17,19,21 89:3,9
89:13,16,25 90:18
90:23 91:6,20 92:4
92:13,19,24 93:1,9
94:22 95:5,22 96:1
96:11,15 97:5,12,15
97:18 98:2,12,18
99:3,7,10 101:6
102:3,5,9 103:24
105:2,4 106:12,20
107:12,18 110:18
112:6,9,12,22 113:1
113:9 114:13,16,21
116:20 117:4,7
118:11,24 119:1,6
120:13 121:5,13,17
121:20,24 122:3,10
122:15,20,25 123:5
123:19,24 124:3,25
125:4,7,10,13 127:1
127:3,11,15,23
128:2,13,16,24
129:2,11 130:4,14
130:24 131:1,8,10
131:18 132:4,8
133:18,22 134:3,5
135:6,13,21 136:4
137:18,22 138:3,5,9
138:14,18,24 139:4
140:3,15,17,20
**specific** 87:3 97:11
110:9
**specifically** 44:2
113:23
**specificity** 136:21
**speculative** 62:12
**speed** 76:21
**spelled** 26:24
**spend** 19:24 33:14
**split** 48:3,4 53:11,12
53:15 64:4,6
**spoke** 94:17
**spoken** 113:18

**spreading**  31:11,13
**spur**  126:3
**square**  66:8
**squarely**  23:21
**st**  8:19,20,21 9:7,12
    15:24,24,25 97:20
    98:3 121:17,18,22
    122:2,5,14 123:25
    124:4 125:2,5,9,11
    131:19,20
**stack**  96:19
**stage**  80:1 100:22
    124:12 125:11
**stand**  82:7
**standard**  79:23
    81:13 83:16,17
**standing**  42:9 43:3
    58:3 126:7 128:20
    130:9,23,25 131:16
    132:1
**star**  140:18
**start**  77:10 127:4
**started**  23:11
    116:21
**starting**  26:17
    137:12
**state**  12:11 22:5
    40:4 42:10,11,12
    44:20 45:8,14,18,20
    45:21 46:4,5,15,16
    46:17,19 48:11,13
    51:11 56:10,14
    57:21 65:8,12 67:16
    71:12 75:3,4 79:7
    82:2 88:3 89:22,22
    92:22 95:2,2 98:25
    103:15,17 110:8
    141:2
**stated**  65:4
**statement**  19:11
    68:10 120:20
    125:16 128:10
**statements**  40:6
    53:5 67:24 68:3
    85:17 107:24

**states**  1:1 2:1 19:2,3
    20:8 21:3 31:17,22
    33:8,8,24 34:1 39:4
    39:21,22 40:12,13
    40:16 43:8 44:21
    45:9,14 50:9 51:10
    52:14,17,21 53:14
    56:11 58:18,23 61:8
    62:21,22 67:5 71:4
    74:17 87:19 88:24
    91:1 94:12,14,17
    95:21 98:5 111:5
    112:16 139:21
**statistic**  80:6
**status**  127:17
    136:20
**statute**  54:2 58:4
    67:6 75:7,8
**statutes**  51:2
**statutory**  50:23
**step**  57:17 74:18
**stepped**  73:20
**steve**  9:11 18:4
**sticky**  104:2
**stimulation**  111:4,8
**stood**  93:16
**straightforward**
    91:3
**straus**  5:12,17 15:21
**strawn**  11:3 15:17
**streamline**  24:10
**street**  3:14 4:6,21
    5:6 6:5,12 7:8,17
    8:14 10:5 11:13,22
    12:6 13:6 55:5
    126:16
**strikes**  97:20
**strong**  58:22
**stronger**  52:18
**strongly**  75:23
**study**  37:12
**subject**  46:20
**submission**  111:18
    135:9,11

**submissions**  135:12
**submit**  20:3 49:20
    91:3 102:10 114:15
    114:16 117:13
    130:21 134:12
**submitted**  68:3 79:4
    111:22 116:5,19
**submitting**  111:13
**subscribed**  141:18
**subsequent**  70:3
**substance**  118:16
**substantively**
    120:10
**succeed**  108:21
**succeeded**  38:25
**successful**  34:14
**succinct**  19:19
**sufficient**  31:11
    132:25
**suggest**  26:6 27:5
    28:11 65:11 78:5
    114:7
**suggested**  22:13
    26:12 44:5 60:12
    84:4
**suggesting**  28:10
    43:13,14,16 137:5
**suggestion**  39:12
    52:1 82:23
**suggests**  41:21
**suit**  74:13 105:21
**suite**  2:17 3:5 4:14
    4:21 5:6,21 6:12,19
    9:19 11:13 12:15
**sullivan**  42:3
**summarize**  86:8
**summarizing**  99:14
**summary**  38:6 41:1
**sums**  100:15
**supplant**  100:6
**supplement**  32:1
    68:2,11,14 125:25
    126:2
**supplemental**  78:24

**support**  16:16 60:2
    126:24
**suppose**  119:24
**supposed**  28:4 121:9
**supreme**  42:17 43:6
    51:7
**sure**  14:13 26:11
    29:12 36:1,17 62:1
    67:22 71:21,22
    79:14 92:2,10
    101:22 102:4 103:4
    123:16 124:3
    125:18 133:23
    135:25 137:20
    138:1,3 139:10,14
    139:25
**surplus**  39:3
**surreply**  121:19
    124:2,10
**survived**  73:25
**suspect**  135:10
**sustainable**  27:7
**suzanne**  1:23 2:19
    141:22
**sway**  70:16
**sworn**  141:6
**sylvie**  6:4 16:17
**sylviekern**  6:8
**sync**  118:2
**system**  81:3

**t**

**t**  5:5 10:20
**table**  24:3 28:7
    100:14
**tail**  93:2
**take**  18:14 22:7
    24:17 31:5 32:14
    58:4,20 59:18 73:6
    76:6 95:6 101:11
    121:5 129:21
    133:19
**taken**  37:15 51:8
    52:14 141:3

**takes** 32:23
**taladay** 10:21 17:16 17:16
**talewsky** 8:11 16:2
**talk** 19:21 39:11,17 44:9 54:4,5,7 118:21 133:19
**talked** 46:12,13 71:1 119:10 120:10 123:3 133:24
**talking** 45:2,2,23 46:9 66:6 102:24 109:5 118:16 135:6
**talks** 44:2 46:20
**tank** 97:14
**target** 77:23
**targeted** 55:3 77:17
**targets** 124:16
**tatp.com** 3:17,18
**tee'd** 23:25 93:21
**tehama** 7:8
**telephone** 6:11,18 9:5,11,18 10:21 11:12,20,21 12:5
**televisions** 36:6,7
**tell** 73:6 81:19 83:24 88:25 99:5 103:21 103:23 104:7
**tells** 82:12
**ten** 76:7 90:7
**tend** 99:25
**tenet** 44:16
**tentatively** 62:6
**term** 98:6 113:4
**terms** 23:5 26:19 27:1 29:5 30:4 39:4 59:22,22 83:18 86:16 87:3 94:20
**testifying** 141:6
**testimony** 138:13 141:9
**texas** 9:20
**thank** 16:13 17:12 23:17,19 24:2 26:3 49:24 53:2,17 70:19 73:16,18 76:5,8 79:10 86:11 88:21 97:18 127:2 131:17 140:1,3,21
**thanks** 93:19
**thekresslawfirm.c...** 9:9
**theoretical** 85:12
**theory** 44:17
**theresa** 8:12,13 16:1
**thing** 32:2 34:12 37:3 49:6 78:1 80:15 85:6 116:11 129:23
**things** 23:23 24:11 33:20 35:6 54:3 57:22 76:3 82:6 102:15,20 118:2,4 121:15
**think** 18:13 21:5,6 23:8 24:12 25:12,15 25:20,25 26:6 29:10 29:25 30:1,19 34:12 40:7 42:3 46:17,18 50:15 52:23,25 53:23 54:24 58:25 60:7,7,13,17 61:18 69:20 71:18,22 72:4 76:20 77:1,12 78:15 79:16,16 81:14,22 82:18 84:25 85:6 86:19 88:18 90:24 93:12 94:2 95:11 97:23 103:18 105:17,18 106:18 107:6,10 109:17 111:1,9,20 114:4 115:19,25 116:17 118:13 119:13,18 119:21 121:25 122:10 123:6,15,19 123:20 124:20 126:11 128:7,9,22 130:18 132:4,12 133:10,14,16 134:20 135:2 137:2 137:2,3,3,7,12 138:24 139:16,24
**thinking** 52:23 57:13 66:21
**thinks** 61:14
**third** 19:5 42:4 54:19 97:9 117:21
**thirteenth** 11:22
**thomson** 11:10 17:9
**thoroughly** 96:18
**thought** 27:15 47:5 65:10 74:4 110:16 112:18 119:19 121:1 123:11 135:11
**thoughts** 25:23 29:19
**thousand** 59:7,10
**three** 19:3 31:22 39:21 54:15,21 55:2 61:4 62:22 67:4 70:2 109:11 117:8 137:4 138:2 140:5
**threshold** 126:21 132:23
**throw** 28:11 59:21 59:22
**thrown** 69:3 72:24
**thursday** 136:6 137:20,22,25 140:9 140:11,18
**tigar** 21:11 23:5,24 24:13,15 34:12 60:20 107:3 117:1 117:18
**time** 19:25 25:15,16 25:17,18 33:15 52:9 55:16 64:24 75:9,21 81:19 85:16,18,18 91:4 96:21 98:21 105:23 106:10 111:20 116:9,15 118:1 123:13 124:1 126:20 127:12 132:16 133:17 140:13,14,22 141:4
**timely** 119:4
**times** 34:18 39:10 52:9 70:22 83:12 109:11 115:11,17
**tinkering** 28:9 30:15
**tmoore** 8:17
**today** 19:21 35:10 39:10,12,13 82:15 118:21 123:11 128:15 136:11 137:11 139:3,5
**told** 32:19 52:12,13 89:15 90:18 98:18 127:20
**tomes** 44:8
**top** 19:12
**toshiba** 11:18 17:14
**total** 26:9 122:23
**totaling** 70:4
**totally** 85:6 122:11
**touched** 110:25
**track** 108:21
**tracy** 7:6 15:1
**traded** 41:20
**traditionally** 99:24 100:21
**transcribed** 141:8
**transcript** 141:9,12 141:14
**transferred** 75:19 75:24
**transparent** 119:12
**treated** 138:21
**treatise** 47:17
**treatment** 91:22 98:20 105:9
**treble** 67:6 108:6 109:5 110:23 111:24 112:1,6,8 114:2,10,24,25 115:20 116:16 136:9

**trebled** 109:8

**tremendous** 132:12
132:14

**trial** 8:3 34:14 35:23
37:12 99:23

**tried** 46:3 64:24
65:25 102:1 119:11

**trk** 7:12

**trotting** 82:18

**trouble** 126:2

**troubled** 62:6,7

**troublesome** 62:8

**troubling** 96:16

**truck** 97:14

**true** 52:5 65:13,16
73:3 138:8 141:9

**trump** 3:11,11

**try** 19:18 32:4 33:5
59:22 72:20 90:10
109:14 119:8
124:11,17 135:4

**trying** 22:19 46:9
76:3 88:7 92:9
99:18 108:4,20
120:15 130:9
134:13

**tube** 1:5 2:5 12:3
17:11

**tubes** 36:4,5,6

**tuesday** 1:17 2:19
14:1

**turn** 110:1

**turns** 134:14,17

**tvs** 77:19

**tweak** 133:11

**two** 21:17 41:12
42:6 67:9 68:24
70:22 71:3 80:14
85:3,4 89:17,21
91:2 102:15 104:3
107:21 112:17
117:25 121:16
125:14 126:7
131:13 133:19
140:4

**type** 52:2

**types** 106:14

**typical** 24:14

**u**

**u.s.** 97:10

**ultimately** 62:23
68:24 103:10
117:14

**umm** 45:11

**un** 60:5

**uncommon** 124:20

**underlying** 27:1,16
28:25 30:10 54:1

**undersigned** 141:1

**understand** 22:25
53:10 69:9 76:17,18
82:7 97:6 123:7
127:5 128:18 132:4
139:14

**understandable**
133:5

**understanding**
102:1 122:12

**undoing** 44:3

**unearth** 72:1

**unequivocal** 68:3

**unfairly** 104:20

**unfairness** 134:22

**unforced** 97:22,25

**unforeseen** 107:8

**unfortunate** 107:7

**uniform** 66:8

**union** 3:14

**unique** 104:14

**united** 1:1 2:1 56:10

**units** 77:22

**university** 5:14 8:10
16:2

**unjust** 45:16,25
46:4,5,7 48:14

**unnamed** 67:16

**unprecedented**
61:22

**unproven** 60:6
61:16

**unreasonable** 19:25

**unredacted** 38:7

**unshackled** 111:8

**untrue** 52:5

**updated** 136:20

**uphill** 58:19

**upshot** 81:8

**urge** 77:2

**urgent** 119:25

**urias** 4:12 14:22

**use** 65:6 77:9,11,15
104:15

**usefulness** 134:11

**uses** 81:5

**usually** 100:22

**v**

**v** 131:21

**vacation** 119:16

**vacuum** 79:16

**valid** 69:14

**valuable** 48:1 71:6

**valuation** 54:9

**value** 34:4,21 35:19
40:6 53:16 109:7,11
110:7 116:15
124:11,18 125:3,5

**valued** 32:8 33:21
33:22,24 34:2,9,25
70:23 71:7

**valueless** 40:20

**values** 35:20

**valuing** 34:22

**varanini** 12:14 16:3
16:3 47:17 56:21
98:15,17 99:2,4,9
99:12 101:8,13
102:4,8,14 105:3
107:12,17,21
111:11 112:11,14
112:23 113:2 115:2
116:23 117:3,6,8
119:19

**varanini's** 105:17
113:16

**various** 18:14 27:1,1
68:25 76:19 123:21

**vegas** 8:6

**vehicles** 48:16,18

**version** 49:22,23

**versus** 70:5,10
110:23 113:24
114:8

**vetted** 74:5 80:2

**vetting** 73:24

**viability** 54:1 74:6

**viable** 56:16 57:10
59:14,23,24 60:2,11
62:1 64:5

**victims** 67:11

**view** 30:13 32:12
72:25 75:12 85:5
99:20 106:3

**viewed** 75:1

**vindicating** 44:15

**violation** 45:4,18
46:24 47:1

**virginia** 5:15

**vis** 28:2,2 29:5,5
30:10,10 105:20,20
121:22,22

**visited** 80:21

**vitally** 34:21

**voelbel** 5:3

**voice** 130:11

**volume** 79:5

**volunteer** 73:10
126:17

**vote** 101:6,8

**w**

**w** 10:12

**wag** 93:2 97:23

**wait** 35:14,14 37:14
69:6,6,6 92:13
110:4

**waive** 39:6

**waived** 115:15
**waiving** 126:10
**wall** 55:5
**walnut** 6:20
**want** 19:20,21,24 21:13,14,15,17 24:6 28:12 31:7 33:14 35:3,9 37:1 39:17 50:17,19 51:19 53:7 56:6,23 59:7,16,23 61:12 62:18 63:25 64:8 66:10 73:6 85:21 93:2,17,18 98:16 107:6 118:5 121:18 123:6,14 124:1 125:18 126:6 132:10,19 133:16 135:23 136:9 139:8 139:10,13,25
**wanted** 50:2 73:20 113:11 114:17 118:21 123:2 138:9
**wanting** 74:13
**wants** 23:7 57:12 61:15,15 97:1 123:9
**ward** 4:12 14:22
**wash** 60:13
**washington** 10:23 11:23 88:5,9,13 93:17 94:15 133:24
**water** 117:23 118:8
**waterfront** 76:15
**way** 18:12 22:4,17 23:12 28:14 29:20 32:2 41:25 42:8 45:15,25 47:16 52:24 64:13 68:19 81:9 93:4,17,18 100:21 110:3,7 119:21 121:9 133:2
**ways** 27:18,20,20 28:6,21,21 29:12 36:13
**we've** 21:20,24 22:13,16 34:18 36:23 60:25 64:16 65:21 103:6 104:16 109:16 113:13 117:23 118:16 119:10 123:2
**weak** 58:22
**website** 80:21 97:4 119:15
**week** 116:24 117:25
**weighs** 57:5
**welcome** 28:15,16 28:24 30:1
**went** 33:2 35:23 64:23 73:24 74:1 81:8 91:12 114:8 135:12
**westlaw** 49:16,22 114:20
**whack** 85:10 102:13 122:1
**whatsoever** 70:16
**whereof** 141:18
**whistles** 54:20
**white** 11:19 17:14
**whitecase.com** 11:25
**wide** 39:11 55:6
**wilhelmina** 113:24 114:8
**willing** 27:22 41:10
**windfall** 109:12,13 110:5
**winston** 11:3 15:17
**winston.com** 11:8
**wipes** 86:6
**wiping** 57:14
**wisdom** 96:12
**wise** 80:2
**wish** 77:3 78:5
**withdraw** 20:23
**withdrawing** 20:21
**witness** 87:14 134:2 141:18
**witnesses** 141:5
**won** 69:2
**wonderful** 47:5
**wondering** 138:16 138:20
**word** 120:7
**words** 20:1 120:21 122:4 124:6,7 135:10
**work** 40:1 57:25 82:9 100:21
**working** 57:24 85:15 105:12 112:16
**works** 63:9 85:1
**world** 31:20 113:8
**worried** 116:20,23
**worse** 66:12
**worth** 48:5 76:2 100:13
**write** 64:8
**writing** 68:14
**wrong** 80:7 105:11 113:4
**wrote** 120:21

**x**

**x** 94:7

**y**

**yahoo.com** 6:8
**yeah** 23:1 53:9 59:4 92:2,7 97:5
**year** 77:13
**years** 16:8 50:11,11 50:11 55:10 58:7 61:5 64:10 74:2 77:9,10,12,15 116:16,21 134:25
**yell** 14:12 24:6
**yelling** 14:11 15:10
**yesterday** 118:18 119:3
**york** 11:6,6

**z**

**zealously** 52:16
**zelle** 5:3 16:21 127:17,19,20
**zelle.com** 5:9,10
**zero** 30:22 32:8 40:6 47:25 48:5 53:16 58:11,12,12
**zucker** 131:21

**à**

**à** 28:2 29:5 30:10 105:20 121:22