Josef D. Cooper (53015)
Tracy R. Kirkham (69912)
John D. Bogdanov (215830)
COOPER & KIRKHAM, P.C.
357 Tehama Street, Second Floor
San Francisco, CA  94103
Telephone:  (415) 788-3030
Facsimile:  (415) 882-7040
jdc@coopkirk.com
trk@coopkirk.com
jdb@coopkirk.com


Francis O. Scarpulla (41059)
Patrick B. Clayton (240191)
LAW OFFICES OF FRANCIS O. SCARPULLA
456 Montgomery Street, 17th Floor
San Francisco, CA  94111
Telephone:  (415) 788-7210
Facsimile:   (415) 788-0706
fos@scarpullalaw.com
pbc@scarpullalaw.com

*Counsel for Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:  CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION.<br><br>This Document Relates to:<br><br>All Indirect-Purchaser Actions | **Master File No. 3:07-cv-5944 JST**<br><br>**MDL No. 1917**<br><br>**DECLARATION OF JOHN D. BOGDANOV IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF OBJECTIONS TO REPORT AND RECOMMENDATION OF SPECIAL MASTER RE MOTIONS (1) TO APPROVE INDIRECT PURCHASER PLAINTIFFS' SETTLEMENTS AND (2) FOR AWARD OF ATTORNEYS FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS TO CLASS REPRESENTATIVES**<br><br>Date:  March 15, 2016<br>Time: 2:00 p.m.<br>Courtroom: 9, 19th Floor<br>Judge:  Honorable Jon S. Tigar |

I, John D. Bogdanov, declare as follows:

1.    I am a member in good standing of the State Bar of California.  I am a partner in Cooper & Kirkham, P.C.  I have personal knowledge of the facts stated in this Declaration and, if called as a witness, I could and would testify competently to them.  I make this Declaration in support of the "Request for Judicial Notice in Support of Objections to Report and Recommendation of Special Master Re Motions (1) To Approve Indirect Purchaser Plaintiffs' Settlements and (2) For Award of Attorneys Fees, Reimbursement of Litigation Expenses, and Incentive Awards to Class Representatives."

2.    Attached hereto as Exhibit A is a true and correct copy of the "Memorandum of Points [and] Authorities in Support of Motion for Preliminary Approval of Settlements with LG, Panasonic, Hitachi, Toshiba and Samsung, and Conditional Certification of Settlement Class of Government Entities," *California, et al. v. Samsung SDI, Co., Ltd., et al.,* Case No. CGC-11-515784 (San Francisco Sup. Ct.), dated February 23, 2016.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 26th day of February, 2016, in San Francisco, California.

   /s/ John D. Bogdanov
      John D. Bogdanov

---

DECLARATION OF JOHN D. BOGDANOV IN    - 1 -    Master File No. 3:07-cv5944 JST
SUPPORT OF REQUEST FOR JUDICIAL NOTICE           MDL 1917

# EXHIBIT A

KAMALA D. HARRIS
Attorney General of California
MARK BRECKLER
Chief Assistant Attorney General
KATHLEEN FOOTE
Senior Assistant Attorney General
EMILIO VARANINI (SBN 163952)
ESTHER H. LA (SBN 160706)
MICHAEL JORGENSON (SBN 201145)
NICOLE S. GORDON (SBN 224138)
PAMELA PHAM (SBN 235493)
PAUL A. MOORE (SBN 241157)
BRIAN D. WANG (SBN 284490)
Deputy Attorneys General
State Bar No. 163952
   455 Golden Gate Avenue, Suite 11000
   San Francisco, CA  94102-7004
   Telephone:  (415) 703-5908
   Fax:  (415) 703-5480
   E-mail:  Emilio.Varanini@doj.ca.gov
*Attorneys for Plaintiffs*
*State of California, et al.*

**ELECTRONICALLY**
**F I L E D**
*Superior Court of California,*
*County of San Francisco*
**02/23/2016**
**Clerk of the Court**
BY:ALISON AGBAY
**Deputy Clerk**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

| | |
|---|---|
| **THE PEOPLE OF THE STATE OF CALIFORNIA, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**SAMSUNG SDI, CO., LTD., et al,**<br><br>Defendants. | Case No. CGC-11-515784<br><br>**MEMORANDUM OF POINTS AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH LG, PANASONIC, HITACHI, TOSHIBA AND SAMSUNG, AND CONDITIONAL CERTIFICATION OF SETTLEMENT CLASS OF GOVERNMENT ENTITIES**<br><br>Date:        March 3, 2016<br>Time:        8:30 a.m.<br>Dept:        304<br>Judge:      Curtis E.A. Karnow<br>Action Filed:  November 8, 2011 |

1

**TABLE OF CONTENTS**

2

**Page**

3

I. INTRODUCTION .......................................................................................... 1

4

II. PROCEDURAL HISTORY AND FACTUAL BACKGROUND ...................... 2

5

III. SUMMARY OF SETTLEMENT TERMS ..................................................... 6

A. Summary of Settlement Terms .............................................................. 6

6

B. Scope of Release .................................................................................. 7

7

IV. PROPOSED ALLOCATION/DISTRIBUTION PLAN .................................. 8

V. ARGUMENT ............................................................................................... 9

8

A. Standard for Preliminary Approval ...................................................... 9

9

B. The Settlements fall within the Range of Reasonableness, especially in
according Deference to the Attorney General's Assessment of the Public
Interest. ................................................................................................ 10

10

11

1. Arm's Length Negotiations, Significant Investigation and
Discovery, Experience of Counsel, and Involvement of
Government Plaintiffs. .............................................................. 10

12

13

2. Applicability of *Kullar v. Footlocker*. .................................... 11

3. The Significance of Non-Monetary Relief. ................................ 13

14

a. Injunctive Relief ............................................................ 14

15

b. Compliance Training ...................................................... 15

16

c. Early and Continuing Benefits of Cooperation ................ 15

4. The Significance and Value of Monetary Relief ......................... 16

17

a. *Kullar* analysis to the class of local government
entities. ........................................................................... 17

18

19

b. *Kullar* analysis (if applicable) to the *parens patriae*
claim. ............................................................................. 17

20

c. Litigation risk factoring into the reasonableness of
settlements and *Kullar* analyses. .................................. 19

21

C. The Proposed Allocation/Distribution is Reasonable ........................ 19

22

1. Cy Pres. .................................................................................... 20

2. Reasonableness of Allocation Plan Among Different Types
of Claims. .................................................................................. 22

23

24

D. The Proposed Allocations to cover Attorneys' Fees and Costs and to award
Incentive Awards are Reasonable. ...................................................... 23

25

E. The Proposed Class of Government Entities satisfies the Criteria for Class
Certification and should be certified for settlement purposes. ............. 24

26

1. There are common issues of law and fact that predominate
over issues affecting individual members. ................................. 26

27

2. The class representative's claims are typical of class
member's claims. ....................................................................... 27

28

i

**TABLE OF CONTENTS**
(continued)

Page

3. The class representative fairly and adequately protects the interests of the settlement class. ....................................................... 27

4. The superiority requirement is met given the impracticality of alternatives to the certification of a settlement class. ...................... 27

F. The Proposed Notice Programs for the Government Settlement Class and for the *Parens Patriae* Group both fulfill the Requirements of Due Process and should be approved. ....................................................................................................... 28

1. The proposed government notice program complies with the CRC, warranting court approval. ..................................................... 29

2. The proposed *parens* notice program complies with the Cartwright Act's due process requirements, warranting court approval. ......................................................................................... 32

G. The Court should set a Final Approval Hearing Schedule. ........................................... 36

VI. CONCLUSION ..................................................................................................................... 37

ii

# TABLE OF AUTHORITIES

**Page**

CASES

*7-Eleven Owners v. Southland Corp.*
(2001) 85 Cal.App.4th 1135 ...........................................................................19, 23

*B.W.I. Custom Kitchens v. Owens-Illinois, Inc.*
(1987) 191 Cal.App.3d 1341..........................................................................26

*California v. eBay, Inc.*
(N.D. Cal. Aug. 29, 2014) No. 5:12-CV-05874-EJD, 2014 WL 4273888 ..............................21

*California v. eBay, Inc.*
(N.D. Cal. Sept. 3, 2015) No. 5:12-CV-05874-EJD, 2015 WL 5168666...................................9

*Cartt v. Superior Court*
(1975) 50 Cal.App.3d 960..........................................................................30, 31, 36

*Cathode Ray Tube* (CRT) *Antitrust Litigation.*
(N.D. Cal.) Case No. 07-5944 SC, MDL No. 1917 ...................................................3

*Chavez v. Netflix*
Inc. (2008) 162 Cal.App.4th 43 ........................................................................31, 36

*Classen v. Weller*
(1983) 145 Cal.App.3d 27..........................................................................27

*County of Suffolk v. Long Island Lighting Co.*
(2nd Cir. 1990) 907 F.2d 1295..........................................................................17

*Curtiss-Wright Corp. v. Helfand*
(7th Cir. 1982) 687 F.2d 171..........................................................................23

*Dunk v. Ford Motor Co.*
(1996) 48 Cal.App.4th 1794 ........................................................................11, 19, 25

*Duran v. U.S. Bank Nat'l Assn.*
(2014) 59 Cal.4th 1 ..........................................................................23

*Ellis v. Naval Air Rework Facility*
(N.D. Cal. 1980) 87 F.R.D. 15 ..........................................................................11

*Fireside Bank v. Superior Court*
(2007) 40 Cal.4th 1069 ..........................................................................26

*FTC v. Kuykendall*
(10th Cir. 2004) 371 F.3d 745..........................................................................15

iii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*In re Bluetooth Headset Prods. Liab. Litig.*
(9th Cir. 2011) 654 F.3d 935.......................................................................................24

*In re Cellphone Fee Termination Cases*
(2010) 186 Cal.App.4th 1380 .......................................................................... *passim*

*In re Compact Disc Minimum Advertised Price Litigation*
(D. Me. 2003) 216 F.R.D. 197.....................................................................................22

*In re Consumer Privacy Cases*
(2009) 175 Cal.App.4th 545 .....................................................................................23, 24

*In re DRAM Antitrust Litigation*
(N.D. Cal. June 27, 2014) MDL No. 1486, Dkt. 2235....................................... *passim*

*In re DRAM Antitrust Litigation*
(9th Cir. Dec. 3, 2015) No. 14-16342, Dkt.33 .............................................................14

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*
(N.D. Cal. June 5, 2006) Case No. M 02-1486 PJH, 2006 WL 1530166 ................................26

*In re Holocaust Victim Assets Litig.*
(2d Cir. 2001) 413 F.3d 183.........................................................................................23

*In re Lorazepam & Clorazepate Antitrust Litigation*
(D.D.C. 2002) 205 F.R.D. 369 .....................................................................................11

*In re Lupron Marketing and Sales Practices Litig.*
677 F.3d 21 (1st Cir. 2012) ..........................................................................................16

*In re Mexico Money Transfer Litigation*
(N.D. Ill. 2000) 164 F.Supp.2d 1002 ...........................................................................22

*In re Mid-Atlantic Toyota Antitrust Litig.*
(1983) 564 F.Supp. 1379...........................................................................................9, 10

*In re Rubber Chem. Antitrust Litig.*
(N.D. Cal. 2005) 232 F.R.D. 346 ..................................................................................26

*In re Tobacco Cases I*
(2010) 186 Cal.App.4th 42 ...........................................................................................13

*In re Vitamin Case*
(2003) 107 Cal. App. 4th 820 .......................................................................................20

iv

**TABLE OF AUTHORITIES**
(continued)

**Page**

*In Re Vitamins Case*
  107 Cal.App. 4th 820. .................................................................20, 21

*Jiminez v. Allstate Ins. Co.*
  (9th Cir. 2014) 765 F.3d 1161..................................................................27

*Kiler v. Elf Atochem N. Am., Inc.*
  (5th Cir. 2011) 658 F.3d 468 ..................................................................23

*Kullar v. Footlocker*
  (2008) 168 Cal.App.4th 116 ........................................................ *passim*

*Laffitte v. Robert Half International, Inc. (Brennan )*
  review granted Feb. 25, 2015, S222996........................................24

*Lockheed Martin Corp. v. Superior Court*
  (2003) 29 Cal.4th 1096 ..................................................................26

*Microsoft I-V Cases,*
  (2006) 135 Cal.App.4th 706, 723 .............................................11

*Miller v. Woods*
  (1983) 148 Cal.App.3d 862..................................................................27

*Motorola Mobility LLC v. AU Optronics Corp.*
  (7th Cir. 2015) 775 F.3d 816..................................................................22

*Mullane v. Central Hanover Bank & Trust Co.*
  (1950) 339 U.S. 306 ..................................................................28, 36

*Nachshin v. AOL*
  (9th Cir. 2011) 663 F.3d 1034..................................................................21

*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*
  (2004) 116 Cal.App.4th 1253 .............................................15

*People v. Pacific Land Research Co.*
  (1977) 20 Cal.3d 10 ..................................................................14, 18

*Richmond v. Dart Industries, Inc.*
  (1981) 29 Ca1.3d 462..................................................................27, 28

*Save-On Drugs Stores, Inc. v. Superior Court*
  (2004) 34 Cal. 4th 319 ..................................................................26

v

**TABLE OF AUTHORITIES**
(continued)

Page

*The State of California, et al. v. Chunghwa Pictures Tubes Ltd.*
   Super. Ct. S.F. City and County, No. CGC-11-515786 ................................................. *passim*

*State of California v. Levi Strauss*
   (1986) 41 Cal.3d 460 ..............................................................................................20

*State of Washington and People of the State of California et al. v. Chimei Innolux
   Corp.*
   (9th Cir. 2011) 659 F.3d 842 ...................................................................................11

*Sullivan v. DB Investments, Inc.*
   (3d Cir. 2011) 667 F.3d 273 ............................................................................. *passim*

*United States Securities & Exchange Commission v. Citigroup Global Markets,
   Ltd.*
   (2d Cir. 2014) 752 F.3d 285 ............................................................................. *passim*

*United States v. Microsoft*
   (D.D.C. 1998) 147 F.3d 935 ....................................................................................15

*Wanke v. Sup. Ct.*
   (2012) 209 Cal.App.4th 1151 ..................................................................................15

*Wershba v. Apple Computer, Inc.*
   (2001) 91 Cal.App.4th 224 ..................................................................................9, 25

*Winans v. Emeritus Corporation*
   (N.D. Cal., Jan. 11, 2016, No. 13-CV-03962-HSG) 2016 WL 107574 ...................................21

*Zeisel v. Diamond Foods, Inc.*
   (N.D. Cal. Oct. 16, 2012, No. 10-cv-01192-JSW) 2012 WL 4902970 ..................................21

STATUTES

Bus. & Prof. Code
   § 16709(c) .................................................................................................................9
   § 16750(b) ...............................................................................................................12
   § 16750, subd. (c) ....................................................................................................24
   § 16754.5 .............................................................................................................12, 14
   § 16760 ....................................................................................................................28
   § 16760(b) ...............................................................................................................18
   § 16760, subd. (b)(2) ...............................................................................................32
   § 16760(c) ...............................................................................................................12

# TABLE OF AUTHORITIES
### (continued)

**Page**

§ 16760, subds. (b) and (c)................................................................32
§ 16760, subd. (e)(1)......................................................................20
§ 17203.....................................................................................12, 14
§ 17204..........................................................................................12
§ 17207..........................................................................................14

Cal. Gov't Code § 11180................................................................................2

Code of Civil Procedure § 664.6......................................................................6

**CONSTITUTIONAL PROVISIONS**

Cal. Const., Article V, § 13..........................................................................12

Cal. Const., Article IX, §§ 9 and 9(a)................................................................2

**COURT RULES**

Cal. Rule of Court
Rule 3.766......................................................................................28
Rule 3.766(d)..................................................................................33
Rule 3.766(d)(1)-(5)..........................................................................29
Rule 3.766(e)........................................................................29, 31, 36
Rule 3.766(f)............................................................................31, 36
Rule 3.769....................................................................................9, 28
Rule 3.769(c)-(g)...............................................................................9
Rule 3.769(c)....................................................................................1
Rule 3.769(f)..............................................................................29, 33
Rule 3.769(g) and (h)..........................................................................10

**OTHER AUTHORITIES**

Judge Curtis E.A. Karnow, Class(ic) Settlement Problems, Selected Works (Oct. 2014) available at http://works.bepress.com/curtis_karnow/18/................................21

MPA in Support of Motion for Preliminary Approval of Settlements (CGC-11-515784)

## I.    INTRODUCTION

The Attorney General brought this action for alleged price-fixing, market allocation, and bid-rigging of Cathode Ray Tubes ("CRTs") that were incorporated into televisions and computers.  The Attorney General sought damages for overcharges paid by California natural persons and government entities that purchased televisions and computers, general damages for the injury suffered to the State's own economy (i.e., deadweight loss), civil penalties, injunctive relief, and equitable disgorgement of profits.

Having previously obtained final approval of settlements with defendants' co-conspirators in a related case, the Attorney General now, pursuant to California Rules of Court 3.769(c), respectfully moves this Court for an order preliminarily approving her settlements with defendants LG,[1] Panasonic,[2] Hitachi,[3] Toshiba,[4] and Samsung.[5]  Combined, these five settlements provide $4.95 million in monetary relief and include significant non-monetary relief that (1) enjoins illegal conduct in products beyond CRTs and, for certain defendants, extends to foreign companies and foreign subsidiaries, (2) requires compliance training in products that goes beyond CRTs and, for certain defendants, extends to foreign parents and foreign subsidiaries, and (3) requires cooperation which the Attorney General benefitted from in this case and/or will benefit from in a separate confidential investigation.

The Attorney General proposes to allocate the $4.95 million settlement fund as follows: $75,000 for the costs of notice and settlement administration; $975,000 for attorneys' fees and

---

[1] LG refers to defendant LG Electronics, Inc.
[2] Panasonic refers to defendants Panasonic Corporation f/k/a Matsushita Electric Industrial Co., Ltd., Panasonic Corporation of North America, Panasonic Consumer Electronic Co., Matsushita Electronics Corporation (Malaysia) SDN. BHD., MT Picture Display Co., Ltd. f/k/a Matsushita-Toshiba Picture Display Co., Ltd. ("MTPD"), and Beijing Matsushita Color CRT Co., Ltd.
[3] Hitachi refers to defendants Hitachi, Ltd., Hitachi Displays, Ltd., Hitachi Electronic Devices (USA), Inc., Hitachi America, Ltd., and Hitachi Asia, Ltd.
[4] Toshiba refers to defendants Toshiba Corporation, Toshiba America Electronic Components, Inc., P.T. Tosumrnit Electronics Devices Indonesia, and Toshiba Display Devices (Thailand) Company, Ltd.
[5] Samsung refers to defendants Samsung SDI, Co., Ltd. F/K/A Samsung Display Device Co. Ltd., Samsung SDI America, Inc., Samsung SDI Mexico, S.A. DE C.V., Samsung SDI Brasil Ltda., Shenzhen Samsung SDI Co., Ltd., Tianjin Samsung SDI Co., Ltd., and Samsung SDI (Malaysia) SDN. BHD.

1

1   litigation costs; $330,000 for incentive payments to the individually named government entities

2   whose claims are represented by the Attorney General in this action; $1,214,250 for the

3   settlement class of local government entities and for state agencies, split into $1,032,113 for the

4   settlement class and $182,137 for state agencies; $195,000 for California natural persons;[6]

5   $865,000 for civil penalties; and 1,295,750 for deadweight loss and equitable disgorgement of

6   profits, split into $863,833 for deadweight loss and $431,917 for disgorgement.

7       The Attorney General further requests that this Court conditionally certify a class of local

8   government entities plus the University of California and the State Bar of California ("Settlement

9   Class")[7] for settlement purposes only.  The certification of such a class enables the Attorney

10  General to give defendants the global release of California government entity claims that they

11  bargained for.

12      As the State's chief law enforcement officer who acted in the public interest in the pursuit

13  of these claims, the Attorney General is entitled to receive deference from courts in the review of

14  her settlements.  Here, given the significant non-monetary and monetary relief obtained, the

15  settlements are well within the range of reasonableness to warrant preliminary approval.

16      **II.    PROCEDURAL HISTORY AND FACTUAL BACKGROUND**

17      The Attorney General opened a formal investigation into allegations of a global price-fixing

18  conspiracy involving CRTs and conducted the investigation for a substantial period of time prior

19  to filing this lawsuit, using *inter alia*, her investigatory powers under California Government

20  Code section 11180 *et al.*, by issuing investigative subpoenas on a number of CRT manufacturers.

21

22

23  [6] The settlements provide for a nominal monetary amount for the Attorney General's *paren patriae* claims, which will be distributed *cy pres*, leaving intact California natural persons' rights to receive monetary payment from the Indirect Purchaser Plaintiffs' ("IPPs") class action in the federal MDL, where the IPPs have recovered a total of $577 million. The federal court recently acknowledged that California natural persons may obtain monetary relief for the Attorney General's *parens patriae* action through the federal IPP settlement fund.  (Varanini Decl., Exh. V[ Order].)

26  [7] The reason these two state agencies are included in the settlement class of local government entities is that these agencies are autonomous under the California Constitution and so cannot be represented by the Attorney General acting in a law enforcement capacity.  (See, e.g., Cal. Const., art. IX, sections 9 and 9(a).)

2

1   (Declaration of Emilio Varanini ("Varanini Decl."), ¶ 8.)  The Attorney General filed the present

2   complaint on November 8, 2011.

3       **Early Settlements and Cooperation in the Related** *Chunghwa* **Case.**  At the same time

4   this lawsuit was filed, the Attorney General filed a parallel settlement complaint in this court

5   against Chunghwa Picture Tubes Ltd. ("Chunghwa"), *The State of California, et al. v. Chunghwa*

6   *Pictures Tubes Ltd.,* No. CGC-11-515786 (the "*Chunghwa* case"), which was later amended to

7   add Philips Electronics North America Corporation ("Philips") as a defendant.  (Varanini Decl., ¶

8   9.)  Both complaints alleged that numerous CRT manufacturers engaged in a global conspiracy to

9   fix the price of CRTs and that California natural persons and government entities were

10  overcharged.  Early in the Attorney General's investigation, Chunghwa provided important

11  cooperation to the Attorney General's development of evidence regarding the Asian aspects of the

12  conspiracy.  (*Id.*)  Philips provided important cooperation as to the European aspects of the

13  conspiracy and regarding North American information-exchange meetings.  (*Id.*)  Both the

14  Chunghwa and Philips settlements received final approval from the Court on December 10, 2013.

15  (*Id.*, Exh. K.)  The Court found the non-monetary relief, including cooperation and injunctive

16  relief and compliance training to be valuable to Plaintiffs.  (*Id.*, Exh. M at 73-75 [Tr. of Final

17  Approval Hg].)

18      **Coordinated Discovery with the Related MDL Case.** This case is related to parallel

19  federal cases filed on behalf of direct purchaser plaintiffs (DPPs), direct action plaintiffs (DAPs),

20  and indirect purchaser plaintiffs (IPPs), pending in the Northern District of California in *In Re:*

21  *Cathode Ray Tube* (CRT) *Antitrust Litigation,* Case No. 07-5944 SC, MDL No. 1917 (N.D. Cal.)

22  (the "MDL"), involving the same conduct and including the same defendants alleged here.

23  (Varanini Decl., ¶13.)  Because of this overlap and to avoid duplicative discovery, the Attorney

24  General's case was coordinated with the MDL for purposes of fact and expert discovery.  (See

25  *Id.*, Exh. N [MDL Discovery Order].)  As part of the coordination, the Attorney General's Office

26  ("AGO") attended over 95 depositions, examining witnesses in over 45 of those depositions,

27  often using the benefits of the cooperation provided from the AGO's prior settlements.  (*Id.*, ¶ 15.)

28  Indeed, the AGO took the lead in deposing a key European witness based on cooperation received

3

from Philips.  (*Id.*)  The AGO reviewed hundreds of written discovery responses and reviewed

tens of thousands of documents produced in the MDL as part of the coordinated work-up on

depositions as well as with respect to trial preparation.  (*Id.*)  The AGO also submitted its own

expert reports and was subjected to extensive expert discovery, including expert depositions on

subjects such as damages for government entities, natural persons, and deadweight loss.  (*Id.,* ¶

16.)

**Independent Discovery in State Court.**  After coordinated discovery in the MDL ended,

the AGO continued to conduct its own independent discovery in state court.  The AGO

propounded interrogatories and requests for admissions.  The AGO also responded to extensive

discovery requests, including answering numerous sets of special interrogatories and requests for

admissions, producing documents, and defending the depositions of six local government entities.

(*Id.,* ¶17.)  The parties also engaged in numerous discovery disputes over the relevance and

burden of various discovery requests, the applicability of the MDL discovery cutoff date to the

state case, the timeliness of supplemental expert reports, and the scope of the government

investigation privilege. (*Id.*)

**Unsettled Legal Issues That Would Lead to Prolonged Appeals.**  In spite of the

overwhelming evidence of defendants' participation in a global price-fixing conspiracy, the

Attorney General also recognized that there were a number of significant and unsettled legal

issues that could potentially reduce defendants' liability and recoverable damages and whose

resolution would likely involve prolonged appeals.  (Varanini Decl., ¶18.)

These issues include the following:

Does the Foreign Trade Antitrust Improvements Act ("FTAIA") under state antitrust
laws and, if so, how is to be applied in this international price fixing case?[8]

Can collateral estoppel apply to the factual findings and legal conclusions in
Samsung's federal criminal guilty plea for the same conduct alleged in this case?

Can collateral estoppel apply to the factual findings and legal conclusions of the
European Commission's decision for the same conduct alleged in this case?

---

[8]  The issue regarding FTAIA's applicability was fully briefed and a hearing was pending
when the final settlement in this case was reached.  (Varanini Decl., ¶18.)

Is deadweight loss recoverable under either the injunctive or *parens patriae* provisions of the Cartwright Act?

Is injunctive relief moot if CRTs are a nearly defunct technology but defendants manufacture other products?  Can the Attorney General obtain disgorgement of profits as part of injunctive relief in order to restore competition?

To what extent can extrapolation be used to prove the government entities' claims for damages?

How would the settlement of Indirect Purchaser Plaintiffs' class claims, which includes Californian natural persons, impact this case?

(See, e.g., Varanini Decl., Exh. O [Feb. 11, 2015 Joint CMC Statement].)

**Settlement Negotiations and Agreements.**  Settlement discussions between the AGO and counsel for defendants began even before final approval of the earlier Chunghwa and Philips settlements.  (Varanini Decl., ¶19.)  During mid to late-2014, the Attorney General settled with LG and Panasonic.  Thereafter, during early to mid-2015, she settled with Hitachi and Toshiba.  Finally, in February 2016, after vigorous litigation, she settled with Samsung.

All of these settlements were negotiated at arm's length and on a non-collusive basis by counsel experienced in antitrust law.  (*Id*.)  The Honorable Vaughn A. Walker (Ret.), a former federal judge experienced in antitrust law, mediated the Panasonic and Samsung settlements, and he encouraged mediation in the Toshiba settlement.  (*Id*.)  Factors that shaped those settlement discussions included: (1) the certification of an IPP class in federal court that included California natural persons, lessening the need for the Attorney General to recover sums of money sufficient to allow for such persons to obtain direct reimbursement of their claim in this action; (2) the damages suffered by the California government entity plaintiffs were modest—$5 million, and the deadweight loss suffered by the state economy was also modest— $9 million; (3) only Samsung had pled guilty as a company and it paid only a $32 million criminal fine; (4) non-monetary relief was important to the Attorney General as the chief law enforcement officer acting in the public interest; and (5) the risks, expense, complexity, and likely duration of further litigation. (*Id.*)

All of the settlements provide for the certification of a Class of Government Entities for settlement purposes only.  (See, e.g., Varanini Decl., Exh. A at 2, Exh. B at 2-3.)  All of the

5

settlements also have Amendments that serve two functions: (1) to ensure compliance with Code of Civil Procedure Section 664.6 such that the Court can retain jurisdiction over this case,[9] and (2) to provide a slightly modified definition of the Settlement Class of Government Entities consistent with the court's suggestion in the *Chunghwa* case, should this Court so require.[10] Copies of these five settlement agreements (and Amendments thereto) are attached as Exhibits A through J to the Varanini Decl.

## III.   SUMMARY OF SETTLEMENT TERMS

### A.   SUMMARY OF SETTLEMENT TERMS

The table below summarizes the components of the Attorney General's settlements:

| Entity | LG | Panasonic/ MTPD | Hitachi | Toshiba | Samsung |
|---|---|---|---|---|---|
| Settlement Date | September 2014 | December 2014 | February 2015 | August 2015 | February 2016 |
| Monetary | $750,000 | $1,100,000 | $625,000 | $875,000 | $1,600,000 |
| Injunction (enjoining price fixing, market allocation, and bid rigging which are per se illegal conduct under the Cartwright Act)[11] | 3 years; applies to CRTs and other display screens | 3 years for MTPD; applies to CRTs and other display screens | 3 years for JDI (a spin-off of Hitachi, Toshiba, and Sony Corporation); extends to flat panel displays | 4 years; applies to CRTs and other display screens; extends to parents and subsidiaries, and extends to JDI, as covered by the Hitachi settlement | 5 years; applies to CRTs and other display screens; extends to all parents and subsidiaries |

---

[9] In reviewing the Chunghwa and Philips settlements, the court stated that its ability to retain jurisdiction over the case under Code of Civil Procedure section 664.6 requires signatures from a non-attorney representative for the settling defendant, a non-attorney representative for the City and County of San Francisco as the class representative, and counsel on behalf of the AGO given that the Attorney General is the representative for the State of California and the *parens patriae* claims brought on behalf of natural persons under California antitrust law and the California Constitution. (See Varanini Decl., ¶ 49.)  The Amendments thus serve this function.

[10] The original class definition set out in the Settlement Agreements is one that is typically used by the Attorney General in her settlements, and the federal court in *DRAM* case certified a nearly identical class to the one proposed here. (Varanini Decl., ¶ 35.)  Mindful, however, that this Court may wish to follow the modified class definition used by its predecessor, the Amendments provide for the modified definition to be applicable to these settlements should this Court so require. (*Id.*)

[11] See Exhs. A at 6; C at 6; E at 7; G at 6; and I at 6.

| Entity | LG | Panasonic/ MTPD | Hitachi | Toshiba | Samsung |
|---|---|---|---|---|---|
| **Compliance Training (antitrust compliance education)[12]** | Must certify they have compliance program; 3-year annual reporting requirement if reenter CRT market (compliance training for LCDs was covered by separate case) | Must certify they have compliance program; 3 year annual reporting requirement if reenter CRT market (compliance training for LCDs was covered by separate case) | JDI must certify it has compliance program; 3-year annual reporting requirement for JDI (a spin-off of Hitachi, Toshiba, and Sony Corporation) | Toshiba America must conduct compliance program; 3-year annual reporting requirement for Toshiba America across all product lines, including any Japanese employees seconded to Toshiba America | Must establish compliance training program; 5-year annual reporting requirement; extends to other display screens and lithium ion batteries |
| **Cooperation[13]** | Proffer; provide and authenticate documents; make employees available for depositions and trial | Provide confidential statements and materials from foreign enforcement agency; authenticate documents; make employees available for depositions and trial | Authenticate documents; make employees available for depositions and trial | Authenticate documents; make employees available for depositions and trial | Authenticate documents; make employees available for depositions and trial; Provide proffer and documents beyond CRT-price fixing conspiracy[14] |

(*See* Varanini Decl, Exh. A, C, E, G, and I.)

B.    SCOPE OF RELEASE

In return for the monetary payment and non-monetary relief described above, the Settling

Defendants are released from all claims relating to the allegations asserted or that could have been

asserted in the Attorney General's complaint, up to the date of execution of the settlement

agreements.  (Varanini Decl., Exh. A at 8-11, Exh. C at 8-10, Exh. E at 9-11, Exh. G at 9-11, Exh.

---

[12] See Exhs. A at 6-7; C at 6-7; E at 7; G at 6-7; and I at 6.
[13] See Exhs. A at 7, 11-13; C at 7, 11-13; E at 7, 11-13; G at 7, 11-13; and I at 76, 12-15.
[14] The cooperation provisions applicable to Samsung include cooperation in a separate confidential investigation.  (Varanini Decl., ¶ 28.)

1   I at 8-9.)  Thus, the release does not cover future conduct.  Indeed, it is the AGO's policy not to

2   release future conduct in settlement agreements.  (*Id.*, ¶ 20.)

3   ## IV.    PROPOSED ALLOCATION/DISTRIBUTION PLAN

4   The settlement agreements provide for the settlement funds to be used for any of the

5   following purposes, within the limits of applicable law:  (1) reimbursement of Settling Plaintiffs'

6   attorney's fees and expenses; (2) compensation for damages sustained by Settling Plaintiffs, for

7   *inter alia,* harm to the general California economy; (3) deposit into an antitrust or consumer

8   protection account (e.g., revolving account, trust account, special fund) for use in accordance with

9   the laws governing such an account; (4) antitrust or consumer protection enforcement by the

10  Attorney General, and (5) costs of notice and settlement administration.[15] (Varanini Decl., Exh. A

11  at 5-6, Exh. C at 6, Exh. E at 5-6, Exh. G at 6, Exh. I at 5-6.)  The settlement agreements thus

12  recognize that the Attorney General acts in a law enforcement capacity in her claims for monetary

13  and injunctive/equitable relief in a price-fixing case, with the exception for the statutory

14  assignment of the damages claims of local government entities under the Cartwright Act.

15  The mix of monetary and equitable claims includes (1) damages/restitution for overcharges

16  paid by state and local government entities for computer monitors containing CRTs; (2)

17  damages/restitution for overcharges paid by natural persons under the Cartwright Act and the

18  Unfair Competition Law granting the Attorney General the authority to seek such damages in a

19  *parens patriae* capacity; (3) damages for deadweight loss  to the general economy; (4) civil

20  penalties; and (5) equitable relief, including injunctive relief and disgorgement of profits.  The

21  balancing of these claims in any allocation plan requires the Attorney General to account for

22  public interest considerations that involve compensation and deterrence considerations in this

23  case and in the future.

24  Accordingly, the Attorney General proposes the following allocation plan for the settlement

25  funds:

26  _____

27  [15] Out of the $625,000 from Hitachi, $25,000 is to used for the costs of notice and
    settlement administration. (Varanini Decl., Exh. A at 6.)  Out of the $875,000 from Toshiba,
    $50,000 may be used for the costs of notice and settlement administration. (*Id.*, Exh. G at 6.)

28

8

1.    $75,000 for the costs of notice and settlement administration;

2.    $975,000 (20% of the settlement funds) for attorneys' fees and litigation costs;

3.    $330,000 for payments to the government entities whose claims are represented by the Attorney General in this action and who had to respond to discovery requests;

4.    $1,214,250 to be distributed *cy pres* for the benefit of the settlement class of government entities and for state agencies, split into $1,032,113 for the settlement class and $182,137 for state agencies;

5.    $195,000 to be distributed *cy pres* for the benefit of natural persons;

6.    $865,000 for civil penalties; and

7.    $1,295,750 to cover the deadweight loss and disgorgement claims, split into $863,833 for deadweight loss to be distributed *cy pres* for the indirect benefit of the general economy of the State, and $431,917 for disgorgement to the AGO pursuant to state and analogous federal law.

## V.    ARGUMENT

### A.    STANDARD FOR PRELIMINARY APPROVAL

California Rules of Court, Rule 3.769 requires court approval of class action settlements.[16] The settlement of the Attorney General's *parens patriae* claims under the Cartwright Act also requires court approval.  (Bus. & Prof. Code § 16709(c).)  Court approval of a class action settlement is a two step-process involving a motion for preliminary approval, followed by a final approval hearing.  (See Rule 3.769(c)-(g).) Neither Rule 3.769 nor state case law, however, specifies the standards governing preliminary approval.  The Cartwright Act also does not specify the procedure or the standards for approving settlements obtained under *parens patriae.* However, this Court may look to federal law for guidance.  (*Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 239-40; cf. *Cellphone Termination Fee Cases* (2010) 186 Cal.App.4th 1380, 1392, fn. 18 [California courts may look to federal authority for guidance on matters involving class action procedures. (Citations omitted)].)

Federal courts apply the same two-step process for approving class action settlements to combined class action and *parens patriae* proceedings. (See *In re Mid-Atlantic Toyota Antitrust*

_____

[16] The Attorney General's action does not involve class claims except insofar she seeks provisional certification of a settlement class of government entities.

1    *Litig.* (1983) 564 F.Supp. 1379, 1383; see also *California v. eBay, Inc.* (N.D. Cal. Sept. 3, 2015)

2    No. 5:12-CV-05874-EJD, 2015 WL 5168666, at *2 ["Neither the Clayton Act nor the Cartwright

3    Act sets forth a standard by which proposed *parens patriae* settlements are approved, thus federal

4    courts have adopted the approval procedure and standards used for approval in class action

5    settlements."].)

6         In the first step, the court reviews the proposed settlement to determine whether it is within

7    the "range of possible approval" to proceed with notice to the class and to schedule a fairness

8    hearing.  (*In re Mid-Atlantic Toyota, supra,* 564 F.Supp. at p. 1384 [preliminary approval "is

9    simply a determination that there is, in effect, 'probable cause' to submit the proposal to members

10   of the class and to hold a full-scale hearing on its fairness"], citing *Manual for Complex Litigation*

11   § 1.46 at 62, 64-65 (5th Ed. 1982).)  In the second step, following preliminary approval and

12   publication of class notice, "the court must conduct an inquiry into the fairness of the proposed

13   settlement" and enter judgment.  (Cal. Rules of Court, rule 3.769, subds. (g) and (h).)

14        While the Attorney General's pursuit of her claims, and her settlements, involve an

15   assessment of the public interest to which courts can and should defer, the court must still

16   determine if these settlements fall within the range of reasonableness if, as here, entry of a final

17   judgment that functions like a consent decree will be involved.  (Cf. *United States Securities &*

18   *Exchange Commission v. Citigroup Global Markets, Ltd.* (2d Cir. 2014) 752 F.3d 285, 294-97

19   [discussing deference to and court assessment of SEC's proposed consent decree].)  As explained

20   below, these settlements fall well within the range of reasonableness.

21   **B.    THE SETTLEMENTS FALL WITHIN THE RANGE OF REASONABLENESS,
      ESPECIALLY IN ACCORDING DEFERENCE TO THE ATTORNEY GENERAL'S**
22   **ASSESSMENT OF THE PUBLIC INTEREST.**

23   **1.    Arm's Length Negotiations, Significant Investigation and Discovery,
       Experience of Counsel, and Involvement of Government Plaintiffs.**
24
25        At the outset, all of the settlements were negotiated through arms-length bargaining by

     experienced counsel, including experienced government attorneys in antitrust law, after
26
     conducting extensive investigation and discovery, and with a full awareness of the strengths and
27

28

weaknesses of the case.[17]  (*See supra* at section II; Varanini Decl., ¶ 19.)  Thus, this Court may

presume these settlements fall within the range of reasonableness for purposes of granting

preliminary approval.  (*See In re Lorazepam & Clorazepate Antitrust Litigation* (D.D.C. 2002)

205 F.R.D. 369, 380 [settlement negotiated by government attorneys committed to protecting

public interest entitled to greater weight]; *Ellis v. Naval Air Rework Facility* (N.D. Cal. 1980) 87

F.R.D. 15, 18, aff'd, (9th Cir. 1981) 661 F.2d 939 ["The fact that experienced counsel involved in

the case approved the settlement after hard-fought negotiations is entitled to considerable

weight."]; see also, e.g., *Microsoft I-V Cases* (2006) 135 Cal.App.4th 706, 723 [citing above

factors, including presence of government participant, as bearing on determination of

reasonableness]; *Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 1801-02 [same].)  Indeed,

based on similar reasoning, this Court's predecessor granted approval of the two earlier

Chunghwa and Philips settlements.  (See Varanini Decl., Exh. M at 73-75 [Tr. of Final Approval

Hg].)

## 2.    Applicability of *Kullar v. Footlocker*.

The following claims are before this Court in connection with the approval of these

settlements and allocation of settlement proceeds: (1) a class claim primarily on behalf of local

government entities; (2) a quasi-sovereign *parens patriae* claim brought on behalf of natural

persons resident in California; (3) law enforcement claims for civil penalties, deadweight loss,

and damages to the State of California itself; and (4) an equitable claim for disgorgement of

profits.  The threshold question is whether *Kullar v. Footlocker* (2008) 168 Cal.App.4th 116,

which calls for a comparison of the value obtained in settlement for released claims versus a

hypothetical result on a good day had these claims gone to trial applies to each of these claims.

The first claim on behalf of the local government entities resembles the class claims at issue

in *Kullar* such that *Kullar* would apply, albeit with some additional deference to the Attorney

General in managing intergovernmental relations.  Insofar as the second claim, the *parens* claim,

---

[17] In particular, the Panasonic and Samsung settlements were arrived at through mediation by a very experienced former federal district court judge and antitrust expert, who also encouraged mediation of the Toshiba settlement.  (Varanini Decl., ¶ 19.)

is concerned, it is the Attorney General's position that *Kullar* does not apply because, in contrast

to class actions, public interest considerations plays an important role in prosecuting *parens*

claims.  (See, e.g., *State of Washington and People of the State of California et al. v. Chimei*

*Innolux Corp.* (9th Cir. 2011) 659 F.3d 842, 848 [noting "great distinction" between a *parens*

*patriae* lawsuit and a class action].)[18]  However, even assuming *Kullar* were to apply to *parens*

claims, the settlements fall well within the range of reasonableness in comparing what was

obtained in settlement versus what hypothetically could have been obtained at trial given the

strengths and weaknesses of the Attorney General's claims and the risks and expense of

continued litigation.

The remaining claims are a different story as *Kullar* does apply to them at all.  For the

damages suffered by the state government entities who paid overcharges, court approval of the

settlement is not required.  The Attorney General brought these claims on behalf of the State, as

permitted by the Cartwright Act—Bus. & Prof. Code § 16750(b), as the chief law enforcement

officer of the State—Cal. Const., art. V, § 13.  These claims are law enforcement claims that

cannot be brought by other parties and can be settled without court approval.  (Compare, e.g.,

Bus. & Prof. Code § 16750(b) [no mention of need for court approval for compromise or

dismissal of claims brought by the Attorney General on behalf of the State of California] with id.

§ 16760(c) [court approval required for compromise or dismissal of *parens patriae* claim brought

on behalf of California natural persons]; see generally *Citigroup*, 752 F.3d at 296-97 [discussing

need of courts to defer to public interest determinations of government enforcement agencies].)

Thus, the Court need not compare the settlements for any hypothetical result reached at trial as to

these claims, although court approval is still needed for the proposed allocation of some

settlement funds to these claims.

Similarly, the claims for deadweight loss, disgorgement of profits, and civil penalties are

claims that only belong to the State of California in which the Attorney General represents the

---

[18] Indeed, the court in the related *Chunghwa* case expressly questioned the applicability of *Kullar* to *parens* cases. (See Varanini Decl., Exh. M [Tr. of Final Approval Hearing at 74-75 ("Is *Kullar* even applicable here? . . . I think there is a substantial question as to whether the *Kullar* analysis does apply to the *Parens Patriae* portion . . . ")].)

1   State as the chief law enforcement officer.  (See, e.g., Bus. & Prof. Code §§ 16754.5, 17203,

2   17204.)  Those claims do not involve the release of claims of third parties such as natural persons

3   or California local government entities.  (See *id*.)  No statutory provision requires the approval of

4   the Court prior to their release or dismissal.  (See *id*.)  And their release for consideration involves

5   only public interest considerations.  (Cf. *Citigroup*, 752 F.3d at 294-95, 296-97 [deferring to

6   public interest determinations of government enforcement agency and contrasting aspects of a

7   government law enforcement agency's consent decree that involve damages for other parties with

8   aspects that involve other measures].)  The Court thus need not compare the settlements to any

9   hypothetical result reached at trial as to these claims although it must still approve any allocation

10  of settlement funds to these claims as part of its overall assessment of the reasonableness of the

11  settlements so that it may enter a final judgment akin to a consent decree that includes a release of

12  these claims. (See *In re Tobacco Cases I* (2010) 186 Cal.App.4th 42, 45; cf. *Citigroup*, 752 F.3d

13  at 294-95, 296-97.)

14         Keeping in mind the foregoing as to the scope of *Kullar's* application to the Attorney

15  General's various claims, the settlements fall well within the range of reasonableness.

### 3.    The Significance of Non-Monetary Relief.

17         The non-monetary components of the settlements by themselves are significant and

18  reasonable.  In considering the public interest, the Attorney General has valued non-monetary

19  relief, such as injunctive relief and compliance training, in nationwide and international price-

20  fixing cases as a means of bringing value back to the California economy, California natural

21  persons, and California government entities.  (Varanini Decl., ¶ 21, Exh. Q at pp. 19-22 [Tr. of

22  *DRAM* Preliminary Approval Hg].)  Indeed, in approving the earlier Chunghwa and Philips

23  settlements, the court found the injunctive relief, compliance training, and cooperation to be of

24  great value.  (See *Id.*, Exh. M at 80-81 [Tr. of Final Approval Hg].)  Further, non-cash

25  components in similar price-fixing cases where the Attorney General has been involved were

26  found to be of great value even though they were not as far reaching as the ones here.  (See

27  Report & Recommendation of Special Master, Part I: Settlement Class Certifications and Plans of

28  Allocation and Distribution of the Settlement Proceeds to the Settlement Classes, pp. 70-74, *In re*

13

*DRAM Antitrust Litigation*, MDL No. 1486 (N.D. Cal. June 27, 2014), Dkt. 2235 (hereinafter

"*DRAM R&R I*"),[19] attached as Exhibit P to the Varanini Decl.)  And while it is not possible to

place a cash equivalent value to the non-monetary relief obtained, it is noteworthy that the non-

monetary relief secured here is close to what the Attorney General would have sought at trial.

(*Id.*, ¶ 21.)

### a.   Injunctive Relief

As the State's chief law enforcement officer, injunctive relief is highly valued by the

Attorney General.  (Varanini Decl., ¶ 24.)  Recognizing the importance of injunctive relief, the

Cartwright Act authorizes the Attorney General to secure any relief necessary *"to restore and*

*preserve fair competition."* (Bus. & Prof. Code, §16754.5 (*emphasis added*).)  In addition, the

Unfair Competition Law authorizes the Attorney General to seek injunctive relief against any

person engaged in unfair competition, and further authorizes the Attorney General to obtain civil

penalties for violation of such injunction.  (Bus. & Prof. Code §§ 17203, 17207.)  The California

Supreme Court has also affirmed the importance of injunctive relief to the Attorney General.

(See *People v. Pacific Land Research Co.* (1977) 20 Cal.3d 10, 17 ["An action filed by the People

seeking injunctive relief and civil penalties is fundamentally a law enforcement action designed to

protect the public and not to benefit private parties. . . . The request for restitution on behalf of

vendees in such an action is only ancillary to the primary remedies sought for the benefit of the

public."].)

Here, the injunctive relief bans price fixing, market allocation, and bid-rigging, which are

*per se* violations of the Cartwright Act.  The ban applies not only to CRTs but extends to other

display screens and, with one exception, applies to foreign parents and multiple subsidiaries over

a time period of three to five years.[20]  (Varanini Decl., ¶ 24.)  The bans are particularly notable for

---

[19] The Special Master in *DRAM* provided a thoughtful analysis of many of the same issues raised in this Motion, and because his report was fully adopted by the court, it is referenced throughout this Motion.  (See Order Granting Preliminary Approval, *In re DRAM Antitrust Litigation*, MDL No. 1486, Dkt. 2235 (N.D. Cal. Filed Jan. 17, 2014),  Order Granting Final Approval, *In re DRAM Antitrust Litigation*, MDL No. 1486, Dkt. 2235 (N.D. Cal. Filed June 27, 2014), *last appeal dismissed,* Order Dismissing Appeal, *In re DRAM Antitrust Litigation,* No. 14-16342, Dkt.33 (9th Cir. Dec. 3, 2015).)

[20] The one exception, Panasonic, involved a more complex set of trade-offs between
(continued…)

1   Hitachi and Samsung:  Hitachi because JDI is subject to that injunctive relief even though it is a

2   company that took over the display manufacturing arms of Hitachi, Toshiba, and Sony; and

3   Samsung, because the ban lasts five years, includes Samsung's parent in Korea and all its foreign

4   subsidiaries sued by the Attorney General.  (*Id*.)  Moreover, the significance and value of the

5   injunctive relief obtained by the Attorney General goes beyond a mere promise to obey the law.

6   The ban is clear and understandable on its face and its violation could enable the Attorney

7   General to ask for civil or criminal contempt.[21]

8   **b.   Compliance Training**

9        The compliance training is important to restore a culture of competition within the

10  defendant companies, thus aiding the injunctive relief obtained in restoring competition in the

11  market, which is valuable to the Attorney General.[22]  (Varanini Decl., ¶ 25.)  The compliance

12  training applies to employees responsible for pricing and sales of CRTs and other display

13  technologies and will include training on antitrust laws.  Annual reports are required on the

14  progress of that training, for a period ranging from three to five years for foreign parents and

15  various subsidiaries.[23]  The compliance training obligations are again particularly significant for

16  Hitachi, Toshiba, and Samsung: Hitachi's obligations extend to JDI; Toshiba's obligations extend

17  across all of the product lines handled by its U.S. subsidiary as well as to any Toshiba employees

18  from Japan seconded to the U.S. subsidiary; and Samsung's obligations extend to its foreign

19  parent and those foreign and domestic subsidiaries sued by the Attorney General as well as to its

20  CRTs, flat panels, and lithium ion battery products.

---

21  (…continued)

22  cooperation and injunctive relief brokered by the mediator based on Panasonic's contention that
    the evidence was insufficient to hold the parent company in Japan liable for the CRT conspiracy.
    (Varanini Decl., ¶ 24.)

23  [21] See, e.g., *Wanke v. Sup. Ct.* (2012) 209 Cal.App.4th 1151, 1165-66; *People ex rel.*

24  *Lockyer v. R.J. Reynolds Tobacco Co.*, (2004) 116 Cal.App.4th 1253, 1283-1288; see also *United States v. Microsoft* (D.D.C. 1998) 147 F.3d 935, 940; accord, *FTC v. Kuykendall* (10th Cir. 2004) 371 F.3d 745, 763.

25  [22] The United States Department of Justice ("USDOJ") has also recognized the
    importance of implementing verifiable compliance training as a means of restoring a culture of

26  competition to affected companies to the benefit of future consumers.  (Varanini Decl., Exh. R.)

27  [23] The annual reporting requirement applies to LG and Panasonic/MTPD only if they
    reenter the CRT market; however, they are still required to certify that they have an antitrust
    compliance training programs in place.  (*Id.*, Exhs. A at 6; C at 6.)

28

### c.   Early and Continuing Benefits of Cooperation

The Attorney General has already benefitted significantly in this case from the cooperation provided by LG and Panasonic pursuant to their early settlements. (Varanini Decl., ¶ 27.)  LG provided a proffer. (*Id.*)  Panasonic's cooperation, which was unique in the experience of the AGO, involved obtaining (1) documents generated by a foreign antitrust enforcer and potential access to documents seized by that enforcer and (2) a jurisdictional declaration by a Chinese company. (*Id.*)  This cooperation was important to developing evidence on FTAIA issues and on further developing the Asian aspects of the conspiracy. (*Id.*)  The cooperation requirements for all five defendants are also designed to facilitate the introduction of evidence at trial, including providing access to employees for deposition and trial, and authenticating documents.  Should a defendant terminate its settlement agreement or otherwise backslide on their commitments, these provisions will become an important part of the AGO's trial preparation against that defendant and facilitate the introduction and use of documents and data and the presentation of fact witnesses.  Finally, the cooperation provisions applicable to Samsung are valuable to the Attorney General because it includes cooperation in a separate confidential investigation.[24] (*Id.*, ¶ 28.)

### 4.   The Significance and Value of Monetary Relief.

The monetary relief secured by the Attorney General is also reasonable. The reasonableness of monetary relief secured in an antitrust action should be compared with actual damages, rather than trebled damages (which one would obtain only after trial).  (See, e.g., Varanini Decl., Exh. P at pp. 151-52, 156-57 [DRAM R&R Part I] (summarizing case law supporting the imposition of a single damages cap in *DRAM* as a means of balancing out the interests of small claimants against corporate claims); see also, e.g., *In re Lupron Marketing and Sales Practices Litig.*, 677 F.3d 21, 34-35 (1st Cir. 2012) [payment of residual funds to *cy pres* recipients preferable to payment of trebled damages as such trebled payment is overcompensation].)

---

[24]  USDOJ has recognized the importance of securing cooperation not just from those who first disclose a price-fixing conspiracy but also from those who follow and provide important information as to the conspiracy and as to other conspiracies. (Varanini Decl., Exh. S.)

To the extent that cases like *Kullar* and *Citigroup* call for a comparison of the settlement amounts to damages sought, such comparison is required only where a settlement will release the rights of third parties and prevent them from filing their own suits.  (See, e.g., *Kullar, supra,* 168 Cal.App.4th at pp. 128-30; *Citigroup,* 752 F.3d at pp. 294-95.)  As noted above, the only aspects of the monetary relief secured by the Attorney General that fit within that bucket are the class claims of primarily local government entities and, for the sake of argument, the quasi-sovereign *parens* claims brought on behalf of Californian natural persons,  However, both sets of claims satisfy a *Kullar* analysis.

### a.   *Kullar* **analysis to the class of local government entities.**

In applying *Kullar*, this Court should apply a measure of deference to the Attorney General given that her choice to allocate settlement processes to this class, as well as to bargain for non-monetary versus monetary relief, involves public interest determinations made by her in managing intergovernmental relationships, (Varanini Decl., ¶ 38.)  Applying such deference, the settlement of this aspect of the Attorney General's case satisfies *Kullar* when viewed in the context of the overall monetary aspects of her settlements.  The State's expert estimated total damages for the State and local government entity plaintiffs named in the complaint at $5.2 million.  (*Id.*, ¶ 37.)  Because the settlement class of government entities includes all political subdivisions and public agencies in the State, plus the University of California and the State Bar of California, it is estimated that the damages for the proposed settlement class is roughly $8.7 million. (*Id.*)  Thus, the proposed allocation of $1,032,113 plus $330,000 in incentive payments to the local government entities (plus the University of California) named in the Complaint is inherently reasonable as 15.66% of total single damages.  (See, e.g., *Sullivan*, 667 F.3d at 324 [settlement that is 10.93% of potential recovery is reasonable]; *County of Suffolk v. Long Island Lighting Co.* (2nd Cir. 1990) 907 F.2d 1295, 1324 & n. 17 [settlement that is 11.4% of potential recovery is reasonable].)  Plus, the forward-looking injunctive relief and compliance training obtained has considerable value to the settlement class as it helps ensure that they will pay low prices for non-CRT products going forward.  (Varanini Dec., ¶ 25.)   And the value of this monetary relief goes up when compared against the litigation risks as discussed below.

17

### b.   *Kullar* **analysis (if applicable) to the** *parens patriae* **claim.**

If *Kullar* is to be applied to the *parens* claim, it must be done taking account of two factors. First, the Attorney General can and has here made public interest determinations of the appropriate mix of non-monetary and monetary relief that would benefit her citizens.  (Varanini Decl., ¶¶ 21, 38.)  Those public interest determinations inherent in her mandate and absent from class actions deserve respect without the need for a formal (and likely speculative) quantification of the non-monetary relief.  (See *People v. Pacific Land Research Co., supra,* 20 Cal.3d at p. 17.)

Second, because any recovery of *parens* damages is statutorily required to be offset by private class recoveries attributable to California natural persons' damages—see Bus. & Prof. Code § 16760(b), those recoveries must be factored into any *Kullar* analysis.  (See *Citigroup, supra*, 752 F.3d at pp. 294-95 [noting that because private parties are free to file their own claims, the extent to which a federal government enforcement agency recovers private losses is not as important as it would be in class actions].)

As this Court is aware, there is a parallel IPP class action in the MDL that includes the same claims made here on behalf of California natural persons.  (Varanini Dec., ¶ 13.)  That class action has achieved settlements (the "IPP settlement") that the Attorney General believes, based on her assessment of this case and her involvement with class counsel in past international price-fixing cases, to be reasonable (see *id.* at ¶ 31) and that have already received preliminary approval (*id.*).  Indeed, this outcome motivated the Attorney General's coordination of her case with the IPPs, a point recognized by the MDL federal court when it recently extended the claims deadline for California natural persons precisely to enable coordination between the settlement process in this court and the federal settlement process.  (*Id.*, Exh. V.)  Thus, to the extent that *Kullar* applies to *parens* claims, a comparison of the settlement amount to damages sought must also take into consideration the monetary recovery obtained in the IPP settlement.  Based on the total IPP settlement of $577 million, and based on calculations by the IPP's expert indicating that approximately 9.4% of the nationwide class damages can be ascribed to California natural persons, it is estimated that, after deducting for attorneys fees and costs, roughly $36 million of the IPP settlement can be ascribed to California natural persons.  (*Id.*, ¶¶ 30-31, Exhs. T and U.)

18

Given that the State's expert estimated damages for California natural persons to be roughly $249 million, the Attorney General believes the IPP's settlement for California natural persons to be entirely reasonable as it is approximately 14.46% of single damages. (Varanini Decl., ¶ 31; see also *Sullivan*, *supra*, 667 F.3d at p. 324 [settlement that is 10.93% of potential recovery is reasonable]). The Attorney General's settlement thus provides for only a nominal monetary amount of $195,000 for the *parens* claims, to be distributed *cy pres*, precisely because California natural persons have been and still will be able to file direct claims for compensation from the IPP settlement.  And again the value of the settlement of the *parens* claim only increases when litigation risk is taken into account.

### c.   Litigation risk factoring into the reasonableness of settlements and *Kullar* analyses.

As discussed above in Section II, while there was overwhelming evidence of defendants' participation in a global price-fixing conspiracy, there were a number of significant legal issues, including the applicability of the FTAIA, that raised questions as to defendants' liability, and that likely would have required appellate resolution.  (Varanini Decl., ¶18.)  There were also other litigation risks involving the scope of a defendant's liability to the extent a defendant claimed a change corporate form or exit from the CRT manufacturing market. (Varanini Decl., ¶ 18.)  For example, LG, Toshiba, and Panasonic all claimed to have turned over CRT manufacturing to joint ventures; these defendants would have argued that the change of corporate form insulated them from liability. (*Id.*)  Hitachi claimed to have stopped manufacturing CRTs by 2003 which it would have argued constitutes withdrawal. (*Id.*)  While the Attorney General believes it could have successfully defeated these arguments, these issues remained unsettled.  Given the risks, expenses, and lengthy duration of further litigation, and given the Attorney General's public interest considerations, the non-monetary and monetary relief obtained can be viewed as a reasonable compromise that falls well within the range of reasonableness.

For all of the foregoing reasons, these settlements fall within the range of reasonableness and, as such, should receive preliminary approval. They offer no ground to doubt their fairness or

19

1   reveal any other obvious deficiencies.  (*Dunk, supra,* 48 Cal.App.4th at pp. 1802-03; see also *7-*

2   *Eleven Owners v. Southland Corp.* (2001) 85 Cal.App.4th 1135, 1145.)

3       **C.     THE PROPOSED ALLOCATION/DISTRIBUTION IS REASONABLE**

4       Allocation plans involve the exercise of equitable discretion, and here the Attorney

5   General's proposed plan involves public interest considerations that warrant deference; thus, they

6   are reviewed for reasonableness and with the understanding that no plan of allocation can be

7   perfect.  (See, e.g., *DRAM R&R,* Part I, *supra,* pp. 87-89, 144-47 [collecting and discussing

8   cases], attached as Exh. P to the Varanini Decl.)  Because several components of the proposed

9   allocation plan involve *cy pres* distribution, *cy pres* will be discussed first, followed by a

10  discussion of how the proposed allocation plan otherwise is reasonable.

11      **1.     *Cy Pres*.**

12      *Cy pres* is greatly valued under California law and has been found appropriate when it is

13  difficult or impossible to compensate direct victims of the alleged wrong doing.  (See, e.g.,

14  Historical and Statutory Notes to Bus. & Prof. Code, § 16760, subd. (e)(1), Stats.2001, c. 74

15  [A.B.260] [the California *parens* statute was amended to provide that "[i]n exercising its

16  discretion, the court may employ *cy pres* or fluid recovery mechanisms as a way of providing

17  value to persons injured as a result of a violation of this chapter."]; *State of California v. Levi*

18  *Strauss* (1986) 41 Cal.3d 460, 479; *In re Vitamin Case* (2003) 107 Cal. App. 4th 820, 823, 830 &

19  n. 2 (approving $38 million in cash, distributed to charitable and non-profit organizations which

20  promote the health and nutrition of consumer class members]; see also *DRAM R&R I, supra*, at

21  pp. 157-62 [collecting and discussing Ninth Circuit and state cases], attached as Exh. P to

22  Varanini Decl.)

23      Here, the allocation plan proposes the following three *cy pres* distributions: (1) $195,000

24  for the benefit of natural persons; (2) $1,032,113 for the benefit of the settlement class of local

25  government entities; (3) $ 182,137 for the benefit of state agencies; and (4) $863,833 for the

26  indirect benefit of the general economy of the State.  All four proposed *cy pres* distributions are

27  appropriate.  First, with respect to California natural persons, given there are over a million

28  potential claimants, allowing for individual claims is clearly impracticable as distribution and

20

1    administrative costs would certainly exceed recovery.  (Varanini Decl. ¶ 33; see also *In Re*

2    *Vitamins Case, supra*, 107 Cal.App. at 830 [noting that allowing for individual claims would be

3    incongruous where distribution and administrative costs would exceed recovery].)  Second, with

4    respect to the settlement class of local government entities, allowing for individual claims also

5    would be impracticable because there are approximately 4,000 class members and they would

6    receive only *de minimus* awards even without factoring in administrative costs.  (*Id.*)  Similarly,

7    for the state agencies, allowing for individual claims would be impracticable because there are

8    approximately 150 state agencies and they would receive only *de minimus* awards even without

9    factoring in administrative costs.  (*Id.*)  Finally, with respect to the general economy of the State,

10   direct distribution is impossible because the harm suffered is to the general economy and there are

11   no "direct" victims.  *Id.*)

12        In selecting *cy pres* recipients, the Attorney General follows a strict policy to ensure a

13   selection of geographically diverse recipients who will use the grants for the indirect benefit of

14   natural persons, government entities, or the economy of the State respectively as well as to avoid

15   self-dealing.  (Varanini Dec., ¶ 38; see also *DRAM R&R I, supra*, pp. 159-61 [describing policy],

16   attached as Exh. P to Varanini Decl.)  That policy matches the requirement imposed by the Ninth

17   Circuit in *Nachshin v. AOL* (9th Cir. 2011) 663 F.3d 1034, 1040.

18        This Court has indicated that it would be preferable to select the *cy pres* recipient at the

19   time of preliminary approval. (See Judge Curtis E.A. Karnow, Class(ic) Settlement Problems,

20   Selected Works (Oct. 2014) available at http://works.bepress.com/curtis_karnow/18/ <visited on

21   January 10, 2016>.)  However, as the AGO previously testified in the DRAM matter, it would be

22   premature to select *cy pres* recipients before knowing the amount of funds available for

23   distribution and when they will be available; by the time the funds are ready to be disbursed, new

24   *cy pres* recipients may well need to be selected. (See Varanini Decl. Exh. U [Declaration of

25   Kathleen E. Foote  at ¶¶ 7-8]; see also *id.*, Exh. V [Declaration of Harry Snyder, noted *cy pres*

26   expert, at ¶ 8]; see also *California v. eBay, Inc.* (N.D. Cal. Aug. 29, 2014) Order Granting

27   Preliminary Approval, No. 5:12-CV-05874-EJD, 2014 WL 4273888, at *6  ["...this court grants

28   preliminary approval of the *cy pres* provision, reserving comment on the proposed recipients at

21

1   final approval."].)  Further, courts in the Northern District of California have held that there is no

2   requirement for, or need to, disclose the *cy pres* recipients in advance in the class notice.  (See

3   *Winans v. Emeritus Corporation* (N.D. Cal., Jan. 11, 2016, No. 13-CV-03962-HSG) 2016 WL

4   107574, at *4 [finding no requirement that a specific *cy pres* recipient must be identified in the

5   class notice]; see also *Zeisel v. Diamond Foods, Inc.* (N.D. Cal. Oct. 16, 2012,  No. 10-cv-01192-

6   JSW) 2012 WL 4902970, at *2 [approving settlement where parties did not identify *cy pres*

7   recipient in class notice].)  Accordingly, the AGO respectfully requests deferring the selection of

8   *cy pres* recipients until after the amounts and timing of any *cy pres* distributions have been

9   determined.

10        **2.    Reasonableness of Allocation Plan Among Different Types of Claims.**

11        The rest of the proposed allocation plan falls well within the range of reasonableness.  First,

12   California natural persons will have an additional opportunity to make direct claims against the

13   federal IPP settlement fund; thus, it is appropriate to reserve only a nominal amount of these

14   settlements funds to be distributed *cy pres* for their indirect benefit.  (Cf., e.g., *In re Compact Disc*

15   *Minimum Advertised Price Litigation* (D. Me. 2003) 216 F.R.D. 197, 208-210, 214 [split

16   distribution plan proposed by state attorneys general with direct distribution of cash, and *cy pres*

17   distribution of music CDs plus cash residue, approved by court]; *In re Mexico Money Transfer*

18   *Litigation* (N.D. Ill. 2000) 164 F.Supp.2d 1002, 1010-11, *aff'd*, (7th Cir. 2001) 264 F.3d 743

19   [split distribution plan with cash and *cy pres* residue approved by court].)

20        Second, allocating less than the total amount of settlement funds (minus an amount to cover

21   notice, attorneys' fees, and litigation costs) to state and local government entities recognizes that

22   their damages were a relatively smaller part of a law enforcement case alleging a global price-

23   fixing conspiracy, and in which claims for deadweight loss, civil penalties, and disgorgement of

24   profits were important and quite sizeable.  (Varanini Dec., ¶ 34.)  And all of these law

25   enforcement claims involve claims of the State itself in which the State is politically accountable

26   for how it allocates settlement proceeds amongst those claims.  (See *Citigroup, supra,* 752 F.3d at

27   p. 294.)

28

22

1    Moreover, although every claim had its strengths and weaknesses, those law enforcement

2    claims involving monetary equitable relief (e.g., deadweight loss, disgorgement, and civil

3    penalties) had a greater chance of surviving dismissal on the FTAIA grounds.  (See, e.g.,

4    *Motorola Mobility LLC v. AU Optronics Corp.* (7th Cir. 2015) 775 F.3d 816, 826 [noting that

5    there was a difference between a government suit seeking to impose penalties or injunctive relief

6    and a private action seeking damages for purposes of applying the FTAIA].)  Further, there were

7    special risks and uncertainties in proving damages for the government entity claims as it would

8    involve questions as to what extent extrapolation can be used to prove up these individual claims.

9    (See, e.g., *Duran v. U.S. Bank Nat'l Assn.* (2014) 59 Cal.4th 1, 38-40, 49 [noting that

10   extrapolation to prove classwide liability and damages involve issues that are far from settled and

11   must account for case-specific deviations in the evidence even if there is more tolerance of

12   uncertainty as to damages than as to liability].)

13   Recognition of these equitable considerations is appropriate in devising an allocation plan

14   where the settlement funds are inadequate to fully satisfy all claims.  (See, e.g., *Curtiss-Wright*

15   *Corp. v. Helfand* (7th Cir. 1982) 687 F.2d 171, 174-75; accord, e.g., *In re Holocaust Victim*

16   *Assets Litig.* (2d Cir. 2001) 413 F.3d 183, 186; *7-Eleven Owners, supra,* 85 Cal.App.4th at 1162-

17   63 [citing *Curtiss-Wright* and noting that such differences need only be rational].) It is especially

18   appropriate here where the Court may defer to the Attorney General's calculus of the public

19   interest in allocating rationally among competing claims. (Cf. *Citigroup,* 752 F.3d at p. 296

20   noting substantial deference is owed to public interest determinations by a government

21   enforcement entity insofar as a consent decree is concerned].)

22   Finally, to allow the Attorney General to allocate portions of the settlement funds to satisfy

23   these different claims would also comport with the terms of the settlement agreements that allow

24   for such an allocation in the equitable discretion of the Attorney General in exchange for the

25   release of the underlying claims.  (See, e.g., *Kiler v. Elf Atochem N. Am., Inc.* (5th Cir. 2011) 658

26   F.3d 468, 475-79 [in determining distribution questions such as the distribution of remaining

27   funds, a court must give controlling effect to the terms of the settlement agreement].)

28

**D.    THE PROPOSED ALLOCATIONS TO COVER ATTORNEYS' FEES AND COSTS AND TO AWARD INCENTIVE AWARDS ARE REASONABLE.**

The reasonableness of a claim for fees and costs requires an independent assessment from the reasonableness of the settlement itself.  (See, e.g., *In re Consumer Privacy Cases* (2009) 175 Cal.App.4th 545, 555.)  The Attorney General proposes that 20% of the common fund be allocated to cover fees and costs.  As set out *supra* at section II, the AGO engaged in significant fact and expert discovery – both in coordination with discovery in the MDL and independently in state court after coordination in the MDL ended.  (Varanini Dec., ¶¶ 15-17.)  The proposed amount is below a typical 25% benchmark for reasonable common fund attorneys fees (see, e.g., *In re Consumer Privacy Cases, supra,* 175 Cal.App.4th at p. 557 fn.13; *In re Bluetooth Headset Prods. Liab. Litig.* (9th Cir. 2011) 654 F.3d 935, 942), and is consistent with the statutory minimum of 10% (see Bus. & Prof. Code § 16750, subd. (c)). The proposed amount also is far below the actual amount expended by the AGO in pursuing this litigation.[25] (Varanini Dec., ¶ 47.)

The Attorney General also proposes that the 33 individually named local government entities (plus the University of California) whose claims were represented by the Attorney General in this case each be awarded $10,000.  While only the City and County of San Francisco is serving as the class representative, individual claims were brought on behalf of all 33 entities, and their role in this case is distinguishable from that of the absent members of the settlement class.  (*Id.*, ¶ 48.)  Unlike the absent class members, all 33 entities provided meaningful and valuable assistance to the Attorney General's Office by gathering and producing documents and information in response to numerous discovery requests.  (*Id.*)  Indeed, six of the entities expended even more considerable resources by giving depositions.  (*Id.*)  Accordingly, incentive

---

[25] The California Supreme Court has accepted review in a case involving the issue of whether a trial court may "anchor its calculation of a reasonable attorney's fees award in a class action on a percentage of the common fund recovered." (*Laffitte v. Robert Half International, Inc.* (*Brennan*), review granted Feb. 25, 2015, S222996.)  Should the Supreme Court rule, prior to the final approval hearing, that a common fund approach is inappropriate in class actions, the Attorney General is prepared to either (a) distinguish her actions under the Cartwright Act from class actions and/or (b) provide a lodestar cross-check in which she will demonstrate that her fees and costs far exceed 20% of the common fund.  (Varanini Dec., ¶ 47.)

1    awards are appropriate these 33 entities.  (See, e.g., *Sullivan, supra*, 667 F.3d at p. 333; see also

2    *DRAM R&R,* Part I, *supra*, pp. 187-194, attached as Exhibit P to the Varanini Decl.)

3    **E.      THE PROPOSED CLASS OF GOVERNMENT ENTITIES SATISFIES THE**
         **CRITERIA FOR CLASS CERTIFICATION AND SHOULD BE CERTIFIED FOR**
4        **SETTLEMENT PURPOSES.**

5        In accordance with the Settlement Agreements, the Attorney General requests that this

6    Court certify the following class ("Settlement Class of Government Entities") for purposes of

7    these settlements only:

8        All political subdivisions and public agencies in California (i.e., counties, cities, K-12
         school districts, and utilities), plus the University of California and the State Bar of
9        California, that have purchased CRTs and/or CRT products during the Relevant
         Period [defined as March 1, 1995 through November 30, 2007]. Excluded from this
10       definition are all state agencies that either constitute an arm of the State of California
         under the Eleventh amendment of the U.S. Constitution or are not otherwise treated
11       under California law as being autonomous from the State of California itself.

12       This Court's predecessor previously certified for settlement purposes an identical class of

13   government entities with the identical class representative (the City and County of San Francisco)

14   after methodically going through the criteria involved for class certification.[26] (*See* Varanini

15   Decl., Exh. M at 72-73 [Tr. of Chunghwa Final Approval Hg].)  And the United States District

16   Court for the Northern District of California certified a nearly identical class, with the current

17   proposed class representative being one of three class representatives, for purposes of settlement

18   in the *DRAM* price-fixing case. (Varanini Decl., Exh.Y at 3-5 [Order Granting Final Approval].)

19       When certifying a settlement class as opposed to a litigation class, courts may use a lower

20   level of scrutiny.  (*Dunk,* 48 Cal.App.4th at p. 1807, fn. 19.)  This is because litigation

21   manageability is not an issue in the context of settlement, and protection of "the interests of the

22   nonrepresentative class members ... as it relates to commonality of issues…are protected by the

23   _____

24       [26] The court used a modified definition for purposes of clarification, but the modified
     definition did not otherwise change the substance of the class.  (Varanini Decl.,¶ 35.) This
25   modified definition is set forth in the Amendments and provides as follows: All political
     subdivisions of the State of California, plus the University of California and the State Bar of
26   California, that indirectly or directly purchased Cathode Ray Tubes ("CRTs") and/or products
     containing CRTs (including but not limited to computer monitors and televisions) between March
27   1, 1995 and November 25, 2007 (the "relevant period").  The term "political subdivisions" is
     defined as all government entities authorized under California state law but without statewide
     jurisdiction.  (Varanini Decl., Exhs. B, D, F, H, J.)

28

1    trial court's fairness review of the settlement." (*Id.; see also Sullivan v. DB Investments, Inc.* (3d

2    Cir. 2011) 667 F.3d 273, 303-04.)

3         Certifying a settlement class is appropriate when (1) common questions of law and fact

4    predominate over questions affecting the individual members; advantageous for litigants; (2) the

5    class representative's claims are typical of the class; and (3) the class representative can fairly and

6    adequately protect the interests of the class. (See, e.g*., Wershba, supra*, 91 Cal.App.4th at p. 238;

7    see also *Sullivan*, 667 F.3d at p. 296). Class certification also requires that the class be

8    sufficiently numerous that it would be a superior means of effectuating the settlement. (*Fireside*

9    *Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1089.) These criteria are all met here.

### 1. There are common issues of law and fact that predominate over issues affecting individual members.

12        The commonality requirement is satisfied if "each member must not be required to

13   individually litigate numerous and substantial questions" and the "issues which may be jointly

14   tried, when compared with those requiring separated adjudication, [are] sufficiently numerous and

15   substantial to make the class action advantageous to the judicial process and to the litigants."

16   (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1108.) Further,

17   "[p]redominance is a comparative concept, and the 'necessity for class members to individually

18   establish eligibility and damages does not mean individual fact questions predominate.'" (*Save-

19   On Drugs Stores, Inc. v. Superior Court* (2004) 34 Cal. 4th 319, 334.)

20        Here, the class members share common questions of law and fact revolving around the

21   defendants' alleged conspiracy to fix the price of CRTs, including the existence, scope,

22   effectiveness, and implementation of the conspiracy that are central to each class member's

23   claims. Similar common questions routinely satisfy the commonality requirement in other

24   antitrust class actions. (See, e.g*., In re Dynamic Random Access Memory* (*DRAM*) *Antitrust Litig.*

25   (N.D. Cal. June 5, 2006) Case No. M 02-1486 PJH, 2006 WL 1530166, at *3 ["the very nature of

26   a conspiracy antitrust action compels a finding that common questions of law and fact exist"],

27   quoting *In re Rubber Chem. Antitrust Litig.* (N.D. Cal. 2005) 232 F.R.D. 346, 351.) Moreover,

28   allegations of a conspiracy to fix prices generally establish common questions that

26

1   "predominates" over any questions affecting only individual members.  (*B.W.I. Custom Kitchens*

2   *v. Owens-Illinois, Inc.* (1987) 191 Cal.App.3d 1341, 1348.)  The court in the related Chunghwa

3   case found this criteria readily met as to the same settlement class as that proposed here.

4   (Varanini Decl., Exh. M at 73:2-6 [Tr. Final Approval Hg ("[The] class consist of numerous

5   government entities that share common questions of fact and law that predominate over

6   individual questions . . .")].)

7        **2.  The class representative's claims are typical of class member's claims.**

8        To satisfy the typicality requirement, the class representative's claims must be similar to

9   those of other members of the proposed settlement class, but they need not be identical.  (See, e.g.

10   *Classen v. Weller* (1983) 145 Cal.App.3d 27, 46; *Richmond v. Dart Industries, Inc.* (1981) 29

11   Ca1.3d 462, 470.)  The class representative's claims are typical of those of the settlement class as

12   a whole if they (1) arise from the same event or course of conduct that gives rise to the claims of

13   other class members, and (2) they are based on the same legal theory.  (See *Classen, supra,* 145

14   Cal.App.3d at 47-48.)

15        Here, the claims of class representative City and County of San Francisco are typical of the

16   claims of the class members because they all purchased, directly or indirectly, CRTs and/or CRT

17   products sold by defendants or their co-conspirators at allegedly supra-competitive levels as a

18   result of the price-fixing conspiracy.  Even if differences may exist in the amount of injury

19   suffered by each class member, such differences do not render the class representative's claims

20   atypical.  (*Jiminez v. Allstate Ins. Co.* (9th Cir. 2014) 765 F.3d 1161, 116, cert. den. (2015) 135

21   S.Ct. 2835.)

22        **3.  The class representative fairly and adequately protects the interests of**
                **the settlement class.**
23

24        Adequacy of representation is established if (l) the class representative is represented by

25   counsel qualified to conduct the pending litigation and (2) the class representative's interests are

     not antagonistic to those of the settlement class.  (See, e.g., *Richmond, supra,* 29 Ca1.3d. at p.
26
     470; *Miller v. Woods* (1983) 148 Cal.App.3d 862, 874.)
27

28

The City and County of San Francisco (the "City") satisfies both of these requirements. First, the City is represented by the Attorney General whose Antitrust Section is highly qualified to prosecute class actions and antitrust cases.  (See Varanini Dec1.,¶ 2.)  Second, the City's interests are co-extensive with those of the settlement class because they are all similarly interested in obtaining prompt and valuable relief from defendants.

### 4. The superiority requirement is met given the impracticality of alternatives to the certification of a settlement class.

Superiority is demonstrated where the class action "both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress for claims which would otherwise be too small to warrant individual litigation."  (*Richmond, supra,* 29 Cal.3d at p. 469.)  That is clearly the case in this action. It would be impractical for the thousands of government entities that are members of the class to individually pursue and settle their claims against defendants.  And certification of a settlement class enables the Attorney General to grant to defendants a global release of all of their claims with respect to California government entities. (See, e.g., *Sullivan, supra,* 667 F.3d at pp. 310-311 ["We need not take judicial notice of the fact that plaintiffs with non-viable claims do nonetheless commence legal action," and "that release of all claims serves the important policy interest of judicial economy by permitting parties to enter into comprehensive settlements that prevent relitigation of settled questions at the core of a class action."][citation and quotations omitted].)  Certifying the settlement class thus will confer benefits on both class members and the judicial system.  (See Varanini Decl., Exh. M at 73:5-6 [Tr. of *Chunghwa* Final Approval Hg ("[T]he mechanism of a class action for that group is appropriate.")]; see also *id.*, Exh. P at 16-18 [*DRAM*  R&R I].)

### F.   THE PROPOSED NOTICE PROGRAMS FOR THE GOVERNMENT SETTLEMENT CLASS AND FOR THE *PARENS PATRIAE* GROUP BOTH FULFILL THE REQUIREMENTS OF DUE PROCESS AND SHOULD BE APPROVED.

The proposed settlements seek to bind unnamed members of the Settlement Class of Government Entities as well as unnamed California individuals on whose behalf the Attorney General filed Cartwright Act claims under *parens patriae.*  While both groups are subject to due process requirements for notice purposes (see, e.g., *Mullane v. Central Hanover Bank & Trust*

28

*Co.* (1950) 339 U.S. 306, 314-315), what notice process is owed to each group is governed by different laws and by the different nature of these two groups.  The California Rules of Court ("CRC") governing class action settlements closely regulate the process provided to unnamed class members (see Cal. Rules of Court, rules 3.766 and 3.769), while the *parens patriae* provisions of the Cartwright Act govern the process provided to California individuals less rigidly (see Bus. & Prof. Code §16760).

Accordingly, two separate notice programs are before the Court for approval—one directs notice to the unnamed class members ("Government Notice Program") and the other to the *parens patriae* group ("*Parens* Notice Program").  Both accord with due process to warrant court approval and both follow similar notices previously approved in the *Chunghwa* case and also in *LCD* and *DRAM* , insofar as the class of government entities is concerned.  (Varanini Decl., ¶¶39, 43.)  The AGO will be responsible for implementing the Government Notice Program while a leading consumer notice company will implement the *Parens* Notice Program with oversight by the AGO.  (Varanini Decl., ¶¶ 40-41; Declaration of Daniel Burke ("Burke Decl."), ¶¶ 1-9.)

### 1. The proposed Government Notice Program complies with the CRC, warranting court approval.

While the CRC set specific parameters for the content of a class notice, courts have "virtually complete discretion [to specify] the manner of giving notice."  (Cal. Rules of Court, rules 3.766(e) and 3.769(f); *In re Cellphone Fee Termination Cases* (2010) 186 Cal.App.4th 1380, 1390.)  Regarding content, for class actions that permit members to opt-out, the notice must contain (1) a brief explanation of the case; (2) a statement that the court will exclude any member that requests exclusion by a specified date; (3) a procedure for members to follow in requesting exclusion; (4) a statement that the judgment, whether favorable or not, will bind all members who do not request exclusion; and (5) a statement that any member who does not request exclusion may enter an appearance through counsel. (Cal. Rules of Court, rule 3.766, subds. (d)(1)-(5).) Additionally, on settlement of such action, class members must be apprised of (1) the final approval hearing, (2) the proposed settlement, and (3) the procedures to follow in filing writing

29

1   objections to the proposed settlement and in arranging to appear at the settlement hearing and

2   state any objections to the proposed settlement.  (Cal. Rules of Court, rule 3.769, subd. (f).)

3          The CRC requirements are satisfied here.  The proposed Government Notice, a copy of

4   which is attached as Exhibit X to the Varanini Declaration, provides all of the required

5   information in plain English to fairly apprise class members of their rights and options under the

6   proposed settlements as well as the procedures for exercising them.  Court approval is therefore

7   warranted.  (See *In re Cellphone Fee Termination Cases, supra,* 186 Cal.App.4th at 1390 [class

8   notices drafted "with the goal of making it easy to understand for non-lawyers and to make

9   certain that the notice clearly explained the rights and obligations of class members in connection

10  with the settlement" accord with due process].)

11         Regarding the manner of giving notice, courts have held it "should have a reasonable

12  chance of reaching a substantial percentage of the class members…."  (*Cartt v. Superior Court*

13  (1975) 50 Cal.App.3d 960, 974.)  Here, the Settlement Class comprises all political subdivisions

14  and public agencies in the state that do not have statewide jurisdiction, as well as the University

15  of California and the State Bar of California.  Thus, the following local government entities fall

16  within the Settlement Class:  (1) all counties; (2) all cities and towns; (3) all K-12 school districts;

17  and (4) all special districts.  (Varanini Decl., ¶ 43.)  The AGO has obtained the emails and/or

18  mailing addresses for the vast majority of these entities.  (*Id.*)  The AGO has also reached out to

19  the County Counsels' Association of California ("CCA"), the League of California Cities

20  ("LCC"), the California School Boards Association ("CSBA"), and the California Association of

21  Special Districts ("CASD") to enlist their assistance in providing notice to their members. (*Id.*)

22         Based on the reachability of the ascertainable class members, the AGO proposes deploying

23  the Government Notice as follows:

24         **Direct E-mail or U.S. Mail**:  For the class members who have an e-mail address, the AGO

25  will transmit a copy of the long form of the notice by e-mail directly to them, following up with

26  any bounce-backs, which based on the AGO past experience, is expected to be minimal.

27  (Varanini Decl., ¶ 43a.)  Both the transmittal and the notice itself will also direct the recipient to

28  the Attorney General's website (http://oag.ca.gov) for additional and more detailed information,

1    including copies of the Complaint, the Settlement Agreements, and other relevant court

2    documents.  (*Id.*)  For the remaining class members for whom the AGO has no email address but

3    has a mailing address, a postcard notice will be sent by U.S. Mail to each.  (*Id.*)  The postcard will

4    direct each recipient to the Attorney General's website, where the long form of the notice will be

5    accessible.  (*Id.*)  Altogether, the vast majority of the class will receive direct notice either by

6    mailed postcards or by e-mail.

7        **Distribution by the Associations**:  For class members who cannot be reached by e-mail or

8    U.S. Mail, the AGO has engaged the assistance of the CCA, the LCC, the CSBA, and the CASD

9    to publish either the long form notice, the short form notice, or the postcard notice to their

10   members either by a mass association e-mail or by publication in their respective print or online

11   newsletters.  (*Id.,* ¶ 43b.)

12       **Broadcast on the Attorney General's Website**:  Copies of the long and short forms of the

13   notice also will be broadcast on the Attorney General's website for class members who cannot be

14   reached directly or through an association as well as for the benefit of any unascertainable

15   members.  (*Id.,* ¶ 43c.)

16       The foregoing proposed manner of giving notice comports with California's class

17   notification standards and should be approved.  The program would be sufficient with just the

18   direct notice component alone.  (See *Cartt*, *supra*, 50 Cal.App.3d at 967 [sending individual

19   notices to one-third of the class that was "easily ascertainable" was sufficient].  The additional

20   distribution of the notice through the associations and broadcasting of the notice on the Attorney

21   General's website further bolsters the sufficiency of this program to further warrant the Court's

22   approval.  (See *Chavez v. Netflix*, Inc. (2008) 162 Cal.App.4th 43, 58 ["Using the capability of the

23   Internet in [this] fashion [is] a sensible and efficient way of providing notice" especially when

24   class members routinely conduct business over the Internet and formal individual notice is not

25   cost-efficient.]); Cal. Rules of Court, rule 3.766(e) [in specifying the manner of giving notice,

26   courts must consider factors such as the stake of the individual class members, the cost of

27   notifying class members, and the parties' resources].)  Indeed, the proposed supplement is

28   expressly permitted by CRC Rule 3.766(f), which states:

                                           31

1
2
3
4

If personal notification is unreasonably expensive or the stake of individual class members is insubstantial, or if it appears that all members of the class cannot be notified personally, the court may order a means of notice reasonably calculated to apprise the class members of the pendency of the action--for example, publication in a newspaper or magazine; broadcasting on television, radio, or the Internet; or posting or distribution through a trade or professional association, union, or public interest group.

5
6
7
8
9
10
11
12

Consistency also supports court approval of the proposed Government Notice Program. Similar notice programs designed to reach the vast majority of the government class members were approved in the Attorney General's related *Chunghwa* case and the *LCD* case, both filed in this Court, as well as in the Attorney General's *DRAM* case in federal court.  (See Varanini Decl., ¶¶ 39, 43.)   The deployment of previously approved notice forms and methods is "perfectly acceptable."  (*In re Cellphone Fee Termination Cases*, *supra*, 186 Cal.App.4th at p. 1392 [adopting the court-approved notice program in the unrelated *Chavez* case].)  Thus, the Attorney General respectfully requests the Court's approval of this Government Notice Program.

13
14

### 2.   The proposed *Parens* Notice Program complies with the Cartwright Act's due process requirements, warranting court approval.

15
16
17
18
19
20
21
22
23
24
25
26
27
28

The proposed *Parens* Notice Program also follows previously approved notice programs targeting the same group and also should be approved here.  (Varanini Decl., ¶ 44.)  Unlike the CRC, the *parens patriae* provisions of the Cartwright Act leave both the content of the notice and the manner of giving notice in the court's discretion.  (Bus. & Prof. Code §16760, subds. (b) and (c).)  It requires only that notice be given to California individuals when Cartwright Act claims brought on their behalf under *parens patriae* are set up for dismissal and compromise.  (*Id.*) Section 16760, subdivision (b)(2) states that, if the proposed settlement seeks to release an individual's "claim of monetary relief," then the notice must tell the affected individuals that they "may elect to exclude" their claim from the Attorney General's lawsuit.  (Bus. & Prof. Code, § 16760, subd. (b )(2)). In addition, the notice must inform those individuals of the procedure and deadline for requesting exclusion.  (*Id.*)  Regarding the manner of providing notice, the Cartwright Act permits the Attorney General to "cause notice thereof to be given by publication." (Bus. & Prof. Code, § 16760, subd. (b)(2).)  But if "the court finds that notice given solely by publication would deny due process of law to any person or persons, the court may direct further

32

1    notice to the person or persons according to the circumstances of the case." (*Id.*)  The proposed

2    *Parens* Notice Program here accords with due process and should be approved.

3         A copy of the proposed long form *Parens* Notice is attached as Exhibit 8 to the Declaration

4    of Daniel Burke ("Burke Decl.").  Mr. Burke's declaration also describes in detail the proposed

5    notification methods. (Burke Decl., ¶¶ 11-23.)  Mr. Burke is the Executive Vice President of

6    Gilardi & Co. LLC ("Gilardi"), a Kurtzman Carson Consultants LLC company ("KCC").  Gilardi

7    is a leading notice and claims administration firm retained by the parties to administer the notice

8    program for the *parens patriae* group. (Burke Decl., ¶¶ 1-6.)  Gilardi also developed and

9    administered the notice program for the *parens patriae* group in the related Chunghwa case.

10   (Varanini Decl., ¶ 40.)  The present program builds on that court-approved program and also has

11   been certified by Gilardi to meet the due process standards for consumer notices. (*Id.,* Burke

12   Decl., ¶ 27)

13        Regarding content, the Attorney General erred on the side of precaution and adopted the

14   CRC requirements for the *Parens* Notice as well.  (See Varanini Decl., ¶ 42.)  Thus, like the

15   proposed Government Notice, the *Parens* Notice states in plain English all the information

16   required by Rules 3.766(d) and 3.769(f) concerning the case, the proposed settlements, and the

17   recipients' rights and obligations in connection with the settlements.  (See Burke Decl., ¶¶ 24-25,

18   Exh. 8.)  But unlike the Government Notice, the *Parens* Notice presents the required information

19   in the context of the *parens patriae* provisions.  (*Id.*)  It also apprises California individuals about

20   events unique to them, specifically that they have the right to make a claim for payment in the

21   IPPs' federal class action, including the new June 30, 2016 claims deadline,[27] while at the same

22   time supporting the *cy pres* distribution of the portion of the Attorney General's settlement funds

23   obtained under *parens patriae.*  (*Id.*)  The *Parens* Notice is therefore adequate and should be

24   approved.  (*Id.,* ¶¶ 25, 26, and 28; see also *In re Cellphone Fee Termination Cases, supra,* 186

25   Cal.App.4th at p. 1390 [notices drafted in language accessible to the public and that explained the

26   _____

         [27] In light of the federal court's recent order extending the claims deadline to June 30,
27   2016 for California natural persons in the IPP action, the *parens* notice also serves to provide
     supplemental notice of the IPP settlement and to stimulate additional claims for money by
28   California natural persons from that settlement.  (Varanini Decl., ¶ 46.)

1   rights and obligations of affected parties in connection with the settlement accord with due

2   process].)

3       The proposed manner of providing notice to the *parens* group also satisfies due process

4   requirements.  Here, the target group is California individuals who are 25 years old and older,

5   because those individuals would have been at least 18 years of age during the end of the relevant

6   time period, i.e., old enough to have been a purchaser of products containing CRTs.  (Burke

7   Decl., ¶ 10.)  There are approximately 24-25 million California individuals 25 years of age of

8   older.  (*Id.*)  Data shows this group favors online materials much more than print materials.  (See

9   *id.,* ¶¶ 18-21.)  In fact, internet usage and online advertising expenditures have been surpassing

10  newspaper readership and print advertisement expenditures at an exponential rate.  (*Id.*)  And

11  87.5% of our target group do indeed "have access to the internet at home using a computer" and

12  approximately 82% of the target group "have looked at or used the internet in the past 30 days."

13  (*Id.*, ¶ 20.)  In contrast, only about 16% of the target group are newspaper readers.  (*Id.*)

14  Therefore, "Girardi believes that the best practicable notice for this matter should include an

15  online component in addition to the direct notice and print publication efforts."  (*Id.*, ¶ 22.)

16      Incorporating the Federal Judicial Center's guidelines on giving notice to consumers,

17  Gilardi appropriately designed a mix media notice program a dominant Internet presence.  (*Id.*, ¶¶

18  8-23 and 26-27.)  Furthermore, because the affected parties are those who purchased televisions

19  and computer monitors, transmitting the notice via the Internet that will end up on a display

20  platform that is either the product itself or a successor product, would be a sensible, cost-

21  effective, and efficient way of providing notice to the affected group.  (Varanini Decl., ¶ 45.)

22      If approved, the *Parens* Notice will be deployed as follows:

23      **20 Million Online Advertisements and other Sponsor Links**:  The predominant Internet

24  users of the target group, particularly those with any interest in the overcharged products alleged

25  in this lawsuit, will be targeted through online advertisements and sponsor links.  (Burke Decl., ¶¶

26  8, 12a, 12b, 23a, 23b, and 26.)  To that end, 20 million advertisements about the settlements will

27  be placed on "the nationally recognized Xaxis Run of Network list of websites" targeted to this

28  group.  (*Id.*)  Viewers who click on the advertisement will be directed to the settlement website

34

(www.CaliforniaCRTlawsuit.com).  (*Id*.)  In addition, online users who conduct searches containing buzz words related to televisions and computer monitors during the notice period also will be shown links to the settlement website.  (*Id*.)  This online campaign is expected to reach at least 6.6 million individuals in the target group.  (*Id*. at ¶ 24b.)

**Direct E-Mail**:  Girardi will transmit a copy of the short form notice to 60,000 potentially affected individuals whose names and addresses have been ascertained by the AGO as having submitted claims for monetary payment in the LCD case, and who thus would be the most likely objectors, if any, to the *parens* settlement.  (Varanini Decl., ¶ 44; Burke Decl., ¶¶ 8, 11, 15 and 26.)

**Two-Time Insertion in USA Today for the California Zones**:  The short form notice also will be published twice in USA Today in the zones covering California.  (Burke Decl., ¶¶ 8, 12c, 16, 17, 22, 23c and 26.)  This paper has 106,934 California subscribers and is the only newspaper that serves the entire state.  (*Id.* at ¶¶ 16 and 23c.)  Gilardi picked this newspaper because, when combined with the online campaign described above, the reach percentage will be 27%, while the top five newspapers in state's centers have a combined reach of only about 7%.  (*Id*., 16-17.)  Moreover, as cautioned by the Federal Judicial Center, "Class members choose to live in small towns as well as large cities.  Be careful with notice exclusively targeted to metropolitan newspapers."  (*Id*., ¶ 16 [quoting FJC's Judges Class Action Notice and Claims Process Checklist and Plain Language Guide, 2010].)  Indeed, the court in the related *Chunghwa* case recognized that publication in a local newspaper would not confer benefits to persons residing elsewhere in the State, and noted that "sometimes you just can't do it better than a single newspaper of statewide circulation plus the other things that are available, the e-mails or whatever."  (Varanini Decl., Exh. L at 9-15 [Tr. of Preliminary Approval Hg].)

**Broadcast on Two Websites**:  Copies of the notice, the Complaint, the Settlement Agreements, and other relevant court documents will be provided on the dedicated settlement website created by Gilardi (Burke Decl., ¶¶ 12e and 23f), as well as on the Attorney General's website (Varanini Decl., ¶ 43c).

1    **Additional Publicity by the AGO**:  The Attorney General also will issue statements

2    concerning these settlements either on her website or through media outlets in California.

3    (Varanini Decl., ¶ 43c; Burke Decl., ¶¶ 12d and 23f.)

4        "Gilardi/KCC believes this plan is sufficient and is consistent with other *parens patriae*

5    notification efforts, as well as class action notice plans that have been approved by California

6    State courts."  (Burke Decl., ¶ 13; see also ¶¶ 26 and 27.)  Indeed, the proposed notification

7    methods satisfy due process either as a whole or taken apart.  The leading case on due process

8    standards governing notification in non-class cases when absent parties may be involved is

9    *Mullane v. Central Hanover Bank & Trust Co.* (1950) 339 U.S. 306.  The United States Supreme

10   Court held that publication of the settlement in a single notice in one publication in the forum

11   state, where the notice was published once a week for four weeks, sufficed to meet due process

12   requirements insofar as absent beneficiaries were concerned whose whereabouts or interests were

13   unknown to the trustee.  (*Id.* at pp. 317-18.)  The Court further observed that the trustee did not

14   have to incur the practical difficulties and costs involved in trying to more precisely determine the

15   status of absent beneficiaries, especially when the numbers are great.  (*Id.* at pp. 317-18; see also

16   Cal. Rules of Court, rules 3.766(e) [the notification method should account for the stake of the

17   individual class members, the cost of notifying class members, and the parties' resources]; Cal.

18   Rules of Court, rules 3.766(f) ["broadcasting [the notice] on the Internet" is reasonable when "it

19   appears that all members of the class cannot be notified personally"]; *Chavez, supra,* 162

20   Cal.App.4th at p. 58 [approving the use of the Internet to provide notice in technology-related

21   cases]; *Cartt, supra,* 50 Cal.App.3d at p. 967 [due process does not require direct notice by US

22   mail].)  Court approval of the *Parens* Notice Program is therefore warranted here.

23       Moreover, a similar *parens* program has been approved and deployed in the related

24   *Chunghwa* case and should be redeployed here.  (See *In re Cellphone Fee Termination Cases,*

25   *supra,* 186 Cal.App.4th at p. 1392.)  But with 16 million more online impressions added to the

26   deployment here, this notice program will be even more robust than its predecessor.

27

28

### G.  THE COURT SHOULD SET A FINAL APPROVAL HEARING SCHEDULE.

The last step in the settlement approval process is the final approval hearing, at which time the Court may hear all evidence and argument necessary to evaluate the proposed settlements.

The Attorney General respectfully requests that the Court set the following final approval schedule:

| Event | Date |
|---|---|
| Notice of Publication Date | Within 30 days of Order Granting Preliminary Approval |
| Final Hearing | 90 days from Order Granting Preliminary Approval |

## VI.  CONCLUSION

The Attorney General respectfully submits that the proposed settlements with LG, Panasonic, Hitachi, Toshiba, and Samsung are fair, adequate, and reasonable insofar as her *parens patriae* and government entity class claims are concerned, and are otherwise in the best interest of the settlement class of government entities.  The Attorney General therefore respectfully moves this Court to:  (1) grant preliminary approval of the settlement; (2) conditionally certify, for settlement purposes only, the class of government entities specified in the LG, Panasonic, Hitachi, Toshiba, and Samsung settlements and appoint the City and County of San Francisco as class representative and the Attorney General as counsel for the settlement class; (3) approve the proposed form of notices; (4) approve the proposal for the dissemination on the proposed notices; and (5) schedule a hearing on final approval of the LG, Panasonic, Hitachi, Toshiba, and Samsung settlements.

Dated:  February 23, 2016

Respectfully Submitted,

KAMALA D. HARRIS
Attorney General of California
MARK BRECKLER
Chief Assistant Attorney General
KATHLEEN FOOTE
Senior Assistant Attorney General


_____/s/ Emilio E. Varanini_____
EMILIO VARANINI
Deputy Attorney General
*Attorneys for Plaintiffs*

SF2011203501
41465679.doc

MPA in Support of Motion for Preliminary Approval of Settlements (CGC-11-515784)