1    ANDREA VALDEZ (Cal. Bar No. 239082)
     530 S. Lake Avenue, No. 574
2    Pasadena, CA 91101
     Tel: (626) 817-6547
3    andrea.valdez.esq@gmail.com

4    JOSEPH SCOTT ST. JOHN (*pro hac vice*)
     514 Mockingbird Drive
5    Long Beach, MS 39560
     Tel: 410-212-3475
6    jscottstjohnpublic@gmail.com

7    *Attorneys for Objector Douglas W. St. John*

8

### UNITED STATES DISTRICT COURT

9

### NORTHERN DISTRICT OF CALIFORNIA

10

### SAN FRANCISCO DIVISION

11

| | |
|---|---|
| 12   **IN RE CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** | Master File No. 3:07-cv-5944 JST |
| 13 | MDL No. 1917 |
| 14 | **OBJECTOR DOUGLAS W. ST. JOHN'S SHORTENED OBJECTION TO REPORT & RECOMMENDATION RE SETTLEMENTS AND FEES (D.E. 4351)** |
| 15 | |
| 16 | |
| 17 | Date: March 15, 2016 |
| 18   This Document Relates To: | Time: 2:00 p.m. Courtroom: 9, 19th Floor Judge: Hon. Jon S. Tigar |
| 19   All Indirect Purchaser Actions | Special Master: Hon. Martin Quinn |

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**TABLE OF CONTENTS** .......................................................................................... 1

**TABLE OF AUTHORITIES** .................................................................................... 3

**INTRODUCTION** ................................................................................................... 1

**LEGAL STANDARDS** ............................................................................................ 1

**ARGUMENT** ........................................................................................................... 1

**I.      IPP COUNSEL FAILED TO MAKE A PRIMA FACIE CASE FOR A
        SIGNIFICANT PORTION OF THEIR REQUESTED FEES.** ..................... 1

> **A.**   At least 20 firms failed to make a *prima facie* case for their requested
>         fees. ......................................................................................................... 1

> **B.**   Awarding IPP Counsel $350-$400/hour i.e., a 1000+% markup, plus a
>         multiplier for contract attorneys for whom no skill or experience
>         information was provided would be an abuse of discretion. ...................... 2

>> **1.**   IPP Counsel mislabeled contract attorneys as associates and
>>          selectively omitted information on their skill and experience. ............. 2

>> **2.**   Awarding $350-$400 per hour for work performed by contract
>>          attorneys would be an abuse of discretion. .................................. 3

>> **3.**   The record and public policy support reducing IPP Counsel's
>>          fee request by at least 15% to account for their mislabeling of
>>          contract attorneys and their failing to supply skill and
>>          experience information. .................................................. 4

**II.     THE RECOMMENDED $173 MILLION FEE AWARD IS EXCESSIVE.** ............... 5

> **A.**   IPP Counsel made multiple errors in pursuing this litigation. ........................ 5

> **B.**   Even assuming that the quality of representation was high, the case
>         was exceptionally complex, and the results were extraordinary, those
>         facts are already accounted for in the white-shoe rates sought by IPP
>         Counsel. ................................................................................................... 6

**III.    THE SPECIAL MASTER MADE FACTUAL AND LEGAL ERRORS IN
        CONNECTION WITH THE SAMSUNG SDI AND PHILIPS
        SETTLEMENTS.** ................................................................................................... 7

> **A.**   Fees cannot be awarded based on value attributable to others. ........................ 7

> **B.**   At least $10 million of the settlement fund is not attributable to IPP
>         Counsel. ................................................................................................... 8

>> **1.**   The Chunghwa settlement is attributable to the DOJ. ........................... 8

        2.      IPP Counsel should be judicially estopped from arguing that
                the Chunghwa settlement did not have redounding benefit to
                the class. ................................................................................................... 8

C.      Samsung SDI's guilty plea and the European Commission Decision
        significantly increased the settlement value of this litigation. ........................... 9

        1.      The Special Master's conclusions regarding Samsung SDI are
                based on legal errors and clearly erroneous factual findings. ................ 9

        2.      Assigning zero value to the EC Decision and the preclusion
                holding in *Vichi* is illogical and inconsistent with Judge Conti's
                findings. ................................................................................................ 11

        3.      The Samsung SDI guilty plea and the European Commission
                Decision account for $160 million of the settlement fund. ................... 13

1

# TABLE OF AUTHORITIES

2 **Cases**

3 *Antoninetti v. Chipotle Mex.Grill, Inc.*, 2012 WL 2923310 (S.D. Cal. July 17, 2012) .......................4

4 *Apple, Inc. v. Samsung Elec. Co.*, 2012 U.S. Dist. LEXIS 160668 (N.D. Cal. Nov. 7, 2012) .....................4

5 *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957 (N.D. Cal. 2014).........................................................4

6 *Baughman v. Walt Disney World Co.*, 685 F. 3d 1131 (9th Cir. 2012).............................................9

7 *Blum v. Stephenson*, 465 U.S. 886 (1984)...............................................................................2

8 *Brown v. Stackler*, 612 F.2d 1057 (7th Cir. 1980) ....................................................................5

9 *City of Burbank v. Gen. Elec. Corp.*, 329 F.2d 825 (9th Cir. 1964) ..............................................10

10 *Class Plaintiffs v. Jaffe & Schlesinger, PA*, 19 F. 3d 1306 (9th Cir. 1994) ...................................1

11 *Darensburg v. Metro. Transp. Com'n*, 636 F.3d 511 (9th Cir. 2011) ............................................3

12 *First State Ins. Grp. v. Nationwide Mut. Ins.*, 402 F.3d 43 (1st Cir. 2005) ...................................5

13 *Gauchat-Hargis v. Forrest River, Inc.*, 2013 WL 4828594 (E.D. Cal. Sept. 9, 2013) .......................4

14 *Goffstein v. State Farm Fire & Casualty Co.*, 764 F.2d 522 (8th Cir. 1985) ...............................11

15 *In re Auction Houses Antitrust Litig.*, 2001 WL 210697 (S.D.N.Y. Feb. 26, 2001)....................... 8, 10

16 *In re Auto. Parts Antitrust Litig.*, 2014 WL 1746121 (E.D. Mich. Apr. 30, 2014) ...........................10

17 *In re Beacon Assocs. Litig.*, 2013 WL 2450960 ........................................................................5

18 *In re Bluetooth Headset Prods. Liability Litig.*, 654 F.3d 935 (9th Cir. 2011) ...............................1

19 *In re Cendant Corp. PRIDES Litigation*, 243 F.3d 722 (3d Cir. 2001).........................................8

20 *In re Coordinated Pretrial Proceedings*, 109 F.3d 602 (9th Cir. 1997)........................................7

21 *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141 (D. Conn. 2009).13

22 *In re Mercury Interactive Sec. Litig.*, 618 F.3d 988 (9th Cir. 2010) ....................................... 2, 15

23 *In re Polyurethane Foam Antitrust Litig.*, 2016 WL 320182 (N.D. Ohio Jan. 27, 2016)............................4

24 *In re Prudential Insurance Company of America Sales Litigation*, 148 F.3d 283 (3d Cir. 1998) ............. 7, 8, 10

25 *In re Wash. Pub. Power Sup. Sys. Lit.*, 19 F. 3d 1291 (9th Cir. 1994) ..........................................15

26 *In re Weatherford Int'l Sec. Litig.*, 2015 U.S. Dist. LEXIS 3370 (S.D.N.Y. Jan. 5, 2015) ......................5

27 *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939) ..................................................15

28 *Local Union No. 490 v. Kirkhill Rubber Co.*, 367 F.2d 956 (9th Cir. 1966 ...................................15

1    *Lola v. Skadden, Arps, Slate, Meagher, & Flom LLP*, 2015 WL 4476828 (2d Cir. July 23, 2015) ............... 4

2    *Lopez v. San Francisco Unified Sch. Dist.*, 385 F. Supp. 2d 981 (N.D. Cal. 2005) ........................................ 2

3    *Loretz v. Regal Stone Ltd.*, 756 F. Supp. 2d 1203 (N.D. Cal. 2010) ................................................................ 7

4    *Monterrubio v. Best Buy Stores, LP*, 291 F.R.D. 443 (E.D. Cal. 2013) ........................................................ 2

5    *Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177 (3d Cir. 2006) .................................................................. 8

6    *United States v. $31,697.59 Cash*, 665 F.2d 903 (9th Cir. 1982) ................................................................ 10

7    *Vichi v. Koninklijke Philips Elec., N.V.*, 85 A.3d 725 (Del. Ch. 2014) ......................................... 12, 13, 15

8    *Washington Public Power System Securities Litigation*, 779 F. Supp. 1056 (D. Ariz. 1991) ........................ 6

9    *Young v. Covington & Burling LLP*, 846 F. Supp. 2d 141 (D.D.C. 2012) .................................................... 4

10   **Statutes**

11   15 U.S.C. § 1 n.1 .......................................................................................................................................... 8

12   28 U. S. C. § 1738 ...................................................................................................................................... 12

13   **Other Authorities**

14   Theodore Eisenberg & Geoffrey Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–*

15       *2008*, 7 J. Empirical L. Stud. 248 (2010) ......................................................................................... 5

16   **Rules**

17   N.D. Cal. Civ. L. R. 54-5 ........................................................................................................................... 2

18   **Treatises**

19   Alba Conte, 1 *Attorney Fee Awards* § 2.05 ................................................................................................ 7

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

At least __20__ firms failed to make a *prima facie* case for their requested fees, including __6__ firms that failed to provide skill and experience information for **any** attorney. Some of those omissions appear to be intentional efforts to hide the use of contract attorneys for whom fees are sought at associate rates, i.e., at __1000+%__ markups, which IPP Counsel seek to inflate still more via a multiplier. Despite those failures, the Special Master concluded there was "no . . . justification to downgrade" IPP Counsel's claimed billing rates, thereby erroneously reversing the applicable burden.

The resulting recommended fee award—30% of the entire settlement fund, totaling over $173 million—is an outlier. In seeking to justify that award, the Special Master undersold serious defects in IPP Counsel's conduct of the litigation. He then found that award reflected an acceptable multiple of the white-shoe rates claimed by IPP Counsel, despite case law suggesting the factors which may support a multiplier are already included in such already-high rates.

Finally, the Special Master concluded that settlement value was not impacted by Chunghwa's early settlement and cooperation, Samsung SDI's guilty plea, or a European Commission Decision assessing over $1.9 billion in fines against the defendants for conduct that Judge Conti found "indisputably overlaps" with this litigation. That conclusion defies common sense, and it can only be reached via a deference to IPP Counsel's assertions that the Ninth Circuit has found inappropriate.

**LEGAL STANDARDS**

The Ninth Circuit reviews a district court's award of fees and costs to class counsel for abuse of discretion. *In re Bluetooth*, 654 F.3d 935, 940 (9th Cir. 2011). The underlying findings of fact are reviewed for clear error. *Id.* Whether the district court applied the correct legal standard in awarding fees is reviewed de novo. *Class Plaintiffs v. Jaffe & Schlesinger, PA*, 19 F. 3d 1306, 1308 (9th Cir. 1994).

**ARGUMENT**

**I.    IPP COUNSEL FAILED TO MAKE A PRIMA FACIE CASE FOR A SIGNIFICANT PORTION OF THEIR REQUESTED FEES.**

    **A.    At least __20__ firms failed to make a *prima facie* case for their requested fees.**

IPP Counsel bore the burden of "produc[ing] satisfactory evidence — in addition to [their] own affidavits — that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v.*

*Stephenson*, 465 U.S. 886, 895 n.11 (1984); *see also Monterrubio v. Best Buy Stores, LP*, 291 F.R.D. 443, 459 (E.D. Cal. 2013). Consistent with that burden, this Court's local rules require fee motions to "be supported by declarations or affidavits containing . . . [a] brief description of relevant qualifications and experience" for each attorney for whom fees are claimed. N.D. Cal. Civ. L. R. 54-5(b).

Here, at least **20** firms seek fees for attorneys for whom they provide no background information. Of those, **6** firms did not provide background information for *any* attorney.[1,2] The Special Master's use of rates of up to $875/hour in awarding fees to attorneys for whom no background information reflects an abuse of discretion. *E.g.*, *In re Mercury Interactive*, 618 F.3d 988, 992 (9th Cir. 2010) ("A district court abuses its discretion if . . . the record contains no evidence on which it rationally could have based its decision.").

For timekeepers for whom IPP Counsel failed to provide background information, the Court has no basis to award anything other than a minimal fee. *See Navarro v. Gen. Nut. Corp.*, 2005 WL 2333803, at *10 (N.D. Cal. Sept. 22, 2005) (awarding minimal hourly rate where fee applicant failed to provide education, litigation experience, etc.); *Lopez v. San Francisco Unified Sch. Dist.*, 385 F. Supp. 2d 981, 990, 992 (N.D. Cal. 2005) (awarding the lowest rate sought due to lack of background information to distinguish timekeepers). An across-the-board reduction is therefore appropriate.

    **B.**     **Awarding IPP Counsel $350-$400/hour i.e., a 1000+% markup, plus a multiplier for contract attorneys for whom no skill or experience information was provided would be an abuse of discretion.**

        **1.**     **IPP Counsel mislabeled contract attorneys as associates and selectively omitted information on their skill and experience.**

Many IPP Counsel firms oddly submitted background information for some attorneys, but omitted that information for others. In many cases, the attorneys for whom information was omitted were labelled "associates," but were actually contract attorneys. For example, Trump,

---

[1] Firms that did not submit background information for any attorney: Lovell, Stewart, Halebian and Jacobson LLP; Milberg LLP; Frankovitch, Anetakis, Colantonio & Simon; Kirkpatrick & Goldsborough; McCallum, Hoaglund, Cook & Irby LLP; Wyatt & Blake LLP.

[2] Firms that did not submit background information for some attorneys: Trump Alioto, Trump & Prescott LLP; Zelle Hofmann Voelbel & Mason LLP; Straus & Boies, LLP; Green & Noblin, P.C.; Andrus Anderson LLP; Fine, Kaplan and Black RPC; Miller Law LLC; Law Offices of Sherman Kassof; Goldman, Scarlato, Karon & Paenny P.C.; Glancy, Prongay & Murray LLP; Karon LLC; Mansfield, Tanick, & Cohen PA / Foley & Mansfield PLLP; McManis Faulkner; Whitfield Bryson & Mason Mason LLP.

Alioto, Trump & Prescott LLP ("TATP") submitted background information for three attorneys, but failed to provide that information for ten attorneys labelled as "associates." Alioto Dec. (D.E. 4073-1). Mr. St. John determined that at least two of those "associates" were actually contract attorneys, and TATP later conceded as much for all ten. Alioto Dec. (D.E. 4373-1) at ¶ 18. The example of contract attorney Kabsakalian suggests that the mislabeling and selective omission was a conscious and organized effort: she apparently worked as a contract attorney for three IPP Counsel firms, but was improperly identified as an associate by each, with none providing information on her background. *See* Alioto Dec. (D.E. 4073-1); Karon Dec. (4073-15); Karon Dec. (4073-27).

**2.    Awarding $350-$400 per hour for work performed by contract attorneys would be an abuse of discretion.**

Having failed to make a prima facie case for fees with its motion, TATP submitted resumes for the ten contract attorneys identified by Mr. St. John with its opposition. IPP Counsel then asserted that "[m]ost of the contract attorneys hired to work on this case needed to be fluent in Chinese, Japanese or Korean," a claim that the Special Master adopted nearly verbatim as the apparent basis for recommending $350-$400/hour for their work. *Compare* R&R (D.E. 4351) at 73 *with* Alioto Dec. (D.E. 4373-1) at ¶ 18. The resulting analysis is replete with errors.

*First*, the Special Master's consideration of TATP's tardy resumes—part of IPP Counsel's prima facie case for fees that should have been publicly filed with their fee original motion—was legal error. Fed. R. Civ. P 23(h); *see also, e.g., In re Mercury Interactive*, 618 F.3d at 995.

*Second*, there is no reason to believe that the resumes submitted by TATP are representative of the unknown number of mislabeled contract attorneys for whom IPP Counsel claim white shoe rates. *See Darensburg v. Metro. Transp. Com'n*, 636 F.3d 511, 522 (9th Cir. 2011) (finding clear error where district court's inference was based on an inappropriate statistical measure). Indeed, Mr. St. John submitted evidence that one contract attorney for whom IPP Counsel seek $350/hour was a recent and undistinguished graduate of an undistinguished law school with no real legal experience. Ex. 2, St. John Reply Dec. at ¶ 11 & Ex. 1. The Special Master simply ignored that evidence.

*Third*, despite IPP Counsel's failure to submit background information, the Special Master concluded that "there is not the slightest justification to downgrade [the claimed] billing rates." R&R (D.E. 4351) at 73. That reversed the applicable burden, which never shifted to Mr. St. John. *See*

*Navarro*, 2005 WL 2333803, at \*8.

Finally, the $350-$400/hour sought for IPP Counsel's contract document reviewers is significantly higher than the rates of junior associates at some of the white shoe law firms that IPP Counsel suggest as comparables. For example, IPP Counsel's fee expert identifies the "lowest associate" rate in 2013 at Kirkland & Ellis LLP as $235/hour and at Morrison & Foerster LLP as $230/hour. Pearl Dec. (D.E. 4071-15) at 34, 35. But there no reason to believe that associates at such firms are "lawyers of reasonably comparable skill, experience, and reputation" for the contract document reviewers hired by IPP Counsel. And the only record indication of the market rate for undifferentiated contract attorneys in the Bay Area is $47-$125. *See* St. John Obj. (D.E. 4106) at 22 (citing *Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 970 (N.D. Cal. 2014) and *Apple, Inc. v. Samsung Elec. Co.*, 2012 U.S. Dist. LEXIS 160668 at \*26 Table (N.D. Cal. Nov. 7, 2012)). [3,4]

**3.     The record and public policy support reducing IPP Counsel's fee request by at least 15% to account for their mislabeling of contract attorneys and their failing to supply skill and experience information.**

IPP Counsel seek markups of **1000+%** on the $25-$30/hour that they paid contract document reviewers, which they seek to further increase by use of a multiplier. *Compare* Kassof Dec. (D.E. 4073-14) Ex. 2 (seeking $350/hour) *with* Ex. 2, St. John Reply Dec. at ¶ 11 (same contract attorney paid $25-$30/hour). Courts have repeatedly rejected attempts to bill the class hundreds of dollars per hour for contract attorneys. *E.g., In re Beacon Assocs.*, 2013 WL 2450960, at \*18 (S.D.N.Y.

---

[3]   Associates at white-shoe law firms simply are not "lawyers of reasonably comparable skill, experience and reputation" for attorneys whose legal experience consists of performing document review for a year or two after graduating from an undistinguished law school. *See, Lola v. Skadden, Arps, Slate, Meagher, & Flom LLP*, 2015 WL 4476828, at \*6 (2d Cir. July 23, 2015) (document review may not constitute the practice of law); *Young v. Covington & Burling LLP*, 846 F. Supp. 2d 141, 147-48, 155 (D.D.C. 2012) (describing the lesser qualifications of "staff attorneys" performing document review as compared to associates); *cf. Navarro v. Gen. Nut. Corp.*, 2004 WL 2648373, at \*4 (N.D. Cal. Nov. 19, 2004) (rates of opposing counsel "are evidence of th[o]se attorneys' own skill, experience, and reputation, and say little about" the appropriate rate for the fee applicant).

[4]   Testimony by IPP Counsel's fee expert has previously been found "irrelevant" because he made the basic mistake of relying on rates for non-comparable attorneys from the wrong locality. *Gauchat-Hargis v. Forrest River, Inc.*, 2013 WL 4828594, at \*9-10 (E.D. Cal. Sept. 9, 2013) (cutting $700/hour rate advocated by Mr. Pearl to $300); *see also Antoninetti v. Chipotle Mex. Grill, Inc.*, 2012 WL 2923310, at \*6 (S.D. Cal. July 17, 2012) (cutting requested rate from $620 to $375). To the extent Mr. Pearl suggests contract attorneys with no substantive legal experience are comparable to mid-level associates at white shoe firms, he is repeating the same basic error here.

May 9, 2013) ("[T]here is absolutely no excuse for paying those temporary, low-overhead [contract attorneys] $40 or $50 an hour and then marking up their pay ten times for billing purposes."); *see also In re Weatherford Int'l*, 2015 U.S. Dist. LEXIS 3370, at *5 (S.D.N.Y. Jan. 5, 2015) (noting lack of persuasive evidence justifying over 600% markup of "staff attorney" rates to $375-$395 per hour). Indeed, one court recently noted that class counsel's markup of contract attorney rates gave the court "the greatest concern" vis-à-vis the fee petition, and cut the requested fees by 12%. *In re Polyurethane Foam Antitrust Litig.*, 2016 WL 320182, at *22 (N.D. Ohio Jan. 27, 2016).

This Court need not enter the fray on unreasonable markups. IPP Counsel's failure to meet their burden of supplying background information for those contract attorneys gives a more-than-adequate basis to deny the requested fees of $350-$400/hour. If TATP is awarded the low-end of the undifferentiated contract attorney rate, i.e. $47 per hour, its lodestar will be reduced by $2.61 million, i.e., about 16.6%. Taking TATP as illustrative, a 15% across-the-board deduction from IPP Counsel's fee request would account for their failure to submit the background information necessary to support their fee request. Doing so would be consistent with the 12% cut recently applied in *Polyurethane Foam*. It would also be consistent with the public policy of responding to excessive or unsupported fee requests with a "severer reaction," *Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980), rather than permitting "heads we win, tails we try again" fee motions.

## II.   THE RECOMMENDED $173 MILLION FEE AWARD IS EXCESSIVE.

There is no doubt that awarding 30% of the settlement fund, i.e., over $173 million, would be an outlier in a case of this size. Indeed, in a study of 689 common fund cases reported between 1993 and 2008, in the highest decile of recoveries analyzed, i.e., the 68 cases with recoveries greater than $175.5 million, the mean fee percentage was 12.0% and the median was 10.2%. T. Eisenberg & G. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 J. Empirical L. Stud. 248, 265 Table 7 (2010). The facts of this case—which benefitted from the efforts of the DOJ and foreign antitrust authorities and settled before summary judgment rulings—do not support the outlying award recommended by the Special Master.

### A.   IPP Counsel made multiple errors in pursuing this litigation.

The Special Master noted "troublesome issues" with IPP Counsel's performance, but he

nevertheless declined to make a downward adjustment to IPP Counsel's fee request. R&R (D.E. 4351) at 60, 66. The Special Master significantly undersold the problems identified by objectors:

- IPP Counsel being forced to withdraw significant claims in the face of a Rule 11 Motion, for which IPP Counsel still seek fees. Alioto Dec. (D.E. 4071-1) at ¶¶ 22-24.

- Having claims for Massachusetts class members dismissed with prejudice because IPP Counsel failed to comply with a statutory predicate—despite the Court giving them an opportunity to do so—and thereby lowering overall settlement value. *See* R&R (D.E 4351) at 39-40.

- Judge Walker's recommending that lead counsel "be augmented" "so that adequate attention and effort can be devoted to settlement." R&R (D.E. 3200) at 4-5.

- Entering settlements with class definitions that are inconsistent with the Chunghwa settlement, thereby complicating resolution of this case. *See* R&R (D.E. 4351) at 41-46.

- Failing to make a *prima facie* case for part of their requested fees. Part I, *supra*.

Such failures should be viewed as illustrative examples of the quality of IPP Counsel's representation. And those examples bring into sharp focus the not-particularly-extraordinary results of this case: settlements amounting to only 20% of untrebled damages, and only about 25% greater than the statutory penalties in the small state of Mississippi alone. The most reasonable inference is that the class could have had greater success at lower cost if IPP Counsel were better-performing.

**B.    Even assuming that the quality of representation was high, the case was exceptionally complex, and the results were extraordinary, those facts are already accounted for in the white-shoe rates sought by IPP Counsel.**

The Special Master concluded that the settlement amount and the complexity of the case support an upward adjustment of IPP Counsel's fees. R&R (D.E. 4351) at 59, 60. But IPP Counsel claim very high hourly rates, with at least **36** lawyers claiming rates of $700+per hour. Indeed, IPP Counsel's fee expert compares those rates to the similar—but often lower—rates charged by the nation's premier white shoe law firms. *See, e.g.*, Pearl Dec. (D.E. 4071-15) at ¶ 34.

The problem with awarding a multiplier on white shoe rates was cogently addressed in *Washington Public Power System*, 779 F. Supp. 1056 (D. Ariz. 1991), *vacated on other grounds* 19 F.3d 1291 (9th Cir. 1994). Noting that the plaintiffs' counsel "represent[ed] the highest echelon" of the bar and "their stature is linked to past success," the court concluded that "[t]heir hourly rates necessarily

reflect that same component." 779 F. Supp. at 1061-62. Those "[c]ounsel demand and receive the highest fees because they obtain extraordinary results." *Id.* at 1062. And because "[t]hose very fees formed the basis of [the] court's lodestar calculation," the court declined to award a multiplier because the results did not "exceed the extraordinary." *Id.* This Court applied a similar analysis in *Loretz v. Regal Stone*, 756 F. Supp. 2d 1203, 1216 (N.D. Cal. 2010). It should do so again: IPP Counsel can have white shoe rates or they can have a multiplier. A reasonable fee does not include both.

## III.   THE SPECIAL MASTER MADE FACTUAL AND LEGAL ERRORS IN CONNECTION WITH THE SAMSUNG SDI AND PHILIPS SETTLEMENTS.

### A.   Fees cannot be awarded based on value attributable to others.

"An attorney's right to common fund fees arises from equitable principles of restitution." *In re Coordinated Pretrial Proceedings*, 109 F.3d 602, 609 (9th Cir. 1997). Accordingly, "[n]umerous courts have concluded that the amount of the ***benefit conferred*** logically is the appropriate benchmark against which a reasonable common fund fee charge should be assessed." Alba Conte, 1 *Attorney Fee Awards* § 2.05, at 37. The benefit conferred is not, however, necessarily coextensive with the value of the settlement fund. Rather, portions of the settlement fund attributable to the efforts of persons other than class counsel must be excluded from the calculation of any fee award.

The leading case on this issue is *In re Prudential*, 148 F.3d 283 (3d Cir. 1998). The *In re Prudential* class action was litigated in parallel with a Multi-State Life Insurance Task Force examination of Prudential's sales practices. *Id.* at 292. The Task Force compiled a report and recommended a remediation plan, which was ultimately adopted as a consent order by forty-three states. *Id.* at 291-92. After extensive discovery, the class action then settled, but with significant improvements over the Task Force's remediation plan. *Id.* at 294 & n.12, 296-97, 319 & n.64.

The district court awarded attorney fees to class counsel based on the common fund doctrine, and it used the percentage-of-recovery method to set the amount of the award. *Id.* at 336. But the district court based its fee calculation on "the entire value of the settlement, including any portion which would have been provided to the class under the Task Force Plan." *Id.* at 330. That was error. *Id.* at 338. Quoting the Conte treatise, the Third Circuit explained that "[n]umerous courts have concluded that the amount of the benefit conferred logically is the appropriate benchmark against which a reasonable common fund fee charge should be assessed." *Id.* The trial court was

thus required to distinguish "benefits created by class counsel from the benefits created under the Task Force Plan." *Id.* That distinction "is especially crucial in consumer class actions where federal or state agencies . . .have conducted their own investigations of wrongdoing." *Id.*

The principle underlying *In re Prudential* was further elucidated in *In re Cendant*, 243 F.3d 722 (3d Cir. 2001). In that case, the class action was filed after the defendant disclosed accounting irregularities, and it quickly settled. 243 F.3d at 725. The Third Circuit found the district court abused its discretion by awarding 5.7% of the common fund as fees, pointing to its warning in *In re Prudential* against overemphasizing class counsel's role in a recovery. *Id.* at 741. Indeed, the court emphasized that "Cendant's liability . . . had been conceded at the outset," and class counsel could not claim fees for freeriding on the efforts of others. *Id.*

**B.      At least $10 million of the settlement fund is not attributable to IPP Counsel.**
**1.      The Chunghwa settlement is attributable to the DOJ.**

There is no suggestion that Chunghwa's settlement was not directly attributable to its participation in the DOJ Leniency Program, which required Chunghwa to confess to illegal anticompetitive conduct. *See Stolt-Nielsen v. United States*, 442 F.3d 177, 179 (3d Cir. 2006); *cf, e.g. Dowdy & Dowdy v. Arbitron*, 2010 U.S. Dist. LEXIS 10712, at *7 (S.D. Miss. Oct. 6, 2010) ("Courts have treated claims under [Miss. Code § 75-21-3] as analytically identical to claims under Sections 1 and 2 of the Sherman Antitrust Act."). And "satisfactory cooperation" with civil plaintiffs was a predicate for limiting Chunghwa's liability. *See* 15 U.S.C. § 1 n.1. Early settlement was the almost inevitable result. *In re Auction Houses*, 2001 WL 210697, at *3 (S.D.N.Y. Feb. 26, 2001) (awarding no multiplier: settlement was "almost inevitable" once the defendant admitted conspiracy to the DOJ).

The Special Master reached no contrary conclusion. His inclusion of the $10 million Chunghwa settlement in the benefits attributable to IPP Counsel was thus without support. To the contrary, the Chunghwa settlement is a quintessential example of a settlement attributable to government actions, such that IPP Counsel should receive only a *de minimis* fee for the formality of filing a complaint that could survive a motion to dismiss. *See In re Cendant Corp.*, 243 F.3d at 741.

**2.      IPP Counsel should be judicially estopped from arguing that the Chunghwa settlement did not have redounding benefit to the class.**

IPP Counsel seek to limit the impact of the Chunghwa settlement on their fee request by denigrating the value of Chunghwa's cooperation. *See* IPP Resp. (D.E. 4373) at 10-11. But in asking

1  this Court to approve that low-dollar settlement, IPP Counsel represented that Chunghwa's "early

2  cooperation **proved invaluable**, as it gave Plaintiffs **detailed** information about the conspiratorial

3  'Glass Meetings,' including the identities of the participants, the time, place and agenda of such

4  meetings, as well as the type of price-fixing agreements reached at such meetings." IPP Mot. (D.E.

5  884) at 1. Those representations were made in the past tense, indicating that IPP Counsel had

6  received and evaluated Chunghwa's cooperation. Indeed, IPP Counsel later repeated the same

7  representations, clarifying that Chunghwa "has agreed to provide (**and has provided**) Plaintiffs with

8  **significant and valuable cooperation** in the prosecution of the case against the remaining

9  defendants." IPP Mot. (D.E. 1062) at 1, 5. The Special Master nevertheless accepted IPP Counsel's

10  convenient assertion that "while it appeared in 2009 that the co-operation [from Chunghwa] might

11  be of great help, circumstances changed as discovery progressed." R&R (D.E. 4351) at 57.

12         There is no question that IPP Counsel now advocate a position wholly contrary to the

13  position they advocated in seeking approval of the Chunghwa settlement. Moreover, in seeking

14  approval of that settlement, IPP Counsel emphasized the "great weight" to which their opinion was

15  entitled, and urged that "the trial judge . . . should be hesitant to substitute [his] own judgment for

16  that of [class] counsel." IPP Mot. (D.E. 1062) at 11. Presumably relying on those arguments, the

17  Court approved the Chunghwa settlement. *See* Order (D.E. 1105). IPP Counsel then took an early

18  benefit, obtaining $2.5 million from the settlement funds to cover their expenses.

19         "Where a party assumes a certain position in a legal proceeding, and succeeds in

20  maintaining that position, he may not thereafter, simply because his interests have changed, assume

21  a contrary position . . . ." *Baughman v. Walt Disney World*, 685 F. 3d 1131, 1133 (9th Cir. 2012); *see also*

22  *Rissetto v. Local 343*, 94 F.3d 597, 606 (9th Cir. 1996). The facts here—where IPP Counsel

23  emphasized the "great deference" owed their opinion and induced the Court to approve a low-dollar

24  settlement with representations that the class was receiving additional value—present a

25  strong case for judicial estoppel.

26  **C.    Samsung SDI's guilty plea and the European Commission Decision significantly increased the settlement value of this litigation.**

27  **1.    The Special Master's conclusions regarding Samsung SDI are based on legal errors and clearly erroneous factual findings.**

28  There is no dispute that Samsung SDI pled guilty to violating the Sherman Act, or that the

guilty plea is preclusive as to Samsung SDI. *See, e.g.*, *United States v. $31,697.59*, 665 F.2d 903, 906 (9th Cir. 1982); *Burbank v. Gen. Elec.*, 329 F.2d 825, 834 (9th Cir. 1964). Indeed, IPP Counsel correctly stated that "[the] guilty plea establishes the existence of the conspiracy . . . ." IPP Mot. (D.E. 3553) at 3. Samsung SDI further admitted that the purpose of the conspiracy "was to fix prices, reduce output, and allocate market shares . . . in the United States," that it made sales "directly affected by the conspiracy" to customers in the U.S., and that "[a]cts in furtherance of th[e] conspiracy were carried out" in California. St. John Dec. Ex. 10 (D.E. 4108-10) at ¶¶ 3-4.

IPP Counsel nevertheless urge that Samsung SDI's guilty plea "allowed Samsung SDI and other Defendants to argue that the conspiracy was much more limited in scope than IPPs alleged and . . . emboldened Samsung to aggressively deny both its participation in the alleged conspiracy and the existence of any U.S. effects . . . ." IPP Reply (D.E. 4373) at 9-10. IPP Counsel have not identified a single brief in which defendants made such an argument. *See id.* The Special Master nevertheless uncritically accepted IPP Counsel's assertion, stating that IPP "[C]ounsel correctly notes that a DOJ prosecution of one defendant actually <u>helps</u> other defendants who argue that their non-prosecution demonstrates their innocence." R&R (D.E. 4351) at 58 n.29. In the same stroke, he concluded that "[t]o suggest that the Samsung guilty plea meaningfully detracts from the quality of IPP [C]ounsel's efforts to produce the settlement is ludicrous." *Id.* at 57-58. Those conclusions are wrong on both the facts and the law.

*First*, the basis for awarding fees is not the value or "quality of IPP Counsel's ***efforts***." R&R (D.E. 4351) at 57-58. Rather, the standard is the ***benefit*** to the common fund directly attributable to those efforts. *In re Prudential*, 148 F.3d at 338. Here, Samsung SDI's liability—as well as the existence of the conspiracy and its U.S. impact—were established by the DOJ, not by any duplicative efforts of class counsel. *See In re Auction Houses*, 2001 WL 210697, at *3. The value of the DOJ's establishing Samsung SDI's liability must be subtracted from the settlement fund in ascertaining the benefit provided by IPP Counsel. The Special Master's refusal to do so—based on application of an incorrect standard—was error.

*Second*, the Special Master's conclusion that Samsung SDI's guilty plea "did nothing to lessen IPP's challenges to obtain class certification," R&R (D.E. 4351) at 57, is contradicted by IPP

Counsel's certification briefing, which referenced that plea in a section titled "The Results of Numerous Government Investigations Also Support the Existence of a Conspiracy," IPP Mem. (D.E. 1531) at 7. The existence of a conspiracy—a fact preclusively established by Samsung SDI's guilty plea—was even cited as an issue of common proof warranting class certification. *Id.* at 15.

*Third*, neither the Special Master nor IPP Counsel grapple with the inadmissibility of DOJ's decision not to prosecute some of the corporate defendants. As IPP Counsel themselves explained, "evidence that criminal charges were not brought is inadmissible in a civil case arising out of the same events as the criminal charges." IPP Mot. (D.E. 3544) at 2 (quoting *Goffstein v. State Farm Fire & Cas. Co.*, 764 F.2d 522, 524 (8th Cir. 1985)). No contrary legal authority was cited.

*Finally*, IPP Counsel's "narrow prosecution" precept is contradicted by the record: the DOJ engaged in a broad prosecution targeting executives from Chunghwa, Samsung SDI, and LG Philips Display. *See* IPP Mem. (D.E. 1531) at 7-8; St. John Dec. Ex. 5 (D.E. 4108-5) & Ex. 9 (D.E. 4108-9). A prosecution is not "narrow" simply because the government focused its resources on individuals rather than pursuing every corporate defendant.

## 2. Assigning zero value to the EC Decision and the preclusion holding in *Vichi* is illogical and inconsistent with Judge Conti's findings.
### a) The European Commission Decision

The European Commission ("EC") investigated the conspiracies at issue, adopted initial findings regarding those conspiracies in a Statement of Objections, then issued a comprehensive 340 page EC Decision in 2012 assessing ~$1.9 billion in fines. *See* St. John Dec. Ex. 15 (D.E. 4108-15). A Summary of the EC Decision was issued in late 2013. *Id.* A redacted version of the full EC Decision was made public on December 5, 2014. St. John Dec. Ex. 16 (D.E. 4108-16).

The EC Decision repeatedly noted that the CRT conspiracies were global, and it characterized the impact on Europe as a regional consequence. *E.g.*, St. John Dec. Ex. 16 (D.E. 4108-16) at ¶¶ 259, 271, 272, 302, 307, 314. The EC Decisions also made multiple references to agreements and price impacts in the American market. For example:

> On 27 October 1999, Chunghwa, SDI, LGE, [CPT producers] met in Thailand. The participants **agreed** on the 14" and 20" CPT prices for five of their customers and **agreed** to maintain the current prices for the first quarter 2000. Furthermore, they discussed Europe and were happy to report of a "price-up trend in European & **American market** thanks to capacity reduction in Asia".

*Id.* at ¶ 290 (emphasis added); *see also, e.g.*, *id.* at ¶¶ 268, 388, 439. And the global nature and impact of the conspiracies were actually litigated before the EC. *See id.* at ¶¶ 259, 262, 268-69, 471-90.

### b) The Commission Decision was found to be preclusive in *Vichi*

In *Vichi v. Koninklijke Philips Elec., N.V.*, 85 A.3d 725 (Del. Ch. 2014), a multi-hundred million dollar fraud case, the Delaware Chancery Court held that the EC Decision preclusive as to:

  • "[the] participation [of LG.Philips Displays Holdings B.V. ("LPD"), a joint venture between Philips Electronics and LG Electronics] in a CRT price fixing cartel;"
  • "the price fixing conduct of LPD and the CRT subsidiaries that preceded it;" and
  • "its determination that certain Philips N.V. CRT subsidiaries engaged in illegal price fixing before the formation of LPD."

85 A.3d 725, 783-84 & n. 370 (Del. Ch. 2014). Of course, the Delaware court's holding that the Commission Decision has issue preclusive effect may itself be preclusive. *See* 28 U. S. C. § 1738

### c) Judge Conti found the EC Decision to be "relevant" and "important to this litigation" because the conduct at issue "indisputably overlaps" with this litigation

Judge Conti twice addressed the relevance and importance of the EC Decision. In March 2014, he found that the EC Decision was "relevant because . . .plaintiffs' allegations in this case have always concerned the international character of the alleged CRT conspiracy . . . ." Order (D.E. 2463) at 5, 7. In November 2014, Judge Conti found that "the Decision . . . remain[ed] important to this litigation," and despite the "extensive discovery [that] has taken place to date, the factual detail contained in the Decision is likely to be of significant value" to plaintiffs. Order (D.E. 3133) at 5. Indeed, Judge Conti found that "regardless of how the [EC] refers to the conspiracies in the Decision, the underlying conduct—price fixing in the CRT and CPT markets—***indisputably overlaps*** with the conduct at issue" in this litigation. *Id.*

### d) The Special Master's concluding the settlement value in this litigation was not impacted by the EC Decision is illogical and inconsistent with Judge Conti's findings.

Despite Judge Conti's findings that the EC Decision was "relevant" and "important to this this litigation" because it proceeded from a theory substantially identical to that urged by the plaintiffs and involved conduct that "indisputably overlaps" with this litigation, the Special Master concluded that settlement "was [not] generated in a meaningful way" by the EC Decision. R&R (D.E. 4351) at 58. That analysis is erroneous and unmoored from the record.

*First*, the Special Master accepted IPP Counsel's unsupported argument that "[t]he evidentiary value of a Statement of Objections is highly debatable." At least one federal court found a Statement of Objections admissible as evidence of antitrust liability, and neither IPP Counsel nor the Special Master identify any contrary authority. *See In re EPDM*, 681 F. Supp. 2d 141, 159, 180 (D. Conn. 2009)). It is enough that precedent exists for admitting such findings and that sophisticated litigants—such as the defendants—would take that possibility into account in ascertaining settlement value. More to the point, the **evidentiary** value of a Statement of Objections says little about the **preclusive** value of the EC Decision, which the *Vichi* court did, in fact, find to be preclusive of the existence of the conspiracies and Philips's involvement.

*Second*, after confusing the Summary Decision with the full EC Decision, the Special Master suggests that the EC Decision had limited value because it was not made public until December 5, 2014. R&R (D.E. 4351) at 58. Of course, that was a mere 15 days after Judge Conti found the EC Decision "remain[ed] important to this litigation" and was "likely to be of significant value . . . ." Order (D.E. 3133) at 5. In view of Judge Conti's findings, it is illogical to suggest that settlement value was not impacted by the publication of the EC Decision. Indeed, after over 7 years of litigation, Philips agreed to settle only 34 days after the EC Decision became publicly available, and it did so for **6.5 times** its earlier settlement in the supposedly easier DPP action.

3. **The Samsung SDI guilty plea and the European Commission Decision account for $160 million of the settlement fund.**

   a) **The Samsung SDI and Philips settlements are disproportionate to their market shares and are at vastly higher multiples of the DPP settlements than the other IPP settlements.**

In support of his objection, Mr. St. John submitted two documents showing CRT market share data. One document was a report by the Oregon DEQ. St. John Dec. Ex. 18 (D.E. 4018-18). The other document was an "Annual Results" presentation obtained directly from Philips. St. John Dec. Ex. 17 (D.E. 4108-17); St. John Dec. (D.E. 4108) at ¶ 23.

The Oregon report states that as of 1997, Philips was responsible for 5-10% of the CRT market and Samsung SDI was responsible for 10-15%. St. John Dec. Ex. 18 (D.E. 4018-18) at 8-9 & Table CRT8. The Philips presentation similarly indicates that as of 2001, Philips was responsible for 13% of the CRT market and Samsung SDI was responsible for 15%. *Id.* Ex. 17 (D.E. 4108-17) at 13.

But the Philips and Samsung SDI settlements represent 69.3% of the total IPP settlement fund, i.e., a discrepancy of over 40% compared to their market shares. That discrepancy suggests that approximately 40% of the Samsung SDI and Philips settlements, i.e., approximately $160 million, is attributable to exogenous factors such as the guilty plea and the EC Decision.

Consistent with inflation of the Samsung SDI and Philips settlements by factors other than IPP Counsel's efforts, those settlements are at a substantial premium vis-à-vis settlements in the supposedly easier DPP action: five of the IPP settlements were for 1.0 – 2.2 times the corresponding DPP settlements. In contrast, Philips's IPP settlement was **6.5** times its DPP settlement, and Samsung SDI's IPP settlement was **6.8** times its DPP settlement. The DPP settlements presumably took into account the differences in the strength of the cases against the various defendants as well as their differing market shares, leaving the outlier Philips and Samsung SDI multiples unexplained.

|  | DIRECT PURCHASERS | | INDIRECT PURCHASERS | | | |
|---|---|---|---|---|---|---|
| DEFENDANT | DATE | AMOUNT | DATE | AMOUNT | % | M |
| Chunghwa | 04/08/2009 | $10,000,000 | 04/08/2009 | $10,000,000 | 1.7 | 1.0 |
| Philips | 02/01/2012 | $27,000,000 | 01/26/2015 | **$175,000,000** | **30.3** | **6.5** |
| Panasonic | 06/04/2012 | $17,500,000 | 01/28/2015 | $70,000,000 | 12.1 | 4.0 |
| LG | 08/13/2012 | $25,000,000 | 05/28/2013 | $25,000,000 | 4.3 | 1.0 |
| Toshiba | 02/06/2013 | $13,500,000 | 03/06/2015 | $30,000,000 | 5.2 | 2.2 |
| Hitachi | 11/29/2013 | $13,450,000 | 02/19/2015 | $28,000,000 | 4.8 | 2.1 |
| Samsung SDI | 02/11/2014 | $33,000,000 | 04/01/2015 | **$225,000,000** | **39.0** | **6.8** |
| Thomson | 02/06/2015 | $9,750,000 | 06/10/2015 | $13,750,000 | 2.4 | 1.4 |
| TOTAL | | $149,200,000 | | $576,750,000 | | |

**b)** **Relying on Lead Counsel's review of unidentified sources to explain the disproportionate Samsung SDI and Philips settlements would be an abuse of discretion.**

To explain the disproportionate settlements, IPP Counsel submitted only a declaration by Mr. Alioto that "[b]ased upon [his] review, the Defendants' market shares changed fundamentally in the early 2000's . . . ." Alioto Dec. (D.E. 4373-1) at ¶ 6. But a declaration "[b]ased upon [Mr. Alioto's] review" of unidentified sources is not evidence based on his personal knowledge. It is no evidence at all. *See Local No. 490 v. Kirkhill Rubber*, 367 F.2d 956, 958 (9th Cir. 1966). The Special Master nevertheless quoted IPP Counsel's unsupported briefing, stating that "[L]ead Counsel

1  believes there was strong evidence of their conspiratorial activity within the U.S.," i.e., a fact

2  admitted by Samsung SDI in connection with its guilty plea, before concluding that "[t]hese factors

3  account for the higher settlement amount." R&R (D.E. 4351) at 58. Relying on such *ipse dixit* claims

4  by class counsel would be an abuse of discretion. *See, e.g.*, *In re Mercury Interactive*, 618 F.3d at 992; *In*

5  *re Wash. Pub. Power*, 19 F. 3d 1291, 1302 (9th Cir. 1994) (discounting class counsel's uncontroverted

6  affidavits based on conflict with the class at the fee stage). Even were the Court to accept Mr.

7  Alioto's declaration, IPP Counsel's argument would still be lacking.

8       *First*, Mr. Alioto's declaration curiously provides market share data only from 2004, i.e., very

9  late in the class period, when the overall CRT market was in free fall. Uniquely, IPP Counsel have

10  historic market share data for the defendants. *Compare* Netz Dec. (D.E.1527-1) at 36 & Exs. 1, 5, 10,

11  12 *with* Fee Mot. (D.E. 4071) at 17. Given IPP Counsel's unique access to that data, there is

12  evidentiary value in their decision to proffer cherry-picked data points rather than complete market

13  share data or damages calculations. *E.g., Interstate Circuit v. United States*, 306 U.S. 208, 226 (1939).

14       *Second*, Mr. Alioto avers that "[t]he settlement amounts paid by Samsung SDI and Philips are

15  entirely consistent with their market shares and the liability evidence." Alioto Dec. (D.E. 4373-1) at

16  ¶ 6. But there is no dispute that the liability case against Samsung SDI and Philips was stronger:

17  Samsung SDI pled guilty, and it expressly admitted to relevant U.S. activities and impact. St. John

18  Dec. Ex. 10 (D.E. 4108- 10) at ¶ 4. And both Samsung SDI and Philips were found by the EC to be

19  participants in the global CRT conspiracies, with the *Vichi* court holding that at least some of the

20  EC's findings are preclusive against Philips. Given that history, it would be problematic if those

21  settlements were ***not*** larger than the other settlements. It does not follow that IPP Counsel can

22  obtain fees based on the increased settlement value attributable to the DOJ and the EC.

23       *Third*, the DPP settlements presumably took into account market shares and the variations in

24  liability evidence properly attributable to plaintiffs' counsel. Mr. Alioto's averments do nothing to

25  explain the much larger multiples of the Samsung SDI and Philips settlements over their

26  corresponding DPP settlements vis-a-vis other defendants. The timing of those larger settlements—

27  each about a month after the EC Decision became public, after more than 7 years of litigation—

28  indicates that the EC Decision was a significant factor.

Dated: February 26, 2016                    Respectfully submitted,

                                            /s/ Joseph Scott St. John

                                            ANDREA VALDEZ (Cal. Bar No. 239082)
                                            530 S. Lake Avenue, No. 574
                                            Pasadena, CA 91101
                                            Tel: (626) 817-6547
                                            andrea.valdez.esq@gmail.com

                                            JOSEPH SCOTT ST. JOHN (*pro hac vice*)
                                            514 Mockingbird Drive
                                            Long Beach, MS 39560
                                            Tel: 410-212-3475
                                            jscottstjohnpublic@gmail.com

                                            *Attorneys for Objector Douglas W. St. John*