# EXHIBIT

# 4

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

——————————————————————
                                    )
IN RE:  CATHODE RAY TUBE            )
(CRT) ANTITRUST LITIGATION          )
——————————————————————)  No. 3:07-cv-05944-SC
                                    )  MDL No. 1917
This Document Relates to:           )
                                    )
ALL ACTIONS                         )
——————————————————————)

ORAL ARGUMENT HEARING

San Francisco, California

Tuesday, January 5, 2016

Reported by:
SUZANNE F. BOSCHETTI
CSR No. 5111

Page 2

```
 1        UNITED STATES DISTRICT COURT
 2        NORTHERN DISTRICT OF CALIFORNIA
 3
 4   _____
                              )
 5   IN RE:  CATHODE RAY TUBE    )
     (CRT) ANTITRUST LITIGATION   )
 6   _____) No. 3:07-cv-05944-SC
                              )  MDL No. 1917
 7   This Document Relates to:   )
                              )
 8   ALL ACTIONS              )
     _____)
 9
10
11
12
13
14
15        ORAL ARGUMENT HEARING held before Special
16   Master Martin Quinn, at JAMS, 2 Embarcadero
17   Center, Suite 1500, San Francisco, California,
18   beginning at 9:55 a.m. and ending at 1:17 p.m.,
19   on Tuesday, January 5, 2015, before SUZANNE F.
20   BOSCHETTI, Certified Shorthand Reporter No.
21   5111.
22
23
24
25
```

Page 3

```
 1  APPEARANCES:
 2
 3  JAMS
 4  BY:  MARTIN QUINN, SPECIAL MASTER
 5  2 Embarcadero Center, Suite 1500
 6  San Francisco, California 94111
 7  (415) 982-5267
 8
 9
10  For the Indirect Purchaser Plaintiffs Class:
11  TRUMP ALIOTO TRUMP & PRESCOTT, ATTORNEYS LLP
12  BY:  MARIO N. ALIOTO, ESQ.
13  BY:  LAUREN C. CAPURRO, ESQ.
14  2280 Union Street
15  San Francisco, California 94123
16  (415) 563-7200
17  marioalioto@tatp.com
18  laurenrussell@tatp.com
19
20
21
22
23
24
25
```

Page 4

```
 1  APPEARANCES (Continued):
 2
 3  FINE, KAPLAN AND BLACK, R.P.C.
 4  BY:  MATTHEW DUNCAN, ESQ.
 5  BY:  DONALD L. PERELMAN, ESQ.
 6  1 South Broad Street, 23rd Floor
 7  Philadelphia, Pennsylvania 19107
 8  (215) 567-6565
 9  mduncan@finekaplan.com
10  dperelman@finekaplan.com
11
12  FREEDMAN BOYD HOLLANDER GOLDBERG URIAS & WARD P.A.
13  BY:  JOSEPH GOLDBERG, ESQ.
14  20 First Plaza, Suite 700
15  Albuquerque, New Mexio 87102
16  (505) 244-7520
17  jg@fbdlaw.com
18
19  KIRBY McINERNEY LLP
20  BY:  ROBERT J. GRALEWSKI, JR., ESQ.
21  600 B Street, Suite 1900
22  San Diego, California 92101
23  (619) 398-4340
24  bgralewski@kmllp.com
25
```

Page 5

```
 1  APPEARANCES (Continued):
 2
 3  ZELLE HOFMANN VOELBEL & MASON LLP
 4  BY:  CRAIG C. CORBITT, ESQ.
 5  BY:  CHRISTOPHER T. MICHELETTI, ESQ.
 6  44 Montgomery Street, Suite 3400
 7  San Francisco California 94104
 8  (415) 693-0700
 9  ccorbitt@zelle.com
10  cmicheletti@zelle.com
11
12  STRAUS & BOIES, LLP
13  BY:  NATHAN CIHLAR, ESQ.
14  4041 University Drive, Fifth Floor
15  Fairfax Virginia 22030
16  (703) 764-8700
17  ncihlar@straus-boies.com
18
19  MILBERG LLP
20  BY:  PAUL F. NOVAK
21  719 Griswold, Suite 620
22  Detroit, Michigan 48226
23  (313) 309-1761
24  pnovak@milberg.com
25
```

2 (Pages 2 - 5)

Page 6

```
1  APPEARANCES (Continued):
2
3    KAG LAW GROUP
4    BY:  SYLVIE K. KERN, ESQ.
5    2532 Lake Street
6    San Francisco California 94121
7    (415) 221-5763
8    sylviekern@yahoo.com
9
10   ANDRUS ANDERSON LLP
11   BY:  JENNIE LEE ANDERSON (By telephone)
12   155 Montgomery Street, Suite 900
13   San Francisco, California 94114
14   (415) 986-1400
15   jennie@andrusanderson.com
16
17   BRAMSON, PLUTZIK, MAHLER & BIRKHAEUSER
18   BY:  DANIEL E. BIRKHAUSER (By telephone)
19   2125 Oak Grove Road, Suite 120
20   Walnut Creek, California 94598
21   (925) 945-0200
22   dbirkhaeuser@bramsonplutzik.com
23
24
25
```

Page 7

```
1  APPEARANCES (Continued):
2
3  For Objecting IPPs:
4    COOPER & KIRKHAM, P.C.
5    BY:  JOSEF COOPER, ESQ.
6    BY:  TRACY KIRKHAM, ESQ.
7    BY:  JOHN D. BOGDANOV, ESQ.
8    357 Tehama Street, 2nd Floor
9    San Francisco, California 94103
10   (415) 788-3030
11   jdc@coopkirk.com
12   trk@coopkirk.com
13
14   LAW OFFICES OF FRANCIS O. SCARPULLA
15   BY:  FRANCIS O. SCARPULLA, ESQ.
16   BY:  PATRICK CLAYTON, ESQ.
17   456 Montgomery Street, 17th Floor
18   San Francisco California 94104
19   (415) 788-7210
20   fos@scarpullalaw.com
21
22
23
24
25
```

Page 8

```
1  APPEARANCES (Continued):
2  For Excluded IPPs:
3    BONSIGNORE TRIAL LAWYERS, PLLC
4    BY:  ROBERT J. BONSIGNORE, ESQ.
5    3771 Meadowcrest Drive
6    Las Vegas, Nevada 89121
7    (781) 350-0000
8    rbonsignore@classactions.us
9
10 For Objectors Rockhurst University, Harry Garavanian and
11 Gary Talewsky:
12   THERESA D. MOORE, ATTORNEY AT LAW
13   BY:  THERESA D. MOORE, ESQ.
14   One Sansome Street, 35th Floor
15   San Francisco, CA 94104
16   (415) 434-8900
17   tmoore@aliotolaw.com
18
19 For Objector Douglas St. John:
20   JOSEPH S. ST. JOHN, ATTORNEY AT LAW
21   BY:  JOSEPH S. ST. JOHN, ESQ.
22   514 Mockingbird Lane
23   Long Beach, Mississippi 39560
24   (410) 212-3475
25   j.scott.stjohn.public@gmail.com
```

Page 9

```
1  APPEARANCES (Continued):
2
3  For Objectors John Finn and Laura Fortman:
4    THE KRESS LAW FIRM LLC
5    BY:  JOHN KRESS, ESQ. (By telephone)
6    4247 South Grand Boulevard
7    St. Louis, Missouri 63111
8    (314) 631-3883
9    jckress@thekresslawfirm.com
10
11   STEVE A. MILLER, ATTORNEY AT LAW (By telephone)
12   1625 Larimer St., No. 2905
13   Denver, CO 80202-1539
14   sampco1@gmail.com
15
16 For Objector Sean Hull:
17   BANDAS LAW FIRM, P.C.
18   BY:  CHRISTOPHER A. BANDAS, ESQ. (By telephone)
19   500 N. Shoreline Boulevard, Suite 1020
20   Corpus Christi, Texas 78401
21   (361) 698-5200
22   cbandas@bandaslawfirm.com
23
24
25
```

3 (Pages 6 - 9)

Page 10

1 APPEARANCES (Continued):
2 For Hitachi Defendants:
3   KIRKLAND & ELLIS LLP
4   BY:  ELIOT A. ADELSON, ESQ.
5   555 California Street
6   San Francisco California 94104
7   (415) 439-1313
8   eadelson@kirkland.com
9
10 For Samsung SDI Defendants:
11   SHEPPARD MULLIN RICHTER & HAMPTON LLP
12   BY:  MICHAEL W. SCARBOROUGH, ESQ.
13   Four Embarcadero Center, 17th Floor
14   San Francisco California 94111-4109
15   (415) 434-9100
16   mscarborough@sheppardmullin.com
17
18 For Philips Defendants:
19   BAKER BOTTS LLP
20   BY:  ERIK T. KOONS, ESQ.
21   BY:  JOHN TALADAY, ESQ. (By telephone)
22   1299 Pennsylvania Avenue, NW
23   Washington, D.C. 40004-2400
24   erik.koons@bakerbotts.com
25   john.taladay@bakerbotts.com

Page 12

1 APPEARANCES (Continued):
2
3 For Chunghwa Picture Tube Defendants:
4   GIBSON DUNN & CRUTCHER LLP
5   BY:  RACHEL S. BRASS, ESQ. (By telephone)
6   555 Mission Street
7   San Francisco, California 94105--0921
8   (415) 393-8293
9   rbrass@gibsondunn.com
10
11 For the State of California:
12   DEPARTMENT OF JUSTICE
13   OFFICE OF THE ATTORNEY GENERAL
14   BY:  EMILIO VARANINI, ESQ.
15   455 Golden Gate Avenue, Suite 11000
16   San Francisco California 94102-7002
17   (415) 703-5908
18   emilio.varanini@doj.ca.gov
19
20
21
22
23
24
25

Page 11

1 APPEARANCES (Continued):
2 For Panasonic Defendants:
3   WINSTON & STRAWN LLP
4   BY:  MARTIN C. GEAGAN, ESQ.
5   200 Park Avenue
6   New York, New York 10166
7   (212) 294-4615
8   mgeagan@winston.com
9
10 For Thomson Defendants:
11   FAEGRE BAKER DANIELS LLP
12   BY:  KATHY L. OSBORN, ESQ. (By telephone)
13   300 N. Meridian Street, Suite 2700
14   Indianapolis, Indiana 46204
15   (317) 237-8562
16   kathy.osborn@faegrebd.com
17
18 For Toshiba Defendants:
19   WHITE & CASE LLP
20   BY:  CHRISTOPHER M. CURRAN, ESQ. (By telephone)
21   BY: J. MARK GIDLEY, ESQ. (By telephone)
22   701 Thirteenth Street, NW
23   Washington D.C. 20005-3807
24   (202 )626-3609
25   ccurran@whitecase.com

Page 13

1 APPEARANCES (Continued):
2
3 For Direct Purchaser Plaintiffs Class:
4   SAVERI & SAVERI, INC.
5   BY:  GUIDO SAVERI, ESQ.
6   706 Sansome Street
7   San Francisco, California 94111
8   (415) 217-6810
9   guido@saveri.com
10
11 Also Present:
12   MARLA COHEN, ESQ.:  Research Attorney
13
14
15
16
17
18
19
20
21
22
23
24
25

4 (Pages 10 - 13)

Page 14

1   San Francisco, California; Tuesday, January 5, 2016
2       10:09 a.m.
3       ---o0o---
4
5       SPECIAL MASTER:  Good morning.  I'd like you to
6   identify yourselves for my benefit if not the court
7   reporter's.  That would be good.
8       MR. ALIOTO:  Good morning.  Mario Alioto, lead
9   counsel for the indirect purchasers.
10      SPECIAL MASTER:  Okay.  And everyone has to
11  speak up, you know, without yelling at each other.  But
12  we have to almost yell at each other because we not only
13  have to be sure Ms. Cohen and I hear, but the people on
14  the phone have to hear.
15      MS. CAPURRO:  Good morning, Your Honor.  Lauren
16  Capurro for the indirect purchaser plaintiffs.
17      MR. DUNCAN:  Good morning, Your Honor.  Matthew
18  Duncan from Fine, Kaplan and Black in Philadelphia for
19  the IPPs.
20      MR. GOLDBERG:  Good morning, Mr. Quinn.  My
21  name is Joe Goldberg from Freedman Boyd Hollander
22  Goldberg Urias & Ward in Albuquerque, New Mexico, for
23  the IPPs.
24      SPECIAL MASTER:  I was just there.
25      MR. GOLDBERG:  So was I.

Page 15

1       MS. KIRKHAM:  Good morning.  Tracy Kirkham of
2   Cooper & Kirkham on behalf of the objecting indirect
3   purchaser plaintiffs.
4       MR. COOPER:  Josef Cooper, the second half of
5   the firm.
6       MR. SCARPULLA:  Francis Scarpulla, Your Honor,
7   from the Law Offices of Francis Scarpulla in
8   San Francisco for the same objectors.
9       MR. BONSIGNORE:  Robert Bonsignore on behalf of
10  the excluded plaintiffs.  Excuse me for yelling.
11      MR. ADELSON:  Eliot Adelson of Kirkland & Ellis
12  for Hitachi.
13      MR. SCARBOROUGH:  Michael Scarborough of
14  Shepard Mullin for the Samsung SDI defendants.
15      MR. KOONS:  Erik Koons, Baker Botts, on behalf
16  of Philips defendants.
17      MR. GEAGAN:  Martin Geagan, Winston & Strawn,
18  on behalf of the Panasonic defendants.
19      MR. CORBITT:  Good morning, Your Honor.  Craig
20  Corbitt for the IPPs.
21      MR. CIHLAR:  Nathan Cihlar from Straus & Boies
22  for the IPPs.
23      MR. NOVAK:  Paul Novak of Milberg for the IPPs.
24      MR. ST. JOHN:  Joseph St. John for objector
25  Douglas St. John.

Page 16

1       MS. MOORE:  Theresa Moore for objectors
2   Rockhurst University, Garavanian and Talewsky.
3       MR. VARANINI:  Emilio Varanini on behalf of the
4   California Attorney General's Office.
5       MR. SAVERI:  Guido Saveri.  I'm the lead
6   counsel for the direct purchasers.  I do not intend to
7   participate.  I'm here just as an observer, but I see a
8   lot of my friends here that I haven't seen for years.
9   Mr. Goldberg and the whole crowd, it's nice to see you.
10  Nice to see you again.  You have your problems.  The
11  direct purchase plaintiffs, as you know, are all
12  finished, and we're here to see what's going on.
13      SPECIAL MASTER:  Thank you.
14      MR. SAVERI:  Nice to see you.  I'd like to see
15  several of you later and renew old acquaintances.
16      SPECIAL MASTER:  We appreciate the support.
17      MS. KERN:  Sylvie Kern for the indirect
18  purchaser plaintiffs.
19      MR. GRALEWSKI:  Bob Gralewski, Kirby McInerney,
20  on behalf of the indirect purchaser plaintiffs.
21      MR. MICHELETTI:  Chris Micheletti with Zelle on
22  behalf of the IPPs.
23      MR. PERELMAN:  Don Perelman, Fine, Kaplan and
24  Black, for the IPPs.
25      MR. BOGDANOV:  John Bogdanov with Cooper &

Page 17

1   Kirkham, objecting IPPs.
2       MR. CLAYTON:  And Patrick Clayton from the Law
3   Offices of Francis O. Scarpulla for the objecting IPPs.
4       SPECIAL MASTER:  All right.  And on the phone,
5   if you could announce yourselves.
6       MR. BANDAS:  Chris Bandas for objector Sean
7   Hull.
8       MS. OSBORN:  This is Kathy Osborn for
9   defendants, the Thomson defendants.
10      MS. BRASS:  This is Rachel Brass for the
11  Chunghwa Picture Tube defendants.
12      SPECIAL MASTER:  Thank you.
13      MR. HOAG:  You have Frank Hogue and Chris
14  Curran from White & Case on behalf of the Toshiba
15  defendants.
16      MR. TALADAY:  John Taladay from Baker Botts on
17  behalf of the Philips defendants.
18      MR. KRESS:  John Kress on behalf of John Finn
19  and Laura Fortman.
20      SPECIAL MASTER:  Mr. Kress, who are you
21  representing?
22      MR. KRESS:  John Finn and Laura Fortman.
23      SPECIAL MASTER:  All right.
24      MR. BIRKHAEUSER:  One more, Your Honor.  Dan
25  Birkhauser of Bramson, Plutzik, Mahler & Birkhaeuser on

5 (Pages 14 - 17)

Page 18

1 behalf of the IPPs.
2     MS. ANDERSON:  And Jennie Lee Anderson of
3 Andrus Anderson on behalf of IPPs.
4     MR. MILLER:  And Steve Miller, co-counsel with
5 John Kress on behalf of Finn and Fortman.
6     SPECIAL MASTER:  All right.  Anyone else on the
7 phone who has not announced himself or herself?
8     All right.  Here comes the email address from
9 the court reporter.
10     (Reporter complies.)
11     SPECIAL MASTER:  Did everyone get that?
12     All right.  So there is no perfect way to run a
13 hearing like this.  I think what I'd like to do is go
14 issue by issue and take up, you know, the various issues
15 that are on my mind, and then at the end give you an
16 opportunity to raise any issues that we haven't covered.
17 And in no particular order, I've just jotted down five
18 issues that I'd like to cover.
19     First, the first is an issue that nobody raised
20 except me, which is is it premature for the special
21 master to be issuing a report and recommendation on the
22 appropriateness of the settlement when there's a motion
23 pending to appoint co-lead counsel that would
24 potentially impact that -- that -- you know, the
25 fairness and reasonableness of the settlement.

Page 19

1     Second, the issue of the appropriateness of
2 releasing the class members in non-repealer states and
3 releasing the class members in the three repealer states
4 that were omitted from the litigation class.
5     Third, the issue of the adequacy of the notice.
6     Fourth, issues that have been raised by
7 objectors relating to the Chunghwa settlement.
8     And fifth, the issue raised by the Attorney
9 General of -- as to whether the claim deadline should be
10 extended and other issues that the Attorney General has
11 raised in her statement of interest.
12     So those are the top items on my hit list, and
13 then we can certainly discuss anything after that.  For
14 those who haven't appeared before me, I mean, just
15 realize that Ms. Cohen and I have read all the briefs.
16 I get sort of restive when people repeat what's in their
17 briefs, particularly if they do so at great length.  So
18 please, you know, try to keep your -- your comments
19 succinct.
20     There are a lot of people who probably want to
21 talk today, and I want to have the chance to give
22 everybody a full and fair hearing.  On the other hand,
23 we have a lot to do to get this report and
24 recommendation in shape, and I don't want to spend an
25 unreasonable amount of time in an oral hearing.  So

Page 20

1 that's just words of caution.
2     So I guess I'd like to ask Mr. Cooper and/or
3 Mr. Scarpulla, is it premature for me to submit a report
4 and recommendation on these issues on the 15th when you
5 are going to have a hearing, I believe on January 17, on
6 your motion to be appointed co-lead counsel to represent
7 the interests of class members in -- in non-repealer
8 states?
9     MR. COOPER:  I guess we have debated that issue
10 back and forth, Your Honor, as to what to do before we
11 filed.  We debated that question before we filed a
12 motion.  And we know the schedule is the one that is
13 set, and we have not asked the court to change the
14 schedule or asked you to change the schedule.  We do not
15 have any intention, if appointed co-lead counsel, of
16 doing anything other than proceeding with the objections
17 which have been advanced.
18     So we would be proceeding with those objections
19 with or without the designation.  The defendants raised
20 the question in response to the motion to be appointed
21 as to whether we would be withdrawing from the
22 settlements.  And we said, you know, finally we filed
23 that we can't withdraw from a contract that Mr. Alioto
24 entered into.
25     We can object, and we can be the court

Page 21

1 designated people to actually advance and advocate for
2 this group, this large group of people, the non-repealer
3 states that have not had anyone advocating for them
4 where their rights and the interests have been
5 abandoned.  We think that the objections would be the
6 same.  So I don't think it would make any difference
7 whether you delayed or don't delay.  You would be
8 facing the same questions and issues.
9     SPECIAL MASTER:  Well, I mean, hypothetically
10 -- and I appreciate this isn't an issue for me, it's for
11 Judge Tigar, but hypothetically, if you were appointed
12 in some capacity, co-lead counsel or allocation counsel
13 or something, you know, would you want to do due
14 diligence?  Would you want to do discovery?  Would you
15 want to say to the court we object to the special
16 master's report and recommendation that just came out
17 two days ago and we essentially want a do-over?
18     MR. COOPER:  Well, we have -- we have a
19 schedule for objecting if necessary or we decide to, you
20 know, report recommendations.  The objections that we've
21 logged are the same.  It's showing that as has been made
22 by Mr. Alioto with regard to the propriety and adequacy
23 of the settlement is presumably the same.
24     We've asked for discovery with regard to the
25 fee matters, and I realize we're not doing that.  I

Page 22

1 believe some people have asked for discovery. But
2 there's been a showing, such as it is, with regard to
3 the adequacy of the settlement and why nothing is being
4 recovered in any way, shape or form for the non-repealer
5 state people. Those arguments are the same whether we
6 have the designation of co-lead counsel or not.
7     SPECIAL MASTER: Okay. So I take it your
8 answer is, to my question is no. It's not premature. I
9 should go ahead and issue the report and the
10 recommendation on the -- on the same schedule?
11     MR. COOPER: I guess that's the answer, yes.
12 Yes, it might be premature for other reasons. For
13 example, we've suggested with regard to the notice that
14 you ought to have an independent expert who can
15 actually, from an expert's perspective, evaluate the
16 notice issues that, to my knowledge, we've not acted on
17 that in any way. So that might be one reason why you
18 would -- it would be appropriate to do it.
19     But I guess what I'm trying to say is the
20 objections are the objections. If you feel that there's
21 a reason why designation as co-lead counsel -- and the
22 co-lead was to be Mr. Scarpulla and myself for this
23 group of people. It wasn't that we would be co-lead
24 with Mr. Alioto for the entire --
25     SPECIAL MASTER: I understand.

Page 23

1     MR. COOPER: Yeah.
2     SPECIAL MASTER: Mr. Scarpulla?
3     MR. SCARPULLA: Yes, Your Honor, just to follow
4 up on that. It probably makes a difference what Judge
5 Tigar does in terms of the responsibilities of any
6 co-leads if he decides to appoint them. So it might be
7 a good idea to ask him what -- what he wants.
8     MR. COOPER: I think it's clear from our answer
9 to your question, Your Honor, that there's some
10 ambivalence about that question which, as I said when we
11 started, we debated about as to whether that would or
12 would not be the appropriate way. And we came down on
13 the side of not asking the schedule be changed.
14     SPECIAL MASTER: Okay.
15     MR. COOPER: But we're acknowledging, I guess,
16 the legitimacy of your inquiry.
17     SPECIAL MASTER: Okay. Thank you.
18 Mr. Alioto?
19     MR. ALIOTO: Yes, thank you, Your Honor.
20 There's no ambivalence on our side. This matter is
21 squarely before Your Honor. There's a court order
22 scheduled in place. There's been no request for relief
23 to delay things. A lot of this matter is going to have
24 to be reviewed again by Judge Tigar de novo. The matter
25 is ripe. The matter is tee'd up. No ambivalence at all

Page 24

1 about it. We need to address the issues right now.
2     SPECIAL MASTER: All right. Thank you. At the
3 end of the table?
4     MR. BONSIGNORE: Can you hear me?
5     SPECIAL MASTER: Mr. Bonsignore, yes.
6     MR. BONSIGNORE: Okay. I didn't want to yell
7 again. My name is Robert Bonsignore, and I also put in
8 a request to be appointed co-lead. I would say that it
9 is premature because once the co-leads are appointed,
10 they have an interest to streamline the issues and also
11 to revisit what's been filed. Also a lot of things
12 weren't done. I personally think that it's premature,
13 especially given the authority that Judge Tigar is
14 likely, given the typical powers of appointment, the
15 powers that Judge Tigar is likely to give the co-leads
16 for these excluded plaintiffs.
17     So I take the opposite position of Mr. Cooper.
18 In framing the issue, you listed everything that I would
19 have put out there, and so I'm not going to bother
20 repeating myself -- yourself, rather.
21     SPECIAL MASTER: And just remind me. When did
22 you make this request to be appointed co-lead counsel?
23     MR. BONSIGNORE: Just -- I'll pull it up.
24     SPECIAL MASTER: So it was -- it was in --
25     MR. COOPER: It was in a reply brief.

Page 25

1     MS. KIRKHAM: It was on the schedule for the
2 opposition/response, that it was a joinder and request
3 -- a joinder in our motion and request to be added as
4 another lead counsel.
5     MR. BONSIGNORE: It was either December 24th or
6 25th because I remember the preparation was less
7 than popular in my office.
8     MR. COOPER: It was December 28th. It was
9 December 28th, the due date for the oppositions.
10     MS. MOORE: Your Honor?
11     SPECIAL MASTER: Ms. Moore.
12     MS. MOORE: First of all, I think the court has
13 changed the date of the hearing on the motion for
14 co-lead counsel to the 21st. So there's a little bit
15 more time. And I think that the court would be --
16     SPECIAL MASTER: There's more time for the
17 judge. There's not more time for me.
18     MS. MOORE: No more time for you.
19     It seems to me the judge would be interested in
20 hearing or seeing your report, and I think that that
21 would inform him on the motion.
22     SPECIAL MASTER: All right. Anyone else have
23 any thoughts on this before we get down --
24     MR. BONSIGNORE: I object to her logic. I
25 think it's self-serving and makes no sense to me.

7 (Pages 22 - 25)

Page 26

1    SPECIAL MASTER: Noted.
2        All right. All right. Let's move on then.
3 Thank you for that. Let's move on then to the issue of
4 the appropriateness of -- well, let me first ask a
5 preliminary question.
6        Mr. Alioto seemed to suggest in I think his
7 most recent filing that it might be possible to separate
8 the approval of the settlement amount with the
9 defendants, that is, the approval of the total amount of
10 the settlement as being fair, adequate and reasonable
11 and somehow separate or defer -- I wasn't quite sure
12 what was being suggested -- the issue of the fairness,
13 reasonableness and adequacy of the allocation plan.
14        Mr. Alioto, just before we get to the merits of
15 that issue, what did you have in mind there?
16    MR. ALIOTO: Well, what I had in mind was this,
17 Your Honor. The starting point for these settlements is
18 the settlement agreements themselves. That sets out all
19 of the essential terms of the settlements. That's what
20 we referred to as the settlement.
21        The plan of allocation is something that we,
22 the indirect purchaser lawyers, have put together. It's
23 something that in our best judgment will effectuate the
24 settlements. This is not all spelled out. This plan of
25 allocations, the releases, the notice provisions, the

Page 27

1 various -- the various terms attendant to the underlying
2 settlements, they're not set out anywhere. This is a
3 plan devised by indirect purchaser counsel in
4 consultation with experts and notice experts.
5        And what I meant to suggest there is that this
6 plan of allocation is reasonable. This plan is
7 sustainable. This plan ought to be implemented. $576
8 million ought to be distributed to the claimants, but
9 our broader goal is to get something done. And to the
10 extent Your Honor feels that yes, it's reasonable, but
11 I'd like to adopt plan B, which is also reasonable, or
12 plan C, which is also reasonable -- I have no pride of
13 authorship here. I'm not dug in. My goal is to get
14 this settlement approved.
15        That's what the thought is there when we cited
16 that law to you that says there's the underlying
17 settlements and there's the plan. There may be
18 different ways to get this done to get everybody happy.
19 I don't -- I certainly am not advocating for these other
20 ways, but if those other ways meet due process and
21 they're fair and reasonable and we can accommodate
22 somebody's concerns, we're more than willing to do that
23 to get this done.
24        SPECIAL MASTER: So hypothetically, and I
25 really mean hypothetically, would it create any problems

Page 28

1 in your mind if -- if I were to say all right, the
2 settlement vis-à-vis the defendants is fair, adequate
3 and reasonable. $576 million, given all the factors
4 that you're supposed to consider, is an appropriate
5 settlement, but the plan of allocation proposed is
6 faulty in these ways. That would have the result of not
7 sending you back to the negotiation table with the
8 defendants, but it would require you to do some in-house
9 tinkering perhaps with the allocation plan.
10        And I -- by suggesting it, I do not mean to
11 suggest I am headed in that direction. I just throw
12 that out -- I just want to know if -- would that create
13 any procedural or legal problems if I were to proceed
14 that way?
15        MR. ALIOTO: Yes. No, that would be welcome.
16 One part of that would not be welcome was -- would be if
17 you were to come to the conclusion that our proposal was
18 not reasonable and not adequate, that -- that would
19 cause some concern.
20        But to the extent you felt that there were
21 other reasonable ways to approach this or other ways to
22 get this settlement approved and accommodate the
23 interests of objectors and the attorney general, we
24 would be open to that, and we would welcome this kind of
25 piecemeal approach, the underlying settlement approved,

Page 29

1 then get on to the approval of the allocation. And I'm
2 not saying that has to be months apart. But --
3        SPECIAL MASTER: Well, the settlement
4 officially as proposed under this hypothetical would not
5 be approved. The terms of the settlement vis-à-vis the
6 defendants would be approved, but you would have to go
7 back and propose another plan of allocation to fix
8 whatever defects I found.
9        MR. ALIOTO: Yes. And again, I don't know that
10 you could -- you could identify matters that could be
11 addressed and solved in different ways. And I'm sure we
12 could put our heads together and come up with something
13 that's very close to what we proposed and that would
14 moot concerns.
15        SPECIAL MASTER: Okay.
16        MR. ALIOTO: I mean --
17        SPECIAL MASTER: So I don't -- anyone else have
18 any thoughts about this? What about the defendants? If
19 I were to proceed that way, would that cause any
20 heartburn for the defendants?
21        MR. SCARBOROUGH: Your Honor, Mike Scarborough
22 for the Samsung SDI defendants, and I'll attempt to
23 articulate a general defense consensus.
24        I think what Your Honor outlined would be

8 (Pages 26 - 29)

Page 30

1  constructive, and I think it would be welcome for our
2  side.  Our primary interest is in getting the
3  agreements, the contracts that we entered into approved
4  in terms of the amount of money being paid collectively
5  and the releases that we bargained for being approved as
6  fair, adequate and reasonable.
7        And we do believe that the allocation issues
8  logically can come later, later down the line.  And so
9  we would like to get at least past that first hurdle of
10  the underlying agreements vis-à-vis the defendants are
11  fair, adequate and reasonable and deserving of a final
12  approval.
13        And we do view many of the objections as really
14  going to allocation issues, and as a general matter we
15  don't have a problem with some tinkering being done to
16  the plan of allocation proposed by lead counsel.
17        SPECIAL MASTER:  Okay.  Mr. Scarpulla.
18        MR. SCARPULLA:  Yes, Your Honor.  On that --
19  first of all, I think I heard Mr. Scarborough say
20  something about the releases.  That's a different issue
21  than the amount of money because the releases, of
22  course, release claims by half the country for zero
23  consideration.
24        SPECIAL MASTER:  No, but -- I'm sorry to
25  interrupt.  But I mean hypothetically, you could say the

Page 31

1  releases are appropriate, but there's got to be some
2  compensation paid to those people --
3        MR. SCARPULLA:  Correct.
4        SPECIAL MASTER:  -- which is not an issue, I
5  take it, that would bother the defendants.  They don't
6  care how the money -- to whom the money is paid, they
7  just want their releases.
8        MR. SCARPULLA:  Yes, Your Honor, that is
9  correct, and I was getting to that point, which would
10  mean that the amount of money is therefore not
11  sufficient because you'd be spreading it out -- if they
12  settle for half the country, not the whole country, then
13  you'd be spreading it out over the whole country.  You'd
14  have to give new notice to everybody.  I mean, there are
15  all those issues.
16        And remember, as Your Honor may recall in LCDs,
17  we settled that case, including for the states,
18  $1.1 billion.  The conspiracy here was of longer
19  duration.  There were hundreds of meetings throughout
20  the world.  Hundreds more than in LCDs.  The affected
21  commerce was much larger, and the settlement was half
22  that amount and excluded three repealer states.  So if
23  you include them in, you'll have to get more money from
24  somewhere, Your Honor, to --
25        SPECIAL MASTER:  Okay.  Got it.

Page 32

1        MR. COOPER:  Can I supplement?  Maybe I'm
2  saying the same thing in a different way.  In order to
3  --
4        SPECIAL MASTER:  Try not to.
5        MR. COOPER:  In order to rule on the adequacy
6  of a settlement, you have to know what claims you're
7  settling.  Here we know that the claims of over half the
8  country were valued at zero.  And it seems very clear
9  from everything that's gone on, the amount of money that
10  was paid was paid for those claims which Mr. Alioto felt
11  had merit.  Nothing was paid for those claims which had
12  no merit in Mr. Alioto's view.
13        So if you're now going to pay money to those
14  people, you've got to take it away under that procedure
15  from the claimants whose claims were being settled for a
16  fixed amount of money, which reduces it by $1 or more,
17  reduces the amount available.
18        There's been however many notices that have
19  gone out that have told people if you're not in those 21
20  jurisdictions, you're not going to get paid.  You'd have
21  to be renoticing, seeing what objections there would be.
22        Now it might be possible to say that amount of
23  money takes care of the claims in 22 jurisdictions and
24  get rid of the national class and leave those
25  non-repealer people on to their own devices, to have a

Page 33

1  different counsel represent them, attempt to get class
2  certification or whatever went on; to litigate the
3  issues of whether they have claims, or, as Mr. Alioto
4  says, they have no claim.
5        But to try to separate them here without
6  knowing how much money that's going to go to those
7  people, whether that now leaves an adequate amount for
8  the non-repealer states and for the repealer states --
9  you know, are they going to get one dollar, are they
10  going to get 50 percent of the money.  You'd need to
11  know all of those issues to be able to evaluate the
12  adequacy of the settlement.  So what claims are being
13  settled is the first question.
14        SPECIAL MASTER:  Okay.  I don't want to spend
15  any more time on this.  Anyone have something new that
16  hasn't been said before?
17        Ms. Moore.
18        MS. MOORE:  Your Honor, in order to approve the
19  settlement, there's certain foundational evidence that
20  needs to be in the record, and one of the things that
21  needs to be is that everything is valued, and not all
22  the claims are valued.
23        There was nothing in the record that any of
24  these other claims were valued, any of these states that
25  were left out or any of these non-repealer or repealer

9 (Pages 30 - 33)

Page 34

1  states that were left out.  There was no evidence that
2  they were considered and valued.  Not until later on in
3  the reply after it was attacked did they say oh, there
4  was no value.
5      So essentially they didn't consider them at
6  all, which makes the $576 million completely
7  inappropriate.  And so you can't approve the settlement
8  at that amount when all of these people being released
9  were never even looked at and valued.
10     SPECIAL MASTER:  Okay.
11     MR. SCARPULLA:  Excuse me.  There's one other
12  thing I think that Judge Tigar raised in the directs
13  maybe about evidence of what each class member would get
14  if there had been a successful trial as opposed to how
15  much they get in this settlement.  And I don't recall
16  seeing that in the record yet.
17     MS. MOORE:  No, it has not come up in the
18  record, and we've asked multiple times.  In LCD we knew
19  exactly what each panel -- the damages were for each
20  panel, for each claimant.  So knowing the claims rate
21  and knowing the value of each is vitally important to
22  valuing the settlement.  And you can't approve the
23  settlement without that information.  And to this day,
24  it's still not in the record.  But we know that when
25  Janet Netz made her expert report and valued the whole

Page 35

1  case at $2.7 billion, there must have been an individual
2  damage analysis, which I know there was in LCD.
3      SPECIAL MASTER:  Did you want to respond to
4  that?
5      MR. ALIOTO:  Well, no.  We have certain issues
6  that we came prepared to address, and one of the things
7  that has not been addressed by objectors is the amount
8  of the settlement and the comparability to LCD and did
9  we get enough money.  I just want to note for the record
10  we -- we have enough issues to discuss here today.
11  That's something that has not been raised.
12     SPECIAL MASTER:  But the point --
13     MS. MOORE:  Well, it was raised.
14     SPECIAL MASTER:  Wait, wait.  The point that's
15  being made by Ms. Moore is you can't just -- the court
16  can't just say:  Okay, 576 million, that's a lot of
17  money, that's okay.
18      You have to know or have some sense of the
19  range of the value of each individual class member's
20  claim.  And they may be different values depending on
21  how they're situated and what they're going to get in
22  the settlement so that you can compare what a class
23  member would have gotten if they went to trial with what
24  they're getting in the settlement.  And Ms. Moore says
25  there's nothing to that effect in the record.

Page 36

1      MR. ALIOTO:  I'm pretty sure there is, Your
2  Honor.  And I know this for a fact, that we did that
3  analysis.  Our expert Janet Netz did that analysis.
4  What was the overcharge on tubes and monitors?  It was a
5  higher overcharge.  What was the overcharge on tubes in
6  small televisions?  What was the overcharge on tubes in
7  large televisions?  All of that analysis was done.
8      SPECIAL MASTER:  And is in her report --
9      MR. ALIOTO:  Yes.
10     SPECIAL MASTER:  -- which is in the record.
11     MR. ALIOTO:  Is in the record.  And it may have
12  also been cited when we filed our motion for preliminary
13  approval -- I'm going back a little ways here, but in
14  the northern district there is a rule that as part of a
15  preliminary approval motion, you have to make a -- as
16  part of your prove-up you have to show the damages and
17  the range of damages, and I'm quite sure that that
18  showing was made in our original papers.
19     SPECIAL MASTER:  All right.
20     MS. MOORE:  Your Honor --
21     MR. ALIOTO:  That's our response to that.
22     MS. MOORE:  It wasn't -- it's the panel --
23     SPECIAL MASTER:  You know, we've got to get on
24  with the meat of the objections here.
25     MS. MOORE:  Actually --

Page 37

1      SPECIAL MASTER:  I don't want to go on much
2  longer on this.
3      MS. MOORE:  May I say one thing?
4      SPECIAL MASTER:  Yes.
5      MS. MOORE:  It is important to this meet the
6  settlement.  You need the dollar amount per panel.  So
7  we know that for a panel it was $65 in damages in LCD.
8  We don't have that number in this case, so we can't
9  evaluate it.
10     MR. COOPER:  I would just request that Mr.
11  Alioto -- we're not aware of where Ms. Netz's report,
12  damage study report for trial is in the record.  So I'm
13  not certain what he's referring to.
14     SPECIAL MASTER:  Was her -- wait, please.
15      Was her deposition taken?
16     MR. ALIOTO:  Yes.
17     MR. COOPER:  And filed -- they're not filed.
18  They're not in the clerk's office.  They weren't filed.
19  They're not available to generally -- generally to
20  people.  We never saw them.  We're lawyers in the case,
21  and we weren't allowed to see them.
22     SPECIAL MASTER:  Was her report not made an
23  exhibit to her deposition?
24     MR. ALIOTO:  It was -- it was an exhibit to her
25  deposition.

10 (Pages 34 - 37)

Page 38

1    MR. COOPER:  The deposition was confidential.
2    MR. ALIOTO:  But they're counsel of record.
3 They've signed the protective order.
4    SPECIAL MASTER:  All right.
5    MS. CAPURRO:  It's also in the record.  It was
6 filed as part of our opposition to summary judgment.
7    MR. COOPER:  Not an unredacted --
8    SPECIAL MASTER:  Was there a -- was there a --
9    MS. CAPURRO:  And it's also referenced in --
10    SPECIAL MASTER:  Was there a Daubert motion?
11    MR. ALIOTO:  Yes.
12    SPECIAL MASTER:  There was a Daubert motion.
13 So guess who ruled on it?  And so I certainly saw her
14 report.
15    MR. ALIOTO:  And when those are filed, Your
16 Honor, they're not in the court record, they're under
17 seal in the court record, but they go by separate email
18 to all of the indirect purchaser counsel because they're
19 parties to the protective order.  So these folks have
20 all that information.
21    SPECIAL MASTER:  Okay.
22    MR. BONSIGNORE:  I just -- make -- I did not
23 get it by email at all.  The information that would be
24 helpful to me in relationship to a case that I had that
25 was -- that we actually succeeded in doing what you're

Page 39

1 proposing was the claims rate.  We don't have any
2 information yet on the claims rate.  We don't know if
3 there's a surplus or whether people will get a cut down.
4 The excluded states, according to the terms of the
5 settlement agreement, you'd have to very carefully craft
6 language that would not cause them to waive their rights
7 to proceed in economic recovery.  And I'm just going to
8 cut it there.
9    Just with a grain of salt, I approached Mr.
10 Alioto at least a dozen times before today and asked him
11 to let's talk about it.  And although he's wide open to
12 the suggestion today, which is very positive, very good,
13 maybe it was something that you said, but before today,
14 he had dug in and wasn't going to change anything.  So
15 this is -- you've already made progress.
16    SPECIAL MASTER:  All right.  So the next issue
17 really I want to talk about is the merits of the -- are
18 the merits of the objections that have been raised as to
19 the failure of the allocation plan with any monetary
20 compensation to the residents or the purchasers in the
21 non-repealer states and the three omitted repealer
22 states.
23    So I really don't need all those arguments
24 repeated, but if there's someone has something eloquent
25 to say -- Ms. Kirkham, I see you're raising your hand.

Page 40

1    MS. KIRKHAM:  I'll work on eloquent here and
2 brevity.  Brevity perhaps more important than eloquence.
3    In the adequacy -- the adequacy of the
4 settlement with regard to the non-repealer state claims,
5 where we begin is with lead counsel's repeated
6 statements that they value the claims as zero.  So I
7 think we can agree that that's been established as a
8 fact.
9    We know that, for example, the 500 plus million
10 dollar settlement is compared in their papers to Dr.
11 Netz's $2.8 billion damage number.  That number is for
12 the 21 damage class states.  So those are the purchases
13 that occurred in those states.  We don't know -- we
14 could compute it if we actually had a per panel and some
15 information about sales of what it is in the other
16 states, but I don't believe Dr. Netz ever did that.
17    So we have, so we're beginning with the idea
18 that what we have, what you have before you and the real
19 fundamental question you have before you really is are
20 those claims valueless.  Are they meritless.  And are
21 they so demonstratively meritless that without affording
22 the possessors of those claims, the due process under
23 Rules 12 or 56, you can say that they should be released
24 here.  They should be dismissed with prejudice because
25 the effect of approving this settlement is exactly the

Page 41

1 same effect as a ruling on summary judgment on those
2 claims or a ruling on Rule 12 on those claims.
3    So that's essentially what you're doing, but
4 not in -- not affording them the due process of those
5 procedures.  So the claims have to be pretty
6 fundamentally meritless at the courthouse door for that
7 determination not to be made.
8    Now I'm not saying that determination is
9 impossible in a class action settlement, but generally
10 where you find judges and special masters being willing
11 to do that is where you have a situation in which you
12 have a factual disparity between two purported class
13 members so that you can look at one and you say you
14 bought the price fixed product.  And in a period that we
15 have evidence that the price was artificially inflated
16 and therefore we say -- I can look at you and say -- for
17 settlement purposes certainly I can say you were
18 injured.
19    And you over here, Mr. Jones, you bought the
20 product, or if it's a securities case, you traded the
21 security during the period that the evidence suggests
22 that the price was in fact competitive.  Maybe the
23 conspiracy was still going on, but it fell apart during
24 that period.  There's some evidence in the case, some
25 way the person purchased, some evidence that those

Page 42

1 purchasers did not damage the individual.
2       Now we come to the situation that we have
3 here -- and I really think that if you read the Sullivan
4 case, you can see that the third circuit was coming to
5 grips with this idea.  Is what we have here is a
6 situation in which you have two class members for whom
7 you can say they bought the same product under the same
8 circumstances, inflated the same way.  The only
9 difference is that they're standing on opposite sides of
10 a geographic boundary called a state line.  And on the
11 one side of the state line it's we're home free, and on
12 the other side of the state line you say, because of
13 that, despite your factual claim, you can't possibly
14 recover under the factual claim.
15       We don't have that situation here.  Illinois
16 Brick doesn't do that.  Illinois Brick is a rule of
17 evidence fundamentally.  The Supreme Court was faced
18 with the choice it felt of overruling Hanover Shoe and
19 allowing defendants to put in evidence of passthrough or
20 enunciating a rule that said what's sauce for the goose
21 is sauce for the gander, and the plaintiffs can't put
22 that evidence into.
23       So if you are a plaintiff and you need evidence
24 of passthrough in order to establish your claim, you're
25 probably out of luck under Illinois Brick.  You still

Page 43

1 actually have the right to come into court and attempt
2 to show why it doesn't apply to you.  It is not a rule
3 of standing.  It does not bar people at the courthouse
4 door, nor is it the indirect purchaser hostility act.
5       SPECIAL MASTER:  But why wouldn't it apply --
6 you know, assuming it's sound law and the Supreme Court
7 doesn't change its mind, why wouldn't it apply to all
8 the class members in these states?  What would be a
9 ground for someone saying I am --
10       MS. KIRKHAM:  It would --
11       SPECIAL MASTER:  -- I am entitled to make a
12 claim as an exception to Illinois Brick?
13       MS. KIRKHAM:  We're not -- we're not suggesting
14 exceptions to Illinois Brick.  We're not suggesting
15 claims and exceptions to Illinois Brick.  We're just
16 suggesting claims that fall outside of Illinois Brick.
17       SPECIAL MASTER:  All right.  Such as?
18       MS. KIRKHAM:  Okay.  Such as the claims for
19 equitable monetary relief.  They do not require proof of
20 pass on, and as soon as you have a claim that does not
21 require proof of pass on, Illinois Brick becomes a case
22 that sits over here and applies to other people.
23       What that is is a situation in which there is
24 the inherent power of the federal court to award in a
25 situation in which a person proves that the factual

Page 44

1 predicate of recovery, any recovery which appears in law
2 or in equity.  The Clayton Act specifically talks about
3 affording a recovery that is reversing, undoing the
4 overcharges the defendants collected.  There is
5 nothing -- the Ninth Circuit has never suggested -- in
6 fact, the Ninth Circuit has explicitly endorsed that
7 that is one of the policies of the antitrust laws.
8       The antitrust laws also -- there are tomes that
9 talk about the benefits that the antitrust laws convey
10 on society as a whole and the benefits of private
11 enforcement of those laws convey on society as a whole.
12       So there's not been probably a better situation
13 where someone is set up to make an equitable claim for
14 monetary relief than someone who is acting as a, quote,
15 private attorneys general and coming in and vindicating
16 a critical tenet of American not only jurisprudence, but
17 indeed of American economic theory and practice, and
18 that is competition.
19       SPECIAL MASTER:  Can I just interrupt a minute?
20 Am I correct that the state of the law on recovery of
21 equitable monetary relief in non-repealer states is
22 number one, everyone agrees there is no federal right to
23 such damage?
24       MS. KIRKHAM:  No, there is.
25       SPECIAL MASTER:  You're saying there is under

Page 45

1 the --
2       MS. KIRKHAM:  We're talking -- I'm talking
3 about someone who comes into federal court and alleges a
4 violation of the Sherman Act.
5       SPECIAL MASTER:  Okay.
6       MS. KIRKHAM:  Yes.
7       SPECIAL MASTER:  And then there are also -- you
8 maintain there would be cognizable state law claims for
9 equitable monetary relief in these non-repealer states,
10 yes?
11       MS. KIRKHAM:  Umm --
12       SPECIAL MASTER:  No?
13       MS. KIRKHAM:  Probably not in the non-repealer
14 states, only because a lot of their state courts have
15 said that -- well, let's put it this way:  There
16 wouldn't be unjust enrichment.  Whether there would be
17 the same kind of equitable monetary relief granted
18 simply for proof of the violation of the state law,
19 because the same argument about Illinois Brick that it's
20 a rule of evidence applies when it's applied in state
21 court to state law as well as when it's applied in
22 federal court to federal law.
23       But we're not talking -- there are a lot of
24 cases -- the cases that Mr. Alioto is citing about
25 unjust enrichment, we agree that they go the way they

12 (Pages 42 - 45)

Page 46

1 go.
2      When Illinois Brick first came down, lawyers
3 for plaintiffs tried to avoid Illinois Brick by pleading
4 unjust enrichment claims under state common law and
5 unjust enrichment, and the state court said hmm-mm,
6 we're not going to let you do that. We're not going to
7 let you just recast an antitrust claim as an unjust
8 enrichment claim.
9      I'm not talking about going back and trying to
10 do that, to get that reversed, and I am focused and we
11 are focused on the federal recovery -- federal monetary
12 recovery that the court in KeySpan talked about and that
13 the court in LCDs, Judge Illston, talked about when she
14 first analyzed that there's a federal right to this.
15 And therefore, the state of Oregon, which was saying we
16 can do it under a state law, she then leapt over and
17 said your state law follows federal law. I think
18 there's a federal right. Then I think there's probably
19 a state right. And that was her decision on that
20 subject. That's why she talks about Oregon law.
21      But she's not -- her analysis doesn't begin
22 with Oregon law, it begins with KeySpan, it begins with
23 a federal right that arises under the antitrust laws
24 that if I prove a violation of the antitrust laws, I
25 might not be able to prove pass-on because Illinois

Page 47

1 Brick says I can't. But if I prove this violation, I
2 can ask the court to give me a monetary equitable remedy
3 that is disgorgement or restitution.
4      SPECIAL MASTER: Okay. I can see that this
5 argument and this line of thought would be a wonderful
6 law review article, but is there any authority out there
7 that says in the federal context that there -- despite
8 Illinois Brick, we are going to allow you to pursue a
9 federal claim for equitable monetary relief?
10      MS. KIRKHAM: There is the KeySpan case which
11 dealt with a governmental entity, and there is Judge
12 Illston's decision in LCDs. There is judge -- the
13 adoption by Chief Judge Hamilton of Judge Renfrew's
14 report and recommendation in DRAM. And then there are
15 the cases that we cited and the development of the law
16 this way that we cited in our brief from the antitrust
17 treatise that actually Mr. Varanini knows more about
18 than I do, since he was one of the editors or authors or
19 both.
20      SPECIAL MASTER: And that's it?
21      MS. KIRKHAM: And so far that's it.
22      SPECIAL MASTER: Okay.
23      MS. KIRKHAM: However, Your Honor, the decision
24 you're making is, is that enough that you can say all of
25 that goes away and zero is the right number, or does

Page 48

1 that raise the question that the claim is valuable?
2      SPECIAL MASTER: You're saying, I guess, that
3 there is a legitimate split of authority on this issue,
4 and, therefore, if there's a split of authority, you
5 can't say the claims are worth zero?
6      MS. KIRKHAM: Actually, there's nothing against
7 it. It's just not been litigated. The authority is
8 actually all on the side of the claim. The cases that
9 are cited against it in the briefs are not considering
10 it.
11      SPECIAL MASTER: They're dealing with state
12 law.
13      MS. KIRKHAM: They're dealing with state law
14 unjust enrichment claims or there -- there is the Ninth
15 Circuit case that wouldn't give the certain kind of
16 relief in the motor vehicles case that got cited down
17 the line for people saying so if you can't give federal
18 disgorgement, but when you read the motor vehicles case,
19 that's not what the Ninth Circuit was saying. On -- it
20 wasn't considering this kind of question, and it wasn't
21 saying you can never get money in an equitable situation
22 if you're an antitrust plaintiff.
23      SPECIAL MASTER: Okay. Before I leave you and
24 hear from other people, you cited Judge Renfrew's report
25 and recommendation and you cited like page 300 and

Page 49

1 something. And the report and recommendation that I
2 have from Judge Renfrew only goes up to page 200.
3      Are you referring to some other report.
4      MS. KIRKHAM: Yes, the Lexis -- I'm citing to
5 the pages of the -- of Judge Hamilton's order adopting
6 it, which attached the whole thing. So the paging is
7 off. If you've got one from him, you have what he filed
8 in federal court, so you'd have what it looks like in
9 the docket. What I was citing to is a brief. I'm sorry
10 for the confusion -- was a Lexis.
11      SPECIAL MASTER: Okay.
12      MS. KIRKHAM: So everyone would be able to have
13 it because you'd have to otherwise go to the DRAM
14 docket.
15      SPECIAL MASTER: Okay. Just for everybody's
16 information, I have access to Westlaw. I do not have
17 easy access to Lexis. Just --
18      MS. KIRKHAM: We'll send -- Your Honor --
19      SPECIAL MASTER: -- limited resources at JAMS.
20      MS. KIRKHAM: -- I will submit a letter that
21 redoes the citations to the -- I don't know if it's
22 still on Westlaw, but to the docket version, the DRAM
23 docket version of the report and recommendation.
24      SPECIAL MASTER: All right. Thank you.
25      Now, on this issue, does anyone else have

13 (Pages 46 - 49)

Page 50

1 anything to say? I presume the answer is yes.
2      MS. MOORE: I just wanted to point out that in
3 the original settlement in this case with Chunghwa, I
4 believe in their papers -- in the defendants' papers
5 where they were arguing for final approval, they argued
6 what is essentially the equitable monetary relief.
7      SPECIAL MASTER: Who argued it?
8      MS. MOORE: Chunghwa, and they said there was a
9 colorable federal claim in all 50 states, and they --
10 and the papers indicated that everybody would get paid,
11 which is why now here we are years and years and years
12 later and that's not happening.
13      So they -- they filed a -- it was the
14 plaintiffs who filed the motion for final approval, and
15 I think there were objections, and the defendants filed
16 an opposition or a reply to those objections, and it's
17 in those papers. I can find them if you want. They're
18 quoted in my original objection papers here, and then I
19 can find them for you if you want.
20      SPECIAL MASTER: All right. All right. Mr.
21 Bonsignore.
22      MR. BONSIGNORE: Briefly, Your Honor, there are
23 statutory claims in Massachusetts and New Hampshire,
24 although the New Hampshire ones might have postdated
25 prior to the settlements. New Hampshire also had and

Page 51

1 Massachusetts also have common law claims under their
2 consumer protection statutes. I cited those in the
3 brief. In fact, I was involved in both cases, and so I
4 know them very well.
5      With regard to Missouri, Missouri was in a
6 similar situation as Massachusetts and New Hampshire was
7 before the supreme court addressed it. And, in fact,
8 the attorney general of Missouri has taken a position
9 that indirect purchaser claims are allowed under those
10 states.
11      SPECIAL MASTER: Missouri is a repealer state,
12 isn't it?
13      MR. BONSIGNORE: Yes, it shouldn't be a
14 problem, but if I got to beat a dead horse, I'll beat a
15 dead horse briefly.
16      SPECIAL MASTER: All right. Consider it
17 beaten.
18      MR. BONSIGNORE: Briefly.
19      SPECIAL MASTER: Did you want to respond on
20 this issue? I don't know who is going to do it from
21 your side.
22      MR. ALIOTO: I'm going to address it, if you
23 don't mind, Your Honor.
24      SPECIAL MASTER: Before we -- before I give Mr.
25 Alioto a full -- full reign here, wasn't there some

Page 52

1 suggestion in one of the briefs that in the LG release
2 settlement, that the same type of release, same scope of
3 release was -- was given to LG that was given to the
4 defendants in these settlements and nobody raised a
5 peep. Is that true or untrue?
6      MR. ALIOTO: That's correct.
7      SPECIAL MASTER: Okay.
8      MS. MOORE: Your Honor, it becomes more obvious
9 at the time of distribution. A lot of times it's not
10 obvious until we get to distribution and then you
11 realize there are issues.
12      MR. BONSIGNORE: I was told by Mr. Alioto -- I
13 put it in my papers. I was told repeatedly that my
14 states would be taken care of at the end. And if I
15 hadn't heard that, I would have been jumping up and down
16 filing, objecting, going and zealously representing my
17 clients. It's horrible that those states are left out,
18 especially Massachusetts, because our law is stronger
19 than the California law. I know it's a debate, but I
20 always say it, and I'm going to say it now. To leave
21 out those states is no excuse. And once the mistake was
22 caught, it should have been corrected instantly. I
23 don't know what someone is thinking to think that that's
24 the way it should go through.
25      SPECIAL MASTER: Okay. I really think I need

Page 53

1 to give Mr. Alioto a chance here or his designee.
2      MR. ALIOTO: Okay. Thank you, Your Honor.
3 Just for the record, Mr. Bonsignore's --
4      SPECIAL MASTER: And let me focus your --
5      MR. ALIOTO: -- statements about what I said
6 and what I didn't say, I'm not going to go into that.
7 It's not evidence, but I want the record to be clear on
8 that. But go ahead, Your Honor, excuse me.
9      SPECIAL MASTER: Yeah, I mean the -- I really
10 understand all the arguments you've raised, but the core
11 question is there a split of authority here, a
12 legitimate, not concocted, but a legitimate split of
13 authority as to whether there is a federal right of
14 action that indirect purchasers in non-repealer states
15 could pursue? And if there is that split of authority,
16 how -- how is it reasonable to value the claims at zero.
17      MR. ALIOTO: All right. Thank you, Your Honor.
18 I'd like to answer that, but I'd like to give Your Honor
19 the full picture of how these cases get settled and how
20 lead counsel in the exercise of his discretion --
21      MR. SCARPULLA: We cannot hear down here, Mr.
22 Alioto. I'm sorry. He has to speak up.
23      MR. ALIOTO: I think it would be important to
24 -- for Your Honor to hear the complete facts because
25 when we settle one of these cases, it's based certainly

14 (Pages 50 - 53)

Page 54

1  on the underlying law, the viability of claims.  It's
2  based on the statute of limitations.  It's based on
3  other things as well, and this is very important.  This
4  is -- we're going to talk about notice or maybe we're
5  not going on talk about notice.
6      SPECIAL MASTER:  Yes, we are.
7      MR. ALIOTO:  We are going to talk about.  Well,
8  maybe I can -- I can give a little preview on the notice
9  because it really has to do with the valuation of claims
10  and how we arrived at this settlement.  And I know this
11  is all in the papers, but it's -- it's not -- maybe it's
12  not as clear as it can be how this notice program and
13  how the history of this case informed my decision to
14  settle on the basis that we did.
15      And by that I mean this:  There have been three
16  nationwide notices in this case: Chunghwa, LG -- the LG
17  was actually a combined notice of the LG settlement and
18  a notice of class certification, but that was a separate
19  nationwide notice.  Very similar to this third notice
20  when all the bells and whistles, newspaper, Internet,
21  email, very, very extensive.  Three programs, massive
22  notice programs.
23      The direct purchasers, they may have even given
24  more notices because I think they did their settlements
25  differently.  They may have had separate settlements,

Page 55

1  and they didn't lump them.  And there were at least
2  three notices in the direct case.
3      Now those notices were targeted at direct
4  purchasers, but they were nationwide in scope.  There's
5  publication in the Wall Street Journal, there's
6  publication in other publications.  There's wide
7  dissemination.  So you have six notices.
8      These claims and these cases, and these -- this
9  litigation against these defendants for these products,
10  it's no secret.  This has been going on for eight years.
11      There's also reference in the brief to
12  something known as a CAFA notice, and we just kind of --
13  kind of make passing mention to this.  This is really
14  not part of our notice program.  It's something that
15  defendants are required to do under the Class Action
16  Fairness Act.  Every time there's a preliminary approval
17  in one of these indirect purchaser cases, each defendant
18  who has settled and is going to be -- and their
19  settlement is going to be proposed for preliminary
20  approval, they prepare a CAFA notice.  This is what one
21  looks like.
22      It's very comprehensive.  It sends the attorney
23  general, attorneys general, all 50 of them all of the
24  important documents in the case: the notices, the
25  evidence, the rulings, the classes certified, the

Page 56

1  classes not certified, who the claimants are.  It's a
2  very comprehensive report by 52 -- by the defendant to
3  52 attorneys general and the Department of Justice.
4      I'll just hand that up to you for your
5  reference.
6      The point I want to make there, Your Honor, is
7  that in this case, there have been nine settlements, so
8  nine defendants, if my math is right, each of those nine
9  defendants sent out 51 CAFA notices.  Each defendant
10  notified every state attorney general in the United
11  States, and each defendant notified the Department of
12  Justice.  By my calculation that's 459 CAFA notices to
13  the highest ranking law enforcement officials in every
14  state.
15      Where are the attorney generals saying there's
16  viable law and I'm going to bring a case?  Where are the
17  attorneys general, people, law enforcement officers, not
18  people with axes to grind or not people with agendas,
19  law enforcement officers, where is the response to those
20  CAFA notices?
21      Well, one response is Mr. Varanini.  He's in
22  here, but he doesn't have any problem with the issues
23  that are being raised by these objectors.  I just want
24  Your Honor to be aware of these issues.  They're out
25  there.  They're out in the public domain, notices given

Page 57

1  to the people that are charged with making these
2  decisions.  And when you don't hear anything from any AG
3  and there's no reaction and no -- certainly no contest
4  or no challenge by those law enforcement officers, that
5  really weighs heavily in my decision.
6      Let me add to that this:  Let's not forget the
7  importance of opt-outs.  Is there someone -- of course
8  this debate is not about, as you say, it's not a law
9  review debate.  It's not about these claims and are they
10  viable and is there -- is there law.  This is not an
11  academic debate.  This is a debate about is there a
12  client out there with a lawyer who wants to bring a
13  claim or is sitting on the sidelines thinking about
14  bringing a claim and we're wiping his rights out.
15  That's the issue.
16      It is highly, highly, highly improbable that
17  someone is going to step forward and assert some claim
18  against these defendants for a global cartel and seek to
19  establish damages on an individual basis and probably
20  even more difficult on a class basis for -- for one
21  state.
22      These kinds of things go into my analysis as
23  lead counsel in consultation with people that I'm
24  working with in the case, which are some of the best
25  people you can possibly work with in these cases.  This

15 (Pages 54 - 57)

1 is what goes into my analysis.

2      So is it science? Yes, it's science. We
3 review the law. We look at the standing issues. We
4 look at statute of limitations issues. We also take
5 this pragmatic approach: What is the -- what is the
6 risk or what is the chance that after this case has been
7 around for eight years with multiple notices, with 459
8 notices to the attorneys general and the Department of
9 Justice, what's the chance that there is a live claim
10 somewhere out there that's being compromised? Almost
11 nil, Your Honor. You can't say zero, you can never say
12 zero, but I would say it's close to zero as you could
13 possibly get.

14      SPECIAL MASTER: Okay. So -- but you have to
15 notice that the difference between what was done here
16 and what was done in LCD, accepting your point that
17 claims by -- for any kind of monetary relief by people
18 in non-repealer states would be very challenging, would
19 be an uphill battle, accepting that, still the
20 defendants in this case I take it insisted on a release,
21 whereas in LCD those claims, as I remember, were not
22 released; that is, whatever claims, weak or strong, that
23 people in non-repealer states had for monetary relief,
24 were -- were not released in the settlement.

25      I don't know if my memory is right, but I think

1 that's the case.

2      MS. KIRKHAM: Yes.

3      MR. GOLDBERG: That's correct.

4      MR. ALIOTO: Yeah. Now, LCD here --

5      SPECIAL MASTER: So here the defendants got
6 releases, in LCD they didn't. There could have been a
7 thousand reasons for that. And it's -- I don't want to
8 go into them but...

9      MR. ALIOTO: Well, I don't know that there's a
10 thousand, but there are different -- there were
11 different reasons because you had claims by AGs in that
12 case, actual pending claims that were different from
13 claims that were alleged as the classes, and there were
14 viable pending claims. But when you come right down to
15 it, the question is was it reasonable to settle those
16 claims. And I want to just focus on this distinction
17 for a minute because this is very important.

18      SPECIAL MASTER: Before you take another
19 breath, how is the court reporter doing?

20      THE REPORTER: I'm okay.

21      MR. ALIOTO: Okay. Remember, we throw these
22 terms around loosely or I try not to throw these terms
23 around loosely, but I want to focus on viable claim.
24 Viable claim means you analyze something, and that means
25 that if someone can provide the facts, the law will

1 afford him a remedy. That's what we're referring to
2 here. Viable. Does the law support the claims if the
3 facts bear it out.

4      That concept gets lost and gets confused with
5 this question of nuisance claims or -- or these un- --
6 unproven claims. Nuisance claims. And I -- I don't
7 think it's a good idea, and I don't think the class
8 action law in fashioning these settlements ought to be
9 giving consideration to be giving payments to claimants
10 for nuisance claims because sometimes you can get
11 payment on a claim if it's not viable.

12      So to the extent that's being suggested, and I
13 think it is. Look, don't wash those claims out for
14 nothing because those people could have asserted these
15 claims and they could have gotten something. Well, they
16 could have gotten something, but it would have been on a
17 nuisance basis. I think that's very important to keep
18 that distinction.

19      The other -- not to repeat what's in the
20 briefs, but recently Judge Tigar in approving the
21 settlements in the direct purchaser case, he took note
22 of and was very important factors for him the number of
23 objectors and the number of opt-outs.

24      Here we have a very small number of objectors
25 and we've given you some background on those objectors,

1 where they're coming from, and a couple of those
2 objectors have already dropped their objections. But
3 you have a pretty good record on what those objectors
4 are about. We have three opt-outs in this case after
5 eight years, after multiple notices, after 459 CAFA
6 notices.

7      SPECIAL MASTER: Were any of those in -- were
8 any of those in non-repealer states?

9      MR. ALIOTO: I don't know the answer to that
10 question.

11      SPECIAL MASTER: Okay.

12      MR. ALIOTO: But I want to emphasize this
13 opt-out mechanism because it's very important. That's
14 what protects someone who thinks they have a claim or
15 that wants to make new law or wants to go off on
16 unproven ground and assert something. They have the
17 opportunity to do that, and you can't just pooh-pooh it.

18      SPECIAL MASTER: Fair point. I think I know
19 the impact of opt-outs.

20      MR. ALIOTO: All right. So that's the notice
21 component, but it also bears on the -- on the releases.
22 This class has had probably unprecedented notice with
23 multiple -- with multiple notifications. That's
24 important. So how did we come to the -- our conclusion?
25 It's all in the brief. The injunctive relief, not

16 (Pages 58 - 61)

1 viable. They're out of the business. Sure, I could
2 have gone to the defendants and said --
3        SPECIAL MASTER: I get injunctive relief.
4        MR. ALIOTO: Okay.
5        SPECIAL MASTER: The real -- again, just
6 tentatively, I'm not so troubled by the injunctive
7 relief issue. I'm not so troubled by the damage issue.
8 The issue that is more troublesome is this one of
9 equitable monetary relief.
10        MR. ALIOTO: Yes, and Your Honor, I'll just say
11 this -- it's in my papers -- it's completely
12 speculative. There is no claim. There is no client.
13 There is no lawyer. There is no lawsuit.
14        SPECIAL MASTER: Was a claim -- I -- it would
15 be helpful to me, Lauren, if you could see that I get
16 copies of or give me the docket numbers or something so
17 I can easily find copies of the four complaints in this
18 case, because I want to know what -- what was actually
19 alleged. Was there ever a claim either for injunctive
20 relief or equitable relief or damages asserted on behalf
21 of the people in either the non-repealer states or the
22 three omitted repealer states? Was there ever a claim
23 asserted and was it ultimately dismissed? What happened
24 to it?
25        MR. ALIOTO: Yes, it was asserted. It was

1 never formally dismissed. It -- it -- it lingered on
2 through the life of the case.
3        SPECIAL MASTER: So if I look in the fourth
4 amended complaint, will I find it?
5        MR. ALIOTO: Yes.
6        MR. COOPER: It's pending is the answer.
7        SPECIAL MASTER: So it's there.
8        MR. COOPER: It's pending.
9        SPECIAL MASTER: It's in the works. It was
10 never --
11        MR. ALIOTO: It's an allegation.
12        SPECIAL MASTER: Right.
13        MS. CAPURRO: There was no injunctive relief
14 class certified at the class certification.
15        SPECIAL MASTER: Right. Okay.
16        MR. COOPER: It was pending.
17        SPECIAL MASTER: Mr. Bonsignore, you're just
18 going to have to chill down there and sit down. I'll
19 get to you.
20        MR. ALIOTO: All right. Your Honor, if you
21 don't mind, I'd just like to have my colleague make just
22 a couple of remarks on this maybe to just sharpen some
23 of these issues up, Mr. Duncan.
24        MR. DUNCAN: Your Honor, just very briefly, I
25 want to cut to the chase on the Illinois Brick

1 question --
2        SPECIAL MASTER: Oh, don't do that.
3        MR. DUNCAN: -- and the federal disgorgement
4 claim. So the question is whether there's a split of
5 authority, whether it's in some sense viable. The
6 answer's no. There's not a split of authority. At most
7 it's a hypothetical law review article that someone
8 might want to write.
9        The Illinois Brick is the law of the land.
10 It's been the law of the land for 40 years. If you
11 could end run Illinois Brick simply by filing a federal
12 disgorgement claim, Illinois Brick wouldn't exist, and
13 people would do that. That's the way these cases would
14 be litigated.
15        SPECIAL MASTER: Did any court ever say that?
16        MR. DUNCAN: Absolutely. We've cited one case,
17 a Ninth Circuit case that's controlling that says there
18 is no disgorgement remedy under a private plaintiff
19 under a federal law.
20        SPECIAL MASTER: Okay.
21        MR. DUNCAN: That's in our most recent reply
22 brief. There's a Northern District of California case
23 to the same effect. If you went around the country,
24 every time someone has tried to end run Illinois Brick
25 in this fashion, I'm aware of no case where a private

1 class or private plaintiff have been allowed to pursue
2 those claims.
3        SPECIAL MASTER: Okay.
4        MR. DUNCAN: Now the objectors have stated that
5 governments -- it's arguably an open question whether a
6 government body can make use of a disgorgement remedy.
7 Private plaintiff --
8        SPECIAL MASTER: So it's the State of Oregon?
9        MR. DUNCAN: Correct.
10        SPECIAL MASTER: Okay. I thought I heard
11 Ms. Kirkham suggest that there were cases that said no
12 end run with respect to state law.
13        MR. DUNCAN: That's absolutely true also.
14        SPECIAL MASTER: But that there were no cases
15 with respect to the federal Clayton Act, Sherman Act.
16        MR. DUNCAN: That's not true. The cases hold
17 to the contrary.
18        SPECIAL MASTER: And you've cited those in your
19 --
20        MR. DUNCAN: Some of them, and there are others
21 in other circuits. We've cited the Ninth Circuit law.
22        MS. KIRKHAM: Your Honor, this is an
23 interesting point. You're saying that there is a case
24 in which an antitrust price fixing class or plaintiff
25 tried to bring an equitable monetary claim, and the

17 (Pages 62 - 65)

1 Ninth Circuit said Illinois Brick barred that claim
2 because you cannot end run --
3          MR. DUNCAN: That's not what I said. What the
4 Ninth Circuit held is that there is no disgorgement
5 remedy for a private plaintiff, not a class case. We're
6 not talking about class action. No private plaintiff
7 has a disgorgement remedy under Section 16, period.
8 It's a square hole, and there's -- the law is uniform on
9 that point nationwide.
10          SPECIAL MASTER: Okay. I don't want any more
11 argument about what the case says because we can read
12 it, so -- and make our own judgment for better or worse.
13          MS. KIRKHAM: I also would just like to mention
14 that in LCD Oregon was acting as a private plaintiff.
15          SPECIAL MASTER: Right.
16          MS. KIRKHAM: It had a parens patriac claim.
17 It was not acting --
18          SPECIAL MASTER: Okay.
19          MS. KIRKHAM: You know that.
20          SPECIAL MASTER: I do know that.
21          Okay. I'm thinking of taking a break if we
22 have beaten this issue to death. If there are other
23 people in the room who have something to say on the
24 repealer, you know, non-repealer issue and it's not too
25 long, let's get it out.

1          Mr. Bonsignore, you've been very active down
2 there.
3          MR. BONSIGNORE: As to the allegation that
4 there was a nuisance claim with regard to the three
5 excluded states, there were no nuisance claims involved.
6 The Massachusetts statute allows for treble damages and
7 attorneys fees. The New Hampshire allows for punitive
8 damages and attorneys fees. I'm less familiar with
9 Missouri, but I'll rely on those two.
10          Mr. Alioto seeks to personalize the issues and
11 play the blame game, blaming the victims for not
12 objecting, blaming lawyers for not being present, and I
13 would like to remind him that lead counsel in a
14 nationwide class action is obligated to represent the
15 interests of all class plaintiffs including the named
16 and unnamed plaintiffs in each and every state
17 encompassed within the class they seek to represent.
18 That's Radcliffe, 715 F.3d 1.57 at 1167.
19          SPECIAL MASTER: These points have been made
20 very cogently and repeatedly in the briefs.
21          MR. BONSIGNORE: Okay. Then I would -- then
22 I'll -- I'll just skip over the law. I'm sure you've
23 read it.
24          As to the statements that Mr. Alioto was making
25 that there were no lawyers and no plaintiffs available

1 to him, I became apoplectic, as you noticed. I request
2 only to be able to supplement the record based on his
3 statements. I submitted evidence, unequivocal evidence
4 that Mr. Alioto was aware of plaintiffs in Massachusetts
5 and New Hampshire and Missouri and that he ignored them.
6 He wasn't even aware that he was aware. There were
7 emails to him. After he was reminded, they changed
8 their argument in their reply brief.
9          So in light of the fact that he made an
10 absolute false statement that can be objectively blown
11 up with the allowance of my supplement, I would request
12 that formally.
13          SPECIAL MASTER: Okay. Any requests to
14 supplement the record should be made in writing.
15          Yes, sir?
16          MR. SCARBOROUGH: Yes, Your Honor, again Mike
17 Scarborough for the Samsung SDI defendants.
18          With respect to Massachusetts just, you know,
19 this case goes a long way back. There was a claim on
20 behalf of Massachusetts consumers originally brought in
21 the case. We filed, defendants, multiple motions to
22 dismiss, and we had very able opposition to those
23 motions from lead counsel. Those were hard fought
24 battles, and ultimately I believe it was two different
25 rounds of motions to dismiss, and we had various attacks

1 on that claim mostly on procedural bases. Defendants
2 won. So it was a claim that was litigated extensively
3 and that was thrown out, and defendants prevailed on a
4 motion to dismiss.
5          MR. BONSIGNORE: In response, Your Honor --
6          SPECIAL MASTER: Wait, wait, wait.
7          MR. BONSIGNORE: Okay.
8          SPECIAL MASTER: I just need to do this one by
9 one. As I understand it, Judge Legge finally lost
10 patience and dismissed the claim for failure to make
11 some what he considered necessary allegation. The
12 defendants prevailed. The claim was gone. But Judge
13 Legge said in his -- in his decision this would not bar,
14 you know, the bringing of a valid claim later on.
15          Do I have it right.
16          MR. SCARBOROUGH: I'm not -- again, it's been a
17 while since I looked at these papers.
18          SPECIAL MASTER: That's just what --
19          MR. SCARBOROUGH: I don't know if that last
20 part is correct necessarily, but I don't think it was
21 necessarily an invitation for lead counsel to pursue
22 such a claim.
23          SPECIAL MASTER: Okay.
24          MR. BONSIGNORE: Your Honor, lead counsel is
25 the only person who has the responsibility to do that.

18 (Pages 66 - 69)

Page 70

1 And beyond that on that point, it was a procedural issue
2 that could have been corrected in three seconds by the
3 issuance of a subsequent demand letter, and it would be
4 totaling, it would go back, and that would be that.
5     And I will also point to Kayes versus Pacific
6 Lumber Company 51 F.3d 1449 --
7     SPECIAL MASTER: We can't -- if you're citing
8 cases that aren't in your brief, I --
9     MR. BONSIGNORE: No, they're in the brief. I'm
10 just reminding -- I'm highlighting them. Kayes versus
11 Pac. Lumber, 51 F.3d 1449. The responsibility of class
12 counsel to absent class members whose control over their
13 attorneys is limited. And that's the point that I'm
14 making. The class members, lawyers other than lead
15 counsel, and more in this case than any other case I've
16 been in, had no sway whatsoever. He ran it like a
17 dictatorship. We had no control. All we could do was
18 argue and complain.
19     SPECIAL MASTER: All right. Thank you.
20     Ms. Moore, final, final, yes.
21     MS. MOORE: With regards to Massachusetts, Your
22 Honor, an error was made. An error was made two times.
23 It could -- Massachusetts could still have been valued
24 and put in the settlement and was not. And this is a
25 case in LCD. We just -- between Massachusetts and

Page 71

1 Missouri, my partial investigation -- I haven't talked
2 to all the aggregators, but there was 41 and a half
3 million dollars distributed in LCD between those two
4 states alone.
5     SPECIAL MASTER: Okay. Well, let me --
6     MS. MOORE: So this is a valuable case that
7 they could have valued and put in the settlement and
8 they chose not to.
9     SPECIAL MASTER: Okay. Is it the duty of lead
10 counsel -- and I know we have a number of people in the
11 room who have served as lead counsel. Is it the duty of
12 lead counsel to go around to every state and phone
13 lawyers and say, you know, go make a claim, go scrounge
14 around and get a class representative. Is that part of
15 the fiduciary duty of lead counsel?
16     No, Mr. Bonsignore.
17     Go ahead.
18     MS. MOORE: Yes, Your Honor, I think he's
19 putative counsel -- he's counsel -- lead counsel is
20 appointed and is given this duty, and it is his
21 responsibility to make sure that these claims are
22 pursued. And I do think he has a right to make sure --
23     SPECIAL MASTER: But is it his duty --
24     MS. MOORE: -- that people are not left out.
25     SPECIAL MASTER: Is it his duty to find claims,

Page 72

1 to unearth claims, to create claims?
2     MS. MOORE: Well, actually, even in this case
3 it isn't even relevant because we had plaintiffs. But
4 yes, I do think he should do that, and, in fact, there's
5 law that --
6     SPECIAL MASTER: You had plaintiffs in
7 Massachusetts. Did you have plaintiffs in New Hampshire
8 and Missouri?
9     MS. MOORE: Yes.
10     SPECIAL MASTER: Okay.
11     MS. MOORE: They existed.
12     SPECIAL MASTER: And what happened to them?
13     MS. MOORE: They just were never pursued. They
14 were just abandoned.
15     SPECIAL MASTER: Okay.
16     MR. SCARBOROUGH: Your Honor, just one very
17 quick point to add on Massachusetts. As I recall, there
18 were attempts to cure the defect with the -- it was
19 basically sending a demand letter, and lead counsel did,
20 and whatever associated Massachusetts counsel did try
21 and fix that defect. The defendants argued at that
22 point you couldn't do it. You couldn't fix it. This
23 was not a problem that could be remediated, and the
24 claim had to be thrown out.
25     And as I recall it, that was the view that

Page 73

1 prevailed with Judge Legge. So these arguments to the
2 contrary that hey, this was simply send a later demand
3 letter and it can all be fixed is just not true, it's
4 just not what Judge Legge found.
5     SPECIAL MASTER: I'm going to ask and then
6 we're going to take a break. I want someone to tell me
7 dispassionately without a lot of adjectives and
8 invective what happened in New Hampshire and what
9 happened in Missouri.
10     No, I'm going to get another volunteer, Mr.
11 Bonsignore.
12     MS. MOORE: The claims were never filed. There
13 was never a claim filed --
14     SPECIAL MASTER: Okay. I'm going to ask --
15     MS. MOORE: -- by lead counsel.
16     SPECIAL MASTER: Ms. Moore, thank you.
17     Go ahead.
18     MR. ALIOTO: Thank you, Your Honor. From lead
19 counsel's perspective, you can only bring claims for
20 those people who stepped forward and wanted to assert a
21 claim. We gathered all of the claims, all of the
22 complaints that were filed at the institution of the
23 case. We reviewed those. Some -- there was an
24 extensive vetting process that went on for months. Some
25 claimants survived that process. Others didn't.

19 (Pages 70 - 73)

Page 74

1     There were also discussions as the case went on
2  to -- to the later years of the case.  There were
3  discussions about other class representatives,
4  discussions with lawyers who thought they had clients,
5  and those were vetted up the line and eventually to me,
6  and decisions were made as to the viability of
7  plaintiffs.
8     SPECIAL MASTER:  So what happened in New
9  Hampshire and Missouri?
10    MR. ALIOTO:  There was never any plaintiff that
11 I -- certainly I didn't represent anyone, and no
12 plaintiff in Missouri was ever brought to my attention
13 as being out there and wanting to press a suit.  That is
14 the absolute fact.
15    It was, as is the case in a lot of these
16 multistate cases, sometimes there are not claimants for
17 these states.  This is a big responsibility, Your Honor,
18 to step up in one of these cases.  You know what goes
19 into that.
20    SPECIAL MASTER:  Okay.  What about New
21 Hampshire?
22    MR. ALIOTO:  I don't believe there was ever a
23 client proffered.  Mr. Bonsignore has mentioned
24 something in his papers about late in the game that
25 there was a -- he had someone and someone was ready to

Page 75

1  go.  I viewed that with extreme caution because when you
2  make a decision like that to put somebody forward for a
3  state, it's very important.  It's not only important for
4  that state, it's important for the whole case.
5     SPECIAL MASTER:  I remember your briefing on
6  this point now.
7     MR. ALIOTO:  The statute had run.  The simple
8  answer is without the invectives, the statute had run at
9  the time he brought that up.
10    SPECIAL MASTER:  Okay.
11    MR. ALIOTO:  But can I make one point without
12 invective or adjective?  We have quite a different view
13 about abandoning and not representing and, you know,
14 sloughing people off.  But, you know, the simple answer
15 to that is Ms. Moore and Mr. Bonsignore and all these
16 other people after the fact, you got the papers.  You
17 know what classes are represented and are not
18 represented.  Go out to the federal courthouse.  File a
19 complaint.  The complaint will be transferred into this
20 district, and we would love nothing more for them to
21 have done that at the time.
22    I can't dictate to them.  If they had a client
23 and they felt strongly about this, file a case, it will
24 be transferred in, and we'll deal with it.  But after
25 the fact, you know, after the money is in the bank and

Page 76

1  Mr. Alioto, you didn't do this and Mr. Alioto, you
2  didn't do that, well, we did $576 million worth of right
3  things.  And that's what we're trying to get approved.
4  And this is -- with all due respect to these objectors,
5  this is just -- let me say it's a side show.  Thank you.
6     SPECIAL MASTER:  Okay.  We're going to take a
7  break now for like ten minutes, and then we'll come back
8  and deal with the other issues.  Thank you.
9     (Recess 11:34 a.m. to 11:47 a.m.)
10    SPECIAL MASTER:  I'd like to move on to the
11 notice issue.  If anybody has anything more to say on
12 this repealer issue, you can say it at the end when I
13 give you a chance to raise any issues that haven't
14 otherwise been raised.  But we need to cover the
15 waterfront here, so I'd like to move on to the issue of
16 whether the notice was adequate again.
17    I've read the briefs, I understand the problems
18 that have been raised with the notice.  I understand the
19 responses of lead counsel and the declaration -- various
20 declarations of Mr. Fisher.  So, you know, I think I'm
21 pretty well up to speed on this, but I'd like to hear --
22 give you a chance to say anything that needs saying.
23    Anyone from the objectors side like to be heard
24 on this issue?
25    MR. SCARPULLA:  Francis Scarpulla, Your Honor.

Page 77

1  I think we said it pretty much in our brief, and I am
2  not going to repeat that.  We just would urge that Your
3  Honor may wish to consider hiring an independent expert
4  to opine on it.
5     Now I've done a hundred-plus notices, and so
6  when you see one where the only evidence -- where the
7  only hard evidence you have is a reach of 58 percent,
8  then there is a problem, especially since as Mr. Fisher
9  points out, if you use the early years, the class
10 members are between six years old at the start of the
11 period and 18 at the end of it if you use his early
12 years.  I don't even think they had -- even at the end
13 of the period, 18 year olds don't have the right to form
14 contracts.  Put that aside.
15    If you use his later years, then it's 12 to 22.
16 I'm sorry, 10 to 22.  Those are -- that's the ages of
17 the people that he targeted during the -- during the
18 period of the -- of the price fixing.
19    And again, those TVs as -- as the LCDs came
20 into the market, there was a great decline in the sales
21 of CRTs, and they were being bought by individual family
22 units that didn't have a lot of money because they were
23 much cheaper than the LCDs.  And to target someone who
24 had income of 60,000 or more misses a whole group of
25 those individual class members.

20 (Pages 74 - 77)

Page 78

1    And one thing that Your Honor may ask for,
2 which I have not been able to get, I don't know the
3 number of individuals, human beings who have made
4 claims, and that's something that I would respectfully
5 suggest Your Honor may wish to find out.
6    Now we know that there are the big corporations
7 that put in claims, but the question is how many natural
8 persons put in claims. So I'm not going to repeat
9 anything else in the brief.
10    SPECIAL MASTER: Okay. You said the only hard
11 evidence is that the reach was 58 percent. I mean Mr.
12 Fisher says it was 83 percent. Why is that not hard
13 evidence?
14    MR. SCARPULLA: Because he's saying -- he's
15 saying I think our Internet reached so many people, but
16 there's nothing -- you have no hard evidence that
17 anybody saw it or that they did anything about it.
18    SPECIAL MASTER: So I don't know how many
19 clicks and so on?
20    MR. SCARPULLA: You have no idea.
21    SPECIAL MASTER: All right.
22    MR. SCARPULLA: And in fact, Your Honor, they
23 had to come to the DRAM database and get that database
24 from us to send out supplemental notices because the
25 notice program was so -- was so flawed.

Page 79

1    SPECIAL MASTER: Good. Anyone else have
2 anything to add on this issue?
3    Mr. Alioto, why would it not be interesting to
4 know this data: How many claims have been submitted,
5 what's the dollar volume, what's the -- where are they
6 from, how many are natural individuals, how many are
7 from the state of California to satisfy the attorney
8 general? Why would it not be interesting to know that
9 and evidently has not been made available?
10    MR. ALIOTO: Yes, thank you, Your Honor. Mr.
11 Duncan and Mr. Novak are going to be responding to those
12 notice issues.
13    SPECIAL MASTER: Okay. Mr. Duncan.
14    MR. DUNCAN: Sure. Your Honor, Matthew Duncan
15 from Fine Kaplan again.
16    I think -- I think in a vacuum that information
17 will be interesting. The problem -- the issue is that
18 the process is ongoing. Claims are still -- many were
19 received at the end. The claims administrator is still
20 processing that and then certainly that information is
21 going to be known to the court. The issue is that it's
22 not -- it's not germane to settlement approval and
23 whether the standard for notice is met ex ante.
24    So bear in mind, the extent to which all of
25 these issues were considered exhaustively at the

Page 80

1 preliminary approval stage. Everything that was going
2 to be done notice-wise was vetted then. It was done.
3 There's an extensive record at this point about
4 everything that was done and the effectiveness of it.
5    To speak briefly to the point that there's no
6 hard evidence about the reach statistic, that's just
7 wrong. I mean, Mr. Fisher's declaration includes
8 exhibits that say, you know, for the digital outreach
9 precisely what was done, the number of impressions.
10 Google, for example. Google is the search engine.
11 There were Google banner ads done throughout the Google
12 ad network. Google search results, paid search results
13 were returned. This is just one example of the digital
14 outreach. Two hundred million plus impressions on that
15 kind of thing. And the data is in Mr. Fisher's
16 declaration.
17    SPECIAL MASTER: By impressions, what do you
18 mean?
19    MR. DUNCAN: Well, by impressions, that means
20 that when something in the Google network, in the Google
21 ad network website is visited, there's a banner ad that
22 someone sees. Now whether they actually click on it,
23 you don't know. We don't have that data. But you know
24 that someone saw the banner ad within the network. And
25 so that's what the impression data does. And there's a

Page 81

1 long list of digital outreach that was done. We have
2 the impression data for all of that. And then what Mr.
3 Fisher does is feed that data into the comScore system,
4 which is what marketing professionals and everyone else
5 uses to do this, to calculate the reach.
6    So at the end of the day, Mr. Fisher has
7 explained what he did. He's given you the data that
8 went into comScore and then the comScore is the upshot
9 of all of that. And nobody has really -- it's the way
10 it's done, and nobody has shown otherwise in any of the
11 projections.
12    So the reach is the reach. It's well within
13 the standard. It's -- it's best -- best practicable
14 notice for all of those reasons, and we think the record
15 is more than robust to find the notice requirements have
16 been met.
17    SPECIAL MASTER: So when -- when would you
18 expect to provide this information to the court assuming
19 I don't tell you to do it sooner at the -- at the time
20 the final papers are filed on the motion for final
21 approval?
22    MR. DUNCAN: I think Mr. Alioto probably knows
23 a little bit more about this than I do. But
24 conceptually, I mean, that's part of the claims process
25 reporting that would happen at the allocation phase.

21 (Pages 78 - 81)

Page 82

1      MR. ALIOTO:  We intend to be doing that,
2  although there is this issue raised by the state of
3  California about extending the deadline, so to the
4  extent it's extended, you won't have it complete until
5  that deadline runs.
6      SPECIAL MASTER:  But can't we know how things
7  stand now?  I mean, I understand the argument that a
8  court has to evaluate a notice program ex ante before it
9  knows how it's actually going to work and make a
10  decision as to whether it's the best practicable.  And
11  the court here has done that.  But gosh, just common
12  sense tells you it might be nice to see what the results
13  are.
14      MR. ALIOTO:  I will check with the
15  administrator today and report on where he is and
16  whether and when that information can be made available.
17      SPECIAL MASTER:  And if it's robust, I should
18  think you'd be the first one to be trotting it out
19  there.
20      Okay.  Anything else on notice?  Let's see if I
21  have any questions.
22      MR. COOPER:  Your Honor, I assume that our
23  suggestion about an independent expert is something
24  you're considering?  I mean, I'm not asking for a
25  response.  I just -- you haven't rejected it?

Page 83

1      SPECIAL MASTER:  I know -- I have not rejected
2  it.
3      MR. COOPER:  Right.
4      SPECIAL MASTER:  I mean -- say I were to do
5  that.  What -- what different information would they --
6  I mean I guess they might provide an opinion that's
7  different than Mr. Fisher's opinion, but then I just
8  have a battle of experts, and how has the ball been
9  advanced?
10      MR. DUNCAN:  Your Honor, that's a good point
11  and it is -- Mr. Fisher is an expert.  He's done this
12  many times.  His CV is in the record.  Everything he's
13  done is in the record, and all of this would lead at
14  most to quibbling about how a different expert might do
15  something slightly differently at the margin.  And
16  that's not the standard for whether notice is
17  reasonable.  The standard is whether it's reasonable on
18  its own terms, not whether different lawyers might have
19  done something differently on margin or whatever.
20      SPECIAL MASTER:  Okay.  Mr. Scarpulla or Mr.
21  Cooper, or you can both speak at once.
22      MR. SCARPULLA:  Yes, Your Honor, the reason
23  that you -- the reason for an independent expert is so
24  that he or she can tell you the flaws in the notice
25  program that Fisher -- Fisher is --

Page 84

1      SPECIAL MASTER:  Or the absence of flaws.  If I
2  hire an independent expert --
3      MR. SCARPULLA:  -- or absence of it.
4      SPECIAL MASTER:  -- not one that you suggested,
5  if I hire an independent expert --
6      MR. SCARPULLA:  Correct.
7      SPECIAL MASTER:  -- he might say or she might
8  say everything is dandy.
9      MR. SCARPULLA:  You're absolutely right.
10      SPECIAL MASTER:  Is that correct?
11      MR. SCARPULLA:  That's absolutely correct.  And
12  then you -- Mr. Fisher was a former lawyer who didn't
13  make it in the practice of law and decided to go into
14  this business.  You can't do --
15      SPECIAL MASTER:  We all make life choices.
16      MR. SCARPULLA:  You can't do nationwide notice
17  of any significance for $1.5 million.  That's not
18  possible.
19      SPECIAL MASTER:  I noted that figure.
20      MR. SCARPULLA:  It would cost at least 4 or 5
21  million to get the kind of reach to 80 or plus percent,
22  and that's the whole point of having an independent
23  expert.
24      MR. COOPER:  I would just say, Your Honor, that
25  I think you put your finger on it.  This is an

Page 85

1  independent expert, someone that works for the court
2  who's not in an advocacy position.  It's not like you
3  get two sides putting up their own experts who are
4  advocating for the two sides.  This is someone who would
5  evaluate it, and give you an independent view.  And I
6  think that's a totally different thing.  You'd have
7  to -- they might say it was fabulous and put an end to
8  all these questions about notice.
9      SPECIAL MASTER:  Or they might be competitors
10  of Mr. Fisher and love to get a whack at him, you know,
11  so...
12      MR. COOPER:  Well, I guess that's a theoretical
13  possibility but...
14      MR. ALIOTO:  Your Honor, let's not forget, when
15  we were working on the schedule, and the objectors
16  needed all of this time and this elongated schedule,
17  there were statements made by Mr. Scarpulla that he
18  needed time to retain an expert.  Well, he got the time,
19  but he has not retained an expert.  Instead, he's come
20  in and said well, we're not going to retain anybody.  We
21  want you to go get an independent expert.  There's no
22  basis on this record to do that, especially after he
23  initially indicated that he was going to pursue that
24  himself.
25      SPECIAL MASTER:  Okay.  Mr. Bonsignore?

22 (Pages 82 - 85)

Page 86

1      MR. BONSIGNORE: Yes. Mr. Alioto is entitled
2  to an opinion, but so is Mr. Scarpulla and the other
3  objectors. It was one option to hire the excluded
4  plaintiffs' reviewer. The smarter option is to have the
5  court hire their own because then it's absolutely
6  independent and it wipes out the argument oh, it's a
7  battle of the experts. That's gone. So you're
8  presented only with -- I'll summarize my -- so you're
9  presented only with someone who you hired and the
10 argument that it's a battle of the experts is entirely
11 eliminated. Thank you.
12     SPECIAL MASTER: All right. The next issue
13 that is on my mind is this -- the impact of the Chunghwa
14 settlement. And I confess to be confused as to what the
15 objectors are really saying is the problem created for
16 this settlement by the terms of the Chunghwa settlement.
17 I forget who -- whether it was Ms. Moore who -- go
18 ahead, Mr. Cooper --
19     MR. COOPER: I think --
20     SPECIAL MASTER: -- or Ms. Kirkham. Either
21 one.
22     MR. COOPER: Go ahead.
23     MS. KIRKHAM: We didn't say that it was a
24 problem for the settlement approval. We said it was a
25 problem for the approval of the plan of allocation

Page 87

1  because the plan of allocation ignores the existence of
2  the Chunghwa settlement. And the Chunghwa settlement
3  has some very specific terms in it about how the money
4  is to be paid out and to whom. So that was what we
5  raised.
6      We simply said that it was -- that the problem
7  was that the Chunghwa settlement, which is final,
8  provides a plan of allocation. That plan of allocation
9  is not incorporated into this plan of allocation, and
10 this plan of allocation would -- is inconsistent with
11 that plan of allocation.
12     SPECIAL MASTER: How?
13     MS. KIRKHAM: Okay. The Chunghwa --
14     THE WITNESS: I know your brief said this but I
15 --
16     MS. KIRKHAM: That's okay. I can go through it
17 fairly quickly.
18     The Chunghwa allocation provides for the
19 settlement money to be divided up among certain states
20 with -- proportionate to census data. So they would --
21 so it creates pots that are fixed amounts. Then claims
22 would be solicited. So -- as opposed to a pro rata
23 among all of the people that the plan of allocation
24 deemed entitled to receive money, which is the current
25 plan, you can see there'd be a real difference if

Page 88

1  there's $10 million in California's pot and $7 million
2  in Arizona's, or $5 million or -- well, some other
3  state. Arizona is not a good, actually, example.
4      MR. COOPER: It also includes Illinois, Oregon
5  and Washington.
6      MS. KIRKHAM: Right, it does include Illinois,
7  but the point I'm trying to make --
8      MR. COOPER: It generally includes
9  distributions to Illinois, Washington and Oregon who are
10 excluded --
11     (Reporter clarification).
12     The distribution in the judgment includes
13 payments to Illinois, Oregon and Washington AGs who are
14 not in these settlements. But there is no provision for
15 that coming out. And also that class, that settlement
16 class includes resellers of product.
17     SPECIAL MASTER: So what should we do?
18     MR. COOPER: I think it's a problem.
19     SPECIAL MASTER: Okay.
20     MR. COOPER: You have to re-notice.
21     SPECIAL MASTER: Thank you. But what do I do
22 about it?
23     MR. COOPER: Well, you disapprove it, is what
24 you do. You've got to re-notice people in other states.
25 You've got to carve out the money. You have to tell

Page 89

1  people what's happening. I just don't -- you can't just
2  ignore it.
3      SPECIAL MASTER: Okay. I'm sorry to be
4  plodding here. But to whom do we have to give notice
5  now?
6      MR. COOPER: Well, if the class includes
7  resellers, you have to now have a notice which says that
8  resellers can claim against this pie.
9      SPECIAL MASTER: Okay. Because the Chunghwa
10 settlement includes payments, potential payments to
11 resellers --
12     MR. COOPER: Right.
13     SPECIAL MASTER: -- whereas this one doesn't.
14     MS. KIRKHAM: Doesn't. And the Chunghwa notice
15 told resellers they would be paid at a later date.
16     SPECIAL MASTER: Okay. So let me see if I get
17 it. You're saying there are two significant differences
18 between the allocation plan in Chunghwa and this
19 allocation plan. One is resellers get money from
20 Chunghwa. They don't here.
21     Number two is there's a different formula for
22 distributing money state by state in Chunghwa than the
23 pro rata plan that is proposed here.
24     MS. KIRKHAM: Yes, yes.
25     SPECIAL MASTER: I got it.

23 (Pages 86 - 89)

1     Mr. Alioto.
2          MR. ALIOTO:  Yes.  There's no inconsistency.
3  First of all, with respect to resellers, the notice
4  that's in our brief, the notice is quite clear that
5  because of the relatively small amount of money paid
6  under the Chunghwa settlement, that would be the
7  settlement for the ten million dollars plus the proffer.
8  Because of that small amount, it would not have been
9  practicable to actually allocate money.  And the notice
10  recites -- I'll try to find that cite in the brief, but
11  -- it's in our most recent brief.  We cite to the notice
12  that says resellers, you may not get money.  And that
13  was put in there because of the small amount of the
14  settlement.
15          And so there's never been any expectation or
16  promise that they would get money as part of that
17  Chunghwa settlement.
18          SPECIAL MASTER:  But I'm being told there was
19  final approval of the Chunghwa settlement, and in that
20  settlement was a provision for giving money to
21  resellers.
22          MR. ALIOTO:  Well, I would have to see that.
23          SPECIAL MASTER:  Isn't that a final judgment?
24          MR. ALIOTO:  Well, that's -- no, I think what
25  they're saying is in that -- they're referring to orders

1  that there was a provision to give money to states.
2          There's two issues here.  One is resellers.
3  That issue, I submit, is very straightforward.  Because
4  of the small amount, we recognized at the time that
5  there might not be money to distribute.
6          SPECIAL MASTER:  Well, it may be a small
7  amount, but we have the small issue of a final judgment
8  that says they get money.
9          MR. ALIOTO:  I don't believe that's recited in
10  the final judgment, Your Honor.  It's been quite a while
11  since I've seen that, and we'll check that.  But the
12  notice, the document that actually went to class members
13  said you're not -- you may not get anything.  That's
14  quite clear, and that's cited in our brief.  Now whether
15  there's some -- some mention to the contrary in the
16  judgment, I just don't know from memory, but I will
17  check that.  The notice, the crucial document that was
18  sent to the class member that they read and relied on
19  had that provision.
20          SPECIAL MASTER:  Okay.  So your -- your
21  position is that any inconsistency with respect to the
22  treatment of resellers or other class members in
23  Chunghwa and this case is cured by the "new
24  comprehensive," in quotes, notice, that you gave in this
25  case, and that notice in effect says oops, actually

1  you're not getting any money?
2          MR. ALIOTO:  Yeah, and I'm not so sure that
3  there is any inconsistency.
4          SPECIAL MASTER:  Well, resellers get money,
5  resellers don't get money.  That sounds like an
6  inconsistency.
7          MR. ALIOTO:  Yeah, but what are they referring
8  to -- I mean, I'm going on arguments that have been
9  made.  What are they -- I'm trying to respond to an
10  argument, but I'm not exactly sure what the argument is.
11  The argument is that there was something in the final
12  judgment in the --
13          SPECIAL MASTER:  In the -- I am being -- wait.
14          Okay.  Mr. Scarpulla.
15          MR. SCARPULLA:  Your Honor, there was a final
16  judgment approving the settlement with Chunghwa which
17  provided for a payment to resellers.  It's in there.
18  It's final.
19          SPECIAL MASTER:  Okay.  All right.
20          MR. SCARPULLA:  Period.  And then there was
21  also a provision in there which provided that the money
22  would be divided certain percentages by state.  That's
23  gone too.
24          SPECIAL MASTER:  Okay.
25          MR. ALIOTO:  All right.

1          SPECIAL MASTER:  Let's be practical here.  We
2  don't want a $10 million tail to wag the $576 million
3  dog.  So this is a problem that I would like to find a
4  way to cure and not have it be a reason to foul up a
5  settlement.
6          MR. SCARPULLA:  But that's a big problem, Your
7  Honor, because it's constitutional issues of due
8  process.
9          SPECIAL MASTER:  I get it.  If it's a problem,
10  it's a problem.
11          MR. ALIOTO:  And what that settlement provided
12  for -- and here's -- I think I get the gist of the
13  argument.  When we sought approval of that Chunghwa
14  settlement, certain attorneys general appeared.  They
15  got the notice, and they got the CAFA notice, and they
16  stood up for their rights.
17          And Washington said we want to go our own way.
18  And Oregon and Illinois said we want to go our own way
19  in the future, but thanks a lot for getting this
20  settlement and we should get this money.  We -- and that
21  issue was tee'd up in front of Judge Legge.  And Judge
22  Legge ruled yes, they're entitled as AGs to that money,
23  and the judgment and the preliminary approval order
24  recited that.  That was a ruling by Judge Legge.  Not a
25  contractual arrangement or deal, it was a -- it was a

24 (Pages 90 - 93)

Page 94

1  contested matter and a ruling by the judge.
2       I think where the confusion comes in, Your
3  Honor, is the amount of the settlement that was
4  allocated to Illinois and Oregon was based on a
5  population allocation.  That population allocation is
6  set out in the order, and it says Illinois and Oregon
7  are going to get X amount based on this population
8  calculation.  It was like setting forth the background
9  of the calculation.
10      What the objectors are saying is that that
11  background of the allocation to Illinois and Oregon,
12  that meant that all those other states had to get money.
13  That's not the case.  The listing of all those other
14  states was just for the purpose of showing how we
15  arrived at the allocation figure from Washington and
16  Oregon.  No inconsistency.  Money is going to be paid to
17  those states.  Matter of fact, I just spoke with Blake
18  Harrop (phonetic) the other day, a couple of days ago
19  confirming that with him.  That settlement is over, it's
20  done, and those terms are going to be honored as part of
21  this larger package.
22      SPECIAL MASTER:  What do you mean they're going
23  to be honored?
24      MR. ALIOTO:  There's a provision in the
25  Chunghwa settlement per Judge Legge's ruling that a

Page 95

1  certain -- certain percentages of money must be paid to
2  the state of Illinois and the state of Oregon.  And
3  those payments will be made because that was part of
4  that settlement approval.
5       SPECIAL MASTER:  So you will carve out an
6  exception to the pro rata distribution to take care of
7  Oregon and Illinois?
8       MR. ALIOTO:  Precisely.
9       MR. COOPER:  And the amount of money that will
10  be distributed pro rata will be the amount of money you
11  think is involved less the amounts that go to those AGs.
12  So all the notice that says this is the amount you're
13  going to share pro rata is incorrect by the amount.  It
14  may not be a large amount, but it's incorrect, and
15  there's been nowhere in all the presentations about
16  this, any acknowledgment until we brought it up of the
17  problems with what exists with regard to the commitments
18  made in connection with the Chunghwa settlement.
19      Look at the -- look at the order of
20  preliminarily approving the Chunghwa settlement.  That's
21  where the chart of states and percentages is attached.
22      SPECIAL MASTER:  What about resellers, Mr.
23  Alioto?  What --
24      MR. ALIOTO:  There will be -- there's no
25  payment contemplated to the resellers, Your Honor.

Page 96

1       SPECIAL MASTER:  But how -- if there was a
2  final approval by the district court of a settlement
3  that provided money going to resellers, how do we ignore
4  that?
5       MR. ALIOTO:  Well, I'm going to have to check
6  that final judgment, Your Honor.
7       MR. COOPER:  Well, the class includes
8  resellers, Your Honor.  The settlement class includes
9  resellers.
10      MR. ALIOTO:  I will say --
11      SPECIAL MASTER:  Did you have -- you're shaking
12  your head.  Do you have something of wisdom to add?  No?
13  All right.
14      MR. ALIOTO:  Keep in mind that this is --
15      SPECIAL MASTER:  Look, this is a small issue in
16  magnitude, but it's troubling, and I don't have any of
17  the -- I mean, they're all in the record.  But nobody
18  has really thoroughly briefed this.  Nobody has given me
19  a stack of material I should look at like the language
20  of the Chunghwa settlement, the -- the orders approving
21  it and so on.  And there's not a lot of time between now
22  and January 15.
23      MR. COOPER:  We'll pull them together and send
24  them to you, Your Honor.  We'll send the list that we're
25  going to send to Mr. Alioto in advance of sending it to

Page 97

1  you in case he wants to add something to the list.
2       MS. MOORE:  Just a point that I believe now
3  that everyone can make a claim, there's no place on the
4  website to actually make a claim for resellers.
5       SPECIAL MASTER:  Yeah, I mean, resellers have
6  been excluded from this settlement.  I understand.
7       Yes, Mr. Bonsignore?
8       MR. BONSIGNORE:  Very briefly Your Honor, you
9  might find 55 F.3d 768, 797.  It's a third circuit case
10  cert. denied, 516 U.S. 824 of interest and when you're
11  evaluating this specific issue.
12      SPECIAL MASTER:  Give me the name of the case.
13      MR. BONSIGNORE:  In re General Motors Corp
14  Pickup Truck Fuel Tank Products Liability Litigation.
15      SPECIAL MASTER:  And is that cited in your
16  brief somewhere?
17      MR. BONSIGNORE:  Yes.
18      SPECIAL MASTER:  Thank you.
19      Sir.
20      MR. ST. JOHN:  This strikes me as someone
21  representing a client who is potentially impacted by
22  this as an unforced error by class counsel.  And I agree
23  with Your Honor that it shouldn't wag the dog.  I think
24  the solution is that the party that's responsible for
25  the unforced error should pay for it.  Deduct the cost

25 (Pages 94 - 97)

1 from class counsel's fees.

2        SPECIAL MASTER:  Deduct what costs?

3        MR. ST. JOHN:  Whatever additional notice and

4 whatever it costs to fix payments for resellers and

5 payments to the states in question.  Mr. Alioto made the

6 mistake.  There's a term for that, but Mr. Alioto should

7 be responsible for fixing it.  And you can fix it

8 without -- and resolve these problems.

9        MR. ALIOTO:  We'll determine that when Your

10 Honor has the full records and you can make that

11 determination.

12        SPECIAL MASTER:  All right.  Before we leave,

13 I'll set up an additional briefing schedule on this

14 issue.

15        Now, that brings us to Mr. Varanini.  And you

16 want to extend the claim deadline?

17        MR. VARANINI:  Yes.  But --

18        SPECIAL MASTER:  And I am told by your

19 colleagues on the other side that doing so will create

20 all sorts of claims of disparate treatment.  California

21 residents will be claimed to be given a longer time to

22 make claims than other people and so on.  Before you get

23 into your argument, let me ask you:  What happens if the

24 court says no?  What happens down in the California

25 state court if the court says no, we're not going to

1 extend the deadline?  Sorry, deadline is a deadline.

2        MR. VARANINI:  Well then --

3        SPECIAL MASTER:  What do you do practically?

4        MR. VARANINI:  Practically that's a difficult

5 question because we have to figure out what to tell

6 California and actual people.

7        SPECIAL MASTER:  They now have settled or --

8 their parens patriae --

9        MR. VARANINI:  Yes.

10        SPECIAL MASTER:  -- their claims that you

11 brought on their behalf.  Where do they make claims?

12        MR. VARANINI:  Well, they can't.  We didn't --

13 this is set out in our briefing, so if Your Honor

14 doesn't mind my summarizing the briefing, that's fine,

15 but I would encourage Your Honor to look at it.

16        When we settled these cases, we did so based on

17 having had discussions with the indirect purchaser

18 plaintiffs trying to fix a situation that occurred

19 within early settlement.  And as part of that, the

20 amounts that we negotiated for were done with the view

21 that the indirect purchaser plaintiffs were out there.

22 They were in federal court.  They were ahead of us going

23 to trial.

24        Traditionally, you know, private plaintiffs are

25 good at getting monetary relief, and we tend to focus on

1 sort of the residue that can help those folks who don't

2 file claims as far as injunctive relief.  And so we

3 agreed if we can persuade defendants to insert language

4 that would make it crystal clear, even though this has

5 always been our position, that we were not out there to

6 supplant or replace class claims.

7        There's a price for that.  Because we can't

8 give defendants exclusivity.  We can't say okay, we can

9 give you a release which would eliminate Mr. Alioto's

10 claim 'cause we don't do that.  They're not going to pay

11 us a lot of money because Mr. Alioto is the one who can

12 come in there and say I've got these big claims.

13 They're worth a lot of money.  This is -- this is what I

14 bring to the table.

15        So we didn't negotiate for the kinds of sums of

16 money that would allow us to run a direct recovery

17 program where people could make claims against our pot,

18 even leaving aside the other claims that we have in our

19 case, because we do have other claims aside from natural

20 people.  So that's what we relied on.

21        Traditionally the way we work is we come in at

22 the allocation stage, like we have here.  Usually this

23 is behind the scenes because we have joint settlements.

24 Here it's not behind the scenes, so this makes it

25 different.  But we come in, and we give advice on

1 allocation.  We say okay, we as AGs really care about

2 natural people.  Not to say private plaintiffs don't,

3 but we really care about them.  They're our citizens,

4 they're going to complain to us if there's a problem.

5 They're not going to go complain to you.

6        SPECIAL MASTER:  Might even vote you out of

7 office.

8        MR. VARANINI:  Right.  They might vote her out

9 of office or hypothetically they might decide not to

10 promote her to the next office that's coming up.  So we

11 take --

12        MR. GOLDBERG:  We have that on the record.

13        MR. VARANINI:  I'm aware of that.  I hope the

14 general looks favorably on me for having said it.  But

15 be that as it may, we're the ones who are going to get

16 the criticism.  So when we send out a notice that would

17 say -- and we can't because we don't agree with it --

18 that would say California natural people, you can't file

19 claims.  You're going to have to live with what we can

20 give you on cy pres, meaning sort of this indirect

21 relief where we give money for the indirect benefit of

22 the class.  Just making sure there's a complete record.

23 I know Your Honor is very well aware of this.  We're the

24 ones who are going to get criticized.  And this is -- we

25 negotiate these settlements in reliance on this

Page 102

1  understanding that we tried to implement to move
2  forward.
3      SPECIAL MASTER: But let me just --
4      MR. VARANINI: Sure.
5      SPECIAL MASTER: All the natural people in
6  California whom you represent have already gotten the
7  federal notices.
8      MR. VARANINI: Correct.
9      SPECIAL MASTER: They've already had an
10  opportunity up until December 7 to submit claims.
11  You're kind of saying they should -- because we have a
12  parens patriae claim on their behalf, they should get a
13  second whack at the Apple?
14      MR. VARANINI: Not exactly, Your Honor. We're
15  saying one of two things here. Okay? This shades into
16  the other issues. So we believe that for allocation
17  purposes, for allocation purposes from what we can see
18  from the face of what was done, because that's all we
19  have -- we don't have access to the notice and claims
20  data -- so what we can see from the face of things is we
21  believe there are deficiencies where natural people
22  didn't get their fair shot.
23      In the context of allocation there is notice.
24  Notice as you've heard these gentlemen and lady talking
25  about have to do with reach, right? How many eyeballs

Page 103

1  literally saw the advertisement. That's important for
2  opt-out purposes. It's important for due process
3  purposes. But that's different than generating claims
4  to make sure that, for example, natural people had their
5  fair shot. Based on the face of what we're seeing, we
6  don't believe for reasons that we've already said in our
7  brief that natural people had their fair shot.
8      Now we asked for notice and claims data to give
9  a more refined -- more refined analysis for the benefit
10  of Your Honor. And that was ultimately denied, as Your
11  Honor is well aware. And it's now pending in front of
12  Your Honor. So absent that, all we have to go on is
13  what's on the face of it, and we believe that's
14  insufficient.
15      So how this plays in the state court because
16  Your Honor asked. This is in the papers, so I apologize
17  for repeating it. But how it plays in state court is we
18  can't put in a notice that we think California natural
19  people already had their opportunity to claim and that's
20  it because we don't believe it. So -- but on the other
21  hand, the claim's deadline has closed, so do we tell
22  people: Well, go ahead and file a claim and maybe it
23  will be honored and maybe it won't? Do I tell people
24  well, the special master has recommended against it, so
25  you could file it, but we plan to make an objection to

Page 104

1  the court?
2      It puts us in a really sticky situation. So
3  one of -- we proposed one of two paths. Either -- you
4  know, either reform the claims process as part of the
5  allocation plan, which Mr. Alioto has referred to he may
6  be open to, or extend the claims deadline so that we can
7  tell California natural persons they have an opportunity
8  to claim.
9      Now one final point. We have said that Your
10  Honor, even on that point, extending the claims
11  deadline, that Your Honor has a choice. You can do that
12  as to California natural people only because we and we
13  alone of all the groups of claimants have this parens
14  claim that's out there for them. And that is unique,
15  and that is something that the court can use to make a
16  difference. And we've given Your Honor cases and
17  argument on that. Or Your Honor can extend it as to
18  everybody.
19      And on that point, Mr. Alioto has expressed his
20  fears about corporations being unfairly advantaged as
21  part of that. We responded to that. We believe there's
22  no evidence to back that up. But more importantly, we
23  believe there's a couple of constructive solutions that
24  Your Honor can recommend to deal with that if Your Honor
25  feels it's more appropriate to extend the claims

Page 105

1  deadline as to everyone.
2      SPECIAL MASTER: So Mr. Alioto, why isn't an
3  easy solution to do what Mr. Varanini says? California
4  natural persons are special because they're the only
5  ones for whom a parens claim was brought. They need to
6  be given a fair opportunity to file claims under the
7  parens lawsuit, extend the deadline for California
8  natural people. And if anybody -- if anybody objects
9  to it as being improper disparate treatment, we say sorry,
10  they're the only ones who have a parens claim. Done,
11  easy, fix. Right? Wrong?
12      MR. ALIOTO: Mr. Paul Novak has been working
13  with the AG. He'll respond.
14      MR. NOVAK: Over here. Paul Novak of the
15  Milberg firm.
16      Let me first identify a couple of points in Mr.
17  Varanini's presentation and his papers that I think we
18  agree with. The first is I think he is accurate in
19  distinguishing the posture of California natural
20  claimants vis-à-vis other class claimants in that they
21  are the only ones with the companion parens patriae suit
22  that has also been pending and litigated, albeit in a
23  separate form at the same time. We recognize that
24  distinction.
25      He also is accurate that the district court

27 (Pages 102 - 105)

Page 106

1 possesses equitable discretion to extend claim deadlines
2 generally. We don't contest that. We don't believe it
3 is necessary given the adequacy in our view of the
4 notice that has been implemented to California claimants
5 that a -- that a deadline extension is necessary, or
6 that an extension of that deadline would be necessary
7 for purposes of issuing final approval of our
8 settlement. But we recognize the sensitivities that are
9 associated with the parens case pending at the same
10 time. And if that's the solution that the court
11 imposes, so be it based upon that distinguished posture.
12      SPECIAL MASTER: But what's the downside?
13      MR. NOVAK: Our primary concern is the exposure
14 to the types of objections that might come from other --
15 from other corners or other angles. But aside from --
16 that's our primary concern, and -- and if the court
17 doesn't find that concern to be one that's particularly
18 persuasive, I don't -- I don't think we otherwise have
19 an issue with it.
20      SPECIAL MASTER: Well, I mean, I was contacted
21 by an enterprising aggregator directly on the afternoon
22 of December 6th asking me to do something to facilitate
23 his ability to file claims. And -- you know, so I'm
24 aware that there is that -- you know, there is that
25 industry out there which -- but...

Page 107

1      I don't know. I'm feeling as if I'm not
2 hearing any serious downside to extending the deadline
3 -- recommending to Judge Tigar that he extend the
4 deadline for California natural persons except that you
5 might get a lot of objections from people that, you
6 know, I think we could deal with. I don't want to do
7 anything that has unfortunate consequences, you know,
8 unforeseen consequences, so -- but I'm not hearing any
9 except the objections that might come in.
10      MR. NOVAK: I -- I think that's probably an
11 accurate characterization.
12      SPECIAL MASTER: Okay. Mr. Varanini, as long
13 as you're on a roll here, what -- you had some other
14 issues. You raised the issue of cy pres. You said
15 there's no cy pres provision in the -- in this
16 settlement.
17      MR. VARANINI: Correct.
18      SPECIAL MASTER: The contemplation is
19 everything would be distributed pro rata, but how does
20 that disadvantage your California natural people?
21      MR. VARANINI: Well, there are two parts to
22 that. One is we don't know if it's -- we don't have
23 anything in the record that says that it's all going to
24 be distributed. We have statements being made in
25 briefing, but we don't actually have the claims data

Page 108

1 with the projection, which in other cases that's been
2 provided.
3      But let's assume for the sake of argument,
4 because I'm not trying to evade the question, that
5 that's what is going to happen; that at the end of the
6 day, leaving aside this issue of giving people treble
7 payment, let's say based on single damages just for the
8 sake of the argument for a moment. So that's the idea
9 that people at the maximum, if they filed the claim,
10 they're only going to get back their single damages.
11      And let's assume that exhausts the fund
12 entirely. Well, if it's single damages, that's okay
13 because there is a preference for direct distribution.
14 So if you have a fund, and assuming Your Honor is
15 otherwise okay with the allocation plan, and, you know,
16 the money that was set aside for people to file claims,
17 both people and corporations, you give them single
18 damages, the money is completely run out, there isn't a
19 cent left -- and this includes issues with people having
20 moved; you can't give them checks. This includes trying
21 to track people down and you don't succeed. Let's just
22 assume for the sake of argument there isn't even that
23 ghost of a residue left.
24      Agreed -- I would agree based on federal law
25 without respect to California law, I would agree cy pres

Page 109

1 is not an issue. Okay? But then -- and again, we're
2 only looking at the face of the notice plan and the
3 allocation plan because we don't have the data. Data
4 would allow us to give a more refined perspective than
5 we can give. Here we're talking treble damages. Okay?
6 So this is the idea that corporations and individuals
7 not only should get the full value of their claims, but
8 that that should be trebled.
9      And so the question that's in front of Your
10 Honor, again in the absence of additional data, is is it
11 appropriate for those folks to get three times the value
12 of their claim or is that a windfall. And if it's a
13 windfall, should that extra money go cy pres or should
14 there be at least notice to try to find additional
15 claimants first.
16      We've proposed both as potential alternatives
17 for the court. So we said well, we think based on other
18 cases there's sort of obvious additional notice that
19 could be done to gin up claims. And because we don't
20 have the data, we don't know whether those obvious
21 additional notice that was done in other cases could be
22 done here or not.
23      All we can do is point to the other cases, and
24 then Your Honor has to make whatever decision Your Honor
25 feels is appropriate. Or we said -- let's say it did

28 (Pages 106 - 109)

Page 110

1  not turn out to be the case, that the indirect purchaser
2  plaintiffs come back and say look, this really would
3  cost us way too much money, and it's just not going to
4  gin up claims, okay?  Well, then we said well, wait a
5  minute, then if there is this windfall, why not leave
6  some money left over for cy pres after everybody gets
7  the value of their claims in full.  Then that way we
8  know everyone in the classes of the different state
9  specific damage classes gets some sort of benefit.  It
10  may be indirect, but they're going to get a benefit.
11       And as long as everyone follows the proper
12  protocol that's been set out in Ninth Circuit cases, a
13  protocol we're very experienced with, there shouldn't be
14  the kinds of issues that have arisen in other cases such
15  as Kellogg, the Ninth Circuit case.  So that's why we
16  thought there's this sort of interplay between claims
17  and cy pres.
18       SPECIAL MASTER:  Okay.
19       MR. NOVAK:  May I respond to that?  Again, Mr.
20  Novak on behalf of the IPPs.
21       Let me make a couple observations with respect
22  to the plan of allocation, its relationship to notice,
23  and the issue of single versus treble damages.
24       First, as has already been discussed, the
25  adequacy of the notice plan has already been touched

Page 111

1  upon.  I think even the California attorney general
2  recognizes that the notice plan as implemented meets the
3  due process requirements and Rule 23 requirements.
4  Exhibit C of his declaration, the claim stimulation
5  document that references the notice plan, states, quote:
6       "Due process notice programs must adhere
7       to the requirements of Rule 23 claim
8       stimulation programs.  Unshackled from these
9       requirements allow us to think outside the
10       box."
11       So what Mr. Varanini is discussing is something
12  that exceeds the requirements that class counsel has for
13  purposes of creating and submitting and implementing the
14  notice plan that then informs the claims administration
15  process.
16       As it relates to claims administration,
17  although we don't have final data, and in the event that
18  the court extends the deadline for the submission of
19  claims, won't have the deadline -- won't have the data
20  for an even greater period of time, but what we think is
21  going to happen with -- based simply upon the claims
22  that have been submitted to date is that claimants are
23  going to receive much closer to single damages than they
24  will to treble damages.
25       And we note that there are a number of other

Page 112

1  cases where treble damages as the cap was acceptable to
2  the court for purposes of issuing final approval, but
3  also even to the California attorney general for
4  purposes of obtaining final approval on some of those
5  settlements.
6       SPECIAL MASTER:  In LCD there was a treble
7  damage cap.
8       MR. NOVAK:  LCD had a treble damage cap.
9       SPECIAL MASTER:  Did the California attorney
10  general complain about that there?
11       MR. VARANINI:  No, we did not.
12       SPECIAL MASTER:  Of course, there was more
13  money.
14       MR. VARANINI:  Well, if -- if I may, aside from
15  the issue of whether there was more money or not, and we
16  were working with other states and so had to compromise,
17  there were two key distinguishing factors about LCDs, at
18  least we thought.  Now Your Honor may disagree with
19  that.  One of those -- one of the distinguishing factors
20  was there was a more extensive notice campaign done for
21  purposes of ginning up claims than is being done here.
22       SPECIAL MASTER:  Right.
23       MR. VARANINI:  The second distinguishing
24  factors are the amount of the fees claims were lower, so
25  there was more money in the pot.

Page 113

1       SPECIAL MASTER:  Not a lot.
2       MR. VARANINI:  Not a lot.  And there was -- in
3  LCDs there was a reversionary -- there was -- sorry,
4  reversionary is the wrong term.  There was a clause that
5  said if there was any money left over, it would go to
6  our cy pres.  So there were distinguishing features of
7  LCDs that we could say well, maybe -- look, in a perfect
8  world -- you get the point.
9       SPECIAL MASTER:  Fair enough.  Go ahead.
10       (Electronic interruption.)
11       MR. NOVAK:  The other point I wanted to make,
12  and this is with respect to at what point does a court
13  make a determination.  We've given enough money to
14  claimants.  Let's proceed to distribute the remaining
15  money on a cy pres basis.
16       I brought to Mr. Varanini's attention this
17  morning when we were discussing these issues that some
18  of the other circuits -- the Ninth Circuit hasn't spoken
19  on this issue or, for that matter, any court in the
20  Ninth Circuit that I'm aware of.  Other circuits have
21  addressed the issue of at what point do you go to cy
22  pres.
23       And in the Second Circuit, specifically in the
24  Masters versus Wilhelmina modelling case, it's 473 F.3d
25  423.  The second circuit actually found it to be an

29 (Pages 110 - 113)

Page 114

1  abuse of discretion to consider cy pres distribution
2  before making a treble damage allocation to the
3  claimants.
4      And I think a couple of other courts have come
5  to a similar conclusion, although not probably as
6  clearly as the Masters decision.  One is a Bank America
7  decision 775 F.3d 1060.  I'm not going to suggest that
8  it went as far as Masters versus Wilhelmina, but it
9  cited language from that decision on the cy pres issue
10  and the treble damages issue approvingly.  That's from
11  the Eighth Circuit.  There's also an in re publication
12  paper --
13      SPECIAL MASTER:  You know what, I'm going to
14  ask you to do the same.
15      MR. NOVAK:  I'll submit --
16      SPECIAL MASTER:  If you could just submit a
17  letter with any citations you wanted.
18      MR. NOVAK:  Okay.  Particularly that one
19  because I've only got a Lexis cite for it, and you'll
20  need it in Westlaw.
21      SPECIAL MASTER:  All right.
22      MR. NOVAK:  So other courts that have looked at
23  that issue have explicitly found that it's okay to go up
24  to a full treble damage, and in some instances have said
25  it was an abuse of discretion not to go first to treble

Page 115

1  damages.  The Lupron marketing decision that Mr.
2  Varanini pointed to actually had a 1.67 multiple of
3  damages for claimants as -- as the cut off in that
4  settlement, and it was a cut off that had been
5  negotiated.
6      What happened in that case is plaintiffs
7  originally had a 100 percent allocation plan.  You had
8  some objectors come in and say hey, we should receive
9  more than 100 percent before cy pres distributions are
10  made.  And so a negotiation to revise the settlement to
11  increase it to 1.67 times was made.
12      And then at that point, the court said because
13  the objectors settled with that revision to the
14  settlement and then came back later and argued about it,
15  and the court said you've -- you've waived your
16  arguments with respect to getting even more than 1.67
17  times your damages because you obtained consideration
18  for it when you revised the settlement agreement.
19      So basically I think the case law certainly
20  allows for distributions to go up to treble damages, if
21  not require it, particularly in an instance where as
22  here it's not contested that the notice plan meets due
23  process and Rule 23 requirements for being the best
24  practicable notice.  And for those reasons we don't
25  think that the modifications to the allocation plan are

Page 116

1  appropriate.
2      And let me make one final observation.  And
3  that is that this whole idea that we need to go until
4  the very end of the claims distribution process when all
5  of this data has been submitted and make the
6  determination based on that, if we continue to extend
7  the claims deadline, it has the problem of continually
8  forestalling the distribution of money to claimants,
9  which given the amount of time between the beginning of
10  the class period -- oh, that actually reminds me of one
11  other thing.
12      And that is there -- if you had actually
13  obtained these damages back when these purchases were
14  initially made at the beginning of the damage period,
15  and didn't have the time value of that money for what's
16  near 20 years, that makes treble damages all the more
17  appropriate, even though I don't think any claimants are
18  going to be getting it based on the claims data that's
19  been submitted.
20      SPECIAL MASTER:  You're worried that people may
21  have been eight years old when the claim period started,
22  but they may be 80 before they get any more.
23      Mr. Varanini, I'm worried about your practical
24  problem here.  Let's say I recommend next week that the
25  claim deadline be extended.  Nothing is going to happen

Page 117

1  on that until March 15 unless I ask Judge Tigar to rule
2  separately on that issue quickly.
3      MR. VARANINI:  Well, there are -- sorry.
4      SPECIAL MASTER:  And you've got a January 27
5  hearing.
6      MR. VARANINI:  Yes.
7      SPECIAL MASTER:  And you've got to give notice.
8      MR. VARANINI:  Yes.  There are three responses
9  to that.  First of all, if nothing else, we could at
10  least say that Your Honor has in your report and
11  recommendation recommended the extension of claims
12  deadline.  That would be positive encouragement that we
13  could point out to people to submit claims, even if
14  ultimately the court retains the discretion to say no,
15  and we would have to say something about that to be
16  frank.
17      The second point is that as Your Honor
18  indicated, Your Honor could recommend to Judge Tigar to
19  rule quickly on this one issue so we would have an
20  answer before the hearing.
21      The third possibility is that we do have
22  pursuant to the proposal we had made to extend the
23  claims deadline, we've left some water in there.  So if
24  something happened, we could -- we could, for example,
25  move the hearing back by a week or two and still have

30 (Pages 114 - 117)

Page 118

1 more than enough time for people to get notice and still
2 not leave things out of sync with the final approval
3 hearing.
4     At some point we do recognize that if things
5 get pushed back far enough, that's on us. So we want to
6 have the preliminary approval hearing very soon, and we
7 prefer to have it on the date that we set, but we did
8 leave a little bit of water in our proposal to move it
9 forward to June 30th so that we would have the ability
10 to deal with these kinds of circumstances.
11     SPECIAL MASTER: Okay. So I've covered my
12 agenda. Is there anyone who has anything remaining that
13 they think should be brought to my attention?
14     Mr. Cooper.
15     MR. COOPER: This doesn't actually have to do
16 with any of the substance we've been talking about. One
17 of my questions relates to the protocols for getting
18 notices and distributions. You posted yesterday an
19 email exchange that apparently you had with Mr. Alioto,
20 and I'm not certain with Mr. Scarpulla or not, which set
21 out the issues you wanted to talk about today. The
22 original emails and your email responding were not sent
23 to all counsel, and so --
24     SPECIAL MASTER: My bad.
25     MR. COOPER: Well, apparently Mr. Alioto's --

Page 119

1     SPECIAL MASTER: I apologize.
2     MR. COOPER: -- directly going to you initially
3 was not sent over yesterday. So my question is what are
4 the protocols so we can all be getting timely notice of
5 what's going on?
6     SPECIAL MASTER: Okay. The Order of Reference
7 allows me to have ex parte conversations with counsel on
8 procedural issues. I keep it -- try to keep it to a
9 minimum. At the very beginning when we were getting
10 organized, Mr. Alioto and I talked quite a bit as we've
11 gotten into this. I've tried to keep it more formal and
12 more transparent.
13     So I think that from now on any email exchange
14 with me, either email or letter exchange with me should
15 be posted on Case Anywhere on the JAMS website, and I
16 failed to do that. I was actually on vacation, and
17 that's just my mistake.
18     And -- I mean I think I sent it to the people I
19 thought would have the most interest in it, Mr. Varanini
20 and Mr. Scarpulla and Mr. Alioto. So I apologize to
21 everyone else. But I think that's the way we should do
22 it. Any communications with me should be -- should be
23 posted on the Case Anywhere.
24     You know, I suppose something could come up
25 that would be incredibly urgent, a procedural matter

Page 120

1 that someone would just have to call me on the phone. I
2 would really like to avoid that, but, you know, if
3 circumstances demand it, my Order of Reference permits
4 it.
5     MR. COOPER: I was aware of what it says in the
6 Order of Reference about ex parte communications,
7 although I do believe the word was "scheduling" and not
8 "procedural" but I'm not quibbling -- I'm not quibbling
9 about that. But this particular email seemed not to be
10 in that category where you've talked substantively about
11 what's going to happen, and that's why I'm bringing it
12 up, so...
13     SPECIAL MASTER: I've already apologized. I
14 don't know what more I can do.
15     MR. COOPER: I'm not trying to beat it up
16 anymore.
17     My second question was during the discussion
18 you were having with regard to notice and claims in the
19 discussions, particularly about the claims rates and
20 what the experience has been, you made a statement, and
21 I wrote the words down, and I believe it's a question to
22 Mr. Alioto with regard to the information about the
23 claims experiences. And you said: Would that be the
24 end of the, quote, "final" -- or when, quote, "the final
25 papers are filed."

Page 121

1     And that confused me because I thought that the
2 only papers that are yet to be filed is your report and
3 objections and responses to that, and I didn't know what
4 you were referring to by final papers.
5     SPECIAL MASTER: I don't either. But I take it
6 what would normally happen is that there'd be an ongoing
7 reporting to the court of the progress of the claim
8 process to allow the court to confirm that the claim
9 process was being carried out the way it was supposed to
10 be carried out. So...
11     MR. COOPER: Well, I just wasn't certain if
12 there was some briefing schedule that I wasn't aware of.
13     SPECIAL MASTER: No, no.
14     All right. Anything else? I have a couple of
15 things to say at the end, but --
16     MR. ALIOTO: Two points, Your Honor.
17     SPECIAL MASTER: Mr. St. John.
18     MR. ST. JOHN: Your Honor, do you want any
19 argument on the issues raised in IPP counsel's surreply?
20     SPECIAL MASTER: Well, what are you referring
21 to?
22     MR. ST. JOHN: The judicial estoppel vis-à-vis
23 Chunghwa and the Philips and Samsung settlements.
24     SPECIAL MASTER: The point on Philips and
25 Samsung I think that you made was they're so big there

31 (Pages 118 - 121)

Page 122

1 must be something out of whack.
2       MR. ST. JOHN:  Correct, Your Honor.
3       SPECIAL MASTER:  The others must be too small.
4 Words to that effect.
5       MR. ST. JOHN:  More that the size is
6 attributable to factors other than class counsel's
7 efforts such that they're not properly -- that the
8 entirety of those settlements are not properly
9 includable in the fee base.
10       SPECIAL MASTER:  I think I have your arguments
11 on that.  I mean -- I mean I may not totally remember
12 them now, but I remember reading them and understanding
13 them when I read them.
14       MR. ST. JOHN:  Fair enough, Your Honor.
15       SPECIAL MASTER:  Did I see other hands?  Mr. --
16       MR. SCARPULLA:  I just have a quick question,
17 Your Honor.  To the extent that Your Honor is going to
18 have a hearing on fees, will you let us know that or if
19 you're not --
20       SPECIAL MASTER:  No, it will be held secretly.
21 No.
22       You mean a hearing on the allocation of fees,
23 or the hearing on the total amount of fees?
24       MR. SCARPULLA:  Well --
25       SPECIAL MASTER:  Oh, I see what you're

Page 123

1 saying -- no.  What I said in that email was that I
2 wanted to focus this hearing on the issues that we've
3 already talked about.
4       MR. SCARPULLA:  Correct.
5       SPECIAL MASTER:  I am not excluding -- you may
6 say anything you want to about fees now.  I mean I think
7 I understand all the arguments you've made.  I have them
8 in mind, and we'll consider them.  If there's anything
9 more anybody wants to say about the fee request or the
10 expense request, you may do so.  If you were sandbagged
11 and thought that wasn't going to come up today, you
12 know, I'm -- I'm -- I don't know what to say.  I don't
13 have time to set another oral argument.  But you're free
14 to say anything you want now.
15       MR. SCARPULLA:  Well, I think it's all in the
16 briefs, and I wasn't -- but I wasn't sure whether Your
17 Honor was going to have that as a separate hearing from
18 this one.
19       SPECIAL MASTER:  No.  I think what I said was I
20 think I have enough in the briefing and in the
21 declarations from the various attorneys and so on and so
22 on to make hopefully an intelligent ruling on that.
23       MR. SCARPULLA:  Right.
24       SPECIAL MASTER:  Sir.
25       MR. ST. JOHN:  Your Honor, I apologize.  I do

Page 124

1 want to briefly address, if now is the time, arguments
2 made in surreply about Chunghwa and judicial estoppel.
3       SPECIAL MASTER:  Sure.
4       MR. ST. JOHN:  Class counsel is playing fast
5 and loose with the idea that small -- small settlement,
6 their words, was invaluable and an icebreaker.  And
7 there's no dispute that those words were represented to
8 the court, and there's still no dispute that Chunghwa's
9 assistance was invaluable.  That's at page 13 of the
10 surreply.
11       What they try to do is limit that value in the
12 early stage of litigation.  But class counsel disposed
13 of the class claims for again a small settlement and
14 made those representations, and the fact that it causes
15 litigation regrets, that's precisely what judicial
16 estoppel targets.
17       Class counsel argues or they try to minimize
18 the value of the Chunghwa settlement by emphasizing that
19 DOJ only prosecuted one corporate defendant.  I don't
20 think that's particularly uncommon.  The DOJ has limited
21 resources.  They prosecute a small number of defendants
22 to bust the settlement -- or bust the conspiracy and
23 then leave the rest to private litigants.  That's
24 precisely what DOJ did here.
25       SPECIAL MASTER:  What is -- your point about

Page 125

1 the Chunghwa settlement is what?
2       MR. ST. JOHN:  The Chunghwa settlement created
3 a lot of value beyond its $10 million.
4       SPECIAL MASTER:  Okay.
5       MR. ST. JOHN:  And that value is not really
6 attributable to class counsel.
7       SPECIAL MASTER:  So we should reduce the fee
8 request to reflect that?
9       MR. ST. JOHN:  Correct, Your Honor.
10       SPECIAL MASTER:  Okay.
11       MR. ST. JOHN:  It's the first stage of the
12 rocket.
13       SPECIAL MASTER:  Okay.
14       MR. ALIOTO:  Two final points, Your Honor, and
15 I'll be very brief.
16       One, there was a statement earlier about
17 further notice to an additional group.  There's nothing
18 in the papers about this.  I want to just make sure this
19 is focused up.
20       After the formal notice program, our claim
21 administrator was able to get an email list of claimants
22 in the DRAM case, people who had actually made claims in
23 the DRAM case.  And our claims administrator arranged
24 for direct email notice to be sent to those claimants.
25 It was a supplement to the notice.  It wasn't something

32 (Pages 122 - 125)

Page 126

1 we did because we were having a problem or having
2 trouble. We did it as a supplement to the notice to
3 spur claims. And you can imagine that was effective
4 because these are people who had claimed before, and
5 they were -- they would be motivated to claim again.
6     The other argument I want to make and just a
7 sentence or two is we have made in our papers a standing
8 argument with respect to Mr. Scarpulla and Cooper.
9 There's nothing been said about that in these
10 proceedings. We have no intention of waiving that. We
11 think it's a very important issue that counsel should
12 not be able to come in and make all kinds of claims in
13 settlement approval hearings.
14     They certainly have the right to do that under
15 Rule 23, but the crucial point is you have to have a
16 client. You can't just come in off the street or on a
17 volunteer basis or on an intermeddler basis and make
18 these arguments because these have consequences for us.
19     We're going to be briefing these questions. We
20 may have appeals. It's a very time-consuming, expensive
21 process, and you have to meet that threshold requirement
22 of representing a client. The cases are clear on that.
23 And the cases cited by the objectors do not provide any
24 support for these objections on behalf of indirect
25 purchasers. There's absolutely no basis for doing so.

Page 127

1     SPECIAL MASTER: Okay.
2     MR. ALIOTO: Thank you.
3     SPECIAL MASTER: Glad you brought that up. Mr.
4 -- just start with Mr. Cooper because you're closest.
5     As I understand the papers, you and your firm
6 currently represent a named or formerly named class
7 representative, correct?
8     MR. COOPER: That is correct, Your Honor, but I
9 believe in addition we are counsel of record for the
10 entire class.
11     SPECIAL MASTER: I know. One question at a
12 time. Okay? So you actually may represent a named
13 member of the class?
14     MR. COOPER: We do.
15     SPECIAL MASTER: Okay. Mr. Scarpulla, you did
16 represent a named class representative when you were
17 with the Zelle firm. What is your status now?
18     MR. SCARPULLA: As part of my agreement leaving
19 Zelle, I was made a -- another lawyer of record for
20 those -- for that client. However, I was told by Zelle
21 that the client does not -- does not approve of my
22 objections.
23     SPECIAL MASTER: Okay. So -- but officially
24 you are still counsel of record for a client in this
25 case?

Page 128

1     MR. SCARPULLA: That is correct.
2     SPECIAL MASTER: Okay. But in bringing these
3 objections that you both have made, you are not bringing
4 them on behalf of your clients, you are bringing them in
5 your capacity as class counsel in furtherance of your
6 fiduciary duties, correct?
7     MR. SCARPULLA: I think Mr. Cooper is bringing
8 it on behalf of his clients.
9     MR. COOPER: No, I think that's a fair
10 statement from me.
11     MS. CAPURRO: That's not what their papers said
12 when they filed their objection.
13     SPECIAL MASTER: Well, their papers --
14     MS. CAPURRO: None of their papers have said
15 that today.
16     SPECIAL MASTER: No, none of their papers name
17 a client on whose behalf they're bringing the objection.
18 As I understand it, they are bringing it in their
19 capacity as class counsel, not on behalf of a client.
20 And that is your standing.
21     MR. ALIOTO: We would just ask you to look at
22 the authorities on that, Your Honor. We think it's an
23 important point --
24     SPECIAL MASTER: Okay.
25     MR. ALIOTO: -- and that we'd like you to

Page 129

1 consider.
2     SPECIAL MASTER: Ms. Capurro.
3     MS. CAPURRO: If I may just briefly, I have
4 look extensively at the law on this, and I can find
5 absolutely no case that permits counsel in a case who
6 are not court appointed class counsel. The cases that
7 they cite in their brief -- and they're not court
8 appointed class counsel to bring an objection to a class
9 action settlement and oppose the position of the court
10 appointed class counsel.
11     SPECIAL MASTER: Why are they not court
12 appointed class counsel the same as all the other
13 lawyers in the --
14     MS. CAPURRO: Mr. Alioto was the only court
15 appointed class counsel. All of the case law that they
16 cite in their brief, those cases when they refer to
17 class counsel, they refer to the court appointed class
18 counsel. If you have a situation where every -- every
19 lawyer in an MDL case, which is potentially hundreds of
20 lawyers, is able to speak on behalf of the entire class,
21 I mean if you take that to its logical conclusion, how
22 do you run the case?
23     I mean Mr. Alioto would be saying one thing,
24 and they can pipe up and say something else. How do the
25 defendants know who to deal with? How does the court

33 (Pages 126 - 129)

Page 130

1 know who to deal with?  What's the point of even having
2 an order appointing lead counsel if they're able to do
3 that?
4          SPECIAL MASTER:  Well --
5          MS. CAPURRO:  And this is not a procedural
6 issue, Your Honor, this is jurisdictional.  And the fact
7 that they have filed this motion to be appointed as
8 co-lead counsel actually shows that they recognize they
9 have a standing problem.  That's -- they're trying to
10 bootstrap themselves in here to get the court's nod to
11 give them the voice, you know, to be able to speak on
12 behalf of these objecting plaintiffs who they've never
13 identified.
14          SPECIAL MASTER:  Well, you know, I'm -- I'm
15 cognizant also the court has an independent fiduciary
16 duty to protect the interest of the class.  And if
17 information is brought to the court from any source, I
18 sort of think the court has an obligation to consider
19 it.  But I -- I need to look at the authorities you've
20 cited with care.
21          MS. CAPURRO:  I submit there is no law, and
22 they have cited to none, and it is their burden to show
23 standing.  They have not cited to one case --
24          SPECIAL MASTER:  Okay.
25          MS. CAPURRO:  -- that gives them standing.

Page 131

1          SPECIAL MASTER:  I get it.
2          Is there -- Ms. Kirkham.  You have your hand
3 up.  Ms. Kirkham.
4          MS. KIRKHAM:  Okay.  I know I'm pointing out
5 the obvious, but if there was one lead counsel and all
6 other counsel were silenced by that appointment, and that
7 lead counsel recommends a settlement --
8          SPECIAL MASTER:  Who is going to object.
9          MS. KIRKHAM:  -- you have an issue there.
10          SPECIAL MASTER:  Okay.  Mr. Bonsignore, I saw
11 some activity down there.
12          MR. BONSIGNORE:  Yes, Your Honor, very briefly
13 I represent six plaintiffs, two of which were named
14 plaintiffs in the settlement class, and we joined and
15 adopted their arguments in my paper.  I do agree that
16 they do have separate standing, but in the event --
17 thank you.
18          SPECIAL MASTER:  Good.
19          Mr. St. John.
20          MR. ST. JOHN:  Your Honor, the argument you
21 just made is precisely the holding of Zucker v
22 Occidental Petroleum Corporation.  I don't have the
23 cite, but it was Case No. 9756270 decided by the Ninth
24 Circuit on October 19th, 1999.  The court has an
25 independent obligation to consider whatever information

Page 132

1 is before it regardless of standing.
2          MS. CAPURRO:  We're not disputing that.  That's
3 not the argument.
4          SPECIAL MASTER:  I think I understand the
5 argument.
6          MR. COOPER:  You have briefing on all of this,
7 Your Honor.
8          SPECIAL MASTER:  I do.  I do.
9          MR. SCARBOROUGH:  Your Honor, if we're down to
10 sort of parting remarks here, I just want to say from
11 the defendants' perspective, you know, we have put a
12 tremendous pot of money into escrow.  As I think lead
13 counsel pointed out may be the second largest indirect
14 purchaser settlement ever.  So a tremendous amount of
15 money that they have already paid, it's already sitting
16 in escrow and has been for some time.
17          That money was put there to buy global peace
18 for this litigation for IPP claims with the same factual
19 predicate.  So that's what we want.  That's what LG
20 already got.  They already paid a considerably smaller
21 amount of money for the exact same release that we are
22 asking for here.  So what we would like to see is at
23 least to get past that first threshold, that the money
24 that was paid, this extraordinarily large amount of
25 money that was paid is sufficient for the global

Page 133

1 release.
2          Just in the same way that the issues with the
3 LG settlement, none of these objections were raised
4 during the final approval of that settlement, the final
5 judgment entered there.  It's understandable that there
6 could be some quibbles with allocation.  What's going to
7 happen with that LG money?  And that's fine, and that
8 can apply more broadly to the settlements that are now
9 before Your Honor for final approval.
10          As a general principle, I don't think
11 defendants have a problem if we tweak the allocation
12 plan.  If notice is perhaps sent out again, as long as
13 it's done in a responsible, comprehensive fashion that's
14 really going to lead to final approval, I don't think we
15 have a problem with some of that being done.  But we
16 want our deal, which we think is fundamentally sound,
17 approved now.  And it's time to do that.
18          SPECIAL MASTER:  Okay.  I would like to just
19 take a minute and talk to Ms. Cohen.  Give us two
20 minutes and we'll be right back.
21          (Recess 1:03 p.m. to 1:07 p.m.)
22          SPECIAL MASTER:  Okay.  Let me ask -- I'm not
23 sure whom -- a question.  Mr. Alioto, I guess, you
24 talked about dealing with the Illinois and Washington
25 issues by sort of carving out of your pro rata scheme a

34 (Pages 130 - 133)

Page 134

1  separate allocation scheme for them.
2       THE WITNESS:  Yes.
3       SPECIAL MASTER:  Correct?
4       MR. ALIOTO:  Yes.
5       SPECIAL MASTER:  Could the same kind of
6  arrangement be made to accommodate the -- the Chunghwa
7  settlement if -- if there are disparities between the
8  distribution scheme that was approved by the court in
9  Chunghwa and your distribution scheme?  I mean it sort
10 of as a practical matter, you only have $10 million.
11 What's the practical usefulness of giving notice to all
12 the resellers saying oh, you can now submit claims?
13      I mean I'm trying to find a solution to this
14 Chunghwa problem if it turns out there is one.
15      MR. ALIOTO:  Well, certainly to -- to the
16 extent that they were given notice that they weren't
17 going to get anything, and if it turns out that in fact
18 they're not going to be getting anything, that's
19 consistent.  And -- and do you have to send another
20 notice to them?  I don't think so.
21      But the big question is is there some
22 unfairness there, and is there some inconsistencies, the
23 objector says.  I would like to address that first and
24 be absolutely certain.  You know, that settlement was
25 many, many years ago, and I don't have the judgment

Page 135

1  memorized, but I'm going to certainly be looking at it.
2       I think maybe the better course there, Your
3  Honor, would be to let us review some of these points
4  that they made and try and identify the problem and then
5  respond to you with this next round of briefing.
6       SPECIAL MASTER:  We're not -- we're not talking
7  rounds of briefing here.  I mean --
8       MR. COOPER:  What next round of briefing?
9       MR. ALIOTO:  Well, with this next submission, I
10 suspect, is probably a better choice of words.
11      MR. COOPER:  What next submission?  I thought
12 we went through this.  There are no next submissions.
13      SPECIAL MASTER:  Well, I'm concerned that I do
14 not have the full picture on Chunghwa, and I'm not about
15 to issue a report and recommendation on something I
16 don't feel comfortable that I have the full picture
17 about.
18      MR. COOPER:  Well, I did offer, Your Honor, to
19 send you the documents in consultation with Mr. Alioto
20 what documents you should see.
21      SPECIAL MASTER:  Yes.
22      MR. COOPER:  I'm not certain if that helps you
23 or solves the issues, or if you want them to go together
24 with some five-page letter or something not to exceed
25 five pages.  I'm sure we can do that relatively quickly.

Page 136

1  But when I hear discussions of future rounds of
2  briefings, I mean that's why I asked the question
3  before.  I though it was confusing.
4       SPECIAL MASTER:  Well, I mean, I guess if
5  this -- if I'm going to hew to the court's schedule,
6  then I'm going to need by Thursday some material, and
7  I'll finish with Chunghwa -- just some other material.
8  I'm going to need -- somebody mentioned cases regarding
9  treble -- I'm going to need any cases that you want us
10 to look at that you -- I didn't give you a chance to
11 give me the citations of today -- the docket numbers for
12 the four complaints in this case so we can easily find
13 them and look at what was alleged or not alleged.
14      We're having a handwriting problem.
15      Oh, Ms. Kirkham was going to give me an
16 additional cite to the -- a reference that she made to
17 the Renfrew's report and recommendation.
18      And then information about -- I'd like -- I'd
19 like Mr. Fisher to provide an additional declaration
20 with the updated status of the claim process in as much
21 specificity as he, you know, reasonably and
22 professionally can.
23      And finally we get to Chunghwa, and I -- we
24 definitely need copies of all the relevant documents
25 that allow us to see what was settled and what was

Page 137

1  ordered there.  The question is whether we also need
2  briefing, and I'd like to say no, but I think -- I think
3  -- I think I do.  I mean, I think I need something like
4  a three to five pages from the Cooper group explaining
5  why this is a problem and hopefully maybe suggesting
6  what to do about it, and a brief from Mr. Alioto.  Now,
7  I think what we should do is maybe have those
8  simultaneous briefs.
9       Can we get those in by Friday?
10      MR. COOPER:  That's fine, Your Honor.  We will
11 send to Mr. Alioto today the list of documents that we
12 think we need to send you copies of starting with the
13 settlement agreement.  Whatever is relevant regarding
14 preliminary approval, final approval and judgments, and
15 we can agree on what documents you should be looking at.
16 And a brief not to exceed five pages -- simultaneous
17 briefs not to exceed five pages by Friday?
18      SPECIAL MASTER:  Yes.  Can we -- Ms. Cohen is
19 asking for noon on Friday.
20      MR. COOPER:  Sure.  How about Thursday?
21      MS. COHEN:  I would love it.
22      SPECIAL MASTER:  Thursday would be great.
23 You've got a lot -- I mean, particularly Mr. Alioto has
24 more on his plate than you do.  We're really under the
25 gun here, so Thursday would be very helpful.

35 (Pages 134 - 137)

Page 138

1      MR. COOPER:  I'm sure we can do it.  That's
2  three days.
3      SPECIAL MASTER:  But Friday at noon for sure.
4      MR. ALIOTO:  Friday at noon.
5      SPECIAL MASTER:  Mr. Bonsignore.
6      MR. BONSIGNORE:  Yes, I mentioned that I have
7  objective evidence that some of the critical and
8  decisive points that Mr. Alioto raised were not true.
9      SPECIAL MASTER:  You wanted to augment the
10  record, as I recall.
11      MR. BONSIGNORE:  Yes, I have emails to him
12  providing information regarding the Massachusetts and
13  the testimony.
14      SPECIAL MASTER:  You're going to have to file a
15  motion to augment the record.
16      MR. BONSIGNORE:  Okay.  I'm just wondering
17  why --
18      SPECIAL MASTER:  I'm not going to give you
19  leave to do that here.
20      MR. BONSIGNORE:  Okay.  I'm just wondering why
21  that's treated differently than the other evidence that
22  you said would complete your picture?  What we have is
23  a --
24      SPECIAL MASTER:  Because I think that's fair
25  and just, and I have constraints, the date on which I

Page 139

1  have to get my report and recommendation in.
2      MR. BONSIGNORE:  I can provide the emails
3  today.
4      SPECIAL MASTER:  You may do so.  You may file
5  the motion today and I'll consider it.
6      Mr. Goldberg.
7      MR. GOLDBERG:  Joseph Goldberg for the IPP.  I
8  don't want to file anything.
9      Before the very first break when you asked a
10  question, and I just want to make sure that the record
11  is clear as to the answer.  You asked about what were
12  the pending claims in the operative, which I believe is
13  the fourth amended complaint.  And I just want to make
14  sure that as I understand it, the record is clear, and
15  you're going to get the docket cites for all of these
16  and you're going to look at it, and I think I'm
17  accurately reporting.
18      In the operative complaint, the fourth amended
19  complaint, any pending -- any pending damages claimed is
20  limited to the 22 class jurisdictions.  That is the 21
21  states and the District of Columbia.  There is no
22  pending damages claim in the operative complaint beyond
23  those 22 jurisdictions.  I believe when you review the
24  complaint, you'll see that's correct.  I think that's
25  what you were asking, and I just want to make sure that

Page 140

1  the record is clear as to what the answer is.  Thank
2  you.
3      SPECIAL MASTER:  All right.  Thank you,
4  everybody.  This was not the two hours I hoped for, but
5  it was three hours and 15 minutes, and you're to be
6  congratulated for that.
7      Mr. Cooper.
8      MR. COOPER:  I'm confused about whether the
9  simultaneous admissions about Chunghwa is to be Thursday
10  at 5 o'clock or Friday at noon.
11      MR. GOLDBERG:  Yours is Thursday and his is
12  Friday.
13      MR. ALIOTO:  I need time.  I need a little
14  time.
15      SPECIAL MASTER:  Friday -- Friday noon.
16      MR. COOPER:  Okay.
17      SPECIAL MASTER:  Friday noon.  If you get it by
18  Thursday, you get a gold star.
19      MR. COOPER:  But they can't be simultaneous.
20      SPECIAL MASTER:  All right.  We're off the
21  record.  Thank you very much.
22      (TIME NOTED: 1:17 p.m.)
23
24
25

Page 141

1      I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby certify:
3      That the foregoing proceedings were taken
4  before me at the time and place herein set forth; that
5  any witnesses in the foregoing proceedings, prior to
6  testifying, were duly sworn; that a record of the
7  proceedings was made by me using machine shorthand which
8  was thereafter transcribed under my direction; that the
9  foregoing transcript is a true record of the testimony
10  given.
11      Further, that if the foregoing pertains to the
12  original transcript of a deposition in a Federal Case,
13  before completion of the proceedings, review of the
14  transcript [ ] was [ ] was not requested.
15      I further, certify I am neither financially
16  interested in the action nor a relative or employee of
17  any attorney or party to this action.
18      IN WITNESS WHEREOF, I have this date subscribed
19  my name.
20  Dated: 1/10/16.
21
22       _Suzanne J. Boschetti_
         SUZANNE F. BOSCHETTI
23          CSR No. 5111
24
25

36 (Pages 138 - 141)

| & | 1900 4:21 | 294-4615 11:7 | 5 |
|---|---|---|---|
| **&** 3:11 4:12 5:3,12 | **19107** 4:7 | **2nd** 7:8 | **5** 1:17 2:19 14:1 |
| 6:17 7:4 10:3,11 | **1917** 1:6 2:6 | **3** | 84:20 88:2 140:10 |
| 11:3,19 12:4 13:4 | **1999** 131:24 | | **50** 33:10 50:9 55:23 |
| 14:22 15:2,11,17,21 | **19th** 131:24 | **300** 11:13 48:25 | **500** 9:19 40:9 |
| 16:25 17:14,25 | **1:03** 133:21 | **309-1761** 5:23 | **505** 4:16 |
| **0** | **1:07** 133:21 | **30th** 118:9 | **51** 56:9 70:6,11 |
| | **1:17** 2:18 140:22 | **313** 5:23 | **5111** 1:23 2:21 |
| **05944** 1:6 2:6 | **2** | **314** 9:8 | 141:23 |
| **0921** 12:7 | | **317** 11:15 | **514** 8:22 |
| **1** | **2** 2:16 3:5 | **3400** 5:6 | **516** 97:10 |
| | **2.7** 35:1 | **350-0000** 8:7 | **52** 56:2,3 |
| **1** 4:6 32:16 | **2.8** 40:11 | **357** 7:8 | **55** 97:9 |
| **1.1** 31:18 | **20** 4:14 116:16 | **35th** 8:14 | **555** 10:5 12:6 |
| **1.5** 84:17 | **200** 11:5 49:2 | **361** 9:21 | **56** 40:23 |
| **1.57** 67:18 | **20005-3807** 11:23 | **3771** 8:5 | **563-7200** 3:16 |
| **1.67** 115:2,11,16 | **2015** 2:19 | **393-8293** 12:8 | **567-6565** 4:8 |
| **1/10/16** 141:20 | **2016** 1:17 14:1 | **39560** 8:23 | **576** 27:7 28:3 34:6 |
| **10** 77:16 88:1 93:2 | **202** 11:24 | **398-4340** 4:23 | 35:16 76:2 93:2 |
| 125:3 134:10 | **21** 32:19 40:12 | **3:07** 1:6 2:6 | **58** 77:7 78:11 |
| **100** 115:7,9 | 139:20 | **4** | **6** |
| **10166** 11:6 | **212** 11:7 | | |
| **1020** 9:19 | **212-3475** 8:24 | **4** 84:20 | **60,000** 77:24 |
| **1060** 114:7 | **2125** 6:19 | **40** 64:10 | **600** 4:21 |
| **10:09** 14:2 | **215** 4:8 | **40004-2400** 10:23 | **619** 4:23 |
| **11000** 12:15 | **217-6810** 13:8 | **4041** 5:14 | **620** 5:21 |
| **1167** 67:18 | **21st** 25:14 | **41** 71:2 | **626-3609** 11:24 |
| **11:34** 76:9 | **22** 32:23 77:15,16 | **410** 8:24 | **631-3883** 9:8 |
| **11:47** 76:9 | 139:20,23 | **415** 3:7,16 5:8 6:7 | **63111** 9:7 |
| **12** 40:23 41:2 77:15 | **22030** 5:15 | 6:14 7:10,19 8:16 | **65** 37:7 |
| **120** 6:19 | **221-5763** 6:7 | 10:7,15 12:8,17 | **693-0700** 5:8 |
| **1299** 10:22 | **2280** 3:14 | 13:8 | **698-5200** 9:21 |
| **13** 124:9 | **23** 111:3,7 115:23 | **423** 113:25 | **6th** 106:22 |
| **1449** 70:6,11 | 126:15 | **4247** 9:6 | **7** |
| **15** 96:22 117:1 | **237-8562** 11:15 | **434-8900** 8:16 | |
| 140:5 | **23rd** 4:6 | **434-9100** 10:15 | **7** 88:1 102:10 |
| **1500** 2:17 3:5 | **244-7520** 4:16 | **439-1313** 10:7 | **700** 4:14 |
| **155** 6:12 | **24th** 25:5 | **44** 5:6 | **701** 11:22 |
| **15th** 20:4 | **2532** 6:5 | **455** 12:15 | **703** 5:16 |
| **16** 66:7 | **25th** 25:6 | **456** 7:17 | **703-5908** 12:17 |
| **1625** 9:12 | **27** 117:4 | **459** 56:12 58:7 61:5 | **706** 13:6 |
| **17** 20:5 | **2700** 11:13 | **46204** 11:14 | **715** 67:18 |
| **17th** 7:17 10:13 | **28th** 25:8,9 | **473** 113:24 | **719** 5:21 |
| **18** 77:11,13 | **2905** 9:12 | **48226** 5:22 | **764-8700** 5:16 |

**[768 - alioto]**                                                                 Page 2

**768**   97:9
**775**   114:7
**781**   8:7
**78401**   9:20
**788-3030**   7:10
**788-7210**   7:19
**797**   97:9

**8**

**80**   84:21 116:22
**80202-1539**   9:13
**824**   97:10
**83**   78:12
**87102**   4:15
**89121**   8:6

**9**

**900**   6:12
**92101**   4:22
**925**   6:21
**94102-7002**   12:16
**94103**   7:9
**94104**   5:7 7:18 8:15
  10:6
**94105**   12:7
**94111**   3:6 13:7
**94111-4109**   10:14
**94114**   6:13
**94121**   6:6
**94123**   3:15
**945-0200**   6:21
**94598**   6:20
**9756270**   131:23
**982-5267**   3:7
**986-1400**   6:14
**9:55**   2:18

**a**

**a.m.**   2:18 14:2 76:9
  76:9
**abandoned**   21:5
  72:14
**abandoning**   75:13
**ability**   106:23 118:9
**able**   33:11 46:25
  49:12 68:2,22 78:2

**125:21 126:12**
  129:20 130:2,11
**absence**   84:1,3
  109:10
**absent**   70:12 103:12
**absolute**   68:10
  74:14
**absolutely**   64:16
  65:13 84:9,11 86:5
  126:25 129:5
  134:24
**abuse**   114:1,25
**academic**   57:11
**acceptable**   112:1
**accepting**   58:16,19
**access**   49:16,17
  102:19
**accommodate**   27:21
  28:22 134:6
**accurate**   105:18,25
  107:11
**accurately**   139:17
**acknowledging**
  23:15
**acknowledgment**
  95:16
**acquaintances**
  16:15
**act**   43:4 44:2 45:4
  55:16 65:15,15
**acted**   22:16
**acting**   44:14 66:14
  66:17
**action**   41:9 53:14
  55:15 60:8 66:6
  67:14 129:9 141:16
  141:17
**actions**   1:8 2:8
**active**   67:1
**activity**   131:11
**actual**   59:12 99:6
**ad**   80:12,21,21,24
**add**   57:6 72:17 79:2
  96:12 97:1

**added**   25:3
**addition**   127:9
**additional**   98:3,13
  109:10,14,18,21
  125:17 136:16,19
**address**   18:8 24:1
  35:6 51:22 124:1
  134:23
**addressed**   29:12
  35:7 51:7 113:21
**adelson**   10:4 15:11
  15:11
**adequacy**   19:5
  21:22 22:3 26:13
  32:5 33:12 40:3,3
  106:3 110:25
**adequate**   26:10 28:2
  28:18 30:6,11 33:7
  76:16
**adhere**   111:6
**adjective**   75:12
**adjectives**   73:7
**administration**
  111:14,16
**administrator**   79:19
  82:15 125:21,23
**admissions**   140:9
**adopt**   27:11
**adopted**   131:15
**adopting**   49:5
**adoption**   47:13
**ads**   80:11
**advance**   21:1 96:25
**advanced**   20:17
  83:9
**advantaged**   104:20
**advertisement**
  103:1
**advice**   100:25
**advocacy**   85:2
**advocate**   21:1
**advocating**   21:3
  27:19 85:4
**afford**   60:1

**affording**   40:21
  41:4 44:3
**afternoon**   106:21
**ag**   57:2 105:13
**agenda**   118:12
**agendas**   56:18
**ages**   77:16
**aggregator**   106:21
**aggregators**   71:2
**ago**   21:17 94:18
  134:25
**agree**   40:7 45:25
  97:22 101:17
  105:18 108:24,25
  131:15 137:15
**agreed**   100:3 108:24
**agreement**   39:5
  115:18 127:18
  137:13
**agreements**   26:18
  30:3,10
**agrees**   44:22
**ags**   59:11 88:13
  93:22 95:11 101:1
**ahead**   22:9 53:8
  71:17 73:17 86:18
  86:22 99:22 103:22
  113:9
**albeit**   105:22
**albuquerque**   4:15
  14:22
**alioto**   3:11,12 14:8,8
  20:23 21:22 22:24
  23:18,19 26:6,14,16
  28:15 29:9,17 32:10
  33:3 35:5 36:1,9,11
  36:21 37:11,16,24
  38:2,11,15 39:10
  45:24 51:22,25 52:6
  52:12 53:1,2,5,17
  53:22,23 54:7 59:4
  59:9,21 61:9,12,20
  62:4,10,25 63:5,11
  63:20 67:10,24 68:4
  73:18 74:10,22 75:7

75:11 76:1,1 79:3
79:10 81:22 82:1,14
85:14 86:1 90:1,2
90:22,24 91:9 92:2
92:7,25 93:11 94:24
95:8,23,24 96:5,10
96:14,25 98:5,6,9
100:11 104:5,19
105:2,12 118:19
119:10,20 120:22
121:16 125:14
127:2 128:21,25
129:14,23 133:23
134:4,15 135:9,19
137:6,11,23 138:4,8
140:13
**alioto's** 32:12 100:9
118:25
**aliotolaw.com** 8:17
**allegation** 63:11
67:3 69:11
**alleged** 59:13 62:19
136:13,13
**alleges** 45:3
**allocate** 90:9
**allocated** 94:4
**allocation** 21:12
26:13,21 27:6 28:5
28:9 29:1,7 30:7,14
30:16 39:19 81:25
86:25 87:1,8,8,9,10
87:11,18,23 89:18
89:19 94:5,5,11,15
100:22 101:1
102:16,17,23 104:5
108:15 109:3
110:22 114:2 115:7
115:25 122:22
133:6,11 134:1
**allocations** 26:25
**allow** 47:8 100:16
109:4 111:9 121:8
136:25
**allowance** 68:11

**allowed** 37:21 51:9
65:1
**allowing** 42:19
**allows** 67:6,7 115:20
119:7
**alternatives** 109:16
**ambivalence** 23:10
23:20,25
**amended** 63:4
139:13,18
**america** 114:6
**american** 44:16,17
**amount** 19:25 26:8
26:9 30:4,21 31:10
31:22 32:9,16,17,22
33:7 34:8 35:7 37:6
90:5,8,13 91:4,7
94:3,7 95:9,10,12
95:13,14 112:24
116:9 122:23
132:14,21,24
**amounts** 87:21
95:11 99:20
**analysis** 35:2 36:3,3
36:7 46:21 57:22
58:1 103:9
**analyze** 59:24
**analyzed** 46:14
**anderson** 6:10,11
18:2,2,3
**andrus** 6:10 18:3
**andrusanderson.c...**
6:15
**angles** 106:15
**announce** 17:5
**announced** 18:7
**answer** 22:8,11 23:8
50:1 53:18 61:9
63:6 75:8,14 117:20
139:11 140:1
**answer's** 64:6
**ante** 79:23 82:8
**antitrust** 1:5 2:5
44:7,8,9 46:7,23,24
47:16 48:21 65:24

**anybody** 76:11
78:17 85:20 105:8,8
123:9
**anymore** 120:16
**apart** 29:2 41:23
**apologize** 103:16
119:1,20 123:25
**apologized** 120:13
**apoplectic** 68:1
**apparently** 118:19
118:25
**appeals** 126:20
**appearances** 3:1 4:1
5:1 6:1 7:1 8:1 9:1
10:1 11:1 12:1 13:1
**appeared** 19:14
93:14
**appears** 44:1
**apple** 102:13
**applied** 45:20,21
**applies** 43:22 45:20
**apply** 43:2,5,7 133:8
**appoint** 18:23 23:6
**appointed** 20:6,15
20:20 21:11 24:8,9
24:22 71:20 129:6,8
129:10,12,15,17
130:7
**appointing** 130:2
**appointment** 24:14
131:6
**appreciate** 16:16
21:10
**approach** 28:21,25
58:5
**approached** 39:9
**appropriate** 22:18
23:12 28:4 31:1
104:25 109:11,25
116:1,17
**appropriateness**
18:22 19:1 26:4
**approval** 26:8,9
29:1 30:12 36:13,15
50:5,14 55:16,20

**anymore** 79:22 80:1 81:21
86:24,25 90:19
93:13,23 95:4 96:2
106:7 112:2,4 118:2
118:6 126:13 133:4
133:9,14 137:14,14
**approve** 33:18 34:7
34:22 127:21
**approved** 27:14
28:22,25 29:5,6
30:3,5 76:3 133:17
134:8
**approving** 40:25
60:20 92:16 95:20
96:20
**approvingly** 114:10
**arguably** 65:5
**argue** 70:18
**argued** 50:5,7 72:21
115:14
**argues** 124:17
**arguing** 50:5
**argument** 1:15 2:15
45:19 47:5 66:11
68:8 82:7 86:6,10
92:10,10,11 93:13
98:23 104:17 108:3
108:8,22 121:19
123:13 126:6,8
131:20 132:3,5
**arguments** 22:5
39:23 53:10 73:1
92:8 115:16 122:10
123:7 124:1 126:18
131:15
**arisen** 110:14
**arises** 46:23
**arizona** 88:3
**arizona's** 88:2
**arranged** 125:23
**arrangement** 93:25
134:6
**arrived** 54:10 94:15
**article** 47:6 64:7

**articulate** 29:24
**artificially** 41:15
**aside** 77:14 100:18
   100:19 106:15
   108:6,16 112:14
**asked** 20:13,14
   21:24 22:1 34:18
   39:10 103:8,16
   136:2 139:9,11
**asking** 23:13 82:24
   106:22 132:22
   137:19 139:25
**assert** 57:17 61:16
   73:20
**asserted** 60:14
   62:20,23,25
**assistance** 124:9
**associated** 72:20
   106:9
**assume** 82:22 108:3
   108:11,22
**assuming** 43:6
   81:18 108:14
**attached** 49:6 95:21
**attacked** 34:3
**attacks** 68:25
**attempt** 29:23 33:1
   43:1
**attempts** 72:18
**attendant** 27:1
**attention** 74:12
   113:16 118:13
**attorney** 8:12,20
   9:11 12:13 13:12
   16:4 19:8,10 28:23
   51:8 55:22 56:10,15
   79:7 111:1 112:3,9
   141:17
**attorneys** 3:11
   44:15 55:23 56:3,17
   58:8 67:7,8 70:13
   93:14 123:21
**attributable** 122:6
   125:6

**augment** 138:9,15
**authorities** 128:22
   130:19
**authority** 24:13
   47:6 48:3,4,7 53:11
   53:13,15 64:5,6
**authors** 47:18
**authorship** 27:13
**available** 32:17
   37:19 67:25 79:9
   82:16
**avenue** 10:22 11:5
   12:15
**avoid** 46:3 120:2
**award** 43:24
**aware** 37:11 56:24
   64:25 68:4,6,6
   101:13,23 103:11
   106:24 113:20
   120:5 121:12
**axes** 56:18

**b**

**b** 4:21 27:11
**back** 20:10 28:7
   29:7 36:13 46:9
   68:19 70:4 76:7
   104:22 108:10
   110:2 115:14
   116:13 117:25
   118:5 133:20
**background** 60:25
   94:8,11
**bad** 118:24
**baker** 10:19 11:11
   15:15 17:16
**bakerbotts.com**
   10:24,25
**ball** 83:8
**bandas** 9:17,18 17:6
   17:6
**bandaslawfirm.com**
   9:22
**bank** 75:25 114:6

**banner** 80:11,21,24
**bar** 43:3 69:13
**bargained** 30:5
**barred** 66:1
**base** 122:9
**based** 53:25 54:2,2
   68:2 94:4,7 99:16
   103:5 106:11 108:7
   108:24 109:17
   111:21 116:6,18
**bases** 69:1
**basically** 72:19
   115:19
**basis** 54:14 57:19,20
   60:17 85:22 113:15
   126:17,17,25
**battle** 58:19 83:8
   86:7,10
**battles** 68:24
**beach** 8:23
**bear** 60:3 79:24
**bears** 61:21
**beat** 51:14,14
   120:15
**beaten** 51:17 66:22
**beginning** 2:18
   40:17 116:9,14
   119:9
**begins** 46:22,22
**behalf** 15:2,9,15,18
   16:3,20,22 17:14,17
   17:18 18:1,3,5
   62:20 68:20 99:11
   102:12 110:20
   126:24 128:4,8,17
   128:19 129:20
   130:12
**beings** 78:3
**believe** 20:5 22:1
   30:7 40:16 50:4
   68:24 74:22 91:9
   97:2 102:16,21
   103:6,13,20 104:21
   104:23 106:2 120:7
   120:21 127:9

**139:12,23
**bells** 54:20
**benefit** 14:6 101:21
   103:9 110:9,10
**benefits** 44:9,10
**best** 26:23 57:24
   81:13,13 82:10
   115:23
**better** 44:12 66:12
   135:2,10
**beyond** 70:1 125:3
   139:22
**bgralewski** 4:24
**big** 74:17 78:6 93:6
   100:12 121:25
   134:21
**billion** 31:18 35:1
   40:11
**birkhaeuser** 6:17
   17:24,25
**birkhauser** 6:18
   17:25
**bit** 25:14 81:23
   118:8 119:10
**black** 4:3 14:18
   16:24
**blake** 94:17
**blame** 67:11
**blaming** 67:11,12
**blown** 68:10
**bob** 16:19
**body** 65:6
**bogdanov** 7:7 16:25
   16:25
**boies** 5:12 15:21
**boies.com** 5:17
**bonsignore** 8:3,4
   15:9,9 24:4,5,6,7,23
   25:5,24 38:22 50:21
   50:22 51:13,18
   52:12 63:17 67:1,3
   67:21 69:5,7,24
   70:9 71:16 73:11
   74:23 75:15 85:25
   86:1 97:7,8,13,17

131:10,12 138:5,6
138:11,16,20 139:2
**bonsignore's** 53:3
**bootstrap** 130:10
**boschetti** 1:23 2:20
141:22
**bother** 24:19 31:5
**botts** 10:19 15:15
17:16
**bought** 41:14,19
42:7 77:21
**boulevard** 9:6,19
**boundary** 42:10
**box** 111:10
**boyd** 4:12 14:21
**bramson** 6:17 17:25
**bramsonplutzik.co...**
6:22
**brass** 12:5 17:10,10
**break** 66:21 73:6
76:7 139:9
**breath** 59:19
**brevity** 40:2,2
**brick** 42:16,16,25
43:12,14,15,16,21
45:19 46:2,3 47:1,8
63:25 64:9,11,12,24
66:1
**brief** 24:25 47:16
49:9 51:3 55:11
61:25 64:22 68:8
70:8,9 77:1 78:9
87:14 90:4,10,11
91:14 97:16 103:7
125:15 129:7,16
137:6,16
**briefed** 96:18
**briefing** 75:5 98:13
99:13,14 107:25
121:12 123:20
126:19 132:6 135:5
135:7,8 137:2
**briefings** 136:2
**briefly** 50:22 51:15
51:18 63:24 80:5

97:8 124:1 129:3
131:12
**briefs** 19:15,17 48:9
52:1 60:20 67:20
76:17 123:16 137:8
137:17
**bring** 56:16 57:12
65:25 73:19 100:14
129:8
**bringing** 57:14
69:14 120:11 128:2
128:3,4,7,17,18
**brings** 98:15
**broad** 4:6
**broader** 27:9
**broadly** 133:8
**brought** 68:20 74:12
75:9 95:16 99:11
105:5 113:16
118:13 127:3
130:17
**burden** 130:22
**business** 62:1 84:14
**bust** 124:22,22
**buy** 132:17

**c**

**c** 3:13 5:4 11:4
27:12 111:4
**ca** 8:15
**cafa** 55:12,20 56:9
56:12,20 61:5 93:15
**calculate** 81:5
**calculation** 56:12
94:8,9
**california** 1:2,16 2:2
2:17 3:6,15 4:22 5:7
6:6,13,20 7:9,18
10:5,6,14 12:7,11
12:16 13:7 14:1
16:4 52:19 64:22
79:7 82:3 98:20,24
99:6 101:18 102:6
103:18 104:7,12
105:3,7,19 106:4

107:4,20 108:25
111:1 112:3,9 141:2
**california's** 88:1
**call** 120:1
**called** 42:10
**campaign** 112:20
**cap** 112:1,7,8
**capacity** 21:12
128:5,19
**capurro** 3:13 14:15
14:16 38:5,9 63:13
128:11,14 129:2,3
129:14 130:5,21,25
132:2
**care** 31:6 32:23
52:14 95:6 101:1,3
130:20
**carefully** 39:5
**carried** 121:9,10
**cartel** 57:18
**carve** 88:25 95:5
**carving** 133:25
**case** 11:19 17:14
31:17 35:1 37:8,20
38:24 41:20,24 42:4
43:21 47:10 48:15
48:16,18 50:3 54:13
54:16 55:2,24 56:7
56:16 57:24 58:6,20
59:1,12 60:21 61:4
62:18 63:2 64:16,17
64:22,25 65:23 66:5
66:11 68:19,21
70:15,15,25 71:6
72:2 73:23 74:1,2
74:15 75:4,23 91:23
91:25 94:13 97:1,9
97:12 100:19 106:9
110:1,15 113:24
115:6,19 119:15,23
125:22,23 127:25
129:5,5,15,19,22
130:23 131:23
136:12 141:12

**cases** 45:24,24 47:15
48:8 51:3 53:19,25
55:8,17 57:25 64:13
65:11,14,16 70:8
74:16,18 99:16
104:16 108:1
109:18,21,23
110:12,14 112:1
126:22,23 129:6,16
136:8,9
**category** 120:10
**cathode** 1:5 2:5
**caught** 52:22
**cause** 28:19 29:20
39:6 100:10
**causes** 124:14
**caution** 20:1 75:1
**cbandas** 9:22
**ccorbitt** 5:9
**ccurran** 11:25
**census** 87:20
**cent** 108:19
**center** 2:17 3:5
10:13
**cert** 97:10
**certain** 33:19 35:5
37:13 48:15 87:19
92:22 93:14 95:1,1
118:20 121:11
134:24 135:22
**certainly** 19:13
27:19 38:13 41:17
53:25 57:3 74:11
79:20 115:19
126:14 134:15
135:1
**certification** 33:2
54:18 63:14
**certified** 2:20 55:25
56:1 63:14 141:1
**certify** 141:2,15
**challenge** 57:4
**challenging** 58:18
**chance** 19:21 53:1
58:6,9 76:13,22

136:10
change 20:13,14
  39:14 43:7
changed 23:13
  25:13 68:7
characterization
  107:11
charged 57:1
chart 95:21
chase 63:25
cheaper 77:23
check 82:14 91:11
  91:17 96:5
checks 108:20
chief 47:13
chill 63:18
choice 42:18 104:11
  135:10
choices 84:15
chose 71:8
chris 16:21 17:6,13
christi 9:20
christopher 5:5 9:18
  11:20
chunghwa 12:3
  17:11 19:7 50:3,8
  54:16 86:13,16 87:2
  87:2,7,13,18 89:9
  89:14,18,20,22 90:6
  90:17,19 91:23
  92:16 93:13 94:25
  95:18,20 96:20
  121:23 124:2,18
  125:1,2 134:6,9,14
  135:14 136:7,23
  140:9
chunghwa's 124:8
cihlar 5:13 15:21,21
circuit 42:4 44:5,6
  48:15,19 64:17
  65:21 66:1,4 97:9
  110:12,15 113:18
  113:20,23,25
  114:11 131:24

circuits 65:21
  113:18,20
circumstances 42:8
  118:10 120:3
citations 49:21
  114:17 136:11
cite 90:10,11 114:19
  129:7,16 131:23
  136:16
cited 27:15 36:12
  47:15,16 48:9,16,24
  48:25 51:2 64:16
  65:18,21 91:14
  97:15 114:9 126:23
  130:20,22,23
cites 139:15
citing 45:24 49:4,9
  70:7
citizens 101:3
claim 19:9 33:4
  35:20 42:13,14,24
  43:12,20 44:13 46:7
  46:8 47:9 48:1,8
  50:9 57:13,14,17
  58:9 59:23,24 60:11
  61:14 62:12,14,19
  62:22 64:4,12 65:25
  66:1,16 67:4 68:19
  69:1,2,10,12,14,22
  71:13 72:24 73:13
  73:21 89:8 97:3,4
  98:16 100:10
  102:12 103:19,22
  104:8,14 105:5,10
  106:1 108:9 109:12
  111:4,7 116:21,25
  121:7,8 125:20
  126:5 136:20
claim's 103:21
claimant 34:20
claimants 27:8
  32:15 56:1 60:9
  73:25 74:16 104:13
  105:20,20 106:4

109:15 111:22
  113:14 114:3 115:3
  116:8,17 125:21,24
claimed 98:21 126:4
  139:19
claims 30:22 32:6,7
  32:10,11,15,23 33:3
  33:12,22,24 34:20
  39:1,2 40:4,6,20,22
  41:2,2,5 43:15,16
  43:18 45:8 46:4
  48:5,14 50:23 51:1
  51:9 53:16 54:1,9
  55:8 57:9 58:17,21
  58:22 59:11,12,13
  59:14,16 60:2,5,6,6
  60:10,13,15 65:2
  67:5 71:21,25 72:1
  72:1 73:12,19,21
  78:4,7,8 79:4,18,19
  81:24 87:21 98:20
  98:22 99:10,11
  100:2,6,12,17,18,19
  101:19 102:10,19
  103:3,8 104:4,6,10
  104:25 105:6
  106:23 107:25
  108:16 109:7,19
  110:4,7,16 111:14
  111:16,19,21
  112:21,24 116:4,7
  116:18 117:11,13
  117:23 120:18,19
  120:23 124:13
  125:22,23 126:3,12
  132:18 134:12
  139:12
clarification 88:11
class 3:10 13:3 19:2
  19:3,4 20:7 32:24
  33:1 34:13 35:19,22
  40:12 41:9,12 42:6
  43:8 54:18 55:15
  57:20 60:7 61:22
  63:14,14 65:1,24

66:5,6 67:14,15,17
  70:11,12,14 71:14
  74:3 77:9,25 88:15
  88:16 89:6 91:12,18
  91:22 96:7,8 97:22
  98:1 100:6 101:22
  105:20 111:12
  116:10 122:6 124:4
  124:12,13,17 125:6
  127:6,10,13,16
  128:5,19 129:6,8,8
  129:10,12,15,17,17
  129:20 130:16
  131:14 139:20
classactions.us 8:8
classes 55:25 56:1
  59:13 75:17 110:8,9
clause 113:4
clayton 7:16 17:2,2
  44:2 65:15
clear 23:8 32:8 53:7
  54:12 90:4 91:14
  100:4 126:22
  139:11,14 140:1
clearly 114:6
clerk's 37:18
click 80:22
clicks 78:19
client 57:12 62:12
  74:23 75:22 97:21
  126:16,22 127:20
  127:21,24 128:17
  128:19
clients 52:17 74:4
  128:4,8
close 29:14 58:12
closed 103:21
closer 111:23
closest 127:4
cmicheletti 5:10
cogently 67:20
cognizable 45:8
cognizant 130:15
cohen 13:12 14:13
  19:15 133:19

137:18,21
**colleague** 63:21
**colleagues** 98:19
**collected** 44:4
**collectively** 30:4
**colorable** 50:9
**columbia** 139:21
**combined** 54:17
**come** 28:17 29:13
  30:8 34:17 42:2
  43:1 59:14 61:24
  76:7 78:23 85:19
  100:12,21,25
  106:14 107:9 110:2
  114:4 115:8 119:24
  123:11 126:12,16
**comes** 18:8 45:3
  94:2
**comfortable** 135:16
**coming** 42:4 44:15
  61:1 88:15 101:10
**comments** 19:18
**commerce** 31:21
**commitments** 95:17
**common** 46:4 51:1
  82:11
**communications**
  119:22 120:6
**companion** 105:21
**company** 70:6
**comparability** 35:8
**compare** 35:22
**compared** 40:10
**compensation** 31:2
  39:20
**competition** 44:18
**competitive** 41:22
**competitors** 85:9
**complain** 70:18
  101:4,5 112:10
**complaint** 63:4
  75:19,19 139:13,18
  139:19,22,24
**complaints** 62:17
  73:22 136:12

**complete** 53:24 82:4
  101:22 138:22
**completely** 34:6
  62:11 108:18
**completion** 141:13
**complies** 18:10
**component** 61:21
**comprehensive**
  55:22 56:2 91:24
  133:13
**compromise** 112:16
**compromised** 58:10
**compute** 40:14
**comscore** 81:3,8,8
**concept** 60:4
**conceptually** 81:24
**concern** 28:19
  106:13,16,17
**concerned** 135:13
**concerns** 27:22
  29:15
**conclusion** 28:17
  61:24 114:5 129:21
**concocted** 53:12
**confess** 86:14
**confidential** 38:1
**confirm** 121:8
**confirming** 94:19
**confused** 60:4 86:14
  121:1 140:8
**confusing** 136:3
**confusion** 49:10
  94:2
**congratulated** 140:6
**connection** 95:18
**consensus** 29:24
**consequences** 107:7
  107:8 126:18
**consider** 28:4 34:5
  51:16 77:3 114:1
  123:8 129:1 130:18
  131:25 139:5
**considerably** 132:20
**consideration** 30:23
  60:9 115:17

**considered** 34:2
  69:11 79:25
**considering** 48:9,20
  82:24
**consistent** 134:19
**conspiracy** 31:18
  41:23 124:22
**constitutional** 93:7
**constraints** 138:25
**constructive** 30:1
  104:23
**consultation** 27:4
  57:23 135:19
**consumer** 51:2
**consumers** 68:20
**consuming** 126:20
**contacted** 106:20
**contemplated** 95:25
**contemplation**
  107:18
**contest** 57:3 106:2
**contested** 94:1
  115:22
**context** 47:7 102:23
**continually** 116:7
**continue** 116:6
**continued** 4:1 5:1
  6:1 7:1 8:1 9:1 10:1
  11:1 12:1 13:1
**contract** 20:23
**contracts** 30:3 77:14
**contractual** 93:25
**contrary** 65:17 73:2
  91:15
**control** 70:12,17
**controlling** 64:17
**conversations** 119:7
**convey** 44:9,11
**cooper** 7:4,5 15:2,4
  15:4 16:25 20:2,9
  21:18 22:11 23:1,8
  23:15 24:17,25 25:8
  32:1,5 37:10,17
  38:1,7 63:6,8,16
  82:22 83:3,21 84:24

85:12 86:18,19,22
  88:4,8,18,20,23
  89:6,12 95:9 96:7
  96:23 118:14,15,25
  119:2 120:5,15
  121:11 126:8 127:4
  127:8,14 128:7,9
  132:6 135:8,11,18
  135:22 137:4,10,20
  138:1 140:7,8,16,19
**coopkirk.com** 7:11
  7:12
**copies** 62:16,17
  136:24 137:12
**corbitt** 5:4 15:19,20
**core** 53:10
**corners** 106:15
**corp** 97:13
**corporate** 124:19
**corporation** 131:22
**corporations** 78:6
  104:20 108:17
  109:6
**corpus** 9:20
**correct** 31:3,9 44:20
  52:6 59:3 65:9
  69:20 84:6,10,11
  102:8 107:17 122:2
  123:4 125:9 127:7,8
  128:1,6 134:3
  139:24
**corrected** 52:22
  70:2
**cost** 84:20 97:25
  110:3
**costs** 98:2,4
**counsel** 14:9 16:6
  18:4,23 20:6,15
  21:12,12 22:6,21
  24:22 25:4,14 27:3
  30:16 33:1 38:2,18
  53:20 57:23 67:13
  68:23 69:21,24
  70:12,15 71:10,11
  71:12,15,19,19,19

72:19,20 73:15
76:19 97:22 111:12
118:23 119:7 124:4
124:12,17 125:6
126:11 127:9,24
128:5,19 129:5,6,8
129:10,12,15,17,18
130:2,8 131:5,6,7
132:13
**counsel's** 40:5 73:19
98:1 121:19 122:6
**country** 30:22 31:12
31:12,13 32:8 64:23
**couple** 61:1 63:22
94:18 104:23
105:16 110:21
114:4 121:14
**course** 30:22 57:7
112:12 135:2
**court** 1:1 2:1 14:6
18:9 20:13,25 21:15
23:21 25:12,15
35:15 38:16,17
42:17 43:1,6,24
45:3,21,22 46:5,12
46:13 47:2 49:8
51:7 59:19 64:15
79:21 81:18 82:8,11
85:1 86:5 96:2
98:24,25,25 99:22
103:15,17 104:1,15
105:25 106:10,16
109:17 111:18
112:2 113:12,19
115:12,15 117:14
121:7,8 124:8 129:6
129:7,9,11,14,17,25
130:15,17,18
131:24 134:8
**court's** 130:10 136:5
**courthouse** 41:6
43:3 75:18
**courts** 45:14 114:4
114:22

**cover** 18:18 76:14
**covered** 18:16
118:11
**craft** 39:5
**craig** 5:4 15:19
**create** 27:25 28:12
72:1 98:19
**created** 86:15 125:2
**creates** 87:21
**creating** 111:13
**creek** 6:20
**critical** 44:16 138:7
**criticism** 101:16
**criticized** 101:24
**crowd** 16:9
**crt** 1:5 2:5
**crts** 77:21
**crucial** 91:17 126:15
**crutcher** 12:4
**crystal** 100:4
**csr** 1:23 141:23
**cure** 72:18 93:4
**cured** 91:23
**curran** 11:20 17:14
**current** 87:24
**currently** 127:6
**cut** 39:3,8 63:25
115:3,4
**cv** 1:6 2:6 83:12
**cy** 101:20 107:14,15
108:25 109:13
110:6,17 113:6,15
113:21 114:1,9
115:9

**d**

**d** 7:7 8:12,13
**d.c.** 10:23 11:23
**damage** 35:2 37:12
40:11,12 42:1 44:23
62:7 110:9 112:7,8
114:2,24 116:14
**damages** 34:19
36:16,17 37:7 57:19
62:20 67:6,8 108:7

108:10,12,18 109:5
110:23 111:23,24
112:1 114:10 115:1
115:3,17,20 116:13
116:16 139:19,22
**dan** 17:24
**dandy** 84:8
**daniel** 6:18
**daniels** 11:11
**data** 79:4 80:15,23
80:25 81:2,3,7
87:20 102:20 103:8
107:25 109:3,3,10
109:20 111:17,19
116:5,18
**database** 78:23,23
**date** 25:9,13 89:15
111:22 118:7
138:25 141:18
**dated** 141:20
**daubert** 38:10,12
**day** 34:23 81:6
94:18 108:6
**days** 21:17 94:18
138:2
**dbirkhaeuser** 6:22
**de** 23:24
**dead** 51:14,15
**deadline** 19:9 82:3,5
98:16 99:1,1,1
103:21 104:6,11
105:1,7 106:5,6
107:2,4 111:18,19
116:7,25 117:12,23
**deadlines** 106:1
**deal** 75:24 76:8
93:25 104:24 107:6
118:10 129:25
130:1 133:16
**dealing** 48:11,13
133:24
**dealt** 47:11
**death** 66:22
**debate** 52:19 57:8,9
57:11,11

**debated** 20:9,11
23:11
**december** 25:5,8,9
102:10 106:22
**decide** 21:19 101:9
**decided** 84:13
131:23
**decides** 23:6
**decision** 46:19 47:12
47:23 54:13 57:5
69:13 75:2 82:10
109:24 114:6,7,9
115:1
**decisions** 57:2 74:6
**decisive** 138:8
**declaration** 76:19
80:7,16 111:4
136:19
**declarations** 76:20
123:21
**decline** 77:20
**deduct** 97:25 98:2
**deemed** 87:24
**defect** 72:18,21
**defects** 29:8,10
**defendant** 55:17
56:2,9,11 124:19
**defendants** 10:2,10
10:18 11:2,10,18
12:3 15:14,16,18
17:9,9,11,15,17
20:19 26:9 28:2,8
29:6,19,21,23 30:10
31:5 42:19 44:4
50:4,15 52:4 55:9
55:15 56:8,9 57:18
58:20 59:5 62:2
68:17,21 69:1,3,12
72:21 100:3,8
124:21 129:25
132:11 133:11
**defense** 29:24
**defer** 26:11
**deficiencies** 102:21

**definitely** 136:24
**delay** 21:7 23:23
**delayed** 21:7
**demand** 70:3 72:19
  73:2 120:3
**demonstratively**
  40:21
**denied** 97:10 103:10
**denver** 9:13
**department** 12:12
  56:3,11 58:8
**depending** 35:20
**deposition** 37:15,23
  37:25 38:1 141:12
**deserving** 30:11
**designated** 21:1
**designation** 20:19
  22:6,21
**designee** 53:1
**despite** 42:13 47:7
**determination** 41:7
  41:8 98:11 113:13
  116:6
**determine** 29:10
  98:9
**detroit** 5:22
**development** 47:15
**devices** 32:25
**devised** 27:3
**dictate** 75:22
**dictatorship** 70:17
**diego** 4:22
**difference** 21:6 23:4
  42:9 58:15 87:25
  104:16
**differences** 89:17
**different** 27:18
  29:12 30:20 32:2
  33:1 35:20 59:10,11
  59:12 68:24 75:12
  83:5,7,14,18 85:6
  89:21 100:25 103:3
  110:8
**differently** 54:25
  83:15,19 138:21

**difficult** 57:20 99:4
**digital** 80:8,13 81:1
**diligence** 21:14
**direct** 13:3 16:6,11
  54:23 55:2,3 60:21
  100:16 108:13
  125:24
**direction** 28:11
  141:8
**directly** 106:21
  119:2
**directs** 34:12
**disadvantage**
  107:20
**disagree** 112:18
**disapprove** 88:23
**discovery** 21:14,24
  22:1
**discretion** 53:20
  106:1 114:1,25
  117:14
**discuss** 19:13 35:10
**discussed** 110:24
**discussing** 111:11
  113:17
**discussion** 120:17
**discussions** 74:1,3,4
  99:17 120:19 136:1
**disgorgement** 47:3
  48:18 64:3,12,18
  65:6 66:4,7
**dismiss** 68:22,25
  69:4
**dismissed** 40:24
  62:23 63:1 69:10
**disparate** 98:20
  105:9
**disparities** 134:7
**disparity** 41:12
**dispassionately** 73:7
**disposed** 124:12
**dispute** 124:7,8
**disputing** 132:2
**dissemination** 55:7

**distinction** 59:16
  60:18 105:24
**distinguished**
  106:11
**distinguishing**
  105:19 112:17,19
  112:23 113:6
**distribute** 91:5
  113:14
**distributed** 27:8
  71:3 95:10 107:19
  107:24
**distributing** 89:22
**distribution** 52:9,10
  88:12 95:6 108:13
  114:1 116:4,8 134:8
  134:9
**distributions** 88:9
  115:9,20 118:18
**district** 1:1,2 2:1,2
  36:14 64:22 75:20
  96:2 105:25 139:21
**divided** 87:19 92:22
**docket** 49:9,14,22
  49:23 62:16 136:11
  139:15
**document** 1:7 2:7
  91:12,17 111:5
**documents** 55:24
  135:19,20 136:24
  137:11,15
**dog** 93:3 97:23
**doing** 20:16 21:25
  38:25 41:3 59:19
  82:1 98:19 126:25
**doj** 124:19,20,24
**doj.ca.gov** 12:18
**dollar** 33:9 37:6
  40:10 79:5
**dollars** 71:3 90:7
**domain** 56:25
**don** 16:23
**donald** 4:5
**door** 41:6 43:4

**douglas** 8:19 15:25
**downside** 106:12
  107:2
**dozen** 39:10
**dperelman** 4:10
**dr** 40:10,16
**dram** 47:14 49:13
  49:22 78:23 125:22
  125:23
**drive** 5:14 8:5
**dropped** 61:2
**due** 21:13 25:9
  27:20 40:22 41:4
  76:4 93:7 103:2
  111:3,6 115:22
**dug** 27:13 39:14
**duly** 141:6
**duncan** 4:4 14:17,18
  63:23,24 64:3,16,21
  65:4,9,13,16,20
  66:3 79:11,13,14,14
  80:19 81:22 83:10
**dunn** 12:4
**duration** 31:19
**duties** 128:6
**duty** 71:9,11,15,20
  71:23,25 130:16

**e**

**e** 6:18
**eadelson** 10:8
**earlier** 125:16
**early** 77:9,11 99:19
  124:12
**easily** 62:17 136:12
**easy** 49:17 105:3,11
**economic** 39:7
  44:17
**editors** 47:18
**effect** 35:25 40:25
  41:1 64:23 91:25
  122:4
**effective** 126:3
**effectiveness** 80:4

effectuate   26:23
efforts   122:7
eight   55:10 58:7
  61:5 116:21
eighth   114:11
either   25:5 62:19,21
  86:20 104:3,4
  119:14 121:5
electronic   113:10
eliminate   100:9
eliminated   86:11
eliot   10:4 15:11
ellis   10:3 15:11
elongated   85:16
eloquence   40:2
eloquent   39:24 40:1
email   18:8 38:17,23
  54:21 118:19,22
  119:13,14 120:9
  123:1 125:21,24
emails   68:7 118:22
  138:11 139:2
embarcadero   2:16
  3:5 10:13
emilio   12:14 16:3
emilio.varanini
  12:18
emphasize   61:12
emphasizing   124:18
employee   141:16
encompassed   67:17
encourage   99:15
encouragement
  117:12
endorsed   44:6
enforcement   44:11
  56:13,17,19 57:4
engine   80:10
enrichment   45:16
  45:25 46:4,5,8
  48:14
entered   20:24 30:3
  133:5
enterprising   106:21

entire   22:24 127:10
  129:20
entirely   86:10
  108:12
entirety   122:8
entitled   43:11 86:1
  87:24 93:22
entity   47:11
enunciating   42:20
equitable   43:19
  44:13,21 45:9,17
  47:2,9 48:21 50:6
  62:9,20 65:25 106:1
equity   44:2
erik   10:20 15:15
erik.koons   10:24
error   70:22,22
  97:22,25
escrow   132:12,16
especially   24:13
  52:18 77:8 85:22
esq   3:12,13 4:4,5,13
  4:20 5:4,5,13 6:4
  7:5,6,7,15,16 8:4,13
  8:21 9:5,18 10:4,12
  10:20,21 11:4,12,20
  11:21 12:5,14 13:5
  13:12
essential   26:19
essentially   21:17
  34:5 41:3 50:6
establish   42:24
  57:19
established   40:7
estoppel   121:22
  124:2,16
evade   108:4
evaluate   22:15
  33:11 37:9 82:8
  85:5
evaluating   97:11
event   111:17 131:16
eventually   74:5
everybody   19:22
  27:18 31:14 50:10

104:18 110:6 140:4
everybody's   49:15
evidence   33:19 34:1
  34:13 41:15,21,24
  41:25 42:17,19,22
  42:23 45:20 53:7
  55:25 68:3,3 77:6,7
  78:11,13,16 80:6
  104:22 138:7,21
evidently   79:9
ex   79:23 82:8 119:7
  120:6
exact   132:21
exactly   34:19 40:25
  92:10 102:14
example   22:13 40:9
  80:10,13 88:3 103:4
  117:24
exceed   135:24
  137:16,17
exceeds   111:12
exception   43:12
  95:6
exceptions   43:14,15
exchange   118:19
  119:13,14
excluded   8:2 15:10
  24:16 31:22 39:4
  67:5 86:3 88:10
  97:6
excluding   123:5
exclusivity   100:8
excuse   15:10 34:11
  52:21 53:8
exercise   53:20
exhaustively   79:25
exhausts   108:11
exhibit   37:23,24
  111:4
exhibits   80:8
exist   64:12
existed   72:11
existence   87:1
exists   95:17

expect   81:18
expectation   90:15
expense   123:10
expensive   126:20
experience   120:20
experienced   110:13
experiences   120:23
expert   22:14 34:25
  36:3 77:3 82:23
  83:11,14,23 84:2,5
  84:23 85:1,18,19,21
expert's   22:15
experts   27:4,4 83:8
  85:3 86:7,10
explained   81:7
explaining   137:4
explicitly   44:6
  114:23
exposure   106:13
expressed   104:19
extend   98:16 99:1
  104:6,17,25 105:7
  106:1 107:3 116:6
  117:22
extended   19:10 82:4
  116:25
extending   82:3
  104:10 107:2
extends   111:18
extension   106:5,6
  117:11
extensive   54:21
  73:24 80:3 112:20
extensively   69:2
  129:4
extent   27:10 28:20
  60:12 79:24 82:4
  122:17 134:16
extra   109:13
extraordinarily
  132:24
extreme   75:1
eyeballs   102:25

**f**

**f** 1:23 2:19 5:20
141:22
**f.3d** 67:18 70:6,11
97:9 113:24 114:7
**fabulous** 85:7
**face** 102:18,20 103:5
103:13 109:2
**faced** 42:17
**facilitate** 106:22
**facing** 21:8
**fact** 36:2 40:8 41:22
44:6 51:3,7 68:9
72:4 74:14 75:16,25
78:22 94:17 124:14
130:6 134:17
**factors** 28:3 60:22
112:17,19,24 122:6
**facts** 53:24 59:25
60:3
**factual** 41:12 42:13
42:14 43:25 132:18
**faegre** 11:11
**faegrebd.com** 11:16
**failed** 119:16
**failure** 39:19 69:10
**fair** 19:22 26:10
27:21 28:2 30:6,11
61:18 102:22 103:5
103:7 105:6 113:9
122:14 128:9
138:24
**fairfax** 5:15
**fairly** 87:17
**fairness** 18:25 26:12
55:16
**fall** 43:16
**false** 68:10
**familiar** 67:8
**family** 77:21
**far** 47:21 100:2
114:8 118:5
**fashion** 64:25
133:13

**fashioning** 60:8
**fast** 124:4
**faulty** 28:6
**favorably** 101:14
**fbdlaw.com** 4:17
**fears** 104:20
**features** 113:6
**federal** 43:24 44:22
45:3,22,22 46:11,11
46:14,17,18,23 47:7
47:9 48:17 49:8
50:9 53:13 64:3,11
64:19 65:15 75:18
99:22 102:7 108:24
141:12
**fee** 21:25 122:9
123:9 125:7
**feed** 81:3
**feel** 22:20 135:16
**feeling** 107:1
**feels** 27:10 104:25
109:25
**fees** 67:7,8 98:1
112:24 122:18,22
122:23 123:6
**fell** 41:23
**felt** 28:20 32:10
42:18 75:23
**fiduciary** 71:15
128:6 130:15
**fifth** 5:14 19:8
**figure** 84:19 94:15
99:5
**file** 75:18,23 100:2
101:18 103:22,25
105:6 106:23
108:16 138:14
139:4,8
**filed** 20:11,11,22
24:11 36:12 37:17
37:17,18 38:6,15
49:7 50:13,14,15
68:21 73:12,13,22
81:20 108:9 120:25
121:2 128:12 130:7

**filing** 26:7 52:16
64:11
**final** 30:11 50:5,14
70:20,20 81:20,20
87:7 90:19,23 91:7
91:10 92:11,15,18
96:2,6 104:9 106:7
111:17 112:2,4
116:2 118:2 120:24
120:24 121:4
125:14 133:4,4,9,14
137:14
**finally** 20:22 69:9
136:23
**financially** 141:15
**find** 41:10 50:17,19
62:17 63:4 71:25
78:5 81:15 90:10
93:3 97:9 106:17
109:14 129:4
134:13 136:12
**fine** 4:3 14:18 16:23
79:15 99:14 133:7
137:10
**finekaplan.com** 4:9
4:10
**finger** 84:25
**finish** 136:7
**finished** 16:12
**finn** 9:3 17:18,22
18:5
**firm** 9:4,17 15:5
105:15 127:5,17
**first** 4:14 18:19,19
25:12 26:4 30:9,19
33:13 46:2,14 82:18
90:3 105:16,18
109:15 110:24
114:25 117:9
125:11 132:23
134:23 139:9
**fisher** 76:20 77:8
78:12 81:3,6 83:11
83:25,25 84:12
85:10 136:19

**fisher's** 80:7,15 83:7
**five** 18:17 135:24,25
137:4,16,17
**fix** 29:7 72:21,22
98:4,7 99:18 105:11
**fixed** 32:16 41:14
73:3 87:21
**fixing** 65:24 77:18
98:7
**flawed** 78:25
**flaws** 83:24 84:1
**floor** 4:6 5:14 7:8,17
8:14 10:13
**focus** 53:4 59:16,23
99:25 123:2
**focused** 46:10,11
125:19
**folks** 38:19 100:1
109:11
**follow** 23:3
**follows** 46:17
110:11
**foregoing** 141:3,5,9
141:11
**forestalling** 116:8
**forget** 57:6 85:14
86:17
**form** 22:4 77:13
105:23
**formal** 119:11
125:20
**formally** 63:1 68:12
**former** 84:12
**formerly** 127:6
**formula** 89:21
**forth** 20:10 94:8
141:4
**fortman** 9:3 17:19
17:22 18:5
**forward** 57:17
73:20 75:2 102:2
118:9
**fos** 7:20
**fought** 68:23

**foul** 93:4
**found** 29:8 73:4
  113:25 114:23
**foundational** 33:19
**four** 10:13 62:17
  136:12
**fourth** 19:6 63:3
  139:13,18
**framing** 24:18
**francis** 7:14,15 15:6
  15:7 17:3 76:25
**francisco** 1:16 2:17
  3:6,15 5:7 6:6,13
  7:9,18 8:15 10:6,14
  12:7,16 13:7 14:1
  15:8
**frank** 17:13 117:16
**free** 42:11 123:13
**freedman** 4:12
  14:21
**friday** 137:9,17,19
  138:3,4 140:10,12
  140:15,15,17
**friends** 16:8
**front** 93:21 103:11
  109:9
**fuel** 97:14
**full** 19:22 51:25,25
  53:19 98:10 109:7
  110:7 114:24
  135:14,16
**fund** 108:11,14
**fundamental** 40:19
**fundamentally** 41:6
  42:17 133:16
**further** 125:17
  141:11,15
**furtherance** 128:5
**future** 93:19 136:1

**g**

**game** 67:11 74:24
**gander** 42:21
**garavanian** 8:10
  16:2

**gary** 8:11
**gate** 12:15
**gathered** 73:21
**geagan** 11:4 15:17
  15:17
**general** 12:13 19:9
  19:10 28:23 29:24
  30:14 44:15 51:8
  55:23,23 56:3,10,17
  58:8 79:8 93:14
  97:13 101:14 111:1
  112:3,10 133:10
**general's** 16:4
**generally** 37:19,19
  41:9 88:8 106:2
**generals** 56:15
**generating** 103:3
**gentlemen** 102:24
**geographic** 42:10
**germane** 79:22
**getting** 30:2 31:9
  35:24 92:1 93:19
  99:25 115:16
  116:18 118:17
  119:4,9 134:18
**ghost** 108:23
**gibson** 12:4
**gibsondunn.com**
  12:9
**gidley** 11:21
**gin** 109:19 110:4
**ginning** 112:21
**gist** 93:12
**give** 18:15 19:21
  24:15 31:14 47:2
  48:15,17 51:24 53:1
  53:18 54:8 62:16
  76:13,22 85:5 89:4
  91:1 97:12 100:8,9
  100:25 101:20,21
  103:8 108:17,20
  109:4,5 117:7
  130:11 133:19
  136:10,11,15
  138:18

**given** 24:13,14 28:3
  52:3,3 54:23 56:25
  60:25 71:20 81:7
  96:18 98:21 104:16
  105:6 106:3 113:13
  116:9 134:16
  141:10
**gives** 130:25
**giving** 60:9,9 90:20
  108:6 134:11
**glad** 127:3
**global** 57:18 132:17
  132:25
**gmail.com** 8:25 9:14
**go** 18:13 22:9 29:6
  33:6 37:1 38:17
  45:25 46:1 49:13
  52:24 53:6,8 57:22
  59:8 61:15 70:4
  71:12,13,13,17
  73:17 75:1,18 84:13
  85:21 86:17,22
  87:16 93:17,18
  95:11 101:5 103:12
  103:22 109:13
  113:5,9,21 114:23
  114:25 115:20
  116:3 135:23
**goal** 27:9,13
**goes** 47:25 49:2 58:1
  68:19 74:18
**going** 16:12 20:5
  23:23 24:19 30:14
  32:13,20 33:6,9,10
  35:21 36:13 39:7,14
  41:23 46:6,6,9 47:8
  51:20,22 52:16,20
  53:6 54:4,5,7 55:10
  55:18,19 56:16
  57:17 63:18 73:5,6
  73:10,14 76:6 77:2
  78:8 79:11,21 80:1
  82:9 85:20,23 92:8
  94:7,16,20,22 95:13
  96:3,5,25 98:25

99:22 100:10 101:4
101:5,15,19,24
107:23 108:5,10
110:3,10 111:21,23
114:7,13 116:18,25
119:2,5 120:11
122:17 123:11,17
126:19 131:8 133:6
133:14 134:17,18
135:1 136:5,6,8,9
136:15 138:14,18
139:15,16
**gold** 140:18
**goldberg** 4:12,13
  14:20,21,22,25 16:9
  59:3 101:12 139:6,7
  139:7 140:11
**golden** 12:15
**good** 14:5,7,8,15,17
  14:20 15:1,19 23:7
  39:12 60:7 61:3
  79:1 83:10 88:3
  99:25 131:18
**google** 80:10,10,11
  80:11,12,20,20
**goose** 42:20
**gosh** 82:11
**gotten** 35:23 60:15
  60:16 102:6 119:11
**government** 65:6
**governmental** 47:11
**governments** 65:5
**grain** 39:9
**gralewski** 4:20
  16:19,19
**grand** 9:6
**granted** 45:17
**great** 19:17 77:20
  137:22
**greater** 111:20
**grind** 56:18
**grips** 42:5
**griswold** 5:21
**ground** 43:9 61:16

**group**  6:3 21:2,2
  22:23 77:24 125:17
  137:4
**groups**  104:13
**grove**  6:19
**guess**  20:2,9 22:11
  22:19 23:15 38:13
  48:2 83:6 85:12
  133:23 136:4
**guido**  13:5,9 16:5
**gun**  137:25

**h**

**half**  15:4 30:22
  31:12,21 32:7 71:2
**hamilton**  47:13
**hamilton's**  49:5
**hampshire**  50:23,24
  50:25 51:6 67:7
  68:5 72:7 73:8 74:9
  74:21
**hampton**  10:11
**hand**  19:22 39:25
  56:4 103:21 131:2
**hands**  122:15
**handwriting**  136:14
**hanover**  42:18
**happen**  81:25 108:5
  111:21 116:25
  120:11 121:6 133:7
**happened**  62:23
  72:12 73:8,9 74:8
  115:6 117:24
**happening**  50:12
  89:1
**happens**  98:23,24
**happy**  27:18
**hard**  68:23 77:7
  78:10,12,16 80:6
**harrop**  94:18
**harry**  8:10
**he'll**  105:13
**head**  96:12
**headed**  28:11

**heads**  29:13
**hear**  14:13,14 24:4
  48:24 53:21,24 57:2
  76:21 136:1
**heard**  30:19 52:15
  65:10 76:23 102:24
**hearing**  1:15 2:15
  18:13 19:22,25 20:5
  25:13,20 107:2,8
  117:5,20,25 118:3,6
  122:18,22,23 123:2
  123:17
**hearings**  126:13
**heartburn**  29:21
**heavily**  57:5
**held**  2:15 66:4
  122:20
**help**  100:1
**helpful**  38:24 62:15
  137:25
**helps**  135:22
**hew**  136:5
**hey**  73:2 115:8
**higher**  36:5
**highest**  56:13
**highlighting**  70:10
**highly**  57:16,16,16
**hire**  84:2,5 86:3,5
**hired**  86:9
**hiring**  77:3
**history**  54:13
**hit**  19:12
**hitachi**  10:2 15:12
**hmm**  46:5
**hoag**  17:13
**hofmann**  5:3
**hogue**  17:13
**hold**  65:16
**holding**  131:21
**hole**  66:8
**hollander**  4:12
  14:21
**home**  42:11
**honor**  14:15,17 15:6
  15:19 17:24 20:10

23:3,9,19,21 25:10
  26:17 27:10 29:22
  29:25 30:18 31:8,16
  31:24 33:18 36:2,20
  38:16 47:23 49:18
  50:22 51:23 52:8
  53:2,8,17,18,24
  56:6,24 58:11 62:10
  63:20,24 65:22
  68:16 69:5,24 70:22
  71:18 72:16 73:18
  74:17 76:25 77:3
  78:1,5,22 79:10,14
  82:22 83:10,22
  84:24 85:14 91:10
  92:15 93:7 94:3
  95:25 96:6,8,24
  97:8,23 98:10 99:13
  99:15 101:23
  102:14 103:10,11
  103:12,16 104:10
  104:11,16,17,24,24
  108:14 109:10,24
  109:24 112:18
  117:10,17,18
  121:16,18 122:2,14
  122:17,17 123:17
  123:25 125:9,14
  127:8 128:22 130:6
  131:12,20 132:7,9
  133:9 135:3,18
  137:10
**honored**  94:20,23
  103:23
**hope**  101:13
**hoped**  140:4
**hopefully**  123:22
  137:5
**horrible**  52:17
**horse**  51:14,15
**hostility**  43:4
**hours**  140:4,5
**house**  28:8
**hull**  9:16 17:7

**human**  78:3
**hundred**  77:5 80:14
**hundreds**  31:19,20
  129:19
**hurdle**  30:9
**hypothetical**  29:4
  64:7
**hypothetically**  21:9
  21:11 27:24,25
  30:25 101:9

**i**

**icebreaker**  124:6
**idea**  23:7 40:17 42:5
  60:7 78:20 108:8
  109:6 116:3 124:5
**identified**  130:13
**identify**  14:6 29:11
  105:16 135:4
**ignore**  89:2 96:3
**ignored**  68:5
**ignores**  87:1
**illinois**  42:15,16,25
  43:12,14,15,16,21
  45:19 46:2,3,25
  47:8 63:25 64:9,11
  64:12,24 66:1 88:4
  88:6,9,13 93:18
  94:4,6,11 95:2,7
  133:24
**illston**  46:13
**illston's**  47:12
**imagine**  126:3
**impact**  18:24 61:19
  86:13
**impacted**  97:21
**implement**  102:1
**implemented**  27:7
  106:4 111:2
**implementing**
  111:13
**importance**  57:7
**important**  34:21
  37:5 40:2 53:23
  54:3 55:24 59:17

60:17,22 61:13,24 75:3,3,4 103:1,2 126:11 128:23
**importantly** 104:22
**imposes** 106:11
**impossible** 41:9
**impression** 80:25 81:2
**impressions** 80:9,14 80:17,19
**improbable** 57:16
**improper** 105:9
**inappropriate** 34:7
**includable** 122:9
**include** 31:23 88:6
**includes** 80:7 88:4,8 88:12,16 89:6,10 96:7,8 108:19,20
**including** 31:17 67:15
**income** 77:24
**inconsistencies** 134:22
**inconsistency** 90:2 91:21 92:3,6 94:16
**inconsistent** 87:10
**incorporated** 87:9
**incorrect** 95:13,14
**increase** 115:11
**incredibly** 119:25
**independent** 22:14 77:3 82:23 83:23 84:2,5,22 85:1,5,21 86:6 130:15 131:25
**indiana** 11:14
**indianapolis** 11:14
**indicated** 50:10 85:23 117:18
**indirect** 3:10 14:9 14:16 15:2 16:17,20 26:22 27:3 38:18 43:4 51:9 53:14 55:17 99:17,21 101:20,21 110:1,10 126:24 132:13

**individual** 35:1,19 42:1 57:19 77:21,25
**individuals** 78:3 79:6 109:6
**industry** 106:25
**inflated** 41:15 42:8
**inform** 25:21
**information** 34:23 38:20,23 39:2 40:15 49:16 79:16,20 81:18 82:16 83:5 120:22 130:17 131:25 136:18 138:12
**informed** 54:13
**informs** 111:14
**inherent** 43:24
**initially** 85:23 116:14 119:2
**injunctive** 61:25 62:3,6,19 63:13 100:2
**injured** 41:18
**inquiry** 23:16
**insert** 100:3
**insisted** 58:20
**instance** 115:21
**instances** 114:24
**instantly** 52:22
**institution** 73:22
**insufficient** 103:14
**intelligent** 123:22
**intend** 16:6 82:1
**intention** 20:15 126:10
**interest** 19:11 24:10 30:2 97:10 119:19 130:16
**interested** 25:19 141:16
**interesting** 65:23 79:3,8,17
**interests** 20:7 21:4 28:23 67:15

**intermeddler** 126:17
**internet** 54:20 78:15
**interplay** 110:16
**interrupt** 30:25 44:19
**interruption** 113:10
**invaluable** 124:6,9
**invective** 73:8 75:12
**invectives** 75:8
**investigation** 71:1
**invitation** 69:21
**involved** 51:3 67:5 95:11
**ipp** 121:19 132:18 139:7
**ipps** 7:3 8:2 14:19 14:23 15:20,22,23 16:22,24 17:1,3 18:1,3 110:20
**issuance** 70:3
**issue** 18:14,14,19 19:1,5,8 20:9 21:10 22:9 24:18 26:3,12 26:15 30:20 31:4 39:16 48:3 49:25 51:20 57:15 62:7,7 62:8 66:22,24 70:1 76:11,12,15,24 79:2 79:17,21 82:2 86:12 91:3,7 93:21 96:15 97:11 98:14 106:19 107:14 108:6 109:1 110:23 112:15 113:19,21 114:9,10 114:23 117:2,19 126:11 130:6 131:9 135:15
**issues** 18:14,16,18 19:6,10 20:4 21:8 22:16 24:1,10 30:7 30:14 31:15 33:3,11 35:5,10 52:11 56:22 56:24 58:3,4 63:23 67:10 76:8,13 79:12

79:25 91:2 93:7 102:16 107:14 108:19 110:14 113:17 118:21 119:8 121:19 123:2 133:2,25 135:23
**issuing** 18:21 106:7 112:2
**items** 19:12

**j**

**j** 4:20 8:4 11:21
**j.scott.stjohn.public** 8:25
**jams** 2:16 3:3 49:19 119:15
**janet** 34:25 36:3
**january** 1:17 2:19 14:1 20:5 96:22 117:4
**jckress** 9:9
**jdc** 7:11
**jennie** 6:11,15 18:2
**jg** 4:17
**joe** 14:21
**john** 7:7 8:19,20,21 9:3,5 10:21 15:24 15:24,25 16:25 17:16,18,18,22 18:5 97:20 98:3 121:17 121:18,22 122:2,5 122:14 123:25 124:4 125:2,5,9,11 131:19,20
**john.taladay** 10:25
**joinder** 25:2,3
**joined** 131:14
**joint** 100:23
**jones** 41:19
**josef** 7:5 15:4
**joseph** 4:13 8:20,21 15:24 139:7
**jotted** 18:17
**journal** 55:5

**jr** 4:20
**judge** 21:11 23:4,24
  24:13,15 25:17,19
  34:12 46:13 47:11
  47:12,13,13 48:24
  49:2,5 60:20 69:9
  69:12 73:1,4 93:21
  93:21,24 94:1,25
  107:3 117:1,18
**judges** 41:10
**judgment** 26:23
  38:6 41:1 66:12
  88:12 90:23 91:7,10
  91:16 92:12,16
  93:23 96:6 133:5
  134:25
**judgments** 137:14
**judicial** 121:22
  124:2,15
**jumping** 52:15
**june** 118:9
**jurisdictional** 130:6
**jurisdictions** 32:20
  32:23 139:20,23
**jurisprudence** 44:16
**justice** 12:12 56:3
  56:12 58:9

**k**

**k** 6:4
**kag** 6:3
**kaplan** 4:3 14:18
  16:23 79:15
**kathy** 11:12 17:8
**kathy.osborn** 11:16
**kayes** 70:5,10
**keep** 19:18 60:17
  96:14 119:8,8,11
**kellogg** 110:15
**kern** 6:4 16:17,17
**key** 112:17
**keyspan** 46:12,22
  47:10
**kind** 28:24 45:17
  48:15,20 55:12,13

58:17 80:15 84:21
  102:11 134:5
**kinds** 57:22 100:15
  110:14 118:10
  126:12
**kirby** 4:19 16:19
**kirkham** 7:4,6 15:1
  15:1,2 17:1 25:1
  39:25 40:1 43:10,13
  43:18 44:24 45:2,6
  45:11,13 47:10,21
  47:23 48:6,13 49:4
  49:12,18,20 59:2
  65:11,22 66:13,16
  66:19 86:20,23
  87:13,16 88:6 89:14
  89:24 131:2,3,4,9
  136:15
**kirkland** 10:3 15:11
**kirkland.com** 10:8
**kmllp.com** 4:24
**knew** 34:18
**know** 14:11 16:11
  18:14,24 19:18
  20:12,22 21:13,20
  28:12 29:9 32:6,7
  33:9,11 34:24 35:2
  35:18 36:2,23 37:7
  39:2 40:9,13 43:6
  49:21 51:4,20 52:19
  52:23 54:10 58:25
  59:9 61:9,18 62:18
  66:19,20,24 68:18
  69:14,19 71:10,13
  74:18 75:13,14,17
  75:25 76:20 78:2,6
  78:18 79:4,8 80:8
  80:23,23 82:6 83:1
  85:10 87:14 91:16
  99:24 101:23 104:4
  106:23,24 107:1,6,7
  107:22 108:15
  109:20 110:8
  114:13 119:24
  120:2,14 121:3

122:18 123:12,12
  127:11 129:25
  130:1,11,14 131:4
  132:11 134:24
  136:21
**knowing** 33:6 34:20
  34:21
**knowledge** 22:16
**known** 55:12 79:21
**knows** 47:17 81:22
  82:9
**koons** 10:20 15:15
  15:15
**kress** 9:4,5 17:18,18
  17:20,22 18:5

**l**

**l** 4:5 11:12
**lady** 102:24
**lake** 6:5
**land** 64:9,10
**lane** 8:22
**language** 39:6 96:19
  100:3 114:9
**large** 21:2 36:7
  95:14 132:24
**larger** 31:21 94:21
**largest** 132:13
**larimer** 9:12
**las** 8:6
**late** 74:24
**laura** 9:3 17:19,22
**lauren** 3:13 14:15
  62:15
**laurenrussell** 3:18
**law** 6:3 7:14 8:12,20
  9:4,11,17 15:7 17:2
  27:16 43:6 44:1,20
  45:8,18,21,22 46:4
  46:16,17,17,20,22
  47:6,15 48:12,13
  51:1 52:18,19 54:1
  56:13,16,17,19 57:4
  57:8,10 58:3 59:25
  60:2,8 61:15 64:7,9

64:10,19 65:12,21
  66:8 67:22 72:5
  84:13 108:24,25
  115:19 129:4,15
  130:21
**laws** 44:7,8,9,11
  46:23,24
**lawsuit** 62:13 105:7
**lawyer** 57:12 62:13
  84:12 127:19
  129:19
**lawyers** 8:3 26:22
  37:20 46:2 67:12,25
  70:14 71:13 74:4
  83:18 129:13,20
**lcd** 34:18 35:2,8
  37:7 58:16,21 59:4
  59:6 66:14 70:25
  71:3 112:6,8
**lcds** 31:16,20 46:13
  47:12 77:19,23
  112:17 113:3,7
**lead** 14:8 16:5 18:23
  20:6,15 21:12 22:6
  22:21,22,23 24:8,22
  25:4,14 30:16 40:5
  53:20 57:23 67:13
  68:23 69:21,24
  70:14 71:9,11,12,15
  71:19 72:19 73:15
  73:18 76:19 83:13
  130:2,8 131:5,7
  132:12 133:14
**leads** 23:6 24:9,15
**leapt** 46:16
**leave** 32:24 48:23
  52:20 98:12 110:5
  118:2,8 124:23
  138:19
**leaves** 33:7
**leaving** 100:18
  108:6 127:18
**lee** 6:11 18:2
**left** 33:25 34:1 52:17
  71:24 108:19,23

110:6 113:5 117:23
**legal** 28:13
**legge** 69:9,13 73:1,4
  93:21,22,24
**legge's** 94:25
**legitimacy** 23:16
**legitimate** 48:3
  53:12,12
**length** 19:17
**letter** 49:20 70:3
  72:19 73:3 114:17
  119:14 135:24
**lexis** 49:4,10,17
  114:19
**lg** 52:1,3 54:16,16
  54:17 132:19 133:3
  133:7
**liability** 97:14
**life** 63:2 84:15
**light** 68:9
**limit** 124:11
**limitations** 54:2
  58:4
**limited** 49:19 70:13
  124:20 139:20
**line** 30:8 42:10,11
  42:12 47:5 48:17
  74:5
**lingered** 63:1
**list** 19:12 81:1 96:24
  97:1 125:21 137:11
**listed** 24:18
**listing** 94:13
**literally** 103:1
**litigants** 124:23
**litigate** 33:2
**litigated** 48:7 64:14
  69:2 105:22
**litigation** 1:5 2:5
  19:4 55:9 97:14
  124:12,15 132:18
**little** 25:14 36:13
  54:8 81:23 118:8
  140:13

**live** 58:9 101:19
**llc** 9:4
**llp** 3:11 4:19 5:3,12
  5:19 6:10 10:3,11
  10:19 11:3,11,19
  12:4
**logged** 21:21
**logic** 25:24
**logical** 129:21
**logically** 30:8
**long** 8:23 66:25
  68:19 81:1 107:12
  110:11 133:12
**longer** 31:18 37:2
  98:21
**look** 41:13,16 58:3,4
  60:13 63:3 95:19,19
  96:15,19 99:15
  110:2 113:7 128:21
  129:4 130:19
  136:10,13 139:16
**looked** 34:9 69:17
  114:22
**looking** 109:2 135:1
  137:15
**looks** 49:8 55:21
  101:14
**loose** 124:5
**loosely** 59:22,23
**lost** 60:4 69:9
**lot** 16:8 19:20,23
  23:23 24:11 35:16
  45:14,23 52:9 73:7
  74:15 77:22 93:19
  96:21 100:11,13
  107:5 113:1,2 125:3
  137:23
**louis** 9:7
**love** 75:20 85:10
  137:21
**lower** 112:24
**luck** 42:25
**lumber** 70:6,11
**lump** 55:1

**lupron** 115:1

## m

**m** 11:20
**machine** 141:7
**magnitude** 96:16
**mahler** 6:17 17:25
**maintain** 45:8
**making** 47:24 57:1
  67:24 70:14 101:22
  114:2
**march** 117:1
**margin** 83:15,19
**mario** 3:12 14:8
**marioalioto** 3:17
**mark** 11:21
**market** 77:20
**marketing** 81:4
  115:1
**marla** 13:12
**martin** 2:16 3:4 11:4
  15:17
**mason** 5:3
**massachusetts**
  50:23 51:1,6 52:18
  67:6 68:4,18,20
  70:21,23,25 72:7,17
  72:20 138:12
**massive** 54:21
**master** 2:16 3:4 14:5
  14:10,24 16:13,16
  17:4,12,20,23 18:6
  18:11,21 21:9 22:7
  22:25 23:2,14,17
  24:2,5,21,24 25:11
  25:16,22 26:1 27:24
  29:3,16,18 30:17,24
  31:4,25 32:4 33:14
  34:10 35:3,12,14
  36:8,10,19,23 37:1
  37:4,14,22 38:4,8
  38:10,12,21 39:16
  43:5,11,17 44:19,25
  45:5,7,12 47:4,20
  47:22 48:2,11,23

49:11,15,19,24 50:7
50:20 51:11,16,19
51:24 52:7,25 53:4
53:9 54:6 58:14
59:5,18 61:7,11,18
62:3,5,14 63:3,7,9
63:12,15,17 64:2,15
64:20 65:3,8,10,14
65:18 66:10,15,18
66:20 67:19 68:13
69:6,8,18,23 70:7
70:19 71:5,9,23,25
72:6,10,12,15 73:5
73:14,16 74:8,20
75:5,10 76:6,10
78:10,18,21 79:1,13
80:17 81:17 82:6,17
83:1,4,20 84:1,4,7
84:10,15,19 85:9,25
86:12,20 87:12
88:17,19,21 89:3,9
89:13,16,25 90:18
90:23 91:6,20 92:4
92:13,19,24 93:1,9
94:22 95:5,22 96:1
96:11,15 97:5,12,15
97:18 98:2,12,18
99:3,7,10 101:6
102:3,5,9 103:24
105:2 106:12,20
107:12,18 110:18
112:6,9,12,22 113:1
113:9 114:13,16,21
116:20 117:4,7
118:11,24 119:1,6
120:13 121:5,13,17
121:20,24 122:3,10
122:15,20,25 123:5
123:19,24 124:3,25
125:4,7,10,13 127:1
127:3,11,15,23
128:2,13,16,24
129:2,11 130:4,14
130:24 131:1,8,10
131:18 132:4,8

133:18,22 134:3,5
135:6,13,21 136:4
137:18,22 138:3,5,9
138:14,18,24 139:4
140:3,15,17,20
**master's**   21:16
**masters**   41:10
113:24 114:6,8
**material**   96:19
136:6,7
**math**   56:8
**matter**   23:20,23,24
23:25 30:14 94:1,17
113:19 119:25
134:10
**matters**   21:25 29:11
**matthew**   4:4 14:17
79:14
**maximum**   108:9
**mcinerney**   4:19
16:19
**mdl**   1:6 2:6 129:19
**mduncan**   4:9
**meadowcrest**   8:5
**mean**   19:14 21:9
27:25 28:10 29:17
30:25 31:10,14 53:9
54:15 78:11 80:7,18
81:24 82:7,24 83:4
83:6 92:8 94:22
96:17 97:5 106:20
119:18 122:11,11
122:22 123:6
129:21,23 134:9,13
135:7 136:2,4 137:3
137:23
**meaning**   101:20
**means**   59:24,24
80:19
**meant**   27:5 94:12
**meat**   36:24
**mechanism**   61:13
**meet**   27:20 37:5
126:21

**meetings**   31:19
**meets**   111:2 115:22
**member**   34:13
35:23 91:18 127:13
**member's**   35:19
**members**   19:2,3
20:7 41:13 42:6
43:8 70:12,14 77:10
77:25 91:12,22
**memorized**   135:1
**memory**   58:25
91:16
**mention**   55:13
66:13 91:15
**mentioned**   74:23
136:8 138:6
**meridian**   11:13
**merit**   32:11,12
**meritless**   40:20,21
41:6
**merits**   26:14 39:17
39:18
**met**   79:23 81:16
**mexico**   14:22
**mexio**   14:15
**mgeagan**   11:8
**michael**   10:12 15:13
**micheletti**   5:5 16:21
16:21
**michigan**   5:22
**mike**   29:22 68:16
**milberg**   5:19 15:23
105:15
**milberg.com**   5:24
**miller**   9:11 18:4,4
**million**   27:8 28:3
34:6 35:16 40:9
71:3 76:2 80:14
84:17,21 88:1,1,2
90:7 93:2,2 125:3
134:10
**mind**   18:15 26:15,16
28:1 43:7 51:23
63:21 79:24 86:13
96:14 99:14 123:8

**minimize**   124:17
**minimum**   119:9
**minute**   44:19 59:17
110:5 133:19
**minutes**   76:7 133:20
140:5
**misses**   77:24
**mission**   12:6
**mississippi**   8:23
**missouri**   9:7 51:5,5
51:8,11 67:9 68:5
71:1 72:8 73:9 74:9
74:12
**mistake**   52:21 98:6
119:17
**mm**   46:5
**mockingbird**   8:22
**modelling**   113:24
**modifications**
115:25
**moment**   108:8
**monetary**   39:19
43:19 44:14,21 45:9
45:17 46:11 47:2,9
50:6 58:17,23 62:9
65:25 99:25
**money**   30:4,21 31:6
31:6,10,23 32:9,13
32:16,23 33:6,10
35:9,17 48:21 75:25
77:22 87:3,19,24
88:25 89:19,22 90:5
90:9,12,16,20 91:1
91:5,8 92:1,4,5,21
93:20,22 94:12,16
95:1,9,10 96:3
100:11,13,16
101:21 108:16,18
109:13 110:3,6
112:13,15,25 113:5
113:13,15 116:8,15
116:22 132:12,15
132:17,21,23,25
133:7

**monitors**   36:4
**montgomery**   5:6
6:12 7:17
**months**   29:2 73:24
**moore**   8:12,13 16:1
16:1 25:10,11,12,18
33:17,18 34:17
35:13,15,24 36:20
36:22,25 37:3,5
50:2,8 52:8 70:20
70:21 71:6,18,24
72:2,9,11,13 73:12
73:15,16 75:15
86:17 97:2
**moot**   29:15
**morning**   14:5,8,15
14:17,20 15:1,19
113:17
**motion**   18:22 20:6
20:12,20 25:3,13,21
36:12,15 38:10,12
50:14 69:4 81:20
130:7 138:15 139:5
**motions**   68:21,23,25
**motivated**   126:5
**motor**   48:16,18
**motors**   97:13
**move**   26:2,3 76:10
76:15 102:1 117:25
118:8
**moved**   108:20
**mscarborough**
10:16
**mullin**   10:11 15:14
**multiple**   34:18 58:7
61:5,23,23 68:21
115:2
**multistate**   74:16

**n**

**n**   3:12 9:19 11:13
**name**   14:21 24:7
97:12 128:16
141:19

**named**  67:15 127:6
  127:6,12,16 131:13
**nathan**  5:13 15:21
**national**  32:24
**nationwide**  54:16,19
  55:4 66:9 67:14
  84:16
**natural**  78:7 79:6
  100:19 101:2,18
  102:5,21 103:4,7,18
  104:7,12 105:4,8,19
  107:4,20
**ncihlar**  5:17
**near**  116:16
**necessarily**  69:20,21
**necessary**  21:19
  69:11 106:3,5,6
**need**  24:1 33:10
  37:6 39:23 42:23
  52:25 69:8 76:14
  105:5 114:20 116:3
  130:19 136:6,8,9,24
  137:1,3,12 140:13
  140:13
**needed**  85:16,18
**needs**  33:20,21
  76:22
**negotiate**  100:15
  101:25
**negotiated**  99:20
  115:5
**negotiation**  28:7
  115:10
**neither**  141:15
**network**  80:12,20
  80:21,24
**netz**  34:25 36:3
  40:16
**netz's**  37:11 40:11
**nevada**  8:6
**never**  34:9 37:20
  44:5 48:21 58:11
  63:1,10 72:13 73:12
  73:13 74:10 90:15
  130:12

**new**  4:15 11:6,6
  14:22 31:14 33:15
  50:23,24,25 51:6
  61:15 67:7 68:5
  72:7 73:8 74:8,20
  91:23
**newspaper**  54:20
**nice**  16:9,10,14
  82:12
**nil**  58:11
**nine**  56:7,8,8
**ninth**  44:5,6 48:14
  48:19 64:17 65:21
  66:1,4 110:12,15
  113:18,20 131:23
**nod**  130:10
**non**  19:2 20:7 21:2
  22:4 32:25 33:8,25
  39:21 40:4 44:21
  45:9,13 53:14 58:18
  58:23 61:8 62:21
  66:24
**noon**  137:19 138:3,4
  140:10,15,17
**normally**  121:6
**northern**  1:2 2:2
  36:14 64:22
**note**  35:9 60:21
  111:25
**noted**  26:1 84:19
  140:22
**notice**  19:5 22:13,16
  26:25 27:4 31:14
  54:4,5,8,12,17,18,19
  54:19,22 55:12,14
  55:20 58:15 61:20
  61:22 76:11,16,18
  78:25 79:12,23 80:2
  81:14,15 82:8,20
  83:16,24 84:16 85:8
  88:20,24 89:4,7,14
  90:3,4,9,11 91:12
  91:17,24,25 93:15
  93:15 95:12 98:3
  101:16 102:19,23

102:24 103:8,18
  106:4 109:2,14,18
  109:21 110:22,25
  111:2,5,6,14 112:20
  115:22,24 117:7
  118:1 119:4 120:18
  125:17,20,24,25
  126:2 133:12
  134:11,16,20
**noticed**  68:1
**notices**  32:18 54:16
  54:24 55:2,3,7,24
  56:9,12,20,25 58:7
  58:8 61:5,6 77:5
  78:24 102:7 118:18
**notifications**  61:23
**notified**  56:10,11
**novak**  5:20 15:23,23
  79:11 105:12,14,14
  106:13 107:10
  110:19,20 112:8
  113:11 114:15,18
  114:22
**novo**  23:24
**nuisance**  60:5,6,10
  60:17 67:4,5
**number**  37:8 40:11
  40:11 44:22 47:25
  60:22,23,24 71:10
  78:3 80:9 89:21
  111:25 124:21
**numbers**  62:16
  136:11
**nw**  10:22 11:22

**o**

**o**  7:14,15 17:3
**o'clock**  140:10
**o0o**  14:3
**oak**  6:19
**object**  20:25 21:15
  25:24 131:8
**objecting**  7:3 15:2
  17:1,3 21:19 52:16
  67:12 130:12

**objection**  50:18
  103:25 128:12,17
  129:8
**objections**  20:16,18
  21:5,20 22:20,20
  30:13 32:21 36:24
  39:18 50:15,16 61:2
  106:14 107:5,9
  121:3 126:24
  127:22 128:3 133:3
**objective**  138:7
**objectively**  68:10
**objector**  8:19 9:16
  15:24 17:6 134:23
**objectors**  8:10 9:3
  15:8 16:1 19:7
  28:23 35:7 56:23
  60:23,24,25 61:2,3
  65:4 76:4,23 85:15
  86:3,15 94:10 115:8
  115:13 126:23
**objects**  105:8
**obligated**  67:14
**obligation**  130:18
  131:25
**observation**  116:2
**observations**  110:21
**observer**  16:7
**obtained**  115:17
  116:13
**obtaining**  112:4
**obvious**  52:8,10
  109:18,20 131:5
**occidental**  131:22
**occurred**  40:13
  99:18
**october**  131:24
**offer**  135:18
**office**  12:13 16:4
  25:7 37:18 101:7,9
  101:10
**officers**  56:17,19
  57:4
**offices**  7:14 15:7
  17:3

**officially** 29:4 127:23
**officials** 56:13
**oh** 34:3 64:2 86:6 116:10 122:25 134:12 136:15
**okay** 14:10 22:7 23:14,17 24:6 29:16 30:17 31:25 33:14 34:10 35:16,17 38:21 43:18 45:5 47:4,22 48:23 49:11 49:15 52:7,25 53:2 58:14 59:20,21 61:11 62:4 63:15 64:20 65:3,10 66:10 66:18,21 67:21 68:13 69:7,23 71:5 71:9 72:10,15 73:14 74:20 75:10 76:6 78:10 79:13 82:20 83:20 85:25 87:13 87:16 88:19 89:3,9 89:16 91:20 92:14 92:19,24 100:8 101:1 102:15 107:12 108:12,15 109:1,5 110:4,18 114:18,23 118:11 119:6 125:4,10,13 127:1,12,15,23 128:2,24 130:24 131:4,10 133:18,22 138:16,20 140:16
**old** 16:15 77:10 116:21
**olds** 77:13
**omitted** 19:4 39:21 62:22
**once** 24:9 52:21 83:21
**ones** 50:24 101:15 101:24 105:5,10,21
**ongoing** 79:18 121:6

**oops** 91:25
**open** 28:24 39:11 65:5 104:6
**operative** 139:12,18 139:22
**opine** 77:4
**opinion** 83:6,7 86:2
**opportunity** 18:16 61:17 102:10 103:19 104:7 105:6
**oppose** 129:9
**opposed** 34:14 87:22
**opposite** 24:17 42:9
**opposition** 25:2 38:6 50:16 68:22
**oppositions** 25:9
**opt** 57:7 60:23 61:4 61:13,19 103:2
**option** 86:3,4
**oral** 1:15 2:15 19:25 123:13
**order** 18:17 23:21 32:2,5 33:18 38:3 38:19 42:24 49:5 93:23 94:6 95:19 119:6 120:3,6 130:2
**ordered** 137:1
**orders** 90:25 96:20
**oregon** 46:15,20,22 65:8 66:14 88:4,9 88:13 93:18 94:4,6 94:11,16 95:2,7
**organized** 119:10
**original** 36:18 50:3 50:18 118:22 141:12
**originally** 68:20 115:7
**osborn** 11:12 17:8,8
**ought** 22:14 27:7,8 60:8
**outlined** 29:25
**outreach** 80:8,14 81:1

**outs** 57:7 60:23 61:4 61:19
**outside** 43:16 111:9
**overcharge** 36:4,5,5 36:6
**overcharges** 44:4
**overruling** 42:18

**p**

**p.a.** 4:12
**p.c.** 7:4 9:17
**p.m.** 2:18 133:21,21 140:22
**pac** 70:11
**pacific** 70:5
**package** 94:21
**page** 48:25 49:2 124:9 135:24
**pages** 49:5 135:25 137:4,16,17
**paging** 49:6
**paid** 30:4 31:2,6 32:10,10,11,20 50:10 80:12 87:4 89:15 90:5 94:16 95:1 132:15,20,24 132:25
**panasonic** 11:2 15:18
**panel** 34:19,20 36:22 37:6,7 40:14
**paper** 50:4 114:12 131:15
**papers** 36:18 40:10 50:4,10,17,18 52:13 54:11 62:11 69:17 74:24 75:16 81:20 103:16 105:17 120:25 121:2,4 125:18 126:7 127:5 128:11,13,14,16
**parens** 66:16 99:8 102:12 104:13 105:5,7,10,21 106:9

**park** 11:5
**part** 28:16 36:14,16 38:6 55:14 69:20 71:14 81:24 90:16 94:20 95:3 99:19 104:4,21 127:18
**parte** 119:7 120:6
**partial** 71:1
**participate** 16:7
**particular** 18:17 120:9
**particularly** 19:17 106:17 114:18 115:21 120:19 124:20 137:23
**parties** 38:19
**parting** 132:10
**parts** 107:21
**party** 97:24 141:17
**pass** 43:20,21 46:25
**passing** 55:13
**passthrough** 42:19 42:24
**paths** 104:3
**patience** 69:10
**patriac** 66:16
**patriae** 99:8 102:12 105:21
**patrick** 7:16 17:2
**paul** 5:20 15:23 105:12,14
**pay** 32:13 97:25 100:10
**payment** 60:11 92:17 95:25 108:7
**payments** 60:9 88:13 89:10,10 95:3 98:4,5
**peace** 132:17
**peep** 52:5
**pending** 18:23 59:12 59:14 63:6,8,16 103:11 105:22 106:9 139:12,19,19 139:22

**pennsylvania**  4:7
  10:22
**people**  14:13 19:16
  19:20 21:1,2 22:1,5
  22:23 31:2 32:14,19
  32:25 33:7 34:8
  37:20 39:3 43:3,22
  48:17,24 56:17,18
  56:18 57:1,23,25
  58:17,23 60:14
  62:21 64:13 66:23
  71:10,24 73:20
  75:14,16 77:17
  78:15 87:23 88:24
  89:1 98:22 99:6
  100:17,20 101:2,18
  102:5,21 103:4,7,19
  103:22,23 104:12
  105:8 107:5,20
  108:6,9,16,17,19,21
  116:20 117:13
  118:1 119:18
  125:22 126:4
**percent**  33:10 77:7
  78:11,12 84:21
  115:7,9
**percentages**  92:22
  95:1,21
**perelman**  4:5 16:23
  16:23
**perfect**  18:12 113:7
**period**  41:14,21,24
  66:7 77:11,13,18
  92:20 111:20
  116:10,14,21
**permits**  120:3 129:5
**person**  41:25 43:25
  69:25
**personalize**  67:10
**personally**  24:12
**persons**  78:8 104:7
  105:4 107:4
**perspective**  22:15
  73:19 109:4 132:11

**persuade**  100:3
**persuasive**  106:18
**pertains**  141:11
**petroleum**  131:22
**phase**  81:25
**philadelphia**  4:7
  14:18
**philips**  10:18 15:16
  17:17 121:23,24
**phone**  14:14 17:4
  18:7 71:12 120:1
**phonetic**  94:18
**pickup**  97:14
**picture**  12:3 17:11
  53:19 135:14,16
  138:22
**pie**  89:8
**piecemeal**  28:25
**pipe**  129:24
**place**  23:22 97:3
  141:4
**plaintiff**  42:23 48:22
  64:18 65:1,7,24
  66:5,6,14 74:10,12
**plaintiffs**  3:10 13:3
  14:16 15:3,10 16:11
  16:18,20 24:16
  42:21 46:3 50:14
  67:15,16,25 68:4
  72:3,6,7 74:7 86:4
  99:18,21,24 101:2
  110:2 115:6 130:12
  131:13,14
**plan**  26:13,21,24
  27:3,6,6,7,11,12,17
  28:5,9 29:7 30:16
  39:19 86:25 87:1,8
  87:8,9,10,11,23,25
  89:18,19,23 103:25
  104:5 108:15 109:2
  109:3 110:22,25
  111:2,5,14 115:7,22
  115:25 133:12
**plate**  137:24

**play**  67:11
**playing**  124:4
**plays**  103:15,17
**plaza**  4:14
**pleading**  46:3
**please**  19:18 37:14
**pllc**  8:3
**plodding**  89:4
**plus**  40:9 77:5 80:14
  84:21 90:7
**plutzik**  6:17 17:25
**pnovak**  5:24
**point**  26:17 31:9
  35:12,14 50:2 56:6
  58:16 61:18 65:23
  66:9 70:1,5,13
  72:17,22 75:6,11
  80:3,5 83:10 84:22
  88:7 97:2 104:9,10
  104:19 109:23
  113:8,11,12,21
  115:12 117:13,17
  118:4 121:24
  124:25 126:15
  128:23 130:1
**pointed**  115:2
  132:13
**pointing**  131:4
**points**  67:19 77:9
  105:16 121:16
  125:14 135:3 138:8
**policies**  44:7
**pooh**  61:17,17
**popular**  25:7
**population**  94:5,5,7
**position**  24:17 51:8
  85:2 91:21 100:5
  129:9
**positive**  39:12
  117:12
**possesses**  106:1
**possessors**  40:22
**possibility**  85:13
  117:21

**possible**  26:7 32:22
  84:18
**possibly**  42:13 57:25
  58:13
**postdated**  50:24
**posted**  118:18
  119:15,23
**posture**  105:19
  106:11
**pot**  88:1 100:17
  112:25 132:12
**potential**  89:10
  109:16
**potentially**  18:24
  97:21 129:19
**pots**  87:21
**power**  43:24
**powers**  24:14,15
**practicable**  81:13
  82:10 90:9 115:24
**practical**  93:1
  116:23 134:10,11
**practically**  99:3,4
**practice**  44:17 84:13
**pragmatic**  58:5
**precisely**  80:9 95:8
  124:15,24 131:21
**predicate**  44:1
  132:19
**prefer**  118:7
**preference**  108:13
**prejudice**  40:24
**preliminarily**  95:20
**preliminary**  26:5
  36:12,15 55:16,19
  80:1 93:23 118:6
  137:14
**premature**  18:20
  20:3 22:8,12 24:9
  24:12
**preparation**  25:6
**prepare**  55:20
**prepared**  35:6
**pres**  101:20 107:14
  107:15 108:25

109:13 110:6,17
113:6,15,22 114:1,9
115:9
**prescott** 3:11
**present** 13:11 67:12
**presentation** 105:17
**presentations** 95:15
**presented** 86:8,9
**press** 74:13
**presumably** 21:23
**presume** 50:1
**pretty** 36:1 41:5
61:3 76:21 77:1
**prevailed** 69:3,12
73:1
**preview** 54:8
**price** 41:14,15,22
65:24 77:18 100:7
**pride** 27:12
**primary** 30:2
106:13,16
**principle** 133:10
**prior** 50:25 141:5
**private** 44:10,15
64:18,25 65:1,7
66:5,6,14 99:24
101:2 124:23
**pro** 87:22 89:23
95:6,10,13 107:19
133:25
**probably** 19:20 23:4
42:25 44:12 45:13
46:18 57:19 61:22
81:22 107:10 114:5
135:10
**problem** 30:15
51:14 56:22 72:23
77:8 79:17 86:15,24
86:25 87:6 88:18
93:3,6,9,10 101:4
116:7,24 126:1
130:9 133:11,15
134:14 135:4
136:14 137:5

**problems** 16:10
27:25 28:13 76:17
95:17 98:8
**procedural** 28:13
69:1 70:1 119:8,25
120:8 130:5
**procedure** 32:14
**procedures** 41:5
**proceed** 28:13 29:20
39:7 113:14
**proceeding** 20:16,18
**proceedings** 126:10
141:3,5,7,13
**process** 27:20 40:22
41:4 73:24,25 79:18
81:24 93:8 103:2
104:4 111:3,6,15
115:23 116:4 121:8
121:9 126:21
136:20
**processing** 79:20
**product** 41:14,20
42:7 88:16
**products** 55:9 97:14
**professionally**
136:22
**professionals** 81:4
**proffer** 90:7
**proffered** 74:23
**program** 54:12
55:14 78:25 82:8
83:25 100:17
125:20
**programs** 54:21,22
111:6,8
**progress** 39:15
121:7
**projection** 108:1
**projections** 81:11
**promise** 90:16
**promote** 101:10
**proof** 43:19,21
45:18
**proper** 110:11

**properly** 122:7,8
**proportionate** 87:20
**proposal** 28:17
117:22 118:8
**propose** 29:7
**proposed** 28:5 29:4
29:14 30:16 55:19
89:23 104:3 109:16
**proposing** 39:1
**propriety** 21:22
**prosecute** 124:21
**prosecuted** 124:19
**protect** 130:16
**protection** 51:2
**protective** 38:3,19
**protects** 61:14
**protocol** 110:12,13
**protocols** 118:17
119:4
**prove** 36:16 46:24
46:25 47:1
**proves** 43:25
**provide** 59:25 81:18
83:6 126:23 136:19
139:2
**provided** 92:17,21
93:11 96:3 108:2
**provides** 87:8,18
**providing** 138:12
**provision** 88:14
90:20 91:1,19 92:21
94:24 107:15
**provisions** 26:25
**public** 56:25
**publication** 55:5,6
114:11
**publications** 55:6
**pull** 24:23 96:23
**punitive** 67:7
**purchase** 16:11
**purchased** 41:25
**purchaser** 3:10 13:3
14:16 15:3 16:18,20
26:22 27:3 38:18
43:4 51:9 55:17

60:21 99:17,21
110:1 132:14
**purchasers** 14:9
16:6 39:20 42:1
53:14 54:23 55:4
126:25
**purchases** 40:12
116:13
**purported** 41:12
**purpose** 94:14
**purposes** 41:17
102:17,17 103:2,3
106:7 111:13 112:2
112:4,21
**pursuant** 117:22
**pursue** 47:8 53:15
65:1 69:21 85:23
**pursued** 71:22
72:13
**pushed** 118:5
**put** 24:7,19 26:22
29:13 42:19,21
45:15 52:13 70:24
71:7 75:2 77:14
78:7,8 84:25 85:7
90:13 103:18
132:11,17
**putative** 71:19
**puts** 104:2
**putting** 85:3

**q**

**question** 20:11,20
22:8 23:9,10 26:5
33:13 40:19 48:1,20
53:11 59:15 60:5
61:10 64:1,4 65:5
78:7 98:5 99:5
108:4 109:9 119:3
120:17,21 122:16
127:11 133:23
134:21 136:2 137:1
139:10
**questions** 21:8
82:21 85:8 118:17

126:19
**quibbles** 133:6
**quibbling** 83:14
  120:8,8
**quick** 72:17 122:16
**quickly** 87:17 117:2
  117:19 135:25
**quinn** 2:16 3:4
  14:20
**quite** 26:11 36:17
  75:12 90:4 91:10,14
  119:10
**quote** 44:14 111:5
  120:24,24
**quoted** 50:18
**quotes** 91:24

**r**

**r.p.c.** 4:3
**rachel** 12:5 17:10
**radcliffe** 67:18
**raise** 18:16 48:1
  76:13
**raised** 18:19 19:6,8
  19:11 20:19 34:12
  35:11,13 39:18 52:4
  53:10 56:23 76:14
  76:18 82:2 87:5
  107:14 121:19
  133:3 138:8
**raising** 39:25
**ran** 70:16
**range** 35:19 36:17
**ranking** 56:13
**rata** 87:22 89:23
  95:6,10,13 107:19
  133:25
**rate** 34:20 39:1,2
**rates** 120:19
**ray** 1:5 2:5
**rbonsignore** 8:8
**rbrass** 12:9
**reach** 77:7 78:11
  80:6 81:5,12,12
  84:21 102:25

**reached** 78:15
**reaction** 57:3
**read** 19:15 42:3
  48:18 66:11 67:23
  76:17 91:18 122:13
**reading** 122:12
**ready** 74:25
**real** 40:18 62:5
  87:25
**realize** 19:15 21:25
  52:11
**really** 27:25 30:13
  39:17,23 40:19 42:3
  52:25 53:9 54:9
  55:13 57:5 81:9
  86:15 96:18 101:1,3
  104:2 110:2 120:2
  125:5 133:14
  137:24
**reason** 22:17,21
  83:22,23 93:4
**reasonable** 26:10
  27:6,10,11,12,21
  28:3,18,21 30:6,11
  53:16 59:15 83:17
  83:17
**reasonableness**
  18:25 26:13
**reasonably** 136:21
**reasons** 22:12 59:7
  59:11 81:14 103:6
  115:24
**recall** 31:16 34:15
  72:17,25 138:10
**recast** 46:7
**receive** 87:24
  111:23 115:8
**received** 79:19
**recess** 76:9 133:21
**recited** 91:9 93:24
**recites** 90:10
**recognize** 105:23
  106:8 118:4 130:8
**recognized** 91:4

**recognizes** 111:2
**recommend** 104:24
  116:24 117:18
**recommendation**
  18:21 19:24 20:4
  21:16 22:10 47:14
  48:25 49:1,23
  117:11 135:15
  136:17 139:1
**recommendations**
  21:20
**recommended**
  103:24 117:11
**recommending**
  107:3
**recommends** 131:7
**record** 33:20,23
  34:16,18,24 35:9,25
  36:10,11 37:12 38:2
  38:5,16,17 53:3,7
  61:3 68:2,14 80:3
  81:14 83:12,13
  85:22 96:17 101:12
  101:22 107:23
  127:9,19,24 138:10
  138:15 139:10,14
  140:1,21 141:6,9
**records** 98:10
**recover** 42:14
**recovered** 22:4
**recovery** 39:7 44:1,1
  44:3,20 46:11,12
  100:16
**redoes** 49:21
**reduce** 125:7
**reduces** 32:16,17
**refer** 129:16,17
**reference** 55:11
  56:5 119:6 120:3,6
  136:16
**referenced** 38:9
**references** 111:5
**referred** 26:20
  104:5

**referring** 37:13 49:3
  60:1 90:25 92:7
  121:4,20
**refined** 103:9,9
  109:4
**reflect** 125:8
**reform** 104:4
**regard** 21:22,24
  22:2,13 40:4 51:5
  67:4 95:17 120:18
  120:22
**regarding** 136:8
  137:13 138:12
**regardless** 132:1
**regards** 70:21
**regrets** 124:15
**reign** 51:25
**rejected** 82:25 83:1
**relates** 1:7 2:7
  111:16 118:17
**relating** 19:7
**relationship** 38:24
  110:22
**relative** 141:16
**relatively** 90:5
  135:25
**release** 30:22 52:1,2
  52:3 58:20 100:9
  132:21 133:1
**released** 34:8 40:23
  58:22,24
**releases** 26:25 30:5
  30:20,21 31:1,7
  59:6 61:21
**releasing** 19:2,3
**relevant** 72:3
  136:24 137:13
**reliance** 101:25
**relied** 91:18 100:20
**relief** 23:22 43:19
  44:14,21 45:9,17
  47:9 48:16 50:6
  58:17,23 61:25 62:3
  62:7,9,20,20 63:13
  99:25 100:2 101:21

rely 67:9
remaining 113:14
118:12
remarks 63:22
132:10
remediated 72:23
remedy 47:2 60:1
64:18 65:6 66:5,7
remember 25:6
31:16 58:21 59:21
75:5 122:11,12
remind 24:21 67:13
reminded 68:7
reminding 70:10
reminds 116:10
renew 16:15
renfrew 49:2
renfrew's 47:13
48:24 136:17
renoticing 32:21
repealer 19:2,3 20:7
21:2 22:4 31:22
32:25 33:8,8,25,25
39:21,21 40:4 44:21
45:9,13 51:11 53:14
58:18,23 61:8 62:21
62:22 66:24,24
76:12
repeat 19:16 60:19
77:2 78:8
repeated 39:24 40:5
repeatedly 52:13
67:20
repeating 24:20
103:17
replace 100:6
reply 24:25 34:3
50:16 64:21 68:8
report 18:21 19:23
20:3 21:16,20 22:9
25:20 34:25 36:8
37:11,12,22 38:14
47:14 48:24 49:1,3
49:23 56:2 82:15
117:10 121:2

135:15 136:17
139:1
reported 1:22
reporter 2:20 18:9
18:10 59:19,20
88:11 141:2
reporter's 14:7
reporting 81:25
121:7 139:17
represent 20:6 33:1
67:14,17 74:11
102:6 127:6,12,16
131:13
representations
124:14
representative
71:14 127:7,16
representatives 74:3
represented 75:17
75:18 124:7
representing 17:21
52:16 75:13 97:21
126:22
request 23:22 24:8
24:22 25:2,3 37:10
68:1,11 123:9,10
125:8
requested 141:14
requests 68:13
require 28:8 43:19
43:21 115:21
required 55:15
requirement 126:21
requirements 81:15
111:3,3,7,9,12
115:23
research 13:12
resellers 88:16 89:7
89:8,11,15,19 90:3
90:12,21 91:2,22
92:4,5,17 95:22,25
96:3,8,9 97:4,5 98:4
134:12
residents 39:20
98:21

residue 100:1
108:23
resolve 98:8
resources 49:19
124:21
respect 65:12,15
68:18 76:4 90:3
91:21 108:25
110:21 113:12
115:16 126:8
respectfully 78:4
respond 35:3 51:19
92:9 105:13 110:19
135:5
responded 104:21
responding 79:11
118:22
response 20:20 25:2
36:21 56:19,21 69:5
82:25
responses 76:19
117:8 121:3
responsibilities 23:5
responsibility 69:25
70:11 71:21 74:17
responsible 97:24
98:7 133:13
rest 124:23
restitution 47:3
restive 19:16
result 28:6
results 80:12,12
82:12
retain 85:18,20
retained 85:19
retains 117:14
returned 80:13
reversed 46:10
reversing 44:3
reversionary 113:3
113:4
review 47:6 57:9
58:3 64:7 135:3
139:23 141:13

reviewed 23:24
73:23
reviewer 86:4
revise 115:10
revised 115:18
revision 115:13
revisit 24:11
richter 10:11
rid 32:24
right 17:4,23 18:6,8
18:12 24:1,2 25:22
26:2,2 28:1 36:19
38:4 39:16 43:1,17
44:22 46:14,18,19
46:23 47:25 49:24
50:20,20 51:16
53:13,17 56:8 58:25
59:14 61:20 63:12
63:15,20 66:15
69:15 70:19 71:22
76:2 77:13 78:21
83:3 84:9 86:12
88:6 89:12 92:19,25
96:13 98:12 101:8
102:25 105:11
112:22 114:21
121:14 123:23
126:14 133:20
140:3,20
rights 21:4 39:6
57:14 93:16
ripe 23:25
risk 58:6
road 6:19
robert 4:20 8:4 15:9
24:7
robust 81:15 82:17
rocket 125:12
rockhurst 8:10 16:2
roll 107:13
room 66:23 71:11
round 135:5,8
rounds 68:25 135:7
136:1

**rule** 32:5 36:14 41:2
  42:16,20 43:2 45:20
  111:3,7 115:23
  117:1,19 126:15
**ruled** 38:13 93:22
**rules** 40:23
**ruling** 41:1,2 93:24
  94:1,25 123:22
**rulings** 55:25
**run** 18:12 64:11,24
  65:12 66:2 75:7,8
  100:16 108:18
  129:22
**runs** 82:5

**s**

**s** 8:20,21 12:5
**sake** 108:3,8,22
**sales** 40:15 77:20
**salt** 39:9
**sampco1** 9:14
**samsung** 10:10
  15:14 29:23 68:17
  121:23,25
**san** 1:16 2:17 3:6,15
  4:22 5:7 6:6,13 7:9
  7:18 8:15 10:6,14
  12:7,16 13:7 14:1
  15:8
**sandbagged** 123:10
**sansome** 8:14 13:6
**satisfy** 79:7
**sauce** 42:20,21
**saveri** 13:4,4,5 16:5
  16:5,14
**saveri.com** 13:9
**saw** 37:20 38:13
  78:17 80:24 103:1
  131:10
**saying** 29:2 32:2
  41:8 43:9 44:25
  46:15 48:2,17,19,21
  56:15 65:23 76:22
  78:14,15 86:15
  89:17 90:25 94:10

102:11,15 123:1
  129:23 134:12
**says** 27:16 33:4
  35:24 47:1,7 64:17
  66:11 78:12 89:7
  90:12 91:8,25 94:6
  95:12 98:24,25
  105:3 107:23 120:5
  134:23
**sc** 1:6 2:6
**scarborough** 10:12
  15:13,13 29:22,22
  30:19 68:16,17
  69:16,19 72:16
  132:9
**scarpulla** 7:14,15
  15:6,6,7 17:3 20:3
  22:22 23:2,3 30:17
  30:18 31:3,8 34:11
  53:21 76:25,25
  78:14,20,22 83:20
  83:22 84:3,6,9,11
  84:16,20 85:17 86:2
  92:14,15,20 93:6
  118:20 119:20
  122:16,24 123:4,15
  123:23 126:8
  127:15,18 128:1,7
**scarpullalaw.com**
  7:20
**scenes** 100:23,24
**schedule** 20:12,14
  20:14 21:19 22:10
  23:13 25:1 85:15,16
  98:13 121:12 136:5
**scheduled** 23:22
**scheduling** 120:7
**scheme** 133:25
  134:1,8,9
**science** 58:2,2
**scope** 52:2 55:4
**scrounge** 71:13
**sdi** 10:10 15:14
  29:23 68:17

**seal** 38:17
**sean** 9:16 17:6
**search** 80:10,12,12
**second** 15:4 19:1
  102:13 112:23
  113:23,25 117:17
  120:17 132:13
**seconds** 70:2
**secret** 55:10
**secretly** 122:20
**section** 66:7
**securities** 41:20
**security** 41:21
**see** 16:7,9,10,12,14
  16:14 37:21 39:25
  42:4 47:4 62:15
  77:6 82:12,20 87:25
  89:16 90:22 102:17
  102:20 122:15,25
  132:22 135:20
  136:25 139:24
**seeing** 25:20 32:21
  34:16 103:5
**seek** 57:18 67:17
**seeks** 67:10
**seen** 16:8 91:11
**sees** 80:22
**self** 25:25
**send** 49:18 73:2
  78:24 96:23,24,25
  101:16 134:19
  135:19 137:11,12
**sending** 28:7 72:19
  96:25
**sends** 55:22
**sense** 25:25 35:18
  64:5 82:12
**sensitivities** 106:8
**sent** 56:9 91:18
  118:22 119:3,18
  125:24 133:12
**sentence** 126:7
**separate** 26:7,11
  33:5 38:17 54:18,25
  105:23 123:17

131:16 134:1
**separately** 117:2
**serious** 107:2
**served** 71:11
**serving** 25:25
**set** 20:13 27:2 44:13
  94:6 98:13 99:13
  108:16 110:12
  118:7,20 123:13
  141:4
**sets** 26:18
**setting** 94:8
**settle** 31:12 53:25
  54:14 59:15
**settled** 31:17 32:15
  33:13 53:19 55:18
  99:7,16 115:13
  136:25
**settlement** 18:22,25
  19:7 21:23 22:3
  26:8,10,18,20 27:14
  28:2,5,22,25 29:3,5
  31:21 32:6 33:12,19
  34:7,15,22,23 35:8
  35:22,24 37:6 39:5
  40:4,10,25 41:9,17
  50:3 52:2 54:10,17
  55:19 58:24 70:24
  71:7 79:22 86:14,16
  86:16,24 87:2,2,7
  87:19 88:15 89:10
  90:6,7,14,17,19,20
  92:16 93:5,11,14,20
  94:3,19,25 95:4,18
  95:20 96:2,8,20
  97:6 99:19 106:8
  107:16 115:4,10,14
  115:18 124:5,13,18
  124:22 125:1,2
  126:13 129:9 131:7
  131:14 132:14
  133:3,4 134:7,24
  137:13
**settlements** 20:22
  26:17,19,24 27:2,17

50:25 52:4 54:24,25
56:7 60:8,21 88:14
100:23 101:25
112:5 121:23 122:8
133:8
**settling**   32:7
**shades**   102:15
**shaking**   96:11
**shape**   19:24 22:4
**share**   95:13
**sharpen**   63:22
**shepard**   15:14
**sheppard**   10:11
**sheppardmullin.co...**
10:16
**sherman**   45:4 65:15
**shoe**   42:18
**shoreline**   9:19
**shorthand**   2:20
141:1,7
**shot**   102:22 103:5,7
**show**   36:16 43:2
76:5 130:22
**showing**   21:21 22:2
36:18 94:14
**shown**   81:10
**shows**   130:8
**side**   23:13,20 30:2
42:11,12 48:8 51:21
76:5,23 98:19
**sidelines**   57:13
**sides**   42:9 85:3,4
**signature**   141:22
**signed**   38:3
**significance**   84:17
**significant**   89:17
**silenced**   131:6
**similar**   51:6 54:19
114:5
**simple**   75:7,14
**simply**   45:18 64:11
73:2 87:6 111:21
**simultaneous**   137:8
137:16 140:9,19

**single**   108:7,10,12
108:17 110:23
111:23
**sir**   68:15 97:19
123:24
**sit**   63:18
**sits**   43:22
**sitting**   57:13 132:15
**situated**   35:21
**situation**   41:11 42:2
42:6,15 43:23,25
44:12 48:21 51:6
99:18 104:2 129:18
**six**   55:7 77:10
131:13
**size**   122:5
**skip**   67:22
**slightly**   83:15
**sloughing**   75:14
**small**   36:6 60:24
90:5,8,13 91:4,6,7
96:15 122:3 124:5,5
124:13,21
**smaller**   132:20
**smarter**   86:4
**society**   44:10,11
**solicited**   87:22
**solution**   97:24 105:3
106:10 134:13
**solutions**   104:23
**solved**   29:12
**solves**   135:23
**somebody**   75:2
136:8
**somebody's**   27:22
**soon**   43:20 118:6
**sooner**   81:19
**sorry**   30:24 49:9
53:22 77:16 89:3
99:1 105:9 113:3
117:3
**sort**   19:16 100:1
101:20 109:18
110:9,16 130:18
132:10 133:25

134:9
**sorts**   98:20
**sought**   93:13
**sound**   43:6 133:16
**sounds**   92:5
**source**   130:17
**south**   4:6 9:6
**speak**   14:11 53:22
80:5 83:21 129:20
130:11
**special**   2:15 3:4 14:5
14:10,24 16:13,16
17:4,12,20,23 18:6
18:11,20 21:9,15
22:7,25 23:2,14,17
24:2,5,21,24 25:11
25:16,22 26:1 27:24
29:3,16,18 30:17,24
31:4,25 32:4 33:14
34:10 35:3,12,14
36:8,10,19,23 37:1
37:4,14,22 38:4,8
38:10,12,21 39:16
41:10 43:5,11,17
44:19,25 45:5,7,12
47:4,20,22 48:2,11
48:23 49:11,15,19
49:24 50:7,20 51:11
51:16,19,24 52:7,25
53:4,9 54:6 58:14
59:5,18 61:7,11,18
62:3,5,14 63:3,7,9
63:12,15,17 64:2,15
64:20 65:3,8,10,14
65:18 66:10,15,18
66:20 67:19 68:13
69:6,8,18,23 70:7
70:19 71:5,9,23,25
72:6,10,12,15 73:5
73:14,16 74:8,20
75:5,10 76:6,10
78:10,18,21 79:1,13
80:17 81:17 82:6,17
83:1,4,20 84:1,4,7
84:10,15,19 85:9,25

86:12,20 87:12
88:17,19,21 89:3,9
89:13,16,25 90:18
90:23 91:6,20 92:4
92:13,19,24 93:1,9
94:22 95:5,22 96:1
96:11,15 97:5,12,15
97:18 98:2,12,18
99:3,7,10 101:6
102:3,5,9 103:24
105:2,4 106:12,20
107:12,18 110:18
112:6,9,12,22 113:1
113:9 114:13,16,21
116:20 117:4,7
118:11,24 119:1,6
120:13 121:5,13,17
121:20,24 122:3,10
122:15,20,25 123:5
123:19,24 124:3,25
125:4,7,10,13 127:1
127:3,11,15,23
128:2,13,16,24
129:2,11 130:4,14
130:24 131:1,8,10
131:18 132:4,8
133:18,22 134:3,5
135:6,13,21 136:4
137:18,22 138:3,5,9
138:14,18,24 139:4
140:3,15,17,20
**specific**   87:3 97:11
110:9
**specifically**   44:2
113:23
**specificity**   136:21
**speculative**   62:12
**speed**   76:21
**spelled**   26:24
**spend**   19:24 33:14
**split**   48:3,4 53:11,12
53:15 64:4,6
**spoke**   94:17
**spoken**   113:18

**spreading**  31:11,13
**spur**  126:3
**square**  66:8
**squarely**  23:21
**st**  8:19,20,21 9:7,12
  15:24,24,25 97:20
  98:3 121:17,18,22
  122:2,5,14 123:25
  124:4 125:2,5,9,11
  131:19,20
**stack**  96:19
**stage**  80:1 100:22
  124:12 125:11
**stand**  82:7
**standard**  79:23
  81:13 83:16,17
**standing**  42:9 43:3
  58:3 126:7 128:20
  130:9,23,25 131:16
  132:1
**star**  140:18
**start**  77:10 127:4
**started**  23:11
  116:21
**starting**  26:17
  137:12
**state**  12:11 22:5
  40:4 42:10,11,12
  44:20 45:8,14,18,20
  45:21 46:4,5,15,16
  46:17,19 48:11,13
  51:11 56:10,14
  57:21 65:8,12 67:16
  71:12 75:3,4 79:7
  82:2 88:3 89:22,22
  92:22 95:2,2 98:25
  103:15,17 110:8
  141:2
**stated**  65:4
**statement**  19:11
  68:10 120:20
  125:16 128:10
**statements**  40:6
  53:5 67:24 68:3
  85:17 107:24

**states**  1:1 2:1 19:2,3
  20:8 21:3 31:17,22
  33:8,8,24 34:1 39:4
  39:21,22 40:12,13
  40:16 43:8 44:21
  45:9,14 50:9 51:10
  52:14,17,21 53:14
  56:11 58:18,23 61:8
  62:21,22 67:5 71:4
  74:17 87:19 88:24
  91:1 94:12,14,17
  95:21 98:5 111:5
  112:16 139:21
**statistic**  80:6
**status**  127:17
  136:20
**statute**  54:2 58:4
  67:6 75:7,8
**statutes**  51:2
**statutory**  50:23
**step**  57:17 74:18
**stepped**  73:20
**steve**  9:11 18:4
**sticky**  104:2
**stimulation**  111:4,8
**stood**  93:16
**straightforward**
  91:3
**straus**  5:12,17 15:21
**strawn**  11:3 15:17
**streamline**  24:10
**street**  3:14 4:6,21
  5:6 6:5,12 7:8,17
  8:14 10:5 11:13,22
  12:6 13:6 55:5
  126:16
**strikes**  97:20
**strong**  58:22
**stronger**  52:18
**strongly**  75:23
**study**  37:12
**subject**  46:20
**submission**  111:18
  135:9,11

**submissions**  135:12
**submit**  20:3 49:20
  91:3 102:10 114:15
  114:16 117:13
  130:21 134:12
**submitted**  68:3 79:4
  111:22 116:5,19
**submitting**  111:13
**subscribed**  141:18
**subsequent**  70:3
**substance**  118:16
**substantively**
  120:10
**succeed**  108:21
**succeeded**  38:25
**successful**  34:14
**succinct**  19:19
**sufficient**  31:11
  132:25
**suggest**  26:6 27:5
  28:11 65:11 78:5
  114:7
**suggested**  22:13
  26:12 44:5 60:12
  84:4
**suggesting**  28:10
  43:13,14,16 137:5
**suggestion**  39:12
  52:1 82:23
**suggests**  41:21
**suit**  74:13 105:21
**suite**  2:17 3:5 4:14
  4:21 5:6,21 6:12,19
  9:19 11:13 12:15
**sullivan**  42:3
**summarize**  86:8
**summarizing**  99:14
**summary**  38:6 41:1
**sums**  100:15
**supplant**  100:6
**supplement**  32:1
  68:2,11,14 125:25
  126:2
**supplemental**  78:24

**support**  16:16 60:2
  126:24
**suppose**  119:24
**supposed**  28:4 121:9
**supreme**  42:17 43:6
  51:7
**sure**  14:13 26:11
  29:12 36:1,17 62:1
  67:22 71:21,22
  79:14 92:2,10
  101:22 102:4 103:4
  123:16 124:3
  125:18 133:23
  135:25 137:20
  138:1,3 139:10,14
  139:25
**surplus**  39:3
**surreply**  121:19
  124:2,10
**survived**  73:25
**suspect**  135:10
**sustainable**  27:7
**suzanne**  1:23 2:19
  141:22
**sway**  70:16
**sworn**  141:6
**sylvie**  6:4 16:17
**sylviekern**  6:8
**sync**  118:2
**system**  81:3

**t**

**t**  5:5 10:20
**table**  24:3 28:7
  100:14
**tail**  93:2
**take**  18:14 22:7
  24:17 31:5 32:14
  58:4,20 59:18 73:6
  76:6 95:6 101:11
  121:5 129:21
  133:19
**taken**  37:15 51:8
  52:14 141:3

**takes** 32:23
**taladay** 10:21 17:16
  17:16
**talewsky** 8:11 16:2
**talk** 19:21 39:11,17
  44:9 54:4,5,7
  118:21 133:19
**talked** 46:12,13 71:1
  119:10 120:10
  123:3 133:24
**talking** 45:2,2,23
  46:9 66:6 102:24
  109:5 118:16 135:6
**talks** 44:2 46:20
**tank** 97:14
**target** 77:23
**targeted** 55:3 77:17
**targets** 124:16
**tatp.com** 3:17,18
**tee'd** 23:25 93:21
**tehama** 7:8
**telephone** 6:11,18
  9:5,11,18 10:21
  11:12,20,21 12:5
**televisions** 36:6,7
**tell** 73:6 81:19 83:24
  88:25 99:5 103:21
  103:23 104:7
**tells** 82:12
**ten** 76:7 90:7
**tend** 99:25
**tenet** 44:16
**tentatively** 62:6
**term** 98:6 113:4
**terms** 23:5 26:19
  27:1 29:5 30:4 39:4
  59:22,22 83:18
  86:16 87:3 94:20
**testifying** 141:6
**testimony** 138:13
  141:9
**texas** 9:20
**thank** 16:13 17:12
  23:17,19 24:2 26:3
  49:24 53:2,17 70:19

73:16,18 76:5,8
  79:10 86:11 88:21
  97:18 127:2 131:17
  140:1,3,21
**thanks** 93:19
**thekresslawfirm.c...**
  9:9
**theoretical** 85:12
**theory** 44:17
**theresa** 8:12,13 16:1
**thing** 32:2 34:12
  37:3 49:6 78:1
  80:15 85:6 116:11
  129:23
**things** 23:23 24:11
  33:20 35:6 54:3
  57:22 76:3 82:6
  102:15,20 118:2,4
  121:15
**think** 18:13 21:5,6
  23:8 24:12 25:12,15
  25:20,25 26:6 29:10
  29:25 30:1,19 34:12
  40:7 42:3 46:17,18
  50:15 52:23,25
  53:23 54:24 58:25
  60:7,7,13,17 61:18
  69:20 71:18,22 72:4
  76:20 77:1,12 78:15
  79:16,16 81:14,22
  82:18 84:25 85:6
  86:19 88:18 90:24
  93:12 94:2 95:11
  97:23 103:18
  105:17,18 106:18
  107:6,10 109:17
  111:1,9,20 114:4
  115:19,25 116:17
  118:13 119:13,18
  119:21 121:25
  122:10 123:6,15,19
  123:20 124:20
  126:11 128:7,9,22
  130:18 132:4,12
  133:10,14,16

134:20 135:2 137:2
  137:2,3,3,7,12
  138:24 139:16,24
**thinking** 52:23
  57:13 66:21
**thinks** 61:14
**third** 19:5 42:4
  54:19 97:9 117:21
**thirteenth** 11:22
**thomson** 11:10 17:9
**thoroughly** 96:18
**thought** 27:15 47:5
  65:10 74:4 110:16
  112:18 119:19
  121:1 123:11
  135:11
**thoughts** 25:23
  29:19
**thousand** 59:7,10
**three** 19:3 31:22
  39:21 54:15,21 55:2
  61:4 62:22 67:4
  70:2 109:11 117:8
  137:4 138:2 140:5
**threshold** 126:21
  132:23
**throw** 28:11 59:21
  59:22
**thrown** 69:3 72:24
**thursday** 136:6
  137:20,22,25 140:9
  140:11,18
**tigar** 21:11 23:5,24
  24:13,15 34:12
  60:20 107:3 117:1
  117:18
**time** 19:25 25:15,16
  25:17,18 33:15 52:9
  55:16 64:24 75:9,21
  81:19 85:16,18,18
  91:4 96:21 98:21
  105:23 106:10
  111:20 116:9,15
  118:1 123:13 124:1
  126:20 127:12

132:16 133:17
  140:13,14,22 141:4
**timely** 119:4
**times** 34:18 39:10
  52:9 70:22 83:12
  109:11 115:11,17
**tinkering** 28:9 30:15
**tmoore** 8:17
**today** 19:21 35:10
  39:10,12,13 82:15
  118:21 123:11
  128:15 136:11
  137:11 139:3,5
**told** 32:19 52:12,13
  89:15 90:18 98:18
  127:20
**tomes** 44:8
**top** 19:12
**toshiba** 11:18 17:14
**total** 26:9 122:23
**totaling** 70:4
**totally** 85:6 122:11
**touched** 110:25
**track** 108:21
**tracy** 7:6 15:1
**traded** 41:20
**traditionally** 99:24
  100:21
**transcribed** 141:8
**transcript** 141:9,12
  141:14
**transferred** 75:19
  75:24
**transparent** 119:12
**treated** 138:21
**treatise** 47:17
**treatment** 91:22
  98:20 105:9
**treble** 67:6 108:6
  109:5 110:23
  111:24 112:1,6,8
  114:2,10,24,25
  115:20 116:16
  136:9

**trebled** 109:8
**tremendous** 132:12
  132:14
**trial** 8:3 34:14 35:23
  37:12 99:23
**tried** 46:3 64:24
  65:25 102:1 119:11
**trk** 7:12
**trotting** 82:18
**trouble** 126:2
**troubled** 62:6,7
**troublesome** 62:8
**troubling** 96:16
**truck** 97:14
**true** 52:5 65:13,16
  73:3 138:8 141:9
**trump** 3:11,11
**try** 19:18 32:4 33:5
  59:22 72:20 90:10
  109:14 119:8
  124:11,17 135:4
**trying** 22:19 46:9
  76:3 88:7 92:9
  99:18 108:4,20
  120:15 130:9
  134:13
**tube** 1:5 2:5 12:3
  17:11
**tubes** 36:4,5,6
**tuesday** 1:17 2:19
  14:1
**turn** 110:1
**turns** 134:14,17
**tvs** 77:19
**tweak** 133:11
**two** 21:17 41:12
  42:6 67:9 68:24
  70:22 71:3 80:14
  85:3,4 89:17,21
  91:2 102:15 104:3
  107:21 112:17
  117:25 121:16
  125:14 126:7
  131:13 133:19
  140:4

**type** 52:2
**types** 106:14
**typical** 24:14

**u**

**u.s.** 97:10
**ultimately** 62:23
  68:24 103:10
  117:14
**umm** 45:11
**un** 60:5
**uncommon** 124:20
**underlying** 27:1,16
  28:25 30:10 54:1
**undersigned** 141:1
**understand** 22:25
  53:10 69:9 76:17,18
  82:7 97:6 123:7
  127:5 128:18 132:4
  139:14
**understandable**
  133:5
**understanding**
  102:1 122:12
**undoing** 44:3
**unearth** 72:1
**unequivocal** 68:3
**unfairly** 104:20
**unfairness** 134:22
**unforced** 97:22,25
**unforeseen** 107:8
**unfortunate** 107:7
**uniform** 66:8
**union** 3:14
**unique** 104:14
**united** 1:1 2:1 56:10
**units** 77:22
**university** 5:14 8:10
  16:2
**unjust** 45:16,25
  46:4,5,7 48:14
**unnamed** 67:16
**unprecedented**
  61:22

**unproven** 60:6
  61:16
**unreasonable** 19:25
**unredacted** 38:7
**unshackled** 111:8
**untrue** 52:5
**updated** 136:20
**uphill** 58:19
**upshot** 81:8
**urge** 77:2
**urgent** 119:25
**urias** 4:12 14:22
**use** 65:6 77:9,11,15
  104:15
**usefulness** 134:11
**uses** 81:5
**usually** 100:22

**v**

**v** 131:21
**vacation** 119:16
**vacuum** 79:16
**valid** 69:14
**valuable** 48:1 71:6
**valuation** 54:9
**value** 34:4,21 35:19
  40:6 53:16 109:7,11
  110:7 116:15
  124:11,18 125:3,5
**valued** 32:8 33:21
  33:22,24 34:2,9,25
  70:23 71:7
**valueless** 40:20
**values** 35:20
**valuing** 34:22
**varanini** 12:14 16:3
  16:3 47:17 56:21
  98:15,17 99:2,4,9
  99:12 101:8,13
  102:4,8,14 105:3
  107:12,17,21
  111:11 112:11,14
  112:23 113:2 115:2
  116:23 117:3,6,8
  119:19

**varanini's** 105:17
  113:16
**various** 18:14 27:1,1
  68:25 76:19 123:21
**vegas** 8:6
**vehicles** 48:16,18
**version** 49:22,23
**versus** 70:5,10
  110:23 113:24
  114:8
**vetted** 74:5 80:2
**vetting** 73:24
**viability** 54:1 74:6
**viable** 56:16 57:10
  59:14,23,24 60:2,11
  62:1 64:5
**victims** 67:11
**view** 30:13 32:12
  72:25 75:12 85:5
  99:20 106:3
**viewed** 75:1
**vindicating** 44:15
**violation** 45:4,18
  46:24 47:1
**virginia** 5:15
**vis** 28:2,2 29:5,5
  30:10,10 105:20,20
  121:22,22
**visited** 80:21
**vitally** 34:21
**voelbel** 5:3
**voice** 130:11
**volume** 79:5
**volunteer** 73:10
  126:17
**vote** 101:6,8

**w**

**w** 10:12
**wag** 93:2 97:23
**wait** 35:14,14 37:14
  69:6,6,6 92:13
  110:4
**waive** 39:6

**waived** 115:15
**waiving** 126:10
**wall** 55:5
**walnut** 6:20
**want** 19:20,21,24
  21:13,14,15,17 24:6
  28:12 31:7 33:14
  35:3,9 37:1 39:17
  50:17,19 51:19 53:7
  56:6,23 59:7,16,23
  61:12 62:18 63:25
  64:8 66:10 73:6
  85:21 93:2,17,18
  98:16 107:6 118:5
  121:18 123:6,14
  124:1 125:18 126:6
  132:10,19 133:16
  135:23 136:9 139:8
  139:10,13,25
**wanted** 50:2 73:20
  113:11 114:17
  118:21 123:2 138:9
**wanting** 74:13
**wants** 23:7 57:12
  61:15,15 97:1 123:9
**ward** 4:12 14:22
**wash** 60:13
**washington** 10:23
  11:23 88:5,9,13
  93:17 94:15 133:24
**water** 117:23 118:8
**waterfront** 76:15
**way** 18:12 22:4,17
  23:12 28:14 29:20
  32:2 41:25 42:8
  45:15,25 47:16
  52:24 64:13 68:19
  81:9 93:4,17,18
  100:21 110:3,7
  119:21 121:9 133:2
**ways** 27:18,20,20
  28:6,21,21 29:12
  36:13
**we've** 21:20,24
  22:13,16 34:18

36:23 60:25 64:16
  65:21 103:6 104:16
  109:16 113:13
  117:23 118:16
  119:10 123:2
**weak** 58:22
**website** 80:21 97:4
  119:15
**week** 116:24 117:25
**weighs** 57:5
**welcome** 28:15,16
  28:24 30:1
**went** 33:2 35:23
  64:23 73:24 74:1
  81:8 91:12 114:8
  135:12
**westlaw** 49:16,22
  114:20
**whack** 85:10 102:13
  122:1
**whatsoever** 70:16
**whereof** 141:18
**whistles** 54:20
**white** 11:19 17:14
**whitecase.com**
  11:25
**wide** 39:11 55:6
**wilhelmina** 113:24
  114:8
**willing** 27:22 41:10
**windfall** 109:12,13
  110:5
**winston** 11:3 15:17
**winston.com** 11:8
**wipes** 86:6
**wiping** 57:14
**wisdom** 96:12
**wise** 80:2
**wish** 77:3 78:5
**withdraw** 20:23
**withdrawing** 20:21
**witness** 87:14 134:2
  141:18
**witnesses** 141:5

**won** 69:2
**wonderful** 47:5
**wondering** 138:16
  138:20
**word** 120:7
**words** 20:1 120:21
  122:4 124:6,7
  135:10
**work** 40:1 57:25
  82:9 100:21
**working** 57:24
  85:15 105:12
  112:16
**works** 63:9 85:1
**world** 31:20 113:8
**worried** 116:20,23
**worse** 66:12
**worth** 48:5 76:2
  100:13
**write** 64:8
**writing** 68:14
**wrong** 80:7 105:11
  113:4
**wrote** 120:21

**x**

**x** 94:7

**y**

**yahoo.com** 6:8
**yeah** 23:1 53:9 59:4
  92:2,7 97:5
**year** 77:13
**years** 16:8 50:11,11
  50:11 55:10 58:7
  61:5 64:10 74:2
  77:9,10,12,15
  116:16,21 134:25
**yell** 14:12 24:6
**yelling** 14:11 15:10
**yesterday** 118:18
  119:3
**york** 11:6,6

**z**

**zealously** 52:16
**zelle** 5:3 16:21
  127:17,19,20
**zelle.com** 5:9,10
**zero** 30:22 32:8 40:6
  47:25 48:5 53:16
  58:11,12,12
**zucker** 131:21

**à**

**à** 28:2 29:5 30:10
  105:20 121:22