# ATTACHMENT 10

1    Q.  Are you single?

2    A.  Of course.

3    Q.  What do you do for a living?

4    A.  Electrician, contractor.

5    Q.  What's your educational background?  Did

6  you finish high school?

7    A.  Yes.

8    Q.  Any post-high school education?

9    A.  Continuing education for electrical and the

10  trades after high school.

11    Q.  And what is your annual salary,

12  approximately?

13    A.  About $100,000.

14    Q.  Between the years of 1995 and 2007, have

15  you ever purchased a TV with a cathode ray tube in

16  it?

17    A.  Yes.

18    Q.  In what states did you make those

19  purchases?

20    A.  Massachusetts.

21    Q.  How many CRT TVs do you think you purchased

22  between that time period?

23    A.  I'd have to estimate about four or five?

24    Q.  Do you remember where you purchased them?

25    A.  Mostly Lechmere Sales over in Cambridge.

1    Q.  Do you still have any receipts from any of
2 those purchases?

3    A.  I believe so.  I'd have to research it.  I
4 also sent receipts to the lawyer, Alioto, back a
5 while ago, and I'm not sure if I still have the
6 originals.

7    Q.  Do you remember when you sent those
8 receipts in?

9    A.  Long time ago.  It'd have to be around
10 2008, 2009, possibly, at the beginning.

11    Q.  Okay.  Between 1995 and 2007, did you
12 purchase any computer monitors that had a Cathode Ray
13 Tube?

14    A.  I believe so, yes.

15    Q.  In what states did you make those
16 purchases?

17    A.  Massachusetts.

18    Q.  And how many computer monitors do you think
19 you purchased during that time period?

20    A.  That would be two, roughly.

21    Q.  Two?

22    A.  Probably a couple.

23    Q.  Where did you buy them?

24    A.  That, I'm not sure.  Primary place would
25 have been Lechmere, but I'm not 100 percent sure on

1  that one.

2     Q.  Do you have any receipts for the purchases

3  of the computer monitors?

4     A.  I don't think they're in my possession

5  anymore.  I think I sent all the receipts -- I

6  forwarded all the receipts.  I have to double check

7  my files to make sure I didn't miss anything.

8     Q.  Did you purchase any products with CRTs in

9  it besides TVs or computer monitors?

10    A.  I may have.  I'm not sure exactly.

11    Q.  Okay.

12    A.  Are you -- specific products --

13    Q.  No, I don't have anything specific in mind.

14  Are you aware of any other products that you have?

15    A.  You know what, those two are probably the

16  main ones.

17    Q.  Did you purchase any products, including

18  TVs or computer monitors, with CRTs in them in any

19  state other than Massachusetts?

20    A.  No.

21    Q.  Do you know what a class action is, sir?

22    A.  Yes.

23    Q.  Do you have an opinion of class actions?

24         MR. BONSIGNORE:  Objection.

25         You can answer.

1    A.  I guess I have no opinion.  I don't have a

2  legal opinion on that one.

3    Q.  Do you have an opinion as a lay person as

4  to class actions?

5    A.  Class actions don't really help the average

6  person.  They help the attorneys.  The average person

7  that fights for consumer rights usually gets shafted

8  at the end is what my feeling is, my personal feeling

9  on that.

10    Q.  Do you know anything about what notice is

11  typically provided in class-action settlements?

12    A.  A lot of notices do not get provided, and

13  that's part of the problem here.  There's a lot of

14  unethical behavior with -- by attorneys that are

15  involved not producing proper documents to affected

16  people.

17    Q.  Do you have anything specific in mind when

18  you say that?

19    A.  Specifically, a lot of people have been

20  left out of this class action.  This is a class

21  action, I believe, in many ways.  A lot of people

22  have not been notified.  There's states that have

23  been left out, including Massachusetts, and that

24  seems to be unethical to me.

25    Q.  Okay.  Do you have an opinion about

1  front of Judge Hillman in the federal court in

2  Worcester. So I didn't get a chance to manipulate

3  that fine copying this morning.

4        BY MR. DEVER:

5    Q.  Okay.  Mr. Giannasca, do you know if a

6  complaint was ever filed on your behalf in this case?

7    A.  I believe my attorney has filed complaints

8  on my behalf.

9    Q.  Did you authorize him to file those

10  complaints?

11    A.  Yes.

12    Q.  Do you remember when he filed those

13  complaints?

14    A.  I think we just went through that.  There's

15  many times --

16        MR. BONSIGNORE:  There's other

17  documents here that we can introduce.  That's

18  probably the one you're looking for.

19    A.  Most recently was the (indecipherable)

20  complaint.

21        (Clarification requested by the court

22  reporter.)

23        MR. BONSIGNORE:  Case 3-08-CV-054 --

24  sorry.  Case 308-CV-01559-SC, Document 1, filed

25  3/21/08.

1          It's a 34-page complaint filed by

2 Mario Alioto, Lauren Russell; Trump, Alioto, Trump &

3 Prescott; and then Joseph Patane, Law Office of

4 Joseph Patane. Terry -- Brigid Terry, Anthony

5 Giannasca, Brigid Flaherty, and Brigid Ten Eyck

6 against LG and a litany of defendants. And for

7 whatever -- there's other signatures at the back on

8 page 33. And my signature -- my name is on page 34.

9          MR. DEVER: Okay. Thank you.

10    BY MR. DEVER:

11    Q.  So the document that was just produced is

12 from 2008.  Do you recall having anything to do with

13 this matter after the initial complaint was filed in

14 2008?

15    A.  Yes.

16    Q.  What did you do?

17    A.  I contacted my attorney.  We talked before

18 and after, and that's what I -- what do we do, and

19 went forward with the case.

20    Q.  And then did anything else happen in the

21 case -- did you personally do anything relating to

22 the case then --

23          MR. BONSIGNORE:  Objection; asked and

24 answered.  He said I sent things --

25    A.  Well, I talked to my attorney.

1 first found out. Do you remember if it was in

2 September?

3    A. That was before. Might have been -- could

4 have been July.

5    Q. And how did you find out about the

6 settlement?

7    A. Contact with my attorney.

8    Q. Did you call him, or did he call you?

9    A. I don't recall. I think we were just

10 talking and it came up. I don't recall who called

11 who.

12    Q. Generally speaking, how often do you speak

13 to Mr. Bonsignore?

14    A. Periodically. Two times a year, I guess.

15    Q. And what caused you to object to the

16 settlements?

17    A. It was my understanding that my name was

18 left out of the -- was pulled out of the class action

19 for no reason. And I was always told that it would

20 be straightened out, but I realize now that it was

21 still an issue.

22    Q. Okay. So you're objecting because your

23 name was taken out?

24    A. I was removed for some unknown reason.

25    Q. Is that the basis for your objection to the

1 settlement?

2     A.  I believe so, yes.

3          MR. BONSIGNORE:  I'm going to object to

4 the extent that it calls for a legal analysis.

5     BY MR. DEVER:

6     Q.  And what do you hope to achieve as a result

7 of your objection?

8     A.  Fairness for all consumers.

9     Q.  Do you know if there was a written

10 objection made on your behalf to the settlements?

11     A.  Yes, I believe so.

12     Q.  And do you know what arguments were made in

13 that objection?

14     A.  Is there a specific one, or ...

15     Q.  I just want to know what --

16     A.  The arguments that basically my name was

17 removed, and that was the main thing, I believe.

18     Q.  Okay.  Whose idea was it to file the

19 objection?

20     A.  Mine.  My idea.

21     Q.  And have you ever received the actual

22 objection that was filed on your behalf?

23     A.  I did look through it, but again, I don't

24 like to read too many documents.  I scan through

25 them.  I don't have time to read every little piece.

1 there?

2    A.  Supplemental?  You mean after this one?

3    Q.  Yes.

4    A.  I'm not sure.  I don't remember that.  I

5 just know I objected.  How many objections?  I'm not

6 100 percent sure about that.

7    Q.  Okay.  The objection in your hand,

8 Exhibit 2 there, did you authorize your attorney to

9 file that objection?

10    A.  Yes.  I told him to object, and I believe

11 this is it.

12        MR. DEVER:  Okay.  Now I'm going to

13 mark Exhibit 3.

14        (Exhibit 3, Supplemental Objection to

15 Proposed class-action settlement and Award of

16 Attorneys' Fees, marked for identification.)

17    BY MR. DEVER:

18    Q.  Exhibit 3, what is that?

19    A.  It looks like a -- "supplemental objection"

20 is what it says.

21    Q.  Have you ever seen this before?

22    A.  I must have.  It's an objection.  I thought

23 it was one and the same, but obviously it's an

24 additional one.

25    Q.  Do you know if you reviewed that

1 supplemental objection before it was filed.

2    A. Yes. It looks familiar, yes.

3    Q. And did you authorize the filing of this

4 supplemental objection?

5    A. Let me look through it. It looks like it,

6 yeah. Definitely looks familiar, yes.

7    Q. And what did you hope to achieve by filing

8 this supplemental objection?

9    A. Well, my name is left out, and it's unfair.

10 And a lot of other people have been left out, and

11 it's very unfair to the consumer. And it's awarding

12 attorneys' fees for doing the -- for not doing their

13 job. Basically giving an award for bad behavior, as

14 far as I can see. So I want to achieve fairness, in

15 answer to your question.

16    Q. Okay. Do you know what arguments are made

17 in the supplemental objection?

18    A. It's coming down to the same thing. You

19 know, it's about a consumer rights and the attorneys'

20 fees, that they're looking for attorneys' fees, and

21 they left out certain states and a lot of people.

22 And that's my objection to that.

23    Q. And do you know why the arguments that you

24 made in the supplemental objection weren't made in

25 the initial objection?

1    A.  Not that I can recall.  And, again, I don't
2   recall names very well, as you can see.

3    Q.  Do you know how much time the attorneys
4   spent on this case?

5    A.  Not specifically, but I would assume it's a
6   long time.  It was many hours.

7    Q.  And do you -- have you reviewed any firm's
8   fee affidavit in this case?

9    A.  No, I have not.

10    Q.  Do you know what any of the firms' hourly
11   rates are?

12    A.  No, I do not.

13    Q.  Are you objecting to the lead counsel's
14   process of accepting and rejecting certain firms'
15   time in this case?

16    A.  Which counsel?

17    Q.  The lead counsel, Trump, Alioto.

18    A.  Yes.

19    Q.  And why?  Why are you objecting to that?

20        MR. BONSIGNORE:  Objection; calls for a
21   legal conclusion.

22        But go ahead.

23    A.  Due diligence.  They did not do any due
24   diligence in notifying the proper affected people in
25   many states, removing names.  They -- very unethical

1 behavior.

2      So, again, getting back to my answer

3 before, they're awarded for bad behavior. I think

4 that's wrong. A lot of attorneys do that. And I'm

5 not -- no insult to you or anybody in this room, but

6 that's bad practice, which is rampant.

7    Q. So my question is actually a little bit

8 different. Are you objecting to the way the lead

9 counsel decides to split any fee that they receive

10 among the various firms that helped them on the case?

11      MR. BONSIGNORE: Objection; asked and

12 answered.

13    A. I'm objecting to fairness to all consumers

14 that were eliminated or not included or notified.

15 And his fee is in direct relation to bad behavior.

16    Q. Okay. Take a look at Exhibit 2, if you

17 would, the little objection, the smaller one.

18    A. Okay. What page?

19    Q. If you look at page 3 --

20    A. Okay.

21    Q. -- this is the California paper, so you can

22 see the eighth line down.

23    A. I can see what.

24    Q. The eighth line down?

25    A. Yes.

Page 48

1    Q.  Oh, I'm sorry.

2    A.  Number eight?

3    Q.  Yeah.  Where it says, "The nationwide
4  class."

5    A.  I'm sorry.  Point it out.

6    Q.  I'm sorry.  It's page 4 on the top, page 3
7  on the bottom.  Sorry about that.  Do you see where
8  it says, "The nationwide class is improper because it
9  requires members of the injunctive release settlement
10  class to release both monetary and
11  injunctive/equitable claims without any consideration
12  for such releases?"  Do you see that?

13    A.  Yes, I see it.

14    Q.  Do you understand what that means?

15    A.  It sounds like a lot of legal mumbo jumbo,
16  but I'd have to refer to my attorney to explain it in
17  better detail.

18    Q.  Okay.  Is that a no?  You don't understand
19  what it means?

20    A.  Well, let me just read it again.

21        All right.  It's basically telling me, I
22  think, that a lot of people are being left out of
23  this and monetary payment is being considered without
24  the class of -- the affected class, is what I'm
25  reading.

1  not for his TV, if that's what you're worried about.

2      A.  Like I said, similar.

3          MR. DEVER:  Oh, I'm not worried about

4  that, but that's what I'm trying to establish.

5      BY MR. DEVER:

6      Q.  So this does not have to do with your TV,

7  then, Exhibit 4?

8      A.  No, it's not my TV, no.  But it's similar

9  to what my -- you said does it look familiar.

10     Q.  Oh, sorry.  Yeah.  So you think you have a

11  receipt that looks like this someplace?

12     A.  It's obvious to me that's the back of a TV

13  with a serial number, and then you've got the front

14  of the TV.  So I am sure I can take pictures of TVs I

15  have that will be similar to that.

16     Q.  Do you still have CRT TVs in your home?

17     A.  Yes, I believe I do.

18     Q.  Okay.  You can put that down now.

19         MR. DEVER:  I'm going to mark

20  Exhibit 5.

21         (Exhibit 5, email from Mr. Alioto to

22  Mr. Bonsignore dated March 5, 2012, marked for

23  identification.)

24     BY MR. DEVER:

25     Q.  What is Exhibit 5?

1  complaint. Could you elaborate?

2      A.  Well, I was cut out as a consumer, and

3  everybody else in Massachusetts was left out.

4      Q.  So when you were saying the words you were

5  cut out, you meant --

6            (Multiple parties speaking.

7  Interruption by the court reporter.)

8      BY MR. BONSIGNORE:

9      Q.  What did you mean by saying you were cut

10  out?

11      A.  The people in Massachusetts and other

12  states as well, as I understand.

13      Q.  Because you were a class representative?

14      A.  Yes.

15      Q.  You received, in advance, the first

16  objection.  I think it's Exhibit 1.  And I think we

17  said that there were no changes.  Did you have

18  anything that you wanted to add at the time to

19  Exhibit 2?

20      A.  That's what it says.

21      Q.  Okay.  Exhibit 2, when we discussed it, did

22  you have anything that you wanted to add in there

23  about behavior or anything?

24      A.  Well, like I mentioned before, I thought it

25  was a lot of unethical stuff happening against the

1 consumer and consumer rights and people not being
2 notified.

3    Q. But your suggestion was not included in
4 that?

5    A. Yes.

6    Q. Throughout the years, you've dealt with a
7 number of the people in my office with regard to the
8 CRT case?

9    A. Okay.

10    Q. Do you recognize the name Kelly?

11    A. Yes. Kelly sounds familiar, yeah.

12    Q. Do you recognize the name Rick?

13    A. Yes.

14    Q. And Robin?

15    A. Robin is your ex-wife, right, I believe
16 you're talking about.

17    Q. You've got to bring it up.

18    A. Oh, I'm sorry.

19    Q. I was having a good day. I was just merely
20 miserable.

21    A. But the answer is yes.

22    Q. And you've had occasion to discuss the case
23 with them?

24    A. I believe so.

25       MR. BONSIGNORE: That's all that I have

Page 63

1    A.  No.

2    Q.  Was she an attorney?

3    A.  She might have been.

4    Q.  Do you know if she was an attorney?

5    A.  I'm not sure.

6    Q.  Do you know if she was a paralegal?

7    A.  It's possible.  It looked like she knew

8  what she was doing.  I don't know.

9    Q.  How about Rick?  Do you know what his

10  position was?

11    A.  No.

12    Q.  And how about Robin?  Do you know what her

13  position was?

14    A.  I know she was an attorney.

15    Q.  And then in response to Mr. Bonsignore's

16  questioning, you just said you had some things that

17  you suggested adding to the initial objection; is

18  that correct?

19    A.  I think I answered that.  Adding the part

20  that -- unethical behavior and the fees being awarded

21  for not properly doing the correct job as a lawyer

22  and not informing people.  I mean, I think I already

23  said -- I said all that.

24        MR. BONSIGNORE:  Objection; asked and

25  answered.

1    BY MR. BONSIGNORE:

2    Q. When you were taken out of the case, you

3  testified earlier that you were advised directly or

4  indirectly that Mario Alioto said not to worry about

5  it and that he would take care of it. Did you have

6  any reason to believe that Court appointed lead

7  counsel would cut you and the State of Massachusetts

8  out of the economic class?

9          MR. DEVER:  Object to the form.

10    A. No. Because I was told not to worry about

11  it and I just assumed it would be taken care of and

12  that justice would prevail for all consumers. But I

13  guess -- I think we're here today because of the

14  objections and me objecting and obviously raising

15  these issues.

16    Q. Would you be happy if Mario Alioto, as lead

17  counsel, acted in the best interest of your behalf

18  and the other Massachusetts and New Hampshire and

19  Missouri and other states and put them back into the

20  economic class?

21    A. I think someone needs to step up to the

22  plate and do what's right for all consumers, and that

23  has not happened. And it looks like it's not going

24  to happen. And there's obviously a class that's not

25  worth anything. There's a worthless class here



Bonsignore and Brewer
193 Plummer Hill Road
Belmont, NH 03220
(781) 856 7650 (cell)
Sent from my iPhone

Begin forwarded message:

From: Office <deryl@dedwardslaw.com>
Date: March 6, 2012 9:44:26 PM EST
To: Robert Bonsignore <rbonsignore@class-actions.us>
Subject: Fwd: David Perriman TV Purchase History


Sent from my iPhone

Begin forwarded message:

From: <office@dedwardslaw.com>
Date: March 6, 2012 6:21:14 PM CST
To: "Karl Dickhaus" <karl@faxlaw.com>, "Office" <deryl@dedwardslaw.com>
Subject: David Perriman TV Purchase History

David Perriman
27300 Maple Road
Carl Junction, MO 64834
Telephone: 417-365-3652

Sarah Goolsby

Secretary for Deryl Edwards, Jr.

606 S. Pearl

Joplin, MO 64801

(417) 624-1962

Fax: (417) 624-1965

deryl@dedwardslaw.com



Perriman TV Purchase 3-
6-2012.pdf



WHEN ORDERING PARTS SHOW MODEL NO.
PHILIPS CONSUMER ELECTRONICS COMPANY
KNOXVILLE, TENNESSEE 37914

MODEL NUMBER
25TR15 C122

SERIAL NUMBER
16722332

DATE CODE

CHASSIS
MODEL NO.    25BB00-7562

ASSEMBLED IN
MEXICO

1.50 AMPS
60HZ
120V
TX FCC ID:

This device complies with Part 15 of the FCC Rules. Operation is subject to the following two conditions:
(1) This device may not cause harmful interference, and
(2) this device must accept any interference received, including interference that may cause undesired operation.

MANUFACTURED   JANUARY 1999
14.19.0.2.52.I

TV RECEIVER
LISTED 247H
E103299









LIMITS SHOWN MODEL NO.

THOMSON CONSUMER ELECTRONICS COMPANY
LICENSEE 37914

C122

194

1.20 AMPS
60HZ
120V

TX FCC ID:

ASSEMBLED IN
MEXICO

This device complies with Part 15 of the FCC Rules. Operation is subject to the following two condition: (1) This device may not cause harmful interference, and (2) this device must accept any interference received, including interference that may cause undesired operation.

Hi POT

MANUFACTURED OCTOBER 1998

1118R191B

19Y600-7560

TV RECEIVER
LISTED 347H
1E10859

