1  Mario N. Alioto (56433)
   Joseph M. Patane (72202)
2  Lauren C. Capurro (241151)
   TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
3  2280 Union Street
   San Francisco, CA 94123
4  Telephone: 415-563-7200
   Facsimile: 415- 346-0679
5  Email: malioto@tatp.com
   jpatane@tatp.com
6  laurenrussell@tatp.com

7  *Lead Counsel for the*
   *Indirect Purchaser Plaintiffs*

8

9

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

                      SAN FRANCISCO DIVISION
12

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. CV-07-5944-JST; No. CV-13-03234-JST |
| | MDL No. 1917 |
| | **CLASS ACTION** |
| This Document Relates to: | **INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO OBJECTIONS TO JANUARY 28, 2016 REPORT AND RECOMMENDATION OF SPECIAL MASTER RE MOTIONS: (1) TO APPROVE INDIRECT PURCHASER PLAINTIFFS' SETTLEMENTS WITH THE PHILIPS, PANASONIC, HITACHI, TOSHIBA, SAMSUNG SDI, TECHNICOLOR AND TECHNOLOGIES DISPLAYS AMERICAS DEFENDANTS; AND (2) FOR AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF LITIGATION EXPENSES, AND INCENTIVE AWARDS TO CLASS REPRESENTATIVES** |
| All Indirect Purchaser Actions | |
| | Hearing Date:  March 15, 2016 Time: 2:00 p.m. Judge: Honorable Jon S. Tigar Court: Courtroom 9, 19th Floor |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

PROCEDURAL HISTORY .....................................................................................2

I.    PRE-HEARING PROCEEDINGS BEFORE THE SPECIAL MASTER .......................2

    A.    The Fee Motion (September 23, 2015)......................................3

    B.    The Objections (October 8, 2015).............................................3

    C.    The Final Approval Motion (November 20, 2015) ...................3

    D.    IPP Fee Reply (November 20, 2015) ........................................4

    E.    The November 30, 2015 Special Master's Order on Time/Expense Records ........4

    F.    Additional Objections (December 9 & 15, 2015)......................4

    G.    IPP Reply (December 23, 2015) ...............................................5

    H.    Proceedings Regarding the CA AG's Request for Extension of the Claims Period (December 29, 2015; January 4, 2016) ........5

II.    THE JANUARY 5, 2016 HEARING...........................................5

III.    POST-HEARING SUBMISSIONS...............................................5

IV.    THE R&R ...................................................................................6

V.    POST-R&R SUBMISSIONS ......................................................7

ARGUMENT ...........................................................................................7

I.    THE COURT SHOULD OVERRULE THE OBJECTIONS TO THE RECOMMENDATIONS ON SETTLEMENT APPROVAL...........................7

    A.    The Nationwide Release is Fair and Reasonable......................8

        1.    Class Settlements Routinely Include a Nationwide Release of All Claims That Were or Could Have Been Brought in the Case—Including the Release of Meritless Claims For Which Class Members Receive No Compensation Under a Post-Settlement Plan of Allocation.........................9

        2.    Nationwide Class Members Were Adequately Represented.......................11

        3.    Class Members in Non-Repealer States Have No Viable Claims for Any Type of Monetary Relief.......................13

            a.    Statutory Background..........................................14

i

b. Controlling Authority..........................................................................14

c. Objectors' Authority is Inapposite............................................15

4. The Nationwide Injunctive Relief Claims Lacked Value.............................18

5. All Class Members Had the Right to Opt Out..............................................19

B. Massachusetts, Missouri and New Hampshire Were Not Improperly Excluded.....19

1. Massachusetts ...............................................................................19

2. Missouri...........................................................................................23

3. New Hampshire...............................................................................24

C. The Notice Program Comports With Due Process, Was More Than Adequate, and Was the Best Notice Practicable Under the Circumstances......................…...24

1. The Reach of Notice was Acceptable.............................................25

2. The Digital Notice Campaign Was Fair and Reasonable..............................27

3. A Neutral Notice Expert Is Unnecessary.......................................28

D. IPPs Complied With the Procedural Guidance for Class Action Settlements..........28

II. THE COURT SHOULD OVERRULE OBJECTIONS TO THE PLAN OF DISTRIBUTION.............................................................................................29

III. THE COURT SHOULD REJECT ALL OBJECTIONS REGARDING FEES, EXPENSES AND INCENTIVE AWARDS................................................................................30

A. Background........................................................................................30

1. The Fee Motion...............................................................................30

2. The Fee Reply.................................................................................31

3. The R&R..........................................................................................31

4. Objections to the R&R....................................................................31

B. The Special Master Properly Employed the Percentage-of-the Fund Approach.....32

C. The Special Master Properly Applied the Law on Mega-Fund Fee Awards...........33

D. The Special Master Correctly Found IPP Counsel's Lodestar to Be Reasonable ...34

ii

1.  The Special Master's Conclusion that IPP Counsel's Rates are Reasonable Is Well-Supported..............................................................34

2.  The Special Master Correctly Concluded that Lead Counsel's Case Management Decisions Did Not Lead to Excess Billing ...........................36

    a.  The Trial Team..................................................................37

    b.  Relationship with the California Attorney General.........................37

3.  IPP Counsel's Billing Practices Were Proper.................................38

4.  The Record Before the Special Master Was Sufficient...............................39

E.  The Special Master Properly Concluded that the Settlements are Attributable to the Efforts of IPP Counsel and Not Government Action.........................................41

    1.  Chunghwa.......................................................................41

    2.  Samsung Guilty Plea.......................................................42

    3.  European Commission Decision and *Vichi*...................................44

    4.  Disproportionate Size of Samsung and Philips Settlements........................45

F.  The Special Master Properly Reviewed and Approved IPP Counsel's Expenses ...47

G.  The Court Should Deny an Incentive Award to Anthony Gianasca..................48

IV. THE OBJECTIONS TO "EX PARTE COMMUNICATIONS" WITH THE SPECIAL MASTER LACK MERIT...................................................................49

**CONCLUSION**.............................................................................49

# TABLE OF AUTHORITIES

<u>Cases</u>

*American Pipe & Const. Co. v. Utah*, 414 U.S. 538 (1974) ..................................................22, 23

*Bankamerica Corp. v. U.S.*, 462 U.S. 122 (1983)........................................................................16

*Booth v. Strategic Realty Trust, Inc.*, No. 13-cv-04921,
2015 WL 6002919  (N.D. Cal. Oct. 15, 2015)..............................................................................9

*Boulds v. Chase Auto Finance Corporation*, 266 S.W. 847 (Mo. App. 2008)............................23

*Charron v. Wiener*, 731 F.3d 241 (2d Cir. 2013) ....................................................................11, 12

*Chafin v. Chafin*, 133 S. Ct. 1017 (2013)...................................................................................18

*Churchill Village LLC v. General Electric,* 361 F.3d 566 (9th Cir. 2004)....................................8

*Class Plaintiffs v. City of Seattle*, 955 F.32d 1268 (9th Cir. 1992) ..............................................9

*Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*,
771 F. Supp. 2d 1195(N.D. Cal. 2011) ......................................................................................14

*Decorative Stone Co. v. Building Trades Council of Westchester County*,
23 F.2d 426 (2d Cir. 1928)………………………………………………………………………15

*Fischel v. Equitable Life Assur. Soc'y of U.S.*, 307 F.3d 997 (9th Cir. 2002) .................................35

*Fleitman v. Welsbach Street Lighting Co. of America*, 240 U.S. 27 (1916)...................................15

*Found. v. Office of Dir. of Nat. Intelligence*, No. C0705278 SI,
2008 WL 2331959 (N.D. Cal. June 4, 2008) ..............................................................................39

*Fox v. Vice,* 131 S.Ct. 2205 (2011) ..............................................................................................32

*Fraley v. Batman, --- Fed. Appx. ---*, 2016 WL 145984 (9th Cir. Jan. 6, 2016) ...........................48

*Friends of the Earth, Inc. v. Laidlaw Environmental Servs., Inc.*, 528 U.S. 167 (2000)...............19

*Gutierrez v. Wells Fargo Bank N.A.,* No. C 07–05923 WHA,
2015 WL 2438274 (N.D. Cal. May 21, 2015) ...........................................................................35

*Hawaii v. Standard Oil Co. of Cal.,* 405 U.S. 251 (1972)...........................................................17

*Hensley v. Eckerhart,* 461 U.S. 424 (1983) .................................................................................32

*Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055 (9th Cir. 2012) ............................................22

*Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004) .................................................15

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) .................................................................. Passim

*In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229 (2d Cir. 2012)...................................................9

*In re ATM Fee Antitrust Litig.*, 686 F.3d 741 (9th Cir. 2012) ......................................................17

*In re Bluetooth Headset Prods. Liab. Litig.,* 654 F.3d 935 (9th Cir. 2011)...................................32

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 27 F. Supp. 3d 1015 (N.D. Cal. 2015)..............22

*In re Cathode Ray Tube [Direct Purchaser] Antitrust Litig.*, No. 14-CV-2058 JST, 2015 WL 9266493  (N.D. Cal. Dec. 17, 2015)...............................................................7, 29

*In re Cendant Corp PRIDES Litig.*, 243 F.3d 722 (3d. Cir. 2001) .................................................42

*In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152 (N.D. Cal. 2001) .....................................29

*In re Google Referrer Header Privacy Litig.*, 87 F. Supp. 3d 1122 (N.D. Cal. 2015) ...................25

*In re High Tech Employees Antitrust Litig.*, No. 11-cv-2509, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) .........................................................................32

*In re Insurance Brokerage Antitrust Litig.*, 579 F.3d 241 (3d Cir. 2009) ......................................12

*In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573 (N.D. Cal. 2015)...............................................7

*In re Mego Financial Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000)...........................................10

*In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988 (9th Cir. 2010)...................................40

*In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231 (9th Cir. 1976).............................14, 15, 18

*In re NASDAQ Market Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y. 1998) ........................43

*In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036 (N.D. Cal. 2008 ...........................9, 10, 12, 29

*In re Pet Food Products Liability Litig.*, 629 F.3d 333 (3d Cir. 2010)............................................12

*In re Rite Aid Corp. Sec. Litig.*, 396 F.3d, 294 (3d Cir. 2005).......................................................33

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. 07-MD-1827 SI, 2013 WL 1365900  (N.D. Cal. Apr. 3, 2013) ...............................................20, 34, 42

*In re TFT-LCD (Flat Panel) Antitrust Litig.*, 787 F. Supp. 2d 1036 (N.D. Cal. 2011) .............14, 18

*Kansas v. Utilicorp United, Inc.*, 497 U.S. 199 (1990)....................................................................17

*Kaufman v. Am. Express Travel Related Servs., Inc.*, 283 F.R.D. 404 (N.D. Ill. 2012).................27

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir. 1975)......................................................32

*Klee v. Nissan N. Am., Inc.*, No. CV 12-08238 AWT (PJWx),  2015 WL 4538426 (C.D. Cal. July 7, 2015) ....................................................................................................19

*Maine State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10–CV–00302, 2013 WL 6577020 (C.D. Cal. Dec. 5 2013) ..........................................................................................10, 11, 13

*Meghrig v. KFC Western, Inc.*, 516 U.S. 479 (1996) .....................................................................16

*Midwest Paper Prods. Co. v. Cont'l Group*, 596 F.3d 573 (3d Cir. 1979) .....................................15

*Nguyen v. Radient Pharm. Corp.*, No. SACV 11-00406, 2014 WL 1802293 (C.D. Cal. May 6, 2014).......................................................................................................................10

*O'Bannon v. Nat'l Collegiate Athletic Ass'n,* Case No. 09–cv–03329–CW (NC), 2015 WL 4274370 (N.D. Cal. July 13, 2015)....................................................................39

v

*Oregon v. AU Optronics Corp.* (*In re TFT-LCD (Flat Panel) Antitrust Litig.*), MDL No. 1827, 2011 WL 2790179 (N.D. Cal. July 11, 2011)................................................................17

*Perkins v. LinkedIn Corp.*, No. 13-cv-04303-LHK, 2016 WL 613255 (N.D. Cal. February 16, 2016) .......................................................................................28

*Porter v. Warner Holding Co.*, 328 U.S. 395 (U.S. 1946) ..............................................16

*Radcliffe v. Experian Information Solutions, Inc.*, 715 F.3d 1157 (9th Cir. 2013) ........48

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741 (9th Cir. 2006).......................9

*Rieckborn v. Velti PLC*, No. 13-cv-03889, 2015 WL 468329  (N.D. Cal. Feb. 3, 2015)....10, 12, 29

*Silber v. Mabon*, 18 F.3d 1449 (9th Cir. 1994)................................................................25

*Sullivan v. DB Investments, Inc.*, 667 F.3d 273 (3d Cir. 2011) .........................................9

*Syverson v. International Business Machines, Corp.*, 472 F.3d 1072 (9th Cir. 2006) ...................45

*U.S. v. Or. State Med. Soc'y*, 343 U.S. 326 (1952)..........................................................18

*U.S. v. Oregon,* 913 F.2d 576 (9th Cir. 1990)....................................................................7

*United States Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623 (7th Cir. 2003),...............15

*Vichi v. Koninklijke Philips Elecs., N.V.,* 85 A.3d 725 (Del. Ch. 2014)....................41, 44

*Vizcaino v. Microsoft Corp.,* 290 F.3d 1043 (9th Cir. 2004)......................................32, 33

*Wash. Pub. Power Sup. Sys. Lit.,* 19 F.3d 1291 (9th Cir. 1994).......................................46

Statutes and Rules

15 U.S.C. §1....................................................................................................................14

15 U.S.C. §6a  (Foreign Trade Antitrust Improvements Act of 1982) ..............30, 43, 46

15 U.S.C. §15..................................................................................................................14

15 U.S.C. §18a................................................................................................................14

15 U.S.C. §21..................................................................................................................14

15 U.S.C. §25..................................................................................................................14

15 U.S.C. §26.............................................................................................................13, 14

Fed. R. Civ. P. 23 .................................................................................................... Passim

Fed. R. Civ. P. 23(c)(2)(B) ......................................................................................24, 25

Fed. R. Civ. P. 23(e) ...........................................................................................7, 12, 21

Fed. R. Civ. P. 53(f)(5) ..................................................................................................47

Mass. Gen. Laws Ch. 93A (Massachusetts Consumer Protection Statute) ....................19

vi

Mass. Gen. Laws. 260 § 5A ............................................................................22

New Hampshire Consumer Protection Act (N.H. Rev. Stat. § 358-A:2) .........................24

Civ. L.R. 54-5(b) ..............................................................................................39

Other Authorities

Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 15:80 (5th ed.) ...........................33

Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 16:7 (4th ed. 2007) ......................9

Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 24:107 (4th ed. 2007) ..................21

Emergency Price Control Act of 1942 ..................................................................16

*Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide*, Federal
Judicial Center (2010) ...........................................................................25

Legal Ethics, Law. Deskbk. Prof. Resp. § 1.5-4(e) (2015-2016 ed.) ................................35

McLaughlin on Class Actions § 3:15 (12th ed.) ...................................................22

Procedural Guidance for Class Action Settlements," available at
http://www.cand.uscourts.gov/ClassActionSettlementGuidance ................................28

1    Indirect Purchaser Plaintiffs ("IPPs") respond to the objections to the Special Master's

2  January 28, 2016 Report & Recommendation and request that they be overruled in their entirety.

3                                              **INTRODUCTION**

4    After eight years of litigation, IPPs have reached settlements resolving all federal and state-

5  law claims brought by IPPs against the Settling Defendants.  Under the proposed settlements, IPPs

6  have recovered ***$541,750,000***.  If approved, these settlements—along with two previously approved

7  settlements[1]—will result in a total recovery of ***$576,750,000,*** as summarized below.

| DEFENDANT | TOTAL SETTLEMENT |
|---|---|
| Philips<br>Panasonic<br>Hitachi<br>Toshiba<br>Samsung SDI<br>Thomson and TDA | $ 175,000,000<br>$   70,000,000<br>$   28,000,000<br>$   30,000,000<br>$ 225,000,000<br>$   13,750,000 |
| Total of seven proposed settlements | **$ 541,750,000** |
| Chunghwa<br>LG | $   10,000,000<br>$   25,000,000 |
| Total of two previously approved settlements | $   35,000,000 |
| **Grand total of all settlements** | **$ 576,750,000**[2] |

18    This is an extraordinary result for the class.  Indeed, it is one of the largest recoveries ever on

19  behalf of indirect purchaser plaintiffs.  It is all cash.  There are no coupons or vouchers and there

20  will be no reversion or refund to any Defendant under any circumstances.

21    After obtaining preliminary approval of the seven settlements (the "Preliminary Approval

22  Order") (Dkt. No. 3906), IPPs disseminated notice in accordance therewith.  Only eleven objections

23  to the settlements were filed, by 22 objectors.  This number corresponds to ***less than .0003 percent***

24  of the number of class members that received direct mail notice—and a much smaller percentage of

25  all the class members who received notice in one or more of the forms approved by the Court.  Two

---

[1] The Court granted final approval to settlements with Chunghwa Picture Tubes Ltd. on March 22, 2012 (Dkt. No. 1105) and the LG Electronics Defendants on April 18, 2014 (Dkt. No. 2542).  Those settlement funds have not yet been disbursed.

[2] The total of all Settlements plus interest is the "Settlement Fund."

1   objectors later withdrew their objections.  The fact that these settlements drew such a miniscule

2   number of objections speaks volumes.  Further, only five requests for exclusion were received, and

3   two of these were filed by direct action plaintiffs ("DAPs") with pending cases (Sears and Kmart).[3]

4        Special Master Quinn, appointed to assist the Court with settlement, attorneys' fees and

5   related matters (*see* Dkt. No. 4077), has now issued a 77-page Report & Recommendation ("R&R").

6   (Dkt. No. 4351.)  The Special Master found that the proposed settlements are fair, reasonable and

7   adequate, and recommended their approval.  He also recommended approval of the proposed

8   allocation (the "Plan of Distribution") except for the allocation of the Chunghwa settlement

9   proceeds.  Lastly, he recommended fee and costs awards to IPP Counsel, as well as an award of

10  incentive payments to selected class representatives (to which no one had objected).

11       Objectors have challenged the R&R, but the great majority of these objections already were

12  raised with the Special Master, who carefully considered and overruled them for sound reasons

13  explained at length.[4]  The smattering of objections raised for the first time in Objectors' recent

14  filings lack merit.  The court should overrule the objections and adopt the Special Master's R&R,

15  subject to the IPPs' Limited Objections as stated in Dkt. No. 4400.

16                              **PROCEDURAL HISTORY**

17  **I.    PRE-HEARING PROCEEDINGS BEFORE THE SPECIAL MASTER**

18       The approval process before the Special Master was exhaustive, involving numerous

19  motions, objections and detailed submissions on all relevant issues.  For the Court's convenience,

20  the IPPs' filings are summarized chronologically below.[5]

---

21

22  [3] *See* Declaration of Joseph M. Fisher Reporting on Notice Program, ¶ 19, Ex. Y.  (Dkt. No 4371.)

23  [4] IPPs respond to the remaining seven sets of objectors following issuance of the Court's February
    23, 2016 Order (Dkt. No. 4430): (1) Saik (Dkt. No. 4384); (2) Hull (Dkt. No. 4394); (3) Clifton
    (Dkt. No. 4401); (4) Cooper/Scarpulla (Dkt. No. 4437); (5) Bonsignore objectors (Dkt. No. 4440);

24  (6) St. John (Dkt. No. 4439); and (7) Moore objectors (Dkt. No. 4436).  Regarding Hull: The Court
    allowed Hull's objection even though he attempts to incorporate "all other objections" as well as his

25  own original objection.  Because the Court denied a similar attempt by objectors Finn/Fortman (Dkt.
    No. 4396), IPPs respond to Hull's original objection only.  Finn/Fortman and Dan L. Williams &

26  Co. (Dkt. Nos. 4397 and 4399) did not refile their objections to the R&R in compliance with this
    Court's February 23, 2016 Order.  Thus, IPPs do not respond to their objections.  Objectors Morgan

27  (who objected alongside Hull) and Palmer have filed withdrawals of objection (Dkt. Nos. 4130,
    4165, respectively).  Objector Johnson (Dkt. No. 4128), and the California Attorney General ("CA

28  AG"), who had filed a Statement of Interest (Dkt. No. 4118), have not objected to the R&R.

    [5] The attached Appendix lists all of IPPs' relevant filings and docket numbers.

2

A.     **The Fee Motion (September 23, 2015)**

On September 23, 2015, IPP Counsel moved for attorneys' fees, reimbursement of expenses, and incentive awards to class representatives (the "Fee Motion"). (Dkt. No. 4071.)  This Motion, taken up by the Special Master, summarized in detail the eight-year history of this case and the work of class counsel. (*See id.* at 2-8.)  A 50-page declaration by Lead Counsel lent support for this account. (*See* Dkt. Nos. 4071-1 ("Alioto Fee Decl. I") and 4071-2 to 4071-14 (exhibits thereto).)[6]

B.     **The Objections (October 8, 2015)**

On October 8, 2015, objectors filed their objections to settlement approval, the Plan of Distribution, and the Fee Motion.  Several objections were filed by lawyers in this case—Messrs. Cooper & Scarpulla, Mr. Bonsignore, and Ms. Moore (the "Insider Objectors").[7]  Most of the other objections were filed by so-called "professional" class action objectors, many of whom have been sanctioned by courts for their conduct. (*See* Dkt. Nos. 4370 at 24-31 and 4370-2 (providing detailed background on objectors).)

C.     **The Final Approval Motion (November 20, 2015)**

On November 20, 2015, IPPs moved for final approval of the settlements (the "Final Approval Motion"). (*See* Dkt. No. 4370.[8])  This Motion summarized the proposed settlements, the notice program, and the factors supporting settlement class certification and final approval of the agreements.  It also proposed the "Plan of Distribution," allocating settlement funds recovered from all nine settlements (i.e., the seven proposed settlements, plus the previously-approved Chunghwa and LG settlements).  Lastly, the Final Approval Motion refuted the objections and noted that objectors could have opted out of the settlements (*id.* at 23-49).

---

[6] *See also* Dkt. Nos. 4073 (Compendium of Declarations) and 4073-1 to 4073-45 (exhibits thereto); and Dkt. Nos. 4071-15 ("Pearl Decl. I") and 4071-16 (exhibits thereto), all supporting the Fee Motion.

[7] Messrs. Cooper and Scarpulla are actual objectors.  Solely for ease of reference, IPPs refer to attorneys Bonsignore and Moore rather than their clients as the "objectors."

[8] *See also* Dkt. Nos. 4370-1 ("Alioto Settl. Decl. II" with exhibits), 4370-2 (Additional Grawleski Decl. with exhibits), 4371 (Fisher Decl. reporting on notice, with exhibits), and 4372 (Fisher Decl. re: objections to notice, with exhibits), all supporting the Final Approval Motion.   Documents lodged with the Special Master were not initially filed on the ECF system. After issuance of the R&R, the Special Master and the parties filed relevant documents on ECF.

1

### D.    IPP Fee Reply (November 20, 2015)

2   IPPs' reply addressing fees (the "Fee Reply," Dkt. No. 4373)[9] responded to the fee-related

3   objections and further demonstrated that the lodestar, hourly rates, and number of hours billed to the

4   case are reasonable and appropriate.  (*Id.* at 15-20.)  The Reply noted that there were no objections

5   to the amount of expenses or incentive awards.  (*Id.* at 29.)

6

### E.    The November 30, 2015 Special Master's Order on Time/Expense Records

7   On November 30, 2015, pursuant to a motion to compel production of time and expense

8   records, the Special Master ordered Lead Counsel to produce: (1) the daily time records of all IPP

9   Counsel for an *in-camera* review (and a subset of these records to Objectors Cooper and Scarpulla);

10  and (2) expense receipts and other backup for expenses.  (Dkt. No. 4211.)  Lead Counsel complied.

11  On December 15, 2015, this Court heard the motion by counsel for Direct Purchaser

12  Plaintiffs in this MDL ("DPPs") for an award of attorneys' fees and expenses.  At this hearing, the

13  Court commented on certain expense submissions relating to travel, meals and lodging.  IPP Lead

14  Counsel was present at the hearing, and promptly thereafter began an audit of expenses incurred by

15  IPP Counsel to ensure compliance with the Court's remarks.[10]  Lead Counsel submitted the audit

16  report to the Special Master, resulting in the withdrawal of $36,153.07 in IPP expenses.[11]

17

### F.    Additional Objections (December 9 & 15, 2015)

18  On December 9, 2015, pursuant to the Special Master's Order Establishing Schedule (Dkt.

19  No. 4185), Objectors filed reply briefs, which again challenged settlement approval, the Plan of

20  Distribution, and the fee request.  The CA AG also filed a "Supplemental Statement of Interest" that

21  included a request to extend the claims filing deadline from December 7, 2015 to June 30, 2016.

22  On December 15, 2015, attorney Bonsignore lodged an untimely Joinder and Reply in

23  Support of Objection.  On December 18, 2015 the Special Master issued an Order Denying Leave to

24  File Late Reply, refusing to consider that document. (Dkt. Nos. 4263 & 4274 (upholding denial).)

25

26  [9] *See also* Dkt. Nos. 4373-1 ("Alioto Fee Decl. II" with exhibits), 4373-2 ("Pearl Decl. II" with exhibits), and 4373-3 (Compendium of Declarations with exhibits), all supporting the Fee Reply.

27  [10] Lead Counsel requested expense backup from all IPP firms.  Mr. Bonsignore withdrew his request for expenses (and fees) and never provided the requested information.  (*See* Dkt. No. 4270.)

28  [11] All time and expense records, as well as the results of the audit, are available to the Court for *in camera* review.

### G. IPP Reply (December 23, 2015)

IPPs obtained leave to respond to the December 9, 2015 replies (*see* Dkt. No. 4367 at 13 (Dec. 14, 2015 Special Master's Order)), because many of the replies raised new matters and arguments.  IPPs filed an omnibus brief addressing the replies (the "IPP Reply").  (*See* Dkt. No. 4367 at 19.)[12]  The Special Master denied Objectors' request to file sur-replies.

### H. Proceedings Regarding the CA AG's Request for Extension of the Claims Period (December 29, 2015; January 4, 2016)

On December 29, 2015, IPPs responded to the CA AG's request for an extension of the claims filing deadline.  (Dkt. No. 4281, Attachment 3.)  The Special Master recommended granting the extension (Dkt. No. 4281), and the Court adopted the recommendation (Dkt. No. 4339).

## II. THE JANUARY 5, 2016 HEARING

On January 5, 2016, the Special Master held a three-hour hearing.  Counsel for IPPs, Defendants, and Objectors appeared and participated.  (*See* Hr. Tr., Dkt. No. 4402-1, Ex. 1.)  At the hearing, the Special Master requested additional submissions from the parties.

## III. POST-HEARING SUBMISSIONS

In response to the Special Master's request, Lead Counsel submitted: (1) a January 11, 2016, letter regarding treble damages (Alioto Decl. re: Response ¶ 17, Ex. B); (2) a January 13, 2016 supplemental brief regarding the distribution of the Chunghwa settlement funds (*id.* ¶ 18, Ex. C); and (3) the January 15, 2016 Declaration of Joseph M. Fisher Reporting on Claims Submissions (Dkt. No. 4402-1 at 179-182).  Objectors Cooper and Scarpulla provided letter briefs regarding the Chunghwa settlement, and certain citations, also requested by the Special Master.

On January 14, 2016 IPPs lodged with JAMS a Motion to Compel Documents and Testimony directed against the clients of attorneys Bonsignore, Moore, and Justi.  On January 19, 2016, attorney Bonsignore submitted an untimely response on the Chunghwa issue.

On January 21, 2016, the Special Master issued a Corrected Report & Recommendation Re: Outstanding Motions, in which he refused to consider Bonsignore's belated response submitted January 19, 2016, and addressed various other discovery and evidentiary issues.  (Dkt. No. 4329.)

---

[12] The IPP Reply also included: (1) Dkt. Nos. 4369-11 (Alioto Decl. in support of Reply, with exhibits); and (2) 4368 at 1 (Fisher Decl. Regarding Objections to Notice, with exhibits).

**IV.     THE R&R**

On January 28, 2016, the Special Master issued his R&R.  (Dkt. No. 4351.)  He recommended approval of the settlements, concluding "that the terms of the Proposed Settlements are fair, reasonable and adequate" (*id*, at 28:24-26); that all class members were adequately represented by both Class Counsel and class representatives; and that "no conflict of interest [existed] requiring the creation of subclasses or separate counsel" (*id.* at 52-53).  He further recommended (*id.* at 76-77) that the Court:

- Certify the settlement class;

- Find that the compensation to the class is fair, reasonable and adequate;

- Find that the Plan of Distribution is fair, reasonable and adequate to the Statewide Damage Class members;

- Find that the Plan of Distribution is fair, reasonable and adequate to the Nationwide Class members from non-repealer States, and to the Nationwide Class members from Massachusetts, Missouri and New Hampshire, even though they receive no monetary compensation; and

- Find that the notice given was reasonable and appropriate, and satisfied due process.

With respect to the Fee Motion, the Special Master recommended (*id.* at 77) that the Court:

- Award $173,250,00, equal to 30% of the Settlement Fund; compute class counsel's lodestars at current billing rates and reduce all lodestars by 10% for presumed inefficiencies (resulting in an adjusted lodestar of $81,067,569 and a 2.14 multiplier);

- Approve reimbursement of expenses in the amount of $7,634,372.50; and

- Approve the requested incentive awards to various class representatives.

The Special Master also rejected certain objections in no uncertain terms.  *See, e.g.,* R&R at 33:17-25 (concluding that claims for equitable relief by class members in non-repealer states are "valueless"); 34:3-11 (referring to Cooper/Scarpulla's proposed injunctive relief as "transparently useless relief"); 36:13-17 (noting Cooper/Scarpulla's reliance on cases "that are plainly distinguishable and a misreading of a Special Master's report"); 37:14-16 (finding that "Class Counsel reasonably concluded that actively pursuing [an equitable relief claim in the face of *Illinois*

1    *Brick* (*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977))] would have been quixotic."); 38:26-39:2

2    (finding that "Lead Counsel had no duty to assert frivolous, hypothetical claims foreclosed by

3    existing law"; and that "while Objectors' arguments provide fascinating speculation for a law review

4    article, they do not realistically inform the very practical decision in a class action which claims have

5    merit."); 39:25-40:9 (concluding that Mr. Bonsignore and others could themselves "have initiated

6    direct actions that could have been joined with the MDL" if they were dissatisfied); 49:14-50:4

7    (finding that the notice program was "fair, adequate and reasonable.").

8         The ***sole objection*** sustained by the Special Master concerned the Plan of Distribution's

9    proposed treatment of the Chunghwa settlement funds.

10   **V.    POST-R&R SUBMISSIONS**

11        On January 30, 2016, IPPs filed an Omnibus Reply in support of their motion to compel,

12   filed on January 14, 2016.  The Special Master has not yet ruled on this matter.

13        On February 12, 2016, objectors filed oppositions to the R&R.  On February 23, 2016, the

14   Court ordered certain objections stricken.  (Dkt. No. 4430.)  Some objectors resubmitted objections.

15   The Special Master issued a Supplemental R&R Re Chunghwa Allocation Issue (Dkt. No. 4445) on

16   February 29, 2016.

17                              **ARGUMENT**

18   **I.    THE COURT SHOULD OVERRULE THE OBJECTIONS TO THE
            RECOMMENDATIONS ON SETTLEMENT APPROVAL**

19

20        Rule 23(e) "requires the district court to determine whether a proposed settlement is

21   fundamentally fair, adequate and reasonable."  *In re: Cathode Ray Tube (CRT) [Direct Purchaser]*

22   *Antitrust Litig.*, No. 14-CV-2058 JST, 2015 WL 9266493, at *3 (N.D. Cal. Dec. 17, 2015) (citation

23   and internal quotation marks omitted).  Objectors bear the burden of proving their challenges to the

24   reasonableness of a settlement.  *See United States v. Oregon*, 913 F.2d 576, 581 (9th Cir.1990). ("In

25   this circuit, we have usually imposed the burden on the party objecting to a class action

26   settlement."); *In re LinkedIn User Privacy Litig.*, 309 F.R.D. 573, 583 (N.D. Cal. 2015) ("An

27   objector to a proposed settlement agreement bears the burden of proving any assertions they raise

28   challenging the reasonableness of a class action settlement.)  Further, "the proper standard for

approval of the proposed settlement is whether it is fair, reasonable, adequate, and free from

1    collusion—not whether the class members could have received a better deal in exchange for the

2    release of their claims." *Id.*

3          The Final Approval Motion (Dkt. No. 4370) included a detailed discussion of the factors set

4    forth in *Churchill Village LLC v. General Electric*, 361 F.3d 566 (9th Cir. 2004).[13] It also described

5    the key settlement terms: (1) The settlements resolve all claims against Defendants stemming from

6    an alleged conspiracy to fix prices for CRT Products indirectly purchased from Defendants (*see id.*

7    at 3); (2) The Settlement Class consists of a Nationwide Class and four Indirect Purchaser State

8    Classes (*id.* at 3-4); (3) IPPs obtain a total of $541,750,000 in cash, along with cooperation

9    provisions (*id.* at 5-6); and (4) IPPs agree to a global release by all class members of all claims they

10   have brought, or could have brought, based on the conduct alleged in this litigation (*id.* at 6-7).

11   Even though the settlements have met with overwhelming support from the class, Objectors

12   challenge the nationwide release, adequacy of representation, treatment of class members in certain

13   states (including Massachusetts, Missouri and New Hampshire), notice, and various other aspects of

14   the settlements.  These issues are discussed in turn below.

15         **A.      The Nationwide Release is Fair and Reasonable**

16         The Plan of Distribution contemplates no recovery for class members in so-called "non-

17   repealer" states, *i.e.*, states that follow the Supreme Court's *Illinois Brick* doctrine to bar any type of

18   monetary recovery for indirect purchasers.  Several objectors argue that the settlements should not

19   have released claims in non-repealer states and/or that class members in those states should recover

20   from the settlement funds despite the weakness of their claims.  (*See, e.g,* Dkt No.4437

21   (Cooper/Scarpulla Obj.[14]); Dkt. No. 4436 (Moore Obj.); Dkt. No. 4401 (Clifton Obj.); Dkt. No. 4440

22   (Bonsignore Obj.).)  But the Special Master properly rejected these arguments for the simple reason

23   that such claims are demonstrably meritless, rendering the treatment of non-repealer states fair and

24

25   [13] These include: "(1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely
     duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4)
26   the amount offered in settlement; (5) the extent of discovery completed and the stage of the
     proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant;
27   and (8) the reaction of class members to the proposed settlement;" and lack of collusion among the
     settling parties.  *Id.* at 575.

28   [14] Cooper/Scarpulla cite to the ECF-generated page numbers at the top of the R&R instead of the
     actual page numbers of the R&R.  Because this is not standard practice, and because no other
     objector does this, IPPs cite to the actual page numbers of the R&R.

reasonable in all respects.  (*See* R&R at 31-41.)  *See also In re Omnivision Techs., Inc.*, 559 F. Supp.

2d 1036, 1045 (N.D. Cal. 2008) (Conti, J.) ("It is reasonable to allocate the settlement funds to class

members based on the extent of their injuries or the strength of their claims on the merits."); *Booth v.*

*Strategic Realty Trust, Inc.*, No. 13-cv-04921, 2015 WL 6002919, at *7 (N.D. Cal. Oct. 15, 2015)

(Tigar, J.) (same).

> ### 1.   Class Settlements Routinely Include a Nationwide Release of All Claims That Were or Could Have Been Brought in the Case—Including the Release of Meritless Claims For Which Class Members Receive No Compensation Under a Post-Settlement Plan of Allocation.

There is nothing unusual about a settlement that releases all claims that were or could have

been brought by a nationwide class, including a subset of meritless claims.  Release terms of this

nature are standard and unobjectionable features of many settlement classes and comport with Rule

23's goal of facilitating global peace.  *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287 (9th

Cir. 1992) (approving release of "not only those claims alleged in the complaint, but also a claim

based on the identical factual predicate . . . even though the claim was not presented and might not

have been presentable in the class action") (citation and internal quotation marks omitted); *Reyn's*

*Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 748 (9th Cir. 2006) (same); *Sullivan v. DB*

*Investments, Inc.*, 667 F.3d 273, 310 (3d Cir. 2011) (en banc) (approving nationwide settlement

structured "to achieve global peace by obtaining releases from all those who might wish to assert

claims, meritorious or not.") (citation and internal quotation marks omitted).[15]

Indeed, the Court approved nearly identical release and plan of allocation provisions *in this*

*very case* in connection with the LG settlement, without objection from anyone—including the

Insider Objectors or their clients. (*See* Dkt. No. 2542 (LG final approval order); R&R at 37 ("the LG

settlement released without monetary compensation any equitable monetary relief claims for non-

---

[15] *See also* 5 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 16:7 (4th ed. 2007) ("It is well-settled that in order to achieve a comprehensive settlement . . . a court may permit the release of a claim based on the identical factual predicate as that underlying the claims in the settled class action even though the claim was not presented and might not have been presentable in the class action."); *In re Am. Int'l Grp., Inc. Secs. Litig.*, 689 F.3d 229, 243-44 (2d Cir. 2012) ("Defendants in class action suits are entitled to settle claims pending against them on a class-wide basis even if a court believes that those claims may be meritless" to achieve "global peace[.]").

1   repealer state class members," which "strongly supports the appropriateness of the same ruling with

2   respect to the Proposed Settlements").)

3          Nor does the proposed allocation of zero funds to non-repealer class members somehow lead

4   to a failure of "consideration" for the settlements as a whole, as Objectors suggest.  (*See*

5   Cooper/Scarpulla Obj. at 2.)  Settlements often result in no distribution for class members with

6   meritless claims without raising any questions about settlement validity or consideration.  *See, e.g.,*

7   *In re Mego Financial Corp. Secs. Litig.*, 213 F.3d 454, 460-61 (9th Cir. 2000) (approving settlement

8   that left "a large portion of the class without a recovery"); *Omnivision*, 559 F. Supp. 2d at 1045-46

9   (approving settlement providing recovery to just one of three groups of class members because they

10  were the only ones with valid claims on the merits); *Rieckborn v. Velti PLC*, No. 13-cv-03889, 2015

11  WL 468329, at *8-10 (N.D. Cal. Feb. 3, 2015) (approving settlement and plan of distribution under

12  which class members would recover based on relative strength of claims, with some receiving

13  nothing); *Nguyen v. Radient Pharm. Corp.*, No. SACV 11-00406, 2014 WL 1802293, at *7 (C.D.

14  Cal. May 6, 2014) ("The Objector argues that any settlement that releases any claim without

15  compensation is per se unreasonable, but the Objector's authority does not bear this out."); *Maine*

16  *State Ret. Sys. v. Countrywide Fin. Corp.*, No. 2:10–CV–00302 MRP, 2013 WL 6577020, at *17-18

17  (C.D. Cal. Dec. 5 2013) ("That a plan of allocation distributes proceeds based on the relative

18  strength and weaknesses of a claim does not, itself, render a proposed settlement unfair.") (collecting

19  cases).

20         The settlements here were not executed claim-by-claim or theory-by-theory, but instead

21  secure a lump-sum recovery from each Defendant in exchange for nationwide peace—a perfectly

22  enforceable (and standard) class action settlement contract.  Indeed, even Objectors concede that the

23  Court's analysis at this stage turns on the adequacy of the recovery for the class *as a whole*.  (*See*

24  Cooper/Scarpulla Obj. at 2 ("it is true that in a class action the adequacy of consideration is analyzed

25  on the basis of an exchange between the defendants and the class as a whole").)  By that measure,

26  the settlements readily meet the standards of fairness, reasonableness, and adequacy given the

27  extraordinary amount of the common fund secured for the class.  (*See* R&R at 4 ("The compensation

28  to the class is fair, reasonable and adequate.").)

1    Because the settlement terms are reasonable, what remains is Objectors' argument that the

2    proposed *Plan of Distribution* is unfair to class members in non-repealer states.  In Objectors' view,

3    the plan suggests that Lead Counsel either represented non-repealer claimants inadequately in the

4    settlement process or acted unreasonably in excluding them from the distribution.  But neither

5    argument is correct.  As the Special Master explained, the issue raises a straightforward question of

6    common fund allocation in which "Lead Counsel made reasonable, rational, good-faith valuations of

7    the strength of potential claims in non-repealer states based on governing law," supporting the

8    treatment of non-repealer claims in all respects.  (R&R at 41.)  The alternative suggested by

9    Objectors—essentially giving some portion of the money to class members with meritless claims—

10   would have been unfair to the rest of the class, whose claims were clearly viable.

**2.      Nationwide Class Members Were Adequately Represented.**

12   Although Objectors' "nationwide release" arguments reduce, in the end, to an allocation

13   dispute concerning the relative merit of certain class member claims, Objectors' adequacy of

14   representation assertions must be addressed up front.  (*See* Dkt. No. 4436 (Moore Obj.); Dkt. No.

15   4401 (Clifton Obj.).)

16   First, adequacy of representation is not called into question merely because a post-settlement

17   plan of allocation values certain meritless claims at zero.  "All class settlements value some claims

18   more highly than others, based on their perceived merits, and strike compromises based on

19   probabilistic assessments . . . If these types of compromises automatically created subclasses that

20   required separate representation, the class action procedure would become even more cumbersome

21   than it already is, and would create even more transaction costs[.]" *Charron v. Wiener*, 731 F.3d 241,

22   253-54 (2d Cir. 2013); *see also Maine State Ret. Sys.,* 2013 WL 6577020, at *17 (rejecting adequacy

23   of representation and subclass arguments and noting that "if every difference among class members

24   'required a new subclass, class counsel would need to confine settlement terms to the simplest

25   imaginable or risk fragmenting the class beyond repair'") (citation omitted).

26   Moreover, there is no question Lead Counsel represented all class members vigorously and

27   adequately throughout the litigation—including during the settlement process, which involved

28   protracted arm's length negotiations supervised by experienced, Court-appointed special masters

1   (*i.e.*, retired Judge Walker) and mediators (retired Judge Smith).  (R&R at 18-19.)  There is "not a

2   shred of evidence in the record suggesting the existence of collusion," *id.* at 28, and class/lawyer

3   interests were squarely aligned throughout because Lead Counsel, like all class members, had every

4   incentive to maximize the total common fund recovery for the class.  The settlements, in short, were

5   the product of vigorous, effective, and adequate representation.  (*See* R&R at 18-19 ("objectors have

6   failed to demonstrate inadequate representation or any conflict of interest"); *id.* at 53 (same); *id.* at

7   74 ("generally superb job done by IPP counsel in this case").)

8          The same is true for the Plan of Distribution.  Lead Counsel's duty in this context is to

9   develop a reasonable plan, consistent with the fiduciary obligation owed to *all* class members in

10  terms of distributing funds fairly based on the relative strength of claims.  *See, e.g., Omnivision*, 559

11  F. Supp. 2d at 1045 ("the plan must be fair, reasonable and adequate" in light of claim value);

12  *Rieckborn*, 2015 WL 468329, at *8 ("Courts recognize that an allocation formula need only have a

13  reasonable, rational basis, particularly if recommended by experienced and competent counsel.").

14         Rule 23 does not, however, typically require separate allocation counsel for different

15  categories of class members, particularly where, as here, a subset of claims is demonstrably

16  valueless.  In that situation, it is appropriate for the Court to approve a plan of allocation based on

17  Lead Counsel's recommendation and the Court's independent review.  *See, e.g., In re Pet Food*

18  *Products Liability Litig.*, 629 F.3d 333, 346-47 (3d Cir. 2010) ("varied relief among class members

19  with differing claims in class settlements is not unusual"; it "do[es] not, without more demonstrate"

20  intra-class conflicts or the need for subclasses; and such objections are "more appropriately

21  addressed as a Rule 23(e) adequacy of allocation question, rather than [an] adequacy of

22  representation question"); *In re Insurance Brokerage Antitrust Litig.*, 579 F.3d 241, 272 (3d Cir.

23  2009) (plan of allocation under which "relief varie[s] among the different groups of class members

24  [does] not demonstrate . . . conflicting or antagonistic interests within the class" or adequacy of

25  representation issues requiring separate counsel);[16] *see also* R&R at 53 ("the Special Master

26

27  _____

28  [16] Numerous courts have approved settlements providing no recovery for a subset of the class with
    valueless claims.  *See, e.g., Charron*, 731 F.3d at 253-54 (rejecting need for subclasses and separate
    representation); *Maine State Ret. Sys.,* 2013 WL 6577020, at *17 (rejecting similar adequacy of
    representation and subclass arguments).

concludes that Class Counsel and the class representatives all provided adequate representation, and there was no conflict of interest requiring the creation of subclasses or separate counsel").

For all of these reasons, the Special Master correctly concluded that Lead Counsel represented the entire class fairly and adequately—indeed, "superbly"—throughout the case, including for settlement and plan of distribution purposes.  (R&R at 18-19, 53, 74.)  In addition, as explained in detail below, Lead Counsel's valuation of the non-repealer claims was reasonable and supported by authority in all respects.[17]

### 3.   Class Members in Non-Repealer States Have No Viable Claims For Any Type of Monetary Relief.

Objectors' nationwide release arguments turn, ultimately, on the fair valuation of claims in non-repealer states.  If the non-repealer claims are reasonably viewed as meritless, the objections fall away.  And these claims do indeed lack merit.  As Lead Counsel has explained in exhaustive briefing before the Special Master, and as the Special Master explained in the R&R, there simply is no viable claim for monetary relief (including equitable monetary relief) for class members in non-repealer states.  (*See* R&R at 31-39.)

Despite decades of law to the contrary, Objectors assert the existence of viable monetary claims in non-repealer states.  According to Cooper/Scarpulla, for example, Section 16 of the Clayton Act, 15 U.S.C. § 26, allows indirect purchasers to pursue equitable monetary relief as a matter of federal law.  But the text and structure of the antitrust statutes and literally a century of precedent—including controlling Ninth Circuit law—hold otherwise.  Objectors do not cite *a single case* in which any court has allowed a non-government plaintiff to recover equitable monetary relief under the federal antitrust laws, and IPPs are aware of none.  Objectors' disgorgement theory is thus groundless, and extensive antitrust authority (surveyed in detail below) underscores the reasonableness of valuing these claims at zero. (*See* R&R at 35-37 (describing Objectors' theory of equitable monetary recovery as meritless and "quixotic").)

---

[17] Objector Saik's contention that the Settlements' fee provisions create a conflict of interest (Dkt. No. 4384 at 1-4) is addressed in IPPs' Final Approval Motion (Dkt. No. 4370) at 42.

### a. Statutory Background

The starting point is the text and structure of the federal antitrust laws, which include comprehensive enforcement provisions.  The federal government, for example, enjoys broad statutory authorization to pursue, *inter alia*, criminal actions (15 U.S.C. § 1), merger reviews (15 U.S.C. § 18a), and "proceedings in equity to prevent and restrain" violations (15 U.S.C. § 25).  *See also* 15 U.S.C. § 21 (additional enforcement terms).

Private remedies also are governed by statute—two sections of the Clayton Act in particular.  The first, Section 4, 15 U.S.C. § 15, creates a federal cause of action for treble damages, which the Supreme Court has limited to "direct purchasers" of price-fixed goods.  *Illinois Brick*, 431 U.S. 720.  The second is Section 16, 15 U.S.C. § 26, which provides in relevant part that:

> Any person, firm, corporation, or association ***shall be entitled to sue for and have injunctive relief***, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue.

15 U.S.C. § 26 (emphasis added).

### b. Controlling Authority

The basic issue, as Objectors have framed it, is whether the authorization of ***injunctive*** relief in Section 16, *supra*, can be used by private plaintiffs to end-run the express statutory damage provision (Section 4, 15 U.S.C. § 15), as well as the Supreme Court's *Illinois Brick* doctrine, by enabling an indirect purchaser claim for equitable monetary relief.

The answer is no, as Ninth Circuit law expressly holds.  *See In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231, 234 (9th Cir. 1976) ("[Section] 16 limits the equitable remedies available under its terms to those against 'threatened loss or damage.' . . . Recovery for past losses is properly covered under [Section] 4; it comes under the head of 'damages.'"); *Coalition for ICANN Transparency Inc. v. VeriSign, Inc.*, 771 F. Supp. 2d 1195, 1202 (N.D. Cal. 2011) ("Such relief is unavailable under Section 16."); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 787 F. Supp.

14

2d 1036, 1040 n.2 (N.D. Cal. 2011) (claims for disgorgement "would be barred" under federal law). In *Multidistrict Vehicle*, the court held that a group of plaintiffs including "counties, cities, and individuals" could not pursue any type of backward-looking equitable monetary relief under Section 16 because monetary recovery for antitrust violations "is properly covered under § 4," *i.e.*, the express Clayton Act damage remedy.  538 F.2d at 233-34.  "Thus, whether payments which appellants seek for some of their citizens is 'equitable' or not is of no consequence because §16 does not allow the claimed relief for past loss."  *Id.*; *see also id.* at 235 ("mak[ing] whole those who have been injured by the conduct of the violators [is a] function usually served by the §4 remedy of treble damages.").

Numerous authorities are in accord.  *See, e.g., Fleitman v. Welsbach Street Lighting Co. of America*, 240 U.S. 27, 29 (1916) (Holmes, J.) (treble damage claim is exclusive private monetary remedy under antitrust laws because Section 16 "does not go farther in terms than to give an injunction to private persons against threatened loss"); *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 170 (2004) ("a Government plaintiff" has "broad" statutory authority to pursue equitable antitrust remedies but "[p]rivate plaintiffs, by way of contrast, are far less likely to be able to secure broad relief"); *Decorative Stone Co. v. Building Trades Council of Westchester County*, 23 F.2d 426, 427-428 (2d Cir. 1928) (Section 4 treble damage claim is exclusive monetary remedy for private plaintiffs).

### c.    Objectors' Authority Is Inapposite

Objectors' response is to all but ignore the controlling *Multidistrict Vehicle* decision in favor of citing a large number of cases in which *the government* has been allowed to pursue disgorgement under federal statutes such as the FTC Act.  (*See* Cooper/Scarpulla Obj. at 3-4.)  But that has little if anything to do with whether a private plaintiff—particularly an indirect purchaser—can end-run the Section 4 damage remedy expressly prescribed by Congress, not to mention *Illinois Brick*, by relying on an alternative statutory provision (Section 16) that, by its terms, speaks only of injunctions.  The two cases cited at the outset of Objectors' argument on this issue[18] say nothing about the availability

---

[18] *See* Cooper/Scarpulla Obj. at 1, citing *Midwest Paper Prods. Co. v. Cont'l Group*, 596 F.32d 573, 594 (3d Cir. 1979), and *United States Gypsum Co. v. Indiana Gas Co.*, 350 F.3d 623, 627 (7th Cir. 2003).

1    of equitable *monetary* relief for private plaintiffs under Section 16.  These cases merely stand for the

2    general proposition that Section 16 permits injunctive relief, a point not in dispute.

3         IPPs are aware of no case in which any court has held that Section 16 authorizes an equitable

4    monetary claim for non-government plaintiffs, and Objectors point to none.  Indeed, if such claims

5    were viable, experienced IPP class counsel nationwide (including Lead Counsel) would pursue that

6    theory routinely, yielding scores of reported decisions embracing Objectors' argument.  But that is

7    not what happens, and no such authority exists, because the claim cannot be squared with the text,

8    structure, or history of the antitrust laws.  *Cf. Bankamerica Corp. v. U.S.*, 462 U.S. 122, 131 (1983)

9    ("just as established practice may shed light on the extent of power conveyed by general statutory

10   language, so the want of assertion of power by those who presumably would be alert to exercise it, is

11   equally significant in determining whether such power was actually conferred") (citation and internal

12   quotation marks omitted).

13        Objectors Cooper/Scarpulla put particular weight on *Porter v. Warner Holding Co.*, 328 U.S.

14   395 (1946), but that was yet another *government case* decided under a different statute (the

15   Emergency Price Control Act of 1942) with different statutory terms.  Moreover, while *Porter* held

16   that the Act authorized both injunctive and equitable monetary remedies in a government case, the

17   Court made clear that its view would be different for a private plaintiff.  *See* 328 U.S. at 401-02

18   (explaining that a parallel damage provision established "the sole means whereby individuals may

19   assert their private right to damages" whereas government remedies were more expansive).

20        The more relevant Supreme Court authority is *Meghrig v. KFC Western, Inc.*, 516 U.S. 479

21   (1996) and, of course, *Illinois Brick*.  In *Meghrig*, the Court rejected a private plaintiff disgorgement

22   claim under the Resource Conservation and Recovery Act, holding that statutory injunction

23   provisions did *not* authorize an equitable monetary recovery for private plaintiffs, irrespective

24   whether the claim was styled as one for "damages or equitable restitution."  516 U.S. at 484; *id.* at

25   487-88 ("where Congress has provided elaborate enforcement provisions for remedying the violation

26   of a federal statute . . . it cannot be assumed that Congress intended to authorize by implication

27   additional judicial remedies for private citizens suing under the statute" because "where a statute

28   expressly provides a particular remedy or remedies, a court must be chary of reading others into it.")

1    (citations and internal quotation marks omitted).  The same is true under the antitrust laws, which

2    prescribe an "elaborate enforcement" regime under which private monetary recovery is governed by

3    the treble damage provisions of Section 4, period.

4         *Illinois Brick*, moreover, should be the end of the matter.  The point of *Illinois Brick* was to

5    bar indirect purchaser monetary recovery categorically under federal law to avoid the "serious risk of

6    multiple liability for defendants," 431 U.S. at 730, and the risk of "transform[ing] treble-damage

7    actions into massive efforts to apportion the recovery among all potential plaintiffs."  *Id.* at 737.

8    That rule been settled law for decades.  *See, e.g., Kansas v. Utilicorp United, Inc.*, 497 U.S. 199,

9    216-17 (1990) ("The possibility of allowing an exception [to *Illinois Brick*], even in rather

10   meritorious circumstances, would undermine the rule"; "we think it an unwarranted and

11   counterproductive exercise to litigate a series of exceptions[.]"); *In re ATM Fee Antitrust Litig.*, 686

12   F.3d 741, 748 (9th Cir. 2012) ("bright line rule") (citation omitted).

13        Accordingly, indirect purchasers cannot avoid *Illinois Brick* merely by pleading

14   disgorgement theories under Section 16 rather than damage claims under Section 4.  Section 16 does

15   not authorize indirect purchaser monetary relief under any circumstances.  *See Illinois Brick*, 431

16   U.S. at 731 ("As in *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 264 (1972), we are unwilling

17   to open the door to duplicative recoveries under Section 4.").[19]

18        Finally, Objectors cite *TFT-LCD* and *DRAM* as cases in which private plaintiff disgorgement

19   remedies were authorized by federal law (Cooper/Scarpulla Obj. at 4-5), but the courts in neither

20   case went that far.  In *TFT-LCD*, the court addressed a claim by the State of Oregon and relied on

21   several *government* disgorgement proceedings to allow Oregon's equitable claims to survive a

22   motion to dismiss.  *See Oregon v. AU Optronics Corp.* (*In re TFT-LCD (Flat Panel) Antitrust

23   Litig.)*, MDL No. 1827, 2011 WL 2790179 (N.D. Cal. July 11, 2011).  But when controlling Ninth

24   Circuit law actually was presented to Judge Illston on this issue in the same MDL (in connection

25   with a different motion), the court correctly held that disgorgement and restitution are "barred"

26

27   [19] The rule is the same for equitable disgorgement-type claims under state law in non-repealer states.
     (*See* IPP Reply (Dkt. No. 4367 at 19) at 11-12.) The Special Master considered this issue and

28   correctly explained that "overwhelming case law bar[s] state law claims for equitable relief that
     attempt to evade *Illinois Brick*," rendering pursuit of such state law claims "quixotic" at best.  (R&R
     at 37.)

1    under federal law.  *In re TFT-LCD*, 787 F. Supp. 2d 1036 at n.3.  And, the decision of the *DRAM*

2    special master "did not analyze" whether non-repealer claims for equitable monetary relief were

3    valid on the merits; it held only that the *DRAM* plaintiffs' decision to allege such claims would not

4    defeat predominance.  (R&R at 37.)  *See also In re DRAM Antitrust Litig.*, MDL No. 1486, Dkt. No.

5    2132, at ¶133 (N.D. Cal. Jan. 8, 2013) ("the relative merit of the claims asserted and to be settled by

6    the proposed settlement classes plays no role in the settlement class certification analysis").  Neither

7    *TFT-LCD* nor *DRAM* could have recognized a valid indirect purchaser disgorgement remedy under

8    Section 16 without running afoul of the controlling authority described above.  *In re Multidistrict*

9    *Vehicle*, 538 F.2d at 234.

10       For all of these reasons, no consumer plaintiff monetary remedy exists under Section 16,

11   meaning Lead Counsel properly—and in all events reasonably—viewed such claims as meritless for

12   settlement and plan of distribution purposes.

### 4.    The Nationwide Injunctive Relief Claims Lacked Value.

14       Objectors also argue that nationwide class members may have had viable claims for

15   prospective injunctive relief, for example an injunction requiring "employee antitrust training and

16   compliance with U.S. law."  (Cooper/Scarpulla Obj. at 6.)  This argument was fully briefed before

17   the Special Master who determined that, given the facts of the case, the passage of time, and the

18   dying nature of the CRT industry, the "unlikelihood of future violations makes an injunction

19   basically worthless, and probably impossible to obtain."  (R&R at 34 (collecting cases); *see also id.*

20   at 35 (describing Objectors' employee education proposal as "transparently useless relief")); *United*

21   *States v. Or. State Med. Soc'y*, 343 U.S. 326, 333-34 (1952) ("The sole function of an action for

22   injunction is to forestall future violations . . . We agree with the trial court that conduct discontinued

23   in 1941 does not warrant issuance of an injunction in 1949.").  The fact that the CA AG has obtained

24   stipulated injunctions from Defendants does not change this analysis.  The Settlements' treatment of

25   nationwide claims for injunctive relief was fair and reasonable in all respects.

26       Finally, Objector Moore asserts (at 14) that, because IPPs are unlikely to prevail on the

27   merits of their claim for injunctive relief, there is no ongoing "case or controversy" for the

28   nationwide class.  "But that argument . . . confuses mootness with the merits."  *Chafin v. Chafin*, 133

---

18

S.Ct. 1017, 1024 (2013).  The fact that a particular claim faces doubtful "prospects of success" on the merits is "not pertinent" to whether a case or controversy exists for purposes of Article III.  *Id.* That is the situation here: The nationwide claims for injunctive relief are weak on the merits, but are not moot.  *See generally Friends of the Earth, Inc. v. Laidlaw Environmental Servs., Inc.*, 528 U.S. 167, 189 (2000) ("a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice" and parties bear a "heavy burden" in seeking to establish lack of ongoing case or controversy).

### 5.    All Class Members Had the Right to Opt Out.

Even if certain non-repealer class members wished to embark on a quixotic pursuit of federal disgorgement claims, or any other novel theory of monetary recovery, they had every opportunity to do so by opting out of the settlements.  But the opt out rates are trivial—a total of five nationwide—further demonstrating that non-repealer claims lack viability.  (*See* R&R at 41 ("Class members in these categories who are unsatisfied with the Proposed Settlements had the opportunity to opt out and pursue their own legal remedies.  Courts routinely hold that the opt-out remedy is sufficient to protect class members who are unhappy with the negotiated class action settlement terms.  *Klee v. Nissan N. Am., Inc.*, 2015 WL 4538426, at *8 (C.D. Cal. July 7, 2015).").)

### B.    Massachusetts, Missouri and New Hampshire Were Not Improperly Excluded.

Certain objectors challenge the Special Master's finding that Massachusetts, Missouri, and New Hampshire were fairly and reasonably omitted from the Indirect Purchaser State Classes, although those states in theory permit indirect purchasers to recover damages.  (*See* Dkt. No. 4440 (Bonsignore Obj.) at 2; Dkt. No. 4436 (Moore Obj.) at 4.) As the Special Master accurately determined, damage claims from each of these states are not viable (and thus reasonably viewed as valueless) given prior rulings on Defendants' motions to dismiss, the lack of class representatives, and the expiration of the respective statutes of limitations.  Thus, "[t]he objections to the settlement on this basis are without merit."  (R&R at 39-41, 76 ¶ 5.)

#### 1.    Massachusetts

IPPs initially asserted a claim under the Massachusetts Consumer Protection Statute, Mass. Gen. Laws Ch. 93A, but it was dismissed with prejudice on procedural grounds. (*See* Dkt. No. 768.)

1    This ruling expressly precluded the possibility that any existing or previously named plaintiffs could

2    file another suit on behalf of Massachusetts class members.  (*Id.* at 13.)  Consequently—and because

3    no other Massachusetts class representatives were located—Massachusetts was thereafter omitted

4    from IPPs' amended complaints.  (*See* Dkt Nos. 827, 1526.)

5         Mr. Bonsignore and Ms. Moore now claim to have represented additional clients that

6    potentially could have served as Massachusetts class representatives, but the facts are otherwise and

7    the Special Master correctly rejected this argument. (*See* R&R at 39.)  Moore never informed Lead

8    Counsel that she had any such potential plaintiff.  (*See* Alioto Settl. Decl. II, ¶ 38 (Dkt. No. 4370-

9    1).)  Bonsignore and his purported client, Mr. Gianasca, similarly failed to communicate with Lead

10   Counsel, never responded to Lead Counsel's requests for information necessary for initial

11   disclosures, and declined to complete the questionnaire designed to vet potential class

12   representatives.  (*Id.* at ¶ 37.)  They even failed to provide Lead Counsel with basic information

13   concerning Mr. Gianasca's claimed purchase of a CRT product.  (*Id.*) As a result, Mr. Gianasca was

14   not named in the Consolidated Amended Complaint (Dkt. No. 437).

15        As the Special Master determined, Lead Counsel "never refused to add a viable plaintiff to

16   this case," and "never excluded a viable plaintiff."  (R&R at 40 (quoting Alioto Settl. Decl. II, ¶ 28

17   (Dkt. No. 4370-1) and finding this "version of the facts is more credible").)  Objectors' contrary

18   claims regarding the presence of viable class representatives are false. (*See id.*) No credible evidence

19   supports the factual assertions of Mr. Bonsignore.  The documents he cites were previously stricken

20   by the Special Master and are subject to another motion to strike being filed by IPPs in conjunction

21   with this Response to the Objections.

22        Nor did the Special Master err in concluding that Lead Counsel had no duty to "to dredge up

23   a plaintiff."  (*See* R&R at 41, 76.)  Indeed, it is common in indirect purchaser cases to exclude some

24   repealer states from the litigation and/or from monetary recovery due to lack of class representatives

25   or adverse pre-certification rulings.  For example, in *LCD*, the 24 monetary relief states included

26   Massachusetts and Missouri but excluded New Hampshire. *See In re TFT-LCD (Flat Panel)*

27   *Antitrust Litig.,* No. 07-md-01827-SI, 2013 WL 1365900, at *1, *4 (N.D. Cal. April 3, 2013) (listing

28   states and approving plan of distribution that allowed only residents of those states to make a claim).

1          Moreover, even assuming that Bonsignore and/or Moore actually had viable Massachusetts

2   plaintiffs, "they could themselves, within the almost two years remaining in the limitations period,

3   have initiated direct actions that could have been joined with the MDL." (R&R at 39-40.)  They did

4   not do so.  They now argue that they were somehow "powerless" to do so because they were not

5   appointed lead counsel for IPPs. (*See* Bonsignore Obj. at 7; Moore Obj. at 9.)  Their arguments

6   ignore the plain language of Special Master Legge's ruling, as well as the simple fact that the

7   Massachusetts claims were thereafter not within the scope of the consolidated class claims overseen

8   by Lead Counsel.  Indeed, as noted, Special Master Legge expressly stated that, although IPPs could

9   neither amend nor re-file their Massachusetts allegations, "certainly no procedural dismissal of this

10  nature should bar the filing of a truly new suit."  (Dkt. No. 768 at 13.)

11         Bonsignore and Moore also wrongly contend that putative Massachusetts class members had

12  no notice that those claims were no longer within the IPP class case.  (R&R at 39; Moore Obj. at 4.)

13  But this fact was made clear not only from docket entries, but also in several class notices.  (*See*

14  R&R at 39 ("Lead Counsel did provide adequate notification in the settlement notices that were sent

15  for both the Chunghwa and LG settlements.").)  As discussed above, by the time IPPs moved for

16  approval of the Chunghwa Settlement in March 2011, the Massachusetts claim was not part of this

17  case and Massachusetts purchasers were informed that they would not recover from the settlement.[20]

18  IPPs again notified purchasers in Massachusetts that they would not be receiving money from the

19  LG Settlement, and further informed them that no Massachusetts class was certified as part of the

20  litigated class certification motion.[21]

21

22  ───────────────────────

23  [20] *See* Dkt. Nos. 1063-1 (published detailed notice), and 1063-2 (published summary notice). The
    Chunghwa Settlement Class was "defined by Plaintiffs' operative complaint at the time this
    Agreement is presented for preliminary approval." (Dkt. No. 884-1, p. 2.) The operative complaint in
24  March 2011 was the Third Consolidated Amended Complaint (Dkt. No. 827), and it did not include
    a Massachusetts claim.

25  [21] *See* Dkt. Nos. 2511 (published LG detailed notice), and 2512 (published LG summary notice).
26  Moore baldly asserts that "the law requires" a separate notice informing Massachusetts purchasers
    their claims were dismissed, giving them a reason "to have filed their own case."  (Moore Obj. at 9.)
27  But Rule 23 expressly provides that notice need only be directed to class members for the dismissal
    of claims of "a certified class," and only when the dismissal is voluntary (*e.g.*, pursuant to a
    settlement).  *See* Fed. Rule Civ. P. 23(e).  Thus, when claims are "dismissed on the merits or the
28  dismissal is otherwise of an involuntary nature . . . , notice under Rule 23(e) is not required."
    *Newberg on Class Actions* § 24:107 (4th ed.).

1     Between the public docket and the published notices, Massachusetts purchasers had notice

2  that their potential damage claims were not encompassed within this case, with ample time to bring

3  separate actions within the limitations period.[22]  But the statute of limitations has now run.  "Since

4  the Massachusetts claims are now barred by the applicable statute of limitations, no claims can now

5  be added." (R&R at 40.)  Objectors dispute that conclusion on the grounds that "the actions of

6  Defendants were fraudulently concealed," and *American Pipe* [*American Pipe & Const. Co. v. Utah,*

7  414 U.S. 538 (1974)] class action tolling suspended the statutes of limitations.  (*See* Bonsignore Obj.

8  at 8; Moore Obj. at 10.)  Fraudulent concealment, however, could not possibly toll the limitations

9  period after the filing of the initial complaints and publicly-announced DOJ investigation, which in

10  this case occurred in 2007—more than eight years ago.  *See, e.g., Hexcel Corp. v. Ineos Polymers,*

11  *Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012) (holding the doctrine of fraudulent concealment cannot toll

12  accrual of cause of action where plaintiff could have reasonably known of its existence).

13     As for tolling under *American Pipe*, any such tolling ceased for Massachusetts claims as of

14  the date those claims were dismissed in October 2010—more than five years ago—and the

15  limitations period then resumed running.  *See* 1 McLaughlin on Class Actions § 3:15 (12th ed.)

16  ("Under *American Pipe*, the moment . . . the case is dismissed without a class being certified, the

17  statute resumes running as to the previously asserted members of the class and they have whatever

18  time remained to them in the limitations period when the purported class suit was filed within which

19  to seek to intervene, or to file a separate individual action.") (citations omitted).  In addition, the

20  other state antitrust claims alleged by IPPs did not toll the statute of limitations for Massachusetts

21  because *American Pipe* only tolls "identical causes of action."  *See In re Cathode Ray Tube (CRT)*

22  *Antitrust Litig.*, 27 F. Supp. 3d 1015, 1021 (N.D. Cal. 2015) ("*American Pipe* tolling did not apply to

23  a later-filed claim that was not identical to the earlier-filed class claims").  The Special Master

24  correctly concluded that the statute of limitations expired, and that Massachusetts claims were not

25  improperly excluded.

26

27

28

---

[22] The applicable limitations period is four years. *See* Mass Gen. Laws. 260 § 5A.

### 2.    Missouri

As Objectors concede, Missouri damage claims were never within the scope of this case, having never been asserted by IPPs. (*See* R&R at 40; Bonsignore Obj. at 6; Moore Obj. at 8.) This was because there was no Missouri plaintiff to represent a Missouri class, and because Special Master Legge ruled that each state-specific class must have a named plaintiff to proceed.[23]  Thus, law of the case prevented Lead Counsel from asserting a Missouri claim.  With no plaintiff, and no live Missouri claim, the limitations period ran. *See Boulds v. Chase Auto Finance Corporation*, 266 S.W. 847, 851 (Mo. App. 2008) (five-year limitations period).  For the same reasons discussed above with respect to Massachusetts, the doctrines of fraudulent concealment and *American Pipe* class action tolling do not save Missouri (or New Hampshire) claims.

Bonsignore again claims that he had a plaintiff from Missouri, and that he presented this potential class representative to Lead Counsel in March 2012.  (R&R at 40; Bonsignore Obj. at 6.) Lead Counsel has no record of this claimed communication and does not believe it to be authentic; and the Special Master rejected Bonsignore's assertion as "not credible" on the facts.  (Alioto Settl. Decl. II., ¶ 40 (Dkt. No. 4370-1); R&R at 40-41.)[24]  Moreover, if Mr. Bonsignore truly represented a viable Missouri class representative in 2012, nothing stopped him from filing a case on behalf of Missouri claimants, since Missouri claims were never included within the class claims in this case. (*See* R&R at 39-40.)  But he did not do so, and Missouri claims are now long time-barred.  They are properly viewed as valueless for Plan of Distribution purposes.

### 3.    New Hampshire

As with Missouri claims, IPPs have never asserted a New Hampshire claim.  There was no New Hampshire plaintiff to proceed on behalf of a class, and Lead Counsel was prohibited from

---

[23] Alioto Settl. Decl. II, ¶ 39 (Dkt. No. 4370-1); Dkt. No. 768 at 5-6; Dkt. No. 799 (Order adopting R&R).  As with Massachusetts, Moore contends that Lead Counsel should have objected or appealed the ruling as it pertained to Missouri and New Hampshire, but she makes no effort to demonstrate that it was legally incorrect.  (Moore Obj. at 6, 8.)

[24] Further, Lead Counsel's experience with Mr. Bonsignore demonstrated that his claims of representing class representatives were unreliable. At the beginning of this case, Mr. Bonsignore claimed to represent plaintiffs from Arizona, Massachusetts, Mississippi and Rhode Island. But when asked to provide basic information necessary for initial disclosures, and to complete a vetting questionnaire, Mr. Bonsignore did not respond. As a result, none of these individuals was included in the consolidated complaints.  (Alioto Settl. Decl. II ¶ 41 (Dkt. No. 4370-1).)

1    asserting such a claim without a New Hampshire class representative.[25]

2        Before the Special Master, Mr. Bonsignore sought to demonstrate that he had notified Lead

3    Counsel of a viable New Hampshire class representative.  His contention is again highly

4    questionable.  The documents presented by Bonsignore make "no showing of when the possible

5    client bought a CRT product or that she had proof of purchase." (*See* R&R at 40-41; Dkt No. 4144-

6    3.)  Moreover, "the e-mails are dated March 2, 2012, by which time the three-year statute of

7    limitations on the New Hampshire Consumer Protection Act (N.H. Rev. Stat. § 358-A:2) had run."[26]

8    Thus, as with Massachusetts and Missouri claims, there are simply no viable (or valuable) claims for

9    New Hampshire.

10       **C.    The Notice Program Comports With Due Process, Was More Than Adequate,
              and Was the Best Notice Practicable Under the Circumstances**

11

12       The Special Master found that the notice program was "fair, adequate and reasonable"[27] and

13   recommended that ***all*** notice objections[28] be overruled.  (*See* R&R at 49-51.)  He also found the

14   notice program reached an acceptable percentage of class members and that a neutral notice expert

15   was unnecessary.  (*Id.* at 49.)

16       This recommendation is consistent with Rule 23(c)(2)(B), due process, and the Preliminary

17   Approval Order approving the notice plan, which has now been fully implemented.  (*See* Preliminary

18   Approval Order (Dkt. No. 3906 at ¶¶ 11-13); Declaration of Joseph M. Fisher Reporting on the Class

19   Notice Program ("Fisher Decl. II") (Dkt. No. 4371); *see generally* R&R at 46-51.)

20

21

22   [25] Dkt. No. 768 at 5-6; Dkt. No. 799 (Order adopting R&R); Alioto Settl. Decl. II, ¶ 42 (Dkt. No.
     4370-1).

23   [26] (R&R at 41.) Despite Mr. Bonsignore's repeated attacks, the Special Master in no way erred or
24   contravened his duties by failing to treat any of Mr. Bonsignore's purported facts as "conclusive," or
     in not allowing untimely supplemental submissions. (*See* Bonsignore Obj. at 6-7.)

25   [27] The applicable standard with regard to the notice plan is evaluated at length in IPPs'
     Memorandum in Support of Final Approval. (Dkt. No. 4370 at 7-10.)

26   [28] The Special Master thoroughly considered various objections with regard to the notice program,
27   including but not limited to: (1) the age and income profile of recipients; (2) notice to foreign
     residents; (3) notice to non-English speakers; (4) the supposed need for televised notice; and (5) the
     terms of the notice provided to the nationwide class. (R&R at 46-48.) Objector Johnson and the CA
28   AG have not objected to the R&R, which also addresses their concerns about the notice program.
     (*See* R&R at 47; Section VII.A.6.)

1    Using a combination of direct mailed and emailed notice, publication notice, digital notice on

2 Google, Facebook and other media, as well as other targeted outreach, the notice program reached an

3 estimated 83% of class members with an estimated frequency of 3.1 (*See* Fisher Decl. II ¶ 18(d)),

4 which is well-within the accepted range.  *See Judges' Class Action Notice and Claims Process*

5 *Checklist and Plain Language Guide*, Federal Judicial Center (2010), at 3; *Silber v. Mabon*, 18 F.3d

6 1449, 1454 (9th Cir. 1994).  Moreover, the reach and frequency of the notice to class members were

7 effectively greater than these numbers imply because the calculated numbers exclude several factors

8 that expanded the program's reach.  For example, the calculated numbers ignore an e-mail campaign

9 arranged by Lead Counsel that resulted in the dissemination of 417,993 emails to *DRAM* claimants

10 notifying them of the CRT Settlement.  (*See* Alioto Decl. re: Response, ¶ 4.)  Further, the calculated

11 numbers do not include unpaid search results and unpaid exposures to the Settlement Website "such

12 as the hundreds of thousands of user-initiated web sessions at www.CRTclaims.com and the

13 extensive exposure afforded by news articles and featured (but unpaid) links from numerous third-

14 party websites to the Settlement Website."  (Fisher Decl. II at ¶ 18(e).)

15    A small number of objectors have objected to the Special Master's treatment of the notice

16 issues, with two filing specific objections and one other "re-urging" his original objections.[29]

17 Notably, the CA AG, who initially raised issues with the Special Master regarding the notice plan,

18 has not objected to the R&R and has acknowledged that the notice plan met due process

19 requirements.  (R&R at 27:14-15.)  All notice-related objections should be overruled.

### 1.    The Reach of Notice Was Acceptable

21    Certain objectors continue to challenge the "reach" and mechanics of the notice program.

22 (*See* Cooper/Scarpulla Obj. at 9-11); Bonsignore Obj. at 8-11).)  Special Master Quinn properly

23 rejected these arguments.  (*See* R&R at 46-49.)  *See In re Google Referrer Header Privacy Litig.*, 87

24 F. Supp. 3d 1122, 1138 (N.D. Cal. 2015) (rejecting objections that "describe alternative ways that

25 notice could have been provided to the class.  It may be true that other methods of notice exist.  But

26 here, the court approved one specific plan that satisfied the standard" of Rule 23(c)(2)(B) such that

---

[29]  *See* objections filed by Cooper/Scarpulla (Dkt. No. 4437); and Bonsignore (Dkt. No. 4440). *See also* "re-urged" objections filed by Hull (Dkt. No. 4394).

1    objectors' alternatives were "not required").

2         First, the Special Master rejected Cooper/Scarpulla's speculative assertion that the notice

3    campaign did not reach 83% of class members.  (*See* R&R at 49; *see also* Fisher Decl. II at ¶ 18(d)

4    (Dkt. No. 4371); Fisher Decl. Re: Cooper/Scarpulla Obj. (Dkt. No. 4368 at 1-8).)  In response,

5    Objectors now shift gears to speculate about the claims rate, suggesting (erroneously) that the

6    number of claims filed to date counsels against a finding of adequate notice.  (*See, e.g.*,

7    Cooper/Scarpulla at 10; Bonsignore Obj. at 9.)

8         These arguments are misplaced.  To begin, the adequacy of class notice is not governed by

9    *post hoc* analysis of claims rates.  Claims rates are a function of numerous factors beyond the notice

10   program, including the size of a consumer's expected recovery, the passage of time since the product

11   was purchased, and many other case- and class-specific considerations.  The simple fact is that many

12   consumers never file claims in many cases—even after proper notice.  But that hardly makes the

13   notice itself defective.  Furthermore, the claims rate here is actually quite strong.  The number of

14   claims received as of December 7, 2015 deadline was 109,709 timely claims with a total of 19.9

15   million CRT units claimed.  (*See* Declaration of Joseph M. Fisher Reporting on Claims Submissions,

16   at 180 ¶ 4(b) (Dkt. No. 4402-1).)

17        Objectors respond by noting that the *LCD* settlement administrator received 233,473 valid

18   claims.  (*See* Cooper/Scarpulla Obj. at 10.)  But this figure is an apples-to-oranges comparison and,

19   in any event, casts no doubt on the CRT notice plan.  For example, Objectors fail to disclose that the

20   *LCD* settlement fund continued accepting claims for eighteen months after the original Court-

21   ordered claims deadline.  *See In re TFT-LCD Antitrust Litig.*, No. 07-cv-10827, Dkt. No. 9217-2 at

22   2, Ex. A Claims Summary (N.D. Cal. 2012).  Obviously a substantially longer claims period is likely

23   to yield more claims.  Moreover, the actual number of *units* claimed in *LCD* was only 9.6 million—

24   far less than the 19.9 million CRT units claimed here.  *Id.*, Dkt. No. 7572 at 2.  The *LCD* claims

25   process also started in 2012 for a class period of 1999-2006, meaning claimants were more likely to

26   have retained the relevant products and/or purchase records, and were therefore more likely to file a

27   claim.  Here, in contrast, the products (CRT televisions and monitors) are largely obsolete and the

28   start of the class period dates back more than 20 years.  *LCD* was simply a different case, and the

INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO OBJECTIONS TO JAN. 28, 2016 R&R
- Master File No. CV-07-5944-JST

1   claims experience there has little relevance to the claims experience here—let alone to the adequacy

2   of the CRT notice program.  There is no basis for attributing the different claim rates to ineffective

3   notice.

4          Objectors' reliance on *Kaufman v. Am. Express Travel Related Servs., Inc.*, 283 F.R.D. 404,

5   408 (N.D. Ill. 2012) is equally unavailing.  In *Kaufman*, the court reviewed a thin publication notice

6   program consisting of only **one** weekday issue of *USA Today,* and an abysmally low response rate

7   with claims of just over one percent of the $4 million settlement fund.  283 F.R.D. at 405-406.  Here,

8   the claims are substantial and IPPs anticipate distributing all of the funds to claimants.  (*See* Dkt. No.

9   4402-1 at 179-182).

10                 **2.      The Digital Notice Campaign Was Fair and Reasonable**

11         Objectors also complain that "digital notices" displayed on Google, Facebook and other

12  websites were not a legitimate prong of the notice program. (*See* Cooper/Scarpulla, Dkt. No. 4437 at

13  9-10; Bonsignore Obj. at 18-19.)  At the preliminary approval stage, however, this Court approved

14  precisely the plan that was implemented, including the use of digital media. (*See* Decl. of Joseph M.

15  Fisher Re: Notice Program at  ¶ 24 (Dkt. No. 3863) ("[t]he combination of print media plus digital

16  advertisements is expected to reach approximately 80% of adults aged 30+ who own TVs or

17  computers with a household income of at least $60,000 with an estimated frequency of 2 times.").)

18  Digital outreach is a standard prong of consumer class notice programs, which is why it was used

19  here.

20         Cooper/Scarpulla's objection is notably odd given that Mr. Scarpulla served as lead counsel

21  in the *LCD* case in which the same types of digital banners were used.  Moreover, such ads were

22  included in the calculated reach percentage in *LCD*.  *Compare* CRT banner ads attached to Fisher

23  Decl. Re: Cooper/Scarpulla Objection (Dkt. No. 4368 at 6-8) *with TFT-LCD Antitrust Litig.*, No. 07-

24  cv-1827, Dkt. No. 7158-1 (N.D. Cal. 2012) (describing notice plan and attaching banner ad

25  examples in Exhibit 3 at pp.44-45).

26         For all of these reasons—and many others addressed at length before the Special Master—

27  the notice program was "fair, adequate and reasonable under the tenets of Rule 23" and the notice-

28  related objections should be overruled.  (*See* R&R at 49.)

1

### 3.    A Neutral Notice Expert Is Unnecessary

2      The Special Master found Objectors' request to appoint a neutral notice expert "unnecessary

3  in light of the persuasive evidence before him to conclude that the Notice Program that has been

4  implemented is fair, adequate and reasonable under the tenets of Rule 23."  (R&R at 49.)  This

5  conclusion should be adopted for the reasons stated in the R&R.

6

### D.    IPPs Complied With the Procedural Guidance for Class Action Settlements.

7      Objectors Cooper and Scarpulla argue that the Special Master erred by not requiring IPP

8  Counsel to provide an express comparison of each class member's potential recovery had the case

9  gone to trial with each class member's actual recovery under the final settlements.  (*See*

10  Cooper/Scarpulla Obj. at 14, citing "Procedural Guidance for Class Action Settlements," available at

11  http://www.cand.uscourts.gov/ClassActionSettlementGuidance (the "Procedural Guidance").)

12  Objectors also point to this Court's order requesting further information from the DPPs based on the

13  guidelines.  (*See* Dkt. No. 4194.)

14      But Objectors ignore that the Procedural Guidance is just that—guidance for evaluating

15  whether a settlement is fair, reasonable, and adequate.  *See* Procedural Guidance, Item 1-d.  *See also*

16  *Perkins v. LinkedIn Corp.*, No. 13-cv-04303-LHK, 2016 WL 613255, at *8, n. 8 (N.D. Cal. February

17  16, 2016) ("the Procedural Guidance does not constitute a legally binding interpretation of Rule

18  23.").  Moreover, there can be no question that IPPs have introduced a massive record on all

19  settlement-related issues—a record more than sufficient to inform the Court's analysis under Rule

20  23.  Indeed, IPP Counsel informed the Court at the preliminary approval stage that (1) potential

21  damages were approximately $2.768 billion (*see* Dkt. No. 3861 at 14 n. 31); (2) the total settlement

22  consideration was $541.75 million (*id.* at 1, 9, 13); (3) that Defendants and their experts intended to

23  show at trial that the conspiracy caused little if any damage to IPPs (*id.* at 14); and (4) that

24  settlements funds would be allocated pursuant to the detailed plan of allocation (*id.* at 26-29).  This

25  information, plus other information presented in IPPs' voluminous filings, was more than enough for

26  the Court to evaluate the settlements' adequacy.  (*See* Dkt. No. 3906.)

27

28

## II.     THE COURT SHOULD OVERRULE OBJECTIONS TO THE PLAN OF DISTRIBUTION

> Approval of a plan of allocation of settlement proceeds in a class action . . . is governed by the same standards of review applicable to approval of the settlement as a whole: the plan must be fair, reasonable and adequate." *In re Omnivision*, 559 F. Supp. 2d at 1045 (internal quotation marks and citation omitted); *see also In re Citric Acid Antitrust Litig.*, 145 F. Supp. 2d 1152, 1154 (N.D. Cal. 2001).  "It is reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits."  *In re Omnivision*, 559 F. Supp. 2d at 1045.

*In re: CRT Antitrust Litig.*, 2015 WL 9266493, at *7.  *See also Rieckborn*, 2015 WL 468329, at *8 ("Courts recognize that an allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent counsel.").

The Plan of Distribution meets these standards.  (*See* R&R at 29-41.)  Qualified claimants will receive a pro-rata share of the Settlement Fund based on the number of valid claims filed, and the number and type of CRT Products each claimant purchased during the class period. (*Id.* at 29-31.) The Plan does not contemplate compensating Nationwide Class Members who are not members of one of the Indirect Purchaser State Classes, because, under the reasoned opinion of Lead Counsel, the equitable and damages claims being released by these purchasers have no value, and the proposed allocations will most fairly compensate the claimants. (*Id.* at 34-41.)

The objections focus on the various arguments addressed at length, *supra*, concerning the value of monetary claims held (in theory) by class members in non-repealer states, as well as Massachusetts, Missouri, and New Hampshire.  For the reasons explained above, however, these claims are not viable.  (*See* Section I. B, *supra*.)  Accordingly, the fairest approach is to account in a reasonable way for both the strength of repealer state damage claims and the weakness of all other monetary claims, and to allocate the common fund accordingly.  *See, e.g.*, page 10, *supra* (collecting many cases approving this approach).  The Plan of Distribution reflects "reasonable, rational, good-faith valuations of the strength of potential claims," and warrants final approval.  (R&R at 41.)

A secondary issue concerns the distribution of the Chunghwa settlement funds.  (*See* R&R at 41-46.)  The Special Master has issued a Supplemental R&R regarding the plan of distribution of the Chunghwa Net Settlement Fund.  (*See* Dkt. No. 4455.)  Pursuant to this Court's February 23, 2016 Order (Dkt. No. 4430), objections to this Supplemental R&R are to be filed separately and

1   considered by the Court at the March 15, 2016 hearing.  This issue does not bear on final approval of

2   the pending settlements or the Plan of Distribution for non-Chunghwa funds.

3   **III.   THE COURT SHOULD REJECT ALL OBJECTIONS REGARDING FEES, EXPENSES AND INCENTIVE AWARDS**

4

5         **A.   Background**

6            **1.   The Fee Motion**

7            IPP Counsel sought fees in the amount of $192,250,000, one-third (33.3%) of the Settlement

8   Fund, representing a 2.3 multiplier—a sum within the acceptable range of awards in this Circuit and

9   warranted by the exceptional results obtained for the Class, the complex nature of the case, and the

10  enormous financial risks undertaken by IPP Counsel over the past eight years.  (*See* Dkt. No. 4071 at

11  9-25.)  A lodestar cross-check confirmed the reasonableness of the requested fee amount.  (*See id.* at

12  25-27.)  Lastly, the Fee Motion requested the reimbursement of IPP Counsel's expenses (*see id.* at

13  27-29) and incentive awards to compensate class representatives (*see id.* at 29-31).

14           The Fee Motion summarized IPP Counsel's work and accomplishments in the case (*see id.* at

15  1-2), including:

16   - successfully defeating two rounds of motions to dismiss that involved 11 separate
       motions and an array of complex issues;

17

18   - reviewing millions of pages of documents, many of which required translation;

19   - coordinating discovery and analysis of over 40 Defendants' and over 50 third parties'
       transactional data, including global CRT Product sales and cost data for hundreds of
20      millions of transactions spanning a 13-year period;

21   - deposing witnesses in locations worldwide, often through interpreters;

22   - obtaining class certification after exhaustive proceedings involving complex
23      economic evidence and expert testimony;

24   - opposing 11 summary judgment motions raising complex legal and factual issues
       including the Foreign Trade Antitrust Improvements Act of 1982, 15 U.S.C. § 6a
25      ("FTAIA"), antitrust standing, and withdrawal from the conspiracy;

26
     - preparing the case for trial, including witness preparation, exhibit and testimony
27      designation, mock trial and demonstrative work, and extensive pre-trial briefing; and

28   - protracted settlement negotiations with multiple Defendants.

## 2. The Fee Reply

In their Fee Reply (Dkt. No. 4373), IPP Counsel responded to objections and explained that the requested one-third fee and 2.3 multiplier were reasonable and appropriate under Ninth Circuit law for a variety of case-specific reasons, including the results secured for the class in light of the risks. They also further demonstrated that the lodestar, hourly rates, and number of hours billed to the case were appropriate. (*Id.* at 15-20.) And, they noted that there were no objections to the amount of expenses or incentive awards. (*Id.* at 29.)

## 3. The R&R

Special Master Quinn first considered the methodologies available for assessing fees, opting for the percentage-of-the-fund method. He concluded that (i) "solid authority [establishes] that a 25% award is presumptively reasonable"; (ii) "many cases—including megafunds—award fees in the 25-33% range"; and (iii) "the 8-year duration of the case," "the extraordinary risk undertaken," and the "unarguably superb result of recovering for the indirect purchasers the second largest indirect purchaser price fixing settlement in history" warranted an award in excess of the 25% benchmark. (R&R at 69.) He further concluded that IPP Counsel's billing rates were reasonable (*id.* at 70) and their billing records "highly reliable and detailed." (*Id.* at 73.) He then recommended a 10% lodestar adjustment for inefficiencies, resulting in a 2.14 multiplier (*id.* at 74) and an award of 30% of the Settlement Fund, or $173,025,000 (*id.* at 69).

The Special Master also reviewed the appropriateness of the requests for expenses and for incentive awards to class representatives, and recommended their approval. (*Id.* at 74-76.)

## 4. Objections to the R&R

Objectors challenge the recommended fee award on essentially the same grounds raised before the Special Master, including challenges to the percentage method, arguments for lower percentage fees in "mega fund" cases, certain lodestar disputes, arguments about the role of government and other proceedings, and various other contentions. Each of these arguments, however, was correctly rejected by Special Master Quinn.

**B.** **The Special Master Properly Employed the Percentage-of-the-Fund Approach**

Noting that "the Ninth Circuit has repeatedly approved beginning with a percentage analysis and cross-checking it against the lodestar with a multiplier if appropriate," the Special Master adopted that approach here.  (*See* R&R at 54.)  In particular, he concluded "that the proper approach to assessing the total attorneys' fee award in this case is to begin with the 9th Circuit benchmark of 25%, to determine whether there are grounds to adjust it upwards as IPP Counsel request, or downward based on Objectors' criticisms, and to cross-check the resulting percentage against the lodestar after adjusting it for any factors such as inefficiency." (*Id.* at 55.)  The Special Master then performed a detailed analysis of the "*Kerr* factors"[30] to calculate a reasonable fee, and appropriately gave the most weight to "[t]he most critical factor . . . the degree of success in achieving results for the class."  (R&R at 56 (citing *Hensley v. Eckerhart,* 461 U.S. 424, 434-436 (1983)).)

Objectors contend the Special Master should have used the lodestar method and performed a more detailed review of time records.[31]  But the overwhelming weight of authority—in the Ninth Circuit and nationwide—supports the Special Master's approach.  (*See* R&R at 54; Fee Motion at 10 (Dkt. No. 4071) (collecting cases); Fee Reply at 26-27 (Dkt. No. 4373) (same).)

Objectors rely on *In re High Tech Employees Antitrust Litig.,* No. 11-cv-2509, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015), but that case is distinguishable—and, indeed, in many respects supports the Special Master's recommended fee.  The court in *High-Tech* was concerned that a percentage approach would have yielded an unreasonably high 4.97 multiplier, so the court used the lodestar method to award an overall multiplier of 2.5—which is higher than the Special Master awarded here.  (*See* R&R at 68, citing *High Tech,* 2015 WL 5158730, at *8.).  And, *High-Tech* did not remotely suggest that the percentage method would be improper in another case.

In the context of the lodestar cross-check, the Special Master's review of a subset of IPP Counsel's time records was entirely appropriate.  *See generally Fox v. Vice,* 131 S.Ct. 2205, 2216 (2011) (in performing lodestar analyses, "courts need not, and indeed should not, become green-

---

[30] *See Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Cir. 1975) (listing *Kerr* factors) which, as the Special Master noted, are the same as the factors applied in more recent Ninth Circuit cases, *e.g.*, *Vizcaino v.Microsoft Corp.,* 290 F.3d 1043, at 1048-49 (9th Cir. 2002), and *In re Bluetooth Headset Prods. Liab. Litig.,* 654 F.3d 935, 942 (9th Cir. 2011). (*See* R&R at 55-56.)

[31] *See, e.g.,* Dkt. No. 4437 at 11 (Cooper/Scarpulla Obj.).

1    eyeshade accountants" because the goal "is to do rough justice, not to achieve auditing perfection");

2    *In re Rite Aid Corp. Secs. Litig.*, 396 F.3d 294, 306-07 (3d Cir. 2005) ("The lodestar cross-check

3    calculation need entail neither mathematical precision nor bean-counting. The district courts may

4    rely on summaries submitted by the attorneys and need not review actual billing records.").

5          Finally, Cooper/Scarpulla's concern that the aggregate fee award is based on "unreasonable

6    and uncompensable work" is baseless speculation, and was thoroughly rejected by the Special

7    Master, as further demonstrated below.  (*See* R&R at 60-66; 69-74; *see also* Section D, *infra*.)

8          **C.     The Special Master Properly Applied the Law on Mega-Fund Fee Awards**

9          Objectors insist that the fee award be reduced because this is a "megafund" case.  (*See* Dkt.

10   No. 4384 (Saik Obj.) at 5-10; Dkt. No. 4394 (Hull) at 5-6; Dkt. No. 4439 (St. John) at 5.) But the

11   Ninth Circuit has rejected "any hard rule that megafund cases are to be treated differently, although

12   the size of the fund is one factor the court should consider."  (R&R at 67-68 (citing *Vizcaino,* 290

13   F.3d at 1047).)  *See also, e.g., Newberg on Class Actions* § 15:80 (5th ed.) (criticizing megafund

14   "sliding scale" approach as "lack[ing] rigor," as being inappropriate in "high fund cases [that]

15   involve significant risks," and for "creat[ing] perverse incentives" for class counsel); *In re Rite Aid*

16   *Corp. Secs. Litig.*, 396 F.3d at 302-03 ("there is no rule that a district court must apply a declining

17   percentage reduction in every settlement involving a sizeable fund"). The Special Master properly

18   concluded that "[t]he most effective way to control a percentage recovery in a megafund case is to

19   compare it to the lodestar multiplier that it would generate."  (R&R at 68 (citing cases rejecting

20   multipliers of 10.38, 9.68, and 4.97); *see also* Fee Reply (Dkt. No. 4373) at 8 n.16 (distinguishing

21   cases).)

22         Here, the 2.14 multiplier recommended by the Special Master is reasonable and falls squarely

23   within acceptable norms.  (*See Vizcaino,* 290 F.3d at 1051 & n.6 (discussing range of multipliers

24   applied in common fund cases); *see also* Fee Reply (Dkt. No. 4373) at 3-9, and in particular *id.* at 7

25   n. 13 (listing "megafund" cases where courts awarded fees of 30% or more and/or multipliers in the

26   2-4 range where, as here, the record shows that class counsel bore substantial risks and delivered

27   outstanding results).)  Moreover, the Special Master carefully applied the *Kerr* factors and analyzed

28   them in light of the facts and circumstances of this case.  (*See* R&R at 55-69.)

Lastly, the Special Master's proposed 30% award is consistent with Judge Illston's award to indirect purchaser plaintiffs' counsel in *LCD*. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 WL 1365900, at *8 & n.11 (30% fee to all counsel, and private counsel multiplier of 2.4 on current rates from $1.08 billion fund).  This case was litigated for two years longer than *LCD* (*see* R&R at 71) and presented additional obstacles (*see id.* at 57).  Thus, an award of 30% (or more) is well-justified here.  The objections should be overruled.

### D.      The Special Master Correctly Found IPP Counsel's Lodestar to Be Reasonable

As part of his lodestar cross-check, the Special Master considered IPP Counsel's time records, reviewing "a sample of about 50 months . . . from a range of about eight class counsel firms."  (R&R at 71.)  He also permitted two objectors to review the time records of Lead Counsel and three other firms for a 15-month period.  (*See* Dkt. No. 4211.)

The Special Master analyzed and rejected objections regarding IPP Counsel's hourly rates (including those of contract attorneys), the hours expended, Lead Counsel's case management, the number of firms involved, and alleged improper billing practices.  (*See* R&R at 60-66; 69-73.)  He concluded that "class counsel's billing records appear highly reliable and detailed and the time spent and the rates charged were reasonable for a case of this complexity."  (*Id.* at 73.)  Nonetheless, in part to account for presumed inefficiencies in a case of this length and magnitude, the Special Master imposed an across-the-board 10% reduction to IPP Counsel's lodestar.  (*Id.*)

Objectors nevertheless insist that IPP Counsel's rates are too high; Lead Counsel mismanaged the case; and IPP Counsel engaged in improper billing practices.  These objections remain meritless for reasons discussed below.

### 1.      The Special Master's Conclusion that IPP Counsel's Rates are Reasonable is Well-Supported

The Special Master found IPP Counsel's average hourly rate (after the 10% adjustment) of $443 at current rates and $412 at historic rates to be "reasonable and responsible."  (R&R at 69-70.) Relying on the Declarations of Richard M. Pearl, he concluded that "Lead Counsel's rates were low," that very few lawyers' rates exceeded $800 and none exceeded $1000, and that "courts in the Northern District have repeatedly approved billing rates in the range seen in this case."  (*Id.* at 70.)

Objectors St. John and Clifton challenge the Special Master's findings on the reasonableness of IPP Counsel's rates.  (*See* Dkt. No. 4439 (St. John Obj.) at 6-7; Dkt. No. 4401 (Clifton Obj.) at 5-7.)  They insist that IPP Counsel's rates are too high and that no multiplier is warranted.  They are wrong.

First, they are wrong that IPP Counsel's rates already account for the risk of doing a major case on contingency.  Instead, the hourly rates are consistent with those for lawyers doing this type of work on a *non-contingent* basis.  *See* Pearl Decl. II (Dkt. No. 4373-2) ¶¶ 9-13, 23 (finding IPP Counsel's rates to be lower than defense counsel rates and concluding that IPP Counsel's rates are non-contingent rates).  The rates, in other words, are reasonable for hourly work *and* should be enhanced by a multiplier to account for risk and payment delay.  (*See* R&R at 66 ("Courts have repeatedly recognized that to induce attorneys to accept the risk of little or no recovery it is appropriate to award reasonable fees that often include a multiplier over their lodestar."); *Gutierrez v. Wells Fargo Bank N.A.,* No. C 07–05923 WHA, 2015 WL 2438274, at *7 (N.D. Cal. May 21, 2015) citing *Fischel v. Equitable Life Assur. Soc'y of U.S.*, 307 F.3d 997, 1008 (9th Cir. 2002) ("It would be unusual not to apply a risk multiplier when (1) the attorneys reasonably take a case with the expectation that they will receive a risk enhancement if they prevail, (2) their hourly rates do not reflect that risk, and (3) there is evidence that the case was indeed risky.").)  Objectors do not and cannot make any showing to the contrary.

Second, the Special Master correctly rejected St. John's objection to contract attorney rates, noting that "the legal community now commonly uses contract attorneys.  There is not the slightest justification to downgrade their billing rates or not apply a multiplier to them."  (R&R at 73.)  This finding has support from the American Bar Association and many federal and California courts. *See* Legal Ethics, Law. Deskbk. Prof. Resp. § 1.5-4(e) (2015-2016 ed.) ("if the contract lawyer is billed as just another lawyer whose work makes up the fee for the matter, the firm may bill the client any reasonable rate for the services just as it does for one of its associates"); Fee Reply (Dkt. No. 4373) at 21-22 (citing cases).[32]  Moreover, many of the contract attorneys used in this case

---

[32] *See also* Pearl Decl. II (Dkt. No. 4373-2), ¶¶14-17 (citing cases and noting "virtually every law firm I know of bills private clients for contract attorneys at *market* rates – *i.e.*, the rates charged for attorneys of comparable experience, and expertise for comparable work.").

1    were fluent in foreign languages and "were essential for reviewing and selecting documents and

2    providing backup translation at depositions."  (R&R at 73.)  *See also* Alioto Fee Decl. II (Dkt. No.

3    4373-1), ¶¶ 18-21, Ex. A.

4         Nor was there any deliberate "mislabeling" of contract attorneys as associates, as St. John

5    suggests. (St. John Obj. at 2-3.) IPP Counsel merely used the same categorized chart for presenting

6    their time as was used and approved in the *LCD* case.  (*See* R&R at 72; Dkt. No. 4373-1, ¶ 24.)

7    There was no label for contract attorney, thus "associate" was the most accurate descriptor available.

8    Moreover, given that these attorneys performed associate-level work, and that the law clearly

9    supports billing contract attorneys as associates, there is simply no need to have a separate category.

10   St. John's mis-labeling argument—like many of his other arguments—is a non-issue.  His claims

11   regarding the adequacy of the record before the Special Master are addressed in Subsection 4, *infra*.

### 2. The Special Master Correctly Concluded that Lead Counsel's Case Management Decisions Did Not Lead to Excess Billing

14        Objectors Cooper and Scarpulla argue that the Special Master should have made more

15   substantial cuts to IPP Counsel's lodestar, asserting that the Special Master's R&R "largely agrees

16   with" their objections regarding the trial team, the CA AG, and alleged improper billing practices.

17   (*See* Dkt. No. 4437 at 11.)

18        This assertion is false.  The Special Master reviewed the record and extensive billing backup,

19   and rejected Cooper/Scarpulla's objections to Lead Counsel's case management.  He found:

20   • "substantial evidence . . . that Mr. Alioto managed the case effectively."  (R&R at
        61);

22   • "the prosecution of the case was divided in a sensible way among class counsel
        firms" (citing several examples).  (*Id.*);

23   • "[a]ccording to his co-counsel, Lead Counsel was superb at coordinating the class
        effort so that the team remained united in its objectives, and avoided squabbling over
        strategy, finances, personalities and the like." (*Id.*);

25   • "the ability to lead a cohesive and collaborative team is the single most important
        attribute of a Lead Counsel in a huge MDL litigation," and "the evidence is
        overwhelming that Lead Counsel pulled this off." (*Id.* at 62);

28   • "the case was managed efficiently and cost-effectively." (*Id.* at 66);

- the "management of attorney time compares favorably with the division of labor in *LCD* based on the Special Master's involvement in that case." (*Id.* at 72); and

- that IPP Counsel did a "generally superb job . . . in this case." (*Id.* at 74.)

Objectors provide no evidence to refute these findings.  Mr. Bonsignore's claims regarding Lead Counsel's billing practices and management of the case likewise lack merit.  (*See* Dkt. No. 4440 at 11-12.)  The objections should be rejected.

### a.    The Trial Team

Despite being given access to the trial team's billing records, Cooper/Scarpulla have been unable to articulate *any* specific objections to support their claims of duplicative and excess billing.  (*See, e.g.,* Dkt. No. 4363 at 33.)  Regardless, the Special Master reviewed the trial team's billing records and refuted Cooper/Scarpulla's claims.  He found that the billing records "do not exhibit undue waste or unproductive time." (R&R at 63.)  In fact, he found the staffing of one firm was "as efficient as legal staffing gets," and for another, "[v]ery lean staffing."  (*Id.* at 63-64.)  The Special Master also gave specific examples of the work done and the rates charged by each of the three firms —rates that are very reasonable for such experienced and skilled counsel.  (*See id.* at 63-64.)  Ultimately, "[g]iven the added focus, intensity and recent trial experience they brought to the potential trial, the Special Master concludes that Mr. Alioto's 'reasoned judgment' [in including the trial team] was appropriate."  (*Id.* at 64.)

Cooper/Scarpulla have no response to these findings.  Their claim that the Special Master found evidence of "unnecessary duplication of effort" (Dkt. No. 4437 at 12) mischaracterizes the R&R and cannot be squared with the Special Master's conclusions.  (*See, e.g., id.* at 72 ("The billing entries here showed that for the most part the case was staffed in a reasonably 'lean and mean' manner.  For most firms, 75% or more of the work was performed by 2-3 lawyers consistently over the eight years. . . . *Duplication of efforts was thus minimized*.") (emphasis added).)  Their baseless objection to the trial team must be rejected.

### b.    Relationship with California Attorney General

Objectors Cooper/Scarpulla continue to assert that Lead Counsel created "unnecessary conflict" and had an "unusually contentious" relationship with the CA AG.  (*See* Dkt. No. 4437 at

13.)  But the Special Master rejected these claims.  First, he found that the time Lead Counsel spent litigating the Philips/CA AG settlement was valuable to the class in several important respects.  (*See* R&R at 64-65.)  Objectors provide no evidence to refute the Special Master's findings, which—as they well know—are supported by the evidence.  (*See* Alioto Decl. re: Response, ¶¶ 6-12 (describing IPPs' relationship with the CA AG); *see also* accompanying Declaration of Lauren C. Capurro in support of Request for Judicial Notice, Ex. A, (California Court of Appeal Order concluding that IPPs would be "potentially bound by the judgment [approving the Philips/CA AG settlement] under the doctrine of res judicata.").  Thus, it was essential for Lead Counsel to intervene to insure that IPPs would not be bound by the judgment.  Second, the Special Master has elsewhere observed that "coordination in this case between the Attorney General and the IPPs has been excellent."  (Dkt. No. 4281 at 3.)  No reduction in IPP Counsel's fee is warranted based on the relationship with the CA AG.

### 3.    IPP Counsel's Billing Practices Were Proper

Cooper/Scarpulla contend that the R&R "confirms the existence of questionable billing practices" (Dkt. No. 4437 at 12), and that the Special Master found "excess billing," "problematic record-keeping practices," and "dubious staffing decisions."  (*Id.* at 11.)  These statements are demonstrably false.  In fact, the Special Master categorically rejected Cooper/Scarpulla's and Bonsignore's unsupported allegations of improper billing practices:

- "The Special Master finds that class counsel's billing records appear highly reliable and detailed and that the time spent and the rates charged were reasonable for case of this complexity."  (R&R at 73);

- "[T]he Special Master has no reason to believe there was any widespread padding of time or failure to keep contemporaneous records" (*id.* at 71);

- Lead Counsel's "daily billing entries, albeit handwritten, give every impression of having been made contemporaneously") (*id.*);

- "[T]he billing entries showed that for the most part the case was staffed in a reasonably 'lean and mean' manner" (*id.* at 72).

While the Special Master did find that the billing records contained entries for "in-house

1   multi-lawyer conferences," which he believed Lead Counsel had instructed lawyers to exclude,[33] he

2   concluded that "it is simply unreasonable to expect a case of this nature to be litigated for eight years

3   without conferences amongst counsel, and there is no reason to think such conferences did not

4   benefit the class."  (R&R at 72.)[34]

5         Cooper/Scarpulla and Bonsignore also object to the Special Master's findings regarding

6   block-billing and billing in quarter-hour increments.  (*See* Dkt. Nos. 4437 at 12; 4440 at 11-12.)  But

7   they cannot distinguish *O'Bannon v. Nat'l Collegiate Athletic Ass'n,* Case No. 09–cv–03329–CW

8   (NC), 2015 WL 4274370, at *6-7 (N.D. Cal. July 13, 2015) (refusing to reduce fees because of block

9   billing).  Like *O'Bannon*, the Special Master found class counsel's billing records to be "highly

10  reliable and detailed and that the time spent . . . [was] reasonable for a case of this complexity."

11  (R&R at 73; *see also Found. v. Office of Dir. of Nat. Intelligence*, No. C0705278 SI, 2008 WL

12  2331959, at *6 (N.D. Cal. June 4, 2008) (refusing to reduce fee award because "there is no evidence

13  that plaintiff's use of quarter-hour increments posed a threat of over-billing").)  Further, they

14  concede the Special Master found that block-billing did not occur "to any egregious extent."

15  (Cooper/Scarpulla Obj. at 25, citing R&R at 73.)

16         **4.      The Record Before the Special Master Was Sufficient**

17         According to objector St. John, the Special Master erred because IPP Counsel supposedly

18  failed to make a *prima facie* case for a significant portion of the fee request.  (St. John Obj. at 1-2.).

19   This contention is wrong on the law and the facts.

20         To inform fee awards, the Local Rules simply require a "brief description of relevant

21  qualifications and experience and a statement of the customary hourly charges of each such person

22  *or* of comparable prevailing hourly rates *or* other indication of value of the services."  Civ. L.R. 54-

23  5(b) (emphasis added).  The evidentiary record before the Special Master meets this standard.

---

[33] Lead Counsel never instructed IPP Counsel to exclude *all* "in-house multi-lawyer conferences."
Some such conferences were excluded by the Audit Committee during the audit of IPP Counsel's
time, but only if they were judged to be "internal case management" conferences, as opposed to in-
house conferences about active assignments in the case.  (*See* Alioto Decl. re: Response, ¶ 5.)

[34] Bonsignore complains that the Special Master dismissed his declaration regarding Lead Counsel's
time keeping practices as "unsupported hearsay," and that this was improper because evidence rules
do not apply at a fairness hearing.  (*See* Dkt. No. 4440 at 11.)  But the Special Master also reviewed
Lead Counsel's actual time records and found they "give every impression of having been made
contemporaneously."  (R&R at 71.)

1      Every IPP firm duly submitted, at a minimum, a detailed firm résumé describing the firm's

2   relevant antitrust experience.  Most firms also submitted the résumés of at least their name partners.

3   These name partners supervised the work of all counsel within their firms.  Lead Counsel provided

4   another layer of supervision.  This ensured that skilled counsel were performing the necessary tasks

5   at all times.

6      Lead Counsel also submitted résumés of over a hundred attorneys, whose time comprised the

7   vast majority of the total lodestar.  The record contains 45 declarations with hundreds of charts

8   disclosing the tasks performed and hours billed per attorney by year.  (*See* Dkt. No. 4073.)  Lead

9   Counsel also submitted two Declarations of Richard Pearl that provided the requisite information on

10  the "comparable prevailing hourly rates."  (*See* Dkt. Nos. 4071-15 and 4373-2.)  With respect to the

11  small number of attorneys whose résumés were not submitted initially, Lead Counsel and Lovell

12  Stewart submitted supplemental declarations on November 20, 2015, and provided résumés for all

13  attorneys for whose work they seek payment. (*See* Dkt. Nos. 4373-1 and 4373-3, Ex. J.)

14     St. John argues that the Special Master's consideration of these "tardy resumes" was error

15  under *In re Mercury Interactive Corp. Secs. Litig.,* 618 F.3d 988 (9th Cir. 2010). (*See* Obj. at 3).

16  The issue there was whether the "district court erred in setting the objection deadline for class

17  members on a date before the deadline for lead counsel to file their fee motion." *Id.* at 993. The court

18  held that a notice procedure is inadequate if "by the time [class members] were served with the

19  motion, the time within which they were required to file their objections had already expired." *Id.*

20  That is not the case here.  IPP Counsel filed their fee motion long before the deadline for objections,

21  supported by a 50-page declaration from Lead Counsel; a declaration from an attorney fee expert;

22  and 45 declarations from each of the individual IPP firms.  (*See* Dkt. Nos. 4071 and 4073.)

23     In sum, St. John's insistence on résumés for all attorneys who ever worked on the case, no

24  matter how briefly, is unduly rigid in light of the Local Rule's flexibility on the evidence required to

25  establish the value of legal services.  The record is more than sufficient for the Court to adopt the

26  Special Master's fee award recommendation.  Finally, although not required, Lead Counsel has

27  collected supplemental declarations containing background information for all attorneys who worked

28  on this case.  These supplemental declarations will be provided at the Court's request.

1

2

**E.** **The Special Master Properly Concluded that the Settlements are Attributable to the Efforts of IPP Counsel and Not Government Action**

3

Objectors St. John and Clifton take the position that the large settlements are not attributable

4

to the work of IPP Counsel, but rather to the amnesty application of Chunghwa Picture Tubes, Ltd.

5

("Chunghwa") and the cooperation obtained from IPPs' settlement with Chunghwa; the Department

6

of Justice's ("DOJ") criminal investigation and the guilty plea by Samsung SDI Co., Ltd.

7

("Samsung"); the European Commission's ("EC") Decision finding that several defendants had

8

violated European antitrust laws; and the holding in an unrelated fraud case against Philips, *Vichi v.*

9

*Koninklijke Philips Elecs., N.V.,* 85 A.3d 725 (Del. Ch. 2014) ("*Vichi*").

10

The Special Master emphatically rejected these arguments in turn as "without merit,"

11

"ludicrous," "the height of Monday-morning quarterbacking, not sound legal analysis or common

12

sense," and "lack[ing] any factual basis or common sense." (*See* R&R at 57-59.)  Undeterred,

13

objectors have objected to the Special Master's findings on all of these issues. (*See* St. John Obj.

14

(Dkt. No. 4439) at 8-13; Clifton Obj. (Dkt. No. 4401 at 7).)

15

**1.** **Chunghwa**

16

With respect to the value of Chunghwa cooperation and St. John's related judicial estoppel

17

argument, the Special Master found that "IPP counsel persuasively demonstrated that, while it

18

appeared in 2009 that the cooperation might be of great help, circumstances changed as discovery

19

progressed." (R&R at 57.)  IPPs also submitted several detailed declarations explaining both the pros

20

and the cons of Chunghwa's information.  (*See* Alioto Fee Decl. I (Dkt. No. 4071-1) ¶¶ 102-103

21

(explaining that Chunghwa was unable to provide information about critical aspects of the

22

conspiracy); Alioto Fee Decl. II (Dkt. No. 4373-1) ¶ 5 (attesting that many Chunghwa meeting

23

reports were not helpful to IPPs' case); IPP Reply (Dkt. No. 4367 at 19) at p.13-14 (explaining that,

24

while Chunghwa's cooperation was indeed valuable in the early litigation, "as the case progressed, it

25

became clear that Chunghwa's information was limited in that it provided virtually no information

26

about large CPTs, the conspiracy in the United States, or its impact in the domestic market—

27

evidence essential to proving the IPP case on the merits.").)

28

St. John has provided no substantive response.  Nor does he explain why, if the value of

Chunghwa's cooperation was so great, no other settlements followed until 2013—four years later—

1   or why the DOJ secured one limited guilty plea and dropped its investigation of *all other defendants*

2   despite Chunghwa's help.  (*See* R&R at 57; IPP Reply (Dkt. No. 4367 at 19) at 14 & n.11.)

3          St. John also objects that IPP Counsel should receive only a *de minimis* fee on the Chunghwa

4   settlement, relying on *In re Cendant Corp PRIDES Litig.,* 243 F.3d 722, 741 (3d. Cir. 2001), which

5   found an "award of 5.7% of the common fund excessive where liability was conceded at the

6   outset").  (Dkt. No. 4439 at 8.)  *Cendant*, however, is distinguishable and does not provide a basis to

7   reduce the recommended fee award.

8          The defendant in *Cendant* conceded its liability several months *before* plaintiffs filed suit,

9   and the case settled almost immediately.  (*Id.* at 736.)  The risk and cost incurred by class counsel

10  was thus minimal.  Moreover, the settlement fund totaled $341,500,000, which meant the 5.7% fee

11  award amounted to $19,329,463—a multiplier of **10** on class counsel's lodestar.  (*Id.* at 742.)  Here,

12  in contrast, Chunghwa's amnesty applicant status was not known at the time IPP Counsel filed their

13  original complaints in November 2007, and the settlement with Chunghwa did not come until April

14  2009—after extensive work had been done on the case.  (*See* Alioto Decl. re Response, ¶ 13; Alioto

15  Fee Decl. I (Dkt. No. 4071-1), ¶¶ 9-13; 26-28.)  What's more, IPP Counsel are seeking a multiplier

16  *five times lower* than counsel in *Cendant*.  The case does not support St. John's position.

### 2.  Samsung Guilty Plea

18         The Special Master rejected as "ludicrous" objectors' argument that the $225 million

19  settlement with Samsung was attributable to Samsung's guilty plea rather than the efforts of IPP

20  Counsel. (*See* R&R at 57-58.)  The guilty plea "did nothing to lessen IPP's [sic] challenges to obtain

21  class certification, obtain translate and organize evidence from many foreign defendants, beat back

22  repeated legal motions, and prove pass-through and a credible damage claim." (*Id.* at 57; *see also*

23  *LCD,* 2013 WL 1365900, at *7-8 (rejecting nearly identical arguments by objectors).)

24         St. John contends the Special Master's findings are factually unsupported, apparently

25  because the Special Master credited declarations from Lead Counsel.  (*See* Dkt. No. 4439 at 10-11.)

26  But the declarations are supported by the record.  For example, in their motions for summary

27  judgment, the Hitachi, Panasonic and BMCC Defendants pointed to their lack of prosecution by the

1   DOJ as evidence of their non-participation in the conspiracy.[35] And IPPs cited to an *LCD* trial

2   involving Toshiba as an example of a case where a defendant successfully presented evidence of its

3   non-prosecution.  (*See* Alioto Fee Decl. II (Dkt. No. 4373-1), ¶ 4.)  Moreover, *three years after its*

4   *guilty plea*, Samsung moved for summary judgment on the majority of IPPs' claims arguing that the

5   Defendants' conduct did not have a "direct, substantial and reasonably foreseeable effect on

6   domestic commerce" in satisfaction of the Foreign Trade Antitrust Improvements Act of 1982

7   ("FTAIA"). (*See* Dkt. Nos. 3006; No. 4071-1, ¶ 76 and Ex. 11.)

8       St. John also ignores the fact that Samsung's guilty plea was much more limited than the

9   conspiracy alleged by IPPs.  The plea encompassed only one type of CRT (CDTs for monitors) and

10  only $89 million in sales during a portion of the class period.[36]  In contrast, IPPs alleged a worldwide

11  conspiracy involving *all* CDTs and CPTs sold to *all* U.S. customers, involving $17.5 billion in sales.

12  (*See* Dkt. No. 3287-2.)  The plea agreement thus stopped far short of establishing Samsung SDI's

13  liability, the existence of the conspiracy or its U.S. impact. (Dkt. No. 4439 at 9-11.)

14      More fundamentally, a finding of criminal guilt is not a *fait accompli* for private plaintiffs in

15  an antitrust class action.  Even if the government had established Samsung's liability, the existence

16  of the conspiracy and its U.S. impact, IPPs still had to prove antitrust injury and damages on a class-

17  wide basis—which involved serious risk and work. Specifically, if IPPs had failed to win class

18  certification—a very real possibility given recent Supreme Court case law (see Fee Reply, Dkt. No.

19  4373, at 11-12)—or had failed to show common injury and damages at trial, IPPs' claims against all

20  of the Defendants, including Samsung, would have been dismissed and the recovery would have

21  been zero.  *See In re NASDAQ Market Makers Antitrust Litig.*, 187 F.R.D. 465, 475-76 (S.D.N.Y.

22  1998) ("Antitrust litigation in general, and class action litigation in particular, is unpredictable . . . .

23  Indeed, the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded

24

25

26  _____

27  [35] *See* motions for summary judgment by Hitachi (Dkt. No. 2976, at 6); Panasonic (Dkt. No. 2998-3, at 7); BMCC (Dkt. No. 2990, at 6-7); and Dkt. No. 4071-1, ¶¶ 74-79, Ex.11 (listing and describing motions for summary judgment).

28  [36] *See U.S. v. Samsung SDI Co., Ltd.,* No. CR 11-0162 (WHA), (N.D. Cal. Aug. 8, 2011) (Dkt. No. 40-1). *See also* Fee Reply (Dkt. No. 4373), at 9; IPPs' Motion in Limine No. 17, Dkt. No. 3544, at 2.

43

1  at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal.")[37]

2  Therefore, the Special Master correctly concluded that "the benefit to the common fund attributable

3  to the efforts" of IPP Counsel is the full $225 million settlement.

4          **3.       European Commission Decision and *Vichi***

5          The Special Master also found that IPPs "cogently refuted" St. John's claim that the EC

6  Decision and the holding in *Vichi* were the real impetus for the large Samsung and Philips

7  settlements.  (*See* R&R at 58; *see further* IPP Fee Reply, at 12-14.)  He concluded: "*It is the height*

8  *of Monday-morning quarterbacking, not sound legal analysis or common sense,* for St. John to

9  suggest that IPP's [sic] result was generated in a meaningful way by [the Chunghwa settlement, the

10  guilty plea and the EC rulings] as opposed to counsel's eight-year sustained efforts."  (R&R at 58

11  (emphasis added).)

12          St. John objects to the Special Master's findings as "illogical and [] inconsistent with Judge

13  Conti's findings" that the European Decision was "relevant" and "important to this litigation."  (Dkt.

14  No. 4439 at 11-13.)  He points to paragraphs from the December 2014 EC Decision, and notes that

15  the Commission "made multiple references to agreements and price impacts in the American

16  market." (*Id.* at 11-12.)  He does not mention that the EC references to the U.S. market comprised a

17  trivial portion of the 1,181 paragraph decision, which focused fundamentally on Europe.

18          Further, these paragraphs do not make any *findings* regarding the impact of the conspiracy in

19  the United States, and stop far short of establishing antitrust liability against the Defendants in the

20  United States.  They merely recite the content of certain meeting reports (of which IPPs were already

21  aware) that mention North America.  (*See* Dkt. No. 4367 at 19, p. 18.)  Moreover, as the Special

22  Master noted, the EC Decision was not made public until December 2014—by which time IPPs had

23  developed their entire case on the merits.  (R&R at 58.)

24          Given that the EC Decision makes no findings regarding the conspiracy's impact on the

25  United States market, and given the substantive differences between U.S. and European antitrust

26  laws, it is highly unlikely that the EC Decision would have been admitted at trial.  *See* Fee Reply

27

28  _____
[37] *See also* Dkt. No. 4071-1, ¶ 93 (describing how two plaintiffs in the *LCD* litigation went to trial and recovered nothing despite most of the defendants having pled guilty).

1    (Dkt. No. 4373) at 13-14.  It is even less likely that any issue preclusive effect would have been

2    granted.  *See, e.g., Syverson v. International Business Machines, Corp.*, 472 F.3d 1072, l078 (9th

3    Cir. 2006) (explaining narrow doctrine of "offensive nonmutual issue preclusion" and requirement

4    that *identical* issue must have been actually litigated and resolved in the prior case).  Judge Conti's

5    discussion of the *potential* importance of the EC Decision—before he had an opportunity to review

6    or consider its actual contents—has no bearing on whether the EC Decision would have been

7    admitted or given any preclusive effect at trial.

8         Lead Counsel can state categorically that the EC ruling was not a material factor in the

9    decision to settle with Philips 34 days later.  The case against Philips was the product of years of

10   work by IPPs—and a closed discovery record—not the EC investigation.  And the deal was reached

11   only after summary judgment motions were fully briefed and the parties had exchanged trial exhibits

12   and deposition designations, when trial was weeks away.  (*See* Alioto Fee Decl., Dkt. No. 4071-1, ¶¶

13   73-80; 86-91; 107.)  Thus, as the Special Master found, the record confirms that it was the posture of

14   the IPP case and the work of IPP Counsel, not the EC, that spurred the Philips settlement.

15        **4.    "Disproportionate" Size of Samsung and Philips Settlements**

16        St. John has also concocted a baseless argument that the Samsung and Philips settlements are

17   "disproportionate" to their market shares in 1997 and 2000, hence, according to St. John, must have

18   been attributable to the guilty plea and EC proceedings.

19        That is incorrect.  Again, the Samsung and Philips settlements stemmed from the work of IPP

20   Counsel in building a particularly strong case against these large Defendants, as the Special Master

21   found.  (R&R at 56-59.)  Moreover, St. John is factually incorrect about the market shares of these

22   two Defendants during the class period.  The evidence shows that "[b]y 2004, Samsung held 29% of

23   the [overall] CRT market and 42% of the CDT market.  Philips/LPD's market share was 27% for

24   CRTs and 32% for CDTs."  (R&R at 58.)  Further, "[t]heir shares of the U.S. market were even

25   higher and lead Counsel believes there was strong evidence of their conspiratorial activity within the

26   U.S.  These factors account for the higher settlement amounts."  (*Id.*)  Ultimately, the Special Master

27   considered extensive record evidence on this issue (market share data and otherwise) and rejected St.

28   John's argument as "lack[ing] any factual basis or common sense."  (*Id.* at 59.)

St. John responds that the Special Master abused his discretion in relying upon Lead Counsel's declaration.  (Dkt. No. 4439 at 14-15.)  But the market share facts are the market share facts, and Lead Counsel's declarations are supported by the record. (*See, e.g.,* Dkt. No. 4367 at 19, p. 16-18 (citing evidence showing that several CRT makers exited the business in the early 2000's and Samsung and Philips/LPD's increasing market share); IPPs' Fourth Consolidated Amended Complaint (Dkt. No. 1526), ¶¶ 59 and 62 (alleging that LPD's market share was 27% and Samsung's was 34.3%); IPPs' Opp. to Motion to Strike Sur-Reply Evidence (Dkt. No. 4369-16) at 5 (listing various court filings containing evidence of Samsung's and Philips/LPD's lead roles in the CRT conspiracy and the strong FTAIA evidence against them).)

St. John misrepresents the Ninth Circuit's opinion in *Wash. Pub. Power Sup. Sys. Lit.,* 19 F.3d 1291, 1302 (9th Cir. 1994) (Dkt. No. 4439 at 15).  That case did not "discount[] class counsel's uncontroverted affidavits based on a conflict with the class at the fee stage."  *Id.*  In fact, the Ninth Circuit expressly relied upon the affidavits in reversing the district court's refusal to apply a risk multiplier to counsel's lodestar.  *Id.*  The court merely noted that the affidavits might have been uncontroverted simply because "Class Plaintiffs were not represented by counsel in the fee setting proceedings before the district court," and that on remand, the district court had the discretion to request additional evidence. *Id.*

Finally, the differences between the IPP and DPP settlements are easily explained.  At the time the DPPs entered into their settlement with Philips (February 2012), they were facing a summary judgment motion that eliminated the vast majority of their claims, and which Special Master Legge recommended the Court grant against them. (*See* Dkt. No. 1221.)  In addition, the DPPs' settlement with Philips came before class certification, before merits discovery, and before any depositions had been taken.  Similarly, the DPPs faced legal obstacles vis-à-vis Samsung that IPPs did not face, making it questionable whether DPPs would have prevailed on their claims against Samsung.[38]  The DPPs also entered into their settlement with Samsung before class certification and before a trial date was even set.

---

[38] The DPPs relied upon on the "ownership-and-control exception" to *Illinois Brick* in order to bring direct purchaser claims against the Defendants.  Samsung SDI vigorously disputed that it "owned

1

**F.      The Special Master Properly Reviewed and Approved IPP Counsel's Expenses**

2          Objectors Scarpulla and Cooper argue that the Special Master erred in failing to address their

3   objections to expenses.  But Cooper/Scarpulla never argued that the expense request should not be

4   approved.  They merely asked for a complete accounting of the underlying records,[39] and to that end,

5   moved to compel production of all expense reports. (*See* Dkt. No. 4191.)

6          The Special Master denied their motion on the grounds that, "[o]ther than general conclusory

7   statements, [Objectors] point to no impropriety in the claimed expenses."  (Dkt. No. 4211, at 4.)  He

8   did, however, order IPP Counsel to "produce detailed backup for all expenses" for the Special

9   Master's review (*id.* at 4), and to "recommend to the Special Master . . . a process for enabling him

10  to spot check a representative sampling of expense receipts and other backup for claimed expenses."

11  (*Id.* at 5.) Cooper/Scarpulla never objected to this Order and have therefore waived any objection

12  that *they* should be permitted to do an accounting of IPP Counsel's expenses.

13         Further, their objection is groundless because the Special Master himself conducted an *in*

14  *camera* accounting of IPP Counsel's expenses and found that approval is warranted.  (*See* R&R at

15  74-77.).  The Special Master did not abuse his discretion in following this procedure for the review

16  of expense records.  (*See* Fed. R. Civ. P. 53(f)(5) ("the court may set aside a master's ruling on a

17  procedural matter only for an abuse of discretion")).)

18         Finally, Cooper/Scarpulla's argument that the Special Master erred in "awarding"

19  $4,495,878.02 from the Future Expense Fund to Lead Counsel is a non-issue.  Lead Counsel has

20  never sought *reimbursement* of these expenses because he has always acknowledged that these funds

21  belong to the Class.[40] Lead Counsel seeks *approval* of those expenses, and the Special Master has

22  recommended to the Court that they be approved.  *Id.* at 77.  As of the date of the Fee Motion, the

23  amount used from the Future Expense Fund totaled $4,495,878.02.  (*See* Dkt. No. 4071, at 29.)

24

25  and controlled" or was owned and controlled by Samsung Electronics Co., Ltd., the entity from
    which DPPs purchased CRT Products.
26

27  [39] *See* Dkt. No. 4437 at 13-14; Dkt. No. 4115 at 6-7.

28  [40] Lead Counsel, with the Court's approval, established the "Future Expense Fund" to help pay
    expenses incurred in this litigation.  (*See* Dkt. Nos. 1334, 2618, 2944, 3524.)  As contemplated when
    the Court approved the Fund's creation, Lead Counsel used the money to pay "expert fees, reporter
    fees, translation costs and the like."  (R&R at 60.)

1   Lead Counsel will seek approval for any additional expenses paid from the Future Expense Fund at a

2   later date.  To the extent additional money remains in the Fund at the end of the litigation, the money

3   will become part of the common fund for distribution to the class.

4       **G.      The Court Should Deny an Incentive Award to Anthony Gianasca**

5           Mr. Bonsignore improperly requests an incentive award for his client, Anthony Gianasca.

6   Mr. Gianasca has not earned this award, as he has not carried any of the burdens of representing the

7   IPP class over the course of this eight-year litigation.  "Incentive awards are payments to class

8   representatives *for their service to the class* in bringing the lawsuit."  *Radcliffe v. Experian*

9   *Information Solutions, Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013) (emphasis added); *Fraley v.*

10  *Batman*, --- Fed. Appx. ---, 2016 WL 145984, at *2 (9th Cir. Jan. 6, 2016) ("there is no evidence that

11  Kazman personally provided any 'service to the class.'" (quoting *Radcliffe*)).

12          In addition to incentive awards for the court-appointed class representatives, IPP Counsel

13  seek $5,000 incentive awards for 15 named plaintiffs, some of whom were deposed and all of whom

14  searched for and produced documents, and worked with their counsel to prepare responses to several

15  sets of interrogatories.  Unlike these 15 named plaintiffs, Mr. Gianasca was deposed only *as an*

16  *objector*.  He was never named on a Consolidated Class Action Complaint and never provided

17  responses to interrogatories or produced documents.  In fact, as explained in Section I. B, *supra*, as a

18  result of Mr. Gianasca's and Mr. Bonsignore's failure to respond to Lead Counsel's repeated

19  requests for even basic information necessary for prosecution of the case, Mr. Gianasca was not

20  named in the Consolidated Amended Complaint.   Lead Counsel never heard from him again until he

21  objected to the settlements.  (*See* Dkt. No. 4370-1, ¶ 37.)  In short, Mr. Gianasca has not made *any*

22  contribution to the recovery obtained for the Class.

23          The Special Master recommended that the Court approve the requested $15,000 incentive

24  awards for the Court-appointed class representatives, and the $5,000 awards for the 15 named

25  plaintiffs. (*See* R&R at 75-76.)  Lead Counsel has received a letter dated February 18, 2016 from

26  Frank Warner, one of the former named plaintiffs for whom IPPs have requested a $5,000 incentive

27  award.  In his letter, Mr. Warner objects to the $5,000 incentive award and asks the Court to award

28  $100,931.25 to each of the 25 class representatives and the 15 named plaintiffs.  Mr. Warner's

1   objection is untimely and Lead Counsel does not believe there is any support for his request.  A copy

2   of Mr. Warner's letter is attached to the Alioto Decl. re: Response as Exhibit E.  The Court should

3   adopt the Special Master's recommendation on incentive awards.

4   **IV.     THE OBJECTIONS TO "EX PARTE COMMUNICATIONS" WITH THE SPECIAL
            MASTER LACK MERIT**

5

6           Objectors Cooper and Scarpulla are also wrong to suggest that any improper *ex parte*

7   communications occurred between Lead Counsel and the Special Master.  (*See* Dkt. No. 4437 at 14-

8   15.)  Each of their examples relates to Lead Counsel's submission of time and expense reports for *in*

9   *camera* review, in accordance with the Order Re Motion to Compel Lead Counsel's Time-And-

10  Expense Reports (Dkt. No. 4211).[41] The Special Master also ordered Lead Counsel to "recommend a

11  process for enabling him to spot check a representative sampling of expense receipts and other

12  backup for claimed expenses."  *Id.*  No one objected to this Order.  Moreover, the Special Master

13  acted well within the scope of his discretion in ordering that time and expense reports be submitted

14  *in camera*.  *See* Order Appointing Special Master (Dkt. No. 4077), ¶ 2 ("The Special Master . . . may

15  review privileged material *in camera*.")[42]  It was permissible for Lead Counsel to communicate *ex*

16  *parte* with the Special Master to the extent necessary to comply with the Order.

17  <u>**CONCLUSION**</u>

18          In sum, the Special Master thoroughly analyzed IPPs' settlement approval motion and fee

19  motion, and properly considered the objections thereto in several rounds of exhaustive briefing and a

20  hearing.  As demonstrated above, the Special Master's recommendations on settlement approval, the

21  Plan of Distribution and the fee motion are well-supported, and the objections to the R&R bring

22  nothing new to the table.  Therefore, the Court should overrule the objections to the Special Master's

23  January 28, 2016 R&R.

24

25

---

26  [41] *Id.* at 4 ("The Special Master will insist on the production of detailed backup for all expenses *for his own review*."); *id.* at 5 ("Lead Counsel shall produce *to the Special Master only* copies of the

27  billing records of all class counsel in whatever format (electronic or hard copy) is most convenient.") (emphasis added).

28  [42] *See also* Dkt. No. 4182 (ordering DPPs to lodge time and expense records with the Court for *in camera* review).

1    Dated:  March 2, 2016

2                                          Respectfully submitted,

3                                           /s/ Mario N. Alioto

4                                          Mario N. Alioto (56433)
                                           malioto@tatp.com
5                                          Joseph M. Patane (72202)
                                           jpatane@tatp.com
6                                          Lauren C. Capurro (241151)
                                           laurenrussell@tatp.com
7                                          TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
                                           2280 Union Street
8                                          San Francisco, CA 94123
                                           Telephone: 415-563-7200
9                                          Facsimile: 415-346-0679

10                                         *Lead Counsel for the Indirect Purchaser Plaintiffs*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO OBJECTIONS TO JAN. 28, 2016 R&R
- Master File No. CV-07-5944-JST

# APPENDIX OF IPP FILINGS IN SUPPORT OF SETTLEMENT APPROVAL AND MOTION FOR ATTORNEYS' FEES

| DOCUMENT | DOCKET OR EXHIBIT NUMBER |
|---|---|
| **IPP FEE MOTION (September 23, 2015)** | |
| 1.  Indirect Purchaser Plaintiffs' Notice of Motion and Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards to Class Representatives | 4071 |
| 2.  Declaration of Mario N. Alioto in Support of Indirect Purchaser Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards | 4071-1 |
| 3.  Declaration of Mario N. Alioto in Support of Indirect Purchaser Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards, Exhibits 1-13 | 4071-2 to 4071-14 |
| 4.  Compendium of Declarations (Index to Exhibits 1-45) | 4073 |
| 5.  Compendium of IPP Counsel Declarations in Support of Motion for Attorneys' Fees, Reimbursement of Expenses and Incentive Awards | 4073-1 to 4073-45 |
| 6.  Declaration of Richard M. Pearl in Support of Indirect Purchaser Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards | 4071-15 |
| 7.  Declaration of Richard M. Pearl in Support of Indirect Purchaser Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards, Exhibits A-L | 4071-16 |
| **IPP FINAL APPROVAL MOTION (November 20, 2015)** | |
| 1.  Indirect Purchaser Plaintiffs' Motion for Final Approval of Settlements with the Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, Technicolor, and Technologies Displays Americas Defendants; Memorandum in Support Thereof | 4370 |
| 2.  Declaration of Mario N. Alioto in Support of Indirect Purchaser Plaintiffs' Motion for Final Approval of Class Action Settlements with the Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, Technicolor, and Technologies Displays Americas Defendants, with Exhibits A-G | 4370-1 (includes exhibits) |
| 3.  Additional Declaration of Robert J. Gralewski, Jr. in Support of Indirect Purchaser Plaintiffs' Motion for Final Approval of Class Action Settlements with Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, Thomson, and TDA Defendants, | 4370-2 (includes exhibits) |

| DOCUMENT | DOCKET OR EXHIBIT NUMBER |
|---|---|
| with Appendices A-O, Exhibit A | |
| 4.   Declaration of Joseph M. Fisher Reporting on Class Notice, with Exhibits A-Y | 4371 (includes exhibits 4371-1 to 4371-25) |
| 5.   Declaration of Joseph M. Fisher Re: Objections to Notice, with Exhibits A-B | 4372 |
| **IPP FEE REPLY (November 20, 2015)** | |
| 1.   Indirect Purchaser Plaintiffs' Reply Re:  Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards to Class Representatives | 4373 |
| 2.   Supplemental Declaration of Mario N. Alioto in Support of Indirect Purchaser Plaintiffs' Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards to Class Representatives, with Exhibits A-B | 4373-1 (includes exhibits) |
| 3.   Supplemental Declaration of Richard M. Pearl in Support of Indirect Purchaser Plaintiffs' Reply Re:  Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards to Class Representatives | 4373-2 |
| 4.   Compendium of Declarations in Support of Indirect Plaintiffs' Reply Re:  Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards with Exhibits A-J | 4373-3 (includes exhibits) |
| **IPP REPLY (December 23, 2015)** | |
| 1.   Indirect Purchaser Plaintiffs' Reply Re:  Final Approval of Settlements with the Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, Technicolor, and Technologies Displays Americas Defendants | 4367 at 19 |
| 2.   Declaration of Mario N. Alioto in Support of Indirect Purchaser Plaintiffs' Reply Re:  Final Approval of Settlements with the Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, Technicolor, and Technologies Displays Americas Defendants, with Exhibits 1-13 | 4369-11 (includes exhibits) Filed Under Seal at Dkt. No. 4362-3 to 4362-5 |
| 3.   Declaration of Joseph M. Fisher Re:  Cooper/Scarpulla Objection, with Exhibit A | 4368 at 1 (includes exhibit) |
| **IPP POST-HEARING SUBMISSIONS** | |
| 1.   January 11, 2016, letter regarding treble damages from Lead Counsel to Special Master Quinn | March 2, 2016 Declaration of Mario N. Alioto in Support of IPP Response to Objections to Jan. 28, 2016 R&R ("Alioto Decl. re: Response"), Ex. B |

INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO OBJECTIONS TO R&R—APPENDIX
Master File No. CV-07-5944-JST

| DOCUMENT | DOCKET OR EXHIBIT NUMBER |
|---|---|
| 2.  January 13, 2016 IPP response on the Chunghwa allocation of funds from Lead Counsel to Special Master Quinn | March 2, 2016 Declaration of Mario N. Alioto in Support of IPP Response to Objections to Jan. 28, 2016 R&R ("Alioto Decl. re: Response"), Ex. C |
| 3.  January 15, 2016 Declaration of Joseph M. Fisher Reporting on Claims Submissions | 4402-1 at 179-182 |
| 4.  February 5, 2016, letter regarding the Chunghwa allocation of funds from Lead Counsel to Special Master Quinn | March 2, 2016 Declaration of Mario N. Alioto in Support of IPP Response to Objections to Jan. 28, 2016 R&R ("Alioto Decl. re: Response"), Ex. D |
| **IPP RESPONSE TO OBJECTIONS TO R&R** | |
| 1.  Indirect Purchaser Plaintiffs' Response to Objections to January 28, 2016 R&R | Filed March 2, 2016 |
| 2.  Declaration of Mario N. Alioto in Support of Indirect Purchaser Plaintiffs' Response to Objections to January 28, 2016 R&R, and Exhibits A-E | Filed March 2, 2016 |
| 3.  Request for Judicial Notice | Filed March 2, 2016 |
| 4.  Declaration of Lauren C. Capurro in support of Indirect Purchaser Plaintiffs' Request for Judicial Notice and Exhibit A | Filed March 2, 2016 |
| 5.  Proposed Order Granting Request for Judicial Notice | Filed March 2, 2016 |