# EXHIBIT B

# Part 1

1

**Robert J. Bonsignore, Esq.**
**BONSIGNORE TRIAL LAWYERS, PLLC**
**3771 Meadowcrest Drive**
**Las Vegas, NV 89121**
**Phone: 781-856-7650**
**Email: rbonsignore@classactions.us**

*Counsel for Indirect Purchaser Plaintiffs*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** | Case No. 3:07-cv-5944<br>MDL No. 1917 |
| | **CLASS ACTION** |
| This Document Relates to:<br><br>All Indirect Purchaser Actions | **DECLARATION OF ROBERT J. BONSIGNORE IN SUPPORT OF REQUEST TO SUBMIT SUPPLEMENTAL EVIDENCE REBUTTING NEW ARGUMENT RAISED BY LEAD COUNSEL ALIOTO DURING HEARING**<br><br>Judge: Hon. Jon S. Tigar<br>Special Master: Martin Quinn, JAMS |

I, Robert J. Bonsignore, declare as follows:

1.      I am an attorney licensed to practice before the courts of New Hampshire and Massachusetts, as well as federal courts throughout the country.  I was a partner in the law firm BONSIGNORE AND BREWER and have personal knowledge of the facts stated in this declaration and, if called as a witness, I could and would testify competently to them.  I make this declaration in support of my firm's Request to Submit Supplemental Evidence Rebutting New Argument Raised by Lead Counsel Alioto During Hearing.

2.      My firm is counsel of record in this case and represents named plaintiff(s) Gloria Comeaux, Jeff Speaect, Rosemary Ciccone, Anthony Gianasca, Jeff Craig, and Mina Ashkannejhad individually and/or as Administrator of the Estate of the Late R. Deryl Edwards, Jr.

3.      Previously, in his Indirect Purchaser Plaintiffs' Reply Re: Final Approval of Settlements with Phillips, Panasonic, Hitachi, Toshiba, Samsung SDI, Technicolor and Technologies Displays Americas Defendants, filed with JAMS on December 23, 2015, Mr. Alioto asserted that the Massachusetts, Missouri and New Hampshire claims (the "Lost Claims") are not part of the settlement agreement "because class representatives did not step forward to press these claims. . . . **That no plaintiff stepped forward is nobody's fault**."

4.      Nevertheless, at the January 5, 2015 hearing, in an about face[1], Mr. Alioto laid the blame for the forfeiture of the Lost Claims squarely at the feet of Mr. Anthony Gianasca[2] and the New Hampshire and Missouri[3] victims and their counsel who submitted documents and requests to be included to Lead Counsel Alioto by claiming they could have done more.[4]

5.      The following exhibits rebut Mr. Alioto's claims of ignorance and baseless blame

---

[1] Mr. Alioto's varied and often contradictory positions, including those offered at hearing, are contained in his filings and the transcript and will not be repeated here.

[2] Mr. Gianasca was Mr. Alioto's client. Mr. Gianasca produced the attached fee agreement after his deposition at the request of Lead Counsel.

[3] As previously submitted, the lawyer for the Missouri plaintiff died in a plane crash shortly after (through the B&B firm) reaching out to Lead Counsel Alioto and providing him with purchase documentation and client information.

[4] At the instruction of the Special Master and the Court I will not repeat the legal arguments that counter this assertion.

1

Declaration of Robert J. Bonsignore in Support of Request to Submit Supplemental Evidence Rebutting New
Argument Raised by Lead Counsel Alioto During Hearing - Case No. 307-cv-5944, MDL No. 1917

1   shifting. They are necessary to create a full and complete record as Lead Counsel Alioto,

2   inadvertently or by design, has procedurally created an inaccurate record that is self-serving and

3   irreparably harms the Excluded Plaintiffs and those similarly situated.

4       6.      As detailed below a bulk of the items submitted to the Special Master at this time to

5   rebut Mr. Alioto's submission at hearing have been in the MDL record since October 2015. Those

6   that are not in the MDL record were not obtained in time to be submitted prior to the deadlines

7   imposed by the Special Master or the Court.  They are however, true and accurate copies of

8   documents that were kept in the ordinary course of business and are necessary to insure full and

9   just consideration of facts and circumstances by the Special Master.

10          **Documents Submitted to the MDL Court in October 2015 Submitted to Rebut**

11                          **Alioto's Statements at Hearing**

12      7.      Exhibit 1 is a copy of MDL Doc. No. 4144, Supplemental Objection To Proposed

13  Class Action Settlement And Award Of Attorneys' Fees, dated Oct. 26, 2015, and the attachments

14  thereto.

15              **Other Documents Submitted to Rebut Alioto's Statements at Hearing**

16      8.      Exhibit 2 is a copy of the Massachusetts Putative Lead Plaintiff Anthony Gianasca

17  Retention directly with Lead Counsel Alioto Agreement dated March 20, 2008.[5] Mr. Gianasca who

18  was a lead Plaintiff in the first filed indirect purchaser complaint in MDL 1917. MDL Dkt #4144-

19  2). It is provided to the Special Master at this time for ease of reference.

20      9.      Exhibit 3 is a copy of pages 21-24, 29-30, 34-35, 37-38, 46-48, 52, 59, 60, 63, and

21  65 of and Attachment 4 to the November 3, 2015 Deposition of Massachusetts Putative Class

22  Representative and Alioto Client Anthony Gianasca.[6] The content directly rebuts Alioto's position

23

24  [5] Mr. Alioto asked at the time for me to "do him a favor" and add his name to that retention
25  agreement, which I did without hesitation. As previously set forth after he became Lead Counsel
    Mr. Alioto cut my firm out. As testified to by Mr. Gianasca at deposition, he communicated
26  directly with Alioto.

    [6] Mr. Alito has not produced a letter to Mr. Gianasca who was a lead Plaintiff in the First Filed IPP
27  Complaint in MDL 1917 advising him his complaint was dismissed.  Mr. Alito has not produced a
    letter or any communication to any Massachusetts counsel asking for assistance in fighting off the
28  motions to dismiss or curing ant perceived defect.

1    at hearing.

2         10.    Exhibit 4 is a copy of a chain of emails between the Bonsignore and Mr. Alioto

3    dated March 1, 2012. The content directly rebuts Alioto's reposition at hearing.

4         11.    Exhibit 5 is a copy of photographs of CRT devices produced thus far by the estate

5    of the Late Deryl Edwards evidencing his purchases.  The estate has advised me that although

6    much has been thrown out, a dusty warehouse can be searched for more purchases.  Although her

7    deposition transcript has not been provided to her, his widow, Mina Ashkannejhad, testified at

8    deposition that Mr. Edwards spoke of the CRT case and made related purchases.  These records

9    were admitted at her deposition. The content directly rebuts Alioto's reposition at hearing.

10        12.    Exhibit 6, (a)-(c) is a copy of an email to Lead Counsel Alioto dated November 9,

11   2015 and photos of a Gianasca TV.

12        13.    Exhibit 7 is a copy of an email to Lead Counsel Alioto dated December 15, 2015.

13        Each of the foregoing documents directly contradict Mr. Alioto's position at the January 5,

14   2016.  Approval of the settlement agreement without consideration of such documents would work

15   a severe injustice to the plaintiffs possessing the Lost Claims and deprive them of the opportunity

16   to respond to his false claims.

17        I declare under penalty of perjury that the foregoing is true and correct.  Executed this 7th

18   day of January 2016, in Las Vegas, Nevada.

19

20                                              */s/ Robert J. Bonsignore*
                                                Robert J. Bonsignore, Esq.
21

22

23

24

25

26

27

28

1

2

3

## <u>CERTIFICATE OF SERVICE</u>

I, Robert J. Bonsignore, hereby certify that on this 7th day of January 2016, I caused the foregoing to be electronically filed with the JAMS Electronic Filing ("JAMS") System, which will send a notice of electronic filing to all parties registered with the JAMS system in the above-captioned matter.  A copy will be forwarded via first class mail, postage prepaid, to those parties not electronically registered.

4

5

6

7

8

9

10                                                                   */s/ Robert J. Bonsignore*
                                                                    Robert J. Bonsignore

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Robert J. Bonsignore in Support of Request to Submit Supplemental Evidence Rebutting New Argument Raised by Lead Counsel Alioto During Hearing - Case No. 307-cv-5944, MDL No. 1917

# EXHIBIT 1

**Robert J. Bonsignore, Esq.**
**BONSIGNORE TRIAL LAWYERS, PLLC**
**3771 Meadowcrest Drive**
**Las Vegas, NV 89121**
**Phone: 781-856-7650**
**Email: rbonsignore@classactions.us**

*Counsel for Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** | Case No. 3:07-cv-5944<br>MDL No. 1917<br><br>**CLASS ACTION**<br><br>**SUPPLEMENTAL OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT AND AWARD OF ATTORNEYS' FEES** |
| This Document Relates to:<br><br>All Indirect Purchaser Actions | Date:　　　　November 13, 2015<br>Time:　　　　10:00 a.m.<br>Courtroom:　One, 17th Floor<br>Judge:　　　Honorable Samuel Conti |

Now come class members and indirect purchasers of Cathode Ray Tube, Anthony Gianasca, Gloria Comeaux, Mina Ashkannejhad individually and/or as Administrator of the Estate of the Late R. Deryl Edwards, Jr., Jeffrey Speaect, Rosemary Ciccone and Jeff Craig, ("Class Members Requesting Amendment to the Proposed Settlement") through their counsel Bonsignore Trial Lawyers, PLLC, and supplement their objection to the proposed Class Action Settlement (#3862 *et seq*) *hereafter refereed to as the* Mario[1] Alioto Settlement Agreement) and Award of Attorneys' Fees.

The Class Members Requesting Amendment to the Proposed Settlement have requested Lead Counsel to:

1.  to work cooperatively curing objectively fatal defects including the arbitrary exclusion of Indirect Purchasers from states that provide them with common law or statutory causes of action allowing for, at a minimum, the right to pursue economic damages from the Defendants in the instant litigation;

2.  not waste the resources of the parties and this Court;

3.  not dissipate the assets of the Class by deposing Class Members who are not represented by Professional Objectors and who have in good faith raised sound and irrefutable legal issues, including arbitrary exclusion from the Damages Settlement Class.[2]

---

[1] In an effort to avoid confusion, and in light of the number of San Francisco Alioto Firms involved in the instant litigation, Class Members Requesting Amendment to the Proposed Settlement have resorted to the use of Mario Alioto's first name.

[2] The proposed Settlement Class is defined as:
NATIONWIDE CLASS:
All persons and or entities who or which indirectly purchased in the United States for their own use and not for resale, CRT Products6 manufactured and/or sold by the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time during the period from March 1, 1995 through November 25, 2007. Specifically excluded from this Class are claims on behalf of Illinois persons (as defined by 740 ILCS 10/4) for purposes of claims under 740 Ill. Comp. Stat § 10/7(2), Oregon natural persons (as defined by ORS 646.705 (2)) for purposes of claims under ORS § 646.775(1), and Washington persons (as defined by RCW 19.86.080) for purposes of claims under RCW 19.86.080 (1). Also specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a

1

SUPPLEMENTAL OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT AND AWARD OF ATTORNEYS' FEES

Case No. 3:07-cv-5944, MDL No. 1917

"The proposed statewide damages classes are defined for purposes of settlement as:[3]

"All persons and or entities in Arizona, California, District of Columbia, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin who or which indirectly purchased for their own use and not for resale, CRT Products manufactured and/or sold by the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time during the period from March 1, 1995 through November 25, 2007.

All persons and entities in Hawaii who or which indirectly purchased for their own use and not for resale CRT Products manufactured and/or sold by the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time from June 25, 2002 through November 25, 2007.

All persons and entities in Nebraska who or which indirectly purchased for their own use and not for resale CRT Products manufactured and/or sold by the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time from July 20, 2002 through November 25, 2007.

All persons and entities in Nevada who or which indirectly purchased for their own use and not for resale CRT Products manufactured and/or sold by

_____

controlling interest; and, any affiliate, legal representative, heir or assign of any Defendant. Also excluded are named coconspirators, any federal, state or local government entities, any judicial officer presiding over this action and the members of

[3] All of the Statewide Damages Classes are the same except that three states, Hawaii, Nebraska and Nevada, have slightly shorter damages periods. This is because the statutes allowing indirect purchasers to bring an antitrust claim for damages in Hawaii, Nebraska and Nevada were enacted after March 1, 1995, the beginning of the alleged Class Period. This Court dismissed claims based on purchases made prior to the enactment of these statutes on the grounds that the state legislatures did not intend the statutes to apply retroactively. In Re: Cathode Ray Tube (CRT) Antitrust Litig., *738 F.Supp.2d 1011, 1025-26 (N.D. Cal. 2010)*.

the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at

any time from February 4, 1999 through November 25, 2007.

Specifically excluded from these Classes are the Defendants; the officers, directors or

employees of any Defendant; any entity in which any Defendant has a controlling

interest; and, any affiliate, legal representative, heir or assign of any Defendant. Also

excluded are named co-conspirators, any federal, state or local government entities, any

judicial officer presiding over this action and the members of his/her immediate family

and judicial staff, and any juror assigned to this action." *See* (#3862 *et seq*).

The Class Members Requesting Amendment to the Proposed Settlement again formally

request that Lead Counsel cooperatively and immediately act to correct the defects in the

Settlement and requesting this Court to compel Lead Counsel to amend the Settlement Agreement

or to so do so, *sua sponte*.

The attachments to this Supplemental Objection are true and accurate copies.

1) It is our understanding that Indirect Purchaser Lead Counsel Mario Alioto has denied he had

   independent knowledge of, or was otherwise provided with notice that, causes of action for

   Indirect Purchasers exist under the common or statutory law of states he arbitrarily, unjustly or

   erroneously excluded from the Damages Class[4] including the following states:

        a.  Missouri

        b.  New Hampshire

        c.  Massachusetts

2. The facts attendant to the instant litigation or and those that were applied to the states

   included in the Damages Settlement Class clearly provide for economic recovery by Indirect

   Purchases in the above referenced and other excluded states.

---

[4] For ease of reading, states that provide economic remedies for antitrust violations to Indirect Purchasers are referred to as Excluded States.

SUPPLEMENTAL OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT AND AWARD OF ATTORNEYS' FEES

Case No. 3:07-cv-5944, MDL No. 1917

3. The Mario Alioto Settlement Agreement arbitrarily, unjustly or erroneously removed or otherwise cut out Indirect Purchaser victims in the Excluded States from their fair share in the economic recovery while at the same time unjustly releasing their right to pursue economic recovery.

4. Despite having defects, including his direct involvement/notice with the Excluded States pointed out; Lead Counsel Alioto flatly refuses to engage in settlement discussions that would efficiently resolve the claims of the Repealer States[5] he excluded from the settlement. See Attachment 1.

5. Attachment 2 is a copy of the related civil action filed by Mario Alioto with the assistance of the undersigned counsel establishing that a Massachusetts consumer was vetted, ready to serve and used in Lead Counsel Alioto's first filed Class Action Complaint. Attachment 2 unequivocally establishes that Lead Counsel Alioto had notice of the obvious – Massachusetts law provides a cause of action for Indirect Consumer Purchasers that includes attorney fees, costs and treble damages.

6. Exhibit 3A Inclusive are true and correct copies of exemplar emails sent to Lead Counsel Alioto providing him with notice and documentation of purchases by a New Hampshire consumer. Lead Counsel Alioto was also repeatedly informed that the undersigned was Lead Counsel of record in the litigation that lead the New Hampshire Supreme Court to declare that Indirect Consumer Purchasers have a state law based cause of action that provides for economic relief. See, Attachment 3B - La Chance v United States Tobacco Co. 2006-564. http://www.courts.state.nh.us/supreme/opinions/2007/lacha125.pdf

7. Attachment 4 inclusive are 2012 emails related to Missouri (resident and counsel) and his vetted client. Atty. R. Deryl Edwards, Jr. Esq. died in a plane crash in 2012.[6]

---

[5] The term "Repealer State" is intended to extended to all states that have provided a cause of action to Indirect Purchasers through common law or statutory action allow indirect purchaser to *See Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).

[6] Rather than working with the Attorney R Deryl Edward's widow who is carrying the Missouri Indirect Purchasers' claim forward in his honor, Mr. Alioto is deposing her at a time that conflicts

8.  In response to these and other communications, Mr. Alioto consistently assured me he would "look into it" and "take the appropriate action". He did not. Rather he inexplicably, unjustly and arbitrarily cut out from the Damages Class Indirect Purchasers who were entitled to pursue state law based claims including but not limited Indirect Purchasers in Missouri, New Hampshire, Massachusetts

9.  He now refuses to budge to correct these fatal defects.

Dated:  October 26, 2015                    Robert J. Bonsignore

                                       /s/ Robert J. Bonsignore
                                       Robert J. Bonsignore (MA No. 547880)
                                       Bonsignore Trial Lawyers, PLLC
                                       3771 Meadowcrest Drive
                                       Las Vegas, NV 89121
                                       Telephone:  (781) 856-7650
                                       rbonsignore@class-actions.us

---

with her childcare. Of note, Missouri was included in the related LCD settlement.

SUPPLEMENTAL OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT AND AWARD OF ATTORNEYS' FEES

Case No. 3:07-cv-5944, MDL No. 1917

**CERTIFICATE OF SERVICE**

I, Robert J. Bonsignore, hereby certify that on this 26th day of October, 2015, I caused the foregoing to be electronically filed with the Clerk of the Court by using the Case Management/Electronic Case Filing (CM/ECF) system, which will send a notice of electronic filing to all parties registered with the CM/ECF system in the above-captioned matter. A copy will be forwarded via first class mail, postage prepaid, to those parties not electronically registered.

/s/ Robert J. Bonsignore
Robert J. Bonsignore

SUPPLEMENTAL OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT AND AWARD OF ATTORNEYS' FEES
Case No. 3:07-cv-5944, MDL No. 1917

# ATTACHMENT 1



Robert Bonsignore <rbonsignore@class-actions.us>

## CRT SETTLEMENT WEBSITE

**Mario Alioto** <MAlioto@tatp.com>                                     Fri, Oct 9, 2015 at 3:00 PM
To: rbonsignore@class-actions.us

Got your message.  No need to talk further at this point.  But I will be back to you when we get to the fee
allocation stage.

Mario N. Alioto

TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP

2280 Union Street

San Francisco, CA 94123

Telephone:415 447-1650

Facsimile:415 346-0679

This message is sent by a law firm and may contain information that is privileged or confidential. If you
received this transmission in error, please notify the sender by e-mail and delete the message and any
attachments.

---

**From:** rbonsignore@class-actions.us [mailto:rbonsignore@class-actions.us]
**Sent:** Thursday, October 8, 2015 2:35 PM
**To:** Mario Alioto
**Subject:** Re: CRT SETTLEMENT WEBSITE

I have left you two messages??

Sent from my iPhone

## Robert J. Bonsignore

Bonsignore Trial Lawyers, PLLC

# ATTACHMENT 2

1  MARIO N. ALIOTO, ESQ. (56433)
   LAUREN C. RUSSELL, ESQ. (241151)
2  TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
   2280 Union Street
3  San Francisco, CA 94123
   Telephone: (415) 563-7200
4  Facsimile: (415) 346-0679
   E-mail: malioto@tatp.com
5  laurenrussell@tatp.com
6
7  JOSEPH M. PATANE, ESQ. (72202)
   LAW OFFICE OF JOSEPH M. PATANE
8  2280 Union Street
   San Francisco, CA 94123
9  Telephone: (415) 563-7200
   Facsimile: (415) 346-0679
10 E-mail: jpatane@tatp.com

11 Attorneys for Plaintiffs
12 [Additional Attorneys Appear On Signature Page]

13              **UNITED STATES DISTRICT COURT**

14            **NORTHERN DISTRICT OF CALIFORNIA**

15 BRIGID TERRY; ANTHONY GIANASCA; BRIGHID      ) Case No.
   FLAHERTY; and, BRIDGET TEN EYCK, on behalf of )  CV 08  1559
16 themselves and all others similarly situated,  )
17                                                 ) **CLASS ACTION COMPLAINT**
                Plaintiffs,                        )
18 vs.                                             )
                                                   )
19 LG ELECTRONICS, INC.; SAMSUNG                   ) **JURY TRIAL DEMANDED**
   ELECTRONICS CO., LTD.; SAMSUNG SDI CO.,         )
20 LTD.; SAMSUNG ELECTRONICS AMERICA, INC.;        )
21 SAMSUNG SDI AMERICA, INC.; SAMTEL               )
   COLOR, LTD.; TOSHIBA CORPORATION;               )
22 TOSHIBA AMERICA ELECTRONIC                      )
   COMPONENTS, INC.; TOSHIBA AMERICA               )
23 INFORMATION SYSTEMS, INC.; MATSUSHITA           )
   TOSHIBA PICTURE DISPLAY CO., LTD.; MT           )
24 PICTURE DISPLAY CORPORATION OF AMERICA          )
25 (NEW YORK); MT PICTURE DISPLAY                  )
   CORPORATION OF AMERICA (OHIO);                  )
26 MATSUSHITA ELECTRIC INDUSTRIAL CO.,             )
   LTD.; PANASONIC CORPORATION OF NORTH            )
27 AMERICA; BEIJING-MATSUSHITA COLOR CRT           )
   COMPANY, LTD.; ORION ELECTRIC CO., LTD.;        )
28

                              **1**
                  **CLASS ACTION COMPLAINT**

1  ORION AMERICA, INC.; HITACHI LTD.; HITACHI )
   AMERICA LTD.; HITACHI ASIA, LTD.;                )
2  CHUNGHWA PICTURE TUBES LTD.;                      )
   CHUNGHWA PICTURE TUBES (MALAYSIA)                 )
3  SDN. BHD.; LP DISPLAYS INTERNATIONAL,             )
   LTD.; KONINKLIJKE PHILIPS ELECTRONICS             )
4  N.V.; PHILIPS ELECTRONICS NORTH AMERICA;          )
   IRICO GROUP CORP.; IRICO DISPLAY DEVICES          )
5  CO., LTD.; THAI CRT COMPANY, LTD.; and            )
   TATUNG COMPANY OF AMERICA, INC.,                  )
6                                                    )
7            Defendants                              )
                                          _____)
8

9                    **CLASS ACTION COMPLAINT**

10         Plaintiffs Brigid Terry, Anthony Gianasca, Brighid Flaherty, and Bridget Ten Eyck

11  ("Plaintiffs") on behalf of themselves and all others similarly situated in the United States, bring

12  this action for damages and injunctive relief under state and federal antitrust, unfair competition,

13  and consumer protection laws against the Defendants named herein, demanding trial by jury,

14  and complaining and alleging as follows:

15                      **NATURE OF THE CASE**

16         1.      This lawsuit is brought as a class action on behalf of individuals and entities that

17  indirectly purchased products containing cathode ray tubes ("CRT Products") (as further defined

18  below), in the United States from Defendants, their predecessors, or their controlled subsidiaries

19  and affiliates during the period beginning at least January 1, 1995 through the present (the

20  "Class Period"). Plaintiffs allege that during the Class Period the Defendants conspired to fix,

21  raise, maintain or stabilize prices of CRT Products sold in the United States. Because of

22  Defendants' unlawful conduct, Plaintiffs and other Class Members paid artificially inflated

23  prices for CRT Products and have suffered antitrust injury to their business or property.

24                      **JURISDICTION AND VENUE**

25         2.      This action is instituted under Section 16 of the Clayton Act, 15 U.S.C. §26, to

26  obtain injunctive relief for violations of Section 1 of the Sherman Act, 15 U.S.C. §1, to recover

27  damages under state antitrust and consumer protection laws, and to recover costs of suit,

28

1 | including reasonable attorneys' fees, for the injuries that Plaintiffs and all others similarly
2 | situated sustained as a result of the Defendants' violations of those laws.

3 |      3.     The Court has subject matter jurisdiction over the federal claim under 28 U.S.C.
4 | §§ 1331 and 1337. The Court has subject matter jurisdiction over the state law claims under 28
5 | U.S.C. § 1367 because those claims are so related to the federal claim that they form part of the
6 | same case or controversy.

7 |      4.     This court also has subject matter jurisdiction over this class action pursuant to
8 | the Class Action Fairness Act of 2005, which amended 28 U.S.C. § 1332 to add a new
9 | subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of
10 | a class of Plaintiffs is a citizen of a state different from any Defendant and the aggregated
11 | amount in controversy exceeds $5,000,000, exclusive of interest and costs." This Court also has
12 | jurisdiction under 28 U.S.C. § 1332(d) because "one or more members of the class is a citizen of
13 | a state within the United States and one or more of the Defendants is a citizen or subject of a
14 | foreign state."

15 |      5.     Venue is laid in this District pursuant to 28 U.S.C. § 1391. Venue is proper in
16 | this judicial district because during the Class Period one or more of the Defendants resided,
17 | transacted business, was found, or had agents in, this district, and because a substantial part of
18 | the events giving rise to Plaintiffs' claims occurred in this district, and a substantial portion of
19 | the affected portion of the interstate trade and commerce described below has been carried out in
20 | this district.

21 | **DEFINITIONS**

22 |      6.     As used herein, the term "CRT Products" means cathode ray tubes and products
23 | containing cathode ray tubes, including television sets and computer monitors.

24 |      7.     The "Class Period" or "relevant period" means the period beginning at least
25 | January 1, 1995 through the present.

26 |      8.     "Person" means any individual, partnership, corporation, association, or other
27 | business or legal entity.

28 |

9. The "Indirect Purchaser States" are Arizona, California, District of Columbia, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

10. The "Consumer Fraud States" are Arkansas, California, District of Columbia, Florida, Hawaii, Kansas, Maine, Massachusetts, Nebraska, New York, New Hampshire, New Mexico, North Carolina, Rhode Island, and Vermont.

## PLAINTIFF

11. Plaintiff Brigid Terry ("Terry") is a Wisconsin resident. During the relevant period, Terry indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

12. Plaintiff Anthony Gianasca ("Gianasca") is a Massachusetts resident. During the relevant period, Gianasca indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

13. Plaintiff Brighid Flaherty ("Flaherty") is an Arizona resident. During the relevant period, Flaherty indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

14. Plaintiff Bridget Ten Eyck ("Ten Eyck") is a Mississippi resident. During the relevant period, Ten Eyck indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

## DEFENDANTS

15. Defendant LG Electronics, Inc. ("LG Electronics") is a corporation organized under the laws of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeoungdeungpo-gu, Seoul 150-721, South Korea. LG Electronics is a $48.5

4
CLASS ACTION COMPLAINT

1    billion global force in consumer electronics, home appliances and mobile communications,

2    which established its first overseas branch office in New York in 1968. The company's name

3    was changed from GoldStar Communications to LG Electronics in 1995, the year in which it

4    also acquired Zenith in the United States. During the Class Period, LG Electronics

5    manufactured, sold and distributed CRT Products to customers throughout the United States.

6          16.    Defendant Samsung Electronics Co., Ltd. is a company organized under the laws

7    of Korea with its principal place of business located at Samsung Main Building, 250, 2-ga,

8    Taepyong-ro, Jung-gu, Seoul 100-742, South Korea. During the Class Period, Samsung

9    Electronics Co., Ltd. manufactured, sold and distributed CRT Products to customers throughout

10   the United States.

11         17.    Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Co., Ltd. is a

12   company organized under the laws of Korea with its principal place of business located at 15th –

13   18th Floor, Samsung Life Insurance Building, 150, 2-ga, Taepyong-ro, Jung-gu, Seoul, 100-716,

14   South Korea. Samsung SDI Co., Ltd. is a public company. Samsung Electronics Co., Ltd. is its

15   majority shareholder holding almost 20 percent of the stock. Founded in 1970, Samsung SDI

16   Co., Ltd. claims to be the world's leading company in the display and energy businesses, with

17   28,000 employees and facilities in 18 countries. Samsung SDI Co., Ltd. has offices in Chicago

18   and San Diego. During the Class Period, Samsung SDI Co. Ltd. manufactured, sold and

19   distributed CRT Products to customers throughout the United States.

20         18.    Defendant Samsung Electronics America, Inc. is a New York corporation with its

21   principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New

22   Jersey 07660. Samsung Electronics America, Inc. is a wholly-owned and controlled subsidiary

23   of defendant Samsung Electronics Co., Ltd. During the Class Period, Samsung Electronics

24   America, Inc. manufactured, sold and distributed CRT Products to customers throughout the

25   United States.

26         19.    Defendant Samsung SDI America, Inc. is a California corporation with its

27   principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California.

28   Samsung SDI America, Inc. is a wholly owned and controlled subsidiary of Samsung SDI Co.,

**5**
**CLASS ACTION COMPLAINT**

1  Ltd., which is in turn a wholly owned and controlled subsidiary of Samsung Electronics Co.,

2  Ltd. During the Class Period, Samsung SDI America, Inc. manufactured, sold and distributed

3  CRT Products to customers throughout the United States.

4       20.     Defendants Samsung Electronics Co., Ltd., Samsung SDI Co., Ltd., Samsung

5  Electronics America, Inc., and Samsung SDI America, Inc. are referred to collectively herein as

6  "Samsung."

7       21.     Defendant Samtel Color, Ltd. ("Samtel") is an Indian company with its principal

8  place of business located at 52, Community Centre, New Friends Colony, New Delhi-110065.

9  Samtel's market share for CRT products sold in India is approximately 40%. Samtel is India's

10  largest exporter of CRT products. Samtel has gained safety approvals from the United States,

11  Canada, Germany and Great Britain for its CRT products. During the Class Period, Samtel

12  manufactured, sold and distributed CRT Products to customers throughout the United States.

13       22.     Defendant Toshiba Corporation ("Toshiba") is a business entity organized under

14  the laws of Japan, with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku,

15  Tokyo 105-8001, Japan. In 2001, Toshiba held a 5-10 percent worldwide market share for CRTs

16  used in televisions and computer monitors. In 2002, Toshiba entered into a joint venture with

17  defendant Matsushita Electric called Matsushita Toshiba Picture Display Co., Ltd. in which the

18  entities consolidated their CRT businesses. In 2004, Toshiba entered into a contract with

19  defendant Orion whereby Orion became the supplier and maker of Toshiba-branded CRT

20  televisions. During the Class Period, Toshiba manufactured, sold and distributed CRT Products

21  to customers throughout the United States.

22       23.     Toshiba America Electronics Components, Inc. is a California corporation with

23  its principal place of business located at 9775 Toledo Way, Irvine, California 92618, and 19000

24  MacArthur Boulevard, Suite 400, Irvine, California 92612. Toshiba America Electronics

25  Components, Inc. is a wholly owned and controlled subsidiary of Toshiba America, Inc., which

26  is a holding company for Defendant Toshiba Corporation, and the sales and marketing

27  representative for Defendant Matsushita Toshiba Picture Display Co., Ltd. During the Class

28

**6**
**CLASS ACTION COMPLAINT**

1 | Period, Toshiba Electronics Components, Inc. manufactured, sold and distributed CRT Products

2 | to customers throughout the United States.

3 |     24.    Defendant Toshiba America Information Systems, Inc. is a California corporation

4 | with its principal place of business located at 9470 Irvine Boulevard, Irvine, California 92718.

5 | Toshiba America Information Systems, Inc. is a wholly owned and controlled subsidiary of

6 | Toshiba America, Inc., a holding company for Defendant Toshiba Corporation. During the Class

7 | Period, Toshiba America Information Systems, Inc. manufactured, sold and distributed CRT

8 | Products to customers throughout the United States.

9 |     25.    Defendants Toshiba Corporation, Toshiba America Electronics Components, Inc.

10 | and Toshiba America Information Systems, Inc. are referred to collectively herein as "Toshiba."

11 |     26.    Defendant Matsushita Toshiba Picture Display Co., Ltd. ("Matsushita-Toshiba")

12 | was established as a CRT joint venture between Defendants Matsushita and Toshiba.

13 | Matsushita-Toshiba is a Japanese entity with its principal place of business located at 1-1,

14 | Saiwai-cho, Takatsuki-shi, Osaka 569-1193, Japan. On April 3, 2007, Defendant Matsushita

15 | Electric purchased the remaining stake in Matsushita-Toshiba, making it a wholly owned

16 | subsidiary, and renaming it MT Picture Display Co., Ltd. During the Class Period, Matsushita-

17 | Toshiba manufactured, sold and distributed CRT Products to customers throughout the United

18 | States.

19 |     27.    Defendant MT Picture Display Corporation of America (New York)

20 | ("MTPDA(NY)") is a dissolved Maryland corporation previously located at 100 Westinghouse

21 | Circle, Horseheads, New York 14845. MTDPA(NY) was a wholly owned and controlled

22 | subsidiary of Defendant Matsushita-Toshiba. MTDPA(NY) specialized in the manufacture of

23 | CRT televisions above 30 inches wide, supplying some 950,000 units annually to the North

24 | American market. Matsushita and Toshiba announced plans to discontinue operations on

25 | December 29, 2005. During the Class Period prior to December 2005, MTDPA(NY)

26 | manufactured, sold and distributed CRT Products to customers throughout the United States.

27 |     28.    Defendant MT Picture Display Corporation of America (Ohio) ("MTDPA(OH)")

28 | was a Delaware corporation with its principal place of business located at 1554 McKaig

**7**

**CLASS ACTION COMPLAINT**

1   Avenue, Building A, Troy, Ohio 45373. MTDPA(OH) was dissolved on March 27, 2007.

2   MTDPA(OH) was a wholly owned and controlled subsidiary of Defendant Matsushita-Toshiba.

3   During the Class Period prior to February 2006, MTDPA(OH) manufactured, sold and

4   distributed CRT Products to customers throughout the United States.

5         29.     Defendant Matsushita Electric Industrial Co., Ltd. ("Matsushita Electric") is a

6   Japanese entity with its principal place of business located at 1006 Oaza Kadoma, Kadoma-shi,

7   Osaka 571-8501, Japan. In 2002, Matsushita Electric entered into a CRT joint venture with

8   Defendant Toshiba forming Defendant Matsushita-Toshiba. Matsushita Electric was the

9   majority owner with 64.5 percent. On April 3, 2007, Matsushita Electric purchased the

10   remaining 35.5 percent stake in the joint venture, making Matsushita-Toshiba a wholly owned

11   subsidiary of Matsushita Electric. Matsushita Electric is best known for its Panasonic brand,

12   which in 2005 had the highest CRT revenue in Japan. During the Class Period, Matsushita

13   Electric manufactured, sold and distributed CRT Products to customers throughout the United

14   States.

15         30.     Defendant Panasonic Corporation of North America ("Panasonic") is a Delaware

16   corporation with its principal place of business located at One Panasonic Way, Secaucus, New

17   Jersey. Panasonic is a wholly owned and controlled subsidiary of Defendant Matsushita Electric.

18   During the Class Period, Panasonic manufactured, sold and distributed CRT Products to

19   customers throughout the United States.

20         31.     Defendant Beijing-Matsushita Color CRT Company, Ltd. ("BMCC") is a

21   Chinese company with its principal place of business located at No. 9, Jiuxianqiao N. Rd.,

22   Dashanzi Chaoyang District, Beijing, China. BMCC is the second largest producer of CRTs for

23   televisions in China. During the Class Period, BMCC manufactured, sold and distributed CRT

24   Products throughout the United States.

25         32.     Defendant Orion Electric Co., Ltd. ("Orion Electric") is a Japanese company

26   with its principal places of business at 41-1 Iehisa-cho, Echizen-shi, Fukui 915-8555, Japan.

27   Orion Electric currently manufactures CRT Products for Defendant Toshiba Corporation.

28

1    During the Class Period, Orion Electric manufactured, sold and distributed CRT Products to

2    customers throughout the United States.

3        33.    Defendant Orion America, Inc. ("Orion America") is an Indiana corporation with

4    its principal place of business located at Hwy 1 North, Orion Place, Princeton, Indiana. Orion

5    America is a wholly owned and controlled subsidiary of Defendant Orion Electric. During the

6    Class Period, Orion America manufactured, sold and distributed CRT Products to customers

7    throughout the United States.

8        34.    Defendant Hitachi, Ltd. is a business entity organized under the laws of Japan,

9    with its principal place of business located at 6-1 Marunouchi Center Building 13F, Chiyoda-ku,

10   Tokyo 100-8280, Japan. Hitachi Ltd. is the parent company for the Hitachi brand of CRT

11   products. During the Class Period, Hitachi Ltd. manufactured, sold and distributed CRT

12   Products to customers throughout the United States.

13       35.    Defendant Hitachi America, Ltd. ("Hitachi America") is a wholly owned and

14   controlled subsidiary of defendant Hitachi. Hitachi America is a business entity organized under

15   the laws of New York, with its principal place of business located at 2000 Sierra Point Parkway,

16   Brisbane, California 94005. During the Class Period, Hitachi America manufactured, sold and

17   distributed CRT Products to customers throughout the United States.

18       36.    Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its

19   principal place of business located at 16 Collyer Quay, #20-00 Hitachi Tower, Singapore,

20   049318. Hitachi Asia is a wholly owned and controlled subsidiary of defendant Hitachi. During

21   the Class Period, Hitachi Asia manufactured, sold and distributed CRT Products to customers

22   throughout the United States.

23       37.    Defendants Hitachi Ltd., Hitachi America, and Hitachi Asia are collectively

24   referred to herein as "Hitachi."

25       38.    Defendant Chunghwa Picture Tubes Ltd. ("Chunghwa Picture Tubes") is a

26   business entity organized under the laws of Taiwan, with its principal place of business located

27   at 1127 Heping Road, Bade City, Taoyuan, Taiwan R.O.C. Chunghwa Picture Tubes is a

28

**9**
**CLASS ACTION COMPLAINT**

1  leading manufacturer of CRT Products. During the Class Period, Chunghwa Picture Tubes

2  manufactured, sold and distributed CRT Products to customers throughout the United States.

3       39.    Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chungwha

4  Malaysia") is a Malaysian company with its principal place of business located at Lot 1, Subang

5  Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.

6  Chunghwa Malaysia a wholly owned and controlled subsidiary of defendant Chungwha Picture

7  Tubes. Chungwha Malaysia is also a leading worldwide supplier of CRT Products. During the

8  Class Period, Chungwha Malaysia manufactured, sold and distributed CRT Products to

9  customers throughout the United States.

10       40.    Defendants Chungwha Picture Tubes and Chungwha Malaysia are collectively

11  referred to herein as "Chungwha."

12       41.    Defendant LP Displays International, Ltd. f/k/a LG Philips Displays ("LP

13  Displays") was created in 2001 as a 50/50 joint venture between defendants LG Electronics and

14  Royal Philips Electronics of The Netherlands. In March 2007, LP Displays became an

15  independent company organized under the laws of Hong Kong with its principal place of

16  business located at Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road

17  Central, Sheung Wan, Hong Kong. LP Displays is a leading supplier of color picture tubes for

18  use in television sets and computer monitors with annual sales for 2006 of over $2 billion. LP

19  Displays announced in March 2007 that Royal Philips and LG Electronics would lose control

20  over the company and the shares would be owned by financial institutions and private equity

21  firms. During the Class Period, LP Displays manufactured, sold and distributed CRT Products to

22  customers throughout the United States.

23       42.    Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics

24  N.V. ("Royal Philips") is a company organized under the laws of The Netherlands with its

25  principal place of business located at Amstelplein 2, Breitner Center, 1070 MX Amsterdam, The

26  Netherlands. Royal Philips, founded in 1891, is one of the world's largest electronics

27  companies, with 160,900 employees located in over 60 countries. Royal Philips had sole

28  ownership of its CRT business until 2000. In 2001, Royal Philips transferred its CRT business

**10**
**CLASS ACTION COMPLAINT**

1 | to a 50/50 CRT joint venture with LG Electronics forming defendant LP Displays. In December
2 | 2005, as a result of increased pressure on demand and prices for CRTs, Royal Philips wrote off
3 | the remaining book value of 126 million Euros of its investment and said it would not inject
4 | further capital into the joint venture. During the Class Period, Royal Philips manufactured, sold
5 | and distributed CRT Products to customers throughout the United States.

6 |      43.     Defendant Philips Electronics North America Corporation ("Philips Electronics
7 | NA") is a Delaware corporation with its principal palce of business located at 1251 Avenue of
8 | the Americas, New York, NY 10020-1104. Philips Electronics NA is a wholly owned and
9 | controlled subsidiary of defendant Royal Philips. During the Class Period, Philips Electronics
10 | NA manufactured, sold and distributed CRT Products to customers throughout the United
11 | States.

12 |      44.     Defendant Irico Group Corporation is a Chinese entity with its principal place of
13 | business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. Irico Group
14 | Corporation is the parent company for multiple subsidiaries engaged in the manufacture,
15 | distribution, and sale of CRT Products. During the Class Period, Irico Group Corporation
16 | manufactured, sold and distributed CRT Products throughout the United States.

17 |      45.     Irico Display Devices Co., Ltd. is a Chinese entity with its principal place of
18 | business located at No. 16, Fenghui South Road West, District High-tech Development Zone,
19 | Xi'an, SXI 710075. Irico Display Devices Co., Ltd. is a partially-owned subsidiary of defendant
20 | Irico Group Corporation. In 2006, Irico Display Devices Co., Ltd. was China's top CRT maker.
21 | During the Class Period, Irico Display Devices Co., Ltd. manufactured, sold and distributed
22 | CRT Products throughout the United States.

23 |      46.     Defendants Irico Group Corporation and Irico Display Devices Co., Ltd. are
24 | collectively referred to herein as "Irico."

25 |      47.     Defendant Thai CRT Company, Ltd. ("Thai CRT") is a Thai company with its
26 | principal place of business located at 1/F Siam Cement Road, Bangsue Dusit, Bangkok,
27 | Thailand. Thai CRT is a subsidiary of Siam Cement Group. It was established in 1986 as

28

1  Thailand's first manufacturer of CRTs for color televisions. During the Class Period, Thai CRT

2  manufactured, sold and distributed CRT Products throughout the United States.

3        48.     Defendant Tatung Company of America, Inc. ("Tatung America") is a California

4  corporation with its principal place of business located at 2850 El Presidio Street, Long Beach,

5  California. Tatung America was founded in 1972 and is a wholly owned and controlled

6  subsidiary of Tatung Company of Taiwan. During the Class Period, Tatung America

7  manufactured, sold and distributed CRT Products throughout the United States.

8  <div align="center">**DEFENDANTS AND CO-CONSPIRATORS**</div>

9        49.     Various other persons, firms and corporations, not named as Defendants herein,

10  and presently unknown to Plaintiffs, have participated as co-conspirators with Defendants and

11  have performed acts and made statements in furtherance of the conspiracy and/or in furtherance

12  of the anticompetitive, unfair or deceptive conduct.

13        50.     Whenever in this Complaint reference is made to any act, deed or transaction of

14  any corporation, the allegation means that the corporation engaged in the act, deed or transaction

15  by or through its officers, directors, agents, employees or representatives while they were

16  actively engaged in the management, direction, control or transaction of the corporation's

17  business or affairs.

18        51.     Each of the Defendants named herein acted as the agent or joint venturer of or for

19  the other Defendants with respect to the acts, violations and common course of conduct alleged

20  herein. Each Defendant which is a subsidiary of a foreign parent acts as the sole United States

21  agent for CRT Products made by its parent company.

22  <div align="center">**INTERSTATE TRADE AND COMMERCE**</div>

23        52.     Throughout the Class Period, there was a continuous and uninterrupted flow of

24  CRT Product sales in interstate and international commerce throughout the United States.

25        53.     Defendants' unlawful activities, as described herein, took place within the flow

26  of interstate commerce to CRT Product purchasers located in states other than the states in

27  which Defendants are located, as well as throughout the world, and had a direct, substantial and

28

<div align="center">**12**
**CLASS ACTION COMPLAINT**</div>

1  reasonably foreseeable effect upon interstate and international commerce, including the United

2  States CRT Products market.

3  <div align="center">**CLASS ACTION ALLEGATIONS**</div>

4      54.    Plaintiffs bring this action on behalf of themselves and as a class action pursuant

5  to the provisions of Rule 23 of the Federal Rules of Civil Procedure on behalf of all members of

6  the following class (the "Nationwide Class"):

7      All persons and or entities residing in the United States who or which indirectly
purchased CRT Products in the United States for their own use and not for resale,
8  at any time during the period from January 1, 1995 through the present.
Specifically excluded from this Class are the Defendants; the officers, directors
9  or employees of any Defendant; any entity in which any Defendant has a
controlling interest; and, any affiliate, legal representative, heir or assign of any
10  Defendant. Also excluded are any federal, state or local government entities, any
judicial officer presiding over this action and the members of his/her immediate
11  family and judicial staff, and any juror assigned to this action.

12

13      55.    Plaintiffs also bring this action on behalf of themselves and as a class action

14  pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure and/or respective

15  state statute(s), on behalf of all members of the following State classes or subclasses

16  (collectively "Indirect Purchaser State Classes"): Arizona, Arkansas, California, District of

17  Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota,

18  Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina,

19  North Dakota, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia, and

20  Wisconsin.

21      56.    This action has been brought and may properly be maintained as a class action

22  pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

23      a.    The Classes are ascertainable and there is a well-defined community of

24  interest among members of the Classes;

25      b.    Based upon the nature of trade and commerce involved and the number of

26  indirect purchasers of CRT Products, Plaintiffs believe that the number of Class members is

27  very large, and therefore joinder of all Class members is not practicable;

28

<div align="center">**13**
**CLASS ACTION COMPLAINT**</div>

c.  Plaintiffs' claims are typical of Class members' claims because Plaintiffs indirectly purchased CRT Products manufactured by Defendants or their co-conspirators, and therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the claims of Class members and the relief sought is common to the Classes;

d.  The following common questions of law or fact, among others, exist as to the members of the Classes:

i.  Whether Defendants formed and operated a combination or conspiracy to fix, raise, maintain, or stabilize the prices of CRT Products;

ii.  Whether the combination or conspiracy caused CRT Products prices to be higher than they would have been in the absence of Defendants' conduct;

iii.  The operative time period of Defendants' combination or conspiracy;

iv.  Whether Defendants' conduct caused injury to the business or property of Plaintiffs and the members of the Classes;

v.  The appropriate measure of the amount of damages suffered by the Classes;

vi.  Whether Defendants' conduct violates Section 1 of the Sherman Act (15 U.S.C. § 1) as alleged in the First Claim for Relief;

vii.  Whether Defendants' conduct violates the Indirect Purchaser States' antitrust laws as alleged in the Second Claim for Relief;

viii.  Whether Defendants' conduct violates the unfair competition and consumer protection laws of the Consumer Protection States as alleged in the Third Claim for Relief;

ix.  The appropriate nature of class-wide equitable relief.

**14**
CLASS ACTION COMPLAINT

1          e.      These and other questions of law and fact common to the members of the

2 Classes predominate over any questions affecting only individual members, including legal and

3 factual issues relating to liability and damages;

4          f.      After determination of the predominant common issues identified above,

5 if necessary or appropriate, the Classes can be divided into logical and manageable subclasses;

6          g.      Plaintiffs will fairly and adequately protect the interests of the Classes in

7 that Plaintiffs have no interests that are antagonistic to other members of the Classes and have

8 retained counsel competent and experienced in the prosecution of class actions and antitrust

9 litigation to represent them and the Classes;

10          h.      A class action is superior to other available methods for the fair and

11 efficient adjudication of this litigation since individual joinder of all damaged Class members is

12 impractical. The damages suffered by the individual Class members are relatively small, given

13 the expense and burden of individual prosecution of the claims asserted in this litigation. Thus,

14 absent the availability of class action procedures it would not be feasible for Class members to

15 redress the wrongs done to them. Even if the Class members could afford individual litigation,

16 the court system could not. Further, individual litigation presents the potential for inconsistent or

17 contradictory judgments and would greatly magnify the delay and expense to all parties and the

18 court system. Therefore, the class action device presents far fewer case management difficulties

19 and will provide the benefits of unitary adjudication, economy of scale and comprehensive

20 supervision in a single court;

21          i.      Defendants have acted, and/or refused to act, on grounds generally

22 applicable to the Classes, thereby making appropriate final injunctive relief with respect to the

23 Classes as a whole; and

24          j.      In the absence of a class action, Defendants would be unjustly enriched

25 because they would be able to retain the benefits and fruits of its wrongful conduct.

26 <center>**CRT PRODUCT MARKET**</center>

27    57.    CRT stands for "cathode ray tube." A CRT is a vacuum tube that is coated on its

28 inside face with light sensitive phosphors. An electron gun at the back of the vacuum tube emits

<center>**15**
**CLASS ACTION COMPLAINT**</center>

1   electron beams. When the electron beams strike the phosphors, the phosphors produce either

2   red, green, or blue light. A system of magnetic fields inside the CRT, as well as varying

3   voltages, directs the beams to produce the desired colors. This process is rapidly repeated

4   several times per second to produce the desired images.

5       58.    CRT technology was first developed more than a century ago. The first

6   commercially practical CRT television was made in 1931. However, it was not until the RCA

7   Corporation introduced the product at the 1939 World's Fair that it became widely available to

8   consumers. Since then, CRTs have become the heart of most display products, including

9   televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs. Even

10   large public displays, including many scoreboards at sports arenas, are comprised of thousands

11   of single color CRTs.

12       59.    Until the last few years, CRTs were the dominant technology used in displays,

13   including television and computer monitors. During the Class Period, this translated into the sale

14   of millions of CRT Products, generating billions of dollars in annual profits.

15       60.    Conventional CRT televisions are being rapidly replaced by liquid crystal and

16   plasma displays, resulting in this alleged price fixing scheme to slow down the declining CRT

17   Product prices. Between 2000 and 2006, revenues from the sale of CRT televisions in the United

18   States declined by 50.7 percent and are predicted to decline by an additional 84.5 percent

19   between 2006 and 2010.

20       61.    Although demand has been sharply declining as a result of the popularity of flat-

21   panel LCDs and plasma televisions, CRT televisions were still being sold during the Class

22   Period, making collusion and the international price fixing conspiracy worthwhile. Due to the

23   high costs of LCD panels and plasma displays during the Class Period, a niche market for CRTs

24   existed as a cheaper alternative to these new technologies.

25       **STRUCTURAL CHARACTERISTICS OF THE CRT PRODUCT MARKET**

26       62.    The structural characteristics of the CRT Product market are conducive to the

27   type of collusive activity alleged in this Complaint.

28

**16**
**CLASS ACTION COMPLAINT**

63.     CRT Products are commodity-like products which are manufactured in standardized sizes. One defendant's CRT Product for a particular application, such as a particular size television set or computer monitor, is substitutable for another's. Defendants sell and Plaintiff (and Class members) purchases CRT Products primarily on the basis of price.

64.     It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

65.     Demand for CRT Products is declining. Static or declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

66.     Defendants are horizontal competitors, meaning that they sell at the same wholesale or retail level of the distribution chain. This makes it easier to monitor adherence to the cartel.

67.     There are substantial barriers to entry in the CRT Products industry. It would require substantial time, resources and industry knowledge to even potentially overcome the barriers to entry. It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRT products.

68.     Newer industries are typically characterized by rapid growth, innovation and high profits. The CRT Product market is a mature one, and like many mature industries, is characterized by slim profit margins, creating a motivation to collude.

69.     During the Class Period, the CRT industry has been dominated by relatively few companies. In 2004, Defendants Samsung SDI, LP Displays, MT Picture Display and Chunghwa Picture Tubes together held a collective 78% share of the global CRT market. The high concentration of market share facilitates coordination since there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel members.

70.     The CRT industry also had significant consolidation during the Class Period, including but not limited to: (a) the creation of LG Philips Displays in 2001 as a joint venture

17
**CLASS ACTION COMPLAINT**

1 | between Royal Philips and LG Electronic's CRT business; (b) the 2002 merger of Toshiba and
2 | Matsushita into Matsushita-Toshiba; and (c) Orion's agreement to manufacture CRT Products
3 | for Toshiba, which effectively took Toshiba's capacity out of the market.

4 |       71.     Involvement in long standing joint ventures, both in the CRT market and closely
5 | related markets, also gave these "competitors" continuous opportunities to discuss pricing,
6 | capacity utilization, and other important prospective market information. The mutually
7 | beneficial nature of the business relations between certain Defendants not only provided the
8 | opportunity to conspire; it also created a financial incentive to do so.

9 |       72.     Examples of the high degree of cooperation among Defendants in both the CRT
10 | market and other closely related markets include the following:

11 |       a.     Defendant Chungwha has a long standing joint venture with Defendant
12 | Samsung Electronics Co., Ltd. for the production of liquid crystal display panels. Chungwha
13 | now licenses the technology from Defendant Royal Philips, although this is a recent
14 | development that helped resolve a patent infringement suit filed in 2002.

15 |       b.     Defendants LG Electronics and Hitachi Ltd. entered into a joint venture in
16 | 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

17 |       c.     Defendant Samtel participates in a joint venture, Samcor Glass Limited,
18 | with Defendant Samsung Electronics Co., Ltd. and non-Defendant Corning Inc., USA for the
19 | production and supply of picture tube glass.

20 |       d.     Defendant Orion participates in a joint venture for the manufacture of
21 | CRT Products with Defendant Toshiba, as well as non-Defendants P.T. Tabung Gambar
22 | Indonesia and Japanese trading company Sumitomo Corporation.

23 |       e.     Defendant Samtel claims to have supplied CRTs to Defendants LG
24 | Electronics, Samsung, Royal Philips, and Matsushita.

25 |       73.     Defendants also maintain their close relationships through common membership
26 | in trade associations. Defendants Chungwha, Hitachi and Samsung are all members of the
27 | Society for Information Display. Defendants Samsung and LG Electronics are two of the co-
28 | founders of the Korea Display Industry Association. Similarly, Defendants Orion, LG

1  Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial

2  Research Association. Upon information and belief, Defendants use these trade associations as

3  vehicles for discussing and agreeing upon their pricing for CRT Products. At the meetings of

4  these trade associations, Defendants exchange proprietary and competitively sensitive

5  information which they use to implement and monitor the conspiracy.

6  ## DEFENDANTS' COLLUSIVE ACTIVITIES

7      74.      Plaintiffs are informed and believe, and thereon allege, that in order to control

8  and maintain profitability during declining demand for CRTs, Defendants and their co-

9  conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which

10  has been to raise the prices at which they sold CRT Products to artificially inflated levels from at

11  least January 1, 1995 through the present.

12      75.      Defendants' collusion is evidenced by unusual price movements in the CRT

13  market. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for

14  CRTs that did not fully materialize. Despite these predictions, and the existence of economic

15  conditions warranting a drop in prices, CRT prices nonetheless remained stable.

16      76.      During the Class Period, while demand in the United States for CRT Products

17  continued to decline, Defendants' conspiracy was effective in moderating the normal downward

18  pressures on prices for CRT Products caused by the entry and popularity of the new generation

19  LCD panels and plasma display products.

20      77.      During the Class Period, there were not only periods of unnatural and sustained

21  price stability, but there were also unexplained increases in prices of CRT Products. These price

22  increases were despite the declining demand due to the approaching obsolescence of CRT

23  Products caused by the emergence of a new, potentially superior and clearly more popular

24  substitutable technology.

25      78.      These price increases and price stability in the market for CRT Products during

26  the Class Period are inconsistent with a competitive market for a product facing rapidly

27  decreasing demand caused by a new, substitutable technology.

28

1      79.    On November 8, 2007, antitrust authorities in Europe, Japan and South Korea raided the offices of manufacturers of CRT Products as part of an international investigation of alleged price fixing.

80.    Defendant MT Picture Display Co., Ltd., the CRT unit of Defendant Matsushita Electric, has confirmed that it was raided by Japan's Fair Trade Commission.

81.    *Kyodo News* reported on November 8, 2007, upon information and belief, that MT Picture Display fixed prices for CRTs with manufacturers in three Asian countries, including South Korea's Samsung SDI Co.

82.    *Kyodo News* further reported that:

> Officials of these three companies are believed to have had at least 10 meetings since 2005 in major Asian cities to coordinate target prices when delivering their products to TV manufacturers in Japan and South Korea, the sources said.

83.    Defendant Samsung SDI Co., Ltd. was raided by South Korea's Fair Trade Commission, which has started an investigation into Samsung's CRT business.

84.    The European Commission confirmed that it had carried out surprise inspections at the European offices of CRT Product manufacturers, seeking evidence of cartel activity in the sector.

85.    According to Japan's *Nikkei Business Daily*, authorities in the United States were also involved in the investigation of an alleged international cartel of CRT manufacturers.

86.    The *Asian Shimbun* further reported on November 10, 2007 that "[t]he representatives held meetings in Southeast Asia where the companies operate CRT factories, the sources said. The European Commission, the European Union's executive branch, and the U.S. Justice Department have been investigating four companies' [referring to the four Asian-based manufacturers—MT Picture Display, Samsung SDI Co., Chungwha Picture Tubes, LP Displays] overseas units and are closely consulting with the Fair Trade Commission by sharing information."

87.    On November 12, 2007, *Dow Jones International News* reported that Defendant Chungwha Picture Tubes Ltd. had received a subpoena on November 9, 2007 issued by a

1 | California District Court "to assist in an investigation into whether cathode ray tube
2 | manufacturers had set up a cartel."

3 | 88. Unnamed sources close to the investigation report that the firms are suspected of
4 | fixing the amount they charge TV manufacturers for CRTs in an effort to stop prices from
5 | dropping.

6 | 89. On November 21, 2007, Defendant Royal Philips publicly disclosed that it too is
7 | subject to one or more investigations into anticompetitive conduct in the CRT industry. Royal
8 | Philips spokesman Joon Knapen declined to comment on which jurisdictions have started
9 | investigations. Royal Philips stated that it intended to assist the regulators.

10 | 90. As outlined above, Defendants have a history of competitor contacts resulting
11 | from joint ventures, numerous cross-licensing agreements, and other alliances in related
12 | businesses in the electronics industry.

13 | 91. Several Defendants have a history of "cooperation" and anticompetitive conduct.
14 | For example, Defendant Samsung was fined $300 million by the U.S. Department of Justice in
15 | October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access
16 | Memory.

17 | 92. Defendants Samsung and Toshiba have acknowledged being contacted by the
18 | U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static
19 | Random Access Memory and NAND Flash Memory.

20 | 93. In December 2006, authorities in Japan, Korea, the European Union and the
21 | United States revealed a comprehensive investigation into anticompetitive conduct among CRT
22 | manufacturers. Defendant Samsung, Toshiba and LG Philips (a joint venture between
23 | Defendants LG Electronics and Royal Philips) are under criminal investigation for price fixing
24 | in the closely related CRT market.

25 | 94. By engaging in collusive conduct in the market for CRT Products, Defendants
26 | were able to manipulate and artificially fix, raise, maintain or stabilize the prices for the CRT
27 | Products that they manufactured and sold in the United States.

28 |

**21**
**CLASS ACTION COMPLAINT**

1    95.    During the Class Period, Plaintiffs and the class members indirectly purchased

2    CRT Products manufactured by the Defendants or their co-conspirators.

3    96.    Plaintiffs and the class members paid more for their indirect CRT Product

4    purchases than they would have paid had Defendants not fixed CRT Product prices and

5    cooperated in other aspects of the CRT Product market.

6    97.    As a direct and proximate result of Defendants' conspiracy, Plaintiffs and the

7    class members have been injured and financially damaged in their respective businesses and

8    property in presently undetermined amounts.

9    **VIOLATIONS ALLEGED**

10    **First Claim for Relief**

11    **(Violation of Section 1 of the Sherman Act)**

12    98.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and

13    every allegation set forth in the preceding paragraphs of this Complaint.

14    99.    Beginning at a time unknown to Plaintiffs, but at least as early as January 1,

15    1995, through at the present, the exact dates being unknown to Plaintiffs and exclusively within

16    the knowledge of Defendants, Defendants and their co-conspirators, entered into a continuing

17    agreement, understanding, and conspiracy to unreasonably restrain trade and commerce in the

18    United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

19    100.    In particular, Defendants have combined and conspired to fix, raise, maintain or

20    stabilize the prices of CRT Products sold in the United States.

21    101.    Defendants, by their unlawful conspiracy, artificially raised, inflated and

22    maintained the market prices of CRT Products as herein alleged.

23    102.    The contract, combination or conspiracy consisted of a continuing agreement,

24    understanding and concert of action among Defendants and their co-conspirators, the substantial

25    terms of which were to fix, raise, maintain and stabilize the prices of CRT Products they sold in

26    the United States and elsewhere.

27    103.    In formulating and carrying out the alleged agreement, understanding, and

28    conspiracy, the Defendants and their co-conspirators did those things that they combined and

1  conspired to do, including, but not limited to the acts, practices, and course of conduct set forth

2  above, and the following, among others:

3              a.     Participated in meetings and conversations to discuss the prices of CRT

4                     Products;

5              b.     Agreed to manipulate prices and supply of CRT Products in a manner that

6                     deprived purchasers of CRT Products of free and open competition;

7              c.     Issued price announcements and price quotations in accordance with the

8                     agreements reached; and

9              d.     Sold CRT Products to customers in the United States at non-competitive

10                    prices.

11    104.     The combination and conspiracy alleged herein has had the following effects,

12  among others:

13             a.     Price competition in the sale of CRT Products has been restrained,

14                    suppressed and/or eliminated in the United States;

15             b.     Prices for CRT Products sold by Defendants and their co-conspirators

16                    have been fixed, raised, maintained and stabilized at artificially high, non-

17                    competitive levels throughout the United States; and

18             c.     Those who purchased CRT Products directly or indirectly from

19                    Defendants have been deprived the benefits of free and open competition.

20    105.     As a direct result of the unlawful conduct of Defendants and their co-conspirators

21  in furtherance of their continuing contract, combination or conspiracy, Plaintiffs and the

22  members of the Nationwide Class have been injured and will continue to be injured in their

23  business and property by paying more for CRT Products purchased indirectly from the

24  Defendants and their co-conspirators than they would have paid and will pay in the absence of

25  the combination and conspiracy.

26    106.     These violations are continuing and will continue unless enjoined by this Court.

27

28

Case 4:07-cv-05944-JST   Document 4151-2   Filed 10/28/16   Page 24 of 31
Case 3:07-cv-05944-SC   Document 4151-2   Filed 10/28/16   Page 25 of 31
Case3:08-cv-01559-SC   Document1   Filed03/21/08   Page24 of 34

1       107.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs and the

2 Nationwide Class seek the issuance of an injunction against Defendants, preventing and

3 restraining the violations alleged herein.

4                                      **Second Claim For Relief**

5                            **(Violation of State Antitrust Statutes)**

6       108.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and

7 every allegation set forth in the preceding paragraphs of this Complaint.

8       109.    Defendants' intentional and purposeful anticompetitive acts that are described

9 above, including but not limited to acts of collusion to set prices and the actual act of price

10 fixing itself, were intended to and did in fact case Plaintiffs and the members of the Indirect

11 Purchaser State Classes to pay supracompetitive prices for CRT Products purchased in the

12 Indirect Purchaser States.

13       110.    Defendants' contract, combination and conspiracy as described above is in

14 violation of the following state antitrust statutes:

15       111.    By reason of the foregoing, Defendants have entered into agreements in restraint

16 of trade in violation of Arizona Revised Stat. §§44-1401 et seq.

17       112.    By reason of the foregoing, Defendants have entered into agreements in restraint

18 of trade in violation of California Business & Professions Code §16720 et seq.

19       113.    By reason of the foregoing, Defendants have entered into agreements in restraint

20 of trade in violation of District of Columbia Code Ann. §§28-4503 et seq.

21       114.    By reason of the foregoing, Defendants have entered into agreements in restraint

22 of trade in violation of Iowa Code §§553.1 et seq.

23       115.    By reason of the foregoing, Defendants have entered into agreements in restraint

24 of trade in violation of Kansas Stat. Ann. §§50-101 et seq.

25       116.    By reason of the foregoing, Defendants have entered into agreements in restraint

26 of trade in violation of Maine Rev. Stat. Ann. 10, §§1101 et seq.

27       117.    By reason of the foregoing, Defendants have entered into agreements in restraint

28 of trade in violation of Michigan Comp. Laws Ann. §§445.773 et seq.

1       118.    By reason of the foregoing, Defendants have entered into agreements in restraint

2  of trade in violation of Minnesota Stat. §§325D.52 et seq.

3       119.    By reason of the foregoing, Defendants have entered into agreements in restraint

4  of trade in violation of Mississippi Code Ann. §75-21-1 et seq.

5       120.    By reason of the foregoing, Defendants have entered into agreements in restraint

6  of trade in violation of Nebraska Rev. Stat. §59-801 et seq.

7       121.    By reason of the foregoing, Defendants have entered into agreements in restraint

8  of trade in violation of Nevada Rev. Stat. Ann. §§598A et seq.

9       122.    By reason of the foregoing, Defendants have entered into agreements in restraint

10  of trade in violation of New Mexico Stat. Ann. §§57-1-1 et seq.

11       123.    By reason of the foregoing, Defendants have entered into agreements in restraint

12  of trade in violation of North Carolina Gen. Stat. §§75-1 et seq.

13       124.    By reason of the foregoing, Defendants have entered into agreements in restraint

14  of trade in violation of North Dakota Cent. Code §§51-08.1-01 et seq.

15       125.    By reason of the foregoing, Defendants have entered into agreements in restraint

16  of trade in violation of South Dakota Codified Laws Ann. §§37-1 et seq.

17       126.    By reason of the foregoing, Defendants have entered into agreements in restraint

18  of trade in violation of Tennessee Code Ann. §§47-25-101 et seq.

19       127.    By reason of the foregoing, Defendants have entered into agreements in restraint

20  of trade in violation of Vermont Stat. Ann. 9 §§2453 et seq.

21       128.    By reason of the foregoing, Defendants have entered into agreements in restraint

22  of trade in violation of West Virginia Code §§47-18-1 et seq.

23       129.    By reason of the foregoing, Defendants have entered into agreements in restraint

24  of trade in violation of Wisconsin Stat. §§133.01 et seq.

25       130.    Class members in each of the states listed above paid supracompetitive,

26  artificially inflated prices for CRT Products. As a direct and proximate result of Defendants'

27  unlawful conduct, Plaintiffs and members of the Indirect Purchaser State Classes have been

28

1 injured in their business and property in that they paid more for CRT Products than they

2 otherwise would have paid in the absence of Defendants' unlawful conduct.

3    131.    As a result of Defendants' and their co-conspirators' violation of the above

4 Indirect Purchaser States' antitrust laws, Plaintiffs seek damages, to be trebled where permitted

5 by a particular State's antitrust law, and costs of suit, including reasonable attorneys' fees, to the

6 extent permitted by the above Indirect Purchaser States' antitrust laws.

7                              **Third Claim for Relief**

8            **(Violation of State Consumer Protection and Unfair Competition Statutes)**

9    132.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and

10 every allegation set forth in the preceding paragraphs of this Complaint.

11    133.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or

12 fraudulent acts or practices in violation of the state consumer protection and unfair competition

13 statutes listed below.

14    134.    Defendants have engaged in unfair competition or unfair or deceptive acts or

15 practices in violation of Arkansas Code §4-88-101 et seq.

16    135.    Defendants have engaged in unfair competition or unfair or deceptive acts or

17 practices in violation of California Business & Professions Code §17200 et seq.

18    136.    Defendants have engaged in unfair competition or unfair or deceptive acts or

19 practices in violation of District of Columbia Code §28-3901 et seq.

20    137.    Defendants have engaged in unfair competition or unfair or deceptive acts or

21 practices in violation of Florida Stat. §501.201 et seq.

22    138.    Defendants have engaged in unfair competition or unfair or deceptive acts or

23 practices in violation of Hawaii Rev. Stat. §480 et seq.

24    139.    Defendants have engaged in unfair competition or unfair or deceptive acts or

25 practices in violation of Kansas Stat. §50-623 et seq.

26    140.    Defendants have engaged in unfair competition or unfair or deceptive acts or

27 practices in violation of 5 Maine Rev. Stat. §207 et seq.

28

1    141.    Defendants have engaged in unfair competition or unfair or deceptive acts or

2 practices in violation of Massachusetts G.L. c. 93A, §2 et seq.

3    142.    Defendants have engaged in unfair competition or unfair or deceptive acts or

4 practices in violation of Nebraska Rev. Stat. §59-1601 et seq.

5    143.    Defendants have engaged in unfair competition or unfair or deceptive acts or

6 practices in violation of New Hampshire Revised Statutes §358-A:1 et seq.

7    144.    Defendants have engaged in unfair competition or unfair or deceptive acts or

8 practices in violation of New Mexico Stat. §57-12-1 et seq.

9    145.    Defendants have engaged in unfair competition or unfair or deceptive acts or

10 practices in violation of New York Gen Bus. Law §349 et seq. Specifically:

11        a.    Defendants engaged in commerce in New York;

12        b.    Defendants and their co-conspirators secretly agreed to raise prices by

13 direct agreement on bids to customers located in New York and through artificial supply

14 restraints on the entire CRT Product market;

15        c.    New York consumers were targets of the conspiracy;

16        d.    The secret agreements were not known to New York consumers;

17        e.    Defendants made public statements about the price of CRT Products that

18 Defendants knew would be seen by New York consumers; such statements either omitted

19 material information that rendered these statements that they made materially misleading or

20 affirmatively misrepresented the real cause of price increases for CRT Products; and,

21 Defendants alone possessed material information that was relevant to consumers, but failed to

22 provide the information;

23        f.    Because of Defendants' unlawful trade practices in the State of New

24 York, there was a broad impact on New York consumer class members who indirectly

25 purchased CRT Products; and consumer class members have been injured because they have

26 paid more for CRT Products than they would have paid in the absence of Defendants' unlawful

27 trade acts and practices;

28

<div align="center">
27<br>
**CLASS ACTION COMPLAINT**
</div>

1           g.      Because of Defendants' unlawful trade practices in the State of New

2    York, New York consumer class members who indirectly purchased CRT Products were misled

3    to believe that they were paying a fair price for CRT Products or the price increases for CRT

4    Products were for valid business reasons; and similarly situated consumers were potentially

5    affected by Defendants' conduct;

6           h.      Defendants knew that their unlawful trade practices with respect to

7    pricing of CRT Products would have an impact on New York consumers and not just

8    Defendants' direct customers;

9           i.      Defendants knew that their unlawful trade practices with respect to

10    pricing of CRT Products would have a broad impact, causing consumer class members who

11    indirectly purchased CRT Products to be injured by paying more for CRT Products than they

12    would have paid in the absence of Defendants' unlawful trade acts and practices;

13           j.      Defendants' consumer-oriented violations adversely affected the public

14    interest in the State of New York.

15        146.    Defendants have engaged in unfair competition or unfair or deceptive acts or

16    practices in violation of North Carolina Gen. Stat. §75-1.1 et seq.

17        147.    Defendants have engaged in unfair competition or unfair or deceptive acts or

18    practices in the sale of CRT Products that were indirectly purchased primarily for personal,

19    family, or household purposes in violation of Rhode Island Gen. Laws §6-13.1-1 et seq.

20           a.      Defendants engaged in commerce in Rhode Island;

21           b.      Defendants and their co-conspirators unscrupulously and secretly agreed

22    to raise CRT Product prices by direct agreement on prices Defendants charged their customers

23    located in Rhode Island and through artificial supply restraints on the entire CRT Products

24    market;

25           c.      The secret agreements were not known to Rhode Island natural persons

26    who indirectly purchased CRT Products primarily for personal, family or household purposes;

27           d.      Defendants made public statements that Defendants knew would be seen

28    by Rhode Island natural persons who indirectly purchased CRT Products primarily for personal,

<div align="center">

**28**

**CLASS ACTION COMPLAINT**

</div>

1  family or household purposes; such statements created a likelihood of confusion or

2  misunderstanding with respect to the real reasons that the prices of CRT Products were rising;

3  and, such statements either omitted material information that rendered the statements materially

4  misleading and confusing, or affirmatively deceived such consumers about the real cause of

5  price increases for CRT Products;

6          e.      Because of Defendants' unlawful and unscrupulous trade practices in

7  Rhode Island, natural persons in Rhode Island who indirectly purchased CRT Products primarily

8  for personal, family or household purposes were misled or deceived to believe that they were

9  paying a fair price for CRT Products or the price increases for CRT Products were for valid

10  business reasons;

11         f.      Natural persons who indirectly purchased CRT Products primarily for

12  personal, family or household purposes have been injured bcause they have paid more for CRT

13  Products than they would have in the absence of Defendants' unlawful and unscrupulous trade

14  acts and practices;

15         g.      Defendants knew that their unscrupulous and unlawful trade practices

16  with respect to pricing CRT Products would have an impact on Rhode Island natural persons

17  who indirectly purchased CRT Products primarily for personal, family or household purposes

18  and not just Defendants' direct customers;

19         h.      Defendants knew that their violations with respect to pricing of CRT

20  Products would have a broad impact, causing natural persons who indirectly purchased CRT

21  Products primarily for personal, family or household purposes to be injured by paying more for

22  CRT Products than they would have paid in the absence of Defendants' unlawful trade acts and

23  practices;

24         i.      Defendants' violations adversely affected public policy in Rhode Island.

25  148.    Defendants have engaged in unfair competition or unfair or deceptive acts or

26  practices in violation of Vermont Stat. Ann. Title 9, §2451 et seq.

27  149.    Class members in each of the Consumer Fraud States listed above paid

28  supracompetitive, artificially inflated prices for CRT Products. As a direct and proximate result

**29**
**CLASS ACTION COMPLAINT**

1    of Defendants' unlawful conduct, Plaintiffs and Class members have been injured in their
2    business and property in that they paid more for CRT Products than they otherwise would have
3    paid in the absence of Defendants' unlawful conduct.

4        150.    Plaintiffs and Class members are therefore entitled to all appropriate relief as
5    provided for by the above Consumer Fraud States' laws, including but not limited to, actual
6    damages, injunctive relief, attorneys' fees and equitable relief such as restitution and/or
7    disgorgement of all revenues, earnings, profits, compensation and benefits which may have been
8    obtained by Defendants as a result of their unlawful conduct.

9                              **Fourth Claim for Relief**

10                  **(Unjust Enrichment and Disgorgement of Profits)**

11       151.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and
12   every allegation set forth in the preceding paragraphs of this Complaint.

13       152.    Defendants have been unjustly enriched through overpayments by Plaintiffs and
14   the Class members and the resulting profits.

15       153.    Under common law principles of unjust enrichment, Defendants should not be
16   permitted to retain the benefits conferred via overpayments by Plaintiffs and the members of the
17   Classes.

18       154.    Plaintiffs seek disgorgement of all profits resulting from such overpayments and
19   establishment of a constructive trust from which Plaintiffs and the Class members may seek
20   restitution.

21                          **FRAUDULENT CONCEALMENT**

22       155.    Throughout the relevant period, Defendants affirmatively and fraudulently
23   concealed their unlawful conduct against Plaintiff and the Classes.

24       156.    Plaintiffs and the members of the Classes did not discover, and could not discover
25   through the exercise of reasonable diligence, that Defendants were violating the antitrust laws as
26   alleged herein until shortly before this litigation was commenced. Nor could Plaintiffs and the
27   Class members have discovered the violations earlier than that time because Defendants
28   conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in

1 furtherance thereof, and fraudulently concealed their activities through various other means and
2 methods designed to avoid detection. The conspiracy was by its nature self-concealing.

3     157.    Defendants engaged in a successful, illegal price-fixing conspiracy with respect
4 to CRT Products, which they affirmatively concealed, in at least the following respects:

5     a.    By agreeing among themselves not to discuss publicly, or otherwise
6 reveal, the nature and substance of the acts and communications in furtherance of their illegal
7 scheme; and

8     b.    By giving false and pretextual reasons for their CRT Product price
9 increases during the relevant period and by describing such pricing falsely as being the result of
10 external costs rather than collusion.

11     158.    As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiffs
12 and the Classes assert the tolling of any applicable statute of limitations affecting the rights of
13 action of Plaintiffs and the members of the Classes.

14 **PRAYER FOR RELIEF**

15 WHEREFORE, Plaintiffs pray as follows:

16 A.    That the Court determine that the claims alleged herein under the Sherman Act,
17 state antitrust laws, state consumer protection and/or unfair competition laws may be maintained
18 as a class action under Rule 23 of the Federal Rules of Civil Procedure;

19 B.    That the Court adjudge and decree that the unlawful conduct, contract,
20 combination and conspiracy alleged herein constitutes:

21     a.  A violation of the Sherman Act, 15 U.S.C. §1, as alleged in the First Claim
22     for Relief;

23     b.  A violation of the Indirect Purchaser States' antitrust laws as alleged in the
24     Second Claim for Relief;

25     c.  A violation of the Consumer Fraud States' consumer protection and unfair
26     competition laws as alleged in the Third Claim for Relief; and

27     d.  Acts of unjust enrichment as set forth in the Fourth Claim for Relief herein.

28

C.     That Plaintiffs and the Indirect Purchaser State Classes recover damages, as provided by the Indirect Purchaser States' antitrust laws and the Consumer Fraud States' consumer protection and unfair competition laws, and that a joint and several judgment in favor of Plaintiffs and the Classes be entered against the Defendants in an amount to be trebled in accordance with such laws;

D.     That Defendants, their co-conspirators, successors, transferees, assigns, parents, subsidiaries, affiliates, and the officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on behalf of Defendants, or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action, or adopting or following any practice, plan, program or design having a similar purpose or effect in restraining competition;

E.     That Plaintiffs and the Classes be awarded restitution, including disgorgement of profits obtained by Defendants as a result of its acts of unfair competition and acts of unjust enrichment;

F.     That the Court award Plaintiffs and the Classes they represent pre-judgment and post-judgment interest as permitted by law;

G.     That Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees as provided by law; and

H.     That the Court award Plaintiffs and the Classes they represent such other and further relief as may be necessary and appropriate.

//

//

//

**32**
**CLASS ACTION COMPLAINT**

Case 4:07-cv-05944-JST   Document 4151-2   Filed 10/23/15   Page 50 of 71
Case 3:07-cv-05944-JST   Document 4154-2   Filed 10/26/15   Page 34 of 34
Case3:08-cv-01559-SC   Document1   Filed03/21/08   Page33 of 34

**JURY DEMAND**

Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated: March 20, 2008          By:   *Mario N. Alioto*

Mario N. Alioto (56433)
Lauren C. Russell (241151)
**TRUMP, ALIOTO, TRUMP & PRESCOTT,
LLP**
2280 Union Street
San Francisco, CA  94123
Telephone:  (415) 563-7200
Facsimile: (415) 346-0679
malioto@tatp.com ; laurenrussell@tatp.com

Joseph M. Patane (72202)
**LAW OFFICES OF JOSEPH M. PATANE**
2280 Union Street
San Francisco, CA 94123
Telephone: (415) 563-7200
Facsimile: (415) 346-0679
E-mail: jpatane@tatp.com

Lawrence G. Papale (67068)
**LAW OFFICES OF LAWRENCE G. PAPALE**
1308 Main Street #117
St. Helena, CA 94574
Telephone: (707) 963-1704
Facsimile: (707) 963-0706
E-mail: lgpapale@papalelaw.com

Kenneth L. Valinoti (118442)
**VALINOTI & DITO LLP**
180 Montgomery Street, Suite 940
San Francisco, CA 94104
Telephone: (415) 986-1338
Facsimile: (415) 986-1231
E-mail: kvalinoti@valinoti-dito.com

Sherman Kassof (66383)
**LAW OFFICES OF SHERMAN KASSOF**
954 Risa Road, Suite B
Lafayette, CA 94549
Telephone: (510) 652 2554
Facsimile: (510) 652 9308
E-mail: heevay@att.net

**33**
**CLASS ACTION COMPLAINT**

Case 4:07-cv-05944-JST Document 4151-2 Filed 09/28/16 Page 51 of 71
Case 3:07-cv-05944-SC Document 4144-2 Filed 10/26/15 Page 53 of 71
Case3:08-cv-01559-SC Document1 Filed03/21/08 Page34 of 34

Seymour J. Mansfield
Jean B. Roth
Lawrence P. Schaefer, Of Counsel
**MANSFIELD, TANICK & COHEN, P.A.**
1700 U.S. Bank Plaza
220 South Sixth Street
Minneapolis, MN 55402
Telephone: (612) 339-4295
Facsimile: (612) 339-3161
E-mail: smansfield@mansfieldtanick.com

Robert Bonsignore
**ATTORNEY AT LAW**
23 Forest Street
Medford, MA 02155
E-mail: rbonsignore@aol.com

**Attorneys for Plaintiffs Gianasca, Flaherty, Ten Eyck, Terry And All Others Similarly Situated**

**CLASS ACTION COMPLAINT**

# ATTACHMENT 3A

From: **Robert Bonsignore** rbonsignore@class-actions.us
Subject: CRT TV
Date: March 5, 2012 at 5:30 PM
To: Carolyn Jorgensen cjorgensen@class-actions.us
Cc: Alioto Mario malioto@tatp.com
Bcc: Robert Bonsignore rbonsignore@class-actions.us

Ok do you remember where you bought it and how much you paid?
Robert J. Bonsignore
Trial Lawyer
Bonsignore and Brewer
193 Plummer Hill Road
Belmont, New Hampshire 03220
781 856 7650 CELL
rbonsignore@class-actions.us

On Mar 2, 2012, at 1:33 PM, Carolyn Jorgensen wrote:

TV is a Sanyo

July 1995
serial # V5290486805519

What a MONSTER! I do not believe I have the manual...

~ Carolyn

**Case Number:** <u>3:07-cv-05944-SC</u>
**Filer:** Indirect Purchaser Plaintiffs



     I, *CAROLYN JORGENSEN* ("CLIENT") retain the law firms of and Robert Bonsignore of BONSIGNORE & BREWER (hereinafter "ATTORNEYS"), to be my attorney in connection with the above-referenced action.

7.    ATTORNEYS shall have the right to associate other attorneys at no additional expense to CLIENT.

DATED: 3/6/2012

CLIENT SIGNATURE

75 Franklin St
**MAILING ADDRESS**

Laconia N.H 03246
**CITY**          **STATE**     **ZIP**

(603) 527-0009
**HOME TELEPHONE (Include Area Code)**

(603) 630-0232
**WORK TELEPHONE (Include Area Code)**

**ACCEPTED BY ATTORNEYS:**

**BONSIGNORE & BREWER/**

By: _____

2
Attorney Representation Agreement

# ATTACHMENT 3B

NOTICE:  This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press.  Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Strafford
No. 2006-564

JAMES J. LACHANCE <u>&</u> <u>a</u>.

v.

UNITED STATES SMOKELESS TOBACCO CO. <u>&</u> <u>a</u>.

Argued:  March 21, 2007
Opinion Issued:  August 24, 2007

<u>Shaheen & Gordon</u>, of Dover (<u>Christine M. Craig</u> and <u>D. Michael Noonan</u> on the brief, and <u>Ms. Craig</u> orally), for the plaintiffs.

<u>McLane, Graf, Raulerson & Middleton, P.A.</u>, of Manchester (<u>Bruce W. Felmly</u> and <u>Jennifer L. Parent</u> on the brief), and <u>Latham & Watkins, LLP</u>, of Washington, D.C. and Los Angeles, California (<u>Margaret M. Zwisler</u> and <u>Charles H. Samel</u> on the brief, and <u>Mr. Samel</u> orally), for the defendants.

DUGGAN, J.  The plaintiffs, James J. LaChance and Chad Crossan, appeal an order of the Superior Court (<u>Fauver</u>, J.), denying their motion for class certification and granting judgment on the pleadings to the defendants, United States Smokeless Tobacco Company, United States Tobacco Sales and Marketing Company, United States Tobacco Manufacturing Company, and UST, Inc.  We reverse and remand.

I.  Background

        The following facts appear in the record.  The defendants sell smokeless
tobacco products using in-store display racks and advertising mechanisms.
The plaintiffs are purchasers of smokeless tobacco products from retailers
across New Hampshire.  Following a verdict unfavorable to the defendants in
antitrust litigation in another jurisdiction, see Conwood Co. L.P. v. United
States Tobacco Co., 290 F.3d 768, 777 (6th Cir. 2002), cert. denied, 537 U.S.
1148 (2003), the plaintiffs filed a civil action in the superior court, alleging that
the defendants also violated the New Hampshire Consumer Protection Act
(CPA), see generally RSA chapter 358-A (1995 & Supp. 2006).  More
specifically, they contended that the defendants engaged in conduct that
excluded competitors, limited customers' product choices, and negatively
affected the advertising and display of competing brands.  According to the
plaintiffs, the defendants "intentionally and routinely" removed competitors'
racks from retail stores and entered into agreements with store retailers to
restrict the sale, advertising and display of competing brands, as well as gave
retailers incentives to exclude competing brands from stores.  The defendants
also are alleged to have "increase[ed] . . . the price and limit[ed] and reduc[ed]
the supply of moist snuff tobacco products[,] [acts which] constitute[d] and
w[ere] intended to constitute unfair and deceptive competition and unfair and
deceptive business acts and practices within the meaning of RSA 358-A."  The
plaintiffs argued that, as a result of the defendants' conduct, they sustained
actual damages and non-economic harm because their "product choice ha[d]
been limited and each plaintiff ha[d] been wrongfully denied the free choice to
purchase a lower-priced consumer product."

        Over the course of litigating their case in superior court, the plaintiffs
moved to certify "a class of similarly situated New Hampshire purchasers of
moist snuff smokeless tobacco."  For their part, the defendants moved for
judgment on the pleadings, arguing, among other things, that the plaintiffs'
claims were barred by our decision in Minuteman, LLC v. Microsoft Corp., 147
N.H. 634 (2002).  The superior court denied the plaintiffs' motion and granted
the defendants' motion, ruling that the plaintiffs, as indirect purchasers, could
not pursue their claims.  The plaintiffs appeal both rulings.

II.  Procedural Posture

        Before reaching the parties' substantive arguments, we must resolve a
preliminary procedural issue.  In their objection to the defendants' motion for
judgment on the pleadings, the plaintiffs argued, among other things, that RSA
358-A:2, XIV (Supp. 2006) provided the authority needed to bring their claims
under the CPA.  RSA 358-A:2, XIV makes unlawful the "[p]ricing of goods or
services in a manner that tends to create or maintain a monopoly, or otherwise
harm competition."  The superior court "acknowledge[d] the legislature

expressly authorize[d] a plaintiff to bring an action for anticompetitive practices under the CPA by the specific language of [RSA 358-A:2, XIV]" but nevertheless concluded that "the plaintiffs' claims are barred by <u>Minuteman</u>."

In their opening brief, the plaintiffs did not address the applicability or effects of RSA 358-A:2, XIV. The defendants cited it as part of their argument against class certification, but did not discuss whether it has any effect on whether indirect purchasers may pursue claims. Recognizing the potential importance of RSA 358-A:2, XIV, we ordered the parties to submit supplemental memoranda addressing the following two issues:

> (1)  Whether this court should consider RSA 358-A:2, XIV in assessing whether the plaintiffs may bring their claims under the CPA; and

> (2)  Assuming this court should consider RSA 358-A:2, XIV, what effect, if any, RSA 358-A:2, XIV should have in determining whether the plaintiffs may bring their claims under the CPA.

In their memoranda, the plaintiffs, not unexpectedly, argue that RSA 358-A:2, XIV buttresses the argument that they may pursue their claims under the CPA. The defendants make two rejoinders. First, citing <u>Derosia v. Warden, N.H. State Prison</u>, 149 N.H. 579, 580 (2003), among other cases, they contend that the plaintiffs waived consideration of RSA 358-A:2, XIV by failing to raise it in their opening brief. Second, they contend that, even if we consider RSA 358-A:2, XIV, it supports affirming the superior court's judgment.

The defendants' first argument is well-taken. Generally, we do not consider arguments that have not been briefed. <u>See Derosia</u>, 149 N.H. at 580. However, the instant case is somewhat unusual in that we ordered the parties to address the effects of the statutory provision at issue, and they have done so. Moreover, the issue was presented to the superior court, and thus should not come as a surprise to either side.

Faced with this procedural posture, we could decide the case without reference to RSA 358-A:2, XIV. That approach, however, is an empty one because we would be ignoring a critical statutory provision in order to render an opinion that would be essentially meaningless outside the context of this case. This would be a waste of judicial resources, a result we typically attempt to avoid. <u>See Rochester School Bd. v. N.H. PELRB</u>, 119 N.H. 45, 50 (1979).

We could also remand to the superior court for it to consider, in the first instance, how RSA 358-A:2, XIV affects the application of <u>Minuteman</u> with respect to whether the plaintiffs may bring claims under the CPA. This, too, would be a waste of judicial resources and unnecessarily burden the parties

because no matter what conclusion the superior court might reach, the parties likely would appeal, and we would once again be called upon to decide the issue.

Finally, we could decide the matter in the first instance.  This approach is the most sensible, so we opt for it.  The issue is now thoroughly briefed and ready for our consideration.  Deciding it now will avoid unnecessarily burdening the parties with additional steps in the litigation process.  Moreover, since the issue of who may bring claims under the CPA is one of statutory interpretation, we would review the matter de novo in any event.  Lower Bartlett Water Precinct v. Murnik, 150 N.H. 690, 692 (2004).

## III.  Discussion

### A.  Whether Indirect Purchasers May Bring Claims under the CPA

The question presented by this case – whether consumers, as indirect purchasers, may bring a cause of action under the CPA – arises from a controversy that began gathering steam in 1977.  At that time, in Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), the United States Supreme Court held that indirect purchasers may not bring claims under the federal antitrust laws.  For purposes of the Illinois Brick rule, indirect purchasers are those who acquire a product not directly from a manufacturer, but from some intermediary in the chain of distribution.  Id. at 724-27.  In support of its holding, the Court cited the unique nature of antitrust litigation, issues of multiple recovery, and the problem of allocating damages if indirect purchasers were allowed to bring suit.  Id. at 737-38.  Later, the Court held that federal antitrust laws do not, however, preempt states from enacting statutes that allow indirect purchasers to recover damages for their injuries.  See California v. ARC America Corp., 490 U.S. 93, 101-02 (1989) (rejecting argument that California's antitrust law, which specifically allows indirect purchaser actions, was preempted by federal law).

In the wake of Illinois Brick and ARC America, states have been grappling with issues involving whether, and in what context, indirect purchasers may pursue their claims.  For example, at least thirty-three states and the District of Columbia have passed so-called Illinois Brick repealer statutes, permitting plaintiffs to bring their claims under state antitrust statutes.  Elkins v. Microsoft Corp., 817 A.2d 9, 18 (Vt. 2002).  Our legislature has not.  Other jurisdictions have ruled that Illinois Brick applies in both the antitrust and the consumer protection realms.  See, e.g., Sickles v. Cabot Corp., 877 A.2d 267, 274 (N.J. Super. Ct. App. Div.), cert. denied, 884 A.2d 1267 (N.J. 2005).  These courts reason that antitrust-type claims are unique and should be resolved under antitrust – as opposed to consumer protection – laws and principles.  Id.  They note that reaching a contrary conclusion would

undermine state antitrust acts and the jurisprudence construing such acts. Id. By contrast, Vermont, Massachusetts and Florida follow a different approach. Courts in all three states have allowed antitrust-type claims to be brought under the state's consumer protection act. See Elkins, 817 A.2d at 16-17, 19-20; Ciardi v. F. Hoffmann-La Roche, Ltd., 762 N.E.2d 303, 311 (Mass. 2002); Mack v. Bristol-Myers Squibb Co., 673 So. 2d 100, 104 (Fla. Dist. Ct. App. 1996), rev. dismissed, 689 So. 2d 1068 (Fla. 1997).

We have never been called upon to decide whether indirect purchasers may bring claims under the CPA. We have, however, held that indirect purchasers may not bring claims under the state antitrust statute, RSA chapter 356 (1995 & Supp. 2006). Minuteman, 147 N.H. at 639. In Minuteman, we adopted the reasoning of Illinois Brick, citing the unique nature of antitrust litigation and the potential complexities that would arise in awarding damages to indirect purchasers. Id. at 638-39.

Against this backdrop, we turn to the case at hand. As referenced above, the superior court granted judgment on the pleadings, holding that Minuteman applied to consumer protection claims and that the plaintiffs therefore could not pursue their claims. In general, a motion seeking judgment based solely on the pleadings is in the nature of a motion to dismiss for failure to state a claim. Jenks v. Menard, 145 N.H. 236, 239 (2000). In reviewing a motion to dismiss for failure to state a claim upon which relief may be granted, we assume the truth of the facts alleged by the plaintiffs and construe all reasonable inferences in the light most favorable to them. Paul v. Sherburne, 153 N.H. 747, 749 (2006). If the facts do not constitute a basis for legal relief, we will uphold the granting of the motion to dismiss. Id.

The plaintiffs contend that the superior court erred in granting judgment to the defendants because the plain language of the CPA supports their position. The defendants counter that if we allow the plaintiffs to bring their claims under the CPA, we will be encouraging litigants to reframe antitrust claims as CPA claims, and thereby be enabling end runs around Minuteman. Citing public policy considerations and principles of statutory construction, the defendants urge us to reject the plaintiffs' arguments and to hold that the Minuteman rule applies in the CPA context. They argue that such a result will produce a harmonious statutory scheme.

In matters of statutory interpretation, we are the final arbiters of the legislature's intent as expressed in the words of the statute considered as a whole. Appeal of Town of Bethlehem, 154 N.H. 314, 319 (2006). When examining the language of a statute, we ascribe the plain and ordinary meaning to the words used. Id. We interpret legislative intent from the statute as written and will not consider what the legislature might have said or add language that the legislature did not see fit to include. Id.

5

We begin with the defendants' contention that antitrust claims should be brought and decided under antitrust statutes and principles. The plaintiffs do not contend that they are not indirect purchasers within the meaning of Minuteman and Illinois Brick. Indeed, it would seem to be because of our decision in Minuteman that the plaintiffs brought CPA – as opposed to antitrust – claims in the first place.

At first blush, the defendants' argument has some appeal. Requiring antitrust-type actions to be brought under the state antitrust statute would be straightforward and simple. However, the CPA does not envisage such rigidity. Under the CPA, "[a]ny person injured by another's use of any method, act or practice declared unlawful under this chapter may bring an action for damages." RSA 358-A:10, I (1995). For purposes of the CPA, "unfair method[s] of competition or unfair or deceptive act[s] or practice[s] shall include . . . [the] [p]ricing of goods or services in a manner that tends to create or maintain a monopoly, or otherwise harm competition." RSA 358-A:2, XIV. By allowing consumer protection actions for the type of monopolistic or anticompetitive conduct set forth in RSA 358-A:2, XIV, it seems indisputable that our legislature intended to make actionable under the CPA at least some types of conduct that typically are associated with the antitrust realm. Thus, we turn to the plain language of the CPA to determine whether indirect purchasers may assert these types of claims.

By allowing "any person injured" to bring an action, the plain language of RSA 358-A:10, I (emphasis added) does not suggest any legislative intent to limit who may bring a CPA claim to persons sustaining direct injuries. See Remsburg v. Docusearch, 149 N.H. 148, 159-60 (2003) ("The statute defines who may bring a private action broadly, and by its plain meaning does not limit the class of persons who have standing to those in privity with the defendant." (citation omitted)). The defendants, however, contend that in order to allow indirect purchasers to fall within the ambit of "any person injured," we would have to read the phrase "directly or indirectly" into the statute as a qualifier of "injured." We disagree.

"Any person injured" is broad. Cf. Chroniak v. Golden Investment Corp., 133 N.H. 346, 349 (1990) (definition of lender as "'any person making a loan secured by a mortgage'" is "quite broad"); Estate of Gordon-Couture v. Brown, 152 N.H. 265, 270-71 (2005) (phrase "any person" is "broad and unqualified" but should be interpreted in its statutory context). It does not differentiate between consumers directly and indirectly injured. If we were to conclude, as the defendants urge, that the legislature intended to allow only those directly injured to bring suit, we would have to find some way to limit the statute's scope, most likely by reading the word "directly" into it, i.e. "any person directly injured." This is not what the statute says, and it is not our practice to add words to statutes. Bethlehem, 154 N.H. at 319.

6

Furthermore, we have never held that the CPA allows consumers to bring suit only against those from whom they have directly purchased a product. The defendants' argument essentially asks us to do just that, for if we read the word "directly" into the CPA for purposes of RSA 358-A:2, XIV or anticompetitive conduct generally, then we must do so for all private actions brought under RSA 358-A:10. It would make no sense for the CPA to allow indirect actions under some circumstances but not others, yet not set forth in its text a basis upon which this distinction can be made. Either the statute requires privity, or it does not. We have held that it does not. See Remsburg, 149 N.H. at 159-60.

The defendants also argue that even if we conclude that indirect purchasers may bring claims under the "any person injured" language of RSA 358-A:10, the plaintiffs still have failed to state a claim to the extent they rely upon RSA 358-A:2, XIV because their allegations concern anticompetitive agreements or combinations, while RSA 358-A:2, XIV is narrowly concerned with anticompetitive or predatory pricing instead. Thus, citing federal authority, the defendants argue that in the absence of allegations of predatory pricing practices, the plaintiffs' complaint "is simply a naked attempt to re-package . . . anticompetitive conduct allegations as pricing claims while ignoring the text and purpose of the [consumer protection] statute."

The plain language of the statute is not, on its face, limited to predatory pricing. Instead, it makes unlawful the "[p]ricing of goods or services in a manner that tends to create or maintain a monopoly, or otherwise harm competition." RSA 358-A:2, XIV (emphasis added.) To be sure, predatory pricing, one definition of which is "pricing below some appropriate measure of cost," Matsushita Elec. Industrial Co. v. Zenith Radio, 475 U.S. 574, 585 n.8 (1986), is among the types of conduct prohibited by RSA 358-A:2, XIV. However, since our CPA generally is given broad sweep, and since "or otherwise harm competition" is, on its face, broad, it would seem anomalous for us to hold that RSA 358-A:2, XIV contemplates only narrow protection. We do, however, agree with the defendants that in order to prevail at trial on a claim brought under RSA 358-A:2, XIV, the plaintiffs will have to prove that pricing tended to create a monopoly, maintain a monopoly, or otherwise harm competition. See RSA 358-A:2, XIV.

Here, the plaintiffs have alleged that the defendants' conduct in, among other things, "increasing . . . the price and limiting and reducing the supply of moist snuff tobacco products . . . constitute[d] and was intended to constitute unfair and deceptive competition and unfair and deceptive business acts and practices within the meaning of RSA 358-A." At this early stage of the litigation, this allegation must be taken in a light most favorable to the plaintiffs. Paul, 153 N.H. at 749. Thus, to the extent the defendants argue that the plaintiffs will not be able to actually prove a violation of RSA 358-A:2, XIV, their argument is for summary judgment or trial.

Another aspect of the CPA's language also supports the conclusion that indirect purchasers may bring suit. RSA 358-A:2 makes it unlawful to "use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." RSA 358-A:1, II (Supp. 2006), defines "[t]rade" and "commerce" to "include any trade or commerce directly or indirectly affecting the people of this state." (Emphasis added.) Citing Blewett v. Abbott Laboratories, 938 P.2d 842, 846 (Wash. Ct. App. 1997), rev. denied, 950 P.2d 475 (Wash. 1998), the defendants contend that the phrase "directly or indirectly" has no bearing on who may bring suit and instead defines the types of business conduct regulated. Even if we adopt the defendants' position, it cannot be denied that the plaintiffs' allegations encompass conduct which was part of trade or commerce that had direct or indirect effects on the people of this state. Thus, if nothing else, "directly or indirectly" is further evidence of the broad sweep the legislature intended for the CPA. Similarly, in Ciardi, the Massachusetts Supreme Judicial Court noted that Massachusetts' consumer protection statute "regulates trade and commerce 'directly or indirectly affecting the people of this commonwealth,'" Ciardi, 762 N.E.2d at 308. It then concluded that although indirect purchasers are barred from bringing suit under the state antitrust act, they are not barred from bringing consumer protection claims.

The defendants try to distinguish Ciardi by pointing out that Massachusetts' Antitrust Act contains a provision stating that it should have "'no effect'" upon the state consumer protection statute, while our antitrust act does not. Ciardi, 762 N.E.2d at 311. Although neither RSA chapter 356 nor RSA chapter 358-A contains a provision similar to the one described in Ciardi, it is also true that neither chapter indicates that interpretations of one bind interpretations of the other.

Beyond the plain meaning of the statutory language, the defendants also argue that since our legislature has not passed an Illinois Brick repealer statute, it must have agreed with Minuteman, and therefore we should apply it in the context of the CPA. However, as the Massachusetts Supreme Judicial Court has persuasively reasoned,

> [t]he fallacy in the argument is that no one knows why the legislature did not pass [such a] . . . measure. The practicalities of the legislative process furnish many reasons for the lack of [passage] . . . of a measure other than legislative dislike for the principle involved in the legislation. One such reason is the belief that the matter should be left to be handled by the normal processes of judicial development of decisional law, including the overruling of outstanding decisions to the extent that the sound growth of the law requires.

8

Ciardi, 762 N.E.2d at 310 n.15 (quotations, citation, brackets and ellipsis omitted).  Moreover, any repealer statute that our legislature could have enacted would have modified RSA chapter 356, not the CPA.  See id.  It is also worth noting that the legislature approved RSA 358-A:2, XIV on May 18, 2002, and it became effective on July 17, 2002.  Laws 2002, 276:1.  Minuteman was decided on April 19, 2002.  Minuteman, 147 N.H. at 634.

The defendants also assert that general rules of statutory construction require us to decide in their favor.  Citing Soraghan v. Mt. Cranmore Ski Resort, 152 N.H. 399, 405 (2005), the defendants argue that since both RSA chapter 358-A and RSA chapter 356 seek to protect "person[s] injured," see RSA 356:11, II (1995); RSA 358-A:10, it follows that, consistent with our practice of attempting to construe statutes that deal with similar subject matter harmoniously, we must extend Minuteman and construe both statutes as precluding indirect purchaser actions.  We disagree.  For one thing, neither RSA chapter 356 nor RSA chapter 358-A contains a provision indicating that one is dependent upon the other.  Additionally, the legislature's purpose in enacting the CPA supports our plain meaning analysis.  The purpose of the CPA is to provide broad protection for consumers.  See Hughes v. DiSalvo, 143 N.H. 576, 578 (1999).  Accordingly, although the defendants correctly note that RSA chapter 356, like the CPA, uses the phrase "any person injured" to describe who may bring suit, see RSA 356:11, II, we cannot interpret a phrase in a statute without regard for the context in which it is found.  In the context of the CPA, which is to be construed broadly, see Hughes, 143 N.H. at 578, "any person injured" must encompass consumers, who are often the ultimate purchasers of goods and services in the marketplace.

Furthermore, to the extent RSA 358-A:2, XIV is at issue, its enactment demonstrates the legislature's clear desire to promote the consumer protection policy of competitive pricing.  To adopt the defendants' position and hold that indirect consumers are prohibited from bringing CPA claims would be to prevent the real victims – those who purchase goods at higher prices – from recovering damages for the injuries caused by an alleged violation of RSA 358-A:2, XIV.  Such a result would seriously undermine or erode the expansive remedial goals of the CPA.  See Ciardi, 762 N.E.2d at 313-14 n.19 ("[P]ermitting only direct purchasers to bring a cause of action and retain as damages the amount that they passed along to indirect purchasers . . . [would produce] a windfall at the expense of the true victims further down the distribution chain . . . .").

Our reasoning is supported by the holding in Mack.  There, the court

> f[ou]nd that there is no plain inconsistency or
> repugnancy between the Florida [consumer protection
> statutes] and Antitrust Act which must be

> harmonized. . . . <u>ARC America</u> establishes that two
> statutes, both of which prohibit anticompetitive
> conduct, are not inconsistent merely because one
> allows indirect purchasers to sue for damages and the
> other does not. . . . [T]o accept the argument of the
> defendants, which would eliminate a remedy provided
> to an entire class of consumers – indirect purchasers
> who have been damaged by alleged illegal price-fixing –
> would be wholly contrary to the legislature's intent in
> enacting [Florida's consumer protection statutes].

<u>Mack</u>, 673 So. 2d at 110.

The defendants argue, as a matter of public policy, that allowing indirect
purchasers to bring suit will have the effect of introducing complex issues of
duplicative liability. Although this is a legitimate concern, we find persuasive
the Massachusetts Supreme Judicial Court's response to this argument:

> [I]t is the province of the . . . Legislature to make its
> own policy decisions about whether to permit claims
> by indirect purchasers for antitrust violations under
> [state] law. We read the language of [the consumer
> protection act] as a clear statement of legislative policy
> to protect . . . consumers through the authorization of
> such indirect purchaser actions. Any disagreement
> with the statute should be directed to the Legislature.

<u>Ciardi</u>, 762 N.E.2d at 314 (footnote omitted). <u>Ciardi</u> also noted that the
Massachusetts legislature, like ours, eliminated some of the perceived difficulty
in apportioning damages between direct and indirect purchasers by allowing
consumers who prevail under the consumer protection statutes to recover
actual damages or a set dollar amount, whichever is greater. <u>See</u> <u>id</u>. at n.20;
RSA 358-A:10 (actual damages or $1,000). Thus, "[t]o the extent that the
plaintiff is able to prevail on the issue of liability but is unable to prove actual
damages, the Legislature has decided that she [or he] is entitled to a specified
remedy." <u>Ciardi</u>, 762 N.E.2d at 314 n.20.

Our overall analysis finds support in the Vermont Supreme Court's
decision in <u>Elkins</u>. <u>Elkins</u>, 817 A.2d at 9. There, a plaintiff brought a class
action suit against Microsoft under the Vermont Consumer Fraud Act (VCFA),
alleging that it had obtained monopoly power over the computer operating
systems market. <u>Id</u>. at 11. After analyzing the VCFA and its legislative history,
as well as <u>Illinois Brick</u>, the court concluded that indirect purchaser suits were
allowed under the VCFA. <u>Id</u>. The <u>Elkins</u> decision is persuasive, in part
because the VCFA and RSA chapter 358-A share similar attributes. For
example, both are broadly worded, <u>id</u>. at 13; <u>Milford Lumber Co. v. RCB Realty</u>,

10

147 N.H. 15, 17 (2001); neither contains an express privity requirement, Elkins, 817 A.2d at 12; Remsburg, 149 N.H. at 159-60; and both have a similar purpose, Elkins, 817 A.2d at 13 ("'protect the public'"); Chase v. Dorais, 122 N.H. 600, 601 (1982) ("consumer protection"). The defendants are correct to point out that Vermont does not have an antitrust act and does have an Illinois Brick repealer statute, but this circumstance does not render the case any less persuasive. Although Vermont had a statutory provision authorizing indirect purchaser suits under the VCFA, the court analyzed the issue as if it did not because the provision became effective after the plaintiff's alleged injury. Elkins, 817 A.2d at 17.

Although the defendants correctly note that courts in other jurisdictions have concluded that indirect purchasers may not bring consumer protection claims, their decisions are not persuasive in light of our statutory scheme. For example, in Davidson v. Microsoft, 792 A.2d 336 (Md. Ct. Spec. App. 2002), cert. denied, 801 A.2d 1032 (Md. 2002), and Sickles, 877 A.2d at 267, the Maryland Court of Special Appeals and the Appellate Division of New Jersey's Superior Court concluded that indirect purchaser suits are barred under each state's consumer protection statute. However, both courts based their decisions upon their respective consumer protection statute's failure to specify antitrust violations as actionable conduct. Davidson, 792 A.2d at 344-45; Sickles, 877 A.2d at 276-77. RSA 358-A:2, XIV, however, expressly includes antitrust violations under the CPA.

In Abbott Laboratories, Inc. v. Segura, 907 S.W.2d 503, 506 (Tex. 1995), the Texas Supreme Court held that indirect purchasers may not bring claims under the state antitrust act, and that allowing indirect purchaser suits under the consumer protection statutes "would essentially permit an end run around the policies allowing only direct purchasers to recover under the Antitrust Act." The court determined that the reasoning of Illinois Brick applied in the context of claims under the consumer protection statutes because those claims "are in essence antitrust claims." Id. at 507.

The Segura decision is not particularly persuasive for several reasons. First, the Texas Consumer Protection Act defines who may bring suit much more narrowly than RSA chapter 358-A. Compare TEX. BUS. & COM. CODE ANN. § 17.50 (Vernon 2002 & Supp. 2006) ("A consumer may maintain an action where any of the following constitute a producing cause of economic damages or damages for mental anguish . . . .") with RSA 358-A:10, I ("Any person injured"). Second, Texas' consumer protection statutes did not cover monopolistic and price-related conduct, see Segura, 907 S.W.2d at 513 (Gonzalez, J., concurring), whereas at least RSA 358-A:2, XIV does. Third, two judges persuasively dissented, noting that just because conduct gives rise to an antitrust action should not mean that consumers are denied a remedy under a statute that was designed to protect them, whether they are direct or indirect consumers. Id. at 516 (Gammage & Spector, JJ., dissenting).

11

Finally, the defendants rely upon <u>Vacco v. Microsoft Corp.</u>, 793 A.2d 1048, 1050 (Conn. 2002). There, the Connecticut Supreme Court held that a "plaintiff is barred from bringing a claim under [the Connecticut Unfair Trade Practices Act (CUTPA)] because his alleged injuries are too remote with respect to the defendant's alleged conduct." <u>Id</u>. The <u>Vacco</u> Court based its conclusion upon a three-part test for remoteness and proximate causation. <u>Id</u>. at 1066-67. To the extent the defendants argue that these particular plaintiffs cannot show a sufficiently close connection between themselves and the defendants' alleged conduct, their arguments relate to whether the plaintiffs can prove their claim under the CPA – not to whether they are entitled, as indirect purchasers, to bring that claim in the first place. <u>See</u> <u>Illinois Brick</u>, 431 U.S. at 728 n.7 (explaining that who is "injured" is "analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages . . . ."); <u>accord</u> <u>Ciardi</u>, 762 N.E.2d at 313.

Accordingly, given the broad protections afforded by RSA chapter 358-A, we conclude that the plaintiffs set forth sufficient allegations to survive the defendants' motion for judgment on the pleadings.

## B. Class Certification

RSA 358-A:10-a (1995 & Supp. 2006) governs when a class action may be maintained under the CPA. It provides, "Persons entitled to bring an action under RSA 358-A:10 may, if the unlawful act or practice has caused similar injury to numerous other persons, institute an action as representative or representatives of a class of persons . . . to recover actual damages . . . ." RSA 358-A:10-a, I.

The superior court observed that "RSA 358-A:2 expressly includes 'unfair method[s] of competition' in the types of claims that may be brought under the CPA. In contrast . . . RSA 358-A:10-a . . . omits 'unfair method[s] of competition' in its statement of the types of claims that may be brought as class actions." Thus, the court reasoned, if the plaintiffs' allegations involve only methods of competition, they may not bring a class action. The superior court then determined that the plaintiffs' allegations did indeed encompass only unfair methods of competition, and therefore the plaintiffs were precluded from bringing a class action. On appeal, the plaintiffs contend that their allegations need not be pigeonholed into a category of "unfair methods" because the conduct they allege against the defendants also constitutes unlawful acts and practices.

As the Massachusetts Supreme Judicial Court reasoned, "antitrust violations are actionable under [the consumer protection act] not only because they are unfair methods of competition, but also because they constitute unfair acts or practices, and because the Legislature did not explicitly preclude

antitrust activity as a violation of" the consumer protection act.  <u>Ciardi</u>, 762 N.E.2d at 311 n.17 (citation omitted).  This reasoning is compelling, given our statutory scheme.  RSA 358-A:10-a, I, permits class actions for "unlawful act[s] or practice[s]."  RSA 358-A:2 defines "**Acts Unlawful**" as "any unfair method of competition or any unfair or deceptive act or practice."  Thus, by its plain terms, "**Acts Unlawful**" includes "unfair method[s] of competition."  RSA 358-A:2; RSA 358-A:10-a, I.

Furthermore, to the extent the parties argue over the applicability of RSA 358-A:2, XIV, the statute specifically states that "unfair method of competition or unfair or deceptive act or practice shall include, but [not be] limited to . . . [the] [p]ricing of goods or services in a manner that tends to create or maintain a monopoly, or otherwise harm competition."  Thus, the legislature made no effort to force this type of antitrust activity into an "unfair method" category for purposes of the CPA.  To the contrary, the plain language of the statute indicates that "acts or practices" includes the conduct set forth in RSA 358-A:2, XIV.  We discern no principled reason to pigeonhole the conduct here alleged into the category of "unfair method" for purposes of the CPA.  To conclude otherwise would erode the broad remedial goals of the CPA and elevate form over substance.

Accordingly, we conclude that the superior court erred in ruling that the allegations against the defendants are not susceptible to class certification.  Thus, we reverse its ruling in this regard and remand for further proceedings consistent with this opinion.

## IV.  Conclusion

For the foregoing reasons we conclude that indirect purchasers may bring claims under the CPA.  We also conclude that they are not precluded from attempting to certify a class of indirect purchasers under RSA 358-A:10-a.

<u>Reversed and remanded</u>.

BRODERICK, C.J., and DALIANIS, GALWAY and HICKS, JJ., concurred.

13

# ATTACHMENT 4



**From:** **Robert Bonsignore** rbonsignore@class-actions.us
**Subject:** Fwd: David Perriman TV Purchase History
**Date:** March 6, 2012 at 9:49 PM
**To:** Mario Alioto malioto@tatp.com

Robert J. Bonsignore
Trial Lawyer
Bonsignore and Brewer
193 Plummer Hill Road
Belmont, NH 03220
(781) 856 7650 (cell)
Sent from my iPhone

Begin forwarded message:

> **From:** Office <deryl@dedwardslaw.com>
> **Date:** March 6, 2012 9:44:26 PM EST
> **To:** Robert Bonsignore <rbonsignore@class-actions.us>
> **Subject: Fwd: David Perriman TV Purchase History**
>
>
> Sent from my iPhone
>
> Begin forwarded message:
>
> > **From:** <office@dedwardslaw.com>
> > **Date:** March 6, 2012 6:21:14 PM CST
> > **To:** "Karl Dickhaus" <karl@faxlaw.com>, "Office" <deryl@dedwardslaw.com>
> > **Subject: David Perriman TV Purchase History**
> >
> > # David Perriman
> > # 27300 Maple Road
> > # Carl Junction, MO 64834
> > # Telephone: 417-365-3652
> >
> > Sarah Goolsby
> >
> > Secretary for Deryl Edwards, Jr.
> >
> > 606 S. Pearl
> >
> > Joplin, MO 64801
> >
> > (417) 624-1962
> >
> > Fax: (417) 624-1965
> >
> > deryl@dedwardslaw.com



Perriman TV Purchase 3-
6-2012.pdf