Pages 1 - 105

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

MDL NO. 1917 IN RE:  CATHODE    )
RAY TUBE (CRT) ANTITRUST        )
LIGITATION,                     )
                                )     NO. C 07-05944 JST
                                )
_____ )

                        San Francisco, California
                        Tuesday, February 23, 2016

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs DAP:
                        BOIES, SCHILLER & FLEXNER, LLP
                        30 South Pearl Street, 11th Floor
                        Albany NY 12207
                BY:  **PHILIP J. IOVIENO**
                     **ATTORNEY AT LAW**

                        BOIES, SCHILLER & FLEXNER, LLP
                        5301 Wisconsin Ave., N.W.
                        Washington, D.C. 20015
                BY:  **KYLE SMITH**
                     **ATTORNEY AT LAW**


For Plaintiffs Costco:
                        PERKINS COIE LLP
                        1201 Third Avenue - Suite 4900
                        Seattle, Washington  98101
                BY:  **ERIC J. WEISS**
                     **CORI GORDON MOORE**
                     **ATTORNEYS AT LAW**




Reported By:        Rhonda L. Aquilina, CSR #9956, RMR, CRR
                    Official Court Reporter

**PLAINTIFF APPEARANCES:   (CONTINUED)**

For Plaintiffs Sharp:

                        TAYLOR & COMPANY LAW OFFICES LLP
                        One Ferry Building - Suite 355
                        San Francisco, California  94111
             BY:  **CHERYL A. GALVIN**
                  **ATTORNEY AT LAW**

For Plaintiff Tech Data Corp, Tech Data Product Mgmnt. Inc.:

                        BILZIN, SUMBERG, BAENA, PRICE & AXELROD
                        1450 Brickell Ave., 23rd Floor
                        Miami, FL 33131-3456
             BY:  **SCOTT N. WAGNER**
                  **ATTORNEY AT LAW**

For Plaintiff Best Buy:

                        ROBINS, KAPLAN
                        2049 Century Park East, Ste. 3400
                        Los Angeles, CA 90067
             BY:  **JILL S. CASSELMAN**
                  **DAVID MARTINEZ**
                  **ATTORNEYS AT LAW**

For Plaintiff Sears and KMart:

                        KENNY, NACHWALTER
                        1100 Miami Center
                        201 South Biscayne Blvd
                        Miami, FL 33131-4327
             BY:  **KEVIN MURRAY**
                  **ATTORNEY AT LAW**

**DEFENSE APPEARANCES:**

For Defendant Panasonic:

> WINSTON & STRAWN LLP
> 200 Park Avenue
> New York, New York 10166
> **BY: JEFFREY L. KESSLER**
> **ATTORNEY AT LAW**

For Defendant Mitsubishi:

> JENNER & BLOCK, LLP
> 353 North Clark Street
> Chicago, IL 60654-3456
> **BY: GABRIEL FUENTES**
> **TERRENCE J. TRUAX**
> **ATTORNEYS AT LAW**

For DefendantMitsubishi Electric:

> QUINN, EMANUEL, URQUHART & SULLIVAN LLP
> 865 South Figueroa St., 10th Flr.
> Los Angeles, CA 90017
> **BY: KEVIN Y. TERUYA**
> **ATTORNEY AT LAW**

For Defendant Toshiba:

> WHITE & CASE, LLP
> 701 Thirteenth Street, NW
> Washington, D.C. 20005-3807
> **BY: DANA FOSTER**
> **CHRISTOPHER CURRAN**
> **ATTORNEYS AT LAW**

For Defendant Thomson:

> FAEGRE, BAKER, DANIELS
> 3200 Wells Fargo Center
> 1700 Lincoln Street
> Denver, CO 80203-4532
> **BY: JEFF ROBERTS**
> **ATTORNEY AT LAW**

> FAEGRE, BAKER, DANIELS
> 300 N. Meridian Street, Ste. 2700
> Indianapolis, IN 46204-1750
> **BY: RYAN M. HURLEY**
> **ATTORNEY AT LAW**

**DEFENSE APPEARANCES (CONTINUED):**

For Defendant Technologies Displays Americas, LLC:

                        SQUIRE, PATTON, BOGGS (US) LLP
                        1 E. Washington Street, Ste. 2700
                        Phoenix, AZ 85004
              BY:   **DAVID E. WALL**
                    **ATTORNEY AT LAW**

                        CURTIS, MALLET-PREVOST, COLT & MOSIE
                        1717 Pennsylvania Ave., N.W.
                        Washington, D.C. 20006
              BY:   **JEFFREY I. ZUCKERMAN**
                    **ATTORNEY AT LAW**

For Defendant KPNV (Royal Philips):

                        BAKER, BOTTS, LLP
                        1299 Pennsylvania Avenue, NW
                        Washington, D.C. 20004-2400
              BY:   **JOHN M. TALADAY**
                    **ATTORNEY AT LAW**

For Defendant LG:
                        MUNGER, TOLLES & OLSON, LLP
                        355 South Grand Avenue, 35th Floor
                        Los Angeles, CA 90071-1560
              BY:   **SUSAN E. NASH**
                    **BRAD D. BRIAN**
                    **ATTORNEYS AT LAW**

APPEARING BY TELEPHONE:  Jason C. Murray

| | |
|---|---|
| 1 | **Tuesday - February 23, 2016**                    **9:30 a.m.** |

2                     **P R O C E E D I N G S**

3                         ---oOo---

4          **THE CLERK:**  Calling civil case 07-5944, MDL No. 1917

5    In Re Cathode Ray Tube Antitrust Litigation.

6        Your Honor, appearances have already been taken.

7          **THE COURT:**  Thank you.  Welcome.

8        The matter is -- the case is on calendar this morning to

9    hear the summary judgment motions on the evidence of liability

10   filed by many of the defendants in the case.  As always, I

11   regret how relatively little time I can allocate to the hearing

12   of any individual motion.  Let me say a few housekeeping

13   things.

14        First, I understand, and it does not surprise me, that

15   there will not be any argument regarding the motion at Docket

16   No. 3048 that was filed on behalf of the entities MEUS, MEVSA,

17   LGEUSA and LGETT.  The only question I have for counsel -- and

18   I don't want to take it up now, we could do it at the end of

19   the hearing -- is whether there's any reason I shouldn't simply

20   grant that motion.  I know there are pending settlements, I

21   don't want to mess that up.  But I would just like to know, for

22   administrative purposes, the answer to that question.

23        Secondly, let me just say a note about what I think will

24   be helpful this morning.  Certainly, I expect counsel, where

25   the facts are subject and more than one characterization, to do

 1  their job of characterizing the evidence in a way that's

 2  favorable to their client.

 3     I will say that it is -- it doesn't really move the ball

 4  for a defendant on summary judgment, if they file a motion, if

 5  they only want to see the evidence in the light most favorable

 6  to them, because that's not the light in which I am going to be

 7  looking at it.  The law tells me *not* to do that.  So you're

 8  going to have a few minutes.  If you spend your time doing

 9  that, you're welcome to do that if you want, but it's probably

10  not going to help me see your motion in the best possible

11  light.

12     Also, having now read all of these motions and all the

13  oppositions and all of the replies, I have a pretty good grasp

14  on the *Citric Acid Litigation* test --

15                      (Laughter)

16     -- so I don't really need every -- I don't need twelve

17  people to repeat the test for me when they get to the podium.

18  You're only going to have a few minutes.  You can talk about

19  something else.  If I forget the test, I printed it out.

20                      (Laughter)

21     I have it up here.  I'll be looking at it from time to

22  time.  I think I'm clear on *Citric Acid*.

23     There are a couple motions that rely on the *Vitamins* case

24  in the district court out of the District of Columbia, and the

25  test there for determining the liability in a situation where

1    the defendant alleges that it wasn't one overarching

2    conspiracy, it was actually separate conspiracies.  If counsel

3    want to talk about the *Vitamins* test, that's fine.  I didn't

4    print it out.  But I mention that only so you know I'm

5    generally aware of that test also.

6         Okay.  I have the motions with me.  I don't have the

7    various exhibits with me.  Just for volume reasons I thought

8    even though that might be helpful in a hearing, to fit the time

9    it would take me physically to put my hands on each of these

10   exhibits as counsel were talking about it probably overall

11   would not be a productive use of time, and so I have not done

12   that.  I'm sure there are a couple times this morning where I

13   will regret that decision.  It's too late.

14        The following will be very helpful to me in your argument:

15        Referencing exhibits in the way that makes it easiest to

16   retrieve them from the electronic docket, which is what I will

17   do when I go back to read the transcript of the hearing, if I

18   believe that you have persuaded me that I need to take a

19   specific look at that exhibit.  So if you want to talk about

20   the deposition testimony of a particular person, obviously if

21   the testimony is longer than a few pages, a specific page

22   number is helpful.  But telling me the docket number is

23   helpful; otherwise, the chances that on a Sunday afternoon when

24   I'm here I will decide that it's a good use of my time to

25   figure out where that exhibit is is very low, because in

1   realtime that's how that works.

2       Similarly, most of these motions take the following form.

3   Here's a bunch of stuff; it's not enough to allow the

4   plaintiffs to go to the jury, and the plaintiffs say that same

5   stuff is definitely enough to allow us to go to the jury.

6   That's these motions.  These are not big-picture issues of law

7   motions like we've had in some other hearings.  There's a pile

8   of evidence; is it good enough or not?

9       If you cite twelve cases -- if you cite no cases in your

10  argument this morning, that will be sort of a weak signal that

11  you're probably in trouble.  Because on summary judgment a

12  judge is just left with his own gut in determining whether or

13  not somebody has proven their case.  Probably his confidence

14  level or her confidence level is not going to be that high.

15      On the other hand, if you cite fifteen cases, they're

16  going to get lost in the shuffle.  What's very useful to me is

17  to say:  *Your Honor, in this case, or these couple of cases,*

18  *this evidence was found to be or not to be enough; and if you*

19  *read this pile of facts in this case, we win.*  That, I can do,

20  and that I *will* do, and that's actually what will be very

21  helpful to focus me, having now read however many pages it took

22  to get ready for this morning, that's the kind of sharpening

23  that I think would be useful.  Of course I know you're all

24  prepared.  You came here to tell me some other things.  I look

25  forward to those things, hearing those things as well.  But

1  these couple things that I mentioned, that would be of

2  particular use to me.

3       I may have specific questions.  On a couple cases I know I

4  have questions.  I may have specific questions for you as we go

5  along.

6       There's no magic to this.  It's essentially random.  We

7  have six motions remaining, putting aside the one that I

8  mentioned earlier.  We're going to argue them in the following

9  order:  Mitsubishi, Hitachi, Panasonic, Royal Philips, Thomson,

10  TDA.  We're going to have ten minutes a side.  We'll take a

11  ten-minute break at some point, so Ms. Aquilina's fingers can

12  rest, and then the motions will be under submission.

13       Let's hear from the moving party, Mitsubishi.

14       **MR. FUENTES:**  Thank you, Judge.  Gabriel Fuentes on

15  behalf of Mitsubishi Corporation.

16       I will spare the Court the reiteration of *Citric Acid*.

17  But many times the Court has asked the parties what do they

18  think their best case it is.  It is clearly *Citric Acid* in this

19  case.

20       And, Judge, I'd like to focus for a moment on what

21  Mitsubishi views as the controlling aspect of *Citric Acid*.  As

22  we read that case, and we read it in contrast with *Petroleum*

23  *Products*, Judge, it's clear to us that if there is an inference

24  of conspiracy from a piece of circumstantial evidence, and

25  there is also an inference of independent action from that

piece of circumstantial evidence, you have a situation in which
there may be competing interpretations.  But if that document
does not tend to exclude independent action, it does not
overcome summary judgment.

        And so that's what we have in the Mitsubishi --

            **THE COURT:**  Do you think there's any significance to
the choice of the words "tend to exclude" as opposed to
"exclude"?

            **MR. FUENTES:**  I think probably there's some
significance to that, Judge.  And I think what that requires is
a careful analysis of the evidence that's been submitted.  We
could go through all of that, Judge.  It would take me far more
than my ten minutes.  And by the way, I'd like to reserve two
for rebuttal.

        But in the case we have in front of the Court -- and I'll
go right to some of the evidence that the plaintiffs rely most
heavily on.  First of all, the plaintiffs say this is a direct
evidence case.  They want to say that *Citric Acid* doesn't
apply.  They want to say that *Petroleum Products* applies.  And,
Judge, the only direct evidence that could possibly be in this
case is the Samsung SDI interrogatory answer.  November 2013,
Samsung SDI submits an answer to an interrogatory it received
from Dell, and it says: *What essentially was the basis for
your criminal guilty plea in the case*?  And Samsung SDI says:
*Well, we conspired with Chunghwa; we conspired with at least*

1    *one Mitsubishi entity*.  And as far as the names of individual,

2    they named somebody named Katu Nakashima, who it turns out,

3    from a deposition record, doesn't exist.

4         **THE COURT:**  You don't think that's a reference to

5    Hitoshi Nakajima of Mitsubishi Electric, and Mr. Kado of

6    Kushita Tech.

7         **MR. FUENTES:**  I think it is a reference to that,

8    Judge, and so we don't really have a dispute about that.

9         I think what it is is when you look behind that reference,

10   and you ask -- when you look at the Samsung SDI interrogatory

11   itself, and you look at the verification, it's verified by a

12   guy named Yung Tae Kim (phonetic), and he verifies on

13   information and belief.  And then there's 70-some witnesses who

14   testify from the ten different defendants in the case over the

15   course of discovery, not -- and fourteen of them were from

16   Samsung SDI, and not a single one testifies to any agreement

17   between Mitsubishi Electric and Samsung SDI at all.  Not a

18   single one of them testifies to the content or the events that

19   occur at the March 3, 2003 meeting, which is Exhibit 12 to the

20   opposition brief filed in this case.  Not a single witness

21   testifies to what actually happened at that meeting.  And the

22   document itself refers to a competitive intent by Mitsubishi

23   Electric and Samsung toward their mutual customer, which was

24   Samsung Electronics was a purchaser of CDT.

25        So the evidence crumbles when you look at it carefully,

1   and that's aside from the fact that, as the Court knows, under

2   Rule 56(c), the Court can't consider inadmissible evidence on

3   summary judgment.  And there's nothing in the case that I know

4   of that's more inadmissible than that interrogatory answer.

5            **THE COURT:**  Is expert opinion admissible?

6            **MR. FUENTES:**  In a limited form, Judge.  I think

7   expert opinion would be -- *Citric Acid* dealt with this as well.

8            **THE COURT:**  You introduced expert opinion, didn't you?

9            **MR. FUENTES:**  We did.

10           **THE COURT:**  It's admissible.

11           **MR. FUENTES:**  It's admissible --

12           **THE COURT:**  It's relevant.

13           **MR. FUENTES:**  -- for a limited purpose, Judge, and we

14   introduced it for a limited purpose.  We didn't introduce

15   expert opinion to say there's no conspiracy.  We introduced

16   expert opinion for principles such as an analysis of the

17   production documents that the other defendants produced show

18   that Mitsubishi Electric had a small market share.

19       We've not offered our expert as a conspirologist or an

20   anti-conspirologist, as Mr. Elzinga is a conspirologist.

21   That's just lawyers argument, Judge, and it doesn't move the

22   scales.

23       So I hope that answers the Court's question.

24       But I want to be sure that I've explained to the Court

25   that the interrogatory answer itself, it's clearly an

1   out-of-court assertion.  It's clearly offered for its truth

2   that Mitsubishi Electric and Hitoshi Nakajima, even though they

3   got the name wrong, conspired.  I think it's interesting that

4   they got the name wrong.  I think it calls into question the

5   reliability of that answer.  But that's not really before the

6   Court either.  If it's inadmissible, it's inadmissible.

7        And if I can, Judge, I'd like to briefly talk about the

8   two cases that are the best cases for that principle, and

9   they're the two cases that plaintiffs rely on in their

10   briefing.  The first one is *Frazier*, *Frazier versus Goodale*,

11   Ninth Circuit case.  This is a case in which there was a diary,

12   and there were entries in the diary that were sought to be

13   introduced on summary judgment, and they were in an

14   interrogatory answer, and the issue was could you consider the

15   interrogatory answer despite the fact that its content

16   technically was hearsay, and the Court said yes, you could.

17   Because in that case the author of the diary, the person who

18   made the assertions, described the events in the diary, was

19   available to testify, and, as far as the Court's opinion was

20   concerned, was prepared to testify to the actual content of the

21   diary.  There was admissible evidence that was going to come in

22   to demonstrate those points, and that's what's missing from

23   this case.

24        And I think one of the most stark admissions you'll find

25   in the record on that would be in the plaintiff's letter to

1    Judge Walker, August of 2014.  The plaintiffs were trying to

2    depose Samsung in a 30(b)(6) deposition over the basis for the

3    guilty plea.  Samsung SDI moved for a protective order, and the

4    plaintiffs wrote to the Court that there wasn't a shred of

5    evidence.  There wasn't any witness who had testified to that

6    agreement that's referred to in the answer.

7         And really the purpose behind that whole effort by the

8    plaintiffs was really a recognition that if they didn't have

9    admissible evidence, they wouldn't have anything to offer to

10   the jury, and they would be facing the argument I'm making

11   today, that it can't be considered on summary judgment.

12        So that's what makes our case different in a stark and

13   illustrative way from *Frazier*.

14        The other case that they mentioned is *Block versus City of

15   Los Angeles*.  That's also a Ninth Circuit case.  And that is a

16   case in which it was an employment wage dispute, and one of the

17   issues in the case was whether some of the plaintiffs had been

18   suspended, properly or improperly, and the City tried to submit

19   this document which was really a bunch of compilations of

20   different assertions about how those suspensions were proper.

21   But there was no basis for them, there was no evidence that the

22   parent actually could testify to them.  And I think the Court

23   also commented that there was no basis to believe that those

24   assertions were made from personal knowledge.  Again, that's

25   what we've got here.  We've got Yung Tae Kim signing a

1   verification that says it's not information and belief.  It's

2   not from personal knowledge.

3        And if you look to Rule 56(c), not only does it say that

4   the evidence has to be admissible, it also says that if you're

5   going to oppose summary judgment with a declaration or

6   document, the declarant, or the affiant, has to be able to

7   testify from personal knowledge.  That's what's hissing here.

8        So the final piece of this, Judge --

9           THE COURT:  There's a fairly large pile of

10  circumstantial evidence, though, isn't there?

11          MR. FUENTES:  I'd say there's a large pile, but the

12  size of the pile --

13          THE COURT:  I had the benefit of reading your motion

14  last, so I make that statement actually comparatively to some

15  of the other motions.  I mean, there are a lot of meetings,

16  there are a lot of -- and granted, as you say in your motion,

17  most of that evidence -- or that evidence doesn't rise to the

18  level of direct evidence.  There isn't a statement of agreement

19  to fix a price, and that sort of thing, but there are several

20  documents showing meetings and discussions regarding

21  production, production lines, inventory, pricing comes up

22  sometimes.

23          MR. FUENTES:  It does, Judge.  And so there's a large

24  number of meetings that were disclosed under the very broad

25  interrogatory requests.  They included trade association

```
 1  meetings.  A large number of the meetings and communications at
 2  issue are trade association meetings.
 3           THE COURT:  Are you the Japanese Trade Association
 4  motion; is that you, EIJA.
 5           MR. FUENTES:  EIAJ.  We actually have a motion in
 6  limine to exclude evidence.
 7           THE COURT:  Right.  But doesn't the history that you
 8  recount in your motion talk about how a lot of these
 9  discussions, and so forth, were done under the aggies of that
10  trade group, and that trade group produced information to the
11  Japanese government, that sort of thing?
12           MR. FUENTES:  A number of them were.
13           THE COURT:  And isn't there evidence then that the
14  exchange of information between competitors continued after the
15  trade association said:  *Stop doing that*.  *We have some*
16  *antitrust concerns*.  Isn't that what plaintiffs will say when
17  they get to the microphone?
18           MR. FUENTES:  I think that's the heart of the
19  plaintiff's argument about the trade association meetings, and
20  it requires the Court to assume that because the EIAJ had a
21  compliance concern and said *hey, it's not a good idea to*
22  *have* -- *to be exchanging firm specific information, don't do it*
23  *anymore*.  But if the parties had a reason to continue to do it,
24  to monitor their competitive activities, to monitor demand, and
25  to continue to do it, however foolish we may think that is,
```

1   because EIAJ told them not to, that that somehow translates to

2   a joining of the Glass Meetings conspiracy, the heart of the

3   complaint conspiracy, it's --

4        **THE COURT:**  What is there that's particular to this

5   industry for your client that makes the exchange of that kind

6   of information an ordinary course activity?

7        Every firm, any rational firm would love to know its

8   competitor's pricing, production, and all that, but nonetheless

9   that information is not generally exchanged.  So it's unusual,

10  and plaintiffs would say it gives rise to an inference that

11  there was something unlawful going on.  What is it about your

12  client or this industry that makes exchanging that kind of

13  information ordinary course?

14       **MR. FUENTES:**  It's a highly competitive industry in

15  which the products, the finished products involved are

16  constantly changing, the sizing of the product that is offered

17  for sale, the demand for a particular size or type of CRT

18  product is frequently changing.

19       This came up in the record in the 30(b)(6) deposition

20  testimony of Mitsubishi Electric.  It wasn't disputed.  It's

21  not disputed that under *Citric Acid* itself there's discussion

22  in *Citric Acid* about how gathering competitive information is

23  standard fare for trade associations.

24       So the plaintiffs have to offer more than that.  They

25  failed to do so.  Because, as in *Citric Acid*, in which Cargill

1   sat in on some of these trade meetings, not a single one of

2   those trade association meetings was a meeting at which a

3   conspiratorial agreement was entered into.

4        Judge, I see my time has ended.  I'm happy to answer any

5   further questions, otherwise I'd like to reserve my two minutes

6   for the rebuttal.

7             THE COURT:  Very good.  Thank you.

8             MR. FUENTES:  Thank you.

9             MR. WAGNER:  Good morning, Your Honor.  Scott Wagner

10  of the Bilzin, Sumberg firm on behalf of Tech Data Corporation

11  and Tech Data Product Management.  And I'll be arguing this

12  motion on behalf of all the DAPs.

13       Your Honor, in order for Mitsubishi to be successful on

14  its motion for summary judgment, the Court would have to ignore

15  a direct admission from SDI that Mitsubishi participated in the

16  conspiracy, and a record that shows --

17            THE COURT:  Well, to consider it I'd have to admit it

18  first before I could ignore it.

19            MR. WAGNER:  That's true, Your Honor.

20            THE COURT:  Why would I?

21            MR. WAGNER:  A few reasons, Your Honor.  And I think

22  it starts, Your Honor, with the fact that, as Mr. Fuentes

23  pointed out, we saw this coming.  We saw this train coming down

24  the track months ago, years ago.  We knew that they were going

25  to come up and make this argument.

 1          And in order -- and we think the interrogatory response is

 2    sufficient.  But in order to avoid this discussion, in order to

 3    avoid all the briefing we've had on whether or not the

 4    interrogatory comes in or doesn't, we went to SDI.  We served a

 5    30(b)(6) notice.  They objected to it.  They filed a motion for

 6    protective order.  Special Master Walker granted the motion.

 7    And in granting the motion the Special Master found that the

 8    interrogatory response was sufficient, and it would be

 9    duplicative if we were to go out and take a 30(b)(6) on the

10    same topic that they responded to in the interrogatory.

11          **THE COURT:**  Yes, was Mr. Mitsubishi a party to that

12    motion?

13          **MR. WAGNER:**  Mitsubishi was not a party to that

14    motion.  It was brought by SDI.  But --

15          **THE COURT:**  I understand what you're saying, that you

16    perceive, with some justification, a tremendous amount of

17    unfairness to you.  But it's not as though Mitsubishi took one

18    position in connection with that motion, now they're taking a

19    different position.

20          **MR. WAGNER:**  That's true, Your Honor.  But this issue

21    is actually still very important to SDI.

22          **THE COURT:**  Why is it -- so you say in your opposition

23    to me, reasonably, *look, if you're not going to admit this, we,*

24    you know, we, your client, *tried to litigate this, we lost.  If*

25    *you're not going to admit this interrogatory response, give us*

1    *the deposition we wanted in the first place.*

2        So I think what Mitsubishi might say to that is, as you

3    heard counsel say in his argument, they've taken the deposition

4    of so many Samsung or SDI witnesses, they've had their shot at

5    the people they thought would know this information.  What's

6    the response to that?

7            **MR. WAGNER:**  Well, the response to that, Your Honor,

8    is that there was a corporate admission from SDI that SDI

9    conspired with Mitsubishi.  That admission came after the

10   completion of the other 30(b)(6) depositions of Mitsubishi,

11   excuse me, of SDI.  And we haven't had a chance to ask SDI

12   about the corporate admission.

13       And that's the difference -- you know, and Mr. Fuentes was

14   talking about the cases we cite, and he was talking about

15   individual knowledge.  This is not an individual compiling

16   information and presenting it in an affidavit.  This is a

17   corporate admission sworn under oath in response to an

18   interrogatory.  And I think the indicia of reliability of that

19   sort of document is much different than an individual

20   collecting information and not necessarily speaking on behalf

21   of the corporation.

22       Now, the verification was done on behalf of SDI.  And the

23   only way to get information out of SDI is through the

24   interrogatories or through a 30(b)(6) deposition.

25       And Your Honor, I think, as you alluded to, even if the

1   Court were to find that the interrogatory could not come in --

2   and we think there are plenty of ways that we could get the

3   substance of the interrogatory into evidence at trial.  We

4   could ask an SDI corporate representative about it at trial, if

5   they're still a party in most of the DAP cases.  If we settle

6   with them, we could reach an agreement as part of the

7   settlement to have an SDI corporate representative come and

8   testify about the interrogatory response.  The interrogatory

9   itself could come in under various hearsay exceptions.

10      And the Court doesn't need to reach that determination

11   today.  All the Court needs to find is that there is some path

12   to admissibility that I think here, as in the *Frazier* case,

13   there are a number of paths to admissibility.

14      I want to go back, Judge, just for a second, and just

15   touch on the standard that Mitsubishi is trying to get the

16   Court to adopt.

17      Mitsubishi is arguing that it is entitled to summary

18   judgment unless one of two things occurs:  One, that DAPs can

19   point to a document that has the magic words "We reached an

20   agreement."  Or, there is an admission that Mitsubishi

21   participated in the conspiracy.  Mitsubishi says if you can't

22   do one of those two things, *DAPs, you're out of luck, and we*

23   *win our summary judgment motion*.  That is not the standard,

24   Judge, on summary judgment.

25      The standard on summary judgment is that viewing the

1   evidence in the light most favorable to the plaintiffs -- and

2   you made this point when you first came on the bench.  You said

3   it's not a good idea for the defendants to argue; you have to

4   view every document in the light most favorable to the

5   defendants.

6        And that's exactly what they do here, Your Honor.  They

7   take a document that we say has a conspiratorial communication,

8   has pricing information that they're exchanging, and they point

9   to another part of the document.  They say, *Well, look at this*

10  *one line.  This evidences competition.*  And because there's

11  this one line that we say evidences competition, counsel can

12  come up with an argument about why there's some pro competitive

13  spin on the document.  But you have to disregard all of the

14  potentially illicit communications that are reflected in the

15  document, and that's just not the standard.

16       **THE COURT:**  There must be tons of cases that are great

17  for you, if Mitsubishi missed that mark by that wide a margin.

18  What's the best one?

19       **MR. WAGNER:**  Well, I think, Judge, you probably heard

20  this way too often, but the best case, once again, comes from

21  *LCD* and Judge Illston in the *LCD* case.

22       In the *LCD* case, Toshiba made virtually the identical --

23       **THE COURT:**  Which of the court's -- please.

24       **MR. WAGNER:**  Sorry.  It's Exhibit 30 to my

25  declaration, and to our opposition.

1      **THE COURT:**  Okay.

2      **MR. WAGNER:**  And Toshiba made exactly the same

3   argument that Mitsubishi is making here.  They argued, one, it

4   was entitled to summary judgment because it never attended the

5   crystal meetings, which are the equivalent of the Glass

6   Meetings in this case; and, two, all it did was exchange

7   information with other members of the conspiracy.  And Judge

8   Illston soundly rejected Toshiba's argument.  She said this

9   case, however, is a far cry from *Citric Acid*.

10      And I want to touch on what Judge Illston talked about as

11   the distinction between that case and *Citric Acid*, because I

12   think it's equally applicable here.

13      **THE COURT:**  No, that's okay.  I'm going to cut you

14   off, because you and I don't have as much time together as we'd

15   like.

16      **MR. WAGNER:**  Understood, Your Honor.

17      **THE COURT:**  Do you take the position that the *Citric*

18   *Acid* test doesn't apply where there's a mix of direct and

19   circumstantial evidence?

20      **MR. WAGNER:**  I think that's right, Your Honor.  And I

21   think what you need to look to for that is the *Petroleum*

22   *Products* case.  And because what -- there's a great discussion

23   in *Petroleum Products*.  It's a bit of an academic discussion,

24   but I think it's very applicable here.  It talks about why we

25   have *Matsushita*, and why we have the *Matsushita* standard.  And

1    what the --

2              **THE COURT:**  Madam reporter, M-A-T-S-U-S-H-I-T-A.

3              **MR. WAGNER:**  I apologize, Your Honor.

4         And why we have the *Matsushita* standard -- and what the

5    Court talks about is that the Ninth Circuit says the Supreme

6    Court did not want to cut off potentially pro competitive

7    effects by having a summary judgment standard that was too

8    rigorous.

9         And when you look at the types of things that the Court

10   was talking about, *Matsushita* itself, they were talking about

11   rebates and reductions in prices, and you compare information

12   exchanges of current and future pricing of production

13   information to what the Ninth Circuit said the Supreme Court

14   was trying to protect in *Matsushita*, the information exchanges,

15   the exchange of current and future pricing information, the

16   exchange of production information is nowhere near the type of

17   thing that the Court was trying to protect the pro competitive

18   effects of in the *Petroleum Products* case.

19        And I think if you look at the evidence that the Court

20   relied on in the *Petroleum Products* case, and you compare it to

21   the evidence that we've come forthwith in this case, and you

22   look at the documents, the exchanges of pricing information, I

23   think the documents, and I think the evidence we presented here

24   is actually very close to the type of evidence that was

25   presented by -- the Court discussed in *Petroleum Products*, and

1    that the Court referred to as direct.

2        But, again, I go back to Judge Illston and *LCD*.  You know,

3    Judge Illston said it doesn't matter if it's direct or

4    circumstantial or some combination of the two.  The fact that

5    they were exchanging current and future pricing information

6    with members of the conspiracy is sufficient.

7        And Your Honor, Judge Illston is really on firm ground

8    with that decision.  Because the Supreme Court has said -- I

9    just want to make sure I have the cite for you -- in U.S. -v-

10   Gypsum -- and it's 438 U.S. 422, and it's page 443, Note 16,

11   and Gypsum is G-Y-P-S-U-M -- the Supreme Court said:

12        "Exchanges of current price information, of course,

13        have the greatest potential for generating

14        anti-competitive effects and, although not per se

15        unlawful, have consistently been held to violate the

16        Sherman Act."

17       And so the point that I'm trying to emphasize, Your Honor,

18   and I hope the point that Your Honor takes away from this

19   morning's discussion, is that exchanges of pricing information

20   fall into an entirely different category, whether you call it

21   another form of circumstantial, whether you call it direct,

22   fall between an entirely different category than things like

23   parallel pricing.

24       And if the Court has no further questions, I thank the

25   Court.

1         **THE COURT:**  Thank you.

2      Mr. Fuentes, I'm going to give you two minutes.

3   Apparently you used ten minute before.

4      I'll say to the room, when Mr. Noble shows you a piece of

5   paper that says "Two Minutes" it doesn't mean that he banked

6   two minutes for you, and this is some other two minutes.

7      Go ahead.

8         **MR. FUENTES:**  And, Judge, I apologize.  I think my

9   mistake was probably not making clear enough that I meant to go

10  only eight and reserve the two, so I apologize for that.

11        **THE COURT:**  It's all right.

12        **MR. FUENTES:**  Judge, first of all, the discussion from

13  the plaintiffs about how somehow if we sat down in a room with

14  Samsung SDI and figured out who could tell us this, we'd be

15  able to figure out, we maybe could have another deposition.

16     Judge, this case, this motion has been briefed for a year,

17  and it was a year ago --

18        **THE COURT:**  You're laying that at the feet of opposing

19  counsel?

20        **MR. FUENTES:**  Judge --

21        **THE COURT:**  Believe me, no one in the room is aware

22  that this motion has been pending for more than a year more

23  than I am.

24        **MR. FUENTES:**  Very well.  Judge, I think my point is

25  that, as has been said many times, including cases we've cited

1  to the Court, summary judgment time is put up or shut up time.

2  And if the plaintiffs had wanted more depositions, if they

3  wanted to reopen the 30(b)(6), they could have filed a motion

4  to do so.

5          **THE COURT:**  Didn't they try that?

6          **MR. FUENTES:**  I mean --

7          **THE COURT:**  Let me ask you the question in this way.

8      What is it that you contend plaintiffs didn't do in

9  connection with this SDI evidence that they should have done?

10         **MR. FUENTES:**  Well, Judge, they could have deposed the

11  two people who were present for the March 3, 2003 meeting,

12  according to the document that describes it.  The whole case is

13  based essentially on that document.  And they did depose those

14  people, Jae In Lee and D.Y. Kim.  They were deposed, and they

15  said not a word about the conspiracy with Mitsubishi, and they

16  are listed on the document --

17         **THE COURT:**  Right.

18         **MR. FUENTES:**  -- as having attended the meeting.

19         **THE COURT:**  I take very seriously the claim that the

20  SDI interrogatory response is not admissible.  I hear no one

21  suggesting that it's false.  And plaintiff's argument regarding

22  indicia of reliability actually has some force.

23      But I do, I do have trouble with the equities of the

24  plaintiffs identifying that they might have this problem, going

25  to the Special Master, getting shut down, and now being told

 1   that the document can't come in.

 2           **MR. FUENTES:**  Judge, that is a circumstance in the

 3   record that, as the Court I think incisively discovered during

 4   the questioning, we at Mitsubishi Electric had nothing to do

 5   with it.

 6       But let me offer you this to counterbalance the equities.

 7           **THE COURT:**  If the plaintiffs were to file a motion to

 8   take that deposition, would Mitsubishi oppose it as a third

 9   party?

10           **MR. FUENTES:**  I think we'd have to read the motion.

11   And I'd be reluctant to answer that off the cuff, Judge, but we

12   very well might.  We're long into the case.  There's been a lot

13   of discovery, a lot of witnesses.  Nobody has ever indicated to

14   us.  We think it's time for us to be out of this case, because

15   not every antitrust conspiracy case can survive summary

16   judgment.  That's the lesson of *Citric Acid*.

17       And, Judge, what I was trying to do to try to

18   counterbalance the Court's concerns about the equities of this

19   a little bit is note that this is not a question of Mitsubishi

20   Electric picking out one or two lines from some of these

21   documents and saying that somehow -- that making a meaningless

22   argument.  Judge, the lines that the plaintiffs did not include

23   in their brief from this seminal March 5, 2003 document were as

24   follows.  This is the Samsung person who wrote the document:

25           "Mitsubishi intends to rule over the 21, 22-inch CDT

1    portion of the CDT business through the development of a

2    low-cost 22-inch model as it cautiously competes with

3    SDI."

4    And not just one line.  Another line from the document:

5        "Need to prevent Mitsubishi's NF interest into SEC,

6    Samsung Electronics, through excellent price reduction and

7    quality improvement."

8    My time has expired, Judge.  Any other questions I'm happy

9    to answer them.

10           **THE COURT:**  Thank you.

11           **MR. FUENTES:**  Thank you.

12           **THE COURT:**  All right.  Hitachi.

13           **MR. FOSTER:**  Good morning, Your Honor.  My name is

14   Dana Foster for Toshiba.  But today I'll be arguing the motion

15   filed by three Hitachi entities, that's Hitachi America

16   Limited, or HAL, Hitachi Electronic Devices, U.S., or HED(US),

17   and Hitachi Displays, which is HDP.  I'll try to keep those

18   acronyms straight throughout my argument.

19       As you know, the five Hitachi defendants that were named

20   in this case, that were in the cases before Your Honor, have

21   all settled with all the plaintiffs in the MDL, but this motion

22   still has some -- the defendants in this case still have some

23   stake in this motion, and that's why I'm here today to argue

24   this.

25       I'm going to skip a lot of the background on *Citric Acid*.

1    I'll take Your Honor's comments to heart.

2         Before I get in deep on my prepared remarks, I want to

3    respond to a question that you had for my colleague about the

4    aspects of this industry, and why exchanges of information

5    among CRT manufacturers is pro competitive.

6         It's a highly competitive industry.  Customers have a lot

7    of buying power, and there's a lot of instances where customers

8    will share a CRT manufacturer's prices with their competitor.

9         **THE COURT:**  Okay.

10        **MR. FOSTER:**  And there's -- and may not be truthful

11   all the time, so there's a need to price check the customers to

12   check to see if they're being accurate in the price that

13   they're sharing.

14        **THE COURT:**  That's what price fixing does.  I mean,

15   I'm not meaning to be flip.  Price fixing gives you leverage

16   against your customers.

17        **MR. FOSTER:**  Well, true.

18        **THE COURT:**  And the idea that customers call you up

19   and say things that are not true in price negotiations to try

20   to get a better deal, you know, we can have -- that might hurt

21   my feelings as a competitor, but that happens, not just about

22   prices, but about a million things.  People are constantly

23   trying you on for size; right?

24        **MR. FOSTER:**  That's right.  But these are -- these are

25   industry factors, and this is one example of something that

experts have said that -- that actually, Professor Elzinga, the

plaintiff's expert, has said is a pro competitive benefit of

sharing information, is that you can check and get the best

information possible from lots of different sources on the

accurate information.

The sharing of production information also provides an

opportunity to know the industry the best, so they can, for

example, have some idea whether it's accurate or not, how much

my competitor is producing, then I can decide whether I should

produce more of this type -- this size or this type of CRT,

because that's what the market wants, or less.  That makes

me -- helps me make better business decisions if I know the

market better.

Those are pro competitive benefits of sharing this

information, and these are aspects of the CRT industry, I

think, in which, you know, this does occur.

**THE COURT:**  Okay.

**MR. FOSTER:**  To go to the instant motion, Your Honor,

this motion was brought by three -- these three specific

Hitachi entities, HAL, HED(US) and HDP.

And I know Your Honor knows the difference between direct

evidence and circumstantial evidence, so I won't go into that.

But I do think the plaintiffs have not offered Your Honor

direct evidence that these three specific entities participated

in the conspiracy that they allege.

1    So then we have to move to the circumstantial evidence.

2    And I think Your Honor's task in this motion, and others, is to

3    crawl through this evidence like Judge Fern Smith did in *Citric*

4    *Acid* in the district court case, that I know you've referenced

5    the *Citric Acid* case in the Ninth Circuit, but her district

6    court opinion I think is very valuable as far as how to

7    evaluate this evidence.  That's at 996 F.Supp. 951.  That's the

8    one case I'll mention during my remarks that was not cited in

9    the motion.

10    Crawling through this evidence, deciding what this

11    evidence means for these three different entities, it is a

12    little bit -- made a little bit more challenging by the

13    plaintiffs because of their almost pathological tendency to

14    group all the Hitachi entities together.  They just lump them

15    together, ignore the corporate separateness.  And I'll give you

16    two examples, Your Honor.

17    First of all, I read the transcript from the summary

18    judgment motion a couple weeks ago where Hitachi presented

19    their withdrawal motion.  And my friend, counsel for Sears

20    K-Mart, Sam Randall, said, quote:  "We submit that Hitachi

21    function as a single entity."  He didn't provide any evidence

22    to Your Honor to back that up or point to something in the

23    record.  He just said it, completely ignoring the corporate

24    separateness of all these five different entities.

25    The other example I'll give Your Honor is footnote 1, the

1    very first footnote -- they have a lot of footnotes in their

2    opposition to the motion for summary judgment -- but footnote 1

3    defines all the Hitachi entities, not just the three that

4    brought this motion, but all five, lumps this other Chinese

5    entity in there SEG Hitachi, calls it Hitachi, defines that

6    term as all six entities Hitachi, and then they refer to that

7    all the way through the motion even though this motions was

8    brought by these specific entities.  I don't think there's any

9    basis in fact or law to treat these separate entities as one

10   big conglomerate, one entity.

11        Courts respect corporate separateness and ignore under

12   only very limited circumstances to prevent injustice to the

13   third party, that's the *Bowato* case, B-O-W-A-T-O.  That's a

14   Judge Illston's decision, 312 F.Supp. 2d. 1229.

15        The plaintiffs have offered no, Your Honor, no basis to

16   ignore this corporate separateness.

17        **THE COURT:**  What's the right test for successor

18   liability here?

19        **MR. FOSTER:**  I think the test is set out -- are you

20   referring to the HDP entity?

21        **THE COURT:**  Yes.

22        **MR. FOSTER:**  Yes.  I think the test is whether the, as

23   set out in the reply brief, whether the new entity that was

24   formed, the spun-off entity, whether they -- whether

25   consideration was paid for the -- for the assets for that

1   entity.

2            THE COURT:  Well, what's the consideration here?

3            MR. FOSTER:  They're shareholders in the -- they own

4   shares in that entity.  It's a wholly-owned subsidiary.  So

5   that's what they received for transferring this -- the assets

6   of that company.

7        With my limited amount of time left, I'd like to talk

8   about -- unless Your Honor has more questions about that -- the

9   evidence that the plaintiffs put forward about whether these

10  three entities, these specific entities participated in a

11  conspiracy, I think, fall into a few buckets.

12       The first bucket is that the two entities that didn't

13  bring the motion, Hitachi Limited and Hitachi Asia, they did

14  it, they were in it.  And I think, you know, the plaintiffs

15  spill a lot of ink and use a lot of footnote space to put in

16  evidence that those two entities colluded, participated in the

17  conspiracy.  We don't agree that they did, but we certainly

18  concede that there is an issue for trial of whether they did or

19  not.  We don't dispute that.  That's not a part of that motion.

20  But I don't think that's proof that these other three

21  completely separate entities, two in the U.S. and this one HDP,

22  did do it.

23       In fact, some of the evidence, actually from CC Lou,

24  that's Exhibit 2 to the Hitachi -- or, I'm sorry, Exhibit 14 to

25  Hitachi's declaration with all the -- or to the plaintiff's

1   declaration with all the evidence that's ECF 3266-6,

2   Exhibit 14.  He said, when he met with Hitachi, he would go to

3   Japan and Singapore.  That's Hitachi Limited and Hitachi Asia,

4   that's HAS.  He never said he went to the U.S., he never said

5   he went to Greenville, South Carolina, or New York.

6        The other bucket of evidence is that there were these

7   seconded employees.  I don't think that the plaintiffs have put

8   forth any evidence that once an employee that was in Japan that

9   goes to South Carolina for three years or four years, or in one

10  instance 16 years, was controlled by the Japanese entity.  He

11  was a U.S. employee of that U.S. entity.  I think the evidence

12  shows that.  I think the evidence shows that for all of these.

13  And I think that even if you want to call it seconded, once an

14  employee goes to a subsidiary, goes to another entity, their

15  actions are attributable to that entity and not to the parent,

16  and they haven't shown any evidence that either those

17  employees --

18       THE COURT:  Isn't there some evidence that Japanese

19  staff are handling pricing for the majority of HED(US)

20  customers?

21       MR. FOSTER:  I really appreciate --

22       THE COURT:  And aren't there regular reports back to

23  Japan?  I mean, the evidence does not show a hermetically

24  sealed entity.

25       MR. FOSTER:  So to your first point about the Japanese

     1   staff -- I appreciate that question, Your Honor -- that's the

     2   Japanese staff in South Carolina.  They're not staff in Japan.

     3   They're Japanese Nationals seconded working in South Carolina,

     4   working in New York that are employees of HED(US).

     5         They try to blur those lines and say it was the Japanese

     6   staff, and they were -- at the time the deposition testimony

     7   was Tom Heiser, who is an American guy.  But those employees

     8   were employees of the HED(US).  They were reporting to that

     9   American guy, Tom Heiser, and another one, Hirai, who was also

    10   a HED(US) employees.  They weren't just guys that are --

    11   there's no connection there, I don't think.

    12         About the report --

    13         **THE COURT:**  Ms. Aquilina, would you tell me at any

    14   time this morning if you have trouble with the pace of the

    15   proceedings?

    16                   (court reporter nods)

    17         **MR. FOSTER:**  My apologies if I'm going too fast.

    18         To answer your second question, Your Honor, your second

    19   point about reporting.  The plaintiffs -- there's two ways to

    20   look at reporting; right?  There is making a report, doing some

    21   report, and giving it to someone --

    22         **THE COURT:**  Your owner.

    23         **MR. FOSTER:**  In the military sense, there's who you

    24   report to in your chain of command:  I report -- I report to

    25   this person, and he's my direct supervisor, and that person

1   reports to somebody else, and that's his direct supervisor.

2        The plaintiffs blur those lines a little bit.  And I think

3   the evidence is clear that in the latter sense, the only person

4   who reported to the -- to Japan -- I see my time is complete,

5   Your Honor, if I might finish answering your question.

6        The only person that actually reported was the president

7   of HED(US), or HAL.  And he didn't -- I think the evidence is

8   there that he didn't go and say, *Hey, are you okay with the*

9   *prices that we're charging with the production levels*?  It was

10  budgets, and it was reports on sales, and things like that.

11            **THE COURT:**  I'm going to ask you to sit down.  Thank

12  you.

13            **MR. FOSTER:**  Thank you, Your Honor.

14       **MR. WEISS:**  Good morning, Your Honor.  Eric Weiss from

15  Perkins, Coie for Costco and the remaining plaintiffs in this

16  case.

17       As my colleague mentioned earlier, the most analogous case

18  is the *LCD* trial.  And Judge Illston summarily rejected all of

19  the arguments that counsel has raised today.  But I want to

20  take it a step further.

21       Judge Illston was proved right.  Less than two weeks after

22  these defendants filed their motion, a jury returned a verdict

23  in Costco's LCD price-fixing trial finding that there was a

24  conspiracy.  But they went further, Your Honor.

25       In that particular case, the judge asked the jury not to

1    just find did Costco prove a conspiracy, but asked the jury who

2    was in the conspiracy?  Thirty different alleged conspirators

3    were given to the jury, and the jury found that every single

4    one of them participated, including not just HTL, but HED(US)

5    and Hitachi Display, two of three that are here today.  And the

6    third, HTL, was not accused of being a conspirator in that

7    case.

8         So the idea of summary judgment and this needing to go to

9    a jury, the danger in granting their motion is significant

10   proof by what the jury found in the other case.

11        Now, I want to --

12        **THE COURT:**  Some of the evidence in opposition -- and

13   by the way, let me know at some point if you want to respond to

14   the objection, the hearsay objection that was made to 73 or 75

15   of your items of evidence.  There's a procedural problem with

16   the objection, and that is it's not entirely contained within

17   the reply brief, as required by our local rules, which I'll

18   deal with later.

19        But do you want to say anything about that today?

20        **MR. WEISS:**  Certainly, Your Honor.  The hearsay

21   exception is this.  There's a co-conspirator exception to the

22   hearsay rule.  These documents that have been provided by

23   co-conspirators fingering the Hitachi entities in the

24   conspiracy are admissible statements in furtherance of the

25   conspiracy.

1          **THE COURT:**  Some of the evidence is a little bit

2    general.  Is there -- what's your best exhibit with regard to

3    each of the three distinct corporations?

4          **MR. WEISS:**  Yes, Your Honor.  If the court is going to

5    look at any particular exhibit for HED(US), I recommend looking

6    at Exhibit 3 to the Jennifer Lee declaration, I believe it's at

7    3275, not only because it's revealing, but also because it's

8    entertaining.

9          Mr. Hirai is the vice-president of sales at HED(US), and

10   he is textbook guilty mind.  He doesn't remember anything:

11        "Q.  Mr. Hirai, between '95 and 2007, did you meet with

12        one of your competitors?

13        "A.  I don't recall.

14        "Q.  Okay.  What about Matsushita?  Did you meet with

15        Matsushita?

16        "A.  I don't recall.

17        "Q.  Well, what about Mr. Iwamoto Matsushita, he said that

18        you had multiple telephone calls with him, multiple

19        meetings.

20          "Do you remember him?

21        "A.  I don't recall.

22        "Q.  Okay.  Mr. Hirai, I have an email that you sent to

23        Mr. Iwamoto saying, quote:  Mr. Iwamoto, this is Hirai of

24        HED(US).  I just called and left a message, but I have

25        reserved the following location for our meeting tomorrow,

1      so please take note:

2          "Does that refresh your recollection?

3      "A.  I don't recall."

4      Let's give him an easy one.

5      "Q.  Well, Mr. Hirai, in that same email you gave

6      Mr. Iwamoto your cell phone number.

7          "Was that your cell phone number?

8      "A.  I don't recall."

9      It doesn't take a great leap for a jury to conclude that

10     Mr. Hirai is not being truthful.

11         Turning to HAL, we have the president of HAL, Fukasawa,

12     Mr. Fukasawa, and there is a Matsushita document describing

13     direct information exchanges with Mr. Fukasawa.

14         At this time, Mr. Fukasawa is moving from HAL to HED(US),

15     and Matsushita is saying, quote:  "Well, now that he's moving

16     there, will direct information exchanges become more

17     difficult?"  Confirming that there had been information

18     exchanges in the past.

19         Again, it doesn't take a great leap --

20             THE COURT:  What's the exhibit number, please?

21             MR. WEISS:  Oh, I'm sorry, Your Honor.  That is

22     Exhibit 54, at page 2.

23         And for HDP, not only do we have the evidence that this is

24     simply a mere continuation, same people, same location -- and

25     you don't shed your liability in a conspiracy by simply

1  changing your name -- there is evidence that HDP is

2  facilitating this conspiracy, helping out Shenzhen Hitachi.

3         Exhibits 99 through 104 we have HDP giving confidential

4  information to Matsushita.

5         100:  HDP asking Toshiba for confidential market prices.

6         In Exhibit 94 -- I'm sorry -- exhibit 101, Matsushita

7  asked HDP for also HED(US)'s information, and that is -- that

8  furthers the point that these entities are not working at

9  arm's-length.

10        And I want to emphasize with the Court that we're not

11  arguing that these three Hitachi subsidiaries are liable

12  because they're subsidiaries of a conspirator.  They are

13  individually conspiring with one another.

14        The argument that CC Lou didn't identify these three.

15  Well, CC Lou is not the only conspirator involved here.  The

16  argument that, well, many of these Hitachi subsidiary employees

17  have denied liability.  Well, if that was the standard, I'm not

18  sure we would ever have a trial, if denial was enough for a

19  grant of summary judgment.

20        I'd like to address, Your Honor, the -- some of the legal

21  arguments that they made in their motion.  This slight

22  connection, slight evidence distinction.

23        The Ninth Circuit -- it's well settled in this circuit

24  that the slight connection rule applies.  There has been

25  criticism of the language of slight evidence, because that

1    suggests that the burden of proof somehow changes.  That's not

2    what we're suggesting here.  The slight connection test -- and

3    when I say well settled, that's quoted from the Ninth Circuit

4    in 2006, *Prolaza*, 439, at 1177 -- well settled in this circuit.

5    And it simply means that if you're a part of the conspiracy

6    even just a little bit, you're jointly and severally liable for

7    the entire thing:

8            "Slight connection means that a member need not have

9        known all the other members, participated in the

10       conspiracy from the beginning, participated in all its

11       enterprises or even known all the conspiracy's details.  A

12       connection to the conspiracy may be inferred from

13       circumstantial evidence."

14       That's all that means.  Not trying, as the defendants

15   suggest in their brief, to pull the wool over the Court's eyes

16   or that we're resting on some crazy theory of law.  In fact, it

17   comes from the ABA model Jury Instruction (B)(13).

18           **THE COURT:**  The number of the instruction again,

19   please?

20           **MR. WEISS:**  B, Bravo, 13.  And the quote, by the way,

21   Your Honor, is from *United States -v- Reed*, 2009 case, 575 F.

22   3d. 900.

23       I want to also, if I might, Your Honor, address the

24   secondment.  What I heard from counsel, Mr. Foster, say when

25   these employees are seconded, they're now at the separate

1   entity, and they're not having discussion back with HTL.

2   They're, again, operating at arm's-length.  But, again, there's

3   plenty of evidence that Mr. Hirai, who has now been seconded

4   from HTL down to HED(US), is communicating with HTL,

5   Exhibits 57 and 72.

6        And to further emphasize this point that these entities

7   are working together, where does Mr. Hirai go when he is done

8   being seconded to HED(US)?  Back to HTL, Exhibit 3.  But at

9   this point HTL has spun off its display group into HDP, who is

10  one of the three entities that we have here today.

11       Evidence of other employees from HTL, Mr. Mitsumoto,

12  Exhibits 69 through 71, being seconded to HED(US), going around

13  the American employees to give information from competitors to

14  Mr. Hirai who then gives it back to HTL.

15       I come back to the simple point, Your Honor, that it

16  doesn't take a big leap for a jury to conclude that these

17  people were a part of the conspiracy.

18       And finally, I just conclude, Your Honor, by saying that

19  there's -- there are no efficiencies to be gained by granting

20  their motion.  All of this evidence involving these

21  subsidiaries will come into the trial, because it shows how HTL

22  and HAS participated in the conspiracy.  But then there's

23  danger in granting it, because if it were to be reversed, then

24  we would have to have a new trial.

25            THE COURT:  Yeah, I don't consider efficiency too much

1    on summary judgment.  People are either entitled to a trial or

2    they're not.

3          **MR. WEISS:**  Understood, Your Honor.

4          **THE COURT:**  And if they're entitled to it, I'm

5    prepared to sit here for as long as it takes.

6          **MR. WEISS:**  Understood, Your Honor.

7          **THE COURT:**  No, no, that's all right.  You opened the

8    door.

9                            (Laughter)

10         **THE COURT:**  It gives, I think -- I think it gives the

11   federal -- it gives the courts a bad name if they talk about

12   that.  So lots of people do.  I'm not blaming you, I'm just

13   relieving any of your colleagues for the need to address that.

14         **MR. WEISS:**  Understood, Your Honor.

15       Well, then I might leave you with a reference to *Beltz*, a

16   Ninth Circuit binding, which talks about in these complex

17   antitrust cases, when the evidence is in the hands of the

18   conspirators, and hostile witnesses make for credibility

19   determinations like Mr. Hirai, it's best left for the jury.

20       Thank you, Your Honor.

21         **THE COURT:**  Thank you.  I think your time has expired.

22         **MR. FOSTER:**  Might have I have thirty?

23         **THE COURT:**  No.

24         **MR. FOSTER:**  Thank you.

25         **THE COURT:**  I'm sorry if I sound sharp.  We talked

 1    about the opportunity cost of time the very first time we got

 2    together.

 3          Panasonic.

 4          **MR. KESSLER:**  Good morning, Your Honor.  Jeffrey

 5    Kessler from Panasonic Corporation and Panasonic of North

 6    America.

 7          Your Honor, the issues here turn upon, as Your Honor said,

 8    is the actual evidence that plaintiffs cite sufficient to take

 9    this case to the jury against these two Panasonic entities.  I

10    would submit, Your Honor, that the answer is no for the

11    following reasons.

12          First of all, this case, as Your Honor knows, is about

13    hundreds of group competitor meetings, none of which Panasonic

14    Corporation or Panasonic North America attended.  That is

15    completely undisputed, Your Honor.  Not a single employee from

16    those two companies ever attended those group meetings.

17          **THE COURT:**  Is that necessary?

18          **MR. KESSLER:**  Not necessary.

19          **THE COURT:**  Required to find liability.

20          **MR. KESSLER:**  It's not necessary, Your Honor, but it

21    means in looking at the context of all the evidence together,

22    the Court has to conclude is the few -- and I'm going to talk

23    about this -- the seven bilateral meetings over twelve years

24    that plaintiffs have cited, all of which were before 2000, four

25    of which were 1997, and then one per year.  Could that possibly

under any scenario have been sufficient for the jury to
plausibly contend that Panasonic joined this complicated
conspiracy just through that.  And the company who participated
in those bilateral meetings was not even Panasonic Corporation
or PNA, it was Panasonic Corporation's Taiwan or Malaysia
affiliate.  And I'll explain that in a second in terms of what
the evidence shows.

So there's no group meeting participation at all by
Panasonic Corp or PNA, and the plea evidence doesn't apply to
Panasonic.  There's no dispute about that.  There are claims
that applies to other companies like Mitsubishi.  So we're
looking purely at a circumstantial record.

So what do they cite?  And Your Honor, to make it easy,
since you don't have this, I will hand up a copy of our
Appendix A.  Appendix A to the reply brief, which I believe
counsel has, but I'll give you another one, Appendix A to the
reply brief reviews each of the pieces of evidence, and you
could see it's a very short appendix, that plaintiffs were able
to cite out of this record that applied to, they say, to
provide an inference to go to the jury.  And what you will see
on this is the following.

First, none of these meetings involve Panasonic Corp or
PNA, it's the Taiwan affiliate that they're talking about, or
in a couple cases a Malaysian affiliate.

Number two, when you look at these seven meetings, what

1   you find -- and I'm now taking the evidence in the light most

2   favorable to the plaintiffs, as Your Honor said I should --

3   what you find at best is a few instances where Shonwah

4   primarily -- okay -- tried to persuade a Panasonic affiliate to

5   say, *hey* -- says *other companies we think are going to charge*

6   *this for a 14-inch set*, let's say, *would you go along*.  Okay.

7   And the Panasonic response was either *we can't go along* in some

8   cases, or *we will go along if everyone else goes along*, *but so*

9   *far people haven't gone along, so we're not going along*.

10       That's in the most favorable light of what the evidence is

11  about that on these few occasions it was an attempt, if you

12  will, to say, gee, Panasonic, which, by the way, only had --

13  and this is undisputed -- a 6 percent market share, so it was

14  not a critical competitor.  In fact, the testimony they rely

15  upon, they cite someone's testimony who said, *well, we have*

16  *someone assigned to talk to the bilaterals to have them go*

17  *along*.  And then that same person was asked -- this is

18  Mr. Lou -- *well, what about Panasonic*.  They said, *well, in*

19  *theory we might have someone to talk to them*.

20           **THE COURT:**  Mr. Kessler, we're very close to each

21  other.

22           **MR. KESSLER:**  I'm sorry.  Sorry.  Thank you.

23           **THE COURT:**  Yeah, I could hear you.  That's all I

24  wanted to say.

25           **MR. KESSLER:**  Okay.  Thank you.  I understand.  I'll

1    take it lower.  I'm turning it down.

2         In theory, Mr. Lou said we would have someone talk to

3    them, but they were not such an important company.  So in

4    actuality, he doesn't know if anybody actually spoke to them

5    about anything.

6         So the point here is, Your Honor, we believe, when you

7    look at these seven documents and the actual pieces of evidence

8    they cite, we're going to come squarely under *Citric Acid*,

9    which we do think is the case.  *Citric Acid I* and *II*, Your

10   Honor, by the way, there were two decisions.

11        And the reason is in that case you had a very similar

12   record with regarding -- regarding Cargill, which is that there

13   were lots of industry conspiracies and agreements.  But Cargill

14   was not part of that evidence, and they try to tie Cargill into

15   these few bilateral, and in the end the Court said that wasn't

16   sufficient.

17        The other point they make, Your Honor, besides the

18   bilaterals, the seven bilaterals, is that they argue that

19   because we formed the joint venture, who we're not moving for

20   summary judgment on, called Matsushita Toshiba Picture Display,

21   MTPD, which was a joint venture with Toshiba formed in 2003,

22   they argue, *Well, we're not moving for summary judgment on*

23   *MTPD, and we're not*.  MTPD did attend other meetings, and we're

24   not moving on that.  They said you should somehow hold

25   Panasonic in on that, or Panasonic North America.

1    The case that refutes that, Your Honor, is DRAM, which I

2    think Your Honor is very familiar with.  DRAM dealt with this

3    very issue where there was a subsidiary that did participate in

4    the DRAM conspiracy, and they tried to hold the parent liable.

5    And the DRAM judge on summary judgment went through the various

6    factors and concluded you can't, just because they're their

7    parent, hold them liable; you have to show some conscious

8    involvement or participation, which is the standard.

9    There is no evidence offered at all by plaintiffs for the

10   entire MTPD period related to Panasonic or PNA, so I want to be

11   very clear about that.  After 2000, they have no evidence

12   against Panasonic Corp or PNA.  MTPD was formed in 2003; okay.

13   And we're not moving for MTPD, so all they have for MTPD is to

14   say, well, Panasonic was the majority owner of MTPD, which it

15   was, during the period of time.  But that alone, as made clear

16   in DRAM, is not sufficient.

17   Unless Your Honor has any other questions, I'm going to

18   save whatever time I have let for rebuttal.

19        **THE COURT:**  Very good.  I don't.  Thank you.

20        **MR. KESSLER:**  Thank you.

21        **MR. IOVIENO:**  Good morning, Your Honor.  Phil Iovieno

22   from Boies, Schiller & Flexner.

23   Rather than address what Mr. Kessler said, I want to run

24   through my outline and really focus on the documents so we can

25   have a real clear understanding of what these documents show,

1    with one exception.

2         I just want to start out, before I get to my outline, that

3    my adversary pointed to this exhibit saying that there's seven

4    bilateral meetings, and that he was viewing the evidence in the

5    light most favorable to the plaintiffs.

6         Well, that's --

7              THE COURT:  For the transcript you're referring to

8    Appendix A.

9              MR. IOVIENO:  Correct, right.  And that's just not

10   right, because Michael Suh, who we're going to get to in his

11   testimony, he testified that he bilaterally met with Chunghwa,

12   in his words, "in the teens."  And so it's not limited to this.

13   There's documents, and there's testimony, and I want to get

14   through all of that sort of in sequence here.

15        And the focus of our argument is twofold; okay.  One thing

16   is that the first argument -- and the documents show this is

17   the Japanese parent, Panasonic Corp and Panasonic North

18   America, directly participated in the conspiracy.  And the

19   documents I'm going to get into are going to show that.

20        Secondly, I'm going to address the evidence regarding the

21   subsidiary's participation and how that participation and

22   information flow facilitated information flow up to the

23   Japanese parent and information flow from the Japanese parent

24   to the conspirators.

25        And on that second argument I want to focus on Judge

1    Conti's motion-to-dismiss decision where a lot of these issues

2    were initially addressed, although at the motion to dismiss

3    stage.  But Judge Conti laid out specific holdings with respect

4    to his view of what the law would be with respect to those

5    allegations.

6         But let's put that to the side, because I want to talk

7    about the direct evidence of Panasonic Corp and Panasonic North

8    America to start with; okay.

9         And I first want to go to.  Just give me a minute.  I had

10   my colleague put together a chart for us here of the docket

11   numbers.  I want to go to Exhibit 9 to our opposition, which is

12   Docket Number 3248-14.

13        And this is a document from Samsung's records -- okay --

14   and it's dated July 18th, 1998, and on the third page of the

15   document, section 3, this is -- it's a meeting minutes from

16   Samsung talking about reporting back from one of the group

17   meetings.  And point three says:

18        "Response of Japanese companies:  Visited Matsushita

19        July 16th as the representative of Japanese Cathode Ray

20        Tube (CRT) representative.  And provided information on

21        the agreements reached by five Korean and Taiwan

22        companies."

23        First bullet:

24        "Expressed their intention to participate actively."

25        Second bullet:

1          "Caution against, all caps, antitrust laws."

2      Visited Panasonic in Japan.   Told Panasonic in Japan these

3  are the agreements.   This is what the group meeting is doing.

4      What did Panasonic say?   Mr. Kessler said that the record

5  is such that Panasonic consistently said what?   We, quote can't

6  go alone, or we won't go alone.   Well, that's not what I'm

7  seeing in this document.   What I'm seeing in this document is

8  Panasonic saying "expressed their intention to participate

9  actively, but cautioning against the antitrust laws."

10     They're shrewd just like in *LCD*.   What did you see in *LCD*?

11 You had companies that went to the group meetings, and you had

12 other companies who are little shrewder about their

13 participation.   They did it bilaterally.   And that's what

14 you're seeing here.   It doesn't change the participation in any

15 way.   They know about the agreements, and they're following

16 them.

17     Okay.   The next document.   So that's Exhibit 9.   The next

18 document -- and, frankly, I think that document alone defeats

19 summary judgment, but we're going to go through all of them.

20     Exhibit 18, which, according to my chart, is Docket

21 3248-23.   Okay.   This is a Chunghwa document.   It's a bilateral

22 meeting with Panasonic Taiwan.

23         **THE COURT:**   I'm sorry.   I was trying to get my

24 computer to show me some images from these documents.   Could

25 you give me that exhibit number again, the one you just gave

1   me?

2   **MR. IOVIENO:**  Sure.  It's Exhibit 18, and it's docket

3   3248-23.

4   **THE COURT:**  Thank you.

5   **MR. IOVIENO:**  Now, this document is a Chunghwa meeting

6   minute of a bilateral meeting with Panasonic Taiwan.  Okay.  So

7   it is a meeting with the sub.

8   The top of the document it says, "Already responded to SDD

9   Nah Samsung.  Nah said last week he met MEC's Japanese boss,"

10  so Matsushita Electric Company, not the sub, Matsushita

11  Electric Company's Japanese boss in Korea, who said that "MEC

12  would definitely raise prices on May 1st.  MEC would definitely

13  raise prices on May 1st."

14  This is not we can't go along, we're not going to go

15  along, we'll only go along if other people go along.  No.  This

16  is the Japanese company saying "sure, no problem," and they're

17  meeting with him.

18  Okay.  The last document I want to focus on here is -- I

19  want to look at two documents together, so these will be

20  Exhibit 4 and Exhibit 5.  Exhibit 4 is 3248-9, and Exhibit 5 is

21  3248-10.

22  Exhibit 5, let's just deal with it quickly, because it's a

23  connecting document.  So Exhibit 5 is the meeting minutes,

24  Chunghwa meeting minutes from April 23, 1997.  And the only

25  reason I want to bring this up is to show you a date that a

group meeting happened.  There was a group meeting on April 23,

1997.  You could see the attendees:  Samsung was in attendance,

O'Ryan was in attendance, obviously Chunghwa was in attendance.

Okay.  But then when you flip to Exhibit 4, this is also a

Chunghwa meeting report from the same day, April 23, 1997.

What is it?  It's a meeting on -- the same day they had a group

meeting, Chunghwa met with Panasonic Taiwan -- I'm sorry --

yeah, Panasonic Taiwan, I got that right.  They met with

Panasonic Taiwan on the same exact day that they had a group

meeting.  Okay.

And if you go down under subpoint one, it's the last

paragraph on the first page, it says:

> "Hitachi has not yet been settled, and now comes one
> more Matsushita.  Although SDD Nah said that Matsushita
> Japan agreed to raise prices in May."

So, again, you're having a meeting report on virtually --

not virtually, exactly the same date as the group meeting.  And

Panasonic Japan is being quoted as saying: *Yeah, we agree*

*we're raising prices.  We're following.*

So again, I think any one of those documents standing

alone is enough.  Those three, from our perspective, are as

clear, direct evidence of conspiratorial conduct by Panasonic

Corp as you're going to find.

But if you want to move outside of that realm, and you

want to move to the bilateral communications alone with the

subs, I think you can get there too and see that very, very

clearly meets the standard that Judge Conti set forth already

in this case.

Okay.  I only have two minutes left.  Let me just point

you quickly -- and this is going to come up later anyway.  If

you go to Docket 660, this is Judge Conti's order, I'm going to

read to you from -- this is docket, page 10.  He's dealing with

these same issues where they're saying you're not identifying

the specific entity in the corporation.  You're trying to -- no

corporate separateness.  And this is what he said:

> "Having reviewed the complaints as a whole, the Court
> determines that the factual allegations plausibly suggest
> that each defendant participated in the alleged
> conspiracy.  Although plaintiffs often refer to a
> corporate family by a single name, they allege that
> employees engaged in conspiratorial meetings on behalf of
> members of their corporate families that participants did
> not always know the corporate affiliation of their
> counterparts, and did not distinguish between the entities
> within a corporate family, and that participants entered
> into agreements on behalf of and reported these meetings
> in discussions to their respective corporate families.  As
> a result, the entire corporate family was represented in
> meetings and discussions by their agents and was a party
> to the agreements reached in them."

1      Now, I don't have a lot of time, so I'm just going to tell

2  you the exhibits numbers.  If you go to Exhibit 13 and --

3  Exhibit 13 and Exhibit 11, again you're going to see a group

4  meeting followed on the same day as the bilateral meeting.  If

5  you go to -- exhibit 17 is another document regarding a

6  bilateral meeting, and both of those series of documents show

7  two things.  They show the subsidiary providing to the

8  conspirator, in this case Chunghwa, information about Japan's

9  production and pricing, and at the same time you also see

10  information flowing from the subs to Japan, where they're

11  saying in these documents: *Oh, yeah, we'll tell Japan that.*

12  *We're going to go to Japan, and we'll tell Japan about the*

13  *pricing.*

14      Again, I already told you about Michael Suh's deposition

15  testimony.  Why don't I end there.  This is Exhibit 7.  He says

16  three things.  Okay.  At page 65 and 66 of his deposition -- he

17  was one of the employees of the sub -- he said "I bilaterally

18  met with Chunghwa in the teens."  At page 119 he said that he

19  considered all of those meetings inappropriate.  And at page 69

20  said, "I reported on all those meetings to Japan."

21      And I think I'm out of time, Your Honor.  Thank you.

22          **THE COURT:**  Thank you, Mr. Iovieno.

23          **THE CLERK:**  You have three minutes.

24          **MR. KESSLER:**  First, on the testimony that the

25  meetings were inappropriate, Your Honor, we addressed this on

 1  the reply brief.  What the witness was saying is that he

 2  thought it was inappropriate to meet with competitors, period.

 3  In other words, there's no -- there's no substance to why it

 4  was inappropriate or what happened at the meetings, so it's

 5  nice, our compliance policy, we prefer they don't meet with

 6  competitors.  It doesn't move the ball substantively on his

 7  last point.

 8       Second, on Judge Conti's ruling --

 9            THE COURT:  Let's, for a moment, take the early --

10  late 1990's documents that Mr. Iovieno referenced.

11            MR. KESSLER:  Yes.

12            THE COURT:  Those are pretty good for him.  I take

13  that as a given.

14       What is the evidence that following those documents there

15  was an effort to withdraw?  Why should I not -- why is a jury,

16  in other words, not entitled to view these later meetings,

17  which, as you say, you think are innocuous, in the light of

18  this 1997 evidence?

19            MR. KESSLER:  Let me address the three documents he

20  cited about that.  Okay.  So, first of all, Your Honor -- and

21  this is very important, okay.  In -- with respect to Exhibit 18

22  that he mentioned, in fact, that document says -- and Your

23  Honor should read it, don't believe me, don't believe

24  plaintiffs, believe the document -- the document says they're

25  not going to be able to raise prices.  So that's number one

1   with respect to Exhibit 18.

2        Okay.  Number two, with respect to Exhibit 4, okay -- and,

3   you know, and Exhibit 5, yes, there was a meeting the same day,

4   but the only testimony about those documents and meetings is

5   that the person attending did not know what happened at any of

6   the group meetings, did not know that was going to be

7   presented, and that's the document, Your Honor, where we

8   mentioned -- where he said, *Well, if others go along, we'll do

9   it.  But so far it was Hitachi*, they're referring to, *hasn't

10  raised its prices, so we can't raise prices*.

11       So those two documents, Your Honor, couldn't prove a

12  twelve-year conspiracy unless at least the following -- and

13  here's what's missing -- at a minimum they should have shown

14  through their experts, well, here are the prices Panasonic

15  charged day after these meetings, and, in fact, they raised

16  their prices.

17       There's a complete absence of any evidence to connect

18  these two discussions where the documents indicate Panasonic

19  saying -- and I said it was sort of like an invitation --

20       **THE COURT:**  Is this sort of like an overt act

21  requirement in a criminal conspiracy?  I mean, is that really

22  their burden?  Are you saying that these documents do not

23  reflect an explicit agreement to raise prices?

24       **MR. KESSLER:**  Yes, Your Honor, they do not.  They do

25  not, in my view, not in the context --

1          **THE COURT:**  And you would argue that no reasonable

2     jury could reach that conclusion.

3          **MR. KESSLER:**  What no reasonable jury could reach in

4     these two documents is that there was an agreement to

5     participate in a massive overall conspiracy.  At most what you

6     could reach, if you wanted to, is that in Taiwan, for a 14-inch

7     set that was not sold in the United States by Panasonic, the

8     evidence is undisputed about that, there was an agreement, if

9     you wanted to go as far as you could, to go along with a price

10    increase in Taiwan for a 14-inch set in 1997.  That is not a

11    substitute for the fact -- and that's why I said it's

12    important, Your Honor, that we weren't in all these hundreds of

13    meetings.

14       I think my time is complete, so I can't, unless Your Honor

15    gives me another minute.

16         **THE COURT:**  That isn't going to happen.

17                         (Laughter)

18         **MR. KESSLER:**  Thank you, Your Honor.  I appreciate

19    that.

20         **THE COURT:**  Very good.  I think that's three motions.

21    We're going to take a ten-minute break.

22                   (Recess taken at 10:55 a.m.)

23              (Proceedings resumed at 11:09 a.m.)

24         **THE COURT:**  Okay.  Let's turn to the Royal Philips

25    motion.

1       **MR. TALADAY:**  Your Honor, John Taladay of Baker, Botts

2   on behalf of defendants Koninklijke Philips, NV, and Royal

3   Philips.

4       Your Honor, I'd like to mention a few key facts that I

5   think are undisputed and relatively uncontroversial.  First is

6   that KPNV is the top most holding company in the Philips group,

7   and it never had at any point in time had more than thirteen

8   employees, while the Philips group on the whole had more than

9   500 subsidiaries and more than 180,000 employees in the center

10  of this time period.

11      And of the millions of documents in this case, and

12  hundreds of depositions, there is no evidence, no direct

13  evidence of KPNV's participation in this alleged cartel.

14  There's no evidence that KPNV attended meetings, that it

15  directed participation by any other party, that it approved or

16  ratified participation by any other party.  And I don't believe

17  these facts are in dispute.  So we're talking purely about

18  circumstantial evidence that the plaintiffs --

19      **THE COURT:**  Would you please talk about the argument

20  that plaintiffs make that Royal Philips got information about

21  the conspiracy when there was an exchange of due diligence

22  documents when it set up LPD?

23      **MR. TALADAY:**  Yes, sir, Your Honor.  They cite two

24  documents in particular, one which is Exhibit 37, I believe, is

25  a document that is a flowchart, and they cite to the fact that

1    it says a "Glass Meeting" on it.  But plaintiffs' state in

2    their opposition, Your Honor, that that document was prepared

3    not by a KPNV employee, but by Jim Smith, who was a subsidiary

4    employee.  And they state specifically that those documents

5    were prepared for review by the other party in the case.  So

6    there's no evidence that any KPNV employee ever reviewed that

7    document.

8        Moreover, Your Honor, on the substance of it, the only

9    arguable connection of that document to the cartel is the fact

10   that it uses the words "Glass Meeting."  But Glass Meeting as

11   we know, according to the plaintiffs' allegations, is a

12   euphemism, it's a code word.  And so unless there's some

13   evidence that there's some knowledge of what the code word

14   means, there's no basis to connect it to the cartel, or to

15   connect it to KPNV's knowledge.  And there's no indication, no

16   piece of circumstantial evidence suggesting that KPNV knew the

17   code word.

18       The other document they cite, Your Honor -- and forgive me

19   I don't remember the exhibit number, it's probably around in

20   the 40s -- 38.  I'm corrected -- is simply a statement that the

21   pricing strategy of these subsidiaries was a follower strategy.

22   It identifies the parties that it follows.  On its face there

23   is no tenable inference to be drawn that it references the

24   cartel.  And I invite close scrutiny of those documents, Your

25   Honor.

1      To continue, what I'd like to do is to look at the
2  circumstantial evidence that plaintiffs cite, and very quickly
3  identify case law that quite firmly establishes that all of the
4  categories that they cite are within the norms of regular
5  business practice, that are consistent with competition in
6  conspiracy.
7      The first category -- and these are straight from the
8  brief -- that Philips operated a CRT business through global
9  divisions under its direction.  But a divisional structure is
10  certainly consistent with competitive behavior, and it doesn't
11  support an inference of antitrust conspiracy nor does it imply
12  day-to-day control.  And I would refer the Court to *Hickory*
13  *Travel Systems, Inc. versus TUI A.G.*, 213 FRD. 547, at 554,
14  which held the day-to-day control was not established where the
15  parent, and I quote here:  "Wholly owns its subsidiaries,
16  referred to them as divisions and not separate companies,
17  reported their earnings in annual statements, boasted of
18  corporate integration, and made decisions about restructuring
19  the business of some of those subsidiaries."  That's hauntingly
20  similar to plaintiff's claim not only on divisional structure,
21  but on the whole, Your Honor.  Now, this is wasn't a RICO case,
22  but it was specifically looking at whether those factors
23  suggest day-to-day control.
24      Second category is that under Philips supervision, senior
25  PDC personnel went to CRT conspiracy.  Just to remind, PDC is

 1   short for Philips Display Components, which is a division

 2   within which the CRT business was housed.

 3       Supervision of a parent by a subsidiary is certainly

 4   legitimate conduct.  I'd refer to *U.S. versus Best Foods*, 542

 5   U.S. 51, and specifically at 72 where it states that:

 6           "Activities that are consistent with a parent's

 7           investor status, such as monitoring of the subsidiary's

 8           performance, supervision of the subsidiary's finance, and

 9           capital budget decisions, and articulation of general

10           policies and procedures should not give rise to direct

11           liability."

12       And that is repeated in the *E&J Gallo* case, Your Honor,

13   which is at 2008 Westlaw 2220396 at 10.

14       And the key point here, Your Honor, is that there is no

15   other evidence that the KPNV employee who was charged with

16   supervision had any knowledge of the cartel.  There's no direct

17   or indirect evidence.  In fact, the only record evidence is

18   testimony by Mr. Smith who states very clearly that nobody in a

19   more senior level at Philips knew of the alleged cartel.

20       Final category, Your Honor.  Circumstantial evidence is

21   that, and I quote, "Royal Philips formed super conspirator LPD

22   with co-conspirator LG."  I think this is the clearest case of

23   all.  Joint ventures are formed very frequently as competitive

24   concerns.  And I will cite as one example ample authority to

25   the Supreme Court's decision in *Northwest Wholesale Stationers*,

 1    472 U.S. 284.

 2         So to conclude, Your Honor, when you take either

 3    individually or the sum of the circumstantial evidence here,

 4    KPNV's conduct is as consistent with competitive behavior as it

 5    is with conspiracy, and it doesn't permit an inference of

 6    conspiracy.  This is --

 7              THE COURT:  You think it would be unfair for the Court

 8    to allow the plaintiffs to make an argument that LPD was acting

 9    as an agent of KPNV; true?

10              MR. TALADAY:  So I'll come to the agency argument

11    right now, Your Honor.  First of all, we don't think the agency

12    argument should be allowed, for reasons that are clear in our

13    brief, that they've essentially said they abandoned vicarious

14    liability, and it's a vicarious liability theory under the *E&J*

15    *Gallo* case, at 6, makes that clear.

16         Secondly, they're making this argument because their

17    evidence of participation has failed them.

18         Thirdly, Your Honor if it's not possible for a court or a

19    jury to presume that a hundred percent ownership of a

20    subsidiary is sufficient to presume agency, then certainly

21    fifty percent ownership of a joint venture is not sufficient.

22              THE COURT:  Well, the question is day-to-day control

23    over something like that.

24              MR. TALADAY:  Yes, you're right.

25              THE COURT:  So ownership is never necessary -- is

1   never sufficient by itself.  But I don't think that's their

2   argument.  Their argument is not, well, they own fifty percent,

3   so they're liable.

4           **MR. TALADAY:**  I agree, Your Honor, that the hallmark

5   is day-to-day control.  For the same reasons they fail on

6   day-to-day control of subsidiaries, they fail on day-to-day

7   control of the joint venture.

8       And I mention, just in closing, before I reserve my time,

9   that the representative service test I think does not apply

10  here, it's the restatement test, both because that typically

11  doesn't apply in a liability setting, and because *E&J Gallo*

12  said it doesn't apply where the parents nearly hold the

13  company.

14      And I'll reserve the balance of my time, Your Honor.

15          **THE COURT:**  Thank you.

16          **MR. IOVIENO:**  Your Honor, good morning again.  Phil

17  Iovieno.

18          **THE COURT:**  Good morning.  I think this is a slighter

19  tougher motion for you.

20          **MR. IOVIENO:**  It's more complicated, and there's no

21  sexy documents like in the Panasonic case, and from the

22  plaintiff's perspective, but we think that the grounds for

23  denying this motion are every bit as strong, and let me run

24  through our arguments.

25      I look at this motion as three parts, three distinct

 1   arguments.  The first one is that we believe the substantial

 2   evidence that Royal Philips directly participated in this

 3   conspiracy through their divisions, and I will explain that.

 4        Secondly, if you don't agree with that, I think you can

 5   fall back to Judge Conti's standard that he set forth in the

 6   motion to dismiss stage in that opinion.

 7        I do want to correct something.  I said it was docket 616

 8   in the prior motion.  It's docket 665.  I was corrected, but

 9   I'll address that standard.

10        And then I think, thirdly, the evidence that Your Honor

11   has pointed to with respect to LPD provides an independent

12   grounds.

13        Okay.  So I want to start with the direct participation.

14   What do we know?  We know, Your Honor, that there are hundreds

15   and hundreds of documents in the record showing that Philips,

16   Philips participated in the conspiracy.  They attended group

17   meetings, went to bilateral meetings; and that Philips was

18   critical in the formation of the conspiracy.  The question on

19   this motion is who is Philips?  Who is Philips?

20        If you go to the documents -- and I'm just going to point

21   to two.  We put in extensive evidence in our opposition.  But

22   if you just go to Exhibits 18 and 19, these are dockets --

23        **THE COURT:**  If you just give me the tag the first

24   time, you're good.  The last time, once you said 3248, I could

25   pull it up.

1           **MR. IOVIENO:**   Okay.   So it's Exhibit 18 and 19 to our

2     opposition.

3           And there are just two examples of group meetings where

4     who participated?   It was Philips.   It was an undifferentiated

5     entity Philips.   And that's the question we have here, is who

6     was participating?

7           But we do know something.   We do know that for a period of

8     time it was David Cheng, and that after that it was Jim Smith.

9     They were the primary participants.

10          **THE COURT:**   Let me ask you a predicate question.

11          **MR. IOVIENO:**   Sure.

12          **THE COURT:**   And that is let's take a situation where

13    there is a corporation that has many subsidiaries and

14    divisions -- it doesn't have to be Philips, it could be

15    anything -- and there's a document in the case that says -- you

16    know, let's say the corporation is called "Fido," and there's a

17    document that says Fido participated in the meeting.   Can

18    plaintiffs survive summary judgment against every division and

19    subsidiary and parent of Fido on that basis?

20          **MR. IOVIENO:**   No.   And this is what I want to say.

21    The key here is that the divisions are unincorporated divisions

22    of Philips.   Okay.   And if there was one document, if you had

23    to say to me on this argument, Mr. Iovieno, what is your best

24    document, it's Exhibit 21.   Okay.   Let's just go to that.

25          So I mentioned before David Cheng, we know that he was one

of the people, Philips' representative, one of the people who
was critical in forming the conspiracy.  Okay.  And this
document is a direct communication between Mr. Cheng and his
co-conspirator at Samsung.  Okay.  And what he's saying in this
document, essentially, is *listen, I'm transferring my
responsibilities over to Jim Smith*.  *Notwithstanding the fact
that you may know Mr. Jim Smith already, I would like to -- I'd
still like to introduce him to you by using the opportunity of
our green meeting on August 20th*.  So he's basically saying
we're going to have a transition here, and Jim Smith is coming
in.

But here's the key thing of the document.  How does he
sign the document?  How does he hold himself out to his
conspirators?  He holds himself out to his conspirators as
David Cheng, President and CEO of Philips Components Asia
Pacific, the unincorporated division of Royal Philips, not the
subs.  He is saying -- he's holding himself out to them as
Royal Philips.  This is the person, David Cheng, who is
repeatedly attending all the meetings.  If you go to our
opposition, he is the one who is essential in the formation of
the conspiracy.  He is the one who is participating in all the
group meetings, and now he's transferring it over to Jim Smith.

And then if you look at the internal corporate documents
of Royal Philips, look at Exhibit 2, they call it One Philips,
this presentation right here, One Philips.  And on page 13 of

1   it, it's talking about the Board of Management, which

2   Mr. Taladay is referring to those thirteen people:

3         "The members of the Board of Management are entrusted

4         collectively with the executive management of Royal

5         Philips Electronics, and the general direction and

6         strategy of the Philips Group as a whole.  Consequently,

7         divisions report to the collective BOM.  Division CEOs

8         report to the president."

9         So what you have is -- and then if you look at Exhibit 3,

10  next document, which is -- I think these documents --

11        **THE COURT:**  The exhibit you just referenced was what

12  again?

13        **MR. IOVIENO:**  Exhibit 2, page 13 I was reading from.

14        **THE COURT:**  Okay.

15        **MR. IOVIENO:**  And now I'm looking at Exhibit 3.  And I

16  think these two documents need to be read together.  This is

17  the company manual.

18        **THE COURT:**  And you'll think this is a stupid

19  question, but going back to your point that these are

20  unincorporated divisions.  I gather that if we're talking about

21  unincorporated divisions, and there isn't really any reason for

22  the Court to reach agency or alter ego, or something else,

23  because it's all the same entity.  This is your position.

24        **MR. IOVIENO:**  Yes, this is our number one argument.

25  They were directly participating through these divisions, David

1    Cheng and Jim Smith.  And you look at the way the conspirators,

2    David Cheng, are holding themselves out to their

3    co-conspirators not as a sub.  They're holding themselves out

4    as the division.

5         And secondly, if you look at the internal documents,

6    you'll see the Board of Management is controlling it.

7         And then if you look at Exhibit 3, which is the company

8    manual, page 4, talking about the basic governance model -- you

9    should read through this, because I think it very clearly shows

10   that it's all being controlled from the top.

11        But here's -- interestingly, "Geographic coordination:

12   Geographic entities are supportive to the business.  The right

13   to existence of geographic entities, i.e., country

14   organizations," they're talking about the subs, "is therefore

15   derived from their serving the needs of the PDs, Product

16   Divisions, and/or the BOM, Royal Philips.  A purely geographic

17   add-up of business functions or businesses in terms of

18   reporting and accountability is meaningless."  That's their

19   words.  The subs are meaningless.  We are controlling.  Who is

20   controlling?  The Board of Management and these Product

21   Divisions.

22             **THE COURT:**  What page are you on?

23             **MR. IOVIENO:**  That's page 4, Exhibit 3.

24        Let me just move on quickly.

25        So basically that's our first argument.  And I do really

1    want to get to all three, and I don't have a whole lot of time.

2        But, really, it's all in the briefs, it's very clear.

3    What you have here is these people are Royal Philips.

4        Jim Smith's deposition, Exhibit 13, again, what does he

5    say?  Actually, let's just take a look at this very quickly.

6    Page 13.  Who does he say Jim Smith took over for David Cheng?

7    This is page 13 of Exhibit 13:

8        "Q.  Could you tell me what Philips company you worked

9        for?

10       "A.  I worked for a number of Philips companies.  I worked

11       for a company called Pay Telecom in Scotland, and then

12       following that I worked for Passive Components Division as

13       a Plant Manager in Southport, England, and then I worked

14       for the CRT Division, which was Display Components, part

15       of Components Division."

16       This is the person, when you look at all the documents,

17   who is going to the meetings.  He's not saying I worked for a

18   subsidiary.  He worked for the unincorporated division of

19   Philips.  Period.  Full stop.

20       Okay.  So that's our first argument.

21       The second argument, I think, if you take a look again,

22   even if you don't agree with that point, that in the light most

23   favorable to plaintiffs, that that's creating a question of

24   fact.

25       If you take a look at what Judge Conti's standard, again,

1     Docket 665, I'm reading from page 10, where he talks about:

2             "Although plaintiffs often refer to a corporate family

3         by a single name, they allege that the employees engaged

4         in conspiratorial meetings on behalf of members of their

5         corporate families, that the participants did not always

6         know the corporate affiliation of their counterparts, and

7         did not distinguish between the entities within a

8         corporate family."

9         That's classic in this instance.

10        **THE COURT:**  I don't have Judge Conti's order in front

11    of me, but can you give me an example -- and I'm not sure, as I

12    hear you read it, how I would apply it as a standard of the

13    liability on summary judgment.

14        But putting that to one side, can you give me an example

15    of when that standard, which sounds a little amorphous to me,

16    would not be satisfied?

17        **MR. IOVIENO:**  Well, if you had a situation where

18    Philips subsidiaries were attending the meetings, and you saw

19    in the documents "Philips Taiwan, Philips Brazil," you're not

20    seeing that, you're seeing "Philips."  They're not

21    distinguishing.

22        **THE COURT:**  Well, so I mean, I'm not trying to be

23    cute, but is it -- it's the responsibility of the person who

24    writes the memo to make sure that the subsidiaries are noted in

25    the memo, and if that doesn't happen every division or

```
1    subsidiary within the organization is potentially liable?

2         MR. IOVIENO:  No.  What I'm saying here, Your Honor,

3    is that what Judge Conti is saying is that if you have a

4    situation where information flow is moving up through the

5    organization -- and clearly when you look at those documents

6    the Board of Management and the Product Divisions are

7    controlling, and information is flowing up to them, that --

8         THE COURT:  What's the best evidence that -- I'm not

9    going to get the abbreviation, you know, big Philips -- that

10   big Philips had knowledge of the conspiracy?

11        MR. IOVIENO:  Two things.  I would go to Exhibit --

12   let me just get the number -- 55 -- 52, sorry, 52.  This is the

13   sole sourcing document we talked about on withdrawal where big

14   Philips says, *Hey, listen, you know, LPD is enforced now.*

15   *Everybody is buying from the* -- and this is contrary to

16   corporate policy -- *everybody is buying from the conspiracy,*

17   *you buy from LPD.*  Full stop.  And then you see the people

18   underneath, if you look at that document, they're saying, *Okay,*

19   *yeah, we're going to do that.*  That's a key document.

20        I think also, too, I mean, you know, Your Honor, you

21   looked at the LPD document.  I mean, I think that's a striking

22   document.  Take a look at the diagram.  This is Exhibit 37,

23   sales interaction between Leo, LG, and Pegasus Philips in

24   Taiwan.  I mean, pricing policy -- pricing policy, where does

25   the arrow go?
```

1           THE COURT:  Say the exhibit number again?

2           MR. IOVIENO:  Exhibit 37.

3           THE COURT:  Thank you.

4           MR. IOVIENO:  And the chart -- okay.  Can I make

5    one -- ten seconds?

6           THE COURT:  Yes.

7           MR. IOVIENO:  The arrow from pricing policy, where

8    does the arrow go?  It goes to Glass Meetings.  Pricing policy,

9    arrow, Glass Meetings.  That's the pricing policy.  Conspiracy.

10          THE COURT:  Thank you.

11          MR. IOVIENO:  Thank you, Your Honor.

12          THE CLERK:  You have three minutes.

13          MR. TALADAY:  Your Honor, a couple points.  First, the

14   argument that Mr. Iovieno just made sounds a lot like a veil

15   piercing vicarious liability theory, which they specifically

16   disclaimed in their opposition.  Plaintiffs do not argue that

17   Royal Philips is vicariously liable for participation in the

18   conspiracy under a corporate veil piercing theory.

19        Secondly, Your Honor, this whole *Who is Philips?* thing,

20   they also specifically say in their opposition *We're no longer*

21   *trying to blur those distinctions.  We're pointing to direct*

22   *evidence -- or direct and indirect evidence of KPNV's*

23   *participation*, not subsidiary's participation.

24          THE COURT:  Well, but I think that here the word,

25   specific word becomes very important.  "Subsidiary" is a term

1   of art in corporations law here, and what I hear Mr. Iovieno

2   saying is these are not actually subsidiaries.  There isn't

3   corporate separateness.

4        **MR. TALADAY:**  Well, there's certainly a presumption of

5   it, Your Honor.  And as I mentioned in my principal remarks,

6   there's justification for this structure.  And, again, the key

7   is day-to-day control, and nothing that Mr. Iovieno said

8   suggests day-to-day control.  Giving him the biggest benefit of

9   the doubt, he mentions the instruction to purchase.  That

10  instruction, by the way, was not given to the CRT Division, it

11  was given to PCE, so I don't know that you could -- which is

12  the Electronics Division, so I don't know that you could

13  transmute it somehow to the other side of the table.  And it's

14  normal behavior for a parent to think about how it can best

15  benefit in saying, *Hey, we should buy from our own subsidiaries*

16  *first*, is perfectly normal.

17       I will mention also that in the withdrawal motions in the

18  footnote -- and I forget which footnote, maybe 16, I believe --

19  it specifically noted that that instruction was not followed.

20  And if you had exercise of control over day-to-day operations,

21  you would have seen a hundred percent purchases.  What you saw

22  was 60-something percent, which is pretty consistent with

23  historic patterns.

24       The other matters they cite, the David Cheng matter.

25  David Cheng was at no time an employee of KPNV.  The fact that

1   he mentioned that he is a part of a division, instead of

2   signing it as part of a corporate entity, I think is irrelevant

3   to that point.  I know also that there is no allegation and no

4   evidence that when he was a member of the supervisory board,

5   that he ever participated in any way in the cartel.  He was

6   simply -- the allegations are that he *used* to be part of it.

7       And on that point, Your Honor, it's certainly perfectly

8   normal for a business to say here is a guy who knows a lot

9   about the business, he would be a good supervisory board

10  member.  And absent any evidence that KPNV knew of his history

11  there, and there is none, that is certainly a justifiable

12  business conduct.

13      I would close, Your Honor, simply by pointing out the

14  alternate question here, which is what inferences can be drawn?

15  And where you have ample case law supporting the fact that each

16  of these types of conduct is legitimate business conduct, and

17  there's case law to support that, it does not permit an

18  inference to be drawn adverse to that.

19      Thank you, Your Honor.

20          **THE COURT:**  Thank you.  I just need a moment to finish

21  making a note.

22                  (Pause in the proceedings.)

23          **THE COURT:**  All right.  Thomson motion.

24          **MR. ROBERTS:**  Good morning, Your Honor.  My name is

25  Jeff Roberts.  I'm here on behalf of the Thomson defendants.

1          Just a few facts to get us grounded in this circumstance.

2          My client, Thomson Consumer Electronics, you might know as

3    "RCA," was a manufacturer of televisions and CPTs, the tubes

4    used to manufacture television, based in Indianapolis, Indiana.

5          It's undisputed, and all plaintiffs have admitted, that

6    Thomson Consumer never manufactured CDTs or the products which

7    contain them, computer monitors, at any time during the

8    relevant period.

9          Yet plaintiffs would have you believe that this Indiana

10   corporation that manufactured televisions somehow joined a

11   conspiracy to fix the price of CDTs effectuated in Asia

12   regarding an industry it never participated in.

13         Plaintiffs have admitted in their briefs that to prove

14   this they must establish that Thomson Consumer knew of the CDT

15   conspiracy, Thomson Consumer intended to join the CDT

16   conspiracy, and Thomson Consumer understood and believed that

17   the CDT conspiracy was interdependent with the CPT conspiracy

18   in which Thomson Consumer allegedly participated in.

19              **THE COURT:**  This is the *In Re Vitamins* test; right?

20              **MR. ROBERTS:**  Yes, Your Honor.

21              **THE COURT:**  Do you think the plaintiffs agree with

22   your formulation of that test?

23              **MR. ROBERTS:**  Yes, I do, Your Honor.

24              **THE COURT:**  Okay.

25              **MR. ROBERTS:**  The principles set forth in *In Re*

1    *Vitamins* require them to prove that Thomson Consumer knew of

2    this CDT conspiracy.  Well, they can't do it, Your Honor, and

3    they haven't done it in their briefs.  In fact, out of the

4    millions of pages of documents that are produced in this case,

5    of the hundreds of depositions that have occurred, they rely on

6    just six documents that were copied to or sent by a Thomson

7    Consumer employee that even mentioned the words "CDT."  And

8    those documents are set forth in detail in the reply brief.

9         But the critical point here, Your Honor, and why this case

10   warrants summary judgment, is that none of those documents show

11   that Thomson Consumer knew of this CDT conspiracy, and they

12   certainly don't show that Thomson Consumer intended to join the

13   CDT conspiracy.

14        **THE COURT:**  Would you agree that Thomson, putting

15   these other two elements to one side, that the markets are

16   interdependent on each other because of the profound effect

17   that either of these two elements would have on the price of

18   glass, which is so important to the participants in both

19   markets?

20        **MR. ROBERTS:**  Yes, Your Honor.  The raw materials used

21   to manufacture those CDTs and CPTs in some cases were related,

22   as you mentioned, in the case of glass.  Glass was up to fifty

23   percent of the price of a tube, and so procuring an efficient

24   and cost effective source of glass was very important to these

25   companies, and so in that sense they had some similar inputs,

1  but otherwise they were very distinct and separate products.

2  It's undisputed that you could not make a television with a

3  CDT, and you could not make a computer monitor with a CPT.  And

4  it's also undisputed that the customers in those markets were

5  very different.  And so yes, there was that similarity in the

6  sense that all required glass.  But beyond that --

7          THE COURT:  Price fixing in a -- I understand your

8  point that the two things are not what economists would call

9  substitutes, but the input that's common to both of them is so

10  important that if there were, hypothetically, a conspiracy in

11  the CDT market to maintain prices, that by definition would

12  have the effect of reducing the production of that good, and

13  that would free up glass for use in the CDT market; true?

14          MR. ROBERTS:  Yes, that would free up glass.  A lot of

15  things could free up glass; for example, the advent of LCD

16  technology, which created a substitute for CDTs, and the

17  computer monitor industry, and therefore could have also

18  reduced the price of glass.  But the fact that any input could

19  be impacted by a conspiracy does not, respectfully, establish

20  that Thomson Consumer knew and intended to join a CDT

21  conspiracy.

22          THE COURT:  Yes, I agree.  I'm just trying to get that

23  other element.  I don't agree, I take your point, but I'm just

24  trying to get this other element off the table.

25          MR. ROBERTS:  I understand, Your Honor.

1      You've often asked throughout these proceedings *What is*
2   *the best case for your side?*  Thomson Consumer's best case is
3   the *In Re Vitamins* case.  In that case, parties who are alleged
4   to have participated in what they refer to as the *All Vitamins*
5   *Conspiracy*, a conspiracy involving multiple different types of
6   vitamins, moved for summary judgment arguing that they only
7   manufactured one vitamin, not all the vitamins alleged within
8   the conspiracy.  And the Court looked at the standards set
9   forth in our brief, and for some of the defendants it granted
10  them summary judgment, and for others it didn't.

11      And the key distinction I want to make, Your Honor, is for
12  those who failed on the motion for summary judgment, the Court
13  found evidence that showed at meetings that those defendants
14  attended with alleged co-conspirators, the CDT conspiracy
15  was -- excuse me -- the *All Vitamins* conspiracy was discussed,
16  and they obtained knowledge that this *All Vitamins* conspiracy
17  was occurring.

18      That is not the case here, Your Honor.  There's absolutely
19  no evidence that Thomson Consumer ever learned of this alleged
20  CDT conspiracy in Asia.  This Indiana company had no idea that
21  this was going on, and the plaintiffs have not put forth
22  evidence that they did.

23      I'd like to reserve the balance of my time.

24          **THE COURT:**  Thank you.  Mr. Iovieno, welcome back.

25          **MR. IOVIENO:**  Third time, and the final.

1          **THE COURT:**  Yes, you must have all been on the same

2     flight when you got either the short straw or the long one.

3          **MR. IOVIENO:**  The very short one.

4       Okay.  So on this motion, very simply to summarize our

5     position here, there's so much talk about these CDT

6     conspiracies, that is at the core, the problem with their

7     entire motion, and I want to get into --

8          **THE COURT:**  Well, this is why I asked your opponent,

9     do you think the plaintiffs would agree with your formulation

10    of the *Vitamin* test, because I expect -- well, anyway, I'll let

11    you argue.

12         **MR. IOVIENO:**  I will say two things.  First of all,

13    *Vitamins* is really the only case out there, and we pass it with

14    flying colors.

15       The distinction I'm making is this is a CRT conspiracy

16    that encompass both --

17         **THE COURT:**  That's what I meant in my question to your

18    opponent.

19         **MR. IOVIENO:**  -- CPTs and CDTs.  That's why when

20    they're talking about the *All Vitamins Conspiracy*, they weren't

21    talking about the chlorine or the Vitamin B.

22       So the question here is did they, under the *Vitamins* test,

23    participate in the CRT conspiracy?  We know that there's a lot

24    of evidence, as you would imagine, for a company that's making

25    CPTs of them participating in that part of the conspiracy.

1      And then the question is, if you apply *Vitamins* -- and we

2   say, okay, well, let's just assume *Vitamins* is existing law,

3   we, *we*, from our perspective, pass this test with flying

4   colors.

5      They knowingly and intentionally joined the CRT

6   conspiracy.  The specific evidence that they had direct

7   knowledge that the CRT conspiracy extended to CDTs, the

8   documents show that.  And I'm going to get to the documents in

9   a second.  But I think it's really striking that when they

10  needed information about CDTs, because from Your Honor's point,

11  absolutely what's going on on the CDT side of the market is

12  going to affect the CPT side of the market.

13      Say they take five lines of production off the CDTs and

14  turn it over to CPTs and increase supply.  You better believe

15  that's going to increase prices, and you're going to see in the

16  documents they knew that.  And so from time to time when they

17  needed information about the CDT part of the market, where do

18  they turn?  Do they turn to public sources?  No.  They turn to

19  their co-conspirators, because they knew, they *knew* that they

20  were sharing information on the CDT market.  Normal situation:

21  Oh, we need information on the CDT market.  Where do you go?

22  You go to public sources.  Not here.  So let's get into the

23  documents.

24      If you look at Exhibit 19, this is an email exchange

25  between Thomson SA and Thomson Consumer in 2004.  The first

page of the document, the top email, we're at 156, they're

talking about Samsung has approached them about having a

meeting, and the Thomson SA representative, Mr. Didier, says to

the Thomson Consumer representative, Mr. Jacqueline:

      "Before we accept the call, we should identify what we

      could get from this meeting, knowledge they have, and we

      don't, for EG on CDT.  On SDI organization in China,

      sourcing sales, their view," and on and on.

      But the point is that *we're going to meet with Samsung,*

*and we're going to ask them -- one of the things we want to get*

*is information about the CDT side of the business*, because that

was relevant to them.  That's Exhibit 19.

      Exhibit 24, again, it's an email from Thomson SA to

Thomson Consumer, and it's dated March 1st, 2005.  The second

full paragraph, last two sentences:

      "SDI has started restructuring in Korea.  They are

      shutting down one CDT line in their Swan factory this

      quarter, and the whole factory by the yearend.  Then they

      plan to shut down one line a year."

      So they are getting what they need for their CPT business

through their co-conspirator.  They're getting information

about what's happening with CDT production.  That's Exhibit 24.

      Okay.  Exhibit 32, actually, I think is a really poignant

document to Your Honor's point about the interdependence.  This

is an internal memo, May 4, 2000.  On the second page, about

```
 1   halfway down, there's a paragraph that starts "CPT competition
 2   comes from both local suppliers."
 3        If you go down it says:
 4            "To reduce Samsung competition, Philips paid Samsung
 5        $26 million to convert their two lines in," I don't know
 6        how to say this, it's smelled M-A-N-A-U-S.
 7            THE COURT:  Where are you on the document?
 8            MR. IOVIENO:  So it is a paragraph in the middle of
 9   the page that starts --
10            THE COURT:  The first page?
11            MR. IOVIENO:  Second page, I'm sorry, Exhibit 322
12   page --
13            THE COURT:  Yeah.  Okay.
14            MR. IOVIENO:  Do you see the paragraph that starts
15   "CPT competition"?
16            THE COURT:  Yes.
17            MR. IOVIENO:  Okay.  If you go down about seven lines,
18   there's a sentence that starts "To reduce Samsung
19   competition...
20            THE COURT:  Yes.
21            MR. IOVIENO:  Okay.
22            "To reduce Samsung competition, Philips paid Samsung
23        $26 million to convert their two lines in Manaus," or
24        however you pronounce that, "to make mostly CDT and
25        reduced CPT price pressure."
```

Interdependence.  This is an internal Thomson Consumer document talking about what competitors are doing, and the effect it's having on pricing.

Let's just talk about *Vitamins* for a second, too.  You know, they say *Vitamins* is their best case.  And these are just three documents.  We cite a ton of documents.  You could go and look at them.  But there were four defendants that were making this argument in *Vitamins*.  One got summary judgment.  And if you go to our brief, page 14 and 15, the defendant UCB that got summary judgment, the Court found no documents.  Nothing.  Zero.  The other three, there was one defendant, Ducoa, there were two documents that were more than sufficient to show that they had knowledge of the *All Vitamins Conspiracy*.  The other defendant Bioproducts, a single document where they're talking about multiple vitamins.  Obviously, they were all in on that one vitamin that they made.  And the last defendant, Chinook, relied solely on testimony.  These are page 14 and 15 of our brief.  We lay it out.

So, Your Honor, if you compare the evidence you have before you here of the fact that when Thomson needed information on the CDT side, where did they go?  They went to their conspirators.  Not because they were pricing CDTs or making CDTs, but it was relevant to their business, and they knew where they could get confidential information, and the information far surpasses the *Vitamins* test.

1    Thank you, Your Honor.

2         **THE COURT:**  Thank you.

3         **THE CLERK:**  You have four minutes remaining.

4    **MR. ROBERTS:**  Thank you.  Well, I guess I did not

5    correctly interpret Your Honor's previous question with respect

6    to whether my opponents would agree with our explanation of

7    *Vitamins*.

8         **THE COURT:**  Well, and to be fair to you, I should have

9    restated it.  I should have said it in a more clear way, where

10   I thought the confusion was likely to lie.  But I didn't want

11   to miss -- I didn't want to guess incorrectly what the

12   plaintiffs' formulation would be.

13   But my question was essentially -- is it Iovieno or

14   Yovieno?  Don't say either.  What is it?

15        **MR. IOVIENO:**  It's really either, but it's Iovieno.

16        **THE COURT:**  Iovieno, okay, that's how you say it.

17   So Mr. Iovieno said, which is, isn't the question is did

18   they join the conspiracy writ large as opposed to formulating

19   the question in a way that already, you know, moves the ball

20   down the field for you a little bit.  That's the question I

21   have.

22        **MR. ROBERTS:**  I understand, Your Honor.

23   A couple key points.  Plaintiffs have chosen to define

24   this as a CRT conspiracy.  In fact, the European Commission,

25   for example, looked at this separately as a CDT conspiracy and

1    a CPT conspiracy.

2          **THE COURT:**  You're like the only person on that side

3    of the courtroom that wants me to say "European Commission" at

4    any time, okay.

5          **MR. ROBERTS:**  I understand.  I understand.

6                        (Laughter)

7          **MR. ROBERTS:**  But I might note that they specifically

8    looked it at as two separate conspiracies and specifically

9    found that Thomson did not participate in the CDT conspiracy,

10   so it's someone arbitrary that plaintiffs themselves had chosen

11   to define it as a CRT conspiracy.

12        What the case law shows, not merely *In Re Vitamins*, but,

13   for example, the *United States versus Duran* case, which was a

14   Ninth Circuit case, which is that if you allege a multi-branch

15   conspiracy, you have to show that the defendant knew about the

16   activities going on in the other branch in which it did not

17   directly participate.  It had to have knowledge of those other

18   activities.  And where --

19         **THE COURT:**  You don't think that the evidence that

20   Mr. Iovieno focused on in his remarks a few minutes ago

21   satisfies that test just for summary judgment purposes?

22         **MR. ROBERTS:**  I absolutely do not, Your Honor.

23         **THE COURT:**  I knew you were going to say that.

24                        (Laughter)

25         **MR. ROBERTS:**  They believe that all they need to do is

1  comb the record of millions of pages of documents and find six,

2  as I say, six documents only that were copied to or sent by a

3  Thomson Consumer employee that mentioned the words "CDT."  They

4  think that's enough.

5        What I'm saying is they must put forth evidence that shows

6  those documents put Thomson Consumer on notice of the existence

7  of a CDT conspiracy, and not merely that, but that Thomson

8  Consumer intended to join that CDT conspiracy.  Those documents

9  do not get them there, Your Honor.

10       And that is in great contrast to *In Re Vitamins* where

11 there was specific testimony from the defendants who had pled

12 guilty to participating in a choline vitamins conspiracy, that

13 at meetings in which they attended with other conspirators, the

14 *All Vitamins Conspiracy* was referenced and discussed.

15       That is not this situation, Your Honor.  There are merely

16 six documents with stray references to CDTs that did not give

17 Thomson Consumer notice or knowledge of this alleged CDT

18 conspiracy, and they do not show that Thomson Consumer intended

19 to join this alleged CDT conspiracy.

20       That's all I have, unless Your Honor has some questions.

21       **THE COURT:**  I don't.  Thank you.

22 Okay.  TDA.

23       **MR. WALL:**  Thank you, Your Honor.

24 Good morning.  Don Wall on behalf of TDA.  And I'd like to

25 save two minutes for rebuttal.

1          **THE COURT:**  Okay.  When you get that two minutes

2     remaining sign, if you sit down, we'll do that.

3          **MR. WALL:**  Thank you.

4        TDA was, as the papers reflect, formed in July of 2005.

5     It was a transferee of some of Thomson's CRT assets in the U.S.

6     as of October 30, 2005.

7          TDA was not a participant in any of the Glass Meetings or

8     the bilateral meetings.  TDA does not have any documents or

9     internal memos or emails that reflect agreements for price

10    fixing.  TDA was not implicated in any government investigation

11    or the subject of any investigation into CRT price fixing.  TDA

12    was not implicated by any plaintiff or any other -- or by any

13    other defendant as a participant in any such meetings, and the

14    evidence here simply doesn't support the conclusion that TDA

15    ever became a participant in a price fixing conspiracy.

16        The plaintiffs have identified some documents that they

17    think are sufficient to support that inference.  We looked --

18         **THE COURT:**  Can I invite you to focus on a couple of

19    those?

20         **MR. WALL:**  Surely.

21         **THE COURT:**  Because in your reply brief you address a

22    lot of the exhibits that they have provided, and I don't have

23    the exhibits in front of me.  So why I'm asking you -- this is

24    unclear to me, but I'm going to get them on my screen -- is

25    that their Exhibits 24 and 27, my notes tell me that those are

 1   not addressed in your reply brief.

 2       Sure.  If you want to consult with somebody or get them,

 3   sure, yeah.

 4                    (Pause in the proceedings.)

 5       **MR. WALL:**  Okay.  Exhibit 24, Your Honor, is the

 6   deposition of Mr. Oh.

 7       Give me just a moment to look at it.

 8       There simply isn't much here, Your Honor, that is

 9   probative of any agreement.  First of all, there is no

10   testimony of an agreement that was reached with TDA in Mr.Oh's

11   testimony.  He says, I think, that he spoke to a Mr. Lee two or

12   three times.

13       **THE COURT:**  You know, I could also suggest -- I don't

14   want to run off your time -- you could just reserve your time

15   and then see what the plaintiff tells me why they think these

16   two things are so great, and then you could address it on

17   reply, if you don't think there's anything there.

18       **MR. WALL:**  Frankly, I don't, Your Honor.  I don't

19   think that there's anything in here that is of great

20   consequence for TDA, and there's nothing in his testimony that

21   reflects an agreement with TDA.  The most it shows is that

22   there were some communications, a small number of

23   communications with one person from TDA, and there is an email

24   that reflects that -- or is forwarding a departure email from

25   Mr. Brunk who was TDA's sale manager until July of 2006 when he

resigned and went to another job, and that email is simply
forwarding a departure email, which by itself has nothing to do
with the issues in this case, but it simply says that in 2004,
someone had met with a vice-president at the CES show in Las
Vegas, and that's simply identifying Mr. Brunk to the V.P. who
wrote the email, and identifying that Mr. Brunk is somebody who
met at that show.

There's nothing about the content of any communications or
even a reflection of any communications that may have occurred
in the meeting in Las Vegas or at the show in Las Vegas, which
is the Consumer Electronics Show.

Exhibit 27 is a slide presentation which has a variety of
different information about TDA and its Mejia Dora Supplier
Technologies Displays Mexicana, and it has logistics
information, engineering information, a variety of information.
It does have some production and pricing information, but
doesn't indicate that there was any agreement, and does not
have any information to suggest where that information came
from, or that it was obtained in any improper manner, so it
could easily have come from customers or public sources, as
well as from anything improper, and there's nothing that would
support an inference that makes it more likely that it came
from some improper source.

And then we did address the other documents in our brief,
and don't think that there is anything in those documents also

that suggest or gives rise to the inference that is more likely
than not that there was any improper, illegal conduct.

Plaintiffs also have said that TDA should be responsible
and became a participant because of what they cite as a
continuation theory.  They're not arguing successor liability.
They're arguing that TDA adopted the conspiracy that Thomson
supposedly was a party to and that therefore would be
responsible.

The essential point is that there has to be evidence that
TDA itself was a participant in the conspiracy, and the case
that they cite, the *Baker Carpet versus Mohawk* case, is one in
which a motion for summary judgment was denied as to conduct of
Mohawk itself.  And the issue was whether Mohawk, as the
purchaser of assets, had joined the conspiracy by adopting the
retail price maintenance agreement that its predecessor
Fieldcrest had entered into, and the Court found that it had.
And that seemed to be a fairly easy decision to reach, because
it was Mohawk which actually terminated the distributorship
agreement that caused the damage and caused Baker Carpet to
bring the lawsuit.  So it was Mohawk's own activity and its own
action, and there was evidence there that Mohawk directly
caused the problems for which the plaintiff was seeking
redress.

So the Thomson references in this case, and the Thomson
continuation issues simply don't hold up.

1       Plaintiffs also say that Videocon, the ultimate parent of

2   TDA, was involved in the conspiracy, and that TDA should be

3   found liable because of conduct by Videocon.  That, however,

4   also doesn't hold up, and there is simply no evidence to

5   support that.  The argument first ignores the requirement for

6   evidence that each defendant individually be found to have

7   participated, and that there be evidence to support it, and

8   that also ignores the fundamental concept of corporate

9   separateness.

10      And here, there is no evidence that Videocon is the

11  ultimate parent, controlled TDA, or was involved in TDA's

12  pricing activities, or any other function.  And the evidence

13  for Mr. Bessa's deposition, to the extent that it even bears on

14  the time period in question, is to the contrary that Videocon

15  did nothing that --

16      **THE COURT:**  Mr. Wall, I know you wanted to reserve

17  your time, and you're into that two minutes now.  I just wanted

18  to let you know that.

19      **MR. WALL:**  Okay.  Thank you.  I'll stop now.

20      **MS. CASSELMAN:**  Good morning, Your Honor.  My name is

21  Jill Casselman.  I'm representing the Best Buy defendants.  For

22  purposes of this motion I'm representing all of the refraction

23  plaintiffs.

24      **THE COURT:**  I like the plaintiffs, but I take your

25  point.

1          MS. CASSELMAN:  Sorry?

2          THE COURT:  You just defendants a moment ago.

3          MS. CASSELMAN:  Oh, plaintiff.

4          THE COURT:  That's okay.  I know what side of the

5     courtroom you're on.  I wasn't confused.

6                         (Laughter)

7          MS. CASSELMAN:  The plaintiffs have shown that there

8     is at least a genuine dispute of material facts as to TDA.  We

9     talked about with counsel Exhibits 24 and 27, which are

10    particularly important for this reason.  But before I get

11    there, and I will, context is king.  You know, this is not a

12    company, TDA, that sprang out of nowhere in the middle of the

13    night with no history and no future.  I mean, TDA is Thomson.

14    The reason that TDA was created in 2005 was because Thomson

15    wanted to ship the business assets, and it did so.

16         Now, we'll talk about TDA and the continuity of the

17    employees in the practices.  But really what happened was

18    Thomson became TDA, and then TDA was acquired by Videocon.  So

19    the conduct of Thomson and Videocon are both incredibly

20    relevant to what was going on at TDA, especially for the

21    purposes of summary judgment where we're talking about what a

22    reasonable inference, which needs to be drawn in plaintiff's

23    favor, the non-movant, would show what a reasonable jury could

24    find.

25         So I know I'm the last of the day, and I'm just giving

1    Mr. Iovieno a break, basically.

2                      (Laughter)

3         But I do want to talk about the summary judgment standard

4    for this -- in particular this motion, because this is

5    circumstantial evidence that we are completely entitled to rely

6    upon in demonstrating that a conspiracy existed, and that a

7    reasonable jury could find that a conspiracy exists.  So we

8    have the *Continental Ore* case, which holds that a court can't

9    compartmentalize the evidence, but it should analyze that

10   evidence together in context to see if put together as the big

11   piece of the puzzle that it supports an inference of concerted

12   action.

13        And we have *Belts*, which talks about the fact that, you

14   know, the summary judgment standard, which is already quite

15   high, should be even higher in an antitrust case, and should be

16   granted more sparingly, because we have evidence in the hands

17   of the defendants.  And here we have TDA which has spun off its

18   business into a different form, and it's no longer doing CRT

19   business, which means it doesn't have its documents anymore.

20        So there's a lot of reasons why indirect evidence would be

21   applicable here to show that a conspiracy was joined and

22   participated by TDA.

23        I also wanted to point out the *Petruzis versus IGA*

24   *Supermarket*s case, which is in our briefs, which talks about

25   the fact that circumstantial evidence is absolutely permissible

1    for this purpose.  And in that case a court granted summary

2    judgment as to defendants who are relying on purely

3    circumstantial evidence.  And the Third Circuit reversed saying

4    absolutely, in this case, if you have a reasonable allegation

5    that that circumstantial evidence supports your conspiracy,

6    summary judgment denied.

7        So I believe that's what we have here.

8        Now, when we're talking about circumstantial evidence, we

9    have to talk about Thomson.  So TDA starts as Thomson.  We need

10   to dispel with the notion that TDA came with a clean slate.  It

11   was a Thomson company.  And we know that Thomson played a role

12   in the conspiracy, Thomson SA admitted as much, and it was

13   fined by the EC, and we know that Thomson Consumer participated

14   in the conspiracy, and we've heard about that the last motion.

15   I won't go into it and belabor it again.

16       In particular, two Thomson Consumer employees, Mr. Jack

17   Brunk and Mr. Key Lee, moved over to TDA.  And when I say --

18       **THE COURT:**  Do you agree that you have no direct

19   evidence?  I agree with you, circumstantial evidence is

20   important.  But there's no direct evidence regarding this

21   defendant, is there?

22       **MS. CASSELMAN:**  There's no smoking gun:  Here is our

23   price agreement, and we, TDA, agreed to fix prices.  That

24   doesn't exist.

25       **THE COURT:**  Right.  I'm going to ask you the same

 1    question again, because I'm going to write a sentence in the

 2    order that says, "There's no direct evidence," and I don't want

 3    to do that if I would look stupid.

 4        So I'm going to ask you again.  I know you're not going to

 5    say there's a smoking gun.  Is there any direct evidence you

 6    have against this defendant?

 7              **MS. CASSELMAN:**  I believe that the evidence is

 8    indirect.

 9              **THE COURT:**  Okay.

10              **MS. CASSELMAN:**  So we have Mr. Brunk and Mr. Lee who

11    were employees of Thomson Consumer, and who met with

12    competitors while they were at Thomson Consumer, and then they

13    moved to TDA.  And when I say moved, I should say they stayed

14    in the same offices, and they went to the same company, and if

15    you listen to Mr. Brunk's testimony, he said it was the same

16    company:  To me, it was the same company.

17        So we've got the fact that he -- Mr. Lee was arranging

18    Green Meetings while he was at Thomson Consumer.  Mr. Brunk had

19    meetings at CES with SDI VPs, and we have evidence from --

20    documents and testimony evidence from W.R. Kim and K.C. Oh

21    saying, *yeah, we met with these Thomson Consumer employees*.

22        And so that takes us to Exhibits 24 and 27.

23        Exhibit 24 --

24              **THE COURT:**  The only reason why I picked those out is

25    not because I thought those were necessarily the two best

1    exhibits for your side, but because I thought that they had not

2    been addressed in your reply brief.

3         **MS. CASSELMAN:**  Understandable, yes.  So K.C. Oh, he

4    testifies, *Yeah, I met with Thomson employees*, and he said he

5    met with Key Lee on several occasions, which he didn't say it

6    was only when he was at Thomson Consumer.  So a reasonable

7    inference in the plaintiff's favor would be that that could

8    have occurred at some of those meetings, at least one or more,

9    during the TDA time frame.

10        And the importance of Exhibit 27 is that this is --

11   Exhibit 27 is a -- it corroborates Mr. Oh's testimony that he

12   met with Thomson employees, or TDA employees, depending on the

13   time frame, and that TDA -- this is a TDA presentation which

14   includes confidential pricing and production info from other

15   parties, the defendants, the conspirators and the other

16   competitors.

17        So when you take that information together, you can see

18   that TDA had that information.  And, as we've seen from the

19   Thomson motion and several other motions today, we know that

20   these competitors were getting information from each other.  So

21   I think that that is incredibly strong evidence on that point.

22        I also wanted to point to Exhibit 31, which is Docket

23   3253-36.  That is an email from W.R. Kim, dated March 22, 2006,

24   which is well after Thomson has formed TDA, and TDA has been

25   acquired by Videocon.  This is a subject that says "Thomson

1    trends."  And when I say "Thomson trends," because, you know,

2    to the competitors TDA was Thomson.  They're not saying TDA.

3         **THE COURT:**  Do you have to show, to establish

4    continuation, that after the transfer of assets there was an

5    identity -- there remained an identity of stock, stockholders

6    and directors?

7         **MS. CASSELMAN:**  I don't believe so.  I think that the

8    case that we cite --

9         **THE COURT:**  What is exactly the test that you have to

10   meet to show that there was a continuation from one corporation

11   to the next?

12        **MS. CASSELMAN:**  So the continuity issue was the case

13   we cited -- let me get it -- was *Baker Carpet Gallery, Inc.*

14   *versus Mohawk* that counsel addressed.  That case said that

15   continuity -- that the fact that the business didn't change was

16   important.  So there were the same employees, the same offices,

17   same procedures.  Here, they didn't change compensation

18   agreements or manuals or their manufacturing, et cetera.

19        **THE COURT:**  Well, what I'm looking for is something

20   that's in the nature of a jury instruction.  What am I going to

21   tell the jury?  If I was asking a jury to find whether or not

22   this continuation had occurred, I would say you're to take

23   these facts that counsel told you about, and you're to apply

24   them to this test and see if they meet this test.  How would

25   you state that test?

1            **MS. CASSELMAN:**  I would say that because we have a

2     global conspiracy with many co-conspirators, the test needs to

3     be have we shown -- and, again, not at summary judgment, at

4     trial -- more likely than not that TDA was a participant in

5     this conspiracy from all of the evidence taken together.

6     Because we can't parse this conspiracy puzzle piece here,

7     puzzle piece there, and then say that we have the whole story,

8     which is what counsel has asked the Court to do.  But under the

9     standard of summary judgment especially, we wouldn't have the

10    ability to say, you know, this piece of the conspiracy is -- on

11    summary judgment, the Court has to draw all of the inferences

12    in our favor.  And so what I hear the Court -- TDA's counsel

13    say is, well, there's no evidence that that's actually just

14    inferring the inferences to their side.  So I think that for

15    the jury instruction what we need to do is all of the evidence

16    taken together.

17            So I was looking at Exhibit 31 a moment ago.  This is a

18    2006 email, a Samsung email, internal Samsung, but it talks

19    about information they're getting from Thomson, including

20    Mr. Brunk's trip to Asia.  So Mr. Brunk is going around to

21    Asia, and yet Samsung knows about this well into the Videocon

22    and TDA period, not Thomson anymore.

23            So, I mean, there is evidence in this case that suggests

24    that the competitors kept meeting, and we have no reason to

25    believe they did not keep meeting after June of 20 -- July,

 1   excuse me, of 2005.

 2        So I don't believe that for summary judgment purposes

 3   especially, that TDA has shown that they either withdrew from

 4   the conspiracy or never entered it, because they were

 5   participating as Thomson.

 6        Now, the withdrawal issue is an interesting one, because

 7   the Court knows once you're in a conspiracy you're normally

 8   presumed to continue, and TDA has not made an attempt to show

 9   withdrawal in this case, and withdrawal is, of course, a

10   question of fact.  So even if the Court were to say, *well, I'm*

11   *not sure about TDA, but I know about Thomson*, you need to look

12   at the withdrawal issue.

13        And we did talk about Videocon slightly, and counsel

14   mentioned Videocon, but I think of these as the bookends.

15   We've got a conspiring parent, Thomson, and a conspiring

16   parent, Videocon, and TDA is in the middle.  So we've got

17   conspiring going on on both sides, and I see that even with

18   that a reasonable jury could find for the plaintiffs that TDA

19   was involved in the conspiracy, because it was involved -- its

20   parents were.

21        So I think we have more evidence than that, of course, but

22   that is where -- that's where the evidence breaks here.

23        Unless the Court has anymore questions, I think I can

24   rest.

25             **THE COURT:**  I don't.  Thank you.

1        **MS. CASSELMAN:**  Thank you.

2        **THE COURT:**  Mr. Wall?

3        **MR. WALL:**  Thank you, Your Honor.

4     Just a couple of quick things.

5        First, Exhibit 31 is an email from someone at Samsung,

6  Samsung reporting on what had apparently been learned from

7  Sharp that Sharp may or may not have learned from some

8  unidentified person at Thomson that does not say in any respect

9  that there was a conspiracy or that TDA agreed to anything.

10       Mr. Brunk is said to be going to Japan to meet with TTE

11  Conka, JVC, and Sharp, all of whom were customers of Mr. Brunk

12  for which he was responsible.  So the fact that he went to

13  Japan to meet with his customers, and that Sharp may have told

14  Samsung that is not in any way suggestive of a conspiracy.

15       Now, with regard to the Thomson issue, Thomson and TDA are

16  not the same company.  They never were.  TDA is different.  It

17  has different ownership.  It has a different manager.  It was

18  Mr. Hanrahan with Thomson.  It became Mr. Moody under TDA.

19  Different sales manager.  Different reporting relationships.

20  And there is no evidence whatsoever that the two were the same

21  company or that there was a continuation in the sense that the

22  plaintiffs are seeking here.

23       With respect to continuation issues, the case that

24  plaintiffs have cited, the *Mohawk* case, *Baker Carpet versus*

25  *Mohawk*, did discuss the continuation issue, and in footnote 7

1   of that case said:

2           "The key element of a mere continuation is common

3       identity of the officers, directors, and stockholders in

4       the selling and purchasing company.  The employment of the

5       selling business entities' officers, but the successor

6       corporation is not enough.  There must be a transfer of

7       stock."

8       And obviously, that didn't happen and the ownership here

9   is different.

10      My time is up.  Thank you.

11          **THE COURT:**  Thank you.

12      Thank you all very much for your arguments.  I continue to

13  enjoy this case.  I'm not quite worn out yet.  I hope you're

14  not either.

15      Let me just say a couple of things.

16      First, I'm going to be at the antitrust section meeting in

17  the spring, and I know many of you are also.  Why am I telling

18  you that?  Because if you are across the room and you see me

19  talking to somebody, and he or she is your opponent in the

20  case, you might think what are they talking about?  We're not

21  talking about this case.  If there were only one or two of you

22  that were going to be at the meeting, I would just say, well, I

23  just won't talk to that person.  But in this particular part of

24  the legal market, at this particular meeting that's simply not

25  possible, because I have a not insubstantial amount of

1    antitrust parties in this case.

2        So I'm going to talk to whoever comes up and talks to me.

3    Don't feel that if you see that I am talking to one of your

4    opponents, that means that you have to come up and talk to me.

5    Please don't assume that.

6                          (Laughter)

7        But this is my first chance to attend that section, and

8    I'm looking forward to that, and to getting to know even more

9    of the members of this part of the bar.

10       Secondly, I mentioned at the beginning of our hearing that

11   if there was a chance that I would grant the motion for summary

12   judgment as to which no evidence was submitted by the DAPs, and

13   that is the LGEUSA, LGETT, MEUS, MEVSA motion that appears at

14   Docket 3048.

15       I suppose regardless of what's going to happen, is there

16   any reason why I would hold off issuing that order in light of

17   the pendency of the IPP settlements or for some other reason?

18       **MR. FUENTES:**  Judge, for the movants Mitsubishi

19   Electric US defendants, we're not seeing a reason to hold off,

20   and we'd request that the Court go ahead and grant the motion.

21       **MR. WAGNER:**  And we agree with that, Your Honor, from

22   the other side.

23       **THE COURT:**  Okay.  Good.  I know there's a lot

24   happening out there.  I don't want to upset anybody's apple

25   carts, but I appreciate that clarification.

1          Is there anything -- I'm actually supposed to get on a

2     conference call in 17 minutes regarding the antitrust section.

3     It's an all antitrust all the time day for me today.

4          Is there anything else we should talk about, though, while

5     I've got everybody here?  No?

6          Okay.  Thanks so much again for your argument.

7                    (Proceedings adjourned at 12:14 p.m.)

8                              ---oOo---

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3 **CERTIFICATE OF REPORTER**

4     I certify that the foregoing is a correct transcript

5 from the record of proceedings in the above-entitled matter.

6

7 DATE:   Monday, February 29, 2016

8

9

10

11 _____

12 Rhonda L. Aquilina, CSR No. 9956, RMR, CRR
            Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25