# ATTACHMENT 4

## ATTORNEY REPRESENTATION AGREEMENT

RE:

| | |
|---|---|
| **Case Name:** | MDL No. 1917 In Re: Cathode Ray Tube (CRT) Antitrust Litigation |
| **Case Number:** | 3:07-cv-05944-SC |
| **Filer:** | Indirect Purchaser Plaintiffs |

I, Anthony Gianasca, ("CLIENT") retain Mario Alioto of Trump, Alioto, Trump & Prescott, LLP and Robert Bonsignore of BONSIGNORE & BREWER (hereinafter "ATTORNEYS"), to be my attorney in connection with the above-referenced action.

1.

2.

3.

4.

1
Attorney Representation Agreement

5.

6.

7.     ATTORNEYS shall have the right to associate other attorneys at no additional expense to CLIENT.

DATED: _3-20-08_      _____
                       CLIENT SIGNATURE

                       _10  Joseph st_
                       MAILING ADDRESS

                       _Medford  Ma  02155_
                       CITY        STATE     ZIP

                       _____
                       HOME TELEPHONE (Include Area Code)

                       _617-479-6600_
                       WORK TELEPHONE (Include Area Code)

ACCEPTED BY ATTORNEYS:

BONSIGNORE & BREWER/TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
By: _____

## Duties of Class Representatives

1.

2.

3.

4.

5.

6.

7.

8.

I have revie___ ed and acknowledge my duties as a class representative in the _____
proceeding:

Dated: ___ -20-08

Signature

C:\Client\Sue\Class A\   CLASSACTIONREAGREEMENT.doc

3
Attorney Representation Agreement

1    Q.  Are you single?

2    A.  Of course.

3    Q.  What do you do for a living?

4    A.  Electrician, contractor.

5    Q.  What's your educational background?  Did

6  you finish high school?

7    A.  Yes.

8    Q.  Any post-high school education?

9    A.  Continuing education for electrical and the

10  trades after high school.

11    Q.  And what is your annual salary,

12  approximately?

13    A.  About $100,000.

14    Q.  Between the years of 1995 and 2007, have

15  you ever purchased a TV with a cathode ray tube in

16  it?

17    A.  Yes.

18    Q.  In what states did you make those

19  purchases?

20    A.  Massachusetts.

21    Q.  How many CRT TVs do you think you purchased

22  between that time period?

23    A.  I'd have to estimate about four or five?

24    Q.  Do you remember where you purchased them?

25    A.  Mostly Lechmere Sales over in Cambridge.

1   Q.  Do you still have any receipts from any of

2  those purchases?

3   A.  I believe so.  I'd have to research it.  I

4  also sent receipts to the lawyer, Alioto, back a

5  while ago, and I'm not sure if I still have the

6  originals.

7   Q.  Do you remember when you sent those

8  receipts in?

9   A.  Long time ago.  It'd have to be around

10  2008, 2009, possibly, at the beginning.

11   Q.  Okay.  Between 1995 and 2007, did you

12  purchase any computer monitors that had a Cathode Ray

13  Tube?

14   A.  I believe so, yes.

15   Q.  In what states did you make those

16  purchases?

17   A.  Massachusetts.

18   Q.  And how many computer monitors do you think

19  you purchased during that time period?

20   A.  That would be two, roughly.

21   Q.  Two?

22   A.  Probably a couple.

23   Q.  Where did you buy them?

24   A.  That, I'm not sure.  Primary place would

25  have been Lechmere, but I'm not 100 percent sure on

1  that one.

2     Q.  Do you have any receipts for the purchases

3  of the computer monitors?

4     A.  I don't think they're in my possession

5  anymore.  I think I sent all the receipts -- I

6  forwarded all the receipts.  I have to double check

7  my files to make sure I didn't miss anything.

8     Q.  Did you purchase any products with CRTs in

9  it besides TVs or computer monitors?

10    A.  I may have.  I'm not sure exactly.

11    Q.  Okay.

12    A.  Are you -- specific products --

13    Q.  No, I don't have anything specific in mind.

14  Are you aware of any other products that you have?

15    A.  You know what, those two are probably the

16  main ones.

17    Q.  Did you purchase any products, including

18  TVs or computer monitors, with CRTs in them in any

19  state other than Massachusetts?

20    A.  No.

21    Q.  Do you know what a class action is, sir?

22    A.  Yes.

23    Q.  Do you have an opinion of class actions?

24         MR. BONSIGNORE:  Objection.

25         You can answer.

1    A.  I guess I have no opinion.  I don't have a
2  legal opinion on that one.
3    Q.  Do you have an opinion as a lay person as
4  to class actions?
5    A.  Class actions don't really help the average
6  person.  They help the attorneys.  The average person
7  that fights for consumer rights usually gets shafted
8  at the end is what my feeling is, my personal feeling
9  on that.
10    Q.  Do you know anything about what notice is
11  typically provided in class-action settlements?
12    A.  A lot of notices do not get provided, and
13  that's part of the problem here.  There's a lot of
14  unethical behavior with -- by attorneys that are
15  involved not producing proper documents to affected
16  people.
17    Q.  Do you have anything specific in mind when
18  you say that?
19    A.  Specifically, a lot of people have been
20  left out of this class action.  This is a class
21  action, I believe, in many ways.  A lot of people
22  have not been notified.  There's states that have
23  been left out, including Massachusetts, and that
24  seems to be unethical to me.
25    Q.  Okay.  Do you have an opinion about

Page 29

1  front of Judge Hillman in the federal court in

2  Worcester. So I didn't get a chance to manipulate

3  that fine copying this morning.

4       BY MR. DEVER:

5     Q.  Okay. Mr. Giannasca, do you know if a

6  complaint was ever filed on your behalf in this case?

7     A.  I believe my attorney has filed complaints

8  on my behalf.

9     Q.  Did you authorize him to file those

10 complaints?

11    A.  Yes.

12    Q.  Do you remember when he filed those

13 complaints?

14    A.  I think we just went through that. There's

15 many times --

16         MR. BONSIGNORE: There's other

17 documents here that we can introduce. That's

18 probably the one you're looking for.

19    A.  Most recently was the (indecipherable)

20 complaint.

21         (Clarification requested by the court

22 reporter.)

23         MR. BONSIGNORE: Case 3-08-CV-054 --

24 sorry. Case 308-CV-01559-SC, Document 1, filed

25 3/21/08.

1         It's a 34-page complaint filed by

2  Mario Alioto, Lauren Russell; Trump, Alioto, Trump &

3  Prescott; and then Joseph Patane, Law Office of

4  Joseph Patane.  Terry -- Brigid Terry, Anthony

5  Giannasca, Brigid Flaherty, and Brigid Ten Eyck

6  against LG and a litany of defendants.  And for

7  whatever -- there's other signatures at the back on

8  page 33.  And my signature -- my name is on page 34.

9         MR. DEVER:  Okay.  Thank you.

10   BY MR. DEVER:

11   Q.  So the document that was just produced is

12  from 2008.  Do you recall having anything to do with

13  this matter after the initial complaint was filed in

14  2008?

15   A.  Yes.

16   Q.  What did you do?

17   A.  I contacted my attorney.  We talked before

18  and after, and that's what I -- what do we do, and

19  went forward with the case.

20   Q.  And then did anything else happen in the

21  case -- did you personally do anything relating to

22  the case then --

23         MR. BONSIGNORE:  Objection; asked and

24  answered.  He said I sent things --

25   A.  Well, I talked to my attorney.

Page 34

1  first found out. Do you remember if it was in

2  September?

3     A.  That was before.  Might have been -- could

4  have been July.

5     Q.  And how did you find out about the

6  settlement?

7     A.  Contact with my attorney.

8     Q.  Did you call him, or did he call you?

9     A.  I don't recall.  I think we were just

10  talking and it came up.  I don't recall who called

11  who.

12     Q.  Generally speaking, how often do you speak

13  to Mr. Bonsignore?

14     A.  Periodically.  Two times a year, I guess.

15     Q.  And what caused you to object to the

16  settlements?

17     A.  It was my understanding that my name was

18  left out of the -- was pulled out of the class action

19  for no reason.  And I was always told that it would

20  be straightened out, but I realize now that it was

21  still an issue.

22     Q.  Okay.  So you're objecting because your

23  name was taken out?

24     A.  I was removed for some unknown reason.

25     Q.  Is that the basis for your objection to the

settlement?
A. I believe so, yes.
MR. BONSIGNORE: I'm going to object to the extent that it calls for a legal analysis.
BY MR. DEVER:
Q. And what do you hope to achieve as a result of your objection?
A. Fairness for all consumers.
Q. Do you know if there was a written objection made on your behalf to the settlements?
A. Yes, I believe so.
Q. And do you know what arguments were made in that objection?
A. Is there a specific one, or ...
Q. I just want to know what --
A. The arguments that basically my name was removed, and that was the main thing, I believe.
Q. Okay. Whose idea was it to file the objection?
A. Mine. My idea.
Q. And have you ever received the actual objection that was filed on your behalf?
A. I did look through it, but again, I don't like to read too many documents. I scan through them. I don't have time to read every little piece.

1  there?

2     A.  Supplemental?  You mean after this one?

3     Q.  Yes.

4     A.  I'm not sure.  I don't remember that.  I

5  just know I objected.  How many objections?  I'm not

6  100 percent sure about that.

7     Q.  Okay.  The objection in your hand,

8  Exhibit 2 there, did you authorize your attorney to

9  file that objection?

10     A.  Yes.  I told him to object, and I believe

11  this is it.

12         MR. DEVER:  Okay.  Now I'm going to

13  mark Exhibit 3.

14         (Exhibit 3, Supplemental Objection to

15  Proposed class-action settlement and Award of

16  Attorneys' Fees, marked for identification.)

17     BY MR. DEVER:

18     Q.  Exhibit 3, what is that?

19     A.  It looks like a -- "supplemental objection"

20  is what it says.

21     Q.  Have you ever seen this before?

22     A.  I must have.  It's an objection.  I thought

23  it was one and the same, but obviously it's an

24  additional one.

25     Q.  Do you know if you reviewed that

1 supplemental objection before it was filed.

2    A. Yes. It looks familiar, yes.

3    Q. And did you authorize the filing of this

4 supplemental objection?

5    A. Let me look through it. It looks like it,

6 yeah. Definitely looks familiar, yes.

7    Q. And what did you hope to achieve by filing

8 this supplemental objection?

9    A. Well, my name is left out, and it's unfair.

10 And a lot of other people have been left out, and

11 it's very unfair to the consumer. And it's awarding

12 attorneys' fees for doing the -- for not doing their

13 job. Basically giving an award for bad behavior, as

14 far as I can see. So I want to achieve fairness, in

15 answer to your question.

16    Q. Okay. Do you know what arguments are made

17 in the supplemental objection?

18    A. It's coming down to the same thing. You

19 know, it's about a consumer rights and the attorneys'

20 fees, that they're looking for attorneys' fees, and

21 they left out certain states and a lot of people.

22 And that's my objection to that.

23    Q. And do you know why the arguments that you

24 made in the supplemental objection weren't made in

25 the initial objection?

1    A.  Not that I can recall.  And, again, I don't
2  recall names very well, as you can see.
3    Q.  Do you know how much time the attorneys
4  spent on this case?
5    A.  Not specifically, but I would assume it's a
6  long time.  It was many hours.
7    Q.  And do you -- have you reviewed any firm's
8  fee affidavit in this case?
9    A.  No, I have not.
10    Q.  Do you know what any of the firms' hourly
11  rates are?
12    A.  No, I do not.
13    Q.  Are you objecting to the lead counsel's
14  process of accepting and rejecting certain firms'
15  time in this case?
16    A.  Which counsel?
17    Q.  The lead counsel, Trump, Alioto.
18    A.  Yes.
19    Q.  And why?  Why are you objecting to that?
20        MR. BONSIGNORE:  Objection; calls for a
21  legal conclusion.
22        But go ahead.
23    A.  Due diligence.  They did not do any due
24  diligence in notifying the proper affected people in
25  many states, removing names.  They -- very unethical

1 behavior.

2      So, again, getting back to my answer

3 before, they're awarded for bad behavior. I think

4 that's wrong. A lot of attorneys do that. And I'm

5 not -- no insult to you or anybody in this room, but

6 that's bad practice, which is rampant.

7   Q. So my question is actually a little bit

8 different. Are you objecting to the way the lead

9 counsel decides to split any fee that they receive

10 among the various firms that helped them on the case?

11      MR. BONSIGNORE: Objection; asked and

12 answered.

13   A. I'm objecting to fairness to all consumers

14 that were eliminated or not included or notified.

15 And his fee is in direct relation to bad behavior.

16   Q. Okay. Take a look at Exhibit 2, if you

17 would, the little objection, the smaller one.

18   A. Okay. What page?

19   Q. If you look at page 3 --

20   A. Okay.

21   Q. -- this is the California paper, so you can

22 see the eighth line down.

23   A. I can see what.

24   Q. The eighth line down?

25   A. Yes.

Page 48

1    Q.  Oh, I'm sorry.

2    A.  Number eight?

3    Q.  Yeah.  Where it says, "The nationwide
4  class."

5    A.  I'm sorry.  Point it out.

6    Q.  I'm sorry.  It's page 4 on the top, page 3
7  on the bottom.  Sorry about that.  Do you see where
8  it says, "The nationwide class is improper because it
9  requires members of the injunctive release settlement
10  class to release both monetary and
11  injunctive/equitable claims without any consideration
12  for such releases?"  Do you see that?

13    A.  Yes, I see it.

14    Q.  Do you understand what that means?

15    A.  It sounds like a lot of legal mumbo jumbo,
16  but I'd have to refer to my attorney to explain it in
17  better detail.

18    Q.  Okay.  Is that a no?  You don't understand
19  what it means?

20    A.  Well, let me just read it again.

21      All right.  It's basically telling me, I
22  think, that a lot of people are being left out of
23  this and monetary payment is being considered without
24  the class of -- the affected class, is what I'm
25  reading.

1  not for his TV, if that's what you're worried about.

2      A.  Like I said, similar.

3          MR. DEVER:  Oh, I'm not worried about

4  that, but that's what I'm trying to establish.

5      BY MR. DEVER:

6      Q.  So this does not have to do with your TV,

7  then, Exhibit 4?

8      A.  No, it's not my TV, no.  But it's similar

9  to what my -- you said does it look familiar.

10     Q.  Oh, sorry.  Yeah.  So you think you have a

11 receipt that looks like this someplace?

12     A.  It's obvious to me that's the back of a TV

13 with a serial number, and then you've got the front

14 of the TV.  So I am sure I can take pictures of TVs I

15 have that will be similar to that.

16     Q.  Do you still have CRT TVs in your home?

17     A.  Yes, I believe I do.

18     Q.  Okay.  You can put that down now.

19         MR. DEVER:  I'm going to mark

20 Exhibit 5.

21         (Exhibit 5, email from Mr. Alioto to

22 Mr. Bonsignore dated March 5, 2012, marked for

23 identification.)

24     BY MR. DEVER:

25     Q.  What is Exhibit 5?

1 complaint. Could you elaborate?

2    A.  Well, I was cut out as a consumer, and

3 everybody else in Massachusetts was left out.

4    Q.  So when you were saying the words you were

5 cut out, you meant --

6        (Multiple parties speaking.

7 Interruption by the court reporter.)

8    BY MR. BONSIGNORE:

9    Q.  What did you mean by saying you were cut

10 out?

11   A.  The people in Massachusetts and other

12 states as well, as I understand.

13   Q.  Because you were a class representative?

14   A.  Yes.

15   Q.  You received, in advance, the first

16 objection.  I think it's Exhibit 1.  And I think we

17 said that there were no changes.  Did you have

18 anything that you wanted to add at the time to

19 Exhibit 2?

20   A.  That's what it says.

21   Q.  Okay.  Exhibit 2, when we discussed it, did

22 you have anything that you wanted to add in there

23 about behavior or anything?

24   A.  Well, like I mentioned before, I thought it

25 was a lot of unethical stuff happening against the

Page 60

1 consumer and consumer rights and people not being
2 notified.

3    Q.  But your suggestion was not included in
4 that?

5    A.  Yes.

6    Q.  Throughout the years, you've dealt with a
7 number of the people in my office with regard to the
8 CRT case?

9    A.  Okay.

10    Q.  Do you recognize the name Kelly?

11    A.  Yes.  Kelly sounds familiar, yeah.

12    Q.  Do you recognize the name Rick?

13    A.  Yes.

14    Q.  And Robin?

15    A.  Robin is your ex-wife, right, I believe
16 you're talking about.

17    Q.  You've got to bring it up.

18    A.  Oh, I'm sorry.

19    Q.  I was having a good day.  I was just merely
20 miserable.

21    A.  But the answer is yes.

22    Q.  And you've had occasion to discuss the case
23 with them?

24    A.  I believe so.

25        MR. BONSIGNORE:  That's all that I have

Page 63

1    A.  No.
2    Q.  Was she an attorney?
3    A.  She might have been.
4    Q.  Do you know if she was an attorney?
5    A.  I'm not sure.
6    Q.  Do you know if she was a paralegal?
7    A.  It's possible.  It looked like she knew
8  what she was doing.  I don't know.
9    Q.  How about Rick?  Do you know what his
10  position was?
11   A.  No.
12   Q.  And how about Robin?  Do you know what her
13  position was?
14   A.  I know she was an attorney.
15   Q.  And then in response to Mr. Bonsignore's
16  questioning, you just said you had some things that
17  you suggested adding to the initial objection; is
18  that correct?
19   A.  I think I answered that.  Adding the part
20  that -- unethical behavior and the fees being awarded
21  for not properly doing the correct job as a lawyer
22  and not informing people.  I mean, I think I already
23  said -- I said all that.
24        MR. BONSIGNORE:  Objection; asked and
25  answered.

1    BY MR. BONSIGNORE:

2    Q.  When you were taken out of the case, you
3  testified earlier that you were advised directly or
4  indirectly that Mario Alioto said not to worry about
5  it and that he would take care of it.  Did you have
6  any reason to believe that Court appointed lead
7  counsel would cut you and the State of Massachusetts
8  out of the economic class?

9         MR. DEVER:  Object to the form.

10    A.  No.  Because I was told not to worry about
11  it and I just assumed it would be taken care of and
12  that justice would prevail for all consumers.  But I
13  guess -- I think we're here today because of the
14  objections and me objecting and obviously raising
15  these issues.

16    Q.  Would you be happy if Mario Alioto, as lead
17  counsel, acted in the best interest of your behalf
18  and the other Massachusetts and New Hampshire and
19  Missouri and other states and put them back into the
20  economic class?

21    A.  I think someone needs to step up to the
22  plate and do what's right for all consumers, and that
23  has not happened.  And it looks like it's not going
24  to happen.  And there's obviously a class that's not
25  worth anything.  There's a worthless class here



Bonsignore and Brewer
193 Plummer Hill Road
Belmont, NH 03220
(781) 856 7650 (cell)
Sent from my iPhone

Begin forwarded message:

From: Office <deryl@dedwardslaw.com>
Date: March 6, 2012 9:44:26 PM EST
To: Robert Bonsignore <rbonsignore@class-actions.us>
Subject: Fwd: David Perriman TV Purchase History

Sent from my iPhone

Begin forwarded message:

From: <office@dedwardslaw.com>
Date: March 6, 2012 8:21:14 PM CST
To: "Karl Dickhaus" <karl@faxlaw.com>, "Office" <deryl@dedwardslaw.com>
Subject: David Perriman TV Purchase History

David Perriman
27300 Maple Road
Carl Junction, MO 64834
Telephone: 417-365-3652

Sarah Goolsby

Secretary for Deryl Edwards, Jr.

606 S. Pearl

Joplin, MO 64801

(417) 624-1962

Fax: (417) 624-1965

deryl@dedwardslaw.com



Perriman TV Purchase 3-
6-2012.pdf











