Pages 1 - 80

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JON S. TIGAR

MDL NO. 1917 IN RE:  CATHODE RAY    )
TUBE (CRT) ANTITRUST LITIGATION,    )
                                    )  No. C 07-5944 JST
                                    )  San Francisco, California
                                    )  Tuesday
_____ )  March 15, 2016


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:


**For Indirect Purchaser**     TRUMP ALIOTO & TRUMP
**Plaintiffs:**                2280 Union Street
                               San Francisco, California 94123
                        BY:    **MARIO N. ALIOTO, ESQ.**
                               **LAUREN C. CAPURRO, ESQ.**
                               **JOSEPH M. PATANE, ESQ.**




                               BONSIGNORE TRIAL LAWYERS, PLLC
                               3771 Meadowcrest Drive
                               Las Vegas, Nevada 89121
                        BY:    **ROBERT J. BONSIGNORE, ESQ.**




                               FINE KAPLAN AND BLACK, R.P.C.
                               One South Broad Street
                               23rd Floor
                               Philadelphia, Pennsylvania 19107
                        BY:    **MATTHEW DUNCAN, ESQ.**


           **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

*Reported By:*   **Debra L. Pas, CSR 11916, CRR, RMR, RPR**
                 *Official Reporter - US District Court*
                 *Computerized Transcription By Eclipse*

```
 1   APPEARANCES:  (CONTINUED)

 2   For Indirect Purchaser   KIRBY McINERNEY, LLP
     Plaintiffs:              600 B Street
 3                            Suite 1900
                              San Diego, California 92101
 4                       BY:  ROBERT J. GRALEWSKI, JR., ESQ.

 5

 6                            LAW OFFICES OF SHERMAN KASSOF
                              954 Risa Road
 7                            Suite B
                              Lafayette, California 94549
 8                       BY:  SHERMAN KASSOF, ESQ.

 9

10                            KERN ANTITRUST GLOBAL
                              PO Box 210135
11                            San Francisco, California 94121
                         BY:  SYLVIE K. KERN, ESQ.
12

13                            ZELLE HOFMANN VOELBEL & MASON, LLP
                              44 Montgomery Street
14                            Suite 3400
                              San Francisco, California 94104
15                       BY:  CHRISTOPHER T. MICHELETTI, ESQ.

16

17   For Plaintiff            KENNY NACHWALTER
     Sears/KMart:             1100 Miami Center
18                            201 South Biscayne Boulevard
                              Miami, Florida 33131
19                       BY:  WILLIAM J. BLECHMAN, ESQ.

20

21   For Plaintiff            TAYLOR & COMPANY LAW OFFICES, LLP
     Sharp:                   One Ferry Building
22                            Suite 355
                              San Francisco, California 94111
23                       BY:  CHERYL A. GALVIN, ESQ.

24
               (APPEARANCES CONTINUED ON FOLLOWING PAGE)
25
```

```
 1   APPEARANCES:  (CONTINUED)

 2   For Plaintiff          KERR & WAGSTAFFE, LLP
     Dell:                  101 Mission Street
 3                          18th Floor
                            San Francisco, California 94105
 4                     BY:  ADRIAN SAWYER, ESQ.

 5

 6   For Defendant          KIRKLAND & ELLIS, LLP
     Hitachi:               555 California Street
 7                          San Francisco, California 94104
                       BY:  ELIOT A. ADELSON, ESQ.
 8

 9
     For Defendant          JENNER & BLOCK
10   Mitsubishi Electric:   353 North Clark Street
                            Chicago, Illinois 60654
11                     BY:  MICHAEL T. BRODY, ESQ.

12

13
     For Defendant          WINSTON & STRAWN, LLP
14   Panasonic:             200 Park Avenue
                            New York, New York 10166
15                     BY:  MARTIN C. GEAGAN, ESQ.

16

17   For Defendant          MUNGER, TOLLES & OLSON
     LG Electronics:        560 Mission Street
18                          27th Floor
                            San Francisco, California  94105
19                     BY:  MIRIAM KIM, ESQ.

20

21                          MUNGER, TOLLES & OLSON
                            365 South Grand Avenue
22                          35th Floor
                            Los Angeles, California 90071
23                     BY:  SUSAN E. NASH, ESQ.

24
               (APPEARANCES CONTINUED ON FOLLOWING PAGE)
25
```

**APPEARANCES:   (CONTINUED)**

**For Defendant**            BAKER BOTTS, LLP
**Philips:**                 The Warner
                             1299 Pennsylvania Avenue, NW
                             Washington, DC 20004
                        BY:  **ERIK T. KOONS, ESQ.**


**For Defendant**            FAEGRE BAKER DANIELS, LLP
**Thomson:**                 300 N. Meridian Street
                             Suite 2700
                             Indianapolis, Indiana 46204
                      BY:  **KATHY LYNN OSBORN, ESQ.**


**For Defendant**            SHEPPARD, MULLIN, RICHTER & HAMPTON
**Samsung SDI:**             Four Embarcadero Center
                             17th Floor
                             San Francisco, California 94111
                        BY:  **MICHAEL W. SCARBOROUGH, ESQ.**


**For Defendant**            SQUIRE PATTON BOGGS, LLP
**Technologies Displays:**   1 E. Washington Street
                             Suite 2700
                             Phoenix, Arizona 85004
                        BY:  **DONALD A. WALL, ESQ.**


**For IPP Objectors:**       COOPER & KIRKHAM
                             357 Tehama Street
                             Second Floor
                             San Francisco, California 94103
                        BY:  **JOSEF DEEN COOPER, ESQ.**
                             **TRACY R. KIRKHAM, ESQ.**
                             **JOHN D. BOGDANOV, ESQ.**




                  **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**APPEARANCES:   (CONTINUED)**

**For Objector**              LAW OFFICES OF PAUL B. JUSTI
**Dan L. Williams & Co.:**    1981 North Broadway
                             Suite 250
                             Walnut Creek, California 94596
                        BY:  **PAUL B. JUSTI, ESQ.**


**For Objectors**             ALIOTO LAW FIRM
**Rockhurst, Garavanian**     One Sansome Street
**and Talewsky:**             35th Floor
                             San Francisco, California 94104
                        BY:  **THERESA MOORE, ESQ.**


**For Objector**              **JOSEPH SCOTT ST. JOHN, ESQ.**
**Douglas St. John:**         514 Mockingbird Drive
                             Long Beach, Mississippi 39560


**For Objector**              LAW OFFICES OF JAN WESTFALL
**Donnie Clifton:**           39786 Blue Water Way
                             Menifee, California 92584
                        BY:  **JAN LEIGH WESTFALL, ESQ.**

                    _   _   _

**P R O C E E D I N G S**

MARCH 15, 2016                                             2:01 P.M.

     **THE CLERK:**  Calling Civil Case 07-5944, MDL No. 1917,

In Re Cathode Ray Tube Antitrust Litigation.

   Your Honor, appearances have already been taken.

     **THE COURT:**  Thank you.  If you have made an

appearance, your appearance will be noted in the minutes.

   The matter is on calendar today for a final approval

hearing with regard to the settlement of the Indirect Purchaser

Plaintiffs.  The Court previously issued an order regarding the

conduct of the hearing.

   I see that although I had the foresight to print the

order, I didn't have the foresight to actually bring it to the

bench.

   (Whereupon, document was tendered to the Court.)

     **THE COURT:**  Oh, there we go.  I have a very good

Courtroom Deputy, so I now have the order with me.

   So you know what the order of proceedings will be today.

Obviously, not all of the issues that were raised in the

various objections that were filed will be discussed today in

open court.  We don't have the time for that.

   I just wanted to make a few observations and indicate a

few questions regarding the subjects that we will tackle today.

   Oh, before I do that, may I ask, please -- and this is in

open court on the record -- is there anyone here who has come

1   as a member of the public as opposed to as an Objector or as an

2   attorney for an Objector?  Has anyone come here today in his or

3   her capacity as a member of the public to address the Court

4   regarding this settlement?

5        (No response.)

6        The record will reflect that after a reasonable pause, no

7   one has responded in the affirmative to the Court's question.

8   So the Court has discharged its obligation to hear from members

9   of the public regarding this settlement.

10        Anyway, these questions or observations are not tentative

11   rulings.  They are not meant to indicate the likely outcome of

12   today's proceedings, but they might provide some structure for

13   the arguments.

14        With regard to the question of whether the Court can

15   approve a settlement that releases the claims of the majority

16   of states without providing consideration, I think it would

17   just be useful, although it's probably implicit in the -- or

18   even explicit in the record for lead counsel to indicate:

19        Do you represent the Indirect Purchasers in the

20   non-repealer states?

21        Do you represent the Indirect Purchasers in the states of

22   Massachusetts, New Hampshire and Missouri?

23        What is the best reported case you can cite for the

24   proposition that a Court should deem fair and adequate a

25   settlement that releases all the claims of a class member, but

1   provides no compensation to that class member?  And I want a

2   case in which the issue was actually litigated.

3        I think I have read, the relevant portions at least, of

4   every case on this question that was cited by Special Master

5   Quinn or lead counsel.  I do not believe there is a case that

6   fits the description that I just gave, but I would be happy to

7   be corrected.  In other words, what is the reported case that

8   is most like this one?

9        Is it unfair to assume that defendants either paid

10  consideration for the global releases that they received, even

11  if that consideration was not separately identified, or that

12  they would not have signed the settlement if they had not

13  received releases from the 29 states that are not receiving

14  compensation?  If so, then don't we know that those releases

15  have value?  And if they do have value, why isn't that value

16  being distributed to claimants in those states?

17        Citing *Booth* to me, which is a case that I decided and

18  which was cited back to me in these proceedings, is not

19  helpful.  I was the judge in that case and *Booth* has nothing to

20  do with this.

21        With regard to the issue of unclaimed funds and the need

22  for *cy pres*.  I issued the order that I issued so we'll devote

23  some time to that topic, but I have to say that I now have a

24  better understanding of the actual likelihood of any funds

25  remaining than I did at the time I issued my order regarding

1   the structure of this hearing.

2       With specific reference to lead counsel's statement at

3   docket No. 4479:

4           "The number of claims received as of December 7,

5           2015 was 109,709 with a total number of 19.9 million

6           CRT units claimed."

7       Even though that was the deadline, lead counsel says that

8   additional claims are being submitted every day.

9       Lead counsel goes on to state, quote:

10          "No *cy pres* distribution is contemplated because

11          there are already sufficient claims to exhaust the

12          fund without any class member receiving anywhere

13          close to three times their estimated damages."

14      So when it is the turn of Objector Clifton to address the

15  Court on this topic, that person can explain to me why lead

16  counsel's conclusion is wrong.  Because if it's not wrong, I

17  don't think there is any need for the Court to address this

18  issue any further.

19      I acknowledge the possibility, which is raised in the

20  papers, that there may be some uncashed checks.  And certainly

21  in the area of class actions generally, the problem of uncashed

22  checks can be significant, but this is a claims made

23  settlement.  The checks will be mailed to persons who made

24  claims.

25      So this isn't one of those cases where the Court has

1  approved a distribution to everybody in the class whether they

2  asked to be compensated or not, and so people don't know if

3  it's junk mail.  These are people who all made claims.

4      So I'm -- it seems to me likely with so many claimants

5  might there be a few unclaimed checks?  Yes.  But I don't think

6  that we need to take the dramatic step now of inserting a

7  *cy pres* provision into a settlement that doesn't have one,

8  because there is nothing that -- now that I understand the

9  distribution, I don't -- it's hard for me to see there would be

10  a need for that.

11     But Objector Clifton, apparently, feels differently and so

12  if -- if you could provide the factual support for the

13  conclusion that there would be such a need, that would be

14  helpful.

15     With regard to the issue of contract attorney's fees,

16  which is the third subject in the Court's scheduling order, I

17  put that on the calendar just because I wanted to run some math

18  by the Objector to see if I'm missing something.

19     Objector St. John contends that the mark-up on contract

20  attorney time is over 1,000 percent; that the mark-up is

21  excessive and that the Court should make an across-the-board

22  cut in the attorney's fees award as a result.

23     He further contends that if the Trump Alioto firm were to

24  have used, quote, the undifferentiated contract attorney

25  rate --  i.e., $47 per hour -- its lodestar would be reduced by

1    $2.61 million or about 16.6 percent of its total bill.

2         Taking that figure as representative, Objector St. John

3    then suggests that the Court should reduce the lodestar

4    15 percent across the board.

5         I'm not saying I agree with that or I don't agree with

6    that.  I'm just stating Objector St. John's position.

7         So my question for the Objector is:  Even if I did that,

8    how would that reduce the attorney's fees in this case?  The

9    attorney's fees in this case is not a straight lodestar award.

10   Lodestar is being used only as a cross-check.

11        So let's apply a 15 percent reduction and ask ourselves

12   what the effect of that would be.  If you add the 15 percent

13   reduction on top of Special Master Quinn's 10 percent reduction

14   and you reduce -- or, excuse me, you lower the current rates,

15   which I think is the appropriate figure and no one objects to

16   that, lodestar of $90,075,076.90.  If you apply that reduction

17   of 25 percent, you get an adjusted lodestar of $67,556,307.68.

18        The recommended percentage award is 30 percent, which is

19   $173,025,000.  If the lodestar were reduced by that much, the

20   adjusted multiplier would be 2.56 percent, which is not even

21   close to being out of the ballpark.

22        So that was kind of a long wind-up to a pretty short

23   question, which is:  Why does it matter?  I'm not saying that I

24   agree or disagree with the practice or that I totally endorse

25   the billing or anything like that.  I'm just wondering out loud

1  why I need to reach this issue because as I see it, assuming

2  everything that Objector St. John says about this billing is

3  correct, even if I were to take the steps he wants me to take,

4  the multiplier would be unremarkable.  But if I'm wrong about

5  that, I would like to know.

6      I think in light of my current state of thinking on the

7  question of unclaimed funds and the need for *cy pres*, when I

8  get there, and it will be the second thing we do, I'm going to

9  ask counsel for Objector Clifton to speak first, which is the

10  reverse of what I said in my order of March 10th.

11      Let's turn first to the question of consideration.  Let me

12  hear from lead counsel.

13          **MR. ALIOTO:**  Good afternoon, your Honor.  Mario

14  Alioto on behalf of the Indirect Purchaser Plaintiffs.

15      With your Honor's permission, we have decided to split

16  these arguments up this afternoon.  Mr. Matthew Duncan will be

17  addressing the release issue and I will be responding on the

18  contract attorneys and on the *cy pres* issues, your Honor.  And

19  I'd like to introduce Mr. Duncan to the Court.

20          **THE COURT:**  All right.  Very good.

21          **MR. DUNCAN:**  Good afternoon, your Honor.

22      Matthew Duncan of Fine, Kaplan and Black on behalf of the

23  Indirect Purchaser Plaintiffs.

24      I'll be addressing the first issue, which is generally the

25  scope of the nationwide release and the treatment of certain

1  claimants in certain states under the plan of distribution.

2  And I think -- I'll get to each of the observations that the

3  Court raised on all of those issues in the course of this or

4  I'm happy to just jump right in with the questions.

5      And maybe the best place to start is your very first

6  question, your Honor, which is whether lead counsel represents

7  the nationwide class at this stage, and the answer is

8  absolutely yes.  The litigated class was one thing, but at the

9  settlement stage, obviously, lead counsel has a fiduciary

10  obligation to represent the entire nationwide class, and that's

11  what lead counsel has done throughout that process.

12      So the answer to question No. 1 is unequivocally yes.

13      The broader issue here, I think --

14      **THE COURT:**  Can you imagine an attorney-client

15  relationship in which you went back to your client and said:

16  This is how the litigation turned out.  I want you to sign a

17  release of claims.  Because with regard to a large number of

18  states, that's the effect.

19      **MR. DUNCAN:**  I think that's right, your Honor --

20      **THE COURT:**  Why is it in the interest of a class

21  member whose lawyer comes back with that result, why would that

22  person feel that their interests had been represented?

23      **MR. DUNCAN:**  I think it's -- I think -- I can imagine

24  that situation, your Honor, and it's a situation in which I

25  think lawyers find themselves routinely.

1          A case is litigated for awhile and claims fail on the

2     merits for one reason or the other, or about to fail on the

3     merits for one reason or the other, and the claims are

4     stipulated to -- for dismissal or there is a dismissal on the

5     merits.  The class loses.  The client loses.  And a lawyer has

6     to explain to the client why that claim had no value.

7          And I don't think that there is anything --

8               THE COURT:  Well, no one is objecting -- well, I

9     shouldn't say no one is objecting.  Everybody is objecting to

10    everything.

11         But, you know, let's take the statements of interest, for

12    example.  Massachusetts says:  Fine, then let's just not be

13    part of it.

14         So it's not a question of -- I'm not asking the question

15    today whether these claims have value.  I'm asking what about

16    the fact that these parties are essentially signing a release.

17    It's not the fact that you've let go of the claims.  It's

18    what's being asked of those class members.

19              MR. DUNCAN:  I think that's -- I think the way you

20    framed that question makes it useful maybe to step back,

21    because it isn't necessarily just where we stand today.  It's

22    useful here to consider the whole history of the case.

23         The root of this nationwide settlement and nationwide

24    release dates back to the complaints.  I mean, there was always

25    a nationwide injunctive relief claim that was part of this

1  case.  And that -- because that case, that was always part of

2  the case.  It was, of course, natural at the settlement stage

3  to release those claims that arise from the same factual

4  predicate that were or could have been brought by the class as

5  originally alleged in this case.

6       And that's pretty boilerplate class action law; that it's

7  appropriate to have a release of that scope arising from the

8  same factual predicate.  And so that's the root of why these

9  claims are, in fact, encompassed by the settlement.

10      And there are -- we cited them in our briefs.  There are

11 plenty of cases, Ninth Circuit cases even, that address

12 directly the scope of that release being appropriate.

13      And so that's point one, is that these claims, nationwide

14 claims, were always part of the case; hence properly released

15 as part of the global deal.

16      The broader point -- and we also made this point in our

17 briefs -- is that there is an interest in finality in complex

18 MDL proceedings of this nature.  Part of the reason for Rule

19 23, part of the reason for the MDL statutes is to aggregate all

20 the claims that arise from a factual predicate in a case like

21 this one, to litigate them, to see which claims have merits, to

22 boil the case down, and at some point, hopefully, to facilitate

23 a global resolution.  And that, too, supports the nature of

24 this nationwide release.

25      And so because the release is appropriate, the question

1   then really boils down -- and we've said this in our briefs as

2   well.  This isn't so much an issue of consideration or the

3   scope of a proper release.  It really is the question of

4   whether an allocation as part of an appropriate release needs

5   to give everybody something.  And we think the issue there is

6   pretty clear also under the law.

7        Ninth Circuit cases -- and this comes to the second

8   question or the observation the Court raised at the beginning.

9   The best case that allows a release of this nature to cover a

10  nationwide class and, yet, only give compensation to a subset

11  of those class members with valuable claims, I would say is the

12  *Mego* case from the Ninth Circuit.

13            **THE COURT:**  The word "release" does not appear in

14  that case.

15            **MR. DUNCAN:**  Does not what?  I'm sorry, your Honor.

16            **THE COURT:**  Appear.  I don't believe the word

17  "release" appears in the *Mego* case.  I think if you Control-F

18  the case, that word does not appear.

19            **MR. DUNCAN:**  I think that's probably -- that's -- I

20  don't doubt your Honor a bit for that, but -- on that point.

21  But I do think that it's true that *Mego* and the other cases we

22  cited in that section of the brief stand for the basic

23  proposition that it's entirely appropriate for a nationwide

24  securities class -- that was a securities case.  This actually

25  comes up all the time in securities cases.

```
 1        A nationwide securities case can allege claims on behalf

 2   of all purchasers or sellers -- purchasers of the security for

 3   a given time period.  Right?  That's the way those claims are

 4   alleged.  Case goes on for awhile.  You do a damage model.

 5   Turns out in the end that only a subset of the class was

 6   actually injured by the alleged misrepresentation.  So the plan

 7   of distribution reflects that in the end.

 8        But the release in a securities case, in a settlement

 9   context, almost always covers everybody who purchased in that

10   period, but then the money only goes to the people that were

11   actually harmed.

12        And that's what Mego stands for and that's what many of

13   the other cases stand for in that section of the brief.  And,

14   your Honor, respectfully we don't think this case is any

15   different.

16        So the general rule is that at the allocation stage, lead

17   counsel has to do what's fair and reasonable and rational based

18   on a good faith valuation of the claims.  And that's all that's

19   happened here, is the whole case was litigated.  The nationwide

20   claims were out there.  There is now a global release that's

21   appropriate.  There is a plan of allocation that we think is

22   fair and reasonable given the state of the claims today.  And

23   nothing unusual about that under Rule 23 in our view, your

24   Honor.

25             THE COURT:  Would the defendants, do you think, have
```

1  signed the settlement agreement in this case if it did not

2  contain global releases?

3        **MR. DUNCAN:**  It's a good question, and I don't know

4  the answer to that.  And I do see where you're going with this.

5  I think this gets to your third observation.

6        And it's fair, because surely the defendants see value in

7  getting global peace.

8        **THE COURT:**  Yes.

9        **MR. DUNCAN:**  There is value to that.

10       **THE COURT:**  And I take your point earlier that there

11  is value to a number of constituencies in a very large class

12  action to achieving a global peace, but I think it's also fair

13  to say that the value is perhaps highest to the defendants in

14  the case.

15       And I -- I just think that relatively straightforward

16  application of economics indicates that the releases of the

17  claims of these 29 states had value to the defendants.

18       **MR. DUNCAN:**  I think two points in response to that,

19  your Honor.

20       First, I just want to start at the 50,000 foot level and I

21  think everybody understands this, which is that the value these

22  defendants paid in this case was overwhelmingly a function of

23  the value of the claims, of the 22 state damage classes.  Those

24  were the claims that were on the brink of trial.  Those were

25  the claims that presented defendants with a serious risk and

 1  that ultimately is why they paid what they did.

 2      So that's only the first part of an answer to your

 3  question.

 4          THE COURT:  Are you able to attach a number to the

 5  overwhelming value?

 6          MR. DUNCAN:  I'm not, your Honor.  But what I will

 7  say is this, and that is the second point in response to, I

 8  think, your Honor's concern.

 9      No question the defendants viewed -- had saw some value in

10  achieving global peace as to the rest of the class.  And the

11  question your Honor has posed is whether those claimants, those

12  class members, should be distributed whatever that value is.

13      And the response at the end of the day, your Honor, is

14  that because those claims are valueless, all they have is

15  nuisance value.

16      And so the question is whether for purposes of a plan of

17  allocation --

18          THE COURT:  Yes.

19          MR. DUNCAN:  -- it's reasonable.  It's reasonable to

20  distribute funds to valid substantive claims and to not

21  compensate nuisance value claims.

22          THE COURT:  There is an interesting moral hazard

23  question, if that's the right term, that you're raising.

24      I think the Second Circuit might have discussed this

25  question in that *Spuds* case that the auction house case cites.

```
1    Anyway, I read it somewhere in the last couple of days as a

2    discussion of your point, which comes out the other way.

3         But let's take your point at face value.  Let's assume

4    hypothetically for just a moment that the lawyers in these

5    other states, we'll call them the claimant -- we'll call them

6    the 29 states.  That the claimants, excuse me, in the 29 states

7    had a different lawyer.  So when it came time for settlement

8    and the claims only had nuisance value, it would get paid.  It

9    would get paid still because the defendants would still want

10   peace, right?  And nuisance value claims get paid in the world,

11   is that happens.

12        And I can have an opinion about that as a person, and I

13   can have an opinion about that as a judge, but I know it

14   occurs.  And this case maybe is no different.

15        So if they had their own lawyers, they would go to the

16   defendants and say:  If we're going to get out of the case,

17   you're -- if you would ask us to sign releases, then we want to

18   get paid.

19        You want to go to trial?  You think you could beat us at

20   trial?  That's fine.  You want to play that game of poker.  But

21   if you want to end that game of poker, we're entitled to be

22   paid.

23             MR. DUNCAN:  It's debatable.  It's debatable whether

24   they would have actually succeeded in doing that.

25        Maybe you could ask the defendants that, whether they
```

1  would allow themselves to be hijacked in that way.  I think --

2  I'm not sure it's obvious to me that they would pay those

3  claims in that scenario.

4          **THE COURT:**  Well, who knows?  I don't know.  It's --

5  I think it's not impossible.

6          **MR. DUNCAN:**  It's not impossible.

7          **THE COURT:**  It's not impossible.  And in that

8  instance, if that had happened, then not only would there have

9  been value to the release claims, money would have changed

10  hands.  And if that's possible, then that means that it's

11  possible in this case that money went to other claimants.

12  That's what's on my mind.

13          **MR. DUNCAN:**  I think it's conceivable, your Honor,

14  but I would respond that the rule is not that you must

15  compensate in that situation.

16     If that were the rule, there would not be all those cases.

17  There would not be a *Mego* case.  There would not be all the

18  others that we've cited in our brief where a subset of the

19  class gets nothing.

20          **THE COURT:**  Am I correct in assuming from your

21  citation to *Mego* that there is not a case that you're aware of

22  in which this issue was litigated that came out the way you

23  want it to?

24          **MR. DUNCAN:**  I think *Mego* is one of those cases.  I'm

25  not sure --

1          THE COURT:  You think this issue was litigated in

2    *Mego*?

3          MR. DUNCAN:  It was certainly litigated.  There was a

4    dispute -- an objection in that case about the plan of

5    allocation.  And the argument was that these -- the category of

6    plaintiffs that were not getting anything were not being

7    treated fairly by the deal.

8          THE COURT:  And it would be fair -- so I guess it

9    would be fair to assume that in that case there was a release,

10   but its existence was simply not identified on the record.

11         MR. DUNCAN:  I think that's correct.  That would be

12   my interpretation.

13         THE COURT:  I'll take a look at the case.

14         MR. DUNCAN:  I think that's right.

15      And, certainly, the others -- and I think they are mostly,

16   if not all, securities cases that we've cited.  This certainly

17   does -- we could have dropped long string cite footnotes with

18   securities cases around the country where this comes up because

19   it does happen relatively routinely.

20      And, your Honor, I am running -- I forgot to reserve five

21   minutes at the beginning and I'm down to seven now, so I've got

22   two more minutes to wrap up.  And I'm happy to just close that

23   out with any additional questions on these issues or...

24         THE COURT:  I won't give you guidance or interrupt

25   you.

1          **MR. DUNCAN:**  Very well.

2          **THE COURT:**   The clock is a tough taskmaster.

3          **MR. DUNCAN:**  It is.

4      The two final points I wanted to make sure get

5  mentioned -- and I'm sure the Court picked up on this in the

6  brief, and the Special Master certainly properly reflected

7  it -- are the practical considerations that indicate the

8  fairness of this deal and this release.

9          And one of those is the *LG* settlement that Judge Conti

10  approved that had identical release provisions, identical plan

11  of allocation framework.  Nobody objected.  Nobody opted out on

12  the grounds that this didn't treat the non-repealer states

13  fairly.  And I think that's because at the end of the day

14  everybody knows these non-repealer claims just have no

15  substantive value.

16          And the same is true for the opt-out situation.  The

17  opt-out rates, as the Courts are aware, are trivial in this

18  case.  And if the claims -- if these claims truly had value,

19  truly had meaningful value, there are plenty of end user class

20  members out in those states that have, you know, significant

21  purchases of these products.

22          If those claims truly had value, you would see opt-out

23  rates significantly higher than what we have here.  You would

24  have a lot of class members coming in to object on all of these

25  grounds, and you just don't see it because at the end of the

1  day everybody knows that these claims cannot succeed.  They are

2  not valid valuable claims, and that's why it's fair to treat

3  them in the way that we have for plan of distribution purposes.

4          **THE COURT:**  Thank you.

5          **MR. DUNCAN:**  Thank you, your Honor.

6          **MS. KIRKHAM:**  Good afternoon, your Honor.  Tracy

7  Kirkham of Cooper and Kirkham responding.

8          Our argument is being divided 10 minutes and 10 minutes

9  with Ms. Theresa Wright, who is going to respond on the

10  individual issues with regard to the repealer states that were

11  lumped in with the non-repealer states; the Massachusetts,

12  et cetera, at issue.

13          The first response I would like to just sort of mention,

14  it was said in passing in response to your Honor's first

15  question, is that apparently the position that is being taken

16  by lead counsel is that up until the point they sat down at the

17  settlement table they did not represent the non-repealer states

18  because we've have heard in writing and again in court today

19  the phrase:  The litigation class is one thing, but, of course,

20  when we sat down to settle, that's another thing.

21          I don't know of any fiduciary duty that works that way.

22  But I do know the cases are legion that I, as plaintiff's

23  counsel, class counsel -- and I have been doing it for a lot of

24  years; that I can't satisfy the settlement criteria unless I've

25  shown that I have, to some degree, litigated every one of the

 1  claims that I am settling.

 2      I have to demonstrate to the Court that the -- that I have

 3  assessed the panoply of claims that I filed; that I took

 4  discovery; that I thought about them; that I litigated them.

 5      I can't say:  I didn't think about some of them and then

 6  when I sat down to settle, I decided they were valueless.

 7          THE COURT:  Is this really so remarkable?  Is it

 8  so -- is it -- does it tell me something, that the sharpest

 9  weapon I can find for you is a District Court case from New

10  York?

11          MS. KIRKHAM:  Are you talking --

12          THE COURT:  In other words, why hasn't this -- you

13  know, is *Mego* as good for your point as he thinks it is?  How

14  good is the law for you on this point?  That's the question.

15          MS. KIRKHAM:  Well, first of all, on the point about

16  the cases that are cited where -- well, there are two -- I

17  guess there are two things to say.

18      Yes, of course, releases always release all claims that

19  were or could have been brought in a case.  Generally speaking,

20  in every case I can think of, the same people who are releasing

21  valuable claims may also be releasing non-valuable claims.

22          THE COURT:  Right.  And for purposes of your

23  argument, you and I can agree that those cases are not helpful;

24  that is, where there are claimants who receive some money and

25  they are releasing all of those claims, even the ones they

 1  didn't get paid for.  Those cases don't help me.  I agree with

 2  that.

 3       But my question for you is:  Is it possible that the

 4  reason that we don't see more cases like this is that there are

 5  whole swaths of claimants whose claims -- all of whose claims

 6  are released, who don't get any money, but it's unremarkable.

 7       And this, I think, is the argument being made by

 8  Mr. Duncan.  Is it wrong?

 9            **MS. KIRKHAM:**  I think we don't see them in reported

10  decisions because they are not happening.

11       What is happening are the situations that -- I mean, I

12  think that lead counsel culled through every case that they

13  could find.  And I certainly looked for all the cases I could

14  find.  And what you have are securities cases in which the

15  class is defined as everybody who bought the security during a

16  time period and the disclosure ends the time period.

17       And so what you have in that case is somebody -- and

18  sometimes they will say who bought in the time period and held

19  after April 12, 2007.  That solves the problem in a different a

20  way, but sometimes they don't talk about your having to hold or

21  sell after the disclosure of the fraud.

22       And so you get cases like the ones that are cited here,

23  where the class encompasses people who bought the security in

24  the class period, but they sold it before the fraud was

25  disclosed.

1    And so you can look at those cases on a factual basis.

2 And frequently the plan of distribution does not pay them, at

3 least in these cases, where they didn't.

4        **THE COURT:**  The *Time Warner* District Court case cited

5 by the Special Master is like that, but it's not a securities

6 case.  There was a list that Time Warner maintained and there

7 are people who simply never appeared on the list and they were

8 released.  But they were not affected by the ill conduct,

9 essentially.

10        **MS. KIRKHAM:**  And neither are the people in all of

11 these securities cases.  They're not affected -- I mean, you

12 can look at these and you can say on a factual basis:  I can

13 see that this person has no claim.

14     That's not what we have here.  What we have here are a

15 whole swath of people who on a factual basis actually have the

16 exact same claim that the citizens of California do.

17     What they don't have is a repealer state law.  And so the

18 question then becomes:  Do they have a claim under any other

19 theory of law?  And what, in fact, you're being asked to decide

20 here, because it keeps coming back to the decision, the root

21 decision --

22        **THE COURT:**  Putting aside the question of whether the

23 fact that the defendants obtained the release shows that it has

24 some bargained-for value, just putting that to one side, what

25 are the best cases that you can think of that show me

1  independently that the claims have value, the released claims?

2       **MS. KIRKHAM:**   The best cases that I can give you --

3       **THE COURT:**   I have to say the statements of interest

4  on this point are fairly weak.  They sort of say:  Well, read

5  the Objector's brief.  Decide for yourself, your Honor, if

6  these claims have value.

7       You're the Attorney General of the states.  Shouldn't you

8  be telling me they have value?

9       **MS. KIRKHAM:**   To be absolutely honest with you -- and

10  I have done this in other cases, in the *LCD* case and in the

11  *DRAM* case -- there are political issues at work here about

12  whether State Attorney Generals want to have an overarching

13  federal claim made --

14       **THE COURT:**   Well, not meaning to be critical of the

15  statements of interest.  They were actually very helpful to me,

16  and I'm glad they were filed, and I appreciate the Attorneys

17  General of those states taking the time and resources to file

18  them.

19       But my question is:  What are the reported cases that show

20  me that these non- -- first of all, let's take Massachusetts.

21  Unfortunately, there is nothing I can do about that situation.

22  I can approve the settlement or reject it.  But if I reject the

23  settlement, it doesn't bring the Massachusetts claims back to

24  life.

25       So let's take the just straight up non-repealer states

1  claims.

2      **MS. KIRKHAM:**  Missouri.

3      **THE COURT:**  As to those claims, what is the best

4  reported case that says in the non-repealer states those claims

5  have real value that attach to them?

6      **MS. KIRKHAM:**  There has been in a -- in a situation

7  with a private plaintiff, because the State of Oregon in *LCD*

8  was acting as a private plaintiff.  It was not acting under its

9  police powers as a Government compliance.  That was not a

10  Government compliance case.

11      Judge Illston looked at the key span decision and she said

12  that she was persuaded that the general equitable powers of the

13  Court, the powers that this Court inherited from Great Britain,

14  apparently, provide the ability to give monetary equitable

15  relief and that, therefore, she was persuaded and she was --

16  there were no cases that said -- if you look at *Porter*, what

17  the Supreme Court says is that the powers of the Court -- its

18  inherent powers are broad unless there is a Congressional

19  intent in a specific area of the law to --

20      **THE COURT:**  When someone talks about my inherent

21  power, it always makes me nervous.

22      **MS. KIRKHAM:**  Well, it's not -- it's really not

23  even -- you know --

24      **THE COURT:**  You used a wonderful word early in your

25  argument.  You used the word "legion."  You said the cases are

1   legion.  Aren't the cases legion going the other way?

2          **MS. KIRKHAM:**  No.  There actually are no cases going

3   the other way.  The only thing going the other way doesn't go

4   the other way.

5          The only case anybody has cited going the other way for

6   the proposition that Section 16 does not provide monetary

7   equitable relief is Multidistrict *Vehicle Air Pollution*, and

8   that is not what it says.

9          What *Air Pollution* says is that -- well, first of all,

10  what *Air Pollution* says is the plaintiffs weren't seeking

11  restitution in *Air Pollution*, so everything else it says could

12  be arguing dicta.

13         But when it goes on, it says:

14             "There are three major antitrust functions which

15             injunctive relief granted under Section 16 might

16             serve.

17             "One, putting an end to the illegal conduct.

18             "Two, depriving violators of the benefits of

19             their illegal conduct.

20             "Three, restoring competition."

21         In our opinion, relief under Section 16 that does not

22  serve any of these antitrust functions is not appropriate.

23  However, monetary restitution or disgorgement serves function

24  number two.  In fact, it's the only way to serve function

25  number two because the illegal -- the benefit of the illegal

1  conduct in a price fixing case is money.

2      In fact, it's hard to think of an antitrust case where the

3  benefit of the illegal conduct doesn't come down to money.  It

4  can be market share, but if you don't translate that into

5  sales, into money, it doesn't do much for you.  So it's always

6  money.

7      So if you're going to have the power to deprive violators

8  of the benefits of their illegal conduct, you have the power to

9  order them to give up that money.  It's not a damage claim.  It

10  is an equitable claim.  It's not a damage remedy.  It's not

11  proof of pass on.  It doesn't implicate *Illinois Brick*.    It

12  is --

13          **THE COURT:**  This is well-settled authority that I

14  have?

15          **MS. KIRKHAM:**  This is Multidistrict *Vehicle Air*

16  *Pollution*, Ninth Circuit case --

17          **THE COURT:**  It's well settled.  I have Judge

18  Illston's passing reference to Oregon and the case that you

19  say -- other people say goes the other way.  It seems a little

20  shaky.  I don't know.

21      **MS. KIRKHAM:**  Well, you have -- you have a relatively

22  clean slate here, but there is no -- no --

23          **THE COURT:**  It makes me only slightly less nervous

24  than the "inherent authority" thing.

25          **MS. KIRKHAM:**  No one other than Judge Illston ever

1   looked at the question square in the face.  No one other than

2   Judge Illston ever had to answer the question:  Can I give

3   equitable monetary relief, disgorgement or restitution?  Can I

4   order the defendant to give up their illegal -- the benefits of

5   their illegal conduct under Section 16 of the Clayton Act?

6       It's -- you know, in some respects this almost didn't

7   happen until *CAFA*.  What happened -- you know, *Illinois Brick*

8   came down, and we had the repealer and the non-repealer states.

9       *Arch America* went up and the Supreme Court said:  Have at

10   it.  Non-repealer -- you know, repealer states, in your courts

11   you can do whatever you want.  Which does kind of address the

12   question of whether the Supreme Court really intended to

13   absolutely put an end to anything that smacked of multiple

14   liability.  The Court said:  Have at it.  You know, California,

15   knock yourself out.

16       Then *CAFA* came along and took all those cases and created

17   the monstrous cases that we now have in Federal Court, where

18   you get opinions like we have in *DRAM* and the *LCDs* where the

19   judge puts -- you put on your Arizona hat for four paragraphs

20   and you take it off.  You put on your Arkansas hat for four

21   paragraphs and you take it off.  Then you put on your Kentucky

22   hat.

23       Until we had that situation which sent lawyers, in effect,

24   I think looking for a way to create a greater degree of

25   cohesiveness, maybe there wasn't the motivation to look at this

```
 1   time-honored equitable power of the Court and to invoke it.

 2   But that doesn't mean it doesn't exist.  And it doesn't mean

 3   it's bad.  And it doesn't mean -- you know, *Plessy versus*

 4   *Ferguson* was the law of the land for how many years.  Til

 5   somebody --

 6          THE COURT:  I was wondering if someone would cite

 7   that case this morning.

 8       (Laughter.)

 9          MS. KIRKHAM:  You know, the fact that something

10   doesn't happen immediately or hasn't been happening since time

11   immemorial doesn't make it invalid.  Doesn't mean it shouldn't

12   happen.  Doesn't make the claim valueless.

13       And when you come right down to it, for lead counsel to

14   tie itself into all of those --

15          THE COURT:  The light is red.

16          MS. KIRKHAM:  Yeah, I know.

17          THE COURT:  You should finish your sentence.

18          MS. KIRKHAM:  I think I have two minutes and 17

19   seconds.

20          THE COURT:  That's not what red means.

21          MS. KIRKHAM:  Oh, that's not what red means.  Okay.

22   I'll finish my sentence.

23          THE COURT:  It's like a traffic signal.  Yellow means

24   the thing you think red means.

25          MS. KIRKHAM:  If you read their brief, if you read
```

1  everything that has been said here, fundamentally the fairness

2  of this settlement turns on your being able to make a

3  categorial adjudication that the claims that are being released

4  without compensation are so valueless that that they,

5  apparently, don't have appellate value.  They don't have

6  settlement value.  They have no value whatsoever.

7       And, therefore, just like the trader who sold his stock

8  for $10 and, you know, when the disclosure sent the stock to

9  four, you can say:  He didn't get hurt.

10      You have to be able to say not that these people didn't

11 get hurt, but that they have absolutely no hope of any legal

12 theory for redress.

13      Thank you.

14           THE COURT:  Thank you.

15      Mr. Noble, has Mr. Duncan reserved some time?

16           THE CLERK:  Your Honor, he has 6 minutes and 45

17 seconds.

18           THE COURT:  All right.

19           THE CLERK:  For the other -- yes.

20           THE COURT:  Oh, I forgot.

21           MS. MOORE:  Yes.  Good afternoon, your Honor.

22 Theresa Moore.  Ms. Kirkham said Theresa Wright would be

23 speaking, but she misspoke.  My name is Theresa Moore.

24           THE COURT:  Very good.  Ms. Moore, at one time were

25 you in the Alioto Trump firm?

```
 1            MS. MOORE:  No, your Honor.  There is a different
 2   Alioto law firm with Joseph Alioto.
 3            THE COURT:  I see.
 4            MS. MOORE:  And I have been of counsel there and
 5   practiced there for over 20 years.
 6            THE COURT:  Very good.  Welcome.
 7            THE CLERK:  Okay.  Thank you very much.
 8        Your Honor, we support everything that counsel said,
 9   Ms. Kirkham stated with regards to the releases, and believe
10   that they apply to the repealer states as well.
11        But there are some other issues that apply to the repealer
12   states which I would like to bring to the attention of the
13   Court or discuss with the Court if you have specific questions.
14        In this situation I think -- in this case and at this time
15   I think there is extraordinarily unusual circumstances with
16   regards to Massachusetts, Missouri and New Hampshire.  And I
17   think it does require the intervention of the Court in order to
18   ensure that the settlement is fair and adequate to these
19   states.
20            THE COURT:  "Intervention," meaning something other
21   than simply approving or rejecting the settlement that's --
22            MS. MOORE:  Right, right --
23            THE COURT:  Please don't talk over me because it
24   makes the reporter's job very difficult.
25        Let me start again.
```

1      Do you mean something other than just approving or

2 rejecting the settlement?

3      **MS. MOORE:**   I mean, by rejecting the settlement, I

4 think optimally if they could be sent back to the negotiating

5 table to include the value for these three states, that would

6 be the best scenario involved, your Honor.

7      In this particular case, as we know, there was a legal

8 error made and the legal error made was made twice.   And then

9 counsel made a voluntary dismissal, intentional voluntary

10 dismissal in Massachusetts.

11      The Court is aware of what happened.   Situations after

12 that that occurred wherein counsel had the opportunity to

13 include Massachusetts in the settlement, in other situations,

14 and failed to do so, probably intentionally.

15      I think counsel did not answer your question, your Honor,

16 as to whether or not lead counsel still represents this

17 putative class of these states.   And I submit to the Court that

18 they do represent these states; that the -- they represent

19 these putative states, in particular, Massachusetts.   They

20 retained their right to appeal when they made that stipulation.

21      It was not a Court order on the merits.   It was a

22 stipulation of counsel and defense counsel to dismiss

23 Massachusetts.   And it was -- they retained their right to

24 appeal.

25      So I think that case is definitely that they are still

1  representing that putative class and should have valued

2  Massachusetts and should have included it in that settlement.

3      In addition to that, your Honor, the cases are that --

4  state that the statute of limitations is tolled.  So there is,

5  I think, still an opportunity for counsel to have cases and

6  plaintiffs for these three states.

7      *American Pipe* says that the cases, individual cases,

8  subsequent cases would be tolled until there is a decision on

9  class certification.  And if there is no decision on class

10 certification, it's still tolled and he's still representing

11 them.

12     So there has not been a decision on the merits.  And the

13 cases say that -- there is a *Sawyer* case.  There is another

14 case, *Catholic Social Services*, which is the Ninth Circuit,

15 which says that in that situation where there is a voluntary

16 dismissal it only affects that individual case.  It doesn't

17 affect the putative class members out in the world.

18     And so I think that it was error that can now be remedied

19 by not including the value of these three states in the case.

20     With regards to New Hampshire, your Honor, the -- there

21 was a statement in counsel's reply papers that said:  Well,

22 they didn't put New Hampshire in *LCD*.  But in *LCD* we filed our

23 consolidated amended complaint in 2007 and the law for New

24 Hampshire, the repealer state law, did not exist at that time.

25     But in *CRT* they filed their consolidated amended complaint

1   in 2009.   And by that time the New Hampshire repealer state law

2   had been in existence for about a year and a quarter.   So it

3   should have been included.

4       In either event, your Honor, I think the fairness and the

5   way that things have happened with regards to these states, as

6   outlined in the briefs, indicates that it's not fair to these

7   states with the exact same factual predicate, with the exact

8   same injury, antitrust injury, and with the exact same damages

9   to have been either dismissed or ignored by lead counsel.   And

10  I think that is imperative that they be included in the

11  settlement, your Honor.

12          THE COURT:   Well, I don't have the authority to do

13  that.

14          MS. MOORE:   No, but you --

15          THE COURT:   I -- I don't have the authority to order

16  that they be included.

17      So looking ahead down the road if I were to do what you

18  are asking me to do, which is to reject the settlement, if the

19  settlement were to come back here and those states were simply

20  not part it and they did not receive any money, but their

21  claims were not released, will you be standing again at the

22  microphone and urging me to do -- to reject that settlement,

23  too?   In other words, just keep rejecting it until these

24  lawyers finally put the states back in the way you want?

25          MS. MOORE:   Well, we'll have to see what happens in

1    the future, your Honor.  I think that --

2            **THE COURT:**  The word "cold comfort" comes to mind.

3        (Laughter.)

4            **MS. MOORE:**  Well, I can't read the future --

5            **THE COURT:**  It's not as scary as "inherent

6    authority."

7        Let me be clear.  But how does that -- so you're telling

8    me:  Do what you want and maybe I'll come back anyway and

9    object.

10           **MS. MOORE:**  No, I know not saying that, your Honor.

11   What I'm saying -- what I'm saying -- the Court has the duty to

12   protect the unnamed class members and the Court has the duty to

13   only approve a settlement where it is fair and adequate.

14       And I submit to the Court that this settlement, and

15   particularly with regards to these three states, because of the

16   extraordinary circumstances that occurred with regards to these

17   states, I submit to the Court that it's not fair and it's not

18   adequate and the Court should not approve the settlement.

19       If the Court were not to approve the settlement because

20   it's not fair and adequate, then in that situation either it

21   goes to trial or counsel would discuss again whether or not --

22   how they would value those three states.

23       And they are very high value states.  As I stated in *LCD*,

24   we submitted more than $41 million to these three states.  So

25   just to dismiss them for some unknown reason --

1    **THE COURT:**  Ms. Moore, you and I have something in

2  common.  We're both looking at the red light.  So when I see

3  you looking at it and keep going, it makes me ask you to wrap

4  up very quickly, please.

5    **MS. MOORE:**  All right.  So, your Honor, we would ask

6  you to reject the settlement.  Send it back to the negotiating

7  table.

8    If necessary, I think that you should appoint a

9  representative, perhaps of these three states, to negotiate on

10 their behalf because I think the past has indicated that there

11 may be a conflict with regards to these three ignored or

12 abandoned states.

13    **THE COURT:**  Thank you.

14    **MS. MOORE:**  Thank you, your Honor.

15    **MR. DUNCAN:**  Your Honor, Matthew Duncan again.

16    I didn't hear much that goes beyond what we discussed in

17 the brief, so I think I can be pretty brief here.  Two issues

18 that I just wanted to respond briefly on.

19    As I think your Honor understands by some of the

20 questions, the Massachusetts, New Hampshire and Missouri claims

21 simply are not viable at this point.  And I don't think it's

22 productive to go back in time and dispute why the procedural

23 rulings went down the way that they did or whether those were

24 correct or not.  They were litigated at the time.

25    Procedural rulings got those claims dismissed from this

1   case and the statute has run.   I mean, the statute has run.

2   Those cases -- those claims now at the settlement stage have no

3   value and that's why they're reasonably being valued in the way

4   they are for plan of distribution purposes.

5        The other issue that was raised by the objectors is simply

6   this notion of a federal disgorgement claim being viable.   It's

7   not true that we didn't cite cases in our briefing.   We cited

8   extensive case law in our briefing.   It's been 100 years of

9   case law saying that Section 16 of the Clayton Act does not

10  allow a private party to seek monetary equitable relief,

11  period.   And that's the law.   That's what the Multidistrict

12  *Vehicle* case says in the Ninth Circuit.   That's what the *ICANN*

13  case says from the Northern District just a couple years ago,

14  citing Multidistrict *Vehicle*.   That's what other cases say.

15       And it's moreover consistent with the text, structure and

16  history of the federal antitrust laws.   I don't need to go back

17  through what we said in our briefing about that.   But taking

18  the structure of the laws as a whole, it's pretty clear that

19  private plaintiffs can't end run the Section -- the Clayton Act

20  Section 4 damage remedy by using Section 16.

21       And I think *Illinois Brick* reinforces that conclusion.   If

22  that were the rule, every Indirect Purchaser case everywhere

23  would do this.   Indirect Purchasers would have a claim for

24  monetary relief, but they don't and the reason is because they

25  can't under Section 16.

 1       So the federal disgorgement theory is creative.  I think,

 2   as the Special Master said, it might make a good *Law Review*

 3   article some day, but it's fanciful as a practical matter and

 4   that's why those claims have been valued in the way that they

 5   have.

 6       So unless the Court has any further questions on any of

 7   the nationwide release plan of distribution issues, I think

 8   that's all for us.

 9            **THE COURT:**  Thank you.

10            **MR. DUNCAN:**   Thank you.

11            **THE COURT:**  The Court will take a brief recess so the

12   court reporter can rest her fingers and then we'll finish up.

13   Thank you.

14            **THE CLERK:**  All rise.

15       (Whereupon there was a recess in the proceedings

16        from 2:52 p.m. until 3:02 p.m.)

17            **THE COURT:**  All right.  Let's discuss the question of

18   what will happen with any unclaimed funds and whether there is

19   a need for *cy pres* in this case.

20       Counsel for Objector Clifton.

21            **MS. WESTFALL:**  Yes.  Good afternoon, your Honor.

22   Jan Westfall for Objector Donnie Clifton, and thank you for

23   allowing me to address the Court on this question.

24       I want to begin, first of all, by commending class counsel

25   for prioritizing direct distribution to the class, and I

1   acknowledge that they have done that.

2       I come to you with a practical concern about the

3   distribution of the settlement fund here.  We have a settlement

4   of 576 million that after a payment of expenses and attorney's

5   fees and all will leave about 371 million to go to the class.

6       I asked the same question that you asked about the

7   mathematics of this.  How many checks go uncashed, and is this

8   a significant amount of money?

9          **THE COURT:**  Can I interrupt you just a second?

10      It's tempting to talk.  I know because there are so many

11  of you and, actually, it produces the opposite effect; and that

12  is, because there are so many of you, we could have three or

13  four little conversations going and cumulatively it's very

14  distracting to me.

15      So if you would like to talk, it won't hurt my feelings if

16  you get up and go out through the doors in the back and sit on

17  the bench and have whatever conversation you would like to

18  have, but if while you're here you could respect Ms. Westfall

19  by not talking, I would very much appreciate it.  Thank you.

20      Ms. Westfall.

21         **MS. WESTFALL:**  Thank you.

22      So we have about 371 million available to distribute to

23  the class.  I actually did a little research to try to

24  determine in a claims made settlement when people have already

25  filled out a claims form and sent off their address, how many

1    checks go uncashed?  And it's difficult to get anything

2    definitive on that.

3        I talked to a few settlement administrators and based on

4    their data -- and a couple of them actually went and did a

5    little research and got back to me -- it appears that average

6    settlements, average consumer settlements, looking at

7    slightly smaller numbers, say, between 20- and $50 million,

8    between 2 and 7 percent of the checks go uncashed.  And that's

9    not at all taking into account the size of the check.

10   Obviously, if it's a $1,000 check, it's more likely to be

11   cashed than if it's an $18 check.

12       But between 2 and 7 percent after an initial distribution

13   in the context of a $371 million settlement is quite a lot of

14   money.  So between $7 million and $24 million.  That's after an

15   initial distribution.

16       Now, another approach that can be taken is to -- as an

17   alternative to a *cy pres* distribution with that money.  So just

18   to begin with, there will be some money after the initial

19   distribution that will go uncashed and it will be a significant

20   amount in this case.

21       Class counsel had used the *TFT-LCD* case as a comparison or

22   as an example of a case where the settlement fund was entirely

23   distributed to the class.  So I -- I looked into that case to

24   try to figure out how that was done.  And I'll actually draw

25   your attention to -- there is a docket No. 9498 on that -- on

1   the docket on that case, which I can file with you if you would

2   like --

3               **THE COURT:**   What is the case number?

4               **MS. WESTFALL:**   The case number is Multidistrict

5   Litigation No. 1827.  And I'm sure class counsel has more

6   information on this, but just looking at -- there was a

7   December statement about the claims distribution process and

8   that case had 707 million available for distribution to the

9   class.  It was a $1.1 billion settlement, but 707 million

10  available to distribute to the class.

11      It looks like 438 million was originally cashed from the

12  first -- from the first distribution.  I'm rounding the numbers

13  off a little bit.

14      There were 2.48 million checks that were uncashed

15  initially and remained uncashed as of December, 2015.

16      There were also 2.14 million checks that had been reissued

17  and remained uncashed as of this December date.

18      And what the Court did there to effect -- essentially to

19  try to zero out the cash fund was to continue to reissue

20  checks.  They paid late claims and they paid defective claims.

21  So it looks like 2.125 million was paid to defective claims and

22  then the last distribution approved by the Court was $4.57

23  distribution to late claims.

24      So I'll acknowledge, it is possible to zero out a

25  settlement fund.  At the same time the settlement administrator

1   is -- is making more money as they continue to try these rounds

2   of distributions.  To me, it looks like there were at least

3   five different rounds of distributions in this.

4        So the Court may choose to --

5        **THE COURT:**  Do you take the position -- here is what

6   I think my choices are:  Approve the settlement and see what

7   happens with this money and then when I'm told what the money

8   is and how much it is, how much the unclaimed money is, figure

9   out what to do and have a hearing about that; or reject the

10  settlement.  I think those are my choices to deal with, the

11  issue you are raising.

12       What are you suggesting that I should do?

13       **MS. WESTFALL:**  Well, let me just look at each of

14  those alternatives a little bit.  I think --

15       **THE COURT:**  I'll do a better job of listening if you

16  tell me first which one you want me to do.

17       **MS. WESTFALL:**  Okay.  We would like you to reject the

18  settlement in this case because there was a lack of adequate

19  representation early on in the settlement process.  So it's

20  hard for me, representing my client, to --

21       **THE COURT:**  Not because of this issue.  You want me

22  to reject it because of this issue.

23       **MS. WESTFALL:**  It's hard for me to separate out this

24  issue.

25       **THE COURT:**  Okay.  Well --

1           MS. WESTFALL:  But let me just tell you why --

2           THE COURT:  But you --

3           MS. WESTFALL:  But on this issue -- I will try to

4   answer your question, and I'll say -- because you have asked me

5   to address this issue and I'm the devil's advocate for this

6   issue, I'm going to say yes and tell you why.

7           THE COURT:  I want you to be the angel's advocate for

8   this issue.

9       I want you to tell me -- I can do devil's advocate with my

10  law clerks.  I want you to tell me what you really think I

11  should do.  I want you to tell me if this were the thing that

12  were bothering you and you were sitting where I'm sitting right

13  now, what would you do?

14      Would you reject the settlement for this reason if this

15  were the only thing that were bothering you?

16          MS. WESTFALL:  Yes.  And the reason I'm going to say

17  that is because it is -- in light of this huge settlement, it

18  is not a diminimus amount.  The important cases in the Ninth

19  Circuit dealing with *cy pres* distribution involve much smaller

20  amounts than any residual that might potentially be triggered

21  here.

22      So the AOL v *Nachshin* in case involved $110,000 in *cy pres*

23  distribution.

24      The *Six Mexican Workers* case was a $1.8 million settlement

25  where part of it was a claims made settlement.  So -- I don't

1  know exactly the amount of the *cy pres* distribution, but it was

2  less than that.

3      So here I believe the *cy pres* component -- assuming that

4  you decide to choose *cy pres* versus zeroing out the settlement,

5  the *cy pres* component is quite significant.

6      And, you know, I think like the other issues that you've

7  looked at in this case, it may seem insignificant in the

8  context of this litigation where we have a $576 million

9  settlement fund.  It's not an insignificant issue.  And there

10 is a lot of money.

11     And so I guess just going back to this question of, do you

12 zero out the settlement with multiple rounds of distribution?

13 I think that a *cy pres* distribution would have more benefit to

14 the class.

15     And the California State Attorney general raised this

16 issue previously.  I know they did not challenge the Special

17 Master's report, but their point was, okay, we have about

18 100,000 claimants here and that's a very limited percentage of

19 class members.  And *cy pres* could effectively benefit a larger

20 group of class members if appropriately awarded.

21     So then when you look at the *cy pres* issue, I think within

22 the Ninth Circuit the requirement is that *cy pres* be designated

23 earlier in this process; that *cy pres* should not be an

24 afterthought to the Court or to the -- to the settling parties.

25     The Ninth Circuit test requires a -- the language is a

driving nexus between the plaintiff class and the -- and the -- and the *cy pres* beneficiary.  It's a complex question.  Trying to find the appropriate beneficiary is complicated.

If you are going to do a *cy pres* distribution, you have to resolve whether or not it's going to be to all 50 states or just to 22 states.

Now, this Court -- the Ninth Circuit's holding in *Dennis v Kellogg* indicated that it should be determined early on in the settlement process.  And I believe *Dennis v Kellogg* addressed the question that you're asking me, which is:  Is it appropriate to reject a settlement when -- when the Court essentially punts this question to determine later, later in the litigation?  What the Ninth Circuit said was by doing that, it prevents meaningful appellate review.

So it's better to designate the *cy pres* beneficiaries at a point in the litigation where class members also have an opportunity to weigh in on the settlement, to weigh in on the appropriateness of the *cy pres* beneficiary, and to distance themselves from causes that they do not want to align themselves with.

And I'll just mention --

**THE COURT:**  Ms. Westfall, I've been allowing you to continue, but your time, I believe, has expired.

**MS. WESTFALL:**  Okay.  Thank you, your Honor.

**MR. ALIOTO:**  Thank you, your Honor.  Mario Alioto for

1    the Indirect Purchaser Plaintiffs.

2         I'm not sure how to respond to that presentation.  Maybe

3    the best thing to do --

4              **THE COURT:**  I'll ask you some questions.

5              **MR. ALIOTO:**  Yes, your Honor.

6              **THE COURT:**  Obviously, the specifics of what

7    Ms. Westfall said are not in the record, but it's not

8    unreasonable to assume that the uncashed check problem will not

9    be a -- that there will be some uncashed checks.  That's not

10   unreasonable to assume that.

11        And would you remind me, please, if all the fees and so

12   forth are approved, what the amount of money is that will be

13   available for distribution?  Round numbers?  Isn't it in the

14   neighborhood of $400 million?

15             **MR. ALIOTO:**  We did that calculation as part of a --

16             **THE COURT:**  Well, if you don't know, and our time is

17   limited, let's just say 400.

18             **MR. ALIOTO:**  400 would be in the ballpark.

19             **THE COURT:**  To keep the ball rolling.

20             **MR. ALIOTO:**  Yes.

21             **THE COURT:**  So if 2 percent, only 2 percent of the

22   checks went uncashed, we would have $8 million to play with.

23        So it's -- it seems to me maybe a non-frivolous point to

24   wonder, shouldn't we be thinking about that now?

25             **MR. ALIOTO:**  Yeah.  Well, I think the answer to that

1   is a couple of things happened.  Down the road there are ways

2   to -- first of all, yes.  There could -- there could be that

3   residue.

4        Secondly, when that residue occurs and we know how much it

5   is and we have a handle on it, you can make supplemental claims

6   distributions.  For example, to late claimants.  You can

7   further exhaust the amount.

8        But the crucial point, your Honor, and the point that I

9   thought the Objector was going to argue, the crucial issue is:

10  When do you deal with this?

11       And it's clear in the Ninth Circuit -- or we have a case

12  in the Ninth Circuit.  Unfortunately, we're coming here on kind

13  of a bare record because this objection was not made before the

14  Special Master.  So it was made before your Honor and we

15  don't -- we don't have the benefit of having been through this.

16       But I will cite to you one case that we got for your

17  Honor, which I think is important, and that is the *Rodriguez*

18  case in the Ninth Circuit, 563 F.3d 948 at 966.  And this is

19  the case that says you deal with this problem when the problem

20  arises.  You deal with this problem when you see what the

21  residue is, when you see how much money is left, and then you

22  address the proper disposition of the money.

23       So I think that answers -- I hope that answers your

24  Honor's question.  This is not ripe for decision now.  We don't

25  know if there is going to be a residue.  We don't know how

1    much.

2         If I have to guess, I would say there would be some

3    residue.  We're going to reduce that as much as possible and if

4    there is some remainder at the end of the day, we'll be out

5    here in front of your Honor making recommendations as to how to

6    distribute that.

7         I have nothing further, your Honor.

8              **THE COURT:**  Thank you, Mr. Alioto.

9         Mr. Noble, has Ms. Westfall reserved time?

10             **THE CLERK:**  No, your Honor.  She has used all her

11   time.

12             **THE COURT:**  All right.  Let's turn to the question of

13   contract attorney's fees.

14        I'll hear from Objector St. John.

15             **MR. ST. JOHN:**  Good afternoon, your Honor.  Scott

16   St. John for Objector Douglas St. John, and I would like to

17   reserve two minutes for rebuttal, please.

18             **THE COURT:**  All right.

19             **MR. ST. JOHN:**  To answer your Honor's question, what

20   you're proposing really abandons the lodestar as a cross-check.

21   Class counsel can submit a severely deficient fee motion and

22   then as long as the multiplier is reasonable, it doesn't

23   matter.  They still get their -- whatever percentage.

24        So where does it stop?  If they start out with a 1.0

25   multiplier and only support a quarter of the application, well,

 1   that's -- according to class counsel, that's still within the

 2   range.   That's 4.0.

 3        And so the answer is, I would look to *Poly Foam*.   It's the

 4   case -- one of the cases I cited in the brief.   In that case

 5   the class counsel solved 30 percent with a multiplier of 1.34

 6   the Court found overcharging, particularly for contract

 7   attorneys.

 8        And the answer at Page 21 was, quote:

 9        "A more appropriate lodestar is 20 percent lower,

10        so a reasonable fee is 20 percent lower."

11        And the Court cut the fee from 30 percent to 24 percent.

12        I would argue that's particularly warranted here given the

13   facts.   This is a common issue in fee motions, the appropriate

14   billing rate for contract attorneys.   You saw it in the cases

15   in the briefing.

16        As we pointed out, there's certainly a reasonable

17   inference that class counsel tried to hide the ball by

18   mislabeling contract attorneys as "associates."   And the

19   original response is, frankly, an absurd argument that, quote,

20   there was no label for contract attorneys, end quote, on a list

21   they chose to use.

22        We're dealing with a -- and I would note that that is not

23   even correct.   One firm, Andrus Anderson did, in fact label --

24   apparently label contract attorneys with a "C."   That is at

25   docket entry 4073-9.

1        Here we're dealing with a material part of the fee,

2   15 percent.  This isn't a -- there was an oversight on Page 232

3   of Exhibit 37.  This is a material part of the fee request.

4        And in line with *Poly Foam*, and the other Courts that have

5   not been unwilling or have expressed reservations -- let me put

6   it that way -- about overcharging, the Court should cut the fee

7   by the same amount, the 15 percent.

8        **THE COURT:**  Well, you know, let's take your

9   hypothetical and let's say that they only supported a quarter

10  of their fee.  That's what you asked me to assume for a second.

11  If I did that and I reduced this $90 million amount by

12  75 percent, I would get a fee of $22-1/2 million dollars.  In

13  that case a multiplier would be 7.69, and then I think we would

14  have something to talk about.

15       So I guess I'm having a little difficulty following your

16  argument that somehow we're abandoning the cross-check by

17  engaging this analysis.  What I thought I was doing was -- was

18  just accepting your argument in its entirety and then applying

19  the same lodestar cross-check rather than abandoning it.

20       There is a point at which, if the impact of these

21  practices is enough, it starts to hit the multiplier in a way

22  that makes it tough for the Court to award the fee.

23       **MR. ST. JOHN:**  Your Honor, I'm not going to stand

24  here and try to embarrass myself with arithmetic again.

25       I think the point being that there -- there is a place

1  where it becomes significant, but it -- but the deficiencies

2  can still be covered over with what your Honor is proposing.

3  It would still just be, oh, well the multiplier went from 1.0

4  to 4.0.  That's a huge change, but still within the range of

5  what cases have called reasonable.

6      The better answer is to follow what the Court did in

7  *Poly Foam* and say:  If there is overcharging, that's

8  unreasonable.  And you ask for X million dollars.  Okay.

9  You've overcharged by 15 percent.  Cut the 15 percent.  It

10  properly incentivizes the submitting a complete fee motion.

11         **THE COURT:**  It's not an unreasonable point.

12         **MR. ST. JOHN:**  Thank you, your Honor.

13      Unless you have any more questions?

14         **THE COURT:**  No.  I would say to you, I think you

15  said -- you described the University of Alabama Law School as

16  "undistinguished."

17         **MR. ST. JOHN:**  Your Honor, both of my parents

18  graduated from the University of Alabama.

19         **THE COURT:**  As did the late Honorable Robert Smith

20  Vance, the Court of Appeals judge in Birmingham, Alabama I

21  clerked for after law school.

22         **MR. ST. JOHN:**  Yes, your Honor.

23         **THE COURT:**  And he accomplished more than either you

24  or I ever will.

25         **MR. ST. JOHN:**  Yes, your Honor.

1          THE COURT:  Thank you.

2      Mr. Alioto.

3          MR. ALIOTO:  Thank you, your Honor.

4      I think this will come as no surprise to you that even if

5  we were to concede the cuts that Mr. St. John suggests, we

6  would be in the 2.5 multiplier range, which is unremarkable,

7  your Honor, and --

8          THE COURT:  Do you want to address the policy point?

9  I mean, the stuff he put in, the LinkedIn profile and all that,

10 I think that might be new to the record.

11         MR. ALIOTO:  I beg your pardon, your Honor?

12         THE COURT:  I think that information might be new to

13 the record at this stage of review, which is not exactly, you

14 know, cricket, but it was pretty good, aside from the thing

15 about the University of Alabama Law School that I just gave him

16 a hard time for.  Otherwise, it was a pretty effective point.

17     And that is that you are calling -- you are calling

18 lawyers -- you're lumping lawyers in with the associate group

19 and you are making a profit on those lawyers that very greatly

20 exceeds what anyone would normally expect; that that

21 information is not known to the Court; that it distorts the

22 total fee; and that it makes it tough for us, as judges, to

23 conclude that we're conducting a fair fee review process.

24     I mean, I made your argument about the multiplier and I

25 hear you winding up to make it back to me.  That's fine.  I get

1    that argument.

2              MR. ALIOTO:  Yes.

3              THE COURT:  But I would like you to address the

4    policy point on the merits.

5              MR. ALIOTO:  Well, I tend to agree with your Honor.

6    And that -- that contract lawyer, of course, was someone that

7    was reported in to us.  We collect the time.  We get the

8    reports from the various counsel in the case.

9         I guess ultimately to the extent I'm the lead counsel, I'm

10   responsible for making that submission.  But I didn't look

11   behind it.  I didn't question it.  I had no reason to question

12   it, but --

13             THE COURT:  Isn't your law firm -- I used to be a

14   partner in a law firm.  Don't you get a financial statement

15   every month that tells you how much money you're making off

16   every lawyer?  And don't you read that statement?

17             MR. ALIOTO:  Yes.  But, your Honor, the point is the

18   gentleman that Mr. St. John is referring to was someone that

19   was employed by one of the other firms.

20             THE COURT:  Ahh.

21             MR. ALIOTO:  That's what I'm trying to convey.  And I

22   don't mean to apologize for that because as lead counsel, I

23   submitted that declaration, but I -- I didn't have this

24   background information, your Honor.

25             THE COURT:  Yes.

1          **MR. ALIOTO:**  I'm not so sure that that's really an

2    excuse or an explanation.  I probably should have cut that off

3    at the pass.  But that was not a timekeeper from my firm.

4          But having said that, this is much different than these

5    cases that deal with contract lawyers and this low level work.

6    Sure, there was some of that.  There is some of that in every

7    case.

8          But even the document review in this case was a little

9    different, because it was foreign language document review and

10   it posed some challenges.  It posed logistic challenges and,

11   obviously, you couldn't incur the tremendous expense of

12   translating everything.  You needed to have some attorney eyes

13   on things initially.  You need to make calls on what needed to

14   be translated.

15         Translations are quite costly.  The review process is

16   quite costly.  And overall I think the whole process was run

17   very efficiently and very effectively.  And I think it's

18   responsible, in large part, for the result we achieved.

19         So I don't think it's accurate to lump this kind of work

20   and this document review work in with more run-of-the-mill

21   routine document work.  It was a little more nuanced.

22         Not to mention the fact that some of these people doing

23   this work were 10, 12, 20-year attorneys.  Some of these people

24   who were working on a contract basis have been with larger

25   firms.  I know one of the people I had working on the case was

1  down at Townsend and Townsend for a spell.  She was working on

2  this case for awhile.  Now she has her own firm.

3      So these are some pretty good tried and true people that

4  were doing this work.  And the rates that they submitted, I

5  believe, are commensurate with their qualifications and with

6  the work they did.  It's in line with Richard Pearl, our expert

7  on fees, who opined that these rates are in the ballpark.

8      So I don't think that there is any basis to really go into

9  this work and these rates on an individual-by-individual basis.

10  I think as lead counsel I can say, and I can say this, I

11  supervised the work.  I was aware of the work.  We made changes

12  in the staffing of the case from time to time to make sure we

13  had the most qualified and -- qualified people doing the work.

14      So, yes.  Should there be some adjustments here and there

15  down?  Possibly.  Should there be some adjustments in this

16  case?  When you look at the overall case, should there be some

17  adjustments up?  Probably.  We had a --

18          **THE COURT:**  I admired the moxie of lead counsel on

19  that point.

20          **MR. ALIOTO:**  Well, I've never seen one --

21          **THE COURT:**  Without stating a tentative ruling, I

22  just thought it was great that Special Master Quinn cut you --

23  I don't use air quotes, but I might -- to a rate that is

24  5 percent higher than the Ninth Circuit benchmark in a megafund

25  case and you pushed right back.  Good for you.  Keep going.

1          **MR. ALIOTO:**  Well, I don't know if I'm going to do

2  that.  But there was a statement, though, by the Special Master

3  that he had reviewed some rates and he made a statement that

4  there were rates probably lower than the market.  I thought

5  that was pretty unusual.  I don't know that I've ever seen that

6  in one of these fee opinions.

7          But having said that, to get back to the question of this

8  contract labor.  It is not significant.  Certainly, there was

9  no intention to present something that we knew we shouldn't be

10  presenting.  There is no element of that.

11          I mean, the record on this case is voluminous, your Honor.

12  Your Honor knows the submissions, the backup, the charts, the

13  time sheets.  I believe you actually have all the daily time

14  sheets of all the lawyers.  We understood that the Special

15  Master was going to provide those to you.

16          **THE COURT:**  Well, he has made that offer.

17          **MR. ALIOTO:**  Okay.

18          **THE COURT:**  Yeah.  I haven't taken him up on it yet.

19          **MR. ALIOTO:**  So I can get into this granular review

20  of what lawyer did what and what rate they were charging.  I

21  can get into that.  I am prepared to do that.  I'm not so sure

22  your Honor wants to hear that today.  But I'm also willing to

23  answer any other questions you have about this.

24          But I do think your observation, that we are still

25  probably in the modest multiplier range here and I'm not so

1  sure that it would warrant the type of granular

2  attorney-by-attorney, by year, by project type of review at

3  this point in light of the substantial record that we've

4  presented your Honor.

5           **THE COURT:**  Thank you, Mr. Alioto.

6           **MR. ALIOTO:**  Thank you, sir.

7           **MR. ST. JOHN:**  Your Honor, a few brief points.

8       The LinkedIn profile you reference is, in fact, in the

9  record.  It was submitted to the Special Master with our reply

10  in response to class counsel's argument that all of the

11  contract attorneys were supremely qualified.

12           **THE COURT:**  You don't need to address that further.

13  I will find that in the record.

14           **MR. ST. JOHN:**  Yes, your Honor.

15       Second, the status matters.  The Ninth Circuit has noted

16  as much in *Moore v Jason Matthews and Company*, 682 F.2d 830 at

17  840.  The difference between a partner, associate, contract

18  attorney, that matters.

19       Ideally we wouldn't be getting into this granularity, but,

20  unfortunately, we didn't have a record to review because class

21  counsel didn't submit the background information.  So I have no

22  ability to say:  Okay.  On the whole, these look reasonable.

23  And I don't think the Court does either.  We have a couple of

24  pin holes in the wall to look through.  Class counsel made that

25  choice.

1    Regarding the individuals, class counsel points out their

2    experience.  One of the LinkedIn profiles that I submitted to

3    your Honor shows a gentleman seven years out of a -- I'll say

4    mid-tier law school, without honors, who has been performing

5    contract document review the whole time.  Seven years of

6    experience performing contract document review does not rate a

7    $350 an hour, $400 an hour fee.  It just doesn't.  It's

8    unreasonable.  No client would pay that.

9    Regarding the reasonableness of these fees, we have

10   something similar in the record, the *Apple v Samsung* matter.

11   We have the fee opinion.  An attorney fee opinion was cited in

12   my briefing.  In that case Morrison and Foerster sought fees

13   for contract attorneys at $125 an hour in the Bay Area.  High

14   stakes.  All the foreign language issues that are at issue

15   here, presumably compounded by engineering and technical

16   documents.

17   Finally, on the qualifications, counsel relies on

18   Mr. Pearl.  Mr. Pearl didn't have the background information of

19   these attorneys to review.  How he opined about the

20   reasonableness of their fees, I don't know.  It's not in the

21   record.

22   And, moreover, Mr. Pearl has twice been discredited by

23   Federal Courts in this state on this very issue, comparing

24   non-comparable attorneys, resulting in a fee cut for his

25   clients, the people that he is testifying on behalf of.

1          Anything else, your Honor?

2                    **THE COURT:**  No.  Thank you.

3                    **MR. ST. JOHN:**  Thank you, your Honor.

4                    **THE COURT:**  Thank you.

5          We have some other housekeeping type matters to address

6     let me get to those.

7          Let me first say how much I enjoyed the arguments this

8     afternoon, all of which were excellent and vigorous.  I

9     appreciate everyone's taking the Court's questions head on.

10         I indicated in the scheduling order I issued last week

11    that I wanted to talk about *Daubert* and in limine motions.  I

12    want to talk about the procedure for the issuance of summary

13    judgment orders.

14         I have another issue.  This will terrify my law clerks

15    because they don't know what I'm going to say now.  "Terrify"

16    is a strong word.  But there is a question on this attorneys --

17    there is floating out there a request that's been made of me

18    regarding what I have been denominating ex parte communications

19    between Special Master Quinn and lead counsel.  And I'm in the

20    process of dealing with that and digesting that.

21         Are the parties who filed on both sides of that issue

22    present?  That would -- we still don't know, even if they are,

23    if it's a good idea to deal with it on a pop quiz basis.  But

24    let me first ask the predicate question:  Are those persons in

25    the courtroom?

1        Mr. Alioto is here.

2             **MR. ALIOTO:**  Yes.

3             **THE COURT:**  And?  I don't know who this gentleman is.

4             **MR. COOPER:**  Joseph Cooper, your Honor.

5             **THE COURT:**  Mr. Cooper.  You are the person on the

6    other side of this issue?

7             **MR. COOPER:**  We're the people who raised the issue,

8    your Honor.

9             **THE COURT:**  Okay.  We'll come back to you.

10       I need to talk about these other things first, but I want

11   to put this on the list.

12       (Brief pause.)

13            **THE COURT:**  You can stand there if you want, but I'm

14   still going to come back to you.

15            **MR. COOPER:**  Oh, I'm sorry.  I misunderstood your

16   Honor.

17            **THE COURT:**  I just wanted to see who was here and

18   whether I could talk about it any further.

19       Let's talk about this list of *Daubert* and in limine

20   motions.

21            **MS. NASH:**  Good afternoon, your Honor.  Susan Nash of

22   Munger Tolles and Olson on behalf of LG Electronics.

23            **MR. BLECHMAN:**  Your Honor, good afternoon.  William

24   Blechman from Kenny Nachwalter on behalf of plaintiffs Sears

25   and K-Mart.

1        **THE COURT:**  Very good.

2        Well, we're going to have a lot more to do regardless of

3    what happens with this IPP settlement.  So I'm just trying to

4    figure out how to do that work in some order that makes sense

5    to everybody.

6        **MS. NASH:**  Your Honor, we have met-and-conferred with

7    the DAPs and we would like to propose a deadline for the list

8    of April 8th, which would be 11 days before we gather on April

9    19th for the trial setting conference.

10        **THE COURT:**  Seems fine.  Let me just be clear about

11    the purpose of the list.  You know, I do -- your input on this

12    question is very, very important, understanding that we might

13    do things in a different order.

14        **MS. NASH:**  I would like to ask the Court two

15    clarifying questions, if I may.

16        **THE COURT:**  Sure.

17        **MS. NASH:**  I read the Court's order as asking us for

18    a joint list.

19        **THE COURT:**  Right.

20        **MS. NASH:**  If that is not possible, would the Court

21    like us to submit competing lists and then the Court can choose

22    or come up with its own list?

23        **THE COURT:**  Umm, hmm.  I hadn't thought about that.

24    Speaking of pop quizzes.

25        The joint list is useful -- you've heard me say this

1  before probably, but I will say it again.  I'm very mindful

2  that most cases settle.  I wish fewer of them would, but that's

3  neither here nor there.

4      Because most cases settle, I'm assuming it's in the

5  interests of all smart lawyers to have case value information

6  as soon as possible, or -- either case value information or

7  information that cuts off unnecessary transaction costs.  Oh,

8  the ruling is that?  Well, then I guess I don't need to take

9  those other three depositions, that kind of thing.

10     So what I'm looking for is a list that provides -- that

11 shows me where that information inheres for everyone.  Where it

12 only inheres for one party, the danger is that by adopting that

13 party's list, I'm giving somebody a tactical advantage.

14     So now that I've actually finished thinking out loud, no,

15 I don't want the list if it's not joint.  I will just surprise

16 you.

17         **MS. NASH:**  Okay.  Fine.  Thank you.

18     My other question is whether it might be helpful to the

19 Court if we tried to take these 44 motions and put them into,

20 approximately, 10 buckets by subject matter, much as we did

21 with the motion for summary judgment, and then perhaps rank the

22 buckets.

23         **THE COURT:**  I think that could be very helpful.  I

24 that I could be very helpful.

25     Dealing with the summary judgment motions in that way was

```
 1   -- and I know that none -- no orders have been issued yet on

 2   any of those motions, but dealing with the summary judgment

 3   motions in that way was very helpful to me because it allowed

 4   me to educate myself about your case one significant piece at a

 5   time.  And that's had some benefits.  That's had a lot of other

 6   benefits to me besides the case management benefit, which it

 7   did have.  So if you all could do that, that would be great.

 8           MS. NASH:  We will try.

 9           MR. ALIOTO:  Your Honor, I had one question.

10           THE COURT:  Sure.

11           MR. ALIOTO:  The Court informed by the experience

12   thus far with the briefing and argument on the summary judgment

13   motions, is there any other information that would be helpful

14   to the Court in working through some efficient way, from the

15   Court's perspective, of dealing with the motions in limine,

16   beyond the questions and suggestion already made?

17           THE COURT:  Not that I can think of, but thank you

18   for asking.

19           MR. ALIOTO:  Very well.  Thank you, your Honor.

20           MS. NASH:  Thank you, your Honor.

21           THE COURT:  Okay.  The order that I issued on March

22   the 10th also indicated an anticipated procedure regarding

23   issuance of summary judgment orders in the event that that

24   order -- that those orders contained a reference to sealed

25   information.
```

1      Does anybody here want to comment on that proposal or try

2   to talk me out of it?

3      Ms. Nash.

4      **MS. NASH:**  I will just say from the defense

5   standpoint, that proposal is fine with us, your Honor.

6      **THE COURT:**  Okay.  And I'm not hearing any objection

7   from anybody.  Okay.  So that's -- that's what we'll do.

8      Are there -- well, never mind.  I was going to say:  Does

9   anyone he have anything else they want to talk about?

10      (Laughter.)

11      **THE COURT:**  Next time I'll get a double latte and I

12   won't even say that out loud.

13      Maybe I could ask Mr. Cooper and Mr. Alioto to come back

14   up to the podium.  I'd like to talk a little bit about this

15   issue with -- with ex parte communications.

16      Now, gentleman, I'm doing this off the top of my head.  I

17   don't intend to rule today.  I wanted to think out loud a

18   little bit.  If I misstate the issue, I know you'll tell me.

19   I hope you'll tell me.

20      As I understand it, the question is -- the question is:

21   Should the Court order that certain documents sent by or

22   received by or considered by Special Master Quinn be filed on

23   the public docket?  And if they are filed on the public docket,

24   should they be filed under seal?

25      If they are not filed on the public docket, no one gets

1   access to them, other than the persons who already have it.  If

2   they are filed on the public docket under seal, then any of the

3   litigants can see them.

4       And the documents fall into, for me, two categories.  One

5   is attorney billing information and the other is everything

6   else.

7       So my question is for Mr. Cooper.  Let's say that the

8   Court were to determine that it did need to order the attorney

9   fee information, at least the information that was considered

10   by Special Master Quinn, filed on the public docket under seal.

11   Then what?  Then what would happen?  Today is the final

12   approval hearing.

13       So what do you anticipate would be the result of the Court

14   making that order if it did make it?

15        **MR. COOPER:**  Well, I think there are a couple of

16   things that could happen, your Honor.

17       First of all, we have previously suggested, which was

18   rejected by your Honor, that you segregate the final approval

19   matters from the fee hearing and decision matters.  Deciding on

20   a fee is not necessary to approve or disapprove the settlement.

21       So your Honor could still divide the two issues and

22   continue all matters relating to the fees til a later time in

23   the event that it's relevant because the settlement is

24   approved.  That would provide adequate time for anybody to look

25   at anything that was put in the public record and to comment

1    further on it.

2             **THE COURT:**  Well, assuming that I've set a briefing

3    schedule that provided for further objections and responses and

4    all that sort of thing, right?

5             **MR. COOPER:**  Yes.  Of course, your Honor.  I'm not

6    saying somebody would just come in and file willy-nilly.

7         I'm saying that you -- as I understood your question, you

8    were raising the issue regarding the timing of anything.  And I

9    was simply saying that it is possible to divide between

10   settlement approval and attorney's fees even at this point and

11   continue all matters relating to attorney's fees.

12        Less than that, of course, the questions relating to the

13   allocation of any fee that might be awarded is also still open

14   and is not even being presented at this point.  That was

15   reserved by the Special Master til a later time.

16        So any of the questions relating to time records would

17   certainly be relevant to that, particularly issues such as:  Is

18   this person's lodestar completely a contract attorney, to tie

19   into the prior argument, or how should they be compensated for

20   that time in the scheme of these things?  So the time records

21   would certainly be relevant to any issues relating to the

22   allocation of fees if and when you get to that.

23        More importantly, I guess, is that our request was that

24   they be submitted to your Honor.  We had some level of --

25            **THE COURT:**  Why?

1          **MR. COOPER:**  -- reliance on your Honor making the

2     judgment if there was anything -- well, you're talking about

3     the attorney's fees --

4          **THE COURT:**  Well, I mean, I just think -- I just want

5     to be very clear about what that means.  You're requesting that

6     I perform a denovo review of every document that was examined

7     by Special Master Quinn?

8          **MR. COOPER:**  No, no.

9          **THE COURT:**  Then what -- then what act do you propose

10    the District Court do if it were to receive these records in

11    camera?

12         **MR. COOPER:**  I don't believe it would require a

13    denovo review of the exhaustive documents.  Although my

14    recollection is that Special Master Quinn said he didn't review

15    the documents either.  So I guess that cuts against what I'm

16    saying.

17         **THE COURT:**  Well, he performed an audit, which I

18    think was his right.  I don't have any concern about that.

19         But whatever he reviewed, are you suggesting that I also

20    need to review it before I can have an opinion about the

21    attorney's fees or other matters connected to the settlement?

22         **MR. COOPER:**  I don't think it's necessary to review

23    fee materials, time materials, to have an opinion about the

24    settlement because I don't view the amount of a fee to be

25    awarded to go to the question of the approval of the

1  settlement, the adequacy and fairness of the settlement.

2      We did raise an objection to the use of a percentage of

3  the fund lodestar cross-check method saying that in the

4  circumstances of this particular case, we felt that the

5  approach that was used in the litigation relating to the

6  stealing of Silicon Valley employees was a better approach for

7  this case.

8          **THE COURT:**  Yes.

9          **MR. COOPER:**  And so -- so having the records

10  available would be relevant to that, that objection.

11          **THE COURT:**  Right.  I want to stay very focused on

12  the specific question of whether there is any need for me to

13  ask Special Master Quinn to give me all of the materials that

14  he had related to plaintiff's fees and read each page of those

15  materials myself.  That's where I'm focused right now.

16      And I guess one question I have is:  Are you suggesting

17  that you think I have an obligation to do that even in the

18  absence of a specific objection?

19          **MR. COOPER:**  It's difficult to answer your question,

20  your Honor.  There are things in the time records which were

21  produced to Mr. Scarpulla and myself which we would have

22  commented on specifically had we not been constrained by being

23  given the sample certain limited time records under seal.  So

24  we were constrained as to what we might say that we might find.

25      We did talk generally about that.  We, of course, have not

```
 1  seen all of the time records ourselves.  The only people who
 2  have the totality of them are Mr. Alioto and whoever he has
 3  shared them with and Special Master Quinn.  So I don't think
 4  for purposes of approving the settlement --
 5           THE COURT:  I still don't know -- I still have not
 6  heard from you exactly what your position is.  I think I have
 7  divined it, so I'm going to state it back to you and you can
 8  correct me.
 9       I think your position is:  Your Honor, someone needs to
10  look at those records.  You haven't let it be us.  And if
11  you're not going to allow us to do it, we think you need to do
12  it because someone has to do it.
13       Is that your position?
14           MR. COOPER:  Umm, I -- I guess that's -- that's --
15           THE COURT:  I'm not trying to --
16           MR. COOPER:  I know, your Honor.  It's a difficult
17  question.  I don't think in the normal case people should have
18  to --
19           THE COURT:  You're one of the most experienced
20  antitrust lawyers in the country.  You're in court.  I'm a
21  judge.  Tell me what relief you want.
22           MR. COOPER:  I want everything, and not even limited
23  to the time records that Special Master Quinn looked at, made
24  available to your Honor so that your Honor can decide what you
25  need to look at, whether it's in the public record or not.
```

```
 1          THE COURT:  So if I decide I don't need to look at
 2   any of it, it would be error?
 3          MR. COOPER:  To not look at the time records, would
 4   that be error?  Is that the question?
 5          THE COURT:  Yeah, in your opinion.  I'm trying to
 6   see --
 7          MR. COOPER:  No, I don't think that it would be
 8   error, your Honor.
 9       I think, though, that this is a case which is very unusual
10   in my experience, from the perspective of the way the
11   attorney's fees -- well, everything about the case is unusual.
12   Putting that aside, it's very unusual in the way the attorney's
13   fees has been presented.
14       We have a case, quite candidly, in which lead counsel
15   basically subcontracted out everything about the case.  And I
16   think all of that goes to the question of how fees should be
17   awarded, which gets you into the time records.
18       From the get-go in this case Mr. Alioto, he turned all the
19   economics --
20          THE COURT:  The opening is not as wide as you think
21   it is.
22          MR. COOPER:  I'll stop then, your Honor.
23          THE COURT:  Thank you.
24       Mr. Alioto.
25          MR. ALIOTO:  Your Honor, we have consistently
```

```
 1  maintained that these records are for the use of the Special
 2  Master and for the Court and they ought not be disseminated
 3  beyond that group.
 4          THE COURT:  Why?  Are they privileged?
 5          MR. ALIOTO:  There are privileged matters in there, I
 6  think.
 7          THE COURT:  You gave them to Special Master Quinn.
 8          MR. ALIOTO:  Yes, your Honor.
 9          THE COURT:  That didn't destroy the privilege?
10          MR. ALIOTO:  We don't believe so.
11          THE COURT:  How is it possible for a person, such as
12  Mr. Cooper and his colleagues on the Objector's side, to
13  determine whether Special Master Quinn erred in his review if
14  they have not seen the records themselves?
15          MR. ALIOTO:  Because they have had plenty of other
16  documents to review; charts, summaries, compilations,
17  declarations.  They know firsthand what was done in the case
18  because they are in the case.
19      And the general rule, the common practice is that the
20  daily time records do not get put -- do not get made available.
21  The decisions on fees are made on the submissions, which are
22  summary in nature.
23      The time records, this is an exceptional case, to the
24  extent that they were made available -- and I might add, this
25  may help your Honor's analysis.  This issue was briefed before
```

```
 1  the Special Master at length, whether it was appropriate to
 2  make these records available.  We contend that it was not
 3  appropriate.  Mr. Cooper and others contended that it was
 4  appropriate.
 5          THE COURT:  Have those briefs been -- I know things
 6  have to migrate from case anywhere to ECF.  Have they migrated?
 7          MR. ALIOTO:  Yes.  And they are contained in our most
 8  recent filing.  It would be ECF Docket 4469.  We took the
 9  substance of what we argued before Special Master and it's in
10  the new brief, again 4469.
11      The only point I want to make here may make your job a
12  little easier.  When this procedure was decided upon before the
13  Special Master, there was a ruling.  There was no objection.
14      So one of the arguments we make is that that's the
15  procedure.  There has been no objection.  There is no place to
16  be making this argument now.  The day has passed to make that
17  argument, that these documents should have been made
18  available --
19          THE COURT:  Well --
20          MR. ALIOTO:  -- to others.
21          THE COURT:  I'm sorry.  I spoke over you for a
22  second.
23      There was -- but the issue was litigated in front of the
24  Special Master.
25          MR. ALIOTO:  Yes.
```

1          **THE COURT:**  And you're saying that there was no

2    objection after he ruled on a contested motion?

3          **MR. ALIOTO:**  Precisely.

4          **THE COURT:**  How many -- how many iterations do there

5    have to be before this -- before the Special Master before

6    something can come to me for review?

7          Isn't -- I mean, if someone -- if someone makes a motion

8    or opposes a motion in front of the Special Master and they

9    lose, don't they automatically then have the right to bring the

10   issue to me?

11         **MR. ALIOTO:**  That's my point, and they didn't.  There

12   is a procedure in place.  There is an order --

13         **THE COURT:**  Oh, I see.  Oh, I'm sorry.  I now take

14   your point.  I was a little slow on the uptake.

15         They did not make any objection to the report and

16   recommendation that the Special Master issued after the

17   litigation of this issue.

18         **MR. ALIOTO:**  Yes.  And the -- pardon me.

19         **THE COURT:**  And I then adopted the report and

20   recommendation as the Court's order.

21         **MR. ALIOTO:**  Yes, your Honor.

22         **THE COURT:**  I see.  And this point is made in the --

23   in 4469.

24         **MR. ALIOTO:**  Yes.

25         **THE COURT:**  If I would just do my job and read that

```
 1   document, I would be where I need to be.

 2           MR. ALIOTO:   I don't want to put it that way, but

 3   your Honor --

 4           THE COURT:   I can put it that way.

 5       (Laughter.)

 6           MR. ALIOTO:   Your Honor also did say in the order --

 7   and I think this is very important.   I think this goes to what

 8   we're discussing right here.   You asked to hear from the

 9   parties and you gave them the right to appear at this hearing

10   and address the Court.

11       But you also -- the integral part of that order said:

12           "And please let me know why you couldn't have

13           raised this issue before."

14       That's the point I'm trying to make.

15           THE COURT:   Yes.   I should apply that order to

16   myself.   We would all be home by now.

17           MR. ALIOTO:   That's all I have, your Honor.

18           THE COURT:   All right.   Mr. Cooper, last words.   Just

19   on the part that Mr. Alioto -- you know, the new things in what

20   he said about report and recommendation and so forth.

21           MR. COOPER:   I believe that what happened before

22   Special Master Quinn is that we asked him to order the

23   production of the records.   He ruled before he issued his

24   report and recommendation, not after, and the ruling limited

25   what we would have access to.
```

1      When we objected to the report and recommendation, I

2 believe we did object to the failure to produce the totality of

3 the records, so -- and observed that we could not say anything

4 about them in the public record.

5      So I assume that will all be reflected in the document

6 that Mr. Alioto was referring to that I -- I don't remember

7 what he said in that document.

8           **THE COURT:**  4469 is doing more and more to recommend

9 itself for my bedtime reading.

10     Okay.  I'll look.  Gentleman, thanks for participating in

11 this pop quiz.

12           **MR. ALIOTO:**  Thank you.

13           **THE COURT:**  I don't know what I'm going to do on this

14 issue, but I thought you both might be here, so...

15           **MR. COOPER:**  Your Honor, there is some -- one thing

16 further about this issue.

17     There are a couple of documents, I believe, which

18 Mr. Alioto filed with the JAMS filing system that were

19 documents reflecting ex parte communications that are not in

20 the record of this court.  They were filed only in JAMS.

21           **THE COURT:**  Yes.  I started my remarks by dividing

22 the documents into two groups:  Attorneys billing information

23 and everything else.  You're in the "everything else" category

24 now.

25           **MR. COOPER:**  Yes, I am, your Honor.  You --

1            **THE COURT:**  I have not invited argument as to that

2    point.  Although there is such argument in writing and I'm a

3    close reader of it, which is why I brought the motion up this

4    afternoon.

5            **MR. COOPER:**  I don't believe that point is in

6    writing, your Honor.  I apologize.  It was -- we did not have

7    the right to --

8            **THE COURT:**  Mr. Cooper, I try so hard to be a patient

9    person.

10           **MR. COOPER:**  I'm sorry, your Honor.

11           **THE COURT:**  You may be trying my patience, though.  I

12   have tried to be gentle with you in pointing out that everyone

13   in this room would like to talk to me about something about

14   these proceedings, I'm sure.

15       You have been very helpful to me on this other point.  I

16   am not going to entertain argument about these other matters.

17   Thank you.

18       Court is in recess.

19           **MR. COOPER:**  Thank you, your Honor.

20           **THE CLERK:**  All rise.

21       (Proceedings adjourned.)

22

23

24

25

## <u>CERTIFICATE OF OFFICIAL REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Debra L. Pas*
_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Monday, March 21, 2016