Mario N. Alioto (56433)
Joseph M. Patane (72202)
Lauren C. Capurro (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123
Telephone: 415-563-7200
Facsimile: 415- 346-0679
Email: malioto@tatp.com
jpatane@tatp.com
laurenrussell@tatp.com

*Lead Counsel for the
Indirect Purchaser Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. CV-07-5944-JST; No. CV-13-03234-JST |
| | MDL No. 1917 |
| | **CLASS ACTION** |
| This Document Relates to:<br><br>All Indirect Purchaser Actions | **DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' RESPONSE TO STATEMENT RE: ORDER TO SHOW CAUSE RE: OBJECTION TO *EX PARTE* COMMUNICATIONS AND IN CAMERA REVIEW OF BILLING RECORDS**<br><br>Date: April 19, 2016<br>Time: 2:00 p.m.<br>Judge: Honorable Jon S. Tigar<br>Court: Courtroom 9, 19th Floor<br>Special Master: Martin Quinn (JAMS) |

I, Mario N. Alioto, declare:

1. I am an attorney duly licensed by the State of California and am admitted to practice before this Court. I am a partner with the law firm Trump, Alioto, Trump & Prescott, LLP and my firm serves as Lead Counsel for the Indirect Purchaser Plaintiffs ("IPPs") in the above-captioned action. I submit this Declaration in support of IPPs' Response to the Statement Pursuant to Order Re: Objection to Ex Parte Communications and In Camera Review of Billing Records (ECF No. 4545-4). The matters set forth herein are within my personal knowledge and if called upon and sworn as a witness I could competently testify regarding them; and as to matters on stated on information and belief, I believe them to be true.

2. I have not recorded my time in this case in .25 increments without regard to whether .25 has actually been devoted to a particular matter. It has been my practice, and the practice of my attorneys working under my supervision, to record .25 on a matter or matters when .25 has actually been devoted to that matter or matters. There is no requirement that small tasks are billed at a "minimum" of .25 hours. Our practice is either to not record such minimal time at all, or to bundle those small tasks into .25 increments, not round up to .25 for each small task.

3. As previously noted, members of my firm have kept contemporaneous time records over the eight-year life of this case. I originally kept my time in handwritten form on time slips. During the course of each day, I made summary notations on the left-hand side of these time slips of tasks I performed on this case and the amount of time devoted to these tasks. At the end of each day, I described these tasks in narrative form, based on the summary notations I had made during the course of the day. On a daily basis, I checked my time and reviewed it, before entering a total for this day.

4. Beginning May 28, 2014, due to the large number of tasks being performed each day, I started recording my time on a single large sheet, rather than on the smaller time slips. I recorded the time devoted to each task along the top of each sheet. For example, for 9/30/14, cited in the Objectors' Appendix A, the notation of 1.5 applies to the first narrative entry: "Conf call LR, Nate Cihlar re trial structure + further emails Corbitt, Dan Hume re same." The next notation of .5 applies

to the second narrative entry: "Conf JMP, LR re Viewsonic damage report + prepare report of all DAP direct damages only as IP damages." And so on for all of the time entries at the top of the page. The total for the day is circled in the right hand corner of the page.

5. This case required that large blocks of time be devoted to it on a daily basis by me, and other lawyers working under my supervision. On many days, we devoted very little, if any time to other cases. Indeed, Ms. Capurro (formerly Ms. Russell, who is referred to in my time records as "LR") has devoted virtually all of her time to this case since 2012. We worked on multiple matters in this case over the course of an entire day, often moving back and forth from task to task. For example, Ms. Capurro was often responsible for drafting briefs, while at the same time supervising IPPs' discovery effort, the document review teams and the deposition teams, as well as coordinating all of these activities with the other plaintiff groups. On a given day, where Ms. Capurro's primary task was drafting a brief, she would frequently have to break to, for example, respond to questions from team members or other plaintiffs' counsel, review and comment on their work product, or participate in a conference call. *See, e.g.*, Ms. Capurro's 8/27/12 time entry. This type of work presents challenges in assigning time to each task performed. But at the end of each day, the total time devoted to all tasks can be and was recorded with precision.

6. We have not charged for purely clerical matters, although we have charged for time spent managing and organizing this complex case. This necessarily required time-consuming work devoted to things like file notes (further described below), organizational planning, dealing with litigation support vendors, making assignments, and monitoring the work of co-counsel. For example, I recorded time reviewing bills from JAMS to insure that the amounts charged were allocated properly among the various parties. Substantial sums were involved, and the interests of the IPP Class were protected as a result of the review. On occasion, I was requested by JAMS to perform this review to assist JAMS in making the proper allocation to the various parties.

7. Objectors point to my November 18, 2010 entry as an example of clerical work. In November 2010, I was working with Milberg LLP to establish a database in which to store and review Defendants' documents. IPPs were also in the midst of extensive meet and confers with

Defendants regarding their document productions, and several Defendants were refusing to produce certain categories of information or claimed the documents for certain important custodians could not be found/had been destroyed.  Thus, it was necessary to "inventory" the substance of Defendants' productions to see what had been produced, and what IPPs still needed to seek.  This was not a clerical exercise, and did not involve organizing materials or arranging files.  In fact, Defendants' document productions were sent directly to Milberg and loaded into the database by Milberg's litigation support team.  Thus, there was no need for my firm to physically inventory the documents.

8.      Objectors also point to Ms. Capurro's October 3, 2011 entry as an example of clerical work.  Objectors appear to be referring to the following notation in the entry: "Various emails to firms re start of doc review and docs they need to review to prepare for same, *review files re same,* assign people to various issue teams etc., f/n re same." (Appendix C at 2, emphasis added.)  This merely indicates that Ms. Capurro reviewed her files to ensure she was providing the correct materials (e.g. the operative Complaint, memoranda regarding the Defendants and various legal issues, the CRT industry, etc.) to bring the new reviewers up-to-speed on the case for the document review.  Again, this was not a clerical task.

9.      Objectors also object to my firm's time entries containing the notation "f/n" ("file note.")  They contend that time spent on "file notes" was unproductive and did not benefit the Class.  To the contrary, "file notes" were an extremely important and necessary part of managing this case.  "File notes" included, *inter alia*, lists of action items, lists of assignments for future work, memoranda regarding various legal issues, notes memorializing meet and confer calls with opposing counsel and notes memorializing telephonic hearings or conference calls with the Special Masters.  Taking notes of a meet and confer call, for example, was necessary for drafting the meet and confer letter to opposing counsel memorializing the call, including the agreements reached and the disputes remaining.  Such letters need to be accurate because they are often submitted to the Court as part of a later motion to compel.

10. My daily time entries from inception through March 9, 2015 consist of 1,032 pages. The Objectors have attached as Appendix A to their brief a very small sampling of my time records for the period 2010-2014. My time records for the period 2007-2009 show my early work on the case, and the more modest time commitment required in these early years. The time records for 2010-2014 show the explosion of activity in these years and the demands of leading a case of this size.

11. As I have previously informed the Court in my prior Declarations, my firm and an Audit Committee comprised of several firms who did a great deal of work in this case, conducted an audit of all IPP firms' time and expenses. (*See* ECF No. 4071-1, ¶ 119; ECF No. 4373-1, ¶ 27.) The Audit Committee reviewed the time records of all firms and eliminated duplicative or unnecessary time, such as unassigned "read and review" of court filings, meetings of counsel unrelated to an assignment, and excessive billing for minor tasks. No firm's lodestar includes time for non-substantive work. As a result of the audit, the total lodestar initially submitted by the 50 IPP firms was reduced by approximately 7%.

12. Objectors contend that certain firms with small lodestars did no substantive work. The firms with very small lodestars are, for the most part, the private lawyers for the more than 40 plaintiffs representing the 22 states involved in this case. These lawyers provided discovery from their clients, assisted with preparing written discovery responses, assisted with preparing their clients for deposition and, in some instances, helped prepare their clients to testify at trial. With a few exceptions, most of the other firms with lodestars less than $2 million primarily performed document review, which was an essential part of this case.

13. Objectors refer in their brief at p. 8, n. 3, to a $100,000 assessment paid by Lead Counsel in January 2015. The assessment was actually paid by Mr. Patane, not Lead Counsel. Moreover, as is quite apparent from the public record, the case was not "virtually over" and there continued to be financial risk at this time, contrary to the assertions of Objectors.

14. At the time the three trial team firms joined the litigation, there were only two settlements totaling $35 million, and an already-existing lodestar far in excess of that. Thus, the three trial team firms faced the very real risk of recovering virtually nothing for their time.

15. I am informed and believe that some time before I contacted Mr. Goldberg about joining the case as part of the trial team, Mr. Scarpulla had contacted him and asked whether he would be available to lead the effort to try the case.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 13th day of April, 2016 at San Francisco, California.

/s/   *Mario N. Alioto*
      Mario N. Alioto

***Lead Counsel for the Indirect Purchaser Plaintiffs***