# EXHIBIT 4
(Redacted)

**January 8-9, 2015**

**Meggan Ehret, Thomson Consumer Electronics, Inc.'s Corporate Designee
Notes Regarding Certain Thomson Consumer 30(b)(6) Deposition Topics**

The following notes on certain of the Plaintiffs' Fed. R. Civ. R. 30(b)(6) topics are intended solely to aid the witness's recollection of specific factual material discovered in the course of Thomson Consumer's investigation in this matter. These notes are not intended to provide any testimony on behalf of Thomson Consumer, exhaust its knowledge or provide a comprehensive response to any inquiry.

Thomson Consumer does not accept Plaintiffs' premise that there was a conspiracy to fix prices or reduce production of CRTs and denies that it participated in any such conspiracy that violated the antitrust laws of the United States.

Thomson Consumer states that these notes, if produced, and any testimony provided in reliance on these notes and in conjunction with any testimony will be subject to the Stipulated Protective Order entered in this action.

**Topic No. 3.**

Your policies applicable to communications with competitors, including Your policies applicable to communications with competitors regarding production, pricing, development costs, marketing or distribution of CRT Products, Your policies regarding the use of competitors' CRT Products prices obtained directly from competitors in setting the Prices of CRTs You quoted to customers or prospective customers, and Your policies regarding the use of competitors' CRT Products prices obtained directly from competitors in setting the prices of CRTs You quoted to customers or prospective customers.

**NOTES:**

- "It is the policy of Thomson Consumer to comply with the antitrust laws of the United States and other countries applicable to its business operations." *See* TCE-



DEPOSITION
EXHIBIT
8165

CRT 0004883, Thomson Policies (dated 12/02): Thomson Policy No. 4.2, "Compliance with the Antitrust Laws."

- Thomson Consumer also had a policy regarding communications with competitors. Thomson Consumer's antitrust policy does "not preclude obtaining competitive information from an independent third party which is not transmitted pursuant to an agreement between the Company and the competitor." *Id.*

- Current or former Thomson Consumer employees such as Jackie Taylor-Boggs, Jack Hirschler, and Alex Hepburn have reported that they received antitrust and Robinson-Patman Act training while working for the company. Ms. Taylor-Boggs also recalls that she instructed the employees that she supervised not to discuss prices with competitors.

- Similarly, former Thomson Consumer CPT salesman John "Jack" Hirschler has reported that throughout his career with Thomson Consumer, employees received regular training on antitrust compliance and were informed as to what they could and could not do when selling Thomson Consumer products. Employees were all made aware of the penalties the company and individual employees could be subject to in the event of non-compliance with these rules. Thomson Consumer employees were strongly encouraged to do nothing to jeopardize the corporation.

**Topic No. 4.**

All internal communications within Thomson related to the production, pricing, sale, marketing, or distribution of CRT Products.

**NOTES:**

- Thomson Consumer employees had numerous internal communications regarding the production, pricing, and sale of the CPTs it manufactured.

- One form of internal communication included monthly PSI (Production, Sales, and Inventory) meetings during which Thomson Consumer sales, product, and

plant managers would meet to discuss supply, demand, production, inventory levels and other issues regarding its operations. *See, e.g.*, TCE-CRT 0006153.

**Topic No. 8.**

Any joint ventures, partnerships or other collaborative business relationships, or acquisitions related to CRT Products production, sale, marketing, or distribution, either undertaken or considered by you with respect to: (a) any other defendant or co-conspirator named in *In re Cathode Ray Tube (CRT) Antitrust Litigation*, U.S. Dist. Ct., Northern District of California, MDL-1917, (b) any competitor, or (c) any other person.

**NOTES:**

- In or about 1998, Thomson SA's wholly-owned subsidiary, Thomson Tubes & Displays S.A. ("TTD") entered into a joint venture with the state-owned Foshan Color Picture Tube Co., to manufacture CPTs in Foshan, China, resulting in the formation of Thomson Foshan Color Picture Tube Co. Ltd. ("Thomson-Foshan"). Thomson-Foshan later also owned a factory in Dongguan, China.  TTD managed and owned a majority interest in Thomson-Foshan until it sold its CPT-related business and assets to Videocon in 2005.

- In 2001-2003, representatives of Thomson SA and Thomson Consumer had numerous meetings with representatives of Matsushita for purposes of exploring and negotiating a possible CPT joint venture and/or collaborative business relationship between the companies.   The potential collaborative business relationship was referred to as project "Blue Sky." Thomson Consumer representatives who participated in meetings and/or negotiations regarding the project included Tom Carson, Jack Brunk, and J.P. Hanrahan. *See e.g.*, MTPD-0570796E.

**TCE-CRT HIGHLY CONFIDENTIAL**

- As a result of these negotiations, Thomson SA and Matsushita executed a Memorandum of Understanding (MOU) which established a reciprocal preferred supplier relationship for CPTs and CPT components, and thereby enhanced the competitiveness of each company's CPT business. *See* MTPD-0346703.

- Thomson Consumer is aware that in September 2003, Thomson SA had discussions with IRICO about a possible joint venture, focused on tube production in China, but no such partnership or joint venture was undertaken. *See* TCE-CRT 0021286 (IRICO proposal re Fortune takeover); TCE-CRT 0026166 (presentation re possibility of IRICO JV – Sept. 2003); TCE-CRT 0026167 (presentation re "Project Ice –Tea" JV with IRICO).

- In early 2002, Thomson SA purchased Hitachi's only US  CPT production line from Hitachi in Greenville, South Carolina, and transferred that line to Foshan, China.  An ancillary provision to the asset sale agreement provided that Hitachi would not compete in the US CPT market with Thomson Consumer in the United States.  The purchase of the CPT production line and ancillary provisions were negotiated at arm's length and were entirely in conformity with United States antitrust laws.

- Thomson Consumer is aware that at various times, other producers may have expressed interest in joint ventures, partnerships, or collaborative business relationships, including Toshiba and Thai CRT, but it is not clear that Thomson Consumer or its affiliates seriously considered any such proposals.

**Topic No. 10.**

Your knowledge or beliefs related to the illegality or impropriety of exchanging information or entering into any understanding, agreement, commitment, or contract with any of the defendants or co-conspirators named in *In re Cathode Ray Tube (CRT) Antitrust Litigation*, U.S. Dist. Ct., Northern District of California, MDL-1917, related to the production, pricing, sale, marketing, or distribution of CRT Products.

**NOTES:**

- Thomson Consumer did not knowingly join any conspiracy, understanding, or agreement related to the production, sale, marketing, or distribution of CRTs or CRT Products.

- It has long been the "policy of Thomson Consumer to comply with the antitrust laws of the United States and other countries applicable to its business operations." *See* TCE-CRT 0004883, Thomson Policies (dated 12/02): Thomson Policy No. 4.2, "Compliance with the Antitrust Laws."

- This policy of compliance with antitrust laws has remained a part of the company's ethics standards throughout the period Thomson Consumer was engaged in the CPT business and beyond. *See* TCE-CRT 0004930–42 (2003 Thomson Ethics Charter); TCE-CRT 0004963–81 (Thomson Code of Ethics 05/06).

- Thomson Consumer employees, including sales and sourcing employees received antitrust compliance training during their employment with the company. *See* Response to Topic 3 above.

**Topic No. 11.**

If you contend that any or all of the Plaintiffs knew or should have known of any meeting, conspiracy, understanding, or agreement related to the production, sale, marketing, or distribution of CRT Products prior to November 2007, the circumstances under which Plaintiffs

became aware, or should have become aware, of your involvement in the meeting, conspiracy, understanding, or agreement, and the documents that support your contention.

**NOTES:**

- Thomson Consumer did not knowingly join any conspiracy, understanding, or agreement related to the production, sale, marketing, or distribution of CRTs or CRT Products and therefore Plaintiffs could not have been aware of Thomson Consumer's involvement in such a conspiracy.

- ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████

- For additional evidence and argument in support of its claim that Plaintiffs' claims are barred in whole or in part by this defense may also be found, see Thomson Consumer's Supplemental Response to Interrogatory No. 5 of Sharp's First Set of Interrogatories to Thomson Consumer; see also . Defendants' Joint Motion For Partial Summary Judgment Against Dell and Sharp Plaintiffs on Statute of Limitations Grounds (Dkt. No. 3041).

## Topic No. 12.

The identity and general description of the CRTs you manufactured, purchased, sold, or distributed.

**NOTES:**

- Thomson Consumer never manufactured, sold, or purchased CDTs during the Relevant Period. It only manufactured, sold, or purchased CPTs for use in televisions.

- To the extent such documents still exist and are in its possession, custody, or control, Thomson Consumer has produced documents to the Plaintiffs that identify the CPTs it manufactured and sold during the Relevant Period.

- The majority of CPTs manufactured and sold by Thomson Consumer during the Relevant Period were curved CPTs 25" or larger.

- Before 2001, it manufactured a relatively small number of 21" CPTs.

- However, starting in 2002 Thomson Consumer only manufactured CPTs 27" or larger. *See e.g.* 2002 Thomson 20F; TCE-CRT 00000001-TCE-CRT 00000308; Expert Report of B. Harris; *infra*, Response to Topic 31 below.

- Between 2002 and 2005 an increasing percentage of the CPTs it manufactured and sold were True Flat, as this new type of tube replaced traditional curved CPTs in an ultimately unsuccessful attempt to compete with emerging technologies like LCD and Plasma.

- Thomson Consumer never produced LCD or Plasma products.

**Topic No. 13.**

The distribution channels or classes of trade through which you sold CRT Products during the Relevant Period, including your sales to the following categories of purchasers: (a) your affiliates; (b) other defendants in this litigation; and (c) other business entities, including OEMs, retailers, mass merchandisers, e-commerce, and distributors.

**NOTES:**

- During most of the Relevant Period Thomson Consumer's largest single CPT customer was its own internal television manufacturing division, which made and sold Televisions under the RCA, GE, and ProScan brand names.

- In addition, Thomson Consumer sold a large volume of CPTs to other television OEMs including Sanyo, JVC, Daewoo, Sharp, Toshiba, Hitachi, Matsushita, Samsung, Philips, and Zenith. *See, e.g.*, TCE-000001–475.

**Topic No. 14.**

The organization and structure of each of your business units that produced, marketed, sold, or distributed CRT Products, including the identity of all persons with decision-making or supervisory responsibility for (a) the pricing, sale or marketing of CRT Products, including persons with authority and/or responsibility for setting, maintaining, and adjusting inventory targets; (b) sales, purchases, and/or transfers with competitors; and (c) reporting information to or receiving information from trade associations.

**NOTES:**

- Thomson Consumer did not manufacture or sell CDTs or CDT Finished Products during the Relevant Period.

- Before it exited the television manufacturing business in 2004 and the CPT manufacturing business in 2005, Thomson Consumer operated CPT and television manufacturing divisions.

- Generally, Thomson Consumer's CPT and television manufacturing divisions functioned independently throughout the Relevant Period.

- For example, separate teams of people were responsible for (1) selling the CPTs made by its CPT manufacturing division and (2) purchasing the CPTs it needed to manufacture televisions. However, there were occasions when CPT sales people or executives assisted the television manufacturing division with procuring CPTs, often assisting when the CPT division could not fulfill the television manufacturing division's demands. *See* Deposition of Thomas Carson (Nov. 21, 2014) at 380:22-382:15.

- During the portions of the Relevant Period before September 2001, the individual who set the prices of CPTs sold by Thomson Consumer was Tom Carson. After September 2001, J.P. Hanrahan set the prices of CPTs sold by Thomson Consumer. Throughout the Relevant Period, US sales people such as Jack Brunk, John "Jack" Hirschler, and others in the US also played a role in negotiating CPT prices with customers in the US.

- Members of Thomson Consumer's CPT sales team also sold CPTs to the television manufacturing divisions of companies like Toshiba, Matsushita, Hitachi, and Samsung – companies that also had divisions which produced CPTs.

- Former Thomson Consumer employee Alex Hepburn attended CPT trade association related activities on the company's behalf and analyzed aggregated data Thomson Consumer obtained regarding the CPT and television markets through its participation in the CPT trade association. Tom Carson and J.P. Hanrahan also participated in trade association meetings, although they would have relied on Mr. Hepburn to perform detailed analysis of any data received from the trade association.

**Topic No. 15.**

The policy and process by which prices, including list prices and actual selling prices, for each CRT Product were set and by whom, including the location of negotiations for sales of CRT Products to Plaintiffs, OEMs, or ODMs; the location of your sales offices in the United States; all factors, formulas, or guidelines you considered in determining prices you charged for each CRT Products; the pricing authority given to employees/affiliates at all levels of the sales and marketing organization; and how pricing decisions were implemented, including any benchmarks (*e.g.*, industry-wide, specific customers, spot market, discounts or rebates) used when establishing and/or negotiating prices.

**NOTES:**

- Thomson Consumer never manufactured or sold CDTs during the Relevant Period. Accordingly, Thomson Consumer did not negotiate or set the price of CDTs sold in the United States at any time.

- The prices for CPTs Thomson Consumer sold in the United States were set in the United States through a collaborative process involving Thomson Consumer CPT sales people and other United States executives who oversaw its CPT division.

- Members of the sales team would engage in negotiations with individual customers regarding CPTs. If the Thomson Consumer sales person was able to negotiate a price with the customer that was above the price at which the sales person was authorized to sell the CPT, the sales person was authorized to complete the transaction.

- During the portions of the Relevant Period before September 2001, the individual who set the prices of CPTs sold by Thomson Consumer was Tom Carson. After September 2001, J.P. Hanrahan set the prices of CPTs sold by Thomson Consumer. Throughout the Relevant Period, US sales people such as Jack Brunk, John "Jack" Hirschler, and others in the US also played a role in setting and negotiating CPT prices with customers.

- With the exception of sales made to Samsung, which were the subject of a Global Supply Agreement between Thomson and Samsung, as a general matter, neither Tom Carson nor J.P. Hanrahan had to seek approval from any Thomson affiliated employee located outside the United States to set the price at which a particular CPT would be sold in the United States.

- The location of Thomson Consumer sales offices changed during the Relevant period, but included Lancaster, PA, Indianapolis, IN, and San Diego, CA.

- Thomson Consumer did offer rebates to customers who purchased its CPTs, with larger rebates provided to customers who purchased a higher volume of CPTs. *See* Thomson Consumer's Response to Topic No. 25.

- Due to the high fixed costs of operating its CPT plants, Thomson Consumer would also discount prices if doing so was necessary to keep its plants operating at higher capacity utilization rates.

- Based on its investigation conducted to date, Thomson Consumer is not aware of evidence indicating that it set the price of CPTs using a rigid list of factors, formulas, or guidelines. Instead, it primarily set prices based on the price

demands of its customers and its desire to earn a profit on its tube sales. It also attempted to understand market demand for its CPTs by evaluating publically available information including NPD publications (TV retail data), CEA reports (data on CRT component sales), and other industry reports.

- During the Relevant Period large national retailers with enormous buying power, such as Sears, Best Buy, and Circuit City, dominated the retail TV market. These large national retailers demanded that TV manufacturers sell them TVs at very low prices. This put severe downward pressure on the prices TV manufacturers could charge and as a result CPT pricing dropped precipitously as well.

**Topic No. 16.**

The relationship between the price of CRTs sold by you and the price of CRT Finished Products sold by you or your domestic and/or international affiliates including, but not limited to: (i) the percentage of the total cost of the CRT Finished Products made up by the CRTs; and (ii) the effect that a change in the price of the CRTs had on the price of the CRT Finished Products.

**NOTES:**

- Although the exact percentage varied by model, size and tube type the cost of a CPT accounted for 45-75% of the total cost of a television. *See* TCE-CRT 0029077.

- The cost of CPTs was just one factor in determining the price of televisions sold by Thomson Consumer. The United States television market was very competitive, and Thomson Consumer's television prices reflected that competition.

- Moreover, as larger retailers such as, Best Buy, Sears, etc. began to dominate the market, they were able to put significant downward pressure on television prices.

This pressure in turn affected the pricing of CPTs.  Thus, the price of CPTs both affected and was affected by the price of televisions.

**Topic No. 17.**

The extent to which the prices charged for CRTs were passed on through the distribution chain by you or your domestic and/or international affiliates.

**NOTES:**

- When the television manufacturing division of Thomson Consumer purchased CPTs manufactured by Thomson Consumer, the television manufacturing division paid a price for these CPTs that was consistent with prevailing market rates in the relevant geographic market.

- The price at which CPTs manufactured by Thomson Consumer's CPT manufacturing division were sold to its TV manufacturing division were negotiated and determined by members of Thomson Consumer's CPT sales team, such as JP Hanrahan, in the same way CPT pricing was negotiated with an external customer.

- However, because Thomson Consumer's TV manufacturing division purchased such a large volume CPTs from its CPT manufacturing division, it typically received favorable pricing on the CPTs it purchased in the same way that other large volume purchasers received favorable pricing.

**Topic No. 18.**

Meetings and other communications between you and any Plaintiff.

**NOTES:**

- Thomson Consumer sold televisions and other products (including VCRs, camcorders, and electronic accessories) to many of the Plaintiffs.  (*E.g.,* TCE-CRT 31315.)  The documents produced in this litigation by Thomson Consumer reflect that a wide range of Thomson Consumer employees (both individually and

in teams) had a variety of communications and meetings (both in person and telephonically) with the Plaintiffs, including the following:

1.    Discussions and meetings regarding the purchase of televisions (and other electronic devices), including extensive price negotiations (*E.g.,* TCE-CRT 0029430–31.)

2.    Discussions and meeting regarding post-sale activities, including promotions, shipping, accounting and reconciliation.

3.    Thomson Consumer attended trade shows and likely had discussions and meetings with certain Plaintiffs at such events. (E.g., TCE-CRT 0011734–36.)

4.    Communications and meetings between counsel for Thomson Consumer and Plaintiffs for the purpose of negotiating contracts (E.g., TCE-CRT 0031994–95, TCE-CRT 0031943–46.)

5.    Communications regarding repairs, warranty issues, and defective products (E.g., TCE-CRT 30905–06.)

6.    With respect to Sharp, Thomson Consumer also had a variety of communications and meetings related to CPT purchases, including communications regarding pricing, specifications, samples, new offerings, production quantities, shipping, warehousing and the like (E.g., TCE-CRT 0005265, TCE-CRT 0008629–32, TCE-CRT 0008877–80.)

7.    In October 2003 Sharp also provided a sales person who worked for a Thomson affiliated company in Japan detailed information regarding the current CRT manufacturing capacity of other CRT manufacturers in Asia, China, Europe, India, Japan, Korea, NAFTA, and Brazil. *See* TCE-CRT 0020425.

**Topic No. 19.**

Negotiations and other communications between you and OEMs or ODMs regarding the sale of CRTs.

**NOTES:**

- Thomson Consumer sold CPTs to numerous different television manufacturers during the Relevant Period including Sanyo, JVC, Daewoo, Sharp, Toshiba, Hitachi, Matsushita, Samsung, Philips, and Zenith. *See, e.g.*, TCE-000001–475.

- To complete these sales Thomson Consumer engaged in negotiations and communications with television manufacturers regarding product specifications, delivery and terms of sale, pricing, volume rebates and discounts, product returns, quality related issues, product availability, and warehousing. *See e.g.*, TCE-CRT 0005265, TCE-CRT 0008629–32, TCE-CRT 0008877–80, TDA 00738, TDA00772, TDA 00784, TDA 708, TCE-CRT 000825, TCE-CRT 0008626, TCE-CRT 0008641, TCE-CRT 0008687.

### Topic No. 20.

Your knowledge that CRTs you sold would be incorporated into products imported into the United States, including that CRTs manufactured for sale to Plaintiffs would be shipped into the United States or that CRTs sold to OEMs or ODMs would be sold to Plaintiffs in the United States and Your monitoring of the prices of CRT Products sold in the United States.

**NOTES:**

- Throughout the Relevant Period the CPT market was a regional market. The overwhelming majority of CPTs manufactured by Thomson Consumer or its subsidiary Thomson Displays Mexicana SA in NAFTA were sold to customers who then integrated them into televisions sold in the United States. Accordingly, Thomson Consumer understood that the majority of CPTs it manufactured during the Relevant Period would ultimately be utilized by consumers in the United States.

**TCE-CRT HIGHLY CONFIDENTIAL**          14

- Former Thomson Consumer employee Alex Hepburn monitored the general dynamics, including pricing trends, in the United States television market to help Thomson Consumer assess demand for its products.

**Topic No. 21.**

Policies, practices, or requirements relating to Your participating in negotiations, entering into, or signing contracts for, Your subsidiaries.

**NOTES:**

- Thomson Consumer did not have a written policy during the Relevant Period regarding "participating in negotiations, entering into, or signing contracts for" its subsidiaries.

**Topic No. 22.**

The role of current and former directors, officers, employees, agents, or other representatives with any managerial responsibility for recommending, reviewing, setting or approving prices, bids, quotes, or rebates for Your CRTs or CRT Products, or those of Thomson SA, TDA, Technologies Displays, or Videocon Industries, Ltd., during the Relevant Period for the U.S. market.

**NOTES:**

- While they were employed with Thomson Consumer, Thomson Consumer employees negotiated the sale of CPTs manufactured and sold by Thomson Consumer or its subsidiary Thomson Displays Americas SA in the NAFTA market. They did not set the prices of CPTs manufactured and/or sold by other Thomson entities in Europe or Asia. The prices of CPTs sold in Europe and/or Asia were negotiated by representatives of Thomson SA's subsidiaries in Europe and/or Asia.

- While they were employed with Thomson Consumer, Thomson Consumer employees played no role in negotiating or setting the prices of CPTs that may have been sold by Technologies Displays or Videocon Industries, Ltd.

**Topic No. 23.**

Business departments or functions shared between You and Your subsidiaries.

**NOTES:**

- Until the time of the sale of the CRT business to Videocon in 2005, Thomson Consumer's only subsidiary related to CRT-operations was Thomson Displays Mexicana, S.A. de C.V.'s.

- In 2005, Thomson Consumer transferred its CRT-related assets to a new company, Thomson Displays America LLC, as part of the processes of selling its CRT business to Videocon.

- From at least 1998, sourcing for all North American CPT operations was consolidated under a "supply chain manager" and later "regional sourcing" manager for North America. Beginning in 2002, Thomson Displays Mexicana manufactured CPTs in a plant in Mexicali, Mexico, and procurement and supply chain management functions were shared with Thomson Consumer. During this period, however, each plant had its own local sourcing personnel. *See* TCE-CRT 0005395.

- CPTs manufactured by Thomson Displays Mexicana's plant in Mexicali were primarily sold by Thomson Consumer's existing sales team located in the United States including Jack Brunk and J.P. Hanrahan.

**Topic No. 24.**

Your instructions, directions, policies, or procedures to or from domestic and/or international affiliates related to the production, pricing, negotiation, sale, marketing, or distribution of CRT Products.

**NOTES:**

- During the Relevant Period, Thomson Consumer's only subsidiary related to CPTs was Thomson Displays Mexicana, S.A. de C.V.'s. Thomson Consumer

owned over 99 percent of Thomson Displays Mexicana from its creation in 1999 until 2005.

- CPTs manufactured by Thomson Displays Mexicana's plant in Mexicali were primarily sold by Thomson Consumer's existing sales team located in the United States including Jack Brunk and J.P. Hanrahan.

- Based on its diligent investigation conducted to date, Thomson Consumer has been unable to determine what role, if any, it played in the day-to-day operations of the Mexicali plant.

**Topic No. 25.**

Your use of discounts or rebates in connection with the sale of its CRT Products, including how such discounts or rebates were recorded by You and the identity and location of documents or data recording discounts or rebates.

**NOTES:**

- Thomson Consumer provided various forms of volume rebates to its CPT customers to incentivize them to produce a larger volume of CPTs from Thomson Consumer.

- The magnitude of the rebate varied depending upon the customer, CPT size, market conditions at the time the rebate was negotiated, and the volume of CPTs purchased by that customer. *See e.g* TDA 00738, TDA00772, TDA 00784, TDA 708 (reflecting various volume rebate programs offered to Daewoo, JVC, Matsushita, Orion, Samsung, Sanyo, and Sharp Mexico).

- Typically, Thomson Consumer would charge the customer the invoice price and then issue any applicable volume rebates at the conclusion of the rebate period after the final volume purchased by the customer had been determined. *See e.g.* TDA00773 (stating that rebates for customer's 2001 CPT purchases shall be

issued "no later than January 31, 2002 after the final volume has been understood.") However, for other customers it would charge the customer a price that assumed the customer would purchase sufficient volumes to earn the maximum volume rebate, but then reserve the right to bill back the customer if the customer did not ultimately purchase a sufficient volume of CPTs to earn the discounted price. *See* TDA 00785.

- Documents reflecting the type and size of the volume discounts Thomson Consumer provided to its customers have been included in the documents produced to the Plaintiffs.


**Topic No. 26.**

The electronic data processing systems, programs, and outputs that you used to record, store, compute, analyze, or retrieve any information relating to the production, pricing, marketing, sale, distribution, profitability, or inventory of CRT Products, including systems shared with your domestic and/or international affiliate(s) or any other company; a description of the meaning of the fields in any electronic data you produced to Plaintiffs; an explanation of how to read or interpret transactional or financial data you produced to Plaintiffs (including sales information, cost information cost accounting reports, and production information); the authors of the entries into the databases; and/or instructions for entry of data.

**NOTES:**

- Thomson Consumer states that at one time it did maintain electronic databases containing information regarding its former CPT business, but because it entirely exited the CPT business in 2005 those systems have long since ceased to exist. Now, almost ten years after Thomson Consumer exited the business, information regarding electronic data processing systems Thomson Consumer used to record or analyze information relating to the production, pricing, marketing, sale, distribution, profitability, or inventory of CPTs is not reasonably available.

**Topic No. 27.**

The nature of the records of your sale of CRT Products (including, but not limited to, sales to domestic and/or international affiliated entities and other defendants in this litigation) during the Relevant Period, including data which shows the types of CRT Products sold, the volume of sales for each type of CRT Products and the prices at which your CRT Products were sold.

**NOTES:**

- Thomson Consumer has produced all records in its possession, custody, or control that contain information regarding the CPT purchases of its television manufacturing division during the Relevant Period.

**Topic No. 28.**

The nature of the records of your purchases of CRT Products (including, but not limited to, purchases from domestic and/or international affiliated entities and other defendants in this litigation) during the Relevant Period, including data that relates to the types of CRT Products purchased, the volume of purchase for each type of CRT Products, the prices at which you purchased those CRT Products and the sellers from whom you purchased each type of CRT Products.

**NOTES:**

- Thomson Consumer has produced all records in its possession, custody, or control that contain information regarding the CPT purchases of its television manufacturing division during the Relevant Period.

**Topic No. 29.**

The relationship among Thomson Consumer Electronics Inc., Technologies Displays Americas LLC (formerly Thomson Displays Americas LLC), Technologies Displays Mexicana, S.A. de C.V., and Thomson SA during the Relevant Period, including the ownership, decision-making, and organizational structure of these entities and any departments or divisions within

these entities responsible for or involved in pricing, selling, marketing, or distributing CRT Products.

**NOTES:**

- Thomson Displays Americas, LLC was a limited liability company created by Thomson Consumer for the purpose of the sale of Thomson's CPT business to Videocon in 2005. As part of the transaction, Thomson Consumer transferred its CPT-related assets to Thomson Displays Americas, LLC. Thomson Displays Americas, LLC was then sold to Videocon as part of the sale of Thomson Consumer's CPT business.

- Thomson Displays Americas LLC was then renamed Technologies Displays Americas LLC by Videocon.

- After the asset sale was completed, Thomson Consumer had (a) no ownership in Technologies Displays Americas and (b) no involvement in the pricing, sale, or distribution of CPTs that may have been manufactured or sold by that entity.

- Thomson Consumer owned over 99 percent of Thomson Displays Mexicana, S.A. de C.V. from its creation in 1999 until 2005.

- CPTs manufactured by Thomson Displays Mexicana's plant in Mexicali were primarily sold by Thomson Consumer's existing sales team located in the United States including Jack Brunk and J.P. Hanrahan.

- Based on its diligent investigation conducted to date, Thomson Consumer has been unable to determine what role, if any, it played in the day-to-day operations of the Mexicali plant.

- After the asset sale was completed, Thomson Consumer also had (a) no ownership in Technologies Displays Mexicana, S.A. de C.V. and (b) no involvement in the pricing, sale, or distribution of CPTs that may have been manufactured by that entity.

- Throughout the Relevant Period Thomson Consumer was a wholly-owned subsidiary of Thomson SA.
- Pricing decisions with respect to customers in the US were made by Thomson Consumer's US employees.

## Topic No. 30.

The officers and directors of Thomson Consumer Electronics, Inc. who also served as officers and directors of Thomson SA during the Relevant Period.

**NOTES:**

- The terms "officers and directors" are vague and undefined when applied to Thomson SA, which is a French entity.
- For purposes of providing testimony on this topic (1) a director is a "person appointed or elected to sit on a board that manages the affairs of a corporation or company by electing and exercising control over its officers." and (2) an officer is "a person elected or appointed by the board of directors to manage the daily operations of a corporation, such as a CEO, president, secretary, or treasurer. *See Black's Law Dictionary* (2nd pocket ed. 2001).
- During the Relevant Period, the following individuals were officers and/or directors of both Thomson Consumer and Thomson SA:

| Name | Role with Thomson SA | Role with Thomson Consumer |
|------|---------------------|---------------------------|
| Thierry Breton | President (1997-2002) | President (12/31/1998 – 10/10/2002) |
| Olivier Mallet | CFO (1997-2001) | Director (12/31/1998 – 5/30/2001) |
| Charles Dehelly | CEO (10/2002 – 9/2004) | Director (10/10/2002 – 12/31/2004) |
| Julian Waldron | CFO (6/2001 – 2008) CEO (3/2008 – 9/2008) | Director (1/8/2002 - 5/9/2008) |

## Topic No. 31.

A description of Your CRT Product production facilities, including: (a) the location of each facility; (b) the start and end date of production operations at each facility; (c) the products produced at each facility; (d) the number of manufacturing lines at each facility and products

produced by line; and (e) the capacity utilization rates for each facility and manufacturing line within each facility.

**NOTES:**

- During portions of the Relevant Period Thomson Consumer operated CPT production plants in Scranton, PA, and Marion, Indiana,

- From approximately 1999 until the transfer of the CRT-business to Videocon, Thomson Consumer's subsidiary Thomson Displays Mexicana, SA de CV operated a CPT production plant in Mexicali, Mexico.

- The Scranton plant was in operation at the beginning of the Relevant Period, but was closed in July 2001. During the years it was in operation during the Relevant Period, the Scranton plant primarily produced 27" CPTs and some 25" CPTs on 2 lines. *See e.g.* 2002 Thomson 20F, TCE-CRT 00000001-TCE-CRT 00000308.

- The Marion plant was in operation at the beginning of the Relevant Period, but was closed in March 2004. *See e.g.* 2004 Thomson 20F. Before 2001 Marion plant produced VLS (32 inches or larger), Large (25-32 inches) and Medium (21 inch) sized CPTs. *See e.g.* 2002 Thomson 20F; TCE-CRT 00000001-TCE-CRT 00000308. However, in 2001 Thomson Consumer ceased production of Medium CPTs and henceforth only produced Large and VLS CPTs because (1) Medium CPTs had become a commodity product primarily manufactured by low cost producers in Asia; and (2) American consumers demanded larger, higher end televisions. Accordingly, after 2001 the Marion plant produced primarily 27" inch or larger CPTs. *See* Expert Report of B. Harris.

- The Mexico City plant was in operation at the beginning of the Relevant Period, but was closed in 2001. It was a relatively small plant and during the years it was in operation during the Relevant Period it only produced a relatively small number of 20/21" CPTs. *See e.g.* 2002 Thomson 20F, TCE-CRT 00000001-TCE-CRT 00000308.

- A Thomson Consumer subsidiary began producing CPTs in Mexicali, Mexico plant in 2002. The Mexicali plant operated 2 lines and only produced CPTs 27" or larger. TCE-CRT 0004703. In 2004 it began producing True Flat, instead of just traditional curved CPTs. TCE-CRT 0004718. The Mexicali plant was sold to Videocon in September 2005.

- Thomson Consumer has not located any comprehensive reports regarding the capacity utilization rates of its CPT plants throughout the entire Relevant Period.

**Topic No. 32.**

Your policies and practices for setting the production levels for CRT Products, including policies and practices for increasing, decreasing, and/or shutting down production (for any amount of time greater than 24 hours), and all formulas and factors considered in making such production decisions as well as the names of the individuals with authority to implement or deviate from these policies and practices for setting production levels for CRT Products.

**NOTES:**

- Thomson Consumer set production levels based on the current and projected demand for its CPTs, existing inventory levels, and its desire to earn a profit on the CPTs it manufactured over and above the high fixed costs it incurred operating its plants.

- Based on its diligent investigation conducted to date, Thomson Consumer is not aware of evidence indicating that it set the production levels using a rigid list of factors, formulas, or guidelines. Instead, it primarily set production levels based on the demands of its customers and its desire to earn a profit on its tube sales. It also attempted to assess market demand for its CPTs by evaluating publically available information including NPD publications (TV retail data) and CEA reports (data on CRT component sales).

- Individuals such as Tom Carson and the plant managers at each Thomson Consumer CPT plant were involved in setting its production levels.

- Thomson Consumer set the production levels of its plants independently. At no time were the production levels of its CPT plants based in any way on an unlawful agreement or conspiracy with any other manufacturer of CPTs.

**Topic No. 33.**

The method(s) used by Your Company to track production capacity for each CRT Product manufacturing facility and each manufacturing line, the method(s) used by Your Company to track inventory levels, link returns and sales, and monitor product margins of CRT Products You purchased, sold or distributed, the method(s) by which Your Company tracked shutdowns at any of Your CRT Products manufacturing facilities.

**NOTES:**

- Thomson Consumer tracked its tube inventory through an application called the "AMAPS System."
- In 2001, Thomson Consumer undertook a project to better manage inventory, warehousing, and forecasting (review T-0000622).
- During the Relevant Period, individuals within Thomson Consumer's finance department generated reports and/or spreadsheets that tracked its margins on the CPTs it manufactured, all of which that still exist have been produced by Thomson Consumer to the Plaintiffs in this litigation. *See, e.g.,* TCE-CRT 0004516; TCE-CRT 0004529 – TCE-CRT 0004535; TCE-CRT 0004603.

**Topic No. 34.**

The typical amount of time and production costs it takes to produce different types of CRT tubes and the typical amount of time after manufacturing of a CRT tube was initiated until manufacturing reached the planned capacity at your manufacturing facilities, and the typical capital costs for building and improving Your CRT manufacturing facilities.

**NOTES:**

- Thomson Consumer did not manufacture CDTs. It only manufactured CPTs and did not incur costs to modify its plants so that they could manufacture CDTs instead of CPTs.

- Thomson Consumer is not aware of a "typical" practice, because the cost and time associated with bringing new CPTs to market varied throughout the Relevant Period as CPT technology and production changed.

- To the extent this topic is directed at the transition from manufacturing traditional curved CPTs to flat CPTs, Thomson Consumer states that between 2003 and 2005 its Mexicali plant began producing an increasing number of True Flat CPTs. TCE-CRT 0004655.

- In conducting its diligent investigation on this topic, Thomson Consumer identified no documents that identified the total capital expenditures necessary to begin producing True Flat CPTs, but believes it required substantial investments of time, money, and technological resources.

**Topic No. 35.**

The production costs and typical amount of time needed to switch Your production from one type of CRT to a different type of CRT.

**NOTES:**

- Thomson Consumer only manufactured CPTs. It never manufactured other "types" of CRTs, such as CDTs or monitor tubes.

- Accordingly, Thomson Consumer never switched the production of its CRT plants between CPTs and CDTs.

- To the extent this topic seeks information regarding the cost and time needed to switch its CPT production from traditional curved CPTs to newer flat CPTs, Thomson Consumer states that it took several years and required large capital investments for Thomson Consumer to successfully begin producing flat CPTs.

**Topic No. 36.**

Whether: (a) particular manufacturing facilities specialized in a particular CRT specification or whether multiple CRT specifications are produced at a single plant, and (b) CDTs and CPTs are, or were, produced at the same manufacturing facilities.

**NOTES:**

- Thomson Consumer never produced CDTs at any of its manufacturing plants.  It only produced CPTs.  *See e.g.* 2002 Thomson 20F; TCE-CRT 00000001-TCE-CRT 00000308.

- While it was in operation the Scranton plant focused exclusively on the production of CPTs 25 inches and larger.

- Before 2001, the Marion plant was capable of producing CPTs that were 21 inches, 25-29 inches, and 32 inches or larger, while after 2001 it only produced CPTs 27 inches or larger.

- After it began production in 2001, the Mexicali plant, owned by Thomson Consumer's subsidiary Thomson Displays Mexicana, only produced CPTs 27 inches and larger.

**Topic No. 37.**

The extent to which a CRT made by Your Company can be used in a CRT Finished Product made by another CRT Product manufacturer, including the defendants in this litigation.

**NOTES:**

- Thomson Consumer manufactured CPTs in industry standard sizes and sold those CPTs both internally to its CRT television manufacturing division, prior to its exit from the CRT television business in 2004, and externally to other manufacturers of CRT televisions, including certain plaintiffs and defendants in this litigation.

- CPTs of like size and design (rounded, true flat, widescreen) were sometimes usable interchangeably, but Thomson Consumer also manufactured CPTs according to the particular specifications of its customers.  Therefore, a CPT

manufactured for one customer was not necessarily interchangeable with a CPT of like size manufactured for another customer. *See, e.g.*, TCE-CRT 0008728 (discussing particular needs for CPTs for Samsung Mexico).

**Topic No. 38.**

The existence and/or function of any department at Your company with responsibility for accounting software and/or electronically stored information.

 **NOTES:**

- Thomson Consumer maintained accounting systems to track its CRT operations throughout the period it manufactured and sold CPTs. The systems formerly used to track its former CPT business are no longer in operation and are not maintained by any department of Thomson Consumer.

**Topic No. 39.**

The use and existence of third-party data sources and other sources of market share data/analyses for CRT Products.

 **NOTES:**

- Thomson Consumer used all data lawfully available to it to analyze CPT market share and market trends.

- Common data sources included NPD publications (TV retail data), CEA reports (data on CRT component sales) and other industry reports.

- Thomson Consumer would sometimes also obtain information about the CPT market from glass component suppliers and from customers. For example, during negotiations a customer might claim that it could obtain a particular CPT from a Thomson competitor at a certain price. Such information might help it assess how prices for CPTs were trending in the market. *See e.g.* TDA 00805 (Sharp providing current market pricing to Thomson sales representative in Japan regarding market prices of various sizes of CPTs).

**TCE-CRT HIGHLY CONFIDENTIAL**   27

TCE-CRT HIGHLY CONFIDENTIAL