# Exhibit B

AO 440 (Rev. 12/09) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

| | |
|---|---|
| Sharp Electronics Corporation; Sharp Electronics Manufacturing Company of America, Inc. *Plaintiff* v. See Attachment A *Defendant* | ) ) ) ) ) ) ) |

**C 13   1173**

Civil Action No.

*EDL*

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  See Attachment B

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Stephen E. Taylor
TAYLOR & COMPANY LAW OFFICES, LLP
One Ferry Building, Suite 355
San Francisco, California, 94111

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

**MAR 1 5 2013**

Date: _____

**HELEN ALMACEN**

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

    ❐  I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

    ❐  I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

    ❐  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

    ❐  I returned the summons unexecuted because _____ ; or

    ❐  Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.

Date: _____     _____
                                                    *Server's signature*

                               _____
                                                    *Printed name and title*

                               _____
                                                     *Server's address*

Additional information regarding attempted service, etc:

**SUMMONS IN A CIVIL ACTION**

**ATTACHMENT A**

*Sharp Electronics Corporation; Sharp Electronics Manufacturing*
*Company of America v. Hitachi, Ltd., et. al.*

<u>Defendants:</u>

1. HITACHI, LTD.
2. HITACHI DISPLAYS, LTD.
3. HITACHI AMERICA, LTD.
4. HITACHI ASIA, LTD.
5. HITACHI ELECTRONIC DEVICES (USA), INC.
6. SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.
7. LG ELECTRONICS, INC.
8. LG ELECTRONICS USA, INC.
9. LG ELECTRONICS TAIWAN TAIPEI CO., LTD.
10. LP DISPLAYS INTERNATIONAL, LTD.
11. MERIDIAN SOLAR & DISPLAY CO., LTD.
12. LG.PHILIPS DISPLAYS HOLDING B.V.
13. LG.PHILIPS DISPLAYS INTERNATIONAL B.V.
14. PANASONIC CORPORATION
15. PANASONIC CORPORATION OF NORTH AMERICA
16. PANASONIC CONSUMER ELECTRONICS CO.
17. MT PICTURE DISPLAY CO., LTD.
18. MATSUSHITA ELECTRONIC CORPORATION (MALAYSIA) SDN BHD.
19. BEIJING MATSUSHITA COLOR CRT CO., LTD.
20. SAMSUNG SDI CO., LTD.
21. SAMSUNG SDI AMERICA, INC.
22. SAMSUNG SDI (MALAYSIA) SDN BHD.
23. SAMSUNG SDI MEXICO S.A. DE C.V.
24. SAMSUNG SDI BRASIL LTDA.
25. SHENZHEN SAMSUNG SDI CO., LTD.
26. TIANJIN SAMSUNG SDI CO., LTD.
27. SAMSUNG SDI (HONG KONG), LTD.
28. TOSHIBA CORPORATION
29. PT.MT PICTURE DISPLAY INDONESIA
30. TOSHIBA AMERICA INC.
31. TOSHIBA AMERICA CONSUMER PRODUCTS LLC
32. TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC.
33. TOSHIBA AMERICA INFORMATION SYSTEMS, INC.
34. TOSHIBA DISPLAY DEVICES (THAILAND) COMPANY, LTD.
35. THOMSON SA (N/K/A TECHNICOLOR SA)
36. THOMSON CONSUMER ELECTRONICS, INC. (N/K/A TECHNICOLOR USA, INC.)
37. VIDEOCON INDUSTRIES LTD.
38. TECHNOLOGIES DISPLAYS AMERICAS LLC
39. TECHNOLOGIES DISPLAYS MEXICANA, S.A. DE C.V.

1

### SUMMONS IN A CIVIL ACTION

2

### ATTACHMENT B

3

***Sharp Electronics Corporation; Sharp Electronics Manufacturing
Company of America v. Hitachi, Ltd., et. al.***

4

<u>Defendants' Names and Addresses:</u>

5    1.   HITACHI, LTD.
         6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan
6

7    2.   HITACHI DISPLAYS, LTD.
         AKS Building, 5F 6-2 Kanda Neribei-cho 3 Chiyoda-ku, Tokyo, 101-0022, Japan
8

9    3.   HITACHI AMERICA, LTD.
         50 Prospect Avenue, Tarrytown, New York
10

11   4.   HITACHI ASIA, LTD.
         7 Tampines Grandes, #08-01 Hitachi Square, Singapore 528736
12

13   5.   HITACHI ELECTRONIC DEVICES (USA), INC.
         208 Fairforest Way, Greenville, South Carolina 29607
14

15   6.   SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.
         5001 Huanggang Road, Futian District, Shenzhen 518035, China
16

17   7.   LG ELECTRONICS, INC.
         LG Twin Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea
18

19   8.   LG ELECTRONICS USA, INC.
         1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632
20

21   9.   LG ELECTRONICS TAIWAN TAIPEI CO., LTD.
         7F, No. 47, Lane 3, Chi Hu Road, NeiHu District, Taipei City, Taiwan
22

23   10.  LP DISPLAYS INTERNATIONAL, LTD.
         6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong
24

25   11.  MERIDIAN SOLAR & DISPLAY CO., LTD.
         184 Gongdan-Dong Kumi Ksb, South Korea
26

27   12.  LG.PHILIPS DISPLAYS HOLDING B.V.
         Zwaanstraat 2A, Eindhoven, 5651 CA, the Netherlands
28

     13.  LG.PHILIPS DISPLAYS INTERNATIONAL B.V.
         Postbus 3, 5600 AA Eindhoven, the Netherlands

14. PANASONIC CORPORATION
    1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan

15. PANASONIC CORPORATION OF NORTH AMERICA
    One Panasonic Way, Secaucus, New Jersey 07094

16. PANASONIC CONSUMER ELECTRONICS CO.
    One Panasonic Way, Secaucus, New Jersey 07094

17. MT PICTURE DISPLAY CO., LTD.
    1-15 Matsuo-Cho, Kadoma-shi, Osaka, 571-8504, Japan

18. MATSUSHITA ELECTRONIC CORPORATION (MALAYSIA) SDN BHD.
    Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam
    Malaysia 40000

19. BEIJING MATSUSHITA COLOR CRT CO., LTD.
    No. 9 Jiuxianqioa N. Rd., Dashanzi Chaoyang District, Beijing, China

20. SAMSUNG SDI CO., LTD.
    428 5 Gongse-dong, Giheung-gu Yongin 446577, South Korea

21. SAMSUNG SDI AMERICA, INC.
    85 West Tasman Dr. San Jose, California

22. SAMSUNG SDI (MALAYSIA) SDN BHD.
    Lots 635 & 660, Kawasan Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri
    Sembilan Darul Khusus, Malaysia

23. SAMSUNG SDI MEXICO S.A. DE C.V.
    Blvd. Los Olivos, No. 21014, Parque Industrial El Florida, Tijuana, B.C. Mexico

24. SAMSUNG SDI BRASIL LTDA.
    Av. Eixo Norte Sul, SIN, Distrito Industrial, 69088-480 Manaus, Amazonas, Brazil

25. SHENZHEN SAMSUNG SDI CO., LTD.
    No. 5003 Huanggang Bei Lu, Futian Gu, Shenzhen, China

26. TIANJIN SAMSUNG SDI CO., LTD.
    Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China

27. SAMSUNG SDI (HONG KONG), LTD.
    8/F., Central Plaza 18 Harbour Road Wanchai, Hong Kong

28. TOSHIBA CORPORATION
    1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan

29. PT.MT PICTURE DISPLAY INDONESIA
Kawasan EJIP Industrial Park Plot 3-G, Bekasi 17550, Desa Sukaresmi, Kecamatan Cikarang Selatan, Kabupaten Bekasi, Republic of Indonesia

30. TOSHIBA AMERICA INC.
1251 Avenue of the Americas, Suite 4110, New York, New York 10020

31. TOSHIBA AMERICA CONSUMER PRODUCTS LLC
82 Totawa Rd., Wayne, New Jersey 07470-3114

32. TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC.
19900 MacArthur Boulevard, Suite 400, Irvine, California 92612

33. TOSHIBA AMERICA INFORMATION SYSTEMS, INC.
9740 Irvine Blvd., Irvine, California 92618

34. TOSHIBA DISPLAY DEVICES (THAILAND) COMPANY, LTD.
142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathurn Thani, Thailand 12000

35. THOMSON SA (N/K/A TECHNICOLOR SA)
1-5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.

36. THOMSON CONSUMER ELECTRONICS, INC. (N/K/A TECHNICOLOR USA, INC.)
10330 N Meridian St., Indianapolis, IN 46290-1024

37. VIDEOCON INDUSTRIES LTD.
14, KM Stone, Chitegaon, Aurangabad 431005, India

38. TECHNOLOGIES DISPLAYS AMERICAS LLC
1778 Carr Road Ste 4B, Calexico, California 92231

39. TECHNOLOGIES DISPLAYS MEXICANA, S.A. DE C.V.
Calz. Robledo Industrial Colorad, Mexicali, B.C. 21384, Mexico

Stephen E. Taylor (SBN 058452)
Jonathan A. Patchen (SBN 237346)
TAYLOR & COMPANY LAW OFFICES, LLP
One Ferry Building, Suite 355
San Francisco, California 94111
Telephone: (415) 788-8200
Facsimile: (415) 788-8208
Email: staylor@tcolaw.com
Email: jpatchen@tcolaw.com

Kenneth A. Gallo (*pro hac vice to be submitted*)
Joseph J. Simons (*pro hac vice to be submitted*)
Craig A. Benson (*pro hac vice to be submitted*)
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, NW
Washington, DC 20006-1047
Telephone: (202) 223-7356
Facsimile: (202) 204-7356
Email: kgallo@paulweiss.com
Email: jsimons@paulweiss.com
Email: cbenson@paulweiss.com

*Attorneys for Plaintiffs Sharp Electronics Corporation,*
*Sharp Electronics Manufacturing Company of America, Inc.*

**FILED**
MAR 15 2013
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

*EDL*

| | |
|---|---|
| SHARP ELECTRONICS CORPORATION; SHARP ELECTRONICS MANUFACTURING COMPANY OF AMERICA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> HITACHI, LTD.; HITACHI DISPLAYS, LTD.; HITACHI AMERICA, LTD.; HITACHI ASIA, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.; LG ELECTRONICS, INC.; LG ELECTRONICS USA, INC.; LG ELECTRONICS TAIWAN TAIPEI CO., LTD.; LP DISPLAYS INTERNATIONAL, LTD.; MERIDIAN SOLAR & DISPLAY CO., LTD.; LG.PHILIPS DISPLAYS HOLDING B.V.; LG.PHILIPS DISPLAYS INTERNATIONAL B.V.; PANASONIC CORPORATION; PANASONIC CORPORATION OF NORTH AMERICA; PANASONIC CONSUMER ELECTRONICS CO.; MT PICTURE DISPLAY CO., LTD.; | **C 13 1173** <br><br> Case No. <br><br> **COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

COMPLAINT AND JURY DEMAND

MATSUSHITA ELECTRONIC CORPORATION
(MALAYSIA) SDN BHD.; BEIJING
MATSUSHITA COLOR CRT CO., LTD.;
SAMSUNG SDI CO., LTD.; SAMSUNG SDI
AMERICA, INC.; SAMSUNG SDI (MALAYSIA)
SDN BHD.; SAMSUNG SDI MEXICO S.A. DE
C.V.; SAMSUNG SDI BRASIL LTDA.;
SHENZHEN SAMSUNG SDI CO., LTD.; TIANJIN
SAMSUNG SDI CO., LTD.; SAMSUNG SDI
(HONG KONG), LTD.; TOSHIBA
CORPORATION; PT.MT PICTURE DISPLAY
INDONESIA; TOSHIBA AMERICA, INC.;
TOSHIBA AMERICA CONSUMER PRODUCTS
LLC; TOSHIBA AMERICA ELECTRONIC
COMPONENTS, INC.; TOSHIBA AMERICA
INFORMATION SYSTEMS, INC.; TOSHIBA
DISPLAY DEVICES (THAILAND) COMPANY,
LTD.; THOMSON SA (N/K/A TECHNICOLOR
SA); THOMSON CONSUMER ELECTRONICS,
INC. (N/K/A TECHNICOLOR USA, INC.);
VIDEOCON INDUSTRIES, LTD.;
TECHNOLOGIES DISPLAYS AMERICAS LLC;
TECHNOLOGIES DISPLAYS MEXICANA, S.A.
DE C.V.,

Defendants.

- 2 -

COMPLAINT AND JURY DEMAND

1

## TABLE OF CONTENTS

2
$\phantom{x}$ Page

3   I.   INTRODUCTION ........................................................................1

4   II.   JURISDICTION AND VENUE ........................................................3

5   III.   MULTIDISTRICT AND INTRADISTRICT ASSIGNMENT ....................5

6   IV.   PARTIES ..................................................................................6

7       A.   Plaintiffs....................................................................6

8       B.   Defendants ................................................................7

9   V.   AGENTS AND CO-CONSPIRATORS ..........................................20

10   VI.   TRADE AND COMMERCE .........................................................26

11   VII.   FACTUAL ALLEGATIONS .........................................................26

12       A.   CRT Technology and Products......................................26

13       B.   Structure of the CRT Industry ......................................27

14            1.   Market Concentration ..........................................28

15            2.   Information Sharing ............................................28

16            3.   Consolidation....................................................28

17            4.   High Costs of Entry into the Industry.......................28

18            5.   Homogeneity of CRTs.........................................29

19       C.   International Antitrust Investigations ...............................29

20       D.   Pre-Conspiracy Market................................................33

21       E.   Defendants' and Co-conspirators' Illegal Agreements.............33

22            1.   "Glass Meetings" ...............................................35

23            2.   *Bilateral Discussions* ...........................................39

24            3.   Defendants' and Co-conspirators' Participation in Group
25                and Bilateral Discussions........................................40

26       F.   The CRT Market During the Conspiracy ...........................47

      G.   Effects of Defendants' Antitrust Violations .........................48
27

28            1.   Examples of Collusive Pricing for CRTs ....................48

- i -

2.    Examples of Reductions in Manufacturing Capacity by
                Defendants ........................................................................................49

        H.    Summary of Effects of the Conspiracy Involving CRTs .........................................50

VIII.   PLAINTIFFS' INJURIES ..........................................................................................50

IX.     TOLLING ..................................................................................................................51

X.      FRAUDULENT CONCEALMENT .........................................................................52

XI.     CLAIM FOR VIOLATIONS .....................................................................................54

FIRST CLAIM FOR RELIEF  (VIOLATION OF SECTION 1 OF THE
        SHERMAN ACT, 15 U.S.C. § 1)..........................................................................54

SECOND CLAIM FOR RELIEF (VIOLATION OF THE CALIFORNIA
        CARTWRIGHT ACT) .........................................................................................55

THIRD CLAIM FOR RELIEF (VIOLATION OF CALIFORNIA UNFAIR
        COMPETITION LAW)........................................................................................57

FOURTH CLAIM FOR RELIEF (VIOLATION OF THE NEW YORK
        DONNELLY ACT) ...............................................................................................58

FIFTH CLAIM FOR RELIEF (VIOLATION OF NEW YORK UNFAIR
        COMPETITION LAW)........................................................................................59

SIXTH CLAIM FOR RELIEF (NEW JERSEY ANTITRUST ACT, N.J. STAT. §
        56:9-1 *ET SEQ.*)....................................................................................................60

SEVENTH CLAIM FOR RELIEF (VIOLATION OF TENNESSEE CODE ANN.
        §§ 47-258-101 *ET SEQ.*) ........................................................................................61

XII.    DAMAGES.................................................................................................................62

XIII.   PRAYER FOR RELIEF .............................................................................................62

XIV.    JURY TRIAL DEMANDED......................................................................................64

COMPLAINT AND JURY DEMAND

1       Plaintiffs Sharp Electronics Corporation and Sharp Electronics Manufacturing

2 Company of America, Inc., ("Sharp" or "Plaintiffs"), bring this action for damages and

3 injunctive relief under the antitrust laws of the United States and under the antitrust and fair

4 competition laws of California, New York, New Jersey, and Tennessee.  Sharp alleges the

5 following based on personal knowledge, investigation by counsel, and publically available

6 materials, including publicly available materials from *In re Cathode Ray Tube (CRT) Antitrust*

7 *Litigation*, 3:07-cv-5944-SC (N.D. Cal.), MDL No. 1917, the U.S. Department of Justice

8 ("DOJ") website and other publicly available information regarding related criminal proceedings

9 by the DOJ, the findings of the Japanese Fair Trade Commission ("JFTC"), the Korean Fair

10 Trade Commission ("KFTC"), the European Commission ("EC"), and upon information and

11 belief.

12 **I.     INTRODUCTION**

13       1.     Sharp brings this action to recover damages on account of the antitrust injuries it

14 incurred as a result of a long-running conspiracy by suppliers of cathode ray tubes ("CRTs") to

15 coordinate and fix the prices of CRTs and exchange detailed competitive information.  The

16 resulting damages include, but are not limited to, overcharges which Sharp paid, directly or

17 indirectly, as a result of purchases in the United States.

18       2.     Defendants and their co-conspirators formed an international cartel that conducted

19 a long-running conspiracy extending at a minimum from at least March 1, 1995, through at least

20 December 2007 (the "Relevant Period").  The purpose and effect of this conspiracy was to fix,

21 raise, stabilize, and maintain prices for CRTs.

22       3.     Defendants are or were among the leading manufacturers of: (a) color picture

23 tubes ("CPTs"), *which are CRTs used primarily in color televisions; (b) color display tubes*

24 ("CDTs"), which are CRTs used primarily in color computer monitors; and (c) electronic devices

25 containing CPTs (such as televisions) or CDTs (such as computer monitors).  For purposes of

26 this Complaint, CPTs and CDTs of all sizes will be referred to collectively as "CRTs".  Also for

27 purposes of this Complaint, CRTs and/or the products containing CRTs shall be referred to

28 collectively as "CRT Products."

4.        Defendants control, or did control, the majority of the CRT industry, a multibillion dollar market, which in 1999 alone generated over $19 billion dollars in gross revenue.  During the Relevant Period, virtually every household in the United States owned at least one CRT Product.

5.        In order to maintain price stability, increase profitability, and decrease the erosion of pricing in the CRT market, Defendants conspired, combined and contracted to fix, raise, maintain, and stabilize the price at which CRTs were sold in the United States.

6.        With respect to CRTs, Defendants or their agents agreed, *inter alia*, to: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production, and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and discuss the reconciliation of accounts; (g) allocate market share of overall sales; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.  Defendants' conspiracy also included agreements on the prices at which certain Defendants would sell CRTs to their own corporate subsidiaries and affiliates that manufactured finished products containing CRTs, such as televisions and computer monitors.  Defendants realized the importance of keeping the internal pricing to their subsidiaries and affiliated original equipment manufacturers (OEMs) at a high enough level to support the CRT pricing in the market to other OEMs.

7.        The conspiracy concerning CRTs commenced with bilateral meetings that began in at least March of 1995 and continued throughout the Relevant Period.  Also beginning in 1995, the co-conspirators began to engage in informal group meetings.  By 1997, these group meetings had become more formalized, as described in greater detail below.  There were at least 500 multilateral and bilateral meetings during the Relevant Period, including hundreds of multilateral meetings and hundreds of bilateral meetings.  These meetings occurred in various locales, including Taiwan, South Korea, Indonesia, Thailand, Singapore, Malaysia, China, the

- 2 -

1   U.K. and elsewhere in Europe. These meetings included representatives from the highest levels

2   of the respective companies, as well as regional managers and others.

3        8.      During the Relevant Period, the conspiracy affected billions of dollars of

4   commerce throughout the United States.

5        9.      This conspiracy is being investigated by the DOJ and has been investigated by

6   multiple foreign competition authorities, including the JFTC, KFTC, and EC. The first

7   participant to be indicted by the DOJ was C.Y. Lin, the former Chairman and CEO of Chunghwa

8   Picture Tubes, Ltd., who had a two-count indictment issued against him by a federal grand jury

9   in San Francisco on February 10, 2009. Since then, five additional individuals have been

10  indicted in connection with Defendants' CRT price-fixing conspiracy.

11       10.     On March 18, 2011, the DOJ issued a press release announcing that it had reached

12  an agreement with Samsung SDI in which Samsung SDI would plead guilty and pay a $32

13  million fine for its role in a conspiracy to fix prices of CDTs. On May 12, 2011, the United

14  States and Samsung SDI entered into an amended plea agreement, where Samsung SDI pled

15  guilty to violating the Sherman Act, 15 U.S.C. § 1, from at least as early as January 1997, until at

16  least as late as March 2006.

17       11.     During the Relevant Period, Plaintiffs purchased CRT Products in the United

18  States and elsewhere directly and indirectly from Defendants and their co-conspirators, and/or

19  Defendants' and their co-conspirators' subsidiaries and affiliates, and/or any agents Defendants

20  or Defendants' subsidiaries and affiliates controlled, including but not limited to joint ventures.

21  Plaintiffs thus suffered damages as a result of Defendants' conspiracy, and brings this action to

22  recover the overcharges paid for the CRT Products they purchased during the Relevant Period.

23  **II.    JURISDICTION AND VENUE**

24       12.     Plaintiffs bring this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, and

25  Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain injunctive relief and to

26  recover damages, including treble damages, costs of suit, and reasonable attorneys' fees, arising

27  from Defendants' and their co-conspirators' violations of the Sherman Act. Jurisdiction also

28  exists under the Foreign Trade and Antitrust Improvement Act, 15 U.S.C. § 6a, because

- 3 -

COMPLAINT AND JURY DEMAND

1   Defendants' and their co-conspirators' conduct had a direct, substantial, and reasonably

2   foreseeable effect on United States domestic commerce, and such effect gave rise to Sharp's

3   claims alleged herein.

4           13.     Plaintiffs also bring this action pursuant to Section 16750(a) of the California

5   Business and Professions Code, for injunctive relief and treble damages that Plaintiffs sustained

6   due to Defendants' and their co-conspirators' violation of Section 16700 *et seq.* of the California

7   Business and Professions Code (the "Cartwright Act"). Plaintiffs' claims are also brought

8   pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain

9   restitution from and an injunction against Defendants due to their violations of Section 17200 *et*

10  *seq.* of the California Business and Professions Code (the "California Unfair Competition Act").

11          14.     Plaintiffs also bring this action pursuant to Section 340 of the New York General

12  Business Law, for injunctive relief and treble damages that Plaintiffs sustained due to

13  Defendants' and their co-conspirators' violation of Section 340 *et seq.* of the New York General

14  Business Law (the "Donnelly Act"). Plaintiffs' claims are also brought pursuant to Section 349

15  of the New York General Business Law, to obtain restitution from and an injunction against

16  Defendants due to their violations of Section 349 *et seq.* of the New York General Business Law

17  (the "New York Unfair Competition Act").

18          15.     Plaintiffs also bring this action pursuant to N.J. Stat. § 56:9-1 *et seq.*, for

19  injunctive relief and damages that Plaintiffs sustained due to Defendants' and their co-

20  conspirators' violation of N.J. Stat. Section 56:9-1 *et seq.* ("New Jersey Antitrust Act").

21          16.     Plaintiffs also bring this action pursuant to Tenn. Code. Ann. §§ 47-258-101 *et*

22  *seq.*, for injunctive relief and damages that Plaintiffs sustained due to Defendants' and their co-

23  conspirators' violation of Tenn. Code. Ann. §§ 47-258-101 *et seq.*

24          17.     This Court has jurisdiction over Plaintiffs' claims arising under Section 1 of the

25  Sherman Act and Sections 4 and 16 of the Clayton Act pursuant to 28 U.S.C. §§ 1331, and

26  1337(a). Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over Plaintiffs'

27  state antitrust and unfair competition claims because they are so related to Plaintiffs' Sherman

28  Act and Clayton Act claims that they form part of the same case and controversy.

- 4 -

1    18.    The activities of Defendants and their co-conspirators, as described herein,

2    involved U.S. import trade or commerce and/or were within the flow of, were intended to, and

3    did have a direct, substantial, and reasonably foreseeable effect on United States domestic and

4    import trade or commerce. This effect gave rise to Plaintiffs' antitrust claims. During the

5    Relevant Period, Defendants' and their co-conspirators' conspiracy affected the prices of CRT

6    Products in the United States, and specifically the CRT Products Plaintiffs purchased in the

7    United States.

8    19.    This Court has jurisdiction over each Defendant named in this action under

9    Section 12 of the Clayton Act, 15 U.S.C. § 22 and Cal. Civ. Code § 410.10. Each Defendant

10   conducts substantial business in the state of California, and a number of Defendants and their co-

11   conspirators maintain their headquarters in this District or elsewhere in California. In addition,

12   Defendants all purposefully availed themselves of the laws of the United States and California

13   insofar as they manufactured, marketed, or distributed CRT Products in the United States and

14   California, and several co-conspirators have admitted that they engaged in conduct in furtherance

15   of the conspiracy in the Northern District of California.

16   20.    Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15 and 22, and

17   28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this

18   District, or is otherwise found within this District. In addition, venue is proper in this District

19   under 28 U.S.C. § 1391 because a substantial part of the events or admissions giving rise to this

20   claim occurred in this District. Defendants and their co-conspirators knew that affected CRT

21   Products would be sold and shipped into this District.

22   **III.    MULTIDISTRICT AND INTRADISTRICT ASSIGNMENT**

23   21.    This action concerns substantially the same defendants, co-conspirators,

24   transactions and events that are involved in Case No. 3:07-cv-5944-SC (N.D. Cal.) before the

25   Honorable Samuel Conti in the San Francisco Division, insofar as it involves a suit for damages

26   and injunctive relief arising out of the conspiracy to fix the price of CRTs or restrain the output

27   of CRTs in violation of the Sherman Act and state law.

28

- 5 -

# IV.    PARTIES

## A.    Plaintiffs

22.    Plaintiff Sharp Electronics Corporation ("Sharp Electronics") is a New York corporation, with its principal place of business in Mahwah, New Jersey.  Sharp Electronics is the wholly owned U.S. sales and marketing subsidiary of Osaka-based Sharp Corporation.

23.    Sharp Manufacturing Company of America, Inc. ("SMCA") is a division of Sharp Electronics, with its principal place of business in Memphis, Tennessee.

24.    Plaintiff Sharp Electronics Manufacturing Company of America, Inc. ("SEMA") is a corporation organized and existing under the laws of California and has its principal place of business in San Diego, California.  SEMA is a wholly owned subsidiary of Sharp Electronics.

25.    Sharp Electronica Mexico, S.A. de C.V. ("SEMEX") is a *maquiladora* company (manufacturing facility).  SEMEX is 99% owned by SEMA, and 1% owned by Sharp Electronics.

26.    Sharp Electronics and SEMA are sometimes referred to collectively herein as "Sharp" or "Plaintiffs."

27.    During the Relevant Period, Sharp Electronics, directly and through its subsidiaries, purchased substantial amounts of CRTs manufactured by Defendants and/or their subsidiaries, their co-conspirators, and others, in the United States for incorporation into CRT televisions ("CRT TVs").  As a result of Defendants' and their co-conspirators' conspiracy, Sharp Electronics was injured in its business and property because the prices it paid for such CRTs and CRT Products were artificially inflated by that conspiracy.

28.    During the Relevant Period, SMCA purchased substantial amounts of CRTs manufactured by Defendants and/or their subsidiaries, their co-conspirators, and others, in the United States, for incorporation into CRT TVs.  SMCA issued purchases orders from and received invoices for its CRT Product purchases at its offices in Tennessee.  As a result of Defendants' and their co-conspirators' conspiracy, SMCA was injured in its business and property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

- 6 -

29.     During the Relevant Period, SEMA purchased and invoiced substantial amounts of CRTs manufactured by Defendants and/or their subsidiaries, their co-conspirators, and others, in the United States that were then sent to SEMEX for assembly into CRT TVs. SEMA issued purchases orders from and received invoices for its CRT Product purchases at its offices in California. After the manufacturing process was complete, all of the finished televisions were shipped FOB back to SEMA in San Diego, California. SEMA retained ownership of the CRTs throughout the entire manufacturing process. Additionally, SEMA recognized all of the revenue from the sales of CRT TVs. As a result of Defendants' and their co-conspirators' conspiracy, SEMA was injured in its business and property because the prices it paid for such CRTs were artificially inflated by that conspiracy.

30.     Plaintiffs also purchased, directly and/or through their subsidiaries, CRT Products, including, but not limited to, from third party system integrators and OEMs, that contained CRTs manufactured by Defendants and/or their subsidiaries, and/or their co-conspirators, in the United States.

31.     During the Relevant Period, Sharp's negotiations for the purchase of CRTs took place in the United States. In addition, Sharp issued purchase orders for CRTs from the United States and invoices for those CRT purchases were sent to Sharp in the United States.

**B.      Defendants**

**Hitachi Entities**

32.     Defendant Hitachi, Ltd. is a Japanese company with its principal executive office at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan. Hitachi, Ltd. is the parent company for the Hitachi brand of CRT Products. In 1996, Hitachi. Ltd.'s worldwide market share for color CRTs was 20 percent. During the Relevant Period, Hitachi, Ltd. manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

33.     Defendant Hitachi Displays, Ltd. ("Hitachi Displays") (now known as Japan Display East, Inc.) is a Japanese company with its principal place of business located at AKS Building. 5F 6-2 Kanda Neribei-cho 3 Chiyoda-ku, Tokyo, 101-0022, Japan. Hitachi Displays,

- 7 -

1    Ltd. was originally established as Mobara Works of Hitachi, Ltd. in Mobara City, Japan, in 1943.

2    In 2002, all the departments of planning, development, design, manufacturing and sales

3    concerned with the display business of Hitachi, Ltd. were spun off to create a separate company

4    called Hitachi Displays. During the Relevant Period, Hitachi Displays manufactured, marketed,

5    sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates

6    throughout the United States. Defendant Hitachi, Ltd. dominated and/or controlled the finances,

7    policies and/or affairs of Hitachi Displays relating to the antitrust violations alleged in this

8    Complaint.

9         34.     Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company

10   with its principal place of business at 50 Prospect Avenue, Tarrytown, New York. Hitachi

11   America is a wholly owned and controlled subsidiary of Defendant Hitachi, Ltd. During the

12   Relevant Period, Hitachi America manufactured, marketed, sold and/or distributed CRT

13   Products, either directly or through its subsidiaries or affiliates, throughout the United States.

14   Hitachi, Ltd. dominated and/or controlled the finances, policies and/or affairs of Hitachi America

15   relating to the antitrust violations alleged in this Complaint.

16        35.     Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singaporean company with its

17   principal place of business at 7 Tampines Grandes, #08-01 Hitachi Square, Singapore 528736.

18   Hitachi Asia is a wholly owned and controlled subsidiary of Hitachi, Ltd. During the Relevant

19   Period, Hitachi Asia manufactured, marketed, sold, and/or distributed CRT Products either

20   directly or through its subsidiaries or affiliates throughout the United States. Hitachi, Ltd.

21   dominated and/or controlled the finances, policies and/or affairs of Hitachi Asia relating to the

22   antitrust violations alleged in this Complaint.

23        36.     *Defendant Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware*

24   corporation with its principal place of business at 208 Fairforest Way, Greenville, South Carolina

25   29607. HEDUS is a subsidiary of Defendant Hitachi, Ltd and Hitachi Displays. During the

26   Relevant Period, HEDUS manufactured, marketed, sold, and/or distributed CRT Products either

27   directly or through its subsidiaries or affiliates throughout the United States. Hitachi, Ltd.

28

- 8 -

COMPLAINT AND JURY DEMAND

1  dominated and/or controlled the finances, policies and/or affairs of HEDUS relating to the
2  antitrust violations alleged in this Complaint.

3      37.   Defendant Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi
4  Shenzhen") was a Chinese company with its principal place of business located at 5001
5  Huanggang Road, Futian District, Shenzhen 518035, China. Hitachi Displays, Ltd. owned at
6  least a 25% interest in Hitachi Shenzhen until November 8, 2007 (around the time that the
7  government investigations into the CRT industry began). Thus, Hitachi Shenzhen was a member
8  of the Hitachi corporate group for all but the last few weeks of the Relevant Period. During the
9  Relevant Period, Hitachi Shenzhen manufactured, marketed, sold, and/or distributed CRT
10 Products either directly or through its subsidiaries or affiliates throughout the United States.
11 Hitachi, Ltd. and Hitachi Displays dominated and/or controlled the finances, policies and/or
12 affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this Complaint.

13     38.   Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, Hitachi Asia, Hitachi
14 Shenzhen and HEDUS are collectively referred to herein as "Hitachi."

15     **LG Electronics Entities**

16     39.   Defendant LG Electronics, Inc. ("LGEI") is a corporation organized under the
17 laws of the Republic of Korea with its principal place of business located at LG Twin Towers 20,
18 Yeouido-dong, Yeongdeungpo-gu, Seoul 150-721, South Korea. LG is a $48.97 billion global
19 force in consumer electronics, home appliances, and mobile communications. It established its
20 first overseas branch office in New York in 1968. The company's name was changed from Gold
21 Star Communications to LGEI in 1995. In 2001, LGEI entered into a 50/50 joint venture with
22 Koninklijke Philips Electronics N.V. called LG.Philips Displays ("LGPD"), in which the entities
23 *combined their CRT businesses. On April 1, 2007, LGPD became an independent company and*
24 changed its name to LP Displays International, Ltd. During the Relevant Period, LGEI
25 manufactured, marketed, sold, and/or distributed CRT Products either directly or through its
26 subsidiaries or affiliates throughout the United States.

27     40.   Defendant LG Electronics USA, Inc. ("LGEUSA") is a Delaware corporation
28 with its principal place of business at 1000 Sylvan Ave., Englewood Cliffs, New Jersey 07632.

- 9 -

COMPLAINT AND JURY DEMAND

1  LGEUSA is a wholly owned and controlled subsidiary of Defendant LGEI. During the Relevant

2  Period, LGEUSA manufactured, marketed, sold, and/or distributed CRT Products either directly

3  or through its subsidiaries or affiliates throughout the United States. Defendant LGEI dominated

4  and/or controlled the finances, policies and/or affairs of LGEUSA relating to the antitrust

5  violations alleged in this Complaint.

6      41.    Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese

7  entity with its principal place of business located at 7F, No. 47, Lane 3, Chi Hu Road, NeiHu

8  District, Taipei City, Taiwan. LGETT is a wholly owned and controlled subsidiary of LGEI.

9  During the Relevant Period, LGETT manufactured, marketed, sold, and/or distributed CRT

10 Products either directly or through its subsidiaries or affiliates throughout the United States.

11 Defendant LGEI dominated and/or controlled the finances, policies, and/or affairs of LGETT

12 relating to the antitrust violations alleged in this Complaint.

13     42.    Defendants LGEI, LGEUSA, and  LGETT are referred to collectively herein as

14 "LG Electronics."

15     **LP Displays**

16     43.    Defendant LP Displays International, Ltd. ("LP Displays International") is a Hong

17 Kong company located at 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan,

18 Hong Kong. LP Displays International is the successor entity to LGPD, which was created in

19 2001 as a 50/50 joint venture between LGEI and Royal Philips. In March 2007, LP Displays

20 International became an independent company. LP Displays International is a leading supplier

21 of CRTs for use in television sets and computer monitors. LP Displays International announced

22 in March 2007 that Royal Philips and LGEI would cede control over the company, and the

23 shares would be owned by financial institutions and private equity firms. Prior to March 2007,

24 LGEI and/or Royal Philips dominated and/or controlled the finances, policies, and/or affairs of

25 LP Displays International relating to the antitrust violations alleged in this Complaint. During

26 the Relevant Period, LP Displays International manufactured, marketed, sold, and/or distributed

27 CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

28

- 10 -

1    44.    Defendant LG.Philips Displays Holding B.V. is a Dutch company located at
2  Zwaanstraat 2A, Eindhoven, 5651 CA, the Netherlands.   Prior to undergoing bankruptcy
3  proceedings, LGEI and Philips had consolidated their global CRT businesses in LG.Philips
4  Displays Holding, with LP Displays International managing the activities of the LPD Group
5  worldwide.

6    45.    Defendant LG.Philips Displays International B.V. is a Dutch company located at
7  Postbus 3, 5600 AA Eindhoven, the Netherlands, registered with the Chamber of Commerce
8  under number 34154.55.   During the LPD Group's bankruptcy proceedings, the viable LPD
9  businesses were transferred to LG.Philips Displays International B.V., including LP Displays
10  International, Ltd.

11    46.    Defendant Meridian Solar & Display Co., Ltd. ("Meridian"), is a Korean
12  company located at 184 Gongdan-Dong Kumi Ksb, South Korea.   As described in the JFTC's
13  October 2009 Announcement regarding the CRT cartel, LG Philips Display Korea, Co. (LPD
14  Korea) transferred its business of manufacturing and selling cathode ray tubes for televisions to
15  Meridian Solar & Display Co., Ltd. on July 21, 2009.

16    47.    Defendants LP Displays International, LG.Philips Displays Holding B.V.,
17  LG.Philips Displays International B.V., and Meridian are referred to collectively herein as "LP
18  Displays."

19    **Panasonic Entities**

20    48.    Defendant Panasonic Corporation, which at all times during the Relevant Period
21  was known as Matsushita Electric Industrial Co., Ltd. (referred to hereafter as either Panasonic
22  or MEI) and only became Panasonic Corporation on October 1, 2008, is a Japanese entity located
23  at 1006, Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.   The entity known as MEI
24  operated under that name until October 1, 2008 when it changed its name to Panasonic
25  Corporation.   During the Relevant Period, MEI manufactured, marketed, sold and/or distributed
26  CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

27    49.    Defendant Panasonic Corporation of North America ("PCNA") is a Delaware
28  corporation with its principal place of business at One Panasonic Way, Secaucus, New Jersey

- 11 -

1    07094. PCNA is a wholly owned and controlled subsidiary of Defendant Panasonic Corporation.

2    During the Relevant Period, PCNA manufactured, marketed, sold and/or distributed CRT

3    Products either directly or through its subsidiaries or affiliates, throughout the United States.

4    Panasonic Corporation dominated and/or controlled the finances, policies, and/or affairs of

5    PCNA relating to the antitrust violations alleged in this Complaint.

6         50.    Defendant Panasonic Consumer Electronics Co. ("PACEC") is a Delaware

7    corporation with its principal place of business at One Panasonic Way, Secaucus, New Jersey

8    07094. PACEC is a subsidiary of Defendant PCNA. During the Relevant Period, PACEC

9    manufactured, marketed, sold and/or distributed CRT Products either directly or through its

10   subsidiaries or affiliates throughout the United States. Panasonic Corporation dominated and/or

11   controlled the finances, policies, and/or affairs of PACEC relating to the antitrust violations

12   alleged in this Complaint.

13        51.    Defendant MT Picture Display Co., Ltd., f/k/a Matsushita Toshiba Picture

14   Display Co., Ltd., f/k/a Matsushita Toshiba Picture Display Co., Ltd. ("MTPD") is a Japanese

15   entity located at 1-15 Matsuo-Cho, Kadoma-shi, Osaka, 571-8504, Japan. In 2002, Panasonic

16   entered into a joint venture with Defendant Toshiba Corporation called Matsushita Toshiba

17   Picture Display Co., Ltd. to manufacture CRTs. Panasonic Corporation was the majority owner

18   with a 64.5 percent interest. On April 3, 2007, MEI purchased the remaining 35.5 percent stake

19   in the joint venture, making it a wholly owned subsidiary of Panasonic Corporation, and

20   renaming it MT Picture Display Co., Ltd. During the Relevant Period, MTPD manufactured,

21   marketed, sold and/or distributed CRT Products, either directly or through its subsidiaries or

22   affiliates, throughout the United States. Panasonic Corporation dominated and/or controlled the

23   finances, policies, and/or affairs of MTPD relating to the antitrust violations alleged in this

24   Complaint.

25        52.    Defendant Matsushita Electronic Corporation (Malaysia) Sdn Bhd. ("Matsushita

26   Malaysia") was a Malaysian entity located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah

27   Alam Industrial Site, Shah Alam Malaysia 40000. Matsushita Malaysia was a wholly owned and

28   controlled subsidiary of Panasonic Corporation, which then transferred it to MT Picture Display

- 12 -

1  Co. in 2003. It was renamed MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly

2  owned subsidiary of MTPD until its closure in 2006. During the Relevant Period, Matsushita

3  Malaysia manufactured, marketed, sold and/or distributed CRTs manufactured by MEI either

4  directly or through its subsidiaries or affiliates. Panasonic Corporation dominated and/or

5  controlled the finances, policies, and/or affairs of Matsushita Malaysia relating to the antitrust

6  violations alleged in this Complaint.

7       53.    Defendant Beijing Matsushita Color CRT Co., Ltd. ("BMCC") is a Chinese

8  company with its principal place of business located at No. 9 Jiuxianqioa N. Rd., Dashanzi

9  Chaoyang District, Beijing, China. BMCC is a joint venture company, 50% of which is held by

10 Defendant MTPD. Formed in 1987, BMCC was Panasonic Corporation's first CRT

11 manufacturing facility in China. BMCC is the second largest producer of CRTs for televisions in

12 China. During the Relevant Period, BMCC manufactured, marketed, sold and/or distributed

13 CRT Products, either directly or through its subsidiaries or affiliates, throughout the United

14 States. Panasonic Corporation dominated and/or controlled the finances, policies, and/or affairs

15 of BMCC relating to the antitrust violations alleged in this Complaint.

16      54.    PT.MT Picture Display Indonesia is an Indonesian company located at Kawasan

17 EJIP Industrial Park Plot 3-G, Bekasi 17550, Desa Sukaresmi, Kecamatan Cikarang Selatan,

18 Kabupaten Bekasi, Republic of Indonesia. In December 1995, TC partnered with Orion

19 Electronic Co. and two other entities to form P.T. Tosummit Electronic Devices Indonesia

20 ("TEDI") in Indonesia. TEDI was projected to have an annual production capacity of 2.3 million

21 CRTs by 1999. In 2002, TC entered into a joint venture with Defendant MEI (now Panasonic

22 Corporation) called Matsushita Toshiba Picture Display Co., Ltd., in which the entities

23 consolidated their CRT businesses. In 2003, TEDI was transferred to Defendant MTPD, TC's

24 joint venture with Panasonic Corporation, and its name was changed to PT.MT Picture Display

25 Indonesia. During the Relevant Period, PT.MT Picture Display manufactured, marketed, sold

26 and/or distributed CRT Products, either directly or through its subsidiaries or affiliates,

27 throughout the United States. Toshiba Corporation (when it was TEDI) and then Panasonic

28

- 13 -

1  Corporation dominated and/or controlled the finances, policies, and/or affairs of PT.MT Picture

2  Display relating to the antitrust violations alleged in this Complaint.

3       55.     Defendants Panasonic Corporation (f/k/a MEI), MTPD, Matsushita Malaysia,

4  PCNA, PACEC, PT.MT Picture Display and BMCC are collectively referred to herein as

5  "Panasonic."

6       **Samsung Entities**

7       56.     Defendant Samsung SDI Co., Ltd. f/k/a Samsung Display Device Company

8  ("Samsung SDI") is a South Korean company with its principal place of business at 428 5

9  Gongse-dong, Giheung-gu Yongin 446577, South Korea.  Samsung SDI is a public company.

10  Founded in 1970, Samsung SDI claims to be the world's leading company in the display and

11  energy business, with 12,000 employees and facilities in 16 countries.  Samsung SDI is one of

12  the largest CRT producers in the world.  Samsung SDI was the top manufacturer for CRTs in

13  2000, with a market share of approximately 20%.  In 2002, Samsung SDI held a 34.3%

14  worldwide market share in the market for CRTs; more than any other producer.  Samsung SDI

15  has offices in Chicago and San Diego.  During the Relevant Period, Samsung SDI manufactured,

16  marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or

17  affiliates throughout the United States.

18       57.     Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California

19  corporation with its principal place of business at 85 West Tasman Dr., San Jose, California.

20  Samsung America is subsidiary of Defendant Samsung SDI.  During the Relevant Period,

21  Samsung SDI America manufactured, marketed, sold, and/or distributed CRT Products either

22  directly or through its subsidiaries or affiliates throughout the United States.   Defendant

23  Samsung SDI dominated and/or controlled the finances, policies, and/or affairs of Samsung SDI

24  America relating to the antitrust violations alleged in this Complaint.

25       58.     Defendant Samsung SDI (Malaysia) Sdn Bhd. ("Samsung SDI Malaysia") is a

26  Malaysian corporation with its principal place of business at Lots 635 & 660, Kawasan

27  Perindustrian, Tuanku Jafaar, 71450 Sungai Gadut, Negeri Sembilan Darul Khusus, Malaysia.

28  Samsung SDI Malaysia is a subsidiary of Samsung SDI.  During the Relevant Period, Samsung

- 14 -

1   SDI Malaysia manufactured, marketed, sold, and/or distributed CRT Products either directly or

2   through its subsidiaries or affiliates throughout the United States.  Defendant Samsung SDI

3   dominated and/or controlled the finances, policies, and/or affairs of Samsung SDI Malaysia

4   relating to the antitrust violations alleged in this Complaint.

5          59.     Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a

6   Mexican company with its principal place of business located at Blvd. Los Olivos, No. 21014,

7   Parque Industrial El Florida, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a subsidiary of

8   Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Mexico manufactured,

9   marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or

10  affiliates throughout the United States.  Defendant Samsung SDI dominated and/or controlled the

11  finances, policies, and/or affairs of Samsung SDI Mexico relating to the antitrust violations

12  alleged in this Complaint.

13         60.     Defendant Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian

14  company with its principal place of business located at Av. Eixo Norte Sul, SIN, Distrito

15  Industrial, 69088-480 Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a subsidiary of

16  Defendant Samsung SDI.  During the Relevant Period, Samsung SDI Brazil manufactured,

17  marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or

18  affiliates throughout the United States.  Defendant Samsung SDI dominated and/or controlled the

19  finances, policies, and/or affairs of Samsung SDI Brazil relating to the antitrust violations

20  alleged in this Complaint.

21         61.     Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a

22  Chinese company with its principal place of business located at No. 5003 Huanggang Bei Lu,

23  *Futian Gu, Shenzhen, China.  Samsung SDI Shenzhen is a subsidiary of Defendant Samsung*

24  SDI.  During the Relevant Period, Samsung SDI Shenzhen manufactured, marketed, sold, and/or

25  distributed CRT Products either directly or through its subsidiaries or affiliates throughout the

26  United States.  Defendant Samsung SDI dominated and/or controlled the finances, policies,

27  and/or affairs of Samsung SDI Shenzhen relating to the antitrust violations alleged in this

28  Complaint.

- 15 -

1    62.    Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese

2    company with its principal place of business located at Developing Zone of Yi-Xian Park,

3    Wuqing County, Tianjin, China.  Samsung SDI Tianjin is a subsidiary of Defendant Samsung

4    SDI.  During the Relevant Period, Samsung SDI Tianjin manufactured, marketed, sold, and/or

5    distributed CRT Products either directly or through its subsidiaries or affiliates throughout the

6    United States.  Defendant Samsung SDI dominated and/or controlled the finances, policies,

7    and/or affairs of Samsung SDI Tianjin relating to the antitrust violations alleged in this

8    Complaint.

9    63.    Defendant Samsung SDI (Hong Kong), Ltd. ("Samsung SDI HK") is a Hong

10   Kong corporation with its principal place of business at 8/F., Central Plaza 18 Harbour Road

11   Wanchai, Hong Kong. During the Relevant Period, Samsung SDI HK manufactured, marketed,

12   sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates

13   throughout the United States.  Defendant Samsung SDI dominated and/or controlled the

14   finances, policies, and/or affairs of Samsung SDI HK relating to the antitrust violations alleged

15   in this Complaint.

16   64.    Defendants Samsung SDI, Samsung SDI America, Samsung SDI Mexico,

17   Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin, Samsung SDI Malaysia,

18   and Samsung SDI HK are collectively referred to herein as "Samsung."

19   **Toshiba Entities**

20   65.    Defendant Toshiba Corporation ("TC") is a Japanese company with its principal

21   place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001,

22   Toshiba held a 5 to 10 percent worldwide market share for CRTs used in televisions and in

23   computer monitors. In December 1995, TC partnered with Orion Electronic Co. and two other

24   entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was

25   projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, TC

26   entered into a joint venture with Defendant MEI (now Panasonic Corporation) called Matsushita

27   Toshiba Picture Display Co., Ltd., in which the entities consolidated their CRT businesses.  In

28   2003, TEDI was transferred to Defendant MTPD, TC's joint venture with Panasonic

- 16 -

1   Corporation, and its name was changed to PT.MT Picture Display Indonesia. During the

2   Relevant Period, TC manufactured, marketed, sold, and/or distributed CRT Products either

3   directly or through its subsidiaries or affiliates throughout the United States.

4         66.     Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation

5   with its principal place of business at 1251 Avenue of the Americas, Suite 4110, New York, New

6   York 10020. Toshiba America is a wholly owned and controlled subsidiary of Defendant TC.

7   During the Relevant Period, Toshiba America manufactured, marketed, sold, and/or distributed

8   CRT Products either directly or through its subsidiaries or affiliates (such as Toshiba Hawaii,

9   Inc.) throughout the United States. Defendant TC dominated and/or controlled the finances,

10  policies, and/or affairs of Toshiba America relating to the antitrust violations alleged in this

11  Complaint.

12        67.     Defendant Toshiba America Consumer Products LLC ("TACP") is a limited

13  liability company that is headquartered at 82 Totawa Rd., Wayne, New Jersey 07470-3114.

14  TACP is a wholly owned and controlled subsidiary of Defendant TC through Toshiba America.

15  During the Relevant Period, TACP manufactured, marketed, sold, and/or distributed CRT

16  Products either directly or through its subsidiaries or affiliates throughout the United States.

17  Defendant TC dominated and/or controlled the finances, policies, and/or affairs of TACP relating

18  to the antitrust violations alleged in this Complaint.

19        68.     Defendant Toshiba America Electronic Components, Inc. ("TAEC") is

20  headquartered at 19900 MacArthur Boulevard, Suite 400, Irvine, California 92612. TAEC is a

21  wholly owned and controlled subsidiary of Defendant TC through Toshiba America. TAEC is

22  currently the North American sales and marketing representative for MTPD. During the

23  Relevant Period, TAEC manufactured, marketed, sold, and/or distributed CRT Products either

24  directly or through its subsidiaries or affiliates throughout the United States. Defendant TC

25  dominated and/or controlled the finances, policies, and/or affairs of TAEC relating to the

26  antitrust violations alleged in this Complaint.

27        69.     Defendant Toshiba America Information Systems, Inc. ("TAIS") is headquartered

28  at 9740 Irvine Blvd., Irvine, California 92618. TAIS is a wholly owned and controlled

- 17 -

1  subsidiary of Defendant TC through Toshiba America. During the Relevant Period, TAIS

2  manufactured, marketed, sold, and/or distributed CRT Products either directly or through its

3  subsidiaries or affiliates throughout the United States. Defendant TC dominated and/or

4  controlled the finances, policies, and/or affairs of TAIS relating to the antitrust violations alleged

5  in this Complaint.

6        70.    Defendant Toshiba Display Devices (Thailand) Company, Ltd. ("TDDT") was a

7  Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial

8  Estate, Tivanon Road, Pathurn Thani, Thailand 12000. TDDT was a wholly owned and

9  controlled subsidiary of Defendant TC. In 2003, TDDT was transferred to Defendant MTPD,

10  TC's joint venture with Panasonic Corporation. It was re-named as MT Picture Display

11  (Thailand) Co., Ltd. and operated as a wholly owned and controlled subsidiary of MTPD until its

12  closure in 2007. During the Relevant Period, TDDT manufactured, marketed, sold and/or

13  distributed CRT Products either directly or through its subsidiaries or affiliates throughout the

14  United States. Defendant TC dominated and/or controlled the finances, policies, and/or affairs of

15  TDDT relating to the antitrust violations alleged in this Complaint.

16        71.    Defendants TC, Toshiba America, TDDT, TACP, TAEC, and TAIS are referred

17  to collectively as "Toshiba."

18  **Thomson Entities**

19        72.    Defendant Thomson SA (n/k/a Technicolor SA) ("Thomson SA") is a French

20  corporation with its principal place of business located at 1-5 Rue Jeanne d'Arc 92130 Issy-les-

21  Moulineaux, France. Thomson SA, through its wholly owned subsidiary Thomson Consumer

22  Electronics Corporation, was a major manufacturer of CRTs for the United States market, with

23  plants located in the United States, Mexico, China and Europe. Thomson SA sold its CRTs

24  internally to its television-manufacturing division, which had plants in the United States and

25  Mexico, and to other television manufacturers in the United States and elsewhere. In 2005,

26  Thomson SA sold its CRT business to Videocon Industries, Ltd. During the Relevant Period,

27  Thomson SA manufactured, marketed, sold and/or distributed CRT Products either directly or

28  through its subsidiaries or affiliates throughout the United States.

- 18 -

73.     Defendant Thomson Consumer Electronics, Inc. (n/k/a Technicolor USA, Inc.) ("Thomson Consumer Electronics") is a U.S. corporation with its principal place of business located at 10330 N Meridian St., Indianapolis, IN 46290-1024. Thomson Consumer Electronics is a wholly owned subsidiary of Thomson SA. Thomson Consumer Electronics was a major manufacturer of CRTs for the United States market, with plants located in Scranton, Pennsylvania, Marion, Indiana and Mexicali, Mexico.  The United States-based plants were closed in 2004.   Thomson Consumer Electronics sold its CRTs internally to its own television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson Consumer Electronics' CRT business was eventually sold to Videocon Industries, Ltd. in 2005.  During the Relevant Period, Thomson Consumer Electronics manufactured, marketed, sold and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States. Defendant Thomson SA dominated and/or controlled the finances, policies, and/or affairs of Thomson Consumer Electronics relating to the antitrust violations alleged in this Complaint.

74.     Thomson SA and Thomson Consumer Electronics are collectively referred to herein as "Thomson."

**Videocon**

75.     Defendant Videocon Industries, Ltd. ("Videocon") is an Indian corporation with its principal place of business located at Aurangabad Paithan Road 14, KM Stone, Chitegaon, Aurangabad 431005, India.  In 2005, Videocon acquired Thomson's CRT businesses, which included manufacturing facilities in Poland, Italy, Mexico and China.  Videocon acquired the businesses, including Thomson Displays Americas LLC and Thomson Display Mexicana S.A. de CV, through its wholly owned investment entity located in the Cayman Islands, Eagle Corporation Limited.  Videocon manufactured its CRTs for the United States market in Thomson's former CRT plants in Mexicali, Mexico and China.  During the Relevant Period, Videocon manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

- 19 -

**Technologies Displays**

76.     Defendant Technologies Displays Americas LLC (formerly Thomson Displays Americas LLC) is a Delaware limited liability company with its principal place of business located at 1778 Carr Road Ste 4B, Calexico, California 92231. Technologies Displays Americas is the parent corporation of Technologies Displays Mexicana, a Mexican corporation which during the Relevant Period manufactured CRTs and sold the CRTs to Technologies Displays Americas for sale and distribution. During the Relevant Period, Technologies Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendants Thomson SA and then Videocon dominated and/or controlled the finances, policies, and/or affairs of Technologies Displays Americas relating to the antitrust violations alleged in this Complaint.

77.     Defendant Technologies Displays Mexicana, S.A. de C.V. (formerly Thomson Displays Mexicana) is a Mexican corporation with its principal place of business located at Calz. Robledo Industrial Colorad, Mexicali, B.C. 21384, Mexico. Technologies Displays Mexicana is a wholly owned subsidiary of Technologies Displays Americas. During the Relevant Period, Technologies Displays manufactured, marketed, sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Defendants Thomson SA and then Videocon dominated and/or controlled the finances, policies, and/or affairs of Technologies Displays Mexicana relating to the antitrust violations alleged in this Complaint.

78.     Technologies Displays Americas and Technologies Displays Mexicana are collectively referred to herein as "Technologies Displays."

**V.     AGENTS AND CO-CONSPIRATORS**

79.     The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

- 20 -

80.     Each of the Defendants named herein acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.  Each Defendant that is a subsidiary of a foreign parent acts as the United States agent for CRT Products made by its parent company.

81.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

82.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

83.     Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the violations alleged herein and may have performed acts and statements in furtherance thereof.  These co-conspirators who are not named as Defendants include, but are not limited to Koninklijke Philips Electronics N.V. ("Royal Philips"), Philips Electronics Industries Ltd. ("PEIL"), Philips Electronics North America Corporation ("Philips America"), Philips Consumer Electronics Co. ("PCEC"), Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil"), IRICO Group Corporation, IRICO Group Electronics Co., Ltd., IRICO Display Devices Co., Ltd., Chunghwa Picture Tubes, Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., Samtel Color, Ltd., Thai CRT, Orion, Orion Engineering and Domex.  Plaintiffs reserve the right to name some or all of these persons as Defendants at a later date.

**Philips Entities**

84.     Co-conspirator Koninklijke Philips Electronics N.V., a/k/a Royal Philips Electronics ("Royal Philips"), is a Dutch entity with its principal place of business at Amstelplein 2, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded in 1891, is one of the world's largest electronics companies, with 121,000 employees located in over 100 countries.  In 2000, Royal Philips was the leading global supplier of CRTs.  Royal Philips operated in Asia directly through divisions (such as Philips Components Asia and Philips

- 21 -

1   BGTV) and through wholly owned and separately incorporated subsidiaries. In 2001, Royal

2   Philips entered into a joint venture with Defendant LGEI forming Defendant LGPD, in which the

3   entities combined their CRT businesses. LGPD operated in Asia and in Europe through its

4   division LG.Philips Displays Europe Region. In December 2005, as a result of increased

5   pressure on demand and prices for CRT Products, Royal Philips wrote off the remaining book

6   value of 126 million Euros of its investment and said it would not inject further capital into the

7   venture. On April 1, 2007, LGPD became an independent company and changed its name to LP

8   Displays International, Ltd. During the Relevant Period, Royal Philips manufactured, marketed,

9   sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates

10  throughout the United States.

11       85.     Co-conspirator Philips Electronics Industries Ltd. ("PEIL") is a Taiwanese

12  corporation with its principal place of business at 15F, 3-1 Yuan Chu St., Nangang District,

13  Taipei 115, Taiwan. PEIL is a subsidiary of Royal Philips. During the Relevant Period, PEIL

14  manufactured, marketed, sold, and/or distributed CRT Products either directly or through its

15  subsidiaries or affiliates throughout the United States. Co-conspirator Royal Philips dominated

16  and/or controlled the finances, policies, and/or affairs of PEIL relating to the antitrust violations

17  alleged in this Complaint.

18       86.     Co-conspirator Philips Electronics North America Corporation ("Philips

19  America") is a Delaware corporation with its principal place of business at 1251 Avenue of the

20  Americas, New York, New York, 10020. Philips America is a wholly owned and controlled

21  subsidiary of Royal Philips. During the Relevant Period, Philips America manufactured,

22  marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or

23  affiliates throughout the United States. Co-conspirator Royal Philips dominated and/or

24  controlled the finances, policies, and/or affairs of Philips America relating to the antitrust

25  violations alleged in this Complaint.

26       87.     Co-conspirator Philips Consumer Electronics Co. ("PCEC") has its principal

27  place of business at 64 Perimeter Center E, Atlanta, Georgia 30346-2295. PCEC is a subsidiary

28  of Royal Philips. During the Relevant Period, PCEC manufactured, marketed, sold, and/or

- 22 -

1  distributed CRT Products either directly or through its subsidiaries or affiliates throughout the

2  United States. Co-conspirator Royal Philips dominated and/or controlled the finances, policies,

3  and/or affairs of PCEC relating to the antitrust violations alleged in this Complaint.

4        88.     Co-conspirator Philips da Amazonia Industria Electronica Ltda. ("Philips Brazil")

5  is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236,

6  1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil. Philips Brazil is a wholly owned and

7  controlled subsidiary of Royal Philips. During the Relevant Period, Philips Brazil manufactured,

8  marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or

9  affiliates throughout the United States. Co-conspirator Royal Philips dominated and/or

10  controlled the finances, policies, and/or affairs of Philips Brazil relating to the antitrust violations

11  alleged in this Complaint.

12        89.     Co-conspirators Royal Philips, PEIL, PCEC, Philips America, and Philips Brazil

13  are collectively referred to herein as "Philips."

14  **Chunghwa Entities**

15        90.     Co-conspirator Chunghwa Picture Tubes, Ltd. ("Chunghwa PT") is a Taiwanese

16  company with its principal place of business at No. 1127, Heping Rd., Bade City, Taoyuan,

17  Taiwan. It was established in 1971 by Tatung Corporation to manufacture CRTs. In 1974,

18  Chunghwa PT's CRTs received certification by the United States, giving the company entry into

19  that market. Throughout the Relevant Period, Chunghwa PT was one of the major global CRT

20  manufacturers. During the Relevant Period, co-conspirator Chunghwa PT manufactured,

21  marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or

22  affiliates (such as its Fuzhou subsidiary) throughout the United States.

23        91.     Co-conspirator Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa

24  Malaysia") is a Malaysian company with its principal place of business at Lot 1, Subang Hi-Tech

25  Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia. It is a wholly

26  owned and controlled subsidiary of Chunghwa. Chunghwa Malaysia is focused on CRT

27  production, and it has established itself as one of the leading worldwide suppliers of CRTs.

28  During the Relevant Period, Chunghwa Malaysia manufactured, marketed, sold, and/or

- 23 -

1  distributed CRT Products either directly or through its subsidiaries or affiliates throughout the

2  United States. Co-conspirator Chunghwa PT dominated and/or controlled the finances, policies,

3  and/or affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this

4  Complaint.

5       92.    Co-conspirators Chunghwa PT and Chunghwa Malaysia are collectively referred

6  to herein as "Chunghwa."

7  **Irico Entities**

8       93.    Co-conspirator Irico Group Corporation ("IGC") is a Chinese entity with its

9  principal place of business at No.11 Xinxi Road, Shangdi, Haidian District. Irico Group

10  Corporation is the parent company for multiple subsidiaries engaged in the manufacture,

11  distribution, and/or sale of CRT Products. During the Relevant Period, Irico Group Corporation

12  manufactured, marketed, sold, and/or distributed CRT Products either directly or through its

13  subsidiaries or affiliates throughout the United States.

14       94.    Co-conspirator Irico Group Electronics Co., Ltd. ("IGE") is a Chinese entity

15  located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. During the Relevant

16  Period, IGE manufactured, marketed, sold, and/or distributed CRT Products either directly or

17  through its subsidiaries or affiliates throughout the United States. IGC dominated and/or

18  controlled the finances, policies, and/or affairs of IGE relating to the antitrust violations alleged

19  in this Complaint.

20       95.    Co-conspirator Irico Display Devices Co., Ltd. ("IDDC") is a Chinese entity

21  located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI

22  710075. IDDC is a partially-owned subsidiary of IGC. In 2006, IDDC was China's top CRT

23  maker. During the Relevant Period, IDDC manufactured, marketed, distributed, and/or sold

24  CRT Products either directly or through its subsidiaries or affiliates or through other Defendants

25  and co-conspirators in the United States. IGC dominated and/or controlled the finances, policies,

26  and/or affairs of IDDC Asia relating to the antitrust violations alleged in this Complaint.

27       96.    IGC, IGE, and IDDC are collectively referred to herein as "Irico."

28

- 24 -

**Samtel**

97.    Co-conspirator Samtel Color, Ltd. ("Samtel") is an Indian company with its registered office at 6th Floor, 7 TDI Centre, Dist. Centre, Jasola, New Delhi-110025.  During the Relevant Period, Samtel manufactured, marketed, sold, and/or distributed CRT Products throughout the United States.

**Thai CRT**

98.    Co-conspirator Thai CRT Company, Ltd. ("Thai CRT") is a Thai company located at 1/F 26 Siam Cement Rd., Bangsue Dusit, Bangkok, Thailand.  Thai CRT is a subsidiary of Siam Cement Group that was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Relevant Period, Thai CRT manufactured, marketed, sold, and/or distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States.

**Orion Entities**

99.    Co-conspirator Orion Electric Company ("Orion"), a South Korean corporation that filed for bankruptcy in 2004, was a major manufacturer of CRT Products during the Relevant Period.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRT Products.  Orion was involved in CRT Products sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico and the United States.  In December 1995, Orion partnered with Defendant Toshiba Corporation and two other non-Defendant entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.

100.    During the Relevant Period Orion owned and/or controlled a Mexican corporation that manufactured and sold CRTs to customers in the United States known as Display Orion Mexicana, S.A. de C.V., ("Domex"), located at KM. 10.5 Carretera A San Luis Rio Colorado, Corredor Industrial Palaco, Gonzalez Ortega, Mexicali, B.C. 21397, Mexico.  Orion dominated and/or controlled the policies and/or affairs of Domex relating to the antitrust violations alleged in this Complaint.

- 25 -

101.    During the Relevant Period Orion owned and/or controlled Orion Engineering Services, Inc., ("Orion Engineering") a California corporation located at PO Box 2768, Calexico, California 92232 that sold CRT Products to customers in the United States.  Orion dominated and/or controlled the policies and/or affairs of Orion Engineering relating to the antitrust violations alleged in this Complaint.

102.    Orion, Orion Engineering and Domex are collectively referred to herein as "Orion."

## VI.    TRADE AND COMMERCE

103.    During the Relevant Period, each Defendant, or one or more of its subsidiaries, sold CRT Products in the United States in a continuous and uninterrupted flow of interstate commerce and foreign commerce, including through and into this judicial district.

104.    During the Relevant Period, Defendants and their co-conspirators collectively controlled a vast majority of the market for CRTs, both globally and in the United States.

105.    The business activities of the Defendants substantially affected interstate trade and commerce in the United States, caused antitrust injury in the United States, and restrained competition.  The business activities of Defendants also substantially affected trade and commerce in California, New Jersey, Tennessee, and New York, caused antitrust injuries in and restrained competition in California, New Jersey, Tennessee, and New York.

## VII.    FACTUAL ALLEGATIONS

### A.    CRT Technology and Products

106.    A CRT has three components: (a) one or more electron guns, each of which is a series of metallic structures used to generate a beam of electrons; (b) a magnetic or other deflection system used to aim the electron beam; and (c) a phosphor-coated glass faceplate that phosphoresces when struck by an electron beam, thereby producing a viewable image.  A faceplate coated with one color of phosphor produces a monochromatic image, while a faceplate coated with multiple colors of phosphor produces a polychromatic image.  An aperture or shadow mask – a thin screen of perforated metal – is welded to the faceplate panel and, to

- 26 -

1    produce a color image, is coated and rinsed multiple times, leaving a surface of thousands of

2    narrow lines of red, green, blue and black.

3        107.    CRT technology was first developed more than a century ago.  The first

4    commercially practical CRT television was made in 1931.  However, it was not until RCA

5    Corporation introduced the product at the 1939 World's Fair that it became widely available to

6    consumers.  After that, CRTs became the heart of most display products, including televisions,

7    computer monitors, oscilloscopes, air traffic control monitors, and ATMs.

8        108.    The quality of a CRT itself determines the quality of the CRT display.  No

9    external control or feature can make up for a poor quality tube.

10       109.    Although there have been refinements and incremental advancements along the

11   way since then, such as the development of thinner CRTs and CRTs with a flat screen, the CRT

12   technology used today is similar to that RCA unveiled in 1939.

13       110.    CRTs can be subdivided into CDTs and CPTs.  As noted above, CPTs are used

14   primarily in televisions and related devices and CDTs are primarily used in computer monitors

15   and similar devices.  The primary difference is that CDTs typically yield a higher resolution

16   image requiring more pixels than do CPTs.

17       111.    CRTs have no independent utility, and have value only as components of other

18   products, such as TVs and computer monitors.  The demand for CRTs thus directly derives from

19   the demand of such products.  Accordingly, the market for CRTs and the market for the products

20   into which they are placed are inextricably linked and intertwined.

21       112.    Plaintiffs and/or their affiliates have purchased CRT Products from Defendants,

22   co-conspirators, and/or their subsidiaries and affiliates.   Defendants' and their co-conspirators'

23   unlawful conspiracy inflated the prices at which Plaintiffs purchased CRT Products to

24   supracompetitive levels, and Plaintiffs have thereby been injured.

25   **B.    Structure of the CRT Industry**

26       113.    The CRT industry has several characteristics that facilitated a conspiracy,

27   including market concentration, ease of information sharing, the consolidation of manufacturers,

28

- 27 -

1  multiple interrelated business relationships, significant barriers to entry, heightened price
2  sensitivity to supply and demand forces, and homogeneity of products.

### 1.   Market Concentration

4      114.   During the Relevant Period, the CRT industry was dominated by relatively few
5  companies. In 2004, Samsung SDI, LGPD (n/k/a LP Displays), MTPD, and Chunghwa, together
6  held a collective 78% share of the global CRT market. The high concentration of market share
7  facilitates coordination because there are fewer cartel members among which to coordinate
8  pricing or allocate markets, and it is easier to monitor the pricing and production of other cartel
9  members.

### 2.   Information Sharing

11     115.   There were many opportunities for Defendants and their co-conspirators to
12  discuss and exchange competitive information. The ease of communication was facilitated by
13  the use of meetings, telephone calls, e-mails and instant messages. Defendants and their co-
14  conspirators took advantage of these opportunities to discuss, and agree upon, their pricing for
15  CRTs as alleged below.

### 3.   Consolidation

17     116.   The CRT industry also had significant consolidation during the Relevant Period,
18  including but not limited to: (a) the creation of LGPD in 2001, which was a joint venture
19  involving Philips' and LG Electronics' CRT businesses; and (b) the 2002 merger of Toshiba's
20  and Panasonic's CRT businesses into MTPD.

### 4.   High Costs of Entry into the Industry

22     117.   There are significant manufacturing and technological barriers to entry into the
23  CRT industry. It would require substantial time, resources and industry knowledge to overcome
24  these barriers to entry. It is also extremely unlikely that a new producer would enter the market
25  in light of the declining demand for CRTs.

26     118.   During the Relevant Period, the costs of the assembly components, both as a
27  whole and individually, have been generally declining, and, in some periods, declining at a
28  substantial rate. A combination of price discussions and manipulation of the output of CRTs

- 28 -

1   allowed Defendants and their co-conspirators to keep prices above where they would have been

2   but for the conspiracy.

3       **5.    Homogeneity of CRTs**

4       119.    CRTs are commodity-like products that are manufactured in standardized sizes.

5   One Defendant's or conspirator's CRT for a particular application, such as a particular size

6   television set or computer monitor, is substitutable for another's.  Defendants and their co-

7   conspirators sell and Plaintiffs purchase CRTs primarily on the basis of price.

8       120.    It is easier to form and sustain a cartel when the product in question is

9   commodity-like because it is easier to agree on prices to charge and to monitor those prices once

10  an agreement is formed.

11  **C.    International Antitrust Investigations**

12      121.    In November 2007, the DOJ and others commenced an investigation into price-

13  fixing in the CRT industry.  The United States investigation of the CRT conspiracy is being

14  conducted by the DOJ's Antitrust Division's office in the Northern District of California.

15      122.    On November 8, 2007, antitrust authorities in Europe, Japan, and South Korea

16  raided the offices of manufacturers of CRTs as part of an international investigation of alleged

17  price fixing.

18      123.    On November 8, 2007, it was reported that EC officials carried out unannounced

19  raids on manufacturers of CRTs based on suspected anticompetitive conduct.  That same day, the

20  EC issued a press release stating that, "[t]he commission has reason to believe that the companies

21  concerned may have violated EU rules against price-fixing, sharing markets or exchanging

22  market information."

23      124.    On November 9, 2007, MEI (now known as Panasonic Corporation) and Samsung

24  SDI reported that they were cooperating with the JFTC, which raided the companies' CRT

25  production facilities on suspicion of anticompetitive conduct.

26      125.    On that same day, a Samsung spokesperson announced that its CRT subsidiary in

27  South Korea was being investigated by the KFTC as "part of an international probe into alleged

28  price-fixing."

- 29 -

126.    On November 12, 2007, Chunghwa announced that it had received a summons from the DOJ with respect to involvement in a CRT price-fixing cartel.

127.    And on November 21, 2007, Philips acknowledged that it was being investigated as well. *The International Herald Tribune* reported that "competition authorities in several jurisdictions had started investigations," and that Philips "would assist regulators."

128.    In its 2008 Annual Report, Defendant Toshiba reported that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to . . . cathode ray tubes (CRT) . . . ."

129.    On February 10, 2009, the DOJ issued a press release announcing that C.Y. Lin of Chunghwa was indicted for participating in a conspiracy to fix the prices of CRTs. The DOJ's announcement of the indictment explained it as follows:

> The indictment, filed today in U.S. District Court in San Francisco, charges Cheng Yuan Lin, aka C.Y. Lin, a resident of Taiwan, with conspiring with others to suppress and eliminate competition by fixing prices, reducing output and allocating market shares of color display tubes (CDTs) to be sold in the U.S. and elsewhere, beginning at least as early as Jan. 28, 1997, until at least as late as April 7, 2003. The indictment also charges C.Y. Lin with conspiring with others to suppress and eliminate competition by fixing prices for color picture tubes (CPTs) to be sold in the U.S. and elsewhere, beginning at least as early as March 12, 1997, until at least as late as April 7, 2003.
>
> CRTs consist of evacuated glass envelopes that contain an electron gun and a phosphorescent screen. When electrons strike the screen, light is emitted, creating an image on the screen. CDTs and CPTs are each types of CRTs. CDTs are used in computer monitors and other specialized applications, while CPTs are used in color televisions. The worldwide market for CRTs, including CPTs and CDTs, in 1997, at the start of the conspiracies has been estimated as approximately $26 billion.
>
> "This conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes sold at fixed prices," said Scott D. Hammond, Acting Assistant Attorney General in charge of the Antitrust Division. "The Antitrust Division will continue to prosecute individuals, wherever they are located and however high their position on the corporate ladder, who engage in price fixing aimed at U.S. businesses and consumers."
>
> According to the charges, C.Y. Lin and co-conspirators carried out the CDT conspiracy by, among other things:
>
> > --Attending meetings and engaging in conversations and communications in Taiwan, Korea, Malaysia, China and elsewhere to discuss the prices, output and market shares of CDTs;
> >
> > --Agreeing during those meetings, conversations and communications to charge prices of CDTs at certain target levels or ranges;

- 30 -

--Agreeing during those meetings, conversations and communications to reduce output of CDTs by shutting down CDT production lines for certain periods of time;

--Agreeing during those meetings, conversations and communications to allocate target market shares for the CDT market overall and for certain CDT customers;

--Exchanging CDT sales, production, market share and pricing information for the purpose of implementing, monitoring and enforcing adherence to the agreed-upon prices, output reduction and market share allocation;

-- Implementing an auditing system that permitted co-conspirators to visit each other's production facilities to verify that CDT production lines had been shut down as agreed;

--Authorizing and approving the participation of subordinate employees in the conspiracy;

--Issuing price quotations and reducing output in accordance with the agreements reached; and

--Taking steps to conceal the conspiracy and conspiratorial contacts through various means.

C.Y. Lin is charged with carrying out the CPT conspiracy with his co-conspirators by, among other things:

--Attending meetings and engaging in conversations and communications in Taiwan, Korea, Malaysia, China, Thailand, Indonesia and elsewhere to discuss the prices of CPTs;

--Agreeing during those meetings, conversations and communications to charge prices of CPTs at certain target levels or ranges;

--Exchanging CPT pricing information for the purpose of implementing, monitoring and enforcing adherence to the agreed-upon prices;

--Authorizing and approving the participation of subordinate employees in the conspiracy;

--Issuing price quotations in accordance with the agreements reached; and

--Taking steps to conceal the conspiracy and conspiratorial contacts through various means.[1]

130.    On August 19, 2009, the DOJ issued a press release announcing that a federal grand jury in San Francisco had returned a one-count indictment against Wu Jen Cheng a/k/a Tony Cheng for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in computer monitors.  Tony Cheng was a former assistant Vice-President of Sales

---

[1]    The significance of the April 7, 2003 ending date in this indictment is that it is when C.Y. Lin left the employ of Chunghwa PT.

- 31 -

and Marketing at Chunghwa.  Mr. Cheng's indictment states that the combination and conspiracy
to fix the prices of CRTs was carried out, in part, in California.

131.   In November 2009, the EC confirmed that it had sent Statements of Objections to
companies suspected of participation in two cartels in the CRT industry—one involving CPTs
and one involving CDTs.

132.   On March 30, 2010, the DOJ issued a press release announcing that a federal
grand jury in San Francisco had returned a one-count indictment against Cheng Cheng Yeh a/k/a
Alex Yeh for his participation in a global conspiracy to fix the prices of CDTs, the type of CRT
used in computer monitors.  The press release identified Yeh as a "former director of sales" at "a
large-Taiwan based color display tube (CDT) manufacturer."  The indictment states that the
combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

133.   On November 9, 2010, the DOJ issued a press release announcing that a federal
grand jury in San Francisco had that same day returned a one-count indictment against Seung-
Kyu Lee a/k/a Simon Lee, Yeong-Ug Yang a/k/a Albert Yang, and Jae-Sik Kim a/k/a J.S. Kim
for their participation in a global conspiracy to fix the prices of CDTs, the type of CRT used in
computer monitors.  The press release identifies Lee, Yang, and Kim as "former executives from
two color display tube (CDT) manufacturing companies."  The indictment states that the
combination and conspiracy to fix the prices of CRTs was carried out, in part, in California.

134.   On March 18, 2011, the DOJ issued a press release announcing that Samsung SDI
Company Ltd. had agreed to plead guilty and pay a $32 million criminal fine for its role in a
global conspiracy to fix prices, reduce output, and allocate market shares of CDTs from at least
as early as January 1997 until at least as late as March 2006.

135.   In June 2012, the EC sent a supplementary Statement of Objections to both Royal
Philips Electronics N.V. and LG Electronics, Inc. to hold them responsible for the conduct of
LPD.

136.   On December 5, 2012, the EC announced that it had fined seven international
groups of companies a total of €1,470,515,000 for participating in cartels to fix prices of CPTs
and/or CDTs.  Fines were imposed on the following companies for price-fixing CPTs:  Samsung

- 32 -

1 | SDI, Philips, LG Electronics, Philips/LG Electronics, Thomson (now Technicolor), Panasonic,

2 | and Panasonic/Toshiba/MTPD, and Panasonic/MTPD. Fines were also imposed on the

3 | following companies for price-fixing CDTs: Samsung SDI, Philips, LG Electronics, and

4 | Philips/LG Electronics. The EC found that "between 1996 and 2006, these companies fixed

5 | prices, shared markets, allocated customers between themselves and restricted their output," and

6 | stated that "[t]he two CRT cartels are among the most organized cartels that the Commission has

7 | investigated." The EC further found that "the cartelists carried out the most harmful anti-

8 | competitive practices including price fixing, market sharing, customer allocation, capacity and

9 | output coordination and exchanges of commercial[ly] sensitive information" and that meetings

10 | were held in various locations in Asia and Europe.

11 | **D.      Pre-Conspiracy Market**

12 |     137.    The CRT conspiracy began in the late 1980s, as the CRT business became more

13 | international and Defendants began serving customers that were also being served by other

14 | international companies. During this period, the employees of Defendants would encounter

15 | employees from their competitors when visiting their customers. A culture of cooperation

16 | developed over the years and these Defendant employees would exchange market information on

17 | production, capacity, and customers.

18 |     138.    In the early 1990s, representatives from Samsung, Chunghwa and others visited

19 | each other's factories in Southeast Asia. During this period, these producers began to include

20 | discussions about price in their meetings.

21 | **E.      Defendants' and Co-conspirators' Illegal Agreements**

22 |     139.    In order to control and maintain profitability for CRTs, Defendants and their co-

23 | conspirators have engaged in a contract, combination, trust or conspiracy, the effect of which has

24 | been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially

25 | inflated levels from at least March 1, 1995 through at least December 2007.

26 |     140.    The CRT conspiracy was effectuated through a combination of group and

27 | bilateral meetings. Bilateral contacts and communications among Defendants commenced in the

28 | late 1980s to early 1990s on an *ad hoc* basis. Competitively sensitive information on pricing,

- 33 -

production capacity, product mix and customer information was exchanged. In 1995, these bilateral meetings began to increase in frequency. There were more than a dozen such meetings in 1995 and several dozen such meetings in 1996 alone. In those formative years, bilateral discussions were the primary method of communication and took place on an *ad hoc* basis. During the early to mid-1990s, representatives from Defendants LG Electronics and Samsung visited the other manufacturers, including Philips, Thai CRT, Hitachi, Toshiba and Panasonic, to discuss increasing prices for CRTs in general and for specific customers. These meetings took place in Taiwan, South Korean, Thailand, Japan, Malaysia, Indonesia and Singapore.

141.    The meetings continued throughout the Relevant Period. Bilateral contacts and communications were conducted in person, by telephone or by e-mail. As time went on, bilateral meetings encompassed specific intercompany agreements or followed up on agreements reached at group meetings. Bilateral meetings were conducted in person, by telephone or by e-mail.

142.    Defendants Samsung and LG Electronics, along with Chunghwa, also attended several *ad hoc* group meetings in the early to mid-1990s. The participants at these group meetings also discussed increasing prices for CRTs.

143.    As more manufacturers entered the conspiracy, group meetings became more prevalent.

144.    With respect to CRTs, Defendants or their agents agreed to, *inter alia*: (a) fix target prices and price guidelines; (b) exchange pertinent information on, *inter alia*, shipments, prices, production, and customer demand; (c) coordinate public statements regarding available capacity and supply; (d) resolve issues created by asymmetrical vertical integration among some of the co-conspirators; (e) keep their collusive meetings secret; (f) expose cheating on the agreements and to discuss the reconciliation of accounts; (g) allocate market share of overall sales; (h) limit competition for certain key customers; (i) allocate customers; (j) allocate each producer's share of certain key customers' sales; and (k) restrict output.

145.    The overall CRT conspiracy set and/or affected worldwide prices (including prices in the United States) that Defendants charged for CRTs.

- 34 -

146.   Agreements as to CRTs were conducted through bilateral meetings as described above, through informal multilateral meetings as described above, and through more formal "Glass Meetings."

**1.   "Glass Meetings"**

147.   Beginning in 1997, CRT makers started to meet in a more organized, systematic fashion.  At some point, these meetings became known as "Glass Meetings" or "GSM."

148.   The Glass Meetings conducted with respect to CRTs fell into several categories:

a.   "Top Meetings" – these meetings were held by individuals at the highest level of the Defendant companies, including CEOs, Presidents, and Vice Presidents.  These happened less frequently, typically on a quarterly basis, and were focused on longer term agreements and dispute resolution.  Because attendees at top meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at top meetings were also able to resolve disputes because they were decision makers who could make agreements.  Top Meetings occurred in South Korea, Taiwan, and China.

b.   "Management Meetings" – these meetings were held by high-level sales executives and/or managers.  These meetings occurred more frequently than "Top Meetings," typically on a monthly basis, and handled implementation of agreements made at "Top Meetings."  Management Meetings occurred in South Korea, Taiwan, China, Indonesia, Japan, and Thailand.

c.   "Working Level Meetings" – these meetings were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The Working Level Meetings also tended to be more regional and often took place near Defendants' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

- 35 -

d.      "Green Meetings" – these meetings occurred on golf courses.  These
meetings were generally attended by top and management level employees of Defendants.

149.    The Chinese Glass Meetings began in 1998 and generally occurred on a monthly
basis following a top or management level meeting.  The China Glass Meetings had the principal
purpose of reporting what had been decided at the most recent Glass Meetings to the Chinese
manufacturers.  Participants at the Chinese Glass Meetings included the manufacturers located in
China, such as IRICO and BMCC, as well as the China-based branches of the other Defendants,
including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen and Samsung SDI
Tianjin.

150.    Glass Meetings also occurred occasionally in various European countries.
Attendees at these meetings included those Defendants and co-conspirators that had subsidiaries
and/or manufacturing facilities located in Europe, including Philips, LG Electronics, and LP
Displays.

151.    Participants would often exchange competitively sensitive information prior to a
Glass Meeting.  This included information on inventories, production, sales and exports.  For
some such meetings, where information could not be gathered in advance of the meeting, it was
brought to the meeting and shared.

152.    The meetings at all levels followed a fairly typical pattern.  First, participants
exchanged competitive information such as proposed future CRT pricing, sales volume,
inventory levels, future production capacity, exports, customer orders, price trends and forecasts
of sales volumes for coming months.  The participants also updated the information they had
provided in the previous meetings.  Each of the other participants then had the opportunity to
challenge the presenter on the information being presented, reflecting monitoring of the
conspiracy.

153.    Each meeting had a rotating, designated "Chairman" who would write the
information on a white board.  (However, with respect to meetings on CPT Products, one person
typically served as chair after 2002.)  Then the meeting participants used this information to
discuss and agree upon what price each would charge for CRTs to be sold in the following

- 36 -

month or quarter. Participants often computed overall production for each product and compared that to estimated demand.

154.    Based on this information, the meeting participants discussed and agreed upon target prices, price increases, so-called "bottom" prices and price ranges for CRTs. They also discussed and agreed upon prices of CRTs that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers. Having analyzed the supply and demand, the participants would also discuss and agree upon production cutbacks.

155.    During periods of oversupply, the focus of the meeting participants turned to making controlled and coordinated price reductions. This was referred to as setting a "bottom price."

156.    The agreements encompassed prices in United States dollars to specific third party customers, and prices reflecting inclusion of specific features in a CRT (such as certain types of coating or the differing types of shadow mask).

157.    The agreements included not only prices charged to third party customers, but, in the case of vertically integrated manufacturers who produced both CRTs and CRT Products, also encompassed: (a) prices charged by the CRT manufacturing arm of each such integrated company to the corporate division or subsidiary that manufactured or sold computer monitors, televisions or other similar CRT Products and (b) price floors on quotations offered by the competitors of the integrated company to such a division or subsidiary.

158.    Defendants also realized the importance of keeping the pricing to their affiliated OEMs at a high enough level to support the CRT pricing in the market to other OEMs. In this way, Defendants ensured that all direct purchaser OEMs paid supracompetitive prices for CRTs.

159.    *The Defendants often also agreed and implemented coordinated output restrictions.* These output agreements began as agreements to shut down production lines for a certain number of days. As time went on, they changed to agreements to shut down entire production lines. To police this aspect of the conspiracy, there were in-person follow-up audits, in which a designated participant would visit the facilities of another participant in order to ensure that output restrictions were being implemented. Sometimes, they also discussed plans

- 37 -

1   related to future capacity expansion. Defendants based these determinations on what the market

2   would look like, after jointly analyzing anticipated supply and demand. The analysis often

3   included consideration of downstream prices for televisions, computer monitors, or similar

4   products and how they would affect the price ranges being collusively set.

5     160. Defendants would also agree on what to say about price changes or output

6   restrictions to their customers in order to conceal their conspiracy. Often, one participant was

7   chosen to make the first price announcement, with the others following on an agreed-upon

8   schedule.

9     161. During the course of these meetings, attending Defendants would be assigned the

10   task of contacting non-attendees in order to secure their consent to the agreements reached.

11     162. Finally, the attending Defendants would organize the next upcoming meeting.

12     163. Efforts were also made to monitor each Defendant's and co-conspirator's

13   adherence to these agreements in a number of ways, including seeking confirmation of pricing

14   both from customers and from employees of Defendants and their co-conspirators themselves.

15   When cheating did occur, it was addressed in at least four ways: (1) monitoring; (2) attendees at

16   the meetings challenging other attendees if they did not live up to an agreement; (3) threats to

17   undermine a competitor at one of its principal customers; and (4) a recognition of a mutual

18   interest in living up to the target price and living up to the agreements that had been made.

19     164. From 2005 - 2007, the group Glass Meetings became less frequent, and bilateral

20   meetings again became more prevalent.

21     165. In summary, the types of agreements reached at the Glass Meetings included:

    i. Agreements on CRT prices, including establishing target prices, "bottom"
22         prices, price ranges and price guidelines;

23       ii. Placing agreed-upon price differentials on various attributes of CRTs, such
      as quality or certain technical specifications;
24

25       iii. Agreements on pricing for intra-company CRT sales to vertically
      integrated customers;
26

    iv. Agreements as to what to tell customers about the reason for a price
27         increase;

28

- 38 -

COMPLAINT AND JURY DEMAND

v.     Agreements to coordinate with CRT manufacturers and marketers that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

vi.    Agreements to exchange pertinent information regarding shipments, capacity, production, prices and customers' demands;

vii.   Agreements to coordinate uniform public statements regarding available capacity and supply;

viii.  Agreements to allocate both overall market shares and share of a particular customer's purchases;

ix.    Agreements to allocate customers;

x.     Agreements regarding capacity, including agreements to restrict output and to audit compliance with such agreements; and

xi.    Agreements to keep their meetings secret.

**2.     Bilateral Discussions**

166.   Throughout the Relevant Period, the Glass Meetings were supplemented by bilateral discussions between various Defendants and their co-conspirators.  The bilateral discussions were more informal than the group meetings and occurred on a frequent, *ad hoc* basis, often between the group meetings.  These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

167.   During the Relevant Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, and Mexico.

168.   The purpose of the bilateral discussions was to exchange information about past and future pricing, coordinate pricing with manufacturers, confirm production levels, share sales order information, and confirm pricing rumors.

169.   In order to ensure the efficacy of their global conspiracy, Defendants and their co-conspirators also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil and Mexico, such as Philips Brazil, Samsung SDI Brazil, and Samsung SDI Mexico.  These Brazilian and Mexican manufacturers were particularly important because they served the North American market for CRTs.  In this way, Defendants and their co-conspirators ensured that

- 39 -

1  prices of all CRTs imported into the United States were fixed, raised, maintained and/or

2  stabilized at supracompetitive levels. North America was the largest market for CRT televisions

3  and computer monitors during the Relevant Period. Defendants and their co-conspirators also

4  used bilateral discussions with each other during the price negotiations with customers to avoid

5  being persuaded by customers to cut prices. The information gained in these communications

6  was then shared with supervisors and taken into account in determining the price to be offered.

7       170.   Bilateral discussions were also used to coordinate prices with CRT manufacturers

8  that sometimes missed the group meetings, such as Toshiba, Panasonic and Samtel. It was often

9  the case that in the few days following a Top or Management Meeting, the attendees at these

10  group meetings would meet bilaterally with the other Defendant or co-conspirator manufacturers

11  for the purpose of communicating whatever CRT pricing and/or output agreements had been

12  reached during the meeting. For example, Samsung had a relationship with Hitachi and was

13  responsible for communicating CRT pricing and/or output agreements to Hitachi. LG

14  Electronics had a relationship with Toshiba and was responsible for communicating CRT pricing

15  and/or output agreements to Toshiba. And Thai CRT had a relationship with Samtel and was

16  responsible for communicating CRT pricing and/or output agreements to Samtel. Hitachi,

17  Toshiba and Samtel implemented the agreed-upon pricing and/or output agreements as conveyed

18  by Samsung, LG Electronics and Thai CRT. Other times, Hitachi and Toshiba attended the

19  Glass Meetings themselves. In this way, Hitachi, Toshiba and Samtel participated in the

20  conspiracy to fix prices of CRTs.

21       **3.   Defendants' and Co-conspirators' Participation in Group and Bilateral Discussions**

22

23       171.   When Plaintiffs refer to a corporate family or companies by a single name in their

24  allegations of participation in the conspiracy, it is to be understood that Plaintiffs are alleging

25  that one or more employees or agents of entities within the corporate family engaged in

26  conspiratorial meetings on behalf of every company in that family. In fact, the individual

27  participants in the conspiratorial meetings and discussions did not always know the corporate

28  affiliation of their counterparts, nor did they distinguish between the entities within a corporate

- 40 -

1     family. The individual participants entered into agreements on behalf of, and reported these

2     meetings and discussions to, their respective corporate families. As a result, the entire corporate

3     family was represented in meetings and discussions by their agents and was a party to the

4     agreements reached in them. For the various meeting participants identified below, in many

5     instances, their high-ranking executives participated in a significant number of the meetings

6     described.

7        172. Between at least 1996 and 2001, Hitachi, through Hitachi Ltd., Hitachi Shenzhen,

8     Hitachi Displays, and Hitachi Asia, participated in and/or was party to over a dozen bilateral and

9     group meetings in which unlawful agreements as to, *inter alia*, price, output restrictions, and/or

10    customer and market allocation of CRTs occurred. These included more than ten bilateral

11    meetings and more than five group meetings of the types described herein, which took place in

12    Taiwan and China. Hitachi never effectively withdrew from this conspiracy.

13        173. Hitachi America and HEDUS were represented at those meetings and were parties

14    to the agreements entered at them. Further, to the extent Hitachi America and HEDUS

15    distributed CRT Products to direct purchasers, they played a significant role in the conspiracy

16    because Defendants wished to ensure that the prices for such products paid by direct purchasers

17    would not undercut the pricing agreements reached at these various meetings. Thus, Hitachi

18    America and HEDUS were active, knowing participants in this conspiracy.

19        174. Between at least 1995 and 2001, LG Electronics participated in, through LGPD,

20    LP Displays, LGEI, and LGETT, and/or was party to more than a dozen bilateral meetings and

21    more than one hundred group meetings in which unlawful agreements as to, *inter alia*, price,

22    output restrictions, and/or customer and market allocation of CRTs occurred. After 2001, LG

23    participated in the CRT conspiracy through its joint venture with Philips, LGPD (n/k/a LP

24    Displays). A substantial number of these meetings were attended by the highest ranking

25    executives from LG Electronics. LG Electronics never effectively withdrew from this

26    conspiracy.

27        175. LGEUSA was represented at these meetings and/or was a party to the agreements

28    entered at them. To the extent LGEUSA sold and/or distributed CRT Products, it played a

- 41 -

1 | significant role in the conspiracy because Defendants wished to ensure that the prices for such

2 | products paid by direct purchasers would not undercut the pricing agreements reached at these

3 | various meetings. Thus, LGEUSA was an active, knowing participant in this conspiracy.

4 |      176.   Between at least 2001 and 2006, LP Displays (f/k/a LGPD) participated in and/or

5 | was party to at least one hundred Glass Meetings at all levels in which illegal agreements as to,

6 | *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred. A

7 | substantial number of these meetings were attended by the highest ranking executives from LP

8 | Displays. Certain of these high level executives from LP Displays had previously attended

9 | meetings on behalf of LG Electronics and Philips. LP Displays also engaged in bilateral

10 | discussions with Defendants or other co-conspirators. Through these discussions, LP Displays

11 | agreed on prices and supply levels for CRTs. LP Displays never effectively withdrew from this

12 | conspiracy.

13 |      177.   Between at least 1996 and 2003, Panasonic, directly or through Panasonic

14 | Corporation, Matsushita Malaysia, PT.MT Picture Display and MTPD, participated in and/or

15 | was party to several dozen bilateral and group meetings in which unlawful agreements as to,

16 | *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred.

17 | These included bilateral meetings and group meetings of the types described herein. These

18 | meetings were attended by high level sales managers from Panasonic and MTPD. Panasonic

19 | never effectively withdrew from this conspiracy.

20 |      178.   PCNA and PACEC were represented at those meetings and/or were parties to the

21 | agreements entered at them. To the extent PCNA and PACEC distributed CRT Products to

22 | direct purchasers, they played a significant role in the conspiracy because Defendants wished to

23 | *ensure that the prices for such products paid by direct purchasers would not undercut the pricing*

24 | agreements reached at these various meetings. Thus, PCNA and PACEC were active, knowing

25 | participants in the alleged conspiracy.

26 |      179.   Between at least 2003 and 2006, MTPD participated in and/or was party to

27 | multiple Glass Meetings in which unlawful agreements as to, *inter alia*, price, output restrictions,

28 | and/or customer and market allocation of CRTs occurred, and in fact MTPD led many of these

- 42 -

1  meetings during the latter years of the conspiracy. These meetings were attended by high level

2  sales managers from MTPD. MTPD also engaged in bilateral discussions with Defendants or

3  other co-conspirators. Through these discussions, MTPD agreed on prices and supply levels for

4  CRTs. MTPD never effectively withdrew from this conspiracy.

5       180.    Between at least 1998 and 2007, BMCC participated in and/or was party to

6  multiple Glass Meetings in which unlawful agreements as to, *inter alia*, price, output restrictions,

7  and/or customer and market allocation of CRTs occurred. These meetings were attended by high

8  level sales managers from BMCC. BMCC also engaged in multiple bilateral discussions with

9  Defendants or other co-conspirators, particularly the other Chinese CRT manufacturers.

10 Through these discussions, BMCC agreed on prices and supply levels for CRTs. None of

11 BMCC's conspiratorial conduct in connection with CRTs was mandated by the Chinese

12 government. BMCC was acting to further its own independent private interests in participating

13 in the alleged conspiracy. BMCC never effectively withdrew from this conspiracy.

14      181.    Between at least 1996 and 2007, Philips, through Royal Philips, PEIL, LGPD,

15 and/or LP Displays, participated in and/or was party to over one hundred bilateral and group

16 meetings in which unlawful agreements as to, *inter alia*, price, output restrictions, and/or

17 customer and market allocation of CRTs occurred. A substantial number of these meetings were

18 attended by high level executives from Philips. Philips participated through Royal Philips or its

19 subsidiaries into 2001 and participated thereafter through LGPD. Philips never effectively

20 withdrew from this conspiracy.

21      182.    Philips America, Philips Brazil, and PCEC were represented at those meetings

22 and were parties to the agreements entered at them. To the extent Philips America, Philips

23 Brazil, and PCEC distributed CRT Products to direct purchasers, they played a significant role in

24 the conspiracy because the conspirators wished to ensure that the prices for such products paid

25 by direct purchasers would not undercut the pricing agreements reached at these various

26 meetings. Thus, Philips America, Philips Brazil, and PCEC were active, knowing participants in

27 this conspiracy.

28

- 43 -

1   183.   Between at least 1995 and 2007, Samsung, through Samsung SDI, Samsung SDI

2   Malaysia, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Samsung SDI HK participated in

3   and/or was party to hundreds of bilateral and group meetings in which unlawful agreements as

4   to, *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred.

5   These included dozens of bilateral meetings and several hundred group meetings of the types

6   described herein.  Samsung never effectively withdrew from this conspiracy.

7   184.   Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were

8   represented at those meetings and/or were parties to the agreements entered at them.  To the

9   extent Samsung America, Samsung SDI Brazil, and Samsung SDI Mexico distributed CRT

10  Products to direct purchasers, they played a significant role in the conspiracy because Defendants

11  wished to ensure that the prices for such products paid by direct purchasers would not undercut

12  the pricing agreements reached at these various meetings.  Thus, Samsung SDI America,

13  Samsung SDI Brazil, and Samsung SDI Mexico were active, knowing participants in this

14  conspiracy.

15  185.   Between at least 1995 and 2003, Toshiba, through TC, MTPD, TDDT and TEDI,

16  participated in over 50 bilateral and group meetings in which unlawful agreements as to, *inter

17  alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred.  These

18  meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba never

19  effectively withdrew from this conspiracy.

20  186.   Toshiba America, TAIS, TACP, and TAEC were represented at those meetings

21  and/or were parties to the agreements entered at them.  To the extent Toshiba America, TAIS,

22  TACP, and TAEC distributed CRT Products to direct purchasers, they played a significant role

23  in the conspiracy because Defendants wished to ensure that the prices for such products paid by

24  direct purchasers would not undercut the pricing agreements reached at these various meetings.

25  Thus, Toshiba America, TAIS, TACP, and TAEC were active, knowing participants in this

26  conspiracy.

27  187.   Between at least 1996 and 2005, Thomson participated in and/or was a party to

28  bilateral and group meetings in which unlawful agreements as to, *inter alia*, price, output

- 44 -

1   restrictions, and/or customer and market allocation of CRTs occurred. These meetings were

2   attended by high level sales managers from Thomson. Thomson never effectively withdrew from

3   this conspiracy.

4        188.   Thomson Consumer Electronics, Technologies Displays Americas (then known as

5   Thomson Displays Americas), and Technologies Displays Mexicana (then known as Thomson

6   Displays Mexicana) were at those meetings and/or were parties to the agreements entered at

7   them.  To the extent Thomson Consumer Electronics, Technologies Displays Americas, and

8   Technologies Displays Mexicana distributed CRT Products to direct purchasers, they played a

9   significant role in the conspiracy because Defendants wished to ensure that the prices for such

10  products paid by direct purchasers would not undercut the pricing agreements reached at these

11  various meetings.  Thus, Thomson Consumer Electronics, Technologies Displays Americas, and

12  Technologies Displays Mexicana were at those meetings and/or were parties to the agreements

13  and were active, knowing participants in this conspiracy.

14       189.   Upon information and belief, between 2005 and 2007, Videocon participated in

15  several Glass Meetings and multiple bilateral meetings with its competitors.  These meetings

16  were attended by high level sales managers from Videocon.  At these meetings, Videocon

17  discussed such things as CRT prices, production, revenues, volumes, demand, inventories,

18  estimated sales, plant shutdowns, customer allocation, and new product development, and agreed

19  on prices and supply levels for CRT Products. Videocon never effectively withdrew from this

20  conspiracy.

21       190.   Technologies Displays Americas and Technologies Displays Mexicana were at

22  those meetings and/or were parties to the agreements entered at them.  To the extent

23  Technologies Displays Americas and Technologies Displays Mexicana distributed CRT Products

24  to direct purchasers, they played a significant role in the conspiracy because Defendants wished

25  to ensure that the prices for such products paid by direct purchasers would not undercut the

26  pricing agreements reached at these various meetings.  Thus, Technologies Displays Americas

27  and Technologies Displays Mexicana were at those meetings and/or were parties to the

28  agreements and were active, knowing participants in this conspiracy.

- 45 -

1  191.  Between at least 1996 and 2004, Orion participated in and/or was party to

2  multiple bilateral and at least several dozen group meetings in which unlawful agreements as to,

3  *inter alia*, price, output restrictions, and/or customer and market allocation of CRTs occurred.

4  Orion never effectively withdrew from this conspiracy.

5  192.  TEDI, Domex, and Orion Engineering were represented at those meetings and/or

6  were parties to the agreements entered at them.  To the extent TEDI, Domex, and Orion

7  Engineering distributed CRT Products to direct purchasers, they played a significant role in the

8  conspiracy because Defendants wished to ensure that the prices for such products paid by direct

9  purchasers would not undercut the pricing agreements reached at these various meetings.  Thus,

10  TEDI, Domex, and Orion Engineering were active, knowing participants in this conspiracy.

11  193.  Between at least 1995 and 2007, Chunghwa, through Chunghwa PT and

12  Chunghwa Malaysia, participated in and/or were parties to hundreds of bilateral and group

13  meetings in which unlawful agreements as to, *inter alia*, price, output restrictions, and customer

14  and/or market allocation of CRTs occurred.  These included hundreds of bilateral meetings and

15  hundreds of group meetings of all the types described herein that took place in Southeast Asia,

16  China, Europe and Scotland.  The representatives of Chunghwa who participated in some of

17  these meetings included its highest executives, such as the former Chairman and CEO of

18  Chunghwa PT, C.Y. Lin.  Chunghwa never effectively withdrew from the conspiracy.

19  194.  Between at least 1998 and 2007, IRICO, through IGC, IGE, and IDDC,

20  participated in and/or was party to multiple bilateral meetings and at least several dozen group

21  meetings in which unlawful agreements as to *inter alia*, price, output restrictions, and/or

22  customer and market allocation of CRTs occurred.  These meetings were attended by the highest

23  ranking executives from IRICO.  IRICO engaged in multiple bilateral discussions with

24  Defendants or other co-conspirators, particularly with other Chinese manufacturers.  Through

25  these discussions, IRICO agreed on prices and supply levels for CRTs.  None of IRICO's

26  conspiratorial conduct in connection with CRTs was mandated by the Chinese government.

27  IRICO was acting to further its own independent private interests in participating in the alleged

28  conspiracy.  IRICO never effectively withdrew from this conspiracy.

- 46 -

1    195.    Between at least 1998 and 2006, Samtel participated in and/or was party to

2    multiple bilateral meetings in which unlawful agreements as to, *inter alia*, price, output

3    restrictions, and/or customer and market allocation of CRTs occurred.  These meetings occurred

4    in Malaysia.  Samtel never effectively withdrew from this conspiracy.

5    196.    Between at least 1998 and 2006, Thai CRT participated in and/or was party to

6    over 50 bilateral and group meetings in which unlawful agreements as to, *inter alia*, price, output

7    restrictions, and customer and/or market allocation of CRTs occurred.  Thai CRT never

8    effectively withdrew from this conspiracy.

9    **F.    The CRT Market During the Conspiracy**

10   197.    Until the last few years, CRTs were the dominant technology used in displays,

11   including televisions and computer monitors.  During the Relevant Period, this translated into the

12   sale of millions of CRTs, generating billions of dollars in annual profits.

13   198.    The following data was reported by Stanford Resources, Inc., a market research

14   firm focused on the global electronic display industry:

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------|------|------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

199.    During the Relevant Period, North America was the largest market for CRT TVs

and computer monitors.  According to a report published by Fuji Chimera Research, the 1995

worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5%) were

consumed in North America.  By 2002, North America still consumed around 35% of the

world's CRT monitor supply.

- 47 -

G.    **Effects of Defendants' Antitrust Violations**

200.    During the Relevant Period, while demand in the United States for CRTs continued to decline, Defendants' and their co-conspirators' conspiracy was effective in moderating the normal downward pressures on prices for CRTs caused by the entry and popularity of the new generation CRTs and plasma display products. As Finsen Yu, President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in January of 2007: "[t]he CRT technology is very mature; prices and technology have become stable."

1.    **Examples of Collusive Pricing for CRTs**

201.    Defendants' collusion is evidenced by unusual price movements in the CRT market. In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRTs that did not fully materialize. For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT prices nonetheless remained stable.

202.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years . . . ." In reality, prices for CRTs never approached $50 in 1997, and were consistently more than double this price.

203.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large color CRTs also rose. The price increase was allegedly based on increasing global demand. In fact, this price increase was a result of the collusive conduct as herein alleged.

204.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000. A March 13, 2000 article in *Infotech Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-related products."

205.    A BNET Business Network news article from August 1998 reported that "the *components (cathode ray tubes) in computer monitors have risen in price. 'Although several*

- 48 -

1   manufacturers raised their CRT prices in the beginning of August, additional CRT price

2   increases are expected for the beginning of October . . . . While computer monitor price

3   increases may be a necessary course of action, we [CyberVision, a computer monitor

4   manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT

5   price increases.'"

6      206.   A 2004 article from Techtree.com reports that various computer monitor

7   manufacturers, including LG Electronics, Philips and Samsung, were raising the price of their

8   monitors in response to increases in CRT prices caused by an alleged shortage of glass shells

9   used to manufacture the tubes. Philips is quoted as saying that, "It is expected that by the end of

10  September this year [2004] there will be [a] 20% hike in the price of our CRT monitors." In fact,

11  this price increase was a result of the collusive conduct as herein alleged.

12      **2.   Examples of Reductions in Manufacturing Capacity by Defendants**

13      207.   Defendants and their co-conspirators also conspired to limit production of CRTs

14  by shutting down production lines for days at a time, and closing or consolidating their

15  manufacturing facilities.

16      208.   For example, Defendants' and their co-conspirators' CRT factory utilization

17  percentage fell from 90% in the third quarter of 2000 to 62% in the first quarter of 2001. This is

18  the most dramatic example of a drop in factory utilization. There were sudden drops throughout

19  the Relevant Period but to a lesser degree. Plaintiffs are informed and believe that these sudden,

20  coordinated drops in factory utilization by Defendants and their co-conspirators were the result

21  of their agreements to decrease output in order to stabilize the prices of CRTs.

22      209.   In December of 2004, MTPD closed its American subsidiary's operations in

23  Horeseheads, New York, citing price and market erosion. Panasonic announced that the closing

24  was part of the company's "global restructuring initiatives in the CRT business." The company

25  further stated that in the future, "CRTs for the North American market will be supplied by other

26  manufacturing locations in order to establish an optimum CRT manufacturing structure."

27      210.   In July of 2005, LGPD ceased CRT production at its Durham, England facility,

28  citing a shift in demand from Europe to Asia.

- 49 -

COMPLAINT AND JURY DEMAND

Case 4:07-cv-05944-JST   Document 4721-3   Filed 07/15/16   Page 61 of 120

Case3:13-cv-01173-EDL   Document1   Filed03/15/13   Page54 of 68

1   211.   In December of 2005, MTPD announced that it would close its American
2   subsidiary's operations in Ohio, as well as operations in Germany, by early 2006.  Like LG
3   Philips, the company explained that it was shifting its CRT operations to Asian and Chinese
4   markets.

5   212.   In late 2005, Samsung SDI followed the lead of other manufacturers, closing its
6   CRT factory in Germany.

7   213.   In July of 2006, Orion America shut down a CRT manufacturing plant in
8   Princeton, Indiana.  The same month, Panasonic announced it was shutting down its CRT factory
9   in Malaysia and liquidating its joint venture with Toshiba.

10  **H.    Summary of Effects of the Conspiracy Involving CRTs**

11  214.   The above combination and conspiracy has had the following effects, among
12  others:

13      a.    Price competition in the sale of CRTs by Defendants and their co-
14  conspirators has been restrained, suppressed and eliminated throughout the United States;

15      b.    Prices for CRTs sold by Defendants has been raised, fixed, maintained and
16  stabilized at artificially high and noncompetitive levels throughout the United States; and

17      c.    Plaintiffs are deprived of the benefit of free and open competition in the
18  purchase of CRTs.

19      d.    As a direct and proximate result of the unlawful conduct of Defendants
20  and their co-conspirators, Plaintiffs have been injured in their business and property in that they
21  paid more for CRTs than it otherwise would have paid in the absence of the unlawful conduct of
22  Defendants.  Plaintiffs were also injured in that they paid more for CRT Products than they
23  otherwise would have paid in the absence of the unlawful conduct of Defendants.

24  **VIII.  PLAINTIFFS' INJURIES**

25  215.   As direct purchasers of CRTs, Plaintiffs have suffered a direct, substantial, and
26  reasonably foreseeable injury as a result of Defendants' and their co-conspirators' conspiracy to
27  raise, fix, stabilize or maintain CRT prices at supra-competitive levels.  Defendants' and their co-
28

- 50 -

COMPLAINT AND JURY DEMAND

1   conspirators' conspiracy artificially inflated the price of CRTs, causing Plaintiffs to pay higher

2   prices than they would have in the absence of Defendants' conspiracy.

3       216.   Throughout the Relevant Period, Defendants and their co-conspirators controlled

4   the market for CRTs.

5       217.   Once a CRT leaves its place of manufacture, it remains essentially unchanged as

6   it moves through the distribution system. CRTs are identifiable, discrete physical objects that do

7   not change from or become an indistinguishable part of a CRT Product. Thus, CRTs follow a

8   physical chain from Defendants through manufacturers of CRTs sold to Plaintiffs.

9       218.   Plaintiffs also purchased CRT Products containing CRTs from OEMs as well as

10   others, which in turn purchased CRTs from Defendants and/or their co-conspirators.

11   Defendants' conspiracy affected and artificially inflated the price of CRTs purchased by these

12   OEMs and others, which paid higher prices for CRTs than they would have absent the

13   conspiracy.

14       219.   Consequently, during the Relevant Period, the OEMs had no choice but to

15   purchase CRTs from Defendants and their co-conspirators and others at prices that were

16   artificially inflated, fixed and stabilized by Defendants' conspiracy.

17   **IX.   TOLLING**

18       220.   As discussed in paragraphs 9-10, and 121-36 above, the DOJ instituted criminal

19   proceedings and investigations against several Defendants and co-conspirators commencing on

20   at least November 2007 through the present. Plaintiffs' claims have been tolling during these

21   criminal proceedings pursuant to 15 U.S.C. § 16. Plaintiffs were also members of the putative

22   class actions asserted against Defendants, including but not limited to the following complaints:

23       •   *Nathan Muchnick, Inc. v. Chunghwa Picture Tubes Ltd.*, Case No. 3:07-cv-5981
24           (N.D. Cal., filed Nov. 27, 2007).

25       •   *In re: Cathode Ray Tube (CRT) Antitrust Litigation*, Direct Purchaser Plaintiffs'
        Consolidated Amended Complaint, MDL No. 1917, Lead Case No. 3:07-cv-5944
26           (N.D. Cal., filed March 16, 2009).

27

28

- 51 -

1    221.    Plaintiffs' claims also have been tolled under the doctrine announced in *American*

2    *Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974) and related authorities recognizing cross-

3    jurisdictional tolling during the pendency of the putative class actions asserted against

4    Defendants, which commenced as early as November 27, 2007.

5    **X.    FRAUDULENT CONCEALMENT**

6    222.    Plaintiffs had neither actual nor constructive knowledge of the facts constituting

7    their claim for relief despite diligence in trying to discover the pertinent facts. Defendants and

8    their co-conspirators engaged in a secret conspiracy that did not give rise to facts that would put

9    Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of CRTs.

10   223.    The affirmative acts of the Defendants alleged herein, including acts in

11   furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that

12   precluded detection. As noted above, Defendants organized Glass Meetings to avoid detection,

13   conducted bilateral meetings in secret and agreed at Glass Meetings to orchestrate the giving of

14   pretextual reasons for their pricing actions and output restrictions. Defendants would coordinate

15   and exchange in advance the texts of the proposed communications with customers containing

16   these pretextual statements and would coordinate which co-conspirator would first communicate

17   these pretextual statements to customers.

18   224.    By its very nature, Defendants' price-fixing conspiracy was inherently self-

19   concealing.

20   225.    Plaintiffs could not have discovered the alleged contract, conspiracy or

21   combination at an earlier date by the exercise of reasonable diligence because of the deceptive

22   practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid

23   detection of, and fraudulently conceal, their contract, conspiracy or combination. The contract,

24   conspiracy or combination as herein alleged was fraudulently concealed by Defendants by

25   various means and methods, including, but not limited to, secret meetings, surreptitious

26   communications between the Defendants by the use of the telephone or in-person meetings in

27   order to prevent the existence of written records, discussion on how to evade antitrust laws and

28

- 52 -

COMPLAINT AND JURY DEMAND

1 | concealing the existence and nature of their competitor pricing discussions from non-
2 | conspirators (including customers).

3 |       226.    Participants at Glass Meetings were also told not to take minutes.  Attending
4 | companies also reduced the number of their respective attendees to maintain secrecy.

5 |       227.    Defendants also agreed at Glass Meetings and bilateral meetings to give
6 | pretextual reasons for price increases and output reductions to their customers.

7 |       228.    As alleged above, in early 1999, despite declining production costs and the rapid
8 | entry of flat panel display products, the price of large-sized color CRTs actually rose.  The price
9 | increase was allegedly based on increasing global demand for the products.  In fact, this price
10 | rise was the result of collusive conduct amongst Defendants, which was undisclosed at the time.

11 |       229.    As alleged above, despite increased competition from flat panel monitors, prices
12 | for CRT monitors were stuck stubbornly at high price levels throughout 2001.  This price
13 | stabilization was purportedly due exclusively to a shortage of critical components such as glass.
14 | This was a pretext used to cover up the conspiracy.

15 |       230.    In addition, when several CRT manufacturers, including Samsung, Philips, and
16 | LG Electronics, increased the price of CRT Products in 2004, the price hike was blamed on a
17 | shortage of glass shells used for manufacturing CRT monitors.  In justifying this price increase, a
18 | Deputy General Manager for an LG Electronics distributor in India stated, "[t]his shortage [of
19 | glass shells] is a global phenomena and every company has to increase the prices of CRT
20 | monitors in due course of time."

21 |       231.    Manufacturers such as LG Electronics periodically issued press statements falsely
22 | asserting that CRT prices were being driven lower by intense competition.

23 |       232.    Plaintiffs are informed and believe, and thereon allege, that Defendants' purported
24 | reasons for the price increases of CRTs were materially false and misleading and made for the
25 | purpose of concealing Defendants' anti-competitive scheme as alleged herein.

26 |       233.    As a result of Defendants' fraudulent concealment of their conspiracy, the running
27 | of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a
28 | result of the anticompetitive conduct alleged in this Complaint.

- 53 -

XI.    **CLAIM FOR VIOLATIONS**

**First Claim for Relief**
**(Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)**

234.    Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

235.    From March 1, 1995, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

236.    In particular, Defendants have combined and conspired to raise, fix, maintain or stabilize the prices of CRTs sold in the United States.

237.    As a result of Defendants' and their co-conspirators' unlawful conduct, prices for CRTs were raised, fixed, maintained, and stabilized in the United States.

238.    The contract, combination or conspiracy among Defendants and their co-conspirators consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

239.    For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

   a.    Participating in meetings and conversations to discuss and agree upon the prices and supply of CRTs;

   b.    Communicating in writing and orally to fix prices, allocate customers, and restrict output;

   c.    Agreeing to manipulate prices and supply of CRTs sold in the United States, and to allocate customers of such products, in a manner that deprived direct purchasers of *free and open competition*;

- 54 -

COMPLAINT AND JURY DEMAND

1          d.    Issuing price announcements and price quotations in accordance with the

2    agreements reached;

3          e.    Selling CRTs to customers in the United States at non-competitive prices;

4          f.    Exchanging competitive sensitive information in order to facilitate their

5    conspiracy;

6          g.    Agreeing to maintain or lower production capacity; and

7          h.    Providing false statements to the public to explain increased prices for

8    CRTs.

9          240.    As a result of Defendants' unlawful conduct, Plaintiffs have been injured in their

10   businesses and property in that they have paid more for CRT Products than they otherwise would

11   have paid in the absence of Defendants' unlawful conduct.

12

13                          **Second Claim for Relief**
                  **(Violation of the California Cartwright Act)**

14

15         241.    Plaintiffs incorporate by reference all the above allegations as if fully set forth

     herein.
16

17         242.    During the Relevant Period, Plaintiffs, and their predecessor entities, conducted a

18   substantial volume of business in California.  In particular, Plaintiffs purchased CRT Products

     from Defendants and their co-conspirators in California by issuing purchase orders from
19
     California and receiving invoices on those purchases there.  As a result of Plaintiffs presence in
20
     California and the substantial business they conducted in California, Plaintiffs are entitled to the
21
     protection of the laws of California.
22
           243.    In addition, Defendants LP Display, Samsung and Toshiba all maintained offices
23
     in California during the Relevant Period.  Employees at Defendants' and co-conspirators'
24
     locations in California participated in meetings and engaged in bilateral communications in
25
     California and intended and did carry out Defendants' and their co-conspirators' anticompetitive
26
     agreement to fix the price of CRTs.  Defendant Samsung SDI admitted in its plea agreement that
27
     acts in furtherance of the conspiracy were carried out in California.  Defendants' and their co-
28

                                         - 55 -

1  conspirators' conduct within California thus injured Plaintiffs and their predecessor entities, both

2  in California and throughout the United States.

3        244.    Beginning at a time presently unknown to Plaintiffs, but at least as early as March

4  1, 1995, and continuing thereafter at least up to and including at least December 2007,

5  Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in

6  restraint of the trade and commerce described above in violation of the Cartwright Act,

7  California Business and Professional Code Section 16720.

8        245.    Defendants have each acted in violation of Section 16720 to fix, raise, stabilize

9  and maintain prices of, and allocate markets for, CRTs at supracompetitive levels. Defendants'

10  and their co-conspirators' conduct substantially affected California commerce.

11        246.    The aforesaid violations of Section 16720, California Business and Professional

12  Code, consisted, without limitation, of a continuing unlawful trust and concert of action among

13  Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain

14  and stabilize the prices of, and to allocate markets for, CRTs.

15        247.    For the purpose of forming and effectuating the unlawful trust, Defendants and

16  their co-conspirators have done those things which they combined and conspired to do, including

17  but in no way limited to the acts, practices and course of conduct set forth above and the

18  following:

19                a.   to fix, raise, maintain and stabilize the price of CRTs;

20                b.   to allocate markets for CRTs amongst themselves; and

21                c.   to allocate among themselves the production of CRTs.

22        248.    The combination and conspiracy alleged herein has had, *inter alia*, the following

23  effects:

24                a.  price competition in the sale of CRTs has been restrained, suppressed and/or

25        eliminated in the State of California;

26                b.  prices for CRTs sold by Defendants, their co-conspirators, and others have

27        been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in

28        the State of California; and

- 56 -

1          c. those who purchased CRTs from Defendants, their co-conspirators, and others

2     and CRT Products containing price-fixed CRTs from Defendants, their co-conspirators,

3     and others have been deprived of the benefit of free and open competition.

4          249.    As a result of the alleged conduct of Defendants and their co-conspirators,

5     Plaintiffs paid supracompetitive, artificially inflated prices for the CRTs they purchased during

6     the Relevant Period.

7          250.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been

8     injured in their business and property by paying more for CRT Products than they would have

9     paid in the absence of Defendants' combination and conspiracy.  As a result of Defendants'

10    violation of Section 16720 of the California Business and Professional Code, Plaintiffs are

11    entitled to treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to

12    Section 16750(a) of the California Business and Professions Code.

13

14                              **Third Claim for Relief**
                    **(Violation of California Unfair Competition Law)**

15

16         251.    Plaintiffs incorporate by reference all the above allegations as if fully set forth

17    herein.

18         252.    During the Relevant Period, Plaintiffs, and their predecessor entities, conducted a

19    substantial volume of business in California.  In particular, Plaintiffs purchased CRT Products

20    from Defendants and their co-conspirators in California by issuing purchase orders from

21    California and receiving invoices on those purchases there.  As a result of Plaintiffs presence in

22    California and the substantial business they conducted in California, Plaintiffs are entitled to the

23    protection of the laws of California.

24         253.    During the Relevant Period, Defendants engaged in unfair competition in

25    violation of California's Unfair Competition Law, California Business and Professional Code §

26    17200 *et seq.*

27         254.    Defendants committed acts of unfair competition, as defined by Section 17200, *et

28    seq.*, by engaging in a conspiracy to fix and stabilize the price of CRTs as described above.

- 57 -

255. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as described above, constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices with the meaning of Section 17200, *et seq.*, including, but not limited to (1) a violation of Section 1 of the Sherman Act and (2) violation of the Cartwright Act.

256. Defendants' acts, omissions, misrepresentations, practices and non-disclosures are unfair, unconscionable, unlawful and/or fraudulent independently of whether they constitute a violation of the Sherman Act or Cartwright Act.

257. Defendants' acts or practices are fraudulent or deceptive within the meaning of Section 17200, *et seq.*

258. Defendants' conduct was carried out, effectuated, and perfected, at least in part, within the state of California.

259. By reason of the foregoing, Plaintiffs are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits that may have been obtained by Defendants as a result of such business acts and practices described above.

**Fourth Claim for Relief**
**(Violation of the New York Donnelly Act)**

260. Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

261. During the Relevant Period, Plaintiffs and their affiliated entities conducted a substantial volume of business in New York. For example, Plaintiffs warehoused CRT Products in New York. As a result of the substantial business they conducted in New York, Plaintiffs are entitled to the protection of the laws of New York.

262. Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including December 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the

- 58 -

1  trade and commerce described above in violation of the Donnelly Act, New York General

2  Business Law §§ 340 *et seq.*

3      263.    Defendants' conspiracy restrained, suppressed and/or eliminated competition in

4  the sale of CRTs in New York and fixed, raised, maintained and stabilized the price of CRTs in

5  New York at artificially high, non-competitive levels.

6      264.    As a result, Defendants' conspiracy substantially affected New York commerce.

7      265.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been

8  injured in their business and property by paying more for CRT Products purchased from

9  Defendants, their co-conspirators and others than they would have paid in the absence of

10  Defendants' combination and conspiracy, and are entitled to relief under New York General

11  Business Law §§ 340 *et seq.*

12      266.    As a result of Defendants' violation of Section 340 of the New York General

13  Business Law, Plaintiffs are entitled to treble damages and the costs of suit, including attorneys'

14  fees.

### Fifth Claim for Relief
### (Violation of New York Unfair Competition Law)

15

16      267.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every

17  allegation set forth in the preceding paragraphs of this Complaint.

18      268.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by

19  affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the

20  prices at which CRTs were sold, distributed or obtained in New York, and took efforts to conceal

21  their agreements from Plaintiffs.

22      269.    The conduct of Defendants described herein constitutes consumer-oriented

23  deceptive acts or practices within the meaning of N.Y. General Business Law § 349, which

24  resulted in consumer injury and broad adverse impact on the public at large, and harmed the

25  public interest of New York State in an honest marketplace in which economic activity is

26  conducted in a competitive manner.

27

28

- 59 -

270.   Defendants' unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed and eliminated throughout New York; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout New York; (3) Plaintiffs were deprived of free and open competition; and (4) Plaintiffs paid supracompetitive, artificially inflated prices for CRT Products.

271.   During the Relevant Period, Defendants' illegal conduct substantially affected New York commerce and consumers.

272.   During the Relevant Period, each of the Defendants named herein, directly, or indirectly and through affiliates or subsidiaries or agents they dominated and controlled, manufactured, sold and/or distributed CRT Products in New York.

273.   Plaintiffs seek treble damages for their injuries caused by these violations in an amount to be determined at trial and are threatened with further injury.

### Sixth Claim for Relief
### (New Jersey Antitrust Act, N.J. Stat. § 56:9-1 *et seq.*)

274.   Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

275.   During the Relevant Period, Sharp Electronics resided in New Jersey, and Plaintiffs and their affiliated entities conducted a substantial volume of business in New Jersey. Sharp Electronics oversaw SMCA's CRT procurement activities. Once the CRTs were purchased, Sharp Electronics instructed SMCA and SEMA on the number of finished products that customers requested. As a result of Plaintiffs presence in New Jersey and the substantial business they conducted in New Jersey, Plaintiffs are entitled to the protection of the laws of New Jersey.

276.   Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including December 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful trust in restraint of the

- 60 -

1    trade and commerce described above in violation of the New Jersey Antitrust Act, N.J. Stat. §

2    56:9-1 *et seq.*

3         277.   Defendants' conspiracy restrained, suppressed and/or eliminated competition in

4    the sale of CRTs in New Jersey and fixed, raised, maintained and stabilized CRTs in New Jersey

5    at artificially high, non-competitive levels.

6         278.   As a result, Defendants' conspiracy substantially affected New Jersey commerce.

7         279.   As a direct and proximate result of Defendants' conduct, Plaintiffs have been

8    injured in their business and property by paying more for CRT Products purchased from

9    Defendants, their co-conspirators and others than they would have paid in the absence of

10   Defendants' combination and conspiracy, and are entitled to relief under N.J. Stat. § 56:9-1 *et*

11   *seq.*

12        280.   By reason of the foregoing, Defendants have entered into agreements in restraint

13   of trade in violation of N.J. Stat. § 56:9-1 *et seq.*   Plaintiffs seek all forms of relief available

14   under N.J. Stat. § 56:9-1 *et seq.*

15
                              **Seventh Claim for Relief**
16                 **(Violation of Tennessee Code Ann. §§ 47-258-101 *et seq.*)**

17        281.   Plaintiffs incorporate by reference all the above allegations as if fully set forth
18   herein.
19
          282.   Defendants' and their co-conspirators' combinations or conspiracies had the
20   following effects: (1) CRT price competition was restrained, suppressed, and eliminated
21
     throughout Tennessee; (2) CRT prices were raised, fixed, maintained and stabilized at artificially
22   high levels throughout Tennessee; (3) Plaintiffs were deprived of free and open competition in
23
     Tennessee; and (4) Plaintiffs paid supracompetitive and artificially inflated prices for CRT
24   Products in Tennessee.
25
          283.   During the Relevant Period, Plaintiffs purchased CRT Products in Tennessee,
26   with purchase orders issuing from, and invoices being received, in Tennessee.
27

28
                                        - 61 -

1    284.    During the Relevant Period, Defendants' and their co-conspirators' illegal
2    conduct substantially affected Tennessee commerce.

3    285.    As a direct and proximate result of Defendants' and their co-conspirators'
4    unlawful conduct, Plaintiffs have been injured in their business and property and are threatened
5    with further injury.

6    286.    By reason of the foregoing, Defendants have entered into agreements in restraint
7    of trade in violation of Tennessee Code Ann. §§ 47-25-101 *et seq.*  Plaintiffs seek all forms of
8    relief available under Tennessee Code Ann. §§ 47-25-101 *et seq.*

9    **XII.    DAMAGES**

10    287.    During the Relevant Period, Plaintiffs purchased CRT Products directly from
11    Defendants, or their subsidiaries, agents, and/or affiliates, and, by reason of the antitrust
12    violations herein alleged, paid more for such products than they would have paid in the absence
13    of such antitrust violations.  During the Relevant Period, Plaintiffs also purchased CRT Products
14    indirectly from Defendants, or their subsidiaries, agents, and/or affiliates, and, by reason of the
15    antitrust violations herein alleged, paid more for such CRT Products than they would have paid
16    in the absence of such antitrust violations.  As a result, Plaintiffs have sustained damages to their
17    business and property in an amount to be determined at trial.

18    **XIII.   PRAYER FOR RELIEF**

19    WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf, adjudging
20    and decreeing that:

21    A.    Defendants engaged in a contract, combination, and conspiracy in violation of
22    Section 1 of the Sherman Act (15 U.S.C. § 1), the California Cartwright Act, the Unfair
23    Competition Law of California, the New York Donnelly Act, New Jersey Antitrust Act, New
24    York General Business Law § 349, and Tennessee Code Ann. §§ 47-25-101 *et seq.*, Plaintiffs
25    were injured in their business and property as a result of Defendants' violations;

26    B.    Plaintiffs shall recover damages sustained, as provided by federal and state
27    antitrust laws, and that a joint and several judgment in favor of Plaintiffs be entered against the
28    Defendants in an amount to be trebled in accordance with such laws;

- 62 -

1    C.    Defendants, their subsidiaries, affiliates, joint ventures, successors, transferees,

2  assignees and the respective officers, directors, partners, agents, and employees thereof and all

3  other persons acting or claiming to act on their behalf be permanently enjoined and restrained

4  from continuing and maintaining the combination, conspiracy, or agreement alleged herein;

5    D.    Plaintiffs shall be awarded pre-judgment and post-judgment interest, and that such

6  interest be awarded at the highest legal rate from and after the date of service of the initial

7  Complaint in this action;

8    E.    Plaintiffs shall recover their costs of this suit, including reasonable attorneys' fees

9  as provided by law; and

10    F.    Plaintiffs shall receive such other or further relief as may be just and proper.

11  ///

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

- 63 -

1   **XIV.   JURY TRIAL DEMANDED**

2           Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all

3   of the claims asserted in this Complaint so triable.

4

5   Dated:  March 15, 2013                   By:  _____

6                                                  Stephen E. Taylor

7                                              Stephen E. Taylor (SBN 058452)
                                               Jonathan A. Patchen (SBN 237346)
                                               TAYLOR & COMPANY LAW OFFICES, LLP
8                                              One Ferry Building. Suite 355
                                               San Francisco, California 94111
9                                              Telephone:  (415) 788-8200
                                               Facsimile:  (415) 788-8208
10                                             Email: staylor@tcolaw.com
                                               Email: jpatchen@tcolaw.com
11

12                                             Kenneth A. Gallo (*pro hac vice to be submitted*)
                                               Joseph J. Simons (*pro hac vice to be submitted*)
13                                             Craig A. Benson (*pro hac vice to be submitted*)
                                               PAUL, WEISS, RIFKIND, WHARTON & GARRISON  LLP
14                                             2001 K Street, NW
                                               Washington, DC  20006
15                                             Telephone: (202) 223-7356
                                               Facsimile: (202) 204-7356
16                                             Email: kgallo@paulweiss.com
                                               Email: jsimons@paulweiss.com
17                                             Email: cbenson@paulweiss.com

18
                                               *Attorneys for Plaintiffs*
19

20

21

22

23

24

25

26

27

28

- 64 -

COMPLAINT AND JURY DEMAND

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In Re: Cathode Ray Tube (CRT)  )   Case No. 07-5944 SC
Antitrust Litigation            )   MDL No. 1917
                                )
_____ )   PRETRIAL ORDER NO. 1
                                )
This Document Relates to:       )
                                )
     ALL ACTIONS                )
                                )
_____ )

On April 4, 2008, the Court conducted a status conference in this multidistrict litigation ("MDL") proceeding. After considering the materials submitted by the parties at the conference and good cause appearing, the Court hereby establishes the following pretrial procedures.

**PRACTICE AND PROCEDURE ORDER UPON TRANSFER PURSUANT TO § 1407(a) (REVISED)**

1. This order shall govern the practice and procedure in those actions transferred to this Court by the Judicial Panel on Multidistrict Litigation (MDL Panel) pursuant to its order of February 15, 2008, as well as all related actions originally filed in this Court or transferred or removed to this Court. This order shall also govern the practice and procedure in any tag-along actions transferred to this Court by the MDL Panel pursuant to Rule 7.4 of the Rules of Procedure of the MDL Panel subsequent to

**United States District Court**
For the Northern District of California

1    the filing of the final transfer order by the Clerk of this Court

2    and any related actions subsequently filed, transferred or removed

3    to this Court.

4    2.   The actions described in paragraph 1 of this Order are

5    consolidated for pretrial purposes.

6    **ESTABLISHMENT OF MASTER DOCKET AND FILE**

7    3.   The files of all direct purchaser actions and indirect

8    purchaser actions shall be maintained in the master file, Case No.

9    C-07-5944 SC MDL No. 1917.  Every pleading filed in direct

10   purchaser actions and indirect purchaser actions shall bear the

11   above caption.  When a pleading or paper is intended to be

12   applicable to all actions, the words "All Actions" shall appear

13   immediately after the words "This Document Relates to:" in the

14   caption above.  When a pleading or paper is intended to be

15   applicable only to all direct purchaser actions, the words "All

16   Direct Purchaser Actions" shall appear in the caption.  When a

17   pleading or paper is intended to be applicable only to all

18   indirect purchaser actions, the words "All Indirect Purchaser

19   Actions" shall appear in the caption.

20   4.   All pleadings and submissions in these actions shall be

21   e-filed both in the master docket and in the individual case

22   docket(s) of any individual case(s) to which the submission

23   pertains.  All submissions filed in these actions shall bear the

24   identification "Case No. C-07-5944 SC MDL No. 1917," and when such

25   a submission relates to all of these actions, following "Case No.

26   C-07-5944 SC MDL No. 1917," shall be the notation "ALL CASES."  If

27   a submission does not relate to all of these actions, the docket

28
                                        2

number of the individual action or actions assigned by the Clerk of the Court shall follow "Case No. C-07-5944 SC MDL No. 1917." The chambers copy of each document e-filed in these cases must clearly indicate the docket number assigned by the electronic case filing system to each such document.

**APPEARANCES**

5.   Counsel who have not yet entered an appearance shall electronically file a Notice of Appearance in the master docket and in the individual case docket(s) of any individual case(s). Counsel who appeared in a transferor court prior to their case being transferred to this Court need not enter an additional appearance before this Court.

6.   Attorneys admitted to practice and in good standing in any United States District Court are admitted pro hac vice in this litigation.   Pursuant to Rule 1.4 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation, association of local counsel is not required.

**COMMUNICATIONS WITH THE COURT AND COUNSEL**

7.   Unless otherwise ordered by the Court, all substantive communications with the Court shall be e-filed.

8.   The Court recognizes that cooperation by and among plaintiffs' counsel and by and among defendants' counsel is essential for the orderly and expeditious resolution of this litigation.   The communication of information among and between plaintiffs' counsel and among and between defendants' counsel shall not be deemed a waiver of the attorney-client privilege or the protection afforded attorney work-product.   Nothing contained

United States District Court
For the Northern District of California

in this provision shall be construed to limit the rights of any
party or counsel to assert the attorney-client privilege or
attorney work-product doctrine.

**FILING AND SERVICE OF PAPERS AND PLEADINGS**

9.   These cases are subject to Electronic Case Filing
("ECF"), pursuant to General Order 45, Section VI, which requires
that all documents in such a case be filed electronically.
General Order, Section IV(A) provides that "[e]ach attorney of
record is obligated to become an ECF User and be assigned a user
ID and password for access to the system upon designation of the
action as being subject to ECF." If he or she has not already done
so, counsel shall register forthwith as an ECF User and be issued
an ECF User ID and password.  Forms and instructions can be found
on the Court's website at
https://ecf.cand.uscourts.gov/cand/index.html.  All documents can
be e-filed in the master file, Case No. C-07-5944 SC MDL No. 1917.

10.   Papers that are filed electronically through the Court's
ECF system are deemed served on all parties as of the date of
filing.  All other service of papers shall be governed by the
Federal Rules of Civil Procedure unless otherwise agreed by the
parties.

11.   Permission to file briefs in excess of the page limits
set forth in Rule 7 of the Local Rules will not be routinely
granted in these cases.  Stipulations allowing oversized briefs
will not be approved unless submitted at least five (5) court days
before the first brief addressed in the stipulation is due.

12.   All parties are to make best efforts to resolve

**United States District Court**
For the Northern District of California

4

**United States District Court**
For the Northern District of California

1  scheduling and other procedural issues by conferring with opposing

2  counsel in the case(s) before contacting the court.

3      **EVIDENCE PRESERVATION**

4      13.  All parties and their counsel are reminded of their duty

5  to preserve evidence that may be relevant to this action.  The

6  duty extends to documents, data and tangible things in the

7  possession, custody and control of the parties to this action, and

8  any employees, agents, contractors, carriers, bailees, or other

9  non-parties who possess materials reasonably anticipated to be

10  subject to discovery in this action.  "Documents, data, and

11  tangible things" shall be interpreted broadly to include writings,

12  records, files, correspondence, reports, memoranda, calendars,

13  diaries, minutes, electronic messages, voicemail, e-mail,

14  telephone message records or logs, computer and network activity

15  logs, hard drives, backup data, removable computer storage media

16  such as tapes, discs and cards, printouts, document image files,

17  Web pages, databases, spreadsheets, software, books, ledgers,

18  journals, orders, invoices, bills, vouchers, check statements,

19  worksheets, summaries, compilations, computations, charts,

20  diagrams, graphic presentations, drawings, films, charts, digital

21  or chemical process photographs, video, phonographic, tape or

22  digital recordings or transcripts thereof, drafts, jottings and

23  notes, studies or drafts of studies or other similar such

24  material.  Information that serves to identify, locate or link

25  such material, such as file inventories, file folders, indices,

26  and metadata, is also included in this definition.  Until the

27  parties reach an agreement on a preservation plan or the Court

28                        5

orders otherwise, each party shall take reasonable steps to preserve all documents, data, and tangible things containing information potentially relevant to the subject matter of this litigation. In addition, counsel shall exercise all reasonable efforts to identify and notify parties and non-parties of their duties, including employees of corporate or institutional parties, to the extent required by the Federal Rules of Civil Procedure.

**PROTECTIVE ORDER**

14. The parties shall meet and confer regarding a protective order for this proceeding. Within 30 days of the entry of an Order appointing interim lead class counsel, the parties shall present a stipulated protective order, or in the event a stipulation cannot be reached, their respective proposals.

**DISCLOSURES**

15. Within 30 days of the entry of this Order, the parties shall complete a Rule 26(f) conference and shall make initial disclosures within 14 days thereafter.

**ALTERNATIVE DISPUTE RESOLUTION**

16. Within 30 days of the entry of an Order appointing interim lead class counsel, the parties shall discuss the selection of an alternative dispute resolution process.

**FURTHER CASE MANAGEMENT CONFERENCE**

17. The Court shall conduct a Status Conference on July 11, 2008 at 10:00 A.M. The parties shall electronically file a Joint Case Management Statement ten (10) court days prior thereto.

///

///

6

**APPLICABILITY OF ORDER**

18.  This Order shall apply to all actions subsequently filed in, or transferred to, this district that are related to this MDL proceeding.  Any party objecting to the application of this Order to a subsequently filed or transferred case shall file a motion for relief supported by good cause within 30 days of the case being added to the master docket.

DATED:  April 4, 2008

_____
UNITED STATES DISTRICT JUDGE

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

## RELATED CASE ORDER

A Motion for Administrative Relief to Consider Whether Cases Should be Related or a *Sua Sponte* Judicial Referral for Purpose of Determining Relationship (Civil L.R. 3-12) has been filed. The time for filing an opposition or statement of support has passed. As the judge assigned to the earliest filed case below that bears my initials, I find that the more recently filed case(s) that I have initialed below are related to the case assigned to me, and such case(s) shall be reassigned to me. Any cases listed below that are not related to the case assigned to me are referred to the judge assigned to the next-earliest filed case for a related case determination.

<u>C 07-05944 SC</u>    <u>MDL No. 1917 In Re: Cathode Ray Tube (CRT) Antitrust Litigation</u>

<u>C 13-01173 EDL</u>    <u>Sharp Electronics Corporation et al v. Hitachi, Ltd. Et al</u>

**I find that the above case is related to the case assigned to me. <u>SC</u>**

## ORDER

Counsel are instructed that all future filings in any reassigned case are to bear the initials of the newly assigned judge immediately after the case number. Any case management conference in any reassigned case will be rescheduled by the Court. The parties shall adjust the dates for the conference, disclosures and report required by FRCivP 16 and 26 accordingly. Unless otherwise ordered, any dates for hearing noticed motions are vacated and must be re-noticed by the moving party before the newly assigned judge; any deadlines set by the ADR Local Rules remain in effect; and any deadlines established in a case management order continue to govern, except dates for appearance in court, which will be rescheduled by the newly assigned judge.

Dated: **03/26/2013**    _____

Judge Samuel Conti

## CLERK'S NOTICE

The court has reviewed the motion and determined that no cases are related and no reassignments shall occur.

Richard W. Wieking, Clerk

DATED: _____          By: _____
                                              **Deputy Clerk**

# CERTIFICATE OF SERVICE

I certify that on the date stated below, I lodged a copy of this order with each judicial officer and I mailed a copy to each counsel of record or *pro se* party in the cases listed above.

**Richard W. Wieking, Clerk**

**DATED: __03/26/2013_____**

**By: _____**

**Deputy Clerk**

Copies to:   Courtroom Deputies
                    Case Systems Administrators
                    Counsel of Record
Entered into Assignment Program: _____(date)

United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

In Re: Cathode Ray Tube (CRT)   )   No. 07-5944 SC
Antitrust Litigation            )
                                )   MDL No. 1917
_____ )
                                )
CRAGO, Inc.,                    )   ORDER APPOINTING
                                )   SPECIAL MASTER
          Plaintiff,            )
                                )
     v.                         )
                                )
CHUNGHWA PICTURE TUBES, LTD., et )
al.,                            )
                                )
          Defendants.           )
                                )
_____ )

I.   **SCOPE OF ORDER**

     1.   Order Applicable to All Cases in MDL Proceedings.  This

Order shall apply to all cases currently pending in MDL No. 1917

and to all related actions that have been or will be originally

filed in, transferred to, or removed to this Court and assigned

thereto (collectively, "the MDL proceedings").  This Order is

binding on all parties and their counsel in all cases currently

pending or subsequently made part of these proceedings and shall

govern each case in the proceedings unless it explicitly states

that it relates to specific cases.

**United States District Court**
For the Northern District of California

2.  <u>Appointment of Special Master</u>.  Pursuant to Federal Rule of Civil Procedure 53 and the hearings held on April 4 and May 9, and with the consent of the parties, the Court hereby appoints the Honorable Charles A. Legge, United States District Court Judge (Retired), as a Special Master to assist the Court in this litigation (hereinafter "Judge Legge" or "Special Master").

**II.  <u>BASIS FOR APPOINTMENT UNDER RULE 53(A) AND 53(B)(1)</u>**

3.  <u>Basis for Appointment</u>.  The Special Master is hereby appointed pursuant to Rule 53(a)(1) to perform duties consented to by the parties (Rule 53(a)(1)(A)), to make findings of fact on issues to be decided by the Court because appointment is warranted by an exceptional condition (namely, the volume of cases pending in these proceedings) (Rule 53(a)(1)(B)(i)), and to address pretrial and post-trial matters that cannot be addressed effectively and timely by an available district judge or magistrate judge of the district (Rule 53(a)(1)(C)).

4.  <u>No Grounds for Disqualification</u>.  Pursuant to Rule 53(a)(2) and 53(b)(3), the Special Master has filed an affidavit with this Court that states that he has no relationship to the parties, counsel, action, or Court that would require disqualification of a judge under 28 U.S.C. § 455.  During the course of these proceedings, the Special Master and the parties shall notify this Court immediately if they become aware of any potential grounds that would require disqualification.

5.  <u>Fairness Considerations</u>.  Pursuant to Rule 53(a)(3), the Court has considered the fairness of imposing the likely expenses

2

of the Special Master on the parties. The Court believes that the appointment and use of the Special Master will materially advance the litigation, thereby achieving considerable cost-saving to all parties. Moreover, the Court notes that the parties have consented to the Special Master's appointment and have agreed to arrange the Special Master's compensation, as discussed in paragraph 13 herein. The Court will protect against unreasonable expenses and delay through regular communication with the Special Master and Liaison Counsel.

6. <u>Proper Notice Given to All Parties</u>. Pursuant to Rule 53(b)(1) and the hearings held on April 4 and May 9, the Court gave all parties to the MDL proceedings notice of its intent to appoint the Special Master and an opportunity to be heard with respect to such appointment before issuing this Order.

**III. <u>SPECIAL MASTER'S DUTIES, AUTHORITY, AND COMPENSATION</u>**

7. <u>Diligence</u>. Pursuant to Rule 53(b)(2), the Court hereby directs the Special Master to proceed with all reasonable diligence in performing his duties in the MDL proceedings.

8. <u>Scope of Special Master's Duties</u>. Pursuant to Rule 53(b)(2)(A), the Special Master shall assist the Court with matters such as case management, trial selection and case resolution procedures, scheduling orders, specially-assigned discovery motions and disputes, facilitation of inter-jurisdictional coordination, and other matters in which the Court wishes to utilize his services.

9. <u>Scope of Special Master's Authority</u>. The Special Master

3

shall have the authority provided in Rule 53(c) and 53(d).

10. <u>Procedure for Motions Submitted to Special Master</u>. The procedural requirements contained in this Court's Pretrial Orders shall govern any motion practice before the Special Master.

11. <u>Ex Parte Communications</u>. Pursuant to Rule 53(b)(2)(B), the Special Master may communicate ex parte with the Court at any time. The Special Master shall not communicate ex parte with any party absent consent of Liaison Counsel without first providing notice and an opportunity to be heard to the opposing Liaison Counsel.

12. <u>Preservation of Materials and Preparation of Record</u>. Pursuant to Rule 53(b)(2)(C), the Special Master shall maintain orderly files consisting of all documents submitted to him by the parties and any of his written orders, findings, and/or recommendations. Pursuant to Rule 53(e), the Special Master shall file any written orders, findings, and/or recommendations with the Court via the Court's Electronic Case Filing ("ECF"), as described in the Court's Pretrial Order No. 1. Such filing shall fulfill the Special Master's duty to serve his order on the parties. Any records of the Special Master's activities other than his written orders, findings, and/or recommendations shall be filed in accordance with paragraph 17 herein.

13. <u>Compensation</u>. Pursuant to Rule 53(b)(2)(E) and 53(g), the parties shall mutually determine the hourly rate of the Special Master for his service in this MDL. The parties shall notify the Court of this rate so that the Court may incorporate it in its orders. The Special Master shall not charge for travel

4

United States District Court
For the Northern District of California

time. Judge Legge shall prepare a monthly invoice for his
services, which he shall provide to Plaintiffs' Liaison Counsel
and Defendants' Liaison Counsel. Plaintiffs' Liaison Counsel and
Defendants' Liaison Counsel shall each be responsible for paying
half of the Special Master's invoice; such invoices shall be paid
promptly.

14. <u>Special Master's Reports to Court</u>. Pursuant to Rule
53(f), the Special Master shall report to the Court as directed by
the Court.

## IV. <u>ACTION ON SPECIAL MASTER'S ORDERS, REPORTS, OR RECOMMENDATIONS</u>

15. <u>Scope of Section</u>. Pursuant to Rule 53(b)(2)(D) and
53(g), the procedures described in paragraphs 16 through 19 herein
shall govern any action on the Special Master's orders, reports,
and/or recommendations.

16. <u>Time Limits for Review</u>. Any party wishing to file
objections to or a motion to adopt or modify the Special Master's
orders, reports, and/or recommendations must file such objections
or motion with the Court within fourteen (14) days from the day
the Special Master filed the order, report, and/or recommendation
via ECF. Any order issued by the Special Master shall remain in
effect pending any such objection or motion.

17. <u>Filing the Record for Review</u>. The party filing the
objection or motion shall submit with such objection or motion any
record necessary for the Court to review the Special Master's
order, report, and/or recommendation, including any transcripts of
proceedings before the Special Master and any documents submitted

by the parties in connection with the Special Master's order, report, and/or recommendation. Failure to provide the record shall constitute grounds for the Court to overrule the objection or deny the motion.

18. <u>Standard for Court's Review</u>. Pursuant to the parties' stipulation, the Court shall review findings of fact made or recommended by the Special Master for clear error. The Court shall review <u>de novo</u> any conclusions of law made or recommended by the Special Master. The Court will set aside the Special Master's ruling on a procedural matter only for an abuse of discretion.

19. <u>Court's Actions on Master's Orders</u>. Pursuant to Rule 53(g)(1), in acting on an order, report, or recommendation of the Special Master, the Court shall afford each party an opportunity to be heard and, in its discretion, may receive evidence, and may adopt or affirm; modify; wholly or partly reject or reverse; resubmit to the Special Master with instructions; or make any further orders it deems appropriate.


IT IS SO ORDERED.


Dated: June 16, 2008


_____

UNITED STATES DISTRICT JUDGE

United States District Court
For the Northern District of California

**WELCOME TO THE U.S. DISTRICT COURT**
**SAN FRANCISCO OFFICE HOURS:**
**9:00 A.M. TO 4:00 P.M.**
**415.522.2000**
**www.cand.uscourts.gov**

In addition to the local rules, the following guidelines have been provided to ensure that the filing process is accomplished with ease and accuracy. For additional information or assistance, please call the above number during office hours.

1. Documents are to be filed in the Clerk's Office at the location of the chambers of the judge to whom the action has been assigned. We do not accept filings for cases assigned to judges or magistrate judges in the Oakland or San Jose division, per Civil L.R. 3-2(b).

2. This office will retain the original plus one copy of most documents submitted. We will conform as many copies as you bring for your use. Related cases require an extra copy for **each** related action designated.

3. The copy retained goes directly to the assigned Judge. Courtesy copies, or instructions for couriers to deliver a copy directly to chambers are inappropriate, unless you have been instructed to do so by court order.

4. In order to facilitate the file stamping process, each original document should be submitted on top of its copies. In other words, group like documents together (as opposed to a set of originals and separate sets of copies).

5. The case number must indicate whether it is a civil or criminal matter by the inclusion of **C** or **CR** at the beginning of the number. Miscellaneous and foreign judgment matters should also be indicated with initials **MISC** at the end of the case number.

6. The document caption should include the appropriate judge or magistrate judge involved in a particular matter or before whom an appearance is being made. This is especially important when submitting Settlement Conference Statements.

7. Documents are to be stapled or acco-fastened at the top. Backings, bindings and covers are not required. Two holes punched at the top of the original document will facilitate processing.

8. Appropriately sized, stamped, self-addressed return envelopes are to be included with proposed orders or when filing documents by mail.

9. Proofs of service should be attached to the back of documents. If submitted separately, you must attach a pleading page to the front of the document showing

case number and case caption.

10.     There are no filing fees once a case has been opened except for a Notice of Appeal.

11.     New cases must be accompanied by a completed and signed Civil Cover Sheet, the filing fee or fee waiver request form and an original plus **two** copies of the complaint and any other documents. For Intellectual Property cases, please provide an original plus **three** (3) copies of the complaint. Please present new cases for filing before 3:30 p.m., as they take a considerable amount of time to process.

12.     Copies of forms may be obtained at no charge. Forms and local rules are available at our website: www.cand.uscourts.gov for a no-cost download. They may also be picked up in person from the Clerk's Office forms cabinet or with a written request accompanied by an appropriate sized, stamped, self-addressed envelope for return. In addition, copies of the Local Rules may be obtained, free of charge, in the Clerk's Office or by sending a written request, along with a self-addressed, 10" x 14" return envelope, stamped with **$ 7.50** postage to: Clerk, U.S. District Court, 450 Golden Gate Avenue, 16th Floor, San Francisco, CA 94102.

13.     Two computer terminals which allow public access to case dockets and one terminal with information regarding files at the Federal Records Center (FRC) are located in the reception area of the Clerk's Office. Written instructions are posted by the terminals. Outside of the Clerk's Office, electronic access to dockets is available through PACER. To obtain information or to register call 1-800-676-6851.

14.     A file viewing room is located adjacent to the reception area. Files may be viewed in this area after signing the log sheet and presenting identification. Files are to be returned by 1:00 pm. Under no circumstances are files to be removed from the viewing room.

15.     The Clerk's Office can only accept payment by exact change, check made payable to Clerk, U.S. District Court, or credit card if paying in person.

16.     Two pay copy machines are located in the file viewing room for public use, at twenty-five cents ($.25) per page or by purchasing a copy card. Orders for copy work may be placed through Colour Drop by phoning 415-353-5720. Arrangements may be made to bring in a personal copier by calling the Clerk's Office in advance.

17.     Drop boxes for filing when the Clerk's Office is closed are available. Please visit our website for further details: .http://www.cand.uscourts.gov/dropbox

United States District Court
For the Northern District of California

1
2
3          IN THE UNITED STATES DISTRICT COURT
4
5          NORTHERN DISTRICT OF CALIFORNIA
6          NOTICE OF ASSIGNMENT OF CASE
7          TO A UNITED STATES MAGISTRATE JUDGE FOR TRIAL
8
9          Pursuant to General Order 44, the Assignment Plan of the United States District Court for
10   the Northern District of California, this case has been randomly assigned to Magistrate Judge
11   Elizabeth D. Laporte.
12          Pursuant to Title 28 U.S. C. § 636(c), with written consent of all parties, a magistrate judge
13   may conduct all proceedings in the case. Attached is a form to complete if you consent to proceed
14   before the assigned magistrate judge and a form to complete if you decline to proceed before the
15   assigned magistrate judge. Electronic versions of both forms are also available at the Court's
16   Internet site: http://www.cand.uscourts.gov. Click on Forms-Civil. A party is free to withhold
17   consent without adverse consequences. If a party declines to consent, the case will be randomly
18   reassigned to a district judge and a case management conference will be scheduled on the district
19   judge's calendar as close as possible to the date presently scheduled before the magistrate judge.
20          Plaintiffs or removing parties must file a consent or declination within 14 days of the filing
21   of the complaint or removal.  All other parties must file a consent or declination within 14 days of
22   appearing in the case.
23          The plaintiff or removing party shall serve a copy of this notice and all attachments upon all
24   other parties in the action pursuant to Federal Rules of Civil Procedure 4 and 5.
25
26                                          FOR THE COURT,
27                                          RICHARD W. WIEKING, CLERK
28
                                            Simone Voltz
                                            By: Deputy Clerk

1
2
3
4
5
6                          UNITED STATES DISTRICT COURT
7                          NORTHERN DISTRICT OF CALIFORNIA
8
9                                                    No. C
10              Plaintiff(s),              **CONSENT TO PROCEED BEFORE A
                                            UNITED STATES MAGISTRATE JUDGE**
11        v.
12
13              Defendant(s).
                                                    /
14
15         CONSENT TO PROCEED BEFORE A UNITED STATES MAGISTRATE JUDGE
16            In accordance with the provisions of Title 28, U.S.C. Section 636(c), the undersigned party
17    hereby voluntarily consents to have a United States Magistrate Judge conduct any and all further
18    proceedings in the case, including trial, and order the entry of a final judgment.  Appeal from the
19    judgment shall be taken directly to the United States Court of Appeals for the Ninth Circuit.
20
21    Dated: _____
                                           _____
22                                         Signature
23                                         Counsel for _____
                                           (Plaintiff, Defendant or indicate "pro se")
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

No. C

Plaintiff(s),

v.

Defendant(s).
_____/

**DECLINATION TO PROCEED BEFORE A MAGISTRATE JUDGE**
**AND**
**REQUEST FOR REASSIGNMENT TO A UNITED STATES DISTRICT JUDGE**

REQUEST FOR REASSIGNMENT TO A UNITED STATES DISTRICT JUDGE

The undersigned party hereby declines to consent to the assignment of this case to a United States Magistrate Judge for trial and disposition and hereby requests the reassignment of this case to a United States District Judge.

Dated: _____

Signature_____

Counsel for _____
(Plaintiff, Defendant, or indicate "pro se")

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA



SHARP ELECTRONICS CORP,

Plaintiff (s),

v.

HITACHI LTD,

Defendant(s).

No. C 13-01173 EDL

**ORDER SETTING INITIAL CASE
MANAGEMENT CONFERENCE
AND ADR DEADLINES**

IT IS HEREBY ORDERED that this action is assigned to the Honorable Elizabeth D. Laporte.  When serving the complaint or notice of removal, the plaintiff or removing defendant must serve on all other parties a copy of this order , the Notice of Assignment of Case to a United States Magistrate Judge for Trial, and all other documents specified in Civil Local Rule 4-2.  Counsel must comply with the case schedule listed below unless the Court otherwise orders.

IT IS FURTHER ORDERED that this action is assigned to the Alternative Dispute Resolution (ADR) Multi-Option Program governed by ADR Local Rule 3.  Counsel and clients shall familiarize themselves with that rule and with the material entitled "Dispute Resolution Procedures in the Northern District of California" on the Court ADR Internet site at www.adr.cand.uscourts.gov.  A limited number of printed copies are available from the Clerk's Office for parties in cases not subject to the court's Electronic Case Filing program (ECF).

IT IS FURTHER ORDERED that plaintiff or removing defendant serve upon all parties the brochure entitled "Consenting To A Magistrate Judge's Jurisdiction In The Northern District Of California," additional copies of which can be downloaded from the following Internet site: http://www.cand.uscourts.gov.

## CASE SCHEDULE -ADR MULTI-OPTION PROGRAM

| Date | Event | Governing Rule |
|------|-------|----------------|
| 3/15/2013 | Complaint filed | |
| 5/21/2013 | *Last day to:<br>• meet and confer re: initial disclosures, early settlement, ADR process selection, and discovery plan | FRCivP  26(f) & ADR L.R.3-5 |
| | • file ADR Certification signed by Parties and Counsel (form available at http://www.cand.uscourts.gov) | Civil L.R. 16-8 (b) & ADR L.R. 3-5(b) |
| | • file either Stipulation to ADR Process or Notice of Need for ADR Phone Conference (form available at http://www.cand.uscourts.gov) | Civil L.R. 16-8 (c) & ADR L.R. 3-5(b) & (c) |

| | | |
|---|---|---|
| 6/4/2013 | Last day to file Rule 26(f) Report, complete initial disclosures or state objection in Rule 26(f) Report and file Case Management Statement per attached Standing Order re Contents of Joint Case Management Statement (also available at http://www.cand.uscourts.gov) | FRCivP 26(a) (1) Civil  L.R . 16-9 |
| 6/11/2013 | INITIAL CASE MANAGEMENT CONFERENCE (CMC)  in Ctrm E, 15th Floor, SF at 10:00 AM | Civil  L.R.  16-10 |

*If the Initial Case Management Conference is continued, the other deadlines are continued accordingly.

**United States District Court**
For the Northern District of California

1
2
3              UNITED STATES DISTRICT COURT
4              NORTHERN DISTRICT OF CALIFORNIA
5
6       Plaintiff(s),              No. C    EDL
7
         v.                        STANDING ORDER RE
8                                  CASE MANAGEMENT CONFERENCE
9
10
        Defendant(s).
11   _____/
12          **Lead trial counsel** who will try this case are directed to confer in advance of the Case
13   Management Conference with respect to all matters contained in the July 1, 2011 Standing Order for
14   all Judges of the Northern District of California regarding Contents of Joint Case Management
15   Conference, including a discovery plan and discovery limits and all other matters described in Federal
16   Rules of Civil Procedure 16(a), 16(b) and 26(f) and Civil Local Rule 16-10. Pursuant to Civil L.R. 16-
17   10(a), **lead trial counsel shall attend the Case Management Conference** and be prepared to discuss
18   all matters referred to in this order.  Counsel shall have the authority to enter stipulations and make
19   admissions regarding all matters described herein.
20          PLAINTIFF IS DIRECTED TO SERVE COPIES OF THIS ORDER AT ONCE UPON ALL
21   PARTIES IN THIS ACTION AND UPON THOSE SUBSEQUENTLY JOINED IN ACCORDANCE
22   WITH THE PROVISIONS OF FEDERAL RULES OF CIVIL PROCEDURE 4 AND 5 AND CIVIL
23   LOCAL RULES 4 AND 5, and to file with the Clerk of the Court a Certificate reflecting such service.
24          Failure to comply with this order, the provisions of Federal Rule of Civil Procedure 16 and 26(f)
25   or the provisions of Civil L.R. 16-10 may be grounds for sanctions. (See Fed. R. Civ. P. 16(f)).
26
27   Dated: October 2, 2012
28                                        *Elizabeth D. Laporte*
                                          ELIZABETH D. LAPORTE
                                          United States Magistrate Judge

STANDING ORDER

Magistrate Judge Elizabeth D. Laporte

1)   Civil law and motion is heard on Tuesdays at 9:00 a.m.  Criminal law and motion is heard on
     Tuesdays at 11:00 a.m.  Counsel need not reserve a hearing date in advance.  However, noticed
     dates may be reset as the court's calendar requires.

2)   Case Management Conferences are held on Tuesdays at 10:00 a.m.  Pretrial Conferences are held
     on Tuesdays at 2:00 p.m.

3)   Discovery motions may be addressed to the Court in three ways.  A motion may be noticed on not
     less than 35 days pursuant to Civil L.R. 7-2.  Alternatively, any party may seek an order to
     shorten or enlarge time under Civil L.R. 6-3 if the circumstances justify that relief.  In
     emergencies during discovery events, the Court is available pursuant to Civil L.R. 37-1(b).

     In the event a discovery dispute arises, counsel (or if pro se, the party) seeking discovery or a
     protective order shall confer in good faith with opposing counsel (or pro se party) in an effort to
     resolve the dispute without court action, as required by Fed. R. Civ. P. 37 and Civil L.R. 37-1(a).
     The Court will not consider discovery motions unless the moving party has complied with Fed. R.
     Civ. P. 37 and Civil L.R. 37-1(a).

4)   The Court strives to set matters and render decisions in a timely manner.  The Court encourages
     parties to advise the Court by letter to chambers of any matter that appears to have been unduly
     delayed.

5)   Requests to appear telephonically at case management conferences must be filed and served one
     (1) week before the conference in accordance with Civil L.R. 16-10(a).


IT IS SO ORDERED.

Dated: November 28, 2012

                                        _Elizth D. Laporte_
                                        ELIZABETH D. LAPORTE
                                        United States Magistrate Judge

# STANDING ORDER FOR ALL JUDGES
## OF THE NORTHERN DISTRICT OF CALIFORNIA

### CONTENTS OF JOINT CASE MANAGEMENT STATEMENT

Commencing July 1, 2011, all judges of the Northern District of California will require identical information in Joint Case Management Statements filed pursuant to Civil Local Rule 16-9. The parties must include the following information in their statement which, except in unusually complex cases, should not exceed ten pages:

1. <u>Jurisdiction and Service</u>: The basis for the court's subject matter jurisdiction over plaintiff's claims and defendant's counterclaims, whether any issues exist regarding personal jurisdiction or venue, whether any parties remain to be served, and, if any parties remain to be served, a proposed deadline for service.

2. <u>Facts</u>: A brief chronology of the facts and a statement of the principal factual issues in dispute.

3. <u>Legal Issues</u>: A brief statement, without extended legal argument, of the disputed points of law, including reference to specific statutes and decisions.

4. <u>Motions</u>: All prior and pending motions, their current status, and any anticipated motions.

5. <u>Amendment of Pleadings</u>: The extent to which parties, claims, or defenses are expected to be added or dismissed and a proposed deadline for amending the pleadings.

6. <u>Evidence Preservation</u>: A brief report certifying that the parties have reviewed the Guidelines Relating to the Discovery of Electronically Stored Information ("ESI Guidelines"), and confirming that the parties have met and conferred pursuant to Fed. R. Civ. P. 26(f) regarding reasonable and proportionate steps taken to preserve evidence relevant to the issues reasonably evident in this action. *See* ESI Guidelines 2.01 and 2.02, and Checklist for ESI Meet and Confer.

7. <u>Disclosures</u>: Whether there has been full and timely compliance with the initial disclosure requirements of Fed. R. Civ. P. 26, and a description of the disclosures made.

8. <u>Discovery</u>: Discovery taken to date, if any, the scope of anticipated discovery, any proposed limitations or modifications of the discovery rules, a brief report on whether the parties have considered entering into a stipulated e-discovery order, a proposed discovery plan pursuant to Fed. R. Civ. P. 26(f), and any identified discovery disputes.

9. <u>Class Actions</u>: If a class action, a proposal for how and when the class will be certified.

10. <u>Related Cases</u>: Any related cases or proceedings pending before another judge of this court, or before another court or administrative body.

*Effective date: July 1, 2011 (Last Revised November 27, 2012)*

11. <u>Relief:</u> All relief sought through complaint or counterclaim, including the amount of any damages sought and a description of the bases on which damages are calculated. In addition, any party from whom damages are sought must describe the bases on which it contends damages should be calculated if liability is established.

12. <u>Settlement and ADR:</u> Prospects for settlement, ADR efforts to date, and a specific ADR plan for the case, including compliance with ADR L.R. 3-5 and a description of key discovery or motions necessary to position the parties to negotiate a resolution.

13. <u>Consent to Magistrate Judge For All Purposes:</u> Whether <u>all</u> parties will consent to have a magistrate judge conduct all further proceedings including trial and entry of judgment. ___ Yes   ___ No

14. <u>Other References:</u> Whether the case is suitable for reference to binding arbitration, a special master, or the Judicial Panel on Multidistrict Litigation.

15. <u>Narrowing of Issues:</u> Issues that can be narrowed by agreement or by motion, suggestions to expedite the presentation of evidence at trial (e.g., through summaries or stipulated facts), and any request to bifurcate issues, claims, or defenses.

16. <u>Expedited Trial Procedure:</u> Whether this is the type of case that can be handled under the Expedited Trial Procedure of General Order No. 64 Attachment A. If all parties agree, they shall instead of this Statement, file an executed Agreement for Expedited Trial and a Joint Expedited Case Management Statement, in accordance with General Order No. 64 Attachments B and D.

17. <u>Scheduling:</u> Proposed dates for designation of experts, discovery cutoff, hearing of dispositive motions, pretrial conference and trial.

18. <u>Trial:</u> Whether the case will be tried to a jury or to the court and the expected length of the trial.

19. <u>Disclosure of Non-party Interested Entities or Persons:</u> Whether each party has filed the "Certification of Interested Entities or Persons" required by Civil Local Rule 3-16. In addition, each party must restate in the case management statement the contents of its certification by identifying any persons, firms, partnerships, corporations (including parent corporations) or other entities known by the party to have either: (i) a financial interest in the subject matter in controversy or in a party to the proceeding; or (ii) any other kind of interest that could be substantially affected by the outcome of the proceeding.

20. Such other matters as may facilitate the just, speedy and inexpensive disposition of this matter.

*Effective date: July 1, 2011 (Last Revised November 27, 2012)*

# UNITED STATES DISTRICT COURT
## Northern District of California

Consenting to a
Magistrate Judge's Jurisdiction in the
Northern District of California








**Claudia Wilken, Chief Judge**
**Richard W. Wieking, Clerk of Court**

# Table of Contents

A MESSAGE FROM THE CHIEF JUDGE ....................................................................................................1

HOW CONSENT JURISDICTION WORKS....................................................................................................2

POTENTIAL BENEFITS OF CONSENTING TO MAGISTRATE JUDGE JURISDICTION ..........................................3

MAGISTRATE JUDGE LAUREL BEELER ....................................................................................................4

MAGISTRATE JUDGE JACQUELINE SCOTT CORLEY................................................................................5

MAGISTRATE JUDGE NATHANAEL COUSINS.............................................................................................6

MAGISTRATE JUDGE MARIA-ELENA JAMES ...........................................................................................7

MAGISTRATE JUDGE ELIZABETH D. LAPORTE .......................................................................................8

MAGISTRATE JUDGE JOSEPH C. SPERO ...................................................................................................9

MAGISTRATE JUDGE DONNA M. RYU....................................................................................................10

MAGISTRATE JUDGE KANDIS A. WESTMORE..........................................................................................11

MAGISTRATE JUDGE PAUL SINGH GREWAL............................................................................................12

MAGISTRATE JUDGE HOWARD R. LLOYD...............................................................................................13

MAGISTRATE JUDGE NANDOR J. VADAS.................................................................................................14

## The Northern District of California

### Chief District Judge
### Claudia Wilken

### Clerk of Court
### Richard W. Wieking
Phone: 415-522-2045
Fax: 415-522-2176

### San Francisco Division
450 Golden Gate Avenue
San Francisco, California 94102
Phone: 415-522-2000
Fax: 415-522-3605

### Oakland Division
1301 Clay Street, Suite 400S
Oakland, California 94612-5212
Phone: 510-637-3530
Fax: 510-637-3545

### San Jose Division
280 South First Street, Room 2112
San Jose, California 95113
Phone: 408-535-5364/5363
Fax: 408-535-5360

### Eureka Division
514 H Street
Eureka, California 95501
Phone: 707-445-3612
Fax: 707-441-1659

### A Message from the Chief Judge of the United States District Court
### CLAUDIA WILKEN



As you embark on civil litigation in the United States District Court for the Northern District of California—whether as a party to a lawsuit or as an attorney—I encourage you to familiarize yourself with the range of services provided by the court's magistrate judges and especially to consider consenting to have a magistrate judge handle all aspects of your case, up to and including dispositive motions, jury or court trial and the entry of judgment.

The Northern District was one of the first federal trial courts in the country to assign a wide range of civil cases directly to magistrate judges upon filing. As a consequence, the magistrate judges have direct experience with nearly all types of civil matters filed in our court. Because our court is very busy, agreeing to proceed before a magistrate judge often means that the case will be resolved more quickly than if the case remained before a district judge. If the case must be tried, your trial date will be more certain and less likely to be continued to accommodate a felony jury trial.

Every magistrate judge in the Northern District underwent a highly competitive selection process and had years of litigation experience before being appointed to the bench.

While consent is customarily given soon after a case is filed, parties may consent to have a magistrate judge preside over their case at any point in the proceedings.

As the biographies that follow demonstrate, each is active in law school teaching and continuing legal education for attorneys. Many have been appointed to important committees within the federal courts.

Each has been appointed based on detailed, confidential feedback from the bar and the community; each is equipped to handle the full range of issues presented to our court. Combined, the Northern District's magistrate judges bring hundreds of hours of federal judicial experience to their work at our court.

**Claudia Wilken**
**Chief Judge**

## HOW CONSENT JURISDICTION WORKS

Since 1979, the parties in a civil action have had the option of consenting to have all aspects of their case, including trial, handled by a United States magistrate judge.[1] The Northern District of California has been one of the leaders nationwide in implementing this process. When a civil action is filed in this District, ordinarily it will be randomly assigned for all purposes to either a district judge or a magistrate judge.[2]

The full-time magistrate judges of this District are included in the civil case assignment system in the same manner as active district judges, except for prisoner petitions, capital habeas corpus cases, securities class actions, and bankruptcy appeals or bankruptcy withdrawal of reference cases. Each magistrate judge typically has over 100 consent cases.

In 2011, the magistrate judges completed handling approximately 1400 civil cases in which they had exercised consent jurisdiction. When a case is initially assigned to a magistrate judge, the plaintiff is given a form to use to either consent to or decline magistrate judge jurisdiction.[3] Plaintiff is also required to serve that form on each defendant.

Each party should make a decision regarding magistrate judge jurisdiction as soon as possible, and in any event prior to the case management conference which is generally held about 100 days after the case is filed. Civil L.R. 73-1.

If all parties consent to magistrate jurisdiction, then the magistrate judge to whom the case is assigned will preside over all aspects of the case, through trial. F.R.Civ.P. 73(b). An appeal from the magistrate judge's rulings is made to the appropriate appellate court exactly as if the rulings were from a district judge. F.R.Civ.P. 73(c).

A civil case initially assigned to a district judge may also be reassigned to a magistrate judge if all parties consent to magistrate judge jurisdiction. The parties should expect the district judge to ask at the case management conference whether they have considered consenting to a magistrate judge jurisdiction.

Each magistrate judge has an assigned courtroom designed to accommodate civil jury trials. Each magistrate judge has at least one law clerk. Many have a second law clerk in lieu of a secretary.

Magistrate judges are fully integrated into the court's administration, serving on all court committees and chairing some of them.

Unlike district judges, magistrate judges do not preside over felony criminal matters.

2

## POTENTIAL BENEFITS OF CONSENTING TO
## MAGISTRATE JUDGE JURISDICTION

The Northern District of California has always recruited experienced trial attorneys of the highest caliber who undergo a merit selection process before being appointed as a magistrate judge. Because of their diverse experiences while in practice and while presiding over civil matters including trials, this District's magistrate judges are able to preside over all types of civil litigation. The biographies of the current magistrate judges are set forth in the pages ahead.

Parties that consent to have their case tried before a magistrate judge will receive a date certain for trial. The right to a speedy trial in felony criminal matters requires district judges to give statutory priority to trying those cases, which can sometimes require that civil trial dates be moved.

The historical experience in this District has been that our magistrate judges have virtually always met their scheduled trial dates. Because magistrate judges' trial dockets are generally less crowded than those of district court judges, they are often able to schedule a trial within a year of the filing of the complaint.

### ENDNOTES

1. Federal Magistrate Act of 1979, 28 U.S.C § 636(c)(1). See also F.R.Civ.P. 73 (b).

2. District judges, sometimes called Article III Judges, are appointed by the President, confirmed with the advice and consent of the Senate and hold their position for life. Magistrate Judges are appointed by the district judges of each district following a merit selection process and serve for a period of eight years, subject to reappointment.

3. If the case has been removed from state court, the form is given to the removing party, who is required to serve it on all other parties.

**MAGISTRATE JUDGE LAUREL BEELER**
San Francisco Division



Magistrate Judge Laurel Beeler was appointed in 2010. She has presided over and settled hundreds of civil and criminal cases in a wide range of subject areas, including intellectual property, employment, civil rights, *qui tam*, and business disputes.

Before joining the court, Judge Beeler was an assistant United States attorney in the Northern District, prosecuting complex white-collar cases with parallel criminal and civil components. She served as the Office's Professional Responsibility Officer, Deputy Chief of the Criminal Division, and Major Crimes' group supervisor. Before that, she was a law clerk to the Honorable Cecil F. Poole, United States Court of Appeals for the Ninth Circuit, and the Civil Appeals Division Chief at the Ninth Circuit's Office of Staff Attorneys.

Judge Beeler is a member of the Ninth Circuit's Jury Trial Improvement Committee, one of four national judicial liaisons to the U.S. Department of Justice/Office of Defender Services Joint Electronic Technology Working Group, the chair of the Northern District's Criminal Rules & Practice Committee, and a member of the Northern District's Criminal Justice Act Committee. She was President of the Federal Bar Association, co-chair of the Lawyer Representatives to the Ninth Circuit from the Northern District, and a member of the board of directors for the Bar Association of San Francisco (BASF). She is a member of BASF's Criminal Advisory Committee and the Edward J. McFetridge American Inn of Court. In April 2006, Judge Beeler received the Northern District Judicial Conference's Public Service Award.

Judge Beeler teaches civil trial practice at the University of California, Berkeley School of Law and a high-school civics and advocacy class at the San Francisco Court School for Juvenile Offenders. She taught Criminal Procedure for many years at U.C. Hastings College of the Law, lectures regularly at Bay Area law schools, and participated in rule-of-law projects in Indonesia, Vietnam, Cambodia, the Philippines, and Jordan.

Judge Beeler graduated with honors from the University of Washington School of Law, where she was Order of the Coif and an Articles Editor on the *Washington Law Review*. She received her A.B. with honors from Bowdoin College.

4

## MAGISTRATE JUDGE JACQUELINE SCOTT CORLEY
### San Francisco Division



Magistrate Judge Jacqueline Scott Corley took the bench in May 2011. As a magistrate judge she has presided over a variety of civil cases at all stages of the proceedings, from motions to dismiss through jury trial. She has also served as a settlement judge in nearly every type of federal litigation.

Just prior to her appointment as a magistrate judge Corley was a partner at Kerr & Wagstaffe LLP in San Francisco as a civil litigator with an emphasis on federal practice. She represented individuals, government entities, and institutions as plaintiffs and defendants in a variety of matters that included trademark, copyright, patent, constitutional law, defamation, malicious prosecution, class actions, contract and probate.

From 1998 through 2009 Judge Corley served as a career law clerk to the Honorable Charles R. Breyer. She also served on the Northern District of California Alternative Dispute Resolution mediation and early neutral evaluation panels from 2006 through her appointment.

Judge Corley received her undergraduate degree from the University of California, Berkeley, and her J.D. from Harvard Law School, *magna cum laude*, where she was an editor and Articles Chair of the *Harvard Law Review*. Upon graduation she served as a law clerk to the Honorable Robert E. Keeton of the United States District Court for the District of Massachusetts. She then practiced complex commercial litigation and white-collar criminal defense at Goodwin, Procter LLP in Boston and was a litigation associate at Coblentz, Patch, Duffy & Bass LLP in San Francisco before joining Judge Breyer in 1998.

## MAGISTRATE JUDGE NATHANAEL COUSINS
### San Francisco Division



Magistrate Judge Nathanael Cousins was appointed in 2011. Immediately before joining the Court, he was a federal prosecutor in the U.S. Attorney's Office for the Northern District of California. One of his most significant duties there was working in Salinas on Operation Ceasefire, a community program to reduce gang violence.

Judge Cousins served for five years in the Antitrust Division of the U.S. Department of Justice. At the Antitrust Division, he was part of the team that investigated and prosecuted global price-fixing cartels in memory chip markets, including DRAM. For his work on the DRAM cases, he was awarded the Attorney General's Distinguished Service Award.

Before joining the Department of Justice, he was an associate and then a partner in the Chicago office of Kirkland & Ellis, and before that an associate in the Los Angeles office of Greenberg Glusker. At these firms he litigated civil and criminal cases in state and federal trial and appellate courts, with an emphasis on cases involving antitrust, class actions, and investment fraud. He also served for many years as pro bono class counsel on behalf of the inmates in an Illinois state prison.

Judge Cousins has taught legal writing, moot court, and antitrust at the University of California, Hastings College of the Law.

Judge Cousins graduated with honors from Hastings, where he was Order of the Coif. He received his undergraduate degree from Stanford. He studied abroad at Leiden University in the Netherlands and Novosibirsk University in Russia. He clerked for the Honorable F.A. Little, Jr., Chief Judge of the United States District Court, Western District of Louisiana.

## MAGISTRATE JUDGE MARIA-ELENA JAMES
### San Francisco Division



Magistrate Judge Maria-Elena James was appointed in 1994. She has presided over numerous cases and conducted thousands of settlement conferences. Outside the courtroom, she teaches a number of classes at three Bay Area law schools: University of California, Hastings College of the Law, University of California, San Francisco School of Law, and Golden Gate University.

She also co-created a course called *The Roles of Referees and Commissioners* and taught the course, along with another course, at the California Judicial Education and Research College.

A 1978 graduate of the University of San Francisco, School of Law, she served as director of the Small Claims Court Education Project in the Consumer Fraud Unit of the San Francisco District Attorney's Office. She went on to serve as a deputy public defender in San Francisco, staff attorney for the National Labor Relations Board, and Deputy City Attorney as well as supervising attorney in San Francisco.

Judge James then served as a Commissioner in the San Francisco Superior Court for six years. She volunteers as a mock trial judge for all grades of students and serves as a mentor to law students. Her speaking engagements include a 2006 panel on Comparative Racial Justice at the University of Paris, Nanterre and the Assemblée Nationale.

7

## MAGISTRATE JUDGE ELIZABETH D. LAPORTE
### San Francisco Division



Magistrate Judge Elizabeth D. Laporte was appointed in 1998. She has presided over numerous civil cases through trial or other disposition, including patent, trademark, copyright, employment, civil rights and environmental cases. She also has conducted over 1000 settlement conferences, handled criminal matters, and resolved discovery disputes.

A 1982 graduate of Yale Law School and a Marshall Scholar, she clerked for the Honorable Marilyn Hall Patel in the Northern District of California. She was a partner at the boutique litigation firm of Turner & Brorby, and an Administrative Law Judge for the California Department of Insurance. In 1996, she began serving as Chief of Special Litigation for the San Francisco City Attorney's Office, and was named a Lawyer of the Year by *California Lawyer*. She has authored articles on patent litigation and settlement in the *Northern California ABTL [Association of Business Trial Lawyers] Report*, and has written on e-discovery.

Judge Laporte serves on the Board of Governors for the Northern California Chapter of the Association of Business Trial Lawyers. She is also a judicial observer for the Sedona Conference Working Group on Electronic Document Retention and Production.

Judge Laporte is the Alternative Dispute Resolution Magistrate Judge for the Northern District of California and the chair of the E-Discovery Subcommittee for the Northern District Local Rules Committee. She is also a past chair of the Magistrate Judge Executive Board of the Ninth Circuit, and was a member of the Jury Trial Improvement Committee of the Ninth Circuit Court of Appeals from 2002 to 2009. She regularly speaks at legal conferences and judicial education programs on patent litigation, jury trials, e-discovery, employment law, settlement, and other topics.

## MAGISTRATE JUDGE JOSEPH C. SPERO
### San Francisco Division



Magistrate Judge Joseph C. Spero was appointed in 1999. He has presided as trial judge in criminal and civil cases in a variety of subject areas, including patent, employment, civil rights, commercial contract, trademark, and federal misdemeanor cases. He has also served as a settlement judge in over 1000 cases.

He serves as the liaison judge for Pretrial Services and Probation, and as a member of the court's Technology Committee as well as having served as a member of the Non-Appropriated Funds Committee.

A 1981 graduate of Columbia University School of Law, he clerked for the United States Court of Appeals for the Ninth Circuit. He worked as an associate at Skadden, Arps, Slate, Meagher & Flom, and as associate then partner at Coblentz, Cahen, McCabe & Breyer (now Coblentz, Patch, Duffy & Bass).

While in private practice, he trained as a mediator at Harvard Law School and served as a mediator in the Northern District's Alternative Dispute Resolution Program. He also served as a Judge Pro-Tem for the San Francisco County Superior Court.

Judge Spero served as pro bono counsel in a variety of cases. He received the Thurgood Marshall Award from the Bar Association of the City of New York.

## MAGISTRATE JUDGE DONNA M. RYU
### Oakland Division



Magistrate Judge Donna M. Ryu was appointed in 2010. Before joining the Court, she served as a Clinical Professor of Law at the University of California, Hastings College of the Law and as Associate Professor and Associate Director of the Women's Employment Rights Clinic of Golden Gate University Law School. Her clinical courses included instruction on negotiation, mediation, and trial techniques, as well as employment and social security disability law. She also taught in the area of legal ethics.

She began her legal career with McCutchen, Doyle, Brown & Enersen in San Francisco before joining an Oakland-based firm specializing in civil rights class actions. She later formed her own firm, Ryu, Dickey & Larkin. She has extensive experience in discovery and motion work, as well as trial work involving complex litigation.

She has been honored as a California Lawyer of the Year in Employment Law. She is also the recipient of the Asian American Bar Association's Joe Morozumi Award for Exceptional Legal Advocacy and the Rutter Award for Excellence in Teaching. She co-designed and served on the faculty of a national training institute on class actions, and has written and lectured extensively in the areas of employment law, discovery, attorneys' fees, class actions, and professionalism in lawyering.

Judge Ryu graduated with honors from Yale University, and received her law degree in 1986 from the University of California, Berkeley School of Law, where she was a founder of the *Berkeley Journal of Gender, Law and Justice*.

## MAGISTRATE JUDGE KANDIS A. WESTMORE
Oakland Division



Magistrate Judge Kandis A. Westmore was appointed in February 2012, and serves on the Court's Standing Committee on Criminal Justice Act Administration.

Judge Westmore received her Bachelor of Arts Degree in Psychology from the University of California, Berkeley in 1989 and her law degree from the University of San Francisco, School of Law in 1997.

During law school, Judge Westmore served as a judicial extern to the Honorable Saundra Brown Armstrong of the United States District Court for the Northern District of California, Oakland Division.

Judge Westmore began her legal career at an Oakland-based boutique law firm specializing in plaintiffs' civil rights litigation. In 1999, she joined the Oakland City Attorney's Office as a deputy city attorney, initially prosecuting code enforcement and drug nuisance abatement cases and serving as advice counsel to City Departments. She later served as general litigation trial counsel and then as law and motion and appellate counsel, representing the City and its employees in cases in federal and state trial and appellate courts, including civil rights, personal injury, debt collection, inverse condemnation, labor and employment, and complex litigation.

In 2011, Judge Westmore served as President-Elect of the Alameda County Bar Association (ACBA) and volunteered for the ACBA Volunteer Legal Services Corporation's Pro Bono Program representing low-income individuals who otherwise could not afford representation in family law cases.

## MAGISTRATE JUDGE PAUL SINGH GREWAL
### San Jose Division



Magistrate Judge Paul S. Grewal was appointed in 2010. He has presided over and settled criminal and civil cases in a wide range of subject areas, including patent, employment, civil rights, commercial contract, trademark, and federal misdemeanor cases. He serves as a member of the court's Technology Practice and Patent Local Rules Committees.

Judge Grewal received his Bachelor of Science from MIT, where he was elected to Tau Beta Pi and Sigma Xi, and his law degree from the University of Chicago. After graduating from law school, he served as a law clerk to the Honorable Sam H. Bell of the United States District Court for the Northern District of Ohio. After working on complex commercial litigation at Pillsbury Madison & Sutro, he served as a law clerk to the Honorable Arthur J. Gjarsa of the United States Court of Appeals for the Federal Circuit.

Judge Grewal then joined Day Casebeer Batchelder & Madrid (which later merged with Howrey LLP), where he was elected partner and served on the firm's management committee. His practice was focused on intellectual property litigation, with a focus on patent trials and appeals.

He has tried patent cases in a variety of federal district courts across the country, and has argued appeals before a variety of federal appellate courts, including the Federal Circuit. His clients ranged from large technology and biotechnology firms to small medical device and financial firms to individual inventors. He also was registered to practice before the Patent and Trademark Office, and his practice included re-examinations before the PTO.

Judge Grewal is a former President of the South Asian Bar of Northern California and the North American South Asian Bar Association.

## MAGISTRATE JUDGE HOWARD R. LLOYD
### San Jose Division



Magistrate Judge Howard R. Lloyd was appointed in 2002. He has presided over a variety of civil and criminal trials and has extensive discovery as well as case-dispositive law and motion experience. He has presided over hundreds of settlement conferences in a wide variety of civil cases.

Judge Lloyd earned his undergraduate degree at the College of William and Mary, graduating Phi Beta Kappa, and his law degree from the University of Michigan Law School. He then worked as a civil trial and appellate lawyer for 30 years with a prominent San Jose law firm and personally tried many cases and argued dozens of appeals. He practiced in all areas, but especially employment, intellectual property, and commercial law. He then worked for two years as an independent and full time arbitrator and mediator.

While in private practice Judge Lloyd was selected for voluntary service as an Early Neutral Evaluator (Northern District of California), mediator (California Court of Appeals), and Settlement Judge Pro Tem (Santa Clara County Superior Court). He is a frequent presenter at continuing education courses for attorneys and currently teaches at Santa Clara University Law School.

## MAGISTRATE JUDGE NANDOR J. VADAS
### Eureka Division



Magistrate Judge Nandor J. Vadas was appointed in 2004. He graduated from the University of California, Santa Cruz and University of California, Hastings College of the Law. Judge Vadas maintains chambers in Eureka, but presides over cases in San Francisco.

Judge Vadas has presided over a wide variety of criminal cases and civil cases, including matters involving civil rights, employment discrimination, the Americans with Disabilities Act, Indian law, and the Endangered Species Act.

Judge Vadas initiated an innovative early settlement program for prisoner civil rights cases designed to provide an alternative method of resolving lawsuits brought each year by unrepresented California prisoners housed at Pelican Bay State Prison. The success of the program led to its expansion to all state prisons in the Northern District of California and to some prisons in the Eastern District of California. Judge Vadas conducts a petty offense and misdemeanor calendar on the Hopland Indian Reservation in Mendocino County.

Judge Vadas served as Deputy District Attorney for Humboldt County and as Special Assistant United States Attorney for the Eureka region where he prosecuted all federal misdemeanor cases before the federal magistrate judge court in Eureka and investigated federal drug and money laundering crimes. He taught a variety of criminal justice courses at the Redwood Police Academy at College of the Redwoods. He served as a Deputy District Attorney for the City and County of San Francisco from 1983 to 1989, and as an Assistant United States Attorney in San Francisco from 1989 to 1998. Judge Vadas is a former member of the Magistrate Judges' Advisory Group to the Judicial Conference of the United States.

All new civil and criminal actions arising in the counties of Del Norte, Lake, Humboldt and Mendocino are assigned directly to Judge Vadas, subject to consent under 28 USC § 636(c)(1).

Judge Vadas can hold case management conferences and hear many types of motions by video-conference if parties prefer to appear in San Francisco rather than travel to Eureka. In addition, parties can schedule dispositive motions to be heard on days when Judge Vadas is in San Francisco.

Should you have additional questions about how consent jurisdiction works, please do not hesitate to contact the San Francisco Division.

If needed, a hard copy of this brochure can be obtained from the Intake Office at any of the court's four divisions. Copies are also available in courtrooms from the Courtroom Clerk.

Magistrate Judge Photos by Roslyn Banish

Last Updated: August 31, 2012

15