UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | MDL No. 1917<br><br>Case No. C-07-5944 JST |
| This Order Relates To:<br><br>ALL ACTIONS | **ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT RELATING TO STANDING AND THE DIRECT PURCHASER RULE** |

**Table of Contents**

I. Introduction ........................................................................................................ 2

II. Facts .................................................................................................................... 3

III. Legal Standard.................................................................................................... 4

IV. Discussion .......................................................................................................... 5

    A. Substantive Legal Standards ................................................................. 5

        1. Antitrust Standing ..................................................................... 6

        2. The Direct Purchaser Rule ........................................................ 7

            a. The Rule ...................................................................... 7

            b. Exceptions To The Rule.............................................. 9

                i. Where Market Forces Are Superseded As A Result Of A Cost-Plus Contract Or Control Relationship .................................................... 10

                ii. Where A Realistic Possibility Of Suit Is Foreclosed As A Result Of A Control Relationship ....................................................... 12

                    (1) The Test.................................................... 15

                    (2) Factors To Be Considered ......................... 17

                    (3) The Direction Of Control ......................... 19

                    (4) The Timing Of Control ............................ 21

        3. The Impact of Principal-Agent Relationships On Standing................................ 23

B.   The Instant Motions ....................................................................... 25

    1.   Defendants' Motion For Summary Judgment With Respect To MARTA .......... 25

        a.   Facts ................................................................................. 25

        b.   Discussion ....................................................................... 27

    2.   Defendants' Motion For Partial Summary Judgment Against Certain DAPs For Lack Of Antitrust Injury And Antitrust Standing Under Federal And Certain State Laws ......................................................................................... 31

    3.   Certain Defendants' Motion for Partial Summary Judgment With Respect To The DAPs' Alleged Direct Damage Claims Based on Purchases From Sanyo ......... 33

        a.   Facts ................................................................................. 34

        b.   Discussion ....................................................................... 34

    4.   SDI Defendants' Motion for Partial Summary Judgment For Lack Of Standing Based On Purchases From Samsung Electronics .................................. 35

        a.   Facts ................................................................................. 36

        b.   Discussion ....................................................................... 39

    5.   Motion For Partial Summary Judgment As To DAPs' Sherman Act Damages Claims Based On CRT Product Purchases From NEC-Corporation And NEC-Mitsubishi Electric Visual Systems Corporation ................................. 42

        a.   NMV ................................................................................. 42

        b.   NEC ................................................................................. 43

    6.   Corrected LGE Defendants' Motion For Partial Summary Judgment On Standing Grounds ................................................................................... 44

V.   Conclusion ...................................................................................... 46

## I.   INTRODUCTION

Now before the Court are various motions for summary judgment against certain Direct Action Plaintiffs ("DAPs") on issues related to antitrust standing and application of the direct purchaser rule.  Oral argument was held on January 13, 2016 and January 20, 2016.  The Court has consolidated its rulings into a single order and finds as follows:

| Name of Motion | Motion ECF No. | Opp'n ECF No. | Reply ECF No. | Ruling |
|---|---|---|---|---|
| Defendants' Motion For Summary Judgment With Respect To MARTA | 2994 ("MARTA Mot.") | 3267 ("MARTA Opp'n") | 3431 ("MARTA Reply") | GRANTED |
| Defendants' Motion For Partial Summary Judgment Against Certain DAPs For Lack Of Antitrust Injury And Antitrust Standing Under Federal And Certain State Laws | 3050 | 3245 | 3428 | DENIED |
| Certain Defendants' Motion for Partial Summary Judgment With Respect To DAPs' Alleged Direct Damage Claims Based on Purchases From Sanyo | 3014 ("Sanyo Mot.") | 3275 ("Sanyo Opp'n") | 3425 ("Sanyo Reply") | DENIED |
| SDI Defendants' Motion For Partial Summary Judgment For Lack of Standing Based on Purchases from Samsung Electronics | 2983 ("SDI Mot.") | 3244 ("SDI Opp'n") | 3454 ("SDI Reply") | DENIED[1] |
| Motion for Partial Summary Judgment as to DAPs' Sherman Act Damages Claims Based on CRT Product Purchases from NEC-Corporation and NEC-Mitsubishi Electric Visual Systems Corporation | 3026 ("Mits. Mot.") | 3275 ("Mits. Opp'n") | 3425 ("Mits. Reply") | GRANTED IN PART, DENIED IN PART |
| Corrected LGE Defendants' Motion for Partial Summary Judgment on Standing Grounds | 3053 ("LGE Mot.") | 3279 ("LGE Opp'n") | 3455 ("LGE Reply") | DENIED |

## II.     FACTS

The factual history is well known to the parties and has been recited in the Court's prior orders.  By way of summation, this case is predicated upon an alleged conspiracy to price-fix cathode ray tubes ("CRTs"), a core component of tube-style screens for common devices including televisions and computer monitors.  This conspiracy ran from March 1, 1995 to November 25, 2007 (the "Conspiracy Period"), involved many of the major companies that produced CRTs, and allegedly resulted in overcharges of billions of U.S. dollars to domestic companies that purchased and sold CRTs or products containing CRTs ("CRT Finished Products")

---

[1] The SDI Defendants' motion was brought against several plaintiffs, including Dell Inc. and Dell Products L.P.  On July 14, 2016, the Court entered a stay of the litigation as between the SDI Defendants and the Dell Plaintiffs.  ECF No. 4716.

United States District Court
Northern District of California

1   for purposes such as personal use.  A civil suit was originally filed in 2007, ECF No. 1,

2   consolidated by the Joint Panel on Multidistrict Litigation shortly thereafter, see ECF No. 122,

3   assigned as a Multidistrict Litigation case ("MDL") to Judge Samuel Conti, see id., and ultimately

4   transferred to the undersigned, see ECF No. 4162.

5        In addition to two class actions, this MDL involves various direct actions from individual

6   plaintiffs who opted out of the class actions, including the DAPs that oppose the present motions.

7   Each DAP alleges that it bought at least one CRT Finished Product from a Defendant or an entity

8   owned or controlled by a Defendant.  The DAPs, despite their moniker, are classified as indirect

9   purchasers under antitrust law -- not direct purchasers.  They seek to be treated as direct

10  purchasers, however, by operation of certain legal exceptions to the direct purchaser rule in Illinois

11  Brick Co. v. Illinois, 431 U.S. 720 (1977).  The direct purchaser rule and its exceptions are

12  discussed at length throughout this order.

13  **III.   LEGAL STANDARD**

14       Summary judgment is proper when a "movant shows that there is no genuine dispute as to

15  any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);

16  accord Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  "A party asserting that a fact

17  cannot be or is genuinely disputed must support the assertion by" citing to depositions, documents,

18  affidavits, or other materials.  Fed. R. Civ. P. 56(c)(1)(A).  A party also may show that such

19  materials "do not establish the absence or presence of a genuine dispute, or that an adverse party

20  cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).  An issue is

21  "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-

22  moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  A fact is

23  "material" if the fact may affect the outcome of the case.  Id. at 248.  "In considering a motion for

24  summary judgment, the court may not weigh the evidence or make credibility determinations, and

25  is required to draw all inferences in a light most favorable to the non-moving party."  Freeman v.

26  Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).  However, unsupported conjecture or conclusory

27  statements do not create a genuine dispute as to material fact and will not defeat summary

28  judgment.  Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1103 (9th Cir. 2008).

United States District Court
Northern District of California

For claims on which the defendant does not carry the ultimate burden of persuasion, the defendant as the moving party has the burden of producing evidence that negates an essential element of each claim on which it seeks judgment or showing that the plaintiff cannot produce evidence sufficient to satisfy the burden of proof at trial.  See Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  If the moving party satisfies its initial burden of production, then the nonmoving party must produce admissible evidence to show that a genuine issue of material fact exists.  Id. at 1102-1103.  The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment."  Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).  "Specific citations, not bulk references, are essential to pinpoint key facts and factual disputes.  [A] district court [i]s not required to put the puzzle together from a boxful of facts, and . . . may permissibly decide the motion without mining [an] entire document for more substantiation" when a citation offers only a "breezy reference" to a part of an "82-page report" not otherwise cited or explained in briefing.  Stanislaus Food Products Co. v. USS-POSCO Indus., 803 F.3d 1084, 1094-95 (9th Cir. Oct. 13, 2015).  "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving party must introduce some significant probative evidence tending to support the complaint."  Summers v. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997) (citation omitted).  If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

## IV.    DISCUSSION

The Court will first resolve the motions' common disputes as to the substantive legal standards that should apply.  It will then turn to the instant motions.

### A.    Substantive Legal Standards

The Court consolidated the instant motions into a single order because they require analysis of three interrelated legal issues: antitrust standing, the direct purchaser rule, and principal-agent relationships.  The substantive legal standard for each is set forth below.  This section also resolves recurring questions of law on which several of the motions turn.

### 1.  Antitrust Standing

Whether certain DAPs have antitrust standing is an issue in several of the motions.  The Supreme Court identified five factors to be considered, summarized as follows:

1) the causal connection between the antitrust violation and the harm to the plaintiff, and whether the harm was intended;

2) the nature of the injury, including whether the plaintiff suffered antitrust injury and whether the plaintiff is a participant in the relevant market;

3) the directness of the injury, and whether the damages are too speculative;

4) the potential for duplicative recovery, and whether the apportionment of damages would be too complex; and

5) the existence of more direct victims.

See Assoc. General Contractors of California v. California State Council of Carpenters, 459 U.S. 519, 537-44 (1983) ("AGC").

Although a court "need not find in favor of the plaintiff on each factor," it should "give great weight" to the second factor -- antitrust injury.  Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California, 190 F.3d 1051, 1055 (9th Cir. 1999).  "In fact, the Supreme Court has noted that '[a] showing of antitrust injury is necessary, but not always sufficient, to establish standing under § 4.'"  Id. (quoting Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 110 n. 5 (1986)).  In order to establish antitrust injury, a plaintiff must show the injury is "of the type the antitrust laws were intended to prevent and [must] flow[] from that which makes defendants' acts unlawful.'"  Id. at 1055 (quoting Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334, (1990) ("ARCO")).  Further, "[a]ntitrust injury requires the plaintiff to have suffered its injury in the market where competition is being restrained."  Id. at 1057.  Thus, "[p]arties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury" (hereafter, "the Market-Participant Requirement").  Id.

There is a narrow exception to the Market-Participant Requirement for parties whose injuries are "inextricably intertwined" with the injuries of market participants.  See Blue Shield v. McCready, 457 U.S. 465 (1982); Ostrofe v. H.S. Crocker Co., 740 F.2d 739, 745–46 (9th Cir.

United States District Court
Northern District of California

1   1984).  Those whose injury is essential to the success of an antitrust violation (as opposed to those

2   whose injuries are merely incidental) are deemed to have suffered antitrust injury even if they do

3   not participate directly in the relevant market.  See Philip E. Areeda & Herbert Hovenkamp,

4   Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 339f (4th ed. 2014).

**2.    The Direct Purchaser Rule[2]**

6       The central legal issue in these motions is the interpretation and application of the so-called

7   "direct purchaser rule."  In particular, many of the motions turn on whether the DAPs' claims fall

8   within an exception to that rule as described in Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977),

9   Royal Printing Co. v. Kimberly Clark Corp., 621 F.2d 323 (9th Cir. 1980), Freeman v. San Diego

10  Ass'n of Realtors, 322 F.3d 1133 (9th Cir. 2003), as amended on denial of reh'g (Apr. 24, 2003),

11  and In re ATM Fee Antitrust Litig., 686 F.3d 741 (9th Cir. 2012) ("ATM Fee"). Because there is a

12  significant amount of confusion both in the case law and the parties' arguments, the legal and

13  economic underpinnings of the rule and its exceptions are set forth in detail below.

**a.   The Rule**

15      Producers often do not sell directly to their ultimate consumers.  They may sell to a

16  wholesaler or a retailer who then sells it to the ultimate consumer, or the product may be used as

17  an input in the production of a final consumer good.  The first purchaser in this chain of

18  distribution is known as the "direct purchaser" and the subsequent purchasers as "indirect

19  purchasers."  If producers join together in a cartel to fix the price of the good then direct

20  purchasers will pay the entire anticompetitive overcharge in the first instance, but because of the

21  dynamics of supply and demand in the indirect purchaser market, will pass on some – but not all –

22  of that overcharge to indirect purchasers.

23      Both direct and indirect purchasers are therefore injured as a result of an upstream

24  producer cartel, though neither's individual injury alone reflects the full extent of the

25  anticompetitive harm.  Notwithstanding this shared loss, pursuant to the so-called "direct

26  purchaser rule," indirect purchasers do not have standing to sue for damages, whereas direct

27

28  _____
    [2] Also referred to as the "indirect purchaser rule."

7

1   purchasers are permitted to sue for the entire amount of the overcharge, trebled.  See Hanover

2   Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481, 487-94 (1968); Illinois Brick, 431 U.S.

3   at 746.

4       In Hanover Shoe, an antitrust defendant challenged the direct purchaser plaintiff's damages

5   by showing that the plaintiff had passed on part of the illegal overcharge to its customers.  392

6   U.S. at 487-94.  The Supreme Court banned the use of this "defensive pass-on" theory because

7   determining how much of the plaintiff's damages had been passed on and how much had been

8   "absorbed" by the plaintiff "would often require additional long and complicated proceedings

9   involving massive evidence and complicated theories."  Id. at 493.  Further, the Hanover Shoe

10  Court

> was also concerned that if defensive pass-on was allowed, antitrust
> violators might be able to show that all or most of the overcharge
> had been passed on by wholesalers and retailers to individual
> consumers.  Then the wholesalers and retailers would not be able to
> show any damages, and the consumers "would have only a tiny
> stake in a lawsuit and little interest in attempting a class action."
> Thus, the antitrust violators would keep their ill-gotten gain, and the
> deterrent power of the private antitrust suit would be nullified.

16  Royal Printing, 621 F.2d at 328 n.3.  In banning the use of a defensive pass-on theory, the

17  Supreme Court permitted a direct purchaser to recover, trebled, an amount that exceeded its true

18  damages.

19      Illinois Brick is simply the other side of the same coin.   There, the Supreme Court held

20  that indirect purchasers could not sue for the portion of the overcharge passed on to them.  See

21  Illinois Brick, 431 U.S. at 746.  This became known as "the direct purchaser rule" of Illinois

22  Brick.  The Court's ban on offensive pass-on theories was a logical extension of Hanover Shoe,

23  given that allowing offensive pass-on theories while prohibiting defensive pass-on theories would

24  have resulted in multiple recoveries.  Id. at 730.  The Court reasoned that the direct purchaser rule

25  would "avoid increasing the cost and burden of antitrust actions with complicated damage theories

26  necessitating massive evidence to determine how the overcharge was apportioned throughout the

27  distribution chain."  Arizona v. Shamrock Foods, 729 F.2d 1208, 1212 (9th Cir. 1984) (citing

28  Illinois Brick, 431 U.S. at 731-32).  The Court also sought to further Congress's intent of deterring

United States District Court
Northern District of California

8

United States District Court
Northern District of California

anticompetitive behavior through "private attorneys general" by conferring standing on the party most likely to bring suit. See id.; Illinois Brick, 431 U.S. at 745-46; Royal Printing, 621 F.2d at 325-26; Delaware Valley Surgical Supply Inc. v. Johnson & Johnson, 523 F.3d 1116, 1124 (9th Cir. 2008).

### b.    Exceptions To The Rule

As Judge Conti, the undersigned's predecessor in this case, previously noted,

> The so-called "Illinois Brick wall," Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1049 (9th Cir. 2008), looms as an imposing barrier for antitrust plaintiffs who, like the [DAPs] here, rely on a pass-through theory. The wall is not impassable, however, for although "the Supreme Court has expressed reluctance in carving out exceptions to the Illinois Brick rule, limited exceptions do exist." In re ATM Fee Antitrust Litig., 686 F.3d 741, 749 (9th Cir. 2012). These exceptions, when applicable, permit indirect purchasers to pursue private treble-damages claims notwithstanding the usual prohibition of Illinois Brick.

In re: Cathode Ray Tube (CRT) Antitrust Litig., 911 F. Supp. 2d 857, 865 (N.D. Cal. 2012). Exceptions to the direct purchaser rule include instances where (1) because of a cost-plus contract or a control relationship, "market forces have been superseded," Illinois Brick, 431 U.S. at 736 n.16, such that "[t]he effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand," id. at 736, and (2) where a control relationship between a direct purchaser and a price fixer forecloses any realistic possibility of suit by the direct purchaser, see Royal Printing, 621 F.2d at 326; ATM Fee, 686 F.3d at 756-58; Freeman, 322 F.3d at 1145-46.[3]

---

[3] The parties, as well as most courts, refer to the exceptions simply as (1) the cost-plus contract exception and (2) the control exception. As explained below, however, the so-called "control exception" set out in Illinois Brick is distinct from the control exception set out in Royal Printing. Further, the cost-plus contract exception and the control exception in Illinois Brick are really just "illustrative of the [same] exception [in Illinois Brick]: where '[t]he effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand.'" Royal Printing, 621 F.2d at 326 n.4. The Court finds that the categories set forth herein more accurately describe the existing exceptions to the direct purchaser rule. Importantly, the change in categorization is not meant to imply a change in the substance of the exceptions themselves, the creation of any new exception, or the expansion of existing exceptions. Indeed, the Court is quite mindful of the Supreme Court's guidance not to create new exceptions in this area. See Kansas v. UtiliCorp United, 497 U.S. 199, 216-17 (1990).

**i.      Where Market Forces Are Superseded As A Result Of A Cost-Plus Contract Or Control Relationship**

As explained above, the injury suffered from an upstream cartel is typically shared by direct and indirect purchasers as a result of market forces in the indirect purchaser market.  There are situations, however, where forces in the indirect purchaser market are superseded such that the entire anticompetitive harm is passed from the direct purchaser to the indirect purchaser.  See Illinois Brick, 431 U.S. at 736 (noting that in those situations "[t]he effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case.").  Courts have recognized an exception to the direct purchaser rule in two such situations: where there is a cost-plus contract and where control "between the direct purchaser and either the defendant or the indirect purchaser" creates "such functional economic or other unity . . . that there effectively has been only one sale."[4]  Sun Microsystems, Inc. v. Hynix Semiconductor Inc., 608 F. Supp. 2d 1166, 1181-82 (N.D. Cal 2009) (citing Jewish Hosp. Ass'n of Louisville, Ky., Inc. v. Stewart Mech. Enterprises, Inc., 628 F.2d 971, 975 (6th Cir. 1980); Illinois Brick, 431 U.S. at 736 n.16)).  Although there may be other situations where market forces are superseded, the Supreme Court has limited the exception to these two instances.  See UtiliCorp, 497 U.S. at 217.

In order for market forces to be superseded, the price paid and quantity purchased by an indirect purchaser cannot be a function of supply and demand in the indirect purchaser market.  For example, with a cost-plus contract, the price paid by the indirect purchaser to the direct purchaser is predetermined such that it is a function of the price paid by the direct purchaser to the producer plus a markup.  As a result, if the price paid by the direct purchaser increases as a result of a collusive overcharge by producers, the entire amount of that overcharge will necessarily be incorporated into the price paid by the indirect purchaser.  Setting the price is not enough, however, to insulate the direct purchaser from all of the anticompetitive harm caused by the

---

[4] Although some courts treat the control exception from Illinois Brick and the cost-plus contract exception from Illinois Brick as distinct exceptions, they are really just "illustrative of the real exception: where '[t]he effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand."  Royal Printing, 621 F.2d at 326 n.4.

United States District Court
Northern District of California

1  upstream cartel: The quantity purchased by the indirect purchaser must also be predetermined.

2  See UtiliCorp., 497 U.S. at 218; Phillips v. Crown Cent. Petroleum Corp., 602 F.2d 616, 633 (4th

3  Cir. 1979).  If the quantity is not fixed, then the direct purchaser could still be injured by the

4  conspiracy if the higher price charged to indirect purchasers reduces the amount sold, thereby

5  reducing the direct purchaser's overall revenue and profits (revenue, after all, is a function of both

6  price and quantity).  See Illinois Brick, 431 U.S. at 735-36 ("[T]he purchaser is insulated from any

7  decrease in its sales as a result of attempting to pass on the overcharge, because its customer is

8  committed to buying *a fixed quantity* regardless of price.") (emphasis added).

9          In addition to cost-plus contracts, the Supreme Court wrote in footnote 16 of Illinois Brick

10  that "[a]nother situation in which market forces have been superseded and the pass-on defense

11  might be permitted is where the direct purchaser is owned or controlled by its customer [or by the

12  price fixer]."  Illinois Brick, 431 U.S. at 736 n.16.  It is unclear, however, when, if ever, a control

13  relationship would result in market forces being *completely* superseded such that the entire

14  overcharge is passed from the direct purchaser to the indirect purchaser.  Take, for example, a

15  conspiracy among lemon growers to raise the price of lemons to $1 from a competitive price of

16  $0.90.  Lemonade producers that purchase lemons will pay the entire overcharge in the first

17  instance and will pass on some of that overcharge, but not all, to lemonade consumers as a result

18  of supply and demand forces in the indirect purchaser (lemonade consumer) market.[5]  That a

19  particular lemonade producer happens to be a wholly owned subsidiary of a lemon grower,

20  however, will not affect the forces in the indirect purchaser market that lead to lemonade

21  consumers paying less than the entire $0.10 overcharge.  Nor does it matter if the lemon grower

22  "controls" the lemonade producer's pricing decisions, as several of the parties to the instant

23  motions seem to believe is significant.  Because the price for lemonade is set by the interaction of

24  supply and demand in the lemonade market, lemonade producers are price takers, not price

25  makers.  It would therefore be irrational for a lemon grower to force its lemonade subsidiary to

26

27  _____

    [5] For example, while some lemonade drinkers will pay a higher price, others will switch to lower-
28  cost substitutes which do not use lemons as an ingredient, such as soda or water, and whose price
    will therefore be unaffected.  A lemonade producer who can afford to absorb some of the lemon
    price increase will do so to avoid losing customers.

United States District Court
Northern District of California

increase the price of its lemonade by the full overcharge amount given that the market price for lemonade would remain below $1 and the subsidiary would lose market share as a result.

At the hearing on January 13, 2006, Defendants suggested that In re Toilet Seat Antitrust Litig., No. 75-184, 1977 WL 1453 (E.D. Mich. Aug. 24, 1977) is an example of a control relationship that superseded market forces. There is no evidence, however, that market forces were superseded in that case. Instead, the court held that the relationship between the purported indirect and direct purchasers was "that of principal and agent rather than buyer and seller." Id. at *2. As a matter of agency law, therefore, the purported indirect purchaser was actually the direct purchaser, and the purported direct purchaser was merely acting on behalf of the direct purchaser as its agent. Principal-agent relationships, however, do not turn on ownership or control. Nor do they supersede market forces such that price and quantity in the indirect purchaser market are insulated from supply and demand.

### ii.    Where A Realistic Possibility Of Suit Is Foreclosed As A Result Of A Control Relationship

A separate exception to the direct purchaser rule was set forth by the Ninth Circuit in Royal Printing. See 621 F.2d at 326 n.4. There, two plaintiffs, a printer and a grocery store, brought an antitrust suit against a group of paper manufacturers. Id. at 324. The manufacturers did not sell their paper directly, but rather distributed it through two kinds of wholesalers: (1) the manufacturers' own wholesaling divisions or wholly-owned wholesaler subsidiaries, and (2) independent, unaffiliated wholesalers. Id. The wholesalers thus were direct purchasers, because they bought paper directly from the accused manufacturers. See id. at 326-27. Each defendant-affiliated wholesaler sold paper manufactured by all of the defendants, "not limiting themselves to in-house products." Id. at 324. Importantly, the court noted that wholesale prices were set by market conditions. See id. at 324 n.1.

The printer and grocer never bought paper directly from the allegedly conspiring manufacturers; they bought paper only from non-conspiring wholesalers. Id. at 324. Thus, they were indirect purchasers whose suit Illinois Brick normally would bar. See id. at 325. The printer, however, had purchased some paper from wholesalers owned or controlled by two of the

United States District Court
Northern District of California

1  defendants.  Id. at 325.  The paper the printer bought from those wholesalers was not

2  manufactured by the wholesalers' respective corporate parents; it was manufactured by some other

3  defendant.  See id.

4          The Ninth Circuit held that the printer had standing to sue regardless of its status as an

5  indirect purchaser and regardless of which defendant had manufactured the purchased paper, but

6  only to the extent that it purchased paper sold by defendant-owned or -controlled wholesalers.  Id.

7  at 327.  The Ninth Circuit reasoned that, because all the manufacturers were highly unlikely to

8  authorize their controlled wholesalers (i.e., the direct purchasers) to sue and thereby risk revealing

9  the conspiracy, the deterrent effect and enforceability of the antitrust laws depended on the

10  existence of antitrust standing for indirect purchasers situated like the printer.  Id. at 326-27.  The

11  grocer, however, which had purchased defendants' paper only through unaffiliated wholesalers,

12  was "truly" an indirect purchaser under Illinois Brick and therefore barred from suit.  Id.  Illinois

13  Brick also barred the printer to the extent it had purchased defendants' paper from anyone other

14  than a defendants' subsidiary or division.  Id.

15          The parties in this case do not distinguish the control exception set out in Royal Printing

16  from the so-called control exception alluded to in footnote 16 of Illinois Brick.[6]  The distinction is

17  important, however, because the tests and underlying rationales for the exceptions are different.

18  As explained in the previous subsection, to the extent the Supreme Court established a control

19  exception in footnote 16 of Illinois Brick, it was premised on the idea that indirect purchasers

20  should be allowed to sue where, as a result of a control relationship, market forces have been

21  superseded such that the entire overcharge is passed on to the indirect purchaser.  See Illinois

22  Brick, 431 U.S. at 736 n.16.  An exception makes sense in that context because the concerns

23

24  ────────────────

25  [6] The Court recognizes that Royal Printing may be in tension with cases that limit the exceptions
   to the direct purchaser rule to those set out in Illinois Brick.  Nevertheless, Royal Printing remains
   good law in the Ninth Circuit and is binding on this Court.  See Costco Wholesale Corp. v. AU
26  Optronics Corp., 2014 U.S. Dist. LEXIS 132145, *6-7 (W.D. Wash. Sept. 18, 2014) ("And
   although [the Ninth Circuit in ATM Fee] noted the Supreme Court's reluctance to carve out
27  exceptions to the Illinois Brick rule, 686 F.3d at 757 (citing Kansas v. Utilicorp United, Inc., 497
   U.S. 199, 216, 110 S. Ct. 2807, 111 L. Ed. 2d 169 (1990)), it did not suggest that any Supreme
28  Court precedent had implicitly or explicitly overruled Royal Printing.").

1   underlying the direct purchaser rule are not present: there is no risk of evidentiary complexities,

2   duplicative recoveries, or inadequate private enforcement.  The <u>Royal Printing</u> exception,

3   however, neither relies on market forces being superseded nor presumes that the entire overcharge

4   has been passed to the indirect purchaser.  <u>See</u> <u>Royal Printing</u>, 621 F.2d at 326 n.4 ("[T]he

5   wholesalers' pricing decisions are determined by market forces.").  In fact, the Ninth Circuit stated

6   explicitly that it was not basing its holding on footnote 16 of <u>Illinois Brick</u>:

> Footnote 16 of <u>Illinois Brick</u>, which apparently establishes an exception to the ban on pass-on theories "where the direct purchaser is owned or controlled by its customer," is only illustrative of the real exception: where "(t)he effect of the overcharge is essentially determined in advance, without reference to the interaction of supply and demand that complicates the determination in the general case," and where the arrangement "circumvent(s) complex market interactions as would a (pre-existing) cost-plus contract." 431 U.S. at 736, 97 S.Ct. at 2070.  Although the wholesalers here are owned or controlled by appellees, the wholesalers' pricing decisions are determined by market forces; *therefore, footnote 16 is inapplicable*.

13  <u>Id.</u> (emphasis added).

14          Even though footnote 16 was inapposite, the Ninth Circuit held that the indirect purchasers

15  in <u>Royal Printing</u> had standing to sue for damages because the control relationship between the

16  price fixer and direct purchaser foreclosed a realistic possibility of suit by the direct purchaser.

17  <u>See</u> <u>Royal Printing</u>, 621 F.2d at 325.  The court reasoned that an exception to the direct purchaser

18  rule was necessary in such instances to ensure the vitality of private enforcement.  <u>See</u> <u>id.</u>  The

19  court further held that where a control relationship forecloses a realistic possibility of suit by the

20  direct purchaser, an indirect purchaser is permitted to sue for the entire amount of the overcharge.

21  <u>Id.</u> at 327.  This too differs from the exception set out in <u>Illinois Brick</u>.  Under the <u>Illinois Brick</u>

22  exception, an indirect purchaser is permitted to sue for the entire overcharge because the entire

23  overcharge was passed on to it as a result of market forces being superseded.  Under the <u>Royal</u>

24  <u>Printing</u> exception, however, an indirect purchaser is permitted to sue for the entire overcharge,

25  even though the indirect purchaser only paid a portion, in order to avoid the risk of evidentiary

26  complexities and duplicative recoveries.  <u>Id.</u>

27          Having distinguished the <u>Royal Printing</u> exception from the "market forces are

28  superseded" language of footnote 16 from <u>Illinois Brick</u>, several questions remain on which many

of the motions turn:  First, what test should the Court apply to determine whether application of the Royal Printing exception is appropriate?  Second, what factors should be considered?  Third, is the direction of control dispositive?  In other words, can the exception apply both when the direct purchaser is controlled by the upstream price fixer and when the upstream price fixer is controlled by the direct purchaser?  Fourth, is the timing of control dispositive?  Put another way, must control exist at the time of the conspiracy, at the time of the filing of suit, or either?

### (1)    The Test

Defendants assert the control exception should apply where there is "such functional economic or other unity between the direct purchaser and either the defendant or the indirect purchaser, that there effectively has been only one sale."  Sun Microsystems Inc., 608 F.2d at 1180-82.  Some Defendants also argue a price fixer must control the litigation decisions of the direct purchaser at the time of suit.  Others claim the price fixer must control the pricing decisions of the direct purchaser during the conspiracy itself.  The Court finds these arguments unpersuasive.  Although the Ninth Circuit yet to articulate a clear test for application of the Royal Printing control exception, the Court finds that it applies whenever a control relationship forecloses a realistic possibility of suit by the direct purchaser.  See, e.g., ATM Fee, 686 F.3d at 756 ("Freeman outlines that, whether a realistic possibility of suit exists, depends on the existence of ownership or control between the direct purchaser and the seller.").

Courts that have required "such functional economic or other unity . . . that there effectively has been only one sale" did so in the context of applying footnote 16 of Illinois Brick.  For example, in Sun Microsystems, Judge Hamilton wrote that the control exception "only applies where market forces are truly superseded" such that the price charged to indirect purchasers "is resistant to supply and demand forces."  Sun Microsystems Inc., 608 F.2d at 1181-82.[7]  As already explained, however, the exception set out in Royal Printing is distinct from the language of

---

[7] See also id. (holding that "situations in which market forces are suspended" is "the fundamental premise upon which the control exception is to be applied"); Jewish Hosp. Ass'n, 628 F.2d at 975 ("Neither of the Hospital's theories suggests market forces were superseded."); In re Beef Indus. Antitrust Litig., 600 F.2d at 1160-61 ("Market forces would have been superseded in such circumstances.").

United States District Court
Northern District of California

footnote 16 of <u>Illinois Brick</u> and has nothing to do with superseding market forces.

In support of their assertion that control over litigation decisions is required, certain Defendants cite <u>Royal Printing</u> wherein the Ninth Circuit pointed out that a subsidiary's "litigation decisions will usually be subject to parental control." 621 F.2d at 326. However, although control over litigation decisions is clearly sufficient to trigger the exception, nowhere in <u>Royal Printing</u> did the Ninth Circuit state that it is necessary.

Other Defendants argue that control over pricing decisions is required and cite <u>ATM Fee</u> wherein the Ninth Circuit stated that "the language added to STAR's agreement with its members does not create control, because . . . STAR still has the ultimate power to change interchange *fees* [*i.e.*, prices]. . . . Likewise, the Network Advisory Board . . . does not create control, because it had no power to set interchange *fees*." 686 F.3d at 757-58 (emphasis added). Nowhere in <u>ATM Fee</u>, however, did the Ninth Circuit state that control over the pricing decisions of the direct purchaser is required.[8]

Instead of limiting the exception to control of litigation or pricing decisions, the Ninth Circuit defined control in general terms. In <u>ATM Fee</u>, the Ninth Circuit held that control means "to exercise restraint or direction over; dominate, regulate, or command," or to have "the power or authority to guide or manage."[9] 686 F.3d at 757. Defendants focus on certain words such as "dominate," "command," and "manage" but ignore less exacting phrases such as "to exercise restraint or direction over," "[to] regulate," or to have "the power or authority to guide." This

---

[8] Control over pricing decisions is even less likely to be an appropriate standard than control over litigation decisions given it is not clear how control over a direct purchaser's pricing decisions makes suit by a direct purchaser unlikely, which is the quintessence of the exception set out in <u>Royal Printing</u>. It seems as though some courts have looked to control over pricing decisions as a way to test whether the facts fall within the meaning of the exception as set out in footnote 16 of <u>Illinois Brick</u>, which was based on market forces being superseded such that computation of pass-on is unnecessary. <u>See, e.g.</u>, <u>Howard Hess Dental Lab. Inc. v. Dentsply Intn'l., Inc.</u>, 424 F.3d 363, 371-72 (3d Cir. 2005) ("[T]he relevant control here is the control of resale *prices* . . . . The issue is computation of pass-on, which is not necessary when the upstream firm controls the intermediaries' *prices*.") (emphasis added). As already explained, however, the exception set out in <u>Royal Printing</u> has nothing to do with market forces being superseded or "computation of pass-on."

[9] It also defined control as something more than mere "input on policies and pricing." <u>ATM Fee</u>, 686 F.3d at 758.

reads the Ninth Circuit's definition too selectively.  Thus, the Court finds that the Royal Printing exception is triggered wherever either the price fixer or the direct purchaser can "exercise restraint or direction over, dominate, regulate, . . . command, . . . guide or manage" the other such that a realistic possibility of suit by the direct purchaser is foreclosed.

### (2)    Factors To Be Considered

Defendants argue that the only factors that can be considered when deciding whether the Royal Printing exception applies are ownership, the ability to appoint a majority of board members, and the ability to set prices.  Defendants' approach is too narrow.

As mentioned, the Ninth Circuit in ATM Fee explained that "control" means "to exercise restraint or direction over; dominate, regulate, or command," or to have "the power or authority to guide or manage."  686 F.3d at 757.  Accordingly, any factor that is probative of that definition is potentially relevant to the analysis.  See also Sun Microsystems, 608 F. Supp. 2d at 1180 (providing a broad list of considerations such as "interlocking directorates, minority stock ownership, loan agreements that subject the wholesalers to the manufacturers' operating control, trust agreements, or other modes of control separate from ownership of a majority of the wholesalers' common stock.").[10]

Defendants argue that this type of approach violates the Supreme Court's guidance in Utilicorp.  There, plaintiffs alleged that, because of unique economic conditions in the utility market, the direct purchaser in that case had passed the entire overcharge to indirect purchasers.

---

[10] Although it was outside the antitrust context, the Supreme Court's opinion in Gould v. Ruefenacht, 471 U.S. 701, 704-05 (1985) notes that control depends on a variety of factors:

> Control . . . may not be determined simply by ascertaining what percentage of the company's stock has been purchased.  To be sure, in many cases, acquisition of more than 50% of the voting stock of a corporation effects a transfer of operational control.  In other cases, however, even the ownership of more than 50% may not result in effective control.  In still other cases, de facto operational control may be obtained by the acquisition of less than 50%.  These seemingly inconsistent results stem from the fact that actual control may also depend on such variables as voting rights, veto rights, or requirements for a super-majority vote on issues pertinent to company management, such as may be required by state law or the company's certificate of incorporation or its bylaws.

United States District Court
Northern District of California

Because plaintiffs did not allege that market forces had been superseded as a result of a recognized exception -- a cost-plus contract or a control relationship -- the Supreme Court refused to allow the indirect purchasers to seek antitrust damages.[11]  See Utilicorp, 497 U.S. at  208.  In part, the Court declined to carve out a new exception because it feared that disputes regarding when an exception is truly justified would generate the type of complicated and costly litigation that the direct purchaser rule was meant to avoid.  See id. at 216-17.  For this reason, the Supreme Court concluded,

> The rationales underlying Hanover Shoe and Illinois Brick will not apply with equal force in all cases.  We nonetheless believe that ample justification exists for our stated decision not to 'carve out exceptions to the [direct purchaser] rule for particular types of markets.'  The possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule.
> . . .
> [E]ven assuming that any economic assumptions underlying the Illinois Brick rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions.

Id.

Defendants assert that Utilicorp stands for the proposition that courts ought not apply the control exception beyond the particular facts in Royal Printing and ATM Fee -- i.e., where a price fixer owns or controls a downstream direct purchaser as a result of majority ownership, control of the board, or control over litigation and pricing decisions.  A more accurate interpretation of Utilicorp, however, is that it stands for the proposition that courts ought not carve out new exceptions even if the concerns animating Illinois Brick are not an issue due to the conditions in a particular market.  The question before the Court on the instant motions, however, is not whether the Court should create a new exception, but whether the existing exception from Royal Printing applies here.  That determination is not a function of the particular characteristics of the CRT market, as advocated by the plaintiffs in Utilicorp.  Rather, it turns on whether a control

---

[11] It also noted, however, that market forces had not actually been superseded as the plaintiffs claimed because the quantity of gas purchased was not fixed.  See UtiliCorp., 497 U.S. at 218 ("The utility customers made no commitment to purchase any particular quantity of gas."); see also supra Section IV.A.2.b.

United States District Court
Northern District of California

1    relationship exists that forecloses a realistic possibility of suit by the direct purchaser.

2           Defendants also argue that failing to limit the factors that can be considered will create the

3    type of complicated and costly litigation that the direct purchaser rule was meant to avoid.  In that

4    way, Defendants suggest it is contrary to the spirit, if not the letter, of Utilicorp and Illinois Brick.

5    The Court recognizes there would likely be less litigation if courts only had to look to the factors

6    of ownership, the ability to appoint a majority of board members, and the ability to set prices when

7    determining whether the Royal Printing exception should apply.  But this follows only from the

8    general proposition that making recovery more difficult leads to less litigation.  Illinois Brick and

9    Utilicorp were not so much concerned about minimizing the quantity of litigation as they were

10   about preventing litigation specifically relating to the calculation of pass-on amounts, which is

11   difficult to perform and carries unique risks such as potentially duplicative recoveries, unduly

12   prolonged proceedings, and certain types of evidentiary complexity.  The plaintiffs in Utilicorp

13   argued for a new exception to Illinois Brick for instances where the overcharge is entirely passed

14   on to the indirect purchaser due to the unique aspects of a particular market.  Application of an

15   exception that turns on whether certain market conditions are present would require competing

16   expert testimony on the unique nature of the particular market at issue.  The inquiry might also

17   require a court to conduct the same pass-on calculations that Illinois Brick sought to avoid in order

18   to confirm that the entire overcharge was in fact passed to indirect purchasers.  The same cannot

19   be said of the additional litigation that might be created by considering factors beyond ownership,

20   the ability to appoint a majority of board members, and the ability to set prices.  Granted, in

21   certain hard cases, the inquiry may be fact-intensive and somewhat complicated.  But courts

22   routinely engage in this type of analysis.

23                              **(3)      The Direction Of Control**

24          The parties agree that the control exception can apply where, as in Royal Printing, control

25   operates downstream -- that is, where an upstream price fixer controls a downstream direct

26   purchaser.  See Royal Printing, 621 F.2d 323.  One of the questions presented in the instant

27   motions, however, is whether the exception can also apply where control operates upstream -- *i.e.*,

28   where the direct purchaser controls the upstream price fixer.  Defendants assert it cannot.  The

1    Court disagrees.

2          The Ninth Circuit signaled in ATM Fee that the control exception could apply where

3    control operates upstream.  There, the court analyzed whether the direct purchaser owned or

4    controlled the upstream price fixer in order to determine whether the indirect purchaser plaintiffs'

5    claims fell within the control exception.  ATM Fee, 686 F.3d at 756-58.  That analysis would have

6    been a pointless exercise, however, if, as Defendants assert, the control exception can never apply

7    where control is directed upstream.[12]  See id.

8          The district courts in the Ninth Circuit that have addressed this issue have also held that the

9    control exception of Royal Printing can apply when control operates upstream.  For example, in In

10   re TFT-LCD (Flat Panel) Antitrust Litig., Judge Illston rejected the same argument that

11   Defendants make here, finding that "ownership/control may exist if the direct purchaser

12   owns/controls the seller/manufacturer or if a co-conspirator owns/controls the direct purchaser."

13   2012 WL 5869588, at *3-4; see also Costco Wholesale Corp. v. AU Optronics Corp., No. C13-

14   1207RAJ, 2014 WL 4674390, at *2 (W.D. Wash. Sept. 17, 2014) (finding that whether control

15   operates upstream or downstream is "a distinction without a difference").

16         The Ninth Circuit's rationale in Royal Printing also supports application of the exception

17   when control is directed upstream.  The Royal Printing court reasoned that because the direct

18   purchasers were unlikely to sue their parent company and thereby risk revealing the conspiracy,

19   the deterrent effect and enforceability of the antitrust laws depended on the existence of antitrust

20   standing for indirect purchasers situated like the plaintiffs.  Royal Printing, 621 F.2d at 326-27;

21   see also Freeman, 322 F.3d at 1145-46 ("[I]ndirect purchasers can sue for damages if there is no

22   realistic possibility that [because of control] the direct purchaser will sue its supplier over the

23   antitrust violation.").  Likewise, if the upstream price fixer is a subsidiary of the direct purchaser,

24

25   _____

26   [12] The Ninth Circuit ultimately found the control exception did not apply in ATM Fee, but not
     because the exception could never apply where control operates upstream.  The exception did not
     apply in ATM Fee because there was insufficient evidence supporting plaintiffs' claim that the
27   direct purchaser actually controlled the upstream price fixer.  Id. at 757-58.  The test for control
     and the factors that can be considered, however, are separate from the question of whether the
28   exception can apply, assuming control exists, where control is directed upstream.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    the direct purchaser might also be unlikely to sue and reveal the conspiracy given, among other

2    reasons, its economic interests in its subsidiary.

3            The Court finds therefore that the direction of control is not dispositive.

4                        **(4)        The Timing Of Control**

5            The next question presented by the instant motions is whether the timing of control is

6    dispositive.  Some Defendants argue that control must exist during the conspiracy itself.  Others

7    claim control must exist at the time of suit.  Still others assert that control must run throughout the

8    conspiracy up through the time of suit.  Once again, the Court disagrees.

9            Control need not exist during the conspiracy itself so long as it exists at the time of suit

10   because a direct purchaser is unlikely to sue a company that controls it.  See In re TFT-LCD (Flat

11   Panel) Antitrust Litig., 2012 U.S. Dist. LEXIS 183751, 2012 WL 7062366, at *58-59 (N.D. Cal.

12   Dec. 26, 2012).  Some Defendants cite Judge Hamilton's opinion in Sun Microsystems, 608 F.

13   Supp. 2d at 1181-82 for the proposition that control must also exist at the time of the conspiracy.

14   The control exception, according to Judge Hamilton, "only applies where market forces are truly

15   superseded."  Id.  Market forces are superseded, the theory goes, when there is "such functional

16   economic or other unity . . . that there effectively has been only one sale."  Id. at 1180.  "[T]here

17   effectively has been only one sale" insofar as the "economic unity" between the direct purchaser

18   and the upstream price fixer exists at the time the direct purchaser purchases the goods from the

19   price fixer -- that is, during the conspiracy.  Otherwise, presumably there are two sales -- the sale

20   from the price fixer to the direct purchaser and the sale from the direct purchaser to the indirect

21   purchaser -- and Illinois Brick's concerns relating to pass-on calculations remain.  What this

22   analysis fails to recognize, however, is that the exception under Royal Printing, as explained in

23   detail above, is premised on control foreclosing a realistic possibility of suit, not on superseding

24   market forces.  Defendants' argument and the authority it cites fail, therefore, to advance their

25   position.

26           It is a somewhat harder question whether the control exception can apply where control

27   exists during the conspiracy but not at the time of suit.  After all, the direct purchaser would be

28   free under that scenario to file suit if it decided it was in its best interests.  The Western District of

21

United States District Court
Northern District of California

Washington addressed the same question in <u>Costco Wholesale Corp. v. AU Optronics Corp.</u>, C13-1207RAJ, 2014 WL 4540068 (W.D. Wash. Sept. 11, 2014).  As that court explained, the Ninth Circuit has not ruled on the timing of control issue expressly, but its decision not to adopt a rule requiring control at the time of suit is instructive:

> The court does not know what arguments the <u>ATM Fee</u> defendants presented, but the Ninth Circuit did not announce a timing rule despite incentive to do so.  Members, including the card-issuing bank defendants, controlled the ATM network in <u>ATM Fee</u> until February 2001.  Plaintiffs sought damages dating back to July 2000, but did not sue until July 2004.  By Defendants' date-of-suit rule, there was no need for the <u>ATM Fee</u> court to discuss the banks' former control of the ATM network.  Because the banks did not control the network on the day the cardholder plaintiffs sued, their control was irrelevant (at least according to Defendants' date-of-suit rule).  But instead of making that simple pronouncement, the <u>ATM Fee</u> court focused on plaintiffs' allegations, concluding that there were no allegations of conspiracy among the bank defendants during the time that they controlled the ATM network.

<u>Id.</u> at *6 (citations omitted).

The court further noted that a rule requiring control at the time of suit would be inconsistent with the holdings and underlying rationales of <u>Royal Printing</u> and <u>Freeman</u>:

> Imagine, for example, that Lemonade, Inc. is the wholly-owned subsidiary of Lemons, Inc. throughout Lemons's participation in a lemon-price-fixing conspiracy.  When the conspiracy ends, Lemons spins Lemonade off as an independent corporation.  Whether there is a realistic possibility of suit *because of control* in that situation is an open question.  Is it realistic that a former subsidiary would sue its former parent for wrongs that occurred while the subsidiary was under its parent's control?  Perhaps in some cases, perhaps not in others.  Defendants' date-of-suit rule ignores any nuance.  By Defendants' rule, even if Lemonade had agreed as a condition of the spinoff that it would not sue Lemons for past wrongs, lemonade purchasers could not sue.  By Defendants' rule, even if Lemonade had knowingly acquiesced to paying the fixed price while under Lemons's control, lemonade purchasers could not sue.  By Defendants' rule, even if Lemonade had conspired to fix the price that Lemons charged it while under Lemons's control, lemonade purchasers would have no remedy.
>
> This final hypothetical example is particularly troubling, because it provides a blueprint for price fixers: conspire with your parent company to fix prices, but also conspire with your parent company to be spun off once the conspiracy is exposed.  Although Ninth Circuit authority is silent as to a catchall rule for the timing of control, it is explicit that no price fixer should be allowed to evade civil liability by manipulating its corporate umbrella.  <u>E.g.</u>, <u>Freeman</u>, 322 F.3d at 1146 ("Were we to grant immunity . . . merely because

1   defendants nominally sell services through another entity rather than
2   to consumers directly, we would risk opening a major loophole for
    resale price maintenance and retailer collusion."); Royal Printing,
3   621 F.3d at 327 (noting that it would be "intolerable" to "close off
    every avenue for private enforcement of the antitrust laws" by
    prohibiting indirect purchasers from suing price fixers who sell
4   goods to their conspirators' subsidiaries).

5   Id. at *7.

6        For the same reasons, this Court agrees that the timing of control may be relevant to the

7   analysis of whether the exception should apply in some instances, but that consideration is not

8   dispositive.  Regardless of the timing, the ultimate question remains whether the control

9   relationship foreclosed a realistic possibility of suit.

10              **3.      The Impact of Principal-Agent Relationships On Standing**

11       The final legal issue presented by the instant motions relates to principal-agent

12  relationships and their effect on antitrust standing and the application of the direct purchaser rule.

13  The traditional test for agency requires "(1) a manifestation by the principal that the agent shall act

14  for him; (2) that the agent has accepted the undertaking; and (3) that there is an understanding

15  between the parties that the principal is to be in control of the undertaking." Sun Microsystems,

16  622 F. Supp. 2d at 899.  Once a principal-agent relationship is established, the agent essentially

17  stands in the shoes of the principal on matters within the scope of the agency agreement.

18  Accordingly, where a purchasing agent purchases goods on behalf of its principal, the principal --

19  not the purchasing agent -- is the direct purchaser, unless the agent represents a distinct economic

20  entity in the good's chain of distribution.  Whether the agent is a distinct economic entity is a

21  function of three factors:

22       • [W]hether the [purported] agent performs a function on
           behalf of his principal other than securing an offer [or a
23         price] from a buyer [or seller] for the . . . product;

24       • [T]he degree to which the [purported] agent is authorized to
           exercise his discretion concerning the price and terms under
25         which the principal's product is to be sold [or bought]; and
           finally
26
         • [W]hether the use of the [purported] agent constitutes a
27         separate step in the vertical distribution of the . . . product.

28  Diskin v. Daily Racing Form, Inc., No. 92 CIV. 6347 (MBM), 1994 WL 330229, at *4 (S.D.N.Y.

United States District Court
Northern District of California

United States District Court
Northern District of California

July 7, 1994) (quoting <u>Fuchs Sugars & Syrups, Inc. v. Amstar Corp.</u>, 602 F.2d 1025, 1029, 1031 n.5 (2d Cir. 1979)).

Parties to some of the instant motions confuse principal-agent relationships with the control exception to the direct purchaser rule.[13]  Typically, the first party to purchase a price-fixed good is considered the direct purchaser.  Where, however, that party is merely a purchasing agent for the party to whom it later resells the price-fixed good (*i.e.*, the principal), the principal will have standing as the direct purchaser, not the agent.  <u>See</u> <u>In re NASDAQ Mkt – Makers Antitrust Litig.</u>, 169 F.R.D. 493, 505 (S.D.N.Y. 1996); <u>In re Lorazepam & Clorazepate Antitrust Litig.</u>, 202 F.R.D. 12, 25 (D.D.C. 2001); <u>In re Toilet Seat Antitrust Litig.</u>, 1977 WL 1453, at *2.  Parties to some of the instant motions attribute the principal's standing as the direct purchaser in these situations to the control exception from footnote 16 of <u>Illinois Brick</u>.  A principal, they argue, will have standing to sue as an indirect purchaser insofar as it owns or controls the purchasing agent.  Not so.  A principal has standing to sue in this context because it is, as a matter of agency law, a direct purchaser, not an indirect purchaser.  The agent, in contrast, is merely an extension of the principal.  Thus, whether the principal owns or controls the purchasing agent within the meaning of the control exception is irrelevant.

Relatedly, if an agent is not a distinct economic entity in the chain of distribution, then it

_____

[13] The parties' confusion on this issue was illustrated when, during the hearing on the instant motions, they pointed to <u>In re Toilet Seat Antitrust Litig.</u>, 1977 WL 1453, at *2 (E.D. Mich. Aug. 24, 1977) as an example of where control had superseded market forces within the meeting of the control exception set out in footnote 16 of <u>Illinois Brick</u>.  In that case, however, the court interpreted the relationship between the parties "as that of principal and agent rather than buyer and seller" and stated expressly that the principal was not an indirect purchaser.  <u>Id.</u>  The confusion, however, is understandable.  Indeed, the court in <u>In re Toilet Seat</u> later went on to note that "[e]ven if [the principal] were deemed to be an indirect purchaser, the Court does not view the decision in <u>Illinois Brick</u> . . . as a barrier to allowing [the principal] standing to proceed" because the agent's "actions regarding purchases made on [the principal's] behalf were controlled by [the principal]."  <u>Id.</u>  For that reason, the court viewed "the relationship between [the principal] and [the agent] as falling within the [control] exception."  <u>Id.</u>  Similarly, Judge Hamilton in <u>Sun Microsystems</u> viewed <u>In re Toilet Seat</u> as an example of the control exception.  608 F. Supp. 2d at 1181 ("<u>In re Toilet Seat</u> is characterized by facts indicating that market forces have been suspended (e.g., flat fee payment that is resistant to supply and demand forces).").  For the reasons set forth in this section, however, the Court finds that whether an individual or entity has standing to sue for damages based on a principal-agent relationship is distinct from whether they have standing as an indirect purchaser under the control exception from <u>Illinois Brick</u>.

cannot sue as the direct purchaser -- again, not by operation of the control exception as certain parties claim -- but because the agent lacks antitrust standing.  Strictly speaking, a purchasing agent that is not a distinct economic entity with respect to the price-fixed goods is selling purchasing services to the principal, not the price-fixed goods themselves.  The price of those services is set by the interaction between supply and demand in the market for purchasing services, not by the interaction of supply and demand in the market for the price-fixed goods.  Granted, the demand for purchasing services might be affected by an increase in the price of the underlying goods, but the markets are nevertheless distinct.  Thus, with respect to the second AGC factor as set forth supra Section IV.A.1, a purchasing agent does not suffer antitrust injury because it is not a market participant.  See also McCullough v. Zimmer, Inc., 382 F. App'x 225, 229 (3d Cir. 2010) (dismissing plaintiffs' complaint for lack of antitrust injury because as "commission-based sales representatives who did business with competitors and consumers in the market . . . [but were not] competitors or consumers themselves," the plaintiffs were "mere intermediaries" and therefore "suffered no cognizable antitrust injury").  The other AGC factors weigh against granting standing as well: a purchasing agent's injury (to the extent it is injured at all) is indirect; there is a high risk that the agent and the principal will secure duplicative recoveries; and the principal is the more direct victim.  See Assoc. General Contractors of California, 459 U.S. at 537-44.

## B.    The Instant Motions

### 1.    Defendants' Motion For Summary Judgment With Respect To MARTA

Because MARTA is a purchasing agent without a distinct economic identity in the chain of distribution of CRTs, Defendants' motion is GRANTED.

#### a.    Facts

MARTA is a buying cooperative in the appliance and electronics (including CRT) industry, owned entirely by the retailers that make up its membership.  According to its "Cooperative Plan," MARTA acts as a "non-exclusive purchasing agent for each and every shareholder" of the cooperative.  ECF No. 3267-4 at CRT-MARTA-0043944.  It purchases

products on behalf of its owners, and sells exclusively to them.  By leveraging the collective purchasing power of its members, MARTA is able to secure lower prices from vendors than members would be able to secure on their own.  In addition to serving as a purchasing agent, MARTA also organizes trade shows for members and assists members in understanding the competitive landscape in relevant markets.

All of MARTA's revenues in excess of expenses and income taxes are distributed to its owners, in proportion to the amount of merchandise purchased.  Membership in the MARTA cooperative is determined solely by ownership: all shares of MARTA are owned by its members, and each member is required to buy one share of MARTA stock (worth $4,000).  The membership is constantly evolving as a result of retailers joining and exiting the membership.  MARTA is a corporate entity separate from its members.  It is governed by a board of directors elected by its membership.

Purchases made through MARTA are normally routed through MARTA's central billing process.  The first step in a centrally billed purchase is that the member decides to place an order, and communicates it directly to the vendor.  Upon receiving an order from a member, the vendor communicates the order to MARTA.  MARTA then checks whether the purchasing member's line of credit with MARTA is sufficient, and notifies the vendor that the transaction is authorized.  The vendor then ships the merchandise directly to the member.  (MARTA generally does not keep an inventory of products with the exception of "opportunity buys" or providing storage space for members.)  The vendor then invoices MARTA, and MARTA in turn bills the member.  It is the expectation that the member will pay MARTA before MARTA pays the vendor.  MARTA charges vendors a two percent fee to participate in central billing.  The fee is implemented by having vendors reduce the price of their merchandise by two percent.  MARTA then charges the purchasing member this reduced price plus a "roundup" (also known as a "holdback"), whereby the price charged by MARTA is rounded up to the next dollar.  Occasionally, the price is increased by a few dollars.

The funds raised through holdbacks/roundups are used to cover MARTA's expenses and to fund "core model discounts."  Core model discounts reduce the price charged to members on

United States District Court
Northern District of California

certain models, allowing members to compete more effectively in the market for those models by reducing the members' costs.  These discounts often result in MARTA selling core models at a loss, which it recoups from the fees it charges for non-core models.  The MARTA director determines which models will be discounted based on whether he believes there is a profit opportunity in the market for that particular model.

During the Conspiracy Period, MARTA's members placed orders with Defendants (through MARTA) for allegedly price-fixed CRTs.  MARTA filed suit, alleging standing to collect damages as a direct purchaser.

### b.        Discussion

Defendants' first argument is that MARTA was not injured because its pricing formula ensured that any illegal overcharge was passed on to its members.  By operation of the direct purchaser rule, however, a direct purchaser is harmed the moment it pays an illegal overcharge. See Hanover Shoe, 392 U.S. at 489 ("We think it sound to hold that when a buyer shows that the price paid by him . . . is illegally high . . . , he has made out a prima facie case of injury" even "if he raises the price for his own product."); In re Apple iPod iTunes Antitrust Litig., No. C 05-00037, 2011 WL 5864036, at *4 (N.D. Cal. Nov. 22, 2011) ("'[W]hen a seller overcharges a buyer . . . the fact that the buyer raises the price for its own product, thereby passing on the overcharge to its customers and avoiding a loss in profit, has no bearing on the issue of whether the buyer has suffered an injury.'") (quoting Meijer, Inc. v. Abbott Labs., 251 F.R.D. 431, 433 (N.D. Cal. 2008) (in turn citing Hanover Shoe, 392 U.S. at 489-92)); Braintree Labs., Inc. v. McKesson Corp., No. 11-80233, 2011 WL 5025096, at *3 (N.D. Cal. Oct. 20, 2011) ("[A] plaintiff's alleged benefit from a defendant's anti-competitive behavior . . . is not relevant to whether the plaintiff [direct purchaser] suffered a cognizable antitrust injury. . . . [T]he relevant question is whether the plaintiff paid an overcharge.").  Insofar as MARTA was a direct purchaser, therefore, it has standing even if it passed on the overcharge to indirect purchasers.

Next, Defendants assert a pass-on defense under an exception to Hanover Shoe.  Pursuant to Hanover Shoe and Illinois Brick, defensive pass-on theories are prohibited except where "'[t]he effect of the overcharge is essentially determined in advance, without reference to the interaction

United States District Court
Northern District of California

of supply and demand that complicates the determination in the general case,' and where the arrangement 'circumvent(s) complex market interactions as would a (pre-existing) cost-plus contract.'"  <u>Royal Printing</u>, 621 F.2d at 326 n.4 (quoting <u>Illinois Brick</u>, 431 U.S. at 736); <u>see also</u> <u>supra</u> Section IV.A.2.b.i.  Because the price charged to MARTA's members was, according to Defendants, predetermined by MARTA's pricing formula and not a function of supply and demand, Defendants argue that market forces were superseded such that it falls within this exception.  Even if the price was fixed, however, MARTA's members were not committed to purchasing a set quantity of CRTs.  The cost-plus contract exception, therefore, does not apply.[14]  See <u>UtiliCorp.</u>, 497 U.S. at 218 ("The utility customers made no commitment to purchase any particular <u>quantity</u> of gas, and the utility itself had no guarantee of any particular profit.") (emphasis added); <u>Illinois Brick</u>, 431 U.S. at 735-36 ("[T]he purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying <u>a fixed quantity</u> regardless of price.") (emphasis added); <u>see also</u> <u>supra</u> Section IV.A.2.b.i.

   MARTA nevertheless lacks standing, not because of an exception to the direct purchaser rule, but as a matter of agency law.  MARTA was an agent for its members: it had an agreement with its members that it would negotiate prices and facilitate purchases of CRTs on members' behalf; MARTA's members remained in control given they determined whether, when, what, and how many CRTs to purchase; and MARTA's charter stated explicitly that it was a "purchasing agent."  <u>See</u> <u>Sun Microsystems</u>, 622 F. Supp. 2d at 899 (providing the test for agency).  Defendants' motion therefore turns on whether MARTA, as a purchasing agent, was a distinct economic entity in the chain of distribution of CRTs.

   To determine whether MARTA was a distinct economic entity, the Court adopts the Second Circuit's factors from <u>Fuchs Sugars</u>.  <u>See</u> <u>Diskin</u>, 1994 WL 330229, at *4 (quoting <u>Fuchs Sugars & Syrups</u>, 602 F.2d at 1029, 1031 n.5).  While MARTA performed some additional

---

[14] Defendants also argue that the facts fall within the control exception from footnote 16 of <u>Illinois Brick</u>.  As explained <u>supra</u> Section IV.A.2.b.i, however, that exception also requires that market forces be superseded, which would require a commitment to purchase a fixed quantity.

United States District Court
Northern District of California

1    ancillary functions, such as organizing trade shows and helping members understand the

2    competitive landscape, its primary function was to leverage the purchasing power of its collective

3    membership to secure low prices from vendors for the benefit of its members.  Further, although

4    MARTA was responsible for negotiating prices with CRT vendors, it was not authorized to

5    exercise its discretion concerning the terms under which CRTs were purchased.  To the contrary,

6    MARTA's members decided whether, when, what, and how many CRTs to purchase.

7    Furthermore, MARTA did not have the discretion to refuse a sale.

8         Whether MARTA constituted "a separate step in the vertical distribution of the . . .

9    product," Diskin, 1994 WL 330229, at *4, is a somewhat harder question, but this factor

10   ultimately weighs against viewing MARTA as a separate economic entity as well.  Unlike most

11   wholesaler-retailer relationships, MARTA's member retailers placed CRT orders by contacting

12   the CRT vendors (the Defendants) directly.  Defendants then transmitted information about the

13   orders to MARTA.  MARTA then reviewed the orders, confirmed that the members had sufficient

14   credit with MARTA to purchase the products, and transmitted the approval to Defendants.  It was

15   the expectation, however, that MARTA would not pay the vendor until the member paid MARTA.

16   Also unlike a wholesaler, MARTA never had possession of the products: Defendants shipped the

17   product directly to MARTA's members.  In short, MARTA never initiated purchases of CRTs; it

18   never purchased products; and it did not maintain an inventory for the purpose of resale.  These

19   facts suggest MARTA was not a separate step in the vertical distribution of CRTs.

20        MARTA's pricing system was also unlike a wholesaler.  Wholesalers generally set prices

21   based on supply and demand in the wholesale market.  Instead, MARTA set prices by taking the

22   price it paid Defendants and adding some fee or "holdback/roundup," often set at some percentage

23   of Defendants' price.  The pricing structure, in other words, was similar to an agent that charges a

24   commission as opposed to a wholesaler that maximizes profits by setting prices as a function of

25   supply and demand in the wholesale market.

26        MARTA argues it was a wholesaler because it paid Defendants for the CRTs, technically

27   owned the CRTs after purchasing them from Defendants until its members paid MARTA, was

28   obligated to pay the vendors even if the member that made the purchase did not pay MARTA,

29

provided discounts on certain core models, and assumed the risk of loss on the sale and shipment of CRTs to its members.  These facts weigh slightly against finding that MARTA acted merely as a purchasing agent.  Unlike a typical wholesaler, however, MARTA only paid Defendants for the CRTs if the member had sufficient credit with MARTA.  Furthermore, as Defendants pointed out at the hearing, credit cards share many of these same characteristics: they are obligated to pay a vendor even if a cardholder does not pay the credit card company; they often assume the risk of loss; and many provide cardholders with discounts (often in the form of rewards) when they purchase certain types of goods.  Nevertheless, when a consumer uses a credit card to purchase a good, the consumer is the direct purchaser, not the credit card company.

In sum, the Court finds that MARTA functioned as an agent on behalf of its members and did not have a distinct economic identity in the chain of distribution of CRTs.  See Diskin, 1994 WL 330229, at *4 (quoting Fuchs Sugars & Syrups, 602 F.2d at 1029, 1031 n.5).  MARTA therefore does not have standing to sue as a direct purchaser.  See also In re NASDAQ Mkt – Makers Antitrust Litig., 169 F.R.D. at 505 (recognizing the standing of purchasers who "transacted through non-Defendant owned brokers where those brokers did not function as a distinct economic entity in the chain of purchase or sale"); In re Lorazepam & Clorazepate Antitrust Litig., 202 F.R.D. at 25 (granting plaintiff hospitals standing even though a group purchasing organization purchased the allegedly price fixed products on the hospitals' behalf); In re Toilet Seat Antitrust Litig., 1977 WL 1453, at *2 (interpreting the relationship between the purported indirect and direct purchaser "as that of principal and agent rather than buyer and seller" where, as here, the agent did not keep an inventory and, in some instances, was billed first by the manufacturer).

MARTA also lacks standing because it fails to satisfy the AGC factors as set forth supra Section IV.A.1.  MARTA did not suffer antitrust injury because it was not a participant in the CRT market: it did not acquire CRTs for resale as a wholesaler might, and it was a competitor in the market for purchasing services, not CRTs.  See McCullough, 382 F. App'x at (finding a lack of antitrust injury because plaintiffs were "mere intermediaries").  Moreover, MARTA's purported injury is speculative and indirect because the primary way MARTA would have been harmed, if at

30

all, is by a reduction in demand for its purchasing services due to higher CRT prices.[15]  Further, the risk of duplicative damages if purchasing agents like MARTA were given standing is high insofar as they would, as here, sue for the same damages as direct purchasers.  Finally, there exist other, more appropriate plaintiffs -- namely, those MARTA members who actually paid the overcharge.  Indeed, MARTA is particularly ill suited as a plaintiff in this case because, although MARTA distributes its revenues to its members, its membership is constantly changing.  Not only did a number of MARTA's members never purchase CRTs during the Conspiracy Period, many of those who did are no longer members.  Further, those who joined after the conspiracy ended suffered no injury whatsoever.  Any award from this suit would therefore benefit members who never purchased CRTs while failing to compensate many of those who did.

Accordingly, Defendants' motion is GRANTED.

> ### 2.    Defendants' Motion For Partial Summary Judgment Against Certain DAPs For Lack Of Antitrust Injury And Antitrust Standing Under Federal And Certain State Laws

Defendants filed a motion for summary judgment on claims certain DAPs brought under state and federal law for their purchase of CRT Finished Products.  Defendants argue that the DAPs lack "antitrust standing" because they purchased CRT Finished Products but were not a participant in the market for CRTs themselves.  Judge Conti addressed the same argument in a previous order on Defendants' motion to dismiss, concluding that the allegations in the DAPs' complaint were sufficient to support antitrust standing:

> The Court finds that, for purposes of the present motion, the DAPs have sufficiently pled an antitrust injury, and that this factor slightly favors standing. The Court finds that where a product like a CRT itself is virtually valueless on its own, and the markets for CRTs themselves and CRT products are plausibly pled to be inextricably intertwined, a plaintiff adequately pleads an antitrust injury when the alleged anticompetitive activity surrounding a component affects the market for the finished product in a traceable way.  See, e.g., In

---

[15] This is because MARTA's pricing formula generally ensured that price increases were passed on to MARTA's members.  Although this pass on would not have been relevant if MARTA was a direct purchaser, see Hanover Shoe, 392 U.S. at 489; In re Apple iPod iTunes Antitrust Litig., 2011 WL 5864036, at *4; Braintree Labs., 2011 WL 5025096, at *3, as explained above, MARTA was not a direct purchaser and therefore does not benefit from the presumption that it was injured insofar as it paid the overcharge in the first instance.

United States District Court
Northern District of California

re Flash Memory Antitrust Litig., 643 F. Supp. 2d 1133, 1154 (N.D. Cal. 2009); In re GPU Antitrust Litig., 540 F. Supp. 2d 1085, 1098 (N.D. Cal. 2007).

In re Cathode Ray Tube (CRT) Antitrust Litig., No. C-07-05944-SC, 2013 U.S. Dist. LEXIS 119598, at *101 (N.D. Cal. Aug. 21, 2013) (emphasis added).  Judge Conti, however, indicated that Defendants could renew this argument "on a fuller factual record." Id. at 103.  Having completed discovery, Defendants now renew their motion as a motion for summary judgment. The Court will deny the motion.

The DAPs have submitted sufficient evidence to support the allegations that Judge Conti ruled were sufficient to establish standing.  Specifically, there is evidence that CRTs made up a substantial and identifiable portion of the cost of CRT Finished Products.  See, e.g., ECF No. 3245-13 (Deposition of Yasu Hisa Takeda (Hitachi 30(b)(6)), July 12, 2012 (Capurro Decl. Ex. 9), at 11:21-12:24 (The percentage of the manufacturing cost of a CRT monitor varies, by model, but would be ". . . approximately . . . 45 to 50 percent of the monitor.")).  Further, there is evidence that the CRT Finished Products for which Defendants designed their CRTs were those CRTs' only use (i.e. the only market for Defendants' products).  See, e.g., ECF No. 3245-17 (Netz Class Cert. Report (Capurro Decl. Ex. 13), at 20, nn. 60-61 (CRT manufacturers do not manufacture or sell CRTs "off-the-shelf" and produce CRTs solely for incorporation into finished products based on specifications dictated by finished product makers)).  The interconnectedness of the CRT market and the CRT Finished Product market is demonstrated, moreover, by evidence showing that Defendants monitored the retail prices of CRT Finished Products and used that information to inform their CRT production and pricing decisions.  See, e.g., ECF No. 3245-5 (Netz Expert Report (Capurro Decl. Ex. 1), at 95, Ex. 59 (collecting evidence of Defendants monitoring street prices of CRT products), Ex. 60 (collecting evidence that market research firms Defendants relied upon regularly published street prices).  Finally, there is substantial evidence that the conspiracy adversely and measurably impacted the DAPs.  See, e.g., id. at 95-96.

Defendants do not challenge this evidence.  Instead, they direct most of their arguments at disputing, albeit implicitly, the legal conclusions underlying Judge Conti's previous order.  In particular, they argue that injuries suffered by purchasers of finished products that incorporate a

United States District Court
Northern District of California

price-fixed good as a component are not inexorably intertwined with the injuries of those who purchase price-fixed goods themselves (i.e., the finished product manufacturers).  Neither the law of the case as set forth in Judge Conti's order nor the weight of authority in this district support Defendants' position.[16]  See In re Flash Memory Antitrust Litig., 643 F. Supp. 2d 1133, 1154 (N.D. Cal. 2009); In re Graphics Processing Unites (GPU) Antitrust Litig., 540 F. Supp. 2d 1085, 1098 (N.D. Cal. 2007); In re Lithium Ion Batteries Antitrust Litig., No. 13-2420, 2014 U.S. Dist. LEXIS 141358 (N.D. Cal. 2014); In re Optical Disk Drive Antitrust Litig., No. 3:10-md-2143, at *6 (N.D. Cal. Apr. 19, 2012); In re TFT-LCD (Flat Panel) Antitrust Litig., 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008); In re TFT-LCD (Flat Panel) Antitrust Litig., No. M 07-1827 SI, 2011 U.S. Dist. LEXIS 140831 (N.D. Cal. Dec. 7, 2011); In re TFT-LCD (Flat Panel) Antitrust Litig., No. M 07-1827 SI, 2012 U.S. Dist. LEXIS 148032 (N.D. Cal. Oct. 9, 2012); In re TFT-LCD (Flat Panel) Antitrust Litig., No. M 07-1827, 2012 U.S. Dist. LEXIS 145935 (N.D. Cal. Oct. 9, 2012); In re TFT-LCD (Flat Panel) Antitrust Litig., M 07-1827, 2014 U.S. Dist. LEXIS 90514 (N.D. Cal. Jul. 1, 2014).  Circuit and district courts outside of the Ninth Circuit are also in accord.  See In re Automotive Parts Antitrust Litig., 2014 U.S. Dist. LEXIS 136403, at *204-11 (E.D. Mich. Sept. 25, 2014); In re Sugar Indus. Antitrust Litig., 579 2d 13 (3d Cir. 1978); In re Linerboard Antitrust Litig., 305 F.3d 145 (3d Cir. Pa. 2002).  The Court agrees with this authority and sees no reason to disturb Judge Conti's earlier ruling in the case.

Accordingly, Defendants' motion is denied.

### 3. Certain Defendants' Motion for Partial Summary Judgment With Respect To The DAPs' Alleged Direct Damage Claims Based on Purchases From Sanyo

Panasonic Defendants seek partial summary judgment on the basis that certain DAPs' claims based on purchases from Sanyo are barred by the direct purchaser rule.  The DAPs argue the control exception under Royal Printing applies to their claims because the direct purchaser -- Sanyo -- was controlled by Panasonic.  In reply, Panasonic points out that it did not control Sanyo

---

[16] Although Judge Hamilton from this district came out on the other side in DRAM, her opinion appears to be an outlier.  See In re DRAM Antitrust Litig. ("DRAM"), 516 F. Supp. 2d 1072 (N.D. Cal. 2007); In re DRAM Antitrust Litig. ("DRAM"), 536 F. Supp. 2d 1129 (N.D. Cal. 2008).

until several years after the conspiracy was complete.  Because there is a genuine dispute of material fact as to whether Panasonic's control of Sanyo foreclosed a realistic possibility of suit by Sanyo at the time the DAPs filed their claims, the Court will deny Defendants' motion.

### a.     Facts

The relevant facts underpinning this motion are few.  The DAPs at issue were purchasers and retail sellers of CRT Finished Products that they purchased, in part, from Sanyo.  The DAPs were therefore indirect purchasers of CRTs, and Sanyo was a direct purchaser.  Throughout the Conspiracy Period, Panasonic did not own or control Sanyo.  On December 21, 2009, two years after the initial complaints were filed in this case, Panasonic acquired a 50.2% ownership in Sanyo.  Panasonic acquired the remaining interest in 2011.

### b.     Discussion

Defendants argue that the control exception cannot apply where there is no control during the time of the conspiracy and that to hold otherwise would effectively create a new exception to the direct purchaser rule.  This is incorrect.  As explained supra Section IV.A.2.b.ii.(4), the timing of control is not dispositive under the existing exception set out in Royal Printing.  See In re TFT-LCD (Flat Panel) Antitrust Litig., 2012 WL 7062366, at *58-59; Costco Wholesale Corp., 2014 U.S. Dist. LEXIS 127727, at 11.  The test for that exception is simply whether the price fixer or the direct purchaser "exercise[s] restraint or direction over, dominate[s], regulate[s], . . . command[s], . . . guide[s] or manage[s]" the other such that a realistic possibility of suit by the direct purchaser is foreclosed.  ATM Fee, 686 F.3d at 757; see also Section IV.A.2.b.ii.(1).

Defendants also argue the exception should not apply because market forces were not superseded.  The control exception under Royal Printing, however, does not require that market forces be superseded.  Royal Printing, 621 F.2d at 326 n.4; see also supra Section IV.A.2.b. Defendants go on to assert that no court has ever applied the control exception where control did not exist during the conspiracy, but that is also incorrect.  See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litig., 2012 U.S. Dist. LEXIS 183751, at *58-59 (applying the control exception where control did not exist until after the conspiracy).  Regardless, limiting the exception in the way Defendants propose would be inconsistent with Royal Printing and its progeny because it would

United States District Court
Northern District of California

34

limit instead of promote private enforcement of the antitrust laws. See supra Section IV.A.2.b.ii.

Defendants' next argument raises an interesting question: Does the exception apply if there was a window within which the direct purchaser could have sued but chose not to? Defendants point out that two years passed between the filing of the initial complaints in this case and Panasonic's acquisition of Sanyo. They assert the control exception should not apply, therefore, because there was a realistic possibility of suit by Sanyo during that time. The Court finds, however, that the point at which to assess whether a realistic possibility of suit was foreclosed is the time at which the indirect purchasers filed suit. If that were not the rule, cartel members would have an incentive to avoid liability by acquiring direct purchasers after the conspiracy is complete. See Costco, 2014 U.S. Dist. LEXIS 127727, at *22-23 ("Although Ninth Circuit authority is silent as to a catchall rule for the timing of control, it is explicit that no price fixer should be allowed to evade civil liability by manipulating its corporate umbrella.") (citing Freeman, 322 F.3d at 1146).

Accordingly, Defendants' motion is denied.

### 4. SDI Defendants' Motion for Partial Summary Judgment For Lack Of Standing Based On Purchases From Samsung Electronics

Alleged conspirator Samsung SDI ("SDI") sold CRTs to Samsung Electronics Co. ("SEC"), which sold CRT Finished Products to the DAPs. Thus, SDI is an alleged price fixer; SEC is a direct purchaser; and the DAPs are indirect purchasers. The DAPs assert their claims fall within the control exception from Royal Printing because SEC allegedly controls SDI. Defendants filed a motion for partial summary judgment on this issue.

Defendants first argue that the control exception does not apply where, as here, control is directed upstream. Second, Defendants assert that the control exception should not apply because SEC, according to Defendants, does not actually control SDI. Defendants' second argument is based on an exacting standard for control that looks only to majority ownership, the ability to appoint a majority of board members, or the ability to "command corporate conduct, including the setting of prices." SDI Mot. at 13. Because SEC does not own a majority of SDI's stock, does not appoint a majority of SDI's board members, and does not have the ability to set SDI's prices, Defendants urge the Court to grant summary judgment in their favor.

United States District Court
Northern District of California

The DAPs respond that the control exception can apply in either direction.  Further, they assert that the standard for control under the control exception is less demanding than the Defendants claim and that the Court should look to a broad range of factors in making that determination.  Finally, the DAPs argue that SEC controlled SDI within the meaning of the control exception given the unique corporate structure within which SEC and SDI operate -- a South Korean chaebol.

The Court has already addressed most of the legal issues presented by this motion.  As previously explained, the direction of control is not dispositive, see supra Section IV.A.2.b.ii.(3), and any factor that is probative of whether the control relationship at issue foreclosed a realistic possibility of suit ought to be considered by the Court, see supra Section IV.A.2.b.ii.(2).  The more difficult and fact-intensive question is whether the control relationship between SEC and SDI was sufficient to trigger the exception.  The Court finds there is at least a genuine issue of material fact on that question.  Defendants' motion is therefore denied.

### a.        Facts

The DAPs claim that SEC controls SDI.  Separate but related, the DAPs also claim that SDI is controlled by the Samsung Group, a South Korean business conglomerate, for which SEC is the flagship[17] company.

The Samsung Group is a particular kind of business conglomerate known as a chaebol. Chaebols are closely knit business groups in South Korea "under the control of a single family or extended family, with key 'flagship' firms which are used as the instruments of control of other firms within the group."  Haggard Decl. ¶ 7.  The Samsung Group has been led by the Lee family since its founding, and Lee Kun-hee currently serves as its Chairman.  In addition to being Chairman of the Samsung Group, Lee Kun-hee was also a Director of SDI from 1998-2004 and

---

[17] SEC accounts for most of the Samsung Group's revenue through sales of smartphones and other electronics.  Samsung does not dispute that SEC is the flagship company of the Samsung Group; indeed, the Samsung website states explicitly that SEC is the flagship.  The DAPs' claim that as the flagship company, "SEC is the instrument through which both horizontal holdings in non-related industries and vertically-integrated relationships in the electronics sector [of the Samsung Group, including SDI] are effectively controlled."  ECF No. 3243-8 ("Haggard Decl.") ¶ 63.

United States District Court
Northern District of California

1    served as Chairman and CEO of SEC from 1998-2007.  Id. ¶ 75.

2        The DAPs point to a variety of indicators of control, including direct and indirect

3    ownership.  SEC directly owned up to 20% of SDI during the Conspiracy Period.  The DAPs

4    assert, however, that "the 20% direct equity holdings must be treated as an absolute lower bound

5    of [SEC's] ownership in . . . SDI" given "an elaborate and opaque set of circular and cross

6    shareholdings."  SDI Opp'n at 18.  As the DAPs' expert, Dr. Haggard, explains, "[t]he Samsung

7    Group as a whole is characterized by a dense network of cross-shareholdings[18] . . . .  SEC is clearly

8    a central node in the Samsung Group network, sitting atop a very complex network of inter-linked

9    firms . . . ."  Haggard Decl. ¶ 62; see also id. ¶ 65 ("The share of . . . SEC holdings in SDI are

10   underestimated by looking only at the direct ownership by Group firms in SDI, because SDI also

11   holds shares in other Samsung Group companies, some of which are in turn direct or indirect

12   owners of SEC and SDI.").  The significance of these indirect holdings to the control analysis,

13   however, was not quantified by Dr. Haggard, and the DAPs admitted at the hearing that the sum of

14   direct and indirect holdings amounted to less than a 50% interest.

15       The DAPs also point to a single interlocking directorship.  Lee Kun-hee was a Director of

16   SDI from 1998-2004 while at the same time serving as Chairman and CEO of SEC (1998-2007).

17   Id. ¶ 75.  Even though this is the only interlocking directorate to which the DAPs point, the DAPs

18   argue it is significant given Mr. Lee's prominence as Chairman of the Samsung Group.

19       Next, the DAPs provide evidence of statements they characterize as admissions of control.

20   For example, the 1996 Samsung Group Annual Report describes the "Samsung Electronics

21   Subgroup," including SEC and SDI, as "fully integrated."  Id. ¶ 85.  Further, SEC's financial

22   disclosures identify SDI as an "equity method investment," defined as an investment in a business

23   entity in which SEC has "control or the ability to exercise significant influence over the operating

24   and financial policies."  SDI Mot. at 22-23.  The DAPs also note that Korean authorities have

25   designated the Samsung Group as a "large business conglomerate . . . over which the same person

26

27   ───────────────────
     [18] According to Dr. Haggard, cross-shareholdings "link firms by horizontal cross-holdings of
     shares in which one firm in the group holds a stake in another, which, in turn, has a stake in the

28   first firm."  Haggard Decl. ¶ 19.

holds de facto control."  Haggard Decl. ¶ 50.  In reply, Defendants admit that SEC has the "ability to exercise significant influence" but deny that SEC has "control" of SDI within the meaning of the control exception.

The DAPs also provide evidence that SEC performed acts inconsistent with its individual corporate interests in order to promote the interests of the Samsung Group as a whole, including SDI.  For example, SEC admits that it executed at least one settlement agreement in other case(s) that extinguished SDI's liability to third parties.  In addition, SEC provided a debt guarantee to SDI's creditors in 1998.

Next, the DAPs claim that corporate governance structures within SDI and SEC undermine Defendants' argument that the companies operate independently of each other and of the Samsung Group as a whole.  The DAPs argue that, in general, the companies pursued the interests of the chaebol over the interests of the individual companies' shareholders, which was made possible, they argue, because of the ratio of inside to outside directors during at least part of the Conspiracy Period:

| SDI and  SEC Inside and  Outside Directors, 1998-2007 | | | | | |
|---|---|---|---|---|---|
| | SDI | | | SEC | |
| Year | Inside | Outside | BOD Total | Inside | Outside | BOD Total |
| 1998 | 11 | 4 | 15 | 24 | 4 | 28 |
| 1999 | 8 | 4 | 12 | 17 | 7 | 24 |
| 2000 | 8 | 4 | 12 | 14 | 6 | 20 |
| 2001 | 4 | 4 | 8 | 7 | 7 | 14 |
| 2002 | 4 | 4 | 8 | 7 | 7 | 14 |
| 2003 | 4 | 5 | 9 | 7 | 7 | 14 |
| 2004 | 4 | 4 | 8 | 6 | 7 | 13 |
| 2005 | 3 | 5 | 8 | 6 | 7 | 13 |
| 2006 | 3 | 5 | 8 | 6 | 7 | 13 |
| 2007 | 3 | 4 | 7 | 6 | 7 | 13 |

Id. ¶ 73.

The DAPs argue that control was also effectuated through centralized institutions within the Samsung Group.  For example, the DAPs claim that the Samsung Global Strategy Group (SGSG) provided consulting services and facilitated the flow of information and personnel across

the chaebol.  Id. ¶ 86.  The group was renamed in 1998 as the "Restructuring Headquarters" and purportedly took dramatic actions in the wake of the Asian financial crises that the DAPs' claim demonstrated centralized control by the Samsung Group over Samsung affiliates.  Id. ¶ 87.  In 2006, the Restructuring Headquarters was renamed the "Strategic Planning Office," which continues to assert some amount of centralized control according to Dr. Haggard.  Id. ¶ 92.

Finally, the DAPs note that suit by SDI is incredibly unlikely given that Samsung-affiliated companies such as SEC and SDI share the same brand, management philosophy, code of conduct, corporate identity ("Samsung"), Group Annual Reports, group-wide employee badges, trademarks, and domain name (Samsung.com).

### b.    Discussion

The test for the control exception under Royal Printing is whether the price fixer or the direct purchaser "exercise[s] restraint or direction over, dominate[s], regulate[s], . . . command[s], . . . guide[s] or manage[s]" the other such that a realistic possibility of suit by the direct purchaser is foreclosed.  ATM Fee, 686 F.3d at 757; see also Section IV.A.2.b.ii.(1).  Defendants argue there is no dispute of material fact as to whether SEC controlled SDI given SEC owned less than a majority of SDI's stock, did not control SDI's board, and did not control SDI's pricing decisions.[19]

---

[19] Defendants also claim that there is no dispute of material fact because the DAPs' expert (Dr. Haggard) purportedly confirmed the absence of any indicia of ownership or control.  That argument mischaracterizes Dr. Haggard's testimony.  Defendants state that Mr. Haggard confirmed that "[n]either SEC nor the Samsung Group presently owns or ever owned a majority (or even close to a majority) of SDI's stock."  SDI Mot. at 13-14.  This is undisputed, but majority ownership is not necessary in order to establish control.  Citing Dr. Haggard's deposition, Defendants claim that Mr. Haggard confirmed that there is "[n]o evidence that either SEC or the Samsung Group appointed or had the ability to appoint a majority of SDI's Board."  Id. at 14.  When asked, however, Mr. Haggard said he had no opinion on this issue.  Citing Dr. Haggard's deposition, Defendants claim that Mr. Haggard confirmed that there "[n]o evidence that either SEC or the Samsung Group controlled SDI's CRT pricing.  Mr. Haggard, however, said that he was not "called upon to reach a judgment in that question."  ECF No. 2980-6 ("Haggard Depo.) at 61:6-9.  Further, citing Mr. Haggard's deposition, Defendants claim that he confirmed that there is "[n]o evidence that either the Samsung Group or SDI had any control over SEC's litigation decisions."  SDI Mot. at 14.  Whether SDI had control over SEC's litigation decisions, however, is irrelevant since the DAPs are claiming that SEC controlled SDI, not that SDI controlled SEC.  Defendants claim that Dr. Haggard admitted that no director of SEC or SDI failed to act in his employer's best interests or violated any fiduciary duties.  In fact, when asked whether he planned on offering an opinion on that issue, Dr. Haggard replied that he did not.

United States District Court
Northern District of California

As already explained, however, a broader range of factors are relevant to the analysis, see supra Section IV.A.2.b.ii.(2), and the type of control needed to trigger the exception is not limited to control over the direct purchaser's board or pricing decisions, see supra Section IV.A.2.b.ii.(1).

Without more, minority ownership – here, 20% – is not enough to establish control under the control exception. See ATM Fee, 686 F.3d at 757. Even when SEC's direct holdings are combined with its indirect holdings, its ownership interest in SDI is still less than 50%. Further, a single interlocking directorship, even though it was held by the chairman of the Samsung Group, is insufficient to establish control. Cf. In re TFT-LCD, 2012 WL 7062366 at *4. In addition, SDI and SEC's close purchasing relationship, including significant long-term supply contracts, is not enough. See Sun Microsystems, 608 F. Supp. 2d at 1181-822; see also In re Microsoft Corp. Antitrust Litig., 127 F.Supp.2d 702, 713 (D. Ma. 2001) ("Whatever incentives OEMs and independent retail dealers may have to cooperate with Microsoft [in selling Microsoft software to end-users] (or disincentives to sue it), they clearly are separate and independent entities capable of making their own decisions."); In re TFT-LCD, 2012 WL 7062366 at *4 (intertwined economic interests stemming from significant customer-supplier relationship not enough to trigger exception). Finally, centralized institutions used to support and coordinate the efforts of Samsung affiliates are not enough to establish control insofar as they merely provide input similar to that of an advisory board. See ATM Fee, 686 F.3d at 758 ("[I]nput on policies and pricing issues by interested members [through an advisory board] does not constitute the type of control necessary to meet the exception to Illinois Brick.").

Whether SEC "exercise[s] restraint or direction over, dominate[s], regulate[s], . . . command[s], . . . guide[s] or manage[s]" SDI, however, requires a broader inquiry. It is undisputed that SEC is the flagship of the Samsung Group and that it at least had "significant influence" over SDI, as reported in SEC's financial disclosures. Samsung itself describes the subgroup of which SEC and SDI are a part as "fully integrated." Further, SEC has taken several actions that are inconsistent with Defendants' claim that SEC is independent from SDI, including providing debt guarantees to SDI's creditors and obtaining at least one settlement (and possibly more) that extinguished SDI's liability. This lack of independence is further supported by Dr.

United States District Court
Northern District of California

Haggard's research into weak corporate governance within chaebols in general and the lack of

independent outside directors at SEC and SDI specifically during at least some of the Conspiracy

Period.  Finally, that both companies are part of the same South Korean chaebol is significant.

The literature cited by Dr. Haggard supports his assertion that companies within a chaebol are

generally controlled by the flagship company notwithstanding their minority ownership interest or

a lack of formal authority to appoint a majority of board members.  Samsung's classification under

Korean law as a "large business conglomerate" further supports these claims given that South

Korean authorities impose additional regulations on such entities in order to mitigate the

centralized (often familial) control that characterizes chaebols.  When taken as a whole and

viewed in the light most favorable to DAPs, this evidence is sufficient to establish a genuine

dispute of material fact as to whether SEC controlled SDI within the meaning of the control

exception from <u>Royal Printing</u>.

Defendants claim that <u>ATM Fee</u> directs the opposite conclusion.  The facts in the instant

motion, however, are distinguishable from those present in <u>ATM Fee</u>.  <u>ATM Fee</u> involved only

10% ownership that was "widely disbursed."  686 F.3d at 757.  <u>ATM Fee</u> also did not involve

allegations of indirect ownership through cross-shareholdings.  Although the Ninth Circuit held

that the ability to "provide input" was insufficient to establish control, it was with regard to an

advisory board's ability to affect the price fixer's pricing decisions.  <u>See</u> <u>id.</u> 686 F.3d at 758.

DAPs have presented evidence suggesting that the level of influence that SEC, as the flagship of

the Samsung chaebol, had on SDI is more significant, though the precise extent of that influence

and whether it is sufficient to establish control within the meaning of the control exception is hard

to determine without a trial.  As this is a motion for summary judgment, Defendants have the

burden to establish that no reasonable juror could find that SEC controlled SDI such that there was

no realistic possibility of suit.  They fail to meet that burden.

Insofar as SEC controlled SDI within the meaning of the control exception, there is also a

genuine dispute of material fact as to whether that control relationship foreclosed a realistic

possibility that SEC would sue SDI.  As the flagship of the Samsung chaebol, the interests SEC

are intertwined with the interests of the Samsung Group as a whole, including maintaining the

United States District Court
Northern District of California

1    Samsung brand.  This fact makes it very unlikely that SEC would sue one of Samsung's affiliates.

2    Further, SEC's direct and indirect ownership interests in SDI made it unlikely that SEC would sue

3    given its economic interests in SDI.  See also supra Section IV.A.2.b.ii.(3).

4          Accordingly, Defendants' motion is denied.

5          **5.     Motion For Partial Summary Judgment As To DAPs' Sherman Act
               Damages Claims Based On CRT Product Purchases From NEC-
6               Corporation And NEC-Mitsubishi Electric Visual Systems Corporation**

7          Alleged conspirator Mitsubishi sold CRTs to NEC and NEC-Mitsubishi Electric Visual

8    Systems Corporation ("NMV") which sold CRT Finished Products to DAPs.  Thus, for the

9    purposes of performing a control exception analysis, Mitsubishi is the alleged price fixer; NEC

10   and NMV are the direct purchasers; and DAPs are the indirect purchasers who claim standing

11   under the Royal Printing control exception.  DAPs assert that their claims fall within the control

12   exception because Mitsubishi allegedly controls NEC and NMV.  Mitsubishi Defendants disagree

13   and filed a motion for partial summary judgment on that issue.

14         The Court will grant in part and deny in part Defendants' motion.  There is, at the very

15   least, a dispute of material fact as to whether NMV, a joint venture of which Mitsubishi owned

16   50%, was controlled by Mitsubishi within the meaning of the control exception.  There is no

17   dispute of material fact as to Mitsubishi's control of NEC, however, given the lack of any

18   evidence establishing a control relationship.  Accordingly, the Court GRANTS Defendants'

19   motion as to purchases made from NEC, and denies it as to purchases made from NMV.

20         **a.     NMV**

21         NMV was established in 2000 as a joint venture between Mitsubishi and NEC.  It was

22   dissolved in 2005 when Mitsubishi transferred its interest to NEC.  NEC and Mitsubishi each

23   owned 50% of NMV and appointed half the directors on NMV's board.  Further, a supermajority

24   shareholder vote was required to approve any resolution by NMV's board of directors.  These

25   facts alone are sufficient to establish a genuine dispute of material fact as to whether Mitsubishi

26   controlled NMV within the meaning of the control exception.  In addition, DAPs note the

27   following:  Mitsubishi loaned employees to NMV while paying their salaries; Mitsubishi

28   appointed NMV's Vice President; and Mitsubishi was required to finance NMV, provide capital

1    injections, and make loan guarantees.

2        Defendants argue Mitsubishi could not have controlled NMV because Mitsubishi and NEC

3    had an equal amount of authority, and therefore Mitsubishi could not single-handedly drive

4    NMV's decisions.  That is not the standard.  That Mitsubishi did not have sole control over NMV

5    does not mean that it did not have an amount of control sufficient to foreclose a realistic

6    possibility of suit by NMV.  See supra Section IV.A.2.b.ii.(1).

7        Next, Defendants argue the control exception does not apply because Mitsubishi did not

8    control NMV at the time of suit.  As explained supra Section IV.A.2.b.ii.(4), the timing of control

9    is not dispositive.  Regardless, Mitsubishi did not control NMV at the time of suit because

10   Mitsubishi dissolved NMV in 2005, two years before the conspiracy was revealed.  If the

11   conspiracy had been revealed before NMV was dissolved, it is highly unlikely NMV would have

12   sued Mitsubishi given Mitsubishi's control of NMV, including its ability to block board

13   resolutions.  If the Court were to adopt Mitsubishi's proposed approach, price fixers would be able

14   to avoid liability by selling their interests in a joint venture after profiting for years from a price

15   fixing conspiracy.  See Costco, 2014 U.S. Dist. LEXIS 127727, at *22-23 ("Although Ninth

16   Circuit authority is silent as to a catchall rule for the timing of control, it is explicit that no price

17   fixer should be allowed to evade civil liability by manipulating its corporate umbrella.") (citing

18   Freeman, 322 F.3d at 1146.

19       Accordingly, the Court denies Defendants' motion as to purchases from NMV.

20                              **b. NEC**

21       As to NEC, DAPs do not present any evidence establishing Mitsubishi's control over NEC,

22   or vice versa.  DAPs argue that it is unlikely that NEC would have sued its former joint venture

23   partner.  Even assuming that is true, DAPs fail to establish a control relationship.  See ATM Fee,

24   686 F.3d at 756 (holding that the direct purchaser's unlikelihood of suit must be a result of a

25   control relationship in order for the exception to apply).  Thus, the Court GRANTS Defendants'

26   motion as to purchases from NEC.

27

28

United States District Court
Northern District of California

United States District Court
Northern District of California

### 6.     Corrected LGE Defendants' Motion For Partial Summary Judgment On Standing Grounds

LGE filed the instant motion arguing that DAPs do not "have standing to assert Sherman Act damage claims for indirect purchases of CRT Products from direct purchaser LGE and its subsidiaries on or after July 1, 2001 when LGE ceased manufacturing or selling CRTs." LGE Mot. at 4. LGE's motion asserts that DAPs' claims do not fall within the control exception because (1) the control exception does not apply where control is directed upstream, and (2) even if it did, LGE did not control LPD within the meaning of the control exception. The Court will deny the motion.[20]

LGE Defendants allegedly sold price-fixed CRTs to DAPs from 1995 to 2001. On July 1, 2001, LGE sold its CRT business to LG Philips Displays ("LPD"), a joint venture between LGE and Philips (also an alleged conspirator). LPD allegedly joined the conspiracy shortly after its creation in 2001 and continued its participation until its bankruptcy in 2006. After 2001, LGE purchased allegedly price-fixed CRTs from LPD and other CRT manufacturers for incorporation into CRT Finished Products, which in turn were sold to DAPs. After 2001, therefore, LPD was an alleged price fixer, LGE was a direct purchaser, and DAPs were indirect purchasers.

DAPs filed suit, in part, for their purchases from LGE after 2001 of CRT Finished Products containing allegedly price-fixed CRTs manufactured by LPD. They claim standing based on the control exception from Royal Printing given LGE's purported control of LPD during the Conspiracy Period. As explained supra Section IV.A.2.b.ii.(1), the test for whether the control exception under Royal Printing applies is whether either the price fixer or the direct purchaser can "exercise restraint or direction over, dominate, regulate, . . . command, . . . guide or manage" the other such that a realistic possibility of suit by the direct purchaser is foreclosed.

The first question presented is whether the control exception can apply where control is directed upstream. As explained supra Section IV.A.2.b.ii.(3), the direction of control is not

---

[20] LG objects to Plaintiffs' use in its Opposition of a European Commission decision and an opinion from a Delaware court. LGE Reply at 4 n.4. Those decisions are irrelevant to the issues presented by this motion and the Court did not consider them in making its decision. Accordingly, Defendants' objection is OVERRULED AS MOOT.

United States District Court
Northern District of California

1    dispositive.

2         The second question presented relates to the timing of control and LPD's bankruptcy.

3    LGE asserts that the control exception cannot apply where control does not exist at the time of

4    suit.  LPD declared bankruptcy in 2006 and since then has been under the control of bankruptcy

5    trustees.  LGE asserts that because it is undisputed that LGE did not control LPD after 2006, the

6    control exception cannot apply.  As explained supra Section IV.A.2.b.ii.(4), however, the timing

7    of control is not dispositive.

8         The third question presented is whether there is a genuine issue of material fact as to

9    whether LGE controlled LPD within the meaning of the control exception.  DAPs provide strong

10   evidence of LGE's control of LPD.  LGE owned fifty percent of LPD's shares, minus one share.

11   Pursuant to the joint venture agreement, LGE shared control of LPD with Philips, and LGE had

12   the power to veto shareholder votes despite its "minority" ownership interest.  Further, LGE

13   appointed three members of LPD's six member Supervisory Board, which was responsible for

14   providing LPD with strategic advice and assisting LPD with setting and implementing policies.

15   Because the Supervisory Board required a unanimous vote in order to take action, it could not

16   have taken action without LGE's consent.  This evidence alone is sufficient to establish a genuine

17   issue of material fact as to LGE's control of LPD, yet DAPs go further, citing LGE's role in

18   various other governing bodies within LPD, its financing of LPD, and its substantial purchasing

19   relationship.

20        Judge Illston in LCD came to the same conclusion on a similar motion based on similar

21   facts:

22             LG Display was formed as a joint venture, with two shareholders,
               each owning a 50% interest: LG Electronics (an alleged conspirator)
23             and Royal Phillips.  However, Royal Philips had acquired a 50%
               interest in LG Electronic's TFT–LCD panel business to form LG
24             Philips, the predecessor to LG Display.  Moreover, LG Display's
               Shareholder Committee consisted exclusively of members affiliated
25             with LG Electronics or Royal Philips and under the terms of the
               joint venture agreement, LG Display and LG Electronics agreed to
26             maintain joint ownership of patents relating to TFT–LCD that were
               not assigned to LG Display.  This evidence supports plaintiffs'
27             contention that LG Electronics owns/controls LG Display.

28   In re TFT-LCD (Flat Panel) Antitrust Litig., No. C 09-4997 SI, 2012 WL 5869588, at *4 (N.D.

1   Cal. Nov. 19, 2012) (citations omitted).

2       The Court finds that there is a genuine issue of material fact as to whether LGE's control

3   of LPD foreclosed a realistic possibility of suit by LGE.  LGE's significant ownership interest in

4   LPD meant that LGE's economic interests were deeply intertwined with the economic interests of

5   LPD.  LGE was also unlikely to file suit against LPD because doing so would have possibly

6   exposed LGE to liability given the role it played in LPD's governance.  Accordingly, Defendants'

7   motion is denied.

8   **V.    CONCLUSION**

9       The Court rules as follows:

| Name of Motion | Ruling |
|---|---|
| Defendants' Motion For Summary Judgment With Respect To MARTA | GRANTED |
| Defendants' Motion For Partial Summary Judgment Against Certain DAPs For Lack Of Antitrust Injury And Antitrust Standing Under Federal And Certain State Laws | DENIED |
| Certain Defendants' Motion for Partial Summary Judgment With Respect To DAPs' Alleged Direct Damage Claims Based on Purchases From Sanyo | DENIED |
| SDI Defendants' Motion For Partial Summary Judgment For Lack of Standing Based on Purchases from Samsung Electronics | DENIED |
| Motion for Partial Summary Judgment as to DAPs' Sherman Act Damages Claims Based on CRT Product Purchases from NEC-Corporation and NEC-Mitsubishi Electric Visual Systems Corporation | GRANTED IN PART, DENIED IN PART |
| Corrected LGE Defendants' Motion for Partial Summary Judgment on Standing Grounds | DENIED |

**IT IS SO ORDERED.**

Dated:  August 4, 2016

_____
JON S. TIGAR
United States District Judge

United States District Court
Northern District of California