1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7   IN RE: CATHODE RAY TUBE (CRT)
    ANTITRUST LITIGATION

8

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | MDL No. 1917 |
| | Case No. C-07-5944 JST |
| This Order Relates To: | **ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGEMENT RELATING TO WITHDRAWAL AND THE STATUTE OF LIMITATIONS** |
| ALL ACTIONS | |

**TABLE OF CONTENTS**

I.   Introduction ..................................................................................................... 2

II.  Facts ................................................................................................................ 2

III. Legal Standard................................................................................................ 3

IV.  Discussion ...................................................................................................... 4

   A.   Substantive Legal Standards ...................................................................... 4

      1.   Withdrawal.......................................................................................... 4

      2.   Statute of Limitations and Fraudulent Concealment ....................... 6

   B.   The Instant Motions ................................................................................. 10

      1.   Hitachi Defendants' Motion for Summary Judgment Based Upon Withdrawal and the Statute of Limitations................................................................. 10

      2.   Toshiba Defendants' Motion for Summary Judgment Concerning Withdrawal ........... 15

      3.   Defendant LG Electronics, Inc.'s Motion for Partial Summary Judgment on Withdrawal Grounds......................................................................... 19

      4.   Philips Electronics North America Corporation, Philips Taiwan Ltd., and Philips Brasil Ltda.'s Motion for Partial Summary Judgment ........................................ 22

United States District Court
Northern District of California

5.    Motion for Partial Summary Judgment Against Dell and Sharp Plaintiffs on Statute of Limitations Grounds ................................................................. 25

V.    Conclusion...................................................................................... 30

## I.    INTRODUCTION

Now before the Court are various motions for summary judgment against certain Direct Action Plaintiffs ("DAPs") on issues related to withdrawal and the statute of limitations.  Oral argument was held on February 9, 2016.  The Court has consolidated its rulings into a single order and finds as follows:

| Name of Motion | Motion ECF No. | Opp'n ECF No. | Reply ECF No. | Ruling |
|---|---|---|---|---|
| Hitachi Defendants' Motion for Summary Judgment Based Upon Withdrawal and the Statute of Limitations | 2972 ("Hitachi Mot.") | 3268 ("Hitachi Opp'n") | 3433-6 ("Hitachi Reply") | Granted in part, denied in part |
| Toshiba Defendants' Motion for Summary Judgment Concerning Withdrawal | 2995 ("Toshiba Mot.") | 3280 ("Toshiba Opp'n") | 3437 ("Toshiba Reply") | Denied |
| Defendant LG Electronics, Inc.'s Motion for Partial Summary Judgment on Withdrawal Grounds | 3086 ("LGE Mot.") | 3262-4 ("LGE Opp'n") | 3441-3 ("LGE Reply") | Denied |
| Philips Electronics North America Corporation, Philips Taiwan Ltd., and Philips Brasil Ltda.'s Motion for Partial Summary Judgment | 3027 ("Philips Mot.") | 3241 ("Philips Opp'n") | 3461 ("Philips Reply") | Granted |
| Motion for Partial Summary Judgment Against Dell and Sharp Plaintiffs on Statute of Limitations Grounds | 3044 ("Dell/ Sharp Mot.") | 3231 ("Dell Opp'n"); 3284-4 ("Sharp Opp'n") | 3472 ("Dell/ Sharp Reply") | Denied |

## II.    FACTS

The history of this case is well known to parties.  By way of summation, this case is predicated upon an alleged conspiracy to price-fix cathode ray tubes ("CRTs"), a core component

United States District Court
Northern District of California

of tube-style screens for common devices including televisions and computer monitors.  This

conspiracy ran from March 1, 1995 to November 25, 2007 (the "Conspiracy Period"), involved

many of the major companies that produced CRTs, and allegedly resulted in overcharges of

billions of U.S. dollars to domestic companies that purchased and sold CRTs or products

containing CRTs ("CRT Finished Products") for purposes such as personal use.  A civil suit was

originally filed in 2007, ECF No. 1, consolidated by the Joint Panel on Multidistrict Litigation

shortly thereafter, see ECF No. 122, assigned as a Multidistrict Litigation case ("MDL") to Judge

Samuel Conti, see id., and ultimately transferred to the undersigned, see ECF No. 4162.

     In addition to two class actions, this MDL involves various direct actions from individual

plaintiffs who have opted out of the class actions, including the DAPs opposing the instant

motions.  Each DAP alleges that it bought at least one CRT Finished Product from a Defendant or

an entity owned or controlled by a Defendant.  The DAPs, despite their label, are classified as

indirect purchasers under antitrust law, not direct purchasers.

### III.   LEGAL STANDARD

     Summary judgment is proper when a "movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);

accord Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  "A party asserting that a fact

cannot be or is genuinely disputed must support the assertion by" citing to depositions, documents,

affidavits, or other materials.  Fed. R. Civ. P. 56(c)(1)(A).  A party also may show that such

materials "do not establish the absence or presence of a genuine dispute, or that an adverse party

cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).  An issue is

"genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-

moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  A fact is

"material" if the fact may affect the outcome of the case.  Id. at 248.  "In considering a motion for

summary judgment, the court may not weigh the evidence or make credibility determinations, and

is required to draw all inferences in a light most favorable to the non-moving party."  Freeman v.

Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).  However, unsupported conjecture or conclusory

statements do not create a genuine dispute as to material fact and will not defeat summary

United States District Court
Northern District of California

1    judgment.  Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1103 (9th Cir. 2008).

2          For claims on which the defendant does not carry the ultimate burden of persuasion,

3    defendant as the moving party has the burden of producing evidence that negates an essential

4    element of each claim on which it seeks judgment or showing that the plaintiff cannot produce

5    evidence sufficient to satisfy the burden of proof at trial.  See Nissan Fire & Marine Ins. Co. v.

6    Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  If the moving party satisfies its initial burden of

7    production, then the nonmoving party must produce admissible evidence to show that a genuine

8    issue of material fact exists.  Id. at 1102-1103.  The non-moving party must "identify with

9    reasonable particularity the evidence that precludes summary judgment."  Keenan v. Allan, 91

10   F.3d 1275, 1279 (9th Cir. 1996).  "Specific citations, not bulk references, are essential to pinpoint

11   key facts and factual disputes.  [A] district court [i]s not required to put the puzzle together from a

12   boxful of facts, and . . . may permissibly decide the motion without mining [an] entire document

13   for more substantiation" when a citation offers only a "breezy reference" to a part of an "82-page

14   report" not otherwise cited or explained in briefing.  Stanislaus Food Products Co. v. USS-POSCO

15   Indus., 803 F.3d 1084, 1094-95 (9th Cir. Oct. 13, 2015).  "A mere scintilla of evidence will not be

16   sufficient to defeat a properly supported motion for summary judgment; rather, the nonmoving

17   party must introduce some significant probative evidence tending to support the complaint."

18   Summers v. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997) (citation omitted).  If the

19   non-moving party fails to make this showing, the moving party is entitled to judgment as a matter

20   of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

21   **IV.    DISCUSSION**

22          **A.    Substantive Legal Standards**

23                 **1.    Withdrawal**

24          Once a corporation has joined a price-fixing conspiracy, it is jointly and severally liable for

25   any actions taken in furtherance of the conspiracy until the objectives of the conspiracy are

26   completed or the defendant withdraws.  See Krause v. Perryman, 827 F.2d 346, 350-51 (8th Cir.

27   1987) (affirming summary judgment for defendant because he had "withdrawn from the alleged

28   conspiracy prior to the events that resulted in [the plaintiffs'] alleged injuries"); In re Brand Name

4

United States District Court
Northern District of California

Prescription Drugs Antitrust Litig., 123 F.3d 599, 616 (7th Cir. 1997); In re Potash Antitrust Litig., 954 F. Supp. 1334, 1339, 1390–91 (D. Minn.1997) (granting summary judgment to antitrust defendant who withdrew from conspiracy), aff'd sub nom Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, 203 F.3d 1028 (8th Cir. 2000); see also United States v. Lothian, 976 F.2d 1257, 1262 (9th Cir. 1992) ("[A] defendant cannot be held liable for substantive offenses committed before joining or after withdrawing from a conspiracy.").  Because it is an affirmative defense, the burden of proving withdrawal lies with the defendant.  See United States v. Brown, 332 F.3d 363, 374 (6th Cir. 2003).

At a minimum, "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators [are] sufficient to establish withdrawal or abandonment."  United States v. U.S. Gypsum Co., 438 U.S. 422, 464–65 (1978); see also Lothian, 976 F.2d at 1261 (9th Cir. 1992) (quoting United States v. Loya, 807 F.2d 1483, 1493 (9th Cir.1987)) ("To withdraw from a conspiracy a defendant must either disavow the unlawful goal of the conspiracy, affirmatively act to defeat the purpose of the conspiracy, or take 'definite, decisive, and positive steps to show that the [defendant's] disassociation from the conspiracy is sufficient.'").

There is no set list of affirmative acts sufficient to establish withdrawal.  See United States v. Antar, 53 F.3d 568, 582 (3d Cir. 1995) ("Of course, there is no single way withdrawal can be established; in large part whether a particular action constitutes withdrawal depends on context."), overruled on other grounds, Smith v. Berg, 247 F.3d 532, 534 (3d Cir. 2001); Virginia v. McKesson Corp., No. C 11-02782 SI, 2013 WL 1287423, at *3 (N.D. Cal. Mar. 28, 2013) ("A defendant can establish withdrawal from a conspiracy in various ways.").  Although mere inactivity or passive nonparticipation is not proof of withdrawal, see Smith v. United States, 133 S. Ct. 714, 720 (2013), courts have been willing to grant summary judgment where the defendant: (1) severed all ties to the conspiracy; (2) severed all ties with the business through which it participated in the conspiracy; and (3) either communicated its withdrawal in a manner reasonably calculated to give notice co-conspirators or took affirmative acts inconsistent with the object of the conspiracy.  See Morton's Mkt., Inc. v. Gustafson's Dairy, Inc., 198 F.3d 823, 839 (11th Cir.

1   1999) amended in part, 211 F.3d 1224 (11th Cir. 2000); United States v. Steele, 685 F.2d 793, 804

2   (3d Cir. 1982); Krause v. Perryman, 827 F.2d 346, 351 (8th Cir. 1987); cf. Antar, 53 F.3d at 583

3   (resignation from a corporation insufficient to establish withdrawal because defendant retained

4   stock in the corporation); Reisman v. United States, 409 F.2d 789, 793 (9th Cir. 1969) ("Although

5   appellant Reisman resigned . . . and ceased to participate in the company's day-to-day business

6   operations, he remained a major stockholder and took no affirmative action to disavow or defeat

7   the promotional activities which he had joined in setting in motion."); United States v. Lothian,

8   976 F.2d 1257, 1264 (9th Cir. 1992) (holding that "[t]he defendant in Reisman had not taken

9   'definite, decisive, and positive steps' to disassociate himself from the scheme because he

10   remained a major stockholder").

11       Finally, even if a defendant severs its ties with an enterprise that is participating in a

12   conspiracy, that defendant cannot assert a withdrawal defense if after withdrawing it engages in

13   additional conduct in furtherance of the conspiracy, see United States v. Lowell, 649 F.2d 950,

14   958 (3d Cir. 1981); United States v. Bullis, 77 F.3d 1553, 1561-63 (7th Cir. 1996), or if it

15   continues to receive benefits from the conspiracy, see, e.g., United States v. Eisen, 974 F.2d 246,

16   269 (2d Cir. 1992) (the defendant's resignation from the conspiring law firm was not sufficient to

17   constitute a withdrawal because he "'continued to be entitled to a percentage of the recovery on all

18   cases he tried including those giving rise to his pre-[resignation] racketeering acts.'").

19                **2.      Statute of Limitations and Fraudulent Concealment**

20       The Sherman and Clayton Acts provide for a four-year statute of limitations.  15 U.S.C.

21   § 15b.  An antitrust "cause of action accrues and the statute [of limitations] begins to run when a

22   defendant commits an act that injures the plaintiffs' business."  Zenith Radio Corp. v. Hazeltine

23   Research, Inc., 401 U.S. 321, 338 (1971).  As the Supreme Court has explained, however,

24       [a]ntitrust law provides that, in the case of a "continuing violation,"
25       say, a price–fixing conspiracy that brings about a series of
        unlawfully high priced sales over a period of years, "each overt act
26       that is part of the violation and that injures the plaintiff," e.g., each
        sale to the plaintiff, "starts the statutory period running again,
27       regardless of the plaintiff's knowledge of the alleged illegality at
        much earlier times."  But the commission of a separate new overt act
28       generally does not permit the plaintiff to recover for the injury
        caused by old overt acts outside the limitations period.

1    Klehr v. A.O. Smith Corp., 521 U.S. 179, 189 (1997).

2         The statute of limitations is tolled, however, if the plaintiff can prove the defendant

3    fraudulently concealed the existence of the conspiracy.  E.W. French & Sons, Inc. v. Gen.

4    Portland, Inc., 885 F.2d 1392, 1399 (9th Cir. 1989).  To toll the statute of limitations under a

5    theory of fraudulent concealment, a plaintiff "must do more than show that it was ignorant of its

6    cause of action.  It must prove that [the defendant] 'fraudulently concealed the existence of the

7    cause of action so that [the plaintiff], acting as a reasonable person, did not know of its

8    existence.'"  Conmar Corp. v. Mitsui & Co. (U.S.A.), 858 F.2d 499, 502 (9th Cir. 1988) (quoting

9    Hennegan v. Pacifico Creative Service, Inc., 787 F.2d 1299, 1302 (9th Cir. 1986)).  It follows that

10   a court should grant a defendant's motion for summary judgment on fraudulent concealment if and

11   only if (1) the plaintiff fails to submit evidence of an affirmative act of concealment, see Stutz

12   Motor Car of Am., Inc. v. Reebok Int'l, Ltd., 909 F. Supp. 1353, 1363 (C.D. Cal. 1995); or (2)

13   "the uncontroverted evidence irrefutably demonstrates" that the plaintiff had actual or constructive

14   knowledge of the facts underlying its claim.  Conmar, 858 F.2d at 502.

                          **a.    Affirmative Acts of Concealment**

16        "A plaintiff alleging fraudulent concealment must establish that its failure to have notice of

17   its claim was the result of affirmative conduct by the defendant."  Conmar, 858 F.2d at 505.

18   Although the affirmative acts can be integral to the underlying conspiracy itself, see In re

19   Animation Workers Antitrust Litig., No. 14-CV-04062-LHK, 2015 WL 4974343, at *16 (N.D.

20   Cal. Aug. 20, 2015) (citing id. at 499-501), passive concealment is not enough, Volk v. D.A.

21   Davidson & Co., 816 F.2d 1406, 1416 (9th Cir. 1987) ("[A]ppellees passively concealed the

22   reports by not disclosing them to the investors.  In such situations, the federal tolling doctrine does

23   not apply.").  "[T]he line between active and passive concealment," however, "is very fine

24   indeed."  Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 320e (4th ed. 2013).

25        Affirmative acts to conceal can include the following: using plain envelopes without return

26   addresses, Kan. City v. Fed. Pac. Elec. Co., 310 F.2d 271, 284 n.2 (8th Cir. 1962); using public

27   pay telephones, id.; contacting company representatives at their residences rather than at their

28   offices, id.; destroying records, id.; communicating in code, id.; circulating the "rules" of the

United States District Court
Northern District of California

7

conspiracy, In re Milk Products Antitrust Litig., 84 F. Supp. 2d 1016, 1023 (D. Minn. 1997), aff'd, 195 F.3d 430 (8th Cir. 1999) (citing In re Wirebound Boxes Antitrust Litig., 128 F.R.D. 262, 266 (D. Minn. 1989)); avoiding the use of telephones, id.; marking conspiracy-related correspondence "personal and confidential," id.; engaging in certain actions to create the illusion of active competition, id.; and meeting secretly regarding the conspiracy while falsely representing that the meetings were legitimate trade association meetings, id..

Courts differ somewhat as to whether secret meetings on their own constitute affirmative actions. Compare Ingram Corp. v. J. Ray McDermott & Co., 1980 WL 1819, at *4 (E.D. La. 1980) (holding that clandestine meetings in hotel rooms were not affirmative actions) and In re Milk Products, 84 F. Supp. 2d at 1023 (same), with Pinney Dock & Transp. Co. v. Penn Cent. Corp., 838 F.2d 1445, 1474 (6th Cir. 1988) (holding that leaving price-fixing meetings off of a trade association meeting agenda in violation of other regulations was an affirmative act). In an order on Defendants' motion to dismiss, however, Judge Conti, the undersigned's predecessor in this case, held that a pattern of secret meetings among alleged coconspirators was enough to establish fraudulent concealment. See In re Cathode Ray Tube (CRT) Antitrust Litig., No. C-07-5944-SC, 2014 WL 1091589, at *9 (N.D. Cal. Mar. 13, 2014).

### b.     Actual or Constructive Knowledge

A plaintiff's lack of knowledge of its claim is essential to establish fraudulent concealment. Once the plaintiff has knowledge or constructive knowledge of all the operative facts underlying its claim, the statute begins to run, even the plaintiff does not believe the information it received or is not convinced of the defendant's culpability. Stegeman v. Aetna Ins. Co., 1980 U.S. Dist. LEXIS 10754, at *16 (E.D. Mich. 1980); Philco Corp. v. RCA, 186 F. Supp. 155, 165-66 (E.D. Pa. 1960).

A plaintiff has constructive knowledge if it has "enough information to warrant an investigation which, if reasonably diligent, would [lead] to the discovery" of the facts underlying its claims. Hexcel Corp. v. Ineos Polymers, Inc., 681 F.3d 1055, 1060 (9th Cir. 2012) (quoting Beneficial Standard Life Ins., Co. v. Madariaga, 851 F.2d 271, 275 (9th Cir. 1988)). A majority of circuits have held that the issue of when a plaintiff has constructive knowledge of his claim is

normally a question of fact for the jury.  Lundy v. Union Carbide Corp., 695 F.2d 394 (9th Cir. 1982); Morton's Mkt, 198 F.3d at 832 (citing Ballew v. A.H. Robins Co., 688 F.2d 1325 (11th Cir. 1982); Maughan v. SW Servicing, Inc., 758 F.2d 1381, 1387 (10th Cir. 1985); Renfroe v. Eli Lilly & Co., 686 F.2d 642 (8th Cir. 1982)).  Nevertheless, courts will grant summary judgment based on a plaintiff's constructive knowledge where (1) the plaintiff is aware of facts[1] such that its "suspicions have been or should have been excited,"[2] Conmar, 858 F.2d at 504; and (2) the plaintiff would have discovered the facts underlying its claims if it had been reasonably diligent in investigating those suspicions,[3] id.; see also, e.g., Volk v. D.A. Davidson & Co., 816 F.2d 1406, 1417 (9th Cir. 1987) (finding investors had constructive knowledge because they received an annual report and a letter that made it clear they had paid more for their investment than it was worth); Rutledge v. Boston Woven Hose & Rubber Co., 576 F.2d 248, 249-50 (9th Cir. 1978) (finding constructive knowledge where the plaintiff had litigated similar issues in an earlier case and had expressed suspicions about the defendants' wrongdoing); Hexcel Corp. v. Ineos Polymers, Inc., 681 F.3d 1055, 1062-63 (9th Cir. 2012) (finding constructive knowledge where the plaintiff authored a report detailing its involvement in a related federal price-fixing investigation).[4]

---

[1] Mere suspicion is not enough.  See Mt. Hood Stages, Inc. v. Greyhound Corp., 555 F.2d 687, 698 (9th Cir. 1977) vacated on other grounds, 437 U.S. 322 (1978) (quoting Friedman v. Meyers, 482 F.2d 435, 439 (2d Cir. 1973) ("The record shows that Mt. Hood suspected Greyhound of unlawful conduct prior to December 14, 1960, but '(s)uspicion will not substitute for knowledge of facts from which fraud could reasonably be inferred.'").

[2] It is not enough, however, "to point to facts which might have caused a plaintiff to inquire, or could have led to evidence supporting [the plaintiff's] claim.  Morton's Mkt, 198 F.3d at 832-33. "A defendant who does this has succeeded in demonstrating only that there is a jury question regarding the tolling of the statute of limitations by fraudulent concealment."  Id.

[3]  Because this is an objective standard, it does not matter whether the plaintiff actually conducted a diligent inquiry.  See Sterlin v. Biomune Sys., 154 F.3d 1191, 1202 n.20 (10th Cir. 1998). Assuming the defendant can show the plaintiff had facts that should have excited its suspicions, the defendant must also show that a diligent inquiry, had it been performed, would have revealed the facts underlying the plaintiff's claims.  See Morton's Mkt., 198 F.3d at 833; see also In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig., 782 F. Supp. 487, 493 (C.D. Cal. 1991) ("Nor is there constructive knowledge if, even upon investigating, plaintiffs might reasonably be unable to uncover their claims.").

[4] See also Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp., 828 F.2d 211, 218 (4th Cir. 1987) (holding no fraudulent concealment where antitrust action alleged interrelationships

United States District Court
Northern District of California

United States District Court
Northern District of California

B.      **The Instant Motions**

1.      **Hitachi Defendants' Motion for Summary Judgment Based Upon Withdrawal and the Statute of Limitations**

Five of the six Hitachi entities named as Defendants in this case brought the instant motion: Hitachi, Ltd. ("HTL"), Hitachi Displays, Ltd. ("HDP"), Hitachi Asia, Ltd. ("HAS"), Hitachi America, Ltd. ("HAL") and Hitachi Electronic Devices (USA), Inc. ("HED(US)") (collectively, the "Hitachi Defendants").  HDP, HAS, HAL, and HED(US) are wholly owned subsidiaries of HTL.

The Hitachi Defendants' motion asks the Court to find as a matter of law (1) that the Hitachi Defendants withdrew from the alleged conspiracy by March 20, 2003 (the point at which the Hitachi Defendants exited the CRT industry), and (2) that the DAPs' claims are barred by the statute of limitations because they were filed more than four years after the Hitachi Defendants (purportedly) withdrew from the conspiracy.  The Hitachi Defendants have since settled, but their motion is sustained by Defendants LG, Mitsubishi, and Toshiba who filed joinders on the withdrawal issue only.  ECF Nos. 3864, 3898, 3011.

The DAPs respond that the Hitachi Defendants did not withdraw from the conspiracy because (1) "cessation of manufacturing and sales, without more, does not establish withdrawal," and (2) "the evidence reflects that Hitachi continued to participate in the CRT conspiracy after

---

between defendant companies, and those interrelationships were readily discoverable on consultation of public mining records); United Klans of America v. McGovern, 621 F.2d 152, 154-55 (5th Cir. 1980) (finding constructive knowledge where there was a national press conference, coverage in two local newspapers, a Senate report, and a letter to president of plaintiff); Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 394 (6th Cir. 1975) (finding constructive knowledge there where congressional hearings on same antitrust violations and industry-wide publicity of FTC suit); GO Computer, Inc. v. Microsoft Corp., 508 F.3d 170, 178-79 (4th Cir. 2007) (finding constructive knowledge where plaintiff was twice involved in FTC antitrust investigations for which the plaintiff provided a declaration and where plaintiff wrote a book that reported conversations related to alleged violation); Advanced Micro Devices, Inc. v. Intel Corp., 1992 U.S. Dist. LEXIS 21529, at *3 (N.D. Cal. July 24, 1992) (finding that statements made by plaintiff's counsel, internal memoranda, and an internal report demonstrated "an awareness sufficient to excite inquiry into potential antitrust claims"); Southwire Co. v. J.P. Morgan Chase & Co., 307 F. Supp. 2d 1046, 1062 (W.D. Wis. 2004) (finding constructive knowledge where reports were published that investigation was being launched); Insulate SB, Inc. v. Advanced Finishing Sys., 2014 WL 943224 (D. Minn. Mar. 11, 2014) (finding constructive knowledge based on FTC action).

1    2003." Hitachi Opp'n at 12, 15.

2    　　　　The motion is GRANTED IN PART and DENIED IN PART.  It is granted as to HAS and

3    HAL.  It is denied, however, as to HTL, HDP, and HED(US).  That portion of the motion relating

4    to the statute of limitations is denied as moot.

5    　　　　　　　　　　　a.　　　Facts

6    　　　　It is undisputed that none of the Hitachi Defendants produced or sold CRTs after March

7    2003: HTL manufactured and sold CRTs until 2002; HDP never manufactured or sold CRTs;

8    HAS sold CRTs until 2002; HAL sold CRTs manufactured by HED(US) until April 1998; and

9    HED(US) sold CRTs until March 20, 2003.  Furthermore, it is undisputed that the Hitachi

10   Defendants' decision to sell their CRT business in 2003 was publicly announced, and that their

11   alleged coconspirators were aware of the sale.

12   　　　　The sixth Hitachi entity in this case – SEG Hitachi Shenzhen Color Display Devices Co.,

13   Ltd. ("Hitachi Shenzhen") – did not join the instant motion but is central to the issues on which the

14   motion turns.  Hitachi Shenzhen allegedly joined the conspiracy in 2000 and continued to

15   participate throughout the balance of the conspiracy period.  Unlike the Hitachi Defendants,

16   Hitachi Shenzhen was not a wholly owned subsidiary of HTL and does not claim to have exited

17   the CRT industry.  HDP, however, owned a 25% interest in Hitachi Shenzhen until November 7,

18   2007.  ECF No. 3268-4 at 1.  HDP also appointed three members to Hitachi Shenzhen's seven

19   member board and received production reports from Hitachi Shenzhen on a regular basis.  See

20   ECF No 3270-8, Exs. 21-22.

21   　　　　The events immediately following the Hitachi Defendants' exit from the CRT industry are

22   relevant.  In April 2003, shortly after the Hitachi Defendants ceased production and sales of CRTs,

23   HED(US) sold its production line for 27- to 32-inch color picture tubes ("CPTs") – a type of CRT

24   – to Thomson, an alleged coconspirator.  ECF No. 3270-5, Ex. 5 (Heiser Depo) at 238:19-239:7.

25   HED(US) retained its production line for 36-inch CPTs, however, and ultimately transferred this

26   line to Hitachi Shenzhen.  Id.  Prior to the asset sale to Thomson, the Hitachi Defendants and

27   Thomson entered into an agreement "whereby Hitachi would refrain from selling 34[-inch] CPTs

28   to North America."  ECF No 3270-5, Ex. 9.  This agreement apparently bound Hitachi Shenzhen

United States District Court
Northern District of California

11

1    as well.  See id.  After the agreement with Thomson expired, HED(US) began working with

2    Hitachi Shenzhen to develop a strategy for Hitachi Shenzhen to sell 34-inch CPTs into the North

3    American market.  See id.; id., Ex. 10.

4        The DAPs provide evidence that HDP employees continued to meet with cartel members

5    after March 2003 to exchange production plans and to discuss CRT market forecasts.  See, e.g.,

6    ECF No. 3270-9, Exs. 36 at 96:4-11; 37; 38.  There is also evidence that HDP employees provided

7    alleged coconspirator MTPD with production information for Hitachi Shenzhen after March 2003.

8    See, e.g., ECF No. 3270-4, Ex. 38.  Finally, there is evidence that Mr. Toniguchi, a HED(US)

9    employee, was "in charge of manufacturing . . . production, [or] engineering" at Hitachi Shenzhen.

10   ECF No. 3270-5, Ex. 5 at 312:23-313:1.

11                          **b.      Discussion**

12       There is a genuine dispute of material fact as to whether HDP and HED(US) withdrew

13   from the conspiracy.  Defendants do not point to any affirmative action by HDP to withdraw.[5]

14   Even if the sale of other Hitachi Defendants' CRT businesses could be imputed to HDP, the sale

15   of a conspiring business does not qualify as an affirmative act of withdrawal if the defendant fails

16   to "sever[] all ties" with the conspiracy and the business through which it participated in the

17   conspiracy.  See Morton's Mkt., 198 F.3d at 839; see also Reisman, 409 F.2d at 793 (holding

18   defendant did not withdraw because he remained a major stockholder); Lothian, 976 F.2d 1264

19   (same); Antar, 53 F.3d at 583 (same).  Here, HDP did not sever all ties because it continued to

20

21   _____

22   [5] That HDP never manufactured CRTs is not relevant to whether HDP withdrew, assuming it
     joined the conspiracy in the first place.  In any event, a defendant does not need to produce the
23   price-fixed good in order to be liable for a conspiracy.  See, e.g., United States v. Apple, Inc., 791
     F.3d 290 (2d Cir. 2015) (finding Apple liable for facilitating a conspiracy among book publishers).
24   Defendants also try to distinguish Reisman and Antar.  They argue the defendants in those cases
     did not qualify for withdrawal because they did not take affirmative acts.  Instead of selling the
25   business, as here, the Reisman and Antar defendants merely retired.  That is a distinction without a
     difference.  The defendants in Reisman and Antar did not effectuate their withdrawal because they
26   retained an ownership interest and therefore failed to sever all ties.  Antar, 53 F.3d at 583;
     Reisman, 409 F.2d at 793; cf. Morton's Mkt, 198 F.3d at 839.  Regardless, other Hitachi
27   Defendants sold the CRT business, not HDP.  As Defendants point out, HDP never manufactured
     or sold CRTs in the first place.  Defendants cannot lament that traditional lines of corporate
28   separateness have been crossed by the DAPs, see infra note 6, only to blur those same lines when
     it is convenient.

United States District Court
Northern District of California

own a 25% interest in a co-conspirator – Hitachi Shenzhen – to whom HED(US) also sold part of its CRT business.[6]  Further, HDP was not simply a passive investor in Hitachi Shenzhen.  See, e.g., ECF No 3270-5, Ex. 9 (stating that HDP would work with Hitachi Shenzhen to sell CRTs into the North American market).  HDP exercised some amount of control over Hitachi Shenzhen and had the ability to appoint three of seven members of Hitachi Shenzhen's board.  Finally, even if HDP had affirmatively withdrawn, however, its withdrawal would have been negated by evidence that it continued to exchange competitive information with coconspirators.  See Lowell, 649 F.2d at 958 (acts taken in furtherance of the conspiracy after the point of withdrawal will negate a withdrawal defense); Bullis, 77 F.3d at 1561-63 (same); see, e.g., ECF No. 3270-9, Exs. 36 at 96:4-11; 37; 38.

There is also evidence that HED(US) failed to sever ties.  For example, HED(US) worked with coconspirator Hitachi Shenzhen to develop a strategy for Hitachi Shenzhen to sell 34-inch CPTs into the North American market.  See ECF No 3270-5, Ex. 10.  In addition, there is evidence that an HED(US) employee named Mr. Toniguchi was placed at Hitachi Shenzhen and put "in charge of manufacturing . . . production, [or] engineering."  ECF No. 3270-5, Ex. 5 at 312:23-313:1.

On the other hand, it is undisputed that HAS and HAL exited the CRT industry and cut all ties as of March 2003.  This is sufficient to make out a prima facie case of withdrawal.  See Morton's Mkt., 198 F.3d at 839; Steele, 685 F.2d at 804 (3d Cir. 1982); Krause, 827 F.2d at 351; Antar, 53 F.3d at 583.  The DAPs do not attempt to rebut Defendants' showing as to HAS and

---

[6] The Hitachi Defendants argue that HDP's 25 percent ownership interest in Hitachi Shenzhen is irrelevant given principles of corporate separateness.  Indeed, the Hitachi Defendants cannot be held liable for the acts of Hitachi Shenzhen, a separate corporate entity, absent alter ego liability or some other legal theory that would allow the DAPs to impute the acts of Hitachi Shenzhen onto the Hitachi Defendants.  See U.S. v. Bestfoods, 524 U.S. 51, 68 (1998) ("It is a general principle of corporate law deeply ingrained in our legal system that a corporation is not liable for the acts of its subsidiaries.").  The question before the Court, however, is whether the Hitachi Defendants have met the elements of withdrawal as a matter of law, not whether the DAPs can hold the Hitachi Defendants liable for the acts of Hitachi Shenzhen.  HDP fails to meet the elements of withdrawal as a matter of law, in part, because it continued to own a 25 percent stake in a coconspirator.  Cf. Morton's Market, 198 F.3d at 830 ("With the sale of its dairy, [the defendant] certainly 'retired' and totally severed its ties to the milk price-fixing conspiracy.") (emphasis added).

HAL specifically.  Instead, without argument or explanation, they treat the Hitachi Defendants as a single entity, referring to them throughout their brief simply as "Hitachi."  Finding no reason to find otherwise, the Court declines to discard traditional notions of corporate separateness and does not treat the Hitachi Defendants as a single entity.

The DAPs also argue that the Hitachi Defendants – including, presumably, HAS and HAL – failed to effectuate their withdrawal insofar as their exit from the industry benefited the conspiracy by making the market more concentrated.  Exiting an industry does not necessarily make the market more concentrated, though the sale of one's business to a competitor does.  Here, the Hitachi Defendants sold their CRT business to competitors and alleged coconspirators Thomson and Hitachi Shenzhen.  The Court recognizes that a sale to a competitor is not necessarily "inconsistent with the object of the conspiracy" insofar as concentrated industries are more prone to collusion.  Cf. Gypsum, 438 U.S. at 464-65 (requiring that the affirmative act be "inconsistent with the object of the conspiracy").  The Court declines, however, to adopt a rule that would effectively prohibit sales to competitors in order to effectuate withdrawal.  In many cases, competitors will be a firm's only potential buyers.  Regardless, the authority on this issue is clear that a defendant has withdrawn if it severs all ties to the conspiracy and to the business through which it participated in the conspiracy.  See Morton's Market, 198 F.3d at 839; Steele, 685 F.2d at 804; Krause, 827 F.2d at 351.  Here, Defendants have met that burden as to HAS and HAL.

Whether HTL withdrew as a matter of law is a more difficult question.  The DAPs urged the Court at the hearing to find that HTL did not effectuate its withdrawal because it continued to possess an indirect interest in coconspirator Hitachi Shenzhen beyond March 2003.  Specifically, HTL wholly owned HDP, which in turn owned 25% of Hitachi Shenzhen.  Although HTL's connection to the conspiracy beyond March 2003 was not as significant as HDP's or HED(US)'s involvement, HTL failed to cut all ties by retaining an indirect interest in a coconspirator and therefore did not meet the high bar for establishing withdrawal as a matter of law.  See Antar, 53 F.3d at 583; Reisman, 409 F.2d at 793; see also Eisen, 974 F.2d at 269 (no withdrawal if defendant continues to benefit from the conspiracy).  Cf. Morton's Market, 198 F.3d at 839

14

1   (cutting all ties to the industry), <u>Steele</u>, 685 F.2d at 804 (same), and <u>Krause</u>, 827 F.2d at 351

2   (same).

3         Accordingly, Defendants' motion is GRANTED IN PART and DENIED IN PART.  It is

4   granted with respect to the withdrawal issue as to HAS and HAL, but it is denied in all other

5   respects.[7]

6               **2.      Toshiba Defendants' Motion for Summary Judgment Concerning
                         Withdrawal**
7

8         The five Toshiba entities in this case brought the instant motion: Toshiba Corporation

9   ("Toshiba Corp."), Toshiba America, Inc. ("TAI"), Toshiba America Consumer Products, LLC

10  ("TACP"), Toshiba America Information Systems, Inc. ("TAIS"), and Toshiba America

11  Electronic Components, Inc. ("TAEC") (collectively, the "Toshiba Defendants").[8]  Their motion

12  asks the Court to rule as a matter of law that Toshiba Defendants withdrew from the conspiracy by

13  April 1, 2003, the date on which Toshiba Defendants transferred their CRT business to Matsushita

14  Toshiba Picture Display Co., Ltd. ("MTPD"), a joint venture between Toshiba and alleged

15  coconspirator Matsushita Electric Industrial Co., Ltd. ("Matsushita").  Further, their motion asks

16  the Court to dismiss the DAPs' claims because the amount of time between Toshiba Defendants'

17  purported withdrawal and the filing of the DAPs' complaint exceeds the statute of limitations.

18  The Court will deny the motion.

19              **a.      Facts**

20        The DAPs present evidence that Toshiba Defendants joined the conspiracy at least as early

21  as 1997 by attending meetings with competitors to discuss price and coordinate supply.  The

22  DAPs also present evidence that Toshiba Defendants took steps to conceal their involvement in

23  the conspiracy, including attending secret meetings in hotels, recording information on a

24

25  ───────────────

    [7] After filing their Reply, Defendants filed objections to evidence submitted in support of the
26  DAPs' Opposition.  ECF Nos. 3449, 4359.  Local Rule 7-3(c) states that "[a]ny evidentiary and
    procedural objections to the opposition must be contained within the reply brief or memorandum."
27  The Court strikes Defendants' objections for failure to comply with the Local Rules.

28  [8] Unlike the Hitachi motion, <u>see</u> <u>supra</u> Section IV.B.1, Toshiba Defendants treat themselves as a
    single entity for the purposes of this motion.

United States District Court
Northern District of California

1    blackboard instead of committing it to paper, instructing recipients of internal emails to destroy

2    the emails after reading them, and communicating in code in order to avoid detection.

3            On September 26, 2002, Toshiba Corp. and Matsushita publicly announced that they were

4    combining their CRT businesses and forming MTPD, a joint venture owned and controlled by

5    both companies.  See ECF No. Ex. A at 1 (issuing a press release stating that Toshiba and

6    Matsushita were "consolidating their cathode ray tube (CRT) business into a single company.").

7    Toshiba Defendants transferred their relevant CRT operations to MTPD on March 31, 2003, and

8    MTPD commenced operations on April 1, 2003.  Toshiba, however, retained rights to certain

9    intellectual property used in the CRT business and licensed those rights to MTPD.

10           Toshiba Corp. owned a 35.5% share of MTPD, appointed four out of ten directors on

11   MTPD's board, and indirectly exercised veto power over important decisions of the Board as a

12   result of the Joint Venture Agreement's requirement that there be consent of at least one Toshiba-

13   appointed director.  Toshiba also assisted in preparing MTPD's Initial Business Plan and secured

14   the right to approve any changes to that plan in future years.

15                          **b.      Discussion**

16           Toshiba Defendants assert that their exit from the CRT industry on April 1, 2003

17   constitutes withdrawal.  Toshiba, however, did not exit the CRT industry; they merely restructured

18   their involvement through a joint venture in partnership with another alleged coconspirator.  The

19   joint venture, MTPD, in turn, allegedly joined the conspiracy shortly after its creation.  As a result

20   of their shared ownership and control of MTPD with alleged coconspirator Matsushita, not only

21   did Toshiba Defendants retain a significant ownership interest in a conspiring corporation, they

22   continued to actively participate in the CRT industry beyond their purported "exit."  Toshiba

23   Defendants appointed members to MTPD's board, exercised veto power over important decisions,

24   assisted in developing MTPD's business plan, and leased intellectual property related to the

25   manufacture of CRTs to MTPD.  There is at least a genuine issue of material fact therefore as to

26   whether Toshiba Defendants severed all ties to their CRT business and to the conspiracy.  See

27   Antar, 53 F.3d at 583; Reisman, 409 F.2d at 793.

28           Toshiba Defendants attempt to distinguish their case from Reisman and Antar.   They note

United States District Court
Northern District of California

1    that whereas they sold their businesses, the defendants in <u>Reisman</u> and <u>Antar</u> merely resigned.

2    They contend that the act of selling a business constitutes an affirmative act that the defendants in

3    <u>Reisman</u> and <u>Antar</u> lacked.  The Court disagrees.  A defendant's resignation from a conspiring

4    business, like a sale, is sufficient to establish withdrawal only if the defendant severs all ties in the

5    process.  <u>See, e.g.</u>, <u>Lothian</u>, 976 F.2d at 1264 (holding that the defendant's resignation effectuated

6    his withdrawal because he did not retain an ownership interest upon his resignation); <u>Lowell</u>, 649

7    F.2d at 955 ("[A]ffirmative action sufficient to show withdrawal as a matter of law from the

8    conspiracy . . . may be demonstrated by the retirement of a coconspirator from the business,

9    severance of all ties to the business, and consequent deprivation to the remaining conspirator

10   group of the services that constituted the retiree's contribution to the fraud.").  Thus, that the

11   defendants in <u>Reisman</u> and <u>Antar</u> resigned as opposed to selling their business is irrelevant.  The

12   question is whether Toshiba Defendants cut off all ties.  They did not.  In fact, because in addition

13   to retaining ownership they also shared control of MTPD, Toshiba Defendants' withdrawal was

14   even more incomplete than that of the defendants in <u>Reisman</u> and <u>Antar</u>.

15        Next, because MTPD was not born a conspirator, Toshiba Defendants argue their

16   withdrawal was complete the moment they created MTPD and sold their CRT business in

17   exchange for MTPD stock.  The Court remains unconvinced.  Because MTPD allegedly joined the

18   conspiracy almost immediately after its formation, there is an issue of material fact as to whether

19   Toshiba Defendants severed all ties with the conspiracy or whether they merely restructured those

20   ties by manipulating their corporate umbrella.  Further, by merely restructuring their CRT business

21   as a joint venture, Toshiba Defendants failed to cut all ties with the business through which it

22   participated in the conspiracy.  True, Toshiba Defendants no longer manufactured CRTs

23   themselves, but it can hardly be said that they "severed all ties to the business" in light of their

24   shared ownership and control of MTPD.  <u>Morton's Mkt.</u>, 198 F.3d at 839.

25        Toshiba Defendants assert the foregoing analysis violates traditional notions of corporate

26   separateness and holds them liable for the acts of a separate company, MTPD.  Indeed, absent a

27   legal theory that would allow the DAPs to impute the acts of MTPD onto Toshiba Defendants,

28   Toshiba Defendants cannot be held liable for the acts of MTPD.  But that is not the issue.  The

17

1    question before the Court is whether Toshiba Defendants have met the high bar for establishing

2    withdrawal as a matter of law.  To meet that burden, Toshiba Defendants must show there is no

3    genuine issue of material fact as to whether they severed all ties with the conspiracy and the

4    business through which they participated in the conspiracy.  See Morton's Mkt., 198 F.3d at 839;

5    Steele, 685 F.2d at 804; Krause, 827 F.2d at 351; Antar, 53 F.3d at 583; Reisman, 409 F.2d at 793;

6    Lothian, 976 F.2d at 1264.  Because of their ownership and control of MTPD, Toshiba Defendants

7    fail to meet their burden.

8        Separate but related, Toshiba Defendants' motion as to withdrawal fails for the

9    independent reason that there is a genuine issue of material fact as to whether Toshiba Defendants

10   adequately communicated their purported withdrawal.  The DAPs do not dispute that press

11   releases and news coverage are means reasonably calculated to reach Toshiba Defendants'

12   coconspirators; rather, they argue the content of the communications was inadequate.  Toshiba and

13   alleged coconspirator Matsushita publicly announced they were combining their CRT businesses

14   and forming MTPD, a joint venture owned and controlled by both companies.  See ECF No. Ex. A

15   at 1 (issuing a press release stating that Toshiba and Matsushita were "consolidating their cathode

16   ray tube (CRT) business into a single company.").  Toshiba Defendants' coconspirators, however,

17   could have easily interpreted that announcement as a restructuring of Toshiba Defendants'

18   involvement in the CRT industry via a joint venture.  That is not the same as announcing a

19   complete exit.

20       Finally, Toshiba Defendants' motion also fails as to fraudulent concealment.  The DAPs

21   provided evidence suggesting that Toshiba Defendants attended secret meetings in hotels,

22   recorded information on a blackboard instead of committing it to paper, instructed recipients of

23   emails to destroy them after reading them, and used codes in correspondence in order to hide the

24   conspiracy.  These are the types of affirmative acts that courts have found sufficient to establish

25   fraudulent concealment.  See, e.g., Pinney, 838 F.2d at 1472 (holding secret meetings); In re

26   Cathode Ray Tube (CRT) Antitrust Litig., 2014 WL 1091589, at *9 (same); Fed. Pac. Elec. Co.,

27   310 F.2d at 284 n.2 (destroying records and encoding information).

28       Accordingly, Toshiba Defendants' motion is DENIED.

18

United States District Court
Northern District of California

### 3.      Defendant LG Electronics, Inc.'s Motion for Partial Summary Judgment on Withdrawal Grounds

LGE Electronics ("LGE") brought the instant motion asking the Court to rule that LGE withdrew from the conspiracy as of July 1, 2001, the date on which it transferred its CRT assets to LG. Philips Displays ("LPD"), a joint venture between LGE and alleged coconspirator Philips. Although LPD allegedly continued to participate in the conspiracy, LGE argues that it should not be held liable for those acts according to principles of corporate separateness. Further, LGE argues that its shift from seeking to increase CRT prices as a CRT seller to seeking the lowest price possible as a CRT buyer constitutes an affirmative act inconsistent with the object of the conspiracy such that the Court should grant its withdrawal defense as a matter of law.

The DAPs respond that the motion should be denied because, according to the DAPs, (1) LGE did not sever ties from the CRT conspiracy through its formation of LPD; (2) LGE benefited from LPD's participation in the conspiracy; and (3) LGE never communicated its purported withdrawal to its coconspirators.

The Court will deny the motion.

#### a.      Facts

LGE and Philips allegedly joined the conspiracy around 1995. On July 1, 2001, LGE and Philips formed LPD, a joint venture to which LGE and Philips transferred their CRT businesses. The DAPs allege that LPD joined the conspiracy shortly after its creation and continued its participation until it declared bankruptcy in January 2006.

LPD's formation was widely reported in the media. Further, the undisputed evidence shows that coconspirators were aware that LPD was a joint venture between LGE and Philips to which LGE and Philips transferred their CRT businesses. The announcements and media reports, however, did not state that LGE and Philips were exiting the CRT industry. Instead, they indicated that LGE and Philips were consolidating their CRT businesses.

LGE held 50% of LPD's shares, minus one share, and Philips held the rest. LGE also had the right to appoint three members to LPD's six-member Supervisory Board, which was responsible for "provid[ing] high-level strategic advice to LPD's management and aid[ing] LPD in determining business policies and how to implement those policies." LGE Mot. at 4. Finally, in

United States District Court
Northern District of California

1  addition to arranging initial financing, LGE provided LPD with a $125 million capital injection on

2  May 31, 2002 and a $250 million capital injection on June 25, 2004.

3        After transferring its CRT business to LPD, LGE became exclusively a CRT purchaser,

4  buying CRTs for incorporation into its finished products.  LGE purchased CRTs from LPD and

5  other suppliers.  LGE presents evidence that these purchases were done at arm's length and that

6  LGE sought the lowest purchase price possible.

7                              **b.    Discussion**

8        LGE did not sever ties with the CRT industry or its CRT manufacturing business.  Instead,

9  it transferred its CRT business to a joint venture that it owned and controlled jointly with another

10  coconspirator.  LGE seems to concede that point, see LGE Reply at 6-7, but argues that although

11  "severing all ties . . . is one way to show withdrawal, [it is] not the only way.  Id. at 6.  LGE

12  quotes from the Third Circuit's opinion in Antar wherein the court held that "if the defendant has

13  not completely severed his ties with the enterprise, then in order to establish a prima facie case, he

14  must demonstrate . . . that he did acts inconsistent with the object of the conspiracy."  Antar, 53

15  F.3d at 582.  LGE contends that "becoming a CRT purchaser and consistently negotiating for

16  lower CRT prices [was an act] squarely inconsistent with continued support of a CRT price-fixing

17  conspiracy."  LGE Reply at 7.

18        The Court is not convinced.  Negotiating the lowest price possible for LGE's own inputs is

19  entirely unremarkable and does not constitute an "affirmative[] act" or a "definite, decisive, and

20  positive step[]."  Lothian, 976 F.2d at 1261; see United States v. Cont'l Grp., Inc., 603 F.2d 444,

21  467 (3d Cir. 1979) (citing United States v. Socony-Vacuum Oil Co., 310 U.S.150, 224 n.59

22  (1940)) (resuming normal competitive behavior is insufficient to establish withdrawal); Plymouth

23  Dealers' Ass'n of No. Cal. v. United States, 279 F.2d 128, 132 (9th Cir. 1960) (same).  Indeed,

24  there is nothing inconsistent with LGE seeking to lower the cost of its own CRT purchases while

25  simultaneously supporting a conspiracy that raised prices for its competitors and increased profits

26  for its joint venture, LPD.  At most, LGE's transition from CRT producer to CRT purchaser

27  suggests it was no longer actively supporting the conspiracy.  Cf. Smith, 133 S. Ct. at 720 (holding

28  that mere cessation of activity in furtherance of the conspiracy is insufficient).  Because LGE

failed to cut all ties with its former CRT manufacturing business, however, more is required.  See

Antar, 53 F.3d at 583 ("[I]f the defendant has not completely severed his ties with the enterprise,

then in order to establish a prima facie case, he must demonstrate . . . that he did acts inconsistent

with the object of the conspiracy.").

LGE also contends that the DAPs are seeking to hold LGE "liable for the actions of LPD

because [LGE] held a minority ownership interest in the newly formed organization."  LGE Reply

at 10.  "This theory," according to LGE, "conflicts with fundamental principles of corporate

separateness."  Id.  LGE mischaracterizes the issue.  The question before the Court is whether

LGE took actions sufficient to establish withdraw as a matter of law.  Whether it took adequate

steps depends on whether it retained stock in a conspiring corporation, see Antar, 53 F.3d at 583;

whether it continued to be involved in the CRT industry and its former CRT manufacturing

business, see Morton's Mkt., 198 F.3d at 839; and whether it continued to interact and

communicate with coconspirators in furtherance of the conspiracy, see Lowell, 649 F.2d at 958.

LGE's relationship to LPD is relevant for these reasons, not because the DAPs are trying to hold

LGE liable for the acts of LPD.

LGE's motion also fails for the independent reason that there is a genuine dispute of

material fact as to whether the announcements regarding the creation of LPD communicated

LGE's exit from the CRT industry or merely that LGE and Philips were consolidating their CRT

efforts through a joint venture.

Finally, at the end of its Reply, LGE states that "[e]ven if this court finds that LGE did not

withdraw from the conspiracy in 2001, at the very latest, the undisputed facts show that it

withdrew by January 2006. . . . LPD declared bankruptcy in 2006, at which time LGE's minority

ownership interest cannot be said to have any relevance."  Reply at 12.  LGE did not make this

argument in their motion; it is not responsive to the DAPs' Opposition; and it was not raised at the

hearing.  The Court therefore declines to consider it.

The motion is DENIED.[9]

---

[9] LG objects to Plaintiffs' use in its Opposition of a European Commission decision and an
opinion from a Delaware court.  LGE Reply at 9 n.7.  Those decisions are irrelevant to the issues

United States District Court
Northern District of California

1

2

3   **4.    Philips Electronics North America Corporation, Philips Taiwan Ltd.,**
    **and Philips Brasil Ltda.'s Motion for Partial Summary Judgment**

4       Koninklijke Philips N.V. ("Royal Philips"), an alleged coconspirator in this case, is the

5   parent company to hundreds of subsidiaries across the world.  Some of those subsidiaries are also

6   defendants in this case.  Three of those subsidiaries – Philips Electronics North America

7   Corporation ("PENAC"), Philips Taiwan Limited (f/k/a Philips Electronics Industries (Taiwan)

8   Ltd.) ("PTL"), and Philips do Brasil Ltda. (f/k/a Philips da Amazonia Industria Electronica Ltda.)

9   ("PDBL") (collectively, the "Philips Subsidiaries") – brought the instant motion.  Royal Philips,

10  itself, however, is not a party to the motion.

11      Defendants ask the Court to rule that the Philips Subsidiaries withdrew from the

12  conspiracy as a matter of law after June 2001 when the Philips Subsidiaries transferred their CRT

13  businesses to LG Philips Displays ("LPD"), a joint venture between Philips and alleged

14  coconspirator LGE.  Although Royal Philips continued to be involved in the CRT industry through

15  its shared ownership and control of LPD, the Philips Subsidiaries argue that they severed all ties to

16  the CRT industry after June 2001 and that Royal Philips' ongoing involvement should not be

17  imputed onto them given principles of corporate separateness.

18      The DAPs' respond that the motion should be denied because <u>Royal Philips</u> continued its

19  involvement in the conspiracy through LPD.  Further, the DAPs contend that the Philips

20  Subsidiaries did not communicate their alleged withdrawal to their coconspirators.  Finally, the

21  DAPs argue that the Philips Subsidiaries continued to benefit from the conspiracy after their

22  purported withdrawal insofar as the Philips conglomerate as a whole benefited.

23      Because the DAPs fail to provide (1) any evidence that Philips Subsidiaries continued their

24  involvement in the CRT industry after June 2001, or (2) a legal theory that would allow them to

25  impute Royal Philips' alleged involvement in the conspiracy through LPD after June 2001 onto

26  the Phillips Subsidiaries, the Court will grant the motion.

27      **a.    Facts**

28

presented by this motion and the Court did not consider them in making its decision.  Accordingly,
Defendants' objection is overruled as moot.

United States District Court
Northern District of California

1    In addition to the facts provided below, the Court incorporates the relevant facts from

2    Section IV.B.3.a, supra, which explain the LPD joint venture between LGE and Philips in detail.

3    Royal Philips is the Netherlands-based parent company of the Philips Group, a

4    multinational business conglomerate.  ECF No. 3238-11, Ex. 3 at 1.  Its business activities are

5    organized through Product Divisions and Country Organizations, and its legal structure is

6    organized through a large number of directly and indirectly held subsidiaries throughout the

7    world.  See id.  The two Product Divisions relevant to this case are the Philips Consumer

8    Electronics Division ("PCE") and the Components Division.  PCE was responsible for finished

9    televisions and monitors.  A business group within the Components Division called Philips

10   Display Components ("PDC") was responsible for the production of CRTs.

11   At Royal Philips' 30(b)(6) deposition, its corporate representative provided a brief

12   overview of the company's corporate structure.  See ECF No. 3238-14, Ex. 7 at 30:1-34:12.  As he

13   explained it, Royal Philips is the top of the Philips Group, with a seat in the Netherlands, governed

14   by the Board of Management.  Id.  Below the Board of Management are the Product Divisions,

15   comprised of different business groups, which are also directed centrally by Royal Philips from

16   the Netherlands.  Id.  Philips, however, is a global operation and is active throughout the world

17   through different corporate entities.  In North America, for example, Philips is active under

18   PENAC, one of the Philips Subsidiaries that brought the instant motion.  Id.  Activities like

19   production and manufacturing are under the responsibility of subsidiaries like PENAC.  Id.  The

20   policies for operating the display components and consumer electronics divisions under PENAC

21   are largely determined, however, by PCE and PDC out of Royal Philips in the Netherlands.  Id.

22   The Philips Subsidiaries manufactured and sold CRTs from March 1995 through June

23   2001 and are alleged to have participated in the conspiracy (along with Royal Philips itself)

24   throughout that time.  As part of Royal Philips' joint venture agreement with LGE, all of the CRT

25   operations of the Philips Subsidiaries were transferred to LPD in June 2001.  Philips Subsidiaries'

26   divestment was widely reported in the press.  LPD, in turn, allegedly joined the conspiracy shortly

27   after its creation.

28   Royal Philips shared ownership and control of LPD with LGE.  The DAPs do not present

United States District Court
Northern District of California

23

United States District Court
Northern District of California

1    any evidence, however, that Philips Subsidiaries owned or were otherwise involved in LPD's

2    operations.

3                              b.        Discussion

4           Philips Subsidiaries' exit from the CRT industry in June 2001 constitutes a prima facie

5    showing of withdrawal.  See Lothian, 976 F.2d at 1264; Morton's Mkt., 198 F.3d at 839; Krause,

6    827 F.2d 346.  Their exit was also adequately communicated to coconspirators given the extensive

7    press coverage.  See Gypsum, 438 U.S. at 464-65; Morton's Mkt., 198 F.2d at 839.  The DAPs' do

8    not attempt to rebut this evidence.  Instead, they focus on Royal Philips' continued involvement in

9    the CRT industry through LPD.  Although the DAPs assert that "the period following LPD's

10   formation was marked by tight integration between the entire Philips corporate family and LPD,"

11   Philips Opp'n at 17, they fail to present a legal theory that would allow them to impute Royal

12   Philips' ongoing involvement in the CRT industry through LPD onto the Philips Subsidiaries.  Cf.

13   Bestfoods, 524 U.S. at 68 ("It is a general principle of corporate law deeply ingrained in our legal

14   system that a corporation is not liable for the acts of its subsidiaries."); Mobil Oil Corp. v. Linear

15   Films Inc., 718 F. Supp. 260, 273 (D. Del. 1989) ("Courts do disregard the corporate form in some

16   instances where such disregard is necessary to prevent injustice to a person or entity that would be

17   harmed by refusing to impose liability on the basis of the corporate structure.  The party seeking to

18   disregard the corporate form bears the burden of showing that there are good reasons for doing

19   so.").

20          At the hearing, the DAPs argued that PENAC's decision to purchase most of its CRTs

21   from LPD negated its withdrawal defense because those purchases benefited the conspiracy.

22   Presumably, the DAPs' theory is that PENAC furthered the conspiracy by providing LDP with a

23   dedicated market. Actions taken subsequent to the point of withdrawal will negate a withdrawal

24   defense if those actions further the conspiracy itself – for example, by concealing the conspiracy

25   from authorities.  See Lowell, 649 F.2d at 958.  Benefiting a conspirator, however, is not the same

26   as furthering the conspiracy.

27          Because the DAPs fail to provide any evidence that Philips Subsidiaries continued their

28   involvement in the CRT industry after June 2001 or a legal theory that would allow them to

                                              24

1    impute Royal Philips' ongoing involvement in the CRT industry through to the Phillips

2    Subsidiaries, the Court GRANTS Defendants' motion.  See Steele, 685 F.2d at 804 (ruling that the

3    defendant had established withdrawal as a matter of law after the evidence showing the defendant

4    had severed his ties with the enterprise went unrebutted by the government).

5
            5.      **Motion for Partial Summary Judgment Against Dell and Sharp**
6                   **Plaintiffs on Statute of Limitations Grounds**

7           The instant motion asserts Dell and Sharp had knowledge or constructive knowledge of the

8    facts constituting their claims as of 1998 and 2002, respectively.  Because fraudulent concealment

9    cannot continue to toll the statute of limitations once a plaintiff has actual or constructive

10   knowledge of facts giving rise to its claim, Defendants assert that Dell's and Sharp's claims

11   relating to conduct occurring before November 27, 2003 – four years after the Direct Purchaser

12   Plaintiff ("DPP") class action was filed – are time-barred.

13          The Court will deny the motion.

14                  a.      **Dell**

15          As the moving party, Defendants have the burden of producing evidence that shows Dell

16   had knowledge or constructive knowledge of the facts underlying their claims prior to November

17   23, 2007.  See Nissan Fire & Marine Ins., 210 F.3d at 1102.  The burden then shifts to Dell to

18   produce admissible evidence to show a genuine issue of material fact as to its knowledge or

19   constructive knowledge.  See id. at 1102-1103.

20          Defendants' evidence consists mainly of internal Dell emails discussing possible collusion

21   in the CRT market:

22          •    In 1998, Sue Lee, a member of Dell's World Wide Procurement group, reported to
                 sixteen other members of the procurement group that "Japanese CDT suppliers had
23               discussion among themselves of raising 17" CDT pricing" and that "Korean and
                 Taiwanese CDT supplier[s] would be glad to 'follow' if the raise worked." ECF No.
24               3067-19, Ex. 17.  Later, Ms. Lee wrote that "Japanese CDT supplier – led by Hitachi
                 was secretly working on to raise 17" CDT price . . . .".  ECF No. 3067-23, Ex 21.
25
            •    In 1999, an internal Dell email written by Dell employee Angela Ford states that Dell
26               suspected there was collusion among CRT suppliers to control the output of CRT
                 products.  ECF No. 3067-10, Ex. 8 at DELL-LCD00000675.
27
            •    That same month, members of the procurement team had a meeting to discuss Dell's
28               strategy to combat price increases.  Subsequently, an email was sent summarizing the

United States District Court
Northern District of California

discussion.  The summary stated that "[t]he CRT Cartel has come back that they are not, in fact, raising their prices – they will probably try again in Q2 . . . The Newspaper reports that the Cartel failed to increase pricing (1/17 - China Economic News?)."  ECF No 3067-14, Ex. 12.

- In January 2002, Dell's procurement team learned information that it believed showed that "CRT suppliers are banding together to raise their cost."  ECF No. 3067-12, Ex. 10.

- In January 2002, in a weekly report to the procurement group, a Dell employee wrote that the "cartel like big three suppliers did advice [sic] the monitor suppliers of price increase on the CDT . . . They agree setting target for example the 17" tube at $58, any supplier who currently sells under it should raise price to reach that level."  ECF No. 3067-16, Ex. 14.

- A few weeks later, Dell employee Eric Korman wrote an email to Dell employee Julie Newmiller proposing a meeting to "discuss the CDT industry's cooperative pricing association."  ECF No. 3067-24, Ex. 22.

- In a February email from Eric Korman among procurement group members, a senior manager wrote, "The other question I had was if we invited CPT – we are going to need their support on 15" LCD panels and they are trying to play ball with the CRT pricing cartel."  ECF No. 3067-22, Ex. 20.

- In a March 2002 email, Eric Korman wrote that "the CRT consortium is holding together well regarding pricing" and that "the CRT consortium is difficult to manage at this point."  ECF No. 3067-21, Ex. 19.

- In a February 2003 email, Dell employees and managers discussed how "CRT inventory is building" and how it was an opportunity to "do a little cartel breaking." ECF No. 3067-20, Ex. 18.

These emails, taken on their own, suggest Dell's "suspicions" regarding the existence of a CRT price-fixing conspiracy were "excited."  See Conmar, 858 F.2d at 504.  The burden therefore shifts to Dell to produce admissible evidence to show a genuine issue of material fact.  See Nissan Fire & Marine Ins., 210 F.3d at 1102-1103.  In response, Dell submits the deposition testimony of various Dell employees who testified that Dell did not, in fact, have suspicions of a conspiracy. See, e.g., ECF No. 3230-40, Ex. 36 (Deposition of Julie French)[10] 158:4-159:2 (had no knowledge or suspicions about CRT makers colluding); id. at 92:10-93:23 ("We would have never expected [CRT suppliers] to be talking to their competitors about pricing. So it would not have entered our minds to ask them to tell us if they're talking to their competitors about pricing."); id. at 156:9-

---

[10] Julie French was the global commodity manager for CRT monitors and senior manager for CRT monitor procurement.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   157:7 ("We had no reason to suspect this . . . And I guarantee you if I had an inkling that it was

2   real or my team, who is very ethical as well, had an inkling that it was real, something would have

3   been done."); ECF No. 3230-32, Ex. 28 (Deposition of Gerry Smith ("Smith Depo")) at 156:6-19,

4   270:15-272:25 (he was not aware of any companies fixing prices of CRT tubes or CRT monitors

5   and did not have suspicions of price fixing); ECF No. 3230-33, Ex 29 (Deposition of Angela Ford)

6   at 146:9-147:11 ("I did not suspect that they were discussing pricing . . . I didn't believe they were

7   talking to raise prices."); id. at 179:8-9 ("I didn't think the CRT makers or the tube makers were

8   meeting to set prices."); ECF No. 3230-34, Ex. 30 (Deposition of Glen Neland) at 249:19-25 (he

9   did not recall anyone at Dell reporting to him suspicions of cartel activity with respect to CRTs or

10  CRT monitors); ECF No. 3230-35, Ex. 31 (Deposition of Mac Stringfellow) at 91:14-92:22 (never

11  heard from anyone at Dell that the companies that were supplying CRTs were colluding on

12  price); id. at 155:15-16 ("I had no suspicions that there was collusion."); ECF No. 3230-36, Ex. 32

13  (Deposition of Jon Melnick) at 259:7-260:13 (no suspicions that CRT tube manufacturers were

14  discussing price and that he did not recall any rumors of others discussing such suspicions); ECF

15  No. 3230-37, Ex. 33 (Deposition of Dennis Selman) at 177:1-178:23 (did not recall having

16  suspicions about CRT collusion or price-fixing); ECF No. 3230-38, Ex. 34 (Deposition of Shutuan

17  Lillie ("Lillie Depo")) at 250:3-21 (never suspected CRT tube suppliers or monitor suppliers were

18  fixing prices and did not hear of such suspicions from anyone else at Dell); ECF No. 3230-39, Ex.

19  35 (Deposition of Ricky Ratley) at 150:1-12 (did not recall hearing any rumors or suspicions with

20  respect to CRT tubes or monitor makers); ECF No. 3230-31, Ex. 27 (Deposition of Martin Garvin

21  ("Garvin Depo.")) at 105:13-17 (did not recall whether he suspected there was a CRT cartel).

22          Dell employees also testified that the word "cartel" was used loosely in company

23  communications to refer to the fact that the CRT market was heavily concentrated or

24  oligopolistic.  See, e.g., Smith Depo. at 121:18-122:1, 126:23-127:2 ("A lot of people at Dell use

25  the term 'cartel' in a broad sense, meaning you only have a couple suppliers in an industry space,

26  which made it more difficult . . . from a procurement perspective."); Ratley Depo. at 142:4-143:3

27  ("My definition of cartel was more or less a market or industry, in a market or industry that linked

28  companies together by product or technology, perhaps even business."); Lillie Depo. at 121:1-16,

27

1     125:6-8; 126:1-21.

2          Finally, when asked about emails in which he referred to "cartel breaking," Dell's Chief

3     Procurement Officer, Martin Garvin, explained that the statement referred to LCD suppliers and

4     that "cartel breaking" was a "metaphor" to see if "there might be an opportunity to get some lower

5     pricing" and that reference to "cartel breaking" was "generically referring to panel providers."

6     Garvin Depo. at 118:14-121:7; see also In re TFT-LCD (Flat Panel) Antitrust Litig., No. M 07-

7     1827 SI, 2012 WL 6000154, at *1 (N.D. Cal. Nov. 30, 2012) ("[A]cording to Dell, the evidence

8     shows that employees used the term 'cartel' loosely to refer to the fact that a heavy concentration

9     of LCD business resided with a handful of companies.").

10         Defendants reply that Dell must have had knowledge of the conspiracy given the strength

11    and credibility of their documentary evidence relative to the deposition testimony submitted by

12    Dell.  "In considering a motion for summary judgment," however, the Court "may not weigh the

13    evidence or make credibility determinations, and is required to draw all inferences in a light most

14    favorable to the non-moving party."  Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).  As to

15    Dell's purported constructive knowledge, Defendants neither point to specific facts that should

16    have excited Dell's suspicions of which Dell was irrefutably aware, nor show that Dell would have

17    discovered the facts underlying its claims had it been reasonably diligent in investigating those

18    suspicions.  See Conmar, 858 F.2d at 504; Mt. Hood Stages, 555 F.2d at 698; Morton's Mkt, 198

19    F.3d at 832-33; In re Petroleum Products, 782 F. Supp. at 493.  The Court therefore finds that

20    there is a genuine issue of material fact as to Dell's actual and constructive knowledge.  See also

21    In re TFT-LCD (Flat Panel) Antitrust Litig., No. M 07-1827 SI, 2012 WL 6000154, at *2 (N.D.

22    Cal. Nov. 30, 2012) (finding on a similar motion with similar facts that "[w]hile defendants have

23    submitted powerful evidence suggesting that Dell knew about defendants' alleged price-fixing

24    activities prior to December 2002, the Court concludes that summary judgment is not appropriate

25    because the parties submitted conflicting evidence regarding what Dell employees knew and when

26    they knew it.").

27         Accordingly, Defendants' motion as to Dell is DENIED.

28              **b.     Sharp**

28

As with Dell, Defendants have the initial burden of producing evidence to show that Sharp had knowledge or constructive knowledge of the facts underlying its claims prior to November 23, 2007.  See Nissan Fire & Marine Ins., 210 F.3d at 1102.  Defendants have failed to meet this burden.

Defendants first point to a June 2002 report regarding CRT pricing trends.  The report is 15 pages pertaining to over a dozen companies.  One line in the report states, "There is a possibility that Samsung and LGPD are conspiring."  ECF No. 3067-4, Ex. 2 at SHARP-CRT-00212458 (emphasis added).  Merely suspecting that certain Defendants were possibly conspiring, however, is not enough to establish constructive knowledge as a matter of law.  See Mt. Hood Stages, 555 F.2d at 698; see also F. Buddie  Contracting, 595 F. Supp. at 431 ("[W]here a plaintiff remains ignorant of at least some of the facts required to make out his claim, the plaintiff does not have knowledge of its claim.").  Further, when asked about the document at deposition, the head of procurement at SEMA – one of the Sharp plaintiffs – testified that the language would not have caused him to believe that Samsung and LGPD were conspiring because he believed the prices were improperly characterized in the report.  See ECF No. 3283-2, Ex. A (Nakanishi Deposition) at 144:24-146:2; 355:22-356:1; 356:3-14.  Thus, even if Defendants had satisfied their burden, there would still be a fact issue as to Sharp's knowledge.

Defendants next point to a report that was received by Sharp from CRT manufactures in 2002 providing CRT production estimates for 2003.  Defendants note that Sharp is using the same document as an example of a meeting or communication among competitors in the CRT industry.  Defendants conclude that "[i]f, as Sharp contends, a CRT supplier's possession of such information evidences improper communications between competitors in violation of the Sherman Act, then Sharp has known about such communications, and thus the basis for its claims, since at least 2002."  Dell/Sharp Mot. at 23.  Not so.  Just because the 2002 report is potentially probative of a conspiracy does not mean that it is sufficient to establish, as a matter of law, that Sharp had knowledge of the conspiracy or was put on notice of its claims.  In order to establish constructive knowledge as a matter of law, the plaintiff must have been aware of "facts from which fraud could reasonably be inferred," Mt. Hood Stages, 555 F.2d at 698, such that its "suspicions have been or

should have been excited, <u>Conmar</u> 858 F.2d at 504.  A report providing CRT production estimates does not come close.  <u>See also</u> <u>Morton's Mkt</u>, 198 F.3d at 832-33 (holding it is not enough "to point to facts which <u>might</u> have caused a plaintiff to inquire, or <u>could</u> have led to evidence supporting [the plaintiff's] claim . . . A defendant who does this has succeeded in demonstrating only that there is a jury question regarding the tolling of the statute of limitations by fraudulent concealment").  Further, even if the report had raised Sharp's suspicions, Defendants do not show that a diligent inquiry, had it been performed, would have revealed the facts underlying the Sharp's claims.  <u>See id.</u>, <u>Morton's Mkt.</u>, 198 F.3d at 833; <u>see also</u> <u>In re Petroleum Products</u>, 782 F. Supp. at 493 ("Nor is there constructive knowledge if, even upon investigating, plaintiffs might reasonably be unable to uncover their claims.").

Defendants motion as to Sharp is therefore DENIED.[11]

## V.    CONCLUSION

The Court rules as follows:

| Motion | Ruling |
|---|---|
| Hitachi Defendants' Motion for Summary Judgment Based Upon Withdrawal and the Statute of Limitations | Granted in part, denied in part |
| Toshiba Defendants' Motion for Summary Judgment Concerning Withdrawal | Denied |
| Defendant LG Electronics, Inc.'s Motion for Partial Summary Judgment on Withdrawal Grounds | Denied |
| Philips Electronics North America Corporation, Philips Taiwan Ltd., and Philips Brasil Ltda.'s Motion for Partial Summary Judgment | Granted |
| Motion for Partial Summary Judgment Against Dell and Sharp Plaintiffs on Statute of Limitations Grounds | Denied |

/ / /

/ / /

/ / /

---

[11] Sharp's Objection to Reply Evidence, ECF No. 3503, is overruled as moot.

United States District Court
Northern District of California

| Motion | Ruling |
|---|---|
| Motion for Partial Summary Judgment Against Dell and Sharp Plaintiffs on Statute of Limitations Grounds | Denied |

IT IS SO ORDERED.

Dated:  August 22, 2016



JON S. TIGAR
United States District Judge

United States District Court
Northern District of California

31