# Exhibit 4

HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

COSTCO WHOLESALE CORPORATION,

Plaintiff,

v.

AU OPTRONICS CORPORATION, et al.,

Defendants.

CASE NO. C13-1207RAJ

ORDER

## I. INTRODUCTION

This matter comes before the court on the parties' submissions in response to the court's April 3, 2015 order. The court has considered those submissions, along with the evidence the parties presented to the jury at trial, the evidence the parties presented solely to the court, and the parties' previous submissions regarding the application of what the court has called the "control exception." For the reasons stated below, the court directs the clerk to TERMINATE the May 1, 2015 motion calendar it created in the April 3 order, to enter judgment for Costco, and to DISMISS this civil action.

## II. DISCUSSION

**A. Summary of Non-Jury Dispute Over Costco's Standing to Sue in Light of the *Illinois Brick* Rule**

*Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729 (1977), establishes the general rule that only the direct purchaser of price-fixed goods has standing to invoke Section 4 of the Clayton Act (15 U.S.C. § 15). The court has considered that rule in the context of this case in several prior orders, and will try to avoid repeating itself. The plaintiff in this

ORDER – 1

case, Costco, was undisputedly not the direct purchaser of any price-fixed goods. The jury concluded that Costco paid more than $36 million in overcharges as the result of a long-running conspiracy to fix the prices of TFT-LCD panels. That conspiracy included LG Display and AU Optronics (who were the Defendants who went to trial), defendants who settled Costco's claims against them, and at least a dozen other entities. Costco paid overcharges by buying finished products incorporating those panels (televisions and laptop computers, for example) from vendors affiliated with that conspiracy. The jury was not asked to determine whether Costco had standing to sue over those overcharges. It is the court's job to decide whether Costco has standing. *Martinez v. Concord EFS, Inc. (In re ATM Fee Antitrust Litig.)*, 686 F.3d 741, 747 (9th Cir. 2012).

In a bench trial running parallel to the five-week jury trial, the parties submitted evidence[1] and argument to the court regarding whether Costco may invoke what the court has called the "control exception" to the *Illinois Brick* rule. During trial, the parties' disputes centered on whether the six vendors from whom Costco purchased finished products (Samsung Electronics America, Inc., Sharp Electronics Corporation, two Toshiba entities whom the court treats as a single vendor, Philips Electronics North America Corp., Panasonic Corporation of North America, and JVC) were in control relationships with one or more conspirators. That dispute is not difficult to resolve, and the findings and conclusions in Part III of this order will memorialize the ruling that each of these vendors was in a "control relationship"[2] with a conspirator.

After the jury trial ended, the court sought the parties' input on the entry of judgment, and the Defendants changed their focus as to the control exception. They

---

[1] Putting aside a smattering of testimony that the court heard outside the jury's presence, the parties presented evidence for the bench trial to the jury or in a "Stipulation Regarding Ownership and Control" that the parties' submitted at the end of the third week of trial. Dkt. # 599. The court cites that stipulation with the notation "O&C Stip."

[2] The court uses the term "control relationship" to mean a relationship that permits Costco to invoke the control exception. The court defined that relationship in a September 11, 2014 order. Dkt. # 558 at 11.

ORDER – 2

1 contended that Costco had failed to prove that its vendors were themselves direct
2 purchasers of the panels embedded in the finished products that they sold to Costco. The
3 fulcrum of that assertion was the presence in the supply chain of what the parties call
4 "original design manufacturers." The court uses the term "ODM" for convenience, but
5 the parties and trial witnesses have used many terms, including "original equipment
6 manufacturer" or "OEM," "contract manufacturer," and "contract assembler." The
7 industry uses these terms to refer to virtually any entity that makes finished products that
8 incorporate TFT-LCD panels.[3] This order will focus on "independent ODMs," a term
9 that the court uses to refer to finished product makers who were not under the control of a
10 member of the price-fixing conspiracy. According to Defendants, because Costco failed
11 to prove that independent ODMs were not the direct purchasers of the price-fixed panels,
12 Costco did not prove its standing to sue.
13 After considering that assertion, the court issued an order on April 3 stating what it
14 called the "next-most-direct purchaser rule":

> Costco's burden to prove standing at trial included the burden to prove that
> for the finished products it purchased from the six vendors, it was the first
> purchaser "outside the conspiracy" of the panels incorporated in those
> products. A purchase is "outside the conspiracy" when a purchaser who is
> neither a conspirator nor an entity in a control relationship with a
> conspirator makes it.

The order asked the parties to confirm that the next-most-direct purchaser rule was an
accurate statement of law, that the jury's verdict did not incorporate a ruling on the
application of that rule, and that the court must decide its application in this case. The
parties' supplemental briefing answered "yes" to all three questions.

---

[3] There is evidence that the conspirators used the term ODM (or one of its equivalents) to refer to
finished product manufacturers who were not part of the conspiracy. There is also evidence,
however, that members of the conspiracy or their affiliates who made or sold their own branded
finished products were considered ODMs. For example, Carl Pinto of Toshiba America
Information Systems referred to TAIS and other branded-product sellers as OEMs in the context
of their meetings to win purchase orders from Best Buy. O&C Stip., Ex. F (Pinto Dep. at 98-
100). The parties agreed that "branded vendors such as Samsung, Sony, Philips, and Sharp" are
also OEMs. O&C Stip. ¶ 33. One witness used the term "OEM" to refer to any entity that
makes finished products. Trial Tr. 2602 (Oct. 16).

ORDER – 3

The court also asked the parties to point to evidence illuminating whether Costco was the next-most-direct purchaser of the finished products it purchased from its vendors.

**B. Evidence Relevant to Identifying the Next-Most-Direct Purchaser of the Panels in Costco's Finished Products**

    **1. Evidence Relevant to Independent ODMs as the Next-Most-Direct Purchasers**

The evidence the parties cited in their supplemental briefs, along with the court's own review of the trial record, leads the court to conclude there is no evidence sufficient to support a finding that any independent ODM was the direct purchaser of any panel incorporated into a finished product that Costco purchased. The court asked Defendants to highlight evidence supporting a contrary finding, what they highlighted instead was substantial evidence that Defendants and their conspirators sold price-fixed panels to ODMs. Absent from the record is any evidence that independent ODMs manufactured finished products that they sold to Costco's six vendors or anyone associated with Costco's six vendors.

Although there was ample evidence that Defendants and their conspirators sold panels to independent ODMs, there was scarcely any evidence as to the acquisition of finished products from independent ODMs in circumstances where it is possible to infer that those finished products were among those sold to Costco. Dr. Douglas Bernheim, who offered expert testimony on damages for Costco, stated in an expert report and in trial testimony that he was aware of two specific examples of ODM activity. Trial Tr. 685-87 (Sept. 25). He noted that portable DVD players sold from 2001 through 2009 were "built with the Philips insignia by contract manufacturers . . . ." *Id.* at 686-87, Ex. 5503-0115.[4] He also noted that Toshiba had a Japanese factory that "outsourced

---

[4] Defendants showed four slides to Dr. Bernheim during his testimony outside the jury's presence. Two are excerpts from his report, numbered 5503-0115 and 5503-0116. The other are demonstrative exhibits that Defendants counsel prepared, numbered 5551-0001 and 5552-0001. All four exhibits were admitted solely for the court's consideration. Trial Tr. 687 (Sept. 25). The parties did not, so far as the court is aware, file those exhibits on the docket. They included them only in the courtesy copy of their Ownership and Control stipulation.

ORDER – 4

1 notebook production to Toshiba Information Equipment Hangzhou and third-party
2 ODMs" from 2002 to 2008.  Trial Tr. 686, Ex. 5503-0116.  Masahiro Yokota, an
3 executive with Sharp Corporation, testified that Sharp manufactured LCD televisions,
4 monitors, and other products containing TFT-LCD panels.  Trial Tr. 2751 (Oct. 16).
5 Sharp shipped some LCD televisions that it manufactured in Japan to its United States
6 subsidiary (and Costco vendor) Sharp Electronics Corporation ("SEC").  O&C Stip.,
7 Ex. I (Yokota depo. at 30).  But Sharp also manufactured some televisions at a "Mexico
8 facility" that was under the control of Sharp or one of its United States subsidiaries.  *Id.*
9 (Yokota depo. at 31).  At some point, Sharp used "assemble manufacturer[s]" in China
10 and in southeast Asian countries that shipped televisions to SEC.  *Id.* (Yokota depo. at
11 43-44).  Sharp owned the Chinese facility; the other facility or facilities in Asia were
12 independent subcontractors.  *Id.* (Yokota depo. at 44).  Costco stipulated that the "TFT-
13 LCD supply chain sometimes includes [ODMs] between panel makers and branded
14 vendors."  O&C Stip. ¶ 33; *see also id.* ¶¶ 34-36 (naming ODMS, including ODMS under
15 control of conspirators, without specifying to whom those ODMs sold finished products).
16 That stipulation does nothing to reveal whether independent ODMs purchased panels and
17 assembled them into finished products that made their way to Costco.  There was
18 evidence that Toshiba used a "contract manufacturer" called "Compal" for some
19 purposes, but nothing that would permit the court to conclude that Compal was an
20 independent ODM purchasing panels and selling finished products to Toshiba, much less
21 that those products reached Costco.  Trial Tr. 969 (Sept. 30).

22     The court has just described *all* of the evidence that shows finished products
23 manufactured by independent ODMs being delivered to conspirators or their affiliates;
24 that evidence is more notable for what it does not show.  Of the hundreds of millions of
25 dollars of Costco finished product purchases at issue, there is evidence that unknown
26 quantities of three kinds of products (Philips portable DVD players, Toshiba notebook
27 computers, and Sharp televisions) were manufactured by independent ODMs.  As to all
28 ORDER – 5

but the Philips DVD players, there is also evidence that the same products were manufactured (in unknown quantities) at ODMs under the control of a conspirator. Even as to products manufactured by independent ODMs, there is no evidence that the independent ODMs *sold* the finished products back into the conspiracy. The Sharp televisions from independent ODMs in southeast Asia were manufactured under subcontracts. Were those contracts for sales of finished products, or were they contracts for the assembly of finished products? That matters, because it is unlikely that the *Illinois Brick* rule applies in a circumstance where an independent ODM buys price-fixed panels only to sell them back into the conspiracy via a cost-plus contract or other arrangement where it is contractually immunized from absorbing any portion of the cost of the price-fixed product. *See In re ATM Fee*, 686 F.3d at 749 (noting Supreme Court's acknowledgement of standing "for indirect purchasers when a preexisting cost-plus contract with the direct purchaser exists").

## 2. Evidence Relevant to Costco as the Next-Most-Direct Purchaser

Although there is no evidence of independent ODMs as the next-most-direct purchasers of the panels embedded in the finished products Costco sold, Costco does not fare much better at citing evidence that *it* was the next-most-direct purchaser. The evidence the court just reviewed shows that Sharp manufactured some of its televisions itself and that Toshiba manufactured some of its notebooks itself. There is other, even less specific evidence, that conspirators manufactured their own products. There was testimony, for example, that LG Display sold panels to Philips Electronics, who used those panels "for [its] own production" and did not sell panels. Trial Tr. 1588-89 (Oct. 7); *see also* Trial Tr. 1704 (Oct. 7) (testimony affirming that "Sharp produces a wide variety of finished products containing LCD panels"); Trial Tr. 2649 (Oct. 16) (testimony that Samsung makes both panels and finished products). That evidence tends to show that Costco might have been the next-most-direct purchaser of panels incorporated in Sharp televisions manufactured at Sharp facilities, Toshiba notebook computers

ORDER – 6

1 manufactured at Toshiba facilities, and Samsung finished products. As to Philips portable DVD players and Sharp televisions manufactured by "contract manufacturers" or "assemble manufacturers," the direct evidence is silent as to whether the ODM or a downstream purchaser like Costco was the next-most-direct purchaser.

As the hundreds of millions of dollars of other finished products at issue in this case, there is no direct evidence as to how the panels within them moved from their manufacture, to assembly into finished products, and then to Costco. Asked to marshal proof that it was the next-most-direct purchaser, Costco pointed instead to a wealth of evidence that Defendants and their conspirators sold price-fixed panels to other members of the conspiracy. That evidence reveals nothing directly about what happened to those panels. It is possible that conspirators themselves assembled finished products from those panels (the court has noted evidence that this occurred in some instances); it is also possible that they sold those panels to independent ODMs who then incorporated them into finished products that they sold back into the conspiracy. The latter possibility is not implausible. A price-fixer is presumably indifferent as to how it profits. Selling panels to independent ODMs is profitable if the independent ODM sells that panel to a purchaser outside the conspiracy. It is also profitable if the independent ODM sells the panel (incorporated into the finished product) back into the conspiracy, but in conditions where the ODM is forced to absorb all or a portion of the overcharge. There is no evidence that happened in this case, but it is nonetheless a possibility.

To summarize: Defendants have no evidence of independent ODMs as the next-most-direct purchasers of any finished product Costco sold; Costco has little evidence that it was the next-most direct purchaser of the panels in the finished products that it purchased. The court cannot point to a single product among Costco's purchases and declare confidently that it contains a panel that was never sold outside the conspiracy until Costco bought the finished product. The court also cannot point to a single product

ORDER – 7

among Costco's purchases and declare confidently that it contains a panel that was sold outside the conspiracy before it reached Costco.

### 3. Costco Had No Burden to Identify the Next-Most-Direct Purchaser on a Panel-by-Panel Basis.

To determine what to make of this thin evidence, the court considers the parties' burdens of proof. No one disputes the general proposition that Costco bears the burden to prove its own standing to sue by a preponderance of the evidence. The parties have sharp disputes over what that means. Defendants believe that Costco was obligated to prove, on a panel-by-panel basis, that it was the next-most-direct purchaser. Costco contends that the MDL court's rulings dispel that notion.

The MDL court's rulings (or at least the rulings to which the parties have pointed) say little that bears on the application of the next-most-direct purchaser rule at trial. Defendants pointed to independent ODMs as the next-most-direct purchasers in a motion for summary judgment. Defs.' Aug. 2, 2012 Mot. (MDL Dkt. # 6342) at 17-18. They did not persuade the MDL court. It ruled as follows:

> To the extent defendants argue that plaintiffs lack standing for finished products purchased by or sold to a systems integrator, ODM or other third party before reaching the Direct Action purchasers, the court finds that a genuine issue of material fact exists as to whether these parties actually buy price-fixed panels directly from panel manufacturers or whether they are retained by direct purchaser companies to merely assemble finished products.

Nov. 19, 2012 ord. (MDL Dkt. # 7188). In the same order, the MDL court reminded Defendants that it had already ruled that plaintiffs had no obligation to prove their antitrust injury on a panel-by-panel basis. *Id.* at 7-8. That ruling played out at trial; Costco proved its damages based on a model that assessed each Defendant's liability by assuming that the panels in Costco's finished products came from each Defendant in proportion to its share of the TFT-LCD panel market. The parties point to no ruling from the MDL court discussing whether plaintiffs were obligated to prove standing on a panel-

ORDER – 8

by-panel basis.[5] Nonetheless, it would be startling if the MDL court had permitted generalized proof of injury while requiring panel-by-panel proof of standing. The court concludes that the MDL court's rulings relieve Costco of any burden to prove its standing panel-by-panel. The court would make the same ruling if it was deciding the question in the first instance.

### 4. Costco Was the Next-Most-Direct Purchaser of the Finished Products at Issue.

The court finds by a preponderance of evidence that Costco was the next-most-direct purchaser of the panels incorporated in the finished products at issue. Costco's vendors were members of corporate families that included at least one entity that purchased price-fixed panels from conspirators outside that corporate family or from a panel-manufacturing conspirator within that corporate family. The evidence supports the inference that those panels were purchased for the purpose of being assembled into finished products bearing the corporate family's brand. In a few cases, that evidence is direct. Toshiba bought panels that it assembled into finished Toshiba products at Toshiba facilities. Sharp bought panels that it assembled into finished Sharp products at Sharp facilities. In other instances, the evidence is direct but less specific, such as the evidence that Philips bought panels from LG Display to make its own finished products. But in each case, the court infers that the conspirators purchased panels for the purpose of making finished products. Without specific evidence that those conspirators were also purchasing finished products from independent ODMs, the court does not draw the inference that they did so. The scant evidence that conspirators sometimes used independent ODMs does not convince the court that the conspirators ever did so in the

---

[5] Costco pointed the court to a ruling the MDL court made in so-called "Track 2" cases after it remanded this case for trial. The Track 2 defendants "move[d] for summary judgment as to all claims for which an ODM was the first purchaser, arguing that plaintiffs lack standing as to these products." Sept. 4, 2014 ord. (MDL Dkt. # 9204) at 3. Again, the MDL court denied summary judgment on the basis that there were genuine issues of material fact as to whether any ODM could be deemed a direct purchaser. *Id.* at 4. The court focuses on rulings the MDL court made before remand, but notes that the MDL court's post-remand rulings appear to be no different as to the issues now before the court.

ORDER – 9

manner that Defendants suggest. The evidence supports a finding that the conspirators used independent ODMs in some instances to manufacture finished products, not that they bought finished products from independent ODMs. The court finds, in short, that independent ODMs did not purchase panels to assemble finished products that they then sold back into the conspiracy where they eventually reached Costco. And in light of that finding, the court makes the finding that Costco was the next-most-direct purchaser of the finished products at issue.

### III. FINDINGS OF FACT AND CONCLUSIONS OF LAW

In light of the discussion above, as well as the court's discussion in its April 3 order, the court enters the following findings of fact and conclusions of law. The findings and conclusions below are those that the court deems essential to the ultimate legal conclusion that Costco had standing to invoke the Clayton Act as to the finished product purchases that were at issue at trial. The court incorporates by reference the other findings it has made in this order.

**A.    Findings of Fact**

1) The following entities were, at all relevant times, either wholly-owned subsidiaries of an entity the jury found to be a member of the price-fixing conspiracy or wholly-owned subsidiaries of a wholly-owned subsidiary of an entity the jury found to be a member of that conspiracy: Samsung Electronics America, Inc., Sharp Electronics Corporation, Toshiba America Consumer Products, Toshiba America Information Systems, Inc., Philips Electronics North America Corp., and Panasonic Corporation of North America.

2) At all relevant times up to July 2007, Panasonic Corporation, an entity who the jury found to be a member of the price-fixing conspiracy, owned an equity interest in Victor Company of Japan, Ltd. ("JVC") of between 52% and 53%. Beginning in July 2007, Panasonic's equity interest declined to 36.8%. Panasonic's equity interest fluctuated at or below 36.8% thereafter. Beginning

ORDER – 10

in the second quarter of 2008, Panasonic stopped treating JVC as its consolidated subsidiary.

3) The jury found that a "JVC" entity (or perhaps a combination of JVC entities) was one of the vendors from whom Costco purchased finished products containing TFT-LCD panels. That entity (or those entities) was at all relevant times a wholly-owned subsidiary of JVC.

4) The price-fixing conspiracy proven at trial ended by no later than the end of 2006.

5) The jury's verdict includes the implicit finding that the finished product purchases that Costco put at issue at trial were of products containing TFT-LCD panels whose prices were fixed by the members of the conspiracy proven at trial.

6) Although the TFT-LCD panels in Costco's finished products were in many instances sold repeatedly (whether as standalone panels or as components of a finished product) before they reached Costco, none of them were purchased by a purchaser who was not either a member of the price-fixing conspiracy or an entity in a control relationship with a member of that conspiracy.

**B.  Conclusions of Law**

1) As to the entities who were wholly-owned subsidiaries of conspirators or conspirators' subsidiaries, there is no realistic possibility that they would have sued any conspirator because they were controlled by members of the conspiracy.

2) As to JVC, there is no realistic possibility that it would have sued prior to July 2007, because it was under the control of a conspirator who owned a majority of its equity.

3) Because it was under the control of a conspirator throughout the price-fixing conspiracy, there is no realistic possibility that JVC would have later sued as to

ORDER – 11

purchases it made during the conspiracy. The court reaches that conclusion even though a conspirator no longer controlled JVC after July 2007, because there is no realistic possibility that a former subsidiary of a conspirator would sue over wrongs that took place while the subsidiary was under the conspirator's control. That is particularly so in this case, where a conspirator retained substantial influence over JVC until well after the conclusion of the conspiracy.

4) Costco was the next-most-direct purchaser of the TFT-LCD panels contained in the finished products at issue at trial.

5) By virtue of the control exception to the *Illinois Brick* rule, Costco has standing to invoke federal antitrust law as to the finished product purchases that were at issue at trial.

## IV. CONCLUSION

The court enters judgment based on its findings of fact and conclusions of law and the jury's verdict. The parties have agreed that the methodology for calculating the judgment is to treble the amount of the jury's verdict and then subtract $47,750,000 to account for payments Costco received from defendants who settled before trial. The total amount of the jury's verdict was $36,657,680 (the sum of the six damage totals the jury reached in response to Question 4 on the verdict form). When that sum is trebled in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15(a), it totals $109,721,040. Subtracting the offset identified above, the resulting sum is $61,971,040.

The clerk shall enter judgment for Costco for $61,971,040, shall TERMINATE the May 1, 2015 motion calendar, and shall DISMISS this civil action.

DATED this 4th day of June, 2015.

Richard A. Jones
The Honorable Richard A. Jones
United States District Court Judge

ORDER – 12