# EXHIBIT 6

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
Roman M. Silberfeld, Bar No. 62783
RMSilberfeld@rkmc.com
Michael A. Geibelson, Bar No. 179970
MAGeibelson@rkmc.com
2049 Century Park East, Suite 3400
Los Angeles, CA 90067-3208
Telephone: 310-552-0130
Facsimile: 310-229-5800

**E-filing**

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
Elliot S. Kaplan (*Pending Pro Hac Vice Application*)
ESKaplan@rkmc.com
K. Craig Wildfang (*Pending Pro Hac Vice Application*)
KCWildfang@rkmc.com
800 LaSalle Avenue
2800 LaSalle Plaza
Minneapolis, MN 55402
Telephone: 612-349-8500
Facsimile: 612-339-4181

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**CV 10 4572**

| | |
|---|---|
| BEST BUY CO., INC.; BEST BUY PURCHASING LLC; BEST BUY ENTERPRISE SERVICES, INC.; BEST BUY STORES, L.P., BEST BUY CHINA LTD; MAGNOLIA HI-FI, INC., <br><br> Plaintiffs, <br><br> v. <br><br> AU OPTRONICS CORP.; AU OPTRONICS CORPORATION AMERICA; CHI MEI CORP.; CHI MEI OPTOELECTRONICS CORP.; CHI MEI OPTOELECTRONICS, USA, INC.; CHUNGHWA PICTURE TUBES, LTD.; CMO JAPAN CO., LTD.; EPSON ELECTRONICS AMERICA, INC.; EPSON IMAGING DEVICES CORPORATION; HANNSTAR DISPLAY CORP.; HITACHI DISPLAYS, LTD.; HITACHI ELECTRONIC DEVICES (USA), INC.; HITACHI, LTD.; KONINKLIJKE PHILIPS ELECTRONICS N.V. (aka ROYAL PHILIPS ELECTRONICS N.V. or ROYAL PHILIPS ELECTRONICS INC.); | Civil Action No.: _____ <br><br> **COMPLAINT AND JURY DEMAND** <br><br> 1. **Violation of Section 1 of the Sherman Act** <br><br> 2. **Violation of the Minnesota Anti-Trust Act of 1971** |

1   LG DISPLAY CO., LTD., LG DISPLAY
    AMERICA, INC.; LG ELECTRONICS
2   U.S.A., INC.; LG ELECTRONICS, INC.;
    NEXGEN MEDIATECH USA, INC.;
3   NEXGEN MEDIATECH, INC.; PHILIPS
    ELECTRONICS NORTH AMERICA
4   CORP.; SEIKO EPSON CORPORATION;
    SHARP CORP.; SHARP ELECTRONICS
5   CORP.; TATUNG COMPANY OF
    AMERICA, INC.,
6
                    Defendants.
7

8

9

10          Plaintiffs Best Buy Co., Inc., Best Buy Purchasing LLC, Best Buy Stores,

11   L.P., Best Buy China Ltd., and Magnolia Hi-Fi, Inc. (collectively "Plaintiffs" or

12   "Best Buy") brings this action for damages and injunctive relief under the antitrust

13   laws of the United States and the antitrust laws of the State of Minnesota, against

14   the Defendants, and allege as follows:

15   I.   **INTRODUCTION**

16          1.   Defendants and their co-conspirators are believed to have conspired

17   from at least January 1, 1996 until approximately December 11, 2006 ("Relevant

18   Period") for the purpose and to the effect of fixing, raising, stabilizing, and

19   maintaining prices for Thin Film Transistor Liquid Crystal Display ("TFT-LCD")

20   panels, and/or products containing a TFT-LCD panel, sold directly and indirectly to

21   Best Buy.   TFT-LCDs are used in a number of products, including, but not limited

22   to, computer monitors, laptop computers, televisions, and mobile phones containing

23   LCD panels.   As used herein, "TFT-LCD Products" refer to TFT-LCD panels, and

24   products containing TFT-LCD panels, manufactured by any of the named

25   Defendants or their subsidiaries, affiliates, or co-conspirators.

26          2.   Beginning in at least 1996, Defendants located in Japan, including but

27   not limited to Hitachi and Sharp met or talked with at least one other Defendant in

28   order to agree on TFT-LCD Product prices and the volume of TFT-LCD Products

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  each would produce. As production in Korea began to increase, the Japanese

2  Defendants expanded their meetings to involve their Korean competitors, including

3  Defendant LG Display, which also agreed to fix prices and to control supply. In

4  2001, the Korean Defendants convinced Taiwanese TFT-LCD Product

5  manufacturers, including Defendants AU Optronics, Chi Mei, Chunghwa, and

6  HannStar, to join the conspiracy to fix prices and to control product supply.

7  Defendants' conspiracy included agreements on the prices at which Defendants

8  would sell TFT-LCD Products to their own corporate subsidiaries and affiliates, as

9  well as their co-conspirators, thereby ensuring TFT-LCD Products prices remained

10 consistent among Defendants and their customers, which was an attempt to prevent

11 any price discrepancies to consumers.

12       3.      Throughout the Relevant Period, Defendants' conspiracy was effective

13 in moderating the normal downward pressures on prices for TFT-LCD Products

14 caused by periods of oversupply and technological change. Defendants' conspiracy

15 resulted in unusually long periods of high prices and high profits. Although there

16 were periods when prices for TFT-LCD Products temporarily declined as a result of

17 new market entrants being assimilated, or breakdowns in the effectiveness of the

18 conspiracy, those price declines were from supra-competitive levels, rather than

19 levels set by free and open competition. And prices declined less than they would

20 have in a competitive market. As a result of Defendants' unlawful conduct,

21 Plaintiffs paid higher prices for TFT-LCD Products than they would have paid in a

22 competitive market.

23 **II.    JURISDICTION AND VENUE**

24       4.      Plaintiffs brings this action to obtain injunctive relief and to recover

25 damages, including treble damages, costs of suit, and reasonable attorneys' fees

26 arising from Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. §

27 1) and the antitrust laws of Minnesota.

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

5.     This action arises under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for violations of the antitrust laws of the United States, including Section 1 of the Sherman Act, 15 U.S.C. § 1.  The jurisdiction of this Court is founded on those sections and on 28 U.S.C. § 1331, which provides this Court with original jurisdiction over actions arising under the laws of the United States, and 28 U.S.C. § 1337, which provides this Court with original jurisdiction over any action arising under federal laws regulating commerce or protecting commerce against restraints and monopolies.  This Court has jurisdiction over the state law claims under 28 U.S.C. § 1332, or, alternatively, pursuant to 28 U.S.C. § 1367.

6.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and Section 1391(b), (c), and (d) of Title 28 of the United States Code because a substantial part of the events giving rise to Plaintiffs' claims occurred in this district , a substantial portion of the affected interstate trade and commerce was carried out in this district, and one or more of the Defendants reside in this district.

7.     Defendants are subject to the jurisdiction of this Court by virtue of their nationwide contacts and other activities, as well as their contacts with the State of California.

III.  **PARTIES**

A.  **Plaintiffs**

8.     Plaintiff Best Buy Co., Inc. is a Minnesota corporation with its principal place of business in Richfield, Minnesota.  Prior to 2004, Best Buy Co., Inc. operated retail stores throughout the United States and sold TFT-LCD Products in those stores.

9.     Plaintiff Best Buy Purchasing LLC is a Minnesota Limited Liability Company and Plaintiff Best Buy Enterprise Services, Inc. is a Minnesota corporation with their principal places of business in Richfield, Minnesota.  Best

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Buy Purchasing LLC and Plaintiff Best Buy Enterprise Services, Inc. negotiate for the purchase of, purchase, and pay for goods for Plaintiff Best Buys Stores, L.P., which operates retail stores throughout the United States and sells TFT-LCD Products in those stores.

10. Plaintiff Best Buy China Ltd. is incorporated in Bermuda with offices in Shanghai and Jiangsu. Among other things, Best Buy China Ltd. makes purchases for Best Buy retail stores located in China and for Best Buy's exclusive brand products sold in its retail stores located in the U.S. and elsewhere. Supportive functions for Best Buy China Ltd., such as, but not limited to, accounting, legal, and brand management, are provided by Best Buy entities in Minnesota.

11. Plaintiff Magnolia Hi-Fi, Inc. is a wholly-owned subsidiary of Best Buy Co., Inc. with its headquarter in Kent, Washington, and has done business as Magnolia Home Theater and Magnolia Audio Video. Magnolia Hi-Fi, Inc. is a specialty consumer electronic retailer that operates Magnolia Audio Video standalone stores along the west coast and the greater Chicago area, and Magnolia Home Theater stores located within Best Buy stores. Best Buy purchased Magnolia in December 2000.

12. During the Relevant Period, Best Buy directly purchased finished products containing TFT-LCD panels from several of the vertically integrated Defendants. For instance, Defendants Chi Mei Optoelectronics, Epson, Hitachi, LG, Philips, Sharp, and Tatung manufacture and sell laptops, monitors, and televisions to resellers, like and including Best Buy. Best Buy suffered injury as a result of Defendants' conduct.

13. During the Relevant Period, Best Buy also indirectly purchased products containing TFT-LCD panels in two different ways. First, Best Buy bought finished products containing TFT-LCD panels from original equipment manufacturers (OEM) that directly or indirectly purchased TFT-LCD panels from

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

81749115.7                                                    COMPLAINT AND JURY DEMAND

1    one or more of the Defendants.  For instance, OEMs, like Dell, Hewlett-Packard,
2    Apple, and Gateway, bought TFT-LCD panels directly and indirectly from
3    Defendants for use in their computer monitors, laptops, iPods, and other finished
4    products.  These OEMs then sold their finished products to Best Buy for resale in
5    Best Buy stores.  Second, Plaintiffs are informed and believe and allege that its
6    integrators bought products containing TFT-LCD panels from one or more of the
7    Defendants for use in its exclusive brand products (*e.g.*, Insignia) that it sold in its
8    stores.  Best Buy suffered injury as a result of Defendants' conduct in both ways.

9        14.    During the Relevant Period, the Best Buy entities (other than Best Buy
10   China Ltd.) purchased and stored in Minnesota and elsewhere throughout the
11   United States substantial volumes of products containing TFT-LCD panels,
12   including finished products containing TFT-LCD panels manufactured by
13   Defendants from defendants and others.

14        15.    Services related to the operation and management of Best Buy China,
15   Ltd., including with respect to the purchasing of TFT-LCD panels and finished
16   products containing TFT-LCD panels in China, were provided in Minnesota.  Best
17   Buy China, Ltd. purchased a substantial volume of products containing defendants'
18   TFT-LCD panels in China, which products were sold to Best Buy and ultimately in
19   Best Buy retail stores in Minnesota and elsewhere throughout the United States.
20   Plaintiffs are informed and believe defendants knew, or should have known and
21   reasonably foreseen that those products would be sold in the United States
22   generally and in Minnesota in particular, such that those purchases involved U.S.
23   import trade or commerce and were within the flow of, were intended to, and did
24   have a direct, substantial and reasonably foreseeable effect on U.S. domestic
25   commerce.  That is, defendants knew, or must have known and reasonably foreseen
26   that purchasers in the United States would be required to pay an excessive, supra-
27   competitive price for products containing TFT-LCD panels that would be, and were
28   ultimately purchased in Minnesota and the United States.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    16.    Those products were kept as inventory and sold in Minnesota and
2  every other state where Best Buy retail stores were located, and over the internet
3  throughout the United States.

4    17.    In addition to the conspiracy establishing globally fixed and supra-
5  competitive prices for TFT-LCD panels and finished products containing TFT-LCD
6  panels that resulted in all of the Best Buy entities being required to pay supra-
7  competitive prices for products containing TFT-LCD panels, plaintiffs are informed
8  and believe and allege that the conspiracy had the direct and proximate effect of
9  causing a separate antitrust injury in that all of the Best Buy entities, including Best
10  Buy China, Ltd., lost sales related to ultimate consumers who were unwilling to pay
11  the supra-competitive prices for products containing TFT-LCD panels.  That is, the
12  supra-competitive prices for products containing TFT-LCD panels directly caused a
13  domestic and foreign antitrust injury by reducing the demand for such products and
14  thereby reducing the domestic and foreign purchases and sales of such products,
15  including Best Buy China, Ltd.'s sales of products in and to Minnesota.

16    18.    As a result of the Best Buy entities' presence, purchases, and sales in
17  Minnesota, and the substantial business they conduct in and with entities in
18  Minnesota, Plaintiffs are entitled to the protection of the Sherman Act and the
19  antitrust laws of Minnesota.

20    **B.    Japanese Defendants**

21         **1.    Epson America**

22    19.    Defendant Epson Electronics America, Inc. ("Epson America") is a
23  California corporation with its principal place of business at 2580 Orchard
24  Parkway, San Jose, California.  Epson America is a wholly-owned and controlled
25  subsidiary of Defendant Seiko Epson Corporation, which is also the ultimate parent
26  company of co-conspirator Defendant Epson Imaging Devices Corporation.  During
27  the Relevant Period, Epson America sold and distributed TFT-LCD Products
28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   manufactured by Epson Imaging Devices Corporation to customers throughout the

2   United States.

3            **2.**    **Hitachi**

4         20.    Defendant Hitachi, Ltd. is a Japanese company with its principal place

5   of business at 6-6, Marunouchi 1-chome, Chiyoda-ku, Tokyo, 100-8280, Japan.

6   The company was one of the original producers of TFT-LCDs. In 2002, it spun off

7   its TFT-LCD manufacturing assets to Hitachi Displays, Ltd., a wholly-owned

8   subsidiary.   During the Relevant Period, Hitachi, Ltd. manufactured, sold, and

9   distributed TFT-LCD Products to customers throughout the United States.

10         21.    Defendant Hitachi Displays, Ltd. is a Japanese company with its

11   principal place of business at AKS Bldg. 5F, 6-2 Kanda Neribei-cho 3, Chiyoda-ku,

12   Tokyo, 101-0022, Japan.  Hitachi Displays, Ltd. was formed in 2002 and acquired

13   Defendant Hitachi, Ltd.'s TFT-LCD manufacturing business.  Hitachi Displays,

14   Ltd. is a wholly-owned and controlled subsidiary of Hitachi, Ltd.   During the

15   Relevant Period, Hitachi Displays, Ltd. manufactured, sold and distributed TFT-

16   LCD Products to customers throughout the United States. Hitachi Displays, Ltd. is

17   a member of the joint venture IPS Alpha Technology, Ltd.

18         22.    Defendant Hitachi Electronic Devices (USA), Inc. is a Delaware

19   corporation with its principal place of business at 575 Mauldin Road, Greenville,

20   South Carolina.  Its ultimate parent company is Hitachi, Ltd. During the Relevant

21   Period, Hitachi Electronic Devices (USA), Inc. sold and distributed TFT-LCD

22   Products manufactured by Hitachi, Ltd. and Hitachi Displays, Ltd. to Customers

23   throughout the United States.

24         23.    Defendants Hitachi, Ltd., Hitachi Displays, Ltd., and Hitachi

25   Electronic Devices (USA), Inc. are referred to collectively herein as "Hitachi."

26            **3.**    **Sharp**

27         24.    Defendant Sharp Corporation is a Japanese company with its principal

28   place of business at 22-22 Nagaike-cho, Abeno-ku, Osaka 545-8522, Japan. The

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1 company was one of the earliest producers of TFT-LCDs.  During the Relevant

2 Period, Sharp Corporation manufactured, sold, and distributed TFT-LCD Products

3 to customers throughout the United States.

4       25.    Defendant Sharp Electronics Corporation is a New York corporation

5 with its principal place of business at Sharp Plaza, Mahwah, New Jersey.  Sharp

6 Electronics Corporation is a wholly-owned and controlled subsidiary of Defendant

7 Sharp Corporation.  During the Relevant Period, Sharp Electronics Corporation

8 sold and distributed TFT-LCD Products manufactured by Defendant Sharp

9 Corporation to customers throughout the United States.

10       26.    Defendants Sharp Corporation and Sharp Electronics Corporation are

11 referred to collectively herein as "Sharp."

12     **C.**    **Korean Defendants**

13         **1.**    **LG Display**

14       27.    Defendant LG Display Co., Ltd., formerly known as LG Philips LCD

15 Co., Ltd., is a Korean entity with its principal place of business at 17th Floor, West

16 Tower, LG Twin Towers 20, Yeouido-dong, Yeongdeungpo-gu, Seoul, Korea 150-

17 721.  LG Display Co., Ltd. was created in July 1999 as a joint venture between

18 Defendant LG Electronics, Inc. and Defendant Koninklijke Philips Electronics N.V.

19 (aka Royal Philips Electronics N.V. or Royal Philips Electronics Inc.)  In July

20 2004, LG Display Co., Ltd. became a public company, with LG Electronics, Inc.

21 and Koninklijke Philips Electronics N.V. as the controlling shareholders.  LG

22 Display Co., Ltd. describes itself as "the global leader in the development and

23 manufacture of TFT-LCD panels for televisions, computer monitors, notebooks and

24 emerging mobile applications."  During the Relevant Period, LG Display Co., Ltd.,

25 Defendant LG Electronics U.S.A., Inc., a Delaware Corporation with its principal

26 place of business in Englewood Cliffs, New Jersey that is the wholly-owned

27 subsidiary of Defendant LG Electronics Inc., Philips Electronics North America

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

81749115.7                           COMPLAINT AND JURY DEMAND

1    Corp. manufactured, sold, and/or distributed TFT-LCD Products to customers
2    throughout the United States.

3          28.    Defendant LG Display America, Inc., formerly known as LG Philips
4    LCD America, Inc., is a California corporation with its principal place of business
5    at 150 East Brokaw Road, San Jose, California.   LG Display America, Inc. is a
6    wholly-owned and controlled subsidiary of LG Display Co., Ltd.   During the
7    Relevant Period, LG Display America, Inc. sold and distributed TFT-LCD Products
8    manufactured by LG Display Co., Ltd. to customers throughout the United States.

9          29.    Defendants LG Display Co., Ltd., LG Display America, Inc., LG
10   Electronics, Inc., LG Electronics U.S.A., Inc., Koninklijke Philips Electronics N.V.
11   (aka Royal Philips Electronics N.V. or Royal Philips Electronics Inc.) are referred
12   to collectively herein as "LG Display."

13   **D.    Taiwanese Defendants**

14         **1.    AU Optronics**

15         30.    Defendant AU Optronics Corporation is a Taiwanese company with its
16   principal place of business at No. 1, Li-Hsin Road 2, Hsinchu Science Park,
17   Hsinchu 30078, Taiwan.   AU Optronics Corporation was created in 2001 by the
18   merger of Acer Display Technology, Inc. and Unipac Electronics, both of which
19   were involved in the manufacture of TFT-LCD Products.   During the Relevant
20   Period, AU Optronics Corporation manufactured, sold, and distributed TFT-LCD
21   Products to customers throughout the United States.

22         31.    Defendant AU Optronics Corporation America ("AU America") is a
23   California corporation with its principal place of business at 9720 Cypresswood
24   Drive, Suite 241, Houston, Texas.   AU America was formerly known as Acer
25   Display Technology America, Inc.   AU America is a wholly-owned and controlled
26   subsidiary of Defendant AU Optronics Corporation.   In 2006, Hsuan Bin Chen, the
27   president and Chief Operating Officer of AU Optronics Corporation, was
28   simultaneously the Chairman of AU America.   During the Relevant Period, AU

81749115.7                          COMPLAINT AND JURY DEMAND

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    America sold and distributed TFT-LCD Products manufactured by AU Optronics to

2    customers throughout the United States.

3        32.    Defendants AU Optronics Corporation and AU America are

4    collectively referred to herein as "AU Optronics."

5            **2.    Chi Mei**

6        33.    Defendant Chi Mei Corporation ("CMC") is a Taiwanese company

7    with its principal place of business located at No. 59-1, San Chia, Jen Te, Tainan

8    County, Taiwan 71702.  CMC is the parent company for all of the Chi Mei entities

9    herein.    During the Relevant Period, CMC manufactured, sold, and distributed

10   TFT-LCD Products to customers throughout the United States.

11       34.    Defendant Chi Mei Optoelectronics Corporation ("CMO") is a

12   Taiwanese company with its principal place of business at No. 3, Sec. 1, Huanshi

13   Road, Southern Taiwan Science Park, Sinshih Township, Tainan County, 74147

14   Taiwan.  It is a subsidiary of CMC.  CMO was formed in 1998, and has since

15   become a major manufacturer of TFT-LCD Products.  During the Relevant Period,

16   CMO manufactured, sold, and distributed TFT-LCD Products to customers

17   throughout the United States.

18       35.    Defendant CMO Japan Co., Ltd. ("CMO Japan") is a Japanese

19   company headquartered at Nansei-Yaesu Bldg. 4F, 2-2-10 Yaesu, Chuo-ku, Tokyo

20   104-0028, Japan.    Until approximately 2006, CMO Japan was known as

21   International Display Technology, Ltd.  CMO Japan is a wholly-owned and

22   controlled subsidiary of Defendant CMO.  CMO Japan has been in the TFT-LCD

23   business since 2001.  During the Relevant Period, CMO Japan manufactured, sold,

24   and distributed TFT-LCD Products throughout the United States.

25       36.    Defendant Chi Mei Optoelectronics USA, Inc. ("CMO USA") is a

26   Delaware corporation with its principal place of business at 101 Metro Drive, Suite

27   510, San Jose, California.  Until approximately 2006, CMO USA was known as

28   International Display Technology U.S.A., Inc.  CMO USA is a wholly-owned and

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   controlled subsidiary of Defendant CMO Japan.  The Chairman of CMO USA in

2   2006, Chen-Lung Kuo, was previously the Chairman of CMO Japan's predecessor,

3   and in or about 2007 became Vice President in charge of sales and marketing for

4   CMO.  Similarly, the President of CMO USA in 2006, Junichi Ishii, was previously

5   the President of CMO Japan's predecessor.  During the Relevant Period, CMO

6   USA sold and distributed TFT-LCD Products manufactured by CMO Japan to

7   customers throughout the United States.

8        37.   Defendant Nexgen Mediatech, Inc. ("Nexgen") is a Taiwanese

9   company with its principal place of business at No. 11-2, Jen Te 4th St., en Te

10  Village Jen Te, Tainan 717 Taiwan.  Nexgen is a wholly-owned and controlled

11  subsidiary of CMC.  During the Relevant Period, Nexgen sold and distributed TFT-

12  LCD Products manufactured by CMO to customers throughout the United States.

13       38.   Defendant Nexgen Mediatech USA, Inc. ("Nexgen USA") is a

14  California corporation with its principal place of business at 16712 East Johnson

15  Drive, City of Industry, California.  Nexgen USA is a wholly-owned and controlled

16  subsidiary of CMC.  During the Relevant Period, Nexgen USA sold and distributed

17  TFT-LCD Products manufactured by CMO to customers throughout the United

18  States.

19       39.   Defendants CMC, CMO, CMO Japan, CMO USA, Nexgen, and

20  Nexgen USA are referred to collectively herein as "Chi Mei."

21       **3.   Chunghwa**

22       40.   Defendant Chunghwa Picture Tubes, Ltd. is a Taiwanese company

23  with its principal place of business at 1127 Heping Road, Bade City, Taoyuan,

24  Taiwan.  It is a subsidiary of Tatung Company, a consolidated consumer electronics

25  and information technology company based in Taiwan.  Chunghwa Picture Tubes,

26  Ltd.'s Board of Directors includes representatives from Tatung Company.  The

27  Chairman of Chunghwa Picture Tubes, Ltd., Weishan Lin, is also the Chairman and

28  General Manager of Tatung Company.  During the Relevant Period, Chunghwa

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    Picture Tubes, Ltd. manufactured, sold, and distributed TFT-LCD Products to
2    customers throughout the United States.

3         41.    Tatung Company of America, Inc. ("Tatung America") is a California
4    corporation with its principal place of business at 2850 El Presidio Street, Long
5    Beach, California. Tatung America is a subsidiary of Tatung Company. Currently,
6    Tatung Company owns approximately half of Tatung America. The other half is
7    owned by Lun Kuan Lin, the daughter of Tatung Company's former Chairman, T.S.
8    Lin. During the Relevant Period, Tatung America sold and distributed TFT-LCD
9    Products manufactured by Chunghwa Picture Tubes, Ltd. to customers throughout
10   the United States.

11        42.    Defendants Chunghwa Picture Tubes, Ltd. and Tatung America are
12   referred to collectively herein as "Chunghwa."

13        **4.    HannStar**

14        43.    Defendant HannStar Display Corporation ("HannStar") is a Taiwanese
15   company with its principal place of business at No. 480, Rueiguang Road, 12th
16   Floor, Neihu Chiu, Taipei 114, Taiwan. HannStar has been in the business of
17   manufacturing and selling TFT-LCD Products since 1998. During the Relevant
18   Period, HannStar manufactured, sold, and distributed TFT-LCD Products to
19   customers throughout the United States.

20   **IV.   AGENTS AND CO-CONSPIRATORS**

21        44.    The acts alleged against the Defendants in this Complaint were
22   authorized, ordered, or done by their officers, agents, employees, or representatives,
23   while actively engaged in the management and operation of Defendants' businesses
24   or affairs.

25        45.    Each Defendant acted as the principal, agent, or joint venturer of, or
26   for, other Defendants with respect to the acts, violations, and common course of
27   conduct alleged by Plaintiffs, for which they are liable as co-conspirators including
28   because of their participation in and acts in furtherance of the conspiracy.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

81749115.7                                              COMPLAINT AND JURY DEMAND

46.     Various persons and/or firms not named as Defendants in this Complaint are believed to have participated as co-conspirators in the violations alleged herein and to have performed acts and made statements in furtherance thereof, all of the names and acts are within the exclusive knowledge of the defendants.

47.     Co-conspirator Epson Imaging Devices Corporation ("Epson Japan") is a Japanese company with its principal place of business at 4F Annex, World Trade Center Building, 2-4-1 Hamamatsu-cho, Minato-ku, Tokyo 105-6 104 Japan. Until approximately December 28, 2006, Epson Japan was known as Sanyo Epson Imaging Devices Corporation.   The company was originally formed as a joint venture between Seiko Epson Corporation and Sanyo Electric Co., Ltd. but is now a wholly-owned subsidiary of Seiko Epson Corporation.     During the Relevant Period, Epson Japan manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States.

48.     Co-conspirator Hydis Technologies Co., Ltd., formerly known as BOE Hydis Technology Co., Ltd. ("Hydis"), is a Korean manufacturer of TFT-LCD Products.   The company originated in 1989 as the LCD business division of Hyundai Electronics Industries Co. ("Hyundai").   It spun-off from Hyundai in 2001, and it was subsequently acquired by the BOE Group. On September 18, 2006, Hydis filed for Court Receivership in South Korea.   During the Relevant Period, Hydis manufactured, sold, and distributed TFT-LCD Products to customers throughout the United States.

49.     Co-conspirator IPS Alpha Technology, Ltd. ("IPS Alpha") is a Japanese entity with its principal place of business at 3732 Hayano, Mobara-shi, Chiba 297-0037, Japan.  IPS Alpha was formed in January 2005 as a joint venture that included Hitachi Displays, Ltd., and Panasonic Corporation to manufacture and sell TFT-LCD panels for televisions.   During the Relevant Period, IPS Alpha

81749115.7

COMPLAINT AND JURY DEMAND

1  manufactured, sold, and distributed TFT-LCD Products to customers throughout
2  the United States.

3        50.    Co-conspirator Mitsubishi Electric Corporation ("Mitsubishi") is a
4  Japanese entity with its principal place of business located at 2-7-3 Marunouchi,
5  Chiyoda-ku, Tokyo 100-83 10, Japan.  Mitsubishi was an early developer of TFT-
6  LCD technology, and in 1991, it entered into a joint venture with Asahi Glass Co.,
7  Ltd. to mass produce TFT-LCD panels. Mitsubishi owned 80 percent of the joint
8  venture, called Advanced Display Incorporated.  In September 1999, Mitsubishi
9  purchased Asahi Glass' stake in Advanced Display Incorporated, making it a
10  wholly-owned subsidiary.  During the Relevant Period, Mitsubishi manufactured,
11  sold, and distributed TFT-LCD Products to customers throughout the United States.

12        51.    Co-conspirator Mitsui & Co., Ltd. ("Mitsui") is a Japanese entity with
13  its principal place of business at Building 2-1, Ohtemachi 1-chome, Chiyoda-ku,
14  Tokyo 100-0004, Japan.  Mitsui, known as Mitsui Bussan Kabashiki Kaisha in
15  Japanese, is a trading house for a diverse group of products.  During the Relevant
16  Period, Mitsui sold and distributed TFT-LCD Products to customers throughout the
17  United States.

18        52.    Co-conspirator NEC LCD Technologies, Ltd. ("NEC") is a Japanese
19  company with its principal place of business at 1753 Shimonumabe, Nakahara-Ku,
20  Kawasaki, Kangawa, 211-8666, Japan.  It has been in the TFT-LCD business since
21  1993.  During the Relevant Period, NEC manufactured, sold, and distributed TFT-
22  LCD Products to customers throughout the United States.

23        53.    Co-conspirator Panasonic Corporation ("Panasonic"), is a Japanese
24  entity with its principal place of business at 1006 Oaza Kadoma, Kadoma, Osaka
25  571-8501, Japan.  Until approximately October 1, 2008, Panasonic was known as
26  Matsushita Electric Industrial Co., Ltd.  Panasonic holds a minority stake in two
27  joint ventures – including IPS Alpha.  During the Relevant Period, Panasonic
28  manufactured, sold, and distributed TFT-LCD Products to customers throughout

1    the United States.

2        54.    Co-conspirator Panasonic Corporation of North America, formerly

3    known as Matsushita Electric Corporation of America, is a Delaware corporation

4    with its principal place of business at 1 Panasonic Way, Secaucus, New Jersey.

5    Panasonic Corporation of North America is a wholly-owned and controlled

6    subsidiary of co-conspirator Panasonic. During the Relevant Period, Panasonic

7    Corporation of North America sold and distributed TFT-LCD Products

8    manufactured by Panasonic to customers throughout the United States.

9    **V.    TRADE AND COMMERCE**

10        55.    During the Relevant Period, each Defendant, or one or more of its

11    subsidiaries, sold TFT-LCD Products in the United States in a continuous and

12    uninterrupted flow of interstate commerce and foreign commerce, including

13    through and into this judicial district.

14        56.    During the Relevant Period, Defendants collectively controlled the

15    vast majority of the market for TFT-LCD Products, both globally and in the United

16    States.

17        57.    The business activities of the Defendants substantially affected

18    interstate trade and commerce in the United States and caused antitrust injury in the

19    United States.

20    **VI.    FACTUAL ALLEGATIONS**

21        **A.    TFT-LCD Technology**

22        58.    The technology behind TFT-LCDs is not new.    In the 1950s and

23    1960s, RCA Corp. researched whether liquid crystals could be the basis for a new,

24    lightweight, low-power display technology. In the 1970s, after RCA Corp.

25    discontinued its efforts, Japanese companies took the lead in commercializing

26    liquid crystal technology.    These efforts resulted in monochrome calculators and

27    watches. By at least the early 1990s, liquid crystal technology was introduced in

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   notebook computers and small, low-resolution televisions. In the mid-1990s, the

2   technology advanced further with the development of TFT-LCDs.

3        59.   The basic structure of a TFT-LCD panel is two pieces of glass, called

4   substrates, sandwiching a layer of liquid crystal compound.  The resulting screen

5   contains hundreds of thousands of electrically charged dots, called pixels, that form

6   an image.  The panel is then combined with a backlight unit, a driver, and other

7   equipment to create a "module" allowing the panel to operate and be integrated into

8   a television, computer monitor or one of numerous other products.  Liquid crystals

9   change orientation under an applied electric field and can thereby block or pass

10  light.  One glass substrate has thin chemical films that act as transistors, and the

11  other glass substrate is coated with liquid pigments that act as color filters.  When

12  voltage is applied to the transistors, the liquid crystal bends, causing light to pass

13  through the filters to create red, green, or blue pixels.  Pixels are the smallest unit in

14  a picture image, and the density of pixels in a display determines the resolution.

15       60.   The term "active matrix" describes the ability to switch each pixel in a

16  display individually.  Unlike older LCDs that have one transistor for each row and

17  column of pixels, TFT-LCDs have a transistor for each pixel.  Thus, the term

18  "active-matrix LCD" is sometimes used interchangeably with TFT-LCD.  Active

19  matrix displays are brighter and sharper than passive matrix displays of the same

20  size.

21       61.   The glass substrates used for TFT-LCD panels begin with a

22  "motherglass," a sheet of glass that is cut to make multiple panels.  TFT-LCDs are

23  manufactured in fabrication plants, sometimes referred to as "fabs," that are

24  equipped to handle a particular size motherglass.  Technological innovations over

25  time have allowed manufacturers to begin the manufacturing process with larger

26  and larger motherglass.  This, in turn, has resulted in the ability to fabricate larger

27  and/or more TFT-LCD panels.  Each increase in motherglass size is described as a

28  generation.  Third generation fabs in the 1998 to 1999 period typically utilized 550

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

millimeter ("mm") by 650 mm motherglass, while some current (eighth generation) fabs utilize 2160 mm by 2460 mm motherglass. The use of larger motherglass provides substantial cost savings to manufacturers.

62.     TFT-LCDs are capable of producing the same image as cathode ray tubes ("CRTs"), but in a much smaller package. TFT-LCDs also have lower energy requirements, are generally easier to read, and do not flicker like CRTs. TFT-LCD panels of approximately 10 inches or less in diagonal are considered "small" or "medium" displays. They are also referred to as "mobile displays." These displays are commonly used in cell phones, personal digital assistants, and cameras.

63.     TFT-LCDs of 10 inches in diagonal and larger are considered "large-area displays." Large-area displays are most commonly used for desktop computer monitors, notebook computers, and televisions. The core products during most of the Relevant Period were displays for notebook computers and computer monitors. But TFT-LCDs were also used in many other types of products requiring a visual user interface, such as cell phones and point of sale terminals. During much of the Relevant Period, 14-inch and 15-inch notebook computers and 15-inch to 17-inch computer monitors were the most popular TFT-LCD Products, representing as much as 80 percent of all TFT-LCDs produced for notebook computers or computer monitors.

**B.     Structure of the TFT-LCD Industry**

64.     The TFT-LCD industry has several characteristics that facilitated a conspiracy, including market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, heightened price sensitivity to supply and demand forces, and homogeneity of products.

**1.     Market Concentration**

65.     The market for TFT-LCD Products is enormous. A September 28, 2006 Reuters article reported that "[m]anufacturers are expected to pump out 48.4

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    million LCDs for TVs this year alone, up 70 percent over 2005, while flat-panel
2    sales -- most of those using LCD technology – are expected to reach $US 88 billion
3    this year and $US 100 billion in 2007."

4        66.    Despite its enormous size, the TFT-LCD industry is highly
5    concentrated, a factor that is conducive to the type of collusive activity alleged by
6    Plaintiff.   In 2005, the top five suppliers – including LG Display, Sharp, AU
7    Optronics, and Chi Mei – collectively shipped 90 percent of all TFT-LCD panels
8    for television use. According to estimates in late 2006 from industry analyst iSuppli
9    Corporation ("iSuppli"), LG Display had the greatest share of LCD television
10   shipments in the first quarter of 2006 (22.3%), followed by Chi Mei (18.7%), AU
11   Optronics (16.8%), and Sharp (13.9%). These companies were four of the largest
12   producers as measured by market share during much of the Relevant Period.

13               **2.    Information Sharing**

14       67.    Because of Defendants' common membership in trade associations,
15   interrelated business arrangements such as joint ventures, allegiances between
16   companies in certain countries, and relationships between the executives of certain
17   companies, there were many opportunities during the Relevant Period for
18   Defendants to discuss and exchange competitive information.   Defendants took
19   advantage of these opportunities through meetings, telephone calls, e-mails, and
20   instant messaging.   Plaintiffs are informed and believe and allege that Defendants
21   took advantage of these opportunities to discuss, and agree upon, their pricing for
22   TFT-LCD Products as alleged below.

23       68.    Additionally, the TFT-LCD industry is analyzed by several market
24   research firms.   Each of these firms offers, for a fee, monthly market data on
25   pricing, supply, utilization of fabs, and other key indicators of market activity. The
26   capacity and pricing data reported by these firms comes directly from
27   manufacturers.  Manufacturers typically report historical, current, and perhaps most
28   importantly, prospective information.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

69.     Defendants thus had access to each other's future plans for bringing new capacity on line, capacity utilization, market share, pricing, and the advent of new technology.  Because so few companies had to be analyzed in order to obtain this data, all competitors in the TFT-LCD market had ready and timely access to reliable information about their direct competitors' pricing as well as future supply and capacity decisions.   Plaintiffs are informed and believe and allege that by meeting together as alleged below, as well as monitoring and analyzing this competitive information over time, participants in the conspiracy were able to signal their respective intent, verify that the conspiracy was working, and identify and prevent defection from the conspiracy.

### 3.     Market Consolidation

70.     The TFT-LCD industry experienced significant consolidation during the Relevant Period, including:  (a) the creation of AU Optronics in 2001 through the merger of Acer Display and Unipac Electronics; (b) Fujitsu, Ltd.'s transfer of its LCD business to Sharp in 2005; (c) the formation of IPS Alpha in 2005 by Hitachi and Panasonic; and (d) AU Optronics' acquisition in 2006 of Quanta Display, which resulted in AU Optronics becoming the third-largest manufacturer of TFT-LCD Products.

### 4.     Multiple Interrelated Business Relationships

71.     The industry involves a web of cross-licensing agreements, joint ventures, and other cooperative arrangements that facilitate collusion.   AU Optronics, for example, entered into licensing arrangements with Sharp in 2005. Chunghwa did the same with Sharp in December of 2006.  Chi Mei has licensing arrangements with Sharp, AU Optronics, Chunghwa, HannStar and Hitachi.

72.     The industry is close-knit.  Multiple business relationships between supposed competitors blur the lines of competition and provided ample opportunity for collusion.  These relationships created a unity of interest among competitors so

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    that the conspiracy was easier to implement and enforce than if such

2    interrelationships did not exist.

3             **5.**     **Significant Barriers to Market Entry Into the TFT-LCD**

4                 **Industry**

5        73.     There are significant manufacturing and technological barriers to entry

6    into the TFT-LCD industry.   Efficient fabs are large and costly.   TFT-LCD

7    Products are extremely vulnerable to technological advances, so research and

8    development costs are substantial.   DisplaySearch, a research firm in Austin, Texas

9    that covers the TFT-LCD industry, reported in September 2005 that the top TFT-

10   LCD manufacturers collectively spend $30 million a day on property, plant, and

11   equipment.   A January 2006 DisplaySearch report noted that a typical seventh-

12   generation fab can cost more than $3 billion.

13        74.     During the Relevant Period, the costs of the assembly components,

14   declined overall, substantially in some periods.   Later in the conspiracy,

15   approximately 70 percent of the cost of TFT-LCD panel production was attributable

16   to the cost of raw materials.   Pricing coordination and manipulation of the output of

17   TFT-LCD Products allowed Defendants to keep prices above what they would have

18   been but for the conspiracy.

19             **6.**     **The "Crystal Cycle"**

20        75.     In the TFT-LCD industry, the supply-and-demand cycle is known as

21   the "crystal cycle."   The cycle has been described as "boom or bust," alternating

22   between oversupply and shortages, which drive prices for TFT-LCD Products up

23   and down.   Among other things, the perceived demand for such products , whether

24   manufacturers have correctly gauged demand in determining how much capacity to

25   build and use, and how many TFT-LCD Products to produce, determines whether

26   supply is inadequate, optimal, or excessive.

27        76.     Another factor is the entry of new competitors into the market. When a

28   new competitor enters a market, it brings incremental production online, thereby

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    adding supply, and prices drop until an equilibrium is reached.  In the TFT-LCD

2    industry, however, Plaintiffs are informed and believe and allege that Defendants

3    conspired to rein in and discipline these new entrants until they assimilated into the

4    conspiracy.  This pressure on new market entrants had the effect of both tempering

5    price drops and preventing competition from creating a market equilibrium that

6    normally follows such drops.

7        77.    The conspiracy did not completely eliminate the effects of the crystal

8    cycle in the TFT-LCD industry.  There were periods when Defendants' collusive

9    practices drove prices for TFT-LCD Products so high that demand decreased to a

10    point where Defendants lowered prices for short periods of time.  However,

11    Defendants' efforts to stabilize prices were successful in moderating the effects of

12    the crystal cycle, including the impact on prices paid by direct and indirect

13    purchasers.  To the extent that prices for TFT-LCD Products fell, they fell from

14    levels that were supra-competitive and had been set conspiratorially, rather than

15    from levels set by free and open competition.  Additionally, prices did not fall as

16    low as they would have absent the conspiratorial conduct.

17        **7.**   **Dominant Products**

18        78.    Notwithstanding the various and varied applications for TFT-LCDs,

19    Defendants have a consistent and uniform methodology to monitor, analyze,

20    discipline, and enforce their conspiracy.  They can look at the predominant, or most

21    popular, size panels and the applications for those panels that represent the highest

22    percentage of sales. They can look at standardized statistics used in the industry,

23    such as the amount of glass produced and revenues per metric ton of glass. By

24    using these, and other industry analytics, Defendants could easily monitor, analyze,

25    discipline, and enforce their conspiracy.

26        79.    For example, from the fourth quarter of 1999 through mid-2003, half

27    or more of the TFT-LCD monitor shipments were 15-inch monitors. From mid-

28    2003 to early 2006, 17-inch monitors were the predominant size. As for TFT-LCD

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   televisions, from the fourth quarter of 1999 through the fourth quarter of 2000,
2   shipments were predominantly of 10-inch to 14-inch models.   During 2001 and
3   much of 2002, sales of 13-inch to 15-inch models dominated.   And in 2004 and
4   2005, the majority of shipments were of 20-inch and 32-inch models.

5   **C.   Pre-Conspiracy Market**

6      80.   Until the mid-1990s, Japanese companies like Hitachi and Sharp were
7   essentially the exclusive suppliers of TFT-LCD panels.

8      81.   In early 1995, the industry faced declining TFT-LCD panel prices,
9   which industry analysts attributed to advances in technology and improving
10   efficiencies.   One analyst in this period noted that the "flat panel display industry is
11   following the classic cyclical business pattern of the semiconductor industry."   The
12   Japanese manufacturers realized that the capacity growth from investing in new
13   plants was weakening the price of TFT-LCDs, and they slowed the rate of their
14   investments.   But this provided an opening to Korean manufacturers.

15      82.   In 1995, three Korean companies – including LG Electronics, Inc. and,
16   to a lesser extent, Hyundai – entered the TFT-LCD market.   These Korean firms
17   offered comparable products at reduced prices in an effort to quickly gain market
18   share.   This resulted in increased industry competition in 1995, which contributed
19   to the significant price declines seen during that timeframe.

20      83.   Increases in manufacturing capacity and decreases in manufacturing
21   costs seemed to assure continuing price declines.   By mid-1995, the Japanese
22   companies and their new Korean competitors had a total capacity to supply 14
23   million TFT-LCD panels, while demand for them was only about three million.   In
24   addition to the surges in capacity during 1995, "[costs] were also dropping as
25   production volume increased and manufacturing methods improved."

26      84.   By late 1995, the effect of the entry by Korean suppliers had pushed
27   the price of some TFT-LCD panels down by 50 percent from the previous year.
28   The origin of the TFT-LCD conspiracy may be traceable to this trough in prices.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

**D.    Defendants' and Co-Conspirators' Illegal Agreements**

85.    Plaintiffs are informed and believe and allege that the TFT-LCD conspiracy was effectuated through a combination of group and bilateral discussions.   In the formative years, when the Japanese Defendants first entered into the conspiracy, bilateral discussions were the primary method of communication.   During this period of the conspiracy, Hitachi and Sharp met or talked to at least one other Defendant about the prices for TFT-LCD Products, and thereby created a model for how the conspiracy would be carried out after the Korean, and later the Taiwanese Defendants joined.   These meetings among Hitachi and Sharp included the discussion of price as well as capacity utilization.   During these discussions, said Defendants also shared proprietary and confidential information.    As more manufacturers entered the conspiracy, however, group meetings became more prevalent, until by 2001 a formal system of multilateral meetings was in place.

**1.    "Crystal Meetings"**

86.    Plaintiffs are informed and believe and allege that the group meetings among the participants in the TFT-LCD price-fixing conspiracy were referred to as "crystal meetings."   Crystal meetings were attended by employees at three general levels of the Defendants' corporations.   The first level of these meetings were attended by the Chief Executive Officers or Presidents, and were known as "CEO" or "top" meetings.   The second level were management-level meetings, referred to as "commercial" or "operation" meetings.   The third level were meetings attended by lower-level sales and marketing personnel.

87.    Plaintiffs are informed and believe and allege that in a typical crystal meeting, the participants established a meeting agenda that included a discussion of the past month's producer shipments, customer demand, capacity utilization, and prices.   Meeting participants shared information relating to all of these topics so that Defendants could agree on what price each would charge for TFT-LCD panels

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

to be sold in the following month.  Meeting participants discussed and agreed upon target prices, floor prices, and price ranges for TFT-LCD panels.  They also discussed prices of TFT-LCD panels that were sold to specific customers, and agreed upon target prices to be used in negotiations with large customers.

88.   Plaintiffs are informed and believe and allege that each of the participants in these meetings knew, and in fact discussed, the significant impact that the price of TFT-LCD panels has on the cost of the finished products into which they are placed.  Defendants knew that the conspiratorially high, supra-competitive prices of TFT-LCD panels would be reflected in the prices for finished TFT-LCD Products, and thus, there was no need to specifically discuss the prices of finished TFT-LCD Products.

89:   Plaintiffs are informed and believe and allege that the purpose of the CEO or top meetings was to stabilize or raise prices.  At the CEO meetings, the participants discussed prices and supply and demand.   The participants also discussed monthly and quarterly TFT-LCD fab output and supply figures, as well as the number of production days the fabs would operate for the next month, and agreed on output restrictions.  At each meeting, an individual was designated as the "chairman," and would put figures on supply and demand and price on a projector or a whiteboard for the group to review. The attendees would discuss the figures, and take turns making comments and adjusting the numbers.  At some point during the meeting, the participants would reach an agreement on price.

90.   Plaintiffs are informed and believe and allege that the commercial or operation meetings were attended by the Defendants' respective Vice Presidents of sales and marketing and other senior sales employees.  The structure and content of the commercial meetings was largely the same as the CEO meetings.   The participants discussed price, output, capacity, and general market conditions.  These meetings occurred approximately monthly and sometimes quarterly.

- 25 -
COMPLAINT AND JURY DEMAND

1    91.    Plaintiffs are informed and believe and allege that the agreements
2  reached at these meetings included: (1) establishing target prices, floor prices, and
3  price ranges; (2) placing agreed-upon values on various attributes of panels, such as
4  quality or certain technical specifications; (3) what to tell customers as the reason
5  for price increases; (4) coordinating public statements regarding anticipated supply
6  and demand; (5) exchanging information about fabrication plant utilization and
7  production capacity; and (6) encouraging other competitors to abide by the agreed-
8  upon pricing.  The meeting participants also agreed to maintain or lower production
9  capacity.

10    92.    Plaintiffs are informed and believe and allege that the lower level
11  meetings were less formal than the CEO and commercial meetings, and typically
12  occurred at restaurants over lunch.  The purpose of the lower level meetings was to
13  exchange market information that would facilitate implementation of the conspiracy
14  and carry out the agreements made at the CEO and commercial meetings.
15  Participants in the lower level meetings exchanged information relating to past and
16  future prices of TFT-LCD Products and shipment quantities.

17    93.    Plaintiffs are informed and believe and allege that in the summer of
18  2006, Defendants discontinued the lower level meetings in favor of coordinated
19  one-on-one meetings.  The meetings were coordinated so that on the same date, two
20  sets of competitors met one-on-one.  After that meeting, each of them met one-on-
21  one with another competitor.  This continued until all competitors met with each
22  other.  These coordinated meetings took place until approximately November or
23  December 2006.  Defendants' specific intent was to conceal their meetings and for
24  these coordinated one-on-one meetings to accomplish the same purposes as the
25  group meetings.

26    **2.    Bilateral Discussions**

27    94.    Plaintiffs are informed and believe and allege that the crystal meetings
28  were supplemented by bilateral discussions between various Defendants.  The

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   purpose of the bilateral discussions was to exchange information about past and
2   future pricing, as well as information about shipments.

3       95.     Plaintiffs are informed and believe and allege that Defendants had
4   bilateral discussions with each other during price negotiations with customers to
5   ensure no Defendant was persuaded by customers to cut prices. These discussions,
6   usually between sales and marketing employees, took the form of in-person
7   meetings, telephone calls, e-mails, and instant messages, among other things. The
8   information gained in these communications was then shared with supervisors and
9   taken into account in determining the price to be offered.

10      96.     Plaintiffs are informed and believe and allege that bilateral discussions
11  were also used to synchronize prices with manufacturers that did not ordinarily
12  attend the group meetings. For example, HannStar was given responsibility for
13  notifying Hitachi of the pricing agreements reached at the crystal meetings. Hitachi
14  implemented the agreed-upon pricing as conveyed by HannStar. In this way,
15  Hitachi participated in the conspiracy to fix the prices of TFT-LCD Products.

16          3.      Defendants' and Co-Conspirators' Participation in Group
17                  and Bilateral Discussions

18      97.     Plaintiffs are informed and believe and allege that Defendant AU
19  Optronics participated in multiple CEO, commercial, and lower level meetings, as
20  well as bilateral discussions, between at least 2001 and 2006. Additionally, Quanta
21  Display Inc. and Unipac Electronics, which merged with AU Optronics,
22  participated in lower level meetings. Through these discussions, AU Optronics
23  agreed on prices and output levels for TFT-LCD Products.

24      98.     Plaintiffs are informed and believe and allege that Defendant Chi Mei
25  participated in multiple CEO, commercial, and lower level meetings, as well as
26  bilateral discussions, between at least 2001 and 2006. Through these discussions,
27  Chi Mei agreed on prices and output levels for TFT-LCD Products.

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  99. Plaintiffs are informed and believe and allege that Defendant

2 Chunghwa participated in multiple CEO, commercial, and lower level meetings, as

3 well as bilateral discussions, between at least 2001 and 2006. Through these

4 discussions, Chunghwa agreed on prices and output levels for TFT-LCD Products.

5  100. Plaintiffs are informed and believe and allege that Defendant HannStar

6 participated in multiple CEO, commercial, and lower level meetings, as well as

7 bilateral discussions, between at least 2001 and 2006. Through these discussions,

8 HannStar agreed on prices and output levels for TFT-LCD Products.

9  101. Plaintiffs are informed and believe and allege that Defendant Hitachi

10 had multiple bilateral discussions during the Relevant Period, and agreed on prices

11 and output levels for TFT-LCD Panels.

12  102. Plaintiffs are informed and believe and allege that Defendant LG

13 Display participated in multiple CEO, commercial, and lower level meetings, as

14 well as bilateral discussions, between at least 2001 and 2006. Through these

15 discussions, LG Display agreed on prices and output levels for TFT-LCD Products.

16  103. Plaintiffs are informed and believe and allege that Defendant Sharp

17 participated in multiple group and bilateral meetings during the Relevant Period,

18 and agreed on prices and output levels for TFT-LCD Products.

19  104. Plaintiffs are informed and believe and allege that Co-conspirator

20 Hydis participated in multiple lower level meetings between at least 2002 and 2005.

21 In addition, Hydis had a bilateral meeting with a Taiwanese Defendant at least as

22 recently as 2005. Through these discussions, Hydis agreed on prices and output

23 levels for TFT-LCD Products.

24  105. Plaintiffs are informed and believe and allege that Co-conspirator

25 Mitsubishi participated in multiple lower level meetings in 2001 with Chi Mei,

26 Chunghwa, and Unipac Electronics (later AU Optronics). Through these meetings,

27 Mitsubishi agreed on prices and output levels for TFT-LCD Products.

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

106.   Plaintiffs are informed and believe and allege that Co-conspirator Mitsui had at least one bilateral meeting, which included a discussion about customers and future pricing, with a Taiwanese Defendant in 2001. Mitsui was acting as an agent for co-conspirator Epson Japan in this discussion. Mitsui and Epson Japan agreed on prices and output levels for TFT-LCD Products.

107.   Plaintiffs are informed and believe and allege that Co-conspirator NEC participated in meetings or discussions during the Relevant Period with at least one other Defendant or co-conspirator, which included discussions about prices for TFT-LCD Products.

108.   When Plaintiffs refer to a corporate family or companies by a single name in its allegations of participation in the conspiracy, it is to be understood that the Plaintiffs are informed and believe and are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial meetings on behalf of every company in that family. In fact, the individual participants in the conspiratorial meetings and discussions did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. Plaintiffs are informed and believe and allege that the individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their respective corporate families. As a result, the entire corporate family was represented in meetings and discussions by their agents and were parties to the agreements reached in them. Furthermore, to the extent that subsidiaries within the corporate families distributed TFT-LCD Products to direct and indirect purchasers, these subsidiaries played a significant role in the conspiracy because Defendants wished to ensure that the prices for such products paid by direct and indirect purchasers would not undercut the pricing agreements reached at these various meetings. Thus, all entities within the corporate families were active, knowing participants in the alleged conspiracy.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1      109. Defendant Epson America is a wholly-owned and controlled

2 subsidiary of co-conspirator Epson Japan and, as alleged above, Plaintiffs are

3 informed and believe and allege that Epson Japan was represented by co-

4 conspirator Mitsui at one of the bilateral meetings described above. Mitsui served

5 as an agent of, and under the direction of, Epson Japan and Epson America. Epson

6 Japan and Epson America, through their agent, were parties to the agreements made

7 at these meetings and acted as co-conspirators. In addition, to the extent Epson

8 America distributed TFT-LCD Products to direct and indirect purchasers, it played

9 a significant role in the conspiracy because Defendants wished to ensure that the

10 prices for such products paid by direct and indirect purchasers did not undercut the

11 pricing agreements reached at these various meetings. Epson America was an

12 active, knowing participant in the alleged conspiracy.

13      110. Plaintiffs are informed and believe and allege that Co-conspirator IPS

14 Alpha is a joint venture including Hitachi Displays, Ltd. and Panasonic, and one or

15 more of the partners in this joint venture participated in the meetings described

16 above. As a result, IPS Alpha was represented at those meetings and was a party to

17 the agreements entered into by its joint venture partners at them. As explained

18 above, the agreements at these meetings included agreements on price ranges and

19 output restrictions. The joint venture partners had substantial control over IPS

20 Alpha's production levels and the prices of TFT-LCD Products the joint ventures

21 sold both to the joint venture partners and other non-affiliated companies. Thus,

22 IPS Alpha and Panasonic were active, knowing participants in the alleged

23 conspiracy.

24     **E.**    **International Government Antitrust Investigations**

25      111. Defendants' conspiracy to artificially restrict the output of, and to raise

26 the prices for, TFT-LCD Products sold in the United States during the Relevant

27 Period, is demonstrated by a multinational investigation commenced by the United

28

COMPLAINT AND JURY DEMAND

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    States Department of Justice ("DOJ" or "Antitrust Division") and others in late
2    2006.

3        112. In December of 2006, government authorities in Japan, Korea, the
4    European Union, and the United States revealed the existence of a comprehensive
5    investigation into anti-competitive activity among TFT-LCD manufacturers. In a
6    December 11, 2006 filing with the Securities and Exchange Commission,
7    Defendant LG Display disclosed that officials from the Korea Fair Trade
8    Commission and Japanese Fair Trade Commission ("JFTC") had visited the
9    company's Seoul and Tokyo offices and that the DOJ had issued a subpoena to its
10    San Jose office.

11        113. On December 12, 2006, news reports indicated that in addition to LG
12    Display, TFT-LCD makers Sharp, Epson, and AU Optronics were also under
13    investigation. The JFTC stated that the probe was related to price-fixing. On that
14    same date, the European Commission confirmed publicly that it as well was
15    investigating the possibility of a cartel agreement and price-fixing among
16    manufacturers of TFT-LCD Products.

17        **F.   United States Department of Justice Indictments and Charges**

18        114. Beginning in late 2008, the DOJ began to announce a series of charges
19    against and indictments of some of the Defendants related to their involvement in a
20    conspiracy to fix prices of TFT-LCD panels sold in the United States and
21    elsewhere.

22            **1.    November 12, 2008 DOJ Announcement: LG, Sharp, and**
23            **Chunghwa Plead Guilty to Global TFT-LCD Price-Fixing**
24            **Conspiracy.**

25        115. On November 12, 2008, the DOJ announced that it had reached
26    agreements with three TFT-LCD manufacturers – LG Display Co. Ltd. (and its U.S.
27    subsidiary, LG Display America Inc.), Sharp Corporation, and Chunghwa Picture
28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    Tubes, Ltd. – to plead guilty and pay a total of $585 million in criminal fines for

2    their roles in the conspiracy to fix prices of TFT-LCD panels.

3                    **a.      Defendant LG Display**

4        116.   On December 15, 2008, LG Display Co. Ltd and LG Display America

5    Inc. pleaded guilty to "participating in a conspiracy to suppress and eliminate

6    competition by fixing the prices of TFT-LCD sold in the United States and

7    elsewhere, from on or about September 21, 2001, to on or about June 1, 2006, in

8    violation of the Sherman Antitrust Act, 15 U.S.C. § 1" and agreed to pay a criminal

9    fine of $400 million, at the time the second-highest criminal fine ever imposed by

10   Antitrust Division of the U.S. Department of Justice.

11       117.   The DOJ had charged LG Display Co., Ltd. and LG Display America

12   Inc. with carrying out the conspiracy by:

13       a.      participating in meetings, conversations, and communications in

14               Taiwan, Korea and the United States to discuss the prices of TFT-LCD

15               panels;

16       b.      agreeing during those meetings, conversations and communications to

17               charge prices for TFT-LCD panels at certain pre-determined levels;

18       c.      issuing price quotations in accordance with the agreements reached;

19               and

20       d.      exchanging information on sales of TFT-LCD panels, for the purpose

21               of monitoring and enforcing adherence to the agreed-upon prices

22               monitoring and enforcing adherence to the agreed-upon prices.

23       118.   In its plea agreement, LG Display admitted that "through its officers

24   and employees, including high-level personnel of the defendant, [it] participated in

25   a conspiracy among major TFT-LCD producers, the primary purpose of which was

26   to fix the price of TFT-LCD sold in the United States and elsewhere."

27       119.   LG Display further admitted that "through its officers and employees,

28   [it] engaged in discussions and attended meetings, including group meetings

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  commonly referred to by the participants as 'crystal meetings,' with representatives
2  of other major TFT-LCD producers."

3      120. LG Display admitted that it was "[d]uring these discussions and
4  meetings, [that] agreements were reached to fix the price of TFT-LCD to be sold in
5  the United States and elsewhere."

6      121. During the plea hearing, The Honorable Susan Illston, of the United
7  States District Court for the Northern District of California, asked Mr. J.T. Hong,
8  authorized by the LG Display board to accept the plea agreement, if the facts
9  contained in the plea agreement were true. Mr. Hong stated, "Yes, true."

10      122. The United States did not seek restitution in light of the civil cases
11  filed against LG Display in the United States District Court for the Northern
12  District of California.

13      123. The United States agreed not to bring further criminal charges against
14  LG Display or its current or former officers, directors, and employees (except those
15  excluded from the plea agreement) because LG Display and its executives agreed
16  "to cooperate fully in the ongoing TFT-LCD investigation."

17              **b.    Defendant Sharp Corporation**

18      124. On December 16, 2008, Sharp Corporation pleaded guilty and agreed
19  to pay a $120 million fine for its participation in conspiracies to fix the price of
20  TFT-LCD panels sold to Dell, Inc. from April 2001 to December 2006 for use in
21  computer monitors and laptops; to Motorola, Inc. from Autumn 2005 to the middle
22  of 2006 for use in RAZR mobile phones; and to Apple Computer, Inc. from
23  September 2005 to December 2006 for use in iPod portable music players.

24      125. The DOJ had charged Sharp Corporation with carrying out the
25  conspiracy by:

26      a.    participating in bilateral meetings, conversations, and communications
27              in Japan and the United States to discuss the prices of TFT-LCD
28              panels to be sold to Dell, Apple, and Motorola;

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

b.     agreeing   during   those   bilateral   meetings,   conversations   and communications to charge prices of TFT-LCD panels at certain pre-determined levels to Dell, Apple, and Motorola;

c.     issuing price quotations in accordance with the agreements reached; and

d.     exchanging information on sales of TFT-LCD panels to be sold to Dell, Apple, and Motorola for the purpose of monitoring and enforcing adherence to the agreed-upon prices.·

126.   In its plea agreement, Sharp admitted that "through its officers and employees, including high-level personnel of the defendant, [it] participated in a conspiracy among major TFT-LCD producers, the primary purpose of which was to fix the price of TFT-LCD sold" to Dell, Apple, and Motorola.

127.   Sharp further admitted that "through its officers and employees, [it] engaged in bilateral telephone discussions and attended bilateral meetings with representatives of other major TFT-LCD producers."

128.   Sharp admitted that it was "[d]uring these discussions and meetings, [that] agreements were reached to fix the price of TFT-LCD sold to" Dell, Apple, and Motorola.

129.   During the plea hearing, United States District Judge Illston asked Mr. Kazutoshi Goto, corporate representative for the plea agreement, if the facts contained in the plea agreement were true. Mr. Kazutoshi Goto stated, "Yes, it is."

130.   Plaintiffs are informed and believe and allege Sharp could not have successfully fixed the prices of the TFT-LCD panels it sold to Dell and Apple unless its biggest competitors had agreed not to undercut it.

c.     **Defendant Chunghwa Picture Tubes, Ltd.**

131.   On January 14, 2009, Chunghwa Picture Tubes, Ltd. pleaded guilty to "participating in a conspiracy to suppress and eliminate competition by fixing the prices of TFT-LCD sold in the United States and elsewhere, from on or about

September 14, 2001, to on or about December 1, 2006, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1" and agreed to pay a criminal fine of $65 million.

132.   The DOJ had charged Chunghwa Picture Tubes, Ltd. with carrying out the conspiracy by:

a.   participating in meetings, conversations, and communications in Taiwan, Korea, and the United States to discuss the prices of TFT-LCD panels;

b.   agreeing, during those meetings, conversations, and communications, to charge prices for TFT-LCD panels at certain pre-determined levels;

c.   issuing price quotations in accordance with the agreements reached; and

d.   exchanging information on sales of TFT-LCD panels, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

133.   In its plea agreement, Chunghwa admitted that "through its officers and employees, including high-level personnel of the defendant, [it] participated in a conspiracy among major TFT-LCD producers, the primary purpose of which was to fix the price of TFT-LCD sold in the United States and elsewhere."

134.   Chunghwa further admitted that "through its officers and employees, [it] engaged in discussions and attended meetings, including group meetings commonly referred to by the participants as 'crystal meetings,' with representatives of other major TFT-LCD producers."

135.   Chunghwa admitted that it was "[d]uring these discussions and meetings, [that] agreements were reached to fix the price of TFT-LCD to be sold in the United States and elsewhere."

136.   As a result of its guilty plea, the United States and Chunghwa agreed that the "appropriate sentence in this case is a fine of $65 million."

ROBINS, KAPLAN, MILLER, & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

137. The United States did not seek restitution in light of the civil cases filed against Chunghwa in the United States District Court for the Northern District of California.

138. The United States agreed not to bring further criminal charges against Chunghwa or its current or former officers, directors, and employees (except those excluded from the plea agreement) because Chunghwa and its executives agreed "to cooperate fully in the ongoing TFT-LCD investigation."

### 2. January 15, 2009 DOJ Announcement: Three Chunghwa Executives and One LG Display Executive Plead Guilty to Price-Fixing Conspiracy

139. On January 15, 2009, DOJ charged Chang Suk "C.S." Chung, a Korean LG Display executive, with conspiring with "unnamed employees from other panel makers to suppress and eliminate competition by fixing the prices of TFT-LCD panels from on or about Sept. 21, 2001 to on or about June 1, 2006." Similarly, DOJ charged Chieng-Hon "Frank" Lin, the Taiwanese former Chunghwa Chairman and Chief Executive Officer, Chih-Chun "C.C." a Taiwanese former Chunghwa Vice President of LCD Sales—and Hsueh-Lung "Brian" Lee, a Taiwanese current Chunghwa executive and former Vice President of LCD Sales, with participating in the same conspiracy at various times during the period from September 14, 2001 to on or about December 1, 2006.

140. The DOJ charged the executives with carrying out the conspiracy by:

a. participating in meetings, conversations, and communications in Taiwan, Korea, and the United States to discuss the prices of TFT-LCD;

b. agreeing, during those meetings, conversations, and communications, to charge prices of TFT-LCD at certain predetermined levels;

c. issuing price quotations in accordance with the agreements reached;

d.   exchanging information on sales of TFT-LCD, for the purpose of monitoring and enforcing adherence to the agreed-upon prices; and

e.   authorizing, ordering, and consenting to the participation of subordinate employees in the conspiracy.

141.   Chang Suk Chung, LG Display's former Vice President of Monitor Sales, pleaded guilty and agreed to serve a seven-month prison sentence in the United States and pay a $25,000 criminal fine.

142.   During Mr. Chung's plea hearing on February 17, 2009, Judge Illston asked him what he did that made him guilty of the crime.  He stated the following:

> While I was in that position [VP of monitor panel sales LG Display], I met and had phone calls with the representative of competitors.  And in the course of those activities or meetings, I reached an agreement or understanding with the competitors to raise or stabilize or maintain price on those panels.  That's what I have done.

143.   Chieng-Hon Lin, Chunghwa's former Chairman and CEO, pleaded guilty and agreed to serve a nine-month prison sentence in the United States and pay a $50,000 criminal fine.

144.   During Mr. Lin's plea hearing on February 20, 2009, Judge Illston asked him what he did that made him guilty of the crime.  He stated the following:

> Shortly after I became Chunghwa picture tubes, the chairman and CEO, at that time I start -- I learned that the vice president for sales and marketing and other Chunghwa executives were meeting with the representative with our competitors and exchanging price information and agreed on the target prices of TFT-LCD to be charged our customers.
>
> And then, when I was -- those meetings, some of those meetings were referred to as "crystal meetings."  In these meetings in conversations I continued while I was the chairman and the CEO with my knowledge and consent, and I occasionally received reports of the meetings and the prices that have been agreed with our competitors.

145.   Chih-Chun Liu, Chunghwa's former Vice President of LCD Sales, pleaded guilty and agreed to serve a seventh-month prison sentence in the United States and pay a $30,000 criminal fine.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

81749115.7                                      COMPLAINT AND JURY DEMAND

146. Hsueh-Lung Lee, holding various positions at Chunghwa, including Vice President of LCD Sales, pleaded guilty and agreed to serve a six-month prison sentence in the United States and pay a $20,000 criminal fine.

### 3. February 3, 2009 DOJ Announcement:  Three Different Executives at Chunghwa and LG Display Indicted In Price-Fixing Conspiracy

147. On February 3, 2009, a federal grand jury in San Francisco returned an indictment against two former Chunghwa executives, Cheng Yuan Lin, "C.Y." Lin, a Taiwanese former Chungwha Chairman and Chief Executive Officer,  Wen Jun "Tony" Cheng, a Taiwanese former Assistant Vice President of Sales and Marketing for Chungwha as well as former LG Display executive, Duk Mo Koo, a Korean former Executive Vice President and Chief Sales Officer for LG Display, "for their participation in a global conspiracy to fix prices of [TFT-LCD] panels."

148. Lin was charged with participating in the conspiracy from Sept. 14, 2001 until April 7, 2003 as Chunghwa's Chairman and CEO.

149. Cheng was charged with participating in the conspiracy from October 5, 2001 to September 24, 2004 as Chunghwa's Vice President of Sales and Marketing.

150. Koo was charged with participating in the conspiracy from December 11, 2001 to December 1, 2005 as LG Display's Executive Vice President and Chief Sales Officer.

151. The Indictment stated that for "the purpose of forming and carrying out the charged combination and conspiracy, the defendants, their corporate employers, and other coconspirators did those things that they combined and conspired to do, including, among other things:

a.      attended meetings and engaged in conversations and communications in Taiwan, Korea, and the United States to discuss the prices of TFT-LCDs;

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

81749115.7                                              COMPLAINT AND JURY DEMAND

b.   agreed during those meetings, conversations, and communications to charge prices of TFT-LCDs at certain levels;

c.   attended regular group meetings, commonly referred to as 'crystal meetings,' in hotel rooms in Taiwan and agreed during those meetings to charge prices for standard-sized TFT-LCDs at certain target levels;

d.   exchanged TFT-LCD shipping, production, supply, demand, and pricing information for the purpose of implementing, monitoring, and enforcing adherence to the agreed-upon prices;

e.   authorized, ordered, and consented to the participation of subordinate employees in the conspiracy;

g.   issued price quotations in accordance with the agreements reached;

h.   accepted payment for the supply of TFT-LCDs sold at collusive, noncompetitive prices to customers in the United States and elsewhere; and

i.   took steps to conceal the conspiracy and conspiratorial contacts through various means."

### 4.   March 10, 2009 DOJ Announcement: Hitachi Agrees to Plead Guilty To Price-Fixing Conspiracy

152.   On March 10, 2009, the DOJ announced that Hitachi agreed to plead guilty and pay $31 million criminal fine for its role in a conspiracy to fix prices in the sale of [TFT-LCD] panels to Dell, Inc.

153.   On May 22, 2009, Hitachi admitted that "[f]rom on or about April 1, 2001 to on or about March 31, 2004, the defendant, through its officers and employees, participated in a conspiracy with other major TFT-LCD producers, the primary purpose of which was to fix the price of TFT-LCD sold to Dell for use in notebook computers."

154.   Hitachi further admitted that it, "through its officers and employees, engaged in telephone discussions and attended bilateral meetings with representatives of other major TFT-LCD producers" and that "[d]uring these discussions and meetings, agreements were reached to fix the price of TFT-LCD sold to Dell for use in notebook computers."

### 5.   March 31, 2009 DOJ Announcement: Hitachi Executive Indicted In Price-Fixing Conspiracy

155.   On March 31, 2009, a federal grand jury in San Francisco returned an indictment charging Sakae Someya, Japanese Senior Manager for Sales and Marketing at Hitachi, with " "enter[ing] into and engag[ing] in a combination and conspiracy to suppress and eliminate competition by fixing the prices of [TFT-LCD] sold to Dell Inc. or its subsidiaries for use in desktop monitors and notebook computers."

156.   The Indictment stated that for "the purpose of forming and carrying out the charged combination and conspiracy, the defendant, his corporate employer, and other coconspirators did those things that they combined and conspired to do, including, among other things:

a.   attended bilateral meetings and engaged in conversations and communications in Japan, Korea, and the United States to discuss the prices of TFT-LCD sold to Dell;

b.   agreed during those meetings, conversations, and communications to charge prices of TFT-LCD sold to Dell at certain levels;

c.   exchanged information on sales of TFT-LCF sold to Dell, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

d.   authorized, ordered, and consented to the participation of subordinate employees in the conspiracy;

e.   issued price quotations in accordance with the agreements reached;

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1  f. accepted payment for the supply of TFT-LCD sold at collusive,

2    noncompetitive prices to Dell; and

3  g. took steps to conceal the conspiracy and conspiratorial contacts

4    through various means."

5   **6.** **April 27, 2009 DOJ Announcement: Bock Kwon, an LG**

6    **Display Executive, Pleads Guilty to Price-Fixing Conspiracy**

7  157. On April 27, 2009, the DOJ charged Bock Kwon, a high-level Korean

8 executive from LG Display, with conspiring with "employees from other panel

9 makers to suppress and eliminate competition by fixing the prices of TFT-LCD

10 panels from on or about Sept. 21, 2001 to on or about June 1, 2006."

11 158. During the period covered by the April 27, 2009 Information, Kwon

12 held various sales and marketing positions, including Head of LG's Taiwan

13 Subsidiary, Vice President of Notebook Sales, Vice President of Sales Planning,

14 and Executive Vice President of Sales and Marketing.

15 159. The Information states, "The charged combination and conspiracy

16 consisted of a continuing agreement, understanding, and concert of action among

17 the defendant, his corporate employer, and coconspirator, the substantial terms of

18 which were to agree to fix the prices of TFT-LCD."

19 160. The DOJ charged that "[f]or the purpose of forming and carrying out

20 the charged combination and conspiracy, the defendant, his employer, and

21 coconspirators did those things that they combined and conspired to do, including,

22 among other things:

23  a. participating in meetings, conversations and communications in

24    Taiwan, Korea and the United States to discuss the prices of TFT-

25    LCD;

26  b. agreeing during these meetings, conversations and communications to

27    charge prices of TFT-LCD panels at certain predetermined levels;

28  c. issuing price quotations in accordance with the agreements reached;

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

d.     exchanging information on sales of TFT-LCD panels for the purpose of monitoring and enforcing adherence to the agreed-upon prices; and

e.     authorizing, ordering and consenting to the participation of subordinate employees in the conspiracy."

161.   On June 26, 2009, Kwon pleaded guilty and agreed to serve a sentence of twelve months and one day in the United States and pay a $30,000 criminal fine.

162.   During Mr. Kwon's plea hearing on June 24, 2009, Judge Illston asked him what he did that made him guilty of the crime. He stated the following:

> During the relevant time period, September 21st, year 2001, through June 1st, year 2006, I headed the various position [*sic*] with LG Display, formerly LG Philips LCD.

> In year 2001, while I was head of LG's Taiwan subsidiary, with the approval of my superior at the company's head office in Seoul, I instructed a company employee to attend the regular meetings in Taiwan with the competitor who sold LG engaged in the manufacture and the sale of TFT-LCD panels.

> These meetings were known as the "crystal meetings." On occasion I attended these meetings. These meetings continued during the relevant time period. I was aware that at these meetings the participant [*sic*] discussed price and other market information.

> At these meetings the participants agreed to fix or stabilize the price of TFT-LCD panels to be sold in the United States and elsewhere.

**7.     August 25, 2009 DOJ Announcement: Epson Imaging Devices Corporation Pleads Guilty to Price-Fixing Conspiracy**

163.   On August 25, 2009, the DOJ filed an Information against Epson Imaging Devices Corporation alleging that "From in or about the fall of 2005 to in or about the middle of 2006, defendant and its coconspirators entered into and engaged in a combination and conspiracy in the United States and elsewhere to suppress and eliminate competition by fixing the prices of thin-film transistor liquid crystal display panels ('TFT-LCD') sold to Motorola Inc. ('Motorola') for use in

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

Razr mobile phones. The combination and conspiracy engaged in by the defendant and its coconspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. §1)."

164. The DOJ charged Epson with carrying out the conspiracy by:

a. "participating in bilateral meetings, conversations, and communications in Japan and the United States to discuss the prices of TFT-LCD to be sold to Motorola;

b. "agreeing, during those bilateral meetings, conversations and communications to charge prices of TFT-LCD panels to be sold to Motorola at certain predetermined levels;

c. "issuing price quotations in accordance with the agreements reached; and

d. "exchanging information on sales of TFT-LCD sold to Motorola, for the purpose of monitoring and enforcing adherence to the agreed-upon prices.

165. On August 25, 2009, DOJ announced that Epson had agreed to plead guilty and pay a criminal fine of $26 Million for its participation in a conspiracy covering TFT-LCD panels sold to Motorola for use in Razr mobile phones from the Fall of 2005 to the middle of 2006.

166. During Epson's plea hearing on October 16, 2009, Judge Illston asked Mr. Hidehiko Seki, director of Epson, what the company did that made it guilty of the crime. He stated the following:

> As written in the fourth paragraph of the plea agreement, between the fall of 2005 and the middle of 2006, our company participated in the conspiracy to fix the price of TFT-LCD panels sold to Motorola for use in Razr mobile phones.

167.

### 8. December 8, 2009 DOJ Announcement:  Chi Mei Optoelectronics Corporation Pleads Guilty to Price-Fixing Conspiracy

168.   On December 8, 2009, the DOJ filed an Information against Chi Mei Optoelectronics Corporation alleging that "[f]rom on or about September 14, 2001 to on or about December 1, 2006, defendant and its coconspirators entered into and engaged in a combination and conspiracy in the United States and elsewhere to suppress and eliminate competition by fixing the prices of thin-film transistor liquid crystal display panels ('TFT-LCD').  The combination and conspiracy engaged in by the defendant and its coconspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. §1)."

169.   The DOJ charged that "[f]or the purpose of forming and carrying out the conspiracy, the defendant and its coconspirators did those things that they combined and conspired to do, including, among other things:

a.   participating in meetings, conversations, and communications in Taiwan, Korea, and the United States to discuss the prices of TFT-LCD;

b.   agreeing, during those meetings, conversations, and communications, to charge prices of TFT-LCD panels at certain predetermined levels;

c.   issuing price quotations in accordance with the agreements reached; and

d.   exchanging information on sales of TFT-LCD, for the purpose of monitoring and enforcing adherence to the agreed-upon prices."

170.   On February 2, 2010, DOJ announced that Chi Mei had agreed to plead guilty and pay a criminal fine of $220 Million for its participation in a conspiracy covering TFT-LCD panels sold worldwide from September 14, 2001 to December 1, 2006.

81749115.7                                                   COMPLAINT AND JURY DEMAND

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

171.   On April 28, 2010, Chu-Hsiang "James" Yang, the Taiwanese former Director of Sales for Chi Mei, pleaded guilty and agreed to serve a nine-month prison sentence in the United States and pay a $25,000 fine.

172.   On June 2, 2010, Jau-Yang "J.Y." Ho, the Taiwanese former President of Chi Mei, pleaded guilty and agreed to serve a fourteen-month prison sentence in the United States and pay a $50,000 criminal fine.

173.   On July 28, 2010, Wen-Hung "Amigo" Huang, the Taiwanese former Director of Sales of Chi Mei, pleaded guilty and agreed to serve a nine-month prison sentence in the United States and pay a $25,000 fine.

174.   On August 4, 2010, Chen-Lung Kuo, the Taiwanese former Vice President of Sales of Chi Mei, pleaded guilty and agreed to serve a nine-month prison sentence in the United States and pay a $35,000 fine.

> **9.   June 10, 2010 Announcement: Largest Taiwanese LCD Producer, AU Optronics Corporation, its American subsidiary and Six Executives Indicted In Price-Fixing Conspiracy**

175.   On June 10, 2010, a federal grand jury in San Francisco returned an indictment against the largest Taiwanese LCD producer, AU Optronics Corporation, its Houston-based subsidiary, AU Optronics Corporation America, and six AU executives, alleging that "[f]rom on or about September 14, 2001, until on or about December 1, 2006, ('the period covered by this Indictment'), the exact dates being unknown to the Grand Jury, the defendants and other coconspirators entered into and engaged in a combination and conspiracy to suppress and eliminate competition by fixing the prices of thin-film transistor liquid crystal display panels ('TFT-LCD') in the United States and elsewhere. The combination and conspiracy engaged in by the defendants and other coconspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1)."

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

176.   The DOJ charged that "[f]or the purpose of forming and carrying out the conspiracy, the defendant and its coconspirators did those things that they combined and conspired to do, including, among other things:

    a. On or about September 14, 2001, representatives from four Taiwan TFT-LCD manufacturers, including defendant AU OPTRONICS CORPORATION, secretly met in a hotel room in Taipei, Taiwan and entered into and engaged in a conspiracy to fix the price of TFT-LCD. At this meeting, the conspirators agreed to meet approximately once a month for the purpose of fixing the price of TFT-LCD panels. These meetings were commonly referred to by some of the conspirators as 'Crystal Meetings.' The four Taiwan TFT-LCD manufacturers also agreed to rotate responsibility for coordinating each of these monthly meetings.   A representative from defendant AU OPTRONICS CORPORATION stated at the September 14, 2001 meeting that the participants in future Crystal Meetings should include the two major Korean TFT-LCD manufacturers to ensure the success of the conspiracy to fix the price of TFT-LCD.

    b. On or about September 21, 2001, representatives from two Korean TFT-LCD manufacturers joined representatives from the four Taiwan TFT-LCD manufacturers, including defendant AU OPTRONICS CORPORATION, at a Crystal Meeting in a hotel room in Taipei, Taiwan. At or before the September 21, 2001 Crystal Meeting, the two Korean TFT-LCD manufacturers agreed to join the conspiracy to fix the price of TFT-LCD.

    c. Employees from defendant AU OPTRONICS CORPORATION attended Crystal Meetings on a regular basis between on or about September 14, 2001 until on or about December 1, 2006 with employees of other participating TFT-LCD manufacturers.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

d. Defendants HSUAN BIN CHEN, HUI HSIUNG, SHIU LUNG LEUNG, BORLONG BAI, TSANNRONG LEE, CHENG YUAN LIN, WEN JUN CHENG, and DUK MO KOO attended and participated in one or more Crystal Meetings.  Defendants HSUAN BIN CHEN, HUI HSIUNG, LAI-JUH CHEN, SHIU LUNG LEUNG, BORLONG BAI, TSANNRONG LEE, CHENG YUAN LIN, WEN JUN CHENG, and DUK MO KOO, at times, also authorized, ordered, or consented to the attendance and participation of their subordinate employees at Crystal Meetings.

e. During the period covered by [the] Indictment, participants in the Crystal Meetings regularly exchanged production, shipping, supply, demand, and pricing information with each other at the meetings for the purpose of agreeing to fix the price of TFT-LCD, as well as implementing, monitoring, and enforcing adherence to the fixed prices. Up until 2003, the participants in the Crystal Meetings reached price agreements on certain sized TFT-LCD used in computer notebooks and monitors.  Beginning in 2003, the price agreements reached at the Crystal Meetings also included certain sized TFT-LCD used in flat screen televisions.

f. The participants in the conspiracy issued price quotations in accordance with the price agreements and accepted payment for the supply of TFT-LCDs sold at collusive, noncompetitive prices to customers in the United States and elsewhere.

g. From on or about September 14, 2001 until on or about May 2005, senior sales executives of the defendant AU OPTRONICS CORPORATION and the other participating TFT-LCD manufacturers attended the Crystal Meetings.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

h. In or about May 2005, the participants in the Crystal Meetings discussed that one or two major TFT-LCD customers may have detected the Crystal Meetings. To keep the meetings secret and avoid detection, the Crystal Meeting participants decided to stop having senior-level sales executives attend the Crystal Meetings. Instead, the senior-level executives instructed lower-level marketing employees to continue the Crystal Meetings. Lower-level marketing employees of defendant AU OPTRONICS CORPORATION and the other participating TFT-LCD manufacturers continued to meet monthly as a group to exchange shipment, production, and pricing information in furtherance of the conspiracy to fix the price of TFT-LCD. The lower-level marketing employees met at restaurants and cafes, instead of hotels, in Taipei.

i. In or about the spring 2006, the participants in the Crystal Meetings became further concerned about being detected after receiving news reports of an ongoing price-fixing investigation by the United States Department of Justice into the dynamic random access memory ("DRAM") industry and after receiving other information about a possible investigation into the TFT-LCD industry. To further avoid detection and keep the meetings secret, the conspiracy members, including representatives of defendant AU OPTRONICS CORPORATION, agreed to no longer meet as a group, but instead have back-to-back, one-on-one meetings with each other on a certain date each month at restaurants and cafes in Taipei, Taiwan. Through these round-robin style meetings, the participants continued to exchange shipment, production, and pricing information in furtherance of the conspiracy to fix the price of TFT-LCD. These round-robin meetings continued until in or about December 2006.

j.  During the period covered by [the] Indictment, employees of defendant AU OPTRONICS CORPORATION, in addition to participating in Crystal Meetings, had one-on-one discussions in person or by phone with representatives of coconspirator TFT-LCD manufacturers during which they reached agreements on pricing of TFT-LCD sold to certain customers, including customers located in the United States.  Through these one-on-one discussions, the participants also monitored each other's compliance with prices agreed upon at Crystal Meetings and during other discussions.  Participants in these one-on-one discussions, at certain times during the conspiracy, included HSUAN BIN CHEN, HUI HSIUNG, LAI-JUH CHEN, SHIU LUNG LEUNG, BORLONG BAI, TSANNRONG LEE, WEN JUN CHEN, and DUK MO KOO.

k.  During the period covered by [the] Indictment, senior-level employees of AU OPTRONICS CORPORATION regularly instructed employees of AU OPTRONICS CORPORATION AMERICA located in the United States to contact employees of other TFT-LCD manufacturers in the United States to discuss pricing to major United States TFT-LCD customers.  In response to these instructions, employees of AU OPTRONICS CORPORATION AMERICA located in the United States had regular contact through in-person meetings and phone calls with employees of other TFT-LCD manufacturers in the United States to discuss and confirm pricing, and at times agree on pricing, to certain TFT-LCD customers located in the United States.  These AU OPTRONICS CORPORATION AMERICA employees regularly reported the pricing information they received from their competitor contacts in the United States to senior-level executives at AU OPTRONICS CORPORATION in Taiwan.  By at least early 2003,

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

representatives of defendant AU OPTRONICS CORPORATION also began sending reports of the discussions and price agreements reached at Crystal Meetings to certain employees at AU OPTRONICS CORPORATION AMERICA. These reports were used by certain employees of AU OPTRONICS CORPORATION AMERICA in their price negotiations with certain TFT-LCD customers located in the United States.

l.   During the period covered by [the] Indictment, representatives of defendants AU OPTRONICS CORPORATION, AU OPTRONICS CORPORATION AMERICA, and other coconspirators took steps to conceal the conspiracy and conspiratorial contacts through various means:

   i.   The Crystal Meeting participants discussed the need to keep the Crystal Meetings secret and warned against revealing the existence of the meetings, even to other employees within their own companies who did not participate in the conspiracy.

   ii.  Participants in the Crystal Meetings were specifically warned to keep the meetings secret because of antitrust laws and the ongoing price-fixing investigation into the DRAM industry.

   iii. In addition, in or about December 2006, representatives of AU OPTRONICS CORPORATION AMERICA took steps to destroy evidence showing contacts with TFT-LCD competitors when they became aware of the United States Department of Justice's investigation into price-fixing in the TFT-LCD industry.

**10.     June 29, 2010 Announcement: Hannstar Display**
**Corporation Indicted In Price-Fixing Conspiracy**

177.   On June 29, 2010, the DOJ announced that Hannstar Display Corporation ("Hannstar"), a Taiwanese TFT-LCD panel producer and seller, agreed to plead guilty and pay a $30 million criminal fine for its role in a conspiracy to fix prices in the sale of TFT-LCD panels sold worldwide.

178.   Hannstar admitted that from on or about September 14, 2001, to on or about January 31, 2006, "[Hannstar], through its officers and employees, including high-level personnel of the defendant, participated in a conspiracy with major TFT-LCD producers, the primary purpose of which was to fix the price of certain TFT-LCD sold in the United States and elsewhere" in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

179.   Hannstar further admitted that "[i]n furtherance of the conspiracy, the defendant, through its officers and employees, engaged in discussions and attended meetings, including group meetings referred to by some of the participants as 'crystal meetings,' with representatives of other TFT-LCD producers.  During these discussions and meetings, agreements were reached to fix the price of certain TFT-LCD to be sold in the United States and elsewhere."

180.   The hundreds of millions of dollars in fines and the long and growing list of guilty pleas demonstrate that the investigations into the TFT-LCD industry are not mere information gathering efforts by regulatory authorities. Plaintiffs are informed and believe and allege, as the DOJ's representative told the U.S. District Court in San Francisco at the September 19, 2007 hearing, the DOJ's investigation into the TFT-LCD industry is premised in part on insider information that presents a detailed "road map" of the conspiracy described in *in camera* submissions made by the DOJ to U.S. District Court in San Francisco.

## G.     Market During the Conspiracy

181.    After initial introduction into a market, consumer electronics products and their component parts are typically characterized by downward pricing trends. However, since at least 1996, the TFT-LCD Products market has been characterized by unnatural and sustained price stability, as well as certain periods of substantial increases in prices.   Defendants achieved price stability and price increases by agreeing to fix and maintain prices and to restrict supply through decreases in capacity utilization and restraint in new plant investment.

182.    As described herein, Defendants' TFT-LCD cartel evolved over time. Defendants initiated their cartel when TFT-LCD Products were in their relative infancy.   At that time, Defendants balanced the desire to set prices collusively with the industry goal of establishing their products in the marketplace. As the cartel matured, new entrants were co-opted, and production costs declined. At the same time, conspirators learned how they could best manage the crystal cycle by agreeing on prices and output.

### 1.     1996

183.    By early 1996, analysts were lamenting the excess supply and drastic price cuts in the TFT-LCD markets.   The downward pressure on prices, which had already fallen 40 to 50 percent in 1995, was projected to continue due to lower manufacturing costs.   Despite this, TFT-LCD Product prices actually rose in 1996, allegedly due to insufficient production capacity.   In reality, Plaintiffs are informed and believe and allege that Defendants were fixing the prices.

184.    Plaintiffs are informed and believe and allege that during this period, the Japanese companies herein began to partner with Taiwanese companies to trade technology and collaborate on supply. Japanese engineers were lent to Taiwanese firms, and Taiwanese output was shipped to Japan. This mutually beneficial relationship between purported competitors continued into at least 1999.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

81749115.7                                          COMPLAINT AND JURY DEMAND

185.   A few months into 1996, there was a reversal in the downward trend in TFT-LCD Product prices and an alleged inability of manufacturers to supply enough TFT-LCD panels to meet demand.  By May of 1996, an industry magazine was reporting that, "[f]lat-panel-display purchasers are riding a roller coaster of pricing in the display market, with no clear predictability anytime soon . . . . Perplexed purchasers trying to keep up with the gyrating market can take solace that even vendors are constantly being surprised by the sudden twists and turns."

186.   By mid-1996, industry analysts were commenting on an unusual rise in TFT-LCD panel prices that was noted to be "quite rare in the electronics industry."

187.   Plaintiffs are informed and believe and allege that the "rare" increase in TFT-LCD panel prices was due to the agreements reached by the Japanese companies to increase prices. These companies met and agreed to increase prices and control supply in order to stop any price erosion as herein alleged.

188.   1996 also brought the advent of third generation fabs. In order to stay current with technology, manufacturers were moving quickly into third generation motherglass. LG Electronics, Inc. was scheduled to have its third generation fab online by 1997, and Hyundai was scheduled to do so by early 1998. However, manufacturers falsely claimed to be operating at full capacity and unable to meet demand, despite the millions of units of over-capacity that had supposedly existed months earlier.  This resulted in surging prices.  These price increases were also inconsistent with the fact that production had become more efficient and cost effective.

## 2.   1997 – 1998

189.   Plaintiffs are informed and believe and allege that by 1997, Japanese manufacturers were steadily sending engineers to Taiwan to provide the Taiwanese manufacturers with the most up-to-date technology.   In return, the Japanese received output from Taiwanese plants. In 1998, Chi Mei entered into such a strategic alliance with Fujitsu, a Japanese manufacturer that Sharp acquired in 2005.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   These arrangements between Japanese and Taiwanese companies resulted in
2   cooperative discussions between supposed competitors.  It was also expected to
3   contribute to an increase in supply of TFT-LCD panels.

4          190.  By 1998, the TFT-LCD industry still had excess capacity, due in part
5   to the still recent entry of the Korean companies into the market.  A March 30, 1998
6   article in Electronic News reported that Hyundai's production lines were running at
7   only 20 to 50 percent of capacity.  The article quoted Rob Harrison, director of
8   marketing for Hyundai's display division, as saying, "There is plenty of inventory
9   and capacity available to suit any shortage . . . . You have to get your production up
10  to full capacity again before you can even talk about there being a shortage and I
11  think there are plenty of under-capacity fabs right now to bear the burden."
12  Plaintiffs are informed and believe and allege that during this period, concerted
13  efforts were made to get other manufacturers in the industry to limit production.

14         191.  The effort to limit production, capacity restraints and the price-fixing
15  agreement caused decreases in prices of TFT-LCD Products to slow and stop in late
16  1998.

17             **3.    1999**

18         192.  In 1999, TFT-LCD Product prices surged during that year due to a
19  claimed "massive undersupply."  This was despite the entry of Taiwanese
20  manufacturers and several new fabs coming online.

21         193.  At the beginning of 1999, industry publications suggested that the
22  Japanese and Korean manufacturers were going to have the opportunity to recoup
23  previous years' losses: "The AM-LCD imbalance has triggered cash-strapped
24  Japanese and Korean vendors to up their tags in an effort to wash away the stain left
25  by years of red ink . . . ."

26         194.  By mid-1999, a Korean source was reporting: "[w]ith the supply
27  shortage for TFT-LCD panels unlikely to be corrected in the near future, the
28  domestic LCD industry is gleefully increasing its sales targets amid a sharp price

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    rise." The lack of supply was a pretextual reason given publicly to justify a price

2    increase.

3         195.   Significantly, Bock Kwon, Vice President of LG Display's Sales

4    Division was quoted, in part, in the same trade publication as announcing that:

> LG LCD will raise prices across its entire TFT-LCD
> portfolio by 30 to 40 percent this year, Kwon said, although
> he expects that prices will stabilize some time in the second
> half. [D]emand for larger panels is reducing capacity because
> each display is eating up more square inches per motherglass
> substrate. This, combined with a stagnation in capital
> spending by many panel makers, will keep the LCD industry
> in a period of relative shortage until 2001, Lee said. The
> shortage has become acute, and has created an unusual
> market in which prices could rise as much as 30% to 80% in
> one year according to Ross Young, President of
> DisplaySearch, a research firm in Austin, Texas.

196.   Also in 1999, the three major TFT-LCD producers in Korea became

two, when LG Electronics, Inc. merged with Hyundai. The year 1999 also saw an

additional merger when LG Electronics, Inc. and Koninklijke Philips Electronics

N.V. created Defendant LG Display.

**4.     2000 - 2001**

197.   By January of 2000, prices for TFT-LCD Products were falling again.

The price decline in this period was substantially influenced by the entry of six new

Taiwanese competitors into the market, including Chi Mei, Chunghwa, HannStar,

and Acer Display Technology, Inc. (later part of AU Optronics). Taiwanese

Defendants began their entry into the market in late 1999 and early 2000, by

undercutting the collusively high prices of the other Defendants to gain immediate

market share. However, by 2000-01, the Taiwanese Defendants had increased their

market share to the point that it made sense to participate in the conspiracy, and

Plaintiffs are informed and believe and allege that they then moderated the volume

of their production.

198.   Concurrent with the entry of the Taiwanese firms, the Koreans, just as

the Japanese had done earlier, were investing in Taiwanese manufacturing capacity.

1    Two of the largest Korean firms announced plans to invest billions in Taiwanese
2    TFT-LCD panel production and to locate manufacturing facilities in Taiwan.

3        199.   Newer generation fabs reduced costs and provided opportunities for
4    additional profits at cartelized prices.   In fact, a leading industry research house
5    indicated that LCD manufacturers would pour $5 billion into new manufacturing in
6    2000, roughly equivalent to the amount the industry spent in the previous three
7    years combined.

8        200.   In October 2000, *The Korea Herald* reported that, "IDC estimates that
9    the global LCD supply is one to two percent in excess and the unbalance will rise to
10   seven percent next year as manufacturers continue to book their output."

11       201.   Then, despite what was billed as massive and growing overcapacity in
12   2000 and early 2001, prices of TFT-LCD panels stopped declining in mid-2001,
13   and actually increased.  In late 2001, a senior official at LG Display stated that the
14   global market faced a supply shortage, and that this would "rapidly resolve the
15   industry's oversupply and improve its profitability." Similarly, industry insiders
16   suggested that the price increases were the result of an inability to meet increased
17   demand.  However, published data for 2001 showed that several Defendants were
18   operating their fabs significantly below capacity.  For example, Chunghwa had a
19   75.3 percent utilization rate and Quanta Display, Inc. (which later merged with AU
20   Optronics) had a 52 percent utilization rate.  Based on the data indicating reduced
21   capacity utilization during a time of rising prices and supposedly tight supply,
22   Plaintiffs are informed and believe and allege that the Taiwanese firms had begun
23   actively cooperating with Japanese and Korean incumbents to restrict supply, and
24   that again, Defendants reacted to the price trough by conspiring to fix prices.  This
25   agreement was reached in part at the bilateral and group meetings described above.

26       202.   The rise in prices made no economic sense at this point in time and
27   was the product of Defendants' setting the price of TFT-LCD by agreement.  First,
28   Defendants were bringing new plants on line that utilized larger motherglass, which

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   was more cost effective. Second, as reported by an industry source, the variable
2   cost of producing TFT-LCDs was declining during the latter part of 2001 and into
3   2002. With lower production costs and capacity to spare, it made little economic
4   sense for Defendants not to utilize their full capacity other than because of an
5   agreement by them not to do so.

6          5.    **2002 – 2003**

7          203. Prices continued to rise from the second half of 2001 through the
8   second half of 2002. Industry analysts attributed these price increases to a "larger-
9   than-expected panel shortage," despite continuing capacity expansion. In reality,
10  Plaintiffs are informed and believe and allege that the price increases were the
11  result of agreements reached in the crystal meetings and bilateral discussions
12  described above.

13         204. By the second half of 2002, the cartel's success at propping up prices
14  led to lagging demand, and the cartel's response was to let prices level off and even
15  begin to fall. Such downward price trends are not inconsistent with a monopoly or
16  cartel.

17         205. Throughout 2002, industry leaders shifted to fifth generation
18  motherglass production technology.

19         206. Industry analysts took note of the unusual trends in the pricing of TFT-
20  LCD Products. In February 2004, CNET.com quoted an analyst from IDC, a
21  research firm, as saying that, "LCD is one of the few [markets] where things have
22  actually gone up in price." As described above and as further detailed in Section
23  VII below, Defendants explained these price increases with false statements about
24  market conditions in order to cover up the conspiracy.

25         207. During five consecutive quarters in 2003 and 2004, TFT-LCD Product
26  prices rose significantly. AU Optronics reported that the price for certain of its
27  TFT-LCD Products increased 28 percent between the second quarter of 2003 and

28

81749115.7                                    COMPLAINT AND JURY DEMAND

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   the second quarter of 2004.   Similarly, LG Display reported that its pricing

2   increased by 21 percent over the same period.

3       208.   Plaintiffs are informed and believe and allege that these soaring prices

4   resulted in similar increases in the profits reaped by the TFT-LCD Product

5   manufacturers.   For example, the eight largest TFT-LCD Product manufacturers

6   reported a collective profit increase of 740 percent between the second quarter of

7   2003 and the second quarter of 2004. These record profits resulted from

8   Defendants' collective action to fix, raise, maintain or stabilize the price of TFT-

9   LCD Products.   Again, the sharing of information about price and production, the

10  under-utilization of capacity, and restraints on output drove up the prices of TFT-

11  LCDs.

12      209.   Around this time, industry analysts suggested that there were too many

13  competitors in the TFT-LCD Product marketplace.   Some industry participants

14  went as far as overtly suggesting that the industry should seek to curtail supply

15  through mergers.   These suggestions were carried out.   Significant consolidation

16  and collaboration among competitors in the TFT-LCD Product market occurred.

17      210.   While TFT-LCD Product prices were increasing in late 2003, AU

18  Optronics, Chi Mei, and HannStar decreased capacity utilization, as Plaintiffs are

19  informed and believe and allege had been agreed to in crystal meetings.

20      211.   As noted above, Panasonic's joint venture announced plans to solicit

21  investment from other companies involved in the production of TFT-LCD panels,

22  including device manufacturers and material suppliers.   NEC formed an alliance

23  with Casio.   In addition, Taiwanese TFT-LCD manufacturers agreed to supply

24  Panasonic with TFT-LCD panels for use in televisions.

25      212.   Consolidation and collaboration continued in 2003 as Chi Mei bought

26  Japan's IDT, a former subsidiary of IBM, and AU Optronics purchased a 20 percent

27  stake in Japan's Fujitsu Display Technology.

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    213.  Despite the increased efficiency and costs savings of fifth generation
2    fabs, the industry experienced higher prices in 2003, purportedly because of a
3    shortage of the most popular sizes of TFT-LCD panels.  Plaintiffs are informed and
4    believe and allege that in order to keep prices artificially high, Defendants chose
5    not to operate at full capacity, nor to take advantage of lower variable costs.

6              **6.    2004**

7    214.  Pursuant to Defendants' agreement to fix and stabilize prices, prices
8    continued to rise during the first half of 2004.  In fact, between 2003 and mid-2004,
9    panel prices increased for five consecutive quarters.   Various types of crystal
10   meetings were ongoing during this period.

11   215.  The cartel's success at raising prices slowly dampened demand.  In
12   response, the cartel allowed prices to once again level off and began to decline in
13   the second half of 2004.  During this period of time, the market for TFT-LCD
14   televisions started to grow, with the 32-inch panel representing approximately 9
15   percent of the market.

16   216.  In late 2004, AU Optronics reduced financial forecasts, claiming that
17   overcapacity-driven price declines were eroding profits. AU Optronics publicly
18   announced plans to reduce capacity at its sixth generation fabs by 30 percent and to
19   delay a planned seventh generation facility.

20   217.  Consolidation and collaboration among and between competitors
21   continued as Sony launched a joint venture, named S-LCD Corp.

22             **7.    2005**

23   218.  Analysts widely predicted a continuing period of oversupply and
24   declining prices throughout 2005.  However, by the third quarter of 2005, it was
25   clear that the industry was not facing oversupply, but rather was reaping the
26   benefits of a panel shortage and stable, or increasing, panel prices.

27

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

81749115.7                              COMPLAINT AND JURY DEMAND

219. By 2005, 15-inch notebooks had surpassed 14-inch notebooks as the predominant product, and the volume of 32-inch panels for televisions took off as well. In 2005, 32-inch panels represented almost 27 percent of sales.

220. Analysts forecast excess production capacity in 2005 because of large TFT-LCD plants including that of LG Display being brought on line. However, Sharp executive director Toshishige Hamano reported in October 2005 that the supply of LCD panels, particularly for use in televisions larger than 32 inches, would fall short of demand by 15 to 30 percent. The shortage came as a surprise to analysts.

221. This shortage was the result of collusion among Defendants. Dr. Hui Hsiung, Executive Vice President and Director of AU Optronics, admitted in November of 2005 that his company persuaded its competitors to lower the inventory for TFT-LCD Products:

> I think our policy, our strategy, has always been minimizing our inventory and that turned out to be quite successful in past few years by keeping the inventory lower. And I think in the past we did have some problem convincing our competitors doing the same thing. But in recent months, especially this year, actually, it did start to happen. I think that the industry understand[s] the benefit of keeping the capacity low. Again, even if the scenario does happen that we have a 5% over capacity this is not the drastic action to reduce about 5% of the loading. And this, coupled with the fact that many of the product cost structure is some 80% are actually material costs. So, fixed costs at 20% if you reduced the 5%, even 10%, loading, that impact on cost is actually, not very big. So, we think the industry become more mature. That is precisely what our competitors would do.

[Emphasis added.]

222. Indeed, earlier that year, a spokesperson for LG Display had predicted that market stabilization.

223. These collusive actions were being perpetuated through the series of ongoing meetings as alleged above.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

81749115.7

### 8.   2006

224.   A temporary oversupply of TFT-LCD Products occurred in 2006, which had the effect of reducing prices in the short term.  Again, in the face of a price trough, Defendants fixed and stabilized prices through their cartel activities.  On May 25, 2006, at a Taiwanese trade show, Mr. Hsiung of AU Optronics stated publicly that his company was reducing production of those products in order to avoid further price erosion.  He expressed the view that his competitors should follow suit, saying that production ought to be reduced by at least 15 percent.  Eddie Chen, a spokesperson for Chi Mei who was present at the trade show, promised to take similar steps in conjunction with his company's peers. A June 13, 2006 article in *InfoWorld* noted that as a result of Mr. Hsiung's statements, "[t]he chatter is growing louder each day."

225.   Chi Mei was not the only one to follow AU Optronics' invitation to restrict the output and increase the prices of TFT-LCD Products.  Plaintiffs are informed and believe and allege that in May of 2006, in discussions between executives of the two companies, AU Optronics convinced Quanta Display, a company that it acquired in October of 2006, to reduce production of TFT-LCD Products.  By June of 2006, LG Display also announced plans to cut production of TFT-LCD Products.

226.   By the summer of 2006, this ongoing conspiracy was being effectuated through bilateral meetings as alleged above.

227.   Despite the fact that certain of the Defendants may have cut back on, or discontinued, their conspiratorial conduct in 2006 upon the commencement of the governmental investigations described below, the impact of the conspiracy continued at least through the end of that year. This carry-over in the antitrust injury was due, in part, to the nature of the pricing mechanisms in the industry, such as supply contracts.

COMPLAINT AND JURY DEMAND

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

**H.     The Role of Trade Associations During the Conspiracy Period**

228.   The TFT-LCD industry is served by several major trade organizations that put on industry-wide meetings several times a year.  These meetings have facilitated collusion, and the trade associations have themselves functioned as a means for Defendants to cooperate and discuss prices.

229.   One such trade association is the Taiwan TFT-LCD Association ("TTLA"), to which AU Optronics, Chi Mei, and HannStar belong.  Founded in 2000, TTLA's self-described mission is to "assist [] [the] TFT-LCD industry, condensing the consensus through various activities, promoting the cooperation within competition, acting as a window for interaction with international organization[s] and promoting the integrated growth to [the] whole display industry." TTLA's annual fiscal plans refer repeatedly to one of its activities being the "call[ing of] international meeting[s] on TFT-LCD field and invit[ing] JAPAN and Korea TFT LCD affiliations to visit TTLA." Thus, TTLA was not merely a trade association that provided an opportunity to conspire; it was a vehicle by which the conspiracy was effectuated and implemented.

230.   South Korean manufacturers, including LG Display, had similar trade associations during the Relevant Period, known as EDIRAK (the Electronic Display Industrial Research Association of Korea) and KODEMIA (the Korea Display Equipment Material Industry Association).  EDIRAK's stated goal was "promoting co-activity with foreign Organizations related to display industries." Since 1996, EDIRAK has had a cooperation pact with the United States Display Consortium ("USDC").  Describing the pact, Malcolm Thompson, then-Chairman of USDC's governing board, said "[e]ven competitors should cooperate on common issues."

231.   Japanese manufacturers of TFT-LCD Products have a similar organization of their own.  The Semiconductor Equipment Association of Japan ("SEAJ"), founded in 1995, serves Japanese manufacturers of TFT-LCD Products.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    Its members include Sharp, NEC, and Hitachi. Like the KODEMIA and TTLA, the

2    SEAJ was not merely a trade association that provided an opportunity to conspire;

3    it was a vehicle by which the conspiracy was effectuated and implemented.

4    232. In addition to these national trade associations, the Society for

5    Information Display ("SID") put on multiple meetings each year that were attended

6    by executives from all of the major producers. One of these meetings had been

7    known as the SID Symposium, but was renamed the "SID International Symposium

8    and Business Conference." SID also puts on a long-running conference called the

9    International Display Research Conference ("IRDC").

10    233. The 2004 SID International Symposium and Business Conference

11    ("SID 2004") featured a presentation entitled "Beyond the Crystal Gateway," by

12    H.B. Chen, President and CEO of AU Optronics. This was followed shortly by a

13    presentation entitled "The FPD Capital Equipment Investment Environment,"

14    which informed the attendees about "investments planned at the major display

15    manufacturers." A representative of DisplaySearch also spoke about the LCD

16    market. There were presentations by analysts from iSuppli/Stanford Resources, and

17    other industry experts. This was all followed by a "networking reception

18    sponsored by LG, Philips LCD," to which all conference attendees were invited to

19    participate.

20    234. SID 2005 featured a reprise of the SID 2004 speech by H.B. Chen of

21    AU Optronics. This time it was called "2005: Beyond the Crystal Gateway." A

22    DisplaySearch representative provided "the latest outlook for flat panel displays

23    covering pricing, demand, and supply . . . and the cost and margin outlook for key

24    FPDs will be projected." Again, these discussions about the market were followed

25    by a "networking reception." Among the attendees at SID 2004 were Bruce

26    Berkoff of LG Display, H.B. Chen of AU Optronics, Larry Weber of Panasonic,

27    and Joel Pollack of Sharp. Senior executives from Sharp and Hitachi also attended.

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

235.   Plaintiffs are informed and believe and allege that the SID 2005 conference was very similar to SID 2004 but was even more blatant in its discussion of the crystal cycle.

236.   SID 2005 provided a prime opportunity for one of the dominant manufacturers to explain to all of its key competitors how to manage supply and maximize "line-investment timing." Among the attendees at SID 2005 was Bruce Berkoff of LG Display. SID 2005 also featured presentations regarding developments in LCD technology by officials from AU Optronics, Sharp, LG Display, and Hitachi.

237.   The conspiracy was also carried out at the annual meetings of the Global FPD Partners' Conference ("GFPC"), which have been held since 2005. The initial conference was held in March of 2005 in Tokyo and the 2006 conference was held from February 28 to March 3, 2006 in Okinawa, Japan.

238.   Plaintiffs are informed and believe and allege that participants in the 2006 GFPC noted how successful the event was in promoting information exchanges and "networking" among the co-conspirators, or, as Dr. Hui Hsiung has said, "[i]n an industry growing as rapidly as the flat panel display industry, it is increasingly important to build connections across the supply chain and around the world . . . the GFPC plays a vital part in building those connections and growing our business."

239.   Plaintiffs are informed and believe and allege that among the participants at GFPC 2006 were Shigaeki Mizushima of Sharp, Kiyoshi Jan-o of NEC, Mr. Nakajima of Panasonic, and Dr. Hui Hsiung of AU Optronics.

240.   As indicated by the public pronouncements, these trade association meetings facilitated the conspiracy by giving Defendants further opportunities to discuss prices and output.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

## VII.    FRAUDULENT CONCEALMENT

241.    Plaintiffs had neither actual nor constructive knowledge of the facts supporting its claim for relief despite diligence in trying to discover the pertinent facts.    Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until December 2006, when investigations by the DOJ and other antitrust regulators became public.    Defendants' secret conspiracy did not give rise to facts that would put Plaintiffs on inquiry notice that there was a conspiracy to fix the prices of TFT-LCD Products.

242.    Plaintiffs are informed and believe and allege that the participants in the crystal meetings agreed to keep the meetings secret, that in some instances, the location of the meeting was circulated only the day before in an effort to avoid detection.    Furthermore, Plaintiffs are informed and believe and allege that the participants agreed on what pretexts they would cite when questioned about rising prices.    Plaintiffs are informed and believe and allege that the participants also agreed to lie to the media and report that their fabs were operating at full capacity even when they were not, in order to create the appearance of a supply shortage.

243.    Defendants have used a variety of other purportedly market-based explanations for price increases in order to conceal their conspiracy, including undercapitalization, supply shortage, and component part availability.

244.    In 1999, Joel Pollack, a marketing manager for Sharp, blamed the sharp price rises of early 1999 on under-capitalization:

> Prices have dropped at a steady rate over the past couple of years to the point where it was difficult to continue the necessary level of capitalization.  The [low prices] have starved the industry.

245.    Also, plaintiffs are informed and believe and thereon allege that in early 1999, Omid Milani, a marketing manager for NEC, stated that "demand by far

COMPLAINT AND JURY DEMAND

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1   is outstripping our supply capability" and predicted that "prices will continue to

2   increase until a reasonable balance is achieved."

3       246.   Plaintiffs are informed and believe and thereon allege that also in

4   1999, Bock Kwon, Vice President of LG Display's Sales Division falsely reported

5   that price increases resulted from "acute" shortages.

6       247.   On February 4, 2001, Bruce Berkoff, Executive Vice President at LG

7   Display, was quoted by News.com as saying that price increases were due to

8   shortages. He claimed, "demand grew so fast that the supply can't keep up."

9       248.   Plaintiffs are informed and believe and thereon allege that in the latter

10  half of 2001, Koo Duk-Mo, an executive at LG Display, predicted a 10 to 15

11  percent price increase, purportedly resulting from increased demand during the

12  holiday season.

13      249.   Hsu Jen-Ting, a Vice President at Chi Mei, and Chen Shuen-Bin,

14  President of AU Optronics, offered another rationale for the 2001 price increase in

15  an interview for the Taiwan Economic News in October 2001.   Plaintiffs are

16  informed and believe and allege that they blamed "component shortages due to the

17  late expansion of 5th generation production lines and new demand from the

18  replacement of traditional cathode ray tubes with LCD monitors."

19      250.   These explanations were pretextual and served to cover up the

20  conspiracy. Later price increases were explained by industry leaders as derived

21  from new demand for LCD televisions.  Plaintiffs are informed and believe and

22  thereon allege that in 2005, Koo Duk-Mo of LG Display stated "[w]e are seeing

23  much stronger demand for large-size LCD TVs than expected, so LCD TV supply

24  is likely to remain tight throughout the year."

25      251.   As a result of Defendants' fraudulent concealment of their conspiracy,

26  the running of any statute of limitations has been tolled with respect to any claims

27  of Plaintiffs arising from the anticompetitive conduct alleged in this Complaint.

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

# VIII. **VIOLATIONS ALLEGED**

## **First Claim for Relief**

## **(Violation of Section 1 of the Sherman Act)**

252.   Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

253.   Beginning at least on or around January 1, 1996, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) by artificially reducing or eliminating competition in the United States.

254.   In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of TFT-LCD Products sold in the United States.

255.   As a result of Defendants' unlawful conduct, prices for TFT-LCD Products were raised, fixed, maintained and stabilized in the United States.

256.   The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants and their co-conspirators.

257.   For purposes of formulating and effectuating their contract, combination or conspiracy, Defendants and their co-conspirators did those things they contracted, combined, or conspired to do, including:

    a.    participating in meetings and conversations to discuss the prices and supply of TFT-LCD Products;

    b.    communicating in writing and orally to fix target prices, floor prices, and price ranges for TFT-LCD Products;

    c.    agreeing to manipulate prices and supply of TFT-LCD Products sold in the United States in a manner that deprived direct and indirect purchasers of free and open competition;

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

d. issuing price announcements and price quotations in accordance with the agreements reached;

e. selling TFT-LCD Products to customers in the United States at non-competitive prices;

f. exchanging competitively sensitive information in order to facilitate their conspiracy;

g. agreeing to maintain or lower production capacity; and

h. providing false statements to the public to explain increased prices for TFT-LCD Products.

258. As a result of Defendants' unlawful conduct, Plaintiffs were injured in its businesses and property in that they paid more for TFT-LCD Products than they otherwise would have paid in the absence of Defendants' unlawful conduct, and lost sales of TFT-LCD Products.

**Second Claim for Relief**

**(Violation of Minnesota Antitrust Act of 1971, Minn. Stat. § 325D.52 et seq.**

259. Plaintiffs incorporate by reference all the above allegations as if fully set forth herein.

260. Beginning at least on or around January 1, 1996, the exact date being unknown to Plaintiffs and exclusively within the knowledge of Defendants, Defendants and their co-conspirators entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and commerce in violation of the Minnesota Antitrust Act of 1971, Minn. Stat. § 326D.52, et seq.

261. In particular, Defendants combined and conspired to raise, fix, maintain or stabilize the prices of TFT-LCD Products sold in the United States.

262. As a result of Defendants' unlawful conduct, prices for TFT-LCD Products were raised, fixed, maintained and stabilized in the United States.

263. The contract, combination or conspiracy among Defendants consisted of a continuing agreement, understanding, and concerted action among Defendants

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    and their co-conspirators.

2         264. For purposes of formulating and effectuating their contract,
3    combination or conspiracy, Defendants and their co-conspirators did those things
4    they contracted, combined, or conspired to do, including:

5         a.   participating in meetings and conversations to discuss the prices and
6              supply of TFT-LCD Products;

7         b.   communicating in writing and orally to fix target prices, floor prices,
8              and price ranges for TFT-LCD Products;

9         c.   agreeing to manipulate prices and supply of TFT-LCD Products sold
10             in the United States in a manner that deprived direct and indirect
11             purchasers of free and open competition;

12        d.   issuing price announcements and price quotations in accordance with
13             the agreements reached;

14        e.   selling TFT-LCD Products to customers in the United States at non-
15             competitive prices;

16        f.   exchanging competitively sensitive information in order to facilitate
17             their conspiracy;

18        g.   agreeing to maintain or lower production capacity; and

19        h.   providing false statements to the public to explain increased prices for
20             TFT-LCD Products.

21        265. As a result of Defendants' unlawful conduct, Best Buy was injured in
22   its businesses and property in that they paid more for TFT-LCD Products than they
23   otherwise would have paid in the absence of Defendants' unlawful conduct, and
24   lost sales of TFT-LCD Products.

25   **IX.   PRAYER FOR RELIEF**

26        WHEREFORE, Plaintiffs pray that the Court enter judgment on their behalf,
27   adjudging and decreeing that:

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1    A.    Defendants engaged in a contract, combination, and conspiracy in
2 violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Minnesota Antitrust
3 Act of 1971, Minn. Stat. § 326D.52, et seq., and Plaintiffs were injured in their
4 business and property as a result of Defendants' violations;

5    B.    Plaintiffs shall recover damages sustained by it, as provided by the
6 state and federal antitrust laws, and a joint and several judgment in favor of
7 Plaintiffs shall be entered against the Defendants in an amount to be trebled in
8 accordance with such laws;

9    C.    Defendants, their subsidiaries, affiliates, successors, transferees,
10 assignees and the respective officers, directors, partners, agents, and employees
11 thereof, and all other persons acting or claiming to act on their behalf, shall be
12 permanently enjoined and restrained from continuing and maintaining the
13 combination, conspiracy or agreement alleged herein;

14    D.    Plaintiffs shall be awarded pre-judgment and post-judgment interest,
15 and such interest shall be awarded at the highest legal rate from and after the date of
16 service of the initial complaint in this action;

17    E.    Plaintiffs shall recover their costs of this suit, including reasonable
18 attorneys' fees as provided by law; and

19    F.    Plaintiffs shall recover such other and further relief as may be just and
20 proper.

21
22 DATED: October 8, 2010        ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
23
24                              By: _____
25                                  Roman M. Silberfeld
                                    Michael A. Geibelson
26                                  Attorneys For Plaintiffs
                                    BEST BUY CO., INC., BEST BUY
27                                  PURCHASING LLP, BEST BUY STORES,
                                    L.P., BEST BUY CHINA LTD., and
28                                  MAGNOLIA HI-FI, INC.

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES

1

## DEMAND FOR JURY TRIAL

2      Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial

3  by jury of all of the claims asserted in this Complaint so triable.

4

5  DATED: October 8, 2010          ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

6

7                                  By: _____

8                                      Roman M. Silberfeld
                                       Michael A. Geibelson
9                                      Attorneys For Plaintiffs
                                       BEST BUY CO., INC., BEST BUY
10                                     PURCHASING LLP, BEST BUY STORES,
                                       L.P., BEST BUY CHINA LTD., and
                                       MAGNOLIA HI-FI, INC.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
ATTORNEYS AT LAW
LOS ANGELES