# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

IN RE CITIGROUP INC.
SECURITIES LITIGATION

Case No: 07 Civ. 9901 (SHS)

DEC 2 7 2012

PRO SE OFFICE

---

## OBJECTION OF THEODORE H. FRANK

---

Theodore H. Frank
11307 Bulova Lane
Fairfax, VA 22030

DC Bar No. 450318
1718 M Street NW, No. 236
Washington, DC 20036

Phone: (703) 203-3848
Email: tedfrank@gmail.com

*In pro per*

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12-27-12

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... I

TABLE OF AUTHORITIES ...................................................................................... II

INTRODUCTION ......................................................................................................1

I.      I Am a Class Member. ...........................................................................................3

II.     A Court Owes a Fiduciary Duty to Unnamed Class Members. ....................................3

III.    The Notice Was Not the "Best Practicable." ..............................................................4

IV.     Class Counsel's Fee Request Does Not Comply With the PSLRA. ...............................6

V.      Even if There Were No Third-Party Expenses, 17% Is Not a Reasonable Percentage of $590
        Million. ...............................................................................................................8

VI.     Class Counsel Dramatically Inflates Its Lodestar with Wildly Exaggerated Hourly Rates
        Several Times the Market Rate of What Paying Clients Are Willing to Pay .............................10

VII.    The Proposed Multiplier Overcompensates Class Counsel for the Risks of the Case and the
        Poor Results Achieved. ..........................................................................................14

VIII.   Nine Cents on the Dollar Is Not a "Success." ...........................................................18

IX.     The Expert Opinions Must Be Excluded. ..................................................................20

X.      Class Counsel's Argument for Resisting Discovery Is Frivolous .....................................21

XI.     The Silence of the Class Should Not Be Construed as Acquiescence to the Fee Request ......22

XII.    Statement Regarding Fairness Hearing. .....................................................................24

CONCLUSION ......................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Abrams v. Van Kampen Funds, Inc.,*
  2006 U.S. Dist. LEXIS 2129 (N.D. Ill. Jan. 18, 2006) .................................................... 7

*In re "Agent Orange" Prod. Liab. Lit.,*
  818 F.2d 145 (2d Cir. 1987) ...................................................................................... 4

*In re Amino Acid Lysine Antitrust Litig.,*
  918 F. Supp 1190 (N.D. Ill. 1996) ........................................................................... 17

*In re Auction Houses Antitrust Litigation,*
  197 F.R.D. 71 (S.D.N.Y. 2000) ............................................................................... 17

*In re Bank of America Securities Lit.,*
  No. 09-MDL-2058 (S.D.N.Y.) .......................................................................... 10, 19

*Carlson v. Xerox Corp.,*
  596 F. Supp. 2d 400 (D. Conn. 2009) ..................................................................... 15

*Cobell, v. Salazar,*
  679 F.3d 909 (D.C. Cir. 2012) ................................................................................ 10

*City of Detroit v. Grinnell Corp.,*
  495 F.2d 448 (2d Cir. 1974) .................................................................................... 22

*In re Corrugated Container Antitrust Litig.,*
  643 F.2d 195 (5th Cir. 1981) .................................................................................. 23

*In re First Fidelity Securities Litigation,*
  750 F.Supp. 160 (D. N.J. 1990) ................................................................................ 8

*In re Franklin National Bank Sec. Litig.,*
  574 F.2d 662 (2d Cir. 1978),
  *modified on other grounds,* 599 F.2d 1109 (2d Cir. 1978) ......................................... 5

*Gen. Elec. Co. v. Joiner,*
  522 U.S. 136 (1997) ................................................................................................ 21

*In re GMC Engine Interchange Litig.,*
  594 F.2d 1106 (7th Cir. 1979) ................................................................................ 23

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.,*
  55 F.3d 768 (3d Cir. 1995) ................................................................................ 22-24

*Goldberg v. Kelly,*
  397 U.S. 254 (1970) ..................................................................................................... 22

*Gonzalez v. S. Wine & Spirits of Am., Inc.,*
  No. 11-cv-5849, 2012 U.S. Dist. LEXIS 46401 (C.D. Cal. Mar. 29, 2012) ............................... 16

*Grant v. Bethlehem Steel Corp.,*
  823 F.2d 20 (2d Cir. 1987) ................................................................................................. 3

*Hecht v. United Collection Bureau,*
  691 F.3d 218 (2d Cir. 2012) ............................................................................................... 4

*In re Initial Public Offering Securities Litig.,*
  671 F. Supp. 2d 467 (S.D.N.Y. 2009) ............................................................................... 7, 9

*In re Johnson & Johnson Shareholder Deriv. Lit.,*
  No. 10-cv-2033 (D.N.J. Sep. 25, 2012) ............................................................................... 5

*In re Lehman Brothers Sec. & ERISA Litig.,*
  No. 09-md-2017 (S.D.N.Y. Jun. 29, 2012) .......................................................................... 9

*Malchman v. Davis,*
  761 F.2d 893 (2d Cir. 1985) ............................................................................................. 21

*In re Merrill Lynch & Co., Inc. Sec., Deriv. & ERISA Litig.,*
  No. 07-cv-09633 (S.D.N.Y. 2009) ...................................................................................... 9

*Mirfasihi v. Fleet Mortg. Corp.,*
  356 F.3d 781 (7th Cir. 2004) .............................................................................................. 3

*Mullane v. Cent. Hanover Bank,*
  339 U.S. 306 (1950) .......................................................................................................... 4

*In re NASDAQ Market-Makers Antitrust Litig.,*
  187 F.R.D. 465 (S.D.N.Y. 1998) ......................................................................................... 8

*Northeast Hosp. Corp. v. Sebelius,*
  657 F.3d 1 (D.C. Cir. 2011)................................................................................................ 7

*Perdue v. Kenny A.,*
  130 S. Ct. 1662 (2010)...................................................................................................... 16

*Phillips Petroleum Co. v. Shutts,*
  472 U.S. 797 (1985) .......................................................................................................... 4

*Powers v. Eichen,*
  229 F.3d 1249 (9th Cir. 2000) ......................................................................................... 7-8

*Robert F. Booth Trust v. Crowley,*
 No. 09 C 5314 (N.D. Ill. Jul. 9, 2010) ............................................................................................5

*Silber v. Mabon,*
 957 F.2d 697 (9th Cir. 1992) ...........................................................................................................3

*Teachers' Ret. Sys. v. A.C.L.N., Ltd.,*
 2004 U.S. Dist. LEXIS 8608 (S.D.N.Y. May 14, 2004) ...............................................................7

*In re Telik, Inc. Sec. Litig.,*
 576 F. Supp. 2d 570 (S.D.N.Y. 2008) ..........................................................................................13

*Vizcaino v. Microsoft Corp.,*
 290 F.3d 1043 (9th Cir. 2002) ......................................................................................................22

*Wal-Mart Stores, Inc. v. Visa USA, Inc.,*
 396 F.3d 96 (2d Cir. 2005) ...........................................................................................................21

*Weeks v. Kellogg Co.,*
 No. 09-cv-8102, 2011 U.S. Dist. LEXIS 155472 (C.D. Cal. Nov. 23, 2011) ...........................16

## Rules and Statutes

15 U.S.C. § 78u-4(a)(6) ........................................................................................................................6

42 U.S.C. § 1988....................................................................................................................................16

Fed. R. Civ. Proc. 12(b)(6)..........................................................................................................1, 17-18

Fed. R. Civ. Proc. 23(a)(4) ................................................................................................................... 14

Fed. R. Civ. Proc. 23(e) ....................................................................................................................... 22

Fed. R. Civ. Proc. 23(h)............................................................................................................ 16, 21-22, 25

Private Securities Litigation Reform Act..................................................................................*passim*

## Other Authorities

ABA Standing Committee on Ethics,
 ABA Formal Opinion 08-451.................................................................................................. 12-13

AMERICAN LAW INSTITUTE,
 PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05(c) (2010) .................................................3

AMERICAN LAW INSTITUTE,
    PRINCIPLES OF THE LAW OF AGGREGATE LITIG. § 3.05, comment *a* (2010) ........................... 24

Brickman, Lester,
    *Lawyer Barons* (Cambridge U. Press 2011) ..................................................................................... 13

Fitzpatrick. Brian, *An Empirical Study of Class Action Settlements and Their Fee Awards*,
    7 J. Empirical L. Stud. 811 (2010) ...................................................................................................... 9

Lattman, Peter, "Investors' Billion-Dollar Fraud Fighter,"
    *New York Times Dealbook* (Oct. 8, 2012) ................................................................................. 10, 19

Leslie, Christopher R.,
    *The Significance of Silence: Collective Action Problems and Class Action Settlements*,
    59 FLA. L. REV. 71 (2007)................................................................................................................... 23

## INTRODUCTION

Class counsel has filed a fee petition and two expert reports in support of that fee petition. But all three fail to mention even once either the relevant statute or the exact figure of money required to be considered by the statute in computing the total fees and expenses. New briefing is required if the Court is not to simply deny the fee petition outright; the expert reports must be stricken for failing to consider the correct legal standards.

But even pretending that this fatal legal omission does not exist, class counsel claims an entitlement of over $100 million of the class's money by pointing to the huge risk they claim to have taken. Yet since the PSLRA was passed, fewer than 35% of cases brought were dismissed on a Rule 12(b)(6) motion; another 18% settle before the motion is even decided. Of the cases that survive a motion to dismiss, over 82% settle. And because of the PSLRA discovery stay, class counsel need not expend very much in the way of resources until they know they have survived that minimal requirement of bringing a clearly stated plausible complaint. These are not *quite* contingency fee cases without contingencies, but PSLRA cases—especially big cases with complex facts precluding dismissal on the face of the complaint—are perhaps one of the safer bets in class action litigation.

Yet class counsel asserts a need for a 1.89 multiplier to compensate them for this non-existent risk—a number that, if class counsel had provided an accurate lodestar figure, would mean that they would average over 146% of lodestar for every hour devoted to securities litigation, including cases that are lost on motions to dismiss and summary judgment.

But class counsel's lodestar figure is far from accurate. In a declaration purporting to represent the hours of Kirby McInerney attorneys, class counsel attributes billing rates of $350 to $550/hour to the ministerial work of first-tier document review done not by Kirby McInerney litigators, but (for example) a "lipstick & style counselor" and a laid-off real-estate attorney moonlighting on temporary contract-attorney assignments. The ***market rate*** for such work—the

---

Frank Objection
Case No: 07 Civ 9901 (SHS)                    1

rate that clients paying with their own money, rather than someone else's money, pay—is a tenth of that. And that is assuming that the work was actually necessary to the case rather than churn to inflate the fee request down the line once the motion to dismiss was denied and settlement was all but assured.

Such inflation might be tolerated if class counsel had actually brought a winning case. But by class counsel's own lights, this case has settled for $0.09 on the dollar. This is not, as class counsel's experts claim, because of the threat of bankruptcy: it reflects about 0.5% of the market capitalization of the defendant. In a world where a government-bailed-out bank (whose biggest shareholder is a Saudi prince) accused of contributing to the financial crisis and the worst recession in generations is perhaps the most unpopular defendant imaginable in a lengthy civil jury trial in the home of Occupy Wall Street, one would think that any colorable case has at least a 9% chance of success. I do not object to the parties agreeing to a nuisance settlement; if class counsel thinks that they cannot win more than nine cents on the dollar, so be it. But it is not the sort of "success" that entitles counsel to the "extraordinary" benefit of a multiplier.

I further object to the failure of the parties to adhere to Second Circuit and constitutional standards of notice. Class counsel admits that Garden City Group did not mail individualized notice to shareholders until December 7, 2012—after the December 6, 2012, opt-out deadline and less than two weeks before objections needed to be mailed to be received by December 21, 2012. Nor does class counsel deny that they knew that their notice procedures would result in hundreds of thousands, if not millions, of class members receiving late notice. My objection has been unfairly prejudiced in multiple ways by this and by class counsel's refusal to cooperate in discovery; the Court has been deprived of objections by the burdens placed on class members and by misleading information being provided by the settlement administrator.

The Court should continue the objection deadline and fairness hearing, require a new fee

---

petition compliant with PSLRA requirements, and permit reasonable discovery relating to the fee request. Class counsel should not be rewarded for their hide-the-ball tactics with the misleading fee papers and deliberately late notice. Class counsel is effectively trying to receive tens of millions of dollars of their clients' money to which they are not entitled, and should not get to play "heads-I-win a windfall, tails-I-get-what-I-should've-gotten-in-the-first-place." An appropriate sanction for the breach of fiduciary duty is to reduce the multiplier below 1 on the uninflated lodestar amounts.

## I.      I Am a Class Member.

I am a member of the class. I purchased 500 shares of Citigroup stock for my Charles Schwab account for $13,979.95 on January 10, 2008. I sold the stock for $12,386.27 on April 21, 2008. These were the only transactions I made in Citigroup stock in 2008. *See* Declaration of Theodore H. Frank ("Frank Decl.") ¶ 3 & Ex. 1 & Ex. 2.

## II.     A Court Owes a Fiduciary Duty to Unnamed Class Members.

"In reviewing a proposed settlement, a court should not apply any presumption that the settlement is fair and reasonable." American Law Institute, *Principles of the Law of Aggregate Litigation* § 3.05(c) (2010). The burden of proving settlement fairness rests with the moving party. *Id.* A "district court ha[s] a fiduciary responsibility to the silent class members." *Grant v. Bethlehem Steel Corp.,* 823 F.2d 20, 23 (2d Cir. 1987). "Because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *Mirfasihi v. Fleet Mortgage Corp.,* 356 F.3d 781, 785 (7th Cir. 2004). "Both the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mabon,* 957 F.2d 697, 701 (9th Cir. 1992).

---

### III. The Notice Was Not the "Best Practicable."

Absent class members have a due process right to notice and an opportunity to opt out of class litigation when the action is predominantly for money damages. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 & n.3 (1985); *Hecht v. United Collection Bureau*, 691 F.3d 218, 222 (2d Cir. 2012). To be constitutionally compliant, notice must be the "best practicable, reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Hecht*, 691 F.3d at 224 (*quoting Shutts*, 472 U.S. at 812). This must be more than a "mere gesture": "The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it." *Id.* (*quoting Mullane v. Cent. Hanover Bank*, 339 U.S. 306, 315 (1950)).

Here, the settlement administrator did not mail individualized notice to me until December 7, which meant that I did not receive it until the evening of December 12—six days after the December 6 opt-out deadline. Frank Decl. ¶¶ 4, 7. True, there was publication notice as well. But such notice is only satisfactory if the parties have exercised appropriate "due diligence" to ascertain the "whereabouts" of individual class members. *Hecht*, 691 F.3d at 224 (*quoting In re "Agent Orange" Prod. Liab. Lit.*, 818 F.2d 145, 168 (2d Cir. 1987)). Citigroup has historically been able to provide individualized electronic notice to shareholders 33 days in advance of a deadline. Frank Decl. ¶ 5 & Ex. 3. There was no reason the same diligence couldn't be shown in a class action; it was facially unreasonable to wait until after the opt-out deadline, and less than two weeks before the objection deadline, to mail notice—especially when electronic notice would have been both cheaper and quicker. *Cf. Larson v. AT&T Mobility LLC*, 687 F.3d 109, 122-31 (3d Cir. 2012).

Class counsel excuses this delay by blaming it on my broker, Charles Schwab. They claim that the settlement administrator asked Schwab for a list of class members in October, and received it only on December 3. Frank Decl. ¶ 7. But this is legally irrelevant. As a matter of law, the Second

Circuit holds that class counsel cannot "shift[] the burden" to the broker and blame a broker for the failure to disseminate notice to individual shareholders, even when the "street name" differs from the "purchaser"; after all, it is the *purchaser* who is the class member, not the beneficial owner. *In re Franklin National Bank Sec. Litig.*, 574 F.2d 662, 669-70 (2d Cir. 1978), *modified on other grounds*, 599 F.2d 1109 (2d Cir. 1978). It "is the responsibility of the class representatives to ascertain the names and addresses of these beneficial owners and mail the notices to them." *Id.* at 672. While *Franklin* endorses the practice of requesting brokers to provide lists of shareholders, it does so only because it assumes that brokers will do so "promptly"—and then requires a subpoena to be issued. *Id.* at 675.

Moreover, even if Schwab had some blame, the behavior of the parties was not reasonable. By class counsel's own admission, the settlement administrator only followed up twice with Schwab between October and December; no subpoena was issued. *Id.* More importantly, neither class counsel, nor experienced defense counsel, nor the settlement administrator claims that the two-month delay surprised them. *Id.* ¶ 13. It certainly does not surprise me: in every case where I have received notice of a pending securities class action or shareholder derivative settlement, Schwab has taken several weeks to provide a list of names, resulting in notice shortly before or even after the objection deadline. *Id.* ¶ 8; *see, e.g., Robert F. Booth Trust v. Crowley*, No. 09 C 5314 (N.D. Ill. Jul. 9, 2010) (continuing fairness hearing and permitting new briefing in response to my objection to late notice filed after objection deadline) (Frank Decl. Ex. 16). In every case where I have represented a shareholder objecting to a class-action or shareholder derivative settlement, I have seen other shareholders who hold stock through brokers be provided late notice. Frank Decl. ¶ 9; *see, e.g., In re Johnson & Johnson Shareholder Deriv. Lit.*, No. 10-cv-2033 (D.N.J. Sep. 25, 2012) (continuing fairness hearing and permitting new briefing in response to objections to late notice filed after objection deadline) (Frank Decl. Ex. 17).

Class counsel and defense counsel are experienced securities litigators that have settled other

securities class actions; the settlement administrator Garden City Group is a richly compensated settlement administrator that has experience providing notice to dozens of securities class actions. The parties and the settlement administrator thus knew or should have known that waiting until October to ask brokers to provide a list of shareholders would mean that many shareholders would not receive notice in time to meaningfully object by December 21. We can infer that the parties and the settlement administrator intended the predictable consequences of their actions: class members would receive late individualized notice. Intentionally designing a notice procedure so that class members will not receive timely notice must be considered unreasonable; otherwise, future class counsel will have no incentive not to similarly hide the ball with their future clients.

I have been prejudiced in multiple ways by the late notice that have hampered this objection: I am forced to testify myself as an expert witness instead of retaining one; I have not had time to find factual witnesses willing to publicly support my expert testimony; I have not had time to fully scrutinize the Coffee and Miller reports, each of which have demonstrate multiple errors. Frank Decl. ¶¶ 16-25. If the Court is not willing to accept my objection in full (negating the prejudice) and demand additional disclosures from the parties, then a new opt-out date, objection deadline, and fairness hearing date is required. Cases that class counsel cite to the contrary predate *Hecht* and/or fail to consider the reasonable expectations of the parties.

## IV. Class Counsel's Fee Request Does Not Comply With the PSLRA.

A PSLRA fee request under the Securities Act of 1934 must adhere to the limitations of 15 U.S.C. § 78u-4(a)(6): "Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class." Yet class counsel's briefs supporting their fee request—and the expert reports purporting to justify that request—fail to mention the statute; the correct numerator; the correct denominator; or the correct percentage.

Instead, class counsel asks for a percentage of the settlement *fund*, but the fund includes millions of dollars of money that will not be "actually paid to the class"—not least the request of $2,842,841.59 in expenses, which class counsel and their experts improperly exclude from the *numerator* of the percentage, while simultaneously including the figure in the *denominator* of their calculation.[1] The effect is to reward class counsel with a commission on the payments to themselves for expenses. The class is only entitled to the "Net Settlement Fund": the $590 million "Settlement Fund less any taxes, attorneys' fees, expert fees, Notice and Administration Costs, Litigation Expenses, or other costs and expenses approved by the Court." Notice ¶ 2. The calculation of class counsel and their experts thus similarly improperly inflate the fee award and deflate the "reasonable percentage" they purport to claim by including undisclosed notice and settlement administration costs, again rewarding class counsel with a commission on amounts paid to third parties—and third parties who aren't doing a particularly good job, either. Frank Decl. ¶¶ 4-15.

By the plain language of the statute, this is wrong. "In order to determine a reasonable fee for the services of counsel, it is necessary to understand what counsel has actually accomplished for their clients, the class members. This can only be done when the expenses paid by the class are deducted from the gross settlement. The amount that remains, the adjusted gross settlement, represents what counsel has been able to achieve for the benefit of the class." *Teachers' Ret. Sys. v. A.C.L.N., Ltd.*, 2004 U.S. Dist. LEXIS 8608 at \*20-\*21 (S.D.N.Y. May 14, 2004); *accord In re Initial Public Offering Securities Litig.*, 671 F. Supp. 2d 467, 514 (S.D.N.Y. 2009): *Abrams v. Van Kampen Funds, Inc.*, 2006 U.S. Dist. LEXIS 2129 at \*17-\*18 (N.D. Ill. Jan. 18, 2006); *contra Powers v. Eichen*, 229 F.3d 1249, 1258 (9th Cir. 2000).

We do not know what the Net Settlement Fund is. It was not disclosed in the notice; it is not

---

[1] (A fraction, of course, is the "numerator" over the "denominator." *Cf., e.g., Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1, 3 (D.C. Cir. 2011).)

in the fee petition; it is not in the expert reports; if it is in any of the other supporting documents, I have not yet found it. Moreover, class counsel seeks fees without once mentioning the relevant statute. It would be perhaps too harsh to preclude counsel from any recovery for failing to carry their burden in their motion for fees, but new briefing and a fair opportunity to respond is required—yet another reason to continue the fairness hearing.

## V.  Even if There Were No Third-Party Expenses, 17% Is Not a Reasonable Percentage of $590 Million.

Class counsel seeks 16.5% of $590 million plus $2,842,841.59 in expenses, a total of 17.0% of the $590 million fund. We know that the actual percentage is substantially higher, because the class will "actually receive" substantially less than $590 million, though class counsel has not seen fit to disclose this information to the class and the Court. But even assuming (quite implausibly) *arguendo* that these third-party expenses are zero, 17.0% is not a reasonable percentage—even under the same empirical studies that the experts cite.

As Miller acknowledges (¶ 32), a reasonable percentage should be a sliding scale because of economies of scale. "It is generally not 150 times more difficult to prepare, try and settle a $150 million case than it is to try a $1 million case." *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465, 486 (S.D.N.Y. 1998). "There is considerable merit to reducing the percentage as the size of the fund increases. In many instances the increase is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." *Id.* (quoting *In re First Fidelity Securities Litigation*, 750 F.Supp. 160, 164 n. 1 (D. N.J. 1990)).

Miller's report heavily relies upon the empirical work of Brian Fitzpatrick. *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010). But he abuses the data. He relies upon Fitzpatrick's average of settlements "over $72.5 million" to find 16.5% reasonable. But *Fitzpatrick himself* says that that "decile" covers an especially wide range of settlement

and is not very useful. The very next page, Fitzpatrick has a table with a row for settlements of $500 million to $1000 million—far more relevant to a case like this where the settlement is $590 million. There, both the mean and the median is 12.9%—corresponding to an award of fees and expenses substantially less than Miller claims is reasonable. Miller is disingenuous to cite the less relevant number as authoritative while omitting the more relevant number the cited author actually uses.

Miller also cherry-picks his data artificially at Paragraph 58: he looks at PSLRA settlements of "$550 million to $800 million." This conveniently omits the following cases just below the artificial cut-off, but more relevant in time, amount, and place than cases that were included:

| Case | Fund | Percentage |
|------|------|------------|
| *In re Lehman Brothers Sec. & ERISA Litig.,* No. 09-md-2017 (S.D.N.Y. Jun. 29, 2012) | $516 million | 11.0% |
| *In re Merrill Lynch & Co., Inc. Sec., Deriv. & ERISA Litig.,* No. 07-cv-09633 (S.D.N.Y. 2009) | $475 million | 7.8% |

If we include these two very recent S.D.N.Y. cases of similar magnitude to the average of six cases in the Miller report, we get a mean of 15.35% and a median of 14%. If we exclude the atypical *IPO* case, an enormously complex MDL involving over three hundred separate nuisance settlements of about $0.01 on the dollar where the attorneys surely received 33.3% solely because it was half of their lodestar, the mean is 12.79% and the median is 12%.

We can also see how high the fee request is by comparing it to recent settlements of much larger magnitude where the attorneys received or requested fees similar to what class counsel is asking here for a much smaller settlement being settled for nuisance value.

This very district has a similar financial-crisis settlement on the books pending against Bank of America, even involving the same defense counsel. *In re Bank of America Securities Lit.,* No. 09-MDL-2058 (S.D.N.Y.). That settlement is four times larger ($2.425 billion instead of $0.59 billion), yet the attorneys are seeking a fee award of $150 million, and may even be awarded less when all is said and done. *See* Peter Lattman, "Investors' Billion-Dollar Fraud Fighter," *New York Times Dealbook*

(Oct. 8, 2012) (quoting both me and defense counsel Brad S. Karp). To award $97.5 million for the first $590 million won for the class, and $52.5 million for the next $1,835 million implies that the *Bank of America* class counsel is only getting a 2.7% percentage of the last three quarters of their settlement.

Or take *Cobell v. Salazar*, 679 F.3d 909 (D.C. Cir. 2012), where the attorneys won $1.512 billion of direct pecuniary relief for the class and another $1.9 billion for indirect relief. *Id.* at 914-15. The attorneys were awarded $99 million in fees. *Id.* at 916 n. 5. *Cobell* not only involved twenty-four written opinions and multiple appeals to the D.C. Circuit on unprecedented complex cutting-edge issues of Indian law and sovereign immunity, but required Congressional legislation before the settlement could be approved; the case lasted from 1996 to 2012, over three times as long as this case. In short the *Cobell* attorneys won five times as much money, yet received almost an identical amount of what class counsel is asking for here, and did so in a riskier, more complex, and longer case.

Somehow both of these settlements are entirely absent from the Coffee and Miller reports. Cases like *Cardinal Health*, however, an out-of-circuit S.D. Ohio case where the multiplier was 5.9, a figure entirely illegal under Second Circuit law, is included, and used to inflate the averages.

I have been prejudiced by the late notice from expanding this section further; further investigation would likely find more holes in the Coffee and Miller reports. But they facially fail to defend the greater-than-17% award that is being requested, or even the 16.5% one they hypothesize.

## VI. Class Counsel Dramatically Inflates Its Lodestar with Wildly Exaggerated Hourly Rates Several Times the Market Rate of What Paying Clients Are Willing to Pay.

As Miller concedes (¶ 32), in a settlement of this size, the lodestar crosscheck is a much more important indicator of fee fairness. Class counsel claims that they have a lodestar of $51,438,451.15. But this figure is nearly entirely imaginary, and based upon the fiction that

temporary contract attorneys doing trivial and relatively unskilled first-pass document review work that discerning paying clients refuse to pay a premium for has the same market rate of $350 to $550/hour that actual Kirby McInerney associates doing substantive work could bill.

Despite the late notice and class counsel's refusal to provide information about this subject, I have been able to uncover a great deal of evidence that class counsel has misled the Court in its fee petition by representing that temporary contract attorneys doing low-skill work are actually full-fledged attorneys doing highly-skilled legal work for class counsel's firms. In paragraph 141 of the joint declaration of Ira M. Press and Peter S. Linden (Docket No. 171), they write that Exhibit E (Docket No. 171-5) "is a firm resume for Lead Counsel and Lead Counsel's lodestar report that sets forth the identity and level of each Lead Counsel attorney and paraprofessional who worked on this litigation, their current billing rates, year of graduation from law school, and the number of hours each devoted to this litigation." But many of the names listed do not have resumes associated with them, and do not appear to be now or ever have been "Lead Counsel attorneys." Rather, online resumes for attorneys with the names of people listed in Exhibit E indicate that they are temporary contract attorneys.

For example, class counsel is requesting $550/hour (or over $1000/hour after a 1.89 multiplier) for the work of Kumudini Uswatte-Aratchi, but attach no resume for her. According to the New York State Unified Court System, Kumudini Uswatte-Aratchi works for Access Staffing in New York, NY, a contract-attorney staffing firm. Frank Decl. ¶ 28 & Ex. 5. Class counsel attributes a lodestar of $235,875.00 to the work of India Autry, and are thus requesting over $445,000 for her work. Ms. Autry's public LinkedIn page describes her as an "attorney, personal shopper, actress, and commercial model," with her current position as a "lipstick & style counselor." Frank Decl. ¶ 29 & Exs. 6-7. Class counsel attributes $1,438,387.50 of lodestar to Eileen Dimitry, and are thus seeking over $2.7 million at over $1000/hour for her work. No firm resume is presented for Ms. Dimitry.

Ms. Dimitry's public LinkedIn page describes her as a contract attorney at Hudson. Frank Decl. ¶ 32 & Ex. 10. There are clearly many more such examples of undisclosed contract attorneys (Frank Decl. ¶¶ 26-35), but because I have been prejudiced by the late notice of the class action settlement, and because class counsel has refused to voluntarily provide this information to me, I have not had time to fully research the extent of the failure to disclose. On information and belief, however, the overwhelming majority of "other attorneys" listed in Exhibit E are contract attorneys doing low-skilled document review, and being paid between $20 and $45 an hour. It is entirely possible that they are not even doing low-skilled attorney work, but are doing purely clerical "objective coding" work that need not be performed by an attorney at all—all to inflate the lodestar and create tremendous profit for class counsel at the expense of the class.

This is unethical. The ABA Standing Committee on Ethics ruled that "In the absence of an agreement with the client authorizing a greater charge, the lawyer may bill the client only its actual cost plus a reasonable allocation of associated overhead, such as the amount the lawyer spent on any office space, support staff, equipment, and supplies for the individuals under contract." Furthermore, "The analysis is no different for other outsourced legal services, except that the overhead costs associated with the provision of such services may be minimal or nonexistent if and to the extent that the outsourced work is performed off-site without the need for infrastructural support. If that is true, the outsourced services should be billed at cost, plus a reasonable allocation of the cost of supervising those services if not otherwise covered by the fees being charged for legal services." ABA Formal Opinion 08-451 (attached as Frank Decl. Ex. 12). There is no evidence how much overhead can be attributed to the temporary attorneys; for a forty-million-page document review, the review was almost certainly conducted offsite, and the supervision performed by attorneys who are already being billed separately. *See also generally, e.g.,* Lester Brickman, *Lawyer Barons* 378-87 (Cambridge U. Press 2011); *id.* at 501-06.

---

In the post-financial crisis era of e-discovery and tighter legal budgets, no discerning client pays $550/hour for a temp document reviewer in a giant class action just because they had ten years of experience as a real estate attorney. Paying clients refuse to pay more than cost for such services, and some negotiate discounts below that for large projects—such as forty-million-page document reviews.

The lodestar requires an analysis of the *market rate*: as class counsel themselves argue, "the best indicator of the 'market rate' in the New York area for plaintiffs' counsel in securities class actions is to examine the rates charged by New York firms that *defend* class actions on a regular basis." Dkt. 170 at 8 n.8 (*quoting In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 589 (S.D.N.Y. 2008)). Simply put, no paying client in 2012 tolerates a New York (or any other) firm charging $350 to $550/hour for low-skilled temporary contract attorney work. Frank Decl. ¶¶ 36-55. Citibank should disclose what it paid for first-tier document review and objective coding in this case, and class counsel should be denied fees until they identify tasks that their attorneys and contract attorneys performed.

Class counsel can certainly point to a handful of district-court cases where other class counsel snookered district court judges into awarding full freight for document review, and permitting class counsel to collect a $550/hour lodestar for fungible attorneys they were paying $35/hour for unskilled drudgework. But none of these cases addressed the relevant language regarding billing for offsite outsourcing in ABA Opinion 08-451, and none of these cases considered the legal market in the post-financial crisis era. For example, *Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400, 409 (D. Conn. 2009), relied upon a 1998 article noting that many law firms upcharged for temporary contract attorneys. And such billing was indeed common in 1998. But judicious paying clients do not pay $300/hour rates for document review attorneys today, or even $150/hour rates. They either hire the temporary attorneys directly, or demand that defense firms pass the attorneys

through at cost, or even below cost, at rates like $50/hour. Simply put, in today's legal market, clients refuse to tolerate law firms treating gigantic document review projects as a profit center. The evidence is that defendants in 2012 do not pay defense firms three-digit sums for basic tasks such as document review, and neither should class members. Frank Decl. ¶¶ 36-55. Coffee and Miller provide no evidence to the contrary and appear to have accepted the false representations of Kirby McInerney about the lodestar without scrutiny.

If the class representatives failed to negotiate with class counsel a rate for first-tier document review and objective coding a rate similar to that what is paid in the marketplace by paying clients, they are in breach of their fiduciary duties to the class by failing to put the class's interests ahead of their attorneys' interests, and decertification would be appropriate under Rule 23(a)(4).

The late notice has prevented me from documenting these facts to my complete satisfaction; if Citibank will not voluntarily disclose their document-review payments or the Court is unwilling to credit my testimony, I will have been unfairly prejudiced by the late notice.

## VII.   The Proposed Multiplier Overcompensates Class Counsel for the Risks of the Case and the Poor Results Achieved.

Because the lodestar figure is wildly inflated, the proposed multiplier is actually likely to be more than 3 rather than the 1.89 the parties claim once reasonable hourly rates are provided.

The expert reports and fee briefing fails to identify a unique feature of PSLRA litigation: the discovery stay. Discovery does not begin until a motion to dismiss is denied. But (1) discovery is the most time-consuming and expensive aspect of pre-trial litigation; and (2) the motion to dismiss is the riskiest part of a PSLRA case. Once a PSLRA plaintiff survives the motion to dismiss, 82% of cases settle. Frank Decl. ¶¶ 56-60.

An analogy from a different type of risk strategy is apropos. In blackjack, a card counter can make money because she varies her bets as she keeps track of the cards that have been played. If the

remaining playable deck is filled with low cards, she knows her odds are worse, and she bets less money or leaves the table; but if the remaining playable deck is filled with high cards and aces, she know that the odds are in her favor and should make larger bets. Similarly, any hedge-fund manager will describe her portfolio of risky investments, and tell you that she invests more money on the investments that are most likely to pay off. *Cf. generally* J.L. Kelly, Jr., *A New Interpretation of Information Rate,* 35 Bell System Tech. J. 917 (1956) (mathematical formulation of this optimization principle, the "Kelly criterion").

Thanks to the discovery stay, it is easy for PSLRA attorneys to act like hedge-fund managers or like card-counters in blackjack. The motion to dismiss is risky, but the plaintiffs' attorneys can devote relatively small bets and investments to the early part of the case. If they lose the motion to dismiss, the loss is pretty small. But once they survive the motion to dismiss, the odds are better than 4:1 in their favor on average, and they can load up the lodestar with as much discovery as the other side will tolerate. The discovery doesn't even have to be useful, because no court second-guesses the decision to devote hours of superfluous temporary attorneys to millions of pages of documents that have nearly no chance of being relevant. Moreover, plaintiffs' attorneys can pick and choose which cases to put resources into, and will naturally choose the cases that are more likely to have a large settlement—just like a blackjack player will double down on an 11, but not on a 12. Thus, it is very rare for PSLRA attorneys to devote tens of thousands of hours to a case—especially a multi-billion dollar alleged damages case where even a nuisance settlement will be large—and be unable to settle. The calculations of Coffee and Miller fail to take into account this "card-counting" effect, and treat every hour spent on a case as if the decision to invest an hour in 2011 after the motion to dismiss was denied is the same as an hour in 2007 before the complaint is filed. But if class counsel is required to disclose how much lodestar was spent before the motion to dismiss was denied and how much lodestar was spent after the motion to dismiss was denied, the Court will see

a stark difference: most of the hours in the case will have been devoted well after most of the risk of not settling had passed.

Furthermore, since most of the class counsel's precedent, the Supreme Court has spoken out against the use of multipliers; the law has a "strong presumption that the lodestar is sufficient" without an enhancement multiplier. *Perdue v. Kenny A.,* 130 S. Ct. 1662, 1669 (2010). A lodestar enhancement is justified only in "rare and exceptional" circumstances where "specific evidence" demonstrates that an unenhanced "lodestar fee would not have been adequate to attract competent counsel." *Id.* at 1673. "[T]he burden of proving that an enhancement is necessary must be borne by the fee applicant." *Id. Kenny A*'s limitation on enhancements was made in the context of interpreting 42 U.S.C. § 1988's language of "reasonable" fee awards, but has equal application to "reasonable" fee awards in class actions made under Fed. R. Civ. P. 23(h). *See, e.g., Gonzalez v. S. Wine & Spirits of Am., Inc.,* No. 11-cv-5849, 2012 U.S. Dist. LEXIS 46401, at *12-*16 (C.D. Cal. Mar. 29, 2012) (citing *Kenny A* and denying enhancement multiplier of 1.5); *Weeks v. Kellogg Co.,* No. 09-cv-8102, 2011 U.S. Dist. LEXIS 155472, at *129-*135 & n.157 (C.D. Cal. Nov. 23, 2011) (citing *Kenny A* and finding "little basis for an application of a multiplier" when calculating lodestar cross-check).

But neither Coffee nor Miller nor the plaintiffs provide the "specific evidence" that a 1.89 multiplier is necessary to create the adequate incentive. It plainly is not. We know that a multiplier is unnecessary to attract class counsel here, because we know that when district courts put class counsel status up for competitive bid, they can increase class recovery to over 90% of the common fund. *E.g., In re Auction Houses Antitrust Litigation,* 197 F.R.D. 71 (S.D.N.Y. 2000); *In re Amino Acid Lysine Antitrust Litig.,* 918 F. Supp 1190 (N.D. Ill. 1996) (winning bid agreed to sliding scale with $3.5 million cap in case that eventually settled for over $40 million). While it is unclear whether the PSLRA permits auction mechanisms in selecting lead counsel, there is no reason not to bind class counsel to the results that the marketplace would have produced. Imagine a world where class

counsel spends ten times as many hours on cases where the motion to dismiss is denied than on cases where the court does not deny the motion to dismiss. (That 5:1 ratio is almost certainly a conservative estimate.) Thus, while only 56.6% of cases may settle, a law firm can readily allocate hours so that it spends only a quarter of its hours on losing cases. As a result, a law firm that received a 1.89 multiplier in every case that it settled would average substantially above lodestar:

**Table 1**

| Category | % of cases[2] | % of hours | Multiplier |
|---|---|---|---|
| Settled before ruling on motion to dismiss | 17.7% | 6.1% | 1.89 |
| Dismissed on 12(b)(6) | 34.8% | 12.0% | 0 |
| Settled after motion to dismiss | 38.9% | 67.2% | 1.89 |
| Dismissed on summary judgment | 8.6% | 14.7% | 0 |
| **TOTAL** | 100% | 100% | 1.38 average |

**Table 2**

| Category | % of cases | % of hours | Multiplier |
|---|---|---|---|
| Settled before ruling on motion to dismiss | 17.7% | 6.1% | 1.76 |
| Dismissed on 12(b)(6) | 34.8% | 12.0% | 0 |
| Settled after motion to dismiss – pre-ruling hours | 38.9% | 13.4% | 1.76 |
| Settled after motion to dismiss – post-ruling hours | | 53.7% | 1.22 |
| Dismissed on summary judgment | 8.6% | 14.7% | 0 |
| **TOTAL** | 100% | 100%* | 1.00 average |

In comparison, a 1.76 multiplier for hours spent before the motion to dismiss is decided and a 1.22 multiplier for hours spent after the motion to dismiss is decided is more than sufficient to incentivize class counsel to engage in securities litigation and ensure that they average above lodestar rates, as demonstrated by Table 2 above. Frank Decl. ¶ 67.

---

[2] *See* Frank Decl. ¶¶ 56-59.

If class counsel disputes these numbers, they should open their books to the last few years of their resolved securities litigation, and we can have a firm-specific empirical basis for calculating the multiplier that will compensate counsel for risk. Given that the 5:1 ratio estimate is conservative, and that this model also conservatively assumes that class counsel doesn't know which cases that survive motions to dismiss are most likely to settle before summary judgment, I would think that opening the books to how much lodestar is devoted to losing cases would show that even lower multipliers than 1.76 and 1.22 for pre- and post-motion-to-dismiss hours would be sufficient to attract competent class counsel.

## VIII. Nine Cents on the Dollar Is Not a "Success."

Assuming *arguendo* that the maximum recoverable damages are $6.3 billion, a $590 million settlement reflects $0.09 of recovery for every dollar of damages. With *chutzpah*, class counsel, Coffee, and Miller call this a "success." That is plainly false. It is only a success relative to even worse nuisance settlements. If $0.09 on the dollar permits a multiplier at the high end of what Second Circuit law allows, what incentive is there to actually win a case? "Class Counsel has requested for itself an uncontested cash award based on lodestar, rather than the value of the class recovery, with only a modest discount from the claimed lodestar amount. In other words, the class is being asked to 'settle,' yet Class Counsel has applied for fees as if it had won the case outright." *Sobel v. Hertz*, No. 3:06-CV-00545, 2011 U.S. Dist. LEXIS 68984, at *44 (D. Nev. Jun. 27, 2011) (contrast that negative multiplier request with the fee request for 1.89 times lodestar in the present case).

Coffee argues that there was risk of bankruptcy from an action seeking $6.3 billion in damages that merits settling for a lower amount. This position alone suggests that he cut-and-paste his report from an earlier "bless these fees" report without looking at the facts. Had Professor Coffee examined the deep-pocket defendant, he would see that Citigroup had a market capitalization

of over $110 billion as of the date of his report, and annual after-tax profits in 2010 and 2011 were $10.95 billion and $11.1 billion respectively. This year, it was one of five banks participating in a $25 billion robosigning settlement, yet its stock price has increased 50% from $26.31 to $39.45. There was no risk of defendant bankruptcy here. If plaintiffs actually thought there was bankruptcy risk when negotiating the settlement, it would be a reason to find the settlement unfair, but one suspects that class counsel just didn't look at the Coffee report very closely because they didn't expect any objectors to look at the report very closely. (Why would they when they weren't going to get notice?)

Given the unpopularity of too-big-to-fail banks and the demand for blood in the financial crisis, Citigroup faced a jury-trial risk second only to defendants in the Deepwater Horizon spill. A months-long Manhattan jury trial, with an eligible pool disproportionately consisting of students and the unemployed or underemployed, presented enormous risks, especially in a lawsuit involving the complex financial instruments of collateralized debt obligations and residential mortgage-backed securities that were the centerpiece of the financial crisis. It is hard to imagine skilled prudent defense counsel telling her client, no matter how confident she is about the merits of the case, that there is a greater than 90% chance of prevailing at a jury trial.

Thus, other financial-crisis cases have resulted in enormous settlements. *In re Bank of America Securities Lit.*, No. 09-MDL-2058 (S.D.N.Y.), which alleges $10 billion to $15 billion in damages from the failure to disclose similar liabilities relating to the merger with Merrill Lynch, with Paul Weiss also acting as defense counsel, is settling for $2.425 billion, or $0.16 to $0.24 on the dollar. Lattman, *supra.*

Marketplace reaction also tells us something about the "success" of this settlement. The Associated Press reported during the trading day of August 29, 2012, that Citigroup had settled this case for $590 million. Though the S&P 500 and other bank stocks such as Bank of America declined in the market that day, the market thought Citigroup had had good news, and Citigroup's stock price

increased 2.0% from \$29.34 to \$29.91, a \$1.67 billion increase in market value. The marketplace apparently thought the settlement was much more successful for Citigroup than for plaintiffs.

This is not an argument against the fairness of the size of the settlement or a claim that class counsel has settled on the cheap; if class counsel claims that the risks of the case meant that the best settlement possible was nine cents on the dollar, when the market apparently thought the litigation would cost Citigroup \$2.26 billion, so be it. (It is ironic, however, that attorneys who stake class certification on "fraud on the market" theory would be in a position of arguing that the market had overestimated the value of class counsel's lawsuit against Citigroup.) But a case with a solvent and unpopular defendant that is settling for nine cents on the dollar is a nuisance settlement, even if it is for \$590 million. Class counsel is entitled to compensation for the very tangible results they have achieved for the class, but they are not entitled to an "exceptional" windfall fee as if they had fully compensated the class when they agree to an unexceptional nuisance settlement. If class counsel are that unconfident about the merits of the case that they would settle it for close to the same amount as an entirely meritless case would settle, it suggests that there is a real injustice that it was brought at all.

**IX.     The Expert Opinions Must Be Excluded.**

Though I have been prejudiced in being unable to have time to identify every error in the expert reports, what I have found in the wake of late notice is more than enough to demonstrate the reports are junk science. The expert opinions are based on the wrong legal standard (Section IV above); they ignore the inconvenient empirical evidence from studies they cite themselves while including improper precedents that violate Second Circuit law as comparisons (Section V above); they assume an exaggerated lodestar (Section VI above); they overstate the risk of PSLRA litigation without accounting for the fact that attorneys need not make substantially heavy investment until they are reasonably assured of at least a nuisance settlement (Section VII above); they overstate the

degree of success (Section VIII above). Garbage in, garbage out. The failure of the experts to even consider what the law requires them to consider shows the degree to which they are acting as rubber stamps rather than as neutral experts. The reports should be excluded: there "is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Any attempt to rejigger the reports to reflect more truthful premises and data yet reaching the same conclusion should be rejected as disingenuous.

## X.     Class Counsel's Argument for Resisting Discovery Is Frivolous.

Class counsel refused to permit the expert witnesses to be deposed because, it claimed, "Courts look with disfavor on attempts to take discovery in connection with objections to a class action." Frank Decl. Ex. 14 at 2. But I am not objecting to a class action; I am not asking to reweigh the merits or review discovery already taken. I am objecting to a Rule 23(h) *fee request* where there has been no litigation, no cross-examination, no discovery, and no testing of the absurd contentions made. Thus, *Malchman v. Davis*, 761 F.2d 893, 897-98 (2d Cir. 1985), talks about avoiding holding "mini-trials on the *merits*" (emphasis added) where "defendants had deposed the named plaintiffs at length" on the same issues that the objectors sought discovery on—at the same time implying that if there had not already been such discovery by defendants, it would have been error to refuse the discovery. *Id.* at 898. Class counsel does not contend that the defendants have deposed the experts on attorneys' fees; they do not contend that I am seeking discovery that duplicates that already taken. Thus, *Malchman supports* my right to discovery in this particular case. Similarly, *Wal-Mart Stores v. Visa*, 396 F.3d 96, 120 (2d Cir. 2005) involved a dispute about discovery into the *merits* of the class action and Rule 23(e) adequacy of the "*settlement offer*" (emphasis added). Again, it is reasonable to preclude second-guessing of an arms-length negotiation between the plaintiffs and the defendants about the underlying merits of litigation in the absence of evidence of collusion or a reverse auction.

But that is not this case. I am making a challenge to the Rule 23(h) reasonableness, rather

than the Rule 23(e) adequacy; the former is a dispute between the class counsel and the class members, while the latter is a dispute between plaintiffs and defendants. If objectors cannot seek discovery on the fee requests, no one will, and the fairness hearing will be a sham. Class counsel seems to think that the Rule 23(h) hearing is simply for show, and that class members are neither entitled to notice nor adversarial testing of the issues. That simply isn't so. In "common fund cases the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052 (9th Cir. 2002). Class counsel is on the same side as class members when it comes to establishing the size of the settlement fund, making discovery on those issues redundant. But class counsel is adverse to the class members when it comes to the question of how much of $100.3 million will go to class counsel or the class. "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970). This is especially so given that I have shown probable cause that there was an abusive fee request for tens of millions of dollars more of the class's money than class counsel is entitled to, and that the expert witnesses gerrymandered their expert opinions to exclude inconvenient evidence and failed to consider the correct relevant legal standard.

## XI. The Silence of the Class Should Not Be Construed as Acquiescence to the Fee Request.

*Grinnell* asks courts to consider the class's reaction to the settlement. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974). But a court should not infer anything from the relatively low number of objectors. Silence is simply *not* consent. "[A] combination of observations about the practical realities of class actions has led a number of courts to be considerably more cautious about inferring support from a small number of objectors to a sophisticated settlement." *In re GMC Pick-Up Litig.*, 55 F.3d 768, 812 (3d Cir. 1995) (*citing In re Corrugated Container Antitrust Litig.*, 643 F.2d 195,

217–18 (5th Cir. 1981)). "Acquiescence to a bad deal is something quite different than affirmative support." *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1137 (7th Cir. 1979) . "Silence may be a function of ignorance about the settlement terms or may reflect an insufficient amount of time to object. But most likely, silence is a rational response to any proposed settlement even if that settlement is inadequate. For individual class members, objecting does not appear to be cost-beneficial. Objecting entails costs, and the stakes for individual class members are often low." Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 FLA. L. REV. 71, 73 (2007). Without *pro bono* counsel to look out for the interests of the class, filing an objection is economically irrational for any individual. Class counsel may have exaggerated their fee request by tens of millions of dollars, but that is spread across over three billion share purchases. A class member would have to have a million shares purchased in the class period to be willing to spend $10,000 on an attorney to challenge the fee request—and would have to have the background expert knowledge to see through the misleading fee request to know that there were grounds to do so. And as rushed as this *pro se* brief was given the short notice and compressed schedule I had, I doubt there would be another attorney in the entire country willing to produce a brief of similar detail for as little as $10,000.

All of this is especially true in this case, where there has been late notice during the holiday season, making it difficult to retain counsel on short notice. It is further true given that when I called the settlement administrator, I was given information that seemed calculated to deter shareholders from objecting. Frank Decl. ¶¶ 14-15. It is further true given that this is a nationwide class, but any objector wishing to be represented by an attorney must incur the burden of hiring local counsel admitted to the Southern District of New York. Such an expensive burden is unfair to unnamed class members who may have no connection to this venue but are involuntarily forced to appear in an inconvenient forum by the class action process to preserve their rights. There should have been a

procedure permitting out-of-state objectors in a national class to more easily retain out-of-state *pro bono* counsel.

The reason this case is being pursued as a class action is because individual class members cannot economically pursue this case without aggregation. The Court should draw no inference in favor of the fee request from the number of objections, especially given the vociferousness of the objectors. *GM Pick-Up Trucks*, 55 F.3d at 812-13; *American Law Institute Principles of Aggregate Litigation* § 3.05 comment *a* at 206.

## XII.    Statement Regarding Fairness Hearing.

My reasons and evidentiary support for the objection are stated in this brief and in my declaration. Because of the late notice, I reserve the right to present additional evidentiary support that I do not currently have in my possession.

The fairness hearing is scheduled for January 15, 2012. I have a pre-existing commitment to argue on behalf of a client in the Texas Fourteenth Court of Appeals in Houston on January 16, 2012, and am unsure if I will be able to attend the fairness hearing, but I reserve the right to do so or retain counsel to do so. I reserve the right to retain an expert witness and call him or her at the fairness hearing, and to present any evidence that is in the record of this case, including the exhibits to my declaration. To the extent the parties continue to claim that the notice was the "best practicable," I reserve the right to call a witness from the Garden City Group. To the extent the parties contend that the market rate for first-tier document review is greater than $50/hour to $65/hour, I reserve the right to call a witness from Citigroup, Inc., to determine what they paid for first-tier document review in this case, and to present any associated evidence. I reserve the right to cross-examine any witnesses presented in support of the fee request and any witnesses who assert that the settlement is more than a nuisance settlement. I join any objections to the fee request and notice to the extent they are not inconsistent with this one.

I add that it is my experience that, because I successfully object to a number of class action settlements as part of my non-profit work, class counsel defending unfair fee requests and settlements attempt to tar me as a "professional objector" and then ask courts to apply precedents to me relating to objectors who file boilerplate objections unrelated to the merits of the settlement in bad faith and then attempt to extort class counsel by threatening to unfairly hold up a settlement. This is wrong. *See* Frank Decl. ¶¶ 75-81. I am not bringing this objection for a personal payout: I wish to win on the merits for the benefit of the shareholder class as a whole. But if this Court has any question whether I am bringing this objection in good faith, I am willing to stipulate to an injunction prohibiting me from accepting payment to settle my objection.

## CONCLUSION

There is more than enough here for the Court to demand additional disclosures; conclude from the revealed hidden information that the proposed percentage, the claimed lodestar, and the proposed multiplier are all excessive; and that class counsel has made a fee request without reference to the correct statute or legal standard. If, however, the Court is not inclined to credit my objections in the absence of the expert witness I have not had time to recruit because of the late notice, it should postpone the objection deadline and fairness hearing, and permit discovery. Given the late notice and the misleading fee request papers, there is no reason to credit class counsel's argument that a supposed lack of objectors indicates support for the settlement. There are tens of millions of dollars at stake for the class in the Rule 23(h) hearing, and the class is entitled to more than a perfunctory imitation of a hearing.

Dated: December 20, 2012.

Theodore H. Frank
11307 Bulova Lane
Fairfax, VA 22030

DC Bar No. 450318
1718 M Street NW, No. 236
Washington, DC 20036

Phone: (703) 203-3848
Email: tedfrank@gmail.com

*In pro per*

### Certificate of Service

The undersigned certifies he caused to be served via FedEx overnight shipment a copy of this Objection and associated Declaration of Theodore H. Frank upon the following.

**Clerk's Office**

Clerk of the Court
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312
Re: In re Citigroup Inc. Securities Litigation,
Case No. 07 Civ 9901 (SHS)

**Defendants' Counsel**

Brad S. Karp, Esq.
Richard A. Rosen, Esq.
Susanna M. Buergel, Esq.
Jane B. O'Brien, Esq.
Asad Kudiya, Esq.
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019

**Lead Class Counsel**

Peter S. Linden, Esq.
Ira M. Press, Esq.
Andrew McNeela, Esq.
Kirby McInerney LLP
825 Third Avenue
New York, NY 10022

I further served these eight attorneys with PDF copies via email.

Dated: December 20, 2012.

_Theodore H. Frank_

Theodore H. Frank