Francis O. Scarpulla (41059)
Patrick B. Clayton (240191)
LAW OFFICES OF FRANCIS O. SCARPULLA
456 Montgomery Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 788-7210
Facsimile: (415) 788-0706
Email: fos@scarpullalaw.com
       pbc@scarpullalaw.com

Counsel for Indirect-Purchaser Plaintiffs

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| **IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION** | Master File No. 3:07-cv-5944-JST<br><br>MDL No. 1917 |
| This Document Relates to:<br><br>All Indirect-Purchaser Actions | **OBJECTIONS TO PROPOSED FEE ALLOCATIONS**<br><br>Judge: The Honorable Jon S. Tigar<br>Special Master: The Honorable Martin Quinn<br>Hearing Date: TBD<br>Hearing Venue: JAMS |

# TABLE OF CONTENTS

Page No.

I.     INTRODUCTION                                                                      1

II.    APPLICABLE LEGAL PRINCIPLES                                                       2

III.   OBJECTION TO FEE ALLOCATION TO LAW OFFICES OF FRANCIS O.
       SCARPULLA                                                                        3

       A.   Derivation of Law Offices of Francis O. Scarpulla's Fees                    3

       B.   Proper Fees Due Law Offices of Francis O. Scarpulla                         4

IV.    OBJECTION TO OVERALL FEE ALLOCATIONS                                             8

       A.   Illegible Time Reports Cannot Furnish the Basis of An Allocation            8

       B.   A Significant Portion of the Time Was Recorded in Quarter-Hour Increments
            and Therefore Cannot be Used to Allocate the Gross Fees Awarded Without
            Significant Reductions                                                      9

       C.   A Reduction in Lodestar for "Block Billing" Is Appropriate and Will Affect
            the Proposed Fee Allocation, Accordingly                                    12

       D.   Time Entries That Demonstrate That Work Did Not Benefit the Class Should
            Be Eliminated from the Lodestar Computation                                 14

            1.   Lead Counsel's LG Settlement Cost the Class Hundreds of Millions
                 of Dollars and Should Not Be Rewarded                                  14

            2.   Clerical Work Should Not Be Compensated at Attorney Rates, Let
                 Alone Subject to any Positive Multiplier                               14

            3.   Lead Counsel's Unnecessary Fight with the California Attorney
                 General Should Not be Compensated                                      15

            4.   Alioto's Refusal to Cooperate with Other Counsel Caused Excessive
                 Time to be Spent and Should Not Be Rewarded                            16

            5.   Limited Class Claims Requires a Reduction in any Multiplier            16

            6.   A Significant Number of the Firms Did No Substantive Work That
                 Benefitted the Settlement Class                                        17

       E.   The Lodestars of the Late-Added Trial Counsel Who Had No Litigation or
            Financial Risk Should Not Be Subject a Multiplier                           17

       F.   Counsel Who Made No Financial Contribution to the Litigation Expense Fund
            Should Not Receive a Positive Multiplier                                    18

       G.   No Multiplier On Lodestars Except For Extraordinary Work                    20

i

<u>TABLE OF CONTENTS (cont.)</u>

<u>Page No.</u>

H.      TATP Did Not Follow Its Own Criteria                          20

V.    CONCLUSION                                                      22

1

<u>TABLE OF AUTHORITIES</u>

2

Page No.

3

*Apple, Inc. v. Samsung Electronics Co.*
    2012 WL 5451411 (N.D. Cal. Nov. 7, 2012)                12

4

*Banas v. Volcano Corp.*
    47 F.Supp.3d 957 (N.D. Cal. 2014)                       12

5

6

*Hajro v. U.S. Citizenship & Immigration Servs.*,
    900 F.Supp.2d 1034 (N.D. Cal. 2012)                     12

7

*In re Agent Orange Product Liability Litigation*
    818 F.2d 216 (2nd Cir. 1987)                            2, 18, 20

8

9

*In re FPI/Agretech Securities Litigation*
    105 F.3d 469 (9th Cir. 1997)                            2

10

*Keller v. National Collegiate Athletic Association*
    Case No. C 09-1967 *et seq.*, 2015 WL 8916392
    (N.D. Cal. Dec. 15, 2015)                               2, 8, 17

11

12

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*
    114 F. Supp.3d 819 (N.D. Cal. 2015)                     11

13

*Prudential Ins. Co. v. Remington*
    No. 2:12-cv-02821 (E.D. Cal. Jan. 24, 2014)             11

14

15

*Robinson v. Plourde*,
    717 F.Supp.2d 1092 (D. Haw. 2010)                       11

16

*Rosales v. El Rancho Farms*
    No. 1:09-cv-00707, 2015 WL 4460635
    (E.D. Cal. July 21, 2015)                               11

17

18

*Scott v. City of New York*
    643 F.3d 56 (2nd Cir. 2011)                             8, 9

19

20

*Thayer v. Wells Fargo Bank*
    92 Cal.App.4th 189 (2001)                               16, 20

21

*Welch v. Metropolitan Life Ins. Co.*
    480 F.3d 942, 948 (9th Cir. 2007)                       11

22

23

24

25

26

27

28

# I
## INTRODUCTION

On August 22, 2016, Lead Counsel for the Indirect-Purchaser Plaintiffs ("IPP") in this MDL proceeding, Trump, Alioto, Trump & Prescott ("TATP" or "Alioto"), filed a proposed allocation of the previously-awarded fees to all IPP firms (Doc. Nos. 4712, 4717, 4740 and 4790); this proposed allocation was revised and re-filed on August 25, 2016 (Doc. No. 4800).  In the currently-proposed allocation, TATP recommends that the Special Master allocate to the Law Offices of Francis O. Scarpulla ("LOFOS" or "Scarpulla") fees in the amount of $49,790.74, without indicating how this amount was derived or why Scarpulla's reported lodestar was reduced from $424,577.50, to $66,431.25 and then subjected to a negative multiplier of 0.7495.  *See* Scarpulla Decl., Ex. 1, filed concurrently herewith, and Doc. No. 4800, Ex. A.  The only explanation offered by TATP for cutting LOFOS's fee is that Scarpulla allegedly "…worked at cross purposes to other counsel in the case …" (Doc No. 4790, at p. 4:13-16).[1]  Therefore, the only reason advanced by TATP to cut Scarpulla's fees is, apparently, to punish Scarpulla for the temerity of opposing this inadequate settlement and excessive fee request.  In no other case has a court ever endorsed punishment as a reason to reduce any class counsel's lodestar or to apply a negative multiplier to it.  This Court should not be the first to do so.

Because LOFOS is directly affected by any fee allocation, it hereby objects both to the proposed fee allocation to LOFOS and to the overall TATP fee-allocation proposal.[2]

---

[1] The other reasons advanced for cutting the multiplier of the nine firms in the bottom tier – *e.g.*, no substantive work, unreliable, position adverse to the class, and billing issues -- do not apply to Scarpulla.

[2] Whether any adjustment in TATP's proposed allocation creates excess funds for either re-allocation to those firms who did substantive work (being careful not to create a "windfall" for any firm) or whether such excess funds should be returned to the Settlement Fund ultimately for distribution to the Class Members is for the Special Master and/or the Court to decide.  LOFOS respectfully suggests that any excess should be first re-allocated to deserving firms and then, if any is still left over, returned to the Class Members.

## II
## APPLICABLE LEGAL PRINCIPLES

For almost 30 years, case-law precedent has required that in awarding and allocating fees from a class action settlement fund, a court must be concerned not only for the overall amount of fees awarded, but also to the fees allocated to the individual firms representing the class plaintiffs. *In re Agent Orange Product Liability Litigation*, 818 F.2d 216, 225 (2nd Cir. 1987).  A district court's role in awarding – and allocating – fees then is as the "protector of the class interests" and it must assure reasonableness in awarding – and allocating – fees in equitable fund cases such as this one.[3]  *In re FPI/Agretech Securities Litigation*, 105 F.3d 469, 473-474 (9th Cir. 1997); *accord, Agent Orange,* 818 F.2d at 222; *see also, Keller v. National Collegiate Athletic Association*, Case No. C 09-1967 *et seq.*, 2015 WL 8916392 (N.D. Cal. Dec. 15, 2015).  Thus, the overriding analysis by any court in allocating a gross fee award is to determine whether the attorney's specific services benefitted the class.  No attorney should be rewarded disproportionately "to the benefits that attorney conferred on the class – even if the allocation in fact has no impact on the class." *Agretech Securities,* 105 F.3d at 473.

In allocating fees among counsel in an equitable fund case such as this one, it is imperative for the Court to comply with the overriding policy that the distribution of fees among class counsel must bear a direct relationship to the services rendered by each of plaintiff's counsel.  Those requirements include a thorough and careful examination of:  (1) the reasonable amount of time spent by each plaintiffs' firm seeking a fee award; (2) the risks of litigation, including both merit risks as well as financial risks to each such firm; (3) the results achieved by each firm; and (4) the benefits to the class – both from any cash settlement fund as well as any non-monetary consideration.  *Agretech Securities, supra*, 105 F.3d at 484; *Agent Orange, supra*, 818 F.2d at 223; *Keller, supra,* 2015 WL 89116392 at *5.  In short, any fee allocation process necessarily must

---

[3] Objectors/IPP Class Counsel, Josef Cooper and Francis Scarpulla, urged the Court to use the lodestar method for awarding fees to each individual firm appearing for plaintiffs in this proceeding (Doc. No. 4545-4).  The Court chose the percentage-of-the-fund approach to awarding a total fee to all plaintiffs' counsel, which order Objectors have appealed (Doc. Nos. 4740, 4751 and 4756).  Objectors do not waive their right to pursue their objections to a percentage-of-the-fund award in this particular case on appeal.

follow the same legal criteria employed for determining the appropriate fee under a "lodestar" approach to setting each firm's separate fees.

Rather than follow case-law precedent, TATP claims to have considered five factors when proposing fee allocations to the plaintiffs' firms:  (1) level of work performed; (2) amount of high level work performed; (3) quality of the work performed; (4) level of risk; and (5) billing efficiency rate.  However, when scrutinized carefully, TATP apparently failed to follow its own stated criteria, let alone comply with Ninth Circuit case-law precedent.

Based on this long-standing line of cases, this brief will demonstrate that certain of the fee allocations proposed by Lead Counsel do not comport with accepted legal precedent and are therefore improper and unfair to those firms who did substantive work on behalf of the Class.

### III
### OBJECTION TO FEE ALLOCATION TO
### LAW OFFICES OF FRANCIS O. SCARPULLA

**A.**      **Derivation of Law Offices of Francis O. Scarpulla's Fees**

This MDL action was filed when Scarpulla was the senior antitrust partner at the then-firm of Zelle, Hofmann, Voelbel & Mason ("Zelle").  While at Zelle, Scarpulla kept contemporaneous time records of his work on this case.  *See* Scarpulla Decl., Ex. 1.  These time records show that Scarpulla had a total Zelle-period lodestar of $424,577.50 at historic billing rates.

When Scarpulla left Zelle on March 21, 2015, he entered into an agreement with that firm, previously disclosed to the Court (Doc. No. 4073-3, p. 18:23-27), which provided, in relevant part, that one-half of Scarpulla's total Zelle-period lodestar was assigned to Scarpulla.  Any Zelle multiplier on its total lodestar also applies to the LOFOS-assigned lodestar amount because Scarpulla was a Zelle partner at the time his lodestar was generated so that if Zelle is entitled to a multiplier on its lodestar, so too is Scarpulla.  Scarpulla Decl., ¶ 3.

In or about May 2015, when Lead Counsel requested that all IPP counsel prepare a declaration attesting to their lodestars, Scarpulla prepared one which included his assigned one-half of Zelle-period lodestar and attached to it his daily time sheets.  Scarpulla Dec., ¶ 4.  Lead Counsel rejected Scarpulla's declaration and refused to include it in the fee petition.  Doc. No. 4071.

Scarpulla then filed his declaration (Doc. No. 4069), separate from the fee petition filed by TATP.  Shortly thereafter, Scarpulla discovered that Zelle's fee declaration excluded his remaining one-half lodestar from that firm's declaration – allegedly at the behest of Lead Counsel.  Doc No. 4073-3.  When Scarpulla discovered that Zelle had refused to include Scarpulla's one-half lodestar in that firm's fee petition – in violation of the agreement Scarpulla signed with Zelle upon his withdrawal from the firm – Scarpulla filed a supplemental fee declaration which included his total lodestar of $424,577.50.  Scarpulla Decl., Ex. 1.[4]

In Lead Counsel's original fee motion (Doc. No. 4073), TATP proposed that Scarpulla be paid $64,708.75, of the $212,288.75 in lodestar owed to him under his agreement with Zelle. Now, Lead Counsel proposes an allocation of $49,790.74 on Scarpulla's total lodestar.  Both reductions appear to be improper attempts to punish Scarpulla.

**B.    Proper Fees Due Law Offices of Francis O. Scarpulla**

The only time Scarpulla claimed in his fee petition was for work done:  (1) before TATP was appointed Lead Counsel, and at a time when the firms, including Zelle, were working on the early pre-trial issues in the case; (2) on tasks that Lead Counsel and the Zelle firm agreed would be handled by the Zelle's antitrust team headed by Scarpulla and Craig Corbitt, both the senior-most Zelle antitrust partners at that time; or (3) at the request of Special Master Vaughn Walker.  All of this time was carefully recorded and directly benefitted the Class and, therefore, is wholly compensable.

The initial Scarpulla time entries, starting on November 28, 2007 and going through the end of May, 2008, include time spent drafting, editing and finalizing the original complaint filed by Zelle (which became the model for the various amended complaints filed throughout this case), as well as working on the MDL pleadings (which resulted in all cases being transferred to the Northern District of California).  Additionally, during this period, Scarpulla was intimately

---

[4] Zelle may have agreed with TATP to reduce the one-half of Scarpulla's lodestar that remained with Zelle following Scarpulla's separation, but that does not reduce the $212,288.75 Zelle assigned to Scarpulla out of the total Zelle fees, which, at a minimum, would be due directly to LOFOS.

1  involved in all aspects of early pre-trial issues.  Scarpulla Decl., ¶ 5.

2      During this early period, Scarpulla also actively participated in drafting and/or editing the

3  initial Case Management Conference Statement, as well as attending the Case Management

4  Conference itself.  He also participated in Rule 26(f) disclosure issues during this period.  *Id.*

5      Then, on May 27, 2008, Scarpulla had an initial conference with counsel for Chunghwa

6  regarding a possible early settlement, which would include cooperation from that defendant;

7  thereafter Scarpulla communicated that information to both Direct-Purchasers' counsel and

8  Indirect-Purchasers' co-counsel.  Following up on this proposed settlement with Chunghwa,

9  Scarpulla worked on gathering information to evaluate the proposed settlement; he attended the

10  settlement conference with Chunghwa and participated in post-settlement meetings with his co-

11  counsel.  Once the Chunghwa settlement was negotiated and the proffer from that defendant

12  concluded, Scarpulla then participated in opposing Defendants' Rule 12(b)(6) motions to dismiss,

13  including those motions raising *Twombly* and FTAIA issues.  *Id.*, ¶ 6.

14      In or about May, 2013, Scarpulla became aware of the proposed settlement with LG, to

15  which he voiced his concerns because it was such a small amount ($25,000,000) from one of the

16  main defendants in the case.  Lead Counsel claimed the settlement was appropriate because it was

17  pre-class certification, which Scarpulla rejected as a valid reason for such settlement.  In fact, as a

18  comparison, Scarpulla obtained a mediated settlement of $380,000,000 from LG in the *LCD*

19  Litigation.  *Id.*, ¶ 7.

20      Subsequently, Scarpulla became aware of, and voiced his views about, the proposed Philips

21  settlement, including the problem created by Lead Counsel's refusal to work cooperatively with

22  the California Attorney General's ("AG") office on a joint settlement with Philips.  *Id.*, ¶¶ 8, 9.

23  During this time period, Scarpulla participated in the class certification motion filed by the

24  Indirect-Purchaser Plaintiffs, as well as in offering class-certification strategy advice to the Zelle

25  attorney who was preparing the class certification argument before the Special Master.  *Id.*, ¶ 10.

26      After the Court approved the Special Master's Report and Recommendation certifying the

27  Class, and with the proposed Philips settlement creating problems with the AG's office, Scarpulla

28  became involved in an attempt to resolve the looming conflict between TATP and the AG.  In that

1   regard, Scarpulla had multiple conferences with representatives from the AG's office, as well as

2   communications with Lead Counsel on this subject.  By August, 2014, the conflict between TATP

3   and the AG had reached the point where the Special Master, Judge Vaughn Walker, asked

4   Scarpulla to participate in an informal conference with Mr. Alioto and Emelio Varanini, from the

5   AG's office, in an attempt to resolve that unnecessary dispute.  To that end, Scarpulla prepared for

6   and attended a meeting with the Special Master, Mr. Alioto, and Mr. Varanini, among others.

7   Neither the Special Master nor Scarpulla could convince Mr. Alioto that it was in the best interests

8   of the Class for him to work cooperatively with the AG – as had been done in the *TFT/LCD*

9   *Antitrust Litigation* – rather than at odds with each other.  Scarpulla tried to impress on Mr. Alioto

10  that his public rift with the AG did nothing to benefit the Class because it gave the Defendants an

11  opportunity to play the IPP settlement against the AG's separate settlement (that included a

12  California *parens* claim for natural-person consumers, who were also in the IPP California Class).

13  *Id.*, ¶¶ 11, 12.

14        Mr. Alioto refused to cooperate with the AG, which exacerbated an already contentious

15  situation.  *Id.*, ¶ 13.

16        The work Scarpulla did to resolve the unnecessary dispute with the AG was a direct result

17  of his being asked to become involved – not only by the AG but also by the Special Master.  *Id.*, ¶

18  14.

19        At or about this same time, Scarpulla received communications from defense counsel

20  asking if he could become involved in settlement negotiation because attempts to discuss that issue

21  with Mr. Alioto had failed and were at an impasse.  Scarpulla suggested that Special Master

22  Walker be informed of the problem.  *Id.*, ¶ 15.

23        At this same time in September, 2014, Scarpulla was involved with giving advice about

24  trial strategy issues for the IPPs, as he was one of the few lawyers who had tried several antitrust

25  cases to juries.  *Id.*, ¶ 16.

26        While trial preparation was going forward, Special Master Walker requested that Scarpulla

27  become more involved in the resolution of the case, primarily in the area of settlement

28  negotiations.  *Id.*, ¶ 16.

To that end, Scarpulla, along with several co-counsel, sent Mr. Alioto a letter dated October 2, 2014, outlining Mr. Alioto's shortcomings and offering to work with him to either settle the case or get it prepared for trial. *Id.*, ¶ 17, Ex.2. That offer was rejected, which apparently prompted Special Master Walker to issue a Report and Recommendation suggesting that Mr. Scarpulla and Josef Cooper, another experienced antitrust attorney, be appointed co-lead counsel with Mr. Alioto to get the case resolved, *See* Doc No. 3200.

Although that recommendation was not adopted by Judge Conti, nevertheless Scarpulla continued to communicate with Special Master Walker, Mr. Alioto, Mr. Varanini and Defense Counsel in an attempt to get this case settled. Scarpulla Decl., ¶ 18.

Because Scarpulla was the senior-most IPP antitrust lawyer in this case, his work was performed at the highest levels. Of all of the individual lawyers in the IPP class action, none has received the honors that Scarpulla has received over his years of practice – Band 1 Chambers Partners USA, Super Lawyer, Best Lawyers in America, Martindale AV Preeminent, Antitrust Lawyer of the Year, CLAY award for Antitrust, and many others. *See* Doc. Nos. 4069-1 and 4086-1. Not only was Scarpulla's work in the highest level, but the quality of his work was excellent – that is why Special Master Walker recommended Scarpulla as a co-lead counsel when Mr. Alioto was unable to properly prosecute this class action. *See* Doc. No. 3200. The risk to Scarpulla while at Zelle was significant, as his then-firm contributed millions in lodestar and had advanced over $168,946.50 in assessments and out-of-pocket expenses.[5] Doc. No. 4073-3. Finally, Scarpulla's daily time records demonstrate clearly that he spent his time efficiently.[6] Therefore, Scarpulla clearly satisfied all of Mr. Alioto's self-derived criteria. Nevertheless, Mr. Alioto has suggested a fee of $49,790.74 on Scarpulla's total lodestar of $424,577.50. This allocation should be rejected in favor of an allocation to Scarpulla that comports with the

---

[5] TATP advanced only $170,000 in assessment payments, although it claimed to have contributed over $1 Million, but was unable to substantiate that assertion. Doc. No. 4545-7.

[6] In fact, in *TFT/LCD*, the Special Master stated that Scarpulla's time reports were kept meticulously. *TFT/LCD*, Supp. R&R of Special Master Re:  Allocation (Doc. No. 7375, Dec. 8, 2012), p. 25:11.  Scarpulla's time reports here are maintained utilizing identical methods as those utilized in *TFT/LCD*.

applicable law and reflects the valuable contributions of Scarpulla to this case, which, at a minimum, would be one-half of Scarpulla's Zelle-period lodestar, which amounts to $212,288.75, with a multiplier of 2.98[7] for a total of $632,620.48.[8]

### IV
### OBJECTION TO OVERALL FEE ALLOCATIONS

**A.    Illegible Time Reports Cannot Furnish the Basis of an Allocation**

It is axiomatic that before any counsel representing class plaintiffs can be compensated, that attorney must keep contemporaneous daily time reports that a court can review to be sure that the time spent was necessary and proper and that such work actually benefitted the Class. *Scott v. City of New York*, 643 F.3d 56, 58-60 (2nd Cir. 2011); *Keller, supra*, 2015 WL 8916392 at *10-12. Otherwise, there would be no way to begin an analysis of how a gross fee should be fairly allocated. In short, because a court's primary concern in first awarding, and then allocating, fees must be as the guardian of the class, a court must be able to ascertain that the work done benefitted the class, so that the fees allocated bear a direct relationship to class benefits. To do so, legible, contemporaneous time records must be submitted to the Court – or Special Master – for a complete and thorough review.

In this case, only one attorney – Mario Alioto – submitted allegedly "contemporaneous" time reports that are handwritten and mostly illegible, with the time entries scrawled across the top or down one side of each separate report.[9]  Doc. Nos. 4545-5 and 4545-6. These handwritten time entries are virtually impossible to read, such that no court could review them adequately to determine whether any of Mr. Alioto's work actually benefitted the Class, and for which TATP should be compensated. Unless and until all of Mr. Alioto's time reports are typed so that they can

---

[7] The 2.98 multiplier is that which Mr. Alioto applied to himself and which he agreed to recommend for all of the Zelle time, an agreement on which Mr. Alioto appears to have reneged.

[8] Because Zelle decided it did not want Scarpulla's one-half lodestar, Scarpulla respectfully suggests that his entire lodestar should be awarded to him with the same multiplier resulting in an allocated fee of $1,265,240.95.

[9] The undersigned has been counsel in previous cases involving Mr. Alioto reaching back for several decades; this case is the first time in which Mr. Alioto submitted hand-written time reports, as all of the other time reports in the other cases were typed and legible. Scarpulla Decl., ¶ 20.

1   be read and understood, none of his time should be part of any allocation of the gross fee.  *Scott,*

2   *supra*, 643 F.3d at 58-60.  Additionally, Mr. Alioto's report of the time spent is unintelligible

3   because it is impossible to tell which time entry is associated with the description of the task

4   performed – which raises the issue of whether these time records were prepared

5   contemporaneously with the events described.[10]  If these time reports were actually prepared

6   contemporaneously by Mr. Alioto, the amount of time spent logically should follow each entry,

7   rather than be scribbled across the top or down one side of the timesheet.  In fact, if Mr. Alioto's

8   time reports were prepared contemporaneously, they should have been submitted to the

9   accountancy firm Mr. Alioto hired to collect contemporaneous time reports on a regular basis; Mr.

10  Alioto should be required to instruct that accountancy firm to turn over any reports submitted by

11  TATP and report when they were received.

12          Therefore, until Mr. Alioto's time records are typed up so that they can be properly read

13  and analyzed – and then only if they are found to have been maintained contemporaneously – can

14  this Court legally and properly allocate any amount to Mr. Alioto.  *Scott, supra*, 643 F.3d at 58-60.

15  Deducting Mr. Alioto's illegible time entries would reduce the TATP lodestar by $5,892,781.25, to

16  a new total of $9,952,810.

17          **B.      A Significant Portion of the Time Was Recorded in Quarter-Hour Increments
18                    and Therefore Cannot Be Used to Allocate the Gross Fees Awarded Without
                      Significant Reductions**

19          In order for the Court to properly allocate a gross fee among the various plaintiffs' class

20  counsel, the various lodestar reports by each firm seeking a fee allocation must use the same

21  billing standards so that they can be compared equally – *i.e.*, it would be improper, and unfair, to

22  permit one firm to request a fee allocation based on quarter-hour billing periods when other firms

23  used the accepted standard of tenths-of-an-hour increments.  Thus, any firm that used quarter-hour

24  billing practices should be converted to tenths-of-an-hour increments.  Billing in 15-minute

25  increments tends to increase the time reported by 2.5 times a tenth-of-an-hour rate.

26

27  _____
     [10] As Robert Bonsignore declared, under oath, Mr. Alioto told him that he (Alioto) did not keep
28  contemporaneous time reports and therefore there was no need for Mr. Bonsignore to do so (Doc.
     No. 4072, p. 5:5-11).

1    A review of time records shows that five firms – TATP (largest lodestar), Kirby McInerney

2 (second largest lodestar), Straus & Boies (fourth largest lodestar), Green & Noblin, and Milberg –

3 kept time in quarter-hour increments for the duration of this multi-year litigation.  The effect on

4 the aggregate lodestar of the timekeeping practice employed by these firms is significant.  The

5 cumulative reported lodestar at current rates for these five firms is $43,138,760.25, which is nearly

6 48% of the total reported aggregate lodestar.  TATP has recommended a total fee allocation to

7 these five firms of $92,695,327 or 58.4% of the gross fee awarded.

8    Recording time in quarter-hour increments, as opposed to the industry standard of one-

9 tenth of an hour, distorts the accuracy of the time records and has the effect of greatly increasing

10 the overall amount of time for which compensation is sought and upon which Lead Counsel based

11 his proposed fee allocations.

12    It also increases the difficulty of assessing the reasonableness of the time expended on any

13 given task.  For example, Mr. Alioto's hand-written time slip for November 18, 2010 consists of

14 the word "JAMS" and time amount of ".25".  Another slip, dated November 22, 2010, states

15 "Guido" and gives a time amount of ".75".  By 2014, Mr. Alioto's time records become even less

16 detailed, and consist of pages from a notepad wherein descriptions are written on the page and a

17 series of time values (always in quarter-hour increments) are written across the top margin.  Thus,

18 Mr. Alioto's entry for October 3, 2014 states, among other entries, "t/c Dan Hume re trial team,

19 Joe Goldberg," "f/n re assignments".  Across the top of the page are the figures "2.5, .25, .5, .25,

20 .25, .25, .25, .25 and .25" and a total of "4.5"; but it is not certain which amount of time applies to

21 which hand-written entry.  These entries are representative of all of Mr. Alioto's time records.

22    While other timekeepers in Mr. Alioto's firm produced what appear to be computer-

23 generated time reports, they employ the same practice of billing in quarter-hour minimums.  Doc.

24 No. 4545-8.  The practice of never billing less than a quarter-hour for reviewing a single email or

25 having a short telephone call, and never rounding a multi-hour activity to the nearest tenth-of-an-

26 hour, translates into substantial time inflation over the course of seven years and tens of thousands

27 of individual billing entries.

28    Because the use of quarter-hour increments distorts the total reported hours by firms using

1   the practice, district courts have exercised their discretion to implement across-the-board

2   percentage reductions to such firms before making an attorney-fee award.  Thus, in *Welch v.*

3   *Metropolitan Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007), the Ninth Circuit affirmed the

4   district court's 20% across-the-board reduction to the hours reported by a firm utilizing quarter-

5   hour billing increments.  A reduction of 20% across-the-board has been applied by various courts

6   when faced with fee requests that are based on time reports that use quarter-hour increments.  For

7   example, the class action fee award granted in *Rosales v. El Rancho Farms*, No. 1:09-cv-00707,

8   2015 WL 4460635 at *30 (E.D. Cal. July 21, 2015), was based on a lodestar analysis in which the

9   court examined the billing records of each firm requesting compensation.  One of those firms,

10   Milberg LLP, is also counsel for the IPPs here.  In *Rosales*, the court observed that, "[n]otably, the

11   minimum time recorded at Milberg LLP was 0.25 hours, which is a practice that has been

12   criticized because it inflates the time billed."  *Id.*  The court then reduced Milberg's lodestar by

13   20% to offset the inflation caused by the billing practice.  *Id.*[11]

14          Here, a review of the billing records demonstrates that entire firms with significant reported

15   hours, including firms representing three of the top-four billing firms, utilized quarter-hour-billing

16   increments throughout the life of this case.  The appropriate remedy is to apply, consistent with

17   *Welch*, a 20% across-the-board reduction to the lodestars of the IPP firms employing the practice.

18   As illustrated in the chart below, reducing the lodestar for these five firms by 20% yields a

19   reduction of $8,575,409.70 to the overall lodestar amount and adjusts each such firm's allocated

20   fee amount accordingly.

21   ///

22   ///

23   ///

24

25   ――――――――――――――――――

26   [11] *See also Prudential Ins. Co. v. Remington*, No. 2:12-cv-02821 (E.D. Cal. Jan. 24, 2014) (applying 20% reduction for quarter-hour billing increments); *Robinson v. Plourde*, 717 F.Supp.2d 1092, 1100-01 (D. Haw. 2010) (same).  Even when, unlike here, the use of quarter-hour increments is not "widespread and excessive," the courts still apply a percentage reduction to offset the distortion.  *Accord O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 114 F. Supp.3d 819,

27

28   833 (N.D. Cal. 2015) (applying a 5% reduction on account of quarter-hour billing, "because the Court does not find the practice widespread and excessive").

| Firm | Special Master's Adjusted Lodestar | Further 20% Reduction for ¼-Hour Billing | Revised Lodestar after 20% Reduction for ¼-Hour Billing |
|---|---|---|---|
| TATP (with Alioto's illegible time reports) | $15,561,704.25 | ($3,458,156.50) | $12,103,547.75 |
| TATP (w/o Alioto's illegible time reports) | $9,852,810.00 | ($1,970,562.00) | $7,882,248.00 |
| Kirby McInerney | $9,981,414.00 | ($2,218,092.00) | $7,763,322.00 |
| Straus & Boies | $8,102,347.88 | ($1,800,521.75) | $6,301,826.13 |
| Green & Noblin | $2,824,012.35 | ($627,558.30 | $2,196,454.05 |
| Milberg | $2,355,405.75 | ($523,423.50) | $1,831,982.25 |

Thus, the total reduction from the lodestars of the firms using quarter-hour billing rates amounts to $8,627,752.05 if all of Mr. Alioto's personal lodestar is included in TATP's lodestar; if that lodestar is excluded then the total saved for the Class is $5,428,718.50.

### C.     A Reduction in Lodestar for "Block Billing" Is Appropriate and Will Affect the Proposed Fee Allocation, Accordingly

In addition to reductions for quarter-hour billing practices, the Ninth Circuit has ruled that where block billing is rampant – as in many of the time records here – a reduction of between 10% and 30% is appropriate.  *See, e.g., Banas v. Volcano Corp.*, 47 F.Supp.3d 957, 968 (N.D. Cal. 2014) ("I am reducing Volcano's bill by 20% for block billing."); *Apple, Inc. v. Samsung Electronics Co.*, 2012 WL 5451411, at *5 (N.D.Cal. Nov. 7, 2012) ("in light of the evidence that block-billing inflates hours by between 10% and 30%, the court trims 20% from the block-billed hours in Samsung's request"); *Hajro v. U.S. Citizenship & Immigration Servs.*, 900 F.Supp.2d 1034, 1053 (N.D. Cal. 2012) ("the court exercises its discretion to reduce the hours for these block-billed entries by twenty percent, the amount noted by the Ninth Circuit as the middle range for time increases that occurs through block-billing").  Many of the firms with the highest lodestars engaged in "block billing" so that it is impossible to ascertain how much time was spent on any given task.  *See* Doc. No. 4545-8.

If this additional 20% reduction is applied to those firms who engaged in block-billing

12

practices, their adjusted lodestars upon which a proper fee allocation must be grounded would be as follows:

| Firm | Revised Lodestar (reduced for Quarter-Hour Time Entries) | Further Reduction for Block Billing (20%) | Resultant Lodestar |
|---|---|---|---|
| TATP (with Alioto's illegible time reports) | $12,103,547.75 | ($2,420,709.40) | $9,682,838.35 |
| TATP (w/o Alioto's illegible time reports) | $7,882.248.00 | ($1,576,449.60) | $6,305,798.40 |
| Kirby McInerney | $7,763,322.00 | ($1,552,664.40) | $6,210,657.60 |
| Straus & Boies | $6,301,826.13 | ($1,260,365.23) | $5,041,460.90 |
| Green & Noblin | $2,196,454.05 | ($439,290.81) | 1,757,163.23 |
| Milberg | $1,831,982.25 | ($366,396.45) | 1,465,585.80 |

Thus, another $6,039.426.29 should be deducted from the total lodestars of these firms because of block-billed time entries if Mr. Alioto's lodestar is included; it would be $5,195,166.49 if his lodestar was not included in TATP's total time.  The total reductions of quarter-hour billing increments and block-billing total between $14,667,178.34 and $10,623,885, depending on whether Mr. Alioto's illegible handwritten time is included in the calculation.

These deductions from each firm's lodestars should be made before any appropriate multipliers can be applied to lodestar amounts for allocation purposes.  Otherwise, these firms are receiving "windfall" fees not based on benefit to the Class, but merely because of unreasonable billing practices.

///

///

///

OBJECTIONS TO PROPOSED FEE ALLOCATIONS
Case No. 3:07-cv-5944, MDL No. 1917

1

**D.   Time Entries That Demonstrate That Work Did Not Benefit the Class Should Be Eliminated from the Lodestar Computation**

2

3

**1.   Lead Counsel's LG Settlement Cost the Class Hundreds of Millions of Dollars and Should Not Be Rewarded**

4

In or about May 2013, Lead Counsel settled with LG for $25,000,000 – a mere pittance

5

from one of the largest and most culpable of the defendants.[12]  When asked why he settled for such

6

a low amount, all Mr. Alioto could say is that the settlement was pre-class certification.  Scarpulla

7

Decl., ¶ 7.

8

But by settling with LG so cheaply, Lead Counsel was able to achieve two objectives that

9

directly benefitted him and his firm:  (1) Alioto was able to use a portion of the LG settlement

10

proceeds to finance this litigation thereby relieving him from any assessment payments (and thus

11

had no financial risk); and (2) he placed in the Settlement Agreement (and all subsequent ones) the

12

unheard of provision that gave Alioto alone the authority to allocate fees without recourse by any

13

of the other class counsel firms.[13]  Doc. No. 1933-1, pp. 9-27.

14

By putting himself first above the interests of the Class, Mr. Alioto cost the Class hundreds

15

of millions in settlement funds from LG.  This behavior should not be rewarded with any

16

multiplier on TATP's adjusted lodestar.

17

**2.   Clerical Work Should Not Be Compensated at Attorney Rates, Let Alone Subject to any Positive Multiplier**

18

19

A significant number of Lead Counsel's time entries are for a function abbreviated as "f/n."

20

There is no explanation of what Lead Counsel's firm means by this notation; however, it is

21

customarily translated as evidencing the creation of a "file note."  Lead Counsel and other billers

22

from TATP have hundreds of "f/n" entries per year for over seven years.  It is almost impossible to

23

tell how much time any of them spent creating "f/n's" because the time entries are block-billed.  It

24

is difficult to imagine what utility and benefit to the Classes was derived from Lead Counsel's

25

writing notations in their files to memorialize pleadings, emails and/or telephone conversations

26

27

[12] In contrast, Scarpulla, one of two Co-Lead Counsel in *TFT/LCD,* obtained $380,000,000 from LG in settlement of that case.

28

[13] When Scarpulla and Cooper foiled Alioto's plan to allocate fees on his own, he punished them by applying a negative multiplier to their lodestars.

14

1    relating to the litigation over the last eight years.  There were no reports on litigation progress

2    generated by Lead Counsel and sent to other counsel in the case.  If a list of filed documents were

3    needed, the Court's electronic docket was available day and night for the expenditure of a few

4    computer key strokes.

5         Additionally, Lead Counsel and other TATP billers have multiple time entries for clerical

6    work – billed at between $500 to $850 per hour – in quarter-hour increments – such as "organizing

7    materials" and "arranging files" (Doc. Nos. 4545-5, 4545-6, and 4545-8), for which TATP

8    suggests it get a 2.98 multiplier.

9              **3.    Lead Counsel's Unnecessary Fight with the California Attorney**
                       **General Should Not Be Compensated**

10

11        Starting at the time the California AG filed her *parens patriae* case in the San Francisco

12   Superior Court on November 8, 2011, Lead Counsel pursued a program of opposition to that case

13   because he incorrectly viewed it as infringing on his California End-User/Consumer Class claims.

14   That antagonism got so heated that Special Master Judge Vaughn Walker proposed to add Messrs.

15   Scarpulla and Cooper as additional co-lead counsel to put an end to Mr. Alioto's unnecessarily

16   contentious fight with the California AG, as well as to resolve the case by settlements or trial.  *See*

17   Doc. No. 3200.  In Lead Counsel's original motion for final approval and fees, he claimed his firm

18   spent 1,837.3 hours on "settlement" issues (Doc. No. 4073-1, Ex. 2, p. 36), which is made up

19   primarily of time Mr. Alioto spent fighting with the California AG.  Although asked to

20   differentiate any time spent fighting with the AG from "settlement," Lead Counsel has never

21   separated the fight with the AG from the time actually spent negotiating settlements with the

22   defendants.  A review of Mr. Alioto's time records (to the extent they can be read), shows that a

23   substantial amount of so-called "settlement" time was spent in an unnecessary fight with the

24   California AG, although the exact amount cannot be ascertained because of the hand-written

25   nature of Mr. Alioto's lodestar reports and with the time entries strung out across the top or the

26   sides of those pages.  *See* Doc Nos. 4545-5 and 4545-6, App. A, Parts 1 and 2).  Before a proper

27   allocation of the gross fee to TATP can be made, this Court should be informed of how much time

28   Alioto wasted on this unnecessary fight with the AG because those hours should be deducted from

1    TATP's lodestar so that any fee allocation does not reward Mr. Alioto for unnecessarily fighting
2    with the California AG.[14]

3                    **4.      Alioto's Refusal to Cooperate with Other Counsel Caused Excessive**
                             **Time to be Spent and Should Not Be Rewarded**
4

5            Throughout this litigation, Mr. Alioto refused to work cooperatively with not only the
6    California AG, but also with counsel for the other non-Indirect-Purchaser Plaintiffs.  Scarpulla
7    Decl. ¶ 8 and Doc. No. 1396.

8            Such failure to cooperate in large class actions such as this one means that each group of
9    lawyers is duplicating efforts. These inflated lodestars throughout the case and should not be
10   rewarded.

11                   **5.      Limited Class Claims Requires a Reduction in any Multiplier**
12           In order to assess the appropriate multiplier to award TATP on its adjusted lodestar
13   requires an examination of the benefits actually received by the Class Members for whom this case
14   was initially brought.  There is no indication of how many natural-person consumers filed claims
15   in this action, even though that information has been requested over and over again.  This case was
16   brought for individual and small-business consumers – not the major so-called "opt-out" Class
17   Members, such as the Fortune 500 corporations, some of whom have filed claims through Third-
18   Party Aggregators.

19           Therefore, before any appropriate allocation can be made to TATP, Mr. Alioto should be
20   required to inform this Court of how many natural-person consumers filed approved claims.  If
21   there are very few, then Mr. Alioto did not fulfill his obligations to the Class Members and should
22   not be rewarded for such failure.

23   ///
24   ///
25   ///
26

27   _____
28   [14] In *Thayer v. Wells Fargo Bank,* 92 Cal.App.4th 189 (2001), The Court of Appeal describes how
     Mr. Alioto – and his co-counsel there and here, Sherman Kassof – manufactured contentious issues
     simply to gin-up fees.

                                                    16

1

2

      **6.    A Significant Number of the Firms Did No Substantive Work That Benefitted the Settlement Class**

3

      The Special Master has already found that "the real work of the case was limited to about

4

sixteen firms that billed over $2 million." Doc. No. 4351, at 72. He also opined that certain firms

5

"did virtually nothing." *Id*. Determining true benefit to the Class requires close scrutiny of the

6

reported lodestars for all firms requesting fees because if certain firms "did virtually nothing" to

7

benefit the Class, they should not receive any portion of the gross fee. Otherwise, funds that could

8

be used to allocate fees to the firms who did substantive work that benefitted the Class will be

9

allocated to firms who did nothing to benefit the Class. In short, there is no reason to pay for time

10

that was not "real work." *See, e.g., Keller, supra*, 2015 WL 8916392 at *9-*18 (detailing

11

allocation of fees for various co-counsel). Taken together, more than $9.8 million in lodestar is

12

attributable to 34 IPP firms that each billed less than $2 million and which the Special Master

13

found previously "did virtually nothing." These firms should be allocated no part of the gross fee

14

awarded and that $9.8 Million should first be re-allocated to the firms who did substantive work

15

that benefitted the Class.

16

      **E.    The Lodestars of the Late-Added Trial Counsel Who Had No Litigation or Financial Risk Should Not Be Subject a Multiplier**

17

18

      In late 2014, Lead Counsel invited three new firms into this case as trial counsel. By the

19

time the last settlements had been reached a few months later, these firms had accrued aggregate

20

lodestars in the amount of $3,845,598.25 (reduced to $3,461,038.43 by application of the 10%

21

Special Master's deduction). It would be error to apply any multiplier to this time for which there

22

was essentially no risk of non-payment. Additionally, these firms made no contribution to the

23

IPP's assessment fund (denominated the "Litigation Expense Fund"), and carried a small amount

24

of out-of-pocket expenses for a very short time compared to some of the firms who had been in the

25

case from the beginning. Doc. No. 4545-4. Further, by the time they appeared, the investment of

26

their time was not at risk because sufficient settlements had been negotiated to assure their

27

compensation.

28

      Additionally, there is no reasonable explanation why TATP suggested that these firms who

bore no significant litigation or financial risks should receive multipliers of 2.5 (Freedman Boyd – second highest), 1.75 (Fine Kaplan) and 1.57 (Hulett Harper).  If these firms' post-10%-reduction lodestars are paid without any risk multiplier, (and upward multipliers are paid for work of superior quality only, and limited to exceptional situations, *Agent Orange, supra*, 818 F.2d at 222), then the effect on the allocation of fees is as follows:

| Firm | Lodestar (Post 10% reduction) | Multiplier | Allocated Fees |
|------|------|------|------|
| Freedman Boyd | $   500,988.60 | 1.0 | $   500,988.60 |
| Fine Kaplan | $2,363,105.25 | 1.0 | $2,363,105.25 |
| Hulett Harper | $   571,654.58 | 1.0 | $   571,654.58 |
| Total Fees | | | $3,435,788.43 |

TATP suggested a total allocation to these three firms of $6,285,400.  Using the total lodestar without any multiplier reduces the allocation to these three firms by $2,849,651.57 – another significant savings to the Class.

**F.    Counsel Who Made No Financial Contribution to the Litigation Expense Fund Should Not Receive a Positive Multiplier**

TATP proposes that a financial-risk positive multiplier be applied to the lodestars of firms that contributed no funds to the prosecution of this case and were not at any financial risk.  A total of $10,956,235 in lodestar was billed by 22 IPP firms who made no assessment payments and should not be awarded any financial-risk multiple.[15]  However, Mr. Alioto gave each one of those ten firms a "financial risk" multiplier.  Doc. No. 4790, at p. 2:21-3:2.  If the firms who contributed nothing to the assessment fund have their multipliers reduced, the following savings to the Class would occur:

///

///

_____

[15] Significantly, of the $170,000 in assessments paid by Lead Counsel, $100,000 was contributed in January 2015 after the case was virtually over and there was no longer any financial risk.  *See* Doc. No. 4545-7, App. B.

| Firm | Lodestar (post 10% reduction) | Alioto Proposed Multiplier | Alioto Proposed Allocation | No Multiplier lodestar for fee allocation |
|---|---|---|---|---|
| LO Sylvie Kern | $3,233,286.00 | 2.2685 | $7,334,806.13 | $3,233,286.00 |
| Freedman Boyd, et al. | $500,988.60 | 2.4984 | $1,251,659.94 | $500,988.60 |
| Fine Kaplan and Black | $2,363,105.25 | 1.7489 | $4,132,755.02 | $2,363,105.25 |
| Hulett Harper Stewart LLP | $571,654.58 | 1.5690 | $896,914.81 | $571,654.58 |
| Law Offices of L.G. Papale | $851,850.00 | 1.4990 | $1,276,947.55 | $851,850.00 |
| Vogl Meredith Burke LLP | $692,388.00 | 1.4765 | $1,022,299.56 | $692,388.00 |
| Besmer Law Firm | $596,610.00 | 1.3991 | $834,713.12 | $596,610.00 |
| Green & Noblin PC | $2,824,012.35 | 1.3491 | $3,809,947.20 | $2,824,012.35 |
| Karon LLC | $184,505.67 | 1.2992 | $239,701.68 | $184,505.67 |
| Wyatt & Blake | $79,593.75 | 1.1993 | $95,453.15 | $79,593.75 |
| Flom Law Office | $21,369.60 | 1.1992 | $25,627.39 | $21,369.60 |
| Bangs McCullen Butler, et al. | $7,087.50 | 1.1992 | $8,499.49 | $7,087.50 |
| Mansfield Tanick & Cohen PA and Foley & Mansfield, PLLP | $114,750.00 | 1.1992 | $137,610.83 | $114,750.00 |
| Law Offices of Jeff Crabtree | $27,184.50 | 1.1992 | $32,600.28 | $27,184.50 |
| Janssen Malloy, LLP | $492,239.25 | 1.1992 | $590,304.29 | $492,239.25 |
| Ryley Carlock & Applewhite | $7,740.45 | 1.1992 | $9,282.49 | $7,740.45 |
| McManis  Faulkner | $59,615.55 | 1.0993 | $65,534.53 | $59,615.55 |
| Schubert Jonckheer, et al. | $66,667.50 | 1.0993 | $73,286.51 | $66,667.50 |
| Morrison Sund | $428,796.00 | 1.0394 | $445,681.20 | $428,796.00 |
| Whitfield Bryson & Mason, LLP | $15,597.00 | 0.9994 | $15,586.90 | $15,597.00 |
| Gustafson Gluek PLLC | $25,290.00 | 0.9994 | $25,273.62 | $25,290.00 |
| The Furth Firm LLP | $26,184.38 | 0.5654 | $19,625.29 | $26,184.38 |
| **TOTAL** | $13,190,515.93 | | $22,344,110.97 | $13,190,515.93 |

The total savings to the Class from no multiplier attached to the lodestars of any firms that were not at risk financially would be $9,153,595.04.

Lead Counsel's assessment contributions show little financial risks.  For example, TATP claims to have advanced $1,260,000.00 into plaintiffs' assessment fund.  Doc. No. 4073-1, p. 2:15-20.  However, after the Court required Alioto to turn over his firm's accounting records for an inspection, it appears as though only $170,000 was paid into that assessment fund ($100,000 of which went in after the case was over), so that TATP had no meaningful financial risk and thus should not receive any risk multiplier based on these criteria.  In fact, Mr. Alioto responded to this criticism by stating that the $170,000 was contributed by TATP's "of counsel" attorney, Joseph Patane, so TATP itself was without any financial risks.

There are additional expense reporting issues that need clarification.  For example,

1    Sherman Kassof,[16] who claims he contributed $50,000 in assessments, shows only $1,521.70 in

2    actual payments without any back-up showing a payment of $50,000 into the Litigation Expense

3    Fund.  Doc. No. 4073-14.  Therefore, he had no financial risk and should not receive any risk

4    multiplier.  Mr. Alioto assigned Kassof a 1.2492 multiplier.

5        Thus, in order to assess financial risk, the Court should be informed by Lead Counsel of the

6    amounts of all assessment payments and when each was made.

7        **G.    No Multiplier On Lodestars Except For Extraordinary Work**

8        The settlements here do not represent a superb recovery, and the Court has so found.  Doc.

9    No. 4740.  A firm is entitled to an upward multiplier on its lodestar if – but only if – that firm does

10   extraordinary work in achieving the results obtained.  *Agent Orange, supra*, 818 F.2d at 222.

11   Here, the Court has already held that this settlement was not extraordinary.  Thus, no multipliers

12   should be awarded to any firm that did not do extraordinary work.  Such an examination and

13   analysis requires a complete review of all plaintiffs' counsel's contemporaneous time reports,

14   something available to the Special Master for his thorough examination, but not to the

15   undersigned.

16       Reviewing documents is not such "extraordinary" work that any positive multiplier is

17   appropriate.  Of the total 183,000 hours allegedly spent on this class action (Doc. No. 4071),

18   72,475.5 hours were spent "reviewing documents."  These hours were billed at between $350

19   ($26,366,425 @ $350/hr.) to $450 ($32,613,975 @ $450/hr.) per hour, so with an average positive

20   multiplier of about 2, the total would be between $52,732,850 and $65,327,950 in compensation.

21       Such a windfall should not be permitted.

22       **H.    TATP Did Not Follow Its Own Criteria**

23       As with his proposed allocation to LOFOS, not only did TATP fail to follow over 30 years

24   of case-law precedent in suggesting the fee allocation proposal, it also failed to follow its own

25   criteria.  For example, one of TATP's suggested criteria was labelled "Level of Work Performed,"

26

27

28   [16] Mr. Kassof (along with Mr. Alioto) has been vilified by the Court of Appeal for intentionally
     disrupting a class for his own financial benefit.  *See Thayer, supra*, 92 Cal.App.4th at 189.

1   which is described as "…drafting important briefs, taking or defending depositions, working with

2   experts, preparing for trial and involvement in the overall management of the case and case

3   strategy …"  Doc. No. 4790, at p. 2:4-10.  TATP assigns itself a 2.98 multiplier – but it does not

4   appear as though TATP drafted or finalized any important briefs; did not take any significant

5   depositions; did not defend any depositions, except that of Janet Netz; did not argue any important

6   motions (the class certification motion was argued by the Zelle firm; did not argue any summary

7   judgment motions or motions *in limine*); and did not prepare for trial as TATP brought in three

8   firms in late 2014 to do all of the trial preparation work and get up-to-speed to try the case.[17]

9        Moreover, TATP did not allocate work in an efficient manner.  Rather than have the most

10  experienced antitrust trial lawyers taking the important substantive depositions, Mr. Alioto

11  assigned that task to inexperienced attorneys who had never taken any significant antitrust

12  depositions before and who had never tried an antitrust case to a jury.  Scarpulla Decl., ¶ 22.

13       Moreover, Alioto assigned multipliers for "quality of work performed" to firms whose

14  work quality was not up to the standards usually associated with antitrust practitioners.  This issue

15  is something the Special Master can examine in-depth by reviewing the daily time records of all

16  plaintiffs' counsel.

17  ///

18  ///

19  ///

20

21

22

23

24

25

26

---

27  [17] One of the attributes of a "Lead Counsel" is that he/she can initiate a class action and see it all

28  the way through trial.  Mr. Alioto appears to have been unable to do this and should not be
    compensated as a "Lead Counsel."

# V
## CONCLUSION

For all of the reasons stated above, the proper allocation of the fees awarded should be in accordance with the chart attached to the Scarpulla Declaration as Exhibit 3.

In the event all of these deductions are made when calculating an appropriate fee for each of Plaintiffs' counsel, a savings of between $36.5 Million and $38.3 Million can be achieved, either to be spread-out among the firms that did real substantive work or given back to the Class.

Dated: September 7, 2016                    Respectfully submitted,


                                             /s/  Francis O. Scarpulla
                                            Francis O. Scarpulla

                                            Francis O. Scarpulla (41059)
                                            Patrick B. Clayton (240191)
                                            LAW OFFICES OF FRANCIS O. SCARPULLA
                                            456 Montgomery Street, 17th Floor
                                            San Francisco, CA 94104
                                            Telephone: 415-788-7210
                                            Facsimile:  415-788-0706
                                            fos@scarpullalaw.com
                                            pbc@scarpullalaw.com

                                            Counsel for Indirect-Purchaser Plaintiffs

1

CERTIFICATE OF SERVICE

2

I hereby certify that a true copy of the foregoing OBJECTIONS TO PROPOSED FEE

3

ALLOCATIONS was filed *via* CM/ECF on September 7, 2016 and as a result has been served on

4

all counsel of record *via* transmission of Notices of Electronic Filing generated by CM/ECF.

5

6

/s/ Francis O. Scarpulla_____
Francis O. Scarpulla

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28