JOSEF D. COOPER (53015)
TRACY R. KIRKHAM (69912)
JOHN D. BOGDANOV (215830)
COOPER & KIRKHAM, P.C.
357 Tehama Street, Second Floor
San Francisco, CA  94103
Telephone:  (415) 788-3030
Facsimile:  (415) 882-7040
jdc@coopkirk.com
trk@coopkirk.com
jdb@coopkirk.com

*Counsel for Class Representative Steven Ganz
And Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:  CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION.<br><br>This Document Relates to:<br><br>All Indirect-Purchaser Actions | **Master File No. 3:07-cv-5944 JST**<br><br>**MDL No. 1917**<br><br>**OBJECTION OF COOPER & KIRKHAM, P.C. TO LEAD COUNSEL'S REVISED PROPOSED ALLOCATION OF AGGREGATE FEE AWARD TO INDIRECT PURCHASER PLAINTIFFS' COUNSEL**<br><br>Judge: Honorable Jon S. Tigar<br><br>Before: Special Master Martin Quinn, JAMS |

OBJECTION TO LEAD COUNSEL'S REVISED PROPOSED ALLOCATION OF AGGREGATE FEE AWARD TO INDIRECT PURCHASER PLAINTIFFS' COUNSEL

Master File No. 3:07-cv-5944 JST
MDL 1917

**TABLE OF CONTENTS**                                                    **PAGE**

I.       STATEMENT OF OBJECTION TO PROPSED ALLOCATION  . . . . . . . . . . . . . . . .1

II.      CONSIDERATIONS IN AWARDING AND ALLOCATING FEES  . . . . . . . . . . . .5

III.     LEAD COUNSEL'S PROPOSED FEE ALLOCATION TO
         COOPER & KIRKHAM IS UNREASONABLE AND THE
         PRODUCT OF PERSONAL ANIMUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

         A.      Lead Counsel Never Questioned One Minute of
                 Cooper & Kirkham Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

         B.      Cooper & Kirkham Never Worked at Cross Purposes to
                 Other Counsel in the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

         C.      Cooper & Kirkham Did a Substantial Volume of Substantive Work . . . . . . . 8

         D.      Cooper & Kirkham is Being Punished for Raising Issues Regarding
                 the Adequacy of the Settlements, the Chunghwa Plan of Distribution
                 and Lead Counsel's Attorneys' Fees Request . . . . . . . . . . . . . . . . . . . . . . . . 16

III.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

1

**TABLE OF AUTHORITIES** <u>PAGE</u>

2

<u>Cases</u>

3

*Azizian v. Federated Dep't Stores, Inc.*
499 F.3d 950 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

4

*Class Plaintiffs v. Jaffe & Schlesinger, P.A.*
19 F.3d 1306 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

5

6

*Florida v. Dunne*
915 F.2d 542 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

7

*In re Agent Orange Prod. Liab. Litig.*
818 F.2d 818 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

8

9

*In re Critical Path, Inc. Secs. Litig.*
No. 01-00551 WHA, 2002 U.S. Dist. LEXIS 26399 (N.D. Cal. Jun 18, 2002). . . . . . 6

10

*In re FPI/Agretech Sec. Litig.*
105 F.3d 469, 474 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

11

12

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*
55 F.3d 768 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

13

*Keller v. NCAA*
2015-2 Trade Cas. (CCH) ¶79,409, 2015 U.S. Dist. LEXIS 166546
(N.D. Cal. Dec. 10, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

14

15

*Lindy Bros. Builders, Inc., v. American Radiator, Etc.*
540 F.2d 102 (3d Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

16

*Mercury Interactive Corp Securities Litigation v. Mercury Interactive Corp.*
618 F.3d 988 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

17

18

*Smiley v. Sincoff*
958 F.2d 498 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

19

20

**Other Authorities**

21

*Manual for Complex Litig.* (Fourth) §21.62 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

22

23

24

25

26

27

28

OBJECTION TO LEAD COUNSEL'S REVISED       ii       Master File No. 3:07-cv-5944 JST
PROPOSED ALLOCATION OF AGGREGATE                    MDL 1917
FEE AWARD TO INDIRECT PURCHASER
PLAINTIFFS' COUNSEL

## I.  STATEMENT OF OBJECTION TO PROPOSED ALLOCATION

Cooper & Kirkham, P.C. ("C&K") objects to Lead Counsel's [Revised] Proposed Allocation of Aggregate Fee Award to Indirect Purchaser Plaintiffs' Counsel (Dkts. 4790 and 4800).  Lead Counsel has proposed a fee award for C&K of $2,345,866.91, which is approximately 77% of the firm's lodestar of $3,068,480.  Lead Counsel provides essentially no explanation for this recommendation, and C&K was not afforded the "opportunity to comment on . . . their proposed multiplier," which Lead Counsel states was given to "almost all firms with a lodestar over $1 million."  (Dkt. 4790 at 1.)    The only clue to the basis for the recommendation is the description of the category into which Lead Counsel placed C&K: "Firms which did little or no substantive work; *firms which have taken an adverse position to the class;* firms which have otherwise worked at cross purposes to the other counsel in the case; and firms which had billing issues." (*Id.* at 4; emphasis added.)

None of the criteria for placement listed above is even remotely applicable as a reason for Lead Counsel's treatment of C&K except the italicized language.  Accordingly, Lead Counsel's recommendation presents this Court with an issue of first impression:  Is it appropriate to punish counsel, who raise objections to a settlement or question Lead Counsel's plans for distributing settlement proceeds, or the amount of a fee request, by devaluing their previous contribution to the litigation?   The answer has to be that this is not proper.  Not only would this kind of punitive action violate all notions of fundamental fairness that are at the core of a proper fee allocation, its chilling effect on the full presentation of issues, and a complete and reasoned evaluation of a settlement and distribution would certainly be detrimental to absent class members.

Until it objected to the proposed settlements, plan of distribution and attorneys' fee request, C&K was a member of the top tier of firms to whom Lead Counsel consistently turned for assistance and expertise in prosecuting this action.  See, the description of the firm's contribution to the case contained in the "Declaration of Josef D. Cooper in Support of Plaintiffs' Application for Attorneys' Fees, Expenses and Incentive Awards" ("Cooper Fee Declaration") (Dkt. 4073-6), a

copy of which is attached hereto and incorporated by reference.  The Special Master previously took note of C&K's major role in the litigation when discussing Lead Counsel's effective deployment of "the other highly experienced class counsel who worked with him for eight years:"

> Straus & Boies [*recommended multiplier 2.3685*] led the foreign language team to organize the translation and review of the thousands of foreign language documents and was also responsible for discovery against Samsung.  Kirby McInerney [*recommended multiplier 1.9561*] defended all discovery against class representatives as well as taking Samsung depositions and leading discovery against Direct Action Plaintiffs.  Zelle Hofmann [*recommended multiplier 1.9587*] managed discovery against Panasonic/MTPD. Andrew [*sic: Andrus*] Anderson [*recommended multiplier 1.7988*] handled Hitachi discovery; Bramson Plutzik [*recommended multiplier 1.7988*] managed Toshiba discovery; Cooper & Kirkham [*recommended multiplier 0.8494*] managed Philips discovery; Glancy Prongay & Murray [*recommended multiplier 1.3991*] handled LG Electronics discovery.

"Report and Recommendation of Special Master re Motions (1) To Approve Indirect Purchaser Plaintiffs' Settlements . . . and (2) for Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards to Class Representatives," filed January 28, 2016, (Dkt. 4351) at 61.

C&K has the sixth largest lodestar among the forty-nine firms to whom Lead Counsel is allocating fees, and was one of the top contributors to the common expense fund.  (Dkt. 4073, at 2, 4.)[1]  Every hour of C&K's lodestar was invested in the litigation *before* the settlement approval process began.  (Cooper Fee Decl. at ¶9.)  All reflect efforts expended in litigating with the defendants.  No time spent preparing or arguing the objections to the settlement, plan of distribution and/or Lead Counsel's fee request is included in the lodestar.  (*Id.* at ¶6)  Indeed, no compensation was requested for any of Josef Cooper's personal time, including time attributable to the process through which Judge Walker recommended that Mr. Cooper to be appointed co-lead settlement counsel [see, Dkt. 3200].  (*Id.* at ¶7. )

---

[1] "Compendium of IPP Counsel Declarations in Support of Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards," dated September 23, 2015.

Not one hour of C&K's $3,068,480 lodestar was disputed by Lead Counsel at any point during the litigation, or during the extensive review that Lead Counsel asserted that he and a review committee gave all of the lodestars before submission of the joint fee petition. (Dkt. 4071-1 at ¶119.[2])  Nonetheless, Lead Counsel applied a multiplier of 0.8494 (less than *half* of the overall case multiplier of 1.96) to the firm's lodestar.  Lead Counsel also applied the blanket 10% cut in hours to C&K that he applied to all firms, which reduction has the effect of increasing the numeric value of the recommended multipliers.[3]  This is irrelevant to the fees in dollars proposed by Lead Counsel for firms receiving a positive multiplier, however, its effect on C&K is to compound the negative multiplier so that the compensation recommended by Lead Counsel is only a little more than 3/4th of the straight hourly value of the firm's commitment to the case.

It is little short of astounding that such a draconian reduction in the lodestar and multiplier of counsel who played a major litigation role would be made with essentially no explanation, but none is given.  No discussion occurred with anyone at C&K during the "collegial and collaborative" process that Lead Counsel claims resulted in his recommendations, and his submission to the Special Master contains no rationale for his treatment of the firm.  The only conclusion that can be reached is that there is no justification for Lead Counsel's refusal to recognize the value of C&K's litigation services commensurate with that of other firms making similar contributions.  Lead Counsel's recommendation to compensate C&K at approximately 25% less than its base lodestar by is an act of revenge that should not be adopted or countenanced by the Special Master.

Lead Counsel's lack of specificity with regard to a rationale for the individual firm recommendations is not confined to Cooper & Kirkham's proposed fee, and detracts from the

---

[2] "Declaration of Mario N. Alioto in Support of Indirect Purchaser Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards," dated September 23, 2015.

[3] For example, the fee that Lead Counsel recommends for itself is $46,344,359.49 reference, which represents a 2.9781 multiplier on its reduced lodestar and a 2.680 on its submitted lodestar.

1  utility of his proposal, and its ability to provide assistance to the Special Master.  For example,

2  Lead Counsel states that the princpal criteria applied to determine the recommended multipliers

3  were the "[l]evel of work performed . . . drafting important briefs, taking or defending depositions,

4  working with experts, preparing for trial and involvement in the overall management of the case . .

5  . the amount of . . . work performed *throughout* the case" and "the level of risk absorbed by each

6  firm, including *the stage at which they joined the case . . . whether or not they paid assessments*

7  *into the litigation fund* and *the amount of money contributed*; and *the amount of time and*

8  *resources devoted by the firm* to the litigation."  (Dkt. 4790 at 2-3.)  Without explanation,

9  however, Lead Counsel recommends the second highest multiplier (2.4984) be given to a firm that

10  satisfies none of these criteria except for participation in trial preparation.  It is a firm that was not

11  formally associated into the litigation until the eleventh hour, made no contributions to the

12  litigation fund, and invested only a total of $556,654 worth of time in the case, all during the last

13  five months before the global settlements were announced.  Similarly, the recommended

14  multipliers for the other two late-added members of the trial team are 1.7489 and 1.5690, the 8th

15  and 9th highest multipliers in Lead Counsel's list.  (Dkt. 4800, Ex. 1.)

16       True, each of the three late-added trial firms is headed by experienced counsel,

17  undoubtedly fully competent to try an antitrust case.  However, the same can be said of any

18  number of firms that were in the litigation from the beginning, and had the advantage of superior

19  familiarity with the facts.  To illustrate, John D. Bogdanov, whose time makes up most of the

20  C&K lodestar, and who lead discovery efforts and evidence management as to defendant Philips,

21  was one of the attorneys requested by Lead Counsel to designate deposition testimony for use at

22  trial.  A member of the late-added trial team proposed edits to Mr. Bogdanov's previously

23  completed designations.  Lauren Capurro, an attorney with Lead Counsel, asked Mr. Bogdanov in

24  an email to review these edits for Philips' witness, Joe Killen, observing on the limitations of

25  bringing in trial counsel unfamiliar with the litigation:

26       Thanks, John!  FYI: I've been reviewing some of their proposed
         changes to the Chunghwa depos & disagreed with quite a few of
27       their proposed deletions.

28  OBJECTION TO LEAD COUNSEL'S REVISED          - 4 -          Master File No. 3:07-cv-5944 JST
    PROPOSED ALLOCATION OF AGGREGATE                          MDL 1917
    FEE AWARD TO INDIRECT PURCHASER
    PLAINTIFFS' COUNSEL

> For example, they proposed to delete testimony from . . . [redacted].
> *This obviously shows a lack of knowledge re the facts in this case.*
> *So don't hesitate to speak up if you disagree with their proposed*
> *changes.  It's no doubt very helpful to have them review the*
> *designations & make sure there's nothing problematic & that we*
> *didn't miss something, but we know more about the facts here.*
> Thanks!

*See* Exhibit 37 to the "Declaration of John D. Bogdanov in Support of Objection of Cooper & Kirkham, P.C. to Lead Counsel's Revised Proposed Allocation of Aggregate Fee Award," filed concurrently herewith. ("Bogdanov Decl."  Emphasis added).

What extraordinary value Lead Counsel believes these late-added firms brought to the case that they should receive higher multipliers than firms who provided leadership in organizing and effectuating discovery and deposition preparation, contributed to the drafting of important motions, worked with experts, took depositions, and provided the money to finance the litigation is anybody's guess.  However, it does suggest that the Special Master needs to be vigilant to weed out those of Lead Counsel's proposed fees that reveal either a special animus or a special bias as to certain firms.

## II.  CONSIDERATIONS IN AWARDING AND ALLOCATING FEES

"When a case results in a common fund for the benefit of a class, a court may exercise its equitable powers to award plaintiffs' attorneys' fees out of the fund."  *State of Florida v. Dunne,* 915 F.2d 542, 544 (9th Cir. 1990).  Awarding attorneys' fees from a common fund to the lawyers whose work produced the fund is uniquely within the purview and discretion of the presiding court.  *See, e.g., Mercury Interactive Corp Securities Litigation v. Mercury Interactive Corp.,* 618 F.3d 988 (9th Cir. 2011); *Manual for Complex Litig.* (Fourth) §21.62 (2004) (courts review "the reasonableness of any provisions for attorney fees, including agreements on the division of fees among attorneys").

District courts have the authority to reject a fee allocation that does not accurately **r**eflect the amount of work performed by the various attorneys.  "It is well established that an award of attorneys' fees from a common fund depends on whether the attorneys' "'specific services benefited the fund - whether they tended to create, increase, protect or preserve the fund.'"  *Class*

*Plaintiffs v. Jaffe & Schlesinger, P.A.,* 19 F.3d 1306, 1308 (9th Cir. 1994) (quoting *Lindy Bros. Builders, Inc., v. American Radiator, Etc.,* 540 F.2d 102, 112 (3d Cir. 1976)).  In *FPI/Agretech,* the Ninth Circuit specifically rejected a rule that a district court may decline to approve a fee allocation only if it is contrary to the interests of the class or in violation of rules of professional conduct.  Rather, courts look to "the relative efforts of, and benefits conferred upon the class by, co-counsel" in evaluating fee allocation proposals.  *In re FPI/Agretech Sec. Litig.,* 105 F.3d 469, 474 (9th Cir. 1997) (citing *Jaffee,* 19 F.3d at 1308 and *In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 816, 223 (2d Cir. 1987)).  Further, "[a] court may consider the same factors when no such agreement exists."  *Keller v. NCAA,* 2015-2 Trade Cas. (CCH) ¶79,409, 2015 U.S. Dist. LEXIS 166546, at *29 (N.D. Cal. Dec. 10, 2015) (citing *In re Critical Path, Inc. Secs. Litig.,*No. 01-00551 WHA, 2002 U.S. Dist. LEXIS 26399, at *33 (N.D. Cal. June 18, 2002) (awarding higher fees to the firm that "undertook most of the work (including document review and negotiation with defendants) that actually delivered real benefit to the classes" and lower fees to the firm that "rode its coattails and received a (close to) free ride to settlement").  Indeed, "'[a] district court's exercise of th[e] broad discretion to review and modify a fee agreement is not limited to situations in which it finds windfall, adverse class impact, or other irregularity.  Whenever a court finds good reason to do so, it may reject an agreement as to attorneys' fees just as it may reject an agreement as to the substantive claim.'"  *FPI/Agretech,* 105 F.3d at 473 (quoting *Smiley v. Sincoff,* 958 F.2d 498, 501 (2d Cir. 1992)).

## III.   LEAD COUNSEL'S PROPOSED FEE ALLOCATION TO COOPER & KIRKHAM IS UNREASONABLE AND THE PRODUCT OF PERSONAL ANIMUS

### A.   Lead Counsel Never Questioned One Minute of Cooper & Kirkham Time

The category into which Lead Counsel proposes to place C&K includes firms "which had billing issues."  (Dkt. 4790 at 4.)  This consideration does not apply to C&K.  Before submitting the Fee Motion, Lead Counsel, with the assistance of an audit committee, "reviewed and audited the daily time entries," and "ensured that the time included in each firm's lodestar complied with

[Lead Counsel's instructions] and is otherwise reasonable and property calculated."  (Dkt. 4071-1, at ¶119.)  Though "[t]he audit committee made substantial cuts to certain firms' lodestars" (*id.*), C&K was not asked to eliminate one minute of its time. (Dkt. 4370-1 at ¶¶34-35.[4])   Neither were C&K's billing rates ever called into question. (*Id. See also* Dkt. 4071 at 34: "[T]he hourly rates charged by IPP Counsel were reviewed by Richard Pearl, an expert in attorney fee matters. Mr. Pearl has concluded that the rates are reasonable.")

When a draft of C&K's fee declaration was submitted to Lead Counsel, his only question concerned the firm's costs, specifically, invoices C&K paid to Veritext court reporters.  (Cooper Decl., ¶5 and Exs. A, B.[5])   Mr. Cooper explained that the invoices all pertained to real-time transcriptions of depositions at which Mr. Bogdanov appeared, plus one rough transcript.  (*Id.*) Mr. Cooper further noted that Veritext charged C&K for hard copies of various transcripts and other charges which were never ordered (which the firm had reversed); the only charges paid were those pertaining to services of which Mr. Bogdanov specifically remembered availing himself.  *Id.* For clarification, these charges were placed in different expense category in the final version of Mr. Cooper's fee declaration.  (*Id.*)   In addition, Lead Counsel proposed a $634.00 reduction in the firm's expense submission to "compl[y] with the guidelines set up by Judge Tigar during the DPP fee and expense proceedings."  (Cooper Decl., ¶6 and Ex. C.)  The four deleted expenses were the cost of "Economy Plus" airline seats purchased for Mr. Bogdanov to attend depositions. The upgrade provided him with a few extra inches of legroom while flying coach.  (*Id.*)  Mr. Bogdanov is 6 feet 4 inches tall and weighs 235 pounds (on a good day).  (Bogdanov Decl., at ¶ 2.)  It was a minor matter to which Mr. Cooper stated that he had no intention of objecting. (Cooper Decl., ¶6 and Ex. C.)[6]

---

[4] "Declaration of Mario N. Alioto in Support of Indirect Purchaser Plaintiffs' Motion for Final Approval of Class Action Settlements with the Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, Technicolor and Technologies Displays Americas Defendants," dated November 20, 2015.

[5] "Declaration of Josef D. Cooper in Support of Objection of Cooper & Kirkham, P.C. to Lead Counsel's Revised Proposed Allocation of Aggregate Fee Award," filed concurrently herewith,("Cooper Decl.")

[6] The Special Master noted that eliminating charges for more leg room on a flight, among other delineated

**B.      Cooper & Kirkham Never Worked at Cross Purposes to Other Counsel in the Case**

Another of the criteria for placement in Lead Counsel's lowest multiplier category was "work[ing] at cross purposes to the other counsel in the case."  (Dkt. 4790 at 4.)  This too does not apply to C&K.  At no time during the period covered by the lodestar did anyone at C&K have any hint of conflict with Lead Counsel and/or any other lawyer in the case.  Indeed, during all of the litigation, there was only one time that C&K failed to do as Lead Counsel requested.

In an email to Mr. Cooper dated August 18, 2015 (well after the lodestar period closed), Lead Counsel requested him to revise the portion of the fee declaration in which he discussed his decision not to request compensation for his personal time, including with regard to Judge Walker's recommendation that Judge Conti designate him to serve as co-lead counsel for settlement purposes.  Specifically, Lead Counsel requested that Mr. Cooper eliminate the following statement: "I understand that Mr. Scarpulla is including his time relating to Special Master Walker's Recommendation in his lodestar, and I do not wish my decision not to include such time to reflect in any way upon that decision."  (Cooper Decl., ¶5 and Ex. A.)  Mr. Cooper refused.  (*Id.*)  Mr. Alioto reiterated his request, but did not try to force Mr. Cooper to make the change, writing on September 2, 2015, "[e]ither way, we still intend to include your fees and expenses in our fee motion" (*id.* at Ex. B), which is exactly what Lead Counsel did.

**C.      Cooper & Kirkham Did a Substantial Volume of Substantive Work**

Another criteria for the category in which Lead Counsel proposes to put C&K is "[f]irms which did little or no substantive work."  (Dkt. 4790 at 4.)   C&K has the sixth largest lodestar even though the vast majority of the hours were Mr. Bogdanov's and billed at the comparatively modest rates of $550 and $600.  (Cooper Fee Decl., Dkt. 4073-6, Ex. 2.)   As noted above, it had responsibility for document and deposition discovery against Philips, a major defendant, who paid the second largest settlement at $175 million.  (Id. at ¶6.B.)  In addition, Ms. Kirkham

---

charges, was "more conservative, in fact, than [the Special Master] would have been in assessing the same expenses."  Dkt. 4351 at 83.

1   spearheaded the process by which standards and protocols for searching, preserving and producing

2   all electronic discovery were negotiated with defendants and presented to the court.  (*Id*. at ¶ 6.A.)

3   Adding to Ms, Kirkham's expertise in e-discovery, C&K also brought substantial expertise to

4   litigating against the CRT defendants from its experience in the *In re TFT-LCD* litigation.  This

5   knowledge base translated into efficiencies, insights, and an understanding of the methods and

6   strategies that would, and would not, be most efficient and beneficial to prosecuting the action on

7   a day-to-day basis.  (Bogdanov Decl., at ¶ 3.)  Indeed, Mr. Bogdanov worked on similar matters

8   and had collegial relationships with many of the same attorneys on both sides of the aisle from his

9   participation in the *TFT-LCD* action.  (*Id*. at ¶ 4.)

10       At all times during the litigation, Lead Counsel consistently assigned high level tasks to

11   C&K in recognition of the skills of its attorneys, and their ability to perform tasks efficiently,

12   complete them on time, and produce excellent work product.  C&K participated in the drafting of

13   the opposition to its summary judgment motions, and played a major role in deposition

14   preparation, as well as the trial preparation.  (Cooper Fee Decl. at ¶6.D.)  Indeed, the reward for

15   C&K's good work was more work.  Lead Counsel notes that "[d]ue to the complexity of this case

16   and the amount of work involved, certain lead attorneys (including several from my firm) were

17   working full time on this case for several years and were unable to take on any other work."  Dkt.

18   4071-1. ¶3.  Cooper & Kirkham invested 5,107.9 hours in the litigation, a substantial commitment

19   for a small, three-partner firm.  (Cooper Fee Decl. at ¶¶5, 9.)  By each and all of the factors which

20   Lead Counsel claims guided him in making his proposed fee allocation (Dkt. 4790 at 2-3), C&K

21   deserves a place among the firms in the highest multiplier tiers.

22       Lead Counsel has justified his own fee request on grounds that his firm "efficiently

23   organized this complex case" and "organized IPP Counsel *at each stage of the case*, and ensured

24   the efficient and successful prosecution of this litigation."  Dkt. 4071-1, at ¶¶ 124, 127 (emphasis

25   added).  During the lodestar period, Mr. Bogdanov was the recipient of 1,509 emails from Lauren

26   Capurro, an attorney in Lead Counsel's office, with whom he worked closely and consistently

27   over a five-year period from mid-2010 through May 31, 2015.  (Bogdanov Decl. at ¶ 5.)  Mr.

28   OBJECTION TO LEAD COUNSEL'S REVISED          - 9 -          Master File No. 3:07-cv-5944 JST
     PROPOSED ALLOCATION OF AGGREGATE                        MDL 1917
     FEE AWARD TO INDIRECT PURCHASER
     PLAINTIFFS' COUNSEL

Bogdanov was also among those attorneys who had direct contact with the other plaintiff groups at depositions and trial preparation.  Dkt. 4071-1, at ¶126 ("IPP Counsel were required to coordinate the prosecution of the case with counsel for the DPPs, DAPs and several State Attorneys General.")

Below are representative excerpts of communications from Lead Counsel either assigning tasks or commenting on the high quality of Mr. Bogdanov's work.  All are from Ms. Capurro, unless otherwise noted:

- September 29, 2010:  "Thanks John.  And thank you for all your hard work to date."  [Bogdanov Decl., Ex. 1.]

- November 23, 2010:  "John, this is great—thanks!  I'm very happy I get to tick this off my to do list …"  [*Id.*, Ex. 2.]

- February 11, 2011:  "Thanks for this.  I like your proposed approach for our next steps with Philips and the missing custodians."  [*Id.*, Ex. 3.]

- April 5, 2011: [Group] "Attached please find the Cast of Characters list that we have compiled with your help.  As you will see, the lists for some of the defendants are extremely long.  We want to make the lists more manageable before presenting them to the defendants and asking them to search for the names.  Therefore, we ask that each of you go through the list for your defendant(s) and choose 30 "core" people."  [*Id.*, Ex. 4.]

- August 2, 2011:  [Group] "We are in the process of starting the document review in this case.  In order to help bring the document reviewers up-to-speed on the facts of this case and, in particular, the facts relating to each of the defendants, I would like each of you to prepare a detailed memo regarding your defendant(s) and what you have learned during the meet and confer process.  The memo will also be a useful reference for us in the event the defendants' productions are deficient in any way." [*Id.*, Ex. 5.]

- February 7, 2012:  [Group]  "As the attorneys responsible for the meet and confers with defendants, you should be up to date on the status of the data negotiations with your defendant(s). … I realize I've been asking a lot of some of you recently, but I really need your help to follow up with the defendants and help Demetrius."  [*Id.*, Ex. 6.]

- April 10, 2012:  [Group]  "I realize that we've been asking a lot of you recently and I very much appreciate the hard work you've been putting into this case.  But unfortunately it's imperative that we undertake this work so that we're ready for

OBJECTION TO LEAD COUNSEL'S REVISED
PROPOSED ALLOCATION OF AGGREGATE
FEE AWARD TO INDIRECT PURCHASER
PLAINTIFFS' COUNSEL

- 10 -

Master File No. 3:07-cv-5944 JST
MDL 1917

class certification.  I hope you understand and realize that this push will be short-lived and will be worth it.  Thank you."  [*Id.*, Ex. 7.]

- <u>July 26, 2012</u>:  "I'm copying John Bogdanov since he is the Philips discovery guy …"  [*Id.*, Ex. 8.]

- <u>July 27, 2012</u>:  "Hi John, I'm sorry to bother you as I know you're busy preparing for the Philips deps right now but I'm trying to make some assignments so everything is covered for the run up to class cert.  Can you please let me know if you will be able to handle the following assignments when you get back from DC:"  [*Id.*, Ex. 9.]

- <u>September 17, 2012</u>:  "I have a research project/doc review project that I'm hoping you can help with. As you may be aware, we recently filed a motion to amend to add Thomson, Mitsubishi and Videocon as defendants . . . . We would like to moot these arguments by showing that the court has personal jurisdiction over Thomson S.A.  We would like you to see if you can find us some evidence on this."  [*Id.*, Ex. 10.]

- <u>February 12, 2013</u>:  [Group] "Now that merit depositions are underway, we would like to have a call with team leaders … regarding some modifications to the deposition preparation protocols that are currently in place. …. English team leaders responsible for a deponent will now be primarily responsible for drafting memoranda explaining the role of the deponent (i.e. background memoranda) as well as outlining the best documents found for use at deposition (i.e. preparation memoranda) [and] … the English team leaders will be responsible for preparing a full preparation memoranda detailing, inter alia, the role of the deponent, their background, documents for use in deposition, etc. …. In short, we need the English team leaders to take responsibility for overseeing and coordinating the preparation for your team's assigned deponent.  We believe this is necessary to ensure there is better communication among the English review team leader, the foreign review team and the deposition taking team, and to ensure that things don't fall through the cracks."  [*Id.*, Ex. 11.]

- <u>March 26, 2013</u>:  "I'm working on opposing the CA AG's motion for preliminary approval of their settlement with Philips.  I would like to be able to briefly state some facts regarding Philips' market share and their role in the conspiracy (e.g., how many meetings they attended, attended meetings in the U.S., their leadership of the meetings etc.) to show the Judge that the $500,000 settlement with Philips is inadequate.  If you have any facts that would be useful to me, can you please shoot them over?  Thanks. …

  "John, this is great.  Thanks so much! …

  "Hi John, this is excellent.  Thanks so much for being so thorough. …

  "Thanks, John.  I thought I'd seen something somewhere about a Philips office in San Diego. That's great!"  [*Id.*, Ex. 12.]

- April 3, 2013:  [Group] "Going forward, we will be expecting you, as the team leaders for your defendants, to be making recommendations to Nate & I regarding which deponents your team should work on next."  [*Id.*, Ex. 13.]

- April 10, 2013:  "I've copied John Bogdanov, who is the team leader for Philips and who has led our discovery negotiations with Philips for the last few years." [*Id.*, Ex. 14.]

- April 10, 2013: "John Bogdanov, copied on this message, is the team leader for the Philips doc review team.  John has been working on Philips discovery issues since 2010, so he is very familiar with the players.  He will be in touch to get you started."  [*Id.*, Ex. 15.]

- April 11, 2013:  "I'm following up on my voicemail to you earlier today regarding Philips and LGE depositions.  I have copied John Bogdanov (Philips) and Brian Umpierre (LGE), who have been working on Philips and LGE discovery matters for some time and who are leading the document review teams in finding evidence for the depositions.  I think the first step should be for John and Brian to send you some background materials on each defendant, as well as a description of where we are in the process of scheduling depositions." [*Id.*, Ex. 16.]

- June 19, 2013:  "Can you please review & let me know if there look like there are issues with anything [Philips] withheld [pursuant to their privilege log]?"  [*Id.*, Ex. 17.]

- September 4, 2013:  "I'm sorry to be changing things up at the last minute, but we're thinking that it may be better to have [C&K client and California Class Representative] Ganz opt out of the CA AG's settlement and attempt to opt out the entire class.  To that end, can you please complete the attached form, have Mr. Ganz sign it & return it to me by tomorrow?  We will need to mail it on Friday." [*Id.*, Ex. 18.]

- October 10, 2013:  "Given Philips' recalcitrance during our custodian negotiations and the fact that we obviously couldn't trust their representations that there was no one else of interest, we need to review all Philips/LPD docs with a view to identifying potential witnesses/custodians that aren't on our custodian lists.  I'm copying Brian Umpierre here because I've piled a lot onto you in the last day or so and you're going to have a lot of work on Philips deps over the next few months, so I think it makes sense to bring Brian on board as your co-team leader for Philips/LPD.  Obviously Brian has a good background in LPD from the LG side of things."  [*Id.*, Ex. 19.]

- November 6, 2013:  "Hi John, thanks for your detailed response."  [*Id.*, Ex. 20.]

- November 13, 2013:  "Thanks, John.  I really appreciate the quick turnaround.  It sounds like we would want to depose Mortier."  [*Id.*, Ex. 21.]

OBJECTION TO LEAD COUNSEL'S REVISED
PROPOSED ALLOCATION OF AGGREGATE
FEE AWARD TO INDIRECT PURCHASER
PLAINTIFFS' COUNSEL

- 12 -

Master File No. 3:07-cv-5944 JST
MDL 1917

- <u>December 3, 2013</u> (from Sylvie Kern): "We need to find out what kinds of jurisdictional arguments these entities [Philips Taiwan and Philips Amazonia] made in motions to dismiss in the DAP actions. Are you available? Fairly short fuse because of upcoming depositions." [*Id.*, Ex. 22.]

- <u>December 23, 2013</u>: [Group] "I would like each of the defendant teams to work on the memo for your defendant(s) since you are the most familiar with the evidence. … While your T1 reviewers may be able to help a bit in gathering the evidence, the selection of the best evidence for the memo will really be a job for the team leaders. I realize that some of you have depositions coming up and may not have time to focus on this over the next few weeks." [*Id.*, Ex. 23.]

- <u>February 26, 2014</u>: "Hi John, do we have any documents showing Philips Brazil sold to Sharp Mexico? Sorry if I asked before but I don't see anything on this in my file. Thanks!" [*Id.*, Ex. 24.]

- <u>June 23, 2014</u>: [Group] "As you're all aware, we are working on coming up with a list of potential trial exhibits that we will send to the defendants and request that they stipulate to their authenticity as business records. … We would like the IPP review team to be the six people on this email." [*Id.*, Ex. 25.]

- <u>July 21, 2014</u>: [Group] "John & Brian should be able to answer any questions you have. I am also very familiar with the Philips evidence and can help if John & Brian are unavailable – there are several Philips/LPD depos over the next month or so that they are preparing for." [*Id.*, Ex. 26.]

- <u>July 31, 2014</u>: [Group] "Hi Everyone, I need your help to get the attached RFA's finalized and serve them on defendants tomorrow. … I'm sorry for the push but we must serve the RFA's tomorrow so that responses are due before the close of discovery. Thank you in advance for your assistance." [*Id.*, Ex. 27.]

- <u>July 31, 2014</u>: [Group] "Hi guys, So I have another fire drill project that I need your help with. Milberg is drafting offensive contention discovery requests (RFA's + rogs) to defendants that must be served by tomorrow. I could use some help reviewing them. are any of you available? … Brian & John: I already took a quick look at the RFA's and they appear to need some work. For example, I'm not sure why they've limited the RFA's to sales by PCEC. Philips sold tubes to many other finished product makers for sale in the U.S. I think these RFA's could really benefit from your Philips' specific knowledge." [*Id.*, Ex. 28.]

- <u>August 18, 2014</u>: [Group] "As you know, we are nearing the close of discovery (Sept 5) and I would like to have a call with you tomorrow … to discuss a few items that we're going to need your help with over the next few weeks.

  - **Updating the conspiracy meeting grid for use in our responses to defendants' contention interrogatories**: this is the most urgent matter that I need your help with. …

- o **Defendants' responses to our contention discovery**: …We obviously need to be ready to move quickly.  Given the very short time period we have to move, each defendant team leader will have to handle the meet and confers and any motion …

- o **Meeting and conferring with defendants regarding our responses to their contention discovery** … I'm hoping that each defendant team leader can handle any meet and confers with Milberg's assistance….

- o **Responding to additional contention interrogatories from defendants.** Milberg is currently working on responses to contention interrogatories from Philips (due August 25) … Milberg will need your assistance to finalize these responses so please be ready." [*Id.*, Ex. 29.]

- <u>September 9, 2014 (from Bogdanov)</u>:  "Lauren –  I just concluded the meet and confer with Philips.  They are going to stand on their position not to respond to Interrogatory 7 purely on the super-numerosity argument.  They agreed to supplement their responses and follow up with all of the other issues discussed during the initial meet and confer yesterday.  I will be memorializing those issues for Chuck….." [*Id.*, Ex. 30.]

- <u>September 12, 2014</u> (from Charles Malaise, Philips):  "John,  Sorry for the delay, but I have reviewed your letter and believe it accurately reflects our recent meet and confers.  I will begin the process of providing you the information or supplementations detailed in your letter."  …  [*Id.*, Ex. 31.]

- <u>October 15, 2014</u> (from Veronica Besmer) "John was at every Philips depo, I believe (and definitely was instrumental in preparing for each of them), so he is in a much better position than me pointing out good depos for you."  [*Id.*, Ex. 32.]

- <u>October 17, 2014</u>:  [Group] "We've agreed with the DAPs to complete the current assignments and exchange [deposition] transcripts no later than Monday, November 3 (I realize this is slightly earlier than we discussed on Wednesday) … Finally, we also need to pare down the list of trial exhibits by December 5.  This will be done, in part, through the deposition designation process, i.e. if you designate testimony regarding a particular exhibit, that exhibit will definitely be on the trial exhibit list that we give to defendants…. Okay guys, this is really crunch time.  We all need to step up the plate here since time is clearly very tight and all of the work I just described in November will be going on at the same time as we're preparing our oppositions to summary judgment.  Let's get as much as we can done in the next three weeks before the summary judgment motions come in so we can fully focus on those.  Thanks!  [*Id.*, Ex. 33.]

- <u>November 6, 2014</u>:  [Group]  "Hi Everyone, Great job on pushing through on the deposition designations and getting them done by the deadline!  I really appreciate everyone's hard work." [*Id.*, Ex. 34.]

- November 11, 2014: [Group] "Here is a list of all of the summary judgment motions, including which plaintiff(s) the motions are directed at…. By Tuesday morning, I would like you to prepare a short simple memo laying out (in bullet form, for example) the arguments and your assessment of them, particularly the most troubling ones.  I want to circulate the memos to the trial team so that they can help us strategize on how best to respond to these motions.  Mario and I will then need to discuss the motions with the DAPs and divide up responsibility for drafting the opposition briefs."  [*Id.*, Ex. 35.]

- November 11, 2014: "Hi John, here are some comments.  I like your suggestion of responding to both Philips motions together … We really have to get away from the separate Philips legal entities because as you and Brian both pointed out, it allows them to frame the issues and limit/compartmentalize the evidence to suit them."  [*Id.*, Ex. 35.]

- November 21, 2014: [Group]  "Finally, I want to take this opportunity to say how much I appreciate all of the hard work you're all putting into this case right now.  You're all doing an awesome job!  Everyone has stepped up and we're on track to get everything that needs done, done.  And the oppositions to the summary judgment motions are shaping up nicely.  Thank you." … [*Id.*, Ex. 36.]

- December 1, 2014: "Thanks, John!  FYI: I've been reviewing some of their proposed changes to the Chunghwa depos & disagreed with quite a few of their proposed deletions.  [¶]  For example, they proposed to delete testimony from . . . . This obviously shows a lack of knowledge re the facts in this case.  So don't hesitate to speak up if you disagree with their proposed changes.  It's no doubt very helpful to have them review the designations & make sure there's nothing problematic & that we didn't miss something, but we know more about the facts here.  Thanks!"  [*Id.*, Ex. 37.]

- December 1, 2014: "Hi Brian & John, I know that you guys are both looking at the exhibits from recent Philips depos to ascertain which ones should remain on the trial exhibit list."  [*Id.*, Ex. 38.]

- December 4, 2014: "I've attached the current version of the statement of facts that Diane & Brian have put together.  Brian & John are still adding some of the evidence citations to Sections II & III, however.  I'm sorry this is a bit later than we originally agreed but I've needed Brian and John to help me finalize our trial exhibit list and depo designations, which are due to defendants tomorrow. …  I need Brian and John today and tomorrow to continue helping me on the trial exhibit list and depo designations, so we'd very much appreciate it if you could take the lead on this.  I hope this is okay.  Thanks."  [*Id.*, Ex. 39.]

- December 29, 2014: "I hope you all had an enjoyable time over the last week or so, especially after our marathon effort to file the summary judgment oppositions on the 23rd!  Boy am I glad that is over!  Thanks so much to everyone for all your hard work on those.  I think the final briefs were very strong.  [¶]  I wanted to check

in with you all and ask for the status of any assignments you (or any of the people on your team) are working on for this case.  I believe that most (if not all) of you have been working on assignments related to the trial exhibit list, depositions and/or designations of testimony, and the summary judgment oppositions.  Since all of those are now more or less behind us, I think most of you should be done on CRT assignments for now.  Is that right?"  [*Id.*, Ex. 40.]

- January 21, 2014:  "Hi John, We are receiving defs' depo designations and trial exhibit list tomorrow?  Are you available to help with the review?  Thanks."  [*Id.*, Ex. 41.]

- March 9, 2015:  [Group] "Good morning!  I have some good news to start your week off!  We have final settlements with Panasonic, Hitachi, Philips and Toshiba, and we're working on finalizing our settlement with Samsung SDI.  This means we have now settled with all defendants and, assuming we can finalize the SDI settlement soon, we will shortly be moving for preliminary approval of all settlements.  The amounts of the settlements will become public at that time.

  [¶]  I don't think that anyone has any current assignments, but to the extent you do, there is no need to do anything more on them.

  [¶] Thank you to all of you for your hard work on this case.  **We got a good result for the class.**  We'll be in touch again soon regarding getting the case wrapped up."  [*Id.*, Ex. 42.] (emphasis added).

Given the weight of this record, C&K's assignment to the bottom tier of all counsel cannot possibly be justified by application of the criterion that the firm did little or no substantive work.

**D.    Cooper & Kirkham is Being Punished for Raising Issues Regarding the Adequacy of the Settlements, the Chunghwa Plan of Distribution and Lead Counsel's Attorneys' Fees Request**

Lead Counsel's proposed fee of $2,345,866.91 was arrived at through two separate deductions from C&K's lodestar.  First, Lead Counsel reduced the lodestar by $306,848, as part of an unexplained across-the-board 10% reduction in all lodestars in his proposal.  As mentioned above, for almost all of the firms listed, this is simply math, and of no practical consequence since the recommended fees are greater, in some cases substantially greater, than the originally requested lodestar.  However, for C&K, the 10% reduction represents actual dollars lost from compensation for the work done in the case.  In other words, while Lead Counsel's table appears to apply a negative multiplier of 0.8494 to C&K's lodestar, the actual difference between the

lodestar submitted to the Court in the fee petition and Lead Counsel's recommended compensation is a negative multiplier of 0.7645.

There is no reason to make this 10% reduction (except, possibly to further damage C&K and those few other firms with a negative multiplier), and Lead Counsel offers none. Indeed, Lead Counsel claims that he and others invested substantial time auditing the lodestars submitted by the various firms both during the course of the litigation and before filing the fee petition. As Lead Counsel described it, he "employed many measures to ensure that the lodestar figure is not inflated," including, "provid[ing] strict guidelines to IPP Counsel that they were to work on the case at the direction of Lead Counsel and that only time authorized or approved by Lead Counsel would be included" in the fee petition. (Dkt. 4071-1 at ¶118.) To that end, Lead Counsel convened "an audit committee comprised of several firms who did a great deal of work in this case" that "ensured that the time included in each firm's lodestar . . . is [compliant with Lead Counsel's guidelines and] otherwise reasonable and properly calculated." (*Id*. at ¶119.) Lead Counsel asserted that as a result of this process, "[t]he audit committee made substantial cuts in certain firms' lodestars." (*Ibid*.) Accordingly, the individual lodestars presented to the Court represent Lead Counsel's best judgment of the "reasonable and properly calculated" value of C&K's and every other counsel's contribution to the case.

The only possible rational reason that Lead Counsel would make this 10% reduction calculation is because the Special Master made a similar reduction as part of his lodestar cross-check before recommending a fee of 30% of the common fund. (Dkt. 4351 at 74.) However, the context was totally different. In a cross-check, applying a general lodestar reduction to see if the resulting multiplier is still within a reasonable range spares courts from the burden of having to examine individual time entries to arrive at an acceptable lodestar to employ. If the aggregate lodestar is reduced by an amount that represents a generous deduction for possible duplication of effort and inefficiency and still produces an acceptable multiplier, then the "cross-check" supports awarding the selected percentage of the fund. Similarly here, the fees proposed by Lead Counsel for almost all of the listed firms, generate an acceptable multiplier whether computed with or

without a lodestar reduction.  For C&K, however, the 10% reduction of its lodestar compounds the injustice of Lead Counsel's proposal.

The fourth criterion for inclusion in the lowest tier of multipliers appears to be aimed squarely at C&K, and signals that Lead Counsel's negative proposed multiplier is punishment for our raising issues about the settlement, plan of distribution and aggregate fee request.  This criterion is "*firms which have taken an adverse position to the class.*"  (Dkt. 4790 at 4.)

As a threshold matter, it raises the question of whether C&K's advancing the issues and objections that it did was in fact "tak[ing] an adverse position" to the settlement class's interests, as opposed to simply irritating or embarrassing to Lead Counsel.  It cannot be assumed that raising an objection to a proposed settlement, even if overruled, is *ipso facto*, an action adverse to the interests of the proposed settlement class.  In fact, such a presumption is contrary to the law, which encourages courts to explore a wide range of issues in settlement approval.  "[W]here there is an absence of objectors, courts lack the independently-derived information about the merits to oppose proposed settlements."  *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 803 (3d Cir. 1995).  For this reason, courts are loathe to interpose procedures that might chill the vigor of settlement objections, such as having a losing objector pay attorneys' fees, or interposing an appeal bond based on the value of the settlement at issue in the case.  *Azizian v. Federated Dep't Stores, Inc.,* 499 F.3d 950, 960 (9th Cir. 2007).  Similarly, most judges will not ignore an issue raised by way of an objection, even in the face of a perceived procedural defect.  For example, although Judge Tigar ruled that C&K and the Law Offices of Francis O. Scarpulla lacked standing to object to the settlements, he wrote that "[n]onetheless, they have participated in the case since its inception, and are knowledgeable regarding antitrust law and the intricacies of the settlement.  The Court has treated Scarpulla and Cooper as *amici curiae* and given full consideration to their arguments."[7]  Now, Lead Counsel urges the Special Master to punish C&K

---

[7] "Order Granting Final Approval of Indirect Purchaser Settlements," entered July 7, 2016 (Dkt. 4712) at 36.

OBJECTION TO LEAD COUNSEL'S REVISED
PROPOSED ALLOCATION OF AGGREGATE
FEE AWARD TO INDIRECT PURCHASER
PLAINTIFFS' COUNSEL

- 18 -

Master File No. 3:07-cv-5944 JST
MDL 1917

1   for acting as *amicus curiae*.  This request is wholly inappropriate and without any legal, factual or

2   equitable basis.

3        As to the specific objections raised by C&K, first, and foremost, there are the two

4   objections that were sustained, and resulted in tangible monetary benefits to class members.  Lead

5   Counsel requested that the class pay an aggregate fee of $192,250,000, or 33.3% of the gross

6   settlement proceeds.  Following evaluation of the objections interposed by C&K, among others,

7   the Special Master recommended a fee of $173,025,000 or 30% of the fund, which would have

8   been a savings to the class of $17,302,500.  (Dkt. 4351 at 69.)  C&K continued to press its

9   objection to the District Court, and Judge Tigar awarded a fee of $158,606,250, 27.5% of the fund.

10  The difference between the award and Lead Counsel's original request benefitted the class by

11  increasing the funds available for distribution to class members by $33,643,750.

12       C&K (along with Francis Scarpulla) were the only counsel to point out that Lead

13  Counsel's proposed plan of distribution to the class would violate the provisions in the Chunghwa

14  settlement agreement calling for a geographical division of the settlement money, and deny due

15  process to reseller members of the Chunghwa settlement class promised a monetary recovery in

16  return for releasing their claims.  The Special Master agreed, sustained the objection, and

17  recommended disapproval of the plan of distribution "until the Chunghwa problem [was]

18  corrected."  (Dkt. 4351 at 41-46.)   In addition, as a result of C&K's objection to Lead Counsel's

19  proposal to deduct $2,500,000 in expenses in computing the amount available for distribution

20  from the gross Chunghwa settlement, that deduction was reduced to $632,369.  (Dkt. 4712 at 33.)

21  As a result, these class members were able to obtain 50% of net Chunghwa settlement proceeds,

22  an amount that was a little under $2 million higher then Lead Counsel had originally proposed in

23  his revised distribution plan.  (*Id.* at 30, 33-34.)  C&K's objection also benefitted all class

24  members by ensuring that the integrity of the class action devise was preserved by strict adherence

25  to due process principles.

26       The other major issue raised by C&K was the appropriateness of releasing all claims held

27  by class members in non-repealer states without compensation.  Although the Special Master

28  

OBJECTION TO LEAD COUNSEL'S REVISED     - 19 -      Master File No. 3:07-cv-5944 JST
PROPOSED ALLOCATION OF AGGREGATE                   MDL 1917
FEE AWARD TO INDIRECT PURCHASER
PLAINTIFFS' COUNSEL

1  recommended that the settlement be approved notwithstanding the objection, and the District

2  Court agreed, neither the Special Master nor the Court ever suggested that C&K's position, i.e.,

3  that class members, regardless of repealer/non-repealer status, possess valuable equitable

4  monetary claims, was either legally or factually frivolous or interposed for any purpose other than

5  a good-faith belief that such claims should either be preserved or compensation paid for their

6  release.  Indeed, the Special Master observed just the opposite:

7          Certainly it is possible for an adroit legal mind to concoct a legal pathway for
        class members in non-repealer states to recover some claim to monetary relief.
8          Certainly, it is possible that, if pressed harder, defendants might have agreed to
        larger settlements to effectuate a nationwide monetary recovery.

9

10  It is a giant leap from a finding that Lead Counsel's agreement to release these claims for nothing

11  was not unreasonable, to a determination that raising this issue was taking a position adverse to the

12  interest of the class.

13  **III.      CONCLUSION**

14          There is absolutely no basis for accepting Lead Counsel's proposed fee allocation to C&K.

15  To do so would deny appropriate compensation for the high quality work it performed in this

16  litigation, its overall commitment to the prosecution of the plaintiff's claims, and its contribution to

17  creating the common fund.  The average multiplier recommended by Lead Counsel for the other

18  leadership firms whose contributions were specifically noted by the Special Master in the

19  quotation (Dkt. 4351 at 61) on page 2 of this memorandum, is 1.8962.  Application of this

20  multiplier to C&K's lodestar, after the 10% reduction, yields a fee of $5,236,587.64.   C&K

21  respectfully requests the Special Master to recommend a fee for the firm of not less than this

22  amount.

23          C&K recognizes that properly compensating it for the value of its contribution to the case

24  will require reallocating $2,890,720.73 to C&K that Lead Counsel's proposal recommends be

25  given to other counsel.  C&K respectfully suggests that the most equitable means for

26  accomplishing this is to treat the three late-added trial counsel as hourly fee attorneys, and fix their

27  compensation at their reported lodestars (without Lead Counsel's 10% deduction).  That would

28

OBJECTION TO LEAD COUNSEL'S REVISED           - 20 -          Master File No. 3:07-cv-5944 JST
PROPOSED ALLOCATION OF AGGREGATE                            MDL 1917
FEE AWARD TO INDIRECT PURCHASER
PLAINTIFFS' COUNSEL

1    mean paying them $3,817,498.25 for their work, instead of the $6,281,329.77 proposed by Lead

2    Counsel.  These lawyers entered the case approximately four to five months before it ended, at a

3    time when settlement negotiations were well underway, and shouldered neither the risk nor the

4    delay in payment that furnishes the general rationale for awarding multipliers in class actions.

5    Payment at their regular hourly rates would in no way impugn the quality of their work since they

6    undoubtedly set their hourly rates are at a level which reflects the skills and expertise of the

7    various members of these firms.

8    Dated: September 7, 2016                          Respectfully submitted,

9

10                                                         /s/ Josef D. Cooper
                                                         Josef D. Cooper

11
                                                     Josef D. Cooper (53015)
12                                                   Tracy R. Kirkham (69912)
                                                     John D. Bogdanov (215830)
13                                                   COOPER & KIRKHAM, P.C.
                                                     357 Tehama Street, Second Floor
14                                                   San Francisco, CA 94103
                                                     Telephone: (415) 788-3030
15                                                   Facsimile: (415) 882-7040
                                                     Email:  jdc@coopkirk.com
16

17

18

19

20

21

22

23

24

25

26

27

28   OBJECTION TO LEAD COUNSEL'S REVISED          - 21 -          Master File No. 3:07-cv-5944 JST
     PROPOSED ALLOCATION OF AGGREGATE                            MDL 1917
     FEE AWARD TO INDIRECT PURCHASER
     PLAINTIFFS' COUNSEL