KIRBY McINERNEY LLP
Robert J. Gralewski, Jr. (196410)
600 B Street, Suite 1900
San Diego, CA 92101
Tel: (619) 398-4340
bgralewski@kmllp.com

and

Daniel Hume
825 3rd Avenue
New York, NY 10022
Tel: (212) 371-6600
dhume@kmllp.com

*Counsel for Class Representatives
Kerry Lee Hall, Daniel Riebow, and the
Certified Class of Indirect Purchaser Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **IN RE: CATHODE TUBE (CRT) ANTITRUST LITIGATION**<br><br>This Document Relates to:<br>All Indirect Purchaser Actions | Case No. CV-07-5944-JST<br>MDL No. 1917<br><br>**CLASS ACTION**<br><br>**OBJECTION TO LEAD COUNSEL'S PROPOSED ALLOCATION OF AGGREGATE FEE AWARD TO INDIRECT PURCHASER PLAINTIFFS' COUNSEL**<br><br>Court: JAMS<br>Special Master: Martin Quinn, JAMS<br>Judge: Honorable Jon S. Tigar |

## I. INTRODUCTION

Kirby McInerney LLP ("KM"), counsel for two certified class representatives and one of the core group of firms leading the IPP effort, objects to Lead Counsel's ("LC") Proposed Allocation of Aggregate Fee Award to Indirect Purchaser Plaintiffs' Counsel ("Proposed Allocation"). For its efforts - 10.4% of all the work in the case and much of it at the most senior level - LC recommends KM be allocated 12.3% of the fee. But LC – who did 16.7% of the work – reserves 29.2% of the overall fee for itself. For the reasons set forth below, this gap should be narrowed and KM should receive a multiplier in the 2.5-2.6 range.

Many of the facts justifying KM's multiplier increase are beyond dispute. For example, LC has already acknowledged in filings in support of the settlement and fee request that KM was one of the firms that performed the majority of the work in this case. *See* Indirect Purchaser Plaintiffs' Notice of Motion and Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards ("Fee Brief"), ECF Document No. 4071, at 26. LC has also represented that, "Kirby McInerney led all class representative discovery; led the FTAIA document review team; prepared for and took the depositions of 12 Samsung SDI witnesses; [1] led the DAP deposition team; and was heavily involved in preparing for trial, including reviewing potential trial exhibits, designating deposition testimony, preparing class representative witnesses and attending mock trials." Supplemental Declaration of Mario N. Alioto In Support of Indirect Purchaser Plaintiffs' Motion for Award of Attorneys' Fees, Reimbursement of Litigation Expenses and Incentive Awards to Class Representatives ("Supp. Alioto Decl."), ECF Document No. 4373-1, at ¶ 9.

KM reliably performed a wide-range of high-level tasks exceedingly well and always to the satisfaction of LC. For example, KM took or defended more depositions than any IPP firm (49) including having primary responsibility for the Samsung SDI, Class Representative, and Direct Action Plaintiff depositions; argued a portion of IPPs' class certification motion; contributed a significant sum of money both in assessments and out of pocket expenses; lead the Japanese-language discovery effort under the direction of Straus & Boies ("SB"); staffed the case with

---

[1] KM took eight Samsung SDI depositions, not 12.

experienced and skilled antitrust lawyers who did high-level work and stuck with the effort; played an instrumental role in beating back Defendants' vigorous FTAIA challenges; and helped in a myriad of ways prepare the case for trial. In light of these things, a multiplier in the range of 2.5-2.6 would more fairly value KM's overall contribution to the case.

## II.  ARGUMENT

### A.  Legal Standards Applicable to Fee Allocation Disputes

An appropriate fee allocation should give emphasis to the responsibilities properly assumed and the contributions of each counsel. *See* 1 Alba Conte, *Attorney Fee Awards*, § 2.17 at 71 (2d ed. 1993). Allocations should be based upon the quantity and quality of effort expended by the attorneys involved in the matter. 2 Mary Francis Derfner & Arthur Wolf, *Court Awarded Attorney Fees*, ¶ 17.02 at 17-7 & n. 23.

Although lead counsel is often afforded deference when allocating a fee, that is not always the case because lead counsel has an incentive to undercompensate non-lead counsel, as such compensation typically decreases lead counsel's own recovery. *See In re: Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prods. Liab. Litig.*, 401 F.3d 143, 173 (3d Cir. 2005) (J. Ambro concurring) (noting that when lead counsel makes recommendations about its own fees it has inherent conflicts because it has a financial interest in the outcome and questioning "[h]ow much deference is due the fox who recommends how to divvy up the chickens"). *See also In re: Vitamins Antitrust Litig.*, 398 F. Supp. 2d 209, 225 (D.D.C. 2005) (finding that lead counsel who sought to retain 20% of the fee for itself under-allocated to one firm and ordering an upward adjustment).

### B.  Kirby McInerney's Substantial Responsibilities Warrant a Higher Multiplier

As set forth in the September 9, 2015 Declaration of Robert J. Gralewski Jr. in Support of Plaintiffs' Application for Attorneys' Fees, Expenses and Incentive Awards ("9/9/15 Gralewski Decl."), incorporated herein by reference and attached hereto as Exhibit A, LC turned to KM repeatedly and often to handle diverse and critically important aspects of the case. For example:

- KM took or defended 49 depositions, more than any other IPP firm (*see* 9/9/15 Gralewski Decl. at 3-5; *see also* § II.C. *infra*);

- KM contributed $120,000 in assessment payments (which is significantly more than other top-tier firms, some of whom contributed $0 in pre-settlement assessments) and invested more money than any other IPP firm on travel-related expenses (*see* 9/9/15 Gralewski Decl. at 8; *see also* § II.D. *infra*);

- SB – in charge of IPPs' entire foreign language discovery effort – valued KM's Japanese lawyers more than any others and decided to put them in charge of the Japanese-language documents. Consequently, KM's Japanese lawyers performed the most senior-level Japanese-language work throughout the case, including serving as Plaintiffs' check-translator at at least six Japanese-language depositions (*see* 9/9/15 Gralewski Decl. at 3-4; *see also* § II.F.3. *infra*);

- Throughout the litigation and especially during the home-stretch when there was an immense amount of work to do, LC could and did count on KM to bring its significant resources to bear – partner, associate, foreign-language, and paralegal – to get a number of important jobs done all at once including: updating and completing IPPs' extensive conspiracy meeting grid (with Green & Noblin) and preparing the Samsung SDI, Toshiba, Chunghwa, Thomson, and Mitsubishi best evidence memoranda for use in IPPs' opposition to Defendants' motions for summary judgment; reviewing, designating, and ranking trial exhibits; designating and issue coding deposition testimony; objecting to Defendants' deposition designations; ranking trial witnesses; opposing certain motions in limine and Toshiba's motion to decertify the Class; and helping to assemble the numerous oppositions to Defendants' motions for summary judgment (*see* 9/9/15 Gralewski Decl. at 6; *see also* Declaration of Robert J. Gralewski, Jr. in Support of Objection to Lead Counsel's Proposed Allocation of Aggregate Fee Award to Indirect Purchaser Plaintiffs' Counsel ("9/7/16 Gralewski Decl.") at ¶ 12, attached hereto as Exhibit B);

- KM suggested and spearheaded the effort to locate former Samsung SDI employee W.R. Kim with the help of an investigator that KM had worked with in the past. Prior efforts had proven unsuccessful and Mr. Kim had fallen off of the radar screen. After getting LC's approval, KM's investigator (with help from SB) located Mr. Kim. Ultimately, KM personally served Mr. Kim with a deposition subpoena, interviewed him, and conducted his deposition. *See* 9/9/15 Gralewski Decl. at 3. According to LC: "IPP Counsel tracked down several key witnesses with private investigators . . . These witnesses included . . . W.R. Kim, a former Samsung SDI America employee [who] gave extremely helpful testimony regarding the existence of the alleged conspiracy and the agreement reached among Defendants. [Mr.] Kim also gave very favorable testimony regarding Defendants' alleged conspiratorial activities in North America (including the United States) and the impact of the conspiracy in the United States. This testimony was critical for opposing Defendants' summary judgment motions on FTAIA grounds." Declaration of Mario N. Alioto in Support of Indirect Purchaser Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards, ECF Document No. 4071-1 at ¶ 49. KM was the driving force behind all of this;

- With respect to FTAIA, the Special Master has noted that litigation involving international price fixing cartels has become more challenging in light of the FTAIA. Report and Recommendation of Special Master Re Motions (1) To Approve Indirect Purchaser Plaintiffs' Settlements with the Phillips, Panasonic, Hitachi, Toshiba, Samsung SDI, Technicolor, and Technologies Displays Americas Defendants, and (2) For Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and Incentive Awards to Class

Representatives ("CRT R&R") at 60. Recognizing this early on in the case, LC put KM in charge of IPPs' FTAIA team. *See* Supp. Alioto Decl. at ¶ 9 ("Kirby McInerney . . . led the FTAIA document review team. . .");[2]

- Consistent with the Supp. Alioto Decl. that KM was "heavily involved in preparing for trial," LC dispatched KM to mainland China in early 2015 to interview three Chunghwa witnesses and prepare them for trial. Had the trial commenced, these witnesses would have undoubtedly been IPPs most important live witnesses. While there, KM sent regular updates to LC and the rest of the trial team about what each would be prepared to testify about so that that information could be factored into IPPs' trial preparation efforts (*see* 9/9/15 Gralewski Decl. at 6; see also 9/7/16 Gralewski Decl. at ¶ 13);

- Also consistent with KM's heavy involvement in trial preparation efforts, KM had overall responsibility for all Plaintiff-related aspects of IPPs' mock jury exercise (*see* 9/9/15 Gralewski Decl. at 6; see also 9/7/16 Gralewski Decl. at ¶ 14);

- LC asked KM to be responsible for arguing the ascertainability and adequacy portions of IPPs' class certification motion before Special Master Quinn. Only two other IPP firms presented argument at that hearing (LC and Zelle). Also in connection with IPPs' class certification efforts, KM assisted with the opening and reply brief in support of the class motion and successfully briefed and argued a motion to amend the complaint to substitute several Plaintiffs (*see* 9/9/15 Gralewski Decl. at 4-5);

- Along with SB, KM was responsible for an important – and successful - motion to strike Samsung SDI's improper deposition errata and a successful motion to compel Samsung SDI employee J.S. Ahn to appear for deposition. KM then conducted the Ahn deposition and obtained several key admissions (*see* 9/9/15 Gralewski Decl. at 5-6);

- From the outset of the document review in the case, LC relied upon KM (as well as select other firms including SB) for assistance with establishing the review protocols and procedures to be used throughout the case (*see* 9/9/15 Gralewski Decl. at 2-3);

- LC put KM in charge of drafting and serving writing responses to Defendants' document demands and interrogatories directed to the class representatives (*see* 9/9/15 Gralewski Decl. at 4); and

- At LC's request, KM provided regular updates to the class representatives through their individual lawyers (*id*.).

C.  **Kirby McInerney Took or Defended More Depositions than Any Other IPP Firm**

Perhaps no one factor illustrates the value that KM brought to the case or the trust that LC had in KM more than the number of depositions handled by KM. The following chart lists the

---

[2] As with most of the assembled topic-specific and then team-specific teams, two firms were charged with leadership responsibility. KM lead the FTAIA team with Ike Diel of Sharp McQueen, a top-notch antitrust class action lawyer.

depositions actually taken or defended in a lead role by LC and the other Core Group of firms[3] on behalf of the IPPs. It does not include depositions attended as a second chair or observer.[4]

| Firm | Number of Depositions Taken or Defended | Depositions |
|---|---|---|
| LC | 6 | Brian Luscher (Arizona Class Representative); Samuel Nasto (Nevada Plaintiff); Janet Netz (Plaintffs' Expert) (four separate depositions) |
| SB | 4 | Chih-Chun Liu (CPT); Sheng-Jen Yang (CPT); Jing Song Lu (CPT); and Sang-Kyu Park (SDI) |
| KAG | 0 | - |
| KM | 49 | H.S. Chu (SDI); S.K. Sung (SDI); W.R. Kim (SDI); J.S. Ahn (SDI); Hoon Choi (SDI); K.C. Oh (SDI); J.I. Lee (SDI); J.Y. Youn (SDI); Thomas Schmitt (Hitachi); Janet Ackerman (New York Class Representative); Albert Sidney Crigler (Tennessee Class Representative); Jeffrey Figone (California Class Representative); Steven Fink (Nebraska Class Representative); Steven Ganz (California Class Representative); Lawyer's Choice Suites, Inc. (Washington D.C. Class Representative); Kerry Lee Hall (Maine Class Representative); Gary Hanson (South Dakota Class Representative); Barry Kushner (Minnesota Plaintiff); John Larch (West Virginia Class Representative); Southern Office Supply, Inc. (Kansas Class Representative); Lisa Reynolds (Michigan Class Representative); Daniel Reibow (Hawaii Class Representative); David Rooks (Florida Class Representative); Margaret Slagle (Vermont Class Representative); Craig Stephenson (New Mexico Class Representative); Frank Warner (Tennessee Plaintiff); Louise Wood (New York Class Representative); Target 30(b)(6); Costco 30 (b)(6); Best Buy 30 (b)(6) (two separate depositions); Dell 30(b)(6); Circuit City 30(b)(6) (two witnesses); Michael Bone (ABC Warehouse); David Dirven (ABC Warehouse); Aimee Fields (MARTA); Jeffrey Sokol (MARTA); Christopher Groves (Best Buy); Todd Williams (Target); Kent Ashley (Target); John LaRegina (P.C. Richards); Andrew Shulklapper (Circuit City); Rick Souder (Circuit City); Kakanishi Toshihito (Sharp); Timothy Furey (Circuit City); Bryan Angus (BrandsMart); Paul Garcia (BrandsMart); Robert Johnson (BrandsMart); and Wendy Linsky (Tech Data)[5] |

---

[3] The Core Group of firms includes LC, KM, SB, and the KAG Law Group ("KAG").

[4] LC attended most of the 30(b)(6) depositions of the defendants. And LC and SB helped prepare for many of the depositions of Defendants' employees. In addition, either LC or SB or both attended numerous depositions of Defendants' employees and offered assistance at those depositions. And Shinae Kim-Helms (with SB) attended almost every Korean-language deposition as Plaintiffs' check-translator. Similarly, KM attended depositions (in addition to taking or defending 49) and provided strategic input at those, and KM's senior foreign language attorneys (Akiko Kikuchi and Sawaka Nagano) attended Japanese-language depositions as Plaintiffs' check-translator.

[5] *See* 9/7/16 Gralewski Decl. at ¶ 4.

Many of the depositions that LC entrusted to KM were critically important to the case. A few objective points bear noting:

- During the briefing on IPPs' motion for class certification, LC dispatched KM to Seattle and Minneapolis to mitigate any damaging pass-through testimony that Defendants' might be able to elicit from Costco and Best Buy. In close consultation with IPPs' economic expert, KM developed and asked a series of questions at those 30(b)(6) depositions that did just that (*see* 9/7/16 Gralewski Decl. at ¶ 7).

- Lead Counsel ultimately selected KM to be in charge of the entire defensive discovery aspect of the case. In connection with this assignment, KM was responsible for: (a) all written responses; (b) obtaining, reviewing, and producing documents; (c) interfacing with all local counsel; and (d) coordinating all of the depositions of the Plaintiffs. This work included meeting with many of the Plaintiffs in person in their home towns to prepare them for their depositions. KM defended 18 out of the 27 Plaintiffs' depositions (67%). (*see* 9/7/16 Gralewski Decl. at ¶ 8).

- Defendants undertook a massive effort to depose numerous Direct Action Plaintiffs and other third party witnesses. These depositions could have had grave implications for the economic aspects of IPPs' case because the depositions focused in large measure on pricing-related matters. Again, LC turned to KM and put KM in charge of handling this entire aspect of the case. Initially KM covered all of these DAP depositions, but eventually these depositions started to be double and triple-tracked. At that point, LC deferred to KM who hand-picked a team of qualified lawyers from other IPP firms to cover the depositions. In connection with this decision, KM trained these lawyers and answered strategic questions in real-time during the course of the depositions. Ultimately, KM oversaw an effort to mine all of the DAP/third party deposition transcripts for helpful economic evidence for IPPs' experts (*see* 9/7/16 Gralewski Decl. at ¶ 9).

- After some modifications to IPPs' deposition teams, LC entrusted KM with the responsibility of taking the Samsung SDI depositions, without question the largest and most important Defendant in the case. *See* 9/9/15 Gralewski Decl. at 3. IPPs' $225,000,000 settlement with Samsung SDI represents 39% of the overall recovery in the action.

D.  **Lead Counsel's Proposed Multipliers Fail to Take into Consideration Kirby McInerney's Significant Assessment Payments and Out-of-Pocket Expenses in Comparison to Some Other Top Tier Firms**

The Special Master has observed that IPP counsel, "put at risk $2,405,000 of their own money in assessments paid to the Litigation Expense Fund to cover the enormous expense of experts, translation and the like." CRT R&R at 66. Aside from LC, only three other firms contributed more than $100,000 in pre-settlement assessments. KM was one of them.[6] The following chart illustrates which top-tier firms made pre-settlement assessment payments (and in what amount) and what each firm's proposed multiplier is:

---

[6] The other two were SB and Lovell Stewart Haebian.

| Firm | Pre-Settlement Assessment[7] | LC's Proposed Multiplier[8] |
|---|---|---|
| LC | $1,260,000 | 2.9781 |
| Freedman Boyd | $0 | 2.4984 |
| SB | $120,000 | 2.3685 |
| KAG | $0 | 2.2685 |
| Zelle | $25,000 | 1.9587 |
| KM | $110,000 | 2.0986[9] |

LC's proposed multiplier to firms who contributed little or nothing to the litigation fund is "inappropriately high." *See* Supplemental Report and Recommendation of Special Master Re Allocation of Attorneys' Fees in the Indirect-Purchaser Class Action ("LCD Supplemental R&R") at 3 (reasoning that sufficient weight was not given to the amount and timing of each law firm's contribution to the litigation fund and stating: "Some of my allocations awarded inappropriately high multipliers to firms that contributed little or nothing to the fund, or made their contributions late in the game and were thus not exposed to the risk of losing their investments. This Supplemental Report makes some downward adjustments of allocations for non-payors and late payors, and increases the allocation of other firms that had been under-rewarded for making early, significant investments.").

In addition to assessments, KM invested more money than any IPP firm traveling around the world at the direction of LC. As the Special Master noted in his R&R, "every dollar of [the out of pocket contributions] was at risk if they were unsuccessful." CRT R&R at 60. The following chart lists the travel-related expenses of LC and the other top-tier firms:

---

[7] These figures are taken from the Compendium of IPP Counsel Declarations in Support of Motion for Attorneys' Fees, Reimbursement of Expenses, and Incentive Awards ("Compendium"), ECF Document No. 4073. In addition to these assessments made prior to settlement, LC asked certain firms to contribute $10,000 each to help defray certain Special Master fees. KM complied and sent LC an addition $10,000.

[8] These figures are taken from Lead Counsel's Revised Proposed Allocation of Aggregate Fee Award to Indirect Purchaser Plaintiffs' Counsel.

[9] Because of an error in KM's reported current rate lodestar, KM's effective multiplier is a 2.0986 instead of a 1.9561. *See* § II.F.2. *infra*.

| Firm | Travel-Related Expenses (Rounded to Nearest Dollar)[10] | LC's Proposed Multiplier |
|---|---|---|
| LC | $9,386 | 2.9781 |
| Freedman Boyd | $36,037 | 2.4984 |
| SB | $77,670 | 2.3685 |
| KAG | $951 | 2.2685 |
| Zelle | $28,052 | 1.9587 |
| KM | $82,588 | 2.0986 |

To be fair, the locus of the case and many (but not all) of the depositions were in San Francisco, where LC is located (as well as KAG, Zelle, and where SB has an office). But this only partly explains these numbers. For example, LC sub-contracted much of the travel-related risk in this action by sending KM to South Korea, China, and Mexico, as well as Arizona, Florida, Georgia, Hawaii, Kansas, Maine, Michigan, Minnesota, Nebraska, New Mexico, New York, South Dakota, Tennessee, Vermont, Washington, Washington D.C., and West Virginia to take and defend depositions, interview Defendants' employees and take proffers, and prepare key witnesses for trial. *See* 9/7/16 Gralewski Decl. at ¶¶ 5-6.

Viewed together and taking all other things equally, this objective comparison of LC's and the five top tier firm's pre-settlement assessments (some of which were $0), travel-related expenses (some of which were under $10,000), and proposed multipliers suggests some unfairness in the multiplier LC proposes for KM.

### E. Lead Counsel Counted on Kirby McInerney to Lead Important Post-Settlement Work

In his R&R, the Special Master recognized that "Lead Counsel and a handful of other firms have and will invest many hundreds of uncompensated hours after May 2015." CRT R&R at 70. KM is one of those few firms. The Special Master continued that, "[p]roviding compensation adequate to cover hours after May 2015 is necessary in determining a fair fee." *Id*. KM submits that the proposed multiplier for KM in relation to other firms' does not adequately compensate it for the significant post-settlement work it has done and continues to do at the direction of LC.

---

[10] These figures are from the Compendium. Some of these travel-related expenses were adjusted down after a further audit. *See* January 7, 2016 Letter from Mario N. Alioto to Special Master Martin Quinn. *See also* 9/7/16 Gralewski Decl. at ¶ 11.

KM's post-settlement lodestar is over $730,000[11] and during that period it has spent $21,389.62, including a $10,000 assessment requested by LC.  *See* 9/7/16 Gralewski Decl. at ¶ 15.  This time and expense is a result of KM directly assisting LC obtain approval of the settlement and fee request, overseeing all objector-related issues, and participating in other important and necessary post-settlement work.  Specifically:

- From the very beginning and throughout the settlement approval process, LC consulted with KM on a routine basis – often on a daily basis and at times on weekends - regarding overall strategy (*see* 9/7/16 Gralewski Decl. at ¶ 17);

- KM was one of three or four firms on the audit committee and, as a member, closely reviewed several firms' time and expense records and interfaced with those firms regarding any adjustments that needed to be made or additional detail that needed to be provided.  As part of its audit committee responsibilities, KM was also charged with speaking with Robert Bonsignore on several occasions about first obtaining his firm's time and then, after auditing it, discussing the results of the audit with him. (*see* 9/7/16 Gralewski Decl. at ¶ 18);

- LC put KM in charge of all aspects of objector discovery.  Thereafter, KM quarterbacked this entire effort including locating the objectors, serving subpoenas and amended subpoenas, meeting and conferring with objectors' counsel, speaking with certain objectors' counsel about withdrawing their objections; obtaining and reviewing responsive documents, assembling and supervising a team of lawyers from various firms to conduct the objector depositions; preparing a uniform outline for the depositions; reviewing the transcripts of the objector depositions and extracting the pertinent testimony; researching the professional objectors' involvement in other cases and assembling a detailed compendium of those results; preparing and filing a substantive declaration regarding various objector-related issues in response to the objections; and filing a motion to compel which is fully briefed but is still pending (*see* 9/7/16 Gralewski Decl. at ¶ 19);

- KM drafted, at LC's request, sections of the Memorandum of Points and Authorities in Support of Indirect Purchaser Plaintiffs' Motion for Final Approval of Settlements with the Philips, Panasonic, Hitachi, Toshiba, Samsung SDI, Technicolor, and Technologies Displays Americas Defendants and provided important legal research support regarding other aspects of the same brief (*see* 9/7/16 Gralewski Decl. at ¶ 20);

- At LC's request, KM drafted and was directly responsible for several briefs related to Robert Bonsignore's improper attempts to submit evidence including: (1) Indirect Purchaser Plaintiffs' Opposition to Robert Bonsignore's Motion for Permission to File Reply in Support of Objections; Request to Strike; (2) Indirect Purchaser Plaintiffs' Opposition to Bonsignore's "Request to Submit Evidence Rebutting New Arguments Raised by Lead Counsel During Hearing;" Request to Strike and for Sanctions; and (3) Indirect Purchaser Plaintiffs' Motion to Strike Previously-Excluded Documents Attached Again to the Bonsignore Affidavit (*see* 9/7/16 Gralewski Decl. at ¶ 21);

- At LC's request, KM drafted the motion to strike relating to Cooper & Kirkham's filings purporting to be on behalf of Steven Ganz (*see* 9/7/16 Gralewski Decl. at ¶ 22);

---

[11] This figure does not include any time spent on this objection.

- KM attended the January 5, 2016 hearing before the Special Master and strategized with LC and other firms the night before the hearing, during the hearing, and after the hearing (*see* 9/7/16 Gralewski Decl. at ¶ 23);

- LC asked KM to be prepared to address a matter related to incentive awards at the March 15, 2016 Final Approval Hearing before Judge Tigar (*see* 9/7/16 Gralewski Decl. at ¶ 24);

- KM attended the April 19, 2016 Final Approval Hearing by telephone and was prepared to address any issues related to a declaration regarding billing records that LC asked KM to submit (*see* 9/7/16 Gralewski Decl. at ¶ 25); and

- At LC's invitation, KM participated in preliminary strategy sessions (along with SB and KAG) regarding the allocation of fees. And at LC's invitation, KM provided the first draft of the counsel tiers and multiplier ranges ultimately used by LC in its Proposed Allocation (*see* 9/7/16 Gralewski Decl. at ¶ 26).

KM's leadership in all of these tasks is further evidence that the multiplier proposed by LC does not adequately compensate KM and that a significant upward adjustment is necessary to arrive at a fair fee for KM.

**F.   Lead Counsel's Purported Justifications Do Not Warrant the Downward Adjustments Made to Kirby McInerney's Multiplier**

Prior to submitting its Proposed Allocation, LC spoke with KM. *See* 9/7/16 Gralewski Decl. at ¶ 27. LC indicated that the quality of KM's work was always excellent and its reliability throughout the case was exceptional. *Id*. However, LC indicated that it would recommend a multiplier less than the other Core Group firms for three reasons: (1) KM started working on the case "a little later;" (2) LC had identified an error in KM's reported current lodestar; and (3) KM's senior foreign language attorneys' rate was too high. *Id*. None of these justifications warrant penalizing KM to the extent LC chose to and, with all due respect, the justifications themselves are either in error or are result-oriented.

**1.   Kirby McInerney Invested a Significant Amount of Its Time when the Case was at Risk**

The following chart illustrates the number of hours billed between 2007 and 2011 by firms in the 1.9-2.5 tier that have higher proposed multipliers than KM. As the chart demonstrates, at the

end of 2011 when the case was still very much at risk,[12] KM had invested, for example, 1,334.65 more hours than KAG and almost as many hours as SB:[13]

| Firm | 2007 | 2008 | 2009 | 2010 | 2011 | 5-Year Total |
|---|---|---|---|---|---|---|
| Freedman Boyd | 0 | 0 | 0 | 0 | 0 | 0 |
| SB | 127.75 | 107.25 | 70 | 318.25 | 1539.75 | 2162.95 |
| KAG | 0 | 0 | 0 | 106.4 | 378.2 | 484.6 |
| KM | 0 | 0 | 0 | 23 | 1796.25 | 1819.25 |

Accordingly, KM's 2010 entry does not justify its lower multiplier in comparison to Freedman Boyd, SB and KAG.

### 2. Kirby McInerney Should Receive the Multiplier It Earned on Its Corrected Current Rate Lodestar After 10% Cut

Just prior to submitting its Proposed Allocation to the Special Master and well after it had submitted the audited lodestar of all class counsel, LC informed KM that it had identified an error in the calculation of KM's total submitted current lodestar. *See* 9/7/16 Gralewski Decl. at ¶¶ 27-28. It appears that when historical rates were converted to current, the document review cap of $350/hour for KM attorneys William Harris and Karina Kosharskyy was not carried over.[14] *Id.* at 28. As a result, KM's correct current lodestar appears to be $10,337,201.25 instead of $11,090,460. *Id.* Accounting for the across-the-board 10% reduction in every firm's lodestar, KM's lodestar for purposes of the Proposed Allocation therefore should be $9,303,481. *Id.* Using this post-fee application adjusted lodestar figure, KM's effective multiplier according to LC's recommended total payout would actually be 2.0986 instead of 1.9561 as stated in LC's Revised Proposed Allocation of Aggregate Fee Award to Indirect Purchaser Plaintiffs' Counsel. Even taking this lodestar adjustment into account, KM's effective multiplier is disproportionately low in comparison to LC and the other Core Group firms.

---

[12] The Court did not grant IPPs' motion for class certification until September 24, 2013.

[13] These figures are from the Compendium.

[14] Unfortunately, no one informed KM of this error during the audit process before each firm submitted their final numbers. *See* 9/7/16 Gralewski Decl. at ¶ 28.

### 3. Kirby McInerney's Senior Japanese-Language Attorneys Rates Do Not Warrant a Downward Adjustment to Kirby McInerney's Multiplier

Finally, LC suggested that KM's senior foreign language attorneys' rate was, according to LC, too high.  This result-driven justification should not be permitted because: (1) the rate is reasonable given the attorneys' experience and the tasks performed (*see* 9/9/15 Gralewski Decl. at 3-4); (2) the rate was long-known to LC because KM submitted its time during the pendency of the case and LC did not request a downward adjustment or contest the rate (*see* 9/7/16 Gralewski Decl. at ¶ 29); (3) the rate was – or should have been – scrutinized during the audit process before everyone's time was finalized but it was not questioned then (*id*. at ¶ 30); and (4) IPP's expert Richard Pearl concluded that counsels' rates are reasonable.   Indeed, according to LC itself, "the hourly rates charged by IPP Counsel were reviewed by Richard Pearl, an expert in attorney fee matters.  Mr. Pearl has concluded that the rates are reasonable." Fee Brief at 26.

Between 2010 and 2013, KM's senior foreign language reviewer was Akiko Kikuchi, Of Counsel to the firm.  *See* 9/9/15 Gralewski Decl. at Exhibit 2.  After she left KM, she was replaced by Sawaka Nagano, also Of Counsel to the firm, who saw discovery in the case through until the end.  *Id*.  Because of each lawyer's experience, senior-level work, and the demanding nature of the Japanese language compared to Korean and Chinese,[15] their billing rate is $575 per hour.[16]

---

[15] Among the three primary foreign languages involved in this case (Japanese, Korean, and Chinese), Japanese is the most demanding and complicated of the languages.  For example, written Japanese is more complicated than written Chinese because of its extensive use of honorific expressions and subtleties, which do not exist in Chinese.  It is, therefore, very difficult for a non-native speaker/reader of Japanese to grasp these differences.  Written Japanese is also more complicated than written Korean due to the fact that the Japanese written language uses many Chinese characters, combined with two sets of phonetic alphabets.  In most cases, current day written Korean uses very few, if any, Chinese characters, and only uses one phonetic alphabet.  As a result of this, most young Koreans, educated in Korea, do not have full grasp of Chinese characters.  Consequently, qualified Japanese-speaking lawyers are more difficult to employ.  This reality is often reflected in salaries paid and rates charged. 9/7/16 Gralewski Decl. at ¶ 31.

[16] KM does not believe any firm's rates should be second-guessed at this point and equalized by manipulating firms' multipliers, but if they are, then the Special Master should not look at KM's foreign language lawyers' rates in a vacuum.

Neither Ms. Kikuchi's nor Ms. Nagano's time is subject to the $400/hour foreign language document review cap because, like Ms. Kim-Helms[17] with SB, neither was a tier one document reviewer. To the contrary, SB (in charge of the entire foreign language review) placed Ms. Kikuchi and then Ms. Nagano in the lead of the Japanese-language discovery effort. In that role, Ms. Kikuchi and/or Ms. Nagano: (1) created and reviewed hot document lists of Japanese documents in preparation for depositions; (2) translated Japanese documents into English; (3) proofread English translations in preparation for obtaining certified translations; (4) provided analysis in response to objections to translations received from Defendants; (5) formulated objections to translations to Defendants' English translations of deposition exhibits; (6) drafted background memoranda and directly assisted senior lawyers prepare to depose Japanese speaking employees of Defendants; (7) reviewed and provided analysis regarding Defendants' responses to interrogatories; (8) analyzed documents to determine if certified translations should be obtained for trial; and (9) served as check translators for at least six Japanese language depositions. *See* 9/9/15 Gralewski Decl. at 3-4. *See also* LCD Supplemental R&R at 3-4 (reasoning that higher billing rates are appropriate for more sophisticated, nuanced document review, selecting documents as deposition exhibits or as evidentiary support for important motions, and providing foreign language reviewers). Of course, in connection with these efforts, Ms. Kikuchi and Ms. Nagano reviewed documents, but that review was virtually always in a leadership or senior role.

To the extent the Special Master believes a downward adjustment is warranted due to Ms. Kikuchi's and Ms. Nagano's rates, LC's penalty was too severe. KM's senior foreign language attorneys' billed 4905.5 hours during the case. At $575 per hour, that amounts to a lodestar of $2,820,662.50. At $425 per hour, their lodestar would have been $2,084,837.50. After accounting for the across the board 10% reduction to everyone's lodestar, the total overall difference between rates is $662,242.50. Accordingly, if the Special Master believes rates should be equalized, KM's correct current lodestar should be adjusted down by no more than this amount before the multiplier

---

[17] Ms. Kim-Helms, the IPP team's lead foreign language attorney, is a native Korean speaker. She is not fluent in written Japanese business documents.

that KM earned (2.5-2.6) is applied. Otherwise LC's Proposed Allocation disproportionately penalizes KM.

## III.   CONCLUSION

For all the foregoing reasons, KM respectfully requests that its objection to LC's Proposed Allocation be granted and that the Special Master issue a report and recommendation that KM be awarded a multiplier in the range of 2.5-2.6 on its corrected current rate lodestar after 10% cut.

Dated: September 7, 2016               Respectfully submitted,

*/s/ Robert J. Gralewski, Jr.*   ___

Robert J. Gralewski, Jr.
**KIRBY MCINERNEY LLP**
Robert J. Gralewski, Jr. (196410)
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: 619.398.4340

*Counsel for Class Representatives*
*Kerry Lee Hall, Daniel Riebow, and the*
*Certified Class of Indirect Purchaser Plaintiffs*