Mario N. Alioto (56433)
Joseph M. Patane (72202)
Lauren C. Capurro (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123
Telephone: 415-563-7200
Facsimile: 415- 346-0679
Email: malioto@tatp.com
jpatane@tatp.com
laurenrussell@tatp.com

***Lead Counsel for the***
***Indirect Purchaser Plaintiffs***

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. CV-07-5944-JST; No. CV-13-03234-JST |
| | MDL No. 1917 |
| This Document Relates to:<br><br>All Indirect Purchaser Actions | **LEAD COUNSEL'S OMNIBUS RESPONSE TO OBJECTIONS TO PROPOSED ALLOCATION OF AGGREGATE FEE AWARD TO INDIRECT PURCHASER PLAINTIFFS' COUNSEL**<br><br>Hearing Date: TBD<br><br>Special Master Martin Quinn, JAMS |

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.   LEAD COUNSEL APPLIED THE APPROPRIATE LEGAL STANDARD ............................... 2

II.  LEAD COUNSEL'S RESPONSES TO OBJECTIONS ......................................................... 3

    A.  *McCallum Hoaglund Cook & Irby, LLP (ECF No. 4817)* ...................................... 3

    B.  *The Law Offices of Francis O. Scarpulla (ECF No. 4818)* .................................. 7

        1.  Lead Counsel Properly Audited and Reduced Scarpulla's Lodestar ................................ 7

        2.  Scarpulla Has Worked at Cross Purposes to IPP Counsel and Has Sought to Delay and Upend the Settlements, Including Appealing the Rulings by the Special Master and the Court ........................................................................................ 10

        3.  For the Most Part, Scarpulla's Objections to IPP Counsel's Lodestars Simply Rehash Objections That Have Already Been Made and Rejected .............................................. 10

          a. Percentage-of-the Fund Approach vs. Lodestar Method ................................ 10

          b. Non-Contemporaneous Time Records.................................................. 11

          c. Quarter-Hour Increments, Blocking Billing and Alleged Clerical and Unproductive Time ............................................................................................. 11

          d. Firms with Lodestars Less Than $2 Million ..................................... 12

          e. Lead Counsel's Alleged Failure to Cooperate with Other Counsel................................ 12

          f. "Limited" Class Claims ............................................................. 13

          g. "Late-Added" Trial Counsel ...................................................... 13

          h. Contributions to the Litigation Fund and Expense Issues ......................... 14

          i. No Multipliers Except for Extraordinary Work:......................................... 15

          j. LG Settlement ....................................................................... 15

    C.  *Glancy Prongay & Murray LLP (ECF No. 4820)* ................................................ 17

    D.  *Cooper & Kirkham P.C. (ECF No. 4821)* ....................................................... 19

        1.  Cooper Worked at Cross Purposes to IPP Counsel ...................................... 20

i

LEAD COUNSEL'S RESPONSE TO OBJECTIONS TO PROPOSED ALLOCATION OF AGGREGATE FEE
AWARD TO INDIRECT PURCHASER PLAINTIFFS' COUNSEL, Master File No. CV-07-5944-JST, MDL NO. 1917

2. Rather Than Work Together With Lead Counsel to Get the Settlements Approved, Cooper Objected to the Settlements................................................................. 22

3. Cooper Has Appealed the District Court's Rulings......................................... 26

4. Cooper Overstates His Firm's Contributions to the Case................................ 27

5. Cooper Is Not Responsible for Reducing the Fee Award................................ 29

E.  *Kirby McInerney LLP (ECF No. 4822)* ............................................................ 29

1. Kirby's Overall Contribution to the Case Pales in Comparison to That of Lead Counsel  30

   a. Work Done by Lead Counsel Prior to Kirby Joining the Case........................................ 30

   b. Even After Kirby Joined the Case, Lead Counsel's Work was Much Higher Level Than That of Kirby................................................................................ 32

      i. Lead Counsel Has Had Three Senior Lawyers Working on This Case Since Inception, Compared to One from Kirby ...................................................... 32

      ii. Kirby's Initial Assignments Were Not Very Demanding............................................. 33

      iii.Kirby's Role in the Document Review and Class Certification Was Minor in ............ Comparison to Lead Counsel and Other Top Tier Firms ............................................. 34

      iv.Kirby Overstates its Role in Merits Discovery............................................................ 35

      v. Kirby Drafted None of the Oppositions to Summary Judgment Motions and its Level of Involvement in Trial Preparations was Comparable to Many Other Firms .......... 36

      vi.Lead Counsel Negotiated the Settlements and Led the Post-Settlement Work.......... 37

2. Kirby's Contribution Relative to Other Top Tier Firms...................................................... 37

3. Other Factors That Lead Counsel Considered in Awarding Kirby a Slightly Lower Multiplier Than Other Top Tier Firms........................................................................ 37

4. Kirby's Expenses and Contribution to the Litigation Fund ............................................... 37

F.  *McCallum Methvin & Terrell, P.C. (ECF No. 4824)* ...................................... 40

G.  *Theresa Moore (ECF No. 4825)*...................................................................... 41

H.  *Law Office of Brian Barry (ECF No. 4836)* .................................................. 44

1. Barry's Failure to Act in the Best Interests of the Class................................ 45

2. Barry's Billing Issues and Inefficiency......................................................... 46

3. Low Quality Work by Other Barry Firm Reviewers ..................................... 48

LEAD COUNSEL'S RESPONSE TO OBJECTIONS TO PROPOSED ALLOCATION OF AGGREGATE FEE AWARD TO INDIRECT PURCHASER PLAINTIFFS' COUNSEL, Master File No. CV-07-5944-JST, MDL NO. 1917

4.  Shea's Hourly Rate Was Properly Capped at $350 ........................................................ 48

5.  Barry's Other Objections Also Lack Merit ................................................................... 50

**CONCLUSION** ................................................................................................................................ **51**

# TABLE OF AUTHORITIES

**Cases**

*Class Plaintiffs v. Jaffe & Schlesinger, P.A.,* 19 F.3d 1306 (9th Cir. 1994)........................... 10, 22, 24

*Hartless v. Clorox Co.,* 273 F.R.D. 630 (S.D. Cal. 2011) ........................................................... 2, 4, 6

*In re Ampicillin Antitrust Litig.,* 81 F.R.D. 395 (D.D.C. 1978)........................................................ 2

*In re Copley Pharm., Inc.,* 50 F.Supp.2d 1141 (D. Wyo. 1999).................................................... 2

*In re High Tech Employees Antitrust Litig.,* No. 11-cv-2509-LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015)........................................................................................................................ 50

*In re TFT-LCD (Flat Panel) Antitrust Litig.,* No. M 07-1827 SI, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ................................................................................................................... passim

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.* No. 8:10ML 02151 JVS (FMOx), 2013 U.S. Dist. LEXIS 123298 (C.D. Cal., July 24, 2013).......... 2, 6

*Keller v. Nat'l Collegiate Athletic Ass'n,* No. C 09-1967 CW, 2015 WL 8916392 (N.D. Cal. Dec. 15, 2015) .............................................................................................................................. passim

Pursuant to the Special Master's Order Re Process for Allocating Attorneys' Fees (ECF No. 4748), Lead Counsel hereby responds to the Objections[1] to Lead Counsel's Proposed Allocation of Aggregate Fee Award to Indirect Purchaser Plaintiffs' Counsel (ECF Nos. 4790 and 4800).

## **INTRODUCTION**

Lead Counsel is in a unique position to make the proposed allocation of the aggregate fee award. Lead Counsel has worked directly with every firm in the case and is aware of the assignments which have been made, and the performance of those assignments over the past eight and a half years. Overall, the work has been excellent.

Since there is a fixed amount of fees to allocate, Lead Counsel must apportion the fee according to relative contributions to the case. The case law also requires this. Each Indirect Purchaser Plaintiff ("IPP") firm can assess its contributions to the case, but it cannot assess its contributions relative to all of the other firms with the precision that Lead Counsel can. Moreover, with the exception of a few firms, IPP Counsel in this case are a cohesive group, and there is no factionalism among counsel or at the Lead Counsel level (since there is only one Lead Counsel). This makes the allocation process easier (and fairer) since there are no competing factions or groups as is often the case where there is more than one Lead Counsel.

Having read the objections to Lead Counsel's allocation, we believe we have considered all relevant factors and that no changes to our allocation are necessary. Prior to making our allocation, we had considerable feedback from IPP Counsel, both as to their allocable shares and as to Lead Counsel's allocable share. This process lasted several weeks and resulted in a series of revisions until we felt we had it right. As a result of this process, the objectors are relatively few.

None of the following discussion is intended to be a criticism of our co-counsel, except counsel who have taken an adverse position to our case. We have simply tried to show, candidly, how we arrived at the allocation, and the considerable time and energy that went into it. The allocation we have arrived at is fair and reasonable. It should not be upset by taking amounts from any firm, group of firms, or from firms pro rata across the board.

---

[1] The Objections to which Lead Counsel is responding are ECF Nos. 4817, 4818, 4820, 4821, 4822, 4824 and 4836.

## ARGUMENT

**I.    Lead Counsel Applied the Appropriate Legal Standard**

It is common practice in class actions for lead counsel to allocate the fee award in the first instance.  Federal courts consistently endorse this fee allocation procedure in complex class actions such as this, where much of the work took place outside the purview of the court.  These courts recognize that lead counsel, who supervised the day-to-day prosecution of the litigation and worked alongside their co-counsel, are much better equipped than the court to evaluate each law firm's respective contribution to the prosecution and settlement of the litigation.  *See, e.g., In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.* No. 8:10ML 02151 JVS (FMOx), 2013 U.S. Dist. LEXIS 123298, at *316 (C.D. Cal., July 24, 2013) (approving plan for class counsel to allocate fees "in a manner that they believe, in good faith, reflects the contributions of counsel to the prosecution and settlement of the claims" because "<u>class counsel are the most familiar with the amount of work actually contributed by each of the 31 firms</u>") (emphasis added); *In re Ampicillin Antitrust Litig.,* 81 F.R.D. 395, 400 (D.D.C. 1978) ("In the context of this litigation, which has extended over an eight-year period, <u>it is virtually impossible for the Court to determine as accurately as can the attorneys themselves the internal distribution of work, responsibility and risk.</u>") (emphasis added).[2]

In allocating the aggregate fee award, Lead Counsel was required to examine "the relative efforts of, and benefits conferred upon the class by, co-counsel." *Keller v. Nat'l Collegiate Athletic Ass'n*, No. C 09-1967 CW, 2015 WL 8916392, at *4 (N.D. Cal. Dec. 15, 2015).  As further explained herein, this is precisely what Lead Counsel did in making its proposed fee allocation to the Special Master.

*//*

---

[2] *See also Hartless v. Clorox Co.,* 273 F.R.D. 630, 646 (S.D. Cal. 2011) ("[F]ederal courts routinely affirm the appropriateness of a single fee award to be allocated among counsel and <u>have recognized that lead counsel are better suited than a trial court to decide the relative contributions of each firm and attorney</u>.") (emphasis added); *In re Copley Pharm., Inc.,* 50 F.Supp.2d 1141, 1148 (D. Wyo. 1999) ("[C]lass counsel were there, working side by side, communicating frequently, and can better assess the relative worth of co-counsels' contributions.")

II. **Lead Counsel's Responses to Objections**

As an initial matter, several of the Objections complain about the cuts made by Lead Counsel to their lodestar during the audit of IPP Counsel's time records. But Lead Counsel had an obligation to avoid unnecessary duplication and unproductive efforts by IPP Counsel. The Order Appointing Interim Lead Counsel, ECF No. 47 ("Lead Counsel Order"), requires that Lead Counsel "promote the orderly and efficient conduct of this litigation and [] avoid unnecessary duplication and unproductive efforts;" "record and administer all times and expenses of counsel and staff;" and "monitor the activities of Plaintiffs' counsel and [] implement procedures to ensure that schedules are met and unnecessary expenditures of time and funds are avoided." (*Id*. at 5-6.)

Consistent with this Order, Lead Counsel collected IPP Counsel's time at regular intervals during the case, and made every effort to avoid unnecessary duplication and unproductive efforts. At the end of the case, Lead Counsel set up an Audit Committee to review and audit each firm's fee request, which included reviewing all counsel's time records. (*See* ECF No. 4071-1, ¶118-19.) As further explained below, all of the cuts made to each firm's lodestar were justified and necessary to comply with the Lead Counsel Order, and Lead Counsel's fiduciary duty to the Class.

Lead Counsel will respond to each objection in the order in which they were filed.

A. **McCallum Hoaglund Cook & Irby, LLP (ECF No. 4817)**

McCallum Hoaglund Cook & Irby, LLP ("McCallum") objects to Lead Counsel proposed fee allocation and their proposed multiplier of 1.2492 on several grounds: (1) they did important work in representing the Tennessee class representative and various other assignments; (2) they stood ready to do additional work but were not given assignments; (3) Lead Counsel requested that they remove a substantial amount of time spent reading and reviewing court filings that were unrelated to any assignment; (4) they contributed $12,000 to the Litigation Fund and firms who did not contribute to the Litigation Fund received more work and higher multipliers than them; and (5) all firms, including McCallum, should receive the case multiplier of 1.96.

Lead Counsel does not dispute that McCallum provided an important service to the Class by representing the Tennessee class representative and assisting with responding to discovery and preparing him for his deposition. Lead Counsel also recognizes that McCallum did a small amount

1   of additional work, including assisting with drafting the opposition to the motions to dismiss early in

2   the case.  Lead Counsel has attempted to reward this service and acknowledge this work by placing

3   McCallum in a higher tier with firms that incurred much higher lodestars and had much more at

4   risk.[3]  But McCallum's work, while important, cannot be viewed in a vacuum.  It must be judged

5   relative to the work performed by all of the other firms in the case. *Keller v. NCAA*, 2015 WL

6   8916392 at *4 (in determining the proper allocation of attorneys' fees, the court should examine the

7   relative efforts of class counsel and how the efforts of each benefitted the class); *Hartless v. Clorox*

8   *Co.,* 273 F.R.D. 630, 646 (S.D. Cal. 2011) ("[F]ederal courts. . . <u>have recognized that lead counsel</u>

9   <u>are better suited than a trial court to decide the relative contributions of each firm and attorney</u>.")

10   (emphasis added.)

11        Simply put, McCallum's work is dwarfed by the work performed by other firms in the

12   litigation, in terms of the level, the amount and the quality of the work performed.  The firms in the

13   same tier as McCallum all assigned several attorneys to the case who did primarily higher level

14   document review, with some other more substantive work. McCallum's relative contribution to the

15   case was the least of the firms in its tier.  Many of the firms in the tier below McCallum represented

16   a class representative—some of them more than one—*and* they did low level document review.  All

17   of the firms in the tiers above McCallum did much higher level work, such as taking multiple

18   depositions, managing document review teams, drafting briefs and preparing for trial, *and* they did

19   much more of it than McCallum and had much more at risk in terms of lodestar.  (Declaration of

20   Mario N. Alioto ISO Lead Counsel's Omnibus Response to Objections to Proposed Allocation of

21   Aggregate Fee Award to Indirect Purchaser Plaintiffs' Counsel ("Alioto Decl."), ¶ 2.)

22        McCallum complains that it should not be penalized for doing a lesser amount of work

23   because they had no control over assignments and they requested additional work.  With all due

24   respect to McCallum, Lead Counsel assigned them work commensurate with their background and

25   experience.  Much of their draft for the opposition to the motion to dismiss had to be heavily edited

26

27   [3] The only firm in that tier with a lodestar close to McCallum's is Karon LLC.  But Karon LLC is
    basically a continuation of Goldman Scarlato & Penny, P.C., f/k/a Goldman Scarlato Karon &

28   Penny, P.C.  Karon is receiving a slightly higher multiplier than Goldman because the work
    performed by Karon was higher level (trial preparation) than the work performed by Goldman
    (higher level document review).

4

by Lead Counsel.  Thereafter, Lead Counsel was reluctant to give them substantial assignments because, as the case got busier, it became more and more important to give work to firms who could be relied upon to produce high quality work.  Later assignments to McCallum were limited to lower level tasks, such as deposition summaries. (*Id*. at ¶3.)

With regard to contributions to the Litigation Fund, as a general matter, firms who did *not* contribute to the Litigation Fund received slightly lower multipliers than firms that did the same or similar work which did contribute to the Litigation Fund.  For example, in the top tier, Law Offices of Sylvie Kern received a slightly lower multiplier than Straus & Boies LLP in large part due to the difference in their contributions to the Litigation Fund.  Similarly, Law Offices of Lawrence G. Papale, Vogl Meredith and Besmer Law Firm would have received slightly higher multipliers had they contributed to the Litigation Fund.  And in the tier consisting of firms that represented a class representative and/or performed low level document review, McCallum Methvin, Frankovitch Anetakis, Kirkpatrick and Bonnett Fairborn, were awarded slightly higher multipliers than others in that tier in recognition of their contributions to the Litigation Fund. (*Id*. at ¶4.)  McCallum's $12,000 contribution pales in comparison to the contributions by the other firms in its tier: Miller ($50,000); Goldman ($75,000)[4]; Kassof ($50,000).  Thus, there can be no argument that McCallum should receive a higher multiplier than these firms.  Indeed, the multiplier Lead Counsel proposes for McCallum is quite generous.

However, contributions to the Litigation Fund did not hold as much weight in this case as in other similar cases because no firm contributed very large amounts.  In *LCD*, for example, many firms had contributed several hundred thousand dollars to the litigation fund,[5] whereas here only five firms paid more than $100,000. (*See* ECF No. 4073, Compendium Index of Expenses.)  Lead Counsel elected to fund the litigation primarily by utilizing funds from the early settlements with Chunghwa Picture Tubes, Ltd. ("Chunghwa") and LG Electronics, Inc. ("LG"), rather than

---

[4] Again, Karon LLC is effectively a continuation of Goldman such that Goldman's contribution to the Litigation Fund is also credited to Karon.

[5] *See* Alioto Decl. ¶ 5, Ex. 1 (Supplemental Report and Recommendation of Special Master Re Allocation of Attorneys' Fees in the Indirect-Purchaser Class Action, ECF No. 7375, Case No. 3:07-md-01827, *In re TFT-LCD Antitrust Litig*., ("*LCD* Suppl. R&R").

1   demanding that IPP Counsel put huge sums of money at risk.  Lead Counsel strongly believes that

2   this approach to funding the litigation was in the best interests of the Class, and led to a better result

3   for class members.  Thus, while Lead Counsel did take into account the fact of a contribution to the

4   Litigation Fund and the amount of that contribution, in most cases it was insufficient when weighed

5   against the level, quality and amount of work performed to elevate any firm into a higher tier.

6        McCallum also complains that its lodestar was cut substantially when Lead Counsel

7   requested that it remove time spent reviewing court filings unrelated to a specific assignment.  Lead

8   Counsel recognizes that some review of court filings is necessary for firms like McCallum who

9   represent a named plaintiff.  This was taken into account in performing the audit of McCallum's

10  time records, and time spent reviewing significant filings was not cut.[6]  But, as outlined above, Lead

11  Counsel was obligated by Court Order (ECF No. 47) and by his fiduciary duty to the Class to avoid

12  charging the Class for duplicative, unnecessary and unproductive work.  Moreover, given the Special

13  Master's findings in *LCD*, it is unlikely that he would have allowed McCallum's "read and review"

14  time.  *See* Alioto Decl., Ex. 1 (*LCD* Suppl. R&R at 11 ("Most firms in this case charged nothing for

15  such 'read and review' time."); *In re TFT-LCD (Flat Panel) Antitrust Litig*., No. M 07-1827 SI,

16  2013 WL 1365900, at *9 (N.D. Cal. Apr. 3, 2013) ("Factors meriting a downward adjustment

17  include**: . . . billing for inconsequential tasks (e.g., reading ECF filing entries . . . .)**) (Emphasis

18  added.)

19       Finally, McCallum's argument that all firms should receive the case multiplier of 1.96,

20  regardless of their relative contribution to the case, is contrary to the law and established practice in

21  class actions.  *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, &*

22  *Prods. Liab. Litig.*, 2013 U.S. Dist. LEXIS 123298, at *316 (approving plan for class counsel to

23  allocate fees "in a manner that they believe, in good faith, reflects the contributions of counsel to the

24  prosecution and settlement of the claims" because "class counsel are the most familiar with the

25  amount of work actually contributed by each of the 31 firms"); *Hartless v. Clorox Co.,* 273 F.R.D. at

26

27  ───────────────

    [6] For example, Lead Counsel did not cut time spent reading Defendants' opposition to IPPs' motion
    for class certification, but did cut time spent reading inconsequential filings such as stipulations

28  regarding administrative matters, or filings in the Direct Purchaser Plaintiffs' or Direct Action
    Plaintiffs' cases.

646 ("[F]ederal courts routinely affirm the appropriateness of a single fee award to be allocated among counsel and have recognized that lead counsel are better suited than a trial court to decide the relative contributions of each firm and attorney.")  It would be grossly unfair to firms who have essentially devoted their entire practice to this case for the last few years, and have performed high level work of excellent quality, to receive the same multiplier as McCallum and other firms who were only involved in the case sporadically and did lower level work.

In sum, the proposed multiplier to McCallum is more than fair.  It is consistent with the multiplier range in *LCD* for similar work.  (Alioto Decl., Ex. 1 (LCD Suppl. R&R at 5).)  Their approved lodestar is very generous since it still contains a certain amount of "read and review" time.[7]  Increasing McCallum's multiplier would upset the delicate balance Lead Counsel has achieved and would require that other firm's multipliers increase too.

### B.      The Law Offices of Francis O. Scarpulla (ECF No. 4818)

#### 1.      Lead Counsel Properly Audited and Reduced Scarpulla's Lodestar

Scarpulla claims that Lead Counsel improperly cut his lodestar without explanation.  On the contrary, Lead Counsel audited Scarpulla's time records in accordance with the procedures applied to all firms.  As with all other firms, and in accordance with the Order Appointing Interim Lead Counsel, ECF No. 47, Lead Counsel eliminated the following categories from Scarpulla's time records: (1) time spent on the motions for appointment as lead counsel; (2) time spent on tasks that were not assigned by Lead Counsel; (3) time spent reading court filings that was unrelated to a specific assignment; and (4) time spent on internal case organization, such as organizing internal case files and excessive internal meetings about "case status."  In addition, Lead Counsel eliminated a number of entries that appear to relate to *LCD*,[8] and entries for time spent reading legal opinions regarding issues to which neither he nor Zelle were assigned.[9]  (Alioto Decl. ¶ 6.)

---

[7] As described above, Lead Counsel exercised his discretion to allow some of this time because McCallum needed to keep his client updated.

[8] *See, e.g.,* Scarpulla time entries dated 4/29/2008, 5/5/2008, 6/27/2008 (relating to depositions of Samsung executives—there were no depositions in *CRT* at this stage); 7/20/2008 and 2/11/2009 (relating to opt out claims—the opt out plaintiffs did not join the CRT case until 2011).

[9] *See, e.g.*, Scarpulla time entries dated 8/22/2008, 7/20/2010.

7

Lead Counsel did not eliminate any of Scarpulla's time prior to Mr. Alioto's appointment as Interim Lead Counsel on May 9, 2008 (except time spent on the lead counsel motions). Nor did Lead Counsel eliminate any of the time spent by Scarpulla thereafter on work that was assigned to Zelle Hofmann.[10] But Lead Counsel could not allow time spent on tasks that were entirely unassigned, such as trial preparation[11] and meetings with the California Attorney General ("AG"), defense counsel, or co-counsel about matters that were assigned to other firms, or were within Lead Counsel's sole purview. (*Id.* at ¶7.)

For example, Lead Counsel had assigned Paul Novak, a senior partner at Milberg LLP and a former Michigan Assistant Attorney General, to work with the AG's office. (*Id*. at ¶ 8.) Thus, Scarpulla's work was duplicative, unnecessary and unproductive. In addition, by Court Order, only Lead Counsel had the authority to negotiate with the Defendants regarding settlement. (*See* Lead Counsel Order (ECF No. 47) at 6 (listing Lead Counsel's responsibilities, including: "To meet and negotiate with defense counsel with respect to settlement and other matters after adequate due diligence.") Allowing all of this unassigned time would also have been at odds with the standards applied to other IPP firms, which would have been very unfair.

The audit reduced Scarpulla's hours from 185.9 hours to 59.05 hours. Lead Counsel then applied Scarpulla's historical rates to calculate his lodestar, which started at $850 and rose to $1250 from 2013 onwards. (Alioto Decl. ¶9.) Again, this was generous given that these rates are *much* higher than any other lawyer in the case, including Lead Counsel. In addition, Scarpulla did very little substantive work and the work he did do was often duplicative of other lawyers at Zelle Hofmann.

---

[10] Allowing much of this time was generous because there were already several Zelle Hofmann partners working on the case, including Craig Corbitt, Judith Zahid and later, Chris Micheletti. Most of Scarpulla's time was spent simply discussing the case with these partners or one of Zelle's associates, or reviewing their work. In other words, Scarpulla's time was often duplicative and unnecessary, and added little value for the Class.

[11] Scarpulla points to his letter dated October 2, 2014 as evidence of his involvement in trial preparations. (Scarpulla Decl., Ex. 2.) But this work was entirely unassigned and was duplicative of what Lead Counsel was already doing in conjunction with the other firms in the core group: Straus & Boies, LLP, Law Office of Sylvie Kern, and Kirby McInerney, LLP, among others. Lead Counsel informed Scarpulla of the status of trial preparations and a host of other matters by email dated October 7, 2014. This email is attorney work product and confidential.

When Scarpulla left Zelle Hofmann, they agreed that half of his time while at Zelle would be assigned to Scarpulla. Practically speaking, this meant that Zelle and Scarpulla submitted the identical time records, with each entry divided 50-50. During the fee audit, Zelle agreed with Lead Counsel that much of Scarpulla's time was of no benefit to the Class and was therefore not compensable. Indeed, Zelle decided to eliminate *all* of Scarpulla's time from their lodestar. (Alioto Decl. ¶ 10.) This decision was not, as Scarpulla claims, a violation of Zelle's agreement with Scarpulla such that Scarpulla can re-claim his full lodestar. That time belonged to Zelle under their agreement. Thus, Zelle was entirely within its rights to write it off.

In his objection, Scarpulla suggests that Lead Counsel summarily rejected his declaration without explanation, and refused to include it in the fee petition. Nothing could be further from the truth. Lead Counsel and other members of the Audit Committee attempted to contact Scarpulla on multiple occasions in order to discuss his declaration and explain the proposed cuts to his lodestar. Lead Counsel also sent Scarpulla an email explaining the problems with his declaration (he didn't submit the lodestar summary chart and had only submitted his time at current rates), and the categories of time we proposed to cut. But Scarpulla refused to speak with Lead Counsel or the Audit Committee. (Alioto Decl. ¶¶ 11-13, Exs. 2-3.) He later filed his declaration but he has never made his own motion for attorneys' fees. Therefore, Scarpulla's only claim to fees is based on the amount included by Lead Counsel in the joint fee petition.

Scarpulla also claims that his time spent meeting with the AG and defense counsel was a result of him being asked to become involved by the AG and Special Master Walker. He also claims that defense counsel contacted him as opposed to the other way around. He provides no evidence in support of these claims other than his own self-serving declaration. Even if it is true that this work was done at the behest of the AG or the Special Master Walker, that is not the standard for payment of attorneys' fees from a common fund. Rather, Scarpulla must show that this work benefited the IPP Class and contributed to the result achieved. *See Class Plaintiffs v. Jaffe & Schlesinger, P.A.,* 19 F.3d 1306, 1308 (9th Cir. 1994) ("It is well established that an award of attorneys' fees from a common fund depends on whether the attorneys' 'specific services benefited the fund—***whether they tended to create, increase, protect or preserve the fund***.'") (internal citations omitted)

9

1   (emphasis added).  He has entirely failed to make this showing.  In fact, as further demonstrated

2   herein and as Lead Counsel will explain in detail at the hearing on these objections, Scarpulla's

3   actions caused additional delay, work and expense for the Class, and adversely impacted Lead

4   Counsel's settlement negotiations with Defendants.   As such, a fractional multiplier on Scarpulla's

5   reduced lodestar is entirely appropriate.  *See LCD*, 2013 WL 1365900, at *9 ("Factors meriting a

6   downward adjustment include: **. . . failure to act professionally and collaboratively to prosecute**

7   **the joint IPP effort**. . . .") (emphasis added.)

8           **2.      Scarpulla Has Worked at Cross Purposes to IPP Counsel and Has Sought**
                       **to Delay and Upend the Settlements, Including Appealing the Rulings by**
9                      **the Special Master and the Court**

10          As indicated above, much of the work included in Scarpulla's lodestar was not only

11  unauthorized, it also adversely affected the efforts of Lead Counsel and other IPP firms.  This will be

12  discussed more fully in the section responding to Cooper & Kirkham, P.C.'s objections.

13          There should be no doubt about what Scarpulla is doing here.  He has no client.  He has no

14  standing to object to the settlements or the aggregate fee award.  (ECF No. 4712 at 35 ("The Court

15  finds that Scarpulla and Cooper do not have standing to object.")  He is engendering delay and

16  causing extra expense for IPP Counsel in the hope of receiving a payoff.  This must be considered

17  when determining his contributions to the case relative to the contributions by the other IPP firms

18  who are working together to get the settlements finalized.

19          **3.      For the Most Part, Scarpulla's Objections to IPP Counsel's Lodestars**
                       **Simply Rehash Objections That Have Already Been Made and Rejected**
20

21          Einstein said that the "definition of insanity is doing the same thing over and over again and

22  expecting different results."  Yet Scarpulla's most recent Objection is replete with the very same

23  objections that he has repeatedly made—and which have been repeatedly rejected—by both the

24  Special Master and the Court.  In addition, all of his objections are based on bald, exaggerated

25  assertions that are without support and are actually contrary to the evidence.  They must be rejected.

26          **a.      Percentage-of-the Fund Approach vs. Lodestar Method**

27          Scarpulla's suggestion that the Special Master return any excess funds to the Class after Lead

28  Counsel's proposed allocation is drastically cut (Scarpulla Obj. at 1, n.2), is an attempt to end run the

1    Special Master's and the Court's rejection of his argument that they should use the lodestar method

2    to calculate the aggregate fee award.  *See* ECF No. 4351 at 54-55 ("None of Scarpulla/Cooper's

3    objections are a basis to employ a pure lodestar approach."); ECF No. 4740 at 5, n.7 (overruling

4    objection to Special Master's use of the percentage-of-the-fund method and noting that Cooper and

5    Scarpulla "cite no case in support of this argument.")  The Special Master should therefore reject this

6    proposal.

7                          **b.      Non-Contemporaneous Time Records**

8            Scarpulla once again accuses Lead Counsel of failing to keep contemporaneous time records

9    (Obj. at 8) when there is not only zero evidence of this, but also the Special Master has specifically

10   found that Lead Counsel's "daily billing entries, albeit handwritten, *give every impression of having*

11   *been made contemporaneously*." (ECF No. 4351 at 71 (emphasis added).)  Nor did the Special

12   Master find Lead Counsel's time records to be "unintelligible."  Moreover, Lead Counsel's time

13   records were provided to the District Court (ECF No. 4523) and the Court apparently saw no reason

14   to reduce Lead Counsel's lodestar beyond the across-the-board 10% cut proposed by the Special

15   Master.  (ECF No. 4740 at 15.)

16                          **c.      Quarter-Hour Increments, Blocking Billing and Alleged Clerical**
                                    **and Unproductive Time**
17

18           Scarpulla's criticisms of billing in quarter-hour increments, block billing and

19   clerical/unproductive time,[12] have likewise been considered and rejected by both the Special Master

20   and the Court.  (ECF No. 4351 at 73; ECF No. 4740 at 15 ("the Special Master has already

21   addressed these objections, and the Court adopts his analysis in full. . .").  Significantly, the Court

22   noted that Scarpulla hadn't "even identified a significant number of entries showing unproductive

23   time."  (*Id.*)  In addition, Lead Counsel has already provided a fulsome explanation of his firm's

24   time-keeping practices, and has shown all of Scarpulla's assertions regarding vague entries (Obj. at

25   10) and "f/n" entries (Obj. at 14-15) to be false. (*See* ECF Nos. 4558 at 5-11; 4558-1 (Alioto Decl.)

26

27

28   ---
     [12] Much of these objections have been cut and pasted verbatim from Scarpulla and Cooper's
     previous filings.  *Compare* ECF No. 4545-4 *with* ECF No. 4818 (Scarpulla Obj.).

and 4558-2 (Suppl. Pearl Decl.).)[13]  At the April 19, 2016 hearing, Scarpulla and Cooper were given an opportunity to reply to this Response.  Neither had anything to say.  (Alioto Decl. ¶ 14.)  Yet now Scarpulla simply makes the same false statements again as if this were an issue of first impression. Wasting everyone's time in this manner should result in a fractional multiplier.

### d.       Firms with Lodestars Less Than $2 Million

Despite the Court specifically calling out the ridiculousness of Cooper and Scarpulla's "*ipse dixit*" assertion that firms billing less than $2 million "did virtually nothing," (*see* ECF No. 4740 at 15 ("it simply cannot be the case that all the work by firms whose billings fell below an artificial threshold did nothing to advance the case"), Scarpulla doubles down by proposing that "these firms should be allocated no part of the gross fee and that $9.8 million should first be re-allocated to the firms who did substantive work that benefitted the Class." (Scarpulla Obj. at 17.)  To the extent such a ridiculous proposal even warrants a response, Lead Counsel can state categorically that he has examined the underlying time records for all firms, including those billing less than $2 million in lodestar, and has proposed multipliers commensurate with the benefit their work bestowed on the Class.  (Alioto Decl. ¶15; *see also* ECF No. 4558 at 13-14.)

### e.       Lead Counsel's Alleged Failure to Cooperate with Other Counsel

Scarpulla again repeats his argument about Lead Counsel's "failure to cooperate" with the California AG.  But the Special Master has already rejected this argument (ECF No. 4351 at 64-65), and found that "apart from some rocky moments, coordination in this case between the Attorney General and the IPP's has been excellent."  (ECF No. 4281.) The Court adopted these findings in full. (ECF No. 4740 at 15.)  Moreover, Lead Counsel has already responded to this argument on several occasions, including refuting the claim that Lead Counsel's "settlement time" is made up "primarily of time spent fighting with the AG."  (*See* ECF Nos. 4367 at 19, p. 24 (IPP Fee Reply); 4449 at 37-38 (IPP Response to Objections); 4558 at 11-13 (IPP Response to Suppl. Obj.).)

---

[13] This filing is Indirect Purchaser Plaintiffs' Response to Statement Pursuant to Order Re: Objection to *Ex Parte* Communications and *In Camera* Review of Billing Records.  IPP Counsel filed this Response to Scarpulla and Cooper's supplemental objections to IPP Counsel's fee motion (ECF No. 4545-4) after they were provided *all* of IPP Counsel's time records.  The other IPP firms that Scarpulla accused of block billing and quarter hour increments also filed declarations explaining their billing practices.  *See* ECF Nos. 4558-3 through 4558-6.

1    Scarpulla has had Lead Counsel's time records for many months now, yet he still provides no

2    support for such claims.

3           It also bears mentioning that over the course of this case, Lead Counsel worked closely and

4    cooperatively with the Attorneys General of Illinois, Washington and Oregon to resolve their

5    objections to the Chunghwa settlement.  Lead Counsel also worked with the Florida Attorney

6    General on case preparation, and the Hawaii Attorney General on various issues over the course of

7    the case.  In addition, Lead Counsel worked closely and cooperatively with counsel for the DPPs and

8    DAPs and shared work product with them throughout the case.  (Alioto Decl. ¶ 16.)

9                         **f.      "Limited" Class Claims**

10          Scarpulla also rehashes his argument regarding the number of claims by natural-persons and

11   small business consumers versus large company claimants.  Neither the Special Master nor the Court

12   gave this argument any credence.  (ECF Nos. 4351 at 47; 4443 at 4; 4712 at 8-9 (agreeing with the

13   Special Master's findings and noting that they "are supported by the strong response rate to the

14   notices.")  The Special Master and the Court also found that the smaller number of claimants here

15   compared to *LCD* is not attributable to any failing by Lead Counsel.  Rather, they agreed with Lead

16   Counsel that because "the claims period in this case stretches back 20 years and the product is

17   obsolete," (ECF No. 4443 at 4), many "claimants [often have] difficulty remembering how many

18   qualifying products they purchased and, accordingly, [are] hesitant to file claims without being

19   sure." (ECF No. 4712 at 32.)

20          Scarpulla's proposal that Lead Counsel's compensation should be lowered if the number of

21   consumer claims is low is directly contrary to these findings.  He also cites no law for this

22   proposition, and such an approach would be contrary to other recent indirect purchaser cases where

23   there was no consideration of the number of consumer claimants vs. large business claimants in

24   allocating the fee award to lead counsel.

25                        **g.      "Late-Added" Trial Counsel**

26          The Special Master found that Lead Counsel's decision to bring the three trial firms into the

27   case was "appropriate," and that "[t]he trial preparation that these three firms did would have had to

28   be done by some other lawyers had they not been on board.  And their 'getting up to speed' time was

---

13

1  quite minimal."  (ECF No. 4351 at 64.) The Court "adopted this analysis in full." (ECF No. 4740 at

2  15.)  Scarpulla is wrong that the three trial firms should get no multiplier because their "investment

3  of time was not at risk because sufficient settlements had been negotiated to assure their

4  compensation." (Scarpulla Obj. at 17.)  In fact, as Lead Counsel has already explained (ECF No.

5  4558 at 14), at the time the trial firms joined the case, there were only two settlements totaling $35

6  million, and an already-existing lodestar far in excess of that.  The trial team faced the very real risk

7  of recovering virtually nothing for their time.  Thus, their time is deserving of a multiplier.[14]

8  Scarpulla's attacks on the trial firms are particularly disingenuous given that it was Scarpulla who

9  first contacted Joe Goldberg and asked him to try the case.  (Goldberg Decl. ¶ 3.)

10         **h.**      **Contributions to the Litigation Fund and Expense Issues**

11         Scarpulla also criticizes Lead Counsel's proposed multipliers for firms who did not

12  contribute to the Litigation Fund. (Scarpulla Obj. at 17-18.) He once again argues that these firms

13  should get no multiplier because they took no financial risk.  While there is certainly law holding

14  that payment of assessments should be considered when allocating a fee award and awarding a

15  multiplier, along with other factors, Scarpulla cites no law in support of his claim that firms that do

16  not pay assessments should receive *no* multiplier.

17         As explained above, Lead Counsel took into account whether a firm did or did not pay an

18  assessment, and firms that did not pay an assessment received lower multipliers than they otherwise

19  would have.  But the fee award for any particular law firm should be a function of that firm's *overall*

20  contribution to the case and the Class, and the factors bearing on that question are not limited to

21  litigation financing.  *See, e.g., LCD*, 2013 WL 1365900, at *9 (approving Special Master's

22  consideration of additional factors including "contribution to the joint IPP effort, as opposed to work

23  performed solely for an individual client; performing higher-skill tasks (e.g., taking depositions) . . .

24  demonstrating efficiency; high quality of work as reported to the Special Master by lead and liaison

25  counsel"; etc.). There is no basis for short-circuiting the proper analysis by focusing solely on cash

26  contributions to the case.

27

28  [14] *See generally* Declaration of Joseph Goldberg in Opposition to Objections to IPP Lead Counsel's
Fee Allocation ("Goldberg Decl."), and Declaration of William J. Blechman in Opposition to
Objections to IPP Lead Counsel Fee Allocation ("Blechman Decl."), filed herewith.

1   In addition, the premise of Scarpulla's contention—that only those who contributed cash

2   bore financial risk on behalf of the class— is demonstrably false. Time is money. And every IPP

3   lawyer in the case devoted time and professional resources to the litigation, all on a contingency

4   basis. This of course was a significant financial risk, and attorneys should be compensated in a

5   manner commensurate with each firm's overall contributions as described above.

6   As for Scarpulla's claims regarding Lead Counsel's and other firms' assessment payments,

7   Lead Counsel has already responded to these claims (ECF Nos. 4558 at 15 & 4558-1, ¶ 13), and has

8   provided ample support for both the assessments and expenses paid by his firm and others.  (ECF

9   Nos. 4071-1, ¶¶ 128-136, and 4073, Exs. 1-45.) Neither the Special Master nor the Court found any

10  irregularity in these records or felt the need to order additional documentation.  Thus, there is no

11  need for any further accounting based on Scarpulla's unsupported assertions.

### i.   No Multipliers Except for Extraordinary Work:

13  Scarpulla argues that because the Court found the settlements here do not represent a superb

14  recovery, the Special Master should undertake a complete review of all time records and only award

15  multipliers for "extraordinary work."  (Scarpulla Obj. at 20.) He points to document review as an

16  example of work that is not extraordinary and should not receive a multiplier.  The entire premise of

17  this argument is wrong.  The Court has already considered the result achieved, as well as the other

18  relevant factors, and has determined that an overall case multiplier of 1.96 is appropriate.  Now the

19  question is how to allocate the aggregate fee amongst IPP Counsel.

20  In making the allocation, the Court must consider "the relative efforts of, and benefits

21  conferred upon the class by, co-counsel." *Keller v. Nat'l Collegiate Athletic Ass'n*, 2015 WL

22  8916392, at *4.  This is exactly what Lead Counsel has done in making the proposed allocation to

23  the Court.  Firms that performed only document review are receiving smaller multipliers than firms

24  that did higher level work.  Moreover, the multipliers proposed are consistent with those awarded in

25  *LCD* for similar work.  There is no basis to deny firms doing lower level work a multiplier on their

26  time, much of which was at risk for many years.

### j.   LG Settlement

1    Scarpulla makes a new argument that the LG settlement is not fair or reasonable. (Scarpulla

2    Obj. at 14.)  Again, this argument is extremely disingenuous.  Around the same time as Lead

3    Counsel negotiated the LG settlement, Scarpulla was advocating that Lead Counsel accept a

4    settlement with Philips—who was equally, if not more culpable than LG—for just over half the

5    amount of the final LG settlement.  Indeed, Scarpulla even went so far as to formulate an

6    unauthorized settlement demand on Philips for this low amount.  (Alioto Decl. ¶ 17.)  Thus, far from

7    "putting himself above the interests of the Class," Lead Counsel got more for the Class than

8    Scarpulla was prepared to take prior to class certification.  And significantly, Lead Counsel

9    ultimately negotiated a settlement of $175 million with Philips.

10    Scarpulla's attempts to compare the LG settlement here to the settlement with an LG entity in

11    *LCD* also fall flat.  The *LCD* settlement was with a different LG entity—a joint venture between LG

12    and Philips.  Here, the joint venture between LG and Philips (LG.Philips Displays or "LPD") was

13    bankrupt, and much of the evidence relating to its CRT business was gone.  In addition, the parent

14    companies (LG and Philips) had additional legal defenses that simply were not present in *LCD*.

15    Thus, it is impossible to draw any conclusions from such comparisons.

16    The "unheard of provision" regarding allocation of attorneys' fees that Scarpulla accuses

17    Lead Counsel of inserting into the LG settlement is substantively identical to provisions in indirect

18    purchaser settlements in *LCD*, *DRAM* and the Direct Purchaser Plaintiffs' ("DPP") settlements in

19    this case.  (*See* ECF No. 3884 (IPPs' Reply In Support of Motion for Preliminary Approval and

20    Response to Conditional Objections) at 2-4.)

21    At bottom, Scarpulla had every opportunity to object to the LG settlement when it was

22    proposed.  He did not do so.  The Court approved the settlement as fair and reasonable and it became

23    final many years ago.  There is no basis to revisit this finding now.

24    For all of the foregoing reasons, Scarpulla should not recover his full lodestar.  The Special

25    Master should reject Scarpulla's objections and adopt the allocation of the fee award proposed by

26    Lead Counsel.

27    //

28

### C.      Glancy Prongay & Murray LLP (ECF No. 4820)

Glancy Prongay & Murray LLP ("Glancy") objects to the proposed fee allocation primarily on the grounds that it "lacks consistency among similarly situated firms, and appears to be unjustified by objective criteria."  (ECF No. 4820 at 1.)  Glancy claims, with no support, that "[m]ultipliers ranged from 2.5 to less than 1.30 for substantially similar work."  (*Id*.)  Glancy also objects that several firms which did not contribute to the Litigation Fund are receiving higher multipliers than it.  (*Id*.)

Glancy gives no specific examples of how it's work was comparable to that of firms receiving higher multipliers other than to point to the Special Master's Report & Recommendation in which he mentioned Glancy's work on LG discovery. (*Id*., citing ECF No. 4351 at 69.)  But the Special Master did not, as Glancy claims, "single out the Glancy firm" after reviewing the submissions by all counsel.  The Special Master was simply describing the "sensible way" in which Lead Counsel had divided the work among IPP Counsel.  Moreover, he was relying upon Lead Counsel's declaration describing how he had allocated the work among IPP Counsel, which was filed in response to objectors' accusations that the case was managed inefficiently.  (*See* ECF No. 4351 at 61, citing "Alioto Decl. III ¶8-14".)

In addition, contrary to Glancy's claims, Lead Counsel did in fact group firms in tiers and has proposed the same or very similar multipliers for firms performing the same or similar work.  For example, Lead Counsel has proposed that Glancy receive the same multiplier as Sharp McQueen PA and a slightly higher multiplier than Green & Noblin PC.  Like Glancy, Sharp McQueen and Green & Noblin PC assigned one lawyer to the case who led a document review team and did higher level document review, assisted with preparations for depositions by selecting documents for the deposition taker, and prepared memoranda regarding the evidence their team found.  All of these firms were also involved, to differing degrees, in preparing for summary judgment and trial.  The work performed by these firms was high quality (to slightly varying degrees, which Lead Counsel also took into account), but it was limited to the foregoing tasks.  They had little or no involvement in taking or defending depositions, whereas The Law Offices of Lawrence G. Papale and Vogl Meredith Burke LLP (which are in the same tier as Glancy but Lead Counsel proposes they receive

17

LEAD COUNSEL'S RESPONSE TO OBJECTIONS TO PROPOSED ALLOCATION OF AGGREGATE FEE
AWARD TO INDIRECT PURCHASER PLAINTIFFS' COUNSEL, Master File No. CV-07-5944-JST

1  slightly higher multipliers) each took and/or defended a number of depositions, in addition to being

2  involved in various other higher level tasks.  (Alioto Decl. ¶18.)

3         Firms in the tier above Glancy—into which Glancy's requested multiplier of 1.7 would place

4  it—did higher level work than Glancy; assigned multiple lawyers to work on the case, many of

5  whom were very senior and experienced; joined the case earlier than Glancy; contributed more

6  financially to the case than Glancy; and/or have performed a substantial amount of post-fee petition

7  work.  More specifically, Bramson Plutzik and Andrus Anderson each oversaw the entire offensive

8  discovery effort against their defendants (Toshiba and Hitachi, respectively) from June 2010 (when

9  the meet and confers with defendants regarding their discovery responses began) through the

10  conclusion of the case against their defendant (January 2015 for Hitachi and March 2015 for

11  Toshiba).  Each firm assigned named partners to the case who led the meet and confer negotiations

12  with their defendants, drafted and filed multiple motions to compel, led the document review teams

13  for their defendants, took multiple Rule 30(b)(6) depositions in 2012 and multiple merits depositions

14  in 2013 and 2014, drafted or assisted in drafting oppositions to motions for summary judgment, and

15  were heavily involved in preparing for trial against their Defendants.  (*Id.* at ¶19.)

16         Similarly, Milberg, Fine Kaplan & Black, and Hulett Harper Stewart all assigned very senior

17  partners to the litigation who were involved in very high level tasks, such as directing trial

18  preparations, trial strategy and mock trials, and did a substantial amount of post-fee petition work.

19  Milberg was also involved in the case from the motion to dismiss stage in 2009 and made very

20  substantial financial contributions to the case.[15] (*Id.* at 20.)

21         In contrast, Glancy's one associate did not become involved in the case until November 2011

22  when the document review started, and while his work was very good, he did not take full control of

23  LG discovery.  Lead Counsel had been responsible for meeting and conferring with LG's counsel

24  before Glancy joined the case, and continued in this role but with assistance from Glancy's

25  associate, who took primary responsibility for reviewing the evidence produced by LG and directing

26  

27  [15] In addition to the $60,000 assessment Milberg paid to the Litigation Fund, and the other high level
28  work its attorneys performed (*see* ECF No. 4073, Ex.12), Milberg provided the document review
database for the case and deferred all payments for hosting and administering the database until the
end of the case.  This expense amounted to $555,766.

1    the LG document review team.  Glancy's associate helped prepare for LG depositions but it was

2    Lauren Capurro who took the Rule 30(b)(6) depositions of LG for IPPs,[16] and Vogl Meredith who

3    took the merits depositions.  And because LG settled relatively early, it did not file any summary

4    judgment motions against IPPs and very little trial preparation was required for LG.  Glancy's

5    associate remained involved in developing LG evidence, particularly as it related to LPD, and also

6    assisted with Philips discovery, summary judgment motions and trial preparations.  But many other

7    more senior lawyers were heavily involved in the case against Philips/LPD—including Lead

8    Counsel and several DAP lawyers—so Glancy's role was limited and in stark contrast to that of the

9    firms in the tier above Glancy.   (*Id.* at ¶21.)

10         With regard to contributions to the Litigation Fund, as described above, firms who did not

11   contribute to the Litigation Fund received slightly lower multipliers than firms that did the same or

12   similar work which did contribute to the Litigation Fund. But because no firm (except Lead Counsel)

13   contributed very large amounts to the Litigation Fund, in most cases it was not sufficient (when

14   weighed against the level, quality and amount of work performed) to elevate any firm into a higher

15   tier.  Glancy, Sharp McQueen and Green & Noblin PC all contributed similar amounts to the

16   Litigation Fund—in fact, Glancy's contribution was the lowest of the three.  There was therefore no

17   need to adjust their multipliers vis-à-vis each other.

18         In sum, Glancy has been properly and fairly placed in the appropriate tier.  As with the other

19   firms, increasing Glancy's multiplier would upset the balance Lead Counsel has achieved and would

20   require that other firm's multipliers increase too.  Unfortunately, this is not possible.

21         **D.     Cooper & Kirkham P.C. (ECF No. 4821)**

22         Cooper & Kirkham P.C. ("Cooper") objects to Lead Counsel's proposed allocation of the

23   aggregate fee award and its proposed multiplier of 0.8494 (0.85 if you round up).  Cooper argues

24   that it is being punished for objecting to the settlements and the aggregate fee award, and claims it

25   should receive a multiplier of 1.8962—the average of other "leadership firms"—with the additional

26   compensation to be deducted from the three "trial team" firms.  (Cooper Objection at 20-21.)

27

28

---

[16] The DPPs first chaired these depositions and Ms. Capurro was second chair.

1

### 1.      Cooper Worked at Cross Purposes to IPP Counsel

2      On several occasions during the pendency of this case—long before the settlements were

3 reached and Cooper filed his objections—Cooper was involved in repeated efforts to undermine IPP

4 Counsel's efforts and worked at cross purposes to them.  The efforts unquestionably had a serious,

5 negative effect on the settlement negotiations.  (Alioto Decl. ¶ 22.)

6      For example, beginning in 2012, along with Scarpulla, Cooper involved himself in the

7 dispute with Philips over its settlement with the California AG.  This was wholly unnecessary

8 because Lead Counsel had assigned a senior partner from Milberg LLP, Paul Novak, who is a former

9 Assistant Attorney General of Michigan, to work with the California Attorney General's office and

10 resolve the dispute.  Cooper and Scarpulla even went so far as to formulate a settlement demand on

11 Philips in mid-2013, which they had no authority to do, and which was far below what Lead Counsel

12 would ever have accepted from Philips.  In fact, their proposed settlement with Philips was even less

13 than the early settlement with LG that Scarpulla now disingenuously criticizes.[17]  (*Id*. at ¶23.)

14      In an effort to convince Lead Counsel to agree to the extremely low settlement with Philips,

15 John Bogdanov of Cooper's office argued that Philips would win summary judgment because IPPs

16 would be unable to pierce the corporate veil and hold Philips responsible for the conduct of its joint

17 venture, LPD.  (*Id*. ¶ 24.)  But as Lead Counsel pointed out, Philips would need to show that it

18 properly withdrew from the conspiracy as a matter of law *before* the Court would ever have to

19 address the question of vicarious liability, and the evidence against Philips in this regard was very

20 strong.  (*Id*.)  Lead Counsel's analysis of Philips has since been borne out.  *See* ECF No. 4786

21 (summary judgment order finding that Royal Philips (the parent company) continued to participate

22 in the CRT business after the formation of LPD). If Lead Counsel had followed Cooper and

23 Scarpulla's advice, the total settlements would have been less.

24      Cooper and Scarpulla again inserted themselves into the case and worked at cross purposes to

25 Lead Counsel when they contacted Judge Walker at some point in 2014 to complain about Lead

26 Counsel's handling of the case.  More specifically, Lead Counsel believes that they accused him of

27

28 [17] Philips is widely accepted to be a more culpable defendant than LG given its conspiratorial activities here in the United States, and should always have paid more than LG.

LEAD COUNSEL'S RESPONSE TO OBJECTIONS TO PROPOSED ALLOCATION OF AGGREGATE FEE
AWARD TO INDIRECT PURCHASER PLAINTIFFS' COUNSEL, Master File No. CV-07-5944-JST

being uncooperative with the California AG, and of overvaluing the case and being unrealistic regarding settlement prospects.  This belief is based upon statements to this effect made by Scarpulla and Emilio Varanini of the California AG's office at a meeting with Judge Walker in August 2014. (Alioto Decl. ¶ 25.)  One thing is for sure, they were not singing the praises of Lead Counsel to Special Master Walker.

As a result of Cooper and Scarpulla "present[ing] themselves" to Special Master Walker and misleading him regarding Lead Counsel's handling of the case, Special Master Walker recommended to the Court that they be appointed as co-lead counsel in charge of settlement.  (ECF No. 3200 at 5.)  This recommendation was never adopted by the Court. (ECF No. 3376.)  But it nevertheless made settling with the Defendants much more difficult.[18]  The Order also caused Lead Counsel and other IPP counsel to divert time and resources to collateral matters at a crucial point in the case.  IPPs were within two months of trial (scheduled to begin on March 6, 2015), and were dealing with briefing summary judgment and an extremely compressed pretrial schedule.  (*See* ECF No. 2459 (scheduling order pursuant to which IPPs had to provide their trial exhibit list, deposition designations, witness list and objections to translations to Defendants by December 5, 2014, respond to eleven motions for summary judgment by December 23, 2014, exchange proposed jury instructions and special verdict forms by January 9, 2015, and file motions in limine and other non-dispositive pretrial motions by January 23, 2015, among other things.) (Alioto Decl. ¶ 26.)

Moreover, Cooper and Scarpulla simply did not have sufficient knowledge of the evidence in this case to be able to provide the best representation for the Class. Their lack of knowledge was on full display during a telephone call in early January 2015, when they informed Lead Counsel that Samsung SDI would pay no more than $50 million to settle the IPP case, and advised that Lead Counsel accept that amount.  Less than three weeks later, Samsung SDI agreed to pay $225 million to IPPs.  (*Id.* ¶ 27.)

---

[18] Lead Counsel would like to provide the Special Master with specific examples of how and why Cooper and Scarpulla's actions made settling this case more difficult.  But it is not appropriate that this information be put on the public record.  Therefore, Lead Counsel requests the Special Master's permission to provide this information *in camera* with notice to Cooper and Scarpulla.

1    Cooper did not produce his time records which would show the full extent of his

2    unauthorized activities.  But Scarpulla's time records show that he and Cooper were not only

3    meeting with the California AG and Special Master Walker regarding settlement, they were also in

4    contact with the Defendants.  Scarpulla's declaration in support of his objection also confirms this.

5    In light of their statements that Lead Counsel was overvaluing the case, and that Samsung SDI

6    would pay no more than $50 million, Lead Counsel suspects that Cooper and Scarpulla were

7    discussing settling the case with these Defendants for much less than Lead Counsel was demanding

8    from them.  Cooper and Scarpulla were likely also informing the Defendants of their plans to get

9    appointed as co-lead counsel.[19] (*Id.* at 28.) It was therefore no wonder that Lead Counsel had

10   difficulty settling the case at this time.

11   Cooper's and Scarpulla's actions adversely impacted Lead Counsel's ability to negotiate the

12   settlements with Defendants.  For example, during Lead Counsel's settlement discussions with

13   certain defense counsel, they indicated that if they could not get a deal done with Lead Counsel, they

14   would do it with someone else.  They also questioned Lead Counsel's authority to get the settlement

15   finally approved.  (Alioto Decl. ¶ 30.)  Obviously it is difficult to prove this now, but informing the

16   Special Master charged with settling the case and mediating the settlement negotiations that Lead

17   Counsel was overvaluing it, conducting unauthorized negotiations with Defendants, and engineering

18   a reverse auction of the case on the eve of trial while Lead Counsel was actively negotiating with

19   several very important Defendants, certainly did not help matters.

20   "It is well established that an award of attorneys' fees from a common fund depends on

21   whether the attorneys' 'specific services benefited the fund—***whether they tended to create,***

22   ***increase, protect or preserve the fund***.'" *Class Plaintiffs v. Jaffe & Schlesinger, P.A.,* 19 F.3d 1306,

23   1308 (9th Cir. 1994) (internal citations omitted) (emphasis added).  If anything, the result achieved

24   by IPP Counsel was in spite of—certainly not because of—Cooper's actions.  Thus, Lead Counsel's

25   proposed multiplier of 0.8496 is more than justified.

26   _____

27   [19] Again, Lead Counsel can provide specific examples in support of his belief that Cooper and
Scarpulla were undermining his negotiations with Defendants, but it is not appropriate to put in the

28   public record.  Therefore, Lead Counsel respectfully requests that he allowed to present this
evidence to the Special Master *in camera* with notice to Cooper and Scarpulla.  (*Id.* ¶ 29.)

## 2.    Rather Than Work Together With Lead Counsel to Get the Settlements Approved, Cooper Objected to the Settlements

Cooper asserts in its Objection that no one at the firm "had any hint of a conflict with Lead Counsel" during the case. (Cooper Objection at 8.)  If this were true, then why did Cooper not attempt to work with Lead Counsel to resolve his concerns regarding the settlements *before* the notices were published?  And why did he repeatedly press unmeritorious objections even after they were rejected in no uncertain terms?  Finally, why did he object to the total fee requested in IPP Counsel's motion for attorneys' fees, in filings filled with vitriol and making numerous frivolous accusations with no evidentiary support?  The answer is that Cooper was *not* acting in the interests of his client or the Class; he was acting (and is continuing to act) in his own self-interest to increase his fees from the large settlement fund in this case.  There can be no other explanation.

Before filing the motion for preliminary approval of the Proposed Settlements, Lead Counsel sent John Bogdanov of Cooper's office, along with other counsel for the other Court-appointed class representatives, copies of the final preliminary approval papers and asked that they review them with their clients and contact Lead Counsel to discuss any issues they might have.  The papers in support of preliminary approval clearly explained the settlement terms, the notice program, and the fact that class members in non-repealer states would not receive any money under the proposed plan of distribution. (*See* ECF No. 3861.)  Neither Cooper nor Bogdanov ever responded, implicitly approving the settlement class definitions, the notice program, and the plan of distribution. (Alioto Decl. ¶31.)

Even after the papers were filed on May 29, 2015, Cooper never voiced any concerns to Lead Counsel.  He clearly read the preliminary approval papers because he and Scarpulla filed "conditional objections" to the Proposed Settlements and the motion for preliminary approval. (ECF Nos. 3874 & 3880.)  But these conditional objections focused solely on the allocation of the fee award by Lead Counsel.  They raised none of the objections they later raised regarding the settlement class definition, the notice program or the plan of distribution. (*Id.*)  (*Id*. at ¶ 32.)

Indeed, Cooper never voiced any of his concerns until the week before formal objections to the settlements were due. By that time, the notice program had already been completed and over $1.5 million of the Class's money had been spent on informing Class members of the terms of the

23

settlement and the plan of distribution.  (*Id.* ¶ 33.) It was therefore too late for Lead Counsel to even attempt to address any of Cooper's concerns without all of that money and time being wasted. Moreover, by making formal objections to the settlements, Cooper risked the settlements being disapproved and Defendants backing out of the second-largest indirect purchaser settlements ever.  If Cooper had been acting in good faith and in the best interests of the Class *and his own client*, he would never have waited to inform Lead Counsel of his concerns about the settlements.

Why did Cooper choose to wait and file a formal objection to the settlements?  Because he is playing both sides of the fence.  Cooper wants fees for his firm's work on the case, but he also wants fees for improving the settlements.  He hasn't done anything to significantly improve the settlements, however.  His only objection that was sustained was to the plan of distribution of the Chunghwa Settlement.  But this objection did not serve to "create, increase, protect or preserve the fund" (*Jaffe*, 19 F.3d at 1308) for class members; it merely led to a reallocation of funds, the overall effect of which is *de minimis*.  Many of his other objections were entirely without factual or legal support, and all of them were categorically rejected by both the Special Master and the Court.

For example, in rejecting Cooper and Scarpulla's objection that Lead Counsel should have sought an injunction from Defendants, the Special Master noted that an injunction would have been "transparently useless relief."  (ECF No. 4351 at 35.)  The Special Master rejected their scant authority for the viability of equitable monetary claims for indirect purchasers under the Clayton Act as "plainly distinguishable" and based on "a misreading of a Special Master's report." (*Id.* at 36.) He concluded that pursuing such claims would have been "quixotic." (*Id.* at 37.)  The Court likewise rejected this objection noting that, "Objectors cite no case authorizing a federal court to order disgorgement or restitution in a private plaintiff antitrust case, which is not surprising given that such a result would work an end run around Illinois Brick's prohibition on the recovery of damages by indirect purchasers."  (ECF No. 4712 at 19.)  Similarly, their objection to the release of non-repealer state damages claims was dismissed as "fascinating speculation for a law review article."  (ECF No. 4351 at 38-39.)

All of Cooper's objections to the motion for attorneys' fees were also rejected.  Many of these objections constituted unwarranted *ad hominem* attacks on Lead Counsel and accused him of

1  serious ethical violations with no supporting evidence.  Moreover, none of these accusations were

2  borne out.  For example, despite having known Lead Counsel for his entire professional career, and

3  therefore knowing the statement to be untrue, Cooper and Scarpulla claimed that Lead Counsel

4  "lacked experience" and "had never tried an antitrust case before." (ECF No. 4115.) The Special

5  Master rejected these claims noting that "Mr. Alioto provided ample evidence of his 30 years of

6  experience in antitrust cases." (ECF No. 4351 at 60.) They also repeatedly claimed there to be

7  "serious problems with the time and expenses" (ECF No. 4115), including that Lead Counsel's time

8  records were not contemporaneously-made and that they were "virtually unintelligible."  But after

9  careful review, the Special Master found that while the time records were "handwritten, [they] give

10  every impression of having been made contemporaneously.  (ECF No. 4351 at 71.)

11  They even resorted to mischaracterizing the Special Master's R&R when they claimed in

12  their objections that the Special Master found "excess billing," "problematic record-keeping

13  practices," and "dubious staffing decisions." (ECF No. 4437 at 12.)  In fact, the Special Master

14  categorically rejected their unsupported allegations.[20]  Cooper and Scarpulla's repeated objections to

15  the three trial team firms being brought into the case in late 2014 (*see, e.g.* ECF Nos. 4115, 4437) are

16  particularly disingenuous given that it was Scarpulla who first contacted Joe Goldberg and asked

17  him to join the case.  (*See* Goldberg Decl. ¶ 3.)  While these objections to the fee award did not pose

18  any risk to Class members, their frivolousness reflects a personal animus towards Lead Counsel and

19  other IPP Counsel, and speaks to Cooper's true motivation in objecting—to reduce the overall fee to

20  IPP Counsel so that he can claim a benefit to the Class and claim an additional fee.

21  Finally, Cooper also moved, along with Scarpulla, to be appointed as co-lead counsel for

22  class members in the non-repealer states. (ECF No. 4241.)  This motion was also denied (ECF No.

23  4377), but it caused more delay and expense for other IPP Counsel.

24  Cooper argues that reducing his multiplier from what it otherwise would have been will have

25  a chilling effect on legitimate objections to class action settlements.  But not reducing his multiplier

---

27  [20] *See* ECF No. 4351 at 73 ("The Special Master finds that class counsel's billing records appear highly reliable and detailed and that the time spent and the rates charged were reasonable for case of

28  this complexity."); *id.* at 71 ("[T]he Special Master has no reason to believe there was any widespread padding of time or failure to keep contemporaneous records"); *id.* at 72 ("[T]he billing entries showed that for the most part the case was staffed in a reasonably 'lean and mean' manner").

1   encourages class lawyers to play both sides by wasting everyone's time with frivolous objections,

2   safe in the knowledge that there will be no consequences and they not only will be paid from the

3   same fund they sought to reduce, but they will get a bonus on their time.  This cannot be the law.

4   And, incidentally, there will be always be a surfeit of professional objectors who will not be chilled

5   in any way if Cooper gets a fractional multiplier in this case.

6                **3.       Cooper Has Appealed the District Court's Rulings**

7              As detailed above, both the Special Master and the District Court rejected Cooper's

8   objections to the settlements and the fee award.  The District Court also ruled that Cooper has no

9   standing to object to the settlements because his objections were not brought on behalf of a class

10   member.  (ECF No. 4712 at 35 ("The Court finds that Scarpulla and Cooper do not have standing to

11   object.")  Cooper has nevertheless appealed the approval of the settlements on behalf of the "Indirect

12   Purchaser Plaintiffs."  His Notice of Appeal could be read as appealing the 27.5% fee award as well.

13             After successfully delaying settlement approval for almost a year by filing repeated

14   objections, motions to compel time records, and a motion to be appointed as co-lead counsel,

15   Cooper's appeal will now cause *more* delay and expense for other IPP firms, and much more

16   attorney time defending the settlements and fee award.  And all this despite the fact that, as

17   demonstrated above, both the Special Master and the Court categorically rejected almost all of his

18   objections as without factual or legal support.

19             Objectors like Cooper have been known to file frivolous appeals solely to cause delay and

20   extra expense for class counsel.  These objectors are sometimes paid off by plaintiffs' counsel and/or

21   claims aggregators to withdraw their appeals.  By filing his appeal, Cooper is hedging his bets again

22   in the hopes that he can extract additional payment from IPP Counsel or claims aggregators.

23             In short, Cooper is going far beyond simply objecting and raising concerns about the

24   settlements.  He is now pressing his frivolous objections for a *third time*, even though he is clearly

25   without standing to do so.  Cooper's actions require a downward adjustment to his multiplier.

26   //

27   //

28

### 4.    Cooper Overstates His Firm's Contributions to the Case

Cooper claims that it "was a member of the top tier of firms to whom Lead Counsel consistently turned for assistance and expertise in prosecuting this action." (Cooper Objection at 1.) This greatly overstates Cooper's contribution to the case.

The work done by Cooper's office in this case was done almost exclusively by John Bogdanov. During the pendency of this case, Bogdanov was a mid-to-senior level associate who specializes in document review. He took no depositions and drafted no briefs. He had no involvement in litigation or trial strategy. His role was limited to being a leader of the Philips document review team, and providing assistance to Lead Counsel and others who were performing higher level tasks such as taking depositions, drafting important briefs and running the case. (Alioto Decl. ¶ 34.)

Bogdanov joined the case in June 2010—2 ½ years after the case began—to assist with the negotiations with Defendants regarding their responses to IPPs' discovery requests. He was assigned to Philips. But unlike some of the other firms assigned to assist with the offensive discovery effort against a particular defendant, Bogdanov was unable to handle the meet and confers without substantial assistance from Lead Counsel. For the most part, Bogdanov had a good understanding of the evidence, but Ms. Capurro often had to draft the meet and confer letters to Philips or heavily edit Bogdanov's drafts. Ms. Capurro also ended up having to take over the negotiation of certain issues entirely because they had been dragging on for so long. While Ms. Capurro was involved in the meet and confers with all Defendants, she was required to play a much bigger role with Philips. (*Id.* ¶ 25.)

With regard to depositions, Ms. Capurro worked with the expert economists to prepare a template for all of the Rule 30(b)(6) depositions. Even with this assistance, Bogdanov declined to take the Philips Rule 30(b)(6) deposition, requiring Lead Counsel to assign another attorney and bring them up-to-speed. The same thing happened with the merits depositions of Philips witnesses. Bogdanov declined to take any of the depositions so Lead Counsel had to bring in another, more experienced attorney to take them. This meant that much of Bogdanov's work on reviewing the Philips evidence had to be duplicated. Moreover, this situation was in stark contrast to other firms

1    that were assigned to manage a particular defendant's discovery, such as Andrus Anderson and

2    Bramson Plutzik, which took all of the Rule 30(b)(6) and merits depositions for their Defendants.

3    (Id. ¶36.)

4            The same situation occurred with regard to all of the briefing relating to Philips.  When IPPs

5    sought to add two Philips entities as defendants in early 2014, it was Ms. Capurro and Sylvie Kern

6    who handled the meet and confers with Philips' counsel and briefed Philips' motion to dismiss for

7    lack of personal jurisdiction, which turned out to be more like a summary judgment motion.  (*See*

8    ECF Nos. 2536-2538, and 2575.)  Similarly, at summary judgment, while Lead Counsel did ask

9    Bogdanov for his input regarding Philips' motions, Bogdanov did not draft any of the opposition

10   briefs. (Alioto Decl. ¶37.)

11           Cooper cites to numerous emails in his objection purporting to show the extent of

12   Bogdanov's involvement in the case and Lead Counsel's reliance on him.  However, a close

13   examination of these emails confirms that Bogdanov's role primarily involved high level document

14   review.  They also show that everything Bogdanov did in this case was pursuant to Ms. Capurro's

15   detailed instructions.  He was not working independently or proposing strategy.

16           In addition, the emails are a window into what Lead Counsel was doing with regard to *all*

17   *Defendants*.  Bogdanov's role was limited to just Philips—one defendant group out of nine.  In sum,

18   while Bogdanov was familiar with the Philips evidence due to his work on the document review, his

19   role was limited to providing assistance to other attorneys who were using that evidence in

20   depositions, in briefs and to prepare for trial.  This is far cry from the work performed by the "top

21   tier" firms in this case.

22           With regard to Tracy Kirkham, Cooper's claim that she "spearheaded" the negotiation of the

23   electronic discovery protocol is also an overstatement.  Tracy Kirkham was involved in the

24   negotiations of the ESI Protocol but several other very knowledgeable attorneys were also involved,

25   including Zelle Hofmann's head of electronic discovery and several DPP attorneys.  Kirkham didn't

26   even draft the protocol; she merely provided edits.  Moreover, the negotiation of the protocol lasted

27   for a mere four months in an eight year case.  Kirkham did no other substantive work in the case.

28

1    (*Id.* at ¶38.) And the small amount of work she did do is already well compensated at a current

2    hourly rate, believed to be around $900.

3          If Cooper had not worked at cross purposes to other IPP Counsel, and had not taken positions

4    adverse to the Class, and wasted everyone's time with frivolous objections, Lead Counsel would

5    have recommended a higher multiplier.  But Cooper's multiplier must be lowered in light of his

6    significant negative contributions to the case.  *See In re TFT-LCD*, 2013 WL 1365900, at *9

7    ("Factors meriting a downward adjustment include: . . . **failure to act professionally and**

8    **collaboratively to prosecute the joint IPP effort**.") (emphases added.)

9                      **5.    Cooper Is Not Responsible for Reducing the Fee Award**

10         Cooper tries to claim responsibility for reducing the aggregate fee award to 27.5%.  There is

11   no evidence that the reduction in the fee was attributable to any of Cooper's objections.  As

12   described above, all of his objections to the fee award were rejected.

13         **E.    Kirby McInerney LLP (ECF No. 4822)**

14         Kirby McInerney LLP ("Kirby") objects to Lead Counsel's proposed allocation of the

15   aggregate fee award and its proposed 2.0986 (2.10 if rounded up) multiplier,[21] and requests a

16   significant upward adjustment to a 2.5-2.6 multiplier.  Awarding Kirby a 2.6 multiplier on its

17   corrected current rate lodestar (minus 10%) amounts to an increase of $4,664,392.40.  Kirby

18   suggests that this amount should come from Lead Counsel's allocation, which would reduce Lead

19   Counsel's multiplier from 2.9781 to 2.678.[22]  Thus, Lead Counsel's multiplier would be only 0.078

20   higher than Kirby.  In other words, Kirby believes its relative contribution to this case was second

21   only to that of Lead Counsel, and was almost equal to that of Lead Counsel.

22         It is an understatement to say that adopting Kirby's proposed allocation and awarding them a

23   2.6 multiplier—or anywhere close to that—would be grossly unfair, both to Lead Counsel and to the

24   _____

25   [21] As Kirby acknowledges, it made a significant error in the computation of the current rate lodestar
     it submitted to the Court.  (Kirby Objection at 11 (describing error in detail).)  Each firm's current
26   rate lodestar was only provided to the Court for the purpose of comparing it to the historical lodestar,
     so Lead Counsel did not feel it necessary to check the calculations and did not even have access to
27   each firm's calculations.

28   [22] $46,344,359 (Lead Counsel's proposed fee allocation) minus $4,664,392.40 equals $41,679,967.
     $41,679,967 divided by $15,561,704.25 (Lead Counsel's current rate lodestar minus 10%) equals
     2.678.

other firms in top tiers.  While Lead Counsel acknowledges that Kirby did some very good work, when compared to the relative contributions by other firms as the law requires (*Keller v. NCAA*, 2015 WL 8916392 at *4), its overall contribution to the case doesn't come close to Lead Counsel's. It is also less than that of Straus & Boies and the Law Office of Sylvie Kern, and only marginally more than that of Zelle Hofmann.  Indeed, the fact that Kirby would make such a proposal reflects a lack of knowledge regarding the relative contributions to the case by other IPP firms, which is very revealing in and of itself.  Kirby's proposed multiplier of 2.1 is more than fair and should be adopted by the Special Master.

### 1. Kirby's Overall Contribution to the Case Pales in Comparison to That of Lead Counsel

While Lead Counsel acknowledges that Kirby did some very good work in this case—and towards the latter part of the case, was one of the firms in the "core group"—its overall contribution to the case pales in comparison to that of Lead Counsel.

Kirby didn't join the *CRT* case until late 2010, and didn't receive an assignment until late April 2011—*three and a half years* after Lead Counsel initiated the case in December 2007, after the settlement and proffer by Chunghwa Picture Tubes, Ltd., after 11 joint and separate motions to dismiss had been largely denied, and discovery was well underway. (Alioto Decl. ¶ 39.)

### a. Work Done by Lead Counsel Prior to Kirby Joining the Case

In those three and a half years before Kirby joined the case, Lead Counsel's firm had been "quarterbacking" the entire case and performed the following work:

- Conducted an initial investigation of the case to develop facts and theories of liability that formed the basis of the allegations against Defendants;
- Researched and filed three complaints on behalf of 14 named plaintiffs representing 14 states;
- Prepared a questionnaire for the class representatives designed to vet them and ensure they could properly represent their respective states;
- Coordinated with counsel for the class representatives to prepare and serve Initial Disclosures;
- Drafted and served the first set of discovery requests on Defendants;
- Engaged in extensive negotiations with the Department of Justice ("DOJ"), the DPPs and the Defendants, and worked out a Stipulated Order that provided for a limited stay of merits discovery (Dkt. No. 379);

30

- Successfully moved for an Order authorizing IPPs to serve certain foreign defendants through service of the Summons and Complaint on their U.S. subsidiary, related entity or U.S. counsel, as permitted by Fed. R. Civ. Pro. 4(f)(3).  This saved the Class the delay and expense associated with formally serving multiple foreign defendants all over the world;

- Interviewed several expert economists and retained Dr. Janet Netz, Ph.D;

- Compiled a team of IPP lawyers and worked with Dr. Netz's economists to subpoena and negotiate the productions of documents and data from over 50 third-party retailers, distributors and CRT television and monitor manufacturers—information critical to proving pass-through of the overcharge on a class-wide basis.  TATP handled the subpoena negotiations with 10 third parties and oversaw the others;

- Further investigated the CRT industry and researched multiple actual and potential defendants, both domestic and foreign, many of which were defunct;

- Negotiated a settlement with defendant Chunghwa Picture Tubes, Ltd. and attended multiple oral proffers with Chunghwa's counsel;

- Researched, pled and filed a comprehensive, 90-page consolidated amended complaint ("CAC") in March 2009 detailing Defendants' violations of the antitrust and unfair competition laws of 21 states and the District of Columbia;

- Drafted the majority of IPPs' 150-page omnibus brief in opposition to Defendants' one joint and nine separate motions to dismiss the CAC, as well as IPPs' responses to Defendants' objections to the Special Master's Report & Recommendation, and argued the motions before the Special Master and the Court;

- Drafted IPPs' opposition to Defendants' request for permission to file an interlocutory appeal pursuant to 28 U.S.C. §1292(b);

- Drafted and filed IPPs' Second CAC in May 2010, and took the lead on briefing and arguing the second round of motions to dismiss;

- Drafted and propounded IPPs' second set of discovery requests in May 2010;

- Organized and oversaw IPP Counsel's negotiations with Defendants regarding their discovery responses, which began in June 2010 and continued until early 2012, and coordinated these efforts with the DPPs. Lead Counsel led the negotiations with LG and was involved in the negotiations with all Defendants, including drafting meet and confer letters, and drafting and arguing multiple motions to compel;

- Travelled to the Netherlands in October 2010 to review documents gathered by Defendants LG and Philips as part of their due diligence prior to forming LPD;

- Met and consulted with Dutch counsel in the Netherlands to seek assistance with obtaining relevant documents and data from the Dutch bankruptcy trustee of LPD;

- Coordinated with DPP counsel to collect documents and data from LPD's U.S. bankruptcy trustee, and organized a team of IPP lawyers to travel to several warehouses to review those documents;

- Collected and inventoried Defendants' initial document productions and organized an initial inventory and review of those documents;

- Attended multiple Case Management Conferences before Special Master Legge and argued on behalf of IPPs;

- Briefed and argued Defendants' motions to compel production of the Chunghwa translations, and their motion to compel responses to contention discovery regarding CRT finished products;

- Drafted IPPs' responses to Defendants' contention discovery regarding CRT finished products, as well as organizing and supervising the review of Defendants' documents for evidence in support of the CRT finished product allegations, and selecting the evidence to use in the responses;

- Drafted and filed IPPs' Third CAC in January 2011; and

- Directed and supervised the search and production of documents from class representatives, edited class representative discovery responses (the preparation of which was initially assigned to Lovell Stewart Halebian LLP and were served in early April 2011), and met and conferred with defense counsel regarding the responses.

(Alioto Decl. ¶ 40; *see also* ECF No. 4071-1)

### b.    Even After Kirby Joined the Case, Lead Counsel's Work was Much Higher Level Than That of Kirby

Even after Kirby joined the case in late 2010, Lead Counsel's work was consistently performed at a much higher level than that of Kirby. Lead Counsel does not wish to impugn Kirby's work. Kirby did a lot of very good work in this case, which is why Lead Counsel has recommended it be rewarded with one of the highest multipliers. But many of Kirby's descriptions of its work in its Objection are greatly overstated. Due to the position Kirby is taking, Lead Counsel is now forced to correct the record.

### i.    Lead Counsel Has Had Three Senior Lawyers Working on This Case Since Inception, Compared to One from Kirby

As an initial matter, Lead Counsel's firm has had two very senior partners and a senior associate/junior partner working on the case since its inception. Kirby assigned only one mid-level partner to this case: Robert Gralewski. Mr. Gralewski did all of the higher level work assigned to Kirby. All of the other Kirby attorneys who worked on this case were junior-mid level associates that primarily did varying levels of document review and some deposition/trial preparation. Mr. Gralewski's lodestar accounts for less than 39% of Kirby's lodestar. In other words, over 60% of

1   Kirby's very large lodestar is made up of lower level work.[23]  Whereas, almost 80% of Lead

2   Counsel's firm lodestar is made up of three senior attorneys who were running the case and doing

3   very high level work. (*Id*. at ¶41.)

4                    **ii.      Kirby's Initial Assignments Were Not Very Demanding**

5           Kirby not only joined the case late, its initial assignments were not very demanding.  For

6   example, Kirby's first assignment in late April 2011 was to participate in negotiations with the

7   Defendants—along with Lead Counsel and DPP counsel—regarding the production of LCD

8   documents in the *CRT* case.  (*Id*. at ¶ 42.)

9           Kirby's next assignment (beginning in July 2011) was to take over the drafting of discovery

10  responses for certain class representatives that had been added to the Third CAC, and coordinate

11  with local counsel to produce documents responsive to Defendants' document requests.  In its

12  objection, Kirby claims that Lead Counsel "selected KM to be in charge of the entire defensive

13  discovery aspect of the case."  (Kirby Obj. at 6.)  This is quite an overstatement since a lot of this

14  work was already done before Kirby got involved in the case.  Most of the class representatives had

15  already produced their documents and provided written responses to Defendants' discovery requests

16  in April 2011.  And because written discovery responses had already been prepared, Kirby's job was

17  simply to plug the information in for the new class representatives.  (Alioto Decl. ¶ 43.)

18          Moreover, Lead Counsel continued to be heavily involved in class representative discovery.

19  For example, Lead Counsel led the meet and confer efforts with Defendants regarding the discovery

20  responses in late 2011/early 2012, and Lead Counsel drafted the responses to supplemental

21  discovery requests regarding evidence of fraudulent concealment and selected the evidence to use

22  therein.  And while it is true that Kirby defended the majority of class representative depositions in

23  early-mid 2012, Lead Counsel and other IPP lawyers were heavily involved in preparing the class

24  representatives, working with local counsel and attended many of the depositions. (*Id*. ¶ 44.)

25

26  ─────────────────────────

27  [23] Lead Counsel cross-checked the reasonableness of the proposed 2.1 multiplier for Kirby by giving
    Mr. Gralewski's lodestar (4709 hours x $775 = $3,649,475) a 2.6 multiplier, which equals

28  $9,488,635.  That means that the firm's remaining lodestar of $5,654,006 ($9,303,481 minus
    $3,649,475) is receiving a multiplier of 1.775 ($19,524,658.25 (Kirby's total payout) minus
    $9,488,635 (Gralewski's lodestar) equals $10,036,023.20) which is more than generous.

1    Finally, while class representative depositions are important and Kirby did a good job, it almost goes

2    without saying that defending such depositions is not high level work.

3                    iii.    **Kirby's Role in the Document Review and Class**
                            **Certification Was Minor in Comparison to Lead Counsel**
4                            **and Other Top Tier Firms**

5            Kirby's next assignment related to the document review, which began in earnest in

6    November 2011.  Mr. Gralewski was assigned to be co-team leader of the FTAIA team, another

7    attorney was assigned to the foreign language team under the direction of Straus & Boies, and

8    another attorney was a member of the FTAIA team.  Kirby claims that Lead Counsel "relied on KM

9    . . . for assistance with establishing review protocols and procedures to be used throughout the case."

10   (Kirby Obj. at 4.)  Any assistance from Kirby in this regard must have been very minor because

11   Lead Counsel has no memory of it and can find no evidence of it.  (Alioto Decl. ¶ 45.)

12           Lead Counsel worked with Milberg, Zelle Hofmann and Straus & Boies to set up the

13   document review, assign the teams, draft the Coding Manual and establish review protocols.  Lead

14   Counsel and other firms who had been working on Defendant discovery drafted numerous

15   memoranda regarding the CRT industry, the Defendants and the legal issues in the case to bring the

16   new lawyers entering the case—like Kirby—up to speed.  And it was Lead Counsel who

17   "quarterbacked" the entire document review for all issues and all Defendants.  Kirby had no

18   involvement in any of this higher level work.  (*Id.* at ¶ 46.)

19           Kirby also exaggerates the role of its Japanese-speaking document reviewers. They did not

20   lead anything, and were "in charge" of nothing and no one.  Kirby's Japanese-language reviewers

21   were good quality and reliable.  But their role was limited to reviewing and translating documents,

22   assisting Straus & Boies with translation objections, and acting as check translators at some

23   depositions.  It was Straus & Boies that managed the entire foreign language review team, including

24   the Japanese-speaking contingent, and would make assignments, select the best documents for

25   depositions and briefs, identify translation issues and identify problematic translation objections by

26   Defendants. (*Id.* at ¶47.)

27           Beginning in early-mid 2012, Lead Counsel spearheaded IPPs' Rule 30(b)(6) depositions in

28   order to collect evidence for class certification.  Lead Counsel worked with the experts to prepare the

1  deposition outline, met and conferred with the Defendants, coordinated with the DPPs, and oversaw

2  the IPP lawyers taking the depositions.  Lead Counsel also took the Samsung SDI and LG Rule

3  30(b)(6) depositions for IPPs and assisted in preparing for, and attended, all of the others.  Kirby had

4  no involvement in the Rule 30(b)(6) depositions, which were a critical part of the preparation for

5  class certification.  Both Sylvie Kern and Straus & Boies were involved in taking Rule 30(b)(6)

6  depositions. (*Id.* at ¶ 48.)

7          During this same time period, Lead Counsel was also leading the effort to gather

8  documentary evidence and data for class certification, as well as drafting the motion for class

9  certification.  Zelle Hofmann and Straus & Boies were also heavily involved in this.  Lead Counsel

10  mined the work done by the document review teams, selected the documentary and testimonial

11  evidence for inclusion in the motion (a total of 150 exhibits), and then drafted the factual sections of

12  the brief.  Zelle Hofmann drafted the legal sections, which Lead Counsel reviewed and edited.

13  Along with Zelle, Lead Counsel also worked closely with Dr. Netz on her opening and reply

14  declarations, defended her depositions, and worked closely with Zelle to draft the reply brief, and all

15  subsequent briefs.  In stark contrast, Kirby's role at class certification was limited to providing

16  factual information about the class representatives' CRT product purchases, and any testimony

17  relevant to adequacy or ascertainability.  (*Id.* at ¶49.)

18                    **iv.    Kirby Overstates its Role in Merits Discovery**

19          With regard to merits discovery and depositions, Kirby again exaggerates its role.  Straus &

20  Boies led the Samsung SDI discovery effort beginning in June 2010.  Kirby did not get involved

21  with Samsung SDI until March 2013, when Mr. Gralewski volunteered to travel to Korea for two

22  Samsung SDI depositions along with two other IPP attorneys who took these depositions.[24]

23  Moreover, while Mr. Gralewski did question eight Samsung SDI witness on behalf of IPPs and did a

24  very good job, the Samsung SDI depositions were very much a team effort, with Straus & Boies,

25  Lead Counsel and the DPPs all involved in selecting deposition exhibits, translating them and

26

27  _____

28  [24] Part of the reason for Mr. Gralewski getting involved at this time was that the Straus & Boies attorney who was in charge of the SDI discovery had travelled to Taiwan in February 2013 to depose three important Chunghwa witnesses.

1    preparing the deposition outline.  In fact, the DPPs led the questioning of the first four Samsung SDI

2    witnesses that Mr. Gralewski took as second chair.  (*Id.* at ¶50.)

3         Kirby also overstates the importance of its work on the DAP depositions. (Kirby Obj. at 6.)

4    Lead Counsel decided to monitor Defendants' depositions of certain DAPs for potentially negative

5    testimony relating to pass-through of the overcharge.  Kirby's assignment was to attend certain

6    depositions—often telephonically—and simply listen, and possibly question if necessary.  (*Id.* at ¶

7    51.) But these depositions were not "critically important."  Nor did they have "grave implications for

8    the economic aspects of IPPs' case."  (Kirby Obj. at 6.)  IPPs' expert economists demonstrated pass-

9    through using the data provided by the Defendants and third parties.  As the Special Master

10   recognized in his order on class certification, such anecdotal, self-serving testimony is insufficient to

11   overcome the weight of that evidence.  (Alioto Decl. ¶ 52.)

12                      **v.    Kirby Drafted None of the Oppositions to Summary
                               Judgment Motions and its Level of Involvement in Trial
13                             Preparations was Comparable to Many Other Firms**

14        With regard to summary judgment and trial preparation, while Kirby was certainly involved

15   in many of the tasks necessary for summary judgment and trial and did good work, it again

16   overstates its role.  Kirby drafted *none* of the summary judgment oppositions.  Indeed, Kirby drafted

17   none of the important briefs in this case.[25]  Lead Counsel, together with Sylvie Kern, drafted most of

18   the important briefs in this case.  Straus & Boies drafted or assisted in drafting the oppositions to two

19   summary judgment motions.  Straus & Boies also handled all of the translation objections—as

20   massive task—took a lead role in preparing trial exhibits. (Id. at ¶ 53.)

21        Kirby claims to have prepared many of the "best evidence memoranda" for multiple

22   Defendants, but at least with regard to the Samsung SDI and Toshiba memoranda, this work was

23   very much a team effort and/or was done primarily by other firms.  Kirby was involved in briefing

24   only one motion *in limine* out of 64.  Kirby's involvement in the motion to decertify the class was

25   limited to assisting with gathering evidence; Lead Counsel was drafting the opposition brief when

26

27   ---
     [25] Kirby claims to have briefed a motion to amend the complaint in 2012, but this brief had to be
     heavily edited by Lead Counsel before filing.  The post-settlement briefing Kirby claims
28   responsibility for related almost exclusively to objector discovery, and again, Lead Counsel and
     Sylvie Kern often had to heavily edit these briefs before filing.

1   the case settled.  All of other work that Kirby describes (ranking trial exhibits, deposition

2   designations etc.) was also done by many other firms, and all of it was directed by Lead Counsel.

3   (Id. at ¶54.)

4   As for the mock trials, Kirby did not have "overall responsibility for all Plaintiff-related

5   aspects of IPPs' mock jury exercise." (Kirby Obj. at 4.)  Kirby was part of team that included Dennis

6   Stewart, one of the lead trial lawyers, which was responsible for class representative witnesses.

7   Dennis Stewart and Joe Goldberg, the other lead trial lawyer, gave the plaintiffs' presentation at the

8   mock jury, and Matthew Duncan of Fine Kaplan & Black and Lead Counsel gave the defense

9   presentation.  Kirby did not present any argument at the mock trials.  (Id. at ¶ 55.)

10                  **vi.      Lead Counsel Negotiated the Settlements and Led the Post-
                                  Settlement Work**

11

12   Finally, it was Lead Counsel who negotiated all of the settlements in this case, including the

13   Samsung SDI settlement (after a two-day mediation).  Lead Counsel also drafted all of the mediation

14   briefs with assistance from Sylvie Kern.  It was Lead Counsel that briefed the motion for preliminary

15   approval of the settlements; worked with notice/claims administrator on the notice program with

16   assistance from Straus & Boies; led the Audit Committee, which also included Sylvie Kern and

17   Straus & Boies; briefed large portions of the motion for final approval and the objections thereto

18   along with Sylvie Kern and Fine Kaplan; briefed the motion for attorneys' fees along with Sylvie

19   Kern and Fine Kaplan; briefed the Chunghwa settlement issues along with Fine Kaplan, and worked

20   with the notice/claims administrator to devise a new notice plan; argued the motions for settlement

21   approval and fees at hearings before the Special Master and the Court; and is now handling the

22   twelve appeals that have been filed.  Kirby's assignment was limited to objector discovery which

23   was important, but not as important or demanding as the work done by Lead Counsel and the other

24   firms listed herein.  Lead Counsel's post-settlement lodestar is far in excess of the post-settlement

25   lodestar incurred by Kirby. (Id. at ¶56.)

26                  **2.      Kirby's Contribution Relative to Other Top Tier Firms**

27

28

---

LEAD COUNSEL'S RESPONSE TO OBJECTIONS TO PROPOSED ALLOCATION OF AGGREGATE FEE
AWARD TO INDIRECT PURCHASER PLAINTIFFS' COUNSEL, Master File No. CV-07-5944-JST

1    As reflected in the detailed description of the work done in the previous section, Lead

2    Counsel judged the Kirby's overall contribution to the case to be slightly less than that of Straus &

3    Boies and Sylvie Kern, such that a slightly lower multiplier is warranted.  (Id. at ¶57.)

4    Straus & Boies joined the case in June 2010 and handled discovery (including meet and

5    confers) with defendant Samsung SDI; assisted Lead Counsel with setting up and managing the

6    document review and overseeing deposition preparations; prepared for Samsung SDI depositions (a

7    Straus & Boies associate who speaks Korean was invaluable to this team); led the foreign language

8    document review team; brought specialized knowledge of issues relating to certified translations

9    from *LCD*, which it used to negotiate hundreds of translation objections with Defendants; prepared a

10   comprehensive grid listing all conspiratorial meetings[26]; drafted the opposition to Defendants'

11   motion for summary judgment for lack of antitrust standing, and assisted with the opposition to one

12   of the Hitachi motions; and took a lead role in the preparation of IPPs' trial exhibit list and otherwise

13   preparing for trial. (Id. at ¶58.)

14   Sylvie Kern also began work in this case in mid-2010.  She had a major role in the

15   preparation of almost all briefings on behalf of IPPs (such as oppositions to motions to dismiss,

16   summary judgment motions and settlement approval); participated in settlement negotiations and

17   overall settlement strategy, and conferred with Lead Counsel on often a daily basis; had primary

18   responsibility for handling issues regarding the Philips/ California AG settlement; co-led the

19   document review teams on Impact and Hitachi; and assisted in deposition and trial preparation

20   (including identifying trial exhibits and designating deposition testimony). (Id. at ¶59.)

21   As explained elsewhere, the second-highest multiplier for the lead trial firm, Freedman Boyd

22   Hollander Goldberg Urias & Ward PA ("Goldberg"), is easily justified.  Alongside Lead Counsel,

23   Joseph Goldberg directed all of the preparations for trial after he joined the case in October 2014.

24   He "cleared the decks" and worked full time on the case for five months. (Goldberg Decl. ¶ 5.) All

25   of the work included in Goldberg's lodestar was of the highest level.  In addition, Goldberg's

26

27

28   _____

[26] A Kirby associate worked on updating and completing this grid towards the end of the case (Kirby
Obj. at 3), but the lion share of the work had already been done by Straus & Boies.

lodestar is very low due in large part to its very low rates.  (*Id*. at ¶8.)  Thus, a higher multiplier is necessary to equalize the rates charged by other firms for similar work.

### 3.    Other Factors That Lead Counsel Considered in Awarding Kirby a Slightly Lower Multiplier Than Other Top Tier Firms

While the work performed by Kirby relative to Lead Counsel and other top tier firms (as described above) was Lead Counsel's primary consideration in recommending a slightly lower multiplier than other top tier firms, as Kirby indicates, Lead Counsel also considered some issues relating to Kirby's rates.  (Alioto Decl. ¶60.)

First, Kirby's two Japanese-speaking attorneys' rates are very high when compared to other attorneys doing similar work.  For example, Shinae Kim-Helms, a Korean-speaking attorney from Straus & Boies who played a much greater role in the case overall than either of Kirby's attorneys, is billed at a current rate of $425.  Both of Kirby's Japanese-speaking attorneys are billed at $575.  This rate is also higher than any other attorneys involved in higher level document review.  While these rates may fall within the range of reasonable, Lead Counsel felt that in the context of the fee allocation, a slight downward adjustment to Kirby's multiplier was necessary to equalize billing rates among attorneys doing similar work. (Id. ¶ 61.)

Second, and in a similar vein, Mr. Gralewski's current rate of $775 is high when compared to that of Ms. Capurro ($580), Sylvie Kern ($700) and Nathan Cihlar of Straus & Boies ($550), all of whom were performing similar-level work.  (Id. ¶ 62.)

Finally, as the Special Master is aware, Lead Counsel capped the rates of document reviewers at $350 (English) and $400 (foreign-language).   Kirby had two English-speaking document reviewers who were subject to this cap.[27]  But Kirby often categorized their work as "Deposition Preparation," which allowed for a higher hourly rate.  Lead Counsel took this into account in arriving at Kirby's multiplier.  (Id. ¶ 63.)

None of these issues with Kirby's rates made a big difference to their lodestar and therefore the downward adjustment to their multiplier was small but necessary to be fair to other firms.

### 4.    Kirby's Expenses and Contribution to the Litigation Fund

---

[27] William Harris and Karina Korsharsky.

1     Kirby's Litigation Fund contribution and expenses combined is less than one sixth of the

2 amount contributed by Lead Counsel.  This cannot justify giving Kirby almost the same multiplier as

3 Lead Counsel.  In addition, Lead Counsel did not "sub-contract[] the travel-related risk in this

4 action."  Mr. Gralewski expressed an eagerness to travel, and volunteered himself for assignments

5 involving travel.  (Id. ¶ 65.)

6     With regard to other firms, as already explained in response to other objections, Lead

7 Counsel took contributions to the Litigation Fund into account and firms who did not contribute got

8 lower multipliers than they otherwise would have.  But no firm's contribution in this case (except

9 Lead Counsel's) comes close to the large assessments paid in *LCD*.  Thus, the reasoning there is

10 inapposite.

11     In conclusion, the 2.1 multiplier for Kirby is more than fair and should be adopted by the

12 Special Master.

13     **F.     McCallum Methvin & Terrell, P.C. (ECF No. 4824)**

14     McCallum, Methvin & Terrell, P.C. ("Methvin") objects to Lead Counsel's proposed

15 allocation of the aggregate fee award and its proposed multiplier of 1.2486, and argues that they

16 should be awarded the case multiplier of 1.96.  In support of their position, they argue that: (1) they

17 did what they were supposed to do and diligently performed their work assignments (which

18 consisted primarily of meetings with co-counsel and reviewing the work of other firms) and timely

19 reported their lodestar; and (2) they contributed $20,000 to the Litigation Fund—an amount less than

20 one-fifth of that contributed by most firms who are receiving multipliers in the range of 1.96.

21     As described above, in proposing an allocation of the aggregate fee award, the law requires

22 Lead Counsel to take into account the relative contributions of IPP Counsel. *Keller v. NCAA*, 2015

23 WL 8916392 at *4.  While Lead Counsel does not wish to denigrate the work done by Methvin, and

24 recognizes that providing a class representative is an important part of the case, Methvin's work

25 pales in comparison to the work done by other firms in this case.

26     Methvin did not draft either the underlying complaint for his client, or the Consolidated

27 Amended Complaint.  Lead Counsel did that.  Methvin was merely responsible for reviewing the

28 allegations with his client before filing.  Similarly, Methvin did not draft his client's discovery

1   responses.  He worked with his client to gather the relevant information and then reviewed the work

2   of other firms that drafted the written discovery responses.  Methvin didn't defend his client's

3   deposition; he merely "attended." (Methvin Objection at 2.)  The remainder of Methvin's work is

4   made up of a small amount of low-level document review, meetings with co-counsel, and reviewing

5   court filings[28] and case updates from Lead Counsel.  Thus, it is absolutely fair to award a higher

6   multiplier to the firms that actually did the work.  (Alioto Decl. ¶ 66.)

7        As for Methvin's $20,000 contribution to the Litigation Fund, Lead Counsel did consider

8   that contribution in making its proposed fee allocation.  Specifically, Lead Counsel set a base

9   multiplier of 1.2 for firms who provided a class representative and then increased the multiplier

10  slightly for those firms who contributed to the Litigation Fund and/or did additional substantive

11  work, such as lower level document review.  That is why Methvin is receiving the highest multiplier

12  in its tier.  Methvin fails to acknowledge that most firms receiving higher multipliers paid more than

13  Methvin, and indeed, several firms that paid more into the Litigation Fund are receiving smaller

14  multipliers than it.  But again, Lead Counsel weighed contributions to the Litigation Fund against the

15  level, quality and amount of substantive work performed.  And because in most cases the amount

16  contributed to the Litigation Fund was small, it was not sufficient to move any firm into a higher tier.

17  (Id. ¶ 67.)

18       As with the other firms, Lead Counsel has properly and thoroughly assessed all of the factors

19  necessary to make a fair recommendation regarding the multiplier for Methvin.  Lead Counsel

20  respectfully requests that the Special Master adopt this recommendation, and award a multiplier of

21  1.2486 to Methvin.

22       **G.   Theresa Moore (ECF No. 4825)**

23       Despite having no work assignments and no client, and having failed to make any positive

24  contributions to this case—financial or otherwise—Theresa Moore ("Moore") requests over half a

25  million dollars for reading court filings, discussing them with co-counsel and offering unsolicited

26  _____

27  [28] Lead Counsel had to cut *more than half* of Methvin's lodestar for reviewing inconsequential
    filings such as Notices of Appearance, Pro Hac Vice Applications and Administrative Motions to

28  Seal.  In fact, Methvin's original lodestar included time spent by three attorneys—each billing at
    rates ranging from $425 to $500—reviewing virtually every docket entry.

1    "advice" to Lead Counsel. (*See* Moore Objection at 7 (requesting a multiplier of up to 3 on her

2    $209,768.65 lodestar).)  None of the time spent by Moore on this case resulted in any benefit to the

3    Class or contributed to the result achieved in any way.  Moreover, contrary to Moore's assertions,

4    her objections to the settlements did *not* result in a $14 million benefit to the Class since Moore

5    never objected to the total fee requested in the motion for attorneys' fees.

6         Lead Counsel never made any work assignments to Moore and never received any time

7    records from Moore during the case.  Nor does Lead Counsel have any record of Moore representing

8    any of the named plaintiffs in the case.  According to Lead Counsel's records, all of the clients

9    Moore claims to represent are in fact represented by other firms in the case.[29]  The only contact Lead

10   Counsel had with Moore during the case was miscellaneous emails and phone calls offering

11   unsolicited advice regarding the case.  Accordingly, Lead Counsel was surprised to receive Moore's

12   declaration in early August 2015 attesting that she had incurred over $200,000 in lodestar.  (Alioto

13   Decl. ¶ 68.)

14        Lead Counsel reviewed Moore's time records and, despite clear instructions to all IPP

15   Counsel to exclude "read and review" time, unassigned time, and time incurred after May 31, 2015,

16   Moore's lodestar included time spent on all of these categories.  In fact, Moore's time records show

17   that the vast majority of her time was spent reading court filings, including inconsequential filings

18   such as Pro Hac Vice Applications and orders thereon, Notices of Appearance, Motions to Relate

19   and orders thereon, and motions to seal.[30]  She also spent a substantial amount of time discussing the

20   case with unidentified co-counsel and conducting "research," all of which time was unassigned since

21

22

23

24

25   [29] Moore's Declaration in support of her fee request states that she represents Margaret Slagle, Mark
26   Pierce, Barbara Caldwell, Barry Kushner, Brian A. Luscher, Jerry Cook and Scott Friedson.  (*See*
     Moore Objection, Ex. A at 2.)  Moore has never presented any proof that she has an attorney-client
27   relationship with any of these plaintiffs.

28   [30] Examples of this are found in Moore time entries dated 4.21.08; 6.23.08; 7.2.08; 8.25.08; 3.31.11;
     3.14.12; 4.2.12; 10.9.12; 2.15.13.  Alioto Decl. ¶ 69.

1    Moore never received any assignments from Lead Counsel.[31]  Significantly, none of Moore's time

2    records indicate that she was communicating with the clients she claims to represent.[32] (Id. at ¶69.)

3           Because Moore had no client and no work assignment, it was entirely unnecessary for her to

4    be reviewing court filings, researching issues or conferring with co-counsel regarding the case.  This

5    time was also duplicative of the time spent by Lead Counsel and other firms that had work

6    assignments.  Moreover, Lead Counsel never received any of the results of Moore's "research," so

7    there was no benefit to the Class.  Lead Counsel wrote to Moore and instructed her to remove these

8    categories of time from her lodestar, along with time spent on lead counsel motions since that time

9    did not benefit the Class.[33]  All of Lead Counsel's instructions were consistent with those given to all

10   IPP Counsel, including Lead Counsel's own firm. (Id. ¶ 70.)  They were also consistent with

11   standard practice in class actions.  (See, e.g., LCD Suppl. R&R at 11 ("Most firms in this case

12   charged nothing for such 'read and review' time.").  See also LCD, 2013 WL 1365900, at *9

13   ("Factors meriting a downward adjustment include**: . . . billing for inconsequential tasks (e.g.,**

14   **reading ECF filing entries . . . .)** (emphases added.)

15          In response to Lead Counsel's instructions, Moore removed only 20 hours from her lodestar.

16   A comparison of Moore's original time records with her revised time records show that, for the most

17   part, she simply deleted references to work done on the lead counsel motions, reviewing

18   inconsequential filings (e.g. PHV applications), and "Rd" and "Rev" notations (short hand for "read"

19   and "review"), and kept the amount of time billed the same.  Lead Counsel therefore cut the non-

20   compensable categories of time, so that only some of Moore's time spent in 2007 and 2008

21   remained.  Lead Counsel informed Moore that we would not include any other time for her in the

22   joint petition, and if she wanted to be included, she would need to submit a revised declaration.

23   (Alioto Decl., ¶ 71.)  Moore submitted a revised declaration but it still claimed the non-compensable

24

25   [31] See, e.g., Moore time entries dated 10.08.08; 11.19.08; 1.30.09; 7.23-7.31.08; 1.5.10; 2.23.10.
     Alioto Decl. ¶ 69.

26   [32] If Moore was, as she claims, providing updates to her clients regarding the case, then she should
27   produce copies of those communications.

     [33] Moore had a substantial amount of time spent on the lead counsel motions since the Alioto Law
28   Firm had moved for appointment as lead counsel.  (See ECF No. 47 at 1 (noting that the Alioto Law
     Firm had withdrawn its motion.).)

time.  Thus, Lead Counsel did not include her declaration in the joint fee petition, but did include her reduced lodestar.  (*See* ECF No. 4073.)  Moore never filed her own fee motion so she can recover no more than Lead Counsel has proposed for her.

Just over a month later, and just over two months after Moore had congratulated Lead Counsel on a "Great job," and thanked us for our hard work,[34] Moore formally objected to the settlements on behalf of several clients.  All of Moore's objections were rejected by both the Special Master and the Court.  Moore has now filed an appeal.  (Alioto Decl. ¶72.)

In sum, Moore did no substantive work in the case.  She did not represent a client or contribute to the Litigation Fund.  She submitted excessive and inflated billings, failed to cooperate with Lead Counsel when we pointed out the problems with her time, and even attempted to mislead Lead Counsel into submitting non-compensable time to the Court.  She then objected to the settlements and delayed settlement approval in a fit of pique against Lead Counsel for abiding by a Court Order and fulfilling his duties to the Class.  Moore has now appealed the Court's approval of the settlements in an effort to leverage more money for herself.  All of these factors justify Lead Counsel's cuts to Moore's lodestar and the proposed fractional multiplier.  *See LCD*, 2013 WL 1365900, at *9 ("Factors meriting a downward adjustment include: **excessive recorded hours**; failure to submit a declaration; performing largely document review; **failure to act professionally and collaboratively to prosecute the joint IPP effort**; **billing for inconsequential tasks (e.g., reading ECF filing entries)**; **paying assessments late or not at all; performing unimportant or poor quality work as reported by lead and liaison counsel**.") (emphases added.)

### H.  Law Office of Brian Barry (ECF No. 4836)

The Law Office of Brian Barry ("Barry") objects to what it terms "the SUB-1.0000 multiplier"[35] proposed for it by Lead Counsel on the grounds that the rate of its primary lawyer

---

[34] In an email to Lead Counsel dated July 29, 2015, Moore stated: "Thanks [sic] you very much, Congratulations and thank you for all your hard work over this extended period of time. Great job." (ECF No. 4370-1, ¶ 32, Ex. F-3.)

[35] As an initial matter, Lead Counsel did not intend to propose less than a 1.0 multiplier for Barry. Lead Counsel intended to propose that Barry receive his full, current rate lodestar. (*See* ECF No. 4790, Ex. A (proposing a 1.0 multiplier for Barry).) It was only due to a technical error caused by Excel that Lead Counsel proposed to reduce everyone's multiplier pro rata in order to correct the

assigned to the case, Jeff Shea, was unjustly capped at $350 per hour and its lodestar was cut during the fee audit.  Shea contends that he "participated extensively in the discovery phase of the CRT litigation," and that the work he performed was high level, despite performing only lower level document review for a period of 13 months.  He also claims, falsely, that Lead Counsel "misled" his firm into agreeing to cap his rate and only allowed him to bill for time spent in the document review database.  As further explained below, Lead Counsel does not dispute that Shea did good work *at his level.*  But due to the Barry firm's failure to act in the best interests of the class by abruptly pulling out of the case at a critical juncture, taken together with various billing issues and low quality work by Barry's other reviewers, Lead Counsel believes that the Barry firm should be placed in a tier lower than it otherwise would have been, and should not be awarded a multiplier.

### 1.    Barry's Failure to Act in the Best Interests of the Class

Barry's objection entirely fails to acknowledge that it pulled out of the case abruptly in December 2012 after only working on the case for 13 months, leaving Lead Counsel to scramble to replace its document reviewers.  This was a particularly critical juncture in the case—IPPs had filed their class certification motion on October 1, 2012 and merits depositions had only just begun.  Merits discovery continued for almost another two years until September 2014.  Shea was a good document reviewer who had acquired a good understanding of the issues in the case, and would have been very helpful to the merits deposition effort.  But all of that institutional knowledge and the many hours of training spent by Lead Counsel and others were lost when Barry pulled Shea from the case with very little notice to Lead Counsel. (*See* Alioto Decl. ¶¶ 74 -75 (Jeff Shea wrote to Sylvie Kern in December 2012 stating that "my boss is switching me to another case- full-time and effective immediately- so that's it for me on CRT.").)  Barry's actions not only left Lead Counsel and the other members of the team in the lurch at a critical point in the case, they were also clearly *not* in the best interests of the Class.

---

error, which resulted in a slightly less than 1.0 multiplier to Barry.  (*See* ECF No. 4800.) Indeed, as Lead Counsel noted in its revised proposed allocation, if you were to round up the multipliers to two decimal places (as is common practice), the multiplier to Barry would still be 1.0.

1    According to emails received by Lead Counsel and others at the time, Barry lost interest in

2  the case when the IPPs did not enter into early settlements as other plaintiffs had done.  Of course,

3  this was because Lead Counsel had assessed the case's value to be higher than the Defendants were

4  willing to pay at that time.  In order to "spread his risk," Brian Barry decided to cut his losses and

5  run after working on the case for only 13 months.  This is in stark contrast to the long term

6  commitment that other firms made.  (Id. ¶ 76.)

7    Thus, far from acting in the best interests of the class, as it was required to do, the Barry firm

8  acted in its own self-interest and left Lead Counsel and others holding the bag.  For this reason

9  alone, the Barry firm does not deserve a multiplier on its lodestar.  *See LCD* Suppl. Report at 6-9

10  (awarding lower multiplier due to certain firm's failure to act in the best interests of the class, and

11  failure to work constructively with other firms); *LCD*, 2013 WL 1365900, at *9 ("Factors meriting a

12  downward adjustment include: **. . . failure to act professionally and collaboratively to prosecute**

13  **the joint IPP effort** . . .") (emphasis added).

14         **2.    Barry's Billing Issues and Inefficiency**

15    In conducting the audit of IPP Counsel's fee requests, Lead Counsel flagged the total time

16  that Shea claimed to have spent on document review (2501.8 hours) because it was very high when

17  compared to the time spent by other document reviewers during the same 13-month time period.  A

18  closer examination revealed a number of issues that suggested Shea's claimed hours were inflated.

19    First, Lead Counsel was not aware of Shea receiving any assignments other than document

20  review and his time records are consistent with this understanding, which means that he should have

21  been spending most of his time in the document review database.  Yet, according to various database

22  reports, the time Shea spent in the database was far less than 2501.8 hours; in fact, it was almost

23  *half* of that amount in total (approx. 1300 hours vs. 2501.8 hours), and in certain months was much

24  *less* than half.  For example, in February 2012, Shea billed 197.1 hours but only spent 58.08 hours in

25  the database.  In March 2012, Shea billed 209 hours but only spent 98.41 hours in the database.

26  While Lead Counsel accepts that it is necessary for document reviewers to spend *some* time working

27  outside of the database, no other reviewer had such a large discrepancy between the time spent in the

28

1   database and the total time they claimed to have worked on the document review.[36] (Alioto Decl.

2   ¶78.)

3        In addition, Shea consistently billed well over 8 hours a day doing document review and

4   often billed on the weekends too.  For example, in February and March 2012, Shea claims to have

5   taken only one day off in each month.  And in April, June and July 2012, he only took two days off

6   in each month.  For most of the period that Shea was reviewing documents, there was no urgency

7   that would have required him to be consistently working more than 8 hours a day plus weekends.

8   And a direct comparison of Shea's hours with other reviewers revealed that he billed *several*

9   *hundred hours more* than any other document reviewer during that same 13-month period.

10  Significantly, after reviewing Shea's time records in *LCD,* the Special Master also found that Shea

11  and other Barry reviewers "recorded an unrealistic number of hours per day." *(LCD* Suppl. R&R at

12  10.)  The same is true here. (Alioto Decl. ¶ 79.)

13       Lead Counsel informed Brian Barry of their findings and initially proposed that Shea's hours

14  be cut to 1400 hours.  But after Shea explained that he spent a significant amount of time offline

15  creating memoranda regarding the documents he reviewed, and taking into consideration the good

16  quality work Shea produced, Lead Counsel proposed to allow 2000 hours for Shea and Barry agreed.

17  Thus, Shea's claim that Lead Counsel only allowed his firm to bill for time spent while logged into

18  the database is false.  Lead Counsel allowed Barry to bill for *more than 600 hours* spent by Shea

19  outside of the database.  (Id. ¶ 80.)

20       Allowing Shea to bill for an additional 600+ hours was more than generous given that Shea's

21  method of creating memoranda and spreadsheets outside of the database (*see* Objection at ¶ 12) was

22  unnecessary and very inefficient.  In addition, it appears that most of the memoranda that Lead

23  Counsel received from Shea were merely lists of good documents with a short description of the

24  contents.  All of this information could and should have been recorded in the database.  Online

25  document review databases have developed so as to allow lawyers to record their analyses of the

26  evidence in a single, central forum, which all lawyers in the case can access and use as the case

27  ────────────────

28  [36] Lead Counsel and the Audit Committee did uncover discrepancies between the time spent in the database and the time claimed by other document reviewers.  Those document reviewers' time was also cut before it was included in the lodestar submitted to the Court.

LEAD COUNSEL'S RESPONSE TO OBJECTIONS TO PROPOSED ALLOCATION OF AGGREGATE FEE
AWARD TO INDIRECT PURCHASER PLAINTIFFS' COUNSEL, Master File No. CV-07-5944-JST

1  progresses.  This is far superior to having hundreds of miscellaneous memoranda floating around.  It

2  is also possible to create spreadsheets of important documents with descriptions of the contents from

3  the database, such that creating separate memoranda outside of the database is completely

4  unnecessary.  Moreover, by his own admission, the detailed Excel spreadsheets that Shea claims to

5  have created no longer exist (see Objection at ¶ 13), and Lead Counsel has no record of ever

6  receiving them.  So when Shea left the case, his knowledge and analysis of the evidence left with

7  him and any benefit to the Class was lost.  (Alioto Decl. ¶ 81.)

8       In light of the over-billing by Shea and the inefficient way in which he worked, taken

9  together with the other factors described herein, Lead Counsel believes that a multiplier of 1.0 for

10  Barry is appropriate.

11          **3.**     **Low Quality Work by Other Barry Firm Reviewers**

12       The Barry firm's lodestar includes approximately 650 hours spent by two Korean-speaking

13  document reviewers whose work was of low quality and of very little benefit to the Class.  Lead

14  Counsel was forced to cut one of the reviewers who didn't understand the issues and who we

15  suspected was using Google to translate documents.  The other reviewer quit abruptly after only

16  working on the case for a few months, most of which time was spent training and getting up-to-

17  speed on the case.  Lead Counsel does not believe it is appropriate to award Barry a multiplier on the

18  time billed by these reviewers. (*See* Alioto Decl. ¶ 82.)  Lead Counsel was more than generous in

19  including this time in Barry's lodestar.

20          **4.**     **Shea's Hourly Rate Was Properly Capped at $350**

21       Lead Counsel does not dispute that the quality of Shea's work was good, or that he was

22  experienced.[37]  But at the end of the day, he was a lower level document reviewer.  He was not a

23  leader of his document review team.  There were two other more senior, partner-level attorneys who

24  performed that role for the team to which Shea was assigned.  No other lawyers in that team were

25

26  _____

27  [37] Although we feel compelled to point out that Shea's violation of the Protective Order by placing multiple Highly Confidential documents in the public record does not reflect well on his lawyering abilities.  The same is true of his decision to place in the public record many documents reflecting

28  plaintiffs' counsel's analyses of the evidence against Defendants.  This is highly confidential attorney work product.

48

LEAD COUNSEL'S RESPONSE TO OBJECTIONS TO PROPOSED ALLOCATION OF AGGREGATE FEE
AWARD TO INDIRECT PURCHASER PLAINTIFFS' COUNSEL, Master File No. CV-07-5944-JST

allowed to charge more than $350 per hour.[38]  The same was true of other teams.[39]  (Alioto Decl. ¶83.)  Accordingly, Shea's claims that Lead Counsel somehow "misled" his firm regarding the capped rates for lower level document reviewers is false.[40]

The leaders of Shea's team were charged with directing the team, holding conference calls, conducting a second-level of review of the documents coded by "tier 1" reviewers, selecting documents for depositions, and preparing detailed, several hundred-page memoranda regarding the "impact" or injury to class members.  While Shea clearly understood the issues and had a good technical understanding of the document review database such that his team leaders complimented him and looked to him on some occasions to assist with searching, he did not perform any of the higher level tasks that were charged to the team leaders.  And while Shea was involved to some degree in reviewing and coding documents that were ultimately used for depositions, he did not perform the higher level of review involved in selecting documents for use at depositions, or helping to prepare the deposition outline.  He merely reviewed and coded his batches, produced lists of hot documents with some analysis, and found some good documents—this is what lower level document reviewers are supposed to do.  (Alioto Decl. ¶84.)

---

[38] The other "tier 1" members of the "Impact team" were Kevin Pearl of Frankovitch, Anekatis, Colantonio & Simon and Shadi Amundin of Green & Noblin PC.  Kevin's rate was $175 and Shadi's rate was $350.  (See ECF No. 4073, Exs. 28 and 8, respectively.)

[39] For example, the "tier 1" members of the "Pricing team," which later became the LG team, were Angela Bongiorno of Milberg LLP and Shanti Michaels of Janssen Malloy LLP.  Angela's rate was $325 and Shanti's rate was $300 (See ECF No. 4073, Exs. 12 and 25, respectively.)  The "tier 1" members of the "Conspiracy team" were Brandon Islieb of the Law Office of Sherman Kassof and Jackson Bingham of Morrison Sund.  Brandon's rate was $350 and Jackson's rate was $350.  (See id., Exs. 14 and 26, respectively.)  And Lead Counsel's foreign language reviewers were all billed at or below the $400 cap.  (See id., Ex. 1.)

[40] Shea doesn't give any specific examples of who he is referring to when he claims that attorneys who performed lower level document review are being billed at over $500 per hour.  But in some cases, attorneys whose rate was initially capped at $350 for document review were allowed to bill at their normal rate for later work that was higher level and was categorized as Deposition Preparation or Trial Preparation.  For example, two of Kirby McInerney's attorneys (Will Harris and Karina Kosharskyy) billed their document review time at $350 and time spent on other tasks at their normal rate. (See ECF No. 4073, Ex. 2.)  Natalie Kabaskalian of Goldman Scarlato Karon & Penny LLC (and later Karon LLC) was likewise capped at $350 for her lower level document review work early in the case.  (See id., Ex. 15.)  But Natalie progressed to become a leader of the Toshiba team and was involved in selecting documents for depositions, drafting memoranda regarding Toshiba evidence, and selecting Toshiba trial exhibits.  She was therefore allowed to bill this time at a higher rate. (See ECF No. 4073, Ex. 27.)

Shea compares his rate to the document review rates of Sylvie Kern, Brian Umpierre, Qianwei Fu, and Demetrius Lambrinos (*see* Barry Objection, ¶¶ 17-18), but they were all team leaders whose time spent on document review involved the higher-level tasks outlined above.  And Lauren Capurro designed and oversaw the entire document review effort, including working with Milberg to set up the database and design the work flow; preparing memoranda regarding the Defendants and the issues to educate the new document reviewers (like Shea) regarding the case;[41] preparing the coding manual; assigning the teams; training reviewers and monitoring their progress; reviewing the memoranda produced by the team leaders; and selecting documents for use in depositions and in briefs.  (*See* ECF No. 4071-1, ¶ 39-42).) (Alioto Decl. ¶ 85.)

Based on the foregoing, Lead Counsel believes that capping Shea's rate at $350 for his work in this case is fair and appropriate.

### 5.   Barry's Other Objections Also Lack Merit

Barry further objects to Lead Counsel's proposed multipliers for firms who had small lodestars.  He claims that in most cases such firms do not receive a multiplier.  (Barry Objection at 3.)  But the firms Barry attacks represented named plaintiffs—sometimes more than one—and/or they provided attorneys to do lower level document review.  In *LCD,* firms with lodestars of less than $100,000 who "basically did work for their own clients," with perhaps some lower level document review, were awarded multipliers of 1.2-1.3.  (*See LCD* Suppl. Report at 5.)  Here, the range for firms falling in this tier is 1.15-1.25.  This is consistent with *LCD*. The multiplier ranges are slightly lower than *LCD* for an obvious reason: the aggregate fee award here is almost half the amount awarded in *LCD*.

Barry also points to his contribution to the Litigation Fund in support of his claim for a higher multiplier.  As already explained, however, contributions to the Litigation Fund do not hold as much weight in this case because they were so much smaller than other cases.  And *In re High Tech Employees Antitrust Litig.,* No. 11-cv-2509-LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) did not hold that if a firm did not contribute to the litigation fund, it should not be paid an enhanced

---

[41] By the time Shea and the other document reviewers joined the case in November 2011, Lauren Capurro had been working on the *CRT* case almost full time since mid-2008—more than three years.

1   award. (Barry Objection at 3.)  To the contrary, the *High Tech Employees* Court applied a positive

2   multiplier to the lodestar of an attorney who had not contributed to the litigation fund.  2015 WL

3   5158730, at *11-12.

4         Finally, Barry's suggestion that Lead Counsel violated State Bar rules of Professional

5   Conduct by employing David Denison to work on the document review is incorrect.  Mr. Denison

6   was at all times during the case admitted to practice and in active status in Iowa.

7         In short, Lead Counsel's proposed allocation to the Barry firm is fair and reasonable and

8   should be adopted.

9                       **CONCLUSION**

10        For all of the foregoing reasons, Lead Counsel respectfully requests that the Special Master

11   adopt his proposed allocation of the aggregate fee award.

12   Dated: September 16, 2016         Respectfully submitted,

13                 By:    */s/ Mario N. Alioto*

14                 Mario N. Alioto (56433)
                     malioto@tatp.com

15                 Joseph M. Patane (72202)
                     jpatane@tatp.com

16                 Lauren C. Capurro (241151)
                     laurenrussell@tatp.com

17                 TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
                     2280 Union Street

18                 San Francisco, CA 94123
                     Telephone: 415-563-7200

19                 Facsimile: 415-346-0679

20                 ***Lead Counsel for Indirect Purchaser Plaintiffs***

21

22

23

24

25

26

27

28