Mario N. Alioto (56433)
Joseph M. Patane (72202)
Lauren C. Capurro (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123
Telephone: 415-563-7200
Facsimile: 415- 346-0679
Email: malioto@tatp.com
jpatane@tatp.com
laurenrussell@tatp.com

*Lead Counsel for the*
*Indirect Purchaser Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. CV-07-5944-JST; No. CV-13-03234-JST |
| | MDL No. 1917 |
| This Document Relates to:<br><br>All Indirect Purchaser Actions | **DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF LEAD COUNSEL'S OMNIBUS RESPONSE TO OBJECTIONS TO PROPOSED ALLOCATION OF AGGREGATE FEE AWARD TO INDIRECT PURCHASER PLAINTIFFS' COUNSEL**<br><br>Hearing Date: TBD<br><br>Special Master Martin Quinn, JAMS |

I, Mario N. Alioto, declare:

1.    I am an attorney duly licensed by the State of California and am admitted to practice before this Court.  I am a partner with the law firm Trump, Alioto, Trump & Prescott, LLP and my firm serves as Lead Counsel for the Indirect Purchaser Plaintiffs ("IPPs") in the above-captioned action.  I submit this declaration in support of Lead Counsel's Omnibus Response to Objections to Proposed Allocation of Aggregate Fee Award to Indirect Purchaser Plaintiffs' Counsel, filed herewith.  The matters set forth herein are within my personal knowledge and if called upon and sworn as a witness I could competently testify regarding them.

2.    The firms in the same tier as McCallum Hoaglund Cook & Irby, LLP ("McCallum") all assigned several attorneys to the case who did primarily higher level document review, with some other more substantive work.  Many of the firms in the tier below McCallum represented a class representative—some of them more than one—*and* they did low level document review.  All of the firms in the tiers above McCallum did much higher level work, such as taking multiple depositions, managing document review teams, drafting briefs and preparing for trial, *and* they did much more of it than McCallum and had much more at risk in terms of lodestar.

3.    I assigned McCallum work commensurate with their background and experience.  Much of their draft for the opposition to the motion to dismiss had to be heavily edited by my office.  Thereafter, I was reluctant to give them substantial assignments because, as the case got busier, it became more and more important to give work to firms who could be relied upon to produce high quality work.  Later assignments to McCallum were limited to lower level tasks, such as deposition summaries.

4.    As a general matter, firms who did *not* contribute to the Litigation Fund received slightly lower multipliers than firms that did the same or similar work which did contribute to the Litigation Fund.  For example, in the top tier, Law Offices of Sylvie Kern received a slightly lower multiplier than Straus & Boies LLP in large part due to the difference in their contributions to the Litigation Fund.  Similarly, Law Offices of Lawrence G. Papale, Vogl Meredith and Besmer Law Firm would have received slightly higher multipliers had they contributed to the Litigation Fund.  And in the tier consisting of firms that represented a class representative and/or performed low level

document review, McCallum Methvin, Frankovitch Anetakis, Kirkpatrick and Bonnett Fairborn, were awarded slightly higher multipliers than others in that tier in recognition of their contributions to the Litigation Fund.

5.      Attached hereto as Exhibit 1 is a true and correct copy of the Supplemental Report and Recommendation of Special Master Re Allocation of Attorneys' Fees in the Indirect-Purchaser Class Action, ECF No. 7375, Case No. 3:07-md-01827, *In re TFT-LCD Antitrust Litig.*, ("*LCD Suppl. R&R*").

6.      My firm audited Scarpulla's time records in accordance with the procedures applied to all firms.  As with all other firms, and in accordance with the Order Appointing Interim Lead Counsel, ECF No. 47, we eliminated the following categories from Scarpulla's time records: (1) time spent on the motions for appointment as lead counsel; (2) time spent on tasks that were not assigned by my firm; (3) time spent reading court filings that was unrelated to a specific assignment; and (4) time spent on internal case organization, such as organizing internal case files and excessive internal meetings about "case status."  In addition, we eliminated a number of entries that appear to relate to *LCD*,[1] and entries for time spent reading legal opinions regarding issues to which neither he nor Zelle were assigned.[2]

7.      We did not eliminate any of Scarpulla's time prior to Mr. Alioto's appointment as Interim Lead Counsel on May 9, 2008 (except time spent on the lead counsel motions).  Nor did we eliminate any of the time spent by Scarpulla thereafter on work that was assigned to Zelle Hofmann. But Lead Counsel could not allow time spent on tasks that were entirely unassigned, such as trial preparation[3] and meetings with the California Attorney General ("AG"), defense counsel, or co-

---

[1] *See, e.g.,* Scarpulla time entries dated 4/29/2008, 5/5/2008, 6/27/2008 (relating to depositions of Samsung executives—there were no depositions in *CRT* at this stage); 7/20/2008 and 2/11/2009 (relating to opt out claims—the opt out plaintiffs did not join the CRT case until 2011).

[2] *See, e.g.*, Scarpulla time entries dated 8/22/2008, 7/20/2010.

[3] Scarpulla points to his letter dated October 2, 2014 as evidence of his involvement in trial preparations. (Scarpulla Decl., Ex. 2.) But this work was entirely unassigned and was duplicative of what Lead Counsel was already doing in conjunction with the other firms in the core group: Straus & Boies, LLP, Law Office of Sylvie Kern, and Kirby McInerney, LLP, among others.  Lead Counsel informed Scarpulla of the status of trial preparations and a host of other matters by email dated October 7, 2014.  This email is attorney work product and confidential.

DECL. OF MARIO N. ALIOTO ISO LEAD COUNSEL'S OMNIBUS RESPONSE TO OBJECTIONS TO PROPOSED
ALLOCATION OF AGGREGATE FEE AWARD - Master File No. CV-07-5944-JST

counsel about matters that were assigned to other firms, or were within Lead Counsel's sole purview.

8.    Lead Counsel had assigned Paul Novak, a senior partner at Milberg LLP and a former Michigan Assistant Attorney General, to work with the AG's office.

9.    The audit reduced Scarpulla's hours from 185.9 hours to 59.05 hours.  Lead Counsel then applied Scarpulla's historical rates to calculate his lodestar, which started at $850 and rose to $1250 from 2013 onwards.

10.   When Scarpulla left Zelle Hofmann, they agreed that half of his time while at Zelle would be assigned to Scarpulla.  Practically speaking, this meant that Zelle and Scarpulla submitted the identical time records, with each entry divided 50-50.  During the fee audit, Zelle agreed that much of Scarpulla's time was of no benefit to the Class and was therefore not compensable.  Indeed, Zelle decided to eliminate *all* of Scarpulla's time from their lodestar, even though I did not request this.

11.   I and other members of the Audit Committee attempted to contact Scarpulla on multiple occasions in order to discuss his declaration and explain the proposed cuts to his lodestar. Lead Counsel also sent Scarpulla an email explaining the problems with his declaration (he didn't submit the lodestar summary chart and had only submitted his time at current rates), and the categories of time we proposed to cut.  But Scarpulla refused to speak with Lead Counsel or the Audit Committee.

12.   On information and belief, attached hereto as Exhibit 2 is a true and correct copy of an email chain between Mr. Scarpulla and Robert J. Gralewski.

13.   Attached hereto as Exhibit 3 is a true and correct copy of an email I sent to Mr. Scarpulla regarding the fee audit.

14.   I have already provided a fulsome explanation of his firm's time-keeping practices. (*See* ECF Nos. 4558 at 5-11; 4558-1 (Alioto Decl.) and 4558-2 (Suppl. Pearl Decl.).)[4]  At the April

---

[4] This filing is Indirect Purchaser Plaintiffs' Response to Statement Pursuant to Order Re: Objection to *Ex Parte* Communications and *In Camera* Review of Billing Records.  IPP Counsel filed this Response to Scarpulla and Cooper's supplemental objections to IPP Counsel's fee motion (ECF No. 4545-4) after they were provided *all* of IPP Counsel's time records.  The other IPP firms that

1  19, 2016 hearing, Scarpulla and Cooper were given an opportunity to reply to this Response.

2  Neither had anything to say.

3      15.    I and members of my firm have examined the underlying time records for all firms,

4  including those billing less than $2 million in lodestar, and have proposed multipliers commensurate

5  with the benefit their work bestowed on the Class.

6      16.    Over the course of this case, I and members of my firm worked closely and

7  cooperatively with the Attorneys General of Illinois, Washington and Oregon to resolve their

8  objections to the Chunghwa settlement.  We also worked with the Florida Attorney General on case

9  preparation, and the Hawaii Attorney General on various issues over the course of the case.  In

10  addition, we worked closely and cooperatively with counsel for the DPPs and DAPs and shared

11  work product with them throughout the case.

12      17.    Around the same time as Lead Counsel negotiated the LG settlement, Scarpulla was

13  advocating that Lead Counsel accept a settlement with Philips—who was equally, if not more

14  culpable than LG—for just over half the amount of the final LG settlement.  Indeed, Scarpulla even

15  went so far as to formulate an unauthorized settlement demand on Philips for this low amount.

16      18.    I have proposed that Glancy Prongay & Murray LLP ("Glancy") receive the same

17  multiplier as Sharp McQueen PA and a slightly higher multiplier than Green & Noblin PC.  Like

18  Glancy, Sharp McQueen and Green & Noblin PC assigned one lawyer to the case who led a

19  document review team and did higher level document review, assisted with preparations for

20  depositions by selecting documents for the deposition taker, and prepared memoranda regarding the

21  evidence their team found.  All of these firms were also involved, to differing degrees, in preparing

22  for summary judgment and trial.  The work performed by these firms was high quality (to slightly

23  varying degrees, which Lead Counsel also took into account), but it was limited to the foregoing

24  tasks.  They had little or no involvement in taking or defending depositions, whereas The Law

25  Offices of Lawrence G. Papale and Vogl Meredith Burke LLP (which are in the same tier as Glancy

26

27

28  Scarpulla accused of block billing and quarter hour increments also filed declarations explaining
their billing practices.  *See* ECF Nos. 4558-3 through 4558-6.

DECL. OF MARIO N. ALIOTO ISO LEAD COUNSEL'S OMNIBUS RESPONSE TO OBJECTIONS TO PROPOSED
ALLOCATION OF AGGREGATE FEE AWARD - Master File No. CV-07-5944-JST

1   but Lead Counsel proposes they receive slightly higher multipliers) each took and/or defended a

2   number of depositions, in addition to being involved in various other higher level tasks.

3       19.     Firms in the tier above Glancy—into which Glancy's requested multiplier of 1.7

4   would place it—did higher level work than Glancy; assigned multiple lawyers to work on the case,

5   many of whom were very senior and experienced; joined the case earlier than Glancy; contributed

6   more financially to the case than Glancy; and/or have performed a substantial amount of post-fee

7   petition work.  More specifically, Bramson Plutzik and Andrus Anderson each oversaw the entire

8   offensive discovery effort against their defendants (Toshiba and Hitachi, respectively) from June

9   2010 (when the meet and confers with defendants regarding their discovery responses began)

10  through the conclusion of the case against their defendant (January 2015 for Hitachi and March 2015

11  for Toshiba).  Each firm assigned named partners to the case who led the meet and confer

12  negotiations with their defendants, drafted and filed multiple motions to compel, led the document

13  review teams for their defendants, took multiple Rule 30(b)(6) depositions in 2012 and multiple

14  merits depositions in 2013 and 2014, drafted or assisted in drafting oppositions to motions for

15  summary judgment, and were heavily involved in preparing for trial against their Defendants.

16      20.     Similarly, Milberg, Fine Kaplan & Black, and Hulett Harper Stewart all assigned very

17  senior partners to the litigation who were involved in very high level tasks, such as directing trial

18  preparations, trial strategy and mock trials, and did a substantial amount of post-fee petition work.

19  Milberg was also involved in the case from the motion to dismiss stage in 2009 and made very

20  substantial financial contributions to the case.[5]

21      21.     In contrast, Glancy's one associate did not become involved in the case until

22  November 2011 when the document review started, and while his work was very good, he did not

23  take full control of LG discovery.  Lead Counsel had been responsible for meeting and conferring

24  with LG's counsel before Glancy joined the case, and continued in this role but with assistance from

25  Glancy's associate, who took primary responsibility for reviewing the evidence produced by LG and

26  

27  [5] In addition to the $60,000 assessment Milberg paid to the Litigation Fund, and the other high level
    work its attorneys performed (*see* ECF No. 4073, Ex.12), Milberg provided the document review
28  database for the case and deferred all payments for hosting and administering the database until the
    end of the case.  This expense amounted to $555,766.

1    directing the LG document review team.  Glancy's associate helped prepare for LG depositions but it

2    was Lauren Capurro who took the Rule 30(b)(6) depositions of LG for IPPs,[6] and Vogl Meredith

3    who took the merits depositions.  And because LG settled relatively early, it did not file any

4    summary judgment motions against IPPs and very little trial preparation was required for LG.

5    Glancy's associate remained involved in developing LG evidence, particularly as it related to LPD,

6    and also assisted with Philips discovery, summary judgment motions and trial preparations.  But

7    many other more senior lawyers were heavily involved in the case against Philips/LPD—including

8    Lead Counsel and several DAP lawyers—so Glancy's role was limited and in stark contrast to that

9    of the firms in the tier above Glancy.

10          22.     On several occasions during the pendency of this case—long before the settlements

11   were reached and Cooper filed his objections—Cooper was involved in repeated efforts to

12   undermine IPP Counsel's efforts and worked at cross purposes to them.  The efforts unquestionably

13   had a serious, negative effect on the settlement negotiations.

14          23.     For example, beginning in 2012, along with Scarpulla, Cooper involved himself in

15   the dispute with Philips over its settlement with the California AG..  This was wholly unnecessary

16   because Lead Counsel had assigned a senior partner from Milberg LLP, Paul Novak, who is a former

17   Assistant Attorney General of Michigan, to work with the California Attorney General's office and

18   resolve the dispute.  Cooper and Scarpulla even went so far as to formulate a settlement demand on

19   Philips in mid-2013, which they had no authority to do, and which was far below what Lead Counsel

20   would ever have accepted from Philips.  In fact, their proposed settlement with Philips was even less

21   than the early settlement with LG that Scarpulla now disingenuously criticizes.[7]

22          24.     In an effort to convince Lead Counsel to agree to the extremely low settlement with

23   Philips, John Bogdanov of Cooper's office argued in an email dated April 30, 2013 that Philips

24   would win summary judgment because IPPs would be unable to pierce the corporate veil and hold

25   Philips responsible for the conduct of its joint venture, LPD.  But as Lauren Capurro of my office

26

27   _____

[6] The DPPs first chaired these depositions and Ms. Capurro was second chair.

28   [7] Philips is widely accepted to be a more culpable defendant than LG given its conspiratorial activities here in the United States, and should always have paid more than LG.

DECL. OF MARIO N. ALIOTO ISO LEAD COUNSEL'S OMNIBUS RESPONSE TO OBJECTIONS TO PROPOSED
ALLOCATION OF AGGREGATE FEE AWARD - Master File No. CV-07-5944-JST

pointed out in an email dated May 2, 2013, Philips would need to show that it properly withdrew from the conspiracy as a matter of law *before* the Court would ever have to address the question of vicarious liability, and the evidence against Philips in this regard was very strong.  Our analysis of Philips has since been borne out.  *See* ECF No. 4786 (summary judgment order finding that Royal Philips (the parent company) continued to participate in the CRT business after the formation of LPD). If I had followed Cooper and Scarpulla's advice, the total settlements would have been less.

25.     Cooper and Scarpulla again inserted themselves into the case and worked at cross purposes to Lead Counsel when they contacted Judge Walker at some point in 2014 to complain about Lead Counsel's handling of the case. More specifically, Lead Counsel believes that they accused him of being uncooperative with the California AG, and of overvaluing the case and being unrealistic regarding settlement prospects.  This belief is based upon statements to this effect made by Scarpulla and Emilio Varanini of the California AG's office at a meeting with Judge Walker in August 2014.

26.     As a result of Cooper and Scarpulla "present[ing] themselves" to Special Master Walker and misleading him regarding Lead Counsel's handling of the case, Walker recommended to the Court that they be appointed as co-lead counsel in charge of settlement.  (ECF No. 3200 at 5.) This recommendation was never adopted by the Court. (ECF No. 3376.)  But it nevertheless made settling with the Defendants much more difficult.[8]  The Order also caused Lead Counsel and other IPP counsel to divert time and resources to collateral matters at a crucial point in the case.  IPPs were within two months of trial (scheduled to begin on March 6, 2015), and were dealing with briefing summary judgment and an extremely compressed pretrial schedule.  (*See* ECF No. 2459 (scheduling order pursuant to which IPPs had to provide their trial exhibit list, deposition designations, witness list and objections to translations to Defendants by December 5, 2014, respond to eleven motions for summary judgment by December 23, 2014, exchange proposed jury instructions and special verdict

---

[8] Lead Counsel would like to provide the Special Master with specific examples of how and why Cooper and Scarpulla's actions made settling this case more difficult.  But it is not appropriate that this information be put on the public record.  Therefore, Lead Counsel requests the Special Master's permission to provide this information *in camera* with notice to Cooper and Scarpulla.

7

forms by January 9, 2015, and file motions in limine and other non-dispositive pretrial motions by January 23, 2015, among other things.)

27.     During a telephone call in early January 2015, Cooper and Scarpulla informed me that Samsung SDI would pay no more than $50 million to settle the IPP case, and advised that Lead Counsel accept that amount.  Less than three weeks later, Samsung SDI agreed to pay $225 million to IPPs.

28.     Cooper did not produce his time records which would show the full extent of his unauthorized activities.  But Scarpulla's time records show that he and Cooper were not only meeting with the California AG and Special Master Walker regarding settlement, they were also in contact with the Defendants.  Scarpulla's declaration in support of his objection also confirms this. In light of their statements that Lead Counsel was overvaluing the case, and that Samsung SDI would pay no more than $50 million, Lead Counsel suspects that Cooper and Scarpulla were discussing settling the case with these Defendants for much less than Lead Counsel was demanding from them.  Cooper and Scarpulla were likely also informing the Defendants of their plans to get appointed as co-lead counsel.

29.     I can provide specific examples in support of my belief that Cooper and Scarpulla were undermining his negotiations with Defendants, but it is not appropriate to put in the public record.

30.     Cooper's and Scarpulla's actions adversely impacted Lead Counsel's ability to negotiate the settlements with Defendants.  For example, during Lead Counsel's settlement discussions with certain defense counsel, they indicated that if they could not get a deal done with Lead Counsel, they would do it with someone else.  They also questioned Lead Counsel's authority to get the settlement finally approved.

31.     Before filing the motion for preliminary approval of the Proposed Settlements, Lauren Capurro sent John Bogdanov of Cooper's office, along with other counsel for the other Court-appointed class representatives, copies of the final preliminary approval papers and asked that they review them with their clients and contact Lead Counsel to discuss any issues they might have. The papers in support of preliminary approval clearly explained the settlement terms, the notice

program, and the fact that class members in non-repealer states would not receive any money under the proposed plan of distribution. (*See* ECF No. 3861.)  Neither Cooper nor Bogdanov ever responded, implicitly approving the settlement class definitions, the notice program, and the plan of distribution.

32.     Even after the papers were filed on May 29, 2015, Cooper never voiced any concerns to Lead Counsel.  He clearly read the preliminary approval papers because he and Scarpulla filed "conditional objections" to the Proposed Settlements and the motion for preliminary approval. (ECF Nos. 3874 & 3880.)  But these conditional objections focused solely on the allocation of the fee award by Lead Counsel.  They raised none of the objections they later raised regarding the settlement class definition, the notice program or the plan of distribution. (*Id.*)

33.     Indeed, Cooper never voiced any of his concerns until the week before formal objections to the settlements were due. By that time, the notice program had already been completed and over $1.5 million of the Class's money had been spent on informing Class members of the terms of the settlement and the plan of distribution.

34.     The work done by Cooper's office in this case was done almost exclusively by John Bogdanov.  During the pendency of this case, Bogdanov was a mid-to-senior level associate who specializes in document review.  He took no depositions and drafted no briefs.  He had no involvement in litigation or trial strategy.  His role was limited to being a leader of the Philips document review team, and providing assistance to Lead Counsel and others who were performing higher level tasks such as taking depositions, drafting important briefs and running the case.

35.     Bogdanov joined the case in June 2010—2 ½ years after the case began—to assist with the negotiations with Defendants regarding their responses to IPPs' discovery requests.  He was assigned to Philips.  But unlike some of the other firms assigned to assist with the offensive discovery effort against a particular defendant, Bogdanov was unable to handle the meet and confers without substantial assistance from Lead Counsel.  For the most part, Bogdanov had a good understanding of the evidence, but I am informed and believe that Ms. Capurro often had to draft the meet and confer letters to Philips or heavily edit Bogdanov's drafts.  Ms. Capurro also ended up having to take over the negotiation of certain issues entirely because they had been dragging on for

1    so long.  While Ms. Capurro was involved in the meet and confers with all Defendants, she was

2    required to play a much bigger role with Philips.

3        36.    With regard to depositions, Ms. Capurro worked with the expert economists to

4    prepare a template for all of the Rule 30(b)(6) depositions.  Bogdanov declined to take the Philips

5    Rule 30(b)(6) deposition, requiring us to assign another attorney and bring them up-to-speed.  The

6    same thing happened with the merits depositions of Philips witnesses.  Bogdanov declined to take

7    any of the depositions so Lead Counsel had to bring in another, more experienced attorney to take

8    them.  This meant that much of Bogdanov's work on reviewing the Philips evidence had to be

9    duplicated.  Moreover, this situation was in stark contrast to other firms that were assigned to

10   manage a particular defendant's discovery, such as Andrus Anderson and Bramson Plutzik, which

11   took all of the Rule 30(b)(6) and merits depositions for their Defendants.

12       37.    The same situation occurred with regard to all of the briefing relating to Philips.

13   When IPPs sought to add two Philips entities as defendants in early 2014, it was Ms. Capurro and

14   Sylvie Kern who handled the meet and confers with Philips' counsel and briefed Philips' motion to

15   dismiss for lack of personal jurisdiction, which turned out to be more like a summary judgment

16   motion.  (*See* ECF Nos. 2536-2538, and 2575.)  Similarly, at summary judgment, while Lead

17   Counsel did ask Bogdanov for his input regarding Philips' motions, Bogdanov did not draft any of

18   the opposition briefs.

19       38.    Tracy Kirkham was involved in the negotiations of the ESI Protocol but several other

20   very knowledgeable attorneys were also involved, including Zelle Hofmann's head of electronic

21   discovery and several DPP attorneys.  Kirkham didn't draft the protocol; she provided edits.  The

22   negotiation of the protocol lasted for a mere four months in an eight year case.  Kirkham did no other

23   substantive work in the case.

24       39.    Kirby didn't join the *CRT* case until late 2010, and didn't receive an assignment until

25   late April 2011—*three and a half years* after Lead Counsel initiated the case in December 2007,

26   after the settlement and proffer by Chunghwa Picture Tubes, Ltd., after 11 joint and separate motions

27   to dismiss had been largely denied, and discovery was well underway.

28

DECL. OF MARIO N. ALIOTO ISO LEAD COUNSEL'S OMNIBUS RESPONSE TO OBJECTIONS TO PROPOSED
ALLOCATION OF AGGREGATE FEE AWARD - Master File No. CV-07-5944-JST

40.     In those three and a half years before Kirby joined the case, Lead Counsel's firm had been "quarterbacking" the entire case and performed the following work:

- Conducted an initial investigation of the case to develop facts and theories of liability that formed the basis of the allegations against Defendants;

- Researched and filed three complaints on behalf of 14 named plaintiffs representing 14 states;

- Prepared a questionnaire for the class representatives designed to vet them and ensure they could properly represent their respective states;

- Coordinated with counsel for the class representatives to prepare and serve Initial Disclosures;

- Drafted and served the first set of discovery requests on Defendants;

- Engaged in extensive negotiations with the Department of Justice ("DOJ"), the DPPs and the Defendants, and worked out a Stipulated Order that provided for a limited stay of merits discovery (Dkt. No. 379);

- Successfully moved for an Order authorizing IPPs to serve certain foreign defendants through service of the Summons and Complaint on their U.S. subsidiary, related entity or U.S. counsel, as permitted by Fed. R. Civ. Pro. 4(f)(3).  This saved the Class the delay and expense associated with formally serving multiple foreign defendants all over the world;

- Interviewed several expert economists and retained Dr. Janet Netz, Ph.D;

- Compiled a team of IPP lawyers and worked with Dr. Netz's economists to subpoena and negotiate the productions of documents and data from over 50 third-party retailers, distributors and CRT television and monitor manufacturers—information critical to proving pass-through of the overcharge on a class-wide basis.  TATP handled the subpoena negotiations with 10 third parties and oversaw the others;

- Further investigated the CRT industry and researched multiple actual and potential defendants, both domestic and foreign, many of which were defunct;

- Negotiated a settlement with defendant Chunghwa Picture Tubes, Ltd. and attended multiple oral proffers with Chunghwa's counsel;

- Researched, pled and filed a comprehensive, 90-page consolidated amended complaint ("CAC") in March 2009 detailing Defendants' violations of the antitrust and unfair competition laws of 21 states and the District of Columbia;

- Drafted the majority of IPPs' 150-page omnibus brief in opposition to Defendants' one joint and nine separate motions to dismiss the CAC, as well as IPPs' responses to Defendants' objections to the Special Master's Report & Recommendation, and argued the motions before the Special Master and the Court;

- Drafted IPPs' opposition to Defendants' request for permission to file an interlocutory appeal pursuant to 28 U.S.C. §1292(b);

- Drafted and filed IPPs' Second CAC in May 2010, and took the lead on briefing and arguing the second round of motions to dismiss;

- Drafted and propounded IPPs' second set of discovery requests in May 2010;

- Organized and oversaw IPP Counsel's negotiations with Defendants regarding their discovery responses, which began in June 2010 and continued until early 2012, and coordinated these efforts with the DPPs. Lead Counsel led the negotiations with LG and was involved in the negotiations with all Defendants, including drafting meet and confer letters, and drafting and arguing multiple motions to compel;

- Travelled to the Netherlands in October 2010 to review documents gathered by Defendants LG and Philips as part of their due diligence prior to forming LPD;

- Met and consulted with Dutch counsel in the Netherlands to seek assistance with obtaining relevant documents and data from the Dutch bankruptcy trustee of LPD;

- Coordinated with DPP counsel to collect documents and data from LPD's U.S. bankruptcy trustee, and organized a team of IPP lawyers to travel to several warehouses to review those documents;

- Collected and inventoried Defendants' initial document productions and organized an initial inventory and review of those documents;

- Attended multiple Case Management Conferences before Special Master Legge and argued on behalf of IPPs;

- Briefed and argued Defendants' motions to compel production of the Chunghwa translations, and their motion to compel responses to contention discovery regarding CRT finished products;

- Drafted IPPs' responses to Defendants' contention discovery regarding CRT finished products, as well as organizing and supervising the review of Defendants' documents for evidence in support of the CRT finished product allegations, and selecting the evidence to use in the responses;

- Drafted and filed IPPs' Third CAC in January 2011; and

- Directed and supervised the search and production of documents from class representatives, edited class representative discovery responses (the preparation of which was initially assigned to Lovell Stewart Halebian LLP and were served in early April 2011), and met and conferred with defense counsel regarding the responses.

41.   My firm has had two very senior partners and a senior associate/junior partner working on the case since its inception.  Kirby assigned only one mid-level partner to this case: Robert Gralewski.  Mr. Gralewski did all of the higher level work assigned to Kirby.  All of the other Kirby attorneys who worked on this case were junior-mid level associates that primarily did varying levels of document review and some deposition/trial preparation.  Mr. Gralewski's lodestar accounts for less than 39% of Kirby's lodestar.  In other words, over 60% of Kirby's very large lodestar is

1   made up of lower level work.[9]  Whereas, almost 80% of Lead Counsel's firm lodestar is made up of

2   three senior attorneys who were running the case and doing very high level work.

3        42.     Kirby not only joined the case late, its initial assignments were not very demanding.

4   For example, Kirby's first assignment in late April 2011 was to participate in negotiations with the

5   Defendants—along with Lead Counsel and DPP counsel—regarding the production of LCD

6   documents in the *CRT* case.

7        43.     Kirby's next assignment (beginning in July 2011) was to take over the drafting of

8   discovery responses for certain class representatives that had been added to the Third CAC, and

9   coordinate with local counsel to produce documents responsive to Defendants' document requests.

10   In its objection, Kirby claims that Lead Counsel "selected KM to be in charge of the entire defensive

11   discovery aspect of the case."  (Kirby Obj. at 6.)  This is quite an overstatement since a lot of this

12   work was already done before Kirby got involved in the case.  Most of the class representatives had

13   already produced their documents and provided written responses to Defendants' discovery requests

14   in April 2011.  And because written discovery responses had already been prepared, Kirby's job was

15   simply to plug the information in for the new class representatives.

16        44.     Moreover, Lead Counsel continued to be heavily involved in class representative

17   discovery.  For example, Lead Counsel led the meet and confer efforts with Defendants regarding

18   the discovery responses in late 2011/early 2012, and Lead Counsel drafted the responses to

19   supplemental discovery requests regarding evidence of fraudulent concealment and selected the

20   evidence to use therein.  And while it is true that Kirby defended the majority of class representative

21   depositions in early-mid 2012, Lead Counsel and other IPP lawyers were heavily involved in

22   preparing the class representatives, working with local counsel and attended many of the

23   depositions.

24        45.     Kirby's next assignment related to the document review, which began in earnest in

25   November 2011.  Mr. Gralewski was assigned to be co-team leader of the FTAIA team, another

---

27   [9] Lead Counsel cross-checked the reasonableness of the proposed 2.1 multiplier for Kirby by giving
Mr. Gralewski's lodestar (4709 hours x $775 = $3,649,475) a 2.6 multiplier, which equals

28   $9,488,635.  That means that the firm's remaining lodestar of $5,654,006 ($9,303,481 minus
$3,649,475) is receiving a multiplier of 1.775 ($19,524,658.25 (Kirby's total payout) minus
$9,488,635 (Gralewski's lodestar) equals $10,036,023.20) which is more than generous.

attorney was assigned to the foreign language team under the direction of Straus & Boies, and another attorney was a member of the FTAIA team.  Kirby claims that Lead Counsel "relied on KM . . . for assistance with establishing review protocols and procedures to be used throughout the case." (Kirby Obj. at 4.)  Any assistance from Kirby in this regard must have been very minor because Lead Counsel has no memory of it and can find no evidence of it.

46.     Lead Counsel worked with Milberg, Zelle Hofmann and Straus & Boies to set up the document review, assign the teams, draft the Coding Manual and establish review protocols.  Lead Counsel and other firms who had been working on Defendant discovery drafted numerous memoranda regarding the CRT industry, the Defendants and the legal issues in the case to bring the new lawyers entering the case—like Kirby—up to speed.  And it was Lead Counsel who "quarterbacked" the entire document review for all issues and all Defendants.  Kirby had no involvement in any of this higher level work.

47.     Kirby's Japanese-speaking document reviewers did not lead anything, and were "in charge" of nothing and no one.  They were good quality and reliable.  But their role was limited to reviewing and translating documents, assisting Straus & Boies with translation objections, and acting as check translators at some depositions.  It was Straus & Boies that managed the entire foreign language review team, including the Japanese-speaking contingent, and would make assignments, select the best documents for depositions and briefs, identify translation issues and identify problematic translation objections by Defendants.

48.     Beginning in early-mid 2012, my office spearheaded IPPs' Rule 30(b)(6) depositions in order to collect evidence for class certification.  Lead Counsel worked with the experts to prepare the deposition outline, met and conferred with the Defendants, coordinated with the DPPs, and oversaw the IPP lawyers taking the depositions.  Lead Counsel also took the Samsung SDI and LG Rule 30(b)(6) depositions for IPPs and assisted in preparing for, and attended, all of the others. Kirby had no involvement in the Rule 30(b)(6) depositions, which were a critical part of the preparation for class certification.  Both Sylvie Kern and Straus & Boies were involved in taking Rule 30(b)(6) depositions.

49.    During this same time period, my office was also leading the effort to gather documentary evidence and data for class certification, as well as drafting the motion for class certification.  Zelle Hofmann and Straus & Boies were also heavily involved in this.  Lead Counsel mined the work done by the document review teams, selected the documentary and testimonial evidence for inclusion in the motion (a total of 150 exhibits), and then drafted the factual sections of the brief.  Zelle Hofmann drafted the legal sections, which Lead Counsel reviewed and edited. Along with Zelle, Lead Counsel also worked closely with Dr. Netz on her opening and reply declarations, defended her depositions, and worked closely with Zelle to draft the reply brief, and all subsequent briefs. Kirby's role at class certification was limited to providing factual information about the class representatives' CRT product purchases, and any testimony relevant to adequacy or ascertainability.

50.    Straus & Boies led the Samsung SDI discovery effort beginning in June 2010.  Kirby did not get involved with Samsung SDI until March 2013, when Mr. Gralewski volunteered to travel to Korea for two Samsung SDI depositions along with two other IPP attorneys who took these depositions.[10]  Moreover, while Mr. Gralewski did question eight Samsung SDI witness on behalf of IPPs and did a very good job, the Samsung SDI depositions were very much a team effort, with Straus & Boies, Lead Counsel and the DPPs all involved in selecting deposition exhibits, translating them and preparing the deposition outline.  In fact, the DPPs led the questioning of the first four Samsung SDI witnesses that Mr. Gralewski took as second chair.

51.    I decided to monitor Defendants' depositions of certain DAPs for potentially negative testimony relating to pass-through of the overcharge.  Kirby's assignment was to attend certain depositions—often telephonically—and simply listen, and possibly question if necessary.

52.    IPPs' expert economists demonstrated pass-through using the data provided by the Defendants and third parties.  As the Special Master recognized in his order on class certification, such anecdotal, self-serving testimony is insufficient to overcome the weight of that evidence.

---

[10] Part of the reason for Mr. Gralewski getting involved at this time was that the Straus & Boies attorney who was in charge of the SDI discovery had travelled to Taiwan in February 2013 to depose three important Chunghwa witnesses.

53.     With regard to summary judgment and trial preparation, while Kirby was certainly involved in many of the tasks necessary for summary judgment and trial and did good work, it again overstates its role.  Kirby drafted *none* of the summary judgment oppositions.  Indeed, Kirby drafted none of the important briefs in this case.[11]  Lead Counsel, together with Sylvie Kern, drafted most of the important briefs in this case.  Straus & Boies drafted or assisted in drafting the oppositions to two summary judgment motions.  Straus & Boies also handled all of the translation objections—as massive task—and took a lead role in preparing trial exhibits.

54.     Kirby claims to have prepared many of the "best evidence memoranda" for multiple Defendants, but at least with regard to the Samsung SDI and Toshiba memoranda, this work was very much a team effort and/or was done primarily by other firms.  Kirby was involved in briefing only one motion *in limine* out of 64.  Kirby's involvement in the motion to decertify the class was limited to assisting with gathering evidence; Lead Counsel was drafting the opposition brief when the case settled.  All of other work that Kirby describes (ranking trial exhibits, deposition designations etc.) was also done by many other firms, and all of it was directed by Lead Counsel.

55.     As for the mock trials, Kirby did not have "overall responsibility for all Plaintiff-related aspects of IPPs' mock jury exercise." (Kirby Obj. at 4.)  Kirby was part of team that included Dennis Stewart, one of the lead trial lawyers, which was responsible for class representative witnesses. Dennis Stewart and Joe Goldberg, the other lead trial lawyer, gave the plaintiffs' presentation at the mock jury, and Matthew Duncan of Fine Kaplan & Black and Lead Counsel gave the defense presentation.  Kirby did not present any argument at the mock trials.

56.     It was Lead Counsel who negotiated all of the settlements in this case, including the Samsung SDI settlement (after a two-day mediation).  Lead Counsel also drafted all of the mediation briefs with assistance from Sylvie Kern.  It was Lead Counsel that briefed the motion for preliminary approval of the settlements; worked with notice/claims administrator on the notice program with assistance from Straus & Boies; led the Audit Committee, which also included Sylvie Kern and

---

[11] Kirby claims to have briefed a motion to amend the complaint in 2012, but this brief had to be heavily edited by Lead Counsel before filing.  The post-settlement briefing Kirby claims responsibility for related almost exclusively to objector discovery, and again, Lead Counsel and Sylvie Kern often had to heavily edit these briefs before filing.

1    Straus & Boies; briefed large portions of the motion for final approval and the objections thereto

2    along with Sylvie Kern and Fine Kaplan; briefed the motion for attorneys' fees along with Sylvie

3    Kern and Fine Kaplan; briefed the Chunghwa settlement issues along with Fine Kaplan, and worked

4    with the notice/claims administrator to devise a new notice plan; argued the motions for settlement

5    approval and fees at hearings before the Special Master and the Court; and is now handling the

6    twelve appeals that have been filed.  Kirby's assignment was limited to objector discovery which

7    was important, but not as important or demanding as the work done by Lead Counsel and the other

8    firms listed herein.  Lead Counsel's post-settlement lodestar is far in excess of the post-settlement

9    lodestar incurred by Kirby.

10       57.    As reflected in the detailed description of the work done in the previous section, I

11   judged the Kirby's overall contribution to the case to be slightly less than that of Straus & Boies and

12   Sylvie Kern, such that a slightly lower multiplier is warranted.

13       58.    Straus & Boies joined the case in June 2010 and handled discovery (including meet

14   and confers) with defendant Samsung SDI; assisted Lead Counsel with setting up and managing the

15   document review and overseeing deposition preparations; prepared for Samsung SDI depositions (a

16   Straus & Boies associate who speaks Korean was invaluable to this team); led the foreign language

17   document review team; brought specialized knowledge of issues relating to certified translations

18   from *LCD*, which it used to negotiate hundreds of translation objections with Defendants; prepared a

19   comprehensive grid listing all conspiratorial meetings[12]; drafted the opposition to Defendants'

20   motion for summary judgment for lack of antitrust standing, and assisted with the opposition to one

21   of the Hitachi motions; and took a lead role in the preparation of IPPs' trial exhibit list and otherwise

22   preparing for trial.

23       59.    Sylvie Kern also began work in this case in mid-2010.  She had a major role in the

24   preparation of almost all briefings on behalf of IPPs (such as oppositions to motions to dismiss,

25   summary judgment motions and settlement approval); participated in settlement negotiations and

26   overall settlement strategy, and conferred with Lead Counsel on often a daily basis; had primary

27   _____

28   [12] A Kirby associate worked on updating and completing this grid towards the end of the case (Kirby Obj. at 3), but the lion share of the work had already been done by Straus & Boies.

DECL. OF MARIO N. ALIOTO ISO LEAD COUNSEL'S OMNIBUS RESPONSE TO OBJECTIONS TO PROPOSED
ALLOCATION OF AGGREGATE FEE AWARD - Master File No. CV-07-5944-JST

1  responsibility for handling issues regarding the Philips/ California AG settlement; co-led the

2  document review teams on Impact and Hitachi; and assisted in deposition and trial preparation

3  (including identifying trial exhibits and designating deposition testimony).

4       60.    While the work performed by Kirby relative to Lead Counsel and other top tier firms

5  (as described above) was Lead Counsel's primary consideration in recommending a slightly lower

6  multiplier than other top tier firms, as Kirby indicates, Lead Counsel also considered some issues

7  relating to Kirby's rates.

8       61.    First, Kirby's two Japanese-speaking attorneys' rates are very high when compared to

9  other attorneys doing similar work.  For example, Shinae Kim-Helms, a Korean-speaking attorney

10  from Straus & Boies who played a much greater role in the case overall than either of Kirby's

11  attorneys, is billed at a current rate of $425.  Both of Kirby's Japanese-speaking attorneys are billed

12  at $575.  This rate is also higher than any other attorneys involved in higher level document review.

13  While these rates may fall within the range of reasonable, Lead Counsel felt that in the context of the

14  fee allocation, a slight downward adjustment to Kirby's multiplier was necessary to equalize billing

15  rates among attorneys doing similar work.

16       62.    Second, and in a similar vein, Mr. Gralewski's current rate of $775 is high when

17  compared to that of Ms. Capurro ($580), Sylvie Kern ($700) and Nathan Cihlar of Straus & Boies

18  ($550), all of whom were performing similar-level work.

19       63.    Finally, as the Special Master is aware, Lead Counsel capped the rates of document

20  reviewers at $350 (English) and $400 (foreign-language).   Kirby had two English-speaking

21  document reviewers who were subject to this cap.[13]  But Kirby often categorized their work as

22  "Deposition Preparation," which allowed for a higher hourly rate.  Lead Counsel took this into

23  account in arriving at Kirby's multiplier.

24       64.    None of these issues with Kirby's rates made a big difference to their lodestar and

25  therefore the downward adjustment to their multiplier was small but necessary to be fair to other

26  firms.

27

28

---

[13] William Harris and Karina Korsharsky.

DECL. OF MARIO N. ALIOTO ISO LEAD COUNSEL'S OMNIBUS RESPONSE TO OBJECTIONS TO PROPOSED
ALLOCATION OF AGGREGATE FEE AWARD - Master File No. CV-07-5944-JST

65. Mr. Gralewski expressed an eagerness to travel, and volunteered himself for assignments involving travel.

66. McCallum Methvin & Terrell LLP ("Methvin") did not draft either the underlying complaint for his client, or the Consolidated Amended Complaint. Lead Counsel did that. Methvin was merely responsible for reviewing the allegations with his client before filing. Similarly, Methvin did not draft his client's discovery responses. He worked with his client to gather the relevant information and then reviewed the work of other firms that drafted the written discovery responses. Methvin didn't defend his client's deposition; he merely "attended." (Methvin Objection at 2.) The remainder of Methvin's work is made up of a small amount of low-level document review, meetings with co-counsel, and reviewing court filings[14] and case updates from Lead Counsel. Thus, it is absolutely fair to award a higher multiplier to the firms that actually did the work.

67. Lead Counsel did consider Methvin's $20,000 contribution to the Litigation Fund in making the proposed fee allocation. Specifically, Lead Counsel set a base multiplier of 1.2 for firms who provided a class representative and then increased the multiplier slightly for those firms who contributed to the Litigation Fund and/or did additional substantive work, such as lower level document review. That is why Methvin is receiving the highest multiplier in its tier. But again, Lead Counsel weighed contributions to the Litigation Fund against the level, quality and amount of substantive work performed. And because in most cases the amount contributed to the Litigation Fund was small, it was not sufficient to move any firm into a higher tier.

68. I never made any work assignments to Theresa Moore and never received any time records from her during the case. Nor do I have any record of Moore representing any of the named plaintiffs in the case. According to my records, all of the clients Moore claims to represent are in fact represented by other firms in the case.[15] The only contact I had with Moore during the case was

---

[14] Lead Counsel had to cut *more than half* of Methvin's lodestar for reviewing inconsequential filings such as Notices of Appearance, Pro Hac Vice Applications and Administrative Motions to Seal. In fact, Methvin's original lodestar included time spent by three attorneys—each billing at rates ranging from $425 to $500—reviewing virtually every docket entry.

[15] Moore's Declaration in support of her fee request states that she represents Margaret Slagle, Mark Pierce, Barbara Caldwell, Barry Kushner, Brian A. Luscher, Jerry Cook and Scott Friedson. (*See*

miscellaneous emails and phone calls offering unsolicited advice regarding the case.  Accordingly, I was surprised to receive Moore's declaration in early August 2015 attesting that she had incurred over $200,000 in lodestar.

69.    My office reviewed Moore's time records and, despite clear instructions to all IPP Counsel to exclude "read and review" time, unassigned time, and time incurred after May 31, 2015, Moore's lodestar included time spent on all of these categories.  In fact, Moore's time records show that the vast majority of her time was spent reading court filings, including inconsequential filings such as Pro Hac Vice Applications and orders thereon, Notices of Appearance, Motions to Relate and orders thereon, and motions to seal.[16]  She also spent a substantial amount of time discussing the case with unidentified co-counsel and conducting "research," all of which time was unassigned since Moore never received any assignments from Lead Counsel.[17]  Significantly, none of Moore's time records indicate that she was communicating with the clients she claims to represent.[18]

70.    Because Moore had no client and no work assignment, it was entirely unnecessary for her to be reviewing court filings, researching issues or conferring with co-counsel regarding the case. This time was also duplicative of the time spent by Lead Counsel and other firms that had work assignments.  Moreover, Lead Counsel never received any of the results of Moore's "research," so there was no benefit to the Class.  Lauren Capurro of my office wrote to Moore on August 17, 2015 and instructed her to remove these categories of time from her lodestar, along with time spent on lead counsel motions since that time did not benefit the Class.[19]  All of Lead Counsel's instructions were consistent with those given to all IPP Counsel, including Lead Counsel's own firm.

---

Moore Objection, Ex. A at 2.)  Moore has never presented any proof that she has an attorney-client relationship with any of these plaintiffs.

[16] Examples of this are found in Moore time entries dated 4.21.08; 6.23.08; 7.2.08; 8.25.08; 3.31.11; 3.14.12; 4.2.12; 10.9.12; 2.15.13.

[17] *See, e.g.,* Moore time entries dated 10.08.08; 11.19.08; 1.30.09; 7.23-7.31.08; 1.5.10; 2.23.10.

[18] If Moore was, as she claims, providing updates to her clients regarding the case, then she should produce copies of those communications.

[19] Moore had a substantial amount of time spent on the lead counsel motions since the Alioto Law Firm had moved for appointment as lead counsel.  (*See* ECF No. 47 at 1 (noting that the Alioto Law Firm had withdrawn its motion.).)

71.     In response to Lead Counsel's instructions, Moore removed only 20 hours from her lodestar. A comparison of Moore's original time records with her revised time records show that, for the most part, she simply deleted references to work done on the lead counsel motions, reviewing inconsequential filings (e.g. PHV applications), and "Rd" and "Rev" notations (short hand for "read" and "review"), and kept the amount of time billed the same.  Lead Counsel therefore cut the non-compensable categories of time, so that only some of Moore's time spent in 2007 and 2008 remained.  By email dated August 27, 2015, Lauren Capurro informed Moore that we would not include any other time for her in the joint petition, and if she wanted to be included, she would need to submit a revised declaration.  (*Id.*)  Moore submitted a revised declaration but it still claimed the non-compensable time.  Thus, Lead Counsel did not include her declaration in the joint fee petition, but did include her reduced lodestar.  (*See* ECF No. 4073.)  Moore never filed her own fee motion so she can recover no more than Lead Counsel has proposed for her.

72.     Just over a month later, and just over two months after Moore had congratulated Lead Counsel on a "Great job," and thanked us for our hard work,[20] Moore formally objected to the settlements on behalf of several clients.  All of Moore's objections were rejected by both the Special Master and the Court.  Moore has now filed an appeal.

73.     I did not intend to propose less than a 1.0 multiplier for the Law Office of Brian Barry ("Barry").  I intended to propose that Barry receive his full, current rate lodestar. (*See* ECF No. 4790, Ex. A (proposing a 1.0 multiplier for Barry).) It was only due to a technical error caused by Excel that I proposed to reduce everyone's multiplier pro rata in order to correct the error, which resulted in a slightly less than 1.0 multiplier to Barry.  (*See* ECF No. 4800.) Indeed, as I noted in its revised proposed allocation, if you were to round up the multipliers to two decimal places (as is common practice), the multiplier to Barry would still be 1.0.

74.     Barry pulled out of the case abruptly in December 2012 after only working on the case for 13 months, leaving us to scramble to replace its document reviewers.  This was a

---

[20] In an email to Lead Counsel dated July 29, 2015, Moore stated: "Thanks [sic] you very much, Congratulations and thank you for all your hard work over this extended period of time. Great job." Alioto Settl. Decl. II, ¶ 32, Ex. F-3.

1    particularly critical juncture in the case—IPPs had filed their class certification motion on October 1,

2    2012 and merits depositions had only just begun.  Merits discovery continued for almost another two

3    years until September 2014.  Shea was a good document reviewer who had acquired a good

4    understanding of the issues in the case, and would have been very helpful to the merits deposition

5    effort.  But all of that institutional knowledge and the many hours of training spent by Lead Counsel

6    and others were lost when Barry pulled Shea from the case with very little notice to Lead Counsel.

7         75.    In an email dated December 26, 2012, Jeff Shea wrote to Sylvie Kern stating that "my

8    boss is switching me to another case- full-time and effective immediately- so that's it for me on

9    CRT."

10        76.    According to emails received by me and others at the time, Barry lost interest in the

11   case when the IPPs did not enter into early settlements as other plaintiffs had done. Of course, this

12   was because Lead Counsel had assessed the case's value to be higher than the Defendants were

13   willing to pay at that time.  In order to "spread his risk," Brian Barry decided to cut his losses and

14   run after working on the case for only 13 months.  This is in stark contrast to the long term

15   commitment that other firms made.

16        77.    In conducting the audit of IPP Counsel's fee requests, Lead Counsel flagged the total

17   time that Shea claimed to have spent on document review (2501.8 hours) because it was very high

18   when compared to the time spent by other document reviewers during the same 13-month time

19   period.  A closer examination revealed a number of issues that suggested Shea's claimed hours were

20   inflated.

21        78.    First, Lead Counsel was not aware of Shea receiving any assignments other than

22   document review and his time records are consistent with this understanding, which means that he

23   should have been spending most of his time in the document review database.  Yet, according to

24   various database reports, the time Shea spent in the database was far less than 2501.8 hours; in fact,

25   it was almost *half* of that amount in total (approx.1300 hours vs. 2501.8 hours), and in certain

26   months was much *less* than half.  For example, in February 2012, Shea billed 197.1 hours but only

27   spent 58.08 hours in the database.  In March 2012, Shea billed 209 hours but only spent 98.41 hours

28   in the database.  While we accept that it is necessary for document reviewers to spend *some* time

1   working outside of the database, no other reviewer had such a large discrepancy between the time

2   spent in the database and the total time they claimed to have worked on the document review.[21]

3        79.    In addition, Shea consistently billed well over 8 hours a day doing document review

4   and often billed on the weekends too.  For example, in February and March 2012, Shea claims to

5   have taken only one day off in each month.  And in April, June and July 2012, he only took two days

6   off in each month.  For most of the period that Shea was reviewing documents, there was no urgency

7   that would have required him to be consistently working more than 8 hours a day plus weekends.

8   And a direct comparison of Shea's hours with other reviewers revealed that he billed *several*

9   *hundred hours more* than any other document reviewer during that same 13-month period.

10  Significantly, after reviewing Shea's time records in *LCD,* the Special Master also found that Shea

11  and other Barry reviewers "recorded an unrealistic number of hours per day." (LCD Suppl. Report at

12  10.)  The same is true here.

13       80.    By email dated August 27, 2015, Lauren Capurro informed Brian Barry of their

14  findings and initially proposed that Shea's hours be cut to 1400 hours.  But after Shea explained that

15  he spent a significant amount of time offline creating memoranda regarding the documents he

16  reviewed, and taking into consideration the good quality work Shea produced, Ms Capurro proposed

17  to allow 2000 hours for Shea and Barry agreed.  Thus, Shea's claim that Lead Counsel only allowed

18  his firm to bill for time spent while logged into the database is false.  We allowed Barry to bill for

19  *more than 600 hours* spent by Shea outside of the database.

20       81.    It appears that most of the memoranda that Lead Counsel received from Shea were

21  merely lists of good documents with a short description of the contents.  All of this information

22  could and should have been recorded in the database.  Online document review databases have

23  developed so as to allow lawyers to record their analyses of the evidence in a single, central forum,

24  which all lawyers in the case can access and use as the case progresses.  This is far superior to

25  having hundreds of miscellaneous memoranda floating around.  It is also possible to create

26  spreadsheets of important documents with descriptions of the contents from the database, such that

27  _____

28  [21] Lead Counsel and the Audit Committee did uncover discrepancies between the time spent in the
    database and the time claimed by other document reviewers.  Those document reviewers' time was
    also cut before it was included in the lodestar submitted to the Court.

creating separate memoranda outside of the database is completely unnecessary.  Moreover, by his own admission, the detailed Excel spreadsheets that Shea claims to have created no longer exist (see Objection at ¶ 13), and Lead Counsel has no record of ever receiving them.  So when Shea left the case, his knowledge and analysis of the evidence left with him and any benefit to the Class was lost.

82.   The Barry firm's lodestar includes approximately 650 hours spent by two Korean-speaking document reviewers whose work was of low quality and of very little benefit to the Class. We were forced to cut one of the reviewers who didn't understand the issues and who we suspected was using Google to translate documents.  The other reviewer quit abruptly after only working on the case for a few months, most of which time was spent training and getting up-to-speed on the case.  I not believe it is appropriate to award Barry a multiplier on the time billed by these reviewers.

83.   I do not dispute that the quality of Shea's work was good, or that he was experienced. But he was a lower level document reviewer.  He was not a leader of his document review team. There were two other more senior, partner-level attorneys who performed that role for the team to which Shea was assigned.  No other lawyers in that team were allowed to charge more than $350 per hour.[22]  The same was true of other teams.[23]  Accordingly, Shea's claims that Lead Counsel somehow "misled" his firm regarding the capped rates for lower level document reviewers is false.[24]

---

[22] The other "tier 1" members of the "Impact team" were Kevin Pearl of Frankovitch, Anekatis, Colantonio & Simon and Shadi Amundin of Green & Noblin PC.  Kevin's rate was $175 and Shadi's rate was $350.  (See ECF No. 4073, Exs. 28 and 8, respectively.)

[23] For example, the "tier 1" members of the "Pricing team," which later became the LG team, were Angela Bongiorno of Milberg LLP and Shanti Michaels of Janssen Malloy LLP.  Angela's rate was $325 and Shanti's rate was $300 (See ECF No. 4073, Exs. 12 and 25, respectively.)  The "tier 1" members of the "Conspiracy team" were Brandon Islieb of the Law Office of Sherman Kassof and Jackson Bingham of Morrison Sund.  Brandon's rate was $350 and Jackson's rate was $350.  (See id., Exs. 14 and 26, respectively.)  And Lead Counsel's foreign language reviewers were all billed at or below the $400 cap.  (See id., Ex. 1.)

[24] Shea doesn't give any specific examples of who he is referring to when he claims that attorneys who performed lower level document review are being billed at over $500 per hour.  But in some cases, attorneys whose rate was initially capped at $350 for document review were allowed to bill at their normal rate for later work that was higher level and was categorized as Deposition Preparation or Trial Preparation.  For example, two of Kirby McInerney's attorneys (Will Harris and Karina Kosharskyy) billed their document review time at $350 and time spent on other tasks at their normal rate. (See ECF No. 4073, Ex. 2.)  Natalie Kabaskalian of Goldman Scarlato Karon & Penny LLC (and later Karon LLC) was likewise capped at $350 for her lower level document review work early in the case.  (See id., Ex. 15.)  But Natalie progressed to become a leader of the Toshiba team and was involved in selecting documents for depositions, drafting memoranda regarding Toshiba evidence, and selecting Toshiba trial exhibits.  She was therefore allowed to bill this time at a higher rate. (See ECF No. 4073, Ex. 27.)

84.     The leaders of Shea's team were charged with directing the team, holding conference calls, conducting a second-level of review of the documents coded by "tier 1" reviewers, selecting documents for depositions, and preparing detailed, several hundred-page memoranda regarding the "impact" or injury to class members.  While Shea clearly understood the issues and had a good technical understanding of the document review database such that his team leaders complimented him and looked to him on some occasions to assist with searching, he did not perform any of the higher level tasks that were charged to the team leaders.  And while Shea was involved to some degree in reviewing and coding documents that were ultimately used for depositions, he did not perform the higher level of review involved in selecting documents for use at depositions, or helping to prepare the deposition outline.  He merely reviewed and coded his batches, produced lists of hot documents with some analysis, and found some good documents—this is what lower level document reviewers are supposed to do.

85.     Sylvie Kern, Brian Umpierre, Qianwei Fu, and Demetrius Lambrinos were all team leaders whose time spent on document review involved the higher-level tasks outlined above.  And Lauren Capurro designed and oversaw the entire document review effort, including working with Milberg to set up the database and design the work flow; preparing memoranda regarding the Defendants and the issues to educate the new document reviewers (like Shea) regarding the case;[25] preparing the coding manual; assigning the teams; training reviewers and monitoring their progress; reviewing the memoranda produced by the team leaders; and selecting documents for use in depositions and in briefs.  (*See* ECF No. 4071-1, ¶ 39-42).)

86.     David Denison was at all times during the case admitted to practice and in active status in Iowa.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 16th day of September, 2016.

*/s/ Mario N. Alioto*

---

[25] By the time Shea and the other document reviewers joined the case in November 2011, Lauren Capurro had been working on the *CRT* case almost full time since mid-2008—more than three years.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28