# EXHIBIT 1

1    Martin Quinn
2    JAMS
     Two EmbarcaderoCenter, Suite 1500
3    San Francisco, CA94111
     Telephone: (415) 982-5267
4    Fax: (415) 982-5287

5    SPECIAL MASTER

6

7

8                    UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA
9
                      SAN FRANCISCO DIVISION
10

11

12   IN RE: TFT-LCD (FLAT PANEL)          CASE NO. M: 07-cv-01827-si
     ANTITRUST  LITIGATION
13
                                          SUPPLEMENTAL REPORT AND
14                                        RECOMMENDATION OF SPECIAL
                                          MASTER RE ALLOCATION OF
15                                        ATTORNEYS' FEES IN THE
                                          INDIRECT-PURCHASER CLASS
16                                        ACTION

17   This Order Relates to:

18   INDIRECT-PURCHASER CLASS ACTION

19

20

21

22

23       On November 9, 2012, I issued a Report and Recommendation [Dkt. No. 7127] that,

24   among other recommendations, proposed a plan to allocate about $308 million in attorneys' fees

     among the 116 law firms that represented the IPP Class.  Fifteen law firms have submitted
25
     objections to my Report with respect only to the proposed allocation of fees.  This Supplemental
26
     Report accomplishes two tasks:  it rules on the fifteen objections, providing as to each firm a
27
     rationale for the amount of fees that I recommend allocating to it; and it makes other revisions to
28
     the proposed allocation based on new information and perspectives provided to me during the

                                                                                              1

objection process. Accordingly, I have not simply ruled on the objections, but have taken a second comprehensive look at the entire allocation plan in an effort to improve its fairness and consistency.

I interviewed each of the objecting firms, mostly in person and a couple by telephone. I received and considered additional declarations, documents and analyses from them. I conducted evidentiary hearings into the existence, terms and fairness of two alleged fee-splitting agreements.

## **Principles Applied**

First, I determined that in dealing with the fifteen objections I would not recommend a material increase in the total amount of attorneys' fees to be awarded to Class Counsel. My recommendation to award 28.5% of the settlement fund as attorneys' fees was, I believe, correct. Therefore, the original recommended total fee award was $308,226,250; the revised recommended total award is $308,225,250. The fact that fifteen firms are unhappy with the amounts allocated to them is no reason to increase the total amount of fees to be subtracted from the class settlement fund. Therefore, to the extent that I recommended an increase in any firm's allocation, I was obliged to rob Peter to pay Paul in order to find the funds.

Second, despite the objection by a couple of firms – notably the Alioto Law Firm – to the use of lodestars and multipliers as the basic tool for making the allocation, I believe that is the best available objective measure of both the effort each firm put into the case and the contribution of each firm to the final result. The Alioto Firm's Objection [Dkt. No. 7205] states that, "the Special Master abandoned the proper, accepted, fair and reasonable percentage method and reverted instead to the unfair and unreasonable and repudiated lodestar method. In addition, he applies a multiplication (the multiplier) to the various lodestars, which "multiplier" also is discriminatory and unfair...." (Alioto Objection, 5:13-18) As an alternative, the Alioto Firm says that I should have "recommended an equal percentage distribution to the Co-Lead Counsel and a serious examination of the recommended percentages to the other counsel." (Id., 5-23-25) There are two flaws with this complaint. First, the rationale and case law cited for using the

"percentage-of-the-fund" approach apply to the setting of a <u>total fee</u> – and I relied precisely on that methodology to set the 28.5% total fee. That rationale and case law does not apply at all to allocating a total fee among participating firms. Second, the Alioto firm does not suggest how I would conduct a "serious examination" of the percentage to be awarded each firm without (1) looking at what the firm did (i.e., hours, billing rates), and (2) using the various factors mentioned in my Report (i.e., complexity of work, contribution to litigation fund, efficiency of work and accuracy of billing, collaborative and professional behavior) to measure the degree to which the firm contributed to the overall effort. The lodestar captures the <u>amount</u> of work; the multiplier captures, albeit imperfectly and subjectively, the <u>quality</u> of the work and contribution to the result.

Third, I did not give sufficient weight in my original allocation to the amount and timing of each law firm's contribution to the litigation fund. Some of my allocations awarded inappropriately high multipliers to firms that contributed little or nothing to the fund, or made their contributions late in the game and were thus not exposed to the risk of losing their investments. This Supplemental Report makes some downward adjustments of allocations for the non-payors and late payors, and increases the allocation of other firms that had been under-rewarded for making early, significant investments.

Fourth, for firms that engaged principally in document review my original allocation lowered their billing rates for that work to about $350/hr. and valued the contribution of document review to the overall result less highly than the more complex work of writing motion papers, taking depositions, conducting settlement negotiations and preparing for trial. What I did not adequately appreciate is that varying levels of document review took place. There was the basic coding of the millions of documents obtained from defendants and third parties into a data base, and performing an initial review for relevance. This work had to be done, and done right, since it was the foundation for gathering evidence to prove the IPP case. But some firms engaged in more sophisticated, nuanced document review by selecting documents as deposition exhibits or as evidentiary support for important motions, providing foreign language reviewers, and writing evidentiary memos for depositions. For this latter type of work, I think higher billing

rates are appropriate. I also now weight that kind of review more heavily in assessing what each firm contributed to the ultimate result.

Fifth, I realized that it was inappropriate to reduce every firm's lodestar by 20%, although that calculation was suggested by Class Counsel. Therefore, for firms I could identify in which one or two lawyers did all the work, and firms with lodestars under $100,000, and other firms that exhibited outstanding efficiency, I used their full lodestar to calculate the recommended allocation. A couple of firms, based on additional input about their billing practices, received only 10% reductions.

Sixth, and most challenging for assessing each firm's contribution, Class Counsel were not a unified group. There was the Zelle, Hoffman group and the Alioto group. Each group has its passionate adherents. Each group believes that its members contributed most to the excellent result. I have tried as fairly as possible to discount the extreme views of both camps, to appreciate that overall the IPP effort benefited from having both skill-sets, and to make my own cold-blooded assessment of what each firm contributed without being swayed by intemperate rhetoric on both sides.

Seventh, and I say this with amusement not in criticism, each of the objecting firms exhibited the mindset reflected in Garrison Keillor's fictitious town of Lake Wobegon, where "all the children are above average." Almost every firm told me that its contribution to the effort was "above average" and that it, therefore, deserved a higher-than-average multiplier. Needless to say, it is impossible to rate them all as "above average."

## Ranges of Multipliers

I grouped firms loosely into five ranges of multipliers. Multipliers vary within those ranges, and sometimes fall above or below a firm's logical range, because I made adjustments to reflect the recommendation of lead and liaison counsel, to consider payment to the litigation fund, and for having a class representative client. Where a firm fell within the range also depended on input I received, if any, about the firm's efficiency, skill, contribution to the litigation fund, and accuracy of billing records. A firm whose client was a class representative

got an increase of about .2 in its multiplier. A firm that paid a maximum amount to the litigation fund received an increase; firms that paid nothing received a decrease. The attached spreadsheet shows for each firm: (1) its full lodestar, (2) its "lodestar less 20%," (3) its "applicable lodestar" which is either its full lodestar, its lodestar less 20% or a lower percentage, or a lodestar adjusted to eliminate billing rates over $1,000/hr., (4) the recommended allocation, which is the "applicable lodestar" times a multiplier, and (5) the multiplier applied.

Firms with lodestars under $100,000: These firms basically did work for their own clients. In addition they may have attended client meetings in person in San Francisco or via telephone conference calls. But they did little, if any, document review or other work to contribute to litigating the IPP case. I allowed multipliers in the 1.2-1.3 range to compensate them for the delay in receiving their money. As noted above, I also applied the multiplier to their full lodestars because there is unlikely to be much wasted time at such low billing levels.

Firms that performed virtually only document review: I applied multipliers in the 1.4-1.6 range, depending on whether they performed basic or more complex document review to the extent I could discern that from the evidence submitted to me.

Firms that performed more complex work (motions, depositions): These firms received multipliers in the 1.7-1.9 range.

Firms that were in the core group driving the IPP case: These firms received multipliers in the 2.0-2.75 range.

Lead and liaison counsel, and selected outstanding contributors: These firms received higher multipliers ranging from 3.24-4.24.

## Recommendations re Objecting Firms

The Alioto Law Firm [Dkt Nos. 7186, 7190, 7205-7208, 7210, 7345, 7352, 7358-7360]

Recommending an appropriate allocation for the Alioto firm requires an assessment of both the contribution the firm made to the substance of the IPP case and Mr. Alioto's performance as co-lead counsel. To make that assessment I have relied on interviews of defense counsel, mediators and other IPP counsel; on the evidence presented at the 12/14/12 hearing on

the alleged fee sharing agreement; on the Alioto objection and accompanying declarations; on the prior Alioto declaration [Dkt. No. 6666]; on the allocation recommendations provided to me confidentially by co-lead and liaison counsel; and on my personal observation of the performance of the Alioto firm and Mr. Alioto for the past 2 ½ years.

IPP counsel agreed in early 2008 that, in general, the Alioto firm and its "trial group" would be primarily responsible for the trial and trial preparation, the Zelle firm and other counsel would be primarily responsible for class certification and other legal issues, while the remainder of the case, including document review and organization and merits discovery would be their shared responsibility.

Mr. Alioto, a talented and experienced trial lawyer, had strong views about how to prepare and win this case. He was determined to go to trial against 2-3 defendants. He insisted that class members and their counsel from all over the country travel repeatedly to San Francisco for meetings to prepare them to testify so that the jury would know the case was about people, not lawyers. He initially insisted on deposing witnesses in Asia where he thought they would be more comfortable and talkative. He wanted to depose high-level corporate Apex witnesses first, while other lawyers preferred a bottom-up approach. Recording time contemporaneously and striving for efficiency were less important to him than the final result. Often Mr. Alioto was right, the lone correct voice crying in the wilderness, but he could also act as an unnecessary impediment to a unified effective plaintiffs' effort.

Four examples stand out. First, just before the merits expert report was due, the main IPP economic expert, Dr. Netz, insisted that part of the approximately $800,000 that was owed to her firm be paid. Mr. Alioto refused to permit any funds to be paid out of the litigation account, so co-lead counsel Francis Scarpulla had to ask other counsel to immediately pay large amounts directly to Dr. Netz's firm. I was required to intervene to help resolve that dispute. Second, after the IPP settlement funds were placed in escrow (and remained the property of defendants), Mr. Alioto questioned the investment decisions taken by Mr. Scarpulla and Ms. Schneider of the Missouri Attorney General's office, and refused to authorize reinvestment of the funds. Again I intervened. Third, the Alioto Firm never paid more than $250,000 in assessments, far less than

6

the firm was assessed and far less than the $700,000 paid by its co-lead counsel at the Zelle, Hoffman firm. Fourth, Mr. Alioto's own time records do not comply with the Court's directive to keep accurate daily time records. His "detailed" records lump together a number of vaguely-described activities and assign a number of hours spent over periods of one or two weeks. There is no indication of what he did each day, or any details of what he actually did. (His own records are distinguished from those of his colleagues at his firm who kept timely and proper records.)

Mr. Alioto quickly formed a small group of lawyers in whom he had confidence as trial lawyers. Often the work and weekly consultations of that group proceeded in near-isolation from the rest of the IPP effort. According to other counsel, the Alioto group's work product often did not reach the Zelle firm and was never filed in court. However, as trial approached in late 2011 and early 2012, there was substantial cooperation between some Alioto team members, such as Daniel Shulman of Gray, Plant Moody and Gary McAllister, and the Zelle firm. Alioto team members were intimately involved in preparation of witness examinations, exhibit lists and deposition designations.

Mr. Alioto and his colleagues, Theresa Moore and Thomas Pier, were heavily involved in the deposition process. Mr. Pier supervised the defense of class representative depositions all over the country, and generally managed the "client relationship." Ms. Moore had input on numerous motions, deposition preparation, expert and other meetings, settlement discussions and trial preparation, but rarely as the leader. I was informed that Mr. Alioto was the examining or defending attorney in 17 depositions and attended another 32 depositions, that Ms. Moore attended 22 depositions but never examined or defended, and that Mr. Pier examined or defended in three depositions and attended 57 others. Those figures may be imprecise, but they convey a sense of how deeply the firm was involved in the deposition process.

Mr. Alioto also made a contribution to the class in the mediation process – although often in a disruptive way. Often against the wishes of his IPP colleagues and the mediators, he insisted on all-cash settlements (no product or coupons or cy pres), he insisted that one settling defendant make four live witnesses available for trial, and he insisted on considerably higher dollar settlements than his colleagues were sometimes willing to accept. He deserves credit for being

obstinate in the best interests of the class, and for portraying the IPP Plaintiffs as ready and eager to try the case. However, his demeanor was often disruptive, uncooperative and intransigent toward the mediators and other plaintiffs' counsel.

In conclusion, the Alioto firm, Mr. Alioto in particular, and some members of the "Alioto trial group" made very real and important contributions. For leading and coordinating that effort, the firm should be rewarded. However, in his role as a co-lead counsel Mr. Alioto failed in his responsibility to cooperate, collaborate and work in tandem with other IPP counsel. His obstinancy made it necessary for other leading counsel to constantly spend time mollifying him, to work around him, and to try to find out what he and his group were doing. As noted above, on the good days pairing of the Zelle and Alioto approaches and skills worked well. But in the end, the overall contribution of the Alioto firm to the final result was considerably less than it might have been had Mr. Alioto adopted a more cooperative approach, and was materially less than the contribution of Zelle Hoffman and other lead firms.

Mr. Alioto's billing rate started at $1,000/hr. in 2007 and climbed to $1,250/hr., then to $1,500/hr. Although his personal clients may pay those rates, it is not appropriate for a court to approve rates at such elevated levels in a class case. As I have done with the portion of Mr. Scarpulla's rate over $1,000, I have recalculated the Alioto lodestar, first to take the 20% reduction that most firms incurred, and second to reduce his personal billing rate to $1,000.

The firm's full lodestar is $18,126,946. Reduced by 20%, it is $14,501,557. Adjusting Mr. Alioto's billing rate to $1,000 produces an appropriate lodestar of $11,677,895. The original allocation to the firm was $45,000,000. I conclude that an upward adjustment is appropriate to reflect Mr. Alioto's leadership of his team to prepare creatively and thoroughly for trial. Therefore, I recommend that the firm's allocation be increased to $47,000,000, which is a multiplier of 4.02 over its appropriate lodestar. However, his allocation must also reflect his failings as a co-lead counsel. These include his lack of cooperation with, and repeated intransigence toward, co-lead counsel, his failure to pay an equal share to the litigation fund, and his imprecise and vague time records. A multiplier of 4.02 is the second-highest of any firm, exceeded only by that of the Zelle firm (4.34). The difference in multipliers between the two co-

8

lead counsel is attributable not to any ranking of their legal skills or effort, but to their highly disproportionate contributions to the IPP effort in their roles as co-lead counsel.

Andrus Anderson LLP [Dkt. No. 7198]

This small (3-4 lawyers) firm performed document review, but at a relatively sophisticated level. They were one of about 12 lawyers who supervised other reviewers in performing second-level document review in connection with deposition preparation. Ms. Anderson supervised the collection of documents for six depositions – crafting search terms, checking the reviewers' work, reviewing the documents retrieved, and writing evidentiary memos. One of their reviewers was Chinese-speaking, and was thus in high demand. The firm performed some drafting work on a summary judgment motion, and did research for jury instructions and class certification. They also did some early corporate research at the request of Mr. Alioto. Their billing appears efficient with little duplication or wasted time. It had a blended hourly rate of $388. The firm paid all of its assessments ($60,000) in full and on time. Their client was a class representative.

The firm's full lodestar is $711,918. It originally was allocated $1,000,000, a 1.75 multiplier of the "lodestar less 20%" amount. Because of the firm's efficiency, contribution to the litigation fund, and its client's role as a class representative, I would increase that to $1,250,000, which is about a 1.75 multiplier of its full lodestar.

Law Offices of Brian Barry [Dkt. No. 7167]

Mr. Barry is an experienced antitrust and class action lawyer. This firm also performed largely document review, but much of it at the second-level of review to prepare for depositions. It also had a Chinese-language reviewer who worked almost full-time and was always in demand. A review of its daily billing records shows that the document reviewers were repeatedly logging 10-12 hours per day. The firm contributed $400,000 to the litigation fund, the full amount requested, of which $300,000 was contributed early in the case. Its client was not a class representative. The firm's blended billing rate was $501.

The firm's full lodestar was $4,198,469. Reduced by 20% its lodestar was $3,358,775. Its original allocation was $5,000,000, which represented a multiplier of 1.49. That amount

9

exceeded the recommendation of all three lead and liaison counsel. Although the firm made a major contribution to the litigation fund and performed some high-level document review, it also had a high billing rate even for sophisticated document review and its reviewers recorded unrealistic numbers of hours per day. Therefore, I recommend no change in the firm's allocation which is based on a multiplier right in the middle of the 1.4-1.6 range.

The Coffman Law Firm [Dkt. No. 7187]

This two-person Texas firm had a client who was a class representative. Its primary contribution to the case was not the performance of traditional legal work, but rather in locating and bringing into the IPP fold plaintiffs from twelve states, of whom four were ultimately named as class representatives. The firm worked on the complaints for these plaintiffs, and oversaw their consolidation into the MDL. Mr. Coffman and his client flew twice to San Francisco for trial preparation sessions. All the work was performed by Richard Coffman himself at a billing rate of $425 that was raised to $550 in 2012 (the blended rate for the entire case was $441). The firm paid an assessment of $50,000 in 2012 when it was first asked to pay. It also incurred about $5,200 in unreimbursed travel and other costs.

The firm's lodestar was $133,806. There is no reason to reduce it since there is no indication of any inefficiencies or excessive billing rates. The original allocation was $180,000, which was a 1.68 multiplier on its "lodestar less 20%" amount. In view of the firm's substantial contribution to the IPP effort by obtaining the inclusion of plaintiffs from twelve states, its representation of a class representative, the efficiency of its work, and its prompt and significant contribution to the litigation fund, I recommend that its allocation be increased to $225,000, which is about 1.7 times its full lodestar.

Cooper & Kirkham [Dkt. No. 7201]

This firm was an early, consistent and important part of the core group of lawyers leading the IPP effort. Although 45% of its contribution was to document review and deposition preparation, that does not capture the leadership role played by Ms. Kirkham in structuring the entire document discovery and ESI process. One of its attorneys was a key team leader in preparing for dozens of depositions. The firm also performed important drafting and editing

work on motions to dismiss, class certification, settlement approvals, summary judgment and Daubert motions, among others. Three of the firm's lawyers performed over 95% of the firm's work. The firm contributed $500,000 in assessments. Following the last settlements in early 2012, the Cooper firm has, along with the Zelle firm, continued to perform substantial work on obtaining settlement approval, setting up the distribution process, opposing objections – and expects to perform a large part of the future post-trial and appellate briefing and other tasks.

The firm's lodestar is $4,725,800. Its original allocation was $9,500,000, which was a 2.5 multiplier over its "lodestar less 20%" number. Given the efficiency of its staffing, it is appropriate to reduce its lodestar by only 10%, which is $4,253,220. Because of the firm's high level of experience and skill, its leadership role in strategy and settlement, its large contribution to the litigation fund, and its heavy continued role in uncompensated post-settlement work, I recommend that its allocation be increased to $10,500,000, which is about 2.5 times its "applicable lodestar".

Foreman & Brasso [Dkt. No. 7180]

Mr. Brasso is an experienced antitrust lawyer, and a long-time associate of Mr. Alioto. The work he performed was all at the direction of co-lead counsel Alioto. Although Mr. Brasso informed me that all his assignments "had to do with trial," he acknowledges that a primary assignment was to review every ECF filing and report the significant developments to Mr. Alioto. His hourly time records confirm that virtually all his time was spent reviewing ECF filings, attending meetings with other lawyers and attending the AUO criminal trial. All of this time by Mr. Brasso himself was billed at $450/hr. Less than 10% of his firm's time was spent doing any actual independent legal work. His time records confirm about 20 hours in April 2012 reviewing depositions and exhibits to locate important testimony. The firm paid assessments of $200,000. Its client was not a class representative.

Regardless of whether the work was assigned by co-lead counsel, it is inappropriate for a senior lawyer billing $450/hr. to charge for reviewing every ECF filing. That is paralegal work. Most firms in this case charged nothing for such "read and review" time. Reviewing and annotating deposition transcripts is similarly work for an experienced associate. Attending

meeting after meeting with other lawyers on the case is a guarantee of duplication and waste. That is not to say that meetings aren't necessary; nor is it to criticize Mr. Brasso's abilities as an antitrust lawyer. But based on my review of all the evidence submitted by Mr. Brasso, and the comments of other experienced antitrust lawyers on the case, I cannot find that Mr. Brasso's efforts did anything meaningful to move the IPP case forward.

The firm's lodestar is $1,412,150. Reduced by 20% it is $1,129,720. The original allocation awarded the firm $1,000,000 at a multiplier of .88 of its "lodestar less 20%." I recommend that the allocation not be changed.

<u>Girardi/Keese [Dkt. No. 7192]</u>

Mr. Girardi's participation consisted largely of high-level strategy meetings and settlement negotiations in which he played an important role. According to Exh. 2 to the firm's original declaration [Dkt. No. 6635-7], he recorded about 903 hours at a billing rate of $1,000/hr. It is difficult to tell how the firm spent the remainder of the 1,900 plus hours because its time records lack any specific detail. About 1,335 hours were spent in document review and deposition preparation, mostly at rates from $600-750/hr. Over 200 hours were spent in meetings by lawyers other than Mr. Girardi. The firm's blended billing rate was a quite high $718. The firm made a contribution of $80,000 to the litigation fund. The firm's original allocation of $3,500,000 was considerably higher than all the recommendations I received for this firm from lead and liaison counsel.

As noted below, I conclude that no weight should be given to the alleged fee-sharing arrangement between Mr. Girardi and Mr. Winters. The allocation for each of the two firms should be evaluated on its own merits without regard to the alleged agreement.

The firm's lodestar is $2,046,387. I think it is appropriate to reduce it by 20% to $1,637,110 in view of the vagueness of its billing records, the large number of hours that attorneys other than Mr. Girardi spent meeting with each other, and its very high billing rates for attorneys other than Mr. Girardi in light of the tasks they performed. Mr. Girardi made an important contribution to the settlement effort, but in other respects the firm provided almost no

1  information about how it contributed to the IPP effort.  I recommend that the firm's allocation of

2  $3,500,000, which is a 2.14 multiplier on its "applicable lodestar" not be changed.

3      Glancy, Binkow& Goldberg LLP  [Dkt. No. 7193]

4      This small firm, with highly-experienced antitrust lawyers, contributed a high-level

5  document reviewer throughout the case.  It also supplied a Japanese translator and an associate

6  who performed lower-level document review.  This work was performed at billing rates from

7  $350-525/hr.  The firm paid a large $250,000 assessment, of which $100,000 was paid early in

8  the case.  Its blended billing rate was a relatively high $427/hr. basically for document review of

9  mixed complexity.  Its detailed billing records show that day-after-day its reviewers logged

10  between 7.5-9.5 hours.

11      Its lodestar is $1,484,959.  Reduced by 20% it is $1,187,967.  Its original allocation was

12  $1,750,000, which was a 1.47 multiplier of its "lodestar less 20%" figure.  Although the firm's

13  recorded hours probably involve little duplication and were efficiently spent, its billing rates and

14  hours recorded for document review – albeit some of it for sophisticated review – were

15  somewhat high.  Therefore, I think it is appropriate to work from the "lodestar less 20% figure."

16  Because of its early financial commitment and employment of skilled reviewers, I recommend

17  that its allocation be increased to the top of the 1.4-1.6 range, to $1,900,000, which is about 1.6

18  times its "applicable lodestar."

19      Gross Belsky Alonso LLP [Dkt. No. 7175]

20      This 7-person firm, with substantial antitrust experience, committed two high-quality

21  full-time document reviewers to the case.  The two reviewers billed at $400/hr.  They performed

22  second-level review to select exhibits for depositions and documents to support important

23  motions.  By all reports they were among the most skilled and reliable document reviewers.

24  They also assisted with ESI issues, and with the mock trials toward the end of the case.  They

25  believe that the 20% reduction should not apply to them since there work was free of duplication

26  and overlap.  However, a review of their detailed billing records shows many days on which

27  reviewers recorded 10-12 hours of time, which raises a question of whether all that time can

28

13

possibly be productively spent. The firm contributed $245,000 to the assessment fund, of which $240,000 was paid early in the case.

The firm's lodestar is $5,917,336, the 8th highest of all Class Counsel. The original allocation was $7,000,000, a 1.48 multiplier over the "lodestar less 20%" amount. Because of the firm's early and consistent contribution of skilled reviewers and large dollars to the IPP effort, I recommend an increase in their allocation to $7,500,000, about a 1.6 multiplier.

Morrison, Frost, Olsen, Irvine & Schwartz, LLP [Dkt. No. 7184]

This firm represented a class representative. It worked largely under the direction of the Gary McAllister firm, which was part of the Alioto trial team. Virtually all the work was performed by name partner Rodney Olsen, billing at $450/hr. throughout the case. Their work consisted largely of preparing for and attending depositions (in person and by telephone) prepared to question if necessary, but in the end not questioning any witnesses. Mr. Olsen traveled from Kansas to Chicago and Omaha for two of those depositions. He defended his client's deposition. Mr. Olsen and his client traveled twice to San Francisco to attend client meetings. The firm paid a $15,000 assessment, which was all it was asked to pay. The firm incurred another $25,000 in unreimbursed travel and other expenses. Mr. Olsen believes the firm's billings should not be reduced by 20% since he did the work without overlap or duplication.

The firm's lodestar was $365,135. Its original allocation was $490,000, which was a 1.68 multiplier of its "lodestar less 20%" amount. In light of the relative efficiency of the firm's work and the fact that it did not increase its billing rate for five years, I conclude that no reduction should be made in its lodestar. The firm worked on deposition preparation, not document review, its client was a class representative, and it paid its full assessment. Therefore, I recommend that its allocation be increased to $620,000, which is a 1.7 multiplier of its full lodestar.

Murray & Howard [Dkt. No. 7173]

Derek Howard was one of the core group of lead lawyers who worked primarily with the Alioto team. He practiced at Murray & Howard before moving to Minami, Tamaki. He was

14

involved on an almost daily basis for the entire length of the IPP case, and made major contributions to strategy, coordination among lawyers, sophisticated legal work and settlement negotiations. The firm took a significant risk in assuming such a large role in this case. An important contribution was to act as a bridge between the Alioto and Zelle Hoffman teams. Mr. Howard believes that a 20% reduction in the firm's billings is inappropriate as over 60% of the work was done by him personally without duplication or overlap with other lawyers. I examined a sampling of the firm's daily billing records to confirm that the time was kept meticulously and the tasks were largely actual legal work, not mere review of e-mails and court filings. However, I also noted some overlap of work: reading each other's e-mails, reviewing drafts of documents, and the like. Therefore, I do think it appropriate to apply the 20% reduction to the lodestar. The firm paid $75,000 in assessments, on time and in the full amount requested. Its client was a class representative.

The firm's lodestar is $1,750,993. Its original allocation was $2,900,000, a 2.07 multiplier over its "lodestar less 20%" amount. Because of the leadership role taken by Mr. Howard and the assessment contribution, I would recommend an increase in the firm's allocation to $3,150,000, which is a 2.25 multiplier of the "applicable lodestar."

Steyer Lowenthal Boodrookas Alvarez & Smith LLP

The Steyer firm was one of the earliest and most consistent members of the core group of firms that provided leadership and high-level work for the case. The firm was one of the primary drafters and editors of class certification and summary judgment motions, among others. Jill Manning of the firm was one of the leaders in structuring and managing the overall document retrieval effort. Steyer lawyers examined witnesses at several depositions, and worked on the mock trials and other trial preparation efforts. However, approximately 63% of its work was spent on document review and deposition preparation. Its blended billing rate was $453. The firm paid $481,000 in assessments.

The firm's lodestar was $9,656,038, the 3rd highest of any IPP firm. It original allocation was $14,500,000, a 1.88 multiplier of its "lodestar less 20%" figure. Because of the firm's key leadership role, its consistent work on motions and locating documents, its large contribution to

the litigation fund, and the recommendations of a majority of the lead/liaison counsels, I recommend that its allocation be increased to $17,000,000, a multiplier of about 2.25 on the "applicable lodestar" figure.

Trump, Alioto, Trump & Prescott LLP [Dkt. No. 7202]

This experienced antitrust firm performed generally low-to-medium level document review, but provided a Japanese-language reviewer who was in great demand. Their client was a class representative. They made a large $250,000 contribution to the litigation fund early in the case. The recommended award was higher than the amounts recommended by all lead and liaison counsel. I recommend that the award of $4,500,000, which is a 1.7 multiplier of its "lodestar less 20%," be increased to $4,750,000, which is a 1.8 multiplier, in order to recognize its contribution of funds, its class representative client, and the specialized review talents.

Whitfield, Bryson & Mason LLP [Dkt. No. 7196]

This small District of Columbia firm performed largely at the request of the Goldman Scarlato firm. The work consisted almost entirely of document review, some of which was done by a partner at $570/hr. but associates also performed review at appropriate billing rates. A partner made four trips to San Francisco for meetings about discovery and strategy. The firm also prepared an extensive memo on the shape of the conspiracy and worked on jury instructions. Its blended billing rate was $318. It contributed $15,000 to the litigation fund.

The firm's full historic lodestar was $279,216. Its original allocation was $260,000, which was a 1.16 multiplier of its "lodestar less 20%" amount. The firm did not make a major contribution to the IPP effort, but it did what it was asked, appeared to have done it efficiently, and made some contribution to the litigation fund. I recommend that its allocation be increased to $325,000, a 1.45 multiplier of its "lodestar less 20%" amount.

Lingel H. Winters P.C. [Dkt. No. 7168]

Mr. Winters is a one-man firm who became part of the Alioto team. At the request of Mr. Alioto he was tasked with reviewing every ECF filing, and evidently reporting on the significant ones to Mr. Alioto. I note that this is precisely the same task for which Mr. Brasso billed. Mr. Winter's daily time records (handwritten so almost impossible to read) contain line

after line with .25 hr. charges to read ECF filings. He also recorded time for a small amount of document review, and many meetings with other counsel. His other major contribution to the case was to attend the AUO criminal trial virtually every day, and then to debrief the day's testimony at a nearby restaurant with Mr. Brasso, Mr. Alioto and Ms. Moore of the Alioto Law Firm who also attended the AUO trial. Mr. Winter's billing rate ranged from $650-950/hr. and the firm had a blended rate for the entire case of $877, one of the highest of any firm.

The firm's lodestar was $2,169,630. Its original allocation was $1,000,000, a .58 multiplier on its "lodestar less 20%" figure. I cannot discern any meaningful contribution that Mr. Winters brought to the IPP effort. To assign one expensive lawyer to review ECF filings is bad enough, but to ask two to do so is just bad case management. Moreover, it showed poor judgment for Mr. Winters to charge about $200 every time he reviewed an ECF filing. Similarly, for one or two IPP lawyers to attend the entire AUO trial had value. For four or more to do so cannot be justified with any compensation. I recommend that no change be made to the Winters allocation.

## Alleged Fee-Splitting Agreements

Since I issued my Report, two alleged fee-splitting arrangements have been brought to my attention: Mr. Alioto contended that he and Francis Scarpulla of Zelle Hoffman had agreed to split the total fees 50-50 between the "Alioto team" and the "Zelle Hoffman team." Mr. Winters contended that he and Mr. Girardi had agreed to split 50-50 the fees awarded to their two firms. I have held brief fact-finding hearings into both these situations.

Lawyers who enter into a fee-splitting agreement in a class action must inform the class action court of the terms of the agreement when it is made, or at least at the time of filing a petition for approval of a settlement. *In re "Agent Orange" Product Liability Litigation*, 818 F.2d 216, 226 (2d Cir. 1987) ["counsel must inform the court of the existence of a fee-sharing agreement at the time it is formulated."]; *Wanninger v. SPNV Holdings, Inc*, No. 85-C-2081, 1994 WL 285071 at *2 (N.D. Ill. June 24, 1994) [counsel are required to disclose fee agreements to court "at the first opportunity"; failure to do so is not dispositive, but a factor weighing against

enforcement]; *Mark v. Spencer*, 166 Cal.App.4[th] 219 (2008) [disclosure required at time the parties seek approval of the settlement].

A court must scrutinize an alleged fee-sharing arrangement as part of its consideration of the fairness of an attorneys' fee award that is part of a class settlement. *In re FPI/Agretech Securities Litigation*, 105 F.3d 469 (9th Cir. 1997); *Alexander v. Chicago Park Dist.*, 927 F.2d 1014 (7th Cir. 1991)  However, the court is not obliged to enforce the fee-sharing arrangement, and should not do so if it would produce a result that is disproportionate to the amount of work and contribution each firm made to the class recovery. *In re "Agent Orange" Prod.Liab.Litig.*,818 F.2d at 222; *In re FPI/Agritech Sec. Litig.*, 105 F.3d at 474 [the "relative efforts of, and benefits conferred upon the class by, class counsel are proper bases for refusing to approve a fee allocation proposal."]  Therefore, the Court is not constrained by either of these fee-sharing arrangements.  It may, indeed must, allocate fees in accordance with the relative contributions that each firm made to obtaining the class recovery.

Alioto-Zelle Issue

Basic facts.  I find that the following facts are true based on the evidence submitted at the 12/14/12 fact-finding hearing.

Mr. Alioto contended that in March 2008 he and co-lead counsel Francis Scarpulla of the Zelle Hoffman firm agreed that the total fees awarded by the Court would be divided 50-50, and that each of them would distribute his half to attorneys working on their respective "teams," subject to Court approval.  Mr. Scarpulla acknowledged that this was their original concept, provided that each "team" did roughly equal work and contributed roughly equal amounts to the litigation fund, provided that Liaison Counsel Jack Lee agreed, provided that all Class Counsel and the State Attorneys General agreed to this approach, and provided that the Court accepted this method of division.  Mr. Scarpulla testified that on two or three occasions he had explained those conditions to Mr. Alioto.  There was no evidence that Mr. Alioto ever acknowledged or agreed to the conditions that Mr. Scarpulla said he insisted upon.

In March 2011, Mr. Scarpulla declared the alleged agreement to be ineffective because, according to him, the Alioto firm and "team" had not performed half the work and had not made

half the contributions to the litigation fund, Mr. Lee had not agreed to the arrangement, and no consent had been obtained from any other Class Counsel or the State Attorneys General. The two men met on March 9, 2011 with former federal district judge, Stephen Larson, whom they both respected and who had worked on the case for several years as part of the Girardi/Keese firm. Following the meeting, Judge Larson described in an e-mail (Alioto Exh. 33) the agreed allocation of work between the two groups (Zelle Hoffman to be primarily responsible for class certification and related issues, and the Alioto firm to be primarily responsible for pre-trial preparation and trial, with the remainder of the case to be a shared responsibility), and stated, "Although there has not been nor is there any actual agreement concerning the distribution of any potential attorneys' fees in this case, you both clearly indicated that you envision that, provided that everyone continues to fulfill their respective responsibilities, any fees awarded or approved by the Court should reflect the fair division of labor described above." Judge Larson testified that neither Mr. Scarpulla nor Mr. Alioto ever objected to his statement that no fee-sharing agreement existed.

The Court was not advised of this purported fee-sharing agreement when it was made in 2008, when IPP Plaintiffs petitioned for approval of the first round of settlements, when they petitioned for approval of Round 2 settlement, or when they petitioned the Court for a fee award. Nor did Mr. Alioto mention the 50-50 agreement in his Declaration in support of his Application for Attorneys Fees [Dkt. No. 6666] filed on 9/7/12. Nor did Mr. Alioto tell me about the 50-50 agreement when lead and liaison and State AG counsel met with me on September 12, 2012 to plan the fee allocation process. Nor did he mention it in his 10/2/12 confidential written recommendation to me regarding how fees should be allocated. Mr. Alioto first informed me of the purported agreement in an e-mail on October 9, 2012.

On August 29, 2012, the Court appointed me as Special Master to recommend an award of fees and an allocation among Class Counsel [Dkt. No. 6580]. The Court did not follow the process employed in the Direct-Purchaser settlement of allowing lead counsel to agree on a recommended allocation of fees.

Conclusions: I conclude that: (1) the existence and terms of the alleged agreement have

not been proven by a preponderance of the evidence; (2) any agreement would be unenforceable in any event; and (3) the Court should give no weight to the alleged agreement since a 50-50 division of fees between the two groups of Class Counsel would be disproportionate to the amount of work and their respective contributions to obtaining the class recovery.

I conclude that Mr. Alioto has not carried his burden of demonstrating that the parties had a meeting of the minds on a definitive agreement. Mr. Scarpulla agreed to a 50-50 division, but only subject to several conditions inherent in class action litigation. Mr. Alioto never accepted those conditions. Therefore, they did not agree on material terms of the alleged agreement. This conclusion is the same as Judge Larson's conclusion in March 2011 that "there has not been nor is there any actual agreement concerning the distribution of any potential attorneys' fees in this case." Moreover, there were massive gaps and rampant ambiguity in the "agreement." First, it was an oral understanding, although each of them alluded to it in various written communications. Second, there was no understanding as to which firms were in the "Alioto group," which in the "Zelle group," or what was to become of the dozens of firms that were not in either group. Mr. Alioto presented at the hearing (Exh. 47) a listing of the two groups, which he conceded he had just prepared, had never shown Mr. Scarpulla or the Court, and for which he had never obtained consent from any other firm. Therefore, the 50-50 concept was too indefinite to have ripened into an agreement.

Even if a definitive agreement had existed, it would have faced insurmountable hurdles to being enforceable. First, the Ninth Circuit has stated that fee-sharing arrangements among class counsel are not enforceable contracts. *In re FPI/Agretech Securities Litigation*, 105 F.3d at 473. Second, there is at least a substantial question as to whether the alleged agreement would violate California law because it was never approved by any of the clients in the IPP case. California Rules of Professional Conduct 2-200(A). Third, the failure to disclose the 50-50 "agreement" to the Court at least at the time approval was sought for the settlements or for an award of attorneys' fees may bar enforcement. Finally, as noted above, the Court would not be bound by a fee-sharing arrangement if it were disproportionate to the effort and results obtained by the firms involved.

Basically, the co-lead counsel agreed on a broad concept in 2008 on the assumption that the Court would permit them to determine how fees should be allocated, subject to overall Court supervision. That assumption proved to be wrong. The Court, having concluded that co-lead counsel had a history of disagreements, determined to make its own allocation with the assistance of a Special Master. Given this different approach, what effect, if any, should the Court give to the original 50-50 concept? I believe that it would be inappropriate to divide the fees equally among two groups of firms. Although at the top level a few lead firms worked with Alioto and a few others worked with Zelle, there is no rational basis at all for lumping the remaining 100 or so firms into one group or another. Moreover, a few important firms worked with both Zelle and Alioto, so assigning them to one group or another would be purely arbitrary. Therefore, I totally reject as unworkable and unfair the concept of dividing the total fees into two halves. (Mr. Alioto presented at the 12/14/12 hearing a pie chart showing that my original Report had allocated 68% of the fees to the Zelle group and only 32% to the Alioto group. Since I had no knowledge when I prepared the Report which firms supposedly belonged in one group or the other, my original allocation was certainly not conscious. And a disparate allocation was hardly unexpected, since the lodestar of the supposed Zelle group was far larger than that of the supposed Alioto group.)

Moreover, I believe, for the reasons stated in this Supplemental Report, that the contributions and work performed by the firms loosely associated with Zelle were greater than that of the firms loosely associated with Alioto. And some of the greatest contributions were made by firms that worked cooperatively with both groups. An equal division of fees between the Alioto firm and the Zelle firm, or between the Alioto group and the Zelle group, would be disproportionate to the work performed by the individual firms and their respective contributions to the excellent class settlements. Instead, I have recommended allocations based on the evidence submitted about the work and contribution of each individual firm without regard to the orbit in which it worked.

Winters-Girardi Issue

Basic Facts: I find that the following facts are true based on the evidence submitted at

the 12/13/12 fact-finding hearing.

On or about June 25, 2007, Lingel Winters and Thomas Girardi entered into a written agreement that stated, "Your firm [Girardi] will advance the costs and I [Winters] will refer the client for joint representation. After reimbursement of costs, the attorneys fees will be shared equally – 50% to your firm 50% to mine." The written agreement was signed by both lawyers and approved in writing by their client, EMW, Inc. (Winters, Exh. 4B) On or about August 9, 2007, Mr. Girardi confirmed the agreement in a voicemail to Mr. Winters stating, "I'm pretty sure I signed an agreement with you, [that] we're going to share fees equally. That being the case, it doesn't make too much difference how much work we do and stuff like that." (Winters, Exh. 10.

On June 12, 2012, Mr. Girardi repudiated the agreement in a letter stating, "As you know, I love you; however, this is not a personal injury case. We'll be happy to share equally any sums over our hourly submission." (emphasis added) On August 2, 2012, Mr. Girardi affirmed the repudiation in a letter stating, "Let's see if I get this correct. We put in thousands of hours and hundreds of thousands of dollars on a case in which fees are based on hours not contingency. You want half. Good luck!" (Winters Exh. 28).

Mr. Winters submitted a lodestar of $2,169,630. My original Report recommended that he receive an allocation of $1,000,000. Mr. Girardi submitted a lodestar of $2,046,387. I recommended that he receive an allocation of $3,500,000. Both lawyers objected to my Report and requested a higher allocation.

At the 12/13/12 fact-finding hearing, Mr. Girardi advanced three reasons why the agreement should not be enforced. First, Mr. Alioto had invited him to participate in the case before Mr. Winters did. Second, he intended that the phrase "after reimbursement of costs" in Exhibit 4B really meant "after reimbursement of costs and my normal hourly fees." Third, he intended the agreement to apply only to the work performed specifically for their client, EMW, Inc., not for the class as a whole.

Conclusion: There was an ascertainable, definite agreement to share equally all fees awarded to the two firms. Mr. Girardi's undisclosed subjective intentions regarding the meaning

of the agreement not only contradict the written terms, but are irrelevant to determine its meaning. Cal. Civil C. §1639. Mr. Girardi's disavowal of the agreement was unjustified.

However, for the reasons stated above with respect to the Alioto-Scarpulla issue, the contract is not enforceable in this context, nor is it binding on the Court. The contract was not disclosed to the Court until after the petitions for approval of the settlements and for an award of attorneys' fees. Neither party disclosed it to the Court in their respective declarations submitted with the petition for attorneys' fees. [Dkt. Nos. 6635-7, 6635-6]

For the reasons stated above in the discussions of the allocations to the two firms, an equal allocation of fees would be highly disproportionate to the work performed and their respective contributions to the class recovery. Mr. Winters work was of little value to the class. Mr. Girardi's efforts in connection with mediation and settlement were of considerable value.

### Other Adjustments to the Allocation

Lodestars less than $100,000: I reversed the 20% discount for these firms since the low number of hours makes it likely that they were efficiently spent. I adjusted multipliers as necessary to confirm to the guidelines stated above and to make them more consistent.

Consistency adjustments: I adjusted allocations by small amounts where necessary to make the resulting multipliers more consistent with the guidelines stated above.

Gray Plant Moody: By all accounts, Dan Shulman of this firm did a superb job in many important aspects of the case. He took the lead in many important depositions; he was intimately involved in discovery and pre-trial strategy; he personally prepared much of the input to pre-trial documents such as witness examinations, exhibits lists and the like. His rates and hours were strikingly economical. However, the original recommended award of $14,000,000 represented a multiplier of 5.22 over the "lodestar less 20%" figure. This multiplier would be substantially in excess of any other firm, and in my judgment cannot be justified. I have reversed the 20% discount for his firm in view of his obvious efficiency, and applied a multiplier of 3.73, for a revised award of $12,500,000. This multiplier is the third highest of any firm, lower only than that for the Alioto and Zelle firms. It is fully justified, but the original award was

1    disproportionately high.

2    <u>Straus & Boies</u>:   This firm was one of the core group of firms that took major

3    responsibility throughout the case.   Two of its clients were class representatives.   It led and

4    managed the foreign language document review process, drafted portions of key motions,

5    prepared witness memos for depositions, ran the translation objection discussions, took two

6    expert depositions, and was heavily involved in preparing pretrial submissions.   The firm made a

7    maximum and early payment to the litigation fund.

8        Its full lodestar was $5,930,764.   Adjusted by 20%, the lodestar was $4,744,611.   Its

9    original allocation was $14,000,000, which was a multiplier of 2.95 over the "lodestar less 20%

10   figure."   This multiplier was in excess of the "core" multiplier range of 2.0-2.75, and was

11   disproportionate to that of other firms doing equivalent work.   Therefore, I recommend reducing

12   the allocation to $13,000,000, for a multiplier of 2.74, the second highest multiplier in the "core"

13   group of firms after Gray Plant Moody.

14   <u>Zelle Hoffman</u>

15       The Zelle Hoffman firm, and co-lead counsel Francis Scarpulla, were the engines that

16   primarily drove the IPP effort to a successful conclusion.   Without meaning to detract from the

17   pre-trial efforts of the Alioto firm and its colleagues on the trial side, I note that the case was not

18   won at trial.   The case was won in a series of mediated settlements.   It was primarily the Zelle

19   firm that led the strategy and made it possible to obtain the victories that enabled the case to be

20   successfully settled.   The Zelle firm organized and coordinated the IPP group, and harmonized

21   the IPP effort with the Direct-Purchaser Plaintiffs, the Direct Action Plaintiffs and the State

22   Attorneys General.   The Zelle firm led the document discovery, translation and organization

23   effort.   The Zelle firm spearheaded the victory in class certification, and the success in winning

24   dozens of summary judgment motions.   The Zelle firm provided the IPP's lead economic expert,

25   Dr. Netz, and coordinated her work through deposition and *Daubert* motions.   During mediation,

26   Mr. Scarpulla set the tone and led the strategy to obtain the excellent settlements.   The Zelle firm

27   will also take the lead in defending the settlement at both the district and appellate courts, and in

28

implementing the distribution of funds to the class and counsel, for which it will receive no additional compensation.

This is not to suggest that the Zelle firm, or Mr. Scarpulla, did it all. As noted above, a core group of lawyers from both teams did immense amounts of productive work, as did lawyers from dozens of less-active participating firms. In many respects the Zelle lawyers played an administrative and coordinating role, rather than doing the hardcore legal work. But they were the indispensable force that made the IPP effort all work cohesively. As co-lead counsel, Mr. Scarpulla played precise the role expected of him, and according to every lawyer and mediator I spoke to, did so superbly. A not insignificant part of his job was to mesh the efforts of the two teams of lawyers, and to mollify the demands and objections of his co-lead counsel.

The firm's full lodestar was $22,269,334. Its time records were kept meticulously. It made a very large $700,000 contribution to the litigation fund. Reduced by 20%, its lodestar was $17,815,467. For the year 2011 Mr. Scarpulla billed at $1,250 an hour. Reducing that to $1,000 produces an applicable lodestar of $17,286,717. I originally recommended an award of $80,000,000, which would be a multiplier of 4.62 over the applicable lodestar. This, I believe, is excessive and disproportionate to the allocations and multipliers for other key firms. Therefore, I recommend reducing the firm's allocation to $75,000,000, which represents a multiplier of 4.34 over the applicable lodestar. This is the highest allocation and highest multiplier received by any firm – and deservedly so.

### Concluding Recommendations

I recommend that the total fee award be $308,225,250, which is 28.5% of the $1.1 billion settlement. I recommend that this amount be allocated among IPP counsel as shown on the attached spreadsheet. I further recommend that no additional compensation be allowed for post-settlement work. This is intended to be a full and final resolution of issues relating to attorneys' fees in the IPP case.

Dated: December 18, 2012

Martin Quinn, Special Master

EXHIBIT A TO SUPPLEMENTAL REPORT AND RECOMMENDATION OF SPECIAL MASTER RE ALLOCATION OF ATTORNEYS FEES IN
THE INDIRECT-PURCHASER CLASS ACTION

| Firm Name | Lodestar | Lodestar minus 20% | Applicable Lodestar | Original Recommended Award | Revised Recommended Award | Multiplier of Applicable Lodestar |
|---|---|---|---|---|---|---|
| Zelle Hofmann et al. | $22,269,334 | $17,815,467 | $17,286,717 | $80,000,000 | $75,000,000 | 4.34 |
| Alioto Law Firm | $18,126,946 | $14,501,557 | $11,677,895 | $45,000,000 | $47,000,000 | 4.02 |
| Steyer Lowenthal | $9,656,038 | $7,724,830 | $7,724,830 | $14,500,000 | $17,000,000 | 2.20 |
| Minami Tamaki | $7,716,017 | $6,172,813 | $6,172,813 | $20,000,000 | $20,000,000 | 3.24 |
| Gustafson Gluek | $7,694,044 | $6,155,235 | $6,155,235 | $15,000,000 | $15,000,000 | 2.44 |
| Lovell Stewart | $6,482,537 | $5,186,030 | $5,186,030 | $10,000,000 | $10,500,000 | 2.02 |
| Straus & Boies | $5,930,764 | $4,744,611 | $4,744,611 | $14,000,000 | $13,000,000 | 2.74 |
| Gross Belsky Alonso | $5,917,336 | $4,733,869 | $4,733,869 | $7,000,000 | $7,500,000 | 1.58 |
| Cooper & Kirkham | $4,725,800 | $3,780,640 | $4,253,220 | $9,500,000 | $10,500,000 | 2.47 |
| Barry, L/O Brian | $4,198,469 | $3,358,775 | $3,358,775 | $5,000,000 | $5,000,000 | 1.49 |
| Goldman Scarlato | $3,825,835 | $3,060,668 | $3,060,668 | $6,000,000 | $6,000,000 | 1.96 |
| Gray Plant Mooty | $3,349,892 | $2,679,913 | $3,349,892 | $14,000,000 | $12,500,000 | 3.73 |
| Trump, Alioto | $3,278,644 | $2,622,915 | $2,622,915 | $4,500,000 | $4,750,000 | 1.81 |
| Reinhardt Wendorf | $3,198,534 | $2,558,827 | $2,558,827 | $5,500,000 | $5,500,000 | 2.15 |
| McCallister, Gary | $2,854,553 | $2,283,642 | $2,283,642 | $6,000,000 | $6,000,000 | 2.63 |
| Winters, Lingel H. | $2,169,630 | $1,735,704 | $1,735,704 | $1,000,000 | $1,000,000 | 0.58 |
| Girardi Keese | $2,046,387 | $1,637,110 | $1,637,110 | $3,500,000 | $3,500,000 | 2.14 |
| Mogin Law Firm | $1,952,306 | $1,561,845 | $1,561,845 | $3,000,000 | $3,000,000 | 1.92 |
| Gergosian & Gralewski | $1,946,170 | $1,556,936 | $1,556,936 | $3,000,000 | $3,000,000 | 1.93 |
| Schubert Jonckheer | $1,832,853 | $1,466,282 | $1,466,282 | $3,000,000 | $3,000,000 | 2.05 |
| Murray & Howard | $1,750,993 | $1,400,794 | $1,400,794 | $2,900,000 | $3,150,000 | 2.25 |
| Saunders Doyle | $1,550,082 | $1,240,066 | $1,240,066 | $3,250,000 | $3,250,000 | 2.62 |
| Green & Noblin | $1,519,801 | $1,215,841 | $1,215,841 | $2,500,000 | $2,500,000 | 2.06 |
| Glancy Binkow | $1,484,959 | $1,187,967 | $1,187,967 | $1,750,000 | $1,900,000 | 1.60 |
| Foreman & Brasso | $1,412,150 | $1,129,720 | $1,129,720 | $1,000,000 | $1,000,000 | 0.89 |
| Kirby Mcinerney | $1,357,310 | $1,085,848 | $1,085,848 | $2,500,000 | $2,300,000 | 2.12 |
| Miller Law | $1,162,964 | $930,371 | $930,371 | $1,750,000 | $1,750,000 | 1.88 |
| Sharp McQueen | $985,320 | $788,256 | $788,256 | $1,600,000 | $1,500,000 | 1.90 |
| Johnson & Perkinson | $809,825 | $647,860 | $647,860 | $800,000 | $900,000 | 1.39 |
| Liberty Law Office | $796,191 | $636,953 | $636,953 | $1,000,000 | $1,000,000 | 1.57 |
| Furth Firm | $781,444 | $625,155 | $625,155 | $900,000 | $900,000 | 1.44 |
| Hulett Harper Stewart | $770,709 | $616,567 | $616,567 | $1,000,000 | $1,000,000 | 1.62 |
| Boesche McDermott | $770,430 | $616,344 | $616,344 | $850,000 | $770,000 | 1.25 |
| Narine, L/O Krishna | $719,993 | $575,994 | $575,994 | $900,000 | $900,000 | 1.56 |
| Andrus Anderson | $711,918 | $569,534 | $711,918 | $1,000,000 | $1,250,000 | 1.76 |
| Schack, L/O Alexander | $700,875 | $560,700 | $560,700 | $850,000 | $850,000 | 1.52 |
| Kralowec Law Group | $629,858 | $503,886 | $503,886 | $900,000 | $925,000 | 1.84 |
| Chavez & Gertler | $570,408 | $456,326 | $456,326 | $800,000 | $770,000 | 1.69 |
| Amamgbo & Assoc. | $555,685 | $444,548 | $444,548 | $390,000 | $390,000 | 0.88 |
| Westlow, Edward J. | $540,585 | $432,468 | $432,468 | $425,000 | $475,000 | 1.10 |
| Rodanast | $519,986 | $415,989 | $415,989 | $625,000 | $625,000 | 1.50 |
| McManis Faulkner | $498,065 | $398,452 | $398,452 | $425,000 | $425,000 | 1.07 |
| Shepherd, Finkelman | $435,580 | $348,464 | $348,464 | $525,000 | $525,000 | 1.51 |
| Bonnett, Fairbourn | $434,149 | $347,319 | $347,319 | $580,000 | $580,000 | 1.67 |

Appendix A

EXHIBIT A TO SUPPLEMENTAL REPORT AND RECOMMENDATION RE SPECIAL MASTER'S ALLOCATION OF ATTORNEYS FEES IN THE INDIRECT-PURCHASER CLASS ACTION

| Firm Name | Lodestar | Lodestar minus 20% | Applicable Lodestar | Original Recommended Award | Revised Recommended Award | Multiplier of Applicable Lodestar |
|---|---|---|---|---|---|---|
| McCallum, Methvin | $407,078 | $325,662 | $325,662 | $500,000 | $500,000 | 1.54 |
| Papale, L/O Lawrence | $389,270 | $311,416 | $311,416 | $400,000 | $400,000 | 1.28 |
| Jenkins Mulligan | $375,480 | $300,384 | $300,384 | $550,000 | $500,000 | 1.66 |
| Morrison, Frost, Olsen | $365,135 | $292,108 | $365,135 | $490,000 | $620,000 | 1.70 |
| Keller Rohrback | $354,444 | $283,555 | $283,555 | $450,000 | $450,000 | 1.59 |
| Durrette Crump | $344,028 | $275,222 | $275,222 | $300,000 | $300,000 | 1.09 |
| Messina Law Firm | $331,400 | $265,120 | $265,120 | $750,000 | $750,000 | 2.83 |
| Freedman Boyd | $304,111 | $243,289 | $243,289 | $550,000 | $500,000 | 2.06 |
| Cohen & Malad | $302,202 | $241,762 | $241,762 | $450,000 | $450,000 | 1.86 |
| Boone, John | $283,150 | $226,520 | $226,520 | $675,000 | $675,000 | 2.98 |
| Whitfield Bryson | $279,216 | $223,373 | $223,373 | $260,000 | $325,000 | 1.45 |
| Perkins, L/O Jeffrey K. | $220,850 | $176,680 | $176,680 | $175,000 | $185,000 | 1.05 |
| McGowan Hood | $216,325 | $173,060 | $173,060 | $265,000 | $265,000 | 1.53 |
| Hellmuth & Johnson | $210,708 | $168,566 | $168,566 | $190,000 | $190,000 | 1.13 |
| Devereux Murphy | $191,234 | $152,987 | $152,987 | $235,000 | $245,000 | 1.60 |
| Terrell Law Group | $182,925 | $146,340 | $146,340 | $225,000 | $200,000 | 1.37 |
| Ekenna Law Firm | $168,363 | $134,690 | $134,690 | $100,000 | $145,000 | 1.08 |
| Nwajei, L/O Lawrence | $155,450 | $124,360 | $124,360 | $16,000 | $16,000 | 0.13 |
| Damrell Nelson | $153,855 | $123,084 | $123,084 | $200,000 | $200,000 | 1.62 |
| Wites & Kapetan | $139,124 | $111,299 | $111,299 | $170,000 | $170,000 | 1.53 |
| Futterman Howard | $137,894 | $110,315 | $110,315 | $170,000 | $170,000 | 1.54 |
| Emerson Poynter | $137,269 | $109,815 | $109,815 | $165,000 | $165,000 | 1.50 |
| Coffman Law Firm | $133,806 | $107,045 | $133,806 | $180,000 | $225,000 | 1.68 |
| Brill, L/O Thomas H. | $128,590 | $102,872 | $102,872 | $160,000 | $165,000 | 1.60 |
| Aylstock, Witkin Kreis | $117,462 | $93,970 | $93,970 | $150,000 | $150,000 | 1.60 |
| Parish & Small | $113,250 | $90,600 | $90,600 | $130,000 | $110,000 | 1.21 |
| Pastor Law Office | $111,395 | $89,116 | $89,116 | $130,000 | $130,000 | 1.46 |
| LaCava Law | $108,045 | $86,436 | $86,436 | $130,000 | $130,000 | 1.50 |
| Guerrieri, Clayman | $96,099 | $76,879 | $96,099 | $120,000 | $135,000 | 1.40 |
| Kassof, L/O Sherman | $82,693 | $66,154 | $82,693 | $85,000 | $90,000 | 1.09 |
| Dombroski, James M. | $76,615 | $61,292 | $76,615 | $80,000 | $85,000 | 1.11 |
| Smith Dollar | $75,655 | $60,524 | $75,655 | $85,000 | $80,000 | 1.06 |
| Wyatt & Blake | $75,430 | $60,344 | $75,430 | $90,000 | $110,000 | 1.46 |
| Spiva Law Firm | $60,230 | $48,184 | $60,230 | $70,000 | $85,000 | 1.41 |
| Melton Law Firm | $52,038 | $41,630 | $52,038 | $60,000 | $60,000 | 1.15 |
| Mallison & Martinez | $50,697 | $40,558 | $50,697 | $55,000 | $58,000 | 1.14 |
| Roberts Law Firm | $50,089 | $40,071 | $50,089 | $60,000 | $65,000 | 1.30 |
| Carey, Danis & Lowe | $50,010 | $40,008 | $50,010 | $5,000 | $5,000 | 0.10 |
| Lanham Blackwell | $46,210 | $36,968 | $46,210 | $60,000 | $70,000 | 1.51 |
| Davis, Unrein, Biggs | $44,240 | $35,392 | $44,240 | see Frieden | see Frieden | |
| Michaels Ward | $40,159 | $32,127 | $40,159 | $47,000 | $53,000 | 1.32 |
| Sachs Waldman | $38,737 | $30,990 | $38,737 | $48,000 | $60,000 | 1.55 |
| Mager & Goldstein | $35,620 | $28,496 | $35,620 | $35,000 | $40,000 | 1.12 |
| Frankovitch, Anetakis | $33,770 | $27,016 | $33,770 | $45,000 | $52,000 | 1.54 |

EXHIBIT A TO SUPPLEMENTAL REPORT AND RECOMMENDATION RE: ALLOCATION OF ATTORNEYS FEES IN THE INDIRECT-PURCHASER CLASS ACTION

| Firm Name | Lodestar | Lodestar minus 20% | Applicable Lodestar | Original Recommended Award | Revised Recommended Award | Multiplier of Applicable Lodestar |
|---|---|---|---|---|---|---|
| Bangs McCullen | $33,300 | $26,640 | $33,300 | $40,000 | $50,000 | 1.50 |
| Godfrey & Kahn | $30,677 | $24,542 | $30,677 | $35,000 | $40,000 | 1.30 |
| Sommers Schwartz, PC | $26,169 | $20,935 | $26,169 | $29,000 | $29,500 | 1.13 |
| Thompson, Jason | $26,169 | $20,935 | $26,169 | $26,000 | $29,500 | 1.13 |
| Wienner & Gould | $22,995 | $18,396 | $22,995 | $28,000 | $35,000 | 1.52 |
| Jimenez, Graffam | $22,961 | $18,369 | $22,961 | $27,000 | $35,000 | 1.52 |
| Branstetter, Stranch | $17,595 | $14,076 | $17,595 | $17,000 | $20,000 | 1.14 |
| Serratore Law | $13,840 | $11,072 | $13,840 | $13,000 | $16,000 | 1.16 |
| Belancio, Michael | $12,805 | $10,244 | $12,805 | $13,000 | $15,000 | 1.17 |
| Wexler Wallace | $11,591 | $9,273 | $11,591 | $13,000 | $16,000 | 1.38 |
| Towe, Ball, Enright | $11,300 | $9,040 | $11,300 | $13,000 | $16,000 | 1.42 |
| Frieden Unrein/Davis Unrein | $11,000 | $8,800 | $11,000 | $55,000 | $60,000 | 5.45 |
| Bearman, Edward | $10,815 | $8,652 | $10,815 | $10,000 | $12,000 | 1.11 |
| Hisaka Yoshida | $10,485 | $8,388 | $10,485 | $13,000 | $16,000 | 1.53 |
| West, L/O George O. | $9,205 | $7,364 | $9,205 | $11,000 | $13,000 | 1.41 |
| Goldberg Katzman | $8,640 | $6,912 | $8,640 | $8,600 | $9,500 | 1.10 |
| Smith, Bundy, Bybee | $8,550 | $6,840 | $8,550 | $900 | $900 | 0.11 |
| Alderson Alderson | $7,400 | $5,920 | $7,400 | $7,250 | $8,200 | 1.11 |
| Rossabi Black | $6,893 | $5,514 | $6,893 | $700 | $700 | 0.10 |
| Fallick Law | $6,150 | $4,920 | $6,150 | $5,800 | $6,750 | 1.10 |
| Kirkpatrick & Goldsb... | $5,680 | $4,544 | $5,680 | $6,500 | $7,500 | 1.32 |
| Meierhenry Sargent | $4,598 | $3,678 | $4,598 | $4,500 | $5,100 | 1.11 |
| Albright Stoddard | $4,590 | $3,672 | $4,590 | $4,500 | $5,000 | 1.09 |
| Ferguson Stein | $3,258 | $2,606 | $3,258 | $3,200 | $3,600 | 1.10 |
| Lowther & Johnson | $3,025 | $2,420 | $3,025 | $3,100 | $3,500 | 1.16 |
| Tollison Law Firm | $2,000 | $1,600 | $2,000 | $2,500 | $2,600 | 1.30 |
| James Law Offices | $1,900 | $1,520 | $1,900 | $2,100 | $2,100 | 1.11 |
| LaMarca & Landry | $1,560 | $1,248 | $1,560 | $1,700 | $1,800 | 1.15 |
| Skinner Law Firm | $860 | $688 | $860 | $900 | $1,000 | 1.16 |
| | TOTAL | TOTAL | TOTAL | TOTAL | TOTAL | |
| | $148,247,730 | $118,598,184 | $116,879,364 | $308,226,250 | $308,225,250 | |

# EXHIBIT 2

From: **Francis Scarpulla** fos@scarpullalaw.com
Subject: Re: conference re CRT
Date: September 3, 2015 at 3:08 PM
To: Bob Gralewski bgralewski@kmllp.com
Cc: Cate Cusick cpc@scarpullalaw.com, Dan Hume dhume@kmllp.com

I don't think there is anything to discuss. If my time is not included I'll file my own petition.

On Sep 3, 2015, at 2:35 PM, Bob Gralewski <bgralewski@kmllp.com> wrote:

> Fran,
>
> I never heard back from you.
>
> We want to include your time in the fee petition but we need to discuss it with you first.  That conversation needs to happen today or tomorrow.  When do you have time to talk?  I'm always reachable on my mobile – 619–818–6255.  You could start with my office number first – 619–398–4340.  Or give me a time and number that works for you and I'll call you.
>
> Thanks Fran.
>
> Bob
>
>> On Aug 31, 2015, at 10:03 AM, Bob Gralewski <bgralewski@kmllp.com> wrote:
>>
>> Fran,
>>
>> Sorry we didn't connect last week.  How does today look for you?  I'm available all day.  Let me know.
>>
>> I'd like to discuss our fee petition.  We all want to include you and your time in it, and I want to understand if that's what you want as we have a hard deadline approaching.  I also want to discuss your request for everyone's time detail.
>>
>> Hope to talk today.
>>
>> Bob
>>
>>> On Aug 27, 2015, at 7:38 AM, Francis Scarpulla <fos@scarpullalaw.com> wrote:
>>>
>>> Today is not good for me. Tomorrow I have commitments for the last day my daughter is with us before returning to Rome.
>>>
>>> What is it you want to discuss about CRT?
>>>
>>>
>>>
>>> On Aug 27, 2015, at 7:07 AM, Bob Gralewski <bgralewski@kmllp.com> wrote:
>>>
>>> Sorry for the delay in replying.  Busy day yesterday.
>>>
>>> How about:
>>>
>>> today at 12:30 pm Pacific
>>> today at 6:00 pm Pacific or
>>> tomorrow at 8:00 am Pacific

When we land on a date/time, let's use:

866-398-2885
175-973#

Look forward to hearing back and talking.

On Aug 25, 2015, at 4:20 PM, Cate Cusick <cpc@scarpullalaw.com> wrote:

Mr. Gralewski,

Fran said he could speak with your regarding the above-referenced matter.   Would you please contact your colleague and let me know three dates/times that are available to each of you, and I will have Fran coordinate with you, unless Fran decides to contact you directly through this shared email.

Thank you.


Cate Cusick
Law Offices of Francis O. Scarpulla
(415) 788-7210

# EXHIBIT 3

**From:** Mario Alioto [mailto:MAlioto@TATP.com]
**Sent:** Friday, September 18, 2015 5:35 PM
**To:** 'Francis Scarpulla'
**Subject:** RE: CRT/Inclusion of Your Time in the Fee Petition

I'm sorry you were not able to speak with me regarding the inclusion of your time in the fee petition.

We understand that you have also declined to speak with Bob Gralewski regarding your fee declaration and your time.  Bob is a member of the audit committee that has been contacting all firms to discuss their time and ensure that the fee declarations are submitted in accordance with Lead Counsel's instructions (see attached letter).  The audit committee has been cutting certain categories of time from all firms according to a number of rules (most of which were included in the attached letter):

1.   Time spent on the lead counsel motions is to be removed on the grounds that this work did not benefit the class;

2.   Read and review time that was not done in connection with a specific assignment from Lead Counsel, on the grounds that it is duplicative of work done by other counsel;

3.   Other time that was unassigned or has not been approved by Lead Counsel; and

4.   Internal case management time, such as organizing internal files.

Your firm's time, like many firms, includes some of the aforementioned categories of time. Since all other firms have agreed to remove these categories of time, we cannot make an exception for you.

In addition, we asked that all firms submit their time at historic rates.  You did not do this.  You have submitted all of your time at your current rate of $1250 per hour.  We cannot submit all of your time at current rates since no other firm is doing this.  Moreover, your current rate is far higher than that of any other attorney who worked on this case.

1

Finally, you also did not include the lodestar summary chart that we asked all firms to submit (and which many courts require), and instead attached your daily time sheets.

Since you have not submitted your fee declaration in accordance with our instructions, and you have refused to speak with us regarding changes to your declaration and your time, we cannot include your fee declaration in the joint fee petition. We will, however, be including $64,708.75 in lodestar for your firm in the joint fee petition. Based on the audit committee's review of your time sheets, we have determined that you have 59.05 hours of compensable time. We applied the historic rates listed in your timesheets to calculate your lodestar.

Having said all of that (which was provided to me by the audit committee), I would like to include as much of your time as we can under the rules set out above. There have been a number of instances where we have questioned the time of other firms and ultimately allowed it after discussing it with them. So please call me so we can do this with your time. Thanks.

Mario N. Alioto

TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP

2280 Union Street

San Francisco, CA 94123

Telephone:415 447-1650

Facsimile:415 346-0679

This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by e-mail and delete the message and any attachments.