Jeffrey C. Shea (212754)
Law Office of Brian Barry
Telephone: 949-307-5975
Email: sheaj_2000@yahoo.com

*Counsel for Indirect Purchaser Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 3:07-cv-5944<br>MDL No. 1917 |
| | **CLASS ACTION** |
| This Document Relates to:<br><br>All Indirect Purchaser Actions | **DECLARATION OF JEFFREY C. SHEA IN SUPPORT OF REPLY OF LAW OFFICE OF BRIAN BARRY TO LEAD COUNSEL'S OMNIBUS RESPONSE TO OBJECTIONS TO PROPOSED ALLOCATION OF AGGREGATE FEE AWARD TO INDIRECT PURCHASER PLAINTIFFS' COUNSEL**<br><br>Court: JAMS<br>Special Master: Martin Quinn, JAMS<br>Judge: Hon. Jon S. Tigar<br><br>**ORAL HEARING REQUESTED** |

I, Jeffrey C. Shea, declare as follows:

I am an attorney licensed to practice before the courts of California, and am Of Counsel to the Law Office of Brian Barry. I have personal knowledge of the facts stated in this filing and, if called as a witness, I could and would testify competently to them.

Pursuant to the Special Master's Order Re Process for Allocation of Attorney's Fees (ECF No. 4748), I hereby respond to Lead Counsel's Omnibus Response to Objections to Proposed Allocation of Aggregate Fee Award to Indirect Purchaser Plaintiffs Counsel (ECF No. 4853) ("Omnibus Response"). Per the Special Master's Order, I am entitled to this response due to the fact that Lead Counsel referenced and relied upon "new evidence" in filing its Omnibus Response.

1.) Lead Counsel includes in its Omnibus Response a discussion regarding "Billing Issues and Inefficiency," and references "various database reports" (Omnibus Response, P.46-48). Even the mere inference by Lead Counsel that time submitted by our firm was anything less than entirely legitimate and justified is wholly incorrect and highly offensive. I worked extremely long hours in generating high quality and high level work product. We have certainly entered a strange realm wherein Lead Counsel in a case of this magnitude would dismiss, downplay, or fail to acknowledge maximum effort put forth for the benefit of the Plaintiff class. Lead Counsel NEVER issued any instruction or directive indicating that a document reviewer's time must be limited to that worked while logged in to the database, nor did it instruct that a reviewer's time should be limited to a specified numbers of hours per day. Further, Lead Counsel did not in any way indicate that performing work on weekends or taking a limited number of days off would be discouraged or weighed negatively in determining fee allocations. Other firms in this case were surely able and permitted to work as many hours as our firm did during the relevant time period. That they chose not to is not my concern, nor should it weigh against the assignment of an upwardly adjusted multiplier for our firm. That our firm worked substantially more hours than other firms during the 2011-2012 time period should rightfully be viewed as a positive, and should be appropriately recognized and properly rewarded. Lead Counsel writes that "Shea consistently billed well over 8 hours a day doing document review and often billed on the weekends too" (Omnibus Response, P.47). Lead Counsel should applaud and properly recognize this level of diligence and work ethic. Strangely, it offers evidence of 8 hour workdays and weekend work as factors weighing against the assignment of a positive multiplier for our firm. Eight hours is a typical workday, and on only

1

3 of the 354 days I worked on the case did I bill 9 hours plus a fraction. The "well over 8" hour days referenced by Lead Counsel are, with the exception of the three 9 hour days, actually days billed at 8 hours plus a small fraction. Weekend work generally consisted of 2-4 hours per day (back up time records will be provided privately to the Special Master if requested). Our firm submitted time records regularly and contemporaneously during our time on the case (2011-2012). Lead Counsel NEVER once voiced concern about our time submissions or work product, process, or efficiency during this time period! It was not until the late and untimely date of August 2015 (right around the time that Lead Counsel had to figure out how to apportion the maximum amount of the fees to itself) did Lead Counsel indicate that it had concern with our billings. Had this "billing issue" been dealt with in a timely manner, it in fact would never have become an "issue" at all. Our firm should not be penalized because Lead Counsel failed to properly or adequately satisfy its case management and oversight responsibilities.

2.) Lead Counsel notes that it allowed our firm to bill some 600 hours for work performed while outside of the database (Omnibus Response, P.47). Lead Counsel was absolutely correct and justified in its decision to allow this time (and in fact should have allowed even more). Given its level of experience and expertise, as well as its knowledge of its case management and professional responsibilities, Lead Counsel surely would not have allowed this time if it believed that any portion of it was in any way unjustified or illusory. It is also worth noting that, during the time I worked on the case, there were NEVER any indications from Lead Counsel (or any firm) that my working process was in any way "inefficient" or that my "in-database" time was resulting in anything less than outstanding production in terms of actual number of documents reviewed and coded.

3.) Lead Counsel claims that our firm failed to act in the best interest of the class, and makes reference in its response to an e-mail in which I notify my review group leader that I will be ending (in December 2012) my work on the case, and alleges that this decision left it "in the lurch," "holding the bag," and "scrambling" to find replacement document reviewers (Omnibus Response, P.45-46). Lead Counsel is overstating things here, to put it mildly. Given the seemingly dire circumstances caused by our firm's decision, it seems odd that Lead Counsel, to my knowledge, did not at any time request that I continue to work on the case or that I be brought back at a later date. Lead Counsel did not even inquire as to whether I might split time between work on CRT and the case I was shifted to (a possibility that Mr. Barry and I discussed). Our firm did not abandon the CRT litigation effort. It is perfectly normal, in addition to being sound strategy, for a firm to work on a number of different cases over a few

2

years so that all of its eggs are not in one basket. Our firm made a decision to work in equal amounts on 4 cases (CRT, Eggs, TransPacific, Digital Music) which were filed in the 2006-2008 time frame, eventually billing approximately $1.5 million of lodestar in each case (time reports proving this can be provided to the Special Master upon request). In fact, a review of the evidence of our firm's history demonstrates that we are consistently among the hardest working and most committed firms in the cases on which we work, both in terms of hours devoted (and resulting lodestar) and contributions to the litigation fund. In CRT, despite the significant reductions to allowable hours and my hourly rate, our firm still ranks 18th out of 50 firms in terms of lodestar, and only 15 firms made higher litigation fund contributions. In LCD, our firm contributed $400,000 to the litigation fund and had a lodestar of $4.2 million (Exhibit 1) (see also Supplemental Report attached to Alioto declaration, P.9). These totals put our firm in the top 10 (or higher) in both categories in a field consisting of 100+ firms. In TransPacific, the case I moved to in January 2013, our firm was (as of April 2015, the time of the first motion for approval of settlements and fees) 11th out of 40 firms in terms of lodestar (Exhibit 2). These facts demonstrate that our firm, despite its small size, consistently commits itself fully to its cases, and works them more heavily than firms far greater in size.

      Lead Counsel has simply contradicted itself and sown confusion in attempting to have it both ways in regard to its fee allocation argument: it alleges that our firm was both overly committed to the case (working too many hours) AND not sufficiently committed to the case (exiting too soon). Lead Counsel claims that the case was at a "particularly critical juncture" at the time of my departure (Omnibus Response, P.45). However, in virtually the same breath, it insists that "there was no urgency" that would have required me to work more than 8 hours per day or work on weekends (Omnibus Response, P.47). Which is it? Either Lead Counsel has put forth an unsupported piece of revisionist history, or it should applaud my work ethic and diligence.

      4.) Lead Counsel cites language from the *LCD* Suppl. Report and suggests that our firm failed to act professionally and collaboratively to prosecute the joint IPP effort (Omnibus Response, P.46). Nothing could be further from the truth. Our professionalism was demonstrated throughout by the amount and indisputably high quality of our work product. Our firm worked extensively on the case for 13 consecutive months, billing in excess of 2000 hours during this time period. I was also at all times an eager, willing, and effective collaborator, as evidenced by the regular and numerous analytical e-mails I circulated to my review group, as well as my rapid and

3

attentive responses to all assignments and substantive and procedural questions asked by my group leaders and fellow group members. Importantly, our firm also provided a certified New York state class representative.

5.) Based upon the foregoing, and in combination with the evidence presented in our prior Objection (and in the Reply to which this Declaration is attached), it is clear that an upward adjustment to our firm's multiplier is warranted and deserved. Lead Counsel consistently contradicts itself in an attempt to justify its improper treatment of our firm, and NEVER ONCE raised any issue regarding our firm's billings, work product, or efficiency of work process during the time we worked on the case (despite the fact that we submitted time records regularly and contemporaneously). Our firm provided maximum effort, performed high level and high quality document review, and worked in close and effective cooperation with other firms. The high quality work product generated by our firm redounded directly to the benefit of the Plaintiff class. Our firm, even after absorbing severe reductions in billable hours and allowable hourly rate, still produced the 18th largest lodestar in the case (and as of the end of 2012, when risk was still at its highest, was one of the top few of all firms in the case). Despite this fact, ours is one of only 8 firms (out of 50) to not have been assigned a positive multiplier. This is entirely inequitable and should be remedied. Lead Counsel has repeatedly stated that firms which performed document review, contributed litigation funds, and provided a class representative should be assigned multipliers of at least 1.23-1.25. Our firm clearly satisfies the above criteria, and should be assigned a multiplier in that range, if not higher.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of September, 2016 in Henderson, Nevada.

_____
Jeffrey C. Shea (212754)
sheaj_2000@yahoo.com
Law Office of Brian Barry

4