JOSEF D. COOPER (53015)
TRACY R. KIRKHAM (69912)
JOHN D. BOGDANOV (215830)
COOPER & KIRKHAM, P.C.
357 Tehama Street, Second Floor
San Francisco, CA  94103
Telephone:  (415) 788-3030
Facsimile:  (415) 882-7040
jdc@coopkirk.com
trk@coopkirk.com
jdb@coopkirk.com

*Counsel for Class Representative Steven Ganz*
*And Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:  CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION. | **Master File No. 3:07-cv-5944 JST** |
| | **MDL No. 1917** |
| This Document Relates to: | **REPLY IN SUPPORT OF COOPER & KIRKHAM P.C.'S OBJECTION TO LEAD COUNSEL'S REVISED PROPOSED ALLOCATION OF AGGREGATE FEE AWARD TO INDIRECT PURCHASER PLAINTIFFS' COUNSEL** |
| All Indirect-Purchaser Actions | |
| | Judge: Honorable Jon S. Tigar |
| | Before: Special Master Martin Quinn, JAMS |

**TABLE OF CONTENTS**                                                    <u>PAGE</u>

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     THE TRUTH ABOUT C&K'S INVOLVEMENT WITH PHILIPS SETTLEMENT
        NEGOTIATIONS AND THE DISPUTE WITH THE CALIFORNIA AG . . . . . . . . 5

III.    THE TRUTH ABOUT C&K'S INVOLVEMENT WITH SPECIAL MASTER
        VAUGHN WALKER'S DECEMBER 2014 REPORT AND RECOMMENDATION
        AND SETTLEMENT DISCUSSIONS WITH THE CALIFONIA ATTORNEY
        GENERAL'S OFFICE AND DEFENDANTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.     THE TRUTH ABOUT C&K'S WORK PRODUCT AND PARTICIPATION IN
        DEPOSITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

V.      C&K'S SUGGESTION THAT MULTIPLIERS FOR THE LATE-ADDED TRIAL
        COUNSEL COULD BE ELIMINATED AS A SOURCE OF FUNDS . . . . . . . . . . 16

VI.     LEAD COUNSEL'S PROPOSED FEE FOR C&K MUST NOT BE ADOPTED IN
        THE SPECIAL MASTER'S RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . 18

**TABLE OF AUTHORITIES**                                              <u>**PAGE**</u>

<u>**Cases**</u>

*Class Plaintiffs v. Jaffe & Schlesinger, P.A.*
     19 F.3d 1306 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*In re TFT-LCD (Flat Panel) Antitrust Litig.*
     No. M 07-1827 SI, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) . . . . . . . . . . . . . . . . 1

*Radcliffe v. Experian Info. Solutions, Inc..*
     715 F.3d 1157  (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## I.  INTRODUCTION

Cooper & Kirkham ("C&K") filed an objection that demonstrated that Lead Counsel's proposal that the Special Master apply a negative multiplier to the firm's lodestar is an unseemly and inappropriate act of personal vengeance.   All of Lead Counsel's subsequent attempts to justify his recommendation only serve to reinforce that conclusion.  These justifications fall into two broad categories: (1) unsubstantiated allegations that C&K worked at cross-purposes to undermine Lead Counsel's settlement efforts; and (2) first-time criticisms of the quality of C&K's work product, that even if true, do not support Lead Counsel's proposed fee.[1]

Lead Counsel cites no authority for denying otherwise appropriate compensation to a lawyer who disagrees with (or even disrespects) Lead Counsel, other than the appearance of the words "failure to act professionally and collaboratively to prosecute the joint IPP effort" in a laundry list of boilerplate considerations that Judge Illston listed in her decision awarding individual firm multipliers in *TFT-LCD*.  This is insufficient to carve out a new exception to the general rule that, regardless of differences with lead counsel, lawyers are compensated appropriately for their efforts on behalf of the class, and the sole exception is where and when counsel's actions create a discernable conflict of the interest with the class.  *Class Plaintiffs v. Jaffe & Schlesinger, P.A.*, 19 F.3d 1306, 1308 (9th Cir. 1994); *Radcliffe v. Experian Info. Solutions, Inc.*, 715 F.3d 1157  (9th Cir. 2013).   For one thing, failure to act "professionally and collaboratively" is a dangerously elastic concept, which, as Lead Counsel's arguments here demonstrate, has the potential to encompass any and every disagreement with the leadership of a case.  For example, Lead Counsel spends almost half of the section on C&K recounting post-settlement behavior as justification for not compensating C&K's litigation efforts.  Apparently, C&K's failure to alert Lead Counsel soon enough about the conflict between the Chunghwa

---

[1]  As anticipated, Lead Counsel also argues that C&K's pursuit of objections to the settlements and plan of distribution justifies a punitive reduction of its lodestar.  See, discussion in "Objection of Cooper & Kirkham, P.C. to Lead Counsel's Revised Proposed Allocation of Aggregate Fee Award to Indirect Purchaser Plaintiffs' Counsel," filed September 7, 2016, Dkt. 4821.

settlement and his proposed plan of distribution is not acting collaboratively.  Objecting to Lead

Counsel's proposed fee request—well, that's not very collaborative either.

Even if Mr. Cooper had done everything that Mr. Alioto alleges,[2] none of it demonstrates

any conflict with the interests of class members, let alone the type of conflict for which fees are

forfeited.  Indeed, it is somewhat difficult to discern exactly what Mr. Cooper allegedly did, other

than object to the settlements.  Lead Counsel's Omnibus Response[3] in this area is long on

characterization and short on detail.  According to Mr. Alioto, Mr. Cooper's offense (for which all

of Mr. Bogdanov's and Ms. Kirkham's contributions to the case are to be devalued) was engaging

in "efforts to undermine IPP Counsel's efforts" and "work[ing] at cross purposes with them" with

regard to settling the case.[4]  He seems to have done this by "involv[ing] himself in the dispute

with Philips over its settlement with the California AG," allowing Mr. Bogdanov write an email

with which Ms. Capurro disagreed, and lobbying Judge Walker to appoint him co-lead counsel.

Alioto Declaration at ¶22-26.  Lead Counsel asserts that these efforts "unquestionably had a

serious, negative effect on the settlement negotiations."  *Id*. at ¶22.   However, he never reveals the

manner in which Mr. Cooper's actions seriously affected settlement negotiations.  Did they take

longer?  Did the defendants pay less money?   Perhaps Mr. Alioto thought that if he used the word

"unquestionably" in his Declaration, no one would ask.

In fact, when Lead Counsel actually attempts to describe how Mr. Cooper acted against the

class's interests, it is apparent that Mr. Alioto is conflating his own personal interests as Lead

Counsel with the best interests of class members.  Nowhere is this more apparent than in the

---

[2]   As discussed below, much of Mr. Alioto's purported testimony is contradicted by declarations of Josef
D. Cooper and John D. Bogdanov, filed concurrently herewith.

[3]   "Lead Counsel's Omnibus Response to Objections to Proposed Allocation of Aggregate Fee Award to
Indirect Purchaser Plaintiffs' Counsel," filed September 17, 2016, ("Omnibus Response") Dkt. 4853.

[4]   "Declaration of Mario N. Alioto in Support of Lead Counsel's Omnibus Response to Objections to
Proposed Allocation of Aggregate Fee Award to Indirect Purchaser Plaintiffs' Counsel," filed September
17, 2016, ("Alioto Declaration") Dkt. 4853-1, at ¶22.  This paragraph, among others is the subject of a
contemporaneously filed motion to strike on the grounds that lack of sufficient foundation for admission
into evidence under Rule 602, Federal Rules of Evidence, and hearsay, pursuant to Federal Evidence Rule
802.

---

discussion of Judge Walker's December 2014 Report and Recommendation ("R&R") that Josef

Cooper and Francis Scarpulla be appointed co-lead counsel to conduct settlement negotiations.  *Id.*

at ¶¶25-26.  Mr. Alioto claims that Mr. Cooper's (and Mr. Scarpulla's) unfair criticism of him to

Judge Walker is the reason for the R&R, and that it harmed the class because it "*caused Lead*

*Counsel and other IPP counsel to divert time and resources to collateral matters at a crucial point*

*in the case.*"  *Id.* at ¶26; emphasis added.  He then lists the major litigation activities in December

2014 and January 2015 that presumably suffered because Lead Counsel and other IPP counsel, at

Mr Alioto's direction, turned their attention from litigating the case to some unspecified activities

occasioned by Judge Walker's filing the R&R.  *Ibid*.

However, nothing in the R&R required action from Lead Counsel that would divert him

from trial preparation.  *See*, Dkt. 3200.  All the R&R did was to politely state that it appeared to

the retired Chief Judge of the Northern District of California (who was, as Lead Counsel notes,

"charged with settling the case and mediating the settlement negotiations;" Omnibus Response at

22) that, given conflicts with the California Attorney General and the press of trial preparation,

Mr. Alioto could use some help.  Judge Walker recommended that it would be beneficial to both

Lead Counsel and class members to bring in two of the most experienced antitrust counsel in the

country[5] to conduct settlement negotiations.  It is neither Mr. Cooper's (nor Judge Walker's) fault

that Mr. Alioto took the R&R as a call to arms, circled the wagons to fight Judge Walker's

recommendation, and, in the process, apparently compromised the class's interests by having its

counsel discontinue trial preparations at a crucial time in the litigation.  Further, although it

apparently appears so to Mr. Alioto, this response is not the only possible reaction a lead counsel

could have had to Judge Walker's R&R.  Another man might just as well have reacted by saying,

"Sure, let the guys who settled LCD take a crack at negotiating, while I keep preparing the case for

trial."  The only interests threatened by the R&R, and the only interests benefitted by diverting

---

[5] Judge Tigar to Josef Cooper at the March 16, 2016 hearing in this matter:  "[y]ou're one of the most experienced antitrust lawyers in the country."   "Transcript of Proceedings," at 73:19-20.

time and resources from trial preparation, were Mr. Alioto's interests in retaining his position as sole lead counsel.

Stretched to the fullest extent of Lead Counsel's factually inaccurate rhetoric, Mr. Cooper allegedly encouraged Judge Walker to recommend his appointment as co-lead counsel, and advocated for settlements with Philips and Samsung that in hindsight would not have been as valuable as the settlements that were ultimately achieved.   According to Lead Counsel, this, as well as later objecting to the settlements, should cause the Special Master to recommend a substantial reduction in C&K's entire lodestar, even though that lodestar does not contain one minute of time for any of these supposedly nefarious activities.  Other than allegedly whispering nasty things about Mr. Alioto in Judge Walker's ear, all of Mr. Cooper's other alleged transgressions boil down to underestimating how much Philips and Samsung would pay to settle, and being wrong (so far) about whether compensation is required for the release of non-repealer state class members' claims.

What is most mind-boggling about all of this is that such an incredibly punitive and draconian position is being advanced by a lead counsel whose own mistakes include abandoning the claims of class members in three repealer states, failing to advocate for a settlement that included compensation for class members' equitable monetary claims, and ignoring his constitutional duty to reseller class members by proposing to give their share of the Chunghwa settlement to consumers.  Given the substantial multiplier that Mr. Alioto is proposing for his own firm, he apparently expects all of his missteps and misjudgments to be ignored.  But Mr. Cooper's alleged "lack of knowledge" of the evidence and allegedly "advise[ing] that Lead Counsel accept" $50 million from Samsung should be severely punished.[6]  Incredible!

---

[6] Omnibus Response, Dkt 4853, at pg. 21.  Moreover, as will be discussed below, most of what Mr. Alioto claims occurred never happened.

## II. THE TRUTH ABOUT C&K'S INVOLVEMENT WITH PHILIPS SETTLEMENT NEGOTIATIONS AND THE DISPUTE WITH THE CALIFORNIA AG

Mr. Alioto testifies that "beginning in 2012, along with Scarpulla, Cooper involved himself in the dispute with Philips over its settlement with the California AG." Alioto Declaration at ¶23. This is not true. Mr. Cooper has no recollection of any involvement in any aspect of the litigation against Philips in 2012, other than consulting occasionally with Mr. Bogdanov about discovery, evidence and his responsibilities. Cooper Declaration at ¶8. In an attempt to refresh his recollection, while drafting his Declaration, Mr. Cooper looked at C&K timesheets, those of Mr. Scarpulla, Mr. Corbitt, Ms. Zahid, and other counsel who were at Zelle Hoffman during the litigation, and the timesheets of Mr. Alioto and Ms. Capurro. *Id*. at ¶¶4, 8. All of these timesheets confirm his recollection. Mr. Scarpulla recorded no time in the case in 2012. *Id*. at ¶8. Mr. Bogdanov has no entries regarding settlement in that year. *Ibid*. Stated bluntly, no one at C&K has any idea what Mr. Alioto is talking about.

Mr. Alioto then testifies "Cooper and Scarpulla even went so far as to formulate a settlement demand on Philips in mid-2013." Alioto Declaration at ¶23. This is also not true. Mr. Cooper never formulated a settlement demand on Philips. Cooper Declaration at ¶9. Mr. Cooper never discussed settlement at any time with anyone representing Philips. *Ibid*. He never determined at anytime during the litigation what an appropriate settlement range for Philips might be, and never attempted to make such a determination. *Ibid*. He never conveyed any opinion regarding the amount of an appropriate settlement with Philips to Mr. Alioto or any other counsel for plaintiffs. *Ibid*. He never advised Mr. Alioto to settle with Philips in 2013, or at any other time. *Ibid*.

Rather, beginning in early 2013, Mr. Cooper recalls becoming generally aware that Mr. Corbitt and other attorneys at Zelle Hoffman were undertaking some activity with regard to the California Attorney General and the conflict with Lead Counsel regarding the *parens patriae* case settlement with Philips. *Id.* at ¶10. Mr. Cooper's recollection is refreshed as to the extent of these efforts by the sixteen (16) time entries for the period January 1, 2013 through April 5, 2013, by

1  Craig Corbitt(12), Judith Zahid(2) and Chris Micheletti(2) which reference the dispute, and

2  possible resolution by way of a global settlement of all claims against Philips.  *Ibid*.

3       Mr. Cooper's only direct involvement in any of these events occurred on April 5, 2013, the

4  day of the hearing in San Francisco Superior Court on the State of California's motion for

5  preliminary approval of its settlement with Philips.  *Id*. at ¶11.  Mr Bogdanov and Ms. Zahid were

6  at the hearing as observers, and afterwards, they had an informal conversation with Kathleen

7  Foote, Senior Assistant Attorney General in the California Antitrust Division, about the

8  desirability of resolving this unfortunate dispute over the California Philips settlement. [7]  This

9  engendered telephone calls and emails among Ms. Zahid and Messrs. Corbitt, Scarpulla,

10  Bogdanov and Cooper about how to approach achieving a resolution of the dispute.  Cooper

11  Declaration at ¶11.  Although there were some follow-up activities by Zelle Hoffman attorneys,

12  neither Mr. Cooper nor Mr. Bogdanov participated.  *Ibid*.

13       Mr. Alioto testifies that "[i]n an effort to convince Lead Counsel to agree to an extremely

14  low settlement with Philips, John Bogdanov of Cooper's office argued in an email dated April 30,

15  2013 that Philips would win summary judgment because IPPs would be unable to pierce the

16  corporate veil and hold Philips responsible for the conduct of its joint venture, LPD."  Alioto

17  Declaration at ¶24.  Mr. Alioto's statement misrepresents the facts.  To begin, Mr. Bogdanov did

18  not write his email to convince Lead Counsel to agree to anything.  Bogdanov Declaration at ¶23.

19  He did not even write the email for or to Lead Counsel; neither did he forward it to Lead Counsel.

20  *Ibid*.  He wrote the email to Craig Corbitt by way of clarification after seeing an email in which

21  Mr. Corbitt mischaracterized his viewpoint on the strength of the evidence against Philips.  *Id*. at

22  ¶¶21-23.  Mr. Corbitt forwarded Mr. Bogdanov's April 30 email to Lead Counsel without advising

23  Mr. Bogdanov that he was intending to do so.  *Id*. at ¶23.  Mr. Bogdanov's email was not intended

24  to be a full assessment of all of the evidence or all of the potential issues regarding Philips'

25  _____

26  [7] "Declaration of John D. Bogdanov in Support of Objection of Cooper & Kirkham, P.C. to Lead Counsel's

27  Revised Proposed Allocation of Aggregate Fee Award to Indirect Purchaser Plaintiffs' Counsel, filed
concurrently herewith ("Bogdanov Declaration") at ¶18.

28

1  liability; neither was it intended to advocate for any specific settlement terms or amount.  *Id*. at

2  ¶¶25-26.  *See also*, Cooper Declaration at ¶11.

3       Although Mr. Cooper undertook no formal efforts with regard to the California AG's

4  dispute with Lead Counsel, he was working with Emilio Varanini, Kathleen Foote and others in

5  the Antitrust Division on two other cases in 2013.  Cooper Declaration at ¶13.  From time to time,

6  the subject of this litigation would come up, primarily with Mr. Varanini.  *Ibid*.  At no time did

7  Mr. Cooper counsel Mr. Varanini to do anything except continue working with Lead Counsel in

8  the most cooperative and collegial manner possible, or express any view other than that continued

9  friction was not in the best interests of either the CRT class or the citizens of California.  *Ibid*.

10      Lead Counsel has no evidence that Mr. Cooper or anyone else at C&K ever failed to act

11  professionally and collaboratively with regard to the settlement of the claims against Philips, or

12  the dispute with the California Attorney General.

13      As an additional reason for reducing C&K's lodestar, Lead Counsel asserts that Mr.

14  Cooper's alleged involvement in the dispute with the California AG "was wholly unnecessary

15  because Lead Counsel had assigned a senior partner from Milberg LLP, Paul Novak, who is a

16  former Assistant Attorney General of Michigan, to work with the California Attorney General's

17  office to resolve the dispute."  Omnibus Response at 20.  Lead Counsel also cites Mr. Novak's

18  being given sole authority to deal with the California AG as a reason to reduce Mr. Scarpulla's

19  requested lodestar by removing time spent dealing with this issue.  *Id*. at 8.  However, since there

20  is no time in C&K's lodestar for any actions, conversations or efforts of any kind with the

21  California AG, the reduction to C&K's fee for Mr. Cooper's alleged involvement in the dispute is

22  purely punitive, and cannot be justified as a refusal to pay for "duplicative, unnecessary and

23  unproductive" work.  *Ibid*.

24      Further, it should be noted that Lead Counsel is not advocating a reduction below lodestar

25  to Zelle Hoffman's proposed fee to punish it for Mr. Corbitt's, Ms. Zahid's and Mr. Micheletti's

26  duplicative, unauthorized and unnecessary dealings with the California AG's office and settlement

27  discussions with Philips' counsel in 2013.  Instead, Lead Counsel proposes to compensate that

28

time at a multiplier of 1.987.  Lead Counsel's reliance on Mr. Cooper's alleged involvement in these activities to justify not properly compensating C&K is disingenuous, at best.

### III.   THE TRUTH ABOUT C&K'S INVOLVEMENT WITH SPECIAL MASTER VAUGHN WALKER'S DECEMBER 2014 REPORT AND RECOMMENDATION AND SETTLEMENT DISCUSSIONS WITH THE CALIFONIA ATTORNEY GENERAL'S OFFICE AND DEFENDANTS

Mr. Alioto testifies that "[Mr. Cooper] contacted Judge Walker at some point in 2014 to complain about Lead Counsel's handling of the case."  Alioto Declaration at ¶25.  He then states that based on undisclosed hearsay statements of Mr. Scarpulla and Mr. Varanini, he believes that Mr. Cooper "accused [Mr. Alioto] of being uncooperative with the California AG, and of overvaluing the case and being unrealistic regarding settlement prospects."  *Ibid*.  The truth is that Mr. Cooper never contacted Judge Walker to discuss anything with regard to this case in 2014, or at anytime.  Cooper Declaration at ¶14.  In fact, Mr. Cooper never spoke to Judge Walker about this case before the R&R recommending his appointment as additional lead counsel was filed.  *Id.* at ¶¶ 14,16.

Mr. Cooper recalls having a conversation with Mr. Scarpulla in early December 2014, during which he was asked if he would agree to get involved in settling the case should that be recommended by Judge Walker and the recommendation acted upon by the Court.  *Id.* at ¶17.  It is Mr. Cooper's recollection, corroborated by Mr. Scarpulla's timesheets, is that this conversation took place on November 19, 2014.  *Ibid*.  Mr. Cooper agreed to serve, and, from his conversation with Mr. Scarpulla, believed that the concept that he and Mr. Scarpulla would be recommended as additional co-lead counsel had been initiated by Judge Walker.  *Ibid*.

Accordingly, having never spoken to Judge Walker prior to the filing of the R&R, at no time did Mr. Cooper "mislead[ ] [Judge Walker] regarding Lead Counsel's handling of the case," as Mr. Alioto alleges at paragraph 26 of his Declaration.  Clearly, Mr. Alioto's statements are not evidence for the genesis of Judge Walker's R&R since Mr. Alioto is not competent to testify as to Judge Walker's thought processes and motivations in making his recommendations.  Indeed, this all seems to be part of a convoluted attempt by Lead Counsel to construct an argument that Mr. Cooper acted unprofessionally, and fraudulently solicited the recommendations in the R&R by

poisoning Judge Walker's opinion of Lead Counsel.  All of this assumes that Judge Walker, who knew Mr. Alioto first-hand, is incredibly weak-minded.   From this leap of reason, Lead Counsel takes another to the conclusion that Mr. Cooper is therefore responsible for the harm caused to the class when Mr. Alioto was compelled to divert IPP counsels' time and resources from preparing for trial to defending his position as sole lead counsel.   However artfully constructed, without some evidence of contact between Mr. Cooper and Judge Walker, Lead Counsel's scenario falls.

Mr. Alioto testifies that Mr. was "in contact with the Defendants" and that he "suspects that Cooper . . .[was] discussing settling the case with . . . [the Samsung] Defendants . . . ."  He further states that I told him during an "early January 2015" conference call "that Samsung SDI would pay no more than $50 million to settle the IPP case, and advised that Lead Counsel accept that amount."  Alioto Declaration at ¶¶27-28.  In fact, Mr. Cooper never spoke to any defense counsel in this case during which they talked about settlement.  Cooper Declaration at ¶18.  Mr. Cooper has reviewed every entry in Mr. Scarpulla's time in the unsuccessful effort to figure out to what Mr. Alioto is referring in paragraph 28 of his Declaration.  *Ibid*.  Mr. Scarpulla simply has no time entry that states, indicates, reflects or implies that Mr. Cooper attended a meeting with any defendant's counsel.  *Ibid*.  Mr. Cooper did participate in a conference call with Messrs. Alioto, Goldberg and Scarpulla in early January, 2015, which Mr. Alioto had organized to discuss the upcoming Samsung mediation.  Since Mr. Cooper never spoke with Samsung's counsel, and had no knowledge of what Samsung might be willing to pay in settlement, he never opined on the subject.  *Ibid.*  Accordingly, he never recommend acceptance of $50 million or any amount.  *Ibid*.

## IV.   THE TRUTH ABOUT C&K'S WORK PRODUCT AND PARTICIPATION IN DEPOSITIONS

Finally, Lead Counsel contends that C&K's Objection to his fee allocation "greatly overstates Cooper's contribution to the case."  Omnibus Response at pg. 27.  He goes on to state, accurately, that the vast majority of C&K's lodestar is work done by John D. Bogdanov, whom he then mischaracterizes by claiming that "during the pendency of this case, Bogdanov was a mid-to-senior level associate who specializes in document review."  Alioto Declaration at ¶34.  Actually, at the beginning of his involvement with the case in 2010, Mr. Bodganov was a senior associate

with nine years of experience in complex antitrust litigation, who became a partner at C&K in 2012.[8]  Mr. Bogdanov does indeed specialize in "document review," but not in the derisive manner that Mr. Alioto uses it here to imply that Mr. Bogdanov is little more than a lawyer "who specializes in paralegal work."

Gone are the days when a first pass document review was done by paralegals or contract clerks who knew almost nothing about the case and were instructed only to copy basic information like names, dates and subject identification onto a coding sheet.  Now document review is indistinguishable from litigation management and trial preparation, and is designed to cull and coordinate relevant admissible evidence from documents on their initial review.  As the Special Masters in both *TFT-LCD* and *DRAM* recognized, document review is a lot more complex and demanding of attorney skill and competence than it used to be.  *See*, "Supplemental Report and Recommendation of Special Master re Allocation of Attorneys' Fees in the Indirect-Purchaser Class Action," filed December 18, 2012, Dkt. 7375, *In re TFT-LCD (Flat Panel) Antitrust Litigation*, No. M-07-1827-SI (N.D. Ca) at pgs. 3-4, and "Report and Recommendations of Special Master, Part III: Attorneys Fees, Expenses, and Incentive Awards for Plaintiffs," filed November 5, 2013, Dkt. 2155, *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, No. M-02-1486-PJH (N.D. Cal.) ("DRAM R&R") at ¶¶76-80, a copy of each of these documents is attached as Exhibits 7 and 8 to the Cooper Declaration.

As the Judge Renfrew noted in the DRAM R&R, the organization and protocols used to examine the millions of pages that were produced, and to create and structure the computerized review tools for the data base generated from that review, were a "reinvention of the entire document review process" that permitted the early "identif[ication of] the best documentary evidence."  *Id*. at ¶79.  That review structure and system was designed at C&K, used in *DRAM*,

---

[8]  "Declaration of Josef D. Cooper in Support of Plaintiffs' Application For Attorneys' Fees, Expenses and Incentive Awards," executed July 27, 2015, filed September 23, 2015, ("Cooper Fee Declaration") Dkt. 4073-6, at Exhibits 1-2.  A copy of this Declaration is attached as an exhibit to the Cooper Declaration filed concurrently herewith for the Special Master's convenience.

1   replicated for *TFT-LCD* and, through Ms. Kirkham's involvement, replicated again in this

2   litigation.  Cooper Declaration at ¶22.[9]

3          The Cooper Fee Declaration at ¶¶6B-E contains a detailed description of Mr. Bogdanov's

4   work as the Philips team leader, and demonstrates that far from being a simple document reviewer,

5   he was the person primarily responsible for marshaling the evidence against Philips and other

6   defendants into a logical, cohesive and persuasive package that could be and was used by counsel

7   with far less factual knowledge to take depositions, move for class certification, defend against

8   summary judgment, and designate exhibits and testimony for trial (a task that Mr. Bogdanov also

9   performed).  The Cooper Fee Declaration, which was drafted in July 2015, was reviewed closely

10  enough by Mr. Alioto before being filed with the Court, that he requested that Mr. Cooper change

11  the text of the declaration regarding his decision not to request a fee for his personal time.[10]

12  Other than requesting this editorial change, and that minor expense items be clarified or removed,

13  Mr. Alioto never took issue with the accuracy of any aspect of the Declaration, including the

14  following descriptions of C&K's contribution to the litigation:

15          Cooper & Kirkham was tasked with responsibility for setting up procedures for
            the obtaining, storing and review of electronically stored information ("ESI")
16          obtained in discovery.  This task involved the evaluation of the Relativity
            software that was ultimately chosen for the document database and the drafting
17          and negotiating the protocols pursuant to which discovery of electronic
            documents and records would be conducted.  This project was headed by Tracy
18          Kirkham, with the assistance of John Bogdanov.  The ESI protocols were
            negotiated over a lengthy period, beginning in 2010, during which there were
19          numerous meetings of groups of plaintiffs' and defendants' counsel, hearings
            before Special Master Legge, as well as individual "meet and confer" conferences
20

21

22  _____

23  [9] We were gratified that of all of the trial preparation in this case, William Blechman, a partner at Kenny
    Nachwalter, P.A., and counsel for two of the direct action plaintiffs, Sears, Roebuck & Co. and Kmart
24  Corp., called out the "detailed and voluminous database of facts reflecting conspiratorial events" as
    particularly beneficial to Mr. Goldberg and the other late-added trial counsel.  "Declaration of William J.
25  Blechman in Opposition to Objections to IPP Lead Counsel Fee Allocation, filed September 16, 2016, Dkt.
    4852.
26
    [10] "Declaration of Josef D. Cooper in Support of Objection of Cooper & Kirkham, P.C. to Lead Counsel's
27  Proposed Allocation of Aggregate Fee Award to Indirect Purchaser Plaintiffs' Counsel," filed September 7,
    2016, Dkt. 4821-1, at ¶5 and Exhibit B.
28

_____

REPLY RE OBJECTION TO LEAD COUNSEL'S        - 11 -        Master File No. 3:07-cv-5944 JST
PROPOSED FEE ALLOCATION                                   MDL 1917

with counsel for each defendant separately to discuss that company's individual e-discovery situation.  (Cooper Fee Declaration, ¶6A.)[11]

Cooper & Kirkham was tasked with responsibility for discovery and evidence pertaining to the Philips Defendant Group.  Since 2010, John Bogdanov, acting as a Team Leader and then Co-Team Leader beginning October 2013, helped to develop, monitor and amend the overall discovery strategy regarding Philips and its confluence with LG.Philips Displays ("LPD") * * * For example, Mr. Bogdanov was charged with:

- Identifying potential Philips and LPD custodians on a rolling basis from whom to seek the production of documents

- Identifying potential Philips and LPD deponents and other persons-of-interest to the case

- Drafting letters and participating in meet-and-confers regarding the negotiations for the production of documents, the production of transactional data, the selection of custodians, and Rule 30(b)(6) deposition topics

- Drafting Rule 30(b)(6) deposition topics in consultation with Plaintiffs' experts

- Leading meet-and-confers and assisting in drafting responses to Philips' requests for admission and contention interrogatories

- Participation in meet-and-confers regarding written discovery requests propounded both by Plaintiffs and Philips

- Assisting in the drafting and service of document and deposition subpoenas

- Examining Philips privilege logs

- Conducting high-level review and analyzation of specific document productions, such as from LPD and third-party witnesses

- Providing spot Philips/LPD-centric research for incorporation in briefs, such as in opposition to the California settlement with Philips in California Superior Court and Philips' motion to dismiss Philips Brazil and Taiwan for lack of personal jurisdiction

- Providing documentary and deposition evidence and arguments in support of Plaintiffs' oppositions to Philips' motions for summary judgment.  (*Id.* at ¶6B.)

In 2012, Cooper & Kirkham's primary focus turned to deposition strategy and preparation. * * * In this capacity, Mr. Bogdanov was responsible for helping to

---

[11] Unlike his attacks on Mr. Bogdanov, Mr. Alioto really doesn't question Ms. Kirkham's role in the litigation.  Rather, he simply states the obvious in a dismissive manner: that it was of limited duration, that Ms. Kirkham did not negotiate the ESI protocols by all by herself, and that she had the assistance of an expert in drafting the technical aspects of the agreement with defendants.  Alioto Declaration at ¶38.

identify potential Philips/LPD witnesses, preparing initial witness memos, briefing the reviewers on each witness, spot checking team members' designation of potential exhibits from the hits, setting and monitoring the review pace, answering questions, handling technical problems, holding periodic team conference calls, adding documents and generally supervising and managing the project. * * * Mr. Bogdanov then reviewed all documents that were deemed highly relevant by the team reviewers. In addition, he ran his own targeted searches throughout the review in order to investigate prospective witnesses and particular issues that were within his personal knowledge from the creation of exhibit lists for other deponents, or from his briefing projects or work with plaintiffs' economists. [Footnote omitted.] Mr. Bogdanov then narrowed the relevant documents into a smaller universe of documents from which deposition exhibits were selected. * * * Team leaders like Mr. Bogdanov were also responsible for generating accompanying memoranda, which incorporated feedback from the foreign language team, the review team members and any search results generated by the team leader, and general information regarding the deponent such as contact information and organizational charts. (*Id.* at 6C.)

This process culminated with Mr. Bogdanov's appearance at each of the following Philips/LPD depositions as second-chair (except Jan de Lombaerde):
Roger de Moor (Philips 30(b)(6))
Jim Smith
Wiebo Vaartjes
Patrick Canavan
Robert O'Brien
Joseph Killen
Kris Mortier
Jeff Johnson
Quin Choi
Frans Spaargaren
Jan de Lombaerde
Leo Mink (deposition postponed indefinitely) (*Ibid.*)

Mr. Bogdanov also assisted in the preparation and appeared at the deposition of Cooper & Kirkham's client Steven Ganz, who was appointed as one of the two California IPP class representatives. (*Ibid.*)

Beginning in late 2013, Mr. Bogdanov assisted in the development of memoranda concerning issues of liability with regard to the Philips/LPD defendants, including withdrawal from the conspiracy, and compiling pertinent documentary and deposition evidence. These memoranda provided a preemptive cache of information for use in opposing Philips' prospective motions for summary judgment, and also for trial prep and trial. Mr. Bogdanov provided foundational evidentiary resources to his colleagues and assisted in the editing and supplementation of the information contained in the summary judgment opposition papers. Mr. Bogdanov contributed to the strategy and briefing of Plaintiffs' oppositions to Philips' motions for summary judgment in 2014. Mr. Bogdanov also provided spot Philips/LPD-centric facts for incorporation in various briefs, including Philips' motion to dismiss Philips Brazil and Taiwan for lack of personal jurisdiction and Plaintiffs' objection to the California Attorney

General's settlement with Philips in state court.  (*Id.* at ¶6D.)

In 2014, Mr. Bogdanov worked as part of a small team of experienced lawyers tasked with culling the documentary evidence previously selected as deposition exhibits and selecting those that qualified as potential trial exhibits, as well as reviewing the deposition testimony and designating excerpts to be introduced into evidence.  (*Id.* at 6E.)

A year ago, Lead Counsel endorsed each of these statements by filing them with the District Court as grounds for the aggregate fee request.  A year ago, when he removed time from many other counsel's proffered lodestars, Lead Counsel did not call out one minute of Mr. Bogdanov's time as duplicative, unnecessary or unproductive.  A year ago, Lead Counsel submitted a declaration from an expert, Richard M. Pearl, who opined that the appropriate hourly rate for an attorney of Mr. Bogdanov's experience was $600 in 2015.[12]  Now, when it suits him, Mr. Alioto is willing to falsely swear that Mr. Bogdanov was little more than a glorified paralegal, whose work was substandard, and who would not or could not perform the tasks requested of him.  Mr. Alioto is willing to further insult Mr. Bogdnaov by recommending that 500.25 (10%) of Mr. Bogdanov's hours be compensated at zero and the remaining 4,502.25 be compensated at around 85% of his normal hourly rate.  It is simply impossible to conclude that there is any basis for Lead Counsel's proposed fee allocation for C&K other than Mr. Alioto's personal animus towards Mr. Cooper. Painfully, Mr. Bogdanov is caught in the cross-hairs.

However, before correcting the falsehoods in Mr. Alioto's proffered testimony regarding Mr. Bogdanov's contribution to the case, it should be noted that even accepting Lead Counsel's current characterization of Mr. Bogdanov (as merely the "leader of the Philips document review team" and a provider of "assistance to Lead Counsel and others who were performing higher level tasks such as taking depositions, drafting important briefs and running the case") does not support the proposed reduction of C&K's compensation for this work by applying a negative multiplier. Indeed, elsewhere in the Omnibus Response, Lead Counsel uses almost identical characterizations to justify a multiplier of 1.3991 for Glancy Prongay & Murray LLP ("Glancy . . . assigned one

---

[12] "Declaration of Richard M. Pearl in Support of Indirect Purchaser Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Litigation Expenses and Incentive Awards," filed September 23, 2015, Dkt. 4071-15, at ¶30.

lawyer to the case who led a document review team and did higher level document review, assisted with preparations for depositions . . . and prepared memoranda regarding the evidence their team found"[13]), and a multiplier of 1.9561 for Kirby McInerny LLP ("Kirby . . . joined the case late.  Mr. Gralewski was assigned to be co-team leader of the FTAIA team."[14]) and multipliers of 1.3491 for Sharp McQueen and Green & Noblin PC ("Like Glancy, Sharp McQueen and Green & Noblin PC assigned one lawyer to the case who led a document review team and did higher level document review, assisted with preparations for depositions . . . and prepared memoranda regarding the evidence their team found."[15])  As with Lead Counsel's apparent acceptance of the same activities by Mr. Corbitt, Ms. Zahid and Mr. Micheletti for which Mr. Scarpulla and Mr. Cooper stand accused and excoriated, there is no consistency in Lead Counsel's treatment of Mr. Bogdanov's time and that of the other discovery team leaders, who also took no depositions and wrote no briefs.

Mr. Alioto testifies that he is "informed and believe[s]" that Mr. Bogdanov was unable to handle meet and confers without substantial assistance from [Lauren Capurro], that Ms. Capurro often had to draft the meet and confer letters to Philips or heavily edit Bogdanov's drafts[, that] Ms. Capurro also ended up having to take over the negotiation of certain issues entirely because they had been dragging on for so long."  Alioto Declaration at ¶35.  The truth is that Philips' counsel were extremely difficult and uncooperative, which made progress with them over discovery issues inordinately slow and difficult, a fact that both Mr Bogdanov and Ms. Capurro contemporaneously acknowledged.  Bogdanov Declaration at ¶20.

---

[13] Omnibus Response at 17.

[14] Id. at 33 and 34.

[15] Id. at 17.  Lead Counsel's implied criticism that a firm that assigns only a single lawyer to the case should be compensated less handsomely than a firm that assigns five lawyers fails to recognize that what is relevant is not the absolute number of attorneys from a firm, but the portion of the firm's resources committed to the litigation.  For much of this case, C&K has been a three-lawyer practice.  Accordingly, on those days (and there were many) when Mr. Bogdanov was working full-time preparing for depositions, marshaling evidence for summary judgment oppositions or designating deposition testimony for use at trial, one-third of C&K's total capacity was dedicated to this case.

Mr. Alioto testifies (presumably also because he was told by some unidentified informant) that "[w]ith regard to depositions . . . Bogdanov declined to take the Philips Rule 30(b)(6) deposition . . . [and that] [t]he same thing happened with the merits depositions of Philips witnesses." Alioto Declaration at ¶36. This is not true. Mr. Bogdanov never declined a request to take a deposition, merits or Rule 30(b)(6). Bogdanov Declaration at ¶5. Rather, he was informed in an email from Ms. Capurro that Judith Zahid would be taking the Philips Rule 30(b)(6) deposition. *Id*. at ¶8. Originally, Ms. Capurro was going to sit "second chair" at the deposition, but she later backed out and Mr. Bogdanov travelled to Washington, D.C. with Ms. Zahid in July 2012, for the deposition. *Id*. at ¶10. Similarly, Mr. Bogdanov was informed by email on April 9, 2013, that Diane Pritchard had been designated by Lead Counsel to take the merits depositions of Philips and LGE employees. *Id*. at ¶11. Mr. Bogdanov was never requested to take these depositions. *Ibid*. Mr. Bogdanov appeared "second chair" at all of the Philips merits depositions, except one. *Id*. at ¶14.

Finally, Mr. Alioto testifies that "[t]he same situation occurred with regard to all of the briefing relating to Philips." Alioto Declaration at ¶37. Here, it is a little difficult to understand what Mr. Bogdanov allegedly did to create the "same situation" with the briefing of a motion "to add two Philips entities as defendants in early 2014." *Ibid*. Presumably, Mr. Alioto is alleging that Mr. Bogdanov refused to be responsible for this briefing so Ms. Capurro and Sylvie Kern had to do it. *Ibid*. The truth is that at the time in early 2014, that the motion to add Philips Taiwan and Brazil was being drafted, Philips depositions were in full swing and preparing for them and attending them was consuming all of Mr. Bogdanov's time and focus. Bogdanov Declaration at ¶29. Accordingly, he was never requested by Lead Counsel to stop deposition preparation and start drafting the motion. *Ibid*.

## V.    C&K'S SUGGESTION THAT MULTIPLIERS FOR THE LATE-ADDED TRIAL COUNSEL COULD BE ELIMINATED AS A SOURCE OF FUNDS

As we stated in our objection, the suggestion that Lead Counsel is proposing inappropriate multipliers for the late-added trial counsel, and that eliminating those multipliers would free up some of the funds needed to appropriately compensate C&K was not intended to cast aspersions

on the quality or legitimacy of the work done by Joseph Goldberg after Lead Counsel brought him in to "be the    lead trial lawyer at the trial."[16]  We simply demonstrated that Mr. Goldberg's situation (and that of the other late-added trial counsel) does not satisfy the criteria for the award of a multiplier.  Many very fine lawyers are compensated every day at their normal hourly rates, and while Mr. Goldberg notes that his rate is lower than Mr. Scarpulla's, Ms. Kirkham's or Mr. Bogdanov's (*Id*. at ¶4), this presumably reflects the lower cost of living and practicing law in Albuquerque as compared to San Francisco.

Mr. Goldberg states that "after [his] advent to the case and during the work-up to trial, I talked several times with . . . Mr. Cooper . . . [who] never objected to my (or the Fine Kaplan or Hulett Harper firms') presence in this case, and at that time . . . [he] expressed approval of and appreciation for the work we were doing." *Id*. at ¶7.  As detailed in the Cooper Declaration at ¶19, Mr. Goldberg's statements do not comport with Mr. Cooper's recollection.  Mr. Cooper never spoke to Mr. Goldberg about Fine Kaplan or Hulett Harper becoming trial counsel in the case, and can recall only a single conversation with Mr. Goldberg himself at which he neither objected to Mr. Goldberg's presence nor expressed approval and appreciation.  *Ibid*.  Nonetheless, it is true that Mr. Cooper was indeed relieved that Lead Counsel had apparently recognized that he did not have the expertise himself or among his inner circle to try the case.  The question here is not really about Mr. Goldberg's skill as a lawyer, but how his compensation should be determined and from where the money should come.

Mr. Goldberg asserts that "[i]f in November 2014, Mr. Alioto had asked [him] to clear his decks and take over the trial effort in this case at solely my hourly rate (with no multiplier), I would have refused the request."  Goldberg Declaration at ¶9.  Although he does not say so directly, this sounds a great deal as though Mr. Alioto promised Mr. Goldberg a multiplier on his time.  If this is so, then such a promise should be fulfilled from Lead Counsel's fee.  Indeed, even if there were no such explicit promise, compensation, certainly compensation above lodestar, for

---

[16] "Declaration of Joseph Goldberg in Opposition to Objections to IPP Lead Counsel Fee Allocation," filed September 16, 2016, Dkt. 4851 ("Goldberg Declaration").

Mr. Goldberg's services, as well as that for the two firms Mr. Alioto agreed he could bring in with him (*Id*. at 4), should come out of Lead Counsel's fee long before C&K or any other counsel in the case see their compensation reduced for this purpose.

## VI.   LEAD COUNSEL'S PROPOSED FEE FOR C&K MUST NOT BE ADOPTED IN THE SPECIAL MASTER'S RECOMMENDATION

Virtually every assertion made by Lead Counsel in support of his fee proposal for C&K is based on incompetent and inadmissible "evidence" that is directly refuted by the sworn testimony of Mr. Cooper and/or Mr. Bogdanov, as well as the documentary evidence attached to their declarations. Even more striking than the lack of foundation, Mr. Alioto's Declaration, if believed, raises the strong inference that he seriously breached his fiduciary duties as Lead Counsel. The Special Master need look no farther than Mr. Alioto's confession that in late 2014, he put his own interests in remaining sole lead counsel before the classes' interests in having the case prepared for trial. Indeed, were Mr. Alioto not so focused on punishing Mr. Cooper for Judge Walker's R&R and for objecting to the settlements, he might have noticed the import of his rhetoric.

During consideration of the aggregate fee award, Lead Counsel defended against accusations that he failed to perform the deposition taking and brief writing functions of most lead counsel by arguing that he was good at management and ran the case efficiently. Yet, his description of C&K's alleged performance in this case reads like there was no one minding the store. For example, Mr. Alioto claims to have been aware since 2012, that Mr. Cooper was engaged in unauthorized and obstructionist actions that were damaging to the interests of the class. If this were true, where is the evidence that Lead Counsel did anything about it? Where is the email or letter advising Mr. Cooper to desist from his unauthorized settlement activities because they were harmful to the interests of the certified classes? Similarly, where is the evidence that any action was taken after Mr. Bogdanov, a lawyer with major responsibilities for one of the two primary defendants, allegedly began from the earliest meet and confers in 2010, to repeatedly refuse assignments and produce substandard work? Where is the email or letter telling him this, or just politely informing him that his services would no longer be needed on the case? Why did Mr.

1  Cooper or Ms. Kirkham never hear that their associate/partner was asked to take Rule 30(b)(6) and

2  merits depositions and repeatedly refused?  Why let Mr. Bogdanov go through the entire case

3  repeatedly doing things in a manner that meant that "much of [his] work . . . had to be

4  duplicated?"  Alioto Declaration at ¶36.  And why wasn't this time eliminated during the audit that

5  preceded the fee petition?

6         The answer, of course, is that none of these things happened.  Mr. Cooper did nothing to

7  obstruct settlement and has never taken a position on anything that was not based on a good faith

8  belief that he was acting in the best interests of the class.  Mr. Bogdanov did everything asked of

9  him more than competently, and along with Mr. Kirkham, was largely responsible for the fact that

10 when Mr. Goldberg assumed the helm of trial preparation, he found "the evidence in the case had

11 been worked up very well."  Goldberg Declaration at ¶4.  The Special Master should categorically

12 reject Lead Counsel's proposed fee allocation to C&K.

13 Dated: September 23, 2016                    Respectfully submitted,

14

15                                              /s/ Josef D. Cooper
                                              Josef D. Cooper

16
                                     Josef D. Cooper (53015)
17                                    Tracy R. Kirkham (69912)
                                     John D. Bogdanov (215830)
18                                    COOPER & KIRKHAM, P.C.
                                     357 Tehama Street, Second Floor
19                                    San Francisco, CA 94103
                                     Telephone: (415) 788-3030
20                                    Facsimile: (415) 882-7040
                                     Email:  jdc@coopkirk.com