JOSEF D. COOPER (53015)
TRACY R. KIRKHAM (69912)
JOHN D. BOGDANOV (215830)
COOPER & KIRKHAM, P.C.
357 Tehama Street, Second Floor
San Francisco, CA  94103
Telephone:  (415) 788-3030
Facsimile:  (415) 882-7040
jdc@coopkirk.com
trk@coopkirk.com
jdb@coopkirk.com

*Counsel for Class Representative Steven Ganz*
*And Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:  CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | **Master File No. 3:07-cv-5944 JST** |
| | **MDL No. 1917** |
| This Document Relates to:<br><br>All Indirect-Purchaser Actions | **SECOND DECLARATION OF JOSEF D. COOPER IN SUPPORT OF COOPER & KIRKHAM, P.C.'S OBJECTION TO LEAD COUNSEL'S REVISED PROPOSED ALLOCATION OF AGGREGATE FEE AWARD TO INDIRECT PURCHASER PLAINTIFFS' COUNSEL** |
| | Judge:   Honorable Jon S. Tigar |
| | Before:  Special Master Martin Quinn |

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

I, Josef D. Cooper, declare as follows:

1.      I am a member in good standing of the State Bar of California, and licensed to practice in the states of California, Illinois and Hawaii.  I am a Principal in Cooper & Kirkham, P.C. ("C&K") I have personal knowledge of the facts stated in this Declaration and, if called as a witness, I could and would testify competently to them.  I make this Declaration in support of the Reply Re Objection of Cooper & Kirkham, P.C. to Lead Counsel's Revised Proposed Allocation of Aggregate Fee Award to Indirect Purchaser Plaintiffs' Counsel.

2.      To prepare this Declaration and refresh my recollection of events, in order to try to understand Lead Counsel's accusations, I reviewed the court docket and selected pleadings, the timesheets of the members of C&K, and the timesheets of other firms, primarily those of Zelle Hoffman, Francis Scarpulla (Dkt. 4818-2) and Trump Alioto.  Mr. Scarpulla was a senior attorney at Zelle Hoffman throughout the relevant time period, but has submitted his records separately for the reasons reflected in his fee application.  *Id.*

3.      At the time the *CRT* litigation began in November 2007, I and my partner Tracy Kirkham decided not to file a *CRT* case because of our other substantial commitments and our belief that we would not have adequate time to satisfy obligations to *CRTs* consistent with the work standards we impose upon ourselves.  Thereafter, I was frequently asked by counsel involved in the *CRTs* litigation to re-consider that decision and join the plaintiffs' counsel group. As a result, approximately one and a half years later I agreed that C&K could be added as counsel and C&K was listed among "Plaintiffs' Counsel" for the first time on the Indirect Purchaser Plaintiffs' Consolidated Complaint, filed March 16, 2009.  (Dkt. 437 at p. 97.)  After having been added as counsel, C&K did not do any substantive work in the case for another thirteen (13) months.  Formal Notices of Appearance were filed for Messrs. Cooper and Bogdanov and Ms. Kirkham on October 5, 2010.  (Dkts. 776, 777, 778.)

4.       At Lead Counsel's request, C&K began taking an active role in *CRTs* on April 8, 2010.  On that day, Lead Counsel (assisted by Zelle Hoffman) requested that my partner, Tracy Kirkham, take the lead on behalf of the Indirect Purchaser Plaintiffs in: (1) negotiating the

document production ESI protocols with the Defendants and Direct Purchaser Plaintiffs; and (2) establishing the IPP database structure and document review methodology and structure.   After consulting with me, Ms. Kirkham accepted Lead Counsel's invitation.   Thus, Ms. Kirkham's April 8, 2010 time entry is the first included in C&K's time submission to Lead Counsel, as reflected in the C&K fee Declaration.   See also time entries of Lauren Capurro of Trump Alioto and Zelle Hoffman (for Craig Corbitt and Patrick Clayton), true and correct copies of which are attached hereto as Exhibits 1 and 2.  Mr. Alioto's time records are not referenced in this Declaration because they are all handwritten and largely illegible and undecipherable.

5.      The Chunghwa settlement was old news by the time C&K became actively involved in *CRTs* on April 8, 2010.  The Chunghwa evidence proffer occurred fourteen (14) months earlier, on February 10, 2009.  (*See* Time records of Francis O. Scarpulla, Dkt. 4818-2 at p. 19.)  The Chunghwa Settlement Agreement was "entered into" almost exactly a year earlier, on April 18, 2009.  (Dkt. 3861 at p. 14.)  While I became generally aware that a settlement had been reached with Chunghwa in return for cooperation and a small amount of money, I never looked into the specific terms of the settlement before the July 2015 dissemination of notice that included the proposed plan for distributing the settlement proceeds.  Lead Counsel never requested that anyone at C&K review or evaluate or comment on the Chunghwa Settlement in any way, and no one ever did.  Their only entry in C&K's time submission relating to the Chunghwa settlement is Mr. Bogdanov's attendance at the March 22, 2012 final approval hearing.  There was no reference at the hearing to the inclusion of resellers in the settlement class.  Moreover, nothing occurred which would have put up a red flag until over three years later when a plan of distribution was submitted to the court which did not properly reflect the terms of the settlement and the Judgment entered.   There was no reason for me or anyone at C&K to review the Chunghwa agreement a year after the fact, given that it was not part of our assigned tasks and the benefits of the evidence proffer were already being gained.  In fact, Lead Counsel repeatedly warned counsel not to review pleadings or perform unauthorized tasks.  See Alioto Declaration (Dkt. 4071-1), where he explains how other counsel were docked for violation of this rule: "Lead Counsel has employed

---

many measures to ensure that the lodestar figure is not improperly inflated.  For example, Lead Counsel . . . (b) provided strict guidelines to IPP Counsel that they were only to work on the case at the direction of Lead Counsel and that only time authorized or approved by Lead Counsel would be included in an application to the Court[.]"  *Id.* at ¶ 118.  At no time pursuant to this procedure did Lead Counsel object to or remove one minute of C&K's submitted time.

6.       Furthermore, C&K had no reason to review the Chunghwa Settlement Agreement since I understood that it was principally conceived, negotiated and documented by attorneys at Zelle Hoffman.  That understanding is verified by the Zelle and Trump Alioto time records.  The Zelle records show 66 entries on this subject by five (5) Zelle attorneys between July 29, 2008 and April 18, 2009, when the Settlement Agreement was executed.  (Dkt. 4818-2 at p. 19) (*See* Zelle time records, true and correct copies attached hereto as Exhibit 3).  The Trump Alioto records show 18 entries on this subject by Ms. Capurro alone between July 29, 2008 and April 18, 2009. (*See* Trump Alioto time records, true and correct copies attached hereto as Exhibit 4).  I do not have a count on Mr. Alioto's participation since, as noted above, his time records are all handwritten and largely illegible and undecipherable

7.       Throughout the pendency of the *CRTs* litigation, C&K has had at least five (5) significant cases in which both it and Zelle took major roles on behalf of plaintiff classes.  One is the much discussed *TFT-LCD* litigation, which was being actively litigated for all but the last couple of years.  In *LCD*, I took a leading role with Mr. Scarpulla in negotiating and documenting settlements totaling almost $1.1 Billion.  Throughout that litigation, Zelle adamantly refused to include resellers in any class(es) or settlements being negotiated.  I had no reason to suspect that Zelle had deviated from that position with Chunghwa.  This was reinforced as the case progressed by the fact that the certified IPP litigating classes did not include resellers.  (Dkts. 1742 and 1950.)

8.       As would be expected, I talked with Mr. Scarpulla frequently about our other joint cases throughout the pendency of the *CRTs* litigation, even speaking daily or multiple times a day during certain periods.  There was no reference to *CRTs* during the overwhelming percentage of those conversations, although, not surprisingly, CRTs did come up on some occasions.  My name

appears in Mr. Scarpulla's time sheets three (3) times during the two and a half years between the November 2007 inception of the case and the April 8, 2010 initiation of C&K's active participation as one of plaintiffs' counsel.  My name appears in Mr. Scarpulla's time sheets three more times in 2010, and then not again for over two years, until April 5, 2013.  Mr. Scarpulla does not have time entries in 2012.  None of Mr. Scarpulla's entries that mention me make any reference to defendant Philips.  The only entries in C&K's time records before January 1, 2013 which reference Philips, relate to Mr. Bogdanov's activities as the head of the Philips discovery group.  Nor did I find any reference to the California AG in either Mr. Scarpulla's or the C&K time records at any time through the end of 2012.  Thus, there is no evidence to support Mr. Alioto's accusation that "beginning in 2012, along with Scarpulla, Cooper involved himself in the dispute with Philips over its settlement with the California AG."  (Dkt. 4853-1, ¶23)

9.     Mr. Alioto's next accusation is that "Cooper and Scarpulla even went so far as to formulate a settlement demand on Philips in mid-2013."  (Dkt. 4853-1, ¶23.)  I never formulated a settlement demand for Philips.  I never discussed settlement at any time with anyone representing Philips.  I never determined at anytime during the litigation what an appropriate settlement range for Philips might be, and I never attempted to make such a determination.  I never conveyed any opinion regarding the amount of an appropriate settlement with Philips to Mr. Alioto or any other counsel for IPP plaintiffs.  I never advised Mr. Alioto to settle with Philips in 2013, or at any other time.

10.     I was generally aware of activities regarding Philips by Zelle Hoffman which are recorded in the timesheets of Zelle Hoffman attorneys other than Mr. Scarpulla.  Between January 1, 2013 and April 5, 2013, there are at least sixteen (16) entries by Craig Corbitt (12), Judith Zahid (2) and Chris Micheletti (2) which reference the IPPs dispute with the California AG over the AG's *parens patriae* settlement with Philips, and possible resolution of this dispute through an IPP settlement with Philips (although the name "Philips" only appears once).  These entries reflect at least five (5) conferences with representative of the California AG's office, and at least three (3)

1    conferences with Mr. Alioto.  A true and correct copy of Zelle Hoffman's time records from

2    January 1 – June 18, 2013 is attached as Exhibit 5.

3        11.    April 5, 2013, was the date of the hearing in San Francisco Superior Court on the

4    State of California's motion for preliminary approval of its settlement with Philips.  The observers

5    included Ms. Zahid of Zelle and Mr. Bogdanov of C&K.  After the hearing, Ms. Zahid and Mr.

6    Bogdanov had a conversation with Kathleen Foote, head of the California AG's Antitrust

7    Division, about the desirability of resolving this unfortunate dispute over the California Philips

8    settlement.  This engendered telephone calls and emails among Ms. Zahid and Messrs. Corbitt,

9    Scarpulla, Bogdanov and me about how to approach achieving a resolution of the dispute.  These

10   are the events referenced in Mr. Scarpulla's April 5, 2013 time record.  They are also reflected in

11   Ms. Zahid's and Mr. Corbitt's timesheets for that day.  Follow-up communications on this subject

12   are noted in both Mr. Scarpulla's and Mr. Corbitt's time entries for April 16 and 30, 2013, and an

13   additional entry by Mr. Corbitt on April 23, 2013.  The April 16, 2013 entries reflect a meeting

14   with Mr. Alioto on this subject attended by Ms. Zahid and Messrs. Corbitt and Scarpulla, but not

15   attended by either me or Mr. Bogdanov.  The April 30, 2013 email from Mr. Bogdanov to Mr.

16   Corbitt referenced in Mr. Alioto's Declaration at paragraph 24, was sent in advance of Mr.

17   Corbitt's meetings that day with the California AG and Philips' counsel, to correct Mr. Corbitt's

18   misunderstanding of Mr. Bogdanov's view of the case against Philips.  See Bogdanov Declaration

19   at paragraphs 22-25.  Mr. Corbitt's time records have six (6) more entries in May and June 2013,

20   relating to these matters, which reflect four (4) communications each with Mr. Alioto and Ms.

21   Foote.  None refer to either Mr. Bogdanov or me.  Mr. Scarpulla does not have any entries that

22   refer to this subject or communications with a representative of the California Attorney General's

23   office until October 2013.

24       12.    Mr. Alioto accuses me of poisoning him in the eyes of Special Master Walker

25   "based on statements . . . made by Scarpulla and Emilio Varanini of the California AG's office at a

26   meeting with Judge Walker in August 2014."  (Dkt. 4853-1, ¶25.)  Based on Mr. Scarpulla's time

27   records, this meeting appears to have been on August 8, 2014.  Mr. Alioto admits that I was not a

28

1  participant in that meeting.  I do not believe that I was aware of this meeting until after it

2  happened.  Mr. Scarpulla has thirty-two (32) time entries between October 4, 2013 and August 8,

3  2014, that mention Mr. Varanini.  My name is not shown in any of those entries.  Mr. Scarpulla

4  has only one time entry during this nine (9) months period (for 12/19/2013) which names me,

5  along with Ms. Zahid, relating to emails "RE: DEPO WORK".  (Dkt. 4818-2, p. 28)

6          13.     During the pendency of the this litigation, C&K had two (2) significant other cases

7  in which, like the *CRTs* situation, it was counsel for plaintiff classes and the California AG was

8  prosecuting related cases on behalf of California governmental entities and *parens patriae* on

9  behalf of California consumers.  One of those cases is now done, and the second is currently in the

10  final wrap-up stages.  Throughout those cases, I talked frequently with representatives of the

11  California AG's office, including Ms. Foote and Mr. Varanini, even speaking with Mr. Varanini

12  daily or multiple times a day during certain periods.  While we did not always agree on questions

13  that arose during those cases, I was always able to work cooperatively with Mr. Varanini to

14  attempt to reach solutions and positions which satisfied the interests of both the classes and the

15  State of California (and the many other states that were involved in both actions).  There was

16  never any of the personal rancor that seemed to characterize the interactions between Lead

17  Counsel and the California AG.  See generally, Special Master's Report and Recommendation Re

18  Settlement (Dkt. 3200).  Reference to *CRTs* during my communications with the California AG

19  was extremely rare, although, not surprisingly, CRTs did come up on occasion.  At all times, I

20  counseled Mr. Varanini to continue doing everything in his power to work with Lead Counsel in

21  the most cooperative and collegial manner possible, and expressed the view that continued friction

22  was not in the best interests of either the CRT class or the citizens of California.

23          14.     Mr. Alioto also claims, based on Mr. Scarpulla's time records (Dkt. 4853 at p.22),

24  that Judge Walker's December 12, 2014 Report and Recommendation Re Settlement (Dkt. 3200)

25  ("R&R") was the result of me:  (A) "contact[ing] Judge Walker at some point in 2014 to

26  complain" (Dkt. 4853-1, ¶25); and (B) "meeting with . . . Special Master Walker . . ." to badmouth

27  him.  (*Id.*, ¶¶25, 26.)  I never contacted Judge Walker to discuss anything with regard to this case

28

SECOND DECLARATION OF JOSEF D. COOPER     - 6 -          Master File No. 3:07-cv-5944 JST
                                                          MDL 1917

1  in 2014, or ever.  I never spoke to Judge Walker before his R&R was filed with the Court, not

2  about Mr. Alioto's job performance, not about the California AG, and not about settlement of the

3  litigation.  Mr. Scarpulla's time records have a total of three (3) entries where Judge Walker is

4  named in the entire four (4) year and eight (8) month time period between the inception of the case

5  and the August 8, 2014 meeting with Messrs. Alioto and Varanini discussed above.  All of these

6  entries are for the eight (8) days before August 8th, and seem to refer to that conference.  None of

7  those entries contain my name.

8      15.    Mr. Scarpulla's records for the three (3) month plus period between the August 8

9  conference with Judge Walker and Judge Conti's November 17, 2014 Order directing "the Special

10  Master to prepare a report and any recommendations necessary regarding the progress of

11  settlement discussions in the Indirect Purchaser Plaintiffs' action" (Dkt. 3118), show four (4)

12  entries where Judge Walker is identified.  I am not identified in any of those four (4) entries.  I am

13  noted in six (6) different time entries during this period, primarily relating to Zelle's October 2,

14  2015 letter to Mr. Alioto offering assistance with trial preparation.  (Dkt. 4818-3.)  Mr. Goldberg

15  is one of the six signatories to the letter (as am I).  There is no specific reference to this letter in

16  Mr. Goldberg's time records, and no acknowledgement of it in his "Declaration Of Joseph

17  Goldberg In Opposition To Objections To IPP Lead Counsel Fee Allocation" (Dkt. 4851).  A true

18  and correct copy of Mr. Goldberg's firm's time submission is attached hereto as Exhibit 6.  Mr.

19  Scarpulla's time entry for November 3, 2014 contains, in part, the notation: "CONFERENCE

20  WITH V. WALKER RE: STATUS AND STRATEGIES, EMAILTO J. GOLDBERG RE SAME,

21  ETC."  (All of Mr. Scarpulla's time records are in all caps.)  Mr. Scarpulla's time entry for

22  November 6, 2014 contains the notation:  "EMAILS AND TELEPHONE CONFERENCE WITH

23  J. GOLDBERG, ET AL., RE TRIAL TEAM AND SCHEDULE, ETC."  There is no reference to

24  either of these matters in Mr. Goldberg's time records.  Actually, there is no reference to either

25  Mr. Scarpulla or me anywhere in his time entries.

26      16.    Mr. Scarpulla's time entries for the almost four (4) week period between Judge

27  Conti's November 17 Order and Judge Walker's December 12, 2014 Report and Recommendation

28

---

SECOND DECLARATION OF JOSEF D. COOPER      - 7 -      Master File No. 3:07-cv-5944 JST
                                                       MDL 1917

contain only two entries that mention me, only one of which is potentially relevant to Mr. Alioto's assertion that I "contacted" Judge Walker.  The timesheet for November 19, 2014, states in pertinent part:  "EMAIL FROM V. WALKER RE: R&R, EMAILS AND TELEPHONE CONFERENCE WITH J. COOPER RE: SAME, EMAIL TO V. WALKER RE SAME".  Mr. Scarpulla's timesheet for December 9, 2014, states in pertinent part: "EMAIL AND TELEPHONE CONFERENCE WITH V. WALKER, E. VARANINI, JD COOPER, ETC. RE: STATUS AND STRATEGIES."  Insofar as this entry appears to memorialize a single telephone conference with Mr. Scarpulla, Judge Walker, and Mr. Varanini, myself and others, I believe that it is the result of a typographical error that omitted the "s" from the word, "conference."  Were the "s" added, the time entry would have accurately reflected that Mr. Scarpulla had multiple communications with different people, including me, that day.  I never participated in any telephone conference with Mr. Scarpulla, Judge Walker, Mr. Varanini on December 9, 2014, or at any time.

17.     After entry of Judge Conti's November 17 Order, Mr. Scarpulla did ask me if I would be willing to get involved in the settlement of this case if recommended by Judge Walker and acted upon by Judge Conti.  I responded "yes."  I understood that this concept of additional co-lead counsel had been initiated by Judge Walker, as shown by the first entry in Mr. Scarpulla's November 19 record  --  e.g., "EMAIL FROM V. WALKER RE: R&R."  I believe that Mr. Scarpulla's November 19 entry reflects my exchange with him and his report back to Judge Walker.

18.     Finally, Mr. Alioto asserts that I was "in contact with the Defendants" and that he "suspects that Cooper . . .[was] discussing settling the case with . . . [the Samsung] Defendants . . . ."  He further states that I told him during an "early January 2015" conference call "that Samsung SDI would pay no more than $50 million to settle the IPP case, and advised that Lead Counsel accept that amount."  (Dkt. 4853-1, ¶27.)  In fact, I never spoke with any defense counsel about settling this case.   By my count, Mr. Scarpulla's timesheets for the period from December 1, 2014 to February 17, 2015, reflect fourteen (14) communications with defense counsel, which includes seven (7) communications with Samsung's counsel before January 23, 2015, when "[a]n

1   agreement in principle was reached . . . [with Samsung] after two full days of mediation with

2   Judge Walker." (Dkt. 3861 at p. 8.)  None of Mr. Scarpulla's entries in any way suggests that I

3   participated in those communications, and I did not.  After the entry of Judge Walker's December

4   2014 R&R, I did have conversations with Mr. Scarpulla and Mr. Varanini about the status of

5   Judge Walker's Recommendation and rumors about the progress and success of Mr. Alioto's

6   settlement negotiations.  I did participate in a conference call with Messrs. Alioto, Goldberg and

7   Scarpulla in early January, 2015, which Mr. Alioto organized to discuss the upcoming Samsung

8   mediation.  Since I never spoke with Samsung's counsel, I had no knowledge of and never opined

9   on what Samsung might be willing to pay, nor did I recommend acceptance of any amount.  I do

10  not recall that Mr. Scarpulla said anything that could properly be characterized as is described by

11  Mr. Alioto.

12      19.     Mr. Goldberg states:  "After my advent to this case and during the work-up to trial,

13  I talked several times with Mr. Scarpulla and Mr. Cooper.  Neither one objected to my . . .

14  presence in this case, and at the time both expressed approval and appreciation for the work we

15  were doing." (Dkt. 4851 at p. 3)  The only time I recall talking to Mr. Goldberg about *CRTs* is the

16  early 2015 conference call about the Samsung mediation noted above.   Mr. Goldberg's time

17  records are not helpful on when I allegedly made these statements, since his entries do not have

18  any reference to either me or Mr. Scarpulla, and do not even note the January conference call.  Nor

19  do I recall making any statements about Mr. Goldberg's participation in the litigation on that call.

20  I do recall stating that Mr. Bogdanov, with his vast knowledge of the evidence in the case, was

21  available to assist him if called upon.  The January call was over three months after I had joined in

22  the Zelle letter to Mr. Alioto, urging him to assemble a team to prepare for trial.  I was glad Mr.

23  Alioto had recognized his inability to try the case and had sought assistance.  The issue I have

24  presented has nothing to do with Mr. Goldberg, but goes to Mr. Alioto's decision to turn to

25  someone who had no knowledge of or background in the litigation as lead trial counsel and then

26  authorize him to bring in two additional law firms who were equally uninformed.   There were

27  numerous lawyers and firms in the case who could have stepped up without the steep learning

28

curve and extensive duplication required to start from scratch.  Mr. Scarpulla and myself aside, the list of experienced, senior antitrust trial lawyers already in the case includes Craig Corbitt, Bob Green, Susan Kupfer, Dan Hume and Chris Lovell all of whose firms had already made a significant commitment to *CRTs*.  (This list is not intended to be exhaustive and I apologize to anyone whose feelings I've hurt by leaving them off.)

20.     Neither Mr. Alioto, Ms. Capurro, nor anyone else ever complained to me or Ms. Kirkham, orally or in writing, about Mr. Bogdanov's work quality or ethic, ever told either of us that Mr. Bogdanov had refused to take depositions, or ever asked either of us to remove Mr. Bogdanov from the case.  Primarily Mr. Bogdanov's work resulted in the sixth largest lodestar in the case – a significant commitment from a three lawyer firm.  Not one minute of C&K's time was challenged by Lead Counsel, which belies the accusation that the work product was lacking.

21.     Mr. Alioto never expressed to me, orally or in writing, any objection to or dissatisfaction with any of my actions or activities in the case.  Specifically, he never complained that I was inappropriately interjecting myself into the dispute with the California Attorney General, or into the settlement process or in any way hindering settlement.  He never expressed the view that any action of mine was unprofessional, uncooperative or against the best interests of the plaintiffs or class members.

22.     As far back as 1994, when she authored an article about electronic discovery in the Practical Litigator and lectured on the subject before the Trial Lawyers of America, Ms. Kirkham has had a particular interest in and has been recognized as an expert in electronic document management and electronic discovery.  For the discovery effort in *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, No. M-02-1486-PJH (N.D. Cal.), where I am one of the Co-Lead-Counsel, she designed and implemented a new document management template that represented a paradigm shift in the area of document discovery and management in complex multiparty litigation.  Up to that point, document discovery was generally carried out with a multi-layered review process, starting with low-level reviewers and eventually working its way up through successive review levels to those with responsibility for formulating the factual and legal

theories that would be used at trial.  With the advent of lower-cost, higher-capacity computers, faster internet speeds and access, and better and more flexible relational databases, Mr. Kirkham was able to design a system and protocols for *DRAM* that essentially turned this process on its head.  Instead of starting with low-level reviewers, the document management process began with the case's most experienced trial lawyers creating a road map of the issues, evidence and allegations that if successfully supported would result in a jury verdict for plaintiffs.  Then, teams were created across firm lines, lead by experienced trial counsel, who reported directly to Ms. Kirkham and Co-Lead Counsel.  These teams were organized by subject matter and issues, and were charged with developing search parameters for the full-text review of all of the documents produced by the defendants to identify the best evidence supporting plaintiffs' positions.  Reviewers, who were generally themselves mid-to-senior level associates worked in their own offices and communicated with each other and were supervised by their team leaders by telephone and email.  At the conclusion of the initial subject matter review, the team leaders selected their best team members to move on to deposition preparation teams and later to trial exhibit preparation.  Slightly modified versions of this system were implemented in both *In re TFT-LCD (Flat Panel) Antitrust Litigation*, No. M-07-1827-SI (N.D. Ca) and this case.  Mr. Bogdanov worked on both *DRAM* and *TFT-LCD*, and developed considerable expertise himself in electronic document discovery and management.  Exhibits 6 and 7 are true and correct copies of Reports and Recommendations of the Special Masters in *DRAM* and *TFT-LCD* that recognize the innovative nature of this form of document review.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 23rd day of September, 2016, in San Francisco, California.

_/s/ Josef D. Cooper_____
Josef D. Cooper

# EXHIBIT 1

## FILED UNDER SEAL

# EXHIBIT 2

## FILED UNDER SEAL

# EXHIBIT 3

## FILED UNDER SEAL

# EXHIBIT 4

## FILED UNDER SEAL

# EXHIBIT 5

## FILED UNDER SEAL

# EXHIBIT 6

## FILED UNDER SEAL

EXHIBIT 7

THE HONORABLE CHARLES B. RENFREW (Ret.)
633 Battery Street
San Francisco, CA 94111
Telephone: (415) 397-3933
Facsimile: (415) 397-7188

SPECIAL MASTER

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| In re DYNAMIC RANDOM ACCESS MEMORY (DRAM) ANTITRUST LITIGATION | Master File No. M-02-1486-PJH |
| | MDL No. 1486 |
| | Case No. C 06-4333 PJH |
| This document relates to: | Case No. C 06-6436 PJH |
| **ALL INDIRECT PURCHASER ACTIONS** | **REPORT AND RECOMMENDATIONS OF SPECIAL MASTER** |
| and | PART III: ATTORNEYS' FEES, EXPENSES, AND INCENTIVE AWARDS FOR PLAINTIFFS |
| *State of California et. al. v. Infineon Technologies AG, et al.* | Judge: Honorable Phyllis J. Hamilton |
| and | |
| *State of New York v. Micron Technology, Inc., et al.* | |

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

# **TABLE OF CONTENTS**

I.      INTRODUCTION ......................................................................................... 1

II.     THE RECORD SUPPORTING THE SPECIAL
        MASTER'S FINDINGS ............................................................................... 2

III.    SUMMARY OF THE SPECIAL MASTER'S FINDINGS
        AND CONCLUSIONS................................................................................. 5

IV.     FINDINGS OF FACT AND CONCLUSIONS OF LAW
        REGARDING THE APPROPRIATE AMOUNT OF ATTORNEYS'
        FEES TO BE AWARDED TO COUNSEL................................................. 13

        A.      The Settlement Fund Achieved for the Proposed Settlement
                Classes Constitutes A Fair, Reasonable and Adequate
                Resolution of the Litigation That Entitles
                Counsel to a Reasonable Attorneys' Fee ....................................... 13

        B.      The Ninth Circuit's Standards and Procedures for Determining
                Attorneys' Fee Awards in Common Fund Cases............................ 15

        C.      Computation of the 25% Benchmark Fee ....................................... 19

        D.      The Lodestar Cross Check Supports an Award of
                At Least the Benchmark Fee.......................................................... 21

        E.      The Results Achieved by Counsel in Light of the Circumstances,
                Risk and Complexity of the Litigation and the Skill and Quality of Their
                Work Supports An Award of At Least the 25% Benchmark Fee ................. 31

                1.      The Results Achieved by Counsel ...................................... 31

                2.      Counsel's Efforts in the Litigation.................................... 33

                3.      The Substantial Risks Facing Counsel in this Complex Litigation ... 42

                        a.  The *Assoc, Gen. Contractors* Issue ............................... 42

                        b.  Risk of Failure to Certify Litigation Classes ................ 46

                        c.  Other Aspects of Risk and Complexity in the Litigation............. 48

                        d.  The Quality of Counsel's Work Reflects
                            Their Skill and Experience........................................ 51

V.    FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE
      REIMBURSEMENT OF LITIGATION COSTS AND EXPENSES ...................... 52

VI.   FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE
      PAYMENT OF INCENTIVE AWARDS TO THE CLASS
      REPRESENTATIVES ............................................................................................. 56

VII.  CONCLUSION ......................................................................................................... 58

# TABLE OF AUTHORITIES

## Cases

*Alpine Pharmacy, Inc. v. Charles Pfizer & Co., Inc.*,
      481 F.2d 1045 (2d Cir.).........................................................................14

*Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*,
      459 U.S.519 (1983).......................................................................*passim*

*Bebchick v. Washington Metro. Area Transit Comm'n*,
      805 F.2d 396 (D.D.C. 1986).................................................................45

*Boeing Co. v. Van Gemert*,
      444 U.S. 472 (1980)..................................................................13, 20

*Brailsford v. Jackson Hewitt, Inc. et al.*, C06-00700 CW,
      2007 U.S. Dist. LEXIS 35509 (May 3, 2007 N.D. Cal.) ..........................19

*California v. Infineon*,
      2008 WL 4155665 (N.D. Cal. Sept. 5, 2008)..........................................48

*California v. Infineon Technologies AG*,
      531 F. Supp. 2d 1124 (N.D. Cal. 2007) ................................................44

*Central R.R. & Banking Co. v. Pettus*,
      113 U.S. 116 (1885)...............................................................................13

*Chapman v. Pac. Tel. & Tel. Co.*,
      456 F. Supp. 77 (C.D. Cal. 1978) .........................................................54

*Chun-Hoon v. McKee Foods Corp.*,
      716 F. Supp. 2d 848 (N.D. Cal. 2010) ..................................................25

*Computer Statistics, Inc. v. Blair*,
      418 F.Supp. 1339 (C.D. Tx. 1976) .......................................................54

*Copperweld Corp. v. Independence Tube Corp.*,
      467 U.S. 752 (1984)...............................................................................14

*Craft v. County of San Bernardino*,
      624 F.Supp 1113 (C.D. Cal 2008) ........................................................51

*Craigslist, Inc. v. Mesiab, et al.*,
      2010 WL 5300883, at * 7 (N.D. Cal. Nov. 15, 2010) .............................30

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive
Awards for Plaintiffs

*Craigslist, Inc. v. Naturemarket, Inc.*,
    694 F. Supp.2d 1039 (N.D. Cal. 2010).................................................................30

*Fischel v. Equitable Life Assur. Soc'y*,
    307 F.3d 997 (9th Cir. 2002)...............................................................23, 25

*Florida v. Dunne*,
    915 F.2d 542 (9th Cir. 1990) ...............................................................15

*Gong-Chun v. Aetna Inc.*,
    2012 WL 2872788 (E.D. Cal. July 12, 2012) ...................................... 25

*Harris v. Marhoefer*,
    24 F.3d 16 (9th Cir. 1994)....................................................................52

*Illinois Brick Co. v. Illinois*,
    431 U.S. 720 (1977) .............................................................................45

*In re Activision Sec. Litig.*,
    723 F. Supp. 1373 (N.D. Cal. 1989)....................................................19

*In re "Agent Orange" Prod. Liabl. Litig.*,
    818 F.2d 115 (2d Cir. 1987) .................................................................25

*In re Apple iPhone 4 Prods. Liability Litig.*,
    2012 WL 3283432 (N.D. Cal. Aug. 10, 2012)....................................56

*In re Automotive Refinishing Paint Antitrust Litig.*,
    2008 U.S. Dist. LEXIS 569 (E.D. Pa. Jan. 3, 2008) ..........................19

*In re Bluetooth Headset Prods. Liability Litig.*,
    654 F.3d 935 (9th Cir. 2011) .........................................................17, 32

*In re Brooktree Sec. Litig.*,
    915 F. Supp. 193 (S.D. Cal. 1996) ......................................................52

*In re Cement & Concrete Antitrust Litig.*,
    1981 WL 2039 (D. Ariz. Feb. 5, 1981) ..............................................49

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
    216 F.R.D. 197 (D. Me. 2003)........................................................13, 14

*In re Crazy Eddie Sec. Litig.*,
    824 F. Supp. 320 (E.D.N.Y. 1993)......................................................24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive
Awards for Plaintiffs

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    M-02-1486, 2007 WL 2416513 (N.D. Cal. Aug. 16, 2007) (Hamilton, J.) .... 16, 26, 57

*In re Heritage Bond Litig.*,
    2005 WL 1594389 (C.D. Cal. June 10, 2005) ............................................. 19, 33, 51

*In re Linerboard Antitrust Litig.*,
    296 F.Supp.2d 568 (E.D. Pa. 2003).................................................................... 49

*In re Media Vision Tech. Sec. Litig.*,
    913 F. Supp. 1362 (N.D. Cal. 1995)................................................................... 52

*In re Medical X-Ray Film Antitrust Litig.*,
    1998 WL 661515 (E.D.N.Y. Aug. 7, 1998) ....................................................... 24

*In re Netflix Privacy Litigation*
    2013 U.S. Dist LEXI 37286 (N.D. Cal March 18, 2013)................................... 17

*In re Omnivision Techs., Inc.*,
    559 F. Supp. 2d 1036 (N.D. Cal. 2007)............................................................. 52

*In re Pacific Enters. Sec. Litig.*,
    47 F.3d 373 (9th Cir. 1995) ......................................................................... 19, 42

*In re Portal Software, Inc. Sec. Litig.*,
    2007 WL 4171201 (N.D. Cal. Nov. 26, 2007) ................................................... 24

*In re Quantum Health Res., Inc.*,
    962 F. Supp. 1254 (C.D. Cal. 1997)................................................................... 52

*In re Relafen Antitrust Litig.*,
    231 F.R.D. 52 (D. Mass. 2005).......................................................................... 19

*In re Shopping Carts Antitrust Litig.*,
    1983 WL 1950 (S.D.N.Y. Nov. 18, 1983) ........................................................ 49

*In re Sodium Gluconate Antitrust Litig.*,
    No. C-97-4142 (N.D. Cal. 1999) (Wilken, J.).................................................... 16

*In re Sorbates Direct Purchaser Antitrust Litig.*,
    No. 98-4886 (N.D. Cal. Nov. 20, 2000) (Legge, J.)........................................... 16

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
    MDL No. 1819 (N.D. Cal. Oct. 14, 2011) ................................................... 19, 24

*In re Superior Beverage/Class Container Consolidated Pretrial*,
   133 F.R.D. 119 (N.D. Ill. 1990) ................................................................. 42

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2013 U.S. Dist. LEXIS 51271 (N.D. Cal. Mar. 29, 2013) ........... 14, 19, 24, 26, 33, 56

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2011 WL 7575003 (Dec. 27, 2011) ......................................................... 57

*In re Toys "R" Us Antitrust Litig.*,
   191 F.R.D. 347 (E.D.N.Y. 2000) ............................................................. 13

*In re Vitamins Antitrust Litig.*,
   2001 U.S. Dist. LEXIS 25067 (D.D.C. July 13, 2001) ............................... 19

*In re Washington Public Power Supply System Sec. Litig.*,
   19 F.3d 1291 (9th Cir. 1994) ...................................................... 13, 17, 25

*Internal Imp. Fund Trustees v. Greenough*,
   105 U.S. 527 (1881) ............................................................................... 13

*Laffey v. Northwest Airlines, Inc.*,
   572 F. Supp. 354 (D.D.C. 1983) ............................................................. 30

*Laffey v. Northwest Airlines, Inc.*,
   746 F.2d 4 (D.C. Cir.1984) .................................................................... 30

*Meijer v. Abbott Laboratories*,
   C-07-05985 (N.D. Cal. Aug. 11, 2011) (Wilken, J.) .................................. 16

*Mills v. Elec. Auto-Lite Co.*,
   396 U.S. 375 (1970) ............................................................................... 13

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
   473 U.S. 614 (1985) ............................................................................... 15

*Paul, Johnson, Alston & Hunt v. Graulty*,
   886 F.2d 268 (9th Cir.1989) ............................................................. 16, 17

*Perma Life Mufflers, Inc. v. International Parts Corp.*,
   392 U.S. 134 (1968) ............................................................................... 14

*Pillsbury Co. v. Conboy*,
   459 U.S. 248 (1983) ............................................................................... 14

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive
Awards for Plaintiffs

*Radcliffe v. Experian Info. Solutions,*
    715 F.3d 1157 (9th Cir. 2013) ............................................................... 57

*Reiter v. Sonotone Corp.,*
    442 U.S. 330 (1979) ................................................................................ 14

*Rodriguez v. Disner,*
    688 F.3d 645 (9th Cir. 2012) ................................................................. 15

*Save Our Cumberland Mountains, Inc. v. Hodel,*
    857 F.2d 1516 (D.C. Cir. 1988) ............................................................. 30

*SEC v. Kirkland,*
    WL 3981434 (M.D. Fla. 2008)............................................................... 54

*Six (6) Mexican Workers v. Arizona Citrus Growers,*
    904 F.2d 1301 (9th Cir. 1990).......................................................... 17, 20

*Spicer v. Chicago Bd. Options Exch., Inc.,*
    844 F. Supp 1226 (N.D. Ill. 1993) ........................................................ 52

*Staton v. Boeing Co.,*
    327 F.3d 938 (9th Cir. 2003).......................................................... 15, 21

*State of Hawaii v. Standard Oil Co.,*
    405 U.S. 251 (1972) ................................................................................ 14

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.,*
    2005 WL 1213926 (E.D. Pa. May 19, 2005) ......................................... 49

*Sullivan v. DB Investments, Inc.,*
    667 F.3d 273 (3d Cir. N.J. 2011) ........................................................... 32

*Sun Microsystems v. Hynix Semiconductor, Inc., et al.,*
    No. C06-1665 PJH (N.D. Cal. May 7, 2009) ........................................ 36

*Theme Productions, Inc. v. North American Marketing,*
    731 F.Supp.2d 937 (N.d. Cal 2010) ...................................................... 23

*United States v. Samsung Electronics Co., Ltd., et al.,*
    No. CR05-0643 PJH (N.D. Cal. November 30, 2005)............................ 36

*Van Vranken v. ARCO,*
    901 F. Supp. 294 (N.D. Cal. 1995)........................................................ 16

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive
Awards for Plaintiffs

*Vincent v. Hughes Air West, Inc.,*
        557 F.2d 759 (9th Cir. 1977) ................................................................. 52

*Vizcaino v. Microsoft*,
        142 F. Supp. 2d 1299 (W.D. Wash. 2001) ............................................. 51

*Vizcaino v. Microsoft Corp.*,
        290 F.3d 1043 (9th Cir. 2002) .................................................... *passim*

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,*
        396 F.3d 96 (4th Cir. 2005) .................................................................. 49

*Williams v. Rohm & Haas Pension Plan,*
        658 F.3d 629 (7th Cir. 2001) ................................................................ 31

*Zografos v. Qwest Communs. Co., LLC,*
        2013 U.S. Dist LEXIS 995573 (D. Or. July 11, 2013) ........................... 20

**<u>Statutes</u>**

15 U.S.C. §26 ............................................................................................ 14, 46

28 U.S.C. §1332 (d)(2) ..................................................................................... 34

28 U.S.C. § 1292(b) ......................................................................................... 43

Federal Rule of Civil Procedure 23(b)(2) ........................................................ 46

Federal Rule of Civil Procedure 23(b)(3) ........................................................ 46

California Business and Professions Code
        § 16720 ................................................................................................. 46
        § 17200 ................................................................................................. 46

Florida Statutes

        § 501.2105 ............................................................................................ 14
        § 501.2075 ............................................................................................ 14
        § 542.23 ................................................................................................ 14

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive
Awards for Plaintiffs

## I.  INTRODUCTION

1.  This is the third and final part of the Report and Recommendations that arises in the context of the proposed settlement of various class, *parens patriae*, and governmental purchaser actions brought on behalf of indirect purchasers of DRAM in the United States between January 1, 1998 and December 31, 2002.[1]  The proposed global settlements ("Settlements") consist of cash payments totaling $310,720,000 ("Settlement Fund")[2] plus injunctive relief.  Upon finality of the Settlements, the Settlement Fund, net of expenses including attorneys' fees, will be distributed to members of the proposed Indirect Purchaser Settlement Class, and two proposed Governmental Purchaser Settlement Classes, as well as Government Purchasers being represented in a non-class capacity by the Attorneys General. Certain issues relevant to the District Court's approval of the Settlements have been referred to the undersigned as Special Master.[3]  This Report and Recommendations, Part III, contains the Special Master's findings of fact, conclusions of law and recommendations concerning the award of fair and reasonable compensation to the counsel whose efforts created the Settlement Fund and other benefits from these Settlements.  It also contains findings, conclusions and recommendations on the appropriateness of making incentive awards to the private plaintiffs who brought the settled actions.

2.  The Special Master recognizes that fixing the award of attorneys' fees, the reimbursement of attorneys' costs and expenses and the decision to make incentive awards

---

[1]  The settling parties and the claims asserted in the litigation are discussed in the Report and Recommendations of Special Master Part I re: Settlement Class Certification, Settlement Fund Allocation and Distribution, filed January 8, 2013 (Dkt. No. 2132) ("Report, Part I") at ¶¶ 1-2, 42, 56-98.

[2] This number represents all cash payments the Defendants are obligated to make pursuant to the terms of their various settlement agreements and includes funds earmarked for attorneys' fees, and notice and claims administration, and as consideration for delay in payment.

[3]  A history of the various orders defining the subject matter of the referral appears in Report, Part I at ¶¶ 3-8.

---

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

to plaintiffs are matters particularly within the sole discretion of this Court.  Nothing in this Report, including the Special Master's ultimate finding that under all of the circumstances of the litigation, the requested Ninth Circuit benchmark fee of 25% of the Settlement Fund would be fair and reasonable compensation for Counsel is intended to invade that discretion in any way.  The Special Master's role is not to usurp the discretion of this Court.  Rather, this Report is intended to provide the Court with an evaluation of the relevant authority and factual findings based on a review of the submissions of Counsel and the Special Master's personal observations of the complexity of the issues, the risks attendant to this case proceeding to trial, and the experience, skill and integrity of the attorneys, which I have personally observed, who have provided leadership in prosecuting the Settled Actions.  It is hoped that these findings and conclusions will be helpful in the exercise of this Court's discretion.

## II.    THE RECORD SUPPORTING THE SPECIAL MASTER'S FINDINGS

3.     On August 7, 2013, the Indirect-Purchaser Plaintiffs' Counsel ("IPP Counsel") and the Attorneys General ("AGs") (together referred to as "Counsel") submitted to the Special Master a joint petition[4], requesting that this Court award Counsel the Ninth Circuit benchmark fee of 25% of the Settlement Fund, or $77,680,000, and to hold that the fee award should accrue its proportionate share of the interest earned by the Settlement Fund.[5]

---

[4] "Indirect Purchaser Plaintiffs' and Attorneys General's Joint Application for Attorneys' Fees; Indirect Purchaser Plaintiffs' Application for Costs and Incentive Awards; and Attorneys' General's Application for Costs," dated August 6, 2013 (hereinafter, "Application"); a copy of the petition is attached as Exhibit 65 in the Appendix hereto.  For clarity, all exhibits to the entire Report and Recommendations are being numbered sequentially beginning with those in the Appendix to Part I.

[5] During the course of the proceedings before the Special Master leading up to this Part III of the Report and Recommendations, the leadership of the Attorneys General and IPP Counsel were requested to negotiate the broad procedures for petitioning for awards of attorneys' fees and the reimbursement of expenses.  These negotiations resulted in an agreement under which they determined that they would submit a joint petition requesting an aggregate fee award of 25% of the common fund, which would then be divided 80.8% to IPP Counsel and 19.2% to the AGs.  They

---

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
Incentive Awards for Plaintiffs

1    4.    Also on August 7, 2013, IPP Counsel submitted to the Special Master a

2  separate application for the reimbursement of expenses incurred by IPP Counsel in the

3  amount of $6,338,232, which included, *inter alia*, expert fees and legal fees of the

4  economists and counsel who participated in the proceedings before the Special Master

5  concerning the plan of allocation and distribution of the Settlement Fund to the proposed

6  Indirect Purchaser Settlement Class.  It also included a request that incentive awards of

7  $5,000 be made to each of the 10 class representatives in the lead *Petro* complaint, who

8  provided key support to the litigation, and that each of the other approximately 140

9  plaintiffs in the settled cases be given incentive awards of $500.[6]

10    5.    At the same time, the Attorneys General submitted a separate application for

11  reimbursement of their expenses incurred in prosecuting these cases, in the amount of

12  $5,483,468.63, which included expert and economist fees and fees for contractual services

13  from paralegals and attorneys who are not in the offices of the Attorneys General and are

14  not part of the Attorneys General's lodestar.[7]

---

also agreed that IPP Counsel and the AGs would submit individual requests for the reimbursement of expenses, that compensation for counsel for Celestica and Resellers' Allocation Counsel would be requested as expense item, that the totality of expenses requested would not exceed an agreed upon cap and that IPP Counsel would submit a request for incentive awards to the named plaintiffs.  A copy of this agreement is attached as Exhibit 66 to the Appendix hereto.

Other than this negotiation, the Special Master has not requested or attempted to suggest any division of the aggregate fee award among Counsel.  First, the Special Master believes that, especially in light of the fact that the aggregate fee request is less than Counsel's aggregate lodestar, no allocation to individual firms or Attorneys General can be fairly made without knowing the totality of the amount of the fee available for division.  Second, while reported lodestars certainly play a role in a fee division, intimate knowledge of the individual firms' relative contributions to Counsel's efforts as a whole – the kind of knowledge that is uniquely in the province of the attorneys who assumed leadership roles – is indispensable to a fair and reasonable division of a fee award.  The Special Master fully endorses the concept embodied in this Court's decision to assign to Co-Lead Counsel for the DRAM direct purchaser plaintiffs the responsibility to allocate their aggregate award among the direct purchaser plaintiffs' counsel and recommends that this procedure be adopted for IPP Counsel and the Attorneys General.  See, "Order Awarding Plaintiffs' Counsel Attorneys' Fees and Reimbursement of Expenses," filed August 16, 2007, Dkt. No. 1682.

[6]  This application is part of Exhibit 65 in the Appendix hereto.

[7]  This application is also part of Exhibit 65 in the Appendix hereto.

---

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
Incentive Awards for Plaintiffs

6.    The Special Master has reviewed the above-described requests for attorneys' fees, expenses and incentive awards.  The Special Master has also received and reviewed the following supporting documentation submitted concurrently with the fee and expense requests:  (1) the Declaration of Terry Gross in Support of the Joint Application for Award of Attorneys' Fees and Indirect Purchase Plaintiffs' Application for Reimbursement of Expenses and Incentive Awards ("Gross Decl.")[8]; (2) each of the declarations contained in the Compendium of IPP Counsel Declarations in Support of Motion for Attorneys' Fees and Incentive awards[9]; (3) the Declaration of Chair of Multistate Group, and Liaison Counsel, for Attorneys General in Support of the Joint Motion for Attorneys' Fees ("Varanini Decl.")[10] and (4) each of the declarations contained in the Compendium of the Attorneys General Declarations in Support of the Joint Motion for Attorneys' Fees and the Attorneys General's Motion for Costs.[11]

7.    The Special Master has further considered and reviewed the history of the indirect purchaser litigation and the novel and complex issues it presented both before the District Court and the Ninth Circuit Court of Appeals, as well as in the proceedings before the Special Master, descriptions of which are set forth in the Report Parts I and II.  The Special Master has also considered his personal observations of the skill and competence with which both private counsel for the Indirect Purchaser Plaintiffs and the Attorneys General who all appeared before him handled the numerous difficult issues in this litigation.

///

///

---

[8]  A copy of the Gross Decl. is attached as Exhibit 67 in the Appendix hereto.

[9]  A copy of the IPP Counsel Compendium is attached as Exhibit 68 in the Appendix hereto.

[10]  A copy of the Varanini Decl. is attached as Exhibit 69 in the Appendix hereto.

[11]  A copy of the AGs Compendium is attached as Exhibit 70 in the Appendix hereto.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

### III. SUMMARY OF THE SPECIAL MASTER'S FINDINGS AND CONCLUSIONS

8.      The Settlement Fund and the injunctive relief provided by the Settlements constitutes fair and reasonable compensation for the claims raised by the Settled Cases and to be released by the proposed Indirect Purchaser Settlement Class and the Governmental Purchaser Settlement Classes, and generates a "common fund" from which Counsel, whose efforts created these benefits, is entitled to be awarded fair and reasonable compensation for their services.[12]

9.      Ninth Circuit case authority provides that the goal of every fee award in a common fund class action is to fairly compensate counsel for their efforts while protecting the interests of the class.  In order to arrive at a fee award that is fair and reasonable under all of the circumstances of the litigation, the district court may employ either a percentage of the fund approach or a lodestar approach.   In the last 25 years, the vast majority of district courts in the Ninth Circuit have utilized the percentage of the fund approach in cases where the principal settlement consideration is monetary, including this Court's fee award to counsel for the direct purchaser plaintiffs in this litigation.  The Special Master finds that the percentage of the fund is the proper methodology to employ in arriving at a fair and reasonable fee award for counsel for the indirect purchaser plaintiffs.

10.      Accordingly, the starting point for determining a fair and reasonable attorneys' fee is a computation of 25% of the value of the settlements achieved, an amount of fees that, although subject to adjustment either upward or downward under the individual circumstances of the case, is presumptively reasonable as a general matter.  Here, the settlement value consists of $310,720,000 in cash payments, plus the benefit of various measures directed to the restoration of competition and the deterrence of future violations of

---

[12]  This finding also includes the claims of those Government Purchasers being represented by and released in a non-class capacity by the Attorneys General.

the antitrust laws in the sale of DRAM.  Counsel have requested a fee of $77,680,000, which is 25% of $310,720,000, which is the total of all monetary deposits made by Defendants into the Settlement Fund, including monies earmarked for the payment of attorneys' fees, the payment of notice and claims administration costs and additional consideration paid for a delay in payment.  The Special Master finds that this is the appropriate number to use for the cash benefit of the settlement to the proposed Settlement Classes and non-class Governmental Purchasers.  Accordingly, the Special Master finds that the Ninth Circuit benchmark fee for Counsel is $77,680,000.

11.     In computing this benchmark fee, no dollar value is being assigned to the non-monetary relief obtained in this case.  However, as discussed below, the benefit of the non-monetary relief is a consideration in deciding whether the benchmark fee is fair and reasonable.  As the Special Master previously found in the Report, Part I, the injunctive provisions of the settlement agreements conveyed a substantial and tangible benefit on the proposed Settlement Classes.  Accordingly, the availability of this non-monetary relief supports the award of the requested benchmark fee to Counsel.

12.     The determination of whether the benchmark 25% fee is fair and reasonable in any particular case requires an inquiry into the particular circumstances of the case, including the hours invested by counsel in the litigation.  This inquiry is commonly referred to as "the lodestar cross-check."  An attorneys' or law firm's lodestar is computed by multiplying the number of hours invested in the litigation by the relevant hourly rate(s).  The cross-check is performed by comparing the aggregate lodestar for all counsel against the 25% benchmark.  The difference between the lodestar and the benchmark fee amount is commonly referred to as a "multiplier."  Ninth Circuit authority permits the awarding of percentage fees that represent a range of "multipliers" on the lodestar amount.  Most commonly, such multipliers are at least 2.0.

13.     Performing the lodestar "cross-check" on a percentage of the fund fee is not the same as arriving at a fee award utilizing the lodestar methodology, and the cross-check does not require the same degree of precision in the computation of the lodestar calculation that would ordinarily accompany a lodestar fee award.  Rather, to perform the cross-check, a court need only determine that the lodestar hours are generally in the range that would be reasonable in litigation of similar duration and complexity, and that the hourly rates are consistent with rates charged by counsel of similar seniority, skill and experience in the relevant market.

14.     For this reason, the Special Master did not perform an item by item or line by line review of Counsel's underlying time records.  Rather, the Special Master reviewed the declarations of the individual firms regarding the services they performed, the hours they spent on the litigation and the hourly rates utilized in their lodestars.  In order to judge the reasonableness of Counsel's aggregate lodestar, the Special Master reviewed the manner in which IPP Counsel and the AGs recorded their time and calculated the hours in the aggregate lodestar.  The Special Master then reviewed the work performed by Counsel, as described in the various declarations filed in support of the fee request as well as in the declarations submitted previously which formed the basis of the litigation history set out in the Report, Part I.  The Special Master's review of Counsel's efforts included the Special Master's personal observations of the work done by the counsel who have appeared before him in the multi-year course of this referral.  The Special Master focused on the work necessary to conduct discovery and prepare the litigation for trial, and the work done with regard to the major legal issues such as antitrust standing and class certification.

15.     The Special Master further reviewed the hourly rates, both historical and current, reported by IPP Counsel as their normal and customary hourly rates, and considered the AGs' use of rates from the Laffey Index, which includes an adjustment for the San

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

Francisco market.   The Special Master focused on the normal and customary hourly rates for IPP Co-Lead Counsel and the other firms forming the IPP leadership group since the personal efforts of these firms account for more than 2/3 of the hours in private counsel's aggregate lodestar.  Not only have these rates been found to be reasonable by numerous other district courts, but the Special Master was personally acquainted with the expertise and experience of many of these counsel prior to this litigation and had the opportunity to observe their skill in handling complex, difficult issues during the referral proceedings.  Similarly, use of the Laffey index as a rate structure for the AGs has been approved by other district courts.   Since the authorities agree that the hourly rates used in a lodestar calculation should be reasonable as judged by the prevailing market rates in the geographic location of the forum court, the Special Master finds that the modest upward adjustment made by the AGs is reasonable.  Finally, the Special Master relied on his observations of the skill and competence of the AGs' leadership group during the proceedings before him in finding that the rates used by the AGs to generate their portion of Counsel's aggregate lodestar are reasonable.

16.     Accordingly, the Special Master finds that the number of reported hours that make up Counsel's aggregate lodestar is reasonable as a general matter in light of the history, difficulty and complexity of the litigation to serve as the hours-expended component of an appropriate lodestar cross-check on the 25% benchmark fee requested by Counsel.   The Special Master also finds that hourly rates that make up both Counsel's aggregate historical and current rate lodestars are reasonable in light of the expertise and experience of Counsel to serve as the hourly rate component of an appropriate lodestar cross-check on the 25% benchmark fee requested by Counsel.

17.     Applying both the historical rate and current rate lodestars as a cross-check on the benchmark fee results in the benchmark fee representing less than 100% of the

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

lodestar amount.  As noted above, in most cases, a percentage of the fund fee provides counsel with a payment that is greater than the lodestar to compensate for the following:  the risk of non-payment; the fact that counsel's payment is delayed, sometimes by many years, after the services were rendered; the fact that counsel in a class action generally carries the costs of prosecution for the duration of the litigation; and the recognition of the quality of counsel's efforts in securing a recovery where the litigation is risky.  When the lodestar used in the cross-check is greater than the 25% benchmark fee, i.e., there is a "negative multiplier," that is usually a sign that an upward adjustment of the percentage should be made.  Here, Counsel have waived any upward adjustment to the benchmark.  Accordingly, the Special Master finds that the lodestar cross-check supports the reasonableness of awarding the benchmark fee in this litigation.

18.     In addition to the lodestar cross-check, Ninth Circuit authority provides that other factors should be considered in assessing the reasonableness of the 25% benchmark fee (and determining whether it should be adjusted either upward or downward) including the result achieved for the class, counsel's skill and experience in antitrust cases, the complexity of the issues presented by the litigation, and the risk of non-payment undertaken and overcome by counsel.  The Special Master finds that each of these considerations supports the reasonableness of Counsel's request for the benchmark fee, and would have supported the reasonableness of making an upward adjustment and awarding a fee greater than 25% of the Settlement Fund had such a fee been requested.  Counsel have requested that the total compensation to be awarded by this Court include the interest that the 25% fee amount has earned during the time the Settlement Fund has been invested.  The Special Master finds that this is consistent with controlling authority and is more than reasonable under the circumstances of this litigation, particularly the fact that Counsel's requested fee is less than their total reported lodestar.

19.     The Special Master is familiar with the lead counsel for both the Indirect Purchaser Plaintiffs and the Attorneys General as being experienced antitrust attorneys.  In addition, the skill and experience of Counsel is demonstrated by the fact that they achieved one of the largest indirect purchaser case settlement funds despite significant obstacles to recovery.  Antitrust litigation virtually always presents complex violation issues, but that complexity is compounded exponentially in cases, like this litigation, where the claims of indirect purchasers arise under the laws of multiple jurisdictions, with variations in the standards of proof required to prevail.  In addition, the complexity of the issues to be tried put Counsel at great risk of not succeeding in obtaining the certification of litigation classes or subclasses.  Finally, both the risky nature of the undertaking and Counsel's skill and expertise are clearly demonstrated by the fact that this recovery of over $300 million for the proposed settlement classes was achieved in the face of an earlier ruling that eliminated the vast majority of the private plaintiffs' claims from the litigation pending an appeal.

20.     The Special Master finds that consideration of the circumstances of the litigation, particularly the relevant factors set out by the Ninth Circuit, fully supports the requested benchmark award of 25% of the Settlement Fund, or $77,680,000, in attorneys' fees to Counsel in this litigation.

21.     The Special Master also evaluated IPP Counsel's request for reimbursement of litigation expenses in the amount of $6,338,232 and the AGs' request for reimbursement of litigation expenses in the amount of $5,483,468.63.  The Special Master reviewed the sixty-three (63) declarations of IPP Counsel and the thirty-two (32) declarations from the AGs as to the reasonableness and necessity of the expenses incurred by each of the private firms and state offices.  The Special Master explored in some detail, although not on a line-by-line basis, the categories into which the claimed expenses fall and finds them to be within the range of magnitude that are usual and expected in litigation of this scope,

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

complexity and duration, and of the type that are generally incurred for the benefit of plaintiffs in antitrust litigation.

22.     For example, the major expense item for each of the private firms was the total of their contributions into IPP Counsel's common expense fund.  This fund was administered by Liaison Counsel Francis Scarpulla and was used to pay plaintiffs' economic experts and third-party vendors, principally those associated with discovery such as the firm providing document processing and electronic data storage for the millions of pages of reviewed documents, as well as court reporter and deposition transcript costs for more than 100 depositions.

23.     Nearly 20% of IPP Counsel's requested expenses are attributable to the billings of the counsel and experts who advanced the interests of the reseller members of the proposed Indirect Purchaser Settlement Class and assisted Counsel and the Special Master in arriving at a fair and reasonable plan for distributing the Settlement Fund.  The Special Master personally observed and is aware of the contribution of these counsel and experts and finds that their bills are a reasonable and necessary expense incurred for the benefit of the proposed Settlement Class.

24.     The Special Master finds that, as with IPP Counsel, a significant portion of the expenses incurred by the AGs were expert witness fees and expenses connected with document processing and deposition discovery, including repeated contributions made by each of the AGs into a fund to cover such fees and expenses.  Approximately 39% of the AGs' aggregate expenses are attributable to the hiring through a contract with the California Attorney General of a specialized and experienced group of paralegals and attorneys, not included in the AGs' lodestar, who assisted the AGs in their document handling and review and trial preparation, e.g., by setting up databases and review protocols for millions of pages of documents as well as engaging in the review of those documents, and who also assisted

the AGs by obtaining information from California and New Mexican governmental entities and personnel regarding DRAM purchases and purchasing patterns by those entities that were used in the motion of class certification, in the AG's formulation of their allocation and distribution plan for Class and Non-Class States, and in the crafting of California's plan of distribution of its share of the Settlement Fund.  The Special Master has reviewed the supporting documentation in the form of the bills submitted by this vendor and the authorities holding that similar costs of contract paralegal and attorney services are reimbursable and finds that the billings submitted for reimbursement by the AGs fall with in the range of magnitude that are usual and expected in litigation of this scope, complexity and duration, and that the services reflected in those billings are of the nature of services generally incurred for the benefit of plaintiffs in antitrust cases.

25.     Accordingly, on this basis, the Special Master finds that the expenses incurred by IPP Counsel and the AGs were reasonable and necessary in the circumstances of this litigation.

26.     Finally, IPP Counsel have requested incentive awards of $5,000 to each class representative on the *Petro* complaint and $500 for each of the approximately 140 named plaintiffs in the other state and federal IPP cases that were coordinated with this litigation. The Special Master has reviewed the portion of the Gross Declaration setting out the contribution to the litigation made by the *Petro* class representatives and finds that they have conferred a benefit on the proposed Indirect Purchaser Settlement Class for which the law of this Circuit provides that a reasonable incentive award is appropriate.  The Special Master further finds that the amount of $5,000 is within the range of incentive awards in other cases of similar size and complexity.  In addition to compensating plaintiffs for time and effort expended in the prosecution of the case that created the common fund, another recognized purpose of incentive awards is to provide an inducement for plaintiffs to come forward and

file meritorious class actions. This purpose is particularly important in the area of antitrust litigation where private enforcement has long been recognized to play an important role in promoting a competitive market place for goods and services. The Special Master finds that the plaintiffs who were not selected as *Petro* class representatives nonetheless fulfilled this second purpose and that the modest $500 incentive awards requested for these plaintiffs are fair and reasonable.

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE APPROPRIATE AMOUNT OF ATTORNEYS' FEES TO BE AWARDED TO COUNSEL

### A. The Settlement Fund Achieved for the Proposed Settlement Classes Constitutes A Fair, Reasonable and Adequate Resolution of the Litigation That Entitles Counsel to a Reasonable Attorneys' Fee

27.    The United States Supreme Court "has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *see also Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 393 (1970); *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 123 (1885). The purpose of this doctrine is that "those who benefit from the creation of the fund should share the wealth with the lawyers whose skill and effort helped create it." *In re Washington Public Power Supply System Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994). This "common fund doctrine" is firmly rooted in American case law. *See, e.g., Internal Imp. Fund Trustees v. Greenough,* 105 U.S. 527, 532-33 (1881); *Central R.R.*, 113 U.S. at 123.

28.    The common fund doctrine applies both to private counsel and state Attorneys General. *See In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 214 (D. Me. 2003); *In re Toys "R" Us Antitrust Litig.,* 191 F.R.D. 347, 357 (E.D.N.Y. 2000) (approving $5.4 million in fees plus costs to the States and class plaintiffs'

counsel pursuant to final approval of settlement agreement); *In re Compact Disc Antitrust Litig.*, 216 F.R.D. at 214-15; *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 51271, at *103 (N.D. Cal. Mar. 29, 2013) (awarding $11,054,191.01 in common fund fees and $1,206,479.48 in expenses to States). Here, many of the States asserted *parens patriae* actions on behalf of their citizens which were settled as part of the global settlement of the Indirect Purchaser Plaintiff claims. In addition, the Clayton Act specifically provides that the AGs, as well as private counsel, can recover their reasonable attorney fees and disbursements if they succeed on their injunctive claims, *see* 15 U.S.C. § 26, demonstrating that Congress has made the determination that States may recover attorney fees and disbursements, whether the case is tried to judgment or settles prior to judgment.[13]

29.     Private antitrust litigation such as the settled cases here are a necessary and desirable tool to assure the effective enforcement of the antitrust laws. *See, e.g., Pillsbury Co. v. Conboy*, 459 U.S. 248, 262-63 (1983); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 331 (1979); *State of Hawaii v. Standard Oil Co.*, 405 U.S. 251, 266 (1972); *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 139 (1968) (overruled on other grounds by *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984)). Appropriate fee awards promote the filing of meritorious antitrust actions, as the United States Supreme Court has repeatedly recognized: "In the absence of adequate attorneys' fee awards, many antitrust actions would not be commenced." *Alpine Pharmacy, Inc. v. Charles Pfizer & Co.,*

---

[13] The AGs also brought their claims pursuant to their own state laws, which also provide for the awarding of reasonable attorneys' fees. *See, e.g.*, Fla. Stat. § 542.23 ("In any action under this section in which the plaintiff substantially prevails, the court shall award the cost of suit, including a reasonable attorney's fee, to the plaintiff."); Fla. Stat. § 501.2105 (the court may award costs and fees); Fla. Stat. § 501.2075 ("If civil penalties are assessed in any litigation, the enforcing authority is entitled to reasonable attorney's fees and costs.") Finally, the settling parties here contemplated an award of fees to the AGs. *See, e.g.,* Samsung Settlement Agreement ¶ 20 (Dkt. No. 1747-3).

*Inc.*, 481 F.2d 1045, 1050 (2d Cir.), *cert. denied*, 414 U.S. 1092 (1973); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 653-54 (1985).

30.     The settlements here have created a common fund intended for benefit of parties—the members of the proposed Indirect Purchaser Settlement Class and the class and non-class governmental entities represented by the AGs—injured by the activities alleged in the settled complaints.  As will be discussed in more detail below, the Special Master finds that the settlements, if given final approval, will confer substantial benefits on these private and governmental entity indirect purchasers of DRAM.  Accordingly, the Special Master finds that Counsel representing the injured plaintiffs—both private lawyers and the AGs—are entitled to an award of attorneys' fees and the reimbursement of their out-of-pocket expenses.

**B.     The Ninth Circuit's Standards and Procedures for Determining Attorneys' Fee Awards in Common Fund Cases**

31.     Courts in the Ninth Circuit are fortunate to have the benefit of clearly articulated common sense standards and procedures for setting attorneys' fees in common fund cases.   To begin, there is the overarching concept of fairness to both the beneficiaries of the fund and the counsel whose efforts created it.  "The guiding principle is that attorneys' fees 'be reasonable under the circumstances.' *Florida v. Dunne*, 915 F.2d 542, 545 (9th Cir. 1990)."  *Rodriguez v. Disner,* 688 F.3d 645, 653 (9th Cir. Cal. 2012).  Although the District Court has a special duty to protect the interests of the class (*Staton v. Boeing Co.*, 327 F.3d 938, 970 (9th Cir 2003)), that duty is consistent with awarding an appropriate share of a common fund as compensation to counsel.   *See id.* at 974.

32.     In the years following the 1966 amendment to Rule 23, when common fund cases began to proliferate, two methods for determining fee awards developed.  One approach, based on the fact that class action common fund cases were almost universally

1    undertaken as a contingency, was to award counsel a percentage of the recovery at the usual

2    "market rate" for contingency representations. The other approach, know as the "lodestar"

3    method, involved developing a fee award by multiplying the hours reasonably expended by

4    counsel times a reasonable hourly rate, mimicking the usual method of setting fees in hourly

5    representations, but then adjusting the lodestar calculation by a "multiplier" to account,

6    among other reasons, for the contingent nature of the representation with its attendant delay

7    in payment and its risk of no payment at all.

8         33.     When faced almost 25 years ago with making a choice between the two

9    methods, the Ninth Circuit wisely endorsed both and left the choice to the discretion of the

10    trial court (although it applied the percentage of the fund approach in that original case).

11    *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d. 268, 272 (9th Cir. 1989) ("*Graulty*"). In

12    the years since *Graulty*, this Court and the other courts in this Circuit have almost

13    universally employed the percentage of the fund approach, coupled with a lodestar cross-

14    check. *See, e.g., In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, M-02-

15    1486, 2007 WL 2416513 (N.D. Cal. Aug. 16, 2007) (Dkt. No 1648) (Hamilton, J.) (25% of

16    common fund awarded); *Meijer v. Abbott Laboratories*, C-07-05985 (N.D. Cal. Aug. 11,

17    2011) (Wilken, J.) (33⅓% of the common fund awarded); *In re Sorbates Direct Purchaser

18    Antitrust Litig.*, No. 98-4886 (N.D. Cal. Nov. 20, 2000) (Legge, J.) (25% of the fund

19    awarded); *Van Vranken v. ARCO*, 901 F. Supp. 294 (N.D. Cal. 1995) (25% awarded*); In re

20    Sodium Gluconate Antitrust Litig.*, No. C-97-4142 (N.D. Cal. 1999) (Wilken, J.) (30%

21    awarded). This method has the advantage of preserving the judicial economies of the

22    percentage of the fund approach while ensuring that counsel do not receive a windfall fee

23    totally out of proportion to the effort they expend in producing the common fund. In the

24    Special Master's personal experience, this is the best approach.[14]

25

26    ───────────────
     [14]   As it developed, the lodestar approach has the tendency to mire trial courts in the minutiae of

27    counsels' daily activities, and in the inevitable second guessing of virtually every decision from pre-

28                16
Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
Incentive Awards for Plaintiffs

34.     *Graulty* established 25% of the common fund as the appropriate "bench mark" percentage award in this Circuit.  In doing so, the Ninth Circuit stated that in general fee awards ordinarily should "range from 20[%] to 30[%] of the fund created."  *Id* at 272. The Ninth Circuit recently described the process in *Jones v. GN Netcom, Inc. (In re Bluetooth Headset Prods. Liab. Litig.)*, 654 F.3d 935, 942 (9th Cir. 2011):

> Because the benefit to the class is easily quantified in common-fund settlements, we have allowed courts to award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar. Applying this calculation method, courts typically calculate 25% of the fund as the "benchmark" for a reasonable fee award, providing adequate explanation in the record of any "special circumstances" justifying a departure. *Six (6) Mexican Workers v. Ariz. Citrus Growers,* 904 F.2d 1301, 1311 (9th Cir. 1990); accord *Powers*, 229 F.3d at 1256-57; *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).

35.     Thus, the starting point for awarding a common fund fee in this Circuit is the calculation of 25% of the common fund.  *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002).  However, the determination of whether to award the 25% benchmark or to upwardly or downwardly adjust it can be made only after consideration of the lodestar cross-check, the quality of counsel's representation and the result obtained for the class in light of the circumstances, risk and complexity of the case, financial considerations such as the delay in payment, the risk of non-payment and the burden of financing the litigation. Finally, the fee should be roughly in keeping with the range of fees awarded in similar cases.  *See, e.g., Id.* at 1048-50; *see also, In re Netflix Privacy Litigation,* 2013 U.S. Dist. LEXIS 37286, *29 (N.D. Cal. March 18, 2013) ("The Ninth Circuit has set forth a non-

---

trial strategy (was filing this motion or that document request "reasonably necessary?") to the staffing of counsels' activities (could that brief have been competently drafted by a lawyer with less seniority and hence a lower hourly rate?).  *See e.g., In re Washington Public Power Supply System Securities Litigation*, 779 F. Supp 1063 (D.Ariz. 1990).  In response to this trend, the Third Circuit convened a Task Force to study the question of common fund fee award.  In 1985, that Task Force issued a report endorsing the percentage of the fund approach.  *Court Awarded Attorney Fees, Third Circuit Task Force*, 108 F.R.D. 237, 250 (1985).

exhaustive list of factors which may be relevant to the district court's determination of the percentage ultimately awarded: (1) the results achieved; (2) the risk of litigation; (3) the skill required and quality of work; (4) the contingent nature of the fee and the financial burden carried by the plaintiffs; and (5) awards made in similar cases.").

36.    The objective of this process is the arrival at a " reasonable percentage" of the fund after consideration of "all the circumstances of the case." *Vizcaino*, 290 F.3d at 1948.   Accordingly, the lodestar cross check does not supplant the percentage calculation as the basis of the award.  Neither does it require the sort of detailed task by task or lawyer by lawyer evaluation of the reasonableness of each of the hours recorded and the hourly rates applied that became common in lodestar based fee awards, and that motivated the Third Circuit Task Force to recommend the percentage over the lodestar approach.  Rather, as the *Vizcaino* Court noted, in applying the lodestar cross-check, "the primary basis of the fee award remains the percentage," and reference to the lodestar is simply to "provide a useful perspective on the reasonableness of a given percentage award." *Id*. at 1050.

37.    In the joint fee application submitted to the Special Master, Counsel have requested a fee of 25% of the total cash benefit secured for the members of the private and governmental purchaser classes and those governmental purchasers represented in a non-class capacity.[15]  Counsel have made this request aware that the requested fee of $77,680,000 represents less than the total of the lodestars reported by the various private firms and Attorneys General whose cases are covered by the proposed global settlements.[16] It is also noteworthy that this request is being made even though one practical effect will be

---

[15]  See the Joint Petition submitted to the Special Master on August 7, 2013, a copy of which appears in the Appendix hereto as Exhibit 65.

[16]  See, Gross Decl. at  ¶47, submitted to the Special Master on August 7, 2013, and Declaration of Emilio Varanini at ¶22, submitted to the Special Master on August 7, 2013.  Copies of the Gross Declaration and the Varanini Declaration appear in the Appendix hereto as Exhibits 67 and 68 respectively.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

that the disparity between Counsel's lodestar and the benchmark fee will continue to increase since Counsel are undertaking and will continue to undertake substantial tasks in connection with obtaining preliminary and final approval of these settlements without any additional compensation.   Nonetheless, the Special Master will take Counsel's requested fee to establish the potential fee under consideration, even though the Special Master notes that, ordinarily, when application of the lodestar cross check produces a "negative multiplier" as in this case, it would be appropriate to consider whether under all of the circumstances of the litigation a fee greater than the 25% benchmark should be awarded.[17]

### C.   Computation of the 25% Benchmark Fee

38.   Counsel have computed the dollar value of the 25% benchmark fee in this case by applying that percentage to the total of all cash payments being made by defendants into the settlement fund, including cash earmarked for notice and claims processing and

---

[17]   Numerous courts in this Circuit and elsewhere have awarded fees exceeding 25%, including fee awards of one-third of the common fund generated by the work of plaintiffs' counsel, under circumstances similar to this case. *See, e.g., In re Pacific Enters. Sec. Litig.*, 47 F.3d at 379 (fee award of one-third of common fund justified due to complexity of issues and risks involved); *Vizcaino*, 290 F.3d at 1047-52 (affirming award of 28% of $96 million common fund because of exceptional result and extreme risks of the litigation); *In re Heritage Bond Litig.*, 2005 WL 1594389, at *8 (C.D. Cal. June 10, 2005) (one-third was justified based on the result obtained, Class Counsel's effort, experience and skill, and the great risk assumed); *see, e.g., In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1378 (N.D. Cal. 1989) (benchmark is closer to 30%).  *In re Automotive Refinishing Paint Antitrust Litig.*, 2008 U.S. Dist. LEXIS 569, at *23 (E.D. Pa. Jan. 3, 2008) (one-third, where class counsel spent almost six years and more than 48,000 hours prosecuting the case); *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 77-82 (D. Mass. 2005) (one-third of common fund was justified due to, *inter alia*, skill and efficiency of counsel, complexity and four-year duration of the litigation, and class counsel's expenditure of tens of thousands of hours on the case); *In re Vitamins Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25067, at *58 (D.D.C. July 13, 2001) (determining that one-third was reasonable and granting fee award of approximately 34% of the total estimated settlement amount in antitrust price fixing litigation); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 51271 (N.D. Cal. Mar. 29, 2013) (28.5% of the common fund awarded as attorneys' fees); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, MDL No. 1819 (N.D. Cal. Oct. 14, 2011) (33-1/3% of common fund awarded as attorneys' fees); *Brailsford v. Jackson Hewitt, Inc. et al.*, C06-00700 CW, 2007 U.S. Dist. LEXIS 35509, at *14 (N.D. Cal. May 3, 2007) (awarding 30% of the common fund).

---

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

attorneys' fees, as well as payments resulting from the renegotiation of certain defendants' payment schedules. The Special Master finds that this is proper, resulting in a benchmark fee in this litigation of $77,680,000. Courts have long recognized that it is appropriate to base a percentage fee on the gross monetary benefits available to pay class members' claims and expenses, including any "additional benefits conferred on the class by the Settling Defendants' separate payment of attorneys' fees and expenses, and the expenses of administration." *Zografos v. Qwest Communs. Co., LLC*, 2013 U.S. Dist. LEXIS 99573, *6-7 (D. Or. July 11, 2013) (citing, *inter alia, Boeing Co. v. Van Gemert*, 444 U.S. 472, 479 (1980)); *see also Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990).[18]

39.     Even if the separate funds contributed by Defendant Samsung and earmarked as attorneys' fees were considered a separate fee payment, the Special Master finds that the requested total fee of $77,680,000 is fair and reasonable for all of the reasons set forth herein. The Samsung contribution to attorneys' fees is approximately 18.1% of the cash consideration in the Samsung Settlement. If this Samsung contribution of 18.1% to fees were considered a separate fee of less than the 25% benchmark, then the requested fees from

---

[18]   As described in the Report, Part I, the litigation was settled in a series of settlements negotiated over a five plus year period. Report, Part I, at ¶¶ 4-8. The first settlement negotiated was with Samsung and included a separate breakdown of an amount for attorneys' fee payments to the IPP Counsel and the AGs in the amounts of $19.5 million and $1 million, respectively, which have been held in separate escrow accounts from the balance of the Samsung payments. *Id* at ¶ 59. However, none of the subsequent settlements with the other Defendants included any separate breakdown of contributions earmarked for attorneys' fees. *Id* at ¶¶ 61-98. The Petition filed by IPP Counsel and the AGs seeks a fee award of 25% of the total $310,720,000 Settlement Fund, without regard to the location of the escrowed funds from which it would be paid. The Special Master agrees that it is appropriate to compute the Ninth Circuit benchmark fee, which is the starting point for making all fee awards in this Circuit, as 25% of the total cash settlement consideration regardless of whether certain amounts of that consideration are earmarked for certain purposes since all such purposes are for the benefit of the proposed settlement classes. Moreover, the Special Master finds that treating the $20,500,000 separately contributed by Samsung for the purpose of paying a portion of counsels' fees and expenses the same as all other funds contributed by the defendants is a fair and reasonable method of reconciling the difference between the provisions of the Samsung settlement agreement and the other five agreements that make up the global settlement of the litigation.

---

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

the other settlements necessary to arrive at a total award of $77,680,000 (the blended 25% benchmark) represent 28.9% of the cash benefits of those settlements, the Special Master finds that the same considerations that support the reasonableness of a blended fee of 25% of the total settlement proceeds equally support the reasonableness of a fee of slightly less than 29% of the settlements entered into after Samsung.

40.     The Special Master notes that Counsel's computation of the benchmark fee does not ascribe any value to the injunctive relief obtained by Counsel in this litigation, although the Special Master previously found that such equitable relief conferred a valuable benefit on the settlement classes.[19]  However, this does not mean that the value of the injunctive relief obtained should play no part in setting an appropriate fee award.  The Ninth Circuit has directed trial courts to "consider the value of the injunctive relief obtained as a 'relevant circumstance' in determining what percentage of the common fund class counsel should receive as attorneys' fees, rather than as part of the fund itself."  *Staton,* 327 F.3d at 974 (citing *Vizcaino,* 290 F.3d at 1049).

### D.     The Lodestar Cross Check Supports an Award of At Least the Benchmark Fee

41.     While the lodestar cross check provides the trial court with valuable data relevant to the determination of a fair and reasonable fee award, the Ninth Circuit has cautioned that under the percentage of the fund method, the focus is not on the attorneys' billing records, but on whether the percentage awarded and the resulting fee are reasonable under the circumstances of the case.  *See Vizcaino,* 290 F.3d at 1048.  The amount of the lodestar by itself is not determinative of the size of a reasonable fee, and the purpose of the cross-check is not to ferret out any particular incidence of duplication, wasted effort or excessive billing:  "Calculation of the lodestar, which measures the lawyers' investment of

---

[19]   Report, Part I at ¶ 136.

---

21

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

1   time in the litigation, provides a check on the reasonableness of the percentage award.

2   Where such investment is minimal, as in the case of an early settlement, the lodestar

3   calculation *may* convince a court that a lower percentage is reasonable." *Id.* at 1050

4   (emphasis added). As the *Vizcaino* Court's use of "may" rather than "should" or "must" in

5   the preceding quote indicates, the purpose of the lodestar calculation is to give the trial court

6   a general sense of the investment that counsel have made in the litigation, which is but one

7   factor relevant to determining what percentage of the common fund represents a fair fee.

8       42.   Here, each of the sixty-three (63) private firms representing a plaintiff in the

9   settled state and federal cases here submitted a declaration to the Special Master computing

10  that firm's individual lodestar as of December 31, 2012.[20] Each declarant affirmed that the

11  hours set forth in his or her declaration were actually and reasonably incurred in the

12  prosecution of this litigation and recorded contemporaneously with the performance of the

13  legal services. Similarly, each declarant affirmed that the hourly rates used in the firm's

14  lodestar computation were the firm's usual and customary rates, either at the present time or

15  at the time the services were preformed, and that no time spent on the preparation of their

16  request for a fee award or its documentation was included in their lodestar calculations. Mr.

17  Terry Gross, Chair of the Indirect Purchaser Plaintiffs' Executive Committee, then

18  aggregated the reported 152,485 of attorney and paralegal hours for and calculated an

19  aggregate lodestar of approximately $64 million at historical rates with no prime rate

20  enhancement for the amount of time spent in litigation and in settlement and $79 million at

21  current rates.[21]

22

23  _____

    [20]   A copy of each of these declarations appears in the Appendix hereto as Exhibit 69.

24  [21]   The Special Master notes that a review of the individual firm declarations reveals that there may
    be some very limited confusion in a couple of the declarations as to the hourly rates reported on an

25  individual firm basis, and therefore neither of Mr. Gross' lodestar calculations (which he does
    qualify as "approximate") is purely current or purely historical. However, this is irrelevant to the

26  validity of the lodestar cross check since in this Circuit, when using the lodestar approach it is
    appropriate to compensate attorneys in common fund cases for delay in payment, "either (1) by

27

43.     Similarly, each of the Attorneys General submitted a declaration to the Special Master setting forth the time expended by their offices prior to December 31, 2013, offered for inclusion in the AGs' portion of the lodestar.[22]   As with the private counsel, the AGs affirmed that the time included in the lodestar was recorded contemporaneously.  In addition, the time included in the lodestar incurred by the AGs prior to August 2010 was submitted on a regular basis to a fees committee formed by the AGs and for which the Attorney General of the State of Hawaii tracked the time.[23]   That time was scrutinized for compliance with the protocol of the National Association of Attorneys General, which was developed based on the case law.  *Id.*

44.     The AGs calculated their portion of Counsel's joint lodestar using a uniform set of hourly rates pursuant to the methodology approved in *Theme Productions, Inc. v. North American Marketing*, 731 F.Supp.2d 937 (N.D. Cal. 2010) and commonly used by AGs with the approval of the courts to calculate the fees to which they are entitled.[24]   The AGs calculated their attorneys' fees by multiplying the hours spent by each attorney and paralegal who work on the litigation by an hourly rate taken from the Laffey index for attorneys and paralegals of similar years of experience and adding a 9% cost of living adjustment for the market differential between Washington D. C. where the Laffey index is calculated and Northern California, the relevant market for this litigation.[25] Using this methodology, Mr. Emilio Varanini, Chair of the Multistate Group of, and Liaison Counsel

---

applying the attorneys' current rates to all hours billed during the course of the litigation; or (2) by using the attorneys' historical rates and adding a prime rate enhancement." *Fischel v. Equitable Life Assur. Soc'y of the United States*, 307 F.3d 997, 1010 (9th Cir. 2002) (internal quotation marks and citation omitted).

[22]   A copy of each of these declarations appears in the Appendix hereto as Exhibit 70.

[23]   Varanini Declaration at ¶ 18-20.

[24]   Application at 37-38.

[25]   *Id.* at ¶ 21.

---

23

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

for, the Attorneys General, aggregated the approximately 77,400 hours reported by the individual state offices, which using the adjusted Laffey index rates described above generates a lodestar of $31,390,687.

45.     Rounding the AG lodestar and adding it to the private firms' lodestar results in total lodestars for all Counsel of approximately $95 million at private counsel's historical rates and $110 million at private counsel's current hourly rates. These lodestars are computed on approximately 229,400 hours of attorney and paralegal time devoted over an eleven-year period to securing a recovery for private indirect purchasers, consumers and government entities. Numerous courts have awarded attorneys' fees of more than 25% of a common fund under similar circumstances. Most recently, Judge Illston of this District awarded attorneys fees of 28.6% of the common fund in an antitrust class action of similar scope in which plaintiffs' counsel invested approximately 313,000 hours. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 51271, *62-68 (N.D. Cal. Mar. 29, 2013); *see also, e.g., In re Static Random Access Memory (SRAM) Antitrust Litig.,* MDL No. 1819 (N.D. Cal. Oct. 14, 2011) (33-1/3% of common fund awarded as attorneys' fees after more than four years and 76,000 hours of work on the case); *In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320, 325 (E.D.N.Y. 1993) (one-third fee award justified in part due to the expenditure of 30,000 hours by 11 firms); *In re Medical X-Ray Film Antitrust Litig.*, No. CV–93–5904, 1998 WL 661515, at *23 (E.D.N.Y. Aug. 7, 1998) (one-third of the common fund awarded after 17 law firms spent about 30,000 hours litigating the case).

46.     The requested benchmark fee of $77,680,000 represents approximately 81.8% of Counsel's lodestar at historical rates and 70.6 % of Counsel's lodestar at current hourly rates, or "negative" multipliers of approximately .82 and .71 respectively. This calculation alone is virtually sufficient to satisfy the cross-check requirement. *In re Portal Software, Inc. Sec. Litig.*, No. C-03-5138 VRW, 2007 WL 4171201, at *16 (N.D. Cal. Nov.

26, 2007) (finding that a negative multiplier suggests that "the requested percentage[-]based fee is fair and reasonable"); *see also, e.g., Gong-Chun v. Aetna Inc.*, No. 1:09–cv–01995–SKO, 2012 WL 2872788, at *23 (E.D. Cal. July 12, 2012) (performing lodestar cross-check resulting in negative multiplier of .79 and therefore finding the fee award reasonable), and *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 853–54 (N.D. Cal. 2010) (performing lodestar cross-check resulting in negative multiplier of .59 and therefore finding the fee award reasonable).

47.     Indeed, it is constructive to compare this negative multiplier that Counsel have voluntarily agreed to with the law of this Circuit that in common fund cases, a fair and reasonable fee should include a positive multiplier on Counsel's lodestar.  "It is an established practice in the private legal market to reward attorneys for taking the risk of non-payment by paying them a premium over their normal hourly rates for winning contingency cases." *Washington Public*, 19 F.3d at 1299; see also *Vizcaino*, 290 F.3d at 1051. This provides the "necessary incentive" for attorneys to bring actions to protect individual rights and to enforce public policies.  *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 226, 236 (2d Cir. 1987).  In common fund cases, there is no concern about financially burdening a defendant to compensate for the risk of nonpayment, because the attorney's fee award is deducted from the plaintiffs' fund. *Washington Public*, 19 F.3d at 1300. In such cases, the plaintiffs "should share the wealth with the lawyers whose skill and effort helped create it." *Id*.  Indeed, where a court selects the lodestar approach, the Ninth Circuit has held it to be an "abuse of discretion to fail to apply a risk multiplier . . . when (1) attorneys take a case with the expectation that they will receive a risk enhancement if they prevail, (2) their hourly rate does not reflect that risk [i.e., it is the same rate charged to hourly clients], and (3) there is evidence that the case was risky." *Fischel v. Equitable Life*

*Assur. Soc'y*, 307 F.3d 997, 1008 (9th Cir. 2002).[26]  Each of the declarations from the private firms states that this litigation was undertaken without guarantee of compensation and at the expense of other contingency and hourly business.[27]

48.     Generally, percentage of the fund awards exceed the amount of the lodestar used in the cross check by a mutiplier greater than 2.0.  See e.g., *Vizcaino v. Microsoft*, 290 F.3d at 1050-51 (upholding a 28% fee award that constituted a 3.65 multiple of lodestar); *id*., at 1052-54 (noting district court cases in the Ninth Circuit approving multipliers as high as 6.2, and citing only 7 of 34 decisions with approved multipliers below 2.0).

49.     This Court's award of the 25% benchmark fee (the amount requested) to counsel for the direct purchaser plaintiffs in this litigation, which the Special Master has considered in arriving at his findings and conclusions, represents a multiplier of 2.3 on their aggregate reported lodestar.  *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, M-02-1486, 2007 WL 2416513 (N.D. Cal. Aug. 16, 2007) (Dkt. No 1648).

50.     The plaintiffs in the *LCD Litigation*[28] submitted two expert declarations in support of their fee request that, *inter alia*, contain a review of multipliers awarded in common fund cases.[29]  One review was conducted by Brian Fitzpatrick, Esq., a Professor of Law at Vanderbilt University and author of an article entitled, *An Empirical Study of*

---

[26]  Although not a lodestar method award, Judge Illston recently reconsidered and increased to 25% an award she had made of 20% of a common fund because the lower award did not provide a risk multiplier on the lodestar calculation.  *Lemus v. H&R Block Enterprises, LLC,* 2012 U.S. Dist. LEXIS 128514 (N.D. Cal. Sept. 10, 2012).

[27]  See, e.g., the Declaration of Josef D. Cooper in Support of Petition for Attorneys' Fees ("Cooper Decl."), at ¶ 8.  This Declaration is included in Exhibit 69 in the Appendix hereto.

[28]  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, MDL No. 1827, (N.D. Cal.).

[29]  These are the Declaration of Brian T. Fitzpatrick, dated September 6, 2012, which is part of Docket No. 6662-3 filed in *the LCD Litigation* on September 7, 2012, a copy of which appears as Exhibit 71 to the appendix hereto, and the Declaration of Richard M. Pearl, dated September 7, 2012 and filed the same day also as part of Docket No. 6662-3, which is Exhibit 72 to the Appendix hereto.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

*Class Action Settlements and Their Fee Awards*, published in December 2010 in the Journal of Empirical Legal Studies (7 J. Empirical L. Stud. 811) for which he examined every class action settlement approved by the federal courts during 2006 and 2007. Fitzpatrick Declaration at ¶ 3. Mr. Fitzpatrick reported that of the 192 fee awards studied where "a lodestar cross-check and the lodestar multiplier was ascertainable, the mean and median multipliers were 1.62 and 1.30." *Id*. at ¶ 25.

51.    The other review of multipliers in common fund cases submitted to Judge Illston was done by Richard M. Pearl, Esq., an attorney specializing in court-awarded attorneys' fees and a member of the California State Bar's Attorneys Fees Task Force and author of California Attorney Fee Awards, 2d Ed. (Calif. Cont. Ed. Of Bar 1994), and its supplements, and California Attorney Fee Awards, 3d Ed. (Cal. CEB 2010) and its supplements, which treatise has been cited by the California appellate courts on more than 35 occasions. Pearl Declaration at ¶¶ 1 and 3. Mr. Pearl's declaration cites to numerous common fund cases in which the fee awards represented multipliers of greater than 4 times counsels' reported lodestars; the highest being a multiplier of 19.6. *Id*. at ¶ 25.

52.    The purpose of this discussion is that the negative multiplier generated here by the lodestar cross-check supports the requested award of the benchmark fee. Some courts in applying the lodestar cross-check make an across the board reduction of the claimed lodestar to account for an assumed element of "unreasonable" waste and duplication. They then examine the reasonableness of the "multiplier" that is generated when the adjusted lodestar is compared to the percentage fee. For the benchmark fee here to generate the same 2.3 multiplier that this Court's benchmark award gave to the counsel who brought actions for direct DRAM purchasers, arguably a far less risky endeavor than indirect purchaser litigation, almost 70% of Counsels' total lodestar at current rates would have to be disallowed. There is no danger that an award of the requested 25% fee would be

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
Incentive Awards for Plaintiffs

1    a windfall out of proportion to the effort Counsel expended in producing the common fund.

2    Counsel have requested that the total compensation to be awarded by this Court include the

3    interest that the 25% fee amount has earned during the time the Settlement Fund has been

4    invested. This Court awarded Direct Purchasers' counsel the proportionate interest earned

5    as part of their settlement funds by their fee award. (Dkt. No 1648). The Special Master

6    finds that doing the same for Counsel is fair and reasonable under the circumstances of this

7    litigation, particularly in light of the fact that, unlike the Direct Purchasers' counsel, the fee

8    requested by Counsel is less than their total reported lodestar.

9        53.    The Special Master carefully reviewed the declarations of the individual

10   private counsel and Attorneys General whose time makes up the lodestar in this case.[30] The

11   Special Master reviewed these declarations and found that in general their descriptions of

12   the tasks upon which Counsel expended time comports with the Special Master's

13   understanding of the scope of the work done on behalf of the proposed Indirect Purchaser

14   Settlement and Governmental Purchaser Settlement Classes and the Governmental

15   Purchasers represented in a non-class capacity.[31] In this regard, the Special Master notes

16

17    _____

18   [30] While not all are not completely free of areas that might bear more inquiry if the lodestar method
were employed, employing any particular lodestar as a cross-check does not require a determination

19   that every hour in the computation was in fact reasonably expended for the benefit of the class. The
cross-check requirement is satisfied if the lodestar when compared to the percentage fee award

20   generates a multiplier that is within a range that the court finds is fair and reasonable in light of the
particular circumstances of the case and multipliers awarded in similar matters. Similarly, the

21   common expedient of applying a percentage reduction to the claimed lodestar for what some courts
believe is an inevitable degree of duplication and waste does not mean that each of the individual

22   firm lodestars that make up the aggregate lodestar should be subject to the same reduction, or
necessarily any reduction at all. It may be that some of the individual lodestars reflect services of

23   very little value to the class while others reflect the services of counsel who held the laboring oars
and exercised rigorous "billing judgment" when recording their time. This is a determination that

24   does not become relevant until there is an allocation of the fee award among individual firms, a
determination, which as the Special Master noted above, is best made by leadership counsel who are

25   the most familiar with the work done in the litigation.

26   [31] Some of these efforts will be discussed below and others are detailed in the Report, Part I, at ¶¶
42-55, 108-114 and 204-260.

27   _____

28   
  Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
Incentive Awards for Plaintiffs

that the efforts of the firms making up Indirect Purchaser Plaintiffs' Leadership Group[32]

account for over 70% of private counsels' total lodestar. Similarly, approximately 60% of

the Attorneys General's total lodestar is attributable to the efforts of California, Florida,

Illinois and Oregon, the states serving as co-lead counsel for the Attorneys General. The

Special Master has personal knowledge of the skill and integrity of these attorneys from

observing their actions in these proceedings.

54.     In addition, based upon personal experience, the Special Master finds that the

total number of attorney and paralegal hours invested in this litigation, as reported in the

declarations of Counsel, fall within the expected range of time reasonably required to

prosecute litigation of the magnitude, complexity and duration of the settled cases.

55.     As to the reasonableness of the hourly rates used in the lodestar, the Special

Master computed an average (but not weighted) blended historical hourly rate of $420 and a

current rate of $518 for the portion of the lodestar attributable to IPP Counsel. The Special

Master also reviewed the individual hourly rates and experience of the IPP Counsel

leadership group and compared them to the hourly rates approved by courts and charged by

San Francisco litigators as listed in the Pearl Declaration at ¶¶ 11-14. The Special Master

also notes that, in reviewing the report and recommendation regarding fees submitted to the

*LCD* court by the Special Master in that case, he accepted Mr. Pearl's specific evaluation

and confirmation of the reasonableness of the hourly rates charged by Cooper & Kirkham,

P.C., Gustafson Gluek, PLLC, and Straus & Boies, LLP, three of the four Co-Lead Counsel

in this case, and of Zelle Hoffman Voelbel & Mason LLP, Liaison Counsel here. As noted

above the individual lodestars of these firms, along with the lodestars of the firms of Co-

Lead Counsel Daniel Mogin and Executive Committee Chair Terry Gross, account for over

---

[32]    Indirect Purchaser Plaintiffs' four Co-Lead Counsel, Liaison Counsel and the Chair of Plaintiffs' Executive Committee.

70% of private counsel's combined lodestar. Accordingly, the Special Master finds that the hourly rates reflected in IPP Counsel's portion of the joint lodestar fall within the range of reasonable hourly rates that would be expected to be charged in the San Francisco market by antitrust counsel with the same skills and expertise as the IPP leadership group for litigation of this magnitude and complexity.

56.     The Attorneys General used the *Laffey* Matrix hourly rates. The *Laffey* Matrix is a "widely recognized compilation of attorney and paralegal rate data." *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1067 (N.D. Cal. 2010), citing *Laffey v. Northwest Airlines, Inc.,* 572 F. Supp. 354 (D.D.C.1983), *aff'd in part, rev'd in part on other grounds*, 746 F.2d 4 (D.C.Cir.1984); *accord, Craigslist, Inc. v. Mesiab, et al.*, 2010 WL 5300883, at * 7 (N.D. Cal. Nov. 15, 2010) (James, MJ). The *Laffey* Matrix is regularly updated by the Civil Division of the United States Attorney's Office for the District of Columbia, and is often used to evaluate work "performed by a mix of senior, junior and mid-level attorneys, as well as paralegals." *Naturemarket*, 694 F. Supp. 2d at 1067; *see* http://www.justice.gov/usao/dc/ divisions/Laffey_Matrix_2003-2013.pdf, visited June 27, 2013. The *Laffey* Matrix is particularly suited to determining prevailing local market rates for government or nonprofit attorneys who do not bill at market rates, because a "proxy for the market must be found in order to set a reasonable hourly rate." *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516, 1519 (D.C. Cir. 1988), *citing Laffey v. Northwest Airlines, Inc.*, 746 F.2d 4, 16 n.74 (D.C. Cir.1984), *overruled on other grounds* by *Hodel*. Accordingly, the Special Master finds that the hourly rates reflected in Attorneys General's portion of the joint lodestar fall within the range of reasonable hourly rates in the San Francisco market for government antitrust counsel with the same skills and expertise as the Attorneys General's leadership group for litigation of this magnitude and complexity.

///

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

57. The Special Master finds that under the law of this Circuit, application of the lodestar cross-check to the benchmark fee here would ordinarily raise the question of whether the requirement to compensate Counsel for risk and other contingency factors, along with consideration of the specific circumstances of the litigation, support an upward adjustment to the benchmark fee. Since Counsel have voluntarily limited their fee request to $77,680,000, the Special Master finds that application of the lodestar cross-check fully supports this fee award, which is 25% of the common fund in this litigation.

**E.** **The Results Achieved by Counsel in Light of the Circumstances, Risk and Complexity of the Litigation and the Skill and Quality of Their Work Supports An Award of At Least the 25% Benchmark Fee**

**1. The Results Achieved by Counsel**

58. The $310,720,000 Settlement Fund ranks among the highest settlements achieved in an indirect-purchaser antitrust case. The settlement is all cash, and there will be no reversion or refund to any Defendant. In general in a contingency representation, the larger the monetary result achieved for the client, the larger the remuneration counsel can expect to receive. However, from time to time, in common fund cases, it has been asserted by objectors that where the class recovery is hundreds of millions of dollars, the attorneys' fees should be capped at a smaller percentage than would apply in cases where the recovery is smaller. *See, e.g., Williams v. Rohm & Haas Pension Plan*, 658 F.3d 629 (7th Cir. 2011); *In re Synthroid Mktg. Litig.,* 264 F.3d 712, 718-19 (7th Cir. 2001); Vizcaino, 290 F.3d at 1047. This proposition has been rejected by the Ninth Circuit. Where, as here, the benchmark fee represents less than Counsel's total reported lodestar, the wisdom of the Ninth Circuit's more flexible approach is clear.

59. The avowed purpose of the so-called "mega-fund" or "increase-decrease rule" (*Vizcaino,* 290 F.3d at 1047) is to prevent a fee that represents an unreasonable windfall for class counsel. However, a reasonable fee under all of the circumstances of the

particular litigation is the goal in all common fund cases regardless of the size of the class's recovery.  In other words, a windfall fee that is out of all proportion to the "hours spent on the case" and not justified by some other consideration is no more acceptable in a $3 million case than in $300 million dollar litigation.  Accordingly, the law of this circuit calls for trial courts in *all* common fund cases to determine whether the benchmark 25% fee should be adjusted after consideration of the circumstances of the individual case, including the lodestar cross-check.  *In re Bluetooth Headset Prods. Liab. Litig*, 654 F.3d at 942.  Or in the words of the *Vizcaino* Court, "[s]election of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case." *Vizcaino*, 290 F.3d at 1048.  Under this procedure, and in light of the facts established here, there can be no possibility of a windfall fee award.

60.     Here, the cash settlement fund is approximately 12% of the overcharge imposed by the Defendants, as computed by the direct purchaser class's damages expert.[33] This result is comparable to settlements in other price-fixing cases where the court awarded 25% or more of the settlement fund as attorneys' fees.  *See, e.g.*, *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 324, 330–33 (3d Cir. 2011), *cert denied*, 132 S. Ct. 1876 (U.S. 2012), *reh'g denied*, 132 S. Ct. 2451 (affirming a settlement fund that represented 10.93% of the estimated overcharge, and affirming attorneys' fees in the amount of 25%).

61.     The Indirect Purchaser and Government Purchaser Plaintiffs also benefit from significant non-monetary relief.  The first settling defendant, Samsung, agreed to provide cooperation to both the IPPs and the AGs in litigation against the other Defendants, and to provide trial witnesses if needed.  This assistance was valuable in maximizing the

---

[33] Although Defendants argued that the conspiracy was largely ineffective at raising prices, Direct Purchaser Plaintiffs' expert, Dr. Paul C. Liu, estimated that the total overcharges due to defendants' conspiracy was at least $2.6 billion.  Rebuttal Expert Report of Paul C. Liu, Nov. 22, 2006, at 3 (Dkt. No. 1182).  Thus, the $310 million recovery represents approximately 12% of single damages.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
Incentive Awards for Plaintiffs

monetary recovery against the other Defendants. In addition, each Defendant agreed: (1) to establish an antitrust compliance program; (2) to an injunction against anticompetitive conduct with respect to DRAM for a period of three years; and (3) to provide complete cooperation to plaintiffs in prosecuting any antitrust cases against any co-conspirator.[34]

### 2. Counsel's Efforts in the Litigation

62.     Although subsumed in the lodestar cross-check, courts also refer to the efforts of counsel as an independent factor to be considered in determining the appropriate percentage of a common fund to award as attorneys' fees. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 51271, at *66; *In re Heritage Bond Litig.*, 2005 WL 1594389, at * 9. As noted above, the recovery here was obtained as a result of over 200,000 hours of work by Counsel. The procedural history of the litigation set out in the Part I of this Report and Recommendations at ¶¶ 42-55, provides a description of most of this effort and will not be repeated here.

63.     However, two aspects of Counsel's efforts, which are particularly illustrative of the efficiency and skill with which they conducted the litigation, will be briefly discussed as examples of the high quality of the representation afforded members of the proposed settlement classes.

64.     To begin, the Special Master notes that both IPP Counsel and the Attorneys General created organizational structures and adopted litigation strategies that facilitated the efficient resolution of a wide range of claims, brought under differing state laws, with different standards of proof, and which ultimately generated settlements benefiting purchasers of DRAM and DRAM containing products nationwide.

65.     Private counsel first filed class action complaints on behalf of a nationwide class of non-governmental indirect DRAM purchasers in California state courts in August

---

[34] Report, Part I, ¶¶ 56-98.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

2002.  These cases were coordinated by the Judicial Council in the complex litigation department in the San Francisco Superior Court.  Cooper & Kirkham and Gross & Belsky were appointed Co-Liaison Counsel and given the duties and responsibilities of lead counsel.[35]  Shortly thereafter, plaintiffs entered into a discovery plan with defendants that included the production of grand jury documents, and the commencement of written discovery and depositions.  Motion practice and discovery continued in the California coordinated proceeding through 2004 and into 2005.[36]

66.     Beginning in late 2004, private indirect-purchaser cases were filed in federal and state courts other than California; and a number of these later-filed state-court cases were removed to federal court.  In all, more than 60 class-action complaints making similar allegations against various DRAM manufacturers, most on behalf of statewide classes, were filed in state and federal courts across the country.  In order to facilitate the global litigation and resolution of the claims of all indirect purchasers nationwide, counsel in the California proceeding, filed a complaint in this Court captioned *Petro Computer Systems, Inc. v. Micron Technology, Inc*, C 05-0247 ("*Petro*"), on June 17, 2005.  The *Petro* complaint alleged original jurisdiction in federal court pursuant to the CAFA-enacted 28 U.S.C. §1332 (d)(2) (class action diversity), and asserted federal equitable claims and damage claims under the California antitrust laws on behalf of a nationwide class, as well as statewide claims under various antitrust and consumer protection laws.  The Judicial Panel on Multidistrict Litigation transferred all federal-court actions to the United States District Court for the Northern District of California, and consolidated the cases for pretrial purposes with *Petro* in the MDL proceeding that had previously been established for the direct purchaser actions.  All indirect-purchaser cases that remained in state courts were thereafter

---

[35] Cooper Decl., ¶ 3.

[36] Gross Decl., ¶ 2.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

1    coordinated with the MDL. *Petro* was then designated as the relevant indirect purchaser

2    complaint for purposes of coordinated pretrial proceedings.[37]

3        67.    In August 2005, pursuant to this Court's order (Dkt. No. 526), plaintiffs

4    created a leadership group made up of the four Co-Lead Counsel, Liaison Counsel and

5    Chair of Plaintiffs' Executive Committee listed above, which included the leadership firms

6    from the California state court litigation, thus ensuring continuity with the earlier

7    proceedings in that forum. As noted above, attorneys and paralegals in the firms comprising

8    this leadership group performed the vast majority of the work that resulted in the settlement

9    of the indirect purchaser litigation.

10       68.    The Attorneys General began their investigation into this case in June 2005,

11   serving subpoenas and interrogatories on Defendants and third parties. Defendants

12   produced the same millions of pages of documents to the AGs that they had previously

13   produced in the California proceedings and supplemented them with additional documents

14   and interrogatory responses including narrative statements of liability from various

15   Defendants. Following a thorough independent review of documents, data, and

16   interrogatory answers, the AGs, other than New York, filed a single action, Case No. 06-

17   4333 PJH, in this Court. The State of New York filed a separate action in the Southern

18   District of New York that was transferred to this Court in Case No. 06-4636 PJH.

19       69.    The Attorneys General also adopted a leadership structure that promoted the

20   efficient prosecution of the claims brought on behalf of governmental purchasers and *parens*

21   *patriae* for their citizens. This structure involved the designation of a representative of the

22   California Attorney General as Chair of the multistate group of AGs, the formation of

23   Executive and Multistate Committees and the designation of the states of California,

24

25

26   _____
     [37] Report, Part I, ¶ 42; Gross Decl., ¶ 3.

27

28
Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
Incentive Awards for Plaintiffs

Florida, Illinois and Oregon as Co-Lead Counsel.[38]  The AGs also organized themselves into working committee for discovery, drafting pleadings and other court filings and working with expert witnesses, as well as a Fees Committee that tracked and scrutinized the hours reported by the various offices.  *Id.*

70.    Both the organization of counsel and the cooperation between the IPP Counsel and AG leadership groups are exemplified in the efficient conduct of discovery in this matter.

71.    Although the first cases were filed in 2002, due to the continuing investigation of the United States Department of Justice ("DOJ"), general discovery in the private actions was stayed until July 24, 2005.  During that stay, however, the IPP Counsel conducted a thorough investigation of the DRAM market, consulted with experts, obtained access to and reviewed the millions of pages of documents that the Defendants produced to the DOJ, propounded interrogatories and also began preparing for class certification.[39]

72.    After IPP Counsel had been litigating against Defendants in state court for two years, the DOJ announced in September 2004 that Infineon was pleading guilty to a price-fixing conspiracy involving six computer manufactures ("OEMs"), which plea agreement was followed over the next year by indictments and pleas with additional DRAM manufacturers.  While helpful, the pleas' utility in the private cases was limited, since they established only a conspiracy to fix DRAM prices to particular OEMs and for a short time period.  *See, e.g., United States v. Samsung Electronics Co., Ltd., et al.*, Plea Agreement, at ¶ 4(c), (d), No. CR05-0643 PJH (N.D. Cal.  Nov. 30, 2005).  This Court later ruled that the plea agreement of a specific Defendant had only limited evidentiary value against other Defendants.  *See* Transcript of Hearing at 113-117, *Sun Microsystems v. Hynix*

---

[38] Varanini Decl., ¶¶ 5-8.

[39] Report, Part I, ¶ 43.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

*Semiconductor, Inc. et al.,* C 06-1665 PJH (N.D. Cal. May 7, 2009). Thus, the DOJ proceedings notwithstanding, IPP Counsel, and later the AGs, were required to conduct substantial discovery focused on demonstrating that the Defendants' conspiracy was much broader than that contained in the DOJ indictments and occurred during a much longer period.[40]

73. In addition, Defendants contended that certification of litigation classes would be improper because there was no method of common proof of impact and damages, and that the indirect-purchaser distribution channels were so complicated that it was virtually impossible to establish that any overcharge was passed through to the ultimate consumers. Accordingly, preparation for the filing of class certification motions required IPP Counsel to conduct comprehensive investigations into various sources of industry data on sales, transactions, and pricing of DRAM, and products containing DRAM, aided by experts, and to work with and facilitate their economic experts' regression analyses. It also required an intricate analysis of the market structure and its numerous distribution channels, in order to develop methods of common proof of impact and damages.[41]

74. Counsel here, along with the Direct Purchaser Plaintiffs, engaged in multi-year coordinated conspiracy and violation discovery, during which numerous witnesses were deposed on issues relating to liability and overcharge. IPP Counsel attended the expert depositions in the Direct-Purchaser actions. In addition, they conducted substantial discovery into the issues of the degree to which the direct purchasers had passed the DRAM overcharges on to the ultimate consumers and other indirect purchasers, as well as the degree to which the Defendants were aware that their price increases were being passed-on

---

[40] Gross Decl., ¶ 5.

[41] *Id.* at ¶ 11.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
Incentive Awards for Plaintiffs

and included the indirect purchaser market within the target of their price-fixing conspiracy, complex and time-consuming issues that were absent from the Direct Purchaser Litigation.

75.     IPP Counsel propounded third-party discovery, directed principally to marshaling evidence necessary to prove the pass-through of overcharges to indirect purchasers. Subpoenas were served on more than 30 third parties, primarily on large computer OEMs that purchased DRAM and sellers of products containing DRAM, such as Dell, Gateway, Apple, Hewlett-Packard, IBM, Circuit City, CompUSA, Ingram Micro and CDW.  This discovery was critical because the as indirect purchasers, the *Petro* plaintiffs needed to demonstrate that pass through of the direct overcharge could be established on a class-wide basis.  Each of these subpoenas had to be individually negotiated, with the assistance of expert economists.[42]  IPP Counsel and their experts and consultants reviewed and carefully analyzed this third-party information, which consisted of hundreds of thousands of pages of documents and extensive data.[43]

76.     During discovery, Defendants and third-parties produced over four million documents from both domestic and foreign entities.  Counsel also obtained worldwide transactional sales data of DRAM manufactured by Defendants in the global market, and, in consultation with their experts, sought and received manufacturing cost data and detailed transactional sales data of DRAM, both as components in computers and as stand-alone DRAM modules.  Over 100 depositions were taken of fact witnesses, as well as Defendants' expert witness for class certification, and IPP Counsel defended the depositions of their own experts, Drs. Michael Harris and Roger Bohn.  Additionally, IPP Counsel worked closely

---

[42] Gross Decl., ¶ 10.

[43] *Id.*

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

1   with consultants and economic experts to ensure that the discovery obtained would be

2   focused on information needed to prepare for class certification and trial.[44]

3       77.     In order to process the millions of pages of document discovery, IPP Counsel

4   undertook the design and implementation of a new structure and technology for document

5   review that, to the knowledge and the Special Master, had never been used before.[45]  In

6   2002, when document discovery commenced in this litigation, advances in computer

7   software and hardware, especially in web-based access to documents on a central server and

8   the enhancements in optical character reading, were opening the door to new and vastly

9   more efficient possibilities for litigation document review, and IPP Counsel took full

10  advantage of this opportunity to create an efficient and flexible system for reviewing,

11  organizing and accessing the evidence in this litigation.  *Id.*

12      78.     Working with an outside consultant, IPP Counsel selected software and a

13  document hosting vendor that could normalize and standardize the formats and load files of

14  the electronic documents that had been produced in the California JCCP Proceeding and

15  were being produced in the MDL litigation, optically "scan" and convert the millions of

16  pages of electronic documents to searchable text files, provide a platform for the retrieval of

17  individual documents through Boolean logic (Lexis style) word searches, and then allow for

18  the annotation and organization of the individual documents by multiple subjects and issues.

19  *Id.*

20

21      79.     The availability and use of this technology permitted the reinvention of the

22  entire document review process.  The IPP counsel selected to review documents were

23  organized into teams of five to eight attorneys, who were responsible for identifying the best

24  documentary evidence relevant to their particular subject matter in the universe of

25  [44] Report, Part I, ¶ 44; Gross Decl., ¶ 14.

26  [45]  Cooper Decl., ¶ 15.

27

28

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
Incentive Awards for Plaintiffs

documents produced in discovery, and organizing and annotating those documents for future use as deposition, pretrial motion and trial exhibits. To maximize the collaborative spirit, as well as quality control, no team leader supervised attorneys from his or her office.

80.     Each team produced a narrative memorandum of the evidence relevant to its issue or subject matter, with citations to individual highly probative documents. These memoranda were updated periodically and were complied into a general case overview or briefing book that was used by attorneys taking depositions and writing briefs. As a subject matter team finished its work, the attorneys receiving the highest evaluations from their team leaders were reorganized into the deposition preparation teams. *Id*.

81.     IPP Counsel provided the AGs with access to their electronic document management system, including their annotations and other work product. The AGs supplemented this system by creating document management systems of their own and conducting independent document review. The AGs were also given access to the depositions taken by the Direct and Indirect Purchaser Plaintiffs and conducted an independent review of those depositions. The AGs reviewed all of the documents, interrogatory responses, and deposition testimony taken in the private actions, and selected essential documents and testimony. As part of this review, the AGs explored additional theories of liability such as the output-signaling aspects of the Defendants' conduct and the agency relationship between Defendants Nanya Taiwan and Nanya U.S.A.[46] Like the IPP Counsel, the AGs worked closely with their experts and consultants in preparing their case for trial.[47]

82.     After this review, the AGs conducted a substantial number of additional depositions and interviews of current and former employees of the Defendants, creating a

---

[46] Varanini Decl., ¶ 14.

[47] Report, Part I, ¶ 52.

supplemental database of depositions, linked to their document database, for ease of reference. The AGs obtained supplemental interrogatory statements from many of the Defendants. Additionally, the AGs conducted numerous interviews, took depositions of, and obtained a voluminous number of documents from OEMs and third-party retailers and resellers involved in the sale of DRAM and DRAM-containing equipment.[48]

83.    The AGs worked with the government entities they represented to gather and analyze purchase information, conduct a purchasing survey, and speak with state employees, in order to determine the extent of the injury and damages the states suffered throughout the relevant damages period.  This work included not only working with expert economists who analyzed the gathered information and data to determine the fact and extent of harm suffered by the represented government entities but also included answering interrogatories and submitting to depositions across the country.[49]  Additionally, the AGs undertook a survey of state purchasers to further support their damages calculation.[50]  This process took many months to complete.[51]

84.    In addition to preparing Counsel for trial, without the threat of which settlement would have been unlikely, much of the discovery conducted into distribution channels, pass-through, market structure, as well as the work of Counsel's experts proved useful in setting the context in which the plan of distribution and allocation of the settlement proceeds was developed during the proceedings before the Special Master.[52]

///

---

[48] Report, Part I, ¶ 50; Varanini Decl., ¶ 11.

[49] Varanini Decl., ¶ 14.

[50] *Id.* at ¶ 16.

[51] Report, Part I, ¶ 51.

[52] Report, Part I, ¶¶ 204-260.

### 3.  The Substantial Risks Facing Counsel in this Complex Litigation

85.     The risk of non-payment in contingent-fee litigation is a significant factor in determining attorneys' fees.  *Vizcaino*, 290 F.3d at 1048-49; *In re Pacific Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (finding no abuse of discretion where the district court awarded 33% of the settlement fund in attorneys' fees -- instead of the standard benchmark of 25% -- due to "the complexity of the issues and the risk"); *In re Wash. Pub. Power Supply Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994) (examining the role of risk in litigation); *see also In re Superior Beverage/Class Container Consolidated Pretrial*, 133 F.R.D. 119, 127 (N.D. Ill. 1990) ("[t]he 'best' case can be lost and the 'worst' case can be won, and juries may find liability but no damages. None of these risks should be underestimated").

86.      Courts have long recognized that there is generally considerable risk in antitrust cases; one reason why in a significant percentage of such cases, a fee higher than the benchmark is awarded.  That is particularly true of antitrust actions commenced on behalf of indirect purchasers, as this litigation illustrates.  Here, the application of the antitrust injury requirements of *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*Assoc. Gen. Contractors*") to the claims asserted in *Petro* and of the issues raised by the certification of litigation classes for both the private parties and the governmental entities are particularly emblematic of the risk and complexity of this litigation and demonstrate that only counsel of the highest competence could have achieved the settlement recovery realized here.

### a.  The *Assoc, Gen. Contractors* Issue

87.     On June 1, 2007, this Court granted judgment on the pleadings as to all antitrust claims asserted in *Petro* arising from the purchase of DRAM as a component in a computer or other device, and dismissing those claims with prejudice (Dkt. No. 1555; "the

*AGC* Order").[53]  The *AGC* Order held that plaintiffs purchasing a DRAM-containing product lacked standing under various state antitrust laws because their injuries were too remote to the price-fixing of DRAM itself, and therefore, these purchasers failed to satisfy the "antitrust standing" requirements set forth in *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*Assoc. Gen. Contractors*").

88.     On August 17, 2007, this Court granted IPP Counsel leave to file an amended complaint asserting claims on behalf of persons who purchased DRAM as a component in a computer, as opposed to other DRAM containing devices, and alleging facts to demonstrate that the markets for DRAM modules and for computers are "inextricably linked, and cannot be considered separately" (Dkt. No. 1683).  Plaintiffs' Second Amended Complaint (Dkt. No. 1684) was filed the same day.[54]

89.     On October 1, 2007, Defendants filed a motion to dismiss the Second Amended Complaint, again citing *Assoc. Gen. Contractors* and challenging Plaintiffs' standing to assert claims for computer purchases under the antitrust laws of California and fifteen other states (Dkt. No. 1740).  On January 29, 2008, the Court granted Defendants' motion to dismiss (Dkt. No. 1809; the "MTD Order").[55]

90.     Upon plaintiffs' motion, the Court certified both the *AGC* Order and the MTD Order for interlocutory appeal of the *AGC* standing issues March 28, 2008 (Dkt. No. 1849). The Ninth Circuit granted the Petition for Permission to Appeal Under 28 U.S.C. § 1292(b) on June 26, 2008.  Following completion of the appellate briefing in 2009, which included an *amicus curiae* brief filed by the Attorney General of the State of California in support of appellants, Counsel reached a settlement in principle with all of the remaining

---

[53] Report, Part I, ¶ 45; Gross Decl., ¶ 15.

[54] Report, Part I, ¶ 46; Gross Decl., ¶ 16.

[55] Report, Part I, ¶ 46; Gross Decl., ¶ 17.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

Defendants.  Thereafter, the Ninth Circuit granted a stay of the appeal, pending final approval of the settlements.

91.     The effect of the *AGC* and MTD Orders was to seriously undermine IPP Counsel's case.   IPP Counsel's damages experts calculated that only 20% of relevant sales were stand-alone DRAM modules, with the remainder being sales of the computers and other DRAM-containing products that had been eliminated from the litigation.[56]  Indeed, in the MTD Order, this Court "acknowledge[d] the potentially devastating effect of this ruling on plaintiffs' case in chief."  Dkt. No. 1809 at 15.

92.     These rulings reduced the value of the private litigation by 80% and increased exponentially IPP Counsel's risk of recovering little or nothing on an investment of tens of thousands of hours of their time and the multi-million dollar financial commitment that had funded discovery and the work of their expert witnesses.  Nonetheless, IPP Counsel never faltered in their vigorous representation of the *Petro* plaintiffs and putative class.  They succeeded in putting the Defendants sufficiently at risk in pressing the *Assoc. Gen. Contractors* issue for interlocutory appeal that the Defendants elected to settle the claims of all DRAM containing product purchasers rather than rely on preserving their victory on appeal.

93.     The Attorneys General also faced motions to dismiss some of their state law claims; however, unlike IPP Counsel's claims, most of the state law claims either did not face a challenge or survived. Only the challenges to the state law claims of Utah, Tennessee, and New Mexico were granted.  This is not to say, however, that the AGs faced no risk or trimming of their claims.  *See, e.g., California v. Infineon Technologies AG*, 531 F. Supp. 2d 1124 (N.D. Cal. 2007) (holding that only the California Attorney General can bring *parens*

---

[56] *See* Declaration of Roger Bohn, June 29, 2007, ¶ 28 (Dkt. No. 1597), and Supplemental Expert Report of Roger Bohn to Special Master, Feb. 18, 2011, ¶ 46, which is Exhibit 73 in the Appendix to this Report.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

1 *patriae* claims under the Cartwright Act and only on behalf of California residents, finding

2 some state price-fixing claims were barred by *Illinois Brick Co. v. Illinois* 431 U.S. 720

3 (1977), finding some state price-fixing claims were barred for failure to allege intrastate

4 activity, applying discovery rule to some state law claims, and finding that some states'

5 *parens patriae* claims were deficient); Am. Notice of Pl. State of Florida's Mot. To Strike,

6 *State of California et. al. v. Infineon Technologies*, No. 06-4333 PJH (N.D. Cal., filed July

7 15, 2008) (Dkt. No. 425), Order Granting Motion to Strike (Dkt. No. 456).

8       94.     The AGs' good fortune in having significant aspects of their case remain

9 intact played a role in achieving the global settlement of all claims since they continued to

10 prepare their cases for trial even after this Court entered the April 18, 2008 stay of the *Petro*

11 proceedings pending the Ninth Circuit's consideration of the 1292(b) Petition on the *AGC*

12 issues (Dkt. No. 1853).[57]

13       95.     Under these circumstances, a settlement fund of $310 million, which

14 represents a recovery of approximately 12% of estimated total damages for all DRAM sales,

15 is a truly remarkable achievement which more than justifies awarding Counsel the 25%

16 benchmark fee which they have requested.[58] *See Vizcaino*, 290 F.3d at 1048; *Bebchick v.*

17 *Washington Metro. Area Transit Comm'n*, 805 F.2d 396, 408 (D.D.C. 1986) (stating that

18 attorneys' resolve in fighting to overturn adverse Commission determinations supported an

19 upward adjustment of their lodestar).

20 ///

---

22 [57] Report, Part I, ¶ 53.

23 [58] The Special Master is mindful in making this statement that the compensation going to the Indirect
Purchaser Settlement Class is also consideration for the release of the *parens patriae* claims being
24 asserted on their behalf by certain of the AGs, and that no determination of the applicability of *AGC*
was ever made as to those claims. Nevertheless, the Special Master agrees with the view that the
25 dismissal of the claims arising from the purchase of DRAM containing products was a "devastating"
blow to the Settlement Class's chances of securing a significant recovery in this litigation and that
26 Counsel should be both commended and compensated for overcoming this obstacle.

**b. Risk of Failure to Certify Litigation Classes**

96.     The question of whether litigation classes would ever have been certified provides another aspect of substantial risk for members of the proposed Indirect Purchaser Settlement Class, the proposed Governmental Purchaser Settlement Classes and their Counsel.   Achieving the substantial settlement fund here in light of these risks provides additional support for awarding more than the 25% benchmark fee.

97.     Filing of IPP Counsel's class certification motion was set by court order for a date shortly after the issuance of the *AGC* Order.  Accordingly, on July 10, 2007, IPP Counsel filed a motion for class certification (Dkt. No. 1689) at the same time that they moved for leave to amend to address this Court's *AGC* concerns.  Following the filing of the Second Amended Complaint, on August 24, 2007, IPP Counsel filed  "Amendments re: Motion for Class Certification" to conform the class certification motion to their recently filed Second Amended Complaint (Dkt. No. 1689).  The motion sought certification of nationwide classes of private indirect purchasers of DRAM modules and DRAM in personal computers, desktops, laptops, notebooks, workstations, or servers under Fed. Civ. P. Rule 23(b)(2) for the purpose of obtaining injunctive relief class under Section 16 of the Clayton Act (15 U.S.C. §26), and under Fed. Civ. P. Rule 23(b)(3) for the purpose of obtaining damages under California's Cartwright Act (Cal. Bus. & Prof. Code § 16720), restitutionary relief under Cal. Bus. & Prof. Code § 17200 ("UCL"), and disgorgement under California law principles of unjust enrichment.

98.     Defendants filed oppositions to the class certification motion on September 28, 2007 (Dkt. Nos. 1728-1736) and on November 27, 2007 (Dkt No. 1780).[59]

---

[59] Report, Part I, ¶¶ 47-48; Gross Decl., ¶¶ 20-22.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

99.     After Defendants filed their motion to dismiss the IPPs' Second Amended Complaint (as discussed above) on December 5, 2007, the Court vacated the January 16, 2008 hearing on class certification in order to "settle the pleadings before class certification [was] addressed." (Dkt. No. 1794).  The class certification process was then stayed pending the interlocutory appeal to the Ninth Circuit, and then was further stayed by the pendency of the settlement agreements.[60]   Nonetheless, this Court's ruling on the motion filed by the California and New Mexico indicates that the IPP Counsel faced a substantial risk that a nationwide class of private indirect purchasers of DRAM modules and computers to pursue damage claims would not have been certified.

100.     Although the majority of claims by the AGs were filed as *parens patriae* or representative claims on behalf of government entities, natural persons, and in a few instances businesses, several AGs filed class claims on behalf of certain local government entities.  *State of California et al. v. Infineon Technologies*, No. 06-4333 PJH (N.D. Cal. 2008).  On November 21, 2007, the AGs of California and New Mexico filed a motion to certify a litigation class of political subdivisions that purchased DRAM and DRAM-containing products in those states under the antitrust laws of California and New Mexico. (Dkt. No. 274).  This Court denied the motion, finding that the state's economic expert had failed to proffer a "sufficiently plausible methodology" to establish that the states' proposed evidence "concerning antitrust impact—and specifically pass-through—will be sufficiently generalized so as to allow common questions as to impact to predominate." *California v. Infineon*, Case No. 06-4333 PJH, 2008 WL 4155665 at *39 (N.D. Cal. Sept. 5, 2008) (Dkt. No. 448).  This Court's skepticism about proof of impact went beyond the specifics of the state's expert's methodology, and several of the statements in the opinion may have had applicability to the litigation class proposed by IPP Counsel as well.  For example, this

---

[60] Report, Part I, ¶ 48 at 25; Gross Decl., ¶ 23.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

Court observed that it was unlikely that any methodology could demonstrate with generalized proof that "the County of Los Angeles, comprised of over 9.5 million persons, and which purchased a large volume of computer servers pursuant to a statewide contract, for example, experienced impact just as a small municipality or agency located in San Francisco, comprised of a few hundred persons, and which purchased a small number of printers from a re-seller in San Francisco's 'Computer Store' did."[61]  This Court believed that "each divergent factor-customer size, type, procurement channel, product, distribution step-is a factor that increases the likelihood that proof of pass-through can only be shown with resort to individualized proof."[62]

101.    Like IPP Counsel, the AGs did not allow this setback to lessen the pressure on the Defendants to either settle or defend their actions at trial.  A month after certification was denied, the California Attorney General filed an action in the California Superior Court in San Francisco on behalf of 97 political subdivisions as well as the University of California.  *Los Angeles v. Infineon Technologies* AG, No. CFC-08-480561 (San Francisco Supr. Ct. Oct. 3, 2008).[63]  The California Attorney General thereafter litigated that state court case, successfully opposing a number of motions and also serving additional discovery that the Defendants were compelled to answer.[64]

### c.  Other Aspects of Risk and Complexity in the Litigation

102.    The 2008-2010 financial crisis materially affected the ability of some Defendants to pay anything and many Defendants were concerned with cash outflows in

---

[61]*Id.* at *11.

[62] *Id.*

[63] The term "political subdivisions" includes K-12 school districts, counties, cities, and special districts of whatever kind.

[64] Varanini Decl., ¶ 12; Report Part I, ¶ 55.

light of the economic conditions. Elpida, for example, ultimately filed for bankruptcy, and Infineon was reorganized and subsequently acquired while in distress. Additionally, Mosel was unable to meet the payment schedule initially set forth in the Multi-Defendant Settlement Agreement due to its restructuring efforts with its lender banks and the Taiwanese government. The precarious financial situations of these Defendants created an additional risk that even if Counsel had obtained litigated judgments against them, collecting on those judgments would have been difficult or impossible.[65]

103.    This litigation is composed of numerous actions brought under the antitrust laws of multiple states. It had long been recognized that antitrust class actions are "arguably the most complex action to prosecute" as "[t]he legal and factual issues involved are always numerous and uncertain in outcome." *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, No. Civ. A 03-4578, 2005 WL 1213926, at *11 (E.D. Pa. May 19, 2005) (quoting *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003)); *see also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 122 (4th Cir. 2005) (finding no abuse of discretion where the district court ordered an "extraordinary" fee in part because "antitrust cases, by their nature, are highly complex"); *In re Shopping Carts Antitrust Litig.*, MDL No. 451, 1983 WL 1950, at *7 (S.D.N.Y. Nov. 18, 1983) (noting that "antitrust price fixing actions are generally complex, expensive and lengthy"); *In re Cement & Concrete Antitrust Litig.*, MDL No. 296, 1981 WL 2039, at *3 (D. Ariz. Feb. 5, 1981) (considering the "complexity and uncertainty of the legal and factual issues presented" in antitrust litigation).

104.    The complexity attendant to conspiracy and violation proof is compounded in indirect purchaser litigation like this where Counsel had to do the discovery and work with econometric models to trace the effect of the overcharge to the ultimate consumer. Moreover, this proof had to be marshaled with an eye to the substantive requirements of

---

[65] See, e.g., Report, Part I at ¶ 66, fn. 50 and ¶ 67.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

antitrust and consumer protection laws in 33 states and the District of Columbia, all of which had to be reconciled with federal procedural law.  In addition, discovery against all but one of the Defendants involved international discovery, a further complicating factor.

105.     Many of the issues that would have made litigating these indirect purchaser claims extremely complex carried over into the post-settlement proceedings before the Special Master.   Those proceedings are covered in detail in the Report, Part I, and the complexity attendant thereto should be self-evident.  Suffice it to say here that Counsel expended many hours under the supervision of the Special Master grappling with and ultimately resolving complex issues, including: (1) establishing the basic market facts relevant to a reasonable allocation of the funds to pay the anticipated claims of all indirect purchasers nationwide; (2) focusing on the products, distribution channels, final uses, and the pass-on of the alleged overcharges between indirect-purchaser-resellers and end-user/consumer groups, as well as their various characteristics and their relative percentages of DRAM commerce; and (3) resolving the issue of the nationwide scope of the proposed private entity settlement class and whether subclasses were required for persons and entities in different positions in the chain of distribution or to account for differences in the "strength" or procedural positions of proposed class members resulting from state law and/or the existence of *parens patriae* claims.   After these issues were resolved, a second phase commenced which involved resolving such complex issues as whether monetary distributions could be made to household claimants, whether a *cy pres* distribution could be used for some claimants, the appropriate form of notice and procedures for calculating and evaluating claims, and other issues of claims administration.

106.     Throughout these proceedings, Counsel prepared and submitted expert reports concerning relevant market facts, focusing on the products, distribution channels,

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

and final uses of DRAM by the resellers and end-user/consumer sub-groups.[66]  The

positions and issues were vigorously contested among the various groups, including

differences between the expert reports from the IPP Counsel's expert, the AGs' expert,

Celestica's expert, and the resellers' expert on DRAM market structure and distribution

channels, and on how these would affect the calculation of any distributions to class

members and allocations among various groups of indirect purchasers.

107.    The complexity attendant to resolving the post-settlement class certification,

distribution and claims processing issues provides further support for an award to Counsel

of the requested 25% benchmark fee.

### d.  The Quality of Counsel's Work Reflects Their Skill and Experience

108.    While the best evidence of the quality of Counsel's work is the result they

achieved in light of the difficulties and complexities of this litigation, some courts separately

call out counsel's skill and experience as an independent factor to be considered in awarding

attorneys' fees.  *See, e.g., In re Heritage Bond Litig.*, 2005 WL 1594389, at *12 (finding

that an award of one-third of the settlement fund was appropriate due to class counsel's

experience representing plaintiffs in class actions); *Craft v. County of San Bernardino*, 624

F. Supp. 1113, 1120 (C.D. Cal. 2008) (considering class counsel's specialization and regard

in the area of law at issue in the case in evaluating experience); *Vizcaino v. Microsoft*, 142

F. Supp. 2d 1299, 1306 (W.D. Wash. 2001) *aff'd* 290 F.3d 1043 (9th Cir. 2002) (finding that

the court should consider the experience, reputation and ability of the attorneys when

considering a fee award).

109.    IPP Counsel here are among some of the top-rated antitrust attorneys and

firms in the country, who cumulatively have decades, if not centuries, of experience

---

[66]  Counsel for class member, Celestica, and counsel appointed by the Special Master to advocate for the reseller members of the proposed Indirect Purchaser Settlement Class also participated in these proceedings.  Compensation for these counsel will be discussed separately below.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
Incentive Awards for Plaintiffs

litigating indirect-purchaser and direct-purchaser antitrust class actions.[67]   The Attorneys General are the chief law enforcement officers for their states charged with enforcing state and federal antitrust law to protect their economies and citizens.   The attorneys prosecuting this litigation on behalf of their respective states are among the most experienced government antitrust litigators in the country, also with decades of experience in antitrust and consumer actions on behalf of the states.[68]   The experience, reputation and skill of IPP Counsel and the AGs,' whose skill and expertise I have personally observed, fully support awarding 25% of the settlement fund.

## V.   FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE REIMBURSEMENT OF LITIGATION COSTS AND EXPENSES

110.   Costs incurred in litigation are reimbursable when they are necessary to furnish effective litigation.  *In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1372 (N.D. Cal. 1995).  IPP Counsel and the AGs are entitled to a reimbursement of reasonable out-of-pocket expenses for litigation and settlement.  *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 769 (9th Cir. 1977); *In re Quantum Health Res., Inc.*, 962 F. Supp. 1254, 1259 (C.D. Cal. 1997); *In re Brooktree Sec. Litig.*, 915 F. Supp. 193, 200 (S.D. Cal. 1996).

111.   Reimbursable expenses are those "reasonable expenses that would typically be billed to paying clients in non-contingency matters."  *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1048 (N.D. Cal. 2007) (citing *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994)).  This includes, but is not limited to, reimbursement for expert fees, court fees, photocopying, telephone charges, postage charges, travel costs, computerized legal research costs, and technology expenses.  *Media Vision*, 913 F. Supp. at 1367–71; *Spicer v. Chicago*

---

[67] Gross Decl., ¶ 45; Compendium of Declarations of IPP Counsel.

[68] Varanini Decl., ¶ 2; Compendium of Declarations of AG Counsel.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and Incentive Awards for Plaintiffs

1  *Bd. Options Exch., Inc.*, 844 F. Supp. 1226, 1264 (N.D. Ill. 1993) (technology services).

2  Reimbursable expenses also include expenses that become necessary because of some

3  specialized issue in a case, such as the Special Master proceedings ordered here by the

4  Court.  (Dkt. Nos. 1789, 2099, 2102 and 2126).

5       112.   IPP Counsel are seeking $6,338,232 for reimbursement of expenses,[69] and

6  the AGs are seeking $5,483,468.63 for reimbursement of expenses.[70]  The Special Master

7  has not performed an audit or item-by-item review of the claimed expenses and does not

8  believe that such a review is required.  The Special Master has reviewed the sixty-three (63)

9  declarations of IPP Counsel and thirty-two (32) Attorneys General setting out the categories

10  of the expenses incurred and finds, based upon his experience in antitrust matters, that as a

11  general matter, the claimed expenses fall into the categories and aggregate to amounts that

12  would be generally expected and reasonable in litigation of this magnitude and duration.  On

13  this basis, the Special Master finds that the expenses incurred herein by IPP Counsel and the

14  AGs were reasonable and necessary to the prosecution of the case, and therefore were made

15  for the benefit of the proposed Settlement Classes.

16       113.   For example, the major expense item for each of the private firms was the

17  total of their contributions into IPP Counsel's common expense fund.  This fund was

18  administered by Liaison Counsel Francis Scarpulla and was used to pay plaintiffs' economic

19  experts and third-party vendors, principally those associated with discovery such as the firm

20  providing document processing and electronic data storage for the millions of pages of

21  reviewed documents, as well as court reporter and deposition transcript costs for more than

22  100 depositions.

23

24

---

25  [69] Gross Decl., ¶¶ 48-51.

26  [70] Varanini Decl., ¶ 23.

27

---

28
Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
Incentive Awards for Plaintiffs

114.   The Special Master finds that as with IPP Counsel, as significant portion of the expenses incurred by the AGs were expert witness fees and expenses connected with document processing. deposition discovery, and setting up computer databases.[71] Approximately 39% of the AGs' aggregate expenses are attributable to the hiring through a contract with the California Attorney General of a specialized and experienced group of paralegals and attorneys who assisted the AGs in their document handling and review in setting up supplemental document and deposition databases, and in obtaining information from California governmental entities regarding their DRAM purchases and purchasing patterns that were used in the motion of class certification, in the crafting of the AGs' allocation and distribution plan for Government Purchaser Plaintiffs, and in the California Attorney General's  crafting of  her plan of distribution for California's share of the Settlement Fund.[72]  The Special Master has reviewed the supporting documentation in the form of the contract bills submitted by this vendor and the authorities holding that similar costs of contract paralegal and attorney services are reimbursable and finds that the billings submitted for reimbursement by the AGs fall with in the range of magnitude that are usual and expected in litigation of this scope, complexity and duration, and that the services reflected in those billings are of the nature of services generally incurred for the benefit of plaintiffs in antitrust cases.  *See, e.g., SEC v. Kirkland*, 2008 WL 3981434 (M.D. Fla. 2008) (contract paralegal work which included "factual investigation . . . including locating and interviewing witnesses; . . ., and document production," could be compensated as *taxable* costs); *Chapman v. Pac. Tel. & Tel. Co.*, 456 F.Supp. 77 (C.D. Cal. 1978) (paralegal costs recoverable as *taxable* costs under certain precedent); *Computer Statistics, Inc. v. Blair*, 418

---

[71]  Varanini Decl. at ¶¶ 24-25; Declaration of James A. Donahue, III in Support of Joint Motion for Attorneys' Fees and the Attorneys General's Motion for Costs, at ¶¶ 17-20, a copy of which appears as Exhibit 24 in the Compendium of Attorneys General's Declarations.

[72] Varanini Decl., ¶ 25.

Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
Incentive Awards for Plaintiffs

1    F. Supp. 1339, 1351-52 (C.D. Tx. 1976)  (paralegal fees could be recovered as taxable costs

2    in antitrust case).

3        115.    Included in the expenses reimbursement requested by IPP Counsel is the

4    amount of $749,086 as compensation to be paid to the law firm of Susman Godfrey, counsel

5    for Celestica, of which $320,298 represents payments made to Nathan & Associates for the

6    services of Dr. Russell Mangum.[73]  IPP Counsel's expense request also includes

7    compensation for Berman De Valerio, the firm appointed by the Special Master as

8    Resellers' Allocation Counsel, in the total amount of $439,986.65, of which $186,926.65

9    represents fees owed to Nathan & Associates for the services of Dr. Gary French.[74]  These

10   two expenditures represent nearly 20% of IPP Counsel's requested expense reimbursement.

11       116.    During proceedings before the Special Master, IPP Counsel, the AGs and the

12   Special Master determined that it would be appropriate and beneficial to secure the fullest

13   participation possible of indirect-purchaser resellers in the allocation process.  Accordingly,

14   the Special Master sent communications to major indirect-purchaser resellers inviting them

15   to participate through their representatives.  A number of resellers attended a few hearings

16   before the Special Master, but only, Celestica Inc., an electronics manufacturing services

17   company, a type of reseller that manufactures computers for OEMs, participated by its

18   counsel and its expert economist throughout the entire allocation process.[75]  Since Celestica

19   as a manufacturing services company had interests that did not necessarily align with

20

21   [73]  In addition to the Gross Decl., this request is supported by the Declaration of James T. Southwick
     dated July 26, 2013. A copy of which appears as Exhibit 64 in the Compendium of IPP Counsel
22   Declarations.

23   [74]  In addition to the Gross Decl., this request is supported by the Declaration of Christopher T.
     Heffelfinger in Support of Petition for Attorneys' Fees and Reimbursement of Expenses Filed on
     Behalf of Berman DeValerio, dated July 11, 2013, a copy of which appears as Exhibit 65 in the
24   Compendium of IPP Counsel Declarations.

25   [75]  Celestica's counsel attended all the hearings and submitted several expert reports regarding pass
     through and the DRAM chain of distribution on behalf of resellers. See Declaration of James T.
26   Southwick, ¶¶ 9-11.

27   ────────────────────────────────────────

28
     Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
     Incentive Awards for Plaintiffs

1    "garden variety" resellers who both purchased and resold DRAM containing products, the

2    Special Master determined that these resellers should be represented by separate counsel.

3    On April 20, 2011, the Special Master issued a Memorandum and Order appointing the law

4    firm of Berman DeValerio as Reseller Allocation Counsel to work in conjunction with

5    Celestica's counsel in the allocation process.[76]

6        117.    Since all of the work done by Susman Godfrey, Berman DeValerio and the

7    experts they retained was post-settlement and for the express purpose of assisting the

8    Special Master to arrive at a recommendation of a fair reasonable and adequate plan of

9    distribution of the settlement proceeds to the proposed Indirect Purchaser Settlement Class,

10   the Special Master finds that it is appropriate to treat their compensation as expenses.  The

11   amounts of compensation requested appear quite reasonable in light of the services that the

12   Special Master observed them performing.

13   **VI.    FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE
         PAYMENT OF INCENTIVE AWARDS TO THE CLASS
14       REPRESENTATIVES**

15       118.    IPP Counsel requested that each of the ten *Petro* class representatives receive

16   a payment of $5,000, and that the approximately 140 plaintiffs in the other state and federal

17   cases that were coordinated with this action receive a payment of $500, for the time and

18   effort they have dedicated to this case.

19       119.    Courts often make incentive awards to class representatives for their service

20   to the class, and for the risks they undertake on behalf of the class.  *See, e.g., In re TFT-LCD*

21   *(Flat Panel) Antitrust Litig.*, No. MDL 3:07–md–1827 SI, 2013 U.S. Dist. LEXIS 51271, at

22   **103-04 (N.D. Cal. Mar. 29, 2013) (approving incentive awards of $15,000 for each of the

23   40 court-appointed indirect-purchaser class representatives and $7,500 for each of the eight

24   additional named plaintiffs); *In re Apple iPhone 4 Prods. Liability Litig.*, No. 5:10–md–

25

26   [76] Report Part I, ¶ 23, ¶¶ 207-210 and ¶ 211; Gross Decl., ¶ 41.

27

28

1    2188 RMW, 2012 WL 3283432, at *5 (N.D. Cal. Aug. 10, 2012) (awarding incentive fee of

2    $500 to each class representative); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. MDL

3    3:07–md–1827 SI, 2011 WL 7575003, at *2 (Dec. 27, 2011) (approving incentive awards of

4    $15,000 for each of the 11 direct-purchaser class representatives "in recognition of their

5    work performed for the benefit of the [c]lass and the risks undertaken"); *In re Dynamic*

6    *Random Access Memory (DRAM) Antitrust Litig.* (Direct Purchaser Actions),  No. M-02-

7    1486-PJH, 2007 WL 2416513 (N.D. Cal. Aug. 16, 2007) (Hamilton, J.); *Radcliffe v.*

8    *Experian Info. Solutions,* 715 F.3d 1157 (9th Cir. 2013) (approving incentive awards as long

9    as they are not conditioned on the class representative's approval of the settlement).

10           120.    Here, each of the ten *Petro* class representatives provided key support to this

11   litigation by responding to discovery requests, including both written discovery and

12   production of documents, and regularly conferring with counsel.  Moreover, most *Petro*

13   class representatives were also subjected to in-depth depositions by Defendants (one *Petro*

14   class representative, although never deposed because he was added to the complaint after

15   the Court's dismissal on *AGC* grounds, served an important role as a purchaser of stand-

16   alone DRAM and was prepared to be deposed).  The approximately 140 plaintiffs in the

17   other state and federal indirect-purchaser actions that were coordinated with this action,

18   though they were not deposed and were not served with written discovery, provided support

19   to the prosecution of these indirect-purchaser actions and represented the citizens of their

20   respective states.[77]

21           121.    Accordingly, the Special Master finds that the requested incentive awards of

22   $5,000 to each of the ten *Petro* class representatives and $500 to each of the approximately

23   140 plaintiffs in the other state and federal cases that were coordinated with this action are

24   fair and reasonable.

25

26   [77] Gross Decl., ¶¶ 55-56.

27

28
                                          57
             Report and Recommendations of Special Master re Attorneys' Fees, Expenses, and
                             Incentive Awards for Plaintiffs

# VII.    CONCLUSION

122.    Based on the above-stated findings and conclusions, the Special Master finds and concludes that: Counsel's requested fee award of $77,680,000, or 25% of the total Settlement Fund, is fair and reasonable and in keeping with the precedent of the Ninth Circuit.  The Special Master also finds that the IPP Counsel's requested expense reimbursement of $6,338,232 and the Attorneys General's requested expense reimbursement of $5,483,468.63 are reasonable.  Finally, the Special Master finds that the requested incentive awards of $5,000 to each class representative on the *Petro* complaint and $500 for each of the approximately 140 plaintiffs in the other state and federal cases that were coordinated with this litigation are appropriate and in keeping with Ninth Circuit precedent.

Dated: October 30, 2013                    /s/ Charles B. Renfrew
                                            Hon. Charles B. Renfrew (Ret.)
                                               Special Master

EXHIBIT 8

1  Martin Quinn
2  JAMS
   Two EmbarcaderoCenter, Suite 1500
3  San Francisco, CA94111
   Telephone: (415) 982-5267
4  Fax: (415) 982-5287

5  SPECIAL MASTER

6

7

8                    UNITED STATES DISTRICT COURT

                   NORTHERN DISTRICT OF CALIFORNIA
9
                     SAN FRANCISCO DIVISION
10

11

12  IN RE: TFT-LCD (FLAT PANEL)          CASE NO. M: 07-cv-01827-si
    ANTITRUST LITIGATION
13
                                          SUPPLEMENTAL REPORT AND
14                                        RECOMMENDATION OF SPECIAL
                                          MASTER RE ALLOCATION OF
15                                        ATTORNEYS' FEES IN THE
                                          INDIRECT-PURCHASER CLASS
16                                        ACTION

17  This Order Relates to:

18  INDIRECT-PURCHASER CLASS ACTION
19

20

21

22
            On November 9, 2012, I issued a Report and Recommendation [Dkt. No. 7127] that,
23
    among other recommendations, proposed a plan to allocate about $308 million in attorneys' fees
24
    among the 116 law firms that represented the IPP Class.  Fifteen law firms have submitted
25
    objections to my Report with respect only to the proposed allocation of fees.  This Supplemental
26
    Report accomplishes two tasks:  it rules on the fifteen objections, providing as to each firm a
27
    rationale for the amount of fees that I recommend allocating to it; and it makes other revisions to
28
    the proposed allocation based on new information and perspectives provided to me during the

1

objection process. Accordingly, I have not simply ruled on the objections, but have taken a second comprehensive look at the entire allocation plan in an effort to improve its fairness and consistency.

I interviewed each of the objecting firms, mostly in person and a couple by telephone. I received and considered additional declarations, documents and analyses from them. I conducted evidentiary hearings into the existence, terms and fairness of two alleged fee-splitting agreements.

## **Principles Applied**

First, I determined that in dealing with the fifteen objections I would not recommend a material increase in the total amount of attorneys' fees to be awarded to Class Counsel. My recommendation to award 28.5% of the settlement fund as attorneys' fees was, I believe, correct. Therefore, the original recommended total fee award was $308,226,250; the revised recommended total award is $308,225,250. The fact that fifteen firms are unhappy with the amounts allocated to them is no reason to increase the total amount of fees to be subtracted from the class settlement fund. Therefore, to the extent that I recommended an increase in any firm's allocation, I was obliged to rob Peter to pay Paul in order to find the funds.

Second, despite the objection by a couple of firms – notably the Alioto Law Firm – to the use of lodestars and multipliers as the basic tool for making the allocation, I believe that is the best available objective measure of both the effort each firm put into the case and the contribution of each firm to the final result. The Alioto Firm's Objection [Dkt. No. 7205] states that, "the Special Master abandoned the proper, accepted, fair and reasonable percentage method and reverted instead to the unfair and unreasonable and repudiated lodestar method. In addition, he applies a multiplication (the multiplier) to the various lodestars, which "multiplier" also is discriminatory and unfair...." (Alioto Objection, 5:13-18) As an alternative, the Alioto Firm says that I should have "recommended an equal percentage distribution to the Co-Lead Counsel and a serious examination of the recommended percentages to the other counsel." (Id., 5-23-25) There are two flaws with this complaint. First, the rationale and case law cited for using the

"percentage-of-the-fund" approach apply to the setting of a <u>total fee</u> – and I relied precisely on that methodology to set the 28.5% total fee. That rationale and case law does not apply at all to allocating a total fee among participating firms. Second, the Alioto firm does not suggest how I would conduct a "serious examination" of the percentage to be awarded each firm without (1) looking at what the firm did (i.e., hours, billing rates), and (2) using the various factors mentioned in my Report (i.e., complexity of work, contribution to litigation fund, efficiency of work and accuracy of billing, collaborative and professional behavior) to measure the degree to which the firm contributed to the overall effort. The lodestar captures the <u>amount</u> of work; the multiplier captures, albeit imperfectly and subjectively, the <u>quality</u> of the work and contribution to the result.

Third, I did not give sufficient weight in my original allocation to the amount and timing of each law firm's contribution to the litigation fund. Some of my allocations awarded inappropriately high multipliers to firms that contributed little or nothing to the fund, or made their contributions late in the game and were thus not exposed to the risk of losing their investments. This Supplemental Report makes some downward adjustments of allocations for the non-payors and late payors, and increases the allocation of other firms that had been under-rewarded for making early, significant investments.

Fourth, for firms that engaged principally in document review my original allocation lowered their billing rates for that work to about $350/hr. and valued the contribution of document review to the overall result less highly than the more complex work of writing motion papers, taking depositions, conducting settlement negotiations and preparing for trial. What I did not adequately appreciate is that varying levels of document review took place. There was the basic coding of the millions of documents obtained from defendants and third parties into a data base, and performing an initial review for relevance. This work had to be done, and done right, since it was the foundation for gathering evidence to prove the IPP case. But some firms engaged in more sophisticated, nuanced document review by selecting documents as deposition exhibits or as evidentiary support for important motions, providing foreign language reviewers, and writing evidentiary memos for depositions. For this latter type of work, I think higher billing

rates are appropriate. I also now weight that kind of review more heavily in assessing what each firm contributed to the ultimate result.

Fifth, I realized that it was inappropriate to reduce every firm's lodestar by 20%, although that calculation was suggested by Class Counsel. Therefore, for firms I could identify in which one or two lawyers did all the work, and firms with lodestars under $100,000, and other firms that exhibited outstanding efficiency, I used their full lodestar to calculate the recommended allocation. A couple of firms, based on additional input about their billing practices, received only 10% reductions.

Sixth, and most challenging for assessing each firm's contribution, Class Counsel were not a unified group. There was the Zelle, Hoffman group and the Alioto group. Each group has its passionate adherents. Each group believes that its members contributed most to the excellent result. I have tried as fairly as possible to discount the extreme views of both camps, to appreciate that overall the IPP effort benefited from having both skill-sets, and to make my own cold-blooded assessment of what each firm contributed without being swayed by intemperate rhetoric on both sides.

Seventh, and I say this with amusement not in criticism, each of the objecting firms exhibited the mindset reflected in Garrison Keillor's fictional town of Lake Wobegon, where "all the children are above average." Almost every firm told me that its contribution to the effort was "above average" and that it, therefore, deserved a higher-than-average multiplier. Needless to say, it is impossible to rate them all as "above average."

## Ranges of Multipliers

I grouped firms loosely into five ranges of multipliers. Multipliers vary within those ranges, and sometimes fall above or below a firm's logical range, because I made adjustments to reflect the recommendation of lead and liaison counsel, to consider payment to the litigation fund, and for having a class representative client. Where a firm fell within the range also depended on input I received, if any, about the firm's efficiency, skill, contribution to the litigation fund, and accuracy of billing records. A firm whose client was a class representative

got an increase of about .2 in its multiplier. A firm that paid a maximum amount to the litigation fund received an increase; firms that paid nothing received a decrease. The attached spreadsheet shows for each firm: (1) its full lodestar, (2) its "lodestar less 20%," (3) its "applicable lodestar" which is either its full lodestar, its lodestar less 20% or a lower percentage, or a lodestar adjusted to eliminate billing rates over $1,000/hr., (4) the recommended allocation, which is the "applicable lodestar" times a multiplier, and (5) the multiplier applied.

Firms with lodestars under $100,000: These firms basically did work for their own clients. In addition they may have attended client meetings in person in San Francisco or via telephone conference calls. But they did little, if any, document review or other work to contribute to litigating the IPP case. I allowed multipliers in the 1.2-1.3 range to compensate them for the delay in receiving their money. As noted above, I also applied the multiplier to their full lodestars because there is unlikely to be much wasted time at such low billing levels.

Firms that performed virtually only document review: I applied multipliers in the 1.4-1.6 range, depending on whether they performed basic or more complex document review to the extent I could discern that from the evidence submitted to me.

Firms that performed more complex work (motions, depositions): These firms received multipliers in the 1.7-1.9 range.

Firms that were in the core group driving the IPP case: These firms received multipliers in the 2.0-2.75 range.

Lead and liaison counsel, and selected outstanding contributors: These firms received higher multipliers ranging from 3.24-4.24.

### Recommendations re Objecting Firms

The Alioto Law Firm [Dkt Nos. 7186, 7190, 7205-7208, 7210, 7345, 7352, 7358-7360]

Recommending an appropriate allocation for the Alioto firm requires an assessment of both the contribution the firm made to the substance of the IPP case and Mr. Alioto's performance as co-lead counsel. To make that assessment I have relied on interviews of defense counsel, mediators and other IPP counsel; on the evidence presented at the 12/14/12 hearing on

the alleged fee sharing agreement; on the Alioto objection and accompanying declarations; on the prior Alioto declaration [Dkt. No. 6666]; on the allocation recommendations provided to me confidentially by co-lead and liaison counsel; and on my personal observation of the performance of the Alioto firm and Mr. Alioto for the past 2 ½ years.

IPP counsel agreed in early 2008 that, in general, the Alioto firm and its "trial group" would be primarily responsible for the trial and trial preparation, the Zelle firm and other counsel would be primarily responsible for class certification and other legal issues, while the remainder of the case, including document review and organization and merits discovery would be their shared responsibility.

Mr. Alioto, a talented and experienced trial lawyer, had strong views about how to prepare and win this case. He was determined to go to trial against 2-3 defendants. He insisted that class members and their counsel from all over the country travel repeatedly to San Francisco for meetings to prepare them to testify so that the jury would know the case was about people, not lawyers. He initially insisted on deposing witnesses in Asia where he thought they would be more comfortable and talkative. He wanted to depose high-level corporate Apex witnesses first, while other lawyers preferred a bottom-up approach. Recording time contemporaneously and striving for efficiency were less important to him than the final result. Often Mr. Alioto was right, the lone correct voice crying in the wilderness, but he could also act as an unnecessary impediment to a unified effective plaintiffs' effort.

Four examples stand out. First, just before the merits expert report was due, the main IPP economic expert, Dr. Netz, insisted that part of the approximately $800,000 that was owed to her firm be paid. Mr. Alioto refused to permit any funds to be paid out of the litigation account, so co-lead counsel Francis Scarpulla had to ask other counsel to immediately pay large amounts directly to Dr. Netz's firm. I was required to intervene to help resolve that dispute. Second, after the IPP settlement funds were placed in escrow (and remained the property of defendants), Mr. Alioto questioned the investment decisions taken by Mr. Scarpulla and Ms. Schneider of the Missouri Attorney General's office, and refused to authorize reinvestment of the funds. Again I intervened. Third, the Alioto Firm never paid more than $250,000 in assessments, far less than

the firm was assessed and far less than the $700,000 paid by its co-lead counsel at the Zelle, Hoffman firm. Fourth, Mr. Alioto's own time records do not comply with the Court's directive to keep accurate daily time records. His "detailed" records lump together a number of vaguely-described activities and assign a number of hours spent over periods of one or two weeks. There is no indication of what he did each day, or any details of what he actually did. (His own records are distinguished from those of his colleagues at his firm who kept timely and proper records.)

Mr. Alioto quickly formed a small group of lawyers in whom he had confidence as trial lawyers. Often the work and weekly consultations of that group proceeded in near-isolation from the rest of the IPP effort. According to other counsel, the Alioto group's work product often did not reach the Zelle firm and was never filed in court. However, as trial approached in late 2011 and early 2012, there was substantial cooperation between some Alioto team members, such as Daniel Shulman of Gray, Plant Moody and Gary McAllister, and the Zelle firm. Alioto team members were intimately involved in preparation of witness examinations, exhibit lists and deposition designations.

Mr. Alioto and his colleagues, Theresa Moore and Thomas Pier, were heavily involved in the deposition process. Mr. Pier supervised the defense of class representative depositions all over the country, and generally managed the "client relationship." Ms. Moore had input on numerous motions, deposition preparation, expert and other meetings, settlement discussions and trial preparation, but rarely as the leader. I was informed that Mr. Alioto was the examining or defending attorney in 17 depositions and attended another 32 depositions, that Ms. Moore attended 22 depositions but never examined or defended, and that Mr. Pier examined or defended in three depositions and attended 57 others. Those figures may be imprecise, but they convey a sense of how deeply the firm was involved in the deposition process.

Mr. Alioto also made a contribution to the class in the mediation process – although often in a disruptive way. Often against the wishes of his IPP colleagues and the mediators, he insisted on all-cash settlements (no product or coupons or cy pres), he insisted that one settling defendant make four live witnesses available for trial, and he insisted on considerably higher dollar settlements than his colleagues were sometimes willing to accept. He deserves credit for being

obstinate in the best interests of the class, and for portraying the IPP Plaintiffs as ready and eager to try the case. However, his demeanor was often disruptive, uncooperative and intransigent toward the mediators and other plaintiffs' counsel.

In conclusion, the Alioto firm, Mr. Alioto in particular, and some members of the "Alioto trial group" made very real and important contributions. For leading and coordinating that effort, the firm should be rewarded. However, in his role as a co-lead counsel Mr. Alioto failed in his responsibility to cooperate, collaborate and work in tandem with other IPP counsel. His obstinancy made it necessary for other leading counsel to constantly spend time mollifying him, to work around him, and to try to find out what he and his group were doing. As noted above, on the good days pairing of the Zelle and Alioto approaches and skills worked well. But in the end, the overall contribution of the Alioto firm to the final result was considerably less than it might have been had Mr. Alioto adopted a more cooperative approach, and was materially less than the contribution of Zelle Hoffman and other lead firms.

Mr. Alioto's billing rate started at $1,000/hr. in 2007 and climbed to $1,250/hr., then to $1,500/hr. Although his personal clients may pay those rates, it is not appropriate for a court to approve rates at such elevated levels in a class case. As I have done with the portion of Mr. Scarpulla's rate over $1,000, I have recalculated the Alioto lodestar, first to take the 20% reduction that most firms incurred, and second to reduce his personal billing rate to $1,000.

The firm's full lodestar is $18,126,946. Reduced by 20%, it is $14,501,557. Adjusting Mr. Alioto's billing rate to $1,000 produces an appropriate lodestar of $11,677,895. The original allocation to the firm was $45,000,000. I conclude that an upward adjustment is appropriate to reflect Mr. Alioto's leadership of his team to prepare creatively and thoroughly for trial. Therefore, I recommend that the firm's allocation be increased to $47,000,000, which is a multiplier of 4.02 over its appropriate lodestar. However, his allocation must also reflect his failings as a co-lead counsel. These include his lack of cooperation with, and repeated intransigence toward, co-lead counsel, his failure to pay an equal share to the litigation fund, and his imprecise and vague time records. A multiplier of 4.02 is the second-highest of any firm, exceeded only by that of the Zelle firm (4.34). The difference in multipliers between the two co-

lead counsel is attributable not to any ranking of their legal skills or effort, but to their highly disproportionate contributions to the IPP effort in their roles as co-lead counsel.

Andrus Anderson LLP [Dkt. No. 7198]

This small (3-4 lawyers) firm performed document review, but at a relatively sophisticated level. They were one of about 12 lawyers who supervised other reviewers in performing second-level document review in connection with deposition preparation. Ms. Anderson supervised the collection of documents for six depositions – crafting search terms, checking the reviewers' work, reviewing the documents retrieved, and writing evidentiary memos. One of their reviewers was Chinese-speaking, and was thus in high demand. The firm performed some drafting work on a summary judgment motion, and did research for jury instructions and class certification. They also did some early corporate research at the request of Mr. Alioto. Their billing appears efficient with little duplication or wasted time. It had a blended hourly rate of $388. The firm paid all of its assessments ($60,000) in full and on time. Their client was a class representative.

The firm's full lodestar is $711,918. It originally was allocated $1,000,000, a 1.75 multiplier of the "lodestar less 20%" amount. Because of the firm's efficiency, contribution to the litigation fund, and its client's role as a class representative, I would increase that to $1,250,000, which is about a 1.75 multiplier of its full lodestar.

Law Offices of Brian Barry [Dkt. No. 7167]

Mr. Barry is an experienced antitrust and class action lawyer. This firm also performed largely document review, but much of it at the second-level of review to prepare for depositions. It also had a Chinese-language reviewer who worked almost full-time and was always in demand. A review of its daily billing records shows that the document reviewers were repeatedly logging 10-12 hours per day. The firm contributed $400,000 to the litigation fund, the full amount requested, of which $300,000 was contributed early in the case. Its client was not a class representative. The firm's blended billing rate was $501.

The firm's full lodestar was $4,198,469. Reduced by 20% its lodestar was $3,358,775. Its original allocation was $5,000,000, which represented a multiplier of 1.49. That amount

9

exceeded the recommendation of all three lead and liaison counsel. Although the firm made a major contribution to the litigation fund and performed some high-level document review, it also had a high billing rate even for sophisticated document review and its reviewers recorded unrealistic numbers of hours per day. Therefore, I recommend no change in the firm's allocation which is based on a multiplier right in the middle of the 1.4-1.6 range.

The Coffman Law Firm [Dkt. No. 7187]

This two-person Texas firm had a client who was a class representative. Its primary contribution to the case was not the performance of traditional legal work, but rather in locating and bringing into the IPP fold plaintiffs from twelve states, of whom four were ultimately named as class representatives. The firm worked on the complaints for these plaintiffs, and oversaw their consolidation into the MDL. Mr. Coffman and his client flew twice to San Francisco for trial preparation sessions. All the work was performed by Richard Coffman himself at a billing rate of $425 that was raised to $550 in 2012 (the blended rate for the entire case was $441). The firm paid an assessment of $50,000 in 2012 when it was first asked to pay. It also incurred about $5,200 in unreimbursed travel and other costs.

The firm's lodestar was $133,806. There is no reason to reduce it since there is no indication of any inefficiencies or excessive billing rates. The original allocation was $180,000, which was a 1.68 multiplier on its "lodestar less 20%" amount. In view of the firm's substantial contribution to the IPP effort by obtaining the inclusion of plaintiffs from twelve states, its representation of a class representative, the efficiency of its work, and its prompt and significant contribution to the litigation fund, I recommend that its allocation be increased to $225,000, which is about 1.7 times its full lodestar.

Cooper & Kirkham [Dkt. No. 7201]

This firm was an early, consistent and important part of the core group of lawyers leading the IPP effort. Although 45% of its contribution was to document review and deposition preparation, that does not capture the leadership role played by Ms. Kirkham in structuring the entire document discovery and ESI process. One of its attorneys was a key team leader in preparing for dozens of depositions. The firm also performed important drafting and editing

work on motions to dismiss, class certification, settlement approvals, summary judgment and Daubert motions, among others. Three of the firm's lawyers performed over 95% of the firm's work. The firm contributed $500,000 in assessments. Following the last settlements in early 2012, the Cooper firm has, along with the Zelle firm, continued to perform substantial work on obtaining settlement approval, setting up the distribution process, opposing objections – and expects to perform a large part of the future post-trial and appellate briefing and other tasks.

The firm's lodestar is $4,725,800. Its original allocation was $9,500,000, which was a 2.5 multiplier over its "lodestar less 20%" number. Given the efficiency of its staffing, it is appropriate to reduce its lodestar by only 10%, which is $4,253,220. Because of the firm's high level of experience and skill, its leadership role in strategy and settlement, its large contribution to the litigation fund, and its heavy continued role in uncompensated post-settlement work, I recommend that its allocation be increased to $10,500,000, which is about 2.5 times its "applicable lodestar".

<u>Foreman & Brasso [Dkt. No. 7180]</u>

Mr. Brasso is an experienced antitrust lawyer, and a long-time associate of Mr. Alioto. The work he performed was all at the direction of co-lead counsel Alioto. Although Mr. Brasso informed me that all his assignments "had to do with trial," he acknowledges that a primary assignment was to review every ECF filing and report the significant developments to Mr. Alioto. His hourly time records confirm that virtually all his time was spent reviewing ECF filings, attending meetings with other lawyers and attending the AUO criminal trial. All of this time by Mr. Brasso himself was billed at $450/hr. Less than 10% of his firm's time was spent doing any actual independent legal work. His time records confirm about 20 hours in April 2012 reviewing depositions and exhibits to locate important testimony. The firm paid assessments of $200,000. Its client was not a class representative.

Regardless of whether the work was assigned by co-lead counsel, it is inappropriate for a senior lawyer billing $450/hr. to charge for reviewing every ECF filing. That is paralegal work. Most firms in this case charged nothing for such "read and review" time. Reviewing and annotating deposition transcripts is similarly work for an experienced associate. Attending

meeting after meeting with other lawyers on the case is a guarantee of duplication and waste. That is not to say that meetings aren't necessary; nor is it to criticize Mr. Brasso's abilities as an antitrust lawyer. But based on my review of all the evidence submitted by Mr. Brasso, and the comments of other experienced antitrust lawyers on the case, I cannot find that Mr. Brasso's efforts did anything meaningful to move the IPP case forward.

The firm's lodestar is $1,412,150. Reduced by 20% it is $1,129,720. The original allocation awarded the firm $1,000,000 at a multiplier of .88 of its "lodestar less 20%." I recommend that the allocation not be changed.

Girardi/Keese [Dkt. No. 7192]

Mr. Girardi's participation consisted largely of high-level strategy meetings and settlement negotiations in which he played an important role. According to Exh. 2 to the firm's original declaration [Dkt. No. 6635-7], he recorded about 903 hours at a billing rate of $1,000/hr. It is difficult to tell how the firm spent the remainder of the 1,900 plus hours because its time records lack any specific detail. About 1,335 hours were spent in document review and deposition preparation, mostly at rates from $600-750/hr. Over 200 hours were spent in meetings by lawyers other than Mr. Girardi. The firm's blended billing rate was a quite high $718. The firm made a contribution of $80,000 to the litigation fund. The firm's original allocation of $3,500,000 was considerably higher than all the recommendations I received for this firm from lead and liaison counsel.

As noted below, I conclude that no weight should be given to the alleged fee-sharing arrangement between Mr. Girardi and Mr. Winters. The allocation for each of the two firms should be evaluated on its own merits without regard to the alleged agreement.

The firm's lodestar is $2,046,387. I think it is appropriate to reduce it by 20% to $1,637,110 in view of the vagueness of its billing records, the large number of hours that attorneys other than Mr. Girardi spent meeting with each other, and its very high billing rates for attorneys other than Mr. Girardi in light of the tasks they performed. Mr. Girardi made an important contribution to the settlement effort, but in other respects the firm provided almost no

information about how it contributed to the IPP effort.  I recommend that the firm's allocation of $3,500,000, which is a 2.14 multiplier on its "applicable lodestar" not be changed.

Glancy, Binkow & Goldberg LLP  [Dkt. No. 7193]

This small firm, with highly-experienced antitrust lawyers, contributed a high-level document reviewer throughout the case.  It also supplied a Japanese translator and an associate who performed lower-level document review.  This work was performed at billing rates from $350-525/hr.  The firm paid a large $250,000 assessment, of which $100,000 was paid early in the case.  Its blended billing rate was a relatively high $427/hr. basically for document review of mixed complexity.  Its detailed billing records show that day-after-day its reviewers logged between 7.5-9.5 hours.

Its lodestar is $1,484,959.  Reduced by 20% it is $1,187,967.  Its original allocation was $1,750,000, which was a 1.47 multiplier of its "lodestar less 20%" figure.  Although the firm's recorded hours probably involve little duplication and were efficiently spent, its billing rates and hours recorded for document review – albeit some of it for sophisticated review – were somewhat high.  Therefore, I think it is appropriate to work from the "lodestar less 20% figure." Because of its early financial commitment and employment of skilled reviewers, I recommend that its allocation be increased to the top of the 1.4-1.6 range, to $1,900,000, which is about 1.6 times its "applicable lodestar."

Gross Belsky Alonso LLP [Dkt. No. 7175]

This 7-person firm, with substantial antitrust experience, committed two high-quality full-time document reviewers to the case.  The two reviewers billed at $400/hr.  They performed second-level review to select exhibits for depositions and documents to support important motions.  By all reports they were among the most skilled and reliable document reviewers.  They also assisted with ESI issues, and with the mock trials toward the end of the case.  They believe that the 20% reduction should not apply to them since there work was free of duplication and overlap.  However, a review of their detailed billing records shows many days on which reviewers recorded 10-12 hours of time, which raises a question of whether all that time can

possibly be productively spent. The firm contributed $245,000 to the assessment fund, of which $240,000 was paid early in the case.

The firm's lodestar is $5,917,336, the 8th highest of all Class Counsel. The original allocation was $7,000,000, a 1.48 multiplier over the "lodestar less 20%" amount. Because of the firm's early and consistent contribution of skilled reviewers and large dollars to the IPP effort, I recommend an increase in their allocation to $7,500,000, about a 1.6 multiplier.

Morrison, Frost, Olsen, Irvine & Schwartz, LLP [Dkt. No. 7184]

This firm represented a class representative. It worked largely under the direction of the Gary McAllister firm, which was part of the Alioto trial team. Virtually all the work was performed by name partner Rodney Olsen, billing at $450/hr. throughout the case. Their work consisted largely of preparing for and attending depositions (in person and by telephone) prepared to question if necessary, but in the end not questioning any witnesses. Mr. Olsen traveled from Kansas to Chicago and Omaha for two of those depositions. He defended his client's deposition. Mr. Olsen and his client traveled twice to San Francisco to attend client meetings. The firm paid a $15,000 assessment, which was all it was asked to pay. The firm incurred another $25,000 in unreimbursed travel and other expenses. Mr. Olsen believes the firm's billings should not be reduced by 20% since he did the work without overlap or duplication.

The firm's lodestar was $365,135. Its original allocation was $490,000, which was a 1.68 multiplier of its "lodestar less 20%" amount. In light of the relative efficiency of the firm's work and the fact that it did not increase its billing rate for five years, I conclude that no reduction should be made in its lodestar. The firm worked on deposition preparation, not document review, its client was a class representative, and it paid its full assessment. Therefore, I recommend that its allocation be increased to $620,000, which is a 1.7 multiplier of its full lodestar.

Murray & Howard [Dkt. No. 7173]

Derek Howard was one of the core group of lead lawyers who worked primarily with the Alioto team. He practiced at Murray & Howard before moving to Minami, Tamaki. He was

involved on an almost daily basis for the entire length of the IPP case, and made major contributions to strategy, coordination among lawyers, sophisticated legal work and settlement negotiations. The firm took a significant risk in assuming such a large role in this case. An important contribution was to act as a bridge between the Alioto and Zelle Hoffman teams. Mr. Howard believes that a 20% reduction in the firm's billings is inappropriate as over 60% of the work was done by him personally without duplication or overlap with other lawyers. I examined a sampling of the firm's daily billing records to confirm that the time was kept meticulously and the tasks were largely actual legal work, not mere review of e-mails and court filings. However, I also noted some overlap of work: reading each other's e-mails, reviewing drafts of documents, and the like. Therefore, I do think it appropriate to apply the 20% reduction to the lodestar. The firm paid $75,000 in assessments, on time and in the full amount requested. Its client was a class representative.

The firm's lodestar is $1,750,993. Its original allocation was $2,900,000, a 2.07 multiplier over its "lodestar less 20%" amount. Because of the leadership role taken by Mr. Howard and the assessment contribution, I would recommend an increase in the firm's allocation to $3,150,000, which is a 2.25 multiplier of the "applicable lodestar."

Steyer LowenthalBoodrookas Alvarez & Smith LLP

The Steyer firm was one of the earliest and most consistent members of the core group of firms that provided leadership and high-level work for the case. The firm was one of the primary drafters and editors of class certification and summary judgment motions, among others. Jill Manning of the firm was one of the leaders in structuring and managing the overall document retrieval effort. Steyer lawyers examined witnesses at several depositions, and worked on the mock trials and other trial preparation efforts. However, approximately 63% of its work was spent on document review and deposition preparation. Its blended billing rate was $453. The firm paid $481,000 in assessments.

The firm's lodestar was $9,656,038, the 3rd highest of any IPP firm. It original allocation was $14,500,000, a 1.88 multiplier of its "lodestar less 20%" figure. Because of the firm's key leadership role, its consistent work on motions and locating documents, its large contribution to

15

the litigation fund, and the recommendations of a majority of the lead/liaison counsels, I recommend that its allocation be increased to $17,000,000, a multiplier of about 2.25 on the "applicable lodestar" figure.

Trump, Alioto, Trump & Prescott LLP [Dkt. No. 7202]

This experienced antitrust firm performed generally low-to-medium level document review, but provided a Japanese-language reviewer who was in great demand. Their client was a class representative. They made a large $250,000 contribution to the litigation fund early in the case. The recommended award was higher than the amounts recommended by all lead and liaison counsel. I recommend that the award of $4,500,000, which is a 1.7 multiplier of its "lodestar less 20%," be increased to $4,750,000, which is a 1.8 multiplier, in order to recognize its contribution of funds, its class representative client, and the specialized review talents.

Whitfield, Bryson & Mason LLP [Dkt. No. 7196]

This small District of Columbia firm performed largely at the request of the Goldman Scarlato firm. The work consisted almost entirely of document review, some of which was done by a partner at $570/hr. but associates also performed review at appropriate billing rates. A partner made four trips to San Francisco for meetings about discovery and strategy. The firm also prepared an extensive memo on the shape of the conspiracy and worked on jury instructions. Its blended billing rate was $318. It contributed $15,000 to the litigation fund.

The firm's full historic lodestar was $279,216. Its original allocation was $260,000, which was a 1.16 multiplier of its "lodestar less 20%" amount. The firm did not make a major contribution to the IPP effort, but it did what it was asked, appeared to have done it efficiently, and made some contribution to the litigation fund. I recommend that its allocation be increased to $325,000, a 1.45 multiplier of its "lodestar less 20%" amount.

Lingel H. Winters P.C. [Dkt. No. 7168]

Mr. Winters is a one-man firm who became part of the Alioto team. At the request of Mr. Alioto he was tasked with reviewing every ECF filing, and evidently reporting on the significant ones to Mr. Alioto. I note that this is precisely the same task for which Mr. Brasso billed. Mr. Winter's daily time records (handwritten so almost impossible to read) contain line

after line with .25 hr. charges to read ECF filings. He also recorded time for a small amount of document review, and many meetings with other counsel. His other major contribution to the case was to attend the AUO criminal trial virtually every day, and then to debrief the day's testimony at a nearby restaurant with Mr. Brasso, Mr. Alioto and Ms. Moore of the Alioto Law Firm who also attended the AUO trial. Mr. Winter's billing rate ranged from $650-950/hr. and the firm had a blended rate for the entire case of $877, one of the highest of any firm.

The firm's lodestar was $2,169,630. Its original allocation was $1,000,000, a .58 multiplier on its "lodestar less 20%" figure. I cannot discern any meaningful contribution that Mr. Winters brought to the IPP effort. To assign one expensive lawyer to review ECF filings is bad enough, but to ask two to do so is just bad case management. Moreover, it showed poor judgment for Mr. Winters to charge about $200 every time he reviewed an ECF filing. Similarly, for one or two IPP lawyers to attend the entire AUO trial had value. For four or more to do so cannot be justified with any compensation. I recommend that no change be made to the Winters allocation.

### Alleged Fee-Splitting Agreements

Since I issued my Report, two alleged fee-splitting arrangements have been brought to my attention: Mr. Alioto contended that he and Francis Scarpulla of Zelle Hoffman had agreed to split the total fees 50-50 between the "Alioto team" and the"Zelle Hoffman team." Mr. Winters contended that he and Mr. Girardi had agreed to split 50-50 the fees awarded to their two firms. I have held brief fact-finding hearings into both these situations.

Lawyers who enter into a fee-splitting agreement in a class action must inform the class action court of the terms of the agreement when it is made, or at least at the time of filing a petition for approval of a settlement. *In re "Agent Orange" Product Liability Litigation*, 818 F.2d 216, 226 (2d Cir. 1987) ["counsel must inform the court of the existence of a fee-sharing agreement at the time it is formulated."]; *Wanninger v. SPNV Holdings, Inc*, No. 85-C-2081, 1994 WL 285071 at *2 (N.D. Ill. June 24, 1994) [counsel are required to disclose fee agreements to court "at the first opportunity"; failure to do so is not dispositive, but a factor weighing against

enforcement]; *Mark v. Spencer*, 166 Cal.App.4[th] 219 (2008) [disclosure required at time the parties seek approval of the settlement].

A court must scrutinize an alleged fee-sharing arrangement as part of its consideration of the fairness of an attorneys' fee award that is part of a class settlement. *In re FPI/Agretech Securities Litigation*, 105 F.3d 469 (9th Cir. 1997); *Alexander v. Chicago Park Dist.*, 927 F.2d 1014 (7th Cir. 1991)  However, the court is not obliged to enforce the fee-sharing arrangement, and should not do so if it would produce a result that is disproportionate to the amount of work and contribution each firm made to the class recovery. *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d at 222; *In re FPI/Agritech Sec. Litig.*, 105 F.3d at 474 [the "relative efforts of, and benefits conferred upon the class by, class counsel are proper bases for refusing to approve a fee allocation proposal."]  Therefore, the Court is not constrained by either of these fee-sharing arrangements.  It may, indeed must, allocate fees in accordance with the relative contributions that each firm made to obtaining the class recovery.

Alioto-Zelle Issue

Basic facts.  I find that the following facts are true based on the evidence submitted at the 12/14/12 fact-finding hearing.

Mr. Alioto contended that in March 2008 he and co-lead counsel Francis Scarpulla of the Zelle Hoffman firm agreed that the total fees awarded by the Court would be divided 50-50, and that each of them would distribute his half to attorneys working on their respective "teams," subject to Court approval.  Mr. Scarpulla acknowledged that this was their original concept, provided that each "team" did roughly equal work and contributed roughly equal amounts to the litigation fund, provided that Liaison Counsel Jack Lee agreed, provided that all Class Counsel and the State Attorneys General agreed to this approach, and provided that the Court accepted this method of division.  Mr. Scarpulla testified that on two or three occasions he had explained those conditions to Mr. Alioto.  There was no evidence that Mr. Alioto ever acknowledged or agreed to the conditions that Mr. Scarpulla said he insisted upon.

In March 2011, Mr. Scarpulla declared the alleged agreement to be ineffective because, according to him, the Alioto firm and "team" had not performed half the work and had not made

half the contributions to the litigation fund, Mr. Lee had not agreed to the arrangement, and no consent had been obtained from any other Class Counsel or the State Attorneys General. The two men met on March 9, 2011 with former federal district judge, Stephen Larson, whom they both respected and who had worked on the case for several years as part of the Girardi/Keese firm. Following the meeting, Judge Larson described in an e-mail (Alioto Exh. 33) the agreed allocation of work between the two groups (Zelle Hoffman to be primarily responsible for class certification and related issues, and the Alioto firm to be primarily responsible for pre-trial preparation and trial, with the remainder of the case to be a shared responsibility), and stated, "Although there has not been nor is there any actual agreement concerning the distribution of any potential attorneys' fees in this case, you both clearly indicated that you envision that, provided that everyone continues to fulfill their respective responsibilities, any fees awarded or approved by the Court should reflect the fair division of labor described above." Judge Larson testified that neither Mr. Scarpulla nor Mr. Alioto ever objected to his statement that no fee-sharing agreement existed.

The Court was not advised of this purported fee-sharing agreement when it was made in 2008, when IPP Plaintiffs petitioned for approval of the first round of settlements, when they petitioned for approval of Round 2 settlement, or when they petitioned the Court for a fee award. Nor did Mr. Alioto mention the 50-50 agreement in his Declaration in support of his Application for Attorneys Fees [Dkt. No. 6666] filed on 9/7/12. Nor did Mr. Alioto tell me about the 50-50 agreement when lead and liaison and State AG counsel met with me on September 12, 2012 to plan the fee allocation process. Nor did he mention it in his 10/2/12 confidential written recommendation to me regarding how fees should be allocated. Mr. Alioto first informed me of the purported agreement in an e-mail on October 9, 2012.

On August 29, 2012, the Court appointed me as Special Master to recommend an award of fees and an allocation among Class Counsel [Dkt. No. 6580]. The Court did not follow the process employed in the Direct-Purchaser settlement of allowing lead counsel to agree on a recommended allocation of fees.

Conclusions: I conclude that: (1) the existence and terms of the alleged agreement have

not been proven by a preponderance of the evidence; (2) any agreement would be unenforceable in any event; and (3) the Court should give no weight to the alleged agreement since a 50-50 division of fees between the two groups of Class Counsel would be disproportionate to the amount of work and their respective contributions to obtaining the class recovery.

I conclude that Mr. Alioto has not carried his burden of demonstrating that the parties had a meeting of the minds on a definitive agreement. Mr. Scarpulla agreed to a 50-50 division, but only subject to several conditions inherent in class action litigation. Mr. Alioto never accepted those conditions. Therefore, they did not agree on material terms of the alleged agreement. This conclusion is the same as Judge Larson's conclusion in March 2011 that "there has not been nor is there any actual agreement concerning the distribution of any potential attorneys' fees in this case." Moreover, there were massive gaps and rampant ambiguity in the "agreement." First, it was an oral understanding, although each of them alluded to it in various written communications. Second, there was no understanding as to which firms were in the "Alioto group," which in the "Zelle group," or what was to become of the dozens of firms that were not in either group. Mr. Alioto presented at the hearing (Exh. 47) a listing of the two groups, which he conceded he had just prepared, had never shown Mr. Scarpulla or the Court, and for which he had never obtained consent from any other firm. Therefore, the 50-50 concept was too indefinite to have ripened into an agreement.

Even if a definitive agreement had existed, it would have faced insurmountable hurdles to being enforceable. First, the Ninth Circuit has stated that fee-sharing arrangements among class counsel are not enforceable contracts. *In re FPI/Agretech Securities Litigation*, 105 F.3d at 473. Second, there is at least a substantial question as to whether the alleged agreement would violate California law because it was never approved by any of the clients in the IPP case. California Rules of Professional Conduct 2-200(A). Third, the failure to disclose the 50-50 "agreement" to the Court at least at the time approval was sought for the settlements or for an award of attorneys' fees may bar enforcement. Finally, as noted above, the Court would not be bound by a fee-sharing arrangement if it were disproportionate to the effort and results obtained by the firms involved.

Basically, the co-lead counsel agreed on a broad concept in 2008 on the assumption that the Court would permit them to determine how fees should be allocated, subject to overall Court supervision. That assumption proved to be wrong. The Court, having concluded that co-lead counsel had a history of disagreements, determined to make its own allocation with the assistance of a Special Master. Given this different approach, what effect, if any, should the Court give to the original 50-50 concept? I believe that it would be inappropriate to divide the fees equally among two groups of firms. Although at the top level a few lead firms worked with Alioto and a few others worked with Zelle, there is no rational basis at all for lumping the remaining 100 or so firms into one group or another. Moreover, a few important firms worked with both Zelle and Alioto, so assigning them to one group or another would be purely arbitrary. Therefore, I totally reject as unworkable and unfair the concept of dividing the total fees into two halves. (Mr. Alioto presented at the 12/14/12 hearing a pie chart showing that my original Report had allocated 68% of the fees to the Zelle group and only 32% to the Alioto group. Since I had no knowledge when I prepared the Report which firms supposedly belonged in one group or the other, my original allocation was certainly not conscious. And a disparate allocation was hardly unexpected, since the lodestar of the supposed Zelle group was far larger than that of the supposed Alioto group.)

Moreover, I believe, for the reasons stated in this Supplemental Report, that the contributions and work performed by the firms loosely associated with Zelle were greater than that of the firms loosely associated with Alioto. And some of the greatest contributions were made by firms that worked cooperatively with both groups. An equal division of fees between the Alioto firm and the Zelle firm, or between the Alioto group and the Zelle group, would be disproportionate to the work performed by the individual firms and their respective contributions to the excellent class settlements. Instead, I have recommended allocations based on the evidence submitted about the work and contribution of each <u>individual firm</u> without regard to the orbit in which it worked.

<u>Winters-Girardi Issue</u>

<u>Basic Facts</u>: I find that the following facts are true based on the evidence submitted at

the 12/13/12 fact-finding hearing.

On or about June 25, 2007, Lingel Winters and Thomas Girardi entered into a written agreement that stated, "Your firm [Girardi] will advance the costs and I [Winters] will refer the client for joint representation. After reimbursement of costs, the attorneys fees will be shared equally – 50% to your firm 50% to mine." The written agreement was signed by both lawyers and approved in writing by their client, EMW, Inc. (Winters, Exh. 4B) On or about August 9, 2007, Mr. Girardi confirmed the agreement in a voicemail to Mr. Winters stating, "I'm pretty sure I signed an agreement with you, [that] we're going to share fees equally. That being the case, it doesn't make too much difference how much work we do and stuff like that." (Winters, Exh. 10.

On June 12, 2012, Mr. Girardi repudiated the agreement in a letter stating, "As you know, I love you; however, this is not a personal injury case. We'll be happy to share equally any sums over our hourly submission." (emphasis added) On August 2, 2012, Mr. Girardi affirmed the repudiation in a letter stating, "Let's see if I get this correct. We put in thousands of hours and hundreds of thousands of dollars on a case in which fees are based on hours not contingency. You want half. Good luck!" (Winters Exh. 28).

Mr. Winters submitted a lodestar of $2,169,630. My original Report recommended that he receive an allocation of $1,000,000. Mr. Girardi submitted a lodestar of $2,046,387. I recommended that he receive an allocation of $3,500,000. Both lawyers objected to my Report and requested a higher allocation.

At the 12/13/12 fact-finding hearing, Mr. Girardi advanced three reasons why the agreement should not be enforced. First, Mr. Alioto had invited him to participate in the case before Mr. Winters did. Second, he intended that the phrase "after reimbursement of costs" in Exhibit 4B really meant "after reimbursement of costs and my normal hourly fees." Third, he intended the agreement to apply only to the work performed specifically for their client, EMW, Inc., not for the class as a whole.

Conclusion: There was an ascertainable, definite agreement to share equally all fees awarded to the two firms. Mr. Girardi's undisclosed subjective intentions regarding the meaning

22

of the agreement not only contradict the written terms, but are irrelevant to determine its meaning. Cal. Civil C. §1639. Mr. Girardi's disavowal of the agreement was unjustified.

However, for the reasons stated above with respect to the Alioto-Scarpulla issue, the contract is not enforceable in this context, nor is it binding on the Court. The contract was not disclosed to the Court until after the petitions for approval of the settlements and for an award of attorneys' fees. Neither party disclosed it to the Court in their respective declarations submitted with the petition for attorneys' fees. [Dkt. Nos. 6635-7, 6635-6]

For the reasons stated above in the discussions of the allocations to the two firms, an equal allocation of fees would be highly disproportionate to the work performed and their respective contributions to the class recovery. Mr. Winters work was of little value to the class. Mr. Girardi's efforts in connection with mediation and settlement were of considerable value.

### Other Adjustments to the Allocation

Lodestars less than $100,000: I reversed the 20% discount for these firms since the low number of hours makes it likely that they were efficiently spent. I adjusted multipliers as necessary to confirm to the guidelines stated above and to make them more consistent.

Consistency adjustments: I adjusted allocations by small amounts where necessary to make the resulting multipliers more consistent with the guidelines stated above.

Gray Plant Moody: By all accounts, Dan Shulman of this firm did a superb job in many important aspects of the case. He took the lead in many important depositions; he was intimately involved in discovery and pre-trial strategy; he personally prepared much of the input to pre-trial documents such as witness examinations, exhibits lists and the like. His rates and hours were strikingly economical. However, the original recommended award of $14,000,000 represented a multiplier of 5.22 over the "lodestar less 20%" figure. This multiplier would be substantially in excess of any other firm, and in my judgment cannot be justified. I have reversed the 20% discount for his firm in view of his obvious efficiency, and applied a multiplier of 3.73, for a revised award of $12,500,000. This multiplier is the third highest of any firm, lower only than that for the Alioto and Zelle firms. It is fully justified, but the original award was

disproportionately high.

Straus & Boies: This firm was one of the core group of firms that took major responsibility throughout the case. Two of its clients were class representatives. It led and managed the foreign language document review process, drafted portions of key motions, prepared witness memos for depositions, ran the translation objection discussions, took two expert depositions, and was heavily involved in preparing pretrial submissions. The firm made a maximum and early payment to the litigation fund.

Its full lodestar was $5,930,764. Adjusted by 20%, the lodestar was $4,744,611. Its original allocation was $14,000,000, which was a multiplier of 2.95 over the "lodestar less 20% figure." This multiplier was in excess of the "core" multiplier range of 2.0-2.75, and was disproportionate to that of other firms doing equivalent work. Therefore, I recommend reducing the allocation to $13,000,000, for a multiplier of 2.74, the second highest multiplier in the "core" group of firms after Gray Plant Moody.

Zelle Hoffman

The Zelle Hoffman firm, and co-lead counsel Francis Scarpulla, were the engines that primarily drove the IPP effort to a successful conclusion. Without meaning to detract from the pre-trial efforts of the Alioto firm and its colleagues on the trial side, I note that the case was not won at trial. The case was won in a series of mediated settlements. It was primarily the Zelle firm that led the strategy and made it possible to obtain the victories that enabled the case to be successfully settled. The Zelle firm organized and coordinated the IPP group, and harmonized the IPP effort with the Direct-Purchaser Plaintiffs, the Direct Action Plaintiffs and the State Attorneys General. The Zelle firm led the document discovery, translation and organization effort. The Zelle firm spearheaded the victory in class certification, and the success in winning dozens of summary judgment motions. The Zelle firm provided the IPP's lead economic expert, Dr. Netz, and coordinated her work through deposition and *Daubert* motions. During mediation, Mr. Scarpulla set the tone and led the strategy to obtain the excellent settlements. The Zelle firm will also take the lead in defending the settlement at both the district and appellate courts, and in

implementing the distribution of funds to the class and counsel, for which it will receive no additional compensation.

This is not to suggest that the Zelle firm, or Mr. Scarpulla, did it all. As noted above, a core group of lawyers from both teams did immense amounts of productive work, as did lawyers from dozens of less-active participating firms. In many respects the Zelle lawyers played an administrative and coordinating role, rather than doing the hardcore legal work. But they were the indispensable force that made the IPP effort all work cohesively. As co-lead counsel, Mr. Scarpulla played precise the role expected of him, and according to every lawyer and mediator I spoke to, did so superbly. A not insignificant part of his job was to mesh the efforts of the two teams of lawyers, and to mollify the demands and objections of his co-lead counsel.

The firm's full lodestar was $22,269,334. Its time records were kept meticulously. It made a very large $700,000 contribution to the litigation fund. Reduced by 20%, its lodestar was $17,815,467. For the year 2011 Mr. Scarpulla billed at $1,250 an hour. Reducing that to $1,000 produces an applicable lodestar of $17,286,717. I originally recommended an award of $80,000,000, which would be a multiplier of 4.62 over the applicable lodestar. This, I believe, is excessive and disproportionate to the allocations and multipliers for other key firms. Therefore, I recommend reducing the firm's allocation to $75,000,000, which represents a multiplier of 4.34 over the applicable lodestar. This is the highest allocation and highest multiplier received by any firm – and deservedly so.

## Concluding Recommendations

I recommend that the total fee award be $308,225,250, which is 28.5% of the $1.1 billion settlement. I recommend that this amount be allocated among IPP counsel as shown on the attached spreadsheet. I further recommend that no additional compensation be allowed for post-settlement work. This is intended to be a full and final resolution of issues relating to attorneys' fees in the IPP case.

Dated: December 18, 2012

Martin Quinn, Special Master

**EXHIBIT A TO SUPPLEMENTAL REPORT AND RECOMMENDATION OF SPECIAL MASTER RE ALLOCATION OF ATTORNEYS FEES IN THE INDIRECT-PURCHASER CLASS ACTION**

| Firm Name | Lodestar | Lodestar minus 20% | Applicable Lodestar | Original Recommended Award | Revised Recommended Award | Multiplier of Applicable Lodestar |
|---|---|---|---|---|---|---|
| Zelle Hofmann et al. | $22,269,334 | $17,815,467 | $17,286,717 | $80,000,000 | $75,000,000 | 4.34 |
| Alioto Law Firm | $18,126,946 | $14,501,557 | $11,677,895 | $45,000,000 | $47,000,000 | 4.02 |
| Steyer Lowenthal | $9,656,038 | $7,724,830 | $7,724,830 | $14,500,000 | $17,000,000 | 2.20 |
| Minami Tamaki | $7,716,017 | $6,172,813 | $6,172,813 | $20,000,000 | $20,000,000 | 3.24 |
| Gustafson Gluek | $7,694,044 | $6,155,235 | $6,155,235 | $15,000,000 | $15,000,000 | 2.44 |
| Lovell Stewart | $6,482,537 | $5,186,030 | $5,186,030 | $10,000,000 | $10,500,000 | 2.02 |
| Straus & Boies | $5,930,764 | $4,744,611 | $4,744,611 | $14,000,000 | $13,000,000 | 2.74 |
| Gross Belsky Alonso | $5,917,336 | $4,733,869 | $4,733,869 | $7,000,000 | $7,500,000 | 1.58 |
| Cooper & Kirkham | $4,725,800 | $3,780,640 | $4,253,220 | $9,500,000 | $10,500,000 | 2.47 |
| Barry, L/O Brian | $4,198,469 | $3,358,775 | $3,358,775 | $5,000,000 | $5,000,000 | 1.49 |
| Goldman Scarlato | $3,825,835 | $3,060,668 | $3,060,668 | $6,000,000 | $6,000,000 | 1.96 |
| Gray Plant Mooty | $3,349,892 | $2,679,913 | $3,349,892 | $14,000,000 | $12,500,000 | 3.73 |
| Trump, Alioto | $3,278,644 | $2,622,915 | $2,622,915 | $4,500,000 | $4,750,000 | 1.81 |
| Reinhardt Wendorf | $3,198,534 | $2,558,827 | $2,558,827 | $5,500,000 | $5,500,000 | 2.15 |
| McCallister, Gary | $2,854,553 | $2,283,642 | $2,283,642 | $6,000,000 | $6,000,000 | 2.63 |
| Winters, Lingel H. | $2,169,630 | $1,735,704 | $1,735,704 | $1,000,000 | $1,000,000 | 0.58 |
| Girardi Keese | $2,046,387 | $1,637,110 | $1,637,110 | $3,500,000 | $3,500,000 | 2.14 |
| Mogin Law Firm | $1,952,306 | $1,561,845 | $1,561,845 | $3,000,000 | $3,000,000 | 1.92 |
| Gergosian & Gralewski | $1,946,170 | $1,556,936 | $1,556,936 | $3,000,000 | $3,000,000 | 1.93 |
| Schubert Jonckheer | $1,832,853 | $1,466,282 | $1,466,282 | $3,000,000 | $3,000,000 | 2.05 |
| Murray & Howard | $1,750,993 | $1,400,794 | $1,400,794 | $2,900,000 | $3,150,000 | 2.25 |
| Saunders Doyle | $1,550,082 | $1,240,066 | $1,240,066 | $3,250,000 | $3,250,000 | 2.62 |
| Green & Noblin | $1,519,801 | $1,215,841 | $1,215,841 | $2,500,000 | $2,500,000 | 2.06 |
| Glancy Binkow | $1,484,959 | $1,187,967 | $1,187,967 | $1,750,000 | $1,900,000 | 1.60 |
| Foreman & Brasso | $1,412,150 | $1,129,720 | $1,129,720 | $1,000,000 | $1,000,000 | 0.89 |
| Kirby Mcinerney | $1,357,310 | $1,085,848 | $1,085,848 | $2,500,000 | $2,300,000 | 2.12 |
| Miller Law | $1,162,964 | $930,371 | $930,371 | $1,750,000 | $1,750,000 | 1.88 |
| Sharp McQueen | $985,320 | $788,256 | $788,256 | $1,600,000 | $1,500,000 | 1.90 |
| Johnson & Perkinson | $809,825 | $647,860 | $647,860 | $800,000 | $900,000 | 1.39 |
| Liberty Law Office | $796,191 | $636,953 | $636,953 | $1,000,000 | $1,000,000 | 1.57 |
| Furth Firm | $781,444 | $625,155 | $625,155 | $900,000 | $900,000 | 1.44 |
| Hulett Harper Stewart | $770,709 | $616,567 | $616,567 | $1,000,000 | $1,000,000 | 1.62 |
| Boesche McDermott | $770,430 | $616,344 | $616,344 | $850,000 | $770,000 | 1.25 |
| Narine, L/O Krishna | $719,993 | $575,994 | $575,994 | $900,000 | $900,000 | 1.56 |
| Andrus Anderson | $711,918 | $569,534 | $711,918 | $1,000,000 | $1,250,000 | 1.76 |
| Schack, L/O Alexander | $700,875 | $560,700 | $560,700 | $850,000 | $850,000 | 1.52 |
| Kralowec Law Group | $629,858 | $503,886 | $503,886 | $900,000 | $925,000 | 1.84 |
| Chavez & Gertler | $570,408 | $456,326 | $456,326 | $800,000 | $770,000 | 1.69 |
| Amamgbo & Assoc. | $555,685 | $444,548 | $444,548 | $390,000 | $390,000 | 0.88 |
| Westlow, Edward J. | $540,585 | $432,468 | $432,468 | $425,000 | $475,000 | 1.10 |
| Rodanast | $519,986 | $415,989 | $415,989 | $625,000 | $625,000 | 1.50 |
| McManis Faulkner | $498,065 | $398,452 | $398,452 | $425,000 | $425,000 | 1.07 |
| Shepherd, Finkelman | $435,580 | $348,464 | $348,464 | $525,000 | $525,000 | 1.51 |
| Bonnett, Fairbourn | $434,149 | $347,319 | $347,319 | $580,000 | $580,000 | 1.67 |

EXHIBIT A TO SUPPLEMENTAL REPORT AND RECOMMENDATION OF SPECIAL MASTER RE: ALLOCATION OF ATTORNEYS FEES IN THE INDIRECT-PURCHASER CLASS ACTION

| Firm Name | Lodestar | Lodestar minus 20% | Applicable Lodestar | Original Recommended Award | Revised Recommended Award | Multiplier of Applicable Lodestar |
|---|---|---|---|---|---|---|
| McCallum, Methvin | $407,078 | $325,662 | $325,662 | $500,000 | $500,000 | 1.54 |
| Papale, L/O Lawrence | $389,270 | $311,416 | $311,416 | $400,000 | $400,000 | 1.28 |
| Jenkins Mulligan | $375,480 | $300,384 | $300,384 | $550,000 | $500,000 | 1.66 |
| Morrison, Frost, Olsen | $365,135 | $292,108 | $365,135 | $490,000 | $620,000 | 1.70 |
| Keller Rohrback | $354,444 | $283,555 | $283,555 | $450,000 | $450,000 | 1.59 |
| Durrette Crump | $344,028 | $275,222 | $275,222 | $300,000 | $300,000 | 1.09 |
| Messina Law Firm | $331,400 | $265,120 | $265,120 | $750,000 | $750,000 | 2.83 |
| Freedman Boyd | $304,111 | $243,289 | $243,289 | $550,000 | $500,000 | 2.06 |
| Cohen & Malad | $302,202 | $241,762 | $241,762 | $450,000 | $450,000 | 1.86 |
| Boone, John | $283,150 | $226,520 | $226,520 | $675,000 | $675,000 | 2.98 |
| Whitfield Bryson | $279,216 | $223,373 | $223,373 | $260,000 | $325,000 | 1.45 |
| Perkins, L/O Jeffrey K. | $220,850 | $176,680 | $176,680 | $175,000 | $185,000 | 1.05 |
| McGowan Hood | $216,325 | $173,060 | $173,060 | $265,000 | $265,000 | 1.53 |
| Hellmuth & Johnson | $210,708 | $168,566 | $168,566 | $190,000 | $190,000 | 1.13 |
| Devereux Murphy | $191,234 | $152,987 | $152,987 | $235,000 | $245,000 | 1.60 |
| Terrell Law Group | $182,925 | $146,340 | $146,340 | $225,000 | $200,000 | 1.37 |
| Ekenna Law Firm | $168,363 | $134,690 | $134,690 | $100,000 | $145,000 | 1.08 |
| Nwajei, L/O Lawrence | $155,450 | $124,360 | $124,360 | $16,000 | $16,000 | 0.13 |
| Damrell Nelson | $153,855 | $123,084 | $123,084 | $200,000 | $200,000 | 1.62 |
| Wites & Kapetan | $139,124 | $111,299 | $111,299 | $170,000 | $170,000 | 1.53 |
| Futterman Howard | $137,894 | $110,315 | $110,315 | $170,000 | $170,000 | 1.54 |
| Emerson Poynter | $137,269 | $109,815 | $109,815 | $165,000 | $165,000 | 1.50 |
| Coffman Law Firm | $133,806 | $107,045 | $133,806 | $180,000 | $225,000 | 1.68 |
| Brill, L/O Thomas H. | $128,590 | $102,872 | $102,872 | $160,000 | $165,000 | 1.60 |
| Aylstock, Witkin Kreis | $117,462 | $93,970 | $93,970 | $150,000 | $150,000 | 1.60 |
| Parish & Small | $113,250 | $90,600 | $90,600 | $130,000 | $110,000 | 1.21 |
| Pastor Law Office | $111,395 | $89,116 | $89,116 | $130,000 | $130,000 | 1.46 |
| LaCava Law | $108,045 | $86,436 | $86,436 | $130,000 | $130,000 | 1.50 |
| Guerrieri, Clayman | $96,099 | $76,879 | $96,099 | $120,000 | $135,000 | 1.40 |
| Kassof, L/O Sherman | $82,693 | $66,154 | $82,693 | $85,000 | $90,000 | 1.09 |
| Dombroski, James M. | $76,615 | $61,292 | $76,615 | $80,000 | $85,000 | 1.11 |
| Smith Dollar | $75,655 | $60,524 | $75,655 | $85,000 | $80,000 | 1.06 |
| Wyatt & Blake | $75,430 | $60,344 | $75,430 | $90,000 | $110,000 | 1.46 |
| Spiva Law Firm | $60,230 | $48,184 | $60,230 | $70,000 | $85,000 | 1.41 |
| Melton Law Firm | $52,038 | $41,630 | $52,038 | $60,000 | $60,000 | 1.15 |
| Mallison & Martinez | $50,697 | $40,558 | $50,697 | $55,000 | $58,000 | 1.14 |
| Roberts Law Firm | $50,089 | $40,071 | $50,089 | $60,000 | $65,000 | 1.30 |
| Carey, Danis & Lowe | $50,010 | $40,008 | $50,010 | $5,000 | $5,000 | 0.10 |
| Lanham Blackwell | $46,210 | $36,968 | $46,210 | $60,000 | $70,000 | 1.51 |
| Davis, Unrein, Biggs | $44,240 | $35,392 | $44,240 | see Frieden | see Frieden | |
| Michaels Ward | $40,159 | $32,127 | $40,159 | $47,000 | $53,000 | 1.32 |
| Sachs Waldman | $38,737 | $30,990 | $38,737 | $48,000 | $60,000 | 1.55 |
| Mager & Goldstein | $35,620 | $28,496 | $35,620 | $35,000 | $40,000 | 1.12 |
| Frankovitch, Anetakis | $33,770 | $27,016 | $33,770 | $45,000 | $52,000 | 1.54 |

EXHIBIT A TO SUPPLEMENTAL REPORT AND RECOMMENDATION OF SPECIAL MASTER RE: ALLOCATION OF ATTORNEYS FEES IN THE INDIRECT-PURCHASER CLASS ACTION

| Firm Name | Lodestar | Lodestar minus 20% | Applicable Lodestar | Original Recommended Award | Revised Recommended Award | Multiplier of Applicable Lodestar |
|---|---|---|---|---|---|---|
| Bangs McCullen | $33,300 | $26,640 | $33,300 | $40,000 | $50,000 | 1.50 |
| Godfrey & Kahn | $30,677 | $24,542 | $30,677 | $35,000 | $40,000 | 1.30 |
| Sommers Schwartz, PC | $26,169 | $20,935 | $26,169 | $29,000 | $29,500 | 1.13 |
| Thompson, Jason | $26,169 | $20,935 | $26,169 | $26,000 | $29,500 | 1.13 |
| Wienner & Gould | $22,995 | $18,396 | $22,995 | $28,000 | $35,000 | 1.52 |
| Jimenez, Graffam | $22,961 | $18,369 | $22,961 | $27,000 | $35,000 | 1.52 |
| Branstetter, Stranch | $17,595 | $14,076 | $17,595 | $17,000 | $20,000 | 1.14 |
| Serratore Law | $13,840 | $11,072 | $13,840 | $13,000 | $16,000 | 1.16 |
| Belancio, Michael | $12,805 | $10,244 | $12,805 | $13,000 | $15,000 | 1.17 |
| Wexler Wallace | $11,591 | $9,273 | $11,591 | $13,000 | $16,000 | 1.38 |
| Towe, Ball, Enright | $11,300 | $9,040 | $11,300 | $13,000 | $16,000 | 1.42 |
| Frieden Unrein/Davis Unrein | $11,000 | $8,800 | $11,000 | $55,000 | $60,000 | 5.45 |
| Bearman, Edward | $10,815 | $8,652 | $10,815 | $10,000 | $12,000 | 1.11 |
| Hisaka Yoshida | $10,485 | $8,388 | $10,485 | $13,000 | $16,000 | 1.53 |
| West, L/O George O. | $9,205 | $7,364 | $9,205 | $11,000 | $13,000 | 1.41 |
| Goldberg Katzman | $8,640 | $6,912 | $8,640 | $8,600 | $9,500 | 1.10 |
| Smith, Bundy, Bybee | $8,550 | $6,840 | $8,550 | $900 | $900 | 0.11 |
| Alderson Alderson | $7,400 | $5,920 | $7,400 | $7,250 | $8,200 | 1.11 |
| Rossabi Black | $6,893 | $5,514 | $6,893 | $700 | $700 | 0.10 |
| Fallick Law | $6,150 | $4,920 | $6,150 | $5,800 | $6,750 | 1.10 |
| Kirkpatrick & Goldsb... | $5,680 | $4,544 | $5,680 | $6,500 | $7,500 | 1.32 |
| Meierhenry Sargent | $4,598 | $3,678 | $4,598 | $4,500 | $5,100 | 1.11 |
| Albright Stoddard | $4,590 | $3,672 | $4,590 | $4,500 | $5,000 | 1.09 |
| Ferguson Stein | $3,258 | $2,606 | $3,258 | $3,200 | $3,600 | 1.10 |
| Lowther & Johnson | $3,025 | $2,420 | $3,025 | $3,100 | $3,500 | 1.16 |
| Tollison Law Firm | $2,000 | $1,600 | $2,000 | $2,500 | $2,600 | 1.30 |
| James Law Offices | $1,900 | $1,520 | $1,900 | $2,100 | $2,100 | 1.11 |
| LaMarca & Landry | $1,560 | $1,248 | $1,560 | $1,700 | $1,800 | 1.15 |
| Skinner Law Firm | $860 | $688 | $860 | $900 | $1,000 | 1.16 |
| | TOTAL $148,247,730 | TOTAL $118,598,184 | TOTAL $116,879,364 | TOTAL $308,226,250 | TOTAL $308,225,250 | |