UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | MDL No. 1917<br><br>Case No. C-07-5944 JST |
| This Order Relates To:<br><br>ALL DIRECT ACTION PLAINTIFFS | **ORDER ON MOTIONS FOR SUMMARY JUDGMENT CONCERNING THE FTAIA** |

## I.       INTRODUCTION

Now before the Court are two motions relating to the application of the Foreign Trade Antitrust Improvement Act ("FTAIA"), 15 U.S.C. § 6a.  See ECF Nos. 3008, 3032.[1]  The Court held oral argument on January 27, 2015.  ECF No. 4357.  In these motions, Defendants argue that certain damages allegedly suffered by the Direct Action Plaintiffs ("DAPs") are not actionable as a matter of law, and further that Plaintiffs' experts have put forth damages models that fail to segregate actionable and non-actionable overcharges.  For the reasons set forth below, the Court will deny both motions.

## II.       BACKGROUND

The facts regarding the conspiracy in this multidistrict litigation case ("MDL") are well

---

[1] The unredacted version of ECF No. 3008 appears at ECF No. 3007-4.  The unredacted version of ECF No. 3032 appears at ECF No. 3062-4.  In addition to the opposition and reply briefs for these motions, ECF Nos. 3272, 3432-4, 3441-3, two supplemental briefs were also filed.  ECF Nos. 4288 (DAP Supp.), 4289 (Defs. Supp.).  There were originally five summary judgment motions filed pertaining to the FTAIA, see ECF Nos. 3003, 3006, 3008, 3032, and 3108, but Dell has settled its claims against all defendants, see 4837-2 at 2, rendering ECF No. 3003 moot; ECF No. 3006 is moot as the last claims subject to that motion have been dismissed; and ECF No. 3108 appears to be moot because ViewSonic has no active claims pending.  See ECF Nos. 4566 at 2; 4837-2 at 2.

United States District Court
Northern District of California

1  known to the parties, see, e.g., ECF No. 4260, and the Court will summarize them only briefly

2  here.

3       This multi-district antitrust litigation arises from an alleged conspiracy to fix prices of

4  cathode ray tubes ("CRTs").  The alleged conspiracy ran from March 1, 1995 through November

5  25, 2007.  Conspirators allegedly met all over the world in "Glass Meetings" to fix the prices of

6  CRTs, which served as the primary component of old tube-style televisions and computer

7  monitors.  CRTs have no other viable function except as a component part in devices of this

8  nature.  Opp'n 3287 at 3 ("CRTs are component goods with no independent utility"); see also In re

9  Cathode Ray Tube (CRT) Antitrust Litig., C-07-5944-SC, 2013 U.S. Dist. LEXIS 119598, at *101

10  (N.D. Cal. Aug. 21, 2013) (a "CRT itself is [of limited individual utility] on its own, and the

11  markets for CRTs themselves and CRT products are . . . inextricably intertwined").  Plaintiffs have

12  alleged billions of dollars in aggregate damages resulting from the artificial price inflation of this

13  component part.

14       The chains of distribution for CRTs and CRT products varied.  Some CRTs and CRT

15  Products were manufactured in the United States, while others were imported and sold here

16  directly by Defendants or their subsidiaries and affiliates.  Other CRT products were manufactured

17  abroad using Defendants' CRTs, and then were imported and sold in the United States by third

18  parties.  Plaintiffs allege, and have submitted evidence, that Defendants were aware of the

19  relationship between their agreements to fix prices for CRTs and the prices paid by consumers of

20  CRTs and CRT-containing finished products in the United States.

21  **III.     LEGAL STANDARD**

22       Summary judgment is proper when a "movant shows that there is no genuine dispute as to

23  any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a);

24  accord Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  "A party asserting that a fact

25  cannot be or is genuinely disputed must support the assertion by" citing to depositions, documents,

26  affidavits, or other materials.  Fed. R. Civ. P. 56(c)(1)(A).  A party also may show that such

27  materials "do not establish the absence or presence of a genuine dispute, or that an adverse party

28  cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(B).  An issue is

2

"genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  A fact is "material" if the fact may affect the outcome of the case.  Id. at 248.  "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party."  Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).

IV.     DISCUSSION

  A.     The Foreign Trade Antitrust Improvements Act

  The Sherman Act broadly prohibits activities that restrict interstate commerce and competition in the marketplace.  It outlaws "every contract, combination . . . , or conspiracy in restraint of trade," 15 U.S.C. § 1, and any monopolization, attempted monopolization, or conspiracy or combination to monopolize, 15 U.S.C. § 2.

  The FTAIA modifies the Sherman Act's reach.  "Congress enacted the FTAIA in 1982 in 'respon[se] to concerns regarding the scope of the broad jurisdictional language in the Sherman Act.'"  United States v. Hui Hsiung, 778 F.3d 738, 751 (9th Cir. 2015) (quoting In re Dynamic Random Access Memory (DRAM) Antitrust Litig., 546 F.3d 981, 985 (9th Cir.2008)).  Following the FTAIA, it is clear that the Sherman Act does not prevent American exporters (or firms seeking to do business abroad) from "entering into business arrangements (say, joint-selling arrangements), however anticompetitive, as long as those arrangements adversely affect only foreign markets."  F. Hoffmann–La Roche Ltd. v. Empagran S.A., 542 U.S. 155, 161 (2004).  Thus, "[t]he FTAIA amends the Sherman Act and 'excludes from [its] reach much anti-competitive conduct that causes only foreign injury.'"  DRAM, 546 F.3d at 985 (quoting Empagran, 542 U.S. at 158).  "It does this by establishing a general rule that the Sherman Act 'shall not apply to conduct involving trade or commerce ... with foreign nations.'"  Id. (quoting 15 U.S.C. § 6a).

  In pertinent part, the FTAIA provides as follows:

    Sections 1 to 7 of this title shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless –

United States District Court
Northern District of California

1
2
       (1) such conduct has a direct, substantial, and reasonably foreseeable effect –

3
4
       (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

5
6
       (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

7
       (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

8    15 U.S.C. § 6a.

9        In essence, the FTAIA "boils down to two principles." Hsiung, 778 F.3d at 751. First, the

10   Sherman Act continues to apply to "import trade or import commerce" with foreign nations

11   because import commerce is excluded from the FTAIA. "[I]mport trade . . . does not fall within

12   the FTAIA at all." Id. at 754. Second, notwithstanding the FTAIA, the Sherman Act applies to

13   nonimport trade or commerce with foreign nations when the domestic effects exception is met.

14   "For the Sherman Act to apply to nonimport trade or commerce with foreign nations, the conduct

15   at issue must have a 'direct, substantial, and reasonably foreseeable effect – (A) on trade or

16   commerce which is not trade or commerce with foreign nations . . . .'" Id. at 751 (quoting 15

17   U.S.C. § 6a).

18        Defendants contend that a substantial portion of Plaintiffs' purchases do not qualify as

19   import commerce, and that Plaintiffs cannot show that those purchases qualify under the domestic

20   effect exception. Defendants also contend that because Plaintiffs' experts commingle damages

21   that are not recoverable under the FTAIA with those that are, the Court should grant summary

22   judgment as to all the DAPs' claims.[2]

23        The Court now examines these arguments in turn.

24
25
26
27
28

---

[2] At least, this appears to be the relief Defendants are seeking. See ECF No. 3062-4 at 10 ("Even if some transactions were affected, the DAPs cannot recover on *all* of their CRT product purchase claims on the basis that *some* or even *most* of the claims meet the requirements of the FTAIA." (emphasis in original)).

4

**B.     The FTAIA's Import Commerce Test**

The Ninth Circuit has instructed district courts applying the term "import trade" under the FTAIA that it means "precisely what it says." Hsiung, 778 F.3d at 754-55.  Thus, it includes both (1) transactions directly between a United States plaintiff purchaser and a defendant cartel and (2) transactions involving goods manufactured abroad and sold in the United States.  Id. at 755 (citing Minn-Chem, 683 F.3d at 855 (the former transactions "are the import commerce of the United States" (emphasis in original)).  It is not necessary that a defendant have been the importer of the good in question; negotiation with United States companies on United States soil to sell a price-fixed product is "surely 'import trade or import commerce.'" Hsiung, 778 F.3d at 756.  "To suggest . . . that [a defendant] was not an 'importer' misses the point." Id.  Where price-fixed products are sold into the United States, they "fall[] squarely within the scope of the Sherman Act." Id.

Here, "all the DAPs assert Sherman Act claims based exclusively on purchases of CRT Products directly from Defendants (or their subsidiaries and affiliates), which had themselves imported the CRT Products into the United States." ECF No. 3272-4 at 10.  The DAPs paid for and took delivery of all these products in the United States. Id. at 1-2; see also id. at 10-11, 33.  The DAPs thus limit themselves to only transactions directly between DAPs and cartel members, which "are the import commerce of the United States." Minn-Chem, 683 F.3d at 855 (emphasis in original).  Thus, on their face these transactions constitute "import commerce" that is not subject to the FTAIA.[3]

Defendants respond by arguing that the DAPs lack standing under the FTAIA because "none of DAPs' claims involved the *direct* importation of price-fixed tubes." ECF No. 4289 at 8 (emphasis added).  They appear to be arguing either that only direct imports by conspirators of price-fixed goods satisfy the import commerce exclusion, and that Defendants are entitled to

---

[3] In making these assertions, Plaintiffs are including in their characterization of "Defendants, subsidiaries, and affiliates" entities subject to the ownership or control exception to Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977) and Royal Printing Co. v. Kimberly Clark Corp., 621 F.2d 323 (9th Cir. 1980).  As the Court noted in a prior order, material disputes of fact remain concerning whether Plaintiffs are entitled to invoke these exceptions.  For purposes of the present motions, however, the Court is required to assume that Plaintiffs will prevail on those issues.

summary judgment because they did not directly import CRTs into the United States; or in the alternative that the DAPs must have purchased the price-fixed good, i.e., CRTs, from a conspirator and imported it into the United States for their claim to be actionable.

Neither of these arguments withstands scrutiny. With regard to the first argument, the Ninth Circuit has clarified that for trade to qualify as "import commerce," it is not necessary that a conspirator itself have physically imported the price-fixed good itself directly into the United States. Hsiung, 778 F.3d at 756. It is sufficient that a conspiring defendant negotiated to set the price of a good that was imported into the United States, even if that good was sold by another conspirator or imported by someone else. As the court stated in Hsiung,

> Although it was undisputed at trial that AUO and AUOA did not manufacture any consumer products for importation into the United States, the evidence revealed that AUO and AUOA executives and employees negotiated with United States companies in the United States to sell TFT–LCD panels at the prices set at the Crystal Meetings. Importation of this critical component of various electronic devices is surely "import trade or import commerce." To suggest, as the defendants do, that AUO was not an "importer" misses the point. The panels were sold into the United States, falling squarely within the scope of the Sherman Act.

Id.

With regard to the second argument, it is not required that the DAPs purchased CRTs themselves for import into the United States; particularly given that CRTs have no use other than as the primary component of a finished product. It is sufficient that the DAPs imported finished products *containing* price-fixed CRTs. See, e.g., Costco Wholesale Corp. v. AU Optronics Corp., No. 13 Civ. 1207 (RAJ), 2014 WL 4718358, at *3 (W.D. Wash. Sept. 22, 2014) (denying summary judgment and finding that "Costco's purchases from foreign conspirators of finished products containing price-fixed panels are import commerce, regardless of the supply chain that brought the finished product to the conspirator who made the sale"); id. at *4 ("provided the price-fixed product ultimately moved from a member of the conspiracy to a United States customer, the conspirators have engaged in import trade regardless of prior movement of the price-fixed product in foreign commerce among the conspirators."); In re TFT-LCD (Flat Panel) Antitrust Litig., No. 07 MD 1827 (SI), 2012 WL 3763616, at *1-2 (N.D. Cal. Aug. 29, 2012) (denying summary

United States District Court
Northern District of California

1    judgment where LCDs were shipped to the United States, transferred to Mexico, and then,

2    following assembly, returned to the United States for sale).  Because there is at least a triable issue

3    of material fact as to whether the challenged transactions constitute import commerce, the motions

4    for summary judgment must be denied.

5        **C.    The FTAIA's Domestic Effects Test**

6        Even if there were not a triable issue of material fact regarding whether the DAPs'

7    purchases constituted "import commerce," the Court would still be required to deny summary

8    judgment because the DAPs can proceed under the domestic effects exception to the FTAIA.

9    Antitrust conduct falls within the domestic effects exception where the conduct (1) has a "direct,

10   substantial, and reasonably foreseeable effect" on domestic commerce, and (2) "such effect gives

11   rise to a [Sherman Act] claim."  15 U.S.C. §§ 6a(1)(A), (2); Empagran, 542 U.S. at 159.

12   Defendants argue that the DAPs cannot show a "direct effect on United States commerce, ECF

13   No. 4289 at 9, and that they cannot show that any domestic effect "gave rise to" their alleged

14   injury, id. at 11.

15       Defendants argue that a "direct effect" is missing because "the distribution chains for CRT

16   products involved multiple steps and entities, including CRT distributors, original design

17   manufacturers, original equipment manufacturers, and electronic product distributors," and the

18   DAPs "will [never] be able to show how many stops the tubes at issue made along this complex

19   supply chain."  ECF No. 4289 at 9-10.  Thus, they argue, any effect on the United States was too

20   attenuated to satisfy the domestic effects test.

21       The Ninth Circuit rejected the identical argument in Hsiung.  That case concerned a

22   conspiracy to fix the prices of liquid crystal display (LCD) panels in violation of the Sherman Act.

23   778 F.3d 738.  The alleged conspirators were foreign defendants and the LCDs had been

24   manufactured abroad.  In determining whether the "direct effect" element was satisfied, the Court

25   looked at the following factors:  (1) whether the price-fixed components were substantial cost

26   components of the finished products, (2) whether conspiratorial meetings led to direct negotiations

27   with United States companies (irrespective of whether the location of any meeting was in or out of

28   the United States), and (3) whether it was understood that sales to foreign subsidiaries were

7

destined for the United States.  Hsiung, 778 F.3d at 758.

The court noted that, as with CRTs, "TFT–LCDs are a substantial cost component of the finished products – 70-80 percent in the case of monitors and 30-40 percent for notebook computers."  Hsiung, 778 F.3d at 759.  Because of the relationship between fixed-price component and finished product, there was a strong correlation between the inflated price of LCD panels and the overcharge paid for finished products:

> One of the trial witnesses explained the correlation: "[I]f the panel price goes up, then it will directly impact the monitor set price." The "price stabilization" meetings, where the price fixing initially occurred, led to direct negotiations with United States companies, both domestically and overseas, on pricing decisions.  As noted before, some of the panels were imported directly into the United States.  Other panels were sold overseas, often to foreign subsidiaries of American companies or to systems integrators, and then incorporated into finished products.  It was well understood that substantial numbers of finished products were destined for the United States and that the practical upshot of the conspiracy would be and was increased prices to customers in the United States.

Id.  On these facts, the Ninth Circuit held, "[t]he constellation of events that surrounded the conspiracy leads to one conclusion—the impact on the United States market was direct and followed 'as an immediate consequence' of the price fixing."  Id.  Likewise, in LCD, similar evidence concerning the use of LCD panels in finished products led Judge Illston to conclude that "[t]he increased price of the components caused the prices of the finished products in the United States to increase.  If this effect is not 'direct,' it is difficult to imagine what would be."  In re TFT-LCD (Flat Panel) Antitrust Litigation, 822 F. Supp. 2d 953, 966 (2011).

The foregoing description from Hsiung applies equally to Plaintiffs' evidence here. Viewed in the light most favorable to Plaintiffs, that evidence shows many hundreds of conspiratorial meetings taking place all over the world, including in the United States, at which participants reached explicit agreements on CRT prices, production levels, market shares and customers.  The United States was the world's largest market for CRTs during the relevant time frame, and Defendants were well aware of the effect their price-fixing agreements were having on the prices paid for CRTs and products containing CRTs.  The same evidence can fairly be read to demonstrate that one goal of the conspiracy was to maintain these prices at an artificially high

1    level.  In short, there is at least a triable issue of material fact regarding whether Defendants'

2    conduct had a direct effect on United States commerce.

3          There also is at least a triable issue of material fact with regard to the "gives rise to" prong

4    of the domestic effects exception.  To satisfy this requirement, Plaintiffs must show that

5    Defendants' conduct proximately caused their antitrust injury.  DRAM, 546 F.3d at 988 (the

6    "'gives rise to' language of the domestic injury exception requires a direct or proximate causal

7    relationship.").  Viewing the evidence favorably to the DAPs, the alleged conspiracy to raise the

8    prices of CRTs "gave rise to" the DAPs' injury by raising the prices of finished goods they

9    purchased in the United States.  See Hsiung, 778 F.3d at 759 (the impact on the United States

10   market for finished products incorporating LCD panels "was direct and followed 'as an immediate

11   consequence' of the price fixing" of those panels).[4]

12          **D.     Plaintiffs' Alleged Failure to Segregate Damages**

13         Defendants argue that even if Plaintiffs can establish that some portion of their claims pass

14   muster under the FTAIA, their experts' damages models lump together damages for claims that

15   that fall within the bounds of the FTAIA, and those that do not.  Moreover, Defendants claim that

16   "there is no competent evidence from which a jury could reasonably determine which portion of

17   Plaintiffs' damages meets FTAIA requirements and which portion does not."  ECF No. 3007-4 at

18   22.  Defendant LGE makes the further argument that Plaintiffs are required to estimate the

19   overcharge separately for each individual CRT and "how much of that overcharge was passed

20   through in the price of the TV or monitor with respect to [that] particular transaction."  ECF No.

21   3062-4 at 7.

22         The simple answer to these arguments at the summary judgment stage is that Plaintiffs

23

24   [4] The Court declines Defendants' invitation to apply the test for "gives rise to" enunciated by
     Motorola Mobility LLC v. AU Optronics Corp., 775 F.3d 816 (7th Cir. 2015).  See ECF No. 4289
25   at 12 ("The original and amended Motorola opinions both concluded that Motorola could not meet the
     'gives rise to' prong of the FTAIA with respect to price-fixed sales overseas, because most of
26   Motorola's damages claims arose out of the foreign effect of LCD panel sales at inflated prices, not
     from any anticompetitive effect in the U.S.").  To the extent that Motorola reaches the same result as
27   Hsiung, it is not necessary to apply Motorola separately.  To the extent the cases differ, the case is
     inapposite.  "When reviewing federal claims, a transferee court in this [Ninth] [C]ircuit is bound
28   only by our circuit's precedent."  Newton v. Thomason, 22 F.3d 1455, 1460 (9th Cir. 1994); In re
     Korean Air Lines Co., Ltd., 642 F.3d 685, 699 n.12 (9th Cir. 2011).

United States District Court
Northern District of California

1  contend that "all of Plaintiffs' purchases fall within the import commerce exclusion to the

2  FTAIA."  ECF No. 3272-4 at 10.  While that claim may be disputed at this stage, that dispute will

3  be resolved by a jury.  Thus, there is no need for Plaintiffs' experts to segregate damages for

4  transactions that fall outside the FTAIA.

5        To the extent that Defendants' arguments relate not to the FTAIA, but to a supposed

6  requirement that Plaintiffs calculate damages separately for each individual product transaction in

7  an antitrust case, the law imposes no such requirement.  As Judge Illston noted in the LCD

8  litigation,

> Plaintiffs need not identify the overcharge on each and every panel
> sold to direct purchasers, and they need not trace that specific
> overcharge through the manufacturing and retail chains to the
> ultimate purchaser.  The fact that plaintiffs lack perfect proof does
> not mean that plaintiffs lack any proof at all.

12  In re: TFT-LCD, No. M 07-1827 SI, 2012 WL 555090, at *4 (N.D. Cal. Feb. 21, 2012).  In fact,

13  Judge Illston on three occasions considered and rejected arguments similar to those Defendants

14  raise here.  See id. ("The fact that plaintiffs lack perfect proof does not mean that plaintiffs lack

15  any proof at all."); In re: TFT-LCD, No. C 09-4997 SI, 2012 WL 5869588, at *5 (N.D. Cal. Nov.

16  19, 2012) (same); In re: TFT-LCD, No. M 07-1827 SI, 2012 WL 253298, at *1-2, 5 (N.D. Cal.

17  Jan. 26, 2012) (finding that the fungible nature of TFT-LCDs does not merit decertification of a

18  class and collecting cases allowing the use of aggregate damages in antitrust cases).

19        At the hearing on these motions, Defendants placed great weight on the Ninth Circuit's

20  opinions in City of Vernon v. Southern California Edison Co., 955 F.2d 1361 (1992) and

21  McGlinchy v. Shell Chemical Co., 845 F.2d 802 (9th Cir.1988).  ECF No. 4357 at 100-07.  These

22  cases do not assist Defendants.

23        In City of Vernon, plaintiff City of Vernon sued Southern California Edison over Edison's

24  alleged refusal to give Vernon fair access to Edison's transmission lines, preventing Vernon from

25  purchasing electricity from non-Edison suppliers.  Among the issues before the court was

26  Vernon's damages study, which both the district court and the Ninth found inadequate.  That study

27  failed to distinguish between losses suffered by Vernon because of Edison's anti-competitive

28  conduct, and losses suffered for other reasons:

1

2

3

4

5

> Vernon insists that all of Edison's acts contributed to the damage figure, but the district court and we have already found that many of those acts were proper.  It might be argued that since Vernon had a contract with Nevada Power which was to save Vernon $80,000 per month and did not, there was at least a loss of that amount, damage studies notwithstanding.  However, that argument would suffer from the same flaw because there is no indication of what part of that $80,000 loss of savings was due to proper interruptions of service and what part to improper ones, or for that matter, due to other factors entirely.

6

7

8

955 F.2d at 1373.  Thus, the district court acted properly in granting summary judgment for

Vernon's inability to show damages, given that its "study failed to segregate the losses, if any,

caused by acts which were not antitrust violations from those that were."  Id. at 1372.

9

10

11

12

13

14

15

16

17

18

McGlinchy involved a similar issue.  In that case, plaintiff McGlinchy and the company he

owned entered into contracts with Shell Chemical to promote a Shell product in Southeast Asia,

the Middle East, and other locations.  845 F.2d at 805.  Shell terminated the contracts, and

McGlinchy sued Shell for breach of contract (including promissory estoppel and quasi-contract)

and tortious interference with McGlinchy's contracts and business opportunities, among other

claims.  845 F.2d at 806.  Prior to trial, the district court excluded McGlinchy's damages study,

and the Ninth Circuit affirmed.   The court found that McGlinchy's expert was unable to draw any

connection between future losses allegedly suffered by McGlinchy and any specific conduct by

Shell:

19

20

21

22

23

24

25

26

> Appellants' final list of witnesses designated Stephen Jizmagian as an expert witness on damages. As his deposition shows, appellants asked Jizmagian to forecast future lost profits to the McGlinchy companies after a change in relations between the McGlinchys and Shell.  On the one hand, Jizmagian stated that he quantified in dollar terms the effect of the act or acts by Shell Oil Company, and that he attributed all of the future lost profits to acts of Shell Oil Company. On the other hand, Jizmagian acknowledged that he did not relate the loss to specific acts and, indeed, could not recall any specific acts by Shell Oil defendants.  He added that the cause of the decline in sales theoretically could have been anything.  Given this inconsistency, Jizmagian's report and testimony would pose a great danger of confusing the fact and cause of damages with the amount of damages.

27

28

845 F.2d at 806.  Among the problems identified by the court, Jizmagian "did not confirm that

relevant market conditions were the same before and after the time the injury was alleged to have

1 │ occurred"; based his damages figures on gross sales, which included revenue from contracts

2 │ totally unrelated to Shell; and was unaware which of plaintiff's product lines had even declined in

3 │ sales.  Id. at 807.  In short, Jizmagian's damages study was "hopelessly flawed," "ha[d] no basis in

4 │ the record," and "pose[d] a great danger of confusing the fact and cause of damages with the

5 │ amount of damages."  Id.

6 │ These cases do not stand for the principal that damages in a price-fixing case must be

7 │ assessed on a transaction-by-transaction basis.  Rather, they stand for the more modest proposition

8 │ that "an antitrust plaintiff must come forward with evidence of damages 'such that the jury is not

9 │ left to speculation or guesswork in determining the award.'"  ECF No. 3007-4 at 17 (quoting

10 │ McGlinchy, 845 F.2d at 808).  Plaintiffs have met that burden here.

11 │ **V.     CONCLUSION**

12 │ For the foregoing reasons, the Court denies these motions for summary judgment.

13 │ IT IS SO ORDERED.

14 │ Dated:  September 30, 2016

15 │

16 │ JON S. TIGAR
United States District Judge

**United States District Court**
**Northern District of California**