1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3        Before The Honorable Jon S. Tigar, District Judge

4

5 In Re:                        )
                                )
6 CATHODE RAY TUBE (CRT)        )
  ANTITRUST LITIGATION.         )   No. C 07-05944-JST
7 _____)

8                               San Francisco, California
                                Tuesday, September 20, 2016
9

10  <u>TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND</u>
           <u>RECORDING 2:01 - 3:13 = 72 MINUTES</u>
11

12 <u>APPEARANCES</u>:

13 For Plaintiffs:
                                WILLIAM BLECHMAN, ESQ.
14                              Kenny Nachwalter, PA
                                1441 Brickell Avenue
15                              Eleventh Floor
                                Miami, Florida 33131

16                              SAMUAL RANDALL, ESQ.
                                Kenny Nachwalter, PA
17                              201 South Biscayne Boulevard
                                Suite 1100
18                              Miami, Florida 33131

19                              CLAIRE DAVIS, ESQ.

20 For Defendants:              E. MARTIN ESTRADA, ESQ.
                                BRAD D. BRIAN, ESQ.
21                              Munger, Tolles & Olson
                                355 South Grand Avenue
22                              Thirty-Fifth Floor
                                Los Angeles, California 90071
23

24

25

2

1  Transcribed by:                Echo Reporting, Inc.
                                 Contracted Court Reporter/
2                                Transcriber
                                 echoreporting@yahoo.com
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1  Tuesday, September 20, 2016                          2:01 p.m.

2                       P-R-O-C-E-E-D-I-N-G-S

3                            --oOo--

4           THE CLERK:  07-5944, this is the MDL number 1917

5  In Re Cathode Ray Tube.  Your Honor, appearances have

6  already been taken.

7           THE COURT:  Thank you.  Everybody should go ahead

8  and take a seat.

9      We have a couple of things on calendar this afternoon.

10 One is a hearing on the motion to bifurcate.  That's docket

11 number 4759.  We're also on for a case management

12 conference.

13     I want to thank the parties for their case management

14 statement, which was very very helpful and thorough, and I

15 appreciate how much -- how far in advance you have to start

16 on something like this with this many cooks making the soup

17 to get it in on time, and so I want to thank you for that.

18 Also I appreciated the updated motions chart.  I appreciated

19 the updated settlement matrix.  Those may actually become

20 relevant at some point in this afternoon's proceedings.

21     I thought I would proceed as follows.  First I'd like

22 to give you a tentative ruling on the motion to bifurcate.

23 I'm happy to take argument on that.  I just think it might

24 be helpful for folks to know which way the wind's blowing.

25 I'd like to tell you and I will tell you I'm about to deny

4

1  the motion for summary judgment, the two FTAI motions for

2  summary judgment.  I apologize for having taken quite so

3  long to get an order out.  Your updated motions chart had

4  the effect of actually causing me to delete some stuff

5  that's no longer even necessary because the things were

6  under submission for long enough that I've been overtaken by

7  events, but I can tell you -- I can tell you conclusively

8  that that will be the ruling.  It's just a question of

9  finalizing the order.

10       I would like to give you my tentative inclination with

11  regard to the very many case management points that are made

12  in the case management statement or, rather, questions that

13  are raised.  Originally I thought, well, let me take the

14  bench and then let's let everyone argue as much as they want

15  about all the different things, and I thought that's kind of

16  silly because on some of these I pretty much know what I'm

17  going to do, and on some of them I don't, and just using a

18  (indiscernible) of everyone's argument I don't think would

19  be that productive.  So I'll do that in just a moment.

20       And then, lastly, somebody may be wondering why I

21  issued an order directing Vaughn Walker to tell me about

22  certain developments that might impact the trial schedule in

23  this case, and if you were wondering that, I would say to

24  you you and me both.  I don't know why I did that.  Judge

25  Walker contacted my chambers.  I -- when I took the case

5

1  over, I implemented a fairly arms'-length relationship

2  between myself and my special masters.  So my chambers was

3  contacted by Judge Walker, and he -- the request that was

4  relayed to me is that I issue that order.  So I just did

5  what the man asked me to do.  That's all.  And at some point

6  maybe I'll find out what he had in mind, but at the moment I

7  don't -- you probably actually -- some of you probably know

8  why he did that.  I'll just wait to see what transpires

9  there.

10      Okay.  So let me provide some tentative rulings in

11  approximately the order that I indicated, and then -- well,

12  actually, let me just provide a tentative order with regard

13  to the motion, take whatever argument folks want to make on

14  that, and then we can turn to case management.

15      My tentative ruling is to deny this motion.  There was

16  patent into the papers a very interesting question about

17  what -- about whether the question of antitrust standing as

18  framed by this motion is a clear question of law that a

19  judge needs to decide.  But there's also a much more meat

20  and potatoes set of issues arising from Rule 42(b) of the

21  Federal Rules of Civil Procedure, which is assuming for the

22  sake of argument that a judge needs to be the one to make

23  this decision, is this the way in which it makes sense for

24  the judge to make that decision, and I'm likely to deny the

25  motion based on the second set of reasons without reaching

6

1  the first set of reasons.

2      I say parenthetically, which is the verbal equivalent

3  of saying it in a footnote, which is what I intend to do in

4  the order, that I think LGE is leaning a little harder on

5  that legal standard section of the ATM Fee Antitrust

6  Litigation case than that section will bear.

7      Now, that's not the only case they cite.  Conceptually,

8  I tend to think -- and this is not a ruling.  I tend to

9  consider this standing question as part of a merits damages

10 issue that would go to a jury, but I don't need to resolve

11 that today because the request that's being made in the

12 motion is that I conduct a bench trial between Thanksgiving

13 and Christmas, and the first of three really complicated

14 antitrust jury trials is scheduled to start in January, and

15 it took -- as everyone knows, it took a long time to set

16 that schedule up.  In fact, we changed it once, in part

17 because of briefing from LGE, and I didn't hear anything

18 from LGE about we need this other separate bench trial.

19 And we got all that set in stone, and here we are, pretty

20 late in the day, and I just don't see that request as making

21 sense.  I'm not convinced there's a big savings of resources

22 for the Court or counsel.  I think there is a reasonable

23 possibility or probability much of the evidence that will be

24 in the bench trial will also be in the jury trial, and I'm

25 very very worried, given how much there is to do in this

7

1  case, that if I put a bench trial in that time slot between

2  Thanksgiving and Christmas and I think I'm supposed to start

3  a jury trial in January and I have to get a statement of

4  decision out, with the spectacular attention to detail of

5  all of you and the briefing that will follow for me, that

6  strikes me as a recipe for delay.

7       So, for all those reasons, my tentative ruling is to

8  deny the motion.  The briefing was very interesting.  Some

9  day when I can no longer conduct the issue, maybe I'll fully

10 engage with the standing issue.

11         LG want to be heard?  Please come to the

12 microphone, please.

13         MR. MACH:  Good afternoon, your Honor.  Kyle Mach,

14 Munger, Tolls, and Olson, for LG Electronics.

15         THE COURT:  Mr. Mach, could you spell your last

16 name, please.

17         MR. MACH:  M-A-C-H, your Honor.

18         THE COURT:  Thank you.

19         MR. MACH:  In light of and with respect to your

20 tentative, I'll be really brief, and I'll sort of try to

21 address the issues that I think you focused most heavily on

22 in your comments.

23         THE COURT:  Yeah.

24         MR. MACH:  The first of those is the implication

25 for the trial schedule and the implications for how the jury

8

1  trial would actually be conducted, and focusing on how the

2  jury trial would be conducted and whether there are

3  efficiencies to be gained from setting aside the ATM fee

4  issues for consideration on the bench trial -- in the bench

5  trial, I think that the answer, respectfully, is that the

6  efficiencies to be gained are really substantial.  And let

7  me start with what I think is a fundamental misapprehension

8  in the Plaintiff's approach to this argument, and that is

9  that the idea that the co-conspirator exception and the

10 question of withdrawal and whether an entity is controlled

11 are all essentially the same thing, and as long as one of

12 those issues is in the case, all of the issues are in the

13 case and need to go before the jury.

14          THE COURT:  Would you say that sentence again?

15          MR. MACH:  Yes.

16          THE COURT:  I apologize.  I'm so spoiled by

17 realtime.  I don't have it today.

18          MR. MACH:  I'll give you a concrete example.

19          THE COURT:  No, but did I understand you to say

20 that you think the Plaintiffs are saying there are three

21 things, one of them is control, one of them is withdrawal,

22 and I forget what the other one is?

23          MR. MACH:  I think the Plaintiffs are suggesting

24 that for a substantial number of the relationships, the

25 control relationships that are involved --

9

1            THE COURT:  Yes.

2            MR. MACH:  -- that the resolution of the control

3   relationship is irrelevant because there may be a co-

4   conspirator relationship and a related withdrawal argument

5   that would cause all of those issues to be litigated in

6   front of the jury anyway.

7            THE COURT:  Yes.

8            MR. MACH:  I think that that is wrong, and I think

9   it's -- it's quite clearly wrong as a matter of law when you

10  read the parts of <u>ATM Fee</u> which no one argues are dicta,

11  okay.  And what that tells you is that it is not sufficient

12  for them to purchase a finished product from an entity that

13  might be a part of a conspiracy to fix the component part

14  with CRT.  But they have to actually show, trace that back

15  to the -- to a control -- to a control relationship with an

16  entity that is a price fixing seller of the allegedly price-

17  fixed product, that is, the CRT.

18       So if there is no control relationship in place,

19  regardless of whether they could demonstrate that a vendor

20  was a member of a CRT conspiracy, purchases of product

21  through that vendor are indirect and don't fall under any

22  <u>Illinois Brick</u> exception.  They're out.  Now, there might

23  still be some evidence that they wish to present about the

24  scope of the conspiracy, who's in, who's out.  I think the

25  notion that the scope and meaning of that evidence would be

10

1  the same regardless of whether Plaintiffs can recover for

2  the purchases coming from that vendor is wrong.  I think as

3  a practical matter that's not how these things are done, and

4  we would see that portion of the case be cut down really

5  quite substantially.

6      I'll also tell you there are a number of -- there are a

7  number of relevant control relationships where this co-

8  conspirator and withdrawal question is totally irrelevant.

9  Panasonic and JVC, for example, it's worth approximately

10 $24,000,000 in single damages.  No one contends it relates

11 to those issues at all, which means if they're resolved in

12 advance in a bench trial, they're out.  They're gone.

13 They're done.  They're not part of the relevant volume.

14     Two other good points on this subject.  The first is

15 that there are very real risks to conducting the jury trial

16 before these issues are solved, and we saw those in the

17 trial in Seattle in the Costco case in the -- in the LCD

18 litigation.

19         THE COURT:  Yes.  So and this point is made very

20 well in your brief about Judge Jones really allowing the

21 jury to render an all-in verdict that was not -- that did

22 not segregate in any way the damages responsive to the

23 standing issue.

24

25     But since we know that happened and since we know that

1 Defendants here are worried about that, aren't I going to

2 get a proposed special verdict form that contains jury

3 interrogatories that anticipate this problem and eliminate

4 it?

5          MR. MACH:  I think it -- I think the parties could

6 make an effort to try to accommodate the individual entities

7 on the verdict -- on the verdict form.  I think there are

8 ways that could play out that end up very complex for the --

9 from the jury's perspective.  They would have to reach

10 individual damages conclusions with regard to a variety of

11 different entities.  It could be complex.  It might be

12 appropriate, but it would be complex.

13          THE COURT:  Aren't they going to have to do that

14 anyway?  I mean, no one's going to say, boy, this was going

15 to be a really simple trial, but then Tigar didn't grant

16 that motion for a bench trial on standing, and I just don't

17 think anyone's going to say that.

18          MR. MACH:  Right.  There's no question this is

19 going to be a long, difficult hard process for the jury.

20 We've seen that in similar cases.  It's tough.  What this

21 proposal does, your Honor, is put a variety of additional

22 very tough topics in front of -- in front of them --

23          THE COURT:  Yes.

24          MR. MACH:  -- and topics that will be, frankly,

25 from the jury's perspective will appear really obscure and

1  arguably irrelevant from their perspective, and asking the

2  jury to focus on those issues and through the additional

3  evidence is a -- is a big ask beyond what we are already

4  burdening the jury with by -- by bringing -- by litigating a

5  case of this nature before a jury.

6         THE COURT:  Don't the Defendants bring a motion

7  for directed something that looks like a motion for directed

8  verdict immediately before a jury starts deliberating?

9  Because they will have been keeping notes on this issue

10 during the whole trial.  In other words, it's not -- it's

11 not a guarantee -- it isn't a certainty that the jury even

12 gets these issues, is it?

13        MR. MACH:  Perhaps not.

14        THE COURT:  I mean, the complaint I hear the

15 Defendants making about what Judge Jones did is he allowed

16 the jury to reach a verdict without dealing with these

17 issues first.

18        MR. MACH:  If I may, this touches very closely on

19 the second point that I was about to make.

20        THE COURT:  Yeah.

21        MR. MACH:  Which is I think when we say bench

22 trial, that -- that sounds like a lot.  I am sympathetic.

23 It sounds like a lot.  I think we're talking about something

24 that could be done in a day and could be done primarily on

25 stipulations of fact.  I think we would find when the

13

parties have to sit down and decide what issues and
arguments they actually want you to evaluate and decide,
that those issues and arguments will come down very
substantially.  Again, this is exactly what took place in
the LCD litigation.

          THE COURT:  Well, forgive me for my relatively
young history in the case when I say there is very little
about the docket that would suggest that what you just said
is true.

          MR. MACH:  I understand your perspective.

          THE COURT:  But I admire optimism.

          MR. MACH:  The -- the experience is quite similar.
It's quite similar to what we went through in LCD, and the
parties found common ground on many issues when the
alternative was to ask the Court to resolve issues that were
in some cases not heavily contested on the facts.  I'll wrap
up --

          THE COURT:  I'll just say, because my prior
comment maybe sounded flippant, the summary judgment motions
in this case tell me that that's not true, what you just
said.  I don't blame anybody, but people partake in
positions that are -- you know, they don't want to leave any
inch of the canvas unpainted.  So I would be wary of the
docket and case management strategy that assumed the
contrary to that.

14

1          MR. MACH:  I can't predict the future.  All I can

2  do is pledge that we would make our best efforts to minimize

3  the issues that would be necessary for the Court to resolve.

4          THE COURT:  Mr. Mach, here's a question.  I would

5  like you to complete the following sentence for me.  Judge

6  Tigar, I know for certainty that if you give us a bench

7  trial between Thanksgiving and Christmas, nonetheless, you

8  will start the January trial on its scheduled date because?

9          MR. MACH:  I think the issues that would be

10 presented in the bench trial are manageable, your Honor, and

11 I think they're manageable on a limited schedule, both for

12 us and for you, with -- with absolute respect for the

13 concerns that you raised about your own -- the Court's own

14 schedule.

15     Let me touch briefly on the -- the hard question that

16 you raised in your tentative, which is the question about

17 the applicability of the language in ATM Fee and --

18          THE COURT:  Yes.

19          MR. MACH:  -- and what it means, because we think

20 that the -- that ATM Fee and related case law obligates the

21 Court to make these decisions.  I understand --

22          THE COURT:  Were you a federal law clerk, Mr.

23 Mach?

24          MR. MACH:  I was, your Honor.

25          THE COURT:  Did you write each legal standard

15

1   section of every order afresh?

2         MR. MACH:  I'm sure you'll be familiar with the

3   fact that --

4         THE COURT:  And an order of the Court is

5   important, Mr. Mach.

6         MR. MACH:  But every issue -- every opinion --

7   every opinion issued by the judge that I clerked for was

8   authored by the judge, with consistence, as you --

9         THE COURT:  Well, then I'm sure all of those were

10  written from scratch.  So I withdraw the question.

11        MR. MACH:  There was no question that those

12  sections are regularly reused.  There are really only two

13  opinions on the applicability of this exception in the Ninth

14  Circuit.  One of them is Royal Printing.  The other is ATM

15  Fee.  It's very difficult to imagine that that panel didn't

16  take that -- that -- take the drafting of that opinion

17  seriously and think about every element.

18        THE COURT:  If I thought -- if I thought it were

19  easy to be able to do them together, I would do that.  I

20  wouldn't be -- I wouldn't just be ruling on 42(b) grounds.

21  It's an interesting question.

22        MR. MACH:  Let me elaborate on the last point,

23  which I promise is the last point, your Honor.  Even if ATM

24  Fee does not bind this Court, I think ATM Fee is clearly

25  right on the point that is arguably dicta.

16

 1          THE COURT:  Yeah.

 2          MR. MACH:  And the reason is that the Plaintiffs

 3 present the issue as a question of Article 3 standing, which

 4 no one says it is, or a question of an element of the

 5 statute, okay, in which --

 6          THE COURT:  Right, and there it's damages

 7 question.

 8          MR. MACH:  Exactly.

 9          THE COURT:  Right.

10          MR. MACH:  I think it's not either of those.  I

11 think the right way to read Illinois Brick and the related

12 Utilicorp opinion is as an embodiment of prudential

13 considerations that are mandatory but that are driven

14 primarily by the Court's concerns about how the Court can

15 manage the case and how the finders of fact can assess it.

16 And when you read Illinois Brick and Utilicorp, you see

17 those concerns really front and center in terms of the

18 Court's explanation of why it's doing what it's doing.

19          THE COURT:  Why is it different from -- I mean, I

20 am going to have to decide this question, right?  I mean,

21 maybe I'm not going to have to decide it today, but at some

22 point I am going to have to decide the question because

23 either it will be part of an instruction that's given to the

24 jury or I'll have to decide it.  It's -- you know, from the

25 bench.  But why is it different from giving a jury an

17

1  instruction on the FTAIA, for example, you know, or any of a

2  number of other defenses that might -- that might arise in

3  the antitrust context.  I mean, I would -- I think that just

4  -- you just used _Prudential_ and so forth.  You could apply

5  those to the FTAIA.  It's just a congressional decision.  It

6  wasn't _Illinois Brick_.  But, nonetheless, you know, concerns

7  about duplicative recovery, overreach, that kind of thing,

8  why is it different?

9         MR. MACH:  Your Honor, I think you've put your

10  finger on it, and that is that it does not originate or even

11  arguably derive from -- directly from the statute, whereas

12  the FTAIA unquestionably does.  There is the FTAIA --

13         THE COURT:  Yes.

14         MR. MACH:  -- in the statute.  That's where we get

15  those rules, and for that reason it goes before the jury.

16  _Illinois Brick_ is not like that.  Of course, the discussion

17  in _Illinois Brick_ and _Utilicorp_, it incorporates discussion

18  about the Clayton Act.  You, however, don't see an

19  exploitation of a congressional intent about what the

20  Clayton Act is supposed to say and do.  Instead, you see the

21  Court saying "We think hearing these types of cases creates

22  real problems for the management of the courts and for

23  finders of fact, and for that reason, we draw the line on

24  these types of cases."  And I think that puts it into the

25  category of _Prudential_ concerns which makes it not an

18

1  element of the statute, not a part of Article 3 standing,

2  still something that the Court absolutely must decide.  And

3  if you consider the implications of the alternative

4  position, it becomes a little clearer, because if the

5  Plaintiffs' position is right, it means that the -- any

6  indirect purchaser who can create or find a disputed issue

7  of fact on an Illinois Brick exception, walks into court

8  with all of their indirect purchaser claims and gets it in

9  front of a jury.  And it's very difficult to read Illinois

10 Brick and Utilicorp and believe that that is the outcome

11 that the Supreme Court intended when it wrote those two

12 opinions.  And so, for that reason I think ATM Fee -- I do

13 believe ATM Fee is binding.  Ultimately it doesn't matter.

14 I think ATM Fee is right, and ATM held that outcome.  I also

15 think, for the reasons we've discussed, that case management

16 concerns suggest that bifurcated trial is best here.

17         THE COURT:  Thank you, Mr. Mach.

18         MR. MACH:  Thank you, your Honor.

19         THE COURT:  Very well argued.

20         Mr. Blechman, do you or someone from your team

21 want to respond?

22         MR. BLECHMAN:  Your Honor, I was going to have Mr.

23 Randall respond on behalf of CRT.

24         THE COURT:  Very good.  Hello, Mr. Randall.

25

1          MR. RANDALL:  Good afternoon, your Honor.  I will

2    also try to be brief.  I agree very much with how your court

3    -- how your Honor is inclined to resolve this, at least

4    initially.  I also agree that Mr. Mach -- I think we have a

5    core dispute.  I would agree with how he characterized it

6    initially on a very key point of law relevant to standing.

7    LG is contending -- and they make this contention in detail

8    on pages five to six of their reply brief -- that if a co-

9    conspirator -- and so we'll use Hitachi as an example -- if

10   a co-conspirator of Hitachi manufactures a price fixed CRT

11   and sells that CRT to a Hitachi direct purchaser vendor and

12   then sells that finished product to Sears, that there is no

13   standing for that transaction.

14          THE COURT:  And when you say Hitachi direct

15   purchaser vendor, you mean without any control owner

16   exception, just someone who normally would buy it from

17   Hitachi?

18          MR. RANDALL:  No, no, no.

19          THE COURT:  In your hypothetical.

20          MR. RANDALL:  Sorry.  In my hypothetical a Hitachi

21   owned or controlled vendor.

22          THE COURT:  I see.  Okay.  Yes.

23          MR. RANDALL:  So in that instance where ownership

24   or control is not in dispute and the CRT is manufactured by

25   a co-conspirator of Hitachi and not by Hitachi itself, that

20

1  there is no standing, and I think that's directly foreclosed

2  by <u>Royal Printing</u> and also by the law of this case.  I think

3  your Honor has resolved that issue at pages 12 through 13 of

4  the -- of the summary judgment order addressing that.  <u>Royal</u>

5  <u>Printing</u> dealt with --

6           THE COURT:  Right.  The order -- that order only

7  says there is a triable issue of fact on this.  I mean, I'm

8  not deciding whether or not that happened.  I'm deciding

9  whether or not Defendants have -- have proven as a matter of

10 law that it didn't happen, and so the question is who

11 decides if there is actually a dispute.

12          MR. RANDALL:  I'm not arguing right now the

13 correct arbiter of that.

14          THE COURT:  Yeah.

15          MR. RANDALL:  I mean, this issue of where a co-

16 conspirator manufactures the -- the price fixed tube and

17 sells it to --

18          THE COURT:  Yes.

19          MR. RANDALL:  -- an unaffiliated vendor --

20          THE COURT:  Yes.

21          MR. RANDALL:  -- in that instance I think your

22 Honor's summary judgment order directly confronts that,

23 because that's the express situation in <u>Royal Printing</u> where

24 a co-conspirator manufactures this -- the paper and sells it

25 to an unaffiliated vendor, and the Ninth Circuit expressly

1  holds that in that instance, there is standing and those

2  claims can go forward, and that's how your Honor at pages 12

3  to 13 of the summary judgment order on standing resolve --

4  or describe <u>Royal Printing's</u> holding.  And where I think

5  LG's confusion on this point comes from is <u>ATM Fee</u> is a case

6  where there is a single entity at the manufacturer level.

7  It's STAR Network.  So there is no -- STAR doesn't have a

8  co-conspirator at the same level of the distribution change.

9  So when -- as a matter of grammar, when <u>ATM Fee</u> says you

10 have to have in this case a control relationship between the

11 seller and the -- the -- the owner controlled direct

12 purchaser, that's how you have to describe it.  There is one

13 seller.  There are no co-conspirators.  So it's not

14 foreclosing that avenue.  That would -- you would have to

15 overrule, expressly overrule <u>Royal Printing</u> to do that.

16 And, in fact, for that portion of the opinion that LG cites,

17 it cites to <u>Royal Printing</u>.  So there's not -- I mean, LG is

18 just, we believe, very wrong on this point, and we think

19 that clarifies the issue -- a number of the issues that

20 would be part of this standing inquiry that we ultimately

21 will not have to litigate at all.

22          THE COURT:  Why did Judge Jones conduct a bench

23 trial on this issue do you think?

24          MR. RANDALL:  Costco did not raise -- did not

25 contend that it was entitled to a jury trial as a matter of

22

1   Seventh Amendment.  I think -- and that's where I think the
2   problem lies is that I'm not aware of any court that's
3   actually addressed this issue where it was relevant who the
4   fact finder is and said that this disputed questions of fact
5   have to go to the -- are questions for the court to decide
6   as -- as a matter of law in a bench trial.  The -- all of
7   the cases that LG cites are summary judgment opinions or
8   there's one judgment as a matter of law opinion.  So we're
9   not dealing with -- it's never gone to the Ninth Circuit who
10  the correct arbiter of fact is.
11          THE COURT:  Even in Atwell?
12          MR. RANDALL:  The -- so I think that narrows
13  substantially the issues that would be part of -- of any --
14  of this -- of the Court's resolution of this issue.
15      Second, LG has made a point about how difficult this
16  would be for the jury.  Judge Jones' verdict form expressly
17  allowed for this.  It broke down damages by vendor, and it
18  allowed him to make a binary choice after trial this vendor
19  is in, this vendor is out, and so it really -- I think it's
20  that simple, that this is a binary outcome.  There's no way
21  that I say where some purchases from -- where we would have
22  standing for some of our purchases from the vendor but not
23  for others.  I think that -- the ownership control has to be
24  an up or down decision.  And so it is really very easy for
25  the Court to decide if that's how the Court ultimately

23

 1  decides the fact finder issue, that it just -- it's not

 2  complicated, that it is just something the Court absolutely

 3  can do.

 4      And, lastly, the -- on the issue of who is the correct

 5  fact finder, all Ninth Circuit cases on this point,

 6  antitrust standing, is a question of law, and the Ninth

 7  Circuit -- I admit the Ninth Circuit has said that

 8  repeatedly.  Go back to -- essentially to two cases, to

 9  Amarel v. Connell, 102 F. -- F.2d, 1494, and the more

10  important one here is R.C. Dick Geothermal Corp. v.

11  Thermogenics, 890 F.2d, 139.  That -- I apologize, your

12  Honor.  The Amarel v. Connell, that was F.3d, not F.2d.  The

13  Thermogenics case is 890 F.2d, 139.

14      And those cases, they do say that it -- back in the

15  '80s, that antitrust standing is a question of law, but they

16  also say that this goes to the merits of a Sherman Act

17  claim, and applying Arbaugh -- that's the Supreme Court's

18  2006 opinion that we rely on heavily in our opposition brief

19  -- once something is part of the merits of the cause of

20  action, it has to go to the jury.  Whether it comes by

21  statute, whether it's judicial gloss on the Sherman Act as

22  we have here, once it's part of the merits of a cause of

23  action -- and they cite to Arita (phonetic) for this

24  opposition.  I think this is not in dispute.  The Ninth

25  Circuit has decided that antitrust standing is part of the

24

merits of a claim and not jurisdictional, that --

THE COURT:  Except then the same thing is true with regard to many many many claims, and that is that the existence of injury is characterized as an element of the claim.

MR. RANDALL:  Absolutely.  And so --

THE COURT:  So, anyway, I guess what I'm saying is analytically it's easy for me to see where you're coming from.  The question is what exactly has the Ninth Circuit said.

MR. RANDALL:  And the Ninth -- I'm not aware of any case where the Ninth Circuit has grappled with this issue in the context where the identity of the fact finder is relevant or outside of the context of a judgment as a matter of law case.  And so I think this is a novel issue for the Court.  I mean, these cases don't foreclose arguments that are not addressed to that court and are necessarily not germane to the resolution of -- of those cases.  And so the Supreme Court has also -- that precedent is also binding on this Court, and I think Arbaugh is very instructive on this point, that something that goes to the merits of a cause of action is not jurisdictional and must be decided by the jury, and Arbaugh is admittedly not a standing case, but it deals with -- it's a -- an FLSA case dealing with a statutory -- the number of employers that an

1 entity has to have to be subject to the Fair Labor Standards

2 Act case, and the Court's reading that that issue is

3 jurisdictional, and the Supreme Court said that that's

4 wrong, but it's a very very broad case.  I think the reason

5 the Supreme Court accepted cert in a case where, you know,

6 they're reviewing a $40,000 damages award, that it's an

7 important issue that it believed that courts were getting

8 wrong repeatedly, and it wanted to issue guidance to courts

9 to get it right.

10          THE COURT:  Thank you.  Okay.  I'm going to take

11 that under submission.

12      Let's talk about case management.  Let me start by

13 listing the different issues that I think the parties' joint

14 case management statement raise about trial, and if I'm

15 missing any, you can tell me.

16      Probably the biggest one is time estimate, the question

17 of the chess clock, are we going to have a chess clock, how

18 much time will people get.  Can jurors take notes?  Can

19 jurors have notebooks?  Can we give them in the opening

20 statements?  Can we give any in closing arguments?  Can

21 attorneys do some of the voir dire?  What are we going to do

22 about the many documents in the case that have been

23 designated highly confidential or confidential?  And then

24 this is not in the trial management bucket, but I forgot to

25 mention that earlier there's a question about can the

26

1 Plaintiffs who want remand file a motion for suggestion of

2 remand, and we can talk about that today too.

3      So, taking it from the top, yes, I'm absolutely going

4 to have time limits.  I try to do them in every civil case.

5 Let me talk a little bit about that at length so you

6 understand what the units of measurement are.  I'm in trial

7 here from 8:30 to 1:30.  The lawyers are here by 8:00.  You

8 don't have a lunch break.  I take two 15-minute breaks at

9 approximately 10:00 o'clock and 11:45.  Jurors like that

10 schedule because they can get back to their jobs for a

11 couple of hours a day or they can pick their kids up, and I

12 have to have that schedule because I have other cases, and

13 so I need to do hearings in the afternoons.

14      I find you get almost as much air time on that schedule

15 as you do in a traditional trial day because a traditional

16 trial day is so burdened with breaks and, you know, when

17 you're in session you have a certain rhythm, but right when

18 you're starting, you don't.  So every time you take a break,

19 the cost of the break is higher than just the minutes you

20 spend in the break.

21      Having said that, that's four and a half hours if you

22 take the two 15-minute breaks away from five hours.

23 Realistically by the calendar time it looks like about four

24 hours a day.  It doesn't sound like a lot.  When you

25 multiply it by the number of days, it also doesn't sound

27

 1   like a lot.  So bear that in mind as we go along.

 2       I'm also not in trial on Fridays.  That's when my

 3   criminal calendar is.  That means realistically, you can

 4   look at about 16 hours a week, and that's assuming that we

 5   don't have very lengthy mid-trial motion proceedings, and if

 6   there was ever a bunch of lawyers who are capable of lengthy

 7   mid-trial motion proceedings, it's the people in the

 8   Courtroom 9 today.

 9       So let's assume you don't have that.  You have 16 hours

10   a week of trial time.  We're not going to set the time

11   today.  We're going to start you all thinking about it.

12   Okay.  Let me just give you some metrics from your case

13   management statement.  Sears, K-Mart doesn't need 1400

14   exhibits.  We cannot resolve objections on those exhibits

15   within the amount of hours that I intend to give you for

16   your entire trial.  That exhibit list seems rather long to

17   me.  You know, if Sears K-Mart did their job and the other

18   side designates their stuff, I'm sure it's going to be just

19   as long, but this is what I have to work with.  They

20   designated 50 hours of deposition -- of deposition.  Well,

21   if you multiply Monday through Thursday four hours a day,

22   you get 16 hours.  We could spend maybe three weeks watching

23   the deposition testimony that Sears, K-Mart has designated.

24   I don't think the trial's going to be long enough to make

25   that a good use of time.

1     The Defendants say on page 17 their estimate's five
2 weeks.  I don't know that to be true.  But what strikes me a
3 little bit away -- or a little ways from that being reality
4 for all of you and people thinking about putting this case
5 really in anything like that kind of time, how do you do
6 that in realtime?  At this point, poking comments about I
7 think things that people have already designated, I want to
8 be constructive about this.  I will set a time limit at some
9 point.  That's an order that I will issue based on what I
10 perceive to be the needs of the case, the limitations of my
11 time, et cetera.  I want to give you the chance to give me a
12 number that I can adopt.  That's what I want.  My goal is to
13 sign off on something you gave me, and I can only do that if
14 you give me something I can work with.
15     Now, I can work with five weeks, which is something
16 that someone said in this case management statement, but I'm
17 not -- I don't think you know yet that that's what you need.
18 So that's all I intended to say about time limits today.
19 We're going to have to set another case management
20 conference.  We can do it at the pretrial conference.  I
21 forgot to bring that date to me.  Maybe you want to know
22 that -- the answer to that question sooner than that, maybe
23 not.  When you all get your turn at the microphone, tell me
24 what, you know, you want me to do about setting the time
25 limits so that it's something that works for all of us.

1     With regard to how that time is allocated, it was
2 accurately stated in the case management stated.  If you're
3 talking, it counts against your time.  Okay.  So if you're
4 doing direct examination, cross examination, it doesn't
5 matter.  If you're using your time, it counts against your
6 time.  Obviously in a multi-party case, how the time is
7 divided is important.  You need to think of all these issues
8 in advance so that we're not adjudicating disputes about
9 time issues in the middle of trial.  That's a recipe for
10 unhappiness.
11     Taking the easier questions.  Yes, jurors in this
12 courtroom take notes, and they ask questions.  That wasn't
13 even on the list.  Jurors ask questions.  It works like
14 this.  They'll have standup hats with last name, the jurors
15 have.  They take a blank piece of paper.  They write their
16 question on the piece of paper.  They do not put their name
17 or juror number on it.  They fold it over.  Eventually it
18 makes its way to the bench.  My courtroom deputy or law
19 clerk will get the question and bring it up here.  Lawyers
20 will have a chance to look at the question at side bar.
21 Anybody can object.  I will rule on the objection just as I
22 rule on objection to a lawyer question, without giving a
23 juror more or less slack.
24     If there is no objection or any objections are
25 overruled, I will ask the question at a break in

30

1  questioning, and there you go.  Sometimes -- of course,

2  sometimes I'll ask the question and the witness will say

3  something that isn't really complete and there's no real

4  clear answer on that.  Sometimes I follow up briefly.

5  Sometimes I just stop and let the lawyers take care of it.

6  I do not want to -- I want to ask no questions in your

7  trial.  In a jury trial, my goal is not to ask any

8  questions, let the lawyers do that.

9       Jury notebooks, yes, we will do juror notebooks.  So

10  assume that will happen and then start meeting and

11  conferring about the contents of those.

12       Mini opening statements?  Probably not.  I love mini

13  opening statements.  I have seen them many times.  I have

14  encouraged them.  I do not order them over objection.  If

15  everyone agrees, great.  I'll have mini opening statements.

16  The moment someone objects, I don't do it.  The reason for

17  that is they're a wonderful device.  You will get through

18  your hardships.  You will get more invested jurors.

19  Everything you've heard about mini opening statements is

20  true.  The risk of prejudgment will go up.  Since I know

21  that happens, I can't -- I can't in good conscious order

22  mini opening statements over objection.

23       Interim closing arguments, we don't have to decide that

24  now.  I've never done it.  I would like to try it, probably

25  in this trial.  I'm not ordering it today, but you should

1  assume I probably will.  I think the most complicated case I

2  had that would be similar to this, I had a large real estate

3  fraud case when I was in the State Court.  I've done a

4  patent trial here in the Federal Court.  I mean, this will

5  be more complicated than the fraud case and longer than the

6  patent case.  It will be like as complicated as the patent

7  case but as long as the other one.  I think the jurors are

8  going to need some help, but we'll see.  We can take that up

9  at the pretrial conference.

10      Attorney voir dire, yes, you'll get voir dire.  I

11  haven't decided how much.  Judge Jones' approach is probably

12  about where I am.  I'm not committing to a hard time limit

13  at this point.  There will be a time limit.  And you should

14  assume that you're going to get a chance to talk to your

15  jurors, and I would rather, frankly, tack on an entire day's

16  worth of voir dire in a five-week trial and know that the

17  lawyers are getting a jury that we can all feel good about

18  than try to get some false efficiency out of my rushing jury

19  selection.  Plus, I liked it when I was a lawyer.

20      Exhibits designated confidential, highly confidential,

21  if somebody wants to do that here, they're going to have a

22  real heck of a battle.  This is a completely obsolete

23  technology no one cares anything about at all really.  I

24  mean, no hard feelings, but really.  I mean, I could just

25  take a CRT monitor and throw it out the window right now.  I

32

1    don't even think my boss would do anything about it, you

2    know.  So the idea that there's some confidential documents

3    floating around somewhere that we have to worry about in a

4    public trial in a federal courtroom, somebody's got a good

5    argument, I'm all ears.

6        I think it's time to let these Plaintiffs file their

7    motion for suggestion of remand if that's the question.

8        Who wants to be heard?  Mr. Blechman?

9            MR. BLECHMAN:  Yes, your Honor.  Your Honor, let

10   me address a few of the points that the Court seemed to

11   invite some comment on.  I won't go through all of them.

12           THE COURT:  I'm sure I missed some.  Take your

13   best shot.

14           MR. BLECHMAN:  First in terms of timing, our

15   expectation is that both our trial exhibit list and our

16   witness list is going to be streamlined.  And I say that in

17   part -- I say that in part because with the benefit of LG's

18   exhibit list and witness list, we're able to make some

19   informed decisions seeing where the points of disagreement

20   or agreement may exist.  I say that in part also because I

21   know that in LG's reply to the motion for bifurcation, LG

22   indicated that it wasn't intending to dispute or it may have

23   even indicated stipulation.  They said whatever they said in

24   their paper, but the point is they signaled a willingness to

25   agree to certain issues with regard to withdrawal of facts,

1  the result of which, if they will stick to that position,

2  would be that I would think that there's stipulations that

3  could be reached with regard to evidence that would come in

4  with regard to some of the testimony of witnesses.  It would

5  help us in streamlining it.  Furthermore, we continue to

6  look at the deposition designations to look at what they've

7  done.

8      Our goal is to have this case tried, your Honor, in

9  five weeks.  That's our goal.  And so the Court had put out

10 that number, and our -- our goal is to -- is to make every

11 effort to meet that.  I concur with the Court's view that we

12 need to be -- the ultimate determination of the time I think

13 should await the parties' ability to talk to each other,

14 which is the last reason why I think our expectation is that

15 this will be streamlined, is that what has yet to happen,

16 your Honor, is that counsel on both sides have not yet sat

17 down to talk about what evidence can we agree to would be

18 not disputed in terms of authenticity and admissibility, the

19 result of which is that there are, for example, some

20 witnesses whose testimony we designated solely for purposes

21 of establishing the foundation for that testimony -- those

22 documents to be admitted, things like that, examples like

23 that, your Honor, which are I think straight-forward, which

24 if -- if there's a meeting of the minds of those things, are

25 going to enable us to be able to streamline both the exhibit

1  list and our witness list, and that's what we expect to be

2  doing.  So that's -- that is my comment with regard to the

3  timing other than in terms of the chess clock as it relates

4  to the timing, your Honor, when we've done this in the past,

5  the way of the road we've abided by is that when you're on

6  your feet speaking, the clock is running, and the --

7            THE COURT:  I'm sorry.  What?  I missed --

8            MR. BLECHMAN:  When counsel is on his or her feet

9  speaking --

10            THE COURT:  Yes, right.

11            MR. BLECHMAN:  -- the clock is running on your

12  time.

13            THE COURT:  Yes.

14            MR. BLECHMAN:  On their time, excuse me.

15            THE COURT:  Right.

16            MR. BLECHMAN:  And I think -- I take that to be in

17  a sense part of what the Court has expressed an intention to

18  be doing, and the rules of that will be -- will be netted

19  out as we get closer to trial, but we're on board with that.

20            THE COURT:  Okay.

21            MR. BLECHMAN:  With regard to the interim openings

22  at the end of each week -- or let me back up.  Excuse me.

23  With regard to the openings before voir dire, we do object.

24  I can give you reasons why we object, but --

25            THE COURT:  That really isn't -- you don't need to

35

1   deal with that.

2          MR. BLECHMAN:  Very well.  With regard to the

3   interim closings at the end of each week, the Court had

4   indicated that it might be -- that's a -- that is a practice

5   it might consider using in this case.  We object, your

6   Honor, to that procedure for the following reasons.  First,

7   it introduces into the Plaintiffs' case in our case in chief

8   the ability of the Defendants to be arguing about the

9   evidence while we're still in our case.

10         The burden of proof that we have is hard enough, is

11  challenging enough for us, your Honor, without having to

12  contend with the introduction of rhetorical argument by

13  counsel while we're in the process of the case.

14         Second, to the extent that there are points that the

15  Defendants, for example, want to make with -- with -- that

16  they would contemplate making in an argumentative way at the

17  end of the -- at the end of the week, our expectation would

18  be that in a non-argumentative way, in the course of cross

19  examination during that week that these are points that they

20  would attempt to elicit.

21         Third, we don't think it is necessary in this case,

22  your Honor, and the reason we don't think it's necessary is

23  because, while I think LG has done a very good job of

24  messaging about some of what it characterizes as the

25  complexity of this case, when you get right down to it, your

1   Honor, this is a conspiracy case not unlike most all
2   conspiracy cases.  The evidence in this case is going to be
3   overwhelming in showing the conspiracy meetings, the
4   conspiracy communications, with LG being right in the middle
5   of it as a charter member of -- charter founder of this
6   conspiracy.
7        The complications that may arise, as LG has
8   characterized in some of its papers, has to do with the
9   economics.  They've got some economists who'll be
10  testifying.  We'll have some experts who'll be testifying.
11  Our goal, your Honor, as Plaintiffs' lawyers is to simplify
12  and clarify the testimony.  If the presentation that we make
13  to the jury, your Honor, is complicated in terms of what is
14  brought out by the economist when they're testifying, for
15  example, then I dare say we may not have done our job
16  because our job in trying to present this evidence to the
17  jury at trial will be to do it in a way that is clear, that
18  is straight-forward, and that avoids complexity to the
19  extent that that can be done.
20       And so, to the extent that arguing at the end of a week
21  about what one -- about the testimony during the course of
22  that week is designed to help the jury understand what
23  they've heard, we think with respect to, for example, the
24  experts or even with respect to the fact witnesses who'll be
25  testifying.  If we do our job, it should be sufficiently

1 clear for the jury.

2     And fourth and finally, your Honor, we think that the

3 time for the jury to consider all the evidence is at

4 closing.  The procedure that LG is suggesting is one that

5 would atomize our case, would present us -- we'd be in the

6 middle of our case in the first week on that Thursday, your

7 Honor.  We'd now be having closing argument, an interim

8 closing argument in which I don't know the extent to which

9 the argument they'd be bringing in is with regard to the

10 evidence we've heard, is it setting up evidence that they're

11 going to be presenting in their case, and now the jury

12 leaves at the end of that week with an atomized vision of

13 what the case is, an understanding of it, excuse me, whereas

14 in a -- in a trial that I've been in, what we would expect

15 to do in our trial, your Honor, is to have the jury hear all

16 of the evidence, informed by their perceptions and their

17 understanding of what they've heard, and then after closing,

18 at that point to be thinking about the evidence that they've

19 heard based on the testimony, based on the documents, and

20 based on the arguments of counsel.

21     Atomizing the trial in that way we think -- we think

22 disrupts their understanding of the testimony.  We actually

23 think it has the opposite effect of what the Defendants are

24 suggesting because it is planting in their mind some

25 understanding of some piece of the case as opposed to

38

1  deferring their consideration and understanding about what

2  they've heard until they've heard all of it, which is what

3  we think is contemplated by the rules.  It's what we think

4  provides for a fair trial.

5      So because the procedure that LG is suggesting would

6  put its thumb on the scale so to speak and not just

7  disadvantaging us, but we think actually prejudicing Sears

8  and K-Mart for the reasons I've explained, we would

9  respectfully object to that procedure.

10     I think, your Honor, that that covers the points that

11  the Court had asked about with regard to discussion.

12  Otherwise, the Court's indications I thought I understand,

13  and I don't have anything further unless the Court has

14  questions.

15          THE COURT:  No.  Thank you.

16          Mr Mach?

17          MR. MACH:  Your Honor, we weren't sure how you

18  were going to proceed.  So we've actually divided this up.

19  Mr. Estrada is going to take the length.  I'll take all the

20  other procedural issues.

21          THE COURT:  All right.  Very good.  Mr. Estrada.

22          MR. ESTRADA:  Good afternoon, your Honor.  Martin

23  Estrada on behalf of LG Electronics.

24     I just wanted to briefly talk about the -- the chess

25  clock issue.  This is actually something that we're in

1 agreement with with Sears K-Mart.  We agree that the chess
2 clock would be useful and appropriate.  Part of the
3 assumption there is that the chess clock would not cover
4 voir dire or attorney argument, closing argument, opening
5 statement.
6         THE COURT:  I'm agnostic about -- about how you
7 divide the number up, and I haven't set a number.  But
8 closing argument and opening statements will be subject to
9 time limits.
10         MR. ESTRADA:  Yes, your Honor.
11         THE COURT:  Now, whether that's an all in time
12 limits or at the opportunity cost of talking an hour is less
13 examination time later or whether it's just self-contained,
14 I don't really care about that too much.  I'm not a big fan
15 of setting a time limit on voir dire.  I can cut that off
16 whenever I want to if I think it's going too long.  I can
17 give the lawyers individual time limits for what they can do
18 with jurors, but in terms of -- well, let me back up.
19     I do impose -- what I just said is a little bit kind of
20 broad brushed.  I do impose limits on how much time the
21 lawyers are going to get for their voir dire with a jury,
22 but I don't -- you know, how long my questioning takes, how
23 long the follow-up takes, maybe we need to bring in more
24 jurors, that's sort of impossible to plan.  So when I'm
25 drawing the big envelope, I like to know what the time

40

1   limits will be for opening statement, argument, and
2   examination only.
3         MR. ESTRADA:  Your Honor, I think we -- we would
4   certainly be in agreement with that, those -- have some time
5   limits on the attorney presentations.  We will meet and
6   confer regarding a proposal for the Court in terms of those
7   time limits.  I will say two things on that.  One is the
8   Court mentioned the extensive number of exhibits and
9   witnesses.  I think we can discuss that because I do agree
10  that many of those witnesses and exhibits are for
11  authentication or for summarizing purposes.  I think we can
12  meet and confer on that and reduce that amount.  In terms of
13  the -- the number, we'll obviously discuss that.  I'll note
14  that Sharp in the CMC mentioned 35 hours.  We actually think
15  that's closer to reality once we discuss and -- and make the
16  appropriate stipulations.
17        THE COURT:  You say 35 hours for what?
18        MR. ESTRADA:  Each side.
19        THE COURT:  I see.
20        MR. ESTRADA:  Certainly with regard to
21  presentation of witnesses, your Honor.
22        THE COURT:  Yeah, that's -- that's not
23  inconsistent with a five-week estimate.
24        MR. ESTRADA:  We will discuss that with
25  Plaintiffs, your Honor.

41

1              THE COURT:  Okay.  That sounds good.

2              MR. ESTRADA:  That's all I had, your Honor, unless

3    the Court has any other questions.

4              THE COURT:  I don't.  Thank you.

5              MR. BRIAN:  I'd love to persuade you -- Brad Brian

6    for LG.  I'd love to persuade you to let us do mini openings

7    over the objection, but I think that's a losing battle.

8    I've done it three or four times, and I think they're

9    fabulous for getting the jury more focused on the voir dire.

10             THE COURT:  Sometime when we've resolved this big

11   case and all of us are at the antitrust session meeting

12   together, maybe in a hotel bar, I'll tell you a story about

13   a time a mini opening statement won the case for somebody.

14   I saw that, and I never ordered one over objection again.

15             MR. BRIAN:  I'll move on to another -- I'll move

16   on to an issue maybe I can win.  The interim closings, I

17   think this is the perfect case for the interim closings.  I

18   disagree with Mr. Blechman.  I think this is going to be a

19   highly complicated case for a lot of reasons.  It's not just

20   the expert testimony.  This is going to be -- evidence in

21   this case -- there are going to be tons and tons, reams of

22   complicated documents, of minutes and memos of meetings that

23   are going to be very complicated.  This case is not going to

24   be fought just on the basis of the experts.  There are going

25   to be significant factual disputes about what was and was

42

1  not agreed to in these meetings.  A lot of this is in a

2  foreign language.  Jurors are going to see hours and hours

3  of depositions through translators, so that this is a

4  perfect case for the end of some time period.

5      We suggest at the end of a week I -- one thing I do

6  actually agree with Mr. Blechman, it doesn't have to be so

7  rigid that it's every Thursday at 1:00.  It could be at a

8  more natural juncture of the case where the Court feels that

9  this is more appropriate to do it now, if there's a natural

10 break, maybe it's after a witness has ended the testimony.

11 I don't think it alters the burden of proof as they have

12 argued in their -- in their papers.  We could alternate who

13 goes first so that sometimes they would go second if that is

14 a concern to them.  I just think it's -- it's really the

15 perfect case.  I don't think it atomizes the case.  I've

16 never heard that as a verb.  I like that verb.  I'm going to

17 use that.  I don't think it does it, precisely if you do it

18 as I suggested at a natural juncture of the case, but I'm

19 very concerned about the fact that we're going to be dealing

20 with complex business, technical, and foreign language

21 issues, and I think it's the right case for it.

22     A couple of other issues, your Honor.  The notebooks

23 you mentioned, the one thing -- we will meet and confer with

24 the other side.  The -- the Court in Seattle in the Costco

25 LCD litigation allowed notebooks, and one thing we're not

43

1  going to allow hopefully is pictures of the witnesses that

2  look like they came out of murderer's row.  We're going to

3  try to find neutral pictures.  We felt that was a problem.

4          THE COURT:  I am -- let me just say I appreciate

5  the importance that these details actually have to the

6  parties and the potential impact they have on the decision

7  the jury might make.  So I'm happy to resolve disputes about

8  what about this picture versus that picture, all that, and I

9  promise not to act like it's petty or -- it matters.  So

10 that's fine.

11         MR. BRIAN:  I think now that we've raised it once

12 before trial, I think we can resolve it.  It got sort of

13 sprung on the sides at the last minute, but we can -- we can

14 resolve that.

15     One of the things that we did not address in our papers

16 but the parties have submitted jointly in the schedule we

17 filed with your Honor was a voir dire -- a written voir dire

18 questionnaire.

19         THE COURT:  Yes.

20         MR. BRIAN:  And I don't -- your Honor didn't

21 mention that.

22         THE COURT:  I've not looked at that.

23         MR. BRIAN:  We used it up in Seattle.  It was very

24 very helpful to the voir dire process.

25         THE COURT:  Is it a separate docket number?  If I

44

1  just -- if I just search, you know, control F for voir dire,

2  am I going to pick it up on the docket?

3          MR. BRIAN:  You're asking the wrong person, your

4  Honor, trust me.  We can --

5          THE COURT:  You and I are both the wrong person.

6  I'm probably supposed to know the answer to that question.

7          MR. BRIAN:  I'm hoping Mr. Mach may be able to

8  help.

9          THE COURT:  Does anybody know?

10         MR. MACH:  It was --

11         THE COURT:  I'm sure it was --

12         MR. MACH:  It was filed.

13         THE COURT:  -- filed.  The question is whether it

14  was filed separately and how it was described and all that.

15         MR. MACH:  Yeah, I -- it might be easier for us to

16  find it and just lodge it with your Honor, if that's

17  acceptable.

18         THE COURT:  Sure.  Actually, you know what you

19  should do?  Just E-mail a copy to my courtroom deputy, Mr.

20  Noble, who's not here today, but his E-mail address is the

21  one that's on the now Web page for the Court.  If you just

22  forward it to him as a separate document, that would be

23  great.

24         MR. BRIAN:  We can do that.  There was some

25  issue --

45

1          THE COURT:  Mr. Estrada has the look of a man who

2    knows the answer to this question.

3          MR. ESTRADA:  For the Court's benefit, your Honor,

4    page 14 of the case management conference statement.

5          THE COURT:  Yes.

6          MR. ESTRADA:  It's the -- it was the August 17th

7    Plaintiffs' in the scheduling order where the Court says

8    written voir dire --

9          THE COURT:  I've got it.  Thank you.

10          MR. BRIAN:  I would say, your Honor, there are

11    some questions in that questionnaire that are unique to

12    Costco because Costco has members, and obviously there was

13    some concern in that case that the prospective jurors would

14    be Costco members.  So that wouldn't apply in this

15    situation.

16          THE COURT:  Sure.  And this is just a -- a Sears,

17    K-Mart, LG.  It's not a -- it's not a lot of players on both

18    sides.

19          MR. BRIAN:  Correct.  The final thing I would

20    mention, your Honor, is the deposition designations, and in

21    the case that I tried down in New Orleans  in the oil spill

22    litigation, the judge in that case did something that I had

23    never done before, which is, rather than playing the video

24    tapes or reading the transcripts in sequence, he actually

25    let the Plaintiffs play or display the portions they

46

1  designated in their case, and the Defense did their

2  designations in the Defense case.  I thought it was

3  terrific.  I thought it was -- and I raise it --

4          THE COURT:  Hold on a second.  Let me interrupt

5  you.

6          Mr. Blechman, what do you think about that?  It

7  sounds like more of a fight, doesn't it?  It would be more

8  -- it sounds more interesting.

9          MR. BLECHMAN:  It does sound more interesting.

10  I'd like to --

11          THE COURT:  Did Mr. Brian raise this with you

12  before?

13          MR. BRIAN:  I haven't.  I apologize for that.

14          THE COURT:  You all can just tell me at the

15  pretrial conference what you want to do.  I've not seen that

16  done.  I'm interested in that.

17          MR. BRIAN:  I hadn't either, and the advantage of

18  it is in a normal trial, of course, the jurors know who's

19  asking the questions.  When you play the depositions, they

20  don't really have a feel who designated it.

21          THE COURT:  Right.

22          MR. BRIAN:  This gives them a better perspective

23  as at least which side thinks it's more favorable to their

24  position.  I'll discuss it with Mr. Blechman, and maybe we

25  can reach agreement or maybe we'll ask the Court --

47

1          THE COURT:  Okay.

2          MR. BLECHMAN:  We'll talk about that, your Honor.

3          THE COURT:  Okay.  Very good.

4          MR. BRIAN:  I have nothing further, your Honor.

5          THE COURT:  Okay.  Well -- yes, sir?

6          MR. BLECHMAN:  May I just make two 40-second

7 comments?

8          THE COURT:  Sure.

9          MR. BLECHMAN:  First, with regard to time, as the

10 Court is considering the amount of time for the trial, I

11 just want to point out that the Sharp case -- that the Sears

12 case presents issues that the Sharp case does not, ownership

13 and control being an obvious one.

14     Second, Sears K-Mart case has four experts in the

15 Plaintiff's case.  LG has but one.

16     The other point I wanted to make is with regard to the

17 juror questionnaires, we would favor that as well.

18          THE COURT:  Okay.  Very good.  I'm a big believe

19 in a case like this for questionnaires, for many reasons.

20 So I'm likely to adopt one.  I'm sorry I didn't look at

21 yours already.  I'll look at it, and I will -- if not before

22 -- well, I have to talk to Mr. Noble about the mechanics of

23 that.  There are different ways of getting questionnaires

24 into the hands of the jurors.  I do not like sending

25 questionnaires in advance.  Some judges do that.  You're not

48

1  in control of what they're doing, the way they're reading it

2  or who they're talking to, and so -- I mean, I could have

3  them come in, fill out the questionnaires here, go home, we

4  all have a mad rush of reading these copies and then bring

5  them back in and we question them from there.  So I'm likely

6  to do that.  I need to look at your questionnaire.  Assuming

7  that I am going to employ the questionnaire in the way I

8  just described, there's no need to deal with the specifics

9  of the questions until the pretrial conference.

10      Mr. Brian?

11          MR. BRIAN:  Brad Brian for LG, your Honor.  We

12  will take that draft and confer with Mr. Blechman.  I am

13  sure that we will either reach an agreement --

14          THE COURT:  Oh.

15          MR. BRIAN:  -- or narrow any disagreements to so

16  few questions that you could then just rule on those

17  objections.

18          THE COURT:  Okay.

19          MR. BRIAN:  We'll use the model of the case in

20  Seattle and present something to your Honor.  The procedure

21  I've used repeatedly is exactly the one you've identified.

22          THE COURT:  Yeah.

23          MR. BRIAN:  Jurors come in, they --

24          THE COURT:  We may need -- in a case of this size

25  and during -- with the anticipated length of the

1 questionnaire, we may need to build in a dead day.  In other

2 words, the questionnaires go out on day one, and the jurors

3 are questioned on day three.  Questioning on day two may not

4 be realistic.  But let's see the questionnaire.

5     Also counsel should be aware that even in the face of a

6 stipulation, I'm likely to pull questions -- sometimes I'll

7 pull a question from a questionnaire if I have some concerns

8 about it, but we'll have a chance to talk about that before

9 I do it.

10          MR. BLECHMAN:  Very well.

11          THE COURT:  Yeah.

12          MR. BLECHMAN:  The procedure your Honor

13 articulated, I agree with Mr. Brian, that would work for us

14 as well.

15          THE COURT:  Do you all want a deadline?  Why don't

16 I just give you a deadline, and then we'll have something to

17 shoot at.

18          MR. BRIAN:  I think we have a deadline in the

19 order we submitted.

20          THE COURT:  Oh, okay.

21          MR. BRIAN:  In the schedule we submitted.

22          THE COURT:  Okay.

23          MR. BRIAN:  I forget what it is.  I don't have it

24 in front of me right here, but we'd propose a schedule

25 sufficiently in advance of the pretrial that if there were

50

1    some issues, you'd have time to look at it.

2            THE COURT:  Very well.  I'll ask counsel -- let me

3    just respond to the things I've heard.  I'll ask counsel in

4    just a second whether we should convene again before the

5    pretrial conference to set a time limit or whether the

6    pretrial conference is enough notice.  Not only that, but

7    you guys reminded me the pretrial is set for December 12th

8    and 13th.  That's a little close to your trial date.  You

9    might want to know your time limits before that, but let me

10   come back to you on that.

11       On mini opening statements, let me take that under

12   submission.  I think the Plaintiffs make a very good

13   argument, which they also made in the case management

14   statement, that it was interrupting the Plaintiffs' kind of

15   prosecutorial energy to allow the Defendants to stand up and

16   say, you know, "Oh, it's not that bad" or whatever they're

17   going to say in the closing argument.  And I -- I get that.

18       This is a -- that's why I was -- my tentative was a

19   little soft.  I understand the concerns.  I just have to

20   decide how -- how strong is that concern versus my concern

21   about jury retention of information.  So just to go back to

22   some of the things both of you said, Mr. Blechman said the

23   time for the jury to consider all the evidence is at

24   closing.  We're starting to do research on jurors.  They

25   actually -- very few of them talk about the case before the

51

1  end.  We know that now.  So I haven't started doing that.  I

2  haven't started doing that.  The law on that's not clear.

3  The data is clear I think, but the law is not clear.  But

4  from a pedagogical standpoint, if you can get past this

5  legitimate concern Mr. Blechman is raising, there are good

6  reasons to prompt some thinking by the jurors at a midpoint

7  or at various midpoints about what they've heard.  Every

8  plaintiff says their case is simple.  Every defendant says

9  their case is so incredibly complicated.  I got that from

10  both of you.  I don't think that -- I mean, I expected both

11  of you to say that, and you said it.  I think really what it

12  boils down to for me is what I just said, that, you know,

13  pedagogically is it going to turn out to be really helpful,

14  is it going to be -- is the cost of that too high for the

15  Plaintiffs.  I mean, a good -- a good closing argument is a

16  person's going to say, well, you didn't want to see it

17  because, number one, you were lying on the floor and you

18  couldn't see over there and, number two, you were drunk,

19  right.  That would be the cross examination.  And then in

20  the closing the person would say they didn't see it because

21  they were drunk and they were lying on the floor.  I mean,

22  it's not as though the jury won't have heard.  It's a

23  question of emphasis.  That's all.  So I'll think about it.

24          MR. BRIAN:  One final point on that.  To the point

25  of that it interrupts their case, we're not suggesting that

1 these be two-hour arguments at the end of the week.  We're

2 talking about 20 minutes.  Your Honor can police that very

3 effectively if he thinks counsel is abusing that in some

4 overly argumentative way.  It's really designed to address

5 precisely the concern you've raised, which is a juror's --

6          THE COURT:  I got it.  But he doesn't want you to

7 talk in his case, not for 20 minutes, not for two hours, not

8 for two hours and 20 minutes.  He doesn't want you to talk

9 at all.

10          MR. BRIAN:  I understand.

11          THE COURT:  It's not a question of -- of degree.

12 It's a matter -- it's a question of kind.  So let me think

13 about it.

14          MR. BRIAN:  He'd prefer that we not cross examine

15 either.

16          THE COURT:  Yeah, there you go.

17     Should we -- do we need a case management conference in

18 advance of the pretrial, just to hash out -- maybe to hash

19 out chess clock and maybe you think of other things?  I

20 mean, you're obviously doing a good job of meeting and

21 conferring.  Other things may occur to you.

22          UNIDENTIFIED SPEAKER:  So my answer, your Honor,

23 is that I think it could help, but what I would suggest,

24 respectfully, is that you allow counsel to talk to each

25 other to see about how the meet and confer process will go.

1 If the Court would like an answer today, my -- my reaction

2 is, yes, I think -- I think the more time we have with your

3 Honor to be able to manage this case and getting it ready

4 for trial only makes the trial more efficient.

5       THE COURT:  This is totally up to you all about

6 whether we do this.  I am going to make an order about time

7 limits, and so for me -- I mean, I know I am.  And so the

8 question is how far in advance of your trial do you need it.

9       MR. BLECHMAN:  That's up to you.

10       MR. BRIAN:  May I suggest, your Honor, that we set

11 a date sometime in let's say November.  We'll meet and

12 confer in the process, and if we then think we've reached an

13 agreement on things, we can propose something, and perhaps

14 it would be unnecessary, but it's probably wise to select a

15 date.

16       THE COURT:  That sounds good to me.  Mr. Blechman,

17 what do you think?

18       MR. BLECHMAN:  I agree with that suggestion, your

19 Honor.

20       THE COURT:  Madam Deputy, in that terrible -- on

21 that terrible calendar, is there any morning or afternoon

22 that we can give these lawyers?

23       THE CLERK:  (Indiscernible.)

24       THE COURT:  Okay.

25       MR. BLECHMAN:  Your Honor, I -- generally

54

1  speaking, November 8th is fine.  I just want to point out

2  that at least according to my calendar, that's election day,

3  and I don't know what people's plans are, but I just think

4  it's an interesting day to -- to note for --

5          THE COURT:  Let me say this on that subject.  I'm

6  obviously not going to talk about the politics, the partisan

7  part of the politics, but it's very very important that

8  anybody that wants to vote in a national election have a

9  chance to do that.  I am a permanent absentee ballot for

10 this reason.  I'm never going to not vote, but I can't know

11 that everybody in the room is going to get there.  So let's

12 see if we have a different date for you.  If we have to do

13 the morning of November 8th, we will, but let's see.

14         THE CLERK:  November 15th.

15         THE COURT:  How's that?  That's not -- that's

16 about four weeks for your pretrial.

17         MR. BRIAN:  That is probably better.  I start

18 trial on October 18th.

19         THE COURT:  Yeah.

20         MR. BRIAN:  I think we'll be done by the 15th.  If

21 I'm not, Mr. Estrada and Mr. Weingart and others will be

22 here in my stead.

23         THE COURT:  Okay.  So that sounds -- the 15th.

24 It's a better date for everybody.  Is that in the morning or

25 in the afternoon?

55

1          THE CLERK:  The whole day is open.  You do have

2  law and motion and --

3          THE COURT:  Is that a Tuesday?

4          THE CLERK:  Yes.

5          THE COURT:  Generally I do law and motion on

6  Thursdays.

7          THE CLERK:  Yes.

8          THE COURT:  Maybe something interesting is

9  happening that week.  Anyway, it looks like that date is

10 open morning or afternoon.  The lawyers that need to travel,

11 I don't know what's better for you.  I'm guessing morning so

12 you can get out to the airport.

13         MR. BLECHMAN:  Correct, your Honor.  If convenient

14 for the Court, we would prefer the morning

15         THE COURT:  Tuesday, November 15th, 9:30 a.m.

16         MR. BRIAN:  Thank you, your Honor.

17         MR. BLECHMAN:  Thank you, your Honor.

18         THE COURT:  And I don't need a -- I certainly

19 don't need a joint case management statement that addresses

20 -- it's sort of like a pre pretrial conference.  Why don't

21 you gentlemen just file by the 8th of November a list of

22 anything that you think we need to talk about.  If you

23 believe that there's nothing to talk about, which doesn't

24 seem too likely, but if you do believe that, you can just

25 request in that document that November 15th be vacated.

56

1          MR. BLECHMAN:  Very well, your Honor.

2          THE COURT:  Are there other things that we should

3  have talked about today that we've not discussed?

4          UNIDENTIFIED SPEAKER:  One other, your Honor.  If

5  the Court wants to address the motions in limine now or just

6  leave that for -- we said with our case management

7  conference that we would meet and confer.

8          THE COURT:  I saw that and that you -- that

9  there's some that you appreciate my getting to sooner rather

10 than later.  I saw that.  I don't have anything further to

11 say on that today.

12         UNIDENTIFIED SPEAKER:  Very good.  We did meet and

13 confer.  I provided a copy to K-Mart and also to the Court

14 of the (indiscernible) to give greater prior to, and I would

15 leave it at the Court's discretion.

16         MR. BLECHMAN:  Your Honor, we received that I

17 think this morning?  This morning, and we can respond to

18 that.  There's some -- we looked through it quickly before

19 this conference.

20         THE COURT:  I actually think that would be helpful

21 because you are first up to bat.  So I would be interested

22 in hearing from LG and from Sears, K-Mart what you think I

23 would be look at first.

24         MR. BLECHMAN:  We'll confer with -- with counsel,

25 and then we'll make a joint submission, your Honor.

57

1          THE COURT:  Okay.

2          MR. BRIAN:  If you decide to hear argument on some

3   or all of those, when is your intention to do that?  Is it

4   the pretrial or some other date?

5          THE COURT:  I don't -- I don't think I'm able to

6   know the answer to that question.  You know, I -- I can't

7   answer that question now.  Okay.

8          MR. BLECHMAN:  Thank you, your Honor.

9          THE COURT:  Other matters for the Court's

10  attention?

11          MS. DAVIS:  Good afternoon, your Honor.  Claire

12  Davis from Paul Weiss, for the Sharp Plaintiffs.  Nothing

13  for us.

14          THE COURT:  Okay.  Very good.  Thank you all.

15  Court's in recess.

16       (Proceedings concluded at 3:13 p.m.)

17

18

19

20

21

22

23

24

25

58

CERTIFICATE OF TRANSCRIBER

1

2

3      I certify that the foregoing is a true and correct

4  transcript, to the best of my ability, of the above pages of

5  the official electronic sound recording provided to me by

6  the U.S. District Court, Northern District of California, of

7  the proceedings taken on the date and time previously stated

8  in the above matter.

9      I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14

15

16      Echo Reporting, Inc., Transcriber

17          Tuesday, October 4, 2016

18

19

20

21

22

23

24

25