JOSEF D. COOPER (53015)
TRACY R. KIRKHAM (69912)
JOHN D. BOGDANOV (215830)
COOPER & KIRKHAM, P.C.
357 Tehama Street, Second Floor
San Francisco, CA  94103
Telephone:  (415) 788-3030
Facsimile:  (415) 882-7040
jdc@coopkirk.com
trk@coopkirk.com
jdb@coopkirk.com

*Counsel for Class Representative Steven Ganz
And Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:  CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION.<br><br>This Document Relates to:<br><br>All Indirect-Purchaser Actions | **Master File No. 3:07-cv-5944 JST**<br><br>**MDL No. 1917**<br><br>**REPLY RE MOTION TO STRIKE DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF LEAD COUNSEL'S OMNIBUS RESPONSE TO OBJECTIONS TO PROPOSED ALLOCATION OF AGGREGATE FEE AWARD TO INDIRECT PURCHASER PLAINTIFFS' COUNSEL AND MOTION TO STRIKE LATE-FILED ALIOTO AND CAPURRO DECLARATIONS**<br><br>Judge: Honorable Jon S. Tigar<br><br>Before: Special Master Martin Quinn, JAMS |

1

## I.   INTRODUCTION AND MOTION TO STRIKE SECOND ALIOTO AND FIRST CAPURRO DECLARATIONS

2

Except in name only, Lead Counsel does not really oppose Cooper & Kirkham, P.C.'s

3 ("C&K") motion to strike portions of the "Declaration of Mario N. Alioto in Support of Lead

4 Counsel's Omnibus Response to Objections to Proposed Allocation of Aggregate Fee Award to

5 Indirect Purchaser Plaintiffs' Counsel," filed September 17, 2016 ("First Alioto Declaration" Dkt.

6 4853-1).   He never attempts to demonstrate a foundation for the hearsay in the First Alioto

7 Declaration.  Indeed, he concedes that much of the Declaration is hearsay by filing a Declaration

8 from his associate, Lauren Capurro, in which she claims first-hand knowledge using language that

9 is taken almost verbatim from the First Alioto Declaration.[1]   Mostly, however, Lead Counsel uses

10 this motion as an opportunity to file an extra brief arguing for his proposed allocation to C&K, and

11 to improperly "submit[] further evidence in support of these claims."[2]

12

The filing of the Capurro Declaration and the inclusion of paragraphs 4-8 in the Second

13 Alioto Declaration[3] violate the Special Master's Order[4] setting out the procedures for evaluating

14 Lead Counsel's proposed fee allocation.  For this reason, they should be stricken from the record.[5]

15 The Order re Process was unambiguous as to when and how factual material was to be put into the

16 record.  Lead Counsel was to have offered his supporting evidence with his original proposal on

17 August 22, 2016, and objectors were to put their "supporting evidence" into the record with their

18 objections on September 7, 2016.  Order re Process, at 1.  Lead Counsel had a second opportunity

19

---

20 [1] "Declaration of Lauren C. Capurro in Opposition to Motion to Strike Declaration of Mario N. Alioto in
Support of Lead Counsel's Omnibus Response to Objections to Proposed Allocation of Aggregate Fee
21 Award to Indirect Purchaser Plaintiffs' Counsel, ECF No. 4874," ("Capurro Declaration"), Dkt. 4911-2.

22 [2] "Opposition to Motion to Strike Declaration of Mario N. Alioto in Support of Lead Counsel's Omnibus
Response to Objections to Proposed Allocation of Aggregate Fee Award to Indirect Purchaser Plaintiffs'
Counsel, ECF No. 4874," ("Opposition"), Dkt. 4911 at 1.

23
[3] "Declaration of Mario N. Alioto in Opposition to Motion to Strike Declaration of Mario N. Alioto in
24 Support of Lead Counsel's Omnibus Response to Objections to Proposed Allocation of Aggregate Fee
Award to Indirect Purchaser Plaintiffs' Counsel, ECF No. 4874," ("Second Alioto Declaration"), Dkt.
25 4911-1.

26 [4] "Special Master's Order re Process for Allocation of Attorneys Fees," entered August 5, 2016, ("Order
re Process"), Dkt. 4748.

27 [5] Paragraph 4 of the Second Alioto Decl. is also inadmissible on the grounds that it is hearsay.

28

---

to submit evidence with his reply to the objections on September 16, 2016 (which is the First Alioto Declaration).  After that date, the Order provides a very specific and limited ability for any party to put further evidence into the record, i.e.: "[i]n the event Lead Counsel files new evidence with his reply the objecting attorney may file a response by [September 23, 2016]."  *Id*. at 2.  As if this were not sufficiently clear to prevent belated attempts to supplement the record, the section of the Order re Process that deals with oral argument reiterates that "[a]ll evidence *must* be presented by declaration with the objection or the reply."  *Ibid;* emphasis added.  Lead Counsel has offered no reason why the Special Master's Order re Process should not enforced, and unless it is, there will be no end to this back and forth of he said, she said.

Lead Counsel did not request leave to violate the Order re Process, and no explanation is offered as to why the information in these late-filed declarations could not have been submitted in compliance with the Order.  For example, in the First Alioto Declaration, Lead Counsel testifies to numerous events during Mr. Bogdanov's service in the case after a general lead-in that he is "informed and believes" what he is about to say.[6]  He then makes the general statement, *inter alia*, that after Mr. Bogdanov declined to take the Philips Rule 30(b)(6) deposition, "[t]he same thing happened with the merits depositions of Philips witnesses."  First Alioto Declaration at ¶36.  Now, after the time for the submission of evidence has passed, Mr. Alioto suddenly remembers that the person who "informed" him of this fact was himself, and changes his testimony to: "Before the merits depositions of Philips witnesses began, I spoke to Mr. Bogdanov to confirm that he did not want to take the depositions."  Second Alioto Declaration at ¶5.  Why did he not just say that in the first place?  Mr. Alioto can't be so ignorant of the Rules of Evidence that he didn't realize until C&K filed this motion, that testimony in the first person is required.  Similarly, no reason is given why Ms. Capurro could not have complied with the Order re Process and timely filed her

---

[6] Actually, the concept of "information and believe" is not found in the Rules of Evidence.  It is not an exception to general prohibition on hearsay testimony.  It is a concept that usually applies to the statement of factual allegations in a verified pleading, and protects the complainant or defendant from charges of perjury in the event that something alleged as fact turns out not to be true.  *West's Encyclopedia of American Law*, edition 2. Copyright 2008 The Gale Group, Inc.

1    declaration, which in many places is a verbatim recitation of statements in the First Alioto

2    Declaration.  The Second Alioto Declaration and the Capurro Declaration are untimely and

3    improper attempts to augment a closed record in violation of the Order re Process.  They should be

4    stricken and disregarded.

5           In the event that the Special Master declines to strike the Second Alioto Declaration and

6    the Capurro Declaration, C&K request leave to further supplement the record with the "Third

7    Declaration of John D. Bogdanov in Support of Cooper & Kirkham. P.C.'s Objection to Lead

8    Counsel's Revised Proposed Allocation of Aggregate Fee Award to Indirect Purchaser Plaintiffs'

9    Counsel," filed concurrently herewith, and with the argument in Section IV of this memorandum.

10

11   **II.     LEAD COUNSEL HAS NOT DEMONSTRATED THAT THE PURPORTED
              TESTIMONY ABOUT JOSEF COOPER OFFERED IN THE FIRST ALIOTO**

12   **         DECLARATION IS BASED ON HIS PERSONAL KNOWLEDGE, AND IS NOT
              RANK SPECULATION OR HEARSAY**

13

14          Lead Counsel "testified" to the following "facts" regarding Mr. Cooper in the First Alioto

15   Declaration:

16          1.   "Cooper involved himself in the dispute with Philips over its settlement with the
                 California AG."  First Alioto Decl. at ¶23.

17

18          2.   "Cooper . . . even went so far as to formulate a settlement demand on Philips in mid-
                 2013."  *Ibid*.

19

20          3.   "Cooper . . . again inserted [him]sel[f] into the case . . . when [he] contacted Judge
                 Walker at some point in 2014 to complain about Lead Counsel's handling of the case."
                 *Id*. at ¶25

21

22          4.   "As a result of Cooper . . . 'present[ing] [him]se[f]' to Special Master Walker and
                 misleading him regarding Lead Counsel's handling of the case, Walker recommended

23               to the Court that [Cooper] be appointed as co-lead counsel in charge of settlement."  *Id*.
                 at ¶26.

24

25          5.   "Scarpulla's time records show that . . . Cooper [was] not only meeting with the
                 California AG and Special Master Walker regarding settlement, [he was] also in

26               contact with the Defendants."  *Id*. at ¶28.

27

28

---

In its motion to strike, C&K questioned the lack of foundation for each of these proffered statements.  How does Mr. Alioto know that Mr. Cooper "involved himself" (whatever that is supposed to mean) in the dispute with Philips over its settlement with the California AG?  How does he know that Mr. Cooper formulated (another vague term) a settlement demand on Philips in mid-2013?  Does Lead Counsel claim that this demand was communicated to Philips?  If so, when and how?  How does Mr. Alioto know that Mr. Cooper contacted Judge Walker at some point in 2014 to complain about his performance as lead counsel?  How does he know that Mr. Cooper mislead Judge Walker, and how does he know that Judge Walker's R&R[7] "resulted" from Mr. Cooper's misleading him as opposed to some other motivation known only to Judge Walker?  And finally, Mr. Alioto never says what in Mr. Scarpulla's time records "shows" that Mr. Cooper was meeting with the California AG and Judge Walker, or was in contact with "the Defendants?"  And is that every one of the defendants, or just some of them?

We still have no answers to those questions.  Lead Counsel has made no attempt to lay any foundation for this "testimony."  He never claims to have the requisite personal knowledge that would qualify him to testify to any of these "facts."  Rather, he asks "the Court to "consider a number of admissions by Cooper himself which substantiate our claims against him."  Opposition, at 2.  While Lead Counsel can argue that Mr. Cooper's "admissions" are evidence of Lead Counsel's "claims against him," they cannot provide a foundation for Mr. Alioto's testimony.  In other words, even if Mr. Cooper had stated in his declaration that he talked to Philips' counsel about settlement, that would be evidence that he had such a conversation, but it would not enable Mr. Alioto to testify about that conversation, unless he could satisfy the Federal Rules of Evidence by showing some personal knowledge of the event.

The reality, of course, is that Mr. Cooper categorically denied each of the specific allegations against him in Mr. Alioto's purported testimony.[8]  All that Mr. Cooper did, and

---

[7] "Special Master's Report and Recommendations re Settlement," filed December 12, 2014, Dkt. 3200.

[8] See, "Second Declaration of Josef D. Cooper in Support of Cooper & Kirkham, PC's Objection to Lead Counsel's Revised Allocation of Aggregate Fee Award to IPP Counsel," ("Second Cooper Decl."), Dkt.

1   therefore all he admitted to doing, was to communicate generally about the litigation with Mr.

2   Scarpulla, and to a lesser extent, talk on occasion with Mr. Varanini.  He also, over a few days in

3   April 2013, communicated with three attorneys at Zelle (Mr. Scarpulla, Mr. Corbitt and Ms.

4   Zahid) regarding the possibility of opening a window of opportunity for a settlement with Philips,

5   the defendant assigned to C&K.[9]

6         Nonetheless, Lead Counsel claims that each of his foundationless speculations about Mr.

7   Cooper's activities should be admitted into evidence on the sole grounds that "Cooper admits

8   speaking with Scarpulla about this case in the early years (i.e., the period from November 2007

9   through April 2010)[,]" and "admits that he talked frequently with the CA AG, and admits that he

10  discussed this case with him."  Opposition at 2-3.  These "admissions" provide no foundation

11  recognized by the Federal Rules of Evidence for the admissibility of the First Alioto Declaration.

12        Similarly, Judge Walker's use of the words "presented themselves" in his R&R does not

13  provide a foundation for Mr. Alioto's purported testimony that Mr. Cooper personally contacted

14  Judge Walker to complain about Mr. Alioto's handling of the case, and then "mislead" Judge

15  Walker which "result[ed]" in Judge Walker's entering the R&R.  Neither does Mr. Cooper's

16  recounting of his conversations with Mr. Scarpulla at ¶¶16-17 of his Second Declaration establish

17  a "record [that] is absolutely clear that Cooper was *involved in* approaching the Special Master,

18  and was *involved in* whatever else followed before the Special Master."  Opposition at 3; emphasis

19  added.

20        While equally incorrect, this statement is a bit of a retreat from the "testimony" in the First

21  Alioto Declaration that Mr. Cooper *contacted* Judge Walker, and made statements to mislead him

22  about Mr. Alioto's competence or lack thereof.  Now, Lead Counsel seems only to be claiming

23  _____

24  4879-3.

25  [9] It should be noted that these communications occurred during a time that, according to Mr. Scarpulla's
    testimony (Dkt. 4086 at ¶8), Zelle Hoffman was authorized to act as a "shadow" or *de facto* co-lead
26  counsel, a fact that, although disputed by Mr. Alioto, is supported by the fact that he proposes that Zelle be
    compensated for Mr. Corbitt's and Ms. Zahid's communications with Mr. Cooper at a lodestar multiplier of
27  1.9587.

28

1   that Mr. Cooper was "involved," in some unexplained manner, "in approaching" Judge Walker.

2   However, as noted above, this is all irrelevant to the issue presented by the motion to strike.  Judge

3   Walker's choice of words and Mr. Cooper's admission that he spoke to Mr. Scarpulla at a time

4   when Judge Walker and Mr. Scarpulla were in contact, does not, and cannot, provide a foundation

5   sufficient to turn Mr. Alioto's First Declaration into admissible evidence.

6        Finally, Lead Counsel does not even try to assert that Mr. Cooper's declaration provides a

7   reason that Mr. Alioto should be able to testify as to what was in Judge Walker's mind when he

8   drafted and filed the R&R, or that it was the "result" of Mr. Cooper misleading him.  In fact, rather

9   than argue that this speculation should be considered valid testimony, Lead Counsel now asserts

10  that attributing the entry of the R&R to Mr. Cooper is merely the "implication" he draws from two

11  facts: (1) Judge Walker's use of the words, "presented themselves" to refer to Mr. Cooper (and

12  Mr. Scarpulla); and (2) the fact that Judge Walker recommended that Mr. Cooper be appointed

13  Co-Lead Counsel.  Opposition at 4.  However, the Rules of Evidence do not permit people to

14  testify to implications, speculations or inferences.

15       Lead Counsel defends his ability to testify to statements allegedly made to him by defense

16  counsel (First Alioto Declaration at ¶30) on the grounds that "they are not offered for the truth of

17  the matter stated . . . [t]hey are offered on the basis of Mr. Alioto's personal knowledge to show

18  that defense counsel made those statements and support his belief that Scarpulla and Cooper

19  created the specter of a reverse auction."  Opposition at 4.  First of all, they are absolutely being

20  offered for the truth of their content.  It is clear from Lead Counsel's Omnibus Response (Dkt.

21  4853) that these statements are offered to prove the factual assertion that "Cooper's . . . actions

22  adversely impacted Lead Counsel's ability to negotiate the settlements with Defendants,"[10]

23  thereby supporting the conclusion that Mr. Cooper acted in conflict with the class's best interest,

24  actions for which C&K should forfeit the right to be treated like the other firms doing comparable

25  work in this litigation.  Mr. Alioto's belief and state of mind in conducting settlement negotiations

26  _____

27  [10]  First Alioto Declaration at ¶30.

28

1    is irrelevant to a fair and reasonable fee award to C&K.  The only thing that is possibly relevant

2    here is whether Mr. Cooper's actions damaged the class's interests.

3         Even if the First and Second Alioto Declarations are not stricken, there is absolutely NO

4    EVIDENCE that Mr. Cooper did one single thing that worked to the detriment of the class in this

5    litigation.  So what if he criticized Mr. Alioto's performance as lead counsel in one, ten or a

6    hundred conversations with Mr. Scarpulla?  The worst that could be said is that those

7    conversations were not authorized by Lead Counsel and of no benefit to the class.  There is a

8    remedy for that, and it is not being paid for that time.  But C&K never asked the class (or its co-

9    counsel in the allocation) to pay for one moment that he spent talking to Mr. Scarpulla about Lead

10   Counsel or any other aspect of the case.

11        So what if during conversations with Mr. Varanini relating to other cases, the subject of the

12   conflict between the State of California and Lead Counsel came up?  The only evidence is that in

13   these conversations, Mr. Cooper always urged Mr. Varanini to continue working with Mr. Alioto

14   as cooperatively as possible.  In fact, the record is uncontroverted that rather than thwart any of

15   Lead Counsel's efforts, C&K cooperated completely in Lead Counsel's strategy for dealing with

16   the California AG.

17        In late August 2013, C&K agreed to have its client, Steven Ganz, one of the California

18   class representatives, file an objection to the settlement in *The State of California, et al. v.*

19   *Chunghwa Picture Tubes, et al.,* San Francisco Superior Court Case No. CGC-11-515786.[11]  This

20   required that Mr. Ganz sign and file the original objection form by September 6, 2013.  *Ibid.*  The

21   objection was drafted and sent to Mr. Ganz for signature.  Then on September 4, around noon, Mr.

22   Bogdanov received an email from Ms. Capurro, apologizing for "changing things up at the last

23   minute" and informing Mr. Bogdanov that Lead Counsel wanted Mr. Ganz to opt out of the

24   settlement on behalf of himself and California class members, rather than object.  *Ibid*; *See* Dkt.

---

26   [11]  "Second Declaration of John D. Bogdanov in Support of Cooper & Kirkham. P.C.'s Objection to Lead
     Counsel's Revised Proposed Allocation of Aggregate Fee Award to Indirect Purchaser Plaintiffs' Counsel,"
27   ("Second Bogdanov Declaration"), filed September 24, 2016, Dkt. 4878-1 at ¶27.

---

1   4821-2, Ex. 18.  Mr. Ganz was requested to review, complete, sign and return the original of the

2   opt-out by September 6.  *Ibid*.  Mr. Bogdanov advised Lead Counsel that Rosh Hashanah was

3   beginning at sundown on September 5, which could make it difficult for Mr. Ganz to review and

4   sign the document.  *Ibid*.  Nevertheless, due to the importance of the issue, Mr. Ganz agreed to

5   meet Mr. Bogdanov shortly before sundown on September 5, review and sign the opt-out, and Mr.

6   Bogdanov was able to messenger the document to Ms. Capurro in time to have it timely filed the

7   following day.  *Ibid*.  Of course, according to Lead Counsel, all of these efforts are worth only a

8   fraction of Mr. Bogdanov's hourly rate because Mr. Cooper "admits that he talked frequently with

9   the CA AG, and admits that he discussed this case with him."  Opposition at 3.  This is ridiculous.

10         So what if Mr. Cooper "exchang[ed] greetings with Mr. Alioto [and then] abruptly left" a

11   court hearing on April 5, 2013?[12]  C&K is not asking to be paid for his going to that hearing.  And,

12   so what if Mr. Cooper talked to Mr. Corbitt, Ms. Zahid and Mr. Scarpulla around the time of that

13   hearing about whether there was a window of opportunity for settlement?  So what if he

14   authorized or approved of Mr. Bogdanov's writing an email to Mr. Corbitt clarifying Mr.

15   Bogdanov's concerns that plaintiffs in CRT might suffer the same fate as the plaintiffs in another

16   case C&K and Zelle were in, and be unable to hold Philips responsible for the conspiratorial

17   activities of its joint venture?  There is NO EVIDENCE that Mr. Cooper "formulate[d] a

18   settlement demand on Philips,"[13] whatever that is supposed to mean, or more importantly, that any

19   settlement demand or correspondence of any sort was conveyed from him to Philips' counsel or to

20   any defense counsel at any time during this litigation.

21         Similarly, there is no foundation for Mr. Alioto's testimony that Mr. Cooper took any

22   action that was "at odds with [another vague term] the work of other IPP Counsel in the case."

23   Opposition at 1.  There is absolutely NO EVIDENCE of Mr. Cooper interfering with or

24   duplicating the work of any other counsel.  Indeed, Mr. Alioto's attempt to justify this "testimony"

25   _____

26   [12]  Second Alioto Declaration at ¶3.

27   [13]  First Alioto Declaration at ¶23.

28

1  demonstrates that it is not a statement of fact at all, but rather, another inference that Lead Counsel

2  wants the Special Master to draw from the fact that Mr. Cooper spoke to Mr. Scarpulla, Mr.

3  Corbitt and Ms. Zahid following the April 5, 2013 hearing on the California AG settlement with

4  Philips.  As Lead Counsel states, "Cooper admits that he was involved in 'multiple telephone calls

5  and email' [solely with Mr. Scarpulla, Mr. Corbitt and Ms. Zahid] about how to approach

6  achieving a resolution of this dispute."  Opposition at 2.  Okay.  And, why is this a bad thing?

7  Apparently because Mr. Alioto did not tell Mr. Cooper that he could talk to these people:  "But

8  Cooper was not assigned to this matter and had no business getting involved in it, which was by its

9  very nature at cross purposes to what other (assigned) IPP Counsel were doing."  *Ibid*.   Really?

10  How does that follow?  Apparently, "by its very nature."  That, and that alone, is the basis upon

11  which Lead Counsel expects the Special Master to accept his unprecedented and punitive

12  treatment of C&K.[14]

13      How, without more, could these other "assigned" IPP Counsel have been affected by a

14  conversation or email (authorized or not) between Mr. Cooper and Mr. Corbitt?  Or Mr. Cooper

15  and Ms. Zahid?  Or even Mr. Cooper and Mr. Scarpulla?  Where is the evidence that these other

16  counsel's performance of their assigned duties was somehow impaired or inhibited by Mr.

17  Cooper?   There is no evidence that anyone outside of Zelle (other than possibly Lead Counsel

18  himself) was aware of the communications, as evidenced by Lead Counsel's assertion that they

19  (along with everything else Mr. Cooper allegedly did) were "all done in secret."  Opposition at

20  3.[15]

21  _____

22  [14]  It seems that Lead Counsel's position that once he was appointed, all of the other lawyers in the case
were supposed to stop reading, thinking, or talking amongst themselves unless specifically instructed to do

23  so only applies to cases in which Mr. Alioto is lead counsel.  In support of his fee petition in the *CIPRO
CASES I and II*, Mr. Alioto argued that his firm should be paid for read and review time because its "ethical

24  duties to our client" necessitated that Mr. Alioto and Ms. Capurro "consistently monitor[] the major
developments in th[at] case."  See, Exhibit 1 (Dkt. 4896-1) to the "Supplemental Statement by Law Offices

25  of Francis O. Scarpulla re Fee Allocation," filed September 28, 2016, Dkt. 4896.

26  [15]  "All done in secret" sounds like someone should cue up the ominous organ chords.  These
communications were no secret to the relevant lawyers involved, one of whom was Mr. Alioto.  Exhibit 5

27  to the Second Cooper Declaration consists of copies of timesheets for Zelle Hoffman attorneys for the
period January 1 through June 18, 2013.  These timesheets show that before and after the April 5, 2013

28

_____

1    As a last resort, Lead Counsel argues that the First Alioto Declaration should not be

2 stricken because "the Court can weigh the evidence and decide the matter."  Opposition at 4.

3 Certainly, this is not a jury trial, and both the Special Master and Judge Tigar can be expected to

4 apply the Federal Rules of Evidence, and give no weight to uncorroborated testimony that is

5 wholly lacking in foundation.  However, we are at a point where it needs to be said that without a

6 foundation, there simply is no potentially admissible and credible evidence to be weighed.

7    Nowhere is this more apparent than Mr. Alioto's "testimony" that Judge Walker's R&R

8 was "a result" of Mr. Cooper's "misleading him regarding Lead Counsel's handling of the case."[16]

9 Is Lead Counsel actually asking the Special Master to make a factual finding on the basis of this

10 "evidence," that Judge Walker filed an R&R with the Court because Mr. Cooper (and Mr.

11 Scarpulla) exerted undue influence over him like some cognitively impaired nursing home resident

12 who is bamboozled into leaving his estate to his unscrupulous nephews?  Has Lead Counsel never

13 met Vaughn Walker?  Of course, he has.  And, as Mr. Alioto well knows, twenty-one years on the

14 federal bench has made Judge Walker about as bamboozle-proof as a person can be.

15    Indeed, Lead Counsel's own "evidence" of Mr. Cooper's alleged misleading of Judge

16 Walker relies heavily on a meeting/hearing (not attended by Mr. Cooper) in August 2014, to

17 discuss the dispute between the private indirect purchaser plaintiffs and the California Attorney

18 General's office.  First Alioto Declaration at ¶25.  That meeting, which Mr. Scarpulla's time

19 records pinpoint as having occurred on August 8, 2014,[17] was attended by Lead Counsel, Mr.

20 Varanini and Mr. Scarpulla.  *Ibid.*  It occurred over three months prior to Judge Conti entering his

21 November 17, 2014 (Dkt. 3118) Order, charging Judge Walker with the task of making

22 _____

23 hearing, and during the time that Mr. Cooper and Mr. Bogdanov were in contact with them regarding
   settlement with Philips, Mr. Scarpulla, Mr. Corbitt and Ms. Zahid had at least one meeting, and numerous
24 communications with Lead Counsel regarding a potential Philips settlement.  Mr. Corbitt sent Mr.
   Bogdanov's April 30, 2013 email to Mr. Alioto, all of which raises the strong inference that Lead Counsel
25 was aware that attorneys at C&K and attorneys at Zelle were discussing evidence against Philips and the
   subject of a possible settlement.  See, Second Cooper Declaration, at ¶¶10-11.

26 [16]  First Alioto Declaration at ¶26.

27 [17]  Second Cooper Declaration, at ¶14.

28

_____

1    recommendations as to the progress of settlement discussions.  It occurred over four months

2    before Judge Walker filed the R&R on December 12, 2014, a document that almost exclusively

3    consists of findings regarding the friction between the private plaintiffs and the California AG, and

4    Lead Counsel's workload for trial preparation.  Nonetheless, Lead Counsel would have the Special

5    Master accept his "testimony" about how the R&R came to be, and therefore, find (implicitly, if

6    not explicitly) that during the four months between the R&R and the meeting at which Mr.

7    Scarpulla and Mr. Varanini allegedly accused Mr. Alioto of being "uncooperative" and

8    "unrealistic," Judge Walker made no unbiased assessment of the situation, and came to no

9    independent judgment that it would be in the plaintiffs' best interests to have additional co-lead

10   counsel appointed.  That inference is not credible, and Mr. Alioto's opinion of Judge Walker's

11   mental processes is not evidence.

12           Obviously, as an advocate, Lead Counsel is free to argue whatever outlandish inferences

13   he cares to draw from Mr. Cooper's testimony – that Mr. Scarpulla, Mr. Cooper and Mr. Varanini

14   were plotting against him, or that Mr. Cooper was conspiring with Mr. Corbitt and Ms. Zahid to

15   overthrow the government—but he cannot amend the Federal Rules, and turn advocacy and mere

16   inferences into "evidence" simply by putting them into a declaration.  All of the purported

17   "testimony" about Mr. Cooper in Mr. Alioto's First Declaration should be stricken from the

18   record.

19

20   **III.    LEAD COUNSEL HAS NOT DEMONSTRATED THAT THE PURPORTED**
            **TESTIMONY ABOUT JOHN BOGDANOV OFFERED IN THE FIRST ALIOTO**
21          **DECLARATION IS BASED ON HIS PERSONAL KNOWLEDGE AND IS NOT**
            **RANK SPECULATION OR HEARSAY**
22

23           In the First Alioto Declaration, Lead Counsel testified that "[i]n an effort to convince Lead

24   Counsel to agree to the extremely low settlement with Philips," John Bogdanov prepared an email

25   dated April 30, 2013, which Lead Counsel characterized as "argu[ing] . . . that Philips would win

26   summary judgment because IPPs would be unable to pierce the corporate veil and hold Philips

27   reponsible for the conduct of its joint venture, LPD."  *Id*. at 24.  C&K moved to strike this

28   testimony as lacking in foundation.  First, of all, Lead Counsel never identifies what "extremely

---

REPLY RE MOTION TO STRIKE                    - 11 -              Master File No. 3:07-cv-5944 JST
DECLARATION OF MARIO N. ALIOTO                                  MDL 1917

1   low settlement" he is talking about.  The implication is that it is a settlement that originated with

2   Mr. Bogdanov, but there is no foundation to support that inference.  C&K moved to strike because

3   Lead Counsel laid no foundation for his "knowledge" that Mr. Bogdanov's email was written in

4   "an effort to convince Lead Counsel to agree to an extremely low settlement" with Philips.

5          As with the testimony about Mr. Cooper, Lead Counsel's Opposition does not attempt to

6   lay a foundation to support this "evidence" coming into record.  Rather, he points to the fact that

7   Mr. Bogdanov "admits" that he had a conversation with Ms. Zahid and Mr. Varanini at the April

8   5, 2013 hearing, "admits" that he suggested to Ms. Zahid that she and her colleagues at Zelle meet

9   with lawyers from C&K about whether there was a "window of opportunity" for a settlement with

10  Philips, and that his timesheets evidence "activities" that "culminated in the April 30, email."

11  Opposition at 2-3.   None of these "admissions" provides evidence that Mr. Alioto is competent to

12  testify to Mr. Bogdanov's reason for writing his email.

13         Indeed, here too, Lead Counsel acknowledges that his testimony about Mr. Bogdanov's

14  state of mind is nothing more than speculation: "the only reasonable reading of this email is that

15  he was advocating in favor of settling with Philips."  Really?  The *only* reasonable reading?  How

16  about the explanation to which Mr. Bogdanov has testified—that he was attempting to clarify Mr.

17  Corbitt's understanding of his view of the evidence against and legal issues as to Philips?  Second

18  Bogdanov Declaration at ¶¶22-25.  Lead Counsel omits mention of the fact that the April 30 email

19  was not addressed to him or Ms. Capurro, but to Craig Corbitt.[18]

20         And, what if Mr. Bogdanov were "advocating in favor of settling with Philips" to Mr.

21  Corbitt?  Why is the drafting of this email an offense that merits Mr. Bogdanov's entire

22  contribution to the case being denigrated?  Apparently because Lead Counsel didn't tell him that

23  

24  _____

25  [18]  He does take the time to note that that "Cooper and Scarpulla are copied," as if this were both sinister
    and significant.  *Id.* at 3.  We assume that the assertion in the First Alioto Declaration that Mr. Bogdanov's

26  April 30 email to Mr. Corbitt was written to "to convince Lead Counsel to agree to the extremely low
    settlement with Philips" was not intended as an admission that, as Mr. Scarpulla and Mr. Corbitt claim,

27  there are emails evidencing an agreement that senior counsel at Zelle would be considered *de facto* lead
    counsel.

28

1   he was allowed to send emails to people at Zelle:  "Bogdanov was not assigned to this matter and

2   should not have involved himself in it."  *Ibid*.   To the contrary, Mr. Bogdanov was indeed

3   assigned to "this matter."  Mr. Bogdanov was, as Ms. Capurro referred to him, "the Philips

4   discovery guy,"[19] and possibly the only person in the case who looked at every relevant document

5   about Philips.  He also attended almost every Philips deposition.  Second Bogdanov Declaration at

6   ¶¶11,15.  There was no one better for Mr. Corbitt to have consulted about Philips evidence and

7   issues, and if Mr. Corbitt's firm is to be handsomely compensated for his end of this exchange, it

8   is simply outrageous that Mr. Bogdanov's participation is cited as a reason to penalize C&K.

9        Lead Counsel makes no attempt in the Opposition to lay a foundation for the testimony in

10   the First Alioto Declaration about Mr. Bogdanov's alleged refusal to take depositions.  Rather, this

11   is the subject of his and Ms. Capurro's untimely and unauthorized declarations.  These

12   declarations are in effect an admission that the statements on this subject in the First Alioto

13   Declaration are impermissible hearsay that cannot be admitted into evidence.  Accordingly,

14   paragraphs 35 through 37 of the First Alioto Declaration must be stricken.

15

16   **IV.     THE SECOND ALIOTO AND FIRST CAPURRO DECLARATIONS DO NOT**
17   **PROVIDE EVIDENCE THAT SUPPORTS LEAD COUNSEL'S PROPOSED**
      **MULTIPLIER ON MR. BOGDANOV'S TIME**

18        Lead Counsel has submitted twelve new pages of declaration testimony devoted largely to

19   proving that John Bogdanov was asked to take the Philips Rule 30(b)(6) and merits depositions,

20   allegations that he continues to deny.[20]  But before getting caught up in the question of credibility,

21   it is appropriate to ask whether the answer to that question really matters.  What if Mr. Bogdanov

22   had been asked if he would take depositions, and he had replied that he simply had too much on

23   ─────────────────────────

24   [19]  Exhibit 8 to the "Declaration of John D. Bogdanov in Support of Cooper & Kirkham. P.C.'s Objection
25   to Lead Counsel's Revised Proposed Allocation of Aggregate Fee Award to Indirect Purchaser Plaintiffs'
     Counsel," ("First Bogdanov Declaration"), filed September 7, 2016, Dkt. 4821-2.

26   [20]  "Third Declaration of John D. Bogdanov in Support of Cooper & Kirkham. P.C.'s Objection to Lead
27   Counsel's Revised Proposed Allocation of Aggregate Fee Award to Indirect Purchaser Plaintiffs' Counsel,"
     ("Third Bogdanov Declaration"), filed concurrently herewith, at ¶¶

28

1  his plate to add being responsible for outlining the interrogations of Philips witnesses, beyond

2  providing the deposition exhibits organized for introduction into evidence?  After all, he is from a

3  small firm with significant responsibilities in multiple major cases.  What if he volunteered to do

4  all of the document work and then sit second chair at the depositions, but just didn't want to do the

5  questioning?  Does that justify compensating his work at less than his hourly rate, and at half the

6  multiplier applied to that of any other document team leader firms, including several who,

7  according to Lead Counsel, also took no depositions and wrote no briefs?  Of course not.

8       One aspect of the record in uncontroverted.  After Mr. Bogdanov allegedly refused to take

9  the Philips Rule 30(b)(6) deposition when allegedly asked by Ms. Capurro "on or around June 19,

10 2012,"[21] nothing was said by Lead Counsel.  No expression of disappointment or censure.  No

11 warning that Mr. Bogdanov was being uncooperative, or that he wasn't doing what all of the other

12 attorneys assigned to lead the document teams were doing.  No suggestion that he was putting in

13 jeopardy his compensation for the work that he was doing.  Nothing.[22] So, Mr. Bogdanov kept on

14 working.  Then approximately a year later,[23] when the Philips merits depositions were coming up,

15 Mr. Capurro says that she "reminded Mr. Alioto that Mr. Bogdanov preferred not to take

16 depositions."  Capurro Declaration at ¶19.  And what did Mr. Alioto allegedly do?  He "spoke to

17 Mr. Bogdanov to confirm that he did not want to take the depositions."  Second Alioto Declaration

18 at ¶5.  And, then?  Nothing.  No expression of disappointment or censure.  No warning that Mr.

19 Bogdanov was being uncooperative, or that he wasn't doing what all of the other attorneys

20 assigned to lead the document teams were doing.  No suggestion that he was putting in jeopardy

21 his compensation for the work that he was doing.  Nothing.  So, Mr. Bogdanov kept on working.

22

23

24 _____

25 [21]  Capurro Declaration, at ¶12.

26 [22] The same is also true of Ms. Capurro's claim that she had to "take over negotiation of certain issues [with Philips] because they has been dragging on for so long."  Capurro Declaration, at ¶9.  These negotiations actually preceded the Rule 30(b)(6) deposition.

27 [23] Third Bogdanov Declaration at ¶7

28

1    When did Lead Counsel decide that this alleged refusal to take depositions (or his alleged

2    inability to resolve meet and confer negotiations with Philips) was grounds to cut Mr. Bogdanov's

3    compensation below his hourly rate?  When did Mr. Alioto first decide to say nothing, but just lie

4    in wait to get Mr. Bogdanov in the fee allocation process four years down the road?

5    Between June 19, 2012, when Mr. Bogdanov allegedly first refused to take a deposition,

6    and the conclusion of the case, he invested approximately 4,079 hours of his time in this

7    litigation.[24]  Lead Counsel represented to the Special Master and the Court that every minute of

8    that time at Mr. Bogdanov's full hourly rate should be considered a valid basis for performing the

9    lodestar cross-check to decide how much money should be taken from the class in attorneys'

10   fees.[25]  Now, when Lead Counsel has that money almost within his grasp, he decides that it is time

11   to assert that Mr. Bogdanov's performance in the case was so defective that it justifies

12   compensating him at approximately 77% of his lodestar and reallocating the rest of the Court-

13   awarded fees based on the Bogdanov lodestar to himself and other counsel.

14   In a detailed Declaration, Mr. Bogdanov again disputes that he was ever asked to take a

15   deposition by either Ms. Capurro or Mr. Alioto.[26]  Mr. Bogdanov has no recollection of any such

16   conversations, either on the telephone or in person, and, as Ms. Capurro admits, there are no

17   emails and she has no time records reflecting any request that Mr. Bogdanov take depositions.

18   Capurro Declaration, at ¶12; Third Bogdanov Declaration, at ¶¶2, 6-7.  Mr. Bogdanov states that

19   he "reviewed all of [his] time records" in an effort to refresh his recollection as to any request that

20   he take depositions in this case.  *Id.* at ¶¶2, 6.  He further states that "[i]t is my firm's policy to note

21   each in person conference and telephone call in attorney time records with sufficient detail to

22

23   [24] Exhibit 6 to the "Compendium of IPP Counsel Declarations in Support of Motion for Attorneys' Fees,
24   Reimbursement of Expenses and Incentive Awards," filed September 23 2015, Dkt. 4073-6.

25   [25] "Declaration of Mario N. Alioto in Support of Indirect Purchaser Plaintiffs' Motion for Attorneys' Fees,
     Reimbursement of Litigation Expenses, and Incentive Awards," filed September 23, 2015, Dkt. 4071-1, at
26   ¶119

27   [26] He also discusses his recollection of the events mentioned in Ms. Capurro's testimony about the
     Philips meet and confer negotiations and letters.

28

REPLY RE MOTION TO STRIKE                - 15 -        Master File No. 3:07-cv-5944 JST
DECLARATION OF MARIO N. ALIOTO                         MDL 1917

identify the participant(s), and to understand the context of the call or conversation," and asserts that he "consistently" followed this policy.  *Id*. at ¶6.

Specifically, as to Mr. Alioto's claim that he called Mr. Bogdanov shortly before he contacted Ms. Pritchard and asked her to take the Philips merits depositions, Mr. Bogdanov testifies that he "has no time entry for a call from Mr. Alioto at any time, on any subject."  *Id*. at ¶7.  He further states that if he had received such a call it would have been unusual enough to not only have been noted in his timesheets, but also likely in his memory.  *Ibid*.  In a further effort to refresh his recollection about any such call, Mr. Bogdanov reviewed Mr. Alioto's time records for several months leading up to April 9, 2013, the day he was told that Diane Pritchard would be taking the depositions, and his name does not appear anywhere in those records, although beginning in the end of January 2013, there are several notations of Mr. Alioto's telephone calls about the Philips depositions, as well as calls with and about Ms. Pritchard.  *Id*. at ¶8.

Either Mr. Alioto's and Ms. Capurro's testimony is not credible, and Mr. Bogdanov should be believed, or their version of the facts reveals at best, duplicity and gross mismanagement in the staffing and supervision of the case by Lead Counsel.  At worst, it is a confession of corruption and intent to defraud the Class into paying an unfair and unreasonable fee, by offering an aggregate lodestar greater than they believed to be accurate.  Both call into question the multiplier that Lead Counsel proposes for his own firm.  Either way, these allegations provide no support for the .77 effective multiplier that Lead Counsel has proposed for C&K.

## IV.   THERE IS NO REASON TO ORDER MR. COOPER'S TO PUT HIS TIME SHEETS INTO THE RECORD

In the name of transparency, Lead Counsel calls for the Special Master to "require production [of Mr. Cooper's time records] on an expedited basis."  Opposition at 5.  He also asserts that "Cooper has sedulously refused to produce his timesheets."  *Ibid*.  C&K is not sure what exactly Lead Counsel is saying since according to the Merriam-Webster Dictionary, to do something "sedulously" means to do it with accomplished and careful perseverance, as in

1   "sedulous craftsmanship," or with diligence in application or pursuit, as in a "sedulous student,"

2   neither of which seem to be what Lead Counsel is going for here.  However, as we were drafting

3   this memorandum, the Special Master ruled against Lead Counsel's request for Mr.

4   Cooper's time records at the hearing on Mr. Scarpulla's objection to Lead Counsel's proposed fee

5   allocation.  Accordingly, C&K will not respond further, other than to state for the record, that

6   Lead Counsel provided no citation to any place in the record where C&K was requested and

7   refused (sedulously or otherwise) to produce Mr. Cooper's time records.[27]  When asked by Ms.

8   Kirkham during today's hearing, where any such request had ever been made, Lead Counsel did

9   not answer.

10  **V.      CONCLUSION**

11          Paragraphs 22 through 25, the first sentence of paragraph 26, paragraph 28, paragraph 30,

12  and paragraphs 34 through 37 of the First Alioto Declaration should be stricken from the record as

13  lacking foundation pursuant to Federal Rules of Evidence 602 and 802.  Paragraphs 4-8 of the

14  Second Alioto Declaration and the Capurro Declaration should be stricken because they constitute

15  an untimely supplementation of the record in violation of the Order re Process.  If the Second

16  Alioto and Capurro Declarations are not disregarded, then the Third Bogdanov Declaration should

17  be admitted into evidence.

18  Dated: October 5, 2016                           Respectfully submitted,

19

20                                                     /s/ Josef D. Cooper
                                                         Josef D. Cooper

21
                                                    Josef D. Cooper (53015)
22                                                  Tracy R. Kirkham (69912)
                                                    John D. Bogdanov (215830)
23                                                  COOPER & KIRKHAM, P.C.
                                                    357 Tehama Street, Second Floor
24                                                  San Francisco, CA 94103
                                                    Telephone: (415) 788-3030
25                                                  Facsimile: (415) 882-7040
                                                    Email:  jdc@coopkirk.com
26  _____

27  [27]  See, Opposition at 5.

28

---