UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION <br><br> This Order Relates To: <br><br> ALL DIRECT ACTION PLAINTIFFS | MDL No. 1917 <br><br> Case No. C-07-5944 JST <br><br> **ORDER DENYING DEFENDANT THOMSON CONSUMER ELECTRONICS, INC.'S MOTION FOR SUMMARY JUDGMENT RE "ALL-CRT" CONSPIRACY LIABILITY** |

Defendant Thomson Consumer Electronics, Inc. ("Thomson" or "Thomson Consumer") has filed a motion for summary judgment on the grounds that there is insufficient evidence for a jury to find it liable for conspiracy to fix the price of cathode display tubes ("CDTs"), one of the types of cathode ray tubes at issue in this case.[1] ECF No. 2981 (motion). The motion is fully briefed. ECF Nos. 3236 (opposition), 3506-4 (supplemental opposition),[2] 3603 (reply). The Court held oral argument on February 23, 2016. See ECF No. 4454 (transcript) at 76-88. The Court denies the motion.

I.  **FACTUAL BACKGROUND**

The factual history is well known to the parties and has been recited in the Court's prior orders. By way of summation, this case is predicated on an alleged conspiracy to price-fix cathode ray tubes ("CRTs"), a core component of tube-style screens for common devices including

---

[1] Thomson Consumer originally brought claims under both the Sherman Act and New York's Donnelly Act. The Direct Action Plaintiffs ("DAPs") have since dismissed their Donnelly Act claims with prejudice. ECF No. 3603 at 1 n.1. Accordingly, only the DAPs' Sherman Act claims against Thomson Consumer remain before the Court.

[2] Discovery was incomplete when briefs were first due, so the DAPs were allowed to file a supplemental brief pursuant to Rule 54(d) of the Federal Rules of Civil Procedure.

televisions and computer monitors. This conspiracy ran from March 1, 1995 to November 25, 2007 (the "Conspiracy Period"), involved many of the major companies that produced CRTs, and allegedly resulted in overcharges of billions of U.S. dollars to domestic companies that purchased and sold CRTs or products containing CRTs. A civil suit was originally filed in 2007, ECF No. 1, consolidated by the Joint Panel on Multidistrict Litigation shortly thereafter, see ECF No. 122, assigned as a Multidistrict Litigation case ("MDL") to Judge Samuel Conti, see id., and ultimately transferred to the undersigned, see ECF No. 4162. In addition to two class actions, this MDL involves various direct actions from individual plaintiffs who opted out of the class actions, including the DAPs that oppose the present motion.

A CRT is a funnel-shaped glass device that translates electronic video signals into visual images. There are at least two different types of CRTs – cathode display tubes ("CDTs") and cathode picture tubes ("CPTs"). CDTs are used in computer monitors and similar devices and typically yield a higher resolution image than a CPT because computer monitors are viewed at a close distance. CPTs are used primarily in televisions and produce a brighter image than CDTs because the images displayed on a television are typically moving pictures viewed from a greater distance.

Because CDTs and CPTs were used in different products and had different customers, CDTs and CPTs competed in different markets. The products were not demand-side substitutes. Demand-side substitution takes place when consumers (or in this case, manufacturers) switch from one product to another in response to a change in the relative prices of the products. A producer of finished CRT products seeking to reduce its costs could not switch from CDTs to CPTs, or vice-versa.

Specific to the instant motion, Thomson SA is the French parent corporation of Thomson Consumer. Thomson SA is not a party to the instant motion. Thomson Consumer does not admit that it was involved in a CPT-conspiracy to price-fix monitor components for televisions, but effectively concedes that no motion for summary judgment based on absence of evidence of liability is appropriate for a CPT-conspiracy. ECF No. 2981 at 1 n.1. Thomson does, however, bring a motion challenging its involvement with any CDT-conspiracy to price-fix monitor components for computers. Thomson claims that the conspiracies to fix the prices of CDTs and

1  CPTs were separate and unrelated.

2      The parties agree that Thomson never purchased, manufactured, or sold any CDT product
3  directly. They dispute, however, whether Thomson had an interest or role in, or otherwise
4  benefitted from involvement in any CDT conspiracy – or the overall CRT conspiracy insofar as
5  the overall CRT conspiracy included both CDTs and CPTs.

## II.   LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by" citing to depositions, documents, affidavits, or other materials. Fed. R. Civ. P. 56(c)(1)(A). A party also may show that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). An issue is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). A fact is "material" if the fact may affect the outcome of the case. Id. at 248. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997). However, unsupported conjecture or conclusory statements do not create a genuine dispute as to material fact and will not defeat summary judgment. Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1103 (9th Cir. 2008).

For claims on which the defendant does not carry the ultimate burden of persuasion, defendant as the moving party has the burden of producing evidence that negates an essential element of each claim on which it seeks judgment or showing that the plaintiff cannot produce evidence sufficient to satisfy the burden of proof at trial. See Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party satisfies its initial burden of production, then the nonmoving party must produce admissible evidence to show that a genuine issue of material fact exists. Id. at 1102-1103. The non-moving party must "identify with

reasonable particularity the evidence that precludes summary judgment." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996).

## III. DISCUSSION

Thomson Consumer implicitly concedes that a jury must decide whether it is liable for fixing the price of CPTs. The question posed by this motion is whether it should avoid liability for the effects of the alleged conspiracy to fix the prices of CDTs. In other words, when a defendant's liability for the effects of one conspiracy are clearly at issue, when may it also potentially be liable for the effects of a related conspiracy? Or, phrased slightly differently, when may a plaintiff proceed on the theory that two (at least nominally) separate conspiracies were actually one?

### A. In Re Vitamins

Although the Ninth Circuit has not articulated the relevant legal standard, the parties agree that this Court should apply the test laid out in the District of the District of Columbia's decision in In re Vitamins Antitrust Litig., 320 F. Supp. 2d 1 (D.D.C. 2004). Applying the test articulated by that court, to prevail at trial on their claims for CDT-related damages, the DAPs must show that:

1. Thomson Consumer had knowledge of an "all-[CRT]" conspiracy;

2. Thomson Consumer intended to join the "all-[CRT]" conspiracy; and

3. By joining the "all-[CRT]" conspiracy, Thomson Consumer and the other members of the conspiracy were interdependent upon one another, in that their respective benefit depended on the success of the "all-[CRT]" venture.

In re Vitamins, 320 F. Supp. 2d at 15. The Court will refer to these factors as "knowledge," "intent," and "interdependence," respectively.

The burden on the DAPs to show that Thomson Consumer "knew of and possibly participated in an all-[CRT] conspiracy" is "very low." Id. at 20. "Although plaintiffs must show that [Thomson Consumer] had knowledge of an agreement as to the overall conspiracy, they need not show (1) evidence of a formal agreement, or (2) knowledge, on behalf of [Thomson Consumer], of every detail of the alleged conspiracy." Id. The DAPs also do not need to provide direct evidence of the conspiracy. Id. (citing United States v. Consol. Packaging Corp., 575 F.2d 117, 126 (7th Cir. 1978) ("a common purpose and plan may be inferred from a development and a

4

collocation of the circumstances") (internal quotation omitted).

A discussion of the evidence in In re Vitamins is helpful. In that case, the plaintiffs alleged that the defendants "conspired to artificially inflate the price of certain vitamins and vitamin products, allocate shares of the vitamin market, predetermine sales volume in the vitamin industry, eliminate competition from non-co-conspirators, limit supply, and allocate specific customers among themselves and their co-conspirators" in the markets for several vitamin markets. 320 F. Supp. 2d at 5. Four defendants moved for summary judgment that they should be liable only with respect to the conspiracy to fix the price of choline chloride (vitamin B4), for which they did not contest liability for summary judgment purposes. Id. at 10. They alleged, however, that the choline chloride conspiracy was separate from the conspiracy to fix the prices of other vitamins, and that there was not – or at least, was not as to the moving defendants – an "all-vitamin" conspiracy.

The Court denied summary judgment as to three of the four defendants based on evidence similar to that before the Court here. With regard to defendant DuCoa, for example, the plaintiffs satisfied their burden based on just two documents, one showing an "overall market review" on an agenda for a meeting DuCoa attended and the other showing an agenda for meetings where there might be an opportunity to share plans. Id. at 21-22. Neither document showed that the meetings actually took place or what was said. For a second defendant, Bioproducts, plaintiffs carried their burden by providing information about two meetings and notes from one of those meetings that indicated knowledge by a single employee who had no designated position within the company. The employee realized that a competitor was trying to "push vitamin and choline prices up to achieve acceptable profitability[,]" recognized that "everything was interrelated," and recommended Bioproducts establish annual meetings to remain looped into "both vitamin and choline world perspectives." Id. at 22. For a third defendant, Chinook, plaintiffs carried their burden against the company with testimony by a single employee who had no designated position in the company. The employee heard a suggestion that America adopt the European "cartel type business" in the vitamins market and later learned Europe had a cartel with respect to vitamins generally. Id. at 23. The company then joined a conspiracy (allegedly) specific to only choline

5

with this knowledge. This created a genuine issue of material fact sufficient to satisfy the three-pronged test and thus deny summary judgment. Id. On the other hand, the Court granted summary judgment as to defendant UCB, where the only documentary evidence showed that UCB engaged in pro-competitive conduct – that is, negotiating with a supplier (and alleged co-conspirator) to obtain the lowest possible price on choline.

With this background, the Court now turns to the evidence the DAPs submitted in opposition to the motion, and finds it sufficient to create a triable issue of material fact.[3]

### B. Evaluation of Specific Evidence

#### 1. DAP Ex. 19

Exhibit 19 is an email exchange between Jacquelyn Taylor-Boggs of Thomson Consumer[4] and Didier Trutt of Thomson SA regarding whether subsidiary Thomson Guangdong Displays Co., Ltd. ("TGDC") should attend a "sourcing dialogue" meeting with Thomson competitor Samsung SDI ("SDI") "to exchange relevant subject matter." See ECF No. 3236-24 ("DAP Ex. 19"). Although Taylor-Boggs advises that she told TGDC personnel "absolutely no price discussions," she goes on to say that she was "not sure if [SDI] are trying to overcome shortages or just get more Thomson business info, or just benchmarking organization size and structure." Trutt responds that SDI "will be looking for all info they can get (benchmark, structure, cost, suppliers, pdt intro . . .) and my guess they are not doing it only with us" and suggests that Thomson

> should identify what we could get from this meeting, knowledge they have and we don't for eg on CDT, on SDI organization in China (sourcing, sales . . . their view of cost driver up and down on the market (oil, gaz [sic], capacity consolidation) cost squeeze well prepared we could learn few things provided we know in advance how we will make use of the info.

Id. (ellipses in original).

The most reasonable inference to be drawn from this document is that Thomson –

---

[3] This order discusses only some of the exhibits submitted by the DAPs. In light of the Court's resolution of the motion, it is not necessary to discuss each of them.

[4] The record shows that Taylor-Boggs was an employee of Thomson Consumer. See Supp. Opp'n at 4 n.8; ECF No. 3236-21 at 3 ("DAP Ex. 16" at 35:7-23).

including defendant Thomson Consumer – was interested in the market for CDTs and was prepared to discuss that market with competitors. Although Thomson Consumer did not manufacture or sell CDTs or CDT products, it had reason to be interested in the impact of the CDT market on the supply of glass, which is a crucial component of both CDTs and CPTs. At her deposition, Thomson Consumer 30(b)(6) witness Meggan Ehret acknowledged that the CDT market was relevant for Thomson SA and those of its subsidiaries involved in the CPT business, so that they could assess, and stay informed regarding, the supply of glass. ECF No. 3506-7 (Ehret Depo.) 657:1-19. And at oral argument, Thomson Consumer acknowledged that if there were a conspiracy in the CDT market to maintain prices, that by definition would have the effect of reducing the production of that good, and that would free up glass for use in the CPT market. ECF 4454 at 79.

Of course, one would expect any manufacturer to stay on top of the market for its important inputs. There is nothing wrong with Thomson Consumer seeking *public* information about the glass market. A reasonable construction of Exhibit 19, however, is that Thomson Consumer obtained confidential information from *its competitor* about their activities in a related product market as a way of gathering that information. This is evidence of knowledge, intent, and interdependence.

### 2. DAP Ex. 22

The DAPs' Exhibit 22 is an email to several persons, including Tom Carson, the head of Thomson Consumer's CPT operations, from Gilles Taldu at Thomson Multi-Media. The subject line is "Korea meeting - Oct. 2000[.]" See ECF No. 3236-27 at 2 ("DAP Ex. 22" at 2). The document begins by noting the trip was "meaningful" and "many things have changed since [the author's] trip last year. And also interesting alongside discussions with Philips. Here are my conclusions." The email mainly discusses CPTs, but expressly states that there is "[s]till growth expected for CDT, despite LCD: from 115M units in 2000 to 150M in 2004." DAP Ex. 22 at 4. Taldu also states that "Koreans are much more open to discussions/partnership" and that meeting participants will "[b]uild a lobbying case towards glass makers (and statistics offices) in order to release their reluctance for additional glass capacity." In essence, a Thomson Consumer employee

7

was made aware of an exchange of information between various competitors (who manufactured both CDTs and CPTs) as to the future growth of the CDT market.

Defendant argues that the Korea meeting was nothing more than a report on attendance at the Electronics Industry Association of Korea ("EIAK") convention, a meeting of members of the European Electronics Components Association ("EECA"), of which Thomson SA was a member. See Reply at 3-4. Defendant's construction ignores the email's references to explicit discussions about cooperation with regard to glass production, and puts the most benign gloss on the references to total CDT production. Defendant's construction may be tenable, but on this summary judgment motion, the Court is required to construe the document in the light most favorable to the DAPs. Particularly given the other evidence the DAPs have submitted, this document is evidence of knowledge, intent, and interdependence.

### 3. DAP Ex. 24

Exhibit 24 is a March 1, 2005 email from Thomson SA employee Xavier Bonjour to other employees in the Thomson corporate family, including Taylor-Boggs. ECF No. 3236-29 ("DAP Ex. 24"); Opp'n at 7 n.21. In it, Bonjour summarized information he gathered "[d]uring a short meeting with my counterpart at SDI," ECF No. 3236-29 at 2, including the following:

- SDI Berlin's 2004 profit was $20,000,000 and SDI Hungary's profit was $40,000,000, but "profit went down by 50% in H2" and "[s]ituation worsening rapidly in Hi-05."

- "SDI will close at least one line in [B]erlin Ql-2006. They are considering to shut down the whole factory at the same time. Final decision to be taken in Q3-05."

- "SDI has started restructuring in Korea. They are shutting down one CDT line in their Suwon factory this quarter and the whole factory by the year end. Then they plan to shut down one line a year."

- "Asset amortization brought down to 5 years in China in Q4-04."

Id. The memorandum also contains much other confidential and non-public information that appears to relate to the CPT market.

This document helps satisfy the In re Vitamins test. It shows that Thomson SA personnel shared non-public, competitive information with Thomson Consumer regarding both the CPT and CDT markets. In the absence of an "all-CRT" conspiracy, SDI had no legitimate reason to discuss

8

CDT sales with Thomson given Thomson's absence from the CDT market. This email suggests there was improper information sharing between Thomson SA and Samsung SDI, and that Thomson SA passed that information along to Thomson Consumer.

### 4. DAP Ex. 32

Exhibit 32 is a memorandum from R.K. Lorch copied to J.R. Hirschler, an employee of Thomson Consumer. See Opp'n at 9 n.31; ECF No. 3236-36 ("DAP Ex. 32"). The memorandum discusses "South American Market Status[.]" In its discussion of the situation in Brazil, it states that:

> [t]o reduce Samsung competition Philips <u>paid Samsung $26 Million</u> to convert their 2 lines in Manaus to make mostly CDT and reduce CPT price pressure. Samsung full capacity is 4.0M units with a product range of 14" - 20" CDT and 19V CPT. The old idea of consortium for Tubes/Glass capacity increases has been abolished by BNDES. TMM/ATO[5] face an uphill challenge in 2000 and thereafter due to the monopolistic practices of Philips with their heavy concentration of tube/glass capacity coupled with a weakened and "bribed" Samsung making mostly CDT. Philips is undercutting Thomson pricing . . . . Of course at the same time we are raising price [sic] and reducing terms.

DAP Ex. 32 (emphasis in original). The reference to a "consortium" is evidence of a collusive relationship among some of the producers of CDTs. The exhibit is also clear that Philips "bribed" SDI to reduce the latter's capacity to produce CDTs and "reduce CPT price pressure." This is anticompetitive behavior. That Thomson Consumer received this information helps satisfy the <u>Vitamin</u> test – not only by showing knowledge of the all-CRT conspiracy and intent to join it, but by demonstrating the effect on Thomson Consumer as it relates to "glass capacity." Moreover, Thomson recognizes that its prices were being undercut yet it is "at the same time *raising price[s]*" – behavior that makes no sense in a competitive world.

### 5. DAP Exhibit 50

Exhibit 50 is an email from Thomson Consumer employee Taylor-Boggs to Trutt. ECF No. 3506-9. In it, Taylor-Boggs notes that an attachment (which is not included in the exhibit) "is the latest presentation we received from Asahi to forecast the CPT *and CDT* market." Id. at 2

---

[5] "TMM" is Thomson Multimedia, part of Thomson SA. ATO is part of Thomson Consumer.

(emphasis added). Taylor-Boggs also states that "[g]lass supply is tight as new investments go towards flat panel production, mask invar is declining in production, and more suppliers are consolidating plants." Id. at 1. Again, Thomson Consumer received information about CDTs, and a reasonable inference is that it did so because it wanted information about the glass supply. This document is evidence regarding the knowledge and interdependence prongs of the In re Vitamins test.

### C.   Considering the Exhibits Collectively

Viewing the DAPs' evidence as a whole,[6] the Court finds that the DAPs have submitted sufficient evidence to create a triable issue of material fact regarding whether there was an "all-CRT" conspiracy, with respect each prong of the In re Vitamins test.

## CONCLUSION

Thomson Consumer's motion for summary judgment is DENIED.

IT IS SO ORDERED.

Dated: October 6, 2016

JON S. TIGAR
United States District Judge

---

[6] See supra n.3.