Exhibit C

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | |
|---|---|
| THE STATE OF ILLINOIS,<br>by its Attorney General, Lisa Madigan<br><br>       Plaintiff,<br><br>vs.<br><br>HITACHI LTD.,<br>HITACHI DISPLAYS, LTD.,<br>HITAHI ELECTRONIC DEVICES (USA) INC.,<br>LG ELECTRONICS, INC.,<br>LG ELECTRONICS USA., INC.<br>LG ELECTRONICS TAIWAN TAIPEI CO., LTD.,<br>PANASONIC CORPORATION,<br>MATSHUSITA ELECTRONIC INDUSTRIAL CO. M., LTD.<br>PANSONIC CORP. OF NORTH AMERICA,<br>MT PICTURE DISPLAY, CO., LTD.,<br>KONINKLIJKE PHILIPS ELECTRONICS N.V.<br>PHILIPS ELECTRONICS NORTH AMERICAN CORP.<br>PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD.<br>SAMSUNG DISPLAY DEVICE CO., LTD,<br>SAMSUNG SDI AMERICA, INC,<br>TOSHIBA CORPORATION<br>TOSHIBA AMERICA. INC.<br>TOSHIBA AMERICA INFORMATION SYSTEMS INC.<br>TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC.,<br><br>       Defendants. | Hon. Rita M. Novak<br><br>No. 12 CH 35266<br><br><br>Injunction<br><br><br>Demand for Jury Trial |

## AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, the State of Illinois, complains against Defendants for violating the Illinois

Antitrust Act, 740 ILCS 10/1 *et seq.*, and alleges as follows:

## I.  **Introduction:**

1.     Defendants manufacture and sell Cathode Ray Tubes ("CRTs") and CRT products to customers in the United States.  Defendants agreed to fix, raise, maintain, and stabilize the price, while also limiting the production, of their CRTs from at least March 1, 1995 until at least November 25, 2007 ("Conspiracy Period").  During the Conspiracy Period, Defendants charged unlawfully inflated prices for CRTs.

2.     During the Conspiracy Period, the Defendants' conduct resulted in higher prices for CRTs than would exist in a competitive market.  Defendants' CRTs were incorporated into CRT products, such as televisions and computer monitors.  A portion of the inflated prices for the CRTs was passed on to end-users who include the State of Illinois, its agencies, and Illinois residents that purchased CRTs and CRT products.  The higher prices for CRTs injured consumers in the United States, including in Illinois.

3.     Illinois Attorney General Lisa Madigan brings this action for injunctive relief, civil penalties, and damages for overcharges on behalf of the State of Illinois, both as a purchaser of CRTs and CRT products and as *parens patriae* on behalf of Illinois residents who purchased CRTs and CRT products.

## II.     Jurisdiction and Venue

4.     Jurisdiction is proper under 735 ILL. COMP. STAT. 5/2-209(a) and (b) because the Defendants conducted business in Illinois or transacted business in Illinois from which this action arises.

5.     Venue is proper under 735 ILL. COMP. STAT. 5/2-101 because part of the transaction out of which this cause of action arises occurred in Cook County, Illinois.

6.     Defendants' conduct involved import trade and import commerce within the meaning of Section 5(14) of the Illinois Antitrust Act.  740 ILL. COMP. STAT. 10/1 *et seq.*

7.     Defendants conspired on the price and output of CRTs that were imported into the United States.  Defendants specifically targeted the United States market for selling their price-fixed CRTs.

8.     Defendants knew, intended, and expected that many of their CRTs would be incorporated into CRT products, imported into the United States and ultimately sold to Illinois customers.

9.     Defendants knew that price-fixing CRTs would increase the prices of CRT products in the United States, including Illinois.

10.    Defendants established subsidiaries in the United States.

11.    Defendants' price-fixing conspiracy had a direct, substantial, and reasonably foreseeable impact on import trade or import commerce: fewer imported CRTs and CRT products sold at higher prices in the United States.

12.    Higher prices for U.S. consumers gives rise to the claims alleged in this Complaint under Section 3 of the Illinois Antitrust Act: the State of Illinois seeks recovery for the higher prices resulting from Defendants' price-fixing conspiracy that the State of Illinois, its agencies, and its residents paid.

## III.   Parties

### A. The State of Illinois

13.    The Illinois Attorney General Lisa Madigan brings this Complaint under her statutory and common law authority to represent the Plaintiff, the State of Illinois, under Section

7 of the Illinois Antitrust Act. 740 ILL. COMP. STAT. 10/7. The Attorney General has the authority to seek several remedies:

    a.    Injunctive relief pursuant to Section 7(1): "The Attorney General . . . shall bring suit in the Circuit Court to prevent and restrain violations of Section 3 of this Act."

    b.    Civil penalties pursuant to Section 7(4): "In lieu of any criminal penalty . . . , the Attorney General may bring an action in the name and on behalf of the people of the State against any . . . corporation, domestic or foreign, to recover a penalty not to exceed $1,000,000 . . . for any act herein declared illegal."

    c.    Treble damages for the State of Illinois and its agencies pursuant to Section 7(2): "The Attorney General may bring an action on behalf of this State . . . to recover the damages under this subsection[.]"

    d.    Treble damages for consumers pursuant to Section 7(2): "The Attorney General may also bring an action in the name of this State, as *parens patriae* on behalf of persons residing in this State, to recover the damages under this subsection … "

**B. Hitachi**

14.    Defendant **Hitachi, Ltd.** ("Hitachi") is a Japanese corporation with its principal place of business at 6-1 Marunounchi Center Building 13F, Chiyoda-ku, Tokyo 100-8280, Japan.

15.    Defendant **Hitachi Displays Ltd.,** n/k/a Japan Displays, Inc., "(Hitachi Displays") is a wholly-owned subsidiary of Hitachi. It is a Japanese corporation headquartered at 5F 6-2 Kanda Neribei-cho 3 Chiyoda-ku Tokyo, 101-0022 Japan. Defendant Hitachi Displays conducted the planning, development, manufacturing, design, and sales of CRTs for Defendant Hitachi.

16.     Co-conspirator **Hitachi America, Ltd**. ("Hitachi America"), a New York corporation  headquartered at 50 Prospect Ave., Tarrytown, NY 10591, is a wholly-owned subsidiary of Hitachi.  Defendant Hitachi dictated and controlled the day-to-day activities of Defendant Hitachi America related to the allegations in this Complaint.

17.     Defendant **Hitachi Electronic Devices (USA), Inc.** n/k/a KOE Americas, Inc., ("Hitachi USA") a Delaware corporation with its principal place of business at 1000 Hurricane Shoals Road, Ste. D-100, Lawrenceville, GA 30043, is a wholly-owned subsidiary of Hitachi America. Hitachi and Hitachi America dictated and controlled the day-to-day activities of Defendant Hitachi USA related to the allegations in this Complaint.

18.     During the Conspiracy Period, Defendants Hitachi, Hitachi Displays, Hitachi USA, and affiliated co-conspirators, Hitachi America, Hitachi Asia, and Hitachi Shenzhen, either directly, or through their subsidiaries or affiliates, distributed, manufactured, marketed, or sold price-fixed CRTs to customers throughout the United States, including Illinois. Each of these entities did business directly or through agents or alter egos in Illinois at the time of the filing of the original complaint or otherwise targeted the Illinois market or purposefully availed themselves of the Illinois market for various products.

C.     **LG Electronics**

19.     Defendant **LG Electronics, Inc**. ("LG") is a South Korean corporation with its principal place of business at LG Twin Towers, 20 Yeouido-dong, Yeoungdeungpo-gu, Seoul 150-721, South Korea.

20.     Defendant **LG Electronics U.S.A., Inc.** ("LG U.S.A.") is a wholly-owned subsidiary of LG.  LG U.S.A. is a Delaware corporation with its principal place of business

located at 1000 Sylvan Avenue, Englewood Cliffs, NJ 07632. LG, directed and controlled the day-to day activities of LG U.S.A related to the allegations in this complaint.

21.     Defendant **LG Electronics Taiwan Taipei Co., Ltd.** ("LG Taiwan") is a Taiwanese corporation and is a wholly-owned subsidiary of LG. Its principal place of business is located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan. LG directed the day-to day activities of LG Taiwan related to the allegations in this complaint.

22.     During the Conspiracy Period, Defendants LG, LG U.S.A., and LG Taiwan, either directly, or through their subsidiaries and affiliates, distributed, manufactured, marketed, or sold price-fixed CRTs to customers throughout the United States, including Illinois. Each of these entities did business directly or through agents or alter egos in Illinois at the time of the filing of the original complaint or otherwise targeted the Illinois market or purposefully availed themselves of the Illinois market for various products.

D.     **Panasonic**

23.     Defendant **Panasonic Corporation** is a Japanese entity with its principal place of business at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. Until 2008, Panasonic was known as Defendant **Matsushita Electric Industrial Co., Ltd.** ("Matsushita").

24.     In approximately 2002, Defendants Panasonic and Defendant Toshiba Corporation entered into a joint venture and created Defendant **MT Picture Display Co., Ltd.** ("MT Picture Display"). MT Picture Display is a Japanese entity with its principal place of business at 1-1, Saiwai-cho, Takatsuki-shi, Osaka 569-1193, Japan.

25.     Defendant Panasonic purchased the remainder of the joint venture on approximately April 3, 2007 making MT Picture Display a wholly-owned subsidiary of Panasonic.

26.     Defendant **Panasonic Corporation of North America** ("Panasonic NA"), is a Delaware corporation with its principal place of business at One Panasonic Way, Secaucus, New Jersey 07094.  Panasonic directed and controlled the day-to-day activities of Panasonic NA related to the allegations in this Complaint.

27.     During the Conspiracy Period, Defendants Panasonic, Panasonic NA, Matsushita, and MT Picture Display, either directly, or through their subsidiaries or affiliates, distributed, manufactured, marketed, or sold CRTs to customers throughout the United States, including Illinois. Each of these entities did business directly or through agents or alter egos in Illinois at the time of the filing of the original complaint or otherwise targeted the Illinois market or purposefully availed themselves of the Illinois market for various products.

E.      **Philips**

28.     Defendant **Koninklijke Philips Electronics N.V.** ("Philips"), also known as Royal Philips Electronics N.V., is a Dutch corporation.  Its principal place of business is located at Amstelplein 2, Breitner Center, 1070 MX Amsterdam, The Netherlands.

29.     Defendant **Philips Electronics North American Corporation** ("Philips NA"), is a Delaware corporation and has its principal place of business at 1251 Avenue of the Americas, New York, NY 10020-1104.  Philips NA is a subsidiary of Philips.  Defendant Philips directed and controlled the day-to-day activities of Defendant Phillips NA related to the allegations in this Complaint.

30.     Defendant **Philips Electronics Industries (Taiwan), Ltd**. ("Philips Taiwan") is a Taiwanese corporation and is a wholly-owned subsidiary of Philips.  Its principal place of business is located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Defendant

Philips directed and controlled the day-to-day activities of Philips Taiwan related to the allegations in this Complaint.

31.     During the Conspiracy Period, Defendants Philips, Philips NA, and Philips Taiwan, either directly or indirectly through their subsidiaries and affiliates, distributed, manufactured, marketed, or sold CRTs to customers throughout the United States, including Illinois. Each of these entities did business directly or through agents or alter egos in Illinois at the time of the filing of the original complaint or otherwise targeted the Illinois market or purposefully availed themselves of the Illinois market for various products.

F.     **Samsung**

32.     Co-conspirator **Samsung Electronics Co, Ltd.** ("Samsung") is a South Korean corporation with its principal place of business located at Samsung Main Building, 250, 2-ga, Taepyong-ro, Jung-gu, Seoul 100-742, South Korea.

33.     Co-conspirator **Samsung Electronics America, Inc.** ("Samsung America"), a New York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660, is a wholly-owned subsidiary of Samsung. Defendant Samsung directed and controlled the day-to-day activities of Samsung America related to the allegations in this complaint.

34.     Defendant **Samsung Display Device Co., Ltd.** ("Samsung SDI") is a South Korean company with its principle place of business located at 150, 2-ga, Taepyong-ro, Jung-gu, Seoul, 100-716, South Korea. Defendant Samsung directed and controlled the day-to-day activities of Samsung SDI related to the allegations in this Complaint.

35.     Samsung SDI pled guilty and agreed to pay thirty-two million dollars in a criminal fine for its role in fixing CRT prices and reducing CRT output. In its plea, Samsung

SDI admitted to participating in the conspiracy between 1997 and at least until 2006, and to agreeing to fix prices, decrease output, and sharing confidential information with other Defendants.

36.     Defendant **Samsung SDI America, Inc.** ("Samsung SDI America"), a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California, is a wholly-owned subsidiary of Defendant Samsung SDI.  Defendants Samsung and Samsung SDI directed and controlled the day-to-da activities of Samsung SDI America related to the allegations in this Complaint.

37.     During the Conspiracy Period, Defendants Samsung SDI, Samsung SDI America and affiliate co-conspirators, Samsung, Samsung America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung Shenzhen, Samsung SDI Tianjin, and Samsung SDI Malaysia, either directly or through their subsidiaries and affiliates,  distributed, manufactured, marketed, or sold CRTs to customers throughout the United States, including Illinois.

G.     **Toshiba**

38.     Defendant **Toshiba Corporation** ("Toshiba") is a Japanese corporation with its principal place of business at 1-1, Shibaura 1-chrome, Minato-ku, Tokyo 105-8001, Japan.

39.     Defendant **Toshiba America, Inc.** ("Toshiba America"), a Delaware corporation with its principal place of business at 1251 Avenue of the Americas, Suite 4110, New York, NY 10020, is a wholly-owned subsidiary of Toshiba. Toshiba directed and controlled the day-to-day activities of Toshiba America related to the allegations in this Complaint.

40.     Co-conspirator **Toshiba America Consumer Products, LLC** ("TACP"), with its principal place of business located at 82 Totawa Road, Wayne, New Jersey 07470-3114, is a

wholly-owned subsidiary of Toshiba. Toshiba, through Toshiba America, directed and controlled the day-to-day activities of TACP related to the allegations in this Complaint.

41.    Defendant **Toshiba America Information Systems, Inc.** ("TAIS"), is a California corporation with its principal place of business at 9740 Irvine Blvd, Irvine, California 92718. TAIS is a wholly-owned subsidiary of Toshiba America. Toshiba, through Toshiba America, directed and controlled day-to-day activities of TAIS related to the allegations in this Complaint.

42.    Defendant **Toshiba America Electronic Components, Inc.** ("TAEC"), is a California corporation with its principal place of business at 19000 MacArthur Boulevard, Suite 400, Irvine, California 92612. It is a subsidiary of Toshiba America. Toshiba, through Toshiba America, directed and controlled the day-to-day activities of TAEC related to the allegations in this Complaint.

43.    During the Conspiracy Period, Toshiba, Toshiba America, TACP, TAIS, and TAEC, either directly, or through their subsidiaries and affiliates, distributed, manufactured, marketed, or sold CRTs to customers throughout the United States, including Illinois. Each of these entities did business directly or through agents or alter egos in Illinois at the time of the filing of the original complaint or otherwise targeted the Illinois market or purposefully availed themselves of the Illinois market for various products.

H.    **Co-Conspirators**

44.    There are various other co-conspirators, persons, and firms that participated with Defendants and performed acts that furthered the anticompetitive conduct:

45.    **Tatung Company** ("Tatung") is a Taiwanese corporation headquartered at 22, Sec.3, Chung-Shan N.Rd., Taipei, Taiwan. Tatung owns half of subsidiary **Tatung Company of**

**America, Inc.** ("Tatung America"), a California corporation with its principal place of business at 2850 El Presidio Street, Long Beach, California 90810. During the Conspiracy Period, Tatung and Tatung America distributed, manufactured, marketed, or sold CRTs to customers throughout the United States, including Illinois.

46.     **Chungwha Picture Tubes** ("Chungwha") is a Taiwanese corporation with its principle place of business at 1127, Heping Rd., Bade City, Taoyuan, Taiwan.

47.     On February 10, 2009, a grand jury in San Francisco indicted the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin,  on two counts for his involvement in the conspiracy to fix prices, reduce output, and allocate market share for CRTs.

48.     **Chunghwa Picture Tubes (Malaysia) Sdn. Bhd.** ("CPT Malaysia"), a Malaysian company with its principal place of business at Lot 1, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia, is a wholly-owned subsidiary of Chunghwa.

49.     During the Conspiracy Period, Chungwha and Chungwha Malaysia distributed, manufactured, marketed, or sold CRTs to customers throughout the United States, including Illinois.

50.     **Samtel Color, Ltd.** ("Samtel") is an Indian Company, with its principal place of business at 52, Community Centre, New Friends Colony, New Delhi -110065. During the Conspiracy Period, Samtel distributed, manufactured, marketed, or sold CRTs to customers throughout the United States, including Illinois.

51.     **Thai CRT Company, Ltd**. ("Thai CRT") is a Taiwanese company and a subsidiary of Siam Cement Group.  Its principal place of business is 1/F Siam Cement Road, Bangsue Dusit, Bangkok, Thailand.  During the Conspiracy Period, Thai CRT distributed,

manufactured, marketed, or sold CRTs to customers throughout the United States, including Illinois.

52.   **Orion Electric Company** ("Orion") was a wholly-owned subsidiary of the Daewoo Group, a South Korean corporation. Orion filed for bankruptcy in 2004.

53.   During the Conspiracy period, Orion manufactured, marketed and sold CRTs to customers throughout the United States, including Illinois.

54.   **IRICO Group Corporation** ("IGC") is a Chinese corporation with its principal place of business at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021, China.

55.   **IRICO Display Devices Co., Ltd.** ("IDDC"), a Chinese corporation with its principal place of business at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075, China, is a wholly-owned subsidiary of IGC.

56.   Defendant **IRICO Group Electronics Co., Ltd.** ("IGE"), a Chinese corporation with its principal place of business at 1 Caihong Rd., Xianyang City, Shaanxi province 712021, China, is a wholly–owned subsidiary of IGC.

57.   During the Conspiracy Period, IGC, IDDC, and IGE either directly or through their subsidiaries or affiliates distributed, manufactured, marketed, or sold price-fixed CRTs to customers throughout the United States, including Illinois.

58.   **Hitachi Asia, Ltd.** ("Hitachi Asia"), a Singapore company with its principal place of business at 16 Collyer Quay, #20-00 Hitachi Tower, Singapore 049318 is a wholly-owned subsidiary of Hitachi. Defendant Hitachi directed and controlled the day-to-day activities of Hitachi Asia related to the allegations in this Complaint.

59.   **Shenzhen SEG Hitachi Color Display Devices, Ltd.** ("Hitachi Shenzhen"), is a Chinese corporation with its principal place of business at 5001 Huanggang Road, Futian

District, Shenzhen 518035, China. Defendants Hitachi and Hitachi Displays directed and controlled the day-to-day activities of Hitachi Shenzhen related to the allegations in this Complaint.

      60.    **SDI Mexico S.A. de C.V**. ("Samsung SDI Mexico"), a Mexican corporation with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico, is a wholly-owned subsidiary of Defendant Samsung SDI. Samsung and Samsung SDI directed and controlled the day-to-day activities of Samsung SDI Mexico related to the allegations in this Complaint.

      61.    **SDI Brasil Ltda.** ("Samsung SDI Brazil"), a Brazilian corporation with its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480, Manaus, Amazonas, Brazil, is a wholly-owned subsidiary of Defendant Samsung SDI. Samsung and Samsung SDI directed and controlled the day-to-day activities of Samsung SDI Brazil related to the allegations in this Complaint.

      62.    **Shenzhen Samsung SDI Co., Ltd.** ("Samsung SDI Shenzhen"), a Chinese corporation with its principal place of business at Huanggang Bei Lu, Futian Gu, Shenzhen, China is a wholly-owned subsidiary of Defendant Samsung SDI. Samsung and Samsung SDI directed and controlled the day-to-day activities of Samsung SDI Shenzhen related to the allegations in this Complaint.

      63.    **Samsung SDI Sdn. Bhd**. ("Samsung SDI Malaysia"), a Malaysian corporation with its principal place of business at Lot 635 & 660, Kawasan Perindustrian, Tuanku, Jaafar, 71450 Sungai Gadut, Negeri Semblian Darul Khusus, Malaysia, is a wholly-owned subsidiary of Defendant Samsung SDI. Samsung and Samsung SDI directed and controlled the day-to-day activities of Samsung SDI Malyasia related to the allegations in this Complaint.

64.     **Tianjin Samsung SDI Co., Ltd.** ("Samsung SDI Tianjin"), a Chinese corporation with its principal place of business at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China, is a wholly-owned subsidiary of Defendant Samsung SDI.  Samsung and Samsung SDI directed and controlled the day-to-day activities of Samsung SDI Tianjin related to the allegations in this Complaint.

65.     **LP Displays International, Ltd**, also known as LG Philips Displays ("LP Displays") is a Chinese corporation with its principal place of business at ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.

66.     LP Displays was formed in 2001 as a joint venture between Defendants Royal Phillips and LG.  In 2007, Defendant LP Displays became an independent company.

67.     During the Conspiracy Period, LP Displays, either directly, or through its subsidiaries and affiliates, distributed, manufactured, marketed, or sold price-fixed CRTs to customers throughout the United States, including Illinois.

68.     **Beijing-Matsushita Color CRT Company, Ltd. ("BMCC")**  is a Chinese corporation headquartered at No. 9 Jiuxianqiaobei Rd., Dashanzi Chaoyang, Bejing, 100015, China. During the Conspiracy Period, BMCC, either directly, or through its subsidiaries and affiliates, distributed, manufactured, marketed, or sold price-fixed CRTs to customers throughout the United States, including Illinois.

69.     **Thomson SA,** n/k/a Technicolor SA, ("Thomson") is a French corporation headquartered at 1-5 rue Jeanne d'Arc, Issy-Les-Moulineaux, 92130, France.

70.     **Thomson Consumer Electronics, Inc.,** n/k/a Technicolor USA, Inc. ("TCEI") is a Delaware corporation, headquartered at 10330 North Meridian Street, Indianapolis, IN 46290.

71.     During the conspiracy period, Thomson and TCEI, either directly, or through their subsidiaries or affiliates, distributed, manufactured, marketed, or sold price-fixed CRTs to customers throughout the United States, including Illinois.

72.     **Mitsubishi Electric Corp.,** ("Mitsubishi") is a Japanese corporation headquartered at 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.

73.     **Mitsubishi Digital Electronics America, Inc.,** ("MDEA") is a California corporation headquartered at 9351 Jeronimo Road, Irvine, CA 92618.

74.     **Mitsubishi Electric & Electronics, USA, Inc.** ("MEEU") is a Delaware corporation, headquartered at 5665 Plaza Drive Cypress, CA 90630.

75.     During the conspiracy period, Mitsubishi, MDEA, and MEEU, either directly, or through their subsidiaries or affiliates, distributed, manufactured, marketed, or sold price-fixed CRTs to customers throughout the United States, including Illinois.

76.     **Videocon Industries, Ltd.** ("Videocon") is an Indian corporation, headquartered at 14 KM Stone, Aurangabad-Paithan Road, Village Chittegaon, Aurangabad District, Maharashtra, India.

77.     During the conspiracy period, Videocon, either directly, or through its subsidiaries or affiliates, distributed, manufactured, marketed, or sold price-fixed CRTs to customers throughout the United States, including Illinois.

78.     Some of the co-conspirators are currently unknown and the Attorney General reserves the right to name some or all of these entities as Defendants or co-conspirators at a subsequent date.

79.     Whenever this Complaint makes a reference to any act, deed, or transaction committed by any corporation, the allegation means that the corporation engaged in the act,

deed, or transaction by or through its officers, directors, agents, employees, or representatives while the individuals were actively engaged in the management, direction, control, or transaction of the corporation's business affairs.

80. Each of the Defendants named in the Complaint acted as the agent of the other Defendants with respect to the acts, violations, and common course of conducted alleged in this Complaint.

### IV. **Background**

81. A Cathode Ray Tube is a piece of technology used in televisions and computer monitors. It is a vacuum tube, consisting of one or more electron guns, which emit electron beams. The beams include primary colors, red, green, and blue. The CRT creates an image on a screen by controlling the intensity of the electron beams.

82. There are two types of CRTs: CDTs and CPTs. CDTs, or color display tubes, are used in a computer monitors. CPTs, or color picture tubes, are used in television monitors. CDTs require a higher resolution than CPTs. Both CPTs and CDTs are made in various standard sizes and specifications.

83. CRT products are the televisions and computer monitors that CRTs are incorporated into. CRTs have no value outside of the products they are incorporated into. The demand for CRTs, therefore, derives directly from the demand for CRT products.

84. CRTs were marketed and sold to manufacturers or assemblers of CRT products. CRT customers included JVP, Proview, HP, Dell, Apple, Acer, IBM, and Gateway.

85. The sale of CRTs during the Conspiracy Period resulted in billons of dollars of profits for the Defendants.

86. The CRT market has structural characteristics that increase the probability of collusive activity, including: significant barriers to entry, interchangeable products, and many opportunities to discuss or exchange competitively-sensitive information with competitors.

87. There were significant barriers to entry for new firms attempting to enter the CRT market. A new firm that attempted to enter the CRT market during the Conspiracy Period would need substantial time, resources, and industry sophistication.

88. Also, during the Conspiracy Period, the CRT market experienced low profit margins due to declining product demand. TFT-LCDs and Plasma Displays began to out-compete conventional CRT televisions and monitors by providing better product quality. With the advances of these new technologies, new firms did not have an incentive to enter the CRT industry.

89. CRTs were interchangeable. Sizes, quality, and specifications for CRTs were standard across the industry. Thus, consumers were unable to differentiate CRTs produced by different Defendants.

90. Defendants had many opportunities to share information with each other. During the conspiracy, several of the Defendants belonged to trade associations such as, the Society of Information Display, Korea Display Industry Association, and the Electronic Display Industrial Research Association. Common membership in trade organizations provided Defendants with ample opportunities to discuss confidential information about CRT pricing and production.

## V.     **Defendants Engaged in Illegal Conduct.**

91. From at least March 1, 1995 through at least November 25, 2007, the Defendants and their co-conspirators engaged in a conspiracy to stabilize and increase prices for CRTs.

92.     During the Conspiracy Period, Defendants agreed, combined, and conspired to fix prices and limit the output of CRTs sold throughout the United States, including Illinois.

93.     During approximately 1995 and 1996, Defendants used bilateral and trilateral communications as the primary method to engage in their conspiracy.  Meetings to discuss CRT prices, both generally and for specific customers, took place between several Defendants and co-conspirators: Orion; LG; Samsung; Philips; Chunghwa; Thai CRT; Hitachi; Toshiba; and Panasonic. They met in several locations including, China, Japan, Indonesia, Malaysia, Taiwan, Thailand, Singapore, South Korea, and the U.K.

94.     One of the first CRT conspiracy bilateral discussions was between Samsung Malaysia and Chunghwa Malaysia on March 22, 1995. During that meeting, representatives from the two companies exchanged detailed production information for specific sizes of CRTs and for specific customers.

95.     There were at least 15 of these bilateral and trilateral meetings between the Defendants and co-conspirators in 1995, and at least 40 in 1996.

96.     Beginning around 1997, as more Defendants became involved in the bilateral and trilateral meetings and the frequency of meetings increased, defendants became more organized and formalized their meetings.  They began to meet in larger groups. The Defendants referred to the group meetings as "Glass Meetings" or Glass Supplier Meetings ("GSM").

97.     During these meetings Defendants and their co-conspirators:

- exchanged competitive information including: prices for CRTs, sales volumes, inventory levels, production capacity, shipments, exports, custom orders, customer demands, price trends, and future predictions regarding CRTs;

- agreed on CRT prices and ranges, including price ranges for specific customers;

- agreed to differentiate prices on various CRT attributes, such as quality or technical specifications;

- discussed and agreed upon the amount of CRTs each would produce;

- allocated both overall market shares and market shares for particular customers;

- agreed on a method of auditing each other's factories to ensure compliance with their production agreements;

- agreed on what to inform customers regarding the price increases and coordinated their public statements regarding capacity and supply;

- agreed on the prices to charge their own corporate subsidiaries and affiliates that manufactured televisions and computer monitors.  By charging their own subsidiaries higher prices, Defendants were able to garner support to charge other original equipment manufacturers higher prices.

98.    At each meeting, participants updated the information they had provided on their price and production of CRTs at the previous meeting to the individual designated as the "Chairman." The position of Chairman was held by one individual for a one-year term that rotated among the Defendants.

99.    The "Chairman" would write the information on a white board. The participants used the information on the white board to discuss what price to charge customers and the production amounts for the following months.

100.    Defendants agreed to coordinate with competitors that did not attend the group meetings by communicating the price and production agreements made during the glass meetings, and soliciting their participation in the agreements.

101.    In order to limit non-compliance with their agreements, the Defendants conducted factory audits of each other's factories, addressed alleged violations during the group meetings, and affirmed their mutual interests to work together to maintain and increase CRT prices.

102.    There were several types of conspiracy meetings: Glass meetings, Chinese glass meetings, Green meetings, and Bilateral meetings.

A.    **Glass Meetings**

103.    The Glass meetings were the most frequent type and had three levels:1) Top meetings; 2) Management meetings; and 3) Working-level meetings.

104.    LG, Hitachi, Samsung Display, LP Displays, Toshiba, Panasonic, MT Picture Display, Matsushita, Philips, Orion, BMCC, IRICO and Thai CRT were among the attendees at the glass meetings.

### *1. Top Meetings*

105.    The Top meetings were attended by high-ranking executives of the Defendants. This group included CEOs, Vice Presidents, and Presidents. They met quarterly to enter long-term price and production agreements and to enforce the price-fixing agreements by resolving disputes amongst the conspirators.

106.    The representatives at the Top Meetings had the most authority and reliable information. Thus, these Meetings often resulted in price, production, and customer allocation agreements.

### *2. Management Meetings*

107.    The Management meetings were attended by high-level sales executives of the Defendants. They held management meetings monthly to implement the price and production agreements made by the Defendants during the Top meetings.

### 3. Working Level Meetings

108.    Lower-level sales and marketing employees attended Working Level meetings. Working Level meetings occurred on a weekly or monthly basis.  The meetings were more regional and occurred near the Defendants' factories.

109.    At these meetings, the less senior employees exchanged and discussed price and production data.  They would then provide the information to their superiors who often signed the meeting notes and provided their own comments.

B.    **Chinese Glass Meetings**

110.    The Chinese Glass Meetings began in 1998 and occurred in China on a monthly basis after a top or management Meeting.

111.    At these meetings, the Defendants reported the agreements made at the most recent top or management meetings.

112.    IRICO, Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, BMCC and Chunghwa were among the attendees at these meetings.

C.    **Green Meetings**

113.    Defendants also attended "Grass Meetings" or "Green Meetings," so named because they were held on golf courses.

114.    Defendants' top and management level employees attended these meetings.

115.    Defendants held Green meetings in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia.

**D.     Bilateral Meetings**

116.    During the Conspiracy Period, Defendants also engaged in bilateral meetings that were more informal than the Glass Meetings. The Defendants conducted these meetings in person, on the phone, and through email.

117.    The bilateral meetings occurred between the Defendants' sales and marketing employees.

118.    After conducting a top or management meeting, Defendants used the bilateral meetings to exchange information and to convey the agreed CRT price and output.

119.    Defendants used the bilateral meetings to coordinate prices with competitors that did not frequently attend the Glass Meetings such as: Hitachi; Toshiba; Thai CRT; and Samtel.

120.    Each glass meeting participant was assigned an absent company to communicate with:

- Samsung communicated the CRT agreements to Hitachi.

- LG communicated the CRT agreements to Toshiba.

- Thai CRT communicated the CRT agreements to Samtel.

121.    For example, at a November 23, 1996 glass meeting, participants reported that Samsung and Chunghwa were successful in persuading Hitachi from lowering the market price.


# VI.   Defendants' Individual Participation in Illegal Agreements

122.    The following examples are illustrative, but not exhaustive of the Defendants conspiracy communications:

123.    On May 29, 1995, LG and Chungwha held a meeting where they exchanged information and discussed a price increase for CRTs.  LG indicated that it was visiting all of the

CRT manufacturers in Thailand, Malaysia, and Singapore to determine whether a price increase was possible.

124.    During a November 25, 1996 meeting between Hitachi Asia, Samsung Display, and Chunghwa, the participants discussed CDT production levels. They implemented a bottom price for 14" CDTs, and Hitachi was encouraged to keep the price of CDTs from falling.  They also discussed prices to particular customers.  When Hitachi's representative expressed reluctance to attend the next group meeting, Chunghwa and Samsung agreed to come to Hitachi directly and explain the agreements made at the next meeting.

125.    At a January 28th, 1997 glass meeting, CDT producers, including Samsung, Philips, Orion, and Chunghwa, discussed their common understanding to guard the bottom line on prices.

126.    At a glass meeting on February 27, 1997 Samsung, LG, Philips, and Chunghwa agreed to bottom-line prices for 14" and 15" CDTs and agreed on a date to implement their agreed price increases.

127.    At a March 26, 1997 glass meeting, Samsung Display, Philips, and Chunghwa reached a common understanding that the price for 15" CDTs should be increased, and that they should show resolve in order to push the Japanese CDT manufacturers to follow the price increase.  They insisted on mutual trust among each other in order to successfully increase prices.

128.    During two glass meetings held on September 7 and 8, 1997, Samsung, LG, Orion, Chunghwa, and Thai CRT exchanged production information and reached common understandings for the bottom price of CRTs and to decrease production.

129.    In an August 5, 1998 China meeting between Samsung, Philips, BMCC, IRICO and Chunghwa, each participant exchanged its upcoming production plans and re-enforced previously made agreements to follow the bottom-line price.

130.    At a March 19, 2001 meeting between Samsung, LG, Orion, and Philips, the attendees agreed to maintain a price differential of $14 between 17" regular and flat CRTs. They also agreed and reported on the number of days each manufacturer would cut production of CRTs. Orion confirmed that it would report its planned production stoppage later.

131.    At a January 4, 2002 meeting, attendees, Samsung, LP Displays, Orion, and Chunghwa, discussed the prices they set for several different sizes of CRTs. They agreed that the prices quoted to other CRT manufactures for internal delivery, would not be below the bottom-line prices quoted to other customers.

132.    Toshiba called a meeting for CPT producers which was held on September 13, 2002. Attending were, Toshiba, Thai CRT, LP Displays, Samsung, and Chunghwa. They discussed and agreed on prices for particular CPT screens and to particular customers.

133.    In March 2004, several Defendants met in Korea to discuss increasing the price of CDTs. They agreed to raise prices for CDTs by $2 to $3 Dollars. They maintained price differentials between prices quoted to "top" customers and others and between prices for top and second tier suppliers. The price differentials were used to stabilize market share among the competitors.

134.    At a December 29, 2004 glass meeting between Samsung Display, LP Displays, and Chunghwa, the participants addressed allegations that some of them cheated on the conspiracy by offering lower prices to customers. They ended the meeting by agreeing to keep the December 2004 price effective through January 2005.

135.    On August 17 and 18, 2004, several CRT manufacturers including, Chunghwa, Samsung, and LP Displays, held top and green meetings, during which they agreed on a scheme to implement a price increase in September 2004: one manufacturer would initiate a price increase to its main customer, while the others would follow with increased price quotes to that same customer.  They also discussed reducing production of CRTs by cutting work days and shutting down production lines.

136.    At a glass meeting between Samsung, LP Displays, and Chunghwa, in South Korea, March 14, 2006, the participants discussed a plan to have Samsung stop supplying a particular customer, upon the condition that LP Displays and Chunghwa would cease and reduce supply to another customer.

137.    During the Conspiracy Period, Samsung, SEAI, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen, Samsung SDI Tianjin, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico engaged in more than two hundred Glass Meetings, Chinese glass meetings, green meetings, and bi-lateral discussions.  Defendants' high-ranking executives attended a substantial number of the meetings

138.    SEAI, Samsung SDI America sold CRTs and CRT products at the Conspiracy price levels to ensure that it did not undercut the pricing agreements the Defendants reached at the Glass Meetings.

139.    During the Conspiracy Period, Defendants LG Electronics, Inc., LGETT, and LG Philips Displays participated in more than one hundred Glass Meetings and bilateral discussions, during which they entered agreements on price and output for CRTs.  Defendants' high-ranking executives attended a substantial number of these meetings.

140.    Defendant LG USA sold CRT products at the Conspiracy price levels to ensure that it did not undercut the pricing agreements the Defendants reached at the Glass Meetings.

141.    During the Conspiracy Period, Philips, Royal Philips, LG Philips Displays, and Philips Taiwan participated in more than one hundred Glass Meetings and bilateral discussions, during which they entered agreements on price and output for CRTs. Their high-ranking executives attended the Glass Meetings.

142.    PENAC and Philips Brazil sold CRT products at the agreed upon prices to ensure compliance with the Defendants' agreements in the Glass Meetings.

143.    During the Conspiracy Period, LP Displays participated in more than one hundred Glass Meetings. LP Displays' high-ranking executives attended numerous Meetings. LP Displays regularly engaged in bilateral discussions to agree upon prices and output.

144.    During the Conspiracy Period, Toshiba, TDDT, TEDI, and MT Picture Display participated in over fifty Glass Meetings and bilateral discussions, during which they entered agreements on price and output for CRTs. These Toshiba Defendants' high-ranking executives regularly attended the Meetings. Defendants Toshiba America, TACP, TAIP, and TAEC sold CRT products at the agreed upon prices to ensure compliance with the Defendants' agreements in the Glass Meetings.

145.    During the Conspiracy Period, Hitachi, Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia participated in numerous Glass Meetings and bilateral discussions, during which they entered agreements on price and output for CRTs. Their high-ranking executives regularly attended the Meetings.

146.    Hitachi America and HEDUS sold CRT products at the agreed upon prices to ensure compliance with the Defendants' agreements in the Glass Meetings.

147.     During the Conspiracy Period, Panasonic, Matsushita Malaysia, and MT Picture Display participated in numerous Glass Meetings and bilateral discussions, during which they entered agreements on price and output for CRTs.  Their high-ranking executives regularly attended the Meetings.  For example, on February 7-8, 2007, MT Picture Display attended a Glass Meeting with Chunghwa, Samsung Display, and LP Displays. During this meeting, the participants exchanged information about their CRT sales, production, and prices.

148.     Defendant Panasonic NA sold CRT products at the agreed upon prices to ensure compliance with the Defendants' agreements in the Glass Meetings.

## VII.   Defendants Passed-Through Overcharges to Illinois Consumers

149.     The Defendants' purpose was to fix, raise, and stabilize CRT and CRT product prices.  The Defendants knew that increasing the price of CRTs would lead to an increase in CRT product prices as well.

150.     For example, in a March, 2004 glass meeting several defendants agreed to notify customers in advance that there would be a second price hike so that the customers could plan to pass on the price increase to their customers of CRT products.

151.     Defendants' conspiracy to fix, raise, maintain, and stabilize CRT prices at higher levels harmed Illinois, its agencies and its consumers, because they paid higher prices for CRT products than they would have in the absence of the Defendants' conspiracy.

152.     CRT product prices were directly affected by the price of CRTs.  Televisions and computer monitors are essentially homogenous products: customers do not have brand loyalty and there is little differentiation in the products.  Firms compete based on pricing and production costs.  Since, original equipment manufacturers used component costs to make price

calculations, television and computer prices increased or decreased depending on the component costs.

153.    Thus, the conspiratorial price increase in CRTs forced the manufacturers of CRT products to increase the prices of those products.

154.    Defendants attended Glass Meetings or engaged in Bilateral Discussions to monitor the prices of televisions and computer monitors sold in the U.S. and internally. This monitoring allowed Defendants that did not manufacture CRT televisions and computer monitors to enforce the price-fixing agreements with the companies that produced televisions and monitors. This practice ensured higher prices for CRT products.

## VIII. Efforts to Conceal Conspiracy

155.    The Defendants fraudulently concealed the existence of the conspiracy alleged herein.

156.    Defendants agreed to keep their meetings secret.

157.    For example, in a May 26, 2000, meeting between Samsung, LG, Orion, Philips, and Chunghwa, the participants raised concern that the subject of their meetings was being disclosed to customers. To reduce the likelihood of their meetings being discovered, they decided to hold meetings regarding CPT and CDTs separately and reduce the number of attendees at each meeting. In addition, the Defendants were also discouraged from taking minutes at the meetings.

158.    Also, to conceal the conspiracy, the Defendants agreed to provide false statements to their customers regarding their price increases and coordinated their public statements regarding capacity and supply.

159.    The State of Illinois exercised due diligence to discover its legal rights with respect to the CRT conspiracy but, despite such diligence, did not and could not have known of the causes of action alleged in this complaint until 2010 at the earliest.

a.  Near the end of 2007, the State of Illinois read press stories of overseas investigations of the CRT industry. Only foreign governments confirmed their investigations. None of these governments provided details of the subject they were investigating. The State continued to monitor press reports on the CRT industry, although it learned nothing more through 2008 and into the beginning of 2009.

b.  In February 2009, the State of Illinois learned through press reports that the U.S. Department of Justice had convened a grand jury to investigate a CRT conspiracy in the United States and indicted an employee of alleged co-conspirator Chunghwa Picture Tubes Limited. This was the first announcement by USDOJ that it was investigating the CRT industry. The State of Illinois received no additional details and received no evidence of such a conspiracy.

c.  Within a month of learning of the U.S. government investigation, the State of Illinois learned from the State of Washington that the State of Washington had contacted several of the CRT manufacturers inquiring as to whether any wished to come forth as a cooperating company with the State of Washington or other states. The State of Illinois was told that none of the contacted companies felt that there was any reason to disclose materials to the states as cooperators, but that they would consider tolling agreements to forestall further investigation at that time.

d.  The State of Illinois agreed to send joint letters with Washington to the known CRT manufacturers asking if they wished to enter into tolling agreements. The Panasonic

group of companies agreed to do so. A few companies said they would not while others never responded to the best of the State of Illinois' knowledge.

e.  In the fall of 2010, the State of Illinois was notified by counsel representing a class of private indirect purchasers ("IPPs") that they were preparing to settle price fixing claims against Chunghwa that would include releases of the claims of Illinois citizens. The State responded that under Illinois law, private class representatives could not represent Illinois citizens, but the State would be willing to discuss a separate settlement with Chunghwa that would result in a universal settlement of the non-government CRT price-fixing claims against that company.

f.  Such discussions with Chunghwa began shortly afterward and continued into 2012. Near the start of these discussions, in November of 2010, for the first time the State of Illinois learned information that led it to believe that there was a good likelihood that allegations of a CRT price-fixing conspiracy were true. However, the State received no evidence that would support allegations of a conspiracy at that time.

g.  In the spring of 2011, the State had reached an agreement with Chunghwa to settle its *parens patriae* claims and was beginning discussions of its government proprietary claims. Finalization of the agreement and the additional discussions were interrupted when IPPs announced that they had decided to contest the State of Illinois' exclusive right to represent its citizens. This necessitated the State of Illinois' intervention and motion practice before the Special Master in the MDL proceeding, resulting in the Special Master sustaining the exclusivity of the State's right of representation. These proceedings concluded in the summer of 2011.

h.  Following resolution of the dispute with the IPPs, the State of Illinois resumed

negotiations of a complete resolution with Chunghwa.  Simultaneously, unsuccessful

discussions were had with other defendants to attempt to obtain settlements that would

have led to access to materials regarding the conspiracy.  In early 2012, the negotiations

with Chunghwa came to a successful conclusion and the State of Illinois obtained

materials, many of them in Chinese that provided the first evidence that the State of

Illinois obtained of the existence of the conspiracy.

160.    The State of Illinois did not learn of the Defendants efforts to conceal the

conspiracy until 2012, during review of the Chunghwa materials.

## Count I: Violation of Section 3(1) of the Illinois Antitrust Act

161.    The preceding paragraphs are incorporated as if set forth herein.

162.    Sections 3(1)(a) and (b) of the Illinois Antitrust Act, 740 ILCS 10/1 *et seq*., make

it illegal to:

Make any contract with, or engage in any combination or conspiracy with, any other
person, who is, or but for a prior agreement would be, a competitor of such person:

a.  for the purpose or with the effect of fixing, controlling, or maintaining the price or
rate charged for any commodity sold or bought by the parties thereto, or the fee
charged or paid for any service performed or received by the parties thereto;

b.  fixing, controlling, maintaining, limiting, or discontinuing the production,
manufacture, mining, sale or supply of any commodity, or the sale or supply of any
service, for the purpose or with the effect stated in paragraph a. of subsection (1).

c.  allocating or dividing customers, territories, supplies, sales, or markets, functional or
geographical, for any commodity or service.

163.    During all relevant times, the Defendants were competitors in the manufacture, sale, and/or distribution of CRTs.

164.    During the Conspiracy Period, the Defendants agreed to fix and fixed the prices for CRTs. The Defendants also agreed to restrict output and did restrict output for CRTs.

165.    During the Conspiracy Period, the Defendants agreed to allocate customers, sales, and markets for CRTs among themselves.

166.    The purpose and effect of these unlawful agreements was to raise and fix prices, and restrict output of CRTs sold throughout the United States, including sales of CRTs and CRT products to the State of Illinois and its residents.

167.    The Defendants' price-fixing conspiracy caused antitrust injury by reducing competition in the production, distribution, and sale of CRTs and CRT products that resulted in less output and higher prices paid by the State of Illinois and its residents.

168.    During the conspiracy period, the Defendants violated Section 3(1) of the Illinois Antitrust Act, 740 ILCS 10/1 *et. seq.*

169.    WHEREFORE, Plaintiff, the State of Illinois, prays for judgment as follows:

    a.    Finding the Defendants liable, jointly and severally, for the price-fixing conspiracy alleged herein as a violation of section 3(1) of the Illinois Antitrust Act, 740 ILCS 10/3(1);

    b.    Awarding treble damages in favor of the State of Illinois for all overcharges paid by the State for CRTs and CRT products;

    c.    Awarding treble damages in favor of the State of Illinois as *parens patriae* for all overcharges paid by Illinois residents for CRTs and CRT products;

    d.    Awarding civil penalties pursuant to 740 ILCS 10/7(4);

e.  Awarding injunctive relief to undo the effects of the Defendants' illegal conduct and to prevent further recurrences of such conduct;

f.  Awarding costs, disbursements, and reasonable attorneys fees pursuant to 740 ILCS 10/7; and

g.  Such other, further, and different relief as the Court may deem just, necessary, or appropriate.

## Jury Trial Demanded

The State of Illinois demands a trial by jury of all issues so triable in this cause.

Dated: May 17, 2013

Respectfully submitted,
THE STATE OF ILLINOIS,
by LISA MADIGAN,
ATTORNEY GENERAL OF ILLINOIS

By: _____

Blake Harrop (99000)
Jamie Manning
Antitrust Bureau
Office of the Illinois Attorney General
100 West Randolph Street
Chicago, Illinois 60601
(312) 814-5470