# Exhibit 6

```
 1              UNITED STATES DISTRICT COURT
 2            NORTHERN DISTRICT OF CALIFORNIA
 3               SAN FRANCISCO DIVISION
 4
 5    IN RE:  CATHODE RAY TUBE    )
      (CRT) ANTITRUST            )
 6    LITIGATION                 ) Case No:
      _____   ) 3:07-cv-5944-SC
 7    This Document Relates To:  )    MDL No. 1917
      ALL ACTIONS                )
 8    _____   )
 9
        SUPERIOR COURT OF THE STATE OF CALIFORNIA
10          CITY AND COUNTY OF SAN FRANCISCO
11    STATE OF CALIFORNIA, et    )
      al.,                       )
12         Plaintiffs,           ) Case No.
           v.                    ) CGC-11-51584
13    SAMSUNG SDI, INC., CO.,    ) (Related to
      LTD., et al.,              ) CGC-110-515786)
14         Defendants.           )
      _____   )
15
      ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
16
17                  July 9, 2015
18                  CONFIDENTIAL
19                  Volume III
20
21      Continued videotaped deposition of:
22                  KOJI MURATA
23
24
25
```

Page 181

```
 1          UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF CALIFORNIA
 3          SAN FRANCISCO DIVISION
 4
 5   IN RE:  CATHODE RAY TUBE  )
     (CRT) ANTITRUST           )
 6   LITIGATION                ) Case No:
     _____  ) 3:07-cv-5944-SC
 7   This Document Relates To: )  MDL No. 1917
     ALL ACTIONS               )
 8   _____  )
 9
         SUPERIOR COURT OF THE STATE OF CALIFORNIA
10        CITY AND COUNTY OF SAN FRANCISCO
11   STATE OF CALIFORNIA, et  )
     al.,                      )
12        Plaintiffs,          ) Case No.
         v.                    ) CGC-11-51584
13   SAMSUNG SDI, INC., CO.,   ) (Related to
     LTD., et al.,             ) CGC-110-515786)
14        Defendants.          )
     _____  )
15
     ~~~~~~~~~~~~~~~~~~~~~~~~~~~~
16
17
18       Continued videotaped deposition of KOJI MURATA,
19   Volume 3, taken on behalf of the Direct Purchaser Class,
20   at the Law Office of Vaughn R. Walker, Four Embarcadero Center,
21   Suite 2200, San Francisco, California, beginning at
22   9:02 A.M. and ending at 4:38 P.M., on Thursday,
23   July 9, 2015, before Leslie Rockwood, RPR, Certified
24   Shorthand Reporter No. 3462.
25
```

Page 182

```
 1   APPEARANCES:
 2
 3   FOR THE DIRECT PURCHASER CLASS:
 4       FREED KANNER LONDON & MILLEN LLC
 5       BY: DOUGLAS A. MILLEN, ESQ.
 6       2201 Waukegan Road, Suite 130
 7       Bannockburn, Illinois 60015
 8       (224) 632-4505
 9       dmillen@fklmlaw.com
10
11   FOR THE DIRECT PURCHASER PLAINTIFFS AND THE CLASS:
12   SAVERI & SAVERI, INC.
13       BY: R. ALEXANDER SAVERI, ESQ.
14           DAVID Y. HWU, ESQ.
15       706 Sansome Street
16       San Francisco, California 94111
17       (415) 217-6810
18       rick@saveri.com
19       dhwu@saveri.com
20
21
22
23
24
25
```

Page 183

```
 1   APPEARANCES (Continued):
 2
 3   FOR THE MITSUBISHI DEFENDANTS AND THE WITNESS:
 4       JENNER & BLOCK LLP
 5       BY: TERRENCE J. TRUAX, ESQ.
 6          GABRIEL A. FUENTES, ESQ.
 7       353 North Clark Street
 8       Chicago, Illinois 60654-3456
 9       (312) 923-2738 (Mr. Truax)
10       (312) 923-2808 (Mr. Fuentes)
11       ttruax@jenner.com
12       gfuentes.jenner.com
13
14       MITSUBISHI ELECTRIC CORPORATION
15       BY: MASAYA NAKATA, ESQ.
16       2-7-3, Marunouchi Chiyoda-ku, Tokyo 100-8310
17       Japan
18       81-3-3218-2699
19       Nakata.Masaya@db.MitsubishiElectric.co.jp
20
21
22
23
24
25
```

Page 184

```
 1   APPEARANCES (Continued):
 2
 3   FOR HITACHI:
 4       KIRKLAND & ELLIS LLP
 5       BY: ELIOT A. ADELSON, ESQ.
 6       555 California Street
 7       San Francisco, California 94104
 8       (415) 439-1413
 9       eadelson@kirkland.com
10
11   FOR LG ELECTRONICS, INC.:
12       MUNGER, TOLLES & OLSON LLP
13       BY: LAURA K. LIN, ESQ.
14       560 Mission Street, 27th Floor
15       San Francisco, California 94105
16       (415) 512-4034
17       laura.lin@mto.com
18
19   FOR PANASONIC:
20       WINSTON & STRAWN LLP
21       BY: JENNIFER M. STEWART, ESQ. (via speakerphone)
22       200 Park Avenue
23       New York, New York 10166-4193
24       (212) 294-4743
25       jstewart@winston.com
```

2 (Pages 181 - 184)

Page 185

1  APPEARANCES (Continued):

2

3  FOR TOSHIBA CORPORATION:

4     WHITE & CASE LLP

5     BY: AYA KOBORI, ESQ. (via speakerphone)

6     1155 Avenue of the Americas

7     New York, New York 10036-2787

8     (212) 819-8932

9     akobori@whitecase.com

10

11

12  FOR THE DIRECT ACTION PLAINTIFF THE CIRCUIT CITY STORES,

13  INC., LIQUIDATING TRUST:

14     SUSMAN GODFREY LLP

15     BY: JONATHAN J. ROSS, ESQ. (via speakerphone)

16     1000 Louisiana, Suite 5100

17     Houston, Texas 77002-5096

18     (713) 653-7813

19     jross@susmangodfrey.com

20

21

22

23

24

25

---

Page 186

1  APPEARANCES (Continued):

2

3  FOR THE PHILIPS DEFENDANTS:

4     BAKER BOTTS LLP

5     BY: TIFFANY GELOTT, ESQ. (via speakerphone)

6     The Warner

7     1299 Pennsylvania Avenue, NW

8     Washington, DC 20004-2400

9     (202) 639-7766

10     tiffany.gelott@bakerbotts.com

11

12  FOR TECH DATA CORPORATION AND TECH DATA PRODUCT

13  MANAGEMENT, INC.:

14     BILZIM SUMBERG BAENA PRICE & AXELROD LLP

15     BY: WENDY POLIT, ESQ. (via speakerphone)

16        SCOTT N. WAGNER, ESQ. (via speakerphone)

17     1450 Brickell Avenue, 23rd Floor

18     Miami, Florida 33131

19     (305) 350-7289 (Ms. Polit)

20     (305) 350-7386 (Mr. Wagner)

21     wpolit@bilzim.com

22     swagner@bilzim.com

23

24  Also Present: Ellen Shang Travis, Japanese Interpreter

25        Sean Grant, Videographer

---

Page 187

1              I N D E X

2

3

4  THURSDAY, JULY 9, 2015

5

6  WITNESS                    EXAMINATION

7  KOJI MURATA

8

9     BY MR. MILLEN          193, 304

10    BY MR. TRUAX              296

11

12

13

14    QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

15        (NONE)

16

17

18

19

20

21

22

23

24

25

---

Page 188

1          DEPOSITION EXHIBITS

2          KOJI MURATA, Volume 3

3  NUMBER      DESCRIPTION        IDENTIFIED

4  Exhibit 8212   Handwritten notes, ME        212

5       00024892 - 899

6  Exhibit 8212E  English translation,          213

7       handwritten notes, ME

8       00024892 - 899

9  Exhibit 8213   Letter to Mr. Nakano from     223

10      F.A. de Bruijne, 2/16/98, ME

11      00024890

12 Exhibit 8214   Letter to Wytze Werkhoven     231

13      from K. Murata, 6/23/97, ME

14      00024873 - 899

15 Exhibit 8214E  English translation, fax      231

16      message to Nakano CM, et al.,

17      ME 00024887E

18 Exhibit 8215   ME 00110088 - 105             266

19 Exhibit 8215E  English translation, ME       266

20      00110088E - 105E

21 Exhibit 8216   ME 00109916 - 917             270

22 Exhibit 8216E  English translation ME        270

23      00109916E - 917E

24 Exhibit 8217   ME 00106516 - 519             274

25

---

3 (Pages 185 - 188)

Page 189

1  Exhibit 8217E  English translation, ME        274
2        00106516E - 519E
3  Exhibit 8218  HDP-CRP00055836 - 841           278
4  Exhibit 8218E  English translation,           278
5        HDP-CRP00055836 - 841
6
7        PREVIOUSLY MARKED EXHIBITS REFERENCED:
8  NUMBER                              PAGE
9  Exhibit 6112                        270
10 Exhibit 6112E                       270
11 Exhibit 6114E                       246
12 Exhibit 6117                        210
13 Exhibit 8085                        268
14 Exhibit 8087                        268
15 Exhibit 8091                        268
16 Exhibit 8091E                       268
17 Exhibit 8200                        199
18              --oOo--
19
20
21
22
23
24
25

Page 190

1  San Francisco, California; Thursday, July 9, 2015
2        9:02 A.M.
3
4        PROCEEDINGS
5
6        THE VIDEOGRAPHER:  Good morning.  We're on the
7  record.  The time is 9:02 a.m., and the date is July 9,
8  2015.  This begins the videotaped deposition of
9  Koji Murata.
10       My name is Sean Grant, here with our court     09:02:45
11 reporter, Leslie Rockwood.  We are here from Veritext
12 Legal Solutions at the request of counsel for direct
13 purchase actions.
14       This deposition is being held at the law office
15 of Vaughn Walker in San Francisco, California.  The     09:02:59
16 caption of this case is Cathode Ray Tube Antitrust
17 Litigation, Case Number 14-cv-2058 SC MDL Number 1917.
18       Please note that audio and video recording will
19 take place unless all parties have agreed to go off the
20 record.                                               09:03:15
21       Microphones are sensitive and may pick up
22 whispers, private conversations, or cellular
23 interference.
24       At this time will all present please identify
25 themselves, beginning with the interpreter.

Page 191

1        Your name, please.
2        THE INTERPRETER:  Ellen Shang Travis.
3        THE VIDEOGRAPHER:  The witness' name.
4        THE WITNESS:  Koji Murata.
5        MR. TRUAX:  Terry Truax on behalf of Mitsubishi   09:03:40
6  Electric and also Mr. Murata.
7        MR. FUENTES:  Gabriel Fuentes on behalf of
8  Mitsubishi Electric and Mr. Murata.
9        MR. NAKATA:  Masaya Nakata from Mitsubishi
10 Electric legal department in Japan.                    09:03:53
11       MR. ADELSON:  Hi, Eliot Adelson, Kirkland &
12 Ellis, for Hitachi.
13       MS. LIN:  Laura Lin, Munger, Tolles & Olson, for
14 LG Electronics.
15       MR. SAVERI:  Good morning.  Rick Saveri on        09:04:03
16 behalf of the direct purchaser plaintiffs and the class.
17       MR. HWU:  David Hwu from Saveri & Saveri for the
18 direct purchaser plaintiffs and the class.
19       MR. MILLEN:  Douglas Millen from Freed Kanner
20 London & Millen on behalf of the direct purchaser class.   09:04:15
21       THE VIDEOGRAPHER:  Thank you.
22       Counsel on the phone, beginning with Ms. Gelott.
23       MS. GELOTT:  Tiffany Gelott, Baker Botts, on
24 behalf of the Philips defendants.
25       THE VIDEOGRAPHER:  Ms. Stewart?

Page 192

1        MS. STEWART:  Jennifer Stewart, Winston &
2  Strawn, on behalf of the Panasonic defendants.
3        THE VIDEOGRAPHER:  And Ms. Kobori?
4        MS. KOBORI:  Aya Kobori, White & Case, on behalf
5  of the Toshiba defendants.                             09:04:40
6        THE VIDEOGRAPHER:  And did anybody else join?
7  Thank you.
8        Will the Certified Court Reporter please swear
9  in the interpreter and the witness.
10       THE REPORTER:  Thank you.                        09:05:09
11       You do solemnly state that you will well and
12 truly interpret from English into Japanese and Japanese
13 into English to the best of your ability, so help you
14 God?
15       THE WITNESS:  Yes, I do.
16       THE REPORTER:  Thank you, ma'am.
17       Raise your right-hand, please, Mr. Murata.
18       You do solemnly state that the evidence you
19 shall give in this matter shall be the truth, the whole
20 truth, and nothing but the truth, so help you God?
21       THE WITNESS:  Yes.
22       THE REPORTER:  Thank you.
23       THE VIDEOGRAPHER:  Counsel.
24       MR. MILLEN:  Thank you.
25              EXAMINATION

4 (Pages 189 - 192)

Page 193

1  BY MR. MILLEN:
2     Q.  Good morning, Mr. Murata.
3     A.  Good morning.
4     Q.  Obviously we met in Chicago last December.  For
5  the record, my name is Doug Millen from Freed Kanner    09:05:29
6  London & Millen, and I represent the direct purchaser
7  plaintiff class in this case.
8        Do you know why we are here to resume your
9  deposition today?
10    A.  Yes.  I received a simple explanation yesterday.    09:06:09
11    Q.  And from whom did you receive this explanation?
12    A.  Attorneys from Jenner & Block.
13        MR. TRUAX:  Doug, just for the record, I don't
14  want to belabor this, but we're going to permit you to
15  inquire into some of that preparation exercise, some of    09:06:34
16  which would be privileged, and I'm going to walk through
17  that carefully with you, but I want to make sure that as
18  we go through it step-by-step, that as we permit the
19  witness to answer questions that might otherwise be
20  privileged in light of the Court's orders, that we don't    09:06:53
21  create some broader waiver.
22        So I'm going to go through it carefully with
23  you, but I wanted to just flag that for you.
24        MR. MILLEN:  Understood.
25        MR. TRUAX:  And you don't need to translate that

Page 194

1  just for efficiency.
2        So please go ahead.
3     Q.  BY MR. MILLEN:  Mr. Murata, although I went over
4  some of these points in December, I wanted to remind you
5  about a few of the ground rules for the deposition.    09:07:12
6  Okay?
7     A.  Yes.
8     Q.  So this is a formal process on the record where
9  I ask questions and you give answers.
10    A.  Yes.    09:07:39
11    Q.  Obviously, we're taking video of this and a
12  court reporter is going to be taking down everything that
13  we say.  Okay?
14    A.  Yes.
15    Q.  Obviously, we have an interpreter translating my    09:07:53
16  questions into Japanese and your answers into English;
17  right?
18    A.  Yes.
19    Q.  Do you understand that you are under an oath
20  today?    09:08:11
21    A.  Yes.
22    Q.  And do you understand that this oath means that
23  you must give honest and truthful answers just as if you
24  were sitting here testifying at trial before a judge and
25  a jury?

Page 195

1     A.  Yes.
2     Q.  And are you willing to abide by this oath to
3  tell the full truth to the best of your ability today?
4     A.  Yes.
5     Q.  And have you suffered any medical conditions    09:08:58
6  that would prevent you from testifying accurately today?
7     A.  No.
8     Q.  I'm happy to hear that.
9        Have you taken any medications that could impact
10  your ability to testify truthfully today?    09:09:23
11    A.  No, I haven't.
12    Q.  And do you understand that the videotape of your
13  testimony today could be presented to a jury if this case
14  goes to trial?
15    A.  Yes.    09:10:00
16    Q.  Please let me know if you need to take a break
17  during today's deposition, but, of course, we can only
18  take a break after any pending line of questions on the
19  document have been answered.  Okay?
20    A.  Yes.    09:10:41
21    Q.  Please provide verbal answers to all of my
22  questions as opposed to nodding or shaking your head in
23  response to a question, as the court reporter cannot
24  transcribe that.
25    A.  Yes.

Page 196

1     Q.  Also, for the sake of the court reporter and
2  Madam Interpreter, it's important that we speak slowly
3  and not speak over each other.  Okay?
4     A.  Yes.
5     Q.  My job is to ask clear questions.  If you do not    09:11:34
6  fully understand a question I've asked, please ask me to
7  clarify it and I will do my best to do so.
8     A.  Yes.
9     Q.  When you answer a question, it will be presumed
10  that you understood the question.  Is that fair?    09:12:02
11    A.  Yes.
12    Q.  Your counsel may make an objection once I've
13  asked a question.  Once your counsel has stated the
14  objection, you're required to answer that question unless
15  your counsel specifically instructs you not to answer it.    09:12:22
16  Okay?
17    A.  Yes.
18    Q.  I want to remind you about a few of the terms
19  that we used at the session of this deposition back in
20  December.  Okay?    09:12:57
21    A.  Yes.
22    Q.  So this litigation focuses on the period between
23  March 1st, 1995, and December 31st, 2007.
24    A.  Yes.
25    Q.  Unless I indicate otherwise, this is the period

5 (Pages 193 - 196)

Page 197

1 I'm referring to when I ask you questions today.
2      Is that clear?
3   A.  Yes.
4   Q.  And if I use the term "relevant period" in
5 asking you a question, I'm referring to this March 1st,    09:13:59
6 1995, through December 31, 2007, time period.  Okay?
7   A.  Yes.
8   Q.  And when I use the term "CRT," I'm referring to
9 cathode ray tubes.  Okay?
10   A.  Yes.                                    09:14:40
11   Q.  And when I say "CPT," I'm referring to a CRT
12 that's made for use in a television set.  Okay?
13   A.  Yes.
14   Q.  When I say "CBT," I'm referring to a CRT made
15 for a computer monitor.  Okay?                 09:15:05
16   A.  Yes.
17   Q.  And when I refer to "CRT products," I mean
18 televisions and monitors that use CRTs.  Okay?
19   A.  Yes.
20   Q.  Do you still work for Mitsubishi Electric    09:15:29
21 Corporation seconded to Mitsubishi Electric Living
22 Environment Systems Corporation?
23   A.  Yes.
24   Q.  Has your position changed since we met last
25 December?

Page 198

1   A.  It has changed.
2   Q.  What is your current position at Mitsubishi
3 Electric Living Environment Systems Corporation?
4   A.  I'm at the Tokyo office of our business
5 management division, and I'm the director there.    09:16:45
6   Q.  And what products are you involved with in this
7 position?
8      MR. SAVERI:  May we take a one-minute break?
9 There are some people trying to dial in, and they have
10 the wrong number.                             09:17:26
11      MR. TRUAX:  Beyond the scope.
12      THE VIDEOGRAPHER:  Going off the record, the
13 time is 9:17 a.m.
14      (Recess.)
15      THE VIDEOGRAPHER:  Back on the record, the time    09:20:38
16 is 9:20 a.m.
17      THE INTERPRETER:  Excuse me.  The interpreter
18 would like to make one slight correction on the English
19 name of the division.  It should be the Tokyo office of
20 the business administration department or division.    09:20:52
21      MR. MILLEN:  Okay.
22   Q.  Mr. Murata, prior to the break I asked you what
23 products you're involved with in your current position.
24      Can I please answer?
25   A.  I am not involved in the actual sales or direct

Page 199

1 sales of particular products.  We are involved in general
2 affairs as well as --
3      (Joining the meeting telephonically.)
4      MR. WAGNER:  It's Scott Wagner and Wendy Polit,
5 Bilzim Sumberg.
6      THE REPORTER:  Can you repeat, please.
7      MR. WAGNER:  Sure.  Hi, it's Scott Wagner, and
8 Wendy Polit, P-O-L-I-T, at Bilzim Sumberg, B-I-L-Z-I-M,
9 S-U-M-B-E-R-G, on behalf of Tech Data.
10      THE INTERPRETER:  The interpreter will start    09:22:18
11 over from the beginning of what the witness stated.
12      THE WITNESS:  We are not involved in direct
13 sales or products per se.  We are involved in general
14 affairs and accounting matters.
15   Q.  BY MR. MILLEN:  Mr. Murata, during the last    09:22:45
16 break, I handed you what's been marked in a previous
17 deposition as Exhibit 8200.
18      Do you see that?
19   A.  Yes.
20   Q.  At the beginning of this deposition, back in    09:23:19
21 December, we -- I asked you questions regarding what's
22 known as Exhibit B to Mitsubishi's Response to Direct
23 Action -- or to Direct Purchaser Plaintiffs
24 Interrogatories.
25   A.  Excuse me.  I'm not sure what you mean when you

Page 200

1 refer to Exhibit B.  What is it exactly?
2   Q.  Can you turn -- it's towards the very -- I know
3 it's a large document -- sort of the very, very end,
4 probably 20 pages, starts about 20 pages from the end.
5   A.  I see.                                   09:24:33
6      MR. TRUAX:  I don't know that there's a question
7 pending; right?
8      MR. MILLEN:  There's not.
9      MR. TRUAX:  Okay.
10      THE WITNESS:  Okay.                       09:24:50
11   Q.  BY MR. MILLEN:  Do you remember answering
12 questions related to a chart similar to this one?
13   A.  I don't recall in detail.
14   Q.  Okay.  Well, on January 16th of this year,
15 Mitsubishi produced an updated Exhibit B, and that's what   09:25:20
16 I've handed you today.  Okay?
17   A.  Okay.
18      MR. MILLEN:  And I'd just like to note for the
19 record that the numbering on Exhibit B of Exhibit 8200
20 that I've just handed Mr. Murata is different than the    09:25:49
21 numbering on Exhibit 6120 that we used at the beginning
22 of this deposition in December because additional entries
23 are added chronologically and that changed the numbering
24 system.
25      THE WITNESS:  Yes, I understand.

6 (Pages 197 - 200)

Page 201

1 Q. BY MR. MILLEN: Okay. At times today I'm going
2 to direct you to review Exhibit B, and when I direct you
3 to review Exhibit B, I'm referring to the Exhibit B that
4 you're looking at right now that was attached to
5 Exhibit 8200. Okay?                              09:26:48
6 A. Yes, I understand.
7 Q. Thank you. So please keep that exhibit handy,
8 but I have no questions on it right now.
9 A. Yes.
10 Q. Thank you. Okay. These next series of        09:27:22
11 questions relate to the period since December 9th, the
12 second day of your deposition, and today. Okay? So
13 between December 9th, 2014, and today is the time period
14 for these questions. Okay?
15 A. Yes.                                          09:27:46
16 Q. Okay. So did you -- have you discussed the
17 deposition testimony you gave in December 2014 with
18 anyone?
19 A. No.
20 Q. Did you prepare at all for today's deposition  09:28:31
21 session?
22 A. Yes.
23 Q. And what did you do to prepare for today's
24 deposition?
25 A. I had discussions from around noon yesterday for

Page 202

1 several hours, say four hours, with attorney or attorneys
2 at Jenner & Block.
3 Q. And do you know the names of the attorneys who
4 you met with during this preparation session?
5 Let me help. Did you meet with Mr. Truax and    09:30:02
6 Mr. Fuentes?
7 A. Yes, I did.
8 Q. And anybody else?
9 MR. TRUAX: Mr. Fuentes is very memorable,
10 Mr. Millen.                                      09:30:17
11 MR. MILLEN: Yes, he is.
12 Q. Mr. Murata, did you meet with anyone else apart
13 from Mr. Truax and Mr. Fuentes?
14 A. When you asked me did I meet anyone else, yes, I
15 met Mr. Nakata of Mitsubishi and the interpreter.  09:30:50
16 Q. And was anyone else present at this preparation
17 session?
18 A. No.
19 Q. Were you shown any documents during this
20 preparation session?                            09:31:16
21 A. Yes.
22 Q. Do you know how many documents you were shown?
23 A. I think it was about two.
24 Q. Did any of these documents refresh your
25 recollection about things that happened in the past?

Page 203

1 A. Yes.
2 Q. Did both of them refresh your recollection?
3 A. Yes.
4 MR. MILLEN: Mr. Truax, I would like to request
5 identification of the two documents that requested --   09:32:21
6 refreshed Mr. Murata's recollection during the
7 preparation session.
8 MR. TRUAX: Sure. I think, frankly, everything
9 that Mr. Murata was shown in any preparation session,
10 both prior to his December deposition, and certainly to  09:32:33
11 the extent he was shown anything yesterday, have been
12 produced in some form to the plaintiffs.
13 I'm happy to tell you what those were maybe at a
14 break. I don't know what they are right now.
15 MR. MILLEN: Fair enough. Thank you.            09:32:49
16 MR. TRUAX: Actually, I think just if you give
17 me one second.
18 So I'll just read off to you the Bates Numbers
19 of what we --
20 MR. MILLEN: Okay.                              09:33:02
21 MR. TRUAX: -- shared with him as part of the
22 preparation session. And I do so, you know, recognizing
23 that, well, at least in our view, there's no waiver being
24 created here by disclosing this information to you. I do
25 so to move this deposition along and not to quarrel about

Page 204

1 this.
2 I think there's -- what we choose to share with
3 him in the course of the preparation session, I think is
4 covered by work product. But nonetheless, for this
5 purpose, we'll identify them.                    09:33:30
6 You don't need to translate all that.
7 It's Bates Number ME0011088 to ME00110105. So
8 that's one document.
9 The other document was -- excuse me -- Bates
10 Number HDP -- Harry, David, Peter -- then hyphen  09:33:50
11 CRT00055836 to HDP-CRT00055841. So 836 to 841.
12 MR. MILLEN: Thank you.
13 MR. TRUAX: Sure.
14 Q. BY MR. MILLEN: Mr. Murata, have you had any
15 other communications with anyone about today's   09:34:22
16 deposition?
17 A. No.
18 Q. You did not discuss this deposition with anyone
19 at Mitsubishi Electronic Living Environment Systems
20 Corporation?                                     09:34:43
21 A. That's correct.
22 Q. Okay. Mr. Murata, are you aware that Mitsubishi
23 was required to disclose certain documents that its
24 counsel reviewed with you prior to your deposition in
25 December?

7 (Pages 201 - 204)

Page 205

1  A. I didn't know that.
2  Q. Back in December you testified that you met with
3 your attorneys the day before your deposition and were
4 shown documents.
5      Do you recall that?                    09:35:41
6  A. Let me clarify if I understand your question.
7 Are you asking me if I was shown documents the day before
8 the deposition back in December; is that your question?
9  Q. You can -- I'll ask that question. Were you
10 shown documents the day before your deposition last    09:36:42
11 December? And I'll just say that deposition started
12 December 8th, 2014. So I'm talking about December 7th,
13 2014.
14  A. Yes.
15  Q. And isn't it also true that the week before the    09:37:12
16 deposition, you had a teleconference with attorneys and
17 were shown documents at that time as well?
18  A. Yes.
19  Q. Apart from the two documents you testified you
20 were shown at your preparation session yesterday, have    09:38:01
21 you reviewed any other documents to prepare for today's
22 deposition?
23  A. I don't think so.
24  Q. Have you reviewed the transcript of the
25 deposition testimony you gave last December?

Page 206

1  A. Although I received it, it was quite voluminous
2 and it was in very difficult English; therefore, I did
3 not read it.
4  Q. Were you provided with a translation into a
5 Japanese version of this transcript?              09:39:24
6  A. No. There wasn't one.
7  Q. Thank you. Have you reviewed any other
8 deposition transcripts that were created in this
9 litigation?
10  A. No.                                09:39:47
11  Q. Did you take any notes to prepare for this
12 deposition?
13  A. No.
14  Q. Have you ever been interviewed by someone at
15 Mitsubishi about the facts relevant to this litigation?    09:40:35
16      (Jonathan Roth joins the deposition via
17      speakerphone.)
18      THE WITNESS: May I continue?
19  Q. BY MR. MILLEN: Yes.
20  A. What time frame are you referencing in that    09:41:12
21 question?
22  Q. Since the beginning of the litigation in 2007
23 through today.
24  A. I'm sorry, I seem to have forgotten the previous
25 question. May I have it again?

Page 207

1  Q. Sure. Has anyone from -- at Mitsubishi
2 interviewed you about facts relevant to this litigation?
3      MR. TRUAX: Object to form.
4      THE WITNESS: Can you elaborate on what you mean
5 when you say was I interviewed.              09:42:38
6  Q. BY MR. MILLEN: Has anyone at Mitsubishi asked
7 you to provide any information about facts relating to
8 this litigation?
9  A. The only time I was told about this litigation
10 was from the legal department, and it had to do with my    09:43:34
11 participation in this deposition. No one else spoke to
12 me about it.
13  Q. So is it your testimony that apart from some
14 communications with Mitsubishi's legal department about
15 this deposition, you haven't been asked by anyone at    09:43:56
16 Mitsubishi to provide information relevant to this case?
17      MR. TRUAX: Object -- excuse me. Object to
18 form.
19      Did you answer?
20      THE WITNESS: I haven't answered yet.    09:44:39
21      MR. TRUAX: Okay. Please answer.
22      THE WITNESS: And you had -- just to confirm,
23 your question was whether I provided information? Was
24 that your question?
25  Q. BY MR. MILLEN: Yes.

Page 208

1  A. No one asked me to provide information.
2  Q. Well, did you provide information relevant to
3 this litigation to anyone?
4  A. No, I did not provide information other than to
5 attorneys and to the legal department.              09:45:40
6  Q. And when you refer to providing information to
7 the attorneys and the legal department, are you talking
8 about conversations relating to your deposition?
9      MR. TRUAX: Object to form. But obviously the
10 witness' answer is noted.                    09:46:11
11      MR. SAVERI: Can we have the witness' answer
12 again, please.
13      THE INTERPRETER: The answer is "yes."
14      MR. SAVERI: Thank you.
15  Q. BY MR. MILLEN: When did you provide information    09:46:28
16 to the legal department relating to this deposition?
17      MR. TRUAX: Object to form and foundation.
18      THE WITNESS: I was referring to last December.
19  Q. BY MR. MILLEN: Okay. So is it fair to say that
20 apart from last December, you've had no communications    09:47:05
21 with anyone relating to the facts relevant in this
22 litigation?
23      MR. TRUAX: Other than lawyers? Are you
24 excluding lawyers from that?
25      MR. MILLEN: No, I'm not excluding lawyers. He

8 (Pages 205 - 208)

Page 209

1  referred to one series of -- one vignette of
2  communications last December with lawyers about the
3  deposition.
4      THE WITNESS:  I have not spoken to any other
5  individuals.                              09:48:12
6      Q.  BY MR. MILLEN:  Did you have any written
7  communications with any individuals about this
8  litigation?
9      A.  No.
10     Q.  Okay.  So you never communicated with    09:48:29
11 Mr. Hara -- strike that, please.
12     Mr. Murata, do you know who Mr. Hara is,
13 H-A-R-A?
14     A.  Yes.
15     Q.  And who is Mr. Hara?              09:48:44
16     A.  He's an employee at Mitsubishi handling
17 compliance-related activities.
18     Q.  And you never spoke to Mr. Hara about anything
19 to do with this litigation; is that correct?
20     A.  No, I've spoken to him.  However, I just    09:49:22
21 received communication indicating that the December
22 deposition will continue so therefore please attend.
23     Q.  Okay.  Thank you for clarifying.
24     Apart from that communication, did you have any
25 other communications with Mr. Hara about this case or

Page 210

1  facts relevant to this case?
2      A.  No.
3      Q.  Mr. Murata, I'm handling you what's been marked
4  as Exhibit 6117 at a previous deposition in this case.
5      You know what, sir?  Can I have that.  I gave    09:50:52
6  you my copy.  I'm going to give you another copy.  Sorry
7  about that (indicating).
8      This document is Mitsubishi's Supplemental
9  Response to the Direct Action Plaintiffs' First Set of
10 Interrogatories.                          09:51:26
11     Interrogatories, as you may remember from
12 December, are legal questions.  Okay?
13     A.  Yes.
14     Q.  Sir, I'd like to direct your attention to the
15 bottom of page 18 and the top of page 19.    09:52:01
16     A.  Yes.  I was able to find that page.
17     Q.  And do you see the section on the bottom of
18 page 18 that says "Murata" in the left-hand box?
19     A.  Yes.
20     Q.  And do you see to the right of that, are you    09:52:46
21 able to read the description, because it's in English, to
22 the right of your name?
23     A.  Yes.
24     Q.  Is this description of your job titles at
25 Mitsubishi during the relevant period accurate?

Page 211

1      A.  May I have some time to look at it?
2      Q.  Of course.
3      A.  Although I can't recall the details, I think
4  it's pretty much accurate.
5      Q.  Sir, I'd like to direct you to two entries.  The    09:55:42
6  first is at the bottom of page 18, and I'm going to read
7  it to you.
8      It says January 16th, 1996, section manager, CPT
9  marketing section, marketing division CRT, dash business
10 division.  Correct?                        09:56:11
11     A.  Yes.
12     Q.  Okay.  And then first entry at the top of page
13 19 says...
14     Okay.  The first entry at the top of page 19
15 says February 16, 1998, section manager, marketing    09:56:33
16 department, PDP business center, display devices business
17 division.
18     Is that correct?
19     A.  Yes.
20     Q.  Isn't it true that there was a period in between    09:56:52
21 these two job titles when you migrated from CRT to PDP
22 that you had responsibilities for both CRT and PDP?
23     A.  No.
24     Q.  Back in December, you testified -- this is from
25 your transcript, page 34, lines 2 to 7, quoting:  "In

Page 212

1  1998, I was still at the Kyoto factory so I was doing
2  administrative work related to display.  But if you're
3  asking about '98, I may have been involved in the plasma
4  business also at that time."
5      Does that refresh your recollection as to    09:58:03
6  whether you might have had duties and responsibilities
7  relating to both CRT and PDP for a period of time?
8      MR. TRUAX:  I don't want to belabor it, Doug,
9  but, of course, you didn't read the entire answer that he
10 gave.  And I'm happy to do that on pages 34, lines 2    09:58:57
11 through 7.  But you're trying to refresh his recollection
12 so I'll let you do that.
13     MR. MILLEN:  Okay.
14     MR. TRUAX:  But I object to the form in the way
15 it was asked.                              09:59:10
16     THE WITNESS:  No.
17     Q.  BY MR. MILLEN:  Okay.  So in 1997, that means
18 that you had responsibilities only relating to CRT
19 products; is that right?
20     A.  Yes.                              10:00:16
21     MR. MILLEN:  Madam Court Reporter, can you
22 please mark these 8212 and the English certified
23 translation as 8212E.
24     (Exhibit 8212, Handwritten notes, ME 00024892 -
25     899, marked for identification.)

9 (Pages 209 - 212)

Page 213

1    (Exhibit 8212E, English translation, handwritten
2    notes, ME 00024892 - 899, marked for
3    identification.)
4    Q. BY MR. MILLEN: Mr. Murata, you've been handed
5 what's been marked as Exhibit 8212 and a certified    10:01:18
6 translation portions of this exhibit identified as
7 Exhibit 8212E.
8    Exhibit 8212 is identified by the Bates range
9 ME 00024892 through 24899. Okay?
10   A. Yes.    10:01:58
11   Q. Is this your handwriting on the first page of
12 the document?
13   A. Yes.
14   Q. And can you please identify what this document
15 is.    10:02:16
16   A. You're just asking about the first page?
17   Q. Well, this has been produced as one document.
18 Let's go page-by-page. Can you identify what this first
19 page is?
20   A. This is a memo from a visit made to the Philips    10:03:53
21 headquarters in the Netherlands.
22      May I continue or --
23   Q. Well, before you continue, are you sure that
24 this was the meeting in the Netherlands?
25   A. Yes.

Page 214

1    Q. Okay. Mr. Murata, can you take a look at
2 page 24897, please.
3    A. Okay.
4    Q. And I'd like to direct your attention towards
5 the bottom to what's numbered as three, meeting schedule    10:05:21
6 and agenda. Under there it refers to a dinner place near
7 Kyoto station.
8      Do you see that?
9      MR. TRUAX: I think, Mr. Millen, in terms of the
10 document itself, I don't know that other counsel -- I    10:06:06
11 don't want to speak for them, but I'm just alerted that
12 they don't have a copy of what you're examining the
13 witness about (indicating).
14      MR. MILLEN: Thank you. I'll keep an eye on
15 them.    10:06:24
16      THE WITNESS: I see it does say Kyoto.
17   Q. BY MR. MILLEN: So does this refresh your
18 recollection as to the location of this meeting between
19 Philips and Mitsubishi?
20      MS. GELOTT: Objection. Form. This is Tiffany    10:06:51
21 Gelott.
22      MR. MILLEN: Ms. Gelott, I'd like to refer you
23 to the transcript from the first day of this deposition
24 back in December 8th, 2015, where I spent about an hour
25 going through the various defendant entities and came up

Page 215

1 with collective descriptions. One of them -- the one for
2 Philips was Philips.
3      MS. GELOTT: Sure. I would just like to have a
4 standing objection then to your characterization of
5 Philips.    10:07:33
6      MR. MILLEN: You've got it.
7    Q. So the pending question is: Does this refresh
8 your recollection as to where this -- the meeting
9 referred to in these documents, this exhibit, excuse me,
10 took place?    10:07:58
11   A. Yes.
12   Q. Where did this meeting take place?
13   A. It says here that it was held at the Mitsubishi
14 office in Kyoto.
15   Q. And when did this meeting take place?    10:08:25
16   A. It says April 1st and April 2nd of 1997.
17   Q. And where does it say that? Are you referring
18 to the top of page 24892?
19   A. It's at the top of 24897.
20   Q. Okay. Mr. Murata, I'd like to direct you back    10:09:00
21 to the first page of this exhibit, your handwritten
22 notes. Do you see the date at the top of that document?
23   A. Yes.
24   Q. And what is the date that you wrote?
25   A. It says April 1st and 2nd, 1997.

Page 216

1    Q. And these are your handwritten notes from this
2 meeting; correct?
3    A. Yes.
4    Q. And in taking these notes you endeavored to be
5 truthful and accurate; is that right?    10:09:44
6    A. Yes.
7    Q. These notes were based on your personal
8 knowledge from attending the meeting; isn't that correct?
9    A. Yes.
10   Q. And you took these notes in real time as you    10:10:12
11 attended the meeting; is that right?
12   A. I think so.
13   Q. Okay. And taking these notes was part of your
14 job for Mitsubishi at that time, wasn't it?
15   A. Yes.    10:10:38
16   Q. And pages 24896 through 898 contain the agenda
17 for this meeting; is that right?
18   A. Yes.
19   Q. And this agenda was prepared on March 20th,
20 1997; isn't that correct?    10:11:13
21   A. It says that, but it's a little peculiar.
22   Q. How come?
23   A. I suspect this is an error (indicating).
24   Q. Please explain.
25   A. I think what this means is that this is the

10 (Pages 213 - 216)

Page 217

1 draft or the plan of the proposed agenda, and the draft
2 was created on March 20th in preparation for the visit by
3 Philips to Kyoto in April.
4     Q. Do you believe the two pages, 24897 and 898, are
5 the final version of this agenda?                    10:12:55
6     A. I can't remember that.
7     Q. Okay. Sir, do you see at the bottom of page
8 24897 there's hand -- Japanese handwriting at the very
9 bottom?
10    A. Yes.                               10:13:31
11    Q. Is that your handwriting, sir?
12    A. No.
13    Q. Can you -- do you recognize the handwriting?
14    A. I do remember.
15    Q. And whose handwriting is it?          10:13:46
16    A. The stamp says Utahara.
17    Q. So that would indicate to you that it was
18 Mr. Hara that made the handwritten notation?
19    A. It's not Mr. Hara. It's Mr. Utahara
20 U-T-A-H-A-R-A.                           10:14:22
21    Q. Sorry. Thank you. Okay.
22    A. Oh, once again, I see the person's name,
23 Utahara, on -- on this page.
24        THE INTERPRETER: And the witness is pointing to
25 last three digits of the Bates Number 897.

Page 218

1     Q. BY MR. MILLEN: Thank you, sir. I see that.
2        This was a business meeting; is that correct?
3     A. Yes.
4     Q. And this exhibit was maintained in the ordinary
5 course of business by Mitsubishi, wasn't it?        10:15:06
6     A. Yes.
7        PLEASE take a look at the page 24894, sir.
8     A. Yes.
9     Q. And this is your handwriting; is that correct?
10    A. Yes.                               10:15:44
11    Q. Mr. Murata, do you know who Dr. Holtslag is?
12    A. Is that name written on this page?
13    Q. I don't know, but it's written on the agenda.
14 You can take a look.
15    A. I see. I don't remember. However, on the top  10:16:21
16 of page 24892, at the top of this memo, there is in my
17 handwriting the name Dr. Holtslag.
18    Q. And Mr. Holtslag was a senior scientist for TB
19 Systems at Philips at that time; is that correct?
20        MR. TRUAX: Object to form, lacks foundation as  10:17:49
21 to this witness.
22        THE WITNESS: I don't know that for a fact, but
23 that may be possible since this was a meeting -- it
24 appears to be that this was a meeting for televisions
25 which would use or incorporate the plasma displays in

Page 219

1 them.
2     Q. BY MR. MILLEN: Okay. On the first page of this
3 exhibit that you just referred to, the I will call it a
4 chart listing some names on the top left, is that -- were
5 you indicating where people were sitting at a table for   10:18:40
6 the meeting?
7     A. I think it's a record of who sat where.
8     Q. Thank you. And so Dr. Baller sat at the head of
9 the table; is that correct?
10    A. I don't know that.                     10:19:40
11    Q. Isn't it true that Dr. Baller had duties and
12 responsibilities at Philips related to its CRT business?
13    A. I don't know.
14    Q. Who else from Philips attended this meeting?
15    A. According to this memo, it was Dr. Winsum of   10:20:41
16 Philips Components as well as Dr. Burgmans and
17 Dr. Toluer. That's what it says here.
18    Q. Okay. And does it also indicate that David
19 Chang was at this meeting for Philips?
20    A. That name does not appear in this list of      10:21:33
21 participants.
22    Q. In this what I'll call the chart, on the top
23 left that we're looking at, what is the third name from
24 the bottom written in Japanese?
25    A. Oh, that is Mr. Chang.

Page 220

1     Q. Thank you. And do you know David Chang?
2     A. I don't remember him.
3     Q. Okay. Mr. Chang was involved in Philips' CRT
4 business at that time; isn't that right?
5        MR. TRUAX: Object to form, lacks foundation as  10:22:35
6 to this witness.
7        THE WITNESS: I don't remember.
8     Q. BY MR. MILLEN: Did Mr. Wada, W-A-D-A, from
9 Philips attend this meeting?
10    A. Yes. Well, his name does appear.          10:22:56
11    Q. Okay. And you took notes from what appears to
12 be a presentation Mr. Wada provided; isn't that true?
13    A. By that when you say "notes," what notes are you
14 referring to?
15    Q. I'm referring to this first page of the exhibit,  10:23:32
16 your handwritten notes. There's a number one, and I
17 believe it says Wada, vice president, and there's entries
18 below it.
19    A. I see. That's correct.
20    Q. And so these are notes from a presentation     10:23:58
21 provided by Mr. Wada at this meeting; is that right?
22    A. Yes.
23    Q. Sir, I'd like to direct your attention to your
24 notes that appear under what looks to be a numeral seven
25 at the bottom of that first page.

11 (Pages 217 - 220)

Page 221

1 Do you see that?

2 A. Yes.

3 Q. What did you mean when you wrote "component CRT

4 28.3 million units," and then a parenthetical "1996

5 actual record"? 10:24:56

6 A. It means that Vice President Wada of Philips

7 components reported that the actual production results of

8 CRTs in 1996 by Philips components was 28.3 million

9 units.

10 Q. Thank you. And what did you mean when you wrote 10:26:11

11 the section below that about factories?

12 A. So what it says here is as follows. It says

13 here Austria, France, Germany, Russia, Spain, the

14 Netherlands, England or UK, the US, Brazil, Taiwan,

15 China, and it says 22.2 million would be the total number 10:28:48

16 of Braun tubes for TV usage, and 6.1 million units for

17 monitors, Braun tubes for monitors. And it says number

18 of employees, 24,000 --

19 THE INTERPRETER: Sorry, interpreter correction.

20 THE WITNESS: It says the number of employees 10:29:14

21 23,400.

22 Q. BY MR. MILLEN: Thank you. And these factories

23 are where Philips produced CRTs at that time; isn't that

24 correct?

25 A. I think it's a record of that type of

Page 222

1 explanation that was made.

2 Q. So you're saying it's a record of Mr. Wada

3 describing Philips CRT production facilities; is that

4 right?

5 A. Yes. 10:30:20

6 Q. And the last entry about research labs refers to

7 Philips CRT research facilities; is that correct?

8 A. That's what it says so I think that's what it

9 means.

10 Q. Okay. Mr. Murata, I'd like to direct your 10:30:56

11 attention back to page 24897, the agenda.

12 A. Okay.

13 Q. Okay. And do you see the section under MELCO?

14 A. Yes.

15 Q. Isn't it true that this lists the member -- the 10:31:25

16 employees of Mitsubishi that attended this meeting with

17 Philips?

18 A. Yes.

19 Q. And so a Mr. Nakano attended this meeting; is

20 that correct? 10:31:53

21 A. Yes.

22 Q. And at this time Mr. Nakano had responsibilities

23 relating to Mitsubishi's CRT business; isn't that right?

24 A. No.

25 Q. How do you know the answer to that question is

Page 223

1 "no"?

2 A. It says here PDP business center.

3 MR. MILLEN: Okay. Please mark this next in

4 order, 8213.

5 (Exhibit 8213, Letter to Mr. Nakano from F.A. de

6 Bruijne, 2/16/98, ME 00024890, marked for

7 identification.)

8 THE VIDEOGRAPHER: 8213.

9 MR. MILLEN: While you're reviewing that, I'll

10 say for the record, Exhibit 8213 is a one-page document 10:33:15

11 bearing the Bates Number ME 00024890.

12 THE WITNESS: Okay.

13 Q. BY MR. MILLEN: Mr. Murata, since this

14 document's in English, I am going to read it to you so

15 Madam Interpreter can translate it to Japanese. 10:33:47

16 It says: "Dear Mr. Nakano, I am sure you

17 learned that unfortunately our schedules could not be

18 matched when I was in Kyoto. Regretfully, I received

19 your fax on February 12, 1998, when I was already in

20 Japan. The discussion on CRT/CMT were of excellent 10:34:11

21 quality, and I am sure benefitted equally on both

22 companies' sides. The choice we have to make on PDP

23 partnership draws to a close now. If I have any further

24 questions, then I will give you a telephone call."

25 This is a fax from a Mr. -- I believe it's

Page 224

1 pronounced "Brown," spelled B-R-U-I-J-N-E -- to

2 Mr. Nakano dated February 16th, 1998; isn't that correct?

3 MR. TRUAX: Object to form, lacks foundation as

4 to this witness.

5 THE WITNESS: Are you asking me if this was a 10:36:09

6 letter sent to either Mr. Wada or Nakano? Is that the

7 question?

8 Q. BY MR. MILLEN: Let me repeat the question.

9 Isn't it true that this is a letter from a

10 Mr. -- I'm going to pronounce it "Brown" to Mr. Nakano 10:36:22

11 that cc's Mr. Wada, and Mr. B-R-U-I-J-E-L-L (sic), sent on

12 February 16th, 1998.

13 Isn't that right?

14 A. That's what it says here.

15 Q. Well, do you have any reason to believe that 10:36:59

16 it's not accurate?

17 MR. TRUAX: Object to form.

18 THE WITNESS: Not in particular.

19 Q. BY MR. MILLEN: Okay. And do you see your stamp

20 on this document, sir? 10:37:14

21 A. Yes.

22 Q. And what does your stamp on this document

23 indicate?

24 A. It means I saw it.

25 Q. And can you identify the other stamp to the left

12 (Pages 221 - 224)

Page 225

1 of yours on this document?

2   A. It says "Nakano."

3   Q. And does this document refresh your recollection

4 as to the time period when Mr. Nakano had

5 responsibilities relating to Mitsubishi's CRT business?   10:37:54

6   A. No.

7   Q. Do you have an understanding about why

8 Mr. Nakano would be discussing CRT with Mr. Bruijne?

9   A. I don't know.

10   Q. Isn't it true that Mr. Bruijne was a participant   10:38:39

11 at the EIAJ meetings?

12   A. I don't know.

13   Q. Does your stamp on this document, sir, indicate

14 that you received it in the course of doing your job at

15 Mitsubishi?                                               10:39:26

16   A. Yes.

17   Q. And would this document be maintained by

18 Mitsubishi in the ordinary course of business?

19   A. Yes.

20   Q. Do you know what Mr. Bruijne meant when he   10:39:48

21 wrote: "The choice we have to make on PDP partnership

22 draws to a close now. If we have further questions, then

23 I will give you a telephone call"?

24      MS. GELOTT: Objection. Speculation. This is

25 Tiffany Gelott.

Page 226

1      THE WITNESS: I don't know.

2   Q. BY MR. MILLEN: Did Mitsubishi enter into a

3 partnership with Philips relating to the PDP business?

4   A. A partnership was never formed.

5   Q. Okay. Thank you, Mr. Murata. Now I want to   10:41:36

6 refer you back to the previous exhibit, which is

7 Exhibit 8212.

8   A. Okay.

9   Q. And I'd like to direct your attention to page

10 24894, please.                                            10:42:23

11   A. Yes.

12   Q. And what did you mean when you wrote at the top

13 "flat CRT (cold cathode)"?

14   A. This refers to --

15      THE INTERPRETER: Oh, interpreter will start   10:43:44

16 over.

17      THE WITNESS: The cold cathode refers to

18 something entirely different from CRTs. It is a new and

19 different method of a display device.

20   Q. BY MR. MILLEN: Is that display device a CRT   10:44:05

21 device?

22      MR. TRUAX: As you've defined it at the

23 beginning of the deposition.

24      MR. MILLEN: Yeah. Thank you, Mr. Truax.

25   Q. Well, I said CRT product. Is this a CRT product

Page 227

1 that you're referring to?

2   A. No.

3   Q. This product does not utilize cathode ray tubes;

4 is that true?

5   A. To be correct in the description, let me say the   10:45:17

6 following: It is different from the definition used at

7 my first deposition of the color picture tube or the

8 color display tube. So it's different. However, the

9 principles applied is similar to a cathode ray tube.

10   Q. Okay. Thank you. And sir, what's the last word   10:45:53

11 you wrote in your handwriting at the bottom of page

12 24894?

13   A. You said the last word?

14   Q. Yeah, very last word in your notes on this page.

15   A. It says "cooperation."                            10:46:36

16   Q. Okay. Thank you.

17      And was this a document that you reviewed with

18 your attorneys last year before -- excuse me. I withdraw

19 that question.

20      Is this one of the documents you reviewed with   10:46:53

21 your attorneys preparing for your deposition last

22 December?

23   A. I don't remember.

24   Q. When is the last time you've seen this document?

25   A. I don't recall.

Page 228

1   Q. Okay. And this Exhibit 8212 are materials

2 related to a business meeting with Philips; is that

3 correct?

4   A. When you say 8212, do you mean this document in

5 front of me?                                             10:48:03

6   Q. Yeah, to clarify, I'm trying to shorthand and

7 just refer to the entire exhibit that was produced as one

8 document. This entire -- does this exhibit consist of

9 materials related to a business meeting with Philips in

10 1997?                                                    10:48:16

11   A. I think these were from the meeting with Philips

12 regarding plasma displays; however, I need to exclude

13 page 24893, with the exception of that page.

14   Q. And this collection -- Exhibit 20 -- I'm sorry,

15 I withdraw that question.                                10:49:31

16      Exhibit 8212 was maintained by Mitsubishi in the

17 ordinary course of business; is that correct?

18      MR. TRUAX: Object to form and foundation.

19      THE WITNESS: Yes, that's right.

20   Q. BY MR. MILLEN: Sir, I'd like to refer you back   10:49:56

21 to that -- what we called Exhibit B at the beginning of

22 the deposition. I can represent to you -- and Mr. Truax,

23 please correct me if I'm wrong -- that these meetings are

24 generally in chronological order, with the exception of

25 entry 17, which was -- sorry, which lists a series of

13 (Pages 225 - 228)

Page 229

1 meetings between 1993 and 2000. But apart from that,
2 this is a chronological list of meetings. Okay?
3   A. Yes. I think so.
4   MR. TRUAX: I can speed it up so we don't waste
5 time. Is your question this particular meeting is not          10:51:34
6 referenced on Exhibit B?
7       MR. MILLEN: I was going to ask him to determine
8 whether this meeting was referenced on Exhibit B. That's
9 right.
10      MR. TRUAX: He didn't put together Exhibit B. I      10:51:44
11 think you've already established that in multiple ways
12 both in the earlier deposition and at the beginning of
13 this deposition. So anyway, I just want -- I just want
14 to move us along as promptly as we can. So I'm willing
15 to stipulate to you that it's not on Exhibit B.             10:51:59
16      MR. MILLEN: Okay. Will you also stipulate that
17 Exhibit 8213, which is this fax communication between
18 Philips and Mitsubishi, is also not listed on Exhibit B?
19      MR. TRUAX: That I don't know. I'll have to
20 look.                                                        10:52:18
21      MR. MILLEN: Okay. It's a two -- February 16,
22 1998.
23      MR. TRUAX: I'll certainly stipulate that the
24 date of February 16, 1998, is not on here. I don't know
25 if the page number is on here somewhere. But we can

Page 230

1 certainly check at a break, and if that will help move
2 things along.
3       MR. MILLEN: Well, let's take a break. We've
4 been going for a while.
5       MR. SAVERI: Now would be a good time.             10:52:44
6       MR. MILLEN: I think it's a good time for a
7 break.
8       MR. TRUAX: We'll take a break whenever you're
9 ready. If you'd like to take one now, that's fine.
10      MR. MILLEN: I would like to take a break now.       10:52:50
11      MR. TRUAX: No problem.
12      THE VIDEOGRAPHER: Going off the record. The
13 time is 10:52 a.m.
14      (Recess.)
15      THE VIDEOGRAPHER: Back on the record. The time     11:11:51
16 is 11:11 a.m.
17   Q. BY MR. MILLEN: Mr. Murata, during this past
18 break, did you discuss your testimony today with counsel?
19   A. No.
20   Q. Sir, are you familiar with the term "CMT"?          11:12:12
21   A. I don't know.
22   Q. Can you just take a quick look at Exhibit 8213,
23 which was that one-page fax.
24      And do you see there it says a CRT/CMT?
25   A. Yes.

Page 231

1   Q. In this context, do you know what "CMT" refers
2 to?
3   A. No, I don't.
4       MR. MILLEN: Okay.
5       THE VIDEOGRAPHER: 8214 and 8214E.                 11:14:03
6       (Exhibit 8214, Letter to Wytze Werkhoven from K.
7       Murata, 6/23/97, ME 00024873 - 899, marked for
8       identification.)
9       (Exhibit 8214E, English translation, fax message
10      to Nakano CM, et al., ME00024887E, marked for
11      identification.)
12      MR. MILLEN: While Mr. Murata is reviewing
13 Exhibit 8214, I'll represent for the record that it's
14 been marked for purposes of identification with the Bates
15 label ME 00024873 through 4889, and we've also provided   11:15:02
16 him with 8214E, which is the certified translation of
17 portions of this document.
18   A. Okay.
19   Q. Mr. Murata, isn't it true that this is one of
20 the documents you reviewed with your lawyers when they    11:15:38
21 prepared you for your deposition last December?
22   A. I don't remember.
23   Q. When is the last time you've seen this document?
24   A. I don't remember.
25   Q. Can you identify this document?

Page 232

1   A. This is a letter I sent to Philips.
2   Q. So the first page is a letter you sent to
3 Philips; correct?
4   A. Yes.
5   Q. Can you identify the stamp on the top left of    11:18:08
6 this document? I'm sorry, the top middle-ish, middle-ish
7 left.
8   A. It's my stamp.
9   Q. And does this stamp indicate that you sent this
10 letter in the course of performing your duties and       11:18:31
11 responsibilities at Mitsubishi?
12   A. Yes.
13   Q. And is that your handwriting right next to the
14 stamp that says in English, it looks like, "thanks"?
15   A. I don't know.                                       11:19:16
16   Q. And can you identify the stamp on the top right
17 corner of this letter?
18      Oh, I stand corrected. Sorry to interrupt. I
19 think it's just handwriting. Can you --
20   A. I don't know.                                       11:19:37
21   Q. This is a letter you sent to a Mr. Werkhoven at
22 Philips on June 23rd, 1997; is that right?
23   A. Yes.
24   Q. And you wrote Mr. Werkhoven to thank him for the
25 productive meeting that Mitsubishi had with Philips;

14 (Pages 229 - 232)

Page 233

1  correct?
2  A. That's what it says.
3  Q. Well, isn't that what you meant?
4  A. Well, it says that.
5  Q. This is a business letter you sent; isn't that    11:20:54
6  correct?
7  A. Yes.
8  Q. And in conducting business, you endeavor to be
9  truthful and accurate; isn't that true?
10  A. Yes.                     11:21:06
11  Q. And the meeting you're referring to here, the
12  one that took place in Eindhoven on June 12th and 13th of
13  1997?
14  A. Although it does not have a date on the first
15  page, if the first page and the rest of the pages are    11:22:30
16  meant to be together, then yes.
17  Q. Okay. Again, I'll represent that this was
18  produced by Mitsubishi as one document so...
19      Is that your signature at the bottom of the
20  document over your name?          11:22:55
21  A. Yes.
22  Q. And would this letter be maintained by
23  Mitsubishi in the ordinary course of business?
24  A. Yes.
25  Q. Okay. Sir, can you please turn to the next page

Page 234

1  of this document that ends in 874. This appears to be a
2  PowerPoint prepared by Philips and emailed to you prior
3  to the Eindhoven meetings; is that accurate?
4  A. I don't remember that.
5  Q. Do you see the Philips logo at the bottom of the    11:23:57
6  slide on page 874?
7  A. Yes.
8  Q. Does this refresh your recollection as to
9  whether this was a document prepared by Philips and sent
10  to you at Mitsubishi?          11:24:23
11  A. Although I can affirm that this is a Philips
12  document, I cannot tell you for certain whether it was
13  sent to me before the meeting or whether I received it
14  onsite.
15  Q. Okay. Thank you.          11:24:58
16      So this is a document that you received from
17  Philips, obviously; correct?
18  A. Yes.
19  Q. Okay. And on this first page, they're welcoming
20  the Mitsubishi delegation that went to Eindhoven for the    11:25:16
21  June 12th and 13th meetings, 1997 meetings, with Philips;
22  is that correct?
23  A. Yes.
24  Q. And so Mr. Nakano attended these meetings; isn't
25  that right?

Page 235

1  A. Yes, that's what it says.
2  Q. Well, do you have a basis to believe that
3  Mr. Nakano did not attend this meeting?
4  A. I don't remember the details. It's a long time
5  ago.                      11:26:21
6  Q. Okay. I want to direct you to page 24887 of
7  this exhibit.
8  A. Yes.
9  Q. And can you identify what this page is?
10  A. This is a letter from Philips Japan to          11:26:57
11  Mitsubishi regarding the hotel reservation in the
12  Netherlands.
13  Q. Thank you. And does this letter refresh your
14  recollection as to whether Mr. Nakano attended the
15  meetings in Eindhoven?              11:27:50
16  A. That's what it says here.
17  Q. Who is Mr. Yoshikawa?
18  A. I think Yoshikawa was a plasma engineer at
19  Mitsubishi.
20  Q. Okay. Sir, I'd like to direct you back to the    11:28:41
21  page we were on, 24874.
22  A. Yes.
23  Q. Do you recall whether anyone not listed on this
24  page for Mitsubishi also attended -- or excuse me --
25  attended the meetings with Philips in Eindhoven?

Page 236

1  A. I don't remember.
2  Q. Have you ever been to Eindhoven before?
3  A. I think this was my first and last time ever.
4  Q. So you attended this meeting; is that correct?
5  These meetings. I'm sorry.          11:29:41
6  A. Yes.
7  Q. And did you stay at that Holiday Inn hotel?
8  A. I don't remember such details.
9  Q. Okay. Please turn the page to 875.
10  A. Yes.                    11:30:32
11  Q. Is that your handwriting under the last bullet
12  point under where it's written 69,195 million Dutch
13  guilders?
14  A. Yes.
15  Q. And what did you mean when you wrote that?    11:30:58
16  A. I think what this means is that the amount in
17  guilders, which is the 69,195 million, would be
18  comparable to between 4 and 5 trillion Japanese yen.
19  Q. Thank you.
20      Please turn two pages to 24877.          11:31:44
21      What is your understanding about what this slide
22  describes?
23  A. I think this describes Philips organization.
24  Q. Okay. And do you see your handwriting over the
25  box that says "components" sort of on the second row of

15 (Pages 233 - 236)

Page 237

1 the chart?
2   A.  Yes.
3   Q.  What did you mean when you wrote that?
4   A.  I don't know.
5   Q.  Does it say Mr. Lo, L-O?              11:32:58
6   A.  Yes.
7   Q.  Do you know who Mr. Lo is?
8   A.  I don't know.
9   Q.  Okay.  Do you know what on this page "BG TV" on
10 the left side refers to?              11:33:17
11  A.  I don't know what it means.
12  Q.  And isn't it true that CRTs would fall within
13 the display components division at Philips?
14      MR. TRUAX:  Object to form, foundation.
15      THE WITNESS:  I would not know that.      11:34:00
16  Q.  BY MR. MILLEN:  Please turn to the next page,
17 which is 24878.
18  A.  Yes.
19  Q.  Philips provided you with this slide showing
20 that it had approximately $3 billion of CRT sales in   11:34:24
21 1996; correct?
22  A.  That's what it says here.
23  Q.  And these would be US dollars; is that right?
24  A.  I would think so.
25  Q.  Do you have -- what do you understand the next

Page 238

1 line where it says "growth over 15 percent" to mean?
2   A.  I think it says here that CRT sales is
3 15 percent and it is growing.
4   Q.  And what is your understanding of what the line
5 about factories means?              11:35:58
6   A.  It says there are 11 factories for CRTs and 15
7 factories for key components, and I don't know the rest.
8   Q.  And the last line, sales offices, refers to
9 Philips display components CRT sales offices; is that
10 correct?              11:37:17
11  A.  I don't know, but probably so.
12  Q.  Sir, could you please turn to the next page,
13 which is 24879.  And this line shows the location of
14 Philips' color CRT factories; isn't that right?
15  A.  That's what it says.              11:37:58
16  Q.  And one of Philips' CRT factories was in
17 Eindhoven.
18      Do you see that?
19  A.  Yes.
20  Q.  And isn't it true that you visited this CRT   11:38:14
21 factory in Eindhoven during your visit there for these
22 meetings?
23  A.  No, I did not visit it.
24  Q.  Sir, please turn to page 24882.
25  A.  Yes.

Page 239

1   Q.  So this page lists the Philips executives that
2 you and the rest of the Mitsubishi delegation met with in
3 Eindhoven; is that correct?
4   A.  I think so, yes.
5   Q.  So you met with Mr. Chang during the course of   11:39:35
6 these meetings; is that correct?
7       MR. TRUAX:  Object to form, foundation.
8       THE WITNESS:  That's what it says.
9   Q.  BY MR. MILLEN:  Do you have a reason to believe
10 that you did not meet with Mr. Chang during this visit to   11:39:57
11 Eindhoven?
12  A.  I don't remember anything.
13  Q.  Well, does this document refresh your
14 recollection as to who you met with during this meeting?
15 And I'll direct you to the top of the document that, of   11:40:20
16 course, says "today you will meet."
17  A.  No.
18  Q.  Do you know -- there's two names at the bottom
19 of this chart, Mr. Verscharen -- or Mr. and Ms.
20 Verscharen and Mr. or Ms. Tolner.              11:41:12
21      Do you see that?
22  A.  Yes, I see it.
23  Q.  Do you know who Mr. or Ms. Verscharen is?
24  A.  I recall nothing.
25  Q.  How about Tolner; do you recall who that is?

Page 240

1   A.  I don't remember anything.
2   Q.  And if you turn to the next page, which is
3 24883, you see an indication that you met with additional
4 individuals, including Mr. Werkhoven; is that correct?
5   A.  That's what it says here.              11:42:22
6   Q.  Well, did you meet with Mr. Werkhoven at this --
7 on this visit?
8   A.  I don't remember anything.
9   Q.  Well, can you turn back to the first page of
10 this exhibit, your letter to Mr. Werkhoven thanking him   11:42:41
11 for the meeting.
12      Does that refresh your recollection?
13  A.  No.
14  Q.  Mr. Murata, you realize that you're still under
15 oath; is that right?              11:43:24
16  A.  Yes.
17  Q.  I want to make sure.
18      Okay, sir, now I'd like to direct your attention
19 to pages 24884 through 889.  Okay?
20  A.  Yes.              11:44:06
21  Q.  This appears to be a slightly out-of-order fax
22 that Philips sent Mitsubishi on June 3rd, 1997; right?
23      And let me try to help by saying I believe the
24 first page of this fax is on 887.  You used the word
25      MR. TRUAX:  Object to form.  You used the word

16 (Pages 237 - 240)

Page 241

1  "this." Are you referring to "this" being the exhibit?
2      MR. MILLEN: I'm referring to the pages I
3  referenced when I directed him to look at this fax.
4      MR. TRUAX: Okay. I just wanted to make sure
5  because when we opened it up with the exhibit, you talked    11:45:03
6  about this being a contiguous document, and I just want
7  to make sure the record's clear about it so...
8      MR. MILLEN: I mean, Mitsubishi, for the
9  record, produced this as a contiguous document.
10     Q. Okay. Mr. Murata, so we're -- please take a    11:45:35
11  look at 24887. And this, of course, was the page we
12  looked at a little while ago, a fax from Philips
13  containing hotel arrangements for the Mitsubishi
14  delegation; is that correct?
15     A. Yes.                        11:46:14
16     Q. Okay. And this fax was forwarded to you; isn't
17  that right?
18     A. Yes.
19     Q. And you had received this fax in the course of
20  doing your job at Mitsubishi at that time; isn't that    11:46:37
21  right?
22     A. Yes.
23     Q. And this document was maintained by Mitsubishi
24  in the ordinary course of business; is that correct?
25     A. Yes.

Page 242

1      Q. And this fax relates to a business meeting with
2  Philips in Eindhoven on June 12th and 13th, 1997; is that
3  correct?
4      A. Yes, I think so.
5      Q. Please turn to 24884.                11:47:33
6      Do you recognize the handwriting on this map?
7      A. No, I don't.
8      Q. Do you know what this map depicts?
9      A. Is it not a map of Eindhoven?
10     Q. I believe it is. Do you think so, also?    11:48:22
11     A. It says "Eindhoven station" so I think so, yes.
12     Q. Okay. And do you see there's a handwriting that
13  says "Philips display components" with an arrow going to
14  a sector on the map marked "R"?
15     A. Yes.                        11:48:57
16     Q. Okay. And do you see below that, similar line
17  for Philips, looks like "S" and "V," which points to a
18  Sector S of the map?
19     A. It's probably "S and V."
20     Q. Thank you. Thank you.            11:49:27
21      And do you see similarly for Philips research,
22  there's an arrow pointing to Sector W of the map?
23     A. Yes.
24     Q. Okay. And finally, do you see the reference to
25  the Holiday Inn and its location relative to these

Page 243

1  Philips facilities?
2      A. Yes.
3      Q. And isn't it true that Philips produced CRTs in
4  Sector R, which is labeled "Philips display components"?
5      MR. TRUAX: Object to form, foundation.        11:50:34
6      You may answer.
7      THE WITNESS: I don't know.
8      Q. BY MR. MILLEN: Okay, sir, please turn to the
9  next page. I believe this is a blowup of the Sector R
10  that we just looked at on the previous page.        11:51:01
11     Do you agree?
12     A. Yes, I think so.
13     Q. In the notation and handwriting on the map
14  indicates that the Mitsubishi delegation met with Philips
15  at the RAF building on June 12th; is that correct?    11:51:35
16     A. Yes.
17     MR. TRUAX: Object to form. The answer will
18  stand.
19     Q. BY MR. MILLEN: Sir, can you please turn to the
20  next page of the document 24886. I believe this is a    11:52:17
21  blowup of Sector W that we saw on the first map we looked
22  at.
23     Would you agree?
24     A. I think so.
25     Q. Okay. And here also does -- well, I withdraw

Page 244

1  that.
2      Does the handwriting on this map indicate that
3  this is where the Mitsubishi delegation met with Philips
4  on the afternoon of June 12th and on June 13th?
5      MR. TRUAX: Object to form, foundation.        11:53:16
6      THE WITNESS: I don't remember that, but that's
7  what it says.
8      Q. BY MR. MILLEN: During the course of this visit
9  to Philips in Eindhoven, did you have the opportunity to
10  talk informally with David Chang?            11:53:55
11     A. I don't remember.
12     Q. Do you remember if the Mitsubishi delegation
13  went out to dinner the Philips -- with any Philips
14  personnel during this visit?
15     A. I do remember that there was a dinner at a    11:55:02
16  restaurant within Philips. In other words, I don't think
17  we went out.
18     Q. Okay. Thank you.
19     Did anybody from the Mitsubishi delegation do
20  anything socially with any Philips' personnel during this    11:55:24
21  visit, for example, go out for a drink?
22     A. I don't remember anything like that.
23     Q. Isn't it customary for business meetings like
24  this for the parties to go out for some fun after
25  meetings?

17 (Pages 241 - 244)

Page 245

1    MR. TRUAX:  Object to form and foundation.
2    THE WITNESS:  I don't remember anything, but
3 back in those days what you described was not common
4 practice.
5    Q.  BY MR. MILLEN:  Mr. Murata, who attended the        11:57:16
6 dinner during this visit on the Philips facility?
7    A.  I don't remember anything.
8    Q.  Do you remember how long the dinner lasted for?
9    A.  It was a long time ago, so no, I don't remember.
10    Q.  Mr. Murata, do you remember whether this        11:59:18
11 Exhibit 6214 was shown to you by your lawyers in
12 preparation for your deposition last December?
13    A.  You said Exhibit 6214?
14    Q.  Sorry, I misspoke then.  8214.
15    A.  I don't recall.        12:00:04
16    Q.  Okay.  When is the last time you've seen this
17 document?
18    A.  I don't remember.
19    Q.  It seems like it must have been recently because
20 if you remember when we were talking about the Kyoto        12:00:33
21 meeting with Philips earlier today, you had a mistaken
22 recollection that that meeting was in Eindhoven; correct?
23    MS. LIN:  Object to form.
24    MR. TRUAX:  I object to form.  I actually think
25 it's also argumentative, but...

Page 246

1    THE WITNESS:  The only thing I clearly recall
2 about a meeting with Philips was the one at Eindhoven,
3 which is why I earlier incorrectly stated that that
4 meeting was in Eindhoven.
5    Q.  BY MR. MILLEN:  Okay.  And when I was asking you        12:02:15
6 questions about this meeting in Eindhoven, you actually
7 said "I don't remember anything" at one point.  And now
8 you're saying that you clearly recall it.
9    Is that true?
10    (Judge Vaughn Walker enters deposition room.)        12:02:31
11    THE WITNESS:  Yes.
12    Q.  BY MR. MILLEN:  Okay.  Mr. Murata, I'm handing
13 you what's been marked as Exhibit 6114E, and this was
14 used at your deposition last December.
15    Do you remember this document?        12:03:23
16    A.  I don't remember if this is the exact same
17 document, but I do recall seeing something similar.
18    Q.  Okay.  And unfortunately, sir, while I was in
19 the midst of asking you questions about this document,
20 your counsel insisted over my objection on taking you out        12:04:28
21 of the conference room to confer with you.
22    Do you remember this incident?
23    A.  I don't recall if it was this particular
24 document, but I remember such a situation at that time.
25    Q.  Okay.  Your counsel pulled you out of the room

Page 247

1 just after you testified that the purpose of
2 Mr. Nakanishi's visit to SDI and LTD, which is reflected
3 on this document, was for a CRT meeting or meetings.
4    Does that refresh your recollection?
5    A.  I can't recall in detail.        12:06:37
6    Q.  To aid your memory, I'm going to read you that
7 portion of the transcript.  I apologize.  Give me a
8 second.
9    MR. TRUAX:  Mr. Millen, I'll help you to move it
10 along.  I think you're looking at pages 142, 143.  I don't        12:08:13
11 know if that's what you're looking for.
12    MR. MILLEN:  Thank you.  Yes, I pulled the --
13 could we go off the record for a minute.
14    MR. TRUAX:  Sure.
15    MR. MILLEN:  All right.        12:08:23
16    THE VIDEOGRAPHER:  Going off the record, the
17 time is 12:08 p.m.
18    (Discussion off the record.)
19    THE VIDEOGRAPHER:  Back on the record, the time
20 is 12:09 p.m.        12:09:44
21    Q.  BY MR. MILLEN:  Okay.  Mr. Murata, as I
22 indicated, I'm going to read for you your testimony
23 regarding this exhibit last December.  I'm going to start
24 on page 143, line 3.  And --
25    A.  Yes.

Page 248

1    Q.  Okay.  So I asked you:  "Can you identify this
2 document?"
3    And you answered:  "Just like the previous ones,
4 this is a document which is to be submitted prior to a
5 business trip.  It is an internal document."        12:10:42
6    And I asked you:  "And this document has your
7 stamp affixed to it; isn't that right?"
8    And you answered:  "Yes."
9    And I said:  "So that indicates that you
10 approved this trip; is that right?"        12:11:41
11    And you answered:  "Yes, in terms of budget, I
12 approved it."
13    And then said:  "Okay, understood.  Thank you."
14    And I asked:  "And in approving it, you did so
15 in the course of performing your job at Mitsubishi;        12:12:16
16 correct?"
17    And you answered:  "Yes."
18    And then I asked:  "And this is a document that
19 Mitsubishi would maintain in the ordinary course of its
20 operations; is that right?"        12:12:38
21    And you answered:  "Yes."
22    And I asked:  "And this request was made by a
23 Mr. Nakanishi; is that right?"
24    And you answered:  "Yes."
25    I then said:  "And he was requesting approval

18 (Pages 245 - 248)

Page 249

1 for a trip to Corning/SDI South Korea and also Hong Kong
2 Totoku LPD; is that right?"
3        And -- well, Mr. Fuentes objected to form.
4        And you asked me: "Could you go over those
5 places again? I don't think that's quite right" --        12:13:34
6 "that's correct." I'm sorry.
7        I then said: "Okay. Can you tell me what you
8 believe the trip request was for?"
9        Mr. Fuentes objected to the form, said: "Object
10 to the form."                12:15:04
11        And then you answered: "The meet -- the trip,
12 the business trip, was for a CRT meeting or meetings.
13 That's what it was for."
14        And I then asked: "Where was the destination
15 for the meeting?"                12:15:38
16        And Mr. Fuentes said: "Can we take a really
17 short break just for a couple of minutes?"
18        You then answered: "What the document says, I
19 believe, is SDI and Seoul, I think that's Samsung SDI,
20 and also LPD in Hong Kong, which I believe stands for LG        12:16:09
21 Philips display."
22        I said: "I just have a couple more questions on
23 the document. I'd like to finish before we take a
24 break."
25        I said: "Okay." On the record, it just reads

Page 250

1 "okay," but I said it with an emphasis, "okay."
2        MR. TRUAX: The transcript says what it says.
3 But in any event, so what is the question? What are you
4 trying to get at?
5        MR. MILLEN: I'm trying to refresh his        12:17:26
6 recollection about the document we were examining on when
7 we took the break. And he just said he doesn't remember.
8        Q. Okay. Then the videographer says: "The time is
9 now 9:49 a.m. We're off the record." Okay?
10        Sir, does this refresh your recollection that        12:17:59
11 this Exhibit 6114 was the exhibit you were testifying on
12 when this break was taken?
13        A. Yes, I was able to listen to that and confirm it
14 in my mind.
15        Q. Okay. And it refreshes your recollection that        12:18:39
16 the break was taken just after you testified that the
17 purpose of Mr. Nakanishi's visit -- trip to visit SDI and
18 LPD was for a CRT meeting or meetings?
19        MR. TRUAX: Object to form. Also object to the
20 extent it mischaracterizes what's actually testified to        12:19:32
21 on the pages of the transcript.
22        THE WITNESS: Yes.
23        Q. BY MR. MILLEN: Okay. I'll represent that the
24 transcript reflects that two breaks were taken. The
25 first one lasted for nine minutes, from 9:49 to 9:57 on

Page 251

1 the morning of December 9th, and then it was quickly
2 followed by a 14-minute break from 9:59 to 10:13 a.m.
3        Okay?
4        Mr. Murata, are you aware that one of the
5 reasons we're all here today to resume your deposition in        12:20:48
6 Judge Vaughn Walker's office is because the Special
7 Master ordered that you were to provide testimony
8 regarding your conversations with counsel during these
9 breaks?
10        A. Yes.                12:22:02
11        Q. And you testified back in December that during
12 these breaks, you had a discussion with counsel; isn't
13 that right?
14        A. Well, I think so.
15        Q. Okay. I don't think I need to read the        12:22:35
16 transcript in. I'll just state for the record that's
17 page 148, lines 13 to 15.
18        And you were instructed at that time not to
19 answer any questions about the context -- contents of
20 your discussion with counsel during these breaks; isn't        12:22:52
21 that right?
22        A. Yes.
23        Q. And Judge Walker has ordered that today you must
24 provide details about discussions with counsel during
25 this -- these breaks.

Page 252

1        Do you understand this?
2        MR. TRUAX: Mr. Millen, just to be clear, and
3 I'm just reading from Judge Walker's order, I believe
4 what Judge Walker ordered was something slightly
5 different than what you've characterized, but maybe the        12:23:57
6 spirit of it is the same, but I think it's important that
7 we have accuracy.
8        What the Order said was that the DPP's motion is
9 granted. I'm looking at page 10 of 11 of this Order, and
10 to make Mr. Murata available in the undersigned's offices        12:24:13
11 in San Francisco, to testify on: A, Exhibit 6114; B, his
12 conversation with counsel during the break of his prior
13 deposition; documents used to refresh his recollection
14 for that deposition; any search for destruction of
15 relevant emails contained in his personal email account.        12:24:37
16 That's under item 1.
17        So I just want to make sure, I think it's
18 important for the record during this portion of the
19 examination that we're clear on what exactly Judge Walker
20 has ordered.                12:24:52
21        MR. MILLEN: Okay. And I am talking about the
22 breaks in question. You know, there are two breaks back
23 to back that it refers to. And so I don't think you're
24 saying that he can only talk about one of the breaks.
25        MR. TRUAX: No. I think, you know, this happens

19 (Pages 249 - 252)

Page 253

1 during questioning. Sometimes there's -- I think if you
2 go back and look at this -- well, we don't need to
3 belabor it. We should move on.
4        MR. MILLEN: Okay.
5        MR. TRUAX: I think for the witness' benefit, as   12:25:14
6 you're examining him about this, we should make it clear
7 what the Court has ordered him to testify about is
8 Exhibit 6114 and his conversations with counsel during
9 the break of his prior deposition.
10        MR. MILLEN: Okay.                    12:25:29
11        MR. TRUAX: We don't need to translate all that
12 if you're comfortable.
13        MR. MILLEN: I'd prefer that you don't, right.
14        MR. TRUAX: If you're comfortable making that
15 clear to him.                        12:25:37
16        MR. MILLEN: Well, I mean, you can object to a
17 question if you don't like it.
18        MR. TRUAX: Okay. What's the question then
19 that's pending? And I apologize that I interrupted, but
20 I was trying to make it simpler.               12:25:50
21        MR. MILLEN: I'll just -- I'll start it. I'm
22 not sure if there was one at this point.
23        Q. Mr. Murata, isn't it true that during these
24 breaks, your counsel conferred with you regarding your
25 testimony on Exhibit 6114?

Page 254

1        A. So I was advised on the testimony method.
2        Q. Okay. And isn't it true that -- well, first of
3 all, who -- which of -- which of your lawyers or multiple
4 lawyers advised you on your testimony with regard to that
5 document?                        12:26:51
6        MR. TRUAX: Object to form, mischaracterizes his
7 answer.
8        THE WITNESS: What I recall is that it was
9 Attorney Fuentes who spoke to me, but it was not
10 regarding the content of the testimony, but it was       12:27:40
11 reemphasized to me to tell the truth.
12        MR. MILLEN: And unfortunately, we have to take
13 a quick break to change tapes so --
14        THE VIDEOGRAPHER: Going off the record, the
15 time is 12:28 p.m.                    12:28:02
16        (Discussion off the record.)
17        THE VIDEOGRAPHER: Back on the record, the time
18 is 12:31 p.m.
19        MR. MILLEN: Madam Court Reporter, can you
20 please read back last answer Mr. Murata provided.       12:31:10
21 Thank you.
22        (The record was read by the reporter
23        as follows:
24        "ANSWER: What I recall is that it was
25        Attorney Fuentes who spoke to me, but it was not

Page 255

1        regarding the content of the testimony, but it
2        was reemphasized to me to tell the truth.")
3        Q. BY MR. MILLEN: What exactly did -- what's your
4 best recollection of what Mr. Fuentes said to you during
5 this conversation?                    12:31:41
6        A. I don't recall the details, but I think he
7 advised me not to speculate and to always tell the truth.
8        Q. Had you been not telling the truth in the
9 testimony we just went over prior to the break?
10        A. No, I was always telling the truth, but       12:32:32
11 sometimes I said things like "I think that
12 such-and-such," and that was why the speculation part was
13 mentioned.
14        Q. So are you testifying under oath that
15 Mr. Fuentes pulled you out of the deposition in the       12:33:08
16 middle of questioning to remind you to tell the truth?
17        MR. TRUAX: Object to form, misstates his
18 testimony.
19        THE WITNESS: Basically I was advised to always
20 tell the truth and to not have any speculation. So I       12:34:12
21 said to myself I should be careful not to speculate.
22        Q. BY MR. MILLEN: Were you advised about any other
23 aspects of your testimony during these breaks?
24        A. I don't recall.
25        Q. Is this the first time your attorneys had

Page 256

1 advised you to tell the truth during your deposition?
2        A. I heard the advice on the day before my
3 deposition in December.
4        Q. So we established a little bit earlier these
5 breaks totaled about 23 minutes. Do you remember that?   12:35:43
6 There was a 9-minute break and a 14-minute break.
7        MR. TRUAX: And to be clear, Mr. Millen, so the
8 witness understands, the second break you're referring
9 to, I believe, is the break that you requested, and it
10 was a break that you requested. You said on the record   12:36:07
11 at page 147, line 2, you said: "Okay, I'd like to take a
12 ten-minute break." So that's the break you're asking
13 about.
14        MR. MILLEN: I'm asking about both breaks.
15        MR. TRUAX: Okay.                    12:36:20
16        MR. MILLEN: Right.
17        MR. TRUAX: Would you translate that.
18        (Colloquy translated.)
19        Q. BY MR. MILLEN: Okay. So before the objection,
20 I was adding up the amount of breaks. Let's take one       12:37:10
21 break at a time.
22        The first break was nine minutes. Was it during
23 this break that Mr. Fuentes advised you to tell the truth
24 and not to speculate?
25        A. I don't recall the details.

20 (Pages 253 - 256)

Page 257

1  Q. During these 23 minutes, the combined breaks,
2  what else did you talk to Mr. Fuentes about?
3  A. I'm sorry, can you be more specific when you say
4  what did we talk about?  Can you more specific?
5  Q. Sure.  So you've testified that you talked, Mr.    12:38:41
6  Fuentes advised you to tell the truth, and not to
7  speculate.  And I'm saying the breaks were 23 minutes,
8  which is a lot of time.
9  What else did you talk to your attorneys about
10  during those breaks?                                 12:38:56
11  MR. TRUAX:  I object to the form of the question
12  the way it's posed.  It's got a foundational problem.
13  Presumes something that hasn't been established.
14  MR. MILLEN:  I'll take that objection, and I'm
15  going to reframe my question.                        12:39:41
16  Q. Did you discuss anything else with Mr. Fuentes,
17  sir, or anyone else during these breaks we're referring
18  to, apart from the admonishment to tell the truth and not
19  to speculate that you've already testified about?
20  A. I did not speak about the substance of the       12:40:34
21  deposition.  The rest of the time, I was taking a break.
22  Q. So is it your testimony that what you've already
23  described were your only conversations, communications
24  with counsel during these breaks?
25  A. That's correct.

Page 258

1  Q. Okay.  Did Mr. Fuentes provide you with examples
2  of you speculating during your testimony?
3  A. No examples or specifics were given.
4  Q. Did Mr. Fuentes inform you that the testimony
5  you provided was not accurate?                       12:41:56
6  A. No, I was not told that my testimony was not
7  accurate.  I was advised that I should not use vague
8  words like "I think so," such-and-such.
9  Q. Since that incident, have you discussed with
10  anyone your conversations with counsel during those   12:43:04
11  breaks?
12  A. No.
13  Q. In preparing for today's deposition session, did
14  counsel confer with you regarding your testimony on the
15  conversations that occurred during these breaks?      12:43:46
16  A. No.
17  Q. Has anyone advised you on how you should testify
18  about this incident today?
19  A. No.
20  Q. Okay.  Let's look at the document for a couple    12:44:43
21  minutes and try to finish some things up here.
22  Looking at Exhibit 6114, this is the type of
23  document Mitsubishi used during this period for approval
24  of overseas travel; isn't that right?
25  A. That's right.

Page 259

1  Q. And you approved this travel request in the
2  course of doing your job at Mitsubishi; isn't that right?
3  A. Yes.
4  Q. And this document was maintained by Mitsubishi
5  in the ordinary course of business; correct?          12:45:41
6  A. Yes.
7  Q. And this document relates to the period in
8  August 2004; isn't that right?
9  A. Yes.
10  Q. And at that time Mr. Nakanishi reported to you;   12:46:16
11  isn't that right?
12  A. No.
13  Q. Who did Mr. Nakanishi report to at that time, if
14  you know?
15  A. Nakanishi was assigned to CA Section 2, and I     12:47:00
16  don't know who led that section.
17  Q. What was the business purpose of CA Section 2?
18  A. Sales of CRT.
19  Q. And Mr. Nakanishi was traveling to Korea to meet
20  with Corning and Samsung SDI; isn't that correct?     12:47:36
21  A. Yes, that's what it says.
22  Q. Well, do you think he was lying when he filled
23  out the request?
24  A. No.
25  Q. Okay.  And you approved this request; right?

Page 260

1  A. I was handling the budgeting and finances so I
2  approved the fact that this trip would be within the
3  confines of the budget.  That's what I approved.
4  Q. And Mr. Nakanishi was going to meet with
5  Mr. J.I. Lee at SDI; isn't that right?                12:48:44
6  MR. TRUAX:  Object to form.  Excuse me.  Object
7  to form, foundation.
8  THE WITNESS:  That's what it says here.  I don't
9  know whether the meeting was, in fact, with that
10  individual.  It just says that the receiving end would be  12:49:22
11  that party.
12  Q. BY MR. MILLEN:  What does it mean to be the
13  receiving end?  I don't understand that.
14  A. Oftentimes when there is a business trip
15  planned, there is someone that they would meet with.   12:49:54
16  However, it doesn't necessarily mean that that is the
17  person that they end up meeting with, because that's
18  happened.
19  Q. So in other words, they would be received by
20  someone they had a relationship with; is that right?   12:50:11
21  MR. TRUAX:  Object to form.  Misstates his
22  testimony.
23  THE WITNESS:  You always need to include the
24  information on who is receiving you even though this
25  could be the very first time that you're visiting.

21 (Pages 257 - 260)

Page 261

1    Q. BY MR. MILLEN:  And Mr. Nakanishi also was
2  traveling to Hong Kong to meet with LG Philips; isn't
3  that right?
4    A. That's what it says here.
5    Q. Okay.  And he was to be received at Philips by    12:51:14
6  Mr. Rene Vonhurst at LPD; isn't that right?
7    A. That's what's written here.
8    Q. And the purpose of this travel was for CRT
9  meetings; isn't that right?
10       MS. LIN:  Object to form.               12:51:58
11       MR. TRUAX:  I object to form and foundation as
12  well.
13       THE WITNESS:  The purpose it says here is CRT
14  meeting.
15    Q. BY MR. MILLEN:  And the purpose of these     12:52:26
16  meetings was for Mr. Nakanishi to discuss the CRT market
17  with SDI and LPD; isn't that right?
18    A. I don't know that.
19       MR. MILLEN:  I think it's almost 1 o'clock.
20  This is probably a good time for a break.        12:53:01
21       MR. TRUAX:  Sure.
22       MR. MILLEN:  We can go off the record.
23       THE VIDEOGRAPHER:  Going off the record, the
24  time is 12:53 p.m.
25       (Lunch recess.)

Page 262

1        THE VIDEOGRAPHER:  Back on the record.  The time
2  is 1:52 p.m.
3        MR. MILLEN:  I want to try to just clean up a
4  couple areas from the morning's testimony.  First of all,
5  Mr. Truax, would you be willing to stipulate on behalf of    13:52:59
6  Mitsubishi that the Eindhoven meetings on June 12th and
7  13th, 1997, that we discussed do not appear on Exhibit B?
8        MR. TRUAX:  I will certainly stipulate that the
9  meetings from '98 that you were asking Mr. Murata about
10  are not on Exhibit B, correct.               13:53:18
11        I just want to be precise.  I don't want, you
12  know, to characterize the meeting.  I think it's
13  exhibit to the --
14        MR. MILLEN:  It's 97.
15        MR. TRUAX:  Exhibit -- excuse me.  Excuse me.     13:53:34
16  97. I misspoke.  Excuse me.  Yep.  If you're asking --
17        MR. MILLEN:  Exhibit 8214.
18        MR. TRUAX:  Yeah, I'll stipulate that the
19  meetings that are referenced there are not on Exhibit B
20  as supplemental.                       13:53:49
21        MR. MILLEN:  Thank you.  Thank you, sir.
22    Q. And then, Mr. Murata, you remember I was asking
23  you some questions about the break that was taken at your
24  last deposition and your communications with counsel
25  during that break?

Page 263

1    A. Yes.
2    Q. Did anyone ask you how you were planning to
3  respond to questions I would ask about communications
4  during that break?
5    A. No.                            13:54:42
6    Q. Mr. Murata, I'm handing you what's been marked
7  at a previous deposition as 611 and 611E, which is a
8  certified translation of that exhibit.
9        While you are reviewing the document, I'll state
10  for the record that this document is identified by the    13:55:37
11  Bates label, at least the English certified translation
12  is, 00109690E through 94E.
13    A. Okay.
14    Q. And sir, do you recall that I asked you
15  questions about this document at your deposition in     13:57:00
16  December?
17    A. My recollection is vague.
18    Q. Sir, isn't it true that your attorneys reviewed
19  this document with you in preparation for your deposition
20  last December?                        13:57:38
21    A. My recollection on that point is also vague.
22    Q. Okay.  Sir, if you can turn to -- well, the
23  first page of the document.  You don't need to turn.  You
24  see at the top there's a stamp.  Can you identify whose
25  stamp that is?

Page 264

1    A. It's my stamp.
2    Q. Okay.  And does the "K" refer to you, as I
3  believe kacho, chief of your section?
4        Oh, no, I withdraw that question.  Sorry.
5        Does the "K" refer to Mr. Konishi?            13:58:36
6    A. No.  It means kacho, K-A-C-H-O.  It means
7  section chief in Japanese.
8    Q. And who was kacho at this time?
9    A. I was the kacho.
10    Q. And can you identify what this document is?     13:59:03
11    A. This is a notification from the EIAJ sent to its
12  member companies informing them that they will stop
13  accumulating statistics on Braun tubes.
14    Q. Isn't it more accurate to say that the EIJ made
15  a decision to change the way they reported the statistics    14:00:16
16  of CRT to production?
17        MR. TRUAX:  Are you asking what the document
18  says or are you asking him to recall generally or what?
19        MR. MILLEN:  That's a speaking objection and
20  it's improper.                        14:01:04
21        MR. TRUAX:  I don't want to do that.  And my
22  interest is really --
23        MR. MILLEN:  My question is identify the
24  document, and I asked him if he wanted to rethink the way
25  he characterized it.

22 (Pages 261 - 264)

Page 265

1    MR. TRUAX:  Well, the reason I asked the
2  question, Mr. Millen, is because that precise question
3  was asked, you know, on page 75 of the transcript
4  before -- or excuse me, page 73 of the transcript.  And
5  have at it.  I just want to make sure we're being        14:01:29
6  efficient.
7    MR. MILLEN:  Okay.  I'm trying to be efficient.
8  These speaking objections are actually slowing things
9  down.
10    THE WITNESS:  Your explanation is correct.  In   14:02:01
11  the past there was a method where the manufacturers met
12  to do the statistics.  However, they are saying a new
13  method will be in place for the statistics.
14    Q.  BY MR. MILLEN:  Thank you.  And it would be a
15  fair description to say that the new method that         14:02:27
16  ultimately the EJIA used to report statistics did not
17  include production by specific manufacturers?
18    A.  Yes, that is correct.
19    Q.  And as you testified last December, isn't it
20  true that Mr. Shimoda from Matsushita would send around  14:03:37
21  unofficial statistics to the EJIA participants which
22  provided CRT production statistics by manufacturer?
23    MS. STEWART:  Object to form.
24    MR. TRUAX:  Object to form.  And foundation.
25    THE WITNESS:  I am not able to confirm what you

Page 266

1  stated by looking at this document.
2    MR. MILLEN:  Okay.  You can put that document
3  away.
4    Can you please mark these next in order.
5    THE VIDEOGRAPHER:  8215 and 8215E.             14:06:27
6    (Exhibit 8215, ME 00110088 - 105, marked for
7    identification.)
8    (Exhibit 8215E, English translation, ME
9    00110088E - 105E, marked for identification.)
10    THE VIDEOGRAPHER:  So 8215 and 8215E.          14:06:51
11    Q.  BY MR. MILLEN:  While you're reviewing that
12  document, Mr. Murata, you've been handed Exhibit 8215 and
13  8215E, which is a certified translation.  It's been
14  marked for purposes of identification with the Bates
15  label ME00110088 through 00110105.               14:07:09
16    A.  Yes.
17    Q.  And isn't it true that this is one of the
18  documents you reviewed with your attorneys yesterday?
19    A.  I remember that it was this one.
20    Q.  Sir, can you identify this document?          14:08:04
21    A.  This shows the actual manufacturing numbers of
22  Japanese devices between the period January through
23  August of 1998.
24    Q.  And who provided these statistics?
25    A.  It would be the EIAJ.

Page 267

1    Q.  And Mr. Murata, is that your stamp at the top of
2  the first page?
3    A.  Yes, that is.
4    Q.  The one on the left; correct?
5    A.  Yes.                                        14:09:26
6    Q.  Okay.  And the stamp on the right belongs to
7  Mr. Yoshida; is that correct?
8    A.  Yes.
9    Q.  And sir, when you affixed this stamp, does that
10  signify that you received this document in the course of  14:09:42
11  performing your duties and obligations at Mitsubishi?
12    A.  Yes.
13    Q.  And was this document maintained by Mitsubishi
14  in the ordinary course of its business?
15    A.  Yes.                                        14:10:18
16    Q.  And is it accurate to say that these production
17  numbers show Japanese CRT production in Japan on an
18  aggregated basis?  And to clarify, I mean not, you know,
19  all manufacturers listed together?
20    A.  It indicates the total number of devices which    14:11:38
21  include the Braun tube in them.  It does not mention the
22  Japanese manufacturers.
23    Q.  Okay.  We're done with this one for now,
24  Mr. Murata.
25    Mr. Murata, I'm handing you what was marked in

Page 268

1  your deposition as Exhibit 8091 and 8091E, the certified
2  translation.  Sorry, I handed you the wrong one.
3    MR. TRUAX:  Are these newly marked or these are
4  previously marked?
5    MR. MILLEN:  Previously marked.                14:13:41
6    Q.  BY MR. MILLEN:  Mr. Murata, my only question on
7  this is:  Was this a document that your attorneys
8  reviewed with you prior to your deposition last December?
9    A.  My recollection is vague.
10    Q.  Mr. Murata, I'm handing you Exhibit 8085 that    14:15:06
11  was used at your deposition session last December.
12    Sir, was this one -- I'm sorry, are you done
13  reviewing it?
14    A.  I'm fine.
15    Q.  Sir, was this one of the documents your          14:15:55
16  attorneys reviewed with you prior to your deposition
17  session last December?
18    A.  My recollection is vague.
19    Q.  Okay.  Well, does this refresh your recollection
20  as to whether Mr. Shimoda from Matsushita was circulating  14:16:15
21  unofficial CRT production statistics to EJIA members?
22    A.  Yes.
23    Q.  Thank you.  Okay.  We're done with that one.
24    Mr. Murata, I'm handing you what was marked as
25  Exhibit 8087 at your deposition last December.

23 (Pages 265 - 268)

Page 269

1        Sir, do you recall that your attorneys reviewed
2  this document with you prior to your deposition last
3  December?
4        A. I don't remember.
5        Q. Okay. Sir, is this another example of the        14:18:19
6  unofficial statistics, CRT production statistics --
7  excuse me -- circulated by Mr. Shimoda?
8        MS. STEWART: Objection. Form.
9        MR. TRUAX: I also object to form and also
10 object to foundation.                                      14:18:52
11       You can answer.
12       THE WITNESS: These are unofficial stats.
13       Q. BY MR. MILLEN: Okay. And can you identify any
14 person who worked for the EJIA that's included on this
15 email distribution list?                                   14:19:20
16       A. I don't remember anyone who worked at EIAJ.
17       Q. Okay. And I'd like to direct your attention to
18 the top of page 23353, and in particular, the email
19 distribution list that's up there.
20       A. Yes.                                              14:20:37
21       Q. And isn't it true that all these recipients work
22 for CRT manufacturers?
23       MR. TRUAX: Object to form. Foundation.
24       MS. STEWART: Objection. Lacks foundation.
25       MR. MILLEN: We went through this in December.

Page 270

1  We laid a ton of foundation. We can stay here all day.
2  I can take him back through his transcript, but this is a
3  continuation of the deposition, and I'm confident the
4  foundation's been laid.
5        THE WITNESS: I can tell that these folks were       14:21:29
6  all from CRT manufacturers, but I cannot tell whether
7  they were all involved in CRT.
8        Q. BY MR. MILLEN: Okay. Thank you.
9        Isn't it true that the circulation of these
10 unofficial statistics was to be kept a secret from the     14:21:44
11 EJIA?
12       A. Yes.
13       MS. STEWART: Objection to form.
14       Q. BY MR. MILLEN: Sir, I'm handing you what's been
15 previously marked as Exhibit 6112 and 6112E, which is a    14:22:51
16 certified translation.
17       A. Yes.
18       Q. Isn't it true that this document was used by
19 your attorneys to help prepare you for your deposition
20 session last December?                                     14:23:27
21       A. I don't recall the details.
22       MR. MILLEN: Okay. That's all on that one.
23       (Exhibit 8216, ME 00109916 - 917, marked for
24       identification.)
25       (Exhibit 8216E, English translation ME 00109916E

Page 271

1        - 917E, marked for identification.)
2        THE VIDEOGRAPHER: 8216 and 8216E.
3        Q. BY MR. MILLEN: Mr. Murata, while you're
4  reviewing the document, I'll just state for the record
5  that you've been handed Exhibit 8216 and 8216E, which is  14:24:56
6  the certified translation, and the document's been marked
7  for purposes of identification with the label ME 00109916
8  through 17.
9        A. Yes.
10       Q. Sir, can you identify this document, please.      14:25:48
11       A. Each year EIAJ formulates some estimates of
12 manufacturing. In order to do that, EIAJ requests that
13 manufacturers participate in a survey so that EIAJ can
14 make that determination for the forecast. This is the
15 response by Mitsubishi to that survey.                     14:27:07
16       Q. Thank you.
17       Mr. Murata, do you see your name on the top line
18 of the first page, sort of on the -- next to that 8/11 on
19 the top right corner?
20       A. Yes.                                              14:27:39
21       Q. Does that indicate that you were the one who
22 sent this survey to the EIAJ?
23       A. No, that's not it. If you go further down,
24 you'll see Mr. Nakanishi's name, and he sent a fax to
25 EIAJ, and for some reason it was once again returned to

Page 272

1  me. That's what it means.
2        Q. Okay. Thank you for that clarification. And
3  you're referring to Mr. Nakanishi's stamp that's on the
4  lower right-hand corner?
5        A. Right.                                           14:29:18
6        Q. And when it was returned to you for whatever
7  reason, did you receive it in the course of performing
8  your job duties at Mitsubishi?
9        A. Yes.
10       Q. And do you know if it was Mr. Nakanishi who       14:29:42
11 compiled these statistics?
12       I'm sorry. I withdraw the question.
13       Was it Mr. Yoshida that compiled these
14 statistics, sir?
15       A. It says here that the person who filled it out    14:30:13
16 was Mr. Yoshida.
17       Q. Do you know how Mr. Yoshida was able to access
18 CRT shipment data at this time?
19       A. Back in those days, the factory where the Braun
20 tubes were manufactured had shipping data, and I believe   14:31:25
21 that was what was tallied.
22       Q. Okay. Was this the factory in Kyoto?
23       A. Yes.
24       Q. Do you have any idea where shipment data from
25 the relevant time period would exist today at Mitsubishi?

24 (Pages 269 - 272)

Page 273

1    A. I don't know.
2    Q. Sir, I'd just like to briefly direct your
3 attention to Exhibit B, entry 13.
4    A. Yes.
5    Q. And does entry 13 -- I withdraw the question.    14:32:46
6       Isn't it true that neither you nor Mr. Nakanishi
7 are listed as a person attending or with knowledge of
8 entry 13?
9    A. I'm sorry, are you referring to the 13th item?
10   Q. Yes, sir.                        14:33:29
11   A. I'd like to find out what kind of document this
12 is.
13   Q. This refers to a document Exhibit 8216 that
14 we're talking about. If you look, sir, in the far right
15 box is the Bates Number that matches up with the    14:33:54
16 document.
17   A. Do you mean this other page? This page?
18   Q. I mean page ME 00109916 and 17.
19   A. No, I see on this document it says "persons
20 attending/with knowledge." What does that mean?    14:34:56
21   Q. That column is supposed to list the employees of
22 Mitsubishi who either participated in a meeting or had
23 knowledge of a meeting or communication.
24   A. I guess you're pointing out that Mr. Nakanishi's
25 name is not there, and I don't know why. And then

Page 274

1 Mr. Yoshida is listed.
2    Q. Okay. And you received that document as well;
3 correct?
4    A. I think so since my name appears here.
5    Q. Okay. And obviously you're not listed in the    14:36:18
6 persons attending with knowledge, either?
7    A. Yes, my name is not listed.
8       MR. MILLEN: That was it. Okay. Thank you,
9 sir. We're done with that document.
10      (Exhibit 8217, ME 00106516 - 519, marked for
11      identification.)
12      (Exhibit 8217E, English translation, ME
13      00106516E - 519E, marked for identification.)
14      THE VIDEOGRAPHER: 8217 and 8217E.
15      MR. MILLEN: Thank you.            14:37:27
16   Q. Mr. Murata, while you're reviewing that
17 document, I'll just state for the record you've been
18 handed what's been marked as 8217 and the certified
19 translation of it, 8217E. It's identified and marked for
20 purposes of identification with the Bates label    14:38:00
21 ME 00106516 through 519.
22   A. Yes.
23   Q. Sir, do you see at the top of the first page it
24 shows that you sent an email to others at -- you sent
25 this email to others at Mitsubishi; isn't that correct?

Page 275

1    A. Yes.
2    Q. And in sending this email, you did so in the
3 course of performing your job function at Mitsubishi;
4 isn't that right?
5    A. Yes.                        14:39:05
6    Q. And this document is maintained by Mitsubishi in
7 the ordinary course of its business; right?
8    A. Yes.
9    Q. And the subject of your email is film
10 readjustment; correct?                    14:39:29
11   A. It's a revision indicating that options were
12 added.
13   Q. Okay. And isn't it true that this was one of
14 the documents your attorneys reviewed with you prior to
15 your deposition last December?            14:40:18
16   A. I have a vague recollection that I did see it.
17   Q. Okay. Thank you.
18      Can you explain what you meant when you talked
19 about common global price for film readjustment?
20   A. May I have some time to do this?        14:41:16
21   Q. Of course.
22   A. Okay.
23   Q. Okay. Can you explain what you meant when you
24 referred to common global price per film readjustment?
25   A. So initially when we looked at the performance,

Page 276

1 there would be a film that would be applied to the
2 surface of the Braun tube, and initially there was a
3 tendency for it to be scratched, and I recall that there
4 were some complaints about it.
5       And subsequently due to these customer        14:44:19
6 complaints, there were efforts made to revise or repair
7 the areas, and we had to think about the cost that would
8 be incurred.
9       Many customers indicated various requirements to
10 us. Some said we don't want to cover the cost of the    14:44:47
11 repairs, and in the end, we wanted to make sure there
12 would be no discrepancy among the customers when it came
13 to the repairs. And therefore, we felt that there should
14 be a set price for providing these repairs.
15   Q. Isn't it true that Mitsubishi preferred to    14:45:25
16 institute a common global price for its CRT products in
17 general?
18      MR. TRUAX: Object to form, also lacks
19 foundation.
20      THE WITNESS: No, that's not it. We wanted to    14:45:57
21 have a set price for providing repairs, not for CRT.
22   Q. BY MR. MILLEN: Okay. Sir, I'd like to have you
23 take a look at the second page of this document.
24 Actually, I'm sorry, the third page of the document.
25      Do you see at the bottom there's an email from

25 (Pages 273 - 276)

Page 277

1 Mr. Seki to others at Mitsubishi?

2   A. Yes.

3   Q. Do you have an understanding of what Mr. Seki

4 meant when he said "Since sales prices are basically kept

5 in step with image electronics, we would like fees in      14:47:00

6 this to operate with the common global price"?

7       THE INTERPRETER: Can we --

8       MR. MILLEN: That's fine with me. I'll read it

9 again.

10      THE INTERPRETER: Okay.      14:47:58

11   Q. BY MR. MILLEN: The translation says: "Since

12 sales prices are basically kept in step with image

13 electronics, we would like fees like this to operate with

14 the common global price."

15   A. There seems to be an error in the written      14:48:23

16 translation. I mean, it says here in the English "image

17 electronics." What is that exactly?

18   Q. Let me, sir --

19   A. I mean, isn't this referring to a factory at

20 Mitsubishi, perhaps?      14:49:02

21   Q. Yeah, what's your understanding of what that,

22 irregardless -- regardless of the translation, what's --

23 what is your understanding of what Mr. Seki was

24 communicating when he talked about common global price

25 there?

Page 278

1   A. What it says here in Japanese is that the

2 material cost is about $20. However, back in those days,

3 the Braun tubes were being manufactured in Japan as well

4 as in Mexico at a place called MDDM.

5       So what Mr. Seki is saying here is that because      14:51:11

6 they were made in different locations, the Mitsubishi

7 Japan folks, when telling their customers about the

8 repair cost and explaining that, should be explained in a

9 similar way when the folks in Mexico explained to the

10 Mexican customers, and that price should be at an      14:51:31

11 assumption of $57. I think that's what Mr. Seki is

12 trying to explain.

13   Q. Okay. Thank you.

14      Mr. Murata, have you heard the term "common

15 global price" used in other contexts at Mitsubishi,      14:51:52

16 meaning apart from this issue with the film?

17   A. That term has not been used.

18      MR. MILLEN: Okay. We're done with that

19 document, sir.

20      (Exhibit 8218, HDP-CRP00055836 - 841, marked for

21      identification.)

22      (Exhibit 8218E, English translation,

23      HDP-CRP00055836 - 841, marked for

24      identification.)

25      THE VIDEOGRAPHER: 8218 and 8218E.

Page 279

1   Q. BY MR. MILLEN: Mr. Murata, you've been

2 handed --

3   A. Excuse me.

4      MR. TRUAX: Sorry.

5      THE WITNESS: After the next question, may I      14:54:06

6 take a break?

7      MR. MILLEN: Sure. In fact, if you want to take

8 a break now, that's fine with me.

9      MR. TRUAX: Okay.

10      THE VIDEOGRAPHER: Going off the record, the      14:54:16

11 time is 2:54 p.m.

12      (Recess.)

13      THE VIDEOGRAPHER: Back on the record, the time

14 is 3:00 p.m.

15   Q. BY MR. MILLEN: Mr. Murata, before this break I      15:00:14

16 had just handed you what's been marked as Exhibit 8218

17 and the certified translation 8218E. While you review

18 it, I'll note for the record that it's been marked with

19 Bates Number HDP-CRT00055836 through 841.

20   A. All right.      15:00:56

21   Q. And sir, isn't it true that this is one of the

22 documents you reviewed with counsel yesterday in

23 preparation for today's deposition?

24   A. Yes, I think so.

25   Q. And during the break we just took, did you

Page 280

1 discuss your testimony on this document with counsel?

2   A. No.

3   Q. Sir, can you identify this document, please.

4   A. This is a document that describes the new

5 methodology of gathering statistics by EIAJ.      15:02:29

6   Q. Thank you. And would you have received this

7 document in the course of performing your job functions

8 at Mitsubishi?

9      Sir, if it helps I'll direct you to page 839.

10 It seems to be a distribution list at the top there.      15:03:04

11   A. Yes, that's right.

12   Q. Would this document be maintained by Mitsubishi

13 in the ordinary course of business?

14   A. Yes.

15      MR. TRUAX: Excuse me. I'll just object to form      15:03:34

16 as it relates, Mr. Millen, to your prior question

17 referring to a particular page within a multipage

18 exhibit. I don't want to belabor it, but I think to be

19 specific. In any event, I object to the form of the

20 question. I'm happy to explain if it would be helpful to      15:03:51

21 you.

22   Q. BY MR. MILLEN: Mr. Murata, did you receive this

23 document in the course of performing your duties and

24 obligations as an employee of Mitsubishi?

25   A. As to the first page, it is not clear to me who

26 (Pages 277 - 280)

Page 281

1  it's from or to whom it is directed, and I don't have a
2  recollection. But when it comes to page 55838, I can
3  tell you that this was received during the course of
4  carrying out my work at Mitsubishi.
5      Q. BY MR. MILLEN: Okay. Thank you.          15:05:09
6          And you would receive this document as a
7  participant in the EIAJ -- or I withdraw that question.
8          Sir, we discussed this last December, but at
9  some point the EIAJ changed its name to the JEIA;
10 correct?                                       15:05:47
11     A. Yes.
12         THE INTERPRETER: Hold on.
13         THE WITNESS: I think it's JEITA.
14     Q. BY MR. MILLEN: Thank you.
15         And you would have received this document as a  15:06:05
16 participant in the JEITA electronic display survey and
17 statistics subcommittee; correct?
18     A. It is the fact that I received this; however, I
19 cannot confirm whether it was from JEITA or from EIAJ.
20     Q. Okay. In looking at page 558339, can you tell  15:07:17
21 me who the participants in CRTs statistics were for the
22 electronic display survey and statistics subcommittee at
23 this time?
24     A. You can read this to mean that the individuals
25 listed on this page 55839 are the members.

Page 282

1      Q. Thank you. And sir, do you know what
2  Mr. Mekada's role was at Mitsubishi in January of 1999?
3      A. The person you are referring to is with
4  Mitsubishi, and if I may correct you, counselor, it
5  should be Mekada, M-E-K-A-D-A, or Mekata, M-E-K-A-T-A.  15:09:02
6      Q. Thank you, sir. I appreciate the clarification.
7          Did you report to Mr. Mekada at that time?
8      A. No, he wasn't.
9      Q. Do you see on this page it lists -- there's a
10 reference to Chief Examiner Mekada?              15:09:35
11     A. Yes. In Japanese, it's Shusa, S-H-U-S-A. But
12 yes, I see his name.
13     Q. What is the significance of the title Shusa?
14     A. I don't know the significance of the title
15 because this is a title that is a position within the  15:10:22
16 EIAJ organization.
17     Q. Do you know what duties or responsibilities come
18 with the title Shusa in this organization?
19     A. In terms of Mr. Mekada's role or job, it is my
20 recollection that he was gathering the numbers and that I  15:11:37
21 recall the Mitsubishi members were serving one portion of
22 the function within EIAJ, and that was the gathering of
23 the numbers.
24     Q. Sir, do you know what the purpose of the CRT
25 production survey was at this time?

Page 283

1      A. It is my understanding that the purpose back
2  then was to assess the size of the CRT industry in Japan
3  to determine whether or not the industry was growing or
4  whether it was diminishing. And it handled the role of
5  one aspect of the country's investigation, Japan's  15:13:32
6  investigation.
7      Q. And for purposes of this survey, the goods for
8  the data being collected included color CRT tubes for
9  both displays and televisions and projector tubes.
10         Isn't that right?                      15:14:02
11     A. That and that it also included other specialty CRTs.
12     Q. Would a projector tube be an example of a
13 specialty CRT that you're referring to?
14     A. Projector types were included, yes.
15     Q. Thank you.                              15:15:06
16         I'd like to direct you to the first page of the
17 document. At the bottom there is a section called "5.3,
18 Method For Collecting Data."
19         Do you see that?
20     A. Yes.                                    15:15:32
21     Q. And underneath it says: "The data collection
22 work has been consigned to Century auditors, who will
23 take care not to reveal the individual data of each
24 company to an outside party, including the secretariat,
25 under any circumstance."

Page 284

1      Do you see that?
2      A. Yes.
3      Q. And in fact, this individual CRT production data
4  was so confidential that Century Data was directed to
5  immediately destroy the floppy disks each company used to  15:16:25
6  provide them with the data immediately after collection.
7      Isn't that right?
8      A. That's what it says here.
9      Q. Thank you, Mr. Murata. I have no further
10 questions on this document at this time.          15:18:16
11     Mr. Murata, during the relevant period, did you
12 use any personal email accounts?
13     A. Yes.
14     Q. How many personal email accounts did you have
15 during the relevant period?                      15:18:52
16     A. I had several. I may not be completely accurate
17 here, but it could have been either six or seven,
18 thereabouts.
19     Q. Okay. And one of those was the address
20 VE03414@Nifty.NE.JAP; correct?                  15:19:39
21     A. May I hear that once again, please.
22     Q. Sure. VE03414@Nifty.NE.JAP.
23     A. Did you say -- did you say VED03414@Nifty.com
24 or --
25     Q. Well, can you tell me what -- do you remember at

27 (Pages 281 - 284)

Page 285

1  your deposition session last December you found a
2  document used -- that you used to send a business -- you
3  found an example where you used the Nifty email account
4  to send a business document?
5       A.  Yes.                          15:21:27
6       Q.  What was that email address that you used for
7  that document?
8       A.  It was VED03414@Nifty.com or Nifty.co.JP.
9  Sorry, it would have been Nifty.NE.JP.
10      Q.  Dot JP.  Okay.  Thank you.  And --    15:22:17
11      MR. TRUAX:  Did you say "N" like in Nancy or
12  M-E?
13      THE WITNESS:  "N" as in Nancy.
14      MR. TRUAX:  That's what I thought.  I just
15  wanted to make sure.                     15:22:31
16      Q.  BY MR. MILLEN:  Can you please describe the
17  other personal email accounts that you maintained at that
18  time by providing the email addresses.
19      A.  I think back in those days, I only used Nifty;
20  however, my recollection is rather vague.    15:23:10
21      Q.  Didn't you just testify that you had six or
22  seven personal email accounts at that time?
23      A.  Oh, that's at the current time, at the present
24  time.
25      Q.  Okay.  So how about during the relevant time

Page 286

1  period, March 1st, 1995, through December 31st, 2007,
2  what personal email accounts did you have during that
3  time period?
4       A.  I think I had one other account; in other words,
5  I had Nifty and then this second one.         15:24:27
6       Q.  Okay.  Can you please describe this second
7  account, please.
8       A.  I really have forgotten it because that mail
9  account -- that email account has been closed.
10      Q.  Do you recall approximately when you closed that   15:25:10
11  email account?
12      A.  More than ten years ago.
13      Q.  Just do you remember what the domain for that
14  email account was?  Was it Nifty or Gmail, for example?
15      A.  I didn't use it so I have forgotten it.    15:26:02
16      Q.  Okay.  Let's talk about the Nifty email can that
17  came up at your deposition last December.  Okay?
18      A.  All right.
19      Q.  Isn't it true that prior to your deposition last
20  December, that no effort was made to determine whether    15:26:30
21  your Nifty email account contained any information
22  relevant to this litigation?
23      A.  Right.
24      Q.  And isn't it true that no effort was made in
25  connection with this litigation to preserve CRT-related

Page 287

1  emails stored in your Nifty email account?
2       A.  That's right.
3       Q.  During the relevant time period, did Mitsubishi
4  have a policy relating to use of personal email for
5  business purposes?                         15:27:51
6       A.  By the -- during the relevant time period, can
7  you remind me what time frame are you talking about?
8       Q.  Sure.  March 1st, 1995 through December 31st,
9  2007.
10      A.  That it would correspond to the relevant period,   15:29:32
11  I believe, because I recall that about ten years ago I
12  heard that there was a serious incident regarding data at
13  Mitsubishi Electric.  Subsequently, employees were told
14  that we should not use our personal PCs for work, and
15  therefore, all work-related emails were to be deleted.    15:30:03
16      Q.  And so you're talking sometime about 2005; is
17  that correct?
18      A.  I don't recall the precise year.
19      Q.  Okay.  Could it have been 2007?
20      A.  I don't know.                      15:30:35
21      Q.  Okay.  Did you comply with this directive to
22  delete all your work-related emails from your Nifty
23  account?
24      A.  Yes, I did.
25      Q.  Did you make any attempt to save these, somehow

Page 288

1  for example, by forwarding them to your work account or
2  saving them on a hard drive?
3       A.  No, I didn't.
4       Q.  Weren't you concerned that you may need some of
5  those emails to perform your job in the future at that    15:31:23
6  time?
7       A.  That's right.
8       Q.  So you were concerned that you may need those
9  emails --
10      A.  Pardon me?                       15:31:51
11      MR. TRUAX:  I think there's a flip in there.
12      THE INTERPRETER:  Yeah, in Japanese it's the
13  reverse.  Maybe the interpreter --
14      MR. MILLEN:  Okay.
15      Q.  Did you have a concern that you would want to be    15:32:07
16  able to have access to these work-related emails on your
17  Nifty account in the future at the time you deleted them?
18      A.  I did not feel that.
19      Q.  Okay.  How did you identify your work-related
20  emails at that time in order to delete them?       15:32:41
21      A.  It was a long time ago so I don't recall
22  clearly, but perhaps I looked at the subject line or the
23  title of the email.
24      Q.  And to delete them, did you simply click the
25  delete button for each email?

28 (Pages 285 - 288)

Page 289

1  A. I don't remember the particulars.
2  Q. Do you remember whether you went into your trash
3  folder to permanently delete any emails?
4  A. Generally, I would go through my emails once a
5  month and delete them. So I don't think there would be   15:34:48
6  anything left.
7  Q. Okay. So you've never tried to delete items
8  from the trash folder of your Nifty account.
9  Is that true?
10  THE INTERPRETER: I'll repeat the interpretation   15:35:20
11  for the witness.
12  THE WITNESS: No, I did delete from the Nifty
13  account.
14  Q. BY MR. MILLEN: Okay. But you did not delete
15  from a trash folder in the Nifty account; correct?   15:35:55
16  A. Perhaps I don't understand what you are asking
17  me.
18  Q. Okay. The way most email accounts work is you
19  can delete once, so from your inbox or your sent box, and
20  it's deleted, but it's saved in a folder usually called   15:36:23
21  trash. To delete folders from trash, it takes a second
22  step of emptying the trash folder.
23  A. Yes, I understand what you're saying. And the
24  question is?
25  Q. Is it true that you're unaware of how to delete

Page 290

1  items from a trash folder of the Nifty email account?
2  A. No, that's not correct. I would delete from the
3  inbox, and I would also delete from the trash. And at
4  least once a month, I would clean out the trash box.
5  Q. Okay. Mr. Murata, Mitsubishi's counsel has   15:38:11
6  represented that following your deposition last December,
7  you personally searched this Nifty account for
8  CRT-related emails.
9  Is this true?
10  A. It is true.   15:38:49
11  Q. Okay. And this was sometime following the
12  deposition in September between December 10th and the
13  19th; is that right?
14  MR. MILLEN: December.
15  THE WITNESS: It was following the December   15:39:28
16  deposition and after I returned to Japan.
17  Q. BY MR. MILLEN: Okay. And how did you search
18  for CRT-related emails at this time?
19  A. I think I looked through all of the subjects,
20  but I did not find any.   15:39:59
21  Q. Do you recall approximately how many emails were
22  in your Nifty email account at the time you conducted
23  this search?
24  A. I don't really know, but somewhere between 500
25  and 1,000.

Page 291

1  Q. And were those all in your inbox?
2  A. Yes.
3  Q. So did you look for CRT-related documents in
4  your sent items?
5  A. Yes.   15:41:16
6  Q. And did you look in your trash folder?
7  A. Yes.
8  Q. Did you try to use any search terms such as
9  "CRT" to identify CRT-related emails?
10  A. I don't think I conducted a search based on the   15:41:58
11  term "CRT."
12  Q. In connection with this search for CRT-related
13  documents, were you given any instructions by anyone
14  about best practices for identifying emails on a given
15  topic?   15:42:18
16  A. No, I didn't.
17  Q. Did you ever provide Mitsubishi access to this
18  Nifty account?
19  A. No.
20  Q. Did you provide your counsel or Mitsubishi's   15:42:53
21  counsel with access to your Nifty account?
22  A. No.
23  Q. So in essence, you simply searched your email
24  account on your own; is that correct?
25  A. That's correct.

Page 292

1  Q. And do you know, does your Nifty account
2  maintain a contact list or address book of contacts that
3  you've emailed before or received an email from?
4  A. It's my understanding that the Nifty account
5  does not come with an address book.   15:44:09
6  Q. Okay. Do you know with your Nifty account if
7  you're going to send somebody an email and you start
8  typing in their email address, does it auto-populate the
9  rest of the email address for you?
10  A. No, it does not appear.   15:44:49
11  Q. You should try a better email service because
12  Gmail does that. It saves a lot of time.
13  A. Thank you for that.
14  Q. You're welcome.
15  Are you aware of whether any of your colleagues   15:45:38
16  at Mitsubishi involved in the CRT business also used
17  personal email accounts during -- to conduct business
18  during the relevant time period?
19  A. I don't remember.
20  Q. I want to shift gears to your work email account   15:46:31
21  during the relevant time period. Okay?
22  During the relevant time period, did Mitsubishi
23  ever implement any type of automatic email deletion
24  policy?
25  MR. TRUAX: Object to form, lack of foundation.

29 (Pages 289 - 292)

Page 293

1    I also object because it's outside the scope of
2 what Judge Walker ordered, but, you know, we're here so
3 I'm not going to instruct him obviously not to answer.
4        THE WITNESS: I did not know about a function
5 called automatic email deletion.                    15:48:08
6    Q. BY MR. MILLEN: I just want to quickly switch
7 back to your Nifty account. Okay?
8        Do you know whether your Nifty email account has
9 what's called an archive folder?
10    A. Did you say archive folder? No, I don't know    15:48:50
11 about this.
12    Q. Okay. Mr. Murata, did you ever receive
13 instructions from anyone at Mitsubishi to preserve emails
14 related to CRT?
15    A. Are you asking me about my Nifty account in that  15:49:39
16 question?
17    Q. Any email. Again, it's a broader question.
18    A. I have not received such instructions.
19        MR. MILLEN: Okay. Let's go off the record for
20 a minute.                                           15:50:07
21        THE VIDEOGRAPHER: Going off the record, the
22 time is 3:50 p.m.
23        (Recess.)
24        THE VIDEOGRAPHER: Back on the record, the time
25 is 4:08 p.m.

Page 294

1    Q. BY MR. MILLEN: Mr. Murata, I'd like to refer
2 you to the Exhibit B that I introduced at the beginning
3 of the deposition.
4    A. Yes.
5    Q. Okay. Please take a look at entry number one on   16:08:17
6 the first page.
7    A. All right.
8    Q. Okay. And this row talks about a written
9 communication on March 1, 1996, and lists the persons
10 attending with knowledge as Mr. Konishi and Mr. Kimura;   16:08:33
11 is that correct?
12    A. Yes.
13    Q. Are you aware of any facts relating to this
14 written communication that you could provide testimony
15 for?                                                16:09:09
16        MR. TRUAX: Object to form, lacks foundation.
17        THE WITNESS: I have nothing to say because I
18 have not seen the written communication.
19    Q. BY MR. MILLEN: Okay. Sir, please take a look
20 at number two. And this relates to a June 11th, 1996,    16:09:37
21 meeting at the Intercontinental Hotel in Tokyo. And once
22 again, you are not listed as a person attending the
23 meeting or with knowledge of it.
24        Isn't that right?
25    A. That's right.

Page 295

1    Q. And do you have knowledge of any facts relating
2 to this meeting?
3    A. I don't know.
4    Q. Sir, can you turn the page and look at number
5 four. This refers to a meeting on March 11th, 1998, at   16:10:35
6 the Hotel Nikko in Tokyo. And once again, you are not
7 listed as a person attending or with knowledge; isn't
8 that right?
9    A. Yes.
10    Q. Do you have knowledge of any facts relating to    16:11:10
11 this meeting, sir?
12    A. I don't know.
13    Q. I'd like to direct your attention to number six.
14 It refers to a meeting on September 16th, 1998, in Tokyo.
15 Once again, you are not listed as a person attending or   16:11:37
16 with knowledge; isn't that right?
17    A. Right.
18    Q. Okay. So, sir, would it be fair to say that you
19 would not be able to provide testimony regarding any of
20 the entries on Exhibit B that don't list you as either an  16:12:05
21 attendee or a person with knowledge?
22    A. Yes.
23        MR. MILLEN: Mr. Murata, I have no further
24 questions at this time, and we'll see if there's any
25 additional examination I may need to come back later and

Page 296

1 ask you some more. Thank you.
2        Anyone else?
3        MR. TRUAX: Yes, I have a few questions on
4 behalf of Mitsubishi Electric.
5        THE VIDEOGRAPHER: Thank you.                  16:13:08
6             EXAMINATION
7 BY MR. TRUAX:
8    Q. Mr. Murata, when did you leave the CRT business?
9    A. In the year 2000, around October.
10    Q. And when you left the CRT business, where did    16:13:47
11 you -- well, withdrawn.
12        What did you transition to within the Mitsubishi
13 Electric family of companies after your responsibilities
14 for the CRT business ended?
15        MR. SAVERI: And Terry, I'm going to object to   16:14:03
16 this whole lining of questioning. What's the authority
17 that you have to now open up questioning in this
18 deposition that you didn't before.
19        MR. TRUAX: I'm following up a question that you
20 guys opened the deposition with about his -- I'm         16:14:15
21 orienting him and laying a foundation for when his
22 responsibilities began and ended, consistent with the
23 line of questioning that you have pursued today.
24        MR. SAVERI: No, but the line of questioning and
25 his responsibilities was asked and answered the last

30 (Pages 293 - 296)

Page 297

1 time.  We were allowed to open up documents that
2 refreshed his recollection.  That's what we did.  Those
3 are the documents you produced that we have an order on.
4         I don't think your asking him when he left the
5 CRT business has anything to do with what the Court        16:14:40
6 ordered.
7         MR. TRUAX:  Are you making an objection?
8         MR. SAVERI:  I am.  I think this whole line of
9 questioning is improper from you, and I'm objecting to
10 the whole line of questioning, and I'm going to move to    16:14:50
11 strike it all.
12        MR. TRUAX:  Okay.  Objection is noted.
13     Q.  When you left the CRT business, how did your
14 responsibilities change?
15        MR. SAVERI:  Same objection.                        16:15:14
16        THE WITNESS:  I transferred over to the business
17 department of headquarters and the planning department.
18     Q.  BY MR. TRUAX:  Did you have responsibilities for
19 CRT-related matters in that role?
20        MR. SAVERI:  Same objection.  Move to strike.       16:15:53
21        THE WITNESS:  I was no longer involved in
22 CRT-related work.  My business was strictly in the areas
23 of planning and budgeting.
24     Q.  BY MR. TRUAX:  But did the planning and
25 budgeting relate to CRT products at all?

Page 298

1         MR. SAVERI:  Objection to form and move to
2 strike.
3         THE WITNESS:  Within the planning, CRT was
4 included.
5     Q.  BY MR. TRUAX:  Okay.  Did there come a point in     16:16:50
6 time where your responsibilities with respect to planning
7 as it related to CRT, did that end at some point?
8         MR. SAVERI:  Objection to form, leading.  Move
9 to strike.
10        THE WITNESS:  I'm not clear on the question as       16:17:50
11 to what it was that ended.
12     Q.  BY MR. TRUAX:  Okay.  I'm just trying to
13 establish a point in time that will tie up to the
14 questions that counsel for the class posed to you as to
15 when any responsibility that you had with respect to CRT   16:18:12
16 ended.
17        MR. SAVERI:  Object to form, leading.  Move to
18 strike.  I'm objecting to this whole line of questioning.
19        THE WITNESS:  It was in 2004 that Mitsubishi
20 left the CDT business and all CRT-related businesses.  So  16:19:07
21 that was the end.
22     Q.  BY MR. TRUAX:  So since 2004, would you have had
23 any occasion to send emails about the CRT business?
24        MR. SAVERI:  Object to form.  Move to strike.
25        THE WITNESS:  No, basically not.

Page 299

1     Q.  BY MR. TRUAX:  Okay.  What is a "PDP"?
2         MR. SAVERI:  Object to form.
3         THE WITNESS:  It's a plasma display panel.
4     Q.  BY MR. TRUAX:  Do you recall some of the
5 documents Mr. Millen showed you earlier today had a         16:20:03
6 reference to PDP.  Do you recall that?
7         MR. SAVERI:  Objection.
8         THE WITNESS:  Yes.
9     Q.  BY MR. TRUAX:  So just so we're clear, what --
10 using that as a reference point, what did you understand    16:20:22
11 PDP to reference in those documents that you looked at?
12     A.  So PDPs would refer to the display devices which
13 we refer to as modules.  So these would be product
14 development and manufacturing of those.
15     Q.  Is a PDP the same thing as a CRT?             16:21:11
16        MR. SAVERI:  Object to form.
17        THE WITNESS:  The methodologies are different.
18 They could be used in similar fashion.  CRTs and PDPs can
19 both be used in televisions.
20     Q.  BY MR. TRUAX:  The technology of a CRT product,     16:21:51
21 is that the same or different from the technology in a
22 PDP product?
23        MR. SAVERI:  Object to form.
24        MR. TRUAX:  Just a second.  What's wrong with
25 the form?

Page 300

1         MR. SAVERI:  I think it's compound and you're
2 leading.
3         MR. TRUAX:  I'll stick with the question,
4 Counsel.
5         THE WITNESS:  The technology used are completely     16:22:25
6 different.
7     Q.  BY MR. TRUAX:  In Mr. Millen's examination, he
8 referenced for you a few documents, and I'm going to put
9 them back in front of you.  They're Exhibits 8212 and
10 8214.                                            16:22:50
11        Let me ask you to take a look first at 8214.
12     A.  Okay.
13     Q.  And you'll see if you look on the re line, do
14 you see where it says R-E, and then it says: "Your
15 request for PDP spec."                            16:23:24
16        Do you see that?
17     A.  Yes.
18     Q.  And what does "PDP" refer to there?
19     A.  Refers to the PDP modules.
20     Q.  Okay.  And if you look at Exhibit 8212, which      16:23:43
21 is -- and Mr. Millen asked you a number of questions
22 about 8212.  Withdrawn.
23        Let me -- let me focus first on 8214.  If you'll
24 look at 8214, I think you'll recall Mr. Millen asking you
25 some questions about 8214?

31 (Pages 297 - 300)

Page 301

1    A. Yes.
2    Q. And do you recall that some -- at least some of
3  the pages in this Exhibit 8214 reference some type of
4  meeting that occurred in '97 with -- in Europe?
5       MR. SAVERI: Object to form.        16:24:49
6       THE WITNESS: Yes.
7    Q. BY MR. TRUAX: What did you understand --
8  withdrawn.
9       Do you have a recollection of those meetings in
10  Europe?                      16:25:09
11    A. I think -- I don't recall the details, but
12  Mitsubishi was giving presentations on what PDPs will be
13  sold.
14    Q. And if you look at Exhibit 8212, which was the
15  first of the exhibits Mr. Millen showed you, I think you   16:25:57
16  originally testified that you thought that that was a
17  meeting that occurred in Europe.
18       MR. SAVERI: Object to form.
19    Q. BY MR. TRUAX: Do you recall that testimony?
20       MR. SAVERI: Same objection.        16:26:11
21       THE WITNESS: Are you referring to the meeting
22  mentioned in 8212?
23    Q. BY MR. TRUAX: Let me be more precise.
24       Do you understand that there's some sort of
25  meeting referenced in some of the pages in Exhibit 8212?

Page 302

1       MR. SAVERI: Object to form.
2       THE WITNESS: This is a memo of the meeting. So
3  yes, that's correct.
4    Q. BY MR. TRUAX: Do you have any recollection or
5  memory of the meeting that's referenced in 8212?     16:27:21
6       MR. SAVERI: Objection. Asked and answered.
7       THE WITNESS: I don't recall details; however,
8  earlier I did remember that there was a meeting held in
9  Kyoto.
10    Q. BY MR. TRUAX: Beyond these two meetings that    16:27:54
11  are referenced in Exhibit 8212 and 8214, do you have any
12  memory of meetings that involved anybody from Philips or
13  LG?
14    A. And your question was regarding LG Philips?
15    Q. I'll say Philips.          16:28:33
16    A. I don't remember.
17    Q. Okay. Now was there -- at either of these
18  meetings or any meeting, was there ever an effort by
19  anybody that you knew of at Mitsubishi Electric to reach
20  an agreement with anybody at Philips regarding the     16:28:55
21  pricing of CRT products?
22       MR. SAVERI: Object to form, leading, compound.
23       THE WITNESS: No.
24    Q. BY MR. TRUAX: Was there ever, to your
25  knowledge, ever any type of effort to reach an agreement

Page 303

1  with anybody at Philips at either of these meetings or
2  any other meeting relating to restricting the production
3  or supply of CRT products?
4       MR. SAVERI: Same objection.
5       THE WITNESS: No, absolutely not.     16:30:12
6    Q. BY MR. TRUAX: Mr. Murata, to your knowledge,
7  was there ever an effort made by anyone at Mitsubishi
8  Electric to reach an agreement with any manufacturer of
9  CRT regarding restricting production or supply of CRT
10  products?                    16:30:30
11       MR. SAVERI: Object to form.
12       THE WITNESS: Absolutely not.
13    Q. BY MR. TRUAX: And was -- to your knowledge, was
14  there ever any effort by anyone at Mitsubishi Electric to
15  reach an agreement with any manufacturer of a CRT product   16:30:52
16  regarding the pricing of CRT products?
17       MR. SAVERI: Object to form.
18       THE WITNESS: No, not at all, even on this
19  question of pricing.
20    Q. BY MR. TRUAX: Do you know when MELCO exited the   16:31:22
21  CPT business?
22    A. I think it was back in 1997.
23       MR. TRUAX: Mr. Murata, thanks for your time.
24  We reserve signature when the deposition is completed.
25       MS. LIN: Counsel, I have no questions.

Page 304

1       MR. SAVERI: Redirect. Recross. Excuse me.
2          FURTHER EXAMINATION
3  BY MR. MILLEN:
4    Q. Okay, Mr. Murata, I have a few more questions
5  for you.                     16:32:07
6       Are you a lawyer, sir?
7    A. No.
8    Q. Do you understand what constitutes an agreement
9  pursuant to the law in the Ninth Circuit?
10    A. I would not know that.        16:32:37
11    Q. Do you understand what a tacit agreement is
12  under United States law?
13    A. I don't have a clear understanding, I don't
14  think.
15    Q. Have you read the case titled In Re Citric Acid   16:33:02
16  Antitrust Litigation, which was issued by the Ninth
17  Circuit?
18    A. No, I have not.
19    Q. Have you read the In Re Petroleum Products
20  opinion from the Ninth Circuit?        16:33:29
21    A. No, I have not.
22    Q. Did it ever come to your attention that Samsung
23  SDI testified by Interrogatory that Mitsubishi fixed
24  prices for CRTs in the US with Samsung?
25       MR. TRUAX: Object to form. Misstates the

32 (Pages 301 - 304)

Page 305

1  testimony.

2      THE WITNESS:  I have never heard of such a

3  thing.

4      Q.  BY MR. MILLEN:  Your lawyer, Mr. Truax, was

5  asking you some additional questions about the meetings    16:34:52

6  with Philip in Exhibits 8212 and 82 -- with Philips,

7  excuse me -- Exhibits 8212 and 8214; correct?

8      A.  Yes.

9      Q.  And isn't it true that you weren't present for

10  all conversations that took place between employees of    16:35:23

11  Mitsubishi and employees of Philips at these meetings?

12      A.  Yes.

13      Q.  So isn't it true that agreements relating to CRT

14  prices could have been made without your knowledge?

15      MR. TRUAX:  Object to form, calls for    16:36:12

16  speculation.

17      THE WITNESS:  I would not know about that.

18      Q.  BY MR. MILLEN:  And you're not aware of the

19  content of all conversations that occurred between

20  representatives of Mitsubishi and Philips at these    16:36:30

21  meetings; correct?

22      A.  I don't know about the content.

23      Q.  So isn't it true, then, that agreements could

24  have been made at these meetings in conversations that

25  you're unaware of the content of?

Page 306

1      MR. TRUAX:  Object to form, calls for

2  speculation.

3      THE WITNESS:  I would not know about those.

4      MR. MILLEN:  Okay.  I have no further questions.

5  Thank you, sir.    16:37:45

6      MR. TRUAX:  And so we'll just reserve signature

7  on the -- on the transcript, review the signature.

8      THE REPORTER:  Excuse me, did you need a copy of

9  the transcript?

10      MR. TRUAX:  We have an agreement, I think, on    16:37:59

11  the way that works.  We can take that up off the record.

12  I just want to make sure the witness, if he so chooses,

13  has an opportunity to review it.

14      THE VIDEOGRAPHER:  Anybody else have questions

15  on the phone?    16:38:10

16      MR. TRUAX:  Anybody have questions on the phone?

17      MS. STEWART:  Not Panasonic.

18      THE VIDEOGRAPHER:  Thank you.  This concludes

19  Volume 3 of the videotaped deposition of Koji Murata.

20  We're off the record at 4:38 p.m.    16:38:20

21      Thank you.

22      (Time noted: 4:38 p.m.)

23          --oOo--

24

25

Page 307

1      I declare under the penalty of perjury under the

2  laws of the State of California that the foregoing is

3  true and correct.

4      Executed on _____, 2015, at

5  _____, _____.

6

7

8

9

10

11      _____

12          KOJI MURATA, VOL III

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 308

1  STATE OF CALIFORNIA      )  ss:

2  COUNTY OF MARIN          )

3

4      I, LESLIE ROCKWOOD, CSR NO. 3452, do hereby

5  certify:

6      That the foregoing deposition testimony was

7  taken before me at the time and place therein set forth

8  and at which time the witness was administered the oath;

9      That testimony of the witness and all objections

10  made by counsel at the time of the examination were

11  recorded stenographically by me, and were thereafter

12  transcribed under my direction and supervision, and that

13  the foregoing pages contain a full, true and accurate

14  record of all proceedings and testimony to the best of my

15  skill and ability.

16      I further certify that I am neither counsel for

17  any party to said action, nor am I related to any party

18  to said action, nor am I in any way interested in the

19  outcome thereof.

20      IN WITNESS WHEREOF, I have subscribed my name

21  this 20th day of July, 2015.

22

23

24

25      LESLIE ROCKWOOD, RPR, CSR NO. 3462

33 (Pages 305 - 308)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.