# Exhibit A

CERTIFIED COPY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

In re:  CATHODE RAY TUBE (CRT)       )
ANTITRUST LITIGATION,                )
_____  )  Case No. 07-5944 SC
                                     )    MDL No. 1917
This Document Relates to:            )
                                     )
ALL ACTIONS.                         )
_____  )

HIGHLY CONFIDENTIAL

VOLUME I

DEPOSITION of NOBUO HARADA

May 20, 2015

Tami L. Le, RPR, CSR No. 8716
   392110


SINCE 1972

BARKLEY
Court Reporters
barkley.com

(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine         (858) 455-5444 San Diego
(916) 922-5777 Sacramento     (408) 885-0550 San Jose         (760) 322-2240 Palm Springs    (951) 686-0606 Riverside
(818) 702-0202 Woodland Hills (212) 808-8500 New York City    (347) 821-4611 Brooklyn        (518) 490-1910 Albany
(516) 277-9494 Garden City    (914) 510-9110 White Plains     (312) 379-5566 Chicago         (702) 366-0500 Las Vegas
          00+1+800 222 1231 Paris       00+1+800 222 1231 Dubai       001+1+800 222 1231 Hong Kong

```
09:21    1                       SAORI BEZOUSKA,

         2            sworn to interpret from English into

         3            Japanese and from Japanese into English

         4            to the best of his or her ability.

         5

         6        MR. CURRAN:  May I proceed?

         7

         8                      EXAMINATION

         9    BY MR. CURRAN:

09:21   10        Q    Mr. Harada, good morning.

        11        A    (In English) Good morning.

        12        Q    Mr. Harada, are you currently employed?

        13        A    (Through the Interpreter) Yes.

        14        Q    And by whom?

09:22   15        A    I work for SEMA Sharp Electronic Manufacturing

        16    Companies.

        17        Q    Where do you work?

        18        MR. BENSON:  Objection to form.

        19        THE DEPONENT:  In San Diego.

09:22   20        Q    BY MR. CURRAN:  Mr. Harada, when did you first

        21    start working for any company in the Sharp family of

        22    companies?

        23        A    Well, 1973.

        24        Q    Okay.  And with what company was that?

09:23   25        A    Sharp Corporation.
```

11

BARKLEY
Court Reporters

10:14   1          THE DEPONENT:  It was a business of

        2   manufacturing or -- color TVs.

        3      Q    BY MR. CURRAN:  And what was the business of

        4   SEMEX at that time?

10:14   5      A    SEMEX was TV production.

        6      Q    Color televisions; correct?

        7      A    Yes, color.

        8      Q    So at that point in time, 2001, SEMA and SEMEX

        9   were in the same line of business?

10:15  10          MR. BENSON:  Objection to form, misstates prior

       11   testimony.

       12          THE DEPONENT:  Well, I'm not sure about same

       13   line of business, but the relationship between SEMA and

       14   SEMEX was that SEMEX was a manufacturing plant and SEMA

10:15  15   was the owner of what was produced by SEMEX, and they

       16   would then sell it on to sales and marketing.

       17      Q    BY MR. CURRAN:  Sell it on to sales and

       18   marketing at SEC?

       19      A    Yes.

10:16  20      Q    And how -- were televisions still being

       21   manufactured at SMCA in 2001?

       22      A    No manufacturing since April of 2001.

       23      Q    Did SEMA and SEMEX replace SMCA?

       24          THE INTERPRETER:  Excuse me.

10:17  25          MR. BENSON:  Objection to form, vague.

                              31

BARKLEY
Court Reporters

10:17 1                    THE DEPONENT:  Replaced, yes.

2        Q     BY MR. CURRAN:  Do you know why SMCA was closed

3    down?

4                    MR. BENSON:  Objection to form, misstates prior

10:17 5    testimony.

6                    THE DEPONENT:  It was transferred.  The TV

7    business is transferred for Mexico.  It wasn't closed

8    down.  The SMCA still had its microwave oven business.

9        Q     BY MR. CURRAN:  Okay.  So SEMA and SEMEX

10:18 10   replaced SMCA's television manufacturing; is that right?

11       A     It was transferred.

12       Q     Do you know why the television manufacturing

13   was transferred from SMCA to SEMA/SEMEX?

14       A     It's because S- -- the -- there was weaker

10:19 15   competitive -- strike that -- because in the U.S., SMCA

16   was losing its competitiveness.

17       Q     Do you know why SMCA was losing its

18   competitiveness?

19       A     There were two reasons; the first was that the

10:20 20   labor was much -- was higher in the United States

21   compared to Mexico, and the second was that most part

22   suppliers had already moved to Mexico.

23       Q     Were either of those two reasons, were -- among

24   those two reasons, was one more important than the

10:20 25   other?

                              32

BARKLEY
Court Reporters

10:20  1          MR. BENSON:  Objection to form, vague.

2          THE DEPONENT:  No.  Both were important

3    factors.

4      Q    BY MR. CURRAN:  How much cheaper was the labor

10:21  5    in Mexico than in Memphis?

6          MR. BENSON:  Objection to form, lack of

7    foundation.

8          THE DEPONENT:  I don't remember exactly, but I

9    think for a line worker, it was maybe about a third.

10:21 10      Q    BY MR. CURRAN:  So the cost of labor in Mexico

11    for a line worker was one-third the wage of the worker

12    in Memphis?

13      A    I don't remember exactly, but I think it was

14    that or less.

10:22 15      Q    And you were the head of manufacturing in

16    Memphis, right, immediately before the transfer?

17      A    Yes.

18      Q    And, sir, did you have any input into the

19    decision to replace the television manufacturing at SMCA

10:22 20    with the television manufacturing at SEMA/SEMEX?

21          MR. BENSON:  Objection -- sorry.  Objection to

22    form, misstates prior testimony.

23          THE DEPONENT:  I was involved.

24      Q    BY MR. CURRAN:  How were you involved?

10:24 25      A    The pres- -- the then president of SEMA and

33

BARKLEY
Court Reporters

10:26 1    Q    And for how long were you president of SEMA and

2    SEMEX?

3    A    Until March 2008.

4    Q    Did you take on a new position then?

10:26 5    A    I was transferred to the plant in Poland from

6    April 2008.

7    Q    Is that a television manufacturing plant?

8    A    It was originally an LCD panel module assembly

9    plant, then it turned into a plant that manufactured the

10:27 10   television through the end.

11   Q    LCD televisions or cathode ray tube

12   televisions?

13   A    LCD TVs.

14   Q    How long were you working in Poland?

10:28 15   A    Four years.

16   Q    What was your title?

17   A    In Poland?

18   Q    Yes.

19   A    President.

10:28 20   Q    And what was the company you were working for

21   at that point in time?

22   A    Sharp Manufacturing of Poland.

23   Q    And so you worked as president of Sharp

24   Manufacturing of Poland from approximately April of '08

10:29 25   for four years; right?

35

BARKLEY
Court Reporters

10:29 1     A    Yes.

2     Q    During that point in time, was Sharp still

3  manufacturing color televisions at the plant in

4  Barcelona, Spain?

10:29 5          MR. BENSON:  Objection to form, vague.

6          THE DEPONENT:  Color -- Spain -- the Spain

7  plant was not manufacturing color TVs, they were

8  manufacturing LCD TVs.

9     Q    BY MR. CURRAN:  While you were in Poland?

10:30 10     A    CRT TVs were no longer being manufactured by

11  the time I was in Poland.

12     Q    Were LCD televisions being manufactured in

13  Barcelona, Spain even after Sharp Manufacturing of

14  Poland was manufacturing LCD televisions?

10:31 15     A    Basically, the TV manufacturing was transferred

16  from Barcelona to Poland.

17     Q    So the -- the Poland plant replaced the

18  Barcelona plant; right?

19          MR. BENSON:  Objection to form,

10:31 20  mischaracterizes prior testimony.

21          THE DEPONENT:  Ultimately, the LCD TV

22  manufacturing was consolidated into Poland.

23     Q    BY MR. CURRAN:  It closed down in Spain and it

24  started up and continued from Poland; right?

10:32 25          MR. BENSON:  Objection to form, asked and

36

BARKLEY
Court Reporters

11:00   1   discussion about looking at the cost level.

2        Q    BY MR. CURRAN:  What did you do after you were

3   president of Sharp Manufacturing of Poland?

4              THE INTERPRETER:  Can the interpreter just look

11:01   5   something up?

6              CHECK INTERPRETER SUMIYOSHI:  Commissioned

7   employee, a contract employee.

8              THE INTERPRETER:  Thank you.

9              THE DEPONENT:  I retired from Sharp Corporation

11:01  10   in 2011, then continued for two years as the president

11   of Poland as a part-time employee -- or a commissioned

12   employee and then worked for Sharp Corporation for an

13   additional two years as a commissioned employee.

14       Q    BY MR. CURRAN:  So let me see if I understand

11:01  15   this.  So you retired from Sharp Corporation in 2011?

16   That's the first question.

17       A    Yes.

18       Q    But you stayed at Sharp Manufacturing of Poland

19   for two more years as a part-time, commissioned

11:02  20   employee?

21       A    Yes.

22       Q    And were you working in Poland during that

23   period?

24       A    Yes, the same.

11:02  25       Q    And were you still the president of Sharp

43

BARKLEY
Court Reporters

11:02  1    Manufacturing of Poland?

       2        A    Yes.

       3        Q    So you were president of the company even

       4    though you were a part-time, commissioned employee?

11:03  5        A    I think really part-time is wrong.  This --

       6    what I was was a contract employee, a contract job, and

       7    it's the same as being a regular employee, the

       8    conditions were the same.  It was just that I had

       9    retired at one point and then I -- I retired and then

11:04 10    returned as this contract employee, so I was working

      11    full-time.  I don't think that we -- you really have

      12    that type of a system in the United States.

      13        Q    And then after two years as a contract employee

      14    at Sharp Manufacturing of Poland, did you move back to

11:04 15    Japan?

      16        A    Yes, I did.

      17        Q    And you worked as a contract employee for Sharp

      18    at that time?

      19        A    I worked as a contract employee for Sharp

11:05 20    Corporation.

      21        Q    Okay.  And what were your responsibilities?

      22        A    For the first year, I was project chief for a

      23    new plant that was being commissioned in Indonesia for

      24    white goods and I -- so I supported that as a project

11:05 25    chief.

                                    44

BARKLEY
Court Reporters

11:05  1         Q     And white goods, meaning refrigerators,

2     washers, dryers?

3         A     (In English) Yes.

4               (Through the Interpreter) The new plant in

11:06  5     Indonesia was a plant for refrigerators and washing

6     machines.

7         Q     No television manufacturing?

8         A     There was some TV too.

9         Q     LCD or CRT television?

11:06 10         A     LCD.

11         Q     And what about the second year with Sharp

12     Corporation?

13         A     I was in the overseas planning department --

14     overseas site planning department and essentially I was

11:07 15     following up from Japan on the new plant -- mainly

16     the -- mainly the new plant in Indonesia.

17         Q     Okay.  So you retired in 2011 and then you were

18     a contract employee for four years; right?

19         A     Yes.

11:08 20         Q     Was that a single contract or multiple

21     contracts covering that four years?

22         A     It was renewed each year.

23         Q     Four back-to-back contracts?

24         A     So four year -- for the span of four years,

11:08 25     each year the contract was renewed.

45

BARKLEY
Court Reporters

11:08  1      Q    Right.  With no gap in between?

2      A    Gap?

3      Q    Yeah, no hiatus, no interregnum.

4      A    No.

11:09  5      Q    All right.  And then what did you do after the

6   fourth of those one-year contracts?

7      A    That ended on January 21st of this year.

8      Q    What did you do then?

9           THE INTERPRETER:  Can the interpreter check the

11:10 10   gender?

11           MR. CURRAN:  Yes.

12           THE DEPONENT:  Then the president, Okayama,

13   from SEMA said -- asked me whether -- invited me to work

14   with him.

11:10 15      Q    BY MR. CURRAN:  And did you accept that

16   invitation?

17      A    Yes, I did.

18      Q    And when did you start working with SEMA again?

19      A    March 24th of this year.

11:10 20      Q    Were you employed between January 21st of this

21   year and March 24th of this year?

22      A    No, I was not.

23      Q    So you've now been working again at SEMA for

24   the past two months?

11:11 25      A    Yes, that's correct.

46

BARKLEY
Court Reporters

11:53   1          THE DEPONENT:  Sharp and Sony, of course, are

2    competitors, but in the Maquiladora Association, there

3    wasn't really a feeling that --

4          THE INTERPRETER:  I'm sorry.

11:53   5          THE DEPONENT:  -- in the Maquiladora

6    Association, there wasn't really that kind of a

7    sentiment.

8       Q    BY MR. CURRAN:  Can you explain what you mean

9    by that?

11:54  10       A    (In English) I cannot explain very well, but...

11          (Through the Interpreter) The -- the companies

12    certainly were competitors, but more than that -- how

13    should I say this?  I can't express it very well.  But

14    they are competitors, but -- of course, they're

11:55  15    competitors, so we did not discuss or exchange

16    work-related information, but more than that, our

17    relationship was as members of the Maquiladora

18    Association.

19       Q    So you did not exchange work-related

11:55  20    information with the other Japanese TV makers who were

21    in the association?

22       A    No.

23       Q    Why not?

24       A    That's because there was also the issue of

11:56  25    antitrust too, so we did -- nobody talked about that

61

BARKLEY
Court Reporters

11:56   1    type of thing.

2        Q    And what do you mean by "work-related

3    information"?  What are the types of information that

4    you did not discuss with these competitors?

11:56   5        A    That I did not discuss?

6        Q    Yes.  I think that's what your testimony was;

7    right?

8        A    Well, work-related information, for example,

9    price or part saucing -- part sourcing and such --

11:57  10    such -- the cost -- information on cost was never

11    discussed.

12        Q    So you did not discuss information related to

13    the price of televisions with these competitor

14    companies; is that right?

11:57  15        A    That is right.

16        Q    Did you discuss production with these other

17    companies?

18           MR. BENSON:  Objection to form, vague.

19           THE DEPONENT:  Detailed discussions about

11:58  20    productions was not done with others.

21        Q    BY MR. CURRAN:  What do you mean by "detailed"?

22        A    We wouldn't discuss things like the scale of

23    production or the daily production output, the employee

24    attendance rate, wages, things like that.  We would only

11:59  25    talk about whether we're busy or not, something like

62

**BARKLEY**
Court Reporters

11:59 1    that.

2        Q    What about monthly production output?

3        A    We would only say approximately what it was.

4        Q    In what discussions would this come up?

11:59 5        A    It doesn't come up in meetings.

6        Q    When does it come up?

7        A    So, we don't talk about it.  Those more

8    detailed topics or detail items would not come up.

9            Are you talking about what the approximate

12:00 10   scale is?

11       Q    When -- in what context did you have

12   discussions about general production output?

13           MR. BENSON:  Objection to form,

14   mischaracterizes prior testimony.

12:00 15         THE DEPONENT:  So it would come up in the

16   context of talking about if it's -- if things are, in

17   general, going well or not.

18       Q    BY MR. CURRAN:  So just social chitchat, is

19   that what you're saying?

12:01 20       A    Yes.

21       Q    Did you discuss market trends with your

22   competitors in the association?

23           MR. BENSON:  Objection to form, vague.

24           THE DEPONENT:  The actual sales and projections

12:01 25   for North America overall would be included in the

63

BARKLEY
Court Reporters

12:01 1  topics, so that would come up.

2      Q    BY MR. CURRAN:  In the topics at the regular

3  meetings?

4      A    Well, that would depend on what the topic being

12:02 5  addressed for a specific meeting was.  It wasn't that it

6  was regularly brought up.

7      Q    But sometimes at the association meetings,

8  there would be a discussion of actual sales and

9  projections for North America?

12:02 10      A    That would be discussed based on information

11  that has been made public through the media.

12      Q    And by "projections," you're talking about for

13  the future; right?

14      A    Yes, that would also be in the actual.

12:03 15      Q    So is it -- is it your testimony that the only

16  figures that were discussed at the association meetings

17  were those that had already been made public in the

18  media already?

19      A    Yes.  That is the only information source there

12:03 20  was for the U.S. as a whole.

21      Q    But at association meetings or social events,

22  did you and the other Japanese TV makers share

23  confidential information about pricing, plans,

24  production, forecasts and other items like that?

12:04 25      A    No, we did not, because those were our -- those

64

BARKLEY
Court Reporters

12:04  1    were secret -- our individual secrets, so we did not.

2         Q    Did you ever ask some of the competitor

3    companies to give you their confidential information on

4    pricing, production, technological advances or other

12:05  5    confidential matters?

6         A    No, I did not.

7         Q    Did you ever ask subordinates of yours at

8    SEMA/SEMEX to try to obtain confidential pricing,

9    production or other confidential materials from

12:05 10   competitor companies?

11         A    No, I did not.

12         Q    Did you ever provide reports to either SEC or

13    top management at Sharp Corporation that included

14    confidential information gathered by your subordinates

12:06 15   from competitors?

16         A    No.

17         Q    All right.  Now I want to step away from the

18    Maquiladora Association for a minute and talk kind of

19    more generally.  Okay?

12:06 20        Separate and apart from the association, did

21    you have communications with competitors in which you

22    exchanged pricing information, production information or

23    other confidential competitive information?

24         A    No, I did not.

12:07 25        Q    Did you ever ask subordinates of yours at SEMA

65

BARKLEY
Court Reporters

12:07 1    and SEMEX to contact competitor companies and attempt to

2    gather confidential pricing, production or other

3    confidential material?

4        A    Do you mean competitor information?

12:08 5    Q    Yes.

6        A    I would ask for information to be obtained

7    through suppliers.

8        Q    Did you ever ask your subordinates to obtain

9    that information directly from competitors?

12:08 10   A    No.

11       Q    Did you ever have email exchanges with your

12   subordinates in which you asked them to get information

13   from competitor companies and then they responded and

14   gave you such confidential information from competitors?

12:09 15        MR. BENSON:  Objection to form, asked and

16   answered.

17            THE DEPONENT:  No.

18       Q    BY MR. CURRAN:  Did you actively monitor what

19   your competitors at the -- well, I'm not limiting it to

12:09 20   the Japanese, so this is for any of the competitors.

21   Did you monitor what your competitors were doing with

22   respect to manufacturing of televisions?

23            MR. BENSON:  Objection to form, vague.

24            THE DEPONENT:  I don't know about actively, but

12:10 25   we wanted to know what the scale of production of other

66

BARKLEY
Court Reporters

12:10  1    companies was, so we did try to obtain that through

2    suppliers.

3        Q    BY MR. CURRAN:  But not directly from

4    competitor companies?

12:11  5            MR. BENSON:  Objection to form, asked and

6    answered.

7            THE DEPONENT:  No.

8        Q    BY MR. CURRAN:  Did you provide reports to SEC

9    or Sharp Corporation in Japan about competitor

12:11 10   activities that you and your subordinates had gathered

11   up?

12           MR. BENSON:  Objection to form, vague and

13   compound.

14           THE DEPONENT:  In regards to the number of

12:12 15   units produced by competitor and television

16   manufacturing was obtained through supply -- through a

17   supplier or suppliers and --

18           (In English) Part supplier.  Part supplier.

19           (Through the Interpreter) -- part suppliers,

12:12 20   and, although irregularly, reports were provided to

21   inform what the approximate scale was.

22       Q    BY MR. CURRAN:  Did you receive reports or

23   other information from SEC about developments in the

24   competitive landscape for televisions?

12:13 25           MR. BENSON:  Objection to form, vague.

                            67

BARKLEY
Court Reporters

12:13 1          THE DEPONENT:  I don't know what type of

2      information that would be, but basically it was not very

3      frequent that -- or it was seldom that information on

4      other companies would be provided by SEC.  Of course, we

12:14 5      would exchange information that has already been in the

6      news that is public, but we did not receive confidential

7      information.

8          Q    BY MR. CURRAN:  To the best of your knowledge,

9      did SEC have direct interactions with competitor

12:14 10      companies that were also selling televisions?

11          MR. BENSON:  Objection to form, vague and lack

12      of foundation.

13          THE DEPONENT:  I don't really know.

14          Q    BY MR. CURRAN:  Did you ever hear that SEC had

12:14 15      developed contacts or channels with its competitors to

16      exchange information?

17          MR. BENSON:  Objection to form, vague.

18          THE DEPONENT:  As far as I know, I haven't

19      heard of that.

12:15 20          Q    BY MR. CURRAN:  Did you instruct your

21      subordinates at SEMA and SEMEX to develop channels with

22      competitors in order to exchange information?

23          MR. BENSON:  Objection to form, asked and

24      answered.

12:15 25          THE DEPONENT:  No, I did not.

68

BARKLEY
Court Reporters

CERTIFIED COPY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

In re:  CATHODE RAY TUBE (CRT)      )
ANTITRUST LITIGATION,                )
_____ )  Case No. 07-5944 SC
                                     )     MDL No. 1917
This Document Relates to:            )
                                     )
ALL ACTIONS.                         )
_____ )


HIGHLY CONFIDENTIAL

V O L U M E  II

<u>DEPOSITION OF NOBUO HARADA</u>

May 21, 2015


Tami L. Le, CSR No. 8716
  392111




(310) 207-8000 Los Angeles    (415) 433-5777 San Francisco    (949) 955-0400 Irvine        (858) 455-5444 San Diego
(916) 922-5777 Sacramento     (408) 885-0550 San Jose         (760) 322-2240 Palm Springs  (951) 686-0606 Riverside
(818) 702-0202 Woodland Hills (212) 808-8500 New York City    (347) 821-4611 Brooklyn      (518) 490-1910 Albany
(516) 277-9494 Garden City    (914) 510-9110 White Plains     (312) 379-5566 Chicago       (702) 366-0500 Las Vegas
        00+1+800 222 1231 Paris      00+1+800 222 1231 Dubai      001+1+800 222 1231 Hong Kong

09:06 1  again?

2           THE REPORTER:  It's your call.

3           MR. CURRAN:  Can the interpreters acknowledge

4  on the record that they understand they're under oath

09:06 5  still.

6           THE INTERPRETER:  I do.

7           CHECK INTERPRETER SUMIYOSHI:  I do.

8           CHECK INTERPRETER BEZOUSKA:  I do.

9           MR. CURRAN:  And can the witness acknowledge as

09:06 10  well that he understands he's under oath.

11           THE DEPONENT:  Yes.

12           MR. CURRAN:  Okay.  May we proceed?

13           MR. BENSON:  Yes.

14

09:07 15               KOKO PETERS,

16             TERESA SUMIYOSHI

17            and SAORI BEZOUSKA

18          were previously sworn to interpret from

19          English into Japanese and from Japanese

09:21 20          into English to the best of their

21          ability.

22

23               NOBUO HARADA,

24          having been previously duly sworn, was

09:07 25          examined and testified as follows:

BARKLEY
Court Reporters

11:46  1          MR. BENSON:  Objection to form, asked and

2    answered.

3          THE DEPONENT:  CRTs were also, of course,

4    included.

11:47  5     Q    BY MR. CURRAN:  And particularly color picture

6    tubes or CPTs; right?

7     A    Well, we called them CRTs, but we were buying

8    CRTs.

9     Q    Okay.  And, sir, while you were president of

11:47 10    SEMA and SEMEX -- and before that, I guess when you were

11    president of SCMA --

12          MR. BENSON:  SMCA.

13          MR. CURRAN:  SMCA, thank you.

14     Q    -- were you involved in the procurement process

11:48 15    for the acquisition of contracts?

16          MR. BENSON:  Objection to form, vague,

17    compound.

18          THE DEPONENT:  Well, I was president for both

19    companies and, of course, it depends on the degree to

11:48 20    which "involvement" is meant; however, because, as

21    president, I was responsible for everything, the

22    question of whether I was involved or not would result

23    in an answer of yes.

24     Q    BY MR. CURRAN:  And, in fact, you personally

11:49 25    participated in negotiations with CRT suppliers; right?

233

BARKLEY
Court Reporters

11:49  1     A    Well, when I was at SMCA in Memphis, I was

2  hardly involved.

3     Q    And what about when you were president of SEMA

4  and SEMEX?

11:50  5     A    When I was at -- when I was president of

6  SEMA/SEMEX, I was -- I participated together with the

7  general manager for procurement.

8     Q    And you personally were involved in

9  negotiations with suppliers for CRTs; right?

11:50 10     A    Well, I'm not sure about the term "personally,"

11  but I participated in the meetings as a representative

12  of the company.

13     Q    Okay.  What I mean "personally," and I don't

14  mean as an individual unaffiliated with the company, I

11:51 15  mean you, yourself, participated on behalf of SEMA and

16  SEMEX in negotiations with suppliers for CRTs.

17          MR. BENSON:  Objection to form, vague, asked

18  and answered.

19          THE DEPONENT:  Well, you make it sound as

11:52 20  though I negotiated alone, but negotiations that I was

21  involved with always included the general manager for

22  procurement and purchasing.

23     Q    BY MR. CURRAN:  Okay.  But you personally

24  attended negotiation sessions with suppliers; correct?

11:52 25          MR. BENSON:  Objection to form, asked and

234

BARKLEY
Court Reporters

11:52  1    answered, argumentative.

2          THE DEPONENT:  I did attend.

3     Q    BY MR. CURRAN:  And you, yourself, had

4    negotiations by email with CRT suppliers; right?

11:53  5          MR. BENSON:  Objection to form, vague.

6          THE DEPONENT:  I don't remember whether I

7    myself directly sent an email or not.

8     Q    BY MR. CURRAN:  Do you -- well, who were the

9    CRT suppliers to SEMA -- to SEMA and SEMEX?

11:53 10          MR. BENSON:  Objection to form,

11   mischaracterizes prior testimony.

12          THE DEPONENT:  There are several companies.

13     Q    BY MR. CURRAN:  Please name them.

14     A    Thomson, Hitachi, Toshiba, Samsung and -- who

11:55 15   else was there? -- Orion -- did I say Toshiba? -- LG.  I

16   think it's around those.  Oh, and also Matsushita.

17     Q    Was LG Philips one?

18     A    Yes.

19     Q    What about Philips alone?

11:55 20          MR. BENSON:  Objection to form, vague.

21          THE DEPONENT:  (In English) Philips alone,

22   Philips alone, I don't remember.  I remember, I believe,

23   Philips, but...

24          (Through the Interpreter) Philips alone, I

11:56 25   don't remember.  I do remember LG Philips.

BARKLEY
Court Reporters

12:11 1  through technical collaboration with the TV side as

2  well.

3      Q    "The TV side" meaning SEMA, SEMEX and other TV

4  manufacturers?

12:12 5      A    No, that's not what I mean.  What I'm trying to

6  say is the Japanese-side technology.

7      Q    TV makers in Japan?

8      A    The engineering department or division for

9  television in Japan.

12:12 10      Q    Okay.  All right.  And then the second point

11  you referred to before were improvements by

12  manufacturers.  Can you explain that, please?

13      A    This decrease in cost based on efforts by the

14  CRT manufacturers to improve things.

12:13 15      Q    Can you give some examples of that?

16      A    Well, there are changing of processes or

17  automating processes.

18      Q    And are these things done at the manufacturing

19  plants of the CRT makers?

12:14 20          MR. BENSON:  Objection to form, lack of

21  foundation.

22          THE DEPONENT:  That's correct.

23      Q    BY MR. CURRAN:  And then, sir, the third point

24  you refer to had to do with getting quotations from the

12:14 25  CRT makers; is that right?

241

BARKLEY
Court Reporters

12:14  1        A     Yes.

       2        Q     Can you explain that one, please?

       3        A     Depending -- by specific category, if a

       4    particular category had multiple production suppliers,

12:15  5    then we would issue a request to them, to those multiple

       6    suppliers, saying that if it's for the first six months,

       7    asking what the price would be for the October-March

       8    period and inform them of what the volume would be.

       9        Q     And then in that event, would you obtain

12:15  10   quotations from a variety of different suppliers?

      11        A     Yes.

      12        Q     And then you would pick the lowest of those?

      13        A     Yes.

      14        Q     Were you able to get multiple suppliers

12:16  15   approved for most of the television sets you were

      16    manufacturing?

      17        A     Yes.

      18        Q     Did you sometimes go -- go back to a supplier

      19    who had made a quotation and ask them to lower it?

12:17  20       A     Yes.

      21        Q     And when you did that, did sometimes you say

      22    that another supplier had given a quotation that was

      23    lower than theirs?

      24              MR. BENSON:  Objection to form, vague.

12:17  25              THE DEPONENT:  We didn't really say it in that

                                    242

BARKLEY
Court Reporters

12:17 1   way.  What we said really was more along the line of,

2   "That doesn't really meet our target, so please lower

3   it."

4      Q   BY MR. CURRAN:  Mr. Harada, what do you mean by

12:18 5   your target?

6      A   When a management plan is drafted, the sales

7   price from SEMA to SEC is set.  And based on that, we

8   establish a target of what the CRT price would be and

9   what our profit will be, so that would be our target.

12:19 10     Q   Sir, that was -- by the target price, that was

11   what SEMA hoped or expected to be able to purchase the

12   CRTs for?

13     A   Yes.

14       CHECK INTERPRETER SUMIYOSHI:  Earlier in the

12:19 15   translation, you said the price from SEMA to -- okay.

16   It was a transcription.  Got it.

17       THE INTERPRETER:  Okay.

18     Q   BY MR. CURRAN:  Mr. Harada, did you try to play

19   one supplier's quotation off of another in order to

12:20 20   drive the prices down?

21       MR. BENSON:  Objection to form, vague.

22       (Reporter seeks clarification.)

23       CHECK INTERPRETER SUMIYOSHI:  The witness said

24   "I don't understand what you mean by 'play off,'" and

12:20 25   then the check interpreter offered the term "compete."

243

BARKLEY
Court Reporters

13:55  1    other day I go to the plant in Mexico.

2          Q    Why do you divide your time up that way now?

3               MR. BENSON:  Objection to form, vague.

4               THE DEPONENT:  My current work is to get new

13:56  5    businesses for SEMEX and it is -- it works out better to

6     be in the United States in order to cultivate new

7     business, so that is the reason why I am not in the U.S.

8     side.

9          Q    BY MR. CURRAN:  All right.  Your job is to get

13:57  10   new business for SEMEX, not SEMA?

11         A    Well, it will end up being the same thing,

12    but...

13         Q    How long is your contract for?

14         A    The contract doesn't really have an end date.

13:57  15       Q    Do you have an expectation as to how long your

16    contract will last?

17              MR. BENSON:  Objection to form, vague.

18              THE DEPONENT:  Well, that would depend on what

19    happens, but I think it is for around a year.

13:58  20       Q    BY MR. CURRAN:  Is it a written contract, sir?

21         A    Yes.

22         Q    When did you sign it?

23         A    I think it was in March, around one week before

24    I came to the U.S.

13:59  25       Q    When did you come to the U.S.?

261

BARKLEY
Court Reporters

13:59   1       A       It was March 24th.

2       Q       Where are you living?

3       A       I'm currently living in a town called Chula

4       Vista.

13:59   5       Q       Can you please give me the address?

6       A       825 East Paloma (sic), Unit 503, Chula Vista

7       91911.

8       Q       You have the zip code memorized already?

9       A       Yes.

14:00  10       Q       That's impressive.

11              MR. CURRAN:  At this time I'd like to ask the

12      court reporter to mark another document.

13              It's a previously marked document so we don't

14      need that.  It's been previously marked as Exhibit 3620

14:00  15      and Exhibit 3620E.  I'll read the Bates number anyway,

16      SHARP-CRT-00212452 through -476.

17              (Document handed to counsel and the deponent.)

18       Q      BY MR. CURRAN:  So, Mr. Harada, of course

19      please take a moment to familiarize yourself with 3620

14:01  20      and then I'll ask you some questions about it.

21       A      (Reviewing document.)

22              Yes.

23       Q      Mr. Harada, what is this document?

24              MR. BENSON:  Objection to form, lack of

14:03  25      foundation.

262

BARKLEY
Court Reporters