Martin Quinn
JAMS
Two Embarcadero Center, Suite 1500
San Francisco, CA 94111
Telephone: (415) 774-2669
Fax: (415) 982-5287

Special Master

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| In re: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | MDL No. 1917 |
|---|---|
| | Case No. C-07-5944-SC |
| This Document Relates to: ALL ACTIONS | **CORRECTED SPECIAL MASTER'S REPORT & RECOMMENDATION RE ALLOCATION OF IPP CLASS COUNSEL ATTORNEYS' FEES (Corrected Only to Add Exhibit A)** |

## I.  Introduction

On August 3, 2016, the Court granted Indirect Purchaser Plaintiff Class Counsel's motion for approval of attorneys' fees, reduced to $158,606,250. The Court instructed Lead Counsel Mario N. Alioto to submit a plan for allocating that total amount among the approximately 50 IPP firms to the Special Master who was directed to recommend to the Court a plan of allocation. Dkt. 4740, p.19.  This Report and Recommendation evaluates Lead Counsel's proposed fee allocation, the objections to it and responses to those objections.  The Special Master now recommends approval of a fair and adequate plan for allocation that reflects the work that each

1   attorney performed, the benefit each attorney's work provided to the Class, and the risk that each

2   attorney firm assumed by its involvement in the case.

3   **II. Process Employed by Special Master**

4   On August 5, 2016, the Special Master issued an order setting the schedule for submitting

5   all allocation papers, including Lead Counsel's proposed allocation (August 22, 2016),

6   objections to that allocation (September 7, 2016), Lead Counsel's reply to any objections

7   (September 16, 2016), the deadline to request oral hearing on objections (September 21, 2016),

8   responses by objectors if Lead Counsel submitted any new evidence with his reply (September

9   23, 2016), and the date of the anticipated filing of the Special Master's Report and

10  Recommendation (October 20, 2016).  With a few exceptions, all interested parties have abided

11  by this schedule.  The Special Master also noted that the "allocation process is intended to be

12  both formal and transparent. All filings, and all communications with the Special Master, shall

13  be filed on the Court docket...."  The Special Master ordered that oral hearings would be by

14  telephone or in person at the San Francisco offices of JAMS, that the hearings would be reported,

15  that oral argument would be permitted only by the objecting attorney and Lead Counsel, and that

16  the hearings would last no more than one hour.[1]  Dkt. 4748.

17  On September 26, 2016, at the Court's direction, the Special Master ordered that Lingel

18  Winters' Motion for Attorneys' Fees (Dkt. 4808) and Lead Counsel's Opposition (Dkt. 4844)

19  would be decided as part of this Report & Recommendation without oral argument. Dkt. 4883.

20  After Lead Counsel submitted his proposed plan for allocation, the Special Master

21  received the following eight objections: (1) McCallum, Hoagland, Cook & Kirby, Dkt. 4817; (2)

22  Francis Scarpulla, Dkt. 4818; (3) Glancy, Prongay & Murray, Dkt. 4820; (4) Cooper & Kirkham,

23  Dkt. No. 4821; (5) Kirby McInerney, Dkt. 4822; (6) Terrell McCallum, Methvin & Terrell, Dkt.

24  4824; (7) Theresa Moore, Dkt. 4825; and (8) Law Offices of Brian Barry, Dkt. 4836.[2] *See* Dkt.

25

26

27  [1] On September 28, 2016, in response to requests for broader participation the Special Master altered the procedure to allow all class counsel to attend oral arguments and any class counsel who had submitted objections or responses to speak.  Dkt. No. 4895.

28  [2] Brian Barry's objections were submitted two days late, but the Special Master permitted their submission.

4880. Only Francis Scarpulla, Cooper & Kirkham,[3] Kirby McInerney, Theresa Moore and the Law Offices of Brian Barry requested a hearing. The Special Master received the following Responses to these objections: (1) Sylvie K Kern, Dkt. 4845; (2) Zelle, LLP, Dkt. 4847; (3) Bramson Plutzik, Dkt. 4848; (4) Straus & Boies, Dkt. 4849; (5) Lawrence Papale, Dkt. 4850, and (6) Mario Alioto, Dkt. 4851-4853.[4] Both Lawrence Papale and Mario Alioto requested a hearing. *Id*. The following Replies to the Responses were also received: (1) Francis Scarpulla, Dkt. 4869; (2) Susan G. Kupfer, Dkt. 4871; (3) Kirby McInerney, Dkt. 4875; (4) Law Offices of Brian Barry, Dkt. 4872; (5) Theresa Moore, Dkt. 4873; and (6) Cooper & Kirkham, Dkt. 4878, 4879.[5]

Cooper & Kirkham filed a Motion to Strike the Declaration of Mario Alioto (Dkt. 4853-1) that was filed with Lead Counsel's Omnibus Response. Dkt. 4874. The Special Master shortened the time for opposition to this motion to September 30, 2016 and the time for reply to October 5, 2016. Dkt. 4880. These papers were filed according to schedule, and no oral argument was requested. Dkt. 4911, 4934. On October 11, 2016, the Special Master issued his Order with regard to this Motion to Strike, granting the Motion in part and denying it in part. Dkt. 4949.

All hearings were recorded and were held on October 3, 2016, (Kirby McInerney and Lead Counsel), October 4, 2016, (Brian Barry and Lawrence Papale), and October 5, 2016, (Theresa Moore and Francis Scarpulla), either telephonically or at the San Francisco office of JAMS. On October 7, 2016, the Special Master ordered Lead Counsel to file by October 12, 2016 evidence confirming the amounts actually contributed to the common fund by each class counsel firm and the dates of each contribution in order to verify the amounts that each counsel claims to have contributed. Dkt. 4944. Lead Counsel timely filed this submission. Dkt. 4960.

---

[3] Cooper & Kirkham withdrew its request for an oral hearing on October 4, 2016, one day before the hearing was scheduled to take place. Dkt. 4926. However, the Special Master permitted Lead Counsel to make arguments regarding the Cooper objection at the hearing on the Scarpulla Objection since many of the issues raised in the two objections were the same.

[4] Although Mr. Alioto's response was filed one day late, the Special Master permitted its submission.

[5] This Reply was also filed one day late but permitted.

3

1    The Special Master has considered the original declarations filed by class counsel in

2    September 2015 in connection with the motion for fees, Lead Counsel's proposed allocation, and

3    the objections and responses and replies, and the content of oral argument.  The Special Master

4    has also had an opportunity to observe first-hand the work of some of IPP counsel during the

5    motion for class certification and the *Daubert* motion and during the earlier motions for approval

6    of the settlement and for attorneys fees.

7    **III. Legal Principles for Allocating Fees**

8    In class actions lead counsel commonly propose the initial plan of fee allocation since

9    "class counsel are the most familiar with the amount of work actually contributed by each of the .

10   . . firms," and can assess "in a manner that they believe, in good faith, reflects the contributions

11   of counsel to the prosecution and settlement of the claims." *In re Toyota Motor Corp.*

12   *Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.* No. 8:10ML 02151 JVS

13   (FMOx), 2013 U.S. Dist. LEXIS 123298, at *316 (C.D.Cal., July 24, 2013); *see also Hartless v.*

14   *Clorox Co.*, 273 F.R.D. 630, 646 (S.D. Cal. 2011), aff'd in part, 473 F. App'x 716 (9th Cir. 2012)

15   ("federal courts routinely . . . have recognized that lead counsel are better suited than a trial court

16   to decide the relative contributions of each firm and attorney.") In proposing the allocation of the

17   aggregate fee award, lead counsel is required to examine "the relative efforts of, and benefits

18   conferred upon the class by, co-counsel." *Keller v. Nat'l Collegiate Athletic Ass'n*, No. C 09-

19   1967 CW, 2015 WL 8916392, at *4 (N.D. Cal. Dec. 15, 2015).

20   That said, "[C]ounsel have inherent conflicts. They make recommendations on their own

21   fees and thus have a financial interest in the outcome." *In re Diet Drugs*

22   *(Phentermine/Fenfluramine/Dexfenflurammine) Prod. Liab. Litig.*, (3d Cir. 2005) 401 F.3d 143,

23   173.  Thus, "[w]hen a case results in a common fund for the benefit of a plaintiff class, a court

24   may exercise its equitable powers to award plaintiffs' attorneys' fees." *State of Fla. v. Dunne*, 915

25   F.2d 542, 544–45 (9th Cir. 1990).  In doing so, the court must assess whether the attorneys'

26   "specific services benefited the fund—whether they tended to create, increase, protect or

27   preserve the fund." *Class Plaintiffs v. Jaffe & Schlesinger, P.A.*, 19 F.3d 1306, 1308 (9th Cir.

28

1  1994) (quoting *Lindy Bros. Builders, Inc. v. American Radiator, Etc.*, 540 F.2d 102, 112 (3d Cir.
2  1976).

3  **IV. Lead Counsel's Proposed Allocation**

4  On August 22, 2016, Lead Counsel submitted his proposed allocation of the
5  $158,606,250 aggregate fee award. Dkt. 4790. (Lead Counsel's spreadsheet allocation is
6  attached hereto as Exhibit A). The spreadsheet contains each firm's name, the firm's current
7  lodestar amount (as reported to the Court in the September 2015 Motion for Attorneys' Fees,
8  Dkt. 4073), the firm's current lodestar amount less the 10% across-the-board cut applied by Lead
9  Counsel to limit inefficiencies, the proposed total payout, and the proposed multiplier. Lead
10 Counsel submitted an amended proposed allocation chart on August 25, 2016 (Dkt. 4800) to
11 correct an error in the payout to Lawrence G. Papale.[6]

12 Lead Counsel states that he and other class counsel with whom he consulted considered
13 the following factors: (1) level of work performed (drafting important briefs, taking or defending
14 depositions, working with experts, preparing for trial, and involvement in the overall
15 management of the case and case strategy were valued higher than document review and routine
16 discovery work); (2) amount of high level work performed (taking depositions, drafting complex
17 briefs and a firm's involvement in the overall management of the case and case strategy); (3)
18 quality of the work performed (Lead Counsel enhanced or reduced a firm's multiplier based on
19 his ability to rely upon that firm to consistently and independently produce excellent work
20 product); (4) level of risk (firms that joined the case prior to early settlements or class
21 certification faced more risk than those who joined later, the amount and date of assessments that
22 a firm paid into the common Litigation Fund, and the amount of time and resources that the firm
23 devoted to the case); and (5) billing efficiency and billing rates. Lead Counsel allowed firms to
24 comment on the proposed allocation and in some cases made adjustments.

25

26

27 [6]The original spreadsheet showed a $1,175,000 payout to Mr. Papale with a 1.5 multiplier; the revised chart allows
28 him $1,277,775 based on the same multiplier. Each firm's total payout was reduced *pro rata* to provide Mr. Papale a correct payout at a 1.5 multiplier.

Lead Counsel proposed multipliers on the various lodestars ranging from 0.5 to 2.98.  He grouped firms into seven multiplier ranges according to the above factors.

Multipliers of 0.5-1.0 were given to nine law firms:

       Firms which did little or no substantive work; firms which were unreliable; firms which took an adverse position to the class; firms which otherwise worked at cross purposes to other class counsel and firms which had billing issues.

Multipliers of 1.0-1.25 were given to 17 law firms:

       Firms which represented one or more class representatives and/or performed low level document review; firms which did only a small amount of substantive work.

Multipliers of 1.25-1.3 were given to five law firms:

       Firms which performed  slightly higher level document review (e.g. foreign language reviewer or high quality work), and/or performed some other substantive work other than document review, e.g. preparing evidentiary or legal memoranda, assisting with deposition and/or trial preparation.

Multipliers of 1.3-1.5 were given to eight law firms:

       Firms which did a smaller amount of higher level work (e.g. briefing, depositions, memoranda on legal issues or evidence, trial preparation) than firms in the tiers above; and firms whose main contribution was higher level document review, including assisting with preparations for depositions, e.g. as a team leader of the document review.

Multipliers of 1.5-1.8 were given to five law firms:

       Firms which performed high level work (e.g. taking depositions, preparing briefs, trial preparations, expert work) but less of it than

the firms in the top tier, and/or they were not involved in overall
case strategy; firms that did some post-fee petition work.

Multipliers of 1.9-2.5 were given to five law firms:

Firms that were core to the class effort; firms that performed a
large amount of high level work at most stages of the case; firms
that drafted important briefs or argued significant motions; firms
that took or defended a large number of depositions, were involved
in trial preparations and expert work; firms that participated in
settlement strategy and negotiations and performed substantial
post-fee petition work.

A multiplier of 2.8 was given to Lead Counsel:

Lead Counsel credits himself with effective coordination and
management of the case over seven years, working cooperatively
with dozens of co-counsel and defense counsel, and developing
strategy to deal with complex legal and strategic issues; and
obtaining a very large settlement for the class.  (Dkt. 4071-1.)

Dkt. 4790, pp.3-4.

**V.  Analysis of Objections**

    A.  McCallum, Hoagland, Cook & Kirby, Dkt. 4817

    Lead Counsel recommended that McCallum receive a multiplier of 1.2492 on its post-10% cut lodestar of $179,122.50 for a total payout of $223,760.01.  McCallum objects, seeking to ascend four tiers higher to a multiplier of 1.96.  This increase would place McCallum among the firms that were core to the class effort and performed the most extensive and sophisticated work.  McCallum makes two arguments for an increase.  First, it incurred $19,475 of unreimbursed expenses, including $10,000 paid to the Litigation Fund, while some firms that received higher multipliers contributed nothing to the Fund.   Second, McCallum already reduced its lodestar by over $100,000 per Lead Counsel's request and it represented a Tennessee class representative.  Dkt. 4817-1.

7

1    McCallum described its work on the case in its September 2015 declaration. Dkt. 4073-

2    30. Its declaration states that it worked with its Tennessee client to collect documents, prepare

3    discovery responses and schedule his deposition; participated in drafting an opposition to one

4    motion to dismiss; and drafted four deposition summaries. Lead Counsel correctly notes that

5    firms in the tiers above McCallum did much higher level work than McCallum, such as taking

6    multiple depositions, managing document review teams, drafting briefs and preparing for trial.

7    Dkt. 4791-1, Alioto Decl., ¶2. McCallum does not dispute that comparison. Therefore, no

8    adjustment is warranted for McCallum's level of work.

9          Contributions to the Litigation Fund were less meaningful in the IPP case than in many

10    class actions because of two factors: the litigation effort was funded in large part from the early

11    settlement proceeds and by the $1,260,000 contribution of Lead Counsel. Lead Counsel

12    contributed over one-half the total Litigation Fund. Other than Lead Counsel only 27 firms

13    contributed anything to the Fund in amounts ranging from $5,000 to $125,000.[7] Dkt. 4960.

14    McCallum's $10,000 contribution to the Litigation Fund is a factor to compare its ranking to

15    those of other firms in its category (it was ranked the same as Kassof that contributed $50,000

16    and Goldman that contributed $75,000 and just below Miller that contributed $50,000 and Karon

17    that contributed nothing). But its contribution (and its expenditure of about $9,000 out-of-pocket

18    expenses) certainly does not support escalating McCallum's multiplier to that of firms that

19    performed far more complex and significant work.

20          McCallum complains about the $100,000 reduction of its lodestar, from $311,695 at

21    current rates to $199,025. Dkt. 4817-1, ¶6, 7. But Lead Counsel required every firm to reduce

22    its lodestar to eliminate unproductive recorded time such as reviewing ECF filings, internal

23    meetings and the like. That reduction does not justify raising McCallum's multiplier.

24          McCallum's final argument, that it and all other firms in this case should receive the

25    average case multiplier of 1.96 regardless of their relative contribution to the case, has no merit.

26

27    _____

28    [7] In addition to the contributions to the Fund itself, various firms made small ($2-5,000) contributions in the last
      months of the case, at Lead Counsel's request, to cover late-incurred expenses such as Special Master fees.

Allocations must and should reflect the disparity in quality and quantity of work performed for the class.

The Special Master finds no merit to McCallum's Objection.

**B.** Francis Scarpulla, Dkt. 4818

Lead Counsel recommended that Scarpulla receive a multiplier of .7495 on its post-10% cut lodestar of $66,431.25 for a total payout of $49,790.74. Scarpulla objects to this allocation, arguing that his total lodestar is $424,577.50 after applying the 10% across-the-board cut required by the Court, to which a multiplier of 3.0 should be applied for a total payout of $1,273,732.50. Dkt. 4818-4, Exh. 4.

Scarpulla objects to Lead Counsel's proposed allocation on the following grounds: (1) his correct lodestar is $424,577.50, from which Lead Counsel omitted all of Scarpulla's work while at the Zelle law firm,[8] (Dkt. 4818-1, ¶3 and Exh. 1, p. 44); (2) Lead Counsel also omitted all of Scarpulla's time negotiating with the California Attorney General and interacting with Special Master Walker; (3) Lead Counsel's time should be reduced because his handwritten time sheets are illegible; (4) Lead Counsel's and other firms' lodestar should be reduced by 20% because they recorded time in quarter-hour increments;[9] (5) firms that engaged in block billing should have their lodestars reduced by an additional 20 percent;[10] (6) Lead Counsel and some other firms were improperly credited for work that did not benefit the class; (7) late-added trial counsel who had no litigation or financial risk should not be awarded a multiplier; (8) no multiplier on lodestars should be awarded except for extraordinary work. Scarpulla provided his own version of a proposed fee allocation based on these concerns as an attachment to his Declaration. Dkt. 4818-4.

---

[8] Scarpulla left the Zelle law firm on March 21, 2015. Dkt. 4818-1, Scarpulla Decl. dtd. 9/7/16, ¶3.

[9] Scarpulla challenges the time records of Lead Counsel, Kirby McInerney, Straus & Boies, Green & Noblin and Milberg.

[10] Scarpulla challenges the time records of the same firms listed in Fn. 8.

9

As an initial matter Scarpulla's multiple calculations of his lodestar and multiplier are inconsistent and confusing. In his Declaration dated 10/1/2015 (Dkt. 4086) he stated that his lodestar for his time at Law Offices of Francis Scarpulla was $232,750 and his lodestar for his time at Zelle was $212,288.75. Dkt. 4086, ¶7. This must be a misstatement since in his Objection he attributes all his lodestar of $424,577.50 to the Zelle period (Dkt 4848, 3:17) and his hourly billing records show no time recorded after he left Zelle on March 21, 2015 (Dkt. 4818-2). Also, his most recent Declaration (Dkt. 4818-1) states that one-half of his Zelle-period lodestar was a minimum of $213,288.75 — a number which does not arithmetically match anything else. After trying to sort through all this the Special Master will use the total lodestar from his hourly billing records, $424,577.50, all of which was recorded while he was a Zelle partner.

The second complication is that Scarpulla cut a deal with Zelle on his departure by which he was to be credited with one-half his CRT lodestar and Zelle was to be credited with the other half. Scarpulla and Zelle previously disclosed this agreement to the Court. Dkt. 4073-3, 16:23-28; Dkt. 4847-1, ¶37, Decl. of Christopher Micheletti. However, Zelle declined to claim a fee award for any of Scarpulla's time. Dkt. 4847-1, Exh. 2, Zelle billing records. Scarpulla now contends that he is entitled to a fee award not only for his one-half of his time, but also for the other one-half that Zelle chose not to claim. The Special Master disagrees. Scarpulla and Zelle agreed that he would cede one-half his recorded time to Zelle. Zelle was entitled to do what it wanted with that time — claim it as part of its fee award or waive it. Zelle chose to waive it. That waiver does not entitle Scarpulla to recoup the time, thus unilaterally disavowing his agreement with Zelle. Thus the total lodestar Scarpulla can claim as a fee award is one-half of $424,577.50, or $212,288.75.

A third factor to consider in evaluating Scarpulla's objection is that commencing in 2011 his hourly billing rate was $1,250, considerably higher than that of any other attorney including Lead Counsel. In the *LCD-TFT* case, a case in which Scarpulla was co-lead counsel, the Special Master recommended and the Court approved a maximum billing rate of $1,000. Case No. 3:07-md-01827, Dkt. 7127, 7375. The Special Master now concludes that given the far more limited

1    contribution Scarpulla made to this case it is appropriate — indeed generous — to apply the

2    same maximum limit, and to reduce Scarpulla's lodestar accordingly.  Scarpulla said that he

3    recorded a total of 124.9 hours in 2011-2015 at a rate of $1,250 (Dkt. 4069, Exh. 2).  Applying a

4    $1,000/hour rate to those hours results in a reduction to the total lodestar of $31,225 (124.9 x

5    $250).

6           The Special Master now addresses each of Scarpulla's objections.

7           (Objections 1 & 2): Omission of his Zelle time and work with California AG and Special

8    Master Walker.  It is not correct that Lead Counsel omitted all of Scarpulla's time at Zelle.  Lead

9    Counsel explains in his Omnibus Response that he reduced Scarpulla's hours from 185.9 to

10   59.05 by eliminating specific categories of work:  time spent seeking appointment as lead

11   counsel, time spent on unassigned tasks, time spent reading court filings unrelated to an

12   assignment; internal case organization, unassigned trial preparation, meetings with the California

13   Attorney General and miscellaneous other matters.   Dkt. 4853, pp. 7-8.

14          The Special Master disagrees with Lead Counsel's omission of the time spent working

15   with the California AG and with Special Master Walker.  As confirmed by Special Master

16   Walker himself (Dkt. 3200), disagreements had arisen between Lead Counsel and the California

17   AG with regard to handling of the case against Phillips.  As Special Master Walker explained,

18   "there has been a lack of 'meaningful coordination' of fact and expert discovery by the IPPs'

19   lead counsel and the California Attorney General's Office," which "has opened up a new front of

20   conflict that in most cases involving indirect purchaser and *parens patriae* claims has been

21   avoided." *Id*., p.3.  Special Master Walker also noted that "IPP lead counsel has made little

22   progress in the face of [the pretrial and trial date] looming deadlines," and "the IPP settlement

23   discussions that the undersigned has been privy to do not appear to have been pursued with the

24   degree of earnestness required to produce results. This most likely is the product not of a lack of

25   good intentions, but rather of the IPP settlement team being understaffed in the face of the

26   demands of getting ready for trial." *Id*., p.4. As a result, Special Master Walker wrote: "in order

27   for the settlement process to move forward, the undersigned RECOMMENDS that the court

28   appoint additional lawyers from the ranks of those who represent IPPs to assume the laboring oar

in seeking to coordinate IPP claims with the *parens patriae* claims of the Cal AG and in settlement negotiations." *Id.*, p.5. Special Master Walker then recommended Francis O Scarpulla and Josef D Cooper for that position.[11]   Since Special Master Walker initiated and requested Scarpulla's involvement, he at least believed that Scarpulla's assistance would benefit the class. Therefore, it is inappropriate to omit the time Scarpulla spent on those matters.

The Special Master also believes that Lead Counsel's other reductions to Scarpulla's time were excessive.  Scarpulla is not a junior or even mid-level lawyer who spent too much time reviewing ECF filings and sorting documents.  He is one of the most experienced and respected antitrust lawyers in the country.  Although Lead Counsel did not assign him specific work, the Special Master is not prepared to conclude that the bulk of the time he recorded between 2007 and 2015 was of no value to the Class.  It is no secret that Scarpulla and Lead Counsel competed for the role of lead counsel in this case and that Scarpulla openly differed with Lead Counsel's judgment on settlement strategy, preparation for trial and the engagement of special trial counsel — all culminating in the objections Scarpulla filed to the settlement.  The reductions Lead Counsel made to Scarpulla's time were so drastic that they suggest payback for Scarpulla's many criticisms of Lead Counsel.  In any event, whatever the motive the reductions were too extreme.

The reductions taken by Lead Counsel were the result of an audit that he and other counsel conducted of all billings submitted.  Lead Counsel represented at the oral hearing on Scarpulla's objection that no written audit report existed, only fragmentary notes.  Therefore, the precise cuts made to Scarpulla's time cannot now be reliably recreated.  Given that state of the record, the Special Master recommends that no reduction in Scarpulla's time be made for the time he spent, other than the 10% across-the-board cut applied to all firms, the reduction of his billing rate, and the reduction of one-half his recorded time that he ceded to Zelle.  His resulting lodestar is $181,063.75 ($212,288.75 - $31,225).

---

[11] The Court did not ultimately adopt this Report and Recommendation, but this does not necessarily mean that Judge Walker's observations were without merit.

1    <u>Multiplier for Scarpulla</u>.  Scarpulla first argues that he and Zelle should receive the same

2    3.0 multiplier, the very highest of any firm and triple the 1.0 multiplier he would assign Lead

3    Counsel.  Dkt. 4818-4 (chart attached to Scarpulla's objections)  To label Scarpulla's proposed

4    re-allocation with him at the top of the heap as ambitious hardly does it justice.  First, it is not

5    appropriate for his multiplier to be the same as Zelle's because the other Zelle timekeepers

6    performed important core leadership functions in the case.  Scarpulla does not claim that he did

7    that.  His Objection notes time he spent drafting the complaint and Case Management

8    Conference Statement, some involvement in the Chunghwa settlement, expressing concerns

9    about the LG and Phillips settlement discussions, and working with the California AG and

10   Special Master Walker.  Dkt. 4818, pp 4-6.  His efforts do not approach the level of effort and

11   contribution by the other Zelle lawyers, and therefore do not deserve the same multiplier.

12   Scarpulla also argues that there was an agreement between Zelle and Lead Counsel

13   pursuant to which Zelle would be "shadow lead counsel" and receive the same multiplier as Lead

14   Counsel.  The record now includes a somewhat unseemly public airing of e-mails and text

15   messages on this subject.  Dkt. 4929, Decl. of Scarpulla re Agreement Between The Firms of

16   Trump Alioto Trump & Prescott and Zelle LLP, and Zelle's Response to Special Master's

17   Request for Documents, filed under seal as Dkt. 4948.   Having reviewed those documents, the

18   Special Master concludes that the record does not establish the existence of a binding agreement.

19   Moreover, Lead Counsel applied a higher multiplier to his firm than to Zelle — to which Zelle

20   did not object, thereby supporting the conclusion that there was no such agreement.  Moreover,

21   even if there had been, it is the Court's task to assign multipliers, if any, to various counsel based

22   on their contributions to the class, not on private agreements.

23   Lead Counsel justifies assigning Scarpulla a negative multiplier of about .75 largely

24   because Scarpulla disagreed with Lead Counsel repeatedly and ultimately objected to the IPP

25   settlement and to the fee award.  Although the Court has already rejected all of Scarpulla's

26   objections save one relating to the structure of the Chunghwa settlement, the Special Master

27   believes that Scarpulla's criticism of the release of class members who received no compensation

28   was a colorable argument that at least had the potential to benefit Class members.  Scarpulla (and

1    Cooper as we see below) cannot fairly be criticized or punished for acting professionally in
2    asserting this colorable attack on the fairness of the IPP settlement.  However, Scarpulla did not
3    stop with the Chunghwa and scope of release objections.  He also objected that notice had been
4    inadequate and that Lead Counsel had not effectively represented the Class.  Those objections —
5    all rejected by the Court — were gratuitous and potentially damaging to the Class.  Had they
6    prevailed and the settlement been vacated it is highly speculative whether a comparable or better
7    settlement could have been achieved.  To impose that risk on the Class by publicly asserting
8    procedural and speculative objections is inexplicable.  Scarpulla's concerns about notice, for
9    example, could have been expressed behind closed doors, or at the very least expressed early on
10   at the time of preliminary settlement approval — not at the last moment when they merely stoked
11   the fires of professional objectors.

12        Weighing Scarpulla's contributions as recognized by Special Master Walker, his raising
13   of colorable criticisms of the Chunghwa and release features of the settlement, and the potential
14   assistance his experience and skill might have brought to the Class had Lead Counsel welcomed
15   it against Scarpulla's lack of meaningful involvement in the case, his running antagonism with
16   Lead Counsel, and his ultimate filing of unmeritorious and potentially harmful objections, the
17   Special Master concludes that a fair and adequate multiplier to apply to Scarpulla's lodestar is
18   1.15.  This results in an adjusted payout of $208,223.31 ($181,063.75 x 1.15).

19        Objections 3-8.  Scarpulla's other concerns have no merit.

20        Scarpulla offers no authority for a rule that Lead Counsel's handwritten billing entries
21   should not be compensable.  While the Special Master hardly commends Lead Counsel for
22   submitting entries that are somewhat difficult to decipher, in itself the practice does not justify a
23   reduction in fees.

24        The Special Master and the Court have already rejected Scarpulla's attacks on block
25   billing and quarter-hour time entries.  Order on Attorneys' Fees, Expenses, and Incentive Awards
26   Re: Indirect Purchaser Plaintiff Settlements. Dkt. 4740 at 15; 4351 at 64-65, 73.  Lead Counsel's
27   ten percent across-the-board cut to each attorney's final lodestar was done, in part, to account for
28   these concerns.

Scarpulla has provided no legal support for his position that late-added trial counsel should not receive a multiplier.  If these firms benefited the class they deserve a multiplier notwithstanding their failure to contribute to the Litigation Fund and their short time on the case. It is ironic that Scarpulla now wants to penalize the Freedman Boyd and two other late-added firms since he was the first to invite Joseph Goldberg of Freedman Boyd to sign on as trial counsel. Dkt. 4851, Decl of Joseph Goldberg, ¶3.   Mr. Goldberg persuasively demonstrates that for about six months he and the other trial counsel "cleared the decks" of all other work to bring focus, discipline and thoroughness to IPP's trial preparation, and incurred $104,218 in out-of-pocket expenses. *Id.* at ¶9. Their presence and the work they did no doubt contributed to the favorable settlements that were ultimately obtained.  To deny them a multiplier simply because they were late arrivals and did not contribute to the Litigation Fund would be highly unfair. While one might quibble with the elevated multipliers that Lead Counsel assigned these firms, the Special Master accepts his judgment since as noted above he is in the best position of all to make that assessment.

Finally, Scarpulla's argument that a multiplier can be awarded only for extraordinary work is not legally supported.  A range of factors go into the assignment of multipliers, all as discussed at length in the Report and Recommendation on Attorneys' Fees, Dkt. 4351.

For the above reasons Scarpulla's Objection will be allowed in part and his recommended payout increased from $49,790.74 to $208,223.31.

**C.** Glancy, Prongay & Murray, Dkt. 4820

Lead Counsel recommended that Glancy, Prongay receive a multiplier of 1.3991 on its post-10% cut lodestar of $1,993,110.18, for a total payout of $2,788,533.06. The Glancy firm paid $45,000 to the Litigation Fund, and incurred about $7,000 in additional out-of-pocket expenses.  Glancy objects to the proposed allocation and seeks a multiplier of 1.7.

Lead Counsel justifies his allocation as follows.  The great bulk, over 85%, of Glancy's work was performed by a single associate.  Dkt. 4073-16.  That lawyer led a document review team, did higher-level document review, helped prepare for depositions and prepared memoranda about evidence found in the reviewed documents.  The defendant for whom the firm

1  was responsible, LG, settled early which limited the need for higher-level work.  The firm did

2  not take or defend any deposition, did not work with experts, was not involved with overall

3  strategy and with the exception of some early work in 2009 had no involvement with motion

4  briefing.   Dkt. 4853, Lead Counsel's Omnibus Response, pp. 17-19.  Lead Counsel placed

5  Glancy in the third-highest tier of firms (those who performed high level work but were not

6  involved in case strategy), and within that firm Glancy received the 3rd-highest multiplier.  Dkt.

7  4800.  Firms in the higher tier simply devoted more resources and performed more complex

8  work of great benefit to the class.   Specifically, Bramson Plutzik and Andrus Anderson each

9  oversaw the entire offensive discovery effort against their defendants – Toshiba and Hitachi,

10  respectively – from June, 2010 through the conclusion of the case against their defendant –

11  January, 2015 for Hitachi and March, 2015 for Toshiba. Each firm assigned named partners to

12  the case who led the meet and confer negotiations with their defendants, drafted and filed

13  multiple motions to compel, led the document review teams for their defendants, took multiple

14  Rule 30(b)(6) depositions in 2012 and multiple merits depositions in 2013 and 2014, drafted or

15  assisted in drafting oppositions in motions for summary judgment, and were heavily involved in

16  preparing for trial against their defendants.  Milberg, Fine Kaplan & Black and Hulett Harper

17  Stewart also assigned senior partners to the litigation who directed trial preparations, trial

18  strategy and mock trials and did a substantial amount of post-fee petition work.  Dkt. 4853-1,

19  Alioto Decl., ¶¶19-20.

20       Glancy notes several additional factors.  It participated in briefing before the Multidistrict

21  Panel early in the case; more senior lawyers other than the single associate performed important

22  work; a Japanese lawyer translated documents.  Dkt. 4871, Reply Decl. of Susan Kupfer.

23  However, giving Glancy's arguments their full weight and more is not sufficient to overcome the

24  evidence that Glancy's work was excellent but simply not comparable in scope and complexity

25  to that of firms ranked above it.  The Glancy firm is the 14th-ranked firm in terms of multiplier.

26  And while Glancy contributed $45,000 to the Litigation Fund (Dkt. 4960), the Special Master is

27  satisfied that Lead Counsel took Glancy's contribution sufficiently into account when assigning

28  different multipliers to the different firms.

1    The Special Master finds Lead Counsel's proposed allocation to the Glancy firm to be

2  reasonable and concludes that Glancy's Objection has no merit.

3    **D.**  Cooper & Kirkham, Dkt. No. 4821:

4    Lead Counsel recommended that Cooper & Kirkham, P.C. ("Cooper") receive a

5  multiplier of .8494 on its post-10% cut lodestar of $2,761,632.00, for a total payout of

6  $2,345,866.91.  Cooper paid $50,000 into the Litigation Fund and incurred about another

7  $50,000 in out-of-pocket expenses.  Cooper objects to the allocation, arguing that its total

8  lodestar of $3,068,480 should be exempt from the across-the-board 10% cut and should receive a

9  multiplier of 1.8962, for a total payout of $5,236,587.64.

10    Cooper & Kirkham's fee application omitted all time incurred by Josef Cooper himself,

11  thus mooting the issue of whether he should be compensated for any time he spent on issues to

12  which he was not assigned, such as the California AG or interacting with Special Master

13  Walker.[12]   Virtually all of Cooper & Kirkham's recorded time consists of (a) work by Ms.

14  Kirkham for about four months early in the case on creating the document database, and (b)

15  work by John Bogdanov, an associate, largely as the lead on document and deposition discovery

16  against defendant Phillips but also second-chairing 11-12 depositions, participating in drafting

17  motions and some involvement in trial preparation.  Lead Counsel makes no criticism of Ms.

18  Kirkham's work although he says she overstates its importance.  He contends that Mr. Bogdanov

19  did competent work but required substantial supervision and declined to take Phillips depositions

20  that others had to step in and take.  Dkt. 4911-2; Dkt. 4853, pp. 27-28.  Mr. Bogdanov disputes

21  all these criticisms.  Dkt. 4821-2, Decl. of Bogdanov[13]; Dkt. 4934, Third Decl. of Bogdanov.

22    The core difference between the Cooper firm and Lead Counsel does not concern the

23  work that Ms. Kirkham and Mr. Bogdanov did.  The difference concerns Lead Counsel's

24  contention that Mr. Cooper worked at "cross-purposes" to Lead Counsel, and Mr. Cooper's

25

26  [12] Lead Counsel asked the Special Master to require Cooper to produce his time records since he had denied ever
acting at cross-purposes to Lead Counsel and the class effort.  The Special Master declined this request because he
27  believes he can fairly evaluate this issue without the Cooper time entries.

28  [13] Mr. Bogdanov inexplicably thought it would be helpful to attach to his declaration over 150 pages of redacted e-
mails between himself and Ms. Capurro of Lead Counsel's office.

contention that Lead Counsel impermissibly assigned a negative multiplier to the firm to punish Cooper. This dispute raises many of the same issues discussed above in regard to the Scarpulla objection. Mr. Cooper's involvement in the dispute with the California AG and in Special Master Walker's recommendation that Messrs. Cooper and Scarpulla be appointed co-lead counsel was indeed at "cross-purposes" with Lead Counsel, but that is not the critical point. Those efforts were not, the Special Master believes, at "cross-purposes" with the Class. The Special Master believes Cooper and Scarpulla became involved in those issues at the urging of Special Master Walker and did so to benefit the Class. Accordingly, those activities do not deserve retribution in the form of an unfavorable multiplier.

The same cannot be said of some of the objections that Cooper (and Scarpulla and Moore) raised to the settlement and the fee award. As discussed above, no criticism is warranted for the objections they asserted as to Chunghwa and the scope of the release. However, their objections to the scope of notice and to the quality of Lead Counsel's leadership definitely showed a lack of collaboration and a disregard of the interests of the Class. Lead Counsel correctly notes that (a) Cooper never raised the notice objection early in the preliminary approval stage when it might have been dealt with before the notice program had been completed and paid for, (b) the objections to Lead Counsel's strategy and leadership bordered on being frivolous and did nothing but assist the challenges by professional objectors, and (c) Cooper (like Moore and Scarpulla) have appealed the Court's denial of their objections, thus delaying any settlement distribution to their own clients. Lead Counsel fairly characterizes this conduct by co-counsel such as Cooper whose firm had a lead role in the Class effort as counter-productive and potentially damaging to the IPP Class. The Special Master concurs that this conduct merits a reduction in the lodestar that the Cooper firm otherwise earned. Cooper argues that reducing its multiplier will chill lawyers from asserting legitimate objections to settlements and fee awards. The Special Master disagrees. Here there is a clear distinction between bringing meritorious and frivolous objections, and a distinction between working out differences with Lead Counsel collaboratively early and privately instead of publicly objecting at the last minute in an effort to bring down the entire settlement.

But for Cooper's unhelpful activities the Cooper firm would have fit comfortably at the top of the 1.3-1.5 tier of multipliers, since it did high level document review as a team leader, prepared for depositions, took a lead in creating the online document database, and contributed $50,000 to the Litigation Fund.  However, the Special Master concludes that the firm should receive a multiplier of 1.25.  This both rewards it for the good legal work it did and accounts for Cooper's less than collaborative actions.  Cooper's contention that it should be excused from the 10% cut applied to all class counsel billings lacks merit.  First, the Court has approved this in order to remove inherent inefficiency in billing.  Dkt. 4740.  Second, although Lead Counsel did not criticize Cooper's billings that does not mean that they were impeccably free from inefficiency.  It is impossible to record thousands of hours over five years without incorporating some inefficiency.  Therefore, the 10% cut will be applied as Lead Counsel appropriately did, reducing Cooper's lodestar to $2,761,632.  The 1.25 multiplier increases Cooper's recommended payout to $3,452,040.

**E.** Kirby McInerney, Dkt. 4822:

Lead Counsel recommended that Kirby McInerney ("Kirby") receive a multiplier of 1.9561 on its post-10% cut lodestar of $9,981.414.00, for a total payout of $19,524,658.25.  However, an error was discovered in the Kirby calculation which does not alter the final payout but changes its lodestar to $9,303,481 and its lodestar to 2.0986, thereby making it the 5th-ranked firm in terms of multiplier.  Kirby objects to this allocation and requests a multiplier in the 2.5-2.6 range, arguing basically that the gap between it and Lead Counsel should be narrowed.

The Special Master agrees that Kirby played an integral role in this case and assumed significant risk by contributing $110,000 to the Litigation Expense Fund and incurring another $111,000 in out-of-pocket expenses.  Dkt. 4960; Dkt. 4073-2.  However, Kirby has been amply rewarded for its work by more than doubling its billings.  Lead Counsel persuasively distinguishes Kirby's work from those of the few firms above it.  Kirby joined the CRT case in late 2010 and did not receive an assignment until late April 2011, three and a half years after Lead Counsel initiated the case in December, 2007.  By the time that Kirby entered the case

1   Lead Counsel had already been involved in 11 joint and separate motions to dismiss and
2   discovery was well underway.  While Kirby's work was at a very high level as reflected in its
3   proposed multiplier, Kirby did not draft any of the oppositions to summary judgment motions
4   and was far less involved in trial preparations.  Lead Counsel, Sylvie Kern and Straus & Boies
5   participated in drafting the summary judgment oppositions, while Kirby drafted only one motion
6   *in limine*.  Lead Counsel led all settlement negotiations and, with Sylvie Kern, drafted all the
7   mediation briefs, while Kirby barely participated in settlement efforts.  Kirby's post-settlement
8   work was far less than that of Lead Counsel.  As Lead Counsel persuasively notes, if Kirby's
9   proposed increased multiplier were to be taken out of Lead Counsel's share, as Kirby suggests,
10  Lead Counsel's multiplier would then only be 0.078 higher than Kirby's.  Dkt. 4853-1, Alioto
11  Decl., ¶¶39-65.  Kirby's work greatly benefited the Class, but nowhere near to the extent that Lead
12  Counsel did.

13      Kirby has provided no persuasive justification for increasing its multiplier.  It is properly
14  positioned just behind the handful of firms that for various reasons performed more significant
15  work, and within the top 10% of all class counsel.  The Special Master declines to second-guess
16  Lead Counsel's assessment of the relative contributions of the group of top-ranked firms since he
17  provides a logical factual justification for it.

18      Kirby's Objection has no merit.

19      **F.**  McCallum, Methvin & Terrell, P.C., Dkt. 4824:

20      Lead Counsel recommended that McCallum, Methvin & Terrell, P.C. ("MMT") receive a
21  multiplier of 1.2486 on its post-10% cut lodestar $96,286.50, for a total payout of $120,222.10.
22  This is identical to McCallum Hoagland's multiplier discussed in section A above, and both
23  firms offer identical arguments for an increase.  MMT contends that it should be awarded a
24  multiplier of 1.96 because it paid $22,000 to the Litigation Fund and diligently performed all of
25  its assigned work.  Dkt. 4824-1, Decl. James Terrell, Ex. A.[14]

26

27  [14] There is a disparity between the $22,000 contribution asserted by MMT and Lead Counsel's calculation of its
    contribution at $20,000 (Dkt. 4960) because MMT made a $2,000 late contribution to Special Master and other
28  expenses that Lead Counsel did not account for as part of the Litigation Fund.

As the Special Master noted with regard to McCallum Hoagland, the law requires a fee allocation to reflect the relative contributions of all participating firms. *See Keller*, 2015 WL 8916392 at *4. MMT did not draft its client's complaints, but merely reviewed allegations with its client. It did not draft its client's discovery responses, but merely gathered information for them. An MMT attorney attended its client's deposition, but did not defend the deposition. Alioto Decl., ¶66. While MMT surely performed its assigned work competently, its tasks did not approach the level of complexity and importance of those of other firms with higher multipliers. Lead Counsel has appropriately made this assessment, and McCallum offers no argument or evidence would persuasively rebut that. The Special Master is also satisfied that MMT's $22,000 contribution to the Litigation Fund and later expenses was adequately considered by Lead Counsel in his proposed fee allocation, and that this contribution does not justify an increase to MMT's multiplier.

The Special Master finds no merit to MMT's objection.

**G.** <u>Theresa Moore, Dkt. 4825:</u>

Lead Counsel recommends that Theresa Moore receive a multiplier of .7495 on her post-10% cut lodestar of $26,184.38, for a total payout of $19,625.28. Moore objects. She seeks restoration of her original lodestar of $209,768.75 for 250.6 hours of work and a multiplier between 1.5 and 3.0.

Moore's position in the IPP effort is unique. First, her only client relationship was as of counsel to the Joseph Alioto firm which did have an attorney-client relationship with a class member. Second, she did extraordinarily little work on the case, about 27 hours per year over the last nine years. Third, it is undisputed that Lead Counsel never assigned her any work so that all her time was spent monitoring ECF filings, occasionally offering Lead Counsel unsolicited advice, and doing research that she never submitted to Lead Counsel. Dkt. 4853. Fourth, neither she nor the Joseph Alioto firm made any financial contribution to the case and incurred no reimbursable expenses. Fifth, Moore joined Scarpulla and Cooper in filing objections to the IPP settlement and the requested fee award. Consequently Lead Counsel demanded that she eliminate from her lodestar all "read and review" time, time spent on Joseph Alioto's application

to become lead counsel, and other non-productive work, then reduced it by the 10% across-the-board reduction, all of which slashed her lodestar by about 88% to $26,184.38.  Lead Counsel basically removed all of Moore's work after 2008.  Dkt. 4853,  Lead Counsel's Omnibus Response, pp. 41-44.

Moore's own accounting of her work (Dkt. 4825-2) shows that over half her hours (129.4) were spent drafting motions/pleadings.  But she does not identify a single motion or pleading on which she worked.  Almost 60 hours were spent in meetings/strategy but she does not describe a single such meeting or strategy discussion other than occasional unsolicited e-mails or calls to Lead Counsel.  She spent 37 hours on research which Lead Counsel says they never saw.  There is simply no factual basis on which the Court can reasonably compensate Moore for most of this time, let alone reward her with a significant multiplier.

Moore credits herself with saving the IPP class $14 million, the difference between the aggregate attorneys fees recommended by the Special Master and the amount awarded by the Court.  Her argument is tortuous at best.  She contends that she, and only she, brought to the Court's attention (in her Objection to the IPP settlement) that the IPP settlement was only 20% of the amount of damages that the IPP's claimed and was not as good a result as the *LCD-TFT* case. By thus discrediting her own class's settlement in this CRT case Moore claims that she single-handedly persuaded the Court to reduce the attorney fee award.  The Special Master views this argument as a fairy tale.  The discrepancy between the CRT settlement amount and the amount of damages asserted by IPP experts in their reports and depositions was hardly a state secret.  It would be extraordinary to reward a class counsel for trashing her own client's settlement, thereby persuading the Court to cut the fee award — and then claiming credit for thereby benefiting the Class.

Finally, Moore objected to the IPP settlement with a laundry list of objections, all of which the Court rejected:  the failure to obtain class representatives from certain states, inadequate notice, poor representation of the class by Lead Counsel, and others.  She did not assert the only objection that prevailed (Chunghwa settlement structure) or the other one that had colorable merit (scope of release).  Moore's objections simply put the IPP class at risk of losing a

valuable settlement — and she like other objectors has now appealed the denial of her objections to the Ninth Circuit, thus delaying payment of settlement proceeds to the class including her purported client.

In light of the above, Moore is certainly not entitled to her full lodestar or to any multiplier. It should be noted that her billing rate ($600-900) was hardly modest. That said, Lead Counsel's total omission of all her time after 2008 was unwarranted. Moore through the Joseph Alioto firm did represent a client, and accordingly had an obligation to at least spend minimum time keeping up on case developments. The Special Master will credit Moore with additional lodestar of one hour/month from January 2009-February 2015 — 74 additional hours. However, the Special Master cannot recommend compensating Moore at a billing rate of $870 for the ministerial level of her work on this case, and therefore will allow a billing rate of $600/hr. These adjustments produce an additional lodestar of $44,400 (74 x $600/hr.). Adding this to her proposed lodestar of $19,625.28 gives her a total lodestar of $64,025.28. Although the Special Master shares Lead Counsel's belief that Moore's objections did not benefit the class, a punitive negative multiplier is not clearly called for. Therefore, the Special Master will recommend a multiplier of 1.0, resulting in a recommended payout of $64,025.28.

**H.** Law Offices of Brian Barry, Dkt. 4836:

Lead Counsel recommended that Law Offices of Brian Barry ("Barry") receive a multiplier of 1.0 on the post-10% cut lodestar of $843,501.15, for a total payout of $842,954.93[15]. Barry objects, requesting a multiplier in the 1.4-1.6 range.

Barry argues that the firm provided a class representative, it employed foreign language document reviewers, it contributed $25,000 to the Litigation Fund, and devoted substantial resources to the case in 2011 and 2012 prior to any settlements when the risk was very high. Barry also challenges the $350 cap on Attorney Shea's document review work.

As to the $350 rate cap, Lead Counsel explains that other attorneys to whom Barry compares Mr. Shea – Sylvie Kern, Brian Umpierre, Qianwei Fu, Demetrius Lambrinos and

---

[15] Lead Counsel's calculated multiplier for Barry was 0.9994 because of an Excel calculation. Dkt. 4800, p. 6.

1    Lauren Capurro – were team leaders whose time spent on document review involved higher-

2    level tasks.  The fact that Mr. Shea's document review was ultimately used for deposition

3    preparation does not convert it to the more sophisticated category of actually selecting deposition

4    exhibits for which a higher billing rate is allowed.  Finally, Lead Counsel gave Barry the benefit

5    of the doubt by allowing Shea's full recorded hours, although his recorded document review time

6    greatly exceeded the time he spent on the online database.  Lead Counsel also notes that Barry's

7    document review was competent and performed early in the case, but not only did the Korean

8    reviewers drop out quickly, the entire Barry firm also abruptly pulled out of the case in

9    December 2012.[16] This departure lost to the Class effort Attorney Shea's institutional knowledge

10   and many hours of training, all of which Lead Counsel had to replace from other resources.  Dkt.

11   4853-1, Alioto Decl. ¶¶73-86.

12          Although a negative multiplier might have been justified because of the damage to the

13   class effort by Barry's withdrawal, Lead Counsel recommended a multiplier of 1.0.  Attorney

14   Shea's work would no doubt command a multiplier in the 1.1-1.25 range, or even the low end of

15   the 1.25-1.3 range because of the Korean language reviewers, but given the early departure of the

16   Korean reviewers (one of whom was suspected of using Google Translate) and the entire firm's

17   sudden withdrawal, a multiplier of 1.0 is appropriate.

18          The Barry objection has no merit.

19   **VI.** Lingel Winters's Motion for Fees, Dkt. 4808

20          Mr. Winters's fee application has both a tarnished procedural history and dubious

21   substantive merit.  Mr. Winters seeks payment of his lodestar of $145,265 (170.9 hrs. at

22   $850/hr.).

23          Procedural Background.  Lead Counsel states that Mr. Winters never reported his

24   recorded time to Lead Counsel as required by the class counsel protocol.  Dkt. 4844-1, ¶3.  He

25   also failed to submit a fee declaration by the court-ordered deadline (Dkt. 3906, ¶22) to be part

26

27   _____

28   [16] This fact is confirmed not only by the Declaration of Mario Alioto, but also, by the time sheets prepared by the
Barry law firm for its fee declaration, which show no work after this time period.  Dkt. 4073-18, p. 25.

of the joint fee application.  Therefore, Lead Counsel says, no submission was made for Mr.

Winters in the joint fee application dated September 15, 2015. Dkt. 4701.  Mr. Winters did not

object to his omission, but instead in December 2015 filed his own Declaration separately

seeking fees.  Dkt. 4248.  On February 9, 2016, he also filed this Declaration with the Special

Master on the JAMS e-filing platform.  Dkt. 4808, p. 30.   Lead Counsel indicated that he had no

objection to the Special Master considering Mr. Winters fee application as part of the allocation

process.[17]  The Special Master then ordered a schedule for submission of briefing and evidence

on the allocation of fees.  Dkt. 4748.  Lead Counsel duly filed his proposed allocation of fees that

allocated nothing to Mr. Winters.  Dkt. 4790 & 4800.  Mr. Winters did not file an objection to

Lead Counsel's proposal as required by the Special Master.  Instead, ignoring the order setting

forth the process for allocation of fees, he filed this motion with the Court.  The final straw was

Mr. Winters' filing of a Reply on October 18, 2016 (Dkt. 4970) that was 26 days late.  N.D. Civ.

Rule 7-3(c).  The Special Master has not considered this untimely filing.

Mr. Winters has failed to honor Lead Counsel's requirement to submit recorded time.  He

did not submit a timely fee declaration.  He did not object when he was omitted from the joint

fee application, but instead filed a separate application.  He failed to file an objection to Lead

Counsel's proposed allocation that gave him nothing.  Instead, once again ignoring court-ordered

procedure he filed this motion and filed an untimely Reply.

Merits of the Fee Application.  Mr. Winters filed a complaint on behalf of a class member

on April 23, 2012, four and a half years after the original complaints which he largely copied.

Dkt. 4844-1, ¶2.  He recorded 14 hours for drafting pleadings.  Thereafter, every minute of his

time was recorded as "fact investigation and development".  Dkt. 4248, pp. 10-13.  His

Declaration states that he drafted memoranda and conducted "case investigation" with no

indication of what the memoranda or investigation concerned.  He states he made court

appearances although none are recorded in his time records.  Lead Counsel states that Mr.

---

[17] Mr. Winters complains that the Special Master did not consider his fee application in connection with the Report & Recommendation on the aggregate fee award (Dkt. 4351).  The reason, of course, is that the Report on aggregate fees did not consider the application of any particular attorney, but only the aggregate total fee.

Winters never contacted him once during the case, and that he was never assigned any work. Dkt. 4844-1, ¶13.

It is apparent to the Special Master that Mr. Winters filed a complaint late in the game, modeled heavily on prior complaints, and thereafter did nothing but review ECF filings.   For this ministerial task he billed at the very robust rate of $850/hr. At least Mr. Winters offers no evidence of having done anything of any substance.   Mr. Winters is in about the same situation as Ms. Moore, discussed above.  None of his work benefited the class, but he had a professional obligation to his client to keep track of the case.  Therefore, the Special Master will treat Mr. Winters just as he did Ms. Moore.  Mr. Winters will be credited with one hour a month from April 2012-February 2015 to review ECF filings, which amounts to 34 hours of time.  The Special Master cannot recommend a billing rate of $850 to perform this ministerial task. Therefore, Mr. Winter's billing rate will be reduced to $600/hr. for the 34 hours of "read and review" time. In addition, the Special Master will credit Mr. Winters with his 18 hours of initial fact investigation in 2012 and 14 hours to draft the complaint, at his normal billing rate.   The resulting lodestar is $47,600 (34 x $600/hr. + 32 x $850/hr.).   Mr. Winter's repeated disregard of court-ordered procedures in connection with his fee application has inconvenienced and created extra work for Lead Counsel, the Special Master and the Court.  This conduct merits a reduction in his multiplier to 0.9. The Special Master recommends that Mr. Winters' motion be granted in part, and that he receive a total payout of $42,840 ($47,600 x .9).

## VII.    Recommended Re-Allocation of Fees

The Special Master has recommended four fee adjustments:

Cooper & Kirkham:  $3,452,040 from $2,345,866.91  (increase of $1,106,173.09)

Scarpulla: $208,223.31 from $49,790.74  (increase of $158,432.57)

Moore:  $64,025.28 from $19,625.28  (increase of $44,400)

Winters:  $42,840 increase from a zero proposed allocation

Total increase:  $1,351,845.66

The difficult issue, of course, is what to recommend as the source of funds to effectuate these increases.  The options which occur are:  an increase in the total fee award, take it from

Lead Counsel's allocation, reduce the allocations of all class counsel *pro rata*, reduce the

allocations of the three special trial counsel (Freedman Boyd Hollander Goldberg Uris & Ward;

Fine, Kaplan and Black; and Hulett Harper Stewart) who joined the case for only the last few

months and contributed nothing to the Litigation Fund.[18]   The Special Master rejects the notion

of an increase in the aggregate award.   The Court has carefully determined the award it believes

appropriate, and it must stand as it is.   A *pro rata* reduction of all class counsel seems patently

unfair since most of them had nothing to do with this allocation and in many cases are already

accepting less than they would have liked.   The idea of a reduction in the allocations of the three

trial firms has some appeal, not because they did not perform sterling work but because their

multipliers are high in comparison to other firms that bore far more financial and litigation risk

for many more years.   However, like other class counsel generally they had nothing to do with

making the allocations to Cooper, Scarpulla, Moore and Winters which are being increased.

Therefore, it seems incongruous to penalize them.

     Ultimately the unwelcome burden should and must fall on Lead Counsel.   First, it was

Lead Counsel who recommended the allocations that the Special Master has found require

adjustment.   Lead Counsel proposed the very low allocations for Cooper, Scarpulla and Moore in

part as a result of his irritation and resentment over their uncooperative conduct toward him

personally as described above.   Second, Lead Counsel's allocation to himself was entirely within

a reasonable range, but nonetheless generous.   There is ample room in his proposed payout to

remove the $1.3 million increase and still leave him with a very adequate and generous award

that fairly reflects his major contribution to the success of this case.   If the $1,351,845.66

increase is taken from Lead Counsel's proposed payout of $46,344,359.49, his payout will be

$44,992,513.83, a reduction of only 2.9% and a reduction in his multiplier from 2.97 to 2.89.

Third, ultimately the buck stops with Lead Counsel who both garners the largest reward but also

bears responsibility for necessary corrections.   The Special Master so recommends.

//

---

[18] This suggestion was made by Josef Cooper in his Objection.   Dkt. 4821

1

## VIII.   Conclusion

Good cause appearing, the Special Master recommends that the Court order as follows:

   1.  Lead Counsel's proposed allocation of the aggregate fee award of $158,606,250 is fair and reasonable and that it be APPROVED except as provided herein;

   2.  The allocation to Cooper & Kirkham be increased to $3,452,040;

   3.  The allocation to Francis Scarpulla be increased to $208,223.31;

   4.  The allocation to Theresa Moore be increased to $64,025.38;

   5.  The allocation to Lingel Winters be increased to $42,840;

   6.  The total of these four increases, $1,351,845.66, be deducted from the allocation of the Trump Alioto firm, bringing its allocation to $44,992,513.83.

Dated:  October 24, 2016

Martin Quinn, Special Master