UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | MDL No. 1917 |
| | Case No. C-07-5944 JST |
| This Order Relates To: | **ORDER ON MOTIONS *IN LIMINE* REGARDING THE ALLEGED CONSPIRACY'S OPERATION** |
| Sharp Electronics Corp., et al. v. Hitachi Ltd., et al., No. 13-cv-1173; | |
| Sharp Electronics Corp., et al. v Koninklijke Philips Elecs. N.V., et al., No. 13-cv-02776; | |
| Siegel v. Hitachi, Ltd., et al., No. 11-cv-05502; Siegel v. Technicolor SA, et al., No. 13-cv-05261; | |
| Best Buy Co., et al. v. Hitachi, Ltd., et al., No. 11-cv-05513; | |
| Best Buy Co., et al. v. Technicolor SA, et al., No. 13-cv-05264; | |
| Target Corp. v. Chunghwa Picture Tubes, Ltd., et al., No. 11-cv-05514; | |
| Target Corp. v. Technicolor SA, et al., No. 13-cv-05686; | |
| Sears, Roebuck and Co. and Kmart Corp. v. Chunghwa Picture Tubes, Ltd., et al., No. 11-cv-05514; | |
| Sears, Roebuck and Co. and Kmart Corp. v. Technicolor SA, et al., No. 13-cv-05262; | |
| Viewsonic Corp. v. Chunghwa Picture Tubes, Ltd., et al., No. 14-cv-02510. | |

The parties organized the pending motions *in limine* into nine categories. See ECF No. 4603, Ex. A. This order addresses the sixth category, entitled "Motions re Alleged Conspiracy's Operation," which contains six motions: three filed jointly by Defendants, two filed by Mitsubishi Electric, and one filed by Direct Action Plaintiffs ("DAPs").

The motions are fully briefed and suitable for disposition without oral argument per Local Rule 7-1(b). The Court now rules as follows:

| **Name of Motion** | **Motion ECF No.** | **Opp'n ECF No.** | **Reply ECF No.** | **Ruling** |
|---|---|---|---|---|
| MOTION FOR PRETRIAL PROFFER AND RULING ON ADMISSIBILITY OF ALLEGED CO-CONSPIRATOR STATEMENTS | 3559 ("DEF. MIL #1 Mot.") | 3652 ("Def. MIL #1 Opp'n") | 3767 ("Def. MIL #1 Reply") | GRANTED IN PART, DENIED IN PART |
| MOTION TO EXCLUDE PLAINTIFFS' PRICE-LADDER THEORY OF RECOVERY | 3568 ("PRICE-Ladder Mot.") | 3648-4 ("PRICE-Ladder Opp'n") | 3761 ("PRICE-Ladder Reply") | DENIED |
| MOTION TO EXCLUDE ARGUMENT OR EVIDENCE REGARDING PURPORTEDLY PRO-COMPETITIVE JUSTIFICATIONS FOR DEFENDANTS' AGREEMENTS REGARDING CRT PRICE, SUPPLY, PRODUCTION, OR CUSTOMERS | 3558 ("DAP MIL #13") | 3676-4 ("DAP MIL #13 Opp'n") | 3757-4 ("DAP MIL #13 Reply") | GRANTED IN PART, DENIED IN PART |
| MOTION TO EXCLUDE REFERENCES TO DOCUMENTS OR BEHAVIOR NOT IN EVIDENCE | 3557 ("Def. MIL #11") | 3686 ("Def. MIL #11 Opp'n") | 3765 ("Def. MIL #11 Reply") | DENIED |
| MITSUBISHI ELECTRIC'S MOTION IN LIMINE NO. 3 TO EXCLUDE ANY REFERENCE AT TRIAL TO ANY PARTY'S PARTICIPATION IN THE EIAJ AND EIAJ ACTIVITIES | 3601 ("Mits. Mot.") | 3644-4 ("Mits. OPP'N") | 3772-4 ("Mits. REPLY") | DENIED |
| MITSUBISHI ELECTRIC'S MOTION IN LIMINE NO. 1 TO EXCLUDE THE SDI INTERROGATORY RESPONSE | 3601 ("Mits. Mot.") | 3644-4 ("MITS. Opp'n") | 3772-4 ("MITS. Reply") | GRANTED |

2

## I. MOTION FOR PRETRIAL PROFFER AND RULING ON ADMISSIBILITY OF ALLEGED CO-CONSPIRATOR STATEMENTS

Defendants move the Court for an order compelling pretrial disclosure of statements that the DAPs seek to admit as non-hearsay co-conspirator statements and for a pretrial evidentiary hearing to determine their admissibility. The DAPs oppose Defendants' motion, contending that "Defendants are asking for a free preview of Plaintiffs' trial strategy," and that "there is a more efficient and less burdensome alternative . . . ." Def. MIL #1 Opp'n at 1-2. Specifically, the DAPs propose that the Court conditionally admit co-conspirator statements "subject to a decision at the close of all the evidence or the plaintiffs' case in chief as to whether the predicates for admission under Rule 801(d)(2)(E) have been met." Id. at 1. Defendants reply that the DAPs' plan creates a substantial risk of severe prejudice. They also propose an alternative whereby the Court would address the admissibility of such evidence on the business day prior to the introduction of any given alleged co-conspirator statement. This was the approach that was taken by Judge Hamilton in Sun Microsystems, and it is the approach that the Court will take here. See Final Pretrial Order at 8, Sun Microsystems Inc. v. Hynix Semiconductor Inc., 4:06-CV-01665-PJH (ECF No. 710) (N.D. Cal. May 20, 2009). Accordingly, Defendants' motion is GRANTED IN PART and DENIED IN PART.

Under Bourjaily v. United States, 483 U.S. 171 (1987), "an accused's knowledge of and participation in an alleged conspiracy are preliminary facts that must be established before extra-judicial statements of a co-conspirator can be introduced into evidence." See also United States v. Silverman, 861 F.2d 571, 576 (9th Cir. 1988); In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig., 906 F.2d 432, 458-59 (9th Cir. 1990) (applying Bourjaily standards to civil antitrust case). Thus, to the extent that any party wishes to rely on co-conspirator statements at trial, the court establishes the following preliminary protocol for the admission of any such statements:

No later than 12:00 p.m. on the business day prior to calling the witness(es) seeking to introduce such statement(s) at trial, the party seeking to introduce such statement(s) must deliver to chambers and to opposing parties two copies of a chart and any related materials delineating:

3

(1) the identity of the testifying witness; (2) a statement describing the witness; (3) a summary of the evidence showing that the witness knew about and participated in the conspiracy; (4) the emails to be introduced via that witness, identifying within the email the specific co-conspirator statements to be introduced via that witness; (5) the identity of the declarant of each specific co-conspirator statement; and (6) a summary of the evidence showing that each declarant of the co-conspirator statement(s) knew about and participated in the conspiracy. The court will hear all arguments regarding the introduction of co-conspirator statements the following day prior to trial.[1] While the court will issue a ruling as to the evidentiary admissibility of co-conspirator statements prior to trial, however, the court will reserve any ruling as to whether a statement was made "in furtherance" of a conspiracy until after the statement has been introduced at trial.

## II.    MOTION TO EXCLUDE PLAINTIFFS' PRICE-LADDER THEORY OF RECOVERY

Defendants move the Court to exclude all evidence and argument at trial that agreements to raise prices for 15-inch cathode ray tube ("CRT") sizes could have had the effect of raising prices for other sizes (hereafter, "Larger-Sized CRTs"). The motion is DENIED.

Defendants' motion essentially makes two arguments. The first turns in part on the sufficiency of the DAPs' evidence. Defendants claim the Court should exclude evidence and argument that agreements to raise the price of 15-inch CRTs had the effect of raising the price of Larger-Sized CRTs because there is *no evidence* that was the purpose of those agreements. The second argument relates to whether the DAPs have standing to assert claims for damages under a "price-ladder" theory of recovery. Defendants argue the DAP's price-ladder theory is substantively the same as umbrella[2] damages because both are a form of consequential damages. See Price-Ladder Reply at 1. Because the Ninth Circuit denied standing for plaintiffs seeking

---

[1] If the volume of statements sought to be admitted exceeds the Court's capacity to analyze them before the next trial day begins, or if argument concerning the admissibility of the statements would unduly consume time that would be better devoted to trial, the Court reserves its right to exclude the statements pursuant to Federal Rule of Evidence 403. If the DAPs anticipate seeking to admit that volume of statements, they are advised to seek a ruling pre-trial.

[2] "Umbrella damages" refer to injuries caused by a price-fixing conspiracy but suffered as a result of purchases made from suppliers outside of the cartel. See Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 347 (4th ed. 2014).

1  umbrella damages in In re Coordinated Proceedings in Petroleum Prods. Antitrust Litig., 691 F.2d
2  1335, 1340 (9th Cir. 1982) ("Petroleum Prods."), Defendants assert this Court should do the same
3  regarding damages based on the DAP's price-ladder theory.

4      Defendants' motion is procedurally inappropriate. Arguments relating to the sufficiency of
5  evidence or standing should be made on a motion for summary judgment, not a motion *in limine*.
6  See 75 Am. Jur. 2d Trial § 44 ("The use of motions i*n limine* to summarily dismiss a portion of a
7  claim has been condemned, and the trial courts are cautioned not to allow motions *in limine* to be
8  used as unwritten and unnoticed motions for summary judgment or motions to dismiss."). The
9  motion also fails on the merits, as explained in more detail below.

### A. Lack Of Evidence Of An Unlawful Purpose

11      Defendants claim the DAPs must prove the conspiracy had both the effect *and* the purpose
12  of fixing prices. See Price-Ladder Mot. at 1-2. That is not the law. The Supreme Court has
13  repeatedly held that a Sherman Act Section 1 "civil violation can be established by proof of *either*
14  an unlawful purpose *or* an anticompetitive effect." United States v. U.S. Gypsum Co., 438 U.S.
15  422, 436 n.13 (1978) (emphasis added); see McLain v. Real Estate Bd. of New Orleans, Inc., 444
16  U.S. 232, 243 (1980); Nat'l Soc. of Prof'l Engineers v. United States, 435 U.S. 679, 690 (1978);
17  Rutman Wine Co. v. E. & J. Gallo Winery, 829 F.2d 729, 735 (9th Cir. 1987); Dreiling v. Peugeot
18  Motors of Am., Inc., 850 F.2d 1373, 1381 (10th Cir. 1988).[3]

19      Defendants also contend that "[p]rice fixing requires proof of an agreement to fix the
20  prices on the product at issue" and that there is no evidence of an agreement to fix the price of

---

[3] Defendants' motion includes a quote taken out of context from Broad. Music, Inc. v. Columbia Broad. Sys., Inc., 441 U.S. 1, 23 (1979) ("BMI"). Price-Ladder Mot. at 2 ("The Supreme Court has made clear that '[n]ot in all arrangements among actual or potential competitors that have an *impact* on price are per se violations of the Sherman Act or even unreasonable restraints.'"). BMI, however, addressed when an agreement is illegal per se versus when it ought to be evaluated under the rule of reason. If Defendants are arguing that the DAPs' claims related to purchases of Larger-Sized CRTs ought to be evaluated under the rule of reason, their argument fails. The DAPs are alleging an agreement to fix prices. That is sufficient to trigger the per se rule. The question here is whether they can claim as damages overcharges from Larger-Sized CRTs. That question turns on whether the DAPs have standing to assert those claims and whether the alleged overcharges from Larger-Sized CRTs were the direct and proximate result of the unlawful acts of the defendant. Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334-46 (1990).

1  Larger-Sized CRTs.  Price-Ladder Mot. at 1.  They reason, therefore, that the DAPs should be

2  prohibited from arguing Defendants distorted the price of Larger-Sized CRTs by fixing the price

3  of 15-inch CRTs.  The DAPs dispute whether there is evidence of an agreement to fix the price of

4  Larger-Sized CRTs.  Further, they argue that agreements to fix the price of 15-inch CRTs were a

5  means by which Defendants distorted the price of Larger-Sized CRTs.

6       Defendants' argument fails for two reasons.  First, whether there is sufficient evidence of

7  an agreement to fix the price of Larger-Sized CRTs is a question for the jury.[4]  See Meyer

8  Intellectual Properties Ltd. v. Bodum, Inc., 690 F.3d 1354, 1378 (Fed. Cir. 2012) (holding that

9  motions *in limine* are "not the appropriate vehicle for weighing the sufficiency of the evidence").

10  Second, Defendants are potentially liable notwithstanding a lack of evidence of agreements to fix

11  the price of Larger-Sized CRTs given that "the machinery employed" to distort the price of

12  Larger-Sized CRTs "is immaterial."  See United States v. Socony-Vacuum Oil Co., 310 U.S. 150,

13  223 (1940).  Defendants are therefore liable for damages caused by purchases of Larger-Sized

14  CRTs if alleged agreements to fix the price of 15-inch CRTs were a means by which they distorted

15  the price of Larger-Sized CRTs, as the DAPs' price-ladder theory suggests.

16      **B.**    **DAPs' "Price-Ladder Theory" Of Damages**

17       The DAPs intend to present evidence showing price agreements for 15-inch CRTs raised

18  the prices of Larger-Sized CRTs because "prices for different size products move in tandem"

19  (hereafter, the DAPs' "Price-Ladder Theory" of recovery).  Price-Ladder Opp'n at 2-3.

20  Defendants argue that the DAPs should be prohibited from pursuing damages based on a Price-

21  Ladder Theory because "derivative effects on prices from allegedly anticompetitive conduct are

22  not actionable . . . ."  Price-Ladder Mot. at 3.  In support of that proposition, Defendants point to

23  cases that have denied standing to plaintiffs pursuing damages under an "umbrella" theory.  These

24  cases, according to Defendants, establish that "the Ninth Circuit and other courts have rejected as

25  'unacceptably speculative' antitrust theories seeking recovery for products that were not

---

[4] Alternatively, if Defendants believed there was no genuine dispute of material fact on this issue, they should have filed a motion for summary judgment.

themselves the subject of price-fixing agreements, but whose prices allegedly increased as a 'result of' other products' price-fixing agreements." Id. at 2-3.

Defendants' authority is inapposite because price-ladder damages are materially different from umbrella damages.  Defendants' argument also fails because it is not true that umbrella damages are prohibited in the Ninth Circuit where, as here, plaintiffs are only one step removed from Defendants in the distribution chain.

### 1. Price-Ladder Damages And Umbrella Damages Are Distinct

"Umbrella damages" refer to injuries caused by a price-fixing conspiracy but suffered as a result of purchases made from suppliers outside of the cartel (hereafter, "non-conspiring suppliers" or "innocent suppliers").  See Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 347 (4th ed. 2014).  Such injuries occur because cartels distort not only the prices charged by conspirators themselves, but also market prices generally.[5]

Many courts have found the distinction between umbrella damages and other types of damages legally and economically inconsequential.  See, e.g., United States Gypsum Co. v. Indiana Gas Co., Inc., 350 F.3d 623, 627 (7th Cir. 2003) ("A cartel cuts output, which elevates price throughout the market; customers of fringe firms (sellers that have not joined the cartel) pay this higher price, and thus suffer antitrust injury, just like customers of the cartel's members."); In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1168 (3d Cir. 1993) ("[T]he mere fact that monies paid to third parties . . . represent a component by which the [plaintiffs] measure their damages does not foreclose further inquiry as to whether standing existed."); Beef Indus. Antitrust Litig., 600 F.2d 1148, 1166 n.24 (5th Cir. 1979), cert. denied, 449 U.S. 905 (1980) (granting standing for sellers to competitors of buying cartel); Uranium Antitrust Litig., 552 F.

---

[5] Specifically, such injuries occur because cartels increase prices by reducing output.  This reduction in market supply causes the market price of the price-fixed good to increase, including potentially the price charged by non-conspiring suppliers.  It follows that consumers who purchase price-fixed goods from non-conspiring suppliers are likely to be injured, at least to some extent, even though the price of the specific good purchased was at no point "set" by a conspirator pursuant to an agreement to fix prices.

Supp. 518, 523-25 (N.D. Ill. 1982) (collecting cases and providing a detailed explanation as to why umbrella damages are substantively no different than damages caused by purchases from conspirators); Strax v. Commodity Exch. Inc., 524 F. Supp. 936, 939–40 (S.D.N.Y. 1981) (granting standing to plaintiffs who purchase from non-conspiring sellers).

Some courts, however, have denied standing for umbrella damages on the theory that umbrella damages are too speculative, causally remote, and/or foreclosed by Illinois Brick's concerns regarding evidentiary complexities and duplicative recoveries. See, e.g., Mid-West Paper Products v. Continental Group, Inc., 596 F.2d 573, 583–87 (3d Cir. 1979) (denying standing "in light of the tenuous line of causation between the defendants' price fixing and the prices paid by [the plaintiff]" and because "[t]he outcome of any attempt to ascertain what price the defendants' competitors would have charged had there not been a conspiracy would at the very least be highly conjectural");[6] FTC v. Mylan Labs., Inc., 62 F. Supp. 2d 25, 38-39 (D.D.C. 1999) ("The main difficulty with the umbrella theory is that, even in the context of a single level of distribution, ascertaining the appropriate measure of damages is a highly speculative endeavor."); Reading Indus., Inc. v. Kennecott Copper Corp., 477 F. Supp. 1150, 1158, 1160–61 (S.D.N.Y. 1979), aff'd, 631 F.2d 10 (2d Cir. 1980) ("Reading's claim that its injury was caused by the defendants holding down prices, which in turn is claimed to have raised prices on the LME and in the scrap market, which in turn required Reading to pay prices higher than it otherwise would have is too remote . . . ."); Folding Carton Antitrust Litig., 88 F.R.D. 211, 219–20 (N.D. Ill. 1980) ("In light of the Supreme Court's overriding concern with the burdensome proof in Illinois Brick and the similar complications in this case, we hold that the . . . plaintiffs do not have standing to sue the defendants from whom they did not purchase folding cartons for damages allegedly sustained on purchases from non-defendants.").

Damages based on a Price-Ladder Theory of recovery, however, are substantively different from umbrella damages. As shown in the previous paragraph, courts that have denied standing for

---

[6] The Third Circuit, however, came to the opposite conclusion in a later case. See In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d at 1168.

1  umbrella damages have focused on the fact that they are based on purchases from third parties
2  operating outside the cartel.  The independent pricing decisions of innocent suppliers outside of
3  the cartel, these courts reason, make umbrella damages causally remote, speculative, and difficult
4  to calculate.  In contrast, the pricing decisions at issue in the DAPs' Price-Ladder Theory –
5  specifically, the prices at which Defendants sold Larger-Sized CRTs – were made by the
6  Defendants *themselves*.  Defendants' authority is therefore inapposite.

### 2.     Umbrella Damages Are Not Prohibited In The Ninth Circuit

Even if Defendants' authority were on point, it would not prohibit the DAPs from pursuing a Price-Ladder Theory of recovery given that umbrella damages are not prohibited where, as here, plaintiffs are only one step removed from defendants in the distribution chain.

In Petroleum Prods., the Ninth Circuit denied standing to sue for umbrella damages where plaintiffs were several steps removed from the defendants in the distribution chain.  See 691 F.2d at 1340 (noting plaintiffs "purchased gasoline from independent marketers who, in turn, purchased their gasoline from independent refiners [who, in turn,] . . . manufactured a percentage of the independent marketers' supply and brokered the remainder of the marketers' supply from major refiners, *i.e.*, the defendants").  The court denied standing in that context because

> [w]hen the fact of a multi-tiered distribution system is imposed upon [a] complex set of variables, the obstacles to intelligent inquiry become nearly insurmountable . . . .  Not only would we be required to speculate that plaintiffs were injured solely as the result of umbrella pricing, but also we would be required to sanction complex judicial inquiry into the pricing decisions of sellers remote from plaintiffs.

Id.  The Ninth Circuit stated expressly, however, that they were not ruling on "whether, in a situation involving a single level of distribution, a single class of direct purchasers from non-conspiring competitors of the defendants can assert claims for damages against price-fixing defendants under an umbrella theory."  Id. at 1340; see also id. at 1341 (limiting the court's holding to "the facts of this case"); Antoine L. Garabet, M.D., Inc. v. Autonomous Tech. Corp., 116 F. Supp. 2d 1159, 1167 (C.D. Cal. 2000) ("Garabet") ("Plaintiffs correctly point out that the Ninth Circuit decided this issue only in the context of a multi-level distribution system . . . .").

Several district courts in the Ninth Circuit, however, have addressed umbrella damages in

the context of a single-level distribution system.  In orders issued prior to Petroleum Prods., courts in the Northern District of California and the Western District of Washington granted standing to plaintiffs seeking umbrella damages.  See Wall Products Co. v. Nat'l Gypsum Co., 357 F. Supp. 832, 840 (N.D. Cal. 1973) ("Given these facts it is clear that the defendants are not only liable for overcharges sustained from purchases from them, but also for overcharges resulting from purchases made from non-conspirators."); In re Bristol Bay, Alaska, Salmon Fishery Antitrust Litig., 530 F. Supp. 36, 38 (W.D. Wash. 1981) ("[I]t is this court's conclusion that the situation here and that presented in Illinois Brick are analytically distinct.").  In orders issued after Petroleum Prods., a court in the District of Arizona granted standing, while a court in the Central District of California denied it.  See Arizona Dairy Prods. Litig., 627 F. Supp. 233 (D. Ariz. 1985); Garabet, 116 F. Supp. 2d at 1167-70.

In Garabet, a district court in the Central District of California rejected plaintiffs' claims for umbrella damages after applying the five factor test for antitrust standing set out in Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 530-35 (1983).[7]  See Garabet, 116 F. Supp. 2d at 1166-70.  The court found it is "questionable" whether umbrella damages are the type of injury the antitrust laws were intended to forestall because injuries caused by purchases from non-conspirators do not necessarily flow from the collusive behavior at issue and therefore are "neither 'direct' nor clearly 'caused' by the conduct of [d]efendants.".  See id. at 1169.  The court also found that "any attempt . . . to measure how much of th[e] increase [in price] is attributable to the 'price umbrella' . . . would be highly speculative" such that it would violate the principles set out in Illinois Brick.  Id. at 1169-70.  Further, the court held there were two classes of plaintiffs superior to those injured as a result of purchases from innocent suppliers: (1) those who purchased directly from conspirators "whose damages would be more demonstrable, and for whom the causal chain would be unbroken," and

---

[7] The five factors include "(1) . . . whether [the alleged injury is] the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages."  Garabet, 116 F. Supp. 2d at 1166 (quoting Am. Ad Mgmt. v. Gen. Tel. Co. of California, 190 F.3d 1051, 1054 (9th Cir. 1999).

1  (2) the non-conspirator suppliers from whom the plaintiffs made their purchases. Id. at 1170.

2  Finally, the court found that because there were superior plaintiffs there was also a "danger of

3  duplicative recovery should any direct purchasers or direct competitors bring damage suits of their

4  own." Id.

5        The Court disagrees with most of the analysis in Garabet. Successful cartels increase the

6  *market* price for a price-fixed good, not just their own price (lest consumers subvert the conspiracy

7  by purchasing from lower-priced competitors instead). The injuries that result from conspirators'

8  impact *on the market* are directly caused by their collusive conduct regardless of the supplier that

9  sells the good.[8] The Garabet court suggests that when purchases are made from innocent suppliers

10  there are additional "independent forces" such as "elasticity of demand, . . . pricing decisions,

11  [and] decreases in production or increases in production costs" that make the resulting injury

12  indirect and speculative. Id. at 1170. But a disaggregation of the same "independent forces" is

13  required in the usual case where damages are calculated based on purchases made directly from

14  conspirators.[9] See Oltz v. St. Peter's Cmty. Hosp., 19 F.3d 1312, 1314 (9th Cir. 1994); Image

---

[8] Specifically, in response to an increase in price from conspirators, consumer demand for an innocent supplier's goods is likely to increase, shifting the innocent supplier's demand curve to the right, thereby causing an increase in price. Further, a reduction in market supply is likely to cause the aggregate supply curve to shift to the left, thereby causing an increase in the price set by all suppliers. Finally, if the cartel results in significant market concentration, an innocent supplier is likely be able to increase its profit margins by increasing price above marginal cost or by engaging in parallel pricing. All of these "pricing decisions," however, are precipitated by the conspiracy and are not unique to innocent suppliers; indeed, they are the means by which conspirators drive their own prices higher. The main substantive difference between conspiring and non-conspiring suppliers, therefore, is that non-conspiring suppliers do not participate in the conduct that sets these forces in motion. Since umbrella damages do not seek to hold innocent suppliers liable, however, that is a distinction without a difference.

[9] Damages are usually the difference between the price paid and the competitive price. The price paid is almost always clear. To determine the competitive price, however, one has to control for unrelated forces, such as those the Garabet court cites, regardless of the party from whom the plaintiff purchased the price-fixed good. Although such calculations may be inherently imprecise, they are not impermissibly speculative. See J. Truett Payne Co. v. Chrysler Motors Corp., 415 U.S. 557, 566 (1981) ("The vagaries of the marketplace usually deny us sure knowledge of what plaintiff's situation would have been in the absence of the defendant's antitrust violation."); Bigelow v. RKO Radio Picture., 327 U.S. 251, 264 (1946) ("The tortious acts had in each case precluded ascertainment of the amount of damages more precisely . . . . Nevertheless, we held that the jury could return a verdict for the plaintiffs."); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562 (1931) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.").

11

Tech. Servs. v. Eastman Kodak Co., 125 F.3d 1195, 1222 (9th Cir. 1997); El Aguila Food Prods. v. Gruma Corp., 131 F. App'x 450, 453 (5th Cir. 2005); see also 1 ABA Section of Antitrust Law, Antitrust Law Developments 789 (7th ed. 2012) (explaining disaggregation requirements).

Relatedly, the reasoning in Garabet is based on a flawed understanding of price theory. That court quoted the Third Circuit's opinion in Mid-West Paper, supra, as follows:

> Although in selecting a price for its product a manufacturer must also take into account the market price for comparable items, to some extent its pricing decisions remain unaffected by the prices charged by others . . . .  Thus, the competitors of the price-fixers may well have charged the same price notwithstanding the conspiracy.

Garabet, 116 F. Supp. 2d at 1168 (quoting Mid–West Paper, 596 F.2d at 584) (ellipse in Garabet).  Contrary to what is suggested there, prices are largely a function of supply and demand, and cartels generally increase price by conspiring to reduce supply.  The phrase "pricing decisions" is a misnomer to the extent it suggests price emerges based largely on individual considerations relating to a firm's particular circumstances as opposed to factors that for the most part are endogenous to the market – here, in particular, the additional market concentration and decreased market supply caused by the cartel.  It is a rare supplier that can set its prices without considering its' competitors prices (and, in the face of the potential for raising its prices, one with no regard for its return on capital).

Of course, sometimes a non-conspirator will raise its prices for reasons that are independent of the conspiracy.  In the particular case, the reasons for such an increase are a proper subject for damages analysis.  But this Court cannot say that an unrelated rise in price happens with such uniformity that antitrust plaintiffs should be precluded from pursuing umbrella damages as a matter of law.

Further, contrary to the court's holding in Garabet, umbrella damages do not implicate the concerns detailed by the Supreme Court in Illinois Brick.  Whereas the complexities of calculating damages based on purchases from non-conspiring suppliers are present in the damages calculations of every cartel case, Illinois Brick was specifically concerned with the complexities associated with determining the amount of overcharge that was passed on to indirect purchasers.

Illinois Brick does not instruct courts to deny an injured plaintiff relief anytime a case requires complex calculations. Rather, it specifically bars pass-on calculations because they are unreliable, and more importantly, because they risk duplicative recovery and erode the incentive for direct purchasers to bring suit. See Illinois Brick, 431 U.S. at 745-46. As to umbrella damages, however, there is no risk of duplicative recovery because there is no pass-on; moreover, allowing plaintiffs to bring umbrella damages suits only makes private antitrust enforcement more robust.

Finally, the Garabet court was wrong to the extent it based its ruling on the idea that umbrella damages claims should be brought by innocent suppliers instead of the purchasers who bought goods from them. See Garabet, 116 F. Supp. 2d at 1170 ("[T]here is [the innocent supplier], whose claim Plaintiffs are apparently attempting to assert."). Innocent suppliers have no claim because they are not injured by their competitors' conspiratorial conduct, absent some unrelated exclusionary conduct by the cartel. In fact, non-conspiring suppliers generally stand to *benefit* from a price-fixing conspiracy insofar as it reduces supply and increases prices.

In sum, Defendants' analogy to umbrella damages does not advance their argument. Contrary to their assertion, Ninth Circuit authority does not prohibit umbrella damages where plaintiffs are only one step removed from defendants in the distribution chain. Moreover, for the foregoing reasons, the Court disagrees with the reasoning of decisions like Garabet that have denied standing to sue for umbrella damages when plaintiffs are only one step removed in the distribution chain.

**C.    Conclusion**

Defendants' motion is DENIED.

**III.   DAP MIL NO. 13: MOTION TO EXCLUDE ARGUMENT OR EVIDENCE REGARDING PURPORTEDLY PRO-COMPETITIVE JUSTIFICATIONS FOR DEFENDANTS' AGREEMENTS REGARDING CRT PRICE, SUPPLY, PRODUCTION, OR CUSTOMERS**

The DAPs Target, ViewSonic, Sears, Kmart, Circuit City, and Best Buy[10] move the Court

---

[10] DAP Sharp did not join the instant motion because it alleges both a per se violation as a result of an agreement to fix prices *and* a violation under the rule of reason as a result of an agreement to exchange information. Whether Defendants are liable under the rule of reason depends on whether the procompetitive benefits of the alleged information exchanges outweigh the

to prohibit Defendants from referring to or introducing evidence that provides procompetitive justifications for Defendants' alleged agreements relating to CRT price, supply, production, or customers. The motion is GRANTED IN PART and DENIED IN PART. Evidence and argument of procompetitive effects is relevant insofar as it is probative of whether Defendants' information exchanges served a legitimate business purpose.[11] Defendants are prohibited, however, from introducing evidence or argument on this issue for any other purpose.

Under the per se rule, an agreement is *conclusively* presumed unreasonable "without elaborate inquiry as to the precise harm [it has] caused or the business excuse for [its] use." N. Pac. Ry. Co. v. United States, 356 U.S. 1, 5 (1958). Evidence and argument suggesting an agreement to fix prices was justified is therefore irrelevant. It is also potentially prejudicial to the extent it invites the jury to consider purported justifications notwithstanding the requirements of the per se rule. See Arizona v. Maricopa Cnty. Med. Soc'y, 457 U.S. 332, 347 (1982); FTC v. Superior Court Trial Lawyers Ass'n, 493 U.S. 411, 423 (1990).

Defendants' contend, however, that the DAPs' motion is unacceptably "broad and indiscriminate" insofar as it would exclude "justifications related to whether exchanges of information were done pursuant to the alleged illegal agreements or for other, legal, purposes." DAP MIL #13 Opp'n at 60. An agreement to exchange information among competitors, while not itself illegal under the per se rule, can be probative of a per se illegal conspiracy to fix prices. See United States v. U.S. Gypsum Co., 438 U.S. 422, 443 (1978). DAPs are likely to present evidence that Defendants exchanged competitive information. They are also likely to ask the jury to infer an underlying agreement to fix prices based in part on those information exchanges. If they do, Defendants are entitled to rebut that inference by presenting evidence and argument showing that their information exchanges were for legitimate business purposes unrelated to any conspiracy to fix prices. In other words, Defendants are entitled to submit evidence and argument, not to show

---

anticompetitive harm.

[11] The DAPs' Rule 403 objection is denied without prejudice. The DAPs are free to object at trial if they believe the probative value is substantially outweighed by unfair prejudice or if the evidence is cumulative. The Court will make a Rule 403 determination at that time based on the context and circumstances in which the evidence is submitted.

that the alleged price fixing agreement was justified, but to show that the alleged information exchanges are not necessarily indicative of a price fixing agreement.

The DAPs' motion is therefore DENIED to the extent it seeks to prevent Defendants from providing evidence or argument to rebut the DAPs' claim that the existence of information exchanges is indicative of an underlying agreement to fix prices. It is GRANTED, however, in all other respects. Further, the DAPs are free to make Rule 403 objections at trial if they believe the probative value of relevant evidence is substantially outweighed by unfair prejudice. Based on the context and circumstances, the Court will determine whether the evidence invites the jury to disregard the per se rule in light of purported procompetitive benefits and whether that risk substantially outweighs the probative value. The DAPs may also object if they believe evidence of the information exchanges' procompetitive effects is cumulative of other evidence suggesting the information exchanges had a legitimate business purpose.

### IV.  MOTION TO EXCLUDE REFERENCES TO DOCUMENTS OR BEHAVIOR NOT IN EVIDENCE

Defendants move the Court to exclude all references by the DAPs and their experts that the documents produced in discovery reflect only a portion of the alleged conspiratorial conduct. The motion is DENIED.

The DAPs intend to submit as evidence documents from Defendants' records probative of conspiratorial conduct that contain instructions to "destroy after reading" or similar directives. The DAPs intend to argue that the jury should infer from that evidence that the record only reflects a fraction of the cartel conduct that actually occurred. Defendants claim such argument is "speculative, lacks foundation, is irrelevant, threatens to mislead the jury, and is unfairly prejudicial." Def. MIL #11 at 1. Defendants' argument has no merit. Asking the jury to conclude from the existing "destroy after reading" documents that some records were indeed destroyed is a permissible inference under the rules of evidence, and not a difficult one to draw.

Defendants also seek to exclude certain testimony from the DAPs' expert economist Kenneth Elzinga on the same topic on the basis that it is inadmissible expert testimony. They point specifically to Dr. Elzinga's Rebuttal Report wherein Dr. Elzinga writes the following:

> If we take the defendants at their word, we know that they were, in general, instructed not to make notes for their concerted conduct and they were not to keep records of their collusive endeavors. To the extent these instructions were followed, then to that extent the evidence of cartel activity is reduced. Because I cannot tell how many documents, spread sheets, notes, memoranda, correspondence, telephonic records, and emails were destroyed or not created in the first place, I cannot make a statistical inference as to how much greater would be the evidence of the cartel's robustness. But one can conclude: *it would be greater.*
>
> Assume that only 50% of these records never saw the light of day by appearing in the record of this case. That would mean the record in this case could be twice as long as it is, and it's very long already.

ECF No. 3557-2 ("Elzinga Report") at 145. Defendants argue this testimony is speculative because it is not based on facts or data in the record, is based on Dr. Elzinga's "subjective beliefs about what defendants may or may not have done," and is outside Dr. Elzinga's expertise. Def. MIL #11 at 2.

Defendants' argument fails. The first paragraph quoted above states a fact: If the Defendants are taken "at their word" then one can assume that some evidence was destroyed, and Dr. Elzinga therefore "cannot make a statistical inference as to how much greater would be the evidence of the cartel's robustness. But one can conclude: *it would be greater.*" Elzinga Report at 145. The second paragraph merely poses a hypothetical. Neither paragraph, however, is speculative, outside Dr. Elzinga's expertise, or otherwise in violation of the Federal Rules of Evidence.

The motion is DENIED.

### V.     MITSUBISHI ELECTRIC'S MOTION IN LIMINE NO. 3 TO EXCLUDE ANY REFERENCE AT TRIAL TO ANY PARTY'S PARTICIPATION IN THE EIAJ AND EIAJ ACTIVITIES

Mitsubishi Electronic ("Mitsubishi") moves *in limine* to exclude any reference to a party's participation in the Electronic Industries Association of Japan (the "EIAJ"), a Japanese trade organization, as well as reference to any exchanges of production information among EIAJ members. The motion is DENIED.

Mitsubishi and certain other Japanese Defendants exchanged information at EIAJ meetings, including production and other information. The DAPs intend to use evidence of EIAJ

16

meetings and information exchanges to show "the context in which certain Japanese Defendants to this action transitioned from participating in trade association meetings to participating in an illegal price-fixing conspiracy." Mitsubishi Opp'n at 14. Mitsubishi contends, however, that the EIAJ evidence is impermissible character evidence and ought to be excluded under Rule 404(b) because it "suggest[s] EIAJ participants were more likely to have participated in the . . . conspiracy." Mitsubishi Mot. at 6. Further, Mitsubishi claims the probative value of the EIAJ evidence is significantly outweighed by unfair prejudice. Specifically, Mitsubishi claims "the evidence poses too great a potential for the jury to hear impermissible character evidence . . . ." Mitsubishi Mot. at 9. Mitsubishi's Rule 403 objection, in other words, is simply a restatement of their Rule 404(b) objection.

Rule 404(b) states that "[e]vidence of a[n] . . . other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Mitsubishi's motion suggests the following: (1) based on the EIAJ evidence, the jury may infer that Mitsubishi engaged in unlawful conspiratorial conduct during the EIAJ meetings, (2) that unlawful conduct would constitute "other acts" unrelated to this case, (3) the "other acts" would then be used by the DAPs to show that Mitsubishi has a propensity for fixing prices, and (4) the jury may conclude that it is more likely that Mitsubishi participated in the CRT conspiracy at issue in this case because they participated in conspiratorial conduct in the past.

Mitsubishi's argument has no merit. The EIAJ evidence is probative of Mitsubishi's participation *in the CRT conspiracy*, not "a separate Japan-based conspiracy." Mitsubishi Mot. at 9. Further, the Court agrees with the DAPs that "the jury could reasonably conclude that the conduct of certain Japanese Defendants [at the EIAJ meetings] was merely one facet of a broader conspiracy" to fix CRT prices. Mitsubishi Opp'n at 15.

The motion is DENIED.

## VI. MITSUBISHI ELECTRIC'S MOTION IN LIMINE NO. 1 TO EXCLUDE THE SDI INTERROGATORY RESPONSE

Mitsubishi moves *in limine* to exclude an interrogatory response (the "SDI Response") in which Samsung SDI Co. ("SDI") admitted that it conspired to fix CRT prices with a Mitsubishi

17

entity.  Mitsubishi argues the SDI Response should be excluded because it is inadmissible hearsay and because the risk of unfair prejudice significantly outweighs its probative value.  The DAPs do not dispute that the SDI Response is hearsay, nor do they claim that a hearsay objection applies.  The DAPs nevertheless argue the SDI Response should be admitted because of a discovery ruling by the Special Master and because it is not unfairly prejudicial.  The motion is GRANTED.

"The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."  Fed. R. Evid. 403.  Given the SDI Response directly implicates Mitsubishi in the conspiracy, it is extremely probative of Mitsubishi's liability.  Mitsubishi argues that it is unfairly prejudicial because "the entity which made the hearsay assertion . . . is *not* available for cross-examination . . . ."  Mitsubishi Mot. at 3.  Because evidence is hearsay and therefore unreliable, however, does not make it unfairly prejudicial.  See United States v. Looking Cloud, 419 F.3d 781, 785 (8th Cir. 2005) (holding that evidence is unfairly prejudicial where "it tends to encourage the jury to find guilt from improper reasoning"); United States v. Sills, 120 F.3d 917, 920 (8th Cir.1997) ("Whether there was unfair prejudice depends on whether there was an "undue tendency to suggest decision on an improper basis.").  Accordingly, Mitsubishi's Rule 403 objection is denied.

"[A] statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" is not admissible unless a hearsay exception applies.  See Fed. R. Evid. 802.  Accordingly, "[a]lthough an answer to an interrogatory is admissible against the party answering the interrogatory, it ordinarily is not admissible in evidence against anyone else . . . ."  23 Am. Jur. 2d, Dispositions and Discovery, § 131.  If the DAPs seek to admit the SDI Response to prove that a Mitsubishi entity conspired with SDI to fix CRT prices, then the SDI Response is hearsay.  As the DAPs point to no applicable exception, the SDI Response is inadmissible if submitted for that purpose.

The DAPs argue the SDI Response should be admitted nevertheless because the Special Master granted SDI's request for a protective order against a Fed. R. Civ. Pro. 30(b)(6) deposition notice served by the DAPs.  The DAPs claim that "the Special Master held that Samsung SDI's interrogatory responses fulfilled the role that a Rule 30(b)(6) deposition would fill, suggesting that

18

1  those interrogatory responses are usable to the same extent as deposition testimony would be."

2  Mitsubishi Opp'n at 3.  Not so.  The Special Master found that a Rule 30(b)(6) deposition of SDI

3  would be duplicative of "SDI's prior discovery responses," which "adequately supplied the

4  information that a FRCP 30(b)(6) deposition would furnish."  ECF No. 3644-7 at 4.  This issue of

5  whether "SDI's prior discovery responses" – including the SDI Response at issue here – are

6  admissible at trial was not before the Special Master.

7      The motion is GRANTED.

## VII. CONCLUSION

The Court now rules as follows:

| Name of Motion | Motion ECF No. | Opp'n ECF No. | Reply ECF No. | Ruling |
|---|---|---|---|---|
| MOTION FOR PRETRIAL PROFFER AND RULING ON ADMISSIBILITY OF ALLEGED CO-CONSPIRATOR STATEMENTS | 3559 ("Def. MIL #1 Mot.") | 3652 ("Def. MIL #1 Opp'n") | 3767 ("Def. MIL #1 Reply") | GRANTED IN PART, DENIED IN PART |
| MOTION TO EXCLUDE PLAINTIFFS' PRICE-LADDER THEORY OF RECOVERY | 3568 ("Price-LADDER Mot.") | 3648-4 ("Price-Ladder Opp'n") | 3761 ("PRICE-Ladder Reply") | DENIED |
| MOTION TO EXCLUDE ARGUMENT OR EVIDENCE REGARDING PURPORTEDLY PRO-COMPETITIVE JUSTIFICATIONS FOR DEFENDANTS' AGREEMENTS REGARDING CRT PRICE, SUPPLY, PRODUCTION, OR CUSTOMERS | 3558 ("DAP MIL #13") | 3676-4 ("DAP MIL #13 Opp'n") | 3757-4 ("DAP MIL #13 Reply") | GRANTED IN PART, DENIED IN PART |
| MOTION TO EXCLUDE REFERENCES TO DOCUMENTS OR BEHAVIOR NOT IN EVIDENCE | 3557 ("Def. MIL #11") | 3686 ("Def. MIL #11 Opp'n") | 3765 ("Def. MIL #11 Reply") | DENIED |
| MITSUBISHI ELECTRIC'S MOTION IN LIMINE NO. 3 TO EXCLUDE ANY REFERENCE AT TRIAL TO ANY PARTY'S PARTICIPATION IN THE EIAJ AND EIAJ ACTIVITIES | 3601 ("MITS. Mot.") | 3644-4 ("MITS. Opp'n") | 3772-4 ("Mits. Reply") | DENIED |

United States District Court
Northern District of California

| Name of Motion | Motion ECF No. | Opp'n ECF No. | Reply ECF No. | Ruling |
|---|---|---|---|---|
| MITSUBISHI ELECTRIC'S MOTION IN LIMINE NO. 1 TO EXCLUDE THE SDI INTERROGATORY RESPONSE | 3601 ("MITS. Mot.") | 3644-4 ("MITS. Opp'n") | 3772-4 ("MITS. Reply") | GRANTED |

**IT IS SO ORDERED.**

Dated: October 26, 2016



_____
JON S. TIGAR
United States District Judge