1   Brian Barry
    151 N. Martel Ave.
2   LA, CA 90036
    323-954-7210
3   Bribarry1@yahoo.com
4   *Pro Se*

5

6               UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF CALIFORNIA
7               SAN FRANCISCO DIVISION

8

9   **IN RE:  CATHODE RAY TUBE (CRT)**          Case No. 3:07-cv-5944          MDL No. 1917
    **ANTITRUST LITIGATION**
10

11                                              **CLASS ACTION**

12  This Document Relates to:

13  All Indirect Purchaser Actions              **OBJECTION OF LAW OFFICE OF BRIAN
                                                BARRY TO SPECIAL MASTERS REPORT
14                                              AND RECOMMENDATION RE
                                                ALLOCATION OF ATTORNEYS FEES**
15

16
                                                Court:                Judge:  Hon. Jon S. Tigar
17

18

19

20

21

22

23

24

25

26

27

28

    1

The Law Office of Brian Barry ("the Firm") hereby objects to the Report and Recommendation of the Special Master (ECF No. 4971, hereinafter R&R). The Court reviews the Special Master's findings of fact and conclusions of law de novo, and his rulings on procedural matters for abuse of discretion. Fed. R. Civ. P. 53(f); see also ECF No. 4077 at 7, amended by ECF No. 4298 at 3.  The proposed allocation methodology is unfair and should not be approved. However, if the Court is inclined to accept it, then the amounts awarded the Firm should be modified.

I.    **THE ENTIRE PROPOSED ALLOCATION SHOULD BE OVERRULED**

A) **THE METHODOLOGY USED BY LEAD COUNSEL TO PROPOSE ITS ALLOCATION IS UNFAIR AND WAS NOT REVIEWED AND APPROVED BY THE SPECIAL MASTER AS FAIR OR EQUITABLE.**

Fee awards are discretionary and thus the principles of equities apply.  While the scope of discretion is broad, it is not boundless.  Abuse of discretion is shown where the fee recommendation is arbitrary, capricious, or patently unreasonable.  Here, the Special Master ("SM") abused his discretion when he blindly relied on the methodology proposed by the Lead Counsel.  The SM rubber-stamped the proposed methodology without inquiring about its legal, scientific, or even logical foundation.  In fact, the proposed methodology is fundamentally flawed on its own terms.  It applies wildly divergent rates and multipliers for the same type of legal work performed by different attorneys at different firms.  The unexplained disparities are so drastic that it is difficult to conceive any plausible justification.  This is particularly problematic for the multipliers, which must be justified on a case-by-case basis in view of all the pertinent circumstances.  The R&R is wholly devoid of any articulation why or the justification for adopting the different multipliers or rates proposed by Lead Counsel.  Ultimately, the R&R violates the principles of equities.  The methodology proposed by the Lead Counsel is inherently inconsistent, unscientific, and unreliable; if adopted by this court, it will lead to patently unfair and inequitable results.  The SM in his

1

R&R abused his discretion by espousing such a patently unreasonable methodology without giving any sufficient justification.

   The multipliers for different types of work should be the same. As another court recently held, the reasonableness of a fee depends on the difficulty and skill level of the work performed, and results achieved, not the title of the person who did the work. *Chambers v. Whirlpool Corp.,* No. CV 11-1733, 2016 US Dist. LEXIS 140839 at *47 (C.D. Cal. Oct. 11 2016).For example, if attorney A did 100 hours of doc review when all reviewers were capped at $350 an hour (because its prior to deposition preparation), and its decided a multiplier of 1.2 is fair for this type of work, then A should 100 x $350 x 1.2. Then the case moves to depositions, and regular rates are allowed, so attorney A bills 100 hours at $500 for all his hours of that nature. Its decided this work deserves a multiplier of 1.5 so 100 x $500 x 1.5. Meanwhile, Attorney B who works at another firm works 100 hours on doc review, and then 100 hours at depositions. This attorney gets 100 x $350 x 1.2 and 100 x $550 ( a higher rate due to more experience) x 1.5.  In this way the attorneys who do a particular type of work are getting their regular or capped rates and the same multiplier for the same types of work.

   Instead, under Lead Counsel's proposal, three firms that had 100 hours of document review prior to deposition prep review get compensated at rates that vary tremendously.  For example, its possible that a firm that had a document reviewer that did 100 hours of document review before depo prep started gets 100 x $350 x 1.2 ($420 an hour). Yet a firm with 100 hours of regular document review and 100 hours of it while in depo prep gets 200 x $500 (the regular rate for this example) x 1.5 multiplier ($750 an hour). A third firm that had a lawyer do 100 hours of regular document review, and 100 hours of depo prep review and then 100 hours of depositions can get 300 x $500 x 2.5 ($1250 an hour). Yet all these firms did the 100 hours of document review before depo prep started. The same type of and amount of work is now getting compensated at either $420 an hour, $750 an hour, or $1250 an hour.

2

How is it fair that the same kind of work is now being paid at dramatically different rates (even assuming the billing rates were same). The allocation should be redone accordingly.  The inequitable nature of the way Lead Counsel did it is shown as follows.  Sylvie Kernwas billing time at $450 per hour in 2010, and by 2015 had increased her rate to $700 per hour: a 66% increase in billable rate in 5 years! [1] It is proposed she get a multiplier of 2.2685: that's the equivalent of $1588 per hour for all of her work on the case, including her 748.2 hours of document review and 771.4 hours of depo prep! Yet others who did the same document review work can be getting far less per hour for this same work.  In fact, as the Dec. of Shea (ECF Docket 4816 at para 8-10, hereinafter "Dec. Shea") went into, Kern thought it appropriate to instruct fellow group members to direct substantive questions to Shea in her absence, and asked Shea for assistance when she couldn't figure out certain database functionalities.  However, she gets $1588 an hour for document review and Shea $350? How is this equitable?  Its not, plain and simple and public policy considerations dictate that Lead Counsel not get to play favorites.  It also prevents Lead Counsel from assigning work he intends to give a higher multiplier for to favorites, or like here, his relative, Mr. Papale (despite the fact he did not contribute to the litigation fund at all!), who could do nothing meaningful at a deposition if the document reviewers had not coded the documents and pulled some for him to use at the depo. Yet he gets paid at a rate, including multiplier, of 5x or so the rate of some of the reviewers?  Other firms have objected to the fact the assignments were exclusively within Lead Counsels control. (See Docket 4817, page 4-5).

If Kerns rate for the document review was capped at $350 (as Lead Counsel has proposed to cap the rate of Mr. Shea and others, or a little higher because she was a team leader) and all got a multiplier of 1.2 for those hours (or slightly higher, maybe 1.35 to acknowledge the team leader aspect, and all team

---

[1] Lead Counsel has proposed paying people based on the "current rate", instead of historical rates (which explains dramatic increases in firms rates that knew this would be done.)

3

leaders got the 1.35), then it would fair.  The other work Kern did, like attending depositions and working with experts and on motion practice, that work can be compensated at her regular rate and whatever higher multiple it is decided those assignments justify, so maybe she ends up getting $1588 an hour for those hours.  But other firms that did that work should also the same multiplier.  For example, Kirby McInerney did the most deposition work of any firm, attending 49 of them.  Why is their multiplier for that work less than Kerns?  Or take another example, Brian Umpierre of the Glancy firm, who was admitted in 2005, billed at $400 per hour in 2011-13, was a team leader like Kern, and performed 1685 hours of document review and 3172 hours of depo prep.  His time stands to be paid at a few cents under $600 per hour with the multiplier of 1.3991 assigned, yet Kern gets $1588 for all her document review and depo prep, which is the exact same work? Clearly not equitable.

Further, Lead Counsel had instructed firms that no read and review time would be allowed, so this Firm did not bill for any, despite reading many pleadings to email its certified NY class rep with updates on the case.  Yet in the R&R, the SM allows time for this for other firms, at $600 an hour!  How can it be equitable that read and review pleadings is compensated at $600 an hour, but real substantive work needed to advance the case is being paid at $350 an hour to many firms?!  Further, how is it fair to change the rules after the fact, now that some firms had hours removed from their reported lodestar for read and review time (See Docket 4817 page 4-5), and others never even billed for same?  Similarly, it was only after the case was fully settled that Lead Counsel started to take issues with people's billing rates and hours, despite the fact time reports with these rates and hours had been submitted throughout the case.  How is it fair that only then Lead Counsel decides to cap rates for certain tasks and decide some hours should be stricken and institutes a NEW rule stating that no document review time will be allowed unless the person was logged into the database.  It is not and public policy should dictate this not be approved, as it allows Lead Counsel to play favorites and try to ensure a bigger slice of the pie for itself.

4

To make it even worse, Mr. Alioto had law clerks and paralegals billing at $250-300 per hour and stands to get a 2.89 multiplier for their work.  So law clerks get paid either $722.50 an hour or $867 an hour for the 1217 hours of document review work they did, while attorneys with 15 plus years' experience get $350 an hour?!  And the paralegals get the same rates for working on pleadings. Obviously paralegals are not writing briefs. So for 538 hours of cite checking and proof reading presumably, they get paid at between $772 and 868 an hour?!  This is absurd.  As other counsel has stated in their objections (ECF Docket 4818 page 14-15), there should be no multiplier for paralegals cite checking, and how can law clerks get almost the same rate as lawyers with many years' experience and far higher multipliers than attorneys for the same document review work?  However, the Special Master never addressed this argument at all.

Lead Counsel stated it made it's allocation based on 5 factors, the level of work, the amount of high level work, the quality of the work, the level of risk and billing efficiency.  These are very subjective factors. How did it determine what was high level work, and the quality of the work, must less billing efficiency?  The methodology is inequitable and subject to too many subjective factors decided by Lead Counsel alone, without any disclosure of how it came to the conclusions on the questions. Further the multipliers are inequitable.  The allocation should be thrown out and a procedure for deciding multipliers for certain types of work that apply equally to everyone who did that work should be established and then the allocation re done. There are only 10 categories of time, assigning a multiplier for each type of work should not be hard.

**B.   THE HOURS OF LEAD COUNSEL WERE NOT AUDITED OR REVIEWED BY ANYBODY AND THE MULTIPLIER IS EXCESSIVE**

Lead Counsel said he audited other firms time.  Who audited his time?  Keep in mind that Lead Counsel has a checkered history.  See *Thayer v. Wells Fargo Bank,* 92 Cal.App.4th 819, 843-844 (2001) ("Alioto and Kassof respectively sought and received compensation for almost 10 hours for work

5

performed on April 16 in connection with this conference, which appears to have lasted about an hour....

This is not an isolated example of the manner in which Kassof and Alioto not only duplicated the work of

counsel for plaintiffs in other cases but duplicated each other's work. At virtually every hearing that took

place after coordination was ordered, plaintiffs in the other cases were invariably represented by a single

attorney and either Himmelstein or Knutson, and sometimes both, made the bulk of the plaintiffs'

presentation, and Alioto and Kassof both appeared to separately express their concurrence").

The time of a firm that stands to make over $44 million thanks to a 2.89 multiplier on "current

rate", not the rate in effect at the time the firm was doing the work, should not go unchecked.  Further, as

Lead Counsel, the firm should have taken many depositions and prepared the case for trial, and if needed,

done the trial.  Yet it did none of these things.  Further, as a Lead Counsel, it contributed very little money,

$170,000 to the litigation fund, $100,000 after the settlements were reached. (See discussion in Scarpullo

objection, ECF 4818 p. 19, line 18-25). Yet in the filing with the Special Master of litigation fund

contributions, it lists itself as having given $1.26 million (ECF 4960).  So it appears it mislead the Special

Master. With all these issues taken together, how is it entitled to such a large multiplier, and how can its

hours go unchecked?

## II.      THE SPECIAL MASTER MADE FOUR MAJOR ERRORS IN HIS HANDLING AND RULING ON THE FIRMS OBJECTION TO THE ALLOCATION

*First*, the Special Master seems to have primarily based his ruling on his belief that ALL of the

Firms hours were included in the calculation of the proposed amount it would receive. This is clearly

erroneous as the briefs clearly stated that Lead Counsel had proposed to reduce the Firms hours by 500

hours, or 20%! See Dec. Jeff Shea (ECF 4816, hereinafter Dec. Shea, paragraph 11,and para 16). As

stated therein, "with the goal of being collegial "team players," we agreed to lead counsel's proposed

reductions."  However, in his Report and Recommendation (ECF 4971, hereinafter R&R), at page 23, line

23-25, the SM stated, "Finally Lead Counsel gave Barry the benefit of the doubt by allowing Shea's **full**

6

**recorded hours**, although his recorded document review time greatly exceeded the time spent on the online database."

*Second,* the SM states in his R&R that the Firm contributed $25,000 to the litigation fund (See Id, page.23, line 15). Apparently this is based on the list provided by Lead Counsel, (ECF 4960). However, as stated in the Dec. of Shea referenced above, an additional $3000 was contributed by the Firm in Jan. 2016 which is not included in the expenses awarded by this Court and thus will presumably not be repaid. (See Dec. of Barry and Exhibit 15 filed herewith). After Lead Counsel filed his list of contributions, proof of the additional payment of $3000 (a cancelled check) was send by email to the Ms. Chan, the Special Master's assistant, but the SM refused to consider it.[2]  It is an abuse of discretion to not accept proof of said payment, which was in dispute. Especially given the fact this additional contribution was discussed in the hearing that took place with the SM, and is relevant because Lead Counsel has argued that the Firm "abandoned the case" (to be discussed further below, but the short answer is the firm ceased to exist as of Jan. 2014 when Mr. Barry, due to health concerns, retired to Bali Indonesia and went on inactive status with the State Bar, a fact Lead Counsel knew full well).

Giving money when requested by Lead Counsel is proof that this abandonment argument is specious. Why would Lead Counsel even request it if it felt the case had been abandoned by the Firm? However, the SM appears to **not** have believed the Firms statement that it gave this money in Jan. 2016, which is another clearly erroneous basis for the ruling.[3]

─────────────────────

[2] Dear Mr. Barry:

Mr. Quinn is not accepting any further submissions on this matter and the content of the declaration is already in the record. See Exhibit 14 Dec. Barry.

[3] Another firm that objected to its allocation and sent money in Jan. 2016, McCallum Methvin & Terrell, also had its amount of litigation und contribution understated in the list filed by Lead Counsel, (the list filed by Lead Counsel states $20,000, but the firms Declaration in support of its objection stated $22,000, with $2000 coming in 2016, See ECF 4824-1, Exhibit A thereto with list of litigation fund contributions).

7

1    _Third,_ the SM stated "The fact that Mr. Shea's document review was ultimately used for

2    deposition preparation does not convert it to the more sophisticated category of selecting deposition

3    exhibits for which a higher billing rate is allowed."  R&Rpage 23, line 21-23. Again, this is not true.Lead

4    Counsel, in asserting that the $350 per hour rate was justified, wrote that while Mr. Shea was involved "to

5    some degree in reviewing and coding documents that were ultimately used for depositions," he "did not

6    perform the higher level review involved in selecting documents for use at depositions, or helping to

7    prepare the deposition outline" (Lead Counsel's Omnibus Opp., P.49, lines 10-13, ECF 4853). However,

8    Mr. Shea stated in his Declaration at paragraph 7, lines 1-7, that he did said work, and attached exhibits

9    that showed he was identifying documents by bates number that should be used in the deposition of

10   certain people. To wit:"I personally reviewed and coded documents in preparation for SEC/SEAI 30(b)(6)

11   depositions (Exhibits 24-25), in addition to documents in preparation for the depositions of Samsung's

12   Dae Eui Lee (Exhibits 26-29), Hitachi's Kazuhiro Sakashita (Exhibits 30-31), Hitachi's Nobuhiko

13   Kobayashi (Exhibits 32-33), and Chunghwa's Chih-Chun ("C.C.") Liu (Exhibit 34). "[4]

14        Despite the exhibits that were submitted which showed Mr. Shea selecting documents for

15   depositions, because of Lead Counsels statement that he did not do this, the question of whether Mr. Shea

16   had done actual deposition preparation was discussed. After the hearing Mr. Shea sent an email with a full

17   30-b-6 deposition outline he had prepared to the SM assistant, Ms. Chan to prove once and for all that he

Thus the evidence shows that Lead Counsel deliberately understated litigation fund contributions by two
of the eight firms objecting, the SM refused to allow proof of this, and used these erroneous numbers in
his ruling.  Further, if Lead Counsel intended on paying itself over $40 million, couldn't/shouldn't it have
paid the last few un-reimbursable expenses in the case?

[4]The exhibits were originally attached to the Declaration, but defense counsel claimed the summaries of
the documents were protected by the Protective Order and requested that they be removed. Then a
compromise was reached where the Declaration was refiled on ECF without the exhibits but the SM had
already been given them and defense counsel consented to this.  Most of the above exhibits are refiled
here in redacted form, See Exhibits 2-11 to Dec. Barry. However, the Court can obtain the un-redacted
versions from the SM if needed.

8

had done this work. (Attached as Exhibit 1 to Dec. Barry is a redacted copy of the outline).

However, instead of allowing the submission of evidence that could resolve the question once and for all, the SM refused to accept any more filings. See Dec. Barry, Exhibit 13.

The refusal to allow the additional evidence of the 30-b-6 outline is an abuse of discretion and the findings of the SM are contrary to undeniable factual evidence which shows that Shea in fact DID do depo outlines and pull documents for depositions.

Lead Counsel has stated that attorney who did deposition preparation could bill at normal rates. In its Proposed Allocation of Aggregate Fee Award, Lead Counsel writes, in very clear and plain language, that "Where document reviewers also worked on preparing for depositions" firms were "allowed to bill this time at the attorney's normal rate" (ECF No. 4790, P.2, Footnote 1).  Thus, Shea should have been allowed to billed at the higher rate of $525 that he was billed at in all reports to Lead Counsel during the case.  This rate is commensurate with the rate other attorneys who did this work are getting (before considering the inequitable multipliers). Further, as this Court has already held, when discussing contract attorneys, there is no justification to downgrade their billing rates or not apply a multiplier to them. *In re Cathode Ray Tube (CRT) Antitrust Litig.,* MDL 1917 2016 U.S. Dist LEXIS 24951 at *310 (N.D. Cal. Jan 28 2016). Clearly the same applies to an associate. The reasonableness of a fee depends on the difficulty and skill level of the work performed, and results achieved, not the title of the person who did the work. *Chambers v. Whirlpool Corp.*, No. CV 11-1733, 2016 US Dist. LEXIS 140839 at *47 (C.D. Cal. Oct. 11 2016). If others who did the same work get their normal billable rate, so should Shea.

*Finally, the fourth* major error was in believing the nonsense put forth by Lead Counsel about the Firm abandoning the case[5] and pure speculation about one Korean reviewer.  To wit, "the entire Barry

---

[5]The Special Master also refers to the Korean reviewers hired by the Firm.  Lead Counsel requested that the Firm find some lawyers to perform foreign language review. Two were hired.  Lead Counsel

9

firm abruptly pulled out of the case in Dec. 2012". Page 24, lines 1-3 R&R.  As explained in the briefing,

the absurd abandonment claim by Lead Counsel is based upon one fact: that the Firm choose to have Mr.

Shea, its attorney who was working primarily on CRT, shift over to start working on another casewhich

was starting discovery in January 2013.  This is not "abandoning" the case.  It is normal and eminently

reasonable for firms to work on a number of cases over a few years.  The Firm made a decision to work

on 4 cases that were filed in the 2006-2008 time frame in equal amounts. This decision was in part based

on the fact that Mr. Barry, the firms sole owner, was preparing to retire and didn't want to "abandon" one

case for another. He wanted to have his attorneys work on the four cases recently filed in an even amount

before the end of 2013 because, in Dec. 2013, Mr. Barry, due to health concerns retired andmoved to Bali

Indonesia.  (See Dec. Barry filed herewith). He went on inactive status with the State Bar on the 6th of Jan.

2014.  See;http://members.calbar.ca.gov/fal/Member/Detail/135631.  Thus the firm was no more. This

hardly abandoning a case.  Further, and most telling, there was NEVER any request from those working

_____

eventually said one was not good and should be let go, and was very happy with the other one, but he left
to take another job, despite being offered a raise in an attempt to retain him.  The fact that the man wanted
to progress in his career is outside of the Firm's ability to control, and is hardly something to criticize, yet
he Special Master did just that (R&R, p. 23-24 lines 26-1 and page 24 line 8-10, where he reiterates an
unsubstantiated speculative allegation of lead Counsel about one of them using Goggle translate.)  The
fact Lead Counsel decided that one attorney was not as good as others working on the case, so she should
be taken off, is not an uncommon event in these types of cases.  The fact is, no evidence has been offered
demonstrating that their work was not useful and/or utilized. Nevertheless, they are billed at $300 per
hour for the person Lead Counsel eventually became unhappy with, and at $350 per hour for the reviewer
it was happy with, not at the $400 (if not higher) per hour rate that all other foreign language reviewers
were billed at. Together they only billed 625 hours, so this should hardly be a major factor in deciding if
the Firm should be given a multiplier. Further, the claim that the Firm did not work cooperatively with
others or act in the best interest of the Class is undermined by the fact it went and hired lawyers
specifically for the case at the request of Lead Counsel. Tellingly, nobody asked that new Korean attorney
be hired.

10

on CRT to have the Firm keep working on the case, or to come back and help later.[6] **As it was, the SM was not informed of the closing of the firm and retirement of Mr. Barry. He made an assumption in his ruling with no factual support that is incorrect.[7]**

**CONCLUSION**

The Court should **not** approve the allocation proposal at all and should do it itself, or order that it be re done with certain multipliers for certain tasks being applied all across the board, and no or extremely minimal multipliers for paralegal and law clerk work.  However, if the Court is not so inclined to rule, then it should modify the allocation given to the Firm. The Firm, which, despite having the 18th largest lodestar in the case (this ranking achieved even after the Firm absorbed a 1/3rd reduction in the hourly rate of its primary attorney and a 20% reduction of its hours billed to the case and then a 10% reduction by the Special Master), is one of only 8 out of 50 firms to not be assigned a positive multiplierThe Firm accepts the 500 hour reduction in its billable time but feels strongly that Shea's time should be compensated at $525 an hour because of his deposition preparation work, which as discussed

---

[6]Most telling on the claim of abandonment, the response of the team leader of Shea to being notified he was going to work n another case was as follows:

On Wednesday, December 26, 2012 11:01 AM, Sylvie Kern <sylviekern@yahoo.com> wrote: Oh no! I am so so sorry to hear this! Well, I wish you the best, Jeff. I have enjoyed working with you-maybe one day will meet in person! Happy new year...  All the best, Sylvie (See Dec  Barry Exhibit 12).


[7]In fact, despite it not being discussed in the briefs or at the hearing at all, the Special Master in his R&R pointed to no billable hours by the Firm after 2012 (see R&R footnote 16).  If the SM had asked why this was, the closing of the Firm due to Mr. Barry's retirement, coupled with the fact the Firm choose to follow the rules set by Lead Counsel and not bill for the read and review and communications with its client on the status of the case in 2013 (and thereafter, as Mr. Barry continues to read filings and update his client to this day) would have been discussed.

11

above Lead Counsel said justified people getting paid at regular rates. Further, this is less than what Lead Counsel's own expert said a lawyer with Mr. Shea's experience should be paid (See Dec. Richard Pearl in Support of Motion for IP Attorney Fees, ECF 4071-15 at paragraph 30) and is less than what Lead Counsel is currently seeking for a sixth year attorney who did 4 months of document review in the *Cipro* case (See ECF 4896-1, page 10 of 35, $580 an hour for Rachael Brasso for 4 months of document review, and requests a multiplier of 3.08, see page 6 line 11 of same, and https://www.linkedin.com/in/rachel-brasso-j-d-92a6825).

Applying this rate would make the Firms lodestar $1,287,538. Taking the 10% reduction the Special Master imposed, its reduced to $1,158,784.  Applying a 1.3 multiplier like similar firms were given, totals $1,506,419. This would give the Firm slightly less than lodestar in a case that basedon historical rates is paying a multiplier of 1.89.[8]

Even assuming the Court finds that the document review work by Mr. Shea was properly capped at $350 per hour, the Firm should STILL be assigned a positive multiplier. Lead Counsel repeatedly states that firms which performed document review work, made litigation fund contributions, and provided a class representative should be given a multiplier of at least 1.3 (as the Special Master noted, yielding a sum of $1,095,841, still only 72% of the original reported lodestar.

The Firm also agrees with other objectors that Lead Counsel has rewarded itself excessively, that its multiplier should be lowered, and that more wealth should be spread around to all others.

---

[8]In further and vivid demonstration of contradiction and inconsistency, Lead Counsel frequently states in a variety of filings that other firms meeting certain criteria do in fact deserve a multiplier.  For example, it opines that firms with small lodestars of $100,000 or less, which did nothing but some work for their clients, should receive multipliers of 1.15-1.25 (See Omnibus Opp. P. 50, lines 16-21).   Lead Counsel repeatedly states in its filings that firms which did even low level document review and provided a class representative deserve multipliers (See Omnibus Opp., P.41, lines 7-11, a base multiplier of 1.2 for firms who had clients, increased for those that contributed to the Litigation Fund and/or did document review).

12

1

2    Dated: Nov. 10, 2016                                Respectfully Submitted,

3

4

5

6                                                        Brian Barry

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13

1  PROOF OF SERVICE VIA ELECTRONIC POSTING
   I, the undersigned say:
2  I am not a party to the above case, and am over eighteen years old. On November 10, 2016, I
3  served true and correct copies of the foregoing document, by posting the document electronically to
   the ECF website of the United States District Court for the Northern District of California, for
4  receipt electronically by the parties listed on the Court's Service List.
   I affirm under penalty of perjury under the laws of the United States of America that the
5  foregoing is true and correct.

6  Executed this 10th day of November, 2016

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

   14