Mario N. Alioto (56433)
Joseph M. Patane (72202)
Lauren C. Capurro (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123
Telephone: 415-563-7200
Facsimile: 415- 346-0679
Email: malioto@tatp.com
jpatane@tatp.com
laurenrussell@tatp.com

*Lead Counsel for
Indirect Purchaser Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>All Indirect Purchaser Actions | Master File No. CV-07-5944-JST;<br>No. CV-13-03234-JST<br><br>MDL No. 1917<br><br>**CLASS ACTION**<br><br>**LEAD COUNSEL'S RESPONSE TO OBJECTION OF LAW OFFICE OF BRIAN BARRY TO SPECIAL MASTER'S REPORT AND RECOMMENDATION RE ALLOCATION OF ATTORNEYS' FEES**<br><br>Judge:  Honorable Jon S. Tigar<br>Court: Courtroom: 9, 19th Floor |

Lead Counsel responds as follows to the Objection of the Law Office of Brian Barry ("Barry") to Special Master's Report and Recommendation Re Allocation of Attorneys' Fees ("Objection") (ECF No. 5013).

## BACKGROUND

Barry's primary contribution to this case was to provide document reviewers: Jeff Shea, who did good work but was suddenly taken off the case by Barry at a crucial time in discovery, and two Korean-speaking reviewers whose efforts did not significantly advance the cause. When the time came to file the Fee Petition, Lead Counsel assessed Barry's relative contribution to the case, as the law requires,[1] and allowed Barry a lodestar of $937,223.50. (ECF No. 4976-1.) Following an across-the-board cut for inefficiencies, imposed by the Court, which reduced Barry's lodestar to $843,501.15, Lead Counsel allocated a multiplier of 0.994, for a total award of $842,954.93.[2] (*Id.*)

Barry objected to the Special Master that the multiplier applied was too low. (ECF No. 4836.) In response, Lead Counsel explained the rationale for his allocation. (*See* ECF No. 4853 at 44-51). That rationale is summarized below:

- Barry failed to act in the best interest of the Class by pulling out of the litigation at a critical time in 2012, leaving Lead Counsel scrambling to replace Shea, an experienced document reviewer who had acquired a good understanding of the case;
- Barry's submitted time records reflected issues and inefficiencies, such as claiming fees for Shea for approximately 1200 hours more than the time Shea spent in the online document review database, and hundreds of hours more than any other document reviewer in the same 13-month period;

---

[1] *Keller v. NCAA*, No. C 09-1967 CW, 2015 WL 8916392, at *4 (N.D. Cal. Dec. 15, 2015) (in determining the proper allocation of attorneys' fees, the court should examine the relative efforts of class counsel and how the efforts of each benefited the class).

1

LEAD COUNSEL'S RESPONSE TO OBJECTION OF LAW OFFICE OF BRIAN BARRY TO SPECIAL MASTER'S
REPORT AND RECOMMENDATION RE ALLOCATION OF ATTORNEYS' FEES
Master File No. CV-07-5944-JST

- o   Barry billed for about 650 hours of work by two Korean-speaking reviewers who performed work of lower quality, one of whom was suspected of using Google to translate documents, and the other who quit abruptly after only a few months of training; and

- o   While the quality of Shea's work was good, he was a lower-level document reviewer rather than a document review team leader, and his rate was thus capped at the same $350 hourly rate of similar document reviewers.

Upon review of the record, the Special Master overruled Barry's objection. (Corrected R&R ("R&R"), ECF No. 4976 at 23-24.[3])  Among other things, the Special Master found that:

- o   Barry improperly compared Shea's work to that of team leaders engaged in higher level tasks (*id*.);

- o   Lead Counsel "gave Barry the benefit of the doubt by allowing Shea's full recorded hours, although his recorded document review greatly exceeded the time he spent on the online database" (*id*. at 24); and

- o   As Lead Counsel and time records established, "the entire firm also abruptly pulled out of the case in December 2012," a departure that "lost to the Class effort Attorney Shea's institutional knowledge and many hours of training, all of which Lead Counsel had to replace from other resources." (*Id*.)

The Special Master concluded that "given the early departure of the Korean reviewers (one of whom was suspected of using Google translate) and the entire firm's sudden withdrawal, a multiplier of 1.0 is appropriate." *Id*.  He recommended that the Court approve Lead Counsel's allocation to Barry without change.[4]  (*Id*. at 28.)

---

[2] The initial award to Barry was a 1.0 multiplier. However, each firm's total payout was reduced *pro rata* to correct a mathematical error. Accordingly, Barry's final multiplier was reduced from 1.0 to 0.994. (*See* ECF No. 4800.)

[3] This brief refers to the Corrected R&R rather than the initial R&R (ECF No. 4971) to which Barry cites.

[4] As stated in n.2, all awards were reduced pro-rata. Accordingly, the multiplier of 1.0 approved by the Special Master (R&R at 28) is actually a revised multiplier of 0.994.

LEAD COUNSEL'S RESPONSE TO OBJECTION OF LAW OFFICE OF BRIAN BARRY TO SPECIAL MASTER'S REPORT AND RECOMMENDATION RE ALLOCATION OF ATTORNEYS' FEES
Master File No. CV-07-5944-JST

Barry now objects to the R&R.  (ECF No. 5013.)  It argues that Lead Counsel used an improper methodology and that the Special Master erred in overruling Barry's earlier objection.  Barry appears to request a lodestar of $1,158,784 with a multiplier of 1.3, for a total award of $1,506,419.  Barry's contentions should all be rejected, and Lead Counsel's award upheld.

## ARGUMENT

### I. THE PROPOSED ALLOCATION IS FAIR.

#### A. The Methodology Used by Lead Counsel Was Fair

Barry never confronts the basis for the Special Master's conclusion that Barry is not deserving of a greater multiplier.  (*See* R&R at 24 (commenting on the problems caused by "the entire firm's sudden withdrawal").)  Instead, it attempts to deflect the deficiencies in its performance by criticizing Lead Counsel's methodology as "fundamentally flawed."  The objection is baseless.

First, Barry fails even to address the specifics of that methodology, which have previously been set forth in detail.  (*See* ECF No. 4790 at 1-4.)  In consultation with other firms, Lead Counsel examined "the relative efforts of, and benefits conferred upon the class by, co-counsel" (*Keller*, 2015 WL 8916392, at *4), and "whether the attorneys' 'specific services benefited the fund—whether they tended to create, increase, protect or preserve the fund.'" *Class Plaintiffs v. Jaffe & Schlesinger, P.A.,* 19 F.3d 1306, 1308 (9th Cir. 1994).  In order to apply these broad standards, Lead Counsel developed several factors to determine relative allocations: (1) level of work performed; (2) amount of high-level work performed; (3) work quality; (4) level of risk undertaken; and (5) billing efficiency and rates.  (ECF No. 4790 at 2-3.)  Lead Counsel then grouped the IPP firms into various tiers according to their relative contributions to the case, and assigned multiplier ranges for each tier.  (*Id*. at 3.)  This methodology is consistent with the methodology used and approved in the *TFT-LCD* litigation.  (*See In re TFT-LCD (Flat Panel) Antitrust Litig*., No. M 07-1827 SI, 2013 WL 1365900, at * 9-10 (N.D. Cal. Apr. 3, 2013) (describing and approving Special Master's methodology). )  In addition, many firms were given the opportunity to comment on Lead Counsel's analysis of their

3
LEAD COUNSEL'S RESPONSE TO OBJECTION OF LAW OFFICE OF BRIAN BARRY TO SPECIAL MASTER'S REPORT AND RECOMMENDATION RE ALLOCATION OF ATTORNEYS' FEES
Master File No. CV-07-5944-JST

contributions, and most of the 50 firms involved in this litigation are in agreement with Lead Counsel's proposed allocations. (ECF No. 4790 at 1.)

Barry makes broad unsupported generalizations about this methodology's perceived flaws, yet offers no viable alternative. For example, Barry argues that similar multipliers should be applied for similar types of work. This approach, of course, completely overlooks differentiating factors such as the nature, quality and difficulty of work performed by lawyers, its value to the case, and the other factors that multipliers are designed to address, such as risk undertaken and added value to the Class, all of which Lead Counsel properly considered. In addition, it would be near-impossible to allocate multipliers based solely on individual tasks performed, as Barry suggests doing. Again, this approach would fail to take into account factors such as quality and value of the work, efficiency, and comparative risk undertaken by firms.

Attempting to prove its point, Barry provides a flawed example, arguing that Sylvie Kern's proposed multiplier yields the equivalent of $1588 per hour for all her hours on the case, including document review, whereas others doing document review work would be getting far less. (Objection at 3-4.) But as Lead Counsel has already explained, Ms. Kern was the leader of the document review team to which Shea was assigned, and consistently performed much higher level tasks than did Shea. (*See* ECF No. 4893 at 49-50 (describing in detail the work performed by team leaders vis-à-vis the work by lower level document reviewers like Shea).) In addition, the particular multipliers allotted to Ms. Kern's firm—and to all other firms—reflect each firm's overall contribution to the case, the level of risk each took on, and all the other factors comprising Lead Counsel's methodology.[5] Barry fails to explain why this approach should be rejected.

Courts routinely recognize that lead counsel are in the best position to allocate fees. *See, e.g., In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab.*

---

[5] Indeed, Barry's argument ignores Kern's significant role in the case justifying a much higher multiplier. (*See, e.g.,* ECF No. 4853 at 8 n.11, 28, 36-38; ECF No. 4873-7 at 1-2.) It also bears mentioning that Kern's document review time as team leader (748.2 hours) represents less than 15%

*Litig.*, No. 8:10ML 02151 JVS (FMOx), 2013 U.S. Dist. LEXIS 123298, at *316 (C.D. Cal., July 24, 2013) (approving plan for class counsel to allocate fees "in a manner that they believe, in good faith, reflects the contributions of counsel to the prosecution and settlement of the claims" because "class counsel are the most familiar with the amount of work actually contributed by each of the 31 firms"). Lead Counsel made the allocation to Barry in good faith. Barry has not presented any evidence that supports a change to that allocation. Lead Counsel's allocation was upheld by the Special Master and should be upheld by this Court as well.

### B. Lead Counsel's Compensation Is Appropriate

Barry criticizes the allocation to Lead Counsel. That does nothing to advance its claim for a higher fee. It has to demonstrate that it is entitled to more money vis-à-vis other lawyers in the case, not that Lead Counsel is entitled to less money. Barry has not done this.

Apart from the objectors to the settlement (Scarpulla, Cooper and Moore), Barry is the only firm criticizing Lead Counsel. Forty-three firms are in agreement with the allocations. All of the major firms have had input, and the allocations to firms up and down the list of counsel (including Lead Counsel) have been adjusted to arrive at a fair result. Lead Counsel's firm's time has been cut, in accordance with the audit guidelines applied to all firms. Lead Counsel also accepted the 10% across-the-board reduction applied by the Special Master. Since Lead Counsel has the largest lodestar, his firm absorbed the largest cut, over $1.7 million. Finally, Lead Counsel's firm's allocation was recently reduced even more to provide greater amounts to four other firms. (R&R at 28.) There is no basis to cut Lead Counsel's allocation even further.[6]

## II. THE SPECIAL MASTER DID NOT ERR IN RULING ON BARRY'S OBJECTION.

### A. The Special Master Correctly Calculated Barry's Hours

Barry contends that the Special Master mistakenly believed that Barry's "full recorded hours" were included in Lead Counsel's lodestar calculations, whereas according to Barry, Lead

---

of her total time spent on the case, and of those hours, 657 were billed at between $450 and $515 per hour—less than the $525 Barry seeks for its document reviewer. (ECF No. 4073-7, Ex. 2.)

[6] Barry cites to the *Thayer* case as further criticism of Lead Counsel. As previously explained, Lead Counsel was not involved in the appeal of *Thayer* in any way. (*See* ECF No. 4370-1, ¶ 49.)

Counsel "proposed to reduce the Firms [sic] hours by 500 hours, or 20%!" (Objection at 6.) It is Barry that is mistaken. The Special Master was referring to the fact that Lead Counsel permitted Barry to bill 2000 hours for Shea, even though Shea only spent 1300 hours in the online database. Lead Counsel gave Shea the "benefit of the doubt" and credited his explanation that he spent a substantial amount of time preparing memoranda offline. (ECF No. 4853 at 46-48.)

Moreover, it is undisputed that Barry agreed to the 500 hour reduction. (Objection at 6.) Since Barry was no longer claiming these additional hours, it cannot complain that the Special Master did not give it credit for those hours.

### B. The Special Master Correctly Characterized Barry's Financial Contribution

Barry faults the Special Master for failing to credit it with an additional $3,000 contribution to the litigation fund in 2016. First, the Special Master refused to consider evidence of Barry's canceled check because it was untimely, and because the evidence was already in the record. (*See* Objection at 7 & n.2; *see also* ECF No. 4836 at 1:23-25.) In fact, he refused to consider several other law firms' attempts to add to the record as well. Second, in any event Barry is not the only firm that made post-settlement contributions to the litigation fund. (*See, e.g.,* ECF No. 4824-1 (McCallum); ECF No. 4847-3 (Zelle); ECF No. 4845 (Kern).) Lead Counsel listed *none* of these later payments in the record of contributions submitted to the Special Master (because the Special Master did not request them), so Barry was not prejudiced by Lead Counsel's omission of Barry's payment. The important point is that Lead Counsel was aware of Barry's contribution and took it into account in determining Barry's allocation.

### C. The Special Master Correctly Characterized Mr. Shea's Work

Barry does not dispute that Shea was not a team leader. Nor, as the Special Master properly concluded, did he perform higher-level tasks. (R&R at 23-24.) As Lead Counsel has stated, Shea was a good reviewer, but a lower-level reviewer, and lawyers of his level were not allowed to bill at more than $350 per hour. (ECF No. 4853-1 ¶¶ 83-84.) "The fact that Mr. Shea's document review was ultimately used for deposition preparation does not convert it to the

6

LEAD COUNSEL'S RESPONSE TO OBJECTION OF LAW OFFICE OF BRIAN BARRY TO SPECIAL MASTER'S REPORT AND RECOMMENDATION RE ALLOCATION OF ATTORNEYS' FEES
Master File No. CV-07-5944-JST

more sophisticated category of actually selecting deposition exhibits for which a higher billing rate is allowed."[7] (R&R at 24.)

Barry claims that Shea did some deposition preparation and therefore that Shea's document review work should be billed at a higher rate of $525. The deposition preparation that Barry points to simply did not rise to the level of the deposition preparation conducted by other firms. Shea was involved to some degree in reviewing and coding documents ultimately used in depositions, but that was the extent of it.

As pointed out by the Special Master, Shea was not a leader of his document review team. Two other, more senior, partner-level attorneys, performed that function. The fees of document reviewers doing work comparable to Shea's were capped at $350; thus, Shea was treated no differently than other lawyers. He did not perform the higher-level review involved in preparing for depositions, in the way or to the degree that more senior other attorneys did.

### D. The Special Master Correctly Found That Barry Abandoned The Case

Barry does not deny that it removed attorney Shea from this litigation. It simply contends that this was not abandonment; Barry simply chose to move its resources to other cases. Barry certainly had the right to do so.[8] But there are consequences to such choices. One of those consequences is that it forced Lead Counsel to find a suitable replacement for Shea at a very inopportune time. (ECF No. 4853 at 46; ECF No. 4853-1 ¶ 74.) Barry's decision was certainly not in the best interests of the Class. Further, the evidence shows that Barry lost interest in the case when IPPs did not enter into early settlements, and therefore decided to spread the risk and

---

[7] The Court should disregard the document submitted (ECF No. 5013-2) and described in the Barry Declaration (ECF No. 5013-1 at ¶ 19) and Exhibit 13 thereto (ECF No. 5013-14). First, as Mr. Barry confirms, this document was submitted after oral argument and was thus refused as untimely (ECF 5013-1 at ¶ 19). Second, the "outline", though redacted, still contains work product that should not have been divulged. Third, in any event the document is not a "deposition outline" at all; it lists document topics served on defendants and merely confirms that Shea's document review was used for deposition preparation, not document selection, as found by the Special Master. All of the information provided could (and should) have been recorded in IPP Counsel's online database. (ECF No. 4853-1 ¶ 81.)

[8] It was not the responsibility of Lead Counsel or any other IPP counsel to insist that Barry continue to work on this case, as Barry implies.

7

LEAD COUNSEL'S RESPONSE TO OBJECTION OF LAW OFFICE OF BRIAN BARRY TO SPECIAL MASTER'S REPORT AND RECOMMENDATION RE ALLOCATION OF ATTORNEYS' FEES
Master File No. CV-07-5944-JST

1  cut its losses, unlike other firms that maintained their commitments.  (*See* ECF No. 4853 at 46;
2  ECF No. 4853-1 ¶ 76.)  Barry's decision adversely impacted the prosecution of the case.  Barry's
3  actions do not warrant an increased multiplier.

## CONCLUSION

Barry has raised new objections and offered new evidence not presented to (or allowed by) the Special Master.  It has not shown its entitlement to an increased lodestar.  In fact, its lodestar is quite generous considering the additional 600 hours that Barry was permitted to claim for work performed outside the electronic database.  (*See* ECF No. 4853 at 47-48.)  These 600 hours, at $350 per hour, provide an additional $210,000 in compensation.

Similarly, Barry has not shown its entitlement to a higher multiplier.  Barry has already received an enhancement since its lodestar was computed at current rates.  A higher multiplier would cause it to leapfrog firms with greater contributions and with none of the negative factors attendant to Barry.  In the end, it is Barry's relative contributions vis-à-vis all other firms that Lead Counsel considered in making the allocation.  Lead Counsel is uniquely qualified to make that assessment of Barry's relative contributions.

For the foregoing reasons, Barry's Objection must be overruled.

Dated:  November 25, 2016

                                                  Respectfully submitted,

                                                  */s/ Mario N. Alioto*

Mario N. Alioto (56433)
malioto@tatp.com
Joseph M. Patane (72202)
jpatane@tatp.com
Lauren C. Capurro (241151)
laurenrussell@tatp.com
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123
Telephone: 415-563-7200
Facsimile: 415-346-0679

***Lead Counsel for Indirect Purchaser Plaintiffs***