**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | |
|---|---|
| THE STATE OF ILLINOIS, ) <br> by its Attorney General, Lisa Madigan ) <br> ) <br>             Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> HITACHI LTD., ) <br> HITACHI DISPLAYS, LTD., ) <br> HITACHI ELECTRONIC DEVICES (USA) INC. ) <br> LG ELECTRONICS, INC., ) <br> LG ELECTRONICS USA., INC. ) <br> LG ELECTRONICS TAIWAN TAIPEI CO., LTD., ) <br> PANASONIC CORPORATION, ) <br> MATSUSHITA ELECTRONIC INDUSTRIAL CO. M., LTD. ) <br> PANASONIC CORP. OF NORTH AMERICA, ) <br> MT PICTURE DISPLAY, CO., LTD., ) <br> KONINKLIJKE PHILIPS ELECTRONICS N.V. ) <br> PHILIPS ELECTRONICS NORTH AMERICAN CORP. ) <br> PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD. ) <br> SAMSUNG DISPLAY DEVICE CO., LTD, ) <br> SAMSUNG SDI AMERICA, INC., ) <br> TOSHIBA CORPORATION ) <br> TOSHIBA AMERICA. INC., ) <br> TOSHIBA AMERICA INFORMATION SYSTEMS INC., ) <br> TOSHIBA AMERICA ELECTRONIC COMPONENTS, INC., ) <br> ) <br>             Defendants. ) | Hon. Rita M. Novak <br><br> No. 12 CH 35266 |

## PHILIPS ELECTRONICS NORTH AMERICA CORPORATION'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S AMENDED COMPLAINT

Defendant Philips Electronics North America Corporation ("PENAC"), by and through its undersigned counsel of record, answers the State of Illinois' ("Plaintiff") Amended Complaint (the "Amended Complaint") and alleges additional or affirmative defenses as follows. PENAC denies each and every allegation in the Amended Complaint's section headings asserted herein and in all portions of the Amended Complaint not contained in numbered paragraphs. To the extent that the Amended Complaint's allegations concern persons and/or entities other than

1

PENAC, PENAC denies that such allegations support any claim for relief against PENAC. PENAC denies any allegations not explicitly admitted herein.

<h1 style="text-align:center">I.   INTRODUCTION[1]</h1>

1.     Defendants manufacture and sell Cathode Ray Tubes ("CRTs") and CRT products to customers in the United States. Defendants agreed to fix, raise, maintain, and stabilize the price, while also limiting the production, of their CRTs from at least March 1, 1995 until at least November 25, 2007 ("Conspiracy Period"). During the Conspiracy Period, Defendants charged unlawfully inflated prices for CRTs.

**ANSWER:** To the extent that the allegations in Paragraph 1 state legal contentions, no response is required.  To the extent that the allegations in Paragraph 1 are definitional, no response is required.  PENAC avers that the use of the terms "CRTs" and "CRT Products," which improperly conflate numerous distinct and non-substitutable products (of, among other things, various sizes, qualities, uses, technologies, and products at different points in the production chain) together, renders the allegations of the Amended Complaint indefinite and uncertain.  To the extent that the allegations in Paragraph 1 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  In regards to the allegation in the first sentence of Paragraph 1, PENAC admits that in the United States, it manufactured CRTs until June 2001 and sold CRT finished products for the entire period.  To the extent that remaining allegations in Paragraph 1 relate to PENAC, PENAC denies all of them.

2.     During the Conspiracy Period, the Defendants' conduct resulted in higher prices for CRTs than would exist in a competitive market. Defendants' CRTs were incorporated into CRT products, such as televisions and computer monitors. A portion of the inflated prices for the CRTs was passed on to end-users who include the State of Illinois, its agencies, and Illinois residents that purchased CRTs and CRT products. The higher prices for CRTs injured consumers in the United States, including in Illinois.

**ANSWER:** To the extent that the allegations in Paragraph 2 state legal contentions, no response is required.  To the extent that the allegations in Paragraph 2 relate to other defendants,

---

[1] For ease of reference, the headings in the Answer correspond with the headings in the Amended Complaint.

PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that the allegations in Paragraph 2 relate to PENAC, PENAC denies all of the allegations.

3.     Illinois Attorney General Lisa Madigan brings this action for injunctive relief, civil penalties, and damages for overcharges on behalf of the State of Illinois, both as a purchaser of CRTs and CRT products and as *parens patriae* on behalf of Illinois residents who purchased CRTs and CRT products.

**ANSWER:** To the extent that the allegations in Paragraph 3 state legal contentions, no response is required. PENAC admits that Plaintiff purports to bring an action for injunctive relief, civil penalties, and damages. PENAC further denies that Plaintiff is entitled to any relief under any theory by means of the allegations set forth in the Amended Complaint and alleged in Paragraph 3. PENAC otherwise denies all of the allegations.

## II.     ALLEGATIONS CONCERNING JURISDICTION AND VENUE

4.     Jurisdiction is proper under 735 ILL. COMP. STAT. 5/2-209(a) and (b) because the Defendants conducted business in Illinois or transacted business in Illinois from which this action arises.

**ANSWER:** The allegations in Paragraph 4 regarding jurisdiction constitute legal contentions to which no response is required. To the extent that a response is required and the allegations in Paragraph 4 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that a response is required and the allegations in Paragraph 4 relate to PENAC, PENAC admits that it conducts and transacts business in Illinois. PENAC denies all other allegations.

5.     Venue is proper under 735 ILL. COMP. STAT 5/2-101 because part of the transaction out of which this cause of action arises occurred in Cook County, Illinois.

**ANSWER:** The allegations in Paragraph 5 regarding venue constitute legal contentions to which no response is required. To the extent that a response is required, PENAC denies these allegations and denies that venue lies with this district based on the conduct of PENAC as alleged in the Amended Complaint.

6.      Defendants' conduct involved import trade and import commerce within the meaning of Section 5(14) of the Illinois Antitrust Act. 740 ILL. COMP. STAT. 10/1 et seq.

**ANSWER:** The allegations in Paragraph 6 regarding jurisdiction constitute legal contentions to which no response is required. To the extent that a response is required and the allegations in Paragraph 6 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that a response is required and the allegations in Paragraph 6 relate to PENAC, PENAC denies that this district has jurisdiction based on the conduct of PENAC as alleged in the Amended Complaint.

7.      Defendants conspired on the price and output of CRTs that were imported into the United States. Defendants specifically targeted the United States market for selling their price fixed CRTs.

**ANSWER:** To the extent that the allegations in Paragraph 7 state legal contentions, no response is required. To the extent that the allegations in Paragraph 7 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent the allegations in Paragraph 7 relate to PENAC, PENAC denies all of the allegations.

8.      Defendants knew, intended, and expected that many of their CRTs would be incorporated into CRT products, imported into the United States and ultimately sold to Illinois customers.

**ANSWER:** To the extent that the allegations in Paragraph 8 state legal contentions, no response is required. To the extent that the allegations in Paragraph 8 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent the allegations in Paragraph 8 relate to PENAC, PENAC denies all of the allegations.

9.      Defendants knew that price-fixing CRTs would increase the prices of CRT products in the United States, including Illinois.

**ANSWER:** To the extent that the allegations in Paragraph 9 state legal contentions, no

response is required.  To the extent that the allegations in Paragraph 9 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent the allegations in Paragraph 9 relate to PENAC, PENAC denies all of the allegations.

10.     Defendants established subsidiaries in the United States.

**ANSWER:** To the extent that the allegations in Paragraph 10 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent the allegations in Paragraph 10 relate to PENAC, PENAC denies all of the allegations.

11.     Defendants' price-fixing conspiracy had a direct, substantial, and reasonably foreseeable impact on import trade or import commerce: fewer imported CRTs and CRT products sold at higher prices in the United States.

**ANSWER:** The allegations in Paragraph 11 state legal contentions, for which no response is required.  To the extent that a response is required and the allegations in Paragraph 11 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent that a response is required and the allegations in Paragraph 11 relate to PENAC, PENAC denies them.

12.     Higher prices for U.S. consumers gives rise to the claims alleged in this Complaint under Section 3 of the Illinois Antitrust Act: the State of Illinois seeks recovery for the higher prices resulting from Defendants' price-fixing conspiracy that the State of Illinois, its agencies, and its residents paid.

**ANSWER:** The allegations in Paragraph 12 state legal contentions, for which no response is required.  To the extent that a response is required and the allegations in Paragraph 12 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent that a response is required and the allegations in Paragraph 12 relate to PENAC, PENAC denies the allegations in Paragraph 12 with the exception of matters specifically admitted herein.   PENAC admits that Plaintiff purports to bring an action under Section 3 of the Illinois Antitrust Act but denies that Plaintiff is

entitled to any relief under any theory by means of the allegations set forth in the Amended Complaint and alleged in Paragraph 12.

### III.   ALLEGATIONS CONCERNING THE PARTIES

13.     The Illinois Attorney General Lisa Madigan brings this Complaint under her statutory and common law authority to represent the Plaintiff, the State of Illinois, under Section 7 of the Illinois Antitrust Act. 740 ILL. COMP. STAT. 10/7. The Attorney General has the authority to seek several remedies:

(a)     Injunctive relief pursuant to Section 7(1 ): "The Attorney General ... shall bring suit in the Circuit Court to prevent and restrain violations of Section 3 of this Act."

(b)     Civil penalties pursuant to Section 7(4): "In lieu of any criminal penalty ... , the Attorney General may bring an action in the name and on behalf of the people of the State against any corporation, domestic or foreign, to recover a penalty not to exceed $1,000,000 for any act herein declared illegal."

(c)     Treble damages for the State of Illinois. and its agencies pursuant to Section 7(2): "The Attorney General may bring an action on behalf of this State ... to recover the damages under this subsection[.]"

(d)     Treble damages for consumers pursuant to Section 7(2): "The Attorney General may also bring an action in the name of this State, as *parens patriae* on behalf of persons residing in this State, to recover the damages under this subsection ..."

**ANSWER:** To the extent that the allegations in Paragraph 13 and its subparts state legal contentions, no response is required.  To the extent that the allegations in Paragraph 13 and its subparts relate to Plaintiff, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.

14.     Defendant Hitachi, Ltd. ("Hitachi") is a Japanese corporation with its principal place of business at 6-1 Marunounchi Center Building 13F, Chiyoda-ku, Tokyo 100-8280, Japan.

**ANSWER:** The allegations in Paragraph 14 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 14 and, on that basis, denies them.

15.     Defendant Hitachi Displays Ltd., n/k/a Japan Displays, Inc., "(Hitachi Displays")
is a wholly-owned subsidiary of Hitachi. It is a Japanese corporation headquartered at 5F 6-2
Kanda Neribei-cho 3 Chiyoda-ku Tokyo, 101-0022 Japan. Defendant Hitachi Displays
conducted the planning, development, manufacturing; design, and sales of CRTs for Defendant
Hitachi.

**ANSWER:** The allegations in Paragraph 15 are not directed at PENAC and, therefore, no
response is required. PENAC otherwise lacks knowledge or information sufficient to form a
belief as to the truth of the allegations in Paragraph 15 and, on that basis, denies them.

16.     Co-conspirator Hitachi America, Ltd. ("Hitachi America"), a New York
corporation headquartered at 50 Prospect Ave., Tarrytown, NY 10591, is a wholly-owned
subsidiary of Hitachi. Defendant Hitachi dictated and controlled the day-to-day activities of
Defendant Hitachi America related to the allegations in this Complaint.

**ANSWER:** The allegations in Paragraph 16 are not directed at PENAC and, therefore, no
response is required. PENAC otherwise lacks knowledge or information sufficient to form a
belief as to the truth of the allegations in Paragraph 16 and, on that basis, denies them.

17.     Defendant Hitachi Electronic Devices (USA), Inc. n/k/a KOE Americas, Inc.,
("Hitachi USA") a Delaware corporation with its principal place of business at 1000 Hurricane
Shoals Road, Ste. D-100, Lawrenceville, GA 30043, is a wholly-owned subsidiary of Hitachi
America. Hitachi and Hitachi America dictated and controlled the day-to-day activities of
Defendant Hitachi USA related to the allegations in this Complaint.

**ANSWER:** The allegations in Paragraph 17 are not directed at PENAC and, therefore, no
response is required. PENAC otherwise lacks knowledge or information sufficient to form a
belief as to the truth of the allegations in Paragraph 17 and, on that basis, denies them.

18.     During the Conspiracy Period, Defendants Hitachi, Hitachi Displays, Hitachi
USA, and affiliated co-conspirators, Hitachi America, Hitachi Asia, and Hitachi Shenzhen, either
directly, or through their subsidiaries or affiliates, distributed, manufactured, marketed, or sold
price-fixed CRTs to customers throughout the United States, including Illinois. Each of these
entities did business directly or through agents or alter egos in Illinois at the time of the filing of

the original complaint or otherwise targeted the Illinois market or purposefully availed themselves of the Illinois market for various products.

**ANSWER:** The allegations in Paragraph 18 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 and, on that basis, denies them.

19.     Defendant LG Electronics, Inc. ("LG") is a South-Korean corporation with its principal place of business at LG Twin Towers, 20 Yeouido-dong, Yeoungdeungpo-gu, Seoul 150-721, South Korea.

**ANSWER:** The allegations in Paragraph 19 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19 and, on that basis, denies them.

20.     Defendant LG Electronics U.S.A., Inc. ("LG U.S.A.") is a wholly-owned subsidiary of LG. LG U.S.A. is a Delaware corporation with its principal place of business located at 1000 Sylvan Avenue, Englewood Cliffs, NJ 07632. LG, directed and controlled the day-to day activities of LG U.S.A. related to the allegations in this complaint.

**ANSWER:** The allegations in Paragraph 20 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20 and, on that basis, denies them.

21.     Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LG Taiwan") is a Taiwanese corporation and is a wholly-owned subsidiary of LG. Its principal place of business is located at 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan. LG directed the day-to day activities of LG Taiwan related to the allegations in this complaint.

**ANSWER:** The allegations in Paragraph 21 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 21 and, on that basis, denies them.

22.     During the Conspiracy Period, Defendants LG, LG U.S.A., and LG Taiwan, either directly, or through their subsidiaries and affiliates, distributed, manufactured, marketed, or sold price-fixed CRTs to customers throughout the United States, including Illinois. Each of these

entities did business directly or through agents or alter egos in Illinois at the time of the filing of the original complaint or otherwise targeted the Illinois market or purposefully availed themselves of the Illinois market for various products.

**ANSWER:** The allegations in Paragraph 22 are not directed at PENAC and, therefore, no response is required. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 and, on that basis, denies them.

23. Defendant Panasonic Corporation is a Japanese entity with its principal place of business at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan. Until 2008, Panasonic was known as Defendant Matsushita Electric Industrial Co., Ltd. ("Matsushita').

**ANSWER:** The allegations in Paragraph 23 are not directed at PENAC and, therefore, no response is required. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 23 and, on that basis, denies them.

24. In approximately 2002, Defendants Panasonic and Defendant Toshiba Corporation entered into a joint venture and created Defendant MT Picture Display Co., Ltd. ("MT Picture Display"). MT Picture Display. is a Japanese entity with its principal place of business at 1-1, Saiwai-cho, Takatsuki-shi, Osaka 569-1193, Japan.

**ANSWER:** The allegations in Paragraph 24 are not directed at PENAC and, therefore, no response is required. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 24 and, on that basis, denies them.

25. Defendant Panasonic purchased the remainder of the joint venture on approximately April 3, 2007 making MT Picture Display a wholly-owned subsidiary of Panasonic.

**ANSWER:** The allegations in Paragraph 25 are not directed at PENAC and, therefore, no response is required. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25 and, on that basis, denies them.

26. Defendant Panasonic Corporation of North America ("Panasonic NA") is a Delaware corporation with its principal place of business at One Panasonic Way, Secaucus, New Jersey 07094. Panasonic directed and controlled the day-to-day activities of Panasonic NA

related to the allegations in this Complaint.

**ANSWER:** The allegations in Paragraph 26 are not directed at PENAC and, therefore, no response is required. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26 and, on that basis, denies them.

27.     During the Conspiracy Period, Defendants Panasonic, Panasonic NA, Matsushita, and MT Picture Display, either directly, or through their subsidiaries or affiliates, distributed, manufactured, marketed, or sold CRTs to customers throughout the United States, including Illinois. Each of these entities did business directly or through agents or alter egos in Illinois at the time of the filing of the original complaint or otherwise targeted the Illinois market or - purposefully availed themselves of the Illinois market for various products.

**ANSWER:** The allegations in Paragraph 27 are not directed at PENAC and, therefore, no response is required. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27 and, on that basis, denies them.

28.     Defendant Koninklijke Philips Electronics N.V. ("Philips"), also known as Royal Philips Electronics N.V., is a Dutch corporation. Its principal place of business is located at Amstelplein 2, Breitner Center, 1070 MX Amsterdam, The Netherlands.

**ANSWER:** PENAC admits that Koninklijke Philips N.V. ("KPNV") is a Dutch entity with its principal place of business at Breitner Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands, but avers that KPNV legally changed its corporate name to Koninklijke Philips N.V.

29.     Defendant Philips Electronics North American Corporation ("Philips NA"), is a Delaware corporation and has its principal place of business at 1251 Avenue of the Americas, New York, NY 10020-11 04. Philips NA is a subsidiary of Philips. Defendant Philips directed and controlled the day-to-day activities of Defendant Phillips NA related to the allegations in this Complaint.

**ANSWER:** PENAC admits that it is a Delaware corporation. PENAC admits that it is an indirect subsidiary of KPNV. PENAC denies that KPNV directed or controlled its day-to-day activities. PENAC denies any remaining allegations in Paragraph 29.

30.     Defendant Philips Electronics Industries (Taiwan), Ltd. ("Philips Taiwan") is a Taiwanese corporation and is a wholly-owned subsidiary of Philips. Its principal place of business is located at 15F 3-1 Yuanqu Street, Nangang District, Taipei; Taiwan. Defendant Philips directed and controlled the day-to-day activities of Philips Taiwan related to the allegations in this Complaint.

**ANSWER:** The allegations in Paragraph 30 are not directed at PENAC, and therefore no response is required. PENAC admits that Philips Electronics Industries (Taiwan), Ltd. is located at 15F 3-1 Yuanqu Street, Nangang District, Taipei; Taiwan, but avers that Philips Electronics Industries (Taiwan), Ltd. changed its name to Philips Taiwan, Ltd. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30 and, on that basis, denies them.

31.     During the Conspiracy Period, Defendants Philips, Philips NA, and Philips Taiwan, either directly or indirectly through their subsidiaries and affiliates, distributed, manufactured, marketed, or sold CRTs to customers throughout the United States, including Illinois. Each of these entities did business directly or through agents or alter egos in Illinois at the time of the filing of the original complaint or otherwise targeted the Illinois market or purposefully availed themselves of the Illinois market for various products.

**ANSWER:** To the extent that the allegations in Paragraph 31 state legal contentions, no response is required.   To the extent that the allegations in Paragraph 31 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.   To the extent that the allegations in Paragraph 31 relate to PENAC, PENAC denies all allegations.

32.     Co-conspirator Samsung Electronics Co, Ltd. ("Samsung") is a South Korean corporation with its principal place of business located at Samsung Main Building, 250, 2-ga, Taepyong-ro, Jung-gu, Seoul 100-742, South Korea.

**ANSWER:** The allegations in Paragraph 32 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 32 and, on that basis, denies them.

33.     Co-conspirator Samsung Electronics America, Inc. ("Samsung America"), a New

York corporation with its principal place of business located at 105 Challenger Road, 6th Floor, Ridgefield Park, New Jersey 07660, is a wholly-owned subsidiary of Samsung. Defendant Samsung directed and controlled the day-to-day activities of Samsung America related to the allegations in this complaint.

**ANSWER:** The allegations in Paragraph 33 are not directed at PENAC and, therefore, no response is required. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33 and, on that basis, denies them.

34.   Defendant Samsung Display Device Co., Ltd. ("Samsung SDI") is a South Korean company with its principle place of business located at 150, 2-ga, Taepyong-ro, Jung-gu, Seoul, 100-716, South Korea. Defendant Samsung directed and controlled the day-to-day activities of Samsung SDI related to the allegations in this Complaint.

**ANSWER:** The allegations in Paragraph 34 are not directed at PENAC and, therefore, no response is required. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34 and, on that basis, denies them.

35.   Samsung SDI pled guilty and agreed to pay thirty-two million dollars in a criminal fine for its role in fixing CRT prices and reducing CRT output. In its plea, Samsung SDI admitted to participating in the conspiracy between 1997 and at least until 2006, and to agreeing to fix prices, decrease output, and sharing confidential information with other Defendants.

**ANSWER:** The allegations in Paragraph 35 are not directed at PENAC and, therefore, no response is required. Additionally, to the extent that the allegations contained in Paragraph 35 are derived from public records, those records speak for themselves and no response is required. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35 and, on that basis, denies them.

36.   Defendant Samsung SDI America, Inc. ("Samsung SDI America"), a California corporation with its principal place of business located at 3333 Michelson Drive, Suite 700, Irvine, California, is a wholly-owned subsidiary of Defendant Samsung SDI. Defendants Samsung and Samsung SDI directed and controlled the day-to-da activities of Samsung SDI America related to the allegations in this Complaint.

**ANSWER:** The allegations in Paragraph 36 are not directed at PENAC and, therefore, no response is required. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36 and, on that basis, denies them.

37.     During the Conspiracy Period, Defendants Samsung SDI, Samsung SDI America, and affiliate co-conspirators, Samsung, Samsung America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung Shenzhen, Samsung SDI Tianjin, and Samsung SDI Malaysia, directly or through their subsidiaries and affiliates, distributed, manufactured, marketed, or sold CRTs to customers throughout the United States, including Illinois.

**ANSWER:** The allegations in Paragraph 37 are not directed at PENAC and, therefore, no response is required. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37 and, on that basis, denies them.

38.     Defendant Toshiba Corporation ("Toshiba") is a Japanese corporation with its principal place of business at 1-1, Shibaura I-chrome, Minato-ku, Tokyo 105-8001, Japan.

**ANSWER:** The allegations in Paragraph 38 are not directed at PENAC and, therefore, no response is required. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38 and, on that basis, denies them.

39.     Defendant Toshiba America, Inc. ("Toshiba America"), a Delaware corporation with its principal place of business at 1251 Avenue of the Americas, Suite 4110, New York, NY 10020, is a wholly-owned subsidiary of Toshiba. Toshiba directed and controlled the day-to-day activities of Toshiba America related to the allegations in this Complaint.

**ANSWER:** The allegations in Paragraph 39 are not directed at PENAC and, therefore, no response is required. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39 and, on that basis, denies them.

40.     Co-conspirator Toshiba America Consumer Products, LLC ("TACP"), with its principal place of business located at 82 Totawa Road, Wayne, New Jersey 07470-3114, is a wholly-owned subsidiary of Toshiba. Toshiba, through Toshiba America, directed and controlled the day-to-day activities of TACP related to the allegations in this Complaint.

**ANSWER:** The allegations in Paragraph 40 are not directed at PENAC and, therefore, no

response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40 and, on that basis, denies them.

41.     Defendant Toshiba America Information Systems, Inc. ("TAIS"), is a California corporation with its principal place of business at 9740 Irvine Blvd, Irvine, California 92718. TAIS is a wholly-owned subsidiary of Toshiba America. Toshiba, through Toshiba America, directed and controlled day-to-day activities of TAIS related to the allegations in this Complaint.

**ANSWER:** The allegations in Paragraph 41 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41 and, on that basis, denies them.

42.     Defendant Toshiba America Electronic Components, Inc. ("TAEC"), is a California corporation with its principal place of business at 19000 MacArthur Boulevard, Suite 400, Irvine, California 92612. It is a subsidiary of Toshiba America. Toshiba, through Toshiba America, directed and controlled the day-to-day activities of TAEC related to the allegations in this Complaint.

**ANSWER:** The allegations in Paragraph 42 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42 and, on that basis, denies them.

43.     During the Conspiracy Period, Toshiba, Toshiba America, TACP, TAIS, and TAEC, either directly, or through their subsidiaries and affiliates, distributed, manufactured, marketed, or sold CRTs to customers throughout the United States, including Illinois. Each of these entities did business directly or through agents or alter egos in Illinois at the time of the filing of the original complaint or otherwise targeted the Illinois market or purposefully 'availed themselves of the Illinois market for various products.

**ANSWER:** The allegations in Paragraph 43 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43 and, on that basis, denies them.

44.     There are various other co-conspirators, persons, and firms that participated with Defendants and performed acts that furthered the anticompetitive conduct:

**ANSWER:** To the extent that the allegations in Paragraph 44 state legal contentions, no response is required. To the extent a response is required and the allegations relate to other defendants, PENAC lacks knowledge or information to form a belief as to the truth of the allegations contained in Paragraph 44 and, on that basis, denies them. To the extent a response is required and the allegations relate to PENAC, PENAC denies all of the allegations in Paragraph 44.

45.     Tatung Company ("Tatung") is a Taiwanese corporation headquartered at 22, Sec. 3, Chung-Shan N. Rd., Taipei, Taiwan. Tatung owns half of subsidiary Tatung Company of America, Inc. ("Tatung America"), a California corporation with its principal place of business at 2850 El Presidio Street, Long Beach, California 90810. During the Conspiracy Period, Tatung and Tatung America distributed, manufactured, marketed, or sold CRTs to customers throughout the United States, including Illinois.

**ANSWER:** The allegations in Paragraph 45 are not directed at PENAC and, therefore, no response is required. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45 and, on that basis, denies them.

46.     Chungwha Picture Tubes ("Chungwha") is a Taiwanese corporation with its principle place of business at 1127, Heping Rd., Bade City, Taoyuan, Taiwan.

**ANSWER:** The allegations in Paragraph 46 are not directed at PENAC and, therefore, no response is required. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46 and, on that basis, denies them.

47.     On February 10, 2009, a grand jury in San Francisco indicted the former Chairman and Chief Executive Officer of Chunghwa, Cheng Yuan Lin, on two counts for his involvement in the conspiracy to fix prices, reduce output, and allocate market share for CRTs.

**ANSWER:** To the extent that the allegations contained in Paragraph 47 refer to public statements by government authorities, those statements speak for themselves and no response is required. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47 and, on that basis, denies them.

48.     Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("CPT Malaysia"), a Malaysian company with its principal place of business at Lot 1, Subang Hi-Tech Industrial Park, Batu

Tiga, 4000 Shah Alam, Selangor Daml Ehsan, Malaysia, is a wholly-owned subsidiary of Chunghwa.

**ANSWER:** The allegations in Paragraph 48 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48 and, on that basis, denies them.

49.     During the Conspiracy Period, Chungwha and Chungwha Malaysia distributed, manufactured, marketed, or sold CRTs to customers throughout the United States, including Illinois.

**ANSWER:** The allegations in Paragraph 49 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49 and, on that basis, denies them.

50.     Samtel Color, Ltd. ("Samtel") is an Indian Company, with its principal place of business at 52, Community Centre, New Friends Colony, New Delhi -110065. During the Conspiracy Period, Samtel distributed, manufactured, marketed, or sold CRTs to customers throughout the United States, including Illinois.

**ANSWER:** The allegations in Paragraph 50 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50 and, on that basis, denies them.

51.     Thai CRT Company, Ltd. ("Thai CRT") is a Taiwanese company and a subsidiary of Siam Cement Group. Its principal place of business is 1/F Siam Cement Road, Bangsue Dusit, Bangkok, Thailand. During the Conspiracy Period, Thai CRT distributed, manufactured, marketed, or sold CRTs to customers throughout the United States, including Illinois.

**ANSWER:** The allegations in Paragraph 51 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51 and, on that basis, denies them.

52.     Orion Electric Company ("Orion") was a wholly-owned subsidiary of the Daewoo Group, a South Korean corporation. Orion filed for bankruptcy in 2004.

**ANSWER:** The allegations in Paragraph 52 are not directed at PENAC and, therefore, no

response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 52 and, on that basis, denies them.

53.     During the Conspiracy period, Orion manufactured, marketed and sold CRTs to customers throughout the United States, including Illinois.

**ANSWER:** The allegations in Paragraph 53 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53 and, on that basis, denies them.

54.     IRICO Group Corporation ("IGC") is a Chinese corporation with its principal place of business at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021, China.

**ANSWER:** The allegations in Paragraph 54 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 54 and, on that basis, denies them.

55.     IRICO Display Devices Co., Ltd. ("IDDC"), a Chinese corporation with its principal place of business at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075, China, is a wholly-owned subsidiary of IGC.

**ANSWER:** The allegations in Paragraph 55 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 55 and, on that basis, denies them.

56.     Defendant IRICO Group Electronics Co., Ltd. ("IGE"), a Chinese corporation with its principal place of business at 1 Caihong Rd., Xianyang City, Shaanxi province 712021, China, is a wholly-owned subsidiary of IGC.

**ANSWER:** The allegations in Paragraph 56 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 56 and, on that basis, denies them.

57.     During the Conspiracy Period, IGC, IDDC, and IGE either directly or through their subsidiaries or affiliates distributed, manufactured, marketed, or sold price-fixed CRTs to customers throughout the United States, including Illinois.

**ANSWER:** The allegations in Paragraph 57 are not directed at PENAC and, therefore, no

response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 57 and, on that basis, denies them.

58.     Hitachi Asia, Ltd. ("Hitachi Asia"), a Singapore company with its principal place of business at 16 Collyer Quay, #20-00 Hitachi Tower, Singapore 049318 is a wholly-owned subsidiary of Hitachi. Defendant Hitachi directed and controlled the day-to-day activities of Hitachi Asia related to the allegations in this Complaint.

**ANSWER:** The allegations in Paragraph 58 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 58 and, on that basis, denies them.

59.     Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen"), is a Chinese corporation with its principal place of business at 5001 Huanggang Road, Futian District, Shenzhen 518035, China. Defendants Hitachi and Hitachi Displays directed and controlled the day-to-day activities of Hitachi Shenzhen related to the allegations in this Complaint.

**ANSWER:** The allegations in Paragraph 59 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 59 and, on that basis, denies them.

60.     SDI Mexico S.A. de C.V. ("Samsung SDI Mexico"), a Mexican corporation with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque Industrial El Florido, Tijuana, B.C. Mexico, is a wholly-owned subsidiary of Defendant Samsung SDI. Samsung and Samsung SDI directed and controlled the day-to-day activities of Samsung SDI Mexico related to the allegations in this Complaint.

**ANSWER:** The allegations in Paragraph 60 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 60 and, on that basis, denies them.

61.     SDI Brasil Ltda. ("Samsung SDI Brazil"), a Brazilian corporation with its principal place of business located at Av. Eixo Norte Sul, SIN, Distrito Industrial, 69088-480, Manaus, Amazonas, Brazil, is a wholly-owned subsidiary of Defendant Samsung SDI. Samsung

and Samsung SDI directed and controlled the day-to-day activities of Samsung SDI Brazil related to the allegations in this Complaint.

**ANSWER:** The allegations in Paragraph 61 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 61 and, on that basis, denies them.

62.      Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen"), a Chinese corporation with its principal place of business at Huanggang Bei Lu, Futian Gu, Shenzhen, China is wholly-owned subsidiary of Defendant Samsung SDI. Samsung and Samsung SDI directed and controlled the day-to-day activities of Samsung SDI Shenzhen related to the allegations in this Complaint.

**ANSWER:** The allegations in Paragraph 62 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 62 and, on that basis, denies them.

63.      Samsung SDI Sdn. Bhd. ("Samsung SDI Malaysia"), a Malaysian corporation with its principal place of business at Lot 635 & 660, Kawasan Perindustrian, Tuanku, Jaafar, . 71450 Sungai Gadut, Negeri Semblian Daiul Khusus, Malaysia, is a wholly-owned subsidiary of Defendant Samsung SDI. Samsung and Samsung SDI directed and controlled the day-to-day activities of Samsung SDI Malaysia related to the allegations in this Complaint.

**ANSWER:** The allegations in Paragraph 63 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 63 and, on that basis, denies them.

64.      Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin"), a Chinese corporation with its principal place of business at Developing Zone of Yi-Xian Park, Wuqing County, Tianjin, China, is a wholly-owned subsidiary of Defendant Samsung SDI. Samsung and Samsung SDI directed and controlled the day-to-day activities of Samsung SDI Tianjin related to the allegations in this Complaint.

**ANSWER:**  The allegations in Paragraph 64 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 64 and, on that basis, denies them.

65.     LP Displays International, Ltd, also known as LG Philips Displays ("LP Displays") is a Chinese corporation with its principal place of business at ING Tower, 308 Des Voellx Road Central, Sheung Wan, Hong Kong.

**ANSWER:** The allegations in Paragraph 65 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 65 and, on that basis, denies them.

66.     LP Displays was formed in 2001 as a joint venture between Defendants Royal Phillips and LG. In 2007, Defendant LP Displays became an independent company.

**ANSWER:** To the extent that the allegations in Paragraph 66 state legal contentions, no response is required.  PENAC admits that in 2001, LG.Philips Displays Holding B.V. was formed when LG Electronics, Inc. transferred its entire CRT business and KPNV transferred its entire CRT business into the independent 50/50 CRT joint venture.  The remaining allegations in Paragraph 66 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 66 and, on that basis, denies them.

67.     During the Conspiracy Period, LP Displays, either directly, or through its subsidiaries and affiliates, distributed, manufactured, marketed, or sold price-fixed CRTs to customers throughout the United States, including Illinois.

**ANSWER:**  The allegations in Paragraph 67 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 67 and, on that basis, denies them.

68.     Beijing-Matsushita Color CRT Company, Ltd. ("BMCC") is a Chinese corporation headquartered at No. 9 Jiuxianqiaobei Rd., Dashanzi Chaoyang, Beijing, 100015, China. During the Conspiracy Period, BMCC, either directly, or through its subsidiaries and affiliates, distributed, manufactured, marketed, or sold price-fixed CRTs to customers throughout the United States, including Illinois.

**ANSWER:** The allegations in Paragraph 68 are not directed at PENAC and, therefore, no

response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 68 and, on that basis, denies them.

69.    Thomson SA, n/k/a Technicolor SA, ("Thomson") is a French corporation headquartered at 1-5 rue Jeanne d'Arc, Issy-Les-Moulineaux, 92130, France.

**ANSWER:** The allegations in Paragraph 69 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 69 and, on that basis, denies them.

70.    Thomson Consumer Electronics, Inc., n/k/a Technicolor USA, Inc. ("TCEI") is a Delaware corporation, headquartered at 10330 North Meridian Street, Indianapolis, IN 46290.

**ANSWER:** The allegations in Paragraph 70 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 70 and, on that basis, denies them.

71.    During the conspiracy period, Thomson and TCEI, either directly, or through their subsidiaries or affiliates, distributed, manufactured, marketed, or sold price-fixed CRTs to customers throughout the United States, including Illinois.

**ANSWER:**  The allegations in Paragraph 71 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 71 and, on that basis, denies them.

72.    Mitsubishi Electric Corp., ("Mitsubishi") is a Japanese corporation headquartered at 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan.

**ANSWER:**  The allegations in Paragraph 72 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 72 and, on that basis, denies them.

73.    Mitsubishi Digital Electronics America, Inc., ("MDEA")· is a California corporation headquartered at 9351 Jeronimo Road, Irvine, CA 92618.

**ANSWER:** The allegations in Paragraph 73 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 73 and, on that basis, denies them.

74.     Mitsubishi Electric & Electronics, USA, Inc. ("MEEU") is a Delaware corporation, headquartered at 5665 Plaza Drive Cypress, CA 90630.

**ANSWER:** The allegations in Paragraph 74 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 74 and, on that basis, denies them.

75.     During the conspiracy period, Mitsubishi, MDEA, and MEEU, either directly, or through their subsidiaries or affiliates, distributed, manufactured, marketed, or sold price-fixed CRTs to customers throughout the United States, including Illinois.

**ANSWER:** The allegations in Paragraph 75 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 75 and, on that basis, denies them.

76.     Videocon Industries, Ltd. ("Videocon") is an Indian corporation, headquartered at 14 KM Stone, Aurangabad-Paithan Road, Village Chittegaon, Aurangabad District, Maharashtra, India.

**ANSWER:** The allegations in Paragraph 76 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 76 and, on that basis, denies them.

77.     During the conspiracy period, Videocon, either directly, or through its subsidiaries or affiliates, distributed, manufactured, marketed, or sold price-fixed CRTs to customers throughout the United States, including Illinois.

**ANSWER:** The allegations in Paragraph 77 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 77 and, on that basis, denies them.

78.     Some of the co-conspirators are currently unknown and the Attorney General reserves the right to name some or all of these entities as Defendants or co-conspirators at a subsequent date.

**ANSWER:** The allegations in Paragraph 78 state legal contentions, for which no response is required. To the extent that a response is required and the allegations relate to Plaintiff, PENAC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 78 and, on that basis, denies them. To the extent a response is required and the allegations in Paragraph 78 relate to PENAC, PENAC denies all of the allegations.

79.     Whenever this Complaint makes a reference to any act, deed, or transaction committed by any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while the individuals were actively engaged in the management, direction, control, or transaction of the corporation's business affairs.

**ANSWER:** The allegations in Paragraph 79 are ambiguous and/or unintelligible. To the extent that the allegations in Paragraph 79 state legal contentions, no response is required. To the extent a response is required and the allegations in Paragraph 79 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent a response is required and the allegations in Paragraph 79 relate to PENAC, PENAC denies all of the allegations.

80.     Each of the Defendants named in the Complaint acted as the agent of the other Defendants with respect to the acts, violations, and common course of conducted alleged in this Complaint.

**ANSWER:** The allegations in Paragraph 80 are ambiguous and/or unintelligible. To the extent that the allegations in Paragraph 80 state legal contentions, no response is required. To the extent a response is required and the allegations in Paragraph 80 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent a response is required and the allegations in Paragraph 80 relate to PENAC, PENAC denies all of the allegations.

## IV.     ALLEGATIONS CONCERNING THE BACKGROUND

81.     A Cathode Ray Tube is a piece of technology used in televisions and computer monitors. It is a vacuum tube, consisting of one or more electron guns, which emit electron beams. The beams include primary colors, red, green, and blue. The CRT creates an image on a

screen by controlling the intensity of the electron beams.

**ANSWER:** PENAC admits that the allegations in Paragraph 81 purport to describe CRT technology, but PENAC denies that such descriptions are accurate or complete.

82.     There are two types of CRTs: CDTs and CPTs. CDTs, or color display tubes, are used in a computer monitors. CPTs, or color picture tubes, are used in television monitors. CDTs require a higher resolution than CPTs. Both CPTs and CDTs are made in various standard sizes, and specifications.

**ANSWER:** PENAC admits that the allegations in Paragraph 82 purport to describe CRT technology, but PENAC denies that such descriptions are accurate or complete.

83.     CRT products are the televisions and computer monitors that CRTs are incorporated into: CRTs have no value outside of the products they are incorporated into. The demand for CRTs, therefore, derives directly from the demand for CRT products.

**ANSWER:** To the extent that the allegations in Paragraph 83 state legal contentions, no response is required. PENAC admits that the allegations in Paragraph 83 purport to describe CRT technology, but PENAC denies that such descriptions are accurate or complete.

84.     CRTs were marketed and sold to manufacturers or assemblers of CRT products. CRT customers included JVP, Proview, HP, Dell, Apple, Acer, IBM, and Gateway.

**ANSWER:** PENAC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 84 and, on that basis, denies them.

85.     The sale of CRTs during the Conspiracy Period resulted in billions of dollars of profits for the Defendants.

**ANSWER:** To the extent that allegations in Paragraph 85 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 85 and, on that basis, denies them. To the extent that the allegations in Paragraph 85 relate to PENAC, PENAC denies all of the allegations.

86.     The CRT market has structural characteristics that increase the probability of collusive activity, including: significant barriers to entry, interchangeable products, and many

opportunities to discuss or exchange competitively-sensitive information with competitors.

**ANSWER:** The allegations in Paragraph 86 are legal contentions to which no response is required. To the extent that a response is required, PENAC denies every allegation in Paragraph 86.

87.    There were significant barriers to entry for new firms attempting to enter the CRT market. A new firm that attempted to enter the CRT market during the Conspiracy Period would need substantial time, resources, and industry sophistication.

**ANSWER:** The allegations in Paragraph 87 are legal contentions to which no response is required. To the extent that the allegations in Paragraph 87 require a response, PENAC denies all of the allegations.

88.    Also, during the Conspiracy Period, the CRT market experienced low profit margins due to declining product demand. TFT-LCDs and Plasma Displays began to out-compete conventional CRT televisions and monitors by providing better product quality. With the advances of these new technologies, new firms did not have an incentive to enter the CRT industry.

**ANSWER:** The allegations in Paragraph 88 are legal contentions to which no response is required. To the extent that the allegations in Paragraph 88 require a response, PENAC denies all of the allegations.

89.    CRTs were interchangeable. Sizes, quality, and specifications for CRTs were standard across the industry. Thus, consumers were unable to differentiate CRTs produced by different Defendants.

**ANSWER:** The allegations in Paragraph 89 are legal contentions to which no response is required. To the extent a response is required and the allegations in Paragraph 89 relate to other defendants PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent a response is required and the allegations in Paragraph 89 relate to PENAC, PENAC denies all of the allegations.

90.    Defendants had many opportunities to share information with each other. During

the conspiracy, several of the Defendants belonged to trade associations such as, the Society of Information Display, Korea Display Industry Association, and the Electronic Display Industrial Research Association. Common membership in trade organizations provided Defendants with ample opportunities to discuss confidential information about CRT pricing and production.

**ANSWER:** To the extent that the allegations in Paragraph 90 state legal contentions, no response is required. To the extent that the other allegations in Paragraph 90 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that the allegations in Paragraph 90 relate to PENAC, PENAC denies all of the allegations.

## V.   ALLEGATIONS CONCERNING DEFENDANTS ENGAGED IN ILLEGAL CONDUCT

91.     From at least March 1, 1995 through at least November 25, 2007, the Defendants and their co-conspirators engaged in a conspiracy to stabilize and increase prices for CRTs.

**ANSWER:** To the extent that the allegations in Paragraph 91 state legal contentions, no response is required. To the extent that the allegations in Paragraph 91 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that the allegations in Paragraph 91 relate to PENAC, PENAC denies them.

92.     During the Conspiracy Period, Defendants agreed, combined, and conspired to fix prices and limit the output of CRTs sold throughout the United States, including Illinois.

**ANSWER:** To the extent that the allegations in Paragraph 92 state legal contentions, no response is required. To the extent that the allegations in Paragraph 92 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that the allegations in Paragraph 92 relate to PENAC, PENAC denies all of the allegations.

93.     During approximately 1995 and 1996, Defendants used bilateral and trilateral communications as the primary method to engage in their conspiracy. Meetings to discuss CRT prices, both generally and for specific customers, took place between several Defendants and coconspirators: Orion; LG; Samsung; Philips; Chunghwa; Thai CRT; Hitachi; Toshiba; and

Panasonic. They met in several locations including, China, Japan, Indonesia, Malaysia, Taiwan, Thailand, Singapore, South Korea, and the U.K.

**ANSWER:** To the extent that the allegations in Paragraph 93 state legal contentions, no response is required. To the extent that the allegations in Paragraph 93 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that the allegations in Paragraph 93 relate to PENAC, PENAC denies all of the allegations.

94. One of the first CRT conspiracy bilateral discussions was between Samsung Malaysia and Chunghwa Malaysia on March 22, 1995. During that meeting, representatives from the two companies exchanged detailed production information for specific sizes of CRTs and for specific customers.

**ANSWER:** To the extent that the allegations in Paragraph 94 state legal contentions, no response is required. To the extent that the allegations in Paragraph 94 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that the allegations in Paragraph 94 relate to PENAC, PENAC denies all of the allegations.

95. There were at least 15 of these bilateral and trilateral meetings between the Defendants and co-conspirators in 1995, and at least 40 in 1996.

**ANSWER:** To the extent that the allegations in Paragraph 95 state legal contentions, no response is required. To the extent that the allegations in Paragraph 95 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that the allegations in Paragraph 95 relate to PENAC, PENAC denies all of the allegations.

96. Beginning around 1997, as more Defendants became involved in the bilateral and trilateral meetings and the frequency of meetings increased, defendants became more organized and formalized their meetings. They began to meet in larger groups. The Defendants referred to the group meetings as "Glass Meetings" or Glass Supplier Meetings ("GSM").

**ANSWER:** To the extent that the allegations in Paragraph 96 state legal contentions, no

27

response is required.   To the extent that the allegations in Paragraph 96 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.   To the extent that the allegations in Paragraph 96 relate to PENAC, PENAC denies all of the allegations.

97.   During these meetings 'Defendants and their co-conspirators:

- exchanged competitive information including: prices for CRTs, sales volumes, inventory levels, production capacity, shipments, exports, custom orders, customer demands, price trends, and future predictions regarding CRTs;
- agreed on CRT prices and ranges, including price ranges for specific customers;
- agreed to differentiate prices on various CRT attributes, such as quality or technical specifications;
- discussed and agreed upon the amount of CRTs each would produce;
- allocated both overall market shares and market shares for particular customers;
- agreed on a method of auditing each other's factories to ensure compliance with their production agreements;
- agreed on what to inform customers regarding the price increases and coordinated their public statements regarding capacity and supply;
- agreed on the prices to charge their own corporate subsidiaries and affiliates that manufactured televisions and computer monitors. By charging their own subsidiaries higher prices, Defendants were able to garner support to charge other original equipment manufacturers higher prices.

**ANSWER:** To the extent that the allegations in Paragraph 97 and its subparts state legal contentions, no response is required.   To the extent that the allegations in Paragraph 97 and its subparts relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.   To the extent that the allegations in Paragraph 97 and its subparts relate to PENAC, PENAC denies all of the allegations.

98.   At each meeting, participants updated the information they had provided on their price and production of CRTs at the previous meeting to the individual designated as the

"Chairman." The position of Chairman was held by one individual for a one-year term that rotated among the Defendants.

**ANSWER:** To the extent that the allegations in Paragraph 98 state legal contentions, no response is required.  To the extent that the allegations in Paragraph 98 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent that the allegations in Paragraph 98 relate to PENAC, PENAC denies all of the allegations.

99.     The "Chairman" would write the information on a white board. The participants used the information on the white board to discuss what price to charge customers and the production amounts for the following months.

**ANSWER:** To the extent that the allegations in Paragraph 99 state legal contentions, no response is required.  To the extent that the allegations in Paragraph 99 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent that the allegations in Paragraph 99 relate to PENAC, PENAC denies all of the allegations.

100.     Defendants agreed to coordinate with competitors that did not attend the group meetings by communicating the price and production agreements made during the glass meetings, and soliciting their participation in the agreements.

**ANSWER:** To the extent that the allegations in Paragraph 100 state legal contentions, no response is required.  To the extent that the allegations in Paragraph 100 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent that the allegations in Paragraph 100 relate to PENAC, PENAC denies all of the allegations.

101.     In order to limit non-compliance with these agreements, the Defendants conducted factory audits of each other's factories, addressed alleged violations during the group meetings, and affirmed their mutual interests to work together to maintain and increase CRT prices.

**ANSWER:** To the extent that the allegations in Paragraph 101 state legal contentions, no

response is required.   To the extent that the allegations in Paragraph 101 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.   To the extent that the allegations in Paragraph 101 relate to PENAC, PENAC denies all of the allegations.

102.     There were several types of conspiracy meetings: Glass meetings, Chinese glass meetings, Green meetings, and Bilateral meetings.

**ANSWER:** To the extent that the allegations in Paragraph 102 state legal contentions, no response is required.   To the extent that the allegations in Paragraph 102 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.   To the extent that the allegations in Paragraph 102 relate to PENAC, PENAC denies all of the allegations.

103.     The Glass meetings were the most frequent type and had three levels:   l) Top meetings; 2) Management meetings; and 3) Working-level meetings.

**ANSWER:** To the extent that the allegations in Paragraph 103 state legal contentions, no response is required.   To the extent that the allegations in Paragraph 103 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.   To the extent that the allegations in Paragraph 103 relate to PENAC, PENAC denies all of the allegations.

104.     LG, Hitachi, Samsung Display, LP Displays, Toshiba, Panasonic, MT Picture Display, Matsushita, Philips, Orion, BMCC, IRICO and Thai CRT were among the attendees at the glass meetings.

**ANSWER:** To the extent that the allegations in Paragraph 104 state legal contentions, no response is required.   To the extent that the allegations in Paragraph 104 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.   To the extent that the allegations in Paragraph 104 relate to PENAC, PENAC denies all of the allegations.

105.     The Top meetings were attended by high-ranking executives of the Defendants. This group included CEOs, Vice Presidents, and Presidents. They met quarterly to enter long-term price and production agreements and to enforce the price-fixing agreements by resolving

disputes amongst the conspirators.

**ANSWER:** To the extent that the allegations in Paragraph 105 state legal contentions, no response is required.   To the extent that the allegations in Paragraph 105 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.   To the extent that the allegations in Paragraph 105 relate to PENAC, PENAC denies all of the allegations.

106.   The representatives at the Top Meetings had the most authority and reliable information. Thus, these Meetings often resulted in price, production, and customer allocation agreements.

**ANSWER:** To the extent that the allegations in Paragraph 106 state legal contentions, no response is required.   To the extent that the allegations in Paragraph 106 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.   To the extent that the allegations in Paragraph 106 relate to PENAC, PENAC denies all of the allegations.

107.   The Management meetings were attended by high-level sales executives of the Defendants. They held management meetings monthly to implement the price and production agreements made by the Defendants during the Top meetings.

**ANSWER:** To the extent that the allegations in Paragraph 107 state legal contentions, no response is required.   To the extent that the allegations in Paragraph 107 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.   To the extent that the allegations in Paragraph 107 relate to PENAC, PENAC denies all of the allegations.

108.   Lower-level sales and marketing employees attended Working Level meetings. Working Level meetings occurred on a weekly or monthly basis. The meetings were more regional and occurred near the Defendants' factories.

**ANSWER:** To the extent that the allegations in Paragraph 108 state legal contentions, no response is required.   To the extent that the allegations in Paragraph 108 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth

and, on that basis, denies them.  To the extent that the allegations in Paragraph 108 relate to PENAC, PENAC denies all of the allegations.

109.    At these meetings, the less senior employees exchanged and discussed price and production data. They would then provide the information to their superiors who often signed the meeting notes and provided their own comments.

**ANSWER:** To the extent that the allegations in Paragraph 109 state legal contentions, no response is required.  To the extent that the allegations in Paragraph 109 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent that the allegations in Paragraph 109 relate to PENAC, PENAC denies all of the allegations.

110.    The Chinese Glass Meetings began in 1998 and occurred in China on a monthly basis after a top or management Meeting.

**ANSWER:** To the extent that the allegations in Paragraph 110 state legal contentions, no response is required.  To the extent that the allegations in Paragraph 110 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent that the allegations in Paragraph 110 relate to PENAC, PENAC denies all of the allegations.

111.    At these meetings, the Defendants reported the agreements made at the most recent top or management meetings.

**ANSWER:** To the extent that the allegations in Paragraph 111 state legal contentions, no response is required.  To the extent that the allegations in Paragraph 111 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent that the allegations in Paragraph 111 relate to PENAC, PENAC denies all of the allegations.

112.    IRICO, Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, BMCC and Chunghwa were among the attendees at these meetings.

**ANSWER:** The allegations in Paragraph 112 are not directed at PENAC and, therefore,

no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 112 and, on that basis, denies them.

113.    Defendants also attended "Grass Meetings" or "Green Meetings," so named because they were held on golf courses.

**ANSWER:** To the extent that the allegations in Paragraph 113 state legal contentions, no response is required.  To the extent that the allegations in Paragraph 113 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent that the allegations in Paragraph 113 relate to PENAC, PENAC denies all of the allegations.

114.    Defendants' top and management level employees attended these meetings.

**ANSWER:** To the extent that the allegations in Paragraph 114 state legal contentions, no response is required.  To the extent that the allegations in Paragraph 114 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent that the allegations in Paragraph 114 relate to PENAC, PENAC denies all of the allegations.

115.    Defendants held Green meetings in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia.

**ANSWER:** To the extent that the allegations in Paragraph 115 state legal contentions, no response is required.  To the extent that the allegations in Paragraph 115 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent that the allegations in Paragraph 115 relate to PENAC, PENAC denies all of the allegations.

116.    During the Conspiracy Period, Defendants also engaged in bilateral meetings that were more informal than the Glass Meetings. The Defendants conducted these meetings in person, on the phone, and through email.

**ANSWER:** To the extent that the allegations in Paragraph 116 state legal contentions, no response is required.  To the extent that the allegations in Paragraph 116 relate to other

defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that the allegations in Paragraph 116 relate to PENAC, PENAC denies all of the allegations.

117. The bilateral meetings occurred between the Defendants' sales and marketing employees.

**ANSWER:** To the extent that the allegations in Paragraph 117 state legal contentions, no response is required. To the extent that the allegations in Paragraph 117 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that the allegations in Paragraph 117 relate to PENAC, PENAC denies all of the allegations.

118. After conducting a top or management meeting, Defendants used the bilateral meetings to exchange information and to convey the agreed CRT price and output.

**ANSWER:** To the extent that the allegations in Paragraph 118 state legal contentions, no response is required. To the extent that the allegations in Paragraph 118 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that the allegations in Paragraph 118 relate to PENAC, PENAC denies all of the allegations.

119. Defendants used the bilateral meetings to coordinate prices with competitors that did not frequently attend the Glass Meetings such as: Hitachi; Toshiba; Thai CRT; and Samtel.

**ANSWER:** To the extent that the allegations in Paragraph 119 state legal contentions, no response is required. To the extent that the allegations in Paragraph 119 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that the allegations in Paragraph 119 relate to PENAC, PENAC denies all of the allegations.

120. Each glass meeting participant was assigned an absent company to communicate with:

- Samsung communicated the CRT agreements to Hitachi.
- LG communicated the CRT agreements to Toshiba.

- Thai CRT communicated the CRT agreements to Samtel.

**ANSWER:** To the extent that the allegations in Paragraph 120 and its subparts state legal contentions, no response is required. To the extent that the allegations in Paragraph 120 and its subparts relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that the allegations in Paragraph 120 and its subparts relate to PENAC, PENAC denies all of the allegations.

121.    For example, at a November 23, 1996 glass meeting, participants reported that Samsung and Chunghwa were successful in persuading Hitachi from lowering the market price.

**ANSWER:** To the extent that the allegations in Paragraph 121 state legal contentions, no response is required. To the extent that the allegations in Paragraph 121 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that the allegations in Paragraph 121 relate to PENAC, PENAC denies all of the allegations.

## VI.    ALLEGATIONS CONCERNING DEFENDANT'S INDIVIDUAL PARTICIPATION IN ILLEGAL AGREEMENTS

122.    The following examples are illustrative, but not exhaustive of the Defendants conspiracy communications:

**ANSWER:** To the extent that the allegations in Paragraph 122 state legal contentions, no response is required. To the extent that the allegations in Paragraph 122 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that the allegations in Paragraph 122 relate to PENAC, PENAC denies all of the allegations.

123.    On May 29, 1995, LG and Chungwha held a meeting where they exchanged information and discussed a price increase for CRTs. LG indicated that it was visiting all of the CRT manufacturers in Thailand, Malaysia, and Singapore to determine whether a price increase was possible.

**ANSWER:** The allegations in Paragraph 123 are not directed at PENAC and, therefore,

no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 123 and, on that basis, denies them.

124.    During a November 25, 1996 meeting between Hitachi Asia, Samsung Display, and Chunghwa, the participants discussed CDT production levels. They implemented a bottom price for 14" CDTs, and Hitachi was encouraged to keep the price of CDTs from falling. They also discussed prices to particular customers. When Hitachi's representative expressed reluctance to attend the next group meeting, Chungwha and Samsung agreed to come to Hitachi directly and explain the agreements made at the next meeting.

**ANSWER:** The allegations in Paragraph 124 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 124 and, on that basis, denies them.

125.    At a January 28th, 1997 glass meeting, CDT producers, including Samsung, Philips, Orion, and Chunghwa, discussed their common understanding to guard the bottom line on prices.

**ANSWER:** To the extent that the allegations in Paragraph 125 state legal contentions, no response is required.  To the extent that the allegations in Paragraph 125 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent that the allegations in Paragraph 125 relate to PENAC, PENAC denies all of the allegations.

126.    At a glass meeting on February 27, 1997 Samsung, LG, Philips, and Chunghwa agreed to bottom-line prices for 14" and 15" CDTs and agreed on a date to implement their agreed price increases.

**ANSWER:** To the extent that the allegations in Paragraph 126 state legal contentions, no response is required.  To the extent that the allegations in Paragraph 126 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent that the allegations in Paragraph 126 relate to PENAC, PENAC denies all of the allegations.

127.    At a March 26, 1997 glass meeting, Samsung Display, Philips, and Chunghwa reached a common understanding that the price for 15" CDTs should be increased, and that they

should show resolve in order to push the Japanese CDT manufacturers to follow the price increase. They insisted on mutual trust among each other in order to successfully increase prices.

**ANSWER:** To the extent that the allegations in Paragraph 127 state legal contentions, no response is required. To the extent that the allegations in Paragraph 127 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that the allegations in Paragraph 127 relate to PENAC, PENAC denies all of the allegations.

128.    During two-glass meetings held on September 7 and 8, 1997, Samsung, LG, Orion, Chunghwa, and Thai CRT exchanged production information and reached common understandings for the bottom price of CRTs and to decrease production.

**ANSWER:** The allegations in Paragraph 128 are not directed at PENAC and, therefore, no response is required. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 128 and, on that basis, denies them.

129.    In an August 5, 1998 China meeting between Samsung, Philips, BMCC, IRICO and Chunghwa, each participant exchanged its upcoming production plans and re-enforced previously made agreements to follow the bottom-line price.

**ANSWER:** To the extent that the allegations in Paragraph 129 state legal contentions, no response is required. To the extent that the allegations in Paragraph 129 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that the allegations in Paragraph 129 relate to PENAC, PENAC denies all of the allegations.

130.    At a March 19, 2001 meeting between Samsung, LG, Orion, and Philips, the attendees agreed to maintain a price differential of $14 between 17" regular and flat CRTs. They also agreed and reported on the number of days each manufacturer would cut production of CRTs. Orion confirmed that it would report its planned production stoppage later.

**ANSWER:** To the extent that the allegations in Paragraph 130 state legal contentions, no

response is required.   To the extent that the allegations in Paragraph 130 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.   To the extent that the allegations in Paragraph 130 relate to PENAC, PENAC denies all of the allegations.

131.   At a January 4, 2002 meeting, attendees, Samsung, LP Displays, Orion, and Chunghwa, discussed the prices they set for several different sizes of CRTs. They agreed that the prices quoted to other CRT manufactures for internal delivery, would not be below the bottom-line prices quoted to other customers.

**ANSWER:** The allegations in Paragraph 131 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 131 and, on that basis, denies them.

132.   Toshiba called a meeting for CPT producers which was held on September 13, 2002. Attending were, Toshiba, Thai CRT, LP Displays, Samsung, and Chunghwa. They discussed and agreed on prices for particular CPT screens and to particular customers.

**ANSWER:** The allegations in Paragraph 132 are not directed at PENAC and, therefore, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 132 and, on that basis, denies them.

133.   In March 2004, several Defendants met in Korea to discuss increasing the price of CDTs. They agreed to raise prices for CDTs by $2 to $3 Dollars. They maintained price differentials between prices quoted to "top" customers and others and between prices for top and second tier suppliers. The price differentials were used to stabilize market share among the competitors.

**ANSWER:** To the extent that the allegations in Paragraph 133 state legal contentions, no response is required.  To the extent that the allegations in Paragraph 133 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent that the allegations in Paragraph 133 relate to PENAC, PENAC denies all of the allegations.

134.   At a December 29, 2004 glass meeting between Samsung Display, LP Displays,

and Chunghwa, the participants addressed allegations that some of them cheated on the conspiracy by offering lower prices to customers. They ended the meeting by agreeing to keep the December 2004 price effective through January 2005.

**ANSWER:** The allegations in Paragraph 134 are not directed at PENAC and, therefore, no response is required. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 134 and, on that basis, denies them.

135.    On August 17 and 18, 2004, several CRT manufacturers including, Chunghwa, Samsung, and LP Displays, held top and green meetings, during which they agreed on a scheme to implement a price increase in September 2004: one manufacturer would initiate a price increase to its main customer, while the others would follow with increased price quotes to that same customer. They also discussed reducing production of CRTs by cutting work days and shutting down production lines.

**ANSWER:** The allegations in Paragraph 135 are not directed at PENAC and, therefore, no response is required. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 135 and, on that basis, denies them.

136.    At a glass meeting between Samsung, LP Displays, and Chunghwa, in South Korea, March 14, 2006, the participants discussed a plan to have Samsung stop supplying a particular customer, upon the condition that LP Displays and Chunghwa would cease and reduce supply to another customer.

**ANSWER:** The allegations in Paragraph 136 are not directed at PENAC and, therefore, no response is required. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 136 and, on that basis, denies them.

137.    During the Conspiracy Period, Samsung, SEAI, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen, Samsung SDI Tianjin, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico engaged in more than two hundred Glass Meetings, Chinese glass meetings, green meetings, and bi-lateral discussions. Defendants' high-ranking executives attended a substantial number of the meetings.

**ANSWER:** To the extent that the allegations in Paragraph 137 state legal contentions, no response is required.  To the extent that the allegations in Paragraph 137 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent that the allegations in Paragraph 137 relate to PENAC, PENAC denies all of the allegations.

138.    SEAI, Samsung SDI America sold CRTs and CRT products at the Conspiracy price levels to ensure that it did not undercut the pricing agreements the Defendants reached at the· Glass Meetings.

**ANSWER:** To the extent that the allegations in Paragraph 138 state legal contentions, no response is required.  To the extent that the allegations in Paragraph 138 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent that the allegations in Paragraph 138 relate to PENAC, PENAC denies all of the allegations.

139.    During the Conspiracy Period, Defendants LG Electronics, Inc., LGETT, and LG Philips Displays participated in more than one hundred Glass Meetings and bilateral discussions, during which they entered agreements on price and output for CRTs. Defendants' high-ranking executives attended a substantial number of these meetings.

**ANSWER:** To the extent that the allegations in Paragraph 139 state legal contentions, no response is required.  To the extent that the allegations in Paragraph 139 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent that the allegations in Paragraph 139 relate to PENAC, PENAC denies all of the allegations.

140.    Defendant LG USA sold CRT products at the Conspiracy price levels to ensure that it did not undercut the pricing agreements the Defendants reached at the Glass Meetings.

**ANSWER:** To the extent that the allegations in Paragraph 140 state legal contentions, no response is required.  To the extent that the allegations in Paragraph 140 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent that the allegations in Paragraph 140 relate to

PENAC, PENAC denies all of the allegations.

141.    During the Conspiracy Period, Philips, Royal Philips, LG Philips Displays, and Philips Taiwan participated in more than one hundred Glass Meetings and bilateral discussions, during which they entered agreements on price and output for CRTs. Their high-ranking executives attended the Glass Meetings.

**ANSWER:** To the extent that the allegations in Paragraph 141 state legal contentions, no response is required.   To the extent that the allegations in Paragraph 141 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.   To the extent that the allegations in Paragraph 141 relate to PENAC, PENAC denies all of the allegations.

142.    PENAC and Philips Brazil sold CRT products at the agreed upon prices to ensure compliance with the Defendants' agreements in the Glass Meetings.

**ANSWER:** To the extent that the allegations in Paragraph 142 state legal contentions, no response is required.   To the extent that the allegations in Paragraph 142 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.   To the extent that the allegations in Paragraph 142 relate to PENAC, PENAC denies all of the allegations.

143.    During the Conspiracy Period, LP Displays participated in more than one hundred Glass Meetings. LP Displays' high-ranking executives attended numerous Meetings. LP Displays regularly engaged in bilateral discussions to agree upon prices and output.

**ANSWER:** To the extent that the allegations in Paragraph 143 state legal contentions, no response is required.   Additionally, the allegations in Paragraph 143 are not directed at PENAC and, therefore, no response is required.   PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 143 and, on that basis, denies them.

144.    During the Conspiracy Period, Toshiba, TDDT, TEDI, and MT Picture Display participated in over fifty Glass Meetings and bilateral discussions, during which they entered agreements on price and output for CRTs. These Toshiba Defendants' high-ranking executives

regularly attended the Meetings. Defendants Toshiba America, TACP, TAIP, and TAEC sold CRT products at the agreed upon prices to ensure compliance with the Defendants' agreements in the Glass Meetings.

**ANSWER:** To the extent that the allegations in Paragraph 144 state legal contentions, no response is required. To the extent that the allegations in Paragraph 144 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that the allegations in Paragraph 144 relate to PENAC, PENAC denies all of the allegations.

145. During the Conspiracy Period, Hitachi, Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia participated in numerous Glass Meetings and bilateral discussions, during which they entered agreements on price and output for CRTs. Their high-ranking 'executives regularly attended the Meetings.

**ANSWER:** To the extent that the allegations in Paragraph 145 state legal contentions, no response is required. Additionally, the allegations in Paragraph 145 are not directed at PENAC and, therefore, no response is required. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 145 and, on that basis, denies them.

146. Hitachi America and HEDUS sold CRT products at the agreed upon prices to ensure compliance with the Defendants' agreements in the Glass Meetings.

**ANSWER:** To the extent that the allegations in Paragraph 146 state legal contentions, no response is required. To the extent that the allegations in Paragraph 146 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that the allegations in Paragraph 146 relate to PENAC, PENAC denies all of the allegations.

147. During the Conspiracy Period, Panasonic, Matsushita Malaysia, and MT Picture, Display participated in numerous Glass Meetings and bilateral discussions, during which they entered agreements on price and output for CRTs. Their high-ranking executives regularly attended the Meetings. For example, on February 7-8, 2007, MT Picture Display attended a

Glass Meeting with Chunghwa, Samsung Display, and LP Displays. During this meeting, the participants exchanged information about their CRT sales, production, and prices.

**ANSWER:** To the extent that the allegations in Paragraph 147 state legal contentions, no response is required. Additionally, the allegations in Paragraph 147 are not directed at PENAC and, therefore, no response is required. PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 147 and, on that basis, denies them.

148. Defendant Panasonic NA sold CRT products at the agreed upon prices to ensure compliance with the Defendants' agreements in the Glass Meetings.

**ANSWER:** To the extent that the allegations in Paragraph 148 state legal contentions, no response is required. To the extent that the allegations in Paragraph 148 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that the allegations in Paragraph 148 relate to PENAC, PENAC denies all of the allegations.

## VII.   ALLEGATIONS CONCERNING DEFENDANTS PASS-THROUGH OVERCHARGES TO ILLINOIS CONSUMERS

149. The Defendants' purpose was to fix, raise, and stabilize CRT and CRT product prices. The Defendants knew that increasing the price of CRTs would lead to an increase in CRT product prices as well.

**ANSWER:** To the extent that the allegations in Paragraph 149 state legal contentions, no response is required. To the extent that the allegations in Paragraph 149 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent the allegations in Paragraph 149 relate to PENAC, PENAC denies all of the allegations.

150. For example, in a March, 2004 glass meeting several defendants agreed to notify customers in advance that there would be a second price hike so that the customers could plan to pass on the price increase to their customers of CRT products.

**ANSWER:** To the extent that the allegations in Paragraph 150 state legal contentions, no response is required.   To the extent that the allegations in Paragraph 150 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent the allegations in Paragraph 150 relate to PENAC, PENAC denies all of the allegations.

151.     Defendants' conspiracy to fix, raise, maintain, and stabilize CRT prices at higher levels harmed Illinois, its agencies, and its consumers, because they paid higher prices for CRT products than they would have in the absence of the Defendants' conspiracy.

**ANSWER:** To the extent that the allegations in Paragraph 151 state legal contentions, no response is required.   To the extent that the allegations in Paragraph 151 relate to Plaintiff, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent that the allegations in Paragraph 151 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent the allegations in Paragraph 151 relate to PENAC, PENAC denies all of the allegations.  PENAC denies that Illinois, its agencies, and its consumers are entitled to any relief under any theory by means of the allegations set forth in the Amended Complaint and alleged in Paragraph 151.

152.     CRT product prices were directly affected by the price. Televisions and computer monitors are essentially homogenous products: customers do not have brand loyalty and there is little differentiation in the products. Firms compete based on pricing and production costs. Since, original equipment manufacturers used component costs to make price calculations, television and computer prices increased or decreased depending on the component costs.

**ANSWER:** To the extent that the allegations in Paragraph 152 state legal contentions, no response is required.  PENAC otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first, third and fourth sentences of Paragraph 152 and, on that basis, denies them.   PENAC denies the allegations in the second sentence of Paragraph 152.

153.     Thus, the conspiratorial price increase in CRTs forced the manufacturers of CRT products to increase the prices of those products.

**ANSWER:** The allegations in Paragraph 153 are legal contentions to which no response is required.   To the extent that a response is required, PENAC denies every allegation in Paragraph 153.

154.   Defendants attended Glass Meetings or engaged in Bilateral Discussions to monitor the prices of televisions and computer monitors sold in the U.S. and internally. This monitoring allowed Defendants that did not manufacture CRT televisions and computer monitors to enforce the price-fixing agreements with the companies that produced televisions and monitors. This practice ensured higher prices for CRT products.

**ANSWER:** To the extent that the allegations in Paragraph 154 state legal contentions, no response is required.   To the extent that the allegations in Paragraph 154 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.   To the extent that the allegations in Paragraph 154 relate to PENAC, PENAC denies all of the allegations.

## VIII.   ALLEGATIONS CONCERNING EFFORTS TO CONCEAL CONSPIRACY

155.   The Defendants fraudulently concealed the existence of the conspiracy alleged herein.

**ANSWER:** To the extent that the allegations in Paragraph 155 state legal contentions, no response is required.   To the extent that the allegations in Paragraph 155 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.   To the extent that the allegations in Paragraph 155 relate to PENAC, PENAC denies all of the allegations.

156.   Defendants agreed to keep their meetings secret.

**ANSWER:** To the extent that the allegations in Paragraph 156 state legal contentions, no response is required.   To the extent that the allegations in Paragraph 156 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.   To the extent that the allegations in Paragraph 156 relate to PENAC, PENAC denies all of the allegations.

157.    For example, in a May 26, 2000, meeting between Samsung, LG, Orion, Philips, and Chunghwa, the participants raised concern that the subject of their meetings was being disclosed to customers. To reduce the likelihood of their meetings being discovered, they decided to hold meetings regarding CPTs and CDTs separately and reduce the number of attendees at each meeting. In addition, the Defendants were also discouraged from taking minutes at the meetings.

**ANSWER:** To the extent that the allegations in Paragraph 157 state legal contentions, no response is required.   To the extent that the allegations in Paragraph 157 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.   To the extent that the allegations in Paragraph 157 relate to PENAC, PENAC denies all of the allegations.

158.    Also, to conceal the conspiracy, the Defendants agreed to provide false statements to their customers regarding their price increases and coordinated their public statements regarding capacity and supply.

**ANSWER:** To the extent that the allegations in Paragraph 158 state legal contentions, no response is required.   To the extent that the allegations in Paragraph 158 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.   To the extent that the allegations in Paragraph 158 relate to PENAC, PENAC denies all of the allegations.

159.    The State of Illinois exercised due diligence to discover its legal rights with respect to the CRT conspiracy but, despite such diligence, did not and could not have known of the causes of action alleged in this complaint until 2010 at the earliest.

(a)    Near the end of 2007, the State of Illinois read press stories of overseas investigations of the CRT industry. Only foreign governments confirmed their investigations. None of these governments provided details of the subject they were investigating. The State continued to monitor press reports on the CRT industry, although it learned nothing more through 2008 and into the beginning of 2009.

(b)    In February 2009, the State of Illinois learned through press reports that the U.S.

Department of Justice had convened a grand jury to investigate a CRT conspiracy in the United States and indicted an employee of alleged co-conspirator Chunghwa Picture Tubes Limited. This was the first announcement by USDOJ that it was investigating the CRT industry. The State of Illinois received no additional details and received no evidence of such a conspiracy.

(c)     Within a month of learning of the U.S. government investigation, the State of Illinois learned from the State of Washington that the State of Washington had contacted several of the CRT manufacturers inquiring as to whether any wished to come forth as a cooperating company with the State of Washington or other states. The State of Illinois was told that none of the contacted companies felt that there was any reason to disclose materials to the states as cooperators, but that they would consider tolling agreements to forestall further investigation at that time.

(d)     The State of Illinois agreed to send joint letters with Washington to the known CRT manufacturers asking if they wished to enter into tolling agreements~ The Panasonic group of companies agreed to do so. A few companies said they would not while others never responded to the best of the State of Illinois' knowledge.

(e)     In the fall of 2010, the State of Illinois was notified by counsel representing a class of private indirect purchasers ("IPPs") that they were preparing to settle price fixing claims against Chunghwa that would include releases of the claims of Illinois citizens. The State responded that under Illinois law, private class representatives could not represent Illinois citizens, but the State would be willing to discuss a separate settlement with Chunghwa that would result in a universal settlement of the nongovernment CRT price-fixing claims against that company.

(f)     Such discussions with Chunghwa began shortly afterward and continued into 2012. Near the start of these discussions, in November of 2010, for the first time the State of Illinois learned information that led it to believe that there was a good likelihood that allegations of a CRT price-fixing conspiracy were true. However, the State received no evidence that would support allegations of a conspiracy at that time.

(g)     In the spring of 2011, the State had reached an agreement with Chunghwa to

settle its *parens patriae* claims and was beginning discussions of its government proprietary claims. Finalization of the agreement and the additional discussions were interrupted when IPPs announced that they had decided to contest the State of Illinois' exclusive right to represent its citizens. This necessitated the State of Illinois' intervention and motion practice before the Special Master in the MDL proceeding, resulting in the Special Master sustaining the exclusivity of the State's right of representation. These proceedings concluded in the summer of 2011.

(h)    Following resolution of the dispute with the IPPs, the State of Illinois resumed negotiations of a complete resolution with Chunghwa. Simultaneously, unsuccessful discussions were had with other defendants to attempt to obtain settlements that would have led to access to materials regarding the conspiracy. In early 2012, the negotiations with Chunghwa came to a successful conclusion and the State of Illinois obtained materials, many of them in Chinese that provided the first evidence that the State of Illinois obtained of the existence of the conspiracy.

**ANSWER:** To the extent that the allegations in Paragraph 159 and its subparts state legal contentions, no response is required. To the extent that the allegations in Paragraph 159 and its subparts relate to Plaintiff, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that the allegations in Paragraph 159 and its subparts relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that the allegations in Paragraph 159 and its subparts relate to PENAC, PENAC denies all of the allegations.

160.    The State of Illinois did not learn of the Defendants efforts to conceal the conspiracy until 2012, during review 'of the Chunghwa materials.

**ANSWER:** To the extent that the allegations in Paragraph 160 state legal contentions, no response is required. To the extent that the allegations in Paragraph 160 relate to Plaintiff, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that the allegations in Paragraph 160 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that

basis, denies them.   To the extent that the allegations in Paragraph 160 relate to PENAC, PENAC denies all of the allegations.

161.    The preceding paragraphs are incorporated as if set forth herein.

**ANSWER:** PENAC repeats and incorporates by reference its responses to Paragraph 1 through 160 of the Amended Complaint with the same force and effect as if set forth herein at length.

162.    Sections 3(1)(a) and (b) of the Illinois Antitrust Act, 740 ILCS 10/1 et seq., make it illegal to:

Make any contract with, or engage in any combination or conspiracy with, any other person, who is, or but for a prior agreement would be, a competitor of such person:

(a)    for the purpose or with the effect of fixing, controlling, or maintaining the price or rate charged for any commodity sold or 'bought by the parties thereto, or the fee charged or paid for any service performed or received by the parties thereto;

(b)    fixing, controlling, maintaining, limiting, or discontinuing the production, manufacture, mining, sale or supply of any commodity, or the sale or supply of any service, for the purpose or with the effect stated in paragraph a. of subsection (1).

(c)    allocating or dividing customers, territories; supplies, sales, or markets, functional or geographical, for any commodity or service.

**ANSWER:** The allegations in Paragraph 162 and its subparts constitute legal contentions and/or conclusions to which no response is required.   To the extent that a response is required, PENAC denies all of the allegations in Paragraph 162 and its subparts.

163.    During all relevant times, the Defendants were competitors in the manufacture, sale, and/or distribution of CRTs.

**ANSWER:** The allegations in Paragraph 163 constitute legal contentions and/or conclusions to which no response is required.   To the extent that a response is required and the allegations in Paragraph 163 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.   To the extent that a

response is required and the allegations in Paragraph 163 relate to PENAC, PENAC denies all of the allegations.

164.    During the Conspiracy Period, the Defendants agreed to fix and fixed the prices for CRTs. The Defendants also agreed to restrict output and did restrict output for CRTs.

**ANSWER:** The allegations in Paragraph 164 constitute legal contentions and/or conclusions to which no response is required.  To the extent that a response is required and the allegations in Paragraph 164 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent that a response is required and the allegations in Paragraph 164 relate to PENAC, PENAC denies all of the allegations.

165.    During the Conspiracy Period, the Defendants agreed to allocate customers, sales, and markets for CRTs among themselves.

**ANSWER:** The allegations in Paragraph 165 constitute legal contentions and/or conclusions to which no response is required.  To the extent that a response is required and the allegations in Paragraph 165 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent that a response is required and the allegations in Paragraph 165 relate to PENAC, PENAC denies all of the allegations.

166.    The purpose and effect of these unlawful agreements was to raise and fix prices, and restrict output of CRTs sold throughout the United States, including sales of CRTs and CRT products to the State of Illinois and its residents.

**ANSWER:** The allegations in Paragraph 166 constitute legal contentions and/or conclusions to which no response is required.  To the extent that a response is required and the allegations in Paragraph 166 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them.  To the extent that a response is required and the allegations in Paragraph 166 relate to PENAC, PENAC denies all of the allegations.

167.    The Defendants' price-fixing conspiracy caused antitrust injury by reducing

competition in the production, distribution, and sale of CRTs and CRT products that resulted in less output and higher prices paid by the State of Illinois and its residents.

**ANSWER:** The allegations in Paragraph 167 constitute legal contentions and/or conclusions to which no response is required. To the extent that a response is required and the allegations in Paragraph 167 relate to Plaintiff, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that a response is required and the allegations in Paragraph 167 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that a response is required and the allegations in Paragraph 167 relate to PENAC, PENAC denies all of the allegations. PENAC denies that Plaintiff is entitled to any relief under any theory by means of the allegations set forth in the Amended Complaint.

168.   During the conspiracy period, the Defendants violated Section 3(l) of the Illinois Antitrust Act, 740 ILCS 10/1 et. seq.

**ANSWER:** The allegations in Paragraph 168 constitute legal contentions and/or conclusions to which no response is required. To the extent that a response is required and the allegations in Paragraph 168 relate to other defendants, PENAC lacks knowledge or information sufficient to form a belief as to their truth and, on that basis, denies them. To the extent that a response is required and the allegations in Paragraph 168 relate to PENAC, PENAC denies all of the allegations.

169.   WHEREFORE, Plaintiff, the State of Illinois, prays for judgment as follows:

(a)   Finding the Defendants liable, jointly and severally, for the price-fixing conspiracy alleged herein as a violation of section 3(1) of the Illinois Antitrust Act, 740 ILCS 10/3(1);

(b)   Awarding treble damages in favor of the State of Illinois for all overcharges paid by the State for CRTs and CRT products;

(c)

(d)   Awarding treble damages in favor of the State of Illinois as *parens patriae* for all overcharges paid by Illinois residents for CRTs and CRT products;

(e)   Awarding civil penalties pursuant to 740 ILCS 10/7(4);

(f)   Awarding injunctive relief to undo the effects of the Defendants' illegal conduct

and to prevent further recurrences of such conduct;

(g)     Awarding costs, disbursements, and reasonable attorney's fees pursuant to 740 ILCS 10/7; and

(h)     g. Such other, further, and different relief as the Court may deem just, necessary, or appropriate.

**ANSWER:** With respect to Plaintiff's allegations concerning prayer for relief in Paragraph 168 and its subparts, PENAC denies that Plaintiff suffered any injury or incurred any damages by any act or omission of PENAC as alleged in the Amended Complaint, and further denies that Plaintiff is entitled to any relief under any theory by means of the allegations set forth in the Amended Complaint. All allegations of the Amended Complaint not heretofore admitted or denied are here and now denied as though specifically denied herein.

## AFFIRMATIVE DEFENSES

Pursuant to 735 ILCS 5/2-613(d), PENAC asserts the following additional and/or affirmative defenses to Plaintiff's Amended Complaint as detailed below.

### FIRST AFFIRMATIVE DEFENSE

### (Statute of Limitations)

1.      Illinois was placed on notice of its claims no later than September 17, 2008, when newspapers around the world, press reports, court filings, among other sources, reported that antitrust agencies in the United States and foreign countries were investigating alleged anticompetitive CRT pricing.

2.      Beginning in November 2007, numerous class action lawsuits were filed in courts across the United States alleging claims related to alleged price-fixing of CRTs.

3.      By September 17, 2008, several press reports and newspaper articles were published concerning the domestic and foreign investigations into the alleged cartel.

4.      Illinois, therefore, knew of its potential cause of action with a reasonable amount of time remaining to file suit under the statute of limitations.

5.      Illinois did not file its lawsuit until September 2012, four years after the last possible date it had notice of its claims.

WHEREFORE, Plaintiff's claims are barred, in whole or in part, by the applicable

statute(s) of limitations, including without limitation 740 Ill. Comp. Stat. 10/7(2).

## SECOND AFFIRMATIVE DEFENSE

### (Laches)

6.       Illinois was placed on notice of its claims no later than September 17, 2008, when newspapers around the world, press reports, court filings, among other sources, reported that antitrust agencies in the United States and foreign countries were investigating alleged anticompetitive CRT pricing.

7.       Beginning in November 2007, numerous class action lawsuits were filed in courts across the United States alleging claims related to alleged price-fixing of CRTs.

8.       By September 17, 2008, several press reports and newspaper articles were published concerning the domestic and foreign investigations into the alleged cartel.

9.       Illinois did not file its lawsuit until September 2012, four years after the last possible date it had notice of its claims.

10.       On information and belief, Plaintiff has no reasonable and valid excuse for such delay.

11.       Plaintiff's delay in bringing this lawsuit prejudices PENAC's ability to defend the lawsuit, including hindering PENAC's ability to access critical documents and witnesses, including those whose memories may have faded. As a result, Plaintiff's claims are barred, in whole or in part, by the equitable doctrine of laches.

## THIRD AFFIRMATIVE DEFENSE

### (Failure to State a Claim under the Foreign Trade Antitrust Improvements Act)

12.       Plaintiff's claims are based entirely on alleged conduct involving commerce with foreign nations that did not involve U.S. import trade or commerce.

13.       The alleged conduct did not have a direct, substantial, nor reasonably foreseeable effect on U.S. domestic, import, or export commerce.

WHEREFORE, Plaintiff's claims for any foreign purchases, if any, should be dismissed to the extent that they are barred, in whole or in part, because Plaintiff has failed to allege facts sufficient to support a claim under the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a, and/or analogous state authority, and/or to the extent Plaintiff has failed to allege facts sufficient to state a claim pursuant to the Foreign Trade Antitrust Improvements Act.

## FOURTH AFFIRMATIVE DEFENSE
### (Vagueness of Claims)

14.     PENAC avers that Plaintiff's claims do not describe the events or legal theories with sufficient particularity to permit PENAC to ascertain what other defenses may exist. Plaintiff also has failed to allege PENAC's involvement in the alleged conspiracy to fix the price of CRTs. The only allegations about PENAC's involvement are conclusory. PENAC, therefore, reserves the right to amend its Answer to assert additional defenses and/or supplement, alter, or change its Answer and/or defenses upon the discovery of more definitive facts upon the completion of its investigation and discovery.

15.     For example, Plaintiff fails to identify the specific products it purchased, the supplied who manufactured and/or sold the CRTs purchased, and the entities and individuals who were supposedly damaged by the alleged purchase of such products.

WHEREFORE, Plaintiff's claims should be dismissed for uncertainty and vagueness and because its claims are ambiguous and/or unintelligible.

## FIFTH AFFIRMATIVE DEFENSE
### (Unilateral Action)

16.     The actions or practices of PENAC that are the subject of the Amended Complaint were undertaken unilaterally for legitimate business reasons and in pursuit of PENAC's independent interests, and were not the product of any contract, combination or conspiracy between PENAC and any other person or entity.

WHEREFORE, Plaintiff's claims are barred, in whole or in part, under the doctrine of unilateral action.

## SIXTH AFFIRMATIVE DEFENSE
### (Rule of Reason)

17.     Any acts or practices of PENAC that are the subject of the Amended Complaint were adopted in furtherance of legitimate business interests of PENAC and do not unreasonably restrain competition.

WHEREFORE, Plaintiff's claims are barred, in whole or in part, under the doctrine of

rule of reason.

## SEVENTH AFFIRMATIVE DEFENSE

### (Competition)

18.     At all times, PENAC acted in good faith to make bona fide competitive business decisions in the legitimate pursuit of business and economic interested in the sale of CRTs.

WHEREFORE, Plaintiff's claims are barred, in whole or in part, because any acts or practices of PENAC that are the subject of the Amended Complaint were cost justified or otherwise economically justified and resulted from a good faith effort to meet competition or market conditions.

## EIGHTH AFFIRMATIVE DEFENSE

### (Non-actionable or Governmental Privilege)

19.     The alleged conduct of PENAC was caused by, due to, based upon, or in response to directives, laws, regulations, policies, and/or acts of governments, governmental agencies and entities, and/or regulatory agencies.

WHEREFORE, Plaintiff's claims are barred, in whole or in part, because the alleged conduct is non-actionable or protected by government privilege.

## NINTH AFFIRMATIVE DEFENSE

### (No Act of PENAC)

20.     PENAC has engaged in no action or practice that has injured Plaintiff.

WHEREFORE, Plaintiff's claims should be dismissed to the extent that they are barred, in whole or in part, because Plaintiff has not been injured in its business or property by reason of any action of PENAC.

## TENTH AFFIRMATIVE DEFENSE

### (Intervening Conduct)

21.     On information and belief, CRTs moved through many different manufacturing, distribution and retail channels and were combined with a multitude of different components to create the various products for which Plaintiff claims to bring suit.

22.     As CRTs and CRT products moved through these various channels, they were used, transported, resold, and otherwise affected by numerous third parties over whom PENAC had no control or responsibility.

23. The damages, if any, to Plaintiff and/or the persons and entities it purports to

represent resulted from the acts or omissions of such third parties.

WHEREFORE, Plaintiff's claims are barred, in whole or in part, because any alleged injuries and/or damages were not legally or proximately caused by any acts or omissions of PENAC and/or were caused, if at all, solely and proximately by the conduct of third parties including, without limitations, the prior, intervening or superseding conduct of such third parties.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Remoteness)

24.     On information and belief, CRTs moved through many different manufacturing, distribution and retail channels and were combined with a multitude of different components to create the various products for which Plaintiff claims to bring suit.

25.     Prices ultimately charged for those products may be only distantly, if at all, related to prices of the original CRTs, making any injury allegedly suffered by Plaintiff, or the persons or entities Plaintiff seeks to represent, speculative, attenuated, and difficult to calculate.

26.     Therefore, the injuries of Plaintiff and/or the persons or entities Plaintiff seeks to represent are too speculative, derivative, indirect, and remote to confer standing under Federal antitrust law, and they also do not confer standing under the Illinois Antitrust Act, which must be construed in a manner consistent with federal antitrust laws. 740 Ill. Comp. Stat. 10/11.

WHEREFORE, Plaintiff is precluded from bringing the claims alleged herein due to its lack of standing.

## TWELFTH AFFIRMATIVE DEFENSE

### (*Ultra Vires*)

27.     On information and belief, CRTs moved through many different manufacturing, distribution and retail channels and were combined with a multitude of different components to create the various products for which Plaintiff claims to bring suit.

28.     Prices ultimately charged for those products may be only distantly, if at all related to prices of the original CRTs.

29.     Therefore, to the extent that any actionable conduct occurred, it was not done under the direction or control of PENAC.

WHEREFORE, Plaintiff's claims against PENAC are barred because all such conduct would have been committed by individuals acting *ultra vires*.

### THIRTEENTH AFFIRMATIVE DEFENSE
### (Damages Passed On)

30.     Plaintiff seeks to recover for overcharged allegedly paid by the state of Illinois and its citizens for purchases of CRTs and CRT products.

31.     To the extent that Plaintiff and/or the persons or entities that Plaintiff seeks to represent passed on those alleged overcharges, through increased prices for finished CRT products or otherwise, Plaintiff suffered no injury.

WHEREFORE, Plaintiff's claims should be dismissed to the extent they are barred, in whole or in part, because any injury or damage alleged in the Amended Complaint, which PENAC specifically denies, was passed on to persons or entities other than Plaintiff and/or was passed on by Plaintiff to other parties.

### FOURTEENTH AFFIRMATIVE DEFENSE
### (Damages Not Passed Through to Plaintiff)

32.     On information and belief, CRTs moved through many different manufacturing distribution and retail channels and were combined with a multitude of different components to create the various products for which Plaintiff claims to bring suit.

33.     Prices ultimately charged for those products are only distantly, if at all, related to the prices of the original CRTs.

34.     Any injury or damage alleged in the Amended Complaint was not incurred by or passed on to Plaintiff and/or the persons or entities that Plaintiff seeks to represent was incurred by or passed on to other persons and entities.

WHEREFORE, Plaintiff's claims should be dismissed to the extent they are barred, in whole or in part, because any alleged injury or damages were not suffered by Plaintiff and/or the persons or entities that Plaintiff seeks to represent.

### FIFTEENTH AFFIRMATIVE DEFENSE
### (Withdrawal)

35.     Effective July 2001, PENAC's parent company, KPNV transferred the CRT manufacturing assets that were owned and operated by numerous subsidiaries to the 50/50 independently operated joint venture with LG Electronics, Inc., LG.Philips Displays Holding B.V. ("LPD").

36.     Therefore, all assets and liabilities, all employees, all records, and all operations

relating to CRT manufacturing and sales were transferred to LPD.

37.    Following the creation of LPD, no subsidiary of KPNV, including PENAC, manufactured or sold CRTs.

WHEREFORE, without conceding the existence of any conspiracy, to the extent that any actionable conduct occurred for which PENAC is liable, some or all of Plaintiff's claims against PENAC are barred because PENAC withdrew from and/or abandoned any alleged conspiracy prior to the commencement of the limitations period set forth in applicable statutes of limitations.

## SIXTEENTH AFFIRMATIVE DEFENSE

### (Failure to Mitigate Damages)

38.    On information and belief, CRTs moved through many different manufacturing distribution and retail channels and were combined with a multitude of different components to create the various products for which Plaintiff claims to bring suit.

39.    Prices ultimately charged for those products are only distantly, if at all, related to the prices of the original CRTs.

40.    The parties involved in each step of the distribution and retail channels are indispensable to the ultimate price paid for products containing CRTs.

41.    On information and belief, Plaintiff and/or the persons or entities Plaintiff seeks to represent sought and/or negotiated the pricing of CRT Products or stand-alone CRTs, which were ultimately placed within other products.

42.    Plaintiff and/or the persons or entities Plaintiff seeks to represent were therefore in a position to mitigate their alleged damages, if any, and failed to do so.

WHEREFORE, Plaintiff's claims should be dismissed, in whole or in part, because Plaintiff failed to take all necessary, reasonable, and appropriate actions to mitigate its alleged damages, if any.

## SEVENTEENTH AFFIRMATIVE DEFENSE

### (Unjust Enrichment)

43.    Plaintiff and/or the persons and entities Plaintiff seeks to represent suffered no harm in the form of prices of PENAC's products or otherwise.

44.    Plaintiff and/or the persons and entities Plaintiff seeks to represent, therefore, would be unjustly enriched if they were allowed to recover any part of the monetary relief sought in the Amended Complaint.

WHEREFORE, Plaintiff's claims should be dismissed to the extent that they are barred, in whole or in part, by the doctrine of unjust enrichment.

## EIGHTEENTH AFFIRMATIVE DEFENSE

### (Set Off)

45.     PENAC is one of many defendants named in this action.

46.     Plaintiff alleges the defendants acted in concert to commit the conduct alleged herein.

WHEREFORE, without admitting that Plaintiff is entitled to recover damages in this matter, PENAC is entitled to set off from any recovery Plaintiff may obtain against PENAC any amount paid to Plaintiff by any other Defendants who have settled, or do settle, Plaintiff's claims in this matter.

## NINETEENTH AFFIRMATIVE DEFENSE

### (Legal Acts)

47.     Any alleged acts, conduct, or statements of PENAC that are the subject of the Amended Complaint are specifically permitted by law.

WHEREFORE, Plaintiff's claims are barred, in whole or in part, under the doctrine of legal acts.

## TWENTIETH AFFIRMATIVE DEFENSE

### (Waiver and/or Estoppel)

48.     Plaintiff claims to bring suit on behalf of the State of Illinois, its agencies, and Illinois residents that purchased CRTs and CRT products.

49.     On information and belief, CRTs moved through many different manufacturing distribution and retail channels and were combined with a multitude of different components to create the various products for which Plaintiff claims to bring suit.

50.     Plaintiff and/or the persons or entities Plaintiff seeks to represent sought and/or negotiated the pricing of CRT Products or stand-alone CRTs, which were ultimately placed within other products.

WHEREFORE, Plaintiff's claims should be dismissed to the extent that they are barred, in whole or in part, by the doctrines of waiver and/or estoppel.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

### (Acquiescence)

51.     Plaintiff claims to bring suit on behalf of the State of Illinois, its agencies, and Illinois residents that purchased CRTs and CRT products.

52.     On information and belief, CRTs moved through many different manufacturing distribution and retail channels and were combined with a multitude of different components to create the various products for which Plaintiff claims to bring suit.

53     Plaintiff and/or the persons or entities Plaintiff seeks to represent sought and/or negotiated the pricing of CRT Products or stand-alone CRTs, which were ultimately placed within other products.

WHEREFORE, Plaintiff's claims should be dismissed to the extent that they are barred, in whole or in part, by Plaintiff's acquiescence and/or confirmation of any and all conduct and/or omissions alleged as to PENAC.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

### (Improper Forum/Arbitration)

54.     Plaintiff claims to bring suit on behalf of the State of Illinois, its agencies, and Illinois residents that purchased CRTs and CRT products.

55.     On information and belief, Plaintiff and/or the persons or entities Plaintiff seeks to represent have agreed to arbitration or chosen a different forum for the resolution of its claims.

WHEREFORE, Plaintiff's claims against PENAC are barred from litigation in this Court to the extent that Plaintiff and/or the persons or entities it seeks to represent have agreed to arbitration or chosen a different forum for the resolution of its claims.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

### (Adequate Remedy at Law)

56.     Plaintiff's claims for injunctive relief are inappropriate and should be dismissed because all of the alleged conduct has ceased, and Plaintiff and/or the persons and entities Plaintiff seeks to represent have available an adequate remedy at law.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

### (Failure to Join Indispensable Parties)

57.     On information and belief, CRTs moved through many different manufacturing distribution and retail channels and were combined with a multitude of different components to

create the various products for which Plaintiff claims to bring suit.

58.     Prices ultimately charged for those products are only distantly, if at all, related to the prices of the original CRTs.

59.     The parties involved in each step of the distribution and retail channels are indispensable to the ultimate price paid for products containing CRTs.

60.     Plaintiff failed to identity as Defendants all of the parties involved in these channels.

WHEREFORE, Plaintiff's claims should be dismissed to the extent that they are barred, in whole or in part, for failure to join indispensable parties.

<u>**TWENTY-FIFTH AFFIRMATIVE DEFENSE**</u>

**(Due Process)**

61.     On information and belief, CRTs moved through many different manufacturing distribution and retail channels and were combined with a multitude of different components to create the various products for which Plaintiff claims to bring suit.

62.     On information and belief, to the extent any persons and entities were overcharged for CRTs or CRT products, which PENAC denies, such persons and entities passed on those overcharges to persons and/or entities at later points in the manufacturing, distribution, and/or retail channel.

63.     Certain of these third-parties located at varied points in the manufacturing, distribution and retail channels have filed complaints seeking to recover damages for alleged overcharges for CRTs and CRT products.

64.     These complaints include both putative class and non-class actions. On information and belief, several of these complaints purport to bring claims on behalf of persons or entities who passed on any overcharge to Illinois residents, and/or persons or entities who claim to have purchased a CRT or CRT product from an Illinois resident.

65.     Taken together, the complaints seek multiple recoveries of the same alleged overcharges. Plaintiff's claims could result in PENAC paying damages to more than one claimant for the same alleged overcharge.

WHEREFORE, Plaintiff's claims are barred, in whole or in part, to the extent it seeks an improper multiple punitive award for a single wrong because such an award would violate PENAC's rights guaranteed by the Due Process provision of the Fourteenth Amendment of the

United States Constitution.

### TWENTY-SIXTH AFFIRMATIVE DEFENSE

**(Equal Protection)**

66.     On information and belief, CRTs moved through many different manufacturing distribution and retail channels and were combined with a multitude of different components to create the various products for which Plaintiff claims to bring suit.

67.     On information and belief, to the extent any persons and entities were overcharged for CRTs or CRT products, which PENAC denies, such persons and entities passed on those overcharges to persons and/or entities at later points in the manufacturing, distribution, and/or retail channel.

68.     Certain of these third-parties located at varied points in the manufacturing, distribution and retail channels have filed complaints seeking to recover damages for alleged overcharges for CRTs and CRT products.

69.     These complaints include both putative class and non-class actions. On information and belief, several of these complaints purport to bring claims on behalf of persons or entities who passed on any overcharge to Illinois residents, and/or persons or entities who claim to have purchased a CRT or CRT product from an Illinois resident.

70.     Taken together, the complaints seek multiple recoveries of the same alleged overcharges. Plaintiff's claims could result in PENAC paying damages to more than one claimant for the same alleged overcharge.

WHEREFORE, Plaintiff's claims are barred, in whole or in part, to the extent it seeks an improper multiple punitive award for a single wrong because such an award would violate PENAC's rights guaranteed by the Equal Protection provision of the Fourteenth Amendment of the United States Constitution.

### TWENTY-SEVENTH AFFIRMATIVE DEFENSE

**(Double Jeopardy)**

71.     Many alleged purchasers of CRTs and CRT finished products have filed complaints seeking to recover damages for alleged overcharges for CRTs and CRT products.

72.     These complaints include both putative class and non-class actions. On information and belief, several of these complaints purport to bring claims on behalf of persons or entities who passed on any overcharge to Illinois residents, and/or persons or entities who

claim to have purchased a CRT or CRT product from an Illinois resident.

73.     Taken together, the complaints seek multiple recoveries of the same alleged overcharges. Plaintiff's claims could result in PENAC paying damages to more than one claimant for the same alleged overcharge.

WHEREFORE, Plaintiff's claims are barred, in whole or in part, to the extent it seeks an improper multiple punitive award for a single wrong because such an award would violate PENAC's rights guaranteed by the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution.

**TWENTY-EIGHTH AFFIRMATIVE DEFENSE**

**(Excessive Fines)**

74.     Many alleged purchasers of CRTs and CRT finished products have filed complaints seeking to recover damages for alleged overcharges for CRTs and CRT products.

75.     These complaints include both putative class and non-class actions. On information and belief, several of these complaints purport to bring claims on behalf of persons or entities who passed on any overcharge to Illinois residents, and/or persons or entities who claim to have purchased a CRT or CRT product from an Illinois resident.

76.     Taken together, the complaints seek multiple recoveries of the same alleged overcharges. Plaintiff's claims could result in PENAC paying damages to more than one claimant for the same alleged overcharge.

WHEREFORE, Plaintiff's claims are barred, in whole or in part, to the extent it seeks an improper multiple punitive award for a single wrong because such an award would violate PENAC's rights guaranteed by the Excessive Fines provision of the Eighth Amendment of the United States Constitution.

**TWENTY-NINTH AFFIRMATIVE DEFENSE**

**(Unconstitutional Multiplicity)**

77.     Many alleged purchasers of CRTs and CRT finished products have filed complaints seeking to recover damages for alleged overcharges for CRTs and CRT products.

78.     These complaints include both putative class and non-class actions. On information and belief, several of these complaints purport to bring claims on behalf of persons or entities who passed on any overcharge to Illinois residents, and/or persons or entities who claim to have purchased a CRT or CRT product from an Illinois resident.

79.     Taken together, the complaints seek multiple recoveries of the same alleged overcharges. Plaintiff's claims could result in PENAC paying damages to more than one claimant for the same alleged overcharge.

WHEREFORE, to the extent any recovery by Plaintiff would be duplicative of recovery by other plaintiffs and other lawsuits, subjecting PENAC to the possibility of multiple recoveries, such recovery is barred by the Fifth and Eighth Amendments to the United States Constitution.

### THIRTIETH AFFIRMATIVE DEFENSE
### (Foreign Sales)

80.     On information and belief, some of the transactions as to which Plaintiff seeks to recover damages began with and/or involved intermediate transactions involving CRT or CRT finished product sales billed to non-U.S. locations, shipped to non-U.S. locations, or both.

81.     In addition, Defendants' alleged conduct did not have a direct, substantial, and reasonably foreseeable impact on import trade or import commerce.

82.     Plaintiff impermissibly seeks to recover damages based on foreign sales of CRTs.

83.     Plaintiff's claims pertain to conduct involving trade or commerce with foreign nations, other than import commerce, that did not have a direct, substantial and reasonably foreseeable effect on trade and commerce with foreign nations.

WHEREFORE, Plaintiff's claims are barred by 740 ILCS 10/5(14) which explicitly states that such conduct involving trade or commerce with foreign nations shall not be made illegal under the Illinois Antitrust Act.

### THIRTY-FIRST AFFIRMATIVE DEFENSE
### (Comparative Fault)

84.     On information and belief, CRTs moved through many different manufacturing distribution and retail channels and were combined with a multitude of different components to create the various products for which Plaintiff claims to bring suit.

85.     Plaintiff and/or the persons or entities Plaintiff seeks to represent sought and/or negotiated the pricing of CRT Products or stand-alone CRTs, which were ultimately placed within other products.

86.     Plaintiff's alleged injuries and those of the individuals they purport to represent, the fact and extent of which PENAC specifically denies, were therefore directly and proximately

caused or contributed to by the statements, act, and/or omissions of Plaintiff.

WHEREFORE, claims should be dismissed to the extent that they are barred, in whole or in part, due to the comparative fault of the Plaintiff.

## THIRTY-SECOND AFFIRMATIVE DEFENSE

### (Uncertainty of damages)

87.     On information and belief, CRTs moved through many different manufacturing distribution and retail channels and were combined with a multitude of different components to create the various products for which Plaintiff claims to bring suit.

88.     Prices ultimately charged for those products may be only distantly, if at all related to prices of the original CRTs, making any injury allegedly suffered by Plaintiff, or the persons or entities Plaintiff seeks to represent, speculative, attenuated, and difficult to calculate.

WHEREFORE, Plaintiff's claims should be dismissed because the alleged damages sought are too speculative and uncertain, and cannot be practicably ascertained or allocated.

## THIRTY-THIRD AFFIRMATIVE DEFENSE

### (Injury or Damages Offset by Benefits Received)

89.     On information and belief, CRTs moved through many different manufacturing distribution and retail channels and were combined with a multitude of different components to create the various products for which Plaintiff claims to bring suit.

90.     Plaintiff and/or the persons or entities Plaintiff seeks to represent received a benefit from the purchase of CRTs and/or products containing CRTs.

91.     Any alleged damages Plaintiff and/or the persons or entities Plaintiff seeks to represent were therefore offset by the benefit conferred upon them.

WHEREFORE, Plaintiff's claims should be dismissed to the extent that they are barred, in whole or in part, because any claimed injury or damage has been offset by benefits Plaintiff and/or the persons and entities Plaintiff seeks to represent received with respect to the challenged conduct.

## THIRTY-FOURTH AFFIRMATIVE DEFENSE

### (Proportionality)

92.     On information and belief, CRTs moved through many different manufacturing distribution and retail channels and were combined with a multitude of different components to create the various products for which Plaintiff claims to bring suit.

93.     Prices ultimately charged for those products may be only distantly, if at all related to prices of the original CRTs.

94.     Thus any alleged damage which may have occurred, the fact and extent of which PENAC denies, PENAC would only be proportionately responsible, if at all.

WHEREFORE, to the extent PENAC is found liable for damages, the fact and extent of which are expressly denied by PENAC, those damages must be reduced in proportion to PENAC's degree of fault.

### THIRTY-FIFTH AFFIRMATIVE DEFENSE
### (Release)

95.     Plaintiff purports to bring suit on behalf of the State of Illinois, its agencies, and Illinois residents that purchased CRTs and CRT products.

96.     On information and belief, Plaintiff and/or the persons or entities that Plaintiff seeks to represent have released the claims that Plaintiff seeks to bring in this suit.

WHEREFORE, Plaintiff's claims which have been previously released are barred.

### THIRTY-SIXTH AFFIRMATIVE DEFENSES
### (Improper Venue)

97.     PENAC is not headquartered in Illinois.

98.     No part of the alleged transactions of which this cause of action arises occurred in Cook County, Illinois.

WHEREFORE, venue is improper under 735 Ill. Comp. Stat. 5/2-101.

### THIRTY-SEVENTH AFFIRMATIVE DEFENSES
### (Improper Extraterritorial Application)

99.     PENAC is not headquartered in Illinois nor is its principal place of business located in Illinois.

100.    Plaintiff's claims seek to apply Illinois law extraterritorially to transactions occurring outside Illinois.

WHEREFORE, Plaintiff's claims are barred, in whole or in part, by the U.S. Constitution and/or applicable state law to the extent its claims seeks the extraterritorial application of Illinois law to any transactions occurring outside Illinois.

## THIRTY-EIGHTH AFFIRMATIVE DEFENSES

### (Acts outside the Jurisdiction)

101.   PENAC is not headquartered in Illinois nor is its principal place of business located in Illinois.

WHEREFORE, Plaintiff's claims are barred, in whole or in part, to the extent PENAC's alleged conduct occurred outside the jurisdiction of this Court and/or was neither directed to nor affected persons, entities, or commerce in Illinois.

## THIRTY-NINTH AFFIRMATIVE DEFENSE

### (Lack of Subject Matter Jurisdiction)

102.   Plaintiff's claims are based entirely on alleged conduct involving commerce with foreign nations that did not involve U.S. import trade or commerce.

103.   The alleged conduct did not have a direct, substantial, nor reasonably foreseeable effect on U.S. domestic, import, or export commerce.

WHEREFORE, the Court, therefore, lacks subject matter jurisdiction of the claims of Plaintiff.

## FORTIETH AFFIRMATIVE DEFENSE

### (Failure to Allege Fraud or Fraudulent Conspiracy with Particularity)

104.   Plaintiff's allegations fail to plead allegations of fraud or fraudulent concealment with sufficient particularity.

105.   For example, Plaintiff fails to identity the alleged means by which the alleged co-conspirators concealed the conspiracy, when such means occurred, what actors were involved in such efforts, nor how Plaintiff and/or the persons or entities it seeks to represent exercised reasonable diligence to discover the alleged conspiracy.

WHEREFORE, Plaintiff's claims are barred, in whole or in part, because Plaintiff has failed to allege fraud or fraudulent concealment with sufficient particularity.

## FORTY-FIRST AFFIRMATIVE DEFENSE

### (Failure to Plead Conspiracy with Particularity)

106.   Plaintiff's allegations fail to plead allegations of conspiracy with sufficient particularity.

107.   For example, Plaintiff fails to sufficiently identity the alleged ways by which

PENAC, either directly or indirectly, participated in the conspiracy alleged in the Amended Complaint.

WHEREFORE, Plaintiff's claims should be dismissed to the extent that they are barred, in whole or in part, because Plaintiff has failed to allege conspiracy with sufficient particularity, especially as it relates to PENAC.

## FORTY-SECOND AFFIRMATIVE DEFENSE
### (Other Defenses Incorporated by Reference)

108.    PENAC adopts and incorporates by reference any and all other affirmative defenses asserted or to be asserted by any other defendant in this proceeding to the extent that PENAC may share in such affirmative defenses.

## FORTY-THIRD AFFIRMATIVE DEFENSE
### (Reservation of Rights to Assert Additional Defenses)

109.    PENAC has not knowingly or intentionally waived any applicable defenses.

110.    PENAC explicitly reserves the right to assert and rely on such other applicable defenses as may become available or apparent during discovery proceedings.

WHEREFORE, PENAC explicitly reserves the right to assert and rely on any such other applicable defense that may become available or apparent during discovery proceedings, and PENAC further reserves the right to amend its Answer and/or its defenses accordingly, and/or to delete defenses that it determines are not applicable during the course of subsequent discovery.


**WHEREFORE**, PENAC prays as follows:

111.    That Plaintiff takes nothing by way of the Amended Complaint and the Amended Complaint be dismissed with prejudice;

112.    That judgment be entered in favor of PENAC and against Plaintiff on each and every claim for relief set forth in the Amended Complaint;

113.    That PENAC recover its costs of suit and attorneys' fees incurred herein; and

114.    That PENAC be granted such other and further relief as the Court deems just and proper.

Dated: April 18, 2014

Respectfully submitted,

By: _____
David C. Gustman, (ARDC 3124377)
Jeffery M. Cross (ARDC 0547980)
Tonita M. Helton (ARDC 6275108)
Freeborn & Peters LLP
311 S. Wacker Drive, Suite 300
Chicago, IL 60606
Tel: 312-360-6000
Fax: 312-360-6520
E-mail:  dgustman@freebornpeters.com

John M. Taladay (*pro hac vice*)
Erik T. Koons (*pro hac vice*)
Charles M. Malaise (*pro hac vice*)
BAKER BOTTS LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2400
202.639.7700
202.639.7890 (fax)
Email:  john.taladay@bakerbotts.com
Email:  erik.koons@bakerbotts.com
Email:  charles.malaise@bakerbotts.com

***Counsel for Defendant Philips Electronics
North America Corporation***

## CERTIFICATION OF LACK OF KNOWLEDGE

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned is submitting this certification in regard to the statements made of no sufficient knowledge sufficient to form a belief as to the truth or falsity of the allegation being answered.  The undersigned certifies that such statements of no knowledge are true and correct based upon reasonable inquiry and to the best of my knowledge.

Philips Electronics North America Corporation

By: _____

## CERTIFICATE OF SERVICE

I do hereby certify that on this 18th day of April, 2014, I caused to be served a true and correct copy of the foregoing *Philips Electronics North America Corporation's Answer and Affirmative Defenses to Plaintiff's Complaint* and *the Certification of Lack of Knowledge* by method indicated below and addressed to the following:

| | |
|---|---|
| Blake Harrop<br>Jamie Manning<br>Antitrust Bureau<br>Office of the Illinois Attorney General<br>100 West Randolph Street<br>Chicago, Illinois 60601<br>Telephone: (312) 814-5470<br>Email: bharrop@atg.state.il.us<br>Email: jmanning@atg.state.il.us<br>*Counsel for Plaintiff Attorney General of Illinois* | *Delivery Via:*<br>[ ] U.S. Mail<br>[ ] Overnight Mail<br>[ ] Facsimile<br>[ ] Hand Delivery<br>[ ] E-Service (if opted in)<br>[■] E-Mail |
| James H. Mutchnik<br>Kate Wheaton<br>KIRKLAND & ELLIS LLP<br>300 North LaSalle Street<br>Chicago, IL 60654<br>Telephone: (312) 862-2000<br>Fax: (312) 862-2200<br>Email: jmutchnik@kirkland.com<br>      kate.wheaton@kirkland.com<br>*Counsel for Hitachi, Ltd..* | *Delivery Via:*<br>[ ] U.S. Mail<br>[ ] Overnight Mail<br>[ ] Facsimile<br>[ ] Hand Delivery<br>[ ] E-Service (if opted in)<br>[■] E-Mail |
| John C. Martin<br>LAW OFFICES OF JOHN C. MARTIN LLC<br>30 North LaSalle Street<br>Suite 3400<br>Chicago, IL 60602<br>Telephone: 312-368-9000<br>206.340.9599 (fax)<br>Email: jmartin@johnmartinlawoffices.com<br><br>*Counsel for LG Electronics USA, Inc.* | *Delivery Via:*<br>[ ] U.S. Mail<br>[ ] Overnight Mail<br>[ ] Facsimile<br>[ ] Hand Delivery<br>[ ] E-Service (if opted in)<br>[■] E-Mail |

| | |
|---|---|
| Hojoon Hwang<br>MUNGER, TOLLES & OLSON LLP<br>560 Mission Street, Twenty-Seventh Floor<br>San Francisco, CA 94105<br>Tel: 415-512-4000<br>Fax: 415-512-4077<br>Email: Hojoon.Hwang@mto.com<br><br>*Counsel for Defendant LG Electronics U.S.A., Inc.* | *Delivery Via:*<br>[ ]U.S. Mail<br>[ ] Overnight Mail<br>[ ] Facsimile<br>[ ] Hand Delivery<br>[ ] E-Service (if opted in)<br>[■] E-Mail |
| Daniel Cummings<br>Alan Madans<br>55 West Monroe Str.<br>Suite 3900<br>Chicago, IL 60603<br>Telephone:  (312) 372-2345<br>Fax: 312-372-2350<br>E-mail:  cummings@rbmchicago.com<br>          madans@rbmchicago.com<br><br>*Counsel for Toshiba Corporation and Toshiba America Electronics Components, Inc.* | *Delivery Via:*<br>[ ]U.S. Mail<br>[ ] Overnight Mail<br>[ ] Facsimile<br>[ ] Hand Delivery<br>[ ] E-Service (if opted in)<br>[■] E-Mail |
| Christopher M. Curran<br>George L. Paul<br>Lucius B. Lau<br>Dana E. Foster<br>White & Case<br>701 Thirteenth Street, N.W.<br>Washington, DC 20005<br>Telephone: (202) 626-3600<br>Email: ccurran@whitecase.com<br>       gpaul@whitecase.com<br>       alau@whitecase.com<br>       defoster@whitecase.com<br><br>*Counsel for Toshiba Corporation and Toshiba America Electronics Components, Inc.* | *Delivery Via:*<br>[ ] U.S. Mail<br>[ ] Overnight Mail<br>[ ] Facsimile<br>[ ] Hand Delivery<br>[ ] E-Service (if opted in)<br>[■] E-Mail |

| | |
|---|---|
| Daniel G. Rosenberg<br>Catherine B. Diggins<br>SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP<br>Three First National Plaza<br>70 West Madison Street, 48th Floor<br>Chicago, Illinois 60602<br>Tel: 312-499-6300<br>Fax: 312-499-6301<br>Email: drosenberg@sheppardmullin.com<br>Email: cdiggins@sheppardmullin.com | *Delivery Via:*<br>[ ] U.S. Mail<br>[ ] Overnight Mail<br>[ ] Facsimile<br>[ ] Hand Delivery<br>[ ] E-Service (if opted in)<br>[■] E-Mail |
| Michael Scarborough<br>Tyler M. Cunningham<br>Sheppard Mullin Richter & Hampton LLP<br>4 Embarcadero Center, 17th Floor<br>San Francisco, CA 94111<br>Telephone: (415) 434-9100<br>Fax: (415) 434-3947<br>Email: mscarborough@sheppardmullin.com<br>Email: tcunningham@sheppardmullin.com<br><br>*Counsel for Samsung SDI America, Inc., Samsung Display Device Co., Ltd.* | *Delivery Via:*<br>[ ] U.S. Mail<br>[ ] Overnight Mail<br>[ ] Facsimile<br>[ ] Hand Delivery<br>[ ] E-Service (if opted in)<br>[■] E-Mail |
| DUANE M. KELLEY<br>Email: dkelley@winston.com<br>JAMES F. HERBISON<br>Email: jherbison@winston.com<br>WINSTON & STRAWN LLP<br>35 West Wacker Drive<br>Chicago, IL 60601<br>Telephone: (312) 558-5600<br>Facsimile: (312) 558-5700<br>Firm No. 90875<br><br>*Counsel for Panasonic Corporation, Panasonic Corporation of North America, and MT Picture Display Co., Ltd.* | *Delivery Via:*<br>[ ] U.S. Mail<br>[ ] Overnight Mail<br>[ ] Facsimile<br>[ ] Hand Delivery<br>[ ] E-Service (if opted in)<br>[■] E-Mail |

| | |
|---|---|
| JEFFREY L. KESSLER<br>Email: jkessler@winston.com<br>EVA W. COLE<br>Email: ewcole@winston.com<br>MOLLY M. DONOVAN<br>Email: mmdonovan@winston.com<br>WINSTON & STRAWN LLP<br>200 Park Avenue<br>New York, New York 10166-4193<br>Telephone: (212) 294-6700<br>Facsimile: (212) 294-7400<br><br>*Counsel for Panasonic Corporation, Panasonic Corporation of North America, and MT Picture Display Co., Ltd.* | *Delivery Via:*<br>[ ]U.S. Mail<br>[ ] Overnight Mail<br>[ ] Facsimile<br>[ ] Hand Delivery<br>[ ] E-Service (if opted in)<br>[■] E-Mail |
| STEVEN A. REISS<br>Email: steven.reiss@weil.com<br>DAVID L. YOHAI<br>Email: david.yohai@weil.com<br>ADAM C. HEMLOCK<br>Email: adam.hemlock@weil.com<br>WEIL, GOTSHAL & MANGES LLP<br>767 Fifth Avenue<br>New York, New York 10153-0119<br>Telephone: (212) 310-8000<br>Facsimile: (212) 310-8007<br><br>*Counsel for Panasonic Corporation, Panasonic Corporation of North America, and MT Picture Display Co., Ltd.* | *Delivery Via:*<br>[ ]U.S. Mail<br>[ ] Overnight Mail<br>[ ] Facsimile<br>[ ] Hand Delivery<br>[ ] E-Service (if opted in)<br>[■] E-Mail |

DATED this 18th day of April, 2014.

David C. Gustman (ARDC 3124377)
Freeborn & Peters LLP
311 S. Wacker Drive, Suite 300
Chicago, IL 60606
Tel: 312-360-6000
Fax: 312-360-6520
E-mail: thelton@freebornpeters.com

*Counsel for Defendant Philips Electronics North America Corporation*