UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | MDL No. 1917<br>Case No. C-07-5944 JST |
| This Order Relates To:<br><br>INDIRECT-PURCHASER ACTIONS;<br><br>*Sharp Electronics Corp., et. al. v. Hitachi Ltd., et al.*, No. 13-cv-01173;<br><br>*Electrograph Sys., Inc., et al. v. Hitachi, Ltd., et al.*, No. 11-cv-01656;<br><br>*Electrograph Sys., Inc., et al. v. Technicolor SA, et al.*, No. 13-cv-05724;<br><br>*Siegel v. Hitachi, Ltd., et al.*, No. 11-cv-05502;<br><br>*Siegel v. Technicolor SA, et al.*, No. 13-cv-05261;<br><br>*Best Buy Co., Inc., et al. v. Hitachi, Ltd., et al.*, No. 11-cv-05513;<br><br>*Best Buy Co., Inc., et al. v. Technicolor SA, et al.*, No. 13-cv-05264;<br><br>*Target Corp. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 11-cv-05514;<br><br>*Target Corp. v. Technicolor SA, et al.*, No. 13-cv-05686;<br><br>*Sears, Roebuck & Co., et al. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 11-cv-05514;<br><br>*Sears, Roebuck & Co., et al. v. Technicolor SA, et al.*, No. 13-cv-05262; | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

*Interbond Corp. of Am. v. Hitachi, Ltd., et al.*, No. 11-cv-06275;

*Interbond Corp. of Am. v. Technicolor SA, et al.*, No. 13-cv-05727;

*Office Depot, Inc. v. Hitachi, Ltd., et al.,* No. 11-cv-06276;

*Office Depot, Inc. v. Technicolor SA, et al.*, No. 13-cv-05726;

*CompuCom Systems, Inc. v. Hitachi, Ltd., et al.*, No. 11-cv-06396;

*P.C. Richard & Son Long Island Corp., et al. v. Hitachi, Ltd., et al.*, No. 12-cv-02648;

*P.C. Richard & Son Long Island Corp., et al. v. Technicolor SA, et al.*, No. 13-cv-05725;

*Schultze Agency Servs., LLC v. Hitachi, Ltd., et al.*, No. 12-cv-02649;

*Schultze Agency Servs., LLC v. Technicolor SA, et al.*, No. 13-cv-05668;

*Tech Data Corp., et al. v. Hitachi, Ltd., et al.*, No. 13-cv-00157

*Viewsonic Corp. v. Chunghwa Picture Tubes, Ltd., et al.*, No. 14-cv-02510.

Before the Court is Defendant Panasonic Corporation of North America ("PNA") and Panasonic Corporation's ("Panasonic Corp.") (collectively "Defendants") Motion for Summary Judgment. ECF No. 2998-4. The Court grants the motion in part and denies it in part.

## I.     BACKGROUND

The factual history is well known to the parties and has been recited in the Court's prior orders. By way of summation, this case is predicated upon an alleged conspiracy to fix the prices of cathode ray tubes ("CRTs"), a core component of tube-style screens for common devices including televisions and computer monitors. The conspiracy ran from March 1, 1995 to November 25, 2007 (the "Conspiracy Period"), involved many of the major companies that produced CRTs, and allegedly resulted in overcharges of billions of U.S. dollars to domestic companies that purchased and sold CRTs or products containing CRTs ("CRT Finished

2

Products"). A civil suit was originally filed in 2007, ECF No. 1, consolidated by the Joint Panel on Multidistrict Litigation shortly thereafter, see ECF No. 122, assigned as a Multidistrict Litigation case ("MDL") to Judge Samuel Conti, see id., and ultimately transferred to the undersigned, see ECF No. 4162. In addition to two class actions, this MDL involves various direct actions from individual plaintiffs who opted out of the class actions, including the DAPs that oppose the present motions. Each DAP alleges that it bought at least one CRT Finished Product from a Defendant or an entity owned or controlled by a Defendant.

The following facts are relevant specifically to the instant motion. Panasonic Corp., which also operated under the name Matsushita Electric Industrial Co, Ltd., manufactured CRTs during the Conspiracy Period. ECF No. 2998-4 at 11. Panasonic Corp. exited the CDT business in 2001 and the CPT business by April 2003. ECF No. 2998-9 at 9; ECF No. 2998-6 at 3. PNA was the CRT sales subsidiary of Panasonic Corp in the United States. 2998-4 at 11. PNA, then called Matsushita Electric Corporation of America, owned a CPT factory called Matsushita Display Devices Company of America, and exited the CRT business in 2003. ECF No. 2998-11 at 2.

Defendants now move for summary judgment, arguing that there is no direct evidence that either Panasonic Corp. or PNA participated in the conspiracy, nor is there circumstantial evidence sufficient to support an inference of participation. ECF No. 2998-4.

## II.   LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by" citing to depositions, documents, affidavits, or other materials. Fed. R. Civ. P. 56(c)(1)(a). A party also may show that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). An issue is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986). A fact is "material" if the fact may affect the outcome of the case. Id. at 248. "In considering a motion for summary judgment, the court may not weigh the evidence or make

3

credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party. Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).

Where the party moving for summary judgment would bear the burden of proof at trial, that party bears the initial burden of producing evidence that would entitle it to a directed verdict if uncontroverted at trial. See C.A.R. Transp. Brokerage Co. v. Darden Rests, Inc., 213 F.3d 474, 480 (9th Cir. 2000). Where the party moving for summary judgment would not bear the burden of proof at trial, that party bears the initial burden of either producing evidence that negates an essential element of the non-moving party's claim, or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. If the moving party satisfies its initial burden of production, then the non-moving party must produce admissible evidence to show that a genuine issue of material fact exists. See Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102–03 (9th Cir. 2000). The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996). Indeed, it is not the duty of the district court "to scour the record in search of a genuine issue of triable fact." Id. "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the non-moving party must introduce some significant probative evidence tending to support the complaint." Summers v. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997) (citation and internal quotations omitted). If the non-moving party fails to make this showing, the moving party is entitled to summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

"In antitrust cases, these general standards are applied even more stringently and summary judgments granted more sparingly." Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n, 620 F.2d 1360, 1364 (9th Cir. 1980). As a general matter, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. . . . The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 698–99 (1962) (alterations omitted). Nonetheless, "conduct as consistent with permissible competition as with illegal conspiracy does

4

1  not, standing alone, support an inference of antitrust conspiracy." Matsushita Elec. Indus. Co. v.
2  Zenith Radio Corp., 475 U.S. 574, 588 (1986). Rather, to defeat a motion for summary judgment,
3  "a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the
4  possibility" that the alleged conspirators acted independently.'" Id. (quoting Monsanto Co. v.
5  Spray-Rite Service Corp., 465 U.S. 752, 764 (1984)).

### III.  ANALYSIS

#### A.  Panasonic Corp.'s Participation in the Conspiracy

Plaintiffs have amassed sufficient evidence suggesting that Panasonic Corp. participated in the CRT conspiracy to defeat summary judgment.[1]

#### 1.  Group Meetings

First, as Defendants acknowledge, a Panasonic employee, Allen Chang, attended a group meeting on March 12, 1997, where various defendants in this case conspired to fix CRT prices. ECF No. 3248-13 at 5-6.[2] Minutes from the meeting document that the attendees discussed future CRT production levels, agreed on CRT price increases, and planned for future group meetings.[3] ECF No. 3248-11 at 3-4. For example, the minutes contain a chart with CRT production levels for March and April, even though the meeting took place mid-March. Id. That chart includes "MEC," a Panasonic entity. Id. The minutes also note that "[e]ach maker indicated that a price increase would be inevitable," although no Panasonic entity is listed among those who agreed on the "bottom price of $67." Id.[4]

---

[1] The parties dispute whether Plaintiffs' evidence is direct or circumstantial. The Court need not address that distinction here, because even construed as circumstantial, Plaintiffs' evidence is more consistent with participation in the conspiracy than with procompetitive, independent behavior.

[2] Plaintiffs do not argue that Defendants were present at other group meetings, so the Court disagrees with Defendants' claim that it was disingenuous for Plaintiffs to omit deposition testimony to that effect. ECF No. 3457-4 at 7.

[3] "It is understood that there would be a top-level meeting in Korea on 3/22. Everybody should get together again after the meeting to have more communications." Id.

[4] "Later on, SDD, LG, PH, and CPT all indicated the bottom price of $67 for MPRII's." Id.

1   Defendants respond by arguing that Chang "attended the meeting only for a 'very short
2   time,' leaving at the first break because he concluded he did not belong there," ECF No. 2998-4 at
3   13, but the evidence is not entirely consistent with this characterization.  Chang testified that the
4   "only reason" he left the meeting early was "because the attendees who were present there, they
5   all had pretty high ranking, high titles.  And Samsung was complaining that my title ranking was
6   too low."  ECF No. 3248-13 at 5-6.  Chang's departure does not suggest that Panasonic was
7   uninvolved in the conspiracy, but only that the other attendees preferred someone higher up in the
8   Panasonic organization.  And although minutes do not mention any Panasonic entity in describing
9   the price agreement, the fact that Chang must have offered Panasonic's future production
10  information suggests that he participated in the meeting before leaving.  His participation, even if
11  isolated, is more consistent with anticompetitive conduct than with legitimate business activity.

### 2. Bilateral Meetings

Next, Plaintiffs offer evidence that Chang and his supervisor, Michael Hsu, attended numerous bilateral meetings during the Conspiracy Period.  Hsu testified that he attended over ten meetings with Chunghwa, five to six meetings with Hitachi Taiwan, five to six meetings with Toshiba Taiwan, and two or three meetings with LG Taiwan.  ECF No. 3248-12 at 4-14.  Chang also described attending bilateral meetings with competitors, including Chunghwa.  ECF No. 3248-13 at 7.

Defendants admit that some bilateral meetings took place,[5] but dispute Plaintiffs' claim that their purpose was to unlawfully convey information and agreements related to the CRT conspiracy reached in the larger group meetings.  Defendants emphasize that Hsu described his goal during the meetings as obtaining information about the CRT "market situation and customer situation," both permissible, procompetitive topics.  ECF No. 3457-6 at 4.  Defendants also note that C.C. Liu, a Chunghwa representative who attended bilateral meetings with Hsu, testified that his "visits to Matsushita were not tied with the group meetings."  ECF No. 3248-8 at 11.

---

[5] In light of this testimony, the Court disagrees with Defendants' claim that "Plaintiffs only cite evidence of seven scattered bilateral meetings." ECF No. 3457-4 at 18.

6

1   But there is also considerable contrary evidence that the bilateral meetings were used to
2   facilitate Panasonic Corp.'s participation in the conspiracy. Chang, the Panasonic employee who
3   attended the group meeting, described the bilateral meetings in anticompetitive terms, explaining
4   that his boss expected him to "obtain the shipment volume of the finished products" of Panasonic
5   Corp.'s competitors. ECF No. 3248-13 at 4. And Chang responded "yes" when asked whether he
6   recalled that "from time to time in your meetings with Chunghwa they would ask you to follow
7   the agreements reached on pricing at group meetings with your other competitors." ECF No.
8   3248-13 at 7. Moreover, Hsu admitted that that, in retrospect, the bilateral meetings were
9   "inappropriate," and testified that "I think to hold meetings with competitors was not the right
10  thing, basically." ECF No. 3248-12 at 9-10.

11  The temporal proximity of the group and bilateral meetings, together with notes from those
12  meetings, further supports Plaintiffs' version of events. For example, notes from one of the CRT
13  group meetings describe how Samsung "[v]isited Matsushita July l6 as the representative of
14  Japanese cathode ray tube (CRT) representative and provided information on the agreements
15  reached by 5 Korean and Taiwan companies." ECF No. 3248-14 at 5. Similarly, several weeks
16  after a July 1998 group meeting to dismiss "maintaining the price of 17" [CRTs] as 93 dollars,"
17  ECF No. 3248-21 at 4, there is evidence that Chunghwa filled Panasonic representatives in on the
18  agreement during a bilateral meeting. Chunghwa's notes from the bilateral meeting state:

> Director Liu [of Chunghwa] explained that starting on August 1, price increase has effectively been implemented. Based on current market condition and in order to pursue a profitable operation, another price increase is being brewed for October l. Actual scale of increase shall be confirmed at beginning of September. Regarding the suspicion on possible oversupply condition on 17", Director Liu also indicated to Matsushita its determination on controlling the price by volume; the entire industry would be jointly to control output volume in order to maintain pricing. . . . Mr. Hsu said he will notify Chunghwa when price increase is confirmed this week.

24  ECF No. 3248-20 at 4. Liu described things somewhat more ambiguously in his deposition when
25  asked whether "somebody at the glass meetings/group meetings [was] assigned to go talk to
26  Matsushita." He responded, "[t]heoretically there must be one. However, it was not a major
27  player, therefore, not many times this company was approached . . . . We would have a general
28  visit to that company talking our situations, their situations. <u>Also the agreement we reached</u>."

7

ECF No. 3248-8 at 9-10 (emphasis added). This testimony and Chunghwa's notes contradict Liu's testimony, emphasized by Defendants, that his "visits to Matsushita were not tied with the group meetings." ECF No. 3248-8 at 11.

At bottom, there is conflicting evidence about the purpose of the bilateral meetings. A jury, not the Court, should determine whose characterization of those meetings is most credible. Therefore, in deciding whether there are disputes of material fact as to Panasonic Corp.'s participation in the conspiracy, the Court assumes that the purpose of the bilateral meetings was to loop Panasonic Corp. into the details of the CRT conspiracy, not to exchange benign market information.

In addition to arguing generally that Panasonic employees attended bilateral meetings with a conspiratorial purpose, Plaintiffs argue specifically that there is evidence that Panasonic Corp. actually agreed to follow the price agreements set at the group meetings. As with the purpose of the meetings, there is conflicting evidence about Panasonic Corp.'s reaction when asked by competitors to follow CRT price agreements. A memorandum documenting an April, 23 1997 group meeting highlights the confusion. One section of the memo states that "Taiwan Matsushita did not agree with the price increase of its headquarters," ECF No. 3248-9 at 3, while section said "[a]s long as it is sure that all other CRT makers have raised prices, MEC will immediately follow," id. at 4. A similar contradiction appears in a memo regarding a bilateral meeting between Panasonic and Chunghwa. Defendants emphasize the note that "MEC hoped that there would be greater momentum in quantity for 14" and 15" and therefore would not be actively raising their prices," ECF No. 3248-23 at 4, while Plaintiffs focus on a handwritten comment on the same document saying "SDD Na. Na said last week he met MEC's Japanese boss in Korea who said MEC would definitely raise prices on May 1st," id. at 3. And Samsung's notes from a 1998 group meeting report that Matsushita representatives "[e]xpressed their intention to participate actively" in the agreements reached by 5 Korean and Taiwan companies." ECF No. 3248-14 at 5. Those notes end with the bullet point: "Caution against ANTITRUST LAWS." Id. Which of these conflicting notes reveals the truth regarding Panasonic Corp.'s agreement is a disputed fact that a jury must resolve.

Defendants argue that a good portion of this evidence relates to Panasonic's Taiwan affiliate, not to Panasonic Corp. itself. And it is true that Chang and Hsu were both employees of Panasonic's Taiwan affiliate. But this argument is ultimately unsuccessful for several reasons. First, Panasonic Corp. is the parent company of the Taiwanese affiliate. ECF No. 3457-4 at 11. Of course, this corporate relationship alone is insufficient to impose liability on Panasonic Corp., United States v. Bestfoods, 524 U.S. 51, 60 n.7, 61 (1998), but the content of the meetings suggests that Chang and Hsu did not participate in the group and bilateral meetings solely on behalf of their affiliate entity. For example, Chunghwa's notes from a bilateral meeting describe price agreements for 21" CRTs, ECF No. 3248-16 at 3-4, which Plaintiffs argue were one of the primary products in Panasonic's U.S. portfolio, ECF No. 3248-19 at 3. Other Chunghwa notes reference Panasonic's American business directly, reporting that "U.S. (AMEC) will add one production line of 17' CDT at beginning of '98." ECF No. 3248-17 at 3. Moreover, some of the notes from bilateral and other meetings discussed above refer to "MEC," "Matsushita," or Panasonic's "headquarters" without specifying which entity they mean. Particularly given Panasonic Corp.'s position at the top of the Panasonic organizational chart, ECF No. 2998-10 at 2, these facts lead the Court to reject Panasonic Corp.'s efforts to distance itself from Plaintiffs' evidence.

In light of Plaintiffs' evidence that Panasonic Corp. participated in group and bilateral meetings where production and price agreements were discussed and agreed to, Panasonic Corp. is not entitled to summary judgment. Despite Defendants' efforts to persuade the Court otherwise, Citric Acid II does not direct a different result. In re Citric Acid Litig., 191 F.3d 1090, 1097 (9th Cir. 1999) ("Citric Acid II"). There "although the evidence ma[de] clear that representatives of the admitted conspirators gathered in 'unofficial' meetings to fix prices and to allocate market shares—often in the same city as, and within a few days of, officially scheduled [trade group] meetings—there [wa]s no evidence that illegal activities took place during [trade group] meetings attended by [the defendant's] representatives." Id. "Nor [wa]s there evidence that [the defendant] participated in any of the 'unofficial' meetings." Id. The same is not true here. Plaintiffs have presented considerable evidence that Panasonic Corp. representatives attended group and bilateral

meetings where they exchanged confidential production and price information and agreed to follow illegal price agreements.

Instead, the facts here are more similar to In re TFT-LCD (Flat Panel) Antitrust Litig., No. 12-CV-4114 SI, 2013 WL 3387652 (N.D. Cal. July 8, 2013), in which the court rejected defendant Toshiba's motion for summary judgment and distinguished In re Citric Acid II. The court concluded that although Toshiba did not participate in any group, or "crystal," meetings, "circumstantial evidence exists from which a jury could conclude that 'Toshiba was informed of the decisions reached at crystal meetings through bilateral communications with other [] manufacturers[,] ... [and] Toshiba received pricing information from its competitors, shared its own pricing information, and was aware of its wrongdoing.'" Id. at *1-2. Like Panasonic Corp., "Toshiba assert[ed that] these exchanges [we]re legitimate exchanges of information," but the LCD court concluded that "such disputes regarding the interpretation of evidence [were] not appropriate for resolution on summary judgment." Id. The same logic applies here. Panasonic Corp. may ultimately prove that Chang left the group meeting because Panasonic Corp. had no interest in the conspiracy, that the bilateral meetings were unrelated to the group meetings, or that no Panasonic Corp. representative ever agreed to raise prices to advance the conspiracy. But given the evidence before the Court now, those facts are all disputed ones that a jury must resolve.[6]

### B.   PNA's Participation in the Conspiracy

PNA presents a different situation. With one small exception, the evidence catalogued above neither relates directly to PNA nor involves PNA employees. Unlike Panasonic Corp., there is no evidence that PNA had any control over the people engaging in what may have been anticompetitive conduct. One meeting minutes summary did reference Panasonic's U.S. operations. E.g., ECF No. 3248-17 at 3 (Chunghwa notes reporting that "U.S. (AMEC) will add one production line of 17' CDT at beginning of '98"). But that isolated mention of PNA is

---

[6] Given this finding, the Court does not address Plaintiffs' alternative argument that Panasonic Corp. participated in the conspiracy through the acts of MT Picture Display Co. Ltd ("MTPD"). ECF No. 3248-4. The Court assumes this argument related only to Panasonic Corp., as Plaintiffs make no effort to connect MTPD to PNA.

insufficient to create a dispute of material fact as to PNA's participation in the CRT conspiracy.

### C.   Defendants' Economic Evidence

In addition to responding to Plaintiffs' evidence of group and bilateral meeting attendance, Defendants offer economic evidence that they say shows their "interests were not aligned with the alleged twelve-year cartel and their alleged participation thus made no economic sense." ECF No. 2998-4 at 26. Defendants claim 1) their CRT prices were lower than the alleged CRT target prices, 2) the cartel fixed prices for tube sizes that Defendants did not sell in the United States, 3) Defendants were small players in the CRT industry and unimportant to the conspiracy, and 4) Defendants' capacity changes during the conspiracy were consistent with Sony's, which is not alleged to be a conspirator. Id.

None of these economic arguments require the Court to enter summary judgment in Defendants' favor. First, several of these claims rest on disputed facts. For example, Plaintiffs argue that Defendants' expert analysis comparing Defendants' CRT prices to their competitors' is flawed. ECF No. 3248 at 28. They also dispute any comparison with Sony, arguing that Sony focused on "high-end, high-quality niches." Id. at 30. Second, even if Defendants' economic claims were true, they do not necessarily require a finding that Defendants did not participate in the conspiracy. Small players can still take part in a larger conspiracy. ECF No. 3248-4 at 29. The fact that prices are fixed for certain types of tubes can affect the prices of tubes for which there appears to be no price agreement. Id.  Moreover, even if Defendants are not liable for MTPD's alleged conspiratorial conduct, the formation of that entity does provide a reason why Defendants would have participated in the conspiracy, despite ending their own CRT business in by 2003. Id. at 30. In sum, Defendants' economic evidence does not alter the Court's conclusion.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

**CONCLUSION**

The Court grants the motion for summary judgment as to PNA, and denies it as to Panasonic Corp.

IT IS SO ORDERED.

Dated: February 27, 2017

_____
JON S. TIGAR
United States District Judge