UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION

This Order Relates To:

Electrograph Sys., Inc. v. Hitachi, Ltd., No. 11-cv-01656;

Electrograph Sys., Inc. v. Technicolor SA, No. 13-cv-05724;

Siegel v. Hitachi, Ltd., No. 11-cv-05502;

Siegel v. Technicolor SA, No. 13-cv-05261;

Best Buy Co., Inc. v. Hitachi, Ltd., No. 11-cv-05513;

Best Buy Co., Inc. v. Technicolor SA, No. 13-cv-05264;

Interbond Corp. of Am. v. Hitachi, Ltd., No. 11-cv-06275;

Interbond Corp. of Am. v. Technicolor SA, No. 13-cv-05727;

Office Depot, Inc. v. Hitachi, Ltd., No. 11-cv-06276;

Office Depot, Inc. v. Technicolor SA, No. 13-cv-05726;

CompuCom Sys., Inc. v. Hitachi, Ltd., No. 11-cv-06396;

P.C. Richard & Son Long Island Corp. v. Hitachi, Ltd., No. 12-cv-02648;

P.C. Richard & Son Long Island Corp. v. Technicolor SA, No. 13-cv-05725;

MDL No. 1917

Case No. C-07-5944 JST

**ORDER DENYING DEFENDANT KONINKLIJKE PHILIPS N.V.'S MOTION FOR SUMMARY JUDGMENT**

United States District Court
Northern District of California

Schultze Agency Servs., LLC v. Hitachi, Ltd., No. 12-cv-02649;

Schultze Agency Servs., LLC v. Technicolor SA, No. 13-cv-05668;

Tech Data Corp. v. Hitachi, Ltd., No. 13-cv-00157;

Dell Inc. v. Hitachi Ltd., No. 13-cv-02171;

Sears, Roebuck and Co. and Kmart Corp. v. Technicolor SA, No. 13-cv-05262;

Sears, Roebuck and Co. and Kmart Corp. v. Chunghwa Picture Tubes, Ltd., No. 11-cv-05514;

Sharp Electronics Corp. v. Hitachi Ltd., No. 13-cv-1173 SC;

Sharp Electronics Corp. v. Koninklijke Philips Elecs., N.V., No. 13-cv-2776 SC;

ViewSonic Corp. v. Chunghwa Picture Tubes, Ltd., No. 14-cv-2510 SC;

All Indirect Purchaser Actions.

Now before the Court is Defendant Koninklijke Philips N.V.'s (f/k/a Koninklijke Philips Electronics N.V.) ("KPNV") Motion for Summary Judgment. ECF No. 3039-3.[1] The Court will deny the motion.

## I. BACKGROUND

The factual history is well known to the parties and has been recited in the Court's prior orders. By way of summation, this case is predicated upon an alleged conspiracy to fix the prices of cathode ray tubes ("CRTs"), a core component of tube-style screens for common devices including televisions and computer monitors. The conspiracy ran from March 1, 1995 to November 25, 2007, involved many of the major companies that produced CRTs, and allegedly resulted in overcharges of billions of U.S. dollars to domestic companies that purchased and sold CRTs or products containing CRTs. Conspirators allegedly met all over the world in "Glass

[1] This is the unredacted version of Defendants' motion.

Meetings" to fix the prices of CRTs, which served as the primary component of old tube-style televisions and computer monitors. CRTs have no other viable function except as a component part in devices of this nature. ECF No. 1856 at 23. Plaintiffs have alleged billions of dollars in aggregate damages resulting from the artificial price inflation of this component part. In the meantime, CRTs have become obsolete. See J.R. Raphael, "Obsolete Technology: 40 Big Losers," PC WORLD (Feb. 25, 2017, 3:38 p.m.), http://www.pcworld.com/article/169863/obsolete_tech.html?page=2.

A civil suit was originally filed in 2007, ECF No. 1, consolidated by the Joint Panel on Multidistrict Litigation shortly thereafter, see ECF No. 122, assigned as a Multidistrict Litigation case ("MDL") to Judge Samuel Conti, see id., and ultimately transferred to the undersigned, see ECF No. 4162. In addition to two class actions, this MDL involves various direct actions from individual plaintiffs who opted out of the class actions, including the DAPs that oppose the present motions. Each DAP alleges that it bought at least one CRT Finished Product from a Defendant or an entity owned or controlled by a Defendant.

KPNV now moves for summary judgment. It does not dispute the existence of a conspiracy to fix the prices of CRTs, nor that there is evidence that employees of other Philips entities participated in the conspiracy. It argues, however, that there is no evidence that *KPNV* did so, or that KPNV was even aware of the conspiracy. ECF No. 3039-3. Plaintiffs respond that there is at least a triable issue of material fact as to KPNV's direct participation; that KPNV is liable for the activities of a joint venture called as LG.Philips Displays Holding B.V. ("LPD"), to which Philips transferred its CRT business; and that KPNV should be liable on an agency theory for the actions of its business division, Philips Display Components. ECF No. 3238-4.

## II. LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by" citing to depositions, documents, affidavits, or other materials. Fed. R. Civ. P. 56(c)(1)(a). A party also may show that such materials "do not establish the absence or presence of a genuine

dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). An issue is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986). A fact is "material" if the fact may affect the outcome of the case. Id. at 248. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party." Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).

Where the party moving for summary judgment would bear the burden of proof at trial, that party bears the initial burden of producing evidence that would entitle it to a directed verdict if uncontroverted at trial. See C.A.R. Transp. Brokerage Co. v. Darden Rests, Inc., 213 F.3d 474, 480 (9th Cir. 2000). Where the party moving for summary judgment would not bear the burden of proof at trial, that party bears the initial burden of either producing evidence that negates an essential element of the non-moving party's claim, or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. If the moving party satisfies its initial burden of production, then the non-moving party must produce admissible evidence to show that a genuine issue of material fact exists. See Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102–03 (9th Cir. 2000). The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996). Indeed, it is not the duty of the district court "to scour the record in search of a genuine issue of triable fact." Id. "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the non-moving party must introduce some significant probative evidence tending to support the complaint." Summers v. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997) (citation and internal quotations omitted). If the non-moving party fails to make this showing, the moving party is entitled to summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

"In antitrust cases, these general standards are applied even more stringently and summary judgments granted more sparingly." Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n, 620 F.2d 1360, 1364 (9th Cir. 1980). As a general matter, "plaintiffs should be given the full benefit of

their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each . . . . The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 698–99 (1962) (alterations omitted). Nonetheless, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). Rather, to defeat a motion for summary judgment, "a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility" that the alleged conspirators acted independently.'" Id. (quoting Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764 (1984)).

## III. ANALYSIS

### A. KPNV Is Potentially Liable for Direct Participation in the CRT Conspiracy

Plaintiffs allege that KPNV participated directly in the conspiracy such that is unnecessary to show alter ego liability or principal/agency liability. To establish a genuine issue of material fact and defeat KPNV's motion, Plaintiffs must produce either direct evidence that KPNV conspired to fix CRT prices or circumstantial evidence from which a reasonable factfinder could conclude that KPNV so conspired. In re Citric Acid Litig., 191 F.3d 1090, 1093 (9th Cir. 1999). For purposes of this motion, KPNV does not deny that there is some evidence that persons affiliated with the Philips group of companies participated in activities related to the conspiracy. What KPNV does dispute is that such actions were undertaken by or on behalf of KPNV. KPNV states that there is no evidence "that any KPNV employee attended a meeting of the alleged conspiracy or ever communicated with a CRT manufacturer for the purpose of fixing CRT prices among competitors"; "that any KPNV employee ever agreed to fix the price or reduce the output of CRTs manufactured or sold by any of KPNV's direct or indirect subsidiaries, or allocate markets or customers"; "that any KPNV employee ever received information about the alleged conspiracy, including from employees of the other Philips Defendants"; or "that any KPNV employee was ever aware of or otherwise had knowledge of the alleged conspiracy." ECF No. 3039-3 at 11.

The Court concludes that KPNV's motion must be denied. First, the evidence does not show as a matter of law that KPNV's divisions were legally separate from KPNV. Second, even if its divisions were nominally separate, there is evidence suggesting that they were not autonomous and that their actions were substantially directed by KPNV. Third, the evidence of Philips' participation in the CRT conspiracy is that its employees acted on behalf of the Philips group of companies, and not any particular subsidiary.

Viewing the evidence favorably to Plaintiffs, as the Court must, the facts are as follows: KPNV is a holding company incorporated in the Netherlands, where it also has its principal place of business. It indirectly owns a variety of separately incorporated subsidiaries, including Defendants Philips Electronics North America Corporation ("PENAC"), Philips Taiwan Limited ("Philips Taiwan"), and Philips do Brasil Ltda. ("Philips do Brasil"). KPNV also contains entities referred to interchangeably as "business groups" or "divisions." ECF No. 3238-8 (Spaargaren Depo.) at 32. Two such business group were Philips Display Components (PDC), which manufactured CRTs until June 2001, and Philips Consumer Electronics (PCE), which manufactured CRT televisions and computer monitors. See, e.g., id. at 9.

Business groups or divisions are not separately incorporated entities. Rather, as the Deputy Secretary of KPNV's Executive Committee testified, "business groups . . . work *across* KPNV's subsidiaries. These . . . business groups manage operations in the areas in which KPNV's subsidiaries conduct business." ECF No. 3039-5 (Jongedijk Decl.) at 7 (emphasis added). As Philips executive Frans Spaargaren explained,

> Q: When you say that Philips Consumer Electronics was a product division of Philips, what do you mean when you say Philips?
>
> A: Well, Philips at that time, so regardless of the legal structure with, you know, a number of various companies, but Philips as an operational entity consisted in that time of around five to six product divisions, and Consumer Electronics was one of them.

ECF No. 3238-8 at 33. These divisions in turn had the ability to direct the activities of Philips subsidiaries. For example, the policies "for operating [the] display component division under PENAC [were] aligned with the policies coming out of the display component business group for KPE" – i.e., PDC. ECF No. 3039-5 (Depo. of Jim Smith) at 42. Consistent with this taxonomy,

the Philips Group corporate manual refers to the *legal* separation of its subsidiaries on the one hand, but only to the *business* separation of its divisions on the other. ECF No. 3238-11 at 10 ("Its business activities are organized through Product Divisions, Businesses, Regions and Country Organizations. Its legal structure is organized through a large number of directly and indirectly held subsidiaries throughout the world.").

Because KPNV's divisions are not separately incorporated, and because they work across subsidiaries, a reasonable jury could conclude that actions undertaken on PCE or PDC's behalf were actually undertaken for the benefit of KPNV.[2] KPNV does not deny that there is sufficient evidence for a jury to conclude that employees acting for PCE or PDC participated in the conspiracy. And when a witness testifies, for example, that an individual participant in the conspiracy "had no position at KPNV" but "was employed by Philips Components" as "the CEO of Display Components, which was a so-called business group and part of the product division Philips Components," ECF No. 3238-8 at 39-40, a jury could conclude that the employee in fact *was* employed by KPNV, since Philips Components is not a separately incorporated entity but instead works across subsidiaries for KPNV's benefit.

Even if there were corporate separateness in name – in other words, even if PCE and PCD were found to have nominally separate legal identities – there is a triable issue of fact as to whether such separateness existed in fact. Internal KPNV documents state that the Board of Management of KPNV determines the corporate strategy for its divisions, ECF No. 11 at 89, and is involved in "material decisions," id. at 85. A JP Morgan memorandum prepared for a potential KPNV business partner states that KPNV's staff acts as a "shared resource" for its divisions. 3238-12 at 53. And Philips' corporate manual makes clear that KPNV sets policy or direction for its divisions in a number of important areas, including major expenditures, ECF No. 3238-11 at 16; investment decisions, id.; the appointment, dismissal and remuneration of top divisional management, id.; marketing and branding, id. at 31; and media relations, id. at 34-35.

KPNV maintained the same lack of clarity to the outside world as well, as shown by

---

[2] Notably, during discovery in this case, KPNV objected to the use of the word "division" on the grounds that it was vague and ambiguous. ECF No. 3238-14 at 37.

minutes of the "glass meetings" at which conspirators determined the global price for and output of CRTs. In dozens of instances, and without exception, the minutes recorded that the Philips group representative was from "Philips," "PH," or "PHS," without describing the representative as belonging to any particular Philips subsidiary or division. See, e.g., ECF No. 3238-18 at 3, 9, 14, 23, 28, 32, 43, 44, 45, 47, 51, 61, 67; ECF No. 3238-19 at 3, 14; ECF No. 3238-20 at 3, 14.[3] Similarly, in deposition, other conspirators who attended the same meetings identified Philips representatives only as coming from "Philips" and not from any particular subsidiary or entity. See, e.g., 3238-15 (Chun-Liu Depo.) at 272 (referring to "David Chang of Philips"). The involvement of such employees was not insignificant: Philips employee David Chang actually had the idea in 1997 to begin the formal meetings that are known as the "glass meetings." Id. To the extent Chang had a separate position within Philips, it was as head of PDC's Asia Pacific Region. ECF No. 3464-14 at 16. As noted above, however, there is a triable issue of material fact as to whether PDC was legally separate from KPNV. Thus, a reasonable jury could conclude that Chang's activities were undertaken on behalf of KPNV.

**B. KPNV Is Potentially Liable for the Actions of LPD**

The other reason why KPNV's motion must be denied is that a reasonable jury could find that KPNV is liable for the actions of a joint venture it entered with co-Defendant LG Electronics, Inc. ("LGEI"). In July 2001, KPNV and LGEI entered into a Joint Venture Agreement in which they each agreed to transfer the entire CRT operations of their respective corporate groups to create a joint venture LG.Philips Displays Holding B.V. ("LPD"). KPNV and and its affiliate Philips GmbH owned 50% plus one share of LPD. ECF No. 3238-14 at 19. The remainder was held by LGEI. Because the Court has found there is a triable issue of fact regarding whether KPNV participated directly in the conspiracy, a reasonable jury might also find that KPNV continued to be liable when it transferred its subsidiary's CRT business into LPD.

Once a corporation has joined a price-fixing conspiracy, it is jointly and severally liable for

[3] Plaintiffs have submitted evidence that Philips employees participated in such meetings almost 200 times to exchange information regarding price and output.

United States District Court
Northern District of California

any actions taken in furtherance of the conspiracy until the objectives of the conspiracy are completed or the defendant withdraws. See Krause v. Perryman, 827 F.2d 346, 350-51 (8th Cir. 1987) (affirming summary judgment for defendant because he had "withdrawn from the alleged conspiracy prior to the events that resulted in [the plaintiffs'] alleged injuries"); In re Brand Name Prescription Drugs Antitrust Litig., 123 F.3d 599, 616 (7th Cir. 1997); In re Potash Antitrust Litig., 954 F. Supp. 1334, 1339, 1390–91 (D. Minn.1997) (granting summary judgment to antitrust defendant who withdrew from conspiracy), aff'd sub nom Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan, 203 F.3d 1028 (8th Cir. 2000); see also United States v. Lothian, 976 F.2d 1257, 1262 (9th Cir. 1992) ("[A] defendant cannot be held liable for substantive offenses committed before joining or after withdrawing from a conspiracy."). Because it is an affirmative defense, the burden of proving withdrawal lies with the defendant. See United States v. Brown, 332 F.3d 363, 374 (6th Cir. 2003).

At a minimum, "[a]ffirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators [are] sufficient to establish withdrawal or abandonment." United States v. U.S. Gypsum Co., 438 U.S. 422, 464–65 (1978); see also Lothian, 976 F.2d at 1261 (9th Cir. 1992) (quoting United States v. Loya, 807 F.2d 1483, 1493 (9th Cir.1987)) ("To withdraw from a conspiracy a defendant must either disavow the unlawful goal of the conspiracy, affirmatively act to defeat the purpose of the conspiracy, or take 'definite, decisive, and positive steps to show that the [defendant's] disassociation from the conspiracy is sufficient.'").

There is no set list of affirmative acts sufficient to establish withdrawal. See United States v. Antar, 53 F.3d 568, 582 (3d Cir. 1995) ("Of course, there is no single way withdrawal can be established; in large part whether a particular action constitutes withdrawal depends on context."), overruled on other grounds, Smith v. Berg, 247 F.3d 532, 534 (3d Cir. 2001); Virginia v. McKesson Corp., No. C 11-02782 SI, 2013 WL 1287423, at *3 (N.D. Cal. Mar. 28, 2013) ("A defendant can establish withdrawal from a conspiracy in various ways."). Although mere inactivity or passive nonparticipation is not proof of withdrawal, see Smith v. United States, 133 S. Ct. 714, 720 (2013), courts have been willing to grant summary judgment where the defendant:

(1) severed all ties to the conspiracy; (2) severed all ties with the business through which it participated in the conspiracy; and (3) either communicated its withdrawal in a manner reasonably calculated to give notice co-conspirators or took affirmative acts inconsistent with the object of the conspiracy. See Morton's Mkt., Inc. v. Gustafson's Dairy, Inc., 198 F.3d 823, 839 (11th Cir. 1999) amended in part, 211 F.3d 1224 (11th Cir. 2000); United States v. Steele, 685 F.2d 793, 804 (3d Cir. 1982); Krause v. Perryman, 827 F.2d 346, 351 (8th Cir. 1987); cf. Antar, 53 F.3d at 583 (resignation from a corporation insufficient to establish withdrawal because defendant retained stock in the corporation); Reisman v. United States, 409 F.2d 789, 793 (9th Cir. 1969) ("Although appellant Reisman resigned . . . and ceased to participate in the company's day-to-day business operations, he remained a major stockholder and took no affirmative action to disavow or defeat the promotional activities which he had joined in setting in motion."); United States v. Lothian, 976 F.2d 1257, 1264 (9th Cir. 1992) (holding that "[t]he defendant in Reisman had not taken 'definite, decisive, and positive steps' to disassociate himself from the scheme because he remained a major stockholder").

Finally, even if a defendant severs its ties with an enterprise that is participating in a conspiracy, that defendant cannot assert a withdrawal defense if after withdrawing it engages in additional conduct in furtherance of the conspiracy, see United States v. Lowell, 649 F.2d 950, 958 (3d Cir. 1981); United States v. Bullis, 77 F.3d 1553, 1561-63 (7th Cir. 1996), or if it continues to receive benefits from the conspiracy, see, e.g., United States v. Eisen, 974 F.2d 246, 269 (2d Cir. 1992) (the defendant's resignation from the conspiring law firm was not sufficient to constitute a withdrawal because he "'continued to be entitled to a percentage of the recovery on all cases he tried including those giving rise to his pre-[resignation] racketeering acts.'").

In its motion, KPNV does not even attempt to show that the placement of its CRT business into LPD constituted a withdrawal from the CRT price-fixing conspiracy. Instead, it merely asserts that "KPNV was never a member of the alleged conspiracy [in the first place] and thus does not need to establish that it withdrew from an alleged conspiracy it never joined." ECF No. 3039-3 at 22; see also id. at 9 n.3 ("KPNV does not need to—indeed, logically it cannot—establish that it withdrew from an alleged conspiracy that it never joined, participated in, or had

knowledge of.”). Since the Court has determined that a reasonable jury could find that KPNV *was* a member of the conspiracy, however, KPNV’s silence on its potential withdrawal leaves it open to liability for LPD’s actions as well. Even if it did intend to withdraw, KPNV proffers no evidence that it ever communicated its withdrawal from the CRT conspiracy to its co-conspirators. Moreover, as a shareholder of LPD, it arguably continued to receive a financial benefit from the conspiracy. Plaintiffs have introduced evidence that LPD was a member of the conspiracy, and LPD’s profits would have flowed back to KPNV.

Rather than confronting its ongoing liability based on lack of withdrawal, KPNV argues that it cannot be liable for the actions of LPD, because “[i]n determining whether KPNV can be held liable for the acts of LPD, the Court must apply Dutch law on veil piercing because LPD was incorporated in the Netherlands.” ECF No. 3039-3 at 22. That might be true if the sole basis of KPNV’s liability were on a theory of agency or alter ego, but the Court need not decide that question because the jury could find KPNV liable for LPD’s actions on a different theory – that LPD’s participation in the CRT conspiracy was merely a continuation of KPNV’s participation.

**CONCLUSION**

For the foregoing reasons, the Court denies Defendant KPNV’s motion for summary judgment.[4]

IT IS SO ORDERED.

Dated: February 27, 2017

JON S. TIGAR
United States District Judge

[4] In light of the Court’s resolution of the parties’ other arguments, it need not address Plaintiffs’ arguments that KPNV is liable for the actions of PDC on an agency theory, or that a jury may consider the conclusions about KPNV reached by the court in Vichi v. Koninklijke Philips Elecs., N.V., 85 A.3d 725 (Del. Ch. 2014) and by the European Commission in its December 5, 2012 order fining seven international groups of companies a total of €1,470,515,000 for participating in CRT cartels. See ECF No. 5034 at 2.