**Pages 1 - 37**

                 UNITED STATES DISTRICT COURT

               NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

IN RE: CATHODE RAY TUBE (CRT) )   **MDL No. 1917**
ANTITRUST LITIGATION,          )
_____)   **No. C. 07-05944 JST**

                         San Francisco, California
                         Tuesday, February 28, 2017

                 **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                         Trump Alioto Trump & Prescott LLP
                         2280 Union Street
                         San Francisco, CA  94123
                         (415) 563-7200
                         (415) 346-0679 (fax)
                    **BY:  MARIO N. ALIOTO**
                         **LAUREN CLARE CAPURRO**
                         **JOSEPH MARIO PATANE**

For Plaintiffs:
                         Straus & Boies LLP
                         4041 University Drive, 5th Floor
                         Fairfax, VA  22030
                         (703) 764-8700
                    **BY:  TIMOTHY D. BATTIN**

For Plaintiffs:
                         Bramson Plutzik Mahler & Birkhaeuser
                         2125 Oak Grove Road, Suite 120
                         Walnut Creek, CA  94598
                         (925) 945-0200
                         (925) 945-8792 (fax)
                    **BY:  DANIEL EDWARD BIRKHAEUSER**

Reported By:  Lydia Zinn, CSR No. 9223, FCRR, Official Reporter

```
 1   APPEARANCES:
     For Plaintiffs:
 2                           Fine, Kaplan and Black, RPC
                             One S. Broad Street, 23rd Floor
 3                           Philadelphia, PA  19107
                             (215) 567-6565
 4                           (215) 568-5872 (fax)
                        BY:  MATTHEW DUNCAN
 5
     For Plaintiffs:
 6                           Gergosian & Gralewski LLP
                             750 B Street, Suite 1250
 7                           San Diego, CA  92101
                             (619) 237-9500
 8                           (619) 237-9555 (fax)
                        BY:  ROBERT J. GRALEWSKI, JR.
 9
     For Plaintiffs:
10                           Freedman Boyd Hollander Goldberg Urias
                               & Ward, PA
11                           20 First Plaza, N.W., Suite 700
                             Albuquerque, NM  87102
12                           (505) 842-9960
                             (505) 842-0761 (fax)
13                      BY:  JOSEPH GOLDBERG

14   For Plaintiffs:
                             Zelle LLP
15                           44 Montgomery Street, Suite 3400
                             San Francisco, CA  94104
16                           (415) 693-0700
                             (415) 693-0770 (fax)
17                      BY:  CHRISTOPHER THOMAS MICHELETTI
     For Objectors:
18                           O'Connor & Associates
                             201 Mission Street, Suite 710
19                           San Francisco, CA  94015
                             (415) 693-9960
20                           (415) 693-6537 (fax)
                        BY:  JOHN DENNIS O'CONNOR
21
     For Objectors:
22                           Alioto Law Firm
                             One Sansome Street, 35th Floor
23                           San Francisco, CA  94104
                             (415) 434-8900
24                           (415) 434-9200 (fax)
                        BY:  THERESA DRISCOLL MOORE
25
```

```
 1  APPEARANCES:
    For Objectors:
 2                          Cooper & Kirkham, P.C.
                            357 Tehama Street, Second Floor
 3                          San Francisco, CA  94013
                            (415) 788-3030
 4                          (415) 882-7040 (fax)
                       BY:  TRACY R. KIRKHAM
 5                          JOSEF DEEN COOPER
                            JOHN DMITRY BOGDANOV
 6
    For Objectors:
 7                          Law Offices of Lingel Hart Winters,
                             A Professional  Corporation
 8                          388 Market Street, Suite 900
                            San Francisco, CA  94111
 9                          (415) 398-2941
                            (415) 393-9887 (fax)
10                     BY:  LINGEL HART WINTERS

11  Also Present
    Special Master Martin Quinn:
12                          JAMS/Endispute
                            Two Embarcadero Center, Suite 1100
13                          San Francisco, CA  94111
                            (415) 982-5267
14

15

16

17

18

19

20

21

22

23

24

25
```

| | |
|---|---|
| 1 | **Tuesday - February 28, 2017**                              **10:06 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---oOo---** |
| 4 | **THE CLERK:**  Calling Civil Case 7-5944, MDL Number |
| 5 | 1917, In Re:  Cathode Ray Tube Antitrust Litigation. |
| 6 | Your Honor, appearances have already been taken. |
| 7 | **THE COURT:**  Thank you, Mr. Noble. |
| 8 | The matter's on calendar this morning for the Court's |
| 9 | consideration of objections to the Report and Recommendation |
| 10 | from Special Master Quinn, allocating the attorneys' fees |
| 11 | awarded to counsel for the Indirect Purchaser Plaintiffs.  And |
| 12 | earlier I issued a text order which allocated for purposes of |
| 13 | argument 20 minutes to Lead Counsel, and 10 minutes to each |
| 14 | objector.  No one is required -- I just want to remind you all: |
| 15 | No one is required to use all of his time. |
| 16 | I'm going to hear from each objector.  I'm going to hear |
| 17 | from the Objectors, then I'm going to hear from Lead Counsel; |
| 18 | but before I do that, I want to make it clear who intends to |
| 19 | address the court this morning.  So would the persons who |
| 20 | intend to address the Court please identify themselves? |
| 21 | **MR. MARIO ALIOTO:**  Good morning, Your Honor. |
| 22 | Mario Alioto, Lead Counsel for the Indirect Purchaser Class.  I |
| 23 | would like to address the Court this morning.  And also I have |
| 24 | asked Lauren Russell of my firm to also address the Court, with |
| 25 | the Court's permission. |

1    **THE COURT:**  That's fine.  You'll be dividing your

2  time, I gather.  All right.  Thank you.

3    Anyone else?  None of the Objectors want to make argument?

4  There we go.

5    **MR. O'CONNOR:**  Good morning, Your Honor,

6  John O'Connor.  I'm appearing for the Law Offices of

7  Francis Scarpulla.

8    **MS. KIRKHAM:**  Good morning, Your Honor.

9  Tracy Kirkham.  I would like to speak with regard to Cooper &

10  Kirkham.

11    **THE COURT:**  All right.  Thank you.

12    **MS. MOORE:**  Good morning, Your Honor.  Theresa Moore.

13  And I will be arguing on behalf of myself.

14    **THE COURT:**  Thank you.

15    **MR. WINTERS:**  Good morning, Your Honor.

16  Lingel Winters.

17    **THE COURT:**  Good morning.  Thank you.

18    Other Objectors who want to address the Court?

19    No.  Okay.  The bidding's closed.  I'm just hearing from

20  counsel in the order that they approach the microphone.

21  Mr. O'Connor, I will hear from you, please.

22    **MR. O'CONNOR:**  Your Honor, if it please the Court, in

23  the limited time we have today I would like to concentrate on

24  one issue; that is the multiplier to be applied to

25  Mr. Scarpulla's time.  We would submit the other objections on

1   the papers.  And if the Court has any questions, of course,

2   we'd be happy to respond.

3       Here, of course, Lead Counsel was tasked with the initial

4   recommendation of fee allocation.  And the Special Master, of

5   course, followed them in large part; and as to Mr. Scarpulla,

6   partially followed those recommendations of Mr. Alioto, the

7   Lead Counsel.  And I would first note, Your Honor, that

8   Mr. Scarpulla wants a compensation -- seeks compensation for

9   185 hours that he spent with the Zelle firm.  And that time

10  ends March of 2015.

11      This morning I'm going to deal with the Special Master's

12  partial adoption of Lead Counsel's criticism of Mr. Scarpulla

13  for certain objecting activities, but I would first note that

14  none of those objecting activities are part of the time for

15  which Mr. Scarpulla seeks compensation.  They occurred after he

16  left Zelle, and after the time was put in for compensation.

17      Now I would represent to the Court that Mr. Scarpulla's

18  put in over 650 hours since then in these objecting activities,

19  and was put in a position that perhaps would be awkward, that

20  Mr. Scarpulla gladly adopted; and that was he felt he was under

21  some professional duty and compulsion, because of Judge Walker,

22  the other Special Master -- his Report and Recommendation that

23  was issued, I believe, in December of '14, and was not vacated

24  until it looked like everything was settled and finalized in

25  October of '15; so for those 11 months, while Mr. Scarpulla

1    felt under some compulsion to act.

2         And so the activities for which he is being criticized are

3    those after the Zelle time.  And really, Mr. Scarpulla was --

4    was carrying out what he thought were his responsibilities.

5    He's not seeking compensation for those 649 hours as of

6    yesterday.

7         Now, the Zelle firm got a multiplier of 1.9587.  That was

8    knocked down only slightly from the Lead Counsel's

9    recommendation of 1.96.  Mr. Scarpulla's time was part of the

10   Zelle -- his Zelle work.

11        Now, Zelle put in 15,500 hours, Your Honor; and 12,500 of

12   those were by personnel that I would call functionary, good,

13   solid legal support, from junior partner on down.

14        The partner billing was about 3,000 hours; and of those

15   3,000 hours, much of the partner hours were in the good,

16   pedestrian work that a partner should do, second-chairing

17   depositions mainly in this case of Lead Counsel.

18        The real leadership functions in the Zelle firm were

19   performed by two lawyers:  By Mr. Corbit, C-o-r-b-i-t, and

20   Mr. Scarpulla.

21        And Mr. Scarpulla was involved at every key inflection

22   point.  I think he could be justifiably criticized, Your Honor,

23   if, at a thousand dollars per hour, he were involved in

24   document review, and -- and those sorts of tasks.  He came in

25   at every key inflection point and tried to add value to the

1  case, and was highly efficient.

2  　　Everyone's time at Zelle is getting a 9.587:  The

3  paralegals, the junior associates.

4  　　There's one lawyer there that's a very good lawyer that

5  did document review at $575 per hour; effectively, his time is

6  at about $1,150.

7  　　And the only person that is now being singled out -- and

8  that's because of his objections -- is Mr. Scarpulla.  And he's

9  being pieced off.  So the first point I would respectfully make

10  to the Court is, if Special Master Quinn said that Zelle gets

11  that multiplier for core leadership functions, which is what

12  Special Master Quinn said, the two leaders in the Zelle firm

13  were Mr. Corbit and Mr. Scarpulla.  Mr. Corbit, of course, is

14  getting the multiplier on his time.  Everyone's getting the

15  multiplier, but Mr. Scarpulla's been pieced off.

16  　　So what I would suggest to the Court is that at the very

17  least, Mr. Scarpulla should get the Zelle multiplier.  If he is

18  to be pieced off, I think logic would dictate that he would get

19  a higher multiplier.  The case law talks about efficiency.

20  He's doing exactly what a senior partner should do.  Only do

21  those things for which he is suited.  If someone with a lower

22  billing rate can do those tasks, those should be delegated.

23  　　He was involved in the initial Complaint.  As Your Honor

24  knows, he -- Mr. Scarpulla was the Lead Counsel in the *LCD*

25  litigation; I believe the *DRAM*, and was Liaison Counsel in the

```
 1  SRAM, if I have that right.  So he comes with a wealth of
 2  information.  Same defendants.  Same market:  Electronics.  He
 3  comes in with a wealth of skill and experience in this, and was
 4  involved in the Complaint, which is almost a repeat of the LCD
 5  Complaint; the MDL work.
 6       And at each key inflection point, down to where Special
 7  Master Walker has Mr. Scarpulla in to try to mediate a dispute
 8  with the AG's Office, which he did very skillfully -- and that
 9  ended up not being problem, but it was when Special Master
10  Walker ordered that.  So I would argue that at least he should
11  deserve that -- that -- that multiplier.
12       Now, what is the criticism that Special Master Quinn
13  adopts from the Lead Counsel that he does not reject?
14       Now, the Special Master said that Lead Counsel's
15  objections to Mr. Scarpulla were payback for Mr. Scarpulla's --
16  the position he was put in, really, by Judge Walker.  It would
17  be -- it would behoove Mr. Scarpulla, if he wanted to be paid,
18  to keep his mouth shut, and do nothing, and get his multiplier.
19  He didn't do that.  He did what he thought he was supposed to
20  do.
21       Now, Special Master Quinn said he criticized Mr. Scarpulla
22  for sort of "lying in the weeds," so to speak, and not
23  objecting to the preliminary motion for approval; not objecting
24  to the notice.  Now, what I would tell the Court is this.  I
25  have in my hand Mr. Scarpulla's objections to the
```

1  preliminary -- the motion for preliminary approval of the

2  settlements, at Document 4115.  And he did object to notice

3  quite fulsomely, given the circumstances.

4      Now at that time the actual banner ad had not been put

5  into evidence by Mr. Fisher, the notice person, or Lead

6  Counsel, so Mr. Scarpulla did not see the actual notice; he

7  could only infer.  And he gave what turned out to be a very

8  prescient objection, but he did not have it in his hand.

9      Special Master stated that, *Well, he could have worked*

10 *with Mr. Alioto behind closed doors, and not raised the*

11 *objections publicly once he got the notice.*  The problem is it

12 wasn't until the motion for final approval was made that the

13 banner ad was actually put into the record here.  Mr. Alioto is

14 on record as saying he was not talking to Mr. Scarpulla.

15     So my question is:  How could --

16     And it's a rhetorical question.

17     How could Mr. Scarpulla deal behind closed doors with an

18 ad he never saw, with a counsel who is on record as saying he

19 didn't feel he should talk to Mr. Scarpulla?

20     And again, I understand the natural distance between them

21 because of Judge Walker's recommendation, but -- so he was put

22 in a highly untenable position because of that.

23     I understand that later on, it might feel to Lead Counsel

24 that he was lying in the weeds.  He was not, but he couldn't do

25 anything about it.

1      The other note I would make, Your Honor, is that the

2   question was -- and I think in the report -- whether objecting

3   to notice risked the class.  I would argue that objecting to

4   notice would save the class.  It would make it more

5   bulletproof, if, in fact, there was a problem with the claims

6   procedure.

7      Mr. Scarpulla went through this in the *LCD* litigation, in

8   which the first round didn't get enough claims, and so he

9   supplemented.  He did TV ads, and so forth.  His objections

10  were a way to save the class, and it was in that spirit.  This

11  is not something that was mean spirited, or personally

12  antagonistic.

13     Mr. Scarpulla is one of the most respected lawyers in the

14  country at this business.  He's widely held in high esteem.

15  And I don't think Judge Walker would have appointed him if that

16  were not true.  Special Master Quinn says the same thing.  This

17  is one of the most respected men in the country.

18     And now he's -- he's subjected to, I think, unfortunately

19  --

20          **THE COURT:**  Mr. O'Connor, would you excuse me just a

21  second?

22  (Discussion off the record.)

23          **THE CLERK:**  Time has expired, Your Honor.

24          **THE COURT:**  Mr. O'Connor, your time's expired.

25       **MR. O'CONNOR:**  Okay.  Thank you very much,

1  Your Honor, for your attention.

2            **THE COURT:**  Thank you.

3           **MS. KIRKHAM:**  Good morning, Your Honor.

4  Tracy Kirkham.

5      Much of what Mr. O'Connor just said applies to my firm, as

6  well; actually, even up to and including the fact that many of

7  the overreaching -- or I guess "interjecting himself" was the

8  words that Lead Counsel used.  Many of the activities by which

9  Mr. Cooper allegedly interjected himself into the case were

10  actually also done in connection with the lawyers at Zelle

11  Hofmann, especially Mr. Corbit, who, as Mr. O'Connor points

12  out, is being compensated for his half of the conversations

13  with Mr. Cooper, but we're not actually even talking about

14  compensation for those activities, because Cooper & Kirkham's

15  fee petition doesn't include those.

16      We're actually talking about the concept of devaluing, as

17  a punitive measure, the litigation contribution of a law firm.

18      And Lead Counsel has said that this won't have a chilling

19  effect on future counsel in cases who have made a significant

20  litigation contribution, but who feel morally that they need to

21  speak out against something that's going on in the case:  The

22  settlement of the case, some aspect of the settlement of the

23  case, some aspect of the fees.

24      I believe that to have a standard that allows for a

25  punitive measure to be taken against that presettlement

1   litigation contribution, without a finding that the subsequent

2   behavior of objection to a settlement or to a fee rises to the

3   level of being frivolous -- either factually frivolous,

4   interposed for a nonlitigation, nefarious purpose, legally

5   frivolous -- but that is an important component to avoid a rule

6   that would chill advocacy in the future.

7        I have never been an objector before.  Cooper & Kirkham

8   has been Lead Counsel many times before.  I have tried to think

9   up ways of chilling objecting advocacy.  I've sat up nights,

10  trying to thinking of ways.  I've had long discussions with

11  Charles Renfrew -- Judge Renfrew about it.

12       And what we keep coming up against in all those thoughts

13  is that it's almost impossible -- absent frivolousness, absent

14  a clear-cut legal standard -- to come up with some way of

15  punishing the wrong objection, the overruled objection, even

16  the objection that borders on being frivolous, without running

17  afoul of the concepts that are enshrined in class-action law

18  that a full and fair evaluation of a settlement and a fee is

19  mandatory to bind absent class members constitutionally; and

20  that you can't get there -- you can't have that full and fair

21  evaluation -- without allowing objectors; even objections that

22  get overruled.

23       And there is absolutely no purpose for a punitive

24  reduction and devaluation in an otherwise meritorious

25  contribution to the litigation efforts that my firm made,

1  except as punishment.  And punishment only has two things.

2  One:  It's to make the person who did the act sorry that they

3  did it.  And it is to make people who look upon that situation

4  think twice about doing that in the future.  And that's

5  chilling.

6       Thank you.

7       Do you have any questions about any of the particulars of

8  my situation?

9            **THE COURT:**  I don't.  Thank you.

10      Ms. Moore.

11           **MS. MOORE:**  Good morning, Your Honor.

12      Your Honor, the fees are awarded to fairly compensate

13  lawyers for services that benefit the class.  And I think

14  that -- and it's also to motivate lawyers to make sure the

15  class members are best -- better off.

16      I think the issue that -- that the core issue in my

17  situation is:  What was the benefit that I provided to the

18  Class, and what was the value of my work?  And we are at great

19  odds about that.

20      But the big issue is that I believe I was punished.  And I

21  was punished for my efficiency.  And I was punished for my

22  focus and my targeting.  And I was punished.

23      And it was -- it worked to be the exact opposite of the

24  intent of the Class Action Fairness Act, and it's against

25  public policy.

1          In the hearing, and at multiple situations in the papers,

2    and in times before the Court and the Special Master, Lead

3    Counsel has admitted that they did, in fact, consider that I

4    was working at, quote, "cross-purposes" in making their

5    allocation.

6          Quote -- in the hearing transcript from the

7    Special Master, Mr. Alioto said, *The criteria -- did counsel*

8    *act collaboratively?  That consideration went into the award*

9    *for Ms. Moore, because we contend that she was at*

10   *cross-purposes to what we were doing.  And I just wanted to*

11   *tell you that that went into our analysis in making the*

12   *allocation.*  So that is what Mr. Alioto told Special Master.

13         Yet -- yet all of my papers and arguments and everything

14   have been purely factual and purely legal.  And I have never

15   worked at cross-purposes to counsel, and I have never worked at

16   cross-purposes to the Class.  Every single thing that I did and

17   every moment I put into this case was to benefit the Class.  So

18   I was always respectful, truthful, and straightforward.  And

19   there was no animosity and no personal issues, at all, with

20   regard to us.

21         What I did was I brought information to the Court's

22   attention.  I put into focus certain issues that were not

23   presented in counsel's papers, that were not presented in any

24   of their arguments, that were not presented in any of their

25   legal analysis.  And I brought that attention -- I brought

1   that -- those issues to the Special Master, and he wrote about

2   them.

3       And then I subsequently brought them to you, Your Honor.

4   And you referred to the Special Master's comments.  And then

5   you actually quoted my papers and you quoted my verbiage, as

6   did the Special Master, in changing the allocation with regard

7   to the overall award of attorneys' fees.

8       **THE COURT:**  Were you aware that on two prior

9   occasions before the submission of any of the materials to the

10  Special Master, I had cited Judge Illston's prior Order

11  approving the *LCD* settlement, and talked about this very issue?

12      **MS. MOORE:**  I don't think it -- if you look at the

13  chronology, Your Honor -- I've looked at the chronology.  I

14  have a time line that I've made.  I've looked at the

15  chronology.  And, first of all, I wrote this before you were

16  even on the Court.  You had not yet even been appointed to this

17  case.

18      **THE COURT:**  I don't have any way of quarreling you

19  with that, nor do I want to.

20      Your pitch is based on its effect on the listener.  I'm

21  the listener.

22      I'm just asking --

23      Anyway, I've made my point.

24      **MS. MOORE:**  No.  I understand.  I think this is a

25  point that we should discuss, Your Honor.  And if you do have

1   questions, I do know that you wrote that, but the idea of the

2   comparison came from my papers.

3       And then the L -- in *LCD*, the cite where it says

4   50 percent was never cited in -- in Lead Counsel's papers.  He

5   never made any sort of comparison about that.  In fact, in any

6   comparison for awards or looking at other cases when he had

7   specific information, he carefully -- or the papers do not

8   refer to the *LCD* case.

9       So if you look at the writing and what was presented,

10  Your Honor -- and I was very careful in looking at it, and

11  making sure that I was very clear before I asked for this.  And

12  it stemmed from me.  And my literal words are quoted all the

13  way through in both of the -- in all of the Orders.

14      I do know you picked it up.  You had a prior attorney-fee

15  Order, and you did not make any sort of comparison in that one.

16  The only comparison you made was after I had written it in all

17  of the papers, and after you had made your -- excuse me --

18  Direct Purchaser attorney-fee Order.  It wasn't referred to in

19  that attorney-fee Order.  And the first time it appeared in an

20  attorney-fee Order was after all of my filings, and in August

21  of 2016.

22      And so I know that even if you're aware of the law, when I

23  make the objection, I didn't know that you were going to be

24  appointed to this court case.  I didn't know if you were --

25  what law you were aware of and what law you weren't aware of.

1  And the case law is clear that if that attorney is the one who

2  highlights it or spotlights it or puts the information before

3  the Court, even if the Court thought of it on its own, if it's

4  spotlighted by the attorneys, the attorney is due fees for that

5  situation.

6       So I think that you're aware of the -- the *Reynolds* case

7  and the *Rodriguez versus Disner* case, because you've cited them

8  in other orders for similar but different propositions.  And

9  those cases are clear that if the attorney has put forward

10  these arguments and facts, and in such a way as it highlights

11  them and make the focus on these facts, that they are due

12  attorneys' fees.

13       So I think the case law is from the Seventh Circuit, and

14  from -- Judge Posner had some great quotes on this issue -- and

15  also from the Ninth Circuit, Your Honor, in the *Rodriguez*

16  matter.

17       So in -- with regards to the overall situation of my --

18  when you look at the lodestar, Your Honor, I modeled everything

19  on Lead Counsel.  I modeled my papers on Lead Counsel's fees

20  and other things.  I did what I felt he thought was

21  appropriate, and actually attempted to make them better.  And

22  with regard to the post-settlement work, Your Honor, I modeled

23  my request based on how he decided to proceed with the regards

24  to these Class members and the benefit to the Class.

25       In his Lead Counsel motion for attorney fees that he

1  wrote, he has a whole section on future work.  And that future

2  work is included in this award.  In his post-settlement quotes

3  he says over and over, *And the papers were not finished.  We*

4  *have a lot more work to do*.  And so this all goes into the

5  award that you've already given the Court, Your Honor.

6      And I think this Court has the equitable jurisdiction and

7  power to make an award for what you feel is appropriate and

8  beneficial, and -- whether you take it from a common fund or

9  whether you take it from the award that you've already made.

10      But I ask you, Your Honor, to look at the chronology, and

11  know that this argument and my verbiage -- my -- are quoted in

12  both Orders, Your Honor.  And I am the only person who wrote

13  this comparison and presented this argument in any manner and

14  in any filings and in any argument before either of these

15  judicial officers, Your Honor.  And I think that based on both

16  prior- and post- work, I think the benefit to the clients and

17  to the Class is clear.

18      And I would ask you to, if you have any questions,

19  Your Honor, really look through a time line, or I can pass you

20  a time line and show you each time how it put it in there.

21      And the Court is clear that you should -- you have to take

22  that into consideration.

23        **THE COURT:**  Thank you.

24        **MS. MOORE:**  Thank you, Your Honor.

25      Do you have any other questions?

1          **THE COURT:**  I don't.

2      Mr. Winters.

3          **MR. WINTERS:**  Good morning, Your Honor.  I'll be very

4  brief.  I was cut from 145K down to 40K.  I thought it was

5  somewhat drastic.

6          **THE COURT:**  Yeah.  I -- just a second.  I think I

7  have your submission here at the bench.  Yeah.  The Declaration

8  that you filed on November 16th doesn't ask me to do anything

9  in particular.  It does recite some facts.

10         **MR. WINTERS:**  What happened was I was left out of

11 round one, so I didn't get in with the regular group.

12     I then talked to Lead Counsel.  He said I should file a

13 declaration with the Special Master, which I did.

14     At the same time, in parallel -- this is in December of

15 2015 -- I filed my Declaration with the Court.

16     Nothing seemed to happen on that.  So I --

17     And, by the way, Lead Counsel said he had no objection if

18 I made this filing.

19     I got no oral hearing below, either.

20     I then again refiled the motion as 4808.

21     The first filing was 4248.  That was in December of 2015.

22     Since nothing was happening, I filed it in the form of a

23 motion as 4808, and attached to the --

24     One of the things Lead Counsel has said is, *Your matter*

25 *must be handled separately.*

1    Then when he filed his refiling of the total fees for

2 everybody, he put zero in for me, but with an asterisk that

3 said, *Filed as a separate motion; not part of the joint filing.*

4 So, of course, I wouldn't object to that, because there's

5 nothing to object to.

6    The point is that I got no hearing below, and I think this

7 is a fairly drastic reduction.

8         **THE COURT:**  When Mr. Alioto stands up and he's

9 responding to the various objections, is what he's going to say

10 that there was a time for materials to be submitted to the

11 Special Master by anyone who wanted a fee, and that you missed

12 that deadline?

13    I'm not asking if that's happened.  I'm asking if that's

14 what he's going to say.

15         **MR. WINTERS:**  In his Declaration, he agrees with a

16 lot of what I said, which --

17         **THE COURT:**  Excuse me, sir.  Can you answer my

18 question first, please, and then explain?

19    Is that what he's going to say?

20         **MR. WINTERS:**  I'm trying to remember if that's what

21 he's going to say or not.  I'm trying to remember what is in

22 his Declaration.

23         **THE COURT:**  Well, I mean, I'm just trying to --

24    I just want to make sure that I can fairly hear what you

25 came to tell me.  And the gist of it seems to be that you don't

1  think you got a fair hearing below in front of just

2  Special Master Quinn.

3         **MR. WINTERS:**  I didn't get any hearing below.

4         **THE COURT:**  I get that.

5     So my question is:  Is the response to that from

6  someone -- perhaps Lead Counsel -- going to be that there was a

7  procedure established for getting a hearing before

8  Special Master Quinn that was not complied with?

9      And actually you don't have to answer my question.  I'm

10  giving you a chance to respond to what I think Mr. Alioto's

11  going to say.  And --

12         **MR. WINTERS:**  May I --

13         **THE COURT:**  -- if I were you, I would do that now, if

14  you think he's going to say it, because once he's done talking,

15  I'm going to get off the bench.

16         **MR. WINTERS:**  I can't reserve and respond to

17  anything?

18         **THE COURT:**  No.  No.  I explained this before.  We're

19  going to hear from the Objectors.  Then we're going to hear

20  from Mr. Alioto.  Then I'm going to get off the bench.

21      We'll have spent at that time probably an hour hearing

22  this one motion.  And I think I will have provided a good

23  hearing time for people.

24         **MR. WINTERS:**  Let's assume he will say that.

25         **THE COURT:**  Yes.  Is it wrong?

1    **MR. WINTERS:**  The reason it's wrong is that when I

2    found that I'd been left out, I called him, and we set up our

3    own procedure in which he said, *You must proceed not with the*

4    *group, but separately.*  Not only did he say that to me, but he

5    put it in his -- as an asterisk footnote in his later filing,

6    which I attached as Exhibit A to my 4808, so that he has taken

7    the position that my deal is separate.

8        **THE COURT:**  Okay.  So I think I get that response on

9    the scheduling.

10       Let's say that the hearing below was inadequate.  Let's

11   get to the substance.  Let get to the merits.  Why was the

12   allocation of the fee to you on the merits wrong?

13       **MR. WINTERS:**  Here's what happened.  Out of the 145-,

14   the Special Master set aside 27-.  Well, let's say make it 25-.

15   Twenty-five, just to keep the numbers straight.  That leaves a

16   balance of 120,000.  He then cut the 120,000 down to 20-.  I'm

17   saying that's a pretty drastic.  He used sort of a -- a double

18   method of doing it.  One was to cut the rate, and the other was

19   to cut the --

20       **THE COURT:**  Right, but this is something that the

21   Special Master did with many people.

22       **MR. WINTERS:**  I appreciate that.

23       **THE COURT:**  And sometimes -- and he had his reasons

24   for it.

25       My question for you is:  Why was his reasoning wrong?

1    For example, if he drew certain conclusions about the

2  quality or timing or benefit of your work, what were the

3  conclusions, and why were those conclusions in error?

4    That's why I started by saying I read your Declaration,

5  but I didn't see you as making any particular request of the

6  Court.  It would be helpful for me to know why you think the

7  Special Master made a mistake.

8    **MR. WINTERS:**  I think on the first thing he did,

9  which was to cut the rate -- that was appropriate.

10    The second thing he did -- I mean, having cut the rate,

11  you would think that might be enough of a reduction, because

12  you've already cut a third:  40,000 out of 120-.

13    Then he went back and just arbitrarily -- the problem is

14  that what he did with the remainder, taking it down from 80- to

15  20-, was just arbitrary.

16    **THE COURT:**  Okay.

17    **MR. WINTERS:**  Thank you.

18    **THE COURT:**  Thank you.

19    Mr. Alioto.

20  (Discussion off the record.)

21    **MR. MARIO ALIOTO:**  Thank you, Your Honor.

22    I'd like to respond to Ms. Kirkham, and to Mr. O'Connor on

23  behalf of Mr. Scarpulla.

24    And before I do, we have quite an extensive record here:

25  A full record before the Special Master, and a large record in

1   front of Your Honor.  So before I embark on this and lose my

2   time, I'd like to ask Your Honor if there are any areas or any

3   points that you would like me to address.

4           **THE COURT:**  There are not, but thank you for asking.

5           **MR. MARIO ALIOTO:**  Thank you.

6       As Your Honor can see from the filings in this matter, we

7   have a large number of law firms; almost 50 firms.  We've been

8   able to allocate the fee to the satisfaction of all of those

9   firms.  That's not to say everyone is happy or everyone is

10  pleased, but we got it done.

11      There are four firms -- actually five firms that have

12  objected.

13      There's another firm, Mr. Barry -- Brian Barry -- who has

14  not appeared to give any oral argument here.

15      So the rest of the Objectors to the allocation are all

16  this subset of the case.  They're Objectors to the case.  They

17  have other issues, and there's no secret about it.  It's all

18  through the papers.  There's problems with fees.  There's

19  problems on our auditing their fees.

20      There are a number of issues in play here; but from my

21  perspective -- from Lead Counsel's perspective -- the goal has

22  always been to get this fee allocated fairly, to get agreement

23  by everyone based upon objective factors.  And that's what we

24  did.  And we did that in the first instance.  And then we

25  circled back with our colleagues to tell them what we had done,

1   and to get their input on that, to sharpen this process up.

2       And as a result of that work, no -- no mean feat,

3   Your Honor.  We've been at this settlement approval and fee

4   phase of this case going on almost two years here now.  It's

5   really been quite -- it's been a case of its own, just getting

6   the case -- the settlements finalized, and the fees -- and the

7   fees allocated, but we've given it our best.  And we've done it

8   at all times based on objective criteria.

9       In the case of -- well, I can make this pretty easy.  In

10  the case of Mr. Winters, in the case of Ms. Moore, and in the

11  case of Mr. Barry, who isn't here, but I'll respond to him, as

12  well, especially with respect to Ms. Moore and Mr. Winters,

13  there was nothing -- and I'm sorry to have to say this on this

14  record, but I have to let the Court know how I got to the

15  result I got to.  There was nothing in the work of Winters or

16  Moore that gave value to the case.  There was nothing that

17  helped the cause.  There was nothing that was of benefit to me.

18  There was nothing that contributed to the result.  I'm sorry to

19  have to say that quite candidly, but that's the basis for my

20  allocation; the basis for giving what I did.  It's not

21  motivated by retaliation or revenge or some mean spirit.  There

22  was no contribution to the case in the case of those

23  individuals.

24      An argument could be made very easily that there should be

25  no compensation -- zero -- but we made the decision that they

1  had a client.  In the case of Mr. Winters, he had a client.

2      In the case of Ms. Moore, it's very -- very unclear

3  whether she had a client or not.  In fact, the record is

4  probably that she did not have a client, but we gave her the

5  benefit of the doubt that she probably had a client.

6  Therefore, it was necessary to compensate her in some degree.

7      So that's the allocations to Winters and to Ms. Moore.

8  The amounts that they received are extremely generous when

9  compared to their contributions to the case.

10     In the case of Mr. Scarpulla, and Mr. -- and the Cooper &

11 Kirkham firm, we have an interesting wrinkle there that you

12 don't usually get in these cases.  You have lawyers who worked

13 on the case shifting gears, changing position, and advocating

14 against the case; taking a position against the case; taking a

15 position against the settlements.

16     Now, let me make one thing very clear about that.  They

17 have the right to do that, under Rule 23; at least, somewhat a

18 right.  I'm going to elaborate a little more on that, to show

19 that it's not precisely what they did; but the concept that

20 someone has the right to object or let his views be known --

21 that's contemplated within Rule 23.

22     And we're not taking any action against these Objectors

23 for the mere fact of objecting and making their views be known;

24 but in the case of these two gentlemen -- Mr. Scarpulla and

25 Mr. Cooper -- they went far beyond that in this case.  They

 1  splintered off and became involved in the settlement process

 2  with the defendants.

 3      And in these cases, there is nothing more damaging or

 4  detrimental that you could possibly do in one of these large

 5  cases.  It undermines Lead Counsel's authority.  It makes

 6  settlement extremely difficult, if it wasn't difficult enough.

 7  It blurs the lines of authority.  It undermines the Lead

 8  Counsel Order which was entered by Judge Conti years ago:

 9  2008.  And that Order, on no uncertain terms, has a provision

10  in there -- the most important provision in the whole Order --

11  that Lead Counsel runs the show on settlement.

12      And maybe I did it right, and maybe I didn't do it right,

13  but we caught the rabbit and we got it done, through no help of

14  those gentlemen.

15      By the way, that reference is to ECF 47.  That's

16  Judge Conti's Order appointing Lead Counsel; a very fundamental

17  Order in a case, because that sets the lines, and sets the

18  lines of authority in cases of this nature.

19      So as Your Honor can see, we are not taking action in

20  retaliation, or trying to reduce people's fees for the mere act

21  of objecting.

22      Injecting themselves in the settlement process, as

23  Mr. Scarpulla and Mr. Cooper did, has nothing to do with

24  objecting to the settlement.  Completely different issue.  But

25  while I'm on that, what else went into my decision making on

awarding their fee?  What objective factors did I consider?

Because these two gentlemen were different than the other lawyers in the case.  The other lawyers in the case supported the case, worked toward the conclusion of the case, still are working toward the conclusion of the case.  We've got a way to go here.  We have 11 appeals that we're processing, and we've got a way to go.

Coming back, though, to Mr. Scarpulla and Cooper, besides injecting themselves into the settlement -- and I will say this, Your Honor; that although the case worked out quite well for the Class and we did get a good result, there is absolutely no question that their actions delayed the ultimate settlements.  There's no question about that.  And delay translates into delay for the litigants.  It translates into expense.  It translates into extra fees.  It translates into more work for the Court.  And we can only wonder whether -- how much sooner we could have gotten these cases resolved, if we didn't have this sideshow out there, with two counsel who injected themselves into the proceeding without any authority.  And it's really quite irrelevant what their motivations were.

There's procedures in place in case -- if you have a disagreement as to how matters ought to be handled.  You go to the Court.  You petition to the Court.  You make your views be known.  You don't go off on a lark, without any authorization.

Two other points here, Your Honor.  And that has to do

with the fee petition, and trying to make fair awards to
Mr. Scarpulla and Mr. Cooper.  Especially in the case of
Mr. Scarpulla, we got zero cooperation.  We got animosity and
resistance, and it made setting his fee that much more
difficult.  We have, however, been able to piece it all
together, and come to what I think is a fair award for
Mr. Scarpulla and for Mr. Cooper.  But again:  More work, more
time, more effort.  It was just -- the process was extended far
and beyond what it had to be.

        Finally, with respect to Scarpulla and Cooper's objections
to the settlement:  Nothing improper about making an objection.
You have your right to get up and express your views on the
case, but two points bear mentioning.  Two points.

        One, the way the objections occurred.

        As Lead Counsel, when we reached a settlement in the case,
the first thing we did was make the Settlement Agreement and
the preliminary approval papers that we were going to file with
Your Honor -- we made those available to all of the lawyers in
the case.  Here is the settlement.  Here is what we're going to
be proposing to Judge Tigar.  Here's the plan of distribution.
Here is the notice.  And we sent that to everyone, so that they
could advise the clients, so that they could be apprised of the
settlements, and so that we could get feedback, and so that we
could have the benefit of our colleagues weighing in on the
settlement.  Not all lawyers in the case were involved, but

1  this was their chance now to look at it and get involved.

2       And, believe it or not, we had some calls and we had some

3  input.  And we were receptive to it, because that was the whole

4  purpose of circulating the documents.

5       Messrs. Scarpulla and Cooper actually -- actually did have

6  some comments about the papers.  They called and they said,

7  *Well, we don't like the way the fees are going to be awarded.*

8  *We're concerned about our fees.  We're concerned about how*

9  *we're going to get paid, and we want to change that around.*

10      Well, all right.  That was within their rights, as well.

11 The important thing is they didn't have a word to say about the

12 substance of the settlements.  And they -- they didn't have a

13 word to say about it until after we came in and got Your

14 Honor's preliminary approval.

15      We published notice to the Class.  Actually, it was a

16 notice that went throughout the Western Hemisphere -- not the

17 United States; the Western Hemisphere -- to the tune of about a

18 million and a half dollars.

19      And only then did we hear from Mr. Scarpulla and

20 Mr. Cooper about the settlement.  *The notice was flawed.  The*

21 *plan was allocation was flawed.  The reach of the notice was*

22 *flawed.  The releases were too broad.*

23      All of those points should have been mentioned before the

24 notice went out.  It was clear as day.  It was plain.  And

25 these are -- you've heard from their counsel; and you've heard

their -- their assessments of their legal abilities.  They have

assessed their legal abilities to be very, very high.  And they

are high.  And they are high enough to know that they should

have made those objections before we spent a million and a half

dollars notifying the -- notifying the whole Western Hemisphere

of the settlement.  And they didn't.  And they didn't.

Those objections probably could have been mooted.  I don't

know.  It's hard to tell if we would have been able to moot

them completely, but we certainly would have tried.  Maybe we

could have mooted them completely.  And instead what we've been

doing now is we've been spending the last couple of years

arguing about settlements, and fees, and all of these tail end

of the settlement.

Our goal here is to get these cases done, and get the

money to the consumers.  Almost $600 million sitting in some

banks -- we want to get it to the consumers.  That's our goal.

Our goal is not retribution or punishment or payback.  Our goal

is:  Get the money back, allocate the fee in a fair and

reasonable manner, and be done with it.

**THE CLERK:**  You have four minutes remaining.

**MR. MARIO ALIOTO:**  Thank you.

I'm going to cede now very briefly.  Just some final

arguments by Ms. Russell, Your Honor.

Again, we took all of this into account.  I obviously had

a large part in designing this allocation, because I -- I am in

 1  the best position of anyone to know what went on.  I have no

 2  axe to grind here.  I have no allegiances.  I have no

 3  alliances.  This is a single Lead Counsel case.  And it -- when

 4  you're a single Lead Counsel, you make the calls without regard

 5  to any kind of political process.  You do what you think is

 6  best for the case.  And that's what we did here to arrive at

 7  this allocation, which is acceptable to almost 50 law firms.

 8       And the only Objectors that we have at this stage of the

 9  game are -- are Objectors to the settlement, itself.  I think

10  they have other issues besides really just these fee issues.

11  There are other factors in play.

12       With that, Your Honor, I'd like to just cede the rest of

13  my time to Ms. Russell.

14       Thank you.

15            **THE COURT:**  Thank you.

16            **MS. CAPURRO:**  Thank you, Your Honor.

17       Good morning.  I'm going to keep this very brief, you'll

18  be pleased to hear.  I don't believe either Ms. Moore or

19  Mr. Winters gave you any reason to diverge from what the

20  Special Master found as to their contributions to this case.

21       The only dispute we have with what the Special Master did

22  with regard to both Ms. Moore and Mr. Winters was that he

23  allowed a certain amount of compensation for what we termed as

24  "read and review time"; in other words, time spent reading the

25  docket, and nothing else.

1     With regard to Ms. Moore, we don't believe that any

2 compensation for the read and review time is warranted, because

3 there has been no showing by Ms. Moore, despite multiple

4 requests from Lead Counsel, that she was reading and reviewing

5 the docket in order to inform a client.  Her time records do

6 not show any communications with a client.  They have no

7 reference to a client in there, at all.  We only have a notice

8 of appearance filed by Joseph Alioto.  That's her only evidence

9 of representing a client.

10     During the case we work with several other lawyers to

11 communicate with the clients that she claims to represent.  So

12 we don't feel that the time that Ms. Moore spent reading and

13 reviewing the docket should receive any compensation.  It would

14 be unfair to the other IPP counsel in this case to compensate

15 her for that time, given that they all eliminated any such time

16 from their -- from the time that was submitted with the fee

17 petition.

18     With regard to Mr. Winters, Your Honor is correct that --

19 and Mr. Special Master Quinn was correct in his summary of the

20 procedural history with regard to Mr. Winters.  He missed all

21 deadlines for becoming part of the fee petition.  He never even

22 communicated with Lead Counsel throughout the case.  We had no

23 idea that he had any time in the case.  He never submitted his

24 time records to us.  That's why he was never included in the

25 original fee petition filed way back in September 2015.  He

1  only appeared months later, in December 2015, to file his

2  Declaration; and then again missed the hearing.

3      He complains about not getting a hearing before Special

4  Master Quinn, but there was a hearing that was publicly noticed

5  on the docket in January of 2016, and Mr. Winters did not

6  appear at that hearing.

7      He then also missed the deadlines for objecting to Lead

8  Counsel's allocation of the fee, and disobeyed the Court Order

9  on the procedure for disputing that allocation, and filed his

10 own motion.  I think all of this is in the papers, Your Honor.

11     Again, with regard to Mr. Moore [sic], we don't believe

12 that the read and review time that he has submitted should be

13 compensated, because again it would be unfair to other counsel

14 who voluntarily eliminated that time.

15     Thank you, Your Honor.

16     Do you have any questions?

17         **THE COURT:**  I don't.

18         **MS. CAPURRO:**  Okay.  Thank you.

19         **THE COURT:**  Thank you.

20     I think that covers it, with one exception, I think, which

21 will be the final approval of the last piece; the last piece of

22 the Direct Purchaser case involving Mitsubishi.  This will be

23 my last hearing in this case, I think, unless the Ninth Circuit

24 asks me to do part of the case over again, which might happen.

25     I just want to thank you all for your hard work on this

1    case.  I wish I could say to the faces of the lawyers who

2    aren't here, which -- as you know, there are many, many, many.

3    Sometimes they all come, but they didn't all come today.  I

4    wish I could say that to them, too.

5        I know this case has been pending for an extraordinarily

6    long time.  No one uses cathode ray tubes anymore.  I've cited

7    in some of my orders articles about how obsolete they are.

8    There's got to be some irony in there.  We're not at the <u>Bleak</u>

9    <u>House</u> stage yet, but the continuation of the case well past the

10   utility of the technology is interesting.

11       Anyway, I know the case has been pending for a long time.

12   I've done what I could since I inherited it to help get it back

13   on track.  And I appreciate your patience while I try to do

14   that.  And I'm glad to see that the case is almost over.

15       I just want to thank -- in addition to all of you, the

16   Special Masters have been so incredibly helpful.  I have only

17   departed very occasionally from their recommendations.  We've

18   all been very, very lucky to have Special Masters of the

19   caliber of Martin Quinn and Judge Vaughn Walker to work on this

20   case.  If I were doing a case over again, if I had been the

21   person who signed and helped draft the Order appointing a

22   Special Masters, we would have had a much more deferential

23   standard of review.  It would have made my life easier.  And I

24   don't think it -- I think it wouldn't have mattered to any of

25   you, because you would have been getting in the first instance

the caliber of judicial work that was required to resolve your

disputes.   So I just wanted to thank both of them.

    I'm going to take this motion regarding fees under

submission.   I think you can expect an order very shortly.

    Thank you all again.   Court's in recess.

    (At 11:03 a.m. the proceedings were adjourned.)

I certify that the foregoing is a correct transcript from the

record of proceedings in the above-entitled matter.


_____   March 3, 2017
Signature of Court Reporter/Transcriber   Date
Lydia Zinn