1    Guido Saveri (22349) guido@saveri.com
     R. Alexander Saveri (173102) rick@saveri.com
2    Geoffrey C. Rushing (126910) grushing@saveri.com
     Cadio Zirpoli (179108) cadio@saveri.com
3    SAVERI & SAVERI, INC.
     706 Sansome Street
4    San Francisco, CA 94111
     Telephone: (415) 217-6810
5    Facsimile (415) 217-6813

6    *Lead Counsel for the*
     *Direct Purchaser Plaintiffs*
7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11

12   In re: CATHODE RAY TUBE (CRT)          Master File No. 07-CV-5944-JST
     ANTITRUST LITIGATION
13   _____    MDL No. 1917

14    This Document Relates to:             **DECLARATION OF RACHEL**
                                            **CHRISTMAN RE DISSEMINATION OF**
15   *Crago, d/b/a Dash Computers, Inc., et al.*  **NOTICE TO CLASS MEMBERS RE**
     *v. Mitsubishi Electric Corporation, et al.,*  **MITSUBISHI ELECTRIC SETTLEMENT**
16   Case No. 14-CV-2058-JST.               **AND APPLICATION FOR ATTORNEYS'**
                                            **FEES AND EXPENSES AND INCENTIVE**
17                                          **AWARDS**

18                                          Date:      June 8, 2017
                                            Time:      2:00 p.m.
19                                          Judge:     Honorable Jon S. Tigar
                                            Courtroom: 9
20

21

22

23

24

25

26

27

28

---

DECLARATION OF RACHEL CHRISTMAN RE DISSEMINATION OF NOTICE TO CLASS MEMBERS
RE MITSUBISHI ELECTRIC SETTLEMENT AND APPLICATION FOR ATTORNEYS' FEES AND
EXPENSES AND INCENTIVE AWARDS; Master File No. 07-CV-5944-JST

1

I, Rachel Christman, declare as follows:

2

1.      I am employed by Gilardi & Co., LLC ("Gilardi"), located at 3301 Kerner Blvd.,

3

San Rafael, California.  Gilardi was hired by class counsel as the Settlement Administrator in this

4

matter.  I am over 21 years of age and am not a party to this action.  I have personal knowledge of

5

the facts set forth herein and, if called as a witness, could and would testify competently thereto.

6

2       Gilardi was formed in 1984 to assist attorneys with securities, antitrust, consumer

7

protection class actions, and other similar matters.  Gilardi specializes in designing, developing,

8

analyzing, and implementing settlement administration plans that support due process.  During

9

the past 32 years Gilardi has administered class notice and class settlements in over 3,500 class

10

actions, and has distributed more than $20 billion in assets.

11

3.      Between May 16 and May 29, 2012 Gilardi received from Plaintiffs' Counsel eight

12

files which included the names, and, where available, the addresses and electronic mail addresses

13

of all class members identified by Defendants in this matter.  In preparation for previous mailings,

14

Gilardi formatted the list for mailing purposes, removed duplicate records, removed known

15

Defendant entities, researched company names lacking addresses and added addresses where

16

found, and processed the names and addresses through the National Change of Address Database

17

to update any addresses on file with the United States Postal Service ("USPS").

18

4.      In preparation for the mailing of notice regarding the Mitsubishi Electric

19

settlement and Plaintiffs' Application for Attorney's Fees and Expenses and Incentive Awards,

20

Gilardi updated the above mailing list to include names, addresses, and electronic mail addresses

21

collected during the Thomson/TDA claims process. Gilardi removed duplicate and known

22

fraudulent claim filings from this updated list and processed the names and addresses through the

23

National Change of Address Database to update any addresses on files with the USPS.

24

5.      On February 27, 2017, Gilardi caused copies of the court-approved Notice to be

25

printed and mailed to the 19,609 unique names and addresses on the updated class list.  Gilardi

26

delivered the Claim Packets to the United States Post Offices located in Burr Ridge, IL in

27

addressed envelopes with first class postage prepaid thereupon.  A true and correct copy of the

28

1

Notice is attached hereto as Exhibit A.

6.      On February 27, 2017, Gilardi also caused the Notice to be electronically distributed to the 3,626 electronic mail addresses on the updated class list.

7.      On or before June 7, 2012, Gilardi established a case-dedicated website at www.CRTDirectPurchaserAntitrustSettlement.com.  This website has been used to allow public access to various materials relevant to this lawsuit, including notices of settlement, settlement agreements, and court orders. In preparation for the claims process for the Mitsubishi Electric settlement in this litigation, Gilardi has configured the website so that class members can file claims using an online claim form.

8.      On February 27, 2017, I caused electronic copies of (1) the Notice; (2) the Claim Form; (3) Direct Purchaser Plaintiffs' Notice of Motion and Motion for Preliminary Approval of Class Action Settlement with the Mitsubishi Electric Defendants; Directing Notice to the Class; and Memorandum in Support Thereof and the declaration in support thereof; (4) the Proposed Order Granting Preliminary Approval of Class Action Settlement with the Mitsubishi Electric Defendants; (5) the Court's Order Granting Preliminary Approval of Class Action Settlement with the Mitsubishi Electric Defendants; and (6) the Mitsubishi Electric Settlement Agreement to be posted the class website.

9      Class members can also view Frequently Asked Questions and obtain Gilardi's contact information on the class website.  On February 27, 2017, Gilardi caused the "Home," "Frequently Asked Questions," "Dates to Remember" and "Contact Us" pages of the website to be updated with all deadlines and information relevant to the claims process, including the date of the Final Approval Hearing on the Mitsubishi Electric Settlement and the Hearing on Plaintiffs' Application for Attorney's Fees and Expenses and Incentive Awards.

10.      On or before June 7, 2012, Gilardi activated a toll-free telephone number, 1-877-224-3063, through which callers are able to connect with a live customer service representative Monday through Friday from 7:00 a.m. to 5:00 p.m. Pacific Time. English and Spanish-speaking operators are available.

2

1

2      11.    Gilardi caused the Summary Notice to be published in the national edition of the

3  *New York Times* and the *Wall Street Journal* on February 28, 2017.  True and correct copies of

4  the tear sheets provided by the *New York Times* and Wall *Street Journal* are attached hereto as

5  Exhibits B and C.

6

7      I declare under penalty of perjury that the foregoing is true and correct, and that this

8  declaration was executed this 6th day of March, 2017.

9

10

11

12                                        RACHEL CHRISTMAN

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ATTESTATION**

I, R. Alexander Saveri, hereby attest, pursuant to United States District Court, Northern District of California Civil Local Rule 5-1(i)(3), that concurrence to the filing of this document has been obtained from the signatory hereto.

By:     */s/ R. Alexander Saveri*

R. Alexander Saveri

4

# EXHIBIT A

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

# If You Bought A Cathode Ray Tube Product,

## A Class Action Settlement May Affect You.

Cathode Ray Tube (CRT) Products include Cathode Ray Tubes and finished products that

contain a Cathode Ray Tube such as Televisions and Computer Monitors.

*A Federal Court authorized this Notice. This is not a solicitation from a lawyer.*

- A class action lawsuit that includes direct purchasers of CRT Products is currently pending. The Court certified a class of direct purchasers of CRT Products by order dated July 8, 2015. If you are a direct purchaser of CRT Products and you did not exclude yourself from the Class following the Notice of Direct Purchaser Class Certification ("Class Notice") mailed on November 23, 2015, you are a member of the Class and your rights will be affected.

- Plaintiffs claim that Defendants and Co-Conspirators (listed below) engaged in an unlawful conspiracy to fix, raise, maintain or stabilize the prices of Cathode Ray Tubes. Plaintiffs further claim that direct purchasers of televisions and monitors that contain a cathode ray tube from the Defendants may recover for the effect that the cathode ray tube conspiracy had on the prices of televisions and monitors. Plaintiffs allege that, as a result of the unlawful conspiracy involving cathode ray tubes, they and other direct purchasers paid more for CRT Products than they would have paid absent the conspiracy. Defendants deny Plaintiffs' claims.

- A settlement has been reached with Mitsubishi Electric Corporation; Mitsubishi Electric US, Inc. (formerly known as Mitsubishi Electric & Electronics USA, Inc.); and Mitsubishi Electric Visual Solutions America, Inc. (formerly known as Mitsubishi Digital Electronics America, Inc.). The companies are together referred to as "Mitsubishi Electric Defendants."

- Your legal rights will be affected whether you act or don't act. This Notice includes information on the Settlement and the continuing lawsuit. Please read the entire Notice carefully.

## These Rights and Options – and deadlines to exercise them –

## are explained in this notice.

| | |
|---|---|
| You can object to or comment on the Settlement | *see* Question 10 |
| You may go to a hearing and comment on the Settlement | *see* Question 13 |
| You may make a new or supplemental claim | *see* Question 9 |

The Court in charge of this case still has to decide whether to approve the Settlement.

### WHAT THIS NOTICE CONTAINS

**Basic Information** ................................................................................................................................................ **Page 2**
1. Why did I get this notice?
2. Who are the Defendant and Co-Conspirator companies?
3. What is this lawsuit about?
4. Were there other settlements in this litigation?
5. What is a Cathode Ray Tube Product?
6. What is a class action?

**The Class** ................................................................................................................................................................ **Page 3**
7. How do I know if I'm part of the Class?
8. What does the Settlement provide?
9. When can I get a payment?
10. May I object to or comment on the Settlement?

**The Settlement Approval Hearing** .................................................................................................................... **Page 4**
11. When and where will the Court decide whether to approve the Settlement?
12. Do I have to come to the hearing?
13. May I speak at the hearing?

**The Lawyers Representing You** ......................................................................................................................... **Page 4**
14. Do I have a lawyer in the case?
15. How will the lawyers be paid?

**Getting More Information** .................................................................................................................................. **Page 4**
16. How do I get more information?

**For More Information: Call 1-877-224-3063 or Visit**
**www.CRTDirectPurchaserAntitrustSettlement.com**

**BASIC INFORMATION**

**1.     Why did I get this notice?**

You or your company may have directly purchased Cathode Ray Tubes (CRTs) or certain products containing those tubes between March 1, 1995 and November 25, 2007. A direct purchaser is a person or business who bought a CRT, or a television or computer monitor containing a CRT directly from one or more of the Defendants, co-conspirators, affiliates, or subsidiaries themselves, as opposed to an intermediary (such as a retail store).

You have the right to know about the litigation and about your legal rights and options before the Court decides whether to approve the Settlement.

The notice explains the litigation, the settlement, and your legal rights.

The Court in charge of the case is the United States District Court for the Northern District of California, and the case is called *In re Cathode Ray Tube (CRT) Antitrust Litigation*, MDL No. 1917. The people who sued are called Plaintiffs and the companies they sued are called Defendants.

**2.     Who are the Defendant and Co-Conspirator companies?**

The Defendant and Co-Conspirator companies include: Thomson SA (now known as Technicolor SA); Thomson Consumer Electronics, Inc. (now known as Technicolor USA, Inc.); Technologies Displays Americas LLC (formerly known as Thomson Displays Americas LLC); Videocon Industries, Ltd.; Mitsubishi Electric Corporation; Mitsubishi Electric US, Inc. (formerly known as Mitsubishi Electric & Electronics USA, Inc.); Mitsubishi Electric Visual Solutions America, Inc. (formerly known as Mitsubishi Digital Electronics America, Inc.); LG Electronics, Inc., LG Electronics U.S.A., Inc., LG Electronics Taiwan Taipei Co., Ltd., Koninklijke Philips Electronics N.V., Philips Electronics North America Corporation, Philips Electronics Industries (Taiwan), Ltd., Philips da Amazonia Industria Electronica Ltda., LP Displays International, Ltd. f/k/a LG.Philips Displays, Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung SDI Co. Ltd., Samsung SDI America, Inc., Samsung SDI Mexico S.A. de C.V., Samsung SDI Brasil Ltda., Shenzhen Samsung SDI Co. Ltd., Tianjin Samsung SDI Co. Ltd., Samsung SDI Malaysia Sdn. Bhd., Toshiba Corporation, Toshiba America Consumer Products, L.L.C., Toshiba America Information Systems, Inc., Toshiba America Electronic Components, Inc., Panasonic Corporation f/k/a Matsushita Electric Industrial, Ltd., Panasonic Corporation of North America, MT Picture Display Co., Ltd., Beijing-Matsushita Color CRT Company, Ltd. (BMCC), Hitachi, Ltd., Hitachi Displays, Ltd. (n/k/a Japan Display Inc.), Hitachi Electronic Devices (USA), Inc., Hitachi America, Ltd., Hitachi Asia, Ltd., Tatung Company of America, Inc., Chunghwa Picture Tubes Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd., IRICO Group Corporation, IRICO Display Devices Co., Ltd., IRICO Group Electronics Co., Ltd., Thai CRT Company, Ltd., Daewoo Electronics Corporation f/k/a Daewoo Electronics Company, Ltd., Daewoo International Corporation, Irico Group Corporation, Irico Group Electronics Co., Ltd., and Irico Display Devices Co., Ltd.

**3.     What is this lawsuit about?**

The lawsuit alleges that Defendants and Co-Conspirators conspired to raise and fix the prices of CRTs and the CRTs contained in certain finished products for over ten years, resulting in overcharges to direct purchasers of those CRTs and certain finished products containing CRTs. The complaint describes how the Defendants and Co-Conspirators allegedly violated the U.S. antitrust laws by establishing a global cartel that set artificially high prices for, and restricted the supply of CRTs and the televisions and monitors that contained them. Defendants deny Plaintiffs' allegations. The Court has not decided who is right.

**4.     Were there other settlements in this litigation?**

Yes. This notice concerns a settlement with the Mitsubishi Electric Defendants. Plaintiffs have also reached previous settlements with eight other groups of defendants: 1) Chunghwa Picture Tubes Ltd., Chunghwa Picture Tubes (Malaysia) Sdn. Bhd.; 2) Koninklijke Philips Electronics N.V.; Philips Electronics North America Corporation, Philips Electronics Industries (Taiwan), Ltd.; Philips da Amazonia Industria Electronica Ltda.; 3) Panasonic Corporation (f/k/a Matsushita Electric Industrial, Ltd.); Panasonic Corporation of North America; MT Picture Display Co., Ltd. (this settlement also releases Beijing-Matsushita Color CRT Company, Ltd.); 4) LG Electronics, Inc.; LG Electronics U.S.A., Inc.; LG Electronics Taiwan Taipei Co., Ltd. (this settlement also releases LP Displays International, Ltd. f/k/a LG.Philips Displays.); 5) Toshiba Corporation; Toshiba America Information Systems, Inc.; Toshiba America Consumer Products, L.L.C.; Toshiba America Electronic Components, Inc.; 6) Hitachi, Ltd.; Hitachi Displays, Ltd. (n/k/a Japan Displays Inc.); Hitachi America, Ltd.; Hitachi Asia, Ltd.; Hitachi Electronic Devices (USA) Inc.; 7) Samsung SDI Co. Ltd. (f/k/a Samsung Display Devices Co., Ltd.); Samsung SDI America, Inc.; Samsung SDI Brasil, Ltd.; Tianjin Samsung SDI Co., Ltd.; Samsung Shenzhen SDI Co., Ltd.; SDI Malaysia Sdn. Bhd.; SDI Mexico S.A. de C.V.; 8) Thomson SA (now known as Technicolor SA); Thomson Consumer Electronics, Inc. (now known as Technicolor USA, Inc.); and Technologies Displays Americas LLC (formerly known as Thomson Displays Americas LLC). The eight previous settlements have been finally approved by the Court.

**5.     What is a Cathode Ray Tube Product?**

For the purposes of the Settlement, Cathode Ray Tube Products means Cathode Ray Tubes of any type (e.g. color display tubes and color picture tubes) and finished products which contain Cathode Ray Tubes, such as Televisions and Computer Monitors.

**6.       What is a class action?**

In a class action, one or more people, called class representatives, sue on behalf of people who have similar claims. All these people are members of the class, except for those who have previously excluded themselves from the class.

Important information about the case is posted on the website, **www.CRTDirectPurchaserAntitrustSettlement.com** as it becomes available. Please check the website to be kept informed about any future developments.

<b>THE CLASS</b>

**7.       How do I know if I'm part of the Class?**

The Class includes:

> All persons and entities who, between March 1, 1995 and November 25, 2007, directly purchased a CRT Product in the United States from any defendant or subsidiary or affiliate thereof, or any co-conspirator ("Class").

If you excluded yourself from the Class by filing a request for exclusion with the Court following the Class Notice sent to you by U.S. Mail or e-mail on November 23, 2015 and published in the *Wall Street Journal* or the *New York Times* on November 24, 2015, you are not a Class member and this Notice does not affect you.

**8.       What does the Settlement provide?**

The Settlement with the Mitsubishi Electric Defendants provides for a payment in the amount of $75,000,000 in cash to the Class (the "Mitsubishi Electric Settlement Fund").

More details are in the Settlement Agreement, available at **www.CRTDirectPurchaserAntitrustSettlement.com.**

**9.       When can I get a payment?**

Distribution of the Mitsubishi Electric Settlement Fund will be made, along with a previous settlement of $9,750,000 with the Thomson and TDA defendants ("Thomson/TDA Settlement Fund"), on a *pro rata* basis once the Court finally approves the settlement and authorizes distribution of the Mitsubishi Electric Settlement Fund.

Class members have already submitted claim forms for distribution of the *pro rata* shares of the previous settlements (except the Thomson/TDA settlement). If you submitted a claim form, it will be considered as part of the *pro rata* distribution of the Mitsubishi Electric and Thomson/TDA Settlement Funds. You need not submit an additional claim form. If you wish to supplement or amend your claim form, for example to add purchases from the Mitsubishi Electric Defendants, Thomson/TDA defendants, or others, you may do so. You may also submit a new claim. Directions for filing a new or supplemental claim, either online or using a downloadable claim form, can be found on the class website **www.CRTDirectPurchaserAntitrustSettlement.com**.

Any new or supplemental claims must be submitted online or postmarked by **May 29, 2017.**

In the future, each Class member's *pro rata* share of the Mitsubishi Electric and Thomson/TDA Settlement Funds will be determined by computing each valid claimant's total CRT Product purchases divided by the total valid CRT Product purchases claimed. This percentage is multiplied by the net Settlement Fund (total of the Mitsubishi Electric and Thomson/TDA Settlement Funds minus all costs, attorneys' fees, and expenses) to determine each claimant's *pro rata* share. To determine your CRT Product purchases, CRT tubes (CPTs and CDTs) are calculated at full value while CRT televisions are valued at 50% and CRT computer monitors are valued at 75%.

In summary, all valid claimants will share in the Mitsubishi Electric Settlement Fund on a *pro rata* basis determined by the CRT value of the product you purchased—tubes 100%, monitors 75% and televisions 50%.

**10.       May I object to or comment on the Settlement?**

Yes. If you have comments about, or disagree with, any aspect of the Settlement, you may express your views to the Court by writing to the address below. The written response needs to include your name, address, telephone number, the case name and number (*In re Cathode Ray Tube (CRT) Antitrust Litigation*, MDL No. 1917), a brief explanation of your reasons for objection, and your signature. The response must be filed with the Court or postmarked no later than **April 20, 2017** and mailed to:

Honorable Jon S. Tigar<br>
United States District Court, Northern District of California<br>
San Francisco Division<br>
450 Golden Gate Avenue<br>
Courtroom 9, 19th floor<br>
San Francisco, CA 94102

You can ask the Court to deny approval by filing an objection. You can't ask the Court to order a larger settlement; the Court can only approve or deny the settlement. If the Court denies approval, no settlement payments will be sent out and the lawsuit will continue. If that is what you want to happen, you must object.

<b>For More Information: Call 1-877-224-3063 or Visit</b><br>
<b>www.CRTDirectPurchaserAntitrustSettlement.com</b>

## THE SETTLEMENT APPROVAL HEARING

**11.     When and where will the Court decide whether to approve the Settlement?**

The Court will hold a Final Approval Hearing at **2:00 p.m.** on **June 8, 2017**, at the United States District Court for the Northern District of California, San Francisco Division, in Courtroom 9 on the 19th Floor, at 450 Golden Gate Avenue. The hearing may be moved to a different date or time without additional notice, so it is a good idea to check the class website for information because additional notice will not be sent. At this hearing, the Court will consider whether the Settlement is fair, reasonable and adequate. If there are objections or comments, the Court will consider them at that time. After the hearing, the Court will decide whether to approve the Settlement. We do not know how long these decisions will take.

**12.     Do I have to come to the hearing?**

No. Lead Counsel will answer any questions the Court may have, but you are welcome to come at your own expense. If you send an objection or comment, you don't have to come to Court to talk about it. As long as you mailed your written objection or comment on time, the Court will consider it. You may also pay another lawyer to attend, but it's not required.

**13.      May I speak at the hearing?**

If you want your own lawyer instead of Lead Counsel to speak at the Final Approval Hearing, you must give the Court a paper that is called a "Notice of Appearance." The Notice of Appearance should include the name and number of the lawsuit (*In re Cathode Ray Tube (CRT) Antitrust Litigation*, MDL No. 1917), and state that you wish to enter an appearance at the Final Approval Hearing. It also must include your name, address, telephone number, and signature. Your Notice of Appearance must be postmarked no later than **April 20, 2017**.

The Notice of Appearance must be sent to the address listed in Question 10.

## THE LAWYERS REPRESENTING YOU

**14.     Do I have a lawyer in the case?**

Yes. The Court has appointed the law firm of Saveri & Saveri, Inc. to represent you as "Lead Counsel." You do not have to pay Lead Counsel. If you want to be represented by your own lawyers, and have that lawyer appear in court for you in this case, you may hire one at your own expense.

**15.     How will the lawyers be paid?**

Lead Counsel will also submit an Application for Attorneys' Fees and Expenses and Incentive Awards to be heard at the Final Approval Hearing on June 8, 2017. Lead Counsel will ask the Court for attorneys' fees not to exceed one-third (33.3%) of the Mitsubishi Electric and Thomson/TDA Settlement Funds plus reimbursement of their costs and expenses, in accordance with the provisions of the Mitsubishi Electric and Thomson/TDA settlement agreements. Lead Counsel may also request that an amount be paid to each of the class representatives who helped the lawyers on behalf of the whole Class.

Lead Counsel will file their Application for Attorneys' Fees and Expenses and Incentive Awards on or before March 30, 2017. On the same day, Lead Counsel will post their Application for Attorneys' Fees and Expenses and Incentive Awards on the Settlement website **www.CRTDirectPurchaserAntitrustSettlement.com**. You may comment on or object to Lead Counsel's Application for Attorneys' Fees and Expenses and Incentive Awards by following the procedure set forth in paragraph 10 above. Any comment or objection must be filed with the Court or postmarked by April 20, 2017.

## GETTING MORE INFORMATION

**16.     How do I get more information?**

This Notice summarizes the lawsuit and the Settlement. You can get more information about the lawsuit and Settlement at **www.CRTDirectPurchaserAntitrustSettlement.com**, by calling 1-877-224-3063, or writing to CRT Direct Settlement, P.O. Box 43455, Providence, RI 02940-3455. Please do not contact the Court about this case.

Dated: February 27, 2017                                                    BY ORDER OF THE COURT

# EXHIBIT B

# A Facebook-Style Social Network Is a Shift in How Science Is Shared

**By MARK SCOTT**

Calvin Coffey, a professor of surgery at the University of Limerick in Ireland, has a world of gadgetry, scientific equipment and medical tests at his disposal.

Recently, he added another tool: social media.

During a monthslong project to prove that the mesentery — folded tissue that connects the intestines to the wall of the abdomen — was in fact a human organ, Professor Coffey regularly turned to his followers on ResearchGate, a free Facebook-style social network aimed solely at scientists



*Helping peers exchange information on their research before publication.*

worldwide, for tips and suggestions on where his four-person team should focus its research.

"It's real-time feedback from people who are experts in this field," said Professor Coffey, who published his findings last month in the The Lancet Gastroenterology & Hepatology, a prestigious British medical journal. "It's not like your typical social media."

That paper was, in part, shaped by his interactions on the social network, indicative of a shift in how scientific research is conducted. As Professor Coffey noted, researchers once faced difficulty in getting feedback from peers before publication, and their projects were often closed to outsiders.

This change was initially gradual. But it has increased in recent years as the cost of cloud computing has plummeted and researchers have become comfortable in uploading their work onto social media.

That is what Ijad Madisch, who founded ResearchGate with three partners in 2008, had in mind when he ditched his budding scientific research career in Massachusetts to return home to Germany to build his start-up in Berlin's fast-growing cluster of technology companies.

According to Mr. Madisch, the social network has signed up 12

Ijad Madisch, a founder of ResearchGate, says that it has signed up 12 million scientists, roughly 60 percent of potential users.

million scientists, or about 60 percent of all such potential users worldwide.

Researchers now upload roughly 2.5 million papers to ResearchGate every month. In comparison, scientists added the same amount of research over the

first four years of the network's operation.

On Tuesday, ResearchGate said that it had raised $52.6 million from a range of investors, including Goldman Sachs, Bill Gates and Benchmark Capital, a venture capital fund. The money, which

more than doubles the amount the network had raised previously, was secured in late 2015 but was only made public on Tuesday in accordance with German corporate accounting rules.

ResearchGate has taken advantage of the growing trend across the scientific world to open up to the wider public and take advantage of technology like machine learning to conduct projects across borders and faster.

The network is one alone in making science more transparent and open. Cancer researchers, for instance, recently created a video game inspired by Space Invaders that allowed people to participate in the crunching of complex data on their smartphones by guiding a craft through space along paths based on genetic sequencing from breast cancer patients.

And as the likes of the Massachusetts Institute of Technology and Harvard increasingly offer online courses to anyone worldwide, even the concept of what it means to go to college — let alone conduct scientific research — is undergoing an upheaval.

Upal Mahbub, a computer scientist at the University of Maryland, for instance, has routinely turned to his followers on ResearchGate as part of his efforts to find a more secure way of protecting people's mobile devices.

Recently, he said, another scientist contacted him through the network, asking to borrow his computer code for an unrelated project, something that would not have been possible if Mr. Mahbub had not posted regular updates about his research.

"I had no problem about sharing my code with him," Mr. Mahbub said. Putting everything online "makes it a lot easier for people to keep track of my research."

---

# Linked to Old Harassment Claim, Uber Official Resigns

**By MIKE ISAAC and DAISUKE WAKABAYASHI**

SAN FRANCISCO — A little more than a week after Uber faced stinging accusations that it had ignored female employees' complaints of sexual harassment, the company dismissed the head of its engineering efforts for failing to disclose a sexual harassment claim from his previous job.

The executive, Amit Singhal, joined Uber last month after overseeing Google's search efforts in a 15-year career at that company. He was asked to resign on Monday by Travis Kalanick, Uber's chief executive.

The move came after Uber learned that Mr. Singhal did not disclose the circumstances of his departure from Google, according to a person familiar with the matter who was not allowed to speak on private personnel issues and asked for anonymity.

The swift dismissal of Mr. Singhal, a high-profile hire who signaled Uber's ability to attract the technology industry's most sought-after executives, comes at a particularly inopportune time for Uber, which is struggling with complaints that a rough-and-tumble culture has allowed sexual harassment to go unpunished. And it may be an indication of how the company is shifting to deal with future problems.

The former Uber engineer Susan Fowler and other current and former employees have claimed that the company's human resources officials repeatedly ignored harassment claims about employees who were "top performers."

Uber asked Eric H. Holder Jr., who served as attorney general under President Obama, to investigate those claims. He is joined by the media mogul Arianna Huffing-



*An executive is said to have failed to disclose the circumstances of his exit from Google.*

ton, a member of Uber's board of directors, and Tammy Albarran, a partner at Mr. Holder's law firm, Covington and Burling.

Last week, the Uber investors Mitch Kapor and Freada Kapor Klein wrote in an open letter to the company that they were frustrated with how Uber had handled its culture issues and that they had "hit a dead end in trying to influence the company quietly from the inside."

The issue involving Mr. Singhal dates to 2015, when he was still at Google. The search giant deemed an employee's claim of sexual harassment against Mr. Singhal "credible" in an internal investigation, according to two people fa-

miliar with the matter who declined to be identified because they were not allowed to speak on the matter.

Mr. Singhal's resignation from Uber was first reported by the technology news website Recode. Uber said, but ultimately he resigned on his own in February 2016. In his goodbye note to the company, there was no mention of a sexual harassment claim against him, or any other signs of problems. In fact, the company held a goodbye party for Mr. Singhal, according to two people who attended the party, one a current Google employee and another a former employee. At the time, Mr. Singhal said he wanted to devote time to philanthropy; he joined Uber less than a year later.

"Harassment is unacceptable in any setting," Mr. Singhal said in a statement Monday. "I certainly want everyone to know that I do not condone and have not committed such behavior. In my 20-year

career, I've never been accused of anything like this before, and the decision to leave Google was my own."

Uber and Google declined to comment on Mr. Singhal.

Mr. Singhal was hired to oversee Uber's mapping division as well as a unit that runs the dispatching, marketing and pricing of Uber cars. He reported directly to Travis Kalanick, Uber's chief executive, and advised Anthony Levandowski, who runs the company's self-driving automobile efforts.

Mr. Singhal's dismissal is another example of both the talent pipeline and the competition between Google and Uber. Last week, Waymo, the self-driving car company spun off from Google, filed a lawsuit against Uber accusing it of colluding with Mr. Levandowski, a former Google employee, to steal its autonomous vehicle technology. Uber called the suit "baseless."

Uber, now privately valued at nearly $70 billion, has raised a dizzying amount of money from venture capitalists around Silicon Valley. One of its early investors was GV, the venture capital arm of Google's parent company, Alphabet. In August, David Drummond, a longtime Alphabet executive who was instrumental in GV's $250 million investment in Uber in 2013, stepped down from Uber's board of directors as it became increasingly clear the two companies were on a collision course.

Mr. Singhal, hired by Google in 2000, was that company's 176th employee, and he rewrote many of the original search algorithms created by the company's founders, Larry Page and Sergey Brin. Mr. Singhal is credited as one of the engineers who built the smarter and faster search engine that gave Google what has proved to be an insurmountable advantage in web search.

Upon joining Uber, Mr. Singhal wrote on his blog that he felt like Uber was a "geek's candy store" because it was trying to solve "one of the most challenging computer science problems I've encountered in my thirty-year career."

---

**LEGAL NOTICE**
**If You Bought A Cathode Ray Tube ("CRT") or CRT Product, A Class Action Settlement May Affect You.**

**CRT Products include Televisions or Computer Monitors that contain Cathode Ray Tubes**

A settlement has been reached with a group of defendants in a class action lawsuit involving CRTs and CRT Products. This is the ninth settlement to date. CRT stands for "Cathode Ray Tube." "Cathode Ray Tube (CRT) Products" include Cathode Ray Tubes and finished products that contain a Cathode Ray Tube such as Televisions and Computer Monitors.

*What is this lawsuit about?*

The lawsuit alleges that Defendants and Co-Conspirators engaged in an unlawful conspiracy to fix, raise, maintain or stabilize the prices of CRTs. Plaintiffs further claim that direct purchasers of televisions and monitors that contain a cathode ray tube from the Defendants may recover for the effect that the cathode ray tube conspiracy had on the prices of televisions and monitors. Plaintiffs allege that, as result of the unlawful conspiracy, they and other direct purchasers paid more for CRT Products than they would have absent the conspiracy. Defendants deny Plaintiffs' claims.

*Who's included in the settlement?*

The settlement includes all persons and entities who, between March 1, 1995 and November 25, 2007, directly purchased a CRT Product in the United States from any defendant or subsidiary or affiliate thereof ("Class"), who did not exclude themselves following the Notice of Class Certification sent to Class members in November 2015 and published in the *New York Times* and the *Wall Street Journal*.

*Who are the settling defendants?*

A settlement has been reached with Mitsubishi Electric Corporation; Mitsubishi Electric US, Inc. (formerly known as Mitsubishi Electric & Electronics USA, Inc.); and Mitsubishi Electric Visual Solutions America, Inc. (formerly known as Mitsubishi Digital Electronics America, Inc.). The companies are together referred to as "Mitsubishi Electric Defendants." A complete list of Defendants and Co-Conspirators is set out in the Long Form Notice available at www. CRTDirectPurchaserAntitrustSettlement.com.

*What does the settlement provide?*

The Mitsubishi Electric settlement provides for the payment of $75,000,000 in cash to the Class. The Settlement Fund will be

distributed, along with the $9,750,000 Thomson and TDA settlement fund, on a *pro rata* basis once the Court finally approves the settlement and authorizes distribution of the Settlement Funds. If you have already submitted a claim relating to the previous settlements, you need not submit an additional claim to receive money from these settlements. If you wish submit a new or supplemental claim you may do so by May 29, 2017. Instructions for submitting a new or supplemental claim can be found at www.CRTDirectPurchaserAntitrustSettlement.com.

*What are my rights?*

If you wish to comment on or disagree with any aspect of the proposed settlement, you must do so in writing no later than April 20, 2017. The settlement agreement, along with details on how to object to it, is available at www.CRTDirectPurchaserAntitrustSettlement. com. The U.S. District Court for the Northern District of California will hold a Final Approval Hearing at 2:00 p.m. on June 8, 2017, at the U.S. District Court for the Northern District of California, 450 Golden Gate Ave., San Francisco, CA 94102, Courtroom 9, 19th Floor. The hearing may be moved to a different date or time without additional notice, so it is a good idea to check the class website for information, as additional notice will not be sent.

The Court has appointed the law firm of Saveri & Saveri, Inc. to represent Direct Purchaser Class members as Lead Class Counsel. At the Final Approval Hearing, the Court will consider whether the settlement is fair, reasonable and adequate. Class Counsel will also make an application for attorney fees of up to 33.3% of the Mitsubishi Electric and Thomson/TDA settlement funds and expenses at the Final Approval Hearing. You may also object to or comment on Class Counsel's fee and expense application in the same manner set forth above. The Court will consider any objection to the Settlement or the fee and expense application at the Final Approval Hearing. You may appear at the hearing, but don't have to. We do not know how long these decisions will take.

This is a Summary Notice. For more details, call toll free 1-877-224-3063, visit www.CRTDirectPurchaserAntitrustSettlement.com, or write to CRT Direct Settlement, P.O. Box 43455, Providence, RI 02940-3455.

---

# Four Carmakers Knew About Airbag Hazard, Class-Action Suit Says

*From First Business Page*

deal on Monday in Detroit, arguing that the automakers were accomplices in the cover-up. He urged the Justice Department to further investigate the automakers' role.

The plaintiffs have taken particular issue with the amount set aside for victims in Takata's plea — a total of $125 million. In contrast, the automakers will have recourse to draw on an $850 million fund to offset recall costs.

Judge George Caram Steeh dismissed Mr. Dean's objections, saying Takata's plea deal was in the best interest of the victims. He said any further action against the automakers should be pursued in civil court, and approved the plea deal.

Randi Johnston, 26, of Farmington, Utah — who was injured in September 2015 when the airbag in her 2003 Honda Civic ruptured and metal shards struck her throat — attended the hearing and said afterward that she was shocked by the judge's decision. The shards severed most of her vocal cords, leaving her able to speak only in a whisper.

"I really don't have any words right now," said Ms. Johnston, a

*Allegations that companies continued to use flawed airbags to save money.*

plaintiff in the Florida class-action case.

The filing by the plaintiffs says emails and internal documents turned over by Honda show that in 1999 and 2000, the automaker was intimately involved in developing a problematic propellant, or explosive, used in Takata's airbags. The propellant is housed in a container called the inflater, which in the Takata case can rupture, shooting metal fragments toward the driver or passengers.

That propellant, based on a volatile compound, raised concerns internally at Takata at the time, and long plagued the company's engineers. During testing of Takata's inflaters in 1999 and 2000 at Honda's own facilities, at least two inflaters ruptured, according to the filing. Still, Honda pushed a particularly problematic configuration of the propellant over Takata's objections, the filing said. Honda chose Takata's airbags because of their relative "inexpensiveness," the filing quoted Honda documents as saying.

The first recalls of Takata's airbags did not take place until almost a decade later, when Honda recalled 4,000 vehicles in 2008. The Times has reported that Honda and Takata became aware in 2004 of an airbag explosion in a Honda Accord in Alabama that

shot out metal fragments and injured the car's driver. But the two companies deemed it "an anomaly" and did not issue a recall or seek the involvement of federal safety regulators.

On Monday, Honda denied the allegations in the plaintiffs' filing. When it installed Takata's airbags, it said in a statement, "Honda reasonably believed, based on extensive test results provided by Takata, that they were safe."

Honda said it believed it reacted "promptly and appropriately" in handling known airbag defects. It also said Takata's airbags had not necessarily been cheaper than those of its competitors.

"Sometimes they were more expensive, sometimes less," the carmaker said.

The filing also cites internal documents from Ford, Nissan and Toyota indicating that cost considerations influenced the automakers' decision to adopt Takata's airbags in the early 2000s, despite safety concerns.

Toyota used Takata's airbags "primarily" for cost reasons, even though the automaker had "large quality concerns" about Takata and considered the supplier's quality performance "unacceptable," the filing said. In 2003, a Takata inflater ruptured at a Toyota facility during testing, the court filing said.

In 2005, Nissan began investigating the use of adding a drying agent to Takata's airbag inflaters out of concern that exposure to moisture made the propellant particularly unstable, the filing says. Takata had long known that its explosive was sensitive to moisture and adopted it despite internal concerns over its safety. Although patents show that its engineers have struggled to tame the propellant, the company maintains the explosive can be stabilized to withstand moist conditions.

Ford chose Takata's inflaters over the objections of the automaker's own inflater expert, who opposed Takata's propellant because of its instability and sensitivity to moisture, the filing said. Ford overrode those objections because it thought Takata was the only supplier that could provide the large number of inflaters Ford needed, the filing says.

The filing says that Ford, Honda, Nissan and Toyota were also aware of instances of ruptures years before any recalls.

It also mentions the German carmaker BMW and points to circumstantial evidence that BMW was similarly involved in what federal prosecutors, in their criminal complaint and in announcing the Takata guilty-plea agreement, have called a cover-up. But BMW has so far refused to submit documents in the case, the filing says.

Representatives of Nissan and BMW said the companies could not comment on active cases. A Toyota representative also declined to comment. A Ford spokeswoman said the automaker would respond through appropriate legal channels.

---

**COMMERCIAL REAL ESTATE BUSINESS OPPORTUNITIES**

**BUSINESS OPPORTUNITIES** (3400)

| Capital Wanted | 3402 |
| --- | --- |

Loan Needs Capital! Loss Mitigation company with excellent high volume of Business in search of capital partner. Direct access to decision maker needed. Residential (Gen mods). NO ... BROKERS.
AGIKUSHT.COM, 80449529

| Camps & Schools | 3450 |
| --- | --- |

Great opportunity
Looking for early childhood teacher, day off the book's especially if your retired. light9nandbright420@gmail.com

# EXHIBIT C

THE WALL STREET JOURNAL.                    * *                    Tuesday, February 28, 2017 | **B5**

## TECHNOLOGY

# Creative Hiring Tactics Attract Tech Talent

BY KIM S. NASH

Competing for scarce technology talent requires creative, sometimes steely tactics from chief information officers.

**Sysco** Corp. coaxes Houston teens to code, encouraging careers in tech. **UBS Group** AG has tweeted encrypted messages to **CIO JOURNAL** attract cryptographers. Ticketmaster hires expert authors of techie books. **Papa John's International** Inc. went to court over a coveted technology executive. **Target** Corp. plans to collaborate with **Cargill** Inc. to persuade IT professionals to move to the Midwest.

The skills shortage is a growing problem as more corporate functions rely on technology and, indeed, become completely digitalized. "Distribution, manufacturing, office jobs are being replaced by software," says Mike McNamara, Target's chief information and digital officer. He hired 1,000 software engineers in the 18 months after joining Target in mid-2015, through a mix of tactical and long-term methods.

President Donald Trump's actions to curb immigration and tighten the H-1B visa program could shrink the labor pool, aggravating an already serious problem, some experts have said. At the same time, demand for IT professionals is expected to grow by more than 12% by 2024 to 4.4 million jobs, compared with 3.9 million in 2014, according to the Bureau of Labor Statistics.

Clever hiring tactics are necessary in a tight race for talent, says Oliver Bussmann, who left as CIO of UBS last year. When the bank sought cryptographers to test blockchain technology, UBS posted encrypted tweets about the job. "If you could decrypt them, you knew where to go," says Mr. Bussmann, now a fintech consultant. Forty to 50 applicants showed up, he says.

Wayne Shurts, global chief technology officer at Sysco, started a "university" program, in which he recruits five to 10 college graduates a year to rotate through key IT groups at the food distributor. They may code in Java, then learn Salesforce.com Inc. systems, which Sysco uses extensively.

He wants to shift skills in his 600-member IT group from older software engineering methods to Agile techniques, and hire cybersecurity experts. About 12 technology positions are open at the Houston company. A downturn in the oil business has helped. "More folks are available and less likely to get eaten up by oil companies," he says.

At Target, Mr. McNamara recruits from universities and takes interns from Genesys Works, a program for teens who want to pursue technical work in college. He expanded


A Target store with a CVS pharmacy in New York. Software is replacing many jobs at the company.

Target's office in Sunnyvale, Calif., to attract data scientists, hiring 40 Ph.D.s. In 2016, he or a member of his staff attended, and often spoke at, 70 to 100 conferences, helping to promote Target as a place where IT professionals practice advanced skills.

With technology expertise in short supply, companies are forcing each other to court over employee defections. Papa John's fought **Panera Bread** Co. over a CIO for six months last year. Mike Nettles, who was Panera's vice president of architecture and IT strategy, quit the restaurant last July to be CIO at the pizza chain. Panera sued Papa John's and Mr. Nettles, saying he had breached a contract barring him from working for a rival for one year after leaving.

Panera said that Mr. Nettles had access to "Panera's thought processes and visions for its technology systems" as well as IT information that would give Papa John's an unfair competitive advantage. Papa John's maintained the two don't compete and it isn't after corporate secrets.

The parties settled the case in December, with each side agreeing to pay its own court costs. Mr. Nettles started at Papa John's Feb. 1. "We are excited about Mike joining," a Papa John's spokesman said. Panera declined to comment.

Jody Mulkey, CTO of **Live Nation Entertainment** Inc.'s Ticketmaster, says about 35 open spots on his staff of 1,200. One recruiting technique is wooing influential authors. In September, Ticketmaster hired Tom Bray, who co-wrote a book on building mobile apps in React, a specialized set of software components.

### ONLINE

**WSJ.COM**  Follow coverage from the WSJ CIO Network meeting on Tuesday.
WSJ.com/CIO

---

# VIDEO

Continued from page B1

that goes away if we each have personalized ecosystems."

YouTube benefits from the enormous reach of Google, which handles about 93% of internet searches, according to market researcher StatCounter. Google embeds YouTube videos in search results and pre-installs the YouTube app on its Android software, which runs 88% of smartphones, according to Strategy Analytics.

That has helped drive new users to its platform. About 2 billion unique users now watch a YouTube video every 90 days, according to a former manager. In 2013, the last time YouTube disclosed its user base, it said it surpassed 1 billion monthly users. YouTube is now likely larger than the world's biggest TV network, China Central Television, which has more than 1.2 billion viewers.

YouTube long configured video recommendations to boost total views, but that approach rewarded videos with misleading titles or preview images. To increase user engagement and retention, the company in early 2012 changed its algorithms to boost watch time instead. Immediately, clicks dropped nearly 20% partly because users stuck with videos longer. Some executives and video creators objected.

Months later, YouTube executives unveiled a goal of 1 billion hours of watch time daily by the end of 2016. At the time, optimistic forecasts projected it would reach 400 million hours by then.

YouTube retooled its algorithms using a field of artificial intelligence called machine learning to parse massive databases of user history to improve video recommendations.

Previously, the algorithms recommended content largely based on what other users clicked after watching a particular video, the former manager said. Now their "understanding of what is in a video [and] what a person or group of people would like to watch has grown dramatically," he said.

Engineers tested each change on a control group, and only kept the change if those users spent more time on YouTube.

One strategy was to find new areas of user interest. For instance, YouTube could suggest a soccer video to users watching a lot of football, and then flood the lineup with more soccer if the first clip was a hit. "Once you realize there's an additional preference, exploit that," the former manager said.

But the algorithm didn't always deliver. For instance, when Ms. Wojcicki joined as CEO in 2016, YouTube recommended videos to her about recent YouTube videos to her about her children had one, said Cristos Goodrow, YouTube's video-recommendation chief.

That made the video-recommendation team realize there were "single-use videos" to ignore as signals of user interest. But to mark them, they had to think of each example, such as health and how-to videos.

Then last year YouTube joined with Google Brain, which develops advanced machine-learning software called deep neural networks. The Google Brain system was able to identify single-use video categories on its own.


YouTube has retooled using AI.

---

# Amazon Makes Play In Gaming

BY SARAH E. NEEDLEMAN

**Amazon.com** Inc.'s live-streaming business, Twitch, is entering the fast-growing market for digitally delivered computer videogames, a move that will give its most popular broadcasters the opportunity to earn a percentage of sales.

A "buy" button will appear this spring on website broadcasts of computer games from 20 companies, Twitch said Monday. Viewers will be able to download the games—as well as add-ons such as expansion packs and virtual goods—directly from the site.

Amazon has delved deep into the $100 billion game industry, releasing its own content as well as game-creation software called Lumberyard that other developers can use free. Gamers are increasingly choosing downloads over discs. Sales of digitally delivered personal-computer games, excluding add-ons, reached $5.4 billion last year, up 11% from 2015, according to SuperData Research Inc.

Under Twitch's new commerce program, game companies will receive 70% of sales, similar to what Apple Inc. and Alphabet Inc. share with app developers. Twitch, however, will fork over 5% to streamers, keeping 25% for itself, the company said.

---

# Uber Engineer Fired Over Alleged Conduct at Google

BY GREG BENSINGER

**Uber Technologies** Inc. fired a top software engineer for failing to disclose allegations of sexual harassment at his previous employer, **Alphabet** Inc.'s **Google**, a person familiar with the matter said on Monday.

Amit Singhal, senior vice president of engineering, had joined Uber just over a month ago. Uber Chief Executive Travis Kalanick asked him to step down after the company learned recently of the allegations about his time at Google, this person said.

Mr. Singhal said in a statement, "Harassment is unacceptable in any setting. I certainly want everyone to know that I do not condone and have not committed such behavior. In my 20-year career, I've never been accused of anything like this before and the decision to leave Google was my own."

Mr. Singhal had left Google about a year before he joined Uber.

The firing comes at a sensitive time for Uber, which is under fire after a former employee said she had experienced sexism and sexual harassment while working there and that management had failed to address her concerns. Uber has begun an internal investigation of the


Uber Technologies Inc. headquarters in San Francisco

claims, led in part by board member Arianna Huffington and former U.S. Attorney General Eric Holder.

Uber also is embroiled in a legal battle with another Alphabet unit, Waymo, which filed a lawsuit last week alleging the ride-hailing company stole Alphabet's trade secrets to accelerate its autonomous-vehicle program. Uber has said it was reviewing those claims.

Mr. Singhal's firing was reported earlier Monday by Recode, which said that a Google investigation into an allegation of sexual harassment against him had found the claim credible. A person familiar with the matter confirmed that account.

Mr. Singhal, who helped to oversee search at Google, was brought in by Uber to advise Mr. Kalanick and executive Anthony Levandowski on projects to develop self-driving vehicles and mapping technology. Mr. Levandowski previously worked at Alphabet, and Alphabet's lawsuit claimed he was mainly responsible for taking its technology to Uber.

Mr. Singhal left Google in February 2016 after 15 years. He said at the time he was leaving to focus on philanthropy. Uber had hailed Mr. Singhal's hiring last month, with Mr. Kalanick saying in a blog post it was "great news."

—Jack Nicas
contributed to this article.

---

ADVERTISEMENT

## Legal Notices

To advertise: 800-366-3975 or WSJ.com/classifieds

---

### Comcast to Offer YouTube Content

Deal could boost efforts to lure subscribers to YouTube's struggling Red service

**Comcast** Corp. and **Alphabet** Inc.'s YouTube announced a deal that will allow Comcast customers with the latest gear to search for and watch You-Tube videos through their cable boxes.

The only customers who will have access to the new YouTube product are those who have Comcast's latest X1 set-top box. The cable company said Monday that nearly 50% of its subscriber base has those boxes.

The deal follows a similar tie-up with **Netflix** Inc. that Comcast unveiled last July.

For YouTube, the deal could allow the company to attract new subscribers to its YouTube Red subscription service, which has struggled to gain traction.

When the YouTube app launches on X1 later this year, customers will be able to use Comcast's voice-controlled remote to search through You-Tube fare along with traditional TV programming and Netflix shows and movies.

YouTube apps are available through many smart TVs and internet-connected boxes like Roku, but those don't allow for an integrated search across traditional TV networks and Netflix.

"By integrating YouTube into the X1 experience, viewers can simply and effortlessly access videos on any topic, from cooking to beauty and fitness with just their voice," said Comcast Cable Chief Business Development Officer Sam Schwartz.

Web video outlets including YouTube and Netflix have for years sought access to cable customers through set-top boxes.

—Shalini Ramachandran

---

**UNITED STATES BANKRUPTCY COURT**
District of Maryland
Greenbelt Division
6500 Cherrywood Lane, Ste. 300
Greenbelt, MD 20770
Case No. 16-30318   Chapter 7

In Re:   Hertzberg, Inc.

**NOTICE OF NEED TO FILE PROOF OF CLAIM DUE TO RECOVERY OF ASSETS**
*Notice is Given That:*

The initial notice in this case instructed creditors that it was not necessary to file a proof of claim. Since the notice was sent, assets have been recovered by the trustee.

Creditors who wish to share in any distribution of funds must file a proof of claim with the clerk of the bankruptcy court at the address above on or before: 5/31/17.

Creditors who do not file a proof of claim on or before this date might not share in any distribution from the debtor's estate. A claim may be filed in the Clerk's office. A claim form may be obtained at: http://www.uscourts.gov/forms/bankruptcy-forms/proof-claim-0. A proof of claim form ("Official Form B 410") can be obtained at the United States Courts Web site at: http://www.uscourts.gov/forms/bankruptcy-forms/proof-claim-0.

Dated: 2/24/17
Mark A. Neal, Clerk of Court
by Deputy Clerk, Barrington Balthrop 301-344-8827

THE WALL STREET JOURNAL.
**LEGAL NOTICES**
ADVERTISE TODAY
(800) 366-3975
sales.legalnotices@wsj.com
© 2017 Dow Jones & Company, Inc.
All Rights Reserved.

**CLASS ACTIONS**

LEGAL NOTICE
**If You Bought A Cathode Ray Tube ("CRT") or CRT Product, A Class Action Settlement May Affect You.**

CRT Products include Televisions or Computer Monitors that contain Cathode Ray Tubes

A settlement has been reached with a group of defendants in a class action lawsuit involving CRTs and CRT Products. This is the ninth settlement to date. CRT stands for "Cathode Ray Tube." "Cathode Ray Tube (CRT) Products" include Cathode Ray Tubes and finished products that contain a Cathode Ray Tube such as Televisions and Computer Monitors.

*What is this lawsuit about?*

The lawsuit alleges that Defendants and Co-Conspirators engaged in an unlawful conspiracy to fix, raise, maintain or stabilize the prices of CRTs. Plaintiffs further claim that direct purchasers of televisions and monitors that contain a cathode ray tube from the Defendants may recover for the effect that the cathode ray tube conspiracy had on the prices of televisions and monitors. Plaintiffs allege that, as result of the unlawful conspiracy, they and other direct purchasers paid more for CRT Products than they would have absent the conspiracy. Defendants deny Plaintiffs' claims.

*Who's included in the settlement?*

The settlement includes all persons and entities who, between March 1, 1995 and November 25, 2007, directly purchased a CRT Product in the United States from any defendant or subsidiary or affiliate thereof ("Class"), who did not exclude themselves following the Notice of Class Certification sent to Class members in November 2015 and published in the *New York Times* and the *Wall Street Journal*.

*Who are the settling defendants?*

A settlement has been reached with Mitsubishi Electric Corporation; Mitsubishi Electric US, Inc. (formerly known as Mitsubishi Electric & Electronics USA, Inc.); and Mitsubishi Electric Visual Solutions America, Inc. (formerly known as Mitsubishi Digital Electronics America, Inc.). The companies are together referred to as "Mitsubishi Electric Defendants." A complete list of Defendants and Co-Conspirators is set out in the Long Form Notice available at www.CRTDirectPurchaserAntitrustSettlement.com.

*What does the settlement provide?*

The Mitsubishi Electric settlement provides for the payment of $75,000,000 in cash to the Class. The Settlement Fund will be distributed, along with the $9,750,000 Thomson and TDA settlement fund, on a pro-rata basis once the Court finally approves the settlement and authorizes distribution of the Settlement Funds. If you have already submitted a claim relating to the previous settlements, you need not submit an additional claim to receive money from these settlements. If you wish submit a new or supplemental claim you may do so by May 29, 2017. Instructions for submitting a new or supplemental claim can be found at www.CRTDirectPurchaserAntitrustSettlement.com.

*What are my rights?*

If you wish to comment on or disagree with any aspect of the proposed settlement, you must do so in writing no later than April 20, 2017. The settlement agreement, along with details on how to object to it, is available at www.CRTDirectPurchaserAntitrustSettlement.com. The U.S. District Court for the Northern District of California will hold a Final Approval Hearing at 2:00 p.m. on June 8, 2017, at the U.S. District Court for the Northern District of California, 450 Golden Gate Ave., San Francisco, CA 94102, Courtroom 9, 19th Floor. The hearing may be moved to a different date or time without additional notice, so it is a good idea to check the class website for information, as additional notice will not be sent.

The Court has appointed the law firm of Saveri & Saveri, Inc. to represent Direct Purchaser Class members as Lead Class Counsel. At the Final Approval Hearing, the Court will consider whether the settlement is fair, reasonable and adequate. Class Counsel will also make an application for attorney fees of up to 33.3% of the Mitsubishi Electric and Thomson/TDA settlement funds and expenses at the Final Approval Hearing. You may also object to or comment on Class Counsel's fee and expense application in the same manner as set forth above. The Court will consider any objection to the Settlement or the fee and expense application at the Final Approval Hearing. You may appear at the hearing, but don't have to. We do not know how long these decisions will take.

This is a Summary Notice. For more details, call toll free 1-877-224-3063, visit www.CRTDirectPurchaserAntitrustSettlement.com, or write to CRT Direct Settlement, P.O. Box 43405, Providence, RI 02940-3455.