UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | MDL No. 1917<br><br>Case No. C-07-5944 JST<br><br>**ORDER DENYING MITSUBISHI ELECTRIC CORPORATION'S MOTION FOR SUMMARY JUDGMENT** |
| This Order Relates To:<br><br>Best Buy Co., Inc., et al. v. Technicolor SA, et al., No. 13-cv-05264;<br><br>Electrograph Systems, Inc., et al. v. Technicolor SA, et al., No. 13-cv-06325;<br><br>Interbond Corporation of America v. Mitsubishi Electric & Electronics USA, Inc., et al., No. 13-cv-05727;<br><br>Office Depot, Inc. v. Technicolor SA, et al., No. 13-cv-81174;<br><br>P.C. Richard & Son Long Island Corporation, et al. v. Technicolor SA, et al., No. 13-cv-06327;<br><br>Target Corp. v. Technicolor SA, et al., No. 13-cv-05686;<br><br>Costco Wholesale Corporation v. Technicolor SA, et al., No. 13-cv-02037;<br><br>Schultze Agency Services, LLC v. Technicolor SA, Ltd., et al., No. 13-cv-05668;<br><br>Sears, Roebuck and Co., et al. v. Technicolor SA, No. 13-cv-05262;<br><br>Dell Inc., et al. v. Phillips Electronics North America Corporation, et al., No. 13-cv-2171; | |

| | |
|---|---|
| 1 | Tech Data Corp., et al. v. Hitachi, Ltd., et al., No.13-cv-00157; |
| 2 | |
| 3 | Siegel v. Technicolor SA, et al., No.13-cv-05261; |
| 4 | Viewsonic Corporation v. Chunghwa Picture Tubes Ltd., et al., No.13-cv-02510. |
| 5 | |

Before the Court is Defendant Mitsubishi Electric Corporation's ("Mitsubishi") Motion for Summary Judgment. ECF No. 3033-4. For the reasons below, the Court will deny the motion.

## I. BACKGROUND

The factual history is well known to the parties and has been recited in the Court's prior orders. By way of summation, this case is predicated upon an alleged conspiracy to fix the prices of cathode ray tubes ("CRTs"), a core component of tube-style screens for common devices including televisions and computer monitors. The conspiracy ran from March 1, 1995 to November 25, 2007 (the "Conspiracy Period"), involved many of the major companies that produced CRTs, and allegedly resulted in overcharges of billions of U.S. dollars to domestic companies that purchased and sold CRTs or products containing CRTs ("CRT Finished Products"). Conspirators allegedly met all over the world in "Glass Meetings" to fix the prices of CRTs, which served as the primary component of old tube-style televisions and computer monitors.

A civil suit was originally filed in 2007, ECF No. 1, consolidated by the Joint Panel on Multidistrict Litigation shortly thereafter, see ECF No. 122, assigned as a Multidistrict Litigation case ("MDL") to Judge Samuel Conti, see id., and ultimately transferred to the undersigned, see ECF No. 4162. In addition to two class actions, this MDL involves various direct actions from individual plaintiffs who opted out of the class actions, including the DAPs that oppose the present motions. Each DAP alleges that it bought at least one CRT Finished Product from a Defendant or an entity owned or controlled by a Defendant.

Mitsubishi was a buyer and seller of CRTs during the Conspiracy Period. ECF No. 3033-4 at 17. On November 7, 2014, Mitsubishi moved for summary judgment based on an absence of

evidence of liability. Id.

## II. LEGAL STANDARD

Summary judgment is proper when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by" citing to depositions, documents, affidavits, or other materials. Fed. R. Civ. P. 56(c)(1)(a). A party also may show that such materials "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B). An issue is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986). A fact is "material" if the fact may affect the outcome of the case. Id. at 248. "In considering a motion for summary judgment, the court may not weigh the evidence or make credibility determinations, and is required to draw all inferences in a light most favorable to the non-moving party. Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997).

Where the party moving for summary judgment would bear the burden of proof at trial, that party bears the initial burden of producing evidence that would entitle it to a directed verdict if uncontroverted at trial. See C.A.R. Transp. Brokerage Co. v. Darden Rests, Inc., 213 F.3d 474, 480 (9th Cir. 2000). Where the party moving for summary judgment would not bear the burden of proof at trial, that party bears the initial burden of either producing evidence that negates an essential element of the non-moving party's claim, or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. If the moving party satisfies its initial burden of production, then the non-moving party must produce admissible evidence to show that a genuine issue of material fact exists. See Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102–03 (9th Cir. 2000). The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996). Indeed, it is not the duty of the district court "to scour the record in search of a genuine issue of triable fact." Id. "A mere scintilla of evidence will not be sufficient to defeat a properly supported motion for summary judgment; rather, the

non-moving party must introduce some significant probative evidence tending to support the complaint." Summers v. Teichert & Son, Inc., 127 F.3d 1150, 1152 (9th Cir. 1997) (citation and internal quotations omitted). If the non-moving party fails to make this showing, the moving party is entitled to summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

"In antitrust cases, these general standards are applied even more stringently and summary judgments granted more sparingly." Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n, 620 F.2d 1360, 1364 (9th Cir. 1980). As a general matter, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each. . . . The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 698–99 (1962) (alterations omitted). Nonetheless, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). Rather, to defeat a motion for summary judgment, "a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility" that the alleged conspirators acted independently.'" Id. (quoting Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764 (1984)).

**III.   ANALYSIS**

**A.   SDI's Interrogatory Responses**

In 2011, Defendant Samsung SDI Company, Ltd. ("SDI") pleaded guilty to participation in the CRT conspiracy. ECF No. 3269-6. In that plea agreement, SDI made the following admission:

> During the relevant period, the defendant, through its officers and employees, including high-level personnel of the defendant, participated in a conspiracy among major CDT producers, the primary purpose of which was to fix prices, reduce output, and allocate market shares of CDTs sold in the United States and elsewhere. In furtherance of the conspiracy, the defendant, through its officers and employees, engaged in discussions and attended meetings with representatives of other major CDT producers. During these discussions and meetings, agreements were reached to fix prices, reduce output, and allocate market shares of CDTs to be sold in the United States and elsewhere.

4

ECF No. 3269-6 at 4. The ambiguity in the plea's language prompted Plaintiffs to serve supplemental interrogatories on SDI. SDI's responses implicated Mitsubishi. First, when asked which entities SDI meant in its plea with the phrase "major CDT producers," SDI stated that "[a]t least one Mitsubishi entity and at least one Chunghwa entity participated in the CDT conspiracy described in SDI's Plea Agreement." ECF No. 3269-8 at 16. Second, when asked which representatives of those other CDT producers participated in meetings with SDI, SDI named "Katou Nakashima, who SDI understood to be a representative of at least one Mitsubishi entity, and Chang Yuan Lin and Chih-Chun Liu, who SDI understood to be representatives of at least one Chunghwa entity, participated in the CDT conspiracy described in SDI's Plea Agreement." Id. at 18.

Plaintiffs argue that, "[s]tanding alone, this evidence creates a question of material fact precluding summary judgment in Mitsubishi Electric's favor." ECF No. 3269-4 at 12. Mitsubishi responds that SDI's interrogatory responses are inadmissible at trial because they are hearsay and not based on personal knowledge. The Court agrees with Mitsubishi's characterizations of the responses. The SDI official who signed the responses, Yongtae Kim, confirmed that he was "authorized to make this Verification on Samsung SDI's behalf" and that he was "informed and believe that the matters and things stated therein are true, and upon that ground allege that the matters things state therein are true." ECF No. 3269-8 at 29. In other words, Kim verified SDI's answers based on information and belief, not personal knowledge. Nevertheless, "[a]t the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents." Fraser v. Goodale, 342 F.3d 1032, 1036–37 (9th Cir. 2003). Therefore, the Court may consider SDI's interrogatory responses so long as their contents would be admissible at trial.

Plaintiffs claim that the substance of the responses can be admitted against Mitsubishi at trial "through the introduction of the interrogatories themselves and the live testimony of a corporate representative of SDI." ECF No. 3269-4 at 12. The first suggestion provides little help to Plaintiffs, since Mitsubishi could assert the same hearsay and personal knowledge objections at trial that it makes now. Nor is Plaintiffs' suggestion that they will call an unidentified corporate

5

representative of SDI to testify at trial sufficient to overcome Mitsubishi's admissibility objections. If the SDI executive who signed its interrogatory responses in 2013 lacked first-hand knowledge of Mitsubishi's participation in the conspiracy, there is no reason to believe that an still-unidentified SDI corporate representative will do any better four years later. Plaintiffs had ample opportunity to obtain admissible evidence that could substantiate SDI's admission or, at the very least, to identify a specific individual with personal knowledge of SDI's the interrogatory responses.

Indeed, Plaintiffs' failure in this respect was made clear when, after receiving SDI's interrogatory responses, they sought a supplemental 30(b)(6) deposition. In response to SDI's motion for a protective order against that deposition, Plaintiffs admitted that, despite substantial pre- and post-plea discovery, they had been unable to discover admissible evidence substantiating SDI's interrogatory responses. Special Master Walker granted SDI's request in large part because he concluded that "discovery sought by this notice is unreasonably duplicative of discovery that has already been taken herein." ECF No. 3269-11 at 4.[1] In other words, the Special Master doubted that the deposition would produce anything helpful given the interrogatory responses, document production, and depositions already completed in the case. Given this history, it makes no sense to permit Plaintiffs to overcome Mitsubishi's evidentiary objections to SDI's interrogatory with a nebulous reference to the testimony of a "corporate representative" of SDI.

The cases Plaintiffs cite in their brief do not support their argument that the Court can consider SDI's interrogatory response for purposes of this motion. In <u>Fraser v. Goodale</u>, the Ninth Circuit held that the district court properly relied on evidence from a diary to deny summary judgment, despite valid hearsay objections, because the "contents of the diary are mere recitations of events within [the author's] personal knowledge and, depending on the circumstances, could be admitted into evidence at trial" if, for example, the author "could testify to all the relevant portions of the diary from her personal knowledge." 342 F.3d 1032, 1036–37 (9th Cir. 2003). Here, by

---

[1] To the extent that Plaintiffs complained that the information provided in response to that discovery was not adequate, the Special Master concluded that the "appropriate recourse was to seek to compel further [interrogatory] responses," which Plaintiffs did not do. <u>Id.</u> at 6.

contrast, Plaintiffs have identified no individual with personal knowledge of the admissions in SDI's interrogatory response.

The situation in which Plaintiffs find themselves is more comparable to the one the defendants faced in Block v. City of Los Angeles, 253 F.3d 410 (9th Cir. 2001). In that case, the defendants sought to rely for summary judgment purposes on an affidavit by Royce Menkus, an officer of the City, which "explain[ed] that he contacted various City departmental personnel officers to learn more about the stipulated suspensions, and [] summarize[d] the results of his inquiries." Id. at 416. The court began by acknowledging the general rule that a "[t]o survive summary judgment, a party does not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56." Id. at 419. The court then explained why the district court erred nonetheless in relying on the affidavit:

> It is clear from the affidavit that Menkus was not personally involved in any of the disciplinary suspensions, and that he did not personally review any business records containing information regarding such disciplinary suspensions. Menkus instead relied on information from (unsworn) departmental personnel officers, and the source of these officers' information is unclear. Rather than set forth facts that would be admissible in evidence, the affidavit was instead based on inadmissible hearsay.

Here, the source of the evidence behind SDI's interrogatory response is even less clear than the Menkus affidavit.

Bank Melli Iran v. Pahlavi is also instructive. 58 F.3d 1406, 1412 (9th Cir. 1995). There, the Ninth Circuit rejected declarations based on information and belief as "entitled to no weight [at summary judgment] because the declarant did not have personal knowledge" of the information contained in the declaration. Id. at 1412-13. The same is true here.

Because Plaintiffs have failed to demonstrate that they will be able to present the contents of SDI's interrogatory responses in an admissible form at trial, the Court will not consider them for purposes of this summary judgment motion.[2]

---

[2] Given this conclusion, the Court need not address the parties' arguments about which Mitsubishi entity SDI was referring to in its interrogatory responses or which individuals SDI meant when it named "Katou Nakashima."

7

### B. Documentary Evidence

The Court's decision with respect to SDI's interrogatory responses does not resolve this summary judgment motion, however, because Plaintiffs also submit substantial documentary evidence that they claim creates a material issue of fact as to Mitsubishi's participation in the CRT conspiracy.

First, Plaintiffs highlight meetings and communications between Mitsubishi and SDI. They point the Court to an internal email written by SDI employee Jae In Lee on March 5, 2003 that summarizes a March 3, 2003 meeting with between SDI and Mitsubishi. ECF No. 3269-17 at 8.[3] Most damaging for Mitsubishi, the email lists four "[p]urpose[s]" of the meeting, one of which was "CDT price maintenance." Id. Under "[m]ain points of discussion," the notes identify "Mitsubishi's 22" Flat for SEC: low cost model development," and list the "[c]urrent price for Mitsubishi 22" Uni Pitch mode1 [as] $200-210, selling about 1 KJ/month to SEC." ECF No. 3269-17 at 9. Mitsubishi counters by emphasizing other parts of the email, which Mitsubishi claims demonstrate pro-competitive behavior by both SDI and Mitsubishi. For example, the email describes SDI's "[n]eed to prevent Mitsubishi NF's entrance into SBC through excellent price reduction and quality improvement." ECF No. 3269-17 at 9. Additionally, the email states that "Mitsubishi intends to rule over the 21"/22" CDT portion of the CDT business through the development of a low cost 22" model, as it cautiously competes with SDI." Id.

Plaintiffs' failure to ask specifically about this email in Lee's deposition or in the deposition of any other SDI representative hampers their ability to rely on its contents. ECF No. 3462-4 at 8. Nevertheless, Mitsubishi cannot erase the incriminating portions of the email, particularly the "price maintenance" purpose of the March 3 meeting, any more than Plaintiffs can ask the Court to ignore SDI's statements about "price reduction and quality improvement." Moreover, Lee did not deny having meetings with Mitsubishi to discuss "sales projections, pricing and price forecasts, production, [and] LPD's manufacturing operations." ECF No. 3033-9 at 63. Drawing all inferences in favor of Plaintiffs, the March 5 email is more consistent with

---

[3] Mitsubishi confirmed that its employees attended this meeting. ECF No. 3269-18 at 6.

8

1    participating in the CRT conspiracy than with pro-competitive conduct, and therefore weighs
2    against granting summary judgment.
3          Plaintiffs also direct the Court to notes taken by Mitsubishi employee Kunihiko Seki, who
4    attended various meetings with SDI.[4]  Plaintiffs argue that Seki's notes further demonstrate
5    Mitsubishi's participation in the conspiracy.  For example, in reporting on a March 31, 2004[5]
6    meeting with SDI, Seki wrote that that "[p]rices for 17" and 19" will be increased by $2-$3."  ECF
7    No. 3269-13 at 4.[6]  But as Mitsubishi explains, the notes also state that those price increases had
8    already been "[a]nnounce[d] to customers" the week before."  Id.  In <u>In re Citric Acid II</u>, the Ninth
9    Circuit found that possession of competitor price lists did not suggest anticompetitive conduct
10   without "evidence tending to exclude the possibility that [the defendant] received these price lists
11   legitimately from customers after they were distributed by competitors."  191 F.3d 1090, 1103
12   (9th Cir. 1999).[7]  It follows that here, Mitsubishi cannot be found to have participated in the
13   conspiracy by virtue of being told pricing information already made public through distribution to
14   SDI's customers.
15         Seki's notes also describe another meeting between Mitsubishi and SDI, date uncertain, in
16   which described SDI's prices and expected profits:

> The June price of 21" DFs for outside customers is $175.  They will
> be sold to SEC for less than that.  With this price as a base, profit is
> 20%.  The cost of the new CRTs with improved DY was reduced by
> $10.  Since it is sufficient to maintain 21' at a volume of 300,000
> units, there will be no aggressive cut in price for them.  Cost
> reduction for 17" is more important than that for 21".  Maintenance
> of the 21" price depends on prices for 19" LCDs and Mitsubishi

---

[4] As of the filing of Plaintiffs' opposition, Seki had yet to be deposed. ECF No. 3269-12 at 5.

[5] Mitsubishi argues that, because it exited the CRT business in 2005, it had no reason to participate in the conspiracy in 2004, when these meetings took place. ECF No. 3033-4. The Court concludes, however, that a year is not an insubstantial time to benefit from a conspiracy, particularly as a company prepares to sell its CRT business.

[6] Mitsubishi confirmed that it attended the March 31, 2004 meeting in its interrogatory responses. ECF No. 3269-16 at 18.

[7] Mitsubishi's claim that the exchange of price information must impact pricing to matter on summary judgment, ECF No. 3033-4 at 22, appears nowhere in <u>In re Citric Acid II</u>. That may be a requirement in the Third Circuit, see <u>In re Baby Food Antitrust Litig.</u>, 166 F.3d 112, 125 (3d Cir. 1999), but not here.

United States District Court
Northern District of California

CRTs.

ECF No. 3269-13 at 4. Unlike with the March 31 meeting, it is not obvious from that these prices were already public information. And the notes explicitly discuss price "[m]aintenance." Id. Mitsubishi seeks to divert the Court's attention from these price discussions to the notes' statement that Mitsubishi expected "serious competition among SDI, LPD and Chunghwa, causing prices to decrease" and the warning that "[t]his year is probably the last chance to raise prices." Id. But competition among those entities is not mutually exclusive of some price agreement between Mitsubishi and SDI. Additionally, that note appears to relate to the March 31, 2004 meeting, not the distinct meeting in which SDI and Mitsubishi appear to have discussed "[m]aintenance of the 21" price." Id.

More meetings between Mitsubishi and SDI took place in 2001. A "business trip report" from an August 9, 2001 meeting by Mitsubishi employee Masahiko Konishi includes a "Price" section, listing SDI's price points for different sizes of CRTs. ECF No. 3269-21 at 6. That report also discussed SDI's material costs and noted that a "suggestion was made to exchange information next time with people involved in materials included." Id.

Another meeting took place a week later, on August 15, 2001. ECF No. 3629-22 at 4. Mitsubishi employee Hitoshi Nakajima offered the following report on August 18, 2001:

> Samsung is prepared for the prices from October of this year for 17th to be 72 dollars with a cost of 57 dollars and then from January of 2002, a price of 68 dollars. In June of this year, the sales price was between 75 and 78 dollars, while cost was 54 dollars and material cost was 38 dollars. Profit in 2000 was 50 billion yen and they predict 2001 profit to be 90% of that of 2000. Because the company's shares are publicly traded, investors won't forgive them if they get in the red. They are confident of producing surplus until 2005. They have lowered price in response to the drop in TFT price but it should be assumed that the price competition between Samsung, LG Electronics and CPT will continue for a while yet. Samsung has quoted 73 dollars for the 17" to Taiwan AOC from LG.

Id. During his deposition, Mitsubishi's corporate representative acknowledged that "SDI's future pricing information was being shared" during this August meeting. ECF No. 3269-19 at 21. Despite the absence of an explicit agreement on prices, this exchange of non-public price information itself is suggestive of participation in the CRT conspiracy. In re Citric Acid II, 191

1   F.3d at 1103 (explaining that, according to the Supreme Court, "the reciprocal exchange of price

2   information pursuant to an agreement by the defendants was concerted action sufficient to

3   establish a price-fixing conspiracy").[8]

4         Although Mitsubishi's information exchanges with SDI are the focus of Plaintiffs' motion,

5   Plaintiffs also point to several meetings between Mitsubishi and Chunghwa, another admitted

6   conspiracy participant. For example, Plaintiffs identify a Chunghwa employee's notes about a

7   December 4, 1996 meeting with Mitsubishi, which report Mitsubishi's "[c]urrent 17" x 0.28mm

8   selling price and market price (USD 250 270.00). Comparably, 17" x 0.25mm selling price can

9   reach 1./SD 320-330/pc." ECF No. 3269-28 at 4. Likewise, notes from a November 21, 1996

10  meeting between Chunghwa and the General Manager of Mitsubishi's CRT Business Division

11  explain that the two companies "exchanged information about production situation as well as

12  future plans etc." ECF No. 3269-29 at 3. This exchange of price and production information

13  goes beyond, as Mitsubishi claims, mere attendance at meetings with alleged participants in the

14  larger CRT conspiracy. ECF No. 3033-4 at 21.

15        Even if Mitsubishi and Chunghwa were engaged in a "technical collaboration" that might

16  require legitimate pricing information exchanges, Mitsubishi's own motion explains that this

17  collaboration began in 1997, *after* these 1996 meetings took place. ECF No. 3033-4 at 21.

18  Mitsubishi also argues that Chunghwa's notes from meetings with other CRT producers in 2003

19  actually exclude Mitsubishi from certain price or production agreements. ECF No. 3462-4 at 15-

20  16 (in discussion production levels, "of the 56M total volume, we first deduct approximately 3M

21  for other CDT makers (Orion/Sony/Mitsubishi) then use existing allocated market share ratios

22  CPT:LPD:SDJ = 27.8%: 34%: 38.2%) to arrive at some values before further adjustments." ECF

23  No. 3462-10 at 11. But the fact that Chunghwa may have excluded Mitsubishi from an agreement

24  in 2003 sheds little light on whether Mitsubishi was involved in the conspiracy seven years earlier

25  in 1996. In sum, the evidence about Mitsubishi's meetings with Chunghwa weighs against

---

[8] Plaintiffs also identify an October 25, 2001 meeting, and a July 1, 2004 meeting between Mitsubishi and SDI. EF No. 3269-4 at 15-16.

1  granting summary judgment in favor of Mitsubishi.[9]

2  The Court has already explained that the existence of pro-competitive comments in
3  documents that also contain conspiratorial remarks does not render those documents useless to
4  Plaintiffs at the summary judgment stage, when inferences must be draw in their favor.
5  Mitsubishi also argues, however, that even if Mitsubishi exchanged price or production
6  information, those exchanges were permissible due to Mitsubishi's position as both a buyer and
7  seller of CRTs. As Mitsubishi's expert explained:

> Mitsubishi Electric needed to decide how many CRTs to manufacture, how many CRTs to purchase, and how many CRTs to sell. These types of decisions require market information about what Mitsubishi Electric would have to pay to acquire CRTs and what Mitsubishi Electric would be able to charge for CRTs. Thus, Mitsubishi Electric discussing pricing and production related issues with other market participants does not indicate that it was a participant in a conspiracy to fix prices.

ECF No. 3033-20 at 17. The Court rejects this argument. As an initial matter, Mitsubishi identifies no case where a court granted summary judgment based on a similar "make-buy decision" theory. Moreover, the bare assertion that a company both sells and buys a product cannot convert all exchanges of sensitive price information about the product into *per se* lawful communications, especially when some of the documents refer to the "maintenance" of CRT prices.

Mitsubishi also argues that its absence from the "'Glass Meetings' distinguishes it from the other defendants in this case" and is "a powerful piece of circumstantial evidence indicating that Mitsubishi Electric was ***not*** involved in the alleged conspiracy." ECF No. 3033-4 at 19-20 (emphasis in original).[10] As this Court has made plain in its recent summary judgment orders, lack of participation in one of the group meetings that formed the heart of the conspiracy is not equivalent to a free pass on summary judgment. See, e.g., ECF No. 5105 (denying Thomson's

---

[9] Plaintiffs offer evidence that Mitsubishi met and exchanged pricing information with LPD in addition to Chunghwa. ECF No. 3269-4 at 20.
[10] The Court does not address the parties' arguments about the import of Mitsubishi's attendance at Electronic Industries Association of Japan ("EIAJ") meetings and its sharing of production data with EIAJ members. Even setting that evidence aside, Plaintiffs have created a dispute of material fact as to Mitsubishi's participation in the conspiracy.

1  motion for summary judgment).  Nor is it necessary that the bilateral meetings explicitly reference
2  the Glass Meetings.  Mitsubishi argues that Plaintiffs "advance no reason to believe that any of the
3  bilateral meetings had any connection to the Glass Meetings."  ECF No. 3462-4 at 12.  That cannot
4  be right.  The presence of various Glass Meetings attendees at the bilateral meetings and the
5  exchange during those meetings of CRT pricing and production information sufficiently connects
6  them to the group meetings at the summary judgment stage.  In so holding, this Court falls
7  squarely in line with the decisions of the district court in the similar LCD litigation.  There, the
8  court denied Toshiba's motion for summary judgment, for example, even though there was no
9  evidence that Toshiba had attended group meetings:

> There is also sufficient evidence for a jury to find that Toshiba received pricing information from its competitors, shared its own pricing information, and was aware of its wrongdoing. Although Toshiba argues that its interactions with its competitors constituted nothing more than legitimate exchanges of information, such disputes regarding the interpretation of evidence are not appropriate for resolution on summary judgment.

ECF No. 3269-35 at 3.  Plaintiffs' evidence of bilateral meetings with admitted conspirators similarly creates a dispute of material fact here with respect to Mitsubishi's participation in the greater CRT conspiracy.

## CONCLUSION

The Court denies Mitsubishi's motion for summary judgment.

IT IS SO ORDERED.

Dated:  March 9, 2017

_____
JON S. TIGAR
United States District Judge