Guido Saveri (22349)
  *guido@saveri.com*
R. Alexander Saveri (173102)
  *rick@saveri.com*
Geoffrey C. Rushing (126910)
  *grushing@saveri.com*
Cadio Zirpoli (179108)
  *cadio@saveri.com*
Matthew D. Heaphy (227224)
  *mheaphy@saveri.com*
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Telephone:  (415) 217-6810
Facsimile:  (415) 217-6813

*Lead Counsel for Direct Purchaser Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 07-CV-5944-JST |
| | MDL No. 1917 |
| This Document Relates to:<br><br>*Crago, d/b/a Dash Computers, Inc., et al. v. Mitsubishi Electric Corporation, et al.*, Case No. 14-CV-2058-JST. | **DIRECT PURCHASER PLAINTIFFS' SECOND APPLICATION FOR ATTORNEYS' FEES AND EXPENSES AND INCENTIVE AWARDS:**<br><br>**1)  NOTICE OF MOTION AND MOTION; AND**<br><br>**2)  MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF.**<br><br>Date:        June 8, 2017<br>Time:       2:00 p.m.<br>Judge:      Honorable Jon S. Tigar<br>Courtroom:  9 |

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................i

TABLE OF AUTHORITIES..........................................................................................iii

NOTICE OF MOTION AND MOTION........................................................................1

ISSUES TO BE DECIDED .............................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES................................................2

I.      INTRODUCTION ................................................................................................2

II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY .........................5

        A.      Initial Phase of the Multidistrict Litigation ..............................................6

        B.      The Complaint Against the Mitsubishi Electric and Thomson Defendants .................7

        C.      Discovery...................................................................................................7

        D.      Motion Practice .........................................................................................8

                1.      Motions for Class Certification and Class Notification ...................8

                2.      Motions to Compel Discovery..........................................................8

                3.      Motion for Evidentiary Sanctions ..................................................10

        E.      Trial Preparation ......................................................................................11

        F.      Settlements and Notice ............................................................................11

III.    ARGUMENT ......................................................................................................12

        A.      The Fee Award Requested By Plaintiffs Is Reasonable and Appropriate.................12

                1.      Class Counsel Are Entitled to a Reasonable Fee Under the Common Fund Doctrine ......................12

        B.      Analysis of the Relevant Factors Shows that a Fee of 30% of the Common Fund Is Warranted ..........................13

                1.      Class Counsel Achieved an Excellent Result for the Class............14

                2.      The Risks of this Litigation .............................................................15

                3.      Contingent Nature of the Fee .........................................................18

                4.      Delay...............................................................................................18

                5.      A High Level of Skill Was Required to Prosecute this Case and Class Counsel's Work Was of High Quality..............................19

6.      The Lodestar Cross-Check Confirms the Reasonableness of the Requested
        Fee .................................................................................................................................19

7.      The Reaction of the Class........................................................................................21

8.      Class Counsel Are Entitled to Reimbursement for Their Reasonable
        Litigation Expenses ...............................................................................................21

IV.     PAYMENTS TO CLASS REPRESENTATIVES .................................................................22

        A.      Financial and Other Risks .......................................................................................23

        B.      Notoriety and Personal Difficulties .........................................................................23

        C.      Time and Effort Expended .......................................................................................23

        D.      Duration of the Litigation........................................................................................24

        E.      Personal Benefits from the Litigation.......................................................................24

V.      CONCLUSION ..................................................................................................................25

1

**TABLE OF AUTHORITIES**

2

**CASES**

3

*Alpine Pharmacy, Inc. v. Chas. Pfizer & Co.,*
   481 F.2d 1045 (2d Cir. 1973), *cert. denied*, 414 U.S. 1092 (1973) ........................... 13

4

*Arenson v. Bd. of Trade of the City of Chicago,*
   372 F. Supp. 1349 (N.D. Ill. 1974)................................................................................ 19

5

6

*Boeing Co. v. Van Gemert,*
   444 U.S. 472 (1980) ....................................................................................................... 12

7

*Cook v. Niedert,*
   142 F.3d 1004 (7th Cir. 1998) ....................................................................................... 24

8

*Glass v. UBS Fin. Servs., Inc.,*
   No. C-06-4068 MMC, 2007 WL 221862 (N.D. Cal. Jan. 26, 2007), *aff'd,* 331 F. App'x 452 (9th
   Cir. 2009)........................................................................................................................ 24

9

10

*Gustafson v. Valley Ins. Co.,*
   No. CV 01-1575-BR, 2004 WL 2260605 (D. Or. Oct. 6, 2004) ................................... 19

11

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998) ....................................................................................... 12

12

*Hensley v. Eckerhart,*
   461 U.S. 424 (1983) ....................................................................................................... 14

13

14

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
   308 F.R.D. 606 (N.D. Cal. 2015) ..................................................................................... 8

15

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
   No. 07-CV-5944, 2016 WL 3648478 (N.D. Cal. July 7, 2016) ....................................... 4

16

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
   No. 07-CV-5944-JST, 2016 WL 153265 (N.D. Cal. Jan. 13, 2016).......................... 2, 23

17

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
   No. 07-CV-5944-JST, 2016 WL 183285 (N.D. Cal. Jan. 14, 2016)............... 2, 13, 14, 16, 19, 21

18

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
   No. 07-CV-5944-JST, 2016 WL 4126533 (N.D. Cal. Aug. 3, 2016) ...... 13, 15, 16, 17, 18, 19, 20

19

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
   No. 14-CV-2058-JST, 2015 WL 6871439 (N.D. Cal. Nov. 9, 2015) ............................... 8

20

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
   No. 14-CV-2058-JST, 2015 WL 9266493 (N.D. Cal. Dec. 17, 2015)................... 4, 15, 16

21

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
   No. 14-CV-2058-JST, 2016 WL 7743500 (N.D. Cal. Mar. 28, 2016).......................... 10

22

23

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
   No. 14-CV-2058-JST, 2017 WL 565003 (N.D. Cal. Feb. 13, 2017) ................. 12, 13, 15, 17

24

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
   No. 14-CV-2058-SC, 2015 WL 12942210 (N.D. Cal. May 29, 2015) ............................. 9

25

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
   No. 14-CV-2058-SC, 2015 WL 12942495 (N.D. Cal. Apr. 28, 2015) ............................. 9

26

27

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
   No. 14-CV-2058-SC, 2015 WL 4451419 (N.D. Cal. July 20, 2015) ............................... 9

28

*In re CV Therapeutics, Inc., Sec. Litig.*,
No. C 03-3709 SI, 2007 WL 1033478 (N.D. Cal. April 4, 2007) ............................................. 24

*In re Dun & Bradstreet Credit Servs. Customer Litig.*,
130 F.R.D. 366 (S.D. Ohio 1990) .................................................................................... 24

*In re Flash Memory Antitrust Litig.*,
No. C 07-0086 SBA, 2010 WL 2332081 (N.D. Cal. June 9, 2010) .......................................... 16

*In re Graphics Processing Units Antitrust Litig.*,
253 F.R.D. 478 (N.D. Cal. 2008) ...................................................................................... 16

*In re Heritage Bond Litig.*,
No. 02-ML-1475 DT, 2005 WL 1594403 (C.D. Cal. June 10, 2005) ........................................ 14

*In re High-Tech Emp. Antitrust Litig.*,
No. 11-CV-02509-LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) ....................... 19, 20, 24

*In re King Res. Co. Sec. Litig.*,
420 F. Supp. 610 (D. Colo. 1976) ..................................................................................... 19

*In re Linerboard Antitrust Litig.*,
No. Civ.A. 98-5055, 2004 WL 1221350 (E.D. Pa. June 2, 2004) ...................................... 19, 24

*In re Lorazepam & Chlorazepate Antitrust Litig.*,
205 F.R.D. 369 (D.D.C. 2002) .......................................................................................... 24

*In re Media Vision Tech. Sec. Litig.*,
913 F. Supp. 1362 (N.D. Cal. 1996) .................................................................................. 22

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
187 F.R.D. 465 (S.D.N.Y. 1998) ...................................................................................... 16

*In re Omnivision Techs., Inc.*,
559 F. Supp. 2d 1036 (N.D. Cal. 2008) ................................................................. 15, 20, 21

*In re Online DVD-Rental Antitrust Litig.*,
779 F.3d 934 (9th Cir. 2015) ......................................................................... 13, 14, 15, 18, 20

*In re Optical Disk Drive Antitrust Litig.*,
303 F.R.D. 311 (N.D. Cal. 2014) ...................................................................................... 16

*In re Optical Disk Drive Antitrust Litig.*,
No. 10-md-02143-RS, ECF No. 1851 (Apr. 14, 2016) .......................................................... 13

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
725 F.3d 244 (D.C. Cir. 2013) .......................................................................................... 16

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
No. 07-md-1819-CW, ECF No. 1370 (N.D. Cal. June 30, 2011) ............................................. 13

*In re Superior Beverage/Glass Container Consol. Pretrial*,
133 F.R.D. 119 (N.D. Ill. 1990) ........................................................................................ 16

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
No. M 07-1827 SI, 2013 WL 149692 (N.D. Cal. Jan. 14, 2013) ............................................ 13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
No. M 07-1827 SI, 2011 WL 7575003 (N.D. Cal. Dec. 27, 2011) .......................................... 13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
No. M 07-1827 SI, 2013 WL 1365900 (N.D. Cal. Apr. 3, 2013) ........................................... 13

*In re Veeco Instruments Inc. Sec. Litig.*,
No. 05 MDL 01695(CM), 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ................................... 18

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*,
  19 F.3d 1291 (9th Cir. 1994) ................................................................................ 12, 18

*Meijer v. Abbott Labs.*,
  No. C-07-05985, ECF No. 514 (N.D. Cal. Aug. 11, 2011) ......................................... 13

*Paul, Johnson, Alston & Hunt v. Graulty*,
  886 F.2d 268 (9th Cir. 1989) ................................................................................... 12

*Perma Life Mufflers, Inc. v. Int'l Parts Corp.*,
  392 U.S. 134 (1968) ................................................................................................. 13

*Pillsbury Co. v. Conboy*,
  459 U.S. 248 (1983) ................................................................................................. 13

*Pokorny v. Quixtar, Inc.*,
  No. C 07-0201 SC, 2013 WL 3790896 (N.D. Cal. July 18, 2013) ............................. 14

*Radcliffe v. Experian Info. Solutions, Inc.*,
  715 F.3d 1157 (9th Cir. 2013) ................................................................................. 23

*Reiter v. Sonotone Corp.*,
  442 U.S. 330 (1979) ................................................................................................. 13

*Rodriguez v. West Publ'g Corp.*,
  563 F.3d 948 (9th Cir. 2009) ................................................................................... 22

*Six (6) Mexican Workers v. Ariz. Citrus Growers*,
  904 F.2d 1301 (9th Cir. 1990) ........................................................................... 13, 14

*Torrisi v. Tucson Elec. Power Co.*,
  8 F.3d 1370 (9th Cir. 1993) ..................................................................................... 14

*Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294 (N.D. Cal. 1995) ..................... 23, 24

*Vincent v. Hughes Air West, Inc.*,
  557 F.2d 759 (9th Cir. 1977) ................................................................................... 21

*Vizcaino v. Microsoft Corp.*,
  142 F. Supp. 2d 1299 (W.D. Wash. 2001), *aff'd*, 290 F.3d 1043 (9th Cir. 2002) ............... 15, 19

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002) ...................................................................... 13, 14, 18, 19

**STATUTES**

Clayton Act, 15 U.S.C. § 15 ......................................................................................... 6

Sherman Act, 15 U.S.C. § 1 .......................................................................................... 6

**OTHER AUTHORITIES**

Alba Conte,
  *Attorney Fee Awards* (3d ed. 2004).................................................................... 21, 22

**RULES**

Rule 23, Federal Rules of Civil Procedure ...................................................................... 1

Rule 30, Federal Rules of Civil Procedure ...................................................................... 9

Rule 54, Federal Rules of Civil Procedure ...................................................................... 1

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 8, 2017, at 2:00 p.m. before the Honorable Jon S. Tigar, United States District Judge of the Northern District of California, San Francisco Courthouse, located at Courtroom 9, 19th Floor, 450 Golden Gate Avenue, San Francisco, California, Direct Purchaser Plaintiffs ("DPPs" or "Plaintiffs") will move this Court for an award of attorneys' fees in the amount of 30% of the proceeds of the settlements with the Mitsubishi Electric and Thomson Defendants ($25,425,000) plus interest, reimbursement of litigation expenses in the amount of $1,053,960.26, and payments to each class representative of $15,000 for their time and effort representing the class in connection with the case against the Mitsubishi Electric and Thomson Defendants. This motion is brought pursuant to Rules 23(h) and 54(d)(2) of the Federal Rules of Civil Procedure.

This motion is made on the grounds that (a) such fees are fair and reasonable in light of Class Counsel's efforts in creating the settlement funds; (b) the requested fees comport with the Ninth Circuit case law in common fund cases; (c) the expenses for which reimbursement is sought were reasonably and necessarily incurred in connection with the prosecution of this action; and (d) an additional payment of $15,000 to each class representative for their substantial efforts on behalf of the class is warranted and appropriate.

This motion is based upon this Memorandum of Points and Authorities; the Declaration of R. Alexander Saveri; the proposed order submitted herewith; the declarations of Class Counsel; and other records, pleadings, and papers filed in this action; and upon such argument and further pleadings as may be presented to the Court at the hearing on this motion.

## ISSUES TO BE DECIDED

1.  Whether to award of attorneys' fees in the amount of 30% of the settlement funds ($25,425,000) plus interest.

2.  Whether to reimburse litigation expenses in the amount of $1,053,960.26.

3.  Whether to make additional payments of $15,000 to class representatives for their time and effort representing the class in connection with the Mitsubishi Electric and Thomson case.

1

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.      INTRODUCTION

3

Direct Purchaser Plaintiffs ("DPPs" or "Plaintiffs") and their counsel ("Class Counsel")

4

respectfully submit this Memorandum of Points and Authorities in Support of Plaintiffs' Second

5

Application for Attorneys' Fees and Expenses.

6

This is Plaintiffs' second application for attorney fees and expense reimbursement. In

7

January, 2016 the Court granted Plaintiffs' first application for $38,235,000 in attorneys' fees and

8

approved and/or awarded $4,402,144.26 in litigation expenses. *See In re Cathode Ray Tube (CRT)*

9

*Antitrust Litig.*, No. 07-CV-5944-JST, 2016 WL 183285 (N.D. Cal. Jan. 14, 2016) ("First Fee

10

Order"). The Court also granted Plaintiffs' motion to award incentive payments of $25,000 to each

11

of the class representatives. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-CV-5944-

12

JST, 2016 WL 153265 (N.D. Cal. Jan. 13, 2016) ("First Incentive Award Order"). The Court's fee

13

award amounted to 30% of the settlement fund before the Court—settlements with seven defendant

14

groups totaling $127,450,000—and 88% of Plaintiffs' lodestar. First Fee Order, 2016 WL 183285,

15

at *1–3. The Court found the award appropriate because: 1) Class Counsel had expended "far more

16

work" and taken on "more risk" than a normal class action case; 2) there were no objections; 3) a

17

30% fee was consistent with fees awarded in similar cases in this District; and 4) "most

18

importantly" the fee was less than the lodestar and therefore did not result in a multiplier. *See id.* at

19

*3–4.

20

Plaintiffs now seek an attorney fee and expense award for two additional settlements

21

totaling $84,750,000. Plaintiffs settled with the Mitsubishi Electric Defendants[1] for $75,000,000 in

22

November, 2016. Plaintiffs settled with the Thomson Defendants[2] for $9,750,000 in February,

23

2015 (collectively, "M&T Settlement Funds"). As with their first application, Plaintiffs request an

24

---

25

[1] Mitsubishi Electric Corporation; Mitsubishi Electric US, Inc. (formerly known as Mitsubishi Electric & Electronics USA, Inc.); and Mitsubishi Electric Visual Solutions America, Inc.

26

(formerly known as Mitsubishi Digital Electronics America, Inc.) (collectively, the "Mitsubishi Electric Defendants").

27

[2] Thomson SA (now known as Technicolor SA), Thomson Consumer Electronics, Inc. (now known as Technicolor USA, Inc.), and Thomson Displays Americas LLC (now known as Technologies

28

Displays Americas LLC) (collectively, the "Thomson Defendants").

award of 30% of these settlement funds, or $25,425,000. Plaintiffs have expended an additional $11,812,004.95 in lodestar prosecuting the case against the Mitsubishi Electric and Thomson Defendants for a total lodestar in this litigation of $55,147,522.45. The fee award Plaintiffs request would therefore result in a total fee of $63,660,000 and a multiplier of 1.154. An award of 30% remains appropriate when judged by the reasoning of the First Fee Order. Class Counsel have performed substantial additional work. The risks undertaken by Class Counsel remain substantial. The 30% fee remains consistent with fee awards in similar cases. The multiplier remains low.

In addition, the additional work Class Counsel performed was of high quality and the settlements Class Counsel obtained as a result of this work provide excellent benefits to the class, especially in light of continuing litigation risks.

First, as detailed in the accompanying declarations, the additional work done by Class Counsel was of high quality, efficiently performed, and essential to the excellent results achieved. Among other things, Class Counsel have:

- Engaged in extensive written discovery with the Mitsubishi Electric and Thomson Defendants;
- Participated in over two dozen depositions of Mitsubishi Electric and Thomson employees and experts;
- Obtained class certification with respect to the Mitsubishi Electric Defendants;
- Performed extensive review of the evidence and analysis necessary to prepare Plaintiffs' case for trial against the Mitsubishi Electric Defendants, including issues relating to the authentication and admissibility of evidence at trial;
- Briefed five motions to compel against the Mitsubishi Electric Defendants;
- Moved for sanctions against the Mitsubishi Electric Defendants;
- Opposed two motions to compel brought by the Mitsubishi Electric Defendants;
- Completed and served four expert reports in anticipation of trial;
- Participated in the multi-party translation dispute resolution process in anticipation of trial;
- Began other trial preparations;
- Participated in two mediations before Magistrate Judge Corley, negotiated settlements with the Mitsubishi Electric and Thomson Defendants, and prepared motions and class notices necessary for their approval.

1    Second, the settlements before the Court constitute excellent recoveries. The $75 million

2    Mitsubishi settlement is the largest settlement Plaintiffs obtained. It more than doubles the $33

3    million from Samsung SDI—the second largest. It also substantially exceeds the damages

4    attributable to the Mitsubishi Electric Defendants' U.S. sales during the class period. The Thomson

5    settlement is also a good result in light of Thomson's poor financial condition.

6    Third, DPPs have continued to face substantial risks in this case, including:

7    - The risk that class certification would be denied;

8    - The risk that the jury would find that defendants did not participate in the alleged
       conspiracy, particularly in regard to the Mitsubishi Electric Defendants because they did
9      not attend the so-called "glass meetings";

10   - The risk of litigating against large, sophisticated law firms with vast resources;

11   - The risk that defendants would successfully argue that any antitrust violation they
       committed caused no antitrust impact or little or no damages to class members;

12   - The risk of trying a case in which many of the events occurred as much as twenty years
       ago, and in which much evidence and many witnesses are no longer available;
13

14   - The risk of diminished recovery because of the financial difficulties, bankruptcy, and/or
       disappearance of corporate defendants due to the demise of the CRT industry; and

15   - The changing legal landscape of the law regarding antitrust class actions.

16   Finally, the total recovery for the class represents approximately 24.2% of the single

17   damages estimated by Plaintiffs' damages expert. Saveri Decl. ¶ 54. This substantially exceeds the

18   average recovery in similar matters. *See In re Cathode Ray Tube (CRT) Antitrust Litig.,* No. 14-

19   CV-2058-JST, 2015 WL 9266493, at *5 n.9 (N.D. Cal. Dec. 17, 2015) ("Thomson Final Approval

20   Order"); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-CV-5944, 2016 WL 3648478, at

21   *7 n.19 (N.D. Cal. July 7, 2016) ("IPP Final Approval Order").

22   Class Counsel also invested $1,053,960.26 in additional out of pocket expenses to obtain

23   the Mitsubishi Electric and Thomson settlements. DPPs therefore also seek reimbursement of their

24   additional litigation expenses in that amount. All were reasonable and necessary.[3]

25

26

27   [3] None of the additional lodestar referred to above was submitted as a basis for Plaintiffs first fee
     and expense application. Neither were any of the additional expenses for which Plaintiffs now seek
28   reimbursement submitted in connection with that application. Saveri Decl. ¶¶ 3, 7, 10.

1    Finally, DPPs seek payment of an additional $15,000 to each of the class representatives for

2    their further service to the class. As with the previous settlements, the service of the class

3    representatives was essential to the class recovery. Among other things, each class representative

4    was deposed again, responded to additional written discovery by the Mitsubishi Electric

5    Defendants, and continued to monitor the litigation on behalf of the class.

6    **II.      FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

7    As Plaintiffs explained in their first application for attorney fees and expenses, this case is

8    notable for and characterized by the complex issues it has presented and the tenacity and creativity

9    with which defendants—all possessing enormous resources and represented by law firms among

10   the best and largest in the world—have litigated those issues. Defendants have steadfastly opposed

11   DPPs on numerous grounds. From the outset of this litigation, defendants have contended that

12   DPPs are entitled to little or no recovery because, *inter alia*, (1) the conspiracy was limited to Asia

13   and did not affect the United States; (2) the FTAIA barred DPPs' action; (3) DPPs lacked standing

14   because the conspiracy did not extend to the Finished Products (i.e., computer monitors and

15   televisions) most had purchased; (4) DPPs' claims were barred by the statute of limitations; (5) the

16   conspiracy involved only CDTs; and (6) the conspiracy, if it existed, caused little or no damage to

17   DPPs. Several defendants also asserted that they were not conspirators or had withdrawn from the

18   conspiracy long ago. At every stage of this litigation, defendants asserted these arguments as a

19   basis to dismiss all or part of the action, to limit damages, or to deny or limit discovery. Saveri

20   Decl. ¶ 13.

21   DPPs did not include the Mitsubishi Electric and Thomson Defendants in their original

22   consolidated complaint because their roles in the alleged conspiracy were not as clear as the other

23   defendants. Instead, DPPs entered into tolling agreements with both groups. *Id.* ¶ 21. As discovery

24   progressed, evidence linking both groups to the conspiracy came to light. *Id.* Accordingly, DPPs

25   filed a complaint against both on May 5, 2014. Case No. 14-CV-2058-JST, ECF No. 1.

26   Despite their later entry into the litigation, the Mitsubishi Electric and Thomson Defendants

27   vigorously asserted the same arguments as the other defendants. DPPs opposed their arguments,

28   but, as with the other defendants, the arguments were sometimes difficult, and the outcomes

1    uncertain. As with the other settlements, the efforts of Class Counsel were essential to the benefits

2    conferred on the class by the Mitsubishi Electric and Thomson settlements. Class Counsel also

3    continued to manage the litigation effectively and efficiently. Saveri Decl. ¶ 15.

4         Plaintiffs described the procedural history of the litigation and their work in their first fee

5    and expense application and the declarations supporting it. *See* ECF No. 4055 at 3–13.[4]

6    Accordingly, Plaintiffs here will briefly summarize previous history and work, but will focus on

7    events relating to the case against the Mitsubishi Electric and Thomson Defendants.[5]

8         **A.      Initial Phase of the Multidistrict Litigation**

9         This multidistrict litigation arises from an alleged worldwide conspiracy to fix prices of

10   Cathode Ray Tubes ("CRTs"). CRTs are the primary components of CRT televisions and computer

11   monitors. The initial complaint alleged a conspiracy involving some of the largest companies in the

12   world—Samsung SDI, Panasonic, LG, Toshiba, Hitachi, and Philips. Saveri Decl. ¶ 18. After the

13   United States Department of Justice ("DOJ") announced its investigation into the conspiracy in

14   November of 2007, twenty direct purchaser plaintiff class action complaints were filed alleging a

15   violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15

16   U.S.C. § 15.[6] Saveri Decl. ¶ 19.

17

---

18   [4] *See also* the Declarations of Class Counsel filed in support of Plaintiffs' first fee and expense
19   application. ECF Nos. 4055-1; 4055-2; 4055-3; 4055-4; 4055-5; 4055-6; 4055-7; 4055-8; 4055-9;
     4055-10; 4055-11; 4055-12; 4055-13; 4055-14; 4055-15; 4055-16; 4055-17; 4055-18; 4055-19;
20   4055-20; 4055-21; 4055-22; 4055-23; 4055-24; 4055-25; 4055-26; 4055-27; 4055-28; 4055-29;
     4055-30; 4055-31; 4055-32; 4055-33; 4055-34; 4055-35; 4055-36.

21   [5] Lead Counsel instructed Class Counsel to keep time related primarily to the Mitsubishi Electric
22   and Thomson Defendants separate from that related to the other defendants. Some of the work
     described here and included in Plaintiffs' additional lodestar—e.g., drafting the complaint against
23   the Mitsubishi Electric and Thomson Defendants, work related to the class certification motion
     against those defendants—was performed before the first application for attorney fees and
24   expenses. Saveri Decl. ¶ 11. Again, however, none of the work included in the additional lodestar
     included in this motion was included in the first fee and expense application.

25   [6] On February 10, 2009 and November 9, 2010, the DOJ announced the indictment of executives of
26   defendants Samsung SDI, LG Electronics and Chunghwa for price fixing Color Display Tubes
     ("CDTs") used in computer monitors. Ultimately, the DOJ secured a single conviction. Defendant
27   Samsung SDI admitted to participation in a conspiracy to fix the prices of CDTs between January
     1997 and March 2006. *U.S. v. Samsung SDI Co.*, No. 11-cr-162-WHA, ECF No. 29 (N.D. Cal.
28   Aug. 8, 2011) (Amended Plea Agreement).

Plaintiffs' work during the first eight years of the case included: conducting limited document discovery during a two-year stay following a DOJ intervention; filing a consolidated amended complaint; opposing and surviving multiple motions to dismiss; opposing defendants' Rule 11 motion; opposing defendants' motion for summary judgment regarding Finished Products; propounding and responding to extensive discovery; reviewing and analyzing millions of pages of documents, including many written in Korean, Chinese and Japanese; participating in the depositions of over 100 representatives of defendants; responding to eight sets of interrogatories and nine sets of document requests propounded by defendants; producing over 12,000 pages of documents; preparing and sitting for class representative depositions; drafting and filing a motion for class certification with respect to the Hitachi and Samsung SDI defendants; negotiating and documenting settlements with the initial seven defendant groups, including gaining final approval of the settlements and executing Court-approved notice programs; and other miscellaneous motion practice. *See* ECF No. 4055 at 3–13; Saveri Decl. ¶ 20.

**B.     The Complaint Against the Mitsubishi Electric and Thomson Defendants**

In 2013, Plaintiffs began developing their case against the Mitsubishi Electric and Thomson Defendants based on evidence uncovered during discovery. Plaintiffs filed their complaint on May 5, 2014 (Case No. 14-CV-2058-JST, ECF No. 1), their first amended complaint on May 20, 2014 (Case No. 14-CV-2058-JST, ECF Nos. 14-3, 34), and their second amended complaint on August 6, 2015 (ECF Nos. 3957-4, 4007).

**C.     Discovery**

Plaintiffs propounded an initial set of interrogatories and sets of requests for production of documents to the Mitsubishi Electric and Thomson Defendants, followed by five additional sets of interrogatories, four sets of requests for production of documents, and three sets of requests for admission to the Mitsubishi Electric Defendants. Saveri Decl. ¶ 22. Plaintiffs also responded to discovery propounded by the Mitsubishi Electric Defendants, including four sets of interrogatories; three sets of requests for production of documents; and one set of requests for admission. *Id.* ¶ 23. Plaintiffs met and conferred with Mitsubishi Electric's counsel with respect to many of these discovery requests, many of which resulted in motion practice before the Special Master. *Id.* ¶ 24.

1   Plaintiffs also reviewed and analyzed discovery responses to Direct Action Plaintiffs

2   ("DAPs") and Indirect Purchaser Plaintiffs ("IPPs") as well as discovery responses and documents

3   produced earlier in this case. *Id.* ¶ 25.

4   In cooperation with IPPs and DAPs, Plaintiffs noticed or participated in over two dozen

5   additional depositions of Mitsubishi Electric and Thomson employees. The depositions involved

6   substantial review of relevant documents as well as negotiation with defense counsel. *Id.* ¶ 26.

7   In addition, DPPs prepared for and defended the depositions of each of the eight class

8   representatives. *Id.* ¶ 27.

9   **D.    Motion Practice**

10   Plaintiffs engaged in substantial motion practice in connection with their case against the

11   Mitsubishi Electric and Thomson Defendants.

12   **1.    Motions for Class Certification and Class Notification**

13   On November 7, 2014, Plaintiffs filed a motion for class certification against the Mitsubishi

14   Electric and Thomson Defendants. ECF No. 2969. The motion was based on the previous motion

15   filed against the Hitachi and Samsung SDI defendants, but required substantial additional work,

16   including updating the declaration of Plaintiffs' expert economist. Saveri Decl. ¶ 29. Plaintiffs also

17   filed a reply brief in support of the motion. ECF No. 3820.

18   On July 8, 2015, the Court entered an order granting Plaintiffs' motion for class

19   certification against the Mitsubishi Electric Defendants. *In re Cathode Ray Tube (CRT) Antitrust*

20   *Litig.*, 308 F.R.D. 606 (N.D. Cal. 2015). Thereafter, Plaintiffs prepared a notice plan, and moved

21   for an order authorizing notice to the class. On November 9, 2015, the Court granted Plaintiffs'

22   motion. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 14-CV-2058-JST, 2015 WL 6871439

23   (N.D. Cal. Nov. 9, 2015). Plaintiffs thereafter provided notice to the class pursuant to the Court's

24   order. *See* ECF No. 4330 ¶¶ 4–5, 7, 9.

25   **2.    Motions to Compel Discovery**

26   Plaintiffs engaged in extensive motion practice before the Special Master regarding the

27   various discovery issues. Plaintiffs brought the following motions against Mitsubishi Electric:

28

- On December 18, 2014, Plaintiffs moved to compel the Mitsubishi Electric Defendants to supplement their answers to discovery requests regarding competitor meetings and transactional data. Saveri Decl. ¶ 30. On April 28, 2015, Judge Walker granted the motion and ordered the Mitsubishi Electric Defendants to supplement their responses. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 14-CV-2058-SC, 2015 WL 12942495, at *4 (N.D. Cal. Apr. 28, 2015).[7]

- On January 30, 2015, Plaintiffs moved to compel the Mitsubishi Electric Defendants to produce a witness for further examination and produce documents. Saveri Decl. ¶ 31. On May 28, 2015, Judge Walker ordered a Mitsubishi Electric employee, Koji Murata, to appear for further examination regarding various matters including the documents used to refresh his recollection, and his search for documents. Judge Walker also ordered the production of documents used to refresh Mr. Murata's recollection as well as information about the Mitsubishi Electric Defendants' efforts to search for and preserve responsive documents. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 14-CV-2058-SC, 2015 WL 12942210, at *5 (N.D. Cal. May 29, 2015).[8]

- On June 2, 2015, in relation to their first motion to compel, Plaintiffs moved to further compel the Mitsubishi Electric Defendants to produce two previous witnesses to testify regarding their supplemental discovery responses. Saveri Decl. ¶ 32. On June 12, 2015, Judge Walker ordered the Mitsubishi Electric Defendants to produce Mr. Murata again for examination regarding their supplemental discovery responses. ECF No. 3873.[9]

- On June 8, 2016, Plaintiffs moved to compel the Mitsubishi Electric Defendants to provide a full and complete privilege log. Saveri Decl. ¶ 33. The motion was fully briefed and pending when the Mitsubishi Electric settlement was reached. *Id.*

- On July 26, 2016, Plaintiffs moved to quash the Mitsubishi Electric Defendants' Notice of Deposition Upon Written Question of a Chunghwa employee who had been previously examined under Rule 30 of the Federal Rules of Civil Procedure. The motion was fully briefed and pending when the Mitsubishi Electric settlement was reached. Saveri Decl. ¶ 34.

- On July 27, 2016, Plaintiffs moved to compel the Mitsubishi Electric Defendants to provide supplemental responses to requests for admission. The motion was fully briefed and pending when the Mitsubishi Electric settlement was reached. *Id.* ¶ 35.

In addition, Plaintiffs responded to motions filed by the Mitsubishi Electric Defendants:

- On September 15, 2015, the Mitsubishi Electric Defendants brought a motion to compel production of documents relating to Plaintiffs' downstream data and further depositions of the class representatives. On March 24, 2016, the Special Master denied the motion as it pertained Plaintiffs' downstream information but ordered Plaintiffs to produce

---

[7] Adopted by the Court on June 11, 2015. ECF No. 3870.

[8] Adopted by the Court on September 11, 2015. ECF No. 4054.

[9] Adopted by the Court on July 20, 2015. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 14-CV-2058-SC, 2015 WL 4451419, at *4 (N.D. Cal. July 20, 2015). The Mitsubishi Electric Defendants subsequently agreed to produce the resumed deposition of the other witness, Masahiko Konishi. Saveri Decl. ¶ 32.

9

documents regarding "competitive intelligence." He further ordered all Plaintiffs' class representatives to sit for resumed depositions. *See* ECF No. 4521.[10]

- On December 21, 2015, the Mitsubishi Electric Defendants brought a motion to compel further responses to two interrogatories. On March 28, 2016, the Special Master granted the motion in part and denied the motion in part. He ordered Plaintiffs to supplement certain interrogatory responses to indicate whether any of the competitor meetings that Plaintiffs alleged were conspiratorial were "glass meetings," but denied the motion in all other respects. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 14-CV-2058-JST, 2016 WL 7743500, at *5 (N.D. Cal. Mar. 28, 2016).[11]

### 3.   Motion for Evidentiary Sanctions

On December 4, 2015, Plaintiffs filed a motion for evidentiary sanctions against the Mitsubishi Electric Defendants based on their continuing failure to fulfill their discovery obligations. In addition to a reply brief, on June 30, 2016, Plaintiffs filed a supplemental brief detailing additional relevant developments. Plaintiffs also sought to compel further responses to interrogatories and document requests regarding the Mitsubishi Electric Defendants' contacts with other alleged conspirators, sales of CRTs and finished products, and destruction of evidence. Saveri Decl. ¶ 36.

On August 29, 2016, Judge Walker issued a report recommending that the Court grant Plaintiffs' motion. Judge Walker recommended that evidentiary sanctions be imposed against the Mitsubishi Electric Defendants because of their "willful" failure to respond to DPPs' discovery requests and violations of previous discovery orders. ECF Nos. 4802, 4810. In particular, Judge Walker recommended that an interrogatory response by Defendant Samsung SDI identifying "Mitsubishi" as a co-conspirator be deemed admitted despite the hearsay objection of the Mitsubishi Electric Defendants. *Id.* at 38–40.[12]

On September 24, 2016, the Mitsubishi Electric Defendants filed a motion asking the Court to reject the Special Master's Report and Recommendation. ECF No. 4877. The parties settled before the motion was resolved. Saveri Decl. ¶ 38.

---

[10] Adopted by the Court on April 18, 2016. ECF No. 4569.

[11] Adopted by the Court on April 18, 2016. ECF No. 4570.

[12] The Court sustained the Mitsubishi Electric Defendants' objection on this ground in connection with Mitsubishi Electric's motion for summary judgment. ECF No. 5128.

**E.    Trial Preparation**

By the time of the final settlement with the Mitsubishi Electric Defendants, the Court had set a trial schedule, and Plaintiffs had undertaken substantial preparations for trial. ECF No. 4628 (trial schedule). Among other things, Plaintiffs had completed and served four expert reports:

- Expert Report of Dr. Stephan Haggard (Sept. 1, 2016) relating to Samsung SDI's membership in and control by the Samsung *chaebol*;

- Expert Report of Joseph P. Russoniello (Sept. 1, 2016) disputing the contention that the DOJ's failure to indict indicated that the Mitsubishi Electric Defendants were not members of the alleged conspiracy;

- Expert Report of Leslie M. Marx, Ph.D (Sept. 1, 2016) explaining that the conduct of Mitsubishi Electric was consistent with participation in the alleged conspiracy and inconsistent with that of a rational competitor; and

- Expert Report of Jeffrey J. Leitzinger, Ph.D (Sept. 1, 2016) explaining his damage study indicating $876 million in single damages, as well as explaining the nature of the CRT market and aspects of Mitsubishi Electric's business, among other things.

The Marx and Leitzinger reports, in particular, required large amounts of work by class counsel, including the identification and analysis of evidence. Saveri Decl. ¶ 39.

Plaintiffs also participated in all aspects of the ongoing and extensive multi-party document translation dispute resolution mechanism before Judge Walker. *See* ECF Nos. 4597, 4625, 4657; Saveri Decl. ¶ 40. Plaintiffs had also begun to identify and organize their trial evidence, including analysis to ensure that it could be authenticated and admitted at trial. *Id.* ¶ 41.

**F.    Settlements and Notice**

Plaintiffs have also spent substantial time negotiating, documenting, obtaining Court approval and providing class notice regarding the Mitsubishi Electric and Thomson settlements. *Id.* ¶ 42.

The Thomson settlement was reached on February 6, 2015, following thorough and contentious face-to-face negotiations as well as numerous telephone and email discussions. *See* ECF No. 3562-1 ¶ 24. Thereafter, Plaintiffs filed motions for preliminary and final approval, *see* ECF Nos. 3562, 4091, and provided notice to the class as ordered by the Court. *See* ECF No. 4017 ¶¶ 4–5, 6, 8; ECF No. 4020 ¶¶ 4–5, 6, 8. The Court preliminarily approved the Thomson settlement

11

1   on June 12, 2015, ECF No. 3872, and finally approved it on December 17, 2015. ECF No. 4260.

2        The Mitsubishi Electric settlement followed years of negotiations, including two mediations

3   before Magistrate Judge Jacqueline Scott Corley. The settlement was reached after the second

4   mediation, and subsequent discussions through Judge Corley. The parties also had numerous

5   unmediated settlement communications, including face-to-face meetings. Saveri Decl. ¶ 45.

6        Plaintiffs filed a motion for preliminary approval which the Court granted. *In re Cathode*

7   *Ray Tube (CRT) Antitrust Litig.*, No. 14-CV-2058-JST, 2017 WL 565003 (N.D. Cal. Feb. 13,

8   2017) ("Mitsubishi Preliminary Approval Order"). Plaintiffs have provided notice of this

9   settlement as directed by the Court. *See* ECF No. 5126 ¶¶ 5–6, 8–9, 11. Plaintiffs will file a brief in

10  support of final approval. Saveri Decl. ¶ 46.

11  **III.    ARGUMENT**

12       DPPs' requests (1) for an award of attorneys' fees in the amount of 30% of the M&T

13  Settlement Funds; (2) for approval of expenses; and (3) for reimbursement of expenses Class Counsel

14  have advanced on behalf of the Class are reasonable and should be approved by the Court.

15       **A.    The Fee Award Requested By Plaintiffs Is Reasonable and Appropriate**

16            **1.    Class Counsel Are Entitled to a Reasonable Fee Under the Common
                      Fund Doctrine**
17

18       Counsel who produce a benefit for class members are entitled to a reasonable fee. *Boeing*

19  *Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("this Court has recognized consistently that a

20  litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or

21  his client is entitled to a reasonable attorney's fee from the fund as a whole"); *see also In re Wash.*

22  *Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994) ("*WPPSS*") ("those who

23  benefit from the creation of the fund should share the wealth with the lawyers whose skill and

24  effort helped create it"); *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 271 (9th Cir.

25  1989) (well-settled that lawyer who helps create common fund should share in the award).

26       The amount of an award of attorneys' fees and expenses is within the discretion of the

27  court. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998); *WPPSS*, 19 F.3d at 1296.

28  The court may utilize the "percentage-of-the-fund" or the "lodestar" method to determine fees.

1    *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) ("*Vizcaino II*"); *In re Online*

2    *DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015) ("*Online DVD*"). Most courts prefer

3    the percentage-of-the-fund method. Virtually all of the major recent antitrust class actions in this

4    District have used this method. *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-

5    1827 SI, 2011 WL 7575003, at *1–2 (N.D. Cal. Dec. 27, 2011) (30%); *In re TFT-LCD (Flat Panel)*

6    *Antitrust Litig.*, No. M 07-1827 SI, 2013 WL 149692, at *1–2 (N.D. Cal. Jan. 14, 2013) (30%); *In*

7    *re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2013 WL 1365900, at *7–8 (N.D.

8    Cal. Apr. 3, 2013) (28.6%); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, No. 07-

9    md-1819-CW, ECF No. 1370 (N.D. Cal. June 30, 2011) (30%); *Meijer v. Abbott Labs.*, No. C-07-

10   05985, ECF No. 514 (N.D. Cal. Aug. 11, 2011) (33⅓%); *In re Optical Disk Drive Antitrust Litig.*,

11   No. 10-md-02143-RS, ECF No. 1851 ¶ 7 (Apr. 14, 2016) (30%). This Court applied the

12   percentage-of-the-fund approach in its First Fee Order, as well as its fee award in the IPP case.

13   2016 WL 183285, at *2; *In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 07-CV-5944-JST,

14   2016 WL 4126533, at *3 (N.D. Cal. Aug. 3, 2016) ("IPP Fee Order") (27.5%).

15        Finally, reasonable fee awards promote private enforcement of—and compliance with—the

16   antitrust laws, an important public good. Private antitrust litigation is essential to the enforcement

17   of the antitrust laws. *See, e.g., Pillsbury Co. v. Conboy*, 459 U.S. 248, 262–63 (1983); *Reiter v.*

18   *Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Hawaii v. Standard Oil Co. of Cal.*, 405 U.S. 251, 266

19   (1972); *Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 139 (1968). "In the absence of

20   adequate attorneys' fee awards, many antitrust actions would not be commenced . . . ." *Alpine*

21   *Pharmacy, Inc. v. Chas. Pfizer & Co.*, 481 F.2d 1045, 1050 (2d Cir. 1973), *cert. denied*, 414 U.S.

22   1092 (1973).

23        **B.     Analysis of the Relevant Factors Shows that a Fee of 30% of the Common
24                 Fund Is Warranted**

25        As the Court has noted, "absent 'special circumstances,' the benchmark for attorneys' fees

26   in this Circuit is 25%." Mitsubishi Preliminary Approval Order, 2017 WL 565003, at *6 (citing *Six*

27   *(6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) ("*Six (6)*

28   *Mexican Workers*")). However, as the Court pointed out in the First Fee Order, the benchmark rate

13

is not always appropriate. 2016 WL 183285, at *2. In any event, *Vizcaino II* makes clear the Court may not arbitrarily apply a percentage; rather it must show why that percentage and the ultimate award are appropriate based on the facts of the case. *Vizcaino II*, 290 F.3d at 1048; *see also Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993) ("This 'benchmark percentage should be adjusted, or replaced by a lodestar calculation, when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors.'" (quoting *Six (6) Mexican Workers*, 904 F.2d at 1311)).

In practice, as the Court noted in the First Fee Order, and as demonstrated by the cases cited above, fee awards in antitrust cases such as this one tend to approximate 30%. *See* 2016 WL 183285, at *2–3. *See also* ECF No. 4055 at 16 (Plaintiffs' first fee application); *Pokorny v. Quixtar, Inc.*, No. C 07-0201 SC, 2013 WL 3790896, at *1 (N.D. Cal. July 18, 2013) ("30% award the norm"). In addition, fees awarded in this Circuit are almost always a multiple of the lodestar in the case. First Fee Order, 2016 WL 183285, at *2–3.

The Ninth Circuit has identified factors a court may consider in making a fee award, including

> the extent to which class counsel "achieved exceptional results for the class," whether the case was risky for class counsel, whether counsel's performance "generated benefits beyond the cash settlement fund," the market rate for the particular field of law (in some circumstances), the burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work), and whether the case was handled on a contingency basis. In addition, a court may cross-check its percentage-of-recovery figure against a lodestar calculation.

*Online DVD*, 779 F.3d at 954–55 (citations omitted). Other factors may also be relevant, including the amount of work performed, counsel's skill and experience, the complexity of the issues faced, and the reaction of the class. *See, e.g.*, *In re Heritage Bond Litig.*, No. 02-ML-1475 DT, 2005 WL 1594403, at *18–23 (C.D. Cal. June 10, 2005).

In this context, it is plain that the award DPPs seek is consistent with recoveries awarded in other major class action cases. Consideration of the factors enumerated above confirms its fairness.

### 1.      Class Counsel Achieved an Excellent Result for the Class

The recovery counsel achieve on behalf of the class is an important factor to be considered in determining an appropriate fee award. *See Hensley v. Eckerhart*, 461 U.S. 424, 431 (1983);

*Vizcaino v. Microsoft Corp.*, 142 F. Supp. 2d 1299, 1303 (W.D. Wash. 2001), *aff'd,* 290 F.3d 1043 (9th Cir. 2002) ("*Vizcaino I*"); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008) ("*Omnivision*"). The results here support an increase of the benchmark fee. DPPs have obtained total settlements of $212,200,000, amounting to 24.2% of the $876 million in single damages estimated by Plaintiffs' damages expert. This is significantly higher than the 20% recovery obtained by IPPs, which the Court described as "without question a good recovery and firmly in line with the recoveries in other cases," IPP Final Approval Order, 2016 WL 3648478, at *7, and supported a "modest increase over the Ninth Circuit benchmark." IPP Fee Order, 2016 WL 4126533, at *5; *see also* Mitsubishi Preliminary Approval Order, 2017 WL 565003, at *4.

Similarly, considered by themselves, the Mitsubishi Electric and Thomson settlements also support an increase of the benchmark fee. The Mitsubishi Electric settlement, in particular, is an excellent result. The $75 million payment substantially exceeds the single damages attributable to the Mitsubishi Electric Defendants' U.S. sales during the class period.[13] The fact that the IPP class obtained no recovery from the Mitsubishi Electric Defendants also highlights the quality of the DPP settlement. *See* IPP Final Approval Order, 2016 WL 3648478, at *2 (listing IPP settlements).

The settlement with the Thomson Defendants was also a good one in light of their poor financial condition, and the possibility that they could reenter bankruptcy proceedings in France. Saveri Decl. ¶ 44. *See also* Thomson Final Approval Order, 2015 WL 9266493, at *5 ("the Court concludes that Thomson's financial condition is indeed poor and that the Settlement was the best one Plaintiffs' counsel could negotiate under the circumstances").

## 2.     The Risks of this Litigation

Risk is another important factor in determining a fair fee award. *Online DVD*, 779 F.3d at 954–55. This factor also supports an increase of the benchmark fee. The Court has already found that DPPs took on more risk in this case than is "present in a normal class action suit." First Fee

---

[13] The Mitsubishi Electric Defendants' CDT market share was usually less than 3% and always less than 5% during the class period. They manufactured Color Picture Tubes ("CPTs") only for the first four years of the alleged conspiracy, stopping in 1998. Saveri Decl. ¶ 55. *See also* ECF No. 4966-4 at 22–23 ("worldwide CRT production by Mitsubishi Electric from 2000 to 2006 of 0–2%"). 5% of the single damages estimated by Plaintiffs' expert is $43.8 million.

Order, 2016 WL 183285, at *2; *see also* IPP Fee Order, 2016 WL 4126533, at *5 ("the actual

litigation risks borne by Class Counsel . . . were significant"; adopting Special Master's finding

that risk factor "weighs strongly in favor of an increase from the Ninth Circuit 25% benchmark");

Thomson Final Approval Order, 2015 WL 9266493, at *4–5.

### a.  Class Certification Risk

While the Court granted class certification in this case, there is always a risk that class

certification will be denied. Class certification has been denied in a number of large antitrust class

actions in this District in recent years. *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.*,

253 F.R.D. 478, 508 (N.D. Cal. 2008) (denying certification of indirect purchaser class and

certifying a direct purchaser class that was much smaller than requested); *In re Optical Disk Drive

Antitrust Litig.*, 303 F.R.D. 311, 325 (N.D. Cal. 2014); *In re Flash Memory Antitrust Litig.*, No. C

07-0086 SBA, 2010 WL 2332081, at *19 (N.D. Cal. June 9, 2010). *See also In re Rail Freight Fuel

Surcharge Antitrust Litig.*, 725 F.3d 244, 255 (D.C. Cir. 2013).

### b.  The Risk of Not Being Able to Establish Liability or Recover Substantial Damages

As explained in Plaintiffs' first fee and expense application, this case also presented

substantial risks on the merits. "Antitrust litigation in general, and class action litigation in

particular, is unpredictable." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 475

(S.D.N.Y. 1998). "The 'best' case can be lost and the 'worst' case can be won, and juries may find

liability but no damages. None of these risks should be underestimated." *In re Superior

Beverage/Glass Container Consol. Pretrial*, 133 F.R.D. 119, 127 (N.D. Ill. 1990). There is also

always a risk of unfavorable changes in the law.

This case also presented more particular risks. Among other things, defendants asserted:

that the alleged conspiracy, to the extent it existed, was limited to CDTs in Asia; that it caused little

or no harm to Plaintiffs; that the FTAIA barred some or all of Plaintiffs' damages; that Plaintiffs

were not entitled to any recovery for finished products; and that some or all of the defendants either

did not participate in the alleged conspiracy, or withdrew from it. Saveri Decl. ¶ 13. Because of

defendants' enormous resources and the skill and experience of their law firms, they litigated these and other issues ferociously and indefatigably.[14] As the Court noted in the IPP Fee Order:

> This was a sprawling, eight-year litigation defended vigorously by aggressive, competent antitrust counsel. Most of the defendants did not plead guilty to any antitrust violation, and most were prepared to prove that they did not participate in any conspiracy and that whatever conspiracy was proven inflicted no damage on the class.

2016 WL 4126533, at *5.

While Plaintiffs were confident in their case, losing any of these issues could have reduced their recovery substantially. Indeed, while the Court ultimately disagreed, Special Master Legge recommended that the Court grant defendants' motion to disallow damages for Finished Products. If his ruling had been affirmed, it would have eliminated approximately 70% of Plaintiffs' damages. Saveri Decl. ¶ 13.

In addition, there is always a risk that the jury will not accept the plaintiffs' damage analysis. As the Court has noted, in the *LCD* litigation, the Plaintiffs' presented a damage study indicating $870 million in single damages; the jury awarded $87 million. *Id.* ¶ 56; *see also* Mitsubishi Preliminary Approval Order, 2017 WL 565003, at *4.

Finally, Plaintiffs' case against the Mitsubishi Electric and Thomson Defendants was no less risky. For example, as explained in the motion for preliminary approval, Plaintiffs faced a substantial risk that the jury would find that the Mitsubishi Electric Defendants did not participate in the alleged conspiracy. Among other things, the Mitsubishi Electric Defendants would have argued at trial that they did not attend a single "glass meeting"; that they ceased manufacture of CPTs in 1998 and CDTs in 2004; that most of the CDTs they made used a different technology and were marketed to different customers than those of the other alleged conspirators; and that their market share was very small—i.e., substantially less than 5%—and they were therefore always a "bit" player in the market with little incentive to join the conspiracy. Saveri Decl. ¶ 16.

---

[14] For example, Defendant Mitsubishi Electric Corporation has over $35 billion in assets and employs over 135,000 people. *See* http://www.mitsubishielectric.com/company/about/at-a-glance/index.html. Its counsel, Jenner & Block, employs over 500 attorneys in 5 offices worldwide. *See* https://jenner.com/about/firm. Faegre Baker Daniels (Thomson's counsel) employs over "750 legal and consulting professionals" in 15 offices worldwide. *See* http://www.faegrebd.com/About-Us.

1    As for the Thomson Defendants, one of the downside risks of a litigation involving an

2    obsolete technology came to pass. Thomson's poor financial condition limited the amount DPPs

3    could obtain by judgment or settlement. *Id.* ¶ 17.

4                    **3.    Contingent Nature of the Fee**

5    The contingent nature of the fee, where there is no assurance of attorneys' fees or

6    reimbursement of expenses, also supports a fee above the benchmark. *See, e.g.*, *Vizcaino II*, 290

7    F.3d at 1050; *Online DVD*, 779 F.3d at 954–55 & n.14. The commencement of a class action is no

8    guarantee of success. "[T]he risk of non-payment in complex cases, such as this one, is very real."

9    *In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695(CM), 2007 WL 4115808, at *6

10   (S.D.N.Y. Nov. 7, 2007). It is well-established that attorneys who take on the risk of a contingency

11   case should receive a premium to compensate for that risk when they are successful:

12       It is an established practice in the private legal market to reward attorneys for
13       taking the risk of non-payment by paying them a premium over their normal
         hourly rates for winning contingency cases. *See* Richard Posner, *Economic*
14       *Analysis of Law* § 21.9, at 534–35 (3d ed. 1986). Contingent fees that may far
         exceed the market value of the services if rendered on a non-contingent basis are
15       accepted in the legal profession as a legitimate way of assuring competent
         representation for plaintiffs who could not afford to pay on an hourly basis
16       regardless whether they win or lose.

17   *WPPSS*, 19 F.3d at 1299.

18   Class Counsel have invested a total of $55,147,522.45 in time and $5,456,104.52 in

19   expenses on behalf of the class, and took the chance that they might not be compensated at all. This

20   factor strongly supports an increase of the benchmark fee.

21                    **4.    Delay**

22   Class Counsel have waited years for payment. This also supports an upward adjustment of

23   the benchmark. *See, e.g.*, *WPPSS*, 19 F.3d at 1305 ("Full compensation requires charging current

24   rates for all work done during the litigation, or by using historical rates enhanced by an interest

25   factor."). *Cf.* IPP Fee Order, 2016 WL 4126533, at *7 (Special Master "applied current, not

26   historic, billing rates 'in order to account for the delay of up to eight years for some firms in

27   receiving payment'"); *Vizcaino II*, 290 F.3d at 1051 ("Calculating fees at prevailing rates to

28

1    compensate for delay in receipt of payment" allowed). Plaintiffs' lodestar has been submitted at

2    historical rates, without any upward adjustment for interest. Saveri Decl. ¶¶ 3, 7.

3          **5.    A High Level of Skill Was Required to Prosecute this Case and Class**
             **Counsel's Work Was of High Quality**
4

5          The skill of Class Counsel and the high quality of their work in this case also support an

6    increase of the benchmark award. *See Gustafson v. Valley Ins. Co.*, No. CV 01-1575-BR, 2004 WL

7    2260605, at *2 (D. Or. Oct. 6, 2004). This complex litigation required DPPs to confront novel and

8    difficult legal and factual issues which courts have recognized as a significant factor to be

9    considered in making a fee award. *See, e.g.*, *Vizcaino I*, 142 F. Supp. 2d at 1303, 1306. Antitrust

10   price-fixing conspiracy cases are notoriously complex and difficult to litigate. *See, e.g.*, *In re*

11   *Linerboard Antitrust Litig.*, No. Civ.A. 98-5055, 2004 WL 1221350, at *10 (E.D. Pa. June 2, 2004)

12   ("*Linerboard*") ("antitrust class action is arguably the most complex action to prosecute"). The

13   high caliber of opposing counsel also supports this conclusion. *Vizcaino I*, 142 F. Supp. 2d at 1303;

14   *In re King Res. Co. Sec. Litig.*, 420 F. Supp. 610, 634 (D. Colo. 1976); *Arenson v. Bd. of Trade of*

15   *the City of Chicago*, 372 F. Supp. 1349, 1354 (N.D. Ill. 1974). Class Counsel also effectively

16   managed the logistics of such a complex action, with more than thirty plaintiffs' firms, and defense

17   counsel representing nine defendant groups over the course of the litigation. Saveri Decl. ¶ 14.

18         **6.    The Lodestar Cross-Check Confirms the Reasonableness of the**
             **Requested Fee**
19

20         Finally, as with the First Fee Order, the lodestar cross-check confirms that the fee Plaintiffs'

21   request is reasonable and appropriate because the multiple is very low—1.154. *See First Fee Order*,

22   2016 WL 183285, at *3 (multiplier confirms reasonableness of award). As noted, fee awards in

23   cases such as this one almost always include a multiplier which can be as high as four. *See id.*

24   Here, the 1.154 multiplier of Plaintiffs' requested fee is far less than multipliers awarded in similar

25   cases. *See, e.g.,* IPP Fee Order, 2016 WL 4126533, at *10 (1.96 multiplier); *In re High-Tech Emp.*

26   *Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730, at *11 (N.D. Cal. Sept. 2, 2015)

27   ("*High-Tech*") (2.5 multiplier). *See also Vizcaino II*, 290 F.3d at 1051 n.6, 1052–54 (majority of

28   cases in the 1.5–3.0 multiplier range).

1    The lodestar method requires that the Court determine the number of hours reasonably

2  spent by counsel on a matter, multiply it by counsel's reasonable hourly rates, and then adjust the

3  lodestar up or down based on various factors similar to those relevant to the percentage method.

4  Ordinarily, where there has been a substantial recovery for the class, the Court applies a multiplier

5  to account for contingency, risk, delay and other factors. *Omnivision*, 559 F. Supp. 2d at 1048.

6    Class Counsel have spent a total of 116,882.03 hours prosecuting this case. Plaintiffs

7  submitted 95,229.33 hours in connection with their first fee application, and now submit an

8  additional 21,652.70 hours. As explained in Plaintiffs' first fee application, and above, all of this

9  time was reasonable and necessary for the prosecution of this action. *Online DVD*, 779 F.3d at 949;

10  *see also* Saveri Decl. ¶ 7; Class Counsel's declarations referred to in footnote 4, *supra*. Among

11  other things, work was assigned by Lead Counsel among Class Counsel to avoid duplication; as

12  required by CMO 1, counsel kept contemporaneous time records; and, where possible, DPPs

13  worked with the IPPs and DAPs to avoid duplication of effort. Saveri Decl. ¶¶ 14, 26.

14    At historic hourly rates—i.e., those in place at the time the work was performed—this time

15  results in a total lodestar of $55,147,522.45—$43,335,517.50 submitted as a basis for the first fee

16  application; $11,812,004.95 additional lodestar submitted for the first time now. *See id.* ¶ 8, Ex. D.

17  The record demonstrates that Class Counsel's hourly rates are reasonable. Each firm avers that the

18  rates charged are that firm's usual and customary rates at the time the work was performed. *See*

19  Declarations of Class Counsel filed herewith. *See also High-Tech*, 2015 WL 5158730, at *9

20  (approving rates); IPP Fee Order, 2016 WL 4126533, at *7 (approving rates from $350 to $875).

21    If the Court grants Plaintiffs' instant fee request of $25,425,000 (30% of the Mitsubishi

22  Electric and Thomson settlements), it will result in a total fee of $63,660,000, and a 1.154 multiple

23  on Plaintiffs' total lodestar of $55,147,522.45.

24    Finally, it should be noted that Plaintiffs eliminated substantial time from their lodestar,

25  including: lodestar predating the appointment of interim lead counsel, ECF No. 4055-1 ¶ 8; as well

26  as work related to Plaintiffs' fee applications. If this time had been included, the multiplier would

27  be lower. In addition, Plaintiffs anticipate substantial future work, including drafting a final

28  approval brief, and settlement administration, among other things.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

###### 7.      The Reaction of the Class

The reaction of the class to counsel's fee request is also an important consideration in awarding attorneys' fees. *See* First Fee Order, 2016 WL 183285, at *2. While no objections have been received to date, consideration of this factor is premature because the deadline for objections—April 20, 2017, *see* ECF No. 5126, Ex. A at 3—has not passed.

###### 8.      Class Counsel Are Entitled to Reimbursement for Their Reasonable Litigation Expenses

Class Counsel also request reimbursement for litigation expenses they incurred on behalf of the Class. Attorneys who create a common fund for the benefit of a class are entitled to be reimbursed out-of-pocket expenses incurred in creating the fund so long as the submitted expenses are reasonable, necessary and directly related to the prosecution of the action. *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 769 (9th Cir. 1977); *Omnivision*, 559 F. Supp. 2d at 1048 ("Attorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters."). Reasonable reimbursable litigation expenses include: those incurred for document production, experts and consultants, depositions, translation services, notice, and claim administration. *See, e.g.*, 1 Alba Conte, *Attorney Fee Awards* § 2.19 (3d ed. 2004).

Class Counsel have incurred a total of $1,053,960.26 in reasonable expenses related to the case against the Mitsubishi Electric and Thomson Defendants as follows: (i) document management system and database costs of $48,616.25; (ii) payments to special masters of $78,413.66; (iii) payments to translation services of $32,511.71; (iv) payments to claims administrator of $112,011.33; (v) Court filing fees and costs of $1,010.00; (vi) payments to experts of $732,650.80; (vii) Federal Express costs of $1,044.67; (viii) transcript costs of $13,559.00; (ix) messenger and delivery costs of $18.34; (x) in-house copy charges (capped at 20 cents per page) of $29,515.79; (xi) professional copy charges of $1,331.30; (xii) postage charges of $366.17; (xiii) service of process charges of $397.75; and (xiv) telephone and facsimile charges of $2,513.49. Saveri Decl. ¶ 10, Ex. E. As detailed in the Declarations of Class Counsel, these expenses were reasonable and necessary for the prosecution of this action and are customarily approved by courts as proper litigation expenses. *See In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1366–72

21

(N.D. Cal. 1996) (court fees, experts/consultants, service of process, court reporters, transcripts, deposition costs, computer research, photocopies, postage, telephone/fax); Conte, *Attorney Fee Awards* § 2.19. All of these expenses relate to the prosecution of this case; none were included in Plaintiffs' previous application for reimbursement. Saveri Decl. ¶ 10.

Of the total amount, Lead Counsel advanced $ 1,036,068.81 out of its own funds on behalf of the class. $17,891.45 was paid by individual Class Counsel and is detailed in their individual declarations. Exhibit E to the Saveri Declaration summarizes these expenses. Class Counsel therefore request reimbursement in the amount of $1,053,960.26 from the M&T Settlement Funds. Saveri Decl. ¶¶ 9–10.

## IV.    PAYMENTS TO CLASS REPRESENTATIVES

DPPs respectfully request that that Court authorize an additional $15,000 incentive award to each of the eight class representatives named in the Second Amended DPPs' Class Action Complaint Against Mitsubishi and Thomson ("SAC").[15] The Court previously awarded $25,000 to these named plaintiffs. *See* ECF No. 4299.[16]

These Class Representatives have performed significant additional work for the benefit of the class in connection with the case against the Mitsubishi Electric and Thomson Defendants.

It is common for courts in this circuit to approve incentive awards to class representatives in recognition of their service to the class. *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958 (9th Cir. 2009) ("Incentive awards are fairly typical in class action cases."). These awards are intended "to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Id.* at 958–59. Courts must "scrutinize carefully the awards so that they do not undermine the adequacy of the class representatives." *Radcliffe v.*

---

[15] The Class Representatives are: (1) Crago, d/b/a Dash Computers, Inc.; (2) Arch Electronics, Inc.; (3) Meijer, Inc. and Meijer Distribution, Inc.; (4) Nathan Muchnick, Inc.; (5) Princeton Display Technologies, Inc.; (6) Radio & TV Equipment, Inc.; (7) Studio Spectrum, Inc.; and (8) Wettstein and Sons, Inc. d/b/a Wettstein's.

[16] Hawel A. Hawel, d/b/a City Electronics, and Royal Data Services, Inc. were named plaintiffs in the initial litigation, but not in the complaints against the Mitsubishi Electric and Thomson Defendants. They were also granted a $25,000 incentive award by the Court. *Id.*

1    *Experian Info. Solutions, Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013).

2         In evaluating the appropriateness of an award, courts consider: (1) financial and other risks

3    to the representative in bringing the case; (2) notoriety and personal difficulties endured by the

4    representative; (3) time and effort expended by the representative; (4) the duration of the litigation

5    and; (5) the benefits, or lack thereof, to the representatives resulting from the litigation. *Van*

6    *Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299 (N.D. Cal. 1995).

7         Application of these factors shows that the requested incentive awards are appropriate:

8    **A.       Financial and Other Risks**

9         Each Class Representative faced the prospect of retaliation from defendants by denying

10   future sales or allocations of non-CRT products necessary for the representative's business. First

11   Incentive Award Order, 2016 WL 153265, at *2 ("the risk of retaliation was quite real").

12   **B.       Notoriety and Personal Difficulties**

13        While most of the Class Representatives are corporate entities, each risked their reputations

14   by bringing high-profile lawsuits against major multinational corporations, many of which

15   questioned their motives in filing suit during depositions. *See id.*

16   **C.       Time and Effort Expended**

17        Each of the eight Class Representatives spent a significant amount of time and effort

18   litigating this case for over three years for the benefit of the class. *See* Saveri Decl. ¶¶ 47–53. In

19   addition to their service documented in connection with the first fee application, *see* ECF No. 4056,

20   each Class Representative spent time reviewing and responding to 3 sets of document requests

21   containing a total of 36 separate document requests. Saveri Decl. ¶ 49. Each Class Representative

22   participated in the search for additional responsive hard copy documents and identification of ESI

23   sources likely to contain responsive data. Each Class Representative also was required to review,

24   respond to and supplement 5 sets of interrogatories totaling 58 separate interrogatories, requiring

25   sworn verifications for each set of initial and supplemental responses *Id.* ¶ 50. The Class

26   Representatives also kept abreast of the major filings in the case, including reviewing briefs and

27   pleadings, and consulting with Class Counsel regarding litigation strategy, settlement negotiations,

28

1   and other matters. *Id.* ¶ 51. Each of the Class Representatives also spent a significant amount of

2   time preparing for a second round of depositions and being deposed. *Id.* ¶ 52.

3   **D.   Duration of the Litigation**

4   These Class Representatives have continued to serve the class for over eighteen months

5   since the first incentive award application (ECF No. 4056).

6   **E.   Personal Benefits from the Litigation**

7   The benefits specific to the named Class Representatives—as opposed to class members

8   generally—include: 1) the $25,000 incentive award previously granted by the Court; and 2) the

9   satisfaction of working for the benefit of the class to a successful result. The efforts of the Class

10  Representatives was not conditioned on the receipt of any incentive award. Saveri Decl. ¶ 48.

11  *            *            *

12  The total award sought for each Class Representative—$40,000—is within the range of

13  awards in comparable cases. *See*, *e.g.*, *Van Vranken*, 901 F. Supp. at 299–300 (awarding $50,000 to

14  class representative where case spanned four years, testimony was valuable, plaintiff had small

15  claim, plaintiff was deposed twice and testified at trial). *Glass v. UBS Fin. Servs., Inc.,* No. C-06-

16  4068 MMC, 2007 WL 221862, at *17 (N.D. Cal. Jan. 26, 2007), *aff'd,* 331 F. App'x 452 (9th Cir.

17  2009) ($25,000 to representatives placing themselves at reputational risk by suing large brokerage

18  houses); *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (affirming award of $25,000 where

19  suit resulted in structural reforms to the industry, plaintiff assisted counsel and faced risk of

20  retaliation); *In re CV Therapeutics, Inc., Sec. Litig.*, No. C 03-3709 SI, 2007 WL 1033478, at *2

21  (N.D. Cal. April 4, 2007) ($26,000 award "for reimbursement of time and expenses incurred in

22  representing the class"); *In re Lorazepam & Chlorazepate Antitrust Litig.*, 205 F.R.D. 369, 400

23  (D.D.C. 2002) (awards of $25,000 and $10,000 representing 0.3% of each class's recovery); *High-

24  Tech*, 2015 WL 5158730, at *18 (total awards of $100,000 and $140,000 to five named class

25  representatives representing 0.157% of the total $344,500,000 recovery).[17]

26  _____

[17] *See also, e.g.*, *Linerboard*, 2004 WL 1221350, at *18–19 (awarding $25,000 to the each
27  representative where representatives participated in discovery and depositions); *In re Dun &
Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 373–74 (S.D. Ohio 1990) (awards of
28  between $35,000 to $55,000).

24

The requested awards would also represent a very small share of the class recovery. Such awards would amount to $120,000, less than 0.142% of the total M&T Settlement Funds. The total of the two sets of awards, $370,000, would represent less than 0.175% of the total $212,200,000 recovery for the class.

By taking on the additional burdens of this case, each Class Representative has made possible the recovery obtained for the class. In light of the substantial recovery for the class, the important role of the Class Representatives should be acknowledged with an additional reasonable payment to compensate them for their additional efforts on behalf of the class, the risks they took, and to incentivize future service. DPPs respectfully request that the Court approve the requested incentive awards.

## V.   CONCLUSION

For the foregoing reasons, DPPs respectfully request that the Court grant Plaintiffs' Second Application for Attorneys' Fees and Expenses and Incentive Awards.

Dated: March 30, 2017

Respectfully submitted,

/s/ *Guido Saveri*
Guido Saveri (22349)
R. Alexander Saveri (173102)
Geoffrey C. Rushing (126910)
Cadio Zirpoli (179108)
Matthew D. Heaphy (227224)
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

*Lead Counsel for Direct Purchaser Plaintiffs*