Guido Saveri (22349)
    *guido@saveri.com*
R. Alexander Saveri (173102)
    *rick@saveri.com*
Geoffrey C. Rushing (126910)
    *grushing@saveri.com*
Cadio Zirpoli (179108)
    *cadio@saveri.com*
Matthew D. Heaphy (227224)
    *mheaphy@saveri.com*
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

*Lead Counsel for Direct Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION<br>_____<br><br>This Document Relates to:<br><br>*ALL DIRECT PURCHASER ACTIONS* | Master File No. 07-CV-5944-JST<br><br>MDL No. 1917<br><br>**DIRECT PURCHASER PLAINTIFFS' OPPOSITION TO THE IRICO DEFENDANTS' MOTION TO SET ASIDE DEFAULT**<br><br>Date:        January 11, 2018<br>Time:       2:00 p.m.<br>Judge:      Honorable Jon S. Tigar<br>Courtroom: 9 |

# REFILED REDACTED VERSION PER COURT ORDER, ECF NO. 5225

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ...........................................................................................................i

TABLE OF AUTHORITIES........................................................................................................ii

ISSUE TO BE DECIDED ..........................................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES...............................................................1

I.      INTRODUCTION ..........................................................................................................1

II.     STATEMENT OF RELEVANT FACTS........................................................................2

    A.      The Irico Defendants Are Ordinary Commercial Entities...............................2

    B.      Irico Participated in a Global Conspiracy to Fix Prices ................................3

    C.      Irico Moved to Dismiss Seven Years Ago and Then Disappeared from the Case........4

III.    THE FSIA DOES NOT DEFEAT JURISDICTION OR PROTECT IRICO ........................5

    A.      Irico Waived Any Defense Based on Foreign Sovereign Immunity ...........................5

    B.      Irico Cannot Make Out a Prima Facie Case of Immunity ...............................7

        1.      Group and Display Each Has the Initial Burden to Establish Its Status as a Foreign State or Agency or Instrumentality ........................7

        2.      Neither Group Nor Display Has Proved Direct Ownership by China..............9

        3.      Neither Group Nor Display Has Proved that It is an Organ of China ............10

    C.      The Commercial Activity Exception Deprives Irico of Any Immunity.....................14

        1.      Irico's Sale of Price-Fixed CRTs was Commercial Activity .........................15

        2.      Irico's Price-Fixing Had a "Direct Effect" in the United States ....................16

    D.      In the Alternative, the Court Should Grant Limited Jurisdictional Discovery...........17

IV.     IRICO FAILS TO SHOW THAT THE DEFAULT SHOULD BE LIFTED ........................18

    A.      Plaintiffs Have Been Prejudiced by Irico's Conduct.................................19

    B.      Irico's Default Involved Culpable Conduct .............................................21

    C.      Irico Has Not Demonstrated That It Has a Meritorious Defense ...............................23

V.      CONCLUSION ............................................................................................................25

1

## TABLE OF AUTHORITIES

2

**Cases**

*Adler v. Federal Republic of Nigeria*,
   107 F.3d 720 (9th Cir. 1997) ........................................................................... 8, 17

*Argentine Republic v. Amerada Hess Shipping Corp.*,
   488 U.S. 428 (1989) ................................................................................................ 5

*Bd. of Regents of Univ. of Texas Sys. v. Nippon Tel. & Tel. Corp.*,
   478 F.3d 274 (5th Cir. 2007) .................................................................................. 12

*Boschetto v. Hansing*,
   539 F.3d 1011 (9th Cir. 2008) ................................................................................ 18

*Cal. Dep't of Water Res. v. Powerex Corp.*,
   533 F.3d 1087 (9th Cir. 2008) ......................................................... 10, 11, 12, 13

*Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.*,
   727 F.2d 274 (2d Cir. 1984) ............................................................................... 5, 7

*Coen Co., Inc. v. Pan Int'l, Ltd.*,
   307 F.R.D. 498 (N.D. Cal. 2015) ............................................................. 20, 22, 23

*Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect*,
   89 F.3d 650 (9th Cir. 1996), *as amended on denial of reh'g* (Aug. 28, 1996) ............................ 12

*Dole Food Co. v. Patrickson*,
   538 U.S. 468 (2003) ......................................................................................... 8, 10

*E.Digital Corp. v. Ivideon LLC*,
   Case No. 15-cv-00691-JST, 2016 WL 4728550 (N.D. Cal. Sept. 12, 2016) ........................ 19, 22

*EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*,
   322 F.3d 635 (9th Cir.2003) ............................................................................ 11, 12

*Embassy of the Arab Republic of Egypt v. Lasheen*,
   603 F.3d 1166 (9th Cir. 2010) ................................................................................ 15

*Export Group v. Reef Indus., Inc.*,
   54 F.3d 1466 (9th Cir. 1995) .................................................................................... 8

*Franchise Holding II, LLC v. Huntington Rests. Grp., Inc.*,
   375 F.3d 922 (9th Cir. 2004) ................................................................ 19, 21, 23, 24

*Frow v. De La Vega*,
   82 U.S. 552 (1872) ................................................................................................. 21

*Gates v. Victor Fine Foods*,
   54 F.3d 1457 (9th Cir. 1995) .................................................................................. 14

*Gregorian v. Izvestia*,
   871 F.2d 1515 (9th Cir. 1989) ................................................................................ 22

*Haskins v. Fuller-O'Brien, Inc.*,
   No. 11-cv-05142-JST, 2013 WL 1789672 (N.D. Cal. Apr. 26, 2013) ........................ 20

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ii

*Hawaii Carpenters' Trust Funds v. Stone*,
    794 F.2d 508 (9th Cir. 1986) .................................................................................................. 23

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    308 F.R.D. 606 (N.D. Cal. 2015) ............................................................................................ 21

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    Case No. C-07-5944 JST, 2016 WL 5848702 (N.D. Cal. Oct. 6, 2016) .................................... 24

*In re Citric Acid Litig.*,
    191 F. 3d 1090 (9th Cir. 1999) .............................................................................................. 25

*In re First T.D. & Inv., Inc.*,
    253 F.3d 520 (9th Cir. 2001) ................................................................................................ 21

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    822 F. Supp. 2d 953 (N.D. Cal. 2011) .................................................................................... 17

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    Case No. 12-CV-4114 SI, MDL No. 1827, 2013 WL 3387652 (N.D. Cal. July 8, 2013) .......... 24

*Keegel v. Key West & Caribbean Trading Co.*,
    627 F. 2d 372 (D.C. Cir. 1980) .............................................................................................. 20

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
    511 U.S. 375 (1994) .............................................................................................................. 9

*Krehl v. Baskin-Robbins Ice Cream Co.*,
    664 F.2d 1348 (9th Cir. 1982) ............................................................................................... 25

*Madsen v. Bumb*,
    419 F.2d 4 (9th Cir. 1969) ..................................................................................................... 23

*Meadows v. Dominican Republic*,
    817 F.2d 517 (9th Cir. 1987) ...................................................................................... 8, 17, 21

*Minn-Chem, Inc. v. Agrium, Inc.*,
    683 F.3d 845 (7th Cir. 2012) ................................................................................................. 17

*Mission Trading Co., Inc. v. Lewis*,
    Case No. 16-cv-01110-JST, 2016 WL 4268667 (N.D. Cal. Aug. 15, 2016) ....................... 20, 22

*Moore v. United Kingdom*,
    384 F.3d 1079 (9th Cir. 2004) ................................................................................................. 6

*NewGen, LLC v. Safe Cig, LLC*,
    840 F.3d 606 (9th Cir. 2016) *as amended* (Oct. 21, 2016) ....................................................... 22

*Patrickson v. Dole Food Co.*,
    251 F.3d 795 (9th Cir. 2001) .............................................................................................. 8, 11

*Perez v. i2a Techs., Inc.*,
    No. C 15-04963 WHA, 2016 WL 4719267 (N.D. Cal. Sept. 9, 2016) ...................................... 22

*Peterson v. Islamic Republic of Iran*,
    627 F.3d 1117 (9th Cir. 2010) ............................................................................................. 8, 9

*Republic of Argentina v. Weltover, Inc.*,
    504 U.S. 607 (1992) ........................................................................................................ 14, 15

iii

*RSM Prod. Corp. v. Fridman*,
   643 F. Supp. 2d 382 (S.D.N.Y. 2009) ....................................................... 9

*Saudi Arabia v. Nelson*,
   507 U.S. 349 (1993) ........................................................................... 9, 15

*Siderman de Blake v. Republic of Argentina*,
   965 F.2d 699 (9th Cir. 1992) ...................................................... 5, 6, 8, 18

*Stephenson v. El-Batrawi*,
   524 F.3d 907 (8th Cir. 2008) ............................................................... 20

*TCI Grp. Life Ins. Plan v. Knoebber*,
   244 F.3d 691 (9th Cir. 2001), *as amended on denial of reh'g and reh'g en banc* (May 9, 2001)
   *overruled in part on other grounds by Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141 (2001)
   ............................................................................................... 19, 23

*Terenkian v. Republic of Iraq*,
   694 F.3d 1122 (9th Cir. 2012) ............................................................... 8

*United States v. Aguilar*,
   782 F.3d 1101 (9th Cir. 2015) .............................................................. 19

*United States v. Hui Hsiung*,
   778 F.3d 738 (9th Cir. 2014) *as amended* (Jan. 30, 2015) ........................... 17

*United States v. LSL Biotechnologies*,
   379 F.3d 672 (9th Cir. 2004) ............................................................... 16

*United States v. Signed Personal Check No. 730 of Yubran S. Mesle*,
   615 F.3d 1085 (9th Cir. 2010) .............................................................. 19

*USX Corp. v. Adriatic Ins. Co.*,
   345 F.3d 190 (3d Cir. 2003) ................................................................ 11

*Verlinden B.V. v. Central Bank of Nigeria*,
   461 U.S. 480 (1983) ........................................................................... 5, 6

**Statutes**

28 U.S.C. § 1330 ..................................................................................... 5

28 U.S.C. § 1603 ................................................................. 7, 8, 9, 10, 15

28 U.S.C. § 1605 ........................................................... 5, 14, 15, 16

**Other Authorities**

Curtis J. Milhaupt & Wentong Zheng,
   <u>Beyond Ownership: State Capitalism and the Chinese Firm</u>, 103 Geo. L.J. 665 (2015) ............ 10

H.R. Rep. No. 94-1487 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604 ............................ 5

**Rules**

Federal Rules of Evidence, Rule 602 ............................................................... 9

## ISSUE TO BE DECIDED

1.    Whether the Court should set aside the default entered against the Irico Defendants.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Direct Purchaser Plaintiffs ("Plaintiffs") respectfully submit this Opposition to the Motion to Set Aside Default, ECF No. 5215, filed by Defendants Irico Group Corporation ("Group") and Irico Display Devices Co., Ltd. ("Display") (together "Irico Defendants" or "Irico").

Nearly a decade after the Plaintiffs filed their complaint, the Irico Defendants argue for the first time that they are immune from suit under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1602–11 ("FSIA"). ECF No. 5215 ("Mot.") at 6. Those newly asserted defenses are waived because Irico failed to raise them at the time required by a stipulation into which they voluntarily entered and which this Court approved. *See infra* Part III.A. Those defenses are also meritless because neither Group nor Display has made out a *prima facie* case that it is a foreign sovereign, or an agency or instrumentality of a foreign state entitled to the protection of the FSIA, *see infra* Part III.B; and because the facts of this case fall clearly within the commercial-activities exception to FSIA immunity, *see infra* Part III.C. Irico's untimely assertion of immunity is therefore no reason to excuse Irico's default. In the alternative, the Court should permit limited jurisdictional discovery before lifting the default or deciding the merits of the FSIA issues in this case. *See infra* Part III.D.

Irico also fails to demonstrate "good cause" to set aside the default. *See infra* Part IV. The record establishes that 1) Plaintiffs suffered prejudice as a result of Irico's conduct; 2) Irico's conduct leading to the default was culpable; and 3) Irico has failed to show that it has a meritorious defense to Plaintiffs' action. Irico's proffered excuse for its actions—that it believed Plaintiffs' action was barred by the FSIA—is not supported by the evidence.

For these reasons, the Court should deny Irico's motion. This Opposition is supported by the accompanying declarations of R. Alexander Saveri ("Saveri Declaration" or "Saveri Decl.") and Cadio Zirpoli ("Zirpoli Declaration" or "Zirpoli Decl.").

## II.      STATEMENT OF RELEVANT FACTS

### A.      The Irico Defendants Are Ordinary Commercial Entities

The Irico Defendants are ordinary commercial entities engaged in the manufacture and sale of electronic devices for profit. ████████████████████████████████████ ███████████████████████████████████████████████ During the class period, approximately ████ of their business was outside of China. *See id.* § C. In ████, the Irico Defendants shipped ██████████████████████████████████████████████ ████ *Id.* § D.

Group claims to be owned by the Chinese government, but has submitted no competent evidence of such ownership and no evidence at all of whether such ownership is direct or indirect. *See infra* Part III.B.2. According to publicly available information, Group is a for-profit, taxpaying company whose primary business is CRTs and related products. Saveri Decl., Ex 3. As of December 2007, Group's web page stated that it had been producing CRT displays since 1982, and listed as accomplishments

> produc[ing] 148 million color tubes, 230 million pieces of colored glass, 8362 tons of luminescent material, achieving profits and taxes of 10.2 billion Yuan, achieving industry assets worth 105.4 billion yuan, exports reached 1.54 billion US dollars, contributing greatly to our country's electronics industry's development.

*Id.* As a producer of CRTs, Group competes (or purports to compete) with other companies in both the Chinese and global marketplaces. *Id.* (describing Group's color tube production business as "number one in China, and number three in the world" and touting its "domestic marketshare" and "sales record").

As of 2007, Group was the majority but not sole shareholder of Irico Group Electronics Co., Ltd. ("Electronics"), owning 75% of its shares. Saveri Decl., Ex. 4 at 2. Electronics in turn owned 41.36% of Display's shares. Saveri Decl., Ex. 5, at 8; *see also* ECF 310. At that time, Display was (as it still is) a publicly traded for-profit company on the Shanghai Stock Exchange, controlled by its shareholders. Saveri Decl., Ex. 6, Art. 63. Thousands of individuals and entities owned the balance of its shares. *Id.*, Ex. 5 at 6. Display pays taxes, *id.*, Ex. 6, Art. 63, and is not

immune from suit under Chinese law. *Id.*, Art. 10. Display's primary business is CRTs and related products. *Id.*, Ex. 5, at 19.

**B.      Irico Participated in a Global Conspiracy to Fix Prices**

In their Application for Default Judgment, Plaintiffs set forth overwhelming evidence that the manufacturers of CRTs engaged in a comprehensive global conspiracy to fix prices, control output, and allocate market share. That evidence includes testimony of executives of the ACPERA applicant Chunghwa Picture Tubes, the guilty plea of Defendant Samsung SDI, hundreds of meeting notes documenting in detail the conspiracy meetings, and comprehensive expert analysis of the conspiracy's operations and effects. Application at 7–9. Irico does not dispute that evidence, and Plaintiffs will not repeat it here.

There is also overwhelming evidence that Irico joined the conspiracy. Irico attended over 70 conspiracy meetings spanning the class period. *Id.* at 10–11; ECF No. 5191-1 ¶ 9. The conspirators also took detailed notes of many of their meetings. These notes show that Irico commonly agreed to price increases and/or production limits. *See, e.g.*, Saveri Decl., Exs. 12 (at November, 1998 CDT meeting hosted by Irico, "the meeting attendees achieved a unified approach and a common understanding" regarding need to maintain prices (CHU00030684–87)); 14 (at April, 1999 China *CDT MAKER* Market Exchange: "IRICO agreed to cooperate, which should be the key point." (CHU00030734–37)); 17 (June, 1999 CPT meeting notes indicate that "Irico is "willing to cooperate with the move in increase the price of the 14" *CPT*. . ." (CHU00029050–51 (Dep. Ex. 1315)); the author of the notes testified that Irico "is willing to cooperate as I wrote it in this report," agreeing "to increase the overall price beginning in August" (Jing Song Lu Dep. Tr. 183:22–190:4 (Saveri Decl., Ex. 18)); 25 (at July 2001 CPT meeting: participants "agreed using the 14": $26.5 . . . as the basis for the lowest *Q*3 quoted price in order to maintain the market order" (CHU00036412–13 (Dep. Ex. 1177E)); 23 (at April, 2000 China *CDT* Market Exchange, Irico and others "agreed still temporarily to maintain the U.S. dollar and RMB pricing coefficient as 10.8." (CHU00030992–94 (Dep. Ex. 1306E))).

The meeting notes show that the conspirators knew their conduct was illegal and anticompetitive. *See, e.g., id.*, Exs. 20 (August, 1999 CDT meeting: "The industry meetings should

3

1   remain confidential considering the international regulation of antitrust laws . . . . Discussions

2   focused on 14"/15" prices" (SDCRT-0086672–74)); 26 (October, 2005 Chunghwa and Irico

3   meeting; parties "[h]ope [that] with both sides' sufficient communication and no malicious

4   competition, can hold the market price and create a win-win opportunity" (CHU00040992–93

5   (Dep. Ex. 1278E))).

6       The meeting notes also demonstrate the global nature of the conspiracy. The prices it set

7   applied worldwide, including the U.S. *See, e.g., id.*, Exs. 30 (May, 1999 CDT meeting: "Since

8   worldwide overall supplies of 14" and 15" CDT are still not balanced, the makers should fully use

9   their domestic sales rights to adjust the market supply and demand situation pro-actively and

10  reasonably" (CHU00030752–55)); 19 (July, 1999 CDT China meeting participants adopted pricing

11  indices for domestic and overseas prices "in accordance with the 6/23 *TOP MANAGEMENT*'s

12  [Glass Meeting] resolution" (CHU00030797–98)); 26 (October, 2005 Chunghwa and Irico meeting

13  surveying global CRT demand, including in the U.S. (CHU00040992–93 (Dep. Ex. 1278E))).[1]

14      Expert analysis by Dr. Jeffrey Leitzinger confirms, "with a high degree of statistical

15  confidence," that the conspiracy meetings led to significant increase in CRT prices worldwide.

16  Leitzinger Rep., ECF No. 5191-2, Ex. D ¶ 49. Dr. Leitzinger's report explains the scope of

17  coordinated efforts to inflate CRT prices, including Irico's participation in an industry-wide, 20-

18  day stop in CRT production. That anti-competitive activity led directly to higher CRT prices in the

19  United States, a major purchaser of both CRTs and finished products containing CRTs. *Id.*

20      **C.      Irico Moved to Dismiss Seven Years Ago and Then Disappeared from the Case**

21      As Plaintiffs explained in their Application, Irico was served, appeared in the action, and

22  defended against Plaintiffs' claims for nearly two years. ECF No. 5191, at 4-5. During that time,

23  Irico participated in a joint motion to dismiss, ECF No. 665, but never raised the sovereign

24  immunity defense it now asserts for the first time. After the Court denied Defendants' motion to

25  dismiss, Irico abandoned the case. Irico directed its counsel to cease representation, ECF No. 729

26

27  ───────────────

    [1] Plaintiffs have attached translated meeting notes for 16 meetings to the Saveri Declaration, in
28  addition to those submitted with the Application. Exhibit 11 to the Saveri Declaration is a chart
    summarizing these meeting notes.

4

¶ 1, ignored two requests for discovery, and otherwise failed to answer Plaintiffs' allegations. Saveri Decl. ¶¶ 3–5. As a result, Plaintiffs spent much of the last ten years analyzing millions of documents, taking over one hundred depositions, opposing summary judgment motions, and obtaining class certification, all without the benefit of Irico's participation. *Id.* ¶ 6. During that time, Irico was kept apprised of all filings in the case but chose not to respond. ECF No. 4683.

### III.   THE FSIA DOES NOT DEFEAT JURISDICTION OR PROTECT IRICO

Irico's lead contention in seeking to avoid the consequences of its seven-year disregard for this litigation is that this Court lacks subject matter jurisdiction under the FSIA. Mot. at 6–7. That jurisdictional challenge lacks merit because Irico waived any FSIA defense, because Irico has failed to meet its burden to show that it is entitled to FSIA immunity, and because Plaintiffs' claims in this case fit squarely within the commercial-activity exception to FSIA immunity.

#### A.   Irico Waived Any Defense Based on Foreign Sovereign Immunity

The FSIA governs the circumstances under which a district court may exercise either subject matter jurisdiction, 28 U.S.C. § 1330(a), or personal jurisdiction, *id.* § 1330(b), over a defendant that qualifies as a "foreign state." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989) (describing "the FSIA [as] the sole basis for obtaining jurisdiction over a foreign state in our courts"); *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 485 n.5 (1983) (exception to FSIA immunity is necessary for "both statutory subject matter jurisdiction and personal jurisdiction"). One situation in which jurisdiction over a foreign state is proper is when foreign sovereign immunity has been "waived . . . either explicitly or by implication[.]" 28 U.S.C. § 1605(a)(1). Immunity can be waived when a defendant fails to assert it at the required time. H.R. Rep. No. 94-1487, at 18 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6617 ("An implicit waiver would also include a situation where a foreign state has filed a responsive pleading in an action without raising the defense of sovereign immunity."), *quoted in Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 721 (9th Cir. 1992); *Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico S.A.*, 727 F.2d 274, 278 (2d Cir. 1984) ("[D]istrict courts have discretion to determine

1  that the conduct of a party in litigation does constitute a waiver of foreign sovereign immunity in

2  light of the circumstances of a particular case.").[2]

3    Here, Irico waived any defense of FSIA immunity by failing to assert that defense in

4  compliance with a court-ordered deadline to which it voluntarily agreed. That deadline was set by a

5  Stipulation and Order into which the Direct and Indirect Purchasers and a group of Defendants

6  entered nine years ago on September 11, 2008 (the "September 2008 Stipulation"). The September

7  2008 Stipulation required "any defendant" claiming protection from discovery "because the Court

8  lacks personal jurisdiction over that defendant" to "serve a short statement explaining the basis for

9  their position by October 15, 2008." ECF No. 379 ¶ 4(g). Filing such a statement would enable

10  Plaintiffs to "seek discovery relating to the issue of personal jurisdiction over that Defendant." *Id.*

11  For their part, Plaintiffs agreed to substantial restrictions on discovery. *See id.* ¶¶ 1–4. Judge Conti

12  signed the September 2008 Stipulation as an order on September 12. *Id.* at 10. Although Irico did

13  not initially sign the September 2008 Stipulation, *see id.* at 5–9, it provided that Defendants could

14  join after its execution "by notifying plaintiffs in writing of their intention to do so." *Id.* ¶ 16. Irico

15  did so, requesting three extensions of the deadline for "the service of a statement explaining the

16  IRICO defendants' personal jurisdiction defenses." Zirpoli Decl., Exs. 1–3. Ultimately, Irico never

17  served a statement asserting any personal jurisdiction defenses. *See id.* ¶ 5; Saveri Decl. ¶ 5.

18    The language and purpose of the September 2008 Stipulation required Irico to notify

19  Plaintiffs of any defense that Group or Display might have under the FSIA by (at latest) the

20  extended deadline they requested. Because an FSIA defense is an attack on personal jurisdiction,

21  *see Verlinden*, 461 U.S. at 485 n.5, it fit within the Stipulation's time limit for contentions that "the

22  Court lacks personal jurisdiction," ECF No. 379 ¶ 4(g). And because an FSIA defense is often the

23  subject of "discovery for the limited purpose of establishing jurisdictional facts," *Siderman de*

24  *Blake*, 965 F.2d at 713, notification was necessary so that Plaintiffs could seek (and Irico, if it

25

26  [2] Because the FSIA itself expressly makes waiver an exception to the immunity it creates, courts
   apply waiver principles in FSIA cases even though a timely and meritorious FSIA defense would

27  bar subject matter jurisdiction. *See Moore v. United Kingdom*, 384 F.3d 1079, 1083 & n.4 (9th Cir.
   2004) (noting that although "it seems anomalous for Congress to create federal subject-matter

28  jurisdiction based purely on waiver," the statute and precedent compel this result).

6

chose, could oppose) discovery into such facts, to resolve any FSIA defense in a timely fashion. Such a deadline was well within this Court's "discretionary authority" and in any event Irico agreed. *Canadian Overseas*, 727 F.2d at 278 (district courts can "requir[e], on the motion of a party or *sua sponte*, assertion of abandonment of [an FSIA] defense prior to the submission of a responsive pleading"). Irico's failure to assert its FSIA defense in 2008 was therefore a waiver.

In exercising its discretion whether to hold Irico to that waiver, the Court may also take into account that Irico passed up two other clear opportunities to inform Plaintiffs of its purported FSIA defense in 2008 and 2009. *First*, Irico joined in the Joint Motion to Dismiss filed on May 18, 2009, which does not mention any sovereign immunity defense. *See* ECF No. 481. *Second*, Irico did not raise an FSIA defense in response to Special Master Legge's order, ECF No. 448 at 2, to file an Irico-specific brief raising any "additional issues" not covered by the Joint Motion to Dismiss. In fact, Irico never filed an additional brief, likely because it had no "additional issues" to raise. If, as Irico's witness now claims, it "believe[d]" at the time "that Irico Group and Irico Display were immune from suit in the United States," ECF No. 5215-1 ¶ 5, its failure to mention FSIA immunity is truly remarkable. This Court can reasonably infer that Irico either knew such a defense would be meritless or withheld it for tactical reasons.

**B.      Irico Cannot Make Out a Prima Facie Case of Immunity**

**1.      Group and Display Each Has the Initial Burden to Establish Its Status as a Foreign State or Agency or Instrumentality**

Irico's FSIA defense also lacks merit because neither Group nor Display can establish that it is a "foreign state" entitled to immunity. The FSIA defines the key term "foreign state" to include "a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603. An "agency or instrumentality of a foreign state" is defined as any entity:

(1) which is a separate legal person, corporate or otherwise, and

(2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

(3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

1    *Id.* § 1603(b). For a corporate defendant, indirect ownership by a foreign state through multiple

2    corporate layers does not convey the status of an agency or instrumentality. Only direct ownership

3    counts. *Dole Food Co. v. Patrickson*, 538 U.S. 468, 477 (2003) ("A corporation is an

4    instrumentality of a foreign state under the FSIA only if the foreign state itself owns a majority of

5    the corporation's shares").

6         When FSIA immunity is asserted, courts apply a three-step "burden-shifting framework."

7    *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012). *First*, a foreign sovereign

8    defendant "bears the burden of proof to establish its entitlement to sovereign immunity[.]" *Export*

9    *Group v. Reef Indus., Inc.*, 54 F.3d 1466, 1470 (9th Cir. 1995); *Siderman de Blake*, 965 F.2d at 708

10   n.9; *Meadows v. Dominican Republic*, 817 F.2d 517, 522 (9th Cir. 1987) (explaining that "the

11   defendant must establish a prima facie case that it is a sovereign state").

12        *Second*, if (and only if) the defendant carries its initial burden to establish its status, the

13   "burden shifts" to the plaintiff. *Export Group*, 54 F.3d at 1470. The plaintiff must then carry "the

14   burden of going forward with the evidence by offering proof that one of the FSIA exemptions

15   applies." *Meadows*, 817 F.2d at 523; *see also Terenkian*, 694 F.3d at 1131; *Adler v. Federal*

16   *Republic of Nigeria*, 107 F.3d 720, 728 (9th Cir. 1997). That second-stage plaintiff's burden is only

17   a "burden of production," *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1125 (9th Cir.

18   2010), and not the ultimate burden of persuasion that the exception applies.

19        *Third*, after the plaintiff has produced some evidence that the defendant is not immune, the

20   burden shifts back to the defendant to "prove by a preponderance of the evidence that the asserted

21   exception does not apply." *Adler*, 107 F.3d at 728; *see Meadows*, 817 F.2d at 523. The court then

22   "evaluate[s] the merits of the jurisdictional claims" and resolves disputes about any "material

23   facts." *Terenkian*, 694 F.3d at 1131.

24        Irico's argument that the Plaintiffs are required to "demonstrate[] the inapplicability of the

25   FSIA" and that the "Irico entities are presumptively immune," Mot. at 9, is thus wrong—or, at

26   least, misleadingly incomplete. Defendants benefit from no such presumption until they carry their

27   initial burden to show that they are agencies or instrumentalities of a foreign state. If Irico could do

28   that (which it cannot), Plaintiffs would bear the burden only to go forward with evidence—not the

1   ultimate burden of persuasion, which would remain on Irico.[3] Here, Irico's contentions turn on its

2   relationship to the People's Republic of China ("China"). Irico does not contend that Group or

3   Display is itself the government of China or is one of China's political subdivisions. Immunity

4   therefore turns on whether Group and Display can establish that they are "agenc[ies] or

5   instrumentalit[ies]" of China as defined by 28 U.S.C. § 1603(b). They can do neither.

6            **2.      Neither Group Nor Display Has Proved Direct Ownership by China**

7            The sole evidence of foreign-sovereign status that Group and Display present is the

8   declaration of Wenkai Zhang. ECF No. 5215-1 ("Zhang Declaration" or "Zhang Decl."). But the

9   Zhang Declaration is insufficient on its face because Zhang offers no support for his conclusory

10  assertion that he has "personal knowledge of the facts set forth herein." *Id.* ¶ 1. According to the

11  Declaration, he has "served as legal counsel at Irico Group"—he does not say whether inside or

12  outside counsel—only since "January 2, 2017." *Id.* ¶ 2. That gives him no basis to testify about

13  Group's and Display's corporate ownership and activities as of 2007. The Court should disregard

14  the Zhang Declaration and reject Irico's FSIA defense as unsupported by competent evidence. *See*

15  Fed. R. Evid. 602; *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 369 n.9 (S.D.N.Y. 2009)

16  (On motion to dismiss under FSIA, refusing to consider attorney affidavit that lacked adequate

17  foundation. "Attorneys' affidavits testifying as to facts must be based on personal knowledge. . . .

18  Attorneys' affidavits testifying as to matters within their expertise must comport with the

19  evidentiary requirements for expert testimony.").

20           Even if Zhang were a competent witness, his Declaration would fall short. As to Group, he

21  asserts that "on November 26, 2007, Irico Group was a State-owned enterprise wholly funded and

22  100% owned by the State Council of the People's Republic of China." Zhang Decl. ¶ 6. Zhang

23  _____

24  [3] Irico relies on *Saudi Arabia v. Nelson*, 507 U.S. 349 (1993), and *Peterson*, 627 F.3d 1117, *see*
    Mot. at 9, but neither case helps it. Both *Nelson* and *Peterson* were cases in which a plaintiff sued

25  an undisputed foreign state: in that situation, the inquiry moves immediately to the second stage
    where the plaintiff has an initial burden of production. *Nelson*, 507 U.S. at 356 ("There is no

26  dispute here that Saudi Arabia, the hospital, and Royspec all qualify as 'foreign state[s]' within the
    meaning of the Act."); *Peterson*, 627 F.3d at 1125 ("The presumption also applies if it is apparent

27  from the pleadings or uncontested that the defendant is a foreign state, as in this case."). *Kokkonen
    v. Guardian Life Insurance Co. of America*, 511 U.S. 375 (1994), on which Irico also relies, did not

28  involve the FSIA at all.

does not testify that China owned Group "directly," nor does he identify Group's direct owner.

Instead, he states that "from 2003 through the filing of the original complaint, Irico Group was

*managed* directly by the State-owned Assets Supervision and Administration Commission of the

State Council ("SASAC")." *Id.* ¶ 7 (emphasis added). Thus, the Zhang Declaration does not show

whether as of 2007 China owned Group directly or whether it did so indirectly through SASAC or

some other intermediary. And if China owned Group only indirectly, Group cannot claim

immunity based on state ownership. *See Dole Food*, 538 U.S. at 477; *Filler v. Hanvit Bank*, 378

F.3d 213, 219 (2d Cir. 2004) (ownership by a state-owned corporation does not "confer agency or

instrumentality status on corporate entities further down the chain of ownership").[4]

It is even clearer that Display is not directly owned by China. Zhang asserts that "[a]t the

time the [Plaintiffs'] original complaint was filed on November 26, 2007, Display was a State-

owned holding company." Zhang Decl. ¶ 8. Zhang does not identify Display's direct owner; he

also does not testify that China owned 100% of Display either directly or indirectly. Nor could he.

According to publicly available documents, when Plaintiffs filed their complaint Display was a

subsidiary of Electronics, which was itself a subsidiary of Group. At the end of 2007, around the

time Plaintiffs filed their complaint, Group owned 75% of Electronics, which in turn owned just

41.36% of Display. Saveri Decl., Ex. 5, at 8; *see also* ECF No. 310. The majority of Display's

shares were publicly held by over 58,000 other shareholders. *Id.* at 6. Thus, even more clearly than

with Group, Irico's evidence as to Display fails to establish the necessary direct ownership.

**3.     Neither Group Nor Display Has Proved that It is an Organ of China**

Irico also cannot show that Group or Display should be treated as an "organ" of China

under 28 U.S.C. § 1603(b)(2). "An entity is an organ of a foreign state . . . if it engages in a public

activity on behalf of the foreign government." *Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d

1087, 1098 (9th Cir. 2008) (quoting *Patrickson v. Dole Food Co.*, 251 F.3d 795, 807 (9th Cir.

---

[4] Academic analyses of SASAC's role in the Chinese state enterprise system describe it as "a
government agency that plays the role of both a holding company and a supervisory authority."
Curtis J. Milhaupt & Wentong Zheng, Beyond Ownership: State Capitalism and the Chinese Firm,
103 Geo. L.J. 665, 676 (2015). That description of SASAC as a "holding company" suggests that it
represents an additional tier of corporate ownership between China and Group.

2001)). Factors to be considered in applying that "definitional test" include "the circumstances surrounding the entity's creation, the purpose of its activities, its independence from the government, the level of government financial support, its employment policies, and its obligations and privileges under state law." *Id.* (quoting *EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.,* 322 F.3d 635, 640 (9th Cir.2003)). Also relevant is "the ownership structure of the entity." *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 209 (3d Cir. 2003).

      **a.**      The Zhang Declaration fails to show that either Group or Display "engages in public activity on behalf of" China. *Powerex*, 533 F.3d at 1098. Zhang asserts that Group was "originally formed . . . to serve the public purpose of supplying CRT products to all companies in the People's Republic of China," Zhang Decl. ¶ 6, but neither Irico nor Zhang offer any factual or legal support for the surprising proposition that manufacturing and selling CRTs and related components for profit is a "public purpose." Further, Zhang's testimony about Group's purpose when it was "originally formed," which happened well before 2000, *see id.* ¶ 7, sheds no light on its purpose as of 2007, which Irico concedes is the relevant time for this inquiry. Zhang also provides no information whatsoever about the purpose of Display—he does not even argue that it was formed to engage in a public activity. Nor does Irico make any such argument in its brief.

      A public report to investors by Electronics, the corporate parent of Display, stated that as of 2009, Display was "principally engaged in the production, development and operation of display devices." Saveri Decl., Ex. 7, at 8. The same report informed investors that Display had successfully "increased its market share and competitiveness by a series of measures" that included "seizing market opportunities"; stated that it was "focused on market expansion"; and boasted of its "38.1% domestic market share and 17.3% international market share" for "color picture tubes," which left Display "ranked first in China and second in the world in terms of market presence." *Id.* Such a description of Display's purpose and achievements shows clearly that its corporate parent perceives it (and describes it to prospective investors) as one participant among many in a private market, rather than a government agency working to benefit the public. In fact, Display has distributed its profits to its shareholders. *See* Saveri Decl., Ex. 8.

Defendants classified as organs have had much closer and more specific relationships with public activities and goals. *Powerex* involved an electric company that marketed and exported power from the Province of British Columbia, 533 F.3d at 1089, 1102, whose responsibilities included "implement[ing] international agreements at the direction of the government" and "carr[ying] out domestic policy goals." *Id.* at 1102. *EIE Guam* involved a bank created to "carry out Japanese national policy related to revitalization of the Japanese financial system." 322 F.3d at 640. And *Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect*, 89 F.3d 650 (9th Cir. 1996), *as amended on denial of reh'g* (Aug. 28, 1996), involved a refining company "charged with the exclusive responsibility of refining and distributing Mexican government property." *Id.* at 655. Defendants point to no similar public functions served by Group or Display.

**b.**     Despite its burden to establish a prima facie case of immunity, Irico offers no facts or argument related to the "circumstances surrounding the . . . creation" of either Group or Display; "the level of government financial support," if any, received by either entity; or the "obligations and privileges" of either entity under Chinese law. *Powerex*, 533 F.3d at 1098 (citation omitted).

Publicly available information shows that Display, at least, was created through means typical for private corporate entities. According to Display's 1996 Share Listing Notice, Display was established via a 1992 share offering as a "Company Limited by Shares." Saveri Decl., Ex. 9. Thus, unlike entities that have successfully asserted organ status, Display was not "created pursuant to an order of [a] Province," *Powerex*, 533 F.3d at 1102, or "created directly by public law," *EIE Guam* , 322 F.3d at 642.[5] Unlike entities created to play a unique, publicly oriented role, Display was just one of many Chinese CRT manufacturers in a crowded field characterized by fierce market competition. Saveri Decl., Ex. 9, at 6; *cf. EIE Guam*, 322 F.3d at 640 (finding organ status where other companies "not permitted to perform . . . activities" performed by the

---

[5] Even if Group or Display had been created by government order or national legislation, that would still not be enough to confer organ status under the FSIA absent a public purposes. *Compare Bd. of Regents of Univ. of Texas Sys. v. Nippon Tel. & Tel. Corp.*, 478 F.3d 274, 279 (5th Cir. 2007) (entity created by national legislation not an "organ" because, *inter alia*, legislation served "market ends" rather than a "national purpose"), *with EIE Guam*, 322 F.3d at 640 (entity created "expressly to perform a public function").

1    defendant). The FSIA does not confer presumptive immunity from suit on companies that perform

2    the functions of private market actors.

3          Similarly, Zhang proffers no evidence (and Irico does not otherwise argue) that either

4    Group or Display receives "government financial support" or has "obligations and privileges under

5    state law" that differ from any other private enterprise. *Powerex*, 533 F.3d at 1098 (citation

6    omitted). As of 2007, Group's web page stated that it paid taxes on the profits it earned. Saveri

7    Decl., Ex 3. As of 2008, Display's Articles of Association stated that it was not immune from suit

8    in China. *Id.*, Ex. 6, Art. 10. Display's annual reports also confirm that it was obliged to pay, and

9    did pay, all typical Chinese corporate taxes. *Id.*, Ex. 5, at 69. Display's corporate parent,

10    Electronics, was also subject to suit, *id.*, Ex. 10, Art. 8 ¶ 2, and paid standard corporate taxes. *Id.*,

11    Ex. 4, at 67; Ex 7, at 4, 6. The absence of evidence that China treated either Group or Display

12    differently from private market actors should prompt this Court to do the same.

13        **c.**      Irico's and Zhang's attempts to fill these gaps are legally and factually insufficient.

14    For example, Zhang claims that Display was "managed directly" by Group, Zhang Decl. ¶ 9, but

15    that vague assertion is not entitled to evidentiary weight because it is conclusory and because it

16    purports to characterize the two companies' relationship ten years before Zhang became Group's

17    lawyer. *See supra* Part III.B.2. Zhang also fails to acknowledge that Group owned Display only

18    partially and indirectly through Electronics, *see id.*, which renders implausible his assertion that

19    Group exerted direct control over Display's affairs.

20          Zhang also claims that Display was required to seek Group's approval for "major business

21    decisions and transactions," and that Group appointed Display's management. Zhang Decl. ¶¶ 9,

22    10. In addition to being vague and general, those assertions are contradicted by Display's Articles

23    of Association, which provide that Display's business policies and investment plans were to be

24    decided at Shareholder Meetings open to all shareholders, Saveri Decl., Ex. 6, Arts. 62, 63; which

25    gave shareholders the right to review and approve operational and strategic decisions, *id.*, Art. 63;[6]

26

27    _____

[6] Shareholders' rights included the right to review and approve annual budgets, profit distribution
28    plans, major related transactions, issuing debt, raising capital, mergers, spinoffs, liquidation, and
amendments to the Articles of Association. *Id.*

and which provided for Display's board of directors and board of supervisors to operate independent of its controlling shareholder, *id.*, Arts. 50, 51. In any event, Zhang's statements fail to establish that the *Chinese government* exerted sufficient control over Display to render Display an organ of that government.

Irico errs in relying on *Gates v. Victor Fine Foods*, 54 F.3d 1457 (9th Cir. 1995), for the proposition that the degree of control Zhang describes is enough for organ status. *Gates* involved an agricultural marketing board whose "purpose . . . [was] to advance the Province of Alberta's interest in marketing Alberta hogs." *Id*. at 1461. The board exercised delegated authority to "issue regulations" binding on Albertan pork producers; its decisions were subject to administrative "appeal to an appellate body appointed by [a] Minister"; and its members were "immune from liability for acts performed in good faith in carrying out their duties." *Id.* Looking at those facts as a whole, the Ninth Circuit found that the marketing board was an organ of Canada. *Id.* But Irico has not come forward with remotely similar facts about Group or Display.

**C.      The Commercial Activity Exception Deprives Irico of Any Immunity**

Even if Irico were presumptively protected from suit (which it is not), its actions fall within the commercial-activity exception of the FSIA, which removes immunity for any

> action . . . based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2). The Supreme Court has called the commercial-activity exception "[t]he most significant of the FSIA's exceptions." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992). It is the obvious exception to apply here, where Plaintiffs seek relief for Irico's participation in a world-wide price-fixing conspiracy. Yet all that Zhang has to say about that conspiracy is a bland statement that "Irico is not aware of any sales by Irico of CRT products . . . to customers of the United States, either directly or indirectly." Zhang Decl. ¶ 11. That is irrelevant.

Irico's participation in a conspiracy to fix prices of CRTs directly harmed Plaintiffs that bought CRT products from Irico or its co-conspirators at inflated prices. This lawsuit is "based . . . upon" Irico's acts and the attributable acts of its co-conspirators, namely its agreement to fix prices

14

and the actions it took in pursuit of that goal. 28 U.S.C. § 1605(a)(2). That conduct was "in connection with a commercial activity," *id.*, because the manufacture and sale of CRTs "to electronics product manufacturers, primarily for the manufacture of computer monitors and televisions," Leitzinger Rep. ¶ 14, is quintessentially commercial. And that conduct "cause[d] a direct effect in the United States," 28 U.S.C. § 1605(a)(2), by creating artificially high prices for American customers including Plaintiffs.

### 1.   Irico's Sale of Price-Fixed CRTs was Commercial Activity

As explained above, there is a wealth of evidence proving Irico's involvement in the conspiracy. It shows, among other things, that Irico representatives, including those at the highest levels of the company, attended over 70 conspiratorial meetings; that the conspirators agreed to maintain supra-competitive prices; that Irico committed to specific price targets; that the agreed upon prices applied worldwide; and that other conspirators were kept apprised of Irico's plans. There is also evidence that Irico did more than attend meetings: it participated in a 20-day stop in production coordinated throughout the Chinese CRT industry, for the purpose of reducing CRT supply and shoring up prices. Leitzinger Rep. ¶ 39; Saveri Decl., Ex. 29 (in early 2007 "the entire CRT TV industry stopped production for 20 days," including Irico (CHWA00226236–69 at 44)).

Irico's conspiratorial acts, which form the "gravamen of the complaint" against it, *Nelson*, 507 U.S. at 357 (citation omitted), are commercial in nature. They were performed "in connection with [the] commercial activity" of manufacturing and selling CRTs. 28 U.S.C. § 1605(a)(2); *see also id.* § 1603(d) (defining "commercial activity"). Where a sovereign (or allegedly sovereign) entity takes on the role of a "a private player within the market" and engages in the sort of action that does not require "those powers peculiar to sovereigns," *Embassy of the Arab Republic of Egypt v. Lasheen*, 603 F.3d 1166, 1170 (9th Cir. 2010), the FSIA does not immunize it from the same liability that would accrue to a private party under like circumstances. Further, Irico's "'particular actions . . . are the *type* of actions by which a private party engages in trade and traffic or commerce,'" *Lasheen*, 603 F.3d at 1170 (quoting *Weltover*, 504 U.S. at 614) (emphasis in original), because so many commercial companies engaged in the same behavior in this very case.

15

## 2.     Irico's Price-Fixing Had a "Direct Effect" in the United States

The conspiracy in which Irico actively participated caused supra-competitive prices for CRTs throughout the world generally and in the United States in particular, including artificially high prices for CRTs themselves and for finished electronics products—televisions and computer monitors—that contained them. During the Class Period, the CRT market was a global one with the United States as one of the world's largest consumers. Leitzinger Rep. ¶¶ 58–59, figs. 12 & 13. The CRT sales data produced by those defendants who participated in discovery show that roughly 18% of the CRTs with known bill-to-country information were sold to U.S. customers, making the U.S. second only to China. *Id.* at 38 n.129. North America was the largest consumer of CRT monitors, representing roughly 30 percent of global purchases. *Id.* Irico itself was aware of the United States' importance to the CRT market. In 2002, Irico shipped over two thousand sample CRTs to the United States "to test the market" for Irico products, demonstrating Irico's intent to sell CRTs in the United States. Zirpoli Decl., Ex. 4, Response to Information Request § D.

Available data provide "a high degree of statistical confidence" that the "target prices" set by the conspiracy "resulted in higher CRT prices . . . in North America and in the rest of the world." Leitzinger Rep. ¶ 49 & figs. 8 & 9. Because the CRT accounted for 45 to 50 percent of the cost of manufacturing a television or monitor, an increase in CRT prices resulted in higher prices for televisions and monitors as well. *Id.* ¶ 79; *see also id.* ¶¶ 74–78. A 1% increase in the cost of a CPT was associated with a 0.78% increase in the price of the finished product, while for CDTs a 1% increase was associated with a 0.72% increase for the finished product. *Id.* ¶ 81.

Those increased prices in the United States establish a "direct effect" in the United States, as required by 28 U.S.C. § 1605(a)(2). Useful guidance in applying that standard comes from cases applying the "direct . . . effect" standard of the FTAIA. *See United States v. LSL Biotechnologies,* 379 F.3d 672, 680 (9th Cir. 2004) (observing that the language of the FTAIA and of § 1605(a)(2) are "nearly identical" and applying FSIA precedent to help interpret the FTAIA). Under the FTAIA, a global conspiracy to fix prices in a global market that causes prices for U.S. consumers to rise is sufficiently "direct" to support the application of U.S. antitrust law to foreign manufacturers. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 822 F. Supp. 2d 953, 964 (N.D. Cal.

16

2011) (price-fixing of panel displays inflated prices for American customers and thus caused a "direct effect" in the United States). So too here: high prices for U.S. customers "follow[ed] as an immediate consequence of [Irico's] activity," without any "'uncertain intervening developments'" between the actions of the manufacturers and the U.S. purchases. *United States v. Hui Hsiung*, 778 F.3d 738, 758 (9th Cir. 2014) *as amended* (Jan. 30, 2015) (citations omitted) (holding that conspiracy to fix prices of panel displays had a "direct, substantial and reasonably foreseeable" effect on United States commerce under the FTAIA). *Id.* at 759.

The directness of the impact does not depend on whether U.S. purchasers bought CRT products from Irico or another conspirator. That is true both because the acts of all conspirators are attributable to Irico as a co-conspirator; and because Irico's own sales at supracompetitive prices outside the U.S., as well as its actions such as the coordinated production stoppage that restricted global supply, had the direct effect of raising prices in the United States. *See Minn-Chem, Inc. v. Agrium Inc.*, 683 F.3d 845, 856–59 (7th Cir. 2012) (applying the FTAIA, where cartel members produced 71% of the global supply of potash, and the United States was the second largest consumer of potash, the cartel's "foreign supply restrictions, and the concomitant price increases forced upon the Chinese purchasers, were a direct—that is, proximate—cause of the subsequent price increases in the United States"). Accordingly, even if it were competent and credible, Zhang's testimony that Irico did not sell within the United States would still be irrelevant.

In sum, the Plaintiffs have more than met their burden of "going forward with the evidence by offering proof that one of the FSIA exemptions applies," *Meadows*, 817 F.2d at 523, because Irico's activities fall within the commercial-activity exception. The ultimate burden of "prov[ing] by a preponderance of the evidence that the asserted exception does not apply," *Adler*, 107 F.3d at 728, therefore shifts back to Irico. The Zhang Declaration wholly fails to carry that burden. Accordingly, the commercial-activity exception applies and Irico is not immune.

**D.    In the Alternative, the Court Should Grant Limited Jurisdictional Discovery**

If the Court concludes that there is a material issue of fact to be resolved concerning the application of the FSIA, Plaintiffs respectfully request limited jurisdictional discovery, before the Court determines whether to lift the default and in any event before it resolves the FSIA issues.

17

This Court has ample discretion to authorize jurisdictional discovery "where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008) (quoting *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.,* 557 F.2d 1280, 1285 n. 1 (9th Cir.1977)). Discovery may be granted to determine whether this Court has jurisdiction under the FSIA. *See Siderman de Blake*, 965 F.2d at 713 ("parties should be allowed to conduct discovery for the limited purpose of establishing jurisdictional facts before the claims can be dismissed"). Limited discovery would be appropriate on the following topics:

- The corporate formation, ownership, and purpose of Group and Display, including any basis for any contention by Irico that Group and Display engage in public activity, and including any changes in status.

- Supervision of either Group or Display by officials of the People's Republic of China, including any specific instances of supervision or control that Irico contends are relevant to alleged organ status.

- The inter-defendant communications identified in Exhibit 11 to the Saveri Declaration or in the Leitzinger Report involving Irico, including any related internal communications on or about the same dates.

- Any sales, planned sales, or contemplated sales by Irico, directly or indirectly, to the United States during the class period.

- All documents and communications that Wenkei Zhang reviewed or relied on in preparing his Declaration.

- Any steps that Group and Display took to preserve evidence, including documents relevant to their FSIA defenses or the merits of this case, from 2008 to now.

Plaintiffs also request an opportunity to take Zhang's deposition and, if that confirms that Zhang lacks personal knowledge concerning some or all of the statements in his declaration, a deposition of a corporate representative of Irico on the matters raised in the Zhang Declaration.

## IV.    IRICO FAILS TO SHOW THAT THE DEFAULT SHOULD BE LIFTED

To determine whether "good cause" exists to lift a default, courts consider "(1) whether [the party seeking to set aside the default] engaged in culpable conduct that led to the default; (2) whether [it] had [no] meritorious defense; or (3) whether reopening the default judgment would prejudice the other party." *Franchise Holding II, LLC v. Huntington Rests. Grp., Inc.*, 375 F.3d

1    922, 925–26 (9th Cir. 2004).[7] The party seeking to lift the default bears the burden of

2    demonstrating that these factors favor it. *TCI Grp. Life Ins. Plan v. Knoebber*, 244 F.3d 691, 696

3    (9th Cir. 2001), *as amended on denial of reh'g and reh'g en banc* (May 9, 2001) *overruled in part*

4    *on other grounds by Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141 (2001). If even one factor

5    does not favor the defendant, a district court may refuse to set aside the default. *Aguilar*, 782 F.3d

6    at 1105 ("This standard . . . is disjunctive, such that a finding that any one of these factors is true is

7    sufficient reason for the district court to refuse to set aside the default." (citation omitted)). Here,

8    all three factors cut against Irico and in favor of default judgment.

9          **A.**     **Plaintiffs Have Been Prejudiced by Irico's Conduct**

10        Plaintiffs have suffered "tangible harm such as loss of evidence, increased difficulties of

11   discovery, or greater opportunity for fraud or collusion." *E.Digital Corp. v. Ivideon LLC*, Case No.

12   15-cv-00691-JST, 2016 WL 4728550, at *2 (N.D. Cal. Sept. 12, 2016) (citing *TCI,* 244 F. 3d at

13   701). Irico's assertions to the contrary are baseless.

14        First, Plaintiffs had no discovery from Irico during the critical period in this case. As the

15   Court is well aware, Plaintiffs reviewed and analyzed millions of pages of documents, participated

16   in the depositions of over a hundred employees and former employees of Irico's co-conspirators,

17   opposed summary judgment motions, obtained class certification, and worked with and paid expert

18   economists to analyze the evidence and write reports. Saveri Decl. ¶ 6. Discovery from each

19   defendant was important to Plaintiffs' ability to understand and discover evidence proving the

20   conspiracy. Because Irico did not provide discovery after they withdrew, Plaintiffs were unable to

21   examine witnesses regarding evidence from Irico, or use Irico information or data to inform their

22   analyses and deposition preparation. That hurt Plaintiffs' case both against Irico and against the

23   other defendants. *Id.* Other courts have found prejudice in similar contexts. *See Stephenson v. El-*

---

[7] Some cases suggest that "extreme or exceptional circumstances" are necessary to set aside a default judgment. *See, e.g.*, *United States v. Signed Personal Check No. 730 of Yubran S. Mesle*, 615 F.3d 1085, 1092 (9th Cir. 2010). The Ninth Circuit has since clarified that "nothing in *Falk* (or any other published decision) requires courts, in addition to applying these three factors, to articulate why a particular case presents "extreme circumstances." *United States v. Aguilar*, 782 F.3d 1101, 1106 (9th Cir. 2015).

1    *Batrawi*, 524 F.3d 907, 915 (8th Cir. 2008) (approving finding that in litigation involving "complex

2    stock loan transactions," "numerous witnesses and voluminous documentary evidence," to "set[ ]

3    aside the default would clearly result in increased difficulties in discovery given the amount of time

4    that has elapsed").

5          Second, even if Irico could somehow produce all of the discovery it would have had it not

6    deserted the litigation, it would be difficult or impossible to re-examine the witnesses of other

7    defendants using Irico's documents. Plaintiffs have settled with all other defendants and dismissed

8    their case against them. Saveri Decl. ¶ 8. In addition, any such further examination (and the motion

9    practice necessary to obtain it) would be extremely expensive. *See Stephenson*, 524 F.3d at 914–15

10   (plaintiff "would be substantially prejudiced in having to re-litigate its claims against [defaulting

11   defendant] at this late stage of the proceedings."). Nor can Plaintiffs re-negotiate settlements with

12   other defendants to the extent Irico's evidence would have strengthened their case against them.

13         Third, common sense compels the conclusion that Irico cannot now produce the evidence it

14   could have seven years ago. It is practically certain that documents and data have been lost or

15   destroyed, witnesses have died or otherwise become unavailable, and memories have faded or been

16   lost entirely. Irico does not even argue to the contrary. And, of course, it has made no effort to

17   provide any discovery since its reappearance in the case. Saveri Decl. ¶ 9.

18         Fourth, the cases upon which the Irico Defendants rely are distinguishable and stand—at

19   most—for the proposition that short delays at the beginning of lawsuits do not cause prejudice. *See

20   e.g., Keegel v. Key West & Caribbean Trading Co.*, 627 F. 2d 372, 374 (D.C. Cir. 1980) (refusal to

21   lift default reversed where default entered before expiration of agreed upon time to answer;

22   defendant attempted to file answer five weeks after original deadline); *Mission Trading Co., Inc. v.

23   Lewis*, Case No. 16-cv-01110-JST, 2016 WL 4268667, at *1 (N.D. Cal. Aug. 15, 2016) (defendant

24   contested service of process; motion to lift default filed two and one half months after answer due);

25   *Coen Co., Inc. v. Pan Int'l, Ltd.*, 307 F.R.D. 498, 503–04 (N.D. Cal. 2015) (default entered 44 days

26   after earliest possible due date for answer; defendant disputed service). *See also Haskins v. Fuller-

27   O'Brien, Inc.*, No. 11-cv-05142-JST, 2013 WL 1789672, at *3 (N.D. Cal. Apr. 26, 2013) (plaintiff

28   admitted little prejudice; defendant not properly served).

Finally, Irico's assertion that the fact that the default was not entered until July 2016 precludes prejudice makes no sense. The timing of the entry of default is irrelevant. Regardless of when it was entered—a ministerial act by the Clerk—Plaintiffs could not obtain a default judgment against Irico until the case was concluded against the other defendants because liability here is joint and several. *In re First T.D. & Inv., Inc.*, 253 F.3d 520, 532 (9th Cir. 2001) ("The Court held in *Frow* [*v. De La Vega*, 82 U.S. 552, 554 (1872)] that, where a complaint alleges that defendants are jointly liable and one of them defaults, judgment should not be entered against the defaulting defendant until the matter has been adjudicated with regard to all defendants.") Irico's claim that after its withdrawal, Plaintiffs "made no effort whatsoever to pursue their claims against Irico" is wrong. Mot. at 1:20–24. Among other things, Plaintiffs served two sets of discovery on Irico, one in March, 2010, and one in September, 2011. Saveri Decl. ¶¶ 3–4, Exs. 1–2. Plaintiffs developed the necessary record and moved to certify the class herein. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 308 F.R.D. 606 (N.D. Cal. 2015). The class certification order identified the Irico Defendants as co-conspirators. *Id.* at 609 n.1. Plaintiffs also developed the record to prove its case against all defendants, including Irico. Saveri Decl. ¶ 7. All of this work was necessary to obtain a default judgment against Irico. *Id.*

## B.      Irico's Default Involved Culpable Conduct

Irico's failure to file an answer was culpable. First, Irico does not take meaningful issue with the dispositive facts: the Irico Defendants are sophisticated entities; they had notice of the action and appeared and litigated aggressively through (and received advice from) sophisticated and experienced counsel for two years; after their motion to dismiss was denied they made a calculated decision to withdraw from the case; they knew or should have known that a default would likely result. In these circumstances, courts commonly find culpable conduct and refuse to set aside defaults. *See, e.g., Franchise Holding II*, 375 F.3d at 926 ("If a defendant 'has received actual or constructive notice of the filing of the action and failed to answer,' its conduct is culpable" (citation omitted)); *Meadows*, 817 F.2d at 521–22 (defendants received notice, were sophisticated and experienced in U.S. law, and informed of consequences of failing to respond); *Perez v. i2a Techs., Inc.*, No. C 15-04963 WHA, 2016 WL 4719267, at *4 (N.D. Cal. Sept. 9,

21

2016) (defendant culpable because he was aware of action for more than eight months; as CEO and majority he shareholder "plainly ha[d] the sophistication to understand the gravity of this action, and the importance of responding to it"); *NewGen, LLC v. Safe Cig, LLC*, 840 F.3d 606, 616 (9th Cir. 2016) *as amended* (Oct. 21, 2016) (entry of default within discretion where defendant was properly served and waited until default was entered to contact the plaintiffs' attorney).

Second, the Irico Defendants' claim that their conduct was not culpable because they believed the FSIA protected them is not supported by any evidence. The Zhang Declaration provides no reason to believe otherwise because it wholly lacks foundation. Zhang can have no personal knowledge of why the Irico Defendants did what they did more than six years before his employment with Irico Group began. Zhang Decl. ¶ 2. The lack of a declaration from previous counsel or someone else with actual knowledge speaks volumes. And common sense compels the conclusion that if Irico believed in good faith that it had a meritorious FSIA defense, it would have asserted that defense at some point during the two years they litigated the case.

Finally, even if the Court were to accept Zhang's assertions about Irico's motives, the Irico Defendants' acted culpably by making a strategic decision not to assert what they believed to be a valid defense, in favor of reserving it for future use when and if necessary. Doing so had the effect (and, the Court can reasonably infer, the purpose) of interfering with and delaying Plaintiffs' prosecution of their case. The timing of the withdrawal confirms this purpose: Irico waited until the motion to dismiss had failed, but decamped just as meaningful discovery was about to begin. *See* ECF Nos. 718, 724.

The cases the Irico Defendants rely on do not support their arguments. In *Gregorian v. Izvestia*, 871 F.2d 1515 (9th Cir. 1989), unlike this case, the defendants made no appearance before the default judgment, and there was clear proof that the Russian government had directed the defendants not to appear. *Id.* at 1524. *E.Digital*, 2016 WL 4728550, at *2–3, involved (unlike this case) a default entered early in the case and Defendants who presented credible evidence that they did not understand the need to appear and answer the complaint. As already noted, *Mission Trading* and *Coen* involved defaults entered early in the case against defendants who had substantial arguments that they had not been properly served. *Mission Trading*, 2016 WL 4268667,

22

at *1; *Coen*, 307 F.R.D. at 503–04. In short, none of the kinds of reasons courts have declined to find culpable intent are present here. The Irico Defendants are sophisticated and experienced litigants; they claim no miscommunication or confusion about the process; they claim no misrepresentation or sharp dealing by Plaintiffs; and they have not challenged service of process. They simply decided to walk away from their defense and should now face the natural consequences for that decision.

### C.     Irico Has Not Demonstrated That It Has a Meritorious Defense

The Irico Defendants also fail to show that they have a meritorious defense. "A defendant seeking to vacate a default judgment must present specific facts that would constitute a defense." *TCI*, 244 F.3d at 700. The question is "whether there is some possibility that the outcome of the suit after a full trial will be contrary to the result achieved by the default." *Hawaii Carpenters' Trust Funds v. Stone*, 794 F.2d 508, 513 (9th Cir. 1986). "[R]eopening of the case in the absence of some showing of a meritorious defense would cause needless delay and expense to the parties and court system." *Id.*

Neither of the two defenses asserted by the Irico Defendants pass muster. As explained above, the FSIA does not protect them. *See supra* Part III. Irico's assertion that Plaintiffs "have failed to adduce evidence of an unlawful undertaking," Mot. at 12:1–2, is a " 'mere general denial without facts to support it,' which "is not enough to justify vacating a default or default judgment." *Franchise Holding II,* 375 F.3d at 926 (quoting *Madsen v. Bumb*, 419 F.2d 4, 6 (9th Cir. 1969)).

As Plaintiffs explained above, and in the Application (pp. 7–9), the evidence proving the existence of the global CRT conspiracy alleged in the complaint and the harm it caused in the U.S. is overwhelming. The evidence also demonstrates Irico's attendance at over 70 group meetings with other conspirators during the conspiracy period. For many of these meetings, moreover, lengthy and detailed notes exist which show, *inter alia*, detailed discussion of CRT pricing, production, capacity and sales, and the exchange of confidential information between competitors. As Professor Marx explains, the exchange of confidential information regarding future pricing, production, capacity and future plans—as each of the meeting notes proves—is not consistent with competitive behavior and would be in the self-interest of each participant only if they were

1    colluding. *See, e.g.*, Marx Rep., ECF No. 5191-2, Ex. A ¶¶ 14, 50–53, 64; Saveri Decl., Ex. 12

2    (Nov. 1998 China CDT meeting: Irico discloses future production levels and plan to "stop

3    operation for one month" as well as "internal transaction price" for one of its customers

4    (CHU00030684–87)); ECF No. 5191-2, Ex. J (April, 2000 Glass meeting—report on Irico's future

5    production and future pricing to Europe (CHU0029110–15 (Dep. Ex. 2260)).

6           The Irico Defendants do not meaningfully contest Plaintiffs' evidence proving the existence

7    of the CRT conspiracy. The closest they come is the assertion in their opposition to the Application

8    that "the existence of the cartel," as evidenced by their joinder in the motion to dismiss, is

9    "expressly disputed." ECF No. 5214 at 13:3–4. That is another "mere general denial," *Franchise*

10   *Holding II*, 375 F.3d at 926, which will not suffice. And, of course, the Court has already denied

11   the motion to dismiss, holding that it stated a claim against all defendants including the Irico

12   Defendants. ECF No. 665. The Irico Defendants thus plainly have not established a defense based

13   on the non-existence of the alleged conspiracy.

14          Irico's assertion that Plaintiffs have produced insufficient evidence of their participation in

15   the conspiracy also fails. Again, they concede most of the evidence. They do not deny attending the

16   meetings. They do not deny that the meeting notes are accurate. Indeed, they fail to specifically

17   address any of the meeting notes, much less provide an explanation of how and why their admitted

18   conduct was legal. Their assertion that the meeting notes do not directly show agreement is wrong.

19   As noted above, many of the notes show collusive agreements. *See supra* Part II.B. All show that

20   the purpose of the meetings was to raise or stabilize the worldwide prices of CRTs. *See id.* The

21   assertion that a conspiracy cannot be proven by circumstantial evidence is also simply wrong. *See,*

22   *e.g., In re Cathode Ray Tube (CRT) Antitrust Litig.*, Case No. C-07-5944 JST, 2016 WL 5848702,

23   *3 (N.D. Cal. Oct. 6, 2016) ("The DAPs also do not need to provide direct evidence of the

24   conspiracy"). And Irico's assertion that a conspiracy cannot be inferred from the exchange of

25   confidential pricing information is also wrong. *See, e.g., In re TFT-LCD (Flat Panel) Antitrust*

26   *Litig.*, Case No. 12-CV-4114 SI, MDL No. 1827, 2013 WL 3387652, at *1–2 (N.D. Cal. July 8,

27   2013) (summary judgment denied where defendant "received pricing information from its

28   competitors, shared its own pricing information, and was aware of its wrongdoing").

1        *Krehl v. Baskin-Robbins Ice Cream Co.*, 664 F.2d 1348, 1357 (9th Cir. 1982) and *In re*

2    *Citric Acid Litigation*, 191 F. 3d 1090 (9th Cir. 1999) are not to the contrary. The evidence here far

3    exceeds that at issue in those cases. In *Krehl*, the Ninth Circuit upheld the District Court's finding

4    at trial that the Plaintiffs had not proved their case. The Court described plaintiffs' proof as "no

5    more than idle 'shop talk'" that was contradicted by other proof. 664 F.2d at 1357. *In re Citric Acid*

6    is also distinguishable because the amount and quality of the evidence is far greater here. *See, e.g.,*

7    *In re Citric Acid*, 191 F. 3d at 1104–05 ("sporadic price discussions").

8        The Irico Defendants' argument that the evidence shows no specific agreements regarding

9    pricing in the U.S. simply ignores the overwhelming evidence that the market for CRTs was a

10   global one, and that the conspiracy was intended to and did set prices worldwide, including the

11   United States. *See supra* Part III.C. Similarly, it is legally irrelevant whether (as the Irico

12   Defendants assert) they did not sell CRTs in the United States, *see id.*; and in any event the Zhang

13   Declaration is insufficient evidence that Irico never made such sales because Zhang lacks the

14   requisite personal knowledge, *see id.* Further, even though Plaintiffs have not had full discovery

15   from Irico on this issue, they have produced undisputed evidence ████████████████████

16   ██████████████████████████████████████████████████ Zirpoli Decl., Ex.

17   4, Response to Information Request §§ B, D.

18       Finally, the Irico Defendants' cynical assertion that there is insufficient evidence against

19   them highlights the prejudice from their default and refusal to comply with their discovery

20   obligations. There is no doubt that Irico is (or was) in possession of much more evidence relating to

21   their participation in the conspiracy than Plaintiffs have been able to obtain. For example, it is

22   practically certain that the Irico executives who attended the conspiratorial meetings communicated

23   with other Irico personnel about them and that those communications would be highly relevant to

24   Plaintiffs' case. The Court should not permit Irico to argue that it has a meritorious defense based

25   on Plaintiffs' inability to cite documents that Irico willfully and culpably refused to produce.

26   **V.    CONCLUSION**

27       For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Irico

28   Defendants' Motion to Set Aside Default.

1    Dated: December 7, 2017                    Respectfully submitted,

2
                                               /s/ *Guido Saveri*
3                                              Guido Saveri (22349)
                                               R. Alexander Saveri (173102)
4                                              Geoffrey C. Rushing (126910)
                                               Cadio Zirpoli (179108)
5                                              Matthew D. Heaphy (227224)
                                               SAVERI & SAVERI, INC.
6                                              706 Sansome Street
                                               San Francisco, CA 94111
7                                              Telephone: (415) 217-6810
                                               Facsimile: (415) 217-6813
8
                                               *Lead Counsel for Direct Purchaser Plaintiffs*
9

10                                             Joseph W. Cotchett
                                               COTCHETT, PITRE & McCARTHY, LLP
11                                             840 Malcolm Road
                                               Burlingame, CA 94010
12                                             Telephone: (650) 697-6000
                                               Facsimile: (650) 697-0577
13
                                               Steven F. Benz
14                                             Gregory G. Rapawy
                                               KELLOGG, HANSEN, TODD, FIGEL &
15                                                 FREDERICK, P.L.L.C.
                                               1615 M Street, N.W., Suite 400
16                                             Washington, DC 20036
                                               Telephone: (202) 326-7900
17                                             Facsimile: (202) 326-7999

18                                             Bruce L. Simon
                                               PEARSON, SIMON & WARSHAW LLP
19                                             44 Montgomery Street, Suite 2450
                                               San Francisco, CA 94104
20                                             Telephone: (415) 433-9000
                                               Facsimile: (415) 433-9008
21
                                               H. Laddie Montague, Jr.
22                                             Ruthanne Gordon
                                               BERGER & MONTAGUE, P.C.
23                                             1622 Locust Street
                                               Philadelphia, PA 19103
24                                             Telephone: (800) 424-6690
                                               Facsimile: (215) 875-4604
25
                                               Michael P. Lehmann
26                                             HAUSFELD LLP
                                               600 Montgomery Street, Suite 3200
27                                             San Francisco, CA 94111
                                               Telephone: (415) 633-1908
28                                             Facsimile: (415) 358-4980

                                               26

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gary Specks
KAPLAN FOX
423 Sumac Road
Highland Park, IL 60035
Telephone: (847) 831-1585
Facsimile: (847) 831-1580

Douglas A. Millen
William H. London
FREED KANNER LONDON & MILLEN
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
Facsimile: (224) 632-4519

Eric B. Fastiff
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

W. Joseph Bruckner
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue S
Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981

*Attorneys for Plaintiffs*

DPPS' OPPOSITION TO THE IRICO DEFENDANTS' MOTION TO SET ASIDE DEFAULT;
Master File No. 07-CV-5944-JST