Pages 1 - 55

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JON S. TIGAR, JUDGE

```
MDL NO. 1917 IN RE:  CATHODE    )
RAY TUBE (CRT) ANTITRUST        )
LITIGATION                      )    Case No. CV 07-5944 JST
_____ )
```

San Francisco, California
Thursday, January 11, 2018

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Direct Purchaser Plaintiffs Plaintiffs:

        COTCHETT, PITRE & MCCARTHY LLP
        San Francisco Airport Office Center
        840 Malcolm Road
        Burlingame, California  94010
    BY:  **JOSEPH W. COTCHETT, ESQUIRE**

        SAVERI & SAVERI
        706 Sansame Street
        San Francisco, California  94111
    BY:  **GUIDO SAVERI, ESQUIRE**
        **R. ALEXANDER SAVERI, ESQUIRE**
        **GEOFFREY C. RUSHING, ESQUIRE**

        KELLOGG, HANSEN, TODD, FIGEL
         & FREDERICK, P.L.L.C.
        1615 M Street, N.W., Suite 400
        Washington, DC 20036
    BY:  **STEVEN F. BENZ, ESQUIRE**

(Appearances continued on next page)

**Reported By:**    *Katherine Powell Sullivan, CSR #5812, RMR, CRR*
              *Official Reporter - U.S. District Court*

1  <u>**APPEARANCES (CONTINUED)**</u>:

2  For the Irico Defendants:
                        BAKER BOTTS L.L.P.
3                       1299 Pennsylvania Avenue, NW
                        Washington, DC 20004
4              **BY:  JOHN M. TALADAY, ESQUIRE**
                   **KAYLEE YANG, ESQUIRE**
5
                        BAKER BOTTS L.L.P.
6                       101 California Street, Suite 3600
                        San Francisco, California  94111
7              **BY:  STUART C. PLUNKETT, ESQUIRE**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | <u>Thursday, January 11, 2018</u>                                    <u>2:09 p.m.</u> |
| 2 | **P-R-O-C-E-E-D-I-N-G-S** |
| 3 | **---oOo---** |

4      **THE CLERK:**  Calling Civil Case 07-5944, MDL Number

5   1917, In Re Cathode Ray Tube Antitrust Litigation.

6       Counsel, if you could please step forward and make your

7   appearances.

8      **MR. R. ALEXANDER SAVERI:**  Good afternoon, Your Honor.

9   May it please the Court, Rick Saveri on behalf of direct

10  purchaser plaintiffs.

11     **MR. COTCHETT:**  Joseph Cotchett on behalf of the direct

12  purchaser class, Your Honor.  Good afternoon.

13     **MR. GUIDO SAVERI:**  Guido Saveri on behalf of the

14  plaintiffs.

15     **MR. RUSHING:**  Good afternoon, Your Honor.  Jeffrey

16  Rushing on behalf of the class plaintiffs.

17     **MR. BENZ:**  Good afternoon, Your Honor.  Steve Benz on

18  behalf of the direct purchaser class plaintiffs.

19     **MR. TALADAY:**  Good afternoon, Your Honor.  John

20  Taladay on behalf of the Irico defendants.

21     **MR. PLUNKETT:**  Good afternoon.  Stuart Plunkett on

22  behalf of the Irico defendants.

23     **MS. YANG:**  Good afternoon, Your Honor.  Kaylee Yang on

24  behalf of the Irico defendants.

25     **THE COURT:**  Welcome.  And welcome to the very large

1   contingent who appear also to have come to hear the hearing on

2   these motions.

3        Let me make a couple of preliminary comments before we

4   start, and then I look forward to hearing argument.

5        I've not made the effort to write these comments down in

6   advance so I hope they're not too scattered.  Also, I want to

7   emphasize that the comments that I'm going to make are all

8   preliminary and tentative and that, if I didn't feel that oral

9   argument would be helpful, I wouldn't have scheduled it.

10        So you should make the arguments that you came to make.

11        I'm likely to grant the motion to set aside the default

12   and deny the motion for default judgment as moot.

13        There are a lot of interesting and complicated and, in

14   some instances, novel questions raised by these motions.

15        I think that the Zhang declaration is problematic.

16   Mr. Zhang is counsel for the Irico defendants.  That word can

17   mean many things, but I assume it means that he is their

18   attorney and that -- I don't know whether he acts in that

19   capacity as an inside or outside lawyer, but I don't know that

20   it matters.  He's had that job only very recently, according to

21   his declaration.

22        He purports to give testimony about a state of affairs

23   that occurred in 2007.  It doesn't say how he knows that.  He

24   doesn't say whether he read the records of the company.  He

25   doesn't say whether he interviewed persons who were there at

1    that time.  So I don't know what his foundation is for the

2    statements that he makes in his declaration.

3        Even putting the Zhang declaration to one side, though, it

4    seems fairly obvious, based on the record, at least to me, that

5    the Irico Group is a sovereign entity under the Foreign

6    Sovereign Immunities Act.  It's less clear that Irico Display

7    qualifies there.

8        And I should back up and say that before I can even get to

9    the legal questions posed by the motion to set aside default, I

10   have to decide whether I have jurisdiction over these parties

11   in the first place.  That's an obligation that I have as a

12   federal judge.

13       Even though that question is again posed by the question

14   of whether the Foreign Sovereign Immunities Act is a

15   meritorious defense, that should form the basis of a setting

16   aside of the default under Rule 55.

17       And I separate those two things out because the standards

18   for making the decision that I have the jurisdiction over

19   them -- excuse me, the standard for doing that is different

20   from the standard of deciding that they have a meritorious -- a

21   potentially meritorious defense under Rule 55.  So I really

22   have to go through this inquiry twice.

23       The inquiry I'm describing now is an inquiry to decide do

24   I even have jurisdiction over these parties sufficient to allow

25   me to proceed on this motion?  And for the reasons I just

1  stated, at this point in the analysis I do have that over Irico

2  Display.

3      So now let's keep going with regards to the Irico Group.

4  This is already at a level of granularity that I hoped to

5  avoid, so let me see if I can speed things up.

6      I think there is -- it's a fair question -- it seems to me

7  not particularly debatable that the Irico Group was engaged in

8  commercial activity at least in regards to the activities in

9  this case.  Whether that had a direct effect on the

10 United States is not a question I have to resolve definitively

11 today, but I think I can resolve it sufficiently to conclude

12 that I have jurisdiction over that party for purposes of

13 considering these motions.

14     That takes us to the motion -- to the merits of the motion

15 to set aside.  I don't think they waived this defense, by the

16 way.  I have to find that there's not a waiver before I can get

17 to the substance of the motion.

18     Okay.  So then we get to the motion to set aside default.

19 And I have to look at three things.  Number one, the prejudice

20 against the DPPs.  It's a pretty good prejudice argument.  It

21 doesn't require a lot of elaboration.

22     When less time has gone by, the Court might sometimes ask,

23 well, could you specifically identify the things you think you

24 could have gotten in discovery, for example, that you can't get

25 anymore.  After the passage of this much time, I think it's

sort of obvious.  But it's a two-way street or it's a two-edged
sword.

     The Court -- you know, maybe there are some reasons about
not perfecting the amount of a default judgment, but the
plaintiff should have done something about this a long time
ago.  And I think it's true when the Irico defendants say,
well, you didn't -- the Court asked you to explain why you
didn't move for entry of default a long time ago, and as to
that particular question you didn't really answer it.  I think
that's true.

     So there's a good prejudice argument, but on the equities
it's undercut somewhat by the DPPs' delay.

     The next thing is the Irico defendants have to show that
they have a meritorious -- potentially meritorious defense.
That will be lost if I don't set aside the default.

     As to the Irico Group, that's easy for the reasons I just
said.  They have a defense that they're immune from suit.

     Irico Display gets a little more complicated.  Honestly,
I'm still working that through.  As I said earlier, the
standards are different.  The evidentiary standards are also
different.

     The Zhang declaration, as I said earlier, is problematic.

     The materials that the DPPs put in, that they want me to
consider, Articles of Association, were enacted after the
complaint was filed.  They don't tell me anything about what

1   was happening -- well, I don't say they tell me nothing.

2        It's not clear what they tell me about the state of

3   affairs as of the date the complaint was filed.  In fact, the

4   adoption of Articles of Incorporation at a later date suggest,

5   I think, as one possibility, that Irico Display underwent a

6   change in ownership or a change in corporate form.

7        Why are Articles of Association or Articles of

8   Incorporation -- I'm not using the right phrase -- why are

9   those adopted at that time?  The record is silent.  There are a

10  few pieces of paper both sides are giving me and asking me to

11  read the tea leaves about what the legal status of this group

12  was.

13       So I'm still working that through with regard to Irico

14  Display, but if I had to predict right now, if someone said

15  notwithstanding this, something has struck the courtroom and so

16  this extraordinarily well-resourced competent group of

17  international antitrust lawyers have all been struck mute, you

18  just have to go on the papers and your gut, I would say I'm

19  going to find the possibility of meritorious defense as to both

20  of those entities and set aside the default as to both of those

21  entities, but I'm going to allow jurisdictional discovery.

22       Culpability is sort of a slam dunk for Irico.  You have to

23  show bad faith.  I don't see any evidence of that in the

24  record.

25       So, balancing the factors and considering the federal

1   courts' very strong preference for deciding cases on their

2   merits, and in light of the very large sum at issue -- and I

3   know I'm probably not going to reach the motion for entry of

4   default judgment, but I've got to say to the DPPs, guys, let's

5   get real.  In that part of the briefing you tried to use that

6   as a factor in your favor, and it just isn't, the idea that the

7   Court wouldn't look with a pretty -- you know, look pretty

8   searchingly at an application to enter a

9   2-and-a-half-billion-dollar default judgment.

10       So that's where I am.  I'm sorry for the length and

11  disorganization of those comments.  It does tell you that this

12  question of how to treat the legal status of Irico Display is

13  probably the thing that's in the greatest flux in my mind.

14       And as I said earlier, notwithstanding whatever comments I

15  made, you should feel free to make the argument you came to

16  make.

17       I do want to consider, first, though, the motion to set

18  aside in whatever arguments are made.  And so for that reason,

19  I'll ask Mr. Taladay to argue first.

20       **MR. TALADAY:**  Thank you, Your Honor.  I'm here today

21  with my colleagues from Baker Botts, Stuart Plunkett and Kaylee

22  Yang, and also seven representatives of the Irico defendants

23  who have come from China for this hearing.  If the Court would

24  allow me, I'd like to mention those briefly.

25       From the Irico Group, we have its vice president, Ms. Sun,

1   and from the legal department, Mr. Yan.  And from the parent

2   company of Irico Group, the China Electronics Corporation,

3   which was formerly The Ministry, we have the director of legal

4   affairs, Ms. Kong, and from the legal department, Mr. Li, and

5   the deputy business manager, Ms. Sun.

6        And then, finally, we have the legal consultant to China

7   Electronics Corporation, Ms. Shi, and their outside Chinese

8   counsel, Mr. Gao.

9        Your Honor, this is obviously a very important matter for

10  Irico Group, Irico Display, and its parent.  And it's

11  noteworthy that the plaintiffs here are seeking what appears to

12  be both the largest default judgment in history and the largest

13  antitrust judgment in history against two Chinese state-owned

14  companies that never sold a single product in the United States

15  and from which no member of the direct purchasers' class ever

16  purchased anything.

17       **THE COURT:**  Don't you represent the Phillips entities

18  also in this litigation?

19       **MR. TALADAY:**  No longer, Your Honor.

20       **THE COURT:**  But you did at one time.

21       **MR. TALADAY:**  Correct, Your Honor.

22       **THE COURT:**  You've read my rulings on the summary

23  judgment motions regarding the Foreign Trade Antitrust

24  Improvement Act.

25       **MR. TALADAY:**  Correct, Your Honor.

1          **THE COURT:**  Go ahead.

2          **MR. TALADAY:**  However, I've also read --

3          **THE COURT:**  I mean, I think it's interesting -- if I

4    recall the papers correctly, I think it's interesting that they

5    only moved 2,000 demonstration units into the United States;

6    they never saw them when they came back.  I get that.

7        But the question of direct effect probably is going to be.

8    That's not dispositive necessarily of the question of direct

9    effect.

10         **MR. TALADAY:**  I don't want to get us off track, Your

11   Honor, but I will also mention that I've also read Judge

12   Conti's decision on the motion for summary judgment with

13   respect to plaintiffs' standing.

14       And in that case he made it very clear that plaintiffs'

15   standing depended on their purchase of finished products from a

16   member of one of the defendant groups.

17       And in our case, Your Honor, we have no member of our

18   defendant group that ever sold products to the plaintiffs.

19   And, therefore, Your Honor, the issue I was raising at that

20   moment wasn't only FTAIA but also standing.

21         **THE COURT:**  Is the point you just made in the papers?

22         **MR. TALADAY:**  It is, Your Honor.  It's referenced in

23   other defenses in the papers.  But what I would say, Your

24   Honor, is that is obviously a matter for -- an intensely

25   factual matter that we would have to provide evidence on.

1        And so I mention it because I think it's relevant and it's

2   certainly a meritorious defense.  But I think that's something

3   to be further explored at another time.

4        So, Your Honor, from the time the Irico companies withdrew

5   from this litigation, what the record will show -- and I'll

6   speak to this on prejudice point -- is that Irico became a true

7   afterthought to plaintiffs' case.  In fact, it was a

8   non-thought to the plaintiffs until the Court itself ordered

9   the plaintiffs -- in trying to clean up the remnants of this

10  case, ordered the plaintiffs to consider Irico and do something

11  about it.

12       And now the plaintiffs, who pursued their case and, in

13  fact, obtained damages and recoveries from every other

14  defendant, are seeking this windfall based on procedural

15  posture, but it's one they could never obtain on the merits of

16  the case.

17       Now, I know while this is not Your Honor's --

18       **THE COURT:**  Well, this is something else that I was --

19  I was talking at such length I didn't want to say everything

20  that was in my notes.  But there is, at a minimum, just on the

21  size of the judgment, a question about IRICO's participation.

22       So even if you assume they're not immune and you assume

23  that they're liable, the earliest that they are alleged, based

24  on the things that are in the papers, to have joined the

25  conspiracy is after the nominal start of the conspiracy.

1   And under antitrust law they might be liable for

2   everything that comes after, but unless there's a very specific

3   showing about their knowledge of what went on before, they're

4   not liable beforehand.  So there's no way on these papers they

5   could be liable for the entire amount prayed for.

6          **MR. TALADAY:**  That's correct, Your Honor.

7          And one other thing I would mention is that, even if we

8   hadn't put forward a single defense in our papers that it was

9   unique to Irico Display and Irico Group, it's meaningful to

10  recall that there is a ten-year history where every other

11  defendant, based on the common claims that the plaintiffs have

12  brought, have advanced many, many meritorious defenses.  In

13  fact, they're certainly meritorious enough to prevent

14  plaintiffs from obtaining the entirety of their claim damages.

15         And so, even if we had not brought forward those unique

16  meritorious defenses, the common defenses to all defendants

17  still apply to these defendants, Your Honor.

18         So the Court is very familiar with the factors relating to

19  setting aside this default.  We don't believe they are extreme

20  circumstances here.

21         The basis on which Irico discontinued participation,

22  believing it was immune as a foreign sovereign, are common.  We

23  see it in other cases.  As Your Honor noted, there is no bad

24  faith apparent.

25         And in terms of meritorious defenses, it's clear that the

1    case law holds that the Court's discretion should give way

2    fairly readily to reaching the merits of the dispute.  We're

3    prepared to do that, Your Honor.  We don't believe we'll need

4    to resubmit it because we believe we are immune from suit, but

5    the merits certainly can be reached.

6        I'd like to speak about prejudice that was, I think, the

7    one factor Your Honor had some questions about.  And I think if

8    Your Honor was to examine the history of this case, it may be

9    able to conclude that there was no prejudice even as to the

10   equities.  And I'd like to spend a few minutes discussing that,

11   if I could.

12       First of all, the general principle is that there is no

13   prejudice if the plaintiffs can pursue their claims.  And your

14   Honor recognized that in *Digital*, in passed time does not

15   constitute prejudice warranting refusal to set aside the

16   default.

17       And here, Your, Honor there are a number of reasons that

18   show pretty clearly why there was no prejudice in the past.

19       First --

20            **THE COURT:**  Do you think common sense suggests that

21   all of the documentary and witness evidence that might have

22   been available ten years ago is still available?  Do you think

23   that?

24            **MR. TALADAY:**  Your Honor, I don't know that we need to

25   rely on common sense when we have evidence in the record.  So I

1   would not substitute my common sense for what I see is record

2   evidence.

3       The plaintiffs say continually that they have overwhelming

4   evidence as to IRICO's guilt.  They say it conclusively --

5       **THE COURT:**  That's a puffery.  That's puffery for the

6   purposes of exciting the judge's attention and giving them 2

7   and a half billion dollars.

8       How many people sitting in the audience have the same jobs

9   ten years ago that they have today?

10      **MR. TALADAY:**  Your Honor, I don't know the answer to

11  that question.

12      **THE COURT:**  I don't either, but -- well, anyway, I

13  won't make any humor about it.  We're going to have some

14  jurisdictional discovery.  Anyway, I'm arguing with you, which

15  I try not to do.

16      **MR. TALADAY:**  But I think it's clear, Your Honor, that

17  the evidence that they have amassed was certainly sufficient to

18  allow them to force other defendants to settle for substantial

19  amounts.

20      And there is a tension, I think, between arguing on the

21  one hand that they were incredibly prejudiced by Irico's

22  absence from the case and on the other hand saying that they

23  had reached adequate settlements with every other defendant in

24  the case.

25      **THE COURT:**  They got discovery from those defendants,

1   then they forced the settlements because they made people

2   nervous.

3          **MR. TALADAY:**  But their argument on prejudice is based

4   on the fact that their absence of evidence from Irico affected

5   their settlements with other parties.

6          **THE COURT:**  Oh, I see.

7          **MR. TALADAY:**  So.

8          **THE COURT:**  Yeah.

9          **MR. TALADAY:**  So, Your Honor, the other thing to

10  consider is that prejudice could well -- and *Gregorian* suggests

11  this -- could well be considered as to prejudice during the

12  time that the default existed.

13         And so, in this case, setting aside the default puts

14  plaintiffs in the exact same position as they were immediately

15  before they obtained the default, because the default wasn't

16  obtained until July 2016.  None of the prejudice that they

17  argue, none of it, related to the period after July of 2016.

18         **THE COURT:**  Is that what the case law says, that's the

19  time?  It is as of that time that I'm to measure this question?

20         **MR. TALADAY:**  Your Honor, I would say that's implicit

21  in *Gregorian*.  I would not --

22         **THE COURT:**  Explicit anywhere?

23         **MR. TALADAY:**  No, Your Honor, but it's not explicit to

24  the contrary anywhere either.

25         **THE COURT:**  Oh, my goodness, that's not the standard I

1    use, but, okay.

2         **MR. TALADAY:**  Okay.  So let's assess the prejudice

3    that plaintiffs assert.

4         First, all of the settlements that they reached, except

5    for one, happened well before any finding of default.  And in

6    the one that happened afterwards -- and I should mention that

7    in the hearings with respect to those settlements, where the

8    plaintiffs came forward to defend those settlements, they never

9    once mentioned any handicap or limitation on those settlements

10   based on the lack of evidence from Irico.

11        In fact, they represented that those were very good

12   settlements, not that they were handicapped.  So that's a more

13   recent view that the plaintiffs have adopted.

14        Secondly, in the only settlement that was reached after

15   the default, which was the Mitsubishi settlement, here's what

16   they said to the Court.  And this is a quote:

17        "The Mitsubishi Electric defendants are the last remaining

18   defendants.  Apart from settlement administration and similar

19   issues, this settlement, if approved, will effectively resolve

20   the direct purchaser action."

21        It's a quote.  There's a footnote to the quote, which

22   says, we might go after a default judgment against Irico.  But

23   that's the point, Your Honor.  Irico was a footnote to their

24   entire case, literally.

25        **THE COURT:**  Two things.  First, you're probably going

1   to win this point on prejudice.  Secondly, I think that you

2   do -- I mean, the briefs on these motions are very, very good.

3   And you make the point in your briefs that you think the only

4   reason anybody is here is because the Court kicked a sleeping

5   dog.  I agree with that.  I don't say I agree with it that I

6   know that happened.  I'm just saying that the circumstances are

7   very suggestive of that.  So if that's the point you're making,

8   consider it made.

9            **MR. TALADAY:**  Okay, Your Honor.  Perhaps I'll move on.

10           **THE COURT:**  I do want to know the answer to this

11   question either now or at some other point in your argument.

12        Let's say that we take Mr. Zhang's declaration off the

13   table.  How do I know that Irico Display is -- I don't have

14   Section 16 what-have-you in front of me, but, you know, organ

15   or instrumentality, et cetera.

16        How do I know that Irico Display qualifies for one of

17   those, not for purposes of jurisdiction but just to get me over

18   that line on meritorious defense?

19        And, candidly, I read these papers very carefully, but I

20   haven't gone back to read my own orders in either *Coen* or

21   *Mission Trading*, which I need to do, because those are the two

22   circumstances I can think of where I faced issues like this.

23        And I know you've all read those cases because you cited

24   them back to me.  I just haven't read them yet.

25           **MR. TALADAY:**  Your Honor, first, I don't think it's

1    necessary that the Court be convinced it's the case.  I think

2    the question is whether it's a meritorious defense.

3            **THE COURT:**  That's why I've been careful to say,

4    right.

5            **MR. TALADAY:**  Thank you.

6        Secondly, Your Honor, there is record evidence of a

7    substantial amount of control.  And I will say, we did not have

8    a lot of time to put together the factual record here.

9        And I agree with plaintiffs in the alternative.  I agree

10   with Your Honor that some additional discovery on those

11   jurisdictional facts is warranted.  However --

12           **THE COURT:**  It was notable to me -- and I don't know

13   whether it should have been -- that in your opening brief on

14   the motion to set aside default you said, you don't have

15   jurisdiction over us.

16       And in your reply you said, well, you should just set

17   aside the default and then we'll have a little discovery and

18   that kind of thing.  The reply brief was a little softer on

19   this question.

20           **MR. TALADAY:**  Well, Your Honor, we understand that you

21   need to be convinced on that question.

22           **THE COURT:**  Yeah.

23           **MR. TALADAY:**  And we have more facts to adduce and

24   that we're still learning, Your Honor.

25       So, for example, I've learned just recently that Irico

1    Group is the -- has the sole authority to nominate all of the

2    members of the board of directors of Irico Display.  That was a

3    fact we weren't aware of or we certainly would have tried to

4    bring that fact toward.

5        So there are other facts I think can help convince Your

6    Honor outside of what's currently in the Zhang deposition.  And

7    if they're not all brought forward, it's really a question of

8    time and not fact.

9            **THE COURT:**  Okay.

10           **MR. TALADAY:**  I've spoken about meritorious defenses

11   and probably spent most of my time on that since it's been

12   hotly contested for ten years.  And there certainly are many,

13   many meritorious defenses brought that are common and several

14   that are unique to Irico.

15       And on culpable conduct, Your Honor, I will stand down on

16   that question except perhaps in response.

17       So I'll pause there, Your Honor, and give Mr. Saveri a

18   chance.  And if you have any other questions, I'm here.

19           **THE COURT:**  No, thanks.  You've been very responsive

20   to the ones I did have.

21       Mr. Saveri.

22           **MR. R. ALEXANDER SAVERI:**  Thank you, Your Honor.

23   Mr. Rushing from my office will handle the argument.  If we get

24   to the entry of the judgment, I'll be happy to talk.

25           **THE COURT:**  You'll be standing there with pen at the

```
 1   ready?

 2           MR. R. ALEXANDER SAVERI:  Yes.

 3           THE COURT:  Okay.

 4        MR. RUSHING:  Good afternoon, Your Honor.  I've got my

 5   work cut out for me.  I guess I'll start with the FSIA and your

 6   questions about jurisdiction and particularly the Zhang

 7   declaration.

 8           THE COURT:  Yeah, you're probably going to win on the

 9   evidentiary value of that.  I just -- yeah.

10        MR. RUSHING:  Thank you, Your Honor.

11        I mean, the point I would add is not just that it lacks

12   foundation.  It obviously does.  And the cases they cite to try

13   and rehabilitate that are inept.

14        But it also lacks credibility in a very fundamental way.

15   He's just wrong about many things that he shouldn't be wrong

16   about.  The most egregious one is when he says that Display is

17   a state-owned holding company.  It's not.  It's a

18   publicly-traded majority-owned-by-private-shareholders

19   manufacturing company.  It's not a holding company either.  I

20   mean, it makes electronic devices.

21        So he's dead wrong on a critical point in the case, a

22   critical point.  And it's a point it's hard to understand how

23   he could get wrong.  It's either gross negligence or it's an

24   attempt to mislead the parties -- I mean the Court.

25           THE COURT:  Right.  So it's an additional reason for
```

1  me to feel comfortable that I have jurisdiction to proceed;

2  right?

3          **MR. RUSHING:**  Yes.

4          **THE COURT:**  Because I really not only do not have

5  foundation, I don't even believe you about some of the things

6  you've said.

7      But then we slide over to Rule 55, and I think Mr. Taladay

8  is right.  They don't have to prove to my satisfaction that

9  they have a legitimate defense.  They just have to -- you know,

10 it's something much lower than that; right?

11         **MR. RUSHING:**  Well, there's two tracks here.  As Your

12 Honor pointed out, this motion began as a motion to dismiss the

13 case for lack of jurisdiction under the FSIA and,

14 alternatively, to lift the default.

15     And there's no reason the Court can't reach the FSIA.

16 Many other courts have; in particular, the -- the case

17 involving the Dominican Republic.

18         **THE COURT:**  You mean decide as a matter of law in a

19 conclusive way that I do have jurisdiction and that they are

20 not immune under the FSIA?  You think I can do that on this

21 record?

22         **MR. RUSHING:**  I think you can, Your Honor, and for

23 this reason.  Number one, as we explained in the papers, they

24 have the burden to go forward to show that they are

25 presumptively or -- within the FSIA.  They have the burden to

1   produce evidence that shows that.  They haven't done it.

2       We go through the burden of proof in our papers.  They

3   don't say anything about it.  And I think the reason is

4   because, it's clear, they have the burden to go forward.

5       And they also have the burden, ultimately, of persuasion,

6   assuming they meet the first burden and we come in with

7   evidence to meet that.

8       But they have the burden to go forward, and they haven't

9   done it.  As we explained in the papers, as Your Honor has

10  discussed it, we don't think the Zhang declaration accomplishes

11  that.  And without the Zhang declaration, they have nothing.

12          **THE COURT:**  You're referring to Display now.

13          **MR. RUSHING:**  Well, Display and Group, but certainly

14  Display.

15          **THE COURT:**  You think they have nothing on the Irico

16  Group except the Zhang declaration?  You don't think there's

17  anything in the record on either side that's of assistance to

18  them?

19          **MR. RUSHING:**  I don't.  I mean, we put in some

20  evidence and they attempt to use that, but I don't believe

21  that's a proper thing for them to do.

22      But certainly as to Display, they don't have any evidence,

23  without the Zhang declaration, that -- they concede that it's

24  not an agent or instrumentality.  There's no question that the

25  stock ownership requirements by the government are not met.

1          **THE COURT:**  Isn't there a 2007 annual report from

2     Irico Display that -- which itself says that the State Council

3     of China owns a hundred percent of Irico Group?  And if that

4     fact is true, doesn't that make them sovereign under the FSIA?

5          **MR. RUSHING:**  If the SAS -- the SASAC entity is the

6     state, yes.

7          **THE COURT:**  Yeah.

8          **MR. RUSHING:**  If that's true.  But we don't know that

9     to be the case.  I mean, it may be --

10         **THE COURT:**  I'm just pushing back a little bit on an

11    idea --

12         **MR. RUSHING:**  Yes.

13         **THE COURT:**  -- that there's nothing as to Group.

14    That's an argument where you might be on somewhat stronger

15    footing with regard to Display.

16         **MR. RUSHING:**  Well, I would agree with that, but I

17    also think that Group is -- I mean, I think the defense was

18    waived, and I also think that the commercial exception applies

19    to Group.

20      And so while they would be subject to the FSIA, it

21    wouldn't ultimately be a defense to the case because they would

22    be subject to the commercial activity exception.  It might

23    affect the way the case is tried, that sort of thing, but it

24    wouldn't be a defense.

25         **THE COURT:**  Oh, that's going to be the best part.  I

 1    mean, really, that is the best part.

 2        I'm on the Ninth Circuit jury instruction committee.  I

 3    have thought very hard about what happens if you get to trial

 4    and the question of jurisdiction is still open.  What do you

 5    do?  I mean, I don't want to highjack the hearing.  That would

 6    be great.

 7        I think it's probably a finding by the Court based on

 8    facts found by the jury in an advisory capacity on special

 9    interrogatories.  And if I'm the defendants, I'd ask the Court

10    to make that ruling before it allows -- you know, as quickly as

11    I can.  The problem, of course, is you have a jury sitting

12    there.

13        Anyway, we'll get there when we get there.

14        (Laughter)

15        MR. RUSHING:  Well, so our position is they haven't

16    even crossed the first threshold, and so the motion is ripe for

17    disposition, at least as to Display, on that ground.  They have

18    no evidence.

19        The suggestion that they haven't had enough time, I don't

20    know, it seems like they've had enough time.  The default was

21    entered 18 months ago.  Irico -- both Irico entities have been

22    receiving every pleading in this case since they withdrew.

23        When their new lawyers appeared, they asked for and

24    received -- I think this set of lawyers, we gave them two

25    extensions, maybe just one, to prepare their papers.  They're

1  sophisticated lawyers.

2      A lot of these questions are pretty fundamental.  And so,

3  in my view, if they had it, we'd have seen it by now.  But I

4  don't -- I don't know.  But it sure seems like we would have.

5      And the kinds of things they're talking about, also, I

6  mean, not only is the Zhang declaration, I'd say, entitled to

7  no weight on its face, it's not the best -- it's not the sort

8  of evidence to prove the things they want to -- you know, it's

9  very vague general statements by a person who apparently

10 doesn't know.

11     Where -- where are the documents?  Where's the analysis of

12 Chinese law and the declarations from the people who know about

13 this stuff?  So they have had time, I think, and yet the record

14 is bare for the most part.

15     Further, on Display, the Court points out that the

16 Articles of Association were apparently enacted after the case

17 was filed.  I'm not sure that's true.  We need to investigate

18 it.  It was my --

19         **THE COURT:**  I'm not the one who put the evidence in

20 the record.

21         **MR. RUSHING:**  Yeah.

22         **THE COURT:**  I'm just trying to figure out when it was

23 created.  As best I can tell, the only date that appears

24 anywhere in the vicinity of that evidence is 2008.  Maybe I

25 misread it.

1          **MR. RUSHING:**  Well, I don't read Chinese, so I believe

2   the Articles have been enacted and reenacted over the years.

3          **THE COURT:**  Could be.

4          **MR. RUSHING:**  And I believe that we can sort out the

5   question of when these particular ones were enacted.

6          **THE COURT:**  Well, that's a day you're very likely to

7   have anyway; right?

8          **MR. RUSHING:**  Yes.

9          **THE COURT:**  Now you're trying to convince me not even

10  to have to go through all of that.  But on the opportunity to

11  take a bunch of jurisdictional discovery, that's probably the

12  way the wind is blowing.

13         **MR. RUSHING:**  Well, okay.  Well, I just -- I --

14         **THE COURT:**  You're making some good points about

15  Display though.  I mean, I started the hearing by saying that's

16  the tough one.

17         **MR. RUSHING:**  Well, the -- so, going back to the

18  evidence before the Court, I mean, there's a number of factors.

19  The question is whether they are -- they have a public purpose.

20  And the exact language is whether they are conducting a public

21  activity on behalf of the foreign government.  Is that what

22  Display is doing?  That's the question.

23      Again, there's no statement of what the public activity --

24  what the public purpose of Display is.

25         **THE COURT:**  Oh, I don't think that's -- I have to be

careful.  I have another motion.  I have a case that's under

submission -- an order that's under submission in a different

case.  And in that case the lawyers took the judge's comments

from the bench and said this is what was the most important

thing to the judge.  It doesn't appear anywhere in the order

the judge issued later.  And so I said something in my order

about how ill-advised that is.  But, nonetheless, I'm very

conscious now if I say something, maybe the emphasis is wrong.

     And now the preface to the thing I was about to say took

so long I can't even remember what I was going to say.  So go

ahead and I'll come back to it.

          MR. RUSHING:  Well, if I repeat my statement, maybe it

will --

          THE COURT:  Yeah.

          MR. RUSHING:  -- remind you.  They don't -- the

question is whether they conducted public activity on behalf of

the government.

          THE COURT:  Oh, right.  Yes, what I was going to say

is I think, as I said in my opening remarks, the question of

whether this is commercial activity seems to me not a difficult

question.

          MR. RUSHING:  Right.

          THE COURT:  I don't think there's been a showing that

it's public activity.  I think the question is, is there a

direct effect on the U.S.; right?  Doesn't that --

1          **MR. RUSHING:**  Well, that's under the commercial

2     activity exception, Your Honor.

3          The question of whether they are an organ in the first

4     instance and entitled to any protection at all from the FSIA is

5     a question of whether they are performing a public activity on

6     behalf of the --

7          **THE COURT:**  Oh, I see.  I'm sorry, I was conflating

8     two things.  Yes, I take your point.

9          **MR. RUSHING:**  Yeah.  And that is a question.  So,

10    first of all, what's the public activity, and there's a number

11    of factors you look at.  And we've analyzed those factors.

12         And, as we pointed out in the brief, number one, they

13    don't even articulate a supposed public activity that Display

14    functions.  They say that Group's public activity is making

15    TVs, which is -- it's a non sequitur in my view.

16         But they don't articulate a public activity for Display.

17    And the factors that are relevant, we analyzed them in the

18    brief, and they -- they don't favor the finding of organ.  It's

19    the opposite.

20         **THE COURT:**  What about this point that Mr. Taladay

21    made, and he may have made it for the first time in the

22    hearing, so we can talk about that.  But this point that he

23    made that, in addition to this -- to the defenses that we've

24    been discussing so far in the hearing, there's the question of

25    all of them; meaning, plaintiffs didn't get summary judgment

1    against anybody.

2        There are so many different defenses that are asserted by

3    these different -- by the other defendants in the case; hence,

4    the need for me to issue summary judgment order after summary

5    judgment order after summary judgment order after summary

6    judgment order.

7        If I don't set this aside under Rule 55, am I finding

8    that, notwithstanding my now many months' tenure on the case,

9    they don't have any defenses?

10        I mean, doesn't the record of the case suggest, by

11    entering a default judgment, there are at least some

12    potentially meritorious defenses that I would be brushing

13    aside?

14        **MR. RUSHING:**  Well, I think that, as I read the case

15    law, they are required to make a specific showing of a specific

16    defense that's meritorious, possibly meritorious.

17        **THE COURT:**  Yeah.

18        **MR. RUSHING:**  And it's repeated in almost every case

19    that a mere general denial doesn't suffice.  And that's -- I

20    think that's the law.  That's the way we've argued it in the

21    briefs.  And I think that's the key thing to focus on.

22        And if you examine their papers, they -- they make

23    statements like that all the time.  They say they have

24    defenses.  They deny the existence of the conspiracy.  They

25    deny joining the conspiracy, et cetera.  But none of it's more

1    than a general denial.

2         We put specific evidence of, for example, did Irico join

3    the conspiracy?  Well, we have evidence of attendance at 70

4    apparently conspiratorial meetings --

5              THE COURT:  Beginning in 1998; right?

6              MR. RUSHING:  I believe that's true.

7              THE COURT:  And the conspiracy, according to all the

8    complaints in the case, ran from 1995 to 2007; correct?

9              MR. RUSHING:  That's correct, yes.

10             THE COURT:  And a 2-and-a-half-billion-dollar damages

11   number that comes from an estimate based on the entirety of the

12   conspiracy; true?

13             MR. RUSHING:  Yes and no.  Yes, that's the total

14   number.  No, if you can -- I believe the expert report is

15   written in a way that you can eliminate damages for '96 and '97

16   and '98 if you were so inclined.

17             THE COURT:  I could do that, but that's not the

18   prayer.  I'm asking what your team is asking for.

19        The thing that I just said is right, isn't it?

20             MR. RUSHING:  Well, I hadn't considered it before the

21   hearing, Your Honor, so --

22             THE COURT:  I'm pretty sure it's right.

23             MR. RUSHING:  Okay.

24             THE COURT:  Because it was the third leading question

25   I asked, just like the two that preceded it.  My point is

1    simply that it's not, by any stretch, the largest point to be

2    made here because it's only a portion -- it's not even clear to

3    me that it's a liability question.  It might be.  It might only

4    be a damages question.

5         But there's nothing at all in the briefing about anybody

6    saying that they -- there's nothing in the complaint.  There's

7    nothing, even under the most generous interpretation, that

8    would make the Irico defendants liable for anything that

9    happened between '95 and '98, is there?  There has to be some

10   showing.

11        **MR. RUSHING:**  Well, I'm not sure that that's the

12   earliest meeting, first of all, but it is '98.  I mean, we put

13   in what we thought was -- you know, in the application for the

14   default judgment, we put in what we thought was a comprehensive

15   amount of evidence tempered by the desire not to put in, you

16   know, four or five feet of paper.

17        And we said that we were happy to address any additional

18   issues the Court wanted to address, that we believe we have

19   evidence to support the basis on which Dr. Leitzinger

20   calculated the damages and -- because, of course, when we put

21   that in we didn't know that they were -- I mean, we didn't know

22   how this proceeding was going to go.

23        But we're willing and able to do, I think, that and to

24   answer any particular questions about the damages.  I would

25   agree, I think that's a damages question, not a liability

1   question.  I mean, but -- but we can answer those kinds of

2   questions when we get there.

3       But, again, I think the question about defenses is a

4   question of what particular defense have they put in.

5           THE COURT:  I think what you're saying is, Judge, just

6   deny the motion to set aside.

7           MR. RUSHING:  Well, I am --

8       (Unreportable simultaneous colloquy.)

9           THE COURT:  -- motion to enter a default judgment, you

10  want to give us a haircut from '95 through '98, we'll take it

11  seven days a week.  I get that argument.

12          MR. RUSHING:  Okay.

13          THE COURT:  Yeah.

14          MR. RUSHING:  But I am saying, on the meritorious

15  defense, they have an obligation -- we put in evidence -- I

16  mean, they don't deny attending the meetings.  They don't deny

17  that the minutes of the meetings are accurate.  They don't

18  offer any explanation for why in the world they were attending

19  these price-fixing meetings.

20      That's the kind of defense they should be offering.  If

21  they want to convince the Court that they have a meritorious

22  defense that they didn't join the conspiracy, they should be

23  explaining why the evidence doesn't show that they joined the

24  conspiracy.  And they have done none of that.

25      Similarly, they deny the existence of the conspiracy.

1    Okay.  They're entitled to do that.  But, again, it's a general

2    denial.  They don't address the fact that people have pled

3    guilty to it, they've been indicted for it, every investigative

4    agency in the world has found the existence of the conspiracy.

5        We have hundreds of meeting notes which are in the record.

6    Dr. Marx goes through them at length and explains in a very

7    lucid way, I think, Your Honor, why -- why the conspiracy

8    existed, how it worked, the effects it would have had.

9        So, but they have not a single particular point to make

10   about any of that.  Their response is, just take us at our word

11   that we have a defense.  And I don't think that meets the

12   standard.

13       The one standard they do elucidate is the FSIA.  But for

14   the reasons that we've described they don't -- we don't believe

15   they -- they're entitled to immunity either because it doesn't

16   apply, as in the case of Display, and because if it does apply,

17   it's subject to the commercial activity exception.  And that's

18   even -- that would also be true of Display if the Court

19   believes that Display is an organ.  But they haven't proven

20   their case under the FSIA.

21       As to -- let me address briefly the question of prejudice

22   and why we -- whether Irico was an afterthought.

23           **THE COURT:**  If I thought I could get 2 and a half

24   billion dollars, mightn't I have started a little earlier and

25   worked a little harder?

1          **MR. RUSHING:**  We had a case against a number of

2     defendants, Your Honor.  Irico absented itself from the

3     litigation and there was nothing much we could do about it.

4          The notion that we should have gotten the default earlier,

5     I don't believe it would have had any practical effect in this

6     case.  We required, as Your Honor is pointing out --

7          **THE COURT:**  Brought the lawyers out of the woodwork.

8     Doesn't it often do that?  I'm not saying that's a fair

9     question.

10         **MR. RUSHING:**  No, the default did not.  The motion

11    for -- the application for default judgment did.  They did not

12    appear until we filed a motion for a default judgment.  The

13    default, nothing happened.

14         It's -- as the Court pointed out in its order, it's a

15    ministerial act.  And the reason we wouldn't have dealt with

16    Irico until the end of the case is that we had defendants in

17    the case filing motions, negotiating settlements, et cetera.

18         We had to develop our case in order to prove the case

19    against everyone, including Irico.  The case law is, I believe,

20    clear that -- I mean, there may be some exception, but, in

21    general, where the liability is joint and several, you should

22    wait until -- the default should wait until the end.

23         They're entitled to an offset, of course, for the

24    settlements we've got.  So until that's determined, until we

25    knew whether or not there was going to be a trial, there was no

 1   reason to proceed to file a default motion -- motion for

 2   default judgment against Irico.  That was our view.

 3       It wasn't -- it wasn't as if we forgot about them.  And I

 4   don't think that any -- there was nothing meaningful for us to

 5   do, or at least I think it's reasonable for us to believe that

 6   there was nothing, you know, meaningful for us to do until we

 7   had done the work necessary to develop the case.

 8       Finish our damage study.  Get the class certified.  All

 9   these things were required for us to proceed against Irico.

10   And so we worked diligently to do that.  And the fact was Irico

11   wasn't here, they didn't have attorneys, there was no

12   meaningful way for us to engage with them.

13       So to the extent -- you know, that's why things happened

14   when they did.  And so I don't think that undercuts our

15   prejudice argument substantially or at all.

16           THE COURT:  And the damages study, Dr. Marx's damages

17   study wasn't even available until September of 2016.

18           MR. RUSHING:  Dr. Marx's -- yes, Dr. Marx's liability

19   study --

20           THE COURT:  That's -- that's a softball.

21           MR. RUSHING:  Yes, that's true.  That's true.

22   Leitzinger and Marx weren't final until that date, yes.

23           THE COURT:  Yeah.

24           MR. RUSHING:  So that's why we proceeded the way we

25   did.  It could wait, so it did.  It didn't make sense to

1    proceed earlier.

2            **THE COURT:**  Yeah.

3            **MR. RUSHING:**  So I'm sure there's something I haven't

4    covered, Your Honor, but -- well, one thing.

5            The question of culpable intent, the cases they rely on,

6    and including the cases Your Honor has authored, and cases in

7    general in the default arena, I mean, this is really a

8    different situation than almost every other case.

9            You don't have sophisticated defendants with --

10           **THE COURT:**  I don't think I'm going to use this as a

11   vehicle for making new law on the question of culpability on

12   default judgment.  And if I wanted to, which I really do not, I

13   don't know what I'd say.

14           **MR. RUSHING:**  Well, what I'm saying is the context --

15   the facts of the case are almost always a defendant with some

16   reason -- some reasonable explanation for why the -- they

17   didn't answer the complaint on time.

18           And it's usually -- it's early in the case in a couple of

19   the cases you -- at least one, I believe, the *Coen* case.  They

20   had an argument that they weren't served properly, okay.  And

21   so the context is, you know, does someone get a default

22   judgment against them because they --

23           **THE COURT:**  I think -- I don't know whether it

24   prevails at the end of the day, but I would have to think the

25   Foreign Sovereigns Immunity Act defense is at least

```
 1   nonfrivolous.  So if they say, look, the reason we didn't want
 2   to deal with these guys is we think we're immune --
 3            MR. RUSHING:  But that's not true.
 4            THE COURT:  What's not true?  That they didn't think
 5   that?
 6            MR. RUSHING:  They didn't think that.  Doesn't make
 7   any sense at all.  Mr. Zhang doesn't know.  He has no idea.
 8            THE COURT:  Right.  Hear me out.
 9        So they think, we don't have to deal with these guys
10   because we're immune.  And then the answer is, well, you have
11   to come into court and litigate that point.
12        No, that's not what immune people have to do.  Immune
13   people don't have to deal with anything, because they're
14   immune.  They don't need to deal with me, they don't need to
15   deal with you, they don't need to deal with United States
16   courts, because they're immune.
17        So unless I concluded, as I sat here now, not that they
18   lose.  That's not even good enough.  Unless I sit here and I
19   conclude now that Foreign Sovereign Immunities Act defense,
20   that's frivolous, how do I find bad faith?  Oh, I see.  For a
21   nonfrivolous reason, that excuses you from dealing with the
22   courts in any way, unless you're in bad faith.
23        Say, well, but they participated in the case in the
24   beginning.  Yeah, they did.  But why am I going to hold that
25   against them?  I'm having a hard time getting there.
```

1       **MR. RUSHING:**  Well, first of all, we don't believe

2 that's true.  And I don't think there's -- and we don't believe

3 there's competent evidence of that before the Court.  Mr. Zhang

4 says that, but he has no way of knowing, as we've discussed.

5 And he's wrong about every other important thing he says.

6      **THE COURT:**  But if they might, in fact, be immune,

7 then --

8      **MR. RUSHING:**  Well, if they're -- but if they've -- I

9 mean, they're going to get their day in court on whether or not

10 they are immune; right.  They're having it right now.

11     The question is whether their behavior was -- whether

12 their failure to answer was culpable.

13      **THE COURT:**  Here's what we're going to do on this,

14 because opportunity, cost of time, and all that.  Just tell me

15 the best case for you on this point, and I'll read it.

16     And if the answer is, Your Honor -- as I gently suggested

17 a moment ago -- none of the cases are good enough to get me all

18 the way there, but I really want you to extend the law a little

19 bit, tell me that and we'll know where we are.

20     You're making a lot of points that are helping me and

21 moving me a little bit in your direction, but this is really

22 not one of them.

23      **MR. RUSHING:**  Well, on the culpable conduct franchise

24 holding, *Meadows* -- *Meadows* is an FSIA case.  The Dominican

25 Republic didn't answer.  Had notice, didn't answer.

1          **THE COURT:**  I'll read *Meadows*, I promise you.

2      Let's move on.

3          **MR. RUSHING:**  But we -- okay.  I have one more

4  sentence on this, Your Honor.  We don't believe that that's

5  true, that they had that belief.

6          **THE COURT:**  I know you think that.

7          **MR. RUSHING:**  Okay.  If they had, they would have

8  brought it.

9          **THE COURT:**  I still know you think that.

10          **MR. RUSHING:**  It's waivable.  What lawyer wouldn't

11  assert it?  That's a rhetorical question, Your Honor.  So

12  that's our view on that.

13      Well, okay.  So I think that's it, Your Honor.  But I

14  would just emphasize we don't believe they've made the showing

15  they need to -- the initial showing, certainly as to Display,

16  and that you should deny the motion as to Display.  Thank you.

17          **THE COURT:**  Thank you.

18      Mr. Taladay, you can have a brief reply because it's your

19  burden.

20      I would say the things that you might focus on are, number

21  one, a point that I had overlooked, which is that there might

22  be evidence with regard to Irico Group about their status as a

23  sovereign entity separate and apart from Mr. Zhang's

24  declaration, but Mr. Rushing makes the point that there's a

25  separate issue of their belief, and what might be the evidence

1    of that.

2        And then I still have not exhausted my appetite for

3    argument about the status of Irico Display.

4            MR. TALADAY:  Thank you, Your Honor.

5        *Hutchings vs. Snell*, Your Honor, says the Court does not

6    evaluate now the credibility of defendant's claims or rule

7    definitively on the question of jurisdiction.  It's Ninth

8    Circuit law.  We think that controls, Your Honor.

9        We believe that there is more than adequate evidence in

10   the record for the Court to conclude that it lacks subject

11   matter jurisdiction over Irico Group, and we would urge the

12   Court to do so.

13       With respect to Irico Display and the FSIA defense, the

14   first thing I would say is that the defendants clearly

15   misapprehend the burden in terms of burden of proof for the

16   FSIA.  This was not our motion for summary judgment on the

17   FSIA.  And the burden on a motion for setting aside default is

18   quite a different burden.  In fact, in the *e.Digital* case you

19   cited (unintelligible) --

20           THE COURT:  You need to slow down a little bit.

21           MR. TALADAY:  I will do that.

22       The burden on a party seeking to vacate a default judgment

23   is not extraordinarily heavy.  So it's certainly not the

24   summary judgment burden that the plaintiff suggests.  It's the

25   burden that applies in these cases.

1          If Your Honor would permit with respect to Irico Display,

2     may I invite my colleague, Mr. Plunkett, up to speak to the

3     Zhang declaration in Irico Display?

4               **THE COURT:**  Sure.

5               **MR. PLUNKETT:**  Your Honor, I'll be brief.  On the --

6               **THE COURT:**  Madam Court Reporter, Stuart with a U,

7     middle initial C, Plunkett.

8               **MR. PLUNKETT:**  That's correct, Your Honor.

9          It is correct that the evidence we put in on both Irico

10    Group and Irico Display is through the Zhang declaration.  We

11    certainly have heard the criticisms of that, and we may

12    ultimately lose this.

13         But I want to make the point that Mr. Zhang is in-house

14    counsel.  He had access to all of the information he needed to

15    make these basic observations.

16         We did not include in his declaration a description of

17    everyone he talked to and all the documents he looked at.  And

18    I do not believe that is standard practice with respect to a

19    declaration.  It certainly may have been called for here

20    because of his short tenure at the company.

21         But what is not true is what counsel just argued, that

22    Mr. Zhang is wrong on all of the facts in his declaration.

23         With regard to Irico Group, he says very clearly, and

24    nobody disputes, that at the time the complaint was filed

25    100 percent of the stock of Irico Group was owned by the State

1   Council.  That is the government of China.

2       When plaintiffs talk about the --

3           **THE COURT:**  That's contained in another report, a

4   piece of which I read to one of the lawyers.  I don't remember

5   which.

6           **MR. PLUNKETT:**  So I'll move on to Display.  We think

7   there is a basis in the record in Mr. Zhang's declaration which

8   is adequate on this point for the Court to conclude on these

9   papers that Irico Group is immune.

10      On Display, we agree that we could make a more complete

11  showing, and we're prepared to do that.  But I want to point

12  out that there are a number of critical facts in his

13  declaration that Mr. Zhang would certainly have knowledge of.

14      The most important, in my view, is in paragraph 10, where

15  it is clear that, with respect to certain important business

16  decisions, including investments, mergers and acquisitions, the

17  sale of shares, financing, budgeting, Irico Display is directly

18  managed by the State Council, which is the government.

19      So there is a -- we have made a sufficient showing that

20  Irico Display is an organ.  And we are prepared to make a more

21  fulsome showing and to provide additional information about

22  where Mr. Zhang got this information.

23          **THE COURT:**  Thank you.

24      Mr. Cotchett.

25          **MR. COTCHETT:**  Just one minute, Your Honor.  I

1   apologize.  I just want to take one quick look at a timeline,

2   and I'll be very brief.

3       The case was filed back in 2008.  I only want to focus on

4   Display just for a minute.  They had Pillsbury Winthrop, an

5   excellent law firm.

6           **THE COURT:**  You and I can agree on that point.

7           **MR. COTCHETT:**  I think everybody in the courtroom can

8   agree on that.

9       In 2009, one year later, Irico defendants come to this

10  courthouse and they make a -- as you've seen in the record, an

11  extensive motion for -- excuse me, a 12(b)6 motion to dismiss.

12  At no time is the FSIA ever mentioned.

13          **THE COURT:**  Right.

14          **MR. COTCHETT:**  And I'll come back to that.

15      They are continued to be represented by Pillsbury -- and

16  I'll call them Pillsbury for short -- until shortly after the

17  judge rules against them across the board and denies that

18  motion.

19      In 2010, now two years later, June 23rd, Pillsbury comes

20  to this courthouse and says, we are no longer going to

21  represent the defendant Irico.

22      The Court, one day later -- June 23rd, they make that

23  administrative motion.  One day later, the Court grants

24  Pillsbury's motion, but he adds a very significant statement to

25  that order.

1          **THE COURT:**  And for the benefit of the record, the

2    judge at that time was Judge Conti.

3          **MR. COTCHETT:**  Conti, thank you.

4          **THE COURT:**  Right.

5          **MR. COTCHETT:**  Judge Conti orders, quote -- and this

6    is docket number 732, which I think is the most important piece

7    of a docket -- piece in the docket.

8        "They must continue to keep service" -- I'm reading

9    this -- "continue to keep service of the papers for the Irico

10   entities for forwarding purposes until substitute counsel

11   appears on behalf of the Irico entities."

12       And they're gone, except they must serve counsel with

13   every single piece of paper filed.  That goes on not for six

14   months, but that goes on for six years.  And it goes on until

15   the 15th -- 2015.

16       This is a very significant document.  Judge Conti finds

17   class certification, and in that order he certifies a class of

18   conspirators, including Display.  And in that order he says

19   they are co-conspirators at page -- I think it's 610 of the

20   docket.

21         **THE COURT:**  What's the docket number?

22         **MR. COTCHETT:**  I believe it's 610, Your Honor.

23         **THE COURT:**  I see.

24         **MR. COTCHETT:**  I apologize.  It is not that docket.

25   It is at -- I apologize.  And I will get that for you.

1          **THE COURT:**  How about the date?

2          **MR. COTCHETT:**  The date is July 8th, 2015.

3     So at that time Judge Conti, having heard all the evidence

4  going to class certification, includes the defendants in the

5  class as certified.

6          **THE COURT:**  I see.  And what evidence is it that you

7  think Judge Conti considered with regard to the Irico

8  defendants that led him to the conclusion that class

9  certification against those particular defendants was

10  appropriate, bearing in mind that I know Judge Conti and his

11  work style very well?

12          **MR. COTCHETT:**  Sure.  He had in front of him -- I

13  couldn't even measure the amount of paperwork that was filed

14  both in the summary judgment motion and in the class cert

15  motion.

16          **THE COURT:**  I have no doubt of that, because I

17  inherited this case from Judge Conti, and you were at the very

18  first hearing I conducted --

19          **MR. COTCHETT:**  I was.

20          **THE COURT:**  -- where the tables were groaning from the

21  weight --

22          **MR. COTCHETT:**  Exactly.

23          **THE COURT:**  -- of all of the motions that had been

24  filed earlier in the case and, unlike that motion, had yet to

25  be decided.

1       But my question is not what was the width or weight of the

2   class cert motions that Judge Conti considered.   My question

3   that I asked you was:  What in there about the Irico defendants

4   led him to certify them in particular, which is what you seem

5   to be suggesting?

6           MR. COTCHETT:  Right.  Right.  I am.

7       I could read you, if I grab my binder, all of the material

8   we submitted.  And I will simply say to you it was voluminous.

9   Emails -- not emails, messages going back and forth, including

10  them at meetings.  We will submit that all if you would like.

11          THE COURT:  I assume most of that material was

12  submitted in connection with these motions that I have in front

13  of me.  And I've read those materials.

14          MR. COTCHETT:  It was.  It was all submitted there.

15      So on 2015, he certifies the class, including them as

16  co-conspirators.

17      Now, we have yet to raise the FSIA.  And they're being

18  served with every paper.  What happens next?  Shortly

19  thereafter, in comes Pillsbury back into this courtroom,

20  representing all these people.

21      And they say, You know what, Judge?  We've got a problem.

22  And the problem is we want to stop serving Irico.  And he at

23  that time says that's fine.  And then later the clerk enters a

24  default.

25      Now, where am I going --

1          **THE COURT:**  It wasn't him at that time.  It was me at

2     that time --

3          **MR. COTCHETT:**  I apologize.

4          **THE COURT:**  -- as I had taken the case over.

5          **MR. COTCHETT:**  I apologize.

6          **THE COURT:**  Right.

7          **MR. COTCHETT:**  Now, where am I going with this?

8     Here's where I am.  I understand your order and I understand

9     your thinking completely.

10         I'm just going to make an admission, when we met this

11    morning I said, I can't imagine the judge is going to let this

12    stand.

13         **THE COURT:**  Is going to what?  Let the default stand?

14         **MR. COTCHETT:**  Let the default stand.  That was my

15    words to these distinguished lawyers.  They're looking at me

16    now saying, What are you saying that for?

17         I understand completely where you're coming from.  And you

18    made a very important point.  You've got to find out whether

19    you have jurisdiction.  Now, I think there's jurisdiction under

20    commercial activities, the exception.

21         Now, I ask this of you, though:  So that these

22    distinguished gentlemen on this side of the table are not

23    punished, jurisdiction means taking depositions of certain

24    individuals going back to many of the Display executives, and

25    what-have-you, as to that commercial exemption.

1        **THE COURT:**  Always a pleasure, Mr. Cotchett, but now

2    you're arguing the hearing that we haven't had yet.

3        I anticipate these problems, believe me.  I totally

4    understand where you're coming from, which is, if the District

5    Court is winding up to relieve these companies of their default

6    and suggesting that we move forward with further litigation on

7    whether or not these companies --

8        **MR. COTCHETT:**  You're using your words.

9        **THE COURT:**  -- that means jurisdictional discovery,

10   and you're saying are they really going to play ball.

11       **MR. COTCHETT:**  There you go.  You get to the bottom

12   line so quickly, Your Honor.  You came out on the bench and

13   within a minute you said, Here's where I'm coming from:

14   jurisdictional discovery.

15       And I would simply ask -- and maybe we're not to that yet,

16   but I would simply ask in your order, that you're going to

17   render following this hearing, that if we do move ahead with

18   jurisdictional -- if you do find that, we would simply ask --

19       **THE COURT:**  The plaintiffs in this case, if I adopt

20   the tentative ruling that I stated at the beginning, are

21   entitled to jurisdictional discovery.

22       **MR. COTCHETT:**  And if that be the case, I ask that it

23   be done in the United States.

24       **THE COURT:**  Well, that will be the subject of a

25   separate motion, which I look forward to --

```
 1            MR. COTCHETT:  I thought I could --

 2            THE COURT:  -- referring probably to a magistrate.

 3    But if I don't, then --

 4            MR. COTCHETT:  I thought I could save a little time

 5    and quickly cut to the chase because I know you want to do

 6    that.

 7            THE COURT:  Yeah.  Very good.

 8            MR. COTCHETT:  Thank you, Your Honor.

 9            THE COURT:  Thank you, Mr. Cotchett.

10       We're beyond the concept of whatever the last word is, so

11    clearly the other concept is that's what we're doing.

12       Mr. Taladay.

13            MR. TALADAY:  This will be very quick, Your Honor.

14       I believe Mr. Cotchett's timeline is straight out of pages

15    4 and 5 of their initial brief, so I don't think there's

16    anything new there.

17       I will say, Your Honor --

18            THE COURT:  I do have to take a hard look at the

19    question of whether there's a waiver by failure to raise the

20    FSIA jurisdictional point at the motion to dismiss stage.

21    What's a responsive pleading and all that, I didn't talk about

22    that in my tentative remarks, but I'll try to get that right.

23            MR. TALADAY:  Well, if I may, Your Honor, I think the

24    case law is exceptionally clear; a responsive pleading requires

25    an answer.
```

1              **THE COURT:**  That's what I think too.

2          **MR. TALADAY:**  Second, Your Honor, there are many,

3    many, many defenses that are typically not included in a motion

4    for summary judgment, especially one that is relevant to all

5    defendants as that one was, that are still preserved for the

6    answer.

7        So a failure to include a defense in a motion for summary

8    judgment, I don't --

9              **THE COURT:**  Motion to dismiss.

10         **MR. TALADAY:**  Excuse me, in a motion to dismiss, I

11   don't believe could in any way be construed as a waiver.

12       But, Your Honor, I will say that, while we believe there's

13   enough record evidence here to demonstrate lack of subject

14   matter jurisdiction, that if the Court concludes that discovery

15   is necessary, that Irico is prepared to engage in reasonable

16   discovery as to the question of subject matter jurisdiction.

17             **THE COURT:**  Yeah.  I just want to ask you something

18   while my mind is stuck on it.  You look like you're about my

19   age.  I don't know if you are.

20       My recollection when I was in law school, if you failed to

21   raise a lack of personal jurisdiction as a defense in a

22   12(b)(6) motion -- it would actually be 12(b)(2) using the

23   current rule -- you waived it.  Maybe my recollection is wrong,

24   because the rule that I have now in front of me, open, is quite

25   clearly in the disjunctive.

```
 1        You either have to make the motion or include it in a
 2   responsive pleading, so you have to have failed to have done
 3   both.  That's just the text of the rule; right?
 4        MR. TALADAY:  Well, Your Honor, that may be so.
 5        But what I will say is that --
 6        THE COURT:  Well, then you win on that point.
 7        MR. TALADAY:  What we're talking about here under the
 8   FSIA is not personal jurisdiction, it's subject matter
 9   jurisdiction, Your Honor.  So that would not have been waived
10   by participation in a motion to dismiss even if personal
11   jurisdiction was waived, which I don't believe it would be.
12        THE COURT:  Yeah.  Okay.
13        MR. TALADAY:  Thank you, Your Honor.
14        THE COURT:  Yeah.  Mr. Rushing, you're back.
15        MR. RUSHING:  I am, Your Honor.  If I could make one
16   quick --
17        THE COURT:  At some point I'm going to actually
18   exercise the authority that the president gave me to control
19   these proceedings.  But, in the meantime, we'll just let people
20   wander back and forth to the podium.
21        Mr. Rushing.
22        MR. RUSHING:  Thank you, Your Honor.
23        Briefly, with regard to waiver, our position is not that
24   it was waived because it wasn't included in a motion to
25   dismiss.  Our position is that it was waived because
```

1   Judge Conti made an order.  It was a stipulation and order that

2   said you must disclose your personal jurisdiction defenses by a

3   date certain.

4        **THE COURT:**  Do you disagree with Mr. Taladay that FSIA

5   is a question of subject matter jurisdiction and not personal

6   jurisdiction?

7        **MR. RUSHING:**  I do.  I do.  And we explain why it's a

8   species of personal jurisdiction in the brief.

9        **THE COURT:**  Are there cases that consider the question

10  of subject matter jurisdiction?

11       **MR. RUSHING:**  That consider FSIA -- the FSIA a

12  question of subject matter jurisdiction?

13       **THE COURT:**  Yes.

14       **MR. RUSHING:**  I believe so.

15       **THE COURT:**  Were any of them decided by people who can

16  reverse me?  Because if they were, we could probably move on.

17       **MR. RUSHING:**  Well, but let me just -- they entered

18  a -- the Court entered an order that said disclose these

19  defenses.

20       Irico was not a party to the stipulation.  However, the

21  order said if you're not a party to the stipulation, you can --

22  any defendant who is not yet before the Court -- it was still

23  at the time of organizing the case and people were making

24  appearances -- you can join the stipulation.

25       And the stipulation provided the defendants with a number

1    of things that they wanted.  It stayed discovery.  It did a

2    bunch of things like that.

3        Irico then, as we explained in the brief, they wrote a

4    letter to us.  They said, we'd like to do that.  Please give us

5    an extension of the deadline for us to disclose our defenses.

6    We said fine.  They did it again.  We said fine.

7        They served a paper in January of 2009; contained no such

8    defenses.  That's the basis for our waiver argument.

9        The Court in the *Canadian Ores* case, I believe, makes

10   clear what should be obvious.  The Court has the power to

11   compel parties to disclose defenses early.  And if they don't

12   comply, again, that's a strong basis for a waiver.  It's well

13   within the -- the three typical ways to find an implied waiver

14   under the FSIA, which -- I mean, they agreed to do this.

15       They agreed to file a pleading that had it, and they

16   didn't.  So that's --

17           THE COURT:  The question that you're addressing now is

18   one of equity and discretion, is it not?  Are you arguing that

19   I'm compelled to find a waiver or that I could?

20           MR. RUSHING:  No, no, I am not arguing that.

21           THE COURT:  I will have to consider seriously whether

22   there's 2 and a half billion dollars' worth of discretion in

23   there.

24           MR. RUSHING:  Okay.

25           THE COURT:  I'll think about that when I get back to

1  chambers.

2          **MR. RUSHING:**  Thank you.

3          **THE COURT:**  Gentlemen, I've enjoyed the arguments

4  tremendously, but my increasing use of bad jokes, which is

5  always a mistake, is a sign that the sponge is getting full, so

6  I'm going to take these motions under submission.

7      Thank you very much for your excellent arguments and your

8  excellent briefs.

9      (At 3:23 p.m. the proceedings were adjourned.)

10                          -   -   -   -

11

12

13

14

15              <u>CERTIFICATE OF REPORTER</u>

16      I certify that the foregoing is a correct transcript

17  from the record of proceedings in the above-entitled matter.

18

19  DATE:   Thursday, January 25, 2018

20

21

22

23  _____

24      Katherine Powell Sullivan, CSR #5812, RMR, CRR
                U.S. Court Reporter

25