

Jeffrey N. Leibell
**Chief Operating Officer &
General Counsel**
(201) 853-1246
jleibell@frsco.com

March 15, 2018

**BY FEDERAL EXPRESS**
Honorable Jon S. Tigar
United States District Judge
United States District Court
  for the Northern District of California
San Francisco Courthouse
450 Golden Gate Avenue
San Francisco, CA 94102



*In re: Cathode Ray Tube (CRT) Antitrust Litigation*, Indirect Purchaser Actions
MDL No. 1917, Case No. C-07-5944-JST (N.D. Cal.) ("*CRTI*")

Dear Judge Tigar:

    FRS respectfully submits this response to new matters raised in IPPs' reply (Doc. No. 5255) to FRS's objection to IPP's Proposed Plan (Doc. No. 5252, hereinafter "FRS's Objection") and to the letter submitted on behalf of Spectrum Settlement Recovery, LLC ("Spectrum") (Doc. No. 5256).[1]

**INTRODUCTION**

**All Claimants Deserve to be Treated Equally**

    Because all claimants – Prior Claimants and First-time Claimants – have the same claims against defendants, FRS is asking this Court to compensate all of them equally. There is no rational or equitable basis, nor have IPPs or Spectrum identified any, on which to exclude First-time Claimants from the Prior Settlements. And all that is necessary fairly to compensate as many victims as possible is for the Court, as did Judge Gonzalez Rogers in *LIB*, to extend the claims deadline for the Prior Settlements and require that the Proposed Plan be modified accordingly so that all otherwise eligible claims filed until the appeals are resolved may participate in the entire $609,750,000 recovered.[2]

---

[1] All terms with initial capitalization used but not specifically defined herein shall have the meaning provided for such terms in FRS's Objection.

[2] Spectrum tries to make much of the fact the FRS did not bring this to the Court's attention sooner. *E.g.*, Spectrum Ltr. at 2. However, FRS has been trying to get this matter resolved since February 8, 2017, when, upon learning from the Settlement Administrator that IPPs had directed that no late claims were to be processed, FRS wrote to IPPs to ask them to seek a formal extension of the deadline, notice of which, if granted, could be made through the official *CRTI* website and by banner ads. After several communications, FRS finally received on March 8, 2017 the following email from the Settlement Administrator:



Honorable Jon S. Tigar
March 15, 2018
Page 2

      IPPs and Spectrum have taken FRS's request for equitable compensation and turned it into a referendum on late claims, and have fabricated a non-existent attack on the class notice. For its part, Spectrum, though it regularly files late claims, opposes late claims here because its *CRTI* clients will benefit more if there are fewer claimants to share in the settlement proceeds.[3] And IPPs, calling FRS's request "Ill-advised," IPP Rep. at 2:4, and Spectrum still do not proffer any equitable or rational basis to depart from the tried and true judicially-approved practice to compensate fairly as many victims as possible under the circumstances present here.[4] But contrary to IPP's and Spectrum's position, FRS is not asking the Court to accept *en masse* claims filed by First-time Claimants; rather, FRS asks the Court to extend the claims filing deadline for the Prior Settlements so that First-time Claimants – **only if their claims are otherwise eligible** – may participate in the Prior Settlements to the same extent as Prior Claimants.[5] There is no procedural

---

    Confirming our discussion earlier today, we will begin auditing the late claims submitted by FRS. No decision has been made about whether, or to what extent, late claims will be paid. I will be discussing the matter with Lead Counsel over the coming weeks.

Given the last sentence of that email, FRS awaited further communications from IPPs. When we were led to believe in July 2017 that claims administration was wrapping up, FRS, by email to IPPs on July 17, 2017, reprised our attempts to resolve this matter. Attached to FRS's email was substantial legal precedent in support of FRS's position. Thereafter, FRS exchanged several telephonic and written communications with the Settlement Administrator, as a result of which FRS believed that IPPs would, as they did in *LCDI*, agree to recommend to the Court that late claims received by an agreed upon date to be determined should be accepted, with notice of IPPs' intent posted on the *CRTI* website. FRS then learned that IPPS had again, without any notice to FRS, decided to stop processing late claims. After several telephonic and written communications with IPPs, FRS began working on a letter to the Court. Shortly thereafter, however, we were advised by IPPs of the proposed settlement with Mitsubishi. Once the preliminary approval motion was filed, FRS filed its objection.

[3] FRS will not waste the Court's time refuting Spectrum's several *ad hominem* attacks or out-of-context quotes. It suffices to say that, although Spectrum opposes late claims here, Spectrum, as purported "*amicus curiae*," regularly files late claims in other settlements. In two of the six settlements described on its website – *DRAM* and *In re Neurontin Marketing Products Liability and Sales Practices Litigation*, Spectrum represents that it "will provide [its] best effort to get a [late] claim approved and accepted":

    The deadline to file a claim has passed, though it may be possible to file a late claim and have it accepted. We cannot, at this point, guarantee a claim will be accepted by the Claims Administrator, but we will provide our best effort to get a claim approved and accepted.

http://spectrumsettlement.com/active-cases/ (last visited March 14, 2018, two years and eight months after the July 1, 2015 *DRAM* deadline, and three years and five months after the October 15, 2014 *Neurontin* deadline). Spectrum's letter, therefore, should be considered accordingly.

[4] Using the information provided in the Fisher FRS Declaration (¶¶ 6, 8) as of March 5, 2018, FRS's First-time Claimant clients' claims included 2,440,503 CRT units and 7,052,205 weighted CRT units, which constitute 8% of the 31,194,068 CRT units and 7.4% of the 95,380,369 weighted CRT units filed.

[5] This puts to rest another IPP strawman: Issues concerning some of the claims submitted by FRS prevent those claims from being accepted. *See* IPP Rep. at 6:14-21. FRS has not asked that those claims be "accepted"; FRS has asked only that they be treated the same as the claims of Prior Claimants. If, in the Settlement



Honorable Jon S. Tigar
March 15, 2018
Page 3

prestidigitation required to grant the relief FRS requests. As they both admit, *see, e.g.*, IPP Rep. at 15:2-4, all the Court need do, if it is inclined to consider and compensate Prior Claimants and First-time Claimants equally, is to extend the claims deadline for the Prior Settlements.[6]

**FRS is Not Challenging the Notice Plan**

IPPs and Spectrum, because they cannot refute either that First-time Claimants and Prior Claimants possess identical claims, or that it is fundamental to class action settlements that identical claims must be compensated identically, both also attempt to distract the Court with the argument that FRS's request for equitable compensation is an indictment of the notice plan that the Court approved for the Prior Settlements. *See, e.g.*, Spectrum Ltr. at 5-8; IPP Rep. at 9:11-20. But nothing is further from the truth: Nowhere in FRS's Objection does FRS attack or otherwise criticize that notice plan. Contrary to IPP's and Spectrum's assertions, the efficacy of the notice plan and First-time Claimants' entitlement to participate equally in the Prior Settlements are mutually exclusive. That is, the notice plan need not be deemed defective to justify First-time Claimants' entitlement to equitable compensation, nor does First-Time Claimants' entitlement to equitable compensation cause the notice plan to be deemed defective. While IPPs and Spectrum do not dispute that the Proposed Plan does not address First-time Claimants' participation in the Prior Settlements, IPPs and Spectrum nevertheless implore the Court to spend money now on notice that will continue to leave First-time Claimants in the dark about whether they will participate in the Prior Settlements to the same extent as Prior Claimants.

**FRS's Claims Did Not Cause Any Delay**

IPPs and Spectrum do not argue, nor can they, that the delay in the distribution is the result of anything other than the pending appeals. But neither of them has cited to any non-reversionary common fund settlement – not one – in which, when the distribution, as it is here, was substantially delayed by appeals, they or any other class counsel did not either seek to extend the filing deadline or ask the court to accept otherwise eligible late claims that did not unduly delay the eventual distribution. Nor did IPPs or Spectrum identify any court that denied such a request. In particular, neither IPPs nor Spectrum attempt to distinguish *LIB*, *LCDI* or *DRAM*: Given that IPP Class Counsel here – Trump, Alioto, Trump &

---

Administrator's ordinary and customary process of auditing claims, some First-time Claimants' claims are determined not to be eligible – *e.g.*, if they are duplicates of other filed claims – then the ineligible claims, as would any other ineligible claim, should not participate in **any** recovery.

[6] Spectrum's assertion that First-time Claimants are not entitled to equitable treatment because they "voluntarily" forwent their opportunity to file timely claims, Spectrum Ltr. at 4, is as factually inaccurate as it is disingenuous. Also misleading is Spectrum's reliance on *In re Air Cargo Shipping Services Antitrust Litigation* and *Freight Forwarders Antitrust Class Action,* for the proposition that it is commonplace in successive settlements to exclude from earlier settlements claims filed in later ones. Spectrum Ltr. at 4. Unlike *CRTI* (as well as *LIB*, *LCDI* and *DRAM*), those two settlements were for direct actions in which all putative class members were sent direct notice.



Honorable Jon S. Tigar
March 15, 2018
Page 4

Prescott ("TAT&P"), Zelle and Strauss & Boies ("S&B")[7] – are among counsel in some or all of those actions,[8] their failure to explain why their position in *CRTI* is diametrically opposed to their treatment of late claims in those settlements is disconcerting.

**IPPs Should Not Have Usurped the Court's Authority**

IPPs' approach to the equitable treatment of First-time Claimants, unfathomable as it is for class counsel under normal circumstances, is particularly troubling in view of the advisory that, on or about November 15, 2017, IPPs – **with** this Court's imprimatur **but without** this Court's approval[9] – published on the official *CRTI* website:

> The deadline to submit claims has passed. We will no longer be processing late claims in connection with the CRT Indirect Purchaser Antitrust Litigation.

IPPs without permission of this Court, advised First-time Claimants that their claims would not be processed, thus chilling the filing of otherwise eligible claims, yet they ask this Court to delay the resolution of that very issue. IPP's usurpatory advisory exacerbates First-time Claimants' confusion; the

---

[7] As set forth in IPP's Notice Plan, TAT&P is "Lead Counsel for [IPPs]," and Zelle is "Counsel for [IPPs]," Notice Plan at 15-16; S&B is "counsel of record on behalf of [IPPs]" in *CRTI*, Decl. of Nathan M. Cihlar in Support of Plaintiffs' App. for Attorneys' Fees, … (Doc. No. 4073-4,) at ¶ 2, and, as such, "was engaged in nearly every element of this litigation from inception through settlement," *id.* at ¶ 4.

[8] In *LIB*, TAT&P is listed on the docket as among class counsel, and S&B "has served … as counsel for IPPs throughout the course of" *LIB*, Decl. of Nathan M. Cihlar in Support of IPPS' Mot. for an Award of Attorneys' Fees … on behalf of" S&B (Doc. No. 1813-38) at ¶ 2. In *LCDI*, Zelle was "Co-Lead Class Counsel for [IPPs]," *see LCDI*, PTO No. 3: Order Appointing Interim Lead Class Counsel … (Doc. No. 224) at 1:18-19; TAT&P was counsel of record for eighteen plaintiffs, including two of the class representatives, Decl. of Mario N. Alioto in Support of Plaintiffs' App. for Attorneys' Fees … (Doc. No. 6635-3) at ¶ 2, and all of TAT&P's work was performed "for the benefit of the [IPPs]," *id.* at ¶ 3; and S&B also was counsel of record in *LCDI*, and represented two named plaintiffs, *see* Decl. of Nathan M. Cihlar in Support of Plaintiffs' App. for Attorneys' Fees … (Doc. No. 6634-8) at ¶ 2, all of their work was performed "for the benefit of the [IPPs]," *id.* at ¶ 3, and S&B was "engaged in nearly all elements of the litigation of [*LCDI*] from inception through settlement," *id.* at ¶ 4. And in *DRAM*, TAT&P was "a member of the Plaintiffs' Steering Committee," Decl. of Mario N. Alioto in Support of Class Counsel's Mot. for an Award of Attorneys' Fees … (Doc. No. 2183-2) at ¶ 4, and TAT&P's work included "the investigation, prosecution, and settlement of claims in the course of" *DRAM*, *id.* at ¶ 1; Zelle was "Co-Lead Counsel for the [IPPS]," Decl. of Zelle … in Support of IPP's Mot. For an Award of Fees … (Doc. No. 2190-1) at 1:22-23, and, in that capacity, Zelle was "extensively involved in the leadership, as well as the day-to-day activities, in all aspects of" *DRAM*, *id.* at 4:4-7:22; and S&B was "Co-Lead Counsel for the [IPPS]" in *DRAM*, and, as such, S&B performed work in connection with "the investigation, prosecution, and settlement of claims in the course of" *DRAM*, Decl. of S&B in Support of IPPs' Mot. for an Award of Attorneys' Fees … (Doc. No. 2183) at ¶ 1.

[9] The *CRTI* website states that "[t]his website is supervised by counsel **and the Court**" (emphasis added).



Honorable Jon S. Tigar
March 15, 2018
Page 5

longer First-time Claimants remain uninformed or misinformed about their equal treatment, the greater the prejudice to them.[10]

\* \* \* \* \*

FRS agrees that "a cut-off date is essential and at some point the matter must be terminated." *Reports of the Conf. for Dist. Ct. Judges*, 63 F.R.D. 231, 262 (1973), *quoted in In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1127 (9th Cir. 1977). But when a distribution is extensively delayed by pending appeals such that the administration of the settlements and the timing of the eventual distribution are unaffected by extending the deadline, there is no equitable or rational basis for cutting off late claims from absent class members who "need to be treated fairly by some method for consideration subsequent to notice." *Id.* at 262-62 (noting that, "[f]requently, such claimants include those who have not had actual notice."); *see* MANUAL FOR COMPLEX LITIGATION (Fourth) (2004) § 21.662 & n.1002 ("The court should allow adequate time for late claims ...") (citing *In re Crazy Eddie Sec. Litig.*, 906 F. Supp. 840, 845 (E.D.N.Y. 1995) (noting "there is an implicit recognition that late claims should ordinarily be considered in the administration of a settlement") (citation omitted); *In re Authentidate Holding Corp. Sec. Litig.*, Master File No. 05 Civ. 5323 (LTS), 2013 WL 324153, at *2 (S.D.N.Y. Jan. 25, 2013).

---

[10] When faced with the identical situation, class counsel in *LCDI* (which included IPP Class Counsel here), took a dramatically different approach. While there is no indication on the *CRTI* docket that IPPs advised this Court concerning late claims, *LCDI* class counsel, less than two months after the December 6, 2012 *LCDI* claims filing deadline, advised the *LCDI* court that, although "[t]he inclusion or exclusion of late-filed claims also bears on [the quantity of LCD products purchased by claimants]; at this time, Class Counsel recommend including late-filed claims." *LCDI*, IPP Summary of Status of Claims Processing, executed May 4, 2016 (Doc. No. 7572), at 4:16-19 (Jan. 29, 2013). *LCDI* class counsel then accurately advised those class members who had not yet filed claims, **and invited them to do so**:

> In order to receive a payment, you must file a valid claim. The claim filing deadline was December 6, 2012 and had passed. You may still file a claim, but there is no guarantee that claims filed after December 6, 2012 will be accepted.

*LCDI*, Decl. of Robin M. Niemiec of Rust Consulting, ... in Support of IPP's Mot. to Authorize Dist. of Settlement Fund, executed Sept. 12, 2014 (Doc. No. 9217-1; "Rust Dist. Decl."), at ¶ 6 (2:23-28) & Ex. A (Claims Summary). That disclosure was later updated properly to advise putative claimants:

> The deadline to file a claim was December 6, 2012, and has now passed. Counsel intend to recommend that the Court accept late claims submitted after December 6, 2012 until June 6, 2014, but not allow late claims submitted after June 6, 2014.

*Id.* at ¶ 6 (3:1-6). IPPs have offered no explanation for their vastly different approach in *CRTI*.



Honorable Jon S. Tigar
March 15, 2018
Page 6

## ARGUMENT

**Allowing First-Time Claimants and Prior Claimants to
Participate Equally in the Prior Settlements Will Not Prejudice Prior Claimants**

Neither IPPs nor Spectrum assert, nor can they, that First-time Claimants' claims against defendants are distinguishable from those of Prior Claimants. That is because they are identical. Neither IPPs nor Spectrum assert, nor can they, that including in the Prior Settlements the claims of First-time Claimants has already or may in the future delay the distribution of the Prior Settlements. That is because any delay in this case was caused by the pending appeals, not by First-time Claimants. The only distinction IPPs and Spectrum make between Prior Claimants and First-time Claimants is that the latter submitted claims after the claims deadline. But that fact has nothing to do with the number, strength or legitimacy of their claims.

IPPs and Spectrum oppose FRS's request for equitable compensation by trying to convert it into one for the *en masse* acceptance of late claims. But even if that were true, FRS has not found a single example of a non-reversionary common fund class action settlement the distribution of which was substantially delayed as a result of pending appeals in which a court refused to accept ***any*** claims received after the claims filing deadline.[11] Indeed, what both IPPs and Spectrum ignore here (though not in other settlements) is that the *sine quo non* of non-reversionary common fund class action settlements is that ***every*** accepted claim diminishes the recoveries provided by ***every other*** accepted claim.

When addressing whether the acceptance of late claims is prejudicial to timely claims, courts have universally held the answer to be "no." While an analysis solely based on basic arithmetic may lead to the opposite conclusion – that is, accepting late claims necessarily will reduce the recoveries to timely claims – those courts also have considered both the equitable nature of class actions, and the fundamental object of class action settlements: All class members who were harmed identically should be compensated identically. In so doing, those courts have determined that accepting late claims, even if doing so would materially reduce the recovery of timely claims, is not prejudicial to timely claims because, with respect to the harm caused by defendants, timely and late claimants stand on equal footing. Those courts also determined that no prejudice to timely claimants exists because timely claimants have no right to receive any particular amount of recovery. Set forth below is extensive precedent that establishes that accepting late claims is not prejudicial to timely claims:

- In *In re Bear Stearns Companies, Inc. Securities, Derivative & ERISA Litigation*, the court, having already accepted over 350 late claims, and over the opposition of the lead plaintiff, allowed

---

[11] While IPPs and Spectrum argue that the substantial value of First-time Claimants' claims weighs against their inclusion, *see* IPP Rep. at 14:1-13, Spectrum Ltr. at 8-9, the value of late claims, as described in the precedent cited below, has not deterred courts from accepting them. In *LCDI*, for example, valid LCD panel equivalents received up to eighteen months after the original deadline accounted for approximately **37%** of the total 16,212,038 valid LCD panel equivalents. See *LCDI,* Rust Dist. Decl. at ¶ 26 & Ex. A (Claims Summary).



Honorable Jon S. Tigar
March 15, 2018
Page 7

the inclusion of another – and relatively substantial – late claim, reasoning that the resulting lower recoveries for timely claimants did not constitute prejudice

> [C]lass members are not prejudiced since they are obligated to share a fixed recovery with other equally entitled claimants and ***timely-filed claimants have no justifiable expectation of any particular payout***.

297 F.R.D. 90, 96 (S.D.N.Y. 2013) (emphasis added).[12]

- Similarly, in *In re Electric Carbon Products Antitrust Litigation*, the court, in allowing late claims that would reduce the recovery by timely claimants by **29%**, observed:

> [C]ourts have generally said that the mere reduction of money available to timely registrants is ***not considered prejudice for purposes of this inquiry***. All legitimate members of the class are normally presumed ***equally entitled to share in recovery.***

622 F. Supp.2d 144, 154 (D.N.J. 2007) (internal citation omitted; emphasis added). Then, addressing the lack of prejudice to timely claimants even as a result of late claims with significant value, the *Electric Carbon Products* court held that no such prejudice existed:

> ***[D]espite the significant value of the late claims, there is no fatal prejudice*** as that term is defined in *Orthopedic Bone Screw* with regard to the mere diminution of the expected recovery of the earlier claimants. …… ***the Court has an obligation not to elevate the claims of any class member over the claims of other class members,*** no matter how large a class member's stake in the case might be. ***All legitimate class members should, if equitable, be permitted to share in the settlement***. …

> … ***The Court cannot find prejudice*** merely because, contrary to the facts of this case and the law of this Circuit, the parties assumed qualified late claimants—who had begun to come forward and of which some of them were aware—would not have access to the settlement.

> … ***the Court has an obligation not to elevate the claims of any class member over the claims of other class members,*** no matter how large a class member's stake in the case might be. ***All legitimate class members should, if equitable, be permitted to share in the settlement***. …

> …

---

[12] *See id.* at 95 (In connection with an earlier distribution, the court allowed late claims that were "disproportionately large"; "Counsel argued [in connection with those late claims] that 'it would be unfair to deny payment of an otherwise eligible claim received while claims were still being processed because it was submitted after the Court-approved claims filing deadline.'").



Honorable Jon S. Tigar
March 15, 2018
Page 8

> ... [T]he failure to anticipate what late claims would materialize ***does not constitute prejudice***.

*Id.* at 156-57 (emphasis added).

- Equally instructive is the holding in *Authentidate*, in which the court denied the lead plaintiff's motion seeking an order to deny late claims, finding instead that including late claims provided a more equitable distribution, and that the resulting ***40% reduction in recoveries for timely claimants*** did not constitute prejudice:

> ***That prejudice does not flow from Late Claimants' untimely filing of their claims***; it flows from the conceded fact that the Late Claimants suffered substantial compensable losses. Such prejudice resulting from payout reductions attributable to a more equitable distribution among a larger group of injured parties is not a form of prejudice that warrants denial of recovery to the Late Claimants under the circumstances of this case.

2013 WL 324153, at *1 (emphasis added).

- Even when "the distribution of the settlement fund [was] at hand" in *In re Agent Orange Product Liability Litigation*, Judge Weinstein accepted approximately ***3,500 late claims***, holding that timely claimants would not be prejudiced both because late claimants and timely claimants stood on equal footing, and because timely claimants had no right to any particular recovery amount:

> There can, therefore, be ***little prejudice to the claimants whose claims were timely filed by admission of these claimants to the class for consideration on an equal footing***. Moreover, ***since no payments have yet been made to any claimants, earlier estimates of possible payment amounts did not confer on the early claimants any right to those particular amounts***.

689 F. Supp. 1250, 1262-63 (E.D.N.Y. 1988) (citations and internal quotes omitted; emphasis added).

- And in *In re Orthopedic Bone Screw Products Liability Litigation*, the Third Circuit went even farther: In addition to holding that the inclusion of late claims would not prejudice timely claimants, who were no more deserving of a recovery than late claimants, the Court of Appeals also held that the District Court's failure to include late claims was an abuse of discretion that would provide timely claimants with a "windfall":

> ***It cannot be maintained that timely registrants are more deserving of remedy***, .... By excluding ... late registrants from the class, ***the timely registrants would receive what is essentially a "windfall,"*** comprised of some portion of the recovery that would be owed to the otherwise deserving late registrants .... ***[T]he loss of a windfall is not prejudicial***.



Honorable Jon S. Tigar
March 15, 2018
Page 9

>246 F.3d 315, 324 (3d Cir. 2001) (emphasis added).[13] The Third Circuit then went on to hold as follows:
>
>>We recognize that deadlines are an integral component of effective consolidation and management of the modern mass tort class action. Yet ***rigid and unquestioned adherence to such limitations belies principles of equity and the court's role as a fiduciary in class actions when allowing a claimant participation in a settlement works no harm on the conduct of the proceedings and does not significantly prejudice the interests of the parties***.
>
>246 F.3d at 316-17 (emphasis added) (citing *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1127 (9th Cir.1977)).

As the foregoing demonstrates, the reduction in distribution amounts to Prior Claimants that will result from including in the Prior Settlements First-time Claimants' claims is not prejudicial to Prior Claimants for two reasons. First, with respect to the harm they suffered, Prior Claimants stand on equal footing with First-time Claimants, and, therefore, Prior Claimants have no better right than First-time Claimants to recover. Second, Prior Claimants have no right to recover any particular amount. Considering the substantial prejudice to First-time Claimants that would result from excluding them from the Prior Settlements simply because their claims were filed after the deadline, that reduction cannot justify the exclusion from the Prior Settlements of First-time Claimants' claims.

### No Additional Information from FRS Is Necessary to Allow First-Time Claimants to Participate Equally in the Prior Settlements

IPPs argue that, to allow FRS's First-time Claimant clients to participate in the Prior Settlements, FRS must provide for each of those 1,360 First-time Claimants a representation that specifies the date (or approximate time period) when the claimant first learned, from any source, of the *CRT I* settlement, and identifies any other justification the claimant relies on for its late filing; IPPs also seek from FRS the date on which FRS first informed each claimant of the *CRT I* settlement and the date on which the claim was filed. *See* IPP Rep. at 6:3-13. FRS advised the Settlement Administrator in July 2017 that those requests would impose upon class members the unnecessary burden of providing information that, under the circumstances present in *CRT I* – that is, the lengthy appeal process that has been delaying the distribution – are irrelevant. Further, given the position that IPPs expressed in connection with objections concerning the Chungwa allocation issue that "claimants had difficulty remembering how many qualifying products they purchased and, accordingly, were hesitant to file claims without being sure,"[14] IPP's insistence

---

[13] *See CME Grp. Inc. v. Chicago Bd. Options Exch., Inc.*, CIV.A. 2369-VCN, 2009 WL 1856693, at *3 (Del. Ch. June 25, 2009) ("Even though other Group A Member distributions will be diminished somewhat ..., ***the additional proceeds from the settlement pool they would receive if late filers were excluded is simply a windfall***.") (emphasis added).

[14] *CRT I*, IPP's Response to Special Master's R&R re Chunghwa Allocation Issue (Dkt. No. 4459), at 6:5-8.



Honorable Jon S. Tigar
March 15, 2018
Page 10

seemed disingenuous. IPPs position is thus an unwarranted barrier to compensating fairly as many victims as possible.

IPPs and Spectrum, because they mischaracterize FRS's request for equitable compensation for all claimants as one for the *en masse* acceptance of late claims, rely upon the "reason for the delay" factor of the excusable neglect standard. *See* IPP Rep. at 13: 15-27; Spectrum Ltr. at 3, 8-9. But even if First-time Claimants' participation in the Prior Settlements is analyzed under the excusable neglect standard, First-time Claimants' "lateness" is excusable. The "reason for the delay" factor should not be the focus of the analysis: Given that First-time Claimants have not caused the delay, the focus under the flexible application of the excusable neglect standard, *see Pincay v. Andrews*, 389 F.3d 853, 860 (9th Cir. 2004) (en banc); *Mendez v. Knowles*, 556 F.3d 757, 765 (9th Cir. 2009), should be to assure that all victims with the same claims are compensated equally.

In *Pincay*, the Ninth Circuit, held that that the excusable neglect factors articulated in *Pioneer Investment Services Co. v. Brunswick Associates Limited Partnership,* 507 U.S. 380, 384, 113 S. Ct. 1489, 1498, 123 L. Ed.2d 74 (1993), are flexible:

> There should similarly be no rigid legal rule against late filings attributable to any particular type of negligence. Instead, we leave the weighing of *Pioneer's* equitable factors to the discretion of the district court in every case.

389 F.3d at 860. In her concurring opinion in *Pincay*, Judge Berzon explained that no one factor is deserving of more weight than any other factor. *Id.* (Berzon, J., concurring). Then, in *Mendez*, the Ninth Circuit expounded on Judge Berzon's concurrence:

> The Warden next argues that the most important *Pioneer* factor is the third—the reason for delay—and that the district court did not give this factor sufficient weight. But in *Pincay* we declined to give primary weight to any one of the *Pioneer* factors, concluding that "the weighing of *Pioneer*'s equitable factors" must be left "to the discretion of the district court in every case."

556 F.3d at 765 (quoting *Pincay*, 389 F.3d at 860).

The *Mendez* Court determined as well that, courts should consider the prejudice to the movant:

> The Warden asserts that the district court also erred by considering the prejudice to Mendez if the district court denied his motion to extend the time for filing. While prejudice to the party seeking an extension is not one of the *Pioneer* factors, it is clear from *Pincay* that a district court is not limited in its analysis of a motion for extension of time to those four factors.



Honorable Jon S. Tigar
March 15, 2018
Page 11

*Id.* at n.2 (citing *Pincay*, 389 F.3d at 859, for the proposition "that a district court can consider 'the likelihood of injustice if the appeal was not allowed.'").[15]

Given the substantial length of the delay in conducting the distribution – twenty-seven months so far, with no distribution likely until 2019 – caused solely by the pendency of the appeals, the Court, if it decides to evaluate FRS's request as one for the acceptance of otherwise eligible late claims, should exercise the discretion granted to it to give less weight to this factor than to the other three factors, and to consider the prejudice to First-time Claimants that would result from being excluded from the Prior Settlements. The substantial majority of FRS's First-time Claimant clients did not file timely claims because, before they became FRS clients, they were unaware of the *CRTI* settlements. When they were advised by FRS after the deadline, they retained FRS, and FRS submitted their claims. While some of FRS's First-time Claimant clients may have had notice in sufficient time to have filed timely claims, those claimants do not undermine the requested equal treatment because, as described above, the sole cause for the now over two-year delay in the distribution is the pendency of the appeals. For that reason, FRS does not believe that it is justified for FRS, IPPs, the Settlement Administrator and the Court to devote the time and cost necessary to identify from the thousands of First-time Claimants the relatively small number of them that may have had direct notice, and then, once they are identified, consider the merits of their fact-specific explanations for their late filings.

IPPs and Spectrum also make much of the extent of the lateness of some claims. *See* IPP Rep. at 14:14-24; Spectrum Ltr. at 6. The object of class action settlements, however, is fairly to compensate as many victims as possible. In *LCDI*, for example, claims were accepted as much as eighteen months after the claims filing deadline.[16] Accordingly, and unlike IPPs and the Settlement Administrator, both of which have rested on the notice plan to stimulate claims filing, FRS, as class counsel did in *LCDI*,[17] continued, after the December 7, 2015 claims filing deadline for the Prior Settlements, to spend time and money to identify potential claimants who were not yet *CRTI* clients of FRS, contact them and, if they were eligible, to work with then to file their claims. As long as the distribution is delayed by the pending appeals, the

---

[15] *See id.* (no one factor, including the third, or "reason for delay" factor, is "most important"); *accord In re Christiansen*, Bankruptcy No. 05–20050, 2007 WL 7535048, at *4 (B.A.P. 9th Cir. Nov. 5, 2007) ("[A] trial court should consider these nonexclusive factors but can weigh the importance of each factor as it deems appropriate in each case.") (quoting and citing cases); *see id* at n.11. ("In *Pioneer*, the Supreme Court itself indicated that some factors may be more important than others (in particular, prejudice to the nonmovant or bad faith) in determining excusable neglect.").

[16] *See LCDI*, Rust Dist. Decl. at ¶ 26 & Ex. A (Claims Summary).

[17] *LCDI* class counsel, with the court's approval, spent almost $1 million on claims stimulation just before and just after the December 6, 2012 *LCDI* claims filing deadline. *See, e.g., LCDI*, [Proposed] Order Re: Dist. from Escrow Funds for Claims Admin. (Doc. No. 7104, Nov. 5, 2012), at Ex. 1 ($19,075.97 spent on email blast); *id.* at Ex. 2 ($553,481.00 spent on media); *LCDI*, [Proposed] Order Re: Dist. from Escrow Funds for Claims Admin. (Doc. No. 7294, Dec. 5, 2012), at Ex. 1 ($376,000.00 spent on media); *LCDI*, [Proposed] Order Re: Dist. from Escrow Funds for Claims Admin. (Doc. No. 7529, Jan. 17, 2013), at Ex. 1 ($15,480.65 spent on email blast).



Honorable Jon S. Tigar
March 15, 2018
Page 12

extent of "lateness" is irrelevant to equitable treatment. *See, e.g.*, *Orthopedic Bone Screw*, 246 F.3d at 325 ("[a]s long as distribution of the limited fund settlement remains pending, we reject th[e] contention" that the 7-month delay warrants exclusion of the late claim);[18] *Electrical Carbon Prods.*, 622 F.Supp.2d at 158 (late claims accepted as late as the time of the distribution motion because "there is only some incremental delay on the judicial proceedings"); *Agent Orange*, 689 F. Supp. at 1252 (allowed 3,500 late claims even "[a]fter three and a half years of appeals," when "the distribution of the settlement fund [was] at hand"); *Authentidate*, 2013 WL 324153, at *1-*2 (holding, even after the distribution motion was granted, that the lead plaintiff had not demonstrated that "permitting the claims would cause undue delay or otherwise adversely impact judicial proceedings"); *Bear Stearns*, 297 F.R.D. at 93-98 (late claim accepted one year after the deadline).

## CONCLUSION

Because First-time Claimants' and Prior Claimants' claims against defendants are identical, and because the prolonged delay in the distribution for the Prior Settlements is the result of the pending appeals, not from allowing First-time Claimants to participate in the Prior Settlements, there is no rational or equitable basis, nor have IPPs or Spectrum identified any, on which to exclude First-time Claimants from the Prior Settlements.

Respectfully,

Jeffrey N. Leibell

Copy to:  Mario N. Alioto, Esq.
Timothy D. Battin, Esq.
Christopher T. Micheletti, Esq.
Eric L. Lewis, Esq.

---

[18] *See id.* (accepting late claims while "the process of winnowing the valid claims from the invalid, and the compensable claims from the uncompensable" is ongoing will not "deter the expedient and just resolution of claims."); *see id.* at 321:

> A primary use of [the court's] equitable powers is balancing the goals of expedient settlement distribution and the consideration due to late-arriving class members. ... Integral to this balancing, however, is the court's responsibility and 'inherent power and duty to protect unnamed, but interested persons. ... The Second Circuit in *Zients* likened those claimants excluded from recovery in a class action to "wards of the court," and we have similarly stated that "the court plays the important role of protector of the absentees' interests, in a sort of fiduciary capacity."

(citations and internal quotations omitted).