MARIO N. ALIOTO, ESQ. (56433)
JOSEPH M. PATANE, ESQ. (72202)
LAUREN C. RUSSELL, ESQ. (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA  94123
Telephone:  (415) 563-7200
Facsimile: (415) 346-0679
E-mail: malioto@tatp.com
laurenrussell@tatp.com

*Lead Counsel for the Indirect Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 07-cv-05944-JST<br><br>MDL No. 1917 |
| This Document Relates to:<br><br>ALL INDIRECT PURCHASER ACTIONS | **DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION UNDER FEDERAL RULE OF CIVIL PROCEDURE 62.1 FOR AN INDICATIVE RULING ON THEIR REQUEST TO AMEND THE FEE ORDER AND APPROVE REVISED PLAN OF DISTRIBUTION**<br><br>Hearing Date:  November 15, 2018<br>Time: 2:00 p.m.<br>Courtroom: 9, 19th Floor<br>Judge:  Honorable Jon S. Tigar |

I, Mario N. Alioto, declare:

1.      I am an attorney duly licensed by the State of California and am admitted to practice before this Court.  I am a partner with the law firm Trump, Alioto, Trump & Prescott, LLP and my firm serves as the Court-appointed Lead Counsel for the Indirect Purchaser Plaintiffs ("IPPs") in the above-captioned action.  I submit this Declaration in support of the IPPs' Motion Pursuant to Federal Rule of Civil Procedure 62.1 For An Indicative Ruling on Their Motion to Amend the IPP Fee Order and Amend the Plan of Distribution, filed herewith.  The matters set forth herein are within my personal knowledge and if called upon and sworn as a witness I could competently testify regarding them.

2.      The three remaining Objector-Appellants and their counsel are:

   a.   Anthony Gianasca, Gloria Comeaux, Mina Ashkannejhad individually and/or as Administrator of the Estate of the Late R. Deryl Edwards, Jr., Jeffrey Speaect, Rosemary Ciccone, and Jeff Craig, all of whom are represented by Robert Bonsignore, who was counsel of record in this litigation from its inception;

   b.   Rockhurst University, Gary Talewsky, and Harry Garavanian, all of whom are represented by Theresa Moore (who was counsel of record in this litigation from its inception) and Polly Estes, who appeared as counsel on appeal; and

   c.   Dan L. Williams & Co. ("Williams"), which is represented by Brian Torres of Brian M. Torres, PA, John Crabtree of Crabtree & Auslander, and Francis Scarpulla of the Law Offices of Francis O. Scarpulla.  Mr. Scarpulla was counsel of record in this litigation from its inception.  This Court dismissed Mr. Scarpulla's objections to the settlements for lack of standing.  *See* Final Approval Order at 34-36.  The Ninth Circuit agreed and dismissed Mr. Scarpulla's appeal for lack of standing.  ECF No. 5127.  However, Mr. Scarpulla later appeared on behalf of Williams.  Mr. Scarpulla's co-counsel, Messrs. Torres and Crabtree, are well-known professional objectors.  They did not previously appear on behalf of

DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 62.1 FOR AN INDICATIVE RULING ON THEIR MOTION TO AMEND THE IPP FEE ORDER AND AMEND THE PLAN OF DISTRIBUTION
Master File No. 07-cv-05944-JST; MDL No. 1917

1    Williams before this Court.  They only appeared in the Ninth Circuit around the

2    time the opening briefs on appeal were filed.

3        3.      Attached hereto as Exhibit A is a true and correct copy of the transcript of the

4    April 10, 2018 hearing before the Ninth Circuit Panel.

5        4.      The Net Settlement Fund has been earning interest for close to four years.  The

6    interest to date amounts to approximately $9 million net of taxes.

7

8    I declare under penalty of perjury under the laws of the United States that the foregoing is

9    true and correct.  Executed this 1st day of October 2018 at San Francisco, California.

10

11    /s/ Mario N. Alioto
                    Mario N. Alioto

12

13    **Lead Counsel for the Indirect Purchaser Plaintiffs**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF MARIO N. ALIOTO IN SUPPORT OF INDIRECT PURCHASER PLAINTIFFS' MOTION
PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 62.1 FOR AN INDICATIVE RULING ON THEIR
MOTION TO AMEND THE IPP FEE ORDER AND AMEND THE PLAN OF DISTRIBUTION
Master File No. 07-cv-05944-JST; MDL No. 1917

# EXHIBIT A

                UNITED STATES COURT OF APPEALS

                   FOR THE NINTH CIRCUIT

No. 16-16368

D.C. No. 3:07-cv-05944-JST
Northern District of California, San Francisco
ORDER


In re:  CATHODE RAY TUBE (CRT)
ANTITRUST LITIGATION,
-----------------------------


INDIRECT PURCHASER PLAINTIFFS,

                  Plaintiff-Appellee,

  Vs.

JOHN FINN; LAURA TOWNSEND FORTMAN,

                  Objectors-Appellants,

  Vs.

TOSHIBA CORPORATION; et al.,

                  Defendants-Appellees.


In re:  CATHODE RAY TUBE (CRT)
ANTITRUST LITIGATION,
-----------------------------

**Page 2**

```
1    No. 16-16371
     D.C. No. 3:07-cv-05944-JST
2
     INDIRECT PURCHASER PLAINTIFFS,
3
          Plaintiff-Appellee,
4
     Vs.
5
     SEAN HULL; GORDON B. MORGAN,
6
          Objectors-Appellants,
7
     Vs.
8
     TOSHIBA CORPORATION; et al.,
9
          Defendants-Appellees.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1    No. 16-16374
     D.C. No. 3:07-cv-05944-JST
2
     In re:  CATHODE RAY TUBE (CRT)
3    ANTITRUST LITIGATION,
     ------------------------------
4
     INDIRECT PURCHASER PLAINTIFFS,
5
          Plaintiff-Appellee,
6
     Vs.
7
     DONNIE CLIFTON,
8
          Objector-Appellant,
9
     Vs.
10
     TOSHIBA CORPORATION; et al.,
11
          Defendants-Appellees.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1    No. 16-16373
     D.C. No. 3:07-cv-05944-JST
2
     In re:  CATHODE RAY TUBE (CRT)
3    ANTITRUST LITIGATION,
     ------------------------------
4
     INDIRECT PURCHASER PLAINTIFFS,
5
          Plaintiff-Appellee,
6    Vs.
7    ANTHONY GIANASCA; et al.,
8         Objectors-Appellants,
9    Vs.
10   TOSHIBA CORPORATION; et al.,
11        Defendants-Appellees.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
1    No. 16-16377
     D.C. No. 3:07-cv-05944-JST
2
     In re:  CATHODE RAY TUBE (CRT)
3    ANTITRUST LITIGATION,
     ------------------------------
4
     INDIRECT PURCHASER PLAINTIFFS,
5
          Plaintiff-Appellee,
6
     Vs.
7
     JOSIE SAIK,
8
          Objector-Appellant,
9
     Vs.
10
     TOSHIBA CORPORATION; et al.,
11
          Defendants-Appellees.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**2 (Pages 2 to 5)**

## Page 6

```
 1   D.C. No. 3:07-cv-05944-JST
 2   In re:  CATHODE RAY TUBE (CRT)
     ANTITRUST LITIGATION,
 3   ------------------------------
 4   INDIRECT PURCHASER PLAINTIFFS,
 5         Plaintiff-Appellee,
 6   Vs.
 7   DAN L. WILLIAMS & CO.,
 8         Objector-Appellant,
 9   Vs.
10   TOSHIBA CORPORATION; et al.,
11         Defendants-Appellees.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 8

```
 1   No. 16-16399
         16-16400
 2
     D.C. No. 3:07-cv-05944-JST
 3
 4   In re:  CATHODE RAY TUBE (CRT)
     ANTITRUST LITIGATION,
     -----------------------------
 5
 6   INDIRECT PURCHASER PLAINTIFFS,
 7         Plaintiff-Appellee,
 8   Vs.
 9   ANTHONY GIANASCA; et al.,
10         Movants-Appellants,
11   Vs.
12   TOSHIBA CORPORATION; et al.,
13         Defendants-Appellees.
14
15         TRANSCRIPT OF PROCEEDINGS
16
17
18
19   BEFORE:  THE HONORABLE KIM McLANE WARDLAW
             THE HONORABLE RICHARD CLIFTON
20           THE HONORABLE ROBERT KATZMANN
21
22
23
24
25
```

## Page 7

```
 1   No. 16-16379
     D.C. No. 3:07-cv-05944-JST
 2
     In re:  CATHODE RAY TUBE (CRT)
 3   ANTITRUST LITIGATION,
     -----------------------------
 4
     INDIRECT PURCHASER PLAINTIFFS,
 5
           Plaintiff-Appellee,
 6
     Vs.
 7
     ROCKHURST UNIVERSITY; et al.,
 8
           Objectors-Appellants,
 9
     Vs.
10
     TOSHIBA CORPORATION; et al.,
11
           Defendants-Appellees.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 9

```
 1         MR. BONSIGNORE:  Good morning, may it please the
 2   Court, Robert James Bonsignore appearing for appellant
 3   objectors Anthony Gianasca, Jeffrey Craig, Nina A.
 4   Edwards, Gloria Comeaux, and Rosemary Ciccone.  Our
 5   argument will be divided into three, Polly Estes and
 6   John Crabtree will follow.  We'll do our best to reserve
 7   seven minutes of rebuttal time keeping our eye on the
 8   clock.
 9         JUDGE WARDLAW:  Well, Counsel, so are you -- so
10   we've been receiving word Friday of settlements.  Can
11   you explain who is settling and what's happening?
12         MR. BONSIGNORE:  Yes, Your Honor, to be candid
13   there's a cottage industry of professional objectors.
14   All of them have settled.  The lawyers remaining in the
15   case, it's my understanding, have never objected to a
16   class action settlement before, if that answer --
17         JUDGE CLIFTON:  But there are people still
18   left -- I mean, not everybody has gone away.
19         MR. BONSIGNORE:  No, my clients, I have Anthony
20   Gianasca from Massachusetts, Jeffrey Craig from New
21   Hampshire, Nina Edwards is from Missouri, Gloria Comeaux
22   from Nevada, and Rosemary Ciccone is from Rhode Island.
23         JUDGE WARDLAW:  So they're all from repealed
24   states?
25         MR. BONSIGNORE:  The admitted repealer states
```

**Page 10**

1    are Massachusetts, which is Gianasca, New Hampshire,
2    which is Craig, and Missouri, which is Edwards.  The
3    admitted were repeal states.
4          JUDGE CLIFTON:  And the other two were from
5    non-repealer states.
6          MR. BONSIGNORE:  The non-repealer state
7    is -- states are covered by Gloria Comeaux from Nevada.
8          JUDGE CLIFTON:  Okay.
9          JUDGE WARDLAW:  All right.  All right.  You may
10   proceed.
11         MR. BONSIGNORE:  My argument will focus on
12   errors of law committed by the district court that
13   compel this appellate board to reverse and remand.  If
14   time permits there's one abuse of discretion that I'd
15   like to possibly have the Court look at because of the
16   importance in jurisprudence and to provide a future
17   guidance to district courts that addresses the omission
18   from the record of evidence that went to the lynchpin of
19   its decision if we have time.
20         The law is clear on several contextual points.
21   A district court may not waive rule 23(A)(4), due
22   process, and substitute in a rule 23(E),
23   adequacy -- sorry, fairness of settlement analysis.  It
24   just can't be done.  That law is found in Ortiz.  It's
25   found in Molsky, which is a Ninth Circuit case and

**Page 11**

1    another case with very precise languages of payment
2    cards.
3          The second principle of law is that an
4    approval of a settlement class is subject to heightened
5    scrutiny.  That's in Amcan once again.  The third point
6    is that it's a duty -- it is the duty of the moving
7    party under rule 23(A)(4) to establish its burden.  The
8    burden cannot be shifted to the objector under 23(A)(4)
9    under 23(E), yes.
10         The fourth point is appellate review of
11   certification under rule 23(A) must be established
12   without dependence to the settlement terms.  The
13   settlement terms can be looked at generally under 23(E).
14   It can be looked at more specifically but under 23(A)
15   the finding of adequacy of representation cannot be
16   based on the terms of the settlement.
17         JUDGE WARDLAW:  All right.  So what if we were
18   to agree with you?  What would happen?
19         MR. BONSIGNORE:  What would happen if it's
20   remanded?
21         JUDGE WARDLAW:  Reversed because the Court
22   applied wrong legal standard in determining adequacy.
23         MR. BONSIGNORE:  It would go back and the
24   issues, all the issues would be briefed.  The litigation
25   would commence, and the people who were omitted and

**Page 12**

1    denied their due process rights would receive their day
2    in court.  I would refer the Court, I have, anticipating
3    the questions of the Court, I have the home run cases.
4    The one at bat is the one that hits your point directly.
5    And this is actually a grand slam.  On third base
6    leading off was Amcan.  That's the seminal decision of
7    the United States Supreme Court rejecting a settlement
8    class certification based on lack of adequate
9    representation.
10         It also established the notion that structural
11   protections such as subclassing are in necessary under
12   certain circumstances to ensure due process.  That's
13   found at 521 U.S. 591, and that is a 1997 case.  Ortiz
14   is on second, 527 U.S. 815, 1999 case.  That's another
15   seminal United States Supreme Court decision case that
16   applies a heightened scrutiny standard to settlement
17   class certification.  It held that (inaudible) of
18   settlement cannot substitute for presence of rule 23(A)
19   review.
20         JUDGE CLIFTON:  But let me --
21         MR. BONSIGNORE:  Yes.
22         JUDGE CLIFTON:  Judge Wardlaw was posing the
23   question what happens.  You talk about going back, when
24   I asked the same question maybe in a slightly different
25   way, which is that is there any reason to anticipate

**Page 13**

1    anything other than the district court reciting the
2    words it's supposed to recite in order to check off that
3    box?  If you look at the district court's decision, it
4    in fact talks about conflict of interest which seems to
5    be the key factor behind the adequacy of representation
6    issue.  And so I don't quarrel with the proposition that
7    the district court have used different words to get
8    around this concern, but I'm not sure that substantively
9    the Court hasn't already answered the question for its
10   purposes.  Why shouldn't we just look to that?
11         MR. BONSIGNORE:  That's exactly what happened in
12   Community Bank, which is a Third Circuit case.  It
13   exactly happened like that.  The facts mirror almost
14   identically -- actually, the theorys of law almost
15   mirror exactly the cases here.
16         What would happen if the district court had
17   carried out its 23(A)(4) review on adequacy was -- would
18   be that it would find that the named class
19   representatives, which by the way in this case weren't
20   named, were not adequate representatives, and beyond
21   that class counsel did not vigorously pursue this case
22   and did not vigorously pursue them.  The question that
23   would be asked by the Court, there's three of them, are
24   the interests aligned.
25         Number two, are the interests of the class

**4 (Pages 10 to 13)**

**Page 14**

1    representatives and the class members in conflict?  The
2    third question the Court would ask and have to answer
3    under a 23 (A) review, which was never carried out, it
4    was never carried out here, and I'll explain -- I'll
5    read the language from the opinion after I raise this
6    last point.
7            The third question would be have the class
8    representatives and class counsel vigorously prosecuted
9    the class member's claims.  This is the individual class
10   members, not as a whole, not the general bulk of work
11   that was thrown at this appellate party in the
12   responsive brief but what did they do for Massachusetts
13   class members.  What did they do for New Hampshire class
14   members, what did they do for Missouri class members.
15           In this particular case the Court would find
16   it would first of all have to identify who the class
17   represents were that represented Massachusetts, New
18   Hampshire, and Missouri.  There's none named.  None had
19   aligned interests.  It didn't identify who they were.
20   These representatives did not hold the same claims as
21   the Massachusetts class members, the New Hampshire class
22   members, or the Missouri class members.  All the other
23   repealer states had their own class representatives.
24   They fought, they got it recovered.  Here they did not.
25           So it's not just the fact, however, that they

**Page 15**

1    had an economic recovery, they had people zealously
2    representing them and protecting their interests.  Now
3    how do we know that?
4            JUDGE CLIFTON:  Well, who is the they in the
5    question you --
6            MR. BONSIGNORE:  They're not named in the
7    opinion, the class --
8            JUDGE CLIFTON:  You said they had somebody
9    vigorously representing them and I'm lost in who the
10   they is in this sentence.  I mean, are you talking about
11   the people from the, what is it, 22 states?
12           MR. BONSIGNORE:  Yes.
13           JUDGE CLIFTON:  And so you're distinguishing
14   that group from your clients in the three states plus
15   the, I guess, potentially non-repealer states as well.
16           MR. BONSIGNORE:  Yes, I'm focusing on the
17   omitted repealer states of Massachusetts, New Hampshire,
18   and Missouri.  They did not have a class representative
19   named.  There is absolutely no law that allows that to
20   occur.
21           JUDGE CLIFTON:  Well --
22           JUDGE WARDLAW:  Okay.
23           MR. BONSIGNORE:  In fact, the rule explicitly
24   says you have to have a class representative and all the
25   case law that interprets it says you need to have a

**Page 16**

1    class representative that advocates for your rights.
2    Here they didn't.  They didn't assert claims.  That in
3    itself is a conflict.
4            JUDGE WARDLAW:  Well, are those claims different
5    from the other repealer states?
6            MR. BONSIGNORE:  Absolutely not.  The only thing
7    different is that with the other repealer states lead
8    counsel prosecuted them.  They've try -- the appellees
9    have tried to turn the burden on its head.  It is not
10   the burden of the absent class members to come -- to
11   come forward and put someone in the case.  That is
12   clearly the duty of lead counsel, and that's found in
13   the wording of the law, of the rule, rather, and it's
14   found in every case that's ever interpreted this.
15           JUDGE WARDLAW:  What would lead counsel have
16   done?
17           MR. BONSIGNORE:  There's lots of cases that
18   cite, and in fact, the order appointing lead counsel
19   said that he is to represent their interests.  So
20   there's a case in New York where lead counsel went out
21   and contacted a number of class, potential class reps by
22   solicitation and he was ethically charged.  And they
23   said no, it's his duty to do that.  In this particular
24   case we can just break it right down to what could he
25   have done.  He shouldn't have dismissed Gianasca, which

**Page 17**

1    was the first class representative.  He just dumped
2    them.  There's not one letter, not one communication,
3    there's not one scintilla of evidence anywhere in the
4    record that he notified Mr. Gianasca that he was
5    discharging him.
6            So number one, he could have called up
7    Mr. Gianasca and asked him do you have receipts.  I
8    guess he never said what this big process is that he
9    used to vet.  But one thing is do you have receipts,
10   Mr. Gianasca?  No.  Does anyone in your family have
11   receipts?  No.  Does any one of your friends?  Well, I'm
12   sure as you go along someone will have a receipt to a
13   TV.  The opinion cited that there are millions of people
14   who were part of this class, everyone who bought a TV
15   during expansive class period is a potential class rep.
16           There's lawyers in the case.  How many law
17   firms in this case?  Do they have existing clients?
18   There's other cases where people have run ads.  There's
19   a lot of different ways that lead counsel should have
20   done what he had to do under the rule of law, under his
21   appointment.  The rule of law says he has a duty to
22   represent these people.  He can't wait until after the
23   fact, include them in his class, and then have satisfied
24   Amcan, Ortiz, or any of the other Ninth Circuit cases.
25           JUDGE CLIFTON:  Time is limited so let me jump

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

Page 18

1    to what seems to be the big problem for me, at least.
2    And I'm surprised that there's not more case law on it,
3    but I've looked in our circuit's case law and don't see
4    very much with regard to what I think is the core
5    problem here, which is there's some people who get money
6    and some people who don't, and the same attorneys
7    purport to represent both groups.
8        The closest I've come, and the case that's
9    been identified in at least some of the papers, I think,
10   is the Mego case from 2000 where in fact there are class
11   members that don't get anything and our court did not
12   block the settlement because of that.  Why isn't this
13   covered by the Mego case?
14       MR. BONSIGNORE:  I think -- well, it's certainly
15   not covered by the Mego case.  This case is
16   distinguished -- this is not a case that involves
17   gradation of a counsel, what efforts he put in.  This is
18   an astound -- the facts in this case are astounding, and
19   I know that that could be --
20       JUDGE CLIFTON:  Leave the adjectives out.  I
21   mean we're trying to figure out if what at the end of
22   day you have a situation where some people get money and
23   some people don't, if that's an unsurmountable obstacle.
24       MR. BONSIGNORE:  I will refer the Court to FER
25   54.  In this particular case lead counsel disavowed his

Page 19

1    duty to the class members.  There is not another case in
2    the United States ever that has this fact, ever, because
3    the clear duty of class counsel is to represent the
4    absent class members.  In this particular case --
5        JUDGE CLIFTON:  I am adrift in volumes of
6    excerpts of record.
7        MR. BONSIGNORE:  Okay.
8        JUDGE CLIFTON:  So can you tell me what FER 54
9    is?
10       MR. BONSIGNORE:  I'll read it to you.  This is
11   lead counsel's --
12       JUDGE WARDLAW:  Excuse me.  Excuse me.  We do
13   not talk during the oral argument.  I'm sure you're very
14   experienced lawyers, you all know that, and when you're
15   talking out there we can't hear what's going on up here,
16   so please refrain or go outside.  Thank you.
17       MR. BONSIGNORE:  This is lead counsel's final
18   approval brief.  These are the words of lead counsel.
19   Lead counsel was appointed to represent the interests of
20   purchasers in the 22 indirect purchaser state classes.
21   Further, lead counsel, he has no duty to represent
22   purchasers in any other state.
23       That goes against the rule 23 (A) (4), it goes
24   against the specific language, and I can read the
25   specific language of his appointment that he is to

Page 20

1    do -- represent all the class members, and it goes
2    against Ortiz, Amcan, Hess, Radcliffe, every other case
3    in the Ninth Circuit or anywhere else in the country.
4    This is not -- this is not gradation did he do enough.
5    Here we have a unique situation where lead counsel said
6    I have -- I don't have to do it, and that is not right.
7    These people, the absent class members are dependent on
8    lead counsel to represent their interests zealously.
9    Zealously, not turn around and say I don't have to
10   represent them.
11       It's also noteworthy that from the beginning
12   lead counsel purported to represent these absent class
13   members that he suddenly, in the final approval brief,
14   washes his hands of.  Gianasca complaint was the first
15   complaint on file.  Massachusetts filed by lead counsel
16   before there was an MDL.  That's ER 2201 to 34.  The
17   next was one is the first amended complaint included
18   Massachusetts, ER 2094 to 2093.
19       Second amended complaint, 1748 to 853 involved
20   the national class.  A national class means a national
21   class.  A national class doesn't mean forget about these
22   three states, forget about the rest, I'll include them
23   in here because it looks good and then at the end I'll
24   say all I have to do is pay attention to these 22 states
25   and forget about the rest.  Absent class members, and

Page 21

1    there's case law all over the place are to rely on
2    ethical rules and the black letter law and the cases
3    interpreting it that lead counsel zealously represents
4    them.  They can't be in appearance of a conflict.  He
5    has to hold them like a mother holding an infant,
6    protect their interests, look out for the best that they
7    can have.
8        In Missouri, what did he do for Missouri?
9    Although he claimed a national class, we can go through
10   the fourth amended complaint but it's more of the same,
11   and it was included until the final approval brief made
12   clear he didn't represent them all the way along, he's
13   not going to represent them now.  What happened along
14   the way?  With Missouri, prior to the settlement for no
15   economic recovery claims were never asserted.  That
16   could be found at ER 726 to 27, 727, Alioto declarations
17   at paragraph 39 and 42.  Plaintiff never named.
18       Notably on March -- notably at ER 788 on March
19   6th, 2012 there's evidence in the record that a Missouri
20   class representative was brought to his attention.  He
21   didn't follow up.  With regard to New Hampshire, New
22   Hampshire was in lead counsel's preempt DL complaint, ER
23   2201 to 304.  It was also in 2243, the Nasto complaint,
24   2297, the Forgoni complaint.  All the complaints, again,
25   were seeking a national nationwide class which includes

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

**Page 22**

1  the omitted repealer states. Once you include the
2  omitted repealer states you can't decide that they
3  disfavored. You're all in or not. If you wanted to
4  bring a 47 --
5       JUDGE WARDLAW:  Counsel --
6       MR. BONSIGNORE:  Sorry.
7       JUDGE WARDLAW:  Excuse me, would you please
8  refrain from speaking or leave the courtroom.  Would you
9  agree to that?  Counsel, I'm looking at you.  I'm asking
10 you to stop talking during oral argument or to leave the
11 courtroom.  Okay?
12      UNIDENTIFIED MALE:  Yes, Your Honor.
13      JUDGE WARDLAW:  Thank you.
14      All right.
15      MR. BONSIGNORE:  With regard to the efforts of
16 the Massachusetts case, Gianasca was in, I already
17 discussed what happened.  He was just summarily
18 dismissed with no notice to him. In came Ms. Caldwell.
19 Ms. Caldwell was first dismissed because lead counsel
20 didn't send out what's called the Massachusetts presuit
21 93(A) letter.
22      JUDGE CLIFTON:  I'm going to switch gears on
23 you.
24      MR. BONSIGNORE:  Okay.
25      JUDGE CLIFTON:  Because there's something I

**Page 23**

1  want, and maybe somebody else is going to address it,
2  but something I wanted to focus on, the district court
3  explained the reason for the different treatment in the
4  end as being the people that weren't going to receive
5  any money had no hope of receiving any money because at
6  least at that point in time they no longer had a viable
7  claim.  Why isn't that a justification for the plan of
8  distribution?
9       MR. BONSIGNORE:  That's very hotly contested.
10 That issue was not briefed.  The district court said
11 that it could not revive claims.  There's also a
12 question about that.  That's something that will be
13 raise when we go back to the district court.  Beyond
14 that --
15      JUDGE CLIFTON:  Well, I'm not sure --
16      MR. BONSIGNORE:  -- it's not --
17      JUDGE CLIFTON:  -- and the point of Mego, which
18 is not on all fours, but the Court in Mego winds up
19 saying, well, there's a category that's just not going
20 to be able to collect.  And so it winds up saying okay
21 to the deal, even though some people walk away with
22 nothing, because the Court apparently concluded they're
23 not going to get anything.  And why isn't that the same
24 true here?
25      MR. BONSIGNORE:  Because it's not conceded.

**Page 24**

1  It's absolutely not conceded that they won't get
2  anything.  In fact, we believe they will.
3       JUDGE CLIFTON:  But hasn't the CR team largely
4  died here?  The CR team market, and so the argument is
5  that the injunctive claims are valueless or moot.
6       MR. BONSIGNORE:  Well, we one thousand percent
7  disagree with that position.
8       JUDGE WARDLAW:  Okay, explain why, though.
9       MR. BONSIGNORE:  Yes.
10      JUDGE WARDLAW:  Factually.
11      MR. BONSIGNORE:  Yes.
12      JUDGE WARDLAW:  Because the district court did
13 make a finding on that point.
14      MR. BONSIGNORE:  Yes, that's not my issue, but I
15 will --
16      JUDGE WARDLAW:  Okay.
17      MR. BONSIGNORE:  -- but I will quickly hit it.
18 In the first place the defendants were placed on notice
19 from word go.  From pre MDL complaints they were put on
20 notice of Massachusetts and New Hampshire.  With regard
21 to Missouri, they were put on notice through the filing
22 of nationwide complaint after nationwide complaint
23 throughout, and so they'll -- I believe necessities will
24 address that.  I don't want to take a long time --
25      JUDGE CLIFTON:  Well, if you need to switch

**Page 25**

1  people this may be a good time to do it because that's
2  the issue we're now at.
3       JUDGE WARDLAW:  This is a concern.
4       MR. BONSIGNORE:  Okay.  Before I leave, one
5  thing, just make two points, in the first place --
6       JUDGE WARDLAW:  How about if you leave and come
7  back?
8       MR. BONSIGNORE:  Okay.
9       JUDGE WARDLAW:  Okay.
10      MR. CRABTREE:  John Crabtree before necessities.
11 I'm going to go and go very quickly.  There's much not
12 to like about this settlement.  I'm going to hit one
13 thing hard.  There's a 90 degree problem that cannot be
14 swept under the rug.  The claims that were released
15 rationalized by statute of limitations doesn't work
16 analytically.  It's incoherent, and the reason is
17 simple.  It is one thing to say that a whole group of
18 people's claims are not barred because the claims are
19 brought within x-years.
20      But it is another thing to say on a wholesale
21 basis that everyone's claim is barred because they were
22 highly individualized issues, that are implicated in the
23 statute of limitations analysis.  Issues relating to
24 accrual and tolling.  And Missouri, like basically every
25 other state, has these principles.  So for the Court to

**7 (Pages 22 to 25)**

## Page 26

1 say that everyone's claim is worthless is incoherent.
2 We can't to that analysis. It's the reason why we don't
3 allow 23(B) common law fraud claims because every person
4 is different.
5     JUDGE CLIFTON: Well, that cuts way broad
6 because even if you didn't have the conflict of
7 interest-type claims here, within any class settlement
8 you've got the possibility of some individual popping up
9 and say my facts are sufficiently different that it
10 shouldn't be covered, and you can't have a class action
11 if you take that too far.
12     MR. CRABTREE: What I'm saying is this, is that
13 you cannot force someone, in a representative action, to
14 release their claims for zero compensation and say they
15 are bound when you do so based on statute of
16 limitations. There are hyper individualized issues
17 especially --
18     JUDGE WARDLAW: Can you -- so explain to me how
19 someone in Missouri would be entitled to an injunctive
20 relief that would be value to them. Like what would it
21 be?
22     MR. CRABTREE: Actually, Your Honor, I was
23 talking only about damages really because Missouri
24 is --
25     JUDGE WARDLAW: Okay, damages. All right.

## Page 27

1 Explain what the value given -- okay. Explain that
2 specifically, concrete terms.
3     MR. CRABTREE: Okay. So in concrete terms --
4     JUDGE WARDLAW: Like what would they have that
5 they don't have?
6     MR. CRABTREE: Missouri is a state that is an
7 Illinois repealer state by court construction of their
8 consumer practices act. That's why NLCD, and I wanted
9 to correct the record, I actually -- we do a lot of
10 repeals in class actions. I did do an objection in the
11 LCD case. I have done one. And in that case I'm quite
12 aware that there was relief for the Missouri people
13 because the Court ruled that the claims were sufficient.
14 And in fact, Mr. Alioto was counsel in that case.
15     I don't want to take any more time from
16 Ms. Estes. She needs to go too. But I would like to
17 make one final point before I step away, and that is
18 that the lode star cross check in this case was nothing
19 but theater. It was a spot check of a spot check of a
20 small minority of cases, and all it revealed was even
21 the records that came out was that you had block
22 billing, quarter hourly billing and half hazard records.
23 That's not enough to justify an upward departure from
24 benchmark in a mega fund case.
25     Thank you, Your Honors.

## Page 28

1     MS. ESTES: Good morning, Your Honors. Polly
2 Estes on behalf of Rockhurst University.
3     JUDGE CLIFTON: Hold the mic.
4     JUDGE WARDLAW: Louder.
5     MS. ESTES: Sorry, I'm short.
6     JUDGE CLIFTON: We understand.
7     MS. ESTES: Is that better? Okay.
8     I'm Polly Estes. I'm representing Rockhurst
9 University, et al., and we have claimants from each of
10 the three omitted repealer states. Let me try to start
11 by answering Your Honors questions that you've had so
12 far. What would happen on remand? First of all, the
13 district court should appoint separate counsel to
14 represent these omitted repealer states.
15     Secondly, that counsel would file a new
16 amended consolidated complaint that would include claims
17 of each of these omitted repealer states, and those
18 claims would relate back to the filing of the original
19 complaints.
20     Secondly, you asked -- I'm sorry, oh, I see
21 two minutes. You asked what should lead counsel have
22 done? Excellent question. We are charging not only the
23 final order of proving the settlement but also the 2010
24 order approving the stipulation. And if Your Honors
25 will read Koby vs. ARS National Services and Reynolds

## Page 29

1 vs. Beneficial National Bank, I think those two cases
2 tell you what it is that both lead counsel and the
3 district court should have done at the stage of the
4 stipulation and at the stage of the settlement.
5     So what should lead counsel have done? Well,
6 first of all, she should have found a plaintiff from
7 Missouri as he in fact --
8     JUDGE CLIFTON: Well, this ground we've covered.
9 The question I posed, and before -- I'd like to get an
10 answer before the time runs out, is why can't the
11 district court's decision that the people in those three
12 states can properly be excluded from receiving any money
13 be justified based on the distinction the Court found
14 with regard to their not going to get any money anyway.
15 It's too late for them.
16     MS. ESTES: The only reason they're not going to
17 get any money and the only reason that their claims have
18 no value withdraws the other repealer state's claims do
19 have value is that lead counsel committed malpractice.
20     JUDGE CLIFTON: Fine. They can sue them for
21 malpractice. That doesn't really help us now.
22     MS. ESTES: That can't, the statute of
23 limitations --
24     JUDGE CLIFTON: Oh, then if they can't then they
25 can't.

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

Page 30

1    MS. ESTES:  However --
2        JUDGE CLIFTON:  But that doesn't -- no, hear me
3    out here.
4        MS. ESTES:  Okay.
5        JUDGE CLIFTON:  It may be that those people
6    can't properly be represented and can't be included
7    within this settlement.  I don't know what it is that
8    makes the lead counsel go out and represent somebody he
9    doesn't represent.  You're saying he doesn't represent
10   them so he can't release their claims.  That argument I
11   hear.  The argument that he's committed malpractice
12   somehow and people would like to bring malpractice
13   claims against him because -- but can't because of
14   limitation period, that argument I don't hear.
15       What I want to know is why is the plan of
16   distribution faulty when the Court distinguishes between
17   people that have claims that live today and people that
18   don't have claims that live today.
19       MS. ESTES:  Okay.  One minor distinction in what
20   you said previously.  I am not asserting that lead
21   counsel did not represent the omitted repealer states.
22   He, in fact, did and he --
23       JUDGE CLIFTON:  Well, for a period of time he
24   purported to do so.  And even now he purports to do so.
25       MS. ESTES:  Right up to the very end.  Right up

Page 31

1    to the very end no other counsel was ever appointed.  So
2    he maintained a fiduciary duty to those claimants
3    through to the end.
4        JUDGE CLIFTON:  Well, yes and no because at a
5    point in time he gets -- he gets -- there's certified
6    classes, and the certified classed don't appear to cover
7    the three omitted states.
8        MS. ESTES:  Yes, and they sought class
9    certification at the very end in conjunction with
10   seeking a settlement.  But let me go back to what I
11   think is your ultimate question, why was the district
12   court wrong that these three states no longer had viable
13   claims.  The reason they no longer had viable claims was
14   the 2010 stipulation, which itself should never have
15   been approved by the district court.
16       JUDGE CLIFTON:  We're hearing a phone in the
17   room now?  Come on, guys.
18       JUDGE WARDLAW:  Come on.  Who's got the phone?
19       MS. ESTES:  The only reason the 2010 stipulation
20   was ever entered was to cover up lead counsel's
21   negligence in failing to properly plead claims on behalf
22   of these three states.  In that stipulation, if you read
23   it, the omitted repealer states --
24       JUDGE WARDLAW:  I want to hear this correctly
25   because properly plead claims.  They never -- you

Page 32

1    didn't -- because that would go to mean to something
2    that was adequacy of representation from the outset that
3    he didn't -- you're saying he didn't properly plead the
4    claims.
5        MS. ESTES:  Yeah, so from --
6        JUDGE WARDLAW:  As oppose to pursue them?
7        MS. ESTES:  Both.  So for Missouri, he just
8    simply never ever pleaded any -- any damages claims on
9    behalf of that class in a consolidated complaint.  For
10   New Hampshire, he failed to take the complaint that had
11   been filed and sent into this MDL and include it into
12   the consolidated amended complaint.
13       For Massachusetts, he did attempt to plead
14   claims but he failed twice to give the requisite 30-day
15   notice, which the special master specifically instructed
16   him he had to do.
17       JUDGE WARDLAW:  Explain to your theory on why
18   these claims are viable.
19       MS. ESTES:  They are viable because if this
20   Court reverses both the order approving the settlement
21   and the order approving the stipulation then a fifth
22   amended complaint can be filed which will relate back to
23   the original complaint.  Now, so -- and the original
24   complaint here will be for Massachusetts, which was
25   included in the consolidated amended complaint, for New

Page 33

1    Hampshire, which had a complaint which should have
2    been -- which was transferred into this MDL and made a
3    part of this whole case, and for Missouri because
4    Missouri has always been a part of the nationwide class
5    and so claims have always been asserted on behalf of
6    Missouri as well.
7        I see that my time is up.  If Your Honors have
8    any other questions, I'm happy to answer them.
9        JUDGE WARDLAW:  Not at this time.  Perhaps after
10   we hear from the other side.
11       MS. ESTES:  Okay.  Thank you very much.
12       MR. MOSKOVITZ:  Good morning, Your Honors.
13   Myron Moskovitz for the appellee here.  The Court
14   reviews the settlement of a class action for abusive
15   discretion, and that means deference.  That's the
16   general rule.  But there's some particular reasons why
17   that rule applies with special force here.  Six judges
18   had a hand in this settlement.  It began with Judge Legg
19   sitting as special master handling many of the motions,
20   then Judge Conti also sitting as special master
21   certified the class for trial.
22       Judge Vaughn Walker helped craft the
23   settlement.  John Fern Smith also helped craft the
24   settlement.  Then it goes to Special Master Martin Quinn
25   who approves the settlement agreement, and then finally

**9 (Pages 30 to 33)**

**Page 34**

1 it goes to Judge Tigar who also approves Quinn's report
2 and the settlement agreement. You've got six judges
3 involved in this thing. These judges heard all of the
4 objections they're making now and rejected all of them.
5 And they're asking you to find an abuse of discretion
6 here.
7     Now, these approvals by Special Master Quinn
8 and Judge Tigar were not rubber stamps. Special Master
9 Quinn wrote a 77 page opinion.
10     JUDGE WARDLAW:  You know, Counsel, all of this
11 is true and it has absolutely no affect on me.
12     MR. MOSKOVITZ:  Okay.
13     JUDGE WARDLAW:  But I want to know -- I mean,
14 yes, of course we're here and this is how we got here,
15 but I guess what I want to know is your view and whether
16 or not the district court applied the wrong legal
17 standard by looking to the distribution and the amount
18 and value of the settlement as opposed to whether
19 everybody member of the cause was adequately represented
20 under Ann Chen and those -- that line of cases.
21     MR. MOSKOVITZ:  The fundamental problem with all
22 of their arguments of the objectors, they're claiming
23 that lead counsel, Mr. Alioto, didn't adequately
24 represent the consumers from the three repealer states,
25 New Hampshire, Massachusetts, and Missouri.

**Page 35**

1     The fundamental problem is they had no
2 representatives from those states. Now, Ms. Estes, in
3 her brief blames Mr. Alioto for this. She says it's
4 easy to get these people. Well, I don't think she has
5 much experience with actually litigating --
6     JUDGE CLIFTON:  For myself, I don't care that
7 they may or may not have been able to go out and find
8 somebody. My problem now is that we've got a settlement
9 teed up that purports to release, that does release
10 claims on behalf of people from those states.
11     MR. MOSKOVITZ:  Yeah.
12     JUDGE CLIFTON:  Without appearing to have any
13 return to them and without appearing to have anybody at
14 the table speaking for them. The fact that Mr. Alioto
15 couldn't find somebody from Missouri, I accept that
16 fine. That's probably the case, but then how is it that
17 he releases their claims since he doesn't have anybody
18 from Missouri that he seems to be looking after. I
19 mean, a deal that says I'm giving away your claims over
20 there and my people over here get money seems to have a
21 piece missing like those people over there.
22     MR. MOSKOVITZ:  That would be troublesome if
23 that's what happened. That's not what happened. This
24 case began as a nationwide class action for an
25 injunction under the Clayton Act against these price

**Page 36**

1 fixing defendants on behalf of every indirect purchaser
2 in the country. All right. Now, you can get that under
3 the Clayton Act. That covers all 50 states. All right.
4     The consumers in those three states were
5 included in that class and from that Mr. Alioto tried,
6 in front of Judge Legg to have the people from those
7 states represented to get the state damages. You can't
8 get damages under the Clayton or Sherman Act under
9 Illinois brick but under the state law you can. And
10 he -- since he didn't have people from those states he
11 tried before Judge Legg, and he had some law to support
12 him but apparently there's a conflict. Judge Legg ruled
13 against them. All right.
14     Now, the only thing for Mr. Alioto to do in
15 order to pursue those three state damage claims is to
16 get representatives from those states. Now, Mr. Alioto
17 can't do that. He's licensed in California. He can't
18 go to Massachusetts and hang out a sign and say sign up
19 for this case. He can't do that. And he can't do that
20 in any of the --
21     JUDGE WARDLAW:  He could get local counsel to do
22 it.
23     MR. MOSKOVITZ:  Yeah, exactly. He depends on
24 local counsel to do it. In 22 states local counsel was
25 cooperative. In those -- in Missouri you've got nobody.

**Page 37**

1 In those three states --
2     JUDGE WARDLAW:  Massachusetts seems like a very
3 unlikely state where you wouldn't be able to get anyone.
4     MR. MOSKOVITZ:  Well, I'll tell you what
5 happened. He depended on people like Mr. Bonsignore to
6 get people for him. And Mr. Bonsignore, a few minutes
7 ago said I did that. I got plaintiffs from
8 Massachusetts. Well, here's what Special Master Quinn
9 found on that on page 40. Bonsignore claims that his
10 client Gianasca was truly vetted and ready to serve as a
11 representative plaintiff. Mr. Alioto swears he never
12 refused to add a viable plaintiff to this case and this
13 just didn't happen.
14     Special Master Quinn says, having reviewed the
15 documents claiming to show that Mr. Bonsignore proffered
16 a viable plaintiff. The special master includes that
17 Mr. Alioto's version of facts is more credible.
18     JUDGE CLIFTON:  So there's no plaintiff --
19     MR. MOSKOVITZ:  And this happened --
20     JUDGE CLIFTON:  -- no class representative from
21 Massachusetts.
22     MR. MOSKOVITZ:  Pardon me?
23     JUDGE CLIFTON:  So there's no class
24 representative from Massachusetts.
25     MR. MOSKOVITZ:  There's no one from any of these

**10 (Pages 34 to 37)**

**Page 38**

1  three states.
2  JUDGE CLIFTON:  So how does Mr. Alioto purport
3  to represent people from Massachusetts in extinguishing
4  and releasing their claims?
5  MR. MOSKOVITZ:  Because he represented them as
6  members of the nationwide class for the injunction.  All
7  right.  And --
8  JUDGE CLIFTON:  And then we get to -- which
9  nobody seems to be much concerned about today.  We're
10  talking at money.
11  MR. MOSKOVITZ:  No, I know that.
12  JUDGE CLIFTON:  And the people in Massachusetts
13  are being told that your claims are being released.
14  MR. MOSKOVITZ:  I realize that.
15  JUDGE CLIFTON:  Including whatever claims you
16  might have for money even though I don't get you any
17  money and I didn't have any plaintiff as a class
18  representative looking out after your particular
19  interests.  How can that be?
20  MR. MOSKOVITZ:  They go into settlement
21  negotiations with Mr. Alioto representing every consumer
22  in the country because that nationwide claim for an
23  injunction.  The defendants, naturally, as they always
24  do --
25  JUDGE WARDLAW:  It wasn't adequate because he

**Page 39**

1  couldn't represent their claim for damages and yet he
2  was purporting to release it.
3  MR. MOSKOVITZ:  Their claims were dead.  This
4  was what --
5  JUDGE WARDLAW:  But that's what you're saying.
6  I realize that -- that the Court made that finding but
7  he's saying the argument is that -- but you didn't
8  litigate to ensure their viability.
9  MR. MOSKOVITZ:  The statute of limitations had
10  run on all of those claims.
11  JUDGE WARDLAW:  But at the beginning, did you go
12  back and litigate the viability of their claims?
13  MR. MOSKOVITZ:  I'm sorry, I didn't get that,
14  Your Honor.
15  JUDGE WARDLAW:  Were they dead when they were
16  named in the complaint?
17  MR. MOSKOVITZ:  No.  No, they --
18  JUDGE WARDLAW:  Because what happened while
19  Mr. Alioto was representing them that their claims were
20  alive and then died.
21  MR. MOSKOVITZ:  The only claim they had in the
22  beginning was for the nationwide injunction.  They had
23  no claims in the beginning for the damages under those
24  state laws.  Well, Mr. Alioto tried to get those but
25  Judge Legg said you can't do that.

**Page 40**

1  JUDGE WARDLAW:  Wait, I thought originally they
2  did have a claim for damages?
3  MR. MOSKOVITZ:  They what?
4  JUDGE WARDLAW:  Did have a claim for damages.
5  MR. MOSKOVITZ:  Theoretically but there were no
6  representatives there.
7  JUDGE WARDLAW:  Well, wait a second.  Now that's
8  a different issue.
9  MR. MOSKOVITZ:  No, it's not.  No, Judge Legg
10  said if you want to have a claim for damages in those
11  three states you got to have representatives.
12  Mr. Alioto didn't have the representatives.  He depended
13  on people like Ms. Moore, like Mr. Bonsignore to get
14  them.  They didn't get them.  Okay.  Mr. Alioto -- what
15  Quinn said was this is an extraordinary achievement.  He
16  got 22 out of 25.  All right.  He organized the whole
17  thing.  Most lawyers in these other states were
18  cooperative once Mr. Alioto was designated to leave
19  counsel, they cooperate, they give him -- they either
20  sue and then have it consolidated or they just give them
21  to Mr. Alioto and it goes ahead and you've got an
22  enormous settlement out of it.
23  But Bonsignore didn't cooperate.  Moore didn't
24  cooperate.  And what can he do?  He's not admitted in
25  Massachusetts.

**Page 41**

1  JUDGE CLIFTON:  And just for myself, I don't
2  care about any of that.
3  MR. MOSKOVITZ:  Yeah.
4  JUDGE CLIFTON:  My problem is at the end of the
5  day he strikes a deal that effects the claims of people
6  from those states without a class representative from
7  those states.  Now, if you tell me, well, he can't
8  pursue damages for them then I have to ask the question
9  what gives him the right to release their damage claims?
10  MR. MOSKOVITZ:  Judge Clifton, earlier you cited
11  the Mego case.  In Mego, the Court said that the
12  distribution does not have to be equal among all the
13  claimants, depends on the value of their claims.  And if
14  you look towards the end of that discussion the Court
15  says were we to discertify the current class it is
16  possible that no one will recover anything from Mego.
17  Now that's exactly the situation here.
18  JUDGE CLIFTON:  Well, the reason for some people
19  not collecting in Mego had to do with the adoption of
20  the private securities litigation reform act.
21  MR. MOSKOVITZ:  Right.  Right.
22  JUDGE CLIFTON:  And here the reason being given
23  is the statute of limitations.
24  MR. MOSKOVITZ:  Right.
25  JUDGE CLIFTON:  Which objectors are busy saying,

**11 (Pages 38 to 41)**

## Page 42

1    look, we got lots of ways to try to finesse that. I
2    don't know whether they're going to be successful or
3    not, but that they have a different point of view and so
4    you start to ask yourself -- and let me -- I understand
5    the practicality of settlement. I practiced law for a
6    long time. I know defendants want complete peace. But
7    you can't always get what you want. And in this case
8    who is at the table looking out for the people from
9    Massachusetts and New Hampshire and Missouri? Nobody.
10   MR. MOSKOVITZ: Yeah.
11   JUDGE CLIFTON: And it becomes easy to do a deal
12   that gives nobody -- the nobody there people nothing,
13   which seems to be what happened here. Now, it may be
14   correct that those people can't collect anything. But
15   why is it that they have to suffer that risk and we're
16   supposed to make that decision?
17   MR. MOSKOVITZ: Number one, they're not
18   suffering anything. The case is gone. The statute of
19   limitations argument they're trying to rebut saying
20   there's a relation back, there's tolling, you can't do
21   any of that.
22   JUDGE CLIFTON: Well, maybe we should ask
23   defendants to bear that risk by saying don't get a
24   release for those states but don't worry, you got -- no
25   problem because the limitations period has run.

## Page 43

1    MR. MOSKOVITZ: Your Honor, if you write an
2    opinion that says something like that --
3    JUDGE WARDLAW: That would be very Solomonic. I
4    think --
5    MR. MOSKOVITZ: I think the Court should be wary
6    of weaponizing objectors and allow them to upset these
7    settlements. This -- this was --
8    JUDGE CLIFTON: Wait a minute. What is
9    sacrosanct about a settlement where you and I strike a
10   deal that makes him over there suffer? We don't have a
11   right to speak for him. And I don't want to kill
12   settlements, but people only have the power to speak for
13   themselves, and in this case I don't see anybody at the
14   table speaking for the people from Massachusetts and New
15   Hampshire and Missouri. I hear defendants wanting to
16   pay piece. Will they pay any more for those? I doubt
17   it. Will the plaintiff class have to share more money
18   to more places? Maybe so. And if they're not willing
19   to then why are we allowed to say that the people in, I
20   think Hawaii is a repealer state, so why should people
21   from Hawaii be able to say we get a little bit more
22   because people from Massachusetts, like Judge Katzmann
23   was and probably was during the class period, he doesn't
24   get anything.
25   MR. MOSKOVITZ: If some of this settlement had

## Page 44

1    been allocated to consumers from those three states
2    you'd have a different set of objectors out here.
3    JUDGE WARDLAW: Well, Counsel --
4    MR. MOSKOVITZ: The objectors from the other
5    state saying why are you giving them money. We got all
6    these judges finding their claims are worthless and
7    you're giving them a piece of action for, what, nuisance
8    value. No, their claims are --
9    JUDGE WARDLAW: Counsel, sometimes cases
10   are -- I mean, I did this very type of litigation for
11   many, many, many year and sometimes there is nuisance
12   value settlement.
13   MR. MOSKOVITZ: Well, Your Honor, lead counsel
14   did have authority to represent these people as part of
15   the nationwide class. Then they go to negotiate,
16   defendant's won global peace, they want, even though the
17   claims of those people in those three states are
18   worthless, they still want a sign off that they won't
19   get any nuisance suits.
20   JUDGE CLIFTON: Well, why should they get it?
21   If they're not willing to pay any more, why should they
22   get what they want if in fact nobody appears to be
23   looking out after the interests of those three states?
24   MR. MOSKOVITZ: I don't think that's accurate.
25   Mr. Alioto was looking out for their interest. He tried

## Page 45

1    to, in front of Judge Legg --
2    JUDGE CLIFTON: This type of deal --
3    MR. MOSKOVITZ: -- to -- I'm sorry?
4    JUDGE CLIFTON: He struck a deal that gave them
5    nothing.
6    MR. MOSKOVITZ: Because their -- by that time
7    their claims were worthless because the local counsel in
8    those states did not produce any class representatives.
9    That's what -- Judge Legg said that's what you got to
10   do.
11   JUDGE CLIFTON: Objectors theorize if they had
12   somebody come in today they could try to make their
13   complaint covering them relate back. I'm not going to
14   opine on whether that's possible. But how is it we can
15   adjudicate that argument?
16   MR. MOSKOVITZ: Well, the proof of the pudding
17   that that's not going to happen is they didn't do it.
18   Mr. Bonsignore claims to have a client who is objecting.
19   At any time he could have brought that client to
20   Mr. Alioto and said join them. Same thing with Ms. Moore, bring them in -- he would have
21   thing with Ms. Moore, bring them in -- he would have
22   been delighted to join them because that would increase
23   the size of the settlement, increased his attorney's
24   fees, it would have been wonderful for --
25   JUDGE CLIFTON: Increase the size of the

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

**Page 46**

1   settlement then you're telling me defendants are going
2   to be willing to pay more for those states, which is
3   kind of contradictory to --
4          MR. MOSKOVITZ:  No.  No, I'm saying if they were
5   worth anything.  Early on they were worth something
6   before the statute of limitations ran.  If they had
7   brought people to him before it ran he would have been
8   delighted to add that.
9          JUDGE WARDLAW:  Just, I mean, I know -- I don't
10  think we have enough in front of us on the statute of
11  limitations but why, if they had a claim and it wasn't
12  barred by the statute of limitations when the complaint
13  was filed, why didn't the filing of the complaint toll
14  the statute of limitations?
15         MR. MOSKOVITZ:  Well, it would have if those
16  people had stayed in the case but they were -- some
17  dropped out and by the time the fourth amended complaint
18  was filed, by the time of settlement they were out.
19  They would have tolled if they had stayed in the case.
20         JUDGE WARDLAW:  But they would have had a viable
21  claim.
22         MR. MOSKOVITZ:  They would have but it was too
23  late.  The key here is there's no plaintiffs from those
24  states because the objectors didn't produce them.  I
25  mean, they're talking about relation backing everything.

**Page 47**

1   There was no motion to amend the fourth amended
2   complaint to add them.
3          I want to respond to the question came up a
4   couple of times about what happens if you reverse and
5   disapprove of this settlement.  All right.  This
6   settlement is over half a billion dollars, cash.  No
7   coupons, no vouchers, no (inaudible), no discounts,
8   money in the bank.  And the money is in the bank.  At
9   this point all of the defendants have paid the money
10  into escrow.
11         Now, the terms of the settlement agreement are
12  if the settlement agreement is undone that money goes
13  back to the defendants.  It's out of the bank, it goes
14  back to them.
15         JUDGE WARDLAW:  Let me ask you something,
16  Counsel, how much of this is influenced by the award of
17  attorney's fees and costs?
18         MR. MOSKOVITZ:  I'm sorry, Your Honor.
19         JUDGE WARDLAW:  How much of this is actually
20  really influenced or affected or the pragmatics of
21  undoing this influenced by the award of attorney's fees
22  and costs, which was substantial?
23         MR. MOSKOVITZ:  That entire fund is in jeopardy
24  if the money goes back to defendants.
25         JUDGE WARDLAW:  Perhaps some of the money that

**Page 48**

1   goes to attorney's fees might end up going to Missouri,
2   New Hampshire, and Massachusetts?
3          MR. MOSKOVITZ:  Well, yeah, but let's not forget
4   about the consumers in the 22 other states.  Right now
5   they have filed something like 150,000 claims that would
6   gobble up that entire half a billion dollars.  If the
7   settlement is disapproved it goes back to defendants.
8          JUDGE WARDLAW:  Is the half billion earning
9   interest right now?
10         MR. MOSKOVITZ:  Pardon me?
11         JUDGE WARDLAW:  Is the half billion earning
12  interest in the bank right now?
13         MR. MOSKOVITZ:  It's getting interest.  They put
14  it in CDs or something.
15         JUDGE WARDLAW:  So it's growing.
16         MR. MOSKOVITZ:  Yeah.  But the money may never
17  come back.  All right.  Toshiba, one of the defendants
18  has been in financial trouble.  Samsung, who contributed
19  the largest chunk was something like four months late in
20  putting it in.  This is a very volatile industry.  If
21  this case goes to trial and there's a judgment of a
22  similar amount there's no assurance they're going to get
23  that money.
24         JUDGE CLIFTON:  So these are all good reasons
25  why we should tell the people of Massachusetts and the

**Page 49**

1   other states too bad.
2          MR. MOSKOVITZ:  Well, let me respond --
3          JUDGE CLIFTON:  I mean, I understand the
4   practicality but I still, I've got a problem with three
5   states being left out for reasons that may be legally
6   valid with regard to a limitations period defense,
7   but --
8          MR. MOSKOVITZ:  Actually, it's not 23 states.
9   It's 25 states.  You left out Texas, you left out
10  Florida, you left out Pennsylvania.
11         JUDGE CLIFTON:  And them too.
12         MR. MOSKOVITZ:  Those people don't get anything
13  either.
14         JUDGE CLIFTON:  That's right.  And I'm willing
15  to accept that -- and there doesn't seem to be a serious
16  challenge that if you're from a non-repealer state
17  you're kind of stuck when it comes to money.
18         MR. MOSKOVITZ:  So were these three states.
19         JUDGE CLIFTON:  So that's a Mego kind of
20  distinction.  You're offering up a limitations period
21  kind of distinction and I'm not sure that's quite as
22  solid as --
23         MR. MOSKOVITZ:  It is.
24         JUDGE CLIFTON:  -- as the difference between
25  Texas and whoever else is a repealer state.

**13 (Pages 46 to 49)**

Page 50

1      MR. MOSKOVITZ: It's the same thing.  No, it's
2  the same thing.
3      JUDGE CLIFTON:  Okay.  But if you want it that
4  way we can say fine.  You've left out just three
5  states but 28, and I'm not sure that makes your argument
6  any stronger.
7      MR. MOSKOVITZ:  Those people in Texas were
8  represented by Mr. Alioto in the injunction action.  All
9  right.  In the settlement they get zero.  Why?  Well, as
10  you know, that's a non-repealer state.  Their claims are
11  worthless so they get nothing.  At this point in time,
12  and at the point of the time of the settlement it's
13  exactly the same thing with Massachusetts, New
14  Hampshire, and Missouri.
15      JUDGE CLIFTON:  Why?  Because you say so.
16      MR. MOSKOVITZ:  No.  Well, Special Master Quinn
17  said so, Judge Tigar said so, and the law says so.  The
18  law says that the statute of limitations has run on
19  these.  Now, there's no emotion to amend to add any
20  representatives from there.  What they're doing is sort
21  of conceding that but they're blaming Mr. Alioto.
22  They're saying inadequate representation.  He should
23  have done more to get representatives from those states.
24  He couldn't do any more.  He's not licensed in those
25  states.  He has to depend on people like Mr. Bonsignore.

Page 51

1  I mean, look at his address on his brief.  He's in
2  Massachusetts.  Mr. Alioto isn't.  He's not licensed in
3  25 states.  I'm not either.  Most lawyers aren't.  He
4  depended on people like the lawyers in the 22 states to
5  come up with people.  And he succeeded.  It was a
6  tremendous achievement.
7      But in these three states it didn't happen,
8  and these people didn't help at all.  So at this point
9  in time Massachusetts equals Texas.  They're worthless
10  and he did nothing wrong in signing a settlement
11  agreement that gave up their worthless claims.
12      JUDGE KATZMAN:  Can I ask, again, returning to
13  the earlier part of your discussion, and this may be
14  repeating what you said already but I'm just trying to
15  get this in my own head.
16      MR. MOSKOVITZ:  Okay.
17      JUDGE KATZMANN:  Did anyone in the settlement
18  and distribution negotiations, and this goes to your
19  colloquy with my colleagues, have incentive to advocate
20  for the position that the injunctive claims possessed by
21  class members who are not eligible for monetary
22  compensation because they are from states that do not
23  allow to sue for damages --
24      MR. MOSKOVITZ:  I'm sorry, I'm having a little
25  trouble hearing you.

Page 52

1      JUDGE KATZMANN:  Okay.  Did anyone in the
2  settlement and distribution negotiations have incentive
3  to advocate for the position that the injunctive claims
4  possessed by class members who are not eligible for
5  monetary damage, for monetary compensation because they
6  are from states that do not allow to sue for damages
7  here actually have some value?  How does that speak to,
8  again, to the adequacy under rule 23?
9      MR. MOSKOVITZ:  One of the most difficult tasks
10  for lead counsel in a case like this where you have
11  varying claims particularly with varying states is to
12  come up with something that's fair, and he gets input
13  from all the lawyers for the people in the various
14  states.  He makes the best judgment he can.  It's messy.
15  I mean it's bound to be imperfect and some people are
16  going to be unhappy.  But what he worked out, people
17  were relatively happy for.
18      JUDGE KATZMANN:  So what is the incentive?
19      MR. MOSKOVITZ:  Pardon me?
20      JUDGE KATZMANN:  What is the incentive?  What is
21  the incentive with respect to those who are not eligible
22  for monetary compensation?
23      MR. MOSKOVITZ:  The incentive during the
24  settlement negotiations.
25      JUDGE KATZMANN:  Yes.

Page 53

1      MR. MOSKOVITZ:  Not earlier?
2      JUDGE KATZMANN:  Right.
3      MR. MOSKOVITZ:  His duty to be fair to
4  everybody.  That's the incentive.  But when you see some
5  claims are worthless what's he supposed to do?  You
6  know, tell these lawyers from these other states your
7  people get less because there's some nuisance value to a
8  Massachusetts lawsuit?  That didn't seem fair to him or
9  to Special Master Quinn or to Judge Tigar.  That just
10  didn't seem fair.  So it's inevitable.  There's a class
11  action with all kinds of people with different claims.
12      If they worked out is they didn't break it up
13  by states.  One of the their objections in the trial
14  court was, oh, this state ought to get more than that
15  state.  No, none of that.  Everybody gets the same,
16  minimum 25 bucks then (inaudible) of your actual
17  damages.  And everybody thought that was relatively
18  fair.  But it's always going to be imperfect.  I mean,
19  this is a huge undertaking.  But, I mean, you know, they
20  want to nitpick every little thing and --
21      JUDGE WARDLAW:  This doesn't sound like legal
22  argument.
23      MR. MOSKOVITZ:  Pardon me?
24      JUDGE WARDLAW:  This isn't sounding like legal
25  argument.  Do you have any further actual legal

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

**Page 54**

```
 1    arguments?  I don't want to --
 2         MR. MOSKOVITZ:  Well --
 3         JUDGE WARDLAW:  This is your life.  You do class
 4    actions for a living.
 5         MR. MOSKOVITZ:  Yeah, the cases we've cited, the
 6    Mego case, the Winn case, there was another case where
 7    they're all Ninth Circuit cases say, along with Mego,
 8    that these things are imperfect.  You take into account
 9    the value of the claims.  And if a claim is worthless or
10    not worth as much the district court judge has the
11    discretion to approve a plan of allocation that gives
12    them less.
13         Now, keep in mind that Judge Tigar dealt with
14    this whole issue we're talking about not in terms of
15    whether the settlement should be approved.  He and Quinn
16    allotted the settlement.  It was a terrific settlement.
17    It came up only with the plaintiff allocation, and I
18    would suggest that you treat it the same way.  If you
19    have a problem with this, I hope you don't, don't undo
20    this settlement and have all that money go back so that
21    the class never sees it again.
22         If you have a problem with the allocation at
23    least we'll keep the money in the bank.  Defendants have
24    no interest in the allocation along the class members.
25         JUDGE WARDLAW:  How do you do that legally?
```

**Page 55**

```
 1         MR. MOSKOVITZ:  Pardon me?
 2         JUDGE WARDLAW:  How do you do that legally,
 3    uphold -- how could you say that there wasn't adequacy
 4    of representation but still uphold the settlement and
 5    order a redistribution?
 6         MR. MOSKOVITZ:  Well, I don't think that's
 7    difficult.  You just use the words you used a few
 8    minutes ago, that this half a billion dollars was
 9    unfairly deliberated all to the 22 states and some of it
10    should go to the three states.  That's an allocation
11    question.  I hope you don't do that, but I think that's
12    the way to handle this rather than undo this settlement
13    which would -- it would truly be a disaster for the
14    class.
15         JUDGE WARDLAW:  Well, then perhaps -- perhaps
16    maybe the parties could reach that and we wouldn't have
17    to if you were to mediate this or something if that's
18    what you think the correct solution is.
19         MR. MOSKOVITZ:  That could happen.  I mean,
20    there could be a settlement.  Oh, you mean on the
21    allocation?
22         JUDGE WARDLAW:  Uh-huh.
23         MR. MOSKOVITZ:  Yeah, that could happen.
24         JUDGE WARDLAW:  If you were to meet now and kind
25    of bring it out.
```

**Page 56**

```
 1         MR. MOSKOVITZ:  They could come to an agreement.
 2    But I would caution you that what I said earlier about
 3    giving objectors weapons to undo class settlements is
 4    very dangerous.  It means, you know, they can get
 5    money --
 6         JUDGE WARDLAW:  But I would submit to you that
 7    the only -- the problem was created by the people who
 8    settled.
 9         MR. MOSKOVITZ:  Well, Special Master Quinn,
10    Judge Tigar looked at this carefully and found that
11    Mr. Alioto behaved properly, that he did his best to try
12    to get representation for those three states and it just
13    didn't work out in this case.  But he still represented
14    those people because of the nationwide injunction that
15    he was seeking.  So legally it was all fine.  I mean,
16    their accusation comes down to one thing, Mr. Alioto had
17    a conflict, which he didn't, his interests were aligned
18    with these three states.  He would love to have gotten
19    representatives from those three states.  He'd get more
20    money.
21         All right.  And then they say he was incompetent
22    because he didn't go out and get clients from those
23    states.
24         JUDGE WARDLAW:  All right, Counsel, now you're
25    just repeating yourself.  So anything further you want
```

**Page 57**

```
 1    to sum up?
 2         MR. MOSKOVITZ:  No.  Defense counsel has a few
 3    comments.
 4         JUDGE WARDLAW:  Yes, I can imagine.
 5         UNIDENTIFIED FEMALE:  Thank you.  May it please
 6    the Court.  I realize I don't have a lot of time.  As
 7    counsel for defendants, I'd really like to make just one
 8    critical point, regardless of how this Court resolving
 9    the question about the fairness of the distribution
10    plan, and we think it was fair, but regardless of that,
11    there is no basis to disturb the settlement agreement.
12    They are two separate documents.  And as this Court has
13    recognized in the Mego case, questions about fairness of
14    the settlement agreement and questions about the
15    fairness of the distribution plan are two separate
16    inquiries.
17         Under the terms of the settlement agreements
18    here defendants paid a single lump sum of almost half a
19    billion dollars which indistinguishably covers the
20    nationwide class and all state classes.  The settlement
21    agreement makes no judgment about the relative value of
22    any claims whether asserted or unasserted.
23         JUDGE CLIFTON:  You don't care how the money is
24    divided?
25         UNIDENTIFIED FEMALE:  We don't care how the
```

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW - SUITE 105, ALBUQUERQUE, NM  87102

## Page 58

```
 1    money is divided.
 2        JUDGE CLIFTON:  You're at complete peace.
 3    You're happy.
 4        UNIDENTIFIED FEMALE:  That's right.  And I would
 5    point this Court to the Third Circuit's decision in the
 6    In Re Pet Food's product liability litigation.  That's
 7    629F3D 333 at 346 to 349 and 358.  It's a 2010 decision.
 8    There the Third Circuit approved the release that was
 9    contained in the settlement agreement and only remanded
10    for a determination as to whether allocation of
11    settlement funds to certain class members was fair,
12    reasonable, and adequate.  There's nothing that
13    precludes this Court from doing the same thing here.
14        If I may, I'd like to address a couple of the
15    questions that the Court had, if this Court will permit
16    me a little bit more time.  Thank you.
17        With respect to the question of valueless
18    claims, whether as a matter of overall fairness or
19    whether as a matter of settlement agreements, valueless
20    claims all need to be compensated in all instances.
21    There is no rule that requires that.  I would point this
22    Court to the Noyan vs. --
23        JUDGE WARDLAW:  But no, that's true, but the
24    problem, I think, at some point was these were viable
25    claims and would have been told and would have lived had
```

## Page 59

```
 1    there been adequacy of representation.
 2        UNIDENTIFIED FEMALE:  The statute of limitations
 3    actually ran on these, each of these claims a long time
 4    ago.  The Missouri claim was never brought.
 5        JUDGE WARDLAW:  Litigation?  Where, in prefiling
 6    of this complaint?
 7        UNIDENTIFIED FEMALE:  The Missouri --
 8        JUDGE WARDLAW:  I mean Counsel said they filed
 9    claims on behalf of them.  They just continue maintain
10    them because there --
11        UNIDENTIFIED FEMALE:  There were never claims
12    filed on behalf of Missouri.  There were no Missouri
13    state law damages claims filed.  So the statute of
14    limitations on Missouri would have run in, it's a
15    five-year statute of limitations as far as I'm aware, so
16    that would have run in November of 2012.  So we're
17    really talking ancient history.  Now, this notion of
18    relation back --
19        JUDGE CLIFTON:  Well, maybe your client has
20    nothing to worry about and doesn't need a release for
21    damage claims for people from Missouri.
22        UNIDENTIFIED FEMALE:  So on the subject of
23    global releases, which are important to incentivize
24    defendants to enter into class settlements of this
25    magnitude, this circuit has found that a federal court
```

## Page 60

```
 1    may release not only those claims that are alleged in a
 2    complaint but also a claim based on the identical
 3    factual predicate, and I'm quoting, "As that underlined
 4    the claims in the settled class action," even though the
 5    claim was not presented and might not have even been
 6    presentable in the class action.
 7        Global releases are exceedingly common.  They
 8    incentivize class settlements.  That's what happened
 9    here.
10        JUDGE CLIFTON:  Well, they're possible.  It
11    doesn't say that it's appropriate in any particular
12    case, and if you're willing to say they've got no viable
13    claim, there's nothing to worry about, then maybe we
14    should let your clients be the ones that decide there's
15    nothing to worry about.  Why should we adjudicate for
16    the people in those states that you don't have a viable
17    claim, nobody brought it, but we're going to pretend
18    that it's been adjudicated.  If you're so confident you
19    can tell your clients not to worry, they don't have any
20    viable claims so we can excise those states from the
21    release.
22        But of course you're not going to do that, and
23    your clients aren't going to agree to that.  So why is
24    it the people in Massachusetts are the ones that take it
25    in the shorts?
```

## Page 61

```
 1        UNIDENTIFIED FEMALE:  A global release does not
 2    convert otherwise valuable claims into -- otherwise
 3    valueless claims into valuable ones.
 4        JUDGE CLIFTON:  But the premise is that the
 5    claims are valueless.  And you're not willing to take
 6    the risk that that's not right.  And so why should
 7    anybody else be expected to take the risk that that's
 8    not right?
 9        UNIDENTIFIED FEMALE:  Well, I guess in this case
10    it goes back to where I started, which is that the
11    settlement agreement, the money that we paid doesn't
12    make any distinction between the value of claims,
13    whether they're valueless, whether they're not
14    valueless.  We paid one single lump sum.
15        JUDGE CLIFTON:  Correct.  But if the risk were
16    zero, as you're assuring us that it is, then your
17    clients could solve the problem as well by deciding,
18    fine, there's no risk so we'll take it.  But they won't
19    do that, and that's what --
20        UNIDENTIFIED FEMALE:  Well, we didn't do that.
21        JUDGE CLIFTON:  You didn't do that.
22        UNIDENTIFIED FEMALE:  We didn't do that in this
23    case.
24        JUDGE CLIFTON:  And if we have this mediation I
25    suspect that question could be put to your clients, only
```

**16 (Pages 58 to 61)**

**Page 62**

```
 1    I wouldn't expect to actually put it if I were the
 2    mediator because it's absurd.  Defendants are paying for
 3    a global release.  But that doesn't explain to me why we
 4    should accept the argument that there's no risk here if
 5    in fact nobody else is willing to step up and take it.
 6          UNIDENTIFIED FEMALE:  But then it's a question
 7    of distribution, and that leaves me where I began, that
 8    really to the extent this --
 9          JUDGE WARDLAW:  But then do you also agree that
10    this is potentially something you could mediate?
11          UNIDENTIFIED FEMALE:  Theoretically.
12          JUDGE WARDLAW:  Right.  All right.  Thank you,
13    Counsel.
14          I'll give you two minutes.
15          JUDGE CLIFTON:  Tell us you've reached an
16    agreement, it'll be worth our while.
17          UNIDENTIFIED FEMALE:  First off, I think in many
18    of these questions they keep going back to by the time
19    of the settlement the claims had no value.  Well, let's
20    look at why the claims had no value.  The claims -- we
21    maintain that they still would have.  But if they had no
22    value the only reason is because in 2010 lead counsel
23    entered into a stipulation which got none of his clients
24    anything.  No client benefitted from that stipulation.
25    The only person who benefitted from that stipulation was
```

**Page 63**

```
 1    lead counsel because it enabled him to hide his
 2    malpractice and start the clock ticking on the one-year
 3    claim for malpractice.
 4          That stipulation was essentially the first
 5    part of a settlement because in the stipulation he
 6    agreed that he would no longer bring any claims, any new
 7    claims for any new party, any new plaintiff, or any new
 8    legal claims.  So he gave up all of the claims and the
 9    omitted repealer states at that time.  And in exchange
10    for it, we got nothing, absolutely nothing.
11          Now, very important, at the time of the
12    stipulation in 2010 the statute of limitations had not
13    run on any of these states.  So he claims he can sit
14    back and wait for others to do his job and bring him a
15    plaintiff.  Well, even if that had happened, the day
16    after the stipulation he'd given up their claims.  He
17    had given up perfectly good claims, which is why we are
18    seeking a reversal of the order approving the
19    stipulation, which is why Reynolds --
20          JUDGE WARDLAW:  But do you also want to -- do
21    you want the approval of the settlement reversed?
22          UNIDENTIFIED FEMALE:  We have sought that, Your
23    Honor.
24          JUDGE WARDLAW:  Do you want to participate in
25    the settlement?
```

**Page 64**

```
 1          UNIDENTIFIED FEMALE:  Yes, because the
 2    settlement itself at the end of the day gives up all of
 3    the claims, both damages and injunctive relief of the
 4    three omitted repealer states in exchange for nothing,
 5    and we think that is in direct violation of Koby.  And
 6    let me just say, in their brief --
 7          JUDGE CLIFTON:  I want to focus your attention
 8    on the question Judge Wardlaw just asked.  Do you really
 9    want this settlement to go away or are you focused, as
10    well, on the plan of allocation that defendants are
11    desperately trying to put it on the table by itself?
12          UNIDENTIFIED FEMALE:  What I really want is for
13    this case to settle and for us to be able to participate
14    equally in the $577 million allocation.
15          JUDGE CLIFTON:  So it sounds like your side of
16    the room might be amenable to seeing if a resolution can
17    be reached as well?
18          UNIDENTIFIED FEMALE:  Absolutely.  Let me just
19    say that back in the trial court the defendants offered
20    to tweak the settlement allocation and it was lead
21    counsel who refused, and that is in Gianasca's ER 554 at
22    133, lines 10 to 14.
23          And finally, he keeps talking about, well, he
24    couldn't go out and find a plaintiff in states where
25    he's not licensed.  First of all, we know that's not
```

**Page 65**

```
 1    true because he already had.
 2          JUDGE CLIFTON:  That's a tangent.
 3          JUDGE WARDLAW:  Yeah, you can be done.
 4          UNIDENTIFIED FEMALE:  And it's legally required.
 5          JUDGE WARDLAW:  I think we're -- I think we're
 6    finished with argument in this case today.
 7          UNIDENTIFIED FEMALE:  Okay.  I thank you very
 8    much for your time.
 9          JUDGE WARDLAW:  We're hearing the same arguments
10    over and over.  So thank you very much, Counsel.  This
11    Indirect Purchaser, plaintiffs, vs. Finn is submitted
12    and this session of the court is adjourned for today.
13          THE BAILIFF:  All rise.
14          [The recording concludes.]
15
16
17
18
19
20
21
22
23
24
25
```

**17 (Pages 62 to 65)**

Page 66

```
 1   In Re:
 2   Indirect Purchaser vs. Finn Hearing

 3   _____

          C E R T I F I C A T E
 4
 5        I, Lisa Reinicke, New Mexico Certified
     Stenotranscriptionist, DO HEREBY CERTIFY that the above
 6   captioned transcription was prepared by me; that the
     RECORDING was reduced to typewritten transcript by me;
 7   that I listened to the entire RECORDING; that the
     foregoing transcript is a complete record of all
 8   material included thereon, and that the foregoing pages
     are a true and correct transcription of the recorded
 9   proceedings, to the best of my knowledge and hearing
     ability.  The recording was of GOOD quality.
10        I FURTHER CERTIFY that I am neither employed by
     nor related to nor contracted with (unless excepted by
11   the rules) any of the parties or attorneys in this
     matter, and that I have no interest whatsoever in the
12   final disposition of this matter.
13
                  _____
14                     Lisa Reinicke,
                       Certified Stenotranscriptionist
15
16
17
18
19
20
21
22
23
24
25
```

PAUL BACA PROFESSIONAL COURT REPORTERS
500 FOURTH STREET NW – SUITE 105, ALBUQUERQUE, NM  87102