UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 3:07-cv-5944 MDL No. 1917 |
| THIS DOCUMENT RELATES TO: ALL INDIRECT PURCHASER ACTIONS | **CLASS ACTION** **DECLARATION OF RICHARD E. FLAMM** Hearing Date: November 15, 2018 Time Set: 2:00 p.m. Judge: Honorable John S. Tigar Courtroom: 9, 19th Floor |

I, Richard E. Flamm, declare:

1.  I am an attorney at law, duly licensed to practice before the state courts of California, as well as many federal courts, including the United States Supreme Court.

2.  I have been a practicing attorney for 36 years and have had my own practice since 1995. In my practice, I concentrate exclusively on matters of legal and judicial ethics. I have served as a consultant or expert witness with respect to dozens of such matters – typically, but not always, those involving claims of conflicted representation – in federal and state courts in many jurisdictions. Often this testimony has been by way of affidavit, but I have also testified as an ethics expert at depositions, at court hearings, and at trial; and, in December of 2009, I was invited to and did testify before Congress regarding the subject of judicial disqualification.

3.  I have taught the subject of Professional Responsibility as an Adjunct Professor at both the University of California at Berkeley (Boalt Hall) and Golden Gate University in San

1

Francisco. In addition, I have frequently lectured on conflicts of interest and other ethical topics, both at private law firm seminars and at public functions throughout the United States.

4. I am the author of several treatises – all of which relate to the subjects of conflicts of interest/or and disqualification. My first law book, Judicial Disqualification*: Recusal and Disqualification of Judges* – originally published by Little, Brown & Company (Boston) in 1996, and now in its Third Edition – has been relied on by the United States Supreme Court and many others. *See, e.g., Whitacre Inv. Co. v. State*, 113 Nev. 1101, 1116 (Nev. 1997), Springer, J. (referring to the undersigned as the nation's "leading authority on judicial disqualification").

5. In 2003 I wrote Lawyer Disqualification*: Conflicts of Interest and Other Bases* (Banks & Jordan Law Publishing Co., Berkeley CA 2003). In 2013 I decided to split the book into two volumes. Lawyer Disqualification: *Disqualification of Attorneys and Law Firms* (Second Edition) was released in 2014. This was followed, in 2015, by the release of a volume which focuses exclusively on conflicts: Conflicts of Interest in the Practice of Law: *Causes and Cures*.

6. From 2000 until 2002, I served as Chair of San Francisco Bar Association's Legal Ethics Committee. I have also served as a member of the Advisory Council for the American Bar Association's Commission on Evaluation of Rules of Professional Conduct ("Ethics 2000"), as Chair of Alameda County Bar Association's Ethics and Professionalism Committee, and as Secretary and Vice-Chair of San Francisco Bar Association's Legal Ethics Committee.

7. Robert J. Bonsignore of Bonsignore Trial Lawyers PLLC ("BTL") recently informed me that in 2016 this Honorable Court issued an Order in which it approved a settlement between the IPP class and certain defendants; that, on behalf of various objectors, BTL and other counsel had appealed; that the Ninth Circuit had expressed serious concerns about the adequacy of the representation that had been afforded to class members in New Hampshire, Massachusetts, and

Missouri ("the Omitted Repealer States" or "ORS") and directed the parties to mediate this issue; and that, when these mediation efforts proved futile, and the case was headed back to the Ninth Circuit, Indirect-Purchaser Plaintiffs' Counsel ("IPPC") made a Motion for Indicative Relief ("MIR") which seeks to amend the Court's prior Fee Order and Distribution Plan in a way that IPPC claim would "moot" the appeal.  Mr. Bonsignore further informed me that the core issue on appeal is the adequacy of IPPC's representation of the Class and the absence of Class representatives from the Omitted Repealer States prior to the Court's 2016 Order, which actions their current proposal cannot remedy.

8.  Mr. Bonsignore asked whether I would be willing to review certain documents, including the transcript of the Ninth Circuit oral argument, and provide the Court with my opinion regarding the ethical issues raised by the MIR.  I agreed to do so.

9.  In order to be in a position to opine about this subject in a way that may be most helpful to the Court I have reviewed a number of documents in addition to the MIR itself and oppositions to that motion. Doc. Nos. 5350, 5351.  These include, but are not limited to: (1) the Report and Recommendations of Special Master Quinn, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 U.S. Dist. LEXIS 24951 (N.D. Cal. Jan. 28 2016); (2) this Court's Final Order Approving Settlement, *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 U.S. Dist. LEXIS 88665 (N.D. Cal. July 7, 2016), (3) this Court's fee order, *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 U.S. Dist. LEXIS 102408 (N.D. Cal. Aug. 3, 2016); and (4) the appellate briefs of both IPPC and some of the Objectors.

10.  After reviewing these documents, and others, I formulated the following two opinions. First, when IPPC utilized the technique of "selective quotation" to inform this Court that they are entitled to make a Motion for Indicative Relief – without mentioning that such a motion must be

timely filed, and without making any effort to show that the Motion was, in fact, timely – IPPC charted an ethically challenged course. My second opinion is that, even if the Motion was deemed timely, IPPC's ability to adequately represent the interests of the claimants in the ORS – as well as class as a whole – has been undermined by actual and serious conflicts of interest.

<u>Timeliness Omission</u>

11. In their MIR, IPPC failed to inform this Court that Rule 62.1(a) – the rule IPPC says they are relying on for the relief they seek – requires that "a timely motion" be made for the relief requested. Here, IPPC omitted any reference to the very first words of the Rule, which make it clear beyond peradventure that a condition precedent to relief under Rule 62.1(a) is the filing of a "timely" motion. This omission is a cause for concern because attorneys who practice law in California have a duty of candor to the court, which is set forth in § 6068(d) of the California Business and Professions Code, which they failed to meet by not disclosing that the MIR had to be "timely."

12. Rule 62.1 does not specify when a motion for indicative relief must be made in order to be timely. The court in *Pinnacle Fitness & Rec. Mgmt., LLC' v. Jerry & Vickie Moyer Family Trust*, 2013 U.S. Dist. LEXIS 155813 (S.D. Cal. Oct. 30, 2013) said that to determine whether such a motion is timely it "must decide what type of motion it is." *Id*. at *9-10. The court found that the motion at issue was "most appropriately considered a motion to alter or amend a judgment under Rule 59(e), which must be filed within 28 days after entry of the judgment." *Id*. at 10. IPPC's motion also appears to be in the nature of a motion to amend or alter a judgment under Rule 59(e) or Rule 60(b), both of which have certain time limits.

13. This Court recently remarked upon a situation – ironically, in the context of a claimed § 6068(d) violation – in which a party cited only that portion of the statute which support its

position. *Cakebread v. Berkeley Millwork & Furniture Co.*, 218 F. Supp. 3d 1040, 1042 (N.D. Cal. 2016) ("Plaintiffs invoke [B&P Code § 6068(d)], but only cite the fragment that appears to support their argument. That fragment says that an attorney must 'employ, for the purpose of maintaining the causes confided to him or her those means only that are as consistent with truth'…the full statute goes on to state 'and never to seek to mislead the judge or any judicial officer by an artifice or false statement of fact or law,' which suggests that section 6068(d) addresses a California attorney's duty of candor toward the court. Indeed, courts have only applied section 6068(d) to an attorney's communications with the court").

Conflicts of Interest

14.  Assuming, *arguendo*, that the pending motion was timely filed – and, therefore, that the Court may properly consider it on its merits – it is not entirely clear to me why IPPC thinks they are in a position to fairly assess the value of the ORS claims or represent the class in advocating for an equitable resolution of those claims.  This is so because, in my opinion, a serious actual conflict has arisen between the interests of IPPC and those of ORS claimants (and the class as a whole) that would appear to preclude a finding that IPPC's continuing representation of the class is adequate.  To understand how I arrived at this opinion it may be helpful to briefly discuss the factors courts have evaluated in determining whether class counsel is impermissibly conflicted.

15.  It has generally been agreed that the conflict-of-interest rules apply to attorneys who represent clients in class action litigation, just as they do to other attorneys. *Schick v. Berg*, 2004 U.S. Dist. LEXIS 6842, 26 (S.D.N.Y. 2004) ("a lawyer's duty to avoid conflicts…is not altered in the class [context]").  The Ninth Circuit has indicated, in fact, that class counsel's responsibility to absent class members does not permit even the "appearance of divided loyalties." *Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1465 (9th Cir.) *cert. denied,* 516 U.S. 914 (1995).  For several

reasons, however, it has been recognized that conflicts that surface in the course of class action litigation cannot be treated in exactly the same way as those that arise in other types of litigation.

16.   For one thing, while all members of a class are similarly situated to some degree, because of the large number of class members it is virtually inevitable that the interests of at least some of them will, at some point, diverge.   *See, e.g., In re Agent Orange Product Liab. Litig.*, 800 F.2d 14, 19 (2d Cir. 1986) (noting that, while there will be common questions affecting the claims of the class members, it is not at all unusual for their interests to diverge at the relief stage).   In other types of cases a material divergence between the interests of a firm's jointly represented clients would oblige it to obtain the informed consent of each affected client or withdraw.   In class actions, full disclosure of the nature and ramifications of all the potential conflicts that could arise is often infeasible and obtaining the requisite consent of all affected class members may be impractical – if not impossible altogether.   *Sharp v. Next Enter. Inc.*, 163 Cal. App.4th 410, 432 (2d App. Dist. 2008). *Cf. Apple Computer, Inc. v. Super. Court*, 126 Cal. App. 4th 1253, 1274 n.7 (2005) ("'Unidentified class members cannot waive a potential conflict'"), quoting *Cal Pak Deliv., Inc. v. Utd. Parcel Serv., Inc.*, 52 Cal. App.4th 1, 12 (1997).

17.   On account of the enhanced prospect for conflicts that exists in the class situation – as well as the diminished potential for acquiring informed consent to proceed with the representation in spite of those conflicts – it has long been recognized that if courts were to automatically transpose the conflicts of interest rules to the class action situation, and invoke the usual remedial responses to conflicts – such as disqualification of conflicted counsel – the result would be a significant reduction in the effectiveness of the class action device.   *See, e.g., In re Agent Orange Prod. Liab. Litig.*, supra, 800 F.2d at 18-19.   It has been said, in fact, that strict application of conflicts rules in the class action context might, in some cases, make the device

unworkable. *Bash v. Firstmark Std. Life Ins. Co.*, 861 F.2d 159, 161 (7th Cir. 1988).  This would be highly undesirable, from a public policy point of view, because in many cases each class member's claims would be too small to justify the expense of a separate suit.  Thus, without a class action there would be no available relief for any of them, however meritorious their claims.

18.  Because class action suits promote the interests of those whose rights might otherwise not be protected, many courts have held or implied that, when it comes to class actions, the conflict rules cannot be applied mechanically applied.  *See, e.g., Andrews Farms v. Calcot, Ltd.*, 2010 U.S. Dist. LEXIS 111656, at *20 (E.D. Cal. 2010) ("'rules that have developed…outside of the class action context should not be mechanically applied'").  *Cf. Lazy Oil Co. v. Wininger v. SI Mgmt.,* 2002 U.S. App. LEXIS 17702, at *18 n.5 (9th Cir. 2002).  Courts have, instead, been exhorted to take a "flexible" approach to evaluating conflicts, in which they balance the interests of the various class members and those of the court and the public at large [*see, e.g., In re Agent Orange Prod Liab. Litig.*, supra, 800 F.2d at 18-190], as well as possible prejudice to any objectors.  *See, e.g., Kullar v. Foot Locker Retail, Inc.*, 191 Cal. App. 4th 1201, 1207 (2011).

19.  The fact that courts have not tended to react "mechanically" to routine conflicts that arise in the course of a class action suit does not mean that conflicts of a more serious nature do not come to the fore, or that courts are powerless to deal with them if they do.  On the contrary, courts know full well that serious conflicts of interest can arise during class action litigation, and they have responded to that possibility with an array of carefully calibrated safeguards.  For one thing, as courts have often observed, following appointment of class counsel the court has an ongoing duty to monitor counsel to assure that the class is adequately represented and that nascent conflicts do not interfere with the exercise of counsel's duties to the class.  *See, e.g., Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998) ("[T]he district court

must…inquire into whether impermissible conflict continues to taint the settlement"); *Mendoza v. United States*, 623 F.2d 1338, 1346 (9th Cir. 1980) (class suits impose special responsibilities upon judges because they carry inherent dangers of conflict), *cert. denied sub nom. Sanchez v. Tucson Unified Sch. Dist. No. 1*, 450 U.S. 912 (1981).

20.  At first blush, the court's duty to monitor class counsel for impermissible conflicts might seem to rest uneasily alongside the admonishment that judges should not react "mechanically" to conflicts that arise in the class action context, but these seemingly competing requirements can readily be reconciled.  The way courts have typically done so is by finding that, while it may be permissible for class counsel to proceed with litigation even if a potential for conflict has arisen – particularly one that is attenuated or, for some other reason, unlikely to redound in any prejudice to members of the class – in a situation where counsel labors under an actual conflict of interest of a more serious nature remedial action must be taken.  *See, e.g., Bash, supra*, 861 F.2d at 161 (noting that courts generally insist that a serious conflict be shown before they take remedial action). *Cf. Apple Computer, Inc., supra* (remarking upon an "insurmountable conflict" that existed between the counsel for the putative class and the class itself).

21.  In class action litigation, conflicts of interest can arise in a variety of ways.  Conflicts concerns often surface, for example, in a situation where some class members object to a proposed settlement; and, as a result, become adverse to the rest of the class.  *See, e.g., Staton v. Boeing Co.*, 327 F.3d 938, 959-961 (9th Cir. 2003).  In addition, because – as in this case – the size of class counsels' fee often dwarfs the maximum possible recovery of each individual class member, a conflict can arise between the interests of class counsel and their clients.  *See, e.g., In re Cendant Corp. Sec. Litig.*, 264 F.3d 201, 254-255 (3d Cir. 2001) ("a rational, self-interested client seeks to maximize net recovery; he or she wants the representation to terminate when his

or her gross recovery minus his or her counsel's fee is largest.  In contrast, at least in theory and often in practice, a rational, self-interested lawyer looks to maximize his or her net fee, and thus wants the representation to end at the moment where the difference between his or her fees and costs…is greatest.  These two points rarely converge.  As a result, there is often a conflict between the economic interests of clients and their lawyers.").

22.  It has been acknowledged that in class actions – as in other types of proceedings in which attorneys negotiate both for a settlement and for fees – the possibility exists that counsel will be tempted to recommend a settlement on terms that are unfavorable to their clients because a large fee is part of the bargain.  *See, e.g., Eubank v. Pella Corp.*, 753 F.3d 718, 720 (7th Cir. 2014) ("American judges are accustomed to presiding over adversary proceedings. They expect the clash of the adversaries to generate the information that the judge needs to decide the case. And so when a judge is being urged by both adversaries to approve the class-action settlement…he's at a disadvantage in evaluating the fairness of the settlement…class counsel, ungoverned as a practical matter by [class members, has], an opportunity to maximize their attorneys' fees…at the expense of the class.  The defendant cares only about the size of the settlement, not how it is divided between attorneys' fees and compensation for the class.  From the selfish standpoint of class counsel and the defendant, therefore, the optimal settlement is one modest in overall amount but heavily tilted toward attorneys' fees.").

23.  As the Court knows, there are two possible checks on this.  The first is the possible presence of objectors.  *In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741 (7th Cir. 2011).  The other is the fact that, in a class action proceeding, the settlement – including the amount of attorneys' fees to award to class counsel – must be approved by the court, which "has a duty 'to protect [class members from lawyers] who may, in derogation of their…obligations, place their

pecuniary self-interest ahead of that of the class.'" *See, e.g., In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 418 F.3d 277, 318 (3d Cir. 2005), quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 279 (7th Cir. 2002).

24.  It has been said that because, in a class action suit, the defense operates as no break against the invidious effects of a conflict of interest between class counsel and class members, courts must be vigilant, and cannot assume the passive role that is appropriate when there is genuine adversity between the parties. *Redman v. Radioshack Corp.*, 2014 U.S. App. LEXIS 18181, at *13 (7th Cir. Sept. 8, 2014).  However, because courts are vested with the authority to reject a settlement offer, the conflict between the class's interest in obtaining the most favorable settlement and the lawyer's interest in maximizing her fee does not necessarily preclude counsel from representing the class. *See In re Agent Orange Product Liab. Litig.*, 818 F.2d 216, 224 (2d Cir. 1987) (opining that, at the stage where both class counsel and defendants seek settlement approval, the court's attention is properly directed toward the overall reasonableness of the offer – not necessarily to whether class counsel placed themselves in a potential conflict situation).

25.  In this case, while it has been more than two years since the Court issued its Final Approval Order its obligations with respect to absent class members has not changed – the Court has both "an independent duty to protect" their interests [*Allen v. Similasan Corp.*, 318 F.R.D. 423, 426 (N.D. Cal. 2016)], and an ongoing "duty to continually scrutinize whether [they] are adequately represented." *Curtis-Bauer v. Morgan Stanley & Co.*, 2008 U.S. Dist. LEXIS 113798, at *5-6 n.1 (N.D. Cal. July 7, 2008) (J. Henderson).  As the Ninth Circuit has instructed, and this Court acknowledged in its Final Approval Order, one of the factors that goes into the "adequate representation" calculus is whether class counsel is laboring under any conflicts of interests. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

26.  In determining whether such a conflict exists courts in the Ninth Circuit typically look to state law.  *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009) ("By virtue of the district court's local rules, California law controls whether an ethical violation occurred"); *Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 136 F.3d 1354, 1357 (9th Cir. 1998) (citing N.D. Cal. Local Rule 11-3) (standards of "professional conduct in [this district] are those of  [the CRPC]").

27.  In California, as elsewhere, a potential for conflict exists in virtually every situation where an attorney represents more than one client, but that potential alone has not normally been deemed to warrant disqualifying counsel or imposing other remedies.  This is true, *a fortiori*, in the class action context, where the potential for conflict is virtually omnipresent.  The situation changes, however, when a potential conflict metamorphosizes into an actual one.  *See, e.g., Cal Pak Deliv. v. United Parcel Serv.*, 52 Cal. App. 4th 1 (1997).

28.  In assessing whether an actual conflict of interest exists, it is also important to consider who bears the burden of proof on this issue.  This may depend, in part, on the nature of the case in which the conflict issue has arisen.  In some types of proceedings – for example, in those where parties have moved to disqualify counsel on conflict grounds – the moving party is ordinarily assigned the initial burden of establishing that counsel's representation is beset by a conflict.  In other types of proceedings, however – particularly those in which counsel must be approved by the court – the burden is usually placed on counsel to show that it is *not* conflicted.

29.  Bankruptcy proceedings provide a case in point.  It is not up to adverse parties or the bankruptcy court to ferret out whether the attorneys who have been chosen to handle a bankruptcy matter have any conflicts of interest that might preclude them from doing so.  It is rather, up to the lawyer or firm who seeks to be appointed to establish that no impermissible conflict exists. *See In re Tevis*, 347 B.R. 679, 693-694 (B.A.P. 9th Cir. 2006).  The same is

generally true of class action litigation.  As this court pointed out in *Garcia v. Johnson*, 2014 U.S. Dist. LEXIS 164454 (N.D. Cal. Nov. 21, 2014), the "party seeking class certification bears the burden of proof in demonstrating that it has satisfied all four Rule 23(a) prerequisites." *Id.* at *45.  This, in turn, means that class counsel is typically assigned the burden of demonstrating that conflicts of interest have not impeded the adequacy of its representation of the class.

30.  In its MIR, however, IPPC is asking the Court to give its imprimatur to proposed amendments to the Court's Fee Order and distribution plan – a request which obliges the Court to consider anew whether the counsel who have proposed these changes are conflicted.  In evaluating the merits of the MIR, in other words, the question the Court must decide is not whether IPPC's class representation was bedeviled by an actual conflict in 2016, but whether a conflict prevents them from providing adequate representation now.  Although IPPC bear the burden of proof on this issue, they have not shown (or even argued) that they are not conflicted; and, therefore, currently capable of adequately representing the class.  However, even if the burden was shifted to the objectors to show that IPPC is laboring under an impermissible conflict, this would not seem to be a particularly onerous burden to bear.

31.  The method the Ninth Circuit chose to attempt to rectify the problems it had identified was to refer the parties to mediation – not to remand the case back to this Court for further proceedings.  It appears, however, that IPPC's ability to use independent judgment to effectively mediate the problem, was constrained by a serious conflict:  IPPC apparently determined that the only realistic way to assuage the concerns the Ninth Circuit had expressed was to offer to have compensation for the claims of claimants in the three ORS come out of their fee award.

32.  This might superficially seem to be a fair and equitable solution to the problem; and, indeed, this was an approach the Ninth Circuit asked IPPC to consider.  The fact is, however,

that by offering to attempt to satisfy the claims of claimants in the ORS out of its fee award IPPC pitted the interests of those claimants in securing the maximum possible compensation for their claims – directly and very adversely – against IPPC's interest in preserving their fee award to the maximum extent possible.  The result of that conflict would appear to be plain to see.

33.  In its Fee Order the Court acknowledged that Class Counsel "would have achieved a better result for the class" if they had, in fact, "obtained compensation for the omitted repealer states."  *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 U.S. Dist. LEXIS 102408, *64 (N.D. Cal. Aug. 3, 2016).  At the time, however, the Court was not called upon to decide – and did not venture a guess – as to just how *much* better that result would have been.

34.  Based on IPPC's own damages expert's study, the damages for all Repealer states was $2.78 billion.  Doc. No. 4740 at p. 6.  Because the parties have agreed that the combined population of the ORS is 10.2% of the total population of the Repealer states, *see* Doc. No. 5335-2 (Schwartz Dec.) at ¶ 14, one might conclude that, all other things being equal, the damages of the IPP claimants in the omitted states would be $283.56 million.  IPPC's recently-hired expert has, however, forecasted the valued those claims at only $5.05 million.  *Id.* at ¶ 22.

35.  I have no expertise that would allow me to meaningfully evaluate the accuracy of either of these estimates.  What seems clear, however, is that in valuing and purporting to advocate for the interests of claimants who reside in the omitted states IPPC had a clear and exceedingly powerful disincentive to zealously represent the interests of those claimants.  I am informed and believe that settlement value is based on damage estimates, not on potential claims rates, as IPPC have proposed here.  *See generally* Newberg on Class Actions § 13:49 (5th ed.) ("Criteria governing final approval—Adequacy of settlement's value").

36. IPPC has recommended that its fee award be reduced by $6 million – a recommendation which, if successful in curing their conflict problem and allowing the Court's settlement approval to be upheld, would result in a reduction of their fee award by a mere point, from 27.5%, to 26.5% (still well above the 25% Ninth Circuit "benchmark"). IPPC's expert has predicted that this amount would suffice to cover all claims from the ORS; but what if he is wrong, as IPPC have conceded he might be? *See, e.g.,* MIR, p.7, n.10. If IPPC was truly using independent judgment in advocating for the interests of the ORS, and the class as a whole, counsel would be arguing that the IPPC fee award should be reduced, not by the amount their expert has postulated – using the parameters IPPC provided to him – but by whatever amount the Court decides, after conducting a plenary hearing, those claims are actually worth based on the potential damages, not on the assumed claims rate. One is constrained to wonder: were the Court to find that the ORS claims are worth $283.56 million, and have a settlement value of $60 million, rather than $6 million, would IPPC still be arguing that their fee be reduced in an amount sufficient to cover the shortfall?

37. To postulate the question, it would seem, is to answer it. The actual conflict that exists in a situation where every penny a lawyer's client will receive must come out of the lawyer's own pocket is an actual and extremely serious one. In fact, with the exception of *Cal Pak Deliv. v. United Parcel Serv.*, 52 Cal. App. 4th 1 (1997) – a case in which counsel surreptitiously contacted the opposing party and offered to dismiss a client's action in return for fees paid directly to the attorney – I cannot recall a situation in which the actual conflict between the interests of class counsel and those they purported to represent was so obvious or severe.

38. This is not, moreover, the only conflict that exists between the interests of IPPC and those of potential claimants in the ORS. For example, as the remaining objectors pointed out in

their oppositions to the MIR, IPPC has proposed that the right to file claims in Massachusetts

and Missouri be limited to natural persons, even though certain entities in Massachusetts are

permitted to make indirect purchaser claims, and Missouri entities can make such claims if their

purchases were made primarily for a non-business use. *See, e.g.*, Doc. No. 5350 at 10:9-13.  It is

certainly in the interests of those entities that IPPC advocate that their claims be compensated;

and, indeed, it appears that IPPC argued that they should be.  As counsel for other objectors has

explained, however, now that the money for claims made by ORS claimants will come out of

IPPC's fee award, instead of from defendants, IPPC have taken a more restrictive view than

before of who qualifies as a bona fide ORS IPP.  Doc. No. 5351 at 16-17.[1]

39.  I have noticed, too – and, I am sure, it has not escaped the attention of the Court – that

IPPC previously argued that they could not be faulted for failing to litigate the ORS claims

because it was not IPPC's job, in Special Master Quinn's words, to "scrounge up" class

representatives from the ORS – and, in any event, Lead Counsel is only "licensed in California"

[Appellate Transcript, 36:17].  However, for purposes of the Mitsubishi Class Action Complaint,

Lead Counsel was able to come up with class representatives in every omitted state who are now

---

[1] Also of interest to me are the points IPPC has made regarding *In Re New Motor Vehicles Canadian Export Antitrust Litigation.* According to IPPC, the district court in *In re NMV* "faced an almost identical situation to that presented here." MIR at 21:3-4. In that case Class Counsel "proposed a plan of distribution that did not permit class members in certain repealer states to file claims because, like here, there were no class representatives for those states. As a result, claims for those states were not alleged in the litigation and the statute of limitations had run." *Id.* at 21:3-8. What the court did in that case was, however, very different from what IPPC previously recommended that this Court should do. As IPPC notes, the district court in *In re NMV* "ordered Class Counsel to include class members in the omitted states in the distribution plan, and ordered a supplemental notice to those class members informing them of their right to file claims." *Id.* at 9-13.  IPPC apparently sees no irony (or conflict) n the fact that, while they have always had a fiduciary duty to zealously advocate for the interests of indirect purchasers in the ORS – and while the precedent for compensating claimants in the ORS preceded this Court's Final Approval Order by five years – it was only after the Court of Appeals let it be known that it was disinclined to affirm an order that provided no mechanism for compensating ORS claimants that IPPC saw fit to argue that "this Court should do the same." *Id.* at 21:13.

willing to swear under penalty of perjury that they approved of IPPC's Rule 62.1 motion.  *See*
Doc. Nos. 5343-45.  The idea that IPPC – who previously justified writing off the claims of
millions of potential claimants in three states because viable class representatives purportedly
could not be found during the many years IPPC represented those claimants – had no trouble
locating and signing up representatives from the ORS as soon as it became necessary to do so in
order to preserve the IPPC's fee award, does nothing to persuade me that IPPC's conflicts of
interest are not continuing to impede their ability to provide adequate representation to the class
as a whole.

40.  It bears emphasizing that IPPC's conflict is not just with absent class members in the
ORS, but with the whole class.  It is in IPPC's interests to preserve as much of its fee award as
possible, but it is in the interests of the class that its counsel act to assure that the settlement fund
that was approved by this Court remains intact.  IPPC concedes that, if their expert's prediction
is off, there could be a "dilution of the claims of existing claimants," but say that the Court
should not worry about this prospect because any such dilution "would be de minimis."  MIR
7:13-15.  The theory seems to be that even if IPPC's expert undervalued the ORS claims by
millions of dollars – and even though compensation for those claims would then have to come
out of the settlement fund, rather than IPPC fees – existing claimants would not suffer a hardship
because they would only receive a few cents less "per CRT Weighted Unit."  MIR 7: 26-27.

41.  The problem with this theory would appear to be two-fold.  First, IPPC does not attempt
to define the term "de minimis" – which one online dictionary describes as "too trivial or minor
to merit consideration" (and which, for some IPP, could be said to apply to the $25 minimum
payment IPPC asked this Court to approve) – or explain why, if the Court accepts IPPC's logic,
every class action attorney would not be emboldened to argue, going forward, that the court

should award counsel a larger fee because, in cases in which there are thousands or even millions

class members, any concomitant "dilution of the existing claimants' claims" by even millions

dollars would result in only a "de minimis" detriment to the individual members of the class.

Second, and perhaps more fundamentally, there is no precept in the law of professional

responsibility which says that attorneys can place their own pecuniary interests above those of

their clients as long as those clients will not suffer substantial hardship as a result.


I declare under penalty of perjury under the laws of the United States and the State of

California that the foregoing is true and correct.


Executed on this 1st day of November, 2018, in Berkeley, California.


Richard E. Flamm