1   John Taladay (*pro hac vice*)
    john.taladay@bakerbotts.com
2   BAKER BOTTS LLP
    1299 Pennsylvania Ave., NW
3   Washington, D.C. 20004
    Telephone: (202) 639-7700
4   Facsimile: (202) 639-7890

5   Stuart C. Plunkett (State Bar No. 187971)
    stuart.plunkett@bakerbotts.com
6   Peter Huston (State Bar No. 150058)
    peter.huston@bakerbotts.com
7   BAKER BOTTS LLP
    101 California Street, Suite 3600
8   San Francisco, California 94111
    Telephone: (415) 291-6200
9   Facsimile: (415) 291-6300

10  *Attorneys for*
    *IRICO GROUP CORP. and*
11  *IRICO DISPLAY DEVICES CO., LTD.*

12

13                  **UNITED STATES DISTRICT COURT**

14          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

15                     **SAN FRANCISCO DIVISION**

16  IN RE: CATHODE RAY TUBE (CRT)        )   Case No. 3:07-cv-05944-JST
    ANTITRUST LITIGATION,               )
17                                      )   MDL No.: 1917
                                        )
18  THIS DOCUMENT RELATES TO:           )   **IRICO GROUP CORPORATION'S**
                                        )   **AMENDED MOTION TO DISMISS**
19  *ALL INDIRECT PURCHASER ACTIONS*    )   **CLAIMS OF INDIRECT**
                                        )   **PURCHASER PLAINTIFFS FOR**
20                                      )   **LACK OF SUBJECT MATTER**
                                        )   **JURISDICTION (FED. R. CIV. P.**
21                                      )   **12(b)(1))**
                                        )
22                                      )   Date:       May 30, 2019
                                        )   Time:       2:00 p.m.
23                                      )   Judge:      Honorable Jon S. Tigar
                                        )   Courtroom:  9
24

25

26

27

28

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on May 30, 2019, at 2:00 p.m., or as soon thereafter as the matter may be heard, before the Honorable Jon S. Tigar, United States District Judge of the Northern District of California, San Francisco Courthouse, located at Courtroom 9, 19th Floor, 450 Golden Gate Avenue, San Francisco, California, Irico Group Corporation ("Irico Group" or "Group", together with Irico Display Devices Co., Ltd., "Irico" or "Irico Defendants"), by and through its undersigned counsel, will and hereby does move, pursuant to Federal Rules of Civil Procedure 12(b)(1) for an Order dismissing all claims in Indirect Purchaser Plaintiffs' ("IPPs") Fourth Consolidated Amended Complaint (Dkt. 1526) against Irico Group for lack of subject matter jurisdiction.

This Amended Motion is based on this Notice of Motion, the following Memorandum of Points and Authorities in support thereof, the Amended Declaration of Zhaojie Wang ("Amended Wang Decl."), the Declaration of Donald Clarke ("Clarke Decl.") (ECF No. 5392-3), the Amended Declaration of Stuart Plunkett ("Amended Plunkett Decl."), any materials attached thereto or otherwise found in the record, along with the argument of counsel and such other matters as the Court may consider.

## ISSUES TO BE DECIDED

1.      Whether the Court lacks subject matter jurisdiction over Irico Group pursuant to the Foreign Sovereign Immunities Act, 28 U.S. §§ 1602 *et seq.*

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ......................................................................................... i

ISSUES TO BE DECIDED ......................................................................................................... i

I.      INTRODUCTION ........................................................................................................... 1

II.     BACKGROUND AND FACTS ....................................................................................... 2

        A.      Procedural Background ......................................................................................... 2

        B.      Irico Group Was Wholly Owned By the State Council, Created for the Benefit
                of the People of China, and Tightly Controlled by the State ................................ 3

                1.      Irico Group Was a State-Owned Enterprise ............................................. 3

                2.      The State Council of the People's Republic of China Created Irico
                        Group for the Benefit of the People of China Pursuant to Centralized
                        Government Reform Initiatives ................................................................. 4

                3.      The State Directly Managed and Tightly Controlled Irico Group .......... 6

III.    ARGUMENT ................................................................................................................... 8

        A.      The Court Lacks Subject Matter Jurisdiction Because Irico Group is Immune
                from Suit in the United States as an Agency or Instrumentality of the
                People's Republic of China .................................................................................. 8

                1.      Irico Group Was Wholly Owned by the Chinese State and Qualifies as an
                        Agency or Instrumentality of China ......................................................... 9

                2.      No Exceptions Apply That Would Deprive Irico Group of Sovereign
                        Immunity ................................................................................................. 10

IV.     CONCLUSION ............................................................................................................. 16

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Adler v. Fed. Republic of Nigeria,*
    107 F.3d 720 (9th Cir. 1997) ....................................................................................12, 13

*Am. West Airlines, Inc. v. GPA Group, Ltd.,*
    877 F.2d 793 (9th Cir. 1989) ....................................................................................10, 14

*Argentine Republic v. Amerada Hess Shipping Corp.,*
    488 U.S. 428 (1989) .........................................................................................................9

*California v. NRG Energy, Inc.,*
    391 F.3d 1011 (9th Cir. 2004) ...........................................................................12, 13, 14

*Chirila v. Conforte,*
    47 Fed. App'x 838 (9th Cir. 2002) ..................................................................................16

*Compania Mexicana de Aviacion, S.A. v. U.S. Dist. Ct. for the C.D. Cal.,*
    859 F.2d 1354 (9th Cir. 1988) ..........................................................................................9

*Corzo v. Banco Cent. Reserva del Peru,*
    243 F.3d 519 (9th Cir. 2001) ....................................................................................10, 15

*Dole Food Co. v. Patrickson,*
    538 U.S. 468 (2003) .........................................................................................................9

*Gregorian v. Izvetsia,*
    871 F.2d 1515 (9th Cir. 1989) ........................................................................................12

*Gross v. FBL Fin. Servs., Inc.,*
    557 U.S. 167 (2009) .......................................................................................................15

*Guirlando v. T.C. Ziraat Bankasi A.S.,*
    602 F.3d 69 (2d Cir. 2010) .............................................................................................12

*In re N. Sea Brent Crude Oil Futures Litig.,*
    No. 1:13-MD-02475(ALC), 2016 WL 1271063 (S.D.N.Y. Mar. 29, 2016) ........................14

*In re Wholesale Electricity Antitrust Cases I & II,*
    No. 2-0990-RHW, 2002 WL 34165887 (S.D. Cal. Dec. 17, 2002) ......................................14

*Joseph v. Office of Consulate Gen. of Nigeria,*
    830 F.2d 1018 (9th Cir. 1987) ........................................................................................14

*Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.,*
    753 F.3d 395 (2d Cir. 2014) ...........................................................................................15

*Lyons v. Augusta S.P.A.*,
  252 F.3d 1078 (9th Cir. 2001) ................................................................12

*MOL, Inc. v. Peoples Republic of Bangladesh*,
  736 F.2d 1326 (9th Cir. 1984) ..................................................................9

*Murphy v. Korea Asset Mgmt. Corp.*,
  421 F. Supp. 2d 627 (S.D.N.Y. 2005) ....................................................16

*Peterson v. Islamic Republic of Iran*,
  627 F.3d 1117 (9th Cir. 2010) ................................................................10

*Piedmont Label Co. v. Sun Garden Packing Co.*,
  598 F.2d 491 (9th Cir. 1979) ..................................................................16

*Rep. of Austria v. Altmann*,
  541 U.S. 677 (2004) ..................................................................................9

*Republic of Argentina v. Weltover, Inc.*,
  504 U.S. 607 (1992) ............................................................................12, 13

*Rote v. Zel Custom Mfg. LLC*,
  816 F.3d 383 (6th Cir. 2016) ..................................................................15

*Saudi Arabia v. Nelson*,
  507 U.S. 349 (1993) ................................................................................10

*Sec. Pac. Nat'l Bank v. Derderian*,
  872 F.2d 281 (9th Cir. 1989) ............................................................11, 15

*Siderman de Blake v. Republic of Argentina*,
  965 F.2d 699 (9th Cir. 1992) ....................................................................9

*Terenkian v. Republic of Iraq*,
  694 F.3d 1122 (9th Cir. 2012) ................................................11, 12, 13, 14

*Theo. H. Davies & Co. v. Republic of Marshall Islands*,
  174 F.3d 969 (9th Cir. 1998) ..................................................................15

*Trans Chem. Ltd. v. China Nat'l Mach. Import & Export Corp.*,
  978 F. Supp. 266 (S.D. Tex. 1997) ............................................................3

*United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*,
  33 F.3d 1232 (10th Cir. 1994) ................................................................13

**STATUTES**

28 U.S.C. §1602 ..........................................................................................5

28 U.S.C. §1603 ..................................................................................6, 9, 10

28 U.S.C. §1604 ...................................................................................................8, 10

28 U.S.C. §1605 ...........................................................................................................11

1  **I.   INTRODUCTION**

2           The Court lacks subject matter jurisdiction over Irico Group under the Foreign Sovereign

3  Immunities Act ("FSIA"), 28 U.S. §§ 1602 *et seq.*  Irico Group has always been *wholly* owned by

4  the State Council ("State Council") of the People's Republic of China ("PRC").  The Chinese

5  government created Irico Group for the benefit of the Chinese people, and the government tightly

6  controlled all of Irico Group's high-level management and day-to-day business operations.  Irico

7  Group is thus an agency or instrumentality of the Chinese Government and is presumptively

8  entitled to sovereign immunity.

9           Irico Group was established through the direct approval of the Chinese Ministry of

10  Machinery and Electronics Industry of the People's Republic of China on March 16, 1989.

11  (Amended Wang Decl. ¶ 20; Amended Plunkett Decl., Ex. 46.)  As a state-owned enterprise,

12  Group was funded *solely* by the Chinese government.  (Amended Wang Decl. ¶ 26; Amended

13  Plunkett Decl., Ex. 29 at -514.)  As part of the PRC's Seventh Five-Year Plan, the national

14  government created Irico Group for the explicit purpose of developing and manufacturing CRT

15  technologies within mainland China and to respond to the needs of the Chinese people for color

16  televisions.  (Amended Wang Decl. ¶ 21; Amended Plunkett Decl., Ex. 6.)  The government also

17  required that Irico Group, as a state-owned company, provide a host of societal benefits to the

18  people, including Group's creation and maintenance of local schools, a police force, hospitals,

19  and recreational facilities.  (Amended Wang Decl. ¶¶ 25-27; Amended Plunkett Decl., Ex. 49 at

20  -964.)  And the State directly managed and tightly controlled virtually all Irico Group operations.

21  By way of example only, the Chinese Government—through the State-owned Assets

22  Supervision and Administration Commission of the State Council ("SASAC")—appointed and

23  removed all members of the board or directors, general managers, and certain lower level

24  employees; required Group to achieve performance targets for maintenance and appreciation of

25  State-owned assets; evaluated and determined compensation for the board and management

26  employees; embedded "supervisory panels" inside Irico Group to monitor the businesses'

27  day-to-day functions; approved/rejected annual budgets and capital expenditure requests;

28  required Group to pay a set portion of profits back to the government and reinvest the remainder

Irico Group's Amended Motion to Dismiss
IPPs for Lack of Jurisdiction                    1                    Case No. 3:07-cv-05944-JST
                                                                     MDL No. 1917

so as to increase the value of State-owned assets; and disciplined Irico Group employees, including by expelling same from Irico Group's employ.  (Amended Wang Decl. ¶¶ 22, 24, 27-29, 31-38.)  At the time the original complaint was filed, Irico Group was a state-owned enterprise wholly owned by the State Council and controlled through several departments of the State Council including SASAC.  (Amended Wang Decl. ¶¶ 22-24.)

IPPs cannot establish that any exception to Irico Group's presumed immunity under the FSIA applies.  In particular, Irico Group's alleged actions do not fall within the "commercial activity" exception to the statute.  As required to defeat a claim of immunity, IPPs cannot establish a "direct effect" in the U.S. that followed as an "immediate" consequence of Irico Group's commercial activity.  Moreover, the law squarely rejects any claim that Irico Group's alleged participation in a global conspiracy qualifies as a "direct effect" that would defeat the presumption of immunity.  Finally, as IPPs cannot establish that any other exception to FSIA immunity applies to Irico Group, the Court should hold that Irico Group is immune from suit as an agency or instrumentality of the People's Republic of China and thus order the dismissal of Irico Group with prejudice.

## II.      BACKGROUND AND FACTS

### A.      Procedural Background

This case relates to a purported conspiracy to fix the prices of cathode ray tubes ("CRTs").  IPPs represent a class of individuals and entities in certain states that purchased televisions or monitors containing CRTs from customers of one or more of the defendants.  (Dkt. 1742 at 2-3.)  Irico appeared in the case in June 2008, represented by different counsel, and joined motions to dismiss, (Dkts. 308, 479), which the Court denied on March 30, 2010, (Dkt. 665).  Believing itself immune to suit in the United States, Irico ceased participation in May 2009.  (Dkt. 732 at 1.)   Default was entered against Irico in the IPP action on July 22, 2016.  (Dkt. 4729.)   Following motions practice with Direct Purchaser Plantiffs ("DPPs"), Irico Defendants and IPPs stipulated that the entry of default be vacated, and the Court vacated the default on April 6, 2018.  (Dkt. 5271.)  After referral of the issue to the Special Master, IPPs were permitted to participate jointly with DPPs in jurisdictional discovery.  (*See* Dkt. 5310.)  The

parties have since engaged in limited discovery relating to whether the Court has jurisdiction over either Irico Defendant.  (*Id.*)

**B.**  **Irico Group Was Wholly Owned By the State Council, Created for the Benefit of the People of China, and Tightly Controlled by the State**

**1.**  **Irico Group Was a State-Owned Enterprise**

Irico Group has been a State enterprise, wholly-owned by the State Council of the People's Republic of China, since its creation by the government in 1989.  (Amended Wang Decl. ¶ 20; Amended Plunkett Decl., Ex. 46.)  Group was formed out of the wholly state-owned assets of the Shaanxi Color CRT "4400" Plant.  (Amended Wang Decl. ¶ 20; Amended Plunkett Decl., Ex. 46.)  The "4400" Plant was also classified as an enterprise owned by the whole people of the PRC. (Amended Wang Decl. ¶ 20; Amended Plunkett Decl., Ex. 46.)  Ownership "by the whole people," a concept enshrined in the Chinese Constitution, is synonymous with ownership by the Chinese government.  *See* Constitution of the People's Republic of China ("PRC Const."), Art. 7 ("The State-owned economy, namely, the socialist economy under ownership by the whole people, is the leading force in the national economy. The State ensures the consolidation and growth of the State-owned economy.")[1]; *see also Trans Chem. Ltd. v. China Nat'l Mach. Import & Export Corp.*, 978 F. Supp. 266, 290 (S.D. Tex. 1997) (concluding that Chinese law and regulations supported a finding that "Chinese industrial enterprises 'owned by the whole people' . . . are 'state-owned,' with proprietary rights exercised by the State Council on behalf of the state").

Group was established through the direct approval of the Chinese Ministry of Machinery and Electronics Industry on March 16, 1989.  (Amended Wang Decl. ¶ 20; Amended Plunkett Decl., Ex. 46.)  Group was a state-owned enterprise wholly owned by the State Council when the IPPs filed their initial complaint in 2007.  (Amended Wang Decl. ¶ 23; Clarke Decl. ¶ 19.[2])  The State Council is the central executive government of the People's Republic of China.  *See* PRC Const., Art. 85 ("The State Council, that is, the Central People's Government, of the People's

---

[1] *Available at* http://www.npc.gov.cn/englishnpc/Constitution/node_2825.htm.

[2] Citations in the Clarke Declaration to "Plunkett Decl." refer to identical exhibit numbers as those attached to the Amended Plunkett Declaration filed in support of this motion.

Republic of China is the executive body of the highest organ of state power; it is the highest organ of State administration."); (Amended Wang Decl. ¶ 22; Clarke Decl. ¶ 20; Amended Plunkett Decl. Ex. 4 at -515 (showing all of Irico Group's capital owned by "The State Council").)

As a state-owned enterprise, Group was funded solely by the Chinese government. (Amended Wang Decl. ¶ 26; Amended Plunkett Decl., Ex. 29 at -514.)  Group benefited from complete government financial support.  (Amended Wang Decl. ¶¶ 25-27; Amended Plunkett Decl., Ex. 49 at -964, 48 (SASAC letter approving "State-owned Capital Operation" budget for Irico Group).)  The level of financial support provided by the PRC went well beyond benefits conferred on non-state-owned Chinese businesses.  (Amended Wang Decl. ¶¶ 25-27; Amended Plunkett Decl., Ex. 49 at -964, 48.)

> **2.     The State Council of the People's Republic of China Created Irico Group for the Benefit of the People of China Pursuant to Centralized Government Reform Initiatives**

The PRC created Irico Group to provide valuable CRT technology to the people of China and the Chinese government mandated that Group provide a host of social services that benefitted the people of Xianyang City, Shaanxi Province, where Group is headquartered.  The PRC deemed Group as an enterprise "hav[ing] a vital bearing on the lifeline of the national economy" of China.  (*See* Decree of the State Council of the People's Republic of China No. 378, Art. 5 (May 27, 2003) ("SASAC Regs.")[3]; Amended Wang Decl. ¶ 24; Amended Plunkett Decl. Ex. 12 at -581 (government notice describing Irico Group as "a key large state-owned enterprise").)

Group's origins trace back to a decision by the State Council in the 1970s to fully fund and support the production of CRTs due to the strategic importance of CRTs in the development of China's national economy.  (Amended Plunkett Decl., Ex. 30 at -651 (comments from Chinese Deputy Prime Minister that "Color TV is very important for industry, national defense, and civilian use.  It must not be omitted from the projects and it must be included in the plan when we formulate the Five-Year Plan.").)   Given the significance of CRTs in the fields of

---

[3] *Available at* http://en.sasac.gov.cn/n1408035/c1477199/content.html.

communications, science, education, culture, medicine, industry, agriculture, and others, the Fourth Ministry of Machinery Industry reported to the State Council on February 17, 1977 that it intended to introduce CRT technology and equipment from abroad.  (*Id.*)  This resulted in the construction of the wholly state-owned, state-funded, and state-operated Shaanxi Color CRT "4400" Plant in 1978 in Xianyang.  The 4400 Plant was "listed as one of the key projects under the State's 'Sixth Five-Year Plan."  (Amended Plunkett Decl., Ex. 46 at -907-908, 6 at -527.)

As part of state-directed reform under China's Seventh Five-Year Plan,[4] Group was established by the Chinese government in 1989 to further develop CRT technology and to aid in China's national economic development by responding to the need of the Chinese people for color televisions. (Amended Wang Decl. ¶ 21; Amended Plunkett Decl., Ex. 6; Clarke Decl. ¶ 14.)  As a state-owned and controlled enterprise, the Chinese government required Group to undertake a host of public service obligations for the benefit of the people of Xianyang City. Group provided primary and secondary public schools, the local police department, a hospital, public transportation, public recreational facilities to citizens living around and working at Irico's business operations in Xianyang, Shaanxi Province, and a host of other public welfare projects.  (Amended Wang Decl. ¶¶ 25-27; Amended Plunkett Decl., Ex. 49 at -964 ("Due to historical reasons and geographical environment, the Group has assumed a considerable number of social functions, wherein affiliated schools, hospitals, kindergartens, public security offices etc. were established. . . .  [C]onsiderable effort and expense are required in such units so that the Group could not fully focus on production and operating activities."), -968 (listing "Social units ran by the Group," including those "responsible for government functions," "[p]ublic welfare units," and other "[w]elfare-type units.").)

---

[4] The Five-Year Plans are broad economic and social development initiatives formulated and issued periodically by the Chinese government.  The Seventh Five-Year Plan, in effect when Irico Group was created, stated among its goals to "gradually shift state control of enterprises from direct to indirect means, in order to establish a socialist macroeconomic control system."  (Amended Plunkett Decl., Ex. 53 at Ch. 43; *see also* Clarke Decl. ¶¶ 10-16 (explaining evolution of China's state-owned economy).)

### 3. The State Directly Managed and Tightly Controlled Irico Group

Group was subject to the direct management, supervision, and control of SASAC and other departments of the State Council, including the Ministries of Finance and Personnel.[5] *See* Decree of the State Council of the People's Republic of China No. 378, Art. 5 (May 27, 2003) ("SASAC Regs."), *available at* http://en.sasac.gov.cn/n1408035/c1477199/content.html; (Amended Wang Decl. ¶ 24; Amended Plunkett Decl. Ex. 12 at -581 (government notice describing Irico Group as "a key large state-owned enterprise"), 29 at -642 (SASAC notice listing Irico Group as an entity "under the direct supervision and management of SASAC"); Clarke Decl. ¶ 22.)  SASAC's control over Group was authorized by the Interim Regulations on Supervision and Management of State-owned Assets of Enterprises, adopted by the State Council in 2003 and in effect in late 2007.  *See* SASAC Regs., Art. 2.  These governmental regulations specified that SASAC *shall*:

- "appoint and remove" the board of directors, "general manager, deputy general manager, chief accountant," and other "responsible persons" of Group, SASAC Regs. at Art. 17(1) (see, e.g., Amended Plunkett Decl. Ex. 45 at -867 (SASAC notice appointing General Manager of Irico Group));

- evaluate the performance and "determine the remuneration" of board members and management of Group, including "grant[ing] rewards" or "impos[ing] punishments . . . based on the evaluation results," SASAC Regs. at Art. 19 (see Amended Wang Decl. ¶ 32; Amended Plunkett Decl. Ex. 15, 26-28 (SASAC notices regarding performance evaluation and compensation for Irico Group management in 2004 and 2005));

- "dispatch supervisory panels" to Group, id. at Art. 34 (see Amended Wang Decl. ¶ 31; Amended Plunkett Decl. Ex. 13 at -706, -708, Ex. 18 at -593 (2004, 2005, and 2007 SASAC letters appointing supervisors to Irico Group));[6]

- "safeguard the rights and interests" of the state in the assets utilized by Group and perform responsibilities on behalf of the State as the sole investor in Group, id. at Art. 13(1), 35;

---

[5] As unincorporated departments of the State Council assigned various tasks of governance, SASAC and other ministries such as the Ministry of Finance are "political subdivisions" of the Chinese government under the FSIA.  *See* 28 U.S.C. 1603(a); (Amended Plunkett Decl. Ex. 51; Clarke Decl. ¶ 15).

[6] These supervisory panels "carr[ied] out regular . . . or irregular inspections" of Irico Group, were empowered to "supervise the financial activities" of Group and "the operational and management activities" of Group's top management, and had specific authorization to interview any employees, review "financial and accounting records," conduct "investigations and inquiries," and attend Irico Group meetings.  Decree of the State Council of the People's Republic of China No. 283 (Mar. 15, 2000), Art. 3, 5-7, *available at* http://en.pkulaw.cn/display.aspx?cgid=27155&lib=law.

- "supervise" and perform regular audits to ensure the "preservation of and increase in the value of State-owned assets" held by Group, SASAC Regs. at Art. 13(5) (see Amended Wang Decl. ¶ 33; Amended Plunkett Decl. Ex. 22-24 (2005, 2006, and 2007 SASAC notices to Irico Group regarding audit and evaluation of Group's prior year financial accounts, which included "level-three or above subsidiaries" of Group));

- review and approve all Group "restructuring plans" and "articles of association," SASAC Regs. at Art. 20  (see Amended Wang Decl., and "guide and push forward" any reform or restructuring efforts, id. at Art. 13(2) (see Amended Wang Decl. (see, e.g., Amended Plunkett Decl. Ex. 25 at -624 (SASAC directive approving and giving instructions to Irico Group regarding 2004 restructuring plans));

- decide "on such major matters as the division, merger, bankruptcy, dissolution, capital increase or decrease, or issue of company bonds" affecting Group and "make arrangements for settling laid-off workers," SASAC Regs. at Art. 21, 25 (Amended Wang Decl. ¶¶ 29-30);

- "authorize . . . operation of State-owned assets" by Group and its subsidiaries, SASAC Regs. at Art. 28; and

- receive regular reports from Group on its "finance[s], production, and operation" as well as the preservation or appreciation of state-owned assets, at Art. 37, 39 (see Amended Wang Decl. ¶ 33; Amended Plunkett Decl. Ex. 19 at -594 (2003 letter from SASAC Statistical Evaluation Bureau reviewing materials submitted by Irico Group to evaluate Group's success in "preservation and appreciation of state-owned capital")).

In addition, all directors, managers, and other "responsible persons" of Group were at all relevant times subject to government disciplinary sanctions by SASAC—including "removal from office," disqualification from any future leadership positions at state-owned enterprises, and potential "criminal liability"—for actions causing a "loss of State-owned assets."  SASAC Regs. at Art. 40, 41 (see Amended Wang Decl. ¶ 37, 38; Amended Plunkett Decl. Ex. 50 at -012.) For example, in 2003, the Communist Party Enterprise Working Committee issued a notice announcing former Group General Manager Weiren Wu's expulsion from the Party for corruption charges and prohibited him from holding future positions at any state-owned enterprises.  (Amended Plunkett Decl. Ex. 50 at -012.)

Group was also required to refer all investment activities and major asset or property rights transfers to SASAC for approval.  (Amended Wang Decl. ¶ 34; Amended Plunkett Decl., Ex. 36 at -712 (2006 investment report and 2007 investment plan of Irico Group and its subsidiaries, submitted to SASAC for review and approval).)  All major operating activities, financial policies, and appointments or dismissals of senior executives were directly managed by

departments of the State Council.  (Amended Wang Decl. ¶¶ 24, 26, 28-29.)  Group was also obligated to achieve performance targets for maintenance and appreciation of State-owned assets in accordance with government requirements.  (Amended Wang Decl. ¶ 35; Amended Plunkett Decl., Ex. 24 at -619-20 (2007 notice from SASAC to Irico Group, evaluating Group's 2006 financial performance, assigning it a "performance evaluation score," and directing Group to "take proactive measures . . . [to] improve the operating efficiency of state-owned capital.").)  Group received all its capital funding from the Chinese government; its budget was set annually by SASAC and the Chinese Ministry of Finance, consisting of government funds appropriated to Group for various purposes, including for use on specific projects by its subsidiaries.  (Amended Wang Decl. ¶ 26, 27; Amended Plunkett Decl., Ex. 38 at -737 (Official SASAC notice of "2009 central state-owned capital operating budget . . . approved by the State Council" and issued to Irico Group.), 39 at -739 (Ministry of Finance notice of same).)  Group was obligated to pay a set portion of its profits back to the government, while the remainder was permitted to be reinvested to increase the value of Group's state-owned assets.  (Amended Wang Decl. ¶ 36; Amended Plunkett Decl., Ex. 43 at Art. III-IV (2007 Ministry of Finance regulations directing "central enterprises" to turn over "proceeds from State-owned capital" directly "to the central treasury," including "profits payable," "dividends and bonuses of State-owned shares" from "State-controll[ed] enterprise[s]", and other "State-owned capital" proceeds); 16 at -588 (SASAC notice to Group directing it to turn over RMB2.98 million in 2007 "state-owned capital gains").)

III.    **ARGUMENT**

   A.    **The Court Lacks Subject Matter Jurisdiction Because Irico Group is Immune from Suit in the United States as an Agency or Instrumentality of the People's Republic of China**

   The FSIA insulates Irico Group from the exercise of jurisdiction in the United States.  *See* 28 U.S.C. § 1604.  The FSIA is "a comprehensive statute containing a set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities."  *Rep. of Austria v. Altmann*, 541 U.S. 677, 691 (2004) (internal quotation marks omitted), and "is the exclusive source of subject matter

jurisdiction over all suits involving foreign states and their instrumentalities." *Compania Mexicana de Aviacion, S.A. v. U.S. Dist. Ct. for the C.D. Cal.*, 859 F.2d 1354, 1358 (9th Cir. 1988).   Under the FSIA, the definition of a "foreign state" includes any "agency or instrumentality of a foreign state," to wit, any entity:

> (1) which is a separate legal person, corporate or otherwise, and

> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b); *see also Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 428-29, 434-35 (1989) (the FSIA is "the sole basis for obtaining jurisdiction over a foreign state in United States courts" and "must be applied by district courts in every action against a foreign sovereign"); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 706 (9th Cir. 1992) ("As a threshold matter, therefore, a court adjudicating a claim against a foreign state must determine whether the FSIA provides subject matter jurisdiction over the claim."); *MOL, Inc. v. Peoples Republic of Bangladesh*, 736 F.2d 1326, 1328 (9th Cir. 1984) ("As section 1330(a) indicates, sovereign immunity is not merely a defense under the FSIA. Its absence is a jurisdictional requirement.").   It is undisputed that Irico Group is a separate legal person under subsection 1603(b)(1) and a citizen of China for purposes of subsection (3).

### 1.      Irico Group Was Wholly Owned by the Chinese State and Qualifies as an Agency or Instrumentality of China

For purposes of applying the FSIA, an entity's status must be determined at the time the complaint was filed. *Dole Food Co. v. Patrickson*, 538 U.S. 468, 479-80 (2003).   At the time the IPPs filed their original complaints against Irico, Irico Group was 100% owned by the State Council of the People's Republic of China.   (Amended Wang Decl. ¶¶ 22-23; Amended Plunkett Decl., Ex. 4 at -515 (showing all of Irico Group's capital owned by "The State Council" in 2000), 34 at -682 (audit report showing all of Irico Group's capital was still wholly "state-owned" in 2008); Clarke Decl. ¶ 19; *see also* Dkt. 310 (corporate disclosure statement filed on June 24,

2008 stating that "Irico Group . . . is a corporation wholly owned by the People's Republic of China and has no parent company").)   Irico Group is thus a "foreign state" for purposes of Section 1603(b)(2) and its immunity from suit is therefore presumed.  28 U.S.C. §§ 1603(a)(2), 1604; *see Am. West Airlines, Inc. v. GPA Group, Ltd.*, 877 F.2d 793, 796 (9th Cir. 1989) (finding corporations "fully owned by the Republic of Ireland" to be "foreign states" under the FSIA); *Corzo v. Banco Cent. Reserva del Peru*, 243 F.3d 519, 522 (9th Cir. 2001) ("Under the FSIA, foreign sovereigns are presumptively immune from suit in the United States.").

Even if not for the fact that Irico Group qualifies as an instrumentality of China under the majority-ownership prong of section 1603(b)(2), it would qualify as an "organ" of China under that same subsection given the circumstances of its creation out of wholly state-owned entities as approved by the State Council, the total ownership and control exercised over Group by the State Council through SASAC and other government bodies, such as the Ministry of Finance, and other privileges and obligations undertaken by Group under Chinese law as a wholly state-owned enterprise, as described above in Section II.B.  (*See* Irico Display Mot. at 4-6 (describing legal standard in the Ninth Circuit for qualification as an "organ of a foreign state").)

### 2.   No Exceptions Apply That Would Deprive Irico Group of Sovereign Immunity

IPPs bear the burden of production to demonstrate that the Court may properly invoke its subject matter jurisdiction over Irico Group subject to one of the FSIA's statutory exceptions. *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) ("Under the Act, a foreign state is presumptively immune from the jurisdiction of the United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state."); *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1125 (9th Cir. 2010) ("The structure of the FSIA—which codifies the background rule that foreign states are immune from suit and execution, and then creates narrow exceptions—suggest that courts must begin with the presumption that a foreign state is immune and then the plaintiff must prove that an exception to immunity applies.").  In cases, as here, "where a defendant . . . makes a factual attack on subject matter jurisdiction" and introduces evidence showing immunity, "no presumptive truthfulness

attaches to plaintiff's allegations." *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012). "The plaintiff then has the burden of going forward with the evidence by offering proof that one of the FSIA exceptions applies." *Id.*

Section 1605(a) of the FSIA provides exceptions to immunity only where a foreign state or instrumentality (1) "waived its immunity," (2) engaged in "commercial activity" upon which the action is based with a sufficient nexus to the United States, (3) took property "in violation of international law," (4) contests rights to "immovable property" in the United States, (5) committed certain noncommercial torts, or (6) is bound by an agreement to arbitrate. 28 U.S.C. § 1605(a). Exceptions (3) through (6) have no conceivable application here, and this Court has already found that actions by the Irico Defendants prior to their default did not waive immunity. (Dkt. 5240 at 12-13.)

IPPs are likely to argue that the "commercial activity" exception would preclude Irico Group from invoking immunity under the FSIA. The commercial activity exception "is given a very restrictive interpretation," *Sec. Pac. Nat'l Bank v. Derderian*, 872 F.2d 281, 285 (9th Cir. 1989), and requires that the lawsuit be "based upon" specific commercial acts by a particular "foreign state" defendant. 28 U.S.C. § 1605(a)(2). A foreign state or instrumentality loses its immunity under this exception only if:

(1) "the action is based upon a commercial activity carried on in the United States by the foreign state;"

(2) "the action is based . . . upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere;" or

(3) "the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."

*Id.* The first and second prongs of the exception cannot apply to Irico Group because Group carried on no "commercial activity" in the United States and performed no "acts" in the United States, let alone one upon which this action is based. (Amended Wang Decl. ¶¶ 12-13.)

IPPs also cannot demonstrate that any of Irico Group's alleged actions underlying their claims had a "direct effect" in the United States as required to defeat immunity under the third prong of section 1605(a)(2). To constitute a "direct effect" under the FSIA, an effect must

"follow[] as an immediate consequence of the defendant's activity." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992).  A consequence is immediate "if no intervening act breaks the chain of causation leading from the asserted wrongful act to its impact in the United States." *Terenkian*, 694 F.3d at 1133 (citing *Lyons v. Augusta S.P.A.*, 252 F.3d 1078, 1083 (9th Cir. 2001) and *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 75 (2d Cir. 2010) ("[T]he requisite immediacy is lacking where the alleged effect depends crucially on variables independent of the conduct of the foreign state.")) (internal quotations omitted).

Moreover, "[s]atisfying the requirement that an effect be 'immediate' and therefore 'direct' is not sufficient by itself to satisfy the 'direct effect' prong of the commercial activity exception, however, because the effect must also be more than 'purely trivial' or 'remote and attenuated.'" *Terenkian*, 694 F.3d at 1134 (citing *Weltover*, 504 U.S. at 618).  This means that, to prove a direct effect, plaintiffs must show that "something legally significant actually happened in the United States" as a direct result of Irico Group's actions. *Id.*; *Gregorian v. Izvetsia*, 871 F.2d 1515, 1527 (9th Cir. 1989).  These "legally significant" actions alleged to have directly injured plaintiffs must be actions of the ***specific defendant*** at issue, as actions by independent or even related entities will not suffice. *See California v. NRG Energy, Inc.*, 391 F.3d 1011, 1024 (9th Cir. 2004) (finding no "direct effect" by a parent company and refusing to impute any effects from direct sales to the U.S. by its wholly-owned subsidiary), *vacated on other grounds*, *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224 (2007).  "[M]ere financial loss by a person—individual or corporate—in the U.S. is not, in itself, sufficient to constitute a direct effect." *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 726-27 (9th Cir. 1997).

In their complaint, IPPs have alleged that Irico Group made sales "either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States." (Dkt. 1526 at ¶ 95.)  These allegations are purely speculative and are entitled to "no presumptive truthfulness" in evaluating FSIA immunity. *Terenkian*, 694 F.3d at 1134.  IPPs have presented no evidence that Irico Group made any sales (whether of CRTs or finished products) to customers in the United States during the Class Period.  Irico Group made no such sales: Irico sold products almost exclusively within China, and its limited exports did not include any sales

into the United States.[7]  (Amended Wang Decl. ¶ 12; *see* Amended Plunkett Decl., Ex. 5 at -527 (government approval for the formation of Irico Group, requiring Group to seek special approval from the Ministry of Machinery and Electronics Industry for any potential exports because "currently . . . domestic market demand still cannot be met").)  Furthermore, Irico Group did not have any salespeople authorized to sell CRT products to U.S. customers at any time between 1995 and 2007.  (Amended Wang Decl. ¶ 13.)  Any claim of direct effect through Irico Group's sales of CRTs is even more tenuous here, where IPP's claims are based explicitly upon *indirect* sales through one or more layers of independent customers.  Sales of televisions and monitors made directly or indirectly by Irico Group's *customers*, pursuing their own sales strategy and setting their own prices, are just the sort of "intervening object, cause, or agency" that cannot trigger the commercial activity exception.  *Terenkian*, 694 F.3d at 1135.  "[T]he requirement that an effect be 'direct' indicates that Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States."  *Id.* at 1134-35 (quoting *United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232, 1238 (10th Cir. 1994)); *see NRG Energy*, 391 F.3d at 1024.

Nor can IPPs rely on their allegations that Irico Group participated in a conspiracy to support a finding of "direct effect."  The "direct effect" prong of the commercial activity exception typically only applies in cases where a foreign sovereign has entered into a contractual relationship requiring performance in the United States, or where a U.S. plaintiff was injured directly by a foreign sovereign's tortious conduct.  *See, e.g., Weltover*, 504 U.S. at 618-19 (finding "direct effect" where contract specified payment in the United States); *Adler*, 107 F.3d 720, 726-27 (same), or where a U.S. plaintiff was allegedly injured by a foreign sovereign's tortious conduct, *see, e.g.*, *Am. West Airlines, Inc.*, 877 F.2d at 796-800 (finding no "direct effect" where defendant's allegedly faulty aircraft maintenance happened outside the United

---

[7] Prior filings by DPPs made reference to approximately two thousand "sample units" of Irico CRTs shipped to the United States in 2002.  (*See* Dkt. 5221 at 16.)  These sales were not made by Irico Group, but rather by China National Electronics Import & Export Caihong Co. ("Caihong Co."), a separate, unaffiliated state-owned entity over which Irico Group had no control.  (*See* Amended Plunkett Decl. Ex. 54 (showing 2,018 CRT units exported to the United States in 2002 by Caihong Co.; country code "502" indicates the United States).)

States); *Joseph v. Office of Consulate Gen. of Nigeria*, 830 F.2d 1018, 1024 (9th Cir. 1987). Cases applying the "direct effect" test in the antitrust context are somewhat rare, but those that do, including in the Ninth Circuit, have concluded that no direct effect exists unless the ***specific defendant*** had direct sales of the allegedly affected product in the United States.  *See NRG Energy, Inc.*, 391 F.3d at 1024 (finding no "direct effect" because a parent company's "decisions affected an intermediary," its own subsidiary, "whose actions in turn affected the U.S." through direct power sales to California), *aff'g in part In re Wholesale Electricity Antitrust Cases I & II*, No. 2-0990-RHW, 2002 WL 34165887, at *8 (S.D. Cal. Dec. 17, 2002) ("It appears, however, that BC Hydro simply delivered energy to Powerex, and Powerex independently marketed and sold the power into the California markets . . . Any 'direct effect' on the California markets was perpetrated by Powerex."), *vacated on other grounds*, *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224 (2007); *Filetech*, 212 F. Supp. 2d at 197 (finding no "direct effect" from allegedly anticompetitive conduct where defendant, an instrumentality of France, had not "intended or contemplated a specific effect in the United States," did not have "substantial sales of marketing lists in the United States," and "failed to arrange for or complete a single U.S. sale" of certain other products).

Cases outside the antitrust context confirm that a "direct effect" cannot be established without direct sales.  *See Terenkian*, 694 F.3d at 1138 (finding no "direct effect" due to breach of contract to deliver oil despite fact that "some of the oil intended for purchase was meant for the U.S. market"); *In re N. Sea Brent Crude Oil Futures Litig.*, No. 1:13-MD-02475(ALC), 2016 WL 1271063, at *12 (S.D.N.Y. Mar. 29, 2016) (finding no "direct effect" where plaintiffs "present[ed] evidence of a correlation between physical Brent crude oil prices and futures prices," where "any effect the physical transactions ha[d] on the United States markets [wa]s mitigated by the actions of third parties").

Jurisprudence on the application of personal jurisdiction to alleged participants in a conspiracy is also instructive on this point.[8]  The Ninth Circuit has held that "the requirement of

---

[8] In its February 1, 2018 Order granting Irico's motion to set aside the default in the DPP action, the Court turned to cases under the Foreign Trade Antitrust Improvements Act for assistance in interpreting the "direct effects" requirement.  Irico respectfully submits that personal jurisdiction principles provide a more apt analogy because, as described below, the Ninth Circuit has explicitly incorporated "minimum

a 'direct effect' incorporates the minimum contacts standards of *International Shoe v. Washington*" and therefore "must comport with the traditional notions of fair play and substantial justice which determine the due process limits of personal jurisdiction." *Derderian*, 872 F.2d at 286-87; *see also Corzo*, 243 F.3d at 525-26 (citing *Security Pacific* for the necessity of "minimum contacts" with the United States to establish a direct effect under the FSIA); *Theo. H. Davies & Co. v. Republic of Marshall Islands*, 174 F.3d 969, 974 (9th Cir. 1998) ("Section 1330(b) [of the FSIA] provides, in effect, a Federal long-arm statute over foreign states . . . . This long-arm statute, however, is constrained by the minimum contacts required by *International Shoe Co. v. Washington* and its progeny.") (internal citation omitted); *Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383, 395 (6th Cir. 2016) (observing "that the Ninth Circuit has adopted . . . 'minimum contacts' analysis to conclude that [an] activity had no 'direct effect.'").

In the personal jurisdiction context, courts in the Ninth Circuit have found that acts or contacts of alleged co-conspirators ***cannot*** be imputed to a different defendant for purposes of establishing jurisdiction over that defendant.  As stated by the court in *Kipperman v. McCone*:

> Contrary to plaintiff's assertion that personal jurisdiction over alleged co-conspirators may be acquired vicariously through the forum-related conduct of any single conspirator, the Court believes that personal jurisdiction over any non-resident individual must be premised upon forum-related acts ***personally*** committed by the individual. ***Imputed conduct is a connection too tenuous to warrant the exercise of personal jurisdiction***.

422 F. Supp. 860, 873 n.14 (N.D. Cal. 1976) (emphases added).  The Ninth Circuit likewise has noted that a "conspiracy theory" of jurisdiction is unwarranted, observing that "[t]here is a great deal of doubt surrounding [its] legitimacy," *Chirila v. Conforte*, 47 Fed. App'x 838, 842 (9th Cir. 2002) (citing *Kipperman* and other cases), and has squarely rejected the imputing of contacts from co-conspirators in the venue context, *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 492 (9th Cir. 1979).  Extending the reach of the "direct effects" exception beyond that

---

contacts" principles in its FSIA jurisprudence.  In addition, unlike the FTAIA, sovereign immunity and personal jurisdiction each address the court's jurisdiction over a *particular defendant*.  The FSIA and FTAIA also have notably different purposes.  *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) (noting that courts "must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination"); *Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 410-11 (2d Cir. 2014) ("Here, both the purpose and language of the FSIA and FTAIA differ in critical respects.").

recognized in this Circuit as appropriate for personal jurisdiction would frustrate "Congress'

intent that it be difficult for private litigants to bring foreign governments into court, thereby

affronting them." *Murphy v. Korea Asset Mgmt. Corp.*, 421 F. Supp. 2d 627, 640 (S.D.N.Y.

2005) (internal quotations omitted).

Given the absence of sales to the U.S. by Irico Group and the lack of any evidence that

Group otherwise meets the strictly-construed requirements of the commercial activity exception,

there is no basis for concluding that jurisdiction under the FSIA exists with respect to Irico

Group.

## IV.    **CONCLUSION**

Based on the foregoing, Irico requests that the Court enter an order: (*a*) dismissing the

IPP Complaint against Irico with prejudice; and (*b*) granting such further relief as may be just

and equitable.

Dated:  March 19, 2019                                  */s/ Stuart C. Plunkett*

John Taladay (*pro hac vice*)
john.taladay@bakerbotts.com
1299 Pennsylvania Ave., NW
Washington, D.C. 20004
Telephone:  (202) 639-7700
Facsimile:   (202) 639-7890

Stuart C. Plunkett (State Bar No. 187971)
stuart.plunkett@bakerbotts.com
Peter Huston (State Bar No. 150058)
peter.huston@bakerbotts.com
BAKER BOTTS LLP
101 California Street, Suite 3600
San Francisco, California 94111
Telephone:  (415) 291-6200
Facsimile:   (415) 291-6300

*Attorneys for*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*