John Taladay (*pro hac vice*)
john.taladay@bakerbotts.com
BAKER BOTTS LLP
1299 Pennsylvania Ave., NW
Washington, D.C. 20004
Telephone: (202) 639-7700
Facsimile: (202) 639-7890

Stuart C. Plunkett (State Bar No. 187971)
stuart.plunkett@bakerbotts.com
Peter Huston (State Bar No. 150058)
peter.huston@bakerbotts.com
BAKER BOTTS LLP
101 California Street, Suite 3600
San Francisco, California 94111
Telephone: (415) 291-6200
Facsimile: (415) 291-6300

*Attorneys for*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION, | Case No. 3:07-cv-05944-JST <br><br> MDL No.: 1917 |
| THIS DOCUMENT RELATES TO: <br><br> *ALL INDIRECT PURCHASER ACTIONS* | **IRICO DISPLAY DEVICES CO., LTD.'S AMENDED MOTION TO DISMISS CLAIMS OF INDIRECT PURCHASER PLAINTIFFS FOR LACK OF SUBJECT MATTER JURISDICTION (FED. R. CIV. P. 12(b)(1))** <br><br> Date:        May 30, 2019 <br> Time:       2:00 p.m. <br> Judge:      Honorable Jon S. Tigar <br> Courtroom:  9 |

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on May 30, 2019, at 2:00 p.m., or as soon thereafter as the matter may be heard, before the Honorable Jon S. Tigar, United States District Judge of the Northern District of California, San Francisco Courthouse, located at Courtroom 9, 19th Floor, 450 Golden Gate Avenue, San Francisco, California, Irico Display Devices Co., Ltd. ("Irico Display" or "Display," together with Irico Group Corporation, "Irico" or "Irico Defendants"), by and through its undersigned counsel, will and hereby does move, pursuant to Federal Rules of Civil Procedure 12(b)(1) and (2) for an Order dismissing all claims in the Indirect Purchaser Plaintiffs' ("IPPs") Fourth Consolidated Amended Complaint (Dkt. 1526) against Irico Display for lack of subject matter jurisdiction.

This Amended Motion is based on this Notice of Motion, the following Memorandum of Points and Authorities in support thereof, the Amended Declaration of Zhaojie Wang ("Wang Decl."), the Declaration of Donald Clarke ("Clarke Decl.") (ECF No. 5392-3), the Amended Declaration of Stuart Plunkett ("Amended Plunkett Decl."), any materials attached thereto or otherwise found in the record, along with the argument of counsel, and such other matters as the Court may consider.

## ISSUES TO BE DECIDED

1.      Whether the Court lacks subject matter jurisdiction over Irico Display pursuant to the Foreign Sovereign Immunities Act, 28 U.S. §§ 1602 *et seq.*

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................................... 1

II.   BACKGROUND ......................................................................................................... 2

    A.   Procedural Background and Claims Against Irico ............................................. 2

    B.   Irico Display ...................................................................................................... 3

III.   ARGUMENT ............................................................................................................... 4

    A.   The Court Lacks Subject Matter Jurisdiction Because Irico Display is
        Immune from Suit in the United States as an Organ of the People's
        Republic of China ............................................................................................... 4

        1.   Irico Display Was Created Pursuant to State-Directed Initiatives,
            Demonstrating its Status as an Organ of China ....................................... 6

        2.   The State Council Tightly Controlled and Supervised Irico Display
            through SASAC, Irico Group, and Other Government Ministries ........... 7

        3.   Irico Display's Purpose Was to Contribute to the Development of
            China's National Economy and Increase the Value of State-Owned
            Assets ..................................................................................................... 12

        4.   Irico Display's Leaders Were Government-Appointed and
            Considered State Officials Under Chinese Law ..................................... 14

        5.   Irico Display Had Significant Public Obligations and Privileges
            Under Chinese Law ............................................................................... 16

    B.   No Exceptions Apply That Would Deprive Irico Display of Sovereign
        Immunity ........................................................................................................... 17

IV.   CONCLUSION ........................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

Adler v. Fed. Republic of Nigeria,
 107 F.3d 720 (9th Cir. 1997) ....................................................................................20

Alperin v. Vatican Bank,
 360 F. App'x 847 (9th Cir. 2009) ................................................................5, 10, 14

Am. West Airlines, Inc. v. GPA Group, Ltd.,
 877 F.2d 793 (9th Cir. 1989) ....................................................................................20

Argentine Republic v. Amerada Hess Shipping Corp.,
 488 U.S. 428 (1989) ...................................................................................................4

Berizzi Bros. Co. v. The Pesaro,
 271 U.S. 562 (1926) .................................................................................................13

Cal. Dep't of Water Res. v. Powerex Corp.,
 533 F.3d 1087 (9th Cir. 2008) .............................................................5, 6, 11, 13, 17

California v. NRG Energy, Inc.,
 391 F.3d 1011 (9th Cir. 2004) ........................................................................19, 20, 21

Chirila v. Conforte,
 47 Fed. App'x 838 (9th Cir. 2002) ...........................................................................22

Compania Mexicana de Aviacion, S.A. v. U.S. Dist. Ct. for the C.D. Cal.,
 859 F.2d 1354 (9th Cir. 1988) ....................................................................................4

Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect,
 89 F.3d 650 (9th Cir. 1996) ......................................................................................14

Corzo v. Banco Cent. de Reserva del Peru,
 243 F.3d 519 (9th Cir. 2001) ....................................................................................22

Dole Food Co. v. Patrickson,
 538 U.S. 468 (2003) ...................................................................................................5

EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.,
 322 F.3d 635 (9th Cir. 2003) ..................................................................................5, 6

EOTT Energy Operating Ltd. P'ship v. Winterthur Swiss Ins. Co.,
 257 F.3d 992 (9th Cir. 2001) .....................................................................................5

Filetech S.A. v. Fr. Telecom, S.A.,
 212 F. Supp. 2d 183 (S.D.N.Y. 2001) ......................................................................21

*Gates v. Victor Fine Foods*,
   54 F.3d 1457 (9th Cir. 1995) ..................................................................7, 11, 13

*Gregorian v. Izvetsia*,
   871 F.2d 1515 (9th Cir. 1989) ...........................................................................19

*Gross v. FBL Fin. Servs., Inc.*,
   557 U.S. 167 (2009) ...........................................................................................22

*Guirlando v. T.C. Ziraat Bankasi A.S.*,
   602 F.3d 69 (2d Cir. 2010) ................................................................................19

*In re N. Sea Brent Crude Oil Futures Litig.*,
   No. 1:13-MD-02475 (ALC), 2016 WL 1271063 (S.D.N.Y. Mar. 29, 2016) ........21

*In re Wholesale Electricity Antitrust Cases I & II*,
   No. 2-0990-RHW, 2002 WL 34165887 (S.D. Cal. Dec. 17, 2002) .....................21

*Joseph v. Office of Consulate Gen. of Nigeria*,
   830 F.2d 1018 (9th Cir. 1987) ...........................................................................21

*Kipperman v. McCone*,
   422 F. Supp. 860 (N.D. Cal. 1976) ...............................................................22, 23

*Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*,
   753 F.3d 395 (2d Cir. 2014) ..............................................................................22

*Lyons v. Augusta S.P.A.*,
   252 F.3d 1078 (9th Cir. 2001) ...........................................................................19

*MOL, Inc. v. Peoples Republic of Bangladesh*,
   736 F.2d 1326 (9th Cir. 1984) .............................................................................5

*Murphy v. Korea Asset Mgmt. Corp.*,
   421 F. Supp. 2d 627 (S.D.N.Y. 2005) .............................................................5, 23

*Peterson v. Islamic Republic of Iran*,
   627 F.3d 1117 (9th Cir. 2010) ...........................................................................18

*Piedmont Label Co. v. Sun Garden Packing Co.*,
   598 F.2d 491 (9th Cir. 1979) .............................................................................23

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
   551 U.S. 224 (2007) .....................................................................................19, 21

*Rep. of Austria v. Altmann*,
   541 U.S. 677 (2004) .............................................................................................4

*Republic of Argentina v. Weltover, Inc.*,
   504 U.S. 607 (1992) .....................................................................................19, 20

*Rote v. Zel Custom Mfg. LLC,*
    816 F.3d 383 (6th Cir. 2016) ...................................................................22

*Saudi Arabia v. Nelson,*
    507 U.S. 349 (1993) .....................................................................................17

*Sec. Pac. Nat'l Bank v. Derderian,*
    872 F.2d 281 (9th Cir. 1989) ................................................................18, 22

*Siderman de Blake v. Republic of Argentina,*
    965 F.2d 699 (9th Cir. 1992) .......................................................................4

*Terenkian v. Republic of Iraq,*
    694 F.3d 1122 (9th Cir. 2012) .................................................18, 19, 20, 21

*Theo. H. Davies & Co. v. Republic of Marshall Islands,*
    174 F.3d 969 (9th Cir. 1998) .......................................................................22

*Trans Chem. Ltd. v. China Nat'l Mach. Imp. & Exp. Co.,*
    978 F. Supp. 266 (S.D. Tex. 1997) ..............................................................16

*United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n,*
    33 F.3d 1232 (10th Cir. 1994) .....................................................................20

**STATUTES**

28 U.S.C. § 1603(b) ............................................................................................4

28 U.S.C. § 1603(b)(2) .......................................................................................5

28 U.S.C. § 1604 ................................................................................................4

28 U.S.C. § 1605 ..............................................................................................17

28 U.S.C. § 1605(a) ..........................................................................................18

28 U.S.C. § 1605(a)(2) ...................................................................13, 18, 19

28 U.S., §§ 1602 *et seq.* ....................................................................................1

Irico Display under the Foreign Sovereign Immunities Act ..........................1

State Officials Under Chinese Law ...............................................................14

## I.      **INTRODUCTION**

The Court lacks subject matter jurisdiction over Irico Display under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S. §§ 1602 *et seq.*  The contemporaneous documentary evidence, sworn declarations of employees with direct personal knowledge, and expert declaration of a highly qualified Chinese legal expert establish that Irico Display, at all relevant times, was an agency or instrumentality of the State Council of the People's Republic of China. Irico Display is thus *presumptively* entitled to sovereign immunity.  Display was created by wholly state-owned governmental entities to contribute to the development of China's national economy and was tightly controlled by the Chinese government.  (Amended Wang Decl. ¶¶ 40-42, 46-47.)  The Chinese government and courts have deemed Display's top management to be state officials by virtue of their positions at Display, and as a state-controlled enterprise, Display had obligations to the people of China.  (Amended Wang Decl. ¶¶ 64-65.)

At the time the Indirect Purchaser Plaintiffs ("IPPs") filed their original complaint in 2007, Irico Display was a state-controlled company.  (Amended Wang Decl. ¶ 45.)  Irico Display was created through a collaboration of four wholly state-owned entities.  (Amended Wang Decl. ¶¶ 40-42.)  These state-owned collaborators created Irico Display with the express intent to "protect and increase the value of [Display's] state-owned assets."  (Amended Plunkett Decl., Ex. 44 at -854.)  All of Display's initial funding at formation, funds required for capital projects, and periodic monetary infusions came from the Chinese government through the State-owned Assets Supervision and Administration Commission ("SASAC"), the Ministry of Finance, and through wholly state-owned Irico Group Corporation ("Irico Group").  (Amended Wang Decl. ¶ 59.)

Display was tightly controlled and supervised by SASAC, Irico Group, and other departments of the State Council, and local Shaanxi Province government authorities.  (Amended Wang Decl. ¶¶ 46-47, 56.)  Irico Display was also monitored on a day-to-day basis by a Chinese Communist Party cell embedded inside Display's facilities to monitor and supervise all operations and employees.  (*See* Amended Wang Decl. ¶¶ 37-38.)  The control and supervision exercised by governmental entities included, *inter alia*, the authority to: (i) "appoint

representatives" to Display shareholder meetings to exercise authority as the controlling shareholder; (ii) "supervise and administer" the financial situation of Display in order to safeguard the state's interest in its "State-owned assets;" (iii) nominate and remove top management of Display, including the "general manager, deputy general manager, [and] chief accountant;" (iv) approve requests for production changes, including new assembly lines and equipment; (v) approve Display's annual operating, budget, and investment plans; and (vi) when Display was in danger of bankruptcy in 2004, SASAC and the Chinese Ministry of Finance intervened to supply funds and approve a restructuring plan for the purpose of preventing damage to the Chinese national economy and harm to Chinese workers.  (Amended Wang Decl. ¶¶ 29-30, 45-47, 52-55.)  Governmental control and supervision thus effected virtually every aspect of Irico Display's top managerial decisions and much of the day-to-day operation of the enterprise.

No exception to Irico Display's presumed immunity applies.  IPPs cannot satisfy their burden to establish that Display's alleged conduct satisfies the "commercial activity" exception to the FSIA's jurisdictional bar.  Irico Display made no sales of CRTs to the United States during the Class Period and no direct effect can be attributed to Irico Display under the commercial activity exception.  The law precludes plaintiffs from relying on *generalized allegations* of a CRT conspiracy, with actions allegedly undertaken by unrelated actors in the United States, to satisfy its burden to demonstrate that sales or other conduct *specifically attributable to Display* had the requisite direct effect on the United States.  Consequently, Irico Display is entitled to sovereign immunity under the FSIA and IPPs' claims should be dismissed with prejudice.

## II.   BACKGROUND

### A.   Procedural Background and Claims Against Irico

The background of the case is known to the Court and is summarized briefly in the motion to dismiss by Irico Group.  (*See* Irico Group Mot. at 2-3.)  The creation, status, obligations, privileges, support, management, and supervision of Irico Group by the Chinese government are also detailed in that motion.  (*See id.* at 3-8.)

### B.   Irico Display

Irico Display is a Chinese company with its principal place of business at 1 Caihong Rd., Xianyang City, Shaanxi Province, 712021, People's Republic of China.  (Amended Wang Decl. ¶ 39; Dkt. 346, ¶ 38.)  At the time of filing of the IPP complaint, the share capital of Display was owned 41.36% by Irico Group Electronics Co., Ltd. ("Electronics"),[1] which was in turn 75% owned by Irico Group, a wholly state-owned entity that controlled both Display and Electronics. (Amended Wang Decl. ¶ 44; Amended Plunkett Decl., Ex. 2 at -240.)   Irico Display was registered as and classified by SASAC as a "state-controlled company" in 2007.[2]  (Amended Wang Decl. ¶ 45; Amended Plunkett Decl., Ex. 32 at -670-71 (Irico Display consolidated financial statements, on file with SASAC, listing the "Economic type" of Display as "State-owned or State-controlled").)   As a state-controlled company, Irico Display was subject to extensive supervision and control by the government, authorized by decree of the State Council and implemented by SASAC, other ministries of the State Council, and the State Council's wholly-owned instrumentality, Irico Group.  (Amended Wang Decl. ¶¶ 46-58.)  All significant operating, financial, and personnel decisions were either made directly by or subject to approval

---

[1] All other shareholders of Irico Display each held less than 2 percent of the company's equity.  Several of these minority shareholders were also Chinese state-owned corporations, increasing the proportion of Display's total state-owned equity.  (*See* Amended Plunkett Decl., Ex. 20 at -599 ("State-owned equity structure table of IRICO Display" showing eight investors in addition to Irico Electronics holding "State-owned legal person shares").)

[2] "State-controlled company" is the same Chinese legal term of art (*guoyou konggu qiye*) translated as "state-owned holding company" in Irico's motion to set aside the default.  (*See* Dkt. 5215 at 8.)  However, "state-owned holding company" was used previously because it appears in the English-language version of the regulations.  Decree of the State Council of the People's Republic of China No. 378, Art. 2 (May 27, 2003) ("SASAC Regs."), available at http://en.sasac.gov.cn/2003/11/24/c_118.htm.  While the phrase "*konggu qiye*" can mean "holding company" in some contexts, "state-controlled company" is the translation that applies to entities less than wholly-owned by the government but still subject to actual government control.  (Amended Plunkett Decl., Ex. 11 at -571 (opinion letter from Chinese State Bureau of Statistics defining "state-controlled company" to include "an enterprise for which, even though the percentage of State capital (equity) is not greater than 50%, it is relatively higher than other economic elements in the enterprise"); Clarke Decl., ¶¶ 24 & n. 22, 28.)  Irico Display's 2007 audit filings approved by SASAC identify it as a state-controlled company (Amended Plunkett Decl., Ex. 32 at -670-71), and SASAC regulations use the same term to define its control and supervision over such companies, including Display.  *See generally* SASAC Regs. (specifying different degrees of direct control over "wholly State-owned companies," "State-owned holding companies [*guoyou konggu qiye*]," and "companies with State-owned equity"); (Amended Wang Decl. ¶ 46-47.)

by these Chinese government entities.  (*Id.*)  Irico Display also received substantial financial support from these same government bodies, from its initial funding at creation by wholly state-owned entities to loan guarantees and government funding appropriations granted through and beyond 2007.  (Amended Wang Decl. ¶¶ 59-61.)  Both the control exercised over Display and the government support provided to Display were by virtue of its status as a state-controlled company and did not apply to private Chinese corporations.

## III.   ARGUMENT

### A.   The Court Lacks Subject Matter Jurisdiction Because Irico Display is Immune from Suit in the United States as an Organ of the People's Republic of China

The FSIA insulates foreign governmental organs and instrumentalities, like Irico Display, from the exercise of jurisdiction in the United States.  *See* 28 U.S.C. § 1604.  The FSIA is "a comprehensive statute containing a set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities" and "is the exclusive source of subject matter jurisdiction over all suits involving foreign states and their instrumentalities." *Rep. of Austria v. Altmann*, 541 U.S. 677, 691 (2004) (internal quotation marks omitted); *Compania Mexicana de Aviacion, S.A. v. U.S. Dist. Ct. for the C.D. Cal.*, 859 F.2d 1354, 1358 (9th Cir. 1988).  Under the FSIA, the definition of a "foreign state" includes any "agency or instrumentality of a foreign state," to wit, any entity:

> (1) which is a separate legal person, corporate or otherwise, and

> (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and

> (3) which is neither a citizen of a State of the United States as defined in section 1332(c) and (e) of this title, nor created under the laws of any third country.

28 U.S.C. § 1603(b); *see also Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 428-29, 434 (1989) (the FSIA is "the sole basis for obtaining jurisdiction over a foreign state in United States courts" and "must be applied by district courts in every action against a foreign sovereign"); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 706 (9th Cir. 1992) ("As a threshold matter, therefore, a court adjudicating a claim against a foreign state must determine

whether the FSIA provides subject matter jurisdiction over the claim."); *MOL, Inc. v. Peoples Republic of Bangladesh*, 736 F.2d 1326, 1328 (9th Cir. 1984) ("As section 1330(a) indicates, sovereign immunity is not merely a defense under the FSIA. Its absence is a jurisdictional requirement.").

It is undisputed that Irico Display is a separate legal person under subsection 1603(b)(1) of the FSIA and is a citizen of China for purposes of subsection (b)(3).

As evidenced below, Display also qualifies for immunity because it was "an organ of a foreign state or political subdivision thereof" under section 1603(b)(2) at the time the original suit was filed in November 2007. 28 U.S.C. § 1603(b)(2). "Consistent with Congress's intent," the Ninth Circuit "defines 'organ' broadly, mindful that 'agency or instrumentality of a foreign state' could assume a variety of forms, including a state trading corporation, a mining enterprise, a transport organization such as a shipping line or airline, [or] a steel company . . . ." *Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087, 1098 (9th Cir. 2008) (internal quotations omitted). Unlike the more rigid ownership requirement under the second prong of section 1603(b)(2), which "turn[s] on formal corporate ownership," *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003), courts in the Ninth Circuit "take a holistic view of the defendant" for the determination of "organ" status. *Alperin v. Vatican Bank*, 360 F. App'x 847, 849 (9th Cir. 2009) (internal quotations omitted); *see also EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*, 322 F.3d 635, 640 (9th Cir. 2003) ("entity may be an organ of a foreign state even if it has some autonomy from the foreign government"); *EOTT Energy Operating Ltd. P'ship v. Winterthur Swiss Ins. Co.*, 257 F.3d 992, 997 (9th Cir. 2001) (even if entity's shares are "not directly held by Ireland, it is still possible for it to be an 'organ' of a foreign state"); *Murphy v. Korea Asset Mgmt. Corp.*, 421 F. Supp. 2d 627, 640-41 (S.D.N.Y. 2005) (determining status as "organ of a foreign state" is "*ad hoc*" analysis since organs are "likely to share characteristics both with governments . . . and non-governmental entities").

The Ninth Circuit considers several factors to determine whether an entity is an "organ of a foreign state" for purposes of the FSIA, including "the circumstances surrounding the entity's creation, the purposes of its activities, its independence from the government, the level

of government financial support, its employment policies, and its obligations and privileges under state law." *Powerex*, 533 F.3d at 1098 (quoting *EIE Guam*, 322 F.3d at 640). The "organ" determination may also "be based exclusively on foreign law." *Id.*

### 1. Irico Display Was Created Pursuant to State-Directed Initiatives, Demonstrating its Status as an Organ of China

Irico Display was established in 1992 by wholly state-owned entities: Irico Group, Shaanxi Electronics Industry Company, Shaanxi ICBC Trust and Investment Corporation, and Shaanxi PCBC Trust and Investment Corporation. (Amended Wang Decl. ¶ 40; Amended Plunkett Decl., Ex. 44 at -853 ("Official response" by Shaanxi Provincial Commission on the Restructuring of the Economic System, approving the formation of Display and listing its founding shareholders).) As a collaboration founded and held by four wholly state-owned entities and created with the approval of the Shaanxi Provincial Economic System Reform Committee, Display was set up and operated as a wholly state-owned enterprise of the Chinese government. (Amended Wang Decl. ¶ 41.) Irico Display was created pursuant to "the requirements of nine commissions, offices and ministries such as the Provincial Economic Commission" as part of a government "joint stock system reform pilot . . . for nationalized enterprises . . . to realize new mechanisms to create new enterprises and construct new product lines," and enjoyed special government "policies" benefiting such enterprises. (Amended Plunkett Decl. Ex. 44 at -853-54; *see also id.*, Ex. 40 at -744-45 (letter between Chinese government agencies, describing Display as "one of the first batch of Shaanxi Province shareholding system test units and . . . one of the national modern enterprise system 100 test units," and "the only enterprise to be recommended by this ministry for listing in 1995," with the government directly purchasing listed shares to "maintain social stability").)

The Chinese Government tasked Display with the development, production, and sales of color picture displays, parts, and raw materials (Amended Wang Decl. ¶ 43; Amended Plunkett Decl., Ex. 31 at -668), and Display was instructed to "protect and increase the value of [its] state-owned assets" under the "industrial supervision work carried out by the provincial office of the electronics industry." (Amended Plunkett Decl., Ex. 44 at -854.) Irico Display's initial public

offering in 1995 was designed to "widely attract idle funds from society, and contribute to the development of [China's] electronic products such as color displays," (Amended Plunkett Decl. Ex. 31 at -668), thus "increasing the controlling power of state-owned assets through leveraging" of funds from passive investors. (Amended Wang Decl. ¶ 42.)

Display's creation, therefore, clearly supports a finding of "organ" status under the FSIA. The evidence establishes a high degree of control and involvement by various government actors at both the Chinese national and provincial government levels in sponsoring Display's formation as a model for centrally-directed state-owned enterprise shareholding reform and establishing control over its high-level management and day-to-day business operations. *See Gates v. Victor Fine Foods*, 54 F.3d 1457, 1460 (9th Cir. 1995) (holding an association of private hog producers to be an organ of the Province of Alberta, where association was created by approval of producers' application by a government marketing council).

### 2. The State Council Tightly Controlled and Supervised Irico Display through SASAC, Irico Group, and Other Government Ministries

Display was subject to both direct and indirect supervision by SASAC as authorized by Interim Regulations on Supervision and Management of State-owned Assets of Enterprises, adopted by the State Council in 2003 and in effect in late 2007. *See* SASAC Regs., Art. 2 ("These regulations are applicable to the supervision and management of . . . State-owned holding enterprises [i.e., state-controlled companies]"); (Amended Wang Decl. ¶ 45). Under those regulations, SASAC exercised authority to:

- "appoint representatives" to Display shareholder meetings to exercise authority as the controlling shareholder, SASAC Regs., Art. 22;

- nominate the Chairman and other directors to Display's board of directors, *id.* at Art. 17(3);

- nominate the Chairman and other members of Display's supervisory panel, *id.*;

- nominate top management of Display, including the "general manager, deputy general manager, [and] chief accountant, *id.*;

- "guide and push forward" Display (and other companies under Irico Group) in "reform and restructuring," and other efforts to adjust corporate governance in accordance with State Council policy, *id.* at Art. 13(2);

- "supervise and administer" the financial situation of Display in order to safeguard the state's interest in its "State-owned assets," *id*. at Art. 13(5);

- establish "guideline[s]" for executive and employee "remuneration" and "regulate and control . . . allocation of remuneration" between Display and other enterprises under its supervision, *id*. at Art. 26; and

- "evaluate the[] performance" of top Display directors and management it has appointed and "grant rewards or impose punishments" based on those evaluations, *id*. at Art. 13(4).

Under these regulations, Display was required to "accept the supervision and administration conducted by" SASAC.  *Id.* at Art. 11.  Display was also subject to special "guidance and coordination" from SASAC in "overcoming difficulties and solving problems in the process of their reform and development." *Id.* at Art. 14(6).  SASAC exercised its authority over Irico Display under these provisions through the SASAC-appointed management of its wholly-owned instrumentality, Irico Group.  (Amended Wang Decl. ¶ 46.)

Major production changes by Display, such as new assembly lines and equipment, required direct approval by Irico Group, which in turn required approval from SASAC.  (Amended Wang Decl. ¶¶ 33, 55; *see, e.g.*, Amended Plunkett Decl. Ex. 36 at -712 (report on Irico Group "Investment Plan for 2007," including investments implemented through various subsidiaries, submitted to SASAC for approval).  Specifically, Irico Display's annual operating plan, budget, and investment plan were compiled with other subsidiaries of Irico Group and submitted for approval by SASAC and the Ministry of Finance.  (Amended Wang Decl. ¶¶ 27, 33.)  Any corporate reforms, restructuring, establishing new subsidiaries, mergers, issuance of new shares, or establishment of joint ventures by Irico Display required the approval of SASAC.  (Amended Wang Decl. ¶ 29.)  As one example, Irico Display was in danger of bankruptcy in 2004 due to a precipitous drop in CRT sales.  To prevent damage to the Chinese national economy and unemployment of numerous Display workers, SASAC intervened and approved a plan of reorganization (submitted by Irico Group) to restructure and streamline Irico Display's operations, with supporting funds supplied by the Ministry of Finance, leaving Display as the only CRT manufacturer in China to avoid bankruptcy.  (Amended Wang Decl. ¶ 30.)

Irico Display was always subject to the direct control of wholly state-owned Group, and thus control by the Chinese government, in all its business activities, financial policies, and

appointment of management.  (Amended Wang Decl. ¶¶ 47-55, 57-58.)  This control was formal and official:  Group was listed as the "actual controller" of Display in 2007 pursuant to the 2006 Chinese Company Law, which defines the term as "a person who is able practically to govern the behavior of a company through investment relations, agreements or other arrangements, although the person is not a shareholder of the company."   Company Law of the People's Republic of China, Art. 217(3);[3] (Amended Wang Decl. ¶ 48; Amended Plunkett Decl., Ex. 2 at -239 (listing Group as "actual controlling" person/shareholder")[4]; Clarke Decl. ¶ 32.[5])  Group's direct control over Display closely mirrored the control that SASAC held over wholly state-owned companies like Group.  Irico Display was required to submit regular financial, operational, and investment reports to Group for approval, which Group was required to incorporate into its own reports for approval by SASAC.  (Amended Wang Decl. ¶¶ 27, 53, 62; Amended Wang Decl. ¶ 11); see SASAC Regs. Art. 37, 39 (requiring such reports).  Irico Group directly selected the Board of Directors of Irico Display by nominating the slate through Irico Electronics and appearing directly at Display's shareholder meetings to approve the same slate it had nominated. (Amended Wang Decl. ¶ 52; compare Amended Plunkett Decl. Ex. 33 at -678 (November 2007 Irico Group resolution regarding a slate of directors for Irico Display, and dismissing other directors), with id., Ex. 2 at -241-42 (list of Irico Display directors, including all the individuals recommended by Group with terms beginning November 2007 and none of the removed individuals)); see SASAC Regs. Art. 17(2)-(3) (authorizing the nomination, appointment, and removal of board candidates).  Because shareholders were required to be present or designate a proxy to vote at these meetings, there was no Display shareholder meeting at which Group did not control a majority of voting shares.  (Amended Wang Decl. ¶ 51.)

---

[3] *Available at* http://www.npc.gov.cn/englishnpc/Law/2007-12/13/content_1384124.htm).

[4] As explained by Professor Clarke, "actual controlling shareholder" is a mistranslation; "actual controlling person" (or "actual controller") is a more accurate meaning given that Irico Group was not a direct shareholder.  Clarke Decl. ¶ 32 n. 37.

[5] Citations in the Clarke Declaration to "Plunkett Decl." refer to identical exhibit numbers as those attached to the Amended Plunkett Declaration filed in support of this motion.

Irico Group also appointed and removed the management of Display, including the General Manager (i.e., CEO), Deputy General Manager, Chief Financial Officer, and all department heads, by directing recommendations to Irico Electronics, which were universally and unquestioningly implemented by the Group-appointed Board of Directors of Irico Display. (Amended Wang Decl. ¶ 50; Amended Wang Decl. ¶¶ 8-10; *see* Clarke Decl. ¶ 31; *compare* Amended Plunkett Decl., Ex. 33 at -678 (November 2007 Irico Group resolution determining candidates for Irico Display's top management and removing others), *with id.*, Ex. 2 at -241-42 (list of Irico Display "senior executives," including all the individuals proposed by Group with terms beginning November 2007 and none of the removed individuals); *see* SASAC Regs. Art. 17(1), (3) (authorizing nomination, appointment, and removal of management).

Irico Group's control acted as a direct extension of the control SASAC exercised over Group, as evidenced by annual "Letters of Responsibilities." These letters were required of all "responsible persons of enterprises controlled by Group," including Display. (Amended Plunkett Decl., Ex. 47 at -914 (example of annual "Letter of Responsibilities for Operational Tasks" laying out obligations and performance requirements for Irico Display management); *see* Amended Wang Decl. ¶ 53; Clarke Decl. ¶ 33.) They established contractual performance and compensation responsibilities of those Display managers to the management of Group, just as SASAC required such letters of Irico Group's top management. (*Compare* Amended Plunkett Decl., Ex. 47 at -915 (specifying that Letter of Responsibilities is to "be executed in accordance with the Measures for Assessment of the Operational Performance of the Responsible Persons of IRICO Group Corporation" issued by SASAC), *with id.*, Ex. 28 at -632 (2006 SASAC notice to Irico Group evaluating "Operational Performance of Persons in Charge of IRICO Group Corporation" in accordance with SASAC regulations)); *see* SASAC Regs. Art. 13(4), 18 (authorizing evaluation of "the performance of the responsible persons of enterprises" and the signing of "performance contracts with the responsible persons of enterprises appointed by it").

The extensive control exercised by SASAC through its appointed agents at wholly state-owned Irico Group not only meets, but far exceeds the requirements necessary to establish Display's status as an "organ" of the Chinese government under the FSIA. *Alperin*, 360 F. App'x

at 850 (holding that "day-to-day control" was unnecessary, and "arms-length supervision" by the government was sufficient to support organ status); *Gates*, 54 F.3d at 1461.  The fact that, at times, government control was exercised indirectly through a wholly state-owned instrumentality "hardly matters" in the analysis.  *Powerex*, 533 F.3d at 1101 ("There is no reason to think Congress cared for the *manner* in which foreign states interacted with their organs—*i.e.*, whether the foreign state supervises the organ directly, or through an incorporated agent.").  Moreover, as Group was a wholly state-owned and wholly state-controlled enterprise, the Chinese government, through SASAC and Group, controlled virtually all aspects of management and day-to-day business operations at Display.  (Amended Wang Decl. ¶ 47.)

In addition to SASAC, Irico Display was also supervised by the Chinese Ministry of Finance, which reviewed and approved Display's financial reports.  These reports were fully consolidated into Group's financials for purposes of Group's financial audit and determination of its mandatory capital gains contribution to the state.  (Amended Wang Decl. ¶ 62; Amended Plunkett Decl., Ex. 24 at -618 (2007 SASAC letter regarding audit of Irico Group's consolidated 2006 financial statements, combining results from "28 level-three or above subsidiaries," which included Display); *id.*, Ex. 16 at -588 (SASAC notice directing Group to pay state-owned capital gains of RMB2.98 million based on its consolidated financial statements); Clarke Decl. ¶ 29).

Shaanxi provincial authorities also supervised Display, including the Shaanxi Province state-owned assets supervision authority.  Display needed approval from the Shaanxi Province state-owned asset supervision authorities for its initial public offering.  (Amended Wang Decl. ¶ 56; Amended Plunkett Decl., Ex. 14 at -584 (document from National Administration of State-Owned Assets, a predecessor to SASAC, granting approval to begin the listing process and mandating that an appraisal of Irico Display's assets be sent for "review and confirmation").  All of these government bodies likewise are subject to the control of the State Council.  (Amended Plunkett Decl. Ex. 51; *see* Clarke Decl. ¶¶ 14-15.)

### 3. Irico Display's Purpose Was to Contribute to the Development of China's National Economy and Increase the Value of State-Owned Assets

As a part of China's "socialist economy under ownership by the whole people," (Constitution of the People's Republic of China ("PRC Const."), Art. 7, *available at* http://www.npc.gov.cn/englishnpc/Constitution/node_2825.htm), the role and purpose of Irico Display and all other subsidiaries under Irico Group in 2007 was significantly different than that of a privately held corporation. The Chinese socialist market economy contrasts sharply with the economy of the United States in that large industrial segments deemed crucial to China's overall economic development and national security are owned and controlled by the state. (Clarke Decl. ¶¶ 16, 18.) While the business activities and some isolated governance structures of these state-owned enterprises may roughly resemble aspects of American private corporations, their purpose is not to enrich shareholders, but to contribute to China's national economy, increase the value of their state-owned assets, and provide for the welfare of their workers. (Clarke Decl. ¶¶ 17-18; Amended Wang Decl. ¶¶ 25, 63, 65); *see* PRC Const., Art. 19 and 21 (encouraging "State enterprises" to "establish educational institutions of various types" and supporting "the setting up of various medical and health facilities by . . . State enterprises . . . for the protection of the people's health").

Irico Group was authorized by various government agencies, along with its fully state-backed investment partners, to create Display in furtherance if its purpose to "contribute to the development of [China's] electronics products," (Amended Plunkett Decl., Ex. 31 at -668), and "protect and increase the value of State-owned assets," (*id.*, Ex. 44 at -854). The purposes of Display and Group were closely linked as part of the same state-owned enterprise group. (*See* Clarke Decl. ¶ 14 (noting formation of "group companies" to replace Chinese industrial ministries).) As a state-controlled company under Chinese law in 2007, Irico Display was required to "make efforts to increase economic efficiency and bear the responsibility of preserving and increasing the value of State-owned assets operated and managed" by Display for the benefit of the Chinese state. SASAC Regs., Art. 11.

As part of its government-mandated efforts to "increase economic efficiency," Display sought to earn a profit for its sale of CRTs and other products, but this fact does not undermine Display's public purpose.  The direct pursuit of economic advancement by the government is a core principle and policy decision of the Chinese state and a valid public purpose recognized in the caselaw.[6]  *See* PRC Const. Art. 7 ("The State-owned economy . . . is the leading force in the national economy.   The State ensures the consolidation and growth of the State-owned economy."); (Clarke Decl. ¶¶ 10-18).   In this case, the Chinese government was the principal beneficiary of Irico Display's profits.   Display's results were consolidated into Irico Group's financial statements and formed the basis for Group's mandatory state-owned capital dividends to SASAC and the Chinese Ministry of Finance.  (Amended Plunkett Decl., Ex. 16 at -588.)  The remainder of Display's profits were either reinvested in its business operations to "increas[e] the value of [Display's] State-owned assets," SASAC Regs., Art. 11, or distributed as dividends to all shareholders, with the largest portion benefitting Irico Group, a wholly-owned instrumentality of the People's Republic of China.  *See Powerex*, 533 F.3d at 1101 (citing, in support of organ status, the fact that "Powerex's earnings are consolidated with those of" its direct parent, a wholly owned instrumentality of Canada, for purposes of rate-setting and net income paid to the Canadian government).   Display's very purpose therefore was to increase the value of state-owned assets, contribute to the development of the Chinese national economy and, thus, function as an organ of the People's Republic of China.

---

[6] The recognition of state-owned profit-making activity as a valid public purpose has a long history in the Supreme Court's sovereign immunity jurisprudence.  In one of its earliest sovereign immunity cases, the Court held that "advancing the trade of its people or providing revenue for its treasury" through commercial activity conducted by the foreign state constituted a valid public purpose and was worthy of immunity.  *Berizzi Bros. Co. v. The Pesaro*, 271 U.S. 562, 574 (1926) ("We know of no international usage which regards the maintenance and advancement of the economic welfare of a people in time of peace of any less a public purpose than the maintenance or training of a naval force."); *see also Gates,* 54 F.3d at 1461 (recognizing public purpose of "advanc[ing] the Province of Alberta's interest in marketing Alberta hogs").  This principle has been codified in the FSIA through Congress' explicit recognition that presumptively immune foreign states and their instrumentalities engage in "commercial activity," and only lose immunity when such activity has a sufficient nexus with the United States.  *See* 28 U.S.C. § 1605(a)(2); *Powerex*, 533 F.3d at 1102 ("Powerex is the kind of government entity that Congress had in mind when it wrote the FSIA's 'commercial activity' provisions.") (internal quotations omitted).

**4.  Irico Display's Leaders Were Government-Appointed and Considered State Officials Under Chinese Law**

Irico Display's management—as employees of state-controlled companies—performed official state duties under Chinese law and therefore held a status that was distinct from management of non-state-owned enterprises.  These employees' official status as public functionaries further supports the finding of organ status of Display.  *See Alperin*, 360 Fed. App'x at 849 (finding entity to be an "organ of a foreign state" in part because its "highest administrative level" was made up of "government officials all appointed by" the government); *Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect*, 89 F.3d 650, 655 (9th Cir. 1996) (finding subsidiary of government-owned enterprise was "organ of [the] foreign state" where subsidiary was controlled by government appointees); (Clarke Decl. ¶¶ 36, 46).

Specifically, Display's management was subject to the Chinese government's mandates for the integrity of state officials, relevant government anti-corruption provisions, and supervision by the state Commission for Discipline Inspection.  (Amended Wang Decl. ¶ 64.) These mandates did not apply to management or employees of non-state-controlled enterprises. (*Id.*)  SASAC regulations specify that Display's directors, management, and other "responsible persons" are subject to disciplinary sanction and are liable to compensate the State for any loss of State-owned assets caused by abuse of power or neglect of duty.  *See* SASAC Regs., Art. 40 and 41 ("Where the responsible person of a . . . State-holding enterprise abuses his power or neglects his duty, thus causing the loss of State-owned assets of the enterprise, such person shall" be liable to make restitution to the government and be subject to "disciplinary sanction," including possible "criminal liability").  SASAC promulgated additional regulations governing the evaluation of the performance of "responsible persons" of state-owned enterprises in 2006, which specified that the management of state-controlled companies like Display were subject to performance evaluation by SASAC.  (Amended Plunkett Decl., Ex. 52 at Art. 2(3) (specifying that the "Chairmen of boards, vice chairmen of boards, directors and general managers . . . as well as vice general managers . . . and chief accountants" who are "representatives of State-owned stock rights of State-controlled enterprises" shall be subject to annual performance assessment by SASAC).)  Under these regulations, SASAC "conduct[ed] proactive supervision

over the implementation of" letters of responsibility with each individual executive under their control.  (*Id.* at Art. 12.)

In addition, Article 93 of the Chinese Criminal Law dictates that "people engaged in official duties in state-owned companies, enterprises, institutions, and people's organizations, and those who shall be assigned to non-state-owned companies, enterprises, institutions, and social organizations from state-owned companies, enterprises, institutions, and other persons who are engaged in official duties in accordance with the law, ***shall be treated as state functionaries***."  Criminal Law of the People's Republic of China, Art. 93, *available at* http://www.npc.gov.cn/englishnpc/Law/2007-12/13/content_1384075.htm (emphasis added); (Clarke Decl. ¶ 39).  The Supreme People's Court and the Supreme People's Procuratorate of China (the highest Chinese court and prosecuting authority, respectively) issued guidance on "handling job-related criminal cases," which clarifies that the management of state-controlled companies such as Display, who serve "upon nomination, recommendation, appointment [or] approval" of a state-owned company such as Group, are considered state functionaries under the Chinese Criminal law.  (Amended Plunkett Decl., Ex. 1 at -014, -018.)

This elevated standard imposed on managers of State-controlled companies applied to Display's management.  Two examples punctuate the application of these laws to the management of Irico Group subsidiaries, which includes Display.  (*See* Clarke Decl. ¶¶ 36, 46.) First, three managers of Irico Group companies were tried as public officials—over the managers' arguments that they were not public officials—and convicted for accepting bribes in the course of their public duties as employees of Irico Group subsidiaries.  (*See* Amended Plunkett Decl., Ex. 8 at -537, 10 at -556, 42 at -764; Clarke Decl. ¶¶ 37, 40-45.)  Two of these officials were managers of other subsidiaries of Irico Group, similarly situated to Display, while one was a manager of a subsidiary of Display, two levels *below* Display in the corporate chain. (*See* Clarke Decl. ¶¶ 40-45.)  Due to their status as public officials, the defendants received harsh sentences reserved solely for public officials.  (*See* Clarke Decl. ¶ 36-37; *see, e.g.*, Amended Plunkett Decl., Ex. 10 at -570 (appeals court reversing initial court decision sentencing defendant

to six years imprisonment for "accepting bribes as a non-State worker," and instead imposing a

sentence of *ten years* for accepting bribes as a state official).)

Second, all management of Irico Display (and other Irico Group subsidiaries) were

required to be members of the Chinese Communist Party and were subject to the authority of

Central Committee for any ethical violations.  (Amended Wang Decl. ¶ 37.)   The Chinese

Communist Party had cells embedded in Irico Display's facilities to monitor and supervise all

employees and operations.  (*See* Amended Wang Decl. ¶¶ 37, 64); *Trans Chem. Ltd. v. China

Nat'l Mach. Imp. & Exp. Co.*, 978 F. Supp. 266, 281 (S.D. Tex. 1997) (holding a Chinese state-

owned corporation to be an "agency or instrumentality" of China, where the "presence of a

Communist Party cell in each enterprise . . . allows for Party control over the enterprise.").

Several top executives of Irico Display were punished by this Central Committee and stripped of

their Communist Party membership for corruption during performance of their official duties at

Display.  (Amended Wang Decl. ¶ 38.)  The effect of these Display employees' expulsion from

the Communist Party was that they were forever barred from holding a management position at

any state-owned enterprise.  (*Id.*)  "The fact that enterprise managers can be 'disciplined' by a

government department necessarily implies that they are administratively part of that department

and subordinate to its leadership."  *Trans Chem.*, 978 F. Supp. 266 at 281 (alterations omitted).

### 5.   Irico Display Had Significant Public Obligations and Privileges Under Chinese Law

Irico Display's obligations to submit to the authority of SASAC and other government

agencies under the State Council are described in detail above.  In return for these obligations,

Display received significant support from Chinese government ministries and wholly state-

owned instrumentalities, including all of its initial funding at the time of formation, and periodic

government appropriations allocated by SASAC and the Ministry of Finance through Group for

use by Display for capital projects.  (Amended Wang Decl. ¶¶ 59-60.)

Irico Display received an allocation of over RMB100 million in government funds in

2007 for its thin-film-transistor liquid-crystal display glass substrate project.[7]  (Amended Wang

---

[7] Irico Group initiated the TFT-LCD glass substrate project in 2007 through a different subsidiary, Shaanxi Irico Electronic Glass Co., Ltd., (*see* Amended Plunkett Decl. Ex. 35 at -709), which was then

1  Decl. ¶ 60.)  As a state-controlled company, Display was entitled to "guidance and coordination"

2  from SASAC in "overcoming difficulties and solving problems in the process of their reform and

3  development."  SASAC Regs., Art. 14(6).  Tied to the control exercised by Group, Display also

4  benefitted from the public services delegated to Group by the Chinese government, including a

5  school system, police department, hospital, and senior living center, which Irico Group was

6  required to set up around Display's operations in Xianyang, Shaanxi Province, and benefitted

7  Display's employees and their families, as well as the surrounding community.  (Amended Wang

8  Decl. ¶¶ 25, 65.)

9      Irico Display thus qualifies as an "organ" of the State Council and, like Irico Group, is

10  presumptively immune from suit under the FSIA.  (*See* Clarke Decl. ¶¶ 24, 31-35, 36, 46.)  Like

11  other entities found to be "organs" by the Ninth Circuit, Irico Display was "restrained by

12  [government] regulations and directives applicable to government corporations," restricted in its

13  "ability to enter [various] financial arrangements," had its "financial operations" regularly

14  "reviewed by" the government, its "objectives" set by the government, and its board members

15  and management directly and "indirectly appoint[ed] and approv[ed]" by the government "to

16  ensure that [Display] carries out its public duties."  *Powerex*, 533 F.3d at 1101.  Even if the Court

17  concludes that Display enjoyed "a limited degree of tactical independence," as with the entity in

18  *Powerex*, "its purposes and strategies—indeed, its continued existence—are determined by" the

19  State Council through SASAC.  *Id.*

20      **B.      No Exceptions Apply That Would Deprive Irico Display of Sovereign**
           **Immunity**

21

22      IPPs bear the burden to demonstrate that the Court may properly invoke its subject matter

23  jurisdiction over Irico Display subject to one of the FSIA's statutory exceptions.  As with Irico

24  Group, no exceptions apply to Irico Display.  *See* 28 U.S.C. § 1605.  *Saudi Arabia v. Nelson*, 507

25  U.S. 349, 355 (1993) ("Under the Act, a foreign state is presumptively immune from the

26  jurisdiction of the United States courts; unless a specified exception applies, a federal court lacks

27

28  placed under Irico Display's majority ownership and control beginning in 2008, (*see* Clarke Decl. ¶¶ 44-45.)

subject-matter jurisdiction over a claim against a foreign state."); *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1125 (9th Cir. 2010) ("The structure of the FSIA—which codifies the background rule that foreign states are immune from suit and execution, and then creates narrow exceptions—suggest that courts must begin with the presumption that a foreign state is immune and then the plaintiff must prove that an exception to immunity applies.").  In cases, as here, "where a defendant . . . makes a factual attack on subject matter jurisdiction" and introduces evidence showing immunity, "no presumptive truthfulness attaches to plaintiff's allegations." *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012).  "The plaintiff then has the burden of going forward with the evidence by offering proof that one of the FSIA exceptions applies." *Id.*

Section 1605(a) of the FSIA provides exceptions to immunity only where a foreign state or instrumentality (1) "waived its immunity," (2) engaged in "commercial activity" upon which the action is based with a sufficient nexus to the United States, (3) took property "in violation of international law," (4) contests rights to "immovable property" in the United States, (5) committed certain noncommercial torts, or (6) is bound by an agreement to arbitrate.  28 U.S.C. § 1605(a).  Exceptions (3) through (6) have no conceivable application here, and this Court has already found that actions by the Irico Defendants prior to their default did not waive immunity. (Dkt. 5240 at 12-13).

IPPs are likely to assert that the "commercial activity" exception would preclude Irico Display from invoking immunity under the FSIA. (Dkt. 5221 at 12-17).  The commercial activity exception "is given a very restrictive interpretation," *Sec. Pac. Nat'l Bank v. Derderian*, 872 F.2d 281, 285 (9th Cir. 1989), and requires that the lawsuit be "based upon" specific commercial acts by a particular "foreign state" defendant.  28 U.S.C. § 1605(a)(2).  A foreign state or instrumentality loses its immunity under this exception only if:

> (1) "the action is based upon a commercial activity carried on in the United States by the foreign state;"
>
> (2) "the action is based . . . upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere;" or

(3) "the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."

*Id.*  The first and second prongs of the exception cannot apply to Irico Display because Display carried on no "commercial activity" in the United States and performed no "acts" in the United States, let alone one upon which this action is based.  (Amended Wang Decl. ¶¶ 12-13.)

IPPs also cannot demonstrate that any of Irico Display's alleged actions underlying their claims had a "direct effect" in the United States as required to defeat immunity under the third prong section 1605(a)(2).  To constitute a "direct effect" under the FSIA, an effect must "follow[] as an immediate consequence of the defendant's activity."  *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992).  A consequence is immediate "if no intervening act breaks the chain of causation leading from the asserted wrongful act to its impact in the United States."  *Terenkian*, 694 F.3d at 1133 (citing *Lyons v. Augusta S.P.A.*, 252 F.3d 1078, 1083 (9th Cir. 2001) and *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 75 (2d Cir. 2010) ("[T]he requisite immediacy is lacking where the alleged effect depends crucially on variables independent of the conduct of the foreign state.")) (internal quotations omitted).

Moreover, "[s]atisfying the requirement that an effect be 'immediate' and therefore 'direct' is not sufficient by itself to satisfy the 'direct effect' prong of the commercial activity exception, however, because the effect must also be more than 'purely trivial' or 'remote and attenuated.'"  *Terenkian*, 694 F.3d at 1134 (citing *Weltover*, 504 U.S. at 618).  This means that, to prove a direct effect, plaintiffs must show that "something legally significant actually happened in the United States" as a direct result of Irico Display's actions.  *Id.*; *Gregorian v. Izvetsia*, 871 F.2d 1515, 1527 (9th Cir. 1989).  These "legally significant" actions alleged to have directly injured plaintiffs must be actions of the ***specific defendant*** at issue, as actions by independent or even related entities will not suffice.  *See California v. NRG Energy, Inc.*, 391 F.3d 1011, 1024 (9th Cir. 2004) (finding no "direct effect" by a parent company and refusing to impute any effects from direct sales to the U.S. by its wholly-owned subsidiary), *vacated on other grounds*, *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224 (2007).  "[M]ere financial

loss by a person—individual or corporate—in the U.S. is not, in itself, sufficient to constitute a direct effect." *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 726-27 (9th Cir. 1997).

In their complaint, IPPs have alleged that Irico Display made sales "either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States." (Dkt. 1526 at ¶ 96.)  These allegations are purely speculative and are entitled to "no presumptive truthfulness" in evaluating FSIA immunity.  *Terenkian*, 694 F.3d at 1134.  IPPs have presented no evidence that Irico Display made any sales (whether of CRTs or finished products) to customers in the United States during the Class Period.  Irico Display made no such sales:  Before 2005, Irico Display did not even have its own sales department and all sales were handled by Irico Group.  (Amended Wang Decl. ¶ 5.)  Irico Display (and Irico Group) made no sales to the United States during the Class Period, (*id.* at ¶ 12.), and no direct effect can be attributed to Display under the commercial activity exception.  Any claim of direct effect through Irico Display's sales of CRTs is even more tenuous here, where IPP's claims are based explicitly upon *indirect* sales through one or more layers of independent customers.  Sales of televisions and monitors made directly or indirectly by Irico Display's *customers*, pursuing their own sales strategy and setting their own prices, are just the sort of "intervening object, cause, or agency" that cannot trigger the commercial activity exception.  *Terenkian*, 694 F.3d at 1135.  "[T]he requirement that an effect be 'direct' indicates that Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States."  *Id.* at 1134-35 (quoting *United World Trade, Inc. v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232, 1238 (10th Cir. 1994)); *see NRG Energy*, 391 F.3d at 1024.

Nor can IPPs rely on their allegations that Irico Display participated in a conspiracy to support a finding of "direct effect."  The "direct effect" prong of the commercial activity exception typically only applies in cases where a foreign sovereign has entered into a contractual relationship requiring performance in the U.S., or where a U.S. plaintiff was injured directly by a foreign sovereign's tortious conduct.  *See, e.g., Weltover*, 504 U.S. at 618-19 (finding "direct effect" where contract specified payment in the United States); *Adler*, 107 F.3d 720, 726-27 (same); *Am. West Airlines, Inc. v. GPA Group, Ltd.*, 877 F.2d 793, 796-800 (9th Cir. 1989)

(finding no "direct effect" where defendant's allegedly faulty aircraft maintenance happened outside the United States); *Joseph v. Office of Consulate Gen. of Nigeria*, 830 F.2d 1018, 1024 (9th Cir. 1987). Cases applying the "direct effect" test in the antitrust context are somewhat rare, but those that do, including in the Ninth Circuit, have concluded that no direct effect exists unless the **specific defendant** had direct sales of the allegedly affected product in the United States. *See NRG Energy,* 391 F.3d at 1024 (finding no "direct effect" because a parent company's "decisions affected an intermediary," its own subsidiary, "whose actions in turn affected the U.S." through direct power sales to California), *aff'g in part In re Wholesale Electricity Antitrust Cases I & II*, No. 2-0990-RHW, 2002 WL 34165887, at *8 (S.D. Cal. Dec. 17, 2002) ("It appears, however, that BC Hydro simply delivered energy to Powerex, and Powerex independently marketed and sold the power into the California markets . . . Any 'direct effect' on the California markets was perpetrated by Powerex."), *vacated on other grounds*, *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224 (2007); *Filetech S.A. v. Fr. Telecom, S.A.*, 212 F. Supp. 2d 183 at 197 (S.D.N.Y. 2001) (finding no "direct effect" from allegedly anticompetitive conduct where defendant, an instrumentality of France, had not "intended or contemplated a specific effect in the United States," did not have "substantial sales of marketing lists in the United States," and "failed to arrange for or complete a single U.S. sale" of certain other products).

Cases outside the antitrust context confirm that a "direct effect" cannot be established without direct sales. *See Terenkian*, 694 F.3d at 1138 (finding no "direct effect" due to breach of contract to deliver oil despite fact that "some of the oil intended for purchase was meant for the U.S. market"); *In re N. Sea Brent Crude Oil Futures Litig.*, No. 1:13-MD-02475 (ALC), 2016 WL 1271063, at *12 (S.D.N.Y. Mar. 29, 2016) (finding no "direct effect" where plaintiffs "present[ed] evidence of a correlation between physical Brent crude oil prices and futures prices," where "any effect the physical transactions ha[d] on the United States markets [wa]s mitigated by the actions of third parties").

Jurisprudence on the application of personal jurisdiction to alleged participants in a conspiracy is also instructive on this point.[8] The Ninth Circuit has held that "the requirement of

---

[8] In its February 1, 2018 Order granting Irico's motion to set aside the default, the Court turned to cases

a 'direct effect' incorporates the minimum contacts standards of *International Shoe v. Washington*" and therefore "must comport with the traditional notions of fair play and substantial justice which determine the due process limits of personal jurisdiction." *Derderian*, 872 F.2d at 286-87; *see also Corzo v. Banco Cent. de Reserva del Peru*, 243 F.3d 519, 525-26 (9th Cir. 2001) (citing *Security Pacific* for the necessity of "minimum contacts" with the United States to establish a direct effect under the FSIA); *Theo. H. Davies & Co. v. Republic of Marshall Islands*, 174 F.3d 969, 974 (9th Cir. 1998) ("Section 1330(b) [of the FSIA] provides, in effect, a Federal long-arm statute over foreign states . . . .  This long-arm statute, however, is constrained by the minimum contacts required by *International Shoe Co. v. Washington* and its progeny.") (internal citation omitted); *Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383, 395 (6th Cir. 2016) (observing "that the Ninth Circuit has adopted . . . 'minimum contacts' analysis to conclude that [an] activity had no 'direct effect.'").

In the personal jurisdiction context, courts in the Ninth Circuit have found that acts or contacts of alleged co-conspirators ***cannot*** be imputed to a different defendant for purposes of establishing jurisdiction over that defendant.  As held in *Kipperman v. McCone*:

> Contrary to plaintiff's assertion that personal jurisdiction over alleged co-conspirators may be acquired vicariously through the forum-related conduct of any single conspirator, the Court believes that personal jurisdiction over any non-resident individual must be premised upon forum-related acts ***personally*** committed by the individual.  ***Imputed conduct is a connection too tenuous to warrant the exercise of personal jurisdiction***.

422 F. Supp. 860, 873 n.14 (N.D. Cal. 1976) (emphases added).  The Ninth Circuit likewise has noted that a "conspiracy theory" of jurisdiction is unwarranted, observing that "[t]here is a great deal of doubt surrounding [its] legitimacy," *Chirila v. Conforte*, 47 Fed. App'x 838, 842 (9th Cir.

---

under the Foreign Trade Antitrust Improvements Act ("FTAIA") for assistance in interpreting the "direct effects" requirement.  Irico submits that personal jurisdiction principles provide a more apt analogy because, as described below, the Ninth Circuit has explicitly incorporated "minimum contacts" principles in its FSIA jurisprudence.  In addition, unlike the FTAIA, sovereign immunity and personal jurisdiction each address the court's jurisdiction over a *particular defendant*.  The FSIA and FTAIA also have notably different purposes.  *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) (noting that courts "must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination"); *Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 410-11 (2d Cir. 2014) ("Here, both the purpose and language of the FSIA and FTAIA differ in critical respects.").

2002) (citing *Kipperman* and other cases), and has squarely rejected the imputing of contacts from co-conspirators in the venue context. *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 492 (9th Cir. 1979). Extending the reach of the "direct effects" exception beyond that recognized in this Circuit as appropriate for personal jurisdiction would frustrate "Congress' intent that it be difficult for private litigants to bring foreign governments into court, thereby affronting them." *Murphy v. Korea Asset Mgmt. Corp.*, 421 F. Supp. 2d 627, 640 (S.D.N.Y. 2005) (internal quotations omitted).

Given the absence of sales to the U.S. by Irico Display and the lack of any evidence that Display otherwise meets the strictly-construed requirements of the commercial activities exception, there is no basis for concluding that jurisdiction under the FSIA exists with respect to Irico Display.

## IV.    **CONCLUSION**

Based on the foregoing, Irico Display requests that the Court enter an order: (*a*) dismissing the IPP Complaint against Irico Display with prejudice; and (*b*) granting such further relief as may be just and equitable.


Dated:  March 19, 2019                        */s/ Stuart C. Plunkett*

John Taladay (*pro hac vice*)
john.taladay@bakerbotts.com
1299 Pennsylvania Ave., NW
Washington, D.C. 20004
Telephone:  (202) 639-7700
Facsimile:   (202) 639-7890

Stuart C. Plunkett (State Bar No. 187971)
stuart.plunkett@bakerbotts.com
Peter Huston (State Bar No. 150058)
peter.huston@bakerbotts.com
BAKER BOTTS LLP
101 California Street, Suite 3600
San Francisco, California 94111
Telephone:  (415) 291-6200
Facsimile:   (415) 291-6300

*Attorneys for*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*