Guido Saveri (22349)
    guido@saveri.com
R. Alexander Saveri (173102)
    rick@saveri.com
Geoffrey C. Rushing (126910)
    grushing@saveri.com
Cadio Zirpoli (179108)
    cadio@saveri.com
Matthew D. Heaphy (227224)
    mheaphy@saveri.com
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Telephone:  (415) 217-6810
Facsimile:  (415) 217-6813

*Lead Counsel for Direct Purchaser Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 07-CV-5944-JST |
| | MDL No. 1917 |
| This Document Relates to: | **DIRECT PURCHASER PLAINTIFFS' OPPOSITION TO THE IRICO DEFENDANTS' AMENDED MOTIONS TO DISMISS CLAIMS OF DIRECT PURCHASER PLAINTIFFS FOR LACK OF SUBJECT MATTER JURISDICTION (FED. R. CIV. P. 12(b)(1)) (ECF Nos. 5410, 5412)** |
| *ALL DIRECT PURCHASER ACTIONS* | |
| | Date:        May 30, 2019 |
| | Time:        2:00 p.m. |
| | Judge:      Honorable Jon S. Tigar |
| | Courtroom:  9 |

# REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ...........................................................................................i

TABLE OF AUTHORITIES.................................................................................. ii

ISSUE TO BE DECIDED ...................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES........................................ 1

I.      INTRODUCTION ....................................................................................... 1

II.     STATEMENT OF RELEVANT FACTS.................................................... 3

        A.      Group and Display Are Independent Profit-Making Enterprises ................... 3

                1.      Group and Display Were Created As Independent Entities ............................ 3

                2.      Applicable Laws and Corporate Governance Documents Affirmed Display's Independence and Focus on Shareholder Profits.............................. 5

                3.      Display Told Investors It Would Act Independently in Their Interests and Stated Its Goals in Terms of Revenues, Profits, and Losses ........................... 8

        B.      Group and Display Agreed with Competitors To Fix Worldwide CRT Prices............ 9

                1.      Uncontested Evidence Establishes Group's and Display's Participation in a Conspiracy To Increase CRT Prices.................................. 9

                2.      Uncontested Evidence Establishes an Effect on the U.S. Market .................. 11

        C.      Group and Display Sold CRTs into the United States ............................... 12

III.    DISPLAY IS NOT AN ORGAN OF THE CHINESE STATE ............................ 14

        A.      Display Was Created as and Remained a Standardized Stock Corporation............... 15

        B.      Display's Purpose Was To Earn Profits for Its Shareholders..................... 17

        C.      Display Was Independent from the Chinese Government ......................... 20

                1.      Display's Governing Documents Establish Its Independence........................ 20

                2.      The SASAC Regulations Are Consistent with Display's Independence ........ 21

                3.      The Wang Declaration is Inadmissible, Contradicted by Wang's Own Admissions, and Immaterial ................................ 23

        D.      Display Did Not Receive Significant Governmental Financial Support.................... 26

        E.      Display's Employees Were Not Chinese Civil Servants............................ 27

        F.      Display Did Not Have Special Privileges or Obligations ......................... 29

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IV.   THE COMMERCIAL ACTIVITY EXCEPTION STRIPS BOTH GROUP AND DISPLAY OF IMMUNITY ...................................................................................................31

A.   An Increase in U.S. Prices from a Global Conspiracy Is a "Direct Effect" ...............31

1.   This Court Has Already Ruled That an Increase in U.S. Prices Is a Direct Effect ..................................................................................................31

2.   This Court's Previous Ruling Was Correct ......................................................32

B.   Discovery Has Confirmed That Group and Display Targeted the U.S. Market..........38

V.   CONCLUSION ..................................................................................................40

DIRECT PURCHASER PLAINTIFFS' OPPOSITION TO THE IRICO DEFENDANTS' MOTIONS TO DISMISS;
Master File No. 07-CV-5944-JST

1

## <u>TABLE OF AUTHORITIES</u>

2

3

### <u>Cases</u>

4

*Adler v. Fed. Republic of Nigeria*,
   107 F.3d 720 (9th Cir. 1997) ........................................................................................... 39

5

*Alperin v. Vatican Bank*,
   No. C-99-04941 MMC, 2007 WL 4570674 (N.D. Cal. Dec. 27, 2007), *aff'd*, 360 F. App'x 847

6

   (9th Cir. 2009), *amended in part*, 365 F. App'x 74 (9th Cir. 2010)...................................... 16, 18

7

*AngioScore, Inc. v. TriReme Med., Inc.*,
   No. 12-CV-03393-YGR, 2015 WL 4040388 (N.D. Cal. July 1, 2015) ...................................... 26

8

*Atlantica Holdings Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
   813 F.3d 98 (2d Cir. 2016) .............................................................................................. 39

9

*Bd. of Regents of Univ. of Texas Sys. v. Nippon Tel. & Tel. Corp.*,

10

   478 F.3d 274 (5th Cir. 2007) ........................................................................................ 19, 20

11

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
   182 F.3d 1096 (9th Cir. 1999) ......................................................................................... 39

12

*Cal. Dep't of Water Res. v. Powerex Corp.*,

13

   533 F.3d 1087 (9th Cir. 2008) ................................................................... 1, 15, 20, 27, 31

14

*Calder v. Jones*,
   465 U.S. 783 (1984) ...................................................................................................... 41

15

*California v. NRG Energy, Inc.*,
   391 F.3d 1011 (9th Cir. 2004) ................................................................................. 37, 38, 40

16

*Capital Trans Int'l, LLC v. Int'l Petroleum Inv. Co.*,

17

   No. 8:10-CV-529-T-30TGW, 2013 WL 557236 (M.D. Fla. Feb. 14, 2013), *vacated in part*, 2013
   WL 12344236 (M.D. Fla. Feb. 25, 2013).......................................................................... 16, 17

18

*Corzo v. Banco Cent. de Reserva del Peru*,

19

   243 F.3d 519 (9th Cir. 2001) .......................................................................................... 40

20

*Cruise Connections Charter Mgmt. 1, LP v. Attorney Gen. of Canada*,
   600 F.3d 661 (D.C. Cir. 2010)........................................................................................ 35

21

*Dole Food Co. v. Patrickson*,
   538 U.S. 468 (2003) ................................................................................................. 17, 22

22

*EOTT Energy Operating Ltd. P'ship v. Winterthur Swiss Ins. Co.*,

23

   257 F.3d 992 (9th Cir. 2001) ..................................................................................... 29, 31

24

*Export Group v. Reef Indus., Inc.*,
   54 F.3d 1466 (9th Cir. 1995) .......................................................................................... 15

25

*Filetech S.A. v. France Telecom, S.A.*,
   212 F. Supp. 2d 183 (S.D.N.Y. 2001) ................................................................................ 38

26

*In re North Sea Brent Crude Oil Futures Litig.*,
   No. 1:13-md-02475 (ALC), 2016 WL 1271063 (S.D.N.Y. Mar. 29, 2016) ......................... 38, 39

27

*In re Optical Disk Drive Antitrust Litig.*,

28

   No. 10-md-02143-RS, 2015 WL 1926635 (N.D. Cal. Apr. 28, 2015)........................................ 41

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    822 F. Supp. 2d 953 (N.D. Cal. 2011)...................................................................... 36, 37

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. C 11-0829 SI, 2011 WL 5444261 (N.D. Cal. Nov. 9, 2011)................................... 41

*In re Wholesale Elec. Antitrust Cases I & II*,
    No. CV 02-0990-RHW, 2002 WL 34165887 (S.D. Cal. Dec. 17, 2002)....................... 38

*Int'l Ass'n of Machinists & Aerospace Workers v. OPEC*,
    649 F.2d 1354 (9th Cir. 1981) ................................................................................... 35

*Janvey v. Libyan Inv. Auth.*,
    840 F.3d 248 (5th Cir. 2016) ...................................................................................... 17

*Lyon v. Agusta S.P.A.*,
    252 F.3d 1078 (9th Cir. 2001) ............................................................................... 34, 43

*NML Capital, Ltd. v. Republic of Argentina*,
    892 F. Supp. 2d 530 (S.D.N.Y. 2012) ........................................................................ 28

*NXP Semiconductors USA, Inc. v. Brevets*,
    No. C 14-1225 SI, 2014 WL 4621017 (N.D. Cal. Sept. 15, 2014) ........................ 16, 17, 18, 31

*Ocean Line Holdings Ltd. v. China Nat. Chartering Corp.*,
    578 F. Supp. 2d 621 (S.D.N.Y. 2008) ........................................................................ 31

*Patrickson v. Dole Food Co.*,
    251 F.3d 795 (9th Cir. 2001), *aff'd in part, cert. dismissed in part*, 538 U.S. 468 (2003) ... 18, 20,
    21, 22, 29, 31, 32

*Perez-Encinas v. AmerUs Life Ins. Co.*,
    468 F. Supp. 2d 1127 (N.D. Cal. 2006)...................................................................... 39

*Powerex Corp. v. Reliant Energy Servs. Inc.*,
    551 U.S. 224 (2007) ............................................................................................. 20, 38

*Republic of Argentina v. Weltover, Inc.*,
    504 U.S. 60 (1992) ........................................................................................... 34, 38, 40

*Rote v. Zel Custom Mfg. LLC*,
    816 F.3d 383 (6th Cir. 2016)...................................................................................... 40

*Scheidemann v. Qatar Football Ass'n*,
    No. 04 Civ. 3432 (LAP), 2008 WL 144846 (S.D.N.Y. Jan. 15, 2008) ........................ 21

*Sea Breeze Salt, Inc. v. Mitsubishi Corp.*,
    899 F.3d 1064 (9th Cir. 2018) ................................................................................... 35

*Sea Breeze Salt, Inc. v. Mitsubishi Corp.*,
    No. CV 16-2345-DMG (AGRX), 2016 WL 8648638 (C.D. Cal. Aug. 18, 2016)................ 35, 40

*Sec. Pac. Nat'l Bank v. Derderian*,
    872 F.2d 281 (9th Cir.1989)....................................................................................... 40

*Siderman de Blake v. Republic of Argentina*,
    965 F.2d 699 (9th Cir. 1992) ...................................................................................... 35

*Supra Med. Corp. v. McGonigle*,
    955 F. Supp. 374 (E.D. Pa. 1997)............................................................................... 31

*Terenkian v. Republic of Iraq*,
   694 F.3d 1122 (9th Cir. 2012) ................................................ 15, 34, 36, 38, 39, 40, 43

*United States v. Hui Hsiung*,
   778 F.3d 738 (9th Cir. 2015) ................................................................................ 33, 36

*United States v. Jicarilla Apache Nation*,
   564 U.S. 162 (2011) ...................................................................................................... 22

*United States v. LSL Biotechnologies*,
   379 F.3d 672 (9th Cir. 2004) ...................................................................................... 35

*USX Corp. v. Adriatic Ins. Co.*,
   345 F.3d 190 (3d Cir. 2003) ........................................................................ 16, 18, 20

*Walden v. Fiore*,
   571 U.S. 277 (2014) ...................................................................................................... 40

*World-Wide Volkswagen Corp. v. Woodson*,
   444 U.S. 286 (1980) ...................................................................................................... 40

## Statutes

18 U.S.C. § 215 ............................................................................................................ 30

18 U.S.C. § 666 ............................................................................................................ 30

28 U.S.C. § 1603(b) .......................................................................................... 1, 16, 22

28 U.S.C. § 1605(a)(2) ...................................................................... 1, 2, 3, 33, 38

Cal. Pen. Code § 639 .................................................................................................. 30

Cal. Pen. Code § 641 .................................................................................................. 30

DIRECT PURCHASER PLAINTIFFS' OPPOSITION TO THE IRICO DEFENDANTS' MOTIONS TO DISMISS;
Master File No. 07-CV-5944-JST

**ISSUES TO BE DECIDED**

1.        Whether, as of November 26, 2007, Defendant IRICO Display Devices, Co., Ltd. was an "organ of a foreign state" within the meaning of 28 U.S.C. § 1603(b)(2).

2.        Whether the actions of Defendants IRICO Group Corporation and IRICO Display Devices, Co., Ltd. "cause[d] a direct effect in the United States" under 28 U.S.C. § 1605(a)(2).

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.        INTRODUCTION**

A year ago, this Court concluded that neither IRICO Group Corporation ("Group") nor its partially, indirectly owned subsidiary IRICO Display Devices Co., Ltd. ("Display") had established immunity under the Foreign Sovereign Immunities Act of 1976 ("FSIA"). ECF No. 5240 ("Feb. 2018 Order"), at 14.  The Court also concluded, however, that Group and Display had each shown "possibly meritorious FSIA defense[s]," and ordered jurisdictional discovery to test those defenses. *Id.* at 19-20.  That discovery is now complete.  On the fuller record now before the Court, the possibility of merit has faded.  Neither Group nor Display is immune.

**Display Is Not an Organ.**  The first issue presented to this Court is whether Display is "an agency or instrumentality of a foreign state" as defined in 28 U.S.C. § 1603(b).  The Court should conclude that Display is not, and therefore is not entitled to any immunity under the FSIA. Because Display is a corporate entity neither directly nor majority-owned by the Chinese state, it can qualify as an "agency or instrumentality" only by showing that it is an "organ of a foreign state" – here, the People's Republic of China.  That showing turns on whether an alleged organ "engages in a public activity on behalf of the foreign government."  *Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087, 1098 (9th Cir. 2008).  The overarching reason that Display's arguments fail is that it engaged in no public activity on behalf of the Chinese state.  Display instead earned profits for its investors – mostly, private shareholders – by manufacturing and selling color picture tubes.  That is a classic private activity.  It did not become a public one through the Chinese government's indirect ownership of less than one-third of Display's equity.

Each factor that courts consider to determine the nature of an alleged organ's activities weighs against finding that Display was an organ of the Chinese state.  Display was formed under

1    generally applicable corporate laws that apply to all Chinese companies, public or private.  It was

2    created to make profits for investors, not to serve any special governmental interest.  According to

3    its own governance documents and public representations, Display was independent from its

4    partial, indirect owner Group – which, itself, was separate from the Chinese government.  Display

5    has also failed to show that it received substantial financial government support; that its employees

6    were civil servants; or that it had privileges or obligations different from those of private Chinese

7    companies.  Also, companies with mixed government and private ownership are common in China.

8    A ruling that mixed ownership protects Display from suit would have the unwarranted result of

9    treating that entire part of the Chinese business sector as sovereign and presumptively immune.

10              **The Commercial Activity Exception Applies.**  This Court's previous ruling established

11   that the Direct Purchaser Plaintiffs ("DPPs") had properly alleged that the FSIA's commercial

12   activity exception, 28 U.S.C. § 1605(a)(2), applied to Group and Display.  Feb. 2018 Order 11.

13   The allegations that "adequately alleged a direct effect," *id.*, turned on two factual premises:  that

14   Group and Display participated in a global conspiracy to fix CRT prices, and that the conspiracy

15   had the effect of raising prices in the United States.  By authorizing a renewed motion to dismiss

16   after jurisdictional discovery, the Court invited Group and Display to challenge those facts.  They

17   have not done so.  Group and Display do not address, much less rebut, the DPPs' evidence

18   (including detailed meeting notes) showing that the conspiracy occurred and that Irico

19   representatives attended at least 70 conspiratorial meetings.  Nor do they address the evidence

20   (including the expert report of Dr. Jeffrey Leitzinger) that the conspiracy affected U.S. prices.

21              Instead, Group and Display argue that the DPPs' allegations and evidence are legally

22   insufficient unless DPPs can also show that Group or Display – themselves – sold CRTs into the

23   United States.  That argument is directly contrary to this Court's previous ruling.  *See* Feb. 2018

24   Order 10 ("[T]hat a defendant did not sell directly into the United States is not dispositive for the

25   question of direct effect.").  It is little more than a petition for reconsideration, and Group and

26   Display make no attempt to show they can meet the standard for reconsideration.  Even if the Court

27   were to reconsider its previous ruling, moreover, that ruling should be reaffirmed.  Both the text of

28

the FSIA and persuasive precedent support this Court's conclusion that the impact of a global

price-fixing conspiracy on U.S. prices is a "direct effect" under 28 U.S.C. § 1605(a)(2).

If needed, there is more.  Discovery has further strengthened the DPPs' jurisdictional case

by providing more evidence that Group and Display targeted the United States market for CRT

sales at the same time they were fixing CRT prices.  Group's own documents show that ███████

████████████████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████ Saveri Decl. Ex. 1, at

084. ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████. That new evidence reinforces the DPPs' previous

showing – already sufficient on its own terms – that Group and Display knew and intended that

their price-fixing conspiracy would affect consumers in the United States.

## II.       STATEMENT OF RELEVANT FACTS

### A.       Group and Display Are Independent Profit-Making Enterprises

#### 1.       Group and Display Were Created As Independent Entities

On October 18, 1988, a group of 14 Chinese "enterprises, scientific research and design

units and institutions of higher learning" applied to the Chinese Ministry of Machinery and

Electronic Industry (the "Ministry") for permission to create "IRICO Group Corporation,"

primarily from the assets of the state-owned "4400 CRT Plant" in Shaanxi, China.  ECF No. 5413

("Am. Plunkett Decl."), Ex. 6, at 530, 532.[1]  Although "based on a system of public ownership,"

Group would be "independently operated" and "self-supporting."  *Id.* at 530.  On March 2, 1989,

the Ministry consented, finding that the new structure would help to "increase product

competitiveness in the international market" and "promote development by the enterprise in being

oriented toward production and operations and exports," among other benefits.  Am. Plunkett Decl.

Ex. 5, at 527.  At its creation, Group adopted Articles of Association.  Saveri Decl. Ex. 2 ("Group

---

[1] For convenience, this Opposition cites Bates-numbered exhibits by the last three digits of each Bates number.  Where applicable, all citations refer to the English translation.

Articles"); *see* Saveri Decl. Ex. 26 ("Zhang Dep. (Day 1)"), at 47:18-20.[2]  Those Articles stated that Group would "work[] to separate the government from enterprise functions and ownership from operational rights" and be "an economic entity of independent management, with self-supporting accounting on its own account at its own risk."  Group Articles, art. IV, at 779.01E; *see also id.* at 780.01E-02E (stating that Group would be "[o]riented by . . . market demand" and pursue a "development strategy of 'international exposure and competitiveness'").  Group's Articles also stated that it would pay taxes.  *See id.* at 779.01E, 779.02E, 783.02E-03E.

In 1992, Group and three other state-owned corporate entities sought permission from the Shaanxi provincial government to create "IRICO Display Devices Co., Ltd."  On June 2, 1992, Shaanxi granted the application. Am. Plunkett Decl. Ex. 44, at 854.  The approval stated that Display was to be "established and organized in strict accordance with a standardized stock corporation," *id.* at 853; that it would "conduct autonomous business operations, [be] responsible for its own profits and losses, . . . develop under its own direction, [and] abide by its own binding operational mechanisms," although "subject to the industrial supervision work carried out by the provincial office of the electronics industry," *id.* at 854; and that it "must" not only "protect and increase the value of State-owned assets" but also "ensure the legal interests of [its] shareholders" and protect the "equality of share rights," *id.* ████████████████████████████████████ ████████████████████████.  Saveri Decl. Ex. 1, at 047.

On September 10, 2004, Group created another subsidiary, IRICO Group Electronics Company Limited ("Electronics").  ECF Nos. 5228-1 and 5228-2 ("2017 Saveri Decl.") Ex. 10, at 3.  In October 2004, Group transferred its entire interest in Display to Electronics.  Saveri Decl. Ex. 3, at 7E.  On December 20, 2004, Electronics' shares were listed on the Hong Kong Stock Exchange.  2017 Saveri Decl. Ex. 4, at 75. ████████████████████████████████████ ████████████████████████████████████████.  Saveri Decl. Ex. 4, at 10.  Thus, the Chinese state indirectly owned 31.02% – less than a third – of Display's equity.  The next largest shareholder owned 1.71%; all others, less than 1%.  *See id.*

---

[2] The Group Articles identify Group as the "Caihong Electronics Group Company," ████████ ████████████████.  Group Articles, art. I, at 779.01E; Zhang Dep. (Day 1) 47:12-14.

The resulting arrangement, in which the Chinese state held an indirect plurality interest in a company mostly owned by non-state investors, is common in the Chinese economy. As Professor Curtis Milhaupt explains in his declaration ("Milhaupt Decl."), companies in Display's position "may commonly be referred to as 'SOEs,'" or state-owned enterprises," but "are more accurately thought of as *mixed ownership* enterprises." Milhaupt Decl. ¶ 14. His report also cites a 2018 study finding that mixed-ownership enterprises account for "36-50% of the total market capitalization of the A Share market in China." *Id.* ¶ 17.

### 2.     Applicable Laws and Corporate Governance Documents Affirmed Display's Independence and Focus on Shareholder Profits

On June 27, 2006, Display adopted amended Articles of Association, Saveri Decl. Ex. 5, at 026 ("2006 Display Articles"), ██████████████████████████████. *See* Saveri Decl. Ex. 29 ("Wang Dep. (Day 2)") 28:16-29:9. The 2006 Display Articles stated that they were "formulated in accordance with the Company Law of the People's Republic of China" and "the Securities Law of the People's Republic of China." 2006 Display Articles art. 1, at 028. The Company Law "provides the basic legal norms of corporate governance for all Chinese companies limited by shares incorporated under the statute, regardless of whether its shareholders are private or state actors." Milhaupt Decl. ¶ 21; *see* Saveri Decl. Ex. 6 ("Company Law"). In 2007, the Company Law provided that:

- Display's Articles had "binding force" not only as to Display and its officers, but also on Display's "shareholders," Company Law art. 11;

- Display had to define its "business scope" in its Articles, and to "register[]" any "revision" or "alteration" of that business scope, *id.*, art. 12;

- no shareholder of Display could "abuse" its "rights to damage the interests of the company or other shareholders," *id.* art. 20;

- Display's "actual controller" – that is, Group – could not "take advantage of [its] affiliated relations to damage the interests of" Display, *id.*, art. 21;

- all of Display's shares had "equal value" and all shares "of the same class . . . carry the same rights," *id.*, arts. 126, 127; and

- Display's "[d]irectors, supervisors, and senior managers" owed "duties of loyalty and diligence" to Display, *id.*, art 148.

In addition, the Company Law provides Display's "shareholders with significant governance rights." Milhaupt Decl. ¶ 22 (giving examples).

As a publicly listed Chinese company, Display was also subject to China's Code of Corporate Governance for Listed Companies, promulgated by the China Securities Regulatory Commission in 2002. Saveri Decl. Ex. 7 ("Code"). The Code imposed duties to protect all shareholders of listed companies and to prevent those companies from falling under the exclusive control of controlling shareholders. In 2007, the Code required that:

- Display was to adopt a "corporate governance structure" that "shall ensure fair treatment toward all shareholders, especially minority shareholders," *id.*, ¶ 2; *see also id.* ¶ 43;

- Electronics, as Display's "controlling shareholder[]," was to act in "good faith toward [Display] and other shareholders," and not to "tak[e] advantage of [its] privileged position to gain additional benefit," *id.* ¶ 19;

- all "important decisions" for Display were to be "made through a shareholders' meeting or board of directors' meeting," and Electronics could not "directly or indirectly interfere with [Display's] decisions or business activities," *id.* ¶ 21;

- Display was to be "separated from its controlling shareholders in such aspects as personnel, assets, and financial affairs," *id.* ¶ 22; *see also id.* ¶¶ 22-27;

- "[t]he election of [Display's] directors" was "fully [to] reflect the opinions of minority shareholders," *id.* ¶ 31;

- Display's directors were "faithfully, honestly, and diligently . . . [to] perform their duties for the best interests of [Display] and *all* the shareholders," *id.* ¶ 33 (emphasis added)

- Display's Board was to include "independent directors" who were not "subject . . . to the influence" of Display's "major shareholder[ ]" – that is, Electronics – or its "actual controller[ ]" – that is, Group, *id.* ¶ 50; and

- Display was to "disclose" to investors the "actual state" of its governance, *id.* ¶ 91(5).

Display's corporate representative testified that ████████████████████████████████ ████████████████████████████████. Wang Dep. (Day 2), at 23:4-7, 25:21-23.

The 2006 Display Articles were themselves "legally binding on [Display and its] shareholders, directors, supervisors and senior management personnel"; and Display and its shareholders could each be sued to enforce them. 2006 Display Articles, art. 10, at 028; *see also id.*, art. 75, at 034 (requiring shareholders to abide by the Articles at general meetings). They defined Display's general "goals" as "focu[sing] on customer demand [and] provid[ing] high-quality products and services with excellent technology and management." *Id.*, art. 12, at 028.

6

Regular distributions of profits to Display's shareholders were contemplated, arts. 261, 262, 266-68, at 053-54; to be made, with certain exceptions, "in proportion to the shares held by the shareholders," *id.* art. 264, at 054.  Display further undertook to "maximiz[e] the interests of its shareholders," while "pay[ing] attention" to various "issues in the community" and "social responsibility."  *Id.* art. 289, at 056; *see* Milhaupt Decl. ¶ 36 (noting that Article 289 is "identical" to a provision in the articles of a wholly private Chinese company).

Consistent with the Code, the 2006 Display Articles prohibited Display's "controlling shareholders" from "interfer[ing] directly or indirectly with [Display's] decision-making and the production and business activities carried out in accordance with the law beyond the statutory procedures."  *Id.*, art. 45, at 032.  Display and its "controlling shareholders" had to "ensure the independence of their personnel, assets and financial affairs, with independent institutions and businesses, independent accounting, responsibilities and risks," *id.*, art. 46, at 032, and:

> The Board of Directors, the Board of Supervisors and other internal institutions of the Company shall operate independently.  There is no hierarchical relationship between controlling shareholders and their functional departments and companies and their functional departments.  The controlling shareholders and their subordinate bodies shall not issue to the Company and its subsidiaries any plans and instructions concerning the operation of the Company, nor shall they in any other way affect the independence of its operation and management.

*Id.*, art. 50, at 032.[3]  The Articles also required Display to have "three independent directors," *id.*, art. 164, at 043, who would pay "attention to the interests of the minority shareholders," *id.*, art. 172, at 044, and give "independent opinion[s]" on a long list of topics, *id.* art. 177, at 045.

Display's witness Wang Zhaojie, as Display's corporate representative,[4] testified that, "based on [his] understanding," ████████████████████████████████████, Wang

---

[3] *See also* 2006 Display Articles, art. 47, at 032 ("The personnel of the Company shall be independent of the controlling shareholders."); *id.*, art. 48, at 032 ("The assets invested by the controlling shareholders in the Company shall be independent and complete with clear ownership."); *id.*, art. 49 ("The controlling shareholders shall respect the financial independence of the Company and shall not interfere in the financial and accounting activities of the Company."); *id.*, art. 51 (prohibiting "approval procedures" by "the controlling shareholder" for personnel decisions); *id.*, art. 240, at 052 ("No organization or individual may interfere with the normal procedures for selecting and appointing managers of the Company.").

[4] *See* Saveri Decl. Ex. 8, at 5:9-11 (Topic 1) (agreeing to provide a witness on the "formation, ownership, and purpose of . . . Display"); *id.* at 6:22-24 (Topic 2) (same for "the supervision or control of . . . Display by the government of China"); *id.* at 10:24-26 (Topic 8)

Dep. (Day 2) 23:4-11; ██████████████████████, *id.* at 25:21-23; and ████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
████████████████ *id.* at 32:2.  Wang also testified that █████████████████████████
█████████████████████████████████████████████. *Id.* at 31:5-12.

### 3. Display Told Investors It Would Act Independently in Their Interests and Stated Its Goals in Terms of Revenues, Profits, and Losses

In 2007 and 2008, Display made representations to its investors that stressed its role as an independent entity acting in their interests.  On August 15, 2007, Display issued a public report, Saveri Decl. Ex. 3 ("Self-Inspection Report"), declaring that it was "managed in strtict [sic] accordance with applicable laws . . . including the Company Law . . . the Code of Corporate Governance . . . and the Company's *Articles of Association*"; its "business [was] independent from [its] controlling shareholder," *id.* at 3E; *id.* at 23E ("Each decision of the Company is independent of the controlling shareholder."); it would improve its voting system "to protect the rights and interests of general public shareholders and enable them to have a greater say," *id.* at 5E; and it had issued various profit distributions and dividends to shareholders, *see id.* at 8E, 11E.  When asked at his deposition about several statements in the Self-Inspection Report, Display's corporate representative Wang ████████████████████████████████████.[5]

The Self-Inspection Report also stated that Display would adopt certain "[f]urther improvement[s] to its corporate governance structure," including "establishment of an independent director system" and "setup of a nomination committee of the board of directors."  *Id.* at 1E.  Later in August 2007, Display's Board adopted a formal "Independent Directors System" that emphasized that its independent directors should not have "any relationship with the Company and

---

(same for "the status of . . . Display under Chinese law as of November 26, 2007"); Saveri Decl. Ex. 9 (re-designating Wang for topics 1, 2, 8, and 15).

[5] *See* Wang Dep. (Day 2) 39:17-40:7 (██████████████████████████████████████
████████████████████████); *id.* at 40:9-23 (██████████████████████████████
██████████████████████████████████████████); *id.* at 41:20-42:4
(██████████████████████████████████████████).

DIRECT PURCHASER PLAINTIFFS' OPPOSITION TO THE IRICO DEFENDANTS' MOTIONS TO DISMISS; Master File No. 07-CV-5944-JST

its major shareholders that may hinder their independent and objective judgment," Saveri Decl. Ex. 10, § 2, at 1E; and "Work Rules" for its "Nominating Committee" that provided for nominations for "directors and senior managers" to be considered by a special committee consisting of "five directors, no less than half of whom shall be independent," Saveri Decl. Ex. 11 §§ 2, 4, at 1E.

On April 23, 2008, Display issued an Annual Report describing its operations in 2007. Am. Plunkett Decl. Ex. 2 (also Dep. Ex. 8418, *see* Saveri Decl. ¶ 14) ("2007 Display Report"). The report described Display's "main business" as "the production, development, and management of color picture tubes" and its "main business goals" as sales and revenue targets. *Id.* at 247, 251. It reaffirmed Display's "independence as relating to controlling shareholders in the areas of business, personnel, assets, institutions, and finance." *Id.* at 245. The same report described the taxes that Display had paid or would pay, *see id.* at 291-92; the government subsidies that Display had received in 2007, which were less than 1% of its operating revenue, *compare id.* at 235 (operating revenue: RMB 1.705 billion) *with id.* at 305 (government subsidies: RMB 3 million); and Display's Board's recommendation not to distribute profits from 2007 because it had operated at a loss, *see id.* at 256; *see also id.* at 303. As with the Self-Inspection Report, Wang adopted several statements from the 2007 Display Report as Display's current position.[6]

**B.    Group and Display Agreed with Competitors To Fix Worldwide CRT Prices**

**1.    Uncontested Evidence Establishes Group's and Display's Participation in a Conspiracy To Increase CRT Prices**

During the class period, Group's focus on "competitiveness" and Display's success in achieving its "main business goals" of selling CRTs and earning revenue were challenged by

---

[6] *See* Wang Dep. (Day 2) 49:13-50:5 (█████████████████████████████████████ ██████████████████████████████████████████████████████████████████████ ; *id.* at 50:11-51:4 (████████████████████████████████████████████████████████ ████████████); *id.* at 54:13-24 (███████████████████████████████████████ ██████████████████████████████████); *see also* ECF No. 5312-3 ("Clarke Decl.") ¶ 32 (stating that the 2007 Display Report "contains disclosures mandated and enforced under China's regime for securities regulation"). For other parts of the 2007 Display Report, Wang – although designated as Display's corporate representative – testified that ██████ ██████████████████████████. *See* Wang Dep. (Day 2) at 47:23-48:12, 48:24-49:4, 51:12-23, 52:14-17. He did not testify that █████████████████████████████████████.

shrinking demand for CRTs.  In response, CRT manufacturers worldwide entered a conspiracy to fix, raise, stabilize and maintain CRT prices.  For purposes of the present motion, neither Group nor Display have denied the existence of this conspiracy or their participation in it.  Nor could they.  The conspiracy was exposed when co-conspirator Chunghwa applied to the DOJ for amnesty from criminal prosecution in 2007.  The federal government indicted executives of several co-conspirators, one of which, Samsung SDI, pleaded guilty.  *See* ECF No. 5182-3.  Detailed notes of hundreds of meetings leave no doubt that the conspirators colluded to manipulate the global CRT market.  *See generally* ECF Nos. 2968-3 (sealed); 2969 (redacted).

Group's and Display's participation in the price-fixing scheme is also well documented. During the class period, Irico representatives attended at least 70 conspiracy meetings in which they agreed to price increases and production limits.  *See*, *e.g.*, ECF No. 5191-1 ¶ 9; 2017 Saveri Decl. Exs. 12, 17, 18, 23, 25; *see also id.* at 686.02E (at a November 6, 1998 meeting hosted by Irico, "the meeting attendees achieved a unified approach and a common understanding" regarding the need to maintain prices).  Wang, a member of Group's sales department who rose to Director in 2003, Am. Wang Decl. ¶ 6, confirmed that ███████████████████████.  Wang Dep. (Day 3) 92:18-24) (stating: ████████████████████████████████████ ████████████████████████████████████; *id.* at 91:15-92:3.

Likewise uncontested is that Group and Display knew and intended that their agreement to fix global CRT prices would increase prices in the United States.  At the meetings, Irico and its co-conspirators discussed U.S. dollar prices, 2017 Saveri Decl. Exs. 19, 26, 30, and U.S. market conditions, *id.* Ex. 26 at 993E (Irico and Chunghwa employees were "bearish on Japanese, U.S., and European CRT TV demand").  Further, the conspirators knew their agreement was anticompetitive:  at an October 2005 meeting with eventual whistleblower Chunghwa, the parties expressed the "[h]ope [that] with both sides' sufficient communication and no malicious competition" they could "hold the market price and create a win-win opportunity."  *Id.* at 992E.  And they also knew that agreement was illegal:  Irico attended an August 1999 meeting in Nanjing at which one participant stated:  "The industry meetings should remain confidential considering the international regulation of antitrust laws."  2017 Saveri Decl. Ex. 20 at 672-74.

1

2.      **Uncontested Evidence Establishes an Effect on the U.S. Market**

2       Uncontested evidence also establishes that the worldwide conspiracy had its intended effect

3   on the U.S. market.  To establish that effect, DPPs have relied on the testimony of expert Dr.

4   Jeffrey Leitzinger.  ECF No. 5191-2, at 120-222 ("Leitzinger Report").  After reviewing data,

5   documents, and testimony, Leitzinger concluded that "there is evidence . . . sufficient to prove

6   widespread impact" of the global conspiracy to fix the price of CRTs and CRT products, *id.* ¶ 6,

7   specifically including higher prices in the United States, *id.* ¶ 49 & figs. 8 & 9.

8       The CRT market was global, and the United States was one of the world's largest

9   consumers.  *Id.* ¶¶ 58-59, figs. 12 and 13.  Group and Display participated actively in that global

10  market:  21.5% of Display's annual sales in 2007 were "overseas," 2007 Display Report 247, and

11  Group and Display admitted in 2009 that only "approximately 70% to 80%" of their annual sales

12  were "in China."  ECF No. 5220-10, attachment at 3 (under seal per Court order ECF No. 5225;

13  also marked as Deposition Exhibit No. 8394).  Sales data from defendants who participated in

14  discovery show that roughly 18% of CRTs with known bill-to-country information were sold to

15  U.S. customers, making the U.S. second only to China in CRT purchases.  Leitzinger Rep. ¶¶ 58-

16  59, figs. 12 and 13; *see also id.* at 38 n.129 (North America represented roughly 30% of global

17  purchases).  Group and Display knew of the United States' importance to the CRT market.  In

18  2002, Group admittedly shipped over two thousand "sample" CRTs to the United States "to test the

19  market," showing an intent to sell CRTs in the United States.  ECF No. 5220-10, attachment at 4.

20      Irico and its co-conspirators accounted for 85 to 100 percent of color display tube ("CDT")

21  sales and 70 to 80 percent of global color picture tube ("CPT") sales during the class period.

22  Leitzinger Report ¶¶ 13, 20 & fig. 4.  The conspirators also accounted for 80 to 100 percent of the

23  CRT industry's total capacity.  *Id.* ¶ 20.  This "high degree of control over sales is significant from

24  the standpoint of the impact of the alleged conspiracy" because control over industry output will

25  translate coordination over pricing into "industry wide price effects."  *Id.* ¶ 21.  Irico and its co-

26  conspirators "effectively established price targets at various points in time for the top-selling

27  CRTs."  *Id.* ¶ 43.  To implement the conspirators' "global pricing strategy," *id.* ¶ 58, Irico

28

participated in efforts to tightly control industry output, including a 20 day work stoppage in 2007, *id.* ¶ 39.  Those efforts "influenced prices across the product spectrum."  *Id.* ¶ 54.

Leitzinger concluded with a "high degree of statistical confidence" that the "target prices" set by the conspirators – which, taken as a group, accounted for up to 100 percent of the industry's capacity – "resulted in higher CRT prices . . . in North America and in the rest of the world."  *Id.* ¶ 49 & figs. 8 & 9.  Elevated CRT prices in North America closely tracked elevated CRT prices globally.  *Id.* ¶ 59 & fig. 12.  Because a CRT accounted for 45 to 50 percent of the cost of making a television or monitor, an increase in CRT prices resulted in higher prices for televisions and monitors.  *Id.* ¶ 79; *see also id.* ¶¶ 74-78.  For CPTs, a 1% increase in cost was associated with a 0.78% increase in the price of the finished product; for CDTs, a 1% increase in cost was associated with a 0.72% increase for the finished product.  *Id.* ¶ 81.  Irico's conspiratorial conduct thus increased the price of CRTs and related products worldwide, including in the United States.

### C.   Group and Display Sold CRTs into the United States

Discovery has further shown that Group and Display sold Irico-brand CRTs in the United States through China National Electronics Import & Export Caihong Company ("Import-Export").[7] According to ███████████████████████████████████████████ ████████████████████████████████████████████████ Saveri Decl. Ex. 1, at 105.  Group's ownership of Import-Export is confirmed in a 2004 Group submission to China's Ministry of Finance, which contains a chart showing Import-Export as a "wholly owned company" of Group.  Am. Plunkett Decl. Ex. 49 (also marked as Dep. Ex. 8394, *see* Saveri Decl. ¶ 16), at 999.  When asked about ████████, Wenkai Zhang, as Irico's corporate representative,[8] ████████████

---

[7] ██████████████████████████████████████████████ ███████████████████████████████ Zhang Dep. (Day 2) 18:6; *see also id.* at 47:12-14 (████████████████████████████████████████████).  In the transcripts and some documents, Import-Export's name is abbreviated as ████████████  In motion to compel briefing and orders, Import-Export is referred to as "Caihong Co."  *See, e.g.*, ECF Nos. 5324, 5352.

[8] *See* Saveri Decl. Ex. 8, at 5:9-11 (Topic 16) (agreeing to provide a witness on the "relationship between Irico Group and Display and . . . entities" including "China National Electronics Imp. & Exp. Caihong Co."); Saveri Decl. Ex. 9 (re-designating Zhang for topic 16).

1    ███████████████████████, Saveri Decl. Ex. 27 ("Zhang Dep. (Day 2)") 35:12-25, █

2    ██████████████████████████████████████████████████████████████████

3    ████████████ *id.* at 33:22-23, and ██████████████████████████████ *id.* at

4    38:14.

5    ██████████████████████████████████████████████████████

6    Saveri Decl. Ex. 1, at 084.  Group's █████████████████████████████████████

7    ████████████████████████████████████████████

8    ████████████████ *Id.* at 105.  That █████████████████████████

9    ███████████████████, Zhang Dep. (Day 1) 47:16-18, likely streamlined the companies' joint

10   efforts to export Irico-brand CRTs to the U.S. and worldwide.[9]

11           Discovery has established ██████████████████████████

12   which Zhang described as █████████████████ Zhang Dep. (Day 2) 26:13-15.  For example,

13   ████████████████████████████████████████████████████████████████████

14   ███████████████████████████, Saveri Decl. Ex. 13, almost $5 million).  And in a

15   contract dated June 26, 2002, Import-Export agreed to purchase 22,961 CRT units from Display at

16   a price of 9.03 million yuan, Saveri Decl. Ex. 14, more than $1 million.[10]

17           During the Class Period, ████████████████████████████████

18   ██████████████████████████.  *See* Saveri Decl. Ex. 15 (showing ████████████

19   ████████████████████████████████████); Hwu Decl. ¶¶ 5-7

20   (discussing Saveri Decl. Ex. 15). ███████████████████████████

21   ████████████████████████████.  For example, a █████████████████████

22   ███████████████████████████████

23   Saveri Decl. Ex. 16, at 569.  Wang confirmed that ████████████████████

24   _____

25        [9] ███████████████████████████.  *Compare* Saveri Decl. Ex. 12, at 579 (████████████████

26   █████████████) *with* Zhang Dep. (Day 1) 47:23-48:3 (███████████████).

27        [10] Dollar figures provided at then-prevailing exchange rates.  For historical *yuan*-dollar
     exchange rates, *see* National Bureau of Statistics of China, *2015 China Statistical Yearbook* tbl. 19-

28   8, *at* http://www.stats.gov.cn/tjsj/ndsj/2015/indexeh.htm.

1  [REDACTED] Saveri Decl. Ex. 28, at 90:17-20, 91:21-24, 105:3-8.  The same

2  Irico product code appears on export invoices that show deliveries of Irico-brand tubes to the

3  United States, such as [REDACTED]

4  [REDACTED]

5  [REDACTED].  Saveri Decl. Ex. 17, at 577.  Group has also produced documents

6  showing that [REDACTED].[11]

7  [REDACTED]

8  [REDACTED].  *See* Saveri Decl. Ex. 19.

9  [REDACTED] *Id.* Ex. 20, at 492, for the purposes of [REDACTED]

10  [REDACTED]

11  [REDACTED] Saveri Decl. Ex. 21.

12  [REDACTED]

13  Saveri Decl. Ex. 20, at 492 ([REDACTED]).  [REDACTED]

14  [REDACTED].  *Id.* at 492.

15  [REDACTED]

16  [REDACTED].  *Id.*

17  [REDACTED].  Saveri Decl. Ex. 15.  [REDACTED]

18  [REDACTED].  *Compare, e.g.*, Saveri Decl. Ex.

19  22 ([REDACTED]), *with* Saveri Decl. Ex.

20  15 ([REDACTED]).  [REDACTED].  ECF No. 5220-10, attachment

21  at 1 ([REDACTED]).

22  **III.   DISPLAY IS NOT AN ORGAN OF THE CHINESE STATE**

23  A defendant moving to dismiss under the FSIA bears the initial "burden of proof to

24  establish its entitlement to sovereign immunity."  *Export Group v. Reef Indus.*, *Inc.*, 54 F.3d 1466,

25  1470 (9th Cir. 1995); Feb. 2018 Order 4 ("[T]he defendant must establish a prima facie case that it

26  _____

27  [11] *See* Saveri Decl. Ex. 18, at 574E, 575 ([REDACTED]

28  [REDACTED]).



is a sovereign state and that the plaintiff's claim arises out of a public act.") (quoting *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012). The entities that can assert FSIA immunity are: (1) a "foreign state," (2) "a political subdivision of a foreign state," and (3) "an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). Neither Group nor Display assert that they are a foreign state in the strict sense (like the People's Republic of China) or a political subdivision of such a state (like Shaanxi Province). Instead, they claim to be agencies or instrumentalities of the Chinese government. Group has shown that when the complaint was filed, a majority of its shares were directly owned by the Chinese government, which entitles it to presumptive immunity – although that immunity is overcome for the reasons set forth in Part IV. It is undisputed, however, that the Chinese government owned none of Display's equity directly, and its indirect ownership interest through Group and Electronics did not amount to a majority of Display's shares. Accordingly, Display's case for immunity depends on its showing that it is an "organ of a foreign state," 28 U.S.C. § 1603(b)(2) – which it cannot do.

Courts determine whether an entity is an "organ of a foreign state" by asking whether it "engages in a public activity on behalf of the foreign government." *Powerex*, 533 F.3d at 1098. Relevant factors include "the circumstances surrounding the entity's creation, the purpose of its activities, its independence from the government, the level of government financial support, its employment policies, and its obligations and privileges under state law." *Id.* The "ownership structure of the entity" is also relevant because it can "influence the degree to which an entity is performing a function 'on behalf of the foreign government.'" *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 209 (3d Cir. 2003). Here, each factor listed by the Ninth Circuit in *Powerex* – and the additional fact that China owns less than a third of Display, indirectly through two levels of corporate separation – weighs against Display's claim that it is an organ of the Chinese state.

### A. Display Was Created as and Remained a Standardized Stock Corporation

Since its creation, Display has consistently been identified as a standardized stock corporation under Chinese law in its own documents and those of its owners and governmental regulators. An entity is more likely to be an organ if it "was created by public law." *Alperin v. Vatican Bank*, No. C-99-04941 MMC, 2007 WL 4570674, at *3 (N.D. Cal. Dec. 27, 2007), *aff'd*,

360 F. App'x 847 (9th Cir. 2009), *amended in part*, 365 F. App'x 74 (9th Cir. 2010); less likely, if

created under the same laws that govern private companies, *see, e.g.*, *NXP Semiconductors USA,*

*Inc. v. Brevets*, No. C 14-1225 SI, 2014 WL 4621017, at *7 (N.D. Cal. Sept. 15, 2014) (considering

"establish[ment] as a standard limited liability company under French law" as weighing against

organ status).[12]  Where a company's governing documents change over time, the documents that

matter are those in effect when the complaint is filed.  *See Janvey v. Libyan Inv. Auth.*, 840 F.3d

248, 260 (5th Cir. 2016) (directing the district court to consider not "the act that created [the

defendant] initially" but "the subsequent act that transferred" the defendant to another owner and

"disentangled [it] from Libya itself"); *see generally Dole Food Co. v. Patrickson*, 538 U.S. 468,

478 (2003) ("[I]nstrumentality status [is] determined at the time suit is filed.").

The 2006 Display Articles, in effect when the initial complaint was filed, state that Display

was organized under China's "Company Law" and that it had the form of a "limited liability

company with permanent existence," 2006 Display Articles, at 028; *see* Milhaupt Decl. ¶ 21

(explaining that the Company Law applies both to private and to public Chinese companies).

Further confirmation that Display was subject to the Company Law appears in the Self-Inspection

Report at 2E; the 2007 Display Report at 244; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  The evidence is conclusive that, like the French company in *NXP*

*Semiconductors* and the UAE company in *Capital Trans*, Display had the same corporate form,

established by the same general corporate laws, as a privately owned Chinese company.

It is telling that Display did not submit its own 2006 Display Articles to the Court, does not

discuss them in its motion, and did not ask its expert to consider them.[13]  Instead, Display's motion

incorrectly relies on its 1992 creation, with governmental authorization, "as part of a government

'joint stock system reform pilot . . . for nationalized enterprises.' "  ECF No. 5412 ("Display

---

[12] *See also Capital Trans Int'l, LLC v. Int'l Petroleum Inv. Co.*,
No. 8:10-CV-529-T-30TGW, 2013 WL 557236, at *10 (M.D. Fla. Feb. 14, 2013) ("Aabar is
governed by the Companies Laws of the UAE and, at the time of the complaint, the rules of the
Abu Dhabi stock exchange. . . . [T]his factor weighs against a finding of organ status."), *vacated in
part*, 2013 WL 12344236 (M.D. Fla. Feb. 25, 2013).

[13] Saveri Decl. Ex. 31 ("Clarke Dep.") 130:5-8 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

16

Mot."), at 6 (quoting Am. Plunkett Decl. Ex. 44, at 853).  That reliance fails for three reasons.

*First*, Display's status in 1992 is relevant only to shed light on Display's status in 2007 "at the time

suit [was] filed," *Dole Food*, 538 U.S. at 478 – as to which the 2006 Display Articles are far more

probable.  *Second*, the mere need for governmental approval carries little weight because, in

China's highly regulated economy, such approval was then and still is required to create any

company – public or private.  *See* Clarke Dep. 30:7-25 (███████████████████████

█████████████████).  *Third*, the 1992 approval itself undercuts Display's claims by stating

that Display would "be established and organized in strict accordance with a standardized stock

corporation" – again, the same form as a privately owned company.  Am. Plunkett Decl. Ex. 44, at

853; *see also id.* Ex. 40, at 748 (stating that in 1995, Display undertook a "share reduction process"

that "followed the requirements of the 'Company Law'").

## B.    Display's Purpose Was To Earn Profits for Its Shareholders

Display's avowed purpose of making profits for its shareholders is inconsistent with its

claim to organ status.  An "independent commercial enterprise[]" that "act[s] to maximize profits

rather than pursue public objectives" is not an organ, even though it may be "heavily regulated."

*Patrickson v. Dole Food Co.*, 251 F.3d 795, 808 (9th Cir. 2001), *aff'd in part, cert. dismissed in

part*, 538 U.S. 468 (2003); *USX Corp.*, 345 F.3d at 210 (contrasting a situation where a foreign

state "seek[s] . . . [a] profit-making opportunity" from one in which it acquires a private company

to "further [an] important governmental interest" such as stabilizing the economy).[14]

Display's governing documents and contemporaneous statements to investors stated that its

purpose was producing color displays and selling them in the market to make a profit.  Those

documents included the 2006 Display Articles, which described Display's "goals" as "focu[sing]

on customer demand [and] provid[ing] high-quality products and services," 2006 Display Articles,

art. 12, at 028, and its "business scope" as:

---

[14] *See also NXP Semiconductors*, 2014 WL 4621017, at *7 (contrasting "a private company
acting to maximize profits" with "an arm of the state conducting sovereign functions such as treaty
negotiation and implementation or distributing government resources"); *Alperin*, 2007 WL
4570674, at *3 ("The second factor focuses on whether the entity serves a public purpose or
whether it acts as an independent commercial enterprise to maximize its own profits.")

17

> production, development and operation of colour display devices, electronic
> products and components and raw materials; self-support and acting for the import
> and export business of all kinds of commodities and technologies; lease in kind,
> undertaking of "processing and compensation trade" and so on.

*Id.*, art. 13, at 028.  Similarly, the 2007 Display Report described Display's "main business" as

"production, development, and management of color picture tubes" and its "main business goals"

as sales and revenue targets.  2007 Display Report, at 247, 251; *see also* Wang Dep. (Day 2) 54:13-

24 (███████████████████████).  None of those goals differ from the

goals of a wholly private CRT manufacturer.

Further, the 2006 Display Articles required Display's shareholders – not just Electronics,

but all shareholders present at the annual meeting – to approve an annual "profit distribution plan"

if Display had made a profit or "loss compensation plan" if it had lost money.  2006 Display

Articles, art. 63(8), at 033; *see also id.* art. 77(4), at 034; *id.* art. 123(2), at 039.  If Display's Board

proposed a profit distribution plan without "cash dividends," the Board's independent directors had

to "express [an] independent opinion" about the decision not to pay out cash.  *Id.* art. 177, at 045.

Any profits were distributed, in cash or otherwise, equally among all shareholders, *see id.*, art. 264,

at 054 – so that more than two-thirds, at the time the complaint was filed, went to private

individuals or entities.  All of those provisions confirm that Display was an ordinary profit-making

entity that happened to be partially, indirectly making profits for the Chinese government.

Display errs in contending that it served the public purpose of "contribut[ing] to the

development of [China's] electronics products."  Display Mot. 12 (quoting Am. Plunkett Decl. Ex.

31, at 668).  That a minority government investment in a mostly private company may be thought

to generate benefits for the industry as a whole does not make the manufacture and sale of goods

for profit a public purpose.  That is especially so because Display was one of a number of firms

competing to sell CRTs in the Chinese domestic and export markets.  *See* Saveri Decl. Ex. 30

("Wang Dep. (Day 3)") 33:8-34:5 (listing ██████████████████████); *cf. Bd. of*

*Regents of Univ. of Texas Sys. v. Nippon Tel. & Tel. Corp.*, 478 F.3d 274, 279 (5th Cir. 2007)

("NTT") (where Japanese government owned 46% of firm that "operate[d] as one of several

commercial interests in a competitive telecommunications market," firm's "creation clearly

serve[d] market ends, not a government function").  Further, the language Display quotes is from a

1   1995 prospectus.  Display does not point to any example from 2006 or 2007 that describes its

2   purpose as contributing to the development of the industry as a whole.

3           Display also fails to show that it served the public purpose of "'increas[ing] the value of . . .

4   State-owned assets.'"  Display Mot. 13 (quoting SASAC Regs., Art. 11).  As of 2007, the Chinese

5   government indirectly owned less than one-third of Display's equity through Group.  Display was

6   required to treat all its investors equally and fairly, and to protect the rights of its minority

7   shareholders.  *See supra* pp. 5-8 (relevant provisions of the Company Law, Code, and 2006

8   Display Articles).  As a result, although Display undoubtedly attempted to increase the values of its

9   assets, any increases benefitted mostly private investors.

10          Finally, Display errs in contending that "state-owned profit-making activity [is] a valid

11  public purpose."  Display Mot. 13 n.6.  Cases applying the FSIA's organ provisions – such as

12  *Patrickson*, *USX Corp.*, and *NTT* – have uniformly held that making profits for mostly private

13  shareholders is a private purpose.  *Powerex*, on which Display relies, found that a state-owned

14  hydropower company served a public purpose in part because its profits "d[id] not go to private

15  shareholders," but instead "to the benefit of the public in payments to the province and reduced

16  electricity prices."  533 F.3d at 1102 (quoting *Powerex Corp. v. Reliant Energy Servs. Inc.*, 551

17  U.S. 224, 247-48 (2007) (Breyer, J., dissenting)).  That reasoning cuts against Display here,

18  because most of its profits went to private shareholders rather than to the Chinese state.[15]

19

20

21

22          [15] When asked at his deposition ████████████████████████████████
                 ████████████████████████████████, Display's expert
23  ████████████████████████████████.  Clarke Dep. 109:10-13
    (██████████████████████████████████████████████████████████████
24  ████████████████████████████████).  But those concerns might prompt a government
    to rescue a private company, as the United States has often done.  *See* Matthew Mitchell, *The*
25  *Pathology of Privilege: The Economic Consequences of Government Favoritism* 10-12 (2014)
    (collecting historical examples of U.S. government bailouts including Lockheed, Chrysler, the
26  savings-and-loan crisis, Bear Stearns, AIG, and the Troubled Asset Relief Program), *available at*
    https://www.mercatus.org/system/files/Mitchell_Pathology_web_v3.pdf.  Having received
27  government support as part of a bailout would hardly support a claim by Lockheed or Chrysler that
    they could assert federal sovereign immunity.
28

19

**C.     Display Was Independent from the Chinese Government**

**1.     Display's Governing Documents Establish Its Independence**

Provision after provision of the 2006 Display Articles insists that Display be "independent" in its "personnel," its "assets," its "accounting," its "financ[es]," its "Board of Directors," its "Board of Supervisors," and its "operation and management."  Arts. 45-51, at 032.  The Articles rule out a "hierarchical relationship" between Display and its controlling shareholders; require "the controlling shareholders [to] strictly exercise the rights of the investor in accordance with the law"; and prohibit "the controlling shareholders and the actual controllers" from "interfer[ing] directly or indirectly with [Display's] decision making."  Arts. 45, 50.  Display represented to investors that it operated in accordance with its Articles, *see* Self-Inspection Report 2E, and that it ran all parts of its business independently, making "each decision . . . independent of the controlling shareholder." Self-Inspection Report 23E; *see also id.* at 3E, 12E, 19E-23E; 2007 Display Report 245-46.

Display's governing documents and public statements thus indicate without ambiguity that any influence the Chinese government exercised over Display through its ownership of Group was no greater than the influence in any corporate relationship where one company indirectly owns a controlling stake (but not a majority) of another's shares.  Such a relationship does not establish organ status.  *See Patrickson*¸ 251 F.3d at 808 (finding that Israeli governmental authority was "not considerably different from the control a majority shareholder would enjoy under American corporate law" helped to "support" a conclusion that the defendants were "independent commercial enterprises"); *see also Scheidemann v. Qatar Football Ass'n*, No. 04 Civ. 3432 (LAP), 2008 WL 144846, at *5 (S.D.N.Y. Jan. 15, 2008) ("[T]he Court affords significant weight to the formal independence of these entities in concluding that they are not 'organs' of the Qatari government.").

The reading of the "organ" provision of the FSIA adopted in *Patrickson* is confirmed by statutory context.  The FSIA provides that a corporate entity can be an "agency or instrumentality" of a foreign state in either of two ways:  because a foreign state owns "a majority of [its] shares or other ownership interest," or because it is an "organ" of a foreign state.  28 U.S.C. § 1603(b)(2). The majority-ownership test is satisfied "only if the foreign state *itself* owns a majority of the corporation's shares."  *Dole Food*, 538 U.S. at 477 (emphasis added).  If the lesser control possible

20

through indirect minority ownership were sufficient to make an "organ," the majority-ownership

test (and the holding of *Dole Food*) would be superfluous:  any corporation whose shares were

either directly or indirectly majority-owned by a foreign state would already be an organ by virtue

of control alone.  *See United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) ("[W]e

are hesitant to adopt an interpretation of a congressional enactment which renders superfluous

another portion of that same law.").

### 2. The SASAC Regulations Are Consistent with Display's Independence

Display's motion nowhere addresses the many independence provisions of its own

governing documents.  Instead, Display attempts to show governmental control by citing a 2003 set

of "Interim Regulations on Supervision and Management" ("SASAC Regulations" or "SASAC

Regs.") setting forth the role of China's State-owned Assets Supervision and Administration

Commission ("SASAC").[16]  SASAC "is a specially established authority directly subordinated to

the State Council" that "performs the responsibilities of investor" and "supervises and manages

State-owned assets of enterprises."  SASAC Regs. art. 12.  The SASAC Regulations state clearly

that SASAC's role is that of "investor" and prohibit direct governmental control over state-owned

enterprises.  Thus, Article 7 provides:

> People's governments at all levels shall strictly abide by the laws and regulations on
> State-owned assets management, persist in the separation of government functions
> of social and public administration from the functions of investor of State-owned
> assets, [and] persist in the separation of government functions from enterprise
> management and separation of ownership from management.

> [SASAC] shall not perform the functions of social and public administration
> assumed by the government.  Other institutions and departments under the
> government shall not perform the responsibilities of investor of State-owned assets
> of enterprises.

Article 10 similarly provides:

> The invested enterprises and the enterprises set up with the investment of such
> invested enterprises enjoy autonomy in their operation as provided by the relevant
> laws and administrative regulations.

---

[16] At time this brief was filed, the HTTP address provided for the SASAC Regulations in footnote 2 of Display's motion did not work.  The same document appears to be available at http://en.sasac.gov.cn/2003/11/24/c_118.htm, which is Exhibit 23 to the Saveri Declaration.

DIRECT PURCHASER PLAINTIFFS' OPPOSITION TO THE IRICO DEFENDANTS' MOTIONS TO DISMISS;
Master File No. 07-CV-5944-JST

> [SASAC] shall support the independent operation of enterprises according to law, and shall not interfere in their production and operation activities, apart from performing the responsibilities of investor.

Article 14(5) further identifies "respect[ing] and safeguard[ing] the operational autonomy of State-owned enterprises and State-owned holding enterprises" as one of SASAC's "main obligations."[17]

Display's description of the SASAC Regulations leaves out those provisions, and other important ones as well. For example, Display contends that Article 17(3) enabled SASAC to nominate directors and certain senior officers, Display Mot. 7, but fails to mention language in Article 17(3) that required SASAC to act "according to the company's articles of association" – which, here, required Display's Board to be independent and prohibited Display's controlling shareholders from approving Display's personnel decisions. *See supra* pp. 6-7, 19-20.

Display also incorrectly contends that Article 13(4) gave SASAC authority to "evaluate" and "grant rewards or impose punishments" to Display's directors and officers. That is not so: Article 13(4) applies by its terms to "responsible persons" whom SASAC has the power to "appoint or remove," and SASAC did not have that power with respect to Display's directors or officers. According to Display's own witness, what would happen is that Group's "SASAC-appointed management" – not SASAC itself – would make a "recommendation" in a "letter to . . . Electronics," which would then exercise its rights at a shareholders' meeting. ECF Nos. 5412-1, 5413-1 ("Am. Wang Decl.") ¶¶ 50-52. At that meeting, both Electronics (as a shareholder) and Display (as a company bound by the Company Law, the Code and by its own Articles) were responsible for ensuring that all shareholders would have an opportunity to be heard and would be

---

[17] Display argues that it was considered a "*guoyou konggu qiye*" under the SASAC Regulations; that this phrase is translated as "state-owned holding company" in the English version of the SASAC Regulations, but really means "state-controlled company"; and that it was a "*guoyou konggu qiye*" based on an opinion of the 2003 Chinese State Bureau of Statistics. Display Mot. 2 & n.3. It cites its expert Clarke on that point, but his Declaration does not cite the SASAC Regulations and does not opine on whether they apply. *See* Clarke Decl. ¶ 8 (list of documents examined); Clarke Dep. 36:11-17 (██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████). Display also cites its witness Wang, but Wang's declaration is not based on personal knowledge, *see infra* p. 24, and Display has not attempted to qualify him as an expert on Chinese law. In any event, even if Display counted as "state-controlled" under the SASAC Regulations, its arguments still fail because those Regulations required SASAC to respect Display's autonomy, as set forth in the text.

22

treated fairly.  Display points to no evidence that SASAC itself was involved in those decisions, much less that it exercised any direct authority to reward or punish.

The testimony of Display's expert, Professor Clarke, reinforces this point.  Clarke made clear that ████████████████████████████████████, Clarke Dep. 104:18-105:1 (██████████████████████████████████████████████████ ██████████████████████████████████████.  When asked about ██████████████, Clarke volunteered ████████████████████████████ ██████████████████████████ *Id.* at 106:12-17. ██████████████████████████████, Clarke then ██████████████████████████████████████████████ *Id.* at 107:1-7.  Even so, he admitted ████████████████ ██████████████████████. *See id.* at 128:22-25 (████████████████ ██████████████████); *id.* at 129:8-10 (██████████████████████ ████████████████████).  Clarke reached that conclusion ████████████████, *see supra* note 13, which make the point clear.

### 3. The Wang Declaration is Inadmissible, Contradicted by Wang's Own Admissions, and Immaterial

To support its contention that it was controlled by the Chinese state, Display relies heavily on the Amended Declaration of Wang Zhaojie, who also served as its corporate representative under Rule 30(b)(6).[18]  For example, Display cites the Amended Wang Declaration to support its claims that "Group directly selected the Board of Directors of Irico Display," and "appear[ed] directly at Display's shareholder meetings" to do so, Display Mot. 9 (citing Am. Wang Decl. ¶ 52); that "there was no Display shareholder meeting at which Group did not control a majority of voting

---

[18] The statements on which Display relies were originally part of the Declaration of Guo Mengquan, ECF No. 5313-1.  Shortly before Guo's scheduled deposition, Display's counsel represented that he had become ill and could not appear.  The parties stipulated, and the Court ordered, that Display could withdraw the Guo Declaration and submit an amended declaration from Wang.  ECF No. 5408.  The DPPs, however, "retain[ed] all objections to the amended Wang declaration."  *Id.* ¶ 5.  Those objections are set forth in this Opposition.

shares," *id.* at 10 (citing Am. Wang Decl. ¶ 51); and that Group's personnel "recommendations to Irico Electronics . . . were universally and unquestioningly implemented by the Group-appointed Board of Directors of Irico Display." *id.* (citing Am. Wang Decl. ¶¶ 8-10, 50).  That is, Display contends that its own statements about independence in the 2006 Display Articles, Self-Inspection Report, and 2007 Display Report were false:  Group disregarded its subsidiaries' corporate forms and made all decisions itself.

Display's reliance on Wang's Amended Declaration falls short for three reasons.  *First*, at his deposition ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████.  Saveri Decl. Ex. 28 ("Wang Dep. (Day 1)") 43:6-7.  When asked whether ████████████████████████████████████ Wang said: ██████████████████████████████████████ Wang Dep. (Day 2) 35:19-24.  When asked whether ██████████████████████████████████████ he answered: ███████████████████████  *Id.* at 44:19-24.  When asked whether, ██████████████████████████████████████████ he stated: ████████████████████████████████ *Id.* at 46:11-47:2.  And when asked whether, ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████  Wang answered: ██████████████ ████████  *Id.* at 48:5-25.  Based on his own words, Wang lacks personal (or any) knowledge about the matters in his declaration, and his testimony is inadmissible, just as this Court previously rejected the testimony of Zhang Wenkai.  *See* Feb. 2018 Order 5-6.[19]

_____

[19] In his Amended Declaration, Wang attempts to establish personal knowledge through (1) a conclusory assertion, Am. Wang Decl. ¶ 1, which is not entitled to weight; (2) a statement that his testimony was "[b]ased on [his] experience throughout [his] time at . . . Group and . . . Electronics," *id.* ¶ 9.  But if his experience at Group and Electronics allowed him to testify concerning what happened at Display's shareholder or board meetings, or about Display's independence generally, he could have answered questions about those matters at his deposition.

24

1       *Second*, when Wang answered questions about Display's independence at his deposition, he

2   painted a very different picture of Display than appears in his Amended Declaration.  That

3   testimony included Wang's statements that he knew of no violations of the independence

4   provisions in Article 46 of Display's Articles of Association, Wang Dep. (Day 2) 32:15-25; that the

5   statements in Display's Self-Inspection Report about independence and shareholder equality were

6   accurate as written, *id.* at 40:8-23, 41:12-42:4, and that the same was true for statements in the

7   2007 Display Report that Display's Board operated independently and that Display made its major

8   decisions independently, *id.* at 49:13-50:5; *see supra* pp. 8-10 & nn. 5, 6.  Because Wang was

9   testifying as Display's designated representative, *see supra* note 4, his testimony is binding as

10   Display's admission even though he lacked personal knowledge of the matters on which he was

11   supposedly prepared to testify.  *See AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-CV-03393-

12   YGR, 2015 WL 4040388, at *23 (N.D. Cal. July 1, 2015) (Rule 30(b)(6) testimony is a "sworn

13   corporate admission that is binding on the corporation").  Further, the Self-Inspection Report and

14   2007 Display Report are themselves corporate admissions, which Display and its directors and

15   officers warranted to be true.  *See* Self-Inspection Report at 1E (representations and warranties in

16   first paragraph); 2007 Display Report at 234 (same).  Likewise, the Independent Directors System

17   and Nominating Committee Work Rules that Display's Board passed in August 2007, *see supra* pp.

18   8-9, are strong evidence that Display's independence was meant to be real.  The Court should give

19   those contemporaneous documents more weight than a declaration signed at the behest of

20   Display's lawyers by a witness who never worked for Display and attended no relevant meetings.

21       *Third*, even if Display's independence were a sham, it should not matter.  The reason for

22   looking at the independence of a putative organ is to determine whether it is "engag[ing] in a

23   public activity on behalf of the foreign government."  *Powerex*, 533 F.3d at 1098.  In making that

24   determination, the Court should focus on whether Display was meant to be independent from the

25   Chinese government according to its governing documents and public statements, which show that

26   Display was created to engage in private activities.  Whether Display's directors and officers

27   subjectively regarded themselves as independent or as subordinate is impossible to prove (doubly

28   so without their testimony) and irrelevant to the jurisdictional issue before this Court.

**D.     Display Did Not Receive Significant Governmental Financial Support**

Display's original 1992 approval from the Shaanxi provincial government stated that Display would be "responsible for its own profits and losses."  Am. Plunkett Decl. Ex. 44, at 854. In 2007, Display reported to its investors that it had received RMB 3 million (equivalent to $3945.92) in government subsidies in 2007 and RMB 584,990.85 (equivalent to $769.32) in 2006. 2007 Display Report at 305.  Those figures are tiny fractions – less than 1% – of Display's operating revenues in 2007 (RMB 1.7 billion, equivalent to $2.2 million) or 2006 (RMB 2.1 billion, equivalent to $2.7 million).  *Id.* at 235.  Thus, according to its own financial statements, the subsidies that Display received from the Chinese government were *de minimis.*

Display nevertheless contends that it received "substantial financial support" from the Chinese government.  Display Mot. 4.  The primary example it mentions in its motion is a government bailout when it faced bankruptcy, *see id.* at 8, but that is the kind of assistance that a government might easily provide to a private company as well as to a public one.  *See supra* note 15.  Display's witness Wang also states that "[i]n 2007 . . . Display received an allocation of over RMB 100 million in government funds for its thin-film-transistor liquid-crystal display glass substrate project."  Am. Wang Decl. ¶ 60.  As noted above, Wang's declaration is not based on personal knowledge.  Display admits in a footnote, moreover, that the subsidized project was "initiated" by "Group" through "a different subsidiary" – not through Display.  Display Mot. 16 n.7; *see* Am. Plunkett Decl. Ex. 35, at 709 (Group document authorizing investment in a 2007 "TFT-LCD glass substrate project" to be performed by "Shaanxi IRICO Electronic Glass Co. Ltd.").  That other subsidiary later became a partly owned subsidiary of Display as part of a corporate reorganization, but only in late 2009.[20]  Accordingly, Wang's description of the substrate project as involving "government funds" that were "allocat[ed]" to Display "[i]n 2007," Am. Wang Decl. ¶ 60, is literally untrue and highly misleading.

---

[20] *See* Saveri Decl. Ex. 24, at 2 (transaction taking place on September, 17, 2009); *id.* at 6 (corporate reorganization chart showing "A Share Company" acquiring a 54.91% interest in "IRICO Glass"); *id.* at 44, 46 (defining "A Share Company" as Display and "IRICO Glass" as "Shaanxi IRICO Electronic Glass Co. Ltd.").

26

1    Even if Wang's statement were accurate, RMB 100 million would still only be 5.9% of

2    Display's 2007 revenues – the vast majority still came from ordinary commercial transactions.

3    Government subsidies to a company that engages in ordinary commercial transactions are not the

4    kind of public financial support that matters under the FSIA.  *See NML Capital*, *Ltd. v. Republic of*

5    *Argentina*, 892 F. Supp. 2d 530, 533 (S.D.N.Y. 2012) (where an entity's function was to "sell

6    natural gas at low prices," and Argentina "subsidize[d] th[e] loss" incurred from those low prices,

7    the "activity [wa]s still the commercial activity of selling natural gas").  Further, "private firms in

8    China also receive government subsidies," Milhaupt Decl. ¶ 19 & n.9 (citing 2013 study), so such

9    subsidies do not distinguish Display from other large Chinese companies.

10        **E.    Display's Employees Were Not Chinese Civil Servants**

11    Display's employees were not Chinese civil servants.  SASAC did not appoint Display's

12    directors or officers, *see supra* pp. 22-23; and Group and Electronics were prohibited by the Code

13    and the 2006 Display Articles from interfering in Display's selection of personnel, *see supra* pp. 6-

14    7 & n.3.  Those facts further weaken Display's position that it was an organ of the Chinese state.

15    *See EOTT Energy Operating Ltd. P'ship v. Winterthur Swiss Ins. Co.*, 257 F.3d 992, 999 (9th Cir.

16    2001) (counting it as a "factor[] weighing against Icarom . . . that Icarom's employees are not

17    public servants"); *Patrickson*, 251 F.3d at 808 (same where corporate defendants were "not run by

18    government appointees" and "their employees were not treated as civil servants").

19    Display incorrectly contends that its "management" – though not its rank-and-file

20    employees – were "public functionaries."  Display Mot. 14.  Each of its arguments falls short.

21    *First*, Display's contention that its managers were subject to governmental "integrity" and "anti-

22    corruption provisions," *id.*, to potential administrative punishment for abuses that caused losses of

23    state-owned assets, *id.*, or to special laws against bribery, *id.* at 15, does not show that they were

24    public servants.  It is common for countries to impose special punishments for corrupt acts by

25    directors, officers, of employees of managers of regulated private companies or of private

26    organizations that receive even small amounts of public funds.[21]  That China may have extended its

27

28    _____
      [21] *See*, *e.g.*, 18 U.S.C. § 215 (bribery of bank officers or employees of financial
      institutions); *id.* § 666 (bribery of agents of federally funded organizations); Cal. Pen. Code § 639

                                              27
      _____
      DIRECT PURCHASER PLAINTIFFS' OPPOSITION TO THE IRICO DEFENDANTS' MOTIONS TO DISMISS;
      Master File No. 07-CV-5944-JST

anti-corruption laws to Display's management does not show that Display is an organ of its government any more than the United States' extension of similar laws to private banks and government contractors makes those entities federal agencies.  Further, Chinese criminal law was unsettled in 2007 on whether Display's managers were subject to the bribery laws in question, and the issue was not resolved until 2010 at the earliest.  *See* Clarke Dep. 146:14-17 (conceding that ███████████████████████████████████████████████████).

  *Second*, Display states that its management received "performance assessment[s]" from SASAC, Display Mot. 14-15, but its evidence does not support that claim.  As Display itself acknowledges, the 2006 regulation on which it relies applied to certain directors and officers "who are '*representatives of State-owned stock rights* of State-controlled enterprises.'"  *Id.* at 14-15 (quoting Am. Plunkett Decl., Ex. 52, art. 2(3)) (emphasis added).  Display does not cite anything (including any expert or fact witness testimony) to show that Display's directors or officers were "representatives of State-owned stock rights."  Display's directors and officers had clear duties to protect the rights of all of Display's shareholders, most of whom were private investors.  Further, Display fails to produce any contemporaneous examples of the SASAC evaluations its managers supposedly received.

  *Third*, the alleged requirement that Display's managers had to be members of the Chinese Communist Party, Display Mot. 16, adds little.  Display cites only Wang's testimony to establish that such a requirement even existed, *see* Display Mot. 16, and he has no personal knowledge. Display points to no Chinese law or regulation, and nothing in its Articles or governing documents, requiring that its managers be Party members.  Display's expert does not address the issue in his report, and DPPs' expert is not aware of any formal legal requirement that senior managers of state-owned enterprises be Party members (though most, in practice, are).  *See* Milhaupt Decl. ¶ 8.

  In any event, influence from the Chinese Communist Party does not distinguish a mixed-ownership enterprise like Display from a privately owned Chinese company, because that Party exerts control over all aspects of China's society and economy.  For example, as of 2007, the

---

(certain bribes to any employee of any company that makes loans or extends credit); *id.* § 641 (certain bribes to any employee of a telephone or telegraph company).

Company Law required every Chinese company, state-owned or not, to "set up" "Communist Party organizations . . . to carry out activities of the Party," and to "provide the necessary conditions for the Party organizations to carry out their activities."  Art. 19; *see* Milhaupt Decl. ¶ 19 ("Chinese Communist Party committees can be found in both SOEs and POEs in China.").

      **F.**      **Display Did Not Have Special Privileges or Obligations**

      Display does not claim that it exercised any regulatory authority on behalf of the Chinese government.  ███████████████████████████████████████████████ ███████████████████████████████, *see* Wang Dep. (Day 3) 33:8-34:5; *see also* Group Articles, art XI, at 780.01E-02E (describing Group's "development strategy of 'international exposure and competitiveness'") – except where that competition was lessened through its anticompetitive conduct.  Display also paid taxes, *see* 2007 Display Report at 291-92, and could be sued by private individuals in Chinese court, *see* 2006 Display Articles art. 10, at 028.  Each of those characteristics reinforces the conclusion that Display was not a state organ.  *See EOTT Energy*, 257 F.3d at 999 (being "subject to suit"); *Patrickson*, 251 F.3d at 808 (lack of "regulatory authority" plus ability to "sue and be sued"); *NXP Semiconductors*, 2014 WL 4621017, at *7 (lack of "regulatory authority" plus payment of taxes);[22] *cf. Powerex Corp.*, 533 F.3d at 1102 ("immun[ity] from taxation" weighed in favor of organ status).

      Display errs in arguing that the financial support it claims to have received from the Chinese government counts as a special privilege.  Display Mot. 16.  The Ninth Circuit's cases distinguish between "government financial support" and "obligations and privileges under state law" as separate factors.  *E.g., Powerex*, 533 F.3d at 1098; *Patrickson*, 251 F.3d at 807.  Display's argument is thus double-counting – and, moreover, its claims of financial support lack merit even on their own terms.  *See supra* pp. 25-27.  Display also claims that its "employees and their families" benefited from social services provided by Group, but admits that those services benefited the entire "surrounding community."  Display Mot. 17.  It offers no authority for the

---

[22] *See also Ocean Line Holdings Ltd. v. China Nat. Chartering Corp.*, 578 F. Supp. 2d 621, 626 (S.D.N.Y. 2008) (exposure to "civil liability" in the same way "as a private commercial entity" weighed against organ status); *Supra Med. Corp. v. McGonigle*, 955 F. Supp. 374, 379 (E.D. Pa. 1997) (same for lack of any "exclusive rights").

implausible assertion that services provided to its employees in common with all other members of

their community should help Display qualify as an organ of the Chinese state.

Display also cannot point to any special obligations to the Chinese state.  The only

obligation it raises is its purported "obligation[] to submit to the authority of SASAC and other

government agencies under the State Council."  Display Mot. 16.  That is double-counting again,

because Display has already relied on the SASAC Regulations to show lack of "independence from

the government" (without success, *see supra* pp. 21-23).  Unlike the power company in *Powerex

Corp.*, Display cannot claim that it had to provide goods or services "on favorable terms" to serve a

policy end, or assisted with matters of state such as "treaty formation and implementation."  533

F.3d at 1100-01.  Instead, like the chemical companies in *Patrickson*, Display "maximize[d]

profits," 251 F.3d at 808, by "[d]etermin[ing] . . . price based on the market supply and demand."

2007 Display Report at 260 (pricing for affiliated transactions "should not be lower than the supply

price to third parties in the market").  That Display was "heavily regulated" in doing so,

*Patrickson*, 251 F.3d at 808, does not make it a state organ.

\* \* \*

Display's showing thus fails on each of the well-established factors that determine the

status of an entity as an "organ of a foreign state" under the FSIA.  That result makes sense,

because giving immunity to Display and similarly situated Chinese companies would go beyond

anything Congress plausibly intended when it wrote that statute.  As Professor Milhaupt explains,

mixed-ownership enterprises make up a large and growing part of the Chinese economy – as of

2018, between one-third and one-half of tradeable shares quoted in RMB and listed on the

Shanghai and Shenzhen stock exchanges.  Milhaupt Decl. ¶¶ 16-17.  Those companies, like

Display, can be and are sued in Chinese court if they break China's laws or injure China's nationals

during their ordinary commercial activities.  Yet if Display's arguments prevailed, those companies

would be presumptively immune from the jurisdiction of United States courts even in the face of

plausible allegations that they have broken United States laws and injured United States

consumers.  Nothing in the FSIA requires that result.

1
2

**IV.    THE COMMERCIAL ACTIVITY EXCEPTION STRIPS BOTH GROUP AND DISPLAY OF IMMUNITY**

3
4
5
6
7
8
9
10
11
12
13
14
15

A foreign state or its instrumentality has no immunity against an "action [that] is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere" if "that act causes a direct effect in the United States."  28 U.S.C. §1605(a)(2).  Group and Display do not dispute that this case is based upon acts connected to their commercial activities – specifically, on Plaintiffs' allegations and evidence that Group and Display fixed the prices of CRTs and sold those CRTs at the fixed prices.  They contend only that their acts caused no "direct effect in the United States."  *Id.*; *see* ECF No. 5410 ("Group Mot.") 13; Display Mot. 19.  That argument fails for two reasons:  *First*, Group and Display raise no factual challenge to the evidence that their conspiracy increased CRT prices in the U.S., and this Court has already ruled that by alleging a U.S. price increase the DPPs have "adequately alleged a direct effect."  Feb. 2018 Order 11.  That ruling was correct and Group and Display offer no reason to reconsider it.  *Second*, discovery shows that Group and Display – despite their claims to the contrary – did in fact make sales to the U.S. during the class period through a wholly owned subsidiary of Group.

16

**A.    An Increase in U.S. Prices from a Global Conspiracy Is a "Direct Effect"**

17
18

**1.    This Court Has Already Ruled That an Increase in U.S. Prices Is a Direct Effect**

19
20
21
22
23
24
25
26
27
28

This Court has already ruled that the DPPs have "adequately alleged a direct effect" under the commercial activity exception.  Feb. 2018 Order 11.  As support for that conclusion, this Court cited (1) evidence that Group and Display participated in the conspiracy, *see* ECF No. 5228 at 20, (2) the Leitzinger Report showing the conspiracy's effect on U.S. markets, *see* ECF No. 5191-2 at 160-162, 173-74, and (3) this Court's prior summary-judgment holding that Plaintiffs had shown conduct that "surpassed" the analogous "directness standard" under the Foreign Trade Antitrust Improvements Act (FTAIA).  Feb. 2018 Order 11 (citing ECF No. 4910 at 7-9).  The Court also found instructive precedent under the FTAIA establishing that "a direct effect was shown when a foreign price-fixing conspiracy raised the worldwide price of [goods] . . . *regardless of whether* the [goods] were sold directly to customers in the United States."  *Id.* at 10 (citing *United States v. Hui*

31

*Hsiung*, 778 F.3d 738, 758-60 (9th Cir. 2015)) (emphasis added); *see also id.* ("[T]hat a defendant did not sell directly into the United States is not dispositive for the question of direct effect."). The Court further noted that Defendants had raised a "factual challenge" to jurisdiction, *id.* at 13, and ordered jurisdictional discovery for factual development, *see id.* at 20.

Jurisdictional discovery, and a renewed motion to dismiss, gave Group and Display the opportunity to contest the DPPs' allegations and evidence that this Court had found sufficient to establish a direct effect:  Defendants' participation in the conspiracy, and the conspiracy's effect of raising prices in U.S. markets.  They have not even attempted to do so.  Their briefs cite no evidence to contest either point.  Instead, Defendants merely reargue the legal standard, claiming that a conspiracy-driven increase on U.S. prices is not enough unless DPPs also prove that Defendants themselves sold CRTs in the United States.  *See* Group Mot. 13-16; Display Mot. 19-23.  That is not a factual challenge.  It is, in substance, no more than a request to reconsider the Court's earlier ruling.  The Court should decline to do so because Defendants have not sought leave to seek reconsideration under Local Civil Rule 7-9, and have not shown – and cannot show – that the requirements of the rule are met.[23]

## 2. This Court's Previous Ruling Was Correct

### a. Defendants' Conspiracy Caused U.S. Prices To Rise

This Court's ruling is not only binding but also correct on its merits:  Group and Display caused a "direct effect" because their conspiracy caused U.S. prices to rise.  Under the commercial activity exception, "an effect is 'direct' if it follows 'as an immediate consequence of the defendant's . . . activity.' "  *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992).  A consequence is sufficiently " 'immediate' if no intervening act breaks 'the chain of causation leading from the asserted wrongful act to its impact in the United States.' "  *Terenkian*, 694 F.3d at

_____

[23] Defendants cannot show that their present arguments could not have been made earlier through "reasonable diligence"; that there have been any "new material facts or a change of law" since February 2018; or that the Court "manifest[ly] fail[ed] . . . to consider" any argument they made in February 2018.  Civil L.R. 7-9(b)(1)-(3).  They also "repeat . . . arguments[s]" they made earlier and this Court rejected, which would be improper even in a properly made motion for leave.  Civil L.R. 7-9(c).  *See* ECF No. 5229, at 7-8 (arguing that the defendant must be "physically present in the U.S. or actually selling products here") (emphasis omitted).

1    1133 (quoting *Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1083 (9th Cir. 2001)).  Additionally, to weed

2    out "purely trivial" effects, the Ninth Circuit requires that some "legally significant act giving rise

3    to the claim" must occur in the United States.  *Id.* at 1134 (quotation omitted); *but see Cruise*

4    *Connections Charter Mgmt. 1, LP v. Attorney Gen. of Canada*, 600 F.3d 661, 665 (D.C. Cir. 2010)

5    (no legally significant act requirement).

6          Those requirements are satisfied where an agency or instrumentality of a foreign state

7    conspires to fix global prices and causes U.S. consumers to pay higher prices.  In *Int'l Ass'n of*

8    *Machinists & Aerospace Workers v. OPEC*, 649 F.2d 1354 (9th Cir. 1981), *recognized as*

9    *abrogated on other grounds*, *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 707 n.8

10   (9th Cir. 1992), the court applied the FSIA's commercial activity exception where "the act

11   complained of [was] a conspiracy to fix [both global and U.S. oil] prices," *id.* at 1358.  Similarly,

12   in *Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, No. CV 16-2345-DMG (AGRX), 2016 WL 8648638

13   (C.D. Cal. Aug. 18, 2016), the court found direct effects because "the United States is the world's

14   largest importer of salt" and the defendant "produces nearly 17% of the world's total salt output,"

15   which meant the defendant's "alleged price-fixing . . . 'le[d] to less variety in the U.S. salt market,

16   as well as less competition and higher prices for United States consumers,' " *id.* at *3 (quoting the

17   complaint in that case).  This Court relied on *Sea Breeze* in its earlier ruling, *see* Feb. 2018 Order 9;

18   the Ninth Circuit has since affirmed the relevant holding, *see Sea Breeze Salt, Inc. v. Mitsubishi*

19   *Corp.*, 899 F.3d 1064, 1068 n.2 (9th Cir. 2018).

20         Because the FTAIA and the FSIA use "nearly identical term[s]," *United States v. LSL*

21   *Biotechnologies*, 379 F.3d 672, 680-83 (9th Cir. 2004), cases construing the term "direct" in the

22   FTAIA are also "useful source[s]."  Feb. 2018 Order 10.  In this Circuit, "direct effect" has the

23   same meaning under both the FSIA and FTAIA:  an effect that "follows as an immediate

24   consequence of the defendant[s'] activity."  *Hui Hsiung*, 778 F.3d at 758 (quotation omitted)

25   (definition under FTAIA); *see Terenkian*, 694 F.3d at 1133 (same under FSIA).[24]  In *Hui Hsiung*,

26   the Ninth Circuit found a direct effect when a foreign price-fixing conspiracy raised global LCD

27

28   _____

     [24] As this Court has noted, the Second and Seventh Circuits have distinguished between the
     FSIA and FTAIA definitions of "direct."  *See* Feb. 2018 Order 10 n.2.

prices, because that caused prices for finished products sold in the United States to rise – regardless of whether the LCDs were sold directly to customers in the United States.  See *id.* at 758-60.  "The direct connection was neither speculative nor insulated by multiple disconnected layers of transactions."  *Id.* at 759.  In a similar case, Judge Illston found a direct effect under the FTAIA where plaintiffs "argue[d] that [foreign] defendants colluded to increase the prices of LCD panels, a major component" in U.S. electronic imports.  *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 822 F. Supp. 2d 953, 966 (N.D. Cal. 2011).  "The increased price of the components caused the prices of the finished products in the United States to increase.  If this effect is not 'direct,' it is difficult to imagine what would be."  *Id.*

That same direct link between a global conspiracy and a U.S. price increase is present here. The complaint plausibly and sufficiently alleges a global conspiracy to fix prices, and further alleges unusual price movement, higher prices, and a restraint of price competition in the United States.  ECF No. 436 ¶¶ 188-199.  The evidence supporting those allegations is uncontested and overwhelming.  To show conspiracy, the DPPs offer unrebutted evidence that Group and Display attended at least 70 conspiratorial meetings, in which they agreed to price increases and production limits, *see* ECF No. 5191-1 ¶ 9; 2017 Saveri Decl. Exs. 12, 14, 17, 18, 23, 25; that U.S. prices and market conditions were specifically discussed at those meetings, *see id.* Exs. 19, 26, 30; and even – going beyond what is required either for jurisdiction or for liability – that the conspirators actually knew their conduct was illegal and anticompetitive, *see id.* Exs. 20, 26.

To show an effect on U.S. prices, the DPPs offer the Leitzinger Report.  That Report confirms, "with a high degree of statistical confidence," that the conspiracy led to a significant increase in CRT prices worldwide and in the United States.  Leitzinger Rep. ¶ 49; *see id.* ¶¶ 58-59. The conspirators' documents show that they "were cognizant of regional price levels and adjusted them to keep them in line with their global pricing strategy."  *Id.* ¶ 58.  The conspirators' CRT sales data showed that the U.S. was 18% of the market for CRT tubes – the second largest market share after China.  *See id* ¶ 59 n.129.  As for completed CRT monitors, North America had the largest share, around 30% of the global market.  *See id.*  North American prices tracked global prices precisely – powerful evidence of the price-fixing conspiracy's impact on U.S. consumers.

34

1    *See id.* ¶ 59 & figs. 12, 13.  No less here than in *Flat Panel*, "it is difficult to imagine" a more

2    direct effect.  822 F. Supp. 2d at 966.

3                    **b.    Defendants' "Direct Sales" Argument Misstates the Law**

4            Group and Display have no support for their argument that (contrary to this Court's earlier

5    ruling) "no direct effect exists unless the *specific defendant* had *direct sales* of the allegedly

6    affected product *in the United States*."  Group Mot. 13 (second and third emphases added); *see*

7    Display Mot. 20.  To begin with, that view cannot be squared with the words of the commercial-

8    activity exception:  the third clause, at issue here, requires "an *act outside* the territory of the

9    United States in connection with a commercial activity of the foreign state elsewhere . . . that . . .

10   *causes* a direct effect *in* the United States."  28 U.S.C. § 1605(a)(2) (emphases added).  By its plain

11   meaning, that provision conveys jurisdiction even if the defendant itself does not act in the United

12   States.  A foreign-state-owned company selling in the United States would instead fit under the

13   first clause ("carr[ying] on" a "commercial activity . . . in the United States") or the second one

14   ("act performed in the United States").

15           Group and Display cite no case applying a direct-sales rule.  Beginning with their antitrust

16   cases, *California v. NRG Energy, Inc.*, 391 F.3d 1011 (9th Cir. 2004), *vacated on other grounds by*

17   *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224 (2007), involved a foreign-state-owned

18   parent company that merely made "credit decisions that affected [its subsidiary], whose actions in

19   turn affected the" United States.  *Id.* at 1024.  The court of appeals did not have before it evidence

20   that the parent asserting immunity had conspired to fix global prices that were then charged in the

21   United States as well as elsewhere.[25]  *Filetech S.A. v. France Telecom, S.A.*, 212 F. Supp. 2d 183

22   (S.D.N.Y. 2001), involved a French state-owned defendant's refusal to sell marketing information

23   to a French competitor; the anticompetitive effects of the refusal were in the French market, and

24   the "allegations concerning the effect of that conduct upon American commerce [we]re scant."  *Id.*

25

26           [25] *See Wholesale Elec. Antitrust Cases I & II*, No. CV 02-0990-RHW, 2002 WL 34165887,
     at *7 (S.D. Cal. Dec. 17, 2002) ("There is simply no evidence in the record that [the parent] exerts
27   operational control over the quantities and prices at which [the subsidiary] sells electricity."), *aff'd*
     *in part, vacated in part, remanded sub nom. NRG Energy Inc.*, 391 F.3d 1011.

28
                                                      35

at 196 (quoting earlier ruling).  Neither *NRG Energy* nor *Filetech* applies or even suggests a rule that direct sales into the United States are necessary for a direct effect.

Group and Display fare no better with their non-antitrust cases.  In *Terenkian*, 694 F.3d at 1138, plaintiffs' claims arose from cancelled contracts with Iraq that might if fulfilled have resulted in oil being delivered to the United States – if, but only if, the plaintiffs made "[m]any additional steps . . . including such fundamental requirements as finding potential U.S. purchasers and negotiating mutually acceptable agreements." *Id.* at 1139.  Those extra, uncertain steps made any connection to the United States "too 'remote and attenuated'" to count. *Id.* at 1139 (quoting *Weltover*, 504 U.S. at 618)).  Likewise, the alleged effect in *In re North Sea Brent Crude Oil Futures Litig.*, No. 1:13-md-02475 (ALC), 2016 WL 1271063 (S.D.N.Y. Mar. 29, 2016), required the "exercise [of] independent judgment" by a third party before it could reach the United States, *id.* at *12, a classic failure of proximate cause.  Here, no independent actor's judgment stood between Defendants' fixed prices and class members.

Further, "legally significant acts" occurred in the United States, *see Terenkian*, 694 F.3d at 1134, each time class members purchased class products at supracompetitive prices.  A "purchase" at an "inflated price" establishes "antitrust injury," a necessary element of a private antitrust claim. *E.g.*, *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1102 (9th Cir. 1999).  Until class members purchased, they had no antitrust claims.  Group and Display err in suggesting that those purchases were "'[m]ere financial loss[es],'" *e.g.*, Group Mot. 12 (quoting *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 726-27 (9th Cir. 1997), that cannot establish a direct effect. *Adler*, which they quote out of context, was a contract case, and it is black-letter law that "[a] cause of action for breach of contract accrues at the time of the breach," *Perez-Encinas v. AmerUs Life Ins. Co.*, 468 F. Supp. 2d 1127, 1134 (N.D. Cal. 2006), regardless of when (or even whether) any damages are suffered.  In antitrust cases, as in other tort cases, the injury is part of the cause of action, so its location is legally significant. *See Atlantica Holdings Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 113 (2d Cir. 2016) ("In cases where the plaintiff's initial injury occurs in the United States – that is, where this country is the locus of the tort – there is no reason

36

why that initial injury should not count as a direct effect merely because it happens to take the form of a financial loss.").

Group and Display also err in suggesting that the "minimum contacts" requirement of due process creates a separate obstacle to jurisdiction.  *See* Group Mot. 14-15; Display Mot. 21-23 (relying on *Sec. Pac. Nat'l Bank v. Derderian*, 872 F.2d 281, 286–287 (9th Cir.1989)).  Although *Derderian* held that "the requirement of a 'direct effect' incorporates . . . minimum contacts standards" from due process cases, 872 F.2d at 286, that was before the Supreme Court's decision in *Weltover*, which held that a "direct effect" need not be either substantial or foreseeable to satisfy the FSIA's commercial-activity exception, *see* 504 U.S. at 618 ("[W]e reject the suggestion that § 1605(a)(2) contains any unexpressed requirement of 'substantiality' or 'foreseeability.'").  *Weltover* abrogates (or at least limits) *Derderian* because minimum-contacts analysis incorporates concepts of substantiality and foreseeability that under *Weltover* do not apply in §1605(a)(2) cases.[26]  The Ninth Circuit's more recent commercial-activity cases do not use a minimum-contacts analysis, *see Terenkian*, 694 F.3d at 1138; *NRG Energy, Inc.*, 391 F.3d at 1024;[27] the court in *Sea Breeze* did not, *see* 2016 WL 8648638, at *2-3; and no other circuit does, *see Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383, 395 n.8 (6th Cir. 2016).

In any event, Defendants had the requisite "minimum contacts" because their wrongful acts were "expressly aimed" at the United States.  *Calder v. Jones*, 465 U.S. 783, 789 (1984).  In 2014, in this very litigation, Judge Conti set forth the relevant standard:

> In a multinational price-fixing conspiracy like the one at issue in this case, defendants do not have to make the price-fixed product themselves within the

---

[26] *See, e.g., Walden v. Fiore*, 571 U.S. 277, 284 (2014) (taking into account whether "the defendant's suit-related conduct . . . create[s] a substantial connection with the forum"); *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 296-97 (1980) (discussing different concepts of "foreseeability," and clarifying that "the foreseeability that is critical to due process analysis" concerns whether a defendant "should reasonably anticipate being haled into court" in the forum).

[27] *Corzo v. Banco Cent. de Reserva del Peru*, 243 F.3d 519 (9th Cir. 2001), cited by Defendants, is the one post-*Weltover* case in which the Ninth Circuit cited *Derderian* for the proposition that minimum contacts are required for a direct effect.  *See id.* at 525-26.  *Corzo* did not consider whether *Weltover* undermined *Derderian*, and the citation to *Derderian* was unnecessary to the court's decision and is therefore nonbinding dictum.  *See id.* at 525 ("whether that activity had a 'direct effect' in the United States is not critical to the outcome of this case").

bounds of the forum state in order for the state to have jurisdiction. They only have to target intentional acts (e.g., price-fixing activities) toward the forum state, knowing the effects of the activity will be felt there.

ECF No. 2440 at 13; *see id.* at 15 ("Thomson SA's contention that it did not manufacture or sell CRTs in the United States itself does not change the fact that Sharp has pled that Thomson SA expressly aimed price-fixing activity at the United States.").[28] Here, Group and Display agreed to fix global CRT prices, which they knew and intended would increase prices in the United States as well as elsewhere. *See* Saveri Decl. Exs. 19, 26, 30. Their argument that the Ninth Circuit does not allow personal jurisdiction based on co-conspirators' conduct is thus misplaced. Jurisdiction rests on each Defendant's own conduct in joining and carrying out the unlawful global agreement, not on imputation.

**B.      Discovery Has Confirmed That Group and Display Targeted the U.S. Market**

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████,[29] █████████████████████
████████████████████, including (1)
██████████████████████████████████
██████████████████████████████████████
████████████████████████, Saveri Decl. Ex. 1, at 105; and (2) a 2004 submission to China's Ministry of Finance that shows Import-Export as a "wholly-owned" subsidiary of Group, Am.

---

[28] *See also In re Optical Disk Drive Antitrust Litig.*, No. 10-md-02143-RS, 2015 WL 1926635, at *2 (N.D. Cal. Apr. 28, 2015) ("[P]laintiffs have adequately pleaded . . . a price-fixing conspiracy directed at the forum, to support minimum contacts, including specific instances of [defendant's] employees exchanging pricing information with competitors with respect to [product] to be sold here."); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 11-0829 SI, 2011 WL 5444261, at *5 (N.D. Cal. Nov. 9, 2011) (relying on "emails discussing prices of . . . products in United States" to show that "conspiratorial activities were expressly targeted at the United States").

[29] *See, e.g.*, Zhang Dep. (Day 1) 42:11-12 (claiming that ████████████████████████ ████████████████████████████████████); Wang Dep. (Day 1) 49:10-11 (████████████████████████████████).

DIRECT PURCHASER PLAINTIFFS' OPPOSITION TO THE IRICO DEFENDANTS' MOTIONS TO DISMISS;
Master File No. 07-CV-5944-JST

1   Plunkett Decl. Ex. 49 (also marked as Dep. Ex. 8394), at 999 – which Zhang 

2   █████████████ Zhang Dep. (Day 2) 38:14. ████████████████████

3   ██████████████████████████████████████████████████

4   ██████████████████████████████████████████████████████

5   ████████████████████████████████ *See supra* pp. 12-13 & nn. 7, 9; *see*

6   *also* Saveri Decl. Ex. 25, at 126 (2005 annual report of Electronics describing Import-Export as a

7   "related part[y]" that is part of "[t]he IRICO Group").

8   ████████████████████████████████████████████

9   ███████████████████████████████████████

10  ██████████████████████████████████████████

11  ████████████████████████████████████████

12  ███████████████ . *See supra* p. 13.  Even Zhang, █████████████

13  ██████████ , admitted that █████████████ Zhang Dep. (Day 2) 26:13-15.

14  ██████████████████████████████████████████ , Saveri

15  Decl. Ex. 1, at 105, ████████████████████████████████████

16  ████████████████████████████████████████

17  ██████████████████████████████████████████

18  ███████████████████████████████████████████

19  ███████████████████████████████████████████

20  ███████████████████ . *See supra* pp. 13-14.

21  █████████████████████████████████████

22  █████████████████████████████████ ,[30] and ██████████████

23  _____

24      [30] █████████████████████████████████

25  ██████████ . Saveri Decl. Ex. 19.  Group's corporate designee testified that ██████

26  ███████████████████████ . Zhang Dep. (Day 1) 49:13-18.  According to █████

27  ███████████████████████████████████████████████████

28  ████████ . Saveri Decl. Ex. 20, at 492.

39



Saveri Decl. Ex. 20, at 492; *see also id.* at 497 (

), *see supra* pp. 12, 14,

*Terenkian*, 694 F.3d at 1133 (quoting *Lyon*, 252 F.3d at 1083).  Group's assertions that it was not involved in the United States market are thus not only legally inadequate, but also factually untrue.

**V.      CONCLUSION**

Both Group's and Display's motions to dismiss should be denied.

Dated: April 1, 2019                          Respectfully submitted,

                                              /s/ *R. Alexander Saveri*
                                              Guido Saveri (22349)
                                              R. Alexander Saveri (173102)
                                              Geoffrey C. Rushing (126910)
                                              Cadio Zirpoli (179108)
                                              Matthew D. Heaphy (227224)
                                              SAVERI & SAVERI, INC.
                                              706 Sansome Street
                                              San Francisco, CA 94111
                                              Telephone: (415) 217-6810
                                              Facsimile: (415) 217-6813

                                              *Lead Counsel for Direct Purchaser Plaintiffs*

                                              Joseph W. Cotchett
                                              COTCHETT, PITRE & McCARTHY, LLP
                                              840 Malcolm Road
                                              Burlingame, CA 94010
                                              Telephone: (650) 697-6000
                                              Facsimile: (650) 697-0577

                                              Steven F. Benz
                                              Gregory G. Rapawy
                                              KELLOGG, HANSEN, TODD, FIGEL &
                                                  FREDERICK, P.L.L.C.
                                              1615 M Street, N.W., Suite 400
                                              Washington, DC 20036
                                              Telephone: (202) 326-7900
                                              Facsimile: (202) 326-7999

                                              *Attorneys for Plaintiffs*

DIRECT PURCHASER PLAINTIFFS' OPPOSITION TO THE IRICO DEFENDANTS' MOTIONS TO DISMISS;
Master File No. 07-CV-5944-JST