## DECLARATION OF PROFESSOR CURTIS J. MILHAUPT

I, CURTIS J. MILHAUPT, declare as follows:

1.   I make this declaration in support of the Direct Purchaser Plaintiffs' ("DPPs")'s opposition to the motions of Irico Group Corporation ("Irico Group") and Irico Display Devices Co., Ltd. ("Irico Display" and together with Irico Group, the "Irico Defendants") to dismiss for lack of subject matter jurisdiction.

2.   I am a Professor of Law at Stanford Law School (endowed professorship pending) and a Senior Fellow, by courtesy, of the Freeman Spogli Institute for International Studies at Stanford University. I am a member of the American Law Institute and a Research Associate of the European Corporate Governance Institute. My fields of expertise include U.S. corporate law, comparative corporate governance, state-owned enterprises ("SOEs"), Chinese state capitalism, Japanese law (particularly Japanese corporate law) and law and economic development.

3.   Prior to joining the Stanford Law School faculty in January of 2018, I served on the Columbia Law School faculty for nearly two decades. At Columbia, I was the Parker Professor of Comparative Corporate Law and the Fuyo Professor of Japanese Law. I have been a law professor for 25 years, beginning at Washington University in St. Louis in 1994.

4.   I am a member of the Bar of the State of New York. I have a B.A. from the University of Notre Dame (1984) and a J.D. from Columbia Law School (1989), where I served on the *Columbia Law Review*. In addition, I conducted graduate studies in law and international relations at the University of Tokyo (1984-86; 1992-93).  Before entering academia, I was an associate at Shearman & Sterling in New York and Tokyo (1989-1994), where I did transactional corporate work as well as sovereign debt restructuring and bank regulatory work.

5.   I have served as a visiting professor at numerous law schools, academic institutions and think tanks around the world. Representative appointments include Distinguished Visiting Scholar at the National University of Singapore (2018); Distinguished Visiting Professor in the International School of Financial Law at East China University of Political Science and Law in Shanghai (2014); and Visiting Professor of Law at the University of Tokyo (2012), the Duisenberg School of Finance in Amsterdam (2008-2015), and Tsinghua Law School in Beijing (2006). I have also served as a Visiting Scholar at the Bank of Japan's Institute for Monetary and Economic Studies (1998) and a Research Fellow of the Research Institute of Economy, Trade and Industry, affiliated with Japan's Ministry of Economy, Trade and Industry (2002). In the United States, I have been a Visiting Professor of Law at Stanford Law School (2016-17), the University of California, Berkeley (2006) and UCLA Law School (1997).

6.    I have testified before the U.S.-China Economic and Security Review Commission on the policy implications of global investment and trade activity by Chinese SOEs. I have also been informally consulted on related issues by officials from the Commerce Department and the United States Trade Representative, as well as European Union trade officials. I was retained by a foreign stock exchange (not located in China or Hong Kong) to conduct a worldwide examination of best practices in the corporate governance of SOEs whose shares are listed on public stock exchanges.

7.    My curriculum vitae is attached as Exhibit 1. As indicated in my curriculum vitae, I have published numerous articles and books on topics related to SOEs, comparative corporate governance, and Chinese state capitalism, and I am regularly invited to speak on these topics at academic and professional meetings.

8.    In particular, I have authored, co-authored or edited several scholarly publications on Chinese SOEs and Chinese state capitalism. I am the co-author (with Li-Wen Lin) of *We are the (National) Champions: Understanding the Mechanisms of State Capitalism in China*, 65 STAN. L. REV. 697 (2013); co-author (with Wentong Zheng) of *Beyond Ownership: State Capitalism and the Chinese Firm*, 103 GEO. L.J. 667 (2015); author of *Chinese Corporate Capitalism in Comparative Context*, in Weitseng Chen ed., THE BEIJING CONSENSUS? HOW HAS CHINA CHANGED WESTERN IDEAS OF LAW AND DEVELOPMENT (Cambridge University Press 2017) and *Is the US Ready for FDI from China? Lessons from Japan's Experience in the 1980s*, in Karl P. Sauvant, ed., INVESTING IN THE UNITED STATES: IS THE US READY FOR FDI FROM CHINA? (Edward Elgar 2009). I am co-editor (with Benjamin L. Liebman) of and contributor to the volume REGULATING THE VISIBLE HAND? THE INSTITUTIONAL IMPLICATIONS OF CHINESE STATE CAPITALISM (Oxford University Press 2016).

9.    My scholarship and views on Chinese SOEs have been reported in publications including *The Economist*, *China Real Time Report* (a web site affiliated with the *Wall Street Journal*), and the Paulson Institute's web site.

10.    I have been retained in this matter by counsel for the DPPs to comment upon the corporate structure and governance of the Irico Defendants and their relationship to the Chinese state in order to assist the court in determining whether Irico Group and Irico Display are agencies, instrumentalities, or organs of a foreign state for purposes of the Foreign Sovereign Immunities Act.

11.    In connection with the preparation of this Declaration, I have examined the following documents, in whole or in part:

a.    Irico Group's Motion to Dismiss for Lack of Subject Matter Jurisdiction.

b.    Irico Display Devices Co., Ltd.'s Amended Motion to Dismiss Claims of Direct Purchaser Plaintiffs for Lack of Subject Matter Jurisdiction ("Irico Display Amended Motion").

c.     Amended Declaration of Zhaojie Wang in Support of Irico Defendants' Motions to Dismiss for Lack of Jurisdiction ("Amended Wang Declaration" or "Amended Wang Decl.").

d.     Declaration of Donald Clarke in Support of Irico Defendants' Motions to Dismiss for Lack of Subject Matter Jurisdiction.

e.     Amended Declaration of Stuart C. Plunkett in Support of Irico Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction ("Amended Plunkett Decl.").

f.     Irico's Motion to Set Aside Default.

g.     Declaration of Wenkai Zhang in Support of Irico's Motion to Set Aside Default

h.     Direct Purchaser Plaintiffs' Opposition to the Irico Defendants' Motion to Set Aside Default.

i.     Declaration of R. Alexander Saveri in Support of Direct Purchaser Plaintiffs' Opposition to the Irico Defendants' Motion to Set Aside Default.

j.     Reply Brief of Irico in Support of Motion to Set Aside Default.

k.     Court Order Setting Aside Default.

l.     Irico Display Devices Co., Ltd. Articles of Association, as amended (2006), numbered IRI-CRT-00001026 through 1067 ("2006 Display Articles").

m.     Irico Display Devices Co., Ltd. Independent Directors System (2007) ("Display Independent Directors System").

n.     Irico Display Devices Co., Ltd. Work Rules of Nominating Committee of the Board of Directors (2007).

o.     Other materials cited in this declaration.

## ANALYSIS

### A.  Ownership Structure of Irico Defendants

12.   The Irico Defendants are members of a Chinese state-owned corporate group at the central government level.[1] The basic ownership structure of such groups is relatively uniform, with a parent holding company directly owned by a single shareholder, the State-Owned Assets Supervision and Administration Commission ("SASAC") under the State Council. SASAC was established in 2003 to act as an investor in state assets on behalf of the State Council. It also exercises certain supervisory functions over the central SOE groups. The parent holding company of the SOE corporate group, in turn, holds shares in numerous subsidiaries. Typically,

---

[1] In the 1980s and 1990s, the Chinese government pursued a strategy of "corporatizing" its SOEs – separating productive units from government ministries and transforming them into corporate entities. Influenced by the successful economies of Japan and South Korea at the time, the government then assembled the corporations into corporate groups. *See* Li-Wen Lin & Curtis J. Milhaupt, *We are the (National) Champions: Understanding the Mechanisms of State Capitalism in China*, 65 STAN. L. REV. 697, 704-721 (2013).

one or more of the major operating subsidiaries has issued shares to public (non-state) investors and is listed on a domestic or foreign stock exchange.

13.   Consistent with this basic ownership structure, the Irico Defendants consist of (1) Irico Group, the parent company of the SOE corporate group, whose sole shareholder is SASAC; and (2) Irico Display, an indirect subsidiary of Irico Group, which has issued shares to public (non-state) investors and is listed on the Shanghai Stock Exchange.

14.   Although publicly traded corporations such as Irico Display that are members of an SOE corporate group may commonly be referred to as "SOEs," they are more accurately thought of as *mixed ownership* enterprises – corporations in which equity ownership is shared between state and public (non-state) investors.

15.   Irico Display's ownership structure as of 2007 illustrates its status as a mixed-ownership enterprise. As of that year, Irico Group owned 75% of its subsidiary Irico Electronics Group Corporation ("Irico Electronics"), a Hong Kong Stock Exchange listed mixed-ownership enterprise. Irico Electronics, in turn, owned 41.36% of the shares of Irico Display. Thus, Irico Group, through its ownership interest in Irico Electronics, controlled 31% of the voting shares of Irico Display. The remainder of Irico Display's shares were issued to public (non-state) investors and listed on the Shanghai Stock Exchange. Thus, as of 2007, public (non-state) investors owned the majority of Irico Display's outstanding shares.[2]

16.   Other companies with an ownership structure similar to that of Irico Display – that is, mixed-ownership enterprises that are members of a corporate group whose parent company is owned by SASAC – are widespread in the Chinese economy. As I wrote with a co-author in 2015:

> [P]ublicly listed firms in China are typically of the mixed-ownership type. Mixed ownership has also become an important ownership form among some of China's central SOE groups at the subsidiary level. For example, almost all of the thirty-four subsidiaries of China National Offshore Oil Corporation (CNOOC) are mixed-ownership firms with an average state share percentage ranging from forty to sixty-five percent. Mixed ownership is set to become a more pervasive ownership form for central SOEs given that the CPC [Communist Party of China] Third Plenum in 2013 made mixed ownership a goal of SOE reforms.[3]

---

[2] *See* Amended Plunkett Decl., Ex. 2, at -238 (listing Irico Display's top ten shareholders in 2007). Irico Display's 2007 Annual Report identifies only Irico Electronics as a state-owned legal person. Even if the other listed shareholders are state-owned (though not identified as such), their shareholdings, combined with those of Irico Electronics, would not constitute a majority of Irico Display's outstanding shares.

[3] Curtis J. Milhaupt & Wentong Zheng, *Beyond Ownership: State Capitalism and the Chinese Firm*, 103 GEO. L.J. 665, 672-73 (2015) (internal references omitted).

17.   According to recent studies, publicly listed, mixed-ownership enterprises under SASAC supervision such as Irico Display account for 36-50% of the total market capitalization of the A Share market in China.[4] These companies are engaged in a wide variety of commercial activities, ranging from the production and sale of automobiles to steel and construction materials. An OECD study found that as of the end of 2015, China accounted for over 75% of the listed companies with majority or minority state shareholdings in the seven non-OECD member countries surveyed, and almost 85% of their combined market value.[5]

18.   As a mixed-ownership enterprise, Irico Display is an example of the blurred boundary between a "state-owned" enterprise and a "privately-owned" enterprise ("POE") in the contemporary Chinese political economy. Again quoting from my 2015 article:

> Drawing a stark distinction among Chinese firms based on the ownership of enterprise (SOE versus POE) … misperceives the reality of that country's institutional environment as it has evolved in the economic reform era and its impact on the formation and operation of large enterprises of all types. Functionally, SOEs and large POEs in China share many similarities in the areas commonly thought to distinguish state-owned firms from privately owned firms: market access, receipt of state subsidies, proximity to state power, and execution of the government's policy objectives.[6]

19.   The blurred dichotomy between "state owned" and "private" companies in China is significant in this case because certain of Irico Display's attributes may appear at first blush to signify its status as an "organ" of the state, when in reality these attributes are commonly found in large Chinese corporations regardless of their ownership structure or formal connections to the state. For example, Irico Display states that it was "monitored on a day-to-day basis by a Chinese Communist Party cell embedded inside Display's facilities to monitor and supervise all operations and employees."[7] However, Chinese Communist Party committees can be found in

---

[4] Yu-Hsin Lin & Yun-chien Chang, *Do State-Owned Enterprises Have Worse Corporate Governance? An Empirical Study of Corporate Practices in China* (Working Paper 2018) (50% of market capitalization); Asia Society Special Report, Missing Link: Corporate Governance in China's State Sector, 14 & Table 1 (2018) (36% of market capitalization). The A Share market refers to tradeable shares of Chinese companies quoted in Renminbi and listed on the country's stock exchanges in Shanghai and Shenzhen.

[5] *See* OECD, The Size and Sectoral Distribution of State-Owned Enterprises, 30 & Table 4 (2017), available at http://dx.doi.org/10.1787/9789264280663-en.

[6] *See* Milhaupt & Zheng, *supra* note 3, at 668.

[7] Irico Display Amended Motion, at 1, lines 25-27 (citing Amended Wang Decl. ¶¶ 37-38). I note that the Amended Wang Declaration does not actually state that there was a Chinese Communist Party cell within Irico Display. Moreover, a 2017 amendment to Irico Display's Articles of Association establishing a party committee within the corporation suggests that prior to this date there was no formal basis for the committee's existence. *See* Announcement on Amendments to the Articles of Association of Irico Display Devices Co., Ltd, December 22, 2017.

both SOEs and POEs in China.[8] A second example cited by Irico Display to support its connection to the state is the receipt of a subsidy from the Chinese government in 2007. However, private firms in China also receive government subsidies, as indicated by a 2013 study showing that government subsidies account for a significant portion of the net profits of some major private companies in China.[9]

## B. Irico Display's Corporate Governance Structures and Independence

20.   The constitutive corporate documents and public disclosures of Irico Display I reviewed for this Declaration do not, in my opinion, support the contention that "Irico Display was at all times subject to the day-to-day control of Irico Group, and thus control by the Chinese government, in all its business activities, financial policies, and appointment of management."[10] To the contrary, as detailed in paragraphs 21-31 below, these documents and disclosures emphasize that Irico Display's corporate governance structures ensure the independent management and operation of the company and safeguard the rights and interests of its shareholders – again, a majority of whom are public (non-state) shareholders.

21.   As a "company limited by shares," Irico Display is subject to the Company Law of the People's Republic of China ("Company Law"). The Company Law provides the basic legal norms of corporate governance for all Chinese companies limited by shares incorporated under the statute, regardless of whether its shareholders are private or state actors.[11]

22.   The Company Law provides shareholders with significant governance rights, including "Making decisions on the company's operational guidelines and investment plans;" "Electing and replacing the directors and supervisors;" "Approving the profit distribution plans

---

[8] *See, e.g.*, Company Law of the Peoples' Republic of China, art. 19 ("An organization of the Communist Party of China ("CPC") shall be established in a company to carry out activities of the CPC pursuant to the Constitution of the Communist Party of China. The company shall provide necessary conditions for the activities of the organization of the CPC."). Although most senior managers of Chinese SOE business groups are members of the CPC, I am not aware of any formal legal requirement to this effect.

[9] Matthew Forney & Laila F. Khawaja, Fathom China Ltd., *Public Funds for Private Firms* 3 (2013), cited in Milhaupt & Zheng, *supra* note 3; Naomi Rovnick, QUARTZ, *Most Big Chinese Companies Get Some Kind of State Subsidy* (April 9, 2013), available at https://qz.com/72354/most-big-chinese-companies-get-some-kind-of-state-subsidies/.

[10] Amended Wang Decl., ¶ 47.

[11] China has a unitary corporate law regime and a unitary securities law regime, applying to both SOEs and POEs. See Curtis J. Milhaupt & Mariana Pargendler, *Governance Challenges of Listed State-Owned Enterprises Around the World: National Experiences and a Framework for Reform*, 50 CORNELL INT'L L.J. 473, 530 & Chart 1 (2017). The Company Law has separate provisions on wholly state-owned limited liability companies such as Irico Group.

and loss recovery plans of the company through deliberation;" and "Exercising other powers specified in the articles of association."[12]

23.   Consistent with and promulgated pursuant to the Company Law, Irico Display's Articles of Association adopted in 2006[13] and in force as of 2007 provide that the General Meeting of Shareholders has the authority to make decisions for the Company.[14] Article 63 of the Articles of Association contains an extensive list of shareholder powers consistent with those enumerated in the Company Law and provides that "[t]he functions and powers of the above-mentioned General Meeting of Shareholders shall not be exercised by the Board of Directors or other institutions and individuals in the form of authorization."[15]

24.   Article 75 of Irico Display's Articles of Association provides for the duties of shareholders, including the duty to abide by relevant laws and the Articles of Association, and the duty not to "infringe upon the legitimate rights and interests of other shareholders."[16]

25.   The Company Law also provides the board of directors with significant governance rights, including "Convening the shareholders' meetings;" "Executing the resolutions of the shareholders' meeting;" "Making decisions on the operational plans and investment plans of the company;" "Formulating the profit distribution plans and loss recovery plans of the company;" "Making decisions on the employment or dismissal of a manager of the company;" and "Exercising other powers specified in the company's articles of association."[17]

26.   Irico Display's Articles of Association emphasize the independence of its Board of Directors and other corporate organs from the controlling shareholder: "The Board of Directors, the Board of Supervisors and other internal institutions of the Company shall operate independently. There is no hierarchical relationship between controlling shareholders and their functional departments and the Company and its functional departments. The controlling shareholders and their subordinate bodies shall not issue to the Company and its subsidiaries any plans and instructions concerning the operation of the Company, nor shall they in any other way affect the independence of its operation and management."[18]

27.   The Articles of Association provide that the Company shall have three independent directors nominated by the Board of Directors, the Board of Supervisors, and shareholders individually or collectively holding more than 1% of the outstanding shares.[19] Specifically

---

[12] *See* Company Law, art. 99; art. 37(1), (2), (6), (11).
[13] *See* 2006 Display Articles, arts. 1-2.
[14] *See id.*, art. 63.
[15] *Id.*
[16] *Id.*, art 75.
[17] *See* Company Law, art.108; art. 46(1), (2), (3), (5), (9), (11).
[18] 2006 Display Articles, art. 50. (The English translation of the quoted passage contains a typographical error which I corrected in the text.)
[19] *Id.*, art. 164; 165.

excluded from eligibility to serve as an independent director are employees of the top five shareholders of the Company.[20]

28. The Articles of Association confer significant powers on the independent directors, including consenting to related-party transactions and expressing an independent opinion on the nomination, appointment or dismissal of directors and senior management personnel.[21]

29. Irico Display adopted an Independent Directors System in 2007 in order to "improve its corporate governance structure" and "ensure the conscientious performance of duties by independent directors in accordance with the Company Law." [22] This document provides that the independent directors have a responsibility to "pay special attention to the protection of the legitimate rights and interests of public shareholders"[23] and guarantees their freedom from interference from the controlling shareholder or shareholders: "Independent Directors shall perform their duties independently and shall not be affected by major shareholders, actual controller, or units or individuals that have an interest in the company and its major shareholder or actual controller."[24]

30. Irico Display's Articles of Association further provide that "The appointment of the Company's managers shall be carried out in strict compliance with the relevant laws and regulations and the provisions of the Articles of Association. No organization or individual may interfere with the normal procedures for selecting and appointing managers of the Company."[25]

31. Irico Display's discussion of its corporate governance structures in its 2007 Annual Report emphasizes complete independence from its controlling shareholder: "Separation and independence from the company's controlling shareholders is implemented in the five areas of business, personnel, assets, institutions, and finance. The company's board of directors and board of supervisors maintain independent operations, ensuring independence in the company's major decisions."[26]

## C. Commercial Purpose of Irico Display

32. As the studies cited in paragraph 17 of this Declaration indicate, the Chinese state has retained partial ownership of business enterprises in various sectors of the economy rather than pursuing an economic reform strategy of complete privatization. In these sectors of the economy, ownership of business enterprise is apparently viewed by the Chinese government as a means of advancing certain industrial policy or social objectives. On an economy-wide basis,

---

[20] *Id.*, art. 174(3).
[21] *Id.*, art 176(1); 177(1), (2).
[22] Display Independent Directors System, sec. 1.
[23] *Id.*, sec. 22.
[24] *Id.*, sec. 23.
[25] 2006 Display Articles, art. 240.
[26] Amended Plunkett Decl., Ex. 2, at -244.

therefore, it is likely that the Chinese government takes considerations other than shareholder wealth maximization at the entity level into account in its overall ownership strategy.

33.   In my opinion, however, it does not follow that each one of the numerous corporations in which the Chinese state holds a direct or indirect equity interest necessarily performs a public function that overrides its commercial, profit-seeking objectives. In fact, to conclude otherwise would be inconsistent with the Chinese government's express ownership objective: to "realize the preservation of and increase in the value of State-owned assets."[27] Rather, a distinction should be drawn between those members of a corporate group under SASAC supervision that perform commercial functions and those that provide public or social services.

34.   A document reviewed for this Declaration indicates that Irico Group *itself* draws such a distinction between commercial and social functions with regard to members of its corporate group.[28] Irico Group divides the members of its corporate group into two categories: those engaged in core commercial activities (which it calls "primary service"), and those engaged in social functions ("secondary service"). Under this system of categorization, Irico Group has unambiguously identified Irico Display as a "Compan[y] of primary service."[29]

35.   Irico Display's Articles of Association also support the conclusion that it is engaged in commercial activity and not public service or social functions. Article 12 states that the "goals of the Company" are to "focus on customer demand, [and to] provide high-quality products and services with excellent technology and management."[30] The "business scope of the Company" is described as the "production, development and operation of color display devices, electronic products and components and raw materials; self-support and acting for the import and export business of all kinds of commodities and technologies; lease in kind, undertaking of 'processing and compensation trade' and so on."[31]

36.   Article 289 of Irico Display's Articles of Association provides as follows: "While maintaining the sustainable development of the Company *and maximizing the interests of its shareholders*, the Company should pay attention to the welfare, environmental protection, public welfare and other issues in the community, and attach importance to its social responsibility."[32]

---

[27] SASAC, Interim Regulations on Supervision and Management of State-owned Assets of Enterprises, art. 1, available at http://en.sasac.gov.cn/2003/11/24/c_118.htm.

[28] Amended Plunkett Decl., Ex. 49, at -967 (Irico Group Corporation Overall Plan on Separation, Restructuring and Diversion of Primary and Secondary Service).

[29] *Id.*

[30] 2006 Display Articles, art. 12.

[31] *Id.,* art 13.

[32] *Id.*, art. 289 (emphasis added).

This language is identical to that found in the Articles of Association of a *private* Chinese company listed on the Shenzhen Stock Exchange.[33]


       I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Curtis J. Milhaupt

Palo Alto, California
March 28, 2019

---

[33] Shenzhen Lianhua Technology Co., Ltd. Articles of Association, art. 278. http://static.cninfo.com.cn/finalpage/2018-11-10/1205590028.PDF (in Chinese). For Lianhua's status as a private company, see https://www.bloomberg.com/profiles/companies/ACMTSZ:CH-shenzhen-lianhua-technology-co-ltd.

10

**EXHIBIT 1**

# Curtis J. Milhaupt

**Stanford Law School**
**(650) 724-8754**
milhaupt@law.stanford.edu

**March 2019**

**Current Positions:**
Professor of Law, Stanford Law School
Senior Fellow, by courtesy, Freeman Spogli Institute for International Studies

**Prior Academic Positions:**
Edwin B. Parker Professor of Comparative Corporate Law, 2010-2017
Fuyo Professor of Japanese Law, 1999-2017
Director, Parker School of Foreign and Comparative Law, 2013-2017
Director, Center for Japanese Legal Studies, 1999-2017
Member, Weatherhead East Asian Institute, Columbia University, 1999-2017
Vice Dean for Intellectual Life, Columbia Law School, 2010-2011
Professor of Law, Washington University School of Law, St. Louis, 1997-1998
Associate Professor of Law, Washington University School of Law, St. Louis, 1994-1998

**Visiting Academic and Research Appointments:**
Herman Phleger Visiting Professor of Law, Stanford Law School, 2016-2017
Distinguished Visiting Professor of Law, Vanderbilt Law School, March 2016
Distinguished Visiting Professor of Law, East China University of Political Science
  and Law, Fall 2014
Visiting Professor, Duisenberg School of Finance, Univ. of Amsterdam, annually 2008-2015
Visiting Professor, Getulio Vargas Foundation Law School, Sao Paulo, March 2010
Erasmus Mundus Fellow in Law and Economics, University of Bologna, June 2008
Paul Hastings Visiting Professor in Corporate Law, Hong Kong University, May 2007
Visiting Professor of Law, Tsinghua University, Beijing, Fall 2006
Visiting Professor of Law, University of California, Berkeley, Spring 2006
Visiting Professor of Law, University of Tokyo Faculty of Law, Summer 2012, Summer 2005
Visiting Fellow, Research Institute of Economy, Trade and Industry, Fall 2002
Lee Gagliardi Visiting Professor of Law, Columbia Law School, Spring 1999
Visiting Scholar, Bank of Japan Institute for Monetary and Economic Studies, Fall 1998
Visiting Professor of Law, University of California, Los Angeles, Fall 1997

**Education:**
Columbia Law School, J.D. 1989
        Editor, *Columbia Law Review*
University of Notre Dame, B.A., with High Honors, 1984, Government and International
Studies
University of Tokyo, Research Fellow, 1992-93 (Faculty of Law), 1984-86 (Dept. of
International Relations)

**Courses and Seminars Taught:**
U.S. Corporate Law; Japanese Law; Comparative Corporate Governance; The Corporation
in Global Perspective; Mergers and Acquisitions; Regulation of Banks and Other Financial
Intermediaries; Law and Capitalism

**Research Interests:**
East Asian legal systems, particularly Japanese and Chinese law; comparative corporate
governance; corporate law; state owned enterprises; state capitalism; law and economic
development

**Special Projects:**
Project Director, Center for International Political Economy, 2001-2002
Member, U.S. delegation, Nation Building for Korean Unification (international,
interdisciplinary planning for unification of the Korean Peninsula, sponsored by the Korean
Economic Research Institute), June 1997-2000
Special Committee on Asian Affairs, Association of the Bar of the City of New York, 2004-
2006; Member, 1991-92

**Books:**
Law and Capitalism: What Corporate Crises Reveal about Legal Systems and Economic
Development around the World (Chicago: University of Chicago Press, 2008) (with
Katharina Pistor) (translated into Chinese and Portuguese)

Economic Organizations and Corporate Governance in Japan: The Impact of Formal and
Informal Rules (Oxford: Oxford University Press, 2004) (with Mark D. West)

**Edited Volumes:**
Regulating the Visible Hand? The Institutional Implications of Chinese State Capitalism
(Oxford: Oxford University Press, 2016) (with Benjamin Liebman)

Transforming Corporate Governance in East Asia (London: Routledge, 2008)

Global Markets, Domestic Institutions: Corporate Law and Governance in a New Era of
Cross-Border Deals (New York: Columbia University Press, 2003)

**Treatises and Textbooks:**
The Japanese Legal System: Cases, Codes, and Commentary (New York: Foundation Press,
2d ed., 2012) (with J. Mark Ramseyer and Mark D. West) Original edition 2006.

U.S. Corporate Law (Tokyo: Yuhikaku, 2009) (in Japanese)

Japanese Law in Context: Readings in Society, the Economy and Politics (Cambridge:
Harvard University Asia Center, Harvard University Press, 2001) (with J. Mark Ramseyer
and Michael K. Young)

2

**Scholarly Articles:**

"China as a 'National Strategic Buyer': Toward a Multilateral Regime for Cross-Border M&A," Columbia Business Law Review (2019) (with Jeffrey Gordon)

"Evaluating Abe's Third Arrow: How Significant Are Japan's Recent Corporate Governance Reforms?," Journal of Japanese Law (Special Issue 12 (2018)

"Bonded to the State: A Network Perspective on China's Corporate Debt Market," Journal of Financial Regulation (2017) (with Li-Wen Lin)

"Beyond Ownership: State Capitalism and the Chinese Firm," Georgetown Law Journal (2015) (with Wentong Zheng)

"Corporate Governance and Executive Compensation: Evidence from Japan," Columbia Business Law Review (2014) (with Robert Jackson)

"We are the (National) Champions: Understanding the Mechanisms of State Capitalism in China," Stanford Law Review (2013) (with Li-Wen Lin)

"The Evolution of Hostile Takeover Regimes in Developed and Emerging Markets: An Analytical Framework," Harvard International Law Journal (2011) (with John Armour and Jack Jacobs)

"Economically Benevolent Dictators: Lessons for Developing Democracies," American Journal of Comparative Law (2011) (with Ronald Gilson)

"Beyond Legal Origin: Rethinking Law's Relationship to the Economy—Implications for Policy," American Journal of Comparative Law 52: 831-845 (2009)

"Reputational Sanctions in China's Securities Market," Columbia Law Review 108: 929-983 (2008) (with Benjamin Liebman)

"Sovereign Wealth Funds and Corporate Governance: A Minimalist Response to the New Merchantilism," Stanford Law Review 60: 1345-1369 (2008) (with Ronald Gilson)

"In the Shadow of Delaware? The Rise of Hostile Takeovers in Japan," Columbia Law Review 105: 2171-2216 (2005)

"Choice as Regulatory Reform: The Case of Japanese Corporate Governance," American Journal of Comparative Law 53: 343-377 (2005) (with Ronald Gilson)

"Nonprofit Organizations as Investor Protection: Economic Theory, and Evidence from East Asia," Yale Journal of International Law 29: 169-207 (2004)

"Re-Examining Legal Transplants: The Director's Fiduciary Duty in Japanese Corporate Law," American Journal of Comparative Law 51: 887-901 (2003) (with Hideki Kanda)

"Law's Dominion and the Market for Legal Elites in Japan," Law and Policy in International Business 34: 451-498 (2003) (with Mark D. West)

"Creative Norm Destruction: The Evolution of Nonlegal Rules in Japanese Corporate Governance," University of Pennsylvania Law Review 146: 2083-2129 (2001)

"Privatization and Corporate Governance in a Unified Korea," Journal of Corporation Law 26: 200-223 (2001)

"The Dark Side of Private Ordering: An Institutional and Empirical Analysis of Organized Crime," University of Chicago Law Review 67: 41-98 (2000) (with Mark D. West)

"Japan's Experience with Deposit Insurance and Failing Banks: Implications for Financial Regulatory Design?," Monetary and Economic Studies 17: 21-46 (1999)

"Property Rights in Firms," Virginia Law Review 84: 1145-1194 (1998)

"The Small Firm Financing Problem: Private Information and Public Policy," Journal of Small and Emerging Business Law 2: 177-196 (1998)

"Cooperation, Conflict, and Convergence in Japanese Finance: Evidence from the *Jusen* Problem," Law & Policy in International Business 29: 1-78 (1997) (with Geoffrey P. Miller)

"The Market for Innovation in the United States and Japan: Venture Capital and the Comparative Corporate Governance Debate," Northwestern University Law Review 91: 865-898 (1997)

"A Regulatory Cartel Model of Decisionmaking in Japanese Finance," Zeitschrift für Japanisches Recht 4: 18-29 (1997) (with Geoffrey P. Miller)

"A Relational Theory of Japanese Corporate Governance: Contract, Culture, and the Rule of Law," Harvard International Law Journal 37: 3-64 (1996)

"Path Dependence and Comparative Corporate Governance," Washington University Law Quarterly 74: 317 (1996) (with Ronald J. Mann)

"Managing the Market:  The Ministry of Finance and Securities Regulation in Japan," Stanford Journal of International Law 30: 423-481 (1994)

**Book Chapters:**
"Chinese Corporate Capitalism in Comparative Context," *in* Weitseng Chen ed., The Beijing Consensus? How has China Changed the Western Ideas of Law and Economic Development (Cambridge: Cambridge University Press, 2017)

"SOEs and State Governance: How State-Owned Enterprises Influence China's Legal System," *in* Benjamin Liebman & Curtis J. Milhaupt eds., Regulating the Visible Hand? The

Institutional Implications of Chinese State Capitalism (Oxford: Oxford University Press, 2016)

"Reforming China's State-Owned Enterprises: Institutions, Not Ownership," *in* Liebman & Milhaupt eds.

"Is the U.S. Ready for FDI from China? Lessons from Japan's Experience in the 1980s," *in* Karl Sauvant ed., Investing in the United States: Is the U.S. Ready for FDI from China? (Cheltanham, UK: Edward Elgar, 2009)

"A Lost Decade for Corporate Governance Reform in Japan? What Has Changed, What Hasn't, and Why" *in* Magnus Blomstrom & Sumner La Croix eds., Institutional Change in Japan (London: Routledge, 2006)

"Historical Pathways of Reform: Foreign Law Transplants and Japanese Corporate Governance" *in* Klaus Hopt et al. eds., Corporate Governance in Context: Corporations, States, and Markets in Europe, Japan and the U.S. (Oxford: Oxford University Press, 2005)

"Institutional Change and M&A in Japan: Diversity through Deals" *in* Curtis Milhaupt ed., Global Markets, Domestic Institutions: Corporate Law and Governance in a New Era of Cross-Border Deals (New York: Columbia University Press, 2003)

**Review and Commentary:**
"Why Mixed Ownership Reforms Cannot Fix China's State Sector," Paulson Institute web site (2016)

"On the (Fleeting) Existence of the Main Bank System and Other Japanese Economic Institutions," Law and Social Inquiry 27: 425-437 (2001)

**Works Written in or Translated into Japanese:**
U.S. Corporate Law (Tokyo: Yuhikaku, 2009) (written in Japanese)

"In the Shadow of Delaware? The Rise of Hostile Takeovers in Japan," Jurisuto 1315: 88-95; 1316: 100-108 (2006) (translation in Japan's leading law journal)

"Choice as Regulatory Reform: The Case of Japanese Corporate Governance" *in* Hideki Kanda ed., Koporeto gabanansu ni okeru shoho no yakuwari (Tokyo: Chuo Keizai, 2004) (written in Japanese)

"The Dark Side of Private Ordering," Leviathan 30: 178-212 (2002) (translation in Japan's leading political science journal)

"What Can Japan Learn from the United States: Reflections based on My Experience at Columbia," Shiho Kaikaku 17: 31-35 (2001) (written in Japanese)

"The *Jusen* Problem in Japanese Finance: A Legal and Economic Analysis," Jurisuto 1132: 140-149; 1134: 86-92; 1136: 86-92 (1998) (with Geoffrey P. Miller) (translation in Japan's leading law journal)

"The Lawyer's Role in Business Transactions: Japan and the United States in Comparative Perspective," Amerikaho 1996-2: 266-274 (1996) (written in Japanese)

**Selected Works Translated into Other Foreign Languages:**
Law and Capitalism translated into Chinese
Numerous scholarly articles translated into Chinese, Portuguese, Spanish and German

**Grants Received:**
Abe Fellowship Program of the Social Science Research Council and the American Counsel of Learned Societies, with funding by the Center for Global Partnership, 2002
Center for International Political Economy, 2001-2002
Japan Foundation Fellowship, 1992-1993
Monbusho (Japanese Ministry of Education) Fellowship, 1984-1986

**Academic Honors:**
Phi Beta Kappa
Three articles chosen as "The Best Corporate and Securities Articles of the Year" (peer election process)

**Teaching Honors:**
Best Teacher in Law and Finance, Masters in Law and Finance Program, Duisenberg School of Finance, University of Amsterdam, 2011-2012; 2009-2010.

**Conferences Organized:**
Business Transactions and Corporate Governance in Asia, Sept. 8-9, 2018, National University of Singapore
Chinese State Capitalism, June 13-14, 2014, Columbia Law School
Japanese Immigration Policy, November 5, 2010, Columbia Law School
M&A and the Law, Tokyo, Japan, June 18, 2010
Evaluating Japan's New Jury (Saiban-in) System, November 5, 2008, Columbia Law School
M&A in Japan, October 12, 2007, Columbia Law School
Gatekeepers and Corporate Governance, August 2, 2005, Tokyo Japan
Hostile M&A and the Poison Pill in Japan: Prospects and Policy, June 13, 2003, Tokyo Japan
Global Markets, Domestic Institutions: Corporate Law and Governance in a New Era of Cross-Border Deals, October 25-26, 2001 and April 5-6, 2002, Columbia Law School
Japanese Law Research Conference, April 4-5, 1998, Washington University School of Law

**Representative Speaking Engagements (Past Five Years)**
Toward a Multilateral Regime for Cross-Border M&A, Distinguished Lecture, National University of Singapore, September 2018
Related-Party Transactions in State-Owned Enterprises, Goethe University, Frankfurt, October 2017
Bonded to the State: A Network Perspective on China's Corporate Debt Market, Global Corporate Governance Colloquium of the European Corporate Governance Institute, Stockholm, June 2016

6

Abenomics and Japanese Corporate Governance Reform, Hawaii State Bar Committee on International Law, Dec. 2015
Roundtable on State-Owned Enterprises, Duke University, Dec. 2015
Party-State Inc., Eighth Annual William Jones Distinguished Lecture, Washington University in St. Louis, Feb. 2015
Japanese Corporate Governance Reform, Japan Society Corporate Breakfast, Feb. 2015
Chinese Corporate Capitalism in Comparative Context, National University of Singapore, Jan. 2015
Chinese State Capitalism, East China University of Political Science and Law, Nov. 2014
Executive Compensation in Japan, Hawaii State Bar Committee on International Law, July 2014
Institutional Implications of Korean Unification, Columbia Univ. Aug 2014
Assessing Chinese Variable Interest Entities, Cornell Law School, Feb. 2014
Beyond Ownership: State Capitalism and the Chinese Firm, NYC Bar Assoc., Feb. 2014

**Major Administrative Experience (Columbia Law School):**
Chair, Global Initiatives Task Force, 2015-2016
Vice Dean for Intellectual Life, 2010-2011
Chair, Curriculum Committee, 2008-2009
Co-Chair, Comparative and International Law Committee, multiple years since 2012
Chair, Transactional Studies Program, 2004-2005
Member, Appointments Committee, 2009-2010; 2003-2005; 1999-2000;
Member, Dean Search Committee, 2004

**Past Advisory Positions:**
Senior Faculty Advisor, Vale Columbia Center on Sustainable International Investment
Advisory Board, *Columbia Transnational Law Journal*
Advisory Board, Asian Institute of International Financial Law, Hong Kong University
Board of Directors, *Columbia Journal of Asian Law*

**Government Testimony**
U.S.-China Economic and Security Review Commission, February 15, 2012

**Other Professional Experience:**
Associate, Shearman & Sterling, New York and Tokyo, 1989-1994
Handled cross-border mergers and acquisitions transactions, sovereign debt restructurings, bank regulatory work, and a range of pro bono matters.

**Bar Admissions and Professional Associations:**
Member, New York State Bar
Member of the American Law Institute (elected March 2009)

**Media Appearances:**
*New York Times, Wall Street Journal, The Economist, Financial Times, CNBC, NHK Television, Bloomberg News, Straits Times of Singapore, Sirius XM*

**Foreign Language:**
Japanese