MARIO N. ALIOTO (SBN 56433)
JOSEPH M. PATANE (SBN 72202)
LAUREN C. CAPURRO (SBN 241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA 94123
Telephone: (415) 563-7200
Facsimile: (415) 346-0679
Email: malioto@tatp.com; jpatane@tatp.com; laurenrussell@tatp.com

*Lead Counsel for the Indirect Purchaser Plaintiffs*
[Additional Counsel Appear on Signature Page]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>*ALL INDIRECT PURCHASER ACTIONS* | Master File No. 07-CV-5944-JST<br><br>MDL No. 1917<br><br>**INDIRECT PURCHASER PLAINTIFFS' OPPOSITION TO THE IRICO DEFENDANTS' AMENDED MOTIONS TO DISMISS CLAIMS OF INDIRECT PURCHASER PLAINTIFFS FOR LACK OF SUBJECT MATTER JURISDICTION (FED. R. CIV. P. 12(b)(1)) (ECF Nos. 5409, 5411)**<br><br>Date: May 30, 2019<br>Time: 2:00 p.m.<br>Judge: Honorable Jon S. Tigar<br>Courtroom: 9 |

## TABLE OF CONTENTS

INTRODUCTION ..... 1

STATEMENT OF RELEVANT FACTS ..... 3

I. Display Is Not an Organ of the Chinese Government ..... 3

II. Group and Display Participated in a Global Conspiracy to Fix CRT Prices that Had a Direct Effect in the United States ..... 4

III. Group and Display Sold Substantial Quantities of CRTs to the United States ..... 6

ARGUMENT ..... 11

I. Display Is Not Entitled to Sovereign Immunity Because It Is Not an Organ of the Chinese Government ..... 11

A. Display Was Created as an Autonomous Joint-Stock Company with No Sovereign Functions ..... 12

B. Display Functioned as an Ordinary Commercial Entity ..... 13

C. Chinese Laws and Regulations Do Not Show that Display Operated as a Governmental Entity or that Its Employees Were Public Servants ..... 14

D. Display Did Not Receive Unusual or Substantial Governmental Financial Support ..... 16

E. Display Did Not Have Special Privileges or Obligations ..... 17

F. Display Improperly Relies on Inadmissible and Contradictory Statements Made in the Wang Declaration ..... 17

II. Group and Display Engaged in Commercial Activities that Caused Direct (and Harmful) Effects in the United States ..... 18

A. The Legal Standard: Sovereign Immunity Does Not Apply When the Claims at Issue Arise from Defendants' Commercial Activities that Have a Direct Effect in the U.S. ..... 18

B. IPP's Claims Arise from Irico's Actions Performed in Connection with Irico's Commercial Activities ..... 20

C. These Commercial Activities Proximately Caused Harm in the United States ..... 20

1. Participation in a Global Price-Fixing Conspiracy Causing Increased Prices in the United States Satisfies the FSIA's Direct Effect Requirement .......... 20

2. Direct CRT Sales to the United States by Group and Display Are Not Required to Prove Direct Effect .......... 23

CONCLUSION .......... 26

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adler v. Fed. Republic of Nigeria*, 107 F.3d 720 (9th Cir. 1997) .......... 20

*Alperin v. Vatican Bank*, No. C-99-04941 MMC, 2007 WL 4570674 (N.D. Cal. Dec. 27, 2007), *aff'd*, 360 F. App'x 847 (9th Cir. 2009), *amended in part*, 365 F. App'x 74 (9th Cir. 2010) .......... 13, 17

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) .......... 24

*Atlantica Holdings Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98 (2d Cir. 2016) .......... 25

*Cal. Dept. of Water Resources v. Powerex Corp.*, 533 F.3d 1087 (9th Cir. 2008) .......... 13

*Cal. v. NRG Energy Inc.*, 391 F.3d 1011 (9th Cir. 2004) .......... 23

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011 (N.D. Cal. 2010) .......... 24

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2014 WL 2581525 (N.D. Cal. June 9, 2014) .......... 22

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 27 F. Supp. 3d 1002 (N.D. Cal. 2014) .......... 25

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 5725008 (N.D. Cal. Sept. 30, 2016) .......... 6, 22

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2018 WL 659084 (N.D. Cal. Feb. 1, 2018) .......... 19, 20, 21

*De Csepel v. Republic of Hungary*, 714 F.3d 591 (D.C. Cir. 2013) .......... 19

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003) .......... 11

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981 (9th Cir. 2008) .......... 19

*EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*, 322 F.3d 635 (9th Cir. 2003) .......... 12

*EOTT Energy Operating Ltd. P'Ship v. Winterthur Swiss Ins. Co*.,
257 F.3d 992 (9th Cir. 2001) ..................... 11

*Filetech S.A. v. France Telecom, S.A.*,
212 F. Supp. 2d 183 (S.D.N.Y. 2001) ..................... 23

*Gates v. Victor Fine Foods*,
54 F.3d 1457 (9th Cir. 1995) ..................... 13

*Gregorian v. Izvestia,*
871 F.2d 1515 (9th Cir. 1989) ..................... 20

*Harrison v. E. I. Dupont De Nemours and Co.*,
2016 WL 3231535 (N.D. Cal. June 13, 2016) ..................... 24

*Lexmark Intern., Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ..................... 25

*Lyon v. Agusta S.P.A.*,
253 F.3d 1078 (9th Cir. 2001) ..................... 19, 20

*In re North Sea Brent Crude Oil Futures Litig.*,
2016 WL 1271063 (S.D.N.Y. Mar. 29, 2016) ..................... 24

*NXP Semiconductors USA, Inc. v. Brevets, S.A.S.*,
2014 WL 4621017 (N.D. Cal. Sept. 15, 2014) ..................... 13

*Patrickson v. Dole Food Co.*,
251 F.3d 795 (9th Cir. 2001),
*aff'd in part, cert. dismissed in part*, 538 U.S. 468 (2003) ..................... 13, 16

*Perez-Encinas v. AmerUs Life Ins. Co.*
468 F. Supp. 2d 1127 (N.D. Cal. 2006) ..................... 25

*Republic of Argentina v. Weltover, Inc.*,
504 U.S. 607 (1992) ..................... 19, 20, 24, 25

*Sea Breeze Salt, Inc. v. Mitsubishi Corp.*,
2016 WL 8648638 (C.D. Cal. Aug. 18, 2016) ..................... 19, 21

*Sea Breeze Salt Inc. v. Mitsubishi Corp.,*
899 F.3d 1064 (9th Cir. 2018) ..................... 21

*Sec. Pac. Nat'l Bank v. Derderian,*
872 F.2d 281 (9th Cir.1989) ..................... 25

*Terenkian v. Republic of Iraq*,
694 F.3d 1122 (9th Cir. 2012) ..................... 11, 20, 24, 25

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
822 F. Supp. 2d 953 (N.D. Cal. 2011) ..................... 22

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
2011 WL 6148677 (N.D. Cal. Dec. 7, 2011) ..................... 24

*U.S. v. Hsiung*,
778 F.3d 738 (9th Cir. 2015) .......... 21. 22

*USX Corp. v. Adriatic Ins. Co.*,
345 F.3d 190 (3d Cir. 2003) .......... 12, 15

*Wholesale Elec. Antitrust Cases I & II,*
Nos. 02-cv--0990-RHW, 02-cv-1000-RHW, 02-cv-1001-RHW,
2002 WL 34165887 (S.D. Cal. Dec. 17, 2002), .......... 23

*Verlinden B.V. v. Cent. Bank of Nigeria*,
461 U.S. 480 (1983) .......... 11

**Rules and Statutes**

7 Tex. Stat. §32.43 .......... 15

28 U.S.C §§ 1602-11 .......... 1

28 U.S.C. § 1603 .......... 11, 19

28 U.S.C. § 1605(a)(2) .......... 18, 19, 25, 26

Ann. Cal. Penal Code § 641.3 .......... 15

Col. Rev. Stat. Ann. § 18-5-401 .......... 15

Conn. Gen. Stat. Ann. § 53a-160 .......... 15

Fed. R. Civ. P. 56(c)(4) .......... 17

Fed. R. Evid. Rule 602 .......... 17

Fla. Stat. Ann. § 838.16 .......... 15

Foreign Corrupt Practices Act (15 U.S.C. §§ 78dd-1, et seq.) .......... 15

Foreign Sovereign Immunities Act (28 U.S.C §§ 1602-11) .......... *passim*

Kansas Stat. Ann. § 21-4405 .......... 15

Kent. Rev. Stat. § 244.600 .......... 15

Kent. Rev. Stat. § 518.020 .......... 15

Minn. Stat. Ann. § 609.86 .......... 15

Miss. Code Ann. § 97-9-10 .......... 15

Mo. Stat. § 570.150 .......... 15

Neb. § 28-613 .......... 15

Nev. Rev. Stat §207.295 .......... 15

Wash. § 9A. 68.060 .................................................................................................................. 15

vi
IPPS' OPPOSITION TO THE IRICO DEFENDANTS' MOTIONS TO DISMISS
Master File No. 07-cv-5944-JST; MDL No. 1917

The Indirect Purchaser Plaintiffs ("IPPs") hereby respond to the amended motions filed by Irico Group Corporation ("Group") (ECF No. 5409) ("Group. Mot."), and Irico Display Devices, Co., Ltd. ("Display") (ECF No. 5411) ("Display Mot.") seeking to dismiss this action on the basis that the Court lacks subject matter jurisdiction. Group and Display claim they are each entitled to sovereign immunity pursuant to the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. §§ 1602-11. For the reasons stated herein and in the opposition to the amended motions filed by the Direct Purchaser Plaintiffs on April 1, 2019 (ECF No. 5419) ("DPP Opp."), this Court should deny these motions. To avoid unnecessary duplication and in the interests of efficiency, the IPPs hereby adopt and incorporate the factual presentation and arguments presented by the DPPs.

## INTRODUCTION

During the class period (from 1995-2007), Group and Display (together "Irico") manufactured, marketed and sold cathode ray tubes ("CRTs") in the global CRT market. As part of their pursuit of this business, Irico participated in a global conspiracy to fix prices of CRTs sold in the United States and elsewhere.

Apparently unable to contest the substantial evidence of their participation in the CRT conspiracy, Group and Display seek to avoid liability by claiming that each is entitled to "sovereign immunity" under the FSIA as "organs" of the People's Republic of China ("PRC"). *See* 28 U.S.C. §§ 1602-11. But instead of presenting facts that would entitle them to immunity on their factual challenge to jurisdiction, they reargue legal positions this Court has already rejected. As the DPPs demonstrate, there is no basis to revisit this Court's prior legal analysis and its conclusion that Irico's participation in the conspiracy and the conspiracy's effect of raising prices in U.S. is sufficient to establish a direct effect under the FSIA. *See* DPP Opp. at 31-32.

Moreover, the facts establish that neither Group nor Display can invoke "sovereign immunity" to shield them from liability for their participation in the conspiracy to fix CRT prices. The FSIA provides "sovereign immunity" only for foreign governments and their agencies and/or instrumentalities. An entity can establish its instrumentality status as of the time the complaint was filed only by showing either that the government held a direct, majority ownership stake or that the entity was an "organ" of the state. Display was not directly owned by the Chinese government and

it operated as an independent commercial entity. It does not qualify under the FSIA as an instrumentality or organ of the PRC.

Further, while Group may be deemed an instrumentality, neither Display nor Group can escape liability because the claims asserted arise out of Irico's commercial activity that caused "direct effects" in the United States. IPPs' claims against Group and Display arise from their participation in a price-fixing conspiracy to further their international CRT business. Group and Display sold millions of dollars of their price-fixed CRTs into the United States through Group's wholly-owned subsidiary, China National Electronics Import & Export Caihong Company ("Import-Export"). Many of those sales were to Irico (USA) Inc. ("Irico USA")—a California company formed by Group and Import-Export.

Group and Display also targeted the United States through substantial sales of its price-fixed CRTs to foreign television manufacturers, with the knowledge that those customers were selling large quantities of televisions containing Irico CRTs into the United States. CRTs were the main component for CRT televisions and computer monitors, accounting for approximately 50% of the manufacturing cost. After conducting extensive analyses of the global CRT market, IPPs' expert Dr. Janet S. Netz estimated that the artificially inflated CRT prices caused television and monitor prices in the United States to rise by 9% (televisions) and 25% (monitors).

In short, Display has failed to meet its burden to demonstrate its "organ" status. Even more crucially, Group and Display reaped tremendous benefits at the expense of American businesses and consumers, who paid billions of dollars more than they should have for televisions and computer monitors containing their (and their co-conspirators') CRTs. Allowing Group and Display to exploit the FSIA to avoid antitrust liability despite their commercial activities would leave U.S. businesses and consumers uncompensated for their injuries. This was not the intended purpose when Congress enacted the FSIA.

## STATEMENT OF RELEVANT FACTS

### I. Display Is Not an Organ of the Chinese Government

During the class period, Group and Display engaged in a commercial business: the design, manufacture, marketing and sale of CRTs used in making televisions and computer monitors.[1] Display was "established and organized in strict accordance with a standardized stock corporation."[2] It became a publicly listed company shortly after its formation.[3] Its initial public offering in 1995 limited its shareholdings to no more than 50%, with the remainder of its shares held by the public investors.[4] Display's offering prospectus shows it was established as an independent, commercial entity.[5] It has always been an independent profit-making entity for "conduct[ing] autonomous business operations," "responsible for its own profits and losses," set up to "develop under its own direction," and "abide by its own binding operational mechanisms."[6] Display has no regulatory functions and its officers are not directly appointed by the government.[7]

---

[1] *See* Amended Declaration of Zhaojie Wang (ECF No. 5412-1) ("Wang Decl.") at ¶¶ 5, 43; Request for Instructions Regarding Formation of Irico Group Corporation, ECF No. 5413-1 (Am. Plunkett Decl, Ex. 6) at IRI-CRT-00000530 ("IRICO Group Corporation . . . set its goal to compete in the domestic market, the international market and with enterprise groups overseas . . . . It will become an independently operated, self-supporting, closely-knit economic entity that has comprehensive functions such as scientific research and development, production and sales."). Display describes its "main business" during the class period as "[r]esearch, development, and manufacture of color picture tubes, display tubes, color televisions, displays and paired products, electronic devices, electronic vacuum devices, and electronic products." *See* Irico Display Devices Co., Ltd, 2007 Annual Report ("2007 Display Annual Report"), ECF No. 5413-1 (Am. Plunkett Decl., Ex. 2) at IRI-CRT-00000239; *see also id.* at IRI-CRT-00000247, IRI-CRT00000259.

[2] Official Response Concerning the Approval to Establish IRICO Display Devices, Co., Ltd. ("Official Response"), ECF No. 5413-7 (Am. Plunkett Decl., Ex. 44) at IRI-CRT-00000853.

[3] Prospectus for Shares of "IRICO", ECF No. 5413-4 (Am. Plunkett Decl., Ex. 31).

[4] *Id.* at IRI-CRT-00000667-68 ("The shares subscribed for by the promoters accounted for 50% of the total share capital . . . social legal entities subscribed for 20% of the total share capital . . .; and the remaining 30% were issued as individual shares").

[5] Display's public offering prospectus declared the commercial purpose of the offering was to "contribute to the development of [China's] electronic products such as color displays," to "promote the development of the economy of [Irico]," and to "better develop domestic and foreign markets." *Id.* at IRI-CRT-00000668. This offering *reduced* state-owned equity and the government's role in Display. Indeed, by 2007, the Chinese government owned none of Display's shares directly. 2007 Display Annual Report, ECF No. 5413-1 (Am. Plunkett Decl., Ex. 2) at IRI-CRT-00000276.

[6] Official Response, ECF No. 5413-7 at IRI-CRT-00000854.

[7] *See* 2006 Display Articles of Association, ECF No. 5418-5 (Saveri Decl., Ex. 5) at IRI-CRT-00001028; Aug. 15, 2007 Display Announcement of Self-Inspection Report, ECF No. 5418-5 (Saveri Decl., Ex. 3) at 2E.

Display's corporate governing documents do not give the government the right to control its business affairs. Its Articles of Association expressly limit the Chinese government's influence on the company's business: "[T]he controlling shareholders and the actual controllers shall not interfere directly or indirectly with [Display's] decision-making and the production and business activities."[8] Display operated in accordance with these provisions to ensure its independence from its governmental shareholders.[9] While government regulations (described below) set standards for the government's role in corporations of which it owns a part, they did not create a government fiat allowing it to choose and remove management.

## II. Group and Display Participated in a Global Conspiracy to Fix CRT Prices that Had a Direct Effect in the United States

Compelling evidence confirms the existence of a global conspiracy to fix the prices of CRTs. IPPs have documentary and testimonial evidence

.[11] There is also compelling evidence that .[12]

[8] 2006 Display Articles, ECF No. 5418-5, Art. 45. Article 46 further requires that "[t]he controlling shareholders and [Display] shall ensure the independence of their personnel, assets, financial affairs, with independent institutions and businesses, independent accounting, responsibilities and risks." Art. 46; *see also* Arts. 47-51.

[9] *See* 2007 Display Annual Report, ECF No. 5413-1 at IRI-CRT-00000244-46.

[10] *See* Supplemental Attachment A to IPPs' Interrogatory Responses ), ECF No. 3281-8 (sealed) ).

[11] *See* April 15, 2014 Expert Report of Janet S. Netz, Ph.D ("Netz Report"), ECF No. 3281-9 & 10, Ex. 1.

The evidence further establishes that the conspiracy was successful and artificially inflated global CRT prices, including prices in the United States.[13] The U.S. was a major market for CRT products during the class period; cartel participants knew their conspiracy would impact U.S. commerce and customers and they intended that result.[14] C.C. Liu, the former Vice President of Chunghwa Picture Tubes, Ltd. ("Chunghwa"), a Chinese company, [redacted], testified that [redacted]).[15]

U.S. consumers bore the brunt of the artificially inflated CRT prices when they purchased televisions and computer monitors containing those price-fixed CRTs. CRTs are the main component of CRT televisions and monitors,[16] and they are a direct (or variable) cost of assembling the finished product.[17] Where material direct (or variable) costs of production change, the ordinary consequence is for some or all of that cost change to be passed on to purchasers of the ultimate product—here CRT televisions and computer monitors.[18]

---

[redacted]

[13] *See* Netz Report, ECF No. 3281-9 & 10 at 26-81 [redacted]) and 96-106 ([redacted] *See also* Leitzinger Report, ECF No. 5191-2, at ¶¶ 49, 58-59, 160-61, 173-74.

[14] *See* Netz Report, ECF No. 3281-9 & 10 at 1, 72-81 & n. 247& n. 247 ([redacted]; Leitzinger Report, ECF No. 5191-2, ¶ 59, n. 129.

[15] Alioto Decl. Ex. 34, Deposition of Chih Chun (C.C.) Liu ("Liu Dep.") at 300:23-301:25 [redacted], 420:8-421:10, 435:10-24.

[16] Netz Report, ECF No. 3281-9 & 10, Ex. 58 ([redacted]); *see also* Alioto Decl., Ex. 1 (Irico Electronics 2004 Annual Report) at 2 ("CPT is the core component of a cathode ray tube ('CRT') television set, accounting for about 50% of the aggregate cost of all of the components of a CRT television set.").

[17] Complaint, ECF No. 1526, ¶ 233; *see* Netz Report, ECF No. 3281-9 & 10 at 6 and 82-96.

[18] Complaint, ECF No. 1526, ¶¶ 237-240; *see* Netz Report, ECF No. 3281-9 & 10 at 82-96 ([redacted]).

As this Court has recognized, "CRTs have no other viable function except as a component part in" televisions and computer monitors.[19] Thus, the demand for and sales of CRT products drives the CRT market. As a result, fixing CRT prices naturally and inevitably led to increases in the price of CRT products sold in the United States and elsewhere. In all, [REDACTED] with damages to IPP class members exceeding $2.768 billion.[20]

## III. Group and Display Sold Substantial Quantities of CRTs to the United States

During the relevant period, Irico billed itself as the largest CPT manufacturer in China, which sought "to develop overseas market[s] . . . and endeavor[ed] to increase its global market shares."[21] In 2004, Irico sought to capitalize on the shut downs of "production lines of CRT televisions and CPTs in Europe *and America* and the trend of moving such production lines to developing countries such as the PRC."[22] Irico recognized—correctly—that the shut downs of production lines in Europe and America would mean "[t]he PRC's status as a global manufacturing center for color television sets and color CPTs will be further strengthened[,]" and "[t]he export of color televisions and CPTs in the PRC will keep growing fast," providing "Group . . . excellent prospects for future development."[23] By the end of the class period in 2007, Irico had successfully

---

[19] *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 5725008, at *1 (N.D. Cal. Sept. 30, 2016).

[20] Netz Report, ECF No. 3281-9 & 10 at 123; Alioto Decl., Ex. 38 (Errata to Netz Report).

[21] Alioto Decl., Ex. 1 (Irico Electronics 2004 Annual Report) at 8. This Annual Report describes the corporate relationship between Electronics and Group as follows: "IRICO Group Electronics Company Limited (the "Company") was incorporated . . . on 10 September 2004. It was established with the contribution made by IRICO Group Corporation, the controlling shareholder and sole promoter of the Company, in respect of its assets of production and sales of color picture tubes ("CPTs") in its related core businesses."

[22] *Id.* (emphasis added).

[23] *Id.* It was common knowledge in the CRT industry that Chinese television manufacturers were supplying large quantities of CRT televisions to the U.S. market. [REDACTED] produced by Chinese defendant Beijing Matsushita Color CRT Co., Ltd., states: [REDACTED] Alioto Decl., Ex. 2 (BMCC-CRT000105538-57 at 105542) (emphasis added).

increased its market share to 22.3% of the Chinese CPT market and 13.8% of the global market, making it the third largest CPT maker in the world.[24]

One of the ways Irico increased its global market share was by selling CRTs into the United States through Import-Export, Group's wholly-owned subsidiary.[25] As Irico has acknowledged in response to information requests, Group and Display "exported products exclusively through" Import-Export prior to the formation of Irico Electronics ("Electronics") in September 2004.[26] This 2009 Response attaches a spreadsheet purportedly containing Group and Display's "CRT exports from 2000 to the present."[27] The spreadsheet reflects substantial exports of Irico CRTs to various countries (but not the United States) by Import-Export — exports which Group and Display expressly claimed as "*their* CRT exports."[28] Now that Plaintiffs have uncovered evidence that [redacted], Group and Display attempt to distance themselves from Import-Export and disclaim all knowledge or ownership of those U.S. exports.[29]

---

[24] *See* Alioto Decl., Ex. 3 (Irico Electronics 2006 Annual Report) at 2, Ex. 4 (Irico Electronics 2007 Annual Report) at 13.

[25] *See* Group's 2002 Master Plan for Separating Principal and Second Businesses, ECF No. 5421-1 (Saveri Decl., Ex. 1) at IRI-CRT-00002105 (stating that Import-Export's "actual assets, personnel, and business all belong[ed] to IRICO Group Corporation"); Request for instructions about Overall Plan for the Separation, Restructuring and Diversion of Primary and Secondary Service of Irico Group Corporation, ECF No. 5413-8 (Amended Plunkett Decl., Ex. 49) at IRI-CRT-00000999 (2004 Group submission to China's Ministry of Finance contains a chart showing Import-Export as a "wholly owned company" of Group). *See also* Selected Records of DBF file, ECF No. 5421-1 (Saveri Decl. Ex. 15) (showing total sales to "IRICO USA" and "G.P.X. Inc." of $8.02 million); ECF No. 5419-2 (Hwu Decl. ¶¶ 5-7 discussing Saveri Decl. Ex. 15); *see also* ECF No. 5421-1 (Saveri Decl., Exs. 12, 16).

[26] *See* January 15, 2009 Response of Irico Group Corporation and Irico Display Devices Co., Ltd. to Plaintiffs' Information Requests (the "2009 Response"), ECF No. 5220-10 at 1. Irico Electronics was described by Irico's former counsel as "a new subsidiary…formed to handle sales and export functions for all the IRICO Companies." *Id.*

[27] *Id.* at 1.

[28] *Id.* at IRICO-00011-22.

[29] Alioto Decl., Ex. 5 (Zhang Dep. (Mar. 4, 2019) ("Zhang Dep. I")) 42:4-17, 43:8-11; Ex. 6 (Zhang Dep. (Mar. 5, 2019) ("Zhang Dep. II")) 18:10-17, 26:9-27:7, 62:10-25; Ex. 7 (Wang Dep. (Mar. 6, 2019) ("Wang Dep. I")) 43:20-44:7; Group Mot. at 12-13; Display Mot. at 20.

Group also targeted the U.S. market [redacted].[30] According to Irico's sworn interrogatory responses, [redacted]"[31] [redacted]"[32] [redacted][33] [redacted][34]

In addition to CRT sales into the United States through Import-Export and Irico USA, Group and Display also sought to access the all-important U.S. market through substantial sales of CRTs to Chinese television manufacturers, with knowledge that those manufacturers were selling large quantities of televisions containing Irico CRTs into the United States. In a publicly available "Global Offering" prospectus published by Electronics on December 8, 2004,[35] Electronics admitted that its "major customers" TCL, Skyworth, Konka, Changhong, and Hisense sold CRT television sets containing Irico CPTs into the United States, and that those customers were the subject of an April 2004 anti-dumping order by the United States Department of Commerce.[36]

---

[30] Alioto Decl., Ex. 10 (Irico Defendants' Suppl. Objections and Responses to Indirect Purchaser Plaintiffs' Second Set of Interrogatories, Suppl. Response to Interrogatory No. 4); *see also* Saveri Decl., Exs. 20-21.

[31] Alioto Decl., Ex. 10.

[32] *Id.*

[33] *Id.*

[34] *See* ECF No. 5421-1 (Saveri Decl., Ex. 15) [redacted]); *see also id.* (Saveri Exs. 12, 16) ([redacted]); Alioto Decl., Exs. 12-17.

[35] *See* Alioto Decl., Ex. 18 ( Irico Group Electronics Co. Ltd. Global Offering Prospectus, dated December 8, 2004, *available at* http://www.irico.com.cn/en/wp-content/uploads/2014/04/LTN20041208000.pdf.

[36] Alioto Decl., Ex. 18 at 33; *see also id.* at 26 (listing Irico's "major customers" as TCL, Skyworth, Konka, Changhong and Hisense); Alioto Decl., Ex. 1 (Electronics' 2004 Annual Report in which the same Chinese television manufacturers are listed as Irico's "major customers."); Alioto Decl., Ex. 9 (Wang Dep. III) 24:24-25:8 [redacted].

Electronics sought to reassure prospective investors that "the United States anti-dumping order [would not] have a significant impact on [Irico's] business, because we generate approximately 60% of our sales from CPTs that are 21" or smaller, which will not be affected by the dumping margin."[37] This prospectus thus acknowledges not only that Irico's CPTs larger than 21" were being sold to the United States, but also that Irico's CPTs of 21" or smaller were also being sold into the United States.

Group and Display [redacted][38] Indeed, Irico's sales of CPTs to these customers accounted for 59.27% of their total sales in 2001, 59.35% in 2002, 63.53% in 2003, and 67.09% in the first six months of 2004.[39]

Other publicly available information and evidence produced in this litigation by other parties[40] confirms that [redacted],[41] and that [redacted].[42] These documents (and many others) demonstrate that Irico's alleged co-conspirators [redacted]

---

[37] Alioto Decl., Ex. 18 at 33.

[38] *See* Alioto Decl., Exs. 10-11 (Irico's Supplemental Objections and Responses to IPPs' Second Set of Interrogatories and Irico's Corrected Supplemental Objections and Responses to IPPs' Second Set of Interrogatories), [redacted]

[39] Alioto Decl., Ex. 18 at 26.

[40] In response to IPPs' discovery requests relating to Irico's sales into the United States through its customers, [redacted] *See* Alioto Decl., Exs. 10-11. [redacted] *See* Alioto Decl., Ex. 39 (Irico's Third Supplemental Objections and Responses to IPPs' First Set of RFPs, Supp. Resp. to RFP No. 18 ([redacted] Group and Display's Rule 30(b)(6) witness, Zhang, testified that [redacted] Alioto Decl., Ex. 5 (Zhang Dep. (Mar. 4, 2019) ("Zhang Dep. I")) 84:11-86:15. As a result of Irico's destruction of responsive materials, IPPs have been forced to rely upon information produced by other parties to this litigation and publicly available information.

[41] *See, e.g.*, Alioto Decl., Ex. 19, CHU00690421 ([redacted]; Ex. 20, SDCRT-0202827.

[42] *See id.*, Ex. 21, MTPD-0573273.



[redacted] Thanks to their frequent meetings and communications with each other and with their customers, [redacted].[43] As a result, they also knew [redacted].[44]

The evidence also shows that [redacted].[45] [redacted][46] [redacted].[47] Thus, Irico was well aware that its CPTs were destined for sale in the United States.

---

[43] *See, e.g.*, *id.*, Ex. 22, PHLP-CRT-010948 ([redacted]. *See id.*, Ex. 23 ([redacted]).

[44] *Id.*, Ex. 22 at slide 4; *see also* fns. 45-47, *infra*.

[45] *See, e.g.*, Alioto Decl., Ex. 24, PHLP-CRT-154896-898 ([redacted]; Ex. 25, PHLP-CRT-155234-36, Ex. 27, BBYCRT053101, Ex. 28, CHU00124400 ("[redacted]), Ex. 29, MTPD-0523073-79 ([redacted], Ex. 30 CHU00572996-98, 573026 and 573034 ([redacted].

[46] *See, e.g.*, Alioto Decl., Ex. 28, CHU00124396 ([redacted]), Ex. 32, CHU00124417-19 ([redacted].

[47] *See, e.g.*, Alioto Decl., Ex. 33, CHU00689067-68 ([redacted]). Advanced Television Systems Committee (ATSC) standards are a set of standards for digital television transmission used mostly in the United States, Mexico and Canada. *See* https://en.wikipedia.org/wiki/ATSC_standards. *See also* Netz Report,

## ARGUMENT

### I. Display Is Not Entitled to Sovereign Immunity Because It Is Not an Organ of the Chinese Government

The FSIA establishes a comprehensive framework governing the extent to which "foreign sovereigns may be held liable in a court in the United States." *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 496-97 (1983). Only "foreign states" can claim FSIA protection. An entity claiming sovereign immunity under the FSIA bears the burden of establishing that it fits within the FSIA's definition of "foreign state." *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012).

The FSIA defines "foreign state" to include any "agency or instrumentality of a foreign state." 28 U.S.C. § 1603. An entity can establish that it fits within the FSIA's definition of agency or instrumentality by showing that either (1) a majority of its shares were owned by the foreign state or political subdivision, or (2) it was an "organ" of the state. *See* 28 U.S.C. § 1603(b)(2). The FSIA recognizes, however, that many countries engage in commercial activities as market participants and, consequently, it codifies what commentators have called the "restrictive theory" of foreign sovereign immunity, under which foreign states may be sued for their "commercial activities." *Verlinden,* 461 U.S. at 487-88.

Display does not fit within the category of entities presumptively immune because the Chinese government did not directly own a majority of Display's shares. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 477 (2003) ("A corporation is an instrumentality of a foreign state under the FSIA only if the foreign state itself owns a majority of the corporation's shares."). Moreover, Display does not qualify as one of the Chinese government's "organs."

To determine whether Display is an "organ of the Chinese state," this Court must consider whether Display engaged in public activities on behalf of the Chinese government. *EOTT Energy Operating Ltd. P'Ship v. Winterthur Swiss Ins. Co*., 257 F.3d 992, 997 (9th Cir. 2001). In making this determination, courts weigh a number of factors, including "the circumstances surrounding the

---

ECF No. 3281-9 & 10 at 74; Rebuttal Decl. of Janet S. Netz ISO IPPs' Mot. for Class Certification, ECF Nos. 1653-25 and 1653-26 (sealed), 1654-21 (redacted), at 52-53.

entity's creation, the purpose of its activities, its independence from the government, the level of government financial support, its employment policies, and its obligations and privileges under state law." *EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*, 322 F.3d 635, 640 (9th Cir. 2003). No one factor is dispositive. *See USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 208-09 (3d Cir. 2003) (examining factors employed by the Ninth and Fifth Circuits in analyzing "organ" status and concluding that "a flexible approach is particularly appropriate after *Dole*" and "no one [factor] is determinative.").

Each of these factors weighs against finding Display an organ of the Chinese government. It is therefore not entitled to sovereign immunity under the FSIA.

**A. Display Was Created as an Autonomous Joint-Stock Company with No Sovereign Functions**

Display was created as a joint-stock company in 1992 for the for-profit business purpose of producing CRTs.[48] It was set up as a commercial entity to "conduct autonomous business operations," be "responsible for its own profits and losses," "develop its own direction," and "abide by its own binding operational mechanism."[49] Three years after its formation in 1995, it became publicly traded with at least 50% of its shares allotted to "public" investors.[50] In 2007, when the IPPs filed their complaint, the Chinese government owned none of Display's shares directly.[51]

Display's changing ownership structure—which shifted to having no direct government ownership and majority "public" ownership—strongly indicates that Display was not created to perform governmental functions. *USX*, 345 F.3d at 209 (the "ownership structure of the entity" can "influence the degree to which" a court may view that "an entity is performing a function 'on behalf of the foreign government.'"(internal citation omitted)). Provincial approval of Display's establishment does not make it a Chinese governmental organ any more than qualification of a

---

[48] *See* Official response concerning the approval to establish Display, ECF No. 5413-7 (Am. Plunkett Decl., Ex. 44) at IRI-CRT-00000853.

[49] *Id.* at IRI-CRT-00000854.

[50] Prospectus for Shares of Irico, ECF No. 5413-4 (Am. Plunkett Decl., Ex. 31) at IRI-CRT-00000667-68.

[51] Display 2007 Annual Report, ECF No. 5413-1 (Am. Plunkett Decl., Ex. 2) at IRI-CRT-00000276.

stock corporation to exist and operate under, for example, Delaware law, makes it a Delaware governmental organ. Nor does governmental regulation make it a "sovereign" entity. Rather, like all companies, it must comply with governmental regulations.[52]

**B. Display Functioned as an Ordinary Commercial Entity**

As evidenced in its corporate documents and disclosures to shareholders, Display was a commercial entity: it manufactured and sold CRTs to make a profit.[53] An "independent commercial enterprise[]" like Display, which "act[s] to maximize profits rather than pursue public objectives" is not an organ, even though it may be "heavily regulated." *Patrickson v. Dole Food Co.*, 251 F.3d 795, 808 (9th Cir. 2001), *aff'd in part, cert. dismissed in part*, 538 U.S. 468 (2003).

Contrary to Display's contention, contributing to the national economy by developing CRT technology and generating taxable revenues serves no uniquely governmental or sovereign function warranting sovereign immunity. *See, e.g.*, *NXP Semiconductors USA, Inc. v. Brevets, S.A.S.*, 2014 WL 4621017, at *7 (N.D. Cal. Sept. 15, 2014) (contrasting "a private company acting to maximize profits" with "an arm of the state conducting sovereign functions such as treaty negotiation and implementation or distributing government resources").[54] Governments subsidize or promote a variety of businesses, but that does not make those businesses sovereign or governmental entities. The essentially commercial, non-governmental nature of Display's activities weighs against finding it as an "organ" of the state. *See Alperin v. Vatican Bank*, No. C-99-04941 MMC, 2007 WL 4570674, at *3 (N.D. Cal. Dec. 27, 2007) ("The second factor [to be considered in determining

[52] Unlike the industry board in *Gates v. Victor Fine Foods*, 54 F.3d 1457 (9th Cir. 1995), a case Display cites, Display was *not* created to assist the Chinese government in performing traditionally sovereign functions. *See id.* at 1460-61 (holding that an industry board that regulated the Canadian pork market was an "organ" where it exercised regulatory authority delegated by the government; it could only act in a manner and on the subjects that the government previously authorized; its decisions could be appealed to a government agency; and its members enjoyed immunity from suit for their official duties).

[53] *See* Alioto Decl., Ex. 35 ([redacted]); 2006 Display Articles, ECF No. 5418-5, art. 12 and art. 13, at IRI-CRT-00001028; 2007 Display Annual Report, ECF No. 5413-1 (Am. Plunkett Decl., Ex 2) at IRI-CRT-00000247, IRI-CRT-00000251.

[54] The authority that Display relies upon is not to the contrary. *Cal. Dept. of Water Resources v. Powerex Corp.*, 533 F.3d 1087, 1099-101 (9th Cir. 2008) (finding that the defendant engaged in multiple "sovereign functions," including energy regulation and "treaty formation and implementation" and any "profits" it might make would go solely to the government).

organ status] focuses on whether the entity serves a public purpose or whether it acts as an independent commercial enterprise to maximize its own profits."), *aff'd*, 360 F. App'x 847 (9th Cir. 2009), *amended in part*, 365 F. App'x 74 (9th Cir. 2010).

### C. Chinese Laws and Regulations Do Not Show that Display Operated as a Governmental Entity or that Its Employees Were Public Servants

To support its argument that Display was controlled by the Chinese government, Display relies heavily upon the 2003 Interim Regulations issued by the State-owned Assets Supervision and Administration Commission of the State Council ("SASAC Regulations"). Display Mot. at 7-8. This reliance is misplaced. The SASAC Regulations describe how SASAC should manage state investments in corporations.[55] By their own terms, the SASAC Regulations strictly *prohibit* governmental interference in the invested enterprises' management and operation, and expressly insist that one of SASAC's main obligations is to "respect and safeguard the operational autonomy of State-owned enterprises and State-owned holding enterprises."[56]

Display also misrepresents SASAC's authority under the Regulations. For example, Display incorrectly contends that Article 13(4) gave SASAC authority to "evaluate" and "grant rewards or impose punishments" to Display's directors and officers. Article 13(4) applies only to "responsible persons" whom SASAC has the power to "appoint or remove," and SASAC did not have that power with respect to Display's directors or officers because it was not a "wholly owned state company." *See* SASAC Regs., art. 17(2)-(4) (power to "appoint or remove" responsible persons limited to chairmen and directors of wholly state-owned companies). Nothing in these provisions suggests SASAC had the authority to override the governing procedures in Display's Articles.

Nor do the broad mandates in the SASAC Regulations to prevent corruption and misappropriation of state funds make Display's employees public servants. Neither SASAC Regulations nor Display's Articles gave the government the authority to appoint Display's

---

[55] SASAC Regs., ECF No. 5418 (Saveri Decl., Ex. 23), *available at* http://en.sasac.gov.cn/2003/11/24/c_118.htm.

[56] *Id.*, art. 7, 10, 14(5), 38.

directors and officers. And the government did not pay Display's executive salaries. *See USX*, 345 F.3d at 213 (the fact that foreign state did not require the hiring of public employees or pay their salaries is a factor that weighs against a finding of organ status).

Display's reliance on the definition of "state functionaries" from Article 93 of the Chinese Criminal Law—an unsettled nomenclature in 2007—is likewise misplaced.[57] The plain language of Article 93 defines "state functionaries" as only employees that perform "public service" functions. Managing a publicly-listed commercial company is hardly "public service."[58] In addition, laws prohibiting commercial bribery do not transform businesspeople into government employees, as Display claims.[59]

Similarly, the alleged presence of Communist Party members in Display's management or on Display's Board does not make Display a state organ or its employees public servants any more than do U.S. laws establishing qualifications for board membership or executive status. The ubiquitous influence of the Party exists in both mixed-ownership enterprises like Display and privately-held companies.[60]

In essence, the regulations and laws Display relies upon amount to nothing more than normal government regulation of businesses and the government's right to exercise normal

---

[57] *See* Alioto Decl., Ex. 36 (Deposition of Donald Clarke, March 26, 2019 ("Clarke Dep.")) 146:14-21 ([REDACTED])

[58] *See* Art. 93 of the PRC Criminal Law, *available at* http://www.npc.gov.cn/englishnpc/Law/2007-12/13/content_1384075.htm.

[59] For example, the Foreign Corrupt Practices Act (15 U.S.C. §§ 78dd-1, *et seq.*) prohibits companies regulated by the SEC from bribing officials to obtain business. Most states have similar laws prohibiting bribery. *See, e.g.*, Ann. Cal. Penal Code § 641.3; Col. Rev. Stat. Ann. § 18-5-401; Conn. Gen. Stat. Ann. § 53a-160; Fla. Stat. Ann. § 838.16; Kansas Stat. Ann. § 21-4405; Kent. Rev. Stat. § 244.600(brewers); Kent. Rev. Stat. § 518.020; Minn. Stat. Ann. § 609.86; Miss. Code Ann. § 97-9-10; Mo. Stat. § 570.150; Neb. § 28-613; Nev. Rev. Stat §207.295; 7 Tex. Stat. §32.43; Wash. § 9A. 68.060. The U.S. employees subject to these laws are not government employees.

[60] *See* The Company Law, ECF No. 5418 (Saveri Decl., Ex. 6), art. 19 (requiring every Chinese company, state-owned or not, to "set up" "Communist Party organizations"); Michael Martina, *Exclusive: In China, the Party's Push for Influence Inside Foreign Firms Stirs Fears*, REUTERS (Aug. 24, 2017) ("The presence of party units has long been a fact of doing business in China, where party organizations exist in nearly 70 percent of some 1.86 million privately owned companies, the official China Daily reported last month"), *available at* https://www.reuters.com/article/us-china-congress-companies/exclusive-in-china-the-partys-push-for-influence-inside-foreign-firms-stirs-fears-idUSKCN1B40JU (last visited Apr 12, 2019).

shareholder ownership rights. *See Patrickson*, 251 F.3d at 808 (concluding defendants were "independent commercial enterprises" and not entitled to sovereign immunity where Israeli government's authority was "not considerably different from the control a majority shareholder would enjoy under American corporate law").

### D. Display Did Not Receive Unusual or Substantial Governmental Financial Support

Display contends that it received "substantial" governmental financial support by virtue of its status as a "state-controlled company" and that such support "did not apply to private Chinese corporations. *See* Display Mot. at 4 (citing Wang Decl., ¶¶ 59-61). But the "support" Display received was not sufficiently unusual or substantial enough to show that it operated as an organ of the Chinese government.

First, according to Display's financial disclosures, the subsidies it received from the Chinese government were RMB 584,990.85 in 2006 and RMB 3 million in 2007.[61] Those figures are tiny fractions (less than 1%) of Display's operating revenues in those years: 0.03% of RMB 2.1 billion in 2006 and 0.18% of RMB 1.7 billion in 2007.[62] Second, many private enterprises receive substantial funds from the Chinese government, which has played a predominant role in the economy. Subsidies to large, fast-growing private firms were and remain widespread in China and can constitute a significant portion of a company's net profits.[63]

---

[61] *See* 2007 Display Annual Report, ECF No. 5413-1 (Am. Plunkett Decl., Ex. 2) at IRI-CRT-00000235.

[62] *Id.* Display also misleadingly suggested that the Chinese government decided to give it substantial funds for its "thin-film-transistor liquid-crystal display glass substrate project." Wang Decl. ¶ 60. However, the subsidized project was "initiated" by Group "through a different subsidiary," and not through Display. Display Mot. at 16-17, n.7. In fact, Display was not involved in the LCD project until after the class period. ECF No. 5418-5 (Saveri Decl., Ex. 24) at 2, 6, 44, 46.

[63] *See* Alioto Decl. Ex. 37 ("China's central and provincial governments have long fed its major state-owned and private companies a steady diet of subsidies to boost growth, support jobs and create national champions"); *see also* Naomi Rovnick, *Most Big Chinese Companies Get Some Kind of State Subsidy*, QUARTZ (Apr. 9, 2013), available at https://qz.com/72354/most-big-chinese-companies-get-some-kind-of-state-subsidies/ (last visited Apr. 12, 2019).

### E. Display Did Not Have Special Privileges or Obligations

The final factor to determine organ status considers "the entity's obligations and privileges under state law, including whether it performs any exclusive activities for the government," and "whether the entity enjoys immunity from suit." *Alperin*, 2007 WL 4570674, at *5. Display does not claim that it performed any sovereign functions for the government or exercised any regulatory authority. It does not claim it had exclusive rights to develop, produce, or sell CRTs and CRT products; to the contrary, it co-existed and competed with other domestic and foreign competitors in the CRT business. Nor does Display claim that it was immune from suit in China. Therefore, Display had no special privileges or obligations under Chinese law.

### F. Display Improperly Relies on Inadmissible and Contradictory Statements Made in the Wang Declaration

To support its contention that Display is fully state-controlled, Display relies heavily upon the Amended Declaration of Zhaojie Wang (ECF No. 5411-1), who also testified as its corporate representative under Rule 30(b)(6). For example, Display offers the Wang Declaration to describe Display's governance and operation. But Wang testified at his deposition that [REDACTED].[65] By his own admission, Wang's declaration is not made on personal knowledge and is thus inadmissible.[66]

Wang also retreated from key portions of his declaration at deposition, by testifying, for example, that [REDACTED].[67] The Court should give no weight to a declaration made with no personal knowledge and directly contradicted by the Display's own governing documents.

---

[64] *See* Alioto Decl., Ex. 7, Deposition of Zhaojie Wang, March 6, 2019 ("Wang Dep. I") 43:6-7.

[65] *See* Alioto Decl., Ex. 8, Deposition of Zhaojie Wang, March 7, 2019 ("Wang Dep. II") 35:9-24; 44:19-24; 46:19-47:2; 48:2-25.

[66] *See* Fed. R. Civ. P. 56(c)(4); Fed. R. Evid. Rule 602 (to be admissible, evidence must be based on personal knowledge).

[67] *See* Alioto Decl., Ex. 8, Wang Dep. II 32:15-25, 40:8-23, 41:12-42:4, 49:13-50:6.

## II. Group and Display Engaged in Commercial Activities that Caused Direct (and Harmful) Effects in the United States

In this case, it appears that Group qualifies as a Chinese government "instrumentality" since it remained a wholly-owned entity at least through 2007. Nonetheless, Group and Display are not entitled to immunity by virtue of their commercial activities. Even where an entity qualifies as a foreign government's instrumentality, the FSIA does not provide "sovereign" immunity for an entity's commercial activity that has "a direct effect" "in the United States." 28 U.S.C. §1605(a)(2). Group and Display do not seriously dispute that their business and the activities challenged here—namely the manufacture and sale of CRTs and their participation in a conspiracy to fix CRT prices—are "commercial activity" of the type exempt from sovereign immunity. Rather, they contend that their commercial activities caused no "direct effects in the United States." *See* Display Mot. at 17-23; Group Mot. at 11-14.

This argument fails because, as the DPPs amply demonstrate, Group and Display fail to contest the allegations and evidence that this Court previously found sufficient to establish a direct effect. *See* DPP Opp. at 31-32. Moreover, contrary their claims, discovery has uncovered evidence that Group and Display sold millions of dollars' worth of CRTs into the United States through Group's wholly-owned subsidiaries Import-Export and Irico USA. *See* pages 7-8, *supra*; DPP Opp. at 38-40. IPPs have also presented evidence of Group's and Display's substantial sales of CRTs to CRT television makers with knowledge that those televisions would be sold in the U.S. *See* pages 8-10, *supra*.

Thus, the law, the facts and this Court's prior orders establish that the actions IPPs challenge are indeed commercial activities that caused direct and adverse effects in the United States. Irico's motions to dismiss for lack of subject matter jurisdiction should be denied.

### A. The Legal Standard: Sovereign Immunity Does Not Apply When the Claims at Issue Arise from Defendants' Commercial Activities that Have a Direct Effect in the U.S.

The FSIA distinguishes between sovereign and commercial activities, providing immunity to the former but not to the latter if they directly cause adverse effects in the U.S. Specifically, as

applicable here, a foreign government (or its organs or agencies) is not entitled to sovereign immunity where:

> [T]he action is based upon . . . an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

28 U.S.C. § 1605(a)(2).

The FSIA defines "commercial activity" as "a regular course of commercial conduct or a particular transaction or act." 28 U.S.C. § 1603(d). However, "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *De Csepel v. Republic of Hungary*, 714 F.3d 591, 599 (D.C. Cir. 2013) ("We must examine 'not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives' but 'whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in trade and traffic or commerce.'" (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992)).[68]

Thus, "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it," and proximately causes harm in the U.S., that entity cannot claim sovereign immunity under FSIA. *Weltover,* 504 U.S. at 614-15; *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 987-88 (9th Cir. 2008) (to establish the requisite domestic effects/injury under Foreign Trade Antitrust Improvements Act ("FTAIA"), a court must examine whether the defendants' actions proximately caused the effect in the U.S.).[69]

---

[68] *See also Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1082 (9th Cir. 2001) (when the action under examination is commercial in nature, the fact that a government may have a number of motives in engaging in the activity does not change its commercial nature).

[69] "Case law from a different statutory scheme, the Foreign Trade Antitrust Improvements Act ("FTAIA"), which outlines when anticompetitive behavior abroad can be prosecuted in the United States, provides insight into what a direct effect is for the purposes of an antitrust case challenged under the FSIA." *In re Cathode Ray Tube (CRT) Antitrust Litig.,* No. C-07-5944 JST, 2018 WL 659084, at *5 (N.D. Cal. Feb. 1, 2018). *See also Sea Breeze Salt, Inc. v. Mitsubishi Corp*., No. 16-cv-2345-DMG (AGRX), 2016 WL 8648638, at *3 (C.D. Cal. Aug. 18, 2016) (reasoning that "direct effect" was like proximate cause).

**B.     IPPs' Claims Arise from Irico's Actions Performed in Connection with Irico's Commercial Activities**

Under the applicable legal standards, Irico's challenged actions were clearly commercial. Group and Display operated a business dedicated to making and selling CRTs for use in the manufacture of televisions and computer monitors. *See* pages 3-4, 6, *supra*. Moreover, in operating this business, Group and Display knowingly participated in a global commercial market (that included the U.S.), and sold substantial quantities of CRTs to the United States. *See* pages 7-10, *supra*. "Regardless of whether the actions were conspiratorial in nature, the Irico Defendants' activities in setting prices and manufacturing schedules for CRTs was [sic] clearly commercial in nature." *CRT*, 2018 WL 659084, at *5. *See also Adler v. Fed. Republic of Nigeria*, 219 F.3d 869, 875-76 (9th Cir. 2000) (entering into illegal agreements to facilitate commercial transactions is activity "in connection with commercial activity" for purposes of the commercial activity exception in FSIA).[70]

Neither Group nor Display presents any basis to revisit this Court's previous finding.

**C.     These Commercial Activities Proximately Caused Harm in the United States**

Under the commercial activity exception to the FSIA, "an effect is 'direct' if it follows 'as an immediate consequence of the defendant's . . . activity.'" *Weltover*, 504 U.S. at 618 (citation omitted). A consequence is sufficiently "'immediate' if no intervening act breaks 'the chain of causation leading from the asserted wrongful act to its impact in the United States.'" *Terenkian*, 694 F.3d at 1133 (quoting *Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1083 (9th Cir. 2001)). "To establish a direct effect, a plaintiff must show that 'something legally significant actually happened in the United States.'" *CRT*, 2018 WL 659084, at *5 (quoting *Gregorian v. Izvestia*, 871 F.2d 1515, 1527 (9th Cir. 1989)).

**1.     Participation in a Global Price-Fixing Conspiracy Causing Increased Prices in the United States Satisfies the FSIA's Direct Effect Requirement**

In this Court's February 2018 Order, it noted that case law interpreting the meaning of the FSIA's "direct effect" requirement in an antitrust case is sparse. *CRT*, 2018 WL 659084, at *5.

---

[70] *See also* H.R. REP. NO. 94-1487, at 16 (1976) ("Activities such as a foreign government's sale of a service or a product . . . would be among those included within the [FSIA definition of commercial activity].").

The Court identified and relied upon only one antitrust case applying the FSIA, *Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, No. 16-cv-2345-DMG (AGRX), 2016 WL 8648638 (C.D. Cal. Aug. 18, 2016), where the court "held that a price-fixing scheme and the granting of exclusive rights to a governmental entity satisfied the requirement for a direct effect in the United States because, given that the U.S. was the largest importer of salt, and the entity produced 17% of the world's salt, the conduct led to less variety, competition and higher prices in the U.S." *CRT,* 2018 WL 659084, at *5.

Since this Court's February 2018 Order, the Ninth Circuit has affirmed the district court's holding in *Sea Breeze. See Sea Breeze Salt, Inc. v. Mitsubishi Corp.,* 899 F.3d 1064, 1068 n. 2 (9th Cir. 2018) ("We agree with the district court that the FSIA's commercial activity exception is applicable because the suit is based upon 'an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.'"). The allegations and evidence presented by IPPs—that Group and Display participated in global CRT price fixing conspiracy that caused IPPs to pay higher prices for CRT televisions and computer monitors in the U.S.—are strikingly similar to those found by the Ninth Circuit to satisfy the FSIA's commercial activity exception in *Sea Breeze.* Thus, this Court likewise has jurisdiction over Group and Display. Tellingly, neither Group nor Display cites this controlling decision.

In addition, as this Court previously noted, many courts—including the Ninth Circuit in a case involving a very similar price-fixing conspiracy on LCD panels—have held that foreign price fixing conspiracies have direct effects in the U.S. for the purposes of the FTAIA where (as here) those conspiracies proximately cause increased prices in the U.S.[71] In *U.S. v. Hsiung,* 778 F.3d 738 (9th Cir. 2015), the Ninth Circuit held that evidence of a close interrelationship between the price of a substantial component (LCD panels) and the prices paid by U.S. consumers for finished goods (LCD televisions, monitors and laptops) meant that increased prices for the finished goods paid in the U.S. constituted a "direct effect" for purposes of FTAIA. *Id.* at 759-60. The district

[71] Both this Court and the Ninth Circuit have looked to case law interpreting the term "direct effect" in the FTAIA for guidance. *CRT*, 2018 WL 659084, at *5.

court in the indirect purchaser *LCD* case likewise concluded that the effect of the alleged LCD conspiracy was clearly direct under the FTAIA. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 822 F. Supp. 2d 953, 966 (N.D. Cal. 2011) ("If this effect is not 'direct,' it is difficult to imagine what would be.").

Similarly, this Court rejected the defendants' motion for summary judgment based on the FTAIA after assessing the same evidence presented by IPPs here—including the Netz Report demonstrating the impact of the conspiracy on U.S. prices[72]—and held that the defendants' conduct and the effects of that conduct created a direct effect on U.S. commerce. *See CRT*, 2016 WL 5725008, at *5 (noting that the description of the evidence in *Hsiung* "applies equally to Plaintiffs' evidence here[,]" and "shows many hundreds of conspiratorial meetings taking place all over the world, including in the United States, at which participants reached explicit agreements on CRT prices, production levels, market shares and customers. The United States was the world's largest market for CRTs during the relevant time frame, and Defendants were well aware of the effect their price-fixing agreements were having on the prices paid for CRTs and products containing CRTs.").[73]

Although not required, IPPs have now supplemented the evidence this Court previously relied upon to find the CRT conspiracy's "direct effects" in the United States with evidence of (1) Group's and Display's participation in the CRT conspiracy and [REDACTED] (*see* pages 4-6, *supra*); (2) Group's and Display's [REDACTED] (*see* pages 7-8, *supra*); and (3) Group's and Display's sales of vast quantities of CRTs to foreign television makers with knowledge that those CRTs were destined for sale in the United States. *See* pages 8-10, *supra*. Irico's claims that they had no idea their CRTs would be sold to the

[72] Although the FTAIA Summary Judgment Order (ECF No. 3802) pertained only to certain Direct Action Plaintiffs ("DAPs"), the motion was filed against both IPPs and the DAPs (ECF No. 3006), and IPPs opposed the motion. *See* ECF Nos. 3281, 3286, 3287.

[73] *See also CRT*, 2014 WL 2581525, at *7-8 (N.D. Cal. June 9, 2014) (finding that certain Philips defendants "specifically directed price-fixing activity toward and into the United States" and "it has always been clear in this case that the United States market was the most significant CRT and CRT Product market for most of the defendants in the case").

United States are disingenuous at best given Irico's admission in Electronics' 2004 Global Offering prospectus. Alioto Decl. Ex. 18. In addition, the evidence clearly shows that it was widely known in the CRT industry that Irico's "major customers" were supplying huge quantities of CRT televisions to the United States market. *See* pages 8-9, *supra*.

**2. Direct CRT Sales to the United States by Group and Display Are Not Required to Prove Direct Effect**

Group and Display assert there can be "no direct effect . . . unless the specific defendant had direct sales of the allegedly affected product in the United States." Group Mot. at 14 (internal emphasis omitted); Display Mot. at 19. They also argue that any effect in the United States from their CRT sales was too "tenuous" and "remote" to constitute a direct effect because "IPP's claims are based explicitly upon indirect sales." Group Mot. at 12-13 (internal emphasis omitted); Display Mot. at 19-20. But neither the law nor the facts support these assertions.

*Cal. v. NRG Energy Inc.*, 391 F.3d 1011 (9th Cir. 2004), *vacated on other grounds*, *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224 (2007), merely stands for the proposition that—absent evidence justifying piercing the corporate veil—the conduct of a subsidiary whose actions affected the United States cannot be imputed to the foreign state-owned parent for the purpose of determining immunity under the FSIA. 391 F.3d at 1024. Unlike here, in *NRG-Energy* there was no evidence that the foreign parent company itself had participated in a global price-fixing conspiracy that increased prices for goods sold in the United States. *Id.*[74]

*Filetech S.A. v. France Telecom, S.A.*, 212 F. Supp. 2d 183 (S.D.N.Y. 2001) is similarly distinguishable. In that case, the anticompetitive effects of a French government-owned defendant's refusal to sell marketing information to a French competitor were limited to the French market. *Id*. at 196. In addition, it is a monopolization case under 15 U.S.C. § 2; thus, there was no suggestion that the government-owned defendant was part of a broader conspiracy that impacted

---

[74] *See Wholesale Elec. Antitrust Cases I & II*, Nos. 02-cv--0990-RHW, 02-cv-1000-RHW, 02-cv-1001-RHW, 2002 WL 34165887, at *7 (S.D. Cal. Dec. 17, 2002) ("There is simply no evidence in the record that [the parent] exerts operational control over the quantities and prices at which [the subsidiary] sells electricity."), *aff'd in part*, *vacated in part*, *remanded sub nom. NRG Energy Inc.*, 391 F.3d 1011.

the United States. *Id.* at 188. Indeed, the only alleged connection with the U.S. was that the *plaintiff* sought to do business here. *Id.* at 185.[75]

In contrast to these cases, here, IPPs have presented compelling evidence of Irico's participation in the CRT conspiracy and the conspiracy's effects in the United States, including that: [REDACTED]. *See, e.g.*, Netz Report, pp. 72-81; Netz Rebuttal Report, pp. 48-49, 62-63. As a direct and proximate result of this conspiracy, IPP class members paid artificially inflated prices for televisions and computer monitors. *Id.* at pp.82-95; Netz Rebuttal Report, pp. 73-94.

Irico's claims that IPPs' alleged injuries are too remote are contrary to this Court's prior holding that pass-through of the overcharge on the CRT to indirect purchasers of the finished televisions and monitors sufficiently establishes antitrust injury. *See In re Cathode Ray Tube (CRT) Antitrust Litig.,* 738 F. Supp. 2d 1011, 1023-24 (N.D. Cal. 2010) (rejecting defendants' argument that IPPs' alleged injury is too remote under *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 529-35 (1983) ("*AGC*"), and finding IPPs alleged injury "is the kind antitrust laws were designed to rectify.").[76] Accordingly, "legally significant acts" giving

[75] Irico's other authorities are similarly inapposite. In *In re North Sea Brent Crude Oil Futures Litig.,* No. 13-md-02475 (ALC), 2016 WL 1271063 (S.D.N.Y. Mar. 29, 2016), the defendants were charged with manipulating a market for physical oil in which the plaintiffs did not participate—as direct or indirect purchasers of oil or oil products. *Id.* at *12. Rather, the plaintiffs' theory was that the futures market was affected by the prices in the physical market because the prices were published in reports and the reports affected futures pricing. *Id.* And *Terenkian v. Republic of Iraq*, 694 F.3d 1122, involved claims arising from cancelled contracts with Iraq that *might* have resulted in oil being delivered to the United States *if* the plaintiffs made "[m]any additional steps . . . including such fundamental requirements as finding potential U.S. purchasers and negotiating mutually acceptable agreements." *Id.* at 1139. Those extra, uncertain steps made any connection to the United States "too 'remote and attenuated'" to count. *Id.* (quoting *Weltover*, 504 U.S. at 618)).

[76] *See also In re TFT-LCD (Flat Panel) Antitrust Litig.,* No. M 07-1827 SI, 2011 WL 6148677, at *1 (N.D. Cal. Dec. 7, 2011) (denying summary judgment on indirect purchaser claims based on *AGC* because "IPPs have suffered "the type [of injury] that the antitrust statute was intended to forestall[,]" and their "injuries flowed directly from the price-fixing conspiracy."); *Harrison v. E. I. Dupont De Nemours and Company*, No. 13-cv-01180-BLF, 2016 WL 3231535, at *4-6 (N.D. Cal. June 13, 2016) (denying motion to dismiss state antitrust claims by consumers who bought paint made with price fixed titanium dioxide under the *AGC* factors). The Supreme Court recently clarified that *AGC* and its progeny set standards for who had a right to maintain causes of action under the antitrust laws as having injuries "proximately caused" by antitrust violations. *See*

rise to IPPs' claims occurred in the United States (*see Terenkian*, 694 F.3d at 1134) each time IPP class members purchased CRT televisions or monitors at supracompetitive prices.

Group and Display are incorrect to suggest that IPPs' purchases were "'[m]ere financial loss[es],'" which cannot establish a direct effect. *See, e.g.*, Group Mot. 12 (quoting *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 726-27 (9th Cir. 1997). *Adler* was a contract case and it is well-established that "[a] cause of action for breach of contract accrues at the time of the breach," regardless of when (or even whether) any damages are suffered. *Perez-Encinas v. AmerUs Life Ins. Co.,* 468 F. Supp. 2d 1127, 1134 (N.D. Cal. 2006). In antitrust cases, as in other tort cases, the injury is part of the cause of action, so its location is legally significant. *See Atlantica Holdings Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 113 (2d Cir. 2016) ("In cases where the plaintiff's initial injury occurs in the United States – that is, where this country is the locus of the tort – there is no reason why that initial injury should not count as a direct effect merely because it happens to take the form of a financial loss.").

Finally, it is not appropriate to incorporate the "minimum contacts" requirements of due process into the analysis of direct effect under the FSIA. *See* Group Mot. at 14-16; Display Mot. at 21-23. In *Republic of Argentina v. Weltover*, *Inc.*, the Supreme Court held that a "direct effect" need not be either substantial or foreseeable to satisfy the FSIA's commercial-activity exception. *See* 504 U.S. at 618 ("[W]e reject the suggestion that § 1605(a)(2) contains any unexpressed requirement of 'substantiality' or 'foreseeability.'"). *Weltover* abrogates (or at least limits) *Sec. Pac. Nat'l Bank v. Derderian,* 872 F.2d 281, 286-87 (9th Cir.1989), relied upon by Irico, because the minimum-contacts analysis incorporates concepts of substantiality and foreseeability that under *Weltover* do not apply in §1605(a)(2) cases.

Moreover, in any event, IPPs' evidence that Group and Display agreed to fix global CRT prices, which they knew and intended would increase prices in the U.S., is sufficient to satisfy due process. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 27 F. Supp. 3d 1002, 1008, 1011-12

---

*Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126-27 (2014). Since the standard for direct effect is informed by proximate cause, these cases provide additional support for the conclusion that Irico's commercial activities caused a direct effect in the United States.

(N.D. Cal. 2014) (relying on evidence similar to that presented by IPPs against Group and Display to hold that their co-conspirator, Beijing Matsushita Color CRT Co., Ltd., "expressly aimed" its anticompetitive conduct at the United States such that due process' "minimum contacts" test was satisfied).

Under the circumstances, Group's and Display's commercial activities produced sufficient "direct" effects in the United States to strip them of any claimed sovereign immunity. *See* 28 U.S.C. § 1605(a)(2) (no sovereign immunity for acts "outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere . . . that . . . cause[] a direct effect in the United States").

**CONCLUSION**

This Court should deny Group's and Display's motions to dismiss. Display is not an organ of the Chinese government, meaning it cannot even claim that sovereign immunity *may* apply to its actions. Moreover, Group and Display are not entitled to sovereign immunity for their actions in furtherance of a conspiracy to raise global CRT prices. IPP's claims arise out of that conspiracy, which dramatically and artificially increased CRT and CRT product prices here in the U.S. As such, neither Group nor Display is entitled to sovereign immunity.

Dated: April 12, 2019

Respectfully submitted,

*/s/ Mario N. Alioto*

Mario N. Alioto (56433)
malioto@tatp.com
Joseph M. Patane (72202)
jpatane@tatp.com
Lauren C. Capurro (241151)
laurenrussell@tatp.com
TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
2280 Union Street
San Francisco, CA 94123
Telephone: 415-563-7200
Facsimile: 415-346-0679

*Lead Counsel for Indirect Purchaser Plaintiffs*