# EXHIBIT 3

No. 17-204

# In the Supreme Court of the United States

APPLE INC., PETITIONER

*v.*

ROBERT PEPPER, ET AL.

*ON WRIT OF CERTIORARI TO THE UNITED STATES COURT
OF APPEALS FOR THE NINTH CIRCUIT*

## BRIEF FOR TEXAS, IOWA, AND 29 OTHER STATES AS AMICI CURIAE IN SUPPORT OF RESPONDENTS

TOM MILLER
Attorney General of Iowa

NATHAN BLAKE
Deputy Attorney General

MAX M. MILLER
Assistant Attorney
  General

OFFICE OF THE
  ATTORNEY GENERAL
1305 E. Walnut St.
Des Moines, Iowa 50319
max.miller@ag.iowa.gov
(515) 281-5926

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

KYLE D. HAWKINS
Solicitor General
  *Counsel of Record*

J. CAMPBELL BARKER
Deputy Solicitor General

JOSEPH D. HUGHES
Assistant Solicitor General

KIM VAN WINKLE
Deputy Chief, Antitrust Division

BRET FULKERSON
DAVID M. ASHTON
NICHOLAS G. GRIMMER
Assistant Attorneys General,
Antitrust Division

OFFICE OF THE
  ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
kyle.hawkins@oag.texas.gov
(512) 936-1700

## TABLE OF CONTENTS

Page

Interest of amici curiae ........................................................ 1

Summary of argument ......................................................... 2

Argument ........................................................................... 7

I. *Illinois Brick*'s bar on proving indirect-purchaser damages rests on predictions and policy judgments, not statutory text or lack of factual injury. ............................................. 8

II. States have since allowed indirect purchasers to sue under state antitrust law, leading to decades of experience that contradict the predictions and policy judgments underlying *Illinois Brick*. .............. 12

    A. Decades of experience applying modern economic analyses demonstrate that pass-on damages are not "virtually unascertainable." ................... 13

    B. Courts have shown themselves capable of applying gatekeeping rules to proof of indirect-purchaser damages .................... 16

    C. The possibility of duplicative recovery for the same injury has not materialized. .................................................. 17

    D. *Illinois Brick*'s assumption that full compensation must be sacrificed to ensure robust deterrence has proved unfounded. ..................................................... 21

(I)

II

III. The Court should overrule *Illinois Brick*. ........ 24

    A.  No significant reliance interests justify retaining *Illinois Brick*. ............................... 24

    B.  *Stare decisis* has weaker force when subsequent economic experience undermines the rationale of antitrust decisions. ...................................................... 25

    C.  *Illinois Brick* is increasingly difficult to apply in the modern world, as this case shows. ................................................. 26

    D.  *Illinois Brick* is not commended by the quality of its reasoning. .............................. 28

    E.  Overruling *Illinois Brick* will align antitrust law with modern concepts of remoteness. .................................................. 33

Conclusion ........................................................................ 36

III

**TABLE OF AUTHORITIES**

Page

Cases:

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
    458 U.S. 592 (1982) ......................................................33

*Ali v. Fed. Bureau of Prisons,*
    552 U.S. 214 (2008) ......................................................29

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
    548 U.S. 291 (2006) ......................................................29

*Associated Gen. Contractors of Cal., Inc. v. Cal.*
    *State Council of Carpenters,*
    459 U.S. 519 (1983) ...............................................30, 34

*Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.,*
    402 U.S. 313 (1971) .......................................................8

*Blue Shield of Va. v. McCready,*
    457 U.S. 465 (1982) ......................................................28

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977) ......................................................32

*California v. ARC Am. Corp.,*
    490 U.S. 93 (1989) ..................................................12, 16

*Campos v. Ticketmaster Corp.,*
    140 F.3d 1166 (8th Cir. 1998) .................................26, 27

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) ......................................................17

*Encino Motorcars, LLC v. Navarro,*
    138 S. Ct. 1134 (2018) ..................................................29

*Georgia v. Evans,*
    316 U.S. 159 (1942) .......................................................1

IV

*Gurley v. Rhoden*,
    421 U.S. 200 (1975) ........................................................8

*Hanover Shoe, Inc. v. United Shoe Mach. Corp.*,
    392 U.S. 481 (1968) ........................................9, 10, 26-27

*Ill. Brick Co. v. Illinois*,
    431 U.S. 720 (1977) ............................................. *passim*

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    No. 3:07-cv-05944-JST, 2013 WL 5391159,
    (N.D. Cal. Sept. 24, 2013) .......................................16-17

*In re Flash Memory Antitrust Litig.*,
    643 F. Supp. 2d 1133 (N.D. Cal. 2009).......................35

*In re Intel Corp. Microprocessor Antitrust Litig.*,
    496 F. Supp. 2d 404 (D. Del. 2007).............................35

*In re Methionine Antitrust Litig.*,
    204 F.R.D. 161 (N.D. Cal. 2001)...................................17

*In re: Polyurethane Foam Antitrust Litig.*,
    753 F. Supp. 2d 1376 (U.S. Jud. Pan. Mult.
    Lit. 2010) ........................................................................20

*In re Refrigerant Compressors Antitrust Litig.*,
    No. 2:09-md-02042, 2013 WL 1431756 (E.D.
    Mich. Apr. 9, 2013) ......................................................35

*In re Static Random Access Memory (SRAM)
    Antitrust Litig.*, 264 F.R.D. 603, 606 (N.D.
    Cal. 2009).......................................................................16

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    No. M:07-cv-1827, 2012 WL 555090 (N.D.
    Cal. Feb. 21, 2012).......................................................17

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
    586 F. Supp. 2d 1109 (N.D. Cal. 2008).......................37

v

*Janus v. Am. Fed'n of State, Cty., & Mun. Emps.,*
   *Council 31*, 138 S. Ct. 2448 (2018) ............24, 26, 28-29

*Kansas v. Utilicorp United, Inc.,*
   497 U.S. 199 (1990) ............................................ 2, 12, 31

*Kasten v. Saint-Gobain Perf. Plastics Corp.,*
   563 U.S. 1 (2011) .......................................................... 29

*Kimble v. Marvel Entm't, LLC,*
   135 S. Ct. 2401 (2015) ................................................ 25

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,*
   551 U.S. 877 (2007) .................................................... 25

*Lexmark Int'l, Inc. v. Static Control Components,*
   *Inc.*, 572 U.S. 118 (2014) .............................................. 29

*Mandeville Island Farms, Inc. v. Am. Crystal*
   *Sugar Co.*, 334 U.S. 219 (1948) .................................... 29

*Ohio v. Am. Express Co.,*
   138 S. Ct. 2274 (2018) .................................................. 28

*Parklane Hosiery Co. v. Shore,*
   439 U.S. 322 (1979) ...................................................... 19

*Patterson v. McLean Credit Union,*
   485 U.S. 617 (1988) ........................................................ 8

*Payne v. Tennessee,*
   501 U.S. 808 (1991) ................................................ 24, 26

*Pearson v. Callahan,*
   555 U.S. 223 (2009) .................................................. 7, 25

*Rodriguez de Quijas v. Shearson/Am. Express,*
   *Inc.*, 490 U.S. 477 (1989) .................................. 28, 31, 33

*South Dakota v. Wayfair, Inc.,*
   138 S. Ct. 2080 (2018) ....................................... 25, 26, 33

VI

*SAS Inst., Inc. v. Iancu,*
    138 S. Ct. 1348 (2018) .............................................29, 31

*Somers v. Apple, Inc.,*
    258 F.R.D. 354 (N.D. Cal. 2009)..................................17

*State Oil Co. v. Khan,*
    522 U.S. 3 (1997) .......................................................25

*Supreme Auto Transp. LLC v. Arcelor Mittal,*
    No. 1:08-cv-05468, 2017 WL 839484 (N.D. Ill.
    Mar. 3, 2017) .......................................................34-35

*Tex. Indus., Inc. v. Radcliffe Materials, Inc.,*
    451 U.S. 630 (1981) .....................................................33

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
    401 U.S. 321 (1971) .....................................................33

Statutes and rules:

28 U.S.C.:
    § 1332(d) .....................................................................20
    § 1335 .........................................................................19
    § 1404 .........................................................................19
    § 1407 .........................................................................19
    § 1453 .........................................................................20
    §§ 1711-1715 ...............................................................20

Class Action Fairness Act of 2005, Pub. L. No. 109-
    2, 119 Stat. 4 ..............................................................20

VII

Clayton Act, 38 Stat. 730, as amended:
    § 4, 15 U.S.C. § 15............................................ 1, 2, 29, 32
    § 4(a), 15 U.S.C. § 15(a)............... 2, 3, 10, 22, 29, 30, 31
    § 4B, 15 U.S.C. § 15b.................................................. 19
    § 4C, 15 U.S.C. § 15c ................... 1, 6, 11, 12, 23, 32, 33
    § 4C(a)(1), 15 U.S.C. § 15c(a)(1)................................ 31
    § 4G(2), 15 U.S.C. § 15g(2)........................................... 1

Sherman Act, § 7, 26 Stat. 209, 210 (1890)....................... 30

Fed. R. Civ. P. 42(a) ......................................................... 19

Fed. R. Evid. 702.............................................................. 16

Sup. Ct. R. 37.2 .................................................................. 1


Miscellaneous:

21 Cong. Rec. 1767 (1890)................................................ 30

21 Cong. Rec. 2640 (1890)................................................ 30

Am. Bar Ass'n, Indirect Purchaser Lawsuits
    (Eric J. McCarthy et al. eds., 2010)........................... 23

Am. Bar. Ass'n, Indirect Purchaser Litigation
    Handbook (2d ed. 2016) ........................................ 12, 23

Antitrust Modernization Commission, Report
    and Recommendations (2007),
    govinfo.library.unt.edu/amc ............... 12, 18, 20, 32-33

Phillip E. Areeda et al., Antitrust Law (3d ed.
    2007)....................................................................... 15, 27

Roger Backhouse & Béatrice Cherrier, "*It's
    Computers Stupid!": The Spread of Computers
    and the Changing Roles of Theoretical and
    Applied Economics*, 49 History of Political
    Economy 103 (Supp. 2017) ......................................... 15

VIII

Joseph P. Bauer, *The Stealth Assault on Antitrust Enforcement: Raising the Barriers for Antitrust Injury and Standing,* 62 U. Pitt. L. Rev. 437 (2001) ......................................27

Roger D. Blair & Jeffrey L. Harrison, *Reexamining the Role of* Illinois Brick *in Modern Antitrust Standing Analysis,* 68 Geo. Wash. L. Rev. 1 (1999) ...................................28

35A C.J.S. Federal Civil Procedure................................19

Edward D. Cavanagh, Illinois Brick*: A Look Back and a Look Ahead,* 17 Loy. Consumer L. Rev. 1 (2004) ...............10, 12, 22

Pierre Cremieux et al., *Proof of Common Impact in Antitrust Litigation: The Value of Regression Analysis,* 17 Geo. Mason L. Rev. 939 (2010).............................14

Andrew I. Gavil, *Thinking Outside the* Illinois Brick *Box: A Proposal for Reform,* 76 Antitrust L.J. 167 (2009)...................................27-28

Pinelopi K. Goldberg & Michael M. Knetter, *Goods Prices and Exchange Rates: What Have We Learned?,* 35 J. Econ. Literature 1243 (1997)...................................................14

H.R. Rep. No. 94-499 (1976)..............................................32

Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis,* 128 U. Pa. L. Rev. 269 (1979) ..........................18, 20, 22

IX

Herbert Hovenkamp, *Book Review:* The
Rationalization of Antitrust, 116 Harv. L.
Rev. 917 (2003)...................................................13-14, 22

Herbert Hovenkamp, *The Indirect-Purchaser*
*Rule and Cost-Plus Sales*, 103 Harv. L. Rev.
1717 (1990).......................................................................23

Jill S. Kingsbury, *The Indirect Purchaser*
*Doctrine: Antecedent Transaction?*, 65 Mo. L.
Rev. 473 (2000)...............................................................27

Robert H. Lande, *New Options for State*
*Indirect Purchaser Legislation: Protecting the*
*Real Victims of Antitrust Violations*,
61 Ala. L. Rev. 447 (2010) ......................................15, 22

Mem. from the Antitrust Modernization
Comm'n Staff to the Antitrust Modernization
Comm'n Comm'rs (May 4, 2006),
govinfo.library.unt.edu/amc/pdf/meetings/
CivRem-IndP_DiscMemo060504-fin.pdf..................22

Seth E. Miller, *Seeing Over the Brick Wall: Limiting*
*the* Illinois Brick *Indirect Purchaser Rule and*
*Looking at Antitrust Standing in* Campos v.
Ticketmaster Corp. *Through a New Lens*,
32 Fla. St. U.L. Rev. 197 (2004) .................................27

J. Thomas Prud'homme, Jr. & Ellen S. Cooper,
*One More Challenge for the AMC: Repairing*
*the Legacy of* Illinois Brick,
40 U.S.F. L. Rev. 675 (2006) .................................18-19

Charles Renfro, *Economic Software: The First*
*Fifty Years in Perspective*, 29 J. of
Econ. & Soc. Measurement 9 (2004) .........................15

X

Restatement (Second) of Torts (1965) ..............................34

Restatement (Third) of Torts: Physical &
    Emotional Harm (2010) .................................34

Barak D. Richman & Christopher R. Murray,
    *Rebuilding* Illinois Brick*: A Functionalist
    Approach to the Indirect Purchaser Rule*,
    81 S. Cal. L. Rev. 69 (2007)................................15, 21-22

S. Rep. No. 94-803 (1976)..................................32

S. Rep. No. 95-934 (1978)..................................23

Maarten P. Schinkel et al., *Illinois Walls: How
    Barring Indirect Purchaser Suits Facilitates
    Collusion*, 39 RAND J. of Econ. 683 (2008) ..............22

Emilio E. Varanini, *Exiting the Fun House of
    Mirrors:* Clayworth v. Pfizer *and the
    Handling of Pass-on in Post-Trial Allocation
    Proceedings in Federal and State Court*,
    20 Competition: J. Anti. & Unfair Comp. L.
    Sec. St. B. Cal. 28 (2011)......................................8, 20-21

### INTEREST OF AMICI CURIAE

This brief is submitted by amici curiae the States of Texas, Iowa, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Hawaiʻi, Idaho, Illinois, Indiana, Louisiana, Maine, Maryland, Massachusetts, Minnesota, Mississippi, Montana, Nebraska, New Mexico, New York, North Dakota, Pennsylvania, Rhode Island, South Carolina, South Dakota, and Virginia and the District of Columbia (which this brief counts as a "State" pursuant to the Clayton Act's definition of that term, 15 U.S.C. § 15g(2)).[1]

The States play an important role in antitrust enforcement. First, in their proprietary capacities, States can bring private damages actions pursuant to section 4 of the Clayton Act. *Georgia v. Evans*, 316 U.S. 159 (1942). In those cases, States are in the same position as other consumers who ultimately pay all or part of an illegal overcharge passed on by a distributor that purchased the goods directly from a price-fixer.

Second, Congress has assigned States a unique enforcement role under federal antitrust law. Pursuant to section 4C of the Clayton Act, States may bring *parens patriae* actions to recover damages for injury to their citizens from an antitrust violation. Section 4C's substantive reach has been held coextensive with that of a private damages action: "[Section 4C] simply created a new procedural device—*parens patriae* actions by States

---

[1] No counsel for any party authored this brief in whole or in part, and no entity other than amici contributed monetarily to the preparation or submission of this brief. *See* Sup. Ct. R. 37.2.

(1)

2

on behalf of their citizens—to enforce existing rights of recovery under § 4." *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 219 (1990) (quotation marks omitted).

States are thus affected in both their proprietary and *parens patriae* capacities by *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), which adopted the legal fiction that illegal overcharges are never passed on to end users by intermediary parties who bought from an antitrust violator. Amici States urge the Court to reconsider and overturn that decision, which is grounded in predictions and policy concerns that have been undermined by subsequent experience and events.

Overturning *Illinois Brick* would result in affirming, on an alternative ground, the court of appeals' judgment reversing the district court's order dismissing under *Illinois Brick*. Although amici urge such a ruling for respondents in this Court, amici take no other position on the viability of respondents' claims, including on correct application of *Illinois Brick* were it to be maintained. This brief solely urges the Court to overrule *Illinois Brick*.

## SUMMARY OF ARGUMENT

This case presents a rare opportunity to revisit the controversial holding in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). The Court can overrule its precedents based on briefing by amici, and it has done so before. The Court should do so again here.

**I.** Section 4 of the Clayton Act directs that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained." 15 U.S.C. § 15(a). It is

3

widely accepted that consumers can be injured when manufacturers take concerted action to fix supracompetitive prices and distributors of the overpriced products pass on some or all of the overcharges to end users.

Before 1977, when this Court decided *Illinois Brick*, lower courts generally allowed consumers who purchased goods made by an antitrust violator to prove that they had been harmed by overcharges passed on to them by intermediaries in the distribution chain. *Illinois Brick*, however, held that an "indirect purchaser" is categorically forbidden from attempting to prove damages from an antitrust violation. 431 U.S. at 726. Instead, "the overcharged direct purchaser should be deemed for purposes of section 4 to have suffered the full injury from the overcharge." *Id.*

The Court admitted that this conclusive presumption "denies recovery to those indirect purchasers who may have been actually injured by antitrust violations." *Id.* at 746. The Court did not identify any statutory text denying recovery to "any person who shall be injured," 15 U.S.C. § 15(a), by an antitrust violation. Instead, the Court reasoned that "the legislative purpose" of "encouraging vigorous private enforcement of the antitrust laws" was "better served" by a ban on "attempting to apportion the overcharge among all that may have absorbed a part of it." *Ill. Brick*, 431 U.S. at 745-46.

The Court relied on a policy concern that the extent of passing-on is "virtually unascertainable," making proof of that injury unreliable and burdensome to courts and to potential plaintiffs. *Id.* at 725 n.3. The Court also reasoned that a serious risk of duplicative liability for the same conduct justified allowing direct

4

purchasers to recover 100% of the violator's overcharges, even if passed on, and disallowing any recovery by indirect purchasers for their injury. Finally, the Court believed that allowing all victims to recover for their actual injuries (trebled, plus attorney's fees) would insufficiently encourage private suit, as compared to *Illinois Brick*'s rule allowing only a subset of victims to recover for a larger but presumed injury. *Id.* at 747 & n.31.

For those reasons, the Court barred judicial inquiry into whether any given indirect purchaser can prove its damages in a reasonably precise manner. *Id.* at 746. The Court recognized an exception, however, for when overcharges are passed on through one type of cost-plus contract that the Court viewed as avoiding a "virtually unascertainable," *id.* at 725 n.3, inquiry into elasticity of demand, *see id.* at 742-45.

**II.** *Illinois Brick* was controversial when decided. Since then, the States have overwhelmingly rejected, under state antitrust law, a limitation of damages actions to those who purchased directly from a violator. Instead, most state antitrust laws now follow the rule for torts generally, marking a violator's liability by foreseeability and proximate cause, not contractual privity.

As a result, state courts (and federal courts hearing state-law antitrust claims) now have decades of experience assessing proof that indirect-purchaser consumers were injured by illegal overcharges that distributors passed on from manufacturers. *Illinois Brick*'s predictions and policy judgments have not withstood that test of time.

5

First, an indirect purchaser's harm can no longer be categorically condemned as "virtually unascertainable." Since *Illinois Brick*, economists serving as experts in indirect-purchaser cases have reliably used previously unavailable tools and methodologies to assess that harm. The Court can no longer treat that harm as categorically unknowable with reasonable precision or as cost-prohibitive of indirect-purchaser claims.

Second, courts have shown themselves capable of applying gatekeeping rules of evidence to this type of expert analysis. The question whether expert proof of indirect-purchaser damages satisfies the gatekeeping rules of evidence is now routinely judged by state and federal courts, in the same way that courts apply those rules of evidence to proof of market definition and other complex issues in antitrust cases.

Third, *Illinois Brick* expressed concern that, without a bar against indirect-purchaser suits, defendants would face "a serious risk of multiple liability," i.e., liability to direct purchasers and indirect purchasers in separate lawsuits for the same overcharge (or same portion of an overcharge). *Id.* at 730-31. But subsequent decades of experience with state laws allowing indirect-purchaser suits show that the Court greatly overestimated that risk. Not a single instance of multiple liability has been reported in all that time, likely due to various practices, procedural rules, and limitations, some of which post-date *Illinois Brick*.

Fourth, *Illinois Brick* concluded that the deterrent purpose of private damages actions "is better served" by "elevating direct purchasers to a preferred position" and denying indirect purchasers the opportunity to sue.

6

*Id.* at 746. But experience has shown that, even then, direct purchasers can often be uniquely *disincentivized* to sue. And even if damages to indirect-purchaser consumers may be small, consumer claims are incentivized not only by Congress's authorization of treble damages and attorney's fees, but also by aggregation of those claims in state *parens patriae* actions.

**III.** The Court should overrule *Illinois Brick*. The doctrine of *stare decisis* may justify the Court's adherence to past decisions in many cases. But considerations relevant to application of *stare decisis* do not counsel continued adherence to *Illinois Brick*.

First, no significant reliance interests support retaining *Illinois Brick*. It is essentially a policy-based meta-rule of evidence, as opposed to a rule defining substantive property or contract rights.

Second, the Court has specifically recognized the importance of responding to evolving economic wisdom and experience in deciding whether to retain antitrust precedents. The Court is thus free to consider how intervening developments undercut *Illinois Brick*'s predictive and policy-based reasoning.

Third, *Illinois Brick*'s rule is increasingly difficult to apply in the modern world, with its growing commerce in intangible rights through new platforms. This case is a prime example.

Fourth, *Illinois Brick*'s reasoning is inconsistent with recent decisions on operative language like the Clayton Act's. *Illinois Brick* is also in tension with the congressional policy underlying section 4C of the Clayton Act, which authorizes States to bring *parens patriae* actions on behalf of their citizens.

7

Fifth, antitrust law has since developed a doctrine limiting liability under an independent test reflecting notions of foreseeability and proximate cause that align with modern tort law. That intervening development eliminates any policy concern with discarding *Illinois Brick*'s outdated privity test.

## ARGUMENT

Many of the traditional justifications for overruling precedent apply to *Illinois Brick*. "Revisiting precedent is particularly appropriate where . . . a departure would not upset expectations, the precedent consists of a judge-made rule that was recently adopted to improve the operation of the courts, and experience has pointed up the precedent's shortcomings." *Pearson v. Callahan*, 555 U.S. 223, 233 (2009). That is the case here.

*Illinois Brick* is an atextual ruling based on a judicial perception of the reliability and burdensomeness of proving indirect-purchaser damages and of the resulting incentives for suit. Since 1977, the economic theory and methodology used to calculate antitrust damages have evolved considerably. And most States now authorize indirect-purchaser claims under state antitrust law. That has led to decades of judicial experience in indirect-purchaser cases with damages analyses, which can no longer be categorically condemned as unreliable or unadministrable. Likewise, the Court's policy concerns in *Illinois Brick* have been undermined by those decades of subsequent experience. And several other *stare decisis* factors justify overruling *Illinois Brick*, such as lack of significant reliance interests and difficulties in its application.

8

The Court has authority to reconsider precedent based on briefing by amici curiae. *E.g.*, *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 319-20 (1971). The Court also has authority to request briefing from the parties on reconsidering precedent. *E.g.*, *Patterson v. McLean Credit Union*, 485 U.S. 617, 617-18 (1988) (per curiam) (citing numerous such requests). The Court should take either course here and, ultimately, overrule *Illinois Brick*.

## I. *Illinois Brick*'s bar on proving indirect-purchaser damages rests on predictions and policy judgments, not statutory text or lack of factual injury.

If manufacturers unlawfully conspire to fix prices of their goods, distributors who buy the goods directly from manufacturers may then pass on the overcharges by increasing the prices charged to consumers. Whether distributors pass on the full price increase, or instead reduce their sales volume and pass on only part of the increase, generally depends on elasticity of demand for the product. At least some pass-on can be expected in most instances. Emilio E. Varanini, *Exiting the Fun House of Mirrors:* Clayworth v. Pfizer *and the Handling of Pass-on in Post-Trial Allocation Proceedings in Federal and State Court*, 20 Competition: J. Anti. & Unfair Comp. L. Sec. St. B. Cal. 28, 52 (2011) ("The pass-on of at least some of the overcharges to end-users is direct, foreseeable, and even inevitable in almost every imaginable market situation as a matter of economics."). Indeed, this Court has assumed the pass-on of charges in other contexts. *See, e.g.*, *Gurley v. Rhoden*, 421 U.S. 200, 204-05 (1975) (establishing, for tax-

9

immunity purposes, a presumptive rule that taxes imposed on sellers are passed on to buyers).

If a distributor brings an antitrust suit against price-fixing manufacturers, it may attempt to show multiple types of damages. It may seek lost profits: profits that would have been earned but for sales lost due to its decision to increase consumer prices. Or a distributor may seek to recover the overcharges that it paid to manufacturers. In the latter situation, an accused manufacturer may allege that the distributor suffered no injury (or reduced injury) because it passed on all (or some) of the overcharges to consumers. That is a "defensive" passing-on allegation.

Consumers who are indirect purchasers of the price-fixers' goods may also sue and allege injury because the overcharges were passed on by distributors, increasing the retail price. That is an "offensive" passing-on allegation—made as part of the consumers' proof of injury from the anticompetitive conduct.

In 1968, this Court generally disallowed defensive passing-on allegations under federal antitrust law. *Hanover Shoe, Inc. v. United Shoe Mach. Corp.*, 392 U.S. 481 (1968). The Court conceded that "there might be situations" in which a manufacturer could "prove that [a distributor] has not been damaged" because it passed on an overcharge. *Id.* at 494. But the claim that an overcharge was passed on to consumers in whole or in part was viewed as "difficult to determine." *Id.* at 493. The Court was concerned that the burdens of facing that defense would discourage private suits, frustrating the deterrent purpose of antitrust law. *Id.* at 493-94. Accordingly, the Court allowed the defense only where it

10

was "easy to prove" using "a pre-existing 'cost-plus' contract." *Id.* at 494.

In subsequent, offensive-use cases, lower courts relied on the deterrence-maximizing rationale of *Hanover Shoe* to let indirect purchasers offer proof that they were injured by illegal overcharges passed on by distributors. Edward D. Cavanagh, Illinois Brick*: A Look Back and a Look Ahead*, 17 Loy. Consumer L. Rev. 1, 8 (2004).

But *Illinois Brick* rejected that approach, reasoning that "the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue." 431 U.S. at 735. The Court did not question that an indirect purchaser "may have been actually injured by antitrust violations." *Id.* at 746. Neither did the Court cite any statutory text limiting Congress's directive in 15 U.S.C. § 15(a) that "any person" who is financially injured by an antitrust violation may sue and "shall recover" damages.

Instead, *Illinois Brick* relied on policy concerns. First, the Court was concerned that determining the antitrust overcharge passed on to indirect purchasers would "inject[] extremely complex issues into the case." 431 U.S. at 745. The Court expressed concern with the reliability of that proof. *Id.* at 725 n.3 (suggesting that pass-on "cannot be measured" reliably and is "virtually unascertainable"); *id.* at 742 (doubting reliability even under "drastic simplifications"). And, given that prediction of complex proof, the Court also expressed concern with "the costs to the judicial system," *id.* at 732, and

11

with "reduc[ing] the incentive to sue" by "increas[ing] the overall costs of recovery," *id.* at 745.

Second, apart from problems of proof, the Court expressed concern over incentives for suit from the size of recovery. It expressed concern that allowing offensive proof "would create a serious risk of multiple liability for defendants." *Id.* at 730. And the Court determined that "the legislative purpose" of deterrence was "better served" by "elevating direct purchasers to a preferred position" among victims of unlawful overcharges. *Id.* at 746. Specifically, the Court found it more desirable to "concentrat[e] the full recovery for the overcharge in the direct purchasers." *Id.* at 735. If every victim could sue only for the portion of an overcharge that it absorbed (trebled, plus attorney's fees), the Court worried that many indirect purchasers would have an insufficient incentive to sue. *Id.* at 720, 746.

The Court acknowledged that, in section 4C of the Clayton Act, Congress had recently allowed the States to aggregate consumers' damages claims through *parens patriae* actions. *Id.* at 747 n.31 (discussing 15 U.S.C. § 15c, enacted in the Hart–Scott–Rodino Antitrust Improvements Act of 1976). The Court did not address that provision's positive effect on promoting *deterrence* through damages actions. *See id.* Instead, the Court simply noted that section 4C might not guarantee full *compensation* to indirect purchasers, as some might not come forward to secure their share of recoveries obtained by States. *Id.* at 747 n.31. The Court did not suggest that the goal of full compensation was better served by denying indirect purchasers any recovery mechanism at all. *See id.* And the Court subsequently con-

12

firmed that *Illinois Brick* has just that result of limiting *parens patriae* actions under section 4C to only claims of injury to direct purchasers. *Utilicorp*, 497 U.S. at 219.

## II. States have since allowed indirect purchasers to sue under state antitrust law, leading to decades of experience that contradict the predictions and policy judgments underlying *Illinois Brick*.

Starting in 1978, many States responded to *Illinois Brick*'s controversial holding by legislatively or judicially disclaiming any direct-purchaser limitation on damages actions under state antitrust law. *See* Cavanagh, *supra*, at 2 n.4, 26-28. This Court declined to halt that trend in *California v. ARC America Corp.*, 490 U.S. 93 (1989), which rejected a preemption challenge to such laws. *Id.* at 105-06.

Today, a decisive majority of States—at least 35—permit damages suits by or on behalf of indirect purchasers. Antitrust Modernization Commission, Report and Recommendations 269 (2007) ("AMC Report"), govinfo.library.unt.edu/amc; *see also* Am. Bar. Ass'n, Indirect Purchaser Litigation Handbook 397-441 (2d ed. 2016). Thus, state courts (and federal courts hearing state-law antitrust claims) have accumulated four decades of experience assessing proof of injury to consumers who purchased price-fixed goods indirectly through distributors.

That experience warrants revisiting *Illinois Brick*. Proof of indirect purchasers' injury can no longer be categorically dismissed as unreliable, prohibitively complex, or beyond the capacity for judicial review.

13

That subsequent experience likewise undermines the policy concerns animating *Illinois Brick*.

### A. Decades of experience applying modern economic analyses demonstrate that pass-on damages are not "virtually unascertainable."

An indirect purchaser's harm from price-fixing can no longer be categorically condemned as "virtually unascertainable." Since *Illinois Brick* was decided, previously unavailable tools and methodologies have allowed economists to assess indirect-purchaser damages with reasonable precision.

The Court in *Illinois Brick* was concerned that economic theory could not accurately model pass-on damages because of the difficulty of reconstructing the pricing decisions of intermediate purchasers at each step in the distribution chain. 431 U.S. at 731-32 & n.12. Calculating pass-on injury, the Court believed, would depend on "virtually unascertainable" elements such as other inputs in pricing decisions, the effect of higher prices on sales volume, and the effect of changes in output on marginal cost. *Id.* at 725 n.3.

Since 1977, the theory and methodology used to calculate antitrust damages have evolved substantially. As has now become clear, the demand and supply elasticities discussed in *Illinois Brick* are merely one way to compute passed-on overcharges. Indirect-purchaser damages are now often measured by the "yardstick" method or the "before-and-after" method, neither of which requires reconstructing a distributor's internal pricing decisions. Herbert Hovenkamp, *Book Review:* The Rationalization of Antitrust, 116 Harv. L. Rev. 917, 940-41 (2003). Instead, those methods look to the prevailing

14

price resulting from market forces unadulterated by cartel activity, or to pre- and post-cartel prices in the same market. *Id.*

Moreover, the volume and usability of available data have exploded since the 1970s. Distributors and other resellers often retain detailed sales data in a digitized format. Varanini, *supra*, at 53. That data allows economists to avoid speculation and control for potentially independent variables to show a reasonable probability that a given price increase to end users resulted from an anticompetitive overcharge by manufacturers. *Id.*; *see, e.g.*, Pierre Cremieux et al., *Proof of Common Impact in Antitrust Litigation: The Value of Regression Analysis*, 17 Geo. Mason L. Rev. 939, 945-46 (2010) (reviewing the econometric analysis used to control for non-collusive factors that may have affected consumer prices). *See generally* Pinelopi K. Goldberg & Michael M. Knetter, *Goods Prices and Exchange Rates: What Have We Learned?*, 35 J. Econ. Literature 1243 (1997) (describing how regression analysis is used to control for independent variables and calculate the "exchange rate passthrough" in international-trade cases).

Modern economic tools and methodologies also alleviate *Illinois Brick*'s concern about the burden on indirect purchasers in proving their injury. A revolution in data analysis has made it feasible for economists to perform analyses that would have been prohibitively expensive and difficult, if not impossible, in the 1970s. Roger Backhouse & Béatrice Cherrier, "*It's Computers Stupid!": The Spread of Computers and the Changing Roles of Theoretical and Applied Economics*, 49 History of Political Economy 103, 104 (Supp. 2017). *See gen-*

15

*erally* Charles Renfro, *Economic Software: The First Fifty Years in Perspective*, 29 J. of Econ. & Soc. Measurement 9, 72-73 (2004). Those are the same tools that enable experts to make reasonably precise estimates of prices and elasticities, using voluminous data, for purposes of other fundamental tasks in antitrust cases such as market definition. *See* Barak D. Richman & Christopher R. Murray, *Rebuilding* Illinois Brick*: A Functionalist Approach to the Indirect Purchaser Rule*, 81 S. Cal. L. Rev. 69, 75, 98-99 (2007); *see also* Phillip E. Areeda et al., Antitrust Law ¶ 346k (3d ed. 2007); Cavanagh, *supra*, at 24-25.

Those analyses are not so burdensome as to suppress indirect purchasers' incentive to bring private actions, especially considering the statutory provision for treble damages and attorney's fees. Since the mid-1990s, indirect purchasers have marshaled expert analyses of their damages and recovered billions of dollars in suits alleging anticompetitive conduct. *See* Robert H. Lande, *New Options for State Indirect Purchaser Legislation: Protecting the Real Victims of Antitrust Violations*, 61 Ala. L. Rev. 447, 448-49 & nn.11-12 (2010) (noting "eighty-four significant successful settlements of indirect purchaser cases" up through 2006). Many of those suits have, of course, produced significant competitive benefits for consumers. *Id.*

Those decades of experience allay *Illinois Brick*'s concern that burdens of proof will deter meritorious private actions by indirect purchasers. As this Court recognized in 1989, when discussing state laws allowing indirect purchasers to sue: "State laws to this effect are consistent with the broad purposes of the federal anti-

16

trust laws: deterring anticompetitive conduct and en-
suring the compensation of victims of that conduct."
*ARC Am.*, 490 U.S. at 102.

**B. Courts have shown themselves capable of ap-
plying gatekeeping rules to proof of indirect-
purchaser damages.**

Allowing indirect purchasers to prove their damages
has not cast courts beyond their competence, as *Illinois
Brick* worried it might. Consumers' injury from passed-
on overcharges by price-fixing manufacturers is capable
of review under the rules governing proof of damages
generally. *E.g.*, Fed. R. Evid. 702.

For instance, in *In re Static Random Access
Memory (SRAM) Antitrust Litigation*, the plaintiff
consumers alleged a price-fixing conspiracy among
manufacturers who sold their products through various
distribution channels. 264 F.R.D. 603, 606 (N.D. Cal.
2009). The indirect-purchaser plaintiffs sued under
state antitrust law, offering expert testimony quantify-
ing the anticompetitive overcharge initially paid by dis-
tributors that was passed on to consumers. *Id.* at 607,
613-15. The district court overruled an objection to that
evidence under state expert-testimony rules, ruling that
the evidence was based on reliable principles, applied to
sufficient data, in a reliable manner. *Id.* at 616.

Similarly, in *In re Cathode Ray Tube (CRT) Anti-
trust Litigation*, the indirect purchasers' expert em-
ployed reliable economic methods for measuring the
passed-on overcharge, identified the types of data re-
quired under each method, and demonstrated that the
models had been used successfully in other cases. No.

17

3:07-cv-05944-JST, 2013 WL 5391159, at *4 (N.D. Cal. Sept. 24, 2013). In another case, the district court analyzed and denied a challenge to expert testimony that used regression models to determine a "cartel's impact on indirect purchasers." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M:07-cv-1827, 2012 WL 555090, at *4 (N.D. Cal. Feb. 21, 2012).

As those examples show, courts are capable of judging proof of indirect-purchaser damages under the same gatekeeping evidentiary rules that govern proof of damages generally. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) (holding that federal gatekeeping factors go beyond an older test focusing only on general acceptance). And, if expert testimony is unreliable in any given instance, federal courts can exclude it at trial or decline to rely on it for other purposes. *See, e.g., Somers v. Apple, Inc.*, 258 F.R.D. 354, 360 (N.D. Cal. 2009) (denying class certification where indirect purchasers' expert had "not yet developed a model or worked with any data in the context of the case."); *In re Methionine Antitrust Litig.*, 204 F.R.D. 161, 165 (N.D. Cal. 2001) (denying class certification where indirect purchasers' expert failed to identify any evidence supporting his proposed pass-on formula or advance a methodology to determine how resellers were injured).

## C. The possibility of duplicative recovery for the same injury has not materialized.

*Illinois Brick* also rested on a policy judgment about deterrence and duplicative recovery. In that case, the United States as amicus curiae urged the Court to allow indirect purchasers to recover if they could prove injury, while retaining *Hanover Shoe*'s bar on reducing a

18

direct purchaser's damages based on pass-on allegations (unless indirect purchasers were already litigating pass-on in the same action). *Ill. Brick*, 431 U.S. at 730-31. That regime would promote the incentive for deterrent private actions. But it would theoretically risk recovery by multiple parties for the same injury if indirect purchasers presented their claims in actions separate from direct purchasers' actions and in a way preventing reconciliation of the claims. *Id.* at 730. *Illinois Brick* judged that risk too serious to allow. *Id.* So the Court concluded, based on *Hanover Shoe*'s bar on defensive use, that offensive use must also be barred. *Id.*

But, now, most States' antitrust laws allow indirect purchasers to sue over the same conduct actionable under federal law. So the decades since *Illinois Brick* have been fertile ground for testing the seriousness of the risk that multiple victims' competing claims cannot be reconciled and result in duplicative liability. Experience has revealed that risk to be profoundly less serious than *Illinois Brick* speculated.

For instance, the Antitrust Modernization Commission assembled by Congress reported that, despite ample testimony on numerous issues, "no one identified an instance of unfair or multiple recovery." AMC Report, *supra*, at 274. Academics observe that "there is not a single credible claim that any defendant was ever held to duplicative liability." Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. Pa. L. Rev. 269, 346 (1979). *See generally, e.g.*, J. Thomas Prud'homme, Jr. & Ellen S. Cooper, *One More Challenge for the AMC: Repairing the Legacy of* Illinois Brick, 40 U.S.F.

19

L. Rev. 675, 684 (2006) ("[The multiple liability] justification has proven, in the almost thirty years since *Illinois Brick*, to be entirely hypothetical."). Amici States are also unaware of any such instance.

A host of safeguards allows reconciliation of competing claims. They include some longstanding limitations and aspects of federal procedure, such as:

- the four-year statute of limitations, 15 U.S.C. § 15b, which makes it unlikely that indirect purchasers could bring a suit only after a direct-purchaser lawsuit ends in a final award, as those lawsuits typically last years;

- the defense of laches, which similarly reduces that risk;

- limits on offensive collateral estoppel when a plaintiff could easily have joined in an earlier action, *see Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979);

- consolidation and transfer of cases, *see* 28 U.S.C. §§ 1404, 1407; Fed. R. Civ. P. 42(a);

- judicial authority to adjust class definitions in class actions, *see* 35A C.J.S. Federal Civil Procedure § 115;

- statutory interpleader, 28 U.S.C. § 1335; and

- judicial authority to use escrow and to delay judgment.

20

*See* Harris & Sullivan, *supra*, at 346 (concluding that the risk of unreconcilable duplicative claims "is one that judicial experience shows to be easily managed").[2]

Second, the Class Action Fairness Act of 2005 ("CAFA") greatly expanded federal jurisdiction over state-law class actions. *See* 28 U.S.C. §§ 1332(d), 1453, 1711-1715. Under CAFA, state-law indirect-purchaser claims that previously would have stayed in state courts are now frequently removed to and consolidated in federal court.

By guiding most indirect-purchaser litigation into federal court, where related actions in various districts can be consolidated for class certification and other pretrial proceedings, CAFA further diminishes the risk of multiple liability. *See* Varanini, *supra*, at 59-60; *see, e.g.*, *In re: Polyurethane Foam Antitrust Litig.*, 753 F. Supp. 2d 1376 (U.S. Jud. Pan. Mult. Lit. 2010) (ordering state-law indirect-purchaser claims to proceed in same federal court as federal-law direct-purchaser claims). That single federal court can unify decisions on the admissibility of damages evidence and the commonality of indirect-purchaser injury. *See generally* AMC Report, *supra*, at 274 (noting that "estimating pass on for a potential class can be a significant barrier to class certifi-

---

[2] *Illinois Brick* was also concerned that allowing pass-on allegations and resolving competing claims of direct and indirect purchasers would add "whole new dimensions of complexity" from managing claims against a common fund. 431 U.S. at 737; *see id.* at 738-41. As explained above, however, the judiciary has proven adept at managing that complexity. Moreover, the complexity is already present in nearly all instances because the majority of States now permit indirect-purchaser suits.

21

cation"). And those consolidated actions often remain in the transferee court for trial because, after class certification, the transferee court can, "using a medley of options, retain jurisdiction over the case for trial purposes." Varanini, *supra*, at 59-60 & n.136.

Sufficient time has passed to conclude that the risk of unreconcilable damages claims by direct and indirect purchasers is not nearly as serious as *Illinois Brick* suggested. The Court should reconsider whether preventing any hypothetical risk of duplicative recovery—a risk that has not materialized in 40 years—justifies denying a remedy to actual victims who can prove their loss with reasonable precision.

**D. *Illinois Brick*'s assumption that full compensation must be sacrificed to ensure robust deterrence has proved unfounded.**

Lastly, *Illinois Brick* rested on a policy view that "the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it." 431 U.S. at 735; *accord id.* at 745-47.

But the ensuing 40 years have shown that this rule results in denying a claim to consumers even when direct purchasers are unlikely to sue: "Recent scholarship has been more empirically grounded, and most results suggest that denying standing to indirect purchasers has severely hindered antitrust enforcement." Richman & Murray, *supra*, at 94.

Direct purchasers often have little desire to disrupt a lucrative relationship with antitrust-violating suppli-

22

ers, especially when direct purchasers can pass on most or all of an anticompetitive overcharge. Lande, *supra*, at 452-53; Hovenkamp, *supra*, at 941-42; Harris & Sullivan, *supra*, at 352. That concern cannot be dismissed as speculative. *See* Memorandum from the Antitrust Modernization Comm'n Staff to the Antitrust Modernization Comm'n Comm'rs 12-13 (May 4, 2006), govinfo.library.unt.edu/amc/pdf/meetings/CivRem-IndP_DiscMemo060 504-fin.pdf (summarizing testimony identifying several instances in which direct purchasers failed to pursue claims that indirect purchasers pursued).

Indeed, the indirect-purchaser rule can perversely "encourage[] additional antitrust violations." Richman & Murray, *supra*, at 94-95. Upstream cartels can "manipulate the incentives" of distributors by "shar[ing] rents with [them] without explicitly including them in an illegal conspiracy." *Id.* at 94; *see* Maarten P. Schinkel et al., *Illinois Walls: How Barring Indirect Purchaser Suits Facilitates Collusion*, 39 RAND J. of Econ. 683, 683 (2008) (detailing mechanics); *id.* at 694-95 (surveying cases where this may have occurred).

Conversely, the past decades' experience shows that allowing injured consumers to sue enhances deterrence. Cavanagh, *supra*, at 49 ("Indirect purchaser suits have led to a modest up-tick in deterrence."). *Illinois Brick* was concerned that "diffusing the benefits" of a damages action "could seriously impair" the viability of private suits. 431 U.S. at 745. But even though the incentive may be divided up, ample incentive for meritorious claims is created by the statutory award of attorney's fees and mandatory treble damages. 15 U.S.C. § 15(a). And indirect-purchaser claims may be aggregated either

23

in appropriate class actions or by state *parens patriae* suits, *see id.* § 15c, mitigating collective-action difficulties.

Unsurprisingly, then, the past four decades have seen many successful indirect-purchaser suits under state antitrust laws. *See* Am. Bar Ass'n, Indirect Purchaser Litigation Handbook (2d ed. 2016); Am. Bar Ass'n, Indirect Purchaser Lawsuits (Eric J. McCarthy et al. eds., 2010).[3] Ultimately, as Professor Hovenkamp opines:

> Direct purchasers may be somewhat better detectors than are indirect purchasers or the consumer groups representing them, but there is no obvious reason for thinking they are so superior as to warrant exclusive rights to action based on a deterrence rationale. Much more plausibly, the likelihood of detection varies with the number of detectives. The indirect-purchaser rule weakens the incentives of consumers and their interest groups to detect violations, for it robs them of their damage action.

Herbert Hovenkamp, *The Indirect-Purchaser Rule and Cost-Plus Sales*, 103 Harv. L. Rev. 1717, 1729 (1990).

---

[3] Even before *Illinois Brick*, indirect purchasers were plaintiffs in almost two-thirds of all private federal antitrust actions and the only plaintiffs in one quarter of those cases. S. Rep. No. 95-934, at 19-20 (1978).

24

### III. The Court should overrule *Illinois Brick*.

*Stare decisis* "is not an inexorable command," and a number of factors inform the determination whether to overrule a past decision. *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2478-79 (2018) (quotation marks omitted). The considerations most relevant here are the strength of any reliance interests, subsequent experience, the decision's administrability, the quality and consistency with other decisions of the precedent's reasoning, and developments in the law since the decision was handed down. Those factors all favor overruling *Illinois Brick*.

### A. No significant reliance interests justify retaining *Illinois Brick*.

In some cases, reliance provides a strong reason for adhering to past decisions. But it does not carry significant weight here. Although *stare decisis* is at its "acme" in property and contract cases that have engendered reliance, "the opposite is true in cases . . . involving procedural and evidentiary rules." *Payne v. Tennessee*, 501 U.S. 808, 828 (1991).

*Illinois Brick* is in the latter camp. It rests heavily on evidentiary concerns about the reliability and burdensomeness of certain evidence of injury. There is no other way to explain *Illinois Brick*'s exception allowing suit for "easy to prove" indirect-purchaser injury under cost-plus contracts. 431 U.S. at 724 n.2, 732 n.12.

Because it is grounded in evidentiary concerns and enforcement policy, *Illinois Brick* has not engendered reliance interests of significance in the *stare decisis* analysis. *Payne*, 501 U.S. at 828. Moreover, antitrust

violators can have no serious expectation that they will not face claims by indirect purchasers, as most States now allow such claims. *See supra* pp. 12-13.

## B. *Stare decisis* has weaker force when subsequent economic experience undermines the rationale of antitrust decisions.

The Court has a recognized willingness to reconsider policy-driven antitrust decisions "as economic understanding evolves." *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2412-13 (2015); *accord State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("In the area of antitrust law, there is a competing interest, well represented in this Court's decisions, in recognizing and adapting to changed circumstances and the lessons of accumulated experience."). Hence, the Court "has viewed *stare decisis* as having less-than-usual force in cases involving the Sherman Act." *Kimble*, 135 S. Ct. at 2412; *accord Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 899 (2007).

And *stare decisis* already places importance on subsequent experience in deciding whether to retain precedent. *E.g.*, *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2092 (2018) (overruling a decision that had become "removed from economic reality"); *Pearson*, 555 U.S. at 233 (overruling a decision based on subsequent experience).

As set out above in Part II, *Illinois Brick*'s concerns with proof of indirect-purchaser injury are no longer justified given decades of experience under state antitrust law and modern economic techniques. *Stare deci-*

26

*sis* is no obstacle to reconsidering *Illinois Brick* based on those intervening developments.

### C. *Illinois Brick* is increasingly difficult to apply in the modern world, as this case shows.

The Court routinely considers the "workability" of its precedent in considering the force of *stare decisis*. *Janus*, 138 S. Ct. at 2481-82; *e.g.*, *Wayfair*, 138 S. Ct. at 2097; *Payne*, 501 U.S. at 827. *Illinois Brick* has proved increasingly difficult to apply with the increase in commerce over modern platforms for licensing rights. That difficulty is shown not only by the disagreement between the district court and court of appeals here, but also by the divided opinions in *Campos v. Ticketmaster Corp.*, 140 F.3d 1166 (8th Cir. 1998).

In a traditional resale model, an intermediary buys goods from a manufacturer and resells them to purchasers, usually with branding or other value added. That was the case with the concrete bricks in *Illinois Brick*, which contractors bought and incorporated into buildings sold to users. 431 U.S. at 726.

In contrast, only some of those features are present with platforms such as Apple's App Store platform or Ticketmaster's platform in *Campos*. Unlike distributors of goods, those platforms merely facilitate the licensing of rights to consumers (i.e., a license to install an app on a device or to enter a performance venue). Consumers are the first parties in that mode of commerce to pay money to someone else. And if consumers pay that money to a platform accused of anticompetitive conduct, some rationales in *Hanover Shoe* suggest that those initial payers can sue under *Illinois Brick*. 392 U.S. at 490 ("A person whose property is diminished by a payment

27

of money wrongfully induced is injured in his property."); *id.* at 490 n.8 (indicating that liability is set at "the first step" of the initial payment to the wrongdoer). That appears to be the gist of the Ninth Circuit's "distributor function" test. Pet. App. 17a-21a.

On the other hand, *Campos* articulated an "antecedent transaction" test for such platforms, applying that test to preclude buyers who used Ticketmaster's platform from alleging injury due to Ticketmaster's practices. 140 F.3d at 1169-70. *Campos*, in turn, has drawn criticism for creating a situation in which no one has standing to sue, since concert venues lack injuries-in-fact and concertgoers are denied a right of action. *See, e.g.*, Joseph P. Bauer, *The Stealth Assault on Antitrust Enforcement: Raising the Barriers for Antitrust Injury and Standing*, 62 U. Pitt. L. Rev. 437, 447 (2001); Jill S. Kingsbury, *The Indirect Purchaser Doctrine: Antecedent Transaction?*, 65 Mo. L. Rev. 473, 490 (2000); *see also Campos*, 140 F.3d at 1174-75 (Arnold, J., dissenting).

This brief takes no position on whether *Campos* or the decision below correctly apply *Illinois Brick*. Those decisions do, however, highlight difficulties in applying *Illinois Brick* in the modern world. Other decisions also grapple with that task and reach a variety of inconsistent conclusions. *See, e.g.*, Areeda et al., *supra*, at ¶ 346j; Seth E. Miller, *Seeing Over the Brick Wall: Limiting the* Illinois Brick *Indirect Purchaser Rule and Looking at Antitrust Standing in* Campos v. Ticketmaster Corp. *Through a New Lens*, 32 Fla. St. U.L. Rev. 197, 212-16 (2004); Andrew I. Gavil, *Thinking Outside the* Illinois Brick *Box: A Proposal for Reform*, 76 Antitrust L.J.

28

167, 191 n.69 (2009); Roger D. Blair & Jeffrey L. Harrison, *Reexamining the Role of* Illinois Brick *in Modern Antitrust Standing Analysis*, 68 Geo. Wash. L. Rev. 1, 18-25 (1999). Those differing conclusions highlight that *Illinois Brick* is increasingly problematic to apply.[4]

### D. *Illinois Brick* is not commended by the quality of its reasoning.

An important factor in deciding whether *stare decisis* compels continued adherence to precedent is "the quality of its reasoning." *Janus*, 138 S. Ct. at 2479; *accord Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 480-81 (1989). Here, *Illinois Brick*'s reasoning is out of step with both the text of the Clayton Act and congressional policy.

**1.** The Court has acknowledged that *Illinois Brick* circumscribes private actions based on "concerns" about "active enforcement." *Blue Shield of Va. v. McCready*, 457 U.S. 465, 474 (1982). But addressing those concerns

---

[4] *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018) ("*AmEx*"), further complicates the issue. *AmEx* held it necessary to analyze anticompetitive effects with reference to "both sides of a two-sided transaction platform," defining such platforms to cover a business that "offers different products or services to two different groups who both depend on the platform to intermediate between them," as long as the business "cannot make a sale to one side of the platform without simultaneously making a sale to the other." *Id.* at 2280, 2287. *AmEx* thereby envisions a seller with *direct* connections to *two groups* of purchasers. If the App Store in this case falls within this definition—as Justice Breyer's dissent may suggest, *see id.* at 2299—then *AmEx* may mean that both app developers and app purchasers are "direct" purchasers from Apple.

29

(which are outdated, *see supra* Part II) came "at the expense of distorting the statutory language." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 136 (2014).

The statute contains no direct-purchaser limitation. Section 4 of the Clayton Act directs that "*any person* who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue . . . and shall recover threefold the damages by him sustained." 15 U.S.C. § 15(a) (emphasis added). It is hard to think of language broader than "any person . . . injured." *Id.*

The Court has repeatedly recognized the breadth of the word "any." *See, e.g.*, *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1354 (2018); *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1141 (2018); *Kasten v. Saint-Gobain Perf. Plastics Corp.*, 563 U.S. 1, 10 (2011); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 218-19 (2008). The Court has even made that point in the context of competition law. *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 236 (1948) (discussing a provision authorizing "any" victim to sue: "The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices . . . ."); *cf. Janus*, 138 S. Ct. at 2478 (analyzing, in weighing *stare decisis*, a past decision's "consistency with other related decisions").

The term "any" therefore indicates that all injured consumers have a right to pursue monetary relief, not just consumers who bought from a price-fixer directly. *Cf. Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) ("When the statutory language

30

is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.") (quotation marks omitted).

Moreover, the Clayton Act authorizes lawsuits "without respect to the amount in controversy," 15 U.S.C. § 15(a), confirming the atextual nature of *Illinois Brick*'s concern with the predicted "small stake[s]" of indirect-purchaser suits, 431 U.S. at 747.[5]

Of course, Congress intended the Clayton and Sherman Acts "to be construed in the light of [their] common-law background," which includes limitations such as proximate cause. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 531-33 (1983) ("*AGC*"). But there is no common-law (or textual) basis for excluding all indirect purchasers who are injured by reason of an antitrust violation. And *Illinois Brick* admits that its rule "denies recovery to those indirect purchasers who may have been actually injured by antitrust violations." 431 U.S. at 746.

---

[5] The legislative history confirms that the Congress that enacted the damages remedy, originally section 7 of the Sherman Act of 1890, envisioned relief for actual users, not simply middlemen. The 51st Congress recognized that individual consumers were primarily injured by the great trusts of the day, even though they did not purchase goods such as sugar directly from those trusts. For example, Senator George included consumers in explaining who could recover damages: "The consumer, therefore, paying all [of a trust's] increased price advanced by the middlemen and profits on the same, is the party necessarily damnified or injured." 21 Cong. Rec. 1767 (1890). Senator Spooner similarly expressed his concern with trusts' "keep[ing] up to consumers" the prices of various foods. 21 Cong. Rec. 2640 (1890).

31

Furthermore, section 4 directs that any person injured by an antitrust "shall recover" his damages sustained. 15 U.S.C. § 15(a). As the Court recently confirmed, "shall" connotes a mandatory duty, not admitting of policy-laden exceptions. *SAS Inst.*, 138 S. Ct. at 1354 ("The word 'shall' generally imposes a nondiscretionary duty.").

2.   The Court has also found it appropriate to overrule precedent where doing so would "correct a seriously erroneous interpretation of statutory language that would undermine congressional policy as expressed in other legislation." *Rodriguez de Quijas*, 490 U.S. at 484. That consideration also counsels overruling *Illinois Brick*.

In the Hart–Scott–Rodino Antitrust Improvements Act of 1976, Congress enacted section 4C of the Clayton Act, which provides that a State may bring a civil action in its name, "as parens patriae on behalf of natural persons residing in such State," to secure monetary relief "for injury sustained by such natural persons to their property by reason of any violation of [the Sherman Act]." 15 U.S.C. § 15c(a)(1). As this Court has held, section 4C is a procedural device to permit aggregation of claims that citizens could themselves bring under section 4 of the Clayton Act. *Utilicorp*, 497 U.S. at 219.

But that aggregation would have little point if, as *Illinois Brick* concluded, section 4 claims are limited to only direct purchasers. The States would have been given a practically useless power, because citizens who buy price-fixers' goods rarely do so directly, as opposed

32

to buying indirectly through distributors.[6] That conflict between *Illinois Brick*'s indirect-purchaser limitation and the policy embodied in the Hart–Scott–Rodino Antitrust Improvements Act further justifies overruling *Illinois Brick*.

**3.** More generally, the Court has recognized compensating injured parties as a major goal of antitrust law. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 486 n.10 (1977) (recognizing the congressional design to "[open] the door of justice to every man, whenever he may be injured by those who violate the antitrust laws, and [to] giv[e] the injured party ample damages for the wrong suffered"). That congressional policy is inconsistent with *Illinois Brick*'s decision to bar recovery by indirect purchasers who can prove their injury with reasonable precision—and to instead allow potential windfall awards to direct purchasers who may not bear any of an illegal overcharge. *See* AMC Report, *supra*, at vi ("Such a system that compensates the uninjured and denies recovery to the injured seems fundamentally unfair.").

---

[6] That structural implication of section 4C is confirmed by the provision's legislative history. The Senate Report explains that, "[a]s between competing claimants within the chain of distribution, however, *including consumers*, [section 4C] is intended to assure that the monetary relief is properly allocated." S. Rep. No. 94-803, at 44-45 (1976) (emphasis added). Likewise, the House Report states Congress's understanding that, "Under section 4 of the Clayton Act, any person, including *any consumer*, who can prove he was injured by price-fixing or any other antitrust violation, has a cause of action." H.R. Rep. No. 94-499, at 6 (1976) (emphasis added).

33

State attorneys general, through section 4C actions, are uniquely situated to achieve Congress's expressed purpose of compensating injured parties. Unlike federal antitrust enforcers, state attorneys general can recover damages for consumers and local-government purchasers. AMC Report, *supra*, at 186. And the States' authority to bring *parens patriae* actions on behalf of their citizens stems in part from their sovereignty. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 600 (1982). That point further justifies departing from *Illinois Brick*'s incorrect limitation of that authority. *See Wayfair*, 138 S. Ct. at 2097 (departing from *stare decisis* where incorrect precedent "is limiting the lawful prerogatives of the States").

## E. Overruling *Illinois Brick* will align antitrust law with modern concepts of remoteness.

Finally, revisiting precedent is supported when it is "undesirable for" the Court's precedent "to exist side by side" with contrary treatment of similar issues. *Rodriguez de Quijas*, 490 U.S. at 484. And *Illinois Brick*'s outdated limitation of liability according to privity is anomalous.

"[C]ourts generally have acknowledged that treble-damages actions under the antitrust laws are analogous to common-law actions sounding in tort," *Tex. Indus., Inc. v. Radcliffe Materials, Inc.*, 451 U.S. 630, 634 (1981), and the Court has referenced rules for "tortfeasors" to set the "rule in antitrust litigation." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 343-47 (1971); *id.* at 347 (dispensing with "the ancient common-law rule" and adopting the Second Restatement of

34

Torts rule). That analogy to tort law supports dispensing with *Illinois Brick*'s direct-purchaser limitation because privity of contract with the wrongdoer is generally not required to recover damages for the consequences of torts. Restatement (Second) of Torts §§ 402A(2)(b), 774A & cmt. b (1965) (as amended). Rather, tortfeasors' liability is generally limited by foreseeability and proximate cause. *Id.* §§ 430, 435-439; *accord* Restatement (Third) of Torts: Physical & Emotional Harm § 29 (2010).

In fact, those modern tort limitations now find expression in a separate antitrust doctrine developed after *Illinois Brick*. In 1983, the Court announced the "remoteness" test for federal antitrust standing. *AGC*, 459 U.S. at 537-44. That test balances five factors: (1) the causal connection between the antitrust violation and the plaintiff's harm; (2) the nature of the injury, including whether the plaintiff is a consumer or competitor in the relevant market; (3) the directness of the injury, and whether the damages are too speculative; (4) the potential for duplicative recovery, and whether the apportionment of damages would be too complex; and (5) the existence of more direct victims with motivation to sue. *Id.*

When state antitrust law allows indirect purchasers to sue, applying *AGC*'s multifactor test guards against liability to far-removed parties in a much more principled way than *Illinois Brick*'s categorical prohibition. Although a court may ultimately deny standing to certain plaintiffs, it does so only after analyzing their relationship to the alleged wrong. *See, e.g.*, *Supreme Auto Transp. LLC v. Arcelor Mittal*, No. 1:08-cv-05468, 2017

35

WL 839484 (N.D. Ill. Mar. 3, 2017); *In re Refrigerant Compressors Antitrust Litig.*, No. 2:09-md-02042, 2013 WL 1431756 (E.D. Mich. Apr. 9, 2013). Although *AGC*'s barrier is high, it is not categorically insurmountable by indirect-purchaser plaintiffs. *See, e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1123-24 (N.D. Cal. 2008); *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133 (N.D. Cal. 2009); *In re Intel Corp. Microprocessor Antitrust Litig.*, 496 F. Supp. 2d 404 (D. Del. 2007). Eliminating *Illinois Brick*'s blunt-edged test would align antitrust law with modern tort concepts, which find expression in the reticulated *AGC* test.

36

## CONCLUSION

The Court should reconsider and overrule *Illinois Brick*'s indirect-purchaser rule.

Respectfully submitted.

TOM MILLER
Attorney General of Iowa

NATHAN BLAKE
Deputy Attorney General

MAX M. MILLER
Assistant Attorney
  General

OFFICE OF THE IOWA
  ATTORNEY GENERAL
1305 E. Walnut St.
Des Moines, Iowa 50319
max.miller@ag.iowa.gov
(515) 281-5926

MARK BRNOVICH
Attorney General of
  Arizona

LESLIE RUTLEDGE
Attorney General of
  Arkansas

XAVIER BECERRA
Attorney General of
  California

CYNTHIA H. COFFMAN
Attorney General of
  Colorado

GEORGE JEPSEN
Attorney General of
  Connecticut

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

KYLE D. HAWKINS
Solicitor General
  *Counsel of Record*

J. CAMPBELL BARKER
Deputy Solicitor General

JOSEPH D. HUGHES
Assistant Solicitor General

KIM VAN WINKLE
Deputy Chief, Antitrust Division

BRET FULKERSON
DAVID M. ASHTON
NICHOLAS G. GRIMMER
Assistant Attorneys General,
Antitrust Division

OFFICE OF THE TEXAS
  ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
kyle.hawkins@oag.texas.gov
(512) 936-1700

*Counsel for Amici Curiae*

37

KARL A. RACINE
Attorney General of the District of Columbia

MATTHEW DENN
Attorney General of Delaware

PAMELA JO BONDI
Attorney General of Florida

CHRISTOPHER M. CARR
Attorney General of Georgia

RUSSELL SUZUKI
Attorney General of Hawai'i

LAWRENCE G. WASDEN
Attorney General of Idaho

LISA MADIGAN
Attorney General of Illinois

CURTIS T. HILL, JR.
Attorney General of Indiana

JEFF LANDRY
Attorney General of Louisiana

JANET T. MILLS
Attorney General of Maine

BRIAN E. FROSH
Attorney General of Maryland

MAURA HEALEY
Attorney General of Massachusetts

LORI SWANSON
Attorney General of Minnesota

JIM HOOD
Attorney General of Mississippi

TIMOTHY C. FOX
Attorney General of Montana

38

Douglas J. Peterson
Attorney General of Nebraska

Hector Balderas
Attorney General of New Mexico

Barbara D. Underwood
Attorney General of New York

Wayne Stenehjem
Attorney General of North Dakota

Josh Shapiro
Attorney General of Pennsylvania

Peter F. Kilmartin
Attorney General of Rhode Island

Alan Wilson
Attorney General of South Carolina

Marty J. Jackley
Attorney General of South Dakota

Mark R. Herring
Attorney General of Virginia