MAKAN DELRAHIM
Assistant Attorney General, Antitrust Division

DAVID L. ANDERSON (CABN 149604)
United States Attorney

ROGER P. ALFORD
MICHAEL F. MURRAY
Deputy Assistant Attorneys General, Antitrust Division

LAUREN S. WILLARD
Counsel to the Assistant Attorney General, Antitrust Division

NICKOLAI G. LEVIN (DCBN 490881)
Attorney, Antitrust Division
950 Pennsylvania Ave. NW
Office 3224
Washington, DC 20530
Telephone: (202) 514-2886
Facsimile: (202) 514-0536
E-mail: nickolai.levin@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION<br><br>This Document Relates to:<br><br>ALL DIRECT PURCHASER ACTIONS | No. 3:07-CV-05944-JST<br>MDL No.: 1917<br><br>**STATEMENT OF INTEREST OF THE UNITED STATES**<br><br>Date: May 30, 2019<br>Time: 2:00 p.m.<br><br>The Honorable Jon S. Tigar<br>Courtroom 9 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTEREST OF THE UNITED STATES ................................................................ 1

BACKGROUND ...................................................................................................... 1

ARGUMENT ............................................................................................................ 4

    I.      Commercial Enterprises Are Not Organs of a Foreign State Unless They Serve a Public Function on Behalf of the Government ............... 4

    II.     The Third Prong of the FSIA's Commercial-Activity Exception Can Be Satisfied Even Though the Foreign State Made No Direct Sales in the United States ................................................................................... 10

# TABLE OF AUTHORITIES

## Cases

*Alperin v. Vatican Bank*, 2007 WL 4570674 (N.D. Cal. Dec. 27, 2007) ........................................ 6

*Alperin v. Vatican Bank*, 365 Fed. App'x 74 (9th Cir. 2010) ........................................ 6

*Altmann v Republic of Austria*, 317 F.3d 954 (9th Cir. 2002) ........................................ 11

*Altmann v Republic of Austria*, 327 F.3d 1246 (9th Cir. 2003) ........................................ 11

*Board of Regents v. Nippon Telephone & Telegraph Corp.*, 478 F.3d 274 (5th Cir. 2007) ........... 8

*Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect*,
89 F.3d 650 (9th Cir. 1996) ........................................ 5, 6, 7

*California Department of Water Resources v. Powerex Corp.*,
533 F.3d 1087 (9th Cir. 2008) ........................................ 5, 6, 7

*California v. NRG Energy, Inc.*, 391 F.3d 1011 (9th Cir. 2004) ........................................ 14

*Capital Trans International, LLC v. International Petroleum Investment Co.*,
2013 WL 557236 (M.D. Fla. Feb. 14, 2013) ........................................ 7

*CYBERsitter, LLC v. People's Republic of China*, 805 F. Supp. 2d 958 (C.D. Cal. 2011) .......... 15

*Dole Food Co. v. Patrickson*, 538 U.S. 468 (2003) ........................................ 2, 5, 11

*EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*, 322 F.3d 635 (9th Cir. 2003) ... 5, 6, 7

*Filetech S.A. v. France Telecom, S.A.*, 212 F. Supp. 2d 183 (S.D.N.Y. 2001) ........................... 14

*Gates v. Victor Fine Foods*, 54 F.3d 1457 (9th Cir. 1995) ........................................ 6

*Gregorian v. Izvestia*, 871 F.2d 1515 (9th Cir. 1989) ........................................ 15

*Hyatt Corp. v. Stanton*, 945 F. Supp. 675 (S.D.N.Y. 1996) ........................................ 9

*Kelly v. Syria Shell Petroleum Development B.V.*, 213 F.3d 841 (5th Cir. 2000) ........................ 9

*Lotes Co., Ltd. v. Hon Hai Precision Industry Co.*, 753 F.3d 395 (2d Cir. 2014) ................. 13, 14

*Lyon v. Agusta S.P.A.*, 252 F.3d 1078 (9th Cir. 2001) ........................................ 15

*Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012) ........................................ 14

*NXP Semiconductors USA, Inc. v. Brevets, S.A.S.*,
2014 WL 4621017 (N.D. Cal. Sept. 15, 2014) ........................................ 8

*Patrickson v. Dole Food Co.*, 251 F.3d 795 (9th Cir. 2001) ............................................... 5, 6, 8, 9

*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992) ..................................... 1, 10, 11, 12

*Republic of Austria v. Altmann*, 541 U.S. 677 (2004) ............................................................ 2, 11

*Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, 2016 WL 8648638 (C.D. Cal. Aug. 18, 2016) .......... 12

*Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, 899 F.3d 1064 (9th Cir. 2018) .................................. 12

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ................................................................................. 11

*United States v. Hsiung*, 778 F.3d 738 (9th Cir. 2015) ............................................................... 13

*United States v. LSL Biotechnologies*, 379 F.3d 672 (9th Cir. 2004) .......................................... 13

*USX Corp. v. Adriatic Insurance Co.*, 345 F.3d 190 (3d Cir. 2003) ........................................ 6, 9

*Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) .... 15

*Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480 (1983) .................................................. 2

**Statutes**

15 U.S.C. § 1 ................................................................................................................................ 1

15 U.S.C. § 6a ............................................................................................................................. 13

28 U.S.C. § 517 ............................................................................................................................ 1

28 U.S.C. § 1602 .......................................................................................................................... 1

28 U.S.C. § 1603(a) ...................................................................................................................... 2

28 U.S.C. § 1603(b) ...................................................................................................................... 2

28 U.S.C. § 1603(b)(2) ..................................................................................................... 1, 4, 5, 16

28 U.S.C. § 1603(d) .................................................................................................................... 10

28 U.S.C. § 1603(e) .................................................................................................................... 11

28 U.S.C. § 1604 .......................................................................................................................... 2

28 U.S.C. § 1605(a)(2) ......................................................................................................... passim

28 U.S.C. § 1606 .......................................................................................................................... 2

**Other Authorities**

Makan Delrahim, *Drawing the Boundaries of the Sherman Act: Recent Developments in the Application of the Antitrust Laws to Foreign Conduct*, 61 N.Y.U. Ann. Surv. Am. L. 415 (2005) .................................................................................................................. 14

H.R. Rep. No. 94-1487 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6615 ........................ 11

Restatement (Fourth) Foreign Relations Law, § 454 .................................................. 11

**INTEREST OF THE UNITED STATES**

The United States respectfully submits this statement pursuant to 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the Department of Justice to attend to the interests of the United States in any case pending in a federal court.  The United States enforces the federal antitrust laws and has a strong interest in the proper interpretation of the jurisdictional limitations in cases involving foreign states set forth in the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.* (FSIA).  In particular, the United States has a significant interest in the correct interpretation of (i) the determination of an "organ of a foreign state" under 28 U.S.C. § 1603(b)(2) and (ii) the application of the "direct effect" requirement in the third prong of the commercial-activity exception in 28 U.S.C. § 1605(a)(2).  An overly broad interpretation of "organ of a foreign state" combined with an overly narrow reading of the commercial-activity exception's "direct effect" requirement could harm American interests by immunizing defendants whose anticompetitive conduct has caused substantial harm to U.S. consumers.

**BACKGROUND**

This case is a large multidistrict litigation following from the United States' criminal investigation and prosecution of foreign corporations that, from 1995 to 2007, conspired to fix the prices of cathode ray tubes (CRTs) used in the manufacture of televisions and computer monitors sold in the United States and elsewhere in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.[1]  Although the United States did not prosecute Irico Group Corp. (Group) or Irico Display Devices Co., Ltd. (Display), both companies were named as defendants in the private follow-on actions and have raised important questions regarding this Court's jurisdiction under the FSIA.

**1.  Statutory Background**

The FSIA is "a comprehensive statute containing a 'set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities.'"  *Republic of Austria v. Altmann*, 541 U.S. 677, 691 (2004).  The

---

[1] The United States previously intervened in this case for the purpose of limiting discovery, *see* Doc. 80, at 2, but that is not the basis of this filing, which is submitted under 28 U.S.C. § 517.

FSIA "codifies, as a matter of federal law, the restrictive theory of sovereign immunity," under which "immunity is confined to suits involving the foreign sovereign's public acts, and does not extend to cases arising out of a foreign state's strictly commercial acts." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 487-88 (1983).  It provides that foreign states are "normally immune from the jurisdiction of federal and state courts, 28 U.S.C. § 1604, subject to a set of exceptions specified in §§ 1605 and 1607" for certain "commercial activities of [a] foreign sovereign" and other types of conduct.  *Id.* at 488.  When a foreign state is not immune from suit under one of those exceptions, the state "shall be liable in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 1606.

The FSIA defines the term "foreign state" to include its political subdivisions as well as its agencies and instrumentalities.  28 U.S.C. § 1603(a).  The FSIA further defines "agency or instrumentality" of a foreign state to include any entity "(1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and (3) which is neither a citizen of a State of the United States . . . nor created under the laws of any third country."  28 U.S.C. § 1603(b).  An entity's status under Section 1603(b) is determined as of the time the complaint was filed.  *Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003).

The commercial-activity exception is the FSIA's "most significant . . . exception[]" to foreign sovereign immunity.  *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992).  This exception provides that a foreign state is not immune from jurisdiction "in any case" in which "the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2).

### 2. Factual Background

Plaintiffs allege that Group and Display conspired with others to fix prices, allocate customers, and restrict output of products containing CRTs (CRT Products).  Direct Purchaser Plaintiffs' Consol. Am. Compl., Doc. 436, ¶ 5.  Specifically, plaintiffs allege that Group and Display participated in at least several dozen meetings between 1998 and 2006 in which the conspirators reached agreements on price, output, and customer and market allocations of CRT Products, *id.* ¶ 159, and that Group and Display "manufactured, sold, and distributed CRT Products either directly or through its subsidiaries or affiliates throughout the United States," *id.* ¶¶ 37-39.

Between May 2009 and October 2017, the Irico Defendants ceased participating in the class action believing themselves immune from suit in the United States, and the clerk entered a default.  Doc. 4727.  On February 1, 2018, the Court granted the Irico Defendants' motions to set aside the entry of default.  Doc. 5240.  Before reaching the question of default, the Court first determined that it had jurisdiction over the Irico Defendants despite their claim of immunity under the FSIA.  *Id.* at 3-11.  The Court held that (i) "[t]he Irico Defendants do not present evidence sufficient to show that Irico Display is an organ of the state," *id.* at 8, and that (ii) "the commercial activities exception applies to any FSIA immunity for the Irico Group because they have adequately alleged a direct effect," *id.* at 11.  The Court nonetheless recognized that it was possible that both Irico Defendants could establish immunity under the FSIA after discovery and further briefing.  *Id.* at 17, 19-20.

Group and Display moved to dismiss the Section 1 claims against them for lack of subject-matter jurisdiction under the FSIA.  *See* Doc. 5410 (Group Mot.), 5412 (Display Mot.).  Group "has always been *wholly* owned by the State Council . . . of the People's Republic of China."  Group Mot. 1.  Unlike Group, however, Display is not directly owned by the Chinese Government.  Display Mot. 3.  Rather, at the time the complaint was filed, "the share capital of Display was owned 41.36% by [another corporation], which was in turn 75% owned by Irico Group," with the remaining 58.64% widely dispersed among other shareholders.  *Id.* at 3 & n.1.  Group argued that it qualified as an agency or instrumentality under the majority-share prong of

Section 1603(b)(2), Group Mot. 3, and Display argued it qualified under the organ prong, Display Mot. 4-17.

Both Irico Defendants also argued that no statutory exception deprives them of sovereign immunity.  *See* Group Mot. 10-16; Display Mot. 17-23.  Focusing on the FSIA's commercial-activity exception, the Irico Defendants claimed that "[t]he first and second prongs of the exception cannot apply to [them] because [they] carried on no 'commercial activity' in the United States and performed no 'acts' in the United States, let alone one upon which this action is based."  Group Mot. 11; Display Mot. 19.  They also argued that the third prong of the exception cannot by satisfied here, as a matter of law, because they never made direct sales of CRTs or CRT-containing products in the United States.  *See* Group Mot. 13-14; Display Mot. 20-21.

## ARGUMENT

The United States takes no position on whether Group and Display are entitled to immunity under the FSIA.  Rather, this statement addresses the United States' views on the applicable legal framework governing (i) the determination of whether an entity is an "organ of a foreign state" under 28 U.S.C. § 1603(b)(2) and (ii) the application of the "direct effect" requirement in the third prong of the commercial-activity exception in 28 U.S.C. § 1605(a)(2).  The statement first discusses the factors courts use to determine whether an entity qualifies as an organ of a foreign state.  The statement next explains that the Irico Defendants are wrong in arguing that proving a direct effect in the United States under the third-prong of the commercial-activity exception requires proof that the foreign state made direct sales in the United States.  There are many situations—in and out of the antitrust context—in which a foreign state's acts outside the United States can cause a direct effect in the United States even though the foreign state made no direct sales in the United States.

## I.   Commercial Enterprises Are Not Organs of a Foreign State Unless They Serve a Public Function on Behalf of the Government

An entity qualifies as an "organ of a foreign state" for purposes of the FSIA if it is engaged in a public function on behalf of the state.  Although courts consider many factors in

determining whether an entity is an "organ," companies in which the state owns only a minority share, either directly or indirectly, rarely qualify.  In such circumstances, the company must make a compelling showing that it actually is serving a public function on behalf of the government and is not merely pursuing profits for its shareholders.

a.  Section 1603(b)(2) defines an "agency or instrumentality" of a foreign state to include any entity "[i] which is an organ of a foreign state or political subdivision thereof, or [ii] a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof."  28 U.S.C. § 1603(b)(2).  In *Dole Food*, the Supreme Court held "that only direct ownership of a majority of shares by the foreign state [itself] satisfies the statutory requirement" under the majority-share prong.  538 U.S. at 474, 477.  Finding the two parts of Section 1603(b)(2) disjunctive—"*[e]ither* the entity can be an 'organ of a foreign state,' *or* the entity can have a majority of its shares or other ownership interest owned by a 'foreign state or a political subdivision thereof,'" *see Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect*, 89 F.3d 650, 654 (9th Cir. 1996)—the Ninth Circuit has held that an entity can be an organ of a foreign state satisfying the first prong of 1603(b)(2) even when the state does not directly own a majority share of it satisfying the second prong.  *See id.*; *see also Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087, 1098 (9th Cir. 2008); *EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*, 322 F.3d 635, 640 (9th Cir. 2003).

The critical inquiry for determining whether an entity is an "organ" of a foreign state is whether it "engages in a public activity on behalf of the foreign government."  *Patrickson v. Dole Food Co.*, 251 F.3d 795, 807 (9th Cir. 2001), *aff'd on other grounds*, 538 U.S. 468 (2003).  Typically, organs of a foreign state are "quasi-public entities [such as] national banks, state universities, and public television networks."  *Id.* at 808.  While "commercial enterprises" can qualify as organs of a foreign state in certain circumstances, they do not constitute organs when they are "acting to maximize profits rather than pursue public objectives" on behalf of the foreign state.  *Id.*

In considering whether an entity is an organ of a foreign state, courts examine factors such as whether the entity was created by the foreign state's law; whether it is owned by the

foreign state in whole or in part; whether it is controlled by government appointees; whether it employs public servants; and whether it is assigned exclusive responsibility over an important public function, such as the management of the state's natural resources. *Corporacion Mexicana*, 89 F.3d at 655; *see also Patrickson*, 251 F.3d at 807 (identifying level of government financial support and obligations and privileges under state law as additional considerations); *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 209 (3d Cir. 2003) (considering "ownership structure" of entity partly owned by the state). These factors inform the ultimate inquiry of whether the entity is "engag[ing] in a public activity on behalf of the foreign government." *Powerex*, 533 F.3d at 1098.

In determining whether an entity is an organ, courts take a "holistic view," *Powerex*, 533 F.3d at 1102, and no single factor is dispositive. For instance, "a company may be an organ of a foreign state for purposes of the FSIA even if its employees are not civil servants" if the evidence otherwise illustrates it serves a public purpose. *EIE Guam*, 322 F.3d at 641. Likewise, a foreign state's ownership and control are typically relevant because an entity is unlikely to be carrying out a public function if those factors are not present. *See USX Corp.*, 345 F.3d at 209 ("different ownership structures might influence the degree to which an entity is performing a function 'on behalf of the foreign government'"). A foreign state's ownership and control of an entity, however, are not sufficient for organ status. An ordinary commercial enterprise will not be considered an organ even when it is wholly owned and controlled by a government agency or instrumentality. *See Gates v. Victor Fine Foods*, 54 F.3d 1457, 1461 (9th Cir. 1995) (holding that an "ordinary pork processing plant[] cannot be considered an 'organ' of the Province of Alberta'" even though it was wholly owned and controlled by a state-controlled marketing board).

A valid public purpose can take a wide variety of forms but must be something more than just making money for the state as a shareholder. *See Patrickson*, 251 F.3d at 808; *see also Alperin v. Vatican Bank*, 2007 WL 4570674, at *3 (N.D. Cal. Dec. 27, 2007) (distinguishing circumstances where "the entity serves a public purpose" from where "it acts as an independent commercial enterprise to maximize its own profits"), *aff'd* 365 Fed. App'x 74 (9th Cir. 2010).

Thus, where an entity serves primarily a commercial purpose, rather than a public one, it is not an organ of the foreign state, regardless of the percentage of the foreign state's ownership.  *See Capital Trans Int'l, LLC v. Int'l Petroleum Inv. Co.*, 2013 WL 557236, at *9 (M.D. Fla. Feb. 14, 2013) ("The key inquiry is whether the entity serves primarily a private interest, such as profit maximizing, or a public interest, such as industry protection or economic stabilization.  Here, Aabar, albeit beneficial to Abu Dhabi and the UAE, was created to invest in businesses to bring its shareholders a profit.  That is not a national or public purpose.") (citations omitted).

b.  In analyzing whether a company is an organ of a foreign state, courts often consider the company's ownership structure, including the percentage of the entity owned directly or indirectly by the state, as well as other details showing the nature and extent of state involvement and control over the company.  When a foreign state creates a company as a wholly owned subsidiary of one of its agencies and instrumentalities in order to advance a public objective, and the subsidiary engages in sovereign functions on its behalf, courts readily deem it an organ of the state.

For instance, in *Powerex*, the British Columbian government directed a state agency to establish a wholly owned subsidiary "to market the export of power outside [British Columbia]." 533 F.3d at 1099.  The exporting subsidiary was an organ of British Columbia because it "owes its very existence to the Province," which used it to further "public policies" concerning a natural resource of the foreign state; it "played a role in treaty formation and implementation"; and "[m]ost importantly," the Province had "sole beneficial ownership and control" of it through the state agency.  *Id.* at 1099-1101 (citations omitted).[2]

---

[2] *See also EIE Guam*, 322 F.3d at 639-41 (finding a wholly owned subsidiary of a state agency to be an "organ" of Japan because the government created it "expressly to perform a public function" of collecting and disposing of non-performing loans from failing financial institutions, funded it, and reimbursed it for any losses); *Corporacion Mexicana*, 89 F.3d at 655 (holding that a wholly owned subsidiary of a state-owned corporation qualified as an "organ of a foreign state" because it "was created by the Mexican Constitution, Federal Organic Law, and Presidential Proclamation; it is entirely owned by the Mexican Government; is controlled entirely by government appointees; employs only public servants; and is charged with the exclusive responsibility of refining and distributing Mexican government property").

Where the state's direct and indirect ownership share of a company is 50% or less, however, courts have demanded more evidence that it is serving a public function on behalf of the government. When a foreign state owns 50% or less of an entity *and* it is profit-seeking, organ status has been routinely denied.

For instance, in *Patrickson*, the government of Israel had privatized its holdings so that it "no longer owned, indirectly or otherwise, a majority of the shares in" two chemical companies (Companies). 251 F.3d at 805. The Ninth Circuit held that the Companies were not organs of Israel even though the government retained the authority under Israeli law "to approve the appointment of directors and officers, as well as any changes in the capital structure of the Companies, and the Companies were obliged to present an annual budget and financial statement to various government ministries." *Id.* at 808. Rather, the Companies were best viewed "as independent commercial enterprises, heavily regulated, but acting to maximize profits rather than pursue public objectives." *Id.*; *cf. NXP Semiconductors USA, Inc. v. Brevets, S.A.S.*, 2014 WL 4621017, at *7 (N.D. Cal. Sept. 15, 2014) (concluding that a corporation owned 50% by France and 50% by another French agency created to "acquire licensing rights to patents" was not an organ of France because it was "more similar to a private company acting to maximize profits, as opposed to an arm of the state conducting sovereign functions such as treaty negotiation and implementation or distributing government resources").

Similarly, in *Board of Regents v. Nippon Telephone & Telegraph Corp.*, 478 F.3d 274 (5th Cir. 2007), the Fifth Circuit held that a television broadcaster in which the government of Japan indirectly owned a minority stake (46%) was not an organ of Japan. *Id.* at 279. The court found significant that it "operate[d] as one of several *commercial* interests in a *competitive* telecommunications market." *Id.* While "Japanese Government authorization [was] required for numerous [firm] transactions, including[] appointing or dismissing board members, distributing profits, appointing auditors, issuing new shares, executing mergers, and amending its articles of incorporation," the government "merely provide[d] passive oversight, related to, and in some cases identical with, the requirements of other governments' regulatory bodies, such as the United States' Securities and Exchange Commission (SEC)." *Id.* at 279-80.

To be clear, there are occasions when a company that is not majority-owned by the state can qualify as its "organ." For example, in *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841 (5th Cir. 2000), the Fifth Circuit held that a Syrian petroleum company that was only 50% owned by a state-owned corporation had made a *prima facie* showing that it was an organ of Syria. *Id.* at 847-48. It based that determination on the fact that the entity "was created by a Syrian government decree for a national purpose: the development and exploration of Syria's mineral resources," that four of the entity's eight board members were "high-level Syrian government officials," and that the entity "has the exclusive right to explore and develop Syria's identified petroleum reserves, which are the property of the Syrian government." *Id.* at 848. Unlike in *Patrickson*, the company in *Kelly* was a "non-profit-making entity." *Patrickson*, 251 F.3d at 808 n.12.

Organ status is reserved for entities serving public purposes, because otherwise courts "would open the door to situations in which a party only tangentially related to a foreign state could claim foreign state status and avail itself" of the FSIA's protections, and it "would be unfair to plaintiffs, who in some such cases might not have reason to know of the slight relationship of their dealings with the foreign states." *USX Corp.*, 345 F.3d at 208; *see also Hyatt Corp. v. Stanton*, 945 F. Supp. 675, 689 (S.D.N.Y. 1996) (expressing concern about extending FSIA coverage to "[m]any corporations with distant government investment, even if far removed from sovereign control," because it would have "several important consequences"). The FSIA affords respect to the sovereignty of organs of a foreign state, but is not a shield for ordinary commercial enterprises engaging in unlawful conduct.

The United States expresses no opinion on whether Display—which appears to acknowledge that it is both minority state-owned and profit seeking, *see* Display Mot. 3 & n.1, 13 n.5; Direct Purchaser Plaintiffs' Opposition to the Irico Defendants' Amended Motions To Dismiss, Doc. 5419, at 3-9, 15, 17-19—has made a sufficiently compelling showing that it is an organ of China.

1
2

**II.     The Third Prong of the FSIA's Commercial-Activity Exception Can Be
Satisfied Even Though The Foreign State Made No Direct Sales in the United
States**

The commercial-activity exception is the FSIA's "most significant . . . exception[]" to

foreign sovereign immunity.  *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992).

This exception provides that a foreign state is not immune from jurisdiction "in any case . . . in

which the action is based":

> [1] upon a commercial activity carried on in the United States by the foreign state; or
>
> [2] upon an act performed in the United States in connection with a commercial activity
> of the foreign state elsewhere; or
>
> [3] upon an act outside the territory of the United States in connection with a commercial
> activity of the foreign state elsewhere and that act causes a direct effect in the United
> States.

28 U.S.C. § 1605(a)(2).

The "action" here is a Sherman Act suit alleging a conspiracy in which the Irico

Defendants participated.  In such a case, the relevant acts include joining the unlawful conspiracy

and acts in furtherance of that conspiracy.  Acts in furtherance of an antitrust conspiracy can

include sales on agreed-upon terms, but they also can include other types of acts such as

foregoing sales at particular prices, reducing production, or creating an enforcement mechanism

to prevent cheating on the agreement.

The Irico Defendants' argument that proof of a foreign state's ***direct sales to the United
States*** is necessary to prove a ***direct effect*** under the third prong of the commercial-activity

exception, *see* Group Mot. 13-14; Display Mot. 20-21, finds no support in the text of the statute

or applicable precedent.  If a foreign state makes direct sales in the United States as part of an

antitrust conspiracy, it is engaging in "commercial activity carried on in the United States" that

falls within the first prong of the commercial-activity exception.  The FSIA defines "commercial

activity" as "either a regular course of commercial conduct or a particular commercial

transaction or act," 28 U.S.C. § 1603(d), and further defines "commercial activity carried on in

the United States by a foreign state" as "commercial activity carried on by such state and having

substantial contact with the United States," *id.* § 1603(e).  Direct sales in the United States is a type of commercial transaction carried on in the United States that satisfies the first prong of the commercial-activity exception.  *See, e.g.*, *Altmann v Republic of Austria*, 317 F.3d 954, 969 (9th Cir. 2002) (holding that Austrian gallery's "publication and sale of [marketing] materials" in the United States were "commercial activities" within the first prong of the commercial activity exception), *amended*, 327 F.3d 1246 (9th Cir. 2003), *aff'd on other grounds*, 541 U.S. 677 (2004); H.R. Rep. No. 94-1487 (1976), reprinted at 1976 U.S.C.C.A.N. 6604, 6615 ("commercial activity carried on in the United States by a foreign state" includes "import-export transactions involving sales to, or purchases from, concerns in the United States").

While the Irico Defendants argue that direct sales into the United States are also necessary to establish a direct effect under the third prong, that interpretation would violate the "cardinal principle of statutory construction" that statutes must be construed, if reasonably possible, so that "no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001); *see also Dole Food*, 538 U.S. at 476-77 (holding that it is improper to construe the FSIA "in a manner that is strained and, at the same time, would render a statutory term superfluous").  Reading "direct effects" to encompass only "direct sales" robs the third prong of any meaningful function.

The Supreme Court thus has recognized that the third prong reaches beyond direct sales to other types of acts "in connection with" commercial activity abroad, so long as the acts cause a "direct effect" in the United States.  *Weltover*, 504 U.S. at 618.  The Court "reject[ed] the suggestion that [the FSIA commercial-activity exception] contains any unexpressed requirement of 'substantiality' or 'foreseeability.'"  *Id.*  Although jurisdiction cannot be predicted on "purely trivial effects in the United States," the Court explained that an effect is "direct" if it follows "as an immediate consequence of the defendant's . . . activity."  *Id.*; *see also* Restatement (Fourth) Foreign Relations Law, § 454, cmt. e ("[a]n effect is not direct if it is a remote or attenuated consequence of the act").  In *Weltover*, the Court held that such a direct effect existed for Argentina's unilateral rescheduling of maturity dates on bonds, even though that commercial

activity was "outside this country," because "[m]oney that was supposed to have been delivered to a New York bank for deposit was not forthcoming."  504 U.S. at 611, 619.

Actions of a foreign company to join and act in furtherance of an antitrust conspiracy can cause a direct effect in the United States even if that company made no direct sales in the United States.  For example, an agreement among foreign manufacturers to boycott businesses in the United States by refusing to supply them with inputs could cause significant harm in the United States.  Moreover, an agreement among foreign manufacturers to fix the price of a component part sold abroad and incorporated into finished products sold in the United States could have a direct effect in the United States, even if the manufacturers themselves never sold the price-fixed component or the finished products in or for delivery to the United States.

While few antitrust cases have applied the FSIA's "direct effect" requirement, a district court in the Ninth Circuit recently found direct effects under the FSIA for conduct other than direct sales by the defendant in the United States.  *See Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, No. CV 16-2345-DMG, 2016 WL 8648638, at *3 (C.D. Cal. Aug. 18, 2016).  There, a company 51% owned by the Mexican Government (Essa) breached its contract to sell solar sea salt to another Mexican firm, leaving the firm "unable to satisfy its contractual obligation to sell the salt to Sea Breeze," who "in turn, was unable to meet its obligations to sell to various purchasers within the United States."  *Id.* at *1.  The court exercised jurisdiction over Essa under the third prong of the commercial-activity exception, even though another firm had distribution rights to sell Essa's salt in the United States.  The court found a "direct effect" in the United States, because the U.S. was the largest importer of salt, Essa produced 17% of the world's salt, and the alleged conduct "leads to less variety in the U.S. salt market, as well as less competition and higher prices for United States consumers."  *Id.* at 1, 3 & n.3.  The Ninth Circuit affirmed, likewise finding the "direct effects" requirement satisfied.  899 F.3d 1064, 1068 n.2 (9th Cir. 2018).

Similarly, in the context of the Foreign Trade Antitrust Improvements Act of 1982 (FTAIA), 15 U.S.C. § 6a,[3] the Ninth Circuit recently held that a global conspiracy to fix the price of TFT-LCD panels "sold overseas" and "then incorporated into finished products" sold in the United States had a direct effect in the United States.  *See United States v. Hsiung*, 778 F.3d 738, 758-59 (9th Cir. 2015), *cert. denied* 135 S. Ct. 2837 (2015).  The Ninth Circuit found sufficient evidence of a direct effect because "[i]t was well understood that substantial numbers of finished products were destined for the United States and that the practical upshot of the conspiracy would be and was increased prices to customers in the United States."  *Hsiung*, 778 F.3d at 759.  The Ninth Circuit concluded that there was a direct effect in the United States, even for price-fixed panels sold abroad, because of the "close and direct connection" between those sales "and the ultimate inflation of prices in finished products imported to the United States."  *Id.*[4]  Because the Ninth Circuit construes "direct" the same way under both the FSIA and the FTAIA, *see Hsiung*, 778 F.3d at 758; *United States v. LSL Biotechs.*, 379 F.3d 672, 680 (9th Cir. 2004), the *Hsiung* case demonstrates that a company need not make direct sales in the United States for its commercial transactions to cause a direct effect in the United States within the meaning of the FSIA's commercial-activity exception.[5]

---

[3] The FTAIA provides that:

> Sections 1 to 7 of this title [including the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—
>> (1) such conduct has a direct, substantial, and reasonably foreseeable effect—
>>> (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
>>> (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
>> (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

15 U.S.C. § 6a.

[4] In *Hsiung*, there were also sales of the price-fixed product into the United States, which the court relied on for its alternative holding that the conspiracy involved import commerce.  778 F.3d at 760.

[5] The United States has urged a more inclusive definition of direct effects under the FTAIA than under the FSIA and, as the *Hsiung* court noted, the Second and Seventh Circuit's FTAIA decisions have rejected application of the Ninth Circuit's more restrictive approach.  778 F.3d at 758 n.9 (citing *Lotes Co., Ltd. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 398 (2d Cir.

1    Contrary to the Irico Defendants' claim, *see* Group Mot., 13-14; Display Mot. 20-21, the

2  Ninth Circuit's decision in *California v. NRG Energy, Inc.*, 391 F.3d 1011 (9th Cir. 2004), and

3  the district court's decision in *Filetech S.A. v. Fr. Telecom, S.A.*, 212 F. Supp. 2d 183, 197

4  (S.D.N.Y. 2001), do not hold that direct sales to the United States are required to prove direct

5  effects in antitrust cases.  Both cases involve very fact-specific holdings that have no bearing on

6  the proper analysis of the direct effect requirement to the antitrust conspiracy claims here.  In

7  fact, in *NRG Energy* there were no antitrust claims against the foreign-state defendants at all,

8  only state-law claims for indemnity.  391 F.3d at 1021.[6]  *Filetech* involved substantially different

9  allegations concerning monopolization claims under Section 2 of the Sherman Act.  212 F. Supp.

10  2d at 185-88, 195.  In that case, the court held that after "substantial discovery" and "years of

11  litigation," Filetech's claim of injury in the United States was unduly speculative and

12  unsupported.  *Id*. at 196-98.  Far from concluding that direct sales in the United States were

13  necessary to demonstrate a direct effect in the antitrust context, the district court simply held that

14  the Filetech had failed to make a factual showing that the foreign agency's activities *abroad* had

15  caused a direct effect in the United States.  *Id.* at 198.

16    Nor are the Irico Defendants correct in arguing that "[c]ases outside the antitrust context

17  confirm that a 'direct effect' cannot be established without direct sales," *see* Group Mot. 13;

18  2014); *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 857 (7th Cir. 2012) (en banc)).  Both the

19  Second and Seventh Circuits have held that, under the FTAIA, "the term 'direct' means only 'a

20  reasonably proximate causal nexus.'"  *Minn-Chem*, 683 F.3d at 857 (quoting Makan Delrahim,

21  *Drawing the Boundaries of the Sherman Act: Recent Developments in the Application of the Antitrust Laws to Foreign Conduct*, 61 N.Y.U. Ann. Surv. Am. L. 415, 430 (2005)); *see Lotes*,

22  753 F.3d at 398.  Regardless of whether the court interprets the "direct effect" language in the

23  FTAIA and FSIA the same, the *Hsiung* decision is useful in clarifying that a foreign company's acts in furtherance of an antitrust conspiracy can cause a direct effect in the United States even if that company made no direct sales in the United States.

24  [6]  *NRG Energy* was an earlier decision by the Ninth Circuit in the *Powerex* litigation discussed

25  above on p. 7.  California had brought state antitrust claims against various energy companies, which filed cross-claims for indemnity in state court.  391 F.3d at 1022.  Defendants conceded

26  that the first prong of the commercial-activity exception applied to the wholly owned exporting

27  subsidiary "because the claim arises from commercial activities [it] conducted within the United States."  *Id.*  The court held, however, that the third prong of the exception did not apply to the

28  state agency because its credit decisions had no direct effect in the United States (only on the exporting subsidiary).  *Id.* at 1024.  There is no parallel to the facts here.

1  Display Mot. 21.  Outside the antitrust context, the Ninth Circuit has held that a plaintiff can

2  show a direct effect "from an act occurring abroad" by establishing that "something legally

3  significant actually happened in the United States."  *Gregorian v. Izvestia*, 871 F.2d 1515, 1527

4  (9th Cir. 1989).  Applying this standard, courts have found direct effects in the United States

5  even though the defendant did not make direct sales in the United States.  For example, in *Lyon*

6  *v. Agusta S.P.A.*, 252 F.3d 1078 (9th Cir. 2001), the Ninth Circuit found the direct-effect

7  requirement satisfied when an airplane manufactured in Italy and sold in Belgium later crashed

8  in California, killing a U.S. citizen.  *Id.* at 1081.  The court stated that, "[p]articularly where

9  failure of a manufactured product is concerned, a more appropriate reading of the phrase should

10 focus on whether some intervening act broke the chain of causation leading from the asserted

11 wrongful act to its impact in the United States."  *Id.* at 1083.  Likewise, in *CYBERsitter, LLC v.*

12 *People's Republic of China*, 805 F. Supp. 2d 958 (C.D. Cal. 2011), a California company alleged

13 a conspiracy to steal its intellectual property and incorporate it into a program called Green Dam.

14 The California company sought to join China to the case because it "allegedly paid [two of the

15 hackers] approximately $6.9 million for a one-year license to distribute the Green Dam

16 program."  *Id.* at 976.  The court held that "[b]ecause the locus of that injury occurred at

17 Plaintiff's principal place of business in California, the PRC's actions had a direct effect in the

18 United States."  *Id.* at 977.

19         Thus, both precedent and standard canons of statutory construction make clear that direct

20 sales in the United States are not required to satisfy the "direct effects" requirement in the third

21 prong of the commercial-activity exception.  Adopting that mistaken reading of the FSIA in

22 antitrust cases could immunize many conspirators from liability for their anticompetitive actions,

23 even where the conspiracy substantially harmed consumers in the United States.  While

24 jurisdiction under the third prong of the commercial-activity exception is lacking over a

25 defendant where there are only remote or trivial effects within the United States, that is not the

26 case when anticompetitive conduct abroad causes a direct effect in the United States.  This is

27 particularly true for cartels—the "supreme evil of antitrust," *Verizon Commc'ns Inc. v. Law*

*Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004)—that increase prices for U.S. consumers.

The United States expresses no opinion on the application of the "direct effect" requirement to the particular facts of this case.

*      *      *

Both the definition of "organ" of a foreign state in 28 U.S.C. § 1603(b)(2) and the commercial-activity exception in 28 U.S.C. § 1605(a)(2) play an important role in implementing the restrictive theory of sovereign immunity codified by the FSIA.  The definition of organ is sufficiently expansive to ensure that entities serving a public function on behalf of a foreign state are eligible for immunity, while the commercial-activity exception ensures that such organs remain subject to U.S. jurisdiction for their commercial activities that cause a direct effect in the United States (and for other acts in the United States that meet the first or second prong).  An overly broad interpretation of an "organ" of a foreign state combined with an overly narrow reading of the commercial-activity exception would risk undermining the careful balance set forth in the FSIA and could harm American interests.

Respectfully submitted,

MAKAN DELRAHIM
Assistant Attorney General

DAVID L. ANDERSON
United States Attorney

ROGER P. ALFORD
MICHAEL F. MURRAY
Deputy Assistant Attorneys General

LAUREN S. WILLARD
Counsel to the Assistant Attorney General

NICKOLAI G. LEVIN
Attorney, Appellate Section

Dated:  April 23, 2019

/s/ Nickolai G. Levin
NICKOLAI G. LEVIN

Attorneys for the United States of America