John Taladay (*pro hac vice*)
john.taladay@bakerbotts.com
BAKER BOTTS LLP
1299 Pennsylvania Ave., NW
Washington, D.C. 20004
Telephone: (202) 639-7700
Facsimile: (202) 639-7890

Stuart C. Plunkett (State Bar No. 187971)
stuart.plunkett@bakerbotts.com
Peter Huston (State Bar No. 150058)
peter.huston@bakerbotts.com
BAKER BOTTS LLP
101 California Street, Suite 3600
San Francisco, California 94111
Telephone: (415) 291-6200
Facsimile: (415) 291-6300

*Attorneys for*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION, <br><br> THIS DOCUMENT RELATES TO: <br><br> *ALL DIRECT PURCHASER ACTIONS* | Case No. 3:07-cv-05944-JST <br><br> MDL No.: 1917 <br><br> **IRICO DEFENDANTS' REPLY IN SUPPORT OF AMENDED MOTIONS TO DISMISS CLAIMS OF DIRECT PURCHASER PLAINTIFFS FOR LACK OF SUBJECT MATTER JURISDICTION (FED. R. CIV. P. 12(b)(1)) (ECF Nos. 5410, 5412, and 5419)** <br><br> Date: May 30, 2019 <br> Time: 2:00 p.m. <br> Judge: Honorable Jon S. Tigar <br> Courtroom: 9 |

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ..................................................................................................................1

ARGUMENT ........................................................................................................................2

I.    DPPs Concede that Group Is Entitled to Presumptive Immunity.......................................2

II.   Display Easily Qualifies as an "Organ" of the Chinese Government and Is
      Thus Entitled to Presumptive Immunity...........................................................................2

      A.    DPPs Ignore the Bulk of Irico's Showing Regarding Display's
            Creation, Purpose, and Control by State-Owned Entities ...................................2

      B.    Making Profits Does Not Undermine Display's Status as an Organ.....................4

      C.    Irico Display Is a Government-Controlled Entity under Chinese
            Law, Which Alone Establishes Display's Status as an Organ ..............................6

      D.    DPPs' Contention that Mr. Wang Lacks Personal Knowledge Is
            Frivolous............................................................................................................8

      E.    The *Powerex* Factors Overwhelmingly Demonstrate Irico Display's
            Status as an Organ ...........................................................................................10

            1.    State-Owned Entities Founded Irico Display and Irico
                  Group Acted as Display's "Actual Controller" .........................................10

            2.    Display's Purpose Was to Benefit the State and Its People,
                  Including Via the Distribution of Its Profits to State-Owned
                  Entities....................................................................................................12

            3.    The Undisputed Evidence Confirms that Irico Group and the
                  Chinese Government Exercised Actual Control Over
                  Display.....................................................................................................14

            4.    The Chinese Government Closely Controlled the
                  Appointment of Display's Senior Employees ...........................................15

            5.    Substantial Evidence Demonstrates Display's Obligations,
                  Privileges, and Support from the Chinese Government. ...........................16

III.  The Commercial Activity Exception Does Not Apply.......................................................17

      A.    The Court Did Not "Decide" that the Commercial Activity
            Exception Applies Here.....................................................................................17

      B.    The Issue of Commercial Activity Under the FSIA is Analytically
            Distinct from the FTAIA and Is Not Met Here ..................................................18

            1.    Unlike the FTAIA, the Commercial Activity Exception
                  under the FSIA is Used to Establish Personal Jurisdiction

and Requires Direct Effects in the U.S. Caused by the
Actions of the Foreign Sovereign ............................................................. 18

2. Alleged Participation in a Conspiracy Purportedly Affecting
Prices in the U.S. Does Not Meet the Commercial Activity
Exception ..................................................................................................... 21

3. DPPs Concede that Neither Group Nor Display Made Sales
to the U.S., Relying Instead on the Sales of an Independent
Entity they Mischaracterize as a "Subsidiary" ........................................... 25

IV.    CONCLUSION .................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adler v. Federal Republic of Nigeria,*
    107 F.3d 720 (9th Cir. 1997) ........................................................................21

*Alpha Therapeutic Corp. v. Nippon Hoso Kyokai,*
    199 F.3d 1078 (9th Cir.2001) .......................................................................13

*Alpha Therapeutic Corp. v. Kyokai,*
    237 F.3d 1007 (9th Cir.2001 ........................................................................13

*Barthelemy v. Air Lines Pilots Ass'n,*
    897 F.2d 999 (9th Cir. 1990) ..........................................................................9

*Board of Regents v. Nippon Telephone & Telegraph Corp.,*
    478 F.3d 274 (5th Cir. 2007) ........................................................................13

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.,*
    137 S. Ct. 1312 (2017) ..................................................................................18

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco County,*
    137 S. Ct. 1773 (2017) ...........................................................................23, 25

*California Dept. of Water Resources v. Powerex Corp.,*
    553 F.3d 1087 (9th Cir. 2008) ................................................2, 4, 10, 12, 16, 17

*California v. NRG Energy Inc.,*
    391 F.3d 1011 (9th Cir. 2004) .......................................................................27

*Capital Trans Intern., LLC v. Int'l Petroleum Inv. Co.,*
    No. 8:10-cv-529-T-30TGW, 2013 WL 557236 (M.D. Fla. Feb. 14, 2013) ...................11, 12

*Clark v. Martinez,*
    543 U.S. 371 (2005) ................................................................................24, 25

*CNET Networks, Inc. v. Etilize, Inc.,*
    No. C 06-5378 MHP, 2008 WL 4104287 (N.D. Cal. Sept. 2, 2008) ..............................9, 10

*Corcoran v. CVS Health Corp.,*
    169 F. Supp. 3d 970 (N.D. Cal. 2016).............................................................27

*Corcoran v. CVS Health Corp.,*
    19 F. Supp. 3d 970 (N.D. Cal. 2016)..............................................................23

*Corzo v. Banco Cent. de Reserva del Peru*,
    243 F.3d 519 (9th Cir. 2001) ............................................................................ 19

*EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*,
    322 F.3d 635 (9th Cir. 2003) ............................................................................ 15

*English v. United States*,
    42 F.3d 473 (9th Cir. 1994) .............................................................................. 19

*EOTT Energy Operating Ltd. P'ship v. Winterthur Swiss Ins. Co.*,
    257 F.3d 992 (9th Cir. 2001) ............................................................................ 17

*Gates v. Victor Fine Foods*,
    54 F.3d 1457 (9th Cir. 1995) ............................................................................ 16

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011) ......................................................................................... 25

*Gregorian v. Izvestia*,
    871 F.2d 1515 (9th Cir. 1989) .......................................................................... 19

*International Association of Machinists & Aerospace Workers v. OPEC*,
    649 F.2d 1354 (9th Cir. 1981) ..................................................................... 21, 22

*Kramer Motors, Inc. v. British Leyland, Ltd.*,
    628 F.2d 1175 (9th Cir. 1980) .......................................................................... 23

*Lake v. Lake*,
    817 F.2d 1416 (9th Cir. 1987) .......................................................................... 22

*Murphy v. Korean Asset Management Corp.*,
    421 F. Supp. 2d 627 (S.D.N.Y. 2005), *aff'd*, 190 Fed. Appx. 43 (2nd Cir. 2006)
    ............................................................................................... 4, 5, 6, 11, 13

*NXP Semiconductors USA, Inc. v. Brevets*,
    No. C 14-1225 SI, 2014 WL 4621017 (N.D. Cal. Sept. 15, 2014) ................. 11, 17

*Patrickson v. Dole Food Co.*,
    251 F.3d 795 (9th Cir. 2001) ....................................................................... 13, 14

*Powerex Corp. v. Reliant Energy Services, Inc.*,
    551 U.S. 224 (2007 ......................................................................................... 12

*Republic of Argentina v. Weltover, Inc.*,
    504 U.S. 607 .............................................................................................. 19, 20

*S & Davis Int'l, Inc. v. The Republic of Yemen*,
    218 F.3d 1292 (11th Cir. 2000) ........................................................................ 20

IRICO'S REPLY ISO AMENDED MOTIONS TO DISMISS
DPPS FOR LACK OF JURISDICTION
    iv
    CASE NO. 3:07-CV-05944-JST
MDL No. 1917

*Schwarzenegger v. Fred Martin Motor Co.*,
      374 F.3d 797 (9th Cir. 2004) .........................................................................22

*Sea Breeze Salt, Inc. v. Mitsubishi Corp.*,
      No. CV 16-2345-DMG, 2016 WL 8648638 (C.D. Cal. Aug. 18, 2016) .............22

*Sea Breeze Salt, Inc. v. Mitsubishi Corp.*,
      899 F.3d 1064 (9th Cir. 2018) .......................................................................22

*Sec. Pac. Nat'l Bank v. Derderian*,
      872 F.2d 281 (9th Cir. 1989) .........................................................................19

*Theo. H. Davies & Co. v. Republic of Marshall Islands*,
      174 F.3d 969 (9th Cir. 1998) .........................................................................19

*Thos. P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica*,
      614 F.2d 1247 (9th Cir. 1980) ...................................................................19, 20

*United States v. Hui Hsiung*,
      778 F.3d 738 (9th Cir. 2015) .........................................................................18

*United World Trade, Inc. v. Mangyshlakneft Oil Production Association*,
      33 F.3d 1232 (10th Cir. 1994) ...................................................................20, 21

*Verlinden B.V. v. Cent. Bank of Nigeria*,
      461 U.S. 480 (1983) .....................................................................................18

*Vermeulen v. Renault, U.S.A., Inc.*,
      985 F.2d 1534 (11th Cir. 1993) ......................................................................20

*Wescott v. Reisner*,
      No. 17-CV-06271-EMC, 2018 WL 2463614 (N.D. Cal. June 1, 2018) .............25

*Williams v. Yamaha Motor Co.*,
      851 F.3d 1015 (9th Cir. 2017) ...................................................................23, 27

**STATUTES**

15 U.S.C. §§ 1, 6a .............................................................................................19

28 U.S.C. § 1603(2) ............................................................................................2

28 U.S.C. § 1605 ..............................................................................................25

28 U.S.C. § 1605(a) ...........................................................................................24

§ 1330(b) .......................................................................................................19

## INTRODUCTION

The Foreign Sovereign Immunities Act ("FSIA") deprives this Court of subject matter jurisdiction over Irico Group ("Group") and Irico Display ("Display") because they are agencies or instrumentalities of the Chinese government. DPPs' opposition fails to undermine Irico Group's and Display's motions to dismiss arguments or the significant evidentiary foundation upon which those arguments rest.

DPPs' opposition concedes that Irico Group is an instrumentality of the Chinese government.  It ignores the majority of Display's documentary and testimonial evidence that confirms that Display was an organ of the Chinese government since its inception and throughout the entire class period, including at the time DPPs' complaint was filed in 2007. For example, DPPs ignore the Chinese government's tight control of Display's management through Irico Group, Display's clear public purposes, and Display's special status under Chinese law. Rather than address this evidence, DPPs primarily argue that Display earned a profit. But earning profits—particularly Display's profits distributed to a state-owned controlling shareholder like Irico Group—does not undermine Display's organ status. In fact, the significant government control over Irico Display's profit distributions weigh in favor of its organ status.

Having failed to rebut the evidence that Irico Group and Display are agencies or instrumentalities of a foreign sovereign, DPPs fall back on the FSIA's commercial activity exception. But contrary to DPPs' assertions, the Court did not "decide" the commercial activity exception issue—if it had, why would the Court have ordered jurisdictional discovery to inform Irico's pending motions to dismiss? DPPs have grasped for jurisdictional hooks that rely on erroneous legal theories that conflict with constitutional due process and stark mischaracterizations about the Irico Defendants' relationships with third parties. DPPs do not dispute that neither Irico Group nor Irico Display ever made sales into the United States or their conduct had any direct effect in the United States. Irico Group and Irico Display are foreign sovereigns and the commercial activity exception does not apply here. Accordingly, this Court lacks subject matter jurisdiction under the FSIA, and DPPs' claims should be dismissed with prejudice.

## ARGUMENT

### I.   DPPs Concede that Group Is Entitled to Presumptive Immunity

DPPs concede that Irico Group is an instrumentality of the Chinese government, and for good reason. The evidence proves that the Chinese government wholly owned Group at the time the complaint was originally filed and throughout the relevant period. (Irico Display Devices Co., Ltd.'s Amended Motion to Dismiss Claims of Direct Purchaser Plaintiffs, Dkt. No. 5410 at 9-10 ("Group's DPP Mot.").) Because "a majority of [Group's] shares or other ownership interest is owned by a foreign state or political subdivision thereof," Group is an instrumentality of a foreign state under the FSIA. *See* 28 U.S.C. § 1603(2). Having conceded Group's presumptive entitlement to immunity, DPPs must prove that one of the FSIA's exceptions apply. This they fail to do, as discussed below.

### II.   Display Easily Qualifies as an "Organ" of the Chinese Government and Is Thus Entitled to Presumptive Immunity

#### A.   DPPs Ignore the Bulk of Irico's Showing Regarding Display's Creation, Purpose, and Control by State-Owned Entities

Tellingly, DPPs do not confront or dispute the vast majority of Irico's evidence demonstrating Display's status as an "organ" of the Chinese government, including substantial evidence concerning (1) the circumstances of Display's creation, (2) its control by a state-owned entity (Irico Group), and (3) the public purposes of its activities. *See California Dept. of Water Resources v. Powerex Corp.*, 553 F.3d 1087, 1098 (9th Cir. 2008). Most strikingly, DPPs ignore all but a few passages in Mr. Wang's lengthy declaration, even though Mr. Wang has worked at Irico Group and its subsidiaries for decades and worked at one of Irico's CPT Plants at the time of Irico Display's founding. (Amended Declaration of Zhaojie Wang, Dkt. No. 5411-1 ("Am. Wang Decl.") ¶¶ 3-7.) DPPs make the frivolous assertion (addressed below) that Mr. Wang lacks personal knowledge, but they do not and cannot demonstrate that Mr. Wang lacks personal knowledge to testify about Display's formation, purpose, or dependence on state-owned entities. (*See* Direct Purchaser Plaintiffs' Opposition to the Irico Defendants' Amended Motions to Dismiss, Dkt No. 5419 ("DPPs' Opp.") at 23-25.) DPPs' efforts to challenge the process of

gathering, rather than the substance, of the underlying facts belies the weakness of their opposition.

DPPs ignore Irico's evidence regarding Display's creation, all of which demonstrates Display's organ status. Irico Display was founded by Irico Group and four other wholly state-owned entities. (Am. Wang Decl. ¶ 40; *see also* Amended Declaration of Stuart Plunkett, Dkt. No. 5413 ("Am. Plunkett Decl."), Ex. 44 at -853.) Consequently, "Irico Display was set up as a wholly state-owned enterprise of the Chinese Government." (Am. Wang Decl. ¶ 40.) DPPs do not address this evidence.

DPPs also ignore evidence that Display's purposes align with the public purposes of Group: contributing to China's socialist national economy, increasing the value of its state-owned assets, and providing for the welfare of its workers. (*See* Am. Wang. Decl. ¶¶ 25, 42, 65.) Contrary to this evidence, DPPs incorrectly assert that Display's sole purpose was to earn profits for shareholders. (*See* DPPs' Opp. 17-19.) But the evidence shows that Irico Display consolidated its financial statements with Group which then re-invested its profits into a school system, police department, hospital, and senior living center for the benefit of the public, including Display's employees and the surrounding community. (Am. Wang Decl. ¶ 65.) DPPs' claim that Display's purpose was solely profit-making is demonstrably false. Similarly, DPPs ignore passages from one of Irico Display's founding documents indicating that it was "composed mainly of public ownership." (Am. Plunkett Decl., Dkt. No. 5413, Ex. 44 at -854.) That document further charges Display to "protect and increase the value of State-owned assets." (*Id.*)

DPPs disregard evidence that Group—a state-owned entity—acted as "actual controller" of Display. (Am. Wang Decl. ¶ 49.) DPPs fail to address the mountain of evidence showing that Group—a state-owned entity—controlled the management and operations of Display. For instance, Display submitted financial reports to Group for approval; Group set up operational goals for Display; Group evaluated the performance of Display's top management; Group approved major production changes at Display; Group approved any transfer of Display's

state-owned assets; Display borrowed large amounts from Group; Display consolidated its results into Group's financial statements; and Group served as guarantor of Display's debts. (*Id.* ¶¶ 53, 54, 55, 57, 61, 62.) All of which is further proof that Display was an organ of the state.

### B.    Making Profits Does Not Undermine Display's Status as an Organ

Critically, DPPs are wrong in asserting that deriving a profit defeats Display's organ status. "[T]here is nothing in the text of the FSIA to suggest that [a company's] ability to make a profit *ipso facto* precludes the conclusion that it is an organ" under the FSIA. *Murphy v. Korean Asset Management Corp.*, 421 F. Supp. 2d 627, 646 (S.D.N.Y. 2005) (finding organ status for a for-profit entity), *aff'd*, 190 Fed. Appx. 43 (2nd Cir. 2006). "The relevant question is not *whether* [Display] earns a profit, but where does that profit go?" *Powerex*, 533 F.3d at 1102. Making and distributing some profits to private shareholders does not preclude FSIA immunity where, as here, the entity has other, public purposes. *Murphy*, 421 F. Supp. 2d at 642 (finding organ status for a for-profit entity). Thus, a for-profit's status as an organ depends on how those profits are distributed and whether the entity has other, public purposes. Importantly, government-imposed restrictions on profit distributions weigh in favor of organ status.

In *Murphy*, the plaintiffs sued the Korea Asset Management Corporation (KAMCO)—a state-created entity that served as a creditor for distressed Korean companies. *Id.* at 629. The Korean government owned 42.8% of KAMCO, an agency of the Korean government owned 28.6%, and private Korean banks owned the remaining 28.6% of the entity. *Id.* at 631. Yet KAMCO was found to be an organ of the Korean government. *Id.* at 646. Notably, KAMCO had the ability to earn profits and made profits of $19 million in one year. *Id.* at 632, 642. Some of those profits were distributed to shareholders but were nonetheless subject to government limitations and restrictions. *See id.* at 632. The court saw "no reason why KAMCO's profitability should preclude FSIA immunity. Rather, it simply means that KAMCO does not have as its *exclusive* purpose a national one." *Id.* at 642 (emphasis in original). Moreover, the court found that "restrictions and limitations" on the distributions of profits "reflect the fact that . . . [KAMCO] performs several functions often associated with—and in most cases reserved for—governments or their agencies." *Id.* at 632. Thus, the nature of KAMCO's distributions,

including the limitations imposed by the Korean government, weighed in favor of KAMCO's organ status. *See id.*

The significant limitations on Display's profit distributions mirror the facts in *Murphy* and weigh in favor of Display's organ status. Like in *Murphy*, the Chinese government imposes "restrictions and limitations" on the distributions of Display's profits. *Id.* Display was required to divert its profits to pay state-owed capital dividends directly to the government. (Am. Plunkett Decl. Ex. 16, Dkt No. 5413, at -588; Am. Wang. Decl. ¶ 2.) Display also re-invested much of its profits into its business operations to "increas[e] the value of [Display's] State-owned assets." (Am. Wang. Decl. ¶ 63.) Shareholders received what remains—but by far the largest portion of those final distributions went back to state-owned Irico Group via Irico Electronics, where they formed the basis for Group's own SASAC-mandated state-owned dividends, investment in additional State-owned assets, and funding for Group's public welfare obligations. (Am. Plunkett Decl., Dkt. No. 5413, Ex. 2 at -240; Ex. 16 at -588; Declaration of Donald Clarke, Dkt. 5392-3 ("Clarke Decl.") ¶ 22h.) DPPs obfuscate these facts by asserting, inaccurately, that "most of its profits went to private shareholders rather than the Chinese state" and neglecting to recognize the initial diversions imposed on these profits before they ever reach private shareholders. (DPPs' Opp. at 19.) In *Murphy*, a similar set of restrictions presented no barrier to organ status. In fact, the very existence of those limitations weighs in favor of organ status because they "reflect the fact that . . . [Display] performs several functions often associated with . . . governments or their agencies." *Murphy*, 421 F. Supp. 2d at 642. DPPs' own expert acknowledges the significant limitations SASAC imposes on companies like Display and Group in an article that he wrote:

> SASAC as the organizational manifestation of the party-state in its role as controlling shareholder, seeks to maximize a range of benefits extending from state revenues to technological prowess and from soft power abroad to regime survival at home.  As one of us recently put it in a separate co-authored work, in state capitalism 'the government attempts to ensure that company-level behavior results in country-level maximization of economic, social, and political benefits.'

(Declaration of Stuart Plunkett in Support of Irico's Reply ("Plunkett Decl."), Ex. H at 746; Ex. F at 116:15-117:10.)  Consequently, Display's distribution of profits does not bar organ status, and

the significant limitations imposed on those distributions demonstrates a level of government **control not imposed on private enterprises.**

Any profit-seeking purpose does not undermine Display's other public purposes, such as contributing to China's socialist national economy, increasing the value of its state-owned assets, and providing for the welfare of its workers. Organs need not have "exclusive[ly]" national purposes. *Murphy*, 421 F. Supp. 2d at 642. DPPs fail to address these public purposes that weigh in favor of Display's organ status, erroneously arguing that profit-seeking was the singular purpose motivating Display. (*See* DPPs' Opp. at 17-18.) Finally, DPPs' reliance on two public reports mentioning profits—including one irrelevant document drafted after the complaint was filed—do not support their argument (*see* DPPs' Opp. at 8-9; Plunkett Decl., Ex. D 53:6-54:24 (establishing that the "2007 Display Report" was drafted in April, 2008).), because discussions of profit-seeking motives do not diminish Display's other, public purposes.

### C. Irico Display Is a Government-Controlled Entity under Chinese Law, Which Alone Establishes Display's Status as an Organ

The contemporaneous documentary evidence and expert testimony of one of the country's leading experts on the law of the People's Republic of China establish that Display is (and was in 2007) state-controlled.

George Washington University Law School Professor Donald Clarke has been studying China for nearly forty years. He is fluent in both written and spoken Chinese. After reviewing the evidence, Professor Clarke concluded that "Irico Display was, before and during 2007, officially considered at the very least a state-controlled entity, and in some contexts a state-owned entity." (Clarke Decl. ¶ 24.) He bases this conclusion on numerous facts, including the following:

- Display was audited in the manner that a state-owned entity would be. (Clarke Decl. ¶ 28-29; Am. Plunkett Decl. Ex. 32.)

- A SASAC financial form from 2007 lists Display as "state owned or state controlled." (or per Professor Clarke's translation "controlled by state ownership"). Such a SASAC form would not exist for a private company. (Clarke Decl. ¶ 30; Am. Plunkett Decl. Ex. 32; Plunkett Decl. Ex. G 52:13-52:25.)

- Irico Group, which DPPs concede is 100% directly owned by the Chinese state, was required to consolidate Display's financial results with its own for accounting

purposes as required under Chinese accounting standards when one company exercises actual control over another. (Clarke Decl. ¶ 28.)

- Chinese courts have repeatedly determined that Display is state controlled as they have subjected its employees to the more severe punishments state personnel face for certain criminal violations. (*Id.* ¶ 36.)

- Display is described as "state-controlled" in Irico Group's 2007 audit report. (*Id.* ¶ 27.)

- Irico Group appointed personnel at Display including in 2007 when Irico Group directed who Display should install as director, chairman of the board, deputy chairman, general manager, deputy general manager, and chief financial officer. (*Id.* ¶ 31 (d); Plunkett Decl. Ex. G 123:3-129:10.)

- Display's 2007 annual report, which contains disclosures mandated and enforced under China's securities regulation regime, states unequivocally that the actual controlling person is Irico Group. (Clarke Decl. ¶ 32.)

DPPs do not deny or challenge any of these facts in their opposition. Nor does their expert, Professor Curtis Milhaupt (who, unlike Professor Clarke, does not consider himself an expert on Chinese law).[1] Rather, they argue that because of an intervening subsidiary, Irico Group indirectly owned only 31% of Display's equity, and that Display's shareholders have significant governance rights. (DPPs' Opp. at 1, 6.) This argument is sophistry. First, the argument ignores the political reality of the Chinese party-state. As Professor Milhaupt himself acknowledged in his deposition, the Chinese Communist Party (CCP) has a monopoly on political power in China, with all organizations subject to its authority. (Plunkett Decl. Ex. F at 39:10-39:15, 63:1-63:5.) The CCP has committees within the SOEs which provide a parallel control structure alongside the corporate structure. (*Id.* at 67:16-68:5.) As stated in an article Professor Milhaupt wrote about Chinese SOEs, "two parallel structures provide for monitoring: one based on the corporate law, with SASAC as controlling shareholder, and a second, party-based structure that shadows the corporate hierarchy, especially with respect to high-level managerial appointments." (Plunkett Decl. Ex. H at 711.) In another article he wrote:

A . . .structure creating a firewall between the state in its role as investor and the management of its portfolio companies would require the CCP to withdraw from its role in personnel appointments and elimination of the firm-level party

---

[1] (Plunkett Decl. Ex. F, Deposition of Curtis Milhaupt ("Milhaupt Dep."), 15:14-15:16.)

committees in favor of depoliticized internal control and reporting structures used in major western firms. Thus far, there is no sign that the party is withdrawing from state invested firms; to the contrary, the grip of the party seems to be tightening.

(Plunkett Decl. Ex. I at 529.) And as a report cited by Professor Milhaupt in his declaration stated:

> For [state-owned enterprises'] listed subsidiaries, on paper the general shareholder meeting appoints all directors.  In practice, however, appointments of executive directors are usually pre-determined by the largest shareholders—the Party state (SASAC and Central Organization Department) . . . . Even formally 'independent' directors typically have ties to executive directors or the government, limiting actual independence and leaving minority shareholders vulnerable to decisions that may jeopardize their interests.

(Plunkett Decl. Ex. J at 29.)

Second, laying aside the control of SASAC and the CCP and focusing just on share ownership, the notion that Irico Group's implied 31% indirect equity percentage of Display corresponds to its level of control over Display, or that non-state shareholders had any meaningful control over Display is wholly defective. As Professor Milhaupt acknowledged in an article about state-owned enterprise groups that include listed companies (like Display): "The percentage of shares retained directly or indirectly by the parent company varies, *but it is always sufficient to retain ultimate control* over the listed firm(s) in the group, particularly given the dispersed nature of the private shareholdings." (Plunkett Decl. Ex. H at 711 (emphasis added).) Considering the corporate formalities at play here, the wholly state-owned Irico Group controlled Irico Electronics (by virtue of its 75% share ownership), and Irico Electronics controlled Display (by virtue of its 41% share ownership, with the remainder widely dispersed with the next highest shareholder owning 1.7% and all others below 1%). When asked in his deposition how much voice minority non-state shareholders had in Chinese SOEs, Professor Milhaupt offered: "not a lot of voice." (Plunkett Decl. Ex. F 84:18-19.)  In short, Professor Milhaupt's previous writings not only contradict his report in this case but reinforce Irico Display's position.

### D.      DPPs' Contention that Mr. Wang Lacks Personal Knowledge Is Frivolous

DPPs make a frivolous, half-hearted attempt to argue that Mr. Wang lacks personal knowledge. They cite just a few passages from his declaration to make the argument, ignoring all the rest. It is thus unclear what exactly they assert. (DPPs' Opp. 23-25.) Mr. Wang plainly has

personal knowledge, and DPPs conveniently ignore all of the following facts: (1) Mr. Wang has worked at Irico Group and its subsidiaries since 1991, including throughout the entire Class Period; (2) he reviewed extensive documentation from Irico's archives prior to submitting his amended declaration; and (3) he obtained additional knowledge through communications from his former supervisor, Mr. Guo, including by reviewing and verifying the information in Mr. Guo's declaration. (Am. Wang. Decl. ¶¶ 3-7; Plunkett Decl., Ex. D at 11:8-10; 13:2-4; 17:2-3; 27:24-28:8.)

During his time working for Irico and its subsidiaries, Mr. Wang has assumed management and leadership roles where he familiarized himself with Irico Group's and Display's management and operations. Mr. Wang was Director of the Sales Department of Irico Group from March 2003 to 2009 where he assumed management work and supervised the entire sales team. (Plunkett Decl., Ex. D, 65:18-66:6.) DPPs' suggestion that Mr. Wang never worked at Irico Display misses the point: until 2005, Irico Group handled all sales of CPTs and CDTs sold by Irico subsidiaries, including Display. (Am. Wang Decl. ¶ 5.) As a sales representative and eventually as head of the sales department at Irico Group, Mr. Wang oversaw all of Display's sales of CPTs and CDTs. (Am. Wang. Decl. ¶¶ 4-5.)

Whether Mr. Wang attended shareholder and board meetings for Display does not determine his personal knowledge to testify on those topics, because "personal knowledge and competence to testify [can be] reasonably inferred from [Mr. Wang's] position[] . . ." *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990). In an instructive case, the declarant CEO never used his company's software but nevertheless was able to testify on the "general process employed by the software." *CNET Networks, Inc. v. Etilize, Inc.*, No. C 06-5378 MHP, 2008 WL 4104287, at *15 (N.D. Cal. Sept. 2, 2008). The court found that the CEO "may rely upon subordinates to explain [the software process] to him" and that "he need not run the software himself in order to understand the broad strokes . . . ." *Id.* Finally, relying on counsel's assistance to draft a declaration, even copying "verbatim, language from opinion's counsel," does not render a declaration inadmissible. *Id.* Declarants may obtain personal knowledge by relying on conversations with other company employees.

Like the declarant in *CNET*, Mr. Wang relied on conversations over the years with someone who had first-hand knowledge of board and shareholder meetings—his supervisor and a senior manager at Irico, Mr. Guo. (Plunkett Decl., Ex. D 13:2-4; 17:2-3; 27:24-28:8.) Mr. Wang went even further, relying on his review of extensive documentation from Irico's archives to support his amended declaration. (*Id.* 11:8-10.) Mr. Wang's extensive work history at Irico Group and its subsidiaries, his review of relevant documents from Irico's archives, and his discussions over the years with his supervisor—Mr. Guo—easily establish his personal knowledge.

Finally, DPPs' contention that the declaration was "signed at the behest of Display's lawyers" is similarly unavailing. (DPPs' Opp. at 25.) If "counsel's language was the clearest formulation of the same, then the court will not penalize [the declarant] for recycling language." *CNET*, 2008 WL 4104287, at *15. Contrary to DPPs' contention, the Court should grant significant weight to the declaration of an Irico Group employee who oversaw Display's CRT and CDT sales during the class period and who worked for Irico since before the creation of Display. *See* DPPs' Opposition at 25; Am. Wang Decl. ¶¶ 3-7.

## E.   The *Powerex* Factors Overwhelmingly Demonstrate Irico Display's Status as an Organ

### 1.   State-Owned Entities Founded Irico Display and Irico Group Acted as Display's "Actual Controller"

DPPs ignore several key facts stemming from Display's founding that weigh heavily toward organ status. Most notably, Display was established by Irico Group and other wholly state-owned entities. (Am. Wang. Decl. ¶ 40; Declaration of Alexander Saveri, Dkt. No. 5419-1, Ex. 5, 2006 Articles of Association for Irico Display ("2006 Display Articles"), at art. 18.) At the time of its founding, only state-owned entities held majority shares of Display. (*Id.*; Am. Wang Decl. ¶ 41.) Even after its IPO in 1996, Irico Group and SASAC exercised actual control over Display's operations and management. (Am. Wang Decl. ¶¶ 48-49; *see also* 2006 Display Articles, arts. 18; 313(2).)

Instead of addressing Display's evidence regarding its creation, DPPs rely on the 2006 Display Articles, arguing that "Display was created as and remained a standardized stock

corporation." (DPPs' Opp. at 15.) Even if true, that fact neither defeats nor weighs against organ status. *See Murphy*, 421 F. Supp. 2d at 632, 643. (finding that profit-making did not preclude KAMCO from being an organ of the Korean government and noting that "the strong national purpose underlying KAMCO's creation . . . weighs heavily in favor of the conclusion that Kamco is an organ."). But the 2006 Display Articles cut against DPPs' argument. First, the 2006 Articles confirm that Display was established by wholly state-owned entities. (*Id.* art. 18.) Second, the 2006 Articles confirm that Group—acting as "actual controller" of Display—retained its ability to "actually control [Display's] behavior through investment relations, agreements or other arrangements." 2006 Display Articles, art. 313(2); (Am. Wang Decl. ¶ 49.) Third, the 2006 Articles indicate that state-owned "sponsors" such as Irico Group held a majority stake in Display. 2006 Display Articles art. 19 (noting that "capital structure of [Display] shall be as follows: 421.1488 million shares of common share, of which 240.16 million shares are held by sponsors".) These articles serve only to confirm the Chinese Government's control over Display at the time of its creation and throughout the Class Period.

DPPs' reliance on *NXP Semiconductors* and *Capital Trans* (DPPs' Opp. at 16) is misplaced. In *NXP*, the court's "conclusion" that the French company was not an organ was irrelevant to the court's ultimate holding that it *lacked* personal jurisdiction over that company. *NXP Semiconductors USA, Inc. v. Brevets*, No. C 14-1225 SI, 2014 WL 4621017, at *7-13 (N.D. Cal. Sept. 15, 2014). The court also found that "certain aspects of France Brevet's creation and structure do weigh in favor of finding that it is an organ or instrumentality of France, such as the facts that France Brevets was created . . . with funding from the French government and [an agency of the French Government]." *Id.* at *7. Similarly, Display's original state funding weighs in favor of its organ status. In *Capital Trans*, five private individuals formed and capitalized the entity at issue—Aabar. *Capital Trans Intern., LLC v. Int'l Petroleum Inv. Co.*, No. 8:10-cv-529-T-30TGW, 2013 WL 557236, at *8 (M.D. Fla. Feb. 14, 2013) (dismissing claims against Aabar for lack of subject matter jurisdiction). In contrast, the Chinese government—not private individuals—formed and capitalized Display through its state-owned entities, including Group. These cases support Display, not DPPs: the court in *NXP* lacked personal jurisdiction

Irico's Reply ISO Amended Motions to Dismiss
DPPs for Lack of Jurisdiction                    11                    Case No. 3:07-cv-05944-JST
                                                                        MDL No. 1917

over the defendant, just as the court in *Capital Trans* lacked subject matter jurisdiction under the FSIA.

### 2. Display's Purpose Was to Benefit the State and Its People, Including Via the Distribution of Its Profits to State-Owned Entities

DPPs contend that Display is not an organ because its "purpose was to earn profits for its shareholders." (DPPs' Opp. at 17-19.) This argument fails because: (1) profit-making to benefit state-owned entities or the public is a valid public purpose; (2) Irico had other public purposes such as providing for the welfare of the local community and its workers; and (3) having a private purpose does not defeat organ status if an entity has other, public purposes.

First, Display reinvested its profits into state-owned assets, including its plurality shareholder Irico Electronics who was majority owned by Group.[2] Much like the company in *Powerex*, Display's financial results were consolidated into Group's financial statements and formed the basis of Group's after-tax payments to the Chinese government. (Am. Wang Decl. ¶ 11); *Powerex*, 533 F.3d 1087, 1102 ("The benefits of Powerex's export trade activity are passed through to the Provincial Government through the consolidation of Powerex's earnings into the net income of BC Hydro."). "In other words, 'if [Display] earns a profit, that profit must be rebated directly or indirectly to [Chinese] residents." *Powerex*, 533 F.3d 1087, 1102 (citing *Powerex Corp. v. Reliant Energy Services, Inc.*, 551 U.S. 224, 247 (2007) (Breyer, J., dissenting)). The consolidation of Display's earnings with a state-owned entity mirrors the facts of *Powerex*, evidencing a valid public purpose.

Second, Display poured its profits into public works via Group, yet another public purpose. These public works include providing a local hospital, police department, and senior living center for local residents. (Am. Wang Decl. ¶¶ 25, 65.) DPPs fail to address this purpose. (*See* DPPs' Opp. 17-19.) Display was, moreover, "responding to the need of the Chinese people for color televisions"—yet another public purpose. (Am. Wang Decl. ¶ 21.) The Ninth Circuit has cited the purpose of "providing entertainment to Japanese citizens" as a relevant public

---

[2] As the Department of Justice highlights in its Statement of Interest, "the Ninth Circuit has held that an entity can be an organ of a foreign state . . . even when the state does not directly own a majority share of it . . . ." Statement of Interest of the United States, Dkt. No. 5457 ("DOJ Statement of Interest") at 5.

purpose weighing in favor of organ status. *See Alpha Therapeutic Corp. v. Nippon Hoso Kyokai*, 199 F.3d 1078, 1084 (9th Cir.2001) (finding organ status for Japanese broadcaster), *withdrawn on other grounds sub nom. Alpha Therapeutic Corp. v. Kyokai*, 237 F.3d 1007 (9th Cir.2001). DPPs fail to address these points.

Finally, even if Display had some limited element of profit-making for private interests in addition to its undisputed public purposes, an entity need not have exclusively public purposes to retain its status as an organ. *See Murphy*, 421 F. Supp. 2d at 642. Instead, courts may find organ status where public purposes outweigh the private purpose of distributing profits to private shareholders. *See id.* Moreover, DPPs' assertion that "cases applying the FSIA's organ provisions . . . have uniformly held that making profits for mostly private shareholders is a private purpose" is flatly wrong. (DPPs' Opp. at 19.) That was never the "holding" of *any* of DPPs' cited cases, and other authority, such as *Murphy*, shows that profit-making for private shareholders does not foreclose organ status nor weigh against it at all. And contrary to the DOJ's and DPPs' characterizations, the *Patrickson* court did not hold that a "valid public purpose . . . must be something more than just making money for the state as a shareholder." (DOJ Statement of Interest, Dkt. No. 5457, at 6.) Rather, the court merely supported the district court's holistic view of the relevant entity as "acting to maximize profits rather than pursue public objectives." *Patrickson v. Dole Food Co.*, 251 F.3d 795, 808 (9th Cir. 2001). In contrast to the entity in *Patrickson*, Display was run by government appointees and treated employees as civil servants.[3] And even under the DPPs' and DOJ's reading of *Patrickson*, Display had numerous other public purposes—such as providing public services to the local community and providing entertainment

---

[3] *See* Am. Wang. Decl. ¶¶ 9, 50. Similarly, the DOJ's reference to the Fifth Circuit case *Board of Regents v. Nippon Telephone & Telegraph Corp.*, 478 F.3d 274 (5th Cir. 2007), is inapposite. DOJ Statement of Interest at p. 8. In that case, the relevant television broadcaster was created "to privateize what had been a government-controlled monopoly and to promote *competition*." *Nippon*, 478 F.3d at 279. Rather, the reasoning in a Ninth Circuit case involving a similar Japanese entity provides more relevant, binding precedent to the facts here. *See Alpha Therapeutic*, 199 F.3d at 1084–85. The *Nippon* court distinguished the Ninth Circuit *Alpha Therapeutic* case that found organ status in part because the organ in the Ninth Circuit case had public purposes including "providing entertainment to Japanese citizens" much like Irico's stated purpose of "responding to the need of the Chinese people for color televisions." *Nippon*, 478 3.d at 281; (Am. Wang. Decl. ¶ 21).

and information for the Chinese people—that weigh in favor of organ status, unlike the entity in *Patrickson*.

### 3. The Undisputed Evidence Confirms that Irico Group and the Chinese Government Exercised Actual Control Over Display

DPPs attempt to establish Display's independence is based on their selective presentation of the 2006 Display Articles, while ignoring the considerable evidence of Group's control over Display.

The 2006 Display Articles contain numerous passages that devastate DPPs' position. The Display Articles required government "sponsors" to hold the majority of Display's shares. (2006 Display Articles art. 19 (noting that "capital structure of [Display] shall be as follows: 421.1488 million shares of common share, of which 240.16 million shares are held by sponsors").) Irico Group is described as one such "sponsor." (*See* 2006 Articles at art. 18.) Another article contradicts DPPs' claim that controlling shareholders and actual controllers—such as Group—were prohibited from exerting control over Display's decision making. (DPPs' Opp. at 20.) An "actual controller," as defined in that document, "can actually control [Display's] behavior." (2006 Display Articles art. 313(2).) The mere fact that actual controllers possibly owed a duty of good faith to Display and could not "interfere" with decision-making "beyond the statutory procedures" does not render them independent from Display. (*See id.* art. 45.) Consequently, article 45 does not establish Display's independence. Moreover, DPPs misstate the reasoning of *Patrickson* on this point. (DPPs' Opp. at 20.) In that case, "the question [was] close" regarding organ status, and the mere fact that the government had a minority yet controlling stake did not determine the court's holding alone. *Patrickson*, 251 F.3d at 808. Instead, the court found that several factors weighed against organ status, including the fact that, unlike Display, the entity was not run by government appointees. *Id.*

The SASAC regulations and substantial documentary evidence clearly establish Group's and the SASAC's control over Display. (*See* Irico Display Devices Co. Ltd's Amended Motion to Dismiss Claims of Direct Purchaser Plaintiffs, Dkt. No. 5412, ("Display's DPP Mot.") at 8-11.) But once again, DPPs ignore all of the evidence demonstrating Display's adherence to

SASAC regulations as a state-controlled entity. (*See* Display's DPP Mot. at 7-11.) For instance, the evidence confirms that (1) new assembly lines required direct approval from Group, (2) Group acted as "actual controller" of Display, (3) Group directly selected members of Display's Board of Directors, and (4) Group appointed management of Display. (*Id.*) The SASAC regulations are not "consistent with Display's independence." (DPPs' Opp. at 21.) Instead, they are consistent with evidence that establishes Display's dependence on Group and the Chinese government.

DPPs next cherry pick passages from a couple of documents—including one drafted after the Class Period in 2008—and argue that these documents tell the whole story. (DPPs' Opp. at 24-25; Plunkett Decl., Ex. D 53:6-54:24 (establishing that the "2007 Display Report" was drafted in April, 2008).) But DPPs' position that a few isolated passages from these documents deserve greater weight than the mountain of evidence of Group's control over Display, including Mr. Wang's testimony, is meritless.

### 4. The Chinese Government Closely Controlled the Appointment of Display's Senior Employees

Contrary to DPPs' implication (DPPs' Opp. at 27), the FSIA does not require organs to employ civil servants: "A company may be an organ of a foreign state for purposes of the FSIA even if its employees are not civil servants." *EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*, 322 F.3d 635, 641 (9th Cir. 2003); *See* DPPs' Opposition at 27-29.[4] But in fact, Display's employees were subject to special bribery laws that did not apply to private citizens. DPPs miss this point, asserting that bribery laws in the U.S. apply to private as well as public officials. But they ignore the fact that Display's employees were subjected to a heightened standard reserved for public officials.

Moreover, Display's managers were required to be members of the Chinese Communist Party—demonstrating a close relationship between Display's leadership and the Chinese government. (Plunkett Decl. Ex. D, 27:1-28:11.) DPPs make only the meritless argument that Mr. Wang lacks personal knowledge on this fact. (DPPs' Opp. at 28.) But in his deposition, Mr.

---

[4] While the DPPs imply that organs *must* employ civil servants, the DOJ correctly points out that no such requirement exists under *EIE Guam*. (DOJ Statement of Interest at 6.)

Wang acknowledged being a communist party member and testified that "all the senior managers [are] supposed to be the member of the communist party," noting that this was "a requirement by the SASAC. (Plunkett Decl. Ex. D, 27:1-28:11.) DPPs ignore this testimony and provide no explanation for why Mr. Wang would lack personal knowledge about his own party membership or that of his coworkers. (*See id.*)

Finally, even if, contrary to fact, day-to-day control did not exist, the government need not "exercise day-to-day control" over an organ if "it does play an active supervisory role." *Gates v. Victor Fine Foods*, 54 F.3d 1457, 1460 (9th Cir. 1995). The undisputed evidence proves that the Chinese government played an active supervisory role here. Group appointed and removed the management and board of Irico Display. (Am. Wang. Decl. ¶ 52.) In fact, Group employees oversaw Mr. Wang's appointment to his management positions at Group's other subsidiaries—Irico Electronics and Irico Smart Lighting. (*Id.* ¶ 8.) DPPs claim that Display has produced no evidence "(including any expert or fact witness testimony) to show that Display's directors or officers were 'representatives of State-owned stock rights.'" (DPPs' Opp. at 28.) Not true. Mr. Wang's declaration provides ample evidence to support the claim that Display's board and management represented Group's interests because they were appointed by Group. (*See* Am. Wang Decl. ¶ 49-52.)

### 5. Substantial Evidence Demonstrates Display's Obligations, Privileges, and Support from the Chinese Government.

Instead of meaningfully addressing Display's evidence of financial support from the government and special obligations, DPPs cry foul, arguing that Display "double-counts" certain facts supporting these two *Powerex* factors. (*See* DPPs' Opp. at 29-30.) This argument is does not merit serious consideration. Of course certain facts or documents bear on multiple factors. Indeed, Display's "double-counting" only serves to demonstrate that most of the evidence in this case weighs in favor of organ status on multiple fronts.

For instance, Display's employees enjoyed special benefits conferred by state-owned Group including a school system, police department, hospital, and senior living center in Xianyang, Shaanxi Province. (Am. Wang. Decl. ¶¶ 25, 65.) The mere fact that other members of

the community in Xianyang enjoyed these benefits does not render Group's public works irrelevant—quite to the contrary, it reinforces the broader public purpose of Display as a state organ. (*See* DPPs' Opp. at 29.) The fact remains that members of a relatively small region centered around companies like Group and Display enjoyed special benefits from the Chinese government due to their employment from or proximity to the headquarters of Display and Group. And once again, Display's obligation to submit to the authority of the state entities controlling it is a special obligation, even if that constitutes "double-counting." The Ninth Circuit obviously does not require all facts to neatly fall into one bucket that bears on a single factor under *Powerex*. Moreover, DPPs' cases do not support their position. *EOTT Energy Operating Ltd. P'ship v. Winterthur Swiss Ins. Co.*, 257 F.3d 992, 999 (9th Cir. 2001) (failing to make a determination on organ status); *NXP Semiconductors*, 2014 WL 4621017, at *7 (finding a lack of personal jurisdiction over the defendant); *Powerex Corp.*, 533 F.3d at 1102 (finding organ status).

## III.   The Commercial Activity Exception Does Not Apply

### A.   The Court Did Not "Decide" that the Commercial Activity Exception Applies Here

DPPs begin their attack on the Irico Defendants' presumptive immunity by repeating their failed argument that the Court has already decided the jurisdictional issues in DPPs' favor. But the Court already rejected this very argument in its April 25, 2018 Order rejecting DPPs' bid to take full merits discovery. (*See* Dkt. No. 5277.) In that Order, the Court clarified that there remained "a substantial question regarding [Irico's] immunity from suit under the Foreign Sovereign Immunities Act," and that "only jurisdictional discovery [wa]s appropriate," rejecting the argument that the Court's February 1, 2018 Order Setting Aside Default ("Default Order") settled the jurisdictional question. (*Id.* at 2; *see also* Default Order, Dkt. No. 5240 at 19 ("[F]urther proceedings might demonstrate that the [FSIA] defense applies and the Court lacks jurisdiction.").) The Court also noted that there was "significant doubt as to whether the Court has jurisdiction over Irico Group," and that there was sufficient cause to "present the issue" of Irico Display's immunity even without the robust factual showing now before the Court. (Default

Order at 17.) Neither finding makes any sense if the Court had somehow already decided that an exception to immunity applies.

DPPs' claim that Irico's legal arguments require a "request to reconsider the Court's earlier ruling," (DPPs' Opp. at 32), also misapprehends the scope of the Court's Default Order as concluding the jurisdictional question, which it did not. Default Order at 14 ("The Court concludes, *at least at this stage in this proceeding*, that the Irico Defendants have not shown immunity . . . .") (emphasis added); Dkt. No. 5277 at 2 ("[T]he Court's jurisdiction over the Irico Defendants remains unsettled.").)

**B.     The Issue of Commercial Activity Under the FSIA is Analytically Distinct from the FTAIA and Is Not Met Here**

**1.     Unlike the FTAIA, the Commercial Activity Exception under the FSIA is Used to Establish Personal Jurisdiction and Requires Direct Effects in the U.S. Caused by the Actions of the Foreign Sovereign**

Plaintiffs rely principally on cases decided under the Foreign Trade Antitrust Improvements Act ("FTAIA") to argue that the commercial activity exception is met "when a foreign price-fixing conspiracy raised global . . . prices, because that caused prices for finished products sold in the United States to rise." (DPPs' Opp. at 33-34.) This reliance is misplaced. Critically, the FSIA is explicitly *jurisdictional* and provides the only basis for *both subject matter and personal jurisdiction* over foreign sovereigns and their instrumentalities. *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1318 (2017) ("Foreign sovereign immunity is jurisdictional in this case because explicit statutory language makes it so."); *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 485 n.5 (1983) ("Thus, if none of the exceptions to sovereign immunity set forth in the Act applies, the District Court lacks both statutory subject matter jurisdiction and personal jurisdiction."). The FTAIA, by contrast, is *not* jurisdictional, but merely "a component of the merits of a Sherman Act claim involving nonimport trade or commerce with foreign nations." *United States v. Hui Hsiung*, 778 F.3d 738, 751 (9th Cir. 2015) (holding that "FTAIA is not a subject-matter jurisdiction limitation on the power of the federal courts"). Additionally, the FTAIA expressly focuses on "conduct involving trade or commerce . . . with foreign nations" in connection with an alleged "contract,

combination . . . or conspiracy" rather than the *individual* acts of a particular foreign defendant. 15 U.S.C. §§ 1, 6a. Thus, the fact that FTAIA cases typically examine conspiracy-wide (rather than individual) conduct and effects is driven by the FTAIA's unique statutory language and cannot justify an identical analytical approach to analyzing jurisdiction over a foreign sovereign under the FSIA.

The Ninth Circuit has recognized the dual-jurisdictional nature of the FSIA by holding that "the requirement of a 'direct effect' incorporates the minimum contacts standards" and "traditional notions of fair play and substantial justice which determine the due process limits of personal jurisdiction." *Sec. Pac. Nat'l Bank v. Derderian*, 872 F.2d 281, 286-87 (9th Cir. 1989); *see also Thos. P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica*, 614 F.2d 1247, 1255 (9th Cir. 1980) ("The words 'direct effect' in the clause . . . have been interpreted as embodying the minimum contacts standard of *International Shoe Co*. . . . and the requirement of *Hanson* that the defendant purposely avail itself of the privilege of conducting business within the forum. The legislative history of the [FSIA] confirms that the reach of § 1330(b) does not extend beyond the limits set by the *International Shoe* line of cases.") (citations omitted); *Gregorian v. Izvestia*, 871 F.2d 1515, 1528 (9th Cir. 1989) ("Personal jurisdiction under the FSIA requires satisfaction of the traditional minimum contacts standard.") (alterations and citations omitted). DPPs argue that the Supreme Court's 1992 decision in *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, should be read to implicitly abrogate *Derderian* and the line of Ninth Circuit cases that follow it, including multiple cases decided in the decade following *Weltover*. *See Corzo v. Banco Cent. de Reserva del Peru*, 243 F.3d 519, 525 (9th Cir. 2001) (citing both *Weltover* and *Derderian* for "direct effect" analysis and noting lack of "'minimum contacts' with the United States" in finding that the commercial activity exception did not apply)[5]; *see also Theo. H. Davies & Co. v. Republic of Marshall Islands*, 174 F.3d 969, 974 (9th

---

[5] Recognizing that *Corzo* eviscerates their argument for implied abrogation, DPPs dismiss it as "nonbinding dictum." (DPPs' Opp. at 37 n.27.) Given the depth at which the *Corzo* decision discussed the lack of "direct effect" in that case and the explicit finding of a lack of a "nexus between the activity of the foreign sovereign and the plaintiff's cause of action," that section of the opinion is better understood as an alternative holding—which is *not* dicta—to support the affirmance of sovereign immunity. 243 F.3d at 524-26 ("[Plaintiff's] argument fails, because the relevant [defendant] activity was not commercial **and** caused at best an indirect effect in the United States.") (emphasis added); *see English v. United States*, 42

Cir. 1998) (citing *Thos. P. Gonzalez* six years post-*Weltover* for the concept that the FSIA "is constrained by the minimum contacts required by *International Shoe Co. v. Washington* and its progeny") (citations omitted). The absurdity of this argument is demonstrated by the fact that the Supreme Court had before it in *Weltover* the exact issue raised here—the applicability of personal jurisdiction due process standards to the "direct effect" analysis—and *declined to rule* on it as unnecessary given the facts of that case. *See* 504 U.S. at 619 ("Argentina argues that . . . we must construe the 'direct effect' requirement as embodying the 'minimum contacts' test of *International Shoe*. . . . [W]e find that Argentina possessed 'minimum contacts' that would satisfy the constitutional test."). DPPs' position thus assumes not only that the Ninth Circuit missed the implications of *Weltover* in subsequent cases, but also that the Supreme Court itself somehow missed the implications of its own decision on an issue raised in that very same decision.  DPPs' position is not plausible.

Other Circuits have also noted the applicability of due process standards to the "direct effects" analysis notwithstanding—or *because of*—the Supreme Court's *Weltover* decision. As recognized by the Eleventh Circuit, the "*Republic of Argentina* [*v. Weltover*] Court acknowledged that the 'direct effect' element of section 1605(a)(2) might be construed as embodying the 'minimum contacts' test of *International Shoe Co. v. Washington*. Arguably, if the direct effect requirement were not so interpreted, the exercise of federal subject matter jurisdiction pursuant to the FSIA could, in a given case, violate the Due Process Clause of the Fifth Amendment." *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1545 (11th Cir. 1993); *see also S & Davis Int'l, Inc. v. The Republic of Yemen*, 218 F.3d 1292, 1304 (11th Cir. 2000) (citing *Weltover* to support fact that "'direct effects' language of § 1605(a)(2) closely resembles the 'minimum contacts' language of constitutional due process and these two analyses have overlapped"). In *United World Trade, Inc. v. Mangyshlakneft Oil Production Association*, the Tenth Circuit extensively analyzed and applied *Weltover* in finding a lack of "*immediate consequences*" in the United States (and thus no "direct effect") because the defendants' acts were "analogous to the type of unilateral activity that the Supreme Court has found to be an

F.3d 473, 485 (9th Cir. 1994) ("Alternative holdings are not dicta.").

insufficient basis for the exercise of jurisdiction under the Due Process Clause of the Fourteenth Amendment." 33 F.3d 1232, 1238 (10th Cir. 1994) (emphasis added).

The FTAIA in no way speaks to these jurisdictional requirements, particularly with respect to minimum contacts required for establishing personal jurisdiction. In light of the fundamental differences between the FTAIA and the FSIA and the clear weight of the authority interpreting the FSIA, the Court should reject DPPs' invitation to expand the reach of the commercial activity exception beyond what Congress intended and the Constitution allows.

### 2. Alleged Participation in a Conspiracy Purportedly Affecting Prices in the U.S. Does Not Meet the Commercial Activity Exception

In determining whether the third prong of the commercial activity exception applies, the Ninth Circuit "look[s] to the place where legally significant acts giving rise to the claim occurred in determining the place where a direct effect may be said to be located." *Adler v. Federal Republic of Nigeria*, 107 F.3d 720, 727 (9th Cir. 1997). DPPs claim that the "legally significant acts occur[ing] in the United States" are DPPs' purchases of "class products at supracompetitive prices." (DPPs' Opp. at 36.) But none of these purchases was made from either Irico Defendant, neither of which sold CRTs or CRT Products in the United States or to U.S. customers. (Am. Wang Decl. ¶ 12-13.) Rather, DPPs' allegedly relevant purchases were made from *other* defendants or independent *nondefendant* intermediaries who assembled CRTs into televisions and monitors, eventually selling or reselling those products to members of the DPP class. Thus, out of the entirety of DPPs' $876 million single damages claim, which is based upon "U.S. purchases by the class" of CRTs and finished products (Dkt. No. 5183 at 13-15), *zero dollars* are attributable to purchases from Irico Defendants. The requisite causal nexus between any actions taken by Irico Group or Irico Display and the "legally significant act" claimed by DPPs is missing.

DPPs cite two cases for their claim that allegations of a price-fixing conspiracy suffice to fill this gap, but neither case supports DPPs. First, DPPs misrepresent the Ninth Circuit's *International Association of Machinists & Aerospace Workers v. OPEC* decision, an early case decided in the first few years after the FSIA became law. The court there, contrary to DPPs'

assertion that it "applied the FSIA's commercial activity exception" (DPPs' Opp. at 33), "d[id]

not apply the doctrine of sovereign immunity" at all. 649 F.2d 1354, 1358 (9th Cir. 1981). Rather,

it merely noted that the district court had found the price-fixing of oil by OPEC to be "a prime

governmental function" rather than a commercial one; the concept of "direct effect" was not even

mentioned. *Id.* The Ninth Circuit went on to dispose of the case under the act of state doctrine,

not the FSIA. *Id.* Similarly, the FSIA issues in *Sea Breeze Salt, Inc. v. Mitsubishi Corp.*,

particularly in the Ninth Circuit decision where they are confined to a single footnote, were

overtaken by the act of state doctrine—likely because the FSIA was not raised or argued by the

defendant in that case. *See Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, No. CV 16-2345-DMG

(AGRx), 2016 WL 8648638 at *2 (C.D. Cal. Aug. 18, 2016) ("Defendant does not bring a motion

to dismiss for lack of subject matter jurisdiction . . . ."); 899 F.3d 1064, 1068 n.2 (9th Cir. 2018).

But most crucially, DPPs omit key details that informed the district court's finding that there was

"no break in the causal chain," namely the fact that salt supply contracts and purchase orders

from U.S. customers were already in place when the foreign state-owned defendant breached its

agreement to supply plaintiffs with salt. 2016 WL 8648638 at *3 n.3. No such direct connection

is present here.

Due process considerations, incorporated into the direct effects test in the Ninth Circuit as

described above, make even more clear that DPPs' conspiracy allegations alone cannot support

jurisdiction over either Irico Defendant. These well-established principles demand that Irico

Defendants have "sufficient minimum contacts" with the United States, which requires DPPs to

show that (1) both Irico Group and Irico Display "purposefully direct[ed]" their "activities or

consummate[d] some transaction with the forum or resident thereof," and (2) DPPs' claim is

"one which arises out of or relates to" Irico Group's and Irico Display's "forum-related activities."

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (quoting *Lake v.

Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)). In addition, "the exercise of jurisdiction must

comport with fair play and substantial justice, *i.e.* it must be reasonable." *Id.* DPPs fail to make

the required showing.

In an attempt to demonstrate "purposeful direction," DPPs state in conclusory fashion that the Irico Defendants "expressly aimed" their alleged "wrongful acts . . . at the United States." DPPs' Opp. at 37. The evidence proffered by DPPs on this point—three Chunghwa meeting reports allegedly documenting discussions with Irico employees[6]—fails to show the "express aiming" DPPs claim. This is especially true given the Ninth Circuit's warning that "the foreign-acts-with-forum-effects jurisdictional principle must be applied with caution, particularly in an international context." *Kramer Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175, 1178 (9th Cir. 1980). Even assuming the truthfulness and accuracy of these documents (which is certainly in dispute), not one of them comes close to demonstrating the necessary causal nexus, because none of them contains more than vague and generalized references to the U.S. CRT market. **Exhibit 19** to the 2017 Saveri Declaration, an alleged record of a 1999 "Mainland China CDT Maker Market Exchange" meeting, contains information regarding Chinese CRT production and sales, and indications of prices "in China" and "outside of China" denominated in U.S. dollars. (Dkt. No. 5221-3 ("2017 Saveri Decl."), Ex. 19 at -798.01.) The *only reference to anything U.S.-specific is the currency in which prices are stated*, which demonstrates nothing more than the fact that the U.S. dollar is a popular currency for international transactions. **Exhibit 26** is a "Market Contact Report" apparently documenting efforts by a Chunghwa employee to gather information from Irico Electronics and Irico Group. Almost all the information reported relates to the domestic Chinese market, with the exception of a reference to "global 14" supply and demand" and an observation that "erosion from LCD TVs" was causing meeting participants to be "bearish on Japanese, U.S., and European CRT TV

---

[6] DPPs do not even attempt to distinguish between evidence of conduct by Irico Group and conduct by Irico Display in their jurisdictional arguments, as they must under Ninth Circuit law. *See Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco County*, 137 S. Ct. 1773, 1783 (2017) ("[T]he requirements of *International Shoe* must be met as to **each defendant** over whom a state court exercises jurisdiction.") (emphasis added) (citation omitted); *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1023 (9th Cir. 2017) (noting that contacts of a subsidiary cannot be imputed to a parent company for establishing specific personal jurisdiction absent showing of agency or alter ego relationship); *Corcoran v. CVS Health Corp.*, 19 F. Supp. 3d 970, 981-83 (N.D. Cal. 2016) (same). Exhibit 19 to the Saveri Declaration simply lists two attendees from "IRICO," Exhibit 26 lists employees from "Irico Group Electronics" and "Irico Group," and Exhibit 30 again simply lists "IRICO." DPPs have not shown that any of the attendees were employees or agents of Irico Display, and have thus failed to make any showing regarding "purposeful direction" specifically by Irico Display.

demand." (*Id.* Ex. 26 at -992-93.) These basic and generalized market observations offer no proof of "express aiming." Finally, **Exhibit 30** is another "China CDT Maker Market Information Exchange" document showing production and sales numbers, with no indication that any prices discussed are for CRT sales outside of mainland China. The mention of the U.S. is an "RMB – USD exchange rate," which appears to relate to a "comprehensive tax levied on imported materials and parts" to China rather than any targeting of the U.S. market. (*Id.* Ex. 30 at -754.) These documents are thus wholly irrelevant to the issue of "express aiming."  In any event, DPPs' arguments that these few vague references constitute "purposeful direction" are wholly implausible given their acknowledgement that there were no sales to the U.S. by either Irico Group or Irico Display.

DPPs' appeal to Judge Conti's 2014 ruling regarding personal jurisdiction over certain Thomson defendants is unavailing. (DPPs' Opp. at 37-38.) That ruling assumed "Thomson SA's direct involvement in price-fixing discussions concerning products *actually sold to and purchased in the United States*" (Dkt No. 2440 at 14 (emphasis added)), one of the factual claims directly challenged here. Furthermore, DPPs omit crucial facts to the Court's analysis, including that "Thomson SA had actual discussions with [plaintiff] agents about CRT sales to the United States" while participating in meetings that "specifically related to the United States CRT market," unlike the China-focused meetings proffered by DPPs for the instant motion. *Id.*

Moreover, DPPs' and the DOJ's statutory reading of the commercial activity exception directly conflicts with constitutional due process requirements that prohibit exercising jurisdiction under these alleged facts. For instance, the DOJ asserts, with no authority, that "[a]ctions of a foreign company to join and act in furtherance of an antitrust conspiracy can cause a direct effect in the United States even if that company made no direct sales in the United States." (DOJ Statement of Interest at 12.) The DPPs and the DOJ argue that requiring sales to or in the United States would render the third prong of 28 U.S.C. § 1605(a) surplusage. (*See id.*; DPPs' Opp. at 35.) But when deciding between two readings of a statute, "if one of them would raise a multitude of constitutional problems, the other should prevail . . . ." *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005). The DOJ's reading would do just that. In fact, "district courts in this circuit

have refused to exercise personal jurisdiction over defendants based solely on the actions of their

co-conspirators." *Wescott v. Reisner*, No. 17-CV-06271-EMC, 2018 WL 2463614, at *4 (N.D.

Cal. June 1, 2018). Moreover, due process requires an "affiliation between the forum and the

underlying controversy, principally, [an] activity or an occurrence that takes place *in the forum*

*State*." *Bristol-Myers*, 137 S. Ct. 1773, 1781 (2017) (emphasis added) (citing *Goodyear Dunlop*

*Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). DPPs' and the DOJ's alleged

"conspiracy" jurisdiction theory—whereby simply participating in a foreign conspiracy can

impute minimum contacts to a defendant who "does not act within the United States"—thus

raises serious constitutional concerns. *See* DPPs' Opp. at 35. Consequently, the DPPs' and DOJ's

surplusage-based statutory interpretation of 28 U.S.C. § 1605 should be rejected. *See Clark*, 543

U.S. at 380-81.  That is particularly so when DPPs make no effort, and present no evidence, to

establish personal jurisdiction or minimum contacts with respect to the Irico defendants.

> **3.      DPPs Concede that Neither Group Nor Display Made Sales to the U.S., Relying Instead on the Sales of an Independent Entity they Mischaracterize as a "Subsidiary"**

DPPs concede, as they must, that neither Irico Group nor Display made any sales to the

U.S. Unable to show such sales, DPPs are forced to rely on an insignificant number of sales made

by a wholly *unrelated*, state-owned company—China National Electronics Import & Export

Caihong Co. ("CNEIECC"). (DPPs' Opp. at 12-14, 38-40.) DPPs begin with the misleading

assertion that the only evidence of CNEIECC's independence from Irico is the "self-serving

testimony" of Irico's corporate representative. (DPPs' Opp. at 38.) DPPs conveniently ignore the

official corporate registration records available through China's National Enterprise Credit

Information Publicity System that confirm Irico Group's lack of ownership of CNEIECC during

the entire period of the alleged conspiracy (Plunkett Decl. Ex. B at 2)[7] and historical records

---

[7] As explained by Mr. Zhang, Irico's corporate representative, the "commerce registration file" maintained by China's State Administration of Industry and Commerce, available online through the National Enterprise Credit Information Publicity System, is the official source for ownership information of licensed businesses in China. (Plunkett Decl. Ex. E, Transcript Excerpts for Deposition of Zhang Wenkai (Day 2) 36:14-37:17 ("[I]t is a common standard that when you verify the relationship between two companies, the fact should be based on the commerce registration file. . . . If the statement is inconsistent, or it does not reflect the commerce registration file, then it is incorrect.").) DPPs do not bother explaining how Irico Group could acquire 100% of the shares of CNEIECC in 2014 if it supposedly already owned those shares.

proving that Shaanxi provincial government authorities placed CNEIECC under the wholly state-owned China National Electronics Import & Export Corporation ("CEIEC") as an independent subsidiary in 1987 (*id.* Ex. A at 1).[8] CNEIECC was "a professional subsidiary directly under CEIEC [that] engage[d] in imports of products necessary for the production by the No. 4400 factory . . . and various color picture tube manufacturers and exports of relevant products." (*Id.*) As directed by the Shaanxi Provincial Commission for Foreign Economic Relations and Trade:

> [CNEIECC] should operate under the national import and export plan. . . . [CNEIECC] should report statistical reports to the Commission as required and is put under the centralized management of the administrative department of foreign economic relations and trade. ***The company carries out operations on its own as an independent entity*** and provides direct services for the No. 4400 factory and various color picture tube manufacturers. . . . [A]ppraisal, transfer and appointment of company leaders are subject to negotiations between CEIEC and the No. 4400 factory.

(Plunkett Decl. Ex. A at 1 (emphasis added).) CEIEC, CNEIECC's parent company at all relevant times, confirmed CNEIECC's true ownership and independence in a letter to the Shaanxi Provincial Commission:

> As a professional subsidiary ***subordinate to CEIEC***, [CNEIECC] is an ***independently-operated economic legal person in which the administrative affairs are in the charge of CEIEC***. . . . Its foreign trade businesses are put under the management of the Ministry of Foreign Economic Relations and Trade, the Commission and CEIEC jointly. . . . [CNEIECC] engages in independent operation with a unified accounting of imports and exports. [CNEIECC] is responsible for both profits and losses.

(Plunkett Decl. Ex. A at 4 (emphasis added).)

DPPs attempt to "connect" Irico to CNEIECC by citing portions of documents that *mistakenly* refer to relationships that do not in fact exist. (*Id.* at 12-13, 38-39; Saveri Decl. Ex. 1 at 105 (claiming that CNEIECC's "assets, personnel, and business all belong to" Irico Group); Ex. 25 at 126 (listing CNEIECC among "related parties" of Irico Electronics); Am. Plunkett

---

[8] DPPs refer to CNEIECC as "Import-Export," but this abbreviation creates confusion with CEIEC, CNEIECC's actual parent company until 2014. Founded in 1980, "CEIEC is a state-owned enterprise, directed by [the] Chinese Central Government to implement international cooperation in critical areas of national security and economic development." Company, CEIEC Corporate Homepage, *available at* www.ceiec.com/content/company (accessed Apr. 29, 2019).

Decl., Dkt No. 5413, Ex. 49 at -999 (chart incorrectly showing CNEIECC as "wholly-owned company" under Irico Group).) From these documents, DPPs make the false claim that CNEIECC was a wholly-owned subsidiary of Irico Group for the entire Class Period. But the official business registration file and directives issued from Chinese government ministries show that CNEIECC was independent from Irico Group at all relevant times. Errors in organizational charts cannot create ownership where in fact none exists.

Because there is no affiliation (and even if there were an affiliation), CNEIECC's sales cannot not be imputed to Irico Group (and certainly not to Display) for purposes of establishing jurisdiction. *See Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1023 (9th Cir. 2017) (contacts of subsidiary cannot be imputed to parent company for establishing specific personal jurisdiction absent showing of agency or alter ego relationship). CNEIECC is not alleged to be a participant in any price-fixing conspiracy, so its sales cannot be construed as furthering that conspiracy.[9] DPPs, moreover, have not even attempted to argue that CNEIECC is an agent or alter ego of either Irico Defendant under the strict standards required by the Ninth Circuit. Nor could they. *See California v. NRG Energy Inc.*, 391 F.3d 1011, 1024-25 (9th Cir. 2004) ("presumption of independence is defeated only where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created"), *vacated on other grounds*, *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224 (2007); *see also Williams*, 851 F.3d at 1024 (expressing doubt as to validity of agency theory to establish specific personal jurisdiction following Supreme Court's *Daimler AG v. Bauman* decision); *Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 983 (N.D. Cal. 2016) ( "alter ego" theory "requires such pervasive control that it can only be met where a parent corporation dictates every facet of the subsidiary's business—from broad policy decisions to routine matters of day-to-day operation" such that "injustice" would result from separate treatment) (internal quotations omitted).

DPPs ask the court to *infer* 100% ownership of CNEIECC where none existed, "pervasive control" where third parties held all rights of control, and extensive knowledge by

---

[9] In any event, the existence of a "conspiracy theory" of jurisdiction in which contacts may be imputed amongst conspirators is very much in doubt in the Ninth Circuit. (*See* Group's DPP Mot. at 15.)

Irico Defendants of the details of CNEIECC's exports (*see* DPPs' Opp. at 39-40) without any proof of such knowledge. Absent evidence, DPPs' argument cannot succeed.

Additionally, the "more than $8 million" of sales by the independent CNEIECC entity to "companies based in the United States" (DPPs' Opp. at 13) cited by DPPs is comprised of irrelevant sales of non-CRTs, products made by companies other than Irico Defendants, and products shipped to countries other than the U.S., as DPPs presumably knew. Even a cursory review of DPPs' supporting evidence shows over $1 million in sales of "Convergence Cups," "T.V. kits," and "Electron guns"—components not at issue in this litigation. (Saveri Decl. Ex. 15.) The 1999 sales to "G.P.X. Inc.," which DPPs assert to be a U.S. purchaser based solely on a 2019 website (DPPs' Opp. at 13; Hwu Decl. ¶ 7), consist only of "14" TVs" that could not have been manufactured by Irico because no Irico entity ever manufactured TVs. (*See* Am. Wang Decl. ¶ 14; Plunkett Decl. Ex. A at 1 (directing that CNEIECC "provide[] direct services for . . . *various* color picture tube manufacturers") (emphasis added).) Perhaps most significant of all, the invoices for sales of CRTs by CNEIECC to Irico (U.S.A.) Inc. ("Irico USA"), including those cited by DPPs, show that they were not shipped to the United States. (*See* Saveri Decl. Ex. 12 at -579 ("Discharging Port" of Qingdao, China); Ex. 16 at -569 ("Discharging Port" of Durban, South Africa); Ex. 22 at -567 ("Discharging Port" of Alexandria, Egypt).) Finally, the single delivery of under $50,000 of CRTs to Diamond Electronics merely reflects the sample set of 2016 CRT units that were "never sold and eventually shipped back to China." (*See* Dkt. No. 5221-5 at 2; Am. Irico Group Mot. at 13 n.7.)

DPPs also seek to muddy the issues by pointing to sales by CNEIECC to another non-defendant entity, Irico USA, a former indirectly- and partly-owned subsidiary of Irico Group that was sold in 2001.[10] (DPPs' Opp. at 13-14, 39-40; Saveri Decl. Ex. 20 at -492.) Introducing

---

[10] DPPs also omit important information about the history of Irico USA, detailed in the 2001 Irico Group audit report cited by DPPs, which demonstrates Irico Group' inability to control the company. (*See* Saveri Decl. Ex. 20.) Irico Group's indirect ownership of Irico USA ended abruptly in 2001 when General Manager Feng Liu sold the company "without authorization" and "for free" to INB Co., a company Mr. Liu founded and of which he was the sole shareholder. (*Id.* at -454-495.) Mr. Liu, acting as "Sole Director," then dissolved Irico USA in 2002. (Plunkett Decl. Ex. C (California Secretary of State document showing corporate dissolution).) In short, Mr. Liu transferred Irico USA's assets to himself, liquidated them, and absconded with the proceeds after obtaining a green card. (*See id.* at -492.)

yet another layer between Irico Group and any alleged effects in the U.S. only attenuates further those effects for jurisdictional purposes. DPPs' arguments for imputing any contacts of Irico USA are even more specious than for CNEIECC. DPPs once again fail to articulate a proper claim of agency or alter ego relationship with either Irico Defendant, resting their entire argument on two phrases from Irico documents: that Group initially "dispatched" an employee to serve as General Manager of Irico USA, and the comment that Group considered "tak[ing] administrative actions against" that former manager. (DPPs' Opp. at 40.) Given the extremely high bar to establish the "extensive" or "pervasive" control necessary for an agency or alter ego relationship as discussed above, this scant showing is plainly inadequate.

DPPs' emphasis on CNEIECC's sales to Irico USA is also unavailing because, as DPPs again knew, *all* of the sales by CNEIECC to Irico USA were shipped to countries other than the United States despite being billed to Irico USA, making it even more implausible that these CRTs ever made it into the hands of DPP class members. CRTs sent to China, South Africa, and Egypt certainly cannot constitute "legally significant acts giving rise to the claim" of harm suffered by U.S purchasers.

## IV.    CONCLUSION

Based on the foregoing, Irico requests that the Court enter an order: (a) dismissing the DPP Complaint against Irico with prejudice; and (b) granting such further relief as may be just and equitable.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: May 2, 2019

*/s/ Stuart C. Plunkett*

John Taladay (*pro hac vice*)
john.taladay@bakerbotts.com
1299 Pennsylvania Ave., NW
Washington, D.C. 20004
Telephone: (202) 639-7700
Facsimile: (202) 639-7890

Stuart C. Plunkett (State Bar No. 187971)
stuart.plunkett@bakerbotts.com
Peter Huston (State Bar No. 150058)
peter.huston@bakerbotts.com
BAKER BOTTS LLP
101 California Street, Suite 3600
San Francisco, California 94111
Telephone: (415) 291-6200
Facsimile: (415) 291-6300

*Attorneys for*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*