# Exhibit F

```
1                UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                     SAN FRANCISCO DIVISION

4

5

6   IN RE: CATHODE RAY TUBE (CRT)
    ANTITRUST LITIGATION,
7                               CASE NO. 3:07-CV-05944-JST
    _____
8

9

10            DEPOSITION OF CURTIS MILHAUPT

11              San Francisco, California

12             Wednesday, April 24, 2019

13

14

15

16

17

18

19

20

21

22

23   Reported by:  Ashley Soevyn, CSR No. 12019

24   Job No. 796715

25   Pages 1 - 148
```

1                    UNITED STATES DISTRICT COURT

2             FOR THE NORTHERN DISTRICT OF CALIFORNIA

3                       SAN FRANCISCO DIVISION

4

5

6    IN RE: CATHODE RAY TUBE (CRT)
     ANTITRUST LITIGATION,
7                               CASE NO. 3:07-CV-05944-JST
     _____
8

9

10

11

12

13           Deposition of CURTIS MILHAUPT taken on
     behalf of the Irico Defendants, at Baker Botts, 101
14   California Street, 36th Floor, San Francisco,
     California, beginning at 9:38 a.m.  and ending at
15   2:30 p.m. on Wednesday, April 24, 2019, before
     ASHLEY SOEVYN, Certified Shorthand Reporter No.
16   12019.

17

18

19

20

21

22

23

24

25

1              A P P E A R A N C E S
2

3  For the Direct Purchaser Plaintiffs and the Deponent

4          SAVERI & SAVERI, INC.

5          BY:  GEOFFREY C. RUSHING

6          Attorney at Law

7          706 Sansome Street

8          San Francisco, California 94111

9          E-mail: grushing@saveri.com

10         Phone: (415) 217-6810

11

12 For the Direct Purchaser Plaintiffs

13         KELLOGG HANSEN TODD FIGEL & FREDERICK

14         BY:  GREGORY G. RAPAWY

15         Attorney at Law

16         1615 M Street, N.W.

17         Suite 400

18         E-mail: grapawy@kellogghansen.com

19         Phone: (202) 326-7900

20

21

22

23

24

25

```
 1   APPEARANCES (CONTINUED)
 2
 3   For the Irico Defendants
 4        BAKER BOTTS LLP
 5        BY:  PETER K. HUSTON
 6        Attorney at Law
 7        101 California Street
 8        Suite 3600
 9        San Francisco, California 94111
10        E-mail: peter.huston@bakerbotts.com
11        Phone: (415) 291-6211
12
13   TELEPHONIC APPEARANCE:
14   For the Indirect Purchaser Plaintiffs
15        TRUMP ALIOTO TRUMP & PRESCOTT
16        BY:  LAUREN C. CAPURRO
17        Attorney at Law
18        2280 Union Street
19        San Francisco, Calfiornia 94123
20        E-mail: laurenrussell@tatp.com
21        Phone: (415) 563-7200
22
23
24
25
```

```
 1                    I N D E X

 2

 3   DEPOSITION OF CURTIS MILHAUPT

 4   EXAMINATION BY:                          PAGE

 5   MR. HUSTON                                  7
```

```
 1                      E X H I B I T S

 2    MILHAUPT DEPOSITION                                PAGE

 3    Exhibit 8535   Document entitled Corrected          10
                     Declaration of Professor Curtis
 4                   J. Milhaupt

 5    Exhibit 8536   Document entitled The Political      26
                     Logic of Corporate Governance in
 6                   China's State-Owned Enterprises

 7    Exhibit 8537   Document entitled Governance         33
                     Challenges of Listed State-Owned
 8                   Enterprises Around the World:
                     National Experiences and a
 9                   Framework for Reform

10    Exhibit 8538   Document entitled The                40
                     Performance of State Owned
11                   Enterprises in China: An
                     Empirical Analysis of Ownership
12                   Control through SASACs

13    Exhibit 8539   Document entitled Irico Display      58
                     Co., Ltd. 2007 Annual Report;
14                   Bates No. IRI-CRT-232 through
                     321
15
      Exhibit 8540   Document entitled Missing Link:      92
16                   Corporate Governance in China's
                     State Sector.
17
      Exhibit 8541   Article entitled, We are the         111
18                   national champions:
                     Understanding the Mechanisms of
19                   State Capitalism in China by
                     Li-Wen Lin and Curtis Milhaupt
20
      Exhibit 8542   Amended Declaration of Zhaojie       127
21                   Wang in Support of Irico
                     Defendants' Motions to Dismiss
22                   for Lack of Jurisdiction

23    Exhibit 8543   Declaration of Donald Clarke in      139
                     Support of Irico Defendants'
24                   Motions to Dismiss for Lack of
                     Jurisdiction
25
```

1      San Francisco, California, April 24, 2019

2                       9:38 a.m.

3

4                    CURTIS MILHAUPT,

5   having been administered an oath, was examined and

6   testified as follows:

7

8                      EXAMINATION

9   BY MR. HUSTON:

10       Q    Good morning, Professor Milhaupt.  How

11   are you?

12       A    I'm doing well.  Thank you.  How are you?

13       Q    Thank you for being here.  My name is

14   Peter Huston, and I represent the Irico Defendants

15   in this case, and I will be taking today's

16   deposition asking you some questions.  I would like

17   to start by just asking you whether you've had your

18   deposition taken before?

19       A    I have.

20       Q    And how many times?

21       A    Once.

22       Q    And when was that?

23       A    That was, if memory serves me, it was in

24   January of 2016.

25       Q    All right.  So that's pretty recently,

1    it's been an ongoing learning process of research,
2    collaboration, interviews, and study.
3         Q    How long did that sabbatical last?
4         A    It was the fall of 20 -- fall of 2006.
5         Q    So a few months?
6         A    Yes.
7         Q    Can you spell the name of the university
8    for our court reporter and for myself?
9         A    Certainly.  Tsinghua.  I believe the
10   English spelling is T-S-I-N-G-H-U-A.
11        Q    And so your first published scholarship
12   on the subject was in 2013; is that right?
13        A    Correct.
14        Q    Would you consider yourself an expert on
15   Chinese law?
16        A    In general, no.
17        Q    And probably the answer to that question
18   presumes the answer to the next, but would you
19   consider yourself an expert on Chinese Criminal Law?
20        A    No.
21        Q    And you mentioned that you took up
22   Mandarin.  Do you speak Chinese?
23        A    No.  I have some familiarity with the
24   language from my period of study, and I also have
25   some familiarity with Chinese characters because of

```
 1  BY MR. HUSTON:
 2      Q    Okay.  What is your -- put in your words,
 3  what you believe that test to be.
 4      A    Well, the statute has essentially two
 5  different parts.  One is an agency or
 6  instrumentality test, which asks whether an entity
 7  is majority owned or wholly owned by a government.
 8  And there is a second test, which asks whether
 9  entity, which does not fall into that first
10  category, which is quote/unquote organ of a foreign
11  government.
12      Q    And I've seen those two prongs, if you
13  will, referred to as the ownership test and the
14  organ test.  Does that ring a bell with you?
15      A    Well --
16           MR. RUSHING:  Object to the form.
17           THE WITNESS:  I mean, I'm not sure I can
18  say it rings a bell with me.  Those sound like
19  reasonable ways of referring to a test.  I'm not
20  sure I've read that or seen that as the definitive
21  way of describing those tests.
22  BY MR. HUSTON:
23      Q    Fair enough.  Is it your understanding
24  that the Irico Group is wholly owned by a political
25  subdivision of the Chinese government?
```

1      A    Yes.

2      Q    Is it fair to say that the bulk of your

3  declaration concerns Irico Display?

4      A    Yes.

5           MR. RUSHING:  Object to the form.

6  BY MR. HUSTON:

7      Q    Are all of the opinions that you've

8  reached in this engagement reflected in your

9  declaration?

10     A    Yes.

11     Q    Is it accurate to say that you do not

12 express an opinion on the ultimate question of

13 whether the Foreign Sovereign Immunities Act applies

14 or doesn't apply?

15     A    Yes.

16     Q    Irico Display is part of the Irico Group,

17 correct?

18     A    That's correct.

19     Q    And in that group, the Irico Group is the

20 core company, correct?

21          MR. RUSHING:  Object to the form.

22          THE WITNESS:  Yes.

23 BY MR. HUSTON:

24     Q    Turning back to your CV, are there any

25 publications or scholarship that you've authored on

1  the subject of China that aren't reflected on your

2  CV?

3       A    Not to my knowledge.

4       Q    Are you -- do you have any current plans

5  or thought that you might offer additional opinions

6  in the future in addition to what's been set forth

7  in your declaration?

8       A    In this case?

9       Q    Correct.  Correct.

10      A    I have no current plans to do so.

11      Q    Have you been asked to do that?

12      A    No, I have not.

13      Q    Okay.  Looking at paragraph 8 of your

14  declaration, there is an article referenced about

15  halfway down the paragraph, "Is the US Ready for FDI

16  from China?  Lessons from Japan's Experience in the

17  1980s."

18           Do you see that?

19      A    Yes, I do.

20      Q    What does FDI stand for?

21      A    Foreign direct investment.

22      Q    Is that referring to investments that

23  Chinese entities or individuals would be making into

24  the United States?

25      A    Correct.

1          MR. RUSHING:  Object to the form.
2          THE WITNESS:  I would hesitate to give my
3  own characterization.  I'm not a political
4  scientist.  The term "party-state" is commonly used
5  as a kind of shorthand for this parallel structure,
6  but I would not hold myself out as having particular
7  expertise in describing or explaining Chinese
8  governments or organizations.
9  BY MR. HUSTON:
10     Q   What, in your mind, what is the role of
11  the communist party in China?
12         MR. RUSHING:  Object to the form.
13         THE WITNESS:  It is a -- I think as I
14  stated earlier, it is a political party with a
15  monopoly on political power in China.
16  BY MR. HUSTON:
17     Q   Turn to page 525 of Exhibit 8537.  And
18  down at the bottom of the page, there is a sentence
19  that maybe gets at what you're talking about.  It
20  says:
21              "SASAC shares decision right on senior
22              management appointments with the
23              Chinese Communist Party (CCP) in a
24              highly institutionalized arrangement
25              whereby the top positions in the most

1   China.  The communist party is, I don't think it's a
2   controversial statement to say that the party itself
3   is kind of above the law.  And so at some level, all
4   organizations in China are subject to the authority
5   of the communist party.  But I think this is -- so I
6   would say that I think this is a little bit
7   overbroad and also I would not equate the communist
8   party necessarily with the party-state as we
9   discussed earlier.
10  BY MR. HUSTON:
11        Q    The next sentence reads:
12             "The Party-state controls SOEs through
13             both general requirements on policy
14             compliance and specific powers such as
15             appointing senior executives of SOEs."
16        Do you agree or disagree with that?
17        A    Again, I think this is conflating several
18  different things here.  I would be more specific.
19  SASAC as a matter of government, as a matter of law
20  and a matter of government organization, it is SASAC
21  that has the appointments power.  Now, SASAC does
22  have within it a party committee.  The extent to
23  which that committee is actually calling the shots,
24  I could not tell you, but I think that this is
25  improperly eliminating SASAC from the picture.  And

1  I would say further, both the general requirements
2  on policy compliance, that's a very general
3  statement -- pardon me.  That's a very general
4  statement.  I really don't know what that would be
5  referring to.
6        Q    So the next highlighted section says:
7             "State and business maybe very close in
8             some other economies with state-owned
9             enterprises, such as Korea, Japan,
10            Singapore or Brazil, but a degree of
11            direct control over state-owned
12            enterprises by an economy's ruling
13            parties is rarely seen in other open
14            economies."
15        You've mentioned that you are a professor
16 of comparative law and that you've looked at some of
17 these other countries.  Do you see a difference in
18 how state-owned enterprises run in China versus
19 these other countries mentioned?
20        A    The most relevant would be Singapore.
21 Korea and Japan have relatively few SOEs.  Singapore
22 uses a holding company model, Temasek -- excuse me.
23 In terms of the size of the capital market under a,
24 at least a sensible government control, Singapore
25 would be similar to China.  Singapore has a

1   different governmental structure for -- different
2   ownership structure for its SOES.  That's certainly
3   true.
4           Q    The next highlighted sentence reads:
5                "... the Party-state in China directly
6                controls not only the personnel but
7                also sometimes the operation of
8                state-owned enterprises, bypassing the
9                legal governance structure consisting
10               of the bored of directors and
11               management."
12          Do you agree with that or disagree?
13          MR. RUSHING:  Object to the form.
14          THE WITNESS:  Again, I -- the party-state
15  directly controls not only the personnel but also
16  sometimes the operation of SOEs.  I mean, I can only
17  restate what I've said, which is that SASAC has the
18  authority to appoint personnel in the -- at the
19  group level, not formally the party.  The party may
20  be involved in that.  I don't know.  There is, as I
21  said, a party committee within SASAC.  And the party
22  generally is involved in personnel matters.  As to
23  the next part of this sentence, also sometimes the
24  operation of SOEs bypassing the governance
25  structure, if this is a statement about what may

1     Q    And then the next sentence reads:
2          "Political governance is a
3          CCP-dominated process that actually
4          controls personnel appointments and
5          decision-making in SOEs."
6          CCP refers to the Communist -- the
7     Chinese Communist Party, correct?
8     A    Correct.
9     Q    And, you know, we've discussed this
10    already, but I take it, you take issue with that
11    sentence?
12    A    In the same way that I did before.  It's
13    conceivable that the party is -- can operate through
14    SASAC, but that is certainly not the way the system
15    is structured.
16    Q    And then the next sentence says:
17         "The two structures run separately,
18         although the same group of players
19         participates in the decision-making
20         processes of both structures."
21    A    Well, I think what this is in reference
22    to is the fact that, as I've explained in some of my
23    scholarship as well and as we alluded to earlier,
24    there is a corporate structure and there is a
25    parallel party committee structure internal to the

1  firm, which stands outside the corporate law.  And
2  it is common for senior executives in the company's
3  under SASAC's supervision to wear two hats, a
4  corporate hat and a party hat.  I think that's what
5  he's referring to.
6       Q    And then the last sentence in this
7  highlighted portion says:
8            "In most cases, the informal, nonlegal,
9            rules in political governance, which
10           run in the shadows, prevail over the
11           legal rules in China's corporate and
12           securities laws."
13           What is your reaction to that answer?
14           MR. RUSHING:  Object to the form.
15           MR. HUSTON:  Do you agree with that
16  statement?
17           MR. RUSHING:  Object to the form.
18           THE WITNESS:  Well, you know, scholarship
19  has to be pitched at a certain level of generality,
20  and so as a very general statement, I would say that
21  he's certainly correct that there are these parallel
22  structures.  Where he says, "In most cases, the
23  informal, non-legal rules" et cetera "prevail over
24  the legal rules," again, I guess I would take issue
25  to that particularly with respect to publicly these

1                   other shareholders, non-state

2                   shareholders (if any) of the SOEs have

3                   virtually no 'voice' when it comes to

4                   crucial company decisions."

5          Do you see that?

6      A   I do.

7      Q   And do you think that that description
8  holds true for state-owned enterprises in the 2007
9  time period?

10         MR. RUSHING:  Object to the form.

11         MR. HUSTON:  Let me rephrase it.

12  BY MR. HUSTON:

13     Q   What -- how much voice do you believe
14  that minority non-state shareholders had in
15  state-owned entities in 2007?

16     A   I think they had the same degree of voice
17  that a minority shareholder in a U.S. or Japanese or
18  Korean company would have.  That is not a lot of
19  voice, but I don't think that's unique to China in
20  anyway.

21     Q   Okay.  With respect to the power of
22  shareholders in Irico Display, do you have an
23  understanding of how voting worked at Irico Display,
24  what shareholders got to vote on, and how often, and
25  what sort of decisions they voted on?