# Exhibit J

# MISSING LINK:

## Corporate Governance in China's State Sector

BY DANIEL H. ROSEN, WENDY LEUTERT & SHAN GUO





EXHIBIT 8540
Curtis Milhaupt
4/24/19
Ashley Soevyn CSR# 12019

AN ASIA SOCIETY SPECIAL REPORT WITH RHODIUM GROUP

Prepared for Nicholas Consonery

# MISSING LINK:
## Corporate Governance
## in China's State Sector

BY DANIEL H. ROSEN,
WENDY LEUTERT & SHAN GUO

NOVEMBER 2018

AN ASIA SOCIETY SPECIAL REPORT
PRODUCED IN COLLABORATION WITH RHODIUM GROUP

AsiaSociety.org/ChinaSOE

Prepared for Nicholas Consonery

© 2018 Asia Society. All Rights Reserved

Asia Society Northern California
500 Washington Street, Suite 350
San Francisco, CA 94111

Phone: 415-421-8707
Email: sanfrancisco@asiasociety.org
AsiaSociety.org/Northern-California

# ABOUT THIS REPORT

**DANIEL H. ROSEN** is a founding partner of Rhodium Group and leads the firm's work on China, India and Asia. Dan has twenty-six years of professional experience analyzing China's economy, commercial sector and external interactions. He is widely recognized for his contributions on the US-China economic relationship. He is affiliated with a number of American think tanks focused on international economics, and is an Adjunct Associate Professor at Columbia University. From 2000-2001, Dan was Senior Adviser for International Economic Policy at the White House National Economic Council and National Security Council. He is a member of the Council on Foreign Relations, and board member of the National Committee on US-China Relations. A native of New York City, Dan graduated with distinction from the graduate School of Foreign Service of Georgetown University (MSFS) and with honors in Asian Studies and Economics from the University of Texas, Austin (BA).

**WENDY LEUTERT** is An Wang Postdoctoral Fellow at the Fairbank Center for Chinese Studies, Harvard University, and Postdoctoral Fellow at the Columbia-Harvard China and the World Program at the School of International and Public Affairs, Columbia University. Her research and teaching interests include political economy, comparative politics, and international relations, with a regional focus on China and East Asia. She holds a Ph.D. in Government from Cornell University, a Master's degree in International Relations from Tsinghua University, and a Bachelor's degree in Political Science and Philosophy from Wellesley College.

**SHAN GUO** is a Research Analyst at Rhodium Group focusing on China's state-owned enterprise reform, labor market and other macroeconomic conditions. Shan's work includes tracking and analyzing China's reform progress and its implications domestically and abroad. Shan previously worked as a tax consultant with Deloitte Hong Kong, advising clients on cross-border transactions and restructuring plans. She has rich experience dealing with corporate decision making and governance structures. She has a Master's degree in Public Administration from Columbia University and a Bachelor's degree in Accounting and Finance from Hong Kong Polytechnic University.



**RHODIUM GROUP (RHG)** combines policy experience, quantitative economic tools and on-the-ground research to analyze disruptive global trends. It supports the investment management, strategic planning and policy analysis needs of clients in the financial, corporate, non-profit and government sectors. RHG has offices in New York, California and Hong Kong, and associates in Washington and New Delhi.



Northern California

## ABOUT ASIA SOCIETY NORTHERN CALIFORNIA

The Asia Society Northern California center is uniquely positioned on the edge of the Pacific and at the entrance to Silicon Valley. Established in 1998, the center connects the San Francisco Bay Area's diverse local community with a wide network of leaders and visionaries in the fields of policy, business, arts & culture, and technology/innovation.

Through in-depth conferences, panel discussions and debates, cultural programs, exclusive roundtable briefings, and larger networking events, the center presents timely and relevant forums for educating and engaging the public about the critical issues facing the United States, Asia, and the world.



## ABOUT ASIA SOCIETY

Asia Society is the leading educational organization dedicated to promoting mutual understanding and strengthening partnerships among peoples, leaders and institutions of Asia and the United States in a global context. Across the fields of arts, business, culture, education, and policy, the Society provides insight, generates ideas, and promotes collaboration to address present challenges and create a shared future. Founded in 1956 by John D. Rockefeller 3rd, Asia Society is a nonpartisan, nonprofit institution with major centers and public buildings in New York, Hong Kong and Houston, and offices in Los Angeles, Manila, Melbourne, Mumbai, San Francisco, Seoul, Shanghai, Sydney, Tokyo, Washington, D.C. and Zurich.

*This report was made possible by*
*the generous support and contributions of:*

Jack Wadsworth, honorary chair of Asia Society Northern California
Ken Wilcox, chair of Asia Society Northern California
Duncan Clark, Asia Society trustee

*On behalf of the Asia Society Northern California center*
*and executive director Margaret Conley, thank you.*

# CONTENTS

Overview                                                                        6

I. SOEs in China's Economic & Political System                                  9

II. Key Players in SOE Corporate Governance                                    14

III. Evolution of Corporate Governance in China's                             17
State Sector (1978-2012)

IV. The Xi Administration's SOE Reform Agenda                                  23

V. Three-Level Analysis of SOE Corporate Governance                           28

VI. Company Case Study: Baosteel                                               33

Conclusion                                                                     37

References                                                                     41

# OVERVIEW

**MOUNTING RISKS IN CHINA'S ECONOMY AND GROWING INTERNATIONAL EXPOSURE TO STATE-OWNED ENTERPRISES** (SOEs) make improving corporate governance at these firms essential. China's leaders have called for strengthening SOE corporate governance at all levels of ownership, but Beijing has not empowered boards of directors to carry out key governance functions. Chinese Communist Party (CCP) influence on enterprise decision-making persists through multiple mechanisms. As the market-oriented reforms pledged at the 2013 Third Plenum meeting remain stalled after five years, President Xi Jinping's administration is acting to institutionalize the Party's leadership role in SOE governance. Yet steps forward can be made even in the current political environment. Taking action to improve SOE corporate governance can boost performance and valuation and foster broader growth. The goal of this report is to provide a full, contextual understanding of the state of corporate governance in SOEs today so that these outcomes can be achieved.

Five trends and conclusions derive from this analysis, each of which is worth highlighting at the outset:

**1. Rising domestic risks and expanding international stakes make improving SOE corporate governance imperative.** SOEs are absorbing more credit in China's economy even as their performance lags behind private firms. The June 2018 inclusion of mainland China-listed A shares—65% of which are SOEs—in the MSCI emerging markets index directly exposes international institutional investors to SOE performance and the risks associated with their governance. Today, SOEs' corporate governance and potential CCP influence on commercial decision-making now impact their foreign joint venture (JV) partners and governments worldwide.

**2. State and private investor incentives remain misaligned, and loosely-defined Party influence persists.** Senior SOE executives are typically also government officials. This incentivizes them to pursue state goals from industrial policy to social stability, distinct from - or even at odds with - maximizing profit and shareholder value. The Party state continues to appoint, assess, promote, and remove top SOE leaders—board chairmen, Party secretaries, and general managers or presidents—who in turn select the leadership of listed subsidiaries. Joint managerial and Party appointments, in which a single individual serves as both board chairman and Party secretary, are now a policy priority and widespread at the group company level (a company's top administrative layer, which controls all subsidiaries below

it and has no commercial function). Significant overlap between the membership of boards and Party committees is also common.

**3. The Xi administration is institutionalizing the Party's leadership role in SOE governance in a manner that concerns some potential investors.** Pledges at the 2013 Third Plenum for market-oriented reform to the state sector have been largely unfulfilled. Instead, the Xi administration is institutionalizing the Party's "leadership role" in SOE governance, most recently by legalizing the long-standing practice of Party committees discussing "major decisions" before they go to boards of directors for final determination. The Xi administration revised the Party constitution to enshrine this principle and is requiring SOEs to do the same in their articles of association. China's current leadership argues that a stronger Party will improve, not impede, SOE performance and valuation by boosting oversight and accountability.

**4. Better corporate governance *could* boost SOE performance and valuation and foster broader growth.** The current political climate makes far-reaching reforms to SOE corporate governance unlikely. However, steps forward can still be made. An important first move is reducing the structural overlap between the board and the Party committee by limiting Party-managerial joint appointments to top SOE leaders. Another critical measure is clearly delineating the Party's role in commercial decision-making. Yet another key step is increasing the transparency of SOE corporate governance activities at the group company level. Further prioritizing the appointment of external and independent directors with private sector and international experience could also help. These moves could boost SOE efficiency and better align board members' incentives and decision-making with the market. They could also foster broader growth by attracting inbound foreign capital, bolstering existing and prospective JV partnerships, and facilitating SOE overseas direct investment and acquisitions in increasingly politicized world markets.

**5. Improved corporate governance is critical for other, related reforms to succeed.** Such reforms include financial reforms to restrain the expansion of credit growth, fiscal reforms to reconcile the responsibilities of government (central and local), competition policy reform to break local protectionism and level the playing field, and labor market reforms. These and other policy reforms are needed to reshape the competitive environment in China that all companies—and national growth in the aggregate—depend on. It is essential to have proper corporate governance in place to make sure that SOEs make responsible decisions with adequate discussion, supervision, and consideration for all stakeholders.

This report leverages original data and new sources to illuminate how China's national champions—opaque and poorly-understood—are governed. Chinese SOE corporate governance has made important advances over the past four decades. Yet serious concerns remain about transparency, the effectiveness of internal monitoring, and Party influence on enterprise affairs. The stakes involved in improving SOE corporate governance are high not only for China, but also for international investors, JV partners, and the growing number of foreign countries where Chinese SOEs operate.

Renewed efforts to improve SOE corporate governance offer positive potential but will face formidable obstacles. Despite these potential benefits, improving SOE governance faces formidable obstacles. Most fundamentally, the Xi administration does not see a contradiction between strengthening the Party's role in SOE corporate governance and improving firm performance and valuation. On the contrary, leaders believe that institutionalizing a stronger role for the Party will *benefit* SOEs by improving supervision and accountability—top priorities in Xi's anti-corruption campaign. This prioritization of Party leadership

makes it unlikely that boards of directors will be empowered to perform key governance functions like selecting corporate leaders or determining their compensation anytime soon. And SOE leaders' continued status as officials in the Party's personnel system means that they are unlikely to share private investors' unitary objective of maximizing profit and shareholder value. These constraints have existed for a long time and are unlikely to change. But improvements are still possible. After all, despite their differences, both the Chinese government and private investors share an interest in improving SOE oversight, efficiency, and long-term value.

# I. SOES IN CHINA'S ECONOMIC & POLITICAL SYSTEM

**CORPORATE GOVERNANCE IS AT THE HEART OF CHINA'S STATE-OWNED ENTERPRISE (SOE) REFORM AGENDA**, and it presents a dilemma—the need to balance economic performance objectives with the political priorities of China's "Party state."[1] Improving SOE performance is critical in order for President Xi Jinping and his administration to sustain domestic growth and prevent systemic economic risks from spinning out of control. Although the proportion of SOEs in China has declined steadily over time, it remains significant (Figure 1, page 10). These state firms have long performed poorly compared to private firms. As of June 2018, SOEs still account for 28% of China's industrial assets but contribute only 18% of total industrial profit.[2] Despite SOEs' poor return on assets—3.9% compared with 9.9% for private firms—they racked up RMB 100 trillion (USD 15 trillion) in debt by the end of 2017, equivalent to 120% of national GDP (Figure 2 and Figure 3, page 10-11).[3] Their leverage has been declining but remains much higher than that of private firms following the global financial crisis (Figure 4, page 11).

SOE performance is also crucial for the performance of China's equity markets—the fourth largest in the world—due to the heavy state presence on the Shanghai and Shenzhen exchanges. While Bloomberg data indicate that only one-eighth of the nearly 4,000 companies listed in China have more than 20% government ownership, these companies account for around 40% of total market capitalization and 50% of total revenue of listed companies.[4] Data from WIND (a leading Chinese financial data provider) suggests that actual SOE presence may be significantly higher if firms ultimately controlled by the state via complicated shareholder structures are included.[5]

---

[1] "State-owned enterprises" refers to "government owned or government controlled economic entities that generate the bulk of their revenues from selling goods and services." "Corporate governance" refers to "the system by which companies are directed and controlled," with the board of directors leading governance at the company level. "Party state" refers to the Chinese state as a entity comprised of both government bodies and the organs of the ruling CCP. London Stock Exchange (1992): 14; World Bank (1995): 26.

[2] Rhodium Group calculation using National Bureau of Statistics data.

[3] Rhodium Group calculation using National Bureau of Statistics and Ministry of Finance data. For comparison, the Bank for International Settlements reports credit-to-GDP ratios of 96.6% for non-financial corporations in all reporting countries and 10.6% for non-financial corporations in emerging markets as of August 2018. BIS (2018).

[4] Rhodium Group calculation using Bloomberg data.

[5] WIND financial data.



Source: National Bureau of Statistics, Rhodium Group



Source: National Bureau of Statistics, Rhodium Group



Source: Ministry of Finance, National Bureau of Statistics, Rhodium Group



Source: National Bureau of Statistics, Rhodium Group

12 | ASIA SOCIETY    MISSING LINK: CORPORATE GOVERNANCE IN CHINA'S STATE SECTOR

| TABLE 1. SOE PRESENCE IN CHINA BY END OF 2017 | | | |
|---|---|---|---|
| **INDUSTRIAL SECTOR** | **SOE** | | **OTHERS** |
| Number of companies ; | 19,000 | | 360,000 |
| By number of companies | 5% | | 95% |
| By revenue | 16% | | 84% |
| By assets | 28% | | 72% |
| By debts | 29% | | 71% |
| **ALL SOES BY OWNERSHIP TYPE** | **CENTRAL** | **LOCAL** | |
| Number of companies | 58,000 | 116,000 | |
| By number of companies | 33% | 67% | |
| By revenue | 55% | 45% | |
| By assets | 46% | 54% | |
| By debts | 49% | 51% | |
| **ALL A SHARES BY ULTIMATE CONTROLLER** | **CENTRAL** | **LOCAL** | **OTHERS** |
| Number of companies | 395 | 706 | 2,446 |
| By number of companies | 11% | 20% | 69% |
| By revenue | 45% | 26% | 29% |
| By market cap | 36% | 25% | 39% |
| **MSCI BY ULTIMATE CONTROLLER** | **CENTRAL** | **LOCAL** | **OTHERS** |
| Number of companies | 67 | 79 | 80 |
| By number of companies | 30% | 35% | 35% |
| By revenue | 62% | 21% | 17% |
| By market cap | 54% | 24% | 22% |
| **ALL A SHARES BY LEVEL OF STATE OWNERSHIP** | **STATE OWNERSHIP > 20%** | | **STATE OWNERSHIP < = 20%** |
| Number of companies | 506 | | 3,036 |
| By number of companies | 14% | | 86% |
| By revenue | 56% | | 44% |
| By market cap | 40% | | 60% |
| PE ratio* | 12.9 | | 25.2 |
| Tobin's Q | 1.2 | | 1.9 |
| Percentage of companies disclosing % of independent directors | 33% | | 11% |
| % of independent directors | 39% | | 38% |
| Governance disclosure score | N/A | | 43.5 |

Source: National Bureau of Statistics (for industrial enterprises), Ministry of Finance (for all SOEs), WIND and Eastmoney (to identify SOE presence in stock market by ultimate controller), Bloomberg (to identify SOE presence in stock market by government ownership, and to compare valuation and governance indicators), Rhodium Group.
*In the initial printed version of this study we used a simple average methodology to arrive at higher PE ratios and Tobin's Q numbers. These numbers are updated in the digital version using aggregated market capitalization instead of simple averages, which better reflect market conditions.

Prepared for Nicholas Consonery

SOEs serve important strategic functions for Beijing beyond maximizing profits and shareholder wealth. Dividends and taxes from SOEs are a major source of government revenue.[6] SOEs advance China's industrial policy by channeling capital toward key and pillar sectors, key technologies, important national projects, and domestic and international strategic initiatives like the Belt and Road Initiative.[7] In addition, the Chinese leadership has relied on SOE help in averting financial crises in the past, for instance in its response to the 2015 equity market meltdown.[8] State firms also contribute to social stability by employing approximately 60 million people as of 2016, keeping prices for key inputs low, and serving on the front lines of disaster relief.[9] Moreover, SOEs serve a redistributive and developmental function sub-nationally by expending the bulk of their investment on infrastructure projects in China's poorer inland provinces.[10] These all reflect important public policy goals, although the efficiency of using SOEs to implement them is debatable.

How Chinese SOEs are governed and perform is of growing concern to international actors. The June 2018 inclusion of mainland China-listed A shares in the MSCI emerging markets index—a benchmark for the equity market performance of emerging economies—directly exposes institutional investors in the United States and elsewhere to SOE performance and governance issues. Of the Chinese companies now included in the MSCI emerging markets index, 65% are ultimately controlled by the state, accounting for 80% of market capitalization and revenue for all new Chinese entrants.[11] SOE governance, especially as it relates to the CCP, also remains a major issue in bilateral economic relations between the United States and China (as well as for other market economies) and internationally at the World Trade Organization.[12] Issues like forced technology transfer and review of intellectual property, already a serious concern for foreign firms with JVs in China, become even more worrying when SOEs are involved.[13] Foreign firms are increasingly anxious about Party influence on commercial activities, especially those in partnerships with Chinese SOEs or considering establishing them.[14] And as Chinese SOEs expand in global markets their governance directly impacts economies and market conditions, communities, and political debate around the world.

---

[6] SOEs transfer up to 25% of their profits as dividends to the Ministry of Finance, amounting to RMB 258 billion (USD 38.2 billion) in 2017. In 2016, the most recent year for which data is available, SOEs paid RMB 4.0 trillion (USD 582.2 billion) in taxes, accounting for 30% of the government's total tax revenue that year. Ministry of Finance (2018); Ministry of Finance (2017).

[7] In 2006, the State Council announced that the state would maintain absolute control in key industries (defense, electricity, oil and gas, telecommunications, coal, shipping, aviation) and maintain strong influence in pillar industries (auto. chemicals, construction, electronics, equipment, manufacturing, nonferrous metals and prospecting, steel, information technology).

[8] SASAC ordered publicly-listed SOEs subsidiaries not to sell shares and to purchase more shares in order to "safeguard market stability." SASAC: 国资委采取有力措施维护股票市场稳定 [SASAC Takes Effective Measures to Safeguard Stock Market Stability], July 8, 2015.

[9] National Bureau of Statistics of China (2018).

[10] A 2017 analysis finds that approximately 60% of SOEs' fixed asset investment is in inland provinces, primarily in the form of infrastructure, even though these provinces account for less than half of China's GDP. Batson (2017).

[11] Rhodium Group calculations using WIND data.

[12] United States Delegation to the World Trade Organization (2018). See especially "Control at the Firm Level": 3-4.

[13] United States Chamber of Commerce (2016): 6.

[14] European Union Chamber of Commerce in China (2017); Delegations of German Industry and Commerce (2017).

# II. KEY PLAYERS IN SOE CORPORATE GOVERNANCE

**MULTIPLE ACTORS IN CHINA SHAPE THE FRAMEWORK OF SOE CORPORATE GOVERNANCE.**
The National People's Congress, China's legislative assembly, sets its broad contours with key statutes such as the *Company Law, Securities Law,* and the *Law on the State-Owned Assets of Enterprises.* The State Council, China's main governing body, and the government bodies under its jurisdiction guide SOE corporate governance development through administrative regulations and experimental schemes. Of the government bodies under the jurisdiction of the State Council, the State-owned Assets Supervision and Administration Commission (SASAC), a special commission established in 2003, plays a leading role in these efforts. SASAC directly administers the central government's portfolio of state firms and is responsible for supervising and assessing SOE leaders and performance. A parallel network of SASACs at the provincial level and in major municipalities—Beijing, Shanghai, Chongqing, and Shenzhen—operates under the central level SASAC.

The China Securities Regulatory Commission (CSRC), the country's main securities regulator also under the authority of the State Council, is another important actor in SOE corporate governance. The CSRC, and to a lesser extent the Shanghai and Shenzhen Stock Exchanges themselves, design and enforce corporate governance rules for domestically listed companies.[15] CSRC regulations and "self-enforcing mechanisms" directly impact the governance of SOEs' publicly listed subsidiaries.[16] In some cases Chinese corporate law has adopted CSRC measures in part or in full.[17]

SOEs themselves are ground zero for corporate governance in China's state sector. There are two main types of Chinese SOEs—central SOEs (state firms owned by the central government) and local SOEs (state firms owned by local governments or SASACs). SASAC oversees most central SOEs, currently

---

[15] Private enforcement is legislatively possible but in practice extremely difficult in China, in part because SOE dominance of equity markets means successful litigation would incur financial losses for the state. See Chen (2003); Clarke and Howson (2012); Pargendler (2011); Shi (2012). ʻ

[16] Self-enforcing mechanisms, such as supermajority negative veto rights, are effective without external enforcement by a state or any external actor, for, example for general shareholders meetings. Howson (2015).

[17] For a list of examples in which CSRC corporate regulations have been incorporated into corporate law, see Howson (2014).

numbering 96 firms in total.[18] These central SOEs are further subdivided into two groups: core firms termed "important backbone state-owned enterprises" (重要骨干国有企业) with vice-ministerial rank equivalent and non-core firms with department-level rank equivalent.[19] Local government departments and local SASACs also control an array of local SOEs.[20] These local SOEs are far more numerous than central SOEs but also typically much smaller in size.[21]

Each Chinese SOE is typically structured as a large, partially-privatized enterprise group (企业集团). At the top of each enterprise group is a group company (集团公司) that is typically wholly owned by SASAC or a local SASAC or government body. Below the group company is a complex constellation of as many as 100 to 200 subsidiary entities, including publicly listed firms, joint venture firms, finance companies, and research institutes. Each of these subsidiary entities may in turn have additional subsidiaries or hold shares in other such subsidiary entities.[22]

SOE leaders at the group company level possess ultimate decision-making authority over the entire enterprise group, making them critical to understanding SOE operations and governance. The board chairman at the group company level frequently also serves as the chairman of a given SOE's main subsidiaries, including listed firms. This leadership overlap between the group company and its listed subsidiaries ensures that the group company is not only their majority shareholder but also their main controller. This bureaucratic set-up makes SOE corporate governance at the group company level vital to understanding how state firms—including their listed subsidiaries—are actually governed.

Party and government authorities directly appoint top SOE leaders at the group company level—board chairmen, Party secretaries, and general managers or presidents.[23] The Central Organization Department, the powerful Party organ responsible for personnel affairs, appoints the top leaders of the core central SOEs in consultation with higher Party authorities; SASAC and local governments choose the heads of non-core central SOEs and local SOEs respectively. Although the Party state routinely transfers officials between leadership positions in central or local governments and SOEs, most SOE leaders today have spent their entire careers in state industry. Figure 5 (page 16) summarizes the typical SOE organizational structure and the administrative hierarchy in which they are embedded, with a focus on key players in corporate governance.[24]

---

[18] Other central government ministries, such as the Ministry of Finance, also own SOEs. This report focuses on the non-financial central SOEs under SASAC administration. A list of these firms is available on SASAC's website at: http://www.sasac.gov.cn/n2588035/n2641579/n2641645/index.html.

[19] SOEs' varying administrative ranks confer important political privileges that impact their leaders' ability to advocate for benefits for their firms, like licenses, or to oppose policies disadvantageous to the sectors in which they operate. Specifically, these political privileges include access to documents of different classification grades, permission to attend meetings for officials of a particular rank, and the chance to participate in Central Party School trainings. Leutert (2016): 87.

[20] Local government departments that control local SOEs include the administrative departments of local governments (such as the Finance Bureau), local state-owned assets supervision bureaus, and companies authorized by local governments to operate their state-owned assets.

[21] There were 116,499 local SOEs at the end of 2016, up from 103,608 at the end of 2013. Ministry of Finance (2017).

[22] Lin and Milhaupt (2013).

[23] The Chinese terms for these positions are board chairman (董事长), Party secretary (党委书记), general manager (总经理), and president (总裁). Companies typically have either a general manager or a president position; they do not usually have both.

[24] They include the Ministry of Finance, which sets SOE operating budgets, receives SOE dividend payments, and remits subsidies and other disbursements; the National Development and Reform Commission, which manages industrial policy and planning; the National Audit Office, which audits SOE books; and last but not least the Central Commission for Discipline Inspection, which routinely inspects SOEs for illicit activity and adherence to Party doctrine and goals.

Prepared for Nicholas Consonery



FIGURE 5. SOE ORGANIZATIONAL STRUCTURE & POSITION IN CHINA'S ADMINISTRATIVE HIERARCHY

*Not all central and local SOEs have established boards of directors at the group company level

# III. EVOLUTION OF CORPORATE GOVERNANCE IN CHINA'S STATE SECTOR (1978-2012)

**AT THE ADVENT OF REFORM IN 1978, SOES WERE ESSENTIALLY PRODUCTION UNITS** executing state-assigned production quotas; they had little authority for operational decision-making or responsibility for their performance. Within SOEs, the factory head (厂长) led production and operational matters, while the Party secretary directed political and personnel affairs. Initial changes to SOE governance centered on increasing the factory heads' accountability and autonomy vis-à-vis the state. The CCP Central Committee and the State Council took the first step to separate ownership and management by identifying factory heads as their companies' legal representatives.[25] The National People's Congress next affirmed factory heads' primary role in enterprise governance relative to the Party committee, and directed SOEs to establish a management committee (管理委员会) to participate in decision-making for major enterprise matters.[26] SOE heads gained further formal autonomy with breakthrough State Council regulations in 1992 granting them decision-making authority across 14 areas, including production, product and labor prices, imports and exports, asset allocation, investments, and joint ventures and mergers.[27]

Jiang Zemin's call to establish a "modern enterprise system," the 1994 Company Law, and SOEs' entry into equity markets, catalyzed initial—but superficial—adoption of corporate governance institutions. In 1992 Jiang directed SOEs to establish a "modern enterprise system," defining its key elements as "clearly established property rights, well-defined power and responsibility, separation of enterprise from government, and scientific management."[28] The landmark 1994 Company Law required all registered firms to

---

[25] The CCP Central Committee and State Council: 全民所有制工业企业厂长工作条例 [Work Regulations for Factory Owners of Industrial Enterprises Owned by the Whole People], September 15, 1986.

[26] National People's Congress: 中华人民共和国全民所有制工业企业法 [Law of the People's Republic of China on Industrial Enterprises Owned by the Entire People], promulgated April 13, 1988, effective August 1, 1988.

[27] State Council: 全民所有制工业企业转换经营机制条例 [Regulations on Transformation of the Operational Mechanisms of Industrial Enterprises Owned By the Whole People], July 23, 1992.

[28] The Chinese leadership did not initially equate corporate governance with a modern enterprise system. Neither Jiang Zemin's 1992 report nor the subsequent 1993 Third Plenum Decisions mentioned corporate governance. Corporate governance was commonly referred to then by the Chinese terms "法人治理结构" and "公司治理制度." Jiang Zemin: 江泽民在中国共产党第十四次全国代表大会上的报告 [Jiang Zemin's Report to the 14th National Party Congress of the CCP], October 12, 1992.

Prepared for Nicholas Consonery

establish three tiers of control—a board of directors, a supervisory committee, and a general shareholders meeting—and enumerated the rights and responsibilities of each.[29] Hungry for capital, growing numbers of SOEs raced to repackage their best assets into subsidiaries for public listing on exchanges in mainland China, Hong Kong, and overseas. While SOEs set up boards of directors for these subsidiaries to fulfill listing requirements, most lacked corresponding boards at the group company level. In the sprint to the markets, much restructuring of Chinese SOEs occurred in name only.

In 1997, the CSRC made its first major foray into corporate governance. In its "Guidance for Articles of Association of Listed Companies," the CSRC outlined the powers of the board of directors, the board chairman, and the general manager, as well as the general shareholders' meeting and the supervisory board. It also gave the first official definition of "independent directors."[30] In theory, independent directors are able to improve corporate governance because their lack of overlapping interests enables them to monitor firm management more effectively and makes them more likely to report major abuses.[31] In the Chinese context, however, their actual independence was—and remains—limited. This is because independent directors often have ties with SOEs that either fall short of formal standards for relationships of interest or which these formal standards do not capture.[32]

As the 1990s drew to a close, Premier Zhu Rongji drastically downsized China's state sector while simultaneously building a select group of national champions. By the second half of 1996, 43% of state-owned enterprises were operating at a loss, making policy action imperative.[33] Zhu's reform push allowed small SOEs to shut down, merge with other firms, or sell off their assets, thereby shedding millions of redundant workers and reducing the non-performing loan burden on state banks.[34] Unfortunately this process, combined with pervasive insider control (内部人控制), also fanned the flames of corruption.[35] At the same time, Jiang and Zhu looked to equity markets at home and abroad to revitalize the largest state firms. Then, as now, they hoped that public listing of SOE assets would give state firms a much-needed capital injection, boost management efficiency, and magnify the state's scope of direct control through leverage.[36] Subsidiaries of China's largest SOEs quickly took flight with IPOs on international capital markets.

---

[29] See Standing Committee, National People's Congress: 中华人民共和国公司法 [Company Law of the People's Republic of China], issued December 27, 1993, effective July 1, 1994 (revised December 25, 1999, August 28, 2004, October 27, 2005, and December 28, 2013).

[30] The 1997 guidance defined independent directors as individuals who were none of the following: 1) company shareholders or employees or shareholder units; 2) "internal personnel" (i.e. employees) of the company; 3) persons with an interest in the company's affiliates or management.

[31] In securities regulation in the United States, for example, the New York Stock Exchange has required independent directors to constitute the majority of the board membership for listed companies since 2004. NYSE regulations also require each listed company to have a compensation committee and a nominating/corporate governance committee that consists entirely of independent directors. NYSE (2018).

[32] Lin (2013).

[33] 周天勇 [Zhou Tianyong], 夏徐迁 [Xia Xuqian]. 我国国有企业改革的历程 [The Course of China's State-Owned Enterprise Reform], 中国共产党新闻网 [CCP News Network], September 17, 2008.

[34] Chen (2008): 216-222.

[35] Insider control refers to "the capture of substantial control rights by the manager or the workers of a formerly state-owned enterprise (SOE) in the process of its corporatization." Aoki 1994: 1. Estimates of the loss of state-owned assets during this period are contested and vary; one researcher estimates the loss of investment in the state-owned economy at between RMB 180 billion and RMB 230 billion (USD 26-34 billion today) between 1995 and 1999, equivalent to between 2.4% and 3.1% of China's GDP at the time. Hu (2001).

[36] Clarke (2003): 497.

Case 4:07-cv-05944-JST   Document 5463-11   Filed 05/02/19   Page 21 of 46

MISSING LINK: CORPORATE GOVERNANCE IN CHINA'S STATE SECTOR    ASIA SOCIETY | 19

Early national experiments during the 1990s to revamp SOE organization and governance at the group company level were unsuccessful.[37] Risk-averse SOE leaders were reluctant to make fundamental modifications to firm governance in an environment of high political uncertainty, especially changes that might affect their own authority within the firm. To strengthen SOE compliance and oversight at the group company level, in 1998 the CCP Central Committee and the State Council jointly authorized the dispatch of special inspectors (稽察特派员) to the largest state firms.[38] This inspector system was intended to create an independent information channel to the State Council, boost the quality of SOE auditing and financial information, and guard against management abuses. In practice, however, it relied on subjective assessments by individual inspectors and its actual effect on governance was limited because inspection occurred ex ante. Nevertheless, the system's initial success in uncovering abuses within SOEs motivated Beijing to take further steps on corporate governance the following year.[39]

In 1999, the Jiang administration officially embraced corporate governance as a key element in SOE reform. Jiang and other top leaders issued a high-level directive ordering all restructured SOEs to establish "an effective corporate governance structure."[40] At the same time, however, this document mandated that a single individual should serve jointly as the board chairman and Party secretary in SOEs. The following year, the State Economic and Trade Commission explicitly identified corporate governance as an essential component of a modern enterprise system for the first time.[41] At the turn of the century, corporate governance had arrived as a first order priority, but its specific meaning continued to evolve.

For listed firms, the CSRC continued filling in the gaps with regulations on independent directors and corporate governance principles. In 2001, the CSRC mandated all listed company boards have at least two independent directors by June 30, 2002, and that at least one third of the board be composed of independent directors by June 30, 2003.[42] It also specified new functions and powers for independent directors.[43] In 2002, the CSRC issued a "Code of Corporate Governance for Listed Companies" modeled on the 1999 "OECD Principles of Corporate Governance." The 2002 Code outlined the basic criteria

---

[37] In 1994, the State Economic and Trade Commission and the State System Restructuring Commission launched a national pilot on the modern enterprise system that required SOEs to restructure as wholly state-owned enterprise groups (国有独资企业集团), stock companies (股份有限公司), or limited liability companies (有限责任公司). However, it ended in failure after most of the 100 pilot enterprises simply reorganized themselves as wholly state-owned enterprise groups in name and did not change their governance. A 1994 State Council pilot to restructure China's largest SOEs as state holding companies also ended unsuccessfully, as supervising ministries continued to routinely extract profits and intervene in firm affairs. State Economic and Trade Commission (1999): 31-32.

[38] State Council: 国务院向国有重点大型企业派出稽察特派员方案的通知 [Notice of State Council Plan to Dispatch Special Inspectors to Large State-owned Enterprises], May 7, 1998; State Council: 国务院稽察特派员条例 [State Council Regulations on Special Inspectors], July 3, 1998. This initiative later became the institution of the external supervisory board. Shao (2014): 512.

[39] For the period between 1998 and 2008, special inspectors uncovered 2,684 major issues and generated 3,239 recommendations concerning punishment or adjustment. Shao (2014): 516.

[40] The CCP Central Committee: 中共中央关于国有企业改革和发展若干重大问题的决定[Decisions of the CCP Central Committee on Major Issues Concerning the Reform and Development of State-Owned Enterprises], September 22, 1999.

[41] State Economic and Trade Commission (1999): 32-33.

[42] CSRC: 关于在上市公司建立独立董事制度的指导意见 [Guiding Opinions on the Establishment of an Independent Director System in Listed Companies], August 16, 2001. Subsequent compliance was incomplete but indicated significant progress. As of June 2003, 1,244 out of the 1,250 A-share listed firms had independent directors. Of these 1,244 firms, 800 had boards composed of at least one third independent directors; 1,023 had boards composed of at least one quarter independent directors. Shao (2014): 521.

[43] These new functions and powers included the authority to approve major transactions for listed firms and hire outside consultants or organizations to prepare additional reference materials (e.g. independent financial reports). Exercising these functions and powers required the approval of at least half of independent directors.

for evaluating listed firms' corporate governance soundness and compliance, including provisions for the rights and equitable treatment of shareholders, the responsibilities of the board, and disclosure and transparency requirements.[44] The real challenge for the CSRC and listed firms, however, was moving from these principles to actual practice.

In reality, the CSRC confronted widespread abuse of listed firms by controlling shareholders. Group companies were routinely "tunneling" funds upward from their publicly listed subsidiaries and using unlisted subsidiaries' assets as external guarantees to take on additional debt. At the end of 2002, the CSRC investigated 1,175 listed companies and found that group companies had misused funds for more than 676 of them, amounting to nearly RMB 97 billion (approximately USD 14 billion today).[45] The CSRC tackled these issues with new regulations strengthening shareholder oversight of external guarantees and related party transactions[46], requiring additional disclosure for potential mergers and acquisitions, restricting insiders' disposal of shares, and outlining further principles for general shareholder meetings and articles of association. In recent years, the CSRC has updated many of these original regulations and issued additional requirements for procedural compliance and disclosure. More work, however, remains to be done.

The Hu Jintao administration's creation of SASAC in 2003 revived efforts to improve group-level SOE corporate governance. In 2004, SASAC and the Central Organization Department initially tapped seven central SOEs to restructure as wholly state-owned enterprises and establish boards of directors at the group company level, with a minimum of two external directors.[47] SASAC gradually expanded this experimental scheme to 24 central SOEs in 2009; by the beginning of 2008, 17 of the pilot enterprises had established boards composed of more than 50% external directors.[48] SASAC also released provisional regulations aimed at standardizing pilot enterprise board operations and enshrining their powers in corporate articles of association.[49] Yet beyond progress in the first, formal step of establishing group-level boards of directors in central SOEs (see Figure 6, page 21), SASAC has largely dropped its early prioritization of corporate governance development. Lack of high-level political support and SASAC's own internal changes have constrained efforts to improve SOE corporate governance at the group company level since 2009. Although SOEs' formal restructuring and board formation have continued, SASAC and Party organs' retention of many key powers has undermined the effectiveness of boards despite their existence on paper.

44 CSRC: 上市公司治理准则 [Code of Corporate Governance for Listed Companies], January 7, 2002.

45 Shanghai Stock Exchange Research Center (2004).

46 Related party transactions refers to transactions in which group companies or their subsidiaries transfer assets, capital, or legal obligations to connected individuals or entities through activities like purchases, sales, loans, or guarantees.

47 SASAC: 关于中央企业建立和完善国有独资公司董事会试点工作的通知[Notice on Central SOEs Establishing and Improving Wholly State-Owned Enterprises Board of Directors Pilot Work], June 9, 2004.

48 In addition, an external board member served as board chairman in three of the pilot enterprises. Shao (2014): 542.

49 SASAC: 董事会试点中央企业董事会规范运作暂行办法的通知 [Temporary Regulations for Standardizing Board of Directors Operations in Central SOE Board of Directors Pilot Enterprises], March 20, 2009.



FIGURE 6.  BOARD OF DIRECTOR ESTABLISHMENT IN CENTRAL SOES AT THE GROUP LEVEL SINCE 2003

Source: Rhodium Group calculation using data from company, media, and official reports.[50]

A common theme throughout the past four decades of corporate governance development in China's state sector (summarized in Table 2, page 22) is the discrepancy between form and function. As Zhang Delin (2008) writes: "It was rather like drawing a tiger with a cat as a model; they [Chinese leaders] were not able to fathom the true meaning of the principle and structure of corporate governance—that is, the principle of separation and balance of power—or to adapt it to the enterprises that they were reforming."[51] In part, this is an understandable outcome given the rapid speed of reform implementation and ongoing processes of experimentation. However, it also resulted from SOEs leaders' lack of appetite (not surprisingly) for introducing new decision-making mechanisms that would curtail their authority within the firm. Another factor was the view of Party authorities and some top officials that strengthening Party organizations inside SOEs, not developing corporate governance institutions, would be the best way to monitor enterprise operations and prevent the loss of state-owned assets.

[50] Systematic data about board of directors establishment for central SOE group companies is not publicly available, reflecting the broader lack of transparency about SOE corporate governance activities at the group company level. This figure represents our best effort to compile data about the dates of initial board of director establishment (董事会建设) for all central SOEs under SASAC administration beginning with its original portfolio of 189 firms in 2003 and all subsequent firms created through mergers or placed under SASAC administration (98 firms as of the end of 2017). Data for approximately 10% of firms was not available. The 2003 list comes from State Council: 国务院办公厅关于公布国务院国有资产监督管理委员会履行出资人职责企业名单的通知 [Notice of the General Office of the State Council on Releasing the List of Enterprises under SASAC State Council], October 30, 2003.

[51] Zhang (2008): 147.

Another key take-away is corporate governance at unlisted SOE group companies consistently lags far behind that of listed subsidiaries. Although analysts often focus on listed subsidiaries' corporate governance, due to immediate commercial interests and better data availability, the locus of decision-making in Chinese SOEs ultimately resides at the group company level. Group companies are crucial because they hold controlling shares in listed subsidiaries and directly administer the bulk of (unlisted) SOE assets. Although many SOEs have now formally set up boards of directors at the group company level, their activities remain highly opaque. Weaker corporate governance and lack of transparency for SOEs' unlisted group companies create uncertainties and risks for their listed subsidiaries' governance.

Finally, this historical overview reveals that greater SOE autonomy from the state has always come with some degree of Party participation in SOE governance. As SOEs have transformed from production units in the planned economy to partially privatized multinationals today, the Party has always been present. The long-term trend has been an implicit division of labor between the authority of SOE managers (later the board of directors) for commercial decision-making and Party representatives' power over personnel, political affairs, and internal supervision and anti-corruption efforts. Maintaining this separation, however, could be more difficult in China's current political environment. The following section takes a closer look at state firms' corporate governance today in the context of the Xi administration's SOE reform agenda.

| TABLE 2. KEY CORPORATE GOVERNANCE DEVELOPMENTS IN CHINA'S STATE SECTOR | |
|---|---|
| **1970s –1980s** | • SOEs transition from production units to enterprises with limited autonomy and accountability for performance |
| **1990s** | • 1994 Company Law and SOEs' entry into equity markets catalyze superficial adoption of corporate governance institutions<br>• Early national pilots on SOE restructuring and governance at the group company level are largely unsuccessful<br>• CSRC outlines the first corporate governance framework for listed firms<br>• Weak oversight and insider control result in loss of state assets during downsizing of state sector and SOE public listing<br>• State Council establishes "special inspectors" system to strengthen group-level oversight of largest SOEs |
| **2000s** | • SASAC experiments with establishing boards of directors and external directors at the group company level<br>• CSRC announces code of corporate governance for listed firms, implements independent director system, issues regulations on tunnelling, related party transactions, M&A, and insider trading |
| **2010s** | • SASAC establishes boards of directors at the group company level for most central SOEs, but slows corporate governance policy efforts<br>• CSRC updates and expands existing regulations aimed at preventing shareholder abuses, works on drafting new version of code of corporate governance for listed firms |

# IV. THE XI ADMINISTRATION'S SOE REFORM AGENDA

AFTER XI JINPING CAME TO POWER IN 2012, the new leadership initially raised hopes for a far-reaching overhaul of China's state sector. At the 2013 Third Plenum meeting, Xi outlined an array of ambitious market-oriented reforms.[52] Yet subsequent developments in SOE reform have fallen short of this reformist vision. Today, the Xi administration's agenda for SOE reform combines the institutionalization of Party leadership with more limited moves toward economic liberalization and enterprise autonomy.

SOE reform efforts in the Xi era began with SASAC pilot programs in 2014, but progress has been slow and results mixed.[53] Stock market turmoil in 2015 left the Chinese leadership reluctant to withdraw the hand of the state by reducing SOE presence in equity markets. With a subgroup of the newly-created Central Leading Group for Comprehensively Deepening Reforms (中央全面深化改革领导小组) directing SOE reform policymaking, the Xi administration issued its first major SOE reform policy document, "Guiding Opinions of the CCP Central Committee and the State Council on Deepening the Reform of State-Owned Enterprises," in September 2015 after repeated delays.[54] The Guiding Opinions repeated familiar messages: SOEs should develop modern corporate governance by hiring professional managers, establishing boards of directors, and authorizing them to make decisions based on market conditions and the principle of shareholder profit maximization. It was more telling about the future trajectory of reform, however, that the Guiding Opinions made no mention of a "decisive role for markets in resource allocation"—the core promise of the 2013 Third Plenum.

---

[52] The CCP Central Committee: 中共中央关于全面深化改革若干重大问题的决定 [Decisions of the Central Committee of the Communist Party of China on Several Major Issues Concerning Comprehensively Deepening Reform], November 12, 2013. For a comprehensive analysis of the 2013 Third Plenum Decisions and the reform agenda they outline for the state sector and other areas, see Rosen (2014).

[53] The 2014 pilots focused on mixed ownership, state capital management, expanding board of directors' autonomy, and improving discipline and anti-corruption efforts. A second round of pilots in 2016 extended the 2014 pilots to a handful of new firms and outlined new experimentation in multiple areas relevant to SOE governance, such as executive professionalization and information disclosure. SASAC: 国务院国资委举办 "四项改革" 试点新闻发布会 [SASAC Held A Press Conference on the "Four Reforms" Pilots], July 15, 2014. China News Network: 国务院国资委公布 "十项改革试点" [State Council SASAC Announces 10 Reform Pilots], February 25, 2016.

[54] The CCP Central Committee and State Council: 中共中央、国务院关于深化国有企业改革的指导意见 [Guiding Opinions of the CCP Central Committee and the State Council on Deepening the Reform of State-Owned Enterprises], September 13, 2015.

A flurry of policy documents followed in the so-called "1+N framework," until government media declared the SOE reform framework complete in February 2017.[55] The current SOE reform agenda under Xi has five main policy elements:

## 1. PARTY BUILDING

The Xi administration has stepped up Party activities and influence in SOEs through a flurry of policy documents and high-level official statements. The first policy document released after the 2015 Guiding Opinions, titled "Several Opinions on Adhering to Party Leadership and Strengthening Party Building in Deepening the Reform of SOEs" ("2015 Party Leadership and Party Building Opinions" hereafter) ordered state firms to make the Party the "political core" of their corporate governance structures."[56] In October 2016, Xi personally chaired a national work meeting on Party building in SOEs. There, he made clear that Party organizations should serve a "leadership core" function as well as a "political core" function, giving Party actors the green light for a more expansive role in directing enterprise activities beyond their traditional remit for political and personnel affairs.[57]

In January 2017, SASAC ordered SOEs to revise their articles of association to formalize requirements for Party building work and the Party committee's role in corporate governance.[58] The CSRC's new "Code of Corporate Governance for Listed Firms," released for public comment in June 2018, also requires publicly listed firms of all ownership types to support Party building activities, and for state-controlled listed firms to codify Party leadership into their articles of association, including but not limited to the Party's ability to influence personnel appointments and proposals going to the board.[59] Notably, recent revisions to articles of association are not confined only to domestically listed firms—the text box on page 25 provides an example of revisions made by Sinopec's Hong Kong-listed subsidiary China Petroleum and Chemical Corporation.[60] The Xi administration further enshrined the Party committee's power to "play a leadership role" (发挥领导作用) in SOE decision-making by adding this phrase to the Party Constitution at the 19th Party Congress in October 2017. Together, these developments underscore the high prioritization of Party building in the Xi's administration's SOE reform agenda and indicate a concerted campaign to institutionalize the Party's leadership role in SOE governance.

---

[55] "1" refers to the 2015 Guiding Opinions, "n" to subsequent policy documents. For a list of these policy documents through December 2016, see PKULaw: 国企改革"1＋N"系列政策盘点 [SOE Reform Policy Series Inventory], December 5, 2016.

[56] 关于在深化国有企业改革中坚持党的领导加强党的建设的若干意见 [Several Opinions on Adhering to Party Leadership and Strengthening Party Building in Deepening the Reform of State-owned Enterprises], September 20, 2015. While the full text of this document is not publicly available, the policy's main ideas are expressed in the official explanation accompanying its release and subsequent documents issued by local governments. For example, see People's Daily,中央组织部负责人就关于在深化国有企业改革中坚持党的领导加强党的建设的若干意见答记者问 [The Person in Charge of the Central Organization Department Answered Questions on "Several Opinions on Adhering to Party Leadership and Strengthening Party Building in Deepening the Reform of State-owned Enterprises"], October 9, 2016.

[57] Xinhua News: 习近平在全国国有企业党的建设工作会议上强调:坚持党对国企的领导不动摇 [Xi Jinping Stressed at the National State-owned Enterprise Party Building Work Conference: Insistence on the Party's Leadership of State-owned Enterprises is Unshakeable], October 11, 2016.

[58] SASAC: 关于加快推进中央企业党建工作总体要求纳入公司章程有关事项的通知 [Notice on Matters Regarding Speeding Up and Advancing the Inclusion of Overall Requirements for Central State-owned Enterprises' Party-Building Work in Articles of Association], January 3, 2017.

[59] CSRC: 关于就修订上市公司治理准则公开征求意见的通知 [Notice of Public Consultation on Amending the Code of Corporate Governance for Listed Firms], June 15, 2018.

[60] For a comparison of the scope of revisions undertaken by China Petroleum and Chemical Corporation relative to other Hong Kong-listed firms, and a discussion of limited pushback in board votes to approve these amendments, see ACGA (2018): 41-44.

## EXAMPLE OF REVISIONS TO SOE ARTICLES OF ASSOCIATION REGARDING THE PARTY COMMITTEE'S LEADERSHIP ROLE

On April 27, 2017, the board of directors of Sinopec's Hong Kong-listed subsidiary China Petroleum and Chemical Corporation approved the following revisions to its articles of association:

### New clause added as Article 9 in Chapter 1 (General Provisions):

"In accordance with the Company Law and the Constitution of the Communist Party of China (the "Party"), the Company hereby set up Party organizations and related working organs, and maintain (sic) an adequate level of staffing to handle Party affairs as well as sufficient funding necessary for the activities of the Party organizations. The Party organizations play the role of the leadership core and the political core in the Company."

### New clause added as Article 109 in Chapter 10 (Board of Directors):

"When making decisions on significant matters such as direction of reform and development, key objectives, and priority operational arrangements of the Company, the board of directors should seek advice from the Party organization. When the board of directors appoints the management personnel of the Company, the Party organization shall consider and provide comments on the candidates for management positions nominated by the board of directors or the president, or recommend candidates to the board of directors and/or the president."

[* This clause was also added to the appendix of the articles of association, "Rules and Procedures for the Board of Directors' Meetings"]

## 2. MIXED OWNERSHIP

Another key element of the SOE reform agenda today is "mixed ownership" (混合所有制).[61] The Xi administration is promoting this concept, a policy idea dating back decades in China, as a new strategy to inject private capital into SOEs. While improving SOE governance is essential to win private sector confidence and participation, recent developments suggest that investors remain wary. The highest profile example of mixed ownership reform to date is the 2017 restructuring of China Unicom's Shanghai-listed flagship subsidiary, which raised 78 billion RMB (11.7 billion USD) from a group of mostly private investors. However, the Unicom restructuring was a state-directed initiative with top economic architect Liu He (then chair of the Central Leading Group on Financial and Economic Affairs and co-chair of the Economic Reform Subgroup of the Central Leading Group for Comprehensively Deepening Reforms) reportedly personally designing the deal.[62] This suggests that other SOEs' publicly listed subsidiaries may find it difficult to implement mixed-ownership reform successfully without strong political backing. Moreover, since each of Unicom's new private investors owns less than a 3% share on average, they are

---

[61] "Mixed ownership" refers to the diversification of state-owned enterprises' shareholding structures via publicly listing a proportion of state-owned enterprises' assets, selling a portion of state shares to the private sector, and/or granting employees stock ownership.

[62] Caijing: BAT等14家入局联通混改, 腾讯或入联通A股公司董事会 [14 Companies Including BAT Have Joined Unicom Mixed Ownership Reform, Tencent May Enter Unicom A-share Company Board of Directors], August 16, 2017.

Prepared for Nicholas Consonery

likely to remain relatively weak players on a board of directors that is itself not yet fully functional.[63] Implementing mixed ownership reform in SOEs at the group company level will be even more challenging. Despite a November 2017 directive urging central SOEs to implement mixed ownership reform at the group company level, the lack of concrete results indicates private sector reticence.[64] Assuring prospective shareholders that their interests will be protected is crucial to gain the private sector buy-in essential for mixed ownership to succeed.

## 3. STATE CAPITAL MANAGEMENT

Another core component of current SOE reform efforts is state capital management. In practice, state capital management encompasses two sets of reforms. The first involves granting some SOE group companies increased autonomy for capital management decision-making within their own enterprise groups. In theory, letting SOEs make their own decisions based on market conditions will improve resource allocation efficiency and firm performance. The second set of reforms calls for treating SOEs with broad cross-industry holdings like asset management companies, allowing them to manage state-owned assets on the government's behalf.[65] At the central level, both types of state capital management reform remain at the pilot stage and few concrete results have been reported to date. At the subnational level, local SASACs in Shandong and other provinces and major municipalities had established 89 state capital investment companies (国有资本投资公司) and state capital operations companies (国有资本运营公司) as of the end of 2017.[66] State capital management reform could serve to reduce direct state interference in SOE commercial activities—but only if accompanied by improved corporate governance, especially stronger boards of directors. Greater SOE commercial autonomy does not automatically yield better firm performance or valuation. Indeed, warning signs are already emerging that some SOEs may treat state capital management reform as an invitation to expand their assets via risky acquisitions in non-core business lines.

## 4. MERGERS

The Xi administration has also embraced mergers, particularly among central SOEs, as a tool in its SOE reform efforts. These mergers have two main objectives. The first is to restructure surplus capacity industries including steel and heavy machinery by eliminating sub-scale operations and enabling coordinated capacity cuts. In theory, mergers will improve pricing power and enable the state to cut losses when stronger SOEs absorb weaker firms. The second and more prominent objective is to create bigger, more competitive national champions with a larger share of global markets in sectors like railways and nuclear power. Theoretically, these mega-mergers will halt price competition among Chinese SOEs abroad and integrate upstream and downstream industries. In July 2016, the State Council stated that mergers among central SOEs aim to "fortify and strengthen a group of central SOEs" (巩固加强一批), indicating

---

[63] Song (2017): 9-10.

[64] National Development and Reform Commission, Ministry of Finance, Ministry of Human Resources and Social Security, Ministry of Land and Resources, State Resources Commission, CSRC, National Defense Science and Technology Bureau: 关于深化混合所有制改革试点若干政策的意见 [Opinions on Deepening Certain Policies in the Pilot Reform of Mixed Ownership], November 29, 2017.

[65] This is often compared with the "Temasek model" in Singapore; however, China differs significantly from Singapore in the nature of its political system and the much larger size and number of its SOEs.

[66] SASAC: 经济参考报: 国资投资、运营公司试点 更多扩围至充分竞争行业 [Economic Reference News: State-owned Investment, Operating Company Pilot Expands More to Fully Competitive Industries], March 15, 2018.

a coordinated, long-term strategy to develop global industry leaders.[67] Although the pace of mergers has slowed somewhat in 2018, it is still steady and further SOE tie-ups are in the works or under discussion in industries including chemicals, shipbuilding, defense, and automobiles. However, the huge size and greater complexity of the state-owned giants formed through mergers create fresh challenges for effective oversight, making corporate governance improvements even more urgent.

## 5. SOE CLASSIFICATION

The Xi administration originally intended that official classification of SOEs into a "public class" (公益 类) or "commercial class" (商业类) would provide the basis for a new round of SOE reform. The 2015 Guiding Opinions envisioned that this categorization could motivate a 'dual-track' approach in which future reforms and performance assessment would proceed differently for SOEs dedicated to public goods provision versus those operating in commercial sectors. In 2017, the government expanded the original binary categories to a tripartite grouping scheme—industrial enterprise groups (实体产业集团), investment companies (投资公司), and operating companies (运营公司). Today, provinces and major municipalities are formulating varied categorization frameworks, while progress on central SOE classification remains a tightly guarded secret. Yet the lack of a unified local classification scheme and public information about central SOE categorization progress undermines the policy's potential market benefit—clarifying investors' expectations about the scope of state intervention in particular sectors and firms.

These five main elements of Xi's SOE reform agenda directly impact SOE corporate governance and its prospects. Institutionalizing the Party's leadership role in enterprise affairs—by revising the Party constitution and companies' articles of association—is ostensibly about improving supervision and control. However, it also gives a new and worrying legal basis for an expanded Party role in SOE governance. Mixed ownership aims to revitalize SOEs with private investors and capital, but its success ultimately depends on ensuring minority shareholders' rights and representation through effective corporate governance. State capital management could decrease direct state interference in SOE commercial activities, but improved corporate governance is vital to realize its positive potential and prevent resource misallocation and abuse. SOE classification could usefully clarify differences in state objectives and Party influence for firms engaged in public service provision versus more commercial sectors—and therefore investor expectations—but the present lack of uniformity and transparency in defining these boundaries limits these benefits. Finally, the larger, more complex SOEs produced in ongoing mergers create new challenges of supervision and integrating dual leadership teams and governance structures.

---

[67] State Council: 国务院办公厅关于推动中央企业结构调整与重组的指导意见 [Guiding Opinions of the Office of the State Council on the Restructuring and Reorganization of Central SOEs], July 26, 2016.

# V. THREE-LEVEL ANALYSIS OF SOE CORPORATE GOVERNANCE

**AN IN-DEPTH LOOK AT THE THREE MAIN ACTORS IN SOE GOVERNANCE**—the board of directors, the Party committee, and SOE leaders themselves—illuminates how Chinese state firms are governed in practice. SOE boards of directors do shape company decision-making, but existing procedures for board member appointment and boards' lack of key powers prevent them from fully performing their defined functions. The Party committee cannot supersede the board of directors, but it does possess important agenda-setting power and now also the legal basis for an expanded leadership role. SOE leaders constitute a crucial link between the two bodies through their joint appointments as board chairmen and Party secretaries. However, multiple non-market incentives motivate SOE leaders to pursue state goals beyond maximizing profit and shareholder value. The State Council's latest policy guidance on SOE corporate governance acknowledges current shortcomings, especially the weakness of the board of directors, while affirming—at least rhetorically—that governance development will remain a top reform priority.[68] This official commitment makes it important to more closely examine the three main players in SOE corporate governance.

## BOARD OF DIRECTORS

The board of directors has limited but still significant influence on SOE decision-making. It exercises authority over enterprise governance through its powers to convene general shareholders' meetings, implement their resolutions, approve company budgets and major investments, determine the information to be publicly disclosed to shareholders, and establish special committees to address matters such as strategy and auditing.[69] For the state, establishing boards of directors at the group company level in SOEs is part of a broader process of transforming the state-owned asset management system, separating the layers within SOEs charged with decision-making and implementation, and fostering collective and standardized corporate decision-making.[70]

---

[68] Office of the State Council: 关于进一步完善国有企业法人治理结构的指导意见 [Regarding Further Improvements to the Guiding Opinions on the Corporate Governance Structure of SOEs], April 24, 2017.

[69] The board of directors is legally subordinate to the general shareholders meeting, but in practice these powers make the board the main player in Chinese SOE corporate governance.

[70] SASAC: 关于中央企业建立和完善国有独资公司董事会试点工作的通知[Notice on Central SOEs Establishing and Improving Wholly State-Owned Enterprises Board of Directors Pilot Work], June 9, 2004.

Boards of directors in Chinese SOEs include three main types of directors. The first type is executive directors (执行董事). These individuals are employees of the company, typically drawn from the top ranks of management. The second type is external directors (外部董事). This grouping refers to all directors who are not employees of the company. The final type is independent directors (独立董事). These individuals are not employees of the company *and* they additionally meet defined standards of independence from it. External directors serve on SOE boards of directors at the group company level and they represent the interests of the state, which does not have the sole objective of maximizing profits and firm value. This is an important difference with independent directors who serve on the boards of SOEs' listed subsidiaries: independent directors' accountability may still be ambiguous, but in theory it can be grounded in a broader shareholder base, interested in profit maximization and firm value.

SASAC selects the executive directors and external directors for SOE boards at the group company level.[71] Although executive and external directors have different roles and responsibilities, the fact that the same government authority appoints them (and that most are Party members) suggests they share a common duty to represent the interests of the Party state, even if they might have different views about how best to do so.[72] Moreover, SASAC draws external directors from a relatively small pool of qualified candidates, making it challenging to constitute boards whose members possess the right skills, personalities, and mind-set.[73] There are a limited number of individuals who have the requisite stature and record of achievement in business, industry, or government to serve as external directors on a SOE board at the group company level. Furthermore, it is routine for the same individual to serve as an external director on the boards of multiple SOEs. Together, these factors function to limit the diversity of opinions that external directors bring to the board.

For SOEs' listed subsidiaries, on paper the general shareholder meeting appoints all directors. In practice, however, appointments of executive directors are usually pre-determined by the largest shareholder—the Party state (SASAC and the Central Organization Department). There is significant overlap between listed subsidiaries' executive directors and other managers and those of the group company, thereby constituting a potential channel for Party state influence on decision-making in listed subsidiaries. Even formally "independent" directors typically have ties to executive directors or the government, limiting their actual independence and leaving minority shareholders vulnerable to decisions that may jeopardize their interests.

Boards of directors in Chinese SOEs are not yet authorized to fully perform their defined functions. SASAC and the Central Organization Department retain critical powers concerning personnel selection, standard setting, assessment, and compensation. It does not appear likely that the Xi administration plans to empower boards of directors to serve these functions in the near future. A pilot scheme on expanding the powers of boards of directors, which SASAC launched in July 2014 in four central SOEs, has made little progress and there is no indication it will be expanded in the future.[74] And after the Politburo slashed

---

71 The Central Organization Department also participates in selecting executive directors for core central SOEs via its personnel authority over their top leaders.

72 Liu (2016): 8. Regarding the responsibilities of group-level SOE board directors' responsibilities, see SASAC: 董事会试点中央企业董事会规范运作暂行办法 [Temporary Regulations for Standardizing Board of Directors Operations in Central SOE Board of Directors Pilot Enterprises], March 20, 2009.

73 On the art and science of constituting boards, see Dey (2014).

74 SASAC: 国务院国资委举办"四项改革"试点新闻发布会 [SASAC Held A Press Conference on the "Four Reforms" Pilots], July 15, 2014.

SOE leaders' pay by up to 50% in a policy dubbed the "pay ceiling order" (限薪令) in 2015, boards of directors in state firms have not gotten any closer to gaining authority to determine top executive compensation.[75] Instead, senior government or Party agencies continue to determine and approve SOE leader salaries.[76]

## PARTY COMMITTEE

In practice, the work of SOE Party committees primarily involves personnel and political affairs. Party committees nominate, approve, and assess senior personnel within the firm, assist selected employees to join the CCP, disseminate political propaganda, and organize study sessions for Party members about central-level policies, key campaigns, and speeches by top leaders like Xi Jinping. Party committees in SOEs are also responsible for communicating and coordinating with higher-level Party authorities, such as the Party committee of SASAC, about CCP policies and campaigns. SOE Party committees typically do not participate in commercial decisions unless they involve large-scale or high-value projects, those deemed of national importance, or projects which have encountered significant regulatory or political problems.

While the Party committee cannot supersede the board of directors, it can nevertheless influence the board's work through its agenda-setting power. This agenda-setting power derives from the Party committee's authority to discuss major decisions of the firm before they go to the board of directors for final determination. This has long been the informal practice within SOEs and originated in the "three majors, one large" (三重一大) concept first proposed during the Jiang Zemin administration. This concept calls for the Party committee to play a role in SOE decision-making when it touches on macro-level controls, national strategy, or national security ("three majors")—or if it involves any operational and managerial affairs that are large or important in scope ("one large"). While SOE Party committees themselves have some discretion to determine specifically what qualifies as "major decisions" (重大决策), a 2004 Party notice provides examples including enterprise strategy, medium- and long-term development plans, annual budgets, major decisions concerning enterprise asset restructuring and capital management, major personnel affairs, and the creation or adjustment of internal departments.[77]

The Xi administration has institutionalized the practice of the Party committee discussing major enterprise issues prior to the board of directors. As discussed previously, it has done this in two main ways: by revising the Party constitution to include it and by requiring SOEs to incorporate it in their articles of association. Although the full text of the 2015 Party Leadership and Party Building Opinions is not publicly available, later SASAC articles and provincial implementation documents reveal that authorities tend to invoke the "three majors, one large" concept to broadly define what constitutes major decisions,

[75] SOE executives' compensation became especially politically sensitive as the Xi administration's anti-corruption campaign revealed rampant graft in the state sector. Chinese leaders also sought to address the enduring issue of one set of officials earning high salaries while their same-ranked counterparts earn far less. This creates a new dilemma of internal wage disparity, however, because market-recruited executives are likely to out-earn state-appointed executives. Politburo of the CCP Central Committee: 中央管理企业负责人薪酬制度改革方案 [SOE Executive Compensation Reform Plan], January 1, 2015.

[76] SASAC: 国务院关于改革国有企业工资决定机制的意见 [State Council's Opinions on Reforming SOE Salary Decision Mechanisms], May 25, 2018.

[77] Office of the CCP Central Committee: 中共中央办公厅转发中央组织部、国务院国资委党委关于加强和改进中央企业党建工作的意见的通知, October 31, 2004.

(decisions involving macro-level controls, national strategy, national security and other major operational and managerial affairs). This suggests that SOEs and their Party committees still retain some discretion to determine what constitutes "major decisions." The extent to which these formal changes under Xi have altered existing informal practices is not yet clear. However, what is clear is their goal of ensuring—if not strengthening—a continued Party voice in SOE governance.

Party organs and committees at higher levels in the Chinese bureaucracy, such as the Party committee of SASAC, are also authorized in principle to play a role in SOE corporate governance. The 2015 Party Leadership and Party Building Opinions confirms that higher Party bodies and the Party Committees of higher-level organs responsible for state-owned asset supervision are authorized to set standards, standardize procedures, assess, and recommend candidates for SOE senior management.[78] It also indicates that these higher-level Party actors are authorized to assign Party building tasks to the board chairman at the group company level. Yet while this new policy document may seem to endow higher-level Party organs and committees with more expansive powers over SOE corporate governance, so far they appear to be limited to principles of hierarchical authority on paper. The 2015 Party Leadership and Party Building Opinions do not specify formal mechanisms for higher-level Party authorities to exercise these rights, and there is no publicly available evidence to date that higher-level Party organs and committees systematically or routinely interfere in the activities of SOE Party committees.

More worrying for the operations of SOE boards of directors is the significant overlap in their membership and that of Party committees at the group company level. It is common for all executive directors, not only the board chairman, to also serve on the Party committee. In some cases, the employee director (职工董事) may even serve on the Party committee too. Take for example China International Intellitech, a central SOE that provides separate rosters for its group-level board of directors and Party committee on its website.[79] Out of its seven board members, four are external directors and the remaining three are all Party committee members—the board chairman, an executive director, and the employee director as well. These three individuals in turn constitute more than half of the membership of the company's five-person Party committee. SOEs' limited disclosure about their Party committees complicates a systematic mapping of the correspondence between board and Party committee membership, but available data suggests overlap is significant.

## SOE LEADERS

SOE leaders refers to individuals holding one or more of the top three leadership positions: board chairman, Party secretary, and general manager or president. They are both businesspeople and bureaucrats— they lead profit-making corporations but are also officials with administrative rank equivalent. Most SOE leaders are men in their mid-50s who have assumed top leadership positions after years, if not decades, spent working in state-owned industry. While it is very rare for SOE leaders to have private sector work experience, many of them have worked abroad and hold degrees in business management. Within the firms they lead, SOE leaders have primary responsibility for matters including corporate strategy, decision-making for major projects, and internal resource allocation and organizational restructuring.

---

[78] These senior management positions include the general manager (总经理), vice-general managers (副总经理), the chief accountant (总会计师), and secretaries to the board of directors (董事会秘书).

[79] China International Intellitech company website, enterprise leaders page: http://www.ciic.com.cn/zzgk/jtld/41220.aspx..

Since 1978, SOE leaders have gradually gained autonomy and influence over enterprise operations relative to the state. They have transitioned from managing production in line with top-down commands to determining how to restructure their enterprises and develop in global markets. The rapid expansion of SOE assets and operations—accelerated by China's RMB 4 trillion (USD 586 billion) stimulus package after the global financial crisis and the nearly RMB 200 trillion swelling of banking system assets since that time—has significantly boosted their leaders' political influence. SOE leaders such as former State Grid chairman Liu Zhenya are widely known for their political clout and high-level lobbying on behalf of their firms and the industries in which they operate.[80] In 2017, the State Council explicitly devolved additional powers from SASAC to central SOEs and their leaders, including the authority to approve equity incentive plans for SOE subsidiaries as well as changes involving state-owned shares in non-listed subsidiaries.[81]

Yet these SOE leaders ultimately remain government officials and myriad non-market factors in China's political and economic system affect their behavior. The Party state can use its power over SOE leaders' careers to influence their behavior and that of their firms. Government subsidies to SOEs—ranging from direct disbursements to tax rebates and discounted factors of production like land and capital—distort incentives for SOE leaders to make market-oriented decisions.[82] Nor is SOE leaders' performance assessment fully aligned with the goal of improving firm value. In addition to profitability requirements, SASAC also evaluates the heads of SOEs operating in strategic sectors with non-market measures like their service to national strategy and national security or their implementation of important state projects.[83]

Joint appointments of SOE leaders, in which the same individual serves as both board chairman and Party secretary, are another critical but underexamined link between the board of directors and the Party committee. It is a long-standing practice for SOE leaders to hold joint managerial and Party positions under the principle of "two-way entry, overlapping position holding" (双向进入，交叉任职). By linking the board and the Party committee at the highest level, such joint appointments blur the theoretical separation between them. The same individual who is chairing a Party committee meeting on a Monday might well be chairing a board meeting later in the week. The Xi administration has taken the pre-existing practice of joint appointments and made it a policy priority. By the end of Xi's first term in 2017, more than 90% of the core central SOEs had a single individual serving jointly as both board chairman and Party secretary.[84] While much attention today focuses on the potential for expanded Party committee influence on SOE boards of directors, analysis of joint appointments reveals that the two bodies are already directly connected via their top leaders.

80 Xu (2018).

81 The 2017 State Council directive specifies that authorization to independently approve changes to equities or management plans does not extend to the non-listed subsidiaries of SOEs operating in industries that involve national security, important sectors and key industries, or those undertaking "major special tasks." State Council. 国务院国资委以管资本为主推进职能转变方案 [Plan for State Council State-owned Assets Supervision and Administration Commission Advancing Functional Transformation By Taking Capital Management as the Core], April 27, 2017.

82 A 2013 Chinese report found that among the Chinese listed companies that had released annual reports for 2012, more than 90% of them received a total of RMB 57 billion in subsidies from the government. Of the companies reported to have received subsidies, 70% are SOEs. The Unirule Institute of Economics also estimated that between 2001 and 2009, state-owned and state-holding enterprises enjoyed a real interest rate of 1.6%, far below the market interest rate of 4.68%, as well as discounted industrial land and energy inputs. 张忠安 [Zhang Zhong'an], 政府补贴570!亿创新高 逾两成国企利润越补越虚 [Government Subsidies of RMB 57 Billion Reach a New High, Profits Grow Emptier with Subsidies For More Than 20% of SOEs], 经济参考报 [Economic Information Daily], April 17, 2013. Unirule Institute of Economics 2011: 2.

83 SASAC: 中央企业负责人经营业绩考核办法 [Assessment Measures for the Performance of the Heads of Central SOEs], December 23, 2016.

84 Leutert (2018): 30.

# VI. COMPANY CASE STUDY: BAOSTEEL

A company case study illustrates the evolution of SOEs' corporate governance and its impact on valuation. This analysis focuses on Baosteel, one of the first pilot enterprises in SASAC's experimentation with establishing boards of directors at the group level, since its status pioneering corporate governance advances makes it likely to represent an upper bound for reform progress among other SOEs. Baosteel also remains important today because BaoWu, the entity formed after Baosteel's 2016 merger with Wuhan Iron and Steel Corporation, is now included in the MSCI emerging markets index. Major changes to Baosteel will thus impact foreign investors now exposed to the company via this index.

Baosteel was listed on the Shanghai Stock Exchange in 2000 (the "Listed Company" hereafter), and formed a board of directors upon establishment.[85] However, its group company (the "Group Company" hereafter), which owned 85% of the Listed Company in 2000 and 51.75% today, did not set up a board until 2005.[86] Company veteran Xie Qihua headed both the Listed Company (2000-2005) and the Group Company (2000-2006). In October 2005, SASAC tapped the Group Company as one of the first SOEs to pilot the establishment of a board of directors at the group company level and named five external directors to its newly-created board.[87]

In the following years, Baosteel became a model of good corporate governance in China, with a well-functioning board at its Group Company making key business decisions. Baosteel's division of responsibilities for group-level governance was the clearest among all central SOEs: three separate individuals served as board chairman, Party secretary, and the president. External directors have consistently constituted more than half of the Group Company's board membership (see Figure 7, page 34) and actively participated in governance. Xu Lejiang, who served as the Group Company board chairman between 2006-2016, recalled several occasions where external directors acted to stop or postpone board proposals.[88] Input from internationally experienced external directors, like Feng Guojing (Hong Kong) and Li Qingyan (Singapore), were particularly helpful. During the 2000s, these external directors sensed impending financial crisis early in the cycle and helped Baosteel to reserve sufficient liquidity for the downturn.

The Listed Company also exhibited good corporate governance during the 2000s. For most of the period between 2000 and 2015, it maintained a higher than average proportion of independent directors compared with other domestically listed firms (including both SOEs and private firms), which averaged 37% between 2005 and 2015 (see Figure 8, page 34). There is also evidence that the independent directors of the Listed Company acted to fulfill their functions of protecting shareholder interests and supervising the board of directors. For example, when the Listed Company attempted to revise its dividend policy in 2005, an independent director openly objected to the proposal. His position along with a detailed explanation were disclosed in the board resolution published immediately after the meeting.

---

[85] 2000 Baosteel Annual Report.

[86] The group company of Baosteel is owned 100% by SASAC. 2000 Baosteel Annual Report; 2017 Baosteel Annual Report.

[87] Ning (2013).

[88] Xu (2013): 33.



Source: Baosteel annual reports, Bloomberg, Xu (2013)



Source: Baosteel annual reports, Bloomberg, Xu (2013)

However, the market does not seem to have valued Baosteel's corporate governance development. In theory, the board of the Listed Company, and especially independent directors' representation and participation, should help to improve the firm's performance and value. But as the below charts indicate, Baosteel has actually been underperforming the industry average in terms of key market valuation indicators: Tobin's Q, which measures the company's market-to-book value, and its price earnings (PE) ratio, which measures the company's price-to-earnings value (see Figure 9 and Figure 10, page 35).



Source: Bloomberg, Rhodium Group. Tobin's Q is calculated by dividing the company's market value by its book value and measures how investors value the company's physical assets. *In the initial print version of this report we used a simple average approach to calculate the Industry Level Tobin's Q; here we update these numbers using an aggregate market capitalization approach (see footnote on Table 1).



Source: Bloomberg, Rhodium Group. PE is calculated by dividing the company's stock price by its earnings per share and measures how investors valued the company's profitability. *In the initial print version of this report we used a simple average approach to calculate the Industry Level PE Ratio; here we update these numbers using an aggregate market capitalization approach (see footnote on Table 1).

The Baosteel case suggests three reasons why investors in China are not pricing in SOEs' corporate governance in the same way that international investors do for firms listed overseas:

**1. Investors know that the ultimate locus of decision-making is at the group company level, not the listed company level.** The Party state has a monopoly over personnel appointment for SOE leaders at the group company level. Furthermore, there is significant overlap between the membership of group company and listed company boards. In addition, group companies also exercise personnel authority over listed subsidiaries. These factors leave little room for independent directors in SOE listed companies to effectively advocate for minority shareholders' interests.

**2. The market cannot price in SOE corporate governance at the group company level, including the role of external directors, due to a lack of transparency.** Former Baosteel chairman Xu recounts that external directors played an important role in shaping board decisions at the group company level.[89] However, without information disclosure mechanisms or requirements for SOE boards at the group company level, the market is left in the dark. Even today, information as basic as the exact dates of board meetings at the group company level are typically not made public. With such poor transparency, investors cannot price in the effects of group-level corporate governance on the market valuation of SOEs' listed subsidiaries in an accurate or timely manner.

**3. Without improved transparency, the market tends to respond negatively to state interventions.** In the early 2000s, Baosteel's value was consistent with the industry average, but it started falling behind in 2009 and the gap widened further in 2015. These years coincide with specific incidences of state intervention. The first involved the government tapping Baosteel to participate in major infrastructure projects in its post-global financial crisis stimulus (the Shanghai-Hangzhou high speed railway is one example), raising broad concerns about the efficiency of those investments and Baosteel's long term value. The second involved the Central Organization Department's choice of replacement for the chairman of the Listed Company in mid-2014. The exiting chairman, He Wenbo, had spent decades at Baosteel and headed the Listed Company since 2010, but was transferred to another central SOE. He was replaced by Chen Derong, who had spent the majority of his career in Zhejiang as a provincial standing committee member and had no previous corporate experience. State interventions like these added significant uncertainties to Baosteel's valuation despite its good corporate governance on paper.

89 Xu (2013): 32-33.

# CONCLUSION

**CORPORATE GOVERNANCE IS THE "MISSING LINK"** to facilitate future capital flows into SOEs and better their performance and valuation. To be meaningful, steps forward to improve SOE governance would need to substantial, not just rhetorical, while also aligning with the Xi administration's SOE reform agenda and the current political context. This study suggests four possible steps that could meet those criteria, discussed in detail below. We offer these recommendations in part to demonstrate that constructive moves forward are possible. They are *conditional* recommendations: they make sense *if prioritizing private capital flows into the state sector is the objective.* We do not presume to determine whether this is the case. Such measures could directly benefit Chinese SOE performance and valuation and strengthen relationships with international stakeholders. However, their implementation would need to overcome formidable obstacles, including structural and procedural constraints and—likely most problematic— divergent views between the Xi administration and potential private sector investors about the ultimate purpose of SOEs, and hence the objective of corporate governance.

## RECOMMENDATIONS

1. **Limit structural overlap between boards of directors and Party committees.** The joint appointment of board chairmen and Party secretaries in SOEs is a policy priority. This is unlikely to change as long as current leadership thinking about an expanded role for the Party remains ascendant. However, restricting Party-managerial joint appointments to SOE executives—or at least to a smaller number of top managers—would still help to reduce structural overlap between boards and Party committees by ensuring that substantially different groups of people staff these two bodies. This aligns with the Xi administration's own stated objective of separating Party committee meetings from board or management meetings, in order for Party committees to better fulfill a supervisory function.[90] Significant overlap between board executive directors and Party committee members also increases outside stakeholders' perceptions that SOEs' commercial decision making is subject to political influence if not political control. Most executive directors are likely to still be Party members even if they do not serve concurrently on the Party committee. However, reducing structural overlap between boards and Party committees—and publicly disclosing its extent—will help to draw a clearer line between the Party and board operations.

2. **Clearly delineate the Party's role in commercial decision-making.** While some degree of Party influence is an inevitable reality of SOE governance, steps can still be taken in practice to limit the scope of Party representatives' role concerning commercial decision-making. One approach is for SOE leaders (who also serve as their firms' Party leaders) to employ—and for stakeholders like SOE shareholders and

---

[90] Central Commission for Discipline Inspection: 严明政治纪律和政治规矩 把"两个维护"细化具体化 [Strict Political Discipline and Political Rules, Make The "Two Maintains" Concrete], August 27, 2018.

JV partners to lobby for—a minimalist definition of the "major decisions" that Party committees are authorized to weigh in on before board meetings. While current policies now prioritize this longstanding practice, it remains ambiguous what specifically constitutes "major decisions" beyond the direction of the "three major, one large" principle. SOEs could therefore formally define and publicly disclose how they define "major decisions." During this "boundary testing" period, shareholders and JV partners can proactively engage Party leaders in SOEs to discuss and develop parameters and principles for the Party's role in corporate governance, particularly concerning decisions about the allocation of capital, assets, and personnel, and to identify areas of mutual interest centered on commercial goals like growth and profitability. Another important reason for foreign JV partners to insist on the right to clarify and delineate—if not restrict—Party representatives' role in commercial decision-making and activities is to minimize legal risks associated with the Foreign Corrupt Practices Act.[91]

**3. Increase the transparency of SOE corporate governance activities at the group company level.**
Lack of information disclosure requirements for unlisted SOE group companies means that even basic information about their corporate governance activities is not made public.[92] Greater transparency about the activities of their boards of directors and external directors could help to improve SOE valuation by enabling the market to better price in corporate governance. Examples of possible disclosures include the times and dates of all group-level board meetings and the attendance of directors at those meetings. Group-level boards do routinely reject or delay board proposals, albeit infrequently, and some of these actions have averted what later proved to be unwise investment decisions.[93] Greater transparency about SOE corporate governance activities at the group company level would increase investor confidence in board functioning and external directors' oversight function, thereby creating a positive feedback loop that would incentivize further transparency. In practice, it may well be that boards and external directors serve little more than a rubberstamp function—greater available data for SOEs' listed subsidiaries indicate that it is extremely rare for independent directors to critique or oppose board decisions. The fundamental issue at present is that investors and the public know virtually nothing about what boards at the group company level in Chinese SOEs are doing. This especially concerning because group-level governance directly impacts listed subsidiaries.

**4. Further prioritize the appointment of external and independent directors with international and private sector experience.** A growing number of SOE executives and senior managers have earned degrees in business management and worked overseas with their firms. However, most top SOE leaders serving today have spent their entire careers in state-owned industry and lack work experience in the private sector. Further prioritizing the appointment of external and independent directors with strong international and private sector experience could help SOEs to better integrate relevant expertise and best practices. Requiring SOEs to disclose the specific actions they take to achieve this goal could incentivize additional improvements by establishing a baseline to which they can be held accountable. Chinese SOEs are already incorporating valuable private sector and international expertise in other ways, such as strategic partnerships with global industry firms, contracting with domestic and international

---

[91] Blanchette (2018).

[92] Group-level boards for central SOEs report annually to SASAC; however, these reports are not publicly available.

[93] A former SASAC vice-director reports in his memoir that 100% of boards of directors at the group level among those central SOEs that participated in SASAC's pilot scheme in the 2000s had cases in which there were objections to board proposals. He also recounts specific examples of projects for Shenhua and Angang in which group-level board rejections and delays of proposed investments averted unwise business decisions. Shao (2014): 544, 547.

consulting companies, and hiring foreign nationals for senior management positions. However, having board members with such experience can also benefit SOEs by enabling this expertise to be input directly at the highest levels of corporate decision-making.

## BENEFITS

The four recommendations outlined above can boost Chinese SOEs' performance and valuation and strengthen their relationships with stakeholders both at home and abroad. Limiting structural overlap between boards of directors and Party committees and clearly specifying the Party's role in commercial decision-making could boost efficiency in at least two ways: by decreasing incentives for non-market allocation of resources and by making SOEs' decision-making faster and more responsive to market conditions.[94] Increasing the transparency of SOE corporate governance activities at the group level would stimulate stronger private sector buy-in for SOE listed subsidiaries and improve their valuation by enabling the market to better price in corporate governance. Finally, prioritizing the appointment of external and independent directors with international and private sector experience would motivate profit maximization and transparency while integrating international best practices.

These moves could create the conditions for broader growth opportunities. First, they can help to attract inbound foreign capital and make SOEs more attractive to international investors. Several months after the inclusion of mainland China-listed A shares on the MSCI emerging markets index, foreign funds are so far steering clear of SOEs and investing predominantly in more private consumer companies.[95] The measures outlined above would also help to boost private investor confidence and buy-in for Beijing's mixed-ownership strategy. In addition, improving SOE corporate governance can bolster existing and prospective JV partnerships, an urgent priority for foreign firms still on edge about the possibility of expanded Party influence in commercial decision-making. It will also help to facilitate SOEs' overseas expansion, by mitigating pushback from foreign governments and communities for state firms' investments and acquisitions abroad.

## OBSTACLES

Efforts to improve SOE corporate governance face an ideological stumbling block and both macro-level and micro-level obstacles. The biggest obstruction is ideological: the fundamental divergence between Xi administration and private sector views about the Party's role in SOE governance. President Xi and his team believe that institutionalizing a stronger leadership role for the Party will benefit SOEs by improving supervision and accountability—top priorities in the ongoing anti-corruption campaign. After the State Council and SASAC's inability to rein in graft during the Hu administration, it is unsurprising that Xi would turn away from the government toward the Party apparatus to fulfill this monitoring function—from Party committees in SOEs all the way to the Party's top watchdog, the Central Committee for Discipline and Inspection. But for private sector actors already skittish about taking a stake in SOEs, especially foreign investors who are unfamiliar with China's political system, assigning Party actors a greater role

---

94 In a cross-national study of listed firms, Lazzarini and Musacchio (2018) find that SOEs are less responsive than private firms to negative shocks that necessitate rapid adjustment.

95 James Kynge, "Foreign Investors Play Defensive with China A-Shares," *Financial Times*, August 23, 2018.

Prepared for Nicholas Consonery

in corporate governance constitutes a threat to their fundamental obligation to pursue maximizing profit and protect shareholder wealth (not the wealth of the Party state). Even if expanded formal authority for Party actors does not necessarily translate into changes in actual practice, *perceptions* alone of political control or interference alone can negatively impact private sector confidence and buy-in.

Improving SOE corporate governance also faces macro-level impediments, including SOEs' conflicting objectives and their leaders' contradictory incentive frameworks. The Party state's monopoly over personnel appointment means that SOE executives' career advancement ultimately depends on the government and the CCP. Firm performance is important to Chinese leaders, and it is a key measure by which SASAC assesses SOE executives.[96] However, stability is paramount for Beijing in times of crisis, and profitability will always be a secondary priority for SOEs tasked with public welfare or national security functions. SOE executives' political incentives may therefore not align with minority shareholders' interests when it comes to performance and profit maximization. In principle and in practice, the joint appointment of board chairmen and Party secretaries further embeds SOE leaders in contradictory incentive frameworks. Such joint appointments also undermine investors' confidence in SOE corporate governance, because they constitute another formal channel of Party influence on commercial decision-making.

Micro-level obstacles to improved SOE corporate governance are the enduring lack of checks and balances within SOEs themselves. State factory heads' early domination of enterprise decision-making helped to create the conditions for insider control that cost SOEs—and the Chinese government and public— billions of RMB in losses of state assets during the 1990s. Zhu Rongji's system of special inspectors and the institution of the supervisory board which succeeded it were supposed to serve an independent monitoring function and therefore provide an implicit check on SOE management.[97] The Hu Jintao administration in turn created SASAC for the same purpose. Yet such an *ex ante* supervisory function is no replacement for making better decisions the first time around. The Party is now embedded further into corporate governance institutions, making it difficult to build genuine checks and balances at the firm level today. Weak incentives for external directors and independent directors to voice critical views or even oppose board decisions further undermine reforms.

Despite these obstacles, the positive potential of improving Chinese SOEs' corporate governance is worth renewed attention. Efforts must begin with an understanding of the key players in SOE corporate governance, the relationship between SOE group level companies and their listed subsidiaries, and the opportunities and constraints that the Xi administration's current agenda for SOE reform creates. Private investors and international actors have limited leverage to directly influence Chinese policy-making or even SOE governance at the group company level. Yet their ongoing engagement with Chinese policymakers and with SOEs themselves is crucial to ensuring existing policies and principles are actually implemented. Despite the differences between the Chinese government, SOEs and their leaders, the private sector and international actors—each benefit from enhanced SOE oversight, efficiency, and long-term value. Taking immediate steps to improve corporate governance is crucial to SOEs, and to their growing roster of stakeholders worldwide.

---

[96] While SASAC's performance assessment system has evolved since 2003, maximization of operational profits (经营利润最大化原则) was first and foremost among the principles on which it was originally based. SASAC also evaluates central SOE executives on their firms' rate of preservation and increase of state-owned assets (国有资产保值增值率).

[97] Supervisory boards are well known for their persistent weakness and limited actual utility in Chinese corporate governance. For a summary of their problems, see Shan and Round (2012): 1334-1337.

# REFERENCES

Allen, Jamie and Rui (Nana) Li, eds. 2018. *Awakening Corporate Governance: The Evolution of Corporate Governance in China*. Hong Kong: Asian Corporate Governance Association.

Aoki, Masahiko. 1994. *Controlling Insider Control: Issues of Corporate Governance in Transition Economies*. Washington, DC: World Bank.

Bank for International Settlements. 2018. "Credit to the Non-Financial Sector." June 5, 2018.

Batson, Andrew. 2017. "The State of the State Sector." Beijing: Gavekal Dragonomics.

Blanchette, Jude. 2018. "To Ensure Harmonious Relations with Party Organizations, Proactively Establish Boundaries." Beijing: The Conference Board China Center.

Chen, Qingtai [陈清泰]: 重塑企业制度: 30年企业制度变迁[Reshaping the Enterprise System: 30 Years of Institutional Change] (Beijing: China Development Press).

Chen, Zhiwu. 2003. "Capital Markets and Legal Development: The China Case," *China Economic Review*, 14(4): 451-472.

Clarke, Donald C. 2003. "Corporate Governance in China: An Overview." *China Economic Review* 14: 494-507.

Clarke, Donald C. and Nicholas Calcina Howson. 2012. "Pathway to Minority Shareholder Protection: Derivative Actions in the People's Republic of China," in Dan W. Puchniak, Harald Baum, and Michael Ewing-Chow, eds., *The Derivative Action in Asia: A Comparative and Functional Approach* (New York: Cambridge University Press): 243-295.

Delegations of German Industry and Commerce. 2017. "Press Statement: Increasing Business Challenges—Delegations of German Industry and Commerce in China Concerned About Growing Influence of Chinese Communist Party on Foreign Business Operations."

Dey, Peter. 2014. "Directors Who Think Like Owners." *Corporate Board* 35(204): 1-4.

European Union Chamber of Commerce in China. 2017. "Chamber Stance on the Governance of Joint Ventures and the Role of Party Organizations."

Howson, Nicholas Calcina. 2014. "Quack Corporate Governance as Traditional Chinese Medicine - The Securities Regulation Cannibalization of China's Corporate Law and a State Regulator's Battle against Party State Political Economic Power." *Seattle University Law Review* 667-716.

Howson, Nicholas Calcina. 2015. "Protecting the State from Itself? Regulatory Interventions in Corporate Governance and the Financing of China's "State Capitalism" in Benjamin L. Liebman and Curtis J. Milhaupt, eds., *Regulating the Visible Hand?: The Institutional Implications of Chinese State Capitalism* (New York: Cambridge University Press).

Hu, Angang [胡鞍钢]. 2001. 腐败: 中国最大的社会污染[Corruption: China's Largest Social Pollution] 中国经济体制改革[China Economic System Reform] 4: 20-21.

Lazzarini, Sergio G. and Aldo Musacchio. 2018. "State Ownership Reinvented? Explaining Performance Differences Between State-Owned and Private Firms," *Corporate Governance International Review* 26: 255-272.

Leutert, Wendy. 2016. "Challenges Ahead in China's Reform of State-Owned Enterprises." *Asia Policy* 21(1): 83-99.

Leutert, Wendy. 2018. "Firm Control: Governing the State-Owned Economy Under Xi Jinping." *China Perspectives* 1-2: 27-36.

Lin, Li-Wen and Curtis J. Milhaupt. 2013. "We Are the (National) Champions: Understanding the Mechanisms of State Capitalism in China." *Stanford Law Review* 65, 4: 697-760.

Lin, Yu-Hsin. 2013. "Do Social Ties Matter in Corporate Governance? The Missing Factor in Chinese Corporate Governance Reform." *George Mason Journal of International Commercial Law* 5(1): 39-74.

Liu, Dong. 2016. 商业类国有企业公司治理改革通论 [Discussion of Corporate Governance Reform of Commercial Class State-Owned Enterprises] (Beijing: Central Party School Publishing House).

London Stock Exchange, Financial Reporting Council. 1992. "Report of the Committee on the Financial Aspects of Corporate Governance" (The Cadbury Report).

Ministry of Finance. 2014. 2013年全国国有企业财务决算情况 [Financial Statements of SOEs Nationwide in 2013].

Ministry of Finance. 2017. 中国财政年鉴 [China Financial Yearbook.]

Ministry of Finance. 2018. 2017年全国国有资本经营收入决算表 [2017 National State Capital Operations Revenue Accounts].

National Bureau of Statistics of China. 2018. 国家数据 [National Data], available at http://data.stats.gov.cn/easyquery.htm?cn=C01.

New York Stock Exchange. 2018. "Listed Company Manual."

Ning, Xiangdong [宁向东]. 2013. 国有企业改革与董事会建设 [SOE Reform and Board of Directors Construction] (Beijing: China Development Publishing House).

Pargendler, Maria. 2012. "State Ownership and Corporate Governance," *Fordham Law Review* 80: 2917-2973.

Rhodium Group. 2018. The China Dashboard, available at https://aspi.gistapp.com/china-dashboard/.

Rosen, Daniel H. 2014. *Avoiding the Blind Alley: China's Economic Overhaul and Its Global Implications* (New York and Washington, DC: Asia Society).

Shan, George Y. and David K. Round. 2012. "China's Corporate Governance: Emerging Issues and Problems." *Modern Asian Studies* 46(5): 1316-1344.

Shanghai Stock Exchange Research Center. 2004. 中国公司治理报告 (2004)：董事会独立性与有效性 [China Corporate Governance Report (2004): Board Independence and Effectiveness] (Shanghai: Fudan University Press).

Shao, Ning [邵宁]. 2014. 国有企业改革实录 [The Reform of State-owned Enterprises in Memoir] (Beijing: Economic Science Press).

Shi, Chen Xia. 2012. *Political Determinants of Corporate Governance in China* (New York: Routledge).

Song, Houze. 2017. "State-Owned Enterprise Reforms: Untangling Ownership, Control, and Corporate Governance," MacroPolo.

State-owned Assets Supervision and Administration Commission of the State Council (Performance Evaluation Bureau). 2003. 中央企业经营业绩考核暂行办法 辅导讲座 [Temporary Measures for Performance Evaluation of Central Enterprises] (Beijing: Economics Science Press).

State Economic and Trade Commission. 1999. 国有企业改革与建立现代企业制度 [State-owned Enterprise Reform and Establishing a Modern Enterprise System] (Beijing: Law Publishing House).

Unirule Institute of Economics. 2011. 国有企业的性质、表现与改革 [The Nature, Performance, and Reform of State-Owned Enterprises].

United States Chamber of Commerce. 2016. "Preventing Deglobalization: An Economic and Security Argument for Free Trade and Investment in ICT."

United States Delegation to the World Trade Organization. 2018. "China's Trade-Disruptive Economic Model."

World Bank. 1995. *Bureaucrats in Business: The Economics and Politics of Government Ownership* (Oxford: Oxford University Press).

Xu, Lejiang [徐乐江]. 2013. 宝钢董事会运作实践 [Baosteel Board of Directors' Operational Practice] (Shanghai: Shanghai People's Publishing House).

Xu, Yi-chong. 2018."China's Giant State-Owned Enterprises as Policy Advocates: The Case of the State Grid Corporation of China." *The China Journal* 79: 21-39.

Zhang, Delin. 2008. "Reform of State-owned Enterprises: A Three Year Disconnect from Difficulties Leads to System Innovation," in Wang Mengkui, ed., *China in the Wake of Asia's Financial Crisis* (New York: Routledge).

Prepared for Nicholas Consonery



## Asia Society Reports with Rhodium Group

Asia Society Report on Chinese Investment Into the United States

An American Open Door? Maximizing the Benefits of Chinese Foreign Direct Investment (April 2011)

Chinese Direct Investment in California (October 2012)

High Tech: The Next Wave of Chinese Investment in America (April 2014)

Chinese Direct Investment in California: 2017 Update (November 2017)



**Preparing Asians and Americans for a Shared Future**

Asia Society is the leading educational organization dedicated to promoting mutual understanding and strengthening partnerships among peoples, leaders and institutions of Asia and the United States in a global context. Across the fields of arts, business, culture, education, and policy, the Society provides insight, generates ideas, and promotes collaboration to address present challenges and create a shared future. Founded in 1956 by John D. Rockefeller 3rd, Asia Society is a nonpartisan, nonprofit institution with headquarters in New York, and offices in Hong Kong, Houston, Los Angeles, Manila, Mumbai, San Francisco, Seoul, Shanghai, Sydney, Tokyo, Washington, DC and Zurich.

For more information, visit **Asiasociety.org/ChinaSOE**

Prepared for Nicholas Consonery