Guido Saveri (22349)
 guido@saveri.com
R. Alexander Saveri (173102)
 rick@saveri.com
Geoffrey C. Rushing (126910)
 grushing@saveri.com
Cadio Zirpoli (179108)
 cadio@saveri.com
Matthew D. Heaphy (227224)
 mheaphy@saveri.com
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

*Lead Counsel for Direct Purchaser Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Master File No. 07-CV-5944-JST<br><br>MDL No. 1917<br><br>**DIRECT PURCHASER PLAINTIFFS' OBJECTIONS TO NEW EVIDENCE IN THE IRICO DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTIONS TO DISMISS CLAIMS OF DIRECT PURCHASER PLAINTIFFS FOR LACK OF SUBJECT MATTER JURISDICTION (ECF No. 5463)**<br><br>Date: May 30, 2019<br>Time: 2:00 p.m.<br>Judge: Honorable Jon S. Tigar<br>Courtroom: 9 |
| This Document Relates to:<br><br>*ALL DIRECT PURCHASER ACTIONS* | |

Pursuant to Civil Local Rule 7-3(d)(1), Direct Purchaser Plaintiffs ("DPPs") submit the following objections to new evidence submitted by Defendants IRICO Group Corporation ("Group") and IRICO Display Devices, Co. Ltd. ("Display") with their reply in support of their motions to dismiss (ECF No. 5463, "Reply"), in the form of exhibits to a declaration of their counsel Stuart C. Plunkett (ECF No. 5463-1) ("Plunkett Reply Declaration").

1. Plunkett Exhibit B is a document whose translated title is given as "China National Enterprise Credit Information Publicity Record." This document is an out-of-court statement proffered for the truth of its contents concerning the ownership of China National Electronics Import & Export Caihong Company ("Import-Export"), and therefore inadmissible hearsay under Federal Rule of Evidence 802. The Plunkett Reply Declaration lays no foundation for Plunkett Exhibit B's admission as a public record or any other hearsay exception.

   a. The Reply quotes testimony of Zhang Wenkai that "when you verify the relationship between two companies, the fact should be based on the commerce registration file." Plunkett Decl. Ex. E, at 36:6-8; Reply 25 n.7. That testimony also lays no foundation for the admission of Plunkett Exhibit B. Group and Display did not introduce Plunkett Exhibit B at Zhang's deposition and have not shown that it is the "commerce registration file" to which Zhang referred. To the contrary, Zhang testified that the "commerce registration" showed "the relationship between Irico Group and CNEICC [*i.e.*, Import-Export] *around 2004*." *Id.* at 37:13-15 (emphasis added). Plunkett Exhibit B shows ownership information only from 2014 onwards. Either Zhang's testimony is materially inaccurate or Plunkett Exhibit B is not the registration file he purported to describe – or both.[1]

   b. Further, Plunkett Exhibit B contains a hyperlink to a "2013 annual report" of Import-Export. A printout and translation of the linked document is Exhibit A to the Declaration of David Y. Hwu, filed with these objections. Hwu Exhibit A, which is titled "2013 Annual Report," identifies Group as Import-Export's owner, contrary to the Reply's statement (at 25 n.7)

---

[1] Zhang's testimony concerning the contents of the registration file "around 2004" is also itself inadmissible under Federal Rule of Evidence 1005 because no foundation has been laid that a copy of such a file (if it exists and is consistent with Zhang's description) could not be obtained by reasonable diligence.

that Plunkett Exhibit B shows Group "acquire[d] 100% of the shares of [Import-Export] in 2014."[2] Consideration of the 2013 Annual Report is appropriate under the rule of completeness, Fed. R. Evid. 106, and to show that Plunkett Exhibit B is not reliable.

      2.      Plunkett Exhibits D and E contain excerpts from transcripts of the deposition of Wang Zhaojie. The Reply cites the transcripts but leaves out context that "in fairness ought to be considered at the same time." Fed. R. Evid. 106. DPPs also have the right to submit additional excerpts of the Wang transcript under Federal Rule of Civil Procedure 32(a)(6). *See* Fed. R. Civ. P. 32(a)(6) ("If a party offers in evidence only part of a deposition, an adverse party may require the offeror to introduce other parts that in fairness should be considered with the part introduced, and any party may itself introduce other parts.").

      a.      The Reply cites Wang's deposition for its claim that he "reviewed extensive documentation from Irico's archives prior to submitting his amended declaration." Reply 9 (citing Plunkett Ex. D). The cited portions of Wang's testimony should be considered alongside his repeated inability to identify any documents that he reviewed other than those provided to him by counsel. *See* Hwu Ex. B ("Wang Dep. (Day 1)") at 27:8-18 ("Q. . . . I'm just asking to you [sic] describe the documents that you reviewed. A. The documents provided by my counsel."); Hwu Ex. C ("Wang Dep. (Day 3)") at 11:21-25 (for 30(b)(6) topics 11 and 14, "I reviewed the relevant documents provided by our counsel."); *id.* at 12:10-13 ("Q. . . . [D]id you only review documents provided by your counsel? A. Basically those are the documents I have reviewed."); *id.* at 28:19-22 (for topic 3, no memory of reviewing other documents "other than the documents that were provided by . . . counsel").

      b.      The Reply cites Wang's deposition for its claim that he "obtained additional knowledge through communications from his former supervisor, Mr. Guo," Reply 9 (citing

---

[2] A table in Plunkett Exhibit B contains the notation "2013 annual report" under the heading "[y]ear submitted," but also states that the "[d]ate of publicity" for the report was "September 29, 2015." The 2013 annual report itself contains statements that it was "Completed September 30, 2015" and has a "Revision Date" of "September 29, 2015." Hwu Ex. A at 1, 2. DPPs have no information concerning the date of the creation or the modification of the report other than what appears on the face of Plunkett Exhibit B and Hwu Exhibit A. It is a reasonable inference that a document titled "2013 Annual Report" provides information as of 2013.

Plunkett Exhibit D).  Guo was Display's original declarant whose testimony was withdrawn by stipulation.  *See* ECF No. 5408.  The cited portions of Wang's testimony should be considered alongside his admission that he could not recall speaking with Guo in preparation for his deposition.  Hwu Ex. D ("Wang Dep. (Day 2)") 14:5-7 ("30 days from today, within this period, I'm not quite sure whether I have conversation with Mr. Guo or not."); *see also* Plunkett Ex. D, at 13:3-4 (testifying that Guo was Wang's supervisor a "long time ago" and that their "regular contact and communication" occurred "[i]n the past").

3.   Plunkett Exhibit F contains excerpts from a transcript of the deposition of Curtis Milhaupt, which was taken after DPPs filed their opposition.  Under Federal Rule of Evidence 106 and Federal Rule of Civil Procedure 32(a)(6), other parts of that transcript ought to be considered at the same time.  Those excerpts are attached as Hwu Exhibit E ("Milhaupt Dep.").

a.   Milhaupt's testimony that he does not "[i]n general" consider himself "an expert on Chinese law," Plunkett Ex. F, at 15:14-16, should be considered alongside his testimony that he considers himself an expert on "Chinese corporate governance in comparative perspective" and his description of his research, publications, and teaching in that area.  Milhaupt Dep. 14:11-17:17; *see also* ECF No. 5437.

b.   Milhaupt's testimony concerning the Chinese Communist Party's "monopoly on political power" in China, *e.g.*, Plunkett Ex. F, at 39:13-15, should be considered alongside the following additional excerpts from his testimony:

> [T]his is a subject about which it is difficult to get a lot of information.  [T]he general understanding and my general understanding is that the party participates in personnel decision-making particularly at the level of SASAC.  Whether the committees, whether the party performs a role, other than that, even downstream subsidiaries, really, I think depends on the particular company that we're talking about.  I've heard a range of things from involved to not involved at all.
>
> . . . Q.  And do you have a sense of how involved they are in the Irico Group?
>
> A.  I can only go by what is in the record.  I was struck by the absence of, really, much discussion at all of the party in the Irico Group.

Milhaupt Dep. 50:18 – 51:9.

> So SASAC is the shareholder, yet in the group-level companies, it's the sole shareholder[ ].  So obviously it controls the group-level companies.  Beyond that, I have seen no scholarship or evidence that SASAC is directly, or really even

3
DIRECT PURCHASER PLAINTIFFS' OBJECTIONS TO REPLY EVIDENCE;
Master File No. 07-CV-5944-JST

> indirectly, influencing the voting behavior of shareholders in these enterprises, and I would say the same thing for the communist party . . . .

Milhaupt Dep. 60:13-20.

> [A]lso, and this is a point I meant to make earlier, these are huge enterprises, publicly listed companies, and it takes obvious skill to manage these companies. How much information does SASAC, sitting in Beijing, or communist party authorities in Beijing, how much capacity do they really have to operate these companies. So again, might it happen from time to time, it's conceivable. Is that the way it routinely operates, I'm skeptical of that.

Milhaupt Dep. 69:6-15.

      c.     Milhaupt's statement in a 2017 article that "the grip of the [Communist] party seems to be tightening" over state-owned enterprises, Plunkett Ex. I, at 529, *quoted in* Reply 7-8, should be considered alongside his testimony that the statement refers to the "current period under [current Chinese leader] Xi Jinping," and that during the previous "Hu Jintao era," from "[a]pproximately 2002 to 2012," the Chinese "state was actually more proactively withdrawing from its involvement in the economy." Milhaupt Dep. 36:17 – 37:14; *see also* 75:13-20 (discussing "the current movement under Xi Jinping . . . to elevate the role of the party in SOEs" and distinguishing that current movement from "the relevant time period for our case"); *id.* at 78:18-21 (similar).

      d.     The Asia Society report submitted as Plunkett Exhibit J, *quoted in* Reply 8, about which Milhaupt was asked at his deposition, should be considered together with his responses to questions about that report. *See* Milhaupt Dep. 92:19 – 111:3. Concerning the report's statements about "overlapp[ing] director positions," and the vulnerability of minority shareholders, *see* Plunkett Ex. J, at 29, Milhaupt testified as follows:

> [I]t is certainly true that SASAC has appointments power with respect to the senior executives in the group-level firms. It's certainly true that there is "overlap between listed subsidiaries' executive directors" and those in the group company. That's standard practice in any corporate group anywhere in the world.
>
> . . .
>
> [I]n any corporate governance system, minority shareholders are vulnerable to decisions that may jeopardize their interests by the controller. That is absolutely not unique to China, and I don't see how party or SASAC or government even really factors into that. It's a fact of life as a minority shareholder in a controlled corporate group, certainly true of Korean shareholders, U.S. shareholders as well.

Milhaupt Dep. 95:8-15, 96:2-10. Concerning the report's statement that the appointments of "executive directors" of listed subsidiaries are "[i]n practice . . . predetermined" at a higher corporate level, Plunkett Ex. J, at 29, Milhaupt testified:

> [T]his is put in the context of Chinese organizations, but you could say the same statement about any listed subsidiary of a controlled group anywhere in the world. I mean, the shareholders formally have the power to elect the board. Even in the United States, I mean, the average shareholder has no power to elect a board member. So if you were to say that they're predetermined, well that's true -- you can say that's true of boards in the United States as well. So as a very general statement about how corporate governance systems work everywhere in the world, this seems basically unobjectionable.

Milhaupt Dep. 97:9-21.  When further asked whether "SASAC and the Central Organization Department generally have the power to appoint executive directors at state-owned enterprises' listed subsidiaries," *id.* at 97:23 – 98:2, Milhaupt answered:

> Operating through corporate channels, yes. And that's what we see in this very case. I saw no evidence that SASAC or the party were leap-frogging over multiple layers of enterprises and dictating who would serve on the board. This seemed all very routine to me in terms of how a corporate group would operate.

*Id.* at 98:4-10; *cf.* ECF No. 5419, at 23 (noting similar testimony of defense expert Clarke).

\* \* \*

As required by this Court's rules, these objections are limited to "new evidence [that] has been submitted in the reply" and do not include "further argument on the motion."  Civil L.R. 7-3(d)(1).  DPPs look forward to presenting any further argument that may be helpful to the Court during oral argument at the hearing on the IRICO Defendants' motion to dismiss for lack of jurisdiction.

Dated: May 9, 2019

Respectfully submitted,

/s/ *R. Alexander Saveri*
Guido Saveri (22349)
R. Alexander Saveri (173102)
Geoffrey C. Rushing (126910)
Cadio Zirpoli (179108)
Matthew D. Heaphy (227224)
SAVERI & SAVERI, INC.
706 Sansome Street
San Francisco, CA 94111
Telephone: (415) 217-6810
Facsimile: (415) 217-6813

*Lead Counsel for Direct Purchaser Plaintiffs*

Joseph W. Cotchett
COTCHETT, PITRE & McCARTHY, LLP
840 Malcolm Road
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

Steven F. Benz
Gregory G. Rapawy
KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, DC 20036
Telephone: (202) 326-7900
Facsimile: (202) 326-7999

*Attorneys for Plaintiffs*