John Taladay (*pro hac vice*)
john.taladay@bakerbotts.com
BAKER BOTTS LLP
1299 Pennsylvania Ave., NW
Washington, D.C. 20004
Telephone: (202) 639-7700
Facsimile: (202) 639-7890

Stuart C. Plunkett (State Bar No. 187971)
stuart.plunkett@bakerbotts.com
Peter Huston (State Bar No. 150058)
peter.huston@bakerbotts.com
BAKER BOTTS LLP
101 California Street, Suite 3600
San Francisco, California 94111
Telephone: (415) 291-6200
Facsimile: (415) 291-6300

*Attorneys for*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION, | Case No. 3:07-cv-05944-JST |
| | MDL No.: 1917 |
| THIS DOCUMENT RELATES TO: | **IRICO DEFENDANTS' REPLY IN SUPPORT OF AMENDED MOTIONS TO DISMISS CLAIMS OF INDIRECT PURCHASER PLAINTIFFS FOR LACK OF SUBJECT MATTER JURISDICTION (FED. R. CIV. P. 12(b)(1)) (ECF Nos. 5409, 5411, and 5440)** |
| *ALL INDIRECT PURCHASER ACTIONS* | |
| | Date:        May 30, 2019 |
| | Time:        2:00 p.m. |
| | Judge:       Honorable Jon S. Tigar |
| | Courtroom:   9 |

# TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................2

I.      IPPs Concede that Group Is Entitled to Presumptive Immunity ..........................2

II.     Display Easily Qualifies as an "Organ" of the Chinese Government and Is
        Thus Entitled to Presumptive Immunity.................................................................2

        A.      IPPs Ignore the Bulk of Irico's Showing Regarding Display's
                Creation, Purpose, and Control by State-Owned Entities .........................2

        B.      Making Profits Does Not Undermine Display's Status as an Organ.........4

        C.      Irico Display Is a Government-Controlled Entity under Chinese
                Law, Which Alone Establishes Display's Status as an Organ ................6

        D.      IPPs' Contention that Mr. Wang Lacks Personal Knowledge Is
                Frivolous...................................................................................................8

        E.      The *Powerex* Factors Overwhelmingly Demonstrate Irico Display's
                Status as an Organ ....................................................................................9

                1.      State-Owned Entities Founded Irico Display and Irico
                        Group Acted as Display's "Actual Controller" ...........................9

                2.      Display's Purpose Was to Benefit the State and Its People,
                        Including Via the Distribution of Its Profits to State-Owned
                        Entities .......................................................................................10

                3.      The Undisputed Evidence Confirms that Irico Group and the
                        Chinese Government Exercised Actual Control Over
                        Display.......................................................................................13

                4.      The Chinese Government Closely Controlled the
                        Appointment of Display's Senior Employees ............................14

                5.      Substantial Evidence Demonstrates Display's Obligations,
                        Privileges, and Support from the Chinese Government ...........15

III.    The Commercial Activity Exception Does Not Apply..........................................15

        A.      The Court Did Not "Decide" that the Commercial Activity
                Exception Applies Here...........................................................................15

        B.      The Issue of Commercial Activity Under the FSIA is Analytically
                Distinct from the FTAIA and Is Not Met Here .......................................16

                1.      Unlike the FTAIA, the Commercial Activity Exception
                        under the FSIA is Used to Establish Personal Jurisdiction

and Requires Direct Effects in the U.S. Caused by the
Actions of the Foreign Sovereign..........................................................16

2.    Alleged Participation in a Conspiracy Purportedly Affecting
Prices in the U.S. Does Not Meet the Commercial Activity
Exception..................................................................................................19

3.    IPPs Concede that Neither Group Nor Display Made Sales
to the U.S., Relying Instead on the Sales of an Independent
Entity they Mischaracterize as a "Subsidiary" .........................................22

4.    Alleged Knowledge of U.S. Sales by Third Parties is Legally
Insufficient to Establish "Direct Effect"...................................................26

IV.    CONCLUSION ..............................................................................................................27

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

CASES

4

*Adler v. Federal Republic of Nigeria,*
5
    107 F.3d 720 (9th Cir. 1997) ........................................................................................19

6

*Akro Corp. v. Luker,*
    45 F.3d 1541 (Fed. Cir. 1995) ......................................................................................22

7

*Alpha Therapeutic Corp. v. Kyokai,*
8
    237 F.3d 1007 (9th Cir.2001) .......................................................................................11

9

*Alpha Therapeutic Corp. v. Nippon Hoso Kyokai,*
    199 F.3d 1078 (9th Cir.2001) ...................................................................................11, 12
10

11

*Barthelemy v. Air Lines Pilots Ass'n,*
    897 F.2d 999 (9th Cir. 1990) ..........................................................................................8

12

*Board of Regents v. Nippon Telephone & Telegraph Corp.,*
13
    478 F.3d 274 (5th Cir. 2007) ........................................................................................12

14

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.,*
    137 S. Ct. 1312 (2017) .................................................................................................16
15

16

*Bristol-Myers Squibb Co. v. Super. Ct. of Cal., San Francisco Cty.,*
    137 S. Ct. 1773 (2017) .................................................................................................22

17

*California Dept. of Water Resources v. Powerex Corp.,*
18
    533 F.3d 1087 (9th Cir. 2008) ..........................................................................2, 4, 11, 13

19

*California v. NRG Energy Inc.,*
    391 F.3d 1011 (9th Cir. 2004) .....................................................................................24
20

21

*CNET Networks, Inc. v. Etilize, Inc.,*
    No. C 06-5378 MHP, 2008 WL 4104287 (N.D. Cal. Sept. 2, 2008) ................................8, 9

22

*Corcoran v. CVS Health Corp.,*
23
    169 F. Supp. 3d 970 (N.D. Cal. 2016) .........................................................................25

24

*Corzo v. Banco Cent. de Reserva del Peru,*
    243 F.3d 519 (9th Cir. 2001) .......................................................................................18
25

26

*EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.,*
    322 F.3d 635 (9th Cir. 2003) .......................................................................................14

27

28

*Gregorian v. Izvestia,*
    871 F.2d 1515 (9th Cir. 1989) ................................................................18

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
    27 F. Supp. 3d 1002 (N.D. Cal. 2014) ......................................................22

*In re Chocolate Confectionary Antitrust Litig.,*
    602 F. Supp. 2d 538 (M.D. Pa. 2009) ......................................................24

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,*
    546 F.3d 981 (9th Cir. 2008) ..................................................................17

*Kramer Motors, Inc. v. British Leyland, Ltd.,*
    628 F.2d 1175 (9th Cir. 1980) ................................................................21

*Lake v. Lake,*
    817 F.2d 1416 (9th Cir. 1987) ................................................................21

*Murphy v. Korean Asset Management Corp.,*
    421 F. Supp. 2d 627 (S.D.N.Y. 2005) ....................................4, 5, 6, 10, 12

*NXP Semiconductors USA, Inc. v. Brevets,*
    No. C 14-1225 SI, 2014 WL 4621017 (N.D. Cal. Sept. 15, 2014) ...............11, 12

*Packsys, S.A. de C.V. v. Exportadora de Sal, S.A. de C.V.,*
    899 F.3d 1081 (9th Cir. 2018) ................................................................21

*Patrickson v. Dole Food Co.,*
    251 F.3d 795 (9th Cir. 2001) ..............................................................12, 14

*Powerex Corp. v. Reliant Energy Services, Inc.,*
    551 U.S. 224 (2007) ..........................................................................11, 24

*Powerex Corp. v. Reliant Energy Servs., Inc.,*
    551 U.S. 224 (2007) ................................................................................24

*Ranza v. Nike, Inc.,*
    793 F.3d 1059 (9th Cir. 2015) ................................................................26

*Republic of Argentina v. Weltover, Inc.,*
    504 U.S. 607 (1992) ....................................................................18, 19, 27

*S & Davis Int'l, Inc. v. The Republic of Yemen,*
    218 F.3d 1292 (11th Cir. 2000) ..............................................................19

*Schwarzenegger v. Fred Martin Motor Co.,*
    374 F.3d 797 (9th Cir. 2004) ..................................................................21

*Sea Breeze Salt, Inc. v. Mitsubishi Corp.,*
    89 F.3d 1064, 1068 n.2 (9th Cir. 2018) ....................................................20

*Sea Breeze Salt, Inc. v. Mitsubishi Corp.*,
    No. CV 16-2345-DMG, 2016 WL 8648638 (C.D. Cal. Aug. 18, 2016).........................17, 20

*Sec. Pac. Nat'l Bank v. Derderian*,
    872 F.2d 281 (9th Cir. 1989) ..................................................................................17, 18

*Theo. H. Davies & Co. v. Republic of Marshall Islands*,
    174 F.3d 969 (9th Cir. 1998) ..........................................................................................18

*Thos. P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica*,
    614 F.2d 1247 (9th Cir. 1980) ..................................................................................17, 18

*United States v. Hsiung*,
    778 F.3d 738 (9th Cir. 2015) ....................................................................................16, 17

*United World Trade, Inc. v. Mangyshlakneft Oil Production Association*,
    33 F.3d 1232 (10th Cir. 1994) ........................................................................................19

*USX Corp. v. Adriatic Ins. Co.*,
    345 F.3d 190 (3rd Cir. 2003) .........................................................................................11

*Verlinden B.V. v. Cent. Bank of Nigeria*,
    461 U.S. 480 (1983) ......................................................................................................16

*Vermeulen v. Renault, U.S.A., Inc.*,
    985 F.2d 1534 (11th Cir. 1993) ......................................................................................19

*Voysys Corp. v. Elk Indus., Inc.*,
    1996 WL 119473 (N.D. Cal. Mar. 14, 1996) ................................................................22

*Walden v. Fiore*,
    571 U.S. 277 (2014) ......................................................................................................24

*Williams v. Yamaha Motor Co.*,
    851 F.3d 1015 (9th Cir. 2017) ..................................................................................24, 25

**STATUTES**

15 U.S.C. §§ 1, 6a...............................................................................................................17

28 U.S.C. § 1603(2)...............................................................................................................2

Foreign Trade Antitrust Improvements Act ..............................................................16, 17, 19

**OTHER AUTHORITIES**

Federal Rule of Evidence 803(8)...........................................................................................22

IRICO'S REPLY ISO AMENDED MOTIONS TO DISMISS
IPPS FOR LACK OF JURISDICTION
    v
    CASE NO. 3:07-cv-05944-JST
    MDL No. 1917

**INTRODUCTION**

The Foreign Sovereign Immunities Act ("FSIA") deprives this Court of subject matter jurisdiction over Irico Group ("Group") and Irico Display ("Display") because they are agencies or instrumentalities of the Chinese government. Like DPPs' opposition, to which Irico has already filed a reply (*see* Dkt. No. 5463), IPPs' opposition fails to undermine Irico Group's and Display's dismissal arguments or the significant evidentiary foundation upon which those arguments rest.

IPPs' opposition brief is almost entirely redundant of DPPs' opposition, and thus Irico's arguments in its reply to DPPs' opposition apply with equal force here. Like DPPs, IPPs concede that Irico Group is an instrumentality of the Chinese government. Regarding Display, IPPs mount an even weaker challenge to Display's organ status than DPPs, ignoring nearly all of Display's documentary and testimonial evidence that confirms it was an organ of the Chinese government since its inception and throughout the entire class period, including at the time IPPs' complaint was filed in 2007.  IPPs rely instead on the irrelevant argument that Display made a profit. But, as Irico demonstrated in its DPP reply, earning a profit does not undermine Display's organ status. In fact, the significant government control over Irico Display's profit distributions show that it is an organ of the Chinese government.

IPPs ultimately place their bet on the commercial activity exception, but like DPPs, the arguments they advance lack merit. They repeat the argument that the Court "decided" the commercial activity exception issue—if it had, why would the Court have ordered jurisdictional discovery to inform Irico's pending motions to dismiss? IPPs, too, have grasped for jurisdictional hooks that rely on erroneous legal theories that conflict with constitutional due process and stark mischaracterizations about the Irico Defendants' relationships with third parties and the destination of CRT sales. One simple fact remains: neither Irico Group nor Irico Display ever made sales into the United States, and any injury IPPs sustained does not trace back to the Irico Defendants. Irico Group and Irico Display are foreign sovereigns and the commercial activity exception does not apply here. Accordingly, this Court lacks subject matter jurisdiction under the FSIA, and IPPs' claims should be dismissed with prejudice.

## **ARGUMENT**

### I.    IPPs Concede that Group Is Entitled to Presumptive Immunity

IPPs concede that Irico Group is an instrumentality of the Chinese government, and for good reason. The evidence proves that the Chinese government wholly owned Group at the time the complaint was originally filed and throughout the relevant period. (Irico Display Devices Co., Ltd.'s Amended Motion to Dismiss Claims of Indirect Purchaser Plaintiffs, Dkt. No. 5409 at 8-10 ("Group's IPP Mot.").) Because "a majority of [Group's] shares or other ownership interest is owned by a foreign state or political subdivision thereof," Group is an instrumentality of a foreign state under the FSIA. *See* 28 U.S.C. § 1603(2). Having conceded Group's presumptive entitlement to immunity, IPPs must prove that one of the FSIA's exceptions apply. This they fail to do, as discussed below.

### II.   Display Easily Qualifies as an "Organ" of the Chinese Government and Is Thus Entitled to Presumptive Immunity

#### A.    IPPs Ignore the Bulk of Irico's Showing Regarding Display's Creation, Purpose, and Control by State-Owned Entities

Tellingly, IPPs do not confront or dispute the overwhelming majority of Irico's evidence demonstrating Display's status as an "organ" of the Chinese government, including substantial evidence concerning (1) the circumstances of Display's creation, (2) its control by a state-owned entity (Irico Group), and (3) the public purposes of its activities. *See California Dept. of Water Resources v. Powerex Corp.*, 533 F.3d 1087, 1098 (9th Cir. 2008). Most strikingly, IPPs ignore all but a few passages in Mr. Wang's lengthy declaration, even though Mr. Wang has worked at Irico Group and its subsidiaries for decades and worked at one of Irico's CPT Plants at the time of Irico Display's founding. (Amended Declaration of Zhaojie Wang, Dkt. No. 5409-1 ("Am. Wang Decl.") ¶¶ 3-7.) IPPs make the frivolous assertion (addressed below) that Mr. Wang lacks personal knowledge, but they do not and cannot demonstrate that Mr. Wang lacks personal knowledge to testify about Display's formation, purpose, or dependence on state-owned entities. (*See* Indirect Purchaser Plaintiffs' Opposition to the Irico Defendants' Amended Motions to Dismiss, Dkt No. 5440 ("IPPs' Opp.") at 17.) IPPs' efforts to challenge the process of gathering, rather than the substance, of the underlying facts belies the weakness of their opposition.

IPPs ignore Irico's evidence regarding Display's creation, all of which demonstrates Display's organ status. Irico Display was founded by Irico Group and four other wholly state-owned entities. (Am. Wang Decl. ¶ 40; *see also* Amended Declaration of Stuart Plunkett, Dkt. No. 5413 ("Am. Plunkett Decl."), Ex. 44 at -853.) Consequently, "Irico Display was set up as a wholly state-owned enterprise of the Chinese Government." (Am. Wang Decl. ¶ 40.) IPPs do not address this evidence.

IPPs also ignore evidence that Display's purposes align with the public purposes of Group: contributing to China's socialist national economy, increasing the value of its state-owned assets, and providing for the welfare of its workers. (*See* Am. Wang. Decl. ¶¶ 25, 42, 65.) Contrary to this evidence, IPPs incorrectly imply that Display's sole purpose was to earn profits for shareholders. (*See* IPPs' Opp. 12-13.) But the evidence shows that Irico Display consolidated its financial statements with Group which then re-invested its profits into a school system, police department, hospital, and senior living center for the benefit of the public, including Display's employees and the surrounding community. (Am. Wang Decl. ¶ 65.) IPPs' claim that Display's purpose was solely profit-making is demonstrably false. Similarly, IPPs ignore passages from one of Irico Display's founding documents indicating that it was "composed mainly of public ownership." (Am. Plunkett Decl., Dkt. No. 5413, Ex. 44 at -854.) That document further charges Display to "protect and increase the value of State-owned assets." (*Id.*)

IPPs do not dispute evidence that Group—a state-owned entity—acted as "actual controller" of Display. (Am. Wang Decl. ¶ 49.) IPPs fail to address the mountain of evidence showing that Group—a state-owned entity—controlled the management and operations of Display. For instance, Display submitted financial reports to Group for approval; Group set up operational goals for Display; Group evaluated the performance of Display's top management; Group approved major production changes at Display; Group approved any transfer of Display's state-owned assets; Display borrowed large amounts from Group; Display consolidated its results into Group's financial statements; and Group served as guarantor of Display's debts. (*Id.* ¶¶ 53, 54, 55, 57, 61, 62.) All of which is further proof that Display was an organ of the state.

## B.    Making Profits Does Not Undermine Display's Status as an Organ

Critically, IPPs are wrong in asserting that deriving a profit defeats Display's organ status. "[T]here is nothing in the text of the FSIA to suggest that [a company's] ability to make a profit *ipso facto* precludes the conclusion that it is an organ" under the FSIA. *Murphy v. Korean Asset Management Corp.*, 421 F. Supp. 2d 627, 646 (S.D.N.Y. 2005) (finding organ status for a for-profit entity), *aff'd*, 190 Fed. Appx. 43 (2d Cir. 2006). "The relevant question is not *whether* [Display] earns a profit, but where does that profit go?" *Powerex*, 533 F.3d at 1102. Making and distributing some profits to private shareholders does not preclude FSIA immunity where, as here, the entity has other, public purposes. *Murphy*, 421 F. Supp. 2d at 642 (finding organ status for a for-profit entity). Thus, a for-profit's status as an organ depends on how those profits are distributed and whether the entity has other, public purposes. Importantly, government-imposed restrictions on profit distributions weigh in favor of organ status.

In *Murphy*, the plaintiffs sued the Korea Asset Management Corporation (KAMCO)—a state-created entity that served as a creditor for distressed Korean companies. *Id.* at 629. The Korean government owned 42.8% of KAMCO, an agency of the Korean government owned 28.6%, and private Korean banks owned the remaining 28.6% of the entity. *Id.* at 631. Yet KAMCO was found to be an organ of the Korean government. *Id.* at 646. Notably, KAMCO had the ability to earn profits and made profits of $19 million in one year. *Id.* at 632, 642. Some of those profits were distributed to shareholders but were nonetheless subject to government limitations and restrictions. *See id.* at 632. The court saw "no reason why KAMCO's profitability should preclude FSIA immunity. Rather, it simply means that KAMCO does not have as its *exclusive* purpose a national one." *Id.* at 642 (emphasis in original). Moreover, the court found that "restrictions and limitations" on the distributions of profits "reflect the fact that . . . [KAMCO] performs several functions often associated with—and in most cases reserved for—governments or their agencies." *Id.* at 632. Thus, the nature of KAMCO's distributions, including the limitations imposed by the Korean government, weighed in favor of KAMCO's organ status. *See id.*

The significant limitations on Display's profit distributions mirror the facts in *Murphy* and weigh in favor of Display's organ status. Like in *Murphy*, the Chinese government imposes "restrictions and limitations" on the distributions of Display's profits. *Id.* Display was required to divert its profits to pay state-owed capital dividends directly to the government. (Am. Plunkett Decl. Ex. 16, Dkt No. 5413, at -588; Am. Wang. Decl. ¶ 2.) Display also re-invested much of its profits into its business operations to "increas[e] the value of [Display's] State-owned assets." (Am. Wang. Decl. ¶ 63.) Shareholders received what remains—but by far the largest portion of those final distributions went back to state-owned Irico Group via Irico Electronics, where they formed the basis for Group's own SASAC-mandated state-owned dividends, investment in additional State-owned assets, and funding for Group's public welfare obligations. (Am. Plunkett Decl., Dkt. No. 5413, Ex. 2 at -240; Ex. 16 at -588; Declaration of Donald Clarke, Dkt. 5392-3 ("Clarke Decl.") ¶ 22h.) IPPs not only fail to address these initial limitations on Display's profits but also fail to acknowledge that the Chinese government had an indirect plurality stake in Display via Irico Group and Irico Electronics  (*See* IPP's Opp. at 12.)  In *Murphy*, a similar set of restrictions presented no barrier to organ status.  In fact, the very existence of those limitations weighs in favor of organ status because they "reflect the fact that . . . [Display] performs several functions often associated with . . . governments or their agencies."  *Murphy*, 421 F. Supp. 2d at 642.  DPPs' own expert acknowledges the significant limitations SASAC imposes on companies like Display and Group in an article that he wrote:

> SASAC as the organizational manifestation of the party-state in its role as controlling shareholder, seeks to maximize a range of benefits extending from state revenues to technological prowess and from soft power abroad to regime survival at home.  As one of us recently put it in a separate co-authored work, in state capitalism 'the government attempts to ensure that company-level behavior results in country-level maximization of economic, social, and political benefits.'

(Declaration of Stuart Plunkett in Support of Irico's Reply ("Plunkett Decl."), Ex. H at 746; Ex. F at 116:15-117:10.)  Consequently, Display's distribution of profits does not bar organ status, and the significant limitations imposed on those distributions demonstrate a level of government control not imposed on private enterprises.

1

2

3

4

5

6

7

8

9

10

Any profit-seeking purpose does not undermine Display's other public purposes, such as contributing to China's socialist national economy, increasing the value of its state-owned assets, and providing for the welfare of its workers.  Organs need not have "exclusive[ly]" national purposes.  *Murphy*, 421 F. Supp. 2d at 642. IPPs fail to address these public purposes that weigh in favor of Display's organ status, erroneously suggesting that profit-seeking was the singular purpose motivating Display.  (*See* IPPs' Opp. at 13-14.)  Finally, IPPs' reliance on two public reports mentioning profits—including one irrelevant document drafted after the complaint was filed—do not support their argument (*see* IPPs' Opp. at 3-4, 13; Plunkett Decl., Ex. D 53:6-54:24 (establishing that the "2007 Display Annual Report" was drafted in April, 2008).), because discussions of profit-seeking do not diminish Display's other, public purposes.

11

12

### C.      Irico Display Is a Government-Controlled Entity under Chinese Law, Which Alone Establishes Display's Status as an Organ

13

14

15

16

The contemporaneous documentary evidence and expert testimony of one of the country's leading experts on the law of the People's Republic of China establish that Display is (and was in 2007) state-controlled.  The IPPs completely ignore Irico's expert testimony establishing Display's organ status and fail to offer any testimony to the contrary.

17

18

19

20

21

22

George Washington University Law School Professor Donald Clarke has been studying China for nearly forty years.  He is fluent in both written and spoken Chinese.  After reviewing the evidence, Professor Clarke concluded that "Irico Display was, before and during 2007, officially considered at the very least a state-controlled entity, and in some contexts a state-owned entity."  (Clarke Decl. ¶ 24.)  He bases this conclusion on numerous facts, including the following:

23

24

- Display was audited in the manner that a state-owned entity would be.  (Clarke Decl. ¶ 28-29; Am. Plunkett Decl. Ex. 32.)

25

26

27

- A SASAC financial form from 2007 lists Display as "state owned or state controlled." (or per Professor Clarke's translation "controlled by state ownership").  Such a SASAC form would not exist for a private company. (Clarke Decl. ¶ 30; Am. Plunkett Decl. Ex. 32; Plunkett Decl. Ex. G 52:13-52:25.)

28

- Irico Group, which IPPs concede is 100% directly owned by the Chinese state, was required to consolidate Display's financial results with its own for accounting purposes as required under Chinese accounting standards when one company exercises actual control over another.  (Clarke Decl. ¶ 28.)

- Chinese courts have repeatedly determined that Display is state controlled as they have subjected its employees to the more severe punishments state personnel face for certain criminal violations.  (*Id*. ¶ 36.)

- Display is described as "state-controlled" in Irico Group's 2007 audit report.  (*Id*. ¶ 27.)

- Irico Group appointed personnel at Display including in 2007 when Irico Group directed who Display should install as director, chairman of the board, deputy chairman, general manager, deputy general manager, and chief financial officer.  (*Id*. ¶ 31 (d); Plunkett Decl. Ex. G 123:3-129:10.)

- Display's 2007 annual report, which contains disclosures mandated and enforced under China's securities regulation regime, states unequivocally that the actual controlling person is Irico Group.  (Clarke Decl. ¶ 32.)

IPPs do not deny or challenge any of these facts in their opposition.  Instead, they mistakenly assert that Display shifted to having "no direct government ownership and majority 'public ownership.'"  (IPPs' Opp. at 12.)  Setting aside the control of SASAC and the CCP and focusing just on share ownership, the notion that Irico Group's implied 31% indirect equity percentage of Display corresponds to its level of control over Display, or that non-state shareholders had any meaningful control over Display is wholly defective.  As DPPs' expert, Professor Milhaupt, acknowledged in an article about state-owned enterprise groups that include listed companies (like Display): "The percentage of shares retained directly or indirectly by the parent company varies, *but it is always sufficient to retain ultimate control* over the listed firm(s) in the group, particularly given the dispersed nature of the private shareholdings."  (Plunkett Decl. Ex. H at 711 (emphasis added).)  Considering the corporate formalities at play here, the wholly state-owned Irico Group controlled Irico Electronics (by virtue of its 75% share ownership), and Irico Electronics controlled Display (by virtue of its 41% share ownership, with the remainder widely dispersed with the next highest shareholder owning 1.7% and all others below 1%).  When asked in his deposition how much voice minority non-state shareholders had in Chinese SOEs, Professor Milhaupt offered: "not a lot of voice."  (Plunkett Decl. Ex. F

84:18-19.)  In short, Professor Milhaupt's previous writings not only contradict his report in this case but reinforce Irico Display's position.

### D.     IPPs' Contention that Mr. Wang Lacks Personal Knowledge Is Frivolous

IPPs make a frivolous, half-hearted attempt to argue that Mr. Wang lacks personal knowledge.  They cite just a few passages from his declaration to make the argument, ignoring all the rest.  It is thus unclear what exactly they assert.  (IPPs' Opp. at 17.)  Mr. Wang plainly has personal knowledge, and IPPs conveniently ignore all of the following facts: (1) Mr. Wang has worked at Irico Group and its subsidiaries since 1991, including throughout the entire Class Period; (2) he reviewed extensive documentation from Irico's archives prior to submitting his amended declaration; and (3) he obtained additional knowledge through communications from his former supervisor, Mr. Guo, including by reviewing and verifying the information in Mr. Guo's declaration.  (Am. Wang. Decl. ¶¶ 3-7; Plunkett Decl., Ex. D at 11:8-10; 13:2-4; 17:2-3; 27:24-28:8.)

During his time working for Irico and its subsidiaries, Mr. Wang has assumed management and leadership roles where he familiarized himself with Irico Group's and Display's management and operations.  Mr. Wang was Director of the Sales Department of Irico Group from March 2003 to 2009 where he assumed management work and supervised the entire sales team.  (Plunkett Decl., Ex. D, 65:18-66:6.)  IPPs' suggestion that Mr Wang never worked at Irico Display misses the point: until 2005, Irico Group handled all sales of CPTs and CDTs sold by Irico subsidiaries, including Display.  (Am. Wang Decl. ¶ 5; IPPs' Opp. at 17.)  As a sales representative and eventually as head of the sales department at Irico Group, Mr. Wang oversaw all of Display's sales of CPTs and CDTs.  (Am. Wang. Decl. ¶¶ 4-5.)

Whether Mr. Wang attended shareholder and board meetings for Display does not determine his personal knowledge to testify on those topics, because "personal knowledge and competence to testify [can be] reasonably inferred from [Mr. Wang's] position[] . . ." *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1018 (9th Cir. 1990).  In an instructive case, the declarant CEO never used his company's software but nevertheless was able to testify on the "general process employed by the software."  *CNET Networks, Inc. v. Etilize, Inc.*, No. C 06-5378 MHP,

2008 WL 4104287, at *15 (N.D. Cal. Sept. 2, 2008).  The court found that the CEO "may rely upon subordinates to explain [the software process] to him" and that "he need not run the software himself in order to understand the broad strokes . . . ." *Id.*  Declarants may obtain personal knowledge by relying on conversations with other company employees.

Like the declarant in *CNET*, Mr. Wang relied on conversations over the years with someone who had first-hand knowledge of board and shareholder meetings—his supervisor and a senior manager at Irico, Mr. Guo.  (Plunkett Decl., Ex. D 13:2-4; 17:2-3; 27:24-28:8.)  Mr. Wang went even further, relying on his review of extensive documentation from Irico's archives to support his amended declaration.  (*Id.* 11:8-10.)  Mr. Wang's extensive work history at Irico Group and its subsidiaries, his review of relevant documents from Irico's archives, and his discussions over the years with his supervisor—Mr. Guo—easily establish his personal knowledge.

### E.    The *Powerex* Factors Overwhelmingly Demonstrate Irico Display's Status as an Organ

#### 1.    State-Owned Entities Founded Irico Display and Irico Group Acted as Display's "Actual Controller"

IPPs ignore several key facts stemming from Display's founding that weigh heavily toward organ status.  Most notably, Display was established by Irico Group and other wholly state-owned entities.  (Am. Wang. Decl. ¶ 40; Declaration of Alexander Saveri, Dkt. No. 5419-1, Ex. 5, 2006 Articles of Association for Irico Display ("2006 Display Articles"), at art. 18.)  At the time of its founding, only state-owned entities held majority shares of Display.  (*Id.*; Am. Wang Decl. ¶ 41.)  Even after its IPO in 1996, Irico Group and SASAC exercised actual control over Display's operations and management.  (Am. Wang Decl. ¶¶ 48-49; *see also* 2006 Display Articles, at arts. 18; 313(2).)

IPPs suggest that the Chinese government's role in Display's creation was merely one of "approval" akin to the state of Delaware approving the formation of a corporation.  (IPPs' Opp. at 12-13.)  This is a strawman.  The Chinese government not only approved but *established* Display via completely state-owned entities and government capital.  (2006 Display Articles, at art. 18;

Am. Wang Decl. ¶ 41.)  Display's creation thus bears no resemblance to a routine incorporation in Delaware.

IPPs also mistakenly rely on the 2006 Display Articles, arguing that Display "manufactured and sold CRTs to make a profit."  (IPPs' Opp. at 13.)  Even if true, that fact neither defeats nor weighs against organ status.  *See Murphy*, 421 F. Supp. 2d at 632, 643 (finding that profit-making did not preclude KAMCO from being an organ of the Korean government and noting that "the strong national purpose underlying KAMCO's creation . . . weighs heavily in favor of the conclusion that Kamco is an organ.").  Moreover, the 2006 Display Articles cut against IPPs' argument.  First, the 2006 Articles confirm that Display was established by wholly state-owned entities.  (2006 Display Articles, at art. 18.)  Second, the 2006 Articles confirm that Group—acting as "actual controller" of Display—retained its ability to "actually control [Display's] behavior through investment relations, agreements or other arrangements." (*Id.* at art. 313(2); (Am. Wang Decl. ¶ 49.))  Third, the 2006 Articles indicate that state-owned "sponsors" such as Irico Group held a majority stake in Display.  (2006 Display Articles at art. 19 (noting that "capital structure of [Display] shall be as follows: 421.1488 million shares of common share, of which 240.16 million shares are held by sponsors").)  These articles serve only to confirm the Chinese Government's control over Display at the time of its creation and throughout the Class Period.

### 2. Display's Purpose Was to Benefit the State and Its People, Including Via the Distribution of Its Profits to State-Owned Entities

IPPs contend that Display is not an organ because it "functioned as an ordinary commercial entity" and "manufactured and sold CRTs to make a profit."  (IPPs' Opp. at 13.) This argument fails because: (1) profit-making to benefit state-owned entities or the public is a valid public purpose; (2) Irico had other public purposes such as providing for the welfare of the local community and its workers; and (3) having a private purpose does not defeat organ status if an entity has other, public purposes.

First, Display reinvested its profits into state-owned assets, including its plurality shareholder Irico Electronics who was majority owned by Group.[1]  Much like the company in *Powerex*, Display's financial results were consolidated into Group's financial statements and formed the basis of Group's after-tax payments to the Chinese government.  (Am. Wang Decl. ¶ 11); *Powerex*, 533 F.3d 1087, 1102 ("The benefits of Powerex's export trade activity are passed through to the Provincial Government through the consolidation of Powerex's earnings into the net income of BC Hydro.").  "In other words, 'if [Display] earns a profit, that profit must be rebated directly or indirectly to [Chinese] residents." *Powerex*, 533 F.3d 1087, 1102 (citing *Powerex Corp. v. Reliant Energy Services, Inc.*, 551 U.S. 224, 247 (2007) (Breyer, J., dissenting)). The consolidation of Display's earnings with a state-owned entity mirrors the facts of *Powerex*, evidencing a valid public purpose.

Second, Display poured its profits into public works via Group, yet another public purpose. These public works include providing a local hospital, police department, and senior living center for local residents. (Am. Wang. Decl. ¶¶ 25, 65.) IPPs fail to address this purpose. (*See* IPPs' Opp. 12-13.) Display was, moreover, "responding to the need of the Chinese people for color televisions"—yet another public purpose. (Am. Wang. Decl. ¶ 21.) The Ninth Circuit has cited the purpose of "providing entertainment to Japanese citizens" as a relevant public purpose weighing in favor of organ status. *See Alpha Therapeutic Corp. v. Nippon Hoso Kyokai*, 199 F.3d 1078, 1084 (9th Cir.2001) (finding organ status for Japanese broadcaster), *withdrawn on other grounds sub nom. Alpha Therapeutic Corp. v. Kyokai*, 237 F.3d 1007 (9th Cir.2001). IPPs fail to address these points.

Third, IPPs' reliance on *USX* (IPPs' Opp. at 12) and *NXP Semiconductors* (IPPs' Opp. at 13) is misplaced. In *USX*, the court noted that "[a]lthough the [Irish] government does not directly own ICARM, it indirectly has complete control over ICAROM's shares."  *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 213 (3rd Cir. 2003) (affirming a finding of organ status). In *NXP*,

---

[1] As the Department of Justice highlights in its Statement of Interest, "the Ninth Circuit has held that an entity can be an organ of a foreign state . . . even when the state does not directly own a majority share of it . . . ." Statement of Interest of the United States, Dkt. No. 5457 ("DOJ Statement of Interest") at 5.

the court's "conclusion" that the French company was not an organ was irrelevant to the court's ultimate holding that it *lacked* personal jurisdiction over that company. *NXP Semiconductors USA, Inc. v. Brevets*, No. C 14-1225 SI, 2014 WL 4621017, at *7-13 (N.D. Cal. Sept. 15, 2014). The court also found that "certain aspects of France Brevet's creation and structure do weigh in favor of finding that it is an organ or instrumentality of France, such as the facts that France Brevets was created . . . with funding from the French government and [an agency of the French Government]." *Id.* at *7. Similarly, Display's original state funding weighs in favor of its organ status.

Finally, even if Display had some limited element of profit-making for private interests in addition to its undisputed public purposes, an entity need not have exclusively public purposes to retain its status as an organ. *See Murphy*, 421 F. Supp. 2d at 642. Instead, courts may find organ status where public purposes outweigh the private purpose of distributing profits to private shareholders. *See id.* And contrary to the DOJ's and IPPs' characterizations, the *Patrickson* court did not hold that a "valid public purpose . . . must be something more than just making money for the state as a shareholder." (DOJ Statement of Interest, Dkt. No. 5457, at 6; *see also* IPPs' Opp. at 15-16.) Rather, the court merely supported the district court's holistic view of the relevant entity as "acting to maximize profits rather than pursue public objectives." *Patrickson v. Dole Food Co.*, 251 F.3d 795, 808 (9th Cir. 2001). In contrast to the entity in *Patrickson*, Display was run by government appointees and treated employees as civil servants.[2] And even under the IPPs' and DOJ's reading of *Patrickson*, Display had numerous other public purposes—such as providing public services to the local community and providing entertainment and information for the Chinese people—that weigh in favor of organ status, unlike the entity in *Patrickson*.

---

[2] *See* Am. Wang. Decl. ¶¶ 9, 50. Similarly, the DOJ's reference to the Fifth Circuit case *Board of Regents v. Nippon Telephone & Telegraph Corp.*, 478 F.3d 274 (5th Cir. 2007), is inapposite. DOJ Statement of Interest at p. 8. In that case, the relevant television broadcaster was created "to privatize what had been a government-controlled monopoly and to promote competition." *Nippon*, 478 F.3d at 279. Rather, the reasoning in a Ninth Circuit case involving a similar Japanese entity provides more relevant, binding precedent to the facts here. *See Alpha Therapeutic*, 199 F.3d at 1084–85. The *Nippon* court distinguished the Ninth Circuit *Alpha Therapeutic* case that found organ status in part because the organ in the Ninth Circuit case had public purposes including "providing entertainment to Japanese citizens" much like Irico's stated purpose of "responding to the need of the Chinese people for color televisions." *Nippon*, 478 3.d at 281; Am. Wang. Decl. ¶ 21.

### 3.   The Undisputed Evidence Confirms that Irico Group and the Chinese Government Exercised Actual Control Over Display

IPPs attempt to establish Display's independence is based on their selective presentation of SASAC Regulations that apply directly to Group while ignoring the considerable evidence of Group's control over Display and the binding effect of the SASAC Regulations on Display.

For instance, IPPs argue that certain SASAC regulations on the appointment of managers did not apply to Display because it was not a "wholly owned state company." (IPPs' Opp. at 14.) Yet a SASAC financial form from 2007 lists Display as "state owned or state controlled" (or per Professor Clarke's translation "controlled by state ownership"), and such an SASAC form would not exist for a private company. (Clarke Decl. ¶ 30; Am. Plunkett Decl. Ex. 32; Plunkett Decl. Ex. G 52:13-52:25.)  SASAC's direct authority to "nominate" or "recommend" the chairman, vice chairman, other board members, the chairman of the supervisory panel, the general manager, deputy general manager, and chief accountant to be "dispatched to" Display (SASAC Regs. Art. 17(3)), combined with near-total control through Group (*see* Am. Wang Decl. ¶¶ 46-52), demonstrate that control by SASAC strongly supports a finding that Display is an organ of the government. *See Powerex*, 533 F.3d at 1101 ("There is no reason to think Congress cared for the *manner* in which foreign states interacted with their organs—i.e. whether the foreign state supervises the organ directly, or through an incorporated agent.").

Contrary to IPPs' selective mischaracterizations, the SASAC regulations and substantial documentary evidence clearly establish Group's and the SASAC's control over Display. (See Irico Display Devices Co. Ltd's Amended Motion to Dismiss Claims of Indirect Purchaser Plaintiffs, Dkt. No. 5411, ("Display's IPP Mot.") at 7-11.) But once again, IPPs ignore all of the evidence demonstrating Display's adherence to SASAC regulations as a state-controlled entity. (*See id.*) For instance, the evidence confirms that (1) new assembly lines required direct approval from Group, (2) Group acted as "actual controller" of Display, (3) Group directly selected members of Display's Board of Directors, and (4) Group appointed management of Display. (*Id.*) The SASAC Regulations are clearly consistent with evidence that establishes Display's dependence on Group and the Chinese government.

Finally, IPPs once again misstate the reasoning of *Patrickson*. (IPPs' Opp. at 15-16.) In that case, "the question [was] close" regarding organ status, and the mere fact that the government had a minority yet controlling stake did not determine the court's holding alone. *Patrickson*, 251 F.3d at 808. Instead, the court found that several factors weighed against organ status, including the fact that, unlike Display, the entity was not run by government appointees. *Id.*

### 4.    The Chinese Government Closely Controlled the Appointment of Display's Senior Employees

Contrary to IPPs' suggestion (IPPs' Opp. at 14-15), the FSIA does not require organs to employ civil servants: "A company may be an organ of a foreign state for purposes of the FSIA even if its employees are not civil servants." *EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*, 322 F.3d 635, 641 (9th Cir. 2003).[3] The undisputed evidence proves that the Chinese government played an active supervisory role here. Group appointed and removed the management and board of Irico Display. (Am. Wang. Decl. ¶ 52.) In fact, Group employees oversaw Mr. Wang's appointment to his management positions at Group's other subsidiaries—Irico Electronics and Irico Smart Lighting. (Id. ¶ 8.) Moreover, Display's employees were subject to special bribery laws that did not apply to private citizens. IPPs miss this point, asserting that bribery laws in the U.S., such as the FCPA, apply to private as well as public officials. (IPPs' Opp. at 15.) But they ignore the fact that Display's employees were subjected to a heightened standard reserved for public officials. IPPs do not even address the documentary evidence demonstrating this fact. (*See id.*; Am. Plunkett Decl., Ex. 8 at -537, 10 at -556, 42 at -764; Clarke Decl. ¶¶ 36-37.)

Moreover, Display's managers were required to be members of the Chinese Communist Party—demonstrating a close relationship between Display's leadership and the Chinese government. (Plunkett Decl. Ex. D, 27:1-28:11.) In his deposition, Mr. Wang acknowledged being a communist party member and testified that "all the senior managers [are] supposed to be

---

[3] While the IPPs imply that organs *must* employ civil servants, the DOJ correctly points out that no such requirement exists under *EIE Guam*. (DOJ Statement of Interest at 6.)

the member of the communist party," noting that this was "a requirement by the SASAC." (Plunkett Decl. Ex. D, 27:1-28:11.) On this point, the IPPs deflect, arguing that such a requirement is analogous to U.S. laws establishing qualifications for board membership. (IPPs' Opp. at 15.) But that analogy fails. The Chinese government required senior employees to belong to the controlling political party of that government, and IPPs have provided no exemplary U.S. law that mirrors that level of political control. (*See id.*) Thus, this fact clearly weighs in favor of Display's organ status.

### 5. Substantial Evidence Demonstrates Display's Obligations, Privileges, and Support from the Chinese Government

Instead of meaningfully addressing Display's evidence of financial support from the government and special obligations, IPPs assert, without authority, that Display's subsidies were "not sufficiently unusual or substantial enough to show that it operated as an organ." (IPPs' Opp. at 16.)  IPPs have cited no authority suggesting that Display fails to meet any threshold of support necessary for this factor to weigh in favor of organ status.

IPPs also ignore other ways the Chinese government provided support to Display. For instance, Display's employees enjoyed special benefits conferred by state-owned Group including a school system, police department, hospital, and senior living center in Xianyang, Shaanxi Province. (Am. Wang. Decl. ¶¶ 25, 65.) The fact that other members of the community in Xianyang enjoyed these benefits reinforces the broader public purpose of Display as a state organ. Members of a relatively small region centered around companies like Group and Display enjoyed special benefits from the Chinese government due to their employment from or proximity to the headquarters of Display and Group.

## III. The Commercial Activity Exception Does Not Apply

### A. The Court Did Not "Decide" that the Commercial Activity Exception Applies Here

IPPs repeat DPPs' failed argument that the Court has already decided the jurisdictional issues in plaintiffs' favor. (*See* IPPs' Opp. at 18.) But the Court already rejected this very argument in its April 25, 2018 Order rejecting DPPs' bid to take full merits discovery. (*See* Dkt. No. 5277.) In that Order, the Court clarified that there remained "a substantial question regarding

[Irico's] immunity from suit under the Foreign Sovereign Immunities Act," and that "only jurisdictional discovery [wa]s appropriate," rejecting the argument that the Court's February 1, 2018 Order Setting Aside Default ("Default Order") settled the jurisdictional question. (*Id.* at 2; *see also* Default Order, Dkt. No. 5240 at 19 ("[F]urther proceedings might demonstrate that the [FSIA] defense applies and the Court lacks jurisdiction.").) The Court also noted that there was "significant doubt as to whether the Court has jurisdiction over Irico Group," and that there was sufficient cause to "present the issue" of Irico Display's immunity even without the robust factual showing now before the Court. (Default Order at 17.) Neither finding makes any sense if the Court had somehow already decided that an exception to immunity applies.

### B. The Issue of Commercial Activity Under the FSIA is Analytically Distinct from the FTAIA and Is Not Met Here

#### 1. Unlike the FTAIA, the Commercial Activity Exception under the FSIA is Used to Establish Personal Jurisdiction and Requires Direct Effects in the U.S. Caused by the Actions of the Foreign Sovereign

IPPs rely on cases decided under the Foreign Trade Antitrust Improvements Act ("FTAIA") to argue that the commercial activity exception is met because Irico allegedly "participated in a global CRT price fixing conspiracy that caused IPPs to pay higher prices for CRT televisions and computer monitors in the U.S." (IPPs' Opp. at 21.) This reliance is misplaced. Critically, the FSIA is explicitly *jurisdictional* and provides the only basis for *both subject matter <u>and</u> personal jurisdiction* over foreign sovereigns and their instrumentalities. *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1318 (2017) ("Foreign sovereign immunity is jurisdictional in this case because explicit statutory language makes it so."); *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 485 n.5 (1983) ("Thus, if none of the exceptions to sovereign immunity set forth in the Act applies, the District Court lacks both statutory subject matter jurisdiction and personal jurisdiction."). The FTAIA, by contrast, is *not* jurisdictional, but merely "a component of the merits of a Sherman Act claim involving nonimport trade or commerce with foreign nations." *United States v. Hsiung*, 778 F.3d 738, 751 (9th Cir. 2015) (holding that "FTAIA is not a subject-matter jurisdiction limitation on the power of the federal courts"). Additionally, the FTAIA expressly focuses on "conduct

involving trade or commerce . . . with foreign nations" in connection with an alleged "contract, combination . . . or conspiracy" rather than the *individual* acts of a particular foreign defendant. 15 U.S.C. §§ 1, 6a. Thus, the fact that FTAIA cases typically examine conspiracy-wide (rather than individual) conduct and effects is driven by the FTAIA's unique statutory language and cannot justify an identical analytical approach to analyzing jurisdiction over a foreign sovereign under the FSIA. *Cf. Hsiung*, 778 F.3d at 759 (examining "conspiracy as a whole" and "constellation of events that surrounded" it rather than acts of specific defendant).

IPPs take their improper reliance on the FTAIA a step further by urging the court to adopt a "proximate cause" standard for determining whether Irico Defendants' alleged actions had a "direct effect" in the United States. (IPPs' Opp. at 19 & n.69.) But this approach jumbles together the "directness" inquiry with a separate prong of the FTAIA – the "gives rise to" requirement. *See In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 986 (9th Cir. 2008) (FTAIA exception applies only "if foreign conduct (1) has a direct, substantial, and reasonably foreseeable effect on domestic commerce, ***and*** (2) such effect gives rise to a Sherman Act claim.") (emphasis added). The Ninth Circuit has held that proximate cause, and not merely "but for" causation, is necessary for the second prong, but that hardly means that proximate causation suffices to satisfy *both* prongs simultaneously. *See id.* at 986 ("Only the district court's conclusion with respect to the second ["gives rise to"] prong of the domestic injury exception is at issue in this appeal."). IPPs also cite the district court opinion in *Sea Breeze Salt v. Mitsubishi Corp.* (IPPs' Opp. at 19 n.69), but that opinion contains no reference to a proximate cause standard. *See* No. 16-cv-2345-DMG (AGRx), 2016 WL 8648638, at *3 (N.D. Cal. Aug. 18, 2016).

The Ninth Circuit has recognized the dual-jurisdictional nature of the FSIA by holding that "the requirement of a 'direct effect' incorporates the minimum contacts standards" and "traditional notions of fair play and substantial justice which determine the due process limits of personal jurisdiction." *Sec. Pac. Nat'l Bank v. Derderian*, 872 F.2d 281, 286-87 (9th Cir. 1989); *see also Thos. P. Gonzalez Corp. v. Consejo Nacional de Produccion de Costa Rica*, 614 F.2d 1247, 1255 (9th Cir. 1980) ("The words 'direct effect' in the clause . . . have been interpreted as

embodying the minimum contacts standard of *International Shoe Co.* . . . and the requirement of

*Hanson* that the defendant purposely avail itself of the privilege of conducting business within

the forum. The legislative history of the [FSIA] confirms that the reach of § 1330(b) does not

extend beyond the limits set by the *International Shoe* line of cases.") (citations omitted);

*Gregorian v. Izvestia*, 871 F.2d 1515, 1528 (9th Cir. 1989) ("Personal jurisdiction under the

FSIA requires satisfaction of the traditional minimum contacts standard.") (alterations and

citations omitted). IPPs parrot DPPs' argument that the Supreme Court's 1992 decision in

*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, should be read to implicitly abrogate

*Derderian* and the line of Ninth Circuit cases that follow it (*see* IPPs' Opp. at 25), including

multiple cases decided in the decade following *Weltover*. *See Corzo v. Banco Cent. de Reserva*

*del Peru*, 243 F.3d 519, 525 (9th Cir. 2001) (citing both *Weltover* and *Derderian* for "direct

effect" analysis and noting lack of "'minimum contacts' with the United States" in finding that

the commercial activity exception did not apply); *see also Theo. H. Davies & Co. v. Republic of*

*Marshall Islands*, 174 F.3d 969, 974 (9th Cir. 1998) (citing *Thos. P. Gonzalez* six years

post-*Weltover* for the concept that the FSIA "is constrained by the minimum contacts required by

*International Shoe Co. v. Washington* and its progeny") (citations omitted). The absurdity of this

argument is demonstrated by the fact that the Supreme Court had before it in *Weltover* the exact

issue raised here—the applicability of personal jurisdiction due process standards to the "direct

effect" analysis—and *declined to rule* on it as unnecessary given the facts of that case. *See* 504

U.S. at 619 ("Argentina argues that . . . we must construe the 'direct effect' requirement as

embodying the 'minimum contacts' test of *International Shoe*. . . . [W]e find that Argentina

possessed 'minimum contacts' that would satisfy the constitutional test."). IPPs' position thus

assumes not only that the Ninth Circuit missed the implications of *Weltover* in subsequent cases,

but also that the Supreme Court itself somehow missed the implications of its own decision on an

issue raised in that very same decision.  IPPs' position is not plausible.

      Other Circuits have also noted the applicability of due process standards to the "direct

effects" analysis notwithstanding—or *because of*—the Supreme Court's *Weltover* decision. As

recognized by the Eleventh Circuit, the "*Republic of Argentina* [*v. Weltover*] Court

acknowledged that the 'direct effect' element of section 1605(a)(2) might be construed as embodying the 'minimum contacts' test of *International Shoe Co. v. Washington*. Arguably, if the direct effect requirement were not so interpreted, the exercise of federal subject matter jurisdiction pursuant to the FSIA could, in a given case, violate the Due Process Clause of the Fifth Amendment." *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1545 (11th Cir. 1993); *see also S & Davis Int'l, Inc. v. The Republic of Yemen*, 218 F.3d 1292, 1304 (11th Cir. 2000) (citing *Weltover* to support fact that "'direct effects' language of § 1605(a)(2) closely resembles the 'minimum contacts' language of constitutional due process and these two analyses have overlapped"). In *United World Trade, Inc. v. Mangyshlakneft Oil Production Association*, the Tenth Circuit extensively analyzed and applied *Weltover* in finding a lack of "*immediate consequences*" in the United States (and thus no "direct effect") because the defendants' acts were "analogous to the type of unilateral activity that the Supreme Court has found to be an insufficient basis for the exercise of jurisdiction under the Due Process Clause of the Fourteenth Amendment." 33 F.3d 1232, 1238 (10th Cir. 1994) (emphasis added).

The FTAIA in no way speaks to these jurisdictional requirements, particularly with respect to minimum contacts required for establishing personal jurisdiction. Given the fundamental differences between the FTAIA and the FSIA and the clear weight of authority interpreting the FSIA, the Court should reject IPPs' invitation to expand the reach of the commercial activity exception beyond what Congress intended and the Constitution allows.

### 2.  Alleged Participation in a Conspiracy Purportedly Affecting Prices in the U.S. Does Not Meet the Commercial Activity Exception

In determining whether the third prong of the commercial activity exception applies, the Ninth Circuit "look[s] to the place where legally significant acts giving rise to the claim occurred in determining the place where a direct effect may be said to be located." *Adler v. Federal Republic of Nigeria*, 107 F.3d 720, 727 (9th Cir. 1997). IPPs claim that the "legally significant acts giving rise to IPPs' claims occurred in the United States each time IPP class members purchased CRT televisions or monitors at supracompetitive prices." (IPPs' Opp. at 24-25.) But none of these purchases was made from either Irico Defendant, neither of which sold CRTs or

CRT Products in the United States or to U.S. customers. (Am. Wang Decl. ¶ 12-13.) Rather, IPPs'

allegedly relevant purchases were made from independent *nondefendant* intermediaries who

assembled CRTs into televisions and monitors, eventually selling or reselling those products to

members of the IPP class. The requisite causal nexus between any actions taken by Irico Group

or Irico Display and the "legally significant act" claimed by IPPs is missing.

IPPs cite the Ninth Circuit's recent decision in *Sea Breeze Salt, Inc. v. Mitsubishi Corp.*

for their claim that allegations of a price-fixing conspiracy suffice to fill this gap (IPPs' Opp. at

21), but that case actually offers a useful example of facts showing "direct effects" that are absent

here.  *See* 89 F.3d 1064, 1068 n.2 (9th Cir. 2018).[4] The "gravamen of the complaint" in that case

was the claim that it was "unlawful for ESSA," the state-owned defendant, "to distribute its salt

solely through Mitsubishi." *Id.* at 1073. As an initial matter, the FSIA issues in that case,

particularly in the Ninth Circuit decision where they are confined to a single footnote, were

overtaken by the act of state doctrine—likely because the FSIA was not raised or argued by the

defendant in that case. *See Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, No. CV 16-2345-DMG

(AGRx), 2016 WL 8648638 at *2 (C.D. Cal. Aug. 18, 2016) ("Defendant does not bring a motion

to dismiss for lack of subject matter jurisdiction . . . ."); 899 F.3d at 1068 n.2 (noting FSIA

immunity was "not pressed on appeal"). But even the limited factual discussion shows key

details, omitted by IPPs, that informed the district court's finding that there was "no break in the

causal chain," namely the fact that salt supply contracts and purchase orders from U.S. customers

were already in place when the foreign state-owned defendant breached its agreement to supply

plaintiffs with salt. 2016 WL 8648638 at *3 n.3.[5] The Ninth Circuit affirmed on this basis alone,

---

[4] IPPs chide Irico for not citing the Ninth Circuit *Sea Breeze* opinion in its opening briefs (IPPs' Opp. at 21), but fail to explain how Irico could cite a decision issued a month *after* its briefs were due. In any event, the decision, which concerns very different circumstances, is certainly not "controlling."

[5] The *Sea Breeze* district court also referred to "ESSA's alleged price-fixing" in its opinion, but that reference appears to be a mistake. No price-fixing conspiracy was alleged in that case, only unlawful exclusive dealing that directly caused the plaintiff to default on its U.S. sales contracts. *See* Complaint at ¶¶ 56-65, *Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, No. 16-2345-DMG (AGRx), 2016 WL 8648638 (Dkt. No. 1) (alleging Sherman Act Section 1 violation for "unlawful exclusive contracts" in restraint of trade, not price-fixing). The Ninth Circuit recognized explicitly that "[e]ach of the five causes of action brought by plaintiffs ha[d] at its core ESSA's alleged decision to repudiate *all* of its distribution contracts with other entities and return to distributing sale exclusively through Mitsubishi," and made no mention

---

noting that a "direct effect" was established "where a foreign state's action causes the breach of third-party contracts with United States companies."  899 F.3d at 1068 n.2 (citing *Packsys, S.A. de C.V. v. Exportadora de Sal, S.A. de C.V.*, 899 F.3d 1081, 1092 n.10 (9th Cir. 2018)). These actions—repudiating contracts and dealing exclusively—were taken by the state-owned defendant against a plaintiff in a direct contractual relationship with that defendant. *See id.* at 1067. No such direct connection is present here.

Due process considerations, incorporated into the direct effects test in the Ninth Circuit as described above, make even more clear that IPPs' conspiracy allegations alone cannot support jurisdiction over either Irico Defendant. These well-established principles demand that Irico Defendants have "sufficient minimum contacts" with the United States, which requires IPPs to show that (1) both Irico Group and Irico Display "purposefully direct[ed]" their "activities or consummate[d] some transaction with the forum or resident thereof," and (2) IPPs' claim is "one which arises out of or relates to" Irico Group's and Irico Display's "forum-related activities." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (quoting *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987)). When analyzing for "purposeful direction," "the foreign-acts-with-forum-effects jurisdictional principle must be applied with caution, particularly in an international context." *Kramer Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175, 1178 (9th Cir. 1980). In addition, "the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.* it must be reasonable." *Id.* IPPs fail to make the required showing.

In an attempt to demonstrate "purposeful direction," IPPs state in conclusory fashion that "IPPs' evidence that Group and Display agreed to fix global CRT prices, which they knew and intended would increase prices in the U.S., is sufficient to satisfy due process." (IPPs' Opp. at 25.) IPPs cite only Judge Conti's 2014 ruling regarding personal jurisdiction over Beijing Matsushita Color CRT Co., Ltd. ("BMCC"). (*Id.* at 25-26.) That ruling relied on evidence that BMCC "specifically shared CRT marketing information" for "sales to United States customers like Wal-Mart, Circuit City, and Sears, with co-conspirators," "coordinated pricing decisions in

whatsoever of a price-fixing conspiracy. 899 F.3d at 1071.

relation to United States marketing conditions," made "direct sales to a United States business," and "specifically coordinated" with a co-conspirator to inflate the prices of products containing BMCC's CRTs in the United States. *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 27 F. Supp. 3d 1002, 1012 (N.D. Cal. 2014). IPP fails to identify any such facts here. Their evidence shows no U.S. sales by Group or Display, no U.S.-related information exchanges, and, at most, the mere possibility of indirect sales of CRTs incorporated into finished products by third-party intermediaries. *See Bristol-Myers Squibb Co. v. Super. Ct. of Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1783 (2017) ("The requirements of *International Shoe* must be met as to each defendant . . . . A defendant's relationship with a third party, standing alone, is an insufficient basis for jurisdiction.") (citations omitted).

### 3. IPPs Concede that Neither Group Nor Display Made Sales to the U.S., Relying Instead on the Sales of an Independent Entity they Mischaracterize as a "Subsidiary"

IPPs concede, as they must, that neither Irico Group nor Display made any sales to the U.S. Unable to show such sales, IPPs (like DPPs) are forced to rely on an insignificant number of sales, irrelevant to this case, made by a wholly *unrelated*, state-owned company—China National Electronics Import & Export Caihong Co. ("CNEIECC"). (DPPs' Opp. at 12-14, 38-40.) As with DPPs, IPPs begin with the false statement that CNEIECC was "Group's wholly-owned subsidiary." (IPPs' Opp. at 7.) IPPs conveniently ignore the official corporate registration records available through China's National Enterprise Credit Information Publicity System that confirm Irico Group's lack of ownership of CNEIECC during the entire period of the alleged conspiracy (Plunkett Decl. Ex. B at 2)[6] and historical records proving that Shaanxi provincial

---

[6] DPPs have wrongly argued that this official corporate registration record is inadmissible hearsay. (DPPs' Objections to New Evidence in Irico Defendants' DPP Reply (Dkt. No. 5474) at 1-2.) Even if this document were hearsay (which it is not), the Court may consider hearsay evidence on a motion to dismiss for lack of jurisdiction. *Voysys Corp. v. Elk Indus., Inc.*, 1996 WL 119473, at *3 (N.D. Cal. Mar. 14, 1996) ("[T]he Court may consider affidavits when determining whether or not Plaintiff has established a prima facie showing of jurisdiction even if the affidavits contain hearsay."); *Id.* (citing *Akro Corp. v. Luker*, 45 F.3d 1541, 1546 (Fed. Cir. 1995) ("[W]e have held that hearsay 'bearing circumstantial indicia of reliability' may be admitted for purposes of determining whether personal jurisdiction obtains.")). Regardless, this document is not hearsay because it falls within the public records exception under Federal Rule of Evidence 803(8) (*See* Plunkett Decl. ¶¶ 3, 12.) The National Enterprise Credit Information Publicity System is a public database of registered Chinese corporations maintained by the Department of Credit Supervision and Administration of the State Administration for Market Regulation. (Plunkett

government authorities placed CNEIECC under the wholly state-owned China National

Electronics Import & Export Corporation ("CEIEC") as an independent subsidiary in 1987 (*id.*

Ex. A at 1).[7] CNEIECC was "a professional subsidiary directly under CEIEC [that] engage[d] in

imports of products necessary for the production by the No. 4400 factory . . . and various color

picture tube manufacturers and exports of relevant products." (*Id.*) As directed by the Shaanxi

Provincial Commission for Foreign Economic Relations and Trade:

> [CNEIECC] should operate under the national import and export plan. . . .
> [CNEIECC] should report statistical reports to the Commission as required and is
> put under the centralized management of the administrative department of
> foreign economic relations and trade. ***The company carries out operations on its
> own as an independent entity*** and provides direct services for the No. 4400
> factory and various color picture tube manufacturers. . . . [A]ppraisal, transfer
> and appointment of company leaders are subject to negotiations between CEIEC
> and the No. 4400 factory.

(Plunkett Decl. Ex. A at 1 (emphasis added).) CEIEC, CNEIECC's parent company at all

relevant times, confirmed CNEIECC's true ownership and independence in a letter to the

Shaanxi Provincial Commission:

> As a professional subsidiary ***subordinate to CEIEC***, [CNEIECC] is an
> ***independently-operated economic legal person in which the administrative
> affairs are in the charge of CEIEC***. . . . Its foreign trade businesses are put under
> the management of the Ministry of Foreign Economic Relations and Trade, the
> Commission and CEIEC jointly. . . . [CNEIECC] engages in independent
> operation with a unified accounting of imports and exports. [CNEIECC] is
> responsible for both profits and losses.

(Plunkett Decl. Ex. A at 4 (emphasis added).)

---

Decl., Ex. K.) The Department is responsible for "supervision and inspection on the registration of market
entities" as well as "the construction and management of" the online information system. (*Id.*) As
explained by Mr. Zhang, Irico's corporate representative, the "commerce registration file" is the official
source for ownership information of licensed businesses in China. (Plunkett Decl. Ex. E, Transcript
Excerpts for Deposition of Zhang Wenkai (Day 2) 36:14-37:17 ("[I]t is a common standard that when you
verify the relationship between two companies, the fact should be based on the commerce registration file.
. . . If the statement is inconsistent, or it does not reflect the commerce registration file, then it is
incorrect.").) Tellingly, IPPs do not bother explaining how Irico Group could acquire 100% of the shares
of CNEIECC in 2014 if it supposedly already owned those shares.

[7] IPPs refer to CNEIECC as "Import-Export," but this abbreviation creates confusion with CEIEC,
CNEIECC's actual parent company until 2014. Founded in 1980, "CEIEC is a state-owned enterprise,
directed by [the] Chinese Central Government to implement international cooperation in critical areas of
national security and economic development." Company, CEIEC Corporate Homepage, *available at*
www.ceiec.com/content/company (accessed Apr. 29, 2019).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IPPs attempt to "connect" Irico to CNEIECC by citing portions of documents that *mistakenly* refer to relationships that do not in fact exist. (IPPs' Opp. at 7 n.25; Saveri Decl. Ex. 1 at 105 (claiming that CNEIECC's "assets, personnel, and business all belong to" Irico Group); Ex. 25 at 126 (listing CNEIECC among "related parties" of Irico Electronics); Am. Plunkett Decl., Dkt No. 5413, Ex. 49 at -999 (chart incorrectly showing CNEIECC as "wholly-owned company" under Irico Group).) From these documents, IPPs make the false claim that CNEIECC was a wholly-owned subsidiary of Irico Group for the entire Class Period. But the official business registration file and directives issued from Chinese government ministries show that CNEIECC was independent from Irico Group at all relevant times. Errors in organizational charts cannot create ownership where in fact none exists.

Because there is no affiliation (and even if there were an affiliation), CNEIECC's sales cannot be imputed to Irico Group (and certainly not to Display) for purposes of establishing jurisdiction. *See Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1023 (9th Cir. 2017) (contacts of subsidiary cannot be imputed to parent company for establishing specific personal jurisdiction absent showing of agency or alter ego relationship); *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (jurisdiction "must arise out of contacts that the defendant *himself* creates with the forum"); *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 565 (M.D. Pa. 2009) (holding that "inter-company shipment of products . . . cross[ing] the border" to the U.S. did "not establish a basis for personal jurisdiction under the *Calder* effects test" despite price-fixing allegations). CNEIECC is not alleged to be a participant in any price-fixing conspiracy, so its sales cannot be construed as furthering that conspiracy.[8] IPPs, moreover, have not even attempted to argue that CNEIECC is an agent or alter ego of either Irico Defendant under the strict standards required by the Ninth Circuit. Nor could they. *See California v. NRG Energy Inc.*, 391 F.3d 1011, 1024-25 (9th Cir. 2004) ("presumption of independence is defeated only where a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created"), *vacated on other grounds*, *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224 (2007); *see also*

---

[8] In any event, the existence of a "conspiracy theory" of jurisdiction in which contacts may be imputed amongst conspirators is very much in doubt in the Ninth Circuit. (*See* Group's DPP Mot. at 15.)

*Williams*, 851 F.3d at 1024 (expressing doubt as to validity of agency theory to establish specific personal jurisdiction following Supreme Court's *Daimler AG v. Bauman* decision); *Corcoran v. CVS Health Corp.*, 169 F. Supp. 3d 970, 983 (N.D. Cal. 2016) ("alter ego" theory "requires such pervasive control that it can only be met where a parent corporation dictates every facet of the subsidiary's business—from broad policy decisions to routine matters of day-to-day operation" such that "injustice" would result from separate treatment) (internal quotations omitted).

IPPs ask the court to *infer* 100% ownership of CNEIECC where none existed, "pervasive control" where third parties held all rights of control, and extensive knowledge by Irico Defendants of the details of CNEIECC's exports (*see* IPPs' Opp. at 7) without any proof of such knowledge. Absent evidence, IPPs' arguments cannot succeed.

IPPs also seek to muddy the issues by pointing to sales by CNEIECC to another non-defendant entity, Irico USA, a former indirectly- and partly-owned subsidiary of Irico Group that was sold in 2001.[9] (IPPs' Opp. at 8, 22.) But as IPPs again knew, *all* of the sales by CNEIECC to Irico USA were shipped to countries other than the United States despite being billed to Irico USA, making it even more implausible that these CRTs ever made it into the hands of IPP class members. (*See* Alioto Decl., Ex. 12 at -567 ("Discharging Port" of Alexandria, Egypt); *id.* at -569 ("Discharging Port" of Durban, South Africa); Ex. 13 at -571 ("Discharging Port" of Cape Town, South Africa); Ex. 14 at -585 ("Discharging Port" of Adabiya, Egypt); Ex. 15 at -587 ("Discharging Port" of Alexandria, Egypt); Ex. 16 at -589 ("Discharging Port" of Cape Town, South Africa); Ex. 17 at -595 ("Discharging Port" of Cape Town, South Africa).) CRTs sent to South Africa and Egypt certainly cannot constitute "legally significant acts giving rise to the claim" of harm suffered by U.S purchasers.

---

[9] IPPs also omit important information about the history of Irico USA, detailed in the 2001 Irico Group audit report cited by DPPs, which demonstrates Irico Group' inability to control the company. (*See* Saveri Decl. Ex. 20.) Irico Group's indirect ownership of Irico USA ended abruptly in 2001 when General Manager Feng Liu sold the company "without authorization" and "for free" to INB Co., a company Mr. Liu founded and of which he was the sole shareholder. (*Id.* at -494-495.) Mr. Liu, acting as "Sole Director," then dissolved Irico USA in 2002. (Plunkett Decl. Ex. C (California Secretary of State document showing corporate dissolution).) In short, Mr. Liu transferred Irico USA's assets to himself, liquidated them, and absconded with the proceeds after obtaining a green card. (*See id.* at -492.)

IPPs' emphasis on CNEIECC's sales to Irico USA also fails because introducing yet another layer between Irico Group and any alleged effects in the U.S. only attenuates further those effects for jurisdictional purposes. IPPs' arguments for imputing any contacts of Irico USA are even more misplaced than for CNEIECC. IPPs once again fail to articulate a proper claim of agency or alter ego relationship with either Irico Defendant, resting their entire argument on corporate ownership by Irico Group and CNEIECC. (*Id.* at 8.) But ownership—even "[t]otal ownership"—is "insufficient to establish the requisite level of control" to impute jurisdictional contacts. *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1073 (9th Cir. 2015). This is especially true here, where any proceeds from Irico USA's activities were lost due to its manager's fraudulent activities rather than flowing up the corporate chain to Irico Group. (*See* Saveri Decl., Ex. 20 at -494-495.)

### 4.     Alleged Knowledge of U.S. Sales by Third Parties is Legally Insufficient to Establish "Direct Effect"

Finally, IPPs claim that Irico Defendants must have "targeted the U.S. market" because they allegedly had knowledge that "Chinese television manufacturers . . . were selling large quantities of televisions containing Irico CRTs into the United States." (IPPs' Opp. at 8.) Even if knowledge of U.S. sales by third parties (which IPPs have not established) could establish a direct effect (which it cannot), IPPs have failed to demonstrate that Irico had any such knowledge of U.S. sales. IPPs' attempt to impute co-defendants' knowledge to Irico belies their failure to cite any direct evidence that Irico or an Irico employee knew that its customers sold end products in the U.S. IPPs' evidence relies on the baseless assumption that the knowledge of Irico's customers or its co-defendants is knowledge of Irico.[10] Critically, IPPs cite *no communications* involving Irico Group or Irico Display employees in their attempt to establish Irico's knowledge of its customers' U.S. sales. (*See* IPPs' Opp. at 9-10.) IPPs' attempt to impute statements from non-defendant Irico Electronics' global prospectus to Irico Group or Irico Display similarly fails

---

[10] *See, e.g.*, IPPs' Opp. at 9-10; Alioto Decl. Exs. 24, 25, 29, 30, 33 (suggesting co-defendants or Irico customers sought approval or merely used Irico products for U.S.-bound end products with no indication that they consulted Irico or spoke with Irico about their end-customers' location); Alioto Decl. Ex. 32 (suggesting that American engineers visited an Irico customer to investigate mechanical issues with no indication that Irico attended those meetings).

(*see* IPPs' Opp. at 9, 23), because IPPs also ignore key passages from that document that devastate their argument. In its prospectus, Electronics noted that "[t]he Directors do not believe that the United States anti-dumping order will have a significant impact on our business." (Alioto Decl., Ex. 18 at 33.) Electronics further stated that the remainder of its products "are sold both in the domestic Chinese market and other foreign countries *besides the United States*." (*Id.* (emphasis added).) The Electronics prospectus is not only irrelevant but also confirms that Electronics and its subsidiaries (including Display) did not sell CPTs into the U.S. Consequently, IPPs' weak evidence comes nowhere close to establishing that Irico Group or Irico Display *knew* any of its products would indirectly enter the U.S. market.

Furthermore, the question of Irico's knowledge regarding exactly what its customers did with its CRTs after purchasing them is not even material to whether an effect was "direct." The foreseeability, or lack thereof, of an effect in the United States does not transform an indirect effect into a direct one, or vice versa, as the Supreme Court has recognized in rejecting a "foreseeability" gloss on the "direct effect" requirement. *See Republic of Argentina v. Weltover*, 504 U.S. 607, 618 (1992). The relevant inquiry is whether the effect "follows as an immediate consequence of the defendant's activity," *id.*, as opposed to a delayed consequence or one affected by actions of intermediate third parties. IPPs' argument that their allegedly inflated-price purchases from non-defendant, non-conspirator third parties are somehow an "immediate" result of Irico Defendants' actions in China—and therefore "direct"—turns the plain meanings of both terms on their head.

## IV.    CONCLUSION

Based on the foregoing, Irico requests that the Court enter an order: (a) dismissing the IPP Complaint against Irico with prejudice; and (b) granting such further relief as may be just and equitable.

Irico's Reply ISO Amended Motions to Dismiss
IPPs for Lack of Jurisdiction                    27          Case No. 3:07-cv-05944-JST
                                                            MDL No. 1917

Dated: May 13, 2019                              */s/ Stuart C. Plunkett*

John Taladay (*pro hac vice*)
john.taladay@bakerbotts.com
BAKER BOTTS LLP
1299 Pennsylvania Ave., NW
Washington, D.C. 20004
Telephone: (202) 639-7700
Facsimile: (202) 639-7890

Stuart C. Plunkett (State Bar No. 187971)
stuart.plunkett@bakerbotts.com
Peter Huston (State Bar No. 150058)
peter.huston@bakerbotts.com
BAKER BOTTS LLP
101 California Street, Suite 3600
San Francisco, California 94111
Telephone: (415) 291-6200
Facsimile: (415) 291-6300

*Attorneys for*
*IRICO GROUP CORP. and*
*IRICO DISPLAY DEVICES CO., LTD.*