Pages 1 - 56

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jon S. Tigar, Judge

```
IN RE: CATHODE RAY TUBE (CRT)  )
ANTITRUST LITIGATION.          )
                               )   NO. 07-05944 JST
                               )
_____)
```

San Francisco, California
Thursday, May 30, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Direct Purchaser Plaintiffs:
            SAVERI & SAVERI, INC.
            707 Sansome Street
            San Francisco, California  94111
      BY:  **R. ALEXANDER SAVERI, ATTORNEY AT LAW**
            **GEOFFREY C. RUSHING, ATTORNEY AT LAW**

            KELLOGG, HANSEN, TODD, FIGEL & FREDERICK PLLC
            Sumner Square
            1615 M Street, N.W. - Suite 400
            Washington, D.C.  20036
      BY:  **GREGORY G. RAPAWY, ATTORNEY AT LAW**

For Indirect Purchaser Plaintiffs:
            TRUMP, ALIOTO, TRUMP & PRESCOTT LLP
            2280 Union Street
            San Francisco, California  94123
      BY:  **MARIO N. ALIOTO, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

1   **APPEARANCES**:   (CONTINUED)

2   For Indirect Purchaser Plaintiffs:
                ZELLE LLP
3               44 Montgomery Street - Suite 3400
                San Francisco, California  94104
4          BY:  **QIANWEI FU, ATTORNEY AT LAW**

5   For Defendants Irico Group Corp. and Irico Display Devices Co.,
    Ltd.:
6               BAKER BOTTS LLP
                101 California Street - Suite 3600
7               San Francisco, California  94111
           BY:  **STUART C. PLUNKETT, ATTORNEY AT LAW**
8
                BAKER BOTTS LLP
9               The Warner
                1299 Pennsylvanie Avenue, N.W.
10              Washington, D.C.  20004
           BY:  **JOHN M. TALADAY, ATTORNEY AT LAW**
11
                BAKER BOTTS LLP
12              1001 Page Mill Road
                Building One - Suite 200
13              Palo Alto, California  94304
           BY:  **BRIAN JACOBSMEYER, ATTORNEY AT LAW**
14              **KAYLEE YANG, ATTORNEY AT LAW**

15  For Intervenor U.S. Department of Justice, Antitrust Division:
                U.S. DEPARTMENT OF JUSTICE
16              Antitrust Division
                950 Pennsylvania Ave., N.W. - Room 3320
17              Washington, D.C. 20530
           BY:  **NICKOLAI G. LEVIN, ATTORNEY AT LAW**

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **<u>Thursday - May 30, 2019</u>**                                         **<u>2:05 p.m.</u>** |

1   **<u>Thursday - May 30, 2019</u>**                                          **<u>2:05 p.m.</u>**

2                             **P R O C E E D I N G S**

3                                  **---oOo---**

4        **THE CLERK:**  Your Honor, now calling civil matter

5   07-5944, Crago, Incorporated v. Chunghwa Picture Tubes Ltd.

6        If counsel could please come forward and state their

7   appearances for the record.

8        **MR. SAVERI:**  Good afternoon, Your Honor.  May it

9   please the Court, Rick Saveri on behalf of the Direct Purchaser

10  plaintiffs.

11       **MR. RAPAWY:**  Gregory Rapawy on behalf of the Direct

12  Purchaser plaintiffs, Your Honor.

13       **MR. RUSHING:**  Your Honor, Geoffrey Rushing on behalf

14  of the Direct Purchasers.

15       **MR. ALIOTO:**  Good afternoon, Your Honor.  Mario Alioto

16  on behalf of the Indirect Purchasers.

17       **MS. FU:**  Good afternoon, Your Honor.  Qianwei Fu from

18  Zelle LLP on behalf of the Indirect Purchaser plaintiffs.

19       **MR. PLUNKETT:**  Good afternoon, Your Honor.

20  Stuart Plunkett on behalf of the Irico defendants.

21       **MR. TALADAY:**  Your Honor, John Taladay on behalf of

22  the Irico defendants.

23       **MR. JACOBSMEYER:**  Good afternoon, Your Honor.  Brian

24  Jacobsmeyer on behalf of the Irico defendants.

25       **MS. YOUNG:**  Good afternoon, Your Honor.  Kaylee Young

1    from Baker Botts on behalf of the Irico defendants.

2           **MR. LEVIN:**  And good afternoon, Your Honor.  Nick

3    Levin on behalf of the United States.

4           **THE COURT:**  Very good.  Welcome.

5        So I'd like to set some time limits.  I'm not quite sure

6    how to go about it.  I think the arguments made by the Direct

7    Purchasers and the Indirect Purchasers substantially overlap,

8    as do the arguments made by the United States.  So that's on

9    the one hand.

10       On the other hand, I need to give the Irico defendants the

11   opportunity to respond to all the arguments made by everybody.

12   So if I were only concerned about the first -- if I were trying

13   to balance all those things, what I might do is give each side

14   30 minutes putting three different parties -- Indirect

15   Purchasers, the Direct Purchasers, and the *amicus* -- on one

16   side and the Irico defendants on the other, but I don't know if

17   that works in injury to the plaintiffs because you probably

18   just are going to need to have some amount of overlap.

19       So I'll set the minutes willy-nilly in just a moment if I

20   don't hear a better suggestion, but does someone want to make a

21   suggestion that I can adopt that gives everybody enough room to

22   argue?  You're the only thing on calendar this afternoon, which

23   doesn't mean I want to here hours and hours of arguments, but

24   it does mean we have a little more time than we might

25   otherwise.

1          **MR. ALIOTO:**  Your Honor, Mario Alioto.

2      We have met and conferred amongst the plaintiffs and tried

3  to coordinate in advance of coming here today, and we're fine

4  with ceding most of the time to the Direct Purchasers.  We may

5  need a little time at the end; but if that's any help,

6  Your Honor, we're fine letting the Directs lead off and take

7  the majority of the time on the plaintiffs' side.

8          **THE COURT:**  All right.

9          **MR. SAVERI:**  Yes, Your Honor, Rick Saveri on behalf of

10  plaintiffs.

11      Mr. Rapawy from Kellogg Hansen is going to be handling the

12  motion for the Direct Purchaser plaintiffs, and that would be

13  our proposal, that he'll handle most of the issues; and then if

14  the Indirects needed to pick up something, they'd pick that up.

15          **THE COURT:**  All right.

16      Mr. Levin -- am I pronouncing that correctly?

17          **MR. LEVIN:**  Yes, Your Honor.

18          **THE COURT:**  Mr. Levin, how much time would you like?

19  How much time do you need?

20          **MR. LEVIN:**  I would say 10 minutes would be great.

21          **THE COURT:**  Okay.  What if I give the Direct

22  Purchasers 20 minutes, I give the Indirect Purchasers 5 minutes

23  to back cleanup, I give Mr. Levin the 10 minutes he wants, and

24  I give the defendants 30 minutes?  That's about an hour and 5

25  minutes.  It seems like that ought to work out.

1      **MR. RAPAWY:**  That sounds fine with us, Your Honor.

2      **THE COURT:**  Good.  So ordered.

3      I'm going to let the -- I will tell the defendants, these

4  are your motions so you have a right of reply.  You have to

5  allocate that yourself by just stopping talking sometime before

6  the 30 minutes is up; and then if you don't stop talking, the

7  30 minutes elapses, I'll conclude from that you've made the

8  tactical decision not to make a reply argument.

9      But it's your motion and so you can go first.  Before you

10  start -- and it's Mr. Plunkett; correct?

11      **MR. PLUNKETT:**  That's correct.

12      **THE COURT:**  Very good.  Mr. Plunkett and other

13  persons, before you start, just a couple of observations.

14      First, as to the -- much is made by the Direct Purchaser

15  plaintiffs and the Indirect Purchaser plaintiffs to the effect

16  of "Your Honor already decided all these issues so just stay

17  right where you are" and that, of course, has some superficial

18  appeal; and if I was them, I'd probably make that argument

19  also.  I might not make it as frequently or as strenuously as

20  they do, but I would make it.

21      Some things were decided subject to further discovery, but

22  they were decided, and some things were simply not decided.  So

23  the question of whether there was a direct effect in the

24  United States was decided.  That question was decided, and I'm

25  the one who sent the parties off with jurisdictional discovery.

1   So I don't think it's -- I don't know that it's 100 percent

2   correct that the Irico defendants need to meet the motion for

3   reconsideration standards.

4       I don't think that's actually helpful to hold these

5   motions up to those particular standards, but I do think it's

6   worth observing that I considered most of the same authorities

7   and not very much different information, and that's the

8   conclusion that I reached.

9       On the other hand, with regard to the question of whether

10  Irico Display is an organ of the state, I simply didn't decide

11  that question at all.  It was urged upon me by the Irico

12  defendants that Irico Display was an organ of the state, and I

13  found that the Zhang declaration, which was the only evidence

14  offered in support of that point, was not -- I was not able

15  simply to consider that declaration.  So I simply made a

16  finding that they hadn't met their *prima facie* burden at that

17  stage of the case.  So that question, I would say -- on that

18  question there is a much cleaner slate.

19      And to say just one more thing and to be a little clearer,

20  the fact that I decided on that first point before doesn't mean

21  that I've already decided it.  It just means that the

22  defendants have more of an uphill burden or uphill battle.

23      And then the last thing I would say is these motions

24  obviously are very important to the parties.  I don't regard

25  them as incredibly complicated.  They're very interesting and

they're very well briefed on both sides, but they don't have

that many moving parts.  So I look forward to your arguments.

     Mr. Plunkett, finally I'll let you have the floor.

          **MR. PLUNKETT:**  Thank you, Your Honor, and thank you

for that guidance.  I look forward to the uphill battle when I

get to that commercial activity exception.

     I'm here to respond primarily to the -- on the four

motions to dismiss.  As you've noted, there is a lot of

overlap.  Mr. Taladay is here principally to respond to

anything DOJ might raise.  There is a lot of overlap.  Subject

to Your Honor's instructions, I've said I'm not going to be

insulted if anybody jumps up when I can't answer a question or

I'm failing to make a point.

     But what I plan to do now -- and someone's going to give

me the hook hopefully after 10 or 15 minutes -- is talk about

the three main issues in the case.  The first has to do with

whether Irico made sales in the U.S.  The second has to do with

whether the commercial activity exception applies, and I'm

going to address directly the uphill battle because I think

there's no problem, Your Honor, getting up that hill.  And then

the third is one that applies to just two of the motions, and

that's whether Irico Display qualifies as an organ.

     On the first argument, we have always said, since our

first filing in this case, that Irico Group and Irico Display

made no sales in the United States and that remains absolutely

true.  There is no evidence whatsoever of any transaction between Irico and any U.S. entity period.  Irico was set up by the Chinese government to make sales domestically and that is largely what they did.

Plaintiffs try to muddy this up in a few ways.  The most significant and troubling of which is their reliance on about $7 million in sales into the United States by an entity called -- I'm going to do this for the court reporter's benefit -- China --

THE COURT:  Isn't it 8 million?

MR. PLUNKETT:  It may be 8 million.

THE COURT:  I think Mr. Saveri thinks it's 8.

MR. PLUNKETT:  Let's go with 8 because it wouldn't matter if it was a hundred million --

THE COURT:  Okay.

MR. PLUNKETT:  -- because of what I'm about to say.

So the entity is called the China National Electronics Import and Export Caihong Company; Caihong spelled C-A-I-H-O-N-G.  I think everyone here today will refer to that entity by an acronym CNEIECC, which is C-N-E-I-E-C-C.

CNEIECC is an unrelated state-owned entity that was not owned in any part by Irico Group or Irico Display during the relevant period.

THE COURT:  There's a declaration that says that; right?

1          **MR. PLUNKETT:**  There's a declaration that says that.

2          **THE COURT:**  And then there's some pieces of paper that

3    say otherwise.

4          **MR. PLUNKETT:**  There are three pieces of paper that

5    plaintiffs rely on, unfortunate documents that were created by

6    individuals who didn't --

7          **THE COURT:**  Why would someone make that up?

8          **MR. PLUNKETT:**  I don't know, but they --

9          **THE COURT:**  No, no.  Let's stop here.  I mean, I love

10   we're off to a good humored start and that sort of augers well

11   for everyone's afternoon, but let's really focus on this

12   question for a second.

13        What possible motivation could someone have had to sit in

14   a room and say, "I know what I'll do.  I'll put CNEIECC in an

15   org. chart where it doesn't belong"?

16         **MR. PLUNKETT:**  I don't know their motivation, but I

17   can give this perspective.  In a huge pile of documents, there

18   were three instances where the ownership was misstated, but

19   plaintiffs can't make a fact true by relying on documents that

20   are mistaken.  Instead, where the Court should look is to the

21   official Chinese records, which show that in 2014 after the

22   class period, 100 percent of CNEIECC was transferred by its

23   100 percent owner to Irico Group.

24        How could that transfer have taken place in 2014 if Irico

25   Group had owned any part of CNEIECC before 2014?  I don't think

```
 1   plaintiffs can stand up here --

 2           THE COURT:  Well, lots of things could have happened

 3   before 2014.  I mean, it's not as though -- it's not like chain

 4   of custody.  It's not like I know what was happening with that

 5   entity every day.  And so if someone says in 2000 -- and I

 6   don't remember what date this -- and, by the way, for the

 7   plaintiffs, there was many, over a hundred-page exhibit in

 8   which that single page showing those sales was located and

 9   nobody gave me the page number so it took me a little while to

10   find.

11       But, anyway, whatever year that was from, lots of things

12   could happen in terms of ownership change; right?

13           MR. PLUNKETT:  Nothing did happen, Your Honor.  The

14   historical records that we've cited show that CNEIECC was

15   created and at the time it became a wholly owned subsidiary of

16   an entity that has another acronym, the China National

17   Electronics Import and Export Corporation.  It became a wholly

18   owned subsidiary of that entity, which I will call CEIEC,

19   C-E-I-E-C, in 1987 and it remained as such until 2014.

20           THE COURT:  Who produced the document that contains

21   the organization chart?

22           MR. PLUNKETT:  We would have produced that document.

23   We produced all documents that we had that related in any way.

24           THE COURT:  So one of the Irico entities did that?

25           MR. PLUNKETT:  We produced those documents, yes,
```

```
 1   Your Honor.
 2              THE COURT:  Right.  Okay.
 3          MR. PLUNKETT:  But, again, we think the only -- it's
 4   an objective question and so the place to look is the public
 5   record in China of this transaction and ownership.
 6       Let's say I wouldn't have a job if my clients had
 7   perfectly consistent documents over multiple years, but I --
 8   and I will also note that the references, even in those
 9   documents, are -- they're all -- none of them are consistent.
10   One says, you know, that it's a branch, and so they're even
11   inconsistent.  The only thing that is consistent is the public
12   record.
13       I would also note, just as sort of icing on the cake, that
14   even if CNEIECC were a related entity and its sales counted as
15   our sales, which they don't, none of the sales they cite are
16   relevant.  They all concern irrelevant products.  They don't --
17   some of the products don't contain CRTs.  They were not shipped
18   to the U.S., and one of them is about a sample sale where the
19   products were sent back to China.
20              THE COURT:  Isn't it about 2,000 units, that sample
21   sale?
22          MR. PLUNKETT:  Yes.
23              THE COURT:  Yeah, I think about that transaction a
24   little differently.
25          MR. PLUNKETT:  Yeah.  And that all of those sales,
```

though, are CNEIECC so they're not Irico sales.  And plaintiffs

don't even make an effort to say, nor could they say, that

those sales could be attributed to us under some theory of

alter ego or agency.

The other way that plaintiffs try to muddy the water on

this no U.S. sales issue is by talking about Irico (USA).

There is a complicated and somewhat unclear story about this

entity, but the following facts are true and it makes Irico

(USA) Inc. completely irrelevant.  It never acted as an agent

for sales from Irico Display, there are no evidence that it

sold Irico CRTs, and all of the purchases in the record that

Irico U.S. made were from CNEIECC, the unrelated entity.  And

what is more, every single sale went to a different country,

not to the U.S.  So Irico (USA) is not relevant here.

Finally, IPPs launch an argument and say Irico had

knowledge of indirect sales, Irico knew that customers it was

selling to in China were selling into the United States; but

without going through each exhibit in detail, I will make the

following representations, which were in our reply brief.  Not

one of IPPs exhibits establishes Irico's knowledge of sales in

the U.S.

Number two, the IPPs have no evidence that any Irico

product, any Irico CRT, ever wound up in a product that was

sold in the United States.  After a year and a half of

discovery with us --

1          **THE COURT:**  Say that sentence again, please.

2          **MR. PLUNKETT:**  IPPs have no evidence of an indirect

3   sale, essentially that an Irico CRT wound up in a product that

4   was sold in the United States, and that's after many, many

5   years, as Your Honor knows, of discovery of multiple of

6   defendants, including manufacturers who sold in the

7   United States.  All they can come up with is this hodgepodge of

8   e-mails that suggest maybe there was a sale.  If they -- if

9   there had been a sale, they would have the evidence of that.

10          I'd like to move to the second issue, the commercial

11   activity exception.  To fit within this exception, Your Honor,

12   in the Ninth Circuit under the *Terenkian* case, there has to be

13   a direct connection between the act and the effect without any

14   intervening object, cause, or agency.

15          This generally means, for example, that the U.S. must be

16   the place of performance of a contract or needs to be the place

17   where a contract -- or the actions of defendants would result

18   in a breach of contract with a United States resident.  In

19   other words, there's generally --

20          **THE COURT:**  It's not a contract case.

21          **MR. PLUNKETT:**  Say again?

22          **THE COURT:**  It's not a contract case.

23          **MR. PLUNKETT:**  This is not a contract case.

24          **THE COURT:**  One of the places -- one of the points of

25   friction this afternoon -- and I thought the United States

*amicus* brief was very helpful on this point -- was the question

of whether there need to be, as your clients say, direct sales

into the United States.

**MR. PLUNKETT:**   Right.   We think that in this case

direct sales are the only thing -- in an antitrust case like

this, direct sales by our client would be the only type of

conduct that could possibly satisfy the commercial activity

exception.

So -- right.   So what I'm going to get to is that because

there's no sales, I think we're probably all going to agree

that the question under the commercial activity exception is

whether it is enough that we participated in a conspiracy that

raised global prices, including in the U.S., causing U.S.

customers to pay higher prices.   That's the theory they have to

proceed on and that's the question under the Foreign Sovereign

Immunities Act:   Is that enough to show a direct effect?

**THE COURT:**   Now, you and I can agree that under the

FTAIA there are circumstances in which -- putting the question

of state actor to one side -- okay? -- we'll take the Foreign

Sovereign Immunities Act off the table, but otherwise that

might be sufficient to hold a defendant in the case under the

FTAIA; correct?

**MR. PLUNKETT:**   There are FTAIA cases that come close

to that.   I can distinguish each one of those on the basis that

all of them --

**THE COURT:**  I can't tell what you think the answer to my question is.

**MR. PLUNKETT:**  I think the answer -- I think it's no.

**THE COURT:**  Okay.

**MR. PLUNKETT:**  I think the answer is no because the FTAIA precedent is all distinguishable on the basis that there were direct sales.  But I think the more important issue is that the FTAIA precedent cannot be applied to the Foreign Sovereign Immunities Act for several reasons, and that's the hill.

**THE COURT:**  Well, that is not where I was going.  I know you think that.

**MR. PLUNKETT:**  Okay.

**THE COURT:**  And had you said yes to my other question, I might have wondered aloud, let's say I'm a French company and I'm engaged in this conspiracy and I'm not a state actor, I'm a privately held company, or what we would in this country call a public company.  I can engage in this antitrust tortious conduct and I'm liable.

And common users of the term "commercial activity" would immediately characterize what I'm doing as commercial activity, and so then that begs the question:  What is it about the way we use that term in the Foreign Sovereign Immunities Act context that would make it not apply here?

But you didn't answer the question that way so I won't ask

1    you that question, but now you know I'm thinking that.

2        **MR. PLUNKETT:**  Okay.  Now I know what you're thinking.

3    In that case with a private company, they don't -- their source

4    of personal jurisdiction in a U.S. court is not the Foreign

5    Sovereign Immunities Act.

6        **THE COURT:**  Right.

7        **MR. PLUNKETT:**  Rather, it would be, you know, all of

8    the due process precedent or the long-arm statute of the

9    specific state where they were sued and due process

10   limitations.

11       When it's a foreign sovereign, as it is here, the source

12   of personal jurisdiction is the Foreign Sovereign Immunities

13   Act; and so in the Ninth Circuit, personal jurisdiction

14   standards have to be met under the commercial activity

15   exception.

16       **THE COURT:**  Actually now that I think about it, that

17   thought that I uttered is not that helpful because "commercial

18   activity," that phrase is not really where the action is this

19   afternoon.  Direct effect is really where the action is.

20       **MR. PLUNKETT:**  Yeah.  I agree with that.

21       I'd like to make my points on why, even though we think

22   those FTAIA cases are distinguishable and don't stand for the

23   proposition that conspiracy is enough -- I'll use that

24   shorthand -- those principles, even if they did exist under the

25   FTAIA, cannot and should not be applied under the Foreign

1   Sovereign Immunities Act.

2       The statutes use very different language.  They have the

3   single words "direct" and "effect" in common, that's true, but

4   they have very different purposes.  The FSIA is jurisdictional.

5   It's not an antitrust statute.  It applies in personal injury,

6   contract, and antitrust cases alike, and it is the only source

7   of jurisdiction over a foreign sovereign.

8       The FTAIA couldn't be more different.  It is an antitrust

9   statute that informs the merits of the case and adds additional

10  elements to Sherman Act claims involving foreign trade.

11      For that reason, courts do not conflate the two statutes.

12  A search for -- a search in Supreme Court cases, Ninth Circuit

13  cases, and all district courts within the Ninth Circuit turns

14  up only three decisions that even mention FTAIA and FSIA in the

15  same decision.  One of those is irrelevant so I'm not going to

16  talk about it, the other one is this Court's order setting

17  aside the default in this case, and the third one is a

18  Ninth Circuit case called *LSL Biotechnologies*.

19      In *LSL Biotechnologies*, there's one paragraph where the

20  court says:  This is an FTAIA case and we need to define the

21  word "direct."  It just so happens that the Supreme Court just

22  did that in the *Weltover* case so we're going to use that

23  definition.

24      There's no discussion by the Ninth Circuit that these

25  statutes are -- that these statutes are comparable or they

1    should --

2         **THE COURT:**  I don't know if Mr. Taladay's note already

3    told you this, but you've been going about 15 minutes.

4         **MR. PLUNKETT:**  Yeah, he did just tell me that.  I'm

5    going to finish this point up and then sit down before I get

6    yelled at.

7         So *LSL Biotechnologies* --

8         **THE COURT:**  For the benefit of the record, I'm not

9    going to yell at you.  I don't know about Mr. Taladay.

10        **MR. PLUNKETT:**  I was referring to Mr. Taladay for the

11   record.

12        *LSL Biotechnologies* cannot bear the weight that plaintiffs

13   and the DOJ want to put on that paragraph that these statutes

14   can be read together.  That one paragraph in the Ninth Circuit

15   case caused several other courts in the Second and

16   Seventh Circuit to say, "Wait a second, Ninth Circuit.  These

17   statutes are very different."

18        And then the final point I'm going to make is that there

19   are five Ninth Circuit cases which hold that under the

20   direct-effect standard, you have -- under the exception, you

21   have to consider personal jurisdiction standards.  They are

22   part of the direct-effect standard.

23        And plaintiffs have said that the Supreme Court overruled

24   that line of cases in *Weltover*.  Nothing can be further from

25   the truth.  It's the one case I brought up here to read.  It's

1  very short.  I'm not going to read it, but it does -- what the

2  Supreme Court does in that case is actually apply due process

3  standards when considering the commercial activity exception.

4  It not only didn't overrule what the Ninth Circuit had held, it

5  followed it.

6      And I'll reserve the rest of our time.  Thank you,

7  Your Honor.

8          THE COURT:  Thank you, Mr. Plunkett.

9      Mr. Taladay.  Or do you want to wait and save it for reply

10 to after Mr. Levin has put his oar in the water, or what do you

11 want to do?

12         MR. TALADAY:  Yes, I prefer to do that, Your Honor.

13         THE COURT:  Very good.  Okay.

14     Let me hear, then, from the plaintiffs.

15         MR. RAPAWY:  Thank you, Your Honor.

16     And may it please the Court, I would like to start with

17 the --

18         THE COURT:  Is it Mr. Rapawy?

19         MR. RAPAWY:  Yes.

20         THE COURT:  Very good.

21         MR. RAPAWY:  Thank you, Your Honor.

22     I would like to start with the organ question, Your Honor,

23 which you had described as being open.  I think it is a

24 complicated one because there are a number of factors, but

25 ultimately those factors all point in our direction.

1      Display was -- I'm sorry -- was not an organ of the

2  Chinese state in November 2007 because it was engaged in a

3  characteristically private activity of manufacturing and

4  selling display tubes to earn profit for its shareholders.  And

5  at that time in 2007, its shareholders were more than two

6  thirds private.  So the majority of its profits and the

7  majority of its assets were going for private benefit.

8      That is the overarching question of whether it is engaged

9  in a public or private activity, which the six factors that are

10  applied by the Ninth Circuit in cases such as *Powerex* and

11  *Patrickson* are meant to inform.  And when you walk -- then go

12  ahead to walk through those six factors, each of them continues

13  to point in the same direction of saying this was a company

14  that was engaged in private and not in public activity.

15      The first factor, as Your Honor knows, is the

16  circumstances of Display's creation, and we think that the

17  controlling document there is the 2006 version of the Articles

18  of Association.  Your Honor will recall that in your previous

19  opinion we had tried to rely on the 2008 version.  You said

20  that you needed to see something from before the filing of the

21  complaint, quite correctly.  We now have the 2006 version.  It

22  is quite unambiguous that this is a standardized joint stock

23  company formed under the same laws that apply to all Chinese

24  companies, whether private or public, the company law and the

25  securities law.

1       There's some further explanation of that legal framework

2   in our expert declaration by Professor Milhaupt.  So in our

3   view that factor points in our favor.

4       And even if you were -- and, now, Display will say that

5   you should look at the earlier documents, the ones from 1992

6   and 1995, in which they were originally set up as a majority --

7   in fact, as a wholly owned public company and then there was

8   private investment allowed, but I think that the correct

9   approach is to look at it at the time of the filing of the

10  complaint.  And we've cited the *Janvey* case from the

11  Fifth Circuit in our briefs on that point, and I think it is

12  persuasive.

13      The second factor is the purpose of the activities, and

14  this in some respects is sort of a miniature version of the

15  overall question, whether the purpose is a public purpose or a

16  private purpose.  And we maintain that making profit for a

17  largely private shareholder is a private purpose, and that that

18  was the -- and the record -- in the record Display is

19  consistently described as a competitor in the market with other

20  companies and as attempting to meet demand and maximize its

21  sales and maximize its revenues and minimize its costs in the

22  same way.

23          **THE COURT:**  I think you probably win on this point.

24          **MR. RAPAWY:**  Understood.

25          **THE COURT:**  I'm just telling you.  I mean, I think

1   about this question of, well, you have to build a hospital or

2   you've got to build a school or something.  You know, there are

3   lots of instances in which, particularly in even slightly more

4   regulated economies than the one we have in the United States,

5   in which the government will require corporations to do certain

6   things that produce a public benefit.  "You have to build this

7   blah, blah, blah before we'll let you, you know, relocate

8   here," that sort of thing.

9        And the idea that making their workers better off is a

10  public benefit, all corporations that pay their workers make

11  their workers better off.  I really think the fight today is

12  going to turn out, for the most part, to be about direct

13  effect.

14           **MR. RAPAWY:**  Okay, Your Honor.

15           **THE COURT:**  That's not the only issue but it's by far

16  the biggest one.

17           **MR. RAPAWY:**  I can certainly move ahead to that if

18  Your Honor would prefer.

19        On the question whether they had to build hospitals,

20  Your Honor, a factual point that I think I would like to assert

21  against the reply is Display itself does not build hospitals.

22  It was Group that built hospitals and one-third of Display's

23  profits went up to Group to use for that if it wanted to.

24        Very briefly on the rest of the factors, the independence

25  from the government, we think that is largely controlled by the

1    Articles of Association that have very strong independence

2    language in them; and their corporate representative, as we

3    explain in our brief, adopted the relevant parts of the

4    Articles and of their 2007 annual report.  All this very strong

5    independence language, when we got him on the stand or at the

6    table, he said, "Yes, what's written is just how it is."  And I

7    think that the declaration that they rely on to the contrary is

8    neither based on personal knowledge nor at all persuasive in

9    light of those concessions.

10         On the fourth factor, which is financial support of the

11   government, we rely on the figures from their own annual report

12   to show that it was less than 1 percent of their operating

13   revenues in 2007.

14         On the fifth factor, there's no contention that most of

15   their employees were civil servants.  There's an argument about

16   the senior management, but I think we have the better of that

17   one; and even if we don't, I don't think it matters.

18              **THE COURT:**  Jo Ann, can you type that fast?

19              **THE REPORTER:**  Yes.

20              **MR. RAPAWY:**  I will attempt to slow down, Your Honor.

21   My apologies.

22         And then the sixth factor, the special privileges and

23   obligations, things like being immune from taxes, being immune

24   from private suit, they don't have any of that under Chinese

25   law and they don't claim to.

1          On the direct-effect point, Your Honor, we do maintain

2     that the overall principle is that where a defendant is engaged

3     in a global cartel and where the United States is a major

4     market for the products that are price fixed or products as to

5     which the price fixed products are a substantial cost

6     component, that is sufficient.  They know that they are

7     changing prices in the United States through their actions

8     overseas, and that is enough for jurisdiction under either of

9     the FSIA or the FTAIA or, for that matter, the due process

10    clause.

11         A defendant that is engaged in one of these cartels simply

12    cannot say in a U.S. court, "Well, I may have fixed prices in

13    your country -- that affected your country, but you have no

14    jurisdiction over me."

15         I think that that -- that the argument that the FSIA

16    requires direct sales is almost entirely foreclosed by the

17    language of the statute.

18         **THE COURT:**  I have it open in front of me.

19         **MR. RAPAWY:**  Well, Your Honor, as you know, then,

20    there are --

21         **THE COURT:**  Is it possible that you're about to refer

22    to the fact that subsection (2) focuses on an act performed in

23    the United States and that subsection (3) focuses on an act

24    outside the territory of the United States?

25         **MR. RAPAWY:**  It was possible, Your Honor; and if

1  Your Honor does not find that point persuasive, I'm happy to go

2  on.

3       **THE COURT:**  No, no, no.  I'm acknowledging the point

4  in advance of its having been made.  So you can make the

5  argument.  I want to hear what you have to say.  This is the

6  thing I was probably thinking about when I got on the bench

7  this afternoon.

8       **MR. RAPAWY:**  Very good, Your Honor.

9       Well, I do think the text is in just the way Your Honor

10 has suggested it is.  If not controlling, it gets us almost all

11 the way there all on its own and then the case law from the

12 Ninth Circuit, the *Hsiung* case, which is an FTAIA case.

13      And I do want to address the question -- the question as

14 to whether direct effect under the FTAIA and under the FSIA

15 should be given different meanings.  And I think that if you

16 look at *LSL Biotechnologies*, which I know Your Honor has

17 because you already cited it, and if you look at the way that

18 that test is further applied in *Hsiung*, you see that what those

19 cases are doing is they are taking the definition of "direct

20 effect" from *Weltover*, which -- and *Weltover* itself is an FSIA

21 case -- and they're saying applying that definition, it is met

22 under these fact patterns that are not really distinguishable

23 from our own.

24      So, Your Honor, if there were doubt about whether the FSIA

25 and the FTAIA should have different definitions of "direct,"

then that might mean that the Ninth Circuit's analysis in *LSL*

or in *Hsiung* was not correct, but those cases would still help

us because they were applying the *Weltover* standard and the

*Weltover* standard is unquestionably controlling here.

We've also cited the *Flat Panel* case, which I think is

persuasive, from Judge Illston on the same point.  And then we

have the *Sea Breeze* case, which is under the FSIA itself.  When

we were last before Your Honor, actually Your Honor found that

case so I can't take really credit for finding it, but you had

relied on the district court case.  It's now been affirmed by

the Ninth Circuit.  There is a footnote in the Ninth Circuit

decision saying they agree with the district court's analysis.

The district court's analysis is directly on point here.

There is an attempt in the reply to distinguish *Sea Breeze*

by suggesting that there were breaches of contract in that

case, and there are not breaches of contract here in the

United States; but I believe that if you refer to those cases,

you will see that in *Sea Breeze*, the breaches of contract were

not breaches of contract by a Mexican foreign sovereign entity

in the United States but, rather, the Mexican foreign sovereign

entity breached a case -- breached a contract with an

intermediary called Innofood and then Innofood breached the

contract with Sea Breeze, which was the United States entity.

So after taking that into account, the case is still

directly inconsistent with the direct sales requirement or

1   direct breach of contract requirement that they claim controls

2   here.

3        Their cases do not support a direct sales rule, the ones

4   that they cite.  I will rest on the briefs on that point unless

5   Your Honor wants to talk about one of the cases that they cite.

6        I think the facts that we have, based on the licensure

7   report and on the meeting e-mails, show that there was at least

8   awareness of effect on the United States market and that that

9   is enough under the FSIA and FTAIA standard.

10       On the question of whether the minimum contacts

11   requirement is incorporated, I think the best reading of

12   *Weltover* is that it is not, and I think the discussion of the

13   due process requirement in *Weltover* does not conflict with

14   that.  Because what the Ninth Circuit -- excuse me -- what the

15   Supreme Court did in *Weltover* is it first did the statutory

16   analysis under the FSIA, and then it went on to say "It's

17   argued that there's a constitutional problem here, but we don't

18   have to reach that question because there would have been the

19   normal contacts anyway."

20       If, as Irico has claimed, the direct contacts -- or the

21   minimum contacts requirement were part of the FSIA requirement,

22   then they would have done it as part of the statutory analysis,

23   not as a separate means of avoiding the constitutional

24   question.

25       That said, if there is doubt about that, I think we have a

very good case for minimum contacts in the United States based
on Judge Conti's earlier analysis even without direct sales.  I
don't think that direct sales are required under the due
process clause, and so Your Honor could certainly tie that
point off completely by finding, as the Supreme Court did in
*Weltover*, that on these facts we have minimum contacts
regardless of whether it's required.

     On the question of whether there were direct sales in the
United States and this whole issue with the intermediary, which
we've called import/export in our briefs, and the Irico (USA)
entity, we rely on this evidence not to attempt to attribute
those sales up the chain by piercing every veil, but to
reinforce our showing that when they entered into the cartel
and when they fixed the prices, they were well aware of the
effect that that would have on U.S. prices because they were
watching the U.S. market trying to get into the market and
through the subsidiary, I would say, even making a few sales in
the U.S. market.

     And I'm referring to a -- especially to these so-called
sample sales.  I don't think the record compels the conclusion
that there were samples -- those were samples.  Excuse me.
They do say they were samples, but we have an invoice showing
the sale.  They do not have any documentation or evidence
showing that they took those products back.  They do not have a
witness to say that and they don't have an exhibit to say that

1   unless I have missed something, Your Honor.

2         THE COURT:  Well, I'm sure they'll say on reply if

3   they think you did miss something.

4         MR. RAPAWY:  I'm sure they will, but I didn't find one

5   when I was preparing for this so I'll look forward to hearing

6   if I missed something.

7       And so a mere representation from counsel, while I'm sure

8   they believe it to be true and they're stating it as fact --

9         THE COURT:  But there's participation in these

10  meetings, which is not -- the participation in the meetings

11  discussing the conspiracy, this also is not disputed in the

12  record.  It doesn't need to be for today's purposes, but it's

13  not disputed I don't think.

14        MR. RAPAWY:  I agree, Your Honor.

15        THE COURT:  I'm saying that out loud because also I

16  would like to be corrected on reply if what I just said is

17  wrong.

18        MR. RAPAWY:  Your Honor, if they were to dispute the

19  participation in those meetings, it would be for the first time

20  today with one exception.  There was a footnote in the reply in

21  which they say that we didn't show that Display had employees

22  present at those meetings.

23      And I was surprised to see that because one of the people

24  who was present at those meetings -- at a number of those

25  meetings was Mr. Wang Zhaojie, who was their declarant on

1    behalf of Display and their 30(b)(6) representative on behalf

2    of Display and who they claim had extensive familiarity with

3    Display because he was responsible for running Display's

4    overseas sales.

5        Now, he may not technically have been an employee of

6    Display, in fact he was not, but I think it is a reasonable

7    inference from the fact that they have described this intimate

8    knowledge that he had of Display's activities and the fact that

9    he was present at these meetings.

10       And I can cite you for examples to the 2017 Saveri

11   declaration, Exhibits 13, 14, 19, 21, 23, 30, and 32.  He was

12   present at all of those.  So the idea that Display didn't know

13   what was going on at these meetings is, I think, Your Honor,

14   not credible on this record.

15       I did want to make one additional point in response to

16   something that --

17       **THE COURT:**  Knowing that -- I mean, this is a little

18   bit of a frolic, but knowing that a conspiracy was discussed at

19   a meeting doesn't make you a participant in a conspiracy under

20   any version of conspiracy law that I'm aware of, does it?

21       **MR. RAPAWY:**  Well, but the question -- I mean, so that

22   on the merits question we have to prove that they participated

23   in the conspiracy; but for the personal jurisdiction question,

24   we have to prove that they were aware of the -- well, we do

25   have to prove that they participated in the cartel, and I do

1    think you can infer that from the documents.

2         But the main point I'm making is that, you know, the claim

3    that Display didn't know what was going on in the United States

4    is --

5              THE COURT:  Hard for you to believe.

6              MR. RAPAWY:  It is hard for me to believe, Your Honor.

7    I hope it's hard for you to believe as well.

8         And the one last point I wanted to make in response to

9    something that Mr. Plunkett had said was that he had said that

10   Irico was set up for domestic sales.  If you refer to page 247

11   of their 2007 annual report, which is one of our -- one of our

12   exhibits -- no, no.  I'm sorry.  It's Amended Plunkett

13   Declaration, Exhibit 2.  It's the 2007 annual report.  You will

14   see that there's a note there that 21.5 percent of Display

15   sales were overseas.

16        So maybe that is them consolidating something from another

17   entity, but based on the annual report itself, this is clearly

18   an entity that believed itself to be doing business in the

19   export market consistent, frankly, with all of the meeting

20   e-mails and discussions.

21             THE COURT:  Let me come at this a slightly different

22   way.  Wasn't Group -- to the extent that Group was involved in

23   the conspiracy, was there any other manufacturers of CRTs to

24   which they could have been referring when they were making

25   their promises to keep prices high other than Display?

1          **MR. RAPAWY:**  I don't think so, Your Honor.

2          **THE COURT:**  Okay.  I mean, I think that's the point.

3          **MR. RAPAWY:**  I'm happy to take the correction,

4    Your Honor.  I think that's an excellent way to put it.

5          Unless you have further questions, I think I'll probably

6    turn it over to Mr. Alioto at this point.

7          **THE COURT:**  All right.  Very good.

8          **MR. RAPAWY:**  Thank you, Your Honor.

9          **THE COURT:**  Mr. Alioto.

10          **MR. ALIOTO:**  Thank you, Your Honor.

11          I just wanted to make one point about the record that we

12    have before Your Honor.  This is unusual.  Usually this type of

13    motion would come up at the inception of a case.  Here we have

14    a complete trial, pretrial record.  We have a case prepared for

15    trial and a full record.

16          And I wanted to just emphasize on this question of direct

17    effect, you couldn't have a fuller picture of that, and I'm

18    sure these other cases that raised these questions at the

19    inception of the case have no record anything like what we have

20    here.

21          The Indirect Purchasers --

22          **THE COURT:**  It is a little strange.  Can I just say

23    it's a little strange?  I reread my February 2018 order before

24    I took the bench, and it just offhandedly says, "Well, the DPPs

25    want discovery so everybody can have discovery."  But in 99 out

```
 1   of 100 other cases, that order would have been the end of it,
 2   and we would have just started litigating --
 3            MR. ALIOTO:  Yes.
 4            THE COURT:  -- but that's okay.
 5            MR. ALIOTO:  Yes.
 6            THE COURT:  And next time the DPPs will say,
 7   "Your Honor, we're withdrawing our request for discovery if you
 8   rule a certain way."  So...
 9            MR. ALIOTO:  And although the record is complicated
10   and there's quite a bit of factual material in the record, I
11   think it does make Your Honor's life a little easier because
12   we're not talking about allegations here.  We're not talking
13   about we believe there was a direct effect on the United States
14   or we think or we have alleged.
15        We, the IPs and the DPs as well, the Direct Purchasers,
16   have prepared a case and you have before you the highlights of
17   that case and you have before you, for example, in the Indirect
18   case our expert report, a report that said there were meetings,
19   a report that summarized the evidence, a report that went so
20   far as to say that "I've reviewed all of these documents and I
21   have done my economic work and I have done my econometrics, and
22   I determined that there was impact in the United States, there
23   was impact on purchasers in the United States."
24        That is -- that's the essence of what we're dealing with
25   here.  That's direct effect, not a sale here or a sale there;
```

impact in the United States.  And we have it based on the
evidence and based on expert testimony.  We have that in front
of Your Honor.

Furthermore, and this is something you don't get on these
motions because of the way they come up at the beginning of the
case, you have our expert, and I believe the Direct's expert as
well, opining on percentage overcharges.  I believe it's
9 percent on picture tubes and double digit on -- 9 percent on
television, 25 percent on computer monitors.  You do the math.
9 percent, 25 percent on the amount of sales involved, sure,
their sales are in the millions of dollars that we know of so
far.  We haven't had as much discovery on that as we would like
and we intend to get that, but you figure their sales in
conjunction with the sales of all of the other defendants
because it's joint and several liability on all of the sales,
you apply those overcharges to those sales, 9 percent and
25 percent, and you can see you're talking about damage in the
billions of dollars to purchasers in the United States.

That is the direct effect, not an allegation, not my idea
of what's going on, but after several years of discovery, that
is the evidence.

And I think that makes Your Honor's job -- I hope it makes
Your Honor's job a lot easier to come to the conclusion that
there was this direct effect and that the commercial activity
exception would apply and that the motion would be denied on

1    those grounds.

2         **THE COURT:**  Thank you.

3         **MR. ALIOTO:**   Thank you, Your Honor.

4         **THE COURT:**  Mr. Levin.

5         **MR. LEVIN:**  May it please the Court, first off, we

6    welcome the -- or we appreciate the ability to appear here

7    today to address the proper legal framework governing the FSIA.

8    We only have a couple points to make on the organ prong.

9         **THE COURT:**  I just completed a term, a three-year

10   term, as the judicial representative to the American Bar

11   Association section on antitrust laws.  I was the judicial

12   representative and in that role I got to appreciate to a very

13   great degree the role that both the Antitrust Division and the

14   Justice Department and the Federal Trade Commission play in the

15   enforcement of the United States antitrust laws, and so it's my

16   pleasure to welcome you here today and listen to what you have

17   to say.

18        **MR. LEVIN:**  Thank you, Your Honor.  We appreciate

19   that.

20        On organ we only have two brief points.  We disagree with

21   two of the Irico defendants legal arguments.  First, a company

22   is not an organ simply because it makes money for the state as

23   a shareholder.  If that were sufficient, the companies in

24   *Patrickson* would have been organs.

25        Second, foreign state control --

1          **THE COURT:**  Say the name of the case again.

2          **MR. LEVIN:**  *Patrickson versus Dole Foods.*

3          **THE COURT:**  Right.

4          **MR. LEVIN:**  And, second, foreign state control is not

5    self-sufficient for organ status.  A foreign state could

6    control -- wholly control an ordinary commercial enterprise,

7    and for this I would point the Court to the *Victor Fine Foods*

8    case.  In there the processing plant was wholly owned by the

9    state indirectly and, thus, controlled by it but it wasn't an

10   organ.

11        So on both of these points, this is why the relevant

12   inquiry is holistic looking at all the relevant factors and not

13   a single factor.  Other than that, on organ we're content to

14   rest on our submission.

15        On direct effect, we appreciate -- we're glad that you

16   found our submission useful.  I'd like to say a few remarks

17   that are mostly directed at the RICO [sic] defendants' reply,

18   and then I'd also like to --

19          **THE COURT:**  I think they said "Irico."

20          **MR. LEVIN:**  Oh.  The Irico defendants' reply.  Then --

21          **THE COURT:**  You're in the Justice Department.  You're

22   used to saying the word "RICO," but I think it's Irico.

23          **MR. LEVIN:**  I've been told better and I should have

24   known it's Irico.  Thank you.

25        But I'd also like to get to the Court's question on why

1   the FTAIA is useful in this specific context here.

2        On direct effect, we're here for the limited purpose of

3   asking the Court to reject the Irico defendants' argument that

4   a foreign state must make sales in the U.S. to fall within the

5   third prong.

6        And as this Court recognized based on a reading of the

7   statute, sales in the United States already fall within the

8   first prong or the second prong.  The Irico defendants never

9   explain what -- under their proposed rule, what would fall in

10  the third prong but not the first, and we respectfully submit

11  that their proposed rule robs the third prong of any meaningful

12  function.

13       In support of their proposed rule, the Irico defendants

14  advance three incorrect arguments.  First, that it's required

15  by precedent; second, that it's necessary to render the statute

16  constitutional in order for there to be sufficient minimum

17  context --

18            THE COURT:  Would you hold on a moment, please.

19            MR. LEVIN:  I'm sorry?

20            THE COURT:  Just hold off a second.  I'm making a note

21  of something you said.

22                      (Pause in proceedings.)

23            THE COURT:  Thanks.  Go ahead.

24            MR. LEVIN:  Second, that it's necessary to render the

25  statute constitutional; and, third, that it's -- that their

1    proposed rule is necessary for there to be a legally

2    significant act in the United States giving rise to the claim.

3    We respectfully submit that each of these three arguments are

4    inconsistent with Ninth Circuit precedent.

5        First, their proposed legal rule is not mandated by

6    precedent, and we respectfully submit that it's flatly

7    inconsistent with the *Sea Breeze* case in which the foreign

8    state defendant, ESSA, made no sales in the United States.

9        Second, a defendant need not make -- assuming that minimum

10   contacts apply, a defendant need not make sales in the

11   United States to have minimum contacts with the United States,

12   and this is made clear by the *Schwarzenegger* case that they

13   cite, which says that purposeful direction at a forum is

14   sufficient for minimum contacts even absent a sale.

15       Third, a defendant does not need to make sales in the

16   United States for there to be a legally significant act in the

17   United States giving rise to the claim, and this is made clear

18   by the *Lyon* case that we cite in our statement of interest.  In

19   that case, the legally significant act in the United States was

20   the plaintiff's death, not the sale of the defective

21   helicopter, which was entirely abroad.

22       As for the Court's question on the FTAIA, we think it's

23   useful because of the way the Court applied the direct-effect

24   requirement in *Hsiung*, and its useful for the limited

25   proposition just as support, it's not binding, but for the

notion that price fixing of a component product can have a
direct effect on the price of finished goods in the
United States even if the fixing of the component prices was
entirely abroad.

THE COURT:  So I want to go back to a couple of points
you just made in reverse order.

So, first, you were talking about a legally significant
act in the United States.  I gather that in the view of the
Department of Justice, that in an antitrust conspiracy case,
the legally significant act is a consumer injury in the form of
higher prices; correct?

MR. LEVIN:  Yes, Your Honor.

THE COURT:  And you tried, with mixed success in your
brief, to avoid talking about the specifics of this case and to
operate at a slightly higher level of generality.  I'm not sure
I can do that with this next question, which goes back to your
point, which I think -- in which I think you said:  As long as
the defendant has minimum contacts, there's no direct sales
into the United States necessary and purposeful direction at
the forum is sufficient to establish minimum contacts.  Right?
That's the point you made.

MR. LEVIN:  It can be sufficient.

THE COURT:  It is a way of demonstrating minimum
contacts.

MR. LEVIN:  Yes.

1    **THE COURT:**  So my question for you is:  To the extent

2    that you're familiar with the record in this particular case,

3    what's the purposeful direction?

4    **MR. LEVIN:**  Well, we're not here to talk about the

5    facts in this particular case.

6    **THE COURT:**  I was worried you might say that.  That's

7    okay.  That's fine.  You don't have to address it.  Your answer

8    is consistent with your brief.  I might ask one of the

9    plaintiffs to stand up and answer just that question in a

10   minute, but go ahead.

11   **MR. LEVIN:**  What I was going to say was the purposeful

12   direction that gets context through cases like *Calder v. Jones*,

13   cases like the *Western States Wholesale Natural Gas* case, and

14   they talk about there's a variety of requirements that go into

15   it.  I mean, so we're not talking about its application here,

16   but we do think I would point the Court to those cases.

17   **THE COURT:**  No, I'm familiar with the general

18   principle that purposeful direction is sufficient to establish

19   minimum contacts.  I'm just wondering in this particular case

20   what form that takes; but you're right, that's someone else's

21   job this afternoon.  It doesn't have to be your job.

22   **MR. LEVIN:**  The last point I would make, unless the

23   Court has further questions, is that defendants' submission, it

24   disregards the way in which different parts of a conspiracy can

25   work together.

1      They're operating under the false premise that a

2   conspiracy is the sum of its sales.  However, as we pointed out

3   in our submission, there's some conspiracies that don't involve

4   sales at all, such as group boycotts in the United States where

5   the conspirators don't have any sales in the United States,

6   like group boycotts, that, nonetheless, have -- can have a

7   direct -- substantial and direct effect in the United States

8   and would be within the third prong.

9      And also the relevant acts in an antitrust conspiracy are

10  not just the sales.  It includes other types of acts, such as

11  restricting production, creating an agreement to devise

12  cheating, and so on.  For example, if a defendant planned to

13  sell in the United States but then didn't because pursuant to

14  an agreement in a conspiracy, it can cause -- the act of

15  foregoing the sale can cause a direct effect in the

16  United States even without the actual sale.

17      In a conspiracy often the parts are interrelated and

18  dependent.  For example, an agreement to raise price, it

19  wouldn't have any effect if everybody else is going to increase

20  output.  So there's often multiple parts to a conspiracy and

21  the direct effect can come from any of them.

22      So if this Court has no more questions, we appreciate the

23  ability to appear here today.  Thank you.

24          **THE COURT:**  I don't have any more questions.  Thank

25  you.

1    Would one of the plaintiffs -- before the reply happens,

2    would one of the plaintiffs stand up and, limiting yourself

3    carefully just to this question, would you answer the question

4    of what you think -- if I find it necessary to go down this

5    path, what the purposeful direction at the forum of the

6    United States was on the part of the Irico defendants?

7            **MR. RAPAWY:**  Yes, Your Honor.  I think that we would

8    say that the purposeful direction, if Your Honor goes down that

9    path, is the fact that they knew and intended that they would

10   increase prices in the United States through the operation of

11   the cartel as shown by the meeting notes where U.S. dollar

12   prices and U.S. market conditions were discussed.

13           **THE COURT:**  Thank you.

14       Reply.  Mr. Taladay.

15       **MR. TALADAY:**  Your Honor, I'll speak just for a few

16   minutes and reserve a few minutes for my colleague,

17   Mr. Plunkett.

18           **THE COURT:**  Very good.

19       **MR. TALADAY:**  First to speak to the DOJ points.  The

20   DOJ said several times in its brief that it takes no position

21   on the facts of this case, but it did take a position on the

22   facts of this case.

23       The DOJ investigated this case for more than six years.

24   It's a massive investigation into this market under these facts

25   with these alleged co-conspirators.  There was a leniency

1    applicant.   There are numerous subpoenas.   There were multiple

2    cooperating defendants that they had access to, millions of

3    documents, dozens of witness interviews, cooperation with

4    foreign authorities who conducted dawn raids and prosecution

5    and a guilty plea in the United States.

6         And based on this massive investigation, which the DOJ

7    Antitrust Division conducted, the DOJ's position on the facts

8    was that it took no action with respect to Irico.

9         **THE COURT:**   But hold on.   There are so many defendants

10   in this case who were not criminally prosecuted who paid

11   millions or many millions of dollars in settlement money, not

12   out of motives of charity but because the evidence against

13   them, presumably, was sufficient to cause them and their

14   counsel's general to conclude they better pay the money rather

15   than go to trial.

16        I'm taking too long to say this.   I don't know that a

17   nonprosecution decision weighs very much.

18        **MR. TALADAY:**   Your Honor, it was beyond a

19   nonprosecution decision.   In fact, the DOJ did not subpoena

20   Irico.   It didn't request interviews of Irico employees.   It

21   didn't even contact U.S. counsel of record in this case for

22   Irico.   It made --

23        **THE COURT:**   Why is the exercise of prosecutorial

24   discretion relevant today?

25        **MR. TALADAY:**   Well, Your Honor, if the U.S. DOJ

```
 1   believed that there was, as they imply in their brief, an act
 2   by a nonsovereign that had direct effect in the United States,
 3   one would expect them to execute on their responsibility to at
 4   least investigate that, and I for one repudiate the suggestion
 5   that they failed in their obligation to discharge their
 6   responsibilities.
 7       The --
 8           THE COURT:  Is your point that you think the Justice
 9   Department changed its mind about either the sovereign status
10   of the Irico defendants or their culpability in the conspiracy?
11           MR. TALADAY:  I'm sorry, Your Honor.  I didn't hear
12   the question.
13           THE COURT:  Well, I just want to know where we're
14   going.  Is your point that you feel the United States has
15   changed its mind either about the sovereign status of the Irico
16   defendants or their culpability in the conspiracy?
17           MR. TALADAY:  No, Your Honor, I don't think they have.
18   My point, Your Honor, is that actions speak louder than words,
19   and the actions of the DOJ on the facts of this case is that
20   they did nothing with respect to Irico because there was no
21   basis on which they should have done anything with respect to
22   Irico.
23       If there was a direct effect in the United States, they
24   had every opportunity to identify that and to do something
25   about it, at least to communicate with Irico about their
```

1    concern, and they did nothing.  That's my point, Your Honor.

2        So for them to say that they take no position on the facts

3    of this case I think is belied a little bit by the degree to

4    which they investigated the facts of this case.

5        Now, Your Honor, just one other point.  The direct sales

6    point.  To the extent that the DOJ or even that Your Honor had

7    previously considered that FSIA direct effect could be based on

8    the FTAIA, I believe, Your Honor, that is not properly

9    directed, and the reason is that the FSIA is a jurisdictional

10   statute.  The FTAIA is not.  The FSIA, therefore, requires

11   minimum contacts; whereas, the FTAIA test does not.

12       And where you have purely foreign conduct by a party that

13   has no minimum contacts with the United States, that is not

14   sufficient to satisfy FSIA even if it's sufficient to satisfy

15   the FTAIA.

16       I'll point Your Honor to two authorities.  The first is

17   the Restatement Fourth of the Foreign Relations Law,

18   Section 454.  I believe it's paragraph 9 at page 17, which says

19   (reading):

20           "No court has held that the commercial activity

21       exception applies in a situation where a minimum contacts

22       analysis would not be satisfied."

23       The other authority, Your Honor, would be *Wescott versus*

24   *Weisner*, Northern District of California 2018, which is Westlaw

25   2463614.

1          **THE COURT:**  You have to say the number again, please.

2    24?

3          **MR. TALADAY:**  2463614 at page 4.

4          **THE COURT:**  Is this in the briefs?

5          **MR. TALADAY:**  I don't know, Your Honor.  I believe so.

6          **THE COURT:**  Okay.

7          **MR. TALADAY:**  And this goes to the point, Your Honor,

8    that conduct by co-conspirators, no matter how much that may

9    have been directed, or by any third party no matter how much

10   that would have been directed, is not sufficient to establish

11   conduct by another party.  It says, Your Honor (reading):

12          "Where conspiracy is alleged, an exercise of personal

13          jurisdiction must be based on forum-related acts that were

14          personally committed by each nonresident defendant and

15          acts of an alleged co-conspirator cannot be imputed to

16          establish jurisdiction over the third-party defendant."

17          That is simply to say, Your Honor, that actions by the

18   parties that we may have sold to -- Irico may have sold to

19   outside the United States or acts by co-conspirators cannot be

20   imputed for purposes of minimum contacts or personal

21   jurisdiction.

22          And, Your Honor, if you look at the corpus of cases that

23   talk about direct effect, the common thread of all of them is

24   that there is some privity between the act of the defendant and

25   the United States.

1        And, yes, Your Honor, there can be acts outside the

2   United States that give rise to an effect in the United States.

3   We would not disagree with that.  That's what the third prong

4   clearly says.  But in every case there is privity between that

5   act and the United States, between a purchaser in the

6   United States, between a lender in the United States.

7        We don't have that here, Your Honor.  There is no privity

8   between any act of the Irico Group with respect to the subject

9   matter of this case and the United States.

10       I'll cede to my colleague.

11           THE COURT:  Very good.  Mr. Plunkett.

12           MR. PLUNKETT:  Thank you, Your Honor.

13       I'll quickly respond to some points raised by the DPP in a

14   question that Your Honor asked about whether we're conceding

15   participation in a conspiracy.  For purposes of jurisdiction,

16   we're not challenging that we attended the meetings that they

17   have submitted evidence of.

18           THE COURT:  Right.  I just don't think that's in front

19   of us today.

20           MR. PLUNKETT:  Yeah, it's not.

21           THE COURT:  I don't take it as an admission.  I'm just

22   saying that for today's motion, that's not what I'm seeing.

23           MR. PLUNKETT:  It's not an admission.

24       But here is the part we do challenge:  That any of that

25   can constitute express aiming at the United States, which is

something they have to establish under *Bristol-Myers Squibb* and

the Ninth Circuit precedent that requires in interpreting the

direct-effects test to consider whether the minimum contacts

are met.

There could not be a weaker showing by the DPPs of express

aiming at the United States.  They point to three e-mails that

they say show that Irico intended to raise prices in the U.S.:

Saveri Exhibits 19 and 26 and 30, and we outline those in our

reply briefs.  In one of these there's simply a reference to

U.S. currency.  There's no reference to the U.S. market.

There's no statement by Irico.  There's no indication that

Irico was going to sell in the United States or that prices

were being discussed.  In the other two there's references to

an exchange rate in U.S. dollars.

So that is the express aiming here.  That is why that

Ninth Circuit precedent, which they are so desperate to say was

overruled by *Weltover* in the Supreme Court, doesn't apply.

Because if it does apply, if the Court considers personal

jurisdiction, they lose.  They cannot show any express aiming

by these Chinese companies at the United States.

Going to organ status, briefly, I know Your Honor says

that you're not persuaded by the public purposes of Irico

Group.

**THE COURT:**  That's a tough one for you.

**MR. PLUNKETT:**  I -- so I'm not going to argue it.

1          **THE COURT:**  Group you don't have to worry about.  It's

2    Display.

3          **MR. PLUNKETT:**  Yeah.  They conceded Group.

4      Display, I am worried about it after Your Honor's

5    statement, but public purpose is only one of the factors.  It's

6    a multifactor test.  We don't have to win all of the factors.

7          Here's the important point with Irico Display.  The

8    experts in this case, their own expert conceded the points that

9    they make, which is that this is a largely privately held

10   company where the shareholders have extensive rights.  In fact,

11   what their own expert said at deposition is that the percentage

12   of shares retained, directly or indirectly, by the parent

13   company varies but it is always sufficient to retain ultimate

14   control.

15         There is a --

16         **THE COURT:**  What does that really tell me?  I'm not

17   sure -- I'm having trouble getting my hands around that

18   argument because reduced to its essence, that argument is sort

19   of, well, you know, in China the percentage of ownership might

20   say a certain thing, the documents, the corporate governance

21   documents might say a certain thing, but actually who knows.

22   That is only a slightly hyperbolic and hopefully not flip way,

23   I think, of characterizing this argument, and it's your burden.

24         **MR. PLUNKETT:**  It is our burden at this point, and let

25   me explain what I mean.

1          **THE COURT:**  So who knows it's not good for you?

2          **MR. PLUNKETT:**  So organ status is always going to be a

3    company that is held less than 50 percent, indirectly or

4    directly, by the government.  Because if it was held more than

5    50 percent, they're in like Flynn like Group is.

6          So here we have to consider the multifactor test, and this

7    was discussed by the expert.  There are many companies in China

8    that are partially owned or controlled by the Chinese

9    government.  That has gone way down in the last 20 years.

10   Maybe 20 or 30 percent of them are.

11         But the point here is that China itself and Group and

12   Display define Irico Display as state controlled, and that is

13   not true of most companies in China.  This is a unique

14   situation.

15         The 2007 annual report of Display says that Group is the

16   actual controller of Display.  It would do me no good nor do I

17   have time to go through the host of ways in which Group and the

18   government control Display, but to me it is astounding the

19   level of control.

20         It does not provide protection for 30 percent of the

21   Chinese economy from liability in the United States because

22   even if they're a foreign sovereign, if they cause a direct

23   effect in the United States, they're liable.  But when the

24   company is state controlled, it ought to be found to be an

25   organ under the FSIA.

1        I want to move on to two --

2        **THE COURT:**  I'm hoping you'll address this point

3   about -- in the -- you know, the three subparts, the third of

4   which is direct effect.  Could you identify some conduct

5   that -- boy, I thought I made a clearer note and now it turns

6   out my notes aren't very good.

7        **MR. PLUNKETT:**  Well, I think --

8        **THE COURT:**  I'll add a minute to your time just

9   because I'm stalling up here.  Hold on.

10                     (Pause in proceedings.)

11       **THE COURT:**  What falls under the third prong,

12  commercial activity, but not under the first or second?  That

13  was Mr. Rapawy's question.  I thought it was a good question.

14       **MR. PLUNKETT:**  Well, in a contract case, it would be

15  somebody entering -- somebody in another country entering into

16  a contract with someone in a U.S. company and their conduct can

17  cause a breach of that contract.  In an antitrust case, I think

18  there could be sales that could fall under either the first or

19  the third.

20       **THE COURT:**  Mr. Levin says in a group boycott case

21  there would never be a direct effect using your test.  It

22  wasn't a bad point.  What do you think of it?

23       **MR. PLUNKETT:**  Well, let me think about that.  If

24  there's a group boycott, I don't know why there couldn't be a

25  direct effect in the United States.  It's conduct.  The refusal

1    would be conduct.  There could be an effect in the

2    United States.  I think in that situation you'd end up with --

3    because this is not the FTAIA --

4              **THE COURT:**  Get back to Mr. Taladay's privity point

5    maybe.

6              **MR. TALADAY:**  Should I?

7              **MR. PLUNKETT:**  Yeah, sure.  Absolutely.

8              **MR. TALADAY:**  Your Honor, to give you what I think is

9    a pretty clear example, if I'm a seller in Mexico and you're a

10   U.S. company, I come into the United States, I sell you a

11   product.  That is, I think, the first exception.

12      If you come to Mexico and I sell you a product to take

13   back to the United States, I think that's the third exception.

14      But if I sell to a store in Mexico and I have no further

15   communication or connection to the United States and Stuart

16   decides to go into the United States and sell or sells to you

17   to take to the United States, that's none of the exceptions,

18   Your Honor.

19             **THE COURT:**  All right.

20             **MR. PLUNKETT:**  But the real issue here is if you

21   interpret the third exception direct effects as allowing a

22   situation where a defendant participates in a global

23   conspiracy, raises prices, causes something here, they have no

24   contacts with the United States, it's unconstitutional.  That's

25   the statute -- that's the statutory construction canon that

1    matters here.

2         If it's interpreted that way, it's unconstitutional

3    because the FSIA is the sole source of jurisdiction.  So it's a

4    completely different statute than the FTAIA.

5         They cite *Sea Breeze*.  It was affirmed by the

6    Ninth Circuit.  I would just encourage Your Honor to look at

7    the footnote where this is addressed in the Ninth Circuit.  It

8    makes clear that the reason for finding a direct effect was

9    that a contract with a U.S. entity would have been breached.

10   It had nothing to do with the effects of a conspiracy.  It

11   doesn't support their position.

12        **THE COURT:**  Can you imagine a defendant, corporate

13   defendant, that is resident in a country with no antitrust

14   laws -- I don't know if there is such a country, but we'll

15   imagine that there is one -- and they participate in a

16   conspiracy to fix prices in a global market?  So that we could

17   all agree that while there might be debates about the level of

18   effect, prices being what they are, if the conspiracy is

19   effective, it will affect prices everywhere.

20        And the company, as I say, is in a country that doesn't

21   have any antitrust laws.  Could they ever be sued anywhere

22   under your theory?

23        **MR. PLUNKETT:**  Well, if they have no contact with

24   another jurisdiction, I mean, it would depend on each

25   jurisdiction's long-arm statutes and their own rules; but in

1  the United States, if it's a foreign sovereign, the problem --

2  they would probably trip on this direct effects argument and

3  the need to show personal jurisdiction.

4          **THE COURT:**  Right.   Okay.

5          **MR. PLUNKETT:**   There would probably be a need to show,

6  as there is under any long-arm statute, especially now with

7  *Bristol-Myers Squibb*, to show something that happened in the

8  forum that is connected to the claim.

9          **THE COURT:**   And if I go back more carefully through

10  this reply brief, I'm going to -- I'm not going to have any

11  trouble pulling apart the $8 million in sales, am I?  It's all

12  laid out there like a surgeon's tool?

13      Mr. Taladay is nodding emphatically.  Okay.  Then I'm not

14  going to worry about it.

15          **MR. PLUNKETT:**   It is laid out there, but there's a

16  very easy answer and it's actually what I wanted to conclude

17  with, which is that all of the sales, every one of them, the

18  samples, all of them, Irico (USA), all of them, everyone is

19  CNEIECC.

20      And I don't want to be -- the reason we know that that's a

21  problem for them is because there was one document of all the

22  documents submitted to the Court where they said, "Hey, that's

23  a hearsay.  That's the official public record in China that

24  shows that Group never had any ownership interest in CNEIECC."

25  And they object to it and don't want the Court to consider it

1   because it shows there's no U.S. sales and it pushes the Court

2   into this place where they can't win, where the only way they

3   can win is by saying, "We participated in a conspiracy and

4   here's some express aiming because U.S. currency is mentioned

5   in these e-mails."

6        Those sales don't matter, but it is set forth in the reply

7   brief why each of them doesn't matter independent of the fact

8   that they're not our sales.

9            **THE COURT:**  Very good.

10           **MR. PLUNKETT:**   Thank you, Your Honor.

11           **THE COURT:**   Thank you.

12       Thank you all for your very good arguments and the

13  interesting briefing.   These motions are under submission.

14           **THE CLERK:**   Court is in recess.

15                (Proceedings adjourned at 3:19 p.m.)

16                     ---oOo---

1

2

3                        __CERTIFICATE OF REPORTER__

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Wednesday, June 12, 2019

8

9

10

11    _____

12         Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                   U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25