CERTIFIED TRANSLATION

**COMMONWEALTH OF PUERTO RICO**
**COURT OF FIRST INSTANCE**
**SUPERIOR CHAMBER OF SAN JUAN**

Exhibit 4

| | |
|---|---|
| **THE GOVERNMENT OF PUERTO RICO THROUGH THE ATTORNEY GENERAL OF PUERTO RICO, WANDA VAZQUEZ GARCED** | Civil Num. SJ2018- |
| Plaintiff | |
| Vs. | In re: Unjust Enrichment |
| **LG ELECTRONICS, INC., LG ELECTRONICS USA, INC. , LG ELECTRONICS TAIWAN TAIPEI CO., LTD., KONINKLIJKE PHILIPS ELECTRONICS N.V., LG PHILIPS DISPLAYS, LTD. , PHILIP ELECTRONICS NORTH AAMERA [sic] CORPORATION NORTH AMERICA CORPORATION, V PHILIPS ELECTRONICS INDUSTRIES (TAIWAN), LTD., PHILIPS DA AMAZONIA INDUSTRIA ELECTRONICA LTDA, LP DISPLAYS INTERNATIONAL, LTD, SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG SDI AMERICA, INC., SAMSUNG SDI MEXICO S.A. DE C.V., SHENZHEN SAMSUNG SDI CO., LTD., TIANJIN SAMSUNG SDI CO., LTD., SAMSUNG SDI (MALAYSIA) SDN. BHD., TOSHIBA CORPORATION, TOSHIBA AMERICA CONSUMER PRODUCTS, LLC, TOSHIBA AMERICA INFORMATION SYSTEMS, INC., TOSHIBA AMERICA ELECTRONICS COMPONENTS, INC., TOSHIBA DISPLAY DEVICES (THAILAND) COMPANY, LTD., P.T. TOSUMMIT ELECTRONIC DEVICES INDONESIA, PANASONIC CORPORATION, PANASONIC CORPORATION OF NORTH AMERICA, MATSUSHITA ELECTRONIC CORPORATION (MALAYSIA) SDN BHD., MT PICTURE DISPLAY CO., LTD., BEIJING-MATSUSHITA COLOR CRT COMPANY, LTD., HITACHI, LTD., HITACHI AMERICA, LTD., HITACHI ASIA, LTD., SHENZHEN SEG HITACHI COLOR DISPLAY DEVICES, LTD.,**<br><br>**TATUNG COMPANY OF AMERICA, INC., CHUNGHWA PICTURE TUBES LTD.,** | |



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

| | |
|---|---|
| **CHUNGHWA PICTURE TUBES (MALAYSIA) SDN. BHD., IRICO GROUP. "JOHN DOE"** married to **"JANE DOE"** together forming a community property, **COMPANY XYZ,** | |
| Defendants. | |

# COMPLAINT

**TO THE HONORABLE COURT:**

    **NOW COMES,** the plaintiff, The Government of Puerto Rico, by and through the Puerto Rico Attorney General, Wanda Vazquez Garced, who very respectfully STATES, ALLEGES and PRAYS:

## I. <u>INTRODUCTION</u>

    **1.**    The Attorney General files this lawsuit in her *parens patriae* authority for purchases of Cathode-Ray Tube Products (CRT Products as defined hereinafter) from March 1, 1995 until at least November 25, 2007 (the Period).

    **2.**    The Attorney General alleges that during this period the Defendants conspired to fix, increase, maintain, and/or stabilize the prices of CRT Products sold in Puerto Rico.

    **3.**    Due to the illegal conduct of the Defendants, Puerto Rican consumers and government entities of Puerto Rico paid inflated prices for CRT Products and consequently suffered damages.

    **4.**    As detailed below, starting in at least 1995, the Defendants Samsung, Philips, Daewoo, LG, and Chunghwa met or spoke with at least another Defendant to discuss and agree on the prices of CRT Products and the quantity of CRT Products that each one would produce.

    **5.**    Over time, these Defendants approached other manufacturers of CRT Products, including Toshiba, Panasonic, Hitachi, BMCC, IRICO, Thai CRT, and Samtel, who then also met or spoke with their competitors with the aim of fixing the prices of the Products.

    **6.**    Already by 1997, a formal system of multilateral and bilateral meetings had been created,

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

involving the highest-level executives from the Defendants' corporations, all for the sole purpose of fixing supracompetitive pricing for CRT Products.

**7.** The Defendants' conspiracy was carried out by moderating the downward pressure on CRT Product prices caused by periods of excess supply (oversupply) and competition by new technologies, such as TFT-LCD and Plasma.

**8.** The Defendants' conspiracy resulted in especially stable prices and even rising prices in a very mature and shrinking market.

**9.** As a result of the Defendants' illegal conduct, consumers in Puerto Rico paid higher prices for CRT products than they would have paid in a competitive market.

**10.** The Defendants knew that when they introduced their CRT Products into the international market by way of sale to retailers and distributors in Puerto Rico, these products with their inflated prices would reach consumers in Puerto Rico.

**11.** The economy of Puerto Rico is fueled by consumerism.

**12.** Although Puerto Rico is not a nation as such, the World Bank ranks it as 29th out of all of the countries of the world, just after Spain and with a higher consumerism per capita than Greece, using the "household final consumption expenditure per capita" formula.

**13.** The Defendants placed CRT Products in the flow of commerce knowing that Puerto Rican consumers would spend millions of dollars more than they should have paid because of the price-fixing scheme created by the Defendants.

**14.** According to Banco Santander, consumers in Puerto Rico spend twice as much as consumers in the United States.

**15.** The #1 Sam's Club in Puerto Rico is the number one of all Sam's Club stores in terms of money sold per square foot.

**16.** The conspiracy was investigated by the Antitrust Division of the U.S. Department of Justice ("DOJ"), and by several other international competition authorities.

**17.** On February 10, 2009, a federal grand jury in San Francisco, California issued an indictment on two counts against C.Y. Lin, the former Director and Chief Executive Officer of the

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Defendant Chunghwa Picture Tubes, Ltd., for his participation in the Global conspiracy to fix the price of CRTs used in computer monitors and televisions

18.      This was the first indictment to be issued following the DOJ investigation into the CRT Product industry.

## II. JURISDICTION AND AUTHORITY

19.      The Attorney General is initiating the present case to recover on a claim of unjust enrichment, to recover litigation costs, including reasonable attorney's fees for damages suffered by consumers and Puerto Rican government entities as a result of the conspiracies by the Defendants to inflate the prices of their products.

20.      Puerto Rico's Anti-Trust Law does not provide a remedy for indirect purchasers of products. Therefore, this Honorable Court has jurisdiction due to defendants' unjust enrichment.

21.      This Honorable Court has jurisdiction over Plaintiffs' claims as a result of their intentional actions to use the Puerto Rican market, by placing their products into the flow of commerce that inevitably comes here.

22.      This Court has jurisdiction due to the fact that: the Defendants sold their products here; a substantial part of the events that make up the Plaintiff's claims occurred in Puerto Rico; and a substantial portion of the affected trade described hereinafter was carried out in Puerto Rico.

23.      The Defendants operated in Puerto Rico, and by doing so, they acted intentionally to take advantage of the Puerto Rican market and consequently the laws of Puerto Rico.

24.      The Defendants' products were sold in the flow of commerce in Puerto Rico, and the Defendants' activities had a direct, substantial, and reasonably foreseeable effect on said trade.

25.      The Defendants' conspiracy to fix the prices of CRT Products substantially affected the trade through Puerto Rico, due to the fact that the Defendants directly, or through their agents, carried out activities that affected Puerto Rico.

26.      The Defendants purposefully availed themselves of the laws of Puerto Rico in connection with their activities related to the production, marketing, sale, and/or distribution of CRT Products.

4

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5539-1 Filed 09/25/19 Page 5 of 61
Case 3:19-cv-01246-ADC Document 30-1 Filed 04/22/19 Page 5 of 61

CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 5 of 61

27.     The Defendants produced, promoted, sold, marketed, and/or distributed CRT Products and therefore deliberately profited financially from accessing Puerto Rican consumers.

28.     As a result of the activities described herein, the Defendants:

    **a.**  Repeatedly caused harm to Puerto Rico's consumers.

    **b.**  Caused harm to Puerto Rico by their acts or omissions made outside of Puerto Rico and by regularly doing or soliciting business in Puerto Rico on several occasions.

    **c.**  Persistently took part in activities within Puerto Rico and/or derived substantial revenue from the marketing and sale of CRT Products in Puerto Rico.

    **d.**  Perpetuated acts or omissions that they knew or should have known would cause harm (and, in fact, did cause harm) in Puerto Rico while carrying out or regularly soliciting business in Puerto Rico, persistently participating in other activities in Puerto Rico such as the Sale of CRT Products in Puerto Rico.

29.     The behavior described in this Complaint adversely affected both Puerto Rico and its consumers, given that the latter bought the CRT Products from the Defendants.

30.     The Defendants' conspiracy has had a negative financial impact on consumers in Puerto Rico.

31.     The prices of CRT Products in Puerto Rico identified in this Complaint rose to supracompetitive levels as a result of the Defendants and their co-conspirators.

32.     The Defendants knew that the CRT trade in Puerto Rico would be adversely affected by the implementation of their conspiracy.

### III. DEFINITIONS

33.     As used in the present Complaint, the term "CRT" or "CRTs" means "cathode ray tube(s)."

5

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5589-1 Filed 09/25/19 Page 6 of 61
Case 3:19-cv-01246-ADC Document 30-1 Filed 04/22/19 Page 6 of 61

CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 6 of 61

**34.**     CRT is a display technology used in televisions, computer monitors, and other specialized applications.

**35.**     The CRT is an electron tube with a light-sensitive phosphor-coated inner side.

**36.**     The tube contains an electron gun that emits electron beams.

**37.**     When the electron beams hit the phosphors, they produce red, green, or blue light emissions.

**38.**     A magnetic field system within the CRT, also at varying voltages, directs the rays to produce the desired colors.

**39.**     Said process is repeated many times each second to produce the desired images.

**40.**     There are two types of CRTs: color display tubes ("CDTs"), which are used in computer monitors and other specialized applications; and colored picture tubes ("CPTs"), which are used for TV sets.

**41.**     CDTs and CPTs shall be referred to collectively in the aforementioned case as cathode ray tubes or "CRTs."

**42.**     As used in the present case, "CRT products" include: (a) CRTs; and (b) products with CRTs, such as TV sets or computer monitors.

**43.**     The "Period" or "relevant period" means the period beginning, at least, on March 1, 1995 until, at least, November 25, 2007.

**44.**     "Persons" means any individual, partnership, corporation, association, or other business or legal entity.

**45.**     "OEM" Original Equipment Manufacturer means any Original Equipment Manufacturer of Products.

## IV. **PLAINTIFF**

**46.**     The Plaintiff is the Attorney General of Puerto Rico, Wanda Vazquez Garced, on behalf of the consumers and government entities of Puerto Rico who were impoverished by the actions of the Defendants in the present case.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5539-1 Filed 08/05/19 Page 7 of 61
Case 3:19-cv-01246-ADC Document 30-1 Filed 04/22/19 Page 7 of 61
CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 7 of 61

## V. **DEFENDANTS**

**LG Electronics Entities**

47.     The Defendant LG Electronics, Inc. is a corporation organized under the laws of Korea and headquartered at LG Twin Towers, 20 Yeouido-dong, Yeoungdeungpo-gu, Seoul 150-721, South Korea.

48.     LG Electronics, Inc. is a global force valued at $48.5 billion that manufactures electronic products for consumers, household appliances, and mobile communications, which established its first branch outside of Korea in New York in 1968.

49.     The company changed its name from GoldStar Communications to LG Electronics, Inc. in 1995, the year in which it also acquired in the United States.

50.     In 2001, LG Electronics, Inc. transferred its CRT business to a 50/50 CRT joint venture with the Defendant Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics N.V., thereby forming the Defendant LG. Philips Displays (a/k/a/ LP Displays International, Ltd.).

51.     During the Period, LG Electronics, Inc. manufactured, marketed, sold, and/or distributed CRT Products directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

52.     The Defendant LG Electronics U.S.A., Inc. ("LGEUSA) is a corporation based in Delaware, with its principal place of business located at 1000 Sylvan Avenue, Englewood Cliffs, NJ 07632.

53.     LG Electronics USA, Inc. is a controlled and wholly owned subsidiary by the Defendant LG Electronics, Inc.

54.     During the Period, LG Electronics U.S.A., Inc. manufactured, marketed, sold, and/or distributed CRT Products directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

55.     The Defendant LG Electronics, Inc. dominated and controlled LGEUSA's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

56.     The Defendant LG Electronics Taiwan Taipei Co., Ltd. ("LGETT") is a Taiwanese entity with its principal place of business located in 7F, No. 47, Lane 3, Jihu Road, NeiHu District, Taipei City, Taiwan.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5539-11 Filed 09/05/19 Page 8 of 61
Case 3:19-cv-01246-ADC Document 30-1 Filed 04/22/19 Page 8 of 61

CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 8 of 61

**57.**      LGETT is a wholly owned and controlled subsidiary of the Defendant LG Electronics, Inc.

**58.**      During the Period, LGETT manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates to consumers within Puerto Rico.

**59.**      The Defendant LG Electronics, Inc. dominated and controlled LGETT's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

**60.**      We shall refer to the Defendants LG Electronics, Inc., LGEUSA and LGETT collectively as "LG."

**Philips Entities**

**61.**      The Defendant Koninklijke Philips Electronics N.V. a/k/a/ Royal Philips Electronics N.V. ("Royal Philips") is a Dutch company with its principal place of business located at Amstelplein 2, 1096 BC Amsterdam, The Netherlands.

**62.**      Royal Philips, founded in 1891, is one of the largest electronics companies in the world with 160,900 employees located in more than 60 countries.

**63.**      Royal Philips was the sole owner of its CRT business until 2001.

**64.**       In 2001, Royal Philips transferred its CRT business to a 50/50 CRT Joint Venture with the Defendant LG Electronics, Inc., thereby forming the Defendant LG. Philips Displays (a/k/a LP Displays International, Ltd.).

**65.**      In December 2005, as a result of increased pressure on the demand and prices of CRT Products, Royal Philips discounted the remaining value of its 126 million euro investment and indicated that it would not invest additional capital in the joint venture.

**66.**      During the Period, Royal Philips manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

**67.**      The Defendant Philips Electronics North America Corporation ("PENAC") is a Delaware corporation with its principal place of business located at 3000 Minuteman Road, M/S 109, Andover, MA 01810-1032.

8

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5539-1 Filed 08/25/19 Page 9 of 61
Case 3:19-cv-01246-ADC Document 30-1 Filed 04/22/19 Page 9 of 61

CERTIFIED TRANSLATION
Case 3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 9 of 61

68.      PENAC is a wholly owned and controlled subsidiary and is controlled by the Defendant Royal Philips.

69.      During the Period, PENAC manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

70.      The Defendant dominated and controlled PENAC's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

71.      The Defendant Philips Electronics Industries Taiwan, Ltd. ("Philips Electronics Taiwan") is a Taiwanese company with its principal place of business located on 15th Floor, No. 3-1 Yuan Qu Street, Nan-Gang District, Taipei, Taiwan.

72.      Philips Electronics Taiwan is a subsidiary of the Defendant Royal Philips.

73.      During the Period, Philips Electronics Taiwan manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

74.      The Defendant Royal Philips dominated, and controlled Philips Electronics Taiwan's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

75.      The Defendant Philips Da Amazonia Industria Electronica Ltda. ("Philips Brazil") is a Brazilian company headquartered in Av Torquato Tapajos 2236, Landar (Part 1), Flores, Manaus, AM 39048-660, Brazil.

76.      Philips Brazil is a wholly owned subsidiary controlled by the Defendant Royal Philips.

77.      During the Period, Philips Brazil manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

78.      The Defendant Royal Philips dominated, and controlled Philips Brazil's finances, policies and issues related to the antitrust infringements alleged in this Complaint.

79.      We shall refer to the Defendants Royal Philips, PENAC, Philips Electronics Taiwan, and

9

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Philips Brazil collectively in this Complaint as "Philips."

**LP Displays**

80.     The Defendant LP Displays International, Ltd. a/k/a/ LG. Philips Displays ("LP Displays") was created in 2001, pursuant to the laws of Hong Kong, as a 50/50 joint venture between the Defendants, LG Electronics, Inc. and Royal Philips Electronics of The Netherlands, with its principal place of business located in Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan, Hong Kong.

81.     LP Displays is a main supplier of CRTs, for use in television sets and computer monitors, with annual sales in 2006 of over $2 billion and it has a market share of 27%.

82.      LP displays announced in March 2007 that Royal Philips and LG Electronics would assign the control over the company and that the shares would belong to financial institutions and private equity firms.

83.     During the Period, LP Displays manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

**Samsung Entities**

84.     The Defendant Samsung Electronics Co., Ltd. ("SEC") is a South Korean company with its principal place of business located at 129, Samsung-ro, Maetan-3dong, Yeongtong-gu, Suwon-si, Gyeonggi-do, South Korea.

85.     During the Period, SEC manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

86.     The Defendant Samsung Electronics America, Inc. ("SEAI") is a New York corporation with its principal place of business located at 85 Challenger Road, Ridgefield Park, New Jersey 07660.

87.     SEAI is wholly owned and is a subsidiary controlled by the Defendant SEC.

88.     During the Period, SEAI manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

10

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5530-1 Filed 08/05/19 Page 11 of 61
Case 3:19-cv-01246-ADC Document 38-1 Filed 04/22/19 Page 11 of 61
CERTIFIED TRANSLATION
Case3:19-cv-01246     Document 1-6     Filed 03/18/19     Page 11 of 61

89.     The Defendant SEC dominated and controlled SEAI's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

90.     The Defendant Samsung SDI Co., Ltd. a/k/a Samsung Display Device Co., Ltd. ("Samsung SDI"), is a South Korean company with its principal place of business located at 150-20, Gongse-ro Giheung-gu Yongin, 446-577, South Korea.

91.     Samsung SDI is a public company.

92.     SEC is a main shareholder with nearly 20 percent of the shares.

93.     Founded in 1970, Samsung SDI claimed to be the leading company in the display and energy industry with 28,000 employees and facilities in 18 countries.

94.     In 2002, Samsung SDI had worldwide market share of 34.3% for CRTs; more than any other manufacturer.

95.     Samsung SDI has offices in Chicago and San Diego.

96.     During the Period, Samsung SDI manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

97.     The Defendant SEC dominated and controlled Samsung SDI's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

98.     The Defendant Samsung SDI America, Inc. ("Samsung SDI America") is a California corporation headquartered at 3333 Michelson Drive, Suite 700, Irvine, California.

99.     Samsung SDI America is wholly owned and a subsidiary controlled by Samsung SDI.

100.    During the Period, Samsung SDI America manufactured, marketed, sold, and/or distributed CRT Products to consumers, directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

101.    The Defendants SEC and Samsung SDI dominated and controlled Samsung SDI America's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

11

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5531 Filed 08/05/19 Page 12 of 61
Case 3:19-cv-01246-ADC Document 30-1 Filed 04/22/19 Page 12 of 61

CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 12 of 61

102.    The Defendant Samsung SDI Mexico S.A. de C.V. ("Samsung SDI Mexico") is a Mexican company with its principal place of business at Blvd. Los Olivos, No .21014-A, Parque Industrial El Florido, Tijuana, BJ 22224, Mexico.

103.    Samsung SDI Mexico is wholly owned and a controlled subsidiary of the Defendant Samsung SDI.

104.    During the Period, Samsung SDI Mexico manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

105.    The Defendants SEC and Samsung SDI dominated and controlled Samsung SDI Mexico's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

106. The Defendants Samsung SDI Brasil Ltda. ("Samsung SDI Brazil") is a Brazilian company with its principal place of business at Av. Eixo Norte Sul, S/N, Industrial District, 69088-480 Manaus, Amazonas, Brazil.

107.    SDI Brazil is wholly owned by the Defendant Samsung SDI.

108.    During the Period, Samsung SDI Brazil manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates, to consumers throughout Puerto Rico.

109.    The Defendants SEC and Samsung SDI dominated and controlled Samsung SDI Brazil's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

110.    The Defendant Shenzhen Samsung SDI Co., Ltd. ("Samsung SDI Shenzhen") is a Chinese company with its principal place of business at No. 5003 Huanggang, North Road, Futian District, Shenzhen, China.

111.    Samsung SDI Shenzhen is wholly owned and a controlled subsidiary of the Defendant Samsung SDI.

112.    During the Period, Samsung SDI Shenzhen manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates, to consumers throughout Puerto Rico.

113.    The Defendants SEC and Samsung SDI dominated and controlled Samsung SDI Shenzhen's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5530-1 Filed 08/05/19 Page 13 of 61
Case 3:19-cv-01246-ADC Document 30-1 Filed 04/22/19 Page 13 of 61
CERTIFIED TRANSLATION
Case3:19-cv-01246 Document 1-6 Filed 03/18/19 Page 13 of 61

114.    The Defendant Tianjin Samsung SDI Co., Ltd. ("Samsung SDI Tianjin") is a Chinese company with its principal place of business located at Developing Zone of Yi-Xizn Park, Tianjin, China.

115.    Samsung SDI Tianjin is wholly owned and a controlled subsidiary of the Defendant Samsung SDI.

116.    During the Period, Samsung SDI Tianjin manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates, to consumers throughout Puerto Rico.

117.    The Defendants SEC and Samsung SDI dominated and controlled Samsung SDI Tianjin's finances, policies and issues related to the antitrust infringements alleged in this Complaint.

118.    The Defendant Samsung SDI (Malaysia) Sdn. Bhd. ("Samsung SDI Malaysia") is a Malaysian company with its principal place of business located at Lot 635 & 660, Kawasan Perindustrian, Tuanku Jaafar, Sungai Gadut, Seremban Malaysia.

119.    Samsung SDI Malaysia is wholly owned and a controlled subsidiary of the Defendant Samsung SDI Co., Ltd.

120.    During the Period, Samsung SDI Malaysia manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates, to consumers throughout Puerto Rico.

121.    The Defendants SEC and Samsung SDI dominated and controlled Samsung SDI Malaysia's finances, policies and issues related to the antitrust infringements alleged in this Complaint.

122.    The Defendants SEC, SEAI, Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Samsung SDI Malaysia shall be collectively referred to in the present complaint as "Samsung."

**Toshiba Entities**

123.    The Defendant Toshiba Corporation is a Japanese corporation with its principal place of business located at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.

13

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST   Document 5539-1   Filed 08/05/19   Page 14 of 61
Case 3:19-cv-01246-ADC   Document 38-1   Filed 04/22/19   Page 14 of 61
CERTIFIED TRANSLATION
Case3:19-cv-01246        Document 1-6        Filed 03/18/19        Page 14 of 61

**124.** In 2001, Toshiba Corporation maintained a global market share of 5-10% for CRT Products used in television sets and computer monitors.

**125.** In December 1995, Toshiba Corporation partnered with Orion Electric Company (a/k/a Daewoo Electronics Corporation) and two other non-defendant entities to create P.T. Tosummit Electronic devices Indonesia ("TEDI") in Indonesia.

**126.** TEDI planned to have a production capacity of 2.3 million of CRT Products by 1999.

**127.** In 2002, Toshiba Corporation entered into a joint venture, with the Defendant Panasonic Corporation, called MT Picture Display Co., Ltd. in which the entities consolidated their CRT business.

**128.** During the Period, Toshiba Corporation manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates, to consumers throughout Puerto Rico.

**129.** The Defendant Toshiba America, Inc. ("Toshiba America") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, Suite 4110, New York, NY 10020.

**130.** Toshiba America is wholly owned and a controlled subsidiary of the Defendant Toshiba Corporation.

**131.** During the Period, Toshiba America manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates, to consumers throughout Puerto Rico.

**132.** The Defendant Toshiba Corporation dominated and controlled Toshiba America's finances, policies and issues related to the antitrust infringements alleged in this Complaint.

**133.** The Defendant Toshiba America Consumer Products, LLC ("TACP") is headquartered at 82 Totawa Rd., Wayne, New Jersey 07470-3114.

**134.** TACP is wholly owned and a controlled subsidiary of the Defendant Toshiba Corporation through Toshiba America.

**135.** During the Period, TACP manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

**136.** The Defendant Toshiba Corporation dominated and controlled TACP's finances, policies and issues related to the antitrust infringements alleged in this Complaint.

14

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5389-1 Filed 03/05/19 Page 15 of 61
Case 3:19-cv-01246-ADC Document 30-1 Filed 04/22/19 Page 15 of 61

CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 15 of 61

137.    The Defendant Toshiba America Information Systems, Inc. ("TAIS") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California 92718.

138.    TAIS is wholly owned and a controlled subsidiary of the Defendant Toshiba Corporation through Toshiba America, Inc.

139.    During the Period, TAIS manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

140.    The Defendant Toshiba Corporation dominated and controlled TAIS' finances, policies and, issues related to the antitrust infringements alleged in this Complaint.

141.    The Defendant Toshiba America Electronics Components, Inc. ("TAEC") is a California corporation with its principal place of business located at 9740 Irvine Blvd., Ste D700, Irvine, California 92618.

142.    TAEC is wholly owned and a controlled subsidiary of Toshiba America, Inc., which is a holding company for the Defendant Toshiba Corporation.

143.    TAEC was the North American Sales and marketing representative of the Defendant MTPD.

144.    Prior to the creation of MTPD in 2003, TAEC was the engineering, manufacturing, and sales arm for North America for the Defendant Toshiba Corporation.

145.    During the Period, TAEC manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

146.    The Defendant, Toshiba Corporation dominated and controlled TAEC's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

147.    Toshiba Display Devices (Thailand) Company, Ltd. ("TDDT") is a Thai company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate, Tivanon Road, Pathum Thani, Thailand 12000.

15

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5539-1 Filed 08/05/19 Page 16 of 61
Case 3:19-cv-01246-ADC Document 30-1 Filed 04/22/19 Page 16 of 61
CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 16 of 61

148.     TDDT is wholly owned and a controlled subsidiary of the Defendant Toshiba Corporation.

149.     Toshiba Corporation transferred Toshiba Thailand to its CRT joint venture with Panasonic Corporation, MT Picture Display Co., Ltd., in 2003.

150.     It was renamed MT Picture Display (Thailand) Co., Ltd. and operated as a wholly owned subsidiary of MT Picture Display until its closure in 2007.

151.     During the Period, TDDT manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

152.     The Defendant Toshiba Corporation dominated and controlled TDDT's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

153.     P.T. Tosummit Electronic devices Indonesia ("TEDI") is a CRT joint venture formed in December 1995, by Toshiba Corporation, Orion Electric Company, and two other non-defendant entities.

154.     TEDI's principal place of business is in Indonesia. TEDI planned to have an annual CRT production capacity of 2.3 million by 1999. In 2003, TEDI was transferred to MT Picture Display Co., Ltd.. and changed its name to PT.MT Picture Display Indonesia.

155.     During the Period, TEDI manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

156.     The Defendant Toshiba Corporation dominated and controlled TEDI's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

157.     The Defendants: Toshiba Corporation, Toshiba America, Inc., TACP, TAIS, TAEC, TDDT and TEDI shall be collectively referred to in the present complaint as "Toshiba."

**Panasonic Entities**

158.     The Defendant Panasonic Corporation, which at all times during the Period was called

16

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

Matsushita Electric Industrial Co., Ltd. And later became Panasonic Corporation on October 1, 2008, is a Japanese entity with its principal place of business at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.

159.      In 2002, Panasonic Corporation formed a CRT joint venture with the Defendant Toshiba, creating MT Picture Display Co., Ltd. ("MTPD").

160.      Panasonic Corporation owned the majority of the shares with 64.5 per cent.

161.      On April 3, 2007, Panasonic Corporation purchased the remaining 35.5 percent interest in the joint venture, making MTPD a wholly owned subsidiary of Panasonic Corporation.

162.      In 2005, the Panasonic brand had the highest CRT Product revenues in Japan.

163.      During the Period, Panasonic manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

164.      The Defendant Panasonic Corporation of North America ("Panasonic NA") is a Delaware corporation with its principal place of business located at Two Riverfront Plaza, Newark, NJ 07102.

165.      Panasonic NA is wholly owned and a controlled subsidiary of the Defendant Panasonic Corporation.

166.      During the Period, Panasonic NA manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

167.      The Defendant Panasonic dominated and controlled Panasonic NA's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

168.      Matsushita Electronic Corporation (Malaysia) Sdn BHD. ("Matsushita Malaysia") was a Malaysian company with its principal place of business located at Lot 12, Jalan PKNK, Utama, Kawasan Perindustrian, Sngai Petani, Malaysia 40000.

169.      Matsushita Malaysia was wholly owned and a controlled subsidiary of the Defendant Panasonic Corporation.

170.      Panasonic Corporation transferred Matsushita Malaysia to its CRT joint venture

17

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5308-1 Filed 08/05/19 Page 18 of 61
Case 3:19-cv-01246-ADC Document 58-1 Filed 04/22/19 Page 18 of 61

CERTIFIED TRANSLATION

Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 18 of 61

with Toshiba Corporation, MT Picture Display Co., Ltd., in 2003.

171.     It was renamed MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly owned subsidiary of MT Picture Display until its closure in 2006.

172.     During the Period, Matsushita Malaysia manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

173.     The Defendant Panasonic Corporation dominated and controlled Matsushita Malaysia's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

174.     The Defendants Panasonic Corporation, Panasonic NA and Matsushita Malaysia shall be collectively referred to in the Lawsuit as "Panasonic."

175.     The Defendant MT Picture Display Co., Ltd. ("MTPD") established itself as a CRT joint venture between the defendants Panasonic Corporation and Toshiba.

176.     The Defendant MTPD is a Japanese entity with its principal place of business located at 1-1, Saiwai-cho, Takatsuki-shi, Osaka 569-1193, Japan.

177.     On April 3, 2007, the Defendant Panasonic Corporation purchased the remaining interest in MTPD, making it a wholly owned subsidiary of Panasonic Corporation and renaming it MT Picture Display Co., Ltd.

178.     During the Period, MTPD manufactured, marketed, sold, and/or distributed CRT Products, directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

179.     The Defendant Beijing-Matsushita Color CRT Company, Ltd. ("BMCC") is a Chinese company with its principal place of business located at No. 9, Jiuxianqiaobei N. Rd., Dashanzi Chaoyang District, Beijing, China.

180.     BMCC is a joint venture, of which 50% belongs to the Defendant MTPD.

181.     The other 50% belongs to Beijing Orient Electronics (Group) Co., Ltd., China National Electronics Import & Export Beijing Company (a company belonging to the Government of China) and the Beijing Yayuncun branch of Industrial and Commercial Bank of China, Ltd. (a company belonging to the government of China).

182.     Founded in 1987, BMCC was Matsushita's first facility (a/k/a Panasonic) to manufacture CRT Products in China.

18

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5530-1 Filed 08/05/19 Page 19 of 61
Case 3:19-cv-01246-ADC Document 38-1 Filed 04/22/19 Page 19 of 61
CERTIFIED TRANSLATION
Case 3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 19 of 61

**183.**       BMCC is the second largest producer of CRTs in China.

**184.**       During the Period, BMCC manufactured, marketed, sold, and/or distributed CRTs, directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

**The Hitachi Entities**

**185.**       The Defendant Hitachi, LTD. is a Japanese company with its headquarters located at 6-6 Marunouchi Center Building, Chiyoda-ku, Tokyo 100-8280, Japan.

**186.**       Hitachi LTD. is the parent company of Hitachi brand of CRT Products.

**187.**       In 1996, Hitachi's worldwide market share for CRTs was 20 percent.

**188.**       During the Period, Hitachi Ltd. manufactured, marketed, sold, and/or distributed CRTs directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

**189.**       Hitachi Displays, Ltd. ("Hitachi Displays") is a Japanese company with its principal place of business located at 3F AKS Building, 3 Neribei-cho Kanda, Chiyoda-ku, 1010022, Japan.

**190.**       Hitachi Displays, Ltd. established the Mobara Works of Hitachi, Ltd. in the city of Mobara, Japan, in 1943.

**191.**       In 2002, all the planning, development, design, manufacturing, and sales departments related to the screen business of Hitachi Ltd. were segregated to create a separate company called Hitachi Displays, Ltd.

**192.**       During the Period, Hitachi Displays manufactured, marketed, sold, and/or distributed CRTs directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

**193.**       The Defendant Hitachi, Ltd. dominated and controlled Hitachi Displays' finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

**194.**       Hitachi Electronic Devices (USA), Inc. ("HEDUS") is a Delaware corporation with its principal place of business located at 1000 Hurricane Shoals Road, Ste. D-100, Lawrenceville, GA 30043.

19

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5530-1 Filed 08/05/19 Page 20 of 61
Case 3:19-cv-01246-ADC Document 38-1 Filed 04/22/19 Page 20 of 61

CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 20 of 61

**195.**      HEDUS is a subsidiary of the Defendants Hitachi Displays, Ltd. and Hitachi, Ltd.

**196.**      During the Period, HEDUS manufactured, marketed, sold, and/or distributed CRTs directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

**197.**      The Defendant Hitachi, Ltd. and Hitachi Displays, Ltd. dominated and controlled HEDUS' finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

**198.**      The Defendant Hitachi America, Ltd. ("Hitachi America") is a New York company with its principal place of business at 50 Prospect Avenue, Tarrytown, NY 10591-4625.

**199.**      Hitachi America is wholly owned and a controlled subsidiary of the Defendant Hitachi, Ltd.

**200.**      During the Period, Hitachi America manufactured, marketed, sold, and/or distributed CRTs directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

**201.**      The Defendant Hitachi, Ltd. dominated and controlled Hitachi America's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

**202.**      The Defendant Hitachi Asia, Ltd. ("Hitachi Asia") is a Singapore company with its principal place of business located at 7 Tampines, Grand #08-01 Hitachi Square, Singapore.

**203.**      Hitachi Asia is wholly owned and a controlled subsidiary of the Defendant Hitachi, Ltd.

**204.**      During the Period, Hitachi Asia manufactured, marketed, sold, and/or distributed CRTs directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

**205.**      The Defendant, Hitachi, Ltd. dominated and controlled Hitachi Asia's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

20

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5530-1 Filed 08/05/19 Page 21 of 61
Case 3:19-cv-01246-ADC Document 50-1 Filed 04/22/19 Page 21 of 61

CERTIFIED TRANSLATION

Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 21 of 61

206.      Shenzhen SEG Hitachi Color Display Devices, Ltd. ("Hitachi Shenzhen") was a Chinese company with headquarters at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.

207.      Hitachi Displays, Ltd. Had a minimum share of 25% in Hitachi Shenzhen until November 8, 2007 (which was, incidentally, close to the time when the government investigations into the CRT industry began).

208.      So, Hitachi Shenzhen was a member of the Hitachi corporate group throughout the Period with the exception of two weeks.

209.      During the Period, Hitachi Shenzhen manufactured, marketed, sold, and/or distributed CRTs directly or indirectly through its subsidiaries or affiliates throughout Puerto Rico.

210.      The Defendants Hitachi, Ltd. And Hitachi Displays, Ltd. Dominated and controlled Hitachi Shenzhen's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

211.      The Defendants Hitachi Ltd., Hitachi Displays, Hitachi America, HEDUS, Hitachi Asia and Hitachi Shenzhen are collectively referred to as "Hitachi." In the present Complaint.


**Tatung**

212.      The Defendant Tatung Company of America, Inc. ("Tatung America") is a Californian corporation with its principal place of business located at 2850 in Presidio Street, Long Beach, California.

213.      Tatung America is a subsidiary of Tatung Company.

214.      Today, Tatung Company is about half of Tatung America.

215.      The other half belonged to Lun Kuan Lin, the daughter of the former president of Tatung Company, T.S. Lin.

216.      After the death of Lun Kuan Lin, her stake passed on to her two sons.

217.      During the Period, Tatung America manufactured, marketed, sold, and/or distributed CRT Products directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

21

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST   Document 5308-1   Filed 08/05/19   Page 22 of 61
Case 3:19-cv-01246-ADC   Document 58-1   Filed 04/22/19   Page 22 of 61
CERTIFIED TRANSLATION
Case3:19-cv-01246     Document 1-6     Filed 03/18/19     Page 22 of 61

**Chunghwa Entities**

218.    The Defendant Chunghwa Picture Tubes Ltd. ("CPT") is a Taiwanese company with its principal place of business located at No. 1, Huaying Rd., Longtan District, Taoyuan City, Taiwan.

219.    CPT was founded in 1971 by Tatung Company.

220.    Through most of the Period, Tatung Company was the owner of a substantial share of CPT.

221.    Although Tatung Company's stake in CPT has dropped over time, it still retains substantial control over CPT's operations.

222.    Tatung Company described Chunghwa on its *Website* as one of its global subsidiaries.

223.    And the *Chairman* of CPT, Weishan Lin, was also the *Chairman* and General Manager of Tatung Company.

224.    CPT was a prominent manufacturer of CRTs.

225.    During the Period, CPT America manufactured, marketed, sold, and/or distributed CRT Products directly or indirectly through its subsidiaries in Malaysia, China, and Scotland to consumers throughout Puerto Rico.

226.    The Defendant Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("Chunghwa Malaysia") is a Malaysian company headquartered at Lot 1, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Malaysia.

227.    Chunghwa Malaysia is a wholly owned subsidiary of the Defendant Chunghwa Picture Tubes.

228.    Chunghwa Malaysia is a prominent supplier of CRT Products.

229.    During the Period, Chungwa Malaysia America manufactured, marketed, sold, and/or distributed CRT Products directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

230.    The Defendant CPT dominated and controlled Chunghwa Malaysia's finances, policies, and issues related to the antitrust violations alleged in this Complaint.


**IRICO Entities**

22

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST   Document 5530-1   Filed 08/05/19   Page 23 of 61
Case 3:19-cv-01246-ADC   Document 58-1   Filed 04/22/19   Page 23 of 61
CERTIFIED TRANSLATION
Case 3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 23 of 61

231.    The Defendant IRICO Group Corporation ("IGC") is a Chinese corporation with its principal place of business located at 1 Caihong Rd., Qindu District, Xianyang, China. 712021.

232.    IGC is the parent company for multiple subsidiaries that manufacture, market, sell, and/or distribute CRT Products.

233.    During the Period, IGC manufactured, marketed, sold, and/or distributed CRT Products directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

234.    The Defendant IRICO Display Devices Co., Ltd. ("IDDC") is a Chinese company with its principal place of business located at Xiayang Yuquan West Road, Xianyang, China.

235.    IDDC is a subsidiary partially belonging to the Defendant IGC.

236.    In 2006, IDDC was the largest CRT manufacturer in China.

237.    During the Period, IDDC manufactured, marketed, sold, and/or distributed CRT Products directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

238.    The Defendant IGC dominated and controlled IDDC's finances, policies, and issues related to the antitrust infringements alleged in this Complaint.

239.    The Defendant IRICO Group Electronics Co., Ltd. ("IGE") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, China.

240.    IGE belongs to the Defendant IGC.

241.    On its **website**, IGE claimed to be the leading CRT manufacturer in China and one of the largest CRT manufacturers in the world.

242.    Its **website** also claimed that in 2003, they were the largest CRT manufacturers in China in terms of production and turnover, sales revenue, aggregate earnings, and paid taxes.

243.    During the Period, IGE manufactured, marketed, sold, and/or distributed CRT Products directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.

244.    The Defendant IGC dominated and controlled IGE's finances, policies, and issues related

23

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5530-1 Filed 08/05/19 Page 24 of 61
Case 3:19-cv-01246-ADC Document 38-1 Filed 04/25/19 Page 24 of 61

CERTIFIED TRANSLATION
Case3:19-cv-01246     Document 1-6     Filed 03/18/19     Page 24 of 61

to the antitrust infringements alleged in this Complaint.

245.     The Defendants IGC, IDDC and IGE shall collectively be referred to in the lawsuit proceedings as "IRICO."


**Thai CRT Entities**

246.     The Defendant Thai CRT Company, Ltd. ("Thai CRT") is a Thai company with its principal place of business located at 1 Siam Cement Road, Bangsue Dusit, Bangkok, Thailand.

247.     Thai CRT is a subsidiary of Siam Cement Group.

248.     It was founded in 1996 as the first manufacturer of CRT Products for color televisions in Thailand.

249.     During the Period, Thai CRT manufactured, marketed, sold, and/or distributed CRT Products directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.


**Samtel**

250.     The Defendant Samtel Color, Ltd. ("Samtel") is an Indian company with its principal place of business located at 5th Floor, 501, 9 Copy Corporate Suites, Dist. Centre, Jasala, New Delhi, India.

251.     Samtel's share of the CRT sales market in India is approximately 40%.

252.     Samtel is the largest exporter of CRT Products in India.

253.     Samtel has obtained security clearance in the United States, Canada, Germany, and Great Britain for its CRT Products.

254.      During the Period, Samtel manufactured, marketed, sold, and/or distributed CRT Products directly or indirectly through its subsidiaries or affiliates to consumers throughout Puerto Rico.


**Daewoo/Orion entities**

255.     During the Period, Orion Electric Company ("Orion") was a major manufacturer of CRTs.

256.     Orion was a Korean corporation that filed for bankruptcy in 2004.

24

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5380-1 Filed 03/05/19 Page 25 of 61
Case 3:19-cv-01246-ADC Document 38-1 Filed 04/22/19 Page 25 of 61
CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 25 of 61

257.      In 1995, approximately 85% of Orion's billion dollars sales were attributable to CRTs.

258.      Orion was involved in CRT Product sales and joint ventures, and had subsidiaries throughout the world, including South Africa, France, Indonesia, Mexico, and the United States.

259.      On information and belief, the Plaintiff understands that Orion was wholly owned by the "Daewoo Group."

260.      The Daewoo Group includes Daewoo Electronics Company, Ltd., Daewoo Telecom Company, Daewoo Corporation and Orion Electric Components Company.

261.      The Daewoo Group shut down in or around 1999.

262.      Daewoo Electronics and Orion formed a joint venture with a 50/50 stake in an entity called Daewoo-Orion Société Anonyme ("DOSA") in France.

263.      In approximately 1996, DOSA produced 1.2 million CRT Products annually.

264.      Daewoo the CRT business in or around 2004.

265.      In December 1995, Orion partnered with the Defendant Toshiba Corporation and two other non-defendant entities to form P.T. Tosummit Electronic devices Indonesia ("TEDI") in Indonesia.

266.      TEDI planned to have an annual CRT production capacity of 2.3 million by 1999.

267.      During the Period, Orion, Daewoo Electronics, TEDI, and DOSA manufactured, marketed, sold, and/or distributed CRT Products directly or indirectly through their subsidiaries or affiliates to consumers throughout Puerto Rico.

268.      Daewoo Electronics, Orion, and DOSA shall collectively be referred to in the aforementioned lawsuit as "Daewoo."

**Unknown Entities**

269.      John Doe, married to Jane Doe with whom he forms community property, is an unknown individual, who may be liable for the allegations in this Complaint.

270.      XYZ Corporation is a corporation, whose identity is currently unknown, which may be liable for the allegations in this Complaint.

25

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5338-1 Filed 03/05/19 Page 26 of 61
Case 3:19-cv-01246-ADC Document 38-1 Filed 04/22/19 Page 26 of 61

CERTIFIED TRANSLATION
Case3:19-cv-01246        Document 1-6        Filed 03/18/19        Page 26 of 61

271.    All the previously named Defendants shall be collectively referred to in the present complaint as "Defendants."

## VI. AGENTS AND CO-CONSPIRATORS

272.    Multiple other persons, firms and corporations, which are not named as Defendants, and which are not known to the Plaintiff in this case, have participated as co-conspirators with the Defendants, and have carried out acts and made statements to foster the conspiracy and/or to encourage anti-competitive, unfair, or deceptive behavior.

273.    When referring to any act, fact, or transaction of any corporations in the aforementioned complaint, such allegation means the corporation performs the act, fact, or transaction through or by its officers, directors, agents, employees, or representatives while they were performing duties regarding the management, direction, control, or transaction of the corporation's businesses or affairs.

274.    The Defendants are also responsible for acts carried out to promote the alleged conspiracy through acquired or merged companies.

275.    Each of the Defendants named in the present complaint acted as an agent or joint venture of or by the other defendant parties regarding the acts, infringements, or common course of conduct alleged herein.

276.    Each Defendant that is a subsidiary of a parent company, acts as the sole agent in the United States for CRT Products made by its parent company.

277.    The plaintiff reserves the right to amend the claim to include all of these parties.

## VII. STATEMENTS OF FACTS

**CRT Technology**

278.    CRT technology was developed over a century ago.

279.    The first commercially practical CRT television set was made in 1931.

280.    However, it was not made widely available to consumers until the RCA Corporation presented the product at the World Fair.

281.    Since then, CRT Products have become the core of many monitors, including television

26

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

sets, computer screens, oscilloscopes, air traffic control monitors, and ATMs.

282.     It manufactured even large public monitors, including many sports arena scoreboards, composed of thousands of single-color CRT Products.

283.     As explained, a CRT is a vacuum tube with a light-sensitive phosphor-coated inner side.

284.     The tube contains an electron gun that emits electron beams.

285.     When the electron beams hit the phosphors, they produce red, green, or blue light emissions.

286.     A magnetic field system within the CRT, also at voltages, directs the beams to produce the desired colors.

287.     This process is repeated quickly multiple times per second to produce the desired images.

288.     The quality of the CRT monitor depends on the material itself, not on its external features.

289.     Until 2006, CRTs were the dominant technology in computer monitors and television sets.

290.     During the Period, this resulted in the sale of millions of CRT Products, generating billions of dollars in annual revenue.

### A. Structural Characteristics of the CRT Market

291.     The structural characteristics of the CRT market led to the type of occlusive activities alleged in the Complaint.

292.     These characteristics include: concentration; the ease of sharing information; the consolidation of manufacturers; interrelated multi-business relationships; significant impediments for entering the business; the maturity of the CRT market; and product homogeneity.

### a.     Market Concentration

293.     During the Period, the CRT industry was dominated by relatively few companies.

294.     In 2004, the defendants Samsung SDI, LG. Philips displays (a/k/a LP Displays), MT Picture Display and Chunghwa together owned a collective share of 78% of the global CRT market.

27

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5538-1 Filed 08/05/19 Page 28 of 61
Case 3:19-cv-01246-ADC Document 1-6 Filed 04/22/19 Page 28 of 61

CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 28 of 61

295.     The high market share concentration facilitates coordination because there are fewer members of the cartel, including coordination for pricing or market allocation, and it is easier to monitor the prices and production of other members of the cartel.

**b.     Exchange of Information**

296.     Due to the common membership in trade associations for the CRT Market and related markets (e.g., TFT-LCD), business arrangements such as joint ventures, alliances between companies in certain countries and relationships between executives in certain companies, there are many opportunities for the Defendants to discuss and exchange competitive information.

297.     Communication was facilitated through meetings, telephone calls, emails, and instant messages.

298.     The Defendants took advantage of these opportunities to discuss and agree on price fixing for CRT Products.

299.     The Defendants Chunghwa, Hitachi, and Samsung are all members of the Society for Information Display.

300.     The Defendants Samsung and LG Electronics, Inc. are two of the co-founders of the Korea Display Industry Association.

301.     Likewise, Daewoo, LG Electronics, LP Displays, and Samsung are members of the Electronic Display Industrial Research Association.

302.     On information and belief, the Defendants repeatedly used said trade associations as vehicles to discuss and reach agreements on price fixing for their CRT Products.

303.     At these trade association meetings, the Defendants exchanged proprietary and sensitive information in competitive terms, which they used to implement and monitor their conspiracy.

**c.     Consolidation**

304.     The CRT Product Industry underwent significant consolidation during the Period, including, but not limited to: (a) the creation of LG. Philips displays (a/k/a LP Displays) in 2001 as a

28

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

joint venture between Royal Philips and LG Electronics, Inc.; and (b) the merger in 2002 of Toshiba's CRT business and Matsushita/Panasonic to MTPD.

305.     The Defendants also consolidated their manufacturing facilities in lower-cost sites such as China and reduced the manufacturing capacity to maintain high prices.

### d.     Multiple Interrelated Business Relationships

306.     Given the nature of the CRT industry, and the multiple business relationships between alleged competitors, competition is reduced and ample opportunities to collude arise.

307.     These business relationships also created a unit of interest among competitors, so the conspiracy became easier to implement and enforce than if said relationships had not existed.

308.     The high degree of cooperation between the Defendants in the CRT Product market and closely related markets is reflected as follows:

a.     The formation of the joint venture of CRT LG. Philips Displays in 2001 by the Defendants LG Electronics, Inc. and Royal Philips.

b.     The Defendants LG Electronics, Inc. and Royal Philips also formed LG. Philips LCD Co., Ltd., a/c/c LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing TFT-LCD panels.

c.     The formation of the joint venture CRT MTPD in 2003 by the Defendants Toshiba and Panasonic.

d.     The Defendants Toshiba and Panasonic also formed Toshiba- Matsushita Display Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

e.     In December 1995, the Defendants Daewoo and Toshiba partnered with two other Non-Defendant entities to form TEDI, which manufactured CRTs in Indonesia.

f.     The Defendants Daewoo and Toshiba also signed an agreement related to LCDs in 1995. Through the agreement, Daewoo produced STN LCDs, and Toshiba, which had replaced

29

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5530-1 Filed 08/05/19 Page 30 of 61
Case 3:19-cv-01246-ADC Document 38-1 Filed 04/22/19 Page 30 of 61

CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 30 of 61

g.  Also, in 1995, the Defendant Chunghwa reached a technology transfer agreement with the Defendant Toshiba for large CPTs [*sic*].

h.  The Defendant Chunghwa has a joint venture with the Defendant Samsung Electronics Co., Ltd. for the production of liquid crystal panels. Chunghwa currently buys the technology from the Defendant Royal Philips, a development that helped resolve a patent infringement lawsuit filed in 2002.

i.  The Defendants LG Electronics, Inc. and Hitachi Ltd. entered into a joint venture in 2000 for manufacturing, selling, and distributing optical storage products such as DVD drives.

j.  The Defendant Samtel participated in a joint venture, Samcor Glass Limited, with the Defendant Samsung Electronics Co., Ltd. and the non-defendant company Corning Inc. USA for the production and supply of glass tubes for displays.

k.  The Defendant Samtel claims to have supplied CRTs to the Defendants LG Electronics, Inc., Samsung, Royal Philips and Panasonic.

e.  **High Entry Costs to the Industry**

**309.**  There were substantial obstacles for entering into the CRT Product industry.

**310.**  It would have required substantial time, resources, and industry knowledge for a potential producer to overcome barriers to entering the CRT Product Industry.

**311.**  It was also unlikely that new producers would have entered the market due to declining demand for CRT Products.

f.  **The Maturity of the CRT Product Market**

**312.**  New industries are typically characterized by rapid growth, innovation, and high gains.

**313.**  The CRT Market was mature, and, like many of these industries, is characterized by narrow

30

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

profit margins, creating a motivation to collude.

**314.**     The demand for Products was declining throughout the Period.

**315.**     Stagnant or declining demand is another factor that leads to the likelihood of conspiracy arrangements, as it provides a greater incentive for firms to avoid having to compete for prices.

**316.**     Moreover, conventional CRT television sets and monitors were being quickly replaced by TFT-LCD monitors and Plasma Displays.

**317.**     This was one of the factors that led Defendants to participate in this pricing scheme to stop the price decline of CRTs Products.

**318.**     Between 2000 and 2006, revenues from the sale of CRT television sets in the United States declined by 50.7 percent, and the market decline has accelerated since then.

**319.**     Although demand decreased as a result of the popularity of flat panel LCD/Plasma TVs and LCD monitors, television sets and monitors were still the dominant monitor technology throughout the Period, leading to the collusion among the Defendants and the valuable international price-fixing conspiracy.

**320.**     Due to the high costs of LCD panels and plasma monitors during the Period, a substantial market for CRT Products existed as a cheaper alternative to these new technologies.

**321.**     In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.

**322.**     By 2002, this figure had dropped to 73 percent; still a substantial market share.

**323.**     As for CRT TVs, they accounted for 73 percent of the television market in North America in 2004, and by the end of 2006 they still held a market share of 46 percent.

31

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5309-1 Filed 02/05/19 Page 32 of 61
Case 3:19-cv-01246-ADC Document 38-1 Filed 04/22/19 Page 32 of 61
CERTIFIED TRANSLATION
Case3:19-cv-01246      Document 1-6      Filed 03/18/19      Page 32 of 61

**324.**     Now, sales of CRT products are practically non-existent.

**g.**     **Homogeneity of CRT Products**

**325.**     CRT Products are similar to basic products, which are manufactured in standardized sizes.

**326.**     CRT Products manufactured by a Defendant for a particular application, such as a particular size of television sets or a computer monitor, could be substituted for one another.

**327.**     The Defendants sold and the consumers of Puerto Rico bought the CRT Products mainly based on price.

**328.**     It is easier to form and support a cartel when the product is similar to a basic product, as it is easier to reach agreements in terms of prices to be charged and to monitor prices once they have already been agreed upon.

**B.**     **The Market before the Conspiracy**

**329.**     The genesis of the CRT conspiracy was at the end of the '80s when the CRT business became more international and the Defendants began to serve customers who were also served by other international companies.

**330.**     During this period, the Defendants' employees met with employees of their competitors while visiting their customers.

**331.**     A culture of cooperation developed over the years and these Defendants' employees exchanged market information regarding production, capacity, and customers.

**332.**     At the beginning of the '90s, representatives of Samsung, Daewoo, Chunghwa, and Orion visited one another's factories in South Asia.

**333.**     During this period, producers began to include discussions on pricing in their meetings.

**334.**     Discussions on pricing tended to be limited, however, to exchanges of price ranges quoted by each competitor to specific customers.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**C.**  **The Illegal Agreements of the Defendants and their Co-Conspirators**

**335.**  The Plaintiff has been informed and therefore believes, and thus alleges, that in order to be able to control and maintain their earnings while the demand for CRT Products decreased, the Defendants and their co-conspirators formed a contract, an agreement, trust, or conspiracy, the effect of which would have been to issue, fix, maintain, and/or stabilize CRT sale prices at artificially inflated levels from at least March 1, 1995 until, at least, November 25, 2007.

**336.**  The CRT conspiracy was carried out through a combination of group and bilateral meetings.

**337.**  In the formative years of the conspiracy (1995-1996), bilateral discussions were the primary method of communication and they took place in an informal and ad hoc manner.

**338.**  During this period, representatives of the Defendants LG, Samsung, and Daewoo visited the other Defendant manufacturers including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba, and Panasonic to discuss the increase in prices of CRT Products in general and for customers.

**339.**  These meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia, and Singapore.

**340.**  The Defendants Samsung, Chunghwa, LG, and Daewoo also attended multiple ad hoc group meetings during this period.

**341.**  The participants in these group meetings also discussed increasing prices for CRT Products.

**342.**  While more manufacturers formally entered the conspiracy, group meetings started to become more prevalent.

**343.**  Beginning in 1997, the Defendants began to meet in a more organized, systematic, and formal manner, and a system of multilateral and bilateral meetings was established.

**344.**  The Defendants' representatives attended hundreds of said meetings during the Period.

**345.**  The global CRT conspiracy rose and set global prices (including prices in Puerto Rico) that the Defendants charged for CRT Products.

33

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5301 Filed 08/05/19 Page 34 of 61
Case 3:19-cv-01246-ADC Document 1-6 Filed 04/22/19 Page 34 of 61

CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 34 of 61

a.          **"Glass Meetings"**

**346.**     Group meetings among participants in the conspiracy to fix CRT prices were referred to by the participants as "Glass Meetings" or GSMs.

**347.**     Employees at three general levels within the Defendants' corporations attended the Glass Meetings.

**348.**     The first tier of meetings was attended by the companies' high-level executives, including CEOs, Chairmen and Vice Chairmen, and were known as the "Top Meetings."

**349.**     *Top Meetings* took place less frequently, typically every three months, and focused on long-term agreements and enforcing price-fixing agreements.

**350.**     Since those attending *Top Meetings* had authority as well as more reliable information, said meetings resulted in agreements.

**351.**     Those attending *Top Meetings* also had to settle disputes, given that they had the authority to enter into agreements.

**352.**     Senior sales managers attended second-tier meetings, which were known as Management Meetings.

**353.**     These meetings took place more frequently, typically monthly, and involved implementing the agreements established in the *Top Meetings.*

**354.**     Finally, marketing and lower-level sales employees attended the third-tier of meetings, which were known as "Work-Level Meetings".

**355.**     These meetings were usually held weekly or monthly and were mostly limited to the exchange of information and discussions on the price fixing, given that employees at the lower levels did not have the authority to reach agreements.

**356.**     Such lower-level employees would then transmit competitive information to individuals in the corporate hierarchy chain with authority to fix prices.

**357.**     The Work-Level Meetings tended to be more regional and often took place near the Defendants' factories.

**358.**     In other words, Taiwan's manufacturing employees met in Taiwan; Korean manufacturing

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST  Document 5308-1  Filed 03/05/19  Page 35 of 61
Case 3:19-cv-01246-ADC  Document 38-1  Filed 04/22/19  Page 35 of 61

CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 35 of 61

employees met in Korea, and so on:

    a.    The Chinese Glass Meetings started in 1998 and usually took place monthly after a *Top Meeting* or a Management Level Meeting.

    b.    The main aim of the meetings held in China, also known as *China Meetings,* was to inform Chinese manufacturers about what had been decided in the most recent Glass Meetings.

    c.    Those taking part in the Chinese meetings included manufacturers located in China, such as IRICO and BMCC, as well as China branches and those of other Defendants, including, but not limited to, Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

    d.    Glass Meetings were occasionally held in several European countries as well.

    e.    Those attending these meetings included Defendants, who had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended such meetings on behalf of Daewoo), and IRICO.

**359.**    Representatives of the Defendants also attended what was known among the members of the conspiracy as "Green Meetings".

**360.**    These meetings were held on golf courses.

**361.**    Generally, employees at the highest levels - officials and managers of the Defendants - attended Green Meetings.

**362.**    During the Period, Glass Meetings took place in Taiwan, South Korea, Europe, China, Singapore, Japan, Indonesia, Thailand, and Malaysia.

**363.**    Participants often exchanged sensitive competitive information before a Glass Meeting.

**364.**    This included information on inventories, production, sales, and exports.

**365.**    For some of said meetings, when information could be obtained prior to the meeting, it was brought to the meeting, where it was shared.

35

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

366.    Glass Meetings at all levels followed a more or less typical agenda.

367.    First, participants would exchange confidential information, such as: pricing proposals for CRTs in the future, sales volume, inventory levels, production capacity, exports, customer orders, trends in pricing, and sales volume forecasts for the coming months.

368.    The participants also updated the information they had provided at the previous meeting.

369.    Each meeting had a designated "Chairman." The Chairman changed from one meeting to another. The Chairman pointed out the information discussed on a white board.

370.    Those taking part in the meetings then used this information to discuss and agree on what price each would charge for the CRTs to be sold in the next month or quarter.

371.    They discussed and agreed on target prices, price increases, so-called "bottom" prices, and price ranges for CRTs.

372.    They also discussed and agreed on prices of CRTs that were sold to specific customers and agreed on target prices for use in negotiations with large customers.

373.    Having analyzed the supply and demand, the participants discussed and agreed on production cuts.

374.    During periods of excess supply, the focus of those taking part in the meeting was on controlling and coordinating price reductions. This was known as the *"bottom price"*.

375.    The Defendants' conspiracy included agreements on the prices at which certain Defendants would sell the CRTs to their own corporate and affiliated subsidiaries, which manufactured the final products such as television sets and computer monitors.

376.    The Defendants understood the importance of keeping their affiliates' domestic prices at a high enough level to support CRT pricing on the market with the other OEMs.

377.    This way, the Defendants made sure that the OEMs that bought directly from the Defendants would pay prices above the competitive level for the CRTs.

378.    All those taking part in the meetings knew of, and in fact discussed, the significant

36

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5538-1 Filed 08/05/19 Page 37 of 61
Case 3:19-cv-01246-ADC Document 5538-1 Filed 04/22/19 Page 37 of 61

CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 37 of 61

impact that the price of the CRTs had on the cost of the finished products, at which the price was fixed.

379.     As for the CRTs themselves, the CRT Market was mature and the profit margins were narrow.

380.     The Defendants therefore concluded that in order to make CRT price increases successful among customers, they had to make the increase high enough to force their direct customers (manufacturers of CRT television sets and monitors) to justify the corresponding price increases for their other customers along the sales chain.

381.     This way, the Defendants ensured that price increases for CRTs were passed on to the indirect purchasers of CRT Products.

382.     The agreements established in the Glass Meetings included:

    a.     Agreements on the pricing of CRT Products, including setting target prices, final prices, price ranges, and pricing guidelines.

    b.     Price difference agreements on various CRT Product traits, such as quality or certain technical specifications.

    c.     Pricing agreements for sales among CRT Product companies to customers who are vertically integrated.

    d.     Agreements on what to say to customers about the reason for the price increase.

    e.     Agreements to coordinate with competitors who could not attend group meetings and agreements with them to comply with the agreed pricing.

    f.     Agreements to coordinate price fixing with CRT manufacturers in other geographic markets such as Brazil, Europe, and India.

    g.     Agreements to exchange pertinent information on shipments, capacity, production, pricing, and customer demand.

    h.     Agreements to coordinate uniform public statements, capacity, and available supply.

    i.     Agreements to allocate both the global market share and the share in customers' private purchases.

    j.     Agreements to assign customers.

37

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5530-1 Filed 08/05/19 Page 38 of 61
Case 3:19-cv-01246-ADC Document 30-1 Filed 04/22/19 Page 38 of 61
CERTIFIED TRANSLATION
Case3:19-cv-01246    Document 1-6    Filed 03/18/19    Page 38 of 61

     k.     Agreements regarding capacity, including agreements to restrict production and to audit compliance with such agreements.

     l.     Agreements to keep their meetings secret.

**383.**     Efforts were made to monitor compliance by each Defendant with said agreements in multiple ways, including seeking confirmation of customer prices and from the Defendants' employees themselves.

**384.**     If a Defendant violated the agreements, this was dealt with in at least four ways: **(1)** Monitoring **(2)** Those taking part in meetings challenged other participants if they did not comply with an agreement; **(3)** Threatening to undermine a competitor with one of their main customers; and **(4)** A recognition of the mutual interest in enforcing the target price and complying with the established agreements.

**385.**     While market conditions worsened between 2005 and 2007, and the replacement rate of CRT Products by TFT-LCDs increased, Glass Meetings between groups became less and less frequent, and bilateral meetings again became more prevalent.

**386.**     Furthermore, in December 2006 the DOJ delivered subpoenas to the manufacturers of the TFT-LCDs and, as a result, CRT co-conspirators began to worry about antitrust issues.

     **b.**     **Bilateral Discussions**

**387.**     During the entire Period, Glass Meetings were complemented by bilateral discussions between several Defendants.

**388.**     Bilateral discussions were more informal than group meetings and often took place ad hoc, often among group meetings.

**389.**     These discussions, usually between sales and marketing employees, took on the form of meetings in person, contact by phone, and emails.

**390.**     During the Period, bilateral meetings in person took place in Malaysia, Indonesia, Taiwan, China, the United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, and Mexico.

**391.**     The purpose of the bilateral discussions was to exchange information on past and future pricing, confirm production levels, share information on sales orders, confirm pricing rumors, and coordinate price fixing with manufacturers in other geographic locations, including

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST   Document 5530-1   Filed 03/05/19   Page 39 of 61
Case 3:19-cv-01246-ADC   Document 58-1   Filed 04/22/19   Page 39 of 61
CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 39 of 61

Brazil, Mexico, and Europe.

392.     To ensure the effectiveness of their global conspiracy, the Defendants also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil and Mexico, such as Philips Brazil, Samsung SDI Brazil, and Samsung SDI Mexico.

393.     Said manufacturers from Brazil and Mexico were extremely important, given that they served the North American market for CRT Products.

394.     As alleged in the present complaint, North America was the largest market for TVs and CRT monitors during the Period.

395.     Given that said manufacturers in Brazil and Mexico are wholly owned and controlled subsidiaries of the Defendants Philips and Samsung SDI, they adhered to the illegal pricing agreements.

396.     This way, the Defendants ensured that the prices of all CRT Products imported into Puerto Rico were fixed, increased, maintained, and/or stabilized at levels above competitive levels.

397.     The Defendants also used bilateral discussions with each other during price negotiations with customers to prevent customers from persuading them to lower prices.

398.     The information obtained in these communications was then shared with the supervisors and taken into account to determine the price to be offered.

399.     Bilateral discussions were also used to coordinate prices with manufacturers of CRT Products that did not attend group meetings such as Hitachi, Toshiba, Panasonic, Thai CRT, and Samtel.

400.     Normally, a few days after a "Top or Management Meeting," the participants of these group meetings met bilaterally with the other manufacturing Defendants in order to communicate any agreements reached on the pricing of CRT or production Products during the meeting.

401.     For example, Samsung had a relationship with Hitachi and was responsible for communicating the pricing agreements of CRT Products to Hitachi.

402.     LG had a relationship with Toshiba and was responsible for informing Toshiba of the price-fixing agreements for CRT Products.

39

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5509-1 Filed 08/05/19 Page 40 of 61
Case 3:19-cv-01246-ADC Document 38-1 Filed 04/22/19 Page 40 of 61
CERTIFIED TRANSLATION
Case 3:19-cv-01246     Document 1-6     Filed 03/18/19     Page 40 of 61

**403.**     Thai CRT had a relationship with Samtel and was responsible for informing Samtel of the price-fixing agreements for CRT Products.

**404.**     Hitachi, Toshiba, and Samtel implemented the agreed prices as they were informed by Samsung, LG, and Thai CRT.

**405.**     Sometimes Hitachi and Toshiba also attended Glass Meetings.

**406.**     This way, Hitachi, Toshiba and Samtel participated in the conspiracy to fix the prices of Products.

###     c.     The Involvement of Defendants and Co-Conspirators in Group and Bilateral Discussions

**407.**     Between at least 1995 and 2007, the Defendant Samsung, through SEC, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen, and Samsung SDI Tianjin, participated in at least two hundred Glass Meetings at all levels.

**408.**     Executives from Samsung's highest ranks attended a substantial number of said meetings.

**409.**     Samsung also regularly participated in bilateral discussions with the other Defendants.

**410.**     Through these discussions, Samsung established the prices and supply levels for CRT Products.

**411.**     The Defendants SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were represented in these meetings and were part of the agreements reached therein.

**412.**     As SEC and SEAI sold and/or distributed CRT Products, they played a significant role in the conspiracy because the Defendants wished to ensure that the prices of CRT Products, paid by direct buyers, did not undermine the price-fixing agreements for CRTs achieved at the Glass Meetings.

**413.**     Thus, SEAI, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were active participants with knowledge of the alleged conspiracy.

**414.**     Between at least 1995 and 2001, the Defendant LG, through LG Electronics, Inc., and LGETT, participated in at least one hundred Glass Meetings at all levels.

**415.**     After 2001, LG participated in the CRT conspiracy through its joint venture with

40

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5539-1 Filed 08/05/19 Page 41 of 61
Case 3:19-cv-01246-ADC Document 5391 Filed 04/22/19 Page 41 of 61
CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 41 of 61

Philips and LG. Philips Displays (a/k/a LP Displays).

**416.** LG executives at the highest levels attended a substantial number of said meetings.

**417.** LG also regularly participated in bilateral discussions with the other Defendants.

**418.** Through these discussions, LG established the prices and supply levels for CRT Products.

**419.** LG never effectively left the conspiracy.

**420.** The Defendant LGEUSA was represented at the meetings and was a part of the agreements reached.

**421.** As LGEUSA sold and/or distributed CRT Products, they played a significant role in the conspiracy because the Defendants wanted to ensure that CRT prices, paid by direct buyers, did not undermine price-fixing agreements for CRT achieved at the Glass Meetings.

**422.** Therefore, LGEUSA was an active participant and fully aware of the alleged conspiracy.

**423.** Between at least 1996 and 2001, the Defendant Philips, through Royal Philips and Philips Taiwan, participated in at least one hundred Glass Meetings at all levels.

**424.** After 2001, Philips participated in the CRT conspiracy through its joint venture with LG and LG. Philips Displays (a/k/a LP Displays).

**425.** Philips executives at the highest levels attended a substantial number of such meetings.

**426.** Philips also participated in multiple bilateral discussions with the other Defendants.

**427.** Through these discussions, Philips established the prices and supply levels for CRT Products.

**428.** Philips never effectively left this conspiracy.

**429.** The Defendants PENAC and Philips Brazil were represented in these meetings and were participants in the agreements reached.

**430.** As PENAC and Philips Brazil sold and/or distributed CRT Products, they played a significant role in the conspiracy because the Defendants wanted to ensure that CRT prices

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5530-1 Filed 08/05/19 Page 42 of 61
Case 3:19-cv-01246-ADC Document 58-1 Filed 04/22/19 Page 42 of 61
CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 42 of 61

paid by direct buyers, did not undermine price-fixing agreements for CRT achieved at the Glass Meetings.

431.     Therefore, PENAC and Philips Brazil were active participants with knowledge of the alleged conspiracy.

432.     Between at least 2001 and 2006, the Defendant LP Displays (a/k/a LG. Philips Displays) participated in at least one hundred Glass Meetings at all levels.

433.     Executives at the highest levels of LP Displays attended a substantial number of said meetings.

434.     Some of these high-level executives had previously attended meetings on behalf of the Defendants LG and Philips.

435.     LP Displays also participated in multiple bilateral discussions with the other Defendants.

436.     Through these discussions, LP Displays established the prices and supply levels for CRT Products.

437.     Between at least 1995 and 2006, the Defendant Chunghwa, through CPT, Chunghwa Malaysia, and representatives of its factories in Fuzhuo (China) and Scotland, participated in at least one hundred Glass Meetings at all levels.

438.     The highest ranking executives of Chungwa, including the previous *Chairman* and CPT CEO, C.Y. Lin, attended a substantial number of these meetings.

439.     Chunghwa also regularly participated in bilateral discussions with the other Defendants.

440.     Through these discussions, Chunghwa established the prices and supply levels for CRT Products.

441.     The Defendant Tatung America was represented at these meetings and was part of the agreements reached during the meeting.

442.     As Tatung America sold and/or distributed CRT Products, it played a significant role in the conspiracy because the Defendants wanted to ensure that CRT prices paid by direct buyers, did not undermine price-fixing agreements for CRT achieved at the Glass Meetings.

443.     Therefore, Tatung America was an active participant and fully aware of the alleged

42

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST   Document 5391   Filed 03/05/19   Page 43 of 61
Case 3:19-cv-01246-ADC   Document 36-1   Filed 04/22/19   Page 43 of 61

CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 43 of 61

conspiracy.

444.    Between at least 1995 and 2004, Daewoo through Daewoo Electronics, Orion, and DOSA, participated in at least one hundred Glass Meetings at all levels.

445.    The highest ranking executives at Daewoo attended a substantial number of these meetings.

446.    Daewoo also regularly participated in multiple bilateral discussions with the other Defendants.

447.    Through these discussions, Daewoo established the prices and supply levels for CRT Products.

448.    Orion, which belonged entirely to Daewoo's CRT subsidiary, continued bilateral discussions with Daewoo until it filed for bankruptcy in 2004.

449.    Daewoo never effectively left the conspiracy.

450.    Between at least 1995 and 2003, the Defendant Toshiba, through Toshiba Corporation, TDDT, and TEDI, participated in multiple Glass Meetings.

451.    After 2003, Toshiba participated in the CRT conspiracy through its joint venture with Panasonic, MTPD.

452.    High-level sales managers attended these meetings for Toshiba and MTPD.

453.    Toshiba also participated in multiple bilateral discussions with other Defendants, notably with LG.

454.    Through these discussions, Toshiba established the prices and supply levels for CRT Products.

455.    Toshiba never effectively left the conspiracy.

456.    The Defendants Toshiba America, Inc., TACP, TAIP, and TAEC were represented at these meetings and were parties to the agreements reached.

457.    As Tatung America Inc., TACP, TAIS, and TAEC sold and/or distributed CRT Products, they played a significant role in the conspiracy because the Defendants wanted to ensure that CRT prices paid by direct buyers, did not undermine price-fixing agreements for CRT achieved at the Glass Meetings.

458.    Therefore, Toshiba America, TACP, TAIS, and TAEC were active participants with

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

knowledge of the alleged conspiracy.

**459.**　　Between at least 1996 and 2001, the Defendant Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia, participated in multiple Glass Meetings.

**460.**　　High-level managers of Hitachi attended these meetings.

**461.**　　Hitachi also participated in multiple bilateral discussions with other Defendants, notably with Samsung.

**462.**　　Through these discussions, Hitachi established the prices and supply levels for CRT Products.

**463.**　　Hitachi never effectively left the conspiracy.

**464.**　　The Defendants Hitachi America and HEDUS were represented in these meetings and were part of the agreements reached in the same.

**465.**　　As Hitachi America and HEDUS sold and/or distributed CRT Products, they played a significant role in the conspiracy because the Defendants wanted to ensure that CRT prices paid by direct buyers, did not undermine price-fixing agreements for CRT achieved at the Glass Meetings.

**466.**　　Therefore, Hitachi America and HEDUS were active participants and fully aware of the alleged conspiracy.

**467.**　　Between at least 1996 and 2003, the Defendant Panasonic (known throughout the Period as Matsushita Electric Industrial Co., Ltd.), through Panasonic Corporation and Matsushita Malaysia, participated in multiple Glass Meetings.

**468.**　　After 2003, Panasonic participated in the CRT conspiracy through its joint venture with Toshiba, MTPD.

**469.**　　High-level sales managers from Panasonic and MTPD attended these meetings.

**470.**　　Panasonic also participated in multiple bilateral discussions with the other Defendants.

**471.**　　Through these discussions, Panasonic established the prices and supply levels for CRT Products.

44

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5530-1 Filed 08/05/19 Page 45 of 61
Case 3:19-cv-01246-ADC Document 58-1 Filed 04/22/19 Page 45 of 61
CERTIFIED TRANSLATION
Case3:19-cv-01246     Document 1-6     Filed 03/18/19     Page 45 of 61

472.    Panasonic never effectively left the conspiracy.

473.    Panasonic NA was represented in these meetings and was part of the agreements reached.

474.    As Panasonic NA sold and/or distributed CRT Products, it played a significant role in the conspiracy because the Defendants wanted to ensure that CRT prices paid by direct buyers, did not undermine price-fixing agreements for CRT achieved at the Glass Meetings.

475.    Therefore, Panasonic NA was an active participant and fully aware of the alleged conspiracy.

476.    Between at least 2003 and 2006, the Defendant MTPD participated in multiple Glass Meetings and, in fact, headed many of these meetings during the last years of the conspiracy.

477.    High-level sales managers from MTPD attended these meetings.

478.    MTPD also participated in multiple bilateral discussions with the other Defendants.

479.    During these discussions, MTPD established the prices and supply levels for CRT Products.

480.    Between at least 1998 and 2007, the Defendant BMCC participated in multiple Glass Meetings.

481.    High-level sales managers from BMCC attended these meetings.

482.    BMCC also participated in multiple bilateral discussions with the other Defendants, particularly with the other Chinese manufacturers of CRT Products.

483.    Through these discussions, BMCC established the prices and supply levels for CRT Products.

484.    No part of BMCC's conspiratorial conduct in connection with CRT Products was ordered by the Chinese government.

485.    BMCC acted to promote its private independent interests through his involvement in the alleged conspiracy.

486.    Between at least 1998 and 2007, the Defendant IRICO, through IGC, IGE, and IDDC, participated in multiple Glass Meetings.

487.    The highest-ranking executives of IRICO attended these meetings.

488.    IRICO also participated in multiple bilateral discussions with the other Defendants, particularly with the other Chinese manufacturers of CRT Products.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

**489.** Through these discussions, IRICO established the prices and supply levels for CRT Products.

**490.** No part of the conspiratorial conduct in connection with CRT Products was ordered by the Chinese government.

**491.** IRICO acted to promote its private independent interests through its involvement in the alleged conspiracy.

**492.** Between at least 1997 and 2006, the Defendant Thai CRT participated in multiple Glass Meetings.

**493.** The highest-ranking executives of Thai CRT attended these meetings.

**494.** Thai CRT also participated in multiple bilateral discussions with other Defendants, notably with Samtel.

**495.** Through these discussions, Thai CRT established the prices and supply levels for CRT Products.

**496.** Thai CRT never effectively left the conspiracy.

**497.** Between at least 1998 and 2006, the Defendant Samtel participated in multiple bilateral discussions with the other Defendants, in particular with Thai CRT.

**498.** High-level executives from Samtel attended these meetings.

**499.** Through these discussions, Samtel established the prices and supply levels for CRT Products.

**500.** Samtel never effectively left the conspiracy.

**501.** When the Plaintiff, the Attorney General, refers to a corporate family or companies by a single denomination in the allegations of conspiracy, the Attorney General is alleging that one or more of the employees or agents of the entity within the Corporate family participated in conspirative meetings on behalf of each company of that family.

**502.** In fact, individual participants in conspirative meetings and discussions did not always know the corporate affiliation of their counterparts, nor could they distinguish between the entities of a corporate family.

**503.** The individual participants entered into the agreements on behalf of, and reported the meetings and discussions to, their respective corporate families.

**504.** As a result, the entire corporate family was represented in meetings and discussions by

46

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5308-1 Filed 08/05/19 Page 47 of 61
Case 3:19-cv-01246-ADC Document 30-1 Filed 04/25/19 Page 47 of 61
CERTIFIED TRANSLATION
Case3:19-cv-01246     Document 1-6     Filed 03/18/19     Page 47 of 61

their agents, and they were part of the agreements held at the meetings.

###     D.     The CRT Market During the Conspiracy

**505.**     Until about ten years ago, CRTs were the dominant technology used for screens, including television sets and computer monitors.

**506.**     During the Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual earnings.

**507.**     The following data was reported to Stanford Rezurces [sic], Inc., a market research firm focused on the global display industry:

| Year | Units sold (millions) | Revenue (billions of US dollars) | Average Price per Unit |
|---|---|---|---|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

**508.**     North America was the largest market for television sets and CRT monitors during the Period.

**509.**     According to a report published in Fuji Chimera Research, the 1995 world market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were purchased in North America.

**510.**     In 2002, North America was still purchasing about 35 percent of the world's CRT monitors. See, The Future of Liquid Crystal and Related Display Materials, Fuji Chimera Research, 1997, page 12.

**511.**     The Defendants' collusion is evidenced by the price movements in the CRT Market during the Period.

**512.**     In the '90s, industry analysts repeatedly predicted the decline in consumer prices for CRT Products, which did not fully materialize.

**513.**     For example, in 1992, an analyst at Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997." Information Display 9/92 on page 19.

47

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

514.     Despite such predictions, and the existence of conditions that warranted a decline in prices, CRT prices remained stable.

515.     In 1996, another industry source noted that: "the price of the 14" tube is at a sustainable USD50 and has been for some years..."

516.     At the beginning of 1999, despite the decrease in production costs and the rapid entry of flat-screen products, the price of large color CRTs, in fact, rose.

517.     The price increase was supposedly based on a growing global demand.

518.     In fact, this price increase was the result of the collusive conduct as alleged in this complaint.

519.     After the over-supply of 17-inch CRTs during the second half of 1999, the average selling price of CRTs rose again at the beginning of 2000.

520.     An article dated March 13, 2000 in Infotech Weekly quoted an industry analyst saying that the price increase was: "unlike most other PC-related products."

521.     A BNET Business Network article in August 1998 reported that:

> "key components (cathode ray tubes) in computer monitors have risen in price. 'Although Several manufacturers raised their CRT prices in the beginning of August, additional CRT price increases are expected for the beginning of October.. While computer monitor price increases may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

522.     An article in 2004 by Techtree.com reports that several computer monitor manufacturers, including LG Electronics, Philips, and Samsung, were increasing the price of their monitors in response to increases in CRT prices caused by the alleged lack of glass shells used to make the tubes.

523.     Philips is quoted as saying:

> *"It is expected that by the end of September this year [2004] there will be 20% hike in the price of our CRT monitors."*

524.     The Defendants also conspired to limit the production of CRTs through the closure of production lines for entire days, and the closure or consolidation of their manufacturing facilities.

525.     For example, factory use by the Defendants fell from 90 per cent in the third

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

quarter of 2000 to 62 per cent in the first quarter of 2001.

**526.** This is the most dramatic example of declines in factory use.

**527.** There were sudden drops throughout the Period, but to a lesser degree.

**528.** The Plaintiff has been informed and believes that such sudden and coordinated drops in factory use by the Defendants was the result of the agreements among the Defendants to decrease production in order to stabilize the prices of CRT Products.

**529.** During the Period, while the demand in Puerto Rico for CRT Products continued to decline, the Defendants' conspiracy was effective in moderating the normal pressures on CRT Product prices caused by the entry and popularity of the new generation of LCD panels and plasma screens.

**530.** Finsen Yu, President of Skyworth Macao Commerical [sic] Offshore Co., Ltd., a television manufacturer was quoted in January 2007 as saying: "[t]he CRT technology is very mature; prices and technology have become stable."

**531.** During the Period, there were not only rare and sustained periods of price stability, but there were even increases in the prices of CRT Products.

**532.** Said price increases occurred even though demand dropped because CRT Products were nearing their obsolescence, due to the emergence of new, potentially superior, and clearly more popular technology; replaceable technology.

**533.** Said price increases and price stability in the CRT market during the Period are inconsistent with a competitive market for a product facing a demand that was rapidly declining due to a new replaceable technology.

### E.    Int<u>ernational Anti-Trust Investigations by Government Agencies</u>

**534.** The Defendants' Conspiracy to fix, increase, maintain, and stabilize the prices and restrict the production of CRT Products sold in Puerto Rico during the Period was demonstrated by a multinational investigation initiated by the Antitrust Division of the United States Department of Justice ("DOJ") and others in November 2007.

**535.** On November 8, 2007, the antitrust authorities in Europe, Japan, and South Korea raided the CRT manufacturing offices as part of an international investigation of alleged price fixing.

49

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5308-1 Filed 08/05/19 Page 50 of 61
Case 3:19-cv-01246-ADC Document 38-1 Filed 04/22/19 Page 50 of 61

CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 50 of 61

**536.** On February 10, 2009, the DOJ issued a press release announcing that a grand jury in San Francisco had sent, on that very day, an indictment of two crimes against the previous *Chairman and Chief Executive Officer* of the Defendant Chunghwa Picture Tubes, Ltd., Cheng Yuan Lin, a/k/a C.Y. Lin, for its participation in global price fixing conspiracies for two types of CRTs used in computer monitors and television sets.

**537.** The press release indicated that:

> "[t]his is the first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray tubes industry."

**538.** The press release also indicates that Lin had previously been accused for his participation in a conspiracy to fix TFT-LCDs prices.

**539.** The indictment of Mr. Lin indicates that the combination and conspiracy to fix CRT prices was partly carried out in the United States.

**540.** The Defendant MT Picture Display Co., Ltd., the CRT unit of the Defendant Panasonic, confirmed that it was raided by the Fair Trade Commission of Japan.

**541.** Kyodo News reported on November 8, 2007, on information and belief, that MT Picture Display fixed CRT prices with manufacturers in three Asian countries, including Samsung SDI Co. of South Korea.

**542.** Kyodo News also reported that:

> "Officials of these three companies are believed to have had at least 10 meetings since 2005 in major Asian cities to coordinate target prices when delivering their products to television manufacturers in Japan and South Korea, the sources said."

**543.** The Defendant Samsung SDI Co., Ltd. was raided by the Fair Trade Commission of South Korea, which had begun an investigation into Samsung's CRT business.

**544.** The *Asian Shimbun* also reported on November 10, 2007 that:

> "[t]he representatives held meetings in Southeast Asia where the companies operate CRT factories, the sources said. The European Commission, the European Union's executive branch, and the U.S. Justice Department have been investigating four companies' [referring to the four Asian-based manufacturers—MT Picture Display, Samsung SDI Co., Chunghwa Picture Tubes, LP Displays] overseas units and are closely consulting with the Fair Trade Commission by sharing information."

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5530-1 Filed 08/05/19 Page 51 of 61
Case 3:19-cv-01246-ADC Document 30-1 Filed 04/22/19 Page 51 of 61

CERTIFIED TRANSLATION
Case3:19-cv-01246 Document 1-6 Filed 03/18/19 Page 51 of 61

545.    On November 21, 2007, the Defendant Royal Philips publicly reported that it was the target of one or more investigations of anti-competitive practices in the CRT industry.

546.    The spokesman for Royal Philips, Joon Knapen, declined to comment on which jurisdictions had begun investigations.

547.    Royal Philips stated that it intended to help regulators.

548.    In its Annual Report of 2008, the Defendant Toshiba reported that:

> "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

549.    On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel. E l HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal-GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.O.O., LG Philips displays Czech Republic s.r.o., LP displays, Chunghwa Picture Tubes (UK), Ltd., Chunghwa Picture Tubes, Ltd., Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany Gmbh, Matsushita Global HQ, Matsushita European HQ.
> Based on the data available, the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including colored picture tubes and colored screen tubes) on the European market between 1995 and 2007. The anti-competitive behavior may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production.
> The undertakings evolved a structural system and functional mechanism of cooperation. According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

550.    As described in this complaint, the Defendants have a history of contact with joint venture competitors, numerous cross-licensing agreements, and other partnerships in the electronics industry.

551.    Many Defendants also have a history of "cooperation" and anti-competitive behavior.

51

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5501 Filed 08/05/19 Page 52 of 61
Case 3:19-cv-01246-JSC Document 1-6 Filed 04/25/19 Page 52 of 61

CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 52 of 61

552.      For example, the Defendant Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix Dynamic Random Access Memory (DRAM) prices.

553.      The Defendants Samsung and Toshiba have admitted being contacted by the DOJ as part of an investigation into Static Random Access Memory and NAND Flash Memory price fixing.

554.      In December 2006, the government authorities of Japan, South Korea, the European Union, and the United States, revealed a comprehensive investigation into anti-competitive practices in the closely related TFT-LCD market.

555.      On December 12, 2006, news reports indicated that the Defendants Samsung and Chunghwa, such as the LCD joint ventures between the Defendants Philips and LG Electronics, Inc., LG Display Co., Ltd., were all under investigation for TFT-LCD price fixing.

556.      On November 12, 2008, the DOJ announced that it had reached agreements with three LCD manufacturers — LG Display Co., Ltd. (and its subsidiary in the United States, LG Display America, Inc.), Sharp Corporation, and the Defendant Chunghwa Picture Tubes, Ltd. — to plead guilty to violating Section 1 of the Sherman Act, 15 U.S.C. § 1, and to pay a total of $585 million in criminal fines for their roles in the conspiracy to fix prices of TFT-LCD panels sold worldwide.

557.      On March 10, 2009, the DOJ announced that it had reached an agreement with the Defendant Hitachi Displays, Ltd., a subsidiary of the Defendant Hitachi, Ltd., to plead guilty to violating Section 1 of the Sherman Act, 15 U.S.C. § 1, and to pay a fine of $31 million for its role in the conspiracy to fix the prices of TFT-LCD panels.

558.      The indictments of LG Display Co., Ltd., Sharp Corporation, Chunghwa Picture Tubes, Ltd., and Hitachi displays, Ltd. all stated that the combination and conspiracy to fix the prices of TFT-LCDs took place, partly in the United States.

52

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5530-1 Filed 08/05/19 Page 53 of 61
Case 3:19-cv-01246-ADC Document 58-1 Filed 04/22/19 Page 53 of 61
CERTIFIED TRANSLATION
Case 3:19-cv-01246     Document 1-6     Filed 03/18/19     Page 53 of 61

## VIII.    THE REPERCUSSION OF THE EXCESSIVE CHARGES ON THE PLAINTIFF

**559.**    The Defendants' conspiracy to fix, increase, maintain, and stabilize the price of CRT Products at artificial levels resulted in damages to the Plaintiff because Puerto Rico consumers had to pay higher prices for CRT Products, than they would have paid in the absence of the conspiracy by the Defendants.

**560.**    The entire overcharge related to sales in Puerto Rico during the Period was passed on to consumers in Puerto Rico.

**561.**    As the DOJ acknowledged in announcing the indictment against the Director General and *Chairman* of the Defendant Chunghwa: "This conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes sold at fixed prices."

**562.**    The Defendants identified earlier, that they regularly attended Glass Meetings, they monitored the prices of televisions and computer monitors sold in the U.S. and elsewhere.

**563.**    The purpose and effect of investigating such data from the retail market had three motivations.

**564.**    First, it allowed Defendants, such as Chunghwa, which did not manufacture televisions or CRT monitors in the way Samsung, LG, Daewoo, Panasonic, Toshiba, Philips and Hitachi did, to monitor the price fixing agreement to ensure that sales among the Defendants were kept at supracompetitive levels.

**565.**    Second, it allowed all the Defendants to monitor the price fixing agreement for independent OEMs, which would reduce the prices of the finished goods if there was a corresponding reduction in a Defendant's CRT prices.

**566.**    Finally, as outlined above, the Defendants used the prices of the finished goods to analyze whether they could increase the prices or on the contrary they had to agree on a "bottom" price.

**567.**    The Defendants concluded that in order to make CRT price increases work, they had to make the increase high enough for their customers (TV and CRT monitor manufacturers) to justify an increase in prices for their clients (e.g., retailers and computer OEMs).

53

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5308-1 Filed 03/05/19 Page 54 of 61
Case 3:19-cv-01246-ADC Document 30-1 Filed 04/22/19 Page 54 of 61

CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 54 of 61

**568.** In this way, the Defendants ensured that 100% of the supracompetitive overcharges for CRT Products was passed on to the indirect consumers of their products.

**569.** Consumers in Puerto Rico purchased CRTs either from an OEM of computers and television sets such as Dell or Sharp, or from a retailer like Best Buy.

**570.** Due to the scope of the price-fixing conspiracy described in the present complaint, television and computer monitor manufacturers were not compelled to pass on the overcharge to the merchandise consumers.

**571.** Due to the fact that each of the direct buyers' competitors were also buying CRT for supracompetitive prices from members of the conspiracy, no direct buyer faced competition of goods from a competitor who was not paying the supracompetitive prices for the CRTs.

**572.** The Price of CRT Products correlates directly to the price of CRTs.

**573.** Margins for CRT television and monitor manufacturers were narrow enough for CRT price increases to force them to increase the prices of their CRT Products.

**574.** The foregoing means that increases in CRT prices lead to the corresponding rapid increases in the prices of CRT Products at the OEM level.

**575.** Computer and television OEMs and CRT retailers are all subject to vigorous price competition if they are selling CRT television sets or monitors.

**576.** The demand for CRTs is ultimately determined by buyers of products containing CRT's.

**577.** The market for CRTs and the market for CRT Products are inextricably intertwined and thus cannot be considered separately.

**578.** The Defendants were fully aware of this close relationship and used CRT television and monitor forecasts to predict sales and determine production levels and pricing of CRTs.

**579.** Computers and television sets are goods with little or no brand loyalty, therefore aggressive pricing will result in consumers changing their preferences to different brands.

54

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5380-1 Filed 03/05/19 Page 55 of 61
Case 3:19-cv-01246-ADC Document 38-1 Filed 04/22/19 Page 55 of 61

CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 55 of 61

580.    Prices are based on production costs, which in turn are determined by the costs of the components, since the cost of assembly is minimal.

581.    Therefore, OEMs use the costs of components, such as the cost of CRTs, as a starting point for calculating all prices.

582.    On information and belief, the OEMs of computers and television sets establish the prices of finished goods by a cost basis plus margin.

583.    So, the prices of computers and television sets follow the costs of the components.

584.    The CRT is the most expensive component of the products in which they are incorporated.

585.    On information and belief, the cost of a CRT in a computer monitor is approximately 60% of the total cost of manufacturing the computer monitor.

586.    On information and belief, the cost of a CRT in a television set is a little less than the total manufacturing cost, because a television set has more components than a computer monitor, such as the tuner and the speakers.

587.    The economic and legal literature recognizes that, as price-fixing decisions are based on cost, it is easy to determine the rate of transferring the cost.

588.    The accuracy of the costs involved refers to whether an overcharge affects a direct cost *i.e.* variable) or indirect *i.e.* general expenses).

589.    Surcharges can be transferred much faster at a higher rate if overcharges affect direct costs.

590.    Here, the CRTs are a direct and substantial cost of CRT Products.

591.    Therefore, the Plaintiff will be able to prove that the CRT overcharges were passed on to consumers in Puerto Rico.**592.** Once a CRT leaves its manufacturing site, it remains essentially unchanged as it moves through the distribution system.

593.    CRTs are identifiable, discrete, and physical objects, which do not change shape and they are not an indistinguishable part of the television set or the computer monitor into which they are incorporated.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST   Document 5530-1   Filed 08/05/19   Page 56 of 61
Case 3:19-cv-01246-ADC   Document 58-1   Filed 04/22/19   Page 58 of 61
CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 56 of 61

594.    Therefore, the CRTs follow a traceable chain from the Defendants to the OEMs to the consumers of the finished products that incorporate the CRTs.

595.    Furthermore, as CRTs can be physically tracked through the supply chain, the price thereof can also be traced to show that changes in prices paid by direct buyers of CRTs affect the prices paid by Users of CRT Products.

596.    Furthermore, upon information and belief, given that CRTs can be physically tracked through the supply chain, the price thereof can also be traced to show that changes in prices paid by direct buyers of CRTs affect the prices paid by consumers of CRT Products; computer and television OEMs establish the prices of the finished products according to cost base plus margin.

597.    Retailers regularly use a margin rule.

598.    The retail price is set as the wholesale cost plus a percentage margin designed to cover non-product-related costs and a profit.

599.    This System ensures that cost increases for the retailer will be passed on to the final consumer.

600.    For example, CDW, a large vendor of CRT monitors, uses such a system. A statement in the case of *DRAM* the CDW pricing director details precisely how sales prices are calculated:

> In general, CDW employs a "building block" approach to setting its advertised prices. The first building block is the Cost of Goods Sold (COGS), which represents the price CDW paid to acquire the product. ..CDW...adds a series of positive markups to the cost to CDW to acquire a given product. These markups are in addition to the pass-through effect of changes in the costs charged to CDW for that product by a given vendor.

601.    The economic and legal literature has recognized that the illegal overcharges of a component usually result in higher prices for products containing this component at the fixed price.

602.    As Professor Herbert Hovenkamp, a notable scholar in the antitrust field, said in his treatise, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) on p. 624:

> A monopoly charge at the top of the distribution chain generally results in

56

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

higher prices at every level below. For example, if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and will pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain will be poorer as a result of the monopoly price at the top. Theoretically, one can calculate the percentage of any overcharge that firm at one distributional level will pass on to those at the next level.

603.    Likewise, two other scholars in the antitrust field — Professor Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Hass School of Business at the University of California, Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern School of Law and author of the Handbook of the Law of Antitrust)—noted that: "In a multiple-level chain of distribution, passing on monopoly overcharges is not the exception; it is the rule."

604.    As Professor Jeffrey McKie-Mason (Arthur W. Burks Professor for Information and Computer Science, Professor of Economics and Public Policy, and associate Dean of Academic Affairs at the School of Information at the University of Michigan), an expert who has presented evidence in several cases of indirect purchasers in relation to Microsoft Corporation, said (giving evidence quoted in a decision in the case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers.... Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

605.    The purpose of the conspiratorial conduct of the Defendants was to fix, increase, maintain, and stabilize the prices of CRTs and, as a direct and predictable result, CRT Products.

606.    The CRT market for CRTs and the market for CRT Products are inextricably intertwined.

607.    One exists to serve the other.

608.    The Defendants not only knew, but expressly contemplated that the prices of CRT Products would increase as a result of their CRT price increases.

57

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5530-1 Filed 08/05/19 Page 58 of 61
Case 3:19-cv-01246-ADC Document 30-1 Filed 04/25/19 Page 58 of 61
CERTIFIED TRANSLATION
Case3:19-cv-01246         Document 1-6         Filed 03/18/19         Page 58 of 61

609.    Finally, many Defendants and/or their co-conspirators themselves were manufacturers of CRT television sets and computer monitors.

610.    Such manufacturers include, for example, Samsung, LG, Hitachi, Toshiba, Philips, and Panasonic.

611.    Having agreed to fix the prices of the CRTs, the major component of the finished products they were making, those Defendants were intent on passing the full cost of this component on to their finished merchandise and, indeed, they did.

612.    As a direct and foreseeable result of the Defendants' illegal conduct, Puerto Rico consumers were forced to pay supracompetitive prices for the Products.

613.    These inflated prices have been passed on to consumers by manufacturers, distributors, and retailers.

## IX. FRAUDULENT CONCEALMENT

614.    Throughout the relevant period, the Defendants affirmatively and fraudulently hid their illegal conduct from the Plaintiff.

615.    The Plaintiff did not discover and could not have discovered through exercising reasonable care, that the Defendants were infringing the law and enriching themselves at the expense of consumers in Puerto Rico until the public disclosures.

616.    Nor could the Plaintiff have discovered the violations before, because the Defendants were conducting their conspiracy in secret, concealing the nature of their illegal conduct and acts in order to foster such activities, and fraudulently concealed these activities through several methods designed to avoid detection.

617.    Moreover, the conspiracy by its very nature was self-concealed.

618.    The Defendants participated in a successful and illegal price-fixing conspiracy with respect to CRT Products, which they affirmatively concealed in the following aspects:

    a.    By way of agreements with each other not to publicly discuss, or in any other way disclose, the nature and substance of acts and communications to promote their illegal scheme, and through expulsion arrangements for those who

58

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5530-1 Filed 08/05/19 Page 59 of 61
Case 3:19-cv-01246-ADC Document 1-6 Filed 04/22/19 Page 59 of 61

CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 59 of 61

ceased to comply with the scheme.

b.     Through agreements with each other to limit the number of representatives of each Defendant attending meetings to avoid detection.

c.     Through agreements to prevent individual representatives attending the meetings from being mentioned in any meeting reports.

d.     Through agreements with each other to stop taking minutes at meetings or to take any form of written notes during meetings.

e.     By giving false and para-textual reasons for their CRT price increases during the relevant period, and falsely describing that such pricing was for external costs rather than through their conspiracy.

f.     Through agreements with each other to tell customers about price changes, and remembering which person attending would communicate the price change to which customer.

g.     Through agreements with each other to cite higher prices than the price fixed for certain customers in order to seem like the price was not fixed.

h.     Through agreements with each other regarding the content of statements on capacity and supply.

i.     Through agreements with each other to remove references in expense reports, which could have revealed illegal meetings.

j.     Through agreements via other means to prevent their illegal conspiracy to fix the prices of CRT Products being detected.

**619.**     As a result of the fraudulent concealment of the conspiracy, the Defendant claims that the statutory limitation did not begin until information about the illegal conspiracy was published.

## X. <u>CAUSE OF ACTION</u>

### <u>UNJUST ENRICHMENT</u>

**620.**     The Plaintiff incorporates each of the foregoing allegations by reference as if they were set forth in full.

**621.**     The Plaintiff presents this claim in person, on behalf of the government entities, and as *parens patriae* of natural persons and corporations, to enforce public rights and to protect residents

59

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5539-1 Filed 08/05/19 Page 60 of 61
Case 3:19-cv-01246-ADC Document 38-1 Filed 04/22/19 Page 60 of 61

CERTIFIED TRANSLATION

Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 60 of 61

from the unjust enrichment of the Defendants.

**622.**      The Defendants' conspiracy enriched them.

**623.**      The enrichment of the Defendants resulted in a correlative loss (or impoverishment) of the Plaintiff.

**624.**      There was a connection or nexus between the Plaintiff's loss (or impoverishment) and the enrichment of the Defendants.

**625.**      There are no reasons whatsoever that justify the enrichment of the Defendants.

**626.**      There is a lack of a provision or legal precept that prevents the application of enrichment without reason.

**627.**      There is no adequate legal remedy to repair the harm caused to the Plaintiff.

**628.**      No statute provides a remedy for the harm caused.

**629.**      No contract relates to the controversy before this Honorable Court.


## XI. **PETITION**

**IN VIEW OF THE FOREGOING,** the Plaintiff, The Government of Puerto Rico, very respectfully requests this Honorable Court;

**(a)**      To declare that the conduct, conspiracy and combination and acts and practices related and alleged in this Lawsuit have enriched the Defendants at the expense of the Plaintiff;

**(b)**      To order that the Defendants compensate the Plaintiff to the extent that the Defendants have been enriched and the Plaintiff impoverished for a sum of no less than $30 million;

**(c)**      That the Plaintiff be granted any other amounts as permitted by Law;

**(d)**      That the Plaintiff be granted the legal interest at the highest rate;

**(e)**      That the Plaintiff be granted the costs and expenses of the litigation, including reasonable attorneys' fees; and

**(f)**      For any other remedy to be ordered when deemed to be fair and appropriate under the circumstances.


In San Juan, Puerto Rico today, December 17, 2018.

**Respectfully submitted.**

WANDA VÁZQUEZ GARCED
Attorney General

/s/Denise Maldonado Rosa

60

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

Case 4:07-cv-05944-JST Document 5389-1 Filed 03/05/19 Page 61 of 61
Case 3:19-cv-01246-ADC Document 30-1 Filed 04/22/19 Page 61 of 61
CERTIFIED TRANSLATION
Case3:19-cv-01246          Document 1-6          Filed 03/18/19          Page 61 of 61

Denise Maldonado Rosa
*Deputy Attorney General*
RUA 15,652

PO Box 9020192
Tel. (787) 201-8900
E-mail dmaldonado@justicia.pr.gov

/s/Jane A. Becker Whitaker
    Jane A. Becker Whitaker
    RUA 9.352

/s/Jean Paul Vissepó Garriga
    Jean Paul Vissepo Garriga
    RUA 14.482

Becker & Vissepó, PSC
P.O. Box 9023914
San Juan, PR 00902-3914
Tel: (787) 945-2406

E-mail jbw@beckervissepo.com
janebeckerwhitaker@gmail.com

E-mail jpv@beckervissepo.com
jp@vissepolaw.comD

61

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.