

Kassra P. Nassiri
NASSIRI & JUNG LLP
1700 Montgomery Street, Suite 207
San Francisco, CA 94111

(t) 415 762 3100 | (f) 415 534 3200
kass@njfirm.com | www.njfirm.com

September 17, 2019

<u>Via E-Filing</u>

Honorable Judge Jon S. Tigar
U.S. District Court for the Northern District of California
450 Golden Gate Avenue
San Francisco, CA 94102

Re:   In re: Cathode Ray Tube (CRT) Antitrust Litigation, Indirect Purchaser Actions
      MDL No. 1917, Case No. C-07-5944-JST (N.D. Cal.)

Dear Judge Tigar:

Non-party Spectrum Settlement Recovery, LLC ("Spectrum"), which has been hired by class members representing approximately 38% of all timely filed claims by value[1] to assist with their recovery, submits this letter to the Court in support of Indirect Purchaser Plaintiffs' Motion Pursuant to Ninth Circuit Mandate to Reconsider and Amend Final Approval Order, Final Judgment and Fee Order ("Motion to Amend"), submitted to this Court on September 16, 2019,[2] and to address a specific matter relating to final approval of the Amendments[3]—the extraordinary number of Late Claims submitted in this case and the imperative to address that issue now, rather than just prior to distribution, as might be expected in a more typical case.

This Court has recognized that time is of the essence in this case.[4] Class members are seeking compensation for harms that occurred as long as 25 years ago and the time for them to receive their due is long past. Now that the way is paved to bring this case to a conclusion, Spectrum respectfully submits that in order to maximize the likelihood of an expeditious distribution of settlement proceeds to the Class, the Court should resolve the Late Claims problem as soon as possible.

---

[1] *See* June 6, 2018 report submitted by The Notice Company ("Settlement Administrator") (Not posted to ECF).

[2] ECF No. 5587.

[3] All capitalized terms herein shall have the meanings assigned to them in the Motion to Amend (ECF No. 5587).

[4] ECF No. 5587 at 2:8-10.

Spectrum applauds IPP Counsel's efforts to reach the Amendments with Defendants. The Amendments smartly address the Ninth Circuit's concerns regarding the release of claims by indirect purchasers who were not eligible to participate in the distribution of the settlement fund,[5] and because of IPP Counsel's willingness to sacrifice a substantial portion of their fees—$29 million—at no cost to the class.[6] IPP Counsel has kept intact the original monetary recovery obtained for class members, making it possible now to distribute those monies to the class in months rather than years. And in so doing, IPP Counsel has provided the Court with a clear path to accomplishing this important goal.

IPP Counsel has not proposed reopening the claims filing window. Spectrum agrees. Not only is it unnecessary to do so—because the original notice program was so effective—but re-opening claims filing now would result in a months'-long (or longer) delay in the distribution of proceeds. It would also require additional expense to process and audit new claims, many of which will inevitably be duplicate or fraudulent claims,[7] and consequently would deplete the fund for the Class.

The Motion to Amend brings up (but does not take a position on) an unresolved issue previously brought before this Court—the treatment of late-filed claims. According to the Settlement Administrator, of the 80,814,586 weighted CRT units that have been filed and processed to date, 13,002,458 weighted units—approximately 16% of all claims submitted—are associated with claims filed after the filing deadlines established by the Court.[8] According to the Settlement Administrator, the value of Timely Claims is nearly twenty percent greater (from $5.12 to $6.10) if Late Claims are disallowed.

Not only would allowing Late Claims *en masse* reduce the recovery of those class members who adhered to the Court-ordered filing deadlines, it might also deny certain class members of due process. While the simplicity of granting blanket approval to Late Claims is in some sense appealing, doing so would improperly afford special treatment for a subset of the class and would deprive other class members of their full due process rights, by effectively

---

[5] ECF No. 5587 at 8:16-18, *passim*.

[6] ECF No. 5587 at 3:11-12, 18-19.

[7] Experience in this and other mega class actions suggests that if the claims period were reopened now, the Settlement Administrator would be required to sort through an enormous number of duplicative and potentially fraudulent claims. *Cf*. Manual Complex Litigation (Fourth) § 21.28 (2004), Interlocutory Appeals of Certification Decisions (recognizing "the confusion and the substantial expense of renotification" that may result when two notices are sent). And the problem of duplicative and fraudulent claims is, unfortunately, likely to be exacerbated by the increasing number of TPCFs looking for opportunities in mega class actions like this one. *See* IPP Objection to Extension of Claim Filing Deadline, 1/12/2016, ECF No. 4292.

[8] Declaration of Joseph M. Fisher re: Amendments to the Settlements ("Fisher Decl."), ECF No. 5587-2, ¶¶ 5-6.

*In re: Cathode Ray Tube (CRT) Antitrust Litig., Indirect Purchaser Actions*
September 17, 2019
Page 3 of 15

granting some class members (and not the class at large) a retroactive extension of the original and extensively litigated claim filing deadline. Had the Settlement Administrator in 2016 notified the class at large that the December 7, 2015 claims filing deadline was merely advisory and late claims would be accepted, or if this Court had treated the deadline as uncertain (as has happened in other cases), there is no doubt that some class members would have submitted claims after the deadline. But no such notice was given, nor did the Court take that approach. The Court's position was definitive regarding the deadline, and both it and IPP Counsel issued warnings against the risks of failing to follow the rules of the road established by the Court.

Indeed, IPP Counsel previously warned of the inequity of blanket acceptance of late-filed claims on behalf of large corporations, to the detriment of consumers and other corporations:

> [T]he single biggest reason to adhere to the existing claims submission deadline is that an extension of that deadline could result in a skewing of additional claims in favor of corporate claimants, to the detriment of existing timely claims submitted by both natural person[s] and corporate claimants. If the claims submission deadline is extended, with no corresponding notice of that extension provided to potential claimants[,] consumers will be largely unaware that the deadline has been extended, resulting in only minimal additional consumer claimants. . . . There is a robust claims administration 'aggregator' market that frequently targets such large corporate claimants [who] submit claims on their behalf in exchange for a fee. . . [L]arge corporate claims will be spurred to the detriment of consumer claimants, and will unfairly dominate the claims process.[9]

Spectrum respectfully posits that if Late Claims were to be summarily allowed, due process would require that the claims filing window be reopened to allow **all** class members the opportunity to file claims. Otherwise, those class members who presumed that the Court-ordered deadline would be enforced would be denied due process. But reopening the claims filing window would require full notice,[10] be costly and result in substantial additional delay. Instead, the Court should adhere to IPP Counsel's expeditious proposed schedule for final approval, and proceed (likely through the Special Master) simultaneously and in parallel to determine which

---

[9] IPP Objection to Extension of Claim Filing Deadline, 1/12/2016, ECF No. 4292.

[10] Due process concerns could not be satisfied by limited notice to those who responded to the prior notice, per IPP Counsel's proposal, because such limited notice would not reach those class members who did not previously file a claim. (*See* Section II(C) below.)

Case 4:07-cv-05944-JST   Document 5588   Filed 09/17/19   Page 4 of 15

*In re: Cathode Ray Tube (CRT) Antitrust Litig., Indirect Purchaser Actions*
September 17, 2019
Page 4 of 15

Late Claims should be allowed because the claimants can demonstrate on an individualized basis that their failure to adhere to the filing deadline was the result of excusable neglect.

Determining the validity of Late Claims now, as opposed to after final approval, will allow for the remaining pieces of the puzzle that this case presents to move in unison towards a speedy resolution. Proceeding now with the individualized adjudication of Late Claims would synchronize well with the likely case timeline, including the inevitable appeals back to the same Ninth Circuit panel that previously considered appellate issues and which is well situated to resolve any further appeals expeditiously.[11]

## I. THE COURT SHOULD DECIDE HOW IT WILL HANDLE LATE CLAIMS NOW, AS TO DO OTHERWISE WOULD ENTAIL SUBSTANTIAL ADDITIONAL DELAY

While the treatment of Late Claims was previously – and prematurely – raised by a third-party claim filer ("TPCF"), both with this Court and more unusually the Ninth Circuit, the issue is now ripe for adjudication. Even though this issue would normally be dealt with later, in this instance and due to the factors described below, now is the appropriate time to confirm that the Court will not issue an order summarily approving *en masse* this body of Late Claims. There will almost certainly be an appeal of the Court's decision regarding the handling of Late Claims, and by considering the matter now, that appeal could be reviewed by the Ninth Circuit at the same time any appeals from an order finally approving the Amendments (if this comes to pass) are taken. Otherwise, if the Court puts this matter off until the later stages of the process, there is a substantial chance that the parties will have to go through a third cycle of appeal, wasting time and judicial resources.

This case is unusual because of the large numbers of Late Claims filed. A majority of the Late Claims in this case was filed by two third party claims filers ("TCPFs")—Financial Recovery Services ("FRS") and Crowell & Moring LLP ("Crowell").[12] FRS alone filed Late Claims—nearly half of them more than one year after the deadline—amounting to more than 7 million weighted units.[13] The financial stakes associated with the Late Claims are substantial. In the aggregate, according to the Settlement Administrator's estimates, the Late Claims are worth over $66 million to the late claimants (and importantly, the TPCFs who stand to earn a fee on those claims).[14] On the other hand, for class members who filed Timely Claims, acceptance of

---

[11] ECF No. 5587 at 2:3-5. As all appeals will go the same panel, it should not be inordinately lengthy, and the time while the appeal is decided can coincide with the resolution of late claimants' assertions of "excusable neglect."

[12] Crowell is a law firm, but it also serves as a third-party claims filer in this and other cases.

[13] ECF No. 5255-1, ¶¶ 7-8.

[14] ECF No. 5587-2, ¶ 7.

Case 4:07-cv-05944-JST Document 5595-1 Filed 09/24/19 Page 5 of 15
Case 4:07-cv-05944-JST Document 5588 Filed 09/17/19 Page 5 of 15

*In re: Cathode Ray Tube (CRT) Antitrust Litig., Indirect Purchaser Actions*
September 17, 2019
Page 5 of 15

the Late Claims *en masse* would result in each weighted unit being worth about 84% of what it would be worth if Late Claims were not accepted.[15]

No matter how the Court rules on the Late Claims issue, an appeal seems inevitable. If the Court summarily accepts all Late Claims, class members who filed Timely Claims will have a financial incentive to appeal. If the Court requires late claimants to demonstrate excusable neglect, late claimants (likely through FRS and Crowell) will have a financial incentive to appeal.

Given this dynamic, and to meet the shared goal of an expeditious distribution of the settlement fund, the Court should decide how it will handle Late Claims now. That way, any appeal of the Court's decision may be heard at the same time as the other appeals that are likely to be taken (e.g., appeals on adequacy of counsel, the amount to be distributed and the award of attorneys' fees) if the Court grants final approval. Otherwise, there might be two, separate rounds of appeals—first, on issues related to the Amendments, and later, on the handling of Late Claims. And of course, since both the numerator and the denominator must be established in order to calculate the weighted unit value, no distribution of settlement funds may proceed until the fate of Late Claims is determined.

Spectrum respectfully contends that the proper method for determining whether Late Claims should be allowed is to require each late claimant to establish excusable neglect. If the Court were to rule now and establish excusable neglect as the standard by which Late Claims will be evaluated, then the issue would be ripe for appeal now. And the process of evaluating excusable neglect (likely through the Special Master) could begin immediately and continue pending the outcome of appeal on the Court's ruling. By the time the appeals were decided, many, if not all, Late Claims will have been determined to be allowed or not, and distribution would soon follow.[16] Otherwise, should the Court wait and decide how Late Claims will be resolved after final approval, there is likely to be a second post Amendments appellate cycle (and third overall) and a corresponding delay (perhaps as long as six-nine months) in the distribution of the settlement proceeds to class members.

---

[15] *Id.*

[16] In practice, viable claims of excusable neglect are likely to fall within categories (e.g., medical issues preventing a class member from filing, versus a class member who was simply too busy or uninterested to file by the deadline, etc.), making the determination of whether to allow Late Claims more manageable.

Case 4:07-cv-05944-JST   Document 5595-1   Filed 09/24/19   Page 6 of 15
Case 4:07-cv-05944-JST   Document 5588   Filed 09/17/19   Page 6 of 15

*In re: Cathode Ray Tube (CRT) Antitrust Litig., Indirect Purchaser Actions*
September 17, 2019
Page 6 of 15

## II. THE COURT SHOULD IMPLEMENT A PROCEDURE FOR DETERMINING WHETHER "EXCUSABLE NEGLECT" JUSTIFIES ACCEPTING INDIVIDUAL LATE CLAIMS

### A. Procedural History: The Court's Setting of the Claims Deadlines and Approval of the Notice to the Class of These Deadlines

This Court established deadlines for claim filing—December 7, 2015 for all end-user claims other than California natural persons, and June 30, 2016, which was the extended deadline for California natural persons[17]—that were communicated to class members through an approved notice plan that included over ten million direct mailings or emails to class members, as well as the creation and publication of a claims website. The Court and the Special Master evaluated and confirmed the sufficiency of the original settlements' notice plan on multiple occasions, including as it related to a request by the California Attorney General to extend the claim-filing deadline.[18]

The IPPs moved for and obtained preliminary and then final approval of the original settlements with Defendants. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2016 WL 3648478, at *1-3 (N.D. Cal. July 7, 2016). Following preliminary approval of the settlements and the proposed plan of distribution on July 9, 2015,[19] the Settlement Administrator directly mailed and emailed notice to 10,082,690 unique addressees.[20] Notice was also published online and in various publications throughout the United States. The notices advised settlement class members of the material terms of the proposed settlements, including the plan of distribution and the claims deadline of December 7, 2015. Notice reached an estimated 83% of class members with an estimated frequency of 3.1.[21] The Court issued its Order Granting Final Approval of the original settlements on July 7, 2016. *Id* at *3. It also determined that the plan of distribution was "fair and appropriate." *Id.* at *16.

The Court did not indicate any wiggle room in its approach to the timing of claim filing—the deadline was the deadline. And indeed, after initially setting an appropriate deadline, this Court repeatedly considered and denied requests to extend the deadline for all settlement class members. In fact, it did so on three separate occasions.

---

[17] ECF No. 5587-2, ¶ 5.

[18] *See* Special Master's Report and Recommendation re Request of California Attorney General that Final Date for Submitting Claims in the Indirect Purchaser Settlement be Extended to June 30, 2016 (ECF No. 4281; ECF No. 4351 at 57-58).

[19] Amended Order on Preliminary Approval, ECF No. 3906.

[20] ECF No. 5587 at 5.

[21] *Id.*

*In re: Cathode Ray Tube (CRT) Antitrust Litig., Indirect Purchaser Actions*
September 17, 2019
Page 7 of 15

      The first challenge to the deadline came on December 7, 2015, when a TPCF wrote to the Court to request an extension of the claim filing deadline after failing to obtain IPP Counsel's consent. The Court denied the request.[22]

      The second challenge came when, during the settlement approval process, the Court addressed whether, due to an intervening settlement by the California Attorney General in a parallel state court case, the claims deadline should be extended 120 days to June 30, 2016 for California natural persons.[23] IPPs objected to the request, and the Court noted that an extension to one group of claimants might result in objections from others.[24] Objector Dan L. Williams also objected to the extension of the claims deadline in that it was extended only for California persons, and requested instead that the claims deadline be extended for all settlement class members.[25] The Court overruled IPPs' objection and extended the claims deadline but did so only for California persons.[26] The Court denied the request that the deadline be extended for all class members, albeit without prejudice. *Id.* at 5. The Court clearly advised parties that disagreed with its order limiting the extension to natural persons that they must appear and challenge the Notice Plan in the proceedings related to Final Approval.[27]

      The third challenge came six months later, in connection with final approval of the original settlements and the related plan of distribution, and well after the original claims deadline had passed. There, the Court considered objectors' requests that, in conjunction with a new notice and claims period for certain CRT resellers, "a new claims period be established, on the grounds that the prior notice was inadequate." *CRT*, 2016 WL 3648478, at *21. The Court denied this extension request as well. *Id.*

---

[22] ECF No. 4235.

[23] *See* Order re Objection to Special Master R&R re Request for Extension of Claims Submission Deadline, ECF No. 4339 at 1.

[24] *Id.* at 3.

[25] *Id.* at 4; *see also* Williams' Objection, ECF No. 4312.

[26] ECF No. 4338 at 4-5.

[27] ECF No. 4712. This selective extension for a subset of the class (California natural persons) was legally justified because the California Attorney General requested a 120-day extension due to an intervening settlement by the California in a parallel state court case. When it ruled, the Court reasoned that since only the State of California pursued a *parens patrie* suit and obtained a settlement, it required a limited an extension in order to maintain a level playing field for all plaintiffs. Far from supporting a global extension through a revised deadline, the Court's treatment of California natural persons is exactly aligned with the process proposed here. The state *parens patrie* action acted as the functional equivalent of excusable neglect, albeit on a state level, rather than on an individual basis.

*In re: Cathode Ray Tube (CRT) Antitrust Litig., Indirect Purchaser Actions*
September 17, 2019
Page 8 of 15

One advocate for ignoring the claims deadline is Financial Recovery Strategies ("FRS"), a TPCF that filed thousands of late claims – many of which were filed not months but nearly two years after the Court-designated deadline had passed. FRS did not object to the adequacy of the notice plan during preliminary approval of the original settlement, or in the proceedings before the Special Master that specifically considered the sufficiency of the notice plan, or during the Court's consideration of final approval of the settlement. Nor did FRS intervene when the Court considered the AG's Motion to Extend the Deadline. From the close of the original deadline until Final Approval, FRS filed thousands of late claims. If FRS had any knowledge that the Notice Plan failed to advise its clients of the settlement, it was required to provide that information to the Court rather than keep it to themselves and for their own benefit. Indeed, the Court specifically ruled that Final Approval would be the last chance to litigate the issue.[28]

The original notice program was effective and constitutional. That notice, combined with the sales activities of many TPCFs, means that there are likely very few eligible mid- and large-sized class members who were unaware of this settlement prior to the December 2015 deadline. And that deadline should matter: "The Court ought to send that message that there are consequences . . . , there are deadlines and they need to be complied with absent extraordinary circumstances." *In re Elec. Carbon Prods. Antitrust Litig.*, 622 F.Supp.2d 144, 153 n.15 (D.N.J. 2007).

The request for the mass and indiscriminate inclusion of late claims is the functional equivalent of a motion to reconsider the earlier Court orders and retroactively extend the deadline, because the request would result in the movement of the claim filing deadline for claims filed by FRS, among others. But as noted, the Court has three times ruled against the extension of the filing deadline. The burden is on FRS and other late filers to provide the Court with new information as to why the Court should reconsider its decisions. Such new facts that actually do exist – the Settlement Administrator's New Claim Report of June 6, 2018, along with the Fisher Declaration, filed yesterday[29] chief among them – strongly support no change in the Court's prior rulings, as described in Section II(B) immediately below.

  B. <u>There Were an Inordinate Number of Rejected Claims and Late-Filed Claims, Including Claims Filed by Those Who Had Received Notice of the Claims Deadline by First-Class Mail</u>

The administration of claims in this case has been unusually taxing and time-consuming. Claims were originally submitted for over 39 million units (as defined in the original settlements), but strikingly, half were rejected and are not under consideration. According to the Settlement Administrator, thousands of late duplicate claims have been filed, mostly by FRS and Crowell.

---

[28] ECF No. 4339 at 5.

[29] ECF No. 5587-2.

FRS filed more than half of its total claims well after the deadline.[30] Moreover, FRS did not just "miss the deadline" and file these claims a few weeks or months late—almost half of all the late FRS claims were filed more than a year after the deadline. Remarkably, about 10% of all late claims (2 million units) were submitted after the Settlement Administrator updated the case website to reinforce that late claims were no longer being processed and that the deadline for filing had passed. Indeed, claims for more than a quarter-million new units came in as recently as May 2018.[31] And according to the Fisher Declaration, Late Claims continue to be submitted on an ongoing basis.[32]

The Settlement Administrator's evaluation of FRS's late claims disclosed multiple late-claim FRS clients who were sent timely direct mailed written notices of the original settlements by first-class mail.[33] The Settlement Administrator also determined that numerous claims filed by FRS are duplicates of timely claims previously submitted by such class members themselves, or of timely claims submitted on behalf of those class members by other claim submission companies.[34] The Settlement Administrator has requested further information from FRS regarding these duplicate claims and all other claims that FRS filed after the claims deadline.[35] *Id.* FRS has not responded to these requests.

---

[30] *Id.* Spectrum, in contrast, filed claims prior to the deadline, with the exception of one claim filed one month late, constituting one-tenth of one percent (.1%) of the claims filed by Spectrum.

[31] *Id.*

[32] ECF 5587-2 at n.8.

[33] *See* Fisher FRS Response Decl, ECF No. 5225-1 at ¶10.

[34] *Id*. Indeed, a number of Spectrum clients were unaware a secondary authorization for filing a claim was purportedly obtained by another TPCF after the deadline. *See* ECF No. 5225-1 at ¶¶ 5-8. Sixty Spectrum clients unintentionally (or unknowingly) had duplicate claims for millions of units filed on their behalf by another TPCF. Many of these were filed after the deadline, and often for a smaller amount. The duplicate filings presented significant confusion and concern to Spectrum clients, many of whom had been working with Spectrum for more than a decade covering numerous cases, with more than 80% having signed their CRT agreements prior to 2014.

[35] The Settlement Administrator contacted FRS in July 2017 requesting the following: (1) the date each late claimant learned of the settlement from any source; (2) any justification for the late filing; (3) the date FRS informed the claimant of the settlement compared to the date when the claim was filed. FRS did not respond to these requests. ECF No. 5255 at 3-4.

*In re: Cathode Ray Tube (CRT) Antitrust Litig., Indirect Purchaser Actions*
September 17, 2019
Page 10 of 15

      C.      <u>The Deprivation of Due Process and Basic Unfairness That Would Result From Summarily Accepting FRS's and Others' Late-Filed Claims</u>

      Absent class members who inadvertently failed to file claims will be denied due process of law and treated unfairly if the Late Claims of FRS and others are accepted automatically. All class members were required to adhere to the claims deadlines set by the Court.[36] Even corporate class members who were solicited by FRS must be required, equitably, to adhere to the same deadlines. Not only would the blanket acceptance of Late Claims result in a dramatic reduction of payments to individuals, but it would also prejudice small companies, and indeed all class members, who played by the rules and whose timely claims were approved. More importantly, blanket acceptance would give a wholly unjustified benefit to TPCFs (such as FRS) and their corporate clients who submitted late claims when individual claimants and unrepresented small and midsized companies were instructed via the official case website that they could not file claims after the deadline. In fact, after the official deadline passed claims forms were no longer available on the case website making filing late claims by anyone who had not previously downloaded and saved those forms functionally impossible.[37]

      Notably, evidence suggests that even directly contacting the Settlement Administrator would <u>not</u> have resulted in the opportunity to file a late claim for self-represented class members. At Spectrum's suggestion, several individuals and small companies that would otherwise be eligible to file a claim, but for the passage of the deadline, contacted the Settlement Administrator in 2016 asking for a form or instructions on how to how to proceed to file a late claim. None of those contacts resulted in any response whatever by the Settlement Administrator. While certain TCPFs kept a foot in the door by filing previously obtained claim forms, the door was deadbolted shut for any self-represented company or individual.

      Blanket acceptance of Late Claims now would essentially result in there being two deadlines – one for self-represented class members, and an entirely separate and unconstitutional "hidden deadline" for TPCFs who submitted claims long after the deadline had passed, and in most cases, after the claim form had been withdrawn from the website. This hidden deadline would result in the drastically disparate treatment of different class members and would deprive

---

[36] The approved Notice Plan established a 120-day period from publication of the notice on August 7, 2015 to run until the deadline to file claims on December 7, 2015. That deadline was included in the mailings, emailings, publication and the case website at www.crtclaims.com. The deadline remains displayed prominently on the home page to this day, and any typical class member visiting the website would reasonably have concluded that claims were not allowed after December 7, 2015. The website was later updated sometime before February 13, 2016 to notify California natural persons that their deadline was extended until June 30, 2016.

[37] FRS ignored the deadline and filed claims even after the online form was removed from the website. FRS never sought or obtained an extension, which would have benefited all otherwise late claimants equally.

absent class members (other than certain TPCFs' clients) of due process. This due process defect could only be remedied by re-noticing the entire class, and by reopening the claim filing window, which would substantially increase costs and further delay the payment of class benefits. More, recent experience in other mega class actions suggests that reopening the claims filing period would result in "blood in the water" and chaos, as TPCFs would rapidly ramp up their efforts to collect fees and inevitably file duplicate claims on behalf of class members who have already filed viable claims.

Actions under Rule 23(b)(3) are subject to a specific regime of due process protections. In addition to maintaining the opportunity to opt-out, another essential protection is that adequate notice is provided. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (absent class member has due process rights requiring, among other things, reasonable notice relating to claims, objections and opting out). The original notice in this matter was found to be sufficient by the Court, which was supported in fact based on the unusually high level of engagement by the class. However, due process requires that notice be ongoing. Class members must not only be made aware of a settlement and given a chance to opt-out or object but should also be kept sufficiently informed of changes in relevant deadlines. If vast numbers of TPCF-filed Late Claims are summarily allowed, the notices previously sent to class members and the official class website will have failed to convey accurate information (i.e., that notwithstanding the deadline, late claims would be summarily accepted), which would render the prior notice defective and require a new and complete notice program and opportunity to file claims.

Blanket acceptance of FRS's and others' Late Claims without requiring an individualized showing of excusable neglect would be prejudicial to other potential claimants who chose not to or were prevented from similarly filing late claims. There is little doubt that many claimants relied on the deadline set in the notice or the website and reasonably believed that filing a late claim would be futile (perhaps because they could show no excusable neglect). Others may have tried but could not file a claim without the claim form which had been removed from the official website. It would be prejudicial to their interests for the Court to disregard the deadline and summarily accept the thousands of already-filed Late Claims, thereby rendering the notice impermissibly misleading as to the actual claims-filing deadline. *See Weber v. Gov't Emps. Ins. Co.*, No. 07-1332, 2009 WL 2496811, at *4 (D.N.J. Aug. 11, 2009) (recognizing that it is essential to make the claims deadline "sufficiently apparent to class members").

The Court can and should avoid this due process problem by using its discretion with respect to individual late-filed claims (as described below) and rejecting the blanket acceptance of Late Claims.

> D. Implementing a Procedure for Determining Whether Late Filing Was the Result of Excusable Neglect

Pursuant to the general rule in class actions, late-filed claims should be allowed only upon an individualized showing of "excusable neglect." *See Elec. Carbon Prods.*, 622 F.Supp.2d

at 148 (courts consider "each claimant's conduct and determine[] whether its delay in filing a claim is the result of 'excusable neglect.'"); *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. 4:02-md-01486-PJH (N.D. Cal. May 19, 2016), ECF No. 2283 at 5-6 (excusable neglect declarations were required, and recovery was permitted only from uncashed checks.[38]

In addition, where a court is urged to accept late claims, courts consider the actual financial impact acceptance would have on timely claimants, and courts are more likely to accept late-filed claims where only a small number of claims are late, as the financial impact to timely claimants of accepting a small number of late claims is insignificant.[39] Here, the effect of blanket acceptance of late-filed claims would significantly impact the value of Timely Claims—nearly twenty percent according to the Settlement Administrator's estimates.

The "excusable neglect" standard was set forth in *Pioneer Inv. Services v Brunswick Associates*, 507 U.S. 380, 395 (1993) (emphasis supplied) ("*Pioneer*"). *Pioneer* established a four-part test in evaluating the excusable neglect of late claims:

(1) The danger of prejudice to other interested parties;
(2) The length of the delay[40] and its potential effect on judicial proceedings;

---

[38] *See also In re Crazy Eddie Securities Litig.*, 906 F. Supp. 840, 844 (E.D.N.Y. 1995) ("excusable neglect" standard must be used to determine if late filed claim can be accepted). Indeed, unless the claimant gives reasons for its tardiness and establishes excusable neglect, a court cannot accept late-filed claims. *See Elec. Carbon Prods.*, 622 F.Supp.2d at 161 ("A late claimant must explain the reasons for its delay when invoking the Court's equitable power; without such factual reasons, a court is unable to weigh the claimant's justification and good faith.")

[39] ECF No. 5587-2 at ¶ 5; *See also In re Agent Orange Prod. Liab. Litig.*, 689 F. Supp. 1250, 1263 (E.D.N.Y. 1988) ("[t]he cost to the fund of admitting late claimants" is so "relatively small" as to be "de minimis in relation to the . . . [number of timely] claims filed."); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 246 F.3d 315, 324 (3d. Cir. 2001) (late filers "represent[ed] only a minuscule fraction of the total settlement class," such that "the effect of their inclusion" was "marginal"); *In re Bear Stearns Companies, Inc. Sec., Derivative, and ERISA, Litig.*, 297 F.R.D. 90, 96 (S.D.N.Y. 2013). (timely claimants would only "recover incrementally less" because "ultimate dilution the remaining members of the class would suffer would be no more than 4% overall, or a reduction of four cents per dollar"); *Zients v. LaMorte*, 459 F.2d 628, 630 (2d Cir. 1972) (allowing five late claims where acceptance "would result in only a minuscule reduction in recovery by timely claimants").

[40] *In re Orthopedic Bone*, 246 F.3d at 325 ("the length of the delay should be considered in absolute terms and not by reference to the import of intervening circumstances."); *Crazy Eddie*, 906 F. Supp. at 847 ("[T]he later the claim, the greater the explanation required" for the delay to be held reasonable); *Burns v. Elrod*, 757 F.2d 151, 155 (7th Cir. 1985) (affirming rejection of

*In re: Cathode Ray Tube (CRT) Antitrust Litig., Indirect Purchaser Actions*
September 17, 2019
Page 13 of 15

  (3) The reason for the delay, including whether it was within their reasonable control;[41] and,
  (4) Whether the movant acted in good faith.

  The *Pioneer* court adopted a test that would permit the acceptance of late filings "caused by inadvertence, mistake, or carelessness, as well as by intervening circumstances beyond the party's control." *Id.* at 388. While *Pioneer* did not directly relate to Rule 23 class actions, lower courts subsequently adopted its excusable neglect standard for the admission of late claims in class actions. *Crazy Eddie*, 906 F. Supp. at 846; *In re Orthopedic Bone*, 246 F.3d at 328-29; *Dahingo v. Royal Caribbean Cruises*, 312 F. Supp. 2d 440, 447 (S.D.N.Y. 2004); *Elec. Carbon Prods.*, 622 F. Supp. 2d at 153; *Weber v. Gov't Emps. Ins. Co.*, 262 F.R.D. 431, 447-48 (D.N.J. 2009).

  Application of the "excusable neglect" standard is particularly appropriate here, where the Court has rejected extension of the claims-filing deadline several times.[42] And as IPP Counsel recognizes, the determination of exceptions to the Court-ordered claims-filing deadline

---

claims filed 19 months after deadline); *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1127 (9th Cir. 1977) (district court did not abuse discretion in refusing to accept claims filed one year late, because "'a cutoff date is essential and at some point the matter must be terminated'") (quoting Reports of the Conference for District Court Judges, 63 F.R.D. 231, 262 (1973)).

[41] *See also In re Authentidate Holding Corp. Sec. Litig.*, No. 05 Civ 5323, 2013 WL 324153, at *2 (S.D.N.Y. Jan. 25, 2013) (movant must "proffer[] reasons" for its delay that are "adequate"); *In re Bear Stearns*, 297 F.R.D. at 98 ("[T]he Court must look at the reason for the delay, including whether it was within the reasonable control of the movant."); *Elec. Carbon Prods.*, 622 F.Supp.2d at 154 n.16 (whether the late filer was "blameless" and hence entitled to be included requires considering "the reasons for the delay and whether the claimant acted in good faith"); *In re Orthopedic Bone*, 246 F.3d at 324 ("timely registrants are [not] more deserving of remedy, for purposes of equity, than tardy registrants with similar claims, presuming the failure to register on time was indeed blameless.") (Emphasis added).

[42] This critical fact, as well as IPP Counsel's opposition to blanket acceptance of late-filed claims, distinguish this case from those in which an unopposed request for blanket acceptance of late-filed claims has been approved. *See, e.g., In Re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008) (where no prior request for extension of the claims-filing deadline was made, class counsel did not object to permitting blanket acceptance of late filings, and there was no briefing or argument on the issue). Another important difference is that in *LCD*, unlike here, even with inclusion of the late filers, class members recovered more than their actual damages; the inclusion of late filers merely reduced the excess that class members received over their actual damages. We are unaware of any case in which a court, as here, was presented with requests to extend the claim-filing deadline, declined to do so, and then accepted all late-filed claims.

must be made by the Court, likely through the Special Master, rather than by IPP Counsel or the Settlement Administrator.[43]

Each late filer should be given the opportunity to present declarations and evidence, if they can, to explain why they missed the claim-filing deadline. Third parties with relevant evidence also should be permitted to introduce declarations and evidence. For example, Spectrum believes that its sales activities during the legitimate claim-filing window resulted in direct contact with many of the companies who later filed Late Claims, and thus it can be shown by documentary evidence that these companies had actual, not just constructive, notice of the settlement and the relevant deadlines. Evidence also could be introduced that some late filers received notice of the claims deadline by mail.[44] Finally, Spectrum expects that many additional late claim filers were contacted by other TPCFs prior to the authorized deadline, again resulting in actual notice, which could be proven by the production of those TPCF's own contemporaneous business records.

### III. CONCLUSION

In order to expedite the long-awaited distribution of settlement funds to class members, this Court should act now to address the issue of Late Claims filed by TPCFs. The quickest path forward is for the Court to tee up any potential appeals regarding Late Claims, so that those appeals may be heard at or near the same time as any other appeals to final approval of the Amendments, and to avoid an unnecessary, time consuming and costly third trip to the Ninth Circuit. Spectrum respectfully submits that the reasonable resolution of Late Claims is for the Court to – yet again and consistent with IPP Counsel's observations – reconfirm that the deadline was the deadline and that the only way Late Claims will be allowed is through a credible showing of excusable neglect. Finally, the Court should implement a Court-managed process to evaluate late-filers' evidence of excusable neglect, with the assistance of the Special Master, so that this too can be efficiently completed (or near completed) by the time the Ninth Circuit resolves any appeals on the final approval of the Amendments. Unless the late-filing determinations are undertaken now, while the validity of the underlying Amendments are being adjudicated, the distribution of settlement proceeds to class members will likely be delayed by months, if not longer. Spectrum respectfully urges the Court to adopt the suggestions set forth herein to expedite the approval of the Amendments and distributions to class members and in a manner respectful of the Court's prior orders and the good faith shown by class members who played by the rules.

---

[43] *See* ECF No. 5252, n.1.

[44] Spectrum contacted no fewer than 2,300 large companies eligible for recovery in this case, likely comprising a great many of the class members for whom FRS and others filed late claims.

*In re: Cathode Ray Tube (CRT) Antitrust Litig., Indirect Purchaser Actions*
September 17, 2019
Page 15 of 15

Dated:  September 17, 2019 　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　NASSIRI & JUNG LLP


　　　　　　　　　　　　　　　　　　　　_____/s/ Kassra P. Nassiri_____

　　　　　　　　　　　　　　　　　　　　Kassra P. Nassiri
　　　　　　　　　　　　　　　　　　　　Attorneys for Spectrum Settlement Recovery, LLC