MARIO N. ALIOTO, ESQ. (56433)
LAUREN C. CAPURRO, ESQ. (241151)
TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP
2280 Union Street
San Francisco, CA  94123
Telephone:  (415) 563-7200
Facsimile: (415) 346-0679
E-mail: malioto@tatp.com
laurenrussell@tatp.com

**Counsel for Indirect Purchaser Plaintiffs**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: CATHODE RAY (CRT) ANTITRUST LITIGATION | ) ) ) MDL No. 1917<br>No.  4:13-cv-03234-JST |
| This document relates to: | ) ) |
| BRIAN LUSCHER, et al., individually and on behalf of a Class of all those similarly situated in the United States, | ) ) ) **SECOND AMENDED CLASS ACTION COMPLAINT** |
| Plaintiffs, | ) **JURY DEMAND** ) ) |
| vs. | ) ) |
| VIDEOCON INDUSTRIES LIMITED; TECHNICOLOR SA (f/k/a THOMSON SA); TECHNICOLOR USA, INC. (f/k/a THOMSON CONSUMER ELECTRONICS, INC.); and TECHNOLOGIES DISPLAYS AMERICAS, LLC (f/k/a THOMSON DISPLAYS AMERICAS LLC), | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) ) ) ) ) ) ) ) |

**TABLE OF CONTENTS**

I.      INTRODUCTION ………………………………………… 1

II.     JURISDICTION AND VENUE ……….………………………… 3

III.    DEFINITIONS ……………..……………………………….. 5

IV.     PLAINTIFFS ………………………………………………… 6

V.      DEFENDANTS ……………………………………………… 9

VI.     AGENTS AND CO-CONSPIRATORS ………………………………... 13

VII.    INTERSTATE TRADE AND COMMERCE……………………………… 29

VIII.   FACTUAL ALLEGATIONS ………………………………… 29

        A.      CRT Technology…………………………………………… 29

        B.      Structural Characteristics Of The CRT Market………………… 30

                a.      Market Concentration…………………………………… 30

                b.      Information Sharing…………………………………… 30

                c.      Consolidation…………………………………………… 31

                d.      Multiple Interrelated Business Relationships………………… 31

                e.      High Costs Of Entry Into The Industry……………………… 32

                f.      The Maturity Of The CRT Product Market………………… 33

                g.      Homogeneity Of CRT Products…………………………… 34

        C.      Pre-Conspiracy Market………………………………………… 34

        D.      Defendants' And Co-Conspirators' Illegal Agreements……………... 34

                a.      "Glass Meetings"……………………………………… 36

                b.      Bilateral Discussions…………………………………… 38

                c.      Defendants' And Co-Conspirators' Participation In Group
                        And Bilateral Discussions……………………………… 40

        E.      The CRT Market During The Conspiracy………………………... 52

        F.      International Government Antitrust Investigations………………… 55

IX.     THE PASS-THROUGH OF OVERCHARGES TO CONSUMERS……..... 58

X.      CLASS ACTION ALLEGATIONS……………………………… 63

i

| | | | |
|---|---|---|---|
| XI. | | **VIOLATIONS ALLEGED**…………………………………………… | 66 |
| | A. | First Claim For Relief: Violation of State Antitrust Statutes ……….. | 66 |
| | B. | Second Claim For Relief: Violation of State Consumer Protection and Unfair Competition Statutes………………………………………….. | 83 |
| | C. | Third Claim For Relief: Unjust Enrichment and Disgorgement Of Profits…………………………………………………………… | 92 |
| XII. | | **FRAUDULENT CONCEALMENT**………………………………… | 93 |
| XIII. | | **PRAYER FOR RELIEF**………………………………………… | 95 |
| XIV. | | **JURY DEMAND**………………………………………………... | 96 |

ii

Plaintiffs Brian Luscher, Jeffrey Figone, Steven Ganz, Lawyer's Choice Suites, Inc., David Rooks, Sandra Riebow, Travis Burau, Southern Office Supply, Inc., Kerry Lee Hall, Lisa Reynolds, Barry Kushner, Steven Fink, David Norby, Charles Jenkins, Gregory Painter, Janet Ackerman, Mary Ann Stephenson, Patricia Andrews, Gary Hanson, Frank Warner, Albert Sidney Crigler, Margaret Slagle, John Larch, Louise Wood, Donna Ellingson-Mack, and Brigid Terry ("Plaintiffs"), individually and on behalf of a Class of all those similarly situated in the United States, bring this action for damages and equitable relief under state antitrust, unfair competition, and consumer protection laws, and unjust enrichment laws, against the Defendants named herein, demanding trial by jury, and complaining and alleging as follows:

## I.  <u>INTRODUCTION</u>

1.       Plaintiffs bring this antitrust class action on behalf of individuals and entities that indirectly purchased Cathode Ray Tubes ("CRTs") (as further defined below), in the United States from Defendants, their predecessors, any subsidiaries or affiliates thereof, or any of their named and unnamed co-conspirators, during the period beginning at least as early as March 1, 1995 until at least November 25, 2007 (the "Class Period").  Plaintiffs allege that during the Class Period the Defendants conspired to fix, raise, maintain and/or stabilize prices of CRTs sold in the United States.  Because of Defendants' unlawful conduct, Plaintiffs and other Class Members paid artificially inflated prices for CRT Products (as defined below) and have suffered antitrust injury to their business or property.

2.       As further detailed below, beginning in at least 1995, co-conspirators Samsung, Philips, Daewoo, LG and Chunghwa met or talked with other co-conspirators in order to discuss and agree upon CRT prices and the amount of CRTs each would produce.  Over time, these co-conspirators reached out to other co-conspirators, including Toshiba, Panasonic, Hitachi, BMCC, IRICO, Thomson (now known as Technicolor), Mitsubishi, Thai CRT and Samtel, who then also met or talked with their competitors for the purpose of fixing the prices of CRTs.  By 1997, a formal system of multilateral and bilateral meetings was in place, involving the highest levels of the co-conspirator corporations, all with the sole purpose of fixing the prices of CRTs at supracompetitive levels.

1

3.        Throughout the Class Period, Defendants' and co-conspirators' conspiracy was effective in moderating the normal downward pressure on prices for CRTs caused by periods of oversupply and competition from new technologies, such as TFT-LCD and Plasma. Defendants' and co-conspirators' conspiracy resulted in unusually stable pricing and even rising prices in a very mature, declining market.  As a result of Defendants' and the co-conspirators' unlawful conduct, Plaintiffs and Class members paid higher prices for CRT Products than they would have paid in a competitive market.

4.        This global conspiracy has been investigated by the Antitrust Division of the United States Department of Justice ("DOJ"), and by several other international competition authorities.  The publicly available information did not indicate that the initial government investigations had targeted Defendants.  The DOJ investigation has so far resulted in a guilty plea by Samsung SDI Co., Ltd. for violations of the Sherman Act, 15 U.S.C. §1, and a $32 million fine, as well as the indictments of three former Chunghwa Picture Tubes, Ltd., executives, one former Samsung SDI executive, and two former LG Philips Displays executives, all for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

5.        Defendant Technicolor SA (formerly Thomson SA) has admitted that it participated in the conspiracy to fix the prices of CRTs.  In its 2011 Annual Report to shareholders, Technicolor SA stated that it "played a minor role in the alleged anticompetitive conduct" concerning CRTs.  In fact, Technicolor SA's role was far from minor.  In December 2012, the European Commission levied a fine of €38.6 million against Technicolor SA for its participation in the CRT conspiracy between 1999 and 2005.  In its 2012 Annual Report, Technicolor SA acknowledged that "[f]ollowing the European Commission decision, purchasers may bring individual claims against the Company seeking compensation for alleged loss suffered as a result of the anti-competitive conduct."

6.        In 2005, Defendant Videocon acquired Thomson's global CRT business, including Thomson's U.S. subsidiary, Defendant Thomson Displays Americas ("TDA") (now known as Technologies Displays Americas), and a Mexican subsidiary, Thomson Displays Mexicana ("TDM") (now known as Technologies Displays Mexicana).

2

7.      Thereafter, Defendants Videocon and Thomson continued to participate in, and did not effectively withdraw from, the conspiracy.  Because Defendants joined a continuing conspiracy, they are responsible not only for their own acts but also all acts of their co-conspirators during the class period, as detailed herein.

## II.  JURISDICTION AND VENUE

8.      This action is instituted to recover damages under state antitrust, unfair competition, and consumer protection laws, to recover under unjust enrichment laws, and to recover costs of suit, including reasonable attorneys' fees, for the injuries that Plaintiffs and all others similarly situated sustained as a result of Defendants' violations of those laws.

9.      This court has subject matter jurisdiction over the state law claims pursuant to the Class Action Fairness Act of 2005, which amended 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, any member of a class of plaintiffs is a citizen of a State and any defendant is a citizen or subject of a foreign state and the aggregated amount in controversy exceeds $5,000,000, exclusive of interest and costs.

10.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391 (b), (c) and (d), because a defendant not resident in the United States may be sued in any judicial district, a substantial part of the events giving rise to Plaintiffs' claims occurred in this district, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

11.     Defendants conduct business throughout the United States, including this jurisdiction, and they have purposefully availed themselves of the laws of the United States, including specifically the laws of the State of California and the individual states listed herein. Defendants' products are and were sold in the flow of interstate commerce, and Defendants' activities had a direct, substantial and reasonably foreseeable effect on such commerce.

12.     For example, Thomson SA had significant contacts with the United States during the Class Period.  It purposefully availed itself of the United States market for CRTs and CRT Products.  It fixed prices and constrained competition on CRTs it and its wholly-owned subsidiary, Defendant Thomson Consumer Electronics, Inc. ("Thomson Consumer Electronics")

3

sold in the United States.  Thomson SA had a controlling role in the operation of Thomson Consumer Electronics.  During the Class Period, at least 40% of Thomson SA's revenues derived from the United States, and Thomson SA's CEO described the U.S. as that company's most important market.  Thomson SA was involved in planning and purchasing discussions with CRT customers in the U.S., as well as in production and pricing discussions relating to the manufacture of CRTs in Mexico destined for the U.S. market.  In addition, representatives from Samsung, LPD and Thomson attended "Green Meetings" in California.  An MTPD representative also testified that MTPD America and Thomson Consumer Electronics met regularly in the United States during the conspiracy period and exchanged confidential information on production and capacity of North American CRT factories and future CRT prices.

13.     Defendants' and co-conspirators' conspiracy to fix the prices of CRTs substantially affected commerce throughout the United States and in each of the states identified herein, because Defendants and co-conspirators directly, or through their agents, engaged in activities affecting each such state.  Defendants have purposefully availed themselves of the laws of each of the states identified herein in connection with its activities relating to the production, marketing, and sale and/or distribution of CRTs.  Defendants produced, promoted, sold, marketed, and/or distributed CRTs, thereby purposefully profiting from access to indirect purchaser consumers in each such state.  As a result of the activities described herein, Defendants:

a.     Caused damage to the residents of the states identified herein;

b.     Caused damage in each of the states identified herein by acts or omissions committed outside each such state and by regularly doing or soliciting business in each such state;

c.     Engaged in a persistent course of conduct within each state and/or derived substantial revenue from the marketing and sale of CRTs and/or CRT Products in each such state; and

4

1         d.      Committed acts or omissions that it knew or should have known

2  would cause damage (and, in fact, did cause damage) in each such state while regularly doing or

3  soliciting business in each such state, engaging in other persistent courses of conduct in each

4  such state, and/or deriving substantial revenue from the marketing and sale of CRTs and/or CRT

5  Products in each such state.

6        14.      The conspiracy described herein adversely affected every person nationwide,

7  and more particularly, consumers in each of the states identified in this Complaint, who

8  indirectly purchased Defendants' and their co-conspirators' CRTs. Defendants' conspiracy has

9  resulted in an adverse monetary effect on indirect purchasers in each state identified herein.

10        15.      Prices of CRT Products in each state identified in this Complaint were raised

11  to supracompetitive levels by the Defendants and their co-conspirators. Defendants knew that

12  commerce in CRT Products in each of the states identified herein would be adversely affected

13  by implementing the conspiracy.

14                  **III.  DEFINITIONS**

15        16.      As used herein, the term "CRT" or "CRTs" stands for "cathode ray tube(s)."

16  A CRT is a display technology used in televisions, computer monitors and other specialized

17  applications. The CRT is a vacuum tube that is coated on its inside face with light sensitive

18  phosphors. An electron gun at the back of the vacuum tube emits electron beams. When the

19  electron beams strike the phosphors, the phosphors produce either red, green, or blue light. A

20  system of magnetic fields inside the CRT, as well as varying voltages, directs the beams to

21  produce the desired colors. This process is rapidly repeated several times per second to produce

22  the desired images.

23        17.      There are two types of CRTs: color display tubes ("CDTs") which are used in

24  computer monitors and other specialized applications; and color picture tubes ("CPTs") which

25  are used in televisions. CDTs and CPTs are collectively referred to herein as "cathode ray

26  tubes" or "CRTs."

27        18.      As used herein, "CRT Products" means products containing CRTs, such as

28  television sets and computer monitors.

19.     The "Class Period" or "relevant period" means the period beginning at least March 1, 1995 through at least November 25, 2007.

20.     "Person" means any individual, partnership, corporation, association, or other business or legal entity.

21.     "OEM" means any Original Equipment Manufacturer of CRT Products.

## IV.  PLAINTIFFS

22.     Plaintiff Brian Luscher is an **Arizona** resident.  During the relevant period, Mr. Luscher indirectly purchased CRTs from Defendants or one or more of their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

23.     Plaintiff Jeffrey Figone is a **California** resident.  During the relevant period, Mr. Figone indirectly purchased CRTs from Defendants or one or more of their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

24.     Plaintiff Steven Ganz is a **California** resident.  During the relevant period, Mr. Ganz indirectly purchased CRTs from Defendants or one or more of their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

25.     Plaintiff Lawyers' Choice Suites, Inc. ("Law Suites") is a corporation doing business in the **District of Columbia**.  During the relevant period, Law Suites indirectly purchased CRTs from Defendants or one or more of their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

26.     Plaintiff David Rooks is a **Florida** resident.  During the relevant period, Mr. Rooks indirectly purchased CRTs from Defendants or one or more of their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

27.     Plaintiff Sandra Riebow is a **Hawaii** resident.  During the relevant period, Ms. Riebow indirectly purchased CRTs from Defendants or one or more of their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint

28.     Plaintiff Travis Burau is an **Iowa** resident.  During the relevant period, Mr. Burau indirectly purchased CRTs from Defendants or one or more of their and has been injured by reason of the antitrust violations alleged in this Complaint.

6

29.        Plaintiff Southern Office Supply, Inc. is a **Kansas** corporation.  During the relevant period, Southern Office Supply, Inc. indirectly purchased CRTs from Defendants or one or more of their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

30.        Plaintiff Kerry Lee Hall is a **Maine** resident.  During the relevant period, Ms. Hall indirectly purchased CRTs from Defendants or one or more of their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

31.        Plaintiff Lisa Reynolds is a **Michigan** resident.  During the relevant period, Ms. Reynolds indirectly purchased CRTs from Defendants or one or more of their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

32.        Plaintiff David Norby is a **Minnesota** resident.  During the relevant period, Mr. Norby indirectly purchased CRTs from Defendants or one or more of their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

33.        Plaintiff Barry Kushner is a **Minnesota** resident.  During the relevant period, Mr. Kushner indirectly purchased CRTs from Defendants or one or more of their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

34.        Plaintiff Charles Jenkins is a **Mississippi** resident.  During the relevant period, Mr. Jenkins indirectly purchased CRTs from Defendants or one or more of their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

35.        Plaintiff Steven Fink is a **Nebraska** resident.  During the relevant period, Mr. Fink indirectly purchased CRTs from Defendants or one or more of their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

36.        Plaintiff Gregory Painter is a Nevada resident.  During the relevant period, Mr. Painter indirectly purchased CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

37.        Plaintiff Mary Ann Stephenson is a **New Mexico** resident.  During the relevant period, Ms. Stephenson indirectly purchased CRTs from Defendants or one or more of

their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

38.     Plaintiff Janet Ackerman is a **New York** resident.  During the relevant period, Ms. Ackerman indirectly purchased CRTs from Defendants or one or more of their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

39.     Plaintiff Louise Wood is a **New York** resident.  During the relevant period, Ms. Wood indirectly purchased CRTs from Defendants or one or more of their co-conspirators and had been injured by reason of the antitrust violations alleged in this Complaint.

40.     Plaintiff Patricia Andrews is a **North Carolina** resident.  During the relevant period, Ms. Andrews indirectly purchased CRTs Defendants or one or more of their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

41.     Plaintiff Gary Hanson is a **North Dakota** resident.  During the relevant period, Mr. Hanson indirectly purchased CRTs from Defendants or one or more of their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

42.     Plaintiff Donna Ellingson-Mack is a South Dakota resident.  During the relevant period, Ms. Ellingson-Mack indirectly purchaser CRT Products from one or more of the Defendants or their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

43.     Plaintiff Frank Warner was a **Tennessee** resident.  While a Tennessee resident and during the relevant period, Mr. Warner indirectly purchased CRTs from Defendants or one or more of their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

44.     Plaintiff Albert Sidney Crigler is a **Tennessee** resident.  During the relevant period, Mr. Crigler indirectly purchased CRTs from Defendants or one or more of their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

45.     Plaintiff Margaret Slagle is a **Vermont** resident.  During the relevant period, Ms. Slagle indirectly purchased CRTs from Defendants or one or more of their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

8

46.     Plaintiff John Larch is a **West Virginia** resident.  During the relevant period, Mr. Larch indirectly purchased CRTs from Defendants or one or more of their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

47.     Plaintiff Brigid Terry is a **Wisconsin** resident.  During the relevant period, Ms. Terry indirectly purchased CRTs from Defendants or one or more of their co-conspirators and has been injured by reason of the antitrust violations alleged in this Complaint.

## V.  DEFENDANTS

### Videocon

48.     Defendant Videocon Industries Limited ("**Videocon**") is an Indian corporation with its principal place of business located at Aurangabad Paithan Road 14, KM Stone, Chitegaon, Tq. Paithan, Dist. Aurangabad - 431105, India.  In or about June 2005, Videocon acquired the CRT businesses of Thomson SA, a French corporation, and its wholly-owned subsidiary Thomson Consumer Electronics, Inc., a U.S. corporation, which included CRT manufacturing subsidiaries in Poland, Italy, Mexico, and China.  Videocon acquired the businesses, including Thomson Displays Americas LLC and Thomson Display Mexicana S.A. de CV, through its wholly-owned investment entity located in the Cayman Islands, Eagle Corporation Limited.  Videocon manufactured its CRTs for the United States market in Thomson's former CRT plants in Mexicali, Mexico, and in China.  Videocon sold these CRTs primarily to the joint venture TCL-Thomson Electronics Corporation, a joint venture that had been formed by Thomson SA and TCL Corporation, a Chinese company ("TCL-Thomson").  TCL-Thomson manufactured CRT televisions for the U.S. market in Juarez, Mexico and in China, and sold them under the RCA brand.  During the Class Period, Videocon manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

### Thomson Entities

49.     Defendant **Thomson SA** (now known as Technicolor SA), is a French corporation with its principal place of business located at 5 Rue Jeanne d'Arc 92130 Issy-les-Moulineaux, France.  Thomson SA, through its wholly-owned subsidiary Thomson Consumer

9

Electronics Corporation, was a major manufacturer of CRTs for the United States market, with plants located in the United States, Mexico, China and Europe.  Thomson SA sold its CRTs internally to its television-manufacturing division, which had plants in the United States and Mexico, and to other television manufacturers in the United States and elsewhere.  Thomson SA's television division also purchased CRTs from other CRT manufacturers.  Thomson SA's CRT televisions were sold in the United States to consumers under the RCA brand.

50.     In November 2003, Thomson SA sold its television division to a joint venture it formed with Chinese company, TCL Corporation.  The joint venture was called TCL-Thomson Electronics Corporation ("TCL-Thomson").  TCL took a 67 percent stake in the joint venture, with Thomson SA holding the rest of the shares.  As part of the joint venture agreement, the parties agreed that televisions made by TCL-Thomson would be marketed under the TCL brand in Asia and the Thomson and RCA brands in Europe and North America, respectively.

51.     In 2005, Thomson SA sold its CRT business to Defendant Videocon.  At the same time, it invested €240 million in Videocon, including a €225 million investment in Videocon and a €15 million investment in Videocon International.  Thomson SA also acquired a 13.1% interest in Videocon.  Under its agreement with Videocon, Thomson management would help Videocon run the CRT business during the transition period and beyond.  Videocon and Thomson also agreed on Preferred Supplier Agreements for Thomson's display components business.  Thomson SA obtained at least one seat on Videocon's board of directors.  Thomson SA maintained at least a 10% ownership interest in Videocon for the rest of the Class Period.  Thomson SA changed its name to Technicolor SA in January 2010.

52.     During the Class Period, many Thomson SA executives served as executives or board members of Thomson Consumer Electronics.  These individuals included:

a.     Thierry Breton, the Chairman and CEO of Thomson SA (1997-2001), who also served on its board (2002-2005), and simultaneously served as the President and CEO of Thomson Consumer Electronics (1997-2000), and as its Chairman (1997-2001);

1           b.     Olivier Mallet (Sr. VP, Finance of Thomson SA (1996-2000), and

2  Director of Thomson Consumer Electronics (1999-2000));

3           c.     Charles Dehelly (Sr. Executive VP (1998-2000), Sr. Executive VP

4  and COO (2001) and CEO (2002-2004) of Thomson SA, and also Director of Thomson

5  Consumer Electronics (2003));

6           d.     Julian Waldron ( Sr. Executive VP, CFO (2001-2007) and Interim

7  CEO and Sr. Executive VP, CFO of Thomson SA (2007-2008), and Director of Thomson

8  Consumer Electronics (2001-2007)); and

9           e.     Frederic Rose (CEO of Thomson SA (2008 to present) and Chairman

10  of Thomson Consumer Electronics (2012 to present)).

11       53.     A number of Thomson SA Executive Officers also had responsibilities in the

12  United States, and were stationed at Thomson Consumer Electronics in Indiana, including:  Jim

13  Meyer (Sr. Executive VP of SBUs Americas, Multimedia Products and New Media Services);

14  Al Arras (Executive VP of SBU Audio & Communications); Michael O'Hara (Sr. VP of SBU

15  Americas); and Enrique Rodriguez (VP of SBU Multimedia Products).

16       54.     During the Class Period, Thomson SA manufactured, marketed, sold and/or

17  distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or

18  affiliates, to customers throughout the United States.

19       55.     Defendant Thomson Consumer Electronics, Inc. ("**Thomson Consumer**

20  **Electronics**"), now known as Technicolor USA, Inc., is a U.S. corporation with its principal

21  place of business located at 10330 N Meridian St., Indianapolis, IN 46290-1024.  Thomson

22  Consumer Electronics is a wholly-owned subsidiary of Thomson SA.  Thomson SA sold

23  Thomson Consumer Electronics' CRT business to Videocon in 2005.  Thomson Consumer

24  Electronics was a major manufacturer of CRTs for the United States market, with plants located

25  in Scranton, Pennsylvania, Marion, Indiana and Mexicali, Mexico.  The United States-based

26  plants were closed in 2004.  Thomson Consumer Electronics sold its CRTs internally to its own

27  television-manufacturing division, which had plants in the United States and Mexico, and to

28

1    other television manufacturers in the United States and elsewhere.  Thomson's CRT televisions

2    were sold in the United States to United States consumers under the RCA brand.

3           56.      Thomson Consumer Electronics' parent sold its television business to TCL-

4    Thomson in 2003, and sold the CRT business to Defendant Videocon in 2005.

5           57.      During the Class Period, Thomson Consumer Electronics manufactured,

6    marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through

7    its subsidiaries or affiliates, to customers throughout the United States.

8           58.      The Department of Justice ("DOJ") has subpoenaed Thomson in connection

9    with the DOJ's investigation of CRT price-fixing.

10          59.      Thomson SA and Thomson Consumer Electronics are collectively referred to

11   herein as "**Thomson**."

12   **Technologies Displays**

13          60.      Defendant Technologies Displays Americas LLC ("**TDA**") (formerly

14   Thomson Displays Americas LLC) is a Delaware limited liability company with its principal

15   place of business located at 1778 Carr Road Suite 4B, Calexico, California 92231.  Thomson

16   Displays Americas LLC was a wholly-owned subsidiary of Thomson Consumer Electronics.  It

17   was one of the Thomson subsidiaries purchased by Videocon as alleged herein.  It is a wholly-

18   owned subsidiary of Videocon and is now owned by Eagle Corp., Ltd., which became a wholly-

19   owned subsidiary of Videocon on December 31, 2005 after Videocon acquired the balance 81%

20   equity stake in Eagle Corp., Ltd.  Eagle Corp. acquired TDA in September 2005.  TDA was

21   originally formed with governing members represented equally from Thomson and Videocon.

22   TDA is the parent corporation of Technologies Displays Mexicana, a Mexican corporation

23   which manufactured CRTs and sold the CRTs to TDA for sale and distribution in the United

24   States.  Thomson, and then defendant Videocon, dominated and/or controlled the finances,

25   policies, and/or affairs of TDA relating to the antitrust violations alleged herein.  Two high-level

26   managers, Jack K. Brunk, Managing Director of NAFTA Sales, and James P. Hanrahan,

27   Thomson's General Manager, transitioned to work for TDA after Videocon acquired Thomson's

28   CRT business.  TDA referred to itself as a "Thomson" business even after Videococon's

12

acquisition.  During the Class Period, TDA marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

## VI.  AGENTS AND CO-CONSPIRATORS

61.     Various other persons, firms and corporations, not named as defendants herein, including the entities described below, have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy and/or in furtherance of the anticompetitive, unfair or deceptive conduct.  Plaintiffs reserve the right to name some or all of these persons as defendants at a later date.

**Mitsubishi Entities**

62.     Mitsubishi Electric Corporation ("**Mitsubishi Electric Japan**") is a Japanese corporation located at Building, 2-7-3, Marunouchi, Chiyoda-ku, Tokyo 100-8310, Japan. Mitsubishi Electric Japan and its subsidiaries manufactured CRTs in factories located in Japan, Taiwan, Mexico and Canada for sale in the United States.  These CRTs were sold internally to Mitsubishi's television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere.  Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Class Period, Mitsubishi Electric Japan manufactured, marketed, sold and distributed CRTs and CRT Products in the United States.

63.     Mitsubishi Electric & Electronics USA, Inc. ("**Mitsubishi Electric USA**") is a United States corporation located at 5665 Plaza Drive, Cypress, CA 90630.   Mitsubishi Electric USA is a wholly-owned subsidiary of Mitsubishi Electric Japan.  Mitsubishi Electric USA manufactured CRTs for the United States market in plants located in Mexicali, Mexico and Ontario, Canada.  Mitsubishi Electric USA sold its CRTs internally to its television and monitor manufacturing division and to other television and monitor manufacturers in the U.S. and elsewhere. Mitsubishi's television and monitor division also purchased CRTs from other CRT manufacturers.  During the Class Period, Mitsubishi Electric USA manufactured, marketed, sold and distributed CRTs in the United States.

13

64.      Mitsubishi Digital Electronics Americas, Inc. ("**Mitsubishi Digital**") is a United States corporation located at 9351 Jeronimo Road, Irvine, CA 92618.  Mitsubishi Digital is a wholly-owned subsidiary of Mitsubishi Electric USA.  During the Class Period, Mitsubishi Digital manufactured, marketed, sold and distributed CRTs and CRT Products in the United States.

65.      Mitsubishi Electric Japan, Mitsubishi Electric USA and Mitsubishi Digital are collectively referred to herein as "Mitsubishi."

**Chunghwa Entities**

66.      Chunghwa Picture Tubes Ltd. ("**CPT**") is a Taiwanese company with its principal place of business located at 1127 Heping Road, Bade City, Taoyuan, Taiwan.  CPT was founded in 1971 by Tatung Company.  Throughout the majority of the Class Period, Tatung Company owned a substantial share in CPT.  Although Tatung Company's holdings in CPT have fallen over time, it retains substantial control over CPT's operations.  Tatung Company lists Chunghwa on its website as one of its "global subsidiaries."  And the Chairman of CPT, Weishan Lin, is also the Chairman and General Manager of Tatung Company.  CPT was a leading manufacturer of CRTs.  During the Class Period, CPT manufactured, marketed, sold and/or distributed CRTs, both directly and through its wholly-owned and controlled subsidiaries in Malaysia, China, and Scotland, to customers throughout the United States.

67.      Chunghwa Picture Tubes (Malaysia) Sdn. Bhd. ("**Chunghwa Malaysia**") is a Malaysian company with its principal place of business located at Lot 1, Subang Hi-Tech Industrial Park, Batu Tiga, 4000 Shah Alam, Selangor Darul Ehsan, Malaysia.  Chunghwa Malaysia is a wholly-owned and controlled subsidiary of Chunghwa Picture Tubes.  Chunghwa Malaysia was a leading worldwide supplier of CRTs.  During the Class Period, Chunghwa Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.   CPT dominated and controlled the finances, policies, and affairs of Chunghwa Malaysia relating to the antitrust violations alleged in this Complaint.

14

68.     CPT and Chunghwa Malaysia are collectively referred to herein as "**Chunghwa**."

**Daewoo/Orion Entities**

69.     During the Class Period, Orion Electric Company ("**Orion**") was a major manufacturer of CRTs.  Orion was a Korean corporation which filed for bankruptcy in 2004.  In 1995, approximately 85% of Orion's $1 billion in sales was attributed to CRTs.  Orion was involved in CRT Product sales and manufacturing joint ventures and had subsidiaries all over the world, including South Africa, France, Indonesia, Mexico, and the United States.  Plaintiffs are informed and believe that Orion was wholly owned by the "**Daewoo Group**."  The Daewoo Group included Daewoo Electronics Company, Ltd., Daewoo Telecom Company, Daewoo Corporation, and Orion Electric Components Company.  The Daewoo Group was dismantled in or around 1999.  Daewoo Electronics and Orion were 50/50 joint venture partners in an entity called Daewoo-Orion Société Anonyme ("**DOSA**") in France.  As of approximately 1996, DOSA produced 1.2 million CRTs annually.  Daewoo sold DOSA's CRT business in or around 2004.  In December 1995, Orion partnered with Toshiba Corporation and two other entities to form P.T. Tosummit Electronic Devices Indonesia ("**TEDI**") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  During the Class Period, Orion, Daewoo Electronics, TEDI and DOSA manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through their subsidiaries or affiliates, to customers throughout the United States.

70.     Daewoo Electronics, Orion, and DOSA are collectively referred to herein as "**Daewoo**."

**Hitachi Entities**

71.     **Hitachi, Ltd**. is a Japanese company with its principal place of business located at 6-1 Marunouchi Center Building 13F, Chiyoda-ku, Tokyo 100-8280, Japan.  Hitachi Ltd. is the parent company for the Hitachi brand of CRT Products.  In 1996, Hitachi, Ltd.'s worldwide market share for color CRTs was 20 percent.  During the Class Period, Hitachi Ltd.

15

1   manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or

2   indirectly through its subsidiaries or affiliates, to customers throughout the United States.

3       72.     Hitachi Displays, Ltd. ("**Hitachi Displays**") is a Japanese company with its

4   principal place of business located at AKS Building, 3 Kandaneribeicho 3, Chiyoda-ku, Tokyo,

5   101-0022, Japan.  Hitachi Displays, Ltd. was originally established as Mobara Works of Hitachi,

6   Ltd. in Mobara City, Japan, in 1943.  In 2002, all the departments of planning, development,

7   design, manufacturing and sales concerned with the display business of Hitachi, Ltd. were spun

8   off to create a separate company called Hitachi Displays, Ltd.  During the Class Period, Hitachi

9   Displays, Ltd. manufactured, marketed, sold and/or distributed CRTs, either directly or

10  indirectly through its subsidiaries or affiliates, to customers throughout the United States.

11  Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi

12  Displays relating to the antitrust violations alleged in this Complaint.

13      73.     Hitachi Electronic Devices (USA), Inc. ("**HEDUS**") is a Delaware

14  corporation with its principal place of business located at 1000 Hurricane Shoals Road, Ste. D-

15  100, Lawrenceville, GA 30043.  HEDUS is a subsidiary of Hitachi Displays and Hitachi, Ltd.

16  During the Class Period, HEDUS manufactured, marketed, sold and/or distributed CRTs to

17  customers, either directly or indirectly through its subsidiaries or affiliates, to customers

18  throughout the United States.   Hitachi, Ltd. and Hitachi Displays dominated and

19  controlled the finances, policies, and affairs of HEDUS relating to the antitrust

20  violations alleged in this Complaint.

21      74.     Hitachi America, Ltd. ("**Hitachi America**") is a New York company with its

22  principal place of business located at 50 Prospect Ave., Tarrytown NY 10591.  Hitachi America

23  is a wholly-owned and controlled subsidiary of Hitachi, Ltd.  During the Class Period, Hitachi

24  America sold and/or distributed CRTs and CRT Products, either directly or indirectly through its

25  subsidiaries or affiliates, to customers throughout the United States.  Hitachi, Ltd. dominated

26  and controlled the finances, policies, and affairs of Hitachi America relating to the

27  antitrust violations alleged in this Complaint.

28

75.     Hitachi Asia, Ltd. ("**Hitachi Asia**") is a Singapore company with its principal place of business located at 7 Tampines Grande, #08-01 Hitachi Square, Singapore 528736. Hitachi Asia is a wholly owned and controlled subsidiary of Hitachi, Ltd.  During the Class Period, Hitachi Asia manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States. Hitachi, Ltd. dominated and controlled the finances, policies, and affairs of Hitachi Asia relating to the antitrust violations alleged in this Complaint.

76.     Shenzhen SEG Hitachi Color Display Devices, Ltd. ("**Hitachi Shenzhen**") was a Chinese company with its principal place of business located at 5001 Huanggang Road, Futian District, Shenzhen 518035, China.  Hitachi Displays, Ltd. owned at least a 25% interest in Hitachi Shenzhen until November 8, 2007 (which was coincidentally around the time that the government investigations into the CRT industry began).  Thus, Hitachi Shenzhen was a member of the Hitachi corporate group for all but the last two weeks of the Class Period. During the Class Period, Hitachi Shenzhen manufactured, sold and distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.   Hitachi, Ltd. and Hitachi Displays dominated and controlled the finances, policies, and affairs of Hitachi Shenzhen relating to the antitrust violations alleged in this Complaint.

77.     Hitachi Ltd., Hitachi Displays, Hitachi America, HEDUS, Hitachi Asia, and Hitachi Shenzhen are collectively referred to herein as "**Hitachi.**"

**IRICO Entities**

78.     IRICO Group Corporation ("**IGC**") is a Chinese corporation with its principal place of business located at No. 11 Xinxi Road, Shangdi, Haidian District, Beijing. IGC is the parent company for multiple subsidiaries engaged in the manufacture, marketing, sale and/or distribution of CRT Products.  During the Class Period, IGC manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

79.          IRICO Display Devices Co., Ltd. ("**IDDC**") is a Chinese company with its principal place of business located at No. 16, Fenghui South Road West, District High-tech Development Zone, Xi'an, SXI 710075.  IDDC is a partially-owned subsidiary of IGC.  In 2006, IDDC was China's top CRT maker.  During the Class Period, IDDC manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.  IGC dominated and controlled the finances, policies and affairs of IDDC relating to the antitrust violations alleged in this Complaint.

80.          IRICO Group Electronics Co., Ltd. ("**IGE**") is a Chinese company with its principal place of business located at 1 Caihong Rd., Xianyang City, Shaanxi Province 712021. IGE is owned by IGC.  According to its website, IGE was the first CRT manufacturer in China and one of the leading global manufacturers of CRTs.  Its website also claims that in 2003, it was the largest CRT manufacturer in China in terms of production and sales volume, sales revenue and aggregated profit and taxation.  During the Class Period, IGE manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.   IGC dominated and controlled the finances, policies and affairs of IGE relating to the antitrust violations alleged in this Complaint.

81.          IGC, IDDC, and IGE are collectively referred to herein as "IRICO."

**LG Electronics Entities**

82.          **LG Electronics, Inc.** is a corporation organized under the laws of Korea with its principal place of business located at LG Twin Towers, 20 Yeouido-dong, Yeoungdeungpo-gu, Seoul 150-721, South Korea.  LG Electronics, Inc. is a $48.5 billion global force in consumer electronics, home appliances and mobile communications, which established its first overseas branch office in New York in 1968.  The company's name was changed from GoldStar Communications to LG Electronics, Inc. in 1995, the year in which it also acquired Zenith in the United States.  In 2001, LG Electronics, Inc. transferred its CRT business to a 50/50 CRT joint venture with Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics N.V. forming LG.Philips Displays.  During the Class Period, LG Electronics, Inc. manufactured, marketed,

18

1   sold and/or distributed CRTs and CRT Products, either directly or indirectly through its

2   subsidiaries or affiliates, to customers throughout the United States.

3          83.      LG Electronics U.S.A., Inc. ("**LGEUSA**") is a Delaware corporation with its

4   principal place of business located at 1000 Sylvan Avenue, Englewood Cliffs, NJ 07632.

5   LG Electronics USA, Inc. is a wholly-owned and controlled subsidiary of LG

6   Electronics, Inc.  During the class period, LG Electronics U.S.A., Inc. manufactured,

7   marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly

8   through its subsidiaries or affiliates, to customers throughout the United States.  LG

9   Electronics, Inc. dominated and controlled the finances, policies, and affairs of

10  LGEUSA relating to the antitrust violations alleged in this Complaint.

11         84.      LG Electronics, Inc. and LGEUSA are collectively referred to herein

12  as "**LG**."

13  **LP Displays**

14         85.      LP Displays International, Ltd. f/k/a LG.Philips Displays ("**LP Displays**")

15  was originally created in 2001 as a 50/50 joint venture between LG Electronics, Inc. and Royal

16  Philips Electronics of The Netherlands.  In March 2007, LP Displays became an independent

17  company organized under the laws of Hong Kong with its principal place of business located at

18  Corporate Communications, 6th Floor, ING Tower, 308 Des Voeux Road Central, Sheung Wan,

19  Hong Kong.  LP Displays was a leading supplier of CRTs for use in television sets and

20  computer monitors with annual sales for 2006 of over $2 billion, and a market share of 27%.  LP

21  Displays announced in March 2007 that Royal Philips and LG Electronics would cede control

22  over the company and the shares would be owned by financial institutions and private equity

23  firms.  During the Class Period, LP Displays manufactured, marketed, sold and distributed

24  CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout

25  the United States.

26  **Panasonic Entities**

27         86.      **Panasonic Corporation**, which was at all times during the Class Period

28  known as Matsushita Electric Industrial Co., Ltd. and only became Panasonic Corporation on

October 1, 2008, is a Japanese entity with its principal place of business located at 1006 Oaza Kadoma, Kadoma-shi, Osaka 571-8501, Japan.  In 2002, Panasonic Corporation entered into a CRT joint venture with Toshiba forming MT Picture Display Co., Ltd. ("**MTPD**").  Panasonic Corporation was the majority owner with 64.5 percent.  On April 3, 2007, Panasonic Corporation purchased the remaining 35.5 percent stake in the joint venture, making MTPD a wholly-owned subsidiary of Panasonic Corporation.  In 2005, the Panasonic brand had the highest CRT Product revenue in Japan.  During the Class Period, Panasonic Corporation manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

87.     Panasonic Corporation of North America ("**Panasonic NA**") is a Delaware corporation with its principal place of business located at One Panasonic Way, Secaucus, New Jersey 07094.  Panasonic NA is a wholly owned and controlled subsidiary of Panasonic Corporation.  During the Class Period, Panasonic NA manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.   Panasonic Corporation dominated and controlled the finances, policies, and affairs of Panasonic NA relating to the antitrust violations alleged in this Complaint.

88.     Matsushita Electronic Corporation (Malaysia) Sdn Bhd. ("**Matsushita Malaysia**") was a Malaysian company with its principal place of business located at Lot 1, Persiaran Tengku Ampuan Section 21, Shah Alam Industrial Site, Shah Alam, Malaysia 40000.  Matsushita Malaysia was a wholly-owned and controlled subsidiary of Panasonic Corporation.  Panasonic Corporation transferred Matsushita Malaysia to its CRT joint venture with Toshiba Corporation, MTPD in 2003.  It was re-named as MT Picture Display (Malaysia) Sdn. Bhd. and operated as a wholly-owned subsidiary of MTMPD until its closure in 2006.  During the Class Period, Matsushita Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.   Panasonic Corporation dominated and controlled the finances, policies, and

1  affairs of Matsushita Malaysia relating to the antitrust violations alleged in this

2  Complaint.

3       89.     Panasonic Corporation, Panasonic NA and Matsushita Malaysia are

4  collectively referred to herein as "**Panasonic**."

5       90.     MT Picture Display Co., Ltd. ("**MTPD**") was established as a CRT joint

6  venture between Panasonic and Toshiba.  MTPD is a Japanese entity with its principal place of

7  business located at1-15 Matsuo-cho, Kadoma-shi, Osaka 571-8504, Japan.  On April 3, 2007,

8  Panasonic Corporation purchased the remaining stake in MTPD, making it a wholly-owned

9  subsidiary, and renaming it MT Picture Display Co., Ltd.  During the Class Period, MTPD

10  manufactured, sold and distributed CRTs, either directly or indirectly through its subsidiaries or

11  affiliates, to customers throughout the United States.

12       91.     Beijing-Matsushita Color CRT Company, Ltd. ("**BMCC**") is a Chinese

13  company with its principal place of business located at No. 9, Jiuxianqiao N. Rd., Dashanzi

14  Chaoyang District, Beijing, China.  BMCC was a joint venture company, 50% of which was

15  held by MTPD.  The other 50% was held by Beijing Orient Electronics (Group) Co., Ltd., China

16  National Electronics Import & Export Beijing Company (a China state-owned enterprise), and

17  Beijing Yayunchun Branch of the Industrial and Commercial Bank of China, Ltd. (a China

18  state-owned enterprise).  Formed in 1987, BMCC was Matsushita's (n/k/a Panasonic) first CRT

19  manufacturing facility in China.  BMCC was the second largest producer of CRTs in China.

20  During the Class Period, BMCC manufactured, marketed, sold and/or distributed CRTs, either

21  directly or indirectly through its subsidiaries or affiliates, to customers throughout the United

22  States.

23  **Philips Entities**

24       92.     Koninklijke Philips Electronics N.V. a/k/a Royal Philips Electronics N.V.

25  ("**Royal Philips**") is a Dutch company with its principal place of business located at

26  Amstelplein 2, Breitner Center, 1070 MX Amsterdam, The Netherlands.  Royal Philips, founded

27  in 1891, is one of the world's largest electronics companies, with 160,900 employees located in

28  over 60 countries.  Royal Philips had sole ownership of its CRT business until 2001.  In 2001,

Royal Philips transferred its CRT business to a 50/50 CRT joint venture with LG Electronics, Inc. forming LG.Philips Displays (n/k/a LP Displays International, Ltd.).  During the Class Period, Royal Philips manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

93.     Philips Electronics North America Corporation ("**PENAC**") is a Delaware corporation with its principal place of business located at 1251 Avenue of the Americas, New York, NY 10020-1104.  Philips Electronics NA is a wholly owned and controlled subsidiary of Royal Philips.  During the Class Period, Philips Electronics NA manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.   Royal Philips dominated and controlled the finances, policies, and affairs of PENAC relating to the antitrust violations alleged in this Complaint.

94.     Philips Electronics Industries (Taiwan), Ltd. ("**Philips Taiwan**") is a Taiwanese company with its principal place of business located at 15F 3-1 Yuanqu Street, Nangang District, Taipei, Taiwan.  Philips Taiwan is a subsidiary of Royal Philips.  During the Class Period, Philips Taiwan manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.   Royal Philips dominated and controlled the finances, policies, and affairs of Philips Taiwan relating to the antitrust violations alleged in this Complaint.

95.     Philips da Amazonia Industria Electronica Ltda. ("**Philips Brazil**") is a Brazilian company with its principal place of business located at Av Torquato Tapajos 2236, 1 andar (parte 1), Flores, Manaus, AM 39048-660, Brazil.  Philips Brazil is a wholly-owned subsidiary of Royal Philips.  During the Class Period, Philips Brazil manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.   Royal Philips dominated

1  and controlled the finances, policies, and affairs of Philips Brazil relating to the

2  antitrust violations alleged in this Complaint.

3        96.     Royal Philips, PENAC, Philips Taiwan and Philips Brazil are collectively

4  referred to herein as "**Philips**."

5        **Samsung Entities**

6        97.     Samsung SDI Co., Ltd. f/k/a Samsung Display Device Co., Ltd. ("**Samsung**

7  **SDI**"), is a South Korean company with its principal place of business located at 4285 Gongse-

8  dong, Giheung-gu Yongin 446577, South Korea.  Samsung SDI is a public company.  Samsung

9  Electronics Co., Ltd. is a major shareholder holding almost 20 percent of the stock.  Founded in

10  1970, Samsung SDI claims to be the world's leading company in the display and energy

11  businesses, with 28,000 employees and facilities in 18 countries.  In 2002, Samsung SDI held a

12  34.3% worldwide market share in the market for CRTs; more than another other producer.

13  Samsung SDI has offices in Chicago and San Diego.  During the Class Period, Samsung SDI

14  manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its

15  subsidiaries or affiliates, to customers throughout the United States.

16        98.     Samsung SDI America, Inc. ("**Samsung SDI America**") is a California

17  corporation with its principal place of business located at 3333 Michelson Drive, Suite 700,

18  Irvine, California.  Samsung SDI America is a wholly-owned and controlled subsidiary of

19  Samsung SDI.  During the Class Period, Samsung SDI America manufactured, marketed, sold

20  and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to

21  customers throughout the United States.   Samsung SDI dominated and controlled the

22  finances, policies, and affairs of Samsung SDI America relating to the antitrust

23  violations alleged in this Complaint.

24        99.     Samsung SDI Mexico S.A. de C.V. ("**Samsung SDI Mexico**") is a Mexican

25  company with its principal place of business located at Blvd. Los Olivos, No. 21014, Parque

26  Industrial El Florido, Tijuana, B.C. Mexico.  Samsung SDI Mexico is a wholly-owned and

27  controlled subsidiary of  Samsung SDI.  During the Class Period, Samsung SDI Mexico

28  manufactured, marketed, sold and/or distributed CRTs to customers, either directly or indirectly

1   through its subsidiaries or affiliates, throughout the United States.   Samsung SDI dominated

2   and controlled the finances, policies, and affairs of Samsung SDI Mexico relating to

3   the antitrust violations alleged in this Complaint.

4         100.    Samsung SDI Brasil Ltda. ("**Samsung SDI Brazil**") is a Brazilian company with

5   its principal place of business located at Av. Eixo Norte Sul, S/N, Distrito Industrial, 69088-480

6   Manaus, Amazonas, Brazil.  Samsung SDI Brazil is a wholly-owned and controlled subsidiary

7   of  Samsung SDI.  During the Class Period, Samsung SDI Brazil manufactured, marketed, sold

8   and/or distributed CRTs to customers, either directly or indirectly through its subsidiaries or

9   affiliates, throughout the United States.   Samsung SDI dominated and controlled the

10  finances, policies, and affairs of Samsung SDI Brazil relating to the antitrust violations

11  alleged in this Complaint.

12        101.    Shenzhen Samsung SDI Co., Ltd. ("**Samsung SDI Shenzhen**") is a Chinese

13  company with its principal place of business located at 5003 Huanggang Bei Lu, Futian Gu,

14  Shenzhen, China.  Samsung SDI Shenzhen is a wholly-owned and controlled subsidiary of

15  Samsung SDI.  During the Class Period, Samsung SDI Shenzhen manufactured, marketed, sold

16  and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to

17  customers throughout the United States.   Samsung SDI dominated and controlled the

18  finances, policies, and affairs of Samsung SDI Shenzhen relating to the antitrust

19  violations alleged in this Complaint.

20        102.    Tianjin Samsung SDI Co., Ltd. ("**Samsung SDI Tianjin**") is a Chinese company

21  with its principal place of business located at Developing Zone of Yi-Xian Park, Wuqing

22  County, Tianjin, China.  Samsung SDI Tianjin is a wholly-owned and controlled subsidiary of

23  Samsung SDI.  During the Class Period, Samsung SDI Tianjin manufactured, marketed, sold

24  and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to

25  customers throughout the United States.   Samsung SDI dominated and controlled the

26  finances, policies, and affairs of Samsung SDI Tianjin relating to the antitrust

27  violations alleged in this Complaint.

28

103.     Samsung SDI (Malaysia) Sdn. Bhd. ("**Samsung SDI Malaysia**") is a Malaysian company with its principal place of business located at Lot 635 & 660, Kawasan Perindustrian, Tuanku, Jaafar, 71450 Sungai Gadut, Negeri Semblian Darul Khusus, Malaysia.  Samsung SDI Malaysia is a wholly-owned and controlled subsidiary of  Samsung SDI Co., Ltd.  During the Class Period, Samsung SDI Malaysia manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.   Samsung SDI dominated and controlled the finances, policies, and affairs of Samsung SDI Malaysia relating to the antitrust violations alleged in this Complaint.

104.     Samsung SDI, Samsung SDI America, Samsung SDI Mexico, Samsung SDI Brazil, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Samsung SDI Malaysia are referred to collectively herein as "**Samsung**."

**Samtel**

105.     Samtel Color, Ltd. ("**Samtel**") is an Indian company with its principal place of business located at 501, Copia Corporate Suites, District Centre, Jasola, New Delhi 110025.  Samtel's market share for CRTs sold in India is approximately 40%.  Samtel was India's largest exporter of CRTs.  Samtel gained safety approvals from the United States, Canada, Germany and Great Britain for its CRTs.  During the Class Period, Samtel manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

**Technologies Displays Mexicana**

106.     Technologies Displays Mexicana, S.A. de CV (formerly Thomson Displays Mexicana) ("**TDM**") is a Mexican corporation with its principal place of business located at Calz Robledo Industrial No 460, Mexicali BC 21384, Mexico.  TDM is a wholly-owned subsidiary of Defendant TDA, which is in turn a subsidiary of Defendant Videocon.   TDM was one of the Thomson CRT manufacturing subsidiaries purchased by Videocon as alleged herein.  Thomson, and then Defendant Videocon, dominated and/or controlled the finances, policies, and/or affairs of TDM relating to the antitrust violations alleged herein.  During the Class

25

Period, TDM manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

**Thai CRT**

107.     Thai CRT Company, Ltd. ("**Thai CRT**") was a Thai company with its principal place of business located at 1/F Siam Cement Road, Bangsue Dusit, Bangkok, Thailand.  Thai CRT was a subsidiary of Siam Cement Group.  It was established in 1986 as Thailand's first manufacturer of CRTs for color televisions.  During the Class Period, Thai CRT manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

**Toshiba Entities**

108.     **Toshiba Corporation** is a Japanese corporation with its principal place of business at 1-1, Shibaura 1-chome, Minato-ku, Tokyo 105-8001, Japan.  In 2001, Toshiba Corporation held a 5-10 % worldwide market share for CRTs used in televisions and computer monitors.  In December 1995, Toshiba Corporation partnered with Orion Electric Company (n/k/a Daewoo Electronics Corporation) and two other entities to form P.T. Tosummit Electronic Devices Indonesia ("TEDI") in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2002, Toshiba Corporation entered into a joint venture with Panasonic Corporation called MT Picture Display Co., Ltd. in which the entities consolidated their CRT businesses.  During the Class Period, Toshiba Corporation manufactured, marketed, sold and/or distributed CRTs and CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.

109.     Toshiba America Consumer Products, LLC ("**TACP**") is headquartered in 82 Totawa Rd., Wayne, New Jersey 07470-3114.  TACP is a wholly owned and controlled subsidiary of  Toshiba Corporation through Toshiba America.  During the Class Period, TACP sold and/or distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.   Toshiba Corporation dominated and controlled the finances, policies, and affairs of TACP relating to the antitrust violations alleged in this Complaint.

26

1   110.     Toshiba America Information Systems, Inc. ("**TAIS**") is a California
2   corporation with its principal place of business located at 9740 Irvine Blvd., Irvine, California
3   92718.  TAIS is a wholly owned and controlled subsidiary of Toshiba Corporation through
4   Toshiba America, Inc.  During the Class Period, TAIS manufactured, marketed, sold and/or
5   distributed CRT Products, either directly or indirectly through its subsidiaries or affiliates, to
6   customers throughout the United States.   Toshiba Corporation dominated and controlled
7   the finances, policies, and affairs of TAIS relating to the antitrust violations alleged in
8   this Complaint.

9   111.     Toshiba America Electronics Components, Inc. ("**TAEC**") is a California
10  corporation with its principal place of business located at 9775 Toledo Way, Irvine, California
11  92618, and 19000 MacArthur Boulevard, Suite 400, Irvine, California 92612.  TAEC is a
12  wholly owned and controlled subsidiary of Toshiba America, Inc., which is a holding company
13  for Toshiba Corporation.  TAEC was the North American sales and marketing representative for
14  MT Picture Display Co., Ltd. ("MTPD").  Before MTPD's formation in 2003, TAEC was the
15  North American engineering, manufacturing, marketing and sales arm of Toshiba Corporation
16  for CRTs.  During the Class Period, TAEC manufactured, marketed, sold and/or distributed
17  CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout
18  the United States.   Toshiba Corporation dominated and controlled the finances, policies,
19  and affairs of TAEC relating to the antitrust violations alleged in this Complaint.

20  112.     Toshiba Display Devices (Thailand) Company, Ltd. ("**TDDT**") was a Thai
21  company with its principal place of business located at 142 Moo 5 Bangkadi Industrial Estate,
22  Tivanon Road, Pathum Thani, Thailand 12000.  TDDT was a wholly-owned and controlled
23  subsidiary of Toshiba Corporation.  Toshiba Corporation transferred Toshiba Thailand to its
24  CRT joint venture with Panasonic Corporation, MTPD, in 2003.  It was re-named as MT Picture
25  Display (Thailand) Co., Ltd. and operated as a wholly-owned subsidiary of MTPD until its
26  closure in 2007.  During the Class Period, TDDT manufactured, marketed, sold and/or
27  distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers
28  throughout the United States.   Toshiba Corporation dominated and controlled the

finances, policies, and affairs of TDDT relating to the antitrust violations alleged in this Complaint.

113.     P.T. Tosummit Electronic Devices Indonesia ("**TEDI**") was a CRT joint venture formed by Toshiba Corporation, Orion Electric Company and two other entities in December 1995.  TEDI's principal place of business was located in Indonesia.  TEDI was projected to have an annual production capacity of 2.3 million CRTs by 1999.  In 2003, TEDI was transferred to MTPD and its name was changed to PT.MT Picture Display Indonesia. During the Class Period, TEDI manufactured, marketed, sold and/or distributed CRTs, either directly or indirectly through its subsidiaries or affiliates, to customers throughout the United States.   Toshiba Corporation dominated and controlled the finances, policies, and affairs of TEDI relating to the antitrust violations alleged in this Complaint.

114.     Toshiba Corporation, TACP, TAIS, TAEC, TDDT and TEDI are referred to collectively herein as "**Toshiba**."

115.     All of the above-listed co-conspirators are collectively referred to herein as "co-conspirators."

116.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affairs.

117.     Defendants also are liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

118.     Defendants and each of the co-conspirators acted as the agent or joint venturer of or for the other co-conspirators and the Defendants with respect to the acts, violations and common course of conduct alleged herein.  Each Defendants or co-conspirator which is a subsidiary of a foreign parent acts as the sole United States agent for CRTs and CRT Products made by its parent company.

## VII.  INTERSTATE TRADE AND COMMERCE

119.     Throughout the Class Period, Defendants and/or their co-conspirators, or one or more of each of their subsidiaries, sold CRTs and CRT Products in the United States in a continuous and uninterrupted flow of interstate and international commerce, including through and into this judicial district.

120.     During the Class Period, Defendants and their co-conspirators collectively controlled the vast majority of the market for CRTs, both globally and in the United States.

121.     Defendants' and co-conspirators' unlawful activities, as described herein, took place within the flow of interstate commerce as well as throughout the world, and had a direct, substantial and reasonably foreseeable effect upon interstate and international commerce, including the United States markets for CRT Products.

## VIII.  FACTUAL ALLEGATIONS

### A.  CRT Technology

122.     CRT technology was first developed more than a century ago.  The first commercially practical CRT television was made in 1931.  It was not until the RCA Corporation introduced the product at the 1939 World's Fair, however, that it became widely available to consumers.  Subsequently, CRTs became the heart of most display products, including televisions, computer monitors, oscilloscopes, air traffic control monitors, and ATMs.  Even large public displays, including many scoreboards at sports arenas, were comprised of thousands of single color CRTs.

123.     As noted above, the CRT is a vacuum tube that is coated on its inside face with light sensitive phosphors.  An electron gun at the back of the vacuum tube emits electron beams.  When the electron beams strike the phosphors, the phosphors produce red, green, or blue light.  A system of magnetic fields inside the CRT, as well as varying voltages, directs the beams to produce the desired colors.  This process is rapidly repeated several times per second to produce the desired images.

29

124.     The quality of a CRT display is dictated by the quality of the CRT itself.  No external control or feature can make up for a poor quality tube.  In this regard, the CRT defines the whole product such that the product is often simply referred to as "the CRT."

125.     Until the last few years, CRTs were the dominant technology used in displays, including television and computer monitors.  During the Class Period, this translated into the sale of millions of CRT Products, generating billions of dollars in annual profits.

**B.  Structural Characteristics Of The CRT Market**

126.     The structural characteristics of the CRT market are conducive to the type of collusive activity alleged in this Complaint.  These characteristics include market concentration, ease of information sharing, the consolidation of manufacturers, multiple interrelated business relationships, significant barriers to entry, maturity of the CRT market, and homogeneity of products.

**a.      Market Concentration**

127.     During the Class Period, the CRT industry was dominated by relatively few companies.  In 2004, Samsung SDI, LG.Philips Displays (n/k/a LP Displays), MT Picture Display and Chunghwa together held a collective 78% share of the global CRT market.  The high concentration of market share facilitated coordination since there were fewer cartel members among which to coordinate pricing or allocate markets, and it was easier to monitor the pricing and production of other cartel members.

**b.      Information Sharing**

128.     Because of common membership in trade associations for the CRT market and related markets (for example, TFT-LCD), interrelated business arrangements such as joint ventures, allegiances between companies in certain countries, and relationships between the executives of certain companies, there were many opportunities for Defendants and co-conspirators to discuss and exchange competitive information.  The ease of communication was facilitated by the use of meetings, telephone calls, e-mails, and instant messages.  Defendants and co-conspirators took advantage of these opportunities to discuss and agree upon their pricing for CRTs.

129.     Chunghwa, Hitachi and Samsung were all members of the Society for Information Display.  Samsung and LG Electronics, Inc. were two of the co-founders of the Korea Display Industry Association.  Similarly, Daewoo, LG Electronics, LP Displays, and Samsung were members of the Electronic Display Industrial Research Association.  Upon information and belief, Defendants and co-conspirators used these trade associations as vehicles for discussing and agreeing upon their pricing for CRTs.  At the meetings of these trade associations, Defendants and co-conspirators exchanged proprietary and competitively sensitive information which they used to implement and monitor the conspiracy.

### c.     Consolidation

130.     The CRT industry also had significant consolidation during the Class Period, including but not limited to: (a) the creation of LG.Philips Displays (n/k/a LP Displays) in 2001 as a joint venture between Royal Philips and LG Electronics, Inc.; and (b) the 2002 merger of Toshiba and Matsushita/Panasonic's CRT business into MTPD.

131.     Defendants and co-conspirators also consolidated their manufacturing facilities in lower cost venues such as China and reduced manufacturing capacity to prop up prices.

### d.     Multiple Interrelated Business Relationships

132.     The CRT industry had a close-knit nature whereby multiple business relationships between supposed competitors blur the lines of competition and provided ample opportunity to collude.  These business relationships also created a unity of interest among competitors so that the conspiracy was easier to implement and enforce than if such interrelationships did not exist.

133.     Examples of the high degree of cooperation among Defendants and co-conspirators in both the CRT market and other closely related markets include the following:

a.     The formation of the CRT joint venture LG.Philips Displays in 2001 by LG Electronics, Inc. and Royal Philips.

31

1    b.    LG Electronics, Inc. and Royal Philips also formed LG.Philips LCD

2 Co., Ltd., n/k/a LG Display Co., Ltd. in 1999 as a joint venture for the purpose of manufacturing

3 TFT-LCD panels.

4    c.    The formation of the CRT joint venture MTPD in 2003 by Toshiba

5 and Panasonic.

6    d.    Toshiba and Panasonic also formed Toshiba-Matsushita Display

7 Technology Co., Ltd. as a joint venture for the purpose of manufacturing TFT-LCD panels.

8    e.    In December 1995, Daewoo and Toshiba partnered with two other

9 entities to form TEDI which manufactured CRTs in Indonesia.

10    f.    Daewoo and Toshiba also signed a cooperative agreement relating to

11 LCDs in 1995.  Pursuant to the agreement, Daewoo produced STN LCDs, and Toshiba, which

12 had substituted its STN LCD production with TFT LCD production, marketed Daewoo's STN

13 LCDs globally through its network.

14    g.    Also in 1995, Chunghwa entered into a technology transfer agreement

15 with  Toshiba for large CPTs.

16    h.     Chunghwa had a joint venture with Samsung Electronics Co., Ltd. for

17 the production of liquid crystal display panels.  Chunghwa licensed the technology from Royal

18 Philips, a recent development that helped resolve a patent infringement suit filed in 2002.

19    i.    LG Electronics, Inc. and Hitachi Ltd. entered into a joint venture in

20 2000 for the manufacture, sale and distribution of optical storage products such as DVD drives.

21    j.    Samtel participated in a joint venture, Samcor Glass Limited, with

22 Samsung Electronics Co., Ltd. and Corning Inc., USA for the production and supply of picture

23 tube glass.

24    134.    Samtel claims to have supplied CRTs to  LG Electronics, Inc., Samsung,

25 Royal Philips, and Panasonic.

26    **e.    High Costs Of Entry Into The Industry**

27    135.    There were substantial barriers to entry in the CRT industry.  It would require

28 substantial time, resources and industry knowledge to even potentially overcome the barriers to

32

entry.  It is also extremely unlikely that a new producer would enter the market in light of the declining demand for CRTs and CRT Products.

### f.      The Maturity Of The CRT Market

136.      Newer industries are typically characterized by rapid growth, innovation and high profits.  The CRT market was a mature one, and like many mature industries, was characterized by slim profit margins, creating a motivation to collude.

137.      Demand for CRTs and CRT Products was declining throughout the Class Period.  Static or declining demand is another factor which makes the formation of a collusive arrangement more likely because it provides a greater incentive to firms to avoid price competition.

138.      In addition, conventional CRT televisions and computer monitors were being rapidly replaced by TFT-LCD and Plasma displays.  This was one of the factors which led Defendants and co-conspirators to engage in this alleged price fixing scheme in order to slow down declining CRT prices.  Between 2000 and 2006, revenues from the sale of CRT televisions in the United States declined by 50.7 percent and were predicted to decline by an additional 84.5 percent between 2006 and 2010.

139.      Although demand was declining as a result of the popularity of flat-panel LCD/plasma televisions and LCD monitors, CRT televisions and monitors were still the dominant display technology during the Class Period, making Defendants' and co-conspirators' collusion and the international price fixing conspiracy worthwhile.  Due to the high costs of LCD panels and plasma displays during the Class Period, a substantial market for CRTs existed as a cheaper alternative to these new technologies.

140.      In 1999, CRT monitors accounted for 94.5 percent of the retail market for computer monitors in North America.  By 2002, that figure had dropped to 73 percent; still a substantial share of the market.

141.      As for CRT televisions, they accounted for 73 percent of the North American television market in 2004, and by the end of 2006, still held a 46 percent market share.  CRT

33

1   televisions continued to dominate the global television market, accounting for 75 percent of

2   worldwide TV units in 2006.

3        **g.    Homogeneity Of CRT Products**

4       142.    CRTs were commodity-like products which were manufactured in

5   standardized sizes.  One Defendant's or one co-conspirator's CRTs for a particular application,

6   such as a particular size television set or computer monitor, was substitutable for another's.

7   Defendants and co-conspirators sold and Plaintiffs (and Class members) purchased CRTs and

8   CRT Products primarily on the basis of price.

9       143.    It is easier to form and sustain a cartel when the product in question is

10  commodity-like because it is easier to agree on prices to charge and to monitor those prices once

11  an agreement is formed.

12    **C.  Pre-Conspiracy Market**

13      144.    The genesis of the CRT conspiracy was in the late 1980s as the CRT business

14  became more international and the co-conspirators began serving customers that were also being

15  served by other international companies.  During this period, the employees of co-conspirators

16  would encounter employees from their competitors when visiting their customers.  A culture of

17  cooperation developed over the years and these Defendants' employees and co-conspirators'

18  employees would exchange market information on production, capacity, and customers.

19      145.    In the early 1990s, representatives from Samsung, Daewoo, Chunghwa and

20  Orion visited each other's factories in S.E. Asia.  During this period, these producers began to

21  include discussions about price in their meetings.  The pricing discussions were usually limited,

22  however, to exchanges of the range of prices that each competitor had quoted to specific

23  customers.

24    **D.  Defendants' And Co-Conspirators' Illegal Agreements**

25      146.    Plaintiffs are informed and believe, and thereon allege, that in order to control

26  and maintain profitability during declining demand for CRTs, Defendants and their co-

27  conspirators engaged in a contract, combination, trust or conspiracy, the effect of which has

28

1    been to raise, fix, maintain and/or stabilize the prices at which they sold CRTs to artificially

2    inflated levels from at least March 1, 1995 through at least November 25, 2007.

3           147.    As further alleged herein, Defendant Thomson has admitted that it

4    participated in the CRT price-fixing conspiracy.

5           148.    Defendant Videocon did not get involved in the CRT industry until

6    approximately mid-2005 when it acquired Thomson's CRT business.  Thereafter, Videocon

7    joined the CRT conspiracy.  Videocon is responsible for all acts of its co-conspirators in

8    furtherance of the conspiracy during the class period, as well as its own acts during and after

9    2005.

10          149.    As alleged herein, TDA is the successor to Thomson Displays Americas

11   LLC, which participated in the conspiracy prior to its acquisition by Videocon in mid-2005.

12   TDA continued to participate in the conspiracy after 2005.  TDA is responsible for all acts of its

13   co-conspirators in furtherance of the conspiracy during the class period, as well as its own acts

14   during and after 2005.

15          150.    The CRT conspiracy was effectuated through a combination of group and

16   bilateral meetings.  In the formative years of the conspiracy (1995-1996), bilateral discussions

17   were the primary method of communication and took place on an informal, ad hoc basis.

18   During this period, representatives from LG, Samsung and Daewoo visited other co-conspirator

19   manufacturers including Philips, Chunghwa, Thai CRT, Hitachi, Toshiba, Mitsubishi and

20   Panasonic to discuss increasing prices for CRTs in general and to specific customers.  These

21   meetings took place in Taiwan, South Korea, Thailand, Japan, Malaysia, Indonesia, and

22   Singapore.

23          151.    Samsung, Chunghwa, LG, Mitsubishi and Daewoo also attended several ad

24   hoc group meetings during this period.  The participants at these group meetings also discussed

25   increasing prices for CRTs.

26          152.    As more manufacturers formally entered the conspiracy, group meetings

27   became more prevalent.  In and after 1997, the co-conspirators began to meet in a more

28   organized, systematic fashion, and a formal system of multilateral and bilateral meetings was

35

put in place.  The-conspirators' representatives attended hundreds of these meetings during the Class Period.

153.    The overall CRT conspiracy raised and stabilized worldwide prices (including United States prices) that Defendants charged for CRTs.

### a.    "Glass Meetings"

154.    The group meetings among the participants in the CRT price-fixing conspiracy were referred to by the participants as "Glass Meetings" or "GSM."  Glass Meetings were attended by employees at three general levels of the co-conspirators' corporations.

155.    Meetings at the first level were attended by high level company executives including CEOs, Presidents, and Vice Presidents.  These meetings were known as "Top Meetings."  Top Meetings occurred less frequently, typically quarterly, and were focused on longer term agreements and forcing compliance with price fixing agreements.  Because attendees at Top Meetings had authority as well as more reliable information, these meetings resulted in agreements.  Attendees at Top Meetings were also able to resolve disputes because they were decision makers who could make agreements.

156.    Meetings at the second level were attended by the co-conspirators' high level sales managers and were known as "Management Meetings."  These meetings occurred more frequently, typically monthly, and handled implementation of the agreements made at Top Meetings.

157.    Finally, meetings at the third level were known as "Working Level Meetings" and were attended by lower level sales and marketing employees.  These meetings generally occurred on a weekly or monthly basis and were mostly limited to the exchange of information and discussing pricing since the lower level employees did not have the authority to enter into agreements.  These lower level employees would then transmit the competitive information up the corporate reporting chain to those individuals with pricing authority.  The Working Level Meetings also tended to be more regional and often took place near the co-conspirators' factories.  In other words, the Taiwanese manufacturers' employees met in Taiwan, the Korean manufacturers' employees met in Korea, the Chinese in China, and so on.

36

158.     The Chinese Glass Meetings began in 1998 and generally occurred on a monthly basis following a top or management level meeting.  The China meetings had the principal purpose of reporting what had been decided at the most recent Glass Meeting to the Chinese manufacturers.  Participants at the Chinese meetings included the manufacturers located in China, such as IRICO and BMCC, as well as the China-based branches of the other co-conspirators, including but not limited to Hitachi Shenzhen, Samsung SDI Shenzhen, Samsung SDI Tianjin, and Chunghwa.

159.     Glass Meetings also occurred occasionally in various European countries. Attendees at these meetings included  those co-conspirators which had subsidiaries and/or manufacturing facilities located in Europe, including Philips, LG, LP Displays, Chunghwa, Samsung, Daewoo (usually DOSA attended these meetings on behalf of Daewoo), IRICO, and Thomson.

160.     Representatives of the co-conspirators also attended what were known amongst members of the conspiracy as "Green Meetings."  These were meetings held on golf courses.  The Green Meetings were generally attended by top and management level employees of the co-conspirators.

161.     The agreements reached at the Glass Meetings included:

   a.     agreements on CRT prices, including establishing target prices, "bottom" prices, price ranges, and price guidelines;

   b.     placing agreed-upon price differentials on various attributes of CRTs, such as quality or certain technical specifications;

   c.     agreements on pricing for intra-company CRT sales to vertically integrated customers;

   d.     agreements as to what to tell customers about the reason for a price increase;

   e.     agreements to coordinate with competitors that did not attend the group meetings and agreements with them to abide by the agreed-upon pricing;

37

1          f.     agreements to coordinate pricing with CRT manufacturers in other

2  geographic markets such as Brazil, Europe and India;

3          g.     agreements to exchange pertinent information regarding shipments,

4  capacity, production, prices and customers demands;

5          h.     agreements to coordinate uniform public statements regarding

6  available capacity and supply;

7          i.     agreements to allocate both overall market shares and share of a

8  particular customer's purchases;

9          j.     agreements to allocate customers;

10         k.     agreements regarding capacity, including agreements to restrict output

11  and to audit compliance with such agreements; and

12         l.     agreements to keep their meetings secret.

13      162.     Efforts were made to monitor each co-conspirators adherence to these

14  agreements in a number of ways, including seeking confirmation of pricing both from customers

15  and from employees of the co-conspirators themselves.  When cheating did occur, it was

16  addressed in at least four ways: 1) monitoring; 2) attendees at the meetings challenging other

17  attendees if they did not live up to an agreement; 3) threats to undermine a competitor at one of

18  its principal customers; and 4) a recognition in a mutual interest in living up to the target price

19  and living up to the agreements that had been made.

20      163.     As market conditions worsened in 2005-2007, and the rate of replacement of

21  CRTs by TFT-LCDs increased, the group Glass Meetings became less frequent and bilateral

22  meetings again became more prevalent.  In addition, in December 2006 the DOJ issued

23  subpoenas to manufacturers of TFT-LCDs and so the CRT co-conspirators began to have

24  concerns about antitrust issues.

25     **b.**    **Bilateral Discussions**

26      164.     Throughout the Class Period, the Glass Meetings were supplemented by

27  bilateral discussions between various co-conspirators.  The bilateral discussions were more

28  informal than the group meetings and occurred on a frequent, ad hoc basis, often between the

38

group meetings. These discussions, usually between sales and marketing employees, took the form of in-person meetings, telephone contacts and emails.

165.     During the Class Period, in-person bilateral meetings took place in Malaysia, Indonesia, Taiwan, China, United Kingdom, Singapore, South Korea, Japan, Thailand, Brazil, Mexico and the United States.

166.     The purpose of the bilateral discussions was to exchange information about past and future pricing, confirm production levels, share sales order information, confirm pricing rumors, and coordinate pricing with manufacturers in other geographic locations, including Brazil, Mexico, Europe and the United States.

167.     In order to ensure the efficacy of their global conspiracy, the conspirators also used bilateral meetings to coordinate pricing with CRT manufacturers in Brazil, Mexico and the United States, such as Philips, Samsung SDI, Thomson, Mitsubishi and later, LPD (from 2001) and Defendants (from 2005).  These CRT manufacturers were particularly important because they served the North American market for CRT Products.  As further alleged, North America was the largest market for CRT televisions and computer monitors during the Class Period.  Because these manufacturers were all wholly-owned and controlled subsidiaries of Defendants or co-conspirators Philips, Samsung SDI, Mitsubishi and LPD, they adhered to the unlawful price-fixing agreements.  In this way, Defendants and the co-conspirators ensured that prices of all CRTs sold in or into the United States were fixed, raised, maintained and/or stabilized at supracompetitive levels.

168.     Defendants and co-conspirators also used bilateral discussions with each other during price negotiations with customers to avoid being persuaded by customers to cut prices.  The information gained in these communications was then shared with supervisors and taken into account in determining the price to be offered.

169.     Bilateral discussions were also used to coordinate prices with CRT manufacturers that did not ordinarily attend the group meetings, such as Defendants Videocon, and co-conspirators Hitachi, Toshiba, Panasonic, Thai CRT, Samtel, and Mitsubishi.  It was often the case that in the few days following a Top or Management Meeting, the attendees at

these group meetings would meet bilaterally with the other Defendant and co-conspirator manufacturers for the purpose of communicating whatever CRT pricing and/or output agreements had been reached during the meeting.  For example, Samsung had a relationship with Hitachi and was responsible for communicating CRT pricing agreements to Hitachi.  LG had a relationship with Toshiba and was responsible for communicating CRT pricing agreements to Toshiba.  And Thai CRT had a relationship with Samtel and was responsible for communicating CRT pricing agreements to Samtel.  Hitachi, Toshiba and Samtel implemented the agreed-upon pricing as conveyed by Samsung, LG, and Thai CRT.  Sometimes Hitachi and Toshiba also attended the Glass Meetings.  Similarly, Philips had regular bilateral communications with Thomson in Europe and the United States, and Samsung SDI had regular communications with Mitsubishi.   In this way, Defendants and their co-conspirators, Hitachi, Toshiba, Samtel, and Mitsubishi participated in the conspiracy to fix prices of CRTs.

### c.   Defendants' And Co-Conspirators' Participation In Group And Bilateral Discussions

**<u>Videocon</u>**

170.     Between 2005 and 2007, Defendant Videocon participated in several group meetings and multiple bilateral meetings with competitors, including a number of meetings taking place in China and in Europe in or about July 2005, in the fall of 2005, and in 2006. These meetings were attended by Videocon executives and employees, continuing the practice established by Thomson as alleged below.  At these meetings, Videocon discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development, and agreed on prices and supply levels for CRTs.  In these meetings, Videocon shared information with competitors about the U.S. market for CRTs.  Videocon never effectively withdrew from this conspiracy.

171.     Upon information and belief, Videocon dominated or controlled the finances, policies and affairs of TDA and TDM once it acquired these companies, and directed the pricing of CRT products sold to the North American market.  Between 1995 and 2007, Defendant TDA and its wholly-owned subsidiary TDM participated in the conspiracy meetings described herein

and/or were a party to the agreements entered at these meetings.  TDA and TDM were active, knowing participants in the alleged conspiracy, and the prices established by TDA and/or TDM were the product of conspiratorial communications between Videocon and its co-conspirators.

172.     To the extent TDA and TDM manufactured, sold and/or distributed CRTs, they played a significant role in the conspiracy because Videocon and its co-conspirators wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the conspiratorial meetings.

**Thomson**

173.     Defendant Thomson has admitted its participation in the CRT price-fixing conspiracy.  Its 2011 Annual Report released in March 2012 states:

> On January 9, 2008, Thomson/Technicolor received a request under art 18 (2) of Council Regulation n1/2003 from the European Commission (the "EC") also relating to the CRT industry.  Thomson/Technicolor received three further requests for information from the EC on January 16, 2009, January 19, 2009, and September 15, 2009 respectively. . . .  On November 25, 2009, Thomson/Technicolor received a Statement of Objections ("SO") from the European Commission.  On March 3, 2010, Thomson/Technicolor filed its written response to the "SO."  On May 26 and 27, 2010, Thomson/Technicolor attended an Oral Hearing together with the other parties and the European Commission.  ***Thomson/Technicolor stated that it played a minor role in the alleged anticompetitive conduct.***  (Emphasis added.)

Plaintiffs dispute that Thomson's role in the conspiracy was minor.  Nonetheless, Thomson admits that it was one of the conspirators in this CRT price-fixing conspiracy.

174.     In December 2012, the EC released its findings on the CRT price-fixing conspiracy.  The EC found that seven companies, including Thomson, participated in cartels "between 1996 and 2006" and that "these companies fixed prices, shared markets, allocated customers between themselves and restricted their output."  The CRT cartels were "textbook cartels featur[ing] all the worst kinds of anticompetitive behavior;" "operated worldwide;" and were "among the most organized cartels that the Commission has investigated."  The EC assessed a fine of €38,631,000 against Thomson, reduced due to Thomson's cooperation with the EC investigation.

41

175.     Following the EC's announcement of its findings, Thomson announced in its 2012 Annual Report released in March 2013 that "purchasers may bring individual claims against the Company seeking compensation for alleged loss suffered as a result of the anti-competitive conduct."  2012 Annual Report at 216.

176.     Between at least 1995 and 2005, Thomson SA and Thomson Consumer Electronics participated in at least 61 meetings with its competitors, including several Glass Meetings and multiple bilateral meetings, and "Green Meetings" in the United States, in which unlawful agreements as to price, output restrictions, and/or consumer and market allocation of CRTs occurred.  These meetings were attended by Thomson high level sales and operations managers.  These meetings attended by Thomson took place in the United States, Europe, Japan, and China, and were also attended by representatives from Samsung SDI, MTPD, LPD, Philips, Toshiba, and Chunghwa.  At these meetings, Thomson discussed such things as CRT prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns, customer allocation, and new product development and agreed on prices and supply levels for CRTs.  The purpose of these meetings was to raise and stabilize the prices of and set supply levels of CRTs sold by Thomson and its competitors in North America, including the United States.  These meetings among competitors did not take place in the context of customer-supplier relationships.  Thomson also communicated with its competitors over the telephone and by e-mail.  Through all these discussions, Thomson agreed on prices and supply levels for CRTs.  Thomson never effectively withdrew from this conspiracy.

177.     Examples of Thomson's participation in the CRT conspiracy include the following:

a.     On January 12, 1999, Samsung SDI met with Thomson Consumer Electronics and others, including Philips and Toshiba, in Las Vegas, Nevada, to discuss a cooperation plan for their businesses in North America.  They agreed to establish communication channels and discussed strategies, including future plans for the large-size CRT market in North America and to make mutual efforts to minimize conflicts.  These conspirators agreed to meet again in February 1999 to maintain mutual cooperation within the North

42

1    American market.  Thomson Consumer Electronics and the other participants knew that North

2    American antitrust laws did not permit the type of discussions of CRT prices that they held.

3            b.      On March 25, 1999, Thomson SA and Thomson Consumer

4    Electronics employees met in Paris, France with Samsung SDI at Thomson headquarters in

5    Paris.  The parties discussed stopping price cuts on medium-sized CPTs and arranging price-

6    fixing between Philips and Thomson SA.  Thomson stated that there were too many players in

7    the medium CPT market and exchanged confidential information with Samsung SDI about

8    future CPT production, including fab line management strategy for 2000 and future CPT release

9    plans for 2000.  Thomson SA and Samsung SDI also discussed the sales of products imported

10   and sold in the U.S.  Thomson attendees included:  Giles Taldu (Thomson SA); Christian

11   Lissorgues (Thomson SA General Manager for Marketing and Sales); and Bob Lorch (head of

12   Thomson Consumer Electronics's Tube Operations Center).  The participants in this meeting

13   agreed to keep it a secret because they knew that their conduct was illegal.

14           c.      On June 22, 1999, Christian Lissorgues of Thomson SA met with

15   Samsung SDI and exchanged information regarding future production of CRTs.

16           d.      On September 23, 1999, M. Kris, a Thomson SA employee, and

17   Pawel Serafinski, Thomson SA's Supply Chain Planning Manager, met with Samsung SDI,

18   Philips and Orion in France, and exchanged information regarding future CRT production and

19   capacity utilization.

20           e.      On October 29, 1999, Lissorgues of Thomson SA met with Samsung

21   SDI at Thomson SA's headquarters in Paris and agreed to price guidelines for 20", 21" and 25"

22   CPTs.  The price guideline included a base price and specified conditions, such as no rebates

23   and no special discounts.  The attendees also discussed Thomson SA's future production of 25",

24   28", 28" wide flat, and 29" flat tubes, and discussed how LG Electronics had stopped production

25   of 21" CPTs due to over-supply in the CPT market.  The attendees agreed to convince Philips

26   not to produce any more medium size tubes in order to keep the prices high.  The attendees were

27   instructed to keep their meeting secret because they knew their conduct was illegal.

28

f.      On September 2, 2000, the president of the Philips for the North American CPT market met with Samsung SDI to discuss and agree on a price increase on 25" and 27" CPTs sold in the U.S. market.  The parties noted that Thomson Consumer Electronics supported a price increase.

g.      On November 1, 2000, Alex Hepburn, Thomson Consumer Electronics Product Support Manager, exchanged confidential information with Hitachi regarding Thomson's North American sales forecast, including sales for medium and large CRTs.

h.      On January 26, 2001, Lissorgues of Thomson SA met with Samsung SDI, Philips and Orion in England and exchanged information on mid-sized CPT strategy and future line production plans for 2001.

i.      On April 24, 2001, Hyang Gul Yang, Thomson Vice President of Sales, and Ji Up Hwang, Thomson Manager, met with Samsung SDI, LG, Irico, Philips, and BMCC in Shenzhen, China and agreed to stop production of the 29" SF model from May 2001 to the end of July 2001.  They also agreed to reduce production of 21" and 25" CPTs.  They noted that their purpose was to curb excessive inventory and to stop price decreases.

j.      On July 5, 2001, Lissorgues again met with Samsung SDI, and Philips, in Luxembourg, and they agreed to mutual cooperation and efforts to control CRT production efforts in order to prevent price reductions.  The attendees agreed to keep their meeting secret because they knew their conduct was illegal.

k.      On October 26, 2001, Lissorgues and Taldu of Thomson SA met with Samsung SDI, Philips, Orion and Chunghwa in Brussels, Belgium, and agreed to avoid price competition by reducing production of CPT supply and maintaining prices level.  Taldu chaired this meeting.

l.      On June 27, 2002, Emeric Charamel, Thomson SA Sales Manager, met with Samsung SDI, LPD, and Orion in Rome, Italy, and the parties exchanged information regarding future medium-size CPT sales and production.  They discussed CPTs ranging in size from 14" to 36".

44

1      m.      On August 15, 2002, Hanrahan, Thomson Consumer Electronics CRT

2  Sales General Manager, exchange information with MTPD regarding discussions with

3  competitors Philips and Hitachi on price increases for 25", 27", and 32" CPTs for the U.S. and

4  U.S. production of CPTs.

5      n.      On November 15, 2002, Ms. Agnes, Thomson SA's Global Marketing

6  Manager, and Ms. Françoise, its Europe Marketing Manager, met in Paris, France with Samsung

7  SDI at Thomson SA's headquarters.  They exchanged confidential information on Thomson's

8  CRT operations in North America, including its projected sales volumes and profits in the U.S.,

9  information on Thomson Consumer Electronics factories in Marion, Ohio, Scranton,

10  Pennsylvania, and Mexico.  They discussed market forecasts, production targets, and pricing

11  concerns in North America.

12      o.      On November 18, 2002, Lissorgues and Charamel of Thomson SA,

13  and Brunk and Hanrahan of Thomson Consumer Electronics met with Toshiba in Japan and

14  exchanged information on 29" and 32" CPT production and pricing.

15      p.      On April 10, 2003, Charamel of Thomson SA exchanged information

16  with Samsung SDI about a future line production stop and future prices for CRTs.  Samsung

17  SDI also set up a meeting with Thomson and LPD to agree on prices for the remainder of 2003.

18      q.      On May 2, 2003, Brunk and Hanrahan of Thomson Consumer

19  Electronics met with Samsung SDI and discussed future pricing for 29" CPTs in the U.S.

20      r.      On July 26, 2003, Brunk of Thomson Consumer Electronics attended

21  a Green Meeting with Samsung SDI and LPD in San Diego, California.  At Green Meetings,

22  competitors discussed price and supply agreements for CPTs.

23      s.      On August 19, 2003, J.R. Hirschler and Hanrahan of Thomson

24  Consumer Electronics met with the president of MTPD's U.S. CPT operations in Detroit,

25  Michigan and exchanged information on future U.S. production of CRTs and pricing of tubes.

26  The purpose of this meeting was to discuss prices and supplies of CPTs in the U.S., and current

27  and future production plans for 25", 27", 32" and 36" CPTs.

28

t.      On November 21, 2003, Charamel Lissorgues of Thomson SA met with co-conspirators at the Schiphol Airport in Amsterdam, Netherlands and agreed to establish mutual prices and to decrease output for 20", 21", 28", 29" and 32" CPTs, including agreements for minimum prices, target prices, price differentials.  They also discussed North American imports.

u.      On December 4, 2003, Thomson SA with Philips and Samsung SDI in Paris, France, and agreed to an alignment on customers, products and prices on CPTs, including 28" and 32" CPTs.  They set minimum prices and price targets and agreed to price differentials.

v.      On November 1, 2004, Lissorgues of Thomson SA met with Samsung SDI in Paris, France to discuss future CRT pricing agreements and plan for a future meeting in Amsterdam to make an agreement on CRT prices.

178.      Thomson SA participated in the conspiracy in its own right and through its subsidiary, Thomson Consumer Electronics, through at least 2005.  Thereafter, it participated through its 13% ownership of Videocon following the sale of its CRT business to Videocon in 2005.  Thomson never effectively withdrew from the conspiracy.

179.      Thomson Consumer Electronics also directly participated in the conspiracy in the United States, which was Thomson's largest market for CRTs.  Between 1995 and 2005, Thomson Consumer Electronics knowingly participated in bilateral and group meetings, including "green meetings" in the United States, during which attendants reached unlawful agreements as to price, output restrictions, and/or customer and market allocation of U.S. market CRTs.

180.      Examples of Thomson Consumer Electronics' participation in the CRT conspiracy include the following:

a.      August 15, 2002: Thomson Consumer's CRT sales manager Hanrahan exchanged information with co-conspirator MTPD regarding discussions with Philips and Hitachi about price increases for 25", 27" and 32" CPTs for the United States, as well as production of CPTs in the U.S.

46

1

2

3

        b.      November 18, 2002 (Toshiba, Japan): Thomson Consumer's Brunk and Hanrahan, along with Thomson SA's Lissorgues, met with co-conspirator Toshiba and exchanged information regarding 29" and 32" CPT production and pricing.

4

5

        c.      May 2, 2003: Thomson Consumer's Brunk and Hanrahan met with coconspirator Samsung SDI and discussed future pricing for 29" CPTs in the United States.

6

7

8

        d.      July 26, 2003 (San Diego, California): Thomson Consumer's Brunk attended a Green Meeting with co-conspirators Samsung SDI and LPD. At Green Meetings, competitors discussed price and supply agreements for CRTs.

9

10

11

12

13

        e.      August 19, 2003 (Detroit, Michigan): Thomson Consumer's CRT Sales Manager J. R. Hirschler and Thomson Consumer's Hanrahan met with the President of MTPD's United States CPT operations and exchanged information regarding future U.S. production and pricing of CRTs. They specifically discussed current and future production plans for 25", 27", 32" and 36" CPTs.

14

15

16

        f.      March 2, 2006: Thomson Consumer's Bruck and Hanrahan discussed with W. R. Kim of Samsung SDI Thomson's CRT production, including its line operation status at its Mexico plant.

17

**Co-Conspirators**

18

19

20

21

22

23

181.      Between at least 1995 and 2007, Samsung SDI, Samsung SDI Malaysia, Samsung SDI Shenzhen, and Samsung SDI Tianjin participated in at least 200 Glass Meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Samsung.  Samsung also engaged in bilateral discussions with other co-conspirators on a regular basis.  Through these discussions, Samsung agreed on prices and supply levels for CRTs.

24

25

26

27

182.      Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were represented at those meetings and were a party to the agreements entered at them.  Thus, Samsung SDI America, Samsung SDI Brazil, and Samsung SDI Mexico were active, knowing participants in the alleged conspiracy.

28

183.     Between at least 1995 and 2001, LG, through LG Electronics, Inc. and LGETT, participated at least 100 Glass Meetings at all levels.  After 2001, LG participated in the CRT conspiracy through its joint venture with Philips, LG.Philips Displays (n/k/a LP Displays).  A substantial number of these meetings were attended by the highest ranking executives from LG.  LG also engaged in bilateral discussions with each of the other co-conspirators on a regular basis.  Through these discussions, LG agreed on prices and supply levels for CRTs. LG never effectively withdrew from this conspiracy.

184.     LGEUSA was represented at those meetings and was a party to the agreements entered at them.  To the extent LGEUSA sold and/or distributed CRTs, it played a significant role in the conspiracy because co-conspirators and Defendants wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings.  Thus, LGEUSA was an active, knowing participant in the alleged conspiracy.

185.     Between at least 1996 and 2001, Philips, through Royal Philips and Philips Taiwan, participated at least 100 Glass Meetings at all levels.  After 2001, Philips participated in the CRT conspiracy through its joint venture with LG, LG.Philips Displays (n/k/a LP Displays). A substantial number of these meetings were attended by high level executives from Philips. Philips also engaged in numerous bilateral discussions with other co-conspirators.  Through these discussions, Philips agreed on prices and supply levels for CRTs.  Philips never effectively withdrew from this conspiracy.

186.     PENAC and Philips Brazil were represented at those meetings and were a party to the agreements entered at them.  To the extent PENAC and Philips Brazil sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because the co-conspirators wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings.  Thus, PENAC and Philips Brazil were active, knowing participants in the alleged conspiracy.

187.     Between at least 2001 and 2006, LP Displays (f/k/a LG.Philips Displays) participated at least 100 Glass Meetings at all levels.  A substantial number of these meetings

48

were attended by the highest ranking executives from LP Displays.  Certain of these high level executives from LP Displays had previously attended meetings on behalf of LG and Philips.  LP Displays also engaged in bilateral discussions with other co-conspirators.  Through these discussions, LP Displays agreed on prices and supply levels for CRTs.

188.     Between at least 1995 and 2006, Chunghwa, through CPT, Chunghwa Malaysia, and representatives from their factories in Fuzhuo (China) and Scotland, participated in at least 100 Glass Meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Chunghwa, including the former Chairman and CEO of CPT, C.Y. Lin. Chunghwa also engaged in bilateral discussions with each of the other co-conspirators on a regular basis.  Through these discussions, Chunghwa agreed on prices and supply levels for CRTs.

189.     Between at least 1995 and 2004, Daewoo, through Daewoo Electronics, Orion and DOSA, participated in at least 100 Glass Meetings at all levels.  A substantial number of these meetings were attended by the highest ranking executives from Daewoo.  Daewoo also engaged in bilateral discussions with other co-conspirators n a regular basis.  Through these discussions, Daewoo agreed on prices and supply levels for CRTs.  Bilateral discussions with Daewoo continued until Orion, its wholly-owned CRT subsidiary, filed for bankruptcy in 2004. Daewoo never effectively withdrew from this conspiracy.

190.     Between at least 1995 and 2003, Toshiba, through Toshiba Corporation, TDDT and TEDI, participated in several Glass Meetings.  After 2003, Toshiba participated in the CRT conspiracy through its joint venture with Panasonic, MTPD.  These meetings were attended by high level sales managers from Toshiba and MTPD.  Toshiba also engaged in multiple bilateral discussions with other co-conspirators particularly with LG.  Through these discussions, Toshiba agreed on prices and supply levels for CRTs.  Toshiba never effectively withdrew from this conspiracy.

191.     Toshiba America, Inc., TACP, TAIS and TAEC were represented at those meetings and were a party to the agreements entered at them.  To the extent Toshiba America, Inc., TACP, TAIS and TAEC sold and/or distributed CRTs to direct purchasers, they played a

49

significant role in the conspiracy because co-conspirators wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, Toshiba America, TACP, TAIS, and TAEC were active, knowing participants in the alleged conspiracy.

192. Between at least 1996 and 2001, Hitachi, through Hitachi, Ltd., Hitachi Displays, Hitachi Shenzhen, and Hitachi Asia, participated in several Glass Meetings. These meetings were attended by high level sales managers from Hitachi. Hitachi also engaged in multiple bilateral discussions with other co-conspirators particularly with Samsung. Through these discussions, Hitachi agreed on prices and supply levels for CRTs. Hitachi never effectively withdrew from this conspiracy.

193. Hitachi America and HEDUS were represented at those meetings and were a party to the agreements entered at them. To the extent Hitachi America and HEDUS sold and/or distributed CRTs to direct purchasers, they played a significant role in the conspiracy because co-conspirators wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing agreements reached at the Glass Meetings. Thus, Hitachi America and HEDUS were active, knowing participants in the alleged conspiracy.

194. Between at least 1996 and 2003, Panasonic (known throughout the class period as Matsushita Electric Industrial Co., Ltd.), through Panasonic Corporation and Matsushita Malaysia, participated in several Glass Meetings. After 2003, Panasonic participated in the CRT conspiracy through its joint venture with Toshiba, MTPD. These meetings were attended by high level sales managers from Panasonic and MTPD. Panasonic also engaged in multiple bilateral discussions with other co-conspirators. Through these discussions, Panasonic agreed on prices and supply levels for CRTs. Panasonic never effectively withdrew from this conspiracy.

195. Panasonic NA was represented at those meetings and was a party to the agreements entered at them. To the extent Panasonic NA sold and/or distributed CRTs to direct purchasers, it played a significant role in the conspiracy because co-conspirators wished to ensure that the prices for CRTs paid by direct purchasers would not undercut the pricing

50

1    agreements reached at the Glass Meetings.  Thus, Panasonic NA was an active, knowing

2    participant in the alleged conspiracy.

3        196.    Between at least 2003 and 2006, MTPD participated in multiple Glass

4    Meetings and in fact led many of these meetings during the latter years of the conspiracy.  These

5    meetings were attended by high level sales managers from MTPD.  MTPD also engaged in

6    bilateral discussions with other co-conspirators.  Through these discussions, MTPD agreed on

7    prices and supply levels for CRTs.

8        197.    Between at least 1998 and 2007, BMCC participated in multiple Glass

9    Meetings.  These meetings were attended by high level sales managers from BMCC.  BMCC

10   also engaged in multiple bilateral discussions with other co-conspirators, particularly the other

11   Chinese CRT manufacturers.  Through these discussions, BMCC agreed on prices and supply

12   levels for CRTs.  None of BMCC's conspiratorial conduct in connection with CRTs was

13   mandated by the Chinese government.  BMCC was acting to further its own independent private

14   interests in participating in the alleged conspiracy.

15       198.    Between at least 1998 and 2007, IRICO, through IGC, IGE, and IDDC,

16   participated in multiple Glass Meetings.  These meetings were attended by the highest ranking

17   executives from IRICO.  IRICO also engaged in multiple bilateral discussions with other co-

18   conspirators, particularly with other Chinese manufacturers.  Through these discussions, IRICO

19   agreed on prices and supply levels for CRTs.  None of IRICO's conspiratorial conduct in

20   connection with CRTs was mandated by the Chinese government.  IRICO was acting to further

21   its own independent private interests in participating in the alleged conspiracy.

22       199.    Between at least 1997 and 2006, Thai CRT participated in multiple Glass

23   Meetings.  These meetings were attended by the highest ranking executives from Thai CRT.

24   Thai CRT also engaged in multiple bilateral discussions with other co-conspirators, particularly

25   with Samtel.  Through these discussions, Thai CRT agreed on prices and supply levels for

26   CRTs.  Thai CRT never effectively withdrew from this conspiracy.

27       200.    Between at least 1998 and 2006, Samtel participated in multiple bilateral

28   discussions with other co-conspirators, particularly with Thai CRT.  These meetings were

51

1   attended by high level executives from Samtel.  Through these discussions, Samtel agreed on

2   prices and supply levels for CRTs.  Samtel never effectively withdrew from this conspiracy.

3        201.   Between 1995 and 2005, Mitsubishi participated in multiple bilateral and

4   some multilateral meetings with its competitors.  These meetings were attended by high level

5   sales managers from Mitsubishi.  At these meetings, Mitsubishi discussed such things as CRT

6   prices, production, revenues, volumes, demand, inventories, estimated sales, plant shutdowns,

7   customer allocation, and new product development, and agreed on prices and supply levels for

8   CRTs.  Mitsubishi never effectively withdrew from this conspiracy.

9        202.   When Plaintiffs refer to a corporate family or companies by a single name in

10  their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more

11  employees or agents of entities within the corporate family engaged in conspiratorial meetings

12  on behalf of every company in that family.  In fact, the individual participants in the

13  conspiratorial meetings and discussions did not always know the corporate affiliation of their

14  counterparts, nor did they distinguish between the entities within a corporate family.  The

15  individual participants entered into agreements on behalf of, and reported these meetings and

16  discussions to, their respective corporate families.  As a result, the entire corporate family was

17  represented in meetings and discussions by its agents and was party to the agreements reached in

18  them.

19  **E.  The CRT Market During The Conspiracy**

20       203.   Until the last few years, CRTs were the dominant technology used in

21  displays, including television and computer monitors.  During the Class Period, this translated

22  into the sale of millions of CRTs and CRT Products, generating billions of dollars in annual

23  profits.

24  The following data was reported by Stanford Resources, Inc., a market research firm focused

25  on the global electronic display industry:

26

27

28

52

| Year | Units Sold (millions) | Revenue (billion US dollars) | Average Selling Price Per Unit |
|------|------|------|------|
| 1998 | 90.5 | $18.9 | $208 |
| 1999 | 106.3 | $19.2 | $181 |
| 2000 | 119.0 | $28.0 | $235 |

204.    During the Class Period, North America was the largest market for CRT TVs and computer monitors.  According to a report published by Fuji Chimera Research, the 1995 worldwide market for CRT monitors was 57.8 million units, 28 million of which (48.5 percent) were consumed in North America.  By 2002, North America still consumed around 35 percent of the world's CRT monitor supply.  *See, The Future of Liquid Crystal and Related Display Materials,* Fuji Chimera Research, 1997, p.12.

205.    Defendants' and co-conspirators' collusion is evidenced by unusual price movements in the CRTs and CRT Product market during the Class Period.  In the 1990s, industry analysts repeatedly predicted declines in consumer prices for CRT Products that did not fully materialize.  For example, in 1992, an analyst for Market Intelligent Research Corporation predicted that "[e]conomies of scale, in conjunction with technological improvements and advances in manufacturing techniques, will produce a drop in the price of the average electronic display to about $50 in 1997."  Information Display 9/92 p.19.  Despite such predictions, and the existence of economic conditions warranting a drop in prices, CRT Product prices nonetheless remained stable.

206.    In 1996, another industry source noted that "the price of the 14" tube is at a sustainable USD50 and has been for some years. . . ."

207.    In early 1999, despite declining production costs and the rapid entry of flat panel display products, the price of large sized color CRTs actually rose.  The price increase was allegedly based on increasing global demand.  In fact, this price increase was a result of the collusive conduct as herein alleged.

208.    After experiencing oversupply of 17" CRTs in the second half of 1999, the average selling price of CRTs rose again in early 2000.  A March 13, 2000 article in *Infotech*

1   *Weekly* quoted an industry analyst as saying that this price increase was "unlike most other PC-

2   related products."

3       209.    A BNET Business Network news article from August 1998 reported that "key

4   components (cathode ray tubes) in computer monitors have risen in price. 'Although several

5   manufacturers raised their CRT prices in the beginning of August, additional CRT price

6   increases are expected for the beginning of October….While computer monitor price increases

7   may be a necessary course of action, we [CyberVision, a computer monitor manufacturer] do

8   not foresee a drop in demand if we have to raise our prices relative to CRT price increases.'"

9       210.    A 2004 article from Techtree.com reports that various computer monitor

10  manufacturers, including LG Electronics, Philips, and Samsung, were raising the price of their

11  monitors in response to increases in CRT prices caused by an alleged shortage of glass shells

12  used to manufacture the tubes.  Philips is quoted as saying that, "It is expected that by the end of

13  September this year [2004] there will be 20% hike in the price of our CRT monitors."

14      211.    Defendants and co-conspirators also conspired to limit production of CRTs

15  by shutting down production lines for days at a time, and closing or consolidating their

16  manufacturing facilities.

17      212.    For example, the co-conspirators' CRT factory utilization percentage fell

18  from 90 percent in the third quarter of 2000 to 62 percent in the first quarter of 2001.  This is the

19  most dramatic example of a drop in factory utilization.  There were sudden drops throughout the

20  Class Period but to a lesser degree.  Plaintiffs are informed and believe that these sudden,

21  coordinated drops in factory utilization were the result of agreements to decrease output in order

22  to stabilize the prices of CRTs.

23      213.    During the Class Period, while demand in the United States for CRT Products

24  continued to decline, Defendants' and co-conspirators' conspiracy was effective in moderating

25  the normal downward pressures on prices for CRTs and CRT Products caused by the entry and

26  popularity of the new generation LCD panels and plasma display products.  As Finsen Yu,

27  President of Skyworth Macao Commercial Offshore Co., Ltd., a television maker, was quoted in

28

54

1   January of 2007: "[t]he CRT technology is very mature; prices and technology have become

2   stable."

3        214.     During the Class Period, there were not only periods of unnatural and

4   sustained price stability, but there were also increases in prices of CRTs.  These price increases

5   were despite the declining demand due to the approaching obsolescence of CRTs caused by the

6   emergence of a new, potentially superior and clearly more popular, substitutable technology.

7        215.     These price increases and price stability in the market for CRTs during the

8   Class Period are inconsistent with a competitive market for a product facing rapidly decreasing

9   demand caused by a new, substitutable technology.

10  **F.  International Government Antitrust Investigations**

11       216.     Defendants' and co-conspirators' conspiracy to fix, raise, maintain and

12  stabilize the prices of, and restrict output for, CRTs sold in or into the United States during the

13  Class Period, is demonstrated by a multinational investigation commenced by the Antitrust

14  Division of the United States Department of Justice ("DOJ") and others in November 2007.

15       217.     On November 8, 2007, antitrust authorities in Europe, Japan and South Korea

16  raided the offices of manufacturers of CRTs as part of an international investigation of alleged

17  price fixing.

18       218.     On February 10, 2009, the DOJ issued a press release announcing that a

19  federal grand jury in San Francisco had that same day returned a two-count indictment against

20  the former Chairman and Chief Executive Officer of Chunghwa Picture Tubes, Ltd., Cheng

21  Yuan Lin, aka C.Y. Lin, for his participation in global conspiracies to fix the prices of two types

22  of CRTs used in computer monitors and televisions.  The press release notes that "[t]his is the

23  first charge as a result of the Antitrust Division's ongoing investigation into the cathode ray

24  tubes industry."  The press release further notes that Lin had previously been indicted for his

25  participation in a conspiracy to fix the prices of TFT-LCDs.  Mr. Lin's indictment states that the

26  combination and conspiracy to fix the prices of CRTs was carried out, in part, in the Northern

27  District of California.

28

219.     As described above, in 2012, the EC imposed a fine of €38.6 million against Technicolor SA for its participation in the CRT conspiracy between 1999-2005.

220.     MT Picture Display Co., Ltd., the CRT unit of Panasonic, has confirmed that it was raided by Japan's Fair Trade Commission.

221.     *Kyodo News* reported on November 8, 2007, upon information and belief, that MT Picture Display fixed prices for CRTs with manufacturers in three Asian countries, including South Korea's Samsung SDI Co.

222.     *Kyodo News* further reported that:

> Officials of these three companies are believed to have had at least 10 meetings since 2005 in major Asian cities to coordinate target prices when delivering their products to TV manufacturers in Japan and South Korea, the sources said.

223.     Samsung SDI Co., Ltd. was raided by South Korea's Fair Trade Commission, which has started an investigation into Samsung's CRT business.

224.     The *Asian Shimbun* further reported on November 10, 2007 that "[t]he representatives held meetings in Southeast Asia where the companies operate CRT factories, the sources said.  The European Commission, the European Union's executive branch, and the U.S. Justice Department have been investigating four companies' [referring to the four Asian-based manufacturers—MT Picture Display, Samsung SDI Co., Chunghwa Picture Tubes, LP Displays] overseas units and are closely consulting with the Fair Trade Commission by sharing information."

225.     On November 21, 2007, Royal Philips publicly disclosed that it too is subject to one or more investigations into anticompetitive conduct in the CRT industry.  Royal Philips spokesman Joon Knapen declined to comment on which jurisdictions have started investigations.  Royal Philips stated that it intended to assist the regulators.

226.     In its 2008 Annual Report, Toshiba reports that "[t]he Group is also being investigated by the [European] Commission and/or the U.S. Department of Justice for potential violations of competition laws with respect to semiconductors, LCD products, cathode ray tubes (CRT) and heavy electrical equipment."

56

227.     On May 6, 2008, the Hungarian Competition Authority ("HCA") announced its own investigation into the CRT cartel.  The HCA described the cartel as follows:

> The Hungarian Competition Authority (Gazdasági Versenyhivatal – GVH) initiated a competition supervision proceeding against the following undertakings: Samsung SDI Co., Ltd., Samsung SDI Germany GmbH, Samsung SDI Magyarország Zrt., Thomson TDP sp. Z.o.o., LG Philips Displays Czech Republic s.r.o., LP Displays, Chunghwa Picture Tubes (UK), Ltd., Chunghwa Picture Tubes, Ltd., Daewoo Orion S.A., Daewoo Electronics Global HQ, Daewoo Electronics European HQ, MT Picture Display Germany Gmbh, Matsushita Global HQ, Matsushita European HQ.
>
> Based on the data available, the undertakings mentioned above concerted their practice regarding the manufacturing and distribution of cathode-ray tubes (including coloured picture tubes and coloured screen tubes) on the European market between 1995 and 2007.  The anti-competitive behaviour may have concerned the exchange of sensitive market information (about prices, volumes sold, demand and the extent to which capacities were exploited), price-fixing, the allocation of market shares, consumers and volumes to be sold, the limitation of output and coordination concerning the production. The undertakings evolved a structural system and functional mechanism of cooperation.
>
> According to the available evidences it is presumable that the coordination of European and Asian undertakings regarding to the European market also included Hungary from 1995 to 2007. The coordination concerning the Hungarian market allegedly formed part of the European coordination. Samsung SDI Magyarország was called into the proceeding since it manufactured and sold cathode-ray tubes in Hungary in the examined period, and it allegedly participated in the coordination between its parent companies.

228.     As outlined above, Defendants and their co-conspirators have a history of competitor contacts resulting from joint ventures, numerous cross-licensing agreements, and other alliances in related businesses in the electronics industry.

229.     Several co-conspirators also have a history of "cooperation" and anticompetitive conduct.  For example, Samsung was fined $300 million by the U.S. Department of Justice in October 2005 for participating in a conspiracy to fix the prices of Dynamic Random Access Memory (DRAM).

230.     Samsung and Toshiba have acknowledged being contacted by the U.S. Department of Justice as part of an ongoing investigation for fixing prices of Static Random Access Memory and NAND Flash Memory.

231.     In December 2006, government authorities in Japan, Korea, the European Union and the United States revealed a comprehensive investigation into anticompetitive conduct in the closely-related TFT-LCD market.

232.     On December 12, 2006, news reports indicated that Samsung and Chunghwa, as well as an LCD joint venture between Philips and LG Electronics, Inc, LG Display Co., Ltd., were all under investigation for price fixing of TFT-LCDs.

233.     On November 12, 2008, the DOJ announced that it had reached agreements with three TFT-LCD manufacturers—LG Display Co., Ltd. (and its U.S. subsidiary, LG Display America, Inc.), Sharp Corporation, and Chunghwa Picture Tubes, Ltd.—to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a total of $585 million in criminal fines for their roles in a conspiracy to fix prices of TFT-LCD panels.

234.     On March 10, 2009, the DOJ announced that it had reached an agreement with Hitachi Displays, Ltd., a subsidiary of Hitachi, Ltd., to plead guilty to violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and pay a $31 million fine for its role in a conspiracy to fix the prices of TFT-LCD panels.

235.     The indictments of LG Display Co., Ltd., Sharp Corporation, Chunghwa Picture Tubes, Ltd. and Hitachi Displays, Ltd., all state that the combination and conspiracy to fix the prices of TFT-LCDs was carried out, in part, in the Northern District of California.

## IX.   THE PASS-THROUGH OF OVERCHARGES TO CONSUMERS

236.     Defendants' and co-conspirators' conspiracy to fix, raise, maintain and stabilize the price of CRTs at artificial levels resulted in harm to Plaintiffs and the indirect purchaser consumer classes alleged herein because it resulted in their paying higher prices for CRT Products than they would have paid in the absence of Defendants' and co-conspirators' conspiracy. The entire overcharge at issue was passed on to Plaintiffs and members of the indirect purchaser classes. As the DOJ acknowledged in announcing the indictment of

58

Chunghwa's former Chairman and CEO, "This conspiracy harmed countless Americans who purchased computers and televisions using cathode ray tubes sold at fixed prices."

237.     The Defendants and co-conspirators identified above that attended the Glass Meetings monitored the prices of televisions and computer monitors sold in the U.S. and elsewhere on a regular basis.  The purpose and effect of investigating such retail market data was at least threefold.  First, it permitted entities such as Chunghwa, which did not manufacture CRT televisions or computer monitors the way that Samsung, LG, Daewoo, Panasonic, Toshiba, Philips, Hitachi, Thomson and Mitsubishi did, to police the price fixing agreement to make sure that intra-conspirator CRT sales were kept at supra-competitive levels.  Secondly, it permitted them to police their price fixing agreement to independent OEMs who would reduce prices for finished goods if there was a corresponding reduction in CRT prices from a co-conspirator or Defendants.  Finally, as discussed above, Defendants and co-conspirators used the prices of finished products to analyze whether they could increase prices or should agree to a "bottom" price instead.  The Defendants and co-conspirators concluded that in order to make their CRT price increases stick, they needed to make the increase high enough that their direct customers (CRT TV and monitor makers) would be able to justify a corresponding price increase to their customers (for example, retailers and computer OEMs).  In this way, Defendants and co-conspirators assured that 100% of the supracompetitive overcharges for CRT Products were passed on to indirect purchaser consumers.

238.     The indirect purchaser consumer bought CRT Products from either a computer or TV OEM such as Dell or Sharp, or a reseller such as Best Buy.

239.     Because of the breadth of the price-fixing conspiracy here, the direct purchaser CRT TV and monitor manufacturers were not constrained by their competitors from passing on the overcharge.  Because each of the direct purchaser's competitors was also buying CRTs at supracompetitive prices from conspiracy members, no direct purchaser faced end-product price competition from a competitor that was not paying supracompetitive prices for CRTs.

59

240.     The price of CRT Products was directly correlated to the price of CRTs.  The margins for CRT TV and monitor makers were sufficiently thin that price increases of CRTs forced them to increase the prices of their CRT Products.  This meant that increases in the price of CRTs led to quick corresponding price increases at the OEM level for CRT Products.

241.     Computer and TV OEMs and retailers of CRT Products were all subject to vigorous price competition, whether selling CRT TVs or computer monitors.  The demand for CRTs was ultimately determined by purchasers of products containing such products.  The market for CRTs and the market for CRT Products were therefore inextricably linked and cannot be considered separately.  Defendants and co-conspirators were well aware of this intimate relationship, and used forecasts of CRT TVs and computer monitors to predict sales of and determine production levels and pricing for CRTs.

242.     Computers and televisions are commodities with little or no brand loyalty such that aggressive pricing causes consumers to switch preferences to different brands.  Prices are closely based on production costs, which are in turn directly determined by component costs, as assembly costs are minimal.  OEMs accordingly use component costs, like the cost of CRTs, as the starting point for all price calculations.  On information and belief, many computer and TV OEMs price their end-products on a "cost-plus" basis.  Thus, computer and television prices closely track increases and decreases in component costs.

243.     The CRT was the most expensive component in the products into which they were incorporated.  On information and belief, the cost of the CRT in a computer monitor was approximately 60% of the total cost to manufacture the computer monitor.  On information and belief, the cost of the CRT in a television was a slightly smaller percentage of the total manufacturing cost because a television has more components than a computer monitor, such as the tuner and speakers.

244.     Economic and legal literature recognizes that the more pricing decisions are based on cost, the easier it is to determine the pass-through rate.  The directness of affected costs refers to whether an overcharge affects a direct (*i.e.,* variable) cost or an indirect (*i.e.,* overhead) cost.  Overcharges will be passed through sooner and at a higher rate if the overcharges affect

direct costs. Here, CRTs were a direct and substantial cost of CRT Products. Therefore, Plaintiffs will be able to show that the overcharge on the CRTs was passed through to indirect purchasers.

245. Once a CRT left its place of manufacture, it remained essentially unchanged as it moved through the distribution system. CRTs are identifiable, discreet, physical objects that do not change form or become an indistinguishable part of the TV or computer monitor in which they are contained. Thus, CRTs followed a traceable physical chain from the Defendants and co-conspirators to the OEMs to the purchasers of finished products incorporating CRTs.

246. Moreover, just as CRTs can be physically traced through the supply chain, so can their price be traced to show that changes in the prices paid by direct purchasers of CRTs affected prices paid by indirect purchasers of CRT Products. On information and belief, computer and TV OEMs priced their end-products on a "cost-plus" basis.

247. In retailing, it is common to use a "mark-up rule." The retail price is set as the wholesale cost plus a percentage markup designed to recover non-product costs and to provide a profit. This system guarantees that increases in costs to the retailer will be passed on to end buyers. For example, CDW, a large seller of CRT monitors, used such a system. A declaration in the *DRAM* case from CDW's director of pricing details exactly how they calculated selling prices:

> In general, CDW employs a "building block" approach to setting its advertised prices. The first building block is the Cost of Goods Sold (COGS), which represents the price CDW paid to acquire the product…CDW…adds a series of positive markups to the cost to CDW to acquire a given product. These markups are in addition to the pass through effect of changes in the costs charged to CDW for that product by a given vendor.

248. Economic and legal literature has recognized that unlawful overcharges in a component normally result in higher prices for products containing that price-fixed component. As Professor Herbert Hovenkamp, a noted antitrust scholar, has stated in his treatise, FEDERAL ANTITRUST POLICY, THE LAW OF COMPETITION AND ITS PRACTICE (1994) at 624:

A monopoly charge at the top of the distribution chain generally results in higher prices at every level below. For example, if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and will pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain will be poorer as a result of the monopoly price at the top.

Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.

249.     Similarly, two other antitrust scholars—Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Hass School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern School of Law and author of the Handbook of the Law of Antitrust)—have observed that "in a multiple-level chain of distribution, passing on monopoly overcharges is not the exception; it is the rule."

250.     As Professor Jeffrey McKie-Mason (Arthur W. Burks Professor for Information and Computer Science, Professor of Economics and Public Policy, and Associate Dean for Academic Affairs in the School of Information at the University of Michigan), an expert who presented evidence in a number of the indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in a judicial decision in that case granting class certification):

As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers…. Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

251.     The purpose of Defendants' and co-conspirators' conspiratorial conduct was to fix, raise, maintain and stabilize the price of CRTs and, as a direct and foreseeable result,

CRT Products.  The market for CRTs and the market for CRT Products were inextricably linked.  One existed to serve the other.  Defendants and co-conspirators not only knew, but expressly contemplated that prices of CRT Products would increase as a direct result of their increasing the prices of CRTs.

252.     Finally, many of the Defendants and/or co-conspirators themselves have been and are currently manufacturers of CRT TVs and computer monitors.  Such manufacturers have included, for example, Samsung, LG, Hitachi, Toshiba, Philips, and Panasonic.  Having agreed to fix prices for CRTs, the major component of the end products they were manufacturing, these Defendants and co-conspirators intended to pass on the full cost of this component in their finished products, and in fact did so.

253.     As a direct and proximate result of Defendants' illegal conduct, Plaintiffs and other indirect purchasers have been forced to pay supra-competitive prices for CRT Products. These inflated prices have been passed on to them by direct purchaser manufacturers, distributors and retailers.

## X.   CLASS ACTION ALLEGATIONS

254.     Plaintiffs bring this action on behalf of themselves and as a class action pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all members of the following State classes or subclasses (collectively "Indirect Purchaser State Classes"): Arizona, California, District of Columbia, Florida, Hawaii, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin.

255.     The Nationwide Class is defined as follows:

All persons and or entities who or which indirectly purchased in the United States for their own use and not for resale, CRT Products manufactured and/or sold by the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time during the period from March 1, 1995 through November 25, 2007. Specifically excluded from this Class are claims on behalf of Illinois persons (as defined by 740 ILCS 10/4) for purposes of claims under 740 Ill. Comp. Stat § 10/7(2), Oregon natural persons (as defined by ORS 646.705 (2)) for purposes of

63

claims under ORS § 646.775(1), and Washington persons (as defined by RCW 19.86.080) for purposes of claims under RCW 19.86.080 (1).  Also specifically excluded from this Class are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and, any affiliate, legal representative, heir or assign of any Defendant.  Also excluded are named co-conspirators, any federal, state or local government entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

256.     The Statewide Damages Classes are defined as follows:

All persons and or entities in Arizona, California, District of Columbia, Florida, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, New Mexico, New York, North Carolina, North Dakota, South Dakota, Tennessee, Vermont, West Virginia, and Wisconsin who or which indirectly purchased for their own use and not for resale, CRT Products manufactured and/or sold by the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time during the period from March 1, 1995 through November 25, 2007.

All persons and entities in Hawaii who or which indirectly purchased for their own use and not for resale CRT Products manufactured and/or sold by  the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time from June 25, 2002 through November 25, 2007.

All persons and entities in Nebraska who or which indirectly purchased for their own use and not for resale CRT Products manufactured and/or sold by  the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time from July 20, 2002 through November 25, 2007.

All persons and entities in Nevada who or which indirectly purchased for their own use and not for resale CRT Products manufactured and/or sold by  the Defendants, or any subsidiary, affiliate, or alleged co-conspirator thereof, at any time from February 4, 1999 through November 25, 2007.

Specifically excluded from these Classes are the Defendants; the officers, directors or employees of any Defendant; any entity in which any Defendant has a controlling interest; and, any affiliate, legal representative, heir or assign of any Defendant.  Also excluded are named co-conspirators, any federal, state or local government entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

257.     This action has been brought and may properly be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

64

1          a.      The Classes are ascertainable and there is a well-defined community

2 of interest among members of the Classes;

3          b.      Based upon the nature of trade and commerce involved and the

4 number of indirect purchasers of CRTs, Plaintiffs believe that the number of Class members is

5 very large, and therefore joinder of all Class members is not practicable;

6          c.      Plaintiffs' claims are typical of Class members' claims because

7 Plaintiffs indirectly purchased CRTs manufactured by Defendants or their co-conspirators, and

8 therefore Plaintiffs' claims arise from the same common course of conduct giving rise to the

9 claims of the members of the Classes and the relief sought is common to the Classes;

10         d.      The following common questions of law or fact, among others, exist

11 as to the members of the Classes:

12             i.      Whether Defendants and one or more co-conspirators formed

13 and operated a combination or conspiracy to fix, raise, maintain, or stabilize the prices of CRTs;

14            ii.      Whether the combination or conspiracy caused CRT prices to

15 be higher than they would have been in the absence of Defendants' and the co-conspirators'

16 conduct;

17           iii.      The operative time period of Defendants' and co-conspirators'

18 combination or conspiracy;

19           iv.      Whether Defendants' conduct caused injury to the business or

20 property of Plaintiffs and the members of the Classes;

21           v.      The appropriate measure of the amount of damages suffered

22 by the Classes;

23           vi.      Whether Defendants' conduct violates the Indirect Purchaser

24 States' antitrust laws as alleged in the First Claim for Relief;

25           vii.      Whether Defendants' conduct violates the unfair competition

26 and consumer protection laws of the Consumer Protection States as alleged in the Second Claim

27 for Relief; and

28

1             viii.      Whether Defendants' conduct violates unjust enrichment

2  principles as alleged in the Third Claim for Relief.

3           e.   These and other questions of law and fact common to the members of the

4  Classes predominate over any questions affecting only individual members, including legal and

5  factual issues relating to liability and damages;

6           f.   After determination of the predominant common issues identified above,

7  if necessary or appropriate, the Classes can be divided into logical and manageable subclasses;

8           g.   Plaintiffs will fairly and adequately protect the interests of the Classes in

9  that Plaintiffs have no interests that are antagonistic to other members of the Classes and have

10  retained counsel competent and experienced in the prosecution of class actions and antitrust

11  litigation to represent them and the Classes;

12           h.   A class action is superior to other available methods for the fair and

13  efficient adjudication of this litigation since individual joinder of all damaged Class members is

14  impractical.  The damages suffered by the individual Class members are relatively small, given

15  the expense and burden of individual prosecution of the claims asserted in this litigation.  Thus,

16  absent the availability of class action procedures it would not be feasible for Class members to

17  redress the wrongs done to them.  Even if the Class members could afford individual litigation,

18  the court system could not.  Further, individual litigation presents the potential for inconsistent

19  or contradictory judgments and would greatly magnify the delay and expense to all parties and

20  the court system.  Therefore, the class action device presents far fewer case management

21  difficulties and will provide the benefits of unitary adjudication, economy of scale and

22  comprehensive supervision in a single court; and

23           i.   In the absence of a class action, Defendants would be unjustly enriched

24  because it would be able to retain the benefits and fruits of its wrongful conduct.

25  ### XI.  <u>VIOLATIONS ALLEGED</u>

26  **A.  <u>First Claim For Relief: Violation of State Antitrust Statutes</u>**

27        258.      Plaintiffs incorporate and reallege, as though fully set forth herein, each and

28  every allegation set forth in the preceding paragraphs of this Complaint.

259.    Plaintiff Brian Luscher ("**Arizona Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Arizona.

b.    Defendants' combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Arizona; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Arizona; (3) the Arizona Plaintiff and members of the Arizona Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c.    During the Class Period, Defendants' illegal conduct substantially affected Arizona commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, the Arizona Plaintiff and members of the Arizona Indirect Purchaser Class have been injured in their business and property.

e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Ariz. Rev. Stat. §§44-1401, *et seq.*[1] Accordingly, the Arizona Plaintiff and the members of the Arizona Indirect Purchaser Class seek all forms of relief available under Ariz. Rev. Stat. §§ 44-1401, *et seq.*

260.    Plaintiffs Jeffrey Figone and Steven Ganz ("**California Plaintiffs**") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further allege as follows:

a.    Beginning at a time presently unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up to and including November 25, 2007, Defendants and their co-conspirators entered into and engaged in a continuing unlawful

trust in restraint of the trade and commerce described above in violation of Section 16720, California Business and Professions Code.  Defendants have acted in violation of Section 16720 to fix, raise, stabilize and maintain prices of CRTs at supra-competitive levels.

b.      The aforesaid violations of Section 16720, California Business and Professions Code, consisted, without limitation, of a continuing unlawful trust and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to fix, raise, maintain and stabilize the prices of, and to allocate markets for CRTs.

c.      For the purpose of forming and effectuating the unlawful trust, the Defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices, and course of conduct set forth above and the following: (1) fixing, raising, stabilizing and/or maintaining the price of CRTs; and (2) allocating among themselves the production of CRTs.

d.      The combination and conspiracy alleged herein has had, *inter alia,* the following effects: (1) price competition in the sale of CRTs has been restrained, suppressed and/or eliminated in the State of California; (2) prices for CRTs sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels in the State of California; and (3) those who purchased CRTs directly or indirectly from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

e.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the members of the California Class have been injured in their business and property in that they paid more for CRT Products than they otherwise would have paid in the absence of Defendants' unlawful conduct.  As a result of Defendant's violation of Section 16720 *et seq.* of the California Business and Professions Code, Plaintiffs seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

---

[1] In compliance with Arizona's Antitrust Act, Ariz. Rev. Stat. § 44-1415, Plaintiffs will mail a

261.     Plaintiff Law Suites ("**DC Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in the District of Columbia.

b.     Defendants' combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout the District of Columbia; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout the District of Columbia; (3) the DC Plaintiff and members of the District of Columbia Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c.     During the Class Period, Defendants' illegal conduct substantially affected District of Columbia commerce.

d.     As a direct and proximate result of Defendants' unlawful conduct, the DC Plaintiff and members of the District of Columbia Indirect Purchaser Class have been injured in their business and property.

e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of District of Columbia Code Ann. §§ 28-4501, *et seq.* Accordingly, the DC Plaintiff and the members of the District of Columbia Indirect Purchaser Class seek all forms of relief available under District of Columbia Code Ann. §§ 28-4501, *et seq.*

262.     Plaintiff Sandra Riebow ("**Hawaii Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

copy of the Complaint to the Arizona Attorney General.

1              a.       Defendants agreed to, and did in fact, act in restraint of trade or

2 commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-

3 competitive levels, the prices at which CRTs were sold, distributed or obtained in Hawaii.

4              b.       Defendants' combinations or conspiracies had the following effects:

5 (1) CRT price competition was restrained, suppressed, and eliminated throughout Hawaii; (2)

6 CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout

7 Hawaii; (3) the Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class paid

8 supracompetitive, artificially inflated prices for CRT Products.

9              c.       During the Class Period, Defendants' illegal conduct substantially

10 affected Hawaii commerce.

11              d.       As a direct and proximate result of Defendants' unlawful conduct, the

12 Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class have been injured in their

13 business and property.

14              e.       By reason of the foregoing, Defendants have entered into agreements

15 in restraint of trade in violation of Hawaii Code, H.R.S. § 480-4.[2]  Accordingly, the Hawaii

16 Plaintiff and the members of the Hawaii Indirect Purchaser Class seek all forms of relief

17 available under Hawaii Code, H.R.S. § 480-1 *et seq.*

18     263.      Plaintiff Travis Burau ("**Iowa Plaintiff**") incorporates and realleges each and

19 every allegation set forth in the preceding paragraphs of this Complaint and further alleges as

20 follows:

21              a.       Defendants agreed to, and did in fact, act in restraint of trade or

22 commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-

23 competitive levels, the prices at which CRTs were sold, distributed or obtained in Iowa.

24              b.       Defendants' combinations or conspiracies had the following effects:

25 (1) CRT price competition was restrained, suppressed, and eliminated throughout the Iowa; (2)

26 CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout

27

28

the Iowa; (3) the Iowa Plaintiff and the members of the Iowa Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

    c.    During the Class Period, Defendants' illegal conduct substantially affected Iowa commerce.

    d.    As a direct and proximate result of Defendants' unlawful conduct, the Iowa Plaintiff and members of the Iowa Indirect Purchaser Class have been injured in their business and property.

    e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Iowa Code §§ 553.1 et *seq.* Accordingly, the Iowa Plaintiff and the members of the Iowa Indirect Purchaser Class seek all forms of relief available under Iowa Code §§ 553.1.

264.    Plaintiff Southern Office Supply, Inc. ("**Kansas Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

    a.    Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Kansas.

    b.    Defendants' combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Kansas; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Kansas; (3) the Kansas Plaintiff and members of the Kansas Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

    c.    During the Class Period, Defendants' illegal conduct substantially affected Kansas commerce.

---

[2] In compliance with Hawaii Rev. Stat. § 480-13.3, Plaintiffs will serve a copy of the Complaint on the Hawaii Attorney General.

d.      As a direct and proximate result of Defendants' unlawful conduct, the Kansas Plaintiff and members of the Kansas Indirect Purchaser Class have been injured in their business and property.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Kansas Stat. Ann. §§50-101 *et seq.* Accordingly, the Kansas Plaintiff and the members of the Kansas Indirect Purchaser Class seek all forms of relief available under Kansas Stat. Ann. §§50-101 *et seq.*

265.      Plaintiff Kerry Lee Hall ("**Maine Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Maine.

b.      Defendants' combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Maine; (2) CRT Product prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Maine; (3) Plaintiffs and members of the Maine Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c.      During the Class Period, Defendants' illegal conduct substantially affected Maine commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Maine Indirect Purchaser Class have been injured in their business and property.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Maine Rev. Stat. Ann. 10, §§1101 *et seq.* Accordingly, Plaintiffs and the members of the Maine Indirect Purchaser Class seek all forms of relief available under Maine Rev. Stat. Ann. 10, §§1101 *et seq.*

72

266.     Plaintiff  Lisa Reynolds  ("**Michigan Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

   a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Michigan.

   b.     Defendants' combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Michigan; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Michigan; (3) the Michigan Plaintiff and members of the Michigan Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

   c.     During the Class Period, Defendants' illegal conduct substantially affected Michigan commerce.

   d.     As a direct and proximate result of Defendants' unlawful conduct, the Michigan Plaintiff and members of the Michigan Indirect Purchaser Class have been injured in their business and property.

   e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Michigan Comp. Laws Ann. §§ 445.771 *et seq.* Accordingly, the Michigan Plaintiff and the members of the Michigan Indirect Purchaser Class seek all forms of relief available under Michigan Comp. Laws Ann. §§ 445.771 *et seq.*

267.     Plaintiffs David Norby and Barry Kushner ("**Minnesota Plaintiffs**") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further allege as follows:

   a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Minnesota.

   b.     Defendants' combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Minnesota; (2)

73

CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Minnesota; (3) the Minnesota Plaintiffs and members of the Minnesota Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

        c.     During the Class Period, Defendants' illegal conduct substantially affected Minnesota commerce.

        d.     As a direct and proximate result of Defendants' unlawful conduct, the Minnesota Plaintiffs and members of the Minnesota Indirect Purchaser Class have been injured in their business and property.

        e.     By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Minnesota Stat. §§ 325D.50 *et seq.* Accordingly, the Minnesota Plaintiffs and the members of the Minnesota Indirect Purchaser Class seek all forms of relief available under Minnesota Stat. §§ 325D.50 *et seq.*

    268.     Plaintiff Charles Jenkins ("**Mississippi Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

        a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Mississippi.

        b.     Defendants' combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Mississippi; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Mississippi; (3) the Mississippi Plaintiff and members of the Mississippi Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

        c.     During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

        d.     As a direct and proximate result of Defendants' unlawful conduct, the Mississippi Plaintiff and members of the Mississippi Indirect Purchaser Class have been injured in their business and property.

1       e.      By reason of the foregoing, Defendants have entered into agreements

2 in restraint of trade in violation of Mississippi Code Ann. §75-21-1 *et seq.* Accordingly, the

3 Minnesota Plaintiff and the members of the Mississippi Indirect Purchaser Class seek all forms

4 of relief available under Mississippi Code Ann. §75-21-1 *et seq.*

5      269.      Plaintiff Steven Fink ("**Nebraska Plaintiff**") incorporates and realleges each

6 and every allegation set forth in the preceding paragraphs of this Complaint and further alleges

7 as follows:

8       a.      Defendants agreed to, and did in fact, act in restraint of trade or

9 commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-

10 competitive levels, the prices at which CRTs were sold, distributed or obtained in Nebraska.

11       b.      Defendants' combinations or conspiracies had the following effects:

12 (1) CRT price competition was restrained, suppressed, and eliminated throughout Nebraska; (2)

13 CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout

14 Nebraska; (3) the Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class paid

15 supracompetitive, artificially inflated prices for CRT Products.

16       c.      During the Class Period, Defendants' illegal conduct substantially

17 affected Nebraska commerce.

18       d.      As a direct and proximate result of Defendants' unlawful conduct, the

19 Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class have been injured in

20 their business and property.

21       e.      By reason of the foregoing, Defendants have entered into agreements

22 in restraint of trade in violation of Nebraska Rev. Stat. § 59-801 *et seq.* Accordingly, the

23 Nebraska Plaintiff and the members of the Nebraska Indirect Purchaser Class seek all forms of

24 relief available under Nebraska Rev. Stat. § 59-801 *et seq.*

25      270.      Plaintiff Gregory Painter ("**Nevada Plaintiff**") incorporates and realleges

26 each and every allegation set forth in the preceding paragraphs of this Complaint and further

27 alleges as follows:

28

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Nevada.

b.      Defendants' combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Nevada; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Nevada; (3) the Nevada Plaintiff and members of the Nevada Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c.      During the Class Period, Defendants' illegal conduct substantially affected Nevada commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, the Nevada Plaintiff and members of the Nevada Indirect Purchaser Class have been injured in their business and property.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Nevada Rev. Stat. Ann. §§ 598A *et seq.*[3] Accordingly, the Nevada Plaintiff and the members of the Nevada Indirect Purchaser Class seek all forms of relief available under Nevada Rev. Stat. Ann. §§ 598A *et seq.*

271.      Plaintiff Mary Ann Stephenson ("**New Mexico Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in New Mexico.

b.      Defendants' combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels

throughout New Mexico; (3) the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c.      During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce.

d.      As a direct and proximate result of Defendants' unlawful conduct, the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class have been injured in their business and property.

e.      By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of New Mexico Stat. Ann. §§ 57-1-1 *et seq.* Accordingly, the New Mexico Plaintiff and the members of the New Mexico Indirect Purchaser Class seek all forms of relief available under New Mexico Stat. Ann. §§ 57-1-1 *et seq.*

272.      Plaintiffs Janet Ackerman and Louise Wood ("**New York Plaintiffs**") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further allege as follows:

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in New York.

b.      Defendants' combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout New York; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout New York; (3) the New York Plaintiffs and members of the New York Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c.      During the Class Period, Defendants' illegal conduct substantially affected New York commerce.

---

[3] In compliance with the Nevada Unfair Trade Practices Act, Nev. Rev. Stat. Ann. § 598A.210(3), Plaintiffs have served a copy of the Complaint on the Nevada Attorney General.

1    d.  As a direct and proximate result of Defendants' unlawful conduct, the

2 New York Plaintiffs and members of the New York Indirect Purchaser Class have been injured

3 in their business and property.

4    e.  By reason of the foregoing, Defendants have entered into agreements

5 in restraint of trade in violation of New York General Business Law § 340 *et seq.*  Accordingly,

6 the New York Plaintiffs and the members of the New York Indirect Purchaser Class seek all

7 forms of relief available under New York G.B.L. § 340 *et seq.*  In accordance with New York

8 G.B.L. § 340.5, the New York Plaintiffs will serve a copy of this Complaint on the New York

9 Attorney General.

10   273.  Plaintiff Patricia Andrews ("**North Carolina Plaintiff**") incorporates and

11 realleges each and every allegation set forth in the preceding paragraphs of this Complaint and

12 further alleges as follows:

13    a.  Defendants agreed to, and did in fact, act in restraint of trade or

14 commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-

15 competitive levels, the prices at which CRTs were sold, distributed or obtained in North

16 Carolina.

17    b.  Defendants' combinations or conspiracies had the following effects:

18 (1) CRT price competition was restrained, suppressed, and eliminated throughout North

19 Carolina; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels

20 throughout North Carolina; (3) the North Carolina Plaintiff and members of the North Carolina

21 Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

22    c.  During the Class Period, Defendants' illegal conduct substantially

23 affected North Carolina commerce.

24    d.  As a direct and proximate result of Defendants' unlawful conduct, the

25 North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class have been

26 injured in their business and property.

27    e.  By reason of the foregoing, Defendants have entered into agreements

28 in restraint of trade in violation of North Carolina Gen. Stat. §§ 75-1 *et seq.* Accordingly, the

1  North Carolina Plaintiff and the members of the North Carolina Indirect Purchaser Class seek all

2  forms of relief available under North Carolina Gen. Stat. §§ 75-1 *et seq.*

3      274.      Plaintiff Gary Hanson ("**North Dakota Plaintiff**") incorporates and realleges

4  each and every allegation set forth in the preceding paragraphs of this Complaint and further

5  alleges as follows:

6          a.      Defendants agreed to, and did in fact, act in restraint of trade or

7  commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-

8  competitive levels, the prices at which CRTs were sold, distributed or obtained in North Dakota.

9          b.      Defendants' combinations or conspiracies had the following effects:

10  (1) CRT price competition was restrained, suppressed, and eliminated throughout North Dakota;

11  (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels

12  throughout North Dakota; (3) the North Dakota Plaintiff and members of the North Dakota

13  Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

14          c.      During the Class Period, Defendants' illegal conduct substantially

15  affected North Dakota commerce.

16          d.      As a direct and proximate result of Defendants' unlawful conduct, the

17  North Dakota Plaintiff and members of the North Dakota Indirect Purchaser Class have been

18  injured in their business and property.

19          e.      By reason of the foregoing, Defendants have entered into agreements

20  in restraint of trade in violation of North Dakota Cent. Code §§ 51-08.1-01 *et seq.* Accordingly,

21  the North Dakota Plaintiff and the members of the North Dakota Indirect Purchaser Class seek

22  all forms of relief available under North Dakota Cent. Code §§ 51-08.1-01 *et seq.*

23      275.      Plaintiff Donna Ellingson-Mack ("**South Dakota Plaintiff**") incorporates and

24  realleges each and every allegation set forth in the preceding paragraphs of this Complaint and

25  further alleges as follows:

26          a.      Defendants agreed to, and did in fact, act in restraint of trade or

27  commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-

28  competitive levels, the prices at which CRTs were sold, distributed or obtained in South Dakota.

b.  Defendants' combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout South Dakota; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout South Dakota; (3) the South Dakota Plaintiff and members of the South Dakota Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c.  During the Class Period, Defendants' illegal conduct substantially affected South Dakota commerce.

d.  As a direct and proximate result of Defendants' unlawful conduct, the South Dakota Plaintiff and members of the South Dakota Indirect Purchaser Class have been injured in their business and property.

e.  By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of South Dakota Codified Laws Ann. §§ 37-1 *et seq.* Accordingly, the South Dakota Plaintiff and the members of the South Dakota Indirect Purchaser Class seek all forms of relief available under South Dakota Codified Laws Ann. §§ 37-1 *et seq.*

276.  Plaintiffs Frank Warner and Albert Sidney Crigler ("**Tennessee Plaintiffs**") incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further allege as follows:

a.  Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Tennessee.

b.  Defendants' combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Tennessee; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Tennessee; (3) the Tennessee Plaintiffs and members of the Tennessee Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c.  During the Class Period, Defendants' illegal conduct substantially affected Tennessee commerce.

1

2          d.      As a direct and proximate result of Defendants' unlawful conduct, the

Tennessee Plaintiffs and members of the Tennessee Indirect Purchaser Class have been injured

3    in their business and property.

4          e.      By reason of the foregoing, Defendants have entered into agreements

5    in restraint of trade in violation of Tennessee Code Ann. §§ 47-25-101 *et seq.* Accordingly, the

6    Tennessee Plaintiffs and the members of the Tennessee Indirect Purchaser Class seek all forms

7    of relief available under Tennessee Code Ann. §§ 47-25-101 *et seq.*

8          277.    Plaintiff Margaret Slagle ("**Vermont Plaintiff**") incorporates and realleges

9    each and every allegation set forth in the preceding paragraphs of this Complaint and further

10   alleges as follows:

11         a.      Defendants agreed to, and did in fact, act in restraint of trade or

12   commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-

13   competitive levels, the prices at which CRTs were sold, distributed or obtained in Vermont.

14         b.      Defendants' combinations or conspiracies had the following effects:

15   (1) CRT price competition was restrained, suppressed, and eliminated throughout Vermont; (2)

16   CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout

17   Vermont; (3) the Vermont Plaintiff and members of the Vermont Indirect Purchaser Class paid

18   supracompetitive, artificially inflated prices for CRT Products.

19         c.      During the Class Period, Defendants' illegal conduct substantially

20   affected Vermont commerce.

21         d.      As a direct and proximate result of Defendants' unlawful conduct, the

22   Vermont Plaintiff and members of the Vermont Indirect Purchaser Class have been injured in

23   their business and property.

24         e.      By reason of the foregoing, Defendants have entered into agreements

25   in restraint of trade in violation of Vermont Stat. Ann. 9 §§ 2453 *et seq.* Accordingly, the

26   Vermont Plaintiff and the members of the Vermont Indirect Purchaser Class seek all forms of

27   relief available under Vermont Stat. Ann. 9 §§ 2453 *et seq.*

28

278.     Plaintiff John Larch ("**West Virginia Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in West Virginia.

b.     Defendants' combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout West Virginia; (2) CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout West Virginia; (3) the West Virginia Plaintiff and members of the West Virginia Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c.     During the Class Period, Defendants' illegal conduct substantially affected West Virginia commerce.

d.     As a direct and proximate result of Defendants' unlawful conduct, the West Virginia Plaintiff and members of the West Virginia Indirect Purchaser Class have been injured in their business and property.

e.     By reason of the foregoing, Defendants have has entered into agreements in restraint of trade in violation of West Virginia Code §§ 47-18-1 *et seq.* Accordingly, the West Virginia Plaintiff and the members of the West Virginia Indirect Purchaser Class seek all forms of relief available under West Virginia Code §§ 47-18-1 *et seq.*

279.     Plaintiff Brigid Terry ("**Wisconsin Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Wisconsin.

b.     Defendants' combinations or conspiracies had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Wisconsin; (2)

82

CRT prices were raised, fixed, maintained, and stabilized at artificially high levels throughout Wisconsin; (3) the Wisconsin Plaintiff and members of the Wisconsin Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

c.    During the Class Period, Defendants' illegal conduct substantially affected Wisconsin commerce.

d.    As a direct and proximate result of Defendants' unlawful conduct, the Wisconsin Plaintiff and members of the Wisconsin Indirect Purchaser Class have been injured in their business and property.

e.    By reason of the foregoing, Defendants have entered into agreements in restraint of trade in violation of Wisconsin Stat. §§133.01 *et seq.* Accordingly, the Wisconsin Plaintiff and the members of the Wisconsin Indirect Purchaser Class seek all forms of relief available under Wisconsin Stat. §§133.01 *et seq.*

**B.  Second Claim for Relief: Violation of State Consumer Protection and Unfair Competition Statutes**

280.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

281.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below.

282.    The **California Plaintiffs** incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint, and further allege as follows:

a.    Beginning on a date unknown to Plaintiffs, but at least as early as March 1, 1995, and continuing thereafter at least up through and including November 25, 2007, Defendants committed and continue to commit acts of unfair competition, as defined by Sections 17200, *et seq.* of the California Business and Professions Code, by engaging in the acts and practices specified above.

b.      This claim is instituted pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution from Defendants for acts, as alleged herein, that violated Section 17200 of the California Business and Professions Code, commonly known as the Unfair Competition Law.

c.      The Defendants' conduct as alleged herein violated Section 17200. The acts, omissions, misrepresentations, practices and non-disclosures of Defendants, as alleged herein, constituted a common continuous and continuing course of conduct of unfair competition by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.,* including, but not limited to, the violations of Section 16720, *et seq.,* of the California Business and Professions Code, set forth above;

d.      Defendants' acts, omissions, misrepresentations, practices and non-disclosures, as described above, whether or not in violation of Section 16720, *et seq.* of the California Business and Professions Code, and whether or not concerted or independent acts, are otherwise unfair, unconscionable, unlawful or fraudulent; Defendants' act and practices are unfair to consumers of CRT Products in the State of California and throughout the United States, within the meaning of Section 17200, California Business and Professions Code; and

e.      Defendants' acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

f.      California Plaintiffs and each of the California Indirect Purchaser Class members are entitled to full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that may have been obtained by Defendants as a result of such business acts or practices.

g.      The unlawful and unfair business practices of Defendants, as described above, has caused  the California Plaintiffs and the members of the California Indirect Purchaser Class to pay supra-competitive and artificially-inflated prices for CRT Products.  The California Plaintiffs and the members of the Class suffered injury in fact and lost money or property as a result of such unfair competition.

84

h. The conduct of Defendants as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

i. As alleged in this Complaint, Defendants and their co-conspirators have been unjustly enriched as a result of their wrongful conduct and by Defendants' unfair competition. The California Plaintiffs and the members of the California Indirect Purchaser Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Defendants as a result of such business practices, pursuant to California Business & Professions Code §17200 *et seq.*

283. Plaintiff David Rooks ("**Florida Plaintiff**") incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a. Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Florida.

b. The foregoing conduct constitutes "unfair methods of competition," and "unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Florida Stat. § 501.204.

c. During the Class Period, Defendants' illegal conduct substantially affected Florida commerce and consumers.

d. Defendants' unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Florida; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout Florida; (3) the Florida Plaintiff and members of the Florida Indirect Purchaser Class were deprived of free and open competition; and (4) the Florida Plaintiffs and members of the Florida Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

e. As a direct and proximate result of Defendants' conduct, the Florida Plaintiff and members of the Florida Indirect Purchaser Class have been injured.

f.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Florida Stat. § 501.201 *et seq.*, and accordingly, the Florida Plaintiffs and members of the Florida Indirect Purchaser Class seek all relief available under that statute.

284.     The **Hawaii Plaintiff** incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Hawaii.

b.      The foregoing conduct constitutes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Hawaii Rev. Stat. § 480-2.

c.      During the Class Period, Defendants' illegal conduct substantially affected Hawaii commerce and consumers.

d.      Defendants' unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Hawaii; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout Hawaii; (3) the Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class were deprived of free and open competition; and (4) the Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

e.      As a direct and proximate result of Defendants' conduct, the Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class have been injured.

f.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Hawaii Rev. Stat. § 480-2.  Accordingly, the Hawaii Plaintiff and members of the Hawaii Indirect Purchaser Class seek all relief available under Hawaii Rev Stat. § 480 *et seq*.

285.     The **Nebraska Plaintiffs** incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further allege as follows:

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in Nebraska.

b.     The foregoing conduct constitutes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" within the meaning of Neb. Rev. Stat. § 59-1602.

c.     During the Class Period, Defendants' illegal conduct substantially affected Nebraska commerce and consumers.

d.     Defendants' unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Nebraska; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout Nebraska; (3) the Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class were deprived of free and open competition; and (4) the Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

e.     As a direct and proximate result of Defendants' conduct, the Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class have been injured.

f.     Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §§ 59-1601 *et seq.*, and accordingly, the Nebraska Plaintiff and members of the Nebraska Indirect Purchaser Class seek all relief available under that statute.

286.     The **New Mexico Plaintiff** incorporates and realleges each and every allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

a.     Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in New Mexico.

b.     Defendants also took efforts to conceal their agreements from the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class.

87

c.      The foregoing conduct constitutes "unfair or deceptive trade practices" and "unconscionable trade practices in the conduct of any trade or commerce" within the meaning of New Mexico Stat. § 57-12-3, in that such conduct resulted in a gross disparity between the value received by New Mexico Plaintiffs and the members of the New Mexico Indirect Purchaser Class and the prices paid by them for CRT Products as set forth in New Mexico Stat. § 57-12-2E.

d.      During the Class Period, Defendants' illegal conduct substantially affected New Mexico commerce and consumers.

e.      Defendants' unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout New Mexico; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout New Mexico; (3) the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class were deprived of free and open competition; and (4) the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

f.      As a direct and proximate result of Defendants' conduct, the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class have been injured.

g.      Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation of New Mexico Stat. § 57-12-1 *et seq.*, and accordingly, the New Mexico Plaintiff and members of the New Mexico Indirect Purchaser Class seek all relief available under that statute.

287.    The **New York Plaintiffs** incorporate and reallege each and every allegation set forth in the preceding paragraphs of this Complaint and further allege as follows:

a.      Defendants agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-competitive levels, the prices at which CRTs were sold, distributed or obtained in New York.

b.      Defendants also took efforts to conceal their agreements from the New York Plaintiffs and members of the New York Indirect Purchaser Class.

1          c.      Defendants' illegal conduct substantially affected New York

2  commerce and consumers.

3          d.      The conduct of Defendants as described herein constitutes consumer-

4  oriented deceptive acts or practices within the meaning of N.Y. Gen. Bus. Law § 349, which

5  resulted in consumer injury and broad adverse impact on the public at large, and harmed the

6  public interest of New York State in an honest marketplace in which economic activity is

7  conducted in a competitive manner.

8          e.      As consumers, the New York Plaintiffs and the members of the New

9  York Indirect Purchaser Class were targets of the conspiracy.

10          f.      Defendants' secret agreements as described herein were not known to

11  the New York Plaintiffs or the members New York Indirect Purchaser Class.

12          g.      Defendants made public statements about the price of CRTs that

13  Defendants knew would be seen by the New York Plaintiffs and the members of the New York

14  Indirect Purchaser Class; such statements either omitted material information that rendered these

15  statements that they made materially misleading or affirmatively misrepresented the real cause

16  of price increases for CRTs; and, Defendants alone possessed material information that was

17  relevant to consumers, but failed to provide the information.

18          h.      Because of Defendants' unlawful trade practices in the State of New

19  York, there was a broad impact on the New York Plaintiffs and the members of the New York

20  Indirect Purchaser Class who indirectly purchased CRT Products; and the New York Plaintiffs

21  and the members of the New York Indirect Purchaser Class have been injured because they have

22  paid more for CRT Products than they would have paid in the absence of Defendants' unlawful

23  trade acts and practices.

24          i.      Because of Defendants' unlawful trade practices in the State of New

25  York, the New York Plaintiffs and the members of the New York Indirect Purchaser Class who

26  indirectly purchased CRT Products were misled to believe that they were paying a fair price for

27  CRT Products, or that the price increases for CRT Products were for valid business reasons.

28

1        j.        Defendants knew that its unlawful trade practices with respect to

2  pricing of CRT Products would have an impact on the New York Plaintiffs and the members of

3  the New York Indirect Purchaser Class and not just Defendants' direct customers;

4        k.        Defendants knew that its unlawful trade practices with respect to

5  pricing of CRTs would have a broad impact, causing consumer class members who indirectly

6  purchased CRTs to be injured by paying more for CRT Products than they would have paid in

7  the absence of Defendants' unlawful trade acts and practices.

8        l.        During the Class Period, Defendants, directly or indirectly through

9  affiliates it dominated and controlled, manufactured, sold and/or distributed CRTs in New York.

10        m.        The New York Plaintiffs and members of the New York Indirect

11  Purchaser Class seek actual damages for their injuries caused by these violations in an amount to

12  be determined at trial.  Without prejudice to their contention that Defendants' unlawful conduct

13  was willful and knowing, the New York Plaintiffs and members of the New York Indirect

14  Purchaser Class do not seek in this action to have those damages trebled pursuant to N.Y. Gen.

15  Bus. Law § 349 (h).

16        288.        The **North Carolina Plaintiff** incorporates and realleges each and every

17  allegation set forth in the preceding paragraphs of this Complaint and further alleges as follows:

18        a.        Defendants agreed to, and did in fact, act in restraint of trade or

19  commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-

20  competitive levels, the prices at which CRTs were sold, distributed or obtained in North

21  Carolina.

22        b.        Defendants also took efforts to conceal their agreements from the

23  North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class.

24        c.        The conduct of Defendants as described herein constitutes consumer-

25  oriented deceptive acts or practices within the meaning of North Carolina Gen. Stat. §75-1.1 *et*

26  *seq.*, which resulted in consumer injury and broad adverse impact on the public at large, and

27  harmed the public interest of North Carolina consumers in an honest marketplace in which

28  economic activity is conducted in a competitive manner.

90

1    d.  During the Class Period, Defendants' illegal conduct substantially

2 affected North Carolina commerce and consumers.

3    e.  Defendants' unlawful conduct had the following effects: (1) CRT

4 price competition was restrained, suppressed, and eliminated throughout North Carolina; (2)

5 CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout

6 North Carolina; (3) the North Carolina Plaintiff and members of the North Carolina Indirect

7 Purchaser Class were deprived of free and open competition; and (4) the North Carolina Plaintiff

8 and members of the North Carolina Indirect Purchaser Class paid supracompetitive, artificially

9 inflated prices for CRT Products.

10    f.  As a direct and proximate result of Defendants' conduct, the North

11 Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class have been

12 injured.

13    g.  During the Class Period, Defendants, directly or indirectly through

14 affiliates they dominated and controlled, manufactured, sold and/or distributed CRTs in North

15 Carolina.

16    h.  Defendants have engaged in unfair competition or unfair or deceptive

17 acts or practices in violation of North Carolina Gen. Stat. § 75-1.1 *et seq.*, and accordingly, the

18 North Carolina Plaintiff and members of the North Carolina Indirect Purchaser Class seek all

19 relief available under that statute.

20  289.  The **Vermont Plaintiff** incorporates and realleges each and every allegation

21 set forth in the preceding paragraphs of this Complaint and further alleges as follows:

22    a.  Defendants agreed to, and did in fact, act in restraint of trade or

23 commerce by affecting, fixing, controlling and/or maintaining, at artificial and/or non-

24 competitive levels, the prices at which CRTs were sold, distributed or obtained in Vermont.

25    b.  Defendants deliberately failed to disclose material facts to the

26 Vermont Plaintiff and members of the Vermont Indirect Purchaser Class concerning

27 Defendants' unlawful activities and artificially inflated prices for CRTs.  Defendants owed a

28 duty to disclose such facts, and considering the relative lack of sophistication of the average,

non-business consumer, Defendants breached that duty by their silence.  Defendants misrepresented to all consumers during the Class Period that Defendants' CRT prices were competitive and fair.

          c.     Because of Defendants' unlawful and unscrupulous trade practices in Vermont, the Vermont Plaintiff and members of the Vermont Indirect Purchaser Class who indirectly purchased CRTs were misled or deceived to believe that they were paying a fair price for CRT Products or that the price increases for CRT Products were for valid business reasons.

          d.     Defendants' unlawful conduct had the following effects: (1) CRT price competition was restrained, suppressed, and eliminated throughout Vermont; (2) CRT prices were raised, fixed, maintained and stabilized at artificially high levels throughout Vermont; (3) the Vermont Plaintiff and members of the Vermont Indirect Purchaser Class were deprived of free and open competition; and (4) the Vermont Plaintiff and members of the Vermont Indirect Purchaser Class paid supracompetitive, artificially inflated prices for CRT Products.

          e.     As a direct and proximate result of Defendants' illegal conduct, the Vermont Plaintiff and the members of the Vermont Indirect Purchaser Class suffered an ascertainable loss of money or property as a result of Defendants' use or employment of unconscionable and deceptive commercial practices as set forth above.  That loss was caused by Defendants' willful and deceptive conduct, as described herein.

          f.     Defendants' misleading conduct and unconscionable activities constitutes unfair competition or unfair or deceptive acts or practices in violation of Vermont Stat. Ann. Title 9, § 2451 *et seq.,* and accordingly, Vermont Plaintiff and members of the Vermont Indirect Purchaser Class seek all relief available under that statute.

### C.  <u>Third Claim for Relief: Unjust Enrichment and Disgorgement of Profits</u>

290.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

291.     Defendants have been unjustly enriched through overpayments by Plaintiffs and the Class members and the resulting profits.

292.     Under common law principles of unjust enrichment, Defendants should not be permitted to retain the benefits conferred via overpayments by Plaintiffs and class members in the following states: Arizona, California, District of Columbia, Iowa, Maine, Michigan, New Mexico and South Dakota.

293.     Plaintiffs and class members in each of the states listed above seek disgorgement of all profits resulting from such overpayments and establishment of a constructive trust from which Plaintiffs and the Class members may seek restitution.

## XII.   FRAUDULENT CONCEALMENT

294.     Throughout the relevant period, Defendants affirmatively and fraudulently concealed its unlawful conduct against Plaintiffs and the Classes.

295.     Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, that Defendants were violating the law as alleged herein until shortly before this litigation was commenced.  Nor could Plaintiffs and the Class members have discovered the violations earlier than that time because Defendants conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.  In addition, the conspiracy was by its nature self-concealing.

296.     Defendants and co-conspirators engaged in a successful, illegal price-fixing conspiracy with respect to CRTs, which they affirmatively concealed, in at least the following respects:

a.     By agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme, and by agreeing to expel those who failed to do so;

b.     By agreeing among themselves to limit the number of representatives from Defendants and each co-conspirator attending the meetings so as to avoid detection;

1          c.       By agreeing among themselves to refrain from listing the individual

2 representatives of the Defendants and co-conspirators in attendance at meetings in any meeting

3 report;

4          d.       By agreeing among themselves to refrain from taking meeting minutes

5 or taking any kind of written notes during the meetings;

6          e.       By giving false and pretextual reasons for their CRT price increases

7 during the relevant period and by describing such pricing falsely as being the result of external

8 costs rather than collusion;

9          f.       By agreeing among themselves on what to tell their customers about

10 price changes, and agreeing upon which attendee would communicate the price change to which

11 customer;

12          g.       By agreeing among themselves to quote higher prices to certain

13 customers than the fixed price in effect to give the appearance that the price was not fixed;

14          h.       By agreeing among themselves upon the content of public statements

15 regarding capacity and supply;

16          i.       By agreeing among themselves to eliminate references in expense

17 reports which might reveal the existence of their unlawful meetings; and

18          j.       By agreeing on other means to avoid detection of their illegal

19 conspiracy to fix the prices of CRTs.

20       297.       In particular, a March 1999 document summarizes a bilateral meeting

21 between Thomson and Samsung SDI, and notes: "This concerns conversation between working-

22 level people in the same industry which is strictly forbidden . . . thus please take special concern

23 in keeping this following confidential."  Another document dated October 1999 reports on a

24 bilateral meeting between Thomson and a co-conspirator, and states: "Everybody is requested to

25 keep it as a secret as it would be serious . . . if it is open to customers or European Commission."

26       298.       As a result of Defendants' fraudulent concealment of its conspiracy, Plaintiffs

27 and the Classes assert the tolling of any applicable statute of limitations affecting the rights of

28 action of Plaintiffs and the members of the Classes.

94

1

## XIII.  **PRAYER FOR RELIEF**

2      WHEREFORE, Plaintiffs pray as follows:

3      A.      That the Court determine that the claims alleged herein understate antitrust laws,

4  state consumer protection laws, and/or unfair competition principles may be maintained as a

5  class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, as informed by

6  the respective state class action laws;

7      B.      That the Court determine that Defendants have engaged in a contract,

8  combination, and conspiracy in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), and

9  that plaintiffs and the members of the Nationwide Class have been injured in their business and

10  property as a result of Defendants' violations;

11      C.      That the Court adjudge and decree that Defendants, their subsidiaries, affiliates,

12  successors, transferees, assignees and  their respective officers, directors, partners, agents, and

13  employees be permanently enjoined and restrained from continuing and maintaining the

14  combination, conspiracy, or agreement alleged herein to be in violation of 15 U.S.C. § 1;

15      D.      That the Court adjudge and decree that the unlawful conduct, contract,

16  combination and conspiracy alleged herein constitutes:

17          a.      A violation of the state antitrust laws as alleged in the First Claim for

18  Relief;

19          b.      A violation of the state consumer protection and unfair competition laws

20  as alleged in the Second Claim for Relief; and

21          c.      Acts of unjust enrichment as set forth in the Third Claim for Relief

22  herein.

23      E.      That Plaintiffs and the Indirect Purchaser State Classes recover damages, as

24  provided by the state antitrust laws, consumer protection laws, and unfair competition principles

25  alleged herein, and that a judgment in favor of Plaintiffs and the Classes be entered against the

26  Defendants in an amount to be trebled in accordance with such laws;

27

28

F.    That Plaintiffs and the Classes be awarded restitution, including disgorgement of profits obtained by Defendants as a result of its acts of unfair competition and acts of unjust enrichment;

G.    That the Court award Plaintiffs and the Classes they represent pre-judgment and post-judgment interest as permitted by law;

H.    That Plaintiffs and the members of the Classes recover their costs of suit, including reasonable attorneys' fees as provided by law; and

I.    That the Court award Plaintiffs and the Classes they represent such other and further relief as may be necessary and appropriate.

## XIV.  <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

Dated:  September 26, 2019          By:      */s/ Mario N. Alioto*

Mario N. Alioto (56433)
Lauren C. Capurro (241151)
**TRUMP, ALIOTO, TRUMP & PRESCOTT, LLP**
2280 Union Street
San Francisco, CA  94123
Telephone:  (415) 563-7200
Facsimile: (415) 346-0679
malioto@tatp.com
laurenrussell@tatp.com

***Lead Counsel for Indirect Purchaser Plaintiffs***