# EXHIBIT 33

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| IN RE: DAIRY FARMERS OF AMERICA, INC. CHEESE ANTITRUST LITIGATION | Master File No. 09-cv-03690 |
| | MDL No. 2031 |
| THIS DOCUMENT RELATES TO: | Judge Robert M. Dow, Jr. |
| | Magistrate Judge Maria Valdez |
| DIRECT PURCHASER ACTION | |

## DIRECT PURCHASER PLAINTIFFS' DISTRIBUTION MOTION

## TABLE OF CONTENTS

I. BACKGROUND ........................................................................................................1

    A. The Settlement ...............................................................................................1

    B. The Robust and Transparent Claims Administration Process .................................3

II. SUBJECT TO CERTAIN LIMITED CONFIRMATORY WORK, THE COURT SHOULD APPROVE RUST'S DETERMINATIONS ..........................................................5

III. THE COURT SHOULD APPROVE RUST'S FEES AND EXPENSES ..........................8

IV. THE COURT SHOULD APPROVE INCENTIVE AWARDS FOR THE CLASS REPRESENTATIVES ..................................................................................................10

V. THE COURT SHOULD APPROVE A RESERVE FUND ..............................................12

VI. NOTICE OF THE DISTRIBUTION MOTION .............................................................13

CONCLUSION ........................................................................................................13

## Table of Authorities

**Cases** **Pages**

*Cange v. Stotler & Co.*,
  826 F.2d 581 (7th Cir. 1987) ................................................................................ 11

*Cook v. Niedert*,
  142 F.3d 1004 (7th Cir. 1998) .............................................................................. 11

*Hershey, et al. v. Pacific Investment Management Company LLC*,
  05-cv-4681, ECF No. 614, (N.D. Ill. Mar. 8, 2012) ............................................. 10

*In re: Amaranth Natural Gas Commodities Litig.*,
  07-cv-6377, ECF No. 428 (S.D.N.Y. Aug. 10, 2016) .......................................... 10

*In re Gilat Satellite Networks, Ltd.*,
  No. 02-1510, 2009 WL 803382 (E.D.N.Y. Mar. 25, 2009) ................................... 6

**Statutes**

7 U.S.C § 1 ................................................................................................................ 5, 10

**Other Authority**

Securities Class Action Settlements, 2015 Review and Analysis,
http://securities.stanford.edu/research-reports/1996-2015/Settlements-Through-12-2015-Review.pdf .................................................................................................................1

Lead Counsel for the Direct Purchaser Plaintiffs ("Plaintiffs") respectfully submits this motion pursuant to the schedule set by the Court on November 15, 2016 (ECF No. 783) and also pursuant to Section 14 of the Stipulation and Agreement of Settlement between Plaintiffs and Dairy Farmers of America, Inc. ("DFA"). ECF No. 487-1 ("Settlement").

Class members determined to be eligible to share in the Net Settlement Fund are expected to recover approximately 21% of the value of their damages under Section I of the Plan of Allocation—well above average class action recoveries.[1] *Compare* ECF No. 771-1, ¶17 *with* Declaration of Jason Rabe, dated December 5, 2016 and submitted herewith, ¶10. Many claimants have also been determined to be eligible for an additional payment under Section II of the Plan of Allocation. *Id.*, Exhibits B-C.

## I. BACKGROUND

### A. The Settlement

The Settlement provided for a $46 million payment by DFA and certain remedial relief. Settlement Agreement, Section 3. The Court granted final approval to Plaintiffs' Settlement with DFA on September 12, 2014. ECF No. 668.

The Class certified by the Court for purposes of the Settlement is as follows:

> All persons who between April 1, 2004 through December 31, 2006: (1) purchased a CME Class III milk futures contract; (2) purchased a CME Cheese Spot Call contract for either blocks or barrels; (3) purchased cheese directly from Dairy Farmers of America, Inc. ("DFA") or Schreiber Foods, Inc. ("Schreiber") or made a first purchase of cheese from a first manufacturer of cheese (*i.e.* a manufacturer that transforms milk into cheese) pursuant to a contract the price term of which specified that the price was based, in whole or in part, on the CME Cheese Spot Call price (block or barrel price, average price, specific price, price

---

[1] During the time period 2006 through 2015, the average securities class action settlement recovered between 1.8% and 2.9% of estimated damages. Cornerstone Research, *Securities Class Action Settlements, 2015 Review and Analysis*, p. 8, available at http://securities.stanford.edu/research-reports/1996-2015/Settlements-Through-12-2015-Review.pdf

**Exhibit 33, Pg. 5**

1

> formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price); or (4) purchased milk directly from DFA or made a first purchase of milk from a first producer of milk (*e.g.*, a dairy farmer) that was made pursuant to a contract the price term of which specified that the price was based, in whole or in part, on (i) the CME Cheese Spot Call price (block or barrel price, average price, specific price, price formula, collar price or any variation that explicitly referenced the CME Cheese Spot Call price); (ii) the CME Class III milk futures price; (iii) the National Agricultural Statistics Service ("NASS") cheese price; or (iv) a government milk formula price which included (i), (ii) or (iii) as a component of such government milk formula price. Excluded from the Class are the Settling Defendants, the Non-Settling Defendants, and any parent, subsidiary, affiliate, or agent of any Settling Defendant or Non-Settling Defendant.

ECF Nos. 495, ¶2; 668, ¶2. On September 14, 2014, the Court entered an Order permitting Schreiber Foods, Inc. to participate in the Settlement. ECF 679.

The Plan of Allocation approved by the Court details how the Net Settlement Fund is to be distributed among Class members who submit eligible claims.[2] The Plan of Allocation has two parts. The first part of the Plan concerns the allocation of 92.5% of the Net Settlement Fund and covers the periods of May 4 through June 25, 2004 and September 1 through October 7, 2004. *Id*., Section I. Each claimant's "Allowed Claim" under this Section of the Plan requires calculating the "Adverse Impact" of the claimant's relevant transactions in CME Class III milk futures contracts, CME spot cheese contracts, physical cheese and/or physical milk using the artificial impact estimates reflected in the Plan of Allocation. *Id*.

The second part of the Plan concerns the allocation of the remaining 7.5% of the Net Settlement Fund and covers the remainder of the Class Period. *Id*., Section II. Each claimant's "Allowed Claim" under this Section of the Plan requires calculating the claimant's "dollar volume" in relevant transactions involving CME Class III milk futures contracts, CME spot cheese contracts, physical cheese and/or physical milk. *Id*.

---

[2] The Court-approved Plan of Allocation is posted on the Settlement website at http://www.dairyfarmersdirectpurchaseraction.com/Portals/0/Documents/DFA.POA.pdf

B. **The Robust and Transparent Claims Administration Process**

The Court appointed Rust to act as Settlement Administrator. ECF No. 495, ¶18. As Settlement Administrator, Rust was responsible for, among other things (*see* "III" below), processing claims submitted by potential Class members and administering those claims for the purpose of allocating the Net Settlement Fund among eligible Class members pursuant to the Plan of Allocation. *Id*. The claims administration process herein (summarized below) has been extremely robust, transparent and has provided claimants with a full and fair opportunity to remedy deficiencies identified by Rust and review and challenge Rust's determinations as to their own claims and also *all claims* determined by Rust to be eligible to share in the Net Settlement Fund.

***Processing Claims Forms and Supporting Documentation***. Persons seeking to share in the Net Settlement proceeds were required to submit a "proof of claim," which sought information necessary to confirm and calculate each eligible claimant's share of the Net Settlement proceeds in accordance with the terms of the Plan of Allocation. ECF No. 495, ¶17.

Rust received and processed 281 proof of claim forms. ECF No. 754, ¶8. These claims contain in excess of 3 million transactions, including 1.95 million potentially compensable transactions across the four different products covered by the Class definition (*i.e.*, CME Class III milk futures, CME spot cheese contracts, physical cheese transactions and physical milk transactions). *Id*., ¶25. Many of the transactions submitted by claimants were not readily apparent as compensable under the Plan of Allocation; transactions had to be reviewed in detail to validate eligibility under the Plan of Allocation. *Id*., ¶¶8-14. Rust analyzed the transactional data for each claim, which included identifying and logging numerous types of deficiencies. *Id*. Approximately 90% of the proofs of claims submitted by claimants were deficient in some

**Exhibit 33, Pg. 7**

3

respect, including by failing to provide information sufficient to calculate a claimant's "Allowed Claim" under the Plan of Allocation. *Id*., ¶15. The quantity and quality of the supporting documentation submit by claimants for the more than 1.95 million potentially eligible transactions required time-intensive review and processing. *Id*., ¶¶8-23.

*Deficiency Notifications*. After processing the claims, Rust prepared and sent detailed deficiency notification letters to each claimant whose claim was identified as being deficient in some respect. *Id*., ¶20. These deficiency notices informed claimants of the specific deficiencies associated with their claim and requested that claimants cure these deficiencies within twenty-one days. *Id*. Approximately two-thirds of claimants submitted responses to the deficiency notifications. *Id*., ¶23. The responses received by Rust included, among other things, the provision of further data and information by claimants and certain responses necessitated further communication between Rust and claimants. *Id*. A great deal of effort was made by Rust to assist claimants in properly curing deficiencies in their submissions. *Id*., ¶¶18-23.

*Determination Notifications*. After completing the deficiency process, Rust sent each claimant a detailed "determination notification," which provided claimants with notice of Rust's determinations of their claim. ECF No. 771-1, ¶¶7-12. These notifications included the claimant's "Allowed Claim" amounts for both Sections of the Plan of Allocation and further included a spreadsheet with a detailed, transaction-by-transaction analysis of Rust's determinations of each claim. *Id*. Pursuant to the schedule set by the Court, claimants had approximately thirty days to review this information and challenge any adverse determinations. Almost half of the claimants availed themselves of this process. *Id*. To the extent that claimants identified any errors in Rust's determination of their claims, Rust considered and, if appropriate, remedied those errors and provided claimants with updated claim determinations. *Id*.

**Exhibit 33, Pg. 8**

4

*Anonymized Claim Determinations*. Unlike any prior class action alleging manipulation in violation of the Commodity Exchange Act, 7 U.S.C. §1, *et seq*., of which Lead Counsel is aware, all claimants had the opportunity to obtain and review detailed (transaction-by-transaction) anonymized claim determination information for **all** eligible claims and, if they chose, object to any of Rust's determinations. ECF No. 785; *see also* 785-1. In total, twenty-four claimants requested and received this information. *Id*. One claimant (Schreiber) submitted objections. *Id*. Rust made certain amendments to its determinations as a result of the objections that resulted in a nominal (less than 0.1%) change in Rust's "Allowed Claim" estimates. *Id*.

## II. SUBJECT TO CERTAIN LIMITED CONFIRMATORY WORK, THE COURT SHOULD APPROVE RUST'S DETERMINATIONS

The Settlement provides that the Net Settlement Fund may be distributed to eligible Class members upon approval and written order of the Court. Settlement, Section 14.

Rust has submitted several reports detailing its administrative efforts and determinations. *See* ECF Nos. 754, 771-1, 776-2, 785-1, Declaration of Jason Rabe dated December 5, 2016 and submitted herewith. Among other things, Rust's reports identify each eligible claim and the applicable "allowed claim" amount for such claims (for both Section I and Section II of the Plan of Allocation), identify each claim submitted after the deadline for submission of claims but that has otherwise been determined to be valid, and identify each ineligible claim and the reason for ineligibility.

*Eligible Claims*. Rust has determined that 148 claims are eligible to share in the Net Settlement Fund. Rabe Declaration, dated December 5, 2016, ¶10. Rust's determinations of the allowed claim amounts for each eligible claim are set forth in Exhibit B to the December 5, 2016 Rabe Declaration.

As explained in the Declaration of Jason Rabe dated December 5, 2016 and submitted

**Exhibit 33, Pg. 9**

herewith, Rust's additional work and outreach in response to the objections raised by Schreiber in connection with the release of anonymous claim determination information (*see* "I.B" above) was limited to purchases of CME Class III milk futures contracts applicable to Section I of the Plan of Allocation (which concerns the allocation of 92.5% of the Net Settlement Fund). *Id*., ¶¶4-7. Rust has not conducted (but could conduct) similar work and outreach for (1) sales of CME Class III milk futures contracts concerning Section I of the Plan of Allocation and (2) purchases and sales of CME Class III milk futures contracts concerning Section II of the Plan of Allocation. *Id*. Rust estimates that 40% of the CME Class III milk futures transactions at issue for Section II of the Plan of Allocation could be potentially impacted by the pricing and volume issues identified by Schreiber. *Id*., ¶7.

Lead Counsel will continue to work with Rust in order to confirm whether or not there is good reason to believe that the results of additional work and outreach as to Section II of the Plan of Allocation would result in a meaningfully different outcome than what has already occurred in connection with Section I of the Plan of Allocation. *See* "I.B." above (less than 0.1% change as to Section I). Lead Counsel intends to make a further report to the Court on this issue in their reply papers, scheduled to be filed on December 26, 2016.

***Late But Otherwise Valid Claims***. Rust has determined that nine claims submitted after the October 20, 2014 claim deadline are otherwise eligible to share in the Net Settlement Fund. *Id*., ¶¶11-12, Exhibit C. Four of the late claims were received less than three weeks after the October 20 claim deadline, two of the claims were received less than two months after the claim deadline, and the remaining three claims were received five months or more after the claim deadline. *Id*., Exhibit D. One claimant (claim 25000381) has disputed that their claim was late. *Id*., ¶11, n. 3.

**Exhibit 33, Pg. 10**

6

The aggregate allowed claim value for these late claims is less than 5% of the total aggregate allowed claim value of all eligible claims under Section I of the Plan of Allocation and less than 2% of the value of all eligible claims under Section II of the Plan of Allocation. *Id.,* ¶12. It is not uncommon for Courts to accept untimely but otherwise valid claims. *See, e.g., Hershey, et al. v. Pacific Investment Management Company LLC,* 05-cv-4681 (RAG), ECF No. 577, p. 6, ECF No. 614, (N.D. Ill. Mar. 8, 2012) (approving 236 untimely but otherwise valid claims); *In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510 CPS/SMG, 2009 WL 803382, at *6 (E.D.N.Y. Mar. 25, 2009) (accepting 178 untimely but otherwise valid claims in connection with class action settlement; "…there is an implicit recognition that late claims should ordinarily be considered in the administration of a settlement."). Rust does not believe that any delay has or would result from the acceptance of these limited late claims. Rabe Declaration, dated December 5, 2016, ¶11. Although some discount to late claims may be appropriate where a Court ordered deadline has not been complied with, Class Counsel respectfully submits that full forfeiture of the late claims would be an extreme consequence, especially given that the common fund doctrine originates in equity.

***Ineligible Claims***. Rust has determined that 133 claims are ineligible to share in the Net Settlement Fund. ECF No. 785-1, ¶21, Exhibit F (setting forth the reasons for ineligibility).[3]

Claimants have received notice of Rust's reports and have had (and will have) a full and fair opportunity to challenge Rust's determinations, including by filing a response to this motion by the deadline ordered by the Court—December 19, 2016. *See* "VI" below.

---

[3] Three persons submitted proof of claim forms to Rust between June and September 2016. None of these claims included any supporting documentation. Rabe Declaration, dated December 5, 2016, ¶13. Thus, Rust has not (and cannot) process these claims. *Id*. Lead Counsel has instructed Rust to notify these three claimants of this distribution motion and that their claims have resulted in an allowed claim amounts of zero.

**Exhibit 33, Pg. 11**

7

### III. THE COURT SHOULD APPROVE RUST'S FEES AND EXPENSES

The Settlement provides that all class notice and settlement administration fees and expenses "…shall be satisfied solely by the Settlement Fund." Settlement, Section 5. On March 13, 2014, the Court appointed Rust to serve as Settlement Administrator. ECF No. 495, ¶18.

The administration of this Settlement (which began in early 2014 with the preparation and sending of notice of the Settlement to the Class) was complex and time consuming. The Settlement and Plan of Allocation cover a two year and nine month Class Period (*i.e.*, April 2004 through December 2006) and involve four different product types (*i.e.*, CME Class III milk futures contracts, CME spot cheese contracts, physical cheese and physical milk). *See* ECF No. 495, ¶2, Plan of Allocation, *passim.* CME milk futures and spot cheese contracts are standardized, exchange traded products with fairly standard documentation (*e.g.*, brokerage statements); physical cheese and milk transactions are anything but standardized. These transactions are individually negotiated between buyers and sellers and are subject to many different terms of purchase.

In total, over 3 million transactions were submitted by claimants. ECF No. 754-1, ¶11. Claimants submitted a variety of different types of supporting materials with their claims and many transactions had to be reviewed in detail to validate eligibility under the Plan of Allocation. Due to the complexity and volume of the claims, the administrative process was designed to be robust and transparent relative to typical class action Settlements. *See* "I.B" above.

Rust's considerable work as Settlement Administrator over the last two and one-half plus years is detailed in the six declarations submitted by Rust (ECF Nos. 629, 754, 771-1, 776-2, 785-1, Declaration of Jason Rabe, dated December 5, 2016 and submitted herewith) and includes, but is not limited to: (1) effecting the multi-pronged program of notice ordered by the

Court to be provided to the Class (which included mail notice to thousands of potential Class members, publication notice in multiple trade journals, and the creation of and maintenance of the official Settlement website), (2) analyzing and processing approximately 281 claims submitted by potential members of the Class seeking to share in the Net Settlement Fund (which included over 3 million transactions); (3) making administrative determinations with respect to each of the 281 claims submitted by potential members of the Class (which included calculating the allowed claim amounts of each claim under both Sections of the Plan of Allocation on a transaction-by-transaction basis); (4) preparing and sending deficiency notifications to claimants and communicating with claimants in order to resolve claim deficiencies; (5) preparing and sending detailed, transaction-by-transaction determination notifications to each claimant and communicating with claimants in order to resolve issues with their claim determinations; and (6) acting as Escrow Agent for the Settlement Fund.

    Rust respectfully requests payment of its outstanding fees and expenses in the amount of $564,688.59, incurred by Rust in connection with its duties as Court-appointed Settlement Administrator.[4] ECF 771-1, ¶24. Pursuant to paragraph 6(iv) of the Escrow Agreement (Exhibit C to the Settlement), Rust previously received one payment from the Settlement Fund after the Settlement was preliminarily approved that totaled $135,184.89 for class notice and administrative fees and expenses Rust incurred through May 2014. *Id*. Rust estimates that it will invoice an additional $43,490 to finalize distribution of the Net Settlement Fund. *Id*. To any extent Rust's completion of the administration of the Settlement results in fees and expenses less than Rust's estimate of $43,490, the difference will be included in a further distribution to

---

[4] Class Counsel has spent considerable time in connection with the claims administration process since the fairness hearing held on August 19, 2014 for which they are not seeking an award of attorneys' fees. *Compare*, Settlement, Section 16(e) (Lead Counsel may apply for an award of attorneys' fees for services performed in connection with the administration of the Settlement after the date of the fairness hearing).

**Exhibit 33, Pg. 13**

9

eligible claimants.

## IV. THE COURT SHOULD APPROVE INCENTIVE AWARDS FOR THE CLASS REPRESENTATIVES

The Settlement provides that the three Court-appointed Class representatives (*i.e.*, Indriolo Distributors, Inc., Knutson's, Inc. and Valley Gold, LLC) may apply to the Court for an aggregate incentive award of up to $60,000. Settlement Agreement, Section 16(d). The Class Notice notified Class members that the request for incentive awards would be made at the time the Net Fund Settlement is proposed to be distributed to eligible claimants and that claimants would have an opportunity to object to such application. Class Notice, Section V.B.[5]

Lead Counsel respectfully submits that the Court should approve an incentive award of $60,000 to be allocated among the three Class representatives. Incentive awards far in excess of the $60,000 requested here (which constitutes less than 0.2% of the amount available for distribution to eligible claimants) have previously been approved in connection with class action settlements involving claims of manipulation in violation of the Commodity Exchange Act, 7 U.S.C. §1 *et seq*. *See, e.g., Hershey, et al. v. Pacific Investment Management Company LLC*, 05-cv-4681 (RAG), ECF No. 614, (N.D. Ill. Mar. 8, 2012) (approving $325,000 in class representative incentive awards among three class representatives in connection with commodity futures manipulation class action settlement); *In re: Amaranth Natural Gas Commodities Litig.*, 07-cv-6377 (SAS), ECF No. 428, ¶5 (S.D.N.Y. Aug. 10, 2016) (approving $200,000 in class representative incentive awards among four class representatives in connection with commodity futures manipulation class action settlement). Public policy also strongly favors approval of the requested incentive awards in this successful CEA manipulation action given that Congress

---

[5] The Class Notice is available on the Settlement website at
http://www.dairyfarmersdirectpurchaseraction.com/Portals/0/Documents/DFA.Long.Form.Notice.pdf

**Exhibit 33, Pg. 14**

10

viewed private lawsuits (such as this action) as "…critical to protecting the public and fundamental to maintaining the credibility of the futures market." *Cange v. Stotler & Co.,* 826 F.2d 581, 594-595 (7th Cir. 1987) *citing* to H.R. Rep. No. 565, 97th Cong., 2d Sess., pt. 1 at 56-7, *reprinted* in 1982 U.S. Code Cong. & Admin. News 3871, 3905-06.

In deciding whether an incentive award is proper "….relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998).

***The Class Has Benefited Substantially***. There is little doubt that the Class has benefited greatly from the service of the three class representatives. The Settlement provided for a $46 million cash payment by DFA for the benefit of the Class. Settlement, Section 3. The Settlement also provided for certain important remedial relief designed to prevent precisely the type of conduct that allegedly caused the damages being compensated by the Settlement. *Id*.

Approximately twenty-eight claimants are expected to receive recoveries in excess of $100,000 and approximately seven claimants are expected to receive recoveries in excess of $1 million. Rabe Declaration, dated December 5, 2016, Exhibits B-C. Unlike these claimants, Plaintiffs will not be receiving substantial recoveries. *See* Declaration of Vincent Indriolo, ¶7 (recovery of less than $500); Declaration of Gregory Knutson, ¶6 (recovery of less than $1,000); Declaration of George Viera, ¶6 (recovery would likely have been less than $1,000).

***Plaintiffs Invested Significant Time and Effort to Protect the Interests of the Class.*** As detailed in the declarations from the three Class representatives submitted herewith, they have been protecting the interests of the Class since each filed complaints against DFA more than seven years ago. Plaintiff Indriolo, owner of a small cheese distributor, estimates that he has

spent more than 100 hours performing work on behalf of the Class. Declaration of Vincent Indriolo, ¶¶4-5. Plaintiff Knutson, a small dairy farmer, was the only milk futures trader willing to step forward and bring a lawsuit against DFA—one of the largest and most influential dairy market cooperatives in the United States. Declaration of Gregory Knutson, ¶7. Plaintiff Knutson estimates spending almost 200 hours performing work on behalf of the Class. *Id.*, ¶¶4-5. Valley Gold estimates having spent at least 120 hours performing work on behalf of the Class and estimates incurring at least $10,000 legal fees for time spent by its corporate counsel. Declaration of George Viera, ¶5. The three Class representatives undertook all of the responsibilities and risks associated with serving as representatives in connection with this complex commodity futures manipulation action against formidable defendants. In short, without the service of the three Class representatives, the Settlement with DFA could not have happened.

Notice of this application will be provided to claimants by e-mail and claimants will have a full and fair opportunity to object or otherwise respond to the requested incentive awards pursuant to the schedule set by the Court. *See* "VI" below.

## V. THE COURT SHOULD APPROVE A RESERVE FUND

Lead Counsel recommends and requests that the Court approve a "reserve fund" in the amount of $300,000 (*i.e.*, approximately one percent of the Net Settlement Fund) that would be available to make equitable adjustments (if any) to claims following the initial distribution. To any extent that monies remain in the Net Settlement Fund six months after the initial distribution to eligible claimants (by virtue of a balance due to the reserve fund, uncashed checks that have become stale, or other reasons), Lead Counsel will recommend a final distribution to the Court. *Id.* At this time, Lead Counsel believes that any such proposed distribution would likely be *pro*

**Exhibit 33, Pg. 16**

*rata* to eligible claimants who cashed their checks in connection with the initial distribution.

## VI. NOTICE OF THE DISTRIBUTION MOTION

Lead Counsel has instructed Rust to post this motion on the official Settlement website so that it may be viewed by members of the Class. Lead Counsel has also instructed Rust to provide an e-mail notification to claimants alerting them that this motion is available for review on the Settlement website and reminding them that any response to this motion must be filed with the Court by December 19, 2016 (ECF No. 783, ¶3). Rust's numerous reports have previously been posted on the Settlement website[6] and claimants have been provided with e-mail notifications alerting them that such reports are available for review on the Settlement website.

## CONCLUSION

Subject to the limited confirmatory work described in Section "II" above, the Court should approve Rust's administrative determinations, approve the incentive awards requested by the Court-appointed Class representatives, approve Rust's outstanding fees and expenses incurred in connection with its service as Court-appointed Settlement Administrator and approve the establishment of a reserve fund in the amount of $300,000.

Dated: New York, New York
       December 5, 2016

                              Respectfully submitted,

                              By: */s/ Christopher M. McGrath*
                              Christopher Lovell
                              Christopher M. McGrath
                              **LOVELL STEWART HALEBIAN JACOBSON LLP**
                              61 Broadway, Suite 501
                              New York, New York 10006
                              Telephone:    (212) 608-1900
                              Facsimile:     (212) 719-4775

                              *Lead Counsel for Direct Purchaser Plaintiffs*

---

[6] Available at http://www.dairyfarmersdirectpurchaseraction.com/CourtDocuments.aspx

**Exhibit 33, Pg. 17**

Theodore B. Bell
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
1 South Dearborn Street, Suite 2122
Chicago, Illinois 60603
Telephone: (312) 984-0000
Facsimile: (312) 212-4401

Fred T. Isquith
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653

*Liaison Counsel for Direct Purchaser Plaintiffs*