UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: CATHODE RAY TUBE (CRT) ANTITRUST LITIGATION | Case No. 07-cv-05944-JST<br><br>**ORDER REGARDING MOTIONS TO DISMISS FOR LACK OF JURISDICTION**<br><br>Re: ECF Nos. 5409, 5410, 5411, 5412 |

Before the Court are Defendants Irico Group Corporation ("Group") and Irico Display Devices Co., Ltd. ("Display," and together, "Irico" or "Irico Defendants")'s motions to dismiss the claims of the direct purchaser plaintiffs and the indirect purchaser plaintiffs for lack of jurisdiction. ECF Nos. 5409, 5410, 5411, 5412. The Court will deny the motions.

## I.   BACKGROUND

The facts regarding this case are well known to the parties, and the Court summarizes them here only insofar as they bear on the present motions.

Plaintiffs allege the Irico Defendants and others conspired to fix prices, allocate market share, and restrict output of products containing cathode ray tubes ("CRT Products") from March 1995 to November 2007. ECF Nos. 436 ("DPP Compl.") ¶¶ 1, 5; 1526 ("IPP Compl.") ¶¶ 1-2. Plaintiffs specifically assert that Irico participated in dozens of meetings during which the conspirators reached agreements on price, output restrictions, and customer and market allocation. DPP Compl. ¶ 159; IPP Compl. ¶¶ 145-50. According to the complaints, "[n]one of Irico's conspiratorial conduct in connection with CRT Products was mandated by the Chinese government; Irico was acting to further its independent private interests." DPP Compl. ¶ 159; IPP Compl. ¶ 185. Plaintiffs allege Group and Display "manufactured, sold, and distributed CRT

Products either directly or through [their] subsidiaries or affiliates throughout the United States." DPP Compl. ¶¶ 37, 39; IPP Compl. ¶¶ 95-96.

"After appearing in the action, accepting service of process, and joining a motion to dismiss filed by other defendants, Irico made the decision not to answer [the] complaint[s] based on Irico's belief that it was immune from suit in the United States." ECF No. 5214 at 6. In July 2016, the Direct Purchaser Plaintiffs ("DPPs") and Indirect Purchaser Plaintiffs ("IPPs") filed for entry of default against the Irico Defendants. ECF Nos. 4724, 4725. The clerk entered default against Irico in favor of both groups of plaintiffs. ECF Nos. 4727, 4729. On Irico's motion, on February 1, 2018, the Court set aside the default. ECF No. 5240.

In that order, the Court considered, in detail, the Irico Defendants' arguments that the Court lacks subject matter jurisdiction over them under the Foreign Sovereign Immunities Act ("FSIA"), which, with some exceptions, provides immunity for foreign states. *Id.* Among other things, the Court concluded that: (1) Irico made out a prima facie case that Group was an instrumentality of the Chinese state, but failed to make a case that Display was an organ of the state; (2) the DPPs had sufficiently alleged facts showing that Group's commercial activities outside the United States had a direct effect inside the country, such that the commercial activity exception to FSIA immunity applied to Group; and (3) despite mounting a factual challenge to jurisdiction, Irico failed to show FSIA immunity as to either Group or Display. *Id.* at 8, 11, 13-14. However, the Court also recognized the possibility that "further proceedings might demonstrate that the [FSIA] defense applies and the Court lacks jurisdiction. They might also show the opposite." *Id.* at 19-20. Accordingly, the Court permitted the parties to undertake jurisdictional discovery. *Id.* at 20.

The Irico Defendants now move to dismiss the claims against them for lack of subject-matter jurisdiction under the FSIA. ECF Nos. 5409 ("Group IPP Mot.") 5410 ("Group DPP Mot."), 5411 ("Display IPP Mot."), 5412 ("Display DPP Mot."). The DPPs oppose the motions, ECF No. 5419, as do the IPPS, ECF No. 5440. Display and Group filed a consolidated reply to each opposition brief. ECF Nos. 5480, 5463. The DPPs object to various exhibits submitted in support of Irico's reply. ECF No. 5474. Finally, the United States has filed a statement setting

1  forth its "strong interest in the proper interpretation of the jurisdictional limitations in cases

2  involving foreign states set forth in the Foreign Sovereign Immunities Act." ECF No. 5457 at 1.

## II.  MOTIONS TO SEAL

The DPPs moved to file certain excerpts from and exhibits to their opposition under seal on the basis that they contain information designated confidential by the Irico Defendants. ECF No. 5418. In response, Irico's counsel filed a declaration clarifying that it no longer seeks to maintain any of the referenced material as confidential. ECF No. 5424. The DPPs' sealing motion is therefore denied. The DPPs are directed to file the documents it refers to on the public docket.

The IPPs also move to seal portions of their opposition, supporting declaration, and exhibits thereto on the basis that Irico, and in some cases other defendants in this action, have designated those documents confidential. ECF No. 5439. Irico's counsel filed a declaration clarifying that none of the listed exhibits or references thereto that it designated confidential need be filed under seal. ECF No. 5442. Counsel for Defendant Chunghwa Picture Tubes, Ltd. ("CPT") has filed a declaration requesting sealing of Exhibits 23, 30, and 34 to the Alioto Declaration in support of the IPPs' opposition brief. ECF No. 5447. In support, counsel declares that these documents are "privileged, protectable as a trade secret or otherwise entitled to protection under the law." *Id.* at 2 (quoting Civil L.R. 79-5(b)). The Court concludes that CPT has shown that compelling reasons exist to rebut the strong presumption of access to judicial records with regard to these documents. *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1101 (9th Cir. 2016). Specifically, the Court finds that these documents are internal company reports, "disclosure of [which] would provide CPT's competitors with a competitive advantage by disclosing customer relationships and internal processes." ECF No. 5447 at 3. No other defendants filed declarations supporting the sealing of the information they had previously designated confidential. Accordingly, the IPPs' sealing motion is granted as to Exhibits 23, 30, and 34 to the Alioto Declaration, and denied as to all the other documents the IPPs provisionally filed under seal. The IPPs are ordered to file all the documents referred to in its sealing motion – with the exception of Exhibits 23, 30, and 34 – on the public docket. Because the Court has not

referenced any of these exhibits in this order, the Court has not filed this order under seal.

## III.    EVIDENTIARY OBJECTIONS

The DPPs object to certain evidence submitted by the Irico Defendants in support of their reply brief and also ask the Court to consider additional evidence to put the Irico Defendants' evidence in context.  ECF No. 5474.

First, the DPPs object on hearsay and foundation grounds to a document whose translated title is given as "China National Enterprise Credit Information Publicity Record."  *Id.* at 2-3 (citing ECF No. 5463-3).  In their reply brief, the Irico Defendants state as follows regarding this document:

> As explained by Mr. Zhang, Irico's corporate representative, the "commerce registration file" maintained by China's State Administration of Industry and Commerce, available online through the National Enterprise Credit Information Publicity System, is the official source for ownership information of licensed businesses in China.  (Plunkett Decl. Ex. E, Transcript Excerpts for Deposition of Zhang Wenkai (Day 2) 36:14-37:17 ("[I]t is a common standard that when you verify the relationship between two companies, the fact should be based on the commerce registration file . . . .  If the statement is inconsistent, or it does not reflect the commerce registration file, then it is incorrect.").)

The Zhang deposition excerpt does not cure the hearsay or foundation problems with this exhibit. Zhang does not say anything in the proffered deposition excerpt about the China National Enterprise Credit Information Publicity Record being the "official source" for any type of information, nor does he talk about the document's online availability.  The objection to this document is sustained, and the Court has not considered it.

Next, the DPPs ask the Court to consider additional deposition testimony of witness Wang Zhaojie beyond that submitted by the Irico Defendants, arguing that the additional testimony is required to be considered "in fairness" to provide needed context.  *Id.* at 3-4 (citing Fed. R. Evid. 106 ("If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part – or any other writing or recorded statement – that in fairness ought to be considered at the same time.") and Fed. R. Civ. P. 32(a)(6) ("If a party offers in evidence only part of a deposition, an adverse party may require the offeror to introduce other parts that in fairness should be considered with the part introduced, and any party

1  may itself introduce any other parts."). The request is granted, and the Court will consider the
2  additional portions of the Wang testimony submitted by the DPPs.
3      Lastly, the DPPs ask the Court to consider additional deposition testimony of witness
4  Curtis Milhaupt and an exhibit from that deposition, citing the same authorities. *Id.* at 4-6. The
5  request is granted, and the Court will consider the additional portions of the Milhaupt testimony
6  submitted by the DPPs.

## IV.  LEGAL STANDARD

    The FSIA is the sole basis for obtaining subject matter jurisdiction over a foreign state. *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989); *Siderman de Blake v. Republic of Arg.*, 965 F.2d 699, 706 (9th Cir. 1992); *MOL, Inc. v. Peoples Republic of Bangl.*, 736 F.2d 1326, 1328 (9th Cir. 1984). An entity's status under the FSIA is determined as of the time the complaint was filed. *Dole Food Co. v. Patrickson*, 538 U.S. 468, 478 (2003). To determine whether a court has jurisdiction over a defendant under the FSIA, the Ninth Circuit applies the following burden-shifting framework:

> [T]he defendant must establish a prima facie case that it is a sovereign state and that the plaintiff's claim arises out of a public act. A presumption then arises that the foreign state is protected by immunity. Once the plaintiff has met the threshold of alleging that the defendant was not entitled to immunity due to one of the FSIA exceptions, the defendant may make either a facial or factual challenge to the district court's subject matter jurisdiction.

*Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012) (citations and quotations omitted).

    Generally speaking, a plaintiff has the burden of establishing that the court has personal jurisdiction over the defendant. *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977) ("It is clear that the party seeking to invoke the jurisdiction of the federal court has the burden of establishing that jurisdiction exists."). The same rule applies in FSIA cases. *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117, 1125 (9th Cir. 2010) ("[T]he structure of the FSIA—which codifies the background rule that foreign states are immune from suit and execution, and then creates narrow exceptions—suggest [sic] that courts must begin with the presumption that a foreign state is immune and then the plaintiff must prove that an exception to

5

immunity applies.").

The FSIA provides immunity only for "foreign state[s]." 28 U.S.C. § 1604. The Act defines a foreign state to include any "agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). There are two ways a defendant can establish a prima facie case that it was an "agency or instrumentality" at the time the complaint was filed. First, it can show that a majority of its shares were owned by the foreign state or a political subdivision thereof. 28 U.S.C. § 1603(b). Second, it can show that it was an "organ" of the state. *Id.*

To determine whether an entity was an organ, the court considers "whether the entity engages in a public activity on behalf of the foreign government." *Patrickson v. Dole Food Co.*, 251 F.3d 795, 807 (9th Cir. 2001). "In making this determination, courts examine the circumstances surrounding the entity's creation, the purpose of its activities, its independence from the government, the level of government financial support, its employment policies, and its obligations and privileges under state law." *Id.* "[A]n entity's involvement in commercial affairs does not automatically render the entity non-governmental." *EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*, 322 F.3d 635, 641 (9th Cir. 2003) (citation omitted).

Once a defendant has established its status as an agency or instrumentality of a foreign state, the burden shifts to the plaintiff to rebut the presumption of immunity by offering proof that one of the exceptions to FSIA immunity applies. *Terenkian*, 694 F.3d at 1131 (citation omitted). Once the plaintiff has presented such evidence, a defendant raising a factual challenge to subject matter jurisdiction bears the burden of proving by a preponderance of the evidence that the exception to sovereign immunity does not apply. *Id.*

One such exception is the commercial activity exception, which applies when "the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2). The FSIA defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial

6

character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). Where a sovereign entity takes on the role of a "a private player within the market" and engages in the sort of action that does not require "those powers peculiar to sovereigns," that entity is not immune, even if some public purpose underlay the commercial activity. *Embassy of the Arab Republic of Egypt v. Lasheen*, 603 F.3d 1166, 1170 (9th Cir. 2010). An effect is "direct" if it follows as an immediate consequence of the defendant's activity. *Republic of Arg. v. Weltover, Inc.*, 504 U.S. 607, 618 (1992). The Supreme Court has "reject[ed] the suggestion that ['direct'] contains any unexpressed requirement of 'substantiality' or 'foreseeability.'" *Id.* To establish a direct effect, a plaintiff must show that "something legally significant actually happened in the [United States]." *Gregorian v. Izvestia*, 871 F.2d 1515, 1527 (9th Cir. 1989) (quoting *Zedan v. Kingdom of Saudi Arabia*, 849 F.2d 1511, 1515 (D.C. Cir. 1988)).

## V.   DISCUSSION

As a preliminary matter, the Court notes that many of Group and Display's arguments are ones the Court has already considered and rejected in connection with the prior motions to dismiss. Thus, the Court is not beginning with a clean slate. However, even considering Irico's repeated arguments de novo, and in light of the new evidence presented by the parties after further jurisdictional discovery, has not convinced the Court to depart from its earlier rulings. The Court addresses Irico's renewed arguments only briefly.

### A.   Agency or Instrumentality of a Foreign State

The Court concluded in its prior order that Irico Group had shown it was an "agency or instrumentality" of China at the time the complaint was filed in 2007 by showing that 100% of its shares were directly owned by the State Council of China. *See* ECF No. 5240 at 7; *see also* 28 U.S.C. § 1603(b); *Patrickson*, 538 U.S. at 473-74. The evidence now before the Court offers no reason to depart from that holding. Indeed, Plaintiffs do not contest Irico Group's status as an instrumentality of China. *See* ECF Nos. 5419 at 21; 5440 at 8. Accordingly, the Court again finds that, under the majority-share prong of § 1603(b)(2), Irico Group was an instrumentality of China when this case was filed in 2007 because it was fully owned by the State Council.

7

1  The Court also maintains its earlier finding that "Irico Display was not an instrumentality [of China based on the majority-share prong] because it was indirectly owned though several layers." *See* ECF No. 5240 at 7 (citing *Gates v. Victor Fine Foods*, 54 F.3d 1457, 1462 (9th Cir. 1995) (explaining that entities owned by an instrumentality of the state, rather than the state itself, are not sovereign immune)). As the Court noted in that order, publicly available information shows that, in 2007, the State Council of China owned 100% of Group, which owned 75% of [another Irico corporation], which in turn owned 41.36% of Display. *Id.* at 6-7 (citing ECF Nos. 310 at 1-2; 5228-1 at 189; 5228-5 at 8). Nothing presented by the parties in this round of briefing undermines that evidence. Given the layers of ownership and minority of shares controlled by the Chinese state, Display does not qualify as an instrumentality under the majority-share prong.

Instead, Display argues it qualifies under the "organ" prong of § 1603(b)(2). Display DPP Mot. at 10-23. In its prior order, the Court rejected this contention due to lack of evidence. ECF No. 5240 at 8. Now, on a fuller record, the Court again determines that Display is not entitled to immunity as an organ of the People's Republic of China.

In assessing "organ" status under the FSIA, "courts examine the circumstances surrounding the entity's creation, the purpose of its activities, its independence from the government, the level of government financial support, its employment policies, and its obligations and privileges under state law." *EIE Guam Corp.*, 322 F.3d at 640 (citation omitted). Display argues that it qualifies as an organ of the Chinese state because first, it was created pursuant to a government plan "as a model for centrally-directed state-owned enterprise shareholding reform." Display DPP Mot. at 13. Second, Display was tightly controlled by the State-owned Assets Supervision and Administration Commission ("SASAC"), both directly and through its appointed agents at Group. *Id.* at 13-17. Third, Display had a public purpose "to contribute to China's national economy, increase the value of their state-owned assets, and provide for the welfare of their workers." *Id.* at 18. Fourth, Display's leaders were government-appointed and performed official state duties under Chinese law. *Id.* at 20-22. Fifth and finally, Display was significantly funded by the Chinese government, including all of its funding at the time of formation. *Id.* at 22-23.

8

1    The DPPs respond first that a review of the 2006 Display Articles, in effect when the initial
2    complaint was filed, makes clear that Display was in fact organized as a "limited liability company
3    with permanent existence" – i.e., a privately owned company.  ECF No. 5419 at 22.  Second, the
4    DPPs emphasize that many of Display's governing documents establish its independence from
5    direct governmental control, instead indicating that government agencies such as SASAC played a
6    role in Display's governance analogous to that of a private investor.  *Id.* at 26-29.  Third, the DPPs
7    argue that Display's asserted purpose of making profits for its shareholders – a majority of whom
8    were private investors – undermines its claim to organ status.  *Id.* at 23-25.  Fourth, the DPPs
9    contend that, contrary to Display's representations, its employees were not in fact Chinese civil
10   servants.  *Id.* at 33-35.  Fifth, the DPPs point out that Display does not even claim to have
11   exercised any regulatory authority on behalf of the Chinese government.  *Id.* at 35.  Lastly, the
12   DPPs dispute Display's assertion of substantial governmental financial support.  *Id.* at 32-33.

The IPPs join the DPPs' response and make similar arguments.  ECF No. 5440 at 8.  First, the IPPs assert that Display was created as a joint-stock company with majority private ownership.  *Id.* at 19.  Second, the IPPs point out that the SASAC Regulations prohibit governmental interference in the management and operation of Display.  *Id.* at 21.  Third, the IPPs insist Display functioned as a commercial entity manufacturing and selling CRTs to make a profit rather than serving any uniquely governmental purpose.  *Id.* at 20.  Fourth, the IPPs argue that the Chinese government did not appoint Display's directors and officers or pay their salaries, undermining the claim that those executives were government officials.  *Id.* at 21-22.  Fifth, the IPPs point out that Display had no special privileges or obligations under Chinese law, nor did it perform any exclusive activities for the government.  *Id.* at 24.  Finally, the IPPs characterize the financial support Display received from the Chinese government as neither unusual nor substantial.  *Id.* at 23.

In addition, the United States urges – without taking a position on the ultimate question of Display's entitlement to immunity – that to qualify as an organ, a minority-state-owned entity "must make a compelling showing that it actually is serving a public function on behalf of the government and is not merely pursuing profits for its shareholders."  ECF No. 5457 at 10.  "A

1   valid public purpose can take a wide variety of forms but must be something more than just
2   making money for the state as a shareholder." *Id.* at 11. The United States further outlines the
3   same factors of the organ analysis highlighted by Plaintiffs in their briefing. *Id.* at 11.
4         While the Ninth Circuit has made clear that the term "organ" should be read broadly, *EIE*
5   *Guam Corp.*, 322 F.3d at 640, here, a consideration of the relevant factors leads the Court to
6   conclude that Irico Display has not met its burden to show that it was "engage[d] in a public
7   activity on behalf of [a] foreign government," as necessary to render it an organ of the Chinese
8   state. *Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087, 1098 (9th Cir. 2008). First, the
9   evidence before the Court indicates that Display was established as a form of privately held
10  corporation under Chinese law. *See NXP Semiconductors USA, Inc. v. Brevets*, No. C 14-1225 SI,
11  2014 WL 4621017, at *7 (N.D. Cal. Sept. 15, 2014) (treating "establish[ment] as a standard
12  limited liability company under French law" as a factor weighing against organ status). Second, a
13  review of the SASAC Regulations, as well as Display's own governing documents, suggests that
14  the Chinese government did not exercise direct control over Display, with SASAC instead
15  interacting with Display in a typical investor role. Third, Display functioned as an ordinary profit-
16  making entity that happened to partially make profits for the Chinese government. Although "an
17  entity's involvement in commercial affairs does not automatically render the entity non-
18  governmental," *EIE Guam Corp.*, 322 F.3d at 641, here, the record reveals that Display's defining
19  purpose was profit-making. *See Patrickson*, 251 F.3d at 808 (holding that even if "heavily
20  regulated," an "independent commercial enterprise[]" that "act[s] to maximize profits rather than
21  pursue public objectives" is not an organ). Fourth, the Chinese government did not appoint
22  Display's executives, nor did it pay their salaries, discrediting Display's contention that its
23  corporate officers were civil servants. *See USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 212-13
24  (3d Cir. 2003) (treating fact that foreign state did not require the entity to hire public employees or
25  pay the entity's employees' salaries as a factor weighing against organ status). Fifth, Display has
26  not pointed to any evidence that it exercised regulatory authority or other special sovereign
27  privileges. That Display was subject to taxation and private lawsuits in Chinese courts further
28  undermines its claims of special privileges. Lastly, while Display did receive some financial

1    support from the Chinese government, that support was not so significant as to outweigh the many

2    factors counting against organ status on the facts presented here.

3        Because Irico Display is not an agency or instrumentality of the Chinese government, it is

4    not sovereignly immune.  However, because the Court has found that Irico Group was an agency

5    or instrumentality of China, the Court will proceed to consider whether the only exception to FSIA

6    immunity urged by the Plaintiffs – the commercial activities exception – applies to Irico Group.

7        **B.**    **Exception for Foreign Commercial Activity with a Direct Effect in the U.S.**

8        The Court previously held that "the commercial activities exception applies to any FSIA

9    immunity for the Irico Group because [the DPPs] have adequately alleged a direct effect." ECF

10   No. 5240 at 11.  That exception applies when "the action is based . . . upon an act outside the

11   territory of the United States in connection with a commercial activity of the foreign state

12   elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).  First,

13   the Court concluded in its prior order that "the Irico Defendants' activities in setting prices and

14   manufacturing schedules for CRTs w[ere] clearly commercial in nature." ECF No. 5240 at 9.

15   Second, the Court held that "the DPPs have sufficiently alleged facts showing that the

16   anticompetitive behavior of the Irico Defendants, as part of the broader conspiracy, had a direct

17   effect on prices of CRTs in the United States." *Id.* at 11.  The Court further noted that Defendants

18   had mounted a "factual challenge" to jurisdiction, *id.* at 13, and ordered jurisdictional discovery

19   for factual development, *see id.* at 20.  After considering the new evidence exchanged in discovery

20   and submitted by the parties, the Court maintains its earlier conclusion that the commercial

21   activity exception neutralizes Group's FSIA immunity because this action is based on commercial

22   activities with direct effects in the United States.  Irico has not met its burden to show, by a

23   preponderance of the evidence, that the commercial activity exception does not apply.

24       Group claims first that Plaintiffs have not presented any evidence that Group made sales of

25   CRTs or CRT Products in the United States during the class period.  Group IPP Mot. at 18.

26   Second, Group insists that Plaintiffs cannot "rely on their allegations that Irico Group participated

27   in a conspiracy to support a finding of 'direct effect.'" *Id.* at 19.  Group argues that, as a matter of

28   law, "a 'direct effect' cannot be established without direct sales." *Id.* at 20.  The United States

disagrees with the latter two contentions, asserting that "[a]ctions of a foreign company to join and act in furtherance of an antitrust conspiracy can cause a direct effect in the United States even if that company made no direct sales in the United States." ECF No. 5457 at 17.

These arguments seemingly ignore the Court's prior order. ECF No. 5240. There, the Court held that a direct effect is shown when a foreign price-fixing conspiracy for a product raises the worldwide price of that product. *Id.* at 10-11. The Court further held that "the DPPs have sufficiently alleged facts showing that the anticompetitive behavior of the Irico Defendants, as part of the broader conspiracy, had a direct effect on prices of CRTs in the United States," relying in part on "evidence that Irico participated in a conspiracy, including an industry report and emails showing that it attended 'over 70 conspiratorial meetings,'" *id.* at 11 (citing ECF No. 5228 at 20) and that "the DPPs' expert report by economist Dr. Leizinger showed that the U.S. was the second largest market for CRTs at 18% of the market, *id.* (citing ECF No. 5191-2 at 160-162). The Court noted that the same report "shows that the conspiracy resulted in higher prices, including in the United States, because the CRT accounted for up to 50 percent of the cost of manufacturing a television or computer monitor." *Id.* (citation omitted). "These facts," the Court concluded, "support a finding that the Irico Defendant's commercial activities had a direct effect in the United States." *Id.*

Nothing the parties have presented in the current round of briefing changes these underlying facts or, by extension, the Court's conclusion. Nonetheless, Group wishes away the Court's prior order, stating baldly that "the law squarely rejects any claim that Irico Group's alleged participation in a global conspiracy qualifies as a "direct effect" that would defeat the presumption of immunity." ECF No. 5409 at 8. The Court invited jurisdictional discovery, not a belated motion for reconsideration.

After weighing the evidence presented by the parties, the Court concludes that Irico Group has failed to prove by a preponderance of the evidence that either 1) it did not participate in the conspiracy or 2) the conspiracy did not have the effect of raising prices in the United States. Because Plaintiffs have successfully asserted a direct effect – conspiracy-induced price increases – which Group has failed to rebut, the Court need not consider the parties' additional arguments

regarding whether Group made direct sales of CRT Products into the United States.

Accordingly, the direct-effect prong of the commercial activity exception applies here, rendering Group subject to suit in the federal courts of the United States for the purposes of this action.

## CONCLUSION

For the reasons above, the motions to dismiss are denied. The Court's exercise of jurisdiction over the Irico Defendants is not barred by the Foreign Sovereign Immunities Act.

**IT IS SO ORDERED.**

Dated: October 28, 2019



JON S. TIGAR
United States District Judge

13